Confidential - Subject to Protective Order

Page 806

1    Q.  Well, yeah, you disagreed
2  with the FDA.
3    A.  Right. Right.
4    Q.  But the question I had asked
5  you before is, did the FDA conclude that
6  there was no statistically significant
7  difference? And your answer in your
8  deposition was yes, right?
9        MR. TISI:  Objection.
10  BY MR. BECK:
11    Q.  Correct, sir?
12    A.  Yes.
13    Q.  All right.
14        Did you analyze all-cause
15  mortality in the Vioxx osteoarthritis
16  trials?
17    A.  I don't recall performing
18  those analyses myself, no.
19    Q.  Do you recall looking at
20  anybody else's analysis of that?
21    A.  Yes. I don't recall
22  having -- I do recall having seen other
23  people's analyses of that.
24    Q.  How about for VIGOR,

Page 807

1  ADVANTAGE and APPROVe, did you conduct
2  any all-cause mortality analysis in
3  those, concerning those clinical trials?
4    A.  We have to go back to the
5  same point. I didn't conduct analyses of
6  the trials. I reviewed the reports of
7  those who had done so.
8    Q.  And in reviewing the reports
9  of those who did look at all-cause
10  mortality for the osteoarthritis trials,
11  VIGOR, ADVANTAGE and APPROVe, is it true
12  that the conclusion was that there was no
13  statistically significant difference in
14  mortality in any one of those trials?
15    A.  I would need to go back and
16  take a look at that data before just
17  answering off the top of my head.
18    Q.  Do you remember as to any
19  one of those any analyses of all-cause
20  mortality suggesting that there was a
21  statistically significant difference
22  between Vioxx and either placebo or any
23  comparator drug?
24    A.  Sitting here at the end of a

Page 808

1  very long day, I cannot identify that.
2  But if you want, I can go back over the
3  analyses which we have here on the table
4  and take a look at them.
5    Q.  Well, maybe we could,
6  instead of looking at all of those --
7        MR. TISI:  Phil, I'm not
8  trying to be -- can we go off the
9  record?
10        THE VIDEOTAPE TECHNICIAN:
11  The time is 4:29.
12        - - -
13        (Whereupon, a recess was
14  taken from 4:29 p.m. until
15  4:33 p.m.)
16        - - -
17        THE VIDEOTAPE TECHNICIAN:
18  We're back on the record. The
19  time is 4:33.
20  BY MR. BECK:
21    Q.  Doctor, I'm going to hand
22  you what I've marked as Exhibit 58.
23        - - -
24        (Whereupon, Deposition

Page 809

1  Exhibit Avorn-58, Document
2  entitled "12/18/04 Interim
3  Review" was marked for
4  identification.)
5        - - -
6  BY MR. BECK:
7    Q.  And I, frankly, don't
8  remember whether it was marked yesterday
9  as an exhibit or not. Maybe you do. Do
10  you recognize Exhibit 58?
11    A.  Well, I've certainly seen
12  it. I don't remember if it was an
13  exhibit in the last day or two, but I
14  know the Villalba report.
15    Q.  Okay.
16        And rather than take time
17  searching back through the exhibits to
18  see if I've remarked the same one, will
19  you just bear with me and use this
20  version of it?
21    A.  Sure.
22    Q.  And you called this the
23  Villalba report?
24    A.  Right.

Confidential - Subject to Protective Order

Page 810

1  Q. What do you mean by that?
2  A. The one of December '04
3 called "Interim review."
4  Q. So, we have here on the
5 first page, "December 2004 Interim
6 Review" by Dr. Villalba, correct?
7  A. Correct.
8  Q. And let's look over on Page
9 7, please. Is there somewhere on Page 7
10 where the FDA indicates whether the --
11 here we go.
12  What's indicated on
13 Paragraph 2.1 of the Villalba review?
14  A. "The current submission...
15 did not suggest an excess in the total
16 number of CV thrombotic events for Vioxx
17 as compared to placebo."
18  Shall I go on?
19  Q. Sure.
20  A. I thought we were talking
21 about deaths.
22  Q. Well, I'm now talking about
23 CV events.
24  A. All right.

Page 811

1  MR. BUCHANAN: I'm going to
2 object foundationally on the
3 document.
4  MR. BECK: Object to what?
5  MR. BUCHANAN:
6 Foundationally on the document and
7 hearsay.
8 BY MR. BECK:
9  Q. All right.
10  Is this one of the documents
11 that was provided to you by the lawyers
12 that you are working with so that you
13 could help form your opinion and testify
14 yesterday and today?
15  A. Yes.
16  Q. Did you take it into account
17 when you reached your opinions?
18  A. Yes, I did.
19  Q. Did you take it into
20 account --
21  MR. TISI: Let him finish.
22 BY MR. BECK:
23  Q. -- before you testified
24 yesterday on direct-examination?

Page 812

1  A. Yes.
2  MR. BECK: Off the record.
3  THE VIDEOTAPE TECHNICIAN:
4 The time is 4:36. We are off the
5 record.
6  MR. TISI: Just lay the
7 foundation, Phil.
8  MR. BECK: Well, if I have
9 to lay the foundation, then --
10  MR. TISI: If the objection
11 is made, then you've got to lay
12 the foundation.
13  MR. BECK: Yes. I
14 understand.
15  MR. TISI: And you have got
16 to let him finish the answer.
17  THE WITNESS: We actually
18 have covered this ground already.
19  THE VIDEOTAPE TECHNICIAN:
20 We are back on the record. The
21 time is 4:37.
22 BY MR. BECK:
23  Q. So, focusing on
24 cardiovascular deaths, does this indicate

Page 813

1 in the Alzheimer's studies that there was
2 no difference between Vioxx and placebo?
3  A. That's not what this box
4 that you've put up talks about, Mr. Beck.
5  Q. Well, then, tell me what it
6 says.
7  A. This is fatal and nonfatal
8 events.
9  Q. I'm sorry. So,
10 cardiovascular events, whether they were
11 deaths or not deaths, there was no
12 difference between Vioxx and placebo in
13 the Alzheimer's trials, correct?
14  A. Right.
15  Q. Okay.
16  Then let's move up and look
17 higher on this page. And here Dr.
18 Villalba says, "Although the numbers are
19 small, there is a greater number of
20 cardiovascular thrombotic deaths" --
21  MR. TISI: Actually, you are
22 mischaracterizing it. It is not
23 what Dr. Villalba says. She is
24 reporting what the company says.

95 (Pages 810 to 813)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

### Page 814

1 This is a document where there's
2 what they say and then her
3 responses to it, Counsel. That's
4 misrepresented.
5 BY MR. BECK:
6     Q.   The words on this piece of
7 paper say, "Although the numbers are
8 small, there is greater number of
9 cardiovascular thrombotic deaths in the
10 rofecoxib 25 milligram daily group, as
11 compared to placebo. Of note, there were
12 8 vs. 4 cases of sudden cardiac death.
13 The finding of more cardiovascular deaths
14 in the Alzheimer's studies is not
15 consistent with other studies, such as
16 VIGOR and APPROVe, in which the number of
17 cardiovascular deaths was the same in
18 Vioxx as compared to naproxen and Vioxx
19 as compared to placebo."
20     And my question for you,
21 sir, is, do you understand this to be the
22 statement of the company, to the FDA or
23 the analysis by Dr. -- by the FDA medical
24 examiner, Dr. Villalba, of the data that

### Page 815

1 was presented?
2     A.   I'm aware that there was
3 readjudication of causes of death in the
4 Alzheimer studies in which there were
5 revisions of which people died of
6 cardiovascular versus other cases. And I
7 cannot tell looking at this in isolation
8 now what these numbers are based on.
9     Q.   My question, sir, was
10 slightly different than that, and that
11 is, can you tell from your experience in
12 having reviewed these documents whether
13 this language talking about deaths in the
14 different studies is language that
15 reflects Merck's positions taken with the
16 FDA or the FDA medical examiner's
17 analysis of the data?
18     A.   Can I tell which of those it
19 is?
20     Q.   Yes.
21     A.   From looking at this?
22     Q.   Yes.
23     A.   No, I cannot.
24     Q.   Okay.

### Page 816

1     Yesterday you referred to an
2 article which was Exhibit 9. You don't
3 have to pull it out. But it was about
4 confounders. Do you remember that?
5     A.   Yes.
6     Q.   And I think you described
7 that you wanted to make sure that you
8 took into account variables that might
9 affect heart attack rates other than the
10 medications that were being examined,
11 right?
12     A.   Right.
13     Q.   For example, that for some
14 reason one group had a lot of smokers in
15 it and the other didn't and that could
16 skew the results, right?
17     A.   Correct.
18     Q.   And that's because you know
19 that smokers are more likely to have
20 heart attacks than nonsmokers, right?
21     A.   Correct.
22     Q.   And there are other
23 confounders such as people who are
24 overweight or high cholesterol, things

### Page 817

1 like that, right?
2     A.   Correct.
3     Q.   All of those would be
4 considered risk factors for someone to
5 have a heart attack; is that right?
6     A.   Correct.
7     Q.   What about, this is not
8 something you've mentioned, but would
9 someone who was subjected to years and
10 years of secondhand smoke, would that
11 also be a confounder?
12     A.   Well, we know that
13 secondhand smoke is a risk factor for
14 heart disease.
15     Q.   So, if, for example, one
16 spouse had been smoking for decades, the
17 other spouse would be at increased risk
18 from that alone of having a heart attack;
19 is that right?
20     MR. BUCHANAN: Objection,
21 beyond the scope.
22     THE WITNESS: Right. So, if
23 Vioxx users had more spouses who
24 smoked than Celebrex users, then

Confidential - Subject to Protective Order

Page 818

1  that would be something that was
2  not measured.
3  BY MR. BECK:
4  Q.   In any event, my question is
5  simply, if somebody's spouse has been
6  smoking for years, that alone puts them
7  at greater risk for a heart attack,
8  right?
9  A.   Yes.
10  MR. TISI: Objection,
11  relevance, beyond the scope.
12  MR. BUCHANAN: Beyond the
13  scope.
14  BY MR. BECK:
15  Q.   On the question of the
16  labels where you and Mr. Tisi went
17  through the 1999 and the 2002 labels
18  yesterday, do you remember that?
19  A.   Yes.
20  Q.   And you indicated that in
21  the 1999 label there was no black box
22  warning, no warning or no precaution
23  concerning cardiovascular risk.  Do you
24  remember that?

Page 819

1  A.   Right.
2  Q.   Do you know whether for the
3  label that was in effect for Celebrex in
4  1999, was there a black box warning
5  concerning cardiovascular risk?
6  A.   No.
7  MR. TISI: Objection.
8  BY MR. BECK:
9  Q.   Was there a warning
10  concerning cardiovascular risk?
11  MR. TISI: Objection.
12  MR. BUCHANAN: Objection.
13  THE WITNESS: I have not
14  reviewed the Celebrex label in
15  that level of detail.
16  MR. TISI: Objection.  Let
17  me just place another objection to
18  relevance, hearsay and collateral
19  and outside the scope.
20  Go ahead.
21  THE WITNESS: I've not
22  reviewed the Celebrex label in
23  that degree of detail.
24  MR. BECK: And would you

Page 820

1  like a continuing objection on
2  those grounds as I ask him?
3  MR. BUCHANAN: I would
4  appreciate that.  That would be
5  fine.  Thank you.
6  MR. TISI: Yes.
7  BY MR. BECK:
8  Q.   And for other prescription
9  NSAIDs in 1999, did any of them have a
10  black box warning about cardiovascular
11  risk?
12  A.   Not to my knowledge.
13  Q.   Did any of them have a
14  warning about cardiovascular risk?
15  MR. TISI: And I assume,
16  Phil, when you say objection,
17  you're not limiting it to
18  Celebrex, you're limiting it to
19  all these questions involving
20  NSAIDs?
21  MR. BECK: Yes.
22  MR. BUCHANAN:
23  Comparatively.
24  MR. TISI: I don't want

Page 821

1  there to be a question later as to
2  where the continuing objection
3  ends.
4  MR. BECK: No.  My effort to
5  save time may already have failed.
6  MR. TISI: I just don't want
7  there to be any confusion.
8  MR. BECK: I was suggesting
9  that you have a continuing
10  objection to all of my questions
11  comparing Vioxx labels to labels
12  of anything else.
13  MR. TISI: Understood.
14  Thank you.
15  MR. BECK: Okay.
16  And now I have forgotten --
17  - - -
18  (Whereupon, the court
19  reporter read back the record.)
20  - - -
21  BY MR. BECK:
22  Q.   So, focusing on other NSAIDs
23  other than Vioxx or Celebrex, did any of
24  them have warnings about cardiovascular

97 (Pages 818 to 821)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

**Page 822**

1 risks?
2    A. In 1999?
3    Q. In 1999.
4    A. I do not think so.
5    Q. That would be true for
6 Feldene, for example, correct?
7    A. I have not reviewed the
8 Feldene label in particular.
9    Q. How about Mobic?
10    A. Again, I have not reviewed
11 specific ones, but my overall impression
12 is that they did not carry cardiovascular
13 risk warnings or black boxes.
14    Q. And is it your understanding
15 that they did not have cardiovascular
16 risk information in the precaution
17 section as well?
18    A. I can't answer that off the
19 top of my head.
20    Q. We know that Vioxx was
21 withdrawn from the market in the fall of
22 2004, right?
23    A. Right.
24    Q. And then later, all of the

**Page 823**

1 NSAIDs, prescription NSAIDs ended up with
2 black box warnings, correct?
3    MR. TISI: Objection.
4    MR. BUCHANAN: Objection.
5    MR. TISI: Facts not in
6 evidence. Go ahead.
7 BY MR. BECK:
8    Q. Well, is that true or not?
9 Do you know?
10    A. Well, I know, and it is
11 actually a complicated answer, I'm
12 afraid. And that is, that FDA seemed to
13 encourage that, but it is not clear that
14 all other nonsteroidal manufacturers have
15 actually put those into their labels.
16    Q. Okay.
17    Well, let me ask this.
18    Now, after Vioxx was
19 withdrawn from the market and then there
20 was an Advisory Committee meeting in
21 early 2005, as you indicated, did the FDA
22 encourage the manufacturers of all
23 prescription NSAIDs to add a black box
24 warning?

**Page 824**

1    A. They encouraged that, but I
2 don't think that most of the companies
3 did so.
4    MR. BUCHANAN: Objection
5 belatedly.
6    MR. TISI: Objection. And
7 relevance.
8 BY MR. BECK:
9    Q. Did Celebrex add one?
10    A. I believe it did.
11    Q. Did Feldene?
12    A. I don't know about the
13 Feldene label.
14    Q. Mobic?
15    A. I don't know about the Mobic
16 label.
17    Q. I'm on my last subject now.
18 I'm going to have to take it in small
19 bites, but we can hopefully move through
20 it pretty quickly.
21    Doctor, you understand that
22 the lawyers that you're working with may
23 be playing a videotape of your testimony
24 in cases, various cases around the

**Page 825**

1 country. Do you understand that?
2    A. Yes.
3    Q. And one of the reasons that
4 we wanted to do it by videotape is so
5 that you didn't have to go traipsing
6 around the country repeating yourself,
7 correct?
8    A. Correct.
9    MR. BUCHANAN: Objection to
10 form.
11 BY MR. BECK:
12    Q. Do you know that there's a
13 trial going on right now in California
14 brought by a person named Stewart
15 Grossberg?
16    A. No.
17    MR. TISI: Objection.
18 BY MR. BECK:
19    Q. Do you know anything about
20 Mr. Grossberg?
21    A. No.
22    MR. TISI: Objection.
23    MR. BECK: What's the
24 objection?

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

Page 826

1    MR. TISI: The objection is
2   it's clearly outside the scope of
3   his report. We have designated
4   him -- and maybe this will be
5   clear. We have designated him as
6   a generic expert not to give any
7   testimony on any individual
8   plaintiff, and so if your question
9   is going to be do you know
10   anything about any of these
11   individual plaintiffs, I will
12   stipulate that he has not been
13   asked to, nor will he give any
14   opinion on those issues.
15    MR. BECK: I'm going to go
16   through a series of names and ask
17   questions of whether he knows
18   whether this individual saw any
19   direct-to-consumer ads, and I'm
20   going to ask whether he knows
21   whether that person's doctor --
22   what information the doctors
23   looked at when prescribing --
24    MR. TISI: I will

---

Page 827

1   stipulate --
2    MR. BECK: And I need the
3   questions and answers because we
4   may want to play them in these
5   trials, but -
6    MR. TISI: So, a stipulation
7   from counsel is not sufficient --
8    MR. BECK: No.
9    MR. TISI: -- where you say
10   it is stipulated that Dr. Avorn
11   does not know X, Y and Z? That's
12   not good enough?
13    MR. BECK: No. I want Dr.
14   Avorn's testimony. What I'm
15   saying is that you can certainly
16   have a continuing objection to all
17   those questions for the same
18   ground that you just had so we can
19   get through it quicker.
20    THE WITNESS: Could I just
21   state that I don't know any of the
22   plaintiffs or any of their
23   circumstances and will not testify
24   about any of that for any

---

Page 828

1   plaintiff?
2    MR. BECK: Here's the
3   problem. We'll off go the record.
4    THE VIDEOTAPE TECHNICIAN:
5   The time is 4:49. We're off the
6   record.
7     - - -
8    (Whereupon, a recess was
9   taken from 4:49 p.m. until
10   4:50 p.m.)
11     - - -
12    THE VIDEOTAPE TECHNICIAN:
13   We're back on the record. Time is
14   10 minutes to 5:00.
15    MR. BECK: While we were off
16   the record, what I explained to
17   counsel and the witness is what
18   I'm about to do is ask the witness
19   a couple of questions on a series
20   of individuals who are plaintiffs,
21   asking about whether he has any
22   information about whether the
23   plaintiff saw any
24   direct-to-consumer advertisement,

---

Page 829

1   and any information about what
2   materials were reviewed by the
3   prescribing physician.
4    He's already indicated that
5   he doesn't have any such
6   information, and I've explained to
7   the witness and counsel that I
8   want to do this plaintiff by
9   plaintiff because I think that in
10   some courts I'll be allowed to
11   play that testimony. Mr. Tisi has
12   an objection, and I agree that he
13   can have a continuing objection
14   and won't have to restate it as to
15   each plaintiff and each
16   prescriber.
17    Mr. Tisi and anybody else,
18   would you like to state your
19   objection now so it can be done
20   once?
21    MR. BUCHANAN: We join in
22   the objection, and we want to have
23   a continuing objection.
24    MS. SHAPIRO: We join in the

---

99 (Pages 826 to 829)

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

**Page 830**

1  objection.
2      MR. BECK:  And I will
3  stipulate that every plaintiffs'
4  lawyer in every Vioxx case
5  anywhere joins in Mr. Tisi's
6  objection.
7      MR. TISI:  I will also state
8  it's beyond the scope.  We clearly
9  did not designate him as anything
10  but a generic expert.  So, for
11  that additional reason, I would
12  state my objection.  But go ahead.
13  If you feel that compelled, Phil,
14  I can't stop you.  Go ahead.
15  BY MR. BECK:
16      Q.  Do you know --
17          Do you have any information
18  about whether Mr. Grossberg in California
19  saw any direct-to-consumer advertisements
20  concerning Vioxx?
21      A.  No.
22      Q.  Do you have any information
23  about what materials were considered by
24  the doctors who prescribed Vioxx for Mr.

---

**Page 831**

1  Grossberg?
2      A.  No.
3      Q.  Do you have any information
4  about whether Mr. Gerald Barnett reviewed
5  any direct-to-consumer advertisements?
6      A.  No.
7      Q.  Do you have any information
8  about the materials that were considered
9  by the physicians who prescribed Vioxx
10  for Mr. Barnett?
11      A.  No.
12      Q.  Do you have any information
13  about whether Robert Smith ever saw any
14  direct-to-consumer advertisements?
15      A.  No.
16      Q.  Do you have any information
17  about the information that was taken into
18  account by the doctors who prescribed
19  Vioxx for Robert Smith?
20      A.  No.
21      Q.  Do you have any information
22  about whether Charles Mason ever saw any
23  direct-to-consumer advertisements?
24      A.  No.

---

**Page 832**

1      Q.  Do you have any information
2  about what materials were considered by
3  the doctors who prescribed Vioxx for
4  Charles Mason?
5      A.  No.
6      Q.  Do you have any information
7  about whether Anthony Dedrick saw any
8  direct-to-consumer advertisements?
9      A.  No.
10      Q.  Do you have any information
11  about the materials considered by the
12  doctors who prescribed Vioxx for Anthony
13  Dedrick?
14      A.  No.
15      Q.  Do you have any information
16  about whether a Steven Hatch ever saw any
17  direct-to-consumer advertisements?
18      A.  No.
19      Q.  Do you have any information
20  about what materials were considered by
21  the doctors who prescribed Vioxx for
22  Steven Hatch?
23      A.  No.
24      Q.  Do you have any information

---

**Page 833**

1  about whether Robert McFarland saw any
2  direct-to-consumer advertisements?
3      A.  No.
4      Q.  Do you have any information
5  about the information -- about the
6  materials considered by the doctors who
7  prescribed Vioxx for Robert McFarland?
8      A.  No.
9      Q.  Do you have any information
10  about whether James Miller ever saw any
11  direct-to-consumer advertising?
12      A.  No.
13      Q.  Do you have any information
14  concerning the materials that were
15  considered by the doctors who prescribed
16  Vioxx for James Miller?
17      A.  No.
18      Q.  Do you have any information
19  about whether Sharon Rigby ever saw any
20  direct-to-consumer advertisements?
21      A.  No.
22      Q.  Do you have any information
23  about the materials considered by the
24  doctors who prescribed Vioxx to Sharon

---

100 (Pages 830 to 833)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

1 Rigby?
2     A.   No.
3         MR. BECK:  That's all the
4 questions I have.
5         MR. TISI:  I am a happy man,
6 as I'm sure Dr. Avorn is.
7         I'm going to be questioning
8 Dr. Avorn.  I would probably like
9 to move around and sit in front of
10 Dr. Avorn.  I have a logistical
11 problem.  Why don't we get up and
12 stretch our legs, and I'll talk
13 about the logistical problem with
14 Phil.
15         THE WITNESS:  Are we off the
16 record?
17         MR. TISI:  We're off the
18 record.
19         THE VIDEOTAPE TECHNICIAN:
20 The time is 4:55.  We're off the
21 record.
22             - - -
23         (Whereupon, a recess was
24 taken from 4:55 p.m. until

1 reasonable degree of medical and
2 scientific certainty.  Okay?
3     A.   Okay.
4     Q.   Okay.
5         First of all, does Vioxx, in
6 your opinion, to a reasonable degree of
7 medical certainty cause heart attack?
8     A.   Yes.
9         MR. BECK:  Objection, asked
10     and answered, outside the scope of
11     cross-examination, improper
12     redirect.
13 BY MR. TISI:
14     Q.   Has anything that Mr. --
15 actually, let start again here.
16         For the past eight hours or
17 so, Mr. Beck has had an opportunity to
18 show you any document that he wanted to
19 in cross-examining you; is that correct?
20     A.   That's right.
21         MR. BECK:  I'm going to
22     object to the speeches by counsel
23     rather than the questions to the
24     witness.

1     5:17 p.m.)
2             - - -
3         THE VIDEOTAPE TECHNICIAN:
4 We're back on the record.  The
5 time is 5:17.
6
7         REDIRECT EXAMINATION
8             - - -
9 BY MR. TISI:
10     Q.   Good afternoon, Dr. Avorn.
11 I appreciate your indulgence.  It's been
12 a long day.  I'm going to ask you some
13 questions.  I may switch around topic to
14 topic a little bit to try to address some
15 of the questions that Mr. Beck asked you,
16 counsel for Merck.  I'm going to ask you
17 to indulge me if it seems like I'm
18 grinding gears a little bit.
19         First of all, let me take
20 the big picture, if I could.  Doctor, you
21 expressed a lot of opinions in your
22 direct-examination, and I'm going to go
23 through some of those opinions and see
24 whether you still hold them to a

1 BY MR. TISI:
2     Q.   And he has indeed shown you
3 quite a few documents, correct?
4     A.   Correct.
5     Q.   Is there any document that
6 Mr. Beck has shown you that has changed
7 the opinion you gave on
8 direct-examination that Vioxx is capable
9 of causing heart attacks in human beings?
10     A.   I have not changed my
11 opinion.
12     Q.   Is there any document that
13 Mr. Beck has shown you in
14 cross-examination that changes your
15 opinion that Vioxx is capable of causing
16 strokes in human beings?
17     A.   I have not changed my
18 opinion.
19     Q.   Is there any document that
20 Mr. Beck has shown you in
21 cross-examination that changes your
22 opinion that there was a reasonable
23 evidence of association between heart
24 attack and Vioxx when the VIGOR results

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 838

1  became available to Merck in March of
2  2000?
3      A.   That is still my opinion.
4      Q.   Okay.
5      Did anything that Mr. Beck
6  showed you during your examination change
7  your opinion that there was — that Merck
8  failed to adequately communicate --
9  excuse me.
10      Is there anything that Mr.
11  Beck showed you in cross-examination that
12  changed your opinion that Merck failed to
13  express in a fair and accurate way the
14  scientific and medical evidence of Vioxx
15  as that evidence was emerging as you have
16  reviewed it?
17      MR. BECK:  Before you
18  answer, I'll renew the objection I
19  made during direct-examination
20  that this subject is not
21  appropriate for expert testimony
22  for all the reasons that I stated
23  when you first raised it.
24      Is that okay with you,

Page 839

1  Chris?
2      MR. TISI:  Absolutely.
3      THE WITNESS:  Nothing he has
4  shown me has changed my opinion
5  about that matter.
6  BY MR. TISI:
7      Q.   Is there anything that Mr.
8  Beck has shown you in the course of the
9  past eight hours or so that has changed
10  any of the core opinions that you have
11  given in a direct-examination in this
12  case?
13      A.   Nothing.
14      Q.   You were asked questions
15  about who has financial interest in this
16  case.  Do you remember that question?
17      A.   Yes.
18      Q.   Do you know whether Mr. Beck
19  has a financial interest in the outcome
20  of this case?
21      MR. BECK:  Object.
22      THE WITNESS:  I don't know.
23  I know that Merck does.  I don't
24  know about Mr. Beck.

Page 840

1      MR. TISI:  All right.
2      MR. BECK:  Move to strike as
3  nonresponsive.
4  BY MR. TISI:
5      Q.   Do you know whether Merck
6  has a financial interest in the outcome
7  of this case?
8      A.   Yes, they do.
9      Q.   Do you know whether Mr.
10  Beck's website indicates that his firm
11  takes cases on a contingency fee basis?
12      MR. BECK:  Object.  I'm
13  going to call the judge if we're
14  going to do this.
15      MR. TISI:  Well, you did it
16  in your direct-examination, Phil.
17      MR. BECK:  I didn't do this.
18      MR. TISI:  Sure did.
19      THE WITNESS:  I've never
20  seen Mr. Beck's website.
21      MR. BECK:  I think it
22  violates Rule Number One in New
23  Jersey, too.
24      MR. TISI:  Could you tell me

Page 841

1  what that rule is, Phil?
2      MR. BECK:  Yeah.  It's
3  disparaging other lawyers.  I
4  understand that Judge Higbee feels
5  very strongly that this type of
6  questioning is improper.
7      MR. TISI:  Correct.  She
8  does.
9      MR. BECK:  She does.  Okay.
10  Well, I certainly object to
11  what you agree is an improper
12  question.
13  BY MR. TISI:
14      Q.   All right.
15      Now, in this particular
16  case, Dr. Avorn, we talked -- you were
17  asked --
18      Well, you were asked some
19  questions about you formed your opinions
20  in Baycol after the drug was withdrawn
21  and in diet drugs after the drug was
22  withdrawn.  Do you remember that line of
23  questioning?
24      A.   Yes.

Confidenti■■■ - Subject to Prote■■■ive Order

Page 842

1    Q.    This case is different,
2  isn't it?
3    A.    I just want to correct —
4       MR. BECK:  Object to leading
5  and — both leading and vague at
6  the same time.
7       THE WITNESS:  I just want to
8  correct that impression.  My
9  impressions or my opinions about
10  Rezulin were definitely developed
11  while the drug was still on the
12  market because I urged our
13  pharmacy and therapeutics
14  committee to remove it from the
15  formulary at our hospital while it
16  was still on the market.
17  BY MR. TISI:
18    Q.    And in this case, did you
19  form the core of your opinion, the
20  opinions you expressed early on in my
21  redirect-examination, did you express
22  them during the time that Vioxx was on
23  the market and before anyone, any lawyer
24  ever spoke to you about being an expert

Page 843

1  in this case?
2       MR. BECK:  Object, leading
3  and compound.
4       THE WITNESS:  Yes, I did.
5  BY MR. TISI:
6    Q.    You were asked some
7  questions about Baycol.  Do you remember
8  that?
9    A.    Yes.
10    Q.    Do you know that the company
11  that manufactured Baycol has paid out to
12  date $1.13 billion to resolve that
13  matter?
14       MR. BECK:  Object to
15  foundation, hearsay, relevance.
16       MR. TISI:  Fair enough,
17  Counsel.  I would like to attach
18  an exhibit.
19       THE WITNESS:  Shall I answer
20  the question?
21  BY MR. TISI:
22    Q.    Yes, please.
23    A.    Billion with a B?
24    Q.    Yes.  Billion with a B.

Page 844

1    A.    I didn't know that.
2       MR. BECK:  Can I go off the
3  video record for a second?
4       THE VIDEOTAPE TECHNICIAN:
5  Do you agree to that?
6       MR. TISI:  I want to hear
7  his answer.
8       MR. BECK:  There's no
9  question.
10       MR. TISI:  Okay.  Fine.  Off
11  the record.
12       THE VIDEOTAPE TECHNICIAN:
13  The time is 5:23.  We're off the
14  record.
15       MR. TISI:  If you want to
16  withdraw those questions, then we
17  won't go into it.
18       MR. BECK:  You know what,
19  I'm happy to withdraw those
20  questions if you'll withdraw the
21  questions about does that mean you
22  were right.
23       MR. TISI:  Well, if you'll
24  withdraw the questions that

Page 845

1  precipitated that answer, then I'm
2  more than happy to do that.
3       MR. BECK:  You know what, it
4  is probably easier for you to ask
5  the questions and me object.
6       MR. TISI:  That's right.
7       MR. BECK:  Because they are
8  all going to be stricken anyway.
9       MR. TISI:  This is the
10  goose-gander rule.
11       MR. BECK:  I understand.
12       THE VIDEOTAPE TECHNICIAN:
13  We're back on the record.  The
14  time is 5:24.
15          - - -
16  (Whereupon, Deposition
17  Exhibit Avorn-59, Baycol website
18  document, was marked for
19  identification.)
20          - - -
21  BY MR. TISI:
22    Q.    Doctor, I have handed you a
23  document which was pulled off a website
24  concerning the resolution of the Baycol

103  (Pages 842 to 845)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 846

1  claims. Do you see that document?
2       MR. BECK: What website?
3       THE WITNESS: I see that.
4  BY MR. TISI:
5       Q.  Would you identify the
6  website?
7       A.  Yes. It is
8  www.adrugrecall.com.
9       Q.  And as of May 10th, 2005,
10  what does it indicate that Bayer has done
11  with respect to Baycol?
12       MR. BECK: I'll object,
13  foundation, hearsay, relevance.
14       THE WITNESS: The first line
15  is, "Bayer said that as of April
16  25 it has paid $1.133 billion,"
17  with a B, "to settle" nearly 3,000
18  "Baycol cases worldwide."
19  BY MR. TISI:
20       Q.  Doctor, I have placed before
21  you --
22       MR. BECK: Did you mark this
23  as an exhibit?
24       MR. TISI: I did.

Page 847

1       MR. BECK: What was the
2  number?
3       THE WITNESS: 59.
4  BY MR. TISI:
5       Q.  Doctor, I have placed two
6  exhibits before you, before you sat down
7  there, and they are exhibits -- would you
8  tell me what exhibits those are?
9       A.  Yes. 41 and 42.
10       Q.  You were asked some
11  questions about Exhibit Number 42, and
12  those being those eight documents that
13  were relevant to Merck's defenses. Do
14  you remember those lines of questions?
15       A.  Yes.
16       Q.  Could you please turn to the
17  next exhibit, Document 41?
18       A.  Yes.
19       Q.  And can you tell me how many
20  references are in document -- could you
21  tell me what Document 41 is?
22       A.  Yes. It is the reliance
23  materials or the materials that were sent
24  to me by plaintiffs' counsel in

Page 848

1  formulating my opinion.
2       Q.  And the document that is
3  Exhibit Number 42 says, "Additional
4  materials provided," correct?
5       A.  Correct.
6       Q.  "Related to Merck's
7  defenses"?
8       A.  Correct.
9       Q.  And it lists eight
10  additional pieces of information,
11  correct?
12       A.  Correct.
13       MR. BECK: I'm going to
14  object. You mischaracterized the
15  document. It doesn't say that at
16  all.
17  BY MR. TISI:
18       Q.  And does it say "Additional
19  materials"?
20       A.  Exhibit 42 does say that,
21  yes.
22       Q.  All right.
23       Now, if you'd turn to
24  Exhibit 41, you've indicated that there

Page 849

1  are almost 200 references in that
2  document?
3       A.  That's right.
4       Q.  Included in those documents
5  are depositions of Dr. Scolnick, for
6  example, correct?
7       A.  Right.
8       MR. BECK: Object, leading.
9  BY MR. TISI:
10       Q.  It would be --
11       Included in those are
12  published peer-reviewed medical journal
13  articles published by Merck officials,
14  Merck employees, correct?
15       A.  That's right.
16       Q.  Included in that would be
17  FDA compilations of data that you
18  reviewed; is that correct?
19       A.  That's right.
20       Q.  Okay.
21       Included in that would be a
22  lot of literature that is not --
23       Has any of that literature
24  that was provided to you been generated

104  (Pages 846 to 849)

58ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 850

1  by the plaintiffs' lawyers, in other
2  words, are those our documents?
3      A.  No.
4      Q.  Okay.
5          So, those either came from
6  the public, the public domain, from
7  Merck, or from the FDA, correct?
8      A.  Right.
9      Q.  Doctor, you were asked some
10 questions about the preapproval signals.
11 Do you remember that?
12     A.  Yes.
13     Q.  Okay.
14         Do you remember we talked a
15 little bit about -- let's talk first
16 about trial 17.  Do you remember that?
17     A.  Yes.
18     Q.  You were asked by Mr. Beck
19 in that trial --
20         First of all, was that a
21 placebo-controlled trial?
22     A.  I believe it was.
23     Q.  Was it blinded?
24     A.  I believe it was.

Page 851

1      Q.  And you were asked a
2  question by Mr. Beck whether or not the
3  investigator in the case, in that
4  individual case where there was a heart
5  attack, attributed the heart attack to
6  Vioxx.  Do you remember that question?
7      A.  I remember the question.
8      Q.  Is that possible to do in a
9  blinded placebo-controlled trial?  Does
10 the investigator know whether or not the
11 patient is on the experimental drug or
12 the sugar pill?
13     A.  The study would have to be
14 unblinded for them to know that.
15     Q.  And typically that is not
16 the case with an investigator, they do
17 not get that information?
18     A.  Right.
19     Q.  And where does the
20 investigator in a company-run trial get
21 information about the side effects of the
22 study drug?
23     A.  Well, especially if it's a
24 drug that is not yet on the market, the

Page 852

1  only place they could get it would be
2  from the company.
3      Q.  And they would be in the
4  investigator brochure, for example, or
5  informed consents, the kind of
6  information that the company typically
7  drafts as part of their study protocol?
8      A.  They should be.
9      Q.  Okay.
10         Have you reviewed and seen
11 in the course of your review that kind of
12 information in connection with other
13 trials involving Vioxx?
14     A.  You mean not 017, but
15 others?
16     Q.  017.
17     A.  I'm not understanding the
18 question.
19     Q.  Well, do you know whether or
20 not the company ever told its
21 investigators whether or not Vioxx was
22 associated with the development of heart
23 attacks so that the investigators could
24 even make that diagnosis in a blinded

Page 853

1  fashion?
2      A.  Well, at the point of 017,
3  I'm not sure that -- since that was so
4  early on, I'm not sure that they would
5  have had that information to give.
6      Q.  All right.
7          Let's talk about --
8          Then let's talk about Dr.
9  Villalba's report where you don't have
10 the individual doctor's assessment of the
11 individual cases because patients are
12 blinded.  What the FDA and what companies
13 typically do is they look at the
14 aggregate trends in those trials.  Is
15 that fair to say?
16     A.  Right.
17         MR. BECK:  Object, leading.
18 BY MR. TISI:
19     Q.  Could you please go to
20 Exhibit Number 44 in the stack of
21 documents that you were given.  And that
22 would be, for the record, Dr.
23 Villalba's --
24         MR. TISI:  I'm sorry.  I'll

105 (Pages 850 to 853)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

**Page 854**

1　wait for you, Linda.
2　　　　THE WITNESS: If she pulls
3　it, it will stay in order. If I
4　pull it, it will be a mess. Thank
5　you.
6　　　　THE COURT REPORTER: (Handing
7　over document.)
8　　　　THE WITNESS: Thank you.
9　BY MR. TISI:
10　　Q. That would be Dr.
11　Villalba's, just for the record, her
12　medical officer report preapproval of the
13　drug in 1998; is that correct?
14　　A. 1998 through 1999, yes.
15　　Q. Would you please go to the
16　page -- they're not really paginated
17　there.
18　　A. Tell me the table number.
19　　Q. Table 51 to 52.
20　　A. Got it.
21　　Q. Would you read the paragraph
22　starting, "Evaluation of CV
23　thromboembolic events"?
24　　A. Yes. "Evaluation of

**Page 855**

1　cardiovascular thromboembolic events
2　regardless of seriousness shows a
3　numerically higher incidence of
4　ischemic/thromboembolic events (angina,
5　myocardial infarction, CVA," which is
6　stroke, "TIA)," which is like a stroke,
7　"in patients taking rofecoxib when
8　compared with patients taking placebo,
9　but the exposure to placebo was less than
10　the exposure to rofecoxib."
11　　Q. Stop right there.
12　　　　Would it be fair to say that
13　there seemed to be a numerical trend
14　which did not favor Vioxx?
15　　　　MR. BECK: Object, leading.
16　　　　THE WITNESS: Correct.
17　　That's what it says, that there's
18　　a higher incidence of these events
19　　in patients taking rofecoxib.
20　BY MR. TISI:
21　　Q. Keep going.
22　　A. Okay.
23　　　　"In 6 weeks studies there
24　was one event in the placebo group" or

**Page 856**

1　2/10ths of a percent "and a total of 12
2　events (approximately 1%) in the
3　rofecoxib groups."
4　　Q. On percentage bases, that
5　would mean there were eight times more
6　events in the rofecoxib group?
7　　　　MR. BECK: Object, leading.
8　　　　THE WITNESS: No, five
9　times.
10　BY MR. TISI:
11　　Q. Five times, excuse me.
12　　A. Right.
13　　Q. And would that be consistent
14　with the kinds of things you saw in
15　VIGOR?
16　　A. That's the same ratio that
17　was seen in VIGOR.
18　　Q. Keep going.
19　　A. "In 6-month studies there
20　were 3 events in placebo (approximately
21　1%) and 23 (approximately 1%) in the
22　total rofecoxib group, even though
23　placebo patients were only exposed for up
24　to 18 weeks. The data seem to suggest

**Page 857**

1　that in 6-week studies, thromboembolic
2　events are more frequent in patients
3　receiving rofecoxib than placebo but do
4　not show a clear dose response
5　relationship with rofecoxib."
6　　Q. Is that consistent with what
7　you ultimately saw in your study which
8　was published in 2004?
9　　　　MR. BECK: Object, leading.
10　　　　THE WITNESS: Yes. It's all
11　　the same pattern of a higher rate
12　　seen with rofecoxib or Vioxx
13　　compared to placebo.
14　BY MR. TISI:
15　　Q. And is that what you meant
16　by way of a signal where you look at, you
17　see a trend and it raises a red flag?
18　　　　MR. BECK: Object, leading.
19　　　　THE WITNESS: That's right.
20　BY MR. TISI:
21　　Q. Well, let me ask you,
22　Doctor, when you used the word "red flag"
23　in your direct testimony, what did that
24　mean?

106　(Pages 854 to 857)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order 

Page 858

1        MR. BECK:  Object as beyond
2    the scope of cross and also to
3    your leading question that
4    preceded it.  You've already
5    suggested to the witness the
6    answer, so, it's leading as well.
7        THE WITNESS:  Shall I answer
8    it?
9    BY MR. TISI:
10       Q.   You sure can.
11       A.   And I should point out, I
12   knew the answer before Mr. Tisi's
13   question because that's what I do for a
14   living.
15       A signal or a red flag is
16   evidence of an increased prevalence of a
17   problem, in this case in one drug
18   compared to another, even though
19   initially that may not reach the level of
20   statistical significance because there's
21   not yet enough experience with the drug
22   to see that.
23       Q.   And in your courses teaching
24   executives, pharmaceutical executives on

Page 859

1    how to conduct research trials that you
2    testified on your direct-examination,
3    what is it you tell researchers -- what
4    do you tell them about how to take
5    signals and apply them in investigations?
6        MR. BECK:  I'm going to
7    object.  First, it was asked and
8    answered on direct-examination.
9        Second, I didn't ask any
10   questions on this subject
11   whatsoever on cross-examination,
12   and it is, therefore, beyond the
13   scope.
14       MR. TISI:  I think you did.
15       Go ahead.  I'm sorry, were
16   you not finished?  Go ahead.
17       THE WITNESS:  I tell them
18   that developing a drug from the
19   beginning to the end of the
20   process through post-marketing
21   surveillance requires that they
22   make assessments on an ongoing
23   basis and respond to new evidence
24   as it comes along.  Sometimes that

Page 860

1    will require doing studies that
2    will follow up on signals that may
3    not have been anticipated that
4    come up in the early stages of
5    drug development.
6        MR. BECK:  Move to strike on
7    the grounds that this is simply a
8    repetition of direct-examination
9    and misuse of redirect.
10   BY MR. TISI:
11       Q.   You were asked some
12   questions about the Board of Scientific
13   Advisors report.  Do you remember that
14   earlier?
15       A.   Yes.
16       Q.   And Mr. Beck asked you
17   questions, and this is just for
18   reference, about some of the good
19   potential -- I think we can fairly call
20   them collateral potential benefits and
21   potential safety problems.  Do you
22   remember the good and the bad discussion
23   that you had with Mr. Beck?
24       A.   Yes.

Page 861

1        MR. BECK:  I object to
2    counsel's characterization.
3    BY MR. TISI:
4        Q.   In terms of looking and
5    working up a new drug --
6        Well, first of all, do you
7    know whether or not Vioxx was being
8    investigated for the purpose of being a
9    drug for cardioprotection?
10       A.   I don't know of any studies
11   that were conducted in humans to
12   demonstrate that.
13       Q.   Okay.
14       Do you know whether or not
15   that was the purpose for developing
16   Vioxx?
17       A.   No, it was not, as far as I
18   know.
19       Q.   Do you know whether or not
20   they filed a new drug application,
21   supplemental new drug application or
22   anything to investigate whether or not
23   Vioxx could be capable of being a
24   cardioprotective drug?

Confidential - Subject to Protective Order

## Page 862

1      A.    That was never part of the
2  Vioxx human development program as far as
3  I know.
4      Q.    So, in the board of safety
5  advisors --
6      A.    Scientific.
7      Q.    -- scientific advisors, they
8  identified issues; is that correct?
9      A.    Right.
10         (Interruption.)
11 BY MR. TISI:
12     Q.    I would like you to find, if
13 you could, the Board of Scientific
14 Advisors note or report.
15     A.    Do you remember what exhibit
16 number it was?
17         MR. TISI:  Do you have the
18     Board of Scientific Advisors?
19     Could you please bring that up?
20     When we find it, we will bring it
21     up.
22         THE WITNESS:  I've got it.
23     It's Exhibit 32.
24         MR. BECK:  What is it?

## Page 863

1          THE WITNESS:  32.
2  BY MR. TISI:
3      Q.    If you'd go to the page with
4  the cardiovascular issues.
5      A.    Yes.
6      Q.    I think it's 11.
7      A.    Okay.
8      Q.    Keep going.
9      A.    I've got 11, but that's...
10     Q.    No, keep going.
11     A.    I'm on 11.  They're not.
12     Q.    All right.
13         Now, you see that they
14 identify three different issues?
15     A.    Yes.
16     Q.    And Mr. Beck asked you,
17 well, isn't it true that some of these
18 could be potentially helpful?
19     A.    Right.
20     Q.    First of all, he didn't ask
21 you about Number 3.  Let me ask you about
22 Number 3.
23     A.    Yeah.  Number 3 is where a
24 lot of the action is.  We didn't get to

## Page 864

1  talk about that.
2      Q.    Well, let me ask you about
3  Number 3.
4          MR. BECK:  Object, move to
5      strike as nonresponsive.
6  BY MR. TISI:
7      Q.    Let me ask you about Number
8  3.  Can it ever be a good thing that
9  there is "thromboembolic occlusion of the
10 vessel at the site of plaque rupture with
11 ensuing consequences of ischemia"?
12     A.    No.  That means that there's
13 a blood clot that forms and it blocks the
14 artery, and the ischemia refers to the
15 deprivation of the tissue of oxygen and
16 often results in the death of the tissue.
17     Q.    Is there ever a circumstance
18 where Number 3 is a good thing?
19     A.    Well, I think in fairness,
20 we need to point out that if you could
21 prevent it, it would be a good thing.  1,
22 2 and 3 were all phrased by the board as
23 the bad thing.  And in the case of 1,
24 they said it could be better or it could

## Page 865

1  be worse.  In the case of 2, Mr. Beck
2  pointed out that their discussion was
3  primarily of preventing the badness.  And
4  in Number 3, it is predominantly about
5  causing the badness, but I would want to
6  spend a moment, in fairness, just making
7  sure that they were not talking about
8  preventing the badness of point number 3.
9      Q.    Feel free to take a look.
10     A.    (Witness reviewing
11 document.)
12         Okay.
13         I think a fair reading of
14 number 3 is that it is pretty much
15 exclusively looking at the likelihood or
16 the threat that a selective COX-2
17 inhibitor like Vioxx could just do harm.
18 There was no good news in their
19 presentation about topic number 3.
20     Q.    And do you have an opinion
21 to a reasonable degree of medical
22 certainty as to whether or not a
23 pharmaceutical company putting a drug on
24 the market has a responsibility to

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 866

1   investigate potential bad things that it
2   may become aware of?
3           MR. BECK: I'm going to
4   object that this is not the proper
5   subject for expert testimony. It
6   is using an expert to make
7   lawyer's argument, lack of
8   foundation.
9           THE WITNESS: I have such an
10  opinion, and my opinion, which is
11  compatible with what I've written
12  in my book and teach to classes
13  that include pharmaceutical
14  executives, is that it's necessary
15  to do so. I've -- since the Vioxx
16  withdrawal, I've even made the
17  argument that it is a good
18  business case to do so because you
19  can really regret it if you don't.
20  BY MR. TISI:
21      Q.   Okay.
22           And --
23           MR. BECK: Move to strike
24  the answer as nonresponsive.

Page 867

1   BY MR. TISI:
2       Q.   Let me ask you this question
3   directly.
4           Do you have an opinion to a
5   reasonable degree of medical and
6   scientific certainty as an expert in drug
7   risks and benefits and evaluating them as
8   to whether or not Vioxx in this case had
9   any responsibility to actually --
10      A.   You mean Merck had a
11  responsibility?
12      Q.   -- Merck had a
13  responsibility or not to investigate the
14  potential bad effect that's identified
15  here by the Board of Scientific Advisors?
16          MR. BECK: Object. Number
17  one, it's a repetition of
18  direct-examination, which is
19  improper redirect.
20          Number two, as Mr. Tisi
21  pointed out, it's beyond the scope
22  of cross-examination.
23          Number three, it is an
24  improper use of expert testimony,

Page 868

1   and he's commenting on the merits
2   and making lawyer's arguments.
3           And number four, foundation.
4           THE WITNESS: I have such an
5   opinion, and the opinion is that
6   the company did have a
7   responsibility to follow up the
8   issued raised in an effective
9   manner by the scientific board.
10  BY MR. TISI:
11      Q.   Now, I want you to put
12  yourself back in 1998 when the Board of
13  Scientific Advisors commented on the
14  potential good and the potential bad as
15  indicated here in this document. Okay?
16      A.   Okay.
17      Q.   Could a responsible
18  pharmaceutical company have designed at
19  that time a trial to investigate whether
20  Vioxx was good or bad for the heart using
21  the information provided by the Board of
22  Scientific Advisors?
23          MR. BECK: Object. It's a
24  repeat of direct-examination,

Page 869

1   beyond the scope of cross. It's
2   an improper subject for expert
3   testimony. This witness is not
4   qualified to give such testimony.
5   It's lawyer's argument via the
6   witness, invades province of the
7   jury, and lacks foundation.
8           THE WITNESS: Yes. I
9   believe such a study could have
10  been initiated at that time.
11  BY MR. TISI:
12      Q.   And do you know whether or
13  not a study -- or was a cardiovascular
14  outcomes study ever designed in 1998 to
15  look at the issue identified by the Board
16  of Scientific Advisors?
17          MR. BECK: Object, asked and
18  answered on direct-examination.
19  It's improper simply to repeat
20  direct-examination on redirect and
21  beyond the scope of cross.
22          THE WITNESS: I'm not aware
23  that in any year a study was
24  designed and implemented to test

109 (Pages 866 to 869)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

Page 870

1    the question of the cardiovascular
2    risk of Vioxx in particular.
3  BY MR. TISI:
4    Q.   You were asked some
5  questions about arm bleeds and rat
6  studies and all those kinds of questions.
7  Do you remember those questions that you
8  spoke to earlier?
9    A.   Yes.
10    Q.   Beyond questions of looking
11  about whether or not these studies,
12  animal studies, et cetera, generally
13  demonstrate biologic plausibility, what
14  relevance do those studies have in light
15  of clinical trial and epidemiologic
16  evidence showing an association?
17    A.   The ultimate outcome is what
18  happens to patients.  And we try to learn
19  what happens -- what is going to happen
20  to patients based on animal studies or
21  lab models or other kinds of science,
22  which can be interesting and informative.
23  But at the end of the day, what matters
24  most is the good and the bad effects as

---

Page 871

1  they are recorded in actual human beings.
2    Q.   And, Doctor, going back to
3  some of Mr. Beck's questions, he asked
4  you some questions about why, going to
5  the Board of Scientific Advisors, why you
6  emphasized the potential bad and not the
7  potential good.  Do you remember those
8  lines of questions?
9    A.   Yes.
10    MR. BECK:  Object.  It
11  mischaracterizes the questions.
12    MR. TISI:  I'm just doing it
13  for orientation, Phil, but I
14  will certainly be --
15    MR. BECK:  Misoriented.
16    MR. TISI:  I will gladly --
17  well, he knew where we were going.
18  BY MR. TISI:
19    Q.   Let me ask you the question
20  again.
21    Do you remember when Mr.
22  Beck asked you a series of questions
23  about why you did not mention the good
24  aspects of the Board of Scientific

---

Page 872

1  Advisors?  Do you remember that?
2    MR. BECK:  Again, I object.
3    That mischaracterizes the
4    question.
5    THE WITNESS:  I recall what
6    you are talking about.
7  BY MR. TISI:
8    Q.   Okay.
9    And then he moved forward
10  and looked at your study, your COX-2
11  study, and he handed you some articles
12  that seemed to support certain positions
13  that Mr. Beck wanted to bring out, I
14  think there were some animal studies, et
15  cetera.  Do you remember that?
16    A.   Yes.
17    MR. BECK:  Object to the
18    characterization, and it's
19    leading.
20  BY MR. TISI:
21    Q.   Do you remember -- in your
22  study that you on heart attacks --
23    MR. BECK:  I'm sorry, my
24    objection was it is leading.

---

Page 873

1  BY MR. TISI:
2    Q.   In your study on heart
3  attack and stroke that was published, did
4  you make an effort to identify both the
5  good and the bad --
6    MR. BECK:  Object, leading.
7  BY MR. TISI:
8    Q.   -- potential?
9    A.   Are we talking about the
10  paper that we had in Circulation in 2004?
11    Q.   Yes, yes.
12    A.   Yeah, that was just heart
13  attack.  We didn't look at stroke.
14    Q.   Right.
15    A.   Well, the good would have
16  been apparent along with the bad, because
17  we were counting heart attacks.  And if
18  there was a prevention of heart attacks,
19  that would have come out in the wash, so
20  to speak, when we count the heart
21  attacks.  And we didn't see any reduction
22  in heart attacks.
23    Q.   I'm sorry.  Then let me go
24  back and do it.

---

110 (Pages 870 to 873)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 874

1    Mr. Beck showed you a couple
2  of articles. I think he showed you the
3  Burleigh article, and I think he showed
4  you another article by Dr. --
5    A.   Cipollone.
6    Q.   -- Cipollone. But there
7  were other articles that you also cited
8  in your article, correct?
9    A.   Right.
10   Q.   Okay.
11     And ultimately, after
12  reviewing the literature on all sides of
13  the issue, including the articles that
14  Mr. Beck highlighted for you and
15  attached, looking at all the references
16  and doing your own studies, what did you
17  conclude?
18   A.   Well, I can probably best
19  answer --
20   Q.   In humans?
21     MR. BECK: Object. Again,
22  it's a repeat of
23  direct-examination, which is
24  improper redirect.

Page 875

1      THE WITNESS: Well, I think
2  an answer that is not going to
3  repeat anything that we've done
4  today is the papers that Mr.
5  Goldman asked me to identify for
6  him at the first deposition two
7  weeks ago, because I think we've
8  heard today a rather skewed
9  presentation of the pharmacology
10  evidence that was in place before
11  the drug was marketed. And two
12  weeks ago Mr. Goldman asked me to
13  identify animal studies that I had
14  relied upon in formulating my
15  opinion. And we haven't gotten to
16  talk about those, but since we are
17  now talking about the animal
18  studies related to the effect of
19  Vioxx and related drugs, it
20  probably would be appropriate to
21  just mention them since they were
22  material that Mr. Goldman had
23  asked about. And these are the
24  three papers that I had identified

Page 876

1  for Merck's counsel.
2      And very brief, because the
3  hour is late, but one is from 1997
4  in Nature. And it's a paper by
5  Murata, and I can provide the full
6  reference later. Mr. Goldman
7  actually has it already, and I
8  assume he shared that with Mr.
9  Beck. And essentially what it
10  says is that if one disrupts the
11  gene for prostacyclin, which is
12  the substance that Vioxx reduces
13  the production of, the
14  susceptibility to thrombosis is
15  increased.
16      And then they go on to say,
17  "Our results establish that
18  prostacyclin is an anti-thrombotic
19  agent in vivo." And what that
20  means in English is, that the
21  material that Vioxx reduces the
22  production of prevents clotting,
23  so that blocking that would
24  increase clotting, and that was,

Page 877

1  as I said, in 1997 in Nature.
2      The other one Mr. Goldman
3  asked me about was a paper that
4  was in the Journal of Biological
5  Chemistry, which is the main
6  journal in biochemistry, published
7  in 1999, again, February of 1999,
8  before the availability of Vioxx
9  on the market.
10      And this was a study in
11  which there was an investigation
12  of whether heart cells were
13  influenced by COX-2, the enzyme
14  that Vioxx blocks. And their
15  conclusion on their abstract is
16  that in heart cells that are
17  injured in a variety of
18  experimental ways, prostacyclin,
19  which is the chemical that Vioxx
20  blocks, protects the heart cells.
21  And their conclusion was that if
22  you block that prostacyclin
23  chemical that protects the heart
24  cells, as you would do with a

111 (Pages 874 to 877)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

**Page 878**

1 COX-2 inhibitor such as Vioxx,
2 that would block the protection of
3 heart cells in an injured heart.
4     And the third paper, very
5 briefly, that I want to talk
6 about -- that paper was by
7 Adderley and Fitzgerald, a
8 different Fitzgerald, by the way.
9     And the last one is a paper
10 by Shinmura. Again, Mr. Goldman,
11 and I expect Mr. Beck, have the
12 reference that I provided two
13 weeks ago. This was a study about
14 the cardioprotective effects in
15 animal studies when they damage
16 animal hearts, and it says -- the
17 title is "Cyclooxygenase-2" or
18 COX-2, "mediates the
19 cardioprotective effects of" a
20 bunch of other things having to do
21 with heart damage.
22     And, again, in brief, what
23 it says, quite clearly, in their
24 abstract is that this study

**Page 879**

1 identifies COX-2 as a
2 cardioprotective protein. They go
3 on to say, "COX-2 mediates the
4 anti-infarct effects," which means
5 COX-2, which is the enzyme that is
6 blocked by Vioxx, mediates or
7 helps to promote the anti-heart
8 attack effects in their model.
9     So, these were -- Mr.
10 Goldman's question to me to which
11 these were a response was what
12 evidence was there before Vioxx
13 was marketed that inhibiting COX-2
14 selectively might be bad for the
15 heart. And I think this is pretty
16 clear that, granted, there was
17 evidence on both sides, but there
18 was pretty compelling evidence on
19 the damage side already, even
20 before the drug hit the market.
21     MR. BECK: Excuse me. I'm
22 going to move to strike that
23 answer.
24     First, it does not respond

**Page 880**

1 to the question that was asked.
2     Second, it's replete with
3 argumentative characterizations.
4     Third, it's beyond the scope
5 of cross-examination, and, in
6 fact, the witness said so, and he
7 said he was not asked about it on
8 cross, but he complained that he
9 was asked about it some weeks ago
10 in his deposition.
11     Third, if I'm on third, it
12 was a volunteered, prepared
13 argument by an advocate rather
14 than proper expert testimony by a
15 witness.
16     THE WITNESS: If I may
17 respond.
18     MR. TISI: No, no, no.
19     THE WITNESS: All right.
20 I won't. I won't.
21     MR. BECK: I'm not sure I'm
22 done yet.
23     Yeah, that's enough.
24 BY MR. TISI:

**Page 881**

1     Q. Okay.
2     Doctor, let me go back to
3 your article, okay? Your article, which
4 is Number 7 in the book.
5     A. Is that my copy of the book?
6     Q. Yes.
7     A. Okay.
8     Q. In that article you refer to
9 both the Burleigh and the --
10     A. Cipollone.
11     Q. -- Cipollone articles.
12     A. Right.
13     Q. Correct?
14     A. Right.
15     Q. So --
16     A. Cipollone.
17     Q. Cipollone.
18     Were you referring to your
19 readers --
20     What were you trying to do
21 by referring the readers to articles like
22 these, as well as articles on the other
23 side of the issue that were also
24 contained in your paper?

112 (Pages 878 to 881)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 882

1    A.  Right.
2         MR. BECK:  Object, leading.
3         THE WITNESS:  What that
4    section is about was essentially
5    saying this is a very active area
6    of research.  There's a lot of new
7    information that is developing
8    about the effect of this COX-2
9    enzyme which had not been fully
10   studied over the years but that
11   people had begun to understand was
12   having an important effect on the
13   health of the vessel wall, as well
14   as on the ability of blood to
15   clot, as well as on the function
16   of the arteries, and that this is
17   an important area because there's
18   a lot of very exciting research
19   going on, that COX-2 has a lot to
20   do with the arteries.
21   BY MR. TISI:
22        Q.   Now, and when you took those
23   issues and you actually studied them in
24   human beings, what did you find?

Page 883

1    A.  We found that —
2         MR. BECK:  I'm going to
3    object.  This is —
4         THE WITNESS:  I'm sorry.
5         MR. BECK:  This is a repeat
6    of direct-examination, which is a
7    misuse of redirect.  It's beyond
8    the scope.
9         THE WITNESS:  In brief, we
10   found that when all is said and
11   done, if you look at real typical
12   patients out there in the
13   community, they were more likely
14   to have heart attacks if they were
15   taking Vioxx.
16   BY MR. TISI:
17        Q.   Now, since Mr. Beck asked
18   you about questions of balance and
19   whether you wanted to be fair or not
20   fair, remember those lines of questions?
21        MR. BECK:  Object,
22   mischaracterizes questions.
23   BY MR. TISI:
24        Q.   In the VIGOR article, and

Page 884

1    I'll place it in front of you again, was
2    Merck ever, in your opinion,
3    scientifically balanced in its reporting
4    of the potential bad associated with
5    Vioxx in that report?
6         MR. BECK:  I'm going to —
7    excuse me, Doctor.
8         I object.  It's beyond the
9    scope of cross.  It's a repeat of
10   a direct-examination, which is a
11   misuse of redirect.
12        MR. TISI:  Well, let me
13   rephrase the question.
14   BY MR. TISI:
15        Q.   In your article that you
16   wrote, did you acknowledge, and we went
17   through some of the articles on both
18   sides of the issue, that perhaps Vioxx
19   could have a beneficial effect and a bad
20   effect in terms of the animal models that
21   you identified?
22        A.   Right.  Those are the
23   citations that Mr. Beck asked me about.
24        Q.   In the articles that Merck

Page 885

1    wrote, did they identify any of the
2    potential bad articles that would support
3    the proposition that Vioxx was
4    prothrombotic?
5         MR. BECK:  I object.
6         Number one, it's a repeat of
7    direct-examination and beyond the
8    scope of cross.
9         Second, it's leading.
10        And third, it's vague and
11   compound.
12   BY MR. TISI:
13        Q.   Well, may I ask you directly
14   —
15        THE WITNESS:  Mr. Beck, if
16   you could indicate when your
17   objection is over, I could know
18   when to answer.
19        MR. BECK:  My objection is
20   over.
21        THE WITNESS:  Okay.
22        MR. BECK:  And if you can
23   indicate when your answers are
24   over, that would help me, too.

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 886

1     THE WITNESS: Okay.
2     In fairness, I'm not --
3     MR. BUCHANAN: I'm going to
4  object to that statement. I think
5  that's improper. The witness is
6  trying to be courteous to allow
7  you to get your objection out.
8     THE WITNESS: In fairness, I
9  can't speak to what Merck did or
10  didn't say. This is an article
11  written by many people, and there
12  will be other testimony about what
13  Merck did or didn't do in relation
14  to the presentation of the
15  findings in VIGOR.
16     So, I can speak just to the
17  paper as it appeared in the New
18  England Journal that Dr.
19  Bombardier and colleagues wrote.
20  We know there was a lot of
21  interaction with Merck, but let me
22  just speak about the paper.
23     The paper is really
24  presented in a very one-sided way.

Page 887

1     It was all about the good news,
2  and the bad news was presented in
3  a way that minimized, in fact,
4  inverted it so that it was not
5  even presented as bad news.
6  BY MR. TISI:
7     Q.   And in any of the
8  materials --
9     MR. BECK: Object and move
10  to strike on the additional ground
11  that it's not responsive to the
12  question that was asked.
13  BY MR. TISI:
14     Q.   In any of the materials that
15  you've seen, the educational materials,
16  the label, the medical literature,
17  anything that came out of Merck, was
18  there ever an acknowledgment that at
19  least a potential mechanism of action was
20  that this drug would be prothrombotic?
21     MR. BECK: I object. This
22  is a complete repeat of the
23  direct-examination, which is
24  improper, and it is completely

Page 888

1  outside the scope of anything in
2  the cross-examination, and it's
3  leading as well.
4  BY MR. TISI:
5     Q.   Well, let me ask you the
6  question.
7     What, if anything, have you
8  ever seen -- have you seen in any of the
9  Merck literature that presented Vioxx as
10  having any potential side effects before
11  APPROVe?
12     MR. BECK: And I'm going to
13  object on the ground that it's a
14  repetition of the
15  direct-examination and outside the
16  scope of the cross-examination.
17     THE WITNESS: The vast
18  preponderance of the material that
19  Merck produced either in articles
20  that it had its staff or
21  consultants author, or the
22  educational so-called materials
23  for physicians, the vast, vast
24  predominance of it was all the

Page 889

1  good things about Vioxx. And I
2  cannot recall any materials that
3  Merck produced that said this drug
4  may increase -- may be
5  prothrombotic, except in reciting
6  the VIGOR data.
7  BY MR. TISI:
8     Q.   Doctor, do you remember the
9  Tuleja article that you were asked about?
10  Do you remember whether these men -- and
11  this was the --
12     A.   Bleeding.
13     Q.   -- bleeding time study that
14  we talked about before.
15     Do you remember whether
16  these were healthy or unhealthy men?
17     A.   They were healthy men as far
18  as I know.
19     Q.   Do you know whether or not
20  they looked at -- what kind of vessels
21  they looked at? Did they look at
22  capillaries, coronary arteries, anything
23  like that?
24     A.   I don't recall what kind of

114 (Pages 886 to 889)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 890

1   vessels.
2        Q.   Let me show you the article.
3   I'm showing you my copy.
4        A.   Okay.
5             It was standardized --
6        MR. BECK:  What exhibit
7   number is this?
8        MR. TISI:  Exhibit 50.
9        MR. BECK:  What is it?
10       MR. TISI:  Yes.
11       MR. BUCHANAN:  50.
12       MR. BECK:  Thanks.
13       THE WITNESS:  It says,
14   "Standard microvascular injury."
15  BY MR. TISI:
16       Q.   What does that mean to you?
17       A.   That it is an experimental
18  technique in which they damage the
19  smallest vessels.
20       Q.   Okay.
21            Are those the same kind of
22  vessels that cause heart attacks in human
23  beings?
24       A.   No.

Page 891

1        Q.   Okay.
2             Did they have
3   atherosclerosis?
4        A.   No.  They were healthy men.
5        Q.   And can you tell us who
6   funded this particular study?
7        A.   Merck of Poland.
8        Q.   Let's go on to the next --
9        A.   And in fairness, the Polish
10  State Research Council.
11       Q.   Let's discuss the 2001
12  Advisory Committee for a moment.  Do you
13  have that transcript there?  I believe
14  it's the big one there.
15       A.   Okay.
16       Q.   I'd like to take you through
17  some things here.
18            First of all, I would like
19  to orient the jury.  This was an Advisory
20  Committee that was held in February of
21  2001 to discuss the VIGOR data?
22       A.   Yes.
23       Q.   First of all, tell us a
24  little bit about Advisory Committees.

Page 892

1        Are they -- how many drugs do they see
2   over the course of sitting as an Advisory
3   Committee?
4        A.   It will vary.  Sometimes
5   they will see a bunch at one sitting.
6   Sometimes they will focus just on one
7   drug.
8        Q.   And over a period of time,
9   how long do advisors sit?
10       A.   You mean how long is their
11  term?
12       Q.   Yes.
13       A.   Or how long are the
14  meetings?
15       Q.   How long is their term?
16       A.   I actually don't know.
17       Q.   Okay.
18            And do they typically
19  receive a packet of information prior to
20  going in and sitting and hearing
21  presentations?
22       A.   Yeah.  But sometimes it's
23  just like the day before.
24       Q.   And how much information do

Page 893

1   they actually get if you're typically
2   speaking?
3        A.   Well, again, it varies.
4   Sometimes they get a ream that colleagues
5   of mine who are on these committees say
6   they can't possibly get through.
7   Sometimes they get just a small packet.
8        Q.   And who typically presents
9   at these Advisory Committees?
10       A.   There will often be somebody
11  from FDA presenting.  There will often be
12  somebody from the company presenting.
13  And sometimes they even have patients
14  presenting.
15       Q.   Now, looking at the Advisory
16  Committee of 2001, this would have been
17  approximately a year after Merck became
18  aware of the VIGOR results?
19       A.   Right.
20       Q.   And would you go to the
21  transcript at Page 5, if you could.
22            First of all, it's a
23  presentation by Dr. Goldman.
24       A.   Okay.

115  (Pages 890 to 893)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

**Page 894**

1    Q.   And Dr. Goldman, I'll
2   represent to you, is the Merck
3   representative.
4    A.   Right.
5    Q.   Do you see where it says,
6   "We believe that the highly significant
7   results from VIGOR mirrored a
8   modification of the product label to
9   reflect a more appropriate presentation
10   of the demonstrated GI safety benefits
11   that is specific to Vioxx"?
12    Do you see that?
13    MR. BECK:  I'm going to
14   object.  This is beyond the scope
15   of cross, and it really may
16   require redirect if we're going to
17   get into brand new subject
18   matters.
19    MR. TISI:  I'm really not,
20   but you did talk about the
21   Advisory Committee.
22    MR. BECK:  The only thing
23   that I talked was Page 206.
24    MR. TISI:  I understand

**Page 895**

1   where you're going there, but let
2   me get to the primary question and
3   then we can move on.
4    THE WITNESS:  I see that.
5   BY MR. TISI:
6    Q.   Okay.
7    Do you have any
8   understanding reading that as to what the
9   primary purpose of this Advisory
10   Committee was?
11    A.   Well, sure.  Not just from
12   that paragraph, but from having reviewed
13   the transcript, the question, as well as
14   the rest of the history.  The question
15   was whether the official labeling of
16   Vioxx was going to be revised to include
17   in it information about Vioxx having a
18   greater safety on the GI tract compared
19   to other drugs.
20    Q.   Okay.
21    Now, could you turn to the
22   deposition -- the presentation by Dr.
23   Alise Reicin.  Do you remember looking at
24   that?

**Page 896**

1    A.   Yes.  Is that in here at a
2   certain page?
3    Q.   Yeah, it begins somewhere
4   around Page 50.
5    Let me ask you generally.
6   Do you ever remember Dr. Reicin telling
7   the members of the Advisory Committee
8   that there was an imbalance in cardiac
9   death in the Alzheimer's trials 8 to 2?
10    MR. BECK:  Object.
11    THE WITNESS:  I don't
12   recall.
13    MR. BECK:  Way outside the
14   scope any of cross-examination.
15    MR. TISI:  Well, it goes to
16   what the medical advisors knew
17   when they made certain
18   recommendations, Counsel.
19    THE WITNESS:  I don't recall
20   having seen that information ever
21   being presented to the Advisory
22   Committee.
23   BY MR. TISI:
24    Q.   Do you know whether or not

**Page 897**

1   they were told that there was excess
2   mortality in the Alzheimer's trial 30 to
3   10?
4    MR. BECK:  Is this by Dr.
5   Reicin or in the --
6    MR. TISI:  By Dr. Reicin.
7    MR. BECK:  -- materials
8   provided by the FDA?
9    MR. TISI:  By anybody.
10    THE WITNESS:  What do you
11   mean 30 to 10, the ratio of
12   deaths?
13   BY MR. TISI:
14    Q.   The ratio of deaths, 30 to
15   10.
16    A.   I don't recall seeing that
17   information having been transmitted to
18   the Advisory Committee.
19    MR. TISI:  Doctor, I'm going
20   to show you what I would like to
21   have marked as Exhibit Number 57
22   -- 60.
23    - - -
24    (Whereupon, Deposition

116  (Pages 894 to 897)

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 898

1    Exhibit Avorn-60, Emails, was
2    marked for identification.)
3       - - -
4  BY MR. TISI:
5    Q.   And we don't have this for
6  the jury to put up on the screen, and I
7  apologize.
8       MR. BECK:  Do you have one
9    for me?
10       MR. TISI:  But I do have one
11   for counsel.
12       MR. BECK:  This is exhibit
13   what?
14       THE COURT REPORTER:  60.
15       MS. DAGOSTINO:  60.
16  BY MR. TISI:
17    Q.   If you don't mind me walking
18  you through this e-mail, Doctor.
19    A.   Sure.
20    Q.   First of all, this is an
21  internal e-mail from Merck dated January
22  29th, 2001; is that correct?
23    A.   That's right.
24    Q.   And is this before the

Page 899

1  February 8th Advisory Committee?
2    A.   About a week before.
3    Q.   Okay.
4       And do you see the first,
5  the e-mail from Dr. Shapiro to, among
6  other things, Alise Reicin?
7    A.   Which one is that, that you
8  want me to look at?
9    Q.   The very top of the page.
10    A.   The top one.
11    Q.   Uh-huh.  Do you see that?
12    A.   From Dr. Shapiro to Dr.
13  Reicin, yes.
14    Q.   Yes.
15       And that's the same Dr.
16  Reicin that made the presentation to the
17  Advisory Committee --
18    A.   Right.
19    Q.   -- and who came up to see
20  your people at Harvard?
21    A.   That's right.
22    Q.   Okay.
23       Do you see where Dr. Reicin,
24  in looking at the last couple of

Page 900

1  sentences of the e-mail, says that there
2  is a 30 to 10 imbalance in deaths in the
3  Alzheimer's trials?
4       MR. BECK:  I'm going to
5    object.  Way beyond the scope of
6    anything on cross-examination.
7       THE WITNESS:  Yes.  30 to
8    10.
9  BY MR. TISI:
10    Q.   Okay.
11       Is that the kind of
12  information --
13       Do you know whether that
14  information was ever shared with the
15  members of the Advisory Committee?
16    A.   I don't believe it was.
17       MR. BECK:  Objection, asked
18    and answered, and beyond the scope
19    of cross-examination.
20  BY MR. TISI:
21    Q.   Doctor --
22       MR. BECK:  These are brand
23    new areas, Counsel.
24       MR. TISI:  These are not

Page 901

1    brand new areas.  You asked a lot
2    of questions, Phil, about what the
3    Advisory Committee knew when it
4    made certain recommendations.
5  BY MR. TISI:
6    Q.   Let me ask you --
7    A.   I didn't get to answer that
8  question.
9    Q.   Can you answer it, please?
10    A.   To my knowledge, that
11  information was never shared with the
12  Advisory Committee as it was thinking
13  about the labeling.
14    Q.   Have you reviewed what has
15  been known as the Shapiro meta-analysis?
16    A.   Yes.
17    Q.   Okay.
18       Could you tell the members
19  of the jury what that was?
20       MR. BECK:  I'm going to
21    object.  It's beyond the scope of
22    anything in the cross-examination.
23       THE WITNESS:  Sure.  Dr.
24  Deborah Shapiro was a

117 (Pages 898 to 901)

Confidential - Subject to Protective Order

Page 902

1  biostatistician, I believe, who
2  worked for Merck, and she was
3  asked to pull together an overview
4  of all of the studies of -- all
5  the clinical studies of Vioxx that
6  was presented at some Merck
7  management meeting, and I had
8  occasion to review the data from
9  that report.
10  BY MR. TISI:
11      Q.   And what did that data show
12  you --
13         And I'll represent to you
14  that that data was compiled and shared
15  within Merck in the fall of 2000 before
16  this Advisory Committee.
17      A.   Right.
18         MR. BECK:  I'm going to
19  object.  This was the subject of
20  questioning on direct-examination.
21         MR. TISI:  I don't think I
22  asked it on direct-examination,
23  Counsel, at all.
24         MR. BECK:  It was not the

Page 903

1  subject of anything on
2  cross-examination whatsoever.
3         MR. TISI:  No.  But your --
4         MR. BECK:  It's beyond the
5  scope of cross.
6         MR. TISI:  Your questions
7  about what the Advisory Committee
8  recommended and did not recommend,
9  it was placed into issue here,
10  Counsel.
11         THE WITNESS:  My
12  recollection was that that was an
13  analysis that was done once VIGOR
14  and ADVANTAGE and 090 and a number
15  of other studies had been
16  completed, and it was an overview
17  of the relative events in Vioxx
18  versus the various comparator
19  groups.  And there is a summary
20  slide that I've looked at that if
21  you have --
22  BY MR. TISI:
23      Q.   Can you look at your report
24  and find out where that is?

Page 904

1      A.   Sure.  I mean, I shouldn't
2  say sure.  I think so.
3      Q.   Do you remember where there
4  was a heart attack-only meta-analysis in
5  Dr. Shapiro's presentation --
6      A.   Yes.
7      Q.   -- within Merck?
8      A.   Yes.
9         MR. BECK:  I object.  It was
10  the subject of direct-examination.
11  It was certainly not the subject
12  of anything on cross-examination.
13  It is way beyond the scope of
14  anything on cross-examination.
15         (Witness reviewing
16  document.)
17         THE WITNESS:  Yes.  In my
18  report on Page 15 at the top, I
19  think it would be Tab 42.
20         It's my exercise for the
21  day.
22         MR. TISI:  That's okay.  I
23  want to get your blood flowing,
24  Doctor.

Page 905

1         THE WITNESS:  Well, Mr. Beck
2  is better at that.
3         MR. TISI:  It's been a long
4  day.
5         THE WITNESS:  Okay.
6         I indicated on the top of
7  Page 15 in my report, "On October
8  18th, 2000, Dr. Deborah Shapiro of
9  Merck presented a meta-analysis of
10  all the company's existing data on
11  cardiovascular outcomes from its
12  collected Vioxx clinical trials."
13  And that is here at Tab 42.
14         MR. BECK:  I'm going to
15  object to the witness reading from
16  his report.
17         MR. TISI:  Fine.  I'll
18  withdraw it.
19         THE WITNESS:  I just needed
20  to find which tab.
21  BY MR. TISI:
22      Q.   Okay.
23         Could you please pull that
24  out of your binder so we can mark it as

118  (Pages 902 to 905)

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 906

1  an exhibit, Doctor?
2      A.   Yes.  To whom shall I hand
3  it?
4      Q.   To me.
5              - - -
6          (Whereupon, Deposition
7      Exhibit Avorn-61, Document
8      entitled, "Vioxx Preliminary
9      Cardiovascular Meta-Analysis
10     dated 10.18.06" was marked for
11     identification.)
12             - - -
13  BY MR. TISI:
14     Q.   Doctor, first of all, what
15  is this?
16     A.   This is Bates Number
17  MRK-NJ0070364.  It's now marked as
18  Exhibit 61.  And it's labeled, "Vioxx
19  Preliminary Cardiovascular Meta-Analysis,
20  Dr. Deborah Shapiro, October 18th, 2000."
21     Q.    So, that would have been
22  before the Advisory Committee raised
23  their hands and made any kind of
24  recommendations on labeling changes that

Page 907

1  Mr. Beck asked you about?
2      A.   Months before.
3      Q.   Do you know whether or
4  not -- and what did that analysis -- did
5  they do an analysis --
6          Did Dr. Shapiro do a
7  meta-analysis of MI-only events seen in
8  the Vioxx clinical trials?
9      A.   Yes.
10         MR. BECK:  Object.  Beyond
11     the scope of cross-examination.
12  BY MR. TISI:
13     Q.   What did Dr. Shapiro present
14  within Merck in October of 2000?
15         MR. BECK:  Object, beyond
16     the scope of cross-examination.
17         THE WITNESS:  The MI
18     endpoint of rofecoxib or Vioxx
19     versus nonsteroidals.  And there's
20     a summary of a variety of the
21     studies with the number of
22     patients in them, the number of
23     patients who had events, and the
24     rates, and then the relative

Page 908

1          risks, which is the risk of the
2          event in Vioxx compared to the
3          nonsteroidal drug that it was
4          compared to.
5  BY MR. TISI:
6      Q.   Okay.
7          And what does it indicate?
8          MR. BECK:  Object, beyond
9      the scope of cross-examination.
10         MR. TISI:  How about if I
11     just give you a continuing
12     objection to this, Phil?
13         MR. BECK:  I'll just keep
14     making it.
15  BY MR. TISI:
16     Q.   All right.  Go ahead.
17     A.   The first row is all
18  patients, which I assume is a summary of
19  everything else on the slide.  And
20  basically it says relative risk 2.02 with
21  a confidence interval of 1.44 to 3.55,
22  which basically means a doubling of risk
23  of heart attacks in the overview of all
24  the studies that Dr. Shapiro of Merck

Page 909

1  evaluated, which, interestingly, was
2  almost exactly the same number as the
3  APPROVe study in many years would find.
4          And then she subdivides that
5  into other studies, specific studies.
6  So, VIGOR, and she then has a five-fold
7  increase in heart attacks listed for
8  VIGOR.  ADVANTAGE, she has a 2.95 or
9  almost a three-fold increase in heart
10  attacks in the ADVANTAGE study.  One
11  called RA has a relative risk of 1.82 or
12  almost a doubling of risk.
13         I think this is probably a
14  summary of all the RA studies, that is,
15  all the rheumatoid arthritis studies.
16  And the next line is non-RA, which, I
17  guess, is the non-rheumatoid arthritis
18  studies, and that has a relative risk of
19  1.68 or a 68 percent increase.  And then
20  the last line is 0A-069, and that has a
21  lower number of 0.55.
22     Q.   Now, Doctor, looking at the
23  overall results, is that, that greater
24  than 2.0, is that the level that Dr.

Page 910

1  Strom in his book that Mr. Beck put in
2  front of you is highly significant?
3      MR. BECK: Object.
4  BY MR. TISI:
5      Q.  Is that the same 2.0 or
6  greater?
7      MR. BECK: Object. Beyond
8      the scope of cross,
9      mischaracterizes what the evidence
10     was.
11     THE WITNESS: It's a
12     doubling of risk, and that is in
13     the category -- it's slightly
14     greater than a doubling of risk,
15     and that is in the category that,
16     according to Dr. Strom's textbook,
17     would be categorized as an
18     important big deal.
19  BY MR. TISI:
20     Q.  And going back to the
21  Advisory Committee which --
22     MR. BECK: I'm going to move
23     to strike because the witness has
24     also mischaracterized what Dr.

Page 911

1      Strom's book talked about in terms
2      of .2 relative risk.
3  BY MR. TISI:
4      Q.  Going back to the Advisory
5  Committee which raised its hand and Mr.
6  Beck asked you questions about what they
7  recommended and why they recommended, the
8  basis of their recommendations, was Dr.
9  Shapiro's analysis, to your knowledge,
10  shared by Dr. Reicin before the Advisory
11  Committee when they raised their hand and
12  made their votes?
13     MR. BECK: Object, beyond
14     the scope of cross.
15     THE WITNESS: To my
16     knowledge, none of this
17     information was shared with the
18     Advisory Committee by Merck.
19  BY MR. TISI:
20     Q.  Now, if you'd go to Page 122
21  of that transcript, if you could.
22     A.  Yes. Let me get rid of this
23  binder.
24     Q.  And this is the presentation

Page 912

1  of Dr. Villalba?
2      A.  On what page? I'm sorry.
3      Q.  Page 122.
4      A.  Got it.
5      Q.  Mr. Beck asked you about
6  some of the presentations that were made
7  at the Advisory Committee. I think he
8  asked you about Dr. Nissen?
9      A.  Yes.
10     Q.  Dr. Villalba is the medical
11  officer at the Food & Drug Administration
12  who looked at the data?
13     A.  Yes.
14     Q.  Okay.
15     Could you go to Page 122 and
16  read the sentence on page -- on lines 11
17  through 14, which is Dr. Villalba's
18  statement?
19     A.  Yes. "Therefore, it is not
20  very convincing to us that this is the
21  whole explanation." And I should look
22  back and see what the "this" is.
23     (Witness reviewing
24     document.)

Page 913

1      Okay. The "this" that she
2  is referring to is the
3  cardioprotective effect of
4  naproxen that is being discussed.
5  So, she says on Line 11,
6  "Therefore, it is not very
7  convincing to us that this" (the
8  cardioprotective effect of
9  naproxen) --
10     MR. BECK: I'm sorry, did I
11  object on the ground that this is
12  beyond the scope?
13     MR. TISI: No, but I'll give
14  it to you.
15     THE WITNESS: "It is not
16  very convincing to us this"
17  (naproxen business) "is the whole
18  explanation, and there are no
19  controlled studies of naproxen
20  versus placebo for cardiovascular
21  prophylaxis" or protection.
22  "There are some available
23  placebo-controlled studies with
24  aspirin and I would really

120  (Pages 910 to 913)

Page 914

1  challenge the cardiologists here
2  to explain to me how this
3  correlates with what we know from
4  those data."
5  BY MR. TISI:
6      Q.   Now, can you please go to
7  Page 124. Again, Dr. Villalba is
8  referring to the Alzheimer's studies?
9      A.   Yes.
10     Q.   Do you see Page 2 to 9,
11 where she's --
12     A.   You mean line 2 to 9?
13     Q.   2 to 9, where she referred
14 to the Alzheimer's studies that Mr. Beck
15 had asked you about and their relevance
16 to the cardiovascular safety of Vioxx?
17     A.   You mean in relation to the
18 conclusion the Advisory Committee came to
19 about the labeling?
20     Q.   Yes. Can you tell me what
21 she says about the power of the
22 Alzheimer's study to detect
23 cardiovascular differences compared to
24 placebo?

Page 915

1      A.   Yes.
2          MR. BECK:  Object, beyond
3  the scope.
4          THE WITNESS:  The number
5  of -- I'm quoting here.
6          "The number of patients
7  included in those studies," the
8  Alzheimer's studies, "was less
9  than 1,000 patients per arm, the
10 two of them together. Therefore,
11 these studies were not powered to
12 show any difference with placebo.
13 I will not make any conclusions
14 about those placebo studies and
15 Alzheimer's disease."
16         MR. BECK:  Just to wrap it
17 up here, would you read the next
18 sentence?
19         MR. TISI:  Yeah, when he
20 goes back on.
21         THE VIDEOTAPE TECHNICIAN:
22 This is the end of Tape Number 4.
23 The time is 6:18. We're off the
24 record.

Page 916

1          - - -
2          (Whereupon, a recess was
3  taken from 6:18 p.m. until
4  6:21 p.m.)
5          - - -
6          THE VIDEOTAPE TECHNICIAN:
7  We're back on the record. This is
8  Tape Number 5. The time is 6:21.
9  BY MR. TISI:
10     Q.   I think Mr. Beck wanted you
11 to read the next sentence, if you could.
12     A.   Yes. Is that the sentence
13 beginning "Also"?
14         MR. BECK:  Yes.
15         THE WITNESS:  "Also the dose
16 that was used in that study was 25
17 milligrams, not 50 milligrams."
18         MR. BECK:  And before you
19 move on, while I object that this
20 is beyond the scope, if you are
21 going to quote this selectively
22 from this paragraph of the
23 testimony, I think it should also
24 be included that the sentence

Page 917

1  actually began with the words, "I
2  did not include in the slide the
3  Alzheimer's studies, and I have
4  not reviewed those studies," and
5  then the rest of what the witness
6  read --
7          MR. TISI:  Fair enough.
8          MR. BECK:  -- was said.
9          MR. TISI:  Fair enough.
10 BY MR. TISI:
11     Q.   So, in fairness, the
12 Advisory Committee was not presented with
13 the data from the Alzheimer's studies,
14 correct?
15         MR. BECK:  I'm going to
16 object. That's leading and false.
17         MR. TISI:  Then I'll
18 withdraw it.
19         MR. BECK:  What --
20         MR. TISI:  I'll withdraw it.
21         MR. BECK:  What the witness
22 said --
23         MR. TISI:  I'll withdraw it.
24 I'll withdraw it. I can't do

1   anything more than that. I'll
2   withdraw it.
3        MR. BECK: I stopped talking
4   as soon as you said it.
5   BY MR. TISI:
6        Q.   Who is Doctor --
7             Do you know whether or not
8   Dr. Wofsy was a member of the panel?
9        MR. BECK: Object, beyond
10  the scope.
11        THE WITNESS: I think so,
12  but I'm not sure.
13  BY MR. TISI:
14        Q.   Okay.
15             I will represent to you that
16  Dr. Wofsy was indeed one of the advisors.
17             Could you please go to Page
18  130?
19        A.   Okay.
20        Q.   Do you see in the middle of
21  the page where Dr. Wofsy says, "I am
22  concerned that the reduction" --
23        A.   Wait, I'm sorry. On 130, I
24  don't have a Wofsy. I have Dr. Harris,

1   Dr. Wolfe.
2        MR. BECK: There's Dr.
3   Brinker at the top.
4        MR. TISI: Let me see it.
5   Maybe I wrote down the wrong page.
6   I'll just move on.
7        THE WITNESS: Okay.
8   BY MR. TISI:
9        Q.   I'd like you to go to Page
10  195.
11        A.   Got it.
12        Q.   This is the testimony --
13  this is the statement of Dr. Nissen, and
14  that would have been the same Dr. Nissen
15  that Mr. Beck referred you to?
16        A.   That's right.
17        Q.   Okay.
18             Do you see where he says,
19  "So, the real question"? Do you see
20  that?
21        A.   Yes.
22        Q.   Would you please read that
23  paragraph?
24        A.   Sure. "So, the real

1   question for us is how do we communicate
2   the message from the trials that we have
3   heard in a fair, balanced way that allows
4   a clinician to weigh the risks and
5   benefits of the classes of drugs
6   available to them and choose a drug that,
7   in their" hearts I think he means, "and
8   their conscience, is the best drug for
9   that individual patient? So, I favor
10  statements of facts in the labeling as we
11  know them. I like the way you, Allan,
12  revised my comments about what do we
13  know. We know that for this population
14  the naproxen event rates in the GI tract
15  were higher than they were for rofecoxib,
16  and we know that the cardiovascular event
17  rates were higher for rofecoxib than they
18  were for the comparator.
19        "So, I think that what we
20  really need to do is provide some kind of
21  a balanced view of what the study showed
22  and then let the physicians use their
23  clinical judgment to pick the agents they
24  think make the most sense for their

1   individual patients. Beyond that we
2   can't guess at what another comparator
3   would have shown because we don't have
4   that data and we are not likely to have
5   it in the near future or even at any time
6   in the future."
7        Q.   Now, do you know whether or
8   not Dr. Nissen had available to him the
9   085 study that you testified before?
10        MR. BECK: Object, calls for
11   speculation.
12  BY MR. TISI:
13        Q.   090. Excuse me.
14        MR. BECK: Beyond the scope
15   of cross-examination.
16        THE WITNESS: I have no way
17   of knowing whether he has -- had
18   090 available to him.
19  BY MR. TISI:
20        Q.   How about ADVANTAGE?
21        MR. BECK: I object. It's
22   beyond the scope.
23        THE WITNESS: I believe that
24   there was a problem with the data

122 (Pages 918 to 921)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 922

1    from ADVANTAGE not getting to the
2    FDA in a way that FDA considered
3    timely.
4    BY MR. TISI:
5        Q.   Now, so, my question is, as
6    a general concept, do you believe that
7    clinicians ought to be able to weigh the
8    risks and the benefits that are available
9    to them?
10       A.   Yes.
11           MR. BECK:  I'm sorry, was
12       that a question?
13           MR. TISI:  Yes.
14           MR. BECK:  I object.  It's a
15       repetition of the
16       direct-examination and beyond the
17       scope of anything on
18       cross-examination.
19   BY MR. TISI:
20       Q.   Now, as a result of the
21   Advisory Committee, the FDA did make a
22   recommendation to Merck, did it not?
23       A.   Yes.
24       Q.   And when it did, did it ask

Page 923

1    that a warning for cardiovascular events
2    be included in the label?
3            MR. BECK:  I object.  This
4        is an almost word-for-word repeat
5        of direct-examination, beyond the
6        scope of cross-examination, and is
7        also hearsay.
8            THE WITNESS:  Yes, they did.
9        The documents I reviewed indicated
10       that was a request.
11   BY MR. TISI:
12       Q.   And was that ever done?
13           MR. BECK:  Object.  It is a
14       complete repeat of
15       direct-examination, beyond the
16       scope of cross-examination, I
17       didn't talk about the subject at
18       all, and calls for hearsay.
19   BY MR. TISI:
20       Q.   Was it ever done?
21       A.   It was never done, to my
22   knowledge.
23       Q.   He asked you -- Mr. Beck
24   asked you many questions about Dr. Topol

Page 924

1    and Dr. Nissen.
2        A.   Right.
3        Q.   Have you read Dr. Topol and
4    Dr. Nissen's public articles concerning
5    Vioxx?
6        A.   Sure.
7        Q.   What is your impression, if
8    any, of their view about the risks and
9    benefits of Vioxx?
10           MR. BECK:  I'm going to
11       object.  Asking this witness to
12       give his impression of the views
13       of other doctors --
14           MR. TISI:  Then let me
15       rephrase it.
16           MR. BECK:  -- is both
17       hearsay.  It's improper.
18           MR. TISI:  Then let me
19       rephrase it.
20           MR. BECK:  Are you
21       withdrawing it?
22           MR. TISI:  No.  I'm going to
23       rephrase the question.
24           THE WITNESS:  I can discuss

Page 925

1    my conversation with Eric Topol at
2    the Institute of Medicine about
3    the topic.
4    BY MR. TISI:
5        Q.   Actually, let me ask you the
6    question, Doctor.
7            Since you were asked on your
8    cross-examination about Dr. Nissen and
9    Dr. Topol, I'm going to ask you this
10   question.
11           Having read -- having read
12   their scholarship on and their articles
13   on Vioxx --
14       A.   Yes.
15       Q.   -- how would you
16   characterize their scholarship in terms
17   of the risks and benefits of Vioxx?
18           MR. BECK:  I'm going to
19       object.  Hearsay, calls for
20       characterization and is beyond the
21       scope of cross-examination.
22           THE WITNESS:  I think a fair
23       summary of what they have written,
24       and that's what I do, I summarize

123  (Pages 922 to 925)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 926

1 the literature and look at what
2 particular papers say viewed in
3 the aggregate, is that both of
4 them for years have expressed
5 grave concerns about the safety of
6 Vioxx.
7 BY MR. TISI:
8 Q. You were asked about your
9 paper. You spent some time on that
10 today?
11 A. Yes.
12 Q. Your paper being the
13 Merck-funded study of myocardial
14 infarction --
15 A. Right.
16 Q. -- and Vioxx?
17 A. Right.
18 MR. BECK: I object.
19 Leading and characterization,
20 speeches by lawyers rather than
21 asking questions.
22 MR. TISI: Well, I wanted to
23 make sure we're talking about the
24 right study, but fair enough.

Page 927

1 MR. BECK: How about doing
2 it by exhibit number then?
3 MR. TISI: Fair enough.
4 BY MR. TISI:
5 Q. Exhibit number, I think it
6 is Number 7?
7 A. Correct.
8 MR. BUCHANAN: We've
9 indulged a lot of speeches today,
10 Counsel. I think that's --
11 THE WITNESS: Correct.
12 BY MR. TISI:
13 Q. Okay.
14 Turning to your study.
15 First of all, is the concept that you
16 referred to, the "depletion of the
17 susceptibles," a generally accepted
18 concept in epidemiology?
19 A. Yes.
20 MR. BECK: Excuse me. I
21 need to --
22 MR. TISI: A generally
23 accepted concept -- generally
24 accepted principle of

Page 928

1 epidemiology.
2 MR. BECK: I didn't -- I
3 couldn't understand the first half
4 of the sentence.
5 MR. TISI: "Depletion of the
6 susceptibles."
7 BY MR. TISI:
8 Q. You talked about that
9 concept with Mr. Beck.
10 MR. BECK: I'm going to
11 object. It's beyond the scope.
12 We certainly did not talk about
13 that concept.
14 BY MR. TISI:
15 Q. Did we talk about that
16 concept?
17 A. We talked about the absence
18 of an effect beyond 90 days, and I
19 honestly can't recall whether we talked
20 about that term.
21 Q. Okay.
22 What was your explanation of
23 why you did not see a risk after 90 days
24 when you were asked that question by Mr.

Page 929

1 Beck?
2 MR. BECK: I'm going to
3 object. I think if there's ever a
4 question that was asked and
5 answered, it's this one.
6 MR. TISI: Well, I'm trying
7 to --
8 THE WITNESS: Okay.
9 Whether or not I used the
10 term "depletion of susceptibles,"
11 I certainly said to Mr. Beck that
12 our understanding of the failure
13 to see an effect after 90 days was
14 that in an observational study
15 where we're not controlling who
16 takes what drug, patients who were
17 going to get into trouble with
18 Vioxx, many of them had already
19 done so by 90 days or had had
20 related side effects to cause them
21 to drop out of the study, and that
22 is what I believe explains
23 why we did not see an effect after
24 90 days, even though it is now

124 (Pages 926 to 929)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 930

1    well known that there is an effect
2    after 90 days.
3  BY MR. TISI:
4    Q.   Is there a --
5        MR. BECK:  Object.  Move to
6    strike as nonresponsive.
7  BY MR. TISI:
8    Q.   Is there a scientific or
9  epidemiologic term for that phenomenon --
10   A.   Yes.
11   Q.   -- that you just described?
12   A.   It is called "depletion of
13 susceptibles."
14   Q.   And is that something that
15 is generally recognized in the
16 epidemiologic community as a principle of
17 when you look at epidemiologic studies
18 like this?
19   A.   Yes.
20       MR. BECK:  Object, leading.
21       THE WITNESS:  Yes.  It is
22   probably even in Brian Strom's
23   textbook.
24 BY MR. TISI:

Page 931

1    Q.   Yes.
2        MR. BECK:  Object,
3    nonresponsive.
4  BY MR. TISI:
5    Q.   You mentioned that in
6  response to Mr. Beck's question that one
7  of the reasons that it might -- that
8  people may drop out in the first 30 to 90
9  days would be things like hypertension,
10 CHF, those kinds of things, just
11 referring you to testimony.  Do you
12 remember that testimony?
13   A.   Yes.
14   Q.   Okay.
15       You have done studies into
16 comparing celecoxib or Vioxx -- Celebrex
17 and Vioxx on the issue of hypertension
18 and congestive heart failure.  Have you
19 done those kinds of studies?
20   A.   That is correct.
21   Q.   Okay.
22       Would those be the same two
23 comparators that were involved in your MI
24 study that we're referring to as Exhibit

Page 932

1  Number 7?
2    A.   Yes.
3        MR. BECK:  I object.  This
4    is way beyond the scope of
5    anything in cross-examination.
6        MR. TISI:  You clearly asked
7    that question, Counsel.  Go ahead.
8    Let me --
9        MR. BECK:  What question is
10   that?
11       MR. TISI:  The question you
12   asked him --
13       MR. BUCHANAN:  He's got his
14   objections reserved.  It's late in
15   the day, and I think we're just
16   being antagonizing now.  Let's
17   move forward.
18 BY MR. TISI:
19   Q.   Okay.
20       Is there a scientific basis,
21 based upon your own studies, for your
22 conclusion that people in the first 30 to
23 90 days would drop out at a greater rate
24 compared to Celebrex because of

Page 933

1  hypertension and congestive heart
2  failure?
3        MR. BECK:  I object.  This
4    is way beyond the scope of
5    anything in cross-examination.
6  BY MR. TISI:
7    Q.   You may answer.
8    A.   Yes.  Our studies of
9  hypertension in Vioxx, as well as those
10 of others such as Dr. Whelton, indicate a
11 higher rate of patients becoming
12 hypertensive when they take Vioxx
13 compared to when they take Celebrex.
14       MR. BECK:  I'm going to
15   object and move to strike.  This
16   is a subject that Mr. Tisi chose
17   not to explore on direct,
18   hypertension, and, therefore, I
19   chose not to explore on
20   cross-examination.  And now to try
21   to shoehorn it in on redirect in
22   the guise of saying that, well, he
23   volunteered an explanation that
24   was nonresponsive on cross, and,

125 (Pages 930 to 933)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 934

1  therefore, this subject has been
2  opened up, I think is a gross
3  abuse of redirect examination.  I
4  move to strike the answer.
5      MR. BUCHANAN:  I'm going to
6  object vehemently to the lengthy
7  speeches.  We extended a far
8  greater courtesy to you and,
9  frankly, could have indulged in
10  this throughout your examination
11  today.  I think it's fairly within
12  the scope of redirect, but that's
13  for somebody else to decide.
14  BY MR. TISI:
15      Q.  Could you please go, Doctor,
16  to your methods and results section of
17  your paper that's up on the screen here?
18      A.  Yes.
19      Q.  Could you -- I think it's 4,
20  where it says .054, the p-value that Mr.
21  Beck --
22      A.  Yes.
23      Q.  -- was asking you about.
24  How many lines up is it?  My eyes are not

Page 936

1  indicated on his handwritten note that
2  Mr. Beck projected, we put the p-value
3  into the abstract, as you can see it
4  right there.
5      Q.  And for anybody who's
6  reading this article, is the p-value
7  prominently displayed for them to look
8  at?
9      A.  Sure.  It's right there.
10  It's on line -- of the blowup, it's line
11  3, just a couple of characters in.  If
12  you can highlight that.  It's right
13  there, p=.054.
14      Q.  Now, in your article in the
15  journal of the -- comments of the Journal
16  of the American Medical Association,
17  which I believe was Exhibit Number 54, if
18  you can pull that, please.
19      A.  Okay.
20          - - -
21      (Whereupon, an
22  off-the-record discussion was
23  held.)
24          - - -

Page 935

1  so good.
2      A.  No.  It's in the abstract.
3      Q.  In the abstract portion of
4  it.
5      A.  If you could just blow up
6  the bottom half of the methods section.
7      Q.  Right there.  Right there.
8      A.  Yeah, that's good.  Okay.
9          It's on Lines 2 and 3.
10      Q.  Do you see that?
11      A.  Yes.
12      Q.  You were asked some
13  questions about some suggestions by the
14  Journal of the American Medical
15  Association, about including the fact --
16  including information about statistical
17  significance.  Do you remember those
18  questions?
19      A.  Yes.
20      Q.  Did you do anything in
21  response to that particular suggestion
22  when you resubmitted the paper to
23  Circulation?
24      A.  Yes.  As Dr. Solomon

Page 937

1  BY MR. TISI:
2      Q.  Overall comments of the
3  people that investigated -- who looked at
4  the paper, the peer reviewers?
5      A.  Yes.  Do you want to
6  indicate what page you're looking at?
7      Q.  Page 2.
8      A.  Page 2 of what?  Page 2 --
9  well, yeah.  It's, I guess, Bates Number
10  3253 --
11      Q.  Yes.
12      A.  -- is probably the best way
13  to refer to it.
14      MR. BECK:  What exhibit are
15  we on now?
16      MR. TISI:  54.
17      THE WITNESS:  54.
18      MR. BECK:  Thank you.
19  BY MR. TISI:
20      Q.  First of all, just so
21  everybody understands, these are
22  anonymous peer reviewers who look at
23  manuscripts that are submitted for
24  publication.  Is that fair?

126  (Pages 934 to 937)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 938

1     A.  Right.
2     Q.  So, you don't know who these
3   people are?
4     A.  Right.
5     Q.  You don't know whether they
6   -- who they work for, what their academic
7   or affiliation is, nothing?
8     A.  Right.  Just experts in the
9   field.
10    Q.  Okay.
11        Now, what is the result --
12  what does the first author say about the
13  manuscript as a general matter?
14    A.  You mean the --
15        MR. BECK:  I'm going to
16  object.
17  BY MR. TISI:
18    Q.  The first peer reviewer.
19        MR. BECK:  Hearsay and
20  characterization by this witness
21  about generally --
22        MR. TISI:  Phil, I'll make
23  you an offer.  You want to
24  withdraw your questions about this

Page 939

1   document, I won't ask any
2   questions about it.
3         MR. BECK:  Mr. Tisi, what I
4   did is I directed him to specific
5   language that reviewers use, and
6   you're asking him to give a
7   general characterization --
8         MR. TISI:  Okay.
9         MR. BECK:  -- of what
10  somebody else said.
11        MR. TISI:  Fair enough.
12        MR. BECK:  My objection is
13  simply that you're -- it's hearsay
14  and characterization.
15        MR. TISI:  Hearsay.  Okay.
16        THE WITNESS:  I can --
17        MR. TISI:  I agree with you
18  it's hearsay, so, we might as well
19  just take it out.  We can take it
20  out right now if you'd like.
21        MR. BECK:  You ask whatever
22  questions you want.
23        MR. TISI:  Fair enough.
24        MR. BECK:  And when you ask

Page 940

1   one witness to give me your
2   general conclusions --
3         MR. BUCHANAN:  Can we move
4   on?
5         MR. BECK:  -- about what
6   somebody else said --
7         MR. BUCHANAN:  Objection.
8         MR. BECK:  -- I'm going to
9   object.
10        MR. BUCHANAN:  The colloquy
11  is not appropriate.
12        THE WITNESS:  Okay.
13        I think in the interest of
14  time, I can just indicate that
15  reviews always start out with an
16  overview, and there's a
17  line-and-a-half overview that is
18  the reviewer's general impression.
19  I will just read the
20  line-and-a-half overview.
21        "This manuscript reports a
22  well-thought out investigation and
23  is well written and concise.
24  There are a number of probably

Page 941

1   minor issues and one major issue."
2   That's the general overview as
3   stated by the reviewer.
4   BY MR. TISI:
5     Q.  Okay.
6         Going to the next comment.
7     A.  The next reviewer, you mean?
8     Q.  Yes.  Could you please read
9   the --
10    A.  Okay.
11        Yes.  Again, the overview
12  that the reviewer presents.  "The authors
13  have conducted a large scale study with
14  appropriate analysis."
15    Q.  Keep going, please.
16    A.  "The strength of the
17  manuscript is the consistency of findings
18  for different subgroups and the
19  sensitivity analysis.  However,
20  conclusions must be tempered with caveats
21  regarding retrospective data from a
22  database, rather than a prospective
23  randomized control trial or even a cohort
24  observational study with propensity

Confidential - Subject to Protective Order

**Page 942**

1 analysis of the likelihood of receiving a
2 particular treatment."
3     Q.   Okay.
4       Now, in your study that was
5 published, did you address the
6 limitations of observational analyses?
7 Did you address the potential issues of
8 the study that you conducted with Dr.
9 Solomon?
10     A.   I believe we did that, yes.
11     Q.   Going to the next reviewer's
12 comments. I'd like to refer you to
13 the general comment that says, "The
14 study's results are interesting."
15     A.   Yes.
16     Q.   Okay.
17       "The study's results are
18 interesting, but not novel."
19     A.   Right.
20     Q.   "Previous observational
21 studies and meta-analyses have already
22 suggested a deleterious effect of
23 rofecoxib and/or a protective effect of
24 naproxen."

**Page 943**

1       Do you see that?
2     A.   Yes.
3     Q.   In fact, Doctor, is that
4 true? Was there, in fact, evidence out
5 there in the medical literature about the
6 deleterious effect of Vioxx?
7     A.   Yes. Dr. Ray's --
8     MR. BECK: Object to
9 leading.
10 BY MR. TISI:
11     Q.   Well, let me ask you that.
12     Is this reviewer correct?
13     A.   Yes. Dr. Ray's paper in
14 Lancet had, I believe, already been
15 published in 2002.
16     Q.   Let's go to your ISPE --
17     MR. BECK: On the subject of
18 completeness, since you read the
19 complete general comments of the
20 other reviewers, I would ask that
21 we also include in the record the
22 following statements where you
23 left off.
24     "The main question that

**Page 944**

1 needs to be answered in this field
2 of study is whether concomitant
3 aspirin use attenuates any of the
4 attributable cardiovascular risk
5 of rofecoxib. The authors admit
6 that aspirin use was not available
7 within the study database and
8 therefore this variable was not
9 adequately controlled for. This
10 is a major limitation of this
11 study."
12 BY MR. TISI:
13     Q.   Do you see that?
14     A.   Yes, I do.
15     Q.   And, in fact, did you study
16 that?
17     A.   Yes. In response to this
18 reviewer's comments is the paper that Dr.
19 Schneeweiss did to address that very
20 question, which we published as a
21 separate paper that, I believe, is in the
22 packet and I can just tell you which tab
23 it is.
24     Q.   Please do.

**Page 945**

1     A.   Particularly to deal with
2 that problem, and it's in tab -- I guess
3 that makes it Exhibit Number 9 that was
4 presented already today.
5     Q.   So, did you take the
6 criticisms or the suggestions --
7     MR. BECK: I want to -- are
8 you going to get to the rest of
9 the general comments or are you
10 moving on?
11     MR. TISI: Oh, I thought you
12 were done, Phil. Go ahead.
13     MR. BECK: Sure. The rest
14 of the general comments are,
15 "Moreover, the demographic data
16 suggests that patients who
17 received rofecoxib did have a
18 slightly higher risk profile than
19 the other groups. Notably,
20 patients prescribed rofecoxib were
21 more likely to have risk factors
22 for acute MI including
23 hypertension, history of prior MI,
24 history of coronary

128 (Pages 942 to 945)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 946

1 revascularization and history of
2 HRT use. Although a multivariate
3 analysis was performed, a more
4 stringent propensity analysis
5 would have strengthened the
6 findings. Finally, the patient
7 population is predominantly
8 elderly female, therefore making
9 the findings difficult to apply to
10 the general population. In fact,
11 the incidence of acute MI in the
12 control 'no exposure' group was
13 exceedingly high at 20 percent."
14 THE WITNESS: Let me address
15 those, because those --
16 MR. TISI: Let me -- I'm
17 going to ask you the question, so
18 you don't respond to his
19 objection.
20 THE WITNESS: Okay.
21 MR. BECK: That was not an
22 objection. That was --
23 MR. TISI: That's fine. I'm
24 going to ask him to respond to the

Page 947

1 whole thing.
2 MR. BECK: Okay.
3 MR. TISI: That's fine.
4 MR. BECK: All it was was a
5 reading of the --
6 MR. TISI: Well, you were
7 objecting to a selective reading,
8 and you included the entire thing,
9 and that's fair. That's fine.
10 MR. BECK: Okay.
11 BY MR. TISI:
12 Q. Doctor, when you receive
13 comments from peer reviewers like this,
14 what do you do as an academic and
15 researcher in response to this kind of
16 information?
17 A. We review each point, we
18 take them very seriously, and we
19 basically divide them into two
20 categories. One is, gee, that's a good
21 point, let's try to fix it and make it
22 better. Or sometimes we say, no, we
23 actually don't agree with that point, we
24 think it is okay the way it is, and I can

Page 948

1 explain how that is laid out.
2 Q. I'm going to ask you -- I
3 have to ask the questions, Doctor. I
4 apologize.
5 A. Good. That's all right.
6 Q. Did you, in fact, do what
7 this reviewer said? Did you look at
8 these issues that they raised?
9 A. Yes. Yes, in the case of
10 the information about concomitant aspirin
11 use, that was the paper that was Exhibit
12 9 by Dr. Schneeweiss. And then we
13 actually did not agree with the two
14 following points, and I could explain
15 why, if you'd like.
16 Q. Sure.
17 First of all, let me ask you
18 about the paper with Dr. Schneeweiss.
19 A. Yes.
20 Q. When you did the study that
21 this reviewer requested, what did you
22 find?
23 A. We found that, in fact,
24 there was -- it was a good question that

Page 949

1 the reviewer raised, but we found that
2 having gone out and looked at whether
3 Vioxx users are less likely to take
4 aspirin than Celebrex users or have other
5 characteristics like smoking or obesity,
6 we found that the groups were all, as
7 reflected in Exhibit 9, very, very
8 similar. And whatever modest differences
9 there were would have actually served to
10 reduce the apparent riskiness of Vioxx.
11 And had we had that information, Vioxx's
12 risk would have been even higher.
13 Q. Now -- and the other two
14 points that the reviewer raised, did you
15 consider them and did you find them to be
16 valid?
17 A. We thought about them very
18 carefully. And let me -- I'll take the
19 last one and then the next to last one.
20 The last one is the reviewer
21 was concerned that the patient population
22 was predominantly elderly and female and
23 said that the findings are difficult to
24 apply to the general population. Our

129 (Pages 946 to 949)

56ae81f3-615a-41a4-af82-acf966afcfcb

Page 950

1  response to that was, this is a very
2  important population of patients who take
3  Vioxx. In fact, most users of Vioxx are
4  elderly and female. And so even though
5  elderly females are not the general
6  population, it is a very important
7  population to understand the risks of
8  Vioxx in. And that is why we have a high
9  heart attack rate in our population of
10 patients, because these are elderly
11 females.
12       Moving above, the point
13 about whether or not we were able to
14 adjust for differences in rates of
15 hypertension, history of prior MI,
16 history of coronary revascularization and
17 so forth, the reviewer says, "Although a
18 multivariate analysis was performed, a
19 more stringent propensity analysis would
20 have strengthened the findings."
21       I believe that's actually
22 not something I would agree with. We've
23 published papers on the relative capacity
24 of propensity score analysis, which is a

Page 951

1  fancy statistical test, compared to
2  multivariate analysis, which is another
3  fancy statistical test, to be able to
4  correct for these kinds of differences in
5  groups.
6       Dr. Alan Brookhart and
7  Dr. Til Sturmer in my group and I have
8  published papers, and I could provide the
9  references, about propensity score
10 analysis versus multivariate analysis.
11 And I believe that we are right and the
12 reviewer was not right on that point,
13 that, in fact, there is very good
14 evidence from our work and that of other
15 groups that propensity score analysis
16 does not necessarily give you better
17 control for confounding than multivariate
18 analysis. And that's a three-hour
19 lecture, but that's our response to that,
20 that we understand his or her position,
21 we don't agree with that point, and we
22 published to that effect in other
23 contexts.
24       Q.   Doctor, you were asked some

Page 952

1  questions about the educational materials
2  that were provided?
3       A.   Yes.
4       Q.   I'm handing you Exhibit
5  Numbers 56 and 57.
6       A.   Yes.
7       Q.   First of all, when you wrote
8  these educational materials to -- I'm
9  sorry.
10       When you approved --
11       A.   Yes.
12       Q.   -- their use at the Brigham,
13 were you aware of the kinds of evidence
14 that you saw in connection with your role
15 as an expert in this case?
16       A.   No. Like the Advisory
17 Committee, there was a lot of information
18 that I wished I'd had, but I didn't have
19 at the time.
20       MR. BECK:  Move to strike
21       that answer as nonresponsive and
22       volunteered characterization.
23 BY MR. TISI:
24       Q.   Then let me reask it.

Page 953

1       Did you have the information
2  that you have been made aware of during
3  the course of this litigation about, let
4  me ask you, trial 090? Did you know
5  that?
6       A.   No, I did not have that
7  information.
8       Q.   Did you know of the results
9  of the ADVANTAGE trial that you now know?
10       A.   I did not have that
11 information.
12       Q.   Did you know of the results
13 of the Alzheimer's study that you now
14 know?
15       A.   Right. There was no way I
16 could have seen that information.
17       Q.   Did you know that in the
18 Alzheimer's study there was an imbalance
19 of cardiovascular deaths, 8 to 2? Did
20 you know that?
21       A.   That information was never
22 made available.
23       Q.   If you had had the totality
24 of the information that you now know, how

Confidential - Subject to Protective Order

Page 954

1 much stronger would these documents have
2 been --
3          MR. BECK:  Object.
4 BY MR. TISI:
5    Q.   -- if at all?
6          MR. BECK:  Object.  Calls
7    for speculation and is vague.
8          THE WITNESS:  Well, let me
9    answer as to fact rather than --
10 BY MR. TISI:
11    Q.   Actually, let me rephrase
12 the question.
13    A.   Okay.
14    Q.   Is that the kind of
15 information that you as a doctor helping
16 make decisions about what goes on a
17 pharmaceutical and therapeutics committee
18 at the Brigham hospital would have wanted
19 to know when you were making decisions
20 about patients in your hospital?
21          MR. BECK:  Again, object,
22    speculative and vague.  My
23    objection is over.
24 BY MR. TISI:

Page 955

1    Q.   You may answer.
2    A.   Okay.
3          If a drug doubles the risk
4 of death, I would want to know that as a
5 member of the pharmacy and therapeutics
6 committee, because I would not be
7 comfortable having that drug on our
8 formulary unless it had some incredible
9 beneficial property that would outweigh
10 the doubling of the risk of death.
11    Q.   By the way, Doctor, since
12 Mr. Beck asked you some questions about
13 what your opinions are in this time
14 frame --
15    A.   Yes.
16    Q.   -- this would have been
17 2003, about that time frame?
18    A.   Yes.
19    Q.   When did you write your book
20 Powerful Medicines?
21    A.   2002 and 2003.
22    Q.   Did you address what you
23 believed in the book to be -- whether or
24 not Vioxx was a cause of heart attack?

Page 956

1    A.   Yes.
2          MR. BECK:  Object.  I didn't
3 ask a single question about --
4          MR. TISI:  No.  But you
5 asked him what his state of mind
6 was.
7          MR. BECK:  Excuse me.  I
8 object.  I didn't ask him a single
9 question about his book.
10          MR. TISI:  But you did ask
11 him what his state of mind was in
12 the 2002 time --
13          MR. BECK:  Can I have a copy
14 of whatever it is you're referring
15 to?
16          MR. TISI:  Sure.  And I will
17 refer you to the --
18          MR. BECK:  What pages are
19 you referring to?
20          MR. TISI:  202.
21 BY MR. TISI:
22    Q.   Doctor, you wrote this in
23 the 2002/2003 time frame, which would
24 have been about the time that you were

Page 957

1 writing these or editing these particular
2 things for the Brigham?
3    A.   Right.
4    Q.   Would you tell us, sir, what
5 you wrote in that time frame about the
6 risk of heart attack based upon your
7 understanding of the evidence?
8    A.   Yes.
9          MR. BECK:  I'm going to
10 object.  Beyond the scope of
11 cross-examination.
12          THE WITNESS:  The first full
13 paragraph on Page 202, "As for the
14 products in question:" which is
15 the COX-2 inhibitors, "Years of
16 clinical research and experience
17 have confirmed that the coxibs,"
18 or COX-2 inhibitors, "are no more
19 effective than older drugs,
20 despite massive ad campaigns that
21 subtly imply otherwise.  And while
22 the coxibs do reduce gastric
23 bleeding somewhat, this advantage
24 appears to be modest.  Then, of

131 (Pages 954 to 957)

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidenti - Subject to Prote tive Order

Page 958

1  course, came the findings that
2  these medications can increase the
3  risk of heart attack and stroke."
4  BY MR. TISI:
5  Q.  Okay.
6  Stop right there.
7  A.  Now, I'm sorry, in fairness,
8  this is the paperback version, which came
9  out later.  If we have a hard cover
10  version -- the paperback came out in
11  2005.  I'd rather read from the original
12  version, which came out, which we happen
13  to have a hard cover version of.
14  MR. BECK:  So, is this -- do
15  we agree that so far this is
16  stricken?
17  MR. TISI:  Let me strike
18  that last question or two.
19  MR. BECK:  Thank you.
20  THE WITNESS:  Yeah.  Let me
21  read from the --
22  BY MR. TISI:
23  Q.  I thought this was --
24  A.  Right, right.  No.  The

Page 959

1  paperback was published later.  So, let
2  me read from Page 202 of the book as it
3  was -- came out in mid-'04, having been
4  written in 2002/2003.  Okay.  To read.
5  "As for the products in
6  question, years of clinical research and
7  experience have confirmed that the coxibs
8  are no more effective than older drugs
9  despite massive ad campaigns that subtly
10  imply otherwise.  And while the coxibs do
11  reduce gastric bleeding somewhat, this
12  advantage appears to be modest.  Concerns
13  have also emerged about other safety
14  problems, primarily for Merck's Vioxx.
15  Research led by Dr. Dan Solomon in my
16  division, as well as studies from
17  Vanderbilt University, and even Merck's
18  own clinical trial data, indicate that
19  Vioxx can increase the risk of heart
20  attack, as well as cause high blood
21  pressure.
22  "Nonetheless, extravagant
23  marketing aimed at patients and doctors
24  have made these among the most profitable

Page 960

1  drugs ever sold.  Those of us who work at
2  universities may not be very good at
3  turning ordinary things into gold, but
4  others clearly are."
5  MR. BECK:  I move to strike
6  the answer.  It was beyond the
7  scope of cross-examination.  It's
8  hearsay to have a witness read his
9  earlier writings, and the writings
10  themselves are inadmissible
11  opinions.
12  BY MR. TISI:
13  Q.  Let me ask you this, Doctor.
14  Is that an accurate
15  statement of how you felt in 2002/2003
16  before you ever became an expert witness
17  in this case?
18  MR. BECK:  I'm going to
19  object.  How he felt in 2002/2003
20  --
21  MR. TISI:  That's fine.
22  MR. BECK:  -- is completely
23  irrelevant.
24  MR. TISI:  You're right.

Page 961

1  Let me rephrase the question.  Let
2  me rephrase the question.
3  BY MR. TISI:
4  Q.  Is that an accurate
5  reflection of your opinion about the
6  relationship between Vioxx and heart
7  attack in 2002/2003?
8  MR. BECK:  And I object,
9  because the statement that was
10  read contains all sorts of
11  hyperbole on other matters that
12  are not the proper subject of
13  expert testimony by this witness.
14  This witness has already explained
15  that in the time frame he
16  considered there to be an
17  association between Vioxx and
18  heart attack.
19  MR. TISI:  You went further
20  in examining his point of view at
21  that time.
22  BY MR. TISI:
23  Q.  Let me ask you specifically
24  about the one sentence then so we can

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 962

1  cure any objection that Mr. Beck might
2  have.
3        Would you please read the
4  one sentence that begins with the word
5  "Research."
6        A.  "Research led by Dr. Dan
7  Solomon in my division, as well as
8  studies from Vanderbilt University, and
9  even Merck's own clinical trial data,
10 indicate that Vioxx can increase the risk
11 of heart attack, as well as cause high
12 blood pressure."
13       Q.  At the time and at that
14 time, were you aware of the kind of
15 evidence that you've seen in connection
16 with this case?
17       A.  Some I was aware —
18       MR. BECK:  Object, vague,
19 incomprehensible.
20       THE WITNESS:  I agree, Mr.
21 Beck.
22       Some I was aware of.
23       MR. TISI:  Then let me
24 rephrase.

Page 963

1        THE WITNESS:  And some I was
2  not aware of.
3  BY MR. TISI:
4        Q.  Let ask it again.  It's late
5  for me, too.
6        Is there information that
7  you were not aware of that you are now
8  aware of that would have changed in any
9  way your statement in your book?
10       MR. BECK:  I object.  It's
11 totally irrelevant.
12       THE WITNESS:  The
13 information that I have --
14       MR. BECK:  Beyond the scope
15 of cross-examination.
16       THE WITNESS:  The
17 information that I have become
18 aware of since the withdrawal of
19 the drug would have just made that
20 an even stronger statement.
21 BY MR. TISI:
22       Q.  Okay.
23       Now, one last line of
24 questioning, if I could.

Page 964

1        You were asked some
2  questions about Celebrex and some other
3  drugs out there.
4        A.  But before we leave the
5  Brigham, may I just clarify my beliefs as
6  of the time this document that Mr. Beck
7  asked me about was written?
8        Q.  Actually, let me ask you a
9  question about it.
10       A.  All right.
11       Q.  Is there anything about
12 these documents that Mr. Beck showed you
13 that needs to be clarified, sir?
14       A.  Yes.  If the question is,
15 what did I believe about the riskiness of
16 Vioxx or the safety of Vioxx in 2003, I
17 think probably the most relevant piece is
18 the fact that Dr. Solomon and I asked our
19 pharmacy and therapeutics committee,
20 which we both sit on, to remove high-dose
21 Vioxx from the formulary because we felt
22 that it was unnecessarily safe (sic), and
23 we questioned the decision of having
24 Vioxx be the COX-2 of choice at our

Page 965

1  hospital because we felt that at any
2  dose, it was not as safe as other
3  alternatives, and we requested the
4  hospital computer system be changed to
5  reflect that.
6        Q.  Let me see --
7        MR. BECK:  I'm going to
8  object as nonresponsive, beyond
9  the scope of cross-examination.
10       THE WITNESS:  Mr. Beck had
11 asked about Celebrex versus
12 Vioxx.
13 BY MR. TISI:
14       Q.  Let me just ask you one
15 question.  Mr. Beck asked you several
16 questions about Celebrex and other drugs
17 and their cardiovascular risks.  Do you
18 remember those questions?
19       A.  Yes.
20       Q.  What is evidence-based
21 medicine?
22       A.  That is the idea that
23 prescribing --
24       MR. BECK:  I'm going to

133 (Pages 962 to 965)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

Page 966

1  object. This was the subject of
2  direct-examination at some length,
3  and I didn't ask any questions
4  whatsoever on this subject. It's
5  beyond the scope of cross and
6  simply a repetition.
7      MR. TISI: This is just a
8  setup question, quite frankly,
9  Phil, but go ahead.
10 BY MR. TISI:
11     Q.   Let me ask you this
12 question. Based upon the evidence, what
13 is -- I'm sorry.
14     Do you have an opinion that
15 you hold to a reasonable degree of
16 medical certainty as to whether or not
17 Celebrex carries the same cardiovascular
18 risks as Vioxx does?
19     MR. BECK: I'm going to
20 object. This was the subject of
21 testimony on direct-examination,
22 not on cross. It's beyond the
23 scope, improper.
24     THE WITNESS: Yes, I do.

---

Page 967

1      And I did at the time that we
2  prepared the document educating
3  the Brigham doctors that Mr. Beck
4  asked me about.
5  BY MR. TISI:
6      Q.   And what was that opinion?
7      A.   That as of 2002/2003, there
8  was very worrisome evidence about the
9  risk of cardiovascular toxicity with
10 Vioxx, and there was --
11     MR. BECK: Excuse me. I'm
12 sorry. I have the same
13 objections.
14     MR. TISI: Sure.
15 BY MR. TISI:
16     Q.   Go ahead.
17     A.   As of 2002/2003, there was
18 evidence in place in the literature, and
19 we now know beyond that, that Vioxx
20 increased the risk of heart attack, and
21 that comparable evidence of a similar
22 magnitude was not available for Celebrex,
23 which is why, in comparing the two drugs,
24 we had petitioned our pharmacy and

---

Page 968

1  therapeutics committee to not have Vioxx
2  be the COX-2 of choice, to not allow use
3  of the high-dose drug at all, and to
4  allow doctors to use Celebrex rather than
5  Vioxx if that was their preference.
6      MR. TISI: If we can have
7  one quick moment, I think we can
8  probably wrap up in one question.
9      THE VIDEOTAPE TECHNICIAN:
10 Going off the record?
11     MR. BUCHANAN: Please.
12     THE VIDEOTAPE TECHNICIAN:
13 Off the record at 6:58.
14     - - -
15     (Whereupon, a recess was
16 taken from 6:58 p.m. until
17 7:02 p.m.)
18     - - -
19     THE VIDEOTAPE TECHNICIAN:
20 We're back on the record. The
21 time is two minutes after 7:00.
22 BY MR. TISI:
23     Q.   Dr. Avorn --
24     A.   Yes.

---

Page 969

1      Q.   -- you were asked in the
2  very beginning of your cross-examination
3  a series of questions essentially about
4  -- that there are different reasons why
5  doctor -- why companies may withdraw a
6  drug. Do you remember those lines of
7  questions?
8      A.   Vaguely.
9      MR. BECK: I object. I
10 think that mischaracterizes the
11 question.
12 BY MR. TISI:
13     Q.   Do you remember that general
14 testimony?
15     A.   I remember it was what can
16 one conclude from withdrawal of a drug.
17     Q.   Okay.
18     Let's talk about Vioxx
19 specifically.
20     A.   Okay.
21     Q.   Having reviewed the medical
22 literature, why was Vioxx withdrawn?
23     MR. BECK: I'm going to
24 object. This is beyond the scope

---

134  (Pages 966 to 969)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 970

1  of cross-examination. I didn't
2  ask any questions at all about why
3  Vioxx was withdrawn. This is just
4  an effort to have a wind-up speech
5  by the witness.
6        MR. TISI: You asked a
7  question about why drugs get
8  withdrawn, Phil.
9        MR. BECK: No, I didn't.
10       MR. TISI: You sure did.
11  We'll go back if we need to.
12  BY MR. TISI:
13     Q.   Let me reask the question.
14     Why was Vioxx withdrawn?
15       MR. BECK: I object. It's
16  beyond the scope of
17  cross-examination, also calls for
18  hearsay and speculation.
19       THE WITNESS: Because a
20  large randomized double-blind
21  placebo-controlled study conducted
22  by Merck found that the drug
23  doubled the risk of heart attack
24  and stroke compared to placebo,

Page 971

1  and it was considered too unsafe
2  for use by anybody.
3  BY MR. TISI:
4     Q.   Okay.
5     And when was that study
6  published?
7        MR. BECK: I'm going to
8  object. It's beyond the scope of
9  cross-examination and merely an
10  effort to elicit a speech at the
11  end of redirect.
12       THE WITNESS: The
13  information was first released on
14  September 30th, 2004, and the
15  paper came out several months
16  later during the course of the
17  winter, I would guess, maybe
18  around January of 2005.
19  BY MR. TISI:
20     Q.   And from 2005 to the
21  present, has the information about Vioxx
22  and that trial gotten changed in any way?
23     A.   Yes.
24       MR. BECK: Objection, beyond

Page 972

1  the scope of cross-examination,
2  designed to elicit a speech at the
3  end of redirect.
4  BY MR. TISI:
5     Q.   How has it changed, Doctor?
6     A.   In just the last week or so,
7  there has been a correction of the data
8  in that, because the original analysis
9  underestimated -- in the publication
10  underestimated the risk of the drug in
11  the first 18 months of use.
12       MR. BECK: Object and move
13  to strike. There was not a single
14  question on cross-examination on
15  this subject.
16  BY MR. TISI:
17     Q.   And, Doctor, do you have an
18  opinion as to whether or not Vioxx is an
19  unsafe drug?
20     A.   Yes, I do.
21       MR. BECK: I object. This
22  is a complete repeat of
23  direct-examination, beyond the
24  scope of cross. It's improper

Page 973

1  simply to ask for a repeat of his
2  direct-examination in order to get
3  a speech that counsel likes at the
4  end of redirect.
5        MR. BUCHANAN: That's an
6  improper objection.
7  BY MR. TISI:
8     Q.   And what is that?
9     A.   I have such an opinion, and
10  the opinion is that Vioxx is an unsafe
11  drug.
12       MR. TISI: No further
13  questions.
14        - - -
15       RECROSS-EXAMINATION
16        - - -
17  BY MR. BECK:
18     Q.   Doctor, I have a few
19  questions on one subject that Mr. Tisi
20  asked you about, and that is
21  hypertension.
22       Do you remember talking with
23  Mr. Tisi about the question of whether
24  Vioxx increases the risk of hypertension?

Golkow Litigation Technologies - 877.DEPS.USA

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

Page 974

1      A.   Yes.
2      Q.   Was hypertension and the
3  possibility that it could be caused by
4  Vioxx something that was in the Vioxx
5  label from day one?
6      A.   I have the labels here, and
7  let me just quickly look at them and I
8  can answer that.
9      Q.   Do you remember off the top
10  of your head?
11      A.   I know there was mention of
12  hypertension, but I can't tell you
13  whether it was from day one or whether
14  there was the April '02 label or the 1999
15  label, but I know they're here, and I can
16  just find them and look at them.
17      Q.   If you don't remember,
18  that's fine, because we'll introduce the
19  labels.  I just wanted to know if you
20  remembered that.
21          During the time that Vioxx
22  was on the market, was hypertension
23  generally defined as 140 over 90?
24          MR. BUCHANAN:  Objection,

Page 975

1      beyond the scope of redirect.
2  BY MR. BECK:
3      Q.   You talked about
4  hypertension.  I want to get a
5  definition.
6      A.   Yes.
7      Q.   The answer is yes?
8      A.   Yes, for most of that time.
9      Q.   If a patient had mostly
10  normal blood pressure readings during the
11  time he took Vioxx but had some elevated
12  blood pressure spikes, would you agree
13  that that would not be considered
14  hypertension?
15          MR. BUCHANAN:  I'm going to
16      object.  It's a blatant attempt to
17      get case-specific testimony from a
18      person who's been designated
19      generically.
20          THE WITNESS:  I couldn't
21      answer that without looking at the
22      patient's clinical record.
23  BY MR. BECK:
24      Q.   Your deposition, Page 330.

Page 976

1      A.   I'll need to have that in
2  front of me.
3          - - -
4          (Whereupon, a discussion off
5      the record occurred.)
6          - - -
7          THE WITNESS:  What page, Mr.
8      Beck?
9  BY MR. BECK:
10      Q.   I'm sorry?
11      A.   What page?
12      Q.   330.  Lines 4 through 10.
13      "Question:  What if a
14  patient actually had mostly normal
15  readings of blood pressure during the
16  period of time that he was on Vioxx, but
17  had some elevated blood pressure spikes?
18  Would you consider that to be
19  hypertension?
20      "Answer:  No."
21          Was that your sworn
22  testimony a couple of weeks ago?
23          MR. BUCHANAN:  Objection.
24      Same objection that I raised

Page 977

1      previously, exceeds the scope of
2      direct, redirect, as well as an
3      intent to get case-specific
4      testimony from a witness that's
5      not been designated as such.
6  BY MR. BECK:
7      Q.   Was that your sworn
8  testimony?
9      A.   It is what I said, but I
10  don't think what I said was correct.
11      Q.   Is it true, sir, that all
12  NSAIDs can cause hypertension?
13      A.   Virtually all the ones that
14  I know about.
15      Q.   Is it true that long before
16  Vioxx came on the market, the medical
17  community knew that NSAIDs could cause
18  hypertension?
19          MR. BUCHANAN:  Objection.
20      Well beyond redirect.  Is there
21      anything that is fairly within the
22      scope of what Mr. Tisi asked on
23      redirect that raises that question
24      or justifies that question?

136 (Pages 974 to 977)

Page 978

1    MR. BECK: I'm sorry, are
2  you asking me a question?
3        MR. BUCHANAN: I am. I
4  don't see any basis for that
5  question on anything that occurred
6  on redirect.
7        MR. BECK: Oh, well, then,
8  maybe you can subpoena me.
9  BY MR. BECK:
10    Q.   But my question, sir –
11       MR. BUCHANAN: My objection
12  stands.
13  BY MR. BECK:
14    Q.   – to you is, is it true
15  that long before Vioxx came on the
16  market, the medical community knew that
17  NSAIDs could cause hypertension?
18       MR. BUCHANAN: Same
19  objections.
20       THE WITNESS: Yes, but some
21  can do it more than others.
22  BY MR. BECK:
23    Q.   And, of course, it was also
24  known that hypertension could increase

Page 979

1  the risk of heart attack and stroke,
2  correct?
3    A.   Yes.
4    Q.   Before the FDA approved
5  Vioxx, was the FDA, to your knowledge,
6  aware that Vioxx could cause
7  hypertension?
8       MR. TISI: Objection.
9       MR. BUCHANAN: Can I have a
10  continuing objection to this line
11  of questioning on hypertension?
12       MR. BECK: Sure.
13       MR. TISI: Objection. This
14  really is outside the scope of
15  what the FDA knew about
16  hypertension. Go ahead.
17       THE WITNESS: I believe it
18  did.
19  BY MR. BECK:
20    Q.   You just said a second ago
21  that some NSAIDs -- I think you said that
22  all or most NSAIDs can increase blood
23  pressure, and some do it more than
24  others, right?

Page 980

1    A.   Correct.
2    Q.   And from your review of the
3  material, is it true, sir, that the FDA
4  was aware, prior to approval of Vioxx,
5  that in some studies Vioxx increased
6  blood pressure and hypertension more than
7  certain other NSAIDs?
8       MR. BUCHANAN: Objection,
9  form, foundation, beyond the scope
10  of redirect.
11       THE WITNESS: I can't answer
12  that without looking at all the
13  materials, and I don't think we
14  have time for that.
15  BY MR. BECK:
16    Q.   Page 331 of your deposition,
17  going over to 332, starting at line 24.
18       "Question: And the FDA was
19  also fully aware, prior to approval and
20  thereafter, that Vioxx, in some studies,
21  increased blood pressure and hypertension
22  more than comparator NSAIDs, right?
23       "Answer: I believe they
24  were aware of that."

Page 981

1       Was that your testimony a
2  couple of weeks ago?
3       MR. BUCHANAN: Object.
4  Misstates his prior answer, and I
5  object to this line of questioning
6  as beyond the scope of redirect.
7       THE WITNESS: That is what
8  it says.
9  BY MR. BECK:
10    Q.   And also you're aware, are
11  you not, of other studies showing that
12  there's no difference in the risk of
13  hypertension between Vioxx and other
14  NSAIDs?
15       MR. BUCHANAN: Same
16  objections.
17       THE WITNESS: And my answer
18  now is the same as my answer then,
19  that I was aware of studies and am
20  aware of studies that come to the
21  opposite conclusion, including our
22  own. I cannot cite for you a
23  study that shows no difference.
24  But if there is one that you want

137 (Pages 978 to 981)

Confidential - Subject to Protective Order

Page 982

1  me to review, I'd be happy to look
2  at it. I don't have a citation in
3  my head about that.
4  BY MR. BECK:
5  Q.  Well, do you know that the
6  literature is mixed on that?
7  MR. BUCHANAN: Objection,
8  misstates –
9  BY MR. BECK:
10  Q.  And that there are some
11  studies that come to the opposite
12  conclusion?
13  MR. TISI: Opposite than
14  what, Phil? I'm just confused.
15  Conclusion of what, that it causes
16  more or it doesn't cause more?
17  BY MR. BECK:
18  Q.  It's mixed on whether Vioxx
19  causes more hypertension or doesn't cause
20  more hypertension?
21  A.  I know there are some
22  studies that show that it causes more. I
23  know there's some studies that show that
24  it causes a comparable amount. I can

Page 983

1  think of no studies that I'm aware of
2  sitting here at the end of a long day
3  that show that it causes less.
4  MR. BECK: That's all I
5  have.
6  MR. TISI: One question.
7  THE WITNESS:
8  Re-re-redirect.
9  MR. TISI: Re-re-re.
10  - - -
11  REDIRECT EXAMINATION
12  - - -
13  BY MR. TISI:
14  Q.  Do you have an opinion as to
15  whether or not Vioxx causes more
16  hypertension than Celebrex?
17  A.  Yes, we've published --
18  MR. BECK: I'm going to
19  object. This is beyond the scope
20  of anything that's been --
21  MR. TISI: You specifically
22  just asked that question. How
23  could you say that?
24  BY MR. TISI:

Page 984

1  Q.  Go ahead.
2  A.  Our group, led by Dr.
3  Solomon, has actually published a paper
4  on that very topic, and we found that
5  Vioxx was more likely to induce
6  hypertension than Celebrex.
7  MR. TISI: No further
8  questions.
9  MR. BUCHANAN: Thank you
10  very much, Doctor.
11  MR. TISI: Thank you,
12  Doctor.
13  THE WITNESS: Thank you.
14  THE VIDEOTAPE TECHNICIAN:
15  The time is 7:14. We are off the
16  record.
17  - - -
18  (Whereupon, the deposition
19  concluded at 7:14 p.m.)
20  - - -
21
22
23
24

Page 985

1  
2  CERTIFICATE
3  I, LINDA L. GOLKOW, a Notary
   Public and Certified Shorthand Reporter
4  of the State of New Jersey, do hereby
   certify that prior to the commencement of
5  the examination, JEROME L. AVORN, M.D.
   was duly sworn by me to testify to the
6  truth, the whole truth and nothing but
   the truth.
7
8  I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
9  testimony as taken stenographically by
   and before me at the time, place and on
10 the date hereinbefore set forth, to the
   best of my ability.
11
12 I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor
13 attorney nor counsel of any of the
   parties to this action, and that I am
14 neither a relative nor employee of such
   attorney or counsel, and that I am not
15 financially interested in the action.
16
17
18
19
   _____
   LINDA L. GOLKOW, CSR
20 Notary Number: 1060147
   Notary Expiration: 1-2-08
21 CSR Number: 30XI176200
   Dated: July 6, 2006
22
23
24

138 (Pages 982 to 985)

56ae81f3-615a-41a4-af82-acf966afcfcb

Confidential - Subject to Protective Order

---

**Page 986**

INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8          After doing so, please sign
9   the errata sheet and date it.
10          You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14          It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

---

**Page 988**

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4
         I,_____, do
5   hereby certify that I have read the
    foregoing pages, 437 - 989, and that the
6   same is a correct transcription of the
    answers given by me to the questions
7   therein propounded, except for the
    corrections or changes in form or
8   substance, if any, noted in the attached
    Errata Sheet.
9
10
11
12
    _____
    JEROME L. AVORN, M.D.         DATE
13
14
15
16
17
18  Subscribed and sworn
    to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
22  Notary Public
23
24

---

**Page 987**

```
      - - - - - -
      E R R A T A
      - - - - - -
```

1
2
3   PAGE  LINE  CHANGE
4   ___  ___  _____
5   ___  ___  _____
6   ___  ___  _____
7   ___  ___  _____
8   ___  ___  _____
9   ___  ___  _____
10  ___  ___  _____
11  ___  ___  _____
12  ___  ___  _____
13  ___  ___  _____
14  ___  ___  _____
15  ___  ___  _____
16  ___  ___  _____
17  ___  ___  _____
18  ___  ___  _____
19  ___  ___  _____
20  ___  ___  _____
21  ___  ___  _____
22  ___  ___  _____
23  ___  ___  _____
24

---

**Page 989**

LAWYER'S NOTES

1
2   PAGE  LINE
3   ___  ___  _____
4   ___  ___  _____
5   ___  ___  _____
6   ___  ___  _____
7   ___  ___  _____
8   ___  ___  _____
9   ___  ___  _____
10  ___  ___  _____
11  ___  ___  _____
12  ___  ___  _____
13  ___  ___  _____
14  ___  ___  _____
15  ___  ___  _____
16  ___  ___  _____
17  ___  ___  _____
18  ___  ___  _____
19  ___  ___  _____
20  ___  ___  _____
21  ___  ___  _____
22  ___  ___  _____
23  ___  ___  _____
24

---

139 (Pages 986 to 989)

56ae81f3-615a-41a4-af82-acf966afcfcb