### Exhibit A - June 16, 2006 Avorn Deposition Excerpts

• Avorn Reply

[433:1] - [433:23]          6/16/2006    Avorn, Jerry (Barnett)

```
page 433
1                              UNITED STATES DISTRICT COURT
                               EASTERN DISTRICT OF LOUISIANA
2                                MDL DOCKET NUMBER:   1657
                                       SECTION L
3
     In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4    GERALD BARNETT AND CORRINE BARNETT,
5              Plaintiffs,
6          VS                                     CIVIL ACTION NUMBER:
                                                       2:06cv485
7    MERCK & CO., INC.,
8              Defendant.
     --------------------------------
9
                               CONTINUING DEPOSITION OF
10
                                 JERRY AVORN, M.D.
11
                                     VOLUME II
12
                                   June 16, 2006
13                                   8:38 a.m.
14                              Sheraton Boston Hotel
                                  39 Dalton Street
15                              Boston, Massachusetts
16      Laurie J. Driggers, Notary Public, Certified Shorthand Reporter, Realtime
     Professional Reporter
17      and Certified Realtime Reporter within and for the Commonwealth of Massachusetts
18
19
20
21
22
23
```

[453:12] - [453:23]          6/16/2006    Avorn, Jerry (Barnett)

```
page 453
12   Q.   Dr. Avorn, you remember yesterday
13   we were talking about a number of
14   documents written by Dr. Scolnick or Dr.
15   Musliner or Dr. Reicin, internal Merck
16   documents that you're relying on for your
17   opinions, right?
18   A.   Yes.
19   Q.   Am I right, sir, that you don't
20   have any personal knowledge of the facts
21   described in those documents; you're just
22   relying on those documents, true?
23   A.   Correct.
```

[454:10] - [455:4]          6/16/2006    Avorn, Jerry (Barnett)

```
page 454
10   A.     I have, indeed, read Dr. Ray's
11   report --
12   Q.   Ma-hom.
13   A.    -- and been impressed by it.  And
14   I believe that my awareness of Dr.
15   Kronmal's analysis of the Alzheimer's data
16   was as it was reported in Dr. Ray's
17   report, as well as -- I think that was my
18   primary awareness of Dr. Kronmal's data.
19        So, yes, I did read it.  I did
20   take it seriously, and it did inform me
21   about the Kronmal evaluation of the
```



EXHIBIT
A

Blumberg No. 5119

1

### Exhibit A - June 16, 2006 Avorn Deposition Excerpts

**• Avorn Reply**

22  Alzheimer data.
23  Q.   As I understand your testimony, Dr.
24  Avorn, you are relying on a portion of Dr.
page 455
1  Ray's expert report where he describes an
2  analysis that was conducted by another
3  plaintiff's expert witness, Dr. Krommal?
4  A.   That's correct.

[678:5] - [678:10]          6/16/2006    Avorn, Jerry (Barnett)

page 678
5  Q.   Have you ever approved a label as
6  an FDA employee, sir?
7  A.   No.
8  Q.   Have you ever prepared a label as
9  an employee of a pharmaceutical company?
10  A.   No.  Thank goodness.

[696:8] - [696:18]          6/16/2006    Avorn, Jerry (Barnett)

page 696
8  Q.   And you don't know the
9  circumstances about why Merck decided that
10  the cardiovascular information is more
11  properly in the precaution section, right?
12  A.   Do I know why Merck made a given
13  decision?
14  Q.   Mm-hmm.
15  A.   I have my opinion about that, but I
16  do not have personal experience from
17  having been in the company when the
18  decision was made.

[758:13] - [759:7]          6/16/2006    Avorn, Jerry (Barnett)

page 758
13  Q.   Have you done any research studying
14  the reasons why doctors who prescribe
15  Vioxx made a decision to prescribe it?
16  A.   No.
17  Q.   And you can't say, sir, for any
18  given doctor in any of the Vioxx cases in
19  which your deposition might be played
20  whether the doctors who prescribed the
21  plaintiffs Vioxx did so because of
22  interactions they had with sales
23  representatives or advertisements that
24  Merck prepared, true?
page 759
1  A.   I have done research and published
2  a paper on doctors' influences in terms of
3  scientific versus commercial influences,
4  and demonstrated that commercial influences
5  are important drivers of what doctors
6  prescribe.  It did not involve Vioxx as a
7  drug.

[771:1] - [771:24]          6/16/2006    Avorn, Jerry (Barnett)

page 771
1            COMMONWEALTH OF MASSACHUSETTS
2
3  I, LAURIE J. DRIGGERS, a Certified
4  Shorthand Reporter and Notary Public in
5  and for the Commonwealth of Massachusetts,
6  do hereby certify that the witness whose
7  deposition is hereinbefore set forth, was
8  duly sworn and that such deposition is a
9  true record of the testimony given by the

Exhibit A - June 16, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
10  witness.
11   I further certify that I am neither
12  related to or employed by any of the
13  parties in or counsel to this action, nor
14  am I financially interested in the outcome
15  of this action.
16   In witness whereof, I have hereunto set
17  my hand and seal this    day of
18  2006.
19
20
21
22     Laurie J. Driggers, CSR, RPR, CRR
23  Notary Public
24  My commission expires October 16, 2009
```

Exhibit B - June 30, 2006 Avorn Deposition Excerpts

• Avorn Reply

[437:] - [437:24]        6/30/2006        Avorn, Jerry (Barnett) - Preservation Depo v.2

                        page 437
                            0437
                        1                     UNITED STATES DISTRICT COURT
                                             EASTERN DISTRICT OF LOUISIANA
                        2                             -   -   -
                                     IN RE:  VIOXX          :  MDL DOCKET NO.
                        3            LITIGATION             :  1657
                        4            ----------------------------------------
                                             SUPERIOR COURT OF NEW JERSEY
                        5                 LAW DIVISION - ATLANTIC COUNTY
                                                     -   -   -
                        6
                                     IN RE: VIOXX
                        7            LITIGATION             : CASE NO. 619
                                     ----------------------------------------
                        8                         CAUSE NO. 05-59499
                        9            IN RE:                 : IN THE DISTRICT
                                                              COURT
                        10           VIOXX LITIGATION       : 157TH JUDICIAL
                                                              DISTRICT
                        11           APPLIES TO ALL CASES : HARRIS COUNTY,
                                                              TEXAS
                        12           ----------------------------------------
                                     SUPERIOR COURT OF THE STATE OF CALIFORNIA
                        13                    COUNTY OF LOS ANGELES
                                             CENTRAL CIVIL WEST
                        14
                                     VIOXX CASES            :  JCCP NO. 4247
                        15                                  :  ASSIGNED TO HON
                                                            :  VICTORIA CHEYNEY
                        16                            -   -   -
                                                     CONFIDENTIAL
                        17                  SUBJECT TO PROTECTIVE ORDER
                                                     -   -   -
                        18                       June 30, 2006
                                                     -   -   -
                        19
                                             Continued videotape deposition of
                        20           JEROME L. AVORN, M.D.
                        21
                        22                            -   -   -
                                             GOLKOW LITIGATION TECHNOLOGIES
                        23               1600 John F. Kennedy Boulevard
                                                     Suite 1210
                        24               Philadelphia, Pennsylvania 19103
                                                     877.DEPS.USA


[449:2] - [449:11]       6/30/2006        Avorn, Jerry (Barnett) - Preservation Depo v.2

                        page 449
                        2            Q.    Did all of the documents
                        3    that you reviewed, the internal Merck
                        4    documents, in reaching your opinion, come
                        5    from the plaintiffs' lawyers?
                        6                  MR. BUCHANAN:  Same
                        7         objection.
                        8                  MR. TISI:  Same objection.
                        9                  THE WITNESS:  Same question.
                        10        Yes.  That's the only way I could
                        11        get internal documents.


[826:15] - [834:4]       6/30/2006        Avorn, Jerry (Barnett) - Preservation Depo v.2

                        page 826
                        15                 MR. BECK:  I'm going to go
                        16        through a series of names and ask
                        17        questions of whether he knows



• Avorn Reply

```
18        whether this individual saw any
19        direct-to-consumer ads, and I'm
20        going to ask whether he knows
21        whether that person's doctor --
22        what information the doctors
23        looked at when prescribing --
24             MR. TISI:   I will
page 827
1         stipulate --
2              MR. BECK:   And I need the
3         questions and answers because we
4         may want to play them in these
5         trials, but -
6              MR. TISI:   So, a stipulation
7         from counsel is not sufficient --
8              MR. BECK:   No.
9              MR. TISI:   -- where you say
10        it is stipulated that Dr. Avorn
11        does not know X, Y and Z?   That's
12        not good enough?
13             MR. BECK:   No.   I want Dr.
14        Avorn's testimony.   What I'm
15        saying is that you can certainly
16        have a continuing objection to all
17        those questions for the same
18        ground that you just had so we can
19        get through it quicker.
20             THE WITNESS:   Could I just
21        state that I don't know any of the
22        plaintiffs or any of their
23        circumstances and will not testify
24        about any of that for any
page 828
1         plaintiff?
2              MR. BECK:   Here's the
3         problem.   We'll off go the record.
4              THE VIDEOTAPE TECHNICIAN:
5         The time is 4:49.   We're off the
6         record.
7                  -  -  -
8              (Whereupon, a recess was
9         taken from 4:49 p.m. until
10        4:50 p.m.)
11                 -  -  -
12             THE VIDEOTAPE TECHNICIAN:
13        We're back on the record.   Time is
14        10 minutes to 5:00.
15             MR. BECK:   While we were off
16        the record, what I explained to
17        counsel and the witness is what
18        I'm about to do is ask the witness
19        a couple of questions on a series
20        of individuals who are plaintiffs,
21        asking about whether he has any
22        information about whether the
23        plaintiff saw any
24        direct-to-consumer advertisement,
page 829
1         and any information about what
2         materials were reviewed by the
3         prescribing physician.
4              He's already indicated that
5         he doesn't have any such
6         information, and I've explained to
7         the witness and counsel that I
8         want to do this plaintiff by
9         plaintiff because I think that in
10        some courts I'll be allowed to
11        play that testimony.   Mr. Tisi has
12        an objection, and I agree that he
13        can have a continuing objection
14        and won't have to restate it as to
```

Exhibit B - June 30, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
15        each plaintiff and each
16        prescriber.
17             Mr. Tisi and anybody else,
18        would you like to state your
19        objection now so it can be done
20        once?
21             MR. BUCHANAN:  We join in
22        the objection, and we want to have
23        a continuing objection.
24             MS. SHAPIRO:  We join in the
page 830
1         objection.
2              MR. BECK:  And I will
3         stipulate that every plaintiffs'
4         lawyer in every Vioxx case
5         anywhere joins in Mr. Tisi's
6         objection.
7              MR. TISI:  I will also state
8         it's beyond the scope.  We clearly
9         did not designate him as anything
10        but a generic expert.  So, for
11        that additional reason, I would
12        state my objection.  But go ahead.
13        If you feel that compelled, Phil,
14        I can't stop you.  Go ahead.
15  BY MR. BECK:
16        Q.   Do you know --
17             Do you have any information
18  about whether Mr. Grossberg in California
19  saw any direct-to-consumer advertisements
20  concerning Vioxx?
21        A.   No.
22        Q.   Do you have any information
23  about what materials were considered by
24  the doctors who prescribed Vioxx for Mr.
page 831
1   Grossberg?
2         A.   No.
3         Q.   Do you have any information
4   about whether Mr. Gerald Barnett reviewed
5   any direct-to-consumer advertisements?
6         A.   No.
7         Q.   Do you have any information
8   about the materials that were considered
9   by the physicians who prescribed Vioxx
10  for Mr. Barnett?
11        A.   No.
12        Q.   Do you have any information
13  about whether Robert Smith ever saw any
14  direct-to-consumer advertisements?
15        A.   No.
16        Q.   Do you have any information
17  about the information that was taken into
18  account by the doctors who prescribed
19  Vioxx for Robert Smith?
20        A.   No.
21        Q.   Do you have any information
22  about whether Charles Mason ever saw any
23  direct-to-consumer advertisements?
24        A.   No.
page 832
1         Q.   Do you have any information
2   about what materials were considered by
3   the doctors who prescribed Vioxx for
4   Charles Mason?
5         A.   No.
6         Q.   Do you have any information
7   about whether Anthony Dedrick saw any
8   direct-to-consumer advertisements?
9         A.   No.
10        Q.   Do you have any information
11  about the materials considered by the
```

• Avorn Reply

```
12  doctors who prescribed Vioxx for Anthony
13  Dedrick?
14        A.    No.
15        Q.    Do you have any information
16  about whether a Steven Hatch ever saw any
17  direct-to-consumer advertisements?
18        A.    No.
19        Q.    Do you have any information
20  about what materials were considered by
21  the doctors who prescribed Vioxx for
22  Steven Hatch?
23        A.    No.
24        Q.    Do you have any information
page 833
1   about whether Robert McFarland saw any
2   direct-to-consumer advertisements?
3         A.    No.
4         Q.    Do you have any information
5   about the information — about the
6   materials considered by the doctors who
7   prescribed Vioxx for Robert McFarland?
8         A.    No.
9         Q.    Do you have any information
10  about whether James Miller ever saw any
11  direct-to-consumer advertising?
12        A.    No.
13        Q.    Do you have any information
14  concerning the materials that were
15  considered by the doctors who prescribed
16  Vioxx for James Miller?
17        A.    No.
18        Q.    Do you have any information
19  about whether Sharon Rigby ever saw any
20  direct-to-consumer advertisements?
21        A.    No.
22        Q.    Do you have any information
23  about the materials considered by the
24  doctors who prescribed Vioxx to Sharon
page 834
1   Rigby?
2         A.    No.
3               MR. BECK:   That's all the
4         questions I have.
```

[985:1] - [985:23]     6/30/2006     Avorn, Jerry (Barnett) - Preservation Depo v.2

```
page 985
1          C E R T I F I C A T E
2
3          I, LINDA L. GOLKOW, a Notary
    Public and Certified Shorthand Reporter
4   of the State of New Jersey, do hereby
    certify that prior to the commencement of
5   the examination, JEROME L. AVORN, M.D.
    was duly sworn by me to testify to the
6   truth, the whole truth and nothing but
    the truth.
7
8          I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
9   testimony as taken stenographically by
    and before me at the time, place and on
10  the date hereinbefore set forth, to the
    best of my ability.
11
12         I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor
13  attorney nor counsel of any of the
    parties to this action, and that I am
14  neither a relative nor employee of such
    attorney or counsel, and that I am not
```

Exhibit B - June 30, 2006 Avorn Deposition Excerpts

**• Avorn Reply**



```
15  financially interested in the action.
16
17
18
19  _____
    LINDA L. GOLKOW, CSR
20  Notary Number:  1060147
    Notary Expiration:  1-2-08
21  CSR Number:  30XI176200
    Dated:  July 6, 2006
22
23
```

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

[1:] - [1:24]        6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 1
   0001
1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
2                          -  -  -
          IN RE:  VIOXX          :  MDL DOCKET NO.
3         LITIGATION             :  1657
4         ------------------------------------------
                SUPERIOR COURT OF NEW JERSEY
5               LAW DIVISION - ATLANTIC COUNTY
                           -  -  -
6
          IN RE: VIOXX
7         LITIGATION             : CASE NO. 619
          ------------------------------------------
8                    CAUSE NO. 05-59499
9         IN RE:                 : IN THE DISTRICT
                                   COURT
10        VIOXX LITIGATION       : 157TH JUDICIAL
                                   DISTRICT
11        APPLIES TO ALL CASES : HARRIS COUNTY,
                                   TEXAS
12        ------------------------------------------
          SUPERIOR COURT OF THE STATE OF CALIFORNIA
13             COUNTY OF LOS ANGELES
                 CENTRAL CIVIL WEST
14
          VIOXX CASES            :  JCCP NO. 4247
15                               :  ASSIGNED TO HON
                                 :  VICTORIA CHEYNEY
16                         -  -  -
                          CONFIDENTIAL
17             SUBJECT TO PROTECTIVE ORDER
                           -  -  -
18                      June 29, 2006
                           -  -  -
19
                Videotaped deposition of JEROME L.
20        AVORN, M.D.
21                         -  -  -
22             GOLKOW LITIGATION TECHNOLOGIES
               1600 John F. Kennedy Boulevard
23                       Suite 1210
               Philadelphia, Pennsylvania 19103
24                     877.DEPS.USA
```

[112:4] - [113:10]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 112
4           Q.    And do you have an opinion
5      that you hold to a reasonable degree of
6      medical certainty as to whether or not
7      Merck accurately conveyed through all of
8      its activities, publications, detailing,
9      direct-to-consumer advertising, labeling,
10     "Dear Doctor" letters, et cetera,
11     effectively communicated the risks and
12     benefits so doctors can make
13     evidence-based prescribing decisions?
14            MR. BECK:  Objection,
15        improper subject for expert
16        testimony, lack of foundation and
17        hearsay.
18            THE WITNESS:  Yes, I have
19        such an opinion.
20     BY MR. TISI:
21        Q.    Okay.
22              And what is that opinion?
```



EXHIBIT
C

1

**• Avorn Reply**

```
23              MR. BECK:  Same objections.
24              THE WITNESS:  That Merck's
page 113
1       conduct over the research program
2       and analysis of its data and
3       communication of those data to
4       physicians, to patients, even to
5       FDA, was inadequate in that it
6       failed to truthfully represent
7       what was known to Merck at the
8       time about the risks of its drug
9       in relation to the cardiovascular
10      symptoms.
```

[173:2] - [178:18]          6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 173
2       Q.    Okay.
3             Doctor, at about the time
4    that you were involved with the
5    discussions with Dr. Cannuscio, were you
6    aware that the company was in discussions
7    with the Food & Drug Administration about
8    what would go into the label on the
9    results of VIGOR?
10      A.    No.
11      Q.    Doctor, I did provide you
12   material that was sent to the Food & Drug
13   Administration.  Have I showed you this
14   before today's deposition?
15      A.    Yes.
16      Q.    Have you had an opportunity
17   to take a look at it?
18      A.    Yes.
19      Q.    Is this a letter that was
20   sent to the -- appear to be a letter sent
21   to the Food & Drug Administration in part
22   referring to your study results on the
23   naproxen study?
24      A.    Yes.  It was sent by Merck
page 174
1    by Dr. Silverman, I believe.
2       Q.    Okay.
3             Can you turn to Page 3 of
4    that cover letter that was sent to the
5    Food & Drug Administration.
6       A.    (Witness complies.)
7       Q.    And the top part of it
8    refers to "Thrombotic Cardiovascular
9    Data," and has some discussion about the
10   VIGOR study.  Do you see that, Doctor?
11      A.    Yes.
12      Q.    Okay.
13            If you'd go down to the
14   second full paragraph --
15      A.    Yes.
16      Q.    -- is there a reference to
17   your study?
18      A.    Yes, there is.
19      Q.    Okay.
20            Would you tell us where that
21   is, Doctor?
22      A.    Yes.  That would be
23   beginning on line 4, the last word of the
24   line, "The."  Okay.
page 175
1             Shall I read it?
2       Q.    Yes.  Sure.
3       A.    "The concept that there are
4    differences among NSAIDs is supported by
5    external epidemiologic data from three
```

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

6      separate studies that utilized different
7      clinical databases, indicating that the
8      use of naproxen, but not other NSAIDs, is
9      cardioprotective." And then it is
10     references 2, 3 and 4, and ours is
11     reference 4.
12              "Among these studies, is a
13     U.S. study of over 22,000 patients in New
14     Jersey by a Boston academic group
15     unaffiliated with industry." And that's
16     us.
17        Q.   Doctor, having read this
18     document, do you have any impression
19     about what was being conveyed to the FDA
20     about your study?
21              MR. BECK:  Objection.
22              THE WITNESS:  Well, it's not
23        an impression.  It's what they
24        say.  What they say is that our

page 176
1         study shows that naproxen protects
2         the heart.  And in the context of
3         what is on the rest of the page,
4         it is justification for the notion
5         that Vioxx does not cause heart
6         attacks, naproxen prevents them.
7      BY MR. TISI:
8        Q.   Did they specifically single
9      out your study as being, quote,
10     independent?
11        A.   Yes.
12        Q.   Doctor, were you aware at
13     the time that Merck was using your study
14     results that were presented to Dr. Guess
15     in August of 2001 to suggest that the
16     results of VIGOR were the result of the
17     cardioprotective effect of naproxen?
18        A.   No, I was not aware of that
19     at the time.
20        Q.   If you had been aware of
21     that, what would your reaction have been?
22              MR. BECK:  Objection,
23        speculation.
24              THE WITNESS:  Well, I can

page 177
1         tell you what my reaction is right
2         now, which is I'm indignant that
3         they took a finding of ours that
4         was very clearly communicated,
5         that is, the very modest effect of
6         protection of the hearts that we
7         found with naproxen, which we
8         explicitly said was not enough to
9         explain the increase in heart
10        attacks in the naproxen/Vioxx
11        comparison in VIGOR, that Dr.
12        Guess was in the room when we
13        presented that, and I now
14        understand, even wrote down, that
15        we hypothesized that what really
16        was probably going on was an
17        increased risk from the selective
18        COX-2, or Vioxx, as an explanation
19        of the VIGOR study.
20              I am upset right now, and I
21        was the first time I saw this, to
22        know that they were essentially
23        distorting our scientific findings
24        to justify exactly the opposite

page 178
1         position from what we have said
2         both in writing and in public.

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

**• Avorn Reply**

```
3   BY MR. TISI:
4       Q.    Let's talk about what you --
5             MR. BECK: Move to strike
6       that answer as speculation
7       concerning others' state of mind
8       and also irrelevant concerning
9       this witness' emotional reaction.
10  BY MR. TISI:
11      Q.    Doctor, was that a fair --
12            Looking at that document, is
13  that a fair and accurate representation
14  of the science that you presented to Dr.
15  Guess at the ISPE meeting in August of
16  2001?
17      A.    No, it's a distortion of
18  what was presented.
```

[176:24] - [178:2]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 176
24            THE WITNESS:  Well, I can
page 177
1       tell you what my reaction is right
2       now, which is I'm indignant that
3       they took a finding of ours that
4       was very clearly communicated,
5       that is, the very modest effect of
6       protection of the hearts that we
7       found with naproxen, which we
8       explicitly said was not enough to
9       explain the increase in heart
10      attacks in the naproxen/Vioxx
11      comparison in VIGOR, that Dr.
12      Guess was in the room when we
13      presented that, and I now
14      understand, even wrote down, that
15      we hypothesized that what really
16      was probably going on was an
17      increased risk from the selective
18      COX-2, or Vioxx, as an explanation
19      of the VIGOR study.
20            I am upset right now, and I
21      was the first time I saw this, to
22      know that they were essentially
23      distorting our scientific findings
24      to justify exactly the opposite
page 178
1       position from what we have said
2       both in writing and in public.
```

[302:9] - [303:15]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 302
9       Q.    Let's go to the next
10  question that we asked you to address,
11  which is Merck's investigation and
12  management of -- investigation of the
13  potential of Vioxx to cause heart attacks
14  and their management of that issue, the
15  studies, the communications, et cetera.
16  Okay?
17            First of all, have you
18  reviewed documents that were before the
19  new drug application was filed for Vioxx?
20      A.    Yes.  There were some
21  initial reports of clinical trials that
22  had been conducted.
23      Q.    What is the term "signal,"
24  Doctor?  First of all, is the term
page 303
1   "signal" something that is commonly used
```

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
 2  in your field of pharmacoepidemiology?
 3       A.    Yes.
 4       Q.    Would you please explain to
 5  the jury what a "signal" is?
 6       A.    Yes.  I think a good regular
 7  language word would be "clue."  That if
 8  there may be some evidence that comes up
 9  that is not in itself a slam dunk proof
10  that there's a problem, but something
11  that might be called a smoking gun,
12  something that sure looks suspicious and
13  warrants followup, even though in itself
14  it does not absolutely wrap up the
15  certainty that there's a problem.
```

[303:21] - [304:7]     6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 303
21  BY MR. TISI:
22       Q.    Okay.
23             Doctor, do you have an
24  opinion as to whether or not Merck should
page 304
 1  have recognized -- a reasonable and
 2  prudent company with the knowledge that
 3  Merck had before the drug was on the
 4  market should have recognized that there
 5  was the potential for cardiovascular
 6  disease in patients who took Vioxx?
 7       A.    Yes.
```

[304:13] - [309:17]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 304
13             THE WITNESS:  Okay.
14             If one looks at the totality
15  of the information that was
16  available as of the time that the
17  new drug application was
18  submitted, there were a number of
19  pieces of information from
20  clinical trial data, as well as
21  from other sources, that certainly
22  raised a question as to whether or
23  not this was a problem.  And I'm
24  not saying that they were slam
page 305
 1  dunk, to use a phrase from the
 2  current administration, slam dunk
 3  evidence that there was a problem,
 4  but that certainly were very
 5  suspicious worries.
 6                  -  -  -
 7             (Whereupon, Deposition
 8  Exhibit Avorn-31, Research
 9  Management Committee 4-10-96
10  MRK-ABC0048699 - MRK-ABC0048706,
11  was marked for identification.)
12                  -  -  -
13  BY MR. TISI:
14       Q.    I'm going to hand you what I
15  have had marked as Exhibit Number 31.
16  And for the record, this is a Research
17  Management Committee document dated
18  October 10, 1996, MRK-ABC0048699.
19             Have you seen this document
20  before?
21       A.    Yes, I have.
22       Q.    Is this a document you
23  relied on in supporting your opinion that
24  there was a, quote, signal of potential
```

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

**• Avorn Reply**

page 306
1  cardiotoxicity for Vioxx prior to filing
2  of the new drug application?
3        A.    In part.
4        Q.    Okay.
5              Would you please go to Page
6  8.
7        A.    Yes.
8        Q.    First of all, what is
9  MK-966?
10       A.    That was the working name
11 for Vioxx before it was called Vioxx.
12       Q.    And is this a document that
13 is a Merck document?
14       A.    Yes.
15       Q.    In Section 3, it indicates a
16 section that says "Adverse Events." Do
17 you see that?
18       A.    Yes.
19       Q.    Okay.
20             Would you tell us what, if
21 anything, was significant in your review
22 of this document which supports your
23 opinions?
24       A.    Sure.  In fairness, I should
page 307
1  point out that these were very, very big
2  doses of Vioxx.  This was before they
3  really knew what the right dose would be,
4  and so these doses were 125 to 175
5  milligrams.  I think that's part of the
6  picture here.
7        Q.    Sure.
8        A.    Having said that, the second
9  paragraph -- and the other important
10 point was that this study lasted only six
11 weeks.  And so it was a really remarkably
12 short period of time in which you really
13 would not expect to see a cardiovascular
14 risk because it was only a
15 month-and-a-half long.
16             And the second paragraph
17 reads, "Adverse events of most concern
18 were in the cardiovascular system (e.g.,
19 MI" or heart attack, "unstable angina"
20 which is increasing chest pain from heart
21 disease, "rapid fall in hemoglobin and
22 hematocrit in some subjects, and a small
23 increase in blood pressure."
24       Q.    And this is October of 1996?
page 308
1        A.    Correct.
2              And then the next sentence
3  which I think is also relevant, "We plan
4  to evaluate MK-966" or Vioxx "in a study
5  where subjects are also given low-dose
6  aspirin."
7        Q.    Was that study ever done?
8        A.    It was not until the VIGOR
9  data came out in 2000 that Merck began to
10 advocate using aspirin in people taking
11 Vioxx, and so that would have been, oh,
12 four years later.
13       Q.    All right.
14             Now, Doctor, did you also
15 review the medical officer reviews for
16 Vioxx, the FDA medical officer review for
17 Vioxx when the drug was approved?
18       A.    Yes.
19       Q.    And did you consider the
20 views of the medical officer when forming
21 your opinions?

• Avorn Reply

    22    A.    Yes.  Because that was what
    23  was known at the time.
    24    Q.    What, if any, significance,
  page 309
    1  and I'm going to try to go through these
    2  fairly quickly, what, if any,
    3  significance was there in the
    4  cardiovascular section of the medical
    5  officer review for the Vioxx clinical
    6  trial program that assisted you in
    7  formulating your opinions?
    8    A.    Well, a number of the FDA
    9  staff that were evaluating Vioxx, and I'm
  10  thinking of Dr. Fulayo, Dr. Villalba and
  11  Dr. Targum, were struck with and noticed
  12  and wrote about the fact that there
  13  appeared to be an excess of
  14  cardiovascular disease in patients who
  15  were given Vioxx in the clinical trials
  16  that were submitted by Merck to FDA in
  17  the late '90s.

[313:21] - [314:7]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

  page 313
  21    Q.    Doctor, putting all the kind
  22  of evidence that we've been talking about
  23  together, do you have an opinion as to
  24  whether or not there was evidence prior
  page 314
    1  to Vioxx being on the market that a
    2  reasonable and prudent company reviewing
    3  the safety profile of this drug would
    4  have considered in terms of designing
    5  their clinical trial program and
    6  investigating this signal?
    7    A.    Yes.

[315:2] - [318:8]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

  page 315
  2        THE WITNESS:  In developing
  3    a drug or looking at drug risks
  4    and benefits, it is necessary to
  5    look not just at what is found in
  6    a particular study, but also what
  7    is all the evidence about what
  8    might work and what might not
  9    work.  And, in fact, what might
  10    work can be very useful in
  11    planning the development of the
  12    drug.
  13        And when I teach in a course
  14    at Tufts Medical School for drug
  15    company executives about thinking
  16    about risks and benefits in drug
  17    development, one of the points I
  18    mention is that it's key to pull
  19    together everything that's known
  20    so that you can plan your clinical
  21    development program, whether it's
  22    animal studies or human studies or
  23    followup epidemiologic studies so
  24    as to follow up on signals.  Some
  page 316
  1    signals may be good signals, like
  2    here is a potential really good
  3    effect of this drug that we want
  4    to find out more about, as well as
  5    the bad signals.
  6        And looking at it all

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

**• Avorn Reply**

|  |  |
|---|---|
| 7 | together, there is the evidence |
| 8 | from Merck's own pharmacology |
| 9 | advisors saying here's some |
| 10 | problems that you guys need to |
| 11 | keep an eye out for because, |
| 12 | specifically, 1, 2, 3, here are |
| 13 | ways in which this drug might |
| 14 | cause heart attacks.  Nobody knew |
| 15 | specifically at the time that it |
| 16 | would, but they were told, watch |
| 17 | out for this.  I think there was |
| 18 | some phrase in here that they |
| 19 | should be actively pursued or |
| 20 | something to that effect. |
| 21 | There were the earlier |
| 22 | clinical trials that Merck had |
| 23 | performed in which whatever the |
| 24 | dose, if you have a drug that |

page 317

|  |  |
|---|---|
| 1 | increases heart attacks in a |
| 2 | six-week study, that's an |
| 3 | important signal to worry about. |
| 4 | There were the animal |
| 5 | studies and other pharmacologic |
| 6 | studies that say, gee, you know, |
| 7 | maybe blocking COX-2 selectively |
| 8 | is not a totally good idea, maybe |
| 9 | there are some important good |
| 10 | things a COX-2 does that you don't |
| 11 | want to block totally.  And that |
| 12 | was in the literature before the |
| 13 | drug was on the market. |
| 14 | And so combining the advice |
| 15 | from their scientific advisors, |
| 16 | the evidence from the animal |
| 17 | studies, from the pharmacologic |
| 18 | literature and the evidence from |
| 19 | their own clinical trial |
| 20 | suggesting an increase in events, |
| 21 | I'm not saying they should have |
| 22 | not marketed the drug, I'm not |
| 23 | saying they should have pulled it |
| 24 | off the market the day it was |

page 318

|  |  |
|---|---|
| 1 | approved, but I am saying that |
| 2 | these were some smoking guns that |
| 3 | a reasonable company would have |
| 4 | said, as we market this drug, |
| 5 | let's make sure that we're also |
| 6 | keeping an eye on this potential |
| 7 | problem that we've been warned |
| 8 | about from multiple sources. |

[329:18] - [329:24]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 329

|  |  |
|---|---|
| 18 | Dr. Avorn, do you have an |
| 19 | opinion that you hold to a reasonable |
| 20 | degree of medical certainty as to when |
| 21 | there was reasonable evidence of an |
| 22 | association between Vioxx and heart |
| 23 | attacks? |
| 24 | A.     Yes. |

[331:19] - [332:16]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 331

|  |  |
|---|---|
| 19 | That said, I have such an |
| 20 | opinion, and it is that by the |
| 21 | time the data from the VIGOR study |
| 22 | were available to Merck, which |

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
23        would have been the spring of
24        2000, combining the VIGOR data
page 332
1         with the evidence from the other
2         clinical trials, all of which
3         Merck had conducted itself,
4         coupled with the guidance that
5         Merck had sought and received from
6         its own Board of Scientific
7         Advisors, coupled with the
8         pharmacologic evidence that was
9         out there in the literature prior
10        to that point, by the spring of
11        2000, the burden of evidence was
12        enough to suggest that there was
13        indeed a reason for concern that
14        Vioxx was associated with heart
15        attack and other cardiovascular
16        disease in humans.
```

[353:11] - [356:24]     6/29/2006     Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 353
11                 This is the report of Dr.
12  Targum at the cardiorenal division,
13  correct?
14        A.    Yes.
15        Q.    Okay.
16              February 1st, 2004 --
17        A.    2001.
18        Q.    -- 2001, excuse me.
19        A.    Right.
20        Q.    Okay.
21              If you'd go to page --
22  actually 36 -- 34.
23        A.    Got it.
24        Q.    Do you see the Section 4 at
page 354
1   the bottom of the page there, it talks
2   about "Assessment of the sponsor's claim
3   of CV risk"?
4         A.    Yes.
5         Q.    First of all, the sponsor's
6   claim there that the "Sponsor claims that
7   the difference in myocardial infarctions
8   between the two groups is primarily due
9   to the anti-platelet effects of
10  naproxen."
11        A.    Yes, I reviewed that
12  section.
13        Q.    Is that what they said in
14  the VIGOR paper that we reviewed earlier
15  today?
16        A.    Yes.
17        Q.    Okay.
18              Is that what they were
19  telling you and your people at Harvard?
20        A.    That's what Dr. Sherwood
21  told me.
22        Q.    Okay.
23              Is that what was being said
24  by Merck publicly in your experience in
page 355
1   2000 and 2001?
2         A.    Correct.
3         Q.    Okay.
4               What does Dr. Targum say
5   about the, quote, naproxen hypothesis?
6         A.    I'll just read her words.
7   "The sponsor claims that the difference
8   in myocardial infarctions between the two
```

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
9    groups is primarily due to the
10   anti-platelet effects" or the protective
11   effects "of naproxen."
12              And then she goes on to say,
13   "This hypothesis is not supported by any
14   prospective placebo-controlled trials
15   with naproxen.  One can further argue
16   that, no matter what the attribution, the
17   results (from the cardiovascular
18   standpoint) are favorable for naproxen."
19       Q.    Do you agree with that?
20       A.    Yes.
21       Q.    Is that what you testified
22   to earlier?
23       A.    Yes.
24       Q.    Next one, next bullet point
page 356
1    on the next page.  "The sponsor claims
2    that the majority of the cardiovascular
3    events in the VIGOR study occurred in
4    those patients who should have been
5    taking aspirin for cardioprotection."
6        A.    Yes.
7        Q.    Is that the issue that we
8    talked about before that had to be
9    corrected in the New England Journal of
10   Medicine?
11       A.    That's right.
12       Q.    And that was corrected in
13   2005?
14       A.    That's correct.
15       Q.    Okay.
16              Do you agree with Dr. Targum
17   as to the significance of that fact?
18       A.    Yes.  As she states it in
19   her own words, "This claim has not
20   convinced this medical reviewer," and she
21   goes on to say that there are increased
22   events, heart attacks in the Vioxx group
23   even in patients who did not fall into
24   the aspirin-indicated subgroup.
```

[358:4] - [359:9]     6/29/2006     Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 358
4        Q.    Could you turn to Page 36,
5    please?
6        A.    Yes.
7        Q.    At the bottom of the page
8    there.
9        A.    Yes.
10       Q.    The very bottom it says,
11   "Suggested labeling."
12       A.    Yes.
13       Q.    Do you see that there?
14       A.    Yes.
15       Q.    Would you read what she says
16   about that?
17       A.    Yes.
18       Q.    Well, actually, go to the
19   second sentence, if you don't mind.
20       A.    All right.
21              In bold it suggests labeling
22   that would properly address CV risks.
23       Q.    In the last sentence there?
24       A.    "It would be difficult to
page 359
1    imagine inclusion of VIGOR results in the
2    rofecoxib" or Vioxx "labeling without
3    mentioning cardiovascular safety results
4    in the study description as well as the
```

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
5   Warnings section."
6        Q.   Okay.
7             Do you agree with Dr.
8   Targum?
9        A.   Yes.
```

**[376:18] - [378:12]**   6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 376
18       Q.   I'm going to show you what I
19   have had marked as Exhibit Number 36.  Is
20   this the document to which you refer?
21       A.   I think so.
22       Q.   Okay.
23            And when you look at the
24   e-mail from Dr. Scolnick dated April 12,
page 377
1   2000, and this would have been right
2   after the VIGOR study, the VIGOR on our
3   timeline --
4        A.   Right.
5        Q.   -- right after VIGOR was
6   unblinded and the data became available?
7        A.   Correct.
8        Q.   Okay.
9             Would you read what Dr.
10   Scolnick has to say?
11       A.   Yes.  This is to Dr. Reicin.
12   "Hi, Alise.  I have been trading e-mails
13   with Doug Greene in realtime.  We are all
14   online too late.  I will tell you my
15   worry quotient is high.  I actually am in
16   minor agony.  What I really want to do is
17   a 10,000 versus 10,000 patient study in
18   mild to moderate osteoarthritis Tylenol
19   versus Vioxx with PRN," which means as
20   needed, "low-dose ASA," which is aspirin,
21   "for those judged to need it.  Safety," I
22   guess he means would be the "first
23   primary endpoint and efficacy secondary
24   or co-primary.  WE WILL NOT" now this is
page 378
1   in capital letters, "WE WILL NOT KNOW FOR
2   SURE WHAT IS GOING ON UNTIL WE DO THIS
3   STUDY.  PLEASE THINK HARD ABOUT THE
4   DESIGN BEFORE THE FAC MEETING.  Thanks,
5   Ed."
6        Q.   As somebody who conducts
7   clinical trials and conducts
8   epidemiologic studies and looks at these
9   kinds of issues, would this have been an
10   ethical study to do?
11       A.   Yeah.  I think he got it
12   exactly right.
```

**[382:10] - [382:12]**   6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 382
10       Q.   Doctor, you testified that
11   you're an expert in the factors that go
12   into physician prescribing practices.
```

**[382:24] - [384:10]**   6/29/2006   Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 382
24       Q.   What are the sources in
page 383
1   which a pharmaceutical company
2   communicates with doctors about their
3   products?
```

• Avorn Reply

```
4         A.    Well, the legal governing
5    document that is probably central because
6    it determines what the company is allowed
7    to say in all of its promotional material
8    and all of its sales presentations is
9    what FDA calls the labeling or sometimes
10   it's called the package insert.  But it's
11   a lengthy document, usually in small
12   print, that describes everything about a
13   drug, what it's used for, what its
14   benefits are, what its risks are, what
15   its dose is and so forth.
16        Q.    Are there any other methods
17   by which a pharmaceutical company
18   communicates with doctors that you're
19   familiar with?
20        A.    Sure.  They will also, of
21   course, send out sales reps to doctors'
22   offices to talk to us about the
23   attributes of their drug, and, of course,
24   they will take out ads in medical
page 384
1    journals.  They will also take out ads or
2    put commercials on TV for patients.  And
3    they will sponsor continuing education
4    programs for physicians.
5         Q.    What about publication of
6    medical articles?
7         A.    Very often companies are
8    heavily involved, as we've learned, in
9    the publication of articles in the
10   medical literature.
```

[423:1] - [424:15]        6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

```
page 423
1         Q.    Doctor, we talked about
2    another method of Merck communicating the
3    risks, accurate information about the
4    risks.  You do understand that there was
5    direct-to-consumer advertising for
6    patients -- directly to patients, and
7    you've written about that, correct?
8         A.    Yes.
9         Q.    Do you have an opinion as to
10   a reasonable degree of medical certainty
11   as to whether or not the
12   direct-to-consumer advertising conducted
13   by Merck played a role in what's a fair
14   and accurate depiction of the risks and
15   benefits associated with Vioxx?
16             MR. BECK:  Can I just say
17        the same objection that I have had
18        for the last ten minutes?
19             MR. TISI:  Yes.  I'll give
20        you a continuing objection on all
21        those bases.
22             THE WITNESS:  Yes.  As I
23        said in my Health Affairs article
24        about direct-to-consumer
page 424
1         advertising a couple of years ago,
2         it's vital that patients be able
3         to get a reasonable depiction of
4         both the good news and the bad
5         news about a drug.  And given what
6         we now understand was available to
7         Merck at the time that all -- that
8         those $100 million a year of
9         commercials and ads were being
10        run, I think it is absolutely
```

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

**• Avorn Reply**

11    correct to say that they provided
12    all the good news about the drug
13    and did an inadequate job of
14    presenting the bad news about the
15    drug to patients.

[424:17] - [425:2]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 424
17    Q.   Now, Doctor, let me turn to
18  the one last topic I would ask you about
19  here, and that is the detailing of the
20  doctors, which is another method in which
21  companies will communicate with doctors.
22    Have you reviewed any of the
23  detailing information that was provided
24  to doctors?
page 425
1    A.   Yes, as well as the training
2  of the sales reps, which is part of that.

[425:21] - [427:9]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 425
21    Q.   Did you see any information
22  about how to respond to doctors'
23  inquiries about cardiovascular events in
24  your review of the documents?
page 426
1    A.   Yes.
2    Q.   What did you see?
3    A.   Well, the most memorable was
4  the dodge ball game that was apparently
5  developed as a training tool for their
6  sales reps to be able to respond to
7  doctors' questions about the
8  cardiovascular risks of Vioxx
9  particularly after the APPROVe study
10  findings had come out. And I was
11  struck —
12    Q.   You meant VIGOR, right?
13    A.   I'm sorry.  That's what I
14  meant to say.
15    Q.   All right.  Okay.
16    A.   And I was struck by the fact
17  that the purpose is pretty much summed up
18  in the name, that it was to dodge
19  questions about this very important risk
20  of the company's drug.
21    Merck's training materials
22  to their sales reps explicitly tell them,
23  do not raise or do not initiate any
24  discussion of our paper or of other
page 427
1  papers related to cardiovascular risk.
2  And there were a number of completely
3  evasive answers that were being fed to
4  the sales reps for them to give as
5  responses to doctors who asked about
6  whether or not this drug could cause
7  heart attacks.  And that did not seem to
8  me to be a reasonable or scientifically
9  accurate presentation of the data.

[436:1] - [436:24]    6/29/2006    Avorn, Jerry (Barnett) - Preservation Depo v.1

page 436
1    C E R T I F I C A T E
2
3    I, LINDA L. GOLKOW, a Notary

Exhibit C - June 29, 2006 Avorn Deposition Excerpts

• Avorn Reply

```
                    Public and Certified Shorthand
     4              Reporter of the State of New
                    Jersey, do hereby certify that
     5              prior to the commencement of the
                    examination, JEROME L. AVORN, M.D.
     6              was duly sworn by me to testify to
                    the truth, the whole truth and
     7              nothing but the truth.
     8
                            I DO FURTHER CERTIFY that
     9              the foregoing is a verbatim
                    transcript of the testimony as
    10              taken stenographically by and
                    before me at the time, place and
    11              on the date hereinbefore set
                    forth, to the best of my ability.
    12
    13                      I DO FURTHER CERTIFY that I
                    am neither a relative nor employee
    14              nor attorney nor counsel of any of
                    the parties to this action, and
    15              that I am neither a relative nor
                    employee of such attorney or
    16              counsel, and that I am not
                    financially interested in the
    17              action.
    18
    19
    20              _____
                    LINDA L. GOLKOW, CSR, RDR
    21              Notary Number:  1060147
                    Notary Expiration:  1.2.08
    22              CSR Number:  30XI00176200
                    Dated:  July 3, 2006
    23
    24
```

Exhibit D - June 15, 2006 Avorn Deposition Excerpts

• Avorn Reply

[1:] - [1:24]          6/15/2006     Avorn, Jerry (Barnett)

page 1
        0001
1                           UNITED STATES DISTRICT COURT
                           EASTERN DISTRICT OF LOUISIANA
2                            MDL DOCKET NUMBER:  1657
                                    SECTION L
3
          In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4         GERALD BARNETT AND CORRINE BARNETT,
5               Plaintiffs,
6                  VS.                      CIVIL ACTION NUMBER:
                                            2:06cv485
7         MERCK & CO., INC.,
8               Defendant.
          ------------------------------------
9
                                    DEPOSITION OF
10
                              JERRY AVORN, M.D.
11
                                 June 15, 2006
12                                 8:36 a.m.
13                            Sheraton Boston Hotel
                               39 Dalton Street
14                        Boston, Massachusetts 02199
15        Susan A. Romano, Notary Public, Register Merit Reporter and Certified
          Realtime Reporter within and for the Commonwealth of Massachusetts
        15
16
17
18
19
20
21
22
23
24


[31:8] - [31:21]          6/15/2006     Avorn, Jerry (Barnett)

page 31
8     Q.    What material of Dr. Kronmal's did
9   you review?
10    A.    Analyses of data, as I recall,
11  particularly related to the Alzheimer's
12  study, in terms of the outcomes in that
13  trial -- in those trials.
14    Q.    Are you relying on anything Dr.
15  Kronmal prepared in your opinions?
16    A.    Yes.
17    Q.    What are you relying on?
18    A.    The analyses.  And they were the
19  most -- they were reflected in Dr. Ray's
20  expert opinion as well as Dr. Kronmal's
21  analyses of the Alzheimer's data.


[56:22] - [57:1]          6/15/2006     Avorn, Jerry (Barnett)

page 56
22    Q.    You wouldn't consider yourself to
23  be an expert in the state of mind of a
24  pharmaceutical company, right?
page 57
1     A.    Right.

EXHIBIT
D
Blumberg No. 5119

Exhibit D - June 15, 2006 Avorn Deposition Excerpts

**• Avorn Reply**

[59:13] - [60:12]        6/15/2006    Avorn, Jerry (Barnett)

    page 59
    13   Q.     So I take that to mean you don't
    14   consider yourself an expert in determining
    15   pharmaceutical companies' intent?
    16   A.     Well, I think that's a very
    17   problematic question for a lot of ways.
    18   One is there are no standards for
    19   determining expertise, and it's not like
    20   you're board certified in pharmaceutical
    21   company intent.
    22          Secondly, the concept of intent
    23   implies knowing something about the
    24   intrapsychic processes of a company, and
    page 60
    1    companies don't have intrapsychic
    2    processes.
    3          So I think one can look at
    4    behaviors of individuals in companies, and
    5    one can make very plausible conclusions
    6    about the goals that those behaviors were
    7    designed to achieve.
    8          But the way you phrased it, since
    9    nobody can get inside the head of a
    10   company, since companies don't have heads,
    11   no one can be an expert in that, the way
    12   you phrased the question.

[164:20] - [165:4]        6/15/2006    Avorn, Jerry (Barnett)

    page 164
    20   Q.     Can you say, sir, under oath, that
    21   you are aware of what the doctors who are
    22   treating -- were treating the patients in
    23   the Vioxx litigation knew, actually knew,
    24   about the potential cardiovascular effects
    page 165
    1    of Vioxx?
    2          MR. TISI:  Objection.
    3    A.     Of course I can't get into the head
    4    of a given doctor that I've never met.

[191:7] - [191:15]        6/15/2006    Avorn, Jerry (Barnett)

    page 191
    7    Q.     What statistics have you applied to
    8    demonstrate that Merck's conduct concerning
    9    Vioxx was unreasonable?
    10   A.     Well, it's not like there's a
    11   statistical test for reasonable behavior.
    12   But what I mean is that there -- in
    13   looking at study results, one needs to
    14   know enough statistics to be able to
    15   interpret the importance of the findings.

[192:17] - [193:17]        6/15/2006    Avorn, Jerry (Barnett)

    page 192
    17   Q.     Do you believe that jurors are
    18   capable of evaluating Merck's conduct in
    19   coming to a conclusion about whether
    20   Merck's conduct was reasonable or
    21   unreasonable?
    22   A.     In some ways yes and in some ways
    23   no, and let me explain.  They would not
    24   be able to understand what acceptable
    page 193
    1    standards of behavior in the medical
    2    community are because they're not doctors,

Exhibit D - June 15, 2006 Avorn Deposition Excerpts

• **Avorn Reply**

```
         3    or about interpreting the meaning of
         4    certain findings because they're not
         5    pharmacoepidemiologists.  So there are some
         6    important technical things which a juror,
         7    on his or her own, could not be able to
         8    interpret.
         9         And then there are other things
        10    which any person with common sense can
        11    interpret, as in if you saw a particular
        12    signal of a problem what would a
        13    reasonable company do.  So there's --
        14    There's the two kinds.
        15         And the latter I think a juror
        16    could handle on their own.  The former, I
        17    think, requires some expert interpretation.
```

[279:6] - [279:15]        6/15/2006   Avorn, Jerry (Barnett)

```
        page 279
         6    Q.    Is it your testimony that when
         7    Vioxx was on the market, the marketing
         8    people believed that Vioxx causes heart
         9    attacks?
        10    A.    I can't indicate what people
        11    believed or didn't believe.  What I can
        12    indicate is that there was information
        13    available to Merck, because Merck generated
        14    most of it, indicating a higher risk of
        15    heart attacks in people taking its drug.
```

[326:23] - [327:2]        6/15/2006   Avorn, Jerry (Barnett)

```
        page 326
        23    Q.    Have you ever worked for the FDA as
        24    an employee?
        page 327
         1    A.    I've been on advisory committees,
         2    but I've not been an employee.
```

[428:1] - [429:1]        6/15/2006   Avorn, Jerry (Barnett)

```
        page 428
         1              CERTIFICATE
         2         COMMONWEALTH OF MASSACHUSETTS
         3              SUFFOLK SS.
         4    I, SUSAN A. ROMANO, Certified Shorthand
         5    Reporter No. 119393, Registered Merit
         6    Reporter and Notary Public in and for the
         7    Commonwealth of Massachusetts, do hereby
         8    certify that the witness whose deposition
         9    is hereinbefore set forth, was duly sworn
        10    and that such deposition is a true record
        11    of the testimony given by the witness.
        12    I further certify that I am neither
        13    related to or employed by any of the
        14    parties in or counsel to this action, nor
        15    am I financially interested in the outcome
        16    of this action.
        17    In witness whereof, I have hereunto set
        18    my hand and seal this 19TH day of June
        19    2006.
        20  .
        21  .
        22
        23
        24    Susan A. Romano, Notary Public
        page 429
         1    My commission expires April 21, 2006
```