UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX <br>     Products Liability Litigation | * <br> * <br> * |
| This Document Relates to: <br>     LENE ARNOLD | *    MDL No. 1657 <br> * <br> *    SECTION L |
| versus | * <br> *    JUDGE ELDON E. FALLON |
| MERCK & CO., INC. <br>     Defendant | * <br> *    MAGISTRATE JUDGE <br> *    KNOWLES |
| Case No. 05-2627 | * <br> * |
| & | * <br> * |
| ALICIA GOMEZ | * <br> * |
| versus | * <br> * |
| MERCK & CO., INC. <br>     Defendant | * <br> * <br> * |
| Case No. 05-1163 | * |

**MERCK'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

Pursuant to Local Rule 56.1, Merck & Co., Inc. hereby submits the following Statement of Material Facts as to Which There is No Genuine Issue to be Tried in support of its Motion for Summary Judgment:

*The FDA Regulation of Prescription Drug Labeling*

1.  The FDA is "the expert Federal public health agency charged by Congress with ensuring that drugs are safe and effective, and that their labeling adequately informs users

817896v.1

of the risks and benefits of the product and is truthful and not misleading." *See* Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3922 (Jan. 24, 2006) (to be codified at 7 C.F.R. pts. 201, 314, 601) ("2006 Labeling Rule") (attached as Ex. 1) at 3936.

2. "Critical, incisive reporting of risks and benefits on the drug's label is essential to the FDA's approval of a drug as 'safe and effective.'" *See* 50 Fed Reg. 7452 (1985) (excerpt attached as Ex. 2) at 7470.

3. "Drug labeling serves as the standard under which FDA determines whether a product is safe and effective." *Id.*

4. The "primary purpose of prescription drug labeling is to provide practitioners with the essential information they need to prescribe the drug safely and effectively for the care of patients." *See* 65 Fed. Reg. 81082 (2000) (excerpt attached as Ex. 3) at 81083.

5. As the FDA stated in the Preamble to its 2006 Labeling Rule, "[u]nder the act and FDA regulations, the agency determines that a drug is approvable based not on an abstract estimation of its safety and effectiveness, but rather on a comprehensive scientific evaluation of the product's benefits and risks under the conditions of use prescribed, recommended, or suggested in the labeling." Ex. 1, 71 Fed. Reg. at 3934.

6. Labeling thus is the "centerpiece" of the FDA's overall "risk management" effort, because the label "reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively in accordance with the act." *Id.*

817896v.1

7. Accordingly, the FDA "carefully controls the content of labeling for a prescription drug, because such labeling is FDA's principal tool for educating health care professionals about the risks and benefits of the approved product to help ensure safe and effective use." *Id.*

8. Both the FDCA and FDA regulations contain detailed specifications governing label content and formatting. *See* 21 U.S.C. § 355 (Federal Food, Drug, and Cosmetic Act) (attached as Ex. 4) at § 355(n); 21 C.F.R. pt. 201 (FDA Labeling Regulations) (attached as Ex. 5).

9. In submitting a new drug for approval, manufacturers must submit not only extensive data about the drug's safety, *see* Ex. 4, 21 U.S.C. § 355(d), but also the language of the drug's proposed labeling, *see id.* § 355(b)(1)(A).

10. If the FDA is not satisfied that the label reflects a concise and accurate depiction of the material benefits and risks of the drug, it will deny the application, because the drug is not "safe and effective" for use under the terms defined by the label. *See* Ex. 1, 71 Fed. Reg. at 3967–68. "[T]he determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the act." *Id.* at 3934.

### *The FDA Approves Vioxx and Its Labeling*

11. On November 23, 1998, Merck filed with the FDA a New Drug Application ("NDA") for Vioxx, an anti-inflammatory pain reliever that belongs to a class known as non-steroidal anti-inflammatory drugs ("NSAIDs"). *See* MRK-OS420000001–05 (cover letter accompanying Vioxx NDA) (attached as Ex. 6).

12. The Vioxx NDA included data regarding Vioxx's safety and effectiveness, including cardiovascular safety data from over 50 studies involving more than 8,500 patients.

3

817896v.1

*See* MRK-OS420124093–96 (excerpt of Merck's October 26, 1998 Integrated Summary of Safety) (attached as Ex. 7).

13. The FDA convened an Advisory Committee of outside experts to review the Vioxx NDA data and make a recommendation as to whether it should be approved. *See* Summary Minutes of April 20, 1999, Arthritis Advisory Committee Meeting (attached as Ex. 8).

14. The Advisory Committee met on April 20, 1999, and, by a vote of 8–0, recommended approval of VIOXX for osteoarthritis and acute pain. *See id.* at 2–3.

15. On May 20, 1999, the FDA approved Vioxx as safe and effective for treatment of osteoarthritic pain, primary dysmenorrhea, and acute pain. *See* MRK-99420021411-34 (May 20, 1999 Approval Letter from R. DeLap of FDA to R. Silverman of Merck) (attached as Ex. 9).

### *VIGOR Study Leads To A Change In Vioxx's FDA-Approved Label*

16. After Vioxx was approved by the FDA, Merck continued to conduct clinical trials to assess the safety and efficacy of Vioxx for additional patient populations and other medical conditions. *See, e.g.,* MRK-I8940042881-83 (cover letter to FDA enclosing Amended VIGOR Protocol – a clinical trial examining gastrointestinal toxicity) (attached as Ex. 10).

17. In March 2000, Merck learned the preliminary results of the Vioxx GI Outcomes Research ("VIGOR") study, a double-blind, 8,000-patient trial designed to assess the relative incidence of gastrointestinal perforations, ulcers, and bleeds ("PUBs") in rheumatoid arthritis patients treated with Vioxx as compared to those treated with the drug naproxen. *See* Testimony of Alise Reicin, M.D. in *Evelyn Irvin Plunkett v. Merck & Co., Inc.* (Dec. 6, 2005) at 1658:7–1662:4 (attached as Ex. 11).

4

18. The VIGOR data showed that patients taking Vioxx suffered fewer serious gastrointestinal PUBs than patients taking naproxen, and it also showed that the Vioxx group suffered a higher incidence of serious cardiovascular thrombotic events than did naproxen users. The difference was statistically significant. *See* MRK-I8940060171-238 (March 23, 2000 facsimile from B. Goldmann of Merck to R. DeLap of FDA forwarding VIGOR data) (attached as Ex. 12) at MRK-I8940060175.

19. On March 23, 2000, two weeks after receiving the unblinded VIGOR data, Merck faxed a summary of the results to the FDA. *See id.* at MRK-I8940060172.

20. On June 29, 2000, Merck submitted to the FDA a proposed label change for Vioxx that incorporated the VIGOR results. *See* MRK-00420008017–19547 (VIGOR sNDA) (excerpt attached as Ex. 13) at MRK-00420008025–047.

21. After receiving a "standard" review classification from the FDA, Merck requested an expedited review of its proposed labeling changes. *See* MRK-00420021832-35 (August 7, 2002 letter from D. Erb of Merck to K. Midthun of FDA) (attached as Ex. 14).

22. The FDA nonetheless retained their "standard" classification of Merck's application, denying Merck's request for expedited review. *See* Testimony of Alise Reicin, M.D. in *Evelyn Irvin Plunkett v. Merck & Co., Inc.* (Feb. 15, 2006) at 2035:4–2037:25 (attached as Ex. 15).

23. The FDA convened an Advisory Committee to discuss the VIGOR results. The Advisory Committee met on February 7–8, 2001 and reviewed the VIGOR results with the FDA. *See* Transcript of February 8, 2001, Arthritis Advisory Committee Meeting (attached as Ex. 16) at 151–218; February 8, 2001 FDA Questions presented to Arthritis Advisory Committee (attached as Ex. 17).

24. Before and after the FDA Advisory Committee meeting, the FDA requested and Merck provided additional data and analyses, and FDA and Merck scientists met on multiple occasions and exchanged multiple versions of revised labeling. *See, e.g.*, MRK-18940064923 (January 8, 2001 letter from R. Silverman to J. Bull forwarding results of African Green Monkey study) (attached as Ex. 18); MRK-01420094338-39 (March 30, 2001 letter from R. Silverman to J. Bull forwarding ADVANTAGE Consolidated Study Report) (attached as Ex. 19); MRK-AAF0005071-92 (December 21, 2001 facsimile from J. Bull to R. Silverman forwarding draft label) (attached as Ex. 20); MRK-AFV0265569-90 (April 9, 2002 e-mail from B. Gould of FDA to N. Braunstein of Merck forwarding final label draft) (attached as Ex. 21).

25. On April 11, 2002, the FDA approved a revised label for Vioxx. This revised label incorporated the VIGOR results, the results from additional placebo-controlled studies, as well as a new indication for rheumatoid arthritis. *See* MRK-ABS0323348-67 (April 11, 2002 approval letter from L. Goldkind of FDA to R. Silverman of Merck) (attached as Ex. 22).

26. In approving the revised label, the FDA stated: "We have completed the review of these supplemental applications, as amended, and have concluded that adequate information has been presented to demonstrate that the drug products are safe and effective for use as recommended in the agreed upon enclosed labeling text." *See id.* at MRK-ABS0323349.

27. The post-VIGOR label substantially revised the former label. In the Precautions section, it read as follows:

> *Cardiovascular Effects*
>
> The information below should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease.

6

817896v.1

> In VIGOR, a study of 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs. 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, *Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety.*) In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebos have not been performed.
>
> **Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINICAL STUDIES, *Special Studies, Platelets,* PRECAUTIONS, *Drug Interactions, Aspirin.*) Prospective, long-term studies on concomitant administration of VIOXX and aspirin evaluating cardiovascular outcomes have not been conducted.

*See* MRK-P0011429-39 (April 2002 Dear Healthcare Professional letter enclosing revised Vioxx labeling with changes highlighted) (attached as Ex. 23).

28. After revising the Vioxx label as approved by the FDA, Merck publicized the content of the new label to the medical community and the news media. *See id.*; MRK-PRL0000246-50 (April 11, 2002 Merck Press Release) (attached as Ex. 24).

### *Merck Obtains Additional Information About Vioxx Risks And Immediately Withdraws Vioxx From The Market*

29. On September 24, 2004, an external safety board monitoring the results of a separate long-term study–the APPROVe study–informed Merck that interim data from the study showed an increased rate of cardiovascular events in the Vioxx arm compared to the placebo arm. *See* MRK-ACH0000051-53 (September 24, 2004 facsimile from K. Horgan of

7

817896v.1

Merck to P. Kim and B. Gertz of Merck forwarding APPROVe ESMB's meeting minutes and recommendations) (attached as Ex. 25).

30. On September 30, 2004, Merck withdrew Vioxx from the market. *See* MRK-N0520018917–20 (September 30, 2004 letter from N. Braunstein of Merck to B. Harvey of FDA) (attached as Ex. 26).

*Plaintiffs' Alleged Exposure to Vioxx – Post-VIGOR Label And Pre-APPROVe*

31. Plaintiff Lene P. Arnold alleges that she used Vioxx between July 2003 and October 2004. *See* Arnold Plaintiff Profile Form ("Arnold PPF") (attached as Ex. 27) at IV.B.

32. Arnold further alleges that she suffered a heart attack on December 28, 2003, as a result of taking Vioxx. *See* Ex. 27, Arnold PPF at I.C.1.b.

33. In her complaint, Arnold alleges claims for strict liability–failure to warn; strict liability–design defect; negligence; breach of express and implied warranties; and fraud, *see* Arnold Compl. (attached as Ex. 28) at ¶ 10-33, and, as the basis for those claims states that, during the time she was using Vioxx, Merck "misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects." *See* Ex. 28, Arnold Compl. at ¶ 8.

34. Arnold also alleges that "[d]espite the fact that Defendant knew or should have known that VIOXX (Rofecoxib) caused unreasonably, dangerous side effects which many users would be unable to remedy by any means, the Defendant continued to market VIOXX (Rofecoxib) to the consuming public." Ex. 28, Arnold Compl. at ¶ 17.

35. The entire period of Ms. Arnold's alleged usage (July 2003–October 2004) occurred after the Vioxx label already had been changed, with the FDA's approval, to

reflect the results of the VIGOR study, and before Merck received the APPROVe data that led Merck to withdraw Vioxx from the market. *Compare* Ex. 23 *with* Ex. 26.

36. Plaintiff Alicia Gomez alleges that her husband, Joe G. Gomez, used Vioxx between November 21, 2002, and January 7, 2003 *See* Gomez Plaintiff Profile Form ("Gomez PPF") (attached as Ex. 29) at IV.B.

37. Gomez claims that her husband suffered a fatal heart attack on January 7, 2003, as a result of taking Vioxx, *see* Ex. 29, Gomez PPF at I.C.1.b, and asserts claims for fraudulent concealment; strict liability–design defect; strict liability–marketing defect/inadequate warnings; claims under the Deceptive Trade Practices Act; fraud; negligence; negligent misrepresentation; and express and implied warranties. *See* Gomez Compl. (attached as Ex. 30) at ¶ 21–52.

38. Gomez premises her claims on the allegation that "Merck did not provide sufficient warnings and instructions that would have put Plaintiffs, and the general public, on notice of the dangers and adverse effects caused by ingesting the Vioxx (Refecoxib) drug," Ex. 30, Gomez Compl. at ¶ 17, and, further, that Vioxx "was defective as marketed due to inadequate warnings, instructions, and/or labelings." Ex. 30, Gomez Compl. at ¶ 19.

39. In the Complaint, Gomez also alleges that VIGOR "was published in 2000 and showed there was a fivefold increase in cardiovascular thrombotic events for Vioxx®," but that "[t]he general public . . . was <u>never</u> warned of the serious side effects, such as heart attacks strokes and/or sudden death, that could occur, especially if you had previous cardiovascular problems, from the ingestion of Vioxx®." Ex. 30, Gomez Compl. at ¶ 13.

40. The entire period of Mr. Gomez's alleged usage (November 21 2002–January 7, 2003) occurred after the Vioxx label already had been changed, with the FDA's

approval, to reflect the results of the VIGOR study, and before Merck received the APPROVe data. *Compare* Ex. 23 *with* Ex. 26.

Respectfully submitted,

/s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendant's Liaison Counsel

And

John H. Beisner
Jonathan D. Hacker
Jessica Davidson Miller
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Merck's Statement of Material Facts as to Which There is no Genuine Issue to be Tried has been served on Liaison Counsel, Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 6th day of July, 2006.

/s/ Dorothy H. Wimberly