UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
|     LENE ARNOLD | * | |
| | * | SECTION L |
| versus | * | |
| | * | JUDGE ELDON E. FALLON |
| MERCK & CO., INC. | * | |
|     Defendant | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
| Case No. 05-2627 | * | |
| | * | |
| & | * | |
| | * | |
| ALICIA GOMEZ | * | |
| | * | |
| versus | * | |
| | * | |
| MERCK & CO., INC. | * | |
|     Defendant | * | |
| | * | |
| Case No. 05-1163 | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM OF LAW IN SUPPORT OF MERCK'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

BACKGROUND ......................................................................................................... 3

    1.    The FDA Regulation of Prescription Drug Labeling............................................. 3

    2.    The FDA Approves Vioxx and Its Labeling......................................................... 5

    3.    VIGOR Study Leads To A Change In Vioxx's FDA-Approved Label................. 6

    4.    Merck Obtains Additional Information About Potential Vioxx Risks And
           Immediately Withdraws Vioxx From The Market ................................................. 8

    5.    Plaintiffs' Alleged Exposure to Vioxx – Post-VIGOR Label And Pre-
           Approve......................................................................................................... 9

STANDARD FOR SUMMARY JUDGMENT......................................................... 10

ARGUMENT ...................................................................................................... 11

I.      FEDERAL LAWS AND REGULATIONS PREEMPT CONFLICTING STATE
        LAWS THAT WOULD FRUSTRATE THEIR PURPOSES AND OBJECTIVES....... 12

II.     THIS COURT MUST DEFER TO THE FDA'S DETERMINATION THAT ITS
        LABELING REGULATIONS PREEMPT STATE-LAW CHALLENGES TO
        FDA-APPROVED LABELS ............................................................................ 14

    A.    The FDA Has Determined That State-Law Failure-To-Warn Claims
          Challenging The Adequacy Of FDA-Approved Labels Frustrate The
          Objectives Of The FDA's Drug Approval Process................................................. 14

    B.    The FDA's Interpretation Of Its Own Regulations Is Entitled To
          "Controlling Deference." ......................................................................................... 18

    C.    Plaintiffs' Claims Fall Within The Preemptive Scope Of The FDA's
          Labeling Regulations. ............................................................................................. 20

    D.    Plaintiffs' Arguments Against Deferring To The FDA's View That Its
          Labeling Regulations Preempt Conflicting State-Law Claims Lack Merit. ........ 21

CONCLUSION.................................................................................................... 32

817989v.1

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abramowitz v. Cephalon, Inc.*,
  2006 WL 560639 (N.J. Super. Ct. Law Div. Mar. 3, 2006) .................................................... 14

*Am. Airlines, Inc. v. Dep't of Transp.*,
  202 F.3d 788 (5th Cir. 2000) ........................................................................................ 31

*Am. Med. Ass'n v. United States*,
  887 F.2d 760 (7th Cir. 1989) ........................................................................................ 29

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................... 11

*Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary*,
  93 F.3d 103 (3d Cir. 1996) ........................................................................................... 32

*Auer v. Robbins*,
  519 U.S. 452 (1997) ............................................................................................... 18, 22

*Belt v. EmCare, Inc.*,
  444 F.3d 403 (5th Cir. 2006) .............................................................................. 18, 22, 23

*Blackmon v. Am. Home Prods. Corp.*,
  328 F. Supp. 2d 659 (S.D. Tex. 2004) ........................................................................... 11

*Brown Express, Inc. v. United States*,
  607 F.2d 695 (5th Cir. 1979) ........................................................................................ 28

*Bryant v. Hoffmann-La Roche Inc.*,
  262 Ga. App. 401 (2003) ............................................................................................. 11

*Capital Cities Cable, Inc. v. Crisp*,
  467 U.S. 691 (1984) ............................................................................................... 14, 18

*Carlin v. Superior Court*,
  13 Cal. 4th 1104 (1996) ............................................................................................... 19

*Chevron U.S.A. Inc. v. Naural. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .................................................................................................... 23

*City of New York v. FCC*,
  486 U.S. 57 (1988) ...................................................................................................... 13

*Colacicco v. Apotex, Inc.*,
  No. 05-5500, 2006 WL 1443357 (E.D. Pa. May 25, 2006) .......................................... *passim*

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986) .................................................................................................... 29

*Cowan v. Bank United of Texas*,
  70 F.3d 937 (7th Cir. 1995) .......................................................................................... 32

817989v.1

## TABLE OF AUTHORITIES

**Page(s)**

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000)..................................................................................................... 12

*Davidson v. Glickman,*
169 F.3d 996 (5th Cir. 1999) ....................................................................................... 28

*Dusek v. Pfizer Inc.,*
No. Civ.A. H-02-3559, 2004 WL 2191804 (S.D. Tex. Feb. 20, 2004) ...................................... 14

*Fid. Fed. Savings & Loan Ass'n v. De La Cuesta,*
458 U.S. 141 (1982)..................................................................................................... 13

*Gade v. Nat'l Solid Waste Mgmt. Ass'n,*
505 U.S. 88 (1992)....................................................................................................... 12

*Geier v. Am. Honda Motor Co.,*
529 U.S. 861 (2000).......................................................................................... 12, 15, 22

*Heimmerman v. First Union Mortgage Co.,*
305 F.3d 1257 (11th Cir. 2002) ................................................................................... 31

*Henley v. FDA,*
77 F.3d 616 (2d Cir. 1996) ............................................................................................. 3

*Hill v. Florida ex rel. Watson,*
325 U.S. 538 (1945).............................................................................................. 26, 27

*Hillsborough County v. Automated Med. Labs. Inc.,*
471 U.S. 707 (1984)............................................................................................... *passim*

*Horn v. Thoratec Corp.,*
376 F.3d 163 (3d Cir. 2004) ........................................................................................ 23

*Kooritzky v. Reich,*
17 F.3d 1509 (D.C. Cir. 1994)..................................................................................... 29

*La. Envtl. Action Network ["LEAN"] v. EPA,*
382 F.3d 575 (5th Cir. 2004) ....................................................................................... 23

*Leslie Salt Co. v. United States,*
55 F.3d 1388 (9th Cir. 1995) ....................................................................................... 28

*Lyon v. Agusta S.P.A.,*
252 F.3d 1078 (9th Cir. 2001) ..................................................................................... 32

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996)............................................................................... 13, 17, 20, 22

*Mo., Kan. & Tex. R.R. Co. v. Haber,*
169 U.S. 613 (1898)..................................................................................................... 26

*Mylan Labs., Inc. v. Thompson,*
389 F.3d 1272 (D.C. Cir. 2004) ................................................................................... 19

817989v.1

## TABLE OF AUTHORITIES

**Page(s)**

*N.Y. Cent. R.R. Co. v. Winfield,*
  244 U.S. 147 (1917)...................................................................................................... 26

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  125 S. Ct. 2688 (2005)................................................................................................... 23

*Ne. Md. Waste Disposal Auth. v. EPA,*
  358 F.3d 936 (D.C. Cir. 2004)....................................................................................... 28

*Needleman v. Pfizer Inc.,*
  No. Civ.A. H-02-3559, 2004 WL 1773697 (N.D. Tex. 2004) ................................... 14

*New York v. Locke,*
  529 U.S. 89 (2000)......................................................................................................... 13

*Phillips Oil Co. v. OKC Corp.,*
  812 F.2d 265 (5th Cir. 1987) ........................................................................................ 11

*Planned Parenthood of Houston and S.E. Tex. v. Sanchez,*
  403 F.3d 324 (5th Cir. 2005) ........................................................................................ 13

*Rust v. Sullivan,*
  500 U.S. 173 (1991)....................................................................................................... 23

*Savage v. Jones,*
  225 U.S. 501 (1912)....................................................................................................... 27

*Sinnot v. Davenport,*
  63 U.S. 227 (1859)......................................................................................................... 27

*Smiley v. Citibank (S.D.), N.A.,*
  517 U.S. 735 (1996)................................................................................................. 23, 25

*United States v. Rutherford,*
  442 U.S. 544 (1979)......................................................................................................... 3

*United States v. Tomasino,*
  206 F.3d 739 (7th Cir. 2000) ........................................................................................ 32

*United States v. Vernon Home Health, Inc.,*
  21 F.3d 693 (5th Cir. 1994) .......................................................................................... 13

## STATUTES AND REGULATIONS

5 U.S.C. § 553(b)(A)......................................................................................................... 27

21 C.F.R. § 10.85 .............................................................................................................. 28

21 U.S.C. § 355................................................................................................................... 4

29 U.S.C. § 514(a) ............................................................................................................ 20

47 Fed. Reg. 50442 (Nov. 5, 1982)................................................................................... 22

51 Fed. Reg. 8180 (Mar. 7, 1986)..................................................................................... 22

817989v.1

## TABLE OF AUTHORITIES

**Page(s)**

59 Fed. Reg. 3944 (Jan. 27, 1994) ................................................................................. 25

65 Fed. Reg. at 81,082 .................................................................................... 3, 24, 30

Fed. R. Civ. P. 56(c) ................................................................................................. 10

Ga. Code Ann. § 11-2-314(2)(e)-(f) ........................................................................... 11

Pub. L. No. 87-781, Tit. II, § 202, 76 Stat. 780 (1962) ................................................ 26

Requirements on Content and Format of Labeling for Human Prescription Drug and Biological
    Products, 71 Fed. Reg. 3922 (Jan. 24, 2006) (to be codified at 7 C.F.R. pts. 201, 314, 601)
    ........................................................................................................................*passim*

Tex. Bus. & Com. Code § 2.314(b)(5)-(6) ................................................................. 11

U.S. Const. art. VI cl. 2 ............................................................................................. 11

## OTHER AUTHORITY

*Colacicco v. Apotex, Inc.*, No. 05-5500 (E.D. Pa.) (filed May 10, 2006) ("U.S. *Colacicco*
    Br.") ........................................................................................................... 5, 24

Lars Noah, *Medicine's Epistemology: Mapping the Haphazard Diffusion of Knowledge in the
    Biomedical Community*, 44 Ariz. L. Rev. 373 (2002) ............................................ 19

Thomas Scarlett, *The Relationship Among Adverse Drug Reaction Reporting, Drug Labeling,
    Product Liability, and Federal Preemption*, 46 Food Drug Cosm. L.J. 31, 36 (1991) ............ 19

Charles J. Walsh & Marc S. Klein, *The Conflicting Objectives of Federal and State Tort Law
    Drug Regulation*, 41 Food Drug Cosm. L.J. 171 (1986) ........................................ 19

Charles Alan Wright & Charles H. Koch, Jr., 32 Federal Practice & Procedure ........................ 29

817989v.1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | |
|     Products Liability Litigation | * | |
| | * | |
| This Document Relates to: | * | MDL No. 1657 |
|     LENE ARNOLD | * | |
| | * | SECTION L |
|     versus | * | |
| | * | JUDGE ELDON E. FALLON |
| MERCK & CO., INC. | * | |
|     Defendant | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
|     Case No. 05-2627 | * | |
| | * | |
|        & | * | |
| | * | |
| ALICIA GOMEZ | * | |
| | * | |
|     versus | * | |
| | * | |
| MERCK & CO., INC. | * | |
|     Defendant | * | |
| | * | |
|     Case No. 05-1163 | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF LAW IN SUPPORT OF MERCK'S
## MOTION FOR SUMMARY JUDGMENT

Lene P. Arnold and Joe G. Gomez both allegedly suffered heart attacks after taking

Vioxx. They also both started taking Vioxx *after* Merck had issued a new label incorporating

information about cardiovascular risks based on the clinical trial known as the VIGOR study.

This new label (the "VIGOR label") was approved by the Food and Drug Administration

("FDA"), after review not only by its own scientists and regulators but also by an Advisory

Committee of outside scientists convened specifically to advise the FDA on the label's contents.

Each plaintiff's failure-to-warn claims against Merck thus pose a direct challenge to the FDA's

determination, based on its expertise and that of other scientists, of what information fairly and

-1-

accurately described the risks and benefits of Vioxx in light of the information available at the time.

For the reasons explained in this memorandum, plaintiffs' claims are preempted by the FDA's prescription drug labeling regulations and cannot proceed. The Food, Drug and Cosmetics Act ("FDCA") confers on the FDA broad authority to regulate the terms on which prescription drugs are distributed and used in the United States. And the FDA has explicitly determined that its labeling regulations preempt state laws and tort claims challenging the adequacy of FDA-approved labels because the FDA's label-approval process is carefully designed to balance the need for disclosure, on the one hand, with the risks of confusion and overwarning, on the other. If states are allowed to mandate their own additional warnings – or to impose liability for allegedly insufficient warnings after the fact, thereby encouraging manufacturers to avoid such liability *ex ante* by filling labels with every imaginable cautionary statement – such state-law labeling regimes would disrupt and obstruct the FDA's statutorily mandated efforts to ensure both the safety and availability of effective prescription drug medications. The FDA has thus concluded that "under existing preemption principles, *FDA approval of labeling* under the [Food, Drug & Cosmetic Act], whether it be in the old or new format, *preempts conflicting or contrary State law.*"

Under well-settled Supreme Court precedent, the FDA's view of its prescription drug labeling regulations as preempting different state law labeling requirements – which the agency has expressed repeatedly in amicus briefs since 2000, and expressed recently in the even more authoritative form of the Preamble to a Final Rule addressing labeling requirements – is entitled to controlling deference from this Court. Accordingly, plaintiffs' challenge to the FDA-approved post-VIGOR label must be dismissed.

-2-

## BACKGROUND

1. _The FDA Regulation of Prescription Drug Labeling_

The FDA is "the expert Federal public health agency charged by Congress with ensuring that drugs are safe and effective, and that their labeling adequately informs users of the risks and benefits of the product and is truthful and not misleading." Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3922, 3936 (Jan. 24, 2006) (to be codified at 7 C.F.R. pts. 201, 314, 601) ("2006 Labeling Rule"). Unlike lay juries that consider scientific issues in the context of an individual's case, the FDA possesses the scientific expertise necessary to make the difficult judgment calls regarding the appropriate data and explanatory language that should be included in a drug label that will apply across the general population:

> Certainly, neither the outside of a drug package nor its insert can contain the
> entire body of scientific research, and the average consumer cannot be expected to
> analyze and weigh each conflicting study. The FDA possesses the requisite
> know-how to conduct such analyses, by sifting through the scientific evidence to
> determine the most accurate and up-to-date information regarding a particular
> drug, and how those data affect human usage.

_Henley v. FDA_, 77 F.3d 616, 621 (2d Cir. 1996).

"Few if any drugs are completely safe in the sense that they may be taken by all persons in all circumstances without risk. Thus, the Commissioner generally considers a drug safe when the expected therapeutic gain justifies the risk entailed by its use." _United States v. Rutherford,_ 442 U.S. 544, 555 (1979). Critical, incisive reporting of risks and benefits on the drug's label is essential to the FDA's approval of a drug as "safe and effective." _See_ 50 Fed. Reg. 7452, 7470 (Feb. 22, 1985) ("Drug labeling serves as the standard under which FDA determines whether a product is safe and effective."); 65 Fed. Reg. 81082, 81083 (Dec. 22, 2000) ("the primary purpose of prescription drug labeling is to provide practitioners with the essential information

-3-

they need to prescribe the drug safely and effectively for the care of patients"). As the FDA stated in the Preamble to its 2006 Labeling Rule, "[u]nder the act and FDA regulations, the agency determines that a drug is approvable based not on an abstract estimation of its safety and effectiveness, but rather on a comprehensive scientific evaluation of the product's benefits and risks *under the conditions of use prescribed, recommended, or suggested in the labeling.*" 71 Fed. Reg. at 3934 (emphasis added). Labeling thus is the "centerpiece" of the FDA's overall "risk management" effort, because the label "reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively in accordance with the act." *Id.* In short, new drugs are not simply approved as generally "safe and effective" – they are approved as "safe and effective *for use in accordance with the label and in light of the risks disclosed on the label.*" *Id.* (emphasis added).

Because of the label's centrality to the FDA's core regulatory objective of ensuring the safe and effective use of prescription drugs, the FDA "carefully controls" the content and format of labels for proposed drugs. *Id.* Both the FDCA and FDA regulations contain detailed specifications governing label content and formatting. 21 U.S.C. § 355(n); 21 C.F.R. pt. 201. In submitting a new drug for approval, manufacturers must submit not only extensive data about the drug's safety, 21 U.S.C. § 355(d), but also the language of the drug's proposed labeling, *id.* § 355(b)(1)(A). After the FDA's scientists extensively review all relevant data related to the drug, they conduct detailed discussions with the manufacturer and work together with the manufacturer to draft labeling that communicates to prescribing physicians precisely the information that the FDA wishes conveyed; the FDA then approves the exact language and formatting of the drug's final label, down to the smallest minutiae:

-4-

FDA considers evidence submitted by the applicant, as well as other relevant scientific information known to the agency, to determine whether the label is accurate, truthful, and adequate. FDA and drug manufacturers discuss in detail the proposed drug labeling, including the various warnings to be placed on the product. Based on the known scientific evidence, appropriate warnings are drafted that identify the established risks while avoiding inadequately substantiated risks, mention of which could improperly deter use of the drug to the detriment of the very patients it is designed to benefit. When FDA approves a new drug application . . . it also approves the precise final version of the drug labeling, including even the type size and font to be used by the manufacturer in that labeling.

Brief of United States at 5, *Colacicco v. Apotex, Inc.*, No. 05-5500 (E.D. Pa.) (May 10, 2006) ("U.S. *Colacicco* Br."), 2006 WL 1724170. If the FDA is not satisfied that the label reflects a concise and accurate depiction of the material benefits and risks of the drug, it will deny the application, because the drug is not "safe and effective" for use under the terms defined by the label. 71 Fed. Reg. at 3967-68. "[T]he determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the act." *Id.* at 3934.

2.     *The FDA Approves Vioxx and Its Labeling*

In November 1998, Merck filed with the FDA a New Drug Application ("NDA") for Vioxx, an anti-inflammatory pain reliever that belongs to a class known as non-steroidal anti-inflammatory drugs ("NSAIDs"). The Vioxx NDA included extensive data regarding Vioxx's safety and effectiveness, including cardiovascular safety data from over 50 studies involving more than 8,500 patients.

The FDA convened an Advisory Committee of outside experts to review the data and make a recommendation. On May 20, 1999, the FDA agreed with the Advisory Committee's recommendation and approved Vioxx as safe and effective for treatment of osteoarthritic pain,

-5-

primary dysmenorrhea (menstrual pain), and acute pain.[1]  Although the FDA-approved label

disclosed that certain cardiovascular events had been observed during the clinical trials, it did not

state that Vioxx caused, or increased the risk of, cardiovascular events.

     3.    *VIGOR Study Leads To A Change In Vioxx's FDA-Approved Label*

     After Vioxx was approved by the FDA, Merck continued to conduct clinical trials

designed to assess the safety and efficacy of Vioxx for additional patient populations and other

medical conditions.

     In March 2000, Merck learned the preliminary results of the Vioxx GI Outcomes

Research ("VIGOR") study, a double-blind,[2] 8,000-patient trial designed to assess the relative

incidence of gastrointestinal perforations, ulcers, and bleeds ("PUBs") in rheumatoid arthritis

patients treated with Vioxx as compared to those treated with the drug naproxen.  Although the

VIGOR data confirmed that patients taking Vioxx suffered significantly fewer serious

gastrointestinal PUBs than patients taking naproxen, it also showed that the Vioxx group

suffered a higher incidence of serious cardiovascular thrombotic events than did naproxen users.

Although the additional number of cardiovascular events was small in relation to the size of the

treatment group (16 incremental myocardial infarctions out of approximately 4,000 patients

taking each drug), the difference was statistically significant.

     On March 23, 2000, two weeks after receiving the unblinded VIGOR data, Merck faxed a

summary of the results to the FDA.  In June 2000, Merck submitted to the FDA a proposed label

change for Vioxx that incorporated the VIGOR results.  Although Merck had requested an

---

[1]    In subsequent years, as additional data was collected, the FDA expanded the approved uses for Vioxx.  In April 2002, the FDA approved Vioxx as safe and effective for treatment of adult rheumatoid arthritic pain.  In 2004, the FDA further approved Vioxx for treatment of migraine headaches and juvenile rheumatoid arthritic pain.

[2]    A "double-blinded" trial is one in which none of the participants – manufacturer, physicians, or patients – knows which patients are taking the drug being tested and which ones are receiving either a placebo or a comparator drug.

expedited review of its proposed changes, the FDA assigned Merck's application a "standard" classification.  Thereafter, the FDA informed Merck that it was convening an Advisory Committee to seek the advice of other scientists about, *inter alia*, the VIGOR results. The Advisory Committee met on February 8, 2001 and reviewed the VIGOR results with the FDA.

Over the ensuing months and after the FDA Advisory Committee meeting, FDA requested and Merck provided additional data and analyses, and FDA and Merck scientists participated in teleconferences on multiple occasions and exchanged numerous versions of revised labeling.  On April 11, 2002, the FDA approved a revised label for VIOXX.  This revised label incorporated the VIGOR gastrointestinal and cardiovascular results, the cardiovascular results from additional placebo-controlled studies, as well as a new indication for rheumatoid arthritis.  Notably, in approving the revised label, the FDA stated:  "We have completed the review of these supplemental applications, as amended, and have concluded that adequate information has been presented to demonstrate that the drug products are safe and effective for use as recommended in the agreed upon enclosed labeling text."

The post-VIGOR label substantially expanded the discussion of cardiovascular events.[3] In the Clinical Studies section, the new label described the VIGOR study and reported, *inter alia*, the following:

*Other Safety Findings: Cardiovascular Safety*

The VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events in patients treated with VIOXX 50 mg once daily as compared to patients treated with naproxen 500 mg twice daily (see Table 2).  This finding was largely due to a difference in the incidence of myocardial infarction between the two groups. (See Table 3.)  (See PRECAUTIONS, *Cardiovascular Effects.*)  Adjudicated serious cardiovascular events (confirmed by a blinded adjudication committee) included:  sudden

---

[3]       A copy of the label, highlighting all of the changes, is attached as Exhibit 23 to Merck's Statement of Material Facts as to which there is no Genuine Issue to be Tried.  Copies of this same label, with the same colored highlighting, were sent to more than 300,000 physicians in the United States.

death, myocardial infarction, unstable angina, ischemic stroke, transient ischemic attack and peripheral venous and arterial thromboses.

The tables accompanying this text reported both the actual numbers and statistical significance of serious cardiovascular thrombotic events on Vioxx versus naproxen in VIGOR, over time and by type of event (Tables 2 and 3). And in the Precautions section, the new label read as follows:

### Cardiovascular Effects

The information below should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease.

In VIGOR, a study in 8076 patients (mean age 58; VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs 6, VIOXX vs naproxen, respectively) was similar between the treatment groups. (See CLINICAL STUDIES, *Special Studies, VIGOR, Other Safety Findings: Cardiovascular Safety.*) In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75; VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg once daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NSAID comparators or placebo have not been performed.

**Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis.** Therefore, in patients taking VIOXX, antiplatelet therapies should not be discontinued and should be considered in patients with an indication for cardiovascular prophylaxis. (See CLINICAL STUDIES, *Special Studies, Platelets*; PRECAUTIONS, *Drug Interactions, Aspirin.*) Prospective, long-term studies on concomitant administration of VIOXX and aspirin evaluating cardiovascular outcomes have not been conducted.

Immediately after receiving FDA approval, Merck began implementing the April 2002 FDA-approved, post-VIGOR label.

4.   *Merck Obtains Additional Information About Potential Vioxx Risks And Immediately Withdraws Vioxx From The Market*

On September 23, 2004, an external safety board monitoring the results of a separate long-term study – the APPROVe study – informed Merck that interim data from the study showed an increased rate of cardiovascular events in the Vioxx arm compared to the placebo arm.  Merck announced on September 30 that, while it believed that it could have continued to market Vioxx with appropriate disclosure of the new APPROVe data, because of the questions raised by the data and because alternative pain-relief therapies were available, it was withdrawing Vioxx from the market.

5. *Plaintiffs' Alleged Exposure to Vioxx – Post-VIGOR Label And Pre-APPROVe*

Plaintiff Lene P. Arnold alleges that she used Vioxx between July 2003 and October 2004.  (*See* Arnold Plaintiff Profile Form, Aug. 11, 2005 ("Arnold PPF") at IV.B.)  She further alleges that she suffered a heart attack on December 28, 2003, as a result of taking Vioxx.  (*See id.* at I.C.1.b.)  In her complaint, she alleges claims for strict liability–failure to warn; strict liability–design defect; negligence; breach of express and implied warranties; and fraud  (Arnold Compl. ¶ 10-33) and, as the basis for those claims states that, during the time she was using Vioxx, Merck "misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects." (*Id.* ¶ 8.)  Arnold also alleges that "[d]espite the fact that Defendant knew or should have known that VIOXX (Rofecoxib) caused unreasonably, dangerous side effects which many users would be unable to remedy by any means, the Defendant continued to market VIOXX (Rofecoxib) to the consuming public." (*Id.* ¶ 17.)  Notably, the entire period of Ms. Arnold's alleged usage (July 2003 – October 2004) occurred after Merck had already changed the Vioxx label, with the FDA's approval, to reflect the results of the VIGOR study, and before Merck received the APPROVe data that led Merck to withdraw Vioxx from the market.

Plaintiff Alicia Gomez alleges that her husband, Joe G. Gomez, used Vioxx between November 21, 2002, and January 7, 2003.  (*See* Gomez Plaintiff Profile Form, Nov. 16, 2005 ("Gomez PPF") at IV.B.)  Gomez claims that her husband suffered a fatal heart attack on January 7, 2003 as a result of taking Vioxx (*see* Gomez PPF at I.C.1.b) and asserts claims for fraudulent concealment; strict liability–design defect; strict liability–marketing defect/inadequate warnings; claims under the Deceptive Trade Practices Act; fraud; negligence; negligent misrepresentation; and express and implied warranties (Gomez Compl. ¶ 21-52).  Gomez premises her claims on the allegation that "Merck did not provide sufficient warnings and instructions that would have put Plaintiffs, and the general public, on notice of the dangers and adverse effects caused by ingesting the Vioxx (Refecoxib) drug" (Gomez Compl. ¶ 17), and, further, that Vioxx "was defective as marketed due to inadequate warnings, instructions, and/or labelings" (Gomez Compl. ¶ 19).  Gomez also alleges that VIGOR "was published in 2000 and showed there was a fivefold increase in cardiovascular thrombotic events for Vioxx®," but that "[t]he general public . . . was <u>never</u> warned of the serious side effects, such as heart attacks strokes and/or sudden death, that could occur, especially if you had previous cardiovascular problems, from the ingestion of Vioxx®."  (Gomez Compl. ¶ 13.)  As with Ms. Arnold, the entire period of Mr. Gomez's alleged usage (November 21, 2002 – January 7, 2003) occurred after Merck had already changed the Vioxx label, with the FDA's approval, to reflect the results of the VIGOR study, and before Merck received the APPROVe data.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . [Merck] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Because "only those disputes over facts that might affect the outcome of the lawsuit under the governing

-10-

substantive law will preclude summary judgment," questions that are "unnecessary" to the

resolution of a particular case "will not be counted." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d

265, 272 (5th Cir. 1987); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

Plaintiffs' failure-to-warn claims challenge the adequacy of the post-VIGOR label

approved by the FDA.  They assert that, as a matter of state law, the label did not include

sufficient information about known Vioxx risks.  But according to the FDA itself, state-law

claims challenging the adequacy of FDA-approved labels frustrate the basic objectives of the

FDA's prescription drug regulatory scheme, which requires the FDA to maintain strict control

over the substantive content of prescription drug labels, so that the agency can ensure that such

labels properly balance the need for disclosure of known, substantiated risks with the equally

important need to avoid confusion, overwarning and overdeterrence.  Under standard and settled

principles of administrative law, this Court must defer to the FDA's construction of its own

regulations as preempting state laws and claims that challenge the carefully controlled content of

FDA-approved prescription drug labels.  Because plaintiffs' failure-to-warn claims do exactly

that, those claims are preempted and all of plaintiffs' claims must be dismissed.[4]

---

[4]     While some of plaintiffs' claims purport to allege design defects rather than failure to warn, both Georgia
and Texas law are clear that plaintiffs can only allege design defects in drug cases on a failure-to-warn theory. *See
Bryant v. Hoffmann-La Roche Inc.*, 262 Ga. App. 401, 406 (2003) (a pharmaceutical manufacturer is relieved from
strict liability for design defect claims if it can prove, *inter alia*, that "the product is properly manufactured and
contains adequate warnings"); Ga. Code Ann. § 11-2-314(2)(e)-(f) (imposing liability for breach of implied
warranty where product is not "adequately contained, packaged, and labeled as the agreement may require" or does
not "[c]onform to the promises or affirmations of fact made on the container or label if any"); *Blackmon v. Am.
Home Prods. Corp.*, 328 F. Supp. 2d 659, 664 (S.D. Tex. 2004) (applying Texas law and holding that if a
prescription drug is "free from manufacturing and warning defects[,] the seller will not be held strictly liable for
injuries resulting from risks inherent in the product's design"); Tex. Bus. & Com. Code § 2.314(b)(5)-(6) (creating a
cause of action for breach of implied warranty where, *inter alia*, product is not "adequately contained, packaged, and
labeled as the agreement may require" or does not "conform to the promises or affirmations of fact made on the
container or label if any").

-11-

## I.   FEDERAL LAWS AND REGULATIONS PREEMPT CONFLICTING STATE LAWS THAT WOULD FRUSTRATE THEIR PURPOSES AND OBJECTIVES.

Federal preemption derives from the U.S. Constitution's Supremacy Clause, which makes all federal laws "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI cl. 2; *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law preempts state law in essentially three situations:  (1) where the federal law expressly states that certain state laws are preempted ("express preemption"); (2) where the federal law is understood to "occupy the field," such that no state law may even touch upon the regulated subject area ("field preemption"); and (3) where there is an actual conflict between the federal law and the state law ("conflict preemption"). *See id.* at 372-73; *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98 (1992); *Colacicco v. Apotex, Inc.*, No. 05-5500, 2006 WL 1443357, at *5 (E.D. Pa. May 25, 2006) (Baylson, J.). In the third category – conflict preemption – an actual conflict exists, requiring preemption of state law, whenever (a) it is "impossible for private parties to comply with both state and federal law" or (b) the state law "prevent[s] or frustrate[s] the accomplishment of a federal objective" reflected in a law or regulation. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000); *see Crosby*, 530 U.S. at 373. "[B]oth forms of conflicting state laws are 'nullified' by the Supremacy Clause." *Geier*, 529 U.S. at 873 (quoting *Fid. Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153 (1982)). The latter form of conflict preemption is at issue here, as elaborated in Part II below.

The foregoing preemption standards apply fully to regulations promulgated by federal agencies. *See Geier*, 529 U.S. at 881 (finding that state tort claim alleging duty to install vehicle airbags would frustrate the purpose of federal regulations designed to encourage mix of restraint options); *Hillsborough County v. Automated Med. Labs. Inc.*, 471 U.S. 707, 713 (1984) ("We

-12-

have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes."); *Planned Parenthood of Houston and S.E. Tex. v. Sanchez*, 403 F.3d 324, 336 (5th Cir. 2005) ("Federal regulations have no less preemptive effect than federal statutes."); *accord New York v. Locke*, 529 U.S. 89, 109-10 (2000); *City of New York v. FCC*, 486 U.S. 57, 63 (1988). And an agency's power to preempt state laws "does not depend on express congressional authorization to displace state law." *Fid. Fed. Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 154 (1982); *see City of New York*, 486 U.S. at 64; *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 695 (5th Cir. 1994). Rather, "in the absence of a clear congressional command as to pre-emption, courts may infer that the relevant administrative agency possesses a degree of leeway to determine which rules, regulations, or other administrative actions will have pre-emptive effect." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 505 (1996) (Breyer, J., concurring in part and concurring in the judgment). Indeed, a court's inquiry into the preemptive force of an agency's action is "limited": so long as the "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," the court "should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *De La Cuesta*, 458 U.S. at 154; *see City of New York*, 486 U.S. at 63-64 (so long as an agency is "acting within the scope of its congressionally delegated authority," it "may pre-empt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law"); *Vernon Home Health*, 21 F.3d at 696 (stating that when a federal agency "promulgates regulations that preempt state law, the court's inquiry is limited to whether the regulations are reasonable, authorized, and consistent with the statute"). In other words, if an agency "has resolved to pre-empt an area of . . . regulation and if this determination represents a reasonable

-13-

accommodation of conflicting policies that are within the agency's domain, [the court] must

conclude that all conflicting state regulations have been precluded." *Capital Cities Cable, Inc. v.*

*Crisp*, 467 U.S. 691, 700 (1984) (citation and internal quotation marks omitted).

II.    **THIS COURT MUST DEFER TO THE FDA'S DETERMINATION THAT ITS**
       **LABELING REGULATIONS PREEMPT STATE-LAW CHALLENGES TO FDA-**
       **APPROVED LABELS.**

As several courts have recently held, the FDA's regulations preempt state-law failure-to-

warn claims – like plaintiffs' claims here – where plaintiffs effectively assert that labels reviewed

and approved by the FDA did not adequately disclose risks based on information available to the

FDA. *See Colacicco v. Apotex, Inc.*, No. 05-5500, 2006 WL 1443357, at *5 (E.D. Pa. May 25,

2006); *Abramowitz v. Cephalon, Inc.*, 2006 WL 560639 (N.J. Super. Ct. Law Div. Mar. 3, 2006);

*see also Dusek v. Pfizer Inc.*, No. Civ.A. H-02-3559, 2004 WL 2191804 (S.D. Tex. Feb. 20,

2004); *Needleman v. Pfizer Inc.*, No. Civ.A. 3:03-CV-3074-N, 2004 WL 1773697 (N.D. Tex.

2004).[5] These decisions correctly recognize that (a) the FDA itself has determined that its

regulations preempt such state-law claims, because they would disrupt the careful policy balance

the FDA seeks to strike in approving both a drug and its label for public distribution; and (b)

courts must defer to the FDA's authoritative construction of its own regulatory scheme.

A.    **The FDA Has Determined That State-Law Failure-To-Warn Claims**
      **Challenging The Adequacy Of FDA-Approved Labels Frustrate The**
      **Objectives Of The FDA's Drug Approval Process.**

The FDA has unambiguously declared that its drug safety regulatory regime – which

depends critically on the agency's ability to control the substantive content of the labels

associated with approved drugs – cannot function properly if states are allowed to force drug

---

[5]    As the *Colacicco* court noted, almost all decisions holding that the labeling regulations do not have
preemptive effect were decided before the Preamble to the 2006 Labeling Regulation fully formalized the FDA's
position on preemption. *See* 2006 WL 1443357, at *16 (noting that pre-2006 decisions are irrelevant to preemption
analysis because, *inter alia*, those courts did not have "an express statement of policy, formally published in the
Federal Register, taking the position that state law failure-to-warn claims are preempted by the FDCA").

817989v.1

manufacturers to add information to prescription drug labels beyond what the FDA has approved.  In the FDA's recently promulgated rule comprehensively revising its regulations governing the content and format of prescription drug labels, the FDA formally elaborated the agency's conclusions on the interplay between the FDA's drug approval process and state tort claims addressed to prescription-drug labels. *See* 71 Fed. Reg. at 3923-35.  As the FDA explained, its regulations seek to accomplish the objectives of the FDCA by establishing labeling requirements that are both a minimum "floor" and a maximum "ceiling" for the content and format of prescription drug labeling. *Id.* at 3935.  Permitting lay juries to make post hoc assessments about whether an FDA-approved label should have contained additional information (or presented already-included information in a different or more prominent way) would undermine the agency's efforts to employ the labeling process to ensure the safe and effective use of prescription drugs. *See id.* at 3922.  State-law claims challenging FDA-approved labels thus conflict with the FDA's regulatory scheme because they "prevent or frustrate the accomplishment of a federal objective" *Geier*, 529 U.S. at 873, namely, the FDA's effort to regulate the safe and effective use of prescription drugs by strictly controlling the content of drug labels.

According to the FDA, a significant problem created by post hoc failure-to-warn claims is the problem of "overwarning," which, "just like underwarning, can . . . have a negative effect on patient safety and public health." 71 Fed. Reg. at 3935.  In contrast to the FDA's regulatory and enforcement processes, state-law tort actions "are not characterized by centralized expert evaluation of drug regulatory issues," but instead "encourage, and in fact require, lay judges and juries to second-guess the assessment of benefits versus risks of a specific drug to the general public . . . sometimes on behalf of a single individual or group of individuals." *Id.*  The pressure

-15-

817989v.1

to avoid potentially devastating state-law tort liability in an individual case encourages manufacturers to engage broadly in "defensive labeling," *id.*, *i.e.*, filling all labels with detailed information about every conceivable risk, so that if any risk, no matter how small, later materializes and causes injury to an individual patient, the manufacturer can argue to jurors that the risk was disclosed to that patient. The looming (but always uncertain) specter of *post hoc* tort liability creates "pressure on manufacturers to expand labeling warnings to include speculative risks and, thus, to limit physician appreciation of potentially far more significant contraindications and side effects." *Id.* Defensive labeling thus "can lead to labeling that does not accurately portray a product's risks," causing "meaningful risk information to lose its significance." *Id.* (internal quotation marks omitted); *see id.* (overly detailed labels can "erode and disrupt the careful and truthful representation of benefits and risks that prescribers need to make appropriate judgments about drug use").[6]

The resulting confusion has multiple harmful effects. On the one hand, doctors and patients, lacking clear direction about benefits and risks may be encouraged to engage in "inappropriate use" of the drug, affirmatively undermining patent safety. *Id.* at 3935. On the other hand, "[e]xaggeration of risk could discourage appropriate use of a beneficial drug," denying patients the therapeutic benefits they need. *Id.* Either way, forcing manufacturers to expand labels and emphasize every last risk *ex ante* by threatening them with *post hoc* tort liability has the effect of "potentially discouraging safe and effective use of approved products and undermining the objectives of the act." *Id.* at 3936.

---

[6]     Pharmaceutical litigation has changed dramatically in the past several decades. No longer are single lawsuits brought in scattered venues. Instead, pharmaceutical cases evolve into mass tort proceedings, fueled by mass advertising, coordinated in several courts and litigated in bellwether trials. As before, juries consider the adequacy of a label in the context of a single individual's injury. But now, the impact of a verdict reaches far beyond the individual case and, by virtue of its impact on thousands of other existing or putative claims, can frustrate the FDA's application of its expertise to thorny regulatory and medical concerns.

In addition, where a drug is a member of a class of drugs or one of several therapies to treat a condition, as is the case with Vioxx, any change in the label of one member of the class or group of therapies can have an impact on the others, driving doctors and patients either toward, or away from, other therapies. Only the FDA is in a position to assess the risks and benefits of all drugs within a class or group and decide how a particular risk should be characterized in the label, in light of the impact the change will have not only on the use of the particular drug but on comparable therapies as well. Unlike any one manufacturer – or for that matter, any one litigant – the FDA will have access to data relating to every drug in the class and therefore can best assess the interplay of the data in apprising doctors of the relative risks and benefits.

For these reasons, the "FDA has determined that the exercise of State authority conflicts with the exercise of Federal authority under the act." *Id.* at 3967. Such conflict exists, the FDA has concluded, because if "State authorities, including judges and juries applying State law, were permitted to reach conclusions about the safety and effectiveness information disseminated with respect to drugs for which FDA has already made a series of regulatory determinations based on its considerable institutional expertise and comprehensive statutory authority, the federal system for regulation of drugs would be disrupted." *Id.* at 3969. Accordingly, the FDA has determined that any state-law claim that challenges the adequacy of a label approved by the FDA on the basis of information considered by the FDA actually conflicts with, and is therefore preempted by, the FDA's labeling regulations. *Id.* at 3936.[7]

---

[7]     The FDA has also noted an exception to this conflict preemption rule: if the FDA did *not* consider the information at issue in the state-law case because it was affirmatively withheld by the applicant, the state-law challenge to the label may proceed, but only if the FDA makes a finding that it was misled by the applicant. 71 Fed. Reg. at 3936. The FDA thus does not interpret its regulations as "occupying the field" of prescription-drug labeling. *See id.* ("FDA recognizes that FDA's regulation of drug labeling will not preempt all State law actions."). If the FDA determines that the Act was violated, states may allow "parallel" claims for recovery, with their own state-law remedies. *Id.* (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996)).

-17-

**B.      The FDA's Interpretation Of Its Own Regulations Is Entitled To
         "Controlling Deference."**

Under settled principles of administrative law, if an agency's intent to preempt state law

is clear, the only question is whether that judgment reflects "a reasonable accommodation of

conflicting policies that are within the agency's domain." *Capital Cities Cable v. Crisp*, 467

U.S. 691, 700 (1984); *see supra* at 12-13.  If so, the agency's judgment is controlling.  Indeed, if

anything, the deference due here is heightened, because the FDA is construing *its own*

*regulations*.  An agency's construction of its own regulations is "controlling unless plainly

erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997)

(internal quotation marks and citation omitted); *see Belt v. EmCare, Inc.*, 444 F.3d 403, 416 &

n.35 (5th Cir. 2006) (agency's informal construction of its own ambiguous regulation is entitled

to "controlling weight").  Any less deferential approach would make "little sense" given the

agency's power "to write its own regulations as broadly as [it] wishes, subject only to the limits

imposed by the statute." *Id.* at 463.  In *Hillsborough County v. Automated Med. Labs., Inc.*, 471

U.S. 707 (1985), the Supreme Court characterized the FDA's understanding of the preemptive

effect of its own regulations as "dispositive" of the issue. *Id.* at 714.  The same is true here.

The FDA's preemption conclusion rests on the agency's judgment that the objectives of

the FDCA and of FDA regulations are frustrated by state laws that effectively force

manufacturers to depart from FDA-approved labels, thereby altering the balance of benefits and

risks reported on the label based on information already reviewed and approved by FDA

scientists.  That judgment cannot plausibly be described as beyond the FDA's power or as an

unreasonable or plainly erroneous construction of the FDCA or the FDA regulations.  To the

contrary, as noted above, the FDA has broad power to enforce the FDCA, and courts – including

the U.S. Supreme Court – have explicitly recognized the FDA's authority to issue regulations

-18-

that have preemptive force. *See Hillsborough County*, 471 U.S. at 714 (upholding FDA

determination that FDA regulations preempt state laws concerning collection of blood plasma);

*Colacicco*, 2006 WL 1443357, at *11 (holding that FDA labeling regulations preempt state-law

failure to warn claims). Further, as the FDA has carefully explained, *post hoc* tort liability too

often encourages manufacturers to overstuff drug labels with a broad range of cautionary

information, leading to labels that fail to distinguish the most meaningful risk information from

information of more marginal significance – and thus to the use of prescription drugs on terms

that may not be what FDA scientists consider "safe and effective." These concerns are

eminently reasonable – indeed, the problem of overwarning is a concern widely recognized by

courts and commentators. *See, e.g., Carlin v. Superior Court*, 13 Cal. 4th 1104, 1115 (1996);

Lars Noah, *Medicine's Epistemology: Mapping the Haphazard Diffusion of Knowledge in the

Biomedical Community*, 44 Ariz. L. Rev. 373, 454-55 (2002); Thomas Scarlett, *The Relationship

Among Adverse Drug Reaction Reporting, Drug Labeling, Product Liability, and Federal

Preemption*, 46 Food Drug Cosm. L.J. 31, 36 (1991); Charles J. Walsh & Marc S. Klein, *The

Conflicting Objectives of Federal and State Tort Law Drug Regulation*, 41 Food Drug Cosm.

L.J. 171, 182 (1986). Perhaps most important, however, the determination that the threat of state

tort liability undermines federal regulatory objectives because it leads to counterproductive and

unsafe overwarning is undoubtedly within the FDA's expertise in this complex area. *See Mylan

Labs., Inc. v. Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004) ("There is no denying the

complexity of the statutory regime under which the FDA operates [or] the FDA's expertise.").

As Justice Breyer explained with respect to the FDA's authority to preempt state law in

enforcing the Medical Device Amendments ("MDA") to the FDCA:

> The [FDA] is fully responsible for administering the MDA. That responsibility
> means informed agency involvement and, therefore, special understanding of the

> likely impact of both state and federal requirements, as well as an understanding
> of whether (or the extent to which) state requirements may interfere with federal
> objectives.  The FDA can translate these understandings into particularized pre-
> emptive intentions accompanying its various rules and regulations.

*Medtronic*, 518 U.S. at 506 (Breyer, concurring in part and concurring the judgment) (citations

omitted).

In sum, as in *Hillsborough County*, 471 U.S. at 714, the FDA's determination that its

regulations preempt state law is entitled to deference from this Court.  "The FDA has acted

within its authority, and this Court must respect its expert judgment that a[] . . . warning label

other than that approved by the FDA would have been in direct, actual conflict with federal law."

*Colacicco*, 2006 WL 1443357, at *11.[8]

### C.     Plaintiffs' Claims Fall Within The Preemptive Scope Of The FDA's Labeling Regulations.

Because the FDA plainly has the power to issue prescription drug labeling regulations

that preempt state-law claims requiring additional information beyond what the FDA has deemed

mandatory, and because the FDA plainly has determined that its prescription drug regulations

have exactly that preemptive force, the only remaining question is whether plaintiffs' claims are

within the scope of the regulations' preemptive sweep.  The answer is just as plainly yes.

Plaintiffs' claims assert that the FDA-approved post-VIGOR label was inadequate and should

have included more information than the FDA deemed necessary after a lengthy review.  Those

claims are unambiguously within the scope of the state-law claims that the FDA has determined

frustrate its regulatory objective of ensuring the safety and efficacy of prescription drugs through

---

[8]     The reasonableness of the FDA's judgment is underscored by the fact that the FDA did not claim that its regulations preempt all state laws with some tangential or indirect connection to federal prescription drug policy. *Cf.* 29 U.S.C. § 514(a) (preempting all state laws that "relate to" federally regulated employee benefit plans). Rather, the FDA has applied a familiar standard of conflict preemption, focusing on particular state actions that the FDA has determined *directly* impede the agency's ability to regulate prescription drug use by controlling the content and format of drug labels. *See* 71 Fed. Reg. at 3935-36.

strict control over labeling content and format.  To be clear:  plaintiffs' use of Vioxx occurred entirely after Merck had updated the label to reflect the results of the VIGOR study in accordance with the FDA's regulatory decision.  After a substantial review, including the participation of an independent Advisory Committee, the FDA determined that the updated label struck an appropriate balance in disclosing the possible risk.  Plaintiffs' claims assert nothing more or less than that the FDA was wrong, and that the balance the FDA struck in approving the post-Vigor label should have been struck differently – or that Merck simply should have added more cautionary information no matter what balance the FDA thought was appropriate.  The FDA has reasonably determined that because state-law claims of this nature prevent the FDA from maintaining strict control over label content and format – control necessary to accomplish the FDCA's and the FDA's regulatory objectives – such claims are preempted by the FDA's labeling regulations.  Accordingly, plaintiffs' claims must be dismissed.

**D.      Plaintiffs' Arguments Against Deferring To The FDA's View That Its Labeling Regulations Preempt Conflicting State-Law Claims Lack Merit.**

In filings in various prescription drug cases around the country, plaintiffs have advanced a number of arguments against deferring to the FDA's view that its labeling regulations preempt state-law claims challenging the adequacy of drug labels approved by the FDA.  The district court in *Colacicco* reviewed and refuted most if not all of those arguments.  Assuming they will largely be repeated here, this section explains why they lack merit, as the *Colacicco* court recognized.

1.  Plaintiffs in other cases have suggested that the FDA's views as to the preemptive force of its own regulations are meaningless because they have been expressed only in amicus briefs and, most recently, in the Preamble to the 2006 Labeling Rule.  Plaintiffs contend that agency statements in such forms are not entitled to any deference from courts.

Black-letter administrative law is squarely to the contrary.  The Supreme Court has expressly held that agencies may "make their intentions clear" as to the preemptive force of their regulations through a "variety of means," including "*preambles*, interpretive statements, and responses to comments."  *Hillsborough County.*, 471 U.S. at 718 (emphasis added); *see Medtronic*, 518 U.S. at 506 (Breyer, J., concurring in part and concurring in the judgment) (stressing that the "FDA can translate" its "understandings" of the conflicts between state and federal enforcement objectives "into particularized pre-emptive intentions *accompanying* its various rules and regulations" (emphasis added)).  Indeed, the Supreme Court has repeatedly made clear that courts must defer to agency statements appearing in amicus briefs, especially where – as here – those statements are constructions of the agency's *own regulations.  See, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000); *Auer v. Robbins*, 519 U.S. 452, 461 (1997).  The Fifth Circuit has held the same.  *See Belt v. EmCare, Inc.*, 444 F.3d 403, 416 & n.35 (5th Cir. 2006) (court must give "controlling weight" to an agency's "informal interpretation" of its own ambiguous regulation expressed in "opinion letters and *amicuscuriae* [sic] briefs").  *A fortiori*, courts must defer to statements expressed in the Preamble of a formally promulgated rule.  *See Colacicco*, 2006 WL 1443357, at *11 ("Given the overwhelming caselaw on the issue of deference, and specifically the Supreme Court's holdings in *Geier* and *Hillsborough County* that preemptive intent may properly be communicated in amicus briefs, preambles and interpretive statements, we find Plaintiff's argument [against deferring to FDA's views] lacks merit.").  In fact, the FDA has on two prior occasions announced in regulatory Preambles that agency rules regarding over-the-counter ("OTC") drugs preempted any state or local requirements that were "not identical" to those mandated by the FDA, *see* 51 Fed. Reg. 8180, 8181 (Mar. 7, 1986); 47 Fed. Reg. 50442, 50447 (Nov. 5, 1982), and nobody contends that those

-22-

817989v.1

OTC rule Preamble statements lack preemptive force.  Because the Preamble to the 2006 Labeling Rule is likewise an authoritative statement of the FDA's views as to the preemptive force of its labeling regulations, those views are entitled to controlling deference from this Court.[9]

2.  Plaintiffs in other cases have also argued that the FDA's views of its regulations as expressed in the 2006 Labeling Rule are invalid because those views represent a change in the agency's position.  Again, black-letter administrative law principles refute this argument.  The Supreme Court has repeatedly held that an agency's change in position is "is not invalidating," because "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of the statute with the implementing agency."  *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740-42 (1996); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2699 (2005); *Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991).  "An initial agency interpretation is not instantly carved in stone.  To the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863-64 (1984); *see Horn v. Thoratec Corp.*, 376 F.3d 163, 171 (3d Cir. 2004) ("we cannot agree that the FDA's position is entitled to no deference or 'near indifference' simply because it represents a departure form its prior position").

Although a change in agency position may be entitled to less deference when it is "sudden and unexplained," *Smiley*, 517 U.S. at 742, that certainly is not the case here.  To the contrary, since 2000, the FDA has set forth its views on the preemptive force of its regulations in

---

[9]      *La. Envtl. Action Network ["LEAN"] v. EPA*, 382 F.3d 575 (5th Cir. 2004), is not to the contrary.  In *LEAN* the court declined to defer to an agency's informal interpretation (in a preamble) of the *underlying statute*.  *Id.* at 583.  The Fifth Circuit in *Belt* subsequently made clear that an agency's informal interpretation of its *own regulation* is entitled to full deference, indeed "controlling weight."  444 F.3d at 416 & n.35.

a series of amicus briefs specifically urging preemption of state-law claims attacking FDA-approved labeling statements. *See Colacicco*, 2006 WL 1443357, at *13 ("[A]fter 2000, the FDA has been very consistent. On four occasions [citing briefs] . . . it set forth detailed analyses of its position that the Supremacy Clause bars state tort liability specifically for failure to include a warning on a drug label that is in conflict with or contrary to the warnings approved by the FDA."). The Preamble to the 2006 Labeling Rule explains the basis for the FDA's evolving concerns on this issue. In the 2000 Notice of Proposed Rulemaking, the FDA had already expressed serious concerns with the effect of tort suits on the clarity and efficacy of drug labels: "[T]he use of labeling in product liability and medical malpractice lawsuits, together with increasing litigation costs, has caused manufacturers to become more cautious and include virtually all known adverse event information, regardless of its importance or its plausible relationship to the drug." 65 Fed. Reg. 81,082, 81,083 (Dec. 22, 2000). At that time, however, the agency deemed as "highly speculative" the proposition that any manufacturer would actually be held liable in tort for disclosures on a label approved by the FDA. *Id.* at 81,087-88. By 2006, however, the FDA had "learned of several instances in which product liability lawsuits have directly threatened the agency's ability to regulate manufacturer dissemination of risk information for prescription drugs in accordance with the act." 71 Fed. Reg. at 3934.

The FDA's conclusion that its labeling regulation must be understood as preempting state-law claims challenging FDA-approved labels is thus neither sudden nor unexplained. It is plainly a result of the FDA's experience with, and observations of, the effect of prospective tort liability on manufacturers' labeling behavior. As a matter of policy, the FDA firmly believes that "where warnings are concerned, more is not always better," U.S. *Colacicco* Br. 13, but manufacturers facing the prospect of massive tort liability for "underwarning" must *always* err

-24-

817989v.1

on the side of "more," and usually "much more." To the extent that up to the year 2000 the FDA believed the risk of state-law tort liability for an FDA-approved label was merely speculative, the harsh reality of modern product liability litigation has easily dispelled such notions. The FDA was unquestionably entitled to adopt views on preemption that reflect a revised assessment of the tort regime currently prevailing in many states, which – the FDA has reasonably concluded – encourages overwarning and confusion, to the detriment of patient safety and public health.

　　3. In a sharper version of the previous argument, some plaintiffs have attempted to undermine the FDA's views by describing them as "politically motivated." This is both wrong and irrelevant. First, there is simply no evidence whatsoever that the FDA's views on preemption reflect anything other than a discretionary policy choice motivated by a genuine concern about the effect of threatened tort liability on the clarity and efficacy of prescription drug labels, as just discussed. Indeed, the last FDA pronouncement on this topic – a regulation preempting state laws regarding over-the-counter drugs discussed *supra* – was promulgated under a Democratic administration. *See* 71 Fed. Reg. at 3935 ("In 1994, FDA amended 21 CFR 20.63 to preempt State requirements for the disclosure of adverse event-related information treated as confidential under FDA regulations") (citing 59 Fed. Reg. 3944 (Jan. 27, 1994)). Second, and in any event, a *unanimous* Supreme Court recently held that a federal agency is perfectly well entitled to change its position "in response to changed factual circumstances, *or a change in administrations*." *Brand X*, 125 S. Ct. at 2700 (emphasis added). Yet again, the point is a simple matter of black-letter administrative law: if an agency under the aegis of a new administration believes a different policy choice within the domain of an agency's discretion would better serve a statute's objectives, it is entitled to choose that policy, so long as it is not outside the agency's discretion or inconsistent with the statute. *See id.*; *Smiley*, 517 U.S. at 742.

-25-

As explained above, plaintiffs can make no such showing here – the FDA has ample discretion under the statute to issue regulations that have the effect of preempting state laws that conflict with the agency's regulatory objectives.

4.  Some plaintiffs have argued that the FDA's preemption analysis cannot be reconciled with the uncodified statement accompanying the 1962 amendments to the FDCA that "[n]othing in the amendments . . . shall be construed as invalidating any provision of State law which would be valid in the absence of such amendments unless there is a direct and positive conflict between such amendments and such provision of State law." Drug Amendments of 1962, Pub. L. No. 87-781, Tit. II, § 202, 76 Stat. 780, 783 (1962).  This argument misconstrues the 1962 provision. That provision simply prohibits "field" preemption and, if anything, actually *confirms* the FDA's authority to issue regulations that preempt on a "conflict" preemption basis.  As numerous Supreme Court precedents on "conflict preemption" make clear, the phrase "positive and direct conflict" is essentially a preemption term of art that includes those situations in which enforcement of the state statute would frustrate or defeat the purposes of the federal law.  *See, e.g., Hill v. Florida ex rel. Watson*, 325 U.S. 538, 552 (1945) ("direct and positive conflict" exists where state law "make actual, not argumentative, inroads on what Congress has commanded or forbidden" (emphasis added)); *N.Y. Cent. R.R. Co. v. Winfield*, 244 U.S. 147, 158 & n.4 (1917) (direct and positive conflict exists where "state action would actually frustrate or impair the intended operation of the Federal legislation"); *Mo., Kan. & Tex. R.R. Co. v. Haber*, 169 U.S. 613, 623 (1898) (similar).  Indeed, in the seminal case that actually gave rise to the phrase "direct and positive conflict" as a preemption term of art, the Court invalidated a state law that imposed requirements above a "ceiling" of existing federal requirements, on the ground that

-26-

enforcement of the state statute would interfere with the design of the federal scheme. *See Sinnot v. Davenport*, 63 U.S. 227, 243 (1859).

The Supreme Court's precedents make clear that the phrase "positive and direct conflict" is used to distinguish actual conflict preemption from the more amorphous "field" preemption that is sometimes inferred when Congress regulates in an area. Whereas the doctrine of field preemption essentially allows a court to infer preemption from the hypothetical or potential *possibility* of conflict resulting from the mere fact that both Congress and the State are regulating in the same area, the requirement of "positive and direct conflict" requires an "actual, not argumentative," conflict between the operation of the federal law and the enforcement of state law. *Hill*, 325 U.S. at 552; *see Savage v. Jones*, 225 U.S. 501, 533 (1912) (explaining that "actual conflict" exists where state law would frustrate purposes of federal law, as opposed to "potential" or "hypothetical" conflict that results from the mere entry into a field by Congress). But so long as the state law *actually* would interfere with the fulfillment of the federal law's purposes, there is a "positive and direct conflict" of the sort requiring invalidation of the state law. The FDA's conclusion that state-law claims challenging FDA-approved labels create exactly that type of interference with federal regulatory objectives is thus fully consistent with the 1962 amendments.

5. Plaintiffs also have claimed that no deference is owed to the FDA's preemption conclusions because the public did not have adequate notice and opportunity to comment on the preemption views stated in the Preamble. This argument errs in two respects. First, and most simply, the notice-and-comment requirements of the Administrative Procedure Act do not apply to "interpretative rules" such as the Preamble. *See* 5 U.S.C. § 553(b)(A) ("Except when notice or hearing is required by statute, this subsection does not apply – (A) to interpretative rules . . . .");

-27-

*Leslie Salt Co. v. United States*, 55 F.3d 1388, 1394 (9th Cir. 1995). An "interpretative rule" is a rule or comment that merely states the agency's views as to the "meaning of the . . . agency's regulation." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979). It is thus distinguished from a "substantive" or "legislative" rule, which establishes "individual rights and obligations" and creates new "law." *Id.*; *see Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999) (following *Brown* distinction between "interpretative" and "legislative" rules); *see also* 21 C.F.R. § 10.85(d)&(e) (preamble to FDA regulation constitutes FDA's "formal position" on issue but does itself establish a substantive "legal requirement"). As explained above, the formal views of an agency are entitled to full judicial deference – whether expressed in a preamble, comment or amicus brief – even if they are not subject to the notice-and-comment required of agency rules that establish legally enforceable obligations or regulate primary conduct.

Second, and in any event, the Preamble *did* satisfy the requirements of APA notice-and-comment rulemaking. The fundamental issue in such rulemaking is whether the agency's "Notice of Proposed Rulemaking" adequately informed the public of the "issues under consideration by the agency." Richard J. Pierce, Administrative Law § 7.3, at 426. Because agencies may "modify proposed rules as a result of the comments they receive," *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951 (D.C. Cir. 2004), notice "cannot possibly be held inadequate every time" there is a divergence between a proposed rule and its final form, Pierce, *supra*, at 427. As the Supreme Court has explained,

> [i]t goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound. . . . [I]t would be antithetical to the purposes of the notice and comment provisions of the Administrative Procedure Act to tax an agency with "inconsistency" whenever it circulates a proposal that it has not firmly decided to put into effect and that it subsequently reconsiders in response to public comment.

-28-

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986).[10]  Accordingly,

agencies are "free to adjust or abandon their proposals in light of public comments or internal

agency reconsideration without having to start another round of rulemaking." *Kooritzky v.*

*Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994).  "Even a major change from the proposed rule in the

final rule, which is accompanied by an adequate explanation, may be upheld."  Charles Alan

Wright & Charles H. Koch, Jr., 32 Federal Practice & Procedure § 8182.  The pertinent inquiry is

simply whether the notice "fairly apprised the public of the possibility of changes of the general

type that occurred" or "sufficiently foreshadowed the elements of the final rule." Pierce, *supra*,

at 428; *see Am. Med. Ass'n v. United States*, 887 F.2d 760, 768 (7th Cir. 1989); (the "relevant

inquiry is whether or not potential commentators would have known that an issue in which they

were interested was on the table" (internal quotation marks and alterations omitted)).

There is no doubt that the FDA's 2000 Notice of Proposed Rulemaking "sufficiently

foreshadowed" the adoption of a preemption standard and "fairly apprised" the public that

changes of this "general type" might occur.  As the 2006 Final Rule notes, the Notice specifically

"requested comments on the product liability implications of revising the labeling for

prescription drugs," and the preemption standard in the final rule was adopted specifically in

response to those comments.  71 Fed. Reg. at 3933; *id.* at 3934, 3969.  The 2000 Notice included

numerous references to product liability problems arising out of labeling regulations and

affirmatively solicited proposals to solve those problems.  Indeed, product liability lawsuits

potentially interfering with sound information management policies were one of the main

reasons cited by the FDA for even considering revisions to the regulations:  "In addition, the use

---

[10]      "[T]he opportunity to comment is provided by § 553(c) with the expectation that comments often will
persuade agencies to make changes from their original proposal or adopt alternatives to their original proposal.  If an
agency were required to issue a second notice and provide an opportunity for a second set of comments every time it
decided to make a change in response to the first round of comments, the rulemaking process would be endless."
Pierce, *supra*., at 427.

of labeling in product liability and medical malpractice lawsuits, together with increasing

litigation costs, has caused manufacturers to become more cautious and include virtually all

known adverse event information, regardless of its importance or its plausible relationship to the

drug." 65 Fed. Reg. at 81,083. The Notice queried whether the Proposed Rule's concept of

"highlights" for certain labeling information could create additional product liability issues for

manufacturers, and whether two specific stylistic changes could solve that problem. *Id.* at

81,086. "If these are not sufficient," the Notice further queried, "could the agency take different

or additional measures to alleviate product liability concerns without eliminating the highlights

section altogether or lengthening it to an extent that it would no longer serve its intended

purpose"? *Id.* The Notice later reiterates the point:

> The agency is seeking comment on whether the inclusion of a highlights section
> would have a significant effect on manufacturers' product liability concerns and,
> if so, whether this concern has been adequately addressed in this proposal. If it is
> believed that product liability concerns have not been adequately addressed, the
> agency seeks comment on whether it could take different or additional measures
> to alleviate product liability concerns without eliminating the highlights section
> altogether, or lengthening it to an extent that it would no longer serve its intended
> purpose.

*Id.* at 81,088.

It is thus clear that the 2000 Notice adequately foreshadowed the agency's 2006

statement of its views on preemption. The 2000 Notice repeatedly raised the problems created

by product liability actions for sound drug labeling policy and solicited comments on how the

agency could best "alleviate product liability concerns" without compromising the agency's

proposed "highlights" concept for labeling. Any interested party could have predicted – as many

did, according to comments reported in the 2006 Labeling Regulation – that if the agency could

not find a way to revise its planned "highlights" labeling format without creating significant

product liability problems for drug sponsors, one possible solution would be simply to make

abundantly clear (through statements such as those in the Preamble) that the interfering actions are preempted.  Having put the conflict between product liability actions and the FDA's preferred federal labeling policy squarely on the table, and having asked the public to propose solutions to that conflict, the 2000 Notice did fairly apprise the public that the FDA might seek to address that conflict in the final rule.

6.  Finally, it has been suggested that if the FDA's view of the preemptive force of its regulations as stated in the Preamble is entitled to deference, such deference cannot be given "retroactive" effect – that is, actions filed before the promulgation of the 2006 Labeling Rule cannot be deemed preempted by the FDA's regulations.  But the Preamble itself makes clear that its statements "represent[] the government's long-standing views on preemption," and that they merely restate "existing preemption principles," pursuant to which "FDA approval of labeling under the act, whether it be in the old or new format, preempts conflicting or contrary State law." 71 Fed. Reg. at 3933-34.  Courts must "accord significant deference to an agency's characterization of its own action." *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 797 (5th Cir. 2000); *see Heimmerman v. First Union Mortgage Co.*, 305 F.3d 1257, 1260 (11th Cir. 2002) (agency's view that "a new statement is a clarification of existing law . . . is generally given much weight").  Further, as noted above, the 2006 Labeling Rule Preamble was not the first time or place the FDA set forth its position that its regulations preempt state laws requiring disclosures not approved by the FDA – a series of amicus brief filings, which are themselves entitled to judicial deference, had set forth that position for six years prior.

Perhaps most significant to the retroactivity argument, however, is the fact that the Preamble is an "interpretative rule," as discussed above.  Because an interpretative rule merely "clarifies" the meaning of existing law, "retroactivity concerns are irrelevant." *Colacicco*, 2006

-31-

WL 1443357, at *14 (citing, *inter alia, United States v. Tomasino*, 206 F.3d 739 (7th Cir. 2000);

*Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary*, 93 F.3d 103, 113 (3d Cir.

1996); *Cowan v. Bank United of Texas*, 70 F.3d 937, 943 (7th Cir. 1995)).[11]

In short, this Court may – and indeed must – defer to the FDA's view that its labeling

regulations preempt state-law claims that challenge the content of FDA-approved labels.

Plaintiffs' state-law claims therefore are preempted, and Merck is entitled to judgment as a

matter of law.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment should be granted.

Respectfully submitted,

/s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA 70130

Defendants' Liaison Counsel

And

John H. Beisner
Jonathan D. Hacker
Jessica Davidson Miller
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006

---

[11]     *See also Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1081, 1086-87 (9th Cir. 2001) (holding that federal statute validly preempted a state law tort action that accrued before statute's enactment).

817989v.1

Douglas R. Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum of Law in Support of

Merck's Motion for Summary Judgment has been served on Liaison Counsel, Russ Herman by

U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order

No. 8, on this 6th day of July, 2006.

/s/ Dorothy H. Wimberly

-33-

817989v.1