# Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses

| Plaintiff's Affirmative Designations | Defendant's Objections | Plaintiff's Responses |
|---|---|---|
| [11:8] - [14:6] 7/3/2006 James Fries<br><br>* James Fries Dep Cut<br><br>page 11<br>8    Q.    Could you state your name<br>9 for the jury, please, Doctor.<br>10     A.    James Franklin Fries.<br>11     Q.    You are a medical doctor,<br>12 correct?<br>13     A.    That's correct.<br>14     Q.    We're here at Stanford<br>15 University to take your deposition today.<br>16 Is this where you're currently employed?<br>17     A.    That's right.<br>18     Q.    And what is your current<br>19 position here?<br>20     A.    I'm a professor of medicine,<br>21 emeritus active.<br>22     Q.    Okay.<br>23           And how long have you been a<br>24 professor of medicine here at Stanford?<br>page 12<br>1     A.    At one grade or another, a<br>2 professor since 1971.<br>3     Q.    Okay.<br>4           Do you have a particular<br>5 specialty?<br>6     A.    I'm a rheumatologist.  I<br>7 also do work in clinical epidemiology, in<br>8 aging research and health public policy<br>9 and in information technology.<br>10     Q.    Okay.<br>11           In terms of your specialty,<br>12 rheumatology, have you done particular<br>13 research in regards to NSAIDs?<br>14     A.    Yes.  I should probably give<br>15 you a little bit of background because it<br>16 will be important probably for everything<br>17 that happens.<br>18     Q.    Sure.<br>19     A.    30 years ago, about 30 years<br>20 ago, I founded ARAMIS, that's<br>21 A-R-A-M-I-S, the Arthritis, Rheumatism &<br>22 Aging Medical Information System.  And<br>23 we've tracked some 17,000 people in total<br>24 from when we get ahold of them until they<br>page 13<br>1 die or just say good-bye to us in another | | |

# Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses

2 way.  And we follow them for everything
3 that happens to them medically.  We get
4 their clinical information, we go to them
5 with questionnaires about health status
6 each six months.  We collect information
7 at that time on the drugs that they've
8 taken, the disability level that their
9 arthritis has inflicted on them, the pain
10 they have, their use of medical care
11 services, the drugs they're taking and
12 any side effects that they've had for
13 those drugs, whether they're symptoms
14 side effects or side effects that cause
15 hospitalizations or that cause death.
16          We tally these and we write
17 papers with regard to the comparative
18 toxicity of different drugs.  So, this is
19 the first chronic disease databank system
20 that has existed.  It's also the longest
21 in duration.  There are about 1,000
22 papers that have emerged from it on a
23 series of different subjects.  Probably
24 my guesstimate would be around 20 on the
page 14
1 subject that we're discussing today,
2 which are side effects of the -- side
3 effects assessment in general and side
4 effects of the nonsteroidal
5 anti-inflammatory drugs in particular,
6 so...

[17:4] - [17:11] 7/3/2006 James Fries

* James Fries Dep Cut

page 17

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 4     Q.   I'm going to go ahead and<br>5  hand you what's been marked as<br>6  Plaintiff's Exhibit 1.0176, which is a<br>7  copy of the letter on Stanford University<br>8  letterhead addressed to Dr. -- or, I'm<br>9  sorry, Mr. Ray Gilmartin, and you can<br>10  feel free to refer to this.<br>11     A.   Yeah.  Thank you. | 401, 402, 403.  Testimony regarding the Fries letter, which the Court has already ruled is inadmissible.  See Court's ruling on Merck's MIL #3 | The Court ruled that the Fries letter itself was inadmissible but has made no ruling on the admissibility of Dr. Fries' testimony.  In the hearing held June 28, 2006, the Court indicated that it needed to look at the deposition.  Dr. Fries' testimony is relevant to show that Merck not only failed to warn physicians and patients but actively suppressed the communication of those who raised serious safety concerns related to Vioxx.  Conduct also proves that Merck failed to act as a reasonable pharmaceutical company in designing and marketing Vioxx. |
| [18:3] - [18:15] 7/3/2006 James Fries<br><br>* James Fries Dep Cut<br><br>page 18<br>3     Q.   So, getting back, on October<br>4  28, 2000, did you receive a call from Dr.<br>5  Sherwood?<br>6     A.   Yes.<br>7     Q.   Okay. | 401, 402, 403.  Phone call between Dr. Fries and Dr. Sherwood has nothing to do with this case and should be excluded. | Dr. Sherwood is a Vice President of Merck.  His statements to Dr. Fries asking Dr. Fries to curtail the comments of Dr. Singh are relevant to show that rather than warn, Merck actively pursued avenues to suppress communication of the CV dangers associated with Vioxx by third parties.  Relevant to Plaintiff's failure to warn claim.  Not unfairly prejudicial. |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 8      And at that time, did he<br>9  identify himself as being with Merck?<br>10    A.   Yes, I believe so.<br>11    Q.   And during that<br>12  conversation, where did you -- where did<br>13  you receive the phone call?<br>14    A.   Well, I received that call<br>15  at home. | | |
| **[18:16] - [18:22] 7/3/2006 James Fries**<br><br>* James Fries Dep Cut<br><br>page 18<br>16    Q.   Okay.<br>17      Had you ever received a call<br>18  from a pharmaceutical company like that<br>19  at home before?<br>20    A.   No.<br>21    Q.   Did you find that unusual?<br>22    A.   Yes. | Same objection | Same response |
| **[19:2] - [19:23] 7/3/2006 James Fries**<br><br>* James Fries Dep Cut<br><br>page 19<br>2    Q.   Was it during the week or on<br>3  a weekend?<br>4    A.   It was on a Saturday.<br>5    Q.   On a Saturday.  Okay.<br>6      What was Dr. Sherwood<br>7  calling to discuss with you at that time?<br>8    A.   He was concerned that a<br>9  doctor, research associate on my staff,<br>10  Gurkipal Singh, had been giving talks in<br>11  public which were critical of Merck's<br>12  Vioxx, and in particular, had emphasized<br>13  the potential cardiovascular toxicity of<br>14  Vioxx.<br>15    Q.   In particular, what was he<br>16  complaining about, Dr. Sherwood?<br>17    A.   He believed that the talks<br>18  in question were unbalanced and that this<br>19  was something that I, as his immediate<br>20  supervisor, should know about and take<br>21  some action.  And he also contacted the<br>22  chairman of the department and the | Same objection | Same response |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 23  chairman of our division. | | |
| **[20:9] - [20:12] 7/3/2006 James Fries**<br><br>* James Fries Dep Cut<br><br>page 20<br>9           What did Dr. Sherwood say at<br>10  that time?  Did he imply to you any<br>11  consequences if -- or what did he want<br>12  you to do in regards to Dr. Singh? | Same objection & leading | Same response.  Counsel corrected leading nature of second question. |
| **[20:18] - [20:20] 7/3/2006 James Fries**<br><br>* James Fries Dep Cut<br><br>page 20<br>18      A.   Yeah.  He wanted Dr. Singh<br>19  to stop making the kinds of statements<br>20  that he had been making -- | Same objection | Same response |
| **[20:22] - [21:11] 7/3/2006 James Fries**<br><br>* James Fries Dep Cut<br><br>page 20<br>22      A.   -- and he wanted, you know,<br>23  me to assist him in that task.<br>24      Q.   Okay.<br>page 21<br>1           And did he indicate to you<br>2  that there would be any kind of<br>3  consequences if you didn't or if Dr.<br>4  Singh did not?<br>5      A.   Well, he did, and I wrote<br>6  up, when I was much closer to the time,<br>7  some of the things that he said, that Dr.<br>8  Singh would flame out if he didn't change<br>9  his behavior and that there would be<br>10  consequences for Stanford, and he implied<br>11  that there might be consequences for me. | Same objection | Same response |
| **[21:13] - [21:23] 7/3/2006 James Fries** | | |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| * James Fries Dep Cut<br><br>page 21<br>13        At that time, did you take<br>14  that to mean that Stanford or yourself<br>15  would not be receiving research funds if<br>16  that didn't stop?<br>17    A.   Well, that was never stated.<br>18    Q.   Is that what you --<br>19    A.   And it's always a question,<br>20  sort of an implied thing.  When you say<br>21  how would it be bad for Stanford, I guess<br>22  it would be bad for Stanford if the<br>23  research funding dried up. | Same objection.  Also calls for speculation -- witness's speculation about Stanford's funding is irrelevant and prejudicial. | Dr. Fries is aware that Merck funds research at Stanford.  His testimony is not speculative.  He is testifying to his understanding of what Dr. Sherwood was communicating to him. |
| [22:12] - [25:8] 7/3/2006 James Fries<br><br><br><br><br><br><br><br>* James Fries Dep Cut<br><br>page 22<br>12        After that conversation with<br>13  Dr. Sherwood, did you contact Dr. Singh?<br>14    A.   Yes.  I took this the same<br>15  way that I think anybody should who hears<br>16  about it.  You want to determine if it's<br>17  true or not.  And so I did ask Dr. Singh,<br>18  and I told Dr. Sherwood that I would do<br>19  this, that I would ask Dr. Singh what had<br>20  transpired and I would check out.  And if<br>21  there was action that was required, I<br>22  would take the action.  And I did that. | 401, 402, 403.  Dr. Fries' conversations with Dr. Singh, and the contents of Dr. Singh's presentation, are irrelevant and prejudicial.  Also contains hearsay | Testimony is relevant to Dr. Fries' knowledge and the investigation that he undertook prior to putting Merck on notice with the letter to Mr. Gilmartin of the inappropriateness of Dr. Sherwood's and other Merck employees' actions.  Relevant to Plaintiff's failure to warn claim.  Dr. Singh's statements are not hearsay as they are not offered for the truth of the matters asserted but to Dr. Fries' state of mind. |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

23    Q.   When you say you "did that,"
24 did you actually review the -- or did you
page 23
1 talk to Dr. Singh specifically about his
2 presentation?
3    A.   I talked with him about the
4 presentation.  He felt that it was a
5 balanced presentation.  That's what he
6 maintained.  And I said, well, can I see
7 the slides?  And so I looked at the
8 PowerPoint slides that he had.  There
9 were, I don't remember, maybe 30 of them.
10 I counted up the ones which were pro --
11 much of the talk was on -- much of his
12 talks were on GI NSAID safety in general
13 not connected with a particular product.
14 But there was mention of both the VIGOR
15 trial and the CLASS trial and of
16 celecoxib and of rofecoxib during that
17 talk.  And I counted the slides for
18 rofecoxib and for celecoxib, and there
19 were the same number, and they were both
20 from similar studies and were really
21 quite parallel.
22          I learned that he had had a
23 previous slide which had a little man who
24 was shoveling -- hiding something under a
page 24
1 rug, and I actually saw that slide.  He
2 explained that he had had it -- it was a
3 little Merck man shoveling something
4 under the rug.  And it was sort of
5 humorous.  And he explained that he had
6 taken this out of his presentation
7 because he had gotten the data that he
8 had been trying to get from Merck.
9    Q.   Did you find the
10 presentation to be balanced?
11    A.   It looked to me to be
12 reasonably balanced.  You can't tell by
13 looking at a set of slides what someone
14 is saying when they have those slides on.
15 So, I went a little bit further and I
16 checked with three people who had been in
17 the audience of the most offending of
18 these, and none of them were particularly
19 offended or thought it particularly
20 unbalanced.
21          So, it was a funny
22 situation, because the data that were of

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 23  interest were on something that would<br>24  almost automatically unbalance a balanced<br>page 25<br>1  presentation, because there was negative<br>2  information on one product of different<br>3  degrees of certainty, and there wasn't<br>4  any balancing information.  So, if you<br>5  really were explaining things at that<br>6  point, one would tend to probably<br>7  overemphasize or emphasize more the Vioxx<br>8  data. | | |
| **[26:22] - [26:24] 7/3/2006 James Fries**<br><br><br>* James Fries Dep Cut<br><br>page 26<br>22         When you say the American<br>23  College of Rheumatology or ACR, when was<br>24  that?  Was that in November of 2000, | Just a question and does not include an answer | Plaintiff will add the answer as it appears at 27:1-2.<br>"1     approximately?<br>2     A.    It must have been, yes." |
| **[34:4] - [35:1] 7/3/2006 James Fries**<br><br><br>* James Fries Dep Cut<br><br>page 34<br>4     Q.    Okay.  All right.<br>5         You also reference in these<br>6  -- or during that time of the ACR<br>7  meeting, did it also come to your<br>8  attention that other doctors had<br>9  complaints of Merck contacting either | 401, 402, 403.  Testimony regarding content from the Fries letter, which the Court has already ruled is inadmissible. See Court's ruling on Merck's MIL #3 Also 801, 802 – hearsay (witness testifying about what other third party doctors said and thought) | Testimony is relevant to Plaintiff's failure to warn claim as outlined above. Moreover, Court excluded the Fries letter from evidence and had made no ruling on Dr. Fries testimony under oath about the letter. Dr. Fries is testifying to his knowledge about Merck's attempt to influence academic debate not to the statements of others. |

# Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
## with Defendant's Objections and Plaintiff's Responses

10 themselves or their bosses in an effort
11 to intimidate them?
12          MR. RABER:  Objection to
13     form.
14          THE WITNESS:  Yes.  It was
15     kind of at that time that the
16     rumor mill was going, and once
17     people started talking about this,
18     there were other people that had
19     similar experiences.  And they
20     reported them, and a number of
21     them had the same reaction that I
22     did, that this was a way of
23     influencing academic debate, which
24     was not appropriate and could not
page 35
1     continue.

---

[35:20] - [36:1] 7/3/2006 James Fries

| | |
|---|---|
| 401, 402, 403.  Phone call between Dr. Fries and Dr. Sherwood has nothing to do with this case and should be excluded. | Relevant to show Merck's notice of Dr. Fries' assertions that it was inappropriately attempting to suppress the statements of physicians attempting to warn about the CV dangers associated with Vioxx. |

* James Fries Dep Cut

page 35
20          Did you actually talk with
21 Dr. Sherwood about these different
22 allegations prior to writing your letter?
23     A.   Yes.  But my recollection is
24 that was a telephone call after the
page 36
1 meetings.

---

[36:3] - [36:20] 7/3/2006 James Fries

| | |
|---|---|
| Same objection | Same response |

* James Fries Dep Cut

page 36
3          Tell me about that telephone
4 call.
5     A.   We'd gone backwards and
6 forwards and got a connection, and then
7 we discussed these issues much as they're

## Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
## with Defendant's Objections and Plaintiff's Responses

8  laid out there.  I put some quotes in
9  that letter that were not recorded
10  quotes, but they were ones that I had
11  remembered from the -- from one
12  discussion.
13          One ironic one was that he
14  had said that the side effects didn't
15  occur at all, they had internal data to
16  indicate that they didn't occur, but that
17  anyway it was only at high doses.  I
18  thought that that was an interesting way
19  to put an affirmation and a denial into
20  the same sentence.

---

**[37:9] - [37:17] 7/3/2006 James Fries**

| | |
|---|---|
| 401, 402, 403.  Testimony regarding the Fries letter, which the Court has already ruled is inadmissible.  See Court's ruling on Merck's MIL #3 | Testimony is relevant to Plaintiff's failure to warn claim as outlined above.  Moreover, Court excluded the Fries letter from evidence not testimony about the letter in its ruling regarding MIL # 3.  Dr. Fries is testifying to his knowledge about Merck's attempt to influence academic debate not to the statements of others. |

* James Fries Dep Cut

page 37
9          So, after having the phone
10  conversation on October 28, 2000, seeing
11  Dr. Sherwood at the ACR meeting, seeing
12  the VIGOR posters at the ACR meeting,
13  talking with Dr. Sherwood again on the
14  phone, you then wrote this letter on
15  January -- or sent the letter on January
16  9, 2001, correct?
17      A.   Yes.

---

**[37:19] - [38:9] 7/3/2006 James Fries**

| | |
|---|---|
| Same objection | Same response. Dr. Fries is testifying to his own actions in response to Dr. Sherwood's call. |

* James Fries Dep Cut

page 37
19          And you wrote this letter to

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 20 Mr. Raymond Gilmartin, correct?<br>21      A.   Yes.<br>22      Q.   Had you ever met Mr.<br>23 Gilmartin before?<br>24      A.   No.<br>page 38<br>1      Q.   He is the -- or at the time<br>2 was the Chief Executive Officer of Merck,<br>3 correct?<br>4      A.   Yes.<br>5      Q.   Okay.<br>6          Had you ever written a<br>7 letter to the CEO of a pharmaceutical<br>8 company before?<br>9      A.   No. | | |
| [38:11] - [38:14] 7/3/2006 James Fries | | |
| * James Fries Dep Cut<br><br>page 38<br>11          Had you ever written a<br>12 letter with these kind of allegations in<br>13 them to a pharmaceutical company before?<br>14      A.   No. | Same objection | Same response |
| [39:14] - [39:24] 7/3/2006 James Fries | | |
| * James Fries Dep Cut<br><br>page 39<br>14          Particularly, and if I could<br>15 focus your attention on the letter for<br>16 just a moment, there were a couple of<br>17 things in the letter that I noticed.  You<br>18 reference in here several times, I<br>19 counted four different times that you<br>20 used the word "intimidate" in this<br>21 letter.<br>22          What was your understanding<br>23 in terms of the intimidation that you<br>24 felt was going on with Merck? | Same objection.  Also calls for speculation and witness lacks personal knowledge. | Same response.  Question seeks Dr. Fries' personal understanding.  No speculation. |
| [[40:5] - [40:16] 7/3/2006 James Fries | | |

# Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
## with Defendant's Objections and Plaintiff's Responses

| | Same objection.  Also calls for speculation and witness lacks personal knowledge. | Same response.  Question seeks Dr. Fries' personal understanding. No speculation. |
|---|---|---|
| * James Fries Dep Cut<br><br>page 40<br>5      A.   Well, my understanding was<br>6  that there is quite a common theme and<br>7  that the reports that I got from everyone<br>8  who alleged that they had been<br>9  intimidated, they tended to use that<br>10  term, too, but they were all very<br>11  similar.  They were threatened in some<br>12  instances directly financially because<br>13  their speaker fees were being threatened<br>14  or removed.  In some cases, they were not<br>15  allowed to be on Merck trials where they<br>16  wanted to be participating investigators. | | |
| [40:17] - [40:19] 7/3/2006 James Fries<br><br>* James Fries Dep Cut<br><br>page 40<br>17      Q.   Were they similar to the<br>18  situation that happened with you and Dr.<br>19  Singh? | Same objection | Same response |
| [40:22] - [41:24] 7/3/2006 James Fries<br><br>* James Fries Dep Cut<br><br>page 40<br>22        THE WITNESS:  Yes.  The<br>23      pattern seemed to be the same, and<br>24      Dr. Sherwood confirmed that with<br>page 41<br>1      me.  It was one of the interesting<br>2      parts of that last conversation,<br>3      is that I told him that I was<br>4      offended that someone would go<br>5      over people's heads and try and<br>6      punish them in some way for<br>7      something that Merck didn't like.<br>8      I had never heard or seen such a<br>9      thing.<br>10        And he said that he was a --<br>11      had been a chairman of a | Same objection | Same response |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 12    department of medicine and that he<br>13    knew all of the people in the<br>14    network and that he would call<br>15    whoever he wanted and that that<br>16    was his right.  And it was partly<br>17    that statement of his that caused<br>18    me to be sure to write this<br>19    letter, because he made it clear<br>20    that he felt it was justified to<br>21    go over the head of the people who<br>22    he was concerned with, and so I<br>23    felt entirely justified to go over<br>24    his head. | | |
| **[42:3] - [42:4] 7/3/2006 James Fries**<br><br>* James Fries Dep Cut<br><br>page 42<br>3      A.    Hence, the letter to<br>4  Gilmartin and others. | Same objection | Same response |
| **[43:11] - [44:14] 7/3/2006 James Fries**<br><br>* James Fries Dep Cut<br><br>page 43<br>11      Q.    And I think if you look at<br>12  Page 3 of the letter in the top<br>13  paragraph -- well, I guess starting,<br>14  actually, I guess it would be on Page 2,<br>15  the last paragraph of the page --<br>16      A.    Uh-huh.<br>17      Q.    -- where it indicates --<br>18  just follow along with me, if you would,<br>19  Doctor, because I'm going to ask you some<br>20  questions about this, in particular, this<br>21  section.<br>22      A.    Right.<br>23      Q.    It states, "Even worse were<br>24  the allegations of Merck damage control<br>page 44<br>1  by intimidation, often with a pattern of<br>2  going to the Dean Or Department Head with<br>3  complaints of anti-Merck bias and always<br>4  alleging unbalanced anti-Vioxx<br>5  presentations."<br>6          Did I read that correctly? | Same objection | Same response |

**Deposition of Dr. James Fries, M.D.: Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 7   A.  That's correct.<br>8   Q.  And is that what happened in<br>9  regards to Dr. Sherwood contacting you in<br>10 regards to Mr. -- Dr. Singh?<br>11      MR. RABER: Object to form.<br>12      THE WITNESS: Yes. He<br>13  clearly wanted me to exert<br>14  pressure on Dr. Singh. | | |
| [44:16] - [45:10] 7/3/2006 James Fries<br><br><br>* James Fries Dep Cut<br><br>page 44<br>16   Q.  Okay. And it goes on to<br>17 say, "This has happened to at least eight<br>18 investigators: Dr. Singh; Dr. Lipsky,<br>19 now research chief at the Arthritis<br>20 Institute; Dr. Andrew Whelton of Hopkins;<br>21 Dr. Michelle Petri of Hopkins; Dr. David<br>22 Yokum of Tucson, currently head of the<br>23 FDA advisory panel; Dr. Lee Simon of<br>24 Harvard; Dr. James McMillen; and Dr.<br>page 45<br>1 Thomas Stillman. I suppose I was mildly<br>2 threatened myself, although I have never<br>3 spoken or written on these issues." Is<br>4 that correct?<br>5   A.  That's correct.<br>6   Q.  Okay.<br>7      And is that the way you felt<br>8 back in 2000 when you wrote this?<br>9   A.  Yes. And that's the way I<br>10 feel now. | Same objection | Same response. Dr. Fries is<br>testifying to his personal<br>knowledge. |

# Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses

| | | |
|---|---|---|
| [46:6] - [46:20] 7/3/2006 James Fries<br><br>* James Fries Dep Cut<br><br>page 46<br>6　　　And you did all of that<br>7  prior to ever writing this letter to<br>8  Merck?<br>9　　A.　It was in process.  During<br>10  the six weeks the letter was being<br>11  written, I was continuing what is<br>12  probably the only investigative research<br>13  of this kind I've ever done.  I really<br>14  wanted to make sure that what I said I<br>15  had permission from the people to say<br>16  that were involved and that they would<br>17  stick behind what they had told me as<br>18  their opinion.  That's why I did all of<br>19  this verification and it went through all<br>20  of these drafts and drafts. | Same objection | Same response |
| [46:22] - [47:13] 7/3/2006 James Fries<br><br><br>* James Fries Dep Cut<br><br>page 46<br>22　　　Focusing your attention down<br>23  to the next paragraph -- actually, the<br>24  second full paragraph on that page.  You<br>page 47<br>1  indicate in there the sentence, "The<br>2  investigators whose balance was<br>3  criticized are prominent and several<br>4  advise the FDA -- a role not often given<br>5  to unbalanced presenters."  Is that<br>6  correct?<br>7　　A.　That's correct.  I think<br>8  there were also some that were not as<br>9  renowned.  Dr. McMillen and Dr. Stillman,<br>10  Dr. Singh were not renowned.  But Andy<br>11  Whelton and Michelle Petri and David<br>12  Yocum, Lee Simon, Peter Lipsky, those are<br>13  widely respected rheumatologist names. | Same objection | Same response.  Dr. Fries is not speculating but testifying to his personal knowledge. |
| [49:3] - [53:5] 7/3/2006 James Fries | | |

## Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
## with Defendant's Objections and Plaintiff's Responses

Same objection.  Also contains hearsay and speculation, and the answer is non-responsive.

Relevant to Plaintiff's claims that Vioxx is defective and that Merck failed to warn.  Also, relevant to show that Merck's "naproxen defense" is false.  Dr. Fries is not speculating but testifying to his personal knowledge as a leading rheumatologist about the state of the science and the results of clinical trials that had been released as of the date of the letter.

* James Fries Dep Cut

3    Q.    Okay.
4          You state in the last
5  sentence on the second page of the last
6  full paragraph, "The publication of the
7  VIGOR trial recently in the NEJM did not
8  contain the data on edema and fluid
9  retention at all, and dismissed the heart
10  attack data with weak arguments."  Is
11  that correct?
12    A.    Yes.
13    Q.    And what weak arguments are
14  you referring to there?
15    A.    Well, Merck confronted these
16  data.  There were three explanations that
17  were put forward, and I'll give you a
18  long answer just because it's not all
19  specific in the letter.
20          There were three possible
21  explanations that were brought out.
22  Merck emphasized two of them.  One was
23  that the heart attacks only occurred in
24  people who were at high risk.  If you
page 50
1  looked at the people who had had the high
2  risk, had the heart attacks on Vioxx,
3  they were high risk people for heart
4  attacks.  And this is true.  But it's
5  weak because it's irrelevant.  These are
6  randomized control trials, and there are
7  just as many high risk people in the
8  control group as there are in the Vioxx
9  group.  So, just as many in the naproxen
10  group as there were in the Vioxx group,
11  yet there were a difference in the

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses**

12 number, significant difference in the
13 number of heart attacks.  So, that's a
14 non-argument.  It was a true observation
15 that they mostly happened in people at
16 risk.  Well, who else would it happen to,
17 of course.  So, that was a weak argument
18 for that part.
19          Now, the second argument
20 which was adduced was that it wasn't that
21 Vioxx was causing heart attacks, it was
22 that naproxen was preventing heart
23 attacks.  So, that's why the difference
24 existed.  Now, that's a weak argument
page 51
1 because there's been a lot of looking at
2 naproxen over the years, way before this,
3 back when they were -- naproxen was made
4 by Syntex.  In our neighborhood, we dealt
5 with questions about whether, because it
6 had antiplatelet actions, it could be as
7 effective as aspirin and one could put it
8 in as a way of preventing heart attacks.
9 It turned out that it was very hard to
10 document that effect, so, that was never
11 made an indication for it.  But there
12 certainly was no indication that there
13 would be a substantial change in heart
14 attack rates because you were taking
15 naproxen.  So, the evidence was negative
16 on that.  That made that a weak argument.
17          Now, my first impression was
18 to say that this is just bad luck.  And
19 that does happen in trials.  This was a
20 secondary endpoint, not a prespecified
21 endpoint for the trial.  And you can have
22 bad luck in 5 percent of your secondary
23 endpoints, because 1 out of 20 of them
24 will be statistically significantly
page 52
1 positive even though there is no true
2 relationship between the observation and
3 the drug.  Now, that was my favorite
4 early hypothesis early on, and I can't
5 remember whether it was at the time I
6 wrote the letter or not.  And I thought
7 it was probably a brouhaha about
8 something, because there was no
9 mechanism, you know, it didn't fit
10 together, it was an unexpected finding,
11 and so --

## Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
## with Defendant's Objections and Plaintiff's Responses

12          However, a friend of mine,
13 Garret FitzGerald, and I keep in touch on
14 these issues and did at that time, and he
15 knew about the Bextra data before I did.
16 It happened really early on.  And then
17 there was a third drug which was never
18 brought to market.  So, it turns out that
19 this finding was found in three drugs,
20 not just one, and it was of similar
21 magnitude.  And these drugs were at the
22 same point on the COX-1 sparing spectrum,
23 so that they were at the very edge of it.
24 They were at the right-hand edge, if you
page 53
1 will, with regard to their effects.  So,
2 that took bad luck out of it.  So, it was
3 at that point that I decided this was
4 true and I stopped prescribing Vioxx to
5 my own patients.

[54:21] - [57:19] 7/3/2006 James Fries

* James Fries Dep Cut

| | |
|---|---|
| 54:21-55:21 – Leading question, also 401, 402, 403 – irrelevant and prejudicial.<br>56:5-57:19 – 401, 402, 403 – relates to the Fries letter, which the Court has already ruled is inadmissible.  See Court's ruling on Merck's MIL #3; also no foundation since witness has never seen the document before | As to the relevance objection, same response as before.  Not a leading question.<br>Testimony relates to Dr. Fries' experiences and actions.  Court excluded admission of letter into evidence but has made no ruling regarding Dr. Fries' sworn testimony. |

page 54
21          The contact that you had
22 from Dr. Sherwood and from Merck in
23 regards to Vioxx, did you feel that was
24 at all appropriate?
page 55
1          MR. RABER:  Objection to
2 form.
3          THE WITNESS:  I felt that
4 belief in the scientific
5 marketplace where you have freedom
6 of expression on all sides without
7 overt intimidation, let alone this
8 kind of thing, really was a threat
9 to academic freedom.  And I saw it
10   and phrased my position in terms
11   of the academic freedom issues,

## Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses

| | | |
|---|---|---|
| 12    not in terms of is it toxic or is<br>13    it not toxic issues.  That was<br>14    irrelevant to the question that<br>15    they would come down on people<br>16    that said something they didn't<br>17    like.  And if everybody did that,<br>18    we would not have a scientific<br>19    process.  So, I became incensed on<br>20    academic freedom issues, and that<br>21    was my real motivating factor.<br>22        - - -<br>23        (Whereupon, Deposition<br>24    Exhibit 1.0299, E-mails | | |
| **[58:7] - [59:1] 7/3/2006 James Fries**<br><br><br><br><br><br><br>* James Fries Dep Cut<br><br>7        This is dated February 10,<br>8    2001.  Do you recall at or around that<br>9    time whether this meeting ever occurred<br>10    where they rolled out the data and<br>11    controlled you in a panel discussion?<br>12        MR. RABER:  Object to form.<br>13        THE WITNESS:  They invited<br>14    me to come and bring their data<br>15    and look at the data, to come to<br>16    me.  I don't believe that I was<br>17    ever invited to do it on a talk.<br>18    And I basically declined the<br>19    other.  That wasn't the issue.  I<br>20    wanted to get closure on the<br>21    academic freedom issue.  That was<br>22    what I was focused on.  I wasn't<br>23    interested in carrying it further<br>24    than that.  I knew a lot of other  59<br>1    people were. | 401, 402, 403.  Also leading question. | Testimony also relevant to Plaintiff's failure to warn claim as it proves that Merck also attempted to suppress Dr. Fries' efforts to investigate Merck's efforts to intimidate physicians who expressed their concern about the safety of Vioxx. |

## Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses

| | | |
|---|---|---|
| [59:17] - [60:17] 7/3/2006 James Fries | 401, 402, 403 – Phone call between Dr. Fries and Dr. Sherwood has nothing to do with this case and should be excluded.<br><br>Document referenced at 60:12-17 is an earlier draft of the Fries letter, which the Court has already ruled is inadmissible. See Court's ruling on Merck's MIL #3 | This testimony is relevant for all of the reasons outlined previously. |

```
17        Let me just very quickly ask
18 you one question backing up.
19        During the conversation of
20 October 28, 2000 with Dr. Sherwood, did
21 he ever tell you that the data that Dr.
22 Singh was relying upon or presented by
23 Dr. Singh was incorrect?
24        MR. RABER:  Object to form.
page 60
1        THE WITNESS:  No, I don't
2    believe so.
3           - - -
4        (Whereupon, Deposition
5    Plaintiff's Exhibit Fries.0008,
6    "Merck Damage Control Activities
7    Confidential Draft Document"
8    11-17-00 FRI0000075 - FRI0000077,
9    was marked for identification.)
10          - - -
11 BY MR. RAFFERTY:
12    Q.   I'm going to show you a copy
13 of what's been identified or marked as
14 Fries 0008, and if you would look at the
15 third full paragraph.  This appears to be
16 a "Confidential Draft Document", it says
17 at the top, November 27th?
```

| | | |
|---|---|---|
| [68:19] - [70:13] 7/3/2006 James Fries | 401, 402, 403.  Testimony regarding the Fries letter, which the Court has already ruled is inadmissible.  See Court's ruling on Merck's MIL #3 | Designation should end at 69:15 rather than 70:13.  Testimony as stated above is relevant to Plaintiff's failure to warn claim. Court's ruling applied to Dr. Fries' actual letter not his sworn testimony. |

\* James Fries Dep Cut

```
19        Why did you write Ray
20 Gilmartin a letter?
21    A.   I was concerned with some
22 internal practices at Merck which I felt
```

## Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
## with Defendant's Objections and Plaintiff's Responses

23  infringed on academic freedom, and I felt
24  it was not in Merck's interest to
page 69
1  continue those.  I attempted to make that
2  case to them, and it concerned, in
3  particular, a lot of allegations around
4  the Vioxx drug.
5       Q.   Had you had some
6  interactions with Merck at this point?
7       A.   No.  Prior to the Sherwood
8  call, I had no interactions whatsoever
9  with Merck.
10      Q.   Now, by "Sherwood call," are
11  you talking about Louis Sherwood?
12      A.   Yes.
13      Q.   The Merck vice president?
14      A.   Yes.  He was vice president
15  for medical affairs or some such title.

[75:10] - [75:20] 7/3/2006 James Fries

* James Fries Dep Cut

page 75
10      Q.   Do you believe that this
11  type of intimidation is healthy for the
12  medical research environment, academia,
13  that you work in?
14          MR. RABER:  Object to form.
15          THE WITNESS:  No.  I think
16      that vigorous debate is very
17      healthy and debate on all sides of
18      the issue.  Open mics.  I believe
19      those things are very
20      constructive.

[80:12] - [82:5] 7/3/2006 James Fries

| | |
|---|---|
| 401, 402, 403.  Also leading question. | Testimony also relevant to Plaintiff's failure to warn claim as it proves that if Merck had been acting as a reasonable drug company it would have encouraged academic debate rather than attempted to suppress it.  Also, relevant to Plaintiff's negligence claim. |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| | 401, 402, 403.  Testimony regarding the Fries letter, which the Court has already ruled is inadmissible.  See Court's ruling on Merck's MIL #3 | Testimony relevant to failure to warn and negligence claims. Court's order related to Fries' letter itself, not his sworn testimony. |
|---|---|---|
| * James Fries Dep Cut<br><br>page 80<br>12     Q.    Did you go to a lot of care<br>13  to make sure it was accurate?<br>14     A.    Yes.<br>15     Q.    Did you write it and rewrite<br>16  it and rewrite it?<br>17     A.    Yes.<br>18     Q.    How long did it take you to<br>19  finally get that in final form?<br>20     A.    Well, we saw a draft a<br>21  little while ago which was back in<br>22  November I think, and then it came out on<br>23  January 9.<br>24     Q.    About six weeks?<br>page 81<br>1     A.    So, I'd say six weeks or so,<br>2  yes.<br>3     Q.    In your letter you spoke<br>4  about a number of other people by name<br>5  that you thought had also expressed some<br>6  concerns of intimidation by Merck.  Do<br>7  you remember that?<br>8     A.    Yes.<br>9     Q.    I want you to focus on that<br>10  for a minute because I want to ask you,<br>11  did you get a followup phone call or two<br>12  from people at Merck after you sent your<br>13  letter?<br>14     A.    Yes.<br>15     Q.    Do you remember anything at<br>16  all about those conversations and what<br>17  was said?<br>18     A.    Yes, a little bit.  One was<br>19  from a vice president who offered to show<br>20  me any data that I wanted to see.  That<br>21  wasn't my major thing.  I knew the data<br>22  would come out, so, I had other things to<br>23  do, so, I declined that.<br>24          A second one was from Dr.<br>page 82<br>1  Anstice, and he told the -- of a<br>2  four-part plan that Merck had to remedy<br>3  the problem and that they were taking | | |

## Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses

| | | |
|---|---|---|
| 4  action in terms of changing their<br>5  internal operations -- | | |
| **[82:9] - [83:17] 7/3/2006 James Fries**<br><br><br><br><br><br><br><br><br>* James Fries Dep Cut | 401, 402, 403.  Testimony regarding the Fries letter, which the Court has already ruled is inadmissible.  See Court's ruling on Merck's MIL #3<br><br><br>Additionally, Mr. Lanier's comments about the backgrounds of Mr. Gilmartin and Mr. Anstice are prejudicial and argumentative | Testimony relevant to failure to warn and negligence claims.  Court's order related to Fries' letter itself, not his sworn  testimony.<br><br>Plaintiff's counsel merely corrected Dr. Fries' misstatement that Mr. Gilmartin is a doctor.  Permissible to ensure that the record is not unclear. |

page 82
9     Q.    -- first of all, there is a
10 David Anstice who is the head at the time
11 of Merck health, the whole Merck health
12 end.
13     A.    Yes.
14     Q.    He's not actually a doctor,
15 though, so when you say Dr. Anstice, you
16 may have assumed he was a doctor --
17     A.    I may have assumed that --
18     Q.    All right.
19         That's the same David
20 Anstice?
21     A.    It is the same person.
22     Q.    Okay.
23         Now, David Anstice has
24 testified in this case, and David Anstice
page 83
1  has said that he was charged with
2  investigating your letter by Ray
3  Gilmartin.
4     A.    Yes.
5     Q.    Are you aware of that?
6     A.    Well, Dr. Gilmartin said
7  that he was going to do that in his
8  letter to me.
9     Q.    I don't mean to interrupt
10 you, but you call him Dr. Gilmartin, and
11 I know he's the head of all of Merck, but
12 he wasn't a doctor, either.  He's an
13 M.B.A. from Harvard in the business --
14         MR. RABER:  Objection to
15     form.

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 16    THE WITNESS:  Yes, I am<br>17    positive you are correct. | | |
| **[86:13] - [87:8] 7/3/2006 James Fries** | | |
| | Mr. Lanier's question "why is it important that drug companies not hide data" is leading, argumentative, assumes facts not in evidence, and prejudicial.  It also calls for speculation from the witness. | Question is not leading.  The fact that Merck withheld important safety data from the NEJM is already in evidence.  As a leading rheumatologist in the country and FDA consultant, Dr. Fries is capable of answering this question as it relates to drug safety. |
| * James Fries Dep Cut<br><br>page 86<br>13    Q.   Why is it important that<br>14  drug companies not hide data?<br>15        MR. RABER:  Object to form.<br>16        THE WITNESS:  It's important<br>17    that at any scientific endeavor<br>18    you report the good and the bad<br>19    and you report it in an<br>20    evenhanded, honest, direct way and<br>21    you let people figure out what it<br>22    is.<br>23        You're permitted little<br>24    leeway in the discussion section<br>page 87<br>1    of your papers, how you interpret<br>2    the data.  Other people may<br>3    disagree with that interpretation<br>4    that you put on it, but they can't<br>5    disagree with the data, and they<br>6    can't say you had these data and<br>7    you deliberately took them out of<br>8    the paper. | | |
| **[89:1] - [89:9] 7/3/2006 James Fries** | | |
| | 401, 402. | Relevant to Dr. Fries credibility as a physician and scientist. |
| * James Fries Dep Cut<br><br>page 89<br>1    Q.   Well, by the way, are you<br>2  the Dr. Fries who is behind the longest<br>3  running, largest arthritis study there | | |

## Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
## with Defendant's Objections and Plaintiff's Responses

4  is, the ARAMIS study?
5      A.    Yes.
6      Q.    How many people in that
7  study?
8      A.    In the various data banks,
9  about 17,000.

---

**[89:12] - [89:14] 7/3/2006 James Fries**

* James Fries Dep Cut

page 89
12     Q.    How long has that been going
13  on?
14     A.    30 years.

| | |
|---|---|
| 401, 402. | Relevant to Dr. Fries credibility as a physician and scientist. |

---

**[89:15] - [92:8] 7/3/2006 James Fries**

* James Fries Dep Cut

| | |
|---|---|
| 401, 402, 403, 602, 701, 702, calls for speculation.  This testimony regarding Naproxen is irrelevant and prejudicial. There was no foundation laid that any of Dr. Fries studies have been set up to determine whether Naproxen is cardio-protective.  Plaintiff's counsel seeks to use this misleading set of questions and answers to confuse the jury into thinking Dr. Fries has actually studied whether Naproxen is cardioprotective. This should not be allowed. | Dr. Fries' testimony regarding naproxen is relevant to dispute Merck's claim that naproxen is cardioprotective.  Dr. Fries is testifying to his personal knowledge of whether naproxen has proven to be cardioprotective when persons tracked by the ARAMIS database took naproxen for arthritis.  Furthermore, Dr. Fries' opinion that naproxen is not cardioprotective is based on his 40 years as a practicing physician. |
| Additionally, at 90:23 the witness begins speculating about what went on internally at Naproxen-maker Syntex, despite the fact that he has no personal knowledge and no foundation was laid. | |
| Finally, the witness gives his personal opinion, not backed up by any study or supported by a foundation, that Naproxen does not prevent heart attacks to any measurable degree. This is improper expert testimony, speculation, and has no foundation and should not be allowed. | |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

page 89
15     Q.    30 years.  A lot of those
16 people take naproxen?
17     A.    Yes.
18     Q.    Have you written up any
19 papers or anybody else written up any
20 papers from the largest, longest running
21 study that says naproxen is five times
22 better than aspirin at stopping heart
23 attacks?
24          MR. RABER:  Object to form.
page 90
1          THE WITNESS:  Our research
2     is not -- the data banks aren't
3     set to answer that specific
4     question.  But we have studied the
5     general overall toxicities, and
6     certainly nothing jumped out with
7     regard to cardiovascular events
8     being protective.  Internally at
9     what was then Syntex, who had
10     developed naproxen --
11 BY MR. LANIER:
12     Q.    Syntex is a company?
13     A.    Syntex was a company which
14 is now, if I'm correct, it has, in a
15 series of big fish eating littler fish,
16 arrived as a part of Pfizer.
17     Q.    Oh, okay.  All right.
18          So, the company that started
19 naproxen, go ahead.
20     A.    Yes, yes.
21     Q.    What happened with them and
22 naproxen?
23     A.    Well, Syntex.  Well, they
24 were looking for indications of it, and
page 91
1 one obvious indication was that you could
2 prevent heart attacks, because the then
3 theory of how aspirin prevented heart
4 attacks, which was known, was that it was
5 an action on the platelets.  And the
6 action of the platelets by aspirin is
7 irreversible, so that for the entire life
8 of the platelet, it --
9     Q.    Will never clump.
10     A.    -- will never clump.  Okay.
11 And naproxen has a similar effect on the
12 platelet, but it lasts only while the
13 drug is still circulating in the

# Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses

14 bloodstream, not for the life of the
15 platelet.  So, it's called reversible
16 inhibition of cyclooxygenase in the
17 platelets.  Okay.
18        But nevertheless, because
19 it's longer acting, one could make the
20 case that it would prevent heart attacks,
21 and so they did a lot of internal
22 speculation because it would be a big
23 market if they could make the case that
24 it prevented heart attacks, and they
page 92
1 never could make that case.  And the
2 studies both before and after, if you
3 take them in the aggregate, indicate that
4 this is not the case.
5      Q.   Naproxen is not the --
6      A.   It does not prevent heart
7 attacks to any degree which is measurable
8 in any studies.

---

[94:21] - [95:10] 7/3/2006 James Fries

* James Fries Dep Cut

page 94
21      Q.   In fact, when he said --
22 when you specifically told him -- or did
23 you specifically tell him that you had
24 never heard of harassment of
page 95
1 investigators through their institutions
2 before this, what was his response to
3 you?
4      A.   Well, it was clear that his
5 response was that he believed this to be
6 an appropriate action.  And at the
7 closing sentence of that telephone
8 conversation, I said, "Lou, you ought to
9 be ashamed of yourself," and then hung
10 up.

401, 402, 403 – Phone call between Dr. Fries and Dr. Sherwood has nothing to do with this case and should be excluded.

This testimony is relevant to Plaintiff's claim that Merck actively sought to intimidate physicians so they would not communicate their concerns about the safety profile of Vioxx to the public or other physicians.

# Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses

| [109:4] - [109:17] 7/3/2006 James Fries | | |
|---|---|---|
| *James Fries Dep Cut<br><br>page 109<br>4    Q.   I'm not talking about the<br>5  New England Journal.  I'm talking about<br>6  just -- it was publicly known in, let's<br>7  say, the summer of 2000 that there were<br>8  significantly more heart attacks in the<br>9  Vioxx group than in the naproxen group.<br>10  Would you agree with that?<br>11    A.   It was known by a small,<br>12  relatively small number of people who<br>13  focus on these things.  If you had asked<br>14  generically probably rheumatologists, I<br>15  would say it was not well known.  And if<br>16  you said general public, I would say it<br>17  wasn't known at all. | The witness is speculating about what the general public and what rheumatologists knew.  The witness does not have personal knowledge of what the general public or rheumatologists knew, and is speculating. | Dr. Fries is testifying to his personal understanding of the state of knowledge in the medical community. |

| [168:13] - [168:22] 7/3/2006 James Fries | | |
|---|---|---|
| *James Fries Dep Cut<br><br>page 168<br>13    Q.   Are you familiar, just in<br>14  your 40 years of medicine, with the idea | 401, 402, 403, 602, 611(c).  At 168:1-10, witness admits he has never seen a document relating to neutralizing doctors.  Then Mr. Lanier proceeds to ask a question related to that.<br><br>Also, assumes facts not in evidence, and Dr. Fries' opinions about this issue are irrelevant and prejudicial. | Question is not leading.  Dr. Fries is being shown a document that lists many of the same physicians listed in his letter to Mr. Gilmartin and indicating that Merck has a comprehensive plan to "neutralize" them.  Document is relevant.  Though Dr. Fries had not previously seen document, Dr. Fries has personal knowledge of the subject matter. |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 15 of drug companies choosing to neutralize<br>16 and discredit doctors?<br>17      A.   I was amazed earlier when we<br>18 saw something that said somebody was<br>19 going to control me as part of -- that's<br>20 hard to do.  So, no, I've never seen<br>21 anything like this.  This is really<br>22 unprecedented in my experience. | | |
| **[169:19] - [170:22] 7/3/2006 James Fries** | Dr. Fries' opinions about what data should be disclosed is irrelevant and prejudicial.  Dr. Fries also does not have personal knowledge.  Additionally, the original question that led to this answer (original question not designated) was improper, and that led to this answer. | Dr. Fries is giving his general opinion based on 40 years experience as a physician and medical researcher. |
| * James Fries Dep Cut<br><br>page 169<br>19           Explain to me why not.  I<br>20 want to make sure the jury is clear on<br>21 that.<br>22      A.   I indicated earlier, but<br>23 I'll try and state again, that I see<br>24 confidentiality as having a variety of<br>page 170<br>1 justifying reasons.  There may be<br>2 propriety interests that are there, it<br>3 would not be good for these things to get<br>4 out.  There may be a lot of residual<br>5 uncertainty, and if things got out that<br>6 were wrong and then later had to be<br>7 retracted, that would not be a good state<br>8 of nature.<br>9           And then there are areas in<br>10 which you get a signal that something is<br>11 happening, which it is in the public<br>12 interest to know fully about as soon as<br>13 possible.  And I consider the association<br>14 of heart attack events in a significant<br>15 way with the drug to be something that<br>16 you go back and you bring all your data<br>17 out to bear on it.  And if it's necessary<br>18 to take the drug out of the approval<br>19 process, you take it out of the approval | Also, if this is allowed, must include 170:23-171:6 | |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

```
20  process or make appropriate changes.  So,
21  those data, I believe, should have been
22  full and fully disclosed.
```

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| [180:20] - [185:21] 7/3/2006 James Fries | | |
|---|---|---|
| | 401, 402, 403, 602.  This section begins with the witness saying he had never seen the document before.  Counsel for Plaintiff then proceeded to ask numerous questions about the document.  There was no foundation or personal knowledge and this designation should be excluded. | Document is relevant to show Merck's intent to intimidate Dr. Fries and others who stood in Merck's way to maximize sales. Even though Dr. Fries had not previously seen document, it's use is still allowed.  Document proves the veracity and credibility of the claims of intimidation Dr. Fries outlines in his letter to Mr. Gilmartin. |
| * James Fries Dep Cut | Additionally, irrelevant and prejudicial 185:1-21 – also speculative, non-responsive answers by the witness | |

page 180
20    Q.    In regards to your contact
21  with Mr. Sherwood, I want to show you a
22  copy of a document that's going to be
23  identified as Plaintiff's Exhibit 1.0184.
24            You were asked questions by
page 181
1  Mr. Raber about your conversations with
2  him, with Mr. Sherwood or Dr. Sherwood, I
3  apologize.  Have you ever seen a copy of
4  this e-mail?
5      A.    I don't think so.
6      Q.    I want to direct your
7  attention to the middle section which
8  starts from Louis Sherwood.
9      A.    Okay.
10     Q.    Dated November 7, 2000.  Do
11  you see that?
12     A.    Yes.
13     Q.    And that's right around the
14  time that you had your first conversation
15  with Dr. Sherwood?
16     A.    Yes, yes.
17     Q.    And it says, "Re:  Visit."
18  And then it says, "I have placed a call
19  to Jim Friese to followup with him, and I
20  hope he will call me on Wednesday.  I
21  would like to hear Friese's comments
22  before you speak with Singh.  Friese and
23  I discussed his (Jim's) getting Singh to
24  stop making the outrageous comments he
page 182
1  has in the past few months (which Singh
2  doesn't really deny and says he felt
3  justified because Merck wouldn't give him

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

4  info).  I am sure Friese will tell me
5  that Singh denies a lot of this, but I
6  will reinforce with Fries that there are
7  too many sources of concern for Singh to
8  be accurate.  I will keep the pressure on
9  and get others at Stanford to help Swain,
10  HGolman" --
11      A.    He means Holman.
12      Q.    "Holman."  Okay -- "Harris,
13  et cetera."
14      A.    I mean, my name is
15  misspelled also.
16      Q.    Okay.
17           "Let me get Friese's input
18  first, but I would suggest to you that
19  you be direct with Singh and indicate
20  that we have received a number of reports
21  of his continuing to bash Merck and
22  Vioxx, that I have expressed my concern
23  directly to Friese and that we expect
24  Singh to stop.  Should it continue,
page 183
1  further actions will be necessary (don't
2  define it).  I will be pleased to speak
3  with Singh after you do if he wants to.
4  Lou."
5           Did I read that accurately,
6  first of all?
7      A.    Yes.
8      Q.    Okay.
9           Is that basically -- I want
10  to focus really quite candidly on two
11  statements.  Number one, "I will keep the
12  pressure on and get others at Stanford to
13  help (Swain, HGolman)."  Tell me who
14  Swain, Holman and Harris are.
15      A.    Well, Harris we've talked
16  about.
17      Q.    We've talked about Harris.
18      A.    And Holman is an emeritus
19  professor of -- well esteemed.  He
20  received the biggest award that ACR gives
21  last year and has got an office on the
22  floor below us.  And --
23      Q.    I'm sorry.
24      A.    Who else was --
page 184
1      Q.    Swain.
2      A.    She was chairman of medicine
3  at that time, chair of medicine.

**Deposition of Dr. James Fries, M.D.: Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

4     Q.   Okay.
5           So would that have been
6 Harris' boss, Dr. Harris' boss or the
7 other way around?
8     A.   At that point.
9     Q.   Okay.
10          At that point.
11     A.   He had at that point.  She
12 succeeded him, actually.
13     Q.   Okay.
14          But at that point, Swain
15 would have even been Harris' boss?
16     A.   Yes.
17     Q.   Okay.
18          And is that basically what
19 you felt when Dr. Sherwood called you,
20 was that he was putting pressure on you?
21     A.   Yes.  I think this is, you
22 know, out of his own mouth.  This is what
23 we've been talking about.
24     Q.   Okay.
page 185
1          Now, he also says down at
2 the bottom there, "Should it continue,
3 further actions will be necessary (don't
4 define it)."
5     A.   Sounds intimidating to me.
6     Q.   And is that basically --
7          MR. RABER:  Objection to
8 form, move to strike.
9 BY MR. RAFFERTY:
10     Q.   And is that basically how he
11 handled the conversation with you when he
12 called you at home on Saturday, implying
13 that there would be consequences, but not
14 defining what those are?
15          MR. RABER:  Objection to
16 form.
17          THE WITNESS:  That's right.
18 I think anybody would know you
19 wouldn't want to say exactly what
20 the consequences might be.  That
21 would be unwise.

[186:7] - [190:3] 7/3/2006 James Fries

**Deposition of Dr. James Fries, M.D.: Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| | 401, 402, 403, 602. No foundation that the witness has ever seen the document before. Counsel for Plaintiff still asked numerous questions about the document. There was no foundation or personal knowledge, it calls for speculation, and this designation should be excluded. | Testimony relevant to Plaintiff's claim that Merck sought to intimidate and neutralize leading physicians that expressed concerns about Vioxx's safety profile. Document lays out the extensive plans that Merck developed and executed so that physicians would be "neutralized." Dr. Fries is included in what Merck describes as "the Yankees of Rheumatology." Dr. Fries knows the individuals on the list and is capable of describing their reputations. |
| * James Fries Dep Cut | Additionally, these issues have nothing to do with Mr. Barnett or his doctors. Finally, 189:1-190:3 contains leading questions, and the witness makes prejudicial statements that must be excluded ("never write emails" and "It sounds like a break-his-kneecaps kind of a suggestion") | |

page 186
7        You were asked questions
8  about certain of the individuals you
9  referenced in your letter by Mr. Raber,
10  including Dr. Simon. Let me hand you a
11  copy of a document that's labeled, and I
12  apologize, Steve, I've only got one copy.
13  It is a document produced by Merck.
14        It is attached to the
15  Charlotte McKines deposition, and it is
16  identified as CM.0077. I'll put it up on
17  the screen. I apologize for that. But
18  it is a document that was produced by
19  Merck to us. And the front cover says
20  "Physician Action Plans. Action plans
21  Deliver Vioxx Oriented Celebrex Averse
22  Targeted" and "Experts."
23        And if you'd go to the third
24  page of that document, it says, the "Top
page 187
1  Rheumatologists 'The Yankees of the
2  Management of Arthritis.'" And if you
3  would look at the second name there, over
4  on the left-hand column, is that Lee
5  Simon?

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations with Defendant's Objections and Plaintiff's Responses**

6    A.   Yes.
7    Q.   Okay.
8         I also notice, just for your
9  own reference, that on the bottom right
10  corner is James Fries.  Do you see that?
11    A.   Yes.
12    Q.   Okay.
13         And there is also Gurkipal
14  Singh, two names above that, and Peter
15  Lipsky up at the top right column as
16  well.  Now, in regards to Lee Simon, I
17  mean, would you agree with, first of all,
18  that he is one of the top
19  rheumatologists, Dr. Simon?
20    A.   Yes.  This is a heroes list.
21    Q.   Okay.  A heroes list.  Okay.
22    A.   Well, not entirely.
23    Q.   Okay.
24         Well, let me show you a copy
page 188
1  now of Plaintiff's Exhibit CM.0049 very
2  quickly.
3              -  -  -
4         (Whereupon, Deposition
5    Exhibit Plaintiff's Exhibit
6    CM.0049, E-mails, MRK-AFI0045236 -
7    MRK-AFI0045237, was marked for
8    identification.)
9              -  -  -
10         MR. RAFFERTY:  I do have a
11    copy of that for you, Steve.
12  BY MR. RAFFERTY:
13    Q.   I want to direct your
14  attention to the middle.  This is an
15  e-mail string produced to us from Merck.
16  And it is -- I want to focus on the one
17  from Leonardo Mendez dated August 30,
18  1999.  And it says "Re:  "Background -
19  Dr. Andrew Welton."
20    A.   Uh-huh.
21    Q.   It says, "I suggest that we
22  get Dr. Lou Sherwood involved ASAP.  This
23  is a top priority at this time.  He needs
24  to have a strong message delivered to him
page 189
1  by Dr. Sherwood like the one sent to Lee
2  Simon.  Thanks, Leo."
3    A.   Never write e-mails.
4    Q.   Now, is this -- now, let me
5  ask you this.

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

6        Is this similar to the
7  complaints you heard from Dr. Simon --
8          MR. RABER:  Objection, form.
9  BY MR. RAFFERTY:
10      Q.    -- when you talked to him in
11  terms of the message, that someone
12  calling and leaving messages?
13      A.    You just have to infer from
14  this.  It's way too short to make any
15  real judgments about it.
16      Q.    But is that basically
17  consistent with what Dr. Simon had told
18  you?
19          MR. RABER:  Object to form.
20          THE WITNESS:  Yes.  It
21      sounds like a break-his-kneecaps
22      kind of a suggestion, a strong
23      message delivered to him like the
24      one sent to Lee Simon.  It doesn't
page 190
1      say what that strong message was
2      or how it was delivered or what it
3      contained.

| [190:11] - [191:10] 7/3/2006 James Fries | | |
|---|---|---|
| | 401, 402, 403, 602.  No foundation that the witness has ever seen the document before.  Counsel for Plaintiff is simply showing the witness documents Plaintiff likes and reading language into the record.  There was no foundation or personal knowledge and this designation should be excluded. | Document lists physicians that are also included in Dr. Fries' letter.  Document supports the claims that Dr. Fries made in his letter to Dr. Gilmartin.   Relevant to Plaintiff's failure to warn claim.  Foundation is sufficient. |

* James Fries Dep Cut

page 190
11      Q.    I also want to show you a
12  copy now of document 1.1485, Plaintiff's
13  Exhibit 1.1485.  It is from Susan
14  Baumgartner, who the jury has heard from
15  in this case.  I'm sorry.  It's from
16  Charlotte McKines to Susan Baumgartner,
17  who the jury has heard from in this case,
18  dated August 23rd, 1999.  And it is
19  "Background - Dr. Andrew Whelton."
20          And in the middle paragraph
21  there, it says in the middle e-mail, it
22  says, "I recommend we use Dr. Sherwood

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

```
23  with Dr. Welton -- I think he is
24  concerned about his reputation and
page 191
1  credibility."  And then it says --
2  Charlotte McKines forwards it to Susan
3  Baumgartner and says "For bad guys list."
4  Did I read that correctly?
5      A.   I don't see the "bad guys."
6      Q.   Up at the top.
7      A.   Oh, okay, yeah.
8      Q.   Have you ever seen a copy of
9  this bad guys list?
10     A.   No.
```

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| [191:17] - [191:23] 7/3/2006 James Fries | | |
|---|---|---|
| | 401, 402, 403.  Also leading. | Not leading.  Relevant as described in previous response. |
| * James Fries Dep Cut<br><br>page 191<br>17      Q.   Have you ever heard of a<br>18  pharmaceutical company keeping a bad guys<br>19  list such as Dr. Whelton?<br>20           MR. RABER:  Objection to<br>21  form.<br>22           THE WITNESS:  No, but<br>23  nothing surprises me. | | |
| [194:17] - [195:17] 7/3/2006 James Fries | | |
| | 401, 402, 403 – relates to the Fries letter, which the Court has already ruled is inadmissible.  See Court's ruling on Merck's MIL #3. | Relevant to Plaintiff's failure to warn claim and claim that Merck acted negligently by intimidating and neutralizing physicians.  Dr. Fries gives his professional opinion about the safety of Vioxx. The letter has been excluded but no ruling has been made about Dr. Fries' testimony. |
| * James Fries Dep Cut<br><br>page 194<br>17           In your letter, your January<br>18  9th letter, you state -- give me one<br>19  second while I pull it out -- which is<br>20  Plaintiff's 1.0176, on Page 2, the second<br>21  full paragraph from the bottom, Mr. Raber<br>22  talked with you about portions of this<br>23  involving the FDA renal reviewer.<br>24      A.   Yes.<br>page 195<br>1      Q.   It says, "A number of<br>2  physicians have concerns that Vioxx may<br>3  have some serious and under emphasized<br>4  drug toxicity problems."  Did I read that<br>5  correctly?<br>6      A.   Yes.<br>7      Q.   Now, at that time -- well,<br>8  at that time, you were involved with the<br>9  ARAMIS database, correct?<br>10      A.   Yes.<br>11      Q.   Okay.<br>12           And were you one of those | | |

**Deposition of Dr. James Fries, M.D.:  Plaintiff's Affirmative Designations
with Defendant's Objections and Plaintiff's Responses**

| | | |
|---|---|---|
| 13  doctors that had those serious<br>14  and underemphasized -- the serious<br>15  concerns about Vioxx?<br>16     A.  Yes.  In a similar place in<br>17  this letter I say "including myself." | | |
| **[206:6] - [207:5] 7/3/2006 James Fries** | 801, 802.  Plaintiff's counsel simply reads into the record a statement attributed to Dr. Fries from an article. This is hearsay, and is also irrelevant and prejudicial | Statement not offered for truth but as notice to Merck's state of mind. |
| * James Fries Dep Cut<br><br>page 206<br>6     Q.    Doctor, I'm going to show a<br>7  copy of something identified and what<br>8  will be marked as Exhibit Fries .0022 to<br>9  the deposition, which is an article<br>10  titled "Hard Sell:  How Marketing Drives<br>11  the Pharmaceutical Industry."  If you<br>12  would turn to Page 4 of 6 on that.<br>13           Under the heading<br>14  "Misleading claims," approximately four<br>15  paragraphs down, it says, "Fries said<br>16  both Pfizer and Merck are still getting<br>17  away with a 'marketing ploy' by<br>18  positioning their drugs as gentler on the<br>19  gastrointestinal tract than other<br>20  painkillers.  Although Vioxx trial data<br>21  show somewhat lower gastrointestinal<br>22  impact than some of the older, cheaper<br>23  painkillers, it is no better than several<br>24  others, Fries said."  Do you recall<br>page 207<br>1  giving this interview?<br>2     A.    Yes.<br>3     Q.    Is that a statement that you<br>4  made at the time?<br>5     A.    Yes. | | |