

**SFGate.com**   Return to regular view

Print This Article

## HARD SELL: HOW MARKETING DRIVES THE PHARMACEUTICAL INDUSTRY
### The side effects of drug promotion
### Aggressive ads for painkillers left more patients exposed to risks

- Bernadette Tansey, Chronicle Staff Writer
Sunday, February 27, 2005





## FIRST IN AN OCCASIONAL SERIES.

The painkillers Vioxx, Celebrex and Bextra may go down in history as a classic example of the danger posed by aggressive industry promotion of prescription drugs to both patients and doctors.

When Vioxx and Celebrex hit the market in the late 1990s, they were touted as a breakthrough class of arthritis drugs that would help avoid ulcers and other digestive ailments linked to medicines such as aspirin.

With their debut coinciding with a surge in advertising aimed directly at consumers, they and Bextra, which was approved in 2001, quickly became one of the most heavily promoted drug classes.

In 2003, their manufacturers spent more than $1.5 billion to promote the drugs through television spots, print ads and pitches to doctors. By 2003, sales topped $5.3 billion, according to IMS Health, a pharmaceutical information and consulting company.

But now that the drugs have been linked to an increased risk of heart attacks and strokes, critics say millions of people were needlessly exposed to those dangers as intense advertising helped make the painkillers some of the most widely prescribed medicines in the United States.

Studies show that many patients took the expensive new drugs unnecessarily, because they were never at risk for ulcers or other digestive problems.

Now, as the FDA considers recommendations from an advisory panel that it ban consumer advertising of the drugs, many health experts say the case has delivered a harsh lesson -- that the FDA needs to change the way drugmakers launch their new products.

Former FDA commissioner David Kessler said the rapid adoption of new drugs -- fueled by



PLAINTIFF'S EXHIBIT FRIES 0022

heavy promotional campaigns -- is an inherent threat to the public.

"The way it used to be, if a drug got approval, its use would increase gradually over time," said Kessler, who is dean of the UCSF School of Medicine. Thus, when unexpected side effects surfaced, he said, relatively few people had been exposed to the risk.

In recent years, though, new medicines explode into widespread use before they build up a safety track record, said Kessler, who prevented the widespread use of drug commercials on television when he was FDA commissioner. "Many more people are going to be exposed. That's the nightmare."

Free speech battle looms

As the FDA prepares to decide how Celebrex and the other drugs, which together are known as COX-2 inhibitors, can be marketed, some people doubt the agency has the authority to limit consumer advertising if the pharmaceutical industry takes it to court.

While critics say overpromotion sends poorly informed patients clamoring to their doctors for medicines whose benefits are exaggerated and risks are obscured, drug companies argue adamantly that patients gain important information from advertising.

On Feb. 18, a federal safety panel advised the FDA to ban consumer advertising of the COX-2 drugs. In general, the FDA frequently adopts the recommendations of its advisory panels. But at the panel hearing, the agency's director of the Office of New Drugs, Dr. John Jenkins, said the agency lacks the power to impose the ban.

When asked to elaborate on Jenkins' comment, the FDA gave no direct answer.

"The tools we have to regulate prescription drug promotion include untitled letters, warning letters, consent decrees, and referrals for criminal prosecution," according to a statement provided by the FDA press office.

FDA can wield power

But former FDA officials, including Kessler, say the agency clearly has the power it needs.

"I think there is no doubt that the agency could, on its own, tighten up direct-to-consumer advertising and impose requirements on that advertising to make sure that the promotion is in the public interest," he said.

Kessler's former deputy commissioner, Mary Pendergast, said the agency can ask for voluntary advertising restrictions and can also seek court orders telling drugmakers to curb consumer ads when such promotion could threaten public health.

"They're not helpless," said Pendergast, now a private consultant in Washington, D.C. "In my opinion, they can bring an injunction, especially if there have been past shame-on-you warnings" about promotional campaigns.

History of complaints

Celebrex, Vioxx and Bextra promotions have all drawn such FDA warnings, according to a review of agency records. Celebrex promotions to consumers and doctors were the subject of eight separate complaints between 1997 and 2005, spanning a period when the drug changed hands among three different companies.

Among the accusations: Doctors were being encouraged to give as much as double the maximum dose on Celebrex's FDA-approved label -- a disquieting charge in light of evidence now indicating that cardiovascular risks emerge when the drug is given at those higher doses.

Although Bextra's manufacturer, Pfizer Inc., denies promoting the drug directly to consumers, the FDA sent the company a letter in January faulting a TV infomercial and direct mail brochures sent to patients for misrepresenting or completely omitting information about serious risks.

In 2001, the FDA faulted a Vioxx campaign denying that the drug boosted heart attack risks, in spite of troubling evidence that had already surfaced by then that the risk could be four or five times greater.

Neither Vioxx manufacturer Merck & Co. nor Pfizer Inc., which makes Celebrex and Bextra, would say whether they will agree voluntarily to forego direct-to-consumer ads permanently if the FDA requests it, or would mount a legal battle if the FDA sought a court injunction. Pfizer honored the FDA's request for a suspension of consumer ads for Celebrex after Merck's voluntary withdrawal of Vioxx from the market last year raised concerns that the whole COX-2 group increased heart risks.

Both drugmakers said they are focusing first on negotiations with the FDA over possible changes to the drug labels that could incorporate strong safety warnings also advocated by the advisory panel.

"The label defines everything we can say about any medication, and until that process is completed, we're not thinking about our direct-to-consumer advertising," said Pfizer spokeswoman Susan Bro.

Consumer pitch unfolds

The era of direct-to-consumer advertising, augmenting traditional campaigns aimed at doctors, began in the 1980s when manufacturers of two products ventured into the arena. At that point, the FDA requested a voluntary moratorium on the ads while it reviewed their possible impact on public health.

After a couple of years, the FDA withdrew the request. But for a long period, the agency limited the use of TV ads by requiring the short spots to include information on possible health risks. It was a rule Kessler refused to eliminate. But once he left, drugmakers were allowed to refer TV viewers to other sources like Web sites for the risk information. That rule change in 1997 opened the floodgates to the pervasive drug commercials seen today.

The first FDA complaint about misleading promotion of a COX-2 painkiller was sent the same year.

In 1997, more than a year before Celebrex received marketing approval, the FDA accused its maker at the time, G.D. Searle, of touting it over the Internet as "a breakthrough in arthritis therapy," and suggesting that it caused no gastrointestinal bleeding.

That was certainly the hope held out for the COX-2 drugs as they were being developed. Doctors needed a solution to a serious dilemma discovered in the mid-1990s by researchers like Dr. James Fries, a Stanford rheumatology expert. Arthritis patients needed relief from chronic pain, but the drugs they used could cause stomach bleeding and other gastrointestinal problems serious enough to land patients in the hospital -- and sometimes cause deaths.

Misleading claims

But in fact, Searle was not able to get that claim of gastrointestinal safety included in the Celebrex label when the drug was approved for marketing. Yet Celebrex manufacturers, from Searle to its successors Pharmacia and finally Pfizer, were each reprimanded by the FDA for stating or implying in promotional campaigns that the drug was better than traditional painkillers because it posed no gastrointestinal risks.

In Bextra's case, the direct mail piece that Pfizer was warned about in January said "your stomach stays protected," even though the drug label lists gastrointestinal damage as a risk.

The Pfizer spokeswoman, Bro, acknowledges that the Celebrex label still includes gastrointestinal side effects as a risk for the drug, but she said recent studies show that Celebrex is gentler than other painkillers.

Fries said both Pfizer and Merck are still getting away with a "marketing ploy" by positioning their drugs as gentler on the gastrointestinal tract than other painkillers. Although Vioxx trial data show somewhat lower gastrointestinal impact than some of the older, cheaper painkillers, it is no better than several others, Fries said.

The case of the COX-2 drugs has turned Fries, who once supported direct-to-consumer advertising, into an opponent.

"We should empower the consumer, but they should be empowered against getting brainwashed," he said.

Closer COX-2 drug scrutiny

The scientific controversy over the COX-2 drugs is by no means over. More studies are planned, and some FDA safety advisers have raised the point that little is known about the possible cardiovascular risks of some of the other painkillers used as alternatives.

The FDA safety panel, after hearing testimony that some patients might do better on the COX-2s than other drugs, recommended keeping them on the market. But the majority advocated so-called "black box warnings" of the heart and stroke risks for all three drugs.

If the FDA accepts that recommendation, its decision would probably prohibit the manufacturers from using one type of consumer ad. Under long-standing FDA policy, drugs with such warnings can't be promoted with "reminder ads," which simply mention the

name of the drug without identifying its uses.

Other pitches aimed at consumers would be permitted, though, unless the FDA takes additional action as advocated by the panel. Such ads would have to detail the drug's risks.

If the FDA does attempt to block consumer advertising for the drugs permanently, it could be headed for a showdown with Pfizer.

Pfizer and free speech

Pfizer, the world's largest drug company, has been one of the most tenacious industry proponents of the position that many FDA rules restricting drug promotion violate the free speech rights of manufacturers. That First Amendment argument has made significant headway in a number of court cases, Pendergast acknowledged.

But she said the FDA could still win a case for promotional limits if it marshals evidence that public health could be at risk.

"You don't have a First Amendment right to lie, to say false and misleading things," she said.

Drug come-ons bring in the masses

Before the drugs had been linked to an increased risk of heart attacks and strokes, the three COX-2s formed one of the most heavily promoted and frequently prescribed drug classes in the industry. Their name comes from the enzyme they inhibit, cyclooxygenase-2. (All figures are for 2003.).

Celebrex

$2.6 billion: Sales

23.6 million: Number of prescriptions

$483 million: Cost of promotions aimed at doctors

$87 million: Cost of direct-to-consumer advertising.

Vioxx

$1.8 billion: Sales

19.9 million: Number of prescriptions

$499.8 million: Cost of promotions aimed at doctors

$78 million: Cost of direct-to-consumer advertising.

Bextra

$935 million: Sales

10.4 million: Number of prescriptions

$395.6 million: Cost of promotions aimed at doctors

No data for cost of direct-to-consumer advertising.

Source: IMS Health, IMS National Sales Perspectives TM, 2/2005 and the Wall Street Journal

*E-mail Bernadette Tansey at btansey@sfchronicle.com.*

Page A - 1
URL: http://sfgate.com/cgi-bin/article.cgi?file=/c/a/2005/02/27/MNGUOBHO781.DTL

©2006 San Francisco Chronicle