# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAG. JUDGE KNOWLES |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. 02:06cv485 |

---

## PLAINTIFF'S BRIEF RE ADMISSIBILITY OF CERTAIN MERCK DOCUMENTS RELATING TO POTENTIAL VIOXX SALES REVENUES

Plaintiff Gerald Barnett, by and through his undersigned counsel, submits the following brief regarding the admissibility of certain Merck documents relating to potential Vioxx sales revenues:

_____ Fee_____
_____ Process_____
__X__ Dktd_____
__√__ CtRmDep_____
_____ Doc. No_____

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   THE SALES REVENUE DOCUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    (a)   Vioxx vs. Celebrex: Estimated Value of Winning the Race to Market –
        $611 Million. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    (b)   Effect of Failure to "Neutralize Safety Concerns" Regarding
        Heart Attacks: Estimated Decrease in Revenues - $437 Million . . . . . . . . . . . . 8

    (c)   VIGOR Referenced in "Precaution" Instead of "Warning": Saves $1 Billion
        Per Year in Sales and a $229 Million Decrease for a Few Months in
        2002 Alone. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.  ISSUES RELATING TO ADEQUACY OF WARNINGS TO PRESCRIBING
     PHYSICIANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.   THE EFFECTIVENESS OF A WARNING WHICH ACCOMPANIES A
     PRESCRIPTION DRUG MAY BE NULLIFIED THROUGH THE
     MANUFACTURER'S OVERPROMOTION, WHICH RENDERS THE
     WARNING INADEQUATE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.    EVEN WHERE THE PRESCRIBING PHYSICIAN'S TESTIMONY INDICATES
     AN AWARENESS OF THE RISKS, EVIDENCE OF OVERPROMOTION MAY
     ESTABLISH THAT THE WARNINGS WERE INADEQUATE AND A
     PROXIMATE CAUSE OF INJURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.   PROFIT MOTIVE EVIDENCE RELATING TO OVERPROMOTION IS
     PROBATIVE AND ADMISSIBLE ON SEVERAL KEY ISSUES, INCLUDING
     ADEQUACY OF WARNINGS, FRAUD, INTENT AND RECKLESSNESS. . . . . . . . 23

VII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

i

## TABLE OF AUTHORITIES

<u>CASES</u>

*Allen v. Long Mfg. NC, Inc.*, 332 S.C. 422, 431, 505 S.E.2d 354 (S.C. App. 1998) . . . . . . . . . . 12

*Allen-Parker Co. v. Lollis*, 257 S.C. 266, 272, 185 S.E.2d 739 (S.C. 1971) . . . . . . . . . . . . . . . 25

*Anderson v. Green Bull, Inc.*, 322 S.C. 268, 270, 471 S.E.2d 708 (S.C. App. 1996) . . . . . . . . . 12

*Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804, 807 Prod.Liab.Rep.
(S.D.Tex. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

*Armstrong v. Collins*, 366 S.C. 204, 621 S.E.2d 368  (S.C.App.2005) . . . . . . . . . . . . . . . . 24, 26

*Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987),
cert. denied 484 U.S. 1005 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Bic Pen Corp. v. Carter*, 171 S.W.3d 657, 675 (Tex.App. 2005) . . . . . . . . . . . . . . . . . . . . . . 27

Carter v. Boyd Const. Co., 255 S.C. 274, 280, 178 S.E.2d 536, (S.C 1971) . . . . . . . . . . . . . . . 25

*CSX Transp., Inc. v. Palank*, 743 So.2d 556, 560 (Fla. App. 1999) . . . . . . . . . . . . . . . . . . . . . 26

*Gardner v. Q.H.S., Inc.*, 448 F.2d 238 (4th Cir.1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 813,174 Cal.Rptr. 348 (1981) . . . . . . . . . 27

*Hermes v. Pfizer, Inc.*, 848 F.2d 66, 69-70 (5th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hill v. Searle Laboratories, a Div. of Searle Pharmaceuticals, Inc.*, 884 F.2d 1064,
1071 (8th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Holley v. Burroughs Wellcome Co.*, 318 N.C. 352, 348 S.E.2d 772 (1986) . . . . . . . . . . . . . . . 16

*In re Diet Drugs*, 2000 WL 876900 (E.D.Pa., Jun 20, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*Krasnopolsky v. Warner-Lambert Co.*, 799 F.Supp. 1342, 1345-46 (E.D.N.Y.1992) . . . . . . . . . 14

*Livingston v. Noland Corp.*, 293 S.C. 521, 525, 362 S.E.2d 16 (S.C. 1987) . . . . . . . . . . . . . . . 13

*Love v. Wolf*, 226 Cal.App.2d 378, 38 Cal.Rptr., 183, 197 (1964)) . . . . . . . . . . . . . . . . . . . 16, 24

*Mahr v. G.D. Searle & Co.*, 72 Ill.App.3d 540, 574, 28 Ill.Dec. 624,
390 N.E.2d 1214, 1238 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Martin v. Hacker*, 83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993)  . . . . . . . . . . 14

*McDonnell v. Chelsea Mfrs., Inc.*, 259 A.D.2d 674, 676, 687 N.Y.S.2d 172,
1999 N.Y. Slip Op. 02491 (N.Y.A.D. 2 Dept. 1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McEwen v. Ortho Pharm. Corp.*, 270 Or. 375, 528 P.2d 522, 529 (1974)  . . . . . . . . . . . . . . . . 13

*Nobles v. Astrazeneca Pharmaceuticals*, 48 Conn.Supp. 134, 832 A.2d 1241,
1242-1243 (Conn.Super. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 204 (Colo. 1984)  . . . . . . . . . . . . . . . . . . . . 27

*Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn.1994) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Proctor v. Davis*, 291 Ill.App.3d 265, 225 Ill.Dec. 126, 682 N.E.2d 1203, 1213 (1997) . . . . . . 13

*Salmon v. Parke Davis & Co.*, 520 F.2d 1359, 1363 (4th Cir.1975) . . . . . . . . . . . . . . . . . . 16, 17

*Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 267 (5th Cir.2002)  . . . . . . . . . . . . . . . . . . . . 14

*Stevens v. Parke, Davis & Company*, 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53,
507 P.2d 653, 661  (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21, 24

*Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir.1992) . . . . . . . . . . . . . . . . . . 19

*Tinnerholm v. Parke, Davis & Co.*, 285 F.Supp. 432, 451 (S.D.N.Y.1968),
mod. 411 F.2d 48 (2 Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*U.S. v. Amr*, 132 Fed.Appx. 632, 2005 WL 1285700 (6th Cir.(Mich.)),
2005 Fed.App. 0434N, 6th Cir.(Mich.), May 25, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Whitley v. Cubberly*, 24 N.C.App. 204, 210 S.E.2d 289 (1974)  . . . . . . . . . . . . . . . . . . . . . . 20

*Woodbury v. Janssen Pharmaceutica, Inc.*, 1997 WL 201571*8 (N.D.Ill. 1997) . . . . . . . . . . . 15

iii

<u>STATUTES</u>

S.C.Code Ann. § 15-73-10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>OTHER</u>

Anderson, S.C. Requests to Charge - Civil, § 18-1 (2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Anderson, S.C. Requests to Charge - Civil, § 18-2 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Anderson, S.C. Requests to Charge - Civil, § 32-35 (2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## I.   INTRODUCTION

The following brief concerns five key Merck documents which reference how Vioxx sales revenues will be affected by Merck's conduct.  Plaintiff submits this brief because it is important for the Court to understand that Plaintiff is not seeking to recklessly put evidence of Merck revenues and profits before the jury without very legitimate evidentiary reasons.

The documents predate the Plaintiff's use of Vioxx, and speak of the predicted effects of Merck's then future actions regarding promotion of Vioxx and the content of warnings.  These documents discuss the potential effects of Merck's actions upon estimated projected revenues, and ultimately profits, from the sale of Vioxx. The five documents are (1) Pl.0732 (attached as Exhibit 1), (2) P1.0009 (attached as Exhibit 2); (3) P1.1135 (attached as Exhibit 3); (4) P1.0966 (attached as Exhibit 4); and (5) P1.0166 (attached as Exhibit 5). As will be shown herein, these are all probative and admissible to establish essential elements of Plaintiff's causes of action, and to impeach Merck's denials and claims to the contrary.  These documents demonstrate:

1.   Merck recklessly rushed Vioxx into production in an effort to beat the launch of a competitor's product, for the purpose of obtaining an additional $611 million in additional revenue by being first on the market.

2.   Merck, as part of a 'strategic objective to save a projected $437 million in revenues, recklessly, intentionally and fraudulently overpromoted Vioxx through a vigorous sales campaign with a 'strategic objective' to 'neutralize safety concerns,' which effectively watered down and nullified the warnings accompanying Vioxx, rendering them inadequate.

3.   Merck recklessly and intentionally minimized and downplayed the cardiovascular risks of Vioxx, by fighting to have such information placed in the 'precautions' instead of the 'warnings' section of the drug's label, in order to maintain $1 Billion in Vioxx sales revenue, which Merck estimated would otherwise be lost with an effective warning.

These documents should all be admissible to impeach the positions taken by Merck and its employees regarding several significant issues in the Vioxx cases. Plaintiff contends that Merck failed to adequately test Vioxx and failed to provide adequate warnings to physicians and consumers. It is Plaintiff's position that Merck, by rushing Vioxx to the market, overpromoting the drug and intentionally downplaying evidence of its cardiovascular risk, watered down and nullified any effectiveness of the already inadequate warnings. Plaintiff also contends that Merck withheld information in its possession and concealed from physicians and the public the true risks of Vioxx.

In this case and others Merck has denied these contentions, and has argued through its answer and other pleadings, as well as through counsel, expert witnesses and employees, that it did not rush Vioxx to the market and did not seek to downplay the risks of Vioxx. It is Merck's position that it provided appropriate and adequate warnings, and that it was forthcoming with respect to the information it had relating to Vioxx and its cardiovascular risk.  However, the subject documents impeach Merck's positions and denials in this regard.

For example, one document references a loss of revenue of $611 million if Merck loses the race with the manufacturer of Celebrex to be first to market.  Merck is taking the position in this litigation that Merck did not rush Vioxx to market, and that it especially did not rush the drug to market to gain revenues or market share against the drug Celebrex.  This document, however, would clearly impeach Merck's position.

Another document discusses the difference in revenues if language regarding the increased heart attack risk shown in the VIGOR study were to be placed in the 'Precautions' section of the label versus the "Warnings" section of the label.  In particular, there is a $1 billion difference cited in the document.  It is Plaintiff's position that Merck opposed the FDA's attempt to place the VIGOR heart attack risk data in the Warnings section so that Merck could

sell more Vioxx.  Conversely, it is the Defendant's position that financial reasons did not factor into Merck's efforts.  Again, this document impeaches the defense position. The same is true with respect to a document wherein Merck estimates that just by delaying the advent of the label between October of 2001 and February 2002, Merck will realize an increase in revenue of $229 million.

Finally, there is a document wherein it is stated that if Merck is successful in "neutralizing" safety concerns about hypertension and heart attacks, the company will realize revenues in the amount of $437 million. Despite the fact that Merck has actually attempted through its own witnesses to redefine the word "neutralize" to mean something far different than the Webster's dictionary definition, this document impeaches the position Merck has taken in this litigation that at all times it was not trying to neutralize the CV risk.

These documents predate Mr. Barnett's heart attack, and each one of them is relevant and probative evidence impeaching positions taken by Merck in this and other Vioxx cases. Merck's position has been that it was concerned about safety but that it did not want to put the language in the Warnings section of the label because it did not believe the risk was serious enough, and so it was placed in the Precautions section. Yet the documents show otherwise. The documents show a different rationale altogether. They demonstrate that Merck's real motives in its actions relating to determining how warnings would be drafted and placed, and in how it would publicly present the risks, were purely financial. The documents prove that Merck was fighting a stronger warning, and downplaying the significance of the data concerning cardiovascular risk, for the overriding concern of sales and profits.

The documents reveal Merck's awareness of and concern over the amount of money the company would lose by issuing an adequate warning. If more doctors are dissuaded from prescribing Vioxx, fewer prescriptions mean declining revenues. A billion dollars less revenue

in a year that means a billion dollars less in Vioxx prescriptions, and that would mean doctors being dissuaded from prescribing Vioxx because of information placed in the Warnings section of the label rather than the Precautions section. The documents also reveal that Merck's overriding concern was not the adequacy of the warnings or the safety of the users, but the adequacy of revenues and the safety of profits. This is directly relevant to each of the Plaintiff's causes of action.

Separate and apart from their admissibility for impeachment purposes, or for punitive liability issues such as reckless disregard for safety, these documents provide essential proof on Plaintiff's causes of action based upon inadequate warnings, including strict liability, negligence and breach of warranty. They demonstrate overpromotion of Vioxx which resulted in watering down and nullifying of the warnings, rendering them inadequate. They also provide a basis for proof of elements of Plaintiff's fraudulent concealment and negligent misrepresentation claims, because they are admissible to demonstrate Merck's motive and intent in connection with Merck's overpromotion of Vioxx, Merck's reckless misrepresentations regarding the safety of Vioxx, and Merck's concealment of what it knew regarding the true risks associated with use of Vioxx.

## II.   THE SALES REVENUE DOCUMENTS

### (a) Vioxx vs. Celebrex:  Estimated Value of Winning the Race to Market – $611 Million.

Merck was in a heated competition with its rival competitor Searle (now Pfizer) for a potential share of the Cox-2 inhibitor pain relief market—potentially worth billions.   The financial stakes for this market were very high.  Merck made it abundantly clear internally that it was in a race to get Vioxx to market first ahead of Searle's competing product known as Celebrex.  In order to win this competition, Merck had to accelerate its clinical studies.  It is Plaintiff's contention that this competition with Searle, including the race to market, caused

Merck to disregard red flags for cardiovascular risk raised by its own studies, and to become blinded by the potential for profit. Merck intentionally failed to follow-up and conduct studies recommended by its own scientific advisors, for the sole purpose of beating its competition to market, with the primary purpose and result being financial gain.

**(P1.0732)**

This document, entitled "MK-966 (Cox 2 Inhibitor) – Product Development Plan-Stage 0 Review" (attached as Exhibit 1), was prepared in approximately 1995 prior to the launch of Vioxx in May 1999. The document provides, in pertinent part, as follows:

Executive Overview (page 3):

> "The osteoarthritis market represents a crowded yet unsatisfied market with substantial commercial opportunity for a novel therapeutic approach. Thus there is **considerable competitive pressure to market the first** highly selective Cox-2 (cyclooxygenase-2) inhibitor. Searle is reported to be targeting a filing in 4Q98 with their COX-2 selective agent. The development of MK-966 must proceed aggressively to meet this challenge. The primary objective of the program is to achieve a 4Q98 filing date.... **The clinical program has thus been compressed and accelerated** and will focus on distinguishing MK-966 from marketed NSAIDS based on its novel mechanism and a superior GI safety profile."
>
> (All bold text in this brief has been added for emphasis.)

Risk Assessment and Strategies for Risk Reduction (page 42-44):

> 1. Searle is seen as major competition in the area of highly selective COX-2 inhibitors. They have reported their targeted filing date for OA as 4Q98. If they were to be the first entry in the market with the new class of compounds it would have a significant negative impact on our financial projections. To reduce the risk of MK-966 as the second entry, an **accelerated development strategy** is proposed and the additional resources needed to achieve the stated objectives are being requested.
>
> . . .
>
> 8. The current filing strategy assumes that the FDA will accept one year patient exposure data with two year data to be forthcoming in a Safety Update Report. **This runs counter to present FDA guidelines**....

6

Financial Evaluations of MK-966 (page 63-64)

> The following section will outline the **financial evaluation and analysis of MK-966 in terms of program investment, net present value (NPV), technical and commercial risk and the financial impact of a second to market scenario.**

> **Thus, the value of MK-966 being first to market versus second to market is $611 MM.** (Page 64)

Conclusions (page 66)

> Based on the above financial evaluations and given the assumptions, **the base case valuation for MK-966 is expected to be $889 MM assuming the product is first to market. In a second to market scenario, the valuation falls to $278 MM, implying a significant value ($611 MM) to being first to market. The Monte Carlo analysis for MK-966 confirms the importance of first to market as a means of optimizing market potential** and lowering commercial risk.

Plaintiff's exhibit P1.0732 was previously admitted into evidence in the case of *Cona/McDarby* through Merck President of Health and Human Resources, David Anstice (Exhibit 7 attached). Further, additional foundation for this document may be found in the deposition of Merck employee Barry J. Gertz. (Exhibit 6 attached).

The document indicates that the filing strategy using one year data as opposed to two-year data "**runs counter to present FDA guidelines.**" However, in the *Cona/McDarby* trial, counsel for Merck in opening statement stated emphatically that "…Vioxx was an important drug, that it was developed and tested the right way by Merck, that Merck's doctors and scientists not only followed the rules and regulations set forth by the United States Food and Drug Administration, but they exceeded them" (Exhibit 15 attached).

**(b)** **Effect of Failure to "Neutralize Safety Concerns" Regarding Heart Attacks: Estimated Decrease in Revenues - $437 Million.**

Merck made every attempt to downplay the cardiovascular risks of Vioxx following the outcome of the VIGOR study, which showed a 5 to 1 increased risk of heart attacks. These efforts included a concerted and intensive program to "Neutralize the CV issue" through numerous avenues of misinformation to the medical community. To start with, Merck failed to disclose the CV risk from VIGOR when it published the study in the *New England Journal of Medicine.* Notwithstanding Merck's misinformation campaign, the cardiovascular ("CV") issue began creeping into the marketplace.

However, in litigation, Merck denies that there was truly a CV risk with Vioxx and therefore denies that it made attempts to neutralize the issue. Instead, Merck claims that it was simply trying to educate physicians in order bring them to a "fair balance" about Vioxx. The documents contradict the claim by Merck that there was no CV risk for Vioxx. Instead they show that Merck attempted to "neutralize" the CV risk in the true sense of the word, for financial gain.

(P1.0009)

The 2001 **Profit Plan** for VIOXX® (attached as Exhibit "2") provides an overview of Merck's objectives and strategies for Vioxx :

"Strategic Objectives

- **Neutralize safety concerns around hypertension, edema and MI"** (p.13)

Further, a financial chart shows the fiscal impact if **"Vioxx unable to neutralize safety/tolerability issues"** and predicts a decrease in sales and an estimated decrease in revenue of $437 MM. (p.38)

8

This document was discussed by Merck employee J. Martin Carroll in the *Irvin II* trial on February 7, 2006 (Exhibit 10 attached). In addition, the document was addressed by Merck employee Susan Baumgartner at her deposition. (Exhibit 8 attached), as well as by David Anstice (Exhibit 9 attached). Plaintiff contends that the word "neutralize" in this document was not originally intended to refer to "educating" physicians as Merck now claims. The definitions for "neutralize" at dictionary.com include, inter alia:

> "To make neutral.
> To counterbalance or counteract the effect of; render ineffective.
> To declare neutral and therefore inviolable during a war.
> Chemistry.
> To make (a solution) neutral.
> To cause (an acid or base) to undergo neutralization.
> Medicine. To counteract the effect of (a drug or toxin).
> Slang. To remove as a threat, especially by killing."

However, these definitions do not include 'educate,' nor any reasonable synonym for educating. This document demonstrates that Merck intended to dissuade doctors from believing there was a cardiovascular risk with Vioxx, to remove concerns in the medical and scientific communities raised by the VIGOR study, and to render warnings of CV risk ineffective. This document also impeaches Merck's arguments to the contrary.

**(c)   VIGOR Referenced in "Precaution" Instead of "Warning":   Saves $1 Billion Per Year in Sales and a $229 Million Decrease for a Few Months in 2002 Alone.**

Merck made a concerted effort to downplay the cardiovascular risks of Vioxx by minimizing the impact of the information in the product labeling. Although the FDA wanted to include the VIGOR results in the "Warning" section of the label, Merck pushed to include this in the "Precaution" section. Merck's past President, Ed Scolnick, and current President, Peter Kim, have come up with various alleged non-fiscal rationales for including these results in the precaution section rather than the warnings section, including the claim that it was not clear to

Merck that Vioxx was causing a CV risk (Scolnick deposition attached as Exhibit 14), and that Merck could not put the CV risk from VIGOR in the label since the study was not against placebo. (Kim deposition attached as Exhibit 13). However, the documents paint a different picture. They show that Merck had a vested interest in the outcome of the location of the CV risk in the product label, estimated to be $1Billion per year. In reality, there was absolutely no harm to Merck in putting the CV risk in the Warning section and there was nothing that prevented Merck from doing so consistent with the FDA's wishes. The only real concern was the potential harm to Merck's sales revenues and the resulting bottom line.

### P1.1135

The "U.S. Long Range Operating Plan: for July, 2001 (attached as Exhibit 3), is a Merck slide presentation with some key assessments concerning Vioxx. Specifically, the document contains a graph on page 17 entitled:

Analgesic & Anti-Inflammatory **Key Sensitivities – Upside/Downside Sales Forecast (Constant $ Millions) Vioxx Downside –50% in '06- CV Label is Warning/Not Precaution-50%.**

Merck employee Martin Carroll confirmed that this forecast meant that sales of Vioxx were expected to drop by 50% if the cardiovascular risk from VIGOR were placed in the 'Warnings' as opposed to the lesser 'Precaution' section. This document was discussed in the Mr. Carroll's deposition which was played in the *Irvin II* case on February 7, 2006 (attached as Exhibit 10). Amazingly, notwithstanding this downside forecast in sales, Mr. Carroll testified he was "**not concerned at all**" about the cardiovascular issue (Exhibit 10).

The document was also addressed by Merck's expert Janet Arrowsmith-Lowe at her deposition (Exhibit 12 attached), where she admitted the document demonstrates a decrease in sales based upon placing CV information in the 'Warnings' section of the label.

**P1-0166**

P1-0166 entitled "Long Range Operating Plan: 2002-2007 – July 15, 2002" (attached as Exhibit 5) forecasts a $.9 Billion negative downside resulting from the cardiovascular labeling issue. (p.24)  This is similar to the graph and forecast identified in Plaintiff's exhibit P1.1135 discussed above.

**P1-0966**

The "Profit Plan 2002 –Merck A&A Franchise" (attached as Exhibit 4) shows the "CV Label Impact" from VIGOR, which Merck estimated would impact Vioxx sales by $229 million for a few months in 2002 (p.4). This was previously admitted in the *Ernst* trial through Merck witness Alise Reicin (attached as Exhibit 11), and then again in the *Cona/McDarby* trial through Merck witness David Anstice (attached as Exhibit 16).

In opening statement in *Irvin II*, Merck's counsel argued to the jury that there was "no dragging anything out" regarding the delay in this label change from March 2000 to April 2002 (Exhibit 17 attached). This is in direct contrast to the testimony of FDA medical officer David Graham, M.D., who testified that this two-year delay was "delay, delay, delay" (Exhibit 21 attached), and that the FDA "does not impose label changes" on the company, but they "negotiate." This argument also contrasts with Merck's FDA expert who testified, "…I thought it could have been done more quickly. I didn't understand why it took so long." (Exhibit 12 attached)

Further, Merck's counsel in opening statement not only minimized this delay but also attempted to minimize the significance of the label change as a mere gentleman's "disagreement." In fact, Merck was absolutely adamant on having its way on this issue, with Ed Scolnick saying, "We will not accept this label" and "it is ugly cubed. thye [sic] are bastards" (Exhibit 20 attached).

Merck's attempts to portray the 'warnings vs. precautions' issue as a minor dispute, and to give the impression that the difference between the two sections is insubstantial, or of no concern, is also evident in the testimony of Merck employee, Alise Reicin, who subtly denied that there was a big difference between the two, and denied that Merck fought the FDA to keep the cardiovascular risk out of the 'warnings' section. (Exhibit 22 attached.)

Despite Merck's claims to the contrary, this was much more than an insignificant disagreement.  This was a high stakes conflict involving the potential loss to Merck of over $1Billion in annual sales, and these documents clearly demonstrate Merck's motive and intention to downplay the risk.

## III.   ISSUES RELATING TO ADEQUACY OF WARNINGS TO PRESCRIBING PHYSICIANS.

Several of Plaintiff's causes of action are based upon the inadequacy of the warnings Merck issued in connection with Vioxx. South Carolina law recognizes a claim for inadequate warnings under principles of strict liability.  One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer.  S.C.Code Ann. § 15-73-10. In order to prevent a product from being unreasonably dangerous, the seller may be required to give a warning on the product concerning its use. *Anderson v. Green Bull, Inc.*, 322 S.C. 268, 270, 471 S.E.2d 708 (S.C. App. 1996) citing RESTATEMENT (SECOND) OF TORTS § 402A cmt. j, at 353 (1965).  Mere compliance with industry standards does not make a warning adequate as a matter of law. *Allen v. Long Mfg. NC, Inc.*, 332 S.C. 422, 431, 505 S.E.2d 354 (S.C. App. 1998).  Once it is established that a product must display a warning to be safe, the question of

the adequacy of the warning is one of fact for the jury as long as evidence has been presented that the warning was inadequate. Id. at 428.

South Carolina law also recognizes a claim in negligence for failure to warn. A supplier and manufacturer of a product are liable for failing to warn if they know or have reason to know the product is or is likely to be dangerous for its intended use; they have no reason to believe the user will realize the potential danger; and, they fail to exercise reasonable care to inform of its dangerous condition or of the facts which make it likely to be dangerous. *Livingston v. Noland Corp.*, 293 S.C. 521, 525, 362 S.E.2d 16 (S.C. 1987), citing *Gardner v. Q.H.S., Inc.*, 448 F.2d 238 (4th Cir.1971).

Additionally, lack of an adequate warning with a product may give rise to a cause of action for breach of warranty. "If the product is not fit for this purpose because its use is or is likely to be dangerous due to a defect in design, manufacture or lack of adequate warning, then the seller has breached its warranty of fitness for a particular purpose and is liable to any person who may be expected to use or be affected by the product and who is damaged as a direct and proximate result of the breach." Anderson, S.C. Requests to Charge - Civil, § 32-35 (2002).

Under each of these theories of liability, the adequacy of the warnings becomes a fundamental issue. Even though the manufacturer's duty to warn runs only to the learned intermediary, that warning must still be adequate. *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 429 (Tenn.1994)) ("[T]he learned intermediary doctrine does not shield a drug manufacturer from liability for inadequate warnings to the physician.")  If the manufacturer fails to adequately warn the learned intermediary, then it may be liable to the injured patient-consumer. *McEwen v. Ortho Pharm. Corp.*, 270 Or. 375, 528 P.2d 522, 529 (1974)) ("Although the duty of the ethical drug manufacturer is to warn the doctor, rather than the patient, the manufacturer is directly liable to the patient for a breach of such duty."); *Proctor v. Davis*, 291 Ill.App.3d 265, 225

13

Ill.Dec. 126, 682 N.E.2d 1203, 1213 (1997) (Manufacturer cannot evade duty to warn physician by hoping doctors will learn of dangers themselves.) The manufacturer's duty is to warn of all potential dangers in its prescription drugs that it knew or should have known to exist, and that a warning must be correct, complete, and fully descriptive, and it must convey updated information as to all of the drug's known side effects. *Martin v. Hacker*, 83 N.Y.2d 1, 11, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993); *Krasnopolsky v. Warner-Lambert Co.*, 799 F.Supp. 1342, 1345-46 (E.D.N.Y.1992) (Manufacturer's duty to warn of all potential dangers "is a continuous one, and requires that the manufacturer be aware of the current information concerning the safety of its product.") The warning must also have clarity so that the language of the warning is "direct, unequivocal and sufficiently forceful to convey the risk." Martin supra, 83 N.Y.2d, at 11.

Merely mentioning a possible injury or adverse effect is not necessarily adequate. *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 267 (5th Cir.2002)) Just because the manufacturer discloses a particular risk of injury will not absolve the defendant from liability if the degree of risk is not sufficiently conveyed. *McDonnell v. Chelsea Mfrs., Inc.*, 259 A.D.2d 674, 676, 687 N.Y.S.2d 172, 1999 N.Y. Slip Op. 02491 (N.Y.A.D. 2 Dept. 1999) (Summary judgment denied where competing affidavits raised issues of fact as to whether the warnings were "accurate, clear, [and] consistent on [their] face, and whether [they] portray[ed] with sufficient intensity the risk involved in taking the drug.") For example in *Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804, 807 Prod.Liab.Rep. (S.D.Tex. 1999), the court found that a triable issue of fact existed despite the fact that the package insert and the PDR entry disclosed the specific injury suffered by the plaintiff: "Although the warnings included the "reaction" suffered by Ms. Anderson, myocardial infarction was only referenced in the context of physiological lactation or uncontrolled hypertension. The warnings did not connect myocardial

infarction to Ms. Anderson's particular diagnosis--reactive hyperprolactimia.  Therefore, despite the fact that the package insert and the PDR allude to a possible connection between Parlodel and myocardial infarction, neither specifically warns that women who take Parlodel to treat reactive hyperprolactimia face the risk of myocardial infarction."

Additionally, even where a 'dear doctor letter' discloses the risk, misleading information may cause a warning to be inadequate.  In *Woodbury v. Janssen Pharmaceutica, Inc.*, 1997 WL 201571*8 (N.D.Ill. 1997), an action alleging that severe liver damage as a result of using a prescription drug, the court denied summary judgment, noting that the plaintiffs' experts testified that the manufacturer had provided an affirmatively misleading warning to the effect that liver damage may be avoided through periodic monitoring during treatment.  ("Consequently, an issue of fact is raised whether Janssen's warnings provided inadequate warning through misinformation…. In light of this testimony, a genuine issue of material fact remains as to whether Janssen's warnings are inadequate by suggesting that frequent testing can prevent the risk of liver injury.")

## IV. THE EFFECTIVENESS OF A WARNING WHICH ACCOMPANIES A PRESCRIPTION DRUG MAY BE NULLIFIED THROUGH THE MANUFACTURER'S OVERPROMOTION, WHICH RENDERS THE WARNING INADEQUATE.

In products liability actions based upon inadequate warnings for prescription drugs, an issue which frequently arises is that of overpromotion.  Courts around the country have recognized that overpromotion of a drug by the manufacturer may have the effect of watering down and nullifying the warnings accompanying a drug, thereby rendering them inadequate.  See *Tinnerholm v. Parke, Davis & Co.*, 285 F.Supp. 432, 451 (S.D.N.Y.1968), mod. 411 F.2d 48 (2 Cir. 1969) ("'Watering down' the substance of a warning so as to give false assurance to

the medical profession that a drug or biological can be safely administered, thereby minimizing the danger which exists in the use of a product, amounts to an inadequate warning."), citing *Love v. Wolf*, 226 Cal.App.2d 378, 38 Cal.Rptr., 183, 197 (1964)) ("[I]f the over-promotion can reasonably be said to have induced the doctor to disregard the warnings previously given, the warning given is thereby withdrawn or canceled." Id at 398-400.);  See also *Hill v. Searle Laboratories, a Div. of Searle Pharmaceuticals, Inc.,* 884 F.2d 1064, 1071 (8th Cir.1989), wherein the court, in noting that "physicians are inundated with information about various prescription drug products," stated that "the overpromotion by a drug manufacturer may cause the prescribing physician not to rely on the warnings and package inserts associated with a particular drug product." Id at FN13, citing *Holley v. Burroughs Wellcome Co.*, 318 N.C. 352, 348 S.E.2d 772 (1986) (Expert testimony that failure of the health personnel responsible for decedent's care failed to recognize malignant hyperthermia syndrome due in part to drug manufacturer's "over-promotion of these drugs without giving fair balance to the dangers of the drugs," raised triable issue of fact.) Id at 358-361.

Overpromotion of a prescription drug, including a manufacturer's efforts to downplay or deemphasize a drug's risk, is directly relevant to the issues of adequacy and causation:

> "[T]he overpromotion theory is simply that, by over-promoting a product, the over-promoter has **de-emphasized or diluted the full effect of the warnings.** See Hill v. Searle Laboratories, a Div. of Searle Pharmaceuticals, Inc., 884 F.2d 1064, 1071 n. 3 (8th Cir.1989) (noting that **overpromotion by a drug manufacturer may cause the prescribing physician not to rely on the warnings** and package inserts associated with a particular drug product); Plummer v. Lederle Laboratories, Div. of American Cyanamid Co., 819 F.2d 349, 358 (2d Cir.1987) (distinguishing Stevens v. Parke, Davis & Co., 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (1973), which imposed liability on a drug manufacturer because its overpromotion of a dangerous drug to the medical profession was coupled with a **gross minimization of the risk of prescribing the drug in the product warnings**); Salmon v. Parke Davis & Co., 520 F.2d 1359, 1363 (4th

Cir.1975) (noting that **overpromotion nullifies effect of valid warnings**); Baldino v. Castagna, 505 Pa. 239, 478 A.2d 807, 810 (1984); Mahr v. G.D. Searle & Co., 72 Ill.App.3d 540, 28 Ill.Dec. 624, 390 N.E.2d 1214, 1238 (1979) (noting that overpromotion evidence is evidence showing that, in marketing the drug in question, the drug manufacturer tried to "**play down" the warnings making them ineffective**)." Caraker v. Sandoz Pharmaceuticals Corp., 172 F.Supp.2d 1018, 1030 ( S.D.Ill., Sep 04, 2001)

In *Salmon v. Parke Davis & Co.*, 520 F.2d 1359, 1363 (4th Cir.1975), an action against the manufacturer of an antibiotic administered to child who thereafter developed aplastic anemia, the court reversed summary judgment in favor of the defendant. Although the trial court found the warnings issued by the manufacturer to be adequate as a matter of law, the appellate court found that a jury could infer that the absence of a warning on an advertisement for the drug was a form of overpromotion which nullified the effect of even a valid warning on the package:

"Timothy's physician had received a calendar advertising chloromycetin, together with a sample package containing a warning about the drug. The district court held that as a matter of law this evidence was insufficient to show overpromotion. Though the evidence is slight, we cannot say that its probative value is wholly lacking. It is foreseeable that a calendar might remain on a physician's desk as a constant reminder to prescribe a drug long after the sample and its warning had been removed. A jury could infer, therefore, that the absence of a warning on an advertisement for the use of a drug as potentially dangerous as chloromycetin was **a form of overpromotion which nullified the effect of even a valid warning on the package**." Id at 1363-1364.

The court in *Salmon* cited *Stevens v. Parke, Davis & Company*, 9 Cal.3d 51, 65, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973) ("Although the manufacturer or supplier of a prescription drug has a duty to adequately warn the medical profession of its dangerous properties or of facts which make it likely to be dangerous, an adequate warning to the

profession may be eroded or even nullified by overpromotion of the drug through a vigorous sales program which may have the effect of persuading the prescribing doctor to disregard the warnings given."), and *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971) ("We think that whether or not the warnings on the cartons, labels and literature of Parke, Davis in use in the relevant years were adequate, and whether or not the **printed words of warning were in effect cancelled out and rendered meaningless in the light of the sales effort made by the detail men,** were questions properly for the jury. Action designed to stimulate the use of a potentially dangerous product must be considered in testing the adequacy of a warning as to when and how the product should not be used; if detail men are an effective means of selling a product and explaining its nature, a jury could find that they also afforded an effective medium of conveying a warning.") Id at 288-289.

More recently, in *Nobles v. Astrazeneca Pharmaceuticals,* 48 Conn.Supp. 134, 832 A.2d 1241, 1242-1243 (Conn.Super. 2003), an action against the manufacturer of a prescription nasal spray, the Defendant moved for summary judgment asserting that the action was barred by the learned intermediary doctrine. In denying the motion, the court found, inter alia, that triable issues existed as to whether the manufacturer had overpromoted the drug:

> "Courts have recognized several **exceptions to the learned intermediary doctrine that include incidences where** the drug is advertised directly to the consumer or where **the drug is overpromoted.** (citation) ... Upon close review of the insert, the court finds that there are disputed issues of fact as to whether proper warning regarding the drug and its proper usage were provided to the treating physician. There are also disputed issues of fact as to whether Astrazeneca overpromoted the drug or directly advertised to the consumer."

## V.   EVEN WHERE THE PRESCRIBING PHYSICIAN'S TESTIMONY INDICATES AN AWARENESS OF THE RISKS, EVIDENCE OF OVERPROMOTION MAY ESTABLISH THAT THE WARNINGS WERE INADEQUATE AND A PROXIMATE CAUSE OF INJURY.

The testimony of both of Plaintiff's prescribing physicians indicates that they would not have continued to prescribe Vioxx to Mr. Barnett had they been aware of the serious risk of heart attack posed by Vioxx, including the significant increased risk of hypertension. (See excerpts from the deposition of Michael Mikola, M.D., attached as Exhibit 18 and the deposition of Michael McCaffrey, M.D., attached as Exhibit 19)

However, proof that the inadequacy of a warning was a proximate cause of injury is not limited to, nor dependent solely upon, the testimony of the prescribing physician. "To satisfy the burden of establishing warning causation, a plaintiff may introduce either objective evidence of how a reasonable physician would have responded to an adequate warning, or subjective evidence of how the treating physician would have responded." *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir.1992); See also *Hermes v. Pfizer, Inc.*, 848 F.2d 66, 69-70 (5th Cir.1988) (Expert testimony that had warning been given, reasonably prudent physician would not have prescribed drug was sufficient to support jury's determination that manufacturer's failure to give adequate warning of side effects of antidepressant drug was cause in fact of consumer's ingesting drug.)

The physician's testimony is not in and of itself dispositive on the issue of adequacy or on the issue of causation. Even where a doctor testifies he or she appreciated the risks, this does not preclude a finding that the warnings were inadequate, nor does it preclude a finding of causation. In *Anderson v. Sandoz Pharmaceuticals Corp.*, 77 F.Supp.2d 804 (S.D.Tex. 1999) 808-809, the court denied summary judgment, even though the prescribing physician testified that he was aware of the risks and continued to prescribe the drug:

> "Despite the wealth of evidence provided by Defendants on this
> issue, the fact remains that Dr. Holt may not have been fully
> apprised of all the attendant risks associated with reactive
> hyperprolactimia patients who take Parlodel. And while
> Defendants urge the Court to rely exclusively upon that portion of
> Dr. Holt's deposition testimony in which he states that at the time
> he prescribed Parlodel to Ms. Anderson he had ample knowledge
> from alternative sources about the risks associated with the drug,
> the Court nevertheless notes other portions of his deposition
> testimony in which Dr. Holt admits having no knowledge of a
> variety of studies concerning Parlodel and stroke and myocardial
> infarction. And, because some of these studies may have been
> sponsored by Defendant, the Court finds it possible to conclude
> that Dr. Holt was not in a position to fully appreciate Parlodel's
> risks--even through independent knowledge--at the time he
> prescribed the drug to Ms. Anderson." "

Evidence that overpromotion has nullified and watered down warnings is relevant and

admissible on the question of adequacy of warnings. In *Whitley v. Cubberly*, 24 N.C.App. 204,

210 S.E.2d 289 (1974), a wrongful death action involving a prescription drug, the appellate

court reversed summary judgment for the manufacturer. Although the prescribing physician

testified that he was familiar with the manufacturer's warnings, the court held that the

manufacturer would not be relieved of liability if overpromotion of the drug though a 'vigorous

sales campaign' should induce a physician to fail to adequately heed the warnings given:

> "[W]e find the material insufficient to establish that there is no
> genuine issue of fact in connection with plaintiff's allegations that
> Parke, Davis was **negligent in improperly marketing and over-
> promoting** Chloromycetin, in failing to heed warnings given to it
> about the dangerous properties of Chloromycetin, and in failing to
> make adequate warnings about the dangerous properties of the
> drug to the medical profession. That Parke, Davis may have fully
> complied with all applicable Federal laws in its marketing and
> labeling of Chloromycetin would not in itself free it of liability for
> harm caused by use of the drug if it were shown that such use and
> **resulting harm was caused by the Company's negligent acts in
> overpromoting the drug**, the dangerous properties of which it
> was aware or in the exercise of due care should have been aware.
> For example, even though all warnings required by Federal
> authorities may have been given, such warnings would be

20

insufficient to exonerate Parke, Davis from all liability **if over-promotion through a vigorous sales campaign should induce the medical profession in general,** and in this case Dr. Cubberly in particular, **to fail adequately to heed the warnings given.** In the present case, **Dr. Cubberly's deposition discloses that, despite his statement that he was familiar with the manufacturer's warnings, he was not 'completely aware' that there should be periodic blood studies during treatment with the drug nor was he aware of the manufacturer's warning** that 'to facilitate appropriate studies and observation during therapy, it is desirable that patients be hospitalized.' **Whether the doctor's lack of awareness was due to negligent over-promotion of the drug** by Parke, Davis is not answered by the present record." Id at 207-208.

In *Stevens v. Parke-Davis & Co.*, (1973) 9 Cal.3d 51, 507 P.2d 653, a wrongful death action, the heirs of a woman who died of aplastic anemia resulting from chloromycetin use, obtained a jury verdict against Parke-Davis.   The California Supreme Court affirmed the judgment for plaintiff, despite the prescribing physician's testimony that he was aware of the dangers:

"Parke, Davis contends, however, that even if it did overpromote the drug, this overpromotion was not the proximate cause of Mrs. Stevens' death. In support of this contention, it points to **testimony of Dr. Beland that he was cognizant of the dangers involved** in continuously prescribing Chloromycetin for a patient.FN15 Parke, Davis argues that this testimony establishes as a matter of law that the negligence of Dr. Beland was an intervening cause which exonerated Parke, Davis from liability. (See Magee v. Wyeth Laboratories, Supra, 214 Cal.App.2d at pp. 351-352, 29 Cal.Rptr. 322.)

FN15. Dr. Beland first began prescribing Chloromycetin in 1950. He testified that, at the time the present cause of action arose, he was aware that Chloromycetin had been linked to aplastic anemia in certain cases and that its prolonged administration carried some danger of fatality. Id at 54-55.

.....There is adequate circumstantial evidence in the record before us to support a reasonable inference by the jury that Dr. Beland was induced to prescribe the drug for Mrs. Stevens because of Parke, Davis' **overpromotion.** Like many others of the

21

> profession, **he had been exposed to the promotional tactics** employed by Parke, Davis. **It is reasonable to assume that the company's efforts consciously or subconsciously influenced him**. In addition, **plaintiff introduced expert testimony by a physician that the advertising and promotion of the drug 'played a role' in inducing physicians to prescribe it when it was not sound practice to do so. The jury could reasonably infer from the above circumstantial evidence that Dr. Beland was induced by the manufacturer's activities to prescribe the drug and were entitled to reject Dr. Beland's testimony to the contrary.**" Id at 55-56.

In *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971), (cited by the court in *Salmon v. Parke Davis & Co.*, 520 F.2d 1359, 1363 (4th Cir.1975)), there were two prescribing physicians. One of them, the initial prescriber, testified that he had received adequate warnings. He also testified 'that he received no impression, when visited by the Parke, Davis detail men, that Chloromycetin could be used with impunity, was not influenced by salesmanship of the manufacturer in his use of the drug, and was aware that it should be used only in serious cases.' Id at 213. Nevertheless, the court upheld a jury verdict in favor of the plaintiffs:

> "**Dr. Cucinotta stated, in effect, that he was adequately warned** and understood the dangers and proper use of the drug, while Dr. Levin for his part indicated the contrary. Plaintiffs were allowed over objection to introduce, by expert witnesses, evidence directed to showing a failure to warn the Medical profession. This consisted of the custom and practice of the manufacturer, Parke, Davis, in 'overpromoting' its product, primarily through the use of **detail men who minimized the dangers of the drug while emphasizing its effectiveness**, wide acceptance and use, and lack of certain objectionable side effects associated with other drugs. The question is whether this evidence was properly admitted.
>
> While the question is close, we think the answer is in the affirmative in the setting of this case. The jury \*292 was not obliged to believe the oral, uncorroborated testimony of either doctor. **The evidence of Parke, Davis' efforts in promoting the drug would tend to refute Dr. Cucinotta's testimony in the sense that he may have been influenced by the efforts, perhaps even unconsciously, to prescribe the drug** (his memory was vague as to what transpired at visits of detail men to his office);

and conversely, it would tend to corroborate and lend credence to
Dr. Levin's testimony that he was so influenced." Id at 221-222.


## VI.   PROFIT MOTIVE EVIDENCE RELATING TO OVERPROMOTION IS PROBATIVE AND ADMISSIBLE ON SEVERAL KEY ISSUES, INCLUDING ADEQUACY OF WARNINGS, FRAUD, INTENT AND RECKLESSNESS.

Courts have recognized that in prescription drug products liability cases, evidence

demonstrating a profit motive is relevant evidence on issues relating to overpromotion, and

ultimately adequacy of warnings. In *Mahr v. G.D. Searle & Co.*, 72 Ill.App.3d 540, 574, 28

Ill.Dec. 624, 390 N.E.2d 1214, 1238 (1979) the plaintiff alleged that the defendant had failed to

give adequate warnings of possible side effects in connection with an oral contraceptive.

Affirming a jury verdict against the manufacturer, the court rejected the defendant's arguments

regarding the admissibility of various letters, directives and memoranda addressed by Searle to

its detailmen were irrelevant and highly prejudicial. The court found that the jury was entitled to

consider marketing efforts in its decision on the adequacy of warnings, and noted the 'motives

for profit' behind the manufacturer's promotional efforts through its sales force, which were

designed to place the drug in the most positive light while downplaying its side effects:

> "The plaintiff maintains the exhibits were properly
> admitted as evidence of Searle's "overpromotion" of Enovid, and,
> therefore, relevant to the issue of adequate warning."...
>
> "The questioned exhibits indicate an **aggressive
> promotional campaign** aimed at increased exposure and
> prescription of Enovid for birth control purposes. The exhibits
> placed into the hands and minds of the sales force **suggestions for
> marketing the drug only in a most positive light and without
> much attention to the possible side effects. Given the motives
> for profit, both for Searle and its commissioned sales
> representatives,** it cannot be said that the information contained
> in the exhibits did not, to a degree, affect the marketing of Enovid
> in such manner as to **play down or ignore those warnings of
> dangers** available only in writing. That such a manner of

marketing was intended and encouraged by Searle is manifested by the exhibits, and it is our opinion that **the jury was entitled to consider them in arriving at a decision as to the adequacy of the warnings.**"

Likewise, in *Love v. Wolf* (1964) 226 Cal.App.2d 378, 38 Cal.Rptr. 183, supra, the plaintiff sued a drug manufacturer, alleging that the she had been injured as a result of the overpromotion of a prescription drug. Although the court reversed a judgment entered on a verdict for plaintiff due to the misconduct of plaintiff's counsel, the court found that proof of sales was relevant to show a motive or reason for the overpromotion:

> "Here it cannot be said that the wealth of Parke-Davis was relevant to any issue. Proof of its sales, however, expressed either in grams or dollars, was relevant to show a **motive or reason for the alleged over-promotion** of the drug, a definite issue in the case." Id at 389

The court in *Stevens v. Parke, Davis & Co.*, (1973) 9 Cal.3d 51, 107 Cal.Rptr. 45, affirmed a jury verdict against a pharmaceutical manufacturer based upon similar allegations, noting that sales dollar amounts **"were admissible to prove a motive of overpromotion."** Id at 72.

Aside from the issue of adequacy of warnings, Plaintiff here has asserted a cause of action for Deceit by Concealment, which alleges, inter alia, that Merck 'willfully deceived Plaintiff[s] by concealing' the true facts concerning Vioxx (Complaint, para 45) and that the Defendant 'intentionally concealed and surpassed the true facts concerning Vioxx with the intent to defraud.'(para 49) The elements of a cause of action for fraud include both reckless disregard and intent. *Armstrong v. Collins*, 366 S.C. 204, 621 S.E.2d 368 (S.C.App.2005) "Fraud is a false representation of a matter of fact, whether by words or by conduct, by false or misleading allegations, or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury.

...Fraud occurs where one person or party intentionally deceives another by word or conduct for the purpose of inducing that other party to part with some property or surrender some legal right and the party thereby accomplishes his purpose. It involves the elements of dishonesty and deceit. ...." Anderson, S.C. Requests to Charge - Civil, § 18-1 (2002). One of the essential elements of a fraud cause of action is "the speaker's knowledge of its falsity or a reckless disregard for its truth or falsity." Anderson, S.C. Requests to Charge - Civil, § 18-2 (2002).

Under South Carolina law '[f]raud may be deduced not only from deceptive or false representations, but from facts, incidents, and circumstances which may be trivial in themselves, but decisive in a given case of the fraudulent design. **It is a state of mind, dependent on intent, which is provable by circumstantial evidence.**" *Carter v. Boyd Const. Co.,* 255 S.C. 274, 280, 178 S.E.2d 536, (S.C 1971), citing *Parham-Thomas-McSwain* v. *Atlantic Life Insurance Company,* 111 S.C. 37, 96 S.E. 697. **"When fraud is charged, much latitude is allowed in the admission of evidence on that issue."** *Allen-Parker Co. v. Lollis,* 257 S.C. 266, 272, 185 S.E.2d 739 (S.C. 1971) **"A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud** and a clear opportunity for doing so." *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), cert. denied 484 U.S. 1005 (1988), overruled on other grounds, *United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989).

In an action based upon fraud, evidence of the defendant's profits is relevant to demonstrate motive and intent to commit fraud. *U.S. v. Amr,* 132 Fed.Appx. 632, 2005 WL 1285700 (6th Cir.(Mich.)), 2005 Fed.App. 0434N, 6th Cir.(Mich.), May 25, 2005. (In prosecution for, inter alia, health care fraud and mail fraud evidence establishing the high profit margin defendant earned when he sold power wheelchairs and then billed Medicare was relevant to establish defendant's motive for committing fraud. **"The evidence of the high profit**

**margin** that the Defendant earned on selling power wheelchairs was highly relevant to showing why the Defendant, in violation of Medicare rules, steered patients who expressed interest only in lift or manual chairs to purchase power wheelchairs and did not inform the patients that they had a right to lease the chairs... Thus, since the evidence was **relevant to establishing the Defendant's motive**, the district court properly admitted the evidence pursuant to Rule 401.")

Plaintiff has also asserted a cause of action for negligent misrepresentation. A pecuniary interest on the part of the Defendant is an essential element of a negligent misrepresentation cause of action. *Armstrong v. Collins*, 366 S.C. 204, 219-220, 621 S.E.2d 368 (S.C.App. 2005) The key difference between fraud and negligent misrepresentation is that "fraud requires the conveyance of a known falsity, while negligent misrepresentation is predicated upon transmission of a negligently made false statement." "A duty to exercise reasonable care in giving information exists when the defendant has a pecuniary interest in the transaction."" Id at 375-376. The subject documents all demonstrate a pecuniary interest on the part of Merck, and that Merck placed such interest ahead of the Plaintiff's safety.

Profit motive is also relevant to demonstrate **reckless disregard**. *In re Diet Drugs*, 2000 WL 876900 (E.D.Pa., Jun 20, 2000) ("[T]he court specifically notes that its ruling does not preclude Plaintiffs from introducing evidence of the intent of AHP leadership or personnel. In fact, the court recognizes that such evidence could be relevant and, indeed, could be admissible. For example, in a particular civil action, punitive damage claims may bring into play the right of plaintiffs to show what conduct of AHP was in **reckless indifference** to the health and well being of persons that were targeted for diet drug consumption by reason of a dominating **or overriding policy to maximize profits at any cost**." Id at *9.); *CSX Transp., Inc. v. Palank*, 743 So.2d 556, 560 (Fla. App. 1999)  (Evidence presented during punitive damage liability phase of trial that railroad engaged in cutbacks of maintenance employees resulting in savings

of $2.4 billion was relevant to wrongful death claim arising out of train derailment. "[D]uring the punitive damage liability phase of the trial, appellee presented evidence showing that CSX and its predecessors engaged in cutbacks of maintenance of way employees from 1981 through 1993, and that these cutbacks resulted in savings of approximately $2.4 billion for the company. CSX contends that the trial court erred in admitting this evidence because it brought information regarding CSX's wealth before the jury during the liability phase .... **Evidence of corporate downsizing for profits was relevant to show a motive for CSX continuing such conduct.** The evidence of downsizing and the testimony that the limited number of CSX inspectors could not conduct proper inspections of the lengths of track and switches to which they were assigned supports a jury finding of a conscious disregard for the safety of the public.")

(See also *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187, 204 (Colo. 1984) (In action involving IUD, evidence that manufacturer hired advertising agency to encourage media publicity favorable to all of its products was relevant to claim for exemplary damages. "This evidence **demonstrated a motive on the part of Robins to profit by making exaggerated statements regarding the safety** and efficacy of its product."; *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 813,174 Cal.Rptr. 348 (1981) (Affirming award of punitive damages award in product liability action. "There was evidence that Ford could have corrected the hazardous design defects at minimal cost but decided to defer correction of the shortcomings by **engaging in a cost benefit analysis balancing human lives and limbs against corporate profits.** Ford's institutional mentality was shown to be one of callous indifference to public safety."); *Bic Pen Corp. v. Carter*, 171 S.W.3d 657, 675 (Tex.App. 2005) (Affirming jury verdict including punitive damages in action by burn victim against manufacturer of disposable lighter. "The jury could have listened to such evidence and concluded that Bic had **a profit**

**motive** for producing lighters with the least child resistance allowable under the federal standards."))

## VII.  CONCLUSION

Even ignoring their obvious probative value on the issues of reckless disregard and liability for punitive damages, the five documents discussed herein are all relevant and admissible here.  They impeach the fundamental positions taken by Merck in its defense, and they provide essential proof on Plaintiff's causes of action based upon failure to warn, including strict liability, negligence and breach of warranty. They demonstrate overpromotion of Vioxx, which resulted in watering down and nullifying of the warnings, rendering them inadequate. The documents also establish elements of Plaintiff's fraudulent concealment and negligent misrepresentation claims, in that they demonstrate Merck's motive and intent in connection with the overpromotion of Vioxx, its misrepresentations regarding the safety of Vioxx, and concealment of the true facts about the risks associated with use of Vioxx.

Accordingly, the subject documents should be admitted into evidence, given their probative value and the fact that given that proper foundation testimony has been provided in both depositions and prior trial testimony.

Date:  July 17, 2006                          Respectfully submitted,

                                              By _____
                                                 Mark P. Robinson, Jr.
                                                 Kevin F. Calcagnie
                                                 Carlos A. Prietto, III
                                                 Ted B. Wacker
                                                 Lexi W. Myer

ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California  92660
Telephone:  (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ & COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
              Facsimile: (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301-1190
Telephone: (318) 487-9874
Facsimile: (318) 561-2591

Shelly Sanford
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, Texas 77002
Telephone: (713) 650-0022
Facsimile: (713) 650-1669

Elizabeth Cabraser
LIEFF, CABRESER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Drew Ranier
RANIER, GAYLE & ELLIOT, LLC
1419 Ryan Street
Lake Charles, Louisiana 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

Thomas Kline
KLINE & SPECTER, P.C.
1525 Locust St., 19th Floor
Philadelphia, Pennsylvania 19102
Telephone: (215) 772-1000
Facsimile: (215) 772-1371

Mark P. Robinson, Jr.
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Fl
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Arnold Levin
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3875
Telephone: (215) 592-1500
Facsimile: (215) 592-4663

Christopher V. Tisi
ASHCRAFT & GEREL
2000 L Street, NW, Suite 400
Washington, DC 20036-4914
Telephone: (202) 783-6400
Facsimile: (307) 733-0028

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants'

Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs'

Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order

No. 8, on this 17th day of July, 2006.

MARK P. ROBINSON, JR.
State Bar No. 108994
Attorney for Plaintiff
Robinson, Calcagnie & Robinson