Exhibit 6
to Plaintiff's Brief Re Pre-Admission of Certain Documents

## Deposition of Barry J. Gertz, August 15, 2005
### (92:9-109:10)

92

```
9        (Whereupon, Deposition Exhibit
10       Gertz-12, "MK-966 (COX-2 Inhibitor)
11       Product Development Plan Stage 0
12       Review," MRK-NJ0220388 - MRK-NJ0220454,
13       was marked for identification.)
14                - - -
15  BY MR. KRISTAL:
16       Q.    I'm going to hand you 12, Exhibit 12.
17  This is the "MK-966 (COX-2 Inhibitor) Product
18  Development Plan Stage 0 Review."  Is it not?
19       A.    Yes, it is.
20       Q.    And if you look at the last page of
21  the document, you are listed as being on the COX-2
22  commercialization sub team, are you not?
23            MR. KLEINBERG:  I'm sorry, the last
24  page?
25            MR. KRISTAL:  Yes.
```

93

```
1            THE WITNESS:  Yes, for clinical
2   pharmacology.
3   BY MR. KRISTAL:
4        Q.    Okay.
5            There were people who were involved
6   in clinical research and clinical pharmacology, and
7   there were also marketing people and financial
8   people on the committee; is that right?
9        A.    You said marketing.  I don't think
10  there's any marketing people here.  There is
11  finance, not marketing people.
```

93

```
12       Q.    Okay.
13            Now, if you'd turn to Page 36, I want
14  to be able to put a date on this document.  Page 36
15  has a timetable.  And it notes, does it not, that
16  the stage 0 review is March of 1996?
```

Exhibit 6                                        1

17    A.    That's correct.
18    Q.    If you look at the first paragraph on
19  Page 3 of the executive summary.
20    A.    What page?
21    Q.    Page 3, first paragraph.
22            Second sentence notes, does it not,
23  that there is "considerable competitive pressure to
24  market the first highly selective COX-2 inhibitor."
25  Right?

94

1    A.    You said third paragraph?
2    Q.    First paragraph.
3    A.    First paragraph.
4    Q.    "Considerable competitive pressure to
5  market the first highly selective COX-2 inhibitor."
6  Right?
7    A.    That's what it says in this sentence.
8    Q.    It also says in that paragraph that
9  "The clinical program had thus been compressed and
10  accelerated." Right?
11    A.    I'm not sure where you are reading.
12    Q.    Well, it says, "Searle is reported to
13  be targeting a filing in 4Q98 with their COX-2
14  selective agent."
15            Do you see that?
16    A.    Yes.
17    Q.    That's the competition; right?
18    A.    Correct.
19    Q.    "The development of MK-966 must
20  proceed aggressively to meet this challenge."
21  Right?
22    A.    "The development...must proceed
23  aggressively to meet this challenge." I read that,
24  yes.
25    Q.    And that's what the commercialization

95

1  sub team was saying; right?
2    A.    That's in the executive summary of
3  that, yes.
4    Q.    Two sentences after that it says,
5  "The clinical program has thus been compressed and
6  accelerated." Right?
7    A.    Yes.
8    Q.    So, the clinical program was

Exhibit 6                    2

9   compressed and accelerated for Vioxx, was it not?
10       A.    It's -- I don't know -- I can't speak
11   to exactly what elements they would point to that
12   would make it -- that could, in fact, assign it as
13   being compressed and accelerated.
14       Q.    Well, you know that for Vioxx,
15   compressed meant that there were Phase III clinical
16   studies done before the Phase II dosing range
17   studies were completed; right?  That's what it means
18   in part?
19       A.    I believe the initial part of the
20   Phase IIb studies were completed, the full -- the
21   extensions weren't completed, but I would have to go
22   over those dates to be sure of that.
23       Q.    Well, there are risks involved in
24   compressing and accelerating the development of
25   Vioxx; right?  There were risks involved?

                                96
1        A.    What kind of risks are you referring
2    to?
3        Q.    Look at the next page, the next to
4    last paragraph.  "There are several risks identified
5    with the accelerated and compressed development
6    strategy for" Vioxx.  Right?
7        A.    Right, but these are risks -- these
8    are not risks related to any patient risks.  These
9    are risks that we -- that regulatory -- you know,
10   that there may not be -- that there may not be an
11   agreement with what dose we choose.  Those were
12   ultimately risks that were -- the company might not
13   get the drug -- they were risks to the ultimate
14   filing to determine when the filing would occur, but
15   not risks that were -- I would not imply that they
16   were risks to patients in any way.
17       Q.    Well, look at risk b.  "The early
18   initiation of Phase III prior to completion of Phase
19   IIB and basing dose selection on Phase IIA data
20   only."  That's a risk of compressing the clinical
21   development; right?
22       A.    Not necessarily risk in this case, as
23   the Phase IIa data had multiple doses in it, and
24   that applied and provided knowledge for what was
25   chosen in Phase IIb.

                                97

Exhibit 6                        3

1      Q.     Were you on the team that wrote this
2  document?
3      A.     I was on the team -- I was on the
4  commercialization sub team.
5      Q.     Right.
6             And didn't they present this
7  document?  This is their document?
8      A.     That's correct.
9      Q.     Okay.
10            And it says --
11     A.     I was on this team, as indicated on
12  here, representing clinical pharmacology.  These
13  decisions that you are referring to were not
14  decisions that related to the clinical pharmacology
15  program for this drug.
16     Q.     Your team at the time said there were
17  several risks identified; right?  That's what they
18  said?
19     A.     There were several risks identified.
20     Q.     And those risks were identified with
21  accelerating and compressing the program; right?
22  That's what you said at the time?
23     A.     That's what this sentence reads.
24  "There are several risks identified with an
25  accelerating compressed development strategy for

                         98
1  MK-966."
2      Q.     And one of the primary risks was
3  initiating Phase III trials before you completed all
4  of the dose selection trials.  That was one of the
5  primary risks that you and the team noted at the
6  time in this document; right?
7      A.     Well, they would be incomplete from a
8  scientific perspective, but again, that was
9  mitigated -- such a risk was mitigated by basing the
10  dose selection on Phase IIa data, which had multiple
11  doses in it.
12            MR. KRISTAL:  Move to strike.
13  BY MR. KRISTAL:
14     Q.     My question is, you were telling the
15  team, the committee that you needed a decision from
16  that one of the primary risks involved proceeding
17  further down in the clinical development Phase III
18  before you had completed the dosing part of the
19  program; correct?

Exhibit 6                         4

20    A.    As I said, there was a small risk
21  involved in that because that risk was mitigated by
22  having dose selection data in Phase IIa.
23    Q.    Is there anything in here that says
24  it's a small risk?
25    A.    There's not anything in here that

99

1  says it's a large risk either.  It was
2  identification of risks.
3    Q.    Is there anything in here that says
4  it's a small risk?
5    A.    In fact, we might want to go to that
6  part of the document and read that, and it probably
7  does say that the risk was mitigated on the basis of
8  Phase IIa data, but I have to check that.  Do you
9  want to check that?  Do you want to look through
10  that?
11    Q.    Sure.  Why don't you look at Page 29?
12  Are you there?
13    A.    (Witness complies.)
14    Q.    Now, one of the things you were doing
15  with respect to Vioxx in the clinical trials is you
16  were doing studies in what's called Phase IIa with
17  respect to selecting the dose of Vioxx that you were
18  going to use in the clinical trials; right?
19    A.    Yes.  I think the important word here
20  is "confirmatory."  So, as you can see from here on
21  page 29 --
22    Q.    Dr. Gertz --
23    A.    Yes.
24    Q.    -- there's a question on the table.
25  Okay?  This is not an opportunity just to start

100

1  talking.
2           The question is, Phase IIa of
3  clinical development is an initial phase to try to
4  figure out what dose of the drug should be used;
5  right?
6    A.    It's the start of dose finding for
7  clinical development.
8    Q.    And Phase IIb in clinical development
9  is the confirmatory phase, so, there's a phase where
10  you want to confirm that what the preliminary dosing
11  was is accurate; right?

Exhibit 6                          5

12    A.    It's a confirming, and that's, I
13  think the operative term -- word here, that it was
14  confirming what we believed we had information on
15  from Phase IIa.
16    Q.    Okay.
17            And the acceleration and compression
18  of the development of Vioxx was proceeding to Phase
19  III development, larger studies in more people,
20  without having confirmed the dose that you initially
21  got in the Phase IIa; is that right?
22    A.    In this case, the Phase IIa studies
23  were of a substantial size and substantially
24  informative that we could do that.  And, in fact, we
25  do that on -- we can make such decisions in other

                             101
1  development programs as well.
2    Q.    Phase IIb is important; correct?
3    A.    Phase IIb may be more or less
4  important depending on the information that you
5  achieve in Phase IIa.
6    Q.    And here you were proceeding further
7  down the clinical development path before you had
8  confirmed what was the appropriate dose?
9    A.    Because in this particular situation,
10  as I indicated, we had fairly good information from
11  Phase IIa what the proper dose or doses was to study
12  in Phase III.
13    Q.    Now, if you look at Page 25, again,
14  in the second paragraph with respect to competition,
15  Merck wanted, in order to ensure that Vioxx was
16  first to market, to have the clinical program based
17  on "aggressive and highly accelerated development
18  plan."  Right?
19    A.    That's what this sentence says.
20    Q.    And that's what you were telling the
21  group that you needed a decision from at the time;
22  right?
23    A.    We were telling them that we were
24  moving as quickly as reasonable with the development
25  of what became Vioxx.

                             102
1    Q.    Now, if you look at Page 64, there's
2  a financial analysis of what it meant to win the
3  race to be first to market; right?

Exhibit 6                    6

4      A.    Well, I'm not a finance specialist.
5  That's what the one person from finance was on to
6  generate this document, this part of the document.
7      Q.    This is written in English; right?
8      A.    It's written in English.
9      Q.    And you read it at the time; right?
10     A.    I'm not a specialist in finance.
11     Q.    The question is whether you read it
12 at the time.
13     A.    I did read it at the time.
14     Q.    Okay.
15           So, let's read it together.
16           They are calculating what's called
17 NPV, net present value; right?
18     A.    Correct.
19     Q.    And they say in the middle of the
20 first paragraph, "In the base case scenario," of
21 Vioxx being first to market.
22     A.    Where are you?
23     Q.    In the middle of the paragraph, under
24 "Net Present Value."
25     A.    Okay.  I see where you are.

                                    103
1      Q.    They are giving an analysis of how
2  much can be expected in sales if Vioxx is first to
3  market, and then how much is expected in sales if
4  Vioxx is second to market, and then they say how
5  much it means to be first to market in dollars;
6  right?
7      A.    For the NPV, yes.
8      Q.    Net present value --
9      A.    Yes.
10     Q.    -- right?
11           And what they said at the time, and
12 what you were aware of at the time is that the value
13 of Vioxx being first to market versus second to
14 market was $611 million; right?
15     A.    That's what this says.
16     Q.    And that was obviously important to
17 Merck?
18     A.    It was one of many considerations
19 that -- as I said, it wasn't the sole consideration
20 for prompting the rapid development of Vioxx.  The
21 other one was to get a drug which we felt had major
22 medical benefits out to patients as quickly as

Exhibit 6                        7

23   possible.  That was a major driver for this program.
24        Q.     So, you're saying the major driver
25   was the concern for the patients to get this out as

104

1   quickly as possible?
2        A.     I said that was one of them.
3        Q.     One of the major ones?
4        A.     One of the most important drivers for
5   the program, yes.
6        Q.     Is there anything in the stage one
7   review that says that?
8        A.     Not in the net present value section.
9        Q.     I'm talking about any section.
10       A.     In several of the other documents, it
11   does.
12       Q.     I'm talking about the stage one
13   review that you are looking at.  Is there anything
14   that says we have to develop this on a highly
15   compressed and accelerated basis because we're
16   trying to help patients?
17       A.     Well, the very first sentence.  "The
18   osteoarthritis market represents a crowded yet
19   unsatisfied market," unsatisfied because patients
20   don't get relief with the medications they have.
21       Q.     That's not what it says.  It says,
22   "The osteoarthritis market represents a crowded yet
23   unsatisfied market with substantial commercial
24   opportunity for a novel therapeutic approach."
25            That's what it says; right?

105

1        A.     Yes.
2        Q.     Okay.
3        A.     But it is a crowded, yet it is an
4   unsatisfied market with substantial commercial
5   opportunity.  I'm not denying there was commercial
6   opportunity associated with the fact that it was an
7   unsatisfied market.  Patients were not getting pain
8   relief with the current arthritis medications that
9   they had.
10       Q.     Does it say anywhere here that the
11   clinical program is being compressed and accelerated
12   because of concern for patients?  Does it say that
13   or does it say that it's the commercial opportunity
14   that's available?

Exhibit 6                          8

15     A.    It says it -- well, it does say --
16  yes.  "The clinical program has...been compressed
17  and accelerated" focusing on "distinguishing MK-996
18  from marketed NSAIDs...based on its novel mechanism
19  and a superior GI safety profile."
20     Q.    You left out a key word though;
21  right?  You left out the word "thus."  They first
22  start out talking about the "considerable
23  competitive pressure" and the "substantial
24  commercial opportunity."  Right?  Right?
25     A.    They talk about an "unsatisfied

                          106
1  market."
2     Q.    "With substantial commercial
3  opportunity."
4     A.    "With substantial commercial
5  opportunity."
6     Q.    "Considerable competitive pressure."
7  Right?
8     A.    It says -- up there, it says, "Thus
9  there is considerable competitive pressure."
10     Q.    And then it says, "The clinical
11  program has thus been compressed and accelerated."
12  Right?
13     A.    Yes.  Referring to all of that which
14  in a sense came before it, which includes a "crowded
15  yet unsatisfied market."
16           I think it is important to continue
17  the note here, "based on its novel mechanism and a
18  superior GI profile."
19     Q.    And that's what gave it a large
20  commercial opportunity?
21     A.    That's what made it important to
22  patients and also provided a large commercial
23  opportunity.
24     Q.    Is there anything that says it was
25  important to patients in that paragraph?

                          107
1     A.    Yes.  I interpret the unsatisfied
2  market as meaning that patients are not satisfied
3  with the medications that they are taking.
4     Q.    Now, you knew, did you not, that
5  within two weeks or so of the presentation --
6     A.    May I -- there's others in here, but

Exhibit 6                      9

7    we don't -- there are other sections in here.
8    "MK-966 will represent a new class of analgesic and
9    anti-inflammatory therapy without the serious
10    gastrointestinal side effects characteristic of the
11    NSAID class."
12        Q.    Does it say anything, and thus we
13    have to rapidly develop this because of that?  It
14    doesn't say that?
15        A.    Not in this particular point.  It did
16    above, though.
17        Q.    Now, you knew that the tactical PAC
18    within two weeks of the stage 0 review approved all
19    of the decisions that were requested to rapidly
20    accelerate the clinical program?
21        A.    I don't know the time frame exactly,
22    but...
23                    - - -
24            (Whereupon, Deposition Exhibit
25            Gertz-13, Memo, 3-26-96, "Tactical PAC

                        108
1            Meeting 3/18/96 - MRK-966 Review,
2            MRK-NJ0142930 - MRK-NJ0142931, was
3            marked for identification.)
4        - - -
5    BY MR. KRISTAL:
6        Q.    Okay.
7            Exhibit 13 is a March 26, 1996 memo,
8    and the subject is a tactical PAC meeting that
9    happened on March 18, 1996 reviewing Vioxx?
10        A.    Correct.
11        Q.    And the first paragraph is a summary;
12    right?
13        A.    Yes.
14        Q.    The second paragraph says, "The
15    commercialization team received approval for the
16    following critical decisions," and that, "(there
17    were no changes to the original decisions
18    requested)."  Right?
19        A.    That's what that paragraph reads,
20    yes.
21        Q.    Well, so, it's your understanding, is
22    it not, that what you had presented with the
23    commercialization sub team in the stage 0 review for
24    approval as of March 18, 1996 had, in fact, been
25    approved?  That's what this is saying; right?

Exhibit 6                    10

109

1    A.    That's what I -- that's how I
2  would -- that's -- I believe that's how I would have
3  read it.
4    Q.    You did receive this at the time;
5  right?
6    A.    Yes.
7    Q.    And this notes, does it not, that one
8  of the decisions was to initiate Phase IIb studies
9  in April of 1996; right?
10    A.    That's what this says, yes.

Exhibit 6                    11

Exhibit 7
to Plaintiff's Brief Re Pre-Admission of Certain Documents

**Trial Testimony of David Anstice, *Cona/McDarby v. Merck*, March 7, 2006**
**(240:1-244:1)**

240

10  (Whereupon, P-2 was marked into evidence.)
11  BY MR. LANIER:
12      Q.  Sir, do you have in front of you the document
13  that's labeled "Product Development Plan Stage 0
14  Review"?
15  A.  Yes, I do.
16      Q.  And so we're clear, by the way, I think we're
17  all clear on this, you still work for Merck, right?
18  A.  Yes, I do.
19      Q.  You have been moved from the job you had, but
20  you're here as an adverse witness.  You work for Merck
21  still at this point, don't you?
22  A.  Yes.  I work for Merck.  I am president of Human
23  Health Agent Pacific.
24      Q.  Got it.  Thank you, sir.
25          Now, if you will look back, when this product

241

1  development plan for VIOXX...
2          And it is called MK-966.  You know what that
3  means, don't you?
4  A.  That's a code name given in our research labs for
5  this particular product.
6      Q.  So that's the code name for VIOXX.  Right?
7  A.  That's correct.
8      Q.  All right.  So this is VIOXX, the Product
9  Development Plan Stage 0 Review, right?
10  A.  Correct.
11      Q.  We can go through this, if we need to, but
12  I'll ask you in the interest of time first -- and this
13  whole exhibit will be available for the jury so they
14  can read every page of it, if they choose, but in the
15  interest of time, I want to see if you can just agree
16  with some things that are in there without the need to
17  go through each one.  Fair?
18  A.  I'll be happy to answer your questions.

Exhibit 7                          1

19     Q.  Merck saw the arthritis market.  That's the 60
20  million plus market you talked about yesterday, right?
21  A.  We talked about 60 million patients, correct.
22     Q.  The arthritis market was, quote, "a
23  substantial commercial opportunity," right?
24  A.  That's a fair characterization.
25     Q.  And by "a substantial commercial opportunity,"

242

1  what your company means is y'all have a chance to make
2  a lot of money there, right?
3  A.  Right, because there are a lot of patients that
4  could benefit from VIOXX.
5     Q.  You got a big market, a lot of people that
6  might buy a good drug there that could make you a lot
7  of money.
8  A.  Yes.
9     Q.  So you have got a substantial commercial
10  opportunity, but there was competitive pressure to try
11  and be first to market, true?
12  A.  Yes.  We talked about being competitive with an
13  alternative product to VIOXX called Celebrex, and it
14  was well known that they were in development with that
15  product around this time period.
16     Q.  The competitive pressure is detailed in here
17  on page -- if you want to look at it, and I'll make
18  sure I get the number right -- it is on page 66.
19       But as I read this document, sir, your folks
20  had figured out that the difference between being first
21  or not being first to market could mean $611 million to
22  your company.  Do you see that, sir?
23  A.  Page 66?
24     Q.  Yes, sir.
25  A.  Um, yes, they're forecasting different possible

243

1  events, and there's a statement that there's a
2  technical risk adjusted net present value, which is a
3  different term, to sales of 657 million.
4     Q.  Well, sir, look at the very bottom conclusion
5  in this document, last thing y'all put in your paper.
6       "Based on the above financial evaluations"...
7       Do you see where I'm reading?
8  A.  Yes, I do.
9     Q.  ..."and given an assumption, the base case
10  evaluation for code name VIOXX is expected to be 889

Exhibit 7                2

11   million." Assuming the product is first to market,
12   right?
13   A.  That's correct.
14      Q.  And in a second to market scenario, the value
15   falls to 278 million.
16         Do you see that?
17   A.  Yes, I do.
18      Q.  Implying a significant value, 611 million, to
19   being first to market, see?
20   A.  Yes.
21      Q.  Your folks have done the computation and
22   figured out if y'all could either physically be first
23   or, in effect, win the race and come out as if you were
24   first, and it made a difference of about $611 million?
25   A.  Yes, at that calculation at that time, that was the

                              244

1   assessment, yes.

Exhibit 7                         3

Exhibit 8

*to Plaintiff's Brief re Pre-Admission of Certain Documents*

## Deposition of Susan Baumgartner, February 25, 2005
### (157:8-162:18)

157

8  Q.     I'm going to take you to this
9  exhibit. Is this 19?
10         MS. LUKEI: Yes.
11 BY MR. ROBINSON:
12      Q.    If you can go to Bates Number, it's
13 MRK-AAO000085. Do you see that? Just look for 85,
14 the last two digits.
15      A.    (Witness complies.)
16      Q.    Do you see under "Objectives" they
17 have, "The 2001 Objectives for Vioxx are defined
18 into two major categories: market performance and
19 strategic objectives. The Market Performance
20 Objectives are focused on sales and income, while
21 the Strategic Objectives address the identified Key
22 Issues." And then they give the "Market Performance
23 Objectives." Do you see that?
24      A.    Yes.
25      Q.    And then below that they give

158

1 "Strategic Objectives." Do you see that?
2      A.    Yes.
3      Q.    For example, one strategic objective
4 is to "Differentiate Vioxx on superior pain relief
5 and GI outcomes in the coxib class." Did I read
6 that right?
7      A.    Yes.
8      Q.    What does that mean to you,
9 "differentiate Vioxx"?
10      A.    To distinguish Vioxx based on the
11 data and information available from other agents in
12 -- to treat pain.
13      Q.    Now, going down to the next one, it
14 says "Create a position of superiority versus
15 valdecoxib/paracoxib." What does that refer to?
16         MR. TSOUGARAKIS: Object to the form.
17 BY MR. ROBINSON:
18      Q.    I'm just reading. What does that

Exhibit 8                    1

19  refer to or what does that mean to you?
20      A.    I didn't write the strategic
21  objective, but in my opinion, that means
22  distinguishing the product from other future
23  products in the area.
24      Q.    The next one says "Neutralize safety
25  concerns around hypertension, edema and MI."  What

159

1  does that mean to you?
2           MR. TSOUGARAKIS:  Object to the form.
3  You can answer.
4           THE WITNESS:  As I said, I didn't
5  write these strategic objectives, but my
6  understanding of that is at that point in time there
7  were many -- a lot of misinformation about the
8  safety of the product.  And that involves
9  communicating information about the product to bring
10  physicians to a more neutral or balanced position
11  around it to accurately reflect the safety profile
12  of the product.
13  BY MR. ROBINSON:
14      Q.    Was it important financially to the
15  company to neutralize the cardiovascular risk
16  issues?
17           MR. TSOUGARAKIS:  Object to the form.
18  BY MR. ROBINSON:
19      Q.    Such as MI and hypertension?
20      A.    *It was important to the communication*
21  of accurate information about the product to do
22  that.
23      Q.    Well, would you agree that if the
24  marketing department and others in the company were
25  unsuccessful in neutralizing the safety concerns

160

1  regarding hypertension, edema and MIs, that that
2  would have cost the company significant sales
3  revenue?
4      A.    I had no responsibility for
5  forecasting or market research around what the
6  potential impact of different events or perceptions
7  were on the finances.
8           MR. FIBICH:  Objection,
9  nonresponsive.
10  BY MR. ROBINSON:

Exhibit 8                              2

11    Q.    I'm just asking would it have an
12 effect. From what you knew as marketing manager,
13 who would get a copy of this profit plan from time
14 to time and be involved in the marketing, sales of
15 Vioxx, would it have an effect on the revenue for
16 Vioxx?
17            MR. TSOUGARAKIS:  I'll object to the
18 form.  You can answer it.
19 BY MR. ROBINSON:
20    Q.    Go ahead.
21    A.    So, without having the expertise in
22 the area, which I acknowledged --
23    Q.    Yes.  I'm talking about as a
24 marketing manager.
25    A.    As a marketing manager, I feel that

161
1 any time there's misinformation about the product,
2 there's a potential to impact the appropriate use of
3 that product, which then would also have an income
4 -- an impact on how much that product was used and
5 the performance of it.
6    Q.    Could you turn to number 110, Bates
7 Number 110 on that document, number 19?
8    A.    (Witness complies.)
9    Q.    Look at the last -- at the head -- at
10 the top of this document it says, "The financial
11 impact of the above-mentioned scenarios are
12 indicated below and in Template P attached.
13 Monitoring Strategic Assumptions and Sensitivity
14 Analysis."  Do you see that?
15    A.    Yes.
16    Q.    Did I read that right?
17    A.    Yes.
18    Q.    Now, go to the bottom.  Do you see
19 where it says "Vioxx" -- strike that.
20            They list assumptions, but the last
21 assumption is, for example, "Vioxx is unable to
22 neutralize safety/tolerability issues."  And then on
23 the far right they put the "Revenue Impact" down.
24 Do you see what the revenue impact is to the right
25 there?

162
1    A.    Yes.
2    Q.    What is that number?

Exhibit 8                                    3

3      A.     437 million.

4      Q.     So, at least somebody forecasted the
5   effect of Merck's being unable to neutralize the
6   safety and tolerability issues for Vioxx; right?

7      A.     As stated in this document.

8      Q.     So, there was a lot of pressure on
9   you as marketing manager to neutralize these
10  physicians that you were dealing with, right, that
11  had, as you put it, misinformation about Vioxx?

12          MR. TSOUGARAKIS:  Object to the form.
13  You can answer.

14          THE WITNESS:  At the time, there were
15  a lot of physicians with either misinformation or a
16  lack of information or incomplete information, and
17  as a marketer, that put pressure on me to
18  communicate accurate and balanced information.

Exhibit 8                        4

Exhibit 9
to Plaintiff's Brief re Pre-Admission of Certain Documents

## Deposition of David Anstice, March 18, 2005
### (836:5-16)

836

5  Q.      Was there a $470 -- $437 million
6  figure that it was estimated to cost if y'all failed
7  to assess the CV risks in one of your profit plans?
8        A.      I don't recall that.
9        Q.      Well, who would I talk to about that?
10        A.      About a profit plan?
11        Q.      Yes, who is in charge of those profit
12  plans for your company when you were president?
13        A.      The final responsibility was mine.
14  The profit plans were developed and discussed with
15  the people responsible in marketing for each of the
16  individual products.

Exhibit 10
to Plaintiff's Brief re Pre-Admission of Certain Documents

**Trial Testimony of J. Martin Carroll, *Irvin Plunkett v. Merck*, February 7, 2006**
**(262:13 – 270:2)**

262

13  Q.  ALL RIGHT.  WELL, I THINK WE'VE HEARD THAT ANSWER, BUT
14  HAVE YOU SEEN THIS DOCUMENT, "U.S. LONG-RANGE OPERATING
PLAN
15  FRANCHISE:  ANALGESIC AND ANTI-INFLAMMATORY PRODUCTS:
VIOXX"?
16  DO YOU SEE THAT?
17  A.  I SEE IT.
18  Q.  DATED JULY 2001?
19  A.  RIGHT.
20  Q.  WHERE WAS MR. CARROLL IN 2001?
21  A.  I WAS STILL WITH MERCK.
22  Q.  STILL THERE.  YOU WERE STILL IN SALES, WEREN'T YOU?
23  A.  THAT'S CORRECT.
24  Q.  YOU'D SEEN THIS DOCUMENT BACK THEN WHERE THEY
ANALYZED
25  WHAT WAS GOING TO HAPPEN IF WE TOLD PEOPLE ABOUT -- IF WE
HAD A

263

1  LABEL, CV WARNING, WE KNEW WHAT WAS GOING TO HAPPEN WITH
SALES.
2  YOU'VE SEEN THIS DOCUMENT BEFORE, HAVEN'T YOU?
3  A.  I'VE GOT TO BE REFRESHED.
4  Q.  BUT I'M ASKING YOU:  VIOXX, FROM THE STANDPOINT OF
5  MARTY CARROLL IN SALES, WAS IMPORTANT FOR MERCK?
6  A.  YES.
7  Q.  RIGHT?  WHEN WE LOOK AT THIS CHART HERE, WE'VE GOT -- DO
8  YOU SEE WHERE IT SAYS, "UPSIDE 25 PERCENT IN 06"?
9  A.  YES.
10  Q.  IT SAYS, "CV LABELING, MINOR."
11  A.  "MILDER."
12  Q.  "MILDER."  EXCUSE ME.  DO YOU SEE THAT?
13  A.  YES.
14  Q.  YOU KNEW THAT IF -- THE CARDIOVASCULAR EVENT LABEL
WHERE
15  YOU'RE WARNING PEOPLE ABOUT CARDIOVASCULAR EVENTS, YOU
KNEW IF
16  IT WAS A MILDER LABEL THAT YOU WOULD HAVE MORE SALES?  YOU
KNEW

Exhibit 10                                    1

17  THAT BACK WHEN YOU WERE IN CHARGE OF SALES, RIGHT?
18  A.  I THINK THE PURPOSE OF THIS WAS TO FORECAST DIFFERENT
19  POTENTIAL OUTPUTS FROM THE FDA.
20  Q.  RIGHT.  YOU HEARD MY -- CAN YOU ANSWER MY QUESTION?  YOU
21  KNEW THAT IF THERE WAS A CV LABEL THAT WAS MILDER, LESS
22  STRINGENT, THAT IT WOULD BE BETTER FOR SALES, RIGHT?  YOU
KNEW
23  THAT?
24  A.  THAT'S WHAT THIS PARTICULAR ANALYSIS -- AGAIN, IT RANGES
25  FROM UPSIDE TO DOWNSIDE DEPENDING ON THE DIFFERENT
CIRCULAR

264

1  POTENTIALS THAT COULD OCCUR.
2  Q.  "CIRCULAR POTENTIALS" BEING INFORMATION THAT DOCTORS
ARE
3  GIVEN AND PATIENTS ARE GIVEN ABOUT THE POTENTIAL DANGERS OF
4  VIOXX?  "YES" OR "NO"?
5  A.  YES, BUT IT DOESN'T PREDICT ANY OUTCOME OF THAT.  IT JUST
6  SUGGESTS ON A FORECASTING BASIS WHAT IT MIGHT BE.
7  Q.  SO IF YOU HAD A MILDER CV EVENT, A CV LABEL, THEN YOU WERE
8  GOING TO MAKE $2.5 BILLION THAT YEAR; BUT IF YOU HAD A LABEL
9  THAT HAD A CV WARNING, THEN YOU WERE ONLY GOING TO MAKE
10  $1.5 BILLION THAT YEAR?  THAT'S WHAT THAT CHART SHOWS,
DOESN'T
11  IT?
12  A.  ACCORDING TO THIS ANALYSIS.
13  Q.  SO THERE'S A $1 BILLION DIFFERENCE WITH THE CV LABEL AND
14  WITHOUT THE CV LABEL, CORRECT, ACCORDING TO THAT CHART?
15  A.  THE PEOPLE WHO ARE RESPONSIBLE FOR FORECASTING DID AN
16  ANALYSIS THAT SAID, BASED ON DIFFERENT OUTCOMES FROM THE
FDA,
17  THERE COULD BE DIFFERENT RANGES.
18  Q.  YOU KNEW FROM THE STANDPOINT OF VIOXX BEING IMPORTANT
THAT
19  IT WAS IMPORTANT TO MERCK FROM A MONEY STANDPOINT?  YOU
KNEW
20  VIOXX COULD -- IF VIOXX COULD BE SOLD WITHOUT CV WARNINGS,
21  CARDIOVASCULAR EVENT WARNINGS, WITHOUT TALKING ABOUT
INCREASED
22  DEATHS AMONG THE ELDERLY, THAT SALES WOULD BE BETTER.  YOU
KNEW
23  THAT WHEN YOU WERE IN CHARGE OF SALES?  MARTY CARROLL
KNEW
24  THAT, CORRECT?
25  A.  WHAT WE KNEW WAS NOT KNOWING WHAT THE OUTCOME OF THE

Exhibit 10                              2

265

1  CIRCULAR DISCUSSIONS WOULD BE, THERE COULD BE A RANGE OF
2  FORECAST.  ALL THIS WAS WAS PREDICTING WHAT THE RANGE POTENTIAL
3  COULD BE DEPENDING ON WHAT THE LABEL WAS CHANGED TO.
4  Q.  SO, MR. CARROLL, IF SALES -- GIVE HIM 402, PLEASE.  SO WE
5  JUST LOOKED THROUGH A DOCUMENT -- AS YOU'RE GOING THROUGH
6  THERE, WE JUST LOOKED AT A DOCUMENT THAT SHOWED -- TO PUT
7  EVERYTHING BACK ON THE RECORD AND IN PERSPECTIVE, WE LOOKED AT
8  A DOCUMENT THAT SHOWED THAT SALES WOULD DECREASE BY $1 BILLION
9  WITH THE STRONGER CV LABEL.  YOU SAW THAT.  REMEMBER THAT
10  DOCUMENT WE JUST TALKED ABOUT?
11  A.  THAT DOCUMENT DIDN'T SAY THAT.  ALL WE KNOW IS WE HAVE A
12  DOCUMENT THAT PROVIDED FORECASTS ON DIFFERENT SCENARIOS.  WE
13  DON'T KNOW WHAT WOULD HAVE HAPPENED.
14  Q.  WELL, SOMEBODY THOUGHT IT WAS A BILLION-DOLLAR DIFFERENCE,
15  MR. CARROLL, DIDN'T THEY?  DO YOU WANT TO LOOK AT IT AGAIN?  IF
16  YOU WANT TO PULL IT OUT AGAIN, WE'LL GO OVER IT AGAIN IF YOU
17  WANT TO.  BUT SOMEBODY SHOWED THAT IF YOU PUT A CV WARNING ON
18  THAT WAS A STRONG CV WARNING THAT THE COMPANY WOULD LOSE
19  $1 BILLION IN SALES.  LOOK AT IT AGAIN AND TELL ME IF THERE IS
20  ANYTHING ELSE THAT THAT PAGE THERE SHOWS.
21  A.  REMIND ME OF THE PAGE.  I'M SORRY.
22  Q.  I HAVE PAGE 17.  $2.5 BILLION, YOU SEE THERE?
23  A.  I SEE IT.
24  Q.  AND $1.5 BILLION?
25  A.  RIGHT.


266

1  Q.  SUBTRACT $1.5 BILLION FROM $2.5 BILLION AND WHAT NUMBER DO
2  YOU GET, MR. CARROLL?
3  A.  ALL I'M SAYING IS THAT THIS IS A FORECAST BY MARKETING
4  THAT GOES TO DIFFERENT SCENARIOS IN THE LABEL.
5  Q.  PUT THIS UP.  THIS IS DOCUMENT -- WHAT'S THE DOCUMENT
6  NUMBER?  1258.  PUT 1258 BACK UP THERE AGAIN, AND I WANT TO GO
7  TO PAGE 17.  NOW, WHAT STATEMENT DO YOU WANT TO MAKE ABOUT
8  THIS?  FIRST OF ALL, UNDERLINE $2.5 BILLION RIGHT HERE.  DO YOU
9  SEE THAT?  $2.5 BILLION.  DO YOU SEE THAT?  THEN UNDERLINE
10  $1.5 BILLION.  WHEN YOU SUBTRACT $1.5 MILLION FROM $2.5
11  BILLION, WHAT DO YOU GET?

Exhibit 10                                    3

12  A.  THAT'S A BILLION.
13  Q.  $1 BILLION.  JUST SO WE CAN BE ABUNDANTLY CLEAR, AT THE
14  TOP OF IT IT SAYS, "UPSIDE/DOWNSIDE SALES FORECAST."  DO YOU
15  SEE THAT?
16  A.  YES.
17  Q.  IT SAYS, "UPSIDE."  DO YOU SEE THAT?  OKAY.  SO IS THERE
18  ANYTHING ELSE YOU WANT TO ADD ABOUT THIS DOCUMENT?
19  A.  AGAIN, MY POINT IS THIS IS A FORECAST.  THIS WAS PENDING
20  CHANGES TO THE LABEL, AND THE MARKETING GROUP WAS MERELY
21  FORECASTING DIFFERENT RANGES THAT WOULD OCCUR DEPENDING
ON THAT
22  CHANGE.
23  Q.  YOU WEREN'T CONCERNED ABOUT SALES, SIR?  YOU WEREN'T
24  CONCERNED ABOUT -- YOU WERE NOT CONCERNED -- IF I'M HEARING
25  WHAT YOU SAID EARLIER, YOU WEREN'T CONCERNED THAT
LABELING OF

267

1  CV EVENTS WERE GOING TO AFFECT SALES?  IS THAT WHAT YOU'RE
2  TELLING ME, MARY CARROLL?
3  A.  WHAT I'M TELLING YOU IS THAT WHEN THE LABEL IS INFORMED BY
4  ALL THE DATA AND THE FDA, YOU TAKE THAT TO THE MARKETPLACE
AND
5  WHAT HAPPENS, HAPPENS.  THAT'S NOT THE PRIMARY VIEW.  THE
6  PRIMARY VIEW IS APPROPRIATELY TAKING THE PRODUCT TO THE
7  MARKETPLACE WITH THE CIRCULAR.
8  Q.  YOU KNEW, SIR, DIDN'T YOU, THAT IF THERE WAS A PRODUCT
9  INSERT OR A LABEL THAT TALKED ABOUT CV EVENTS THAT SALES
WOULD
10  DROP, DIDN'T YOU?  YOU KNEW THAT ALL THE WAY BACK TO 2001?
11  A.  AGAIN, I'VE GOT THE DOCUMENT, BUT WHAT ARE YOU
REFERENCING
12  IN THE DOCUMENT?
13  Q.  WELL, LET'S LOOK AT THE FRONT OF THE DOCUMENT.  WHAT DOES
14  IT SAY?
15  A.  THE ONE I HAVE IS "2001 PROFIT PLAN FOR VIOXX."
16  Q.  LET'S LOOK AT THE FIRST PAGE THERE.  PUT THAT UP THERE.
17  "2001 PROFIT PLAN FOR VIOXX."
18  A.  RIGHT.
19  Q.  DID YOU PARTICIPATE IN THIS?  IS THIS SOMETHING THAT YOU
20  PARTICIPATED IN?
21  A.  I CAN'T RECALL, BUT MOST LIKELY I WOULD HAVE BEEN
INVOLVED
22  IN SOME WAY.
23  Q.  ALL RIGHT.  YOU WERE ALSO INVOLVED IN THE PRODUCT INSERT
24  PROCESS, WEREN'T YOU?

Exhibit 10                    4

25  A.  NO, I WASN'T INVOLVED IN DIRECT PRODUCT INSERT PROCESS.

268

1  THAT WAS REGULATORY, MARKETING, AND THE PEOPLE WHO DEALT WITH
2  THE FDA.
3  Q.  LET'S LOOK AT PAGE 38 ON THIS AND LET'S SEE WHAT THIS
4  WHOLE THING ABOUT LABELING AND PRODUCT INSERT HAD TO DO WITH
5  IT.  OKAY.  YOU WERE CONCERNED -- MARTY CARROLL WAS CONCERNED
6  THAT THERE WAS A SAFETY ISSUE THAT WAS LOOMING OVER VIOXX ALL
7  THE WAY BACK TO 2001, CORRECT?
8  A.  I WAS NOT CONCERNED AT ALL ABOUT THAT.
9  Q.  YOU DIDN'T KNOW ANYTHING ABOUT IT?
10  A.  I KNEW ABOUT THE INFORMATION THAT WE HAD THROUGH VIGOR AND
11  THE LABEL, AND I WASN'T CONCERNED ABOUT SAFETY.
12  Q.  WE'RE TALKING ABOUT 2001 HERE IN THIS DOCUMENT.
13  A.  I SEE THAT.
14  Q.  YOU WERE THERE WITH THE COMPANY, CORRECT?
15  A.  YES.
16  Q.  YOU KNEW THAT THERE WAS AN ISSUE ABOUT SAFETY IN
17  RELATIONSHIP TO CV EVENTS, CARDIOVASCULAR EVENTS?  HEART
18  ATTACK, STROKE, THROMBO PROCESS, BLOOD CLOTS, YOU KNEW ALL OF
19  THOSE ISSUES WERE SAFETY ISSUES THAT FOLKS AT MERCK WERE
20  CONCERNED ABOUT WITH VIOXX?  YOU KNEW THAT IN 2001, RIGHT?
21  A.  WHAT I KNEW IS THAT WE HAD A LOT OF DATA THAT WAS BEING
22  SHARED INTO THE MARKETPLACE AND WITH THE FDA.  THAT'S WHAT I
23  KNEW.  I ALSO KNEW THAT MERCK AT THAT TIME HAD NO SAFETY
24  CONCERNS ON VIOXX.
25  Q.  OH, THEY HAD NO SAFETY CONCERNS?

269

1  A.  NO.
2  Q.  WOULD YOU TAKE A LOOK AT THAT CHART RIGHT THERE?
3  A.  YES.
4  Q.  WOULD YOU LOOK AT THE LAST -- DO YOU SEE THAT LAST BOX AT
5  THE FRONT WHERE IT SAYS "ASSUMPTIONS"?  IT SAYS, "ASSUMPTIONS:
6  VIOXX IS UNABLE TO NEUTRALIZE SAFETY" -- WHAT DOES THAT SAY?
7  A.  "SAFETY/TOLERABILITY."
8  Q.  "SAFETY/TOLERABILITY ISSUES."  WHAT, IN YOUR MIND, IS
9  SAFETY/TOLERABILITY ISSUES, SIR, IF IT'S NOT SAFETY?  WHAT IS
10  IT?  HOW IS THAT DIFFERENT FROM THE QUESTION I JUST ASKED YOU?

Exhibit 10                    5

11  I JUST ASKED YOU WHETHER OR NOT THE FOLKS AT MERCK WERE
12  CONCERNED ABOUT SAFETY ISSUES, DIDN'T I, JUST 30 SECONDS AGO?
13  I SAID, "MR. CARROLL, WERE THE FOLKS AT MERCK IN 2001 CONCERNED
14  ABOUT SAFETY ISSUES?"  WHAT DID YOU TELL ME?
15  A.  I SAID NO.
16  Q.  THEY WEREN'T?
17  A.  THEY WERE NOT.
18  Q.  WHAT DOES THIS SAY RIGHT HERE?
19  A.  THIS?
20  Q.  LET'S READ IT AGAIN.  "VIOXX IS UNABLE TO NEUTRALIZE" --
21  AN ASSUMPTION.  "VIOXX IS UNABLE TO NEUTRALIZE
22  SAFETY/TOLERABILITY ISSUES," RIGHT?  GO OUT TO THE SIDE.  DO
23  YOU SEE WHAT THE NUMBER IS RIGHT THERE?  $437 MILLION.  DO YOU
24  KNOW WHAT THEY ARE TALKING ABOUT HERE, MR. CARROLL?  THEY'RE
25  SAYING IN 2001 -- MARTY CARROLL WAS IN CHARGE IN 2001, WEREN'T

270

1  YOU?
2  A.  YES.

Exhibit 10                    6

Exhibit 11
to Plaintiff's Brief re Pre-Admission of Certain Documents

**Cross-Examination of Alise Reicin, *Ernst v. Merck* trial, August 11, 2005**
**(97:5-98:11)**

97
5   Q   Look at Exhibit 2002, the profit plan for your
6   Merck AA franchise.  Do you got it?
7       A   Yes, I do.
8       Q   Page 4, "Cardiovascular Label Impact."  Am I
9   reading that right?
10      A   That's correct.
11      Q   "This is the impact of having the new
12  cardiovascular label."  Do you see that?
13      A   Yes, I do.  Again, as I discussed before, you
14  have to assess what you think you're marketing, how much
15  you're going to sell the following year so manufacturing
16  knows how much they need to make.  So you would have to
17  make -- a marketer -- this is what it was written by, a
18  marketer -- would need to assess what the impacts of a
19  label would have.
20      Q   Ma'am, CV label impact.  "The second key driver
21  impacting the forecast" -- that's the money forecast,
22  right -- "is the CV label change expected due to VIGOR
23  and class.  Although this event was anticipated to occur
24  in February 2002" -- do you see where it says that?
25      A   I do.

98
1       Q   -- "and was modeled as such" -- we did our
2   financial budget based on that, right -- "recent
3   discussions with the FDA indicate it may be as soon as
4   October 2001."  Do you see where it says that?
5       A   I do.
6       Q   And then it says, "It's assumed in the base
7   case the label change will have class language."  So
8   it's going to also affect Celebrex.  But look at this:
9   "The impact to VIOXX sales is a negative $229 million."
10  Do you see that?
11      A   I do.

1

Exhibit 12
to Plaintiff's Brief re Pre-Admission of Certain Documents

**Deposition of Janet Arrowsmith-Lowe, October 28, 2005**
**(207:5-19; 212:3-19; 314:19-317:11)**

207

5   Q.  Now, as an FDA alumna, are you proud of the
6   way the labeling change for Vioxx dragged out?
7          MR. ROTHMAN:  Objection to the form.
8          THE WITNESS:  No, I thought it could have
9   been done more quickly.  I didn't understand why it
10   took so long.

212

3   Q.  Now, the regulations allow a company to
4   change the labeling for a drug by adding stronger
5   safety provisions without first obtaining FDA approval
6   for the new language; isn't that right?
7          MR. ROTHMAN:  Objection to the form.
8          THE WITNESS:  Yes, there are circumstances
9   that are outlined in the regulations under which a
10   company could change a label without prior approval.
11   BY MR. BLACK:
12      Q.   And, in fact, the regulations explicitly
13   state that such a change can be made to add or
14   strengthen a contraindication, warning, precaution, or
15   adverse reaction without prior approval; isn't that
16   right?
17          MR. ROTHMAN:  Objection to the form.
18          THE WITNESS:  I believe that's true, that
19   that's the wording of it.

314

19   Q.  Okay.  Doctor, I am handing you what's been
20   marked as Exhibit 36 which is a copy of the U.S.
21   Long Range Operating Plan Franchise:  Analgesic &
22   Anti-Inflammatory Products:  Vioxx, Etoricoxib, July
23   2001.  Is that what this document says in the front?
24      A.   That's what it says.
25      Q.   Okay.  I would call your attention, Doctor,

Exhibit 12                                    1

315

1  to page 17 of the document.  And there's a graph on
2  page 17 that gives sales in dollars for Vioxx based on
3  three different assumptions; is that correct?
4     A.  Okay.
5     Q.  And the top curve which is the highest sales
6  numbers, that's called the upside.  And that says CV
7  Labeling Milder; No Prothrombotic language.  Did I
8  read that correct?
9     A.  Yes, you did.
10    Q.  And the base is a Class CV Label Precaution.
11 Did I read that correctly?
12    A.  That's what it says, yes.
13    Q.  And the downside is CV Label is Warning/Not
14 Precaution.  Did I read that correctly?
15    A.  Yes, you did.
16    Q.  So this is the projections of what the sales
17 are going to be for Vioxx depending on what the Vioxx
18 label says; is that a fair characterization of the
19 document?
20    A.  I think that's what it's supposed to be,
21 yeah.
22    Q.  Okay.  And, if you'll take a look over in
23 2006, it looks like the difference in sales is about a
24 billion dollars; would that be about right?
25    A.  Let's see.  In millions.

316

1     Q.  It looks like it's about 1,000 million
2  difference to me, if you take a look at the scale.
3     A.  I think that's about right, yes.
4     Q.  And that would be true in 2005 as well, about
5  a billion dollars difference, the upside and from the
6  downside?
7     A.  Yes, I think that's what they're -- that they
8  forecast, yeah.
9     Q.  Okay.  And the same would be true in 2004,
10 about a billion dollars difference, right?
11    A.  Well, I don't know.  I think it looks a
12 little narrower in 2004.
13    Q.  Okay.  But there's also some difference in
14 the prior years too, correct, not quite the same
15 magnitude.  But also some difference for the years
16 going back all the way to 2001, correct?
17    A.  In 2001 is when it starts.  But 2002, 2003,
18 yes, there are differences in each of those.

Exhibit 12                                    2

19    Q.  Fair to say that based on --
20       A.  In each of those upside, downside, base
21   estimates, that's correct.
22       Q.  Fair to say that, over the period covered by
23   the graph, that the difference in sales from the top
24   side to the bottom side would probably sum to more
25   than $3 billion; is that correct?

317

1       A.  What are you talking about?  I'm sorry.
2   What?
3       Q.  If you took a look at the total difference in
4   sales for the period covered by the graph, it would
5   come to more than $3 billion; isn't that right,
6   Doctor?
7       A.  I mean these are -- it looks to me as though
8   they're expecting the total revenue to go down over
9   time from 2000 -- in mid 2001 down to 2006.  I mean I
10   don't know how to add those up.  Maybe that's correct.
11   I don't know.

Exhibit 12                                3

Exhibit 13
to Plaintiff's Brief re Pre-Admission of Certain Documents

**Deposition of Peter Kim, March 15, 2005**
**(69:13-71:25)**

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order        69

13  Q.    When we're talking about location,

14  we're talking about location in the label.  For

15  example, as we discussed earlier, some people inside

16  the FDA thought it should go under the warnings

17  section.  Merck wanted it under a different section;

18  correct?

19       A.    Merck felt that the information from

20  the VIGOR trial should be in the prescribing

21  information in the label, but that it should be in

22  the precautions section.

23       Q.    And ultimately, where did the

24  information go?

25       A.    Ultimately, the information about the

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order  70

Exhibit 13                            1

1   VIGOR trial, which did not contain a placebo group,

2   and the two large Alzheimer's trials, which did

3   contain a placebo group and which did not show a

4   difference between placebo and Vioxx in long-term

5   studies, ended up in the precautions section with an

6   explicit statement that stated that the clinical

7   significance of these observations is unknown.

8        Q.    It was under the precautions section;

9   correct?

10       A.    That's correct.  With the Alzheimer's

11  data and a statement saying that the clinical

12  significance was unknown.

13       Q.    Now, do you think that if you were a

14  treating physician and if you wanted to know about

15  the adverse consequences of the drug, you would look

16  first under the warnings section?

17            MR. KIERNAN:  Object to form.

18            THE WITNESS:  A physician should look

19  at the entire label, which would include the

20  warnings section and precaution section.

21  BY MR. GREG ALLEN:

22       Q.    What would it hurt for Merck to have

23  put that information, the VIGOR information and the

Exhibit 13                        2

24    VIGOR studies, under the warnings section?

25         A.    It would have been inappropriate to


ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order  71


1    put the VIGOR information in the warnings section.

2         Q.    Why would it have been inappropriate?

3         A.    Well, because as I've explained, in

4    the VIGOR study, we were comparing two active

5    components.  One of them was Vioxx, and the other

6    one was naproxen.  It was not possible to tell from

7    that study alone whether the naproxen was having a

8    protective effect or whether the Vioxx was having a

9    detrimental effect.  And so, therefore, to put that

10    information in context, we looked at the long-term

11    data from the Alzheimer's studies where we compared

12    Vioxx to placebo, and there was no difference in the

13    cardiovascular event rates in the long-term studies,

14    two large studies with Alzheimer's patients.  And so

15    those two studies together put the information in

16    context.

17         Q.    So, would it have hurt anything to


Exhibit 13                           3

18   put it under the warnings section, though, and say,

19   these studies show the possibility of heart attacks,

20   these studies show there's not?  What would it have

21   hurt?

22        A.    It would have been inappropriate to

23   put this into the warnings section.  And at the end,

24   as we've discussed, the FDA and Merck agreed that

25   the clinical significance of these data were

Exhibit 13                                4

Exhibit 14
to Plaintiff's Brief re Pre-Admission of Certain Documents

**Deposition of Ed Scolnick, M.D., April 29, 2005**
**(242:18-243:18)**

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order   242

18     Q.     Merck submitted a proposed label to

19  FDA sometime in 2000; right?

20     A.     Yes.  I believe within three months

21  of having the VIGOR data.

22     Q.     Did that label have a cardiovascular

23  warning?

24     A.     I think it had a precaution.  I don't

25  think it had a warning, because there was no clear


ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order   243

1  evidence that Vioxx caused heart attacks.  The

2  warning is for clear evidence.

3     Q.     What's the difference between a

4  warning and a precaution in the label?

5     A.     In my view, a warning is something


Exhibit 14                           1

6    you know about that's a real risk to people.  A

7    precaution is something that needs to be taken into

8    account where you're not completely certain what the

9    implications are.

10         Q.     Well, you know heart attacks are a

11   real risk to people; right?

12         A.     Heart attacks --

13             MR. MAYER:  Objection.

14             THE WITNESS: -- are a risk, but we

15   did not believe Vioxx would cause heart attacks,

16   therefore, I believe the thinking was that it was,

17   therefore, not appropriate for a warning, but the

18   data should be presented, and a caution should be

put in the label.

Exhibit 14                          2

Exhibit 15
to Plaintiff's Brief re Pre-Admission of Certain Documents

## Opening Argument of Merck Defense Attorney Jones, Cona/McDarby v. Merck
### (March 6, 2006)

Page 117

8   What we now know about VIOXX is that VIOXX was
9   an important drug, that it was developed and tested the
10  right way by Merck, that Merck's doctors and scientists
11  not only followed the rules and regulations set forth
12  by the United States Food and Drug Administration, but
13  they exceeded them.
14          The plaintiffs, as you know, are here because
15  they believe that VIOXX caused their heart attacks.
16  They told you that they believe Merck knowingly rushed
17  an unsafe drug to market, that Merck's -- even Merck's
18  doctors and scientists put profits over safety, and
19  that Merck's executives misrepresented the facts.
20  Well, ladies and gentlemen, if any of that were true,
21  it would be reason for all of us to be concerned, but
    22  it is not.

Page 130

Plaintiffs said and say that Merck rushed
10  VIOXX to the market. Well, let me show you that in
11  truth, Merck did more testing than the FDA required.
12  In fact, if we go through, and you'll hear, for
13  example, the FDA requires a drug to be tested in about
14  1,500 patients before it can qualify to be proven as
15  safe and effective, but in this case, Merck, long
16  before it got on the market, tested VIOXX in over 5,400
17  patients, about three-and-a-half times the number that
18  were expected.  In fact, when VIOXX went on the market,
19  VIOXX was one of, if not, the most studied drug or most
20  studied pain reliever ever to go on the market other
    21  than perhaps aspirin.

Page 145

After they had all of this information, every
12  bit of this information, what did the FDA do?
13          In April of 2002, the FDA approves VIOXX once

Exhibit 15                              1

14    again.  This time they approve it for a new use,
15    rheumatoid arthritis.  And in the course of this, they
16    say we believe that it is safe and effective for
17    treatment of rheumatoid arthritis after they have all
18    of the information from the VIGOR data.  After, in
19    fact, they have called together a special advisory
20    committee to consider the data from the VIGOR trials.
21             And when they approved the -- when they
22    approved VIOXX at this point in time, they had all of
23    the information that VIOXX had about Naproxen.
24             You see, at the time Merck got these results
25    from VIGOR that were unexpected, they tried to look at
0146
1    it and see what it was, what could be causing this,
2    what's the explanation for the difference?  One of the
3    things that Merck thought was that Naproxen might be
4    cardioprotective, it might be acting like aspirin.
5             And you'll hear a lot about that, but so that
6    you understand, in a clinical trial here where you are
7    comparing people taking the drug against placebo and
8    something happens and there's a difference between the
9    two, you can generally assume that that might be due to
10   the drug.  But when you're comparing two different
11   drugs, you don't know whether one drug is protective or
12   the other drug is causing a risk.
13             Let me give you an example.
14             Suppose you've got two families and one eats
15   spaghetti and has soda with dinner every night, and the
16   other has spaghetti and red wine for supper every
17   night, and after a period of time you find that the
18   group that has spaghetti and soda every night seems to
19   have more heart attacks.  Does that mean that the soda
20   is causing the heart attacks?  Or does it mean that the
21   red wine is protective?
22             What we know today is that the red wine seems
23   to have some type of protective benefit.  It's the same
24   issue that you were looking at in the VIGOR trial.  And
25   all of this information was given to the FDA, and the
0147
1    FDA came back and approved it as safe and effective.
2             And at the time that the FDA came back and
3    approved it, they also approved a new label.  In the
4    original label that was first approved in 1999, what
5    you had were references to heart attacks in the adverse
6    reactions section of the label.
7             And let me go back and remind you, when I said

Exhibit 15                              2

8  early on that when you did any of these clinical
9  trials, you monitored side effects in all of these
10 clinical trials, you look for everything, whether you
11 think you're going to see it or not, and when you
12 submit the NDA, you submit all of those.  And when the
13 FDA ultimately approves the label, it tells you where
14 to put that information, whether to put it in adverse
15 reactions, warnings, whatever.
16        In the first label that came out, the very
17 first one in 1999, there's a reference to the fact that
18 myocardial infarctions had been reported.  When Merck
19 got the findings from the VIGOR study, they submitted
20 the request for a change in labeling.
21        Now, you're going to hear a lot about this
22 over a period of time, but what happened was that they
23 wanted to include information about the GI benefits and
24 the cardiovascular benefits.  They asked for an
25 expedited review.  The FDA, in fact, called in a
0148
1  special advisory committee meeting in February of 2001
2  to consider the VIGOR data, to find out what it was,
3  what, in fact, did it mean?
4        And they brought all this in and they
5  discussed all of this, and after that advisory
6  committee meeting, Merck submitted yet another proposed
7  amended label to the FDA.  That was in March of 2001.
8        In October of 2001, the FDA finally submitted
9  or gave to Merck its suggestion of what ought to be in
10 the label.  By that time, suffice it to say Merck was a
11 little bit frustrated.  Merck had hoped to get a
12 labeling out for the GI benefits and describing things
13 earlier.  When they got the suggestion from the FDA, it
14 was not what they wanted to get, and you're going to
15 see some e-mails that were critical of the FDA and
16 cursed the FDA and demonstrate all of the frustration
17 that Merck was having with the FDA at that time.
18        But, in fact, Merck ultimately went back,
19 submitted another label, and in April of 2002, when
20 they approved this, they approved another label.  And
21 the label has a specific description of the VIGOR
22 findings in the clinical studies.  It talks about other
23 findings of cardiovascular safety.  It has a chart that
24 talks about thrombotic adverse effects and includes in
25 that MIs, heart attacks, myocardial infarctions.  It
0149
1  includes other information in the precautions section

Exhibit 15                          3

2  of the labeling where they say specifically what
3  information the FDA approved after, after it had all of
4  the information about VIGOR and after it had most of
5  the other information, or a significant amount of other
6  information from all the other studies that I showed
7  you up there earlier.
8      So the FDA comes back and approves this in
9  April of 2002.

### Anstice 3-7-06 Cona/McDarby trial testimony

426
5  Q.  The FDA wanted it in the warnings.  Y'all were
6  the ones who went to the FDA and said we don't want to
7  put it in the warnings, right?
8  A.  There is a difference in terms of the standards for
9  inclusion of data in those different sections of the
10  document, and we believe that the right place for the
11  data is in precautions.  We pursued that point with the
12  FDA, and in the end they agreed and that's where it was
13  included in the label for VIOXX.
14      Q.  That wasn't my question, sir.  Would you
15  answer my question?
16      MR. BROCK:  I object to him instructing the
17  witness.  He answered the question.
18      THE COURT:  I don't think he really did.  You
19  can repeat the question.
20  BY MR. LANIER:
21      Q.  Sir, simple truth, yes or no, FDA asked for it
22  in the warnings section.  Y'all told them, no, you want
23  to put it in precautions.  Y'all were the ones that
24  pushed the FDA in that direction, and, finally, the FDA
25  agreed.

427
1      That's the truth, isn't it?
2  A.  That is -- yes, that is what happened.
3      Q.  Thank you.
4  A.  But the FDA made a number of requests for the data
5  which we discussed, and there were a number of changes
6  that was not the only one versus --
7      Q.  I agree?
8  A.  -- that particular section from their October
9  communication.
10      Q.  I agree.  We're going to go through them in
11  just a second.  There's a number of places where y'all

Exhibit 15                     4

12  talked them out of things, right?
13  A.  I don't believe that's a way to describe it.  I
14  think if they agreed with us then they did so based on
15  the data.
16     Q.  Well, I'll tell you this, okay, sir, your
17  folks started panicking toward the end of 2001 because
18  y'all were afraid that you were going to have to put
19  that label in a lot sooner than originally anticipated,
20  right?
21  A.  No, that's not right.  Our people don't panic.
22     Q.  Well, panic may not be the right word, but I
23  want to show you Plaintiff's Exhibit Number 4, which is
24  the profit plan for 2002.
25        MR. LANIER:  Has this been offered into

                                    428
1  evidence already?  I believe it has.
2        Your Honor, we would move into evidence
3  Plaintiff's Exhibit Number 4.
4        THE COURT:  Any objection?
5        MR. BROCK:  Just one word with the Court,
6  please.
7        (Discussion off the record.)
8        THE COURT:  At this point the objection is
9  overruled.
10        (Whereupon, Exhibit P-4 was marked in
11  evidence.)
12  BY MR. LANIER:
13     Q.  Sir, we have got Plaintiff's Exhibit Number 4,
14  and I'm going to give you a copy up there so you have a
15  copy in front of you, but in the interest of time let
16  me start by showing you the cover.  Profit plan 2002
17  Merck A & A Franchise.
18        Do you see that?
19  A.  Yes, I do.
20     Q.  Will you tell the jury what A & A stands for?
21  A.  Arthritis and analgesia.
22     Q.  Arthritis and analgesia.  That means pain
23  medicine?
24  A.  It means pain relief.
25     Q.  I can't spell it, so we're going to

                                    429
1  abbreviate.  And this is the profit plan for 2002.  So
2  this is put out in 2001, right?
3  A.  Right.  It is a planning -- a profit plan is a

Exhibit 15                          5

4 planning document which contains, therefore,
5 assumptions about the next year.
6    Q.  I'll give you a copy of it so you have got it
7 if you want to check as we're going along.  But I would
8 like you to turn, please, to the front page, Executive
9 Summary.
10      Tell me when you're there.
11 A.  I think I have that page.
12    Q.  Okay.  This is an executive summary that talks
13 about your revenue forecast for VIOXX and how much
14 money -- and your other drugs and how much money you
15 think you're going to make, right?
16 A.  This is a planning document, which includes a broad
17 range of possible events for the next year and makes
18 various forecasts related to that.
19    Q.  Would you look on Page 4 where it talks about
20 the impact of changing your label for heart problems,
21 heart attacks, do you see that?
22 A.  I see that section.
23    Q.  "The second key driver impacting the money
24 forecast is the heart attack label change expected due
25 to VIGOR and CLASS," which is another study, right?

430

1 A.  That was another study for a competitive product.
2    Q.  For Celebrex, right?
3 A.  Right.  Because in this planning document we're
4 making assumptions about competitive products and our
5 own products.
6    Q.  I understand, sir.  If you could tailor your
7 answers to my questions I'll get through you.
8      "Although this event was anticipated to occur
9 in February, 2002 and was modelled as such, recent
10 discussions with the FDA indicate it may be as soon as
11 October."
12      That's what it said, doesn't it?
13 A.  That's what it says.
14    Q.  It says "It is assumed in the base case the
15 label change will have coxib class language, and will,
16 therefore, affect all coxibs equally."
17      That means Celebrex, as well?
18 A.  That's right.
19    Q.  "The impact to VIOXX sales is a negative
20 $229 million," right?
21 A.  That's what it says.
22    Q.  So if y'all have to change your label in

Exhibit 15                         6

23   October to warn about heart attacks instead of getting
24   to wait until February of '02 it is going to cost you
25   $229 million, right?

431

1   A.   That is a forecast being made here, but we had
2   wanted the label changed as soon as possible.

Exhibit 15                          7

Exhibit 16
to Plaintiff's Brief re Pre-Admission of Certain Documents

**Trial Testimony of David Anstice, *Cona/McDarby*, 3/7/06**
**(426:5-431:2)**

426

5  Q.  The FDA wanted it in the warnings.  Y'all were
6  the ones who went to the FDA and said we don't want to
7  put it in the warnings, right?
8  A.  There is a difference in terms of the standards for
9  inclusion of data in those different sections of the
10  document, and we believe that the right place for the
11  data is in precautions.  We pursued that point with the
12  FDA, and in the end they agreed and that's where it was
13  included in the label for VIOXX.
14      Q.  That wasn't my question, sir.  Would you
15  answer my question?
16          MR. BROCK:  I object to him instructing the
17  witness.  He answered the question.
18          THE COURT:  I don't think he really did.  You
19  can repeat the question.
20  BY MR. LANIER:
21      Q.  Sir, simple truth, yes or no, FDA asked for it
22  in the warnings section.  Y'all told them, no, you want
23  to put it in precautions.  Y'all were the ones that
24  pushed the FDA in that direction, and, finally, the FDA
25  agreed.

427

1      That's the truth, isn't it?
2  A.  That is -- yes, that is what happened.
3      Q.  Thank you.
4  A.  But the FDA made a number of requests for the data
5  which we discussed, and there were a number of changes
6  that was not the only one versus --
7      Q.  I agree?
8  A.  -- that particular section from their October
9  communication.
10      Q.  I agree.  We're going to go through them in
11  just a second.  There's a number of places where y'all
12  talked them out of things, right?
13  A.  I don't believe that's a way to describe it.  I
14  think if they agreed with us then they did so based on
15  *the data.*

Exhibit 16                          1

16    Q.  Well, I'll tell you this, okay, sir, your
17  folks started panicking toward the end of 2001 because
18  y'all were afraid that you were going to have to put
19  that label in a lot sooner than originally anticipated,
20  right?
21  A.  No, that's not right.  Our people don't panic.
22    Q.  Well, panic may not be the right word, but I
23  want to show you Plaintiff's Exhibit Number 4, which is
24  the profit plan for 2002.
25     MR. LANIER:  Has this been offered into

428

1  evidence already?  I believe it has.
2     Your Honor, we would move into evidence
3  Plaintiff's Exhibit Number 4.
4     THE COURT:  Any objection?
5     MR. BROCK:  Just one word with the Court,
6  please.
7     (Discussion off the record.)
8     THE COURT:  At this point the objection is
9  overruled.
10     (Whereupon, Exhibit P-4 was marked in
11  evidence.)
12  BY MR. LANIER:
13    Q.  Sir, we have got Plaintiff's Exhibit Number 4,
14  and I'm going to give you a copy up there so you have a
15  copy in front of you, but in the interest of time let
16  me start by showing you the cover.  Profit plan 2002
17  Merck A & A Franchise.
18    Do you see that?
19  A.  Yes, I do.
20    Q.  Will you tell the jury what A & A stands for?
21  A.  Arthritis and analgesia.
22    Q.  Arthritis and analgesia.  That means pain
23  medicine?
24  A.  It means pain relief.
25    Q.  I can't spell it, so we're going to

429

1  abbreviate.  And this is the profit plan for 2002.  So
2  this is put out in 2001, right?
3  A.  Right.  It is a planning -- a profit plan is a
4  planning document which contains, therefore,
5  assumptions about the next year.
6    Q.  I'll give you a copy of it so you have got it
7  if you want to check as we're going along.  But I would

Exhibit 16                 2

8  like you to turn, please, to the front page, Executive
9  Summary.
10        Tell me when you're there.
11 A.  I think I have that page.
12     Q.  Okay.  This is an executive summary that talks
13 about your revenue forecast for VIOXX and how much
14 money -- and your other drugs and how much money you
15 think you're going to make, right?
16 A.  This is a planning document, which includes a broad
17 range of possible events for the next year and makes
18 various forecasts related to that.
19     Q.  Would you look on Page 4 where it talks about
20 the impact of changing your label for heart problems,
21 heart attacks, do you see that?
22 A.  I see that section.
23     Q.  "The second key driver impacting the money
24 forecast is the heart attack label change expected due
25 to VIGOR and CLASS," which is another study, right?

430

1 A.  That was another study for a competitive product.
2     Q.  For Celebrex, right?
3 A.  Right.  Because in this planning document we're
4 making assumptions about competitive products and our
5 own products.
6     Q.  I understand, sir.  If you could tailor your
7 answers to my questions I'll get through you.
8        "Although this event was anticipated to occur
9 in February, 2002 and was modelled as such, recent
10 discussions with the FDA indicate it may be as soon as
11 October."
12        That's what it said, doesn't it?
13 A.  That's what it says.
14     Q.  It says "It is assumed in the base case the
15 label change will have coxib class language, and will,
16 therefore, affect all coxibs equally."
17        That means Celebrex, as well?
18 A.  That's right.
19     Q.  "The impact to VIOXX sales is a negative
20 $229 million," right?
21 A.  That's what it says.
22     Q.  So if y'all have to change your label in
23 October to warn about heart attacks instead of getting
24 to wait until February of '02 it is going to cost you
25 $229 million, right?

Exhibit 16                    3

431

1   A.   That is a forecast being made here, but we had
2       wanted the label changed as soon as possible.

Exhibit 16                          4

Exhibit 17

to Plaintiff's Brief re Pre-Admission of Certain Documents

**Phil Beck Opening in Irvin II – March 6, 2006**

147

18  MR. BIRCHFIELD TALKED ABOUT THE WARNINGS THAT
19  WERE ON OUR LABEL. LET ME JUST BRIEFLY TRY TO WALK THROUGH
20  WHAT HAPPENED THERE. AGAIN, THERE WAS NO RUNNING ROUGHSHOD
21  OVER THE FDA AND THERE WAS NO DRAGGING ANYTHING OUT. WE GOT
22  THE VIGOR RESULTS IN MARCH OF 2000. IN JUNE OF 2000, WE ASKED
23  THE FDA IF WE COULD PUT A NEW LABEL ON. YOU HAVE TO GET THE
24  FDA APPROVAL. YOU CAN'T JUST CHANGE THE LABEL. YOU HAVE TO
25  GET THE FDA'S APPROVAL FOR A NEW LABEL. WE ASKED THE FDA IF

148

1  THEY WOULD GIVE US EXPEDITED TREATMENT OF OUR NEW LABEL
2  REQUEST. MR. BIRCHFIELD SAYS WE DRAGGED IT OUT. YOU'LL SEE
3  THAT WE ASKED FOR EXPEDITED TREATMENT SO THAT WE COULD GET THE
4  NEW LABEL ON THERE FAST, BUT THE FDA DECIDED THAT THEY WANTED
5  TO GO THROUGH THE NORMAL PRACTICE. WE'RE NOT BLAMING THEM FOR
6  THAT. THAT'S ACTUALLY WHEN THEY CONVENED THAT ADVISORY
7  COMMITTEE THAT I TALKED ABOUT BEFORE.
8          SO WE GOT VIGOR IN MARCH 2000. WE ASKED FOR A
9  NEW LABEL IN JUNE OF 2000. THEY CONVENED THE BIG ADVISORY
10  COMMITTEE IN EARLY 2001. THE ADVISORY COMMITTEE SAYS, "WE
11  DON'T KNOW WHAT THE EXPLANATION IS, BUT THE INFORMATION SHOULD
12  BE PUT ON THE LABEL." SO WE MAKE A REVISED LABEL REQUEST RIGHT
13  AFTER THIS, THE NEXT MONTH, SO THAT WE CAN DO EXACTLY WHAT THE
14  ADVISORY COMMITTEE IS SUGGESTED THAT WE DO. THIS IS LIKE
15  AROUND APRIL OF 2001. IT'S NOT UNTIL SEPTEMBER OF 2001 THAT
16  ANYBODY FROM THE FDA STAFF GETS BACK TO US WITH THEIR
17  SUGGESTION ON THE LANGUAGE. IN THE MEANTIME, MR. IRVIN PASSED
18  AWAY, BEFORE THE FDA STAFF EVER CAME BACK WITH THEIR

Exhibit 17                                1

19  SUGGESTION.
20        YOU HEARD ABOUT THERE WAS A DISAGREEMENT -- AND
21  THERE WAS -- BETWEEN THE FDA STAFFERS AND MERCK ABOUT WHETHER
22  THIS INFORMATION SHOULD GO IN THE PRECAUTION SECTION OR THE
23  WARNING SECTION.  EVERYBODY AGREED THE INFORMATION SHOULD GO ON
24  THE LABEL, BUT THERE WAS JUST A DISAGREEMENT ABOUT WHERE.
25  WELL, THAT DISAGREEMENT -- AND, IN FACT, YOU HEARD

149

1  MR. BIRCHFIELD SAY THAT OUR GUYS GOT VERY FRUSTRATED WITH THE
2  STAFF.  ONE OF THEM EVEN IN AN E-MAIL TO ONE OF THE OTHER MERCK
3  GUYS CALLED THE GOVERNMENT A SWEAR WORD.  WELL, WE PLEAD GUILTY
4  TO THAT.  I DON'T THINK HE'S THE FIRST GUY IN MERCK TO USE
5  SWEAR WORD WHEN REFERRING TO A GOVERNMENT AGENCY.  BUT THEY
6  WERE FRUSTRATED BECAUSE THEY THOUGHT -- "THEY" BEING THE MERCK
7  GUYS -- THAT THE STAFFERS WANTED TO PUT THIS INFORMATION IN THE
8  WRONG SPOT ON THE LABEL.  SO THIS WAS AN AGREEMENT
9  DISAGREEMENT, BUT THIS WAS A DISAGREEMENT THAT TOOK PLACE AFTER
10  MR. IRVIN HAD ALREADY PASSED AWAY.
11        THE COURT:  OKAY, LET'S WRAP IT UP, COUNSEL.
12        MR. BECK:  SO THE FDA ENDED UP AGREEING WITH US AND
13  WE CHANGED THE LABEL.

Exhibit 17                        2

Exhibit 18
to Plaintiff's Brief re Pre-Admission of Certain Documents

**Deposition of Plaintiff Gerald Barnett's Prescriber**
**Michael Mikola, M.D., April 15, 2006**
**(66:6-66:20)**

66

6   Q.   Okay.  Now, given the information that
7   you've read in exhibits I've just shown you and
8   this proposed label, if you had known that
9   information that I've shown you and you had seen a
10  label like this, would you have prescribed Vioxx to
11  Mr. Barnett given his history with possible angina
12  in January of 2000?
13          MR. GOLDMAN:  Object to the form.
14          THE WITNESS:  I believe I would have
15  left him on Feldene.
16  BY MR. ROBINSON:
17      Q.   Okay.  You --
18      A.   No.
19      Q.   You wouldn't have put him on Vioxx?
20      A.   I don't believe so, no, sir.

114

11  Q.   And given what you've read today, that
12  combined with his angina, would you say that from
13  everything you've read about Vioxx today that you
14  probably would not have prescribed Vioxx for him if
15  you'd known all this information --
16          MR. GOLDMAN:  Object to the form.
17  BY MR. ROBINSON:
18  Q.   -- in 2000?

114

22  A.   Having known today what I know about
23  Vioxx, I would not have prescribed it.

1

Exhibit 19
to Plaintiff's Brief re Pre-Admission of Certain Documents

### Deposition of Plaintiff Gerald Barnett's Prescriber
### Michael McCaffrey, M.D., May 3, 2006
(185:16-186:4)

185

16  You're saying with what you know about
17  Vioxx that had you known that there was an increase
18  in his blood pressure, you would not have
19  prescribed him Vioxx?
20      A.  If he would have followed up at three
21  weeks and had an elevated blood pressure, I would
22  have taken him off the medicine.
23      Q.  Why?
24      A.  Because my concern is heart attack and
25  stroke would -- I was seeing people with blood

186

1  pressure -- when you're on Vioxx, you can be put on
2  blood pressure medication and the blood pressure
3  doesn't come down, so the easiest way to solve the
4  problem is to take them off the medicine.

1

**Anstice, David W.**

| | |
|---|---|
| From: | Scolnick, Edward M. |
| Sent: | Tuesday, October 16, 2001 12:08 AM |
| To: | Anstice, David W. |
| Subject: | RE: vioxx label |

it is ugly cubed. thye are bastards

-----Original Message-----
| | |
|---|---|
| From: | Anstice, David W. |
| Sent: | Monday, October 15, 2001 6:32 PM |
| To: | Scolnick, Edward M. |
| Subject: | RE: vioxx label |

Ed, Thanks. I just received a copy 5 minutes ago and will digest tonight. We knew it would be UGLY and it is. We'll fight back and see where we get. I agree that we should ask for an advisory committee if necessary.  David

-----Original Message-----
| | |
|---|---|
| From: | Scolnick, Edward M. |
| Sent: | Monday, October 15, 2001 6:02 PM |
| To: | Anstice, David W. |
| Subject: | vioxx label |

*David  Be assured we will not accept this label. if we need to we will ask to go to an advisory committee meeting/Ed*

Wendy

RECEIVED
OCT 17 2001
WENDY L. DIXON

Legal hold

P1.0002

1

Confidential - Subject To Protective Order                                                    MRK-ABW0004799

Exhibit 21
to Plaintiff's Brief re Pre-Admission of Certain Documents

## Deposition of FDA Officer, David Graham, M.D., May 9, 2006
### (104:13-109:6)

104

13  And then what happens?  What
14  happens is delay.  Delay, delay, delay.
15  And as a result -- you can see it.  You
16  can see it with rofecoxib, with Vioxx,
17  that we have the results of the VIGOR
18  study showing a five-fold increased risk
19  of heart attack with Vioxx compared to
20  naproxen at the high dose, and it takes
21  almost two years for FDA to come up with
22  the label, a label, by the way, that in
23  my estimation, accomplished nothing of
24  utility to the public health.

105

1       Why a two-year delay?  The
2  FDA was able to come up with a public
3  health announcement within a week of the
4  article appearing in the Annals of
5  Internal Medicine about liver failure
6  with Ketek.  So, if FDA can act that fast
7  on three cases of liver failure, why do
8  they have to take two years in reacting
9  to something as important as heart attack
10  with Vioxx.  And my answer is, it comes
11  down to this conflict of interest in
12  structural issues.
13       There's also the cultural
14  issues.
15       Q.   Before you go to the
16  cultural issue, let's stick with the
17  structural issue.  I'm going to do all
18  four.
19       On the structural issue,
20  let's pick up a couple points and move on
21  to others.  We've got a lot of things to
22  cover now in about an hour and a quarter,
23  and I want to do the Vioxx story and the
24  Kaiser story as well, so, we've got to

Exhibit 21                                  1

106

1  move quickly.
2          But on this, you mentioned
3  that the label didn't make a difference.
4  My question about the label is, is the
5  label something that the FDA tells the
6  drug company to do or is it something
7  else?
8      A.   Well, the FDA press office
9  recently made a statement that they have
10  the authority to force label changes, but
11  they prefer to negotiate with the
12  company.  My experience has been that, at
13  least since PDUFA, FDA does not impose
14  label changes on the company.
15  Basically -- well, let's give a typical
16  example.  We have a drug, we know it
17  causes a problem.  We have a meeting, a
18  premeeting of the OND people, the drug
19  safety people, we're talking about a
20  post-marketing safety issue, and we've
21  decided we're going to insist that this
22  problem belongs in the warnings on the
23  label.  We go in then, we have a meeting
24  with the company, and you come out with

107

1  it's not in the warnings, it might not be
2  in the precautions.  It gets worked down
3  because the FDA capitulates.
4      Q.   Why is it important to the
5  drug companies not to warn about risks?
6  You'd think they would want to warn about
7  risks if there was any chance that there
8  was a risk?
9      A.   Well --
10          MR. BECK:  Object to form.
11  BY MR. KLINE:
12      Q.   Why do they not warn about
13  the risks?
14      A.   Companies, I believe,
15  have -- resist having safety issues
16  highlighted in the warnings because it
17  raises them to sort of a level of
18  significance in terms of importance in

Exhibit 21                        2

19  the minds of physicians and patients.  It
20  could be used for -- as a competitive
21  advantage from a competitor marketing the
22  same product.  And if it has a box around
23  the warning, my understanding is that
24  that imposes then additional restraints

108

1  on the company as to how they can go
2  about marketing the drug product to
3  consumers and also how it gets marketed
4  and detailed to physicians.  So, the
5  boxed warning sort of has the -- I think
6  the greatest potential impact on a drug
7  product in terms of how a company can go
8  about marketing it.
9       Q.  Is that something -- are you
10  saying that that's something that the
11  drug company would want to avoid for
12  financial reasons?
13      A.  Yes.
14          MR. BECK:  Object to form.
15  BY MR. KLINE:
16      Q.  Why would a drug company
17  want to avoid that kind of thing?
18      A.  A company would want to
19  avoid a boxed warning because it will
20  make it more difficult to market the
21  drug, it could interfere with the
22  profitability of the product.  It could
23  give their competitors a marketing
24  advantage, and it could call into

109

1  question the safety of their product and
2  then perhaps give physicians or patients
3  pause to reconsider whether they want to
4  take that particular drug if there are
5  others available that don't have such a
6  warning.

Exhibit 21                         3

Exhibit 22
to Plaintiff's Brief re Pre-Admission of Certain Documents

**Testimony of Alise Reicin, *Irvin Plunkett v. Merck* trial, February 16, 2006**
**(2065:22-2070:2)**

22  Q.   AND THEN IN MARCH OF 2000, THE VIGOR STUDY IS COMPLETED,

23  CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   IT SHOWS TWICE THE RATE OF SERIOUS CV PROBLEMS AND FIVE

2066

1   TIMES THE RATE OF HEART ATTACKS COMPARED TO NAPROXEN, CORRECT?

2   A.   THAT'S CORRECT.

3   Q.   AND SO THE VIGOR RESULTS ARE IN HERE, BUT THERE IS NO

4   WARNING OF HEART ATTACK IN THE LABEL EVER, CORRECT, EVEN UNTIL

5   THE TIME IT WAS PULLED OFF THE MARKET?

6   A.   THAT IS CORRECT.

7   Q.   AND THEN IN APRIL OF 2002 IS WHEN THE VIGOR RESULTS, THE

8   DATA, AT LEAST, FOR THE VIGOR RESULTS WERE INCLUDED IN THE

9   PRECAUTION SECTION.  RIGHT?

10  A.   THAT'S CORRECT.

11  Q.   BUT UNTIL APRIL OF 2002, THERE WAS NOT EVEN ANYTHING

12  MENTIONED IN THE LABEL ABOUT THE VIGOR RESULTS OR THE

13  DIFFERENCE BETWEEN HEART ATTACKS VERSUS NAPROXEN, CORRECT?

14  A.   YOU'RE CORRECT.  THE FDA DIDN'T APPROVE FOR US TO PUT THAT

15  DATA IN UNTIL APRIL OF 2002.

16  Q.   WELL, YOU ASKED FOR A LABEL CHANGE, CORRECT?

17  A.   YES, WE DID.

18  Q.   BUT THE PURPOSE OF THE LABEL CHANGE THAT YOU ASKED FOR IN

19  JUNE OF '99 -- I MEAN, IN JUNE OF 2000 WAS NOT TO ADD A HEART

Exhibit 22                              1

20   ATTACK WARNING TO THE LABEL, WAS IT?

21   A.   NO.   IT WAS TO ADD BOTH THE GASTROINTESTINAL AND THE

22   CARDIOVASCULAR RESULTS FROM VIGOR TO THE LABEL, NOT FOR A

23   WARNING.

24   Q.   AND THE PRIMARY PURPOSE FOR THAT LABEL CHANGE THAT YOU

25   WERE ASKING FOR WAS TO TAKE OUT THE GI WARNING; IS THAT RIGHT?

2067

1    A.   NO.   THE PRIMARY PURPOSE WAS TO ADD THE RESULTS FROM THE

2    VIGOR LABEL, FROM THE VIGOR STUDY.

3    Q.   WELL, WE HAVE THE EVIDENCE, AND THE JURY WILL BE ABLE TO

4    SEE THE ACTUAL LABEL CHANGE THAT YOU-ALL PROPOSED IN JUNE OF

5    2000.   YOU UNDERSTAND THAT?

6    A.   YES.

7    Q.   AND SO WE'RE CLEAR, DID YOU ASK FOR A HEART ATTACK WARNING

8    OR EVEN A PRECAUTION IN THAT LABEL?

9    A.   NO.   WE DIDN'T THINK THAT ONE WAS NECESSARY.   ALTHOUGH --

10          THE COURT:   COUNSEL, ONE MINUTE.   I UNDERSTAND THE

11   SCREEN IS NOT ON FOR THE JURY.   DO YOU WANT THE SCREEN HERE TO

12   BE ON?

13          MR. BIRCHFIELD:   YES.

14          THE WITNESS:   CAN I FINISH MY ANSWER?

15          THE COURT:   YES.   LET'S HAVE THE QUESTION PUT AND

16   THEN THE SAME ANSWER.

17          (WHEREUPON, THE QUESTION AND ANSWER WERE READ OUT

18   LOUD.)

19          THE WITNESS:   I BELIEVE THAT THE CARDIOVASCULAR DATA

20   WERE PUT IN THE PRECAUTION SECTION.

21   BY MR. BIRCHFIELD:

Exhibit 22                                   2

22   Q.   ULTIMATELY?

23   A.   MY RECOLLECTION IS IN JUNE, BUT I COULD BE WRONG.  WE

24   WOULD HAVE TO LOOK AT IT.

25   Q.   SO FROM MARCH OF 2000 UNTIL APRIL OF 2002, MERCK HAD THE

2068

1   VIGOR RESULTS THAT SHOWED FIVE TIMES AS MANY HEART ATTACKS ON

2   VIOXX, CORRECT?

3   A.   THAT'S CORRECT.  IN THE VIGOR STUDY.

4   Q.   BUT THERE IS NEVER ANY INFORMATION INCLUDED IN THE PRODUCT

5   LABEL UNTIL 2002, AND THEN IT'S IN THE PRECAUTION SECTION,

6   RIGHT?

7   A.   THAT IS CORRECT.  THAT'S WHAT THE FDA ALLOWED US TO PUT IN

8   THE LABEL, AND NOT UNTIL APRIL OF 2002.

9   Q.   AND THE FDA HAD PROPOSED THAT THE CARDIOVASCULAR RISKS BE

10   INCLUDED IN THE WARNING SECTION OF THE PRODUCT LABEL, CORRECT?

11   A.   THAT WAS ONE OF THEIR EARLY PROPOSALS, AND THEN THEY FELT

12   THAT THE MOST APPROPRIATE PLACE FOR IT WAS IN THE PRECAUTION

13   SECTION.

14   Q.   WELL, THEY FELT THAT WAY AFTER MERCK FOUGHT THEM ON THE

15   LABEL CHANGE, FOUGHT THEM TO KEEP THE CV RISK OUT OF THE

16   WARNING SECTION, CORRECT?

17   A.   I DON'T THINK THAT'S AN ACCURATE CHARACTERIZATION.

18   Q.   YOU DON'T THINK THAT ED SCOLNICK, THE PRESIDENT OF MERCK

19   RESEARCH LABS, SAID, "WE'RE GOING TO FIGHT THE FDA TO AVOID

20   THIS LABEL CHANGE"?

21   A.   ED MIGHT HAVE SAID THAT.  HE WASN'T AT THE MEETINGS, AND I

22   WOULDN'T CHARACTERIZE IT AS A FIGHT WITH THE FDA.

23   Q.   WELL, HE WAS THE BOSS, WASN'T HE?

24   A.   HE WAS THE HEAD OF MERCK RESEARCH LABS.  HE MAY HAVE SAID

Exhibit 22                          3

25    THAT.  HE WAS NOT AT THE MEETINGS WITH THE FDA WHEN WE

2069

1    DISCUSSED THE LABEL.

2    Q.    WELL, YOU UNDERSTAND THAT THERE IS A BIG DIFFERENCE IN

3    HAVING A CV RISK IN THE WARNING SECTION VERSUS THE PRECAUTION

4    SECTION, DON'T YOU?

5    A.    I'M NOT -- MY UNDERSTANDING OF WHAT GOES IN THE WARNINGS

6    IS WHEN YOU ARE CERTAIN THAT THERE IS A RISK ASSOCIATED WITH

7    THE DRUG.  SO, FOR INSTANCE, IF YOU KNOW THAT A DRUG CAN CAUSE

8    SOMEONE TO HAVE A SEVERE ALLERGIC REACTION, THAT WILL GO IN THE

9    WARNING SECTION.  THE PRECAUTION NEEDS TO BE TAKEN INTO

10    ACCOUNT --

11    Q.    DR. REICIN, ARE YOU TELLING US THAT --

12          MR. ISMAIL:  YOUR HONOR, MAY SHE BE ALLOWED TO FINISH

13    HER ANSWER?

14          THE COURT:  WHAT'S THE QUESTION?  I'M SORRY.  I WAS

15    FOCUSED ON THIS.  DO YOU HAVE IT NOW, JURY?

16          MR. ISMAIL:  MR. BIRCHFIELD ASKED THE DIFFERENCE

17    BETWEEN A PRECAUTION AND THE WARNING, AND THE WITNESS WAS IN

18    THE MIDDLE OF HER ANSWER AND HE CUT HER OFF.

19          MR. BIRCHFIELD:  NOT EXACTLY.

20          MR. ISMAIL:  HE DID CUT HER OFF.

21          THE COURT:  ASK THE QUESTION AGAIN.

22    BY MR. BIRCHFIELD:

23    Q.    DOCTOR, WOULD YOU AGREE THAT THERE IS A BIG DIFFERENCE IN

24    HAVING A CV RISK IN THE WARNING SECTION VERSUS THE PRECAUTION

25    SECTION IN A LABEL?

2070

*Exhibit 22*                    4

1   A.   I'M NOT SURE I WOULD CHARACTERIZE IT THE WAY YOU'RE

2   PUTTING IT.

Exhibit 22                            5