Exhibit A - Zipes Deposition Excerpts

- Zipes Addendum Rpt. Motion

[270:] - [270:24]   7/19/2006   Zipes, Douglas v.2 (Barnett)

```
page 270
    0270
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
        In re: VIOXX PRODUCTS LIABILITY
 4      LITIGATION
 5      MDL Docket No. 1657   Section L
                         Judge Fallon
 6                       Magistrate Judge Knowles
 7      This document relates to:
 8      GERALD BARNETT and CORRINE BARNETT,
 9                       Plaintiffs,
        v.
10
        MERCK & CO., INC.,
11                       Defendant.
12      Civil Action No. 2:06cv485
13
14                     - - -
15             July 19, 2006
16                     - - -
17
18             DEPOSITION OF
19         DOUGLAS P. ZIPES, M.D.
20
21                     - - -
22         GOLKOW LITIGATION TECHNOLOGIES
           1600 John F. Kennedy Boulevard
23                 Suite 1210
           Philadelphia, Pennsylvania  19103
24              (877) DEPS-USA
```

[299:18] - [299:20]   7/19/2006   Zipes, Douglas v.2 (Barnett)

```
page 299
18              MR. GOLDMAN:  No, this is the
19      date you gave me.  I traveled to
20      Indiana to take your deposition.
```

[300:15] - [301:2]   7/19/2006   Zipes, Douglas v.2 (Barnett)

```
page 300
15         Q.    It sounds to me like you are
16  just accepting Mr. Robinson's representation
17  of what Dr. Karavan said in his deposition
18  yesterday as true and you're relying on
19  whatever he just told you about Dr. Karavan's
20  deposition without actually seeing it
21  yourself; is that right?
22         A.    I have not seen his
23  deposition.
24         Q.    What's the answer to my
page 301
 1  question?
 2         A.    The answer is yes.
```

[308:21] - [309:17]   7/19/2006   Zipes, Douglas v.2 (Barnett)

```
page 308
21         A.    Yes.  I also showed it to a
22  neighbor and an expert, Dr. Harvey
23  Feigenbaum.
24         Q.    Is that one person, the
page 309
 1  neighbor and Harvey Feigenbaum?
 2         A.    It's one person who is a
```

Exhibit A - Zipes Deposition Excerpts

• Zipes Addendum Rpt. Motion

```
 3  neighbor and an expert and his name is Harvey
 4  Feigenbaum.
 5      Q.   Sorry.  Why did you show the
 6  catheterization to your neighbor Harvey
 7  Feigenbaum?
 8      A.   He's a world expert in echo,
 9  as well as a catheterizer, though he hasn't
10  done that for five years or so.  Was head of
11  the catheterization laboratory at my
12  institution for many, many, years.  He lives
13  across the street.
14           I looked at the CD.  I made
15  my own decisions, conclusions.  I saw what I
16  saw and I thought, well, why don't I ask
17  Harvey if he agrees with me?
```

[311:10] - [311:18]     7/19/2006     Zipes, Douglas v.2 (Barnett)

```
page 311
10      Q.   Do you hold yourself out in
11  the medical community as an expert in echo
12  cardiograms and the interpretation of cardiac
13  catheterizations?
14      A.   I hold myself out as an
15  expert in the ability to read them.  I don't
16  hold myself out as an expert to the extent
17  that Feigenbaum is or, probably, Dr. Karavan,
18  in interventional cardiology.
```

[322:5] - [325:13]     7/19/2006     Zipes, Douglas v.2 (Barnett)

```
page 322
 5      Q.   Since September of 2002, is
 6  it your opinion that Mr. Barnett has had a
 7  second heart attack?
 8      A.   You asked me that question in
 9  my previous deposition and I answered it by
10  saying that I wasn't sure.  However, he had
11  developed new wall motion abnormality, at
12  least based on the heart echo that we had
13  obtained, which would indicate death of heart
14  muscle with subsequent scarring fibrosis.
15           So in all probability, he did
16  have a second heart attack at some point,
17  because otherwise, I really can't explain the
18  development of the new wall motion
19  abnormality and fibrosis that he has on
20  cardiac echo.
21      Q.   When did Mr. Barnett develop
22  the wall motion abnormality and the fibrosis
23  that you saw on the echo from May of 2006?
24      A.   Well, that's his first echo,
page 323
 1  so we don't know exactly when.  We know that
 2  his catheterization in September 9 of 2002,
 3  that he has wall motion abnormality
 4  associated with the posterior descending
 5  artery thrombosis and occlusion.
 6           The first echo that he has,
 7  however, is four years later or roughly, May
 8  2, of '06.  So at some time during that time
 9  period he has developed wall motion
10  abnormality resulting from a scar.
11           Now we know that in July 2003
12  he has a Cardiolite stress test which does
13  not show distinct wall motion abnormalities.
14  However, it's important to stress that the
15  Cardiolite exam is not as sensitive as is the
16  cardiac echo in picking up wall motion
17  abnormalities.  And you can find that in this
18  book as well.
```

Exhibit A - Zipes Deposition Excerpts

• Zipes Addendum Rpt. Motion

```
19              So at some point during that
20 time period, from the infarct in '02, and
21 '06, he ends up with definite wall motion
22 abnormality. Now, if we assume that the July
23 '03 Cardiolite exam shows no wall motion
24 abnormalities, then sometime between July '03
page 324
1  and May 2, '06 he, more probably than not,
2  has had a second infarct.
3              Now, we know in July '04 he
4  has an episode of chest pain for which he's
5  evaluated but no enzymes are obtained. And
6  it's certainly possible that he has his
7  infarct at that time but I can't be
8  absolutely sure.
9      Q.   Did Dr. Karavan or anybody
10 else during the July 2004 episode diagnose
11 Mr. Barnett with a heart attack or an
12 infarct?
13             MR. ROBINSON: Objection,
14         Andy. Karavan said he didn't know
15         about the July '04. You just took
16         his depo.
17             MR. GOLDMAN: I don't
18         remember that.
19             MR. ROBINSON: The doctor was
20         the guy in the emergency room.
21 QUESTIONS BY MR. GOLDMAN:
22     Q.   Did anybody who saw
23 Mr. Barnett in July of 2004 indicate in the
24 medical records that they believe he had a
page 325
1  heart attack or an infarct?
2      A.   Not to my knowledge.
3      Q.   Are you able to say to any
4  degree of reasonable, any reasonable degree
5  of medical certainty, that Mr. Barnett had a
6  second heart attack while he was taking Vioxx
7  between September of 2002 and September of
8  2004?
9      A.   I don't know when he had his
10 second infarct. I think that, more probably
11 than not, it relates to the July chest pain
12 episode, but we have no objective data with
13 enzymes and so on to prove it.
```

[329:2] - [329:7]        7/19/2006    Zipes, Douglas v.2 (Barnett)

```
page 329
2      Q.   Am I right, sir, that you
3  haven't obtained any new data since June of
4  2006 when you gave your deposition and today,
5  you've just spent more time thinking about
6  the data you already had?
7      A.   That's correct.
```

[335:10] - [335:17]      7/19/2006    Zipes, Douglas v.2 (Barnett)

```
page 335
10             I might also add that one of
11 the reasons I did show the films to
12 Dr. Feigenbaum to see if he agreed with my
13 interpretation is because he is an expert.
14 And as you pointed out, I haven't,
15 personally, done the catheterizations for
16 many, many, years, and consequently, went to
17 an expert to verify my conclusions.
```

Exhibit A - Zipes Deposition Excerpts

- Zipes Addendum Rpt. Motion

[356:9] - [357:5]   7/19/2006   Zipes, Douglas v.2 (Barnett)

page 356
```
 9              MR. GOLDMAN:  Let me say for
10      the record that this is highly
11      objectionable that I receive a
12      report from Dr. Zipes a week before
13      trial that I just reviewed for the
14      first time at 2:30 in the afternoon,
15      and it goes into areas far beyond
16      Mr. Barnett's recent
17      catheterization.
18              I couldn't possibly,
19      adequately, I cannot adequately
20      examine Dr. Zipes on this three-page
21      report given the limited time that I
22      have to work with it.  And I will do
23      my best to, to explore some of these
24      statements, but our position is that
```
page 357
```
 1      these are belated opinions that
 2      cannot be expressed to the jury.
 3      And we will try and seek whatever
 4      relief we think is appropriate after
 5      the deposition.
```

[442:9] - [443:21]   7/19/2006   Zipes, Douglas v.2 (Barnett)

page 442
```
 9          A.      Right.  And my understanding
10      is that you used this document to, in front
11      of Dr. Karavan, and you have the differences
12      of the interpretation of the vessels written
13      down.
14          Q.      And do you know whether we
15      got into anything in the third column?  I
16      don't want you to look at the testimony.
17              MR. ROBINSON:  He can't look
18      at the testimony I gave him?
19          Q.      Do you know as you sit here
20      today whether you had a chance to get into
21      the third column?
22          A.      Yes.  And my interpretation,
23      but again this is told to me by counsel, is
24      that you assume that subtotal occlusion
```
page 443
```
 1      represented a lesser occlusion than the
 2      80 percent, when in actual fact, there was
 3      significant progression in multiple areas.
 4          Q.      That's what Mr. Robinson told
 5      you?
 6              MR. ROBINSON:  Let's move on.
 7          Q.      Did Mr. Robinson tell you
 8      anything else about how this document was
 9      used with Dr. Karavan's deposition?
10          A.      Basically, that was it.
11          Q.      Basically, all you know about
12      this document that's called Comparison of
13      Cardiac Catheterization Findings is what
14      Mr. Robinson or others who work for him told
15      you about how it was used in Dr. Karavan's
16      deposition, right?
17          A.      That is correct.  Obviously,
18      appended here are excerpts from Dr. Karavan's
19      deposition which I've not had an opportunity
20      to read and it's not fair for me to comment
21      further.
```

Exhibit A - Zipes Deposition Excerpts

- Zipes Addendum Rpt. Motion

[450:13] - [451:7]   7/19/2006   Zipes, Douglas v.2 (Barnett)

```
page 450
13        Q.   You refer to, in Paragraph 4,
14   table 13 of the APPROVe Trial Cardiovascular
15   Safety Report. Where did you get that?
16        A.   From Mr. Robinson.
17        Q.   When?
18        A.   This morning.
19        Q.   And had you read it before
20   this morning?
21        A.   I don't remember. I went
22   through so much of the APPROVe data that I,
23   probably, saw it but I don't remember.
24        Q.   I'm looking at table 13. And
page 451
1    there's some highlighting on it and the
2    highlighting's not mine. Those highlighting
3    is it?
4         A.   I think Mr. Robinson's.
5         Q.   And this was given to you
6    this morning, right?
7         A.   Yes.
```

[469:1] - [470:18]   7/19/2006   Zipes, Douglas v.2 (Barnett)

```
page 469
1    STATE OF INDIANA         )
                              ) SS:
2    COUNTY OF MORGAN         )
3                I, Rebecca J. Swinney,
4    RMR-FCRR, a Notary Public in and for the
5    County of Morgan, State of Indiana at large,
6    do hereby certify that DOUGLAS ZIPES, M.D.,
7    the deponent herein, was by me first duly
8    sworn to tell the truth, the whole truth, and
9    nothing but the truth in the aforementioned
10   matter;
11               That the foregoing deposition
12   was taken on behalf of the Defendant pursuant
13   to the Indiana Rules of Trial Procedure;
14               That said deposition was
15   taken down in stenograph notes and afterwards
16   reduced to typewriting under my direction,
17   and that the typewritten transcript is a true
18   record of the testimony given by the said
19   deponent; and that the signature of said
20   deponent to his or her deposition was
21   requested;
22               That the parties were
23   represented by their counsel as
24   aforementioned.
page 470
1                I do further certify that I
2    am a disinterested person in this cause of
3    action; that I am not a relative or attorney
4    of either party, or otherwise interested in
5    the event of this action, and am not in the
6    employ of the attorneys for either party.
7                IN WITNESS WHEREOF, I have
8    hereunto set my hand and affixed my notarial
9    seal this 20th day of July, 2006.
10
11
12
                    _____
                    Rebecca J. Swinney, RMR-FCRR
13                  CSR No. 94-R-1047
                    Notary Public
14
15   My Commission Expires:
     March 9, 2007
```

Exhibit A - Zipes Deposition Excerpts

- Zipes Addendum Rpt. Motion

```
16
             County of Residence:
17   Morgan
18
```

Douglas P. Zipes, MD
Addendum to Expert Report

1. I had a brief phone discussion with Dr. Karavan after the angiogram. I was happy to hear that Mr. Barnett pulled through fine. Dr. Karavan said he stented the ramus intermedius occlusion. Dr. Karavan also said that the RCA was totaled. He said in retrospect, he felt that there was less than a 50% occlusion in the left main artery on the 9/9/02 catheterization, which was what he had stated originally.

2. In reviewing the 7/10/06 angiogram with Dr. Harvey Feigenbaum, we saw plaque development in every coronary artery. In fact, the RCA was shut off, which no doubt will be a problem for Mr. Barnett over time. I have attached a copy of an Exhibit I understand was shown to Dr. Karavan, which was a chronicle of this plaque build-up. (See Exhibit 1: Ex 41 from Karavan deposition and 1a). I also reviewed the 2006 ventriculogram with Dr. Feigenbaum. We noted the premature beats that can minimize the appearance of the wall motion abnormality.

3. This 7/10/06 angiogram definitely explains more clearly the course of Vioxx-induced plaque acceleration. There are two periods of plaque build-up:

    a)   1/2000 through 9/2002
    b)   9/2002 through 9/2004

   Vioxx is the only plausible explanation for both of these short periods of extreme plaque build-up. For example, in July 2006, Mr. Barnett's total cholesterol was 100 with an LDL of 52. This is excellent modification of the most significant plaque build-up risk. From May 2000 through 2006, Mr. Barnett made great efforts to reduce his cholesterol, but did not know that Vioxx was insidiously adding to his plaque. Unfortunately, Mr. Barnett continued to take Vioxx for 2 years from September 2002 through September 2004, which accelerated his plaque build-up. This plaque build-up is also evidenced by comparing the lack of ischemia in the July 2003 Cardiolite exam with the ischemia found in the May 2006 Cardiolite exam.

4. Also, Table 13 from the APPROVe Trial Cardiovascular Safety Report is consistent with Vioxx causing vascular plaque remodeling. There were 25 Vioxx coronary artery disease events compared with placebo 10 events. This supports this unique plaque build-up aspect of Vioxx on the coronary arteries. (See Exhibit 2)

5. Now that we have 3 Cardiolite exams, 2 angiograms, an echocardiogram, and a CTA, we can better understand how minimal Mr. Barnett's risk of a heart attack was as of January 24, 2000 (if he had not taken Vioxx). He had less than a 5%


EXHIBIT B

risk of a heart attack according to all accepted methods of calculating risk of MI based on his Cardiolite score, blood pressure, age and other risk factors in January 2000. (See Exhibit 3, calculation from June 9, 2006 deposition; see also Exhibit 4, the exercise standards by Fletcher, which was an exhibit in Dr. Karavan's deposition; *Braunwald*, pp. 313-318 and 382-384). The O'Keefe study, (J. Nucl. Cardiol. 5:90-95 1998) which was referenced by Dr. Popma, shows: There were 1,352 non-high risk patients who had mild to moderate risks on the nuclear stress tests. One thousand two hundred thirty-six (or 91%) had only a 2% rate of non-fatal MI or cardiac death over a three year period. These patients were treated medically and did not require invasive surgical intervention.

6. Other points of interest concerning the most recent angiogram are as follows:

   a) The early report from the hospital at which the Cardiolite test was done January 24, 2000, stated that there was mild decreased lateral wall uptake. Regardless of whether is it mild or it is a perfectly normal test, it indicates that there is no significant coronary artery obstruction.

   b) During the stress test, if there were significant coronary artery disease, the ventricle would dilate so it gets bigger, and the "hole of the doughnut" would enlarge. The reason that transient ischemic dilation (TID) is important is the fact that if there were balanced obstructions in the three coronary arteries, then during stress and at rest there could be uniform decreased uptake, and one would not see a differential with one area showing more decreased uptake than another. So, the lack of TID becomes a very important measure to exclude this balanced reduction in uptake. And in actual fact in Mr. Barnett, the TID is .8 which means that the hole in the doughnut actually got smaller at stress versus rest. Also, there is no pulmonary uptake, which provides further evidence against balanced ischemia.

   c) In terms of the echocardiogram, there is posterobasal wall motion abnormality and there is fibrosis or calcification which means that this is an area that has been damaged, and death of the heart muscle has occurred and healed over with a scar. Now, over time calcium actually can get deposited in that area. The affected area is particularly obvious on what is called the long axis view of the left ventricle, and it is in the posterobasal area, or back of the heart, below the mitral valve, indicating that at some point there has been significant damage in that area that has subsequently scarred over.

   d) The scarring, hypokinesis or wall motion abnormality can lead to a loss of life for at least two reasons. One, it indicates that there is abnormal coronary blood flow to that area, or Mr. Barnett would not have the scar and the abnormal contraction. Two, the scar itself,

though the overall function of the ventricle is still good and the ejection fraction is still within normal range, is abnormal, which means that Mr. Barnett could be at risk for heart rhythm abnormalities, because scarred areas can generate life-threatening heart rhythm problems, possibly cardiac arrest.

e) If the extent of the damage were to increase because of other coronary artery obstruction, then there can be more scarring, more heart attacks, ventricular dilation, heart failure, and ultimately, death.

f) Further, the coronary arteries to the rest of his heart muscle are significantly damaged and are at risk, and if any of these begin to close down and he has additional infarcts, then this will significantly impair how well his heart muscle squeezes, and the ejection fraction will then fall. In terms of this area of hypokinesis, that area is lost. That will never recover. That is a scar. Consequently, he has lost what is called myocardial reserve, or the ability of that area to squeeze is lost, and it then affects how well Mr. Barnett heart can manage additional infarcts.

g) Now, although his ejection fraction is normal, we know that his exercise capability is already reduced. He could only walk nine and a half minutes on the treadmill.

h) Mr. Barnett will lose years from his life because he has wall motion abnormality and he is dependent upon vein grafts, which can occlude. In general, 50% occlude by ten years. Mr. Barnett's LAD is totally occluded, and supported by the LIMA graft, which can also occlude. In general, 20% of LIMAs occlude by ten years. Therefore, he is at risk for continued reduction of blood flow to his heart.

i) It is my opinion that Vioxx caused the occlusions to Mr. Barnett's vein grafts. To begin with, the occlusion was very premature and was not due to poor surgical technique. In addition, from February 2003 through July 2004, we know he had at least three episodes of chest pain following his bypass surgery. Though the July 2003 stress test shows no significant change, he did have significant chest pain in July 2004, and I believe more probably than not he infarcted at that time with vein graft occlusion. The fact that there is calcium in the scarred area, or at least changes by the echocardiogram consistent with calcium, puts it within the time frame that Mr. Barnett took Vioxx, through September 2004.

DATED: July ___, 2006

_____
Douglas P. Zipes, MD