UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE |
| GERALD D. BARNETT, | * | KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | | |

**OPPOSITION OF MERCK & CO., INC. ("MERCK") TO
PLAINTIFF'S BRIEF RE ADMISSIBILITY OF CERTAIN MERCK
DOCUMENTS RELATING TO POTENTIAL VIOXX SALES REVENUES**

In the *Plunkett* trial, the Court correctly ruled that documents containing specific economic information about Merck – such as projected sales revenues and profits – were inadmissible in the liability phase, while allowing testimony (without specific dollar amounts) that Merck understood that its actions would have economic consequences.  In this way, the Court balanced plaintiff's desire to argue that Merck had an economic motive for its actions against Merck's desire to avoid the inescapable prejudice of informing the jury of its substantial revenues and profits.  (*See, e.g.*, Feb. 14, 2006 *Plunkett* Tr. at 1504:10-23, attached hereto as Ex.

A.)  Plaintiff in this case seeks to upset this balance by asking the Court to admit five documents containing Merck's revenue and profit forecasts for Vioxx.  The Court should refuse.

As discussed below, the documents are either irrelevant or of only marginal relevance. Yet the danger of undue prejudice is real.  Courts routinely exclude evidence of sales, profits, and financial condition in the liability/compensatory damages phase of trials out of concern that it would inflame juror prejudice.  Moreover, as the hyperbole in plaintiff's motion aptly demonstrates, the risk that these particular documents would be misconstrued is manifest.  None should be admitted.

I.  **THE FIVE DOCUMENTS ARE EITHER IRRELEVANT OR ONLY MARGINALLY RELEVANT.**

In evaluating the relevance of the five documents, the Court should focus on what they actually say, rather than plaintiff's wildly exaggerated claims of what they "prove."  As plaintiff correctly notes, "[t]hese documents discuss the potential effects of Merck's actions upon estimated projected revenues, and ultimately profits from the sale of Vioxx."  (Pl.'s Br. at 2.) For example, one document – written before Vioxx came on the market – estimates that the net present value of revenues from Vioxx sales would be $611 million more if Vioxx came on the market before Celebrex.  (It did not.)  That document and others contain various revenue projections for Vioxx in the billions of dollars.  These are big numbers, and plaintiff's goal is to put them in front of the jury in the hope that they will improperly sway its decision on liability and compensatory damages.  Contrary to plaintiff's claims, the documents do *not* demonstrate that "Merck recklessly rushed Vioxx into production," "recklessly, intentionally and fraudulently overpromoted Vioxx," or that "Merck's overriding concern was not the adequacy of the warnings or the safety of the users, but the adequacy of revenues and the safety of profits."  (Pl.'s Br. at 2-5.)  The documents say no such thing.

2

Courts have routinely found evidence of profit margins and sales to be irrelevant and inadmissible in a products liability case. *See, e.g.*, *In re Norplant Contraceptive Prods. Liab. Litig.*, MDL No. 1038, 1997 U.S. Dist. LEXIS 11118, at *1-2 (E.D. Tex. Feb. 19, 1997) (excluding evidence of defendant's gross profit margins as irrelevant and rejecting plaintiffs' claims that such evidence was relevant to their "rush to market" argument); *LaPlante v. Am. Honda Motor Co.*, 27 F.3d 731, 740 (1st Cir. 1994) (ruling that defendant's profits were inadmissible); *Shuff v. Consolidated Rail Corp.*, No. 91 C 5326, 1994 U.S. Dist. LEXIS 14151, at *4 (N.D. Ill. Sept. 30, 1994) (finding "the relative worth of the parties is immaterial").

A.   **The Documents are Irrelevant to Plaintiff's Failure to Warn Claim.**

Under South Carolina law, a "manufacturer's duty to warn extends only to the prescribing physician, who then assumes responsibility for advising the individual plaintiff of risks associated with the drug or device." *Odom v. G. D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) ("It is plain that [plaintiff's] claim is governed by the 'learned intermediary' doctrine."); *see also Madison v. Am. Home Prods. Corp.*, 595 S.E.2d 493, 496 (S.C. 2004) (acknowledging the learned intermediary doctrine in *dictum*); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230-32 (4th Cir. 1984) ("Although the South Carolina Supreme Court has not addressed the issue, we conclude it would adopt the rule, generally accepted and supported by sound policy, restricting the manufacturer's duty to warn to the prescribing physician."). Once a manufacturer discharges its duty to warn the physician, it cannot be held liable even if the plaintiff was injured by the drug. The manufacturer has no duty to warn consumers directly. *Brooks*, 750 F.2d at 1230-32.

South Carolina has not recognized any claim for a manufacturer's "overpromotion" of its product. Moreover, in those states that do recognize an "overpromotion" claim, any evidence of alleged "overpromotion" – such as advertisements, marketing material, or sales and revenue

3

documents – is relevant *only* if it caused the physician to disregard the manufacturer's otherwise satisfactory warning.  *See Huntman v. Danek Med., Inc.*, No. 97-2155-IEG RBB, 1998 WL 663362, at *5-6 (S.D. Cal. July 24, 1998) (Plaintiff alleged that defendant "overpromoted" the use of a medical device for an unapproved use.  But, "[i]n the absence of evidence that a doctor made the decision to use a product in an 'off-label' manner in reliance on a manufacturer's misrepresentations, claims for failure to warn, fraud and breach of warranty cannot stand."); *Love v. Wolf*, 226 Cal. App. 2d 378, 399-400 (1964) ("Of course, if such over-prescription by the doctor was not caused by the over-promotion of Parke-Davis then, however negligent such over promotion may have been, Parke-Davis could not be held liable.  Its negligence would not have been an inducing, or proximate, cause of the resulting injuries.")

The reliance/causation requirement of an "overpromotion" claim gives rise to the well-recognized principle that courts should exclude as irrelevant marketing and promotional materials never seen nor relied upon by the prescribing physician.  *See, e.g.*, *In re Norplant Contraceptive Prods. Liab. Litig.*, No. MDL 1038, 1997 WL 81092, at *1 (E.D. Tex. Feb. 21, 1997) ("Absent evidence that the physicians were exposed to [such materials], the court finds that the promotional and advertising materials are not relevant evidence."); *see also Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1095, 1123 n.92 (D. Kan. 2002) (observing in failure-to-warn case that court previously granted motion in limine to exclude marketing material not relied on by prescribing physician), *aff'd*, 356 F.3d 1326 (10th Cir.), *cert. denied*, 543 U.S. 917 (2004).

Thus, although plaintiff devotes many pages of his brief to the "overpromotion" doctrine, the five documents in question do not prove "overpromotion."  The doctrine does not hinge on the intent of the manufacturer.  Rather, the issue is whether plaintiff's prescribing physicians

4

disregarded Merck's warnings as a result of Merck's other marketing. The five documents do not say that they did, and all the evidence is to the contrary.

Mr. Barnett's initial prescribing physician, Dr. McCaffrey, testified that he prescribed Vioxx to Mr. Barnett because in his best medical judgment, Vioxx was the best medication for Mr. Barnett. (Deposition of Dr. McCaffrey at 206:20-23, attached hereto as Ex. B.) Dr. McCaffrey thought Vioxx "was a very good and safe medication." (*Id*. at 204:1-5.) Dr. McCaffrey based his decision to prescribe Vioxx to Mr. Barnett not on any advertisements, promotional material, sales representative lunches, or any documents on Vioxx's profitability or effectiveness. (*Id*. at 99:8-100:7; 203:22-25; 207:10-208:3; 208:9-11; 209:17-25; 210:17-20.) According to Dr. McCaffrey, he prescribed Vioxx to Mr. Barnett based on his own medical judgment and his independent review of any medical studies and literature. (*Id*. at 206:20-23; 231:19-23.) He testified that it is his practice to rely on the FDA approved package insert in deciding what the risks and benefits are with respect to the medicine he prescribes – not commercials or other marketing material, presumably including internal sales and revenue material. (*Id*. at 207:10-208:11.)

Similarly, Dr. Mikola, Mr. Barnett's internist who continued to prescribe Vioxx to Mr. Barnett, did not rely on television commercials, advertisements, promotional materials, marketing materials, or presumably internal Merck financial sales/revenues or projected profit figures in making his decision to prescribe Vioxx to Mr. Barnett. (Deposition of Dr. Mikola at 343:5-8; 55:14-56:4; 180:3-181:1, attached hereto as Ex. C.) In fact, Dr. Mikola testified that he told the pharmaceutical sales representatives that he did not want to be "detailed" but preferred to "get [his] medical education from journal articles." (*Id*.) Of course, there is no evidence that either of plaintiff's prescribing physicians ever saw any of the five internal sales and revenue

5

documents, much less any evidence that either physician relied on any of these documents in making their decisions to prescribe Vioxx to Mr. Barnett.[1]

### B.   The Documents Also Are Irrelevant to Plaintiff's Fraud-Based Claims.

Similarly, plaintiff's claims for deceit by concealment, misrepresentation, and negligence also require proof that Merck's marketing activities caused plaintiff's prescribing physicians to disregard the manufacturer's warning – *i.e.*, proof of reliance and causation. *Schnellmann v. Roettger*, 627 S.E.2d 742 (S.C. App. 2006) (detrimental reliance is a required element of fraud/misrepresentation claims). Without that nexus, the evidence is irrelevant. And that nexus clearly does not exist here because – as noted above – plaintiff's prescribing physicians testified that, when prescribing Vioxx to plaintiff, they relied only on their own medical judgments and not on any marketing, promotional or other materials regarding Vioxx. Where, as here, there is no evidence of detrimental reliance, plaintiff's claims necessarily fail. *O'Shields v. Southern Fountain Mobile Homes, Inc.*, 204 S.E.2d 50, 52 (S.C. 1974) ("Failure to prove any one of the … elements [of fraud] is fatal to recovery.").

Moreover, the five documents do *not* demonstrate any intent on the part of Merck to deceive plaintiff or his physicians. None states that Merck intended to disseminate false or misleading information as part of its marketing efforts. The closest plaintiff has been able to come is a reference in one of the documents to a strategic objective to "neutralize safety concerns around hypertension, edema and MI." Far from indicating a desire to mislead, however, that

---

[1] Nor is there any evidence that Mr. Barnett himself ever saw, much less relied on, any of the exhibits cited in plaintiff's brief. In fact, Mr. Barnett testified that his decision to start using Vioxx in January 2000 was based on Dr. McCaffrey's medical judgment. (Deposition of Gerald Barnett at 129:19-25, attached hereto as Ex. D.) Mr. Barnett also testified that his decision to continue to take Vioxx was based on the medical judgment of Dr. Mikola. (*Id*. at 148:21-149:5 ("Q: Other than relying on the medical judgment of Dr. Mikola and Dr. McCaffrey, did you rely on *anything else* in deciding to use Vioxx? A: No." (emphasis added).)

same document identifies as one the "Key Success Factors for Merck" the need to "[e]ffectively communicate [Vioxx's] CV safety profile."[2] (*See* MRK-ABI0008668, attached as Exhibit 3 to Pl.'s Br..)

Even if the documents were relevant to any of plaintiff's claims, their probative value is greatly outweighed by their prejudicial effect.  Allowing plaintiff to introduce or even comment on that evidence at trial will seriously prejudice Merck.  In fact, courts routinely exclude evidence of sales, profits and revenues because of the prejudicial and inflammatory effect such evidence has.  *See*, *e.g.*, *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) ("We agree with the overwhelming majority of courts which have examined this issue and which have disapproved of the use of a defendant's financial condition in determining compensatory damages."); *Heyman v. Beatrice Co.*, Case No. 89 C 7381, 1995 U.S. Dist. LEXIS 14250, *6-7 (N.D. Ill. Sept. 26, 1995) (finding the probative value of evidence regarding Beatrice's size and financial condition would be substantially outweighed by the danger of unfair prejudice).  As the Supreme Court noted in *State Farm*, permitting a plaintiff to adduce evidence of the defendant's sales or profitability risks invoking any latent antipathy, animosity, or resentment that jurors might harbor towards large corporations or their officers.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421-27 (2003).  Evidence proffered with the intent to inflame a jury's prejudices in this manner is plainly improper, particularly where the effect is to divert the jurors' attention from the outcome-determinative facts and, instead, to unrelated, collateral matters.  *See* FED. R. EVID. 403; *Miller*, 196 F. Supp. 2d at 1123 n.92 (recognizing the prejudicial impact of marketing materials not relied on by prescribing physicians).  For example, in *LaPlante*, plaintiff

---

[2] Plaintiff also claims to want to use the documents to "impeach" statements made by counsel in other trials.  Of course, statements of counsel in other trials are irrelevant and have nothing to do
(*footnote continued next page*)

sought to turn the success of a commercial product against its manufacturer by introducing internal marketing materials and arguing that the manufacturer had been unduly influenced by marketing and profit concerns. The court held that the materials were inadmissible because the "risk that the jury would be prejudiced by this reference to the enormous profitability [from sales of the product] was almost inescapable." *LaPlante*, 27 F.3d at 740. The same reasoning applies here.

Moreover, plaintiff's exaggerated claims about what the five documents prove underscores the likelihood that the jury will misinterpret the documents. For instance, according to Plaintiff, Exhibit 1 (P1.0732), entitled "MK-966 (Cox-2 Inhibitor) – Product Development Plan – Stage 0 Review," shows that Merck put patient's safety at risk by pursuing a filing strategy using one year data as opposed to two-year data which "runs counter to present FDA guidelines." (Pl.'s Br. at 7.) On the basis of this quote, plaintiff argues that Merck failed to comply with FDA requirements. Yet, as the Court knows, the FDA reviewed and approved Merck's development plan. Moreover, Merck accelerated the clinical trial program not by shortening the time the drug was studied, but simply by increasing manpower to compress the time between the studies (*i.e.*, analysis of data, write ups, etc.). Merck did not shorten the study period of any study and did not cut any studies. A major driver for the development of Vioxx – and one that Exhibit 1 does not dispute – was to get a medicine that Merck felt had enormous safety benefits in the form of reduced GI risks out to patients as quickly as possible. The magnitude of the commercial opportunity was indicative of the fact that Vioxx would provide a major medical benefit to such a large and unsatisfied market.

---

with impeachment of witnesses in this case.

Likewise, Plaintiff argues that Exhibits 2 (P1.0009) and 4 (P1.0966) entitled "2001 Profit Plan for Vioxx" and "Profit Plan 2002 - Merck A&A Franchise," respectively, show that Merck puts profits ahead of patient safety by seeking to "neutralize safety concerns" and delay the label change. Plaintiff mischaracterizes these documents as well, however. By 2001, Merck's competitors had engaged in an aggressive campaign to position Vioxx as an unsafe product. The scientific evidence at the time did not support these allegations. The simple fact that the Profit Plan projected lower revenue from Vioxx if Merck was unable to balance these unfair allegations of safety concerns with information regarding the scientifically supported safety profile of Vioxx does not mean that Merck was attempting to minimize any potential risk. At the time the 2002 Profit Plan was written, FDA approval of Vioxx label changes to reflect the data from VIGOR was anticipated for February 2002, but it was thought that it could come as soon as October of 2001. Nothing in the document says Merck delayed the label change to increase revenue.

Finally, Plaintiff seeks to use Exhibits 3 (P1.1135) and 5 (P1.0166), entitled "U.S. Long Range Operating Plan: for July, 2001" and "Long Range Operating Plan: 2002-2007," respectively, for the proposition that Merck was more concerned with the possibility of a decrease in sales as a result of the placement and location of cardiovascular risks on the product label than it was with patient safety. (Pl.'s Br. at 9-11.) But the documents do not say that. Nor do the documents add anything to the questions of what Merck knew about cardiovascular risk or when it knew it. Those questions are answered by the clinical studies referenced in the documents.

Were these documents admitted, Merck would be forced to unnecessarily defend itself against plaintiff's prejudicial and inflammatory attacks by: (i) introducing testimony to put the various sales and revenue documents into context; (ii) explaining industry-wide practices; and

9

(iii) delineating the purposes and practices behind categories of documents, the result being a trial within a trial on Merck's profit motives – an issue not relevant to any of plaintiff's claims. Moreover, Merck would never be able to overcome the undue prejudice that would result from putting its sales and profit numbers in front of the jury.

## II.   CONCLUSION.

The Court struck a sensible balance in *Plunkett*. It should maintain that balance in this case and should reject plaintiff's request to admit the five documents addressed in plaintiff's "Brief Re Admissibility of Certain Merck Documents Relating to Potential Vioxx Sales Revenues."

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

820867v.1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Opposition to Plaintiff's Brief Re Admissibility of Certain Merck Documents Relating to Potential Vioxx Sales Revenues has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 25th day of July, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel