| | | |
|---|---|---|
| IN RE VIOXX PRODUCTS LIABILITY<br>LITIGATION | )<br>)<br>) | MDL No. 1657 |

### DECLARATION OF DONALD C. ARBITBLIT IN SUPPORT OF MOTION FOR LEAVE TO DESIGNATE ADDITIONAL EXPERT WITNESS AND AMEND WITNESS LIST

I, Donald C. Arbitblit, hereby declare as follows:

1. I am an attorney and partner in the firm of Lieff, Cabraser, Heimann & Bernstein (LCHB), 275 Battery Street, 30th Floor, San Francisco, California 94111. LCHB is a member of the Plaintiffs' Steering Committee in the Vioxx Products Liability Litigation, MDL No. 1657. I have personal knowledge of the matters set forth herein and could testify competently thereto.

2. This Declaration is submitted in support of Plaintiffs' Motion for Leave to Designate Additional Expert Witness, and to Amend Plaintiffs' Witness List, to add Nicholas P. Jewell, Ph.D., Professor in the Division of Biostatistics, School of Public Health, at the University of California, Berkeley, California. Dr. Jewell has consulted with plaintiffs' expert John W. Farquhar, M.D., on biostatistical issues relating to Dr. Farquhar's Supplemental Expert Report dated May 26, 2006, and Dr. Farquhar's Supplemental/Rebuttal Expert Report dated June 22, 2006. A true and correct copy of Dr. Jewell's expert report in this case is attached as Exhibit 1.

### A. Plaintiffs' Counsel Reasonably Relied on Past Practice in Not Identifying Dr. Jewell as a Testifying Expert Initially.

3. Dr. Farquhar has testified as an expert witness in three cases: In re Diet Drugs Litigation (MDL 1203), In re Baycol Litigation (MDL 1431), and In re Vioxx Products Liability Litigation (MDL 1657). In each case, LCHB has been a member of

- 1 -

547383.1

Plaintiffs' Steering Committee/Management Committee, and I have served on subcommittees assigned to submit expert testimony on behalf of plaintiffs. In that capacity, I have become familiar with Dr. Farquhar's standard practice of preparing expert reports. In each case, Dr. Farquhar has reviewed pertinent documents, including scientific literature, FDA reviews, and internal company documents. In each case, Dr. Farquhar has consulted with biostatisticians to perform calculations relating to his expert opinions. He does not claim expertise in biostatistics, and he has testified that he similarly relies on biostatistical consultants in his peer-reviewed articles.

4. During the course of Dr. Farquhar's work and testimony in the Diet Drugs, Baycol, and prior Vioxx proceedings, from November 1998 to the present, none of the biostatistician consultants upon whom he relied were ever designated as testifying experts prior to June 2006. Instead, in each instance, plaintiffs' counsel voluntarily provided defense counsel with the reports of the biostatisticians that Dr. Farquhar reviewed, whether relied upon or not. None of the biostatisticians with whom Dr. Farquhar consulted has ever been deposed, and none has ever testified at trial. Merck did not seek to depose either of the two biostatistician consultants upon whom Dr. Farquhar relied in the preparation of his September 26, 2005 expert report in this litigation, although his reliance upon them was a subject of his deposition testimony on October 10, 2005. In the Baycol litigation, Bayer is represented by Bartlit Beck, the same firm representing Merck in the Vioxx case. Bartlit Beck did not seek to depose the biostatistician with whom Dr. Farquhar consulted in the Baycol case.

5. Plaintiffs' counsel relied upon this history with respect not only to Dr. Farquhar, but also with respect to prior dealings with the same defense firm in the

- 2 -

Vioxx and Baycol cases, in making the initial determination that Dr. Nicholas Jewell, Ph.D., would have a similar role to the biostatisticians with whom Dr. Farquhar had worked in this case and other cases. Therefore, in accordance with past practice, Plaintiffs' counsel did not list Dr. Jewell as a testifying witness when experts were disclosed on May 22, 2006, but included Dr. Jewell's reports, which Dr. Farquhar had reviewed, in the materials provided to defense counsel.

### B.  History of Merck's Knowledge of Dr. Jewell

6.  Merck's Memorandum in Support of its Motion to Exclude Testimony, Merck states, "Professor Jewell first surfaced in this case in connection with plaintiff's testifying epidemiologist, Dr. John Farquhar." (Id., at 2). The Memorandum further states, "Merck promptly sought to take Professor Jewell's deposition. . . ." after Dr. Jewell first surfaced (Id., at 3). However, Dr. Jewell's report on Vioxx Protocol 203 was provided to defense counsel over four months earlier, in January 2006, and defense counsel conducted an extensive, 30-page examination of Robert Fletcher, one of plaintiffs' expert witnesses in the Irvin case about Dr. Jewell's report, on January 20, 2006. Defense counsel did not request any discovery or deposition regarding Dr. Jewell between the date of Dr. Fletcher's deposition on January 20, 2006 and May 27, 2006, a period of more than four months. A true and correct copy of the deposition transcript of Dr. Fletcher, pp. 210-241, is attached as Exhibit 2.

7.  On May 28, 2006, six days after the deadline for Plaintiffs' expert witness designations, I received an e-mail from defense counsel Andrew Goldman, requesting dates for Dr. Jewell's deposition. (Ex. 3, p. 6.) This was the first time that I

- 3 -

547383.1

had heard of any interest of defense counsel in deposing Dr. Jewell. True and correct copies of my e-mail correspondence with Mr. Goldman are attached as Exhibit 3.

    8. In accordance with the past practice described above, I responded to Mr. Goldman's e-mail on May 30, 2006, advising that Dr. Jewell was a non-testifying expert, that we had provided Dr. Jewell's report upon which Dr. Farquhar relied, and that we did not believe "exceptional circumstances" existed justifying discovery of a non-testifying expert, where Dr. Jewell's report was "based on data from three Merck studies, provided by Merck during discovery in the course of the litigation," because Merck could "obtain fact and opinions on the same subject by the readily available means of having its own experts analyze the same data." (Exhibit 3, p. 7.)

    9. On June 2, 2006, Mr. Goldman sent a draft of a motion to compel discovery and deposition of Dr. Jewell and asked whether plaintiffs were willing to reconsider the decision not to produce him for deposition. (Id., at p. 9.) I responded on June 2, 2006, after reviewing Mr. Goldman's draft motion and the case law that he cited. I informed Mr. Goldman that we agreed with his views on work product privilege, and that all materials from Dr. Jewell that were considered by Dr. Farquhar would be provided, "regardless of whether they are relied upon or rejected." My reply to Mr. Goldman included a request, "Please let us know whether you wish to discuss this further." (Id., at 10.) Mr. Goldman responded on June 2, 2006, stating, "Thanks, Don. We'll wait until after Farquhar's deposition before deciding whether to file our motion." (Id., at 19.)

- 4 -

### C. Circumstances Prompting Re-Designation of Dr. Jewell as a Testifying Expert

10. After the exchange of e-mails on June 2, 2006, circumstances changed which, Plaintiffs submit, provide good cause to add Dr. Jewell to plaintiffs' expert witness list, as follows.

11. Following my exchange of emails with Mr. Goldman on June 2, 2006, I reviewed the report of Kyungmann Kim, Ph.D., a biostatistician identified as a defense expert. While the Report of Dr. Kim was dated June 1, 2006, it was not served to me on that date, despite my prior email to Mr. Goldman stating "my request for electronic service of the Report and accompanying materials at the same time as service is carried out as to Mark Robinson" (email, May 24, 2006; Ex. 3, p. 4). Thus, I did not receive the report until it was forwarded to me on June 2, 2006.

12. Also, on the morning of June 2, I received Mr. Goldman's draft motion to compel the deposition of Dr. Jewell (email June 2, 2006; Ex. 3, p. 9). Based upon Mr. Goldman's statement that he was "about to file" that motion, I responded on an urgent basis by reviewing the draft motion, researching case law, and responding within less than 2.5 hours of receipt of Mr. Goldman's email (email, June 2, 2006, Ex. 3, p. 10). An hour later, Mr. Goldman responded, "Thanks Don. We'll wait until after Farquhar's deposition before deciding whether to file our motion." (Id., at p. 19).

13. As a result of the need to respond to defendant's draft motion, I did not have an opportunity to review Dr. Kim's report until after my exchange of emails with defense counsel on June 2, 2006. Upon review of that report, it was apparent that it raised biostatistical, technical issues that would justify a rebuttal. However, given

- 5 -

547383.1

Mr. Goldman's email stating that he would defer the issue until after Dr. Farquhar's deposition, I expected that counsel would revisit the issue of Dr. Jewell's role at that time. The deposition of Dr. Farquhar on June 8, 2006, and the deposition of Dr. Kim on June 12, 2006, also gave rise to additional issues as to which response by Dr. Jewell is appropriate. These are listed below (¶¶ 14-22). True and correct copies of excerpts of Dr. Farquhar's deposition, Dr. Kim's report, and Dr. Kim's deposition are attached as Exhibits 5, 6 and 7, respectively.

### D. Dr. Jewell's Report Is Responsive to Opinions and Testimony of Defense Expert Kim, and to Documents Recently Introduced by Defense Counsel as Deposition Exhibits

14. Dr. Kim's Report (Ex. 5, p. 7) states that scientifically valid conclusions can only be based on the prespecified composite endpoint of confirmed thrombotic events ("CV/T"). At his deposition of June 12, 2006, Dr. Kim criticized Dr. Jewell's Protocol 203 analysis because it reported results as to the "cardiac events" endpoint rather than CV/T. (Ex. 6, pp. 104:5-17.) Accordingly, Dr. Jewell responded by providing the analysis Dr. Kim stated to be preferable, which shows materially similar results, i.e., prompt and persistent excess risk of Vioxx. (Ex. 1 at p. 6.) These opinions are directly responsive to an issue raised by defendant

15. During the deposition of Dr. Farquhar on June 8, 2006, defense counsel initiated questions specific to biostatistical expertise, including, for example, a 19-page sequence based upon introduction of a recent article that Dr. Farquhar had never seen, which was written by a biostatistician, Stephen Lagakos, on the technical issues of which p-values to employ for statistical tests of interaction and subgroup analyses. Further, the indexed version of Dr. Farquhar's deposition indicates that Dr. Jewell's name

- 6 -

547383.1

was mentioned 104 times in a 296-page transcript, and the context shows that defense counsel asked questions on biostatistical issues which elicited responses referring to Dr. Jewell. Examples include the following:

> Q. Dr. Farquhar, do you know if plaintiffs' attorneys are going to allow Dr. Jewell to explain himself? . . .
>
> Q. Do you think the plaintiffs' attorneys should allow Dr. Jewell to come to trial and explain to the jury his analysis and explain, if he can, professor Lagakos' views? . . .
>
> Q. You rely on Dr. Jewell for that analysis [of significant interactions], correct? . . .
>
> Q. Dr. Farquhar, do you think its appropriate to have Dr. Jewell explain himself as to what he meant by the appropriate P for significant interaction that you are relying on?
>
> A. Well I would say if that is something that you and other attorneys would like to do, then fine. He needs to speak for himself.

16.     At the deposition of Dr. Farquhar, defense counsel challenged Dr. Farquhar's reliance on Dr. Jewell with respect to the finality of the data used for the Protocol 203 analysis. Merck has submitted no evidence of any insufficiencies of the data, which it provided during this litigation. Plaintiffs should be permitted to have Dr. Jewell respond to the questions posed by defense counsel, in order to rebut the innuendo of improper reliance on incomplete data. Accordingly, Dr. Jewell's report (Exhibit 1) includes a section describing the data that he used for his analysis of Protocol 203, and the basis upon which he concluded that it was appropriate for analysis (Ex. 1, pp. 11-12). Whether characterized as "rebuttal" or not, it is important for

547383.1

plaintiffs to have the ability to introduce testimony from the expert whose reliance on Merck's data has been unfairly challenged.

17. Dr. Kim's Report asserts that post-hoc subgroup analyses are not reliable. (Ex. 5 at 7-10.) These opinions are conceptually and strategically linked to defense counsel's questioning at Dr. Farquhar's deposition, which challenged the validity of Dr. Farquhar's opinions concerning "high risk" patients, on the grounds that the subgroup analyzed by Dr. Farquhar did not meet defense counsel's definition of the pre-specified "increased cardiovascular risk" category. Dr. Farquhar stated that he believed he did follow the pre-specified subgroup definition, but further stated that the analysis could be redone in the manner suggested by defense counsel's questioning, and that the results would be similar. (Ex. 4, at 62:23-63:3; 165:17-166:9. Accordingly, Dr. Jewell's Report provides an appropriate, relevant response to defense counsel's challenge to the analysis in Dr. Farquhar's Supplemental Report. (Ex. 1, at pp. 2-4.)

18. On June 12, 2006, at the conclusion of Plaintiffs' counsel's deposition examination of defense expert Kim, defense counsel conducted a direct examination of its own expert on a new study (June 3, 2006) by Kearney, *et al*, which presented a meta-analysis of studies of Vioxx and other COX-2 inhibitors. Dr. Kim had stated in his report and testimony that the excess risk of CV events in the APPROVe study cannot be generalized to other patient populations, on the basis that the Alzheimer's trials of Vioxx did not show increased risk of "confirmed thrombotic" events. (See Kim Report, Ex. 5, at pp. 7, 22-25, 35; Kim Depo. Tr., Ex. 6, at 76:13-77:25.) On questioning by his own counsel, Dr. Kim stated at the deposition that he plans to testify at trial that the recent Kearney article supports his position, by showing an inconsistency between

- 8 -

the relative risks for the patients with polyps versus patients with Alzheimer's. Accordingly, Dr. Jewell's Report responds to Dr. Kim's opinion that the APPROVe/polyp data cannot be generalized to Dr. Kim's interpretation of the new Kearney article, and to Dr. Kim's argument that Alzheimer's trial data are inconsistent with APPROVe (Ex. 1, at 7-11).

19.  In his Report, and at his deposition, Dr. Kim testified that he believed there was "adequate (greater than 80%) power to detect a relative risk of 2 or greater" in Alzheimer's trial 078. (Ex. 5, at 23.) However, Dr. Kim agreed with the statement that when a study with low power fails to show a significant effect, the results are more fairly described as inconclusive rather than negative; the proof is weak because the power is low. (Ex. 6; 206:10-15.) Dr. Kim further admitted that the main effect of low compliance with study medication in a clinical trial is to reduce the teatment effect, thus requiring a larger sample to achieve the same power, and that he had not accounted for the low (61%) compliance rate in his power calculation for 078 (Ex. 6, at 208:1-212:11; 217:16-25). Accordingly, Dr. Jewell has provided plaintiffs' expert evaluation of the biostatistical issues and reason for the lack of power of Alzheimer's trials 078 to detect a difference between Vioxx and placebo, including low compliance and high dropout rates. (Ex. 1, pp. 7-9.) This is relevant to rebut the testimony of defense experts that the excess risk in APPROVe cannot be generalized to other populations because of an alleged inconsistency with the Alzheimer's trials' data by demonstrating that the Alzheimer's trials were insufficiently powered and therefore "inconclusive."

20.  At the deposition of Dr. Farquhar on June 8, 2006, defense counsel introduced a document described as an "Updated Cardiovascular Pooled Analysis,"

547383.1

which was submitted to the FDA on March 22, 2004. Dr. Farquhar had neither seen nor relied on that document before. (Ex. 4, at 220-224.) Defense counsel referred to Table 13 of the document at MRK-I8940080095, and asked Dr. Farquhar to agree to the contention that the document showed there was no excess risk in the Alzheimer's trials. This examination is conceptually and strategically linked to Merck's theory and Dr. Kim's testimony relying upon the Alzheimer's results to show that the excess risk in APPROVe could not be generalized to other populations. Exhibit 8, attached hereto, is a true and correct copy of Table 13 of Exhibit 13 from the Farquhar deposition of June 8, 2006. Defense counsel introduced and relied upon this document, and Dr. Jewell has accordingly responded to other data in the same document that rebut defendant's position as to generalizability of the APPROVe data, by showing that the data in the defense exhibits demonstrate statistically significant excess risk in the relevant population of osteoarthritis and rheumatoid arthritis patients. (Ex. 1, pp. 10-11.)

21.  On May 30, 2006, after plaintiffs' expert reports had been served according to the Scheduling Order, Merck issued a public statement of a correction of the APPROVe study, which stated that the published article had incorrectly described the test of proportional hazards upon which the authors relied as evidence that there was increased risk only after eighteen months of use. In fact, when the test was conducted in the manner specified in the Data Analysis Plan, the test of proportional hazards provided a non-significant result. On June 26, 2006, the New England Journal of Medicine ("NEJM") published a correction of the APPROVe publication, based upon the previous public statement of correction issued by Merck. A true and correct copy of the NEJM publication is attached as Exhibit 9. The evaluation of Vioxx' risk over time changed

547383.1

substantially on May 30, 2006, due to Merck's own actions and the peer-review correction that resulted. These developments involved technical biostatistical issues, which Dr. Kim addressed at length in his deposition (Ex. 6 at 124:13-130:6.) Accordingly, Dr. Jewell has included in his rebuttal report a section on "Time Interaction with Vioxx," which addresses these recent issues and Dr. Kim's testimony. (Ex. 1 at pp. 4-6.)

22. In his Report and deposition, Dr. Kim addressed biostatistical interpretation of relative risk and confidence intervals, and in particular the claims that (1) the confidence interval does not tell the probability of the true relative risk within that interval; and (2) that there is an "individual confidence interval (CI)" applicable to a person, which is wider than the CI for the population as a whole(Ex. 5 at pp. 5-6; Ex. 6 at 131:18-133:25, 135:13-136:1.) Accordingly, Dr. Jewell has responded to Dr. Kim's assertions, by explaining the greater probability of central values within the CI, and (2) the applicability of the "individual CI" only to continuous outcome variables, such as head circumference of a newborn, and not to binary outcome variables, such as a heart attack. (Ex. 1 at 13.)

23. At the deposition of Dr. Farquhar, and in its *Daubert* motion, defense counsel have asserted that the VICTOR trial data were incomplete until May 2006, and that Protocol 203 could not be analyzed until the VICTOR data were "final." (Ex. 6, pp. 71-86.) Accordingly, Dr. Jewell has provided relevant responses showing the basis for his reliance on the sufficiency of the data. (Ex. 1 at 11-12.)

### E. Defendant Urges Strict Adherence to the Scheduling Order, But It Has Not Strictly Adhered to the Court's Scheduling Order in Other Circumstances

24. Merck's Memorandum states that the Scheduling Order provides for expert disclosure by May 22, 2006, and that the designation of Dr. Jewell should be prohibited because it is untimely. (Def. Mem. at 1-2.) However, Merck counsel have not strictly adhered to the Court's Scheduling Order in other situations. For example, Merck counsel initially informed plaintiffs' counsel that the deposition of Dr. Kim would take place on May 31, 2006. Further, defendant planned to provide Dr. Kim's Report on May 26, 2006, leaving plaintiffs only 5 days to review the report and prepare for the deposition. Defense counsel Andrew Goldman then unilaterally notified plaintiffs' counsel that Dr. Kim's deposition would take place on June 12, 2006, a date that was beyond the June 8, 2006 deadline for expert depositions. Plaintiffs' counsel did not object to this scheduling change, which did not adhere to the deadlines set forth in the Order. (Ex. 3, pp. 1-4.)

25. Due to the schedules of counsel and the experts themselves, the parties have continued to take expert depositions well beyond the June 8, 2006 deadline in the Scheduling Order, and in fact expert depositions have yet to be completed. Dr. Jewell was offered to defendant for deposition dates of June 28 or 29, 2006, within a window when expert depositions are continuing. (Ex. 3, pp. 34-36.) Defendant made no response to the offer of Dr. Jewell for deposition, but instead filed a motion to exclude his testimony.

26. Based upon the foregoing, Plaintiffs respectfully submit that the developments since May 22, 2006 provide good cause for the addition of Nicholas Jewell, Ph.D., as an expert witness for plaintiffs.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 30, 2006 in San Francisco, California

*[signature]*
Donald C. Arbitblit

547383.1