REBUTTAL EXPERT WITNESS REPORT

For the past 25 years, I have been a Professor in the Division of Biostatistics, School of Public Health, and in the Department of Statistics, both at the University of California, Berkeley. Specifically, I have served as a Full Professor (1987 – present); Associate Professor (1983 – 1987); and Assistant Professor (1981 – 1983). Prior to that, I was an Assistant Professor in the Department of Statistics at Princeton University, Princeton, New Jersey (1979 – 1981) where I also served as Director of the Statistical Laboratories. At Berkeley, I also hold positions as the Director of the Center for Computational Biology, and Chair of the University of California Graduate Groups in (i) Biostatistics, and in (ii) Computational and Genomic Biology. From 1994 to 2000 I served as Vice Provost at the University of California, Berkeley, in the Office of the Chancellor. A true copy of my CV is attached as Exhibit A.

I have served as a member of the National Academy of Sciences Committee on National Statistics (1993 – 1996) and of the Committee on Theoretical and Applied Statistics (1994 – 1996). I received my Ph.D. in Mathematics from the University of Edinburgh, Scotland in June 1976, and was a post-doctoral Harkness Fellow at Stanford University and the University of California at Berkeley from 1976 to 1978 (funded by the Commonwealth Fund of New York). In 1978-79 I was a Research Fellow in the Medical Statistics Unit at the University of Edinburgh, Scotland. I also held a Visiting Professor appointment at Oxford University, England, in Spring 1990.

I am the author of a textbook, "Statistics for Epidemiology," (Chapman and Hall, New York 2003), as well as approximately 100 peer-reviewed articles in the field of biostatistics. I am a founding editor of the *International Journal of Biostatistics*, Senior Editor for the journal *Statistical Applications in Genetics and Molecular Biology*, and Associate Editor for the journal *Biometrika*. In 2005, I received the Snedecor Award, of the Committee of Presidents of the Statistical Societies, awarded to "an individual who was instrumental in the development of statistical theory in biometry." The award is associated with the best publication in biostatistics in the world in the previous 3 years. I also received a Distinguished Teaching Award from School of Public Health, University of California at Berkeley, in 2004.

I am or have been a member of several international statistical societies including the International Biometric Society, the Institute of Mathematical Statistics, and the American Statistical Association. I was made a Fellow of the American Statistical Association in 1991, and a Fellow of the Institute of Mathematical Statistics in 1996. I served as President of the Western North American Region of the International Biometric Society in 1991, and as Treasurer of the Institute of Mathematical Statistics from 1985-1988.

This report is submitted to respond to some issues raised by defense counsel in the deposition of Dr John Farquhar and in the Expert Witness Statement and Deposition of defense biostatistician Dr. Kim.

1

**EXHIBIT** *1*

**High Risk and Vioxx Interaction: APPROVe**

In the deposition of Dr. Farquhar, defense counsel challenged the definition of the "high risk" group that I analyzed, as described in Dr. Farquhar's Supplemental Report of May 2006. This is my response.

In my original analysis of the joint effects of Vioxx and baseline high risk status, I defined the high risk group to include anyone classified by Merck as having "increased cardiovascular risk" (defined as a prior history of symptomatic ASCVD, or possessing two or more cardiovascular risk factors) and/or diabetics, after discussion with Dr. Farquhar. Following Dr. Farquhar's deposition, I re-analyzed the data to only include the "increased cardiovascular risk" individuals, as defined by Merck, in the high risk group . This change resulted in a shift of only two of thirty confirmed thrombotic events from the "high risk" Vioxx treatment arm to the "low risk" Vioxx treatment arm. There was no change in the number of placebo events. As would be expected with such a relatively minor change in the overall data, the results are materially very similar to those from my previous analysis. For example, in the analysis of all 72 thrombotic events, the Relative Risk for an event associated with assignment of Vioxx was 1.28 with a 95% confidence interval of (0.65—2.51) in the low-risk group (as compared to 1.15 with the previous definition of baseline risk). On the other hand, the same Relative Risk in the high-risk group remained considerably higher, namely 2.70 with a 95% confidence interval of (1.31—5.57), with an associated p-value of 0.007 (as compared to 2.87 before, with a p-value of 0.004).

Thus it is still apparent that the deleterious effect of Vioxx is more than 2 times worse in the high risk group as compared to the low-risk group. These two Relative Risks can be compared quantitatively by using a test for interaction, to address the question as to whether risk status significantly modifies the effect of Vioxx on the risk for an adverse event. This test yields a p-value of 0.137 (as compared to 0.07 before). The fact that this is not "significant" by conventional or mindless application of a 0.05 significance level has to be viewed in the context that interaction tests are well-known to have reduced power (and raising the significance level is a direct way of addressing this) and the fact that a similar interactive effect was also observed in my analysis of VIGOR. Further, it should be stressed that the interaction test used here is examining the evidence for *multiplicative* interaction which sets a much higher 'bar' than looking for *additive* interaction. Most epidemiologists consider the existence of additive interaction to suggest biological synergism between two factors (here Vioxx exposure, and "increased cardiovascular risk" at baseline)—see Rothman and Greenland (1998). The presence of multiplicative interaction, as described above in detail, always determines that there is even more striking evidence of additive interaction in the data (given that the Relative Risks of both factors are greater than one). I thus consider the evidence of an elevated Relative Risk associated with Vioxx in the high-risk group to be notable, supporting biologic synergism of the effects of Vioxx with other pre-determined cardiovascular risk factors in the APPROVE trial.

Merck's challenge appears to be based on whether a particular high risk subgroup was prespecified. So it is important to note that the high-risk subgroup used in this new analysis was defined by Merck in their own Statistical DAP for Protocol 203 (on p.20). (In the DAP the symptomatic ASCVD individuals were referred to by the term "Aspirin

2

indicated".) Thus, in analyzing the question of synergistic effects of Vioxx and baseline risk status in this document, I have directly followed the DAP for Protocol 203, here applied to available data from APPROVe study. As stated by Merck Research Laboratories President Peter Kim, Merck itself followed the DAP for Protocol 203 in its analysis of APPROVe data. (Conference call transcript, May 30, 2006.) Finally, similar results to prior analyses are again found if other endpoints are examined (cardiac events only, or cardiac and cerebrovascular events).

Merck's challenge raises the question of whether our analysis should be regarded with skepticism as a "post hoc" analysis. However, in this regard it is important to note that the hypothesis of greater CV risk on Vioxx among patients at increased baseline risk was previously raised by Merck itself in the Bombardier (2000) article on the VIGOR trial. That article reported a statistically significant increased risk of MI among the high-risk "aspirin-indicated" subgroup, while stating that there was no significant difference in MI rates in the lower-risk, non-aspirin-indicated subgroup. The question of whether patients at increased baseline risk would be at greater risk of CV events due to Vioxx was subsequently discussed in the FDA Targum report (2/1/01). Thus, my purpose in examining high cardiovascular risk status, was to confirm—or not—the findings in the VIGOR trial regarding the joint effects of baseline risk status and exposure to Vioxx, and make relevant comparisons. In this sense, this particular subgroup analysis is confirmatory rather than exploratory. The above analysis shows that the results do not depend on the exact definition of "high risk" and my conclusions stand when using the "increased CV risk" group pre-defined by Merck. Thus, this examination clearly does not fall prey to the issues of misinterpretation arising from indiscriminate subgroup comparisons, most recently described by Lagakos (2006).

A separate issue, not addressed in Lagakos (2006), is the choice of an appropriate significance level for a single test of interaction with moderate sample sizes (although he uses an example with the "usual P=0.05" he does not discuss other alternatives). This is an important point because statisticians are well aware of the reduced power to detect an interaction effect in samples of moderate size (where the study is usually powered only to detect main effects). Indeed, in a similar vein, defense expert Dr. Kim stated that we (statisticians) have been "too successful" in the promulgation of the $p < 0.05$ significance level, in reference to a test of proportional hazards, a special case of a test for interaction (Kim deposition). A standard and simple way to address this in the case of a test for interaction is to use a larger nominal p-value, such as 0.2, a strategy immediately familiar to statisticians as a way to increase power, and a technique that I have previously recommended in my book (Jewell, 2004). This is particularly appropriate when the analysis is confirmatory—as it is here—rather than exploratory. I also note that Lagakos' conclusions regarding the interaction tests carried out by Bhatt at al (2006) would remain the same even if he had started with a nominal p-value of 0.2 rather than the 0.05 he considered (specifically if the Bhatt et al (2006) interaction tests been assessed with a significance level of $0.2 \div 20 = 0.01$, none would have reached statistical significance).

A higher significance level than 0.05 for examining interactions is widely used in other contexts, including drug safety analyses. In the context of Vioxx analyses, note that "Results that were statistically significant at level 0.1" are listed in a Safety Analysis (Table 4) of the Statistical Reviewer Briefing Document for the Advisory Committee (p.

3

11). In the same document, Table 3 (p. 9) lists "statistically significant subgroup by treatment interactions at level 0.10", and, for example, a claim that a "statistically significant (p-value = 0.073) treatment by baseline steroid use interaction was observed." In the Vioxx Review of NDA #21-042 transcript, Dr. Li of the FDA states that "there is (sic) a strong statistical significant study by treatment interactions. ... the P-value is (sic) .09 and .08."

Note that if a 0.2 significance level is applied to the subgroup analyses given in Table 19 of the APPROVe Trial Cardiovascular Safety Report, four of the interactions discovered can be considered "significant". All four of these subgroups refer to biologically plausible high risk categories (Symptomatic Atherosclerotic Cardiovascular Disease, History of Ischemic Heart Disease, Diabetes, and Two or More Cardiovascular Risk Factors). This further supports the conclusion that a significance level of 0.2 for interaction is a reasonable indicator of consistent elevated risk among prespecified higher risk patient groups, as compared to the circumstances of concern to Lagakos (2006), namely a chance occurrence in one of many subgroups indiscriminately defined potentially after examination of the data.

Finally, these findings regarding the potential synergistic effects of Vioxx with baseline cardiovascular risk factors are consistent with the recent meta-analyses performed by Kearney et al (2006). The authors there reported upon increased CV events among Cox 2 inhibitor users, noting the likelihood of "a smaller excess [of vascular events due to COX 2 inhibitors] among those at lower risk (such as women with rheumatoid arthritis) and a higher excess in those at above average risk (such as older patients with established atherosclerotic disease)." This expectation of higher excess in patients at above average background risk is precisely the finding that my APPROVe analysis confirmed.

**Time Interaction with Vioxx: Protocol 203**
In his Report and deposition, Dr. Kim stated that there was no effect of Vioxx during the first 18 months of use in the APPROVe study, and he further stated that the assumption of the Cox proportional hazards model was properly assessed using linear time rather than log(time) in an interaction term in the model. The issue of which statistical method to use in this model was raised by Merck's recent public statement that the published APPROVe article employed the linear method, although the DAP had specified log(time) and the authors erroneously reported that log(time) had been used. The following is my response to the recent disclosures and Dr. Kim's testimony about them.

As indicated, the Statistical Data Analysis Plan for Protocol 203 suggested that the issue of variation of the Relative Risk, or Relative Hazard, over time be addressed by including an interaction term with the treatment indicator multiplied by $\log(t)$ where $t$ represents follow-up time. An alternative approach would be to use an interaction term with the treatment indicator multiplied by $t$ itself (the linear time technique noted above).

In my analysis of Protocol 203, I employed a more flexible (and conservative) approach allowing the Relative Hazard to take different values over five time intervals which covered the three years of follow-up. A subsequent test of interaction examined whether there was evidence of variation of these Relative Risks or whether the estimates were

4

compatible with a single constant value over time. As previously reported the p-value for this test of time interaction was 0.13 with cardiac events as the endpoint.

I disagree with the use of log($t$) in the interaction term in a proportional hazards model since it essentially forces the Relative Risk to be 1 or very close to 1 for early follow-up periods (mathematically this follows from the fact that the logarithm of zero is negative infinity so that the constant of proportionality comparing the risks in the two groups is then the exponential of negative infinity or 1). A Relative Risk of 1, or close to 1, would contradict the findings for Protocol 203 where the data provides an estimate of RR = 3.36 over the first 2 months of follow-up, and 1.42 over the first three months. If a parametric model is to be chosen, then the use of $t$ itself in the interaction term is preferable as originally carried out by investigators in their analysis of APPROVe data. However, the analysis begins but does not end with this point.

For completeness, I tested for time-varying Relative Risks using both parametric approaches: with the log($t$) approach, and using cardiac endpoints, the p-value for interaction of Vioxx and time is 0.08. Alternatively, using $t$ itself—more reasonable as I have argued above—the p-value for the test for interaction is 0.035. Note that that the existence of nonproportional hazards does not refer to the magnitude of the Relative Risk in any particular time period, but only states that they are different. So, in the Protocol 203 context, a declaration of "nonproportional hazards", based on these tests, does not say that the Relative Risk is near to 1 in early follow-up periods, only that the data suggests that the Relative Risk apparently grows with increasing exposure to Vioxx (given the sign of the coefficient of the interaction term is positive). This is compatible with my previous Protocol 203 analysis using the more non-parametric analysis (noted above). To emphasize this point clearly, the proportional hazards model with an interaction term of Vioxx and $t$ itself, yields the following (necessarily time-varying) estimates of Relative Hazard:

At $t$ = 3 months, RH= 1.48 with a 95% CI of (0.79, 2.77)
At $t$ = 6 months, RH= 2.09 with a 95% CI of (1.04, 3.10)
At $t$ = 12 months, RH= 2.67 with a 95% CI of (1.53, 4.65)
At $t$ = 18 months, RH= 3.89 with a 95% CI of (1.83, 8.27)

It is important to note here that the prescriptive description of how the Relative Hazard varies smoothly over time allows more accurate estimation of Relative Hazards at earlier follow up times than my previous Protocol 203 analysis which did not make use of this assumed parametric structure. With the Merck approach, which Dr. Kim did not carry out, the Protocol 203 data then establishes significant effects of Vioxx as early as after 6 months of exposure.

The Statistical Analysis Plan for Protocol 203 in fact, envisaged doing both the parametric and non-parametric approaches that I have briefly described above. Quoting the report "If the nonproportionality is large and real, various approaches may be explored to investigate the ... nonproportionality: ... partition of the time axis ..., adding a time-dependent covariate, or using a different model." The partitioning of the time axis is what I used in my original analysis of Protocol 203; the use of a time-dependent covariate—here the treatment term times $t$—is described above.

5

In summary, both the parametric and less parametric approach to time-varying Relative Hazards lead to the same conclusion, namely, a sizeable Relative Hazard—greater than 1—in the early follow-up period, which tends to only increase as exposure to Vioxx lengthens.

**Overall Cumulative Incidence Curves for All Thrombotic Events: Protocol 203**
In his report, Dr. Kim does not mention my Protocol 203 analysis, although at his deposition he said that he had read it. Dr. Kim believed that my Report should have focused on the "primary endpoint" of confirmed thrombotic cardiovascular adverse effects. The following is my response.

In my previous analysis of Protocol 203, I focused on cardiac events as the endpoint, because it was a prespecified endpoint in the statistical DAP for Protocol 203. Also, the published APPROVe study reported separately upon the results for Cardiac Events, Cerebrovascular and Peripheral events, with the highest Relative Risk in the Cardiac Endpoint (2.80).

Nevertheless, to address Dr. Kim's concern, I have since repeated my overall Protocol 203 analysis using two other endpoints: all thrombotic events (the primary endpoint in the DAP), and an endpoint that combines cardiac and cerebrovascular events. In the set of figures attached (Figures 1—8), I provide the analogous graphs of cumulative incidence of all thrombotic events that I originally provided for cardiac events in my previous analysis of Protocol 203 data. The figures reflect increasing cumulative amounts of follow-up data, starting from the first 30 days (Figure 1) to a full three years of follow-up (Figure 8). With the entire follow-up information, the estimate of the Relative Risk, associated with assignment to Vioxx, is 1.77 with a 95% confidence interval of (1.22, 2.56) with a p-value of 0.003.

The cumulative incidence plots (Figures 1—8) are very similar to those produced for cardiac events in my original Protocol 203 analyses, as they should be since the two endpoints (cardiac events only and all thrombotic events) are highly correlated. In fact, one is a major subset of the other so that we would expect similar results. For the same reason, the analysis of multiple endpoints does not suffer from the same multiplicity issue that we previously discussed for subgroups and as noted by Lagakos (2006). Finally, there is consistent evidence that the Relative Risk associated with Vioxx is elevated in the first 18 months of exposure, and then elevated yet higher after 18 months of follow-up, as seen in my original Protocol 203 analysis of cardiac events. As such, we would anticipate a significant p-value in a test for interaction of the Vioxx effects with time itself and that a significant difference between Vioxx and placebo patients in the incidence of thrombotic events would be detected early in the follow-up period if a proportional hazards model—with this time interaction term included—is used (as described above for cardiac events).

**Generalizability**

Dr. Kim's central hypothesis appears to be that the results of APPROVe cannot be generalized to other populations. However, the manner in which Dr. Kim appears to have reached this opinion is not reliable. Below is my response to Dr. Kim's claim.

Generalization Was Anticipated by the Protocol 203 DAP

Protocol 203 was designed to allow generalization of its results. The three studies comprising Protocol 203 were based on different patient eligibility criteria—adenomatous polyps, prostate cancer and colorectal cancer. The DAP noted that the patients would have a spectrum of CV risk, and stated that the results would allow generalization to other patient populations including osteoarthritis and rheumatoid arthritis patients. At his deposition, Dr. Kim claimed support for the contrary view (that the results of APPROVe cannot be generalized to other populations) from an overview paper by Kearney et al (2006). In particular, Dr. Kim relied upon Figure 2 of the Kearney article which restricts their meta-analysis to trials with scheduled duration of at least one year, effectively limiting the data for Vioxx to the long-term APPROVe and Alzheimers studies (Kim deposition, p.253). Interpreting differences in estimated Relative Risks as due to the definition of the populations, e.g. one group had polyps and the others didn't, is indefensible without a plausible scientific explanation as to why a polyp patient should anticipate a more serious deleterious effect from Vioxx. Notably, Dr. Kim admitted that he could not identify a single factor that would make a polyp patient more likely than an osteoarthritic to have a myocardial infarction while on Vioxx (Kim Deposition).

Inadequate Power of Alzheimer's Studies

At his deposition, Dr. Kim agreed with the general principle that, when a study with low power fails to show a significant effect, the results are more fairly described as inconclusive than negative; the proof is weak because the power is low. (Kim deposition, p. 206).

Dr. Kim's opinion that the APPROVe results cannot be generalized is largely based on the belief that the Vioxx Alzheimers trials, in particular 078 Thal et al, 2005), were adequately powered to detect an increase in risk due to Vioxx, and that since none was detected the results of APPROVe and Alzheimers are inconsistent and contradictory. Regarding the power of the 078 study to detect Vioxx cardiovascular effects. Dr. Kim states without attribution that "the 078 study had adequate (greater than 80%) power to detect a relative risk of 2 or greater" (Kim report, p. 23). The only information given in his report was the observed number of all thrombotic events in each group and the average follow-up which he quotes as being "approximately 4 years". When questioned about this power calculation in his deposition, Dr. Kim did not provide further detail regarding the validity of this statement, other than indicating that it was post-hoc (i.e. based on assumed rates and sample sizes as actually observed in the 078 study), and that he "did a calculation on the fly". He indicated that he neither accounted for compliance, nor for patient drop-out; he stated that he "used the patient enrollment duration and the follow-up duration", presumably the latter being assumed to be approximately 4 years as quoted above. It is well-known that compliance, loss to follow-up and duration of study all have serious impact on power calculations so that there seems to be little if any value to Dr. Kim's assertion regarding the power of the 078 study without further analysis of his assumptions.

7

To test Dr. Kim's assertion of adequate power in 078, I carried out power calculations that took into account the effects of poor compliance, loss to follow-up, and shorter study duration, based on information provided in published literature and FDA reviews. Results, sources and methods for this power calculation are described below.

In Thal et al (2005) it is stated that patients were accrued over two years from April 1998 to March 2000. It is stated that the median duration on medication was 94 weeks (about 21 months) in the Vioxx group and a little longer in the placebo group. It is inexplicable to me why Dr. Kim used "approximately four years" as the follow-up duration since Thal et al (2005) clearly state that the study was terminated 11 months earlier than the four year scheduled endpoint, particularly since he did not allow for drop-outs. Next, 36 thrombotic events were observed in 1550.97 patient years of follow-up in the placebo group, yielding a baseline incidence rate of 2.32 events per 100 patient years (12/18/04 Interim Review of thrombotic events in Alzheimer's studies 078 and 091). It is further indicated that 45% of the patients discontinued the study prematurely. No detailed indication of the timing of when these individuals terminated is given. The impact of drop-outs on power is accommodated by using the reported durations.

Crucially, Thal et al (2005) note that there is only 61% compliance to treatment in the Vioxx group, meaning that only 61% of the Vioxx patients took at least 80% of their assigned tablets, determined by counting pills (the authors' definition of compliance). It is known that "pill counts overestimate compliance" (*Encyclopedia of Biostatistics*, p. 836; Rudd et al, 1988), so that the actual compliance rate is likely lower. Dr. Kim indicates that he couldn't do any calculation of the effects of compliance since "we don't have data indicating what … [loss of compliance] …does to the relative risk". Yet Dr. Kim agreed with the generally accepted statement that the main impact of noncompliance is to reduce a treatment effect. This means that the risk in the Vioxx group will be lowered overall because a substantial fraction, 39%, of these individuals took less than the prescribed amount of medication (an insufficient level of compliance for this study to provide a valid estimate of a causal treatment effect). If the risk in Vioxx non-compliers is the same as in the placebo group, Dr. Kim's targeted intent-to-treat Relative Risk of 2.0 would be reduced to 1.61, given the observed low level of compliance; (throughout I assume that non-compliance in the placebo group does not affect their risk, since placebo is not expected to have any effect whether it is taken or not). Since the magnitude of the anticipated Relative Risk is thus lowered, the necessary design sample size (and thus the number of events) needed to achieve appropriate power must be substantially increased. The reduced power due to noncompliance with treatment is widely known to those planning and interpreting the results of randomized clinical trials. The 1998 *Encyclopedia of Biostatistics* (of which I was an Editor) entry on "Compliance Assessment in Clinical Trials" indicates that interpretation of insignificant results from an intention-to-treat analysis of a randomized clinical trial must necessarily be inconclusive in the presence of poor compliance since the latter causes treatment differences to be underestimated thereby reducing power to detect a treatment effect.

I next did a power calculation, with the following inputs: (i) the background (placebo) incidence rate calculated above, (ii) accrual over 24 months with subsequent follow-up for (a median of) 21 months, (iii) that 1460 patients were randomly (and equally)

assigned to either Vioxx or placebo, and (iv) the noted reduction in the intent-to-treat relative risk due to non-compliance. The software used is publicly available from the Department of Biostatistics at Harvard (Massachusetts General) at the following website http://hedwig.mgh.harvard.edu/biostatistics/software.php.

With all of these stated inputs based on reported data, the intent-to-treat power declines to 0.71. Now, considering drop-outs, Thal et al (2005) state that 368 of participants (approximately equally split between Vioxx and placebo) withdrew consent and so discontinued the study. Thal et al (2005) does not provide information as to the times when such dropouts occurred, but some reasonable assumptions can be made. If these individuals dropped out early after recruitment, they would contribute few patient months of follow-up to either treatment group, lowering the power even further to 0.58. Even if omitting such individuals increases the median follow-up duration of remaining participants to say 25 months, the power remains as low as 0.63. If we however consider a targeted Relative Risk of 1.5 instead of 2.0, the power is now 0.27 even if all drop-outs contribute some information. These power calculations illustrate that non-compliance and drop-out drastically reduces the power of the 078 study making it considerably less than 0.80. It is my view, that the low compliance rate in study 078 makes reliable estimation of the *causal* effects of Vioxx (as against the intent-to-treat effects) very uncertain; without question, the causal effects in a high-noncompliance situation are greater than those reported by an intent-to-treat analysis, since the latter deems subjects to have been drug-exposed based on their original randomization status, even though they did not meet the protocols for acceptable use of study medication.

These remarks regarding the power of the 078 study are supported by an FDA reviewer's comments concerning the Vioxx Alzheimers trials as a whole. For example, in the Arthritis Advisory Committee transcript, Dr. Villalba of the FDA asserts that the Alzheimers studies "were not powered to show any difference with placebo" in reference to the analysis of cardiovascular events.

Consistency of Increased Risk after 18 Months
While Dr. Kim maintains that the APPROVe and Alzheimers studies are inconsistent, in one relevant respect they are strikingly consistent. As shown above (in the section on time interaction with Vioxx effects), the Protocol 203 data analysis shows that the deleterious effects of Vioxx are greater with longer-term exposure, for example, at least 18 months of exposure than with shorter exposure. This appears to also be true in the combined data for studies 078 and 091 submitted by Merck to the FDA. In the 12/18/04 FDA Interim Review of thrombotic events in Alzheimer's studies 078 and 091, Table 6 indicates that there were 26 thrombotic events after 18 months of exposure (in 538 patient years of follow-up) in the Vioxx group, and 16 thrombotic events (in 665 patient years) in the analogous time period for the placebo group. Comparison of these numbers yields a Relative Risk of 2.01 with an exact 95% confidence interval of (1.03, 4.01), with a p-value of 0.027. Thus, just as in APPROVe specifically, and Protocol 203 more generally, studies 078 and 091 show a consistent and significant elevation of risk of thrombotic events in patients with 18 months or more exposure to Vioxx.

In addition, Dr. Kim's Report does not address the issue of unadjudicated CV thrombotic events that have not been included in the statements regarding the Alzheimers studies

078, 091 and 126. According to the Medical Officer Memo to file (3/12/02) 22 patients had potential cardiovascular thrombotic events with insufficient information to adjudicate. Of these 22 patients, 18 were on Vioxx and only 4 on placebo. Given the small number of observed events, inclusion of these events in the calculations would increase the Relative Risk associated with Vioxx, bringing the estimate substantially closer to what has been observed in other trials.

<u>The Kearney Article Does Not Support Kim's Claim of Inconsistency between Polyp Patients and other Populations</u>
In Dr. Kim's deposition, he states that the Kearney et al (2006) meta-analysis supports his assertion about inconsistency between polyp data, (as illustrated in APPROVe) and Alzheimer's disease data. However, these two groups of trials do not cover the universe of trial populations assessed by Kearney et al.. Using the data from Kearney's article, we can see that in trials of Vioxx on other patient populations other than the Alzheimer's and polyp patients described in their Figure 2, there is an estimated Relative Risk of 1.45 with a 95% confidence interval of (0.58, 4.07), almost identical to the overall estimated Relative Risk of 1.49 reported for all trials they considered. Thus, these data are consistent with the conclusion that the non-polyp, non-Alzheimer's populations had increased risk of vascular events of the same magnitude as the population as a whole.

<u>Merck's Trials against Placebo Show Increased Risk for OA and RA Populations</u>
At the deposition of Dr. Farquhar, defense counsel introduced a table of Merck clinical trial data for thrombotic events in Vioxx patients versus placebo, for the apparent purpose of showing no difference in the rate of thrombotic events in the Alzheimer's trials (Table 13 of the Information Amendment – Clinical (IND 46,894: Vioxx (rofecoxib), provided to the FDA by Merck on March 22, 2004). For the reasons stated above, the Alzheimer's studies presented in Table 13 were underpowered to detect a difference. At the same time, Table 13 presents summary information on trials containing rheumatoid arthritis (RA) and osteoarthritis (OA) patients. Combining the OA and RA trials in a similar fashion to Kearney et al (2006) yields an estimated Relative Risk of 3.14 with a 95% confidence interval of (1.19, 10.46) with associated p-value of 0.01 (TCVSAE endpoint). In fact, the analysis of solely the OA trials in Table 13 yields a Relative Risk of 3.03 with a 95% confidence interval of (1.02, 12.13), and p-value of 0.03 (using the grouped data provided). Thus, this clearly suggests that the elevated risk associated with Vioxx is not restricted to "polyp" patients, but appears, for example, in combined studies of OA patients.

As to the OA trials, I note that Kearney included the 010 trial, which does not appear in Merck's Table 13. Merck's documentations of Protocol 010 (MRK-OS420045791-92) shows that there were two events (both TIAs) under Vioxx, and approximately 15.5 and 7.3 patient-years of exposure to Vioxx and placebo, respectively. Thus the Relative Risk for the primary endpoint of TCVSAE among the Merck OA trial populations is now 3.30 [23/765.0 vs. 4/439.6], with 95% confidence interval (1.13, 13.14), and p-value 0.016. It is noteworthy that the mean duration of exposure to Vioxx or placebo in the OA trials was only 76 days. The appearance of a statistically significant tripling of risk of thrombotic events in the OA trials in such a short duration contradicts the hypothesis that there is no effect for the first 18 months of use of Vioxx. (note that the Relative Risk for

the combined OA and RA trials, including 010, yields a Relative Risk of 3.27 with a 95% confidence interval of (1.25, 10.86) and p-value 0.007.)

To determine further consistency of the OA trials data with Protocol 203 results I prepared a Kaplan-Meier cumulative incidence plot of the risk of thrombotic events for Vioxx versus placebo participants, as shown in Figure 9 below. These calculations were based upon the data in Table 13, supplemented by the 010 data (both referenced above), as well as exact event day information from the "Listing of All CV Events in Rofecoxib" (MRK-I8940080121-133, p. 56-68). The log-rank test comparing these cumulative incidence curves yields a p-value of 0.023. The estimated Relative Risk is 5.42 with a 95% confidence interval of (1.26, 23.29). Thus, the OA trials again show a significant separation of the risk of a thrombotic event for Vioxx patients above that for the placebo group, even within the first 60 days of exposure. The consistency of the results displayed in Figures 2 (attached) and 9 (below) demonstrates that the Protocol 203 DAP was correct in its assertion that Protocol 203 results allow generalization to other populations at risk, including osteoarthritis patients.

**FIGURE 9**
OA Trials All Thrombotic Events: 0—60 days of Follow-up



### Data sets used

In constructing a pooled data set for Protocol 203 from SAS data files provided by Merck I checked to confirm counts of particular events by treatment assignment to compare with published and unpublished reports of these counts. It was my understanding that these data files for APPROVe and ViP were considered complete when provided, and that there was delay in finalizing the VICTOR data set. In the VICTOR information I

11

received in November 2005, there was information on exposure periods, treatment assignment, and adverse event outcomes, in sufficient detail to combine with the other trials. Specifically, in addition to data files on a hard drive, I reviewed copies of Tables 1 and 3 from a MRL memo stamped "Final, July 28, 2005" that showed 14 (Vioxx) versus 4 (placebo) confirmed thrombotic events. These totals exactly matched the counts in the VICTOR data records I received. In addition, the event counts correspond exactly with what is described in Dr. Kim's Expert Witness report of June 1, 2006. In May 2006, I received a CD with files containing apparent update data on VICTOR. I did not find any additional information on adverse events on these files, nor data on identification numbers etc. I therefore did not make any changes to the pooled data set based on this update. In Dr. Kim's deposition, there is reference to one possible additional placebo event for VICTOR (subject #10385). If confirmed, an addition of a single event would make very little difference to my reported analyses of Protocol 203.

In a Merck memorandum regarding the testimony of Dr. Farquhar, the defense counsel argues that analysis of Protocol 203 data is premature, claiming that "The Merck Data Analysis Plan for Protocol 203 contemplated that a combined analysis of cardiac events in all three studies would be conducted only when each study had run its full pre-specified course". This statement is incorrect. The ESMB for Protocol 203 was empowered and directed to perform interim analyses during the course of Protocol 203, and to terminate the trials due to "inferiority" applied to the primary endpoint, confirmed thrombotic cardiovascular events. Here, "inferiority" refers to the occurrence of a sufficiently greater number of adverse thrombotic events in patients assigned to Vioxx as compared to placebo. Specifically, according to the DAP, the "Early Decision for Inferiority" stopping rule required "the lower limit of a CI for HR> 1.0 ... and observed HR >1.30". (Here "CI" refers to a confidence interval and "HR" to the term Hazard Ratio, often referred to as Relative Risk.) My analysis of Protocol 203, based on data accumulated by mid-October 2004, indicates that the combined study would have been terminated early on the basis of this stopping rule, even if it had not been stopped because of the termination of the APPROVe study: the event data accumulated through mid-October 2004 data provides an estimated Hazard Ratio of 1.77 (far greater than 1.30), with the lower limit of the appropriate CI as 1.22, again far higher than 1.0. If all three trials had not been terminated due to the finding of excess toxicity in APPROVe by itself, it would have been the obligation of the ESMB to review the same pooled data that I analyzed, which would have required early termination of Protocol 203 based on the inferiority stopping rule.

In addition, the defense counsel statement contradicts what is stated in the Merck Data Analysis Plan. This plan specifically indicates that the ESMB for Protocol 203 would conduct "numerous (approximately twice yearly) interim analyses to monitor safety, which afford potential for consideration of early decision to report scientific conclusions, i.e. publish results" (p. 9). Even more directly, the DAP stated unequivocally that "The combined analysis for formal primary assessment of the primary hypothesis will be performed when the total number of confirmed thrombotic cardiovascular events ... reaches 611 in the three trials combined. It is anticipated that the 611 confirmed thrombotic events will be reached in early 2006, which is after completion of APPROVe and prior to study completion of VICTOR and ViP." Thus, Merck's own plan anticipated publication of results from Protocol 203 in early 2006. Of more importance, the plan

12

anticipated analysis of Protocol 203 data *prior to completion of VICTOR and ViP.* In all regards, these statements indicate that the analysis of Protocol 203 data is overdue rather than premature.

**Effect of Naproxen on Cardiovascular Outcomes**

In Dr. Kim's Expert Witness report, he relies on an observational study to establish the protective effect of Naproxen on the rate of thrombotic events, with the assumption that this explains the findings (the deleterious effects of Vioxx) of VIGOR. However, in Kearney et al. (2006), their meta-analysis of NSAID randomized clinical trials show a Relative Risk of 0.92 for a comparison of Naproxen to placebo with a 95% confidence interval of (0.67, 1.26). This fails to exhibit a protective effect for Naproxen.

**Individual Confidence Interval**

Dr. Kim's Expert Witness report refers to a confidence interval for the Relative Risk for an *individual*. Defense counsel brought up this subject at the deposition of Dr. Farquhar with reference to the book by Pagano & Gauvreau (2000). This concept is completely inappropriate in a discussion of an increased risk of a cardiovascular event associated with Vioxx. In more detail, Pagano & Gauvreau (2000) are referring to the prediction of a *continuous* outcome for a single individual where it is well known that the confidence interval for a predicted single value is wider than the confidence interval for the population mean. These ideas are not applicable to prediction of a binary outcome such as experiencing a cardiac event or not in a specified window of time. In fact, a binary outcome is either "Yes" or "No" and any prediction would either be "Yes" or "No" depending on the estimated underlying risk of the event for an individual. In most studies such as this where the outcomes are rare (certainly less than 50%) any prediction would have to be "No" whether the individual was exposed to Vioxx or placebo. And there is no such concept then available for the Relative Risk for an individual based on these predicted outcomes. Such a discussion is all beside the point anyway: what we would like to know for a random individual from an appropriate population is: what is the ratio of their estimated risk (of the endpoint of interest) under Vioxx to their estimated risk under placebo. This is, of course, nothing more than the Relative Risk for the population and there is no "widening" of the confidence interval for an estimate of this. It is just this number that been reported by investigators studying Vioxx in their description of risk comparisons.

The generally accepted concept associated with ascertaining how much an individual's risk increases due to exposure to Vioxx is provided by the Attributable Risk. The Attributable Risk quantifies the fraction of cardiovascular outcomes that are *attributable* to exposure to Vioxx in an exposed population. Mathematically the Attributable Risk (AR), among exposed individuals, is related to the cumulative population Relative Risk as follows:

$$AR = \frac{RR-1}{RR}.$$

A confidence interval for *AR* therefore follows directly from a confidence interval for *RR*.



**Confidence Intervals Interpretation**

In his Expert Witness Report, Dr. Kim makes the erroneous statement that a "95% confidence interval of 1.19-3.11 (as for all thrombotic events in APPROVe) tells us only that the true relative risk could be as small as 1.19 or as large as 3.11 and does not enable us to assign a probability to either of these two probabilities." (Kim Expert Witness Report, p.6). This error is picked up by defense counsel's questioning of Dr. Farquhar where he asks a question regarding confidence intervals that contains the same misinterpretation. A correct understanding of a 95% confidence interval for the Relative Risk is as follows: with probability 0.95, the reported confidence interval contains the true unknown Relative Risk. The true value of the Relative Risk is much more likely to fall near the center of the confidence interval than near either endpoint. In fact, the likelihood of the data is more than six times greater at the point estimate of the Relative Risk as compared to the likelihood of the data at either endpoint. In the example used by Dr. Kim, the point estimate of the Relative Risk, 1.92, is *much* more plausible than the estimate 1.2, for example, near the edge of the confidence interval. Similarly, in my analysis of Protocol 203 data, where I estimated the Relative Risk of 2.37 for cardiac events, associated with exposure to Vioxx, with a 95% confidence interval of (1.43, 3.91), the value 2.4 is again *much* more plausible as an estimate of the true Relative Risk than the estimate 1.5, for example.

**Book reviews**

My book, *Statistics for Epidemiology*, was published in 2004 before I had any contact with data relating to Vioxx. It has been extremely successful and is used as text in many graduate programs across the world. Reviews were extremely positive. The longest of these (Bellocco, 2005) states that "the book reaches an almost perfect balance between including very advanced concepts, and keeping the discussion at a (sic) acceptable level for intermediate graduate students. I consider it to set a new standard for texts on statistics in epidemiology, especially in its treatment of causation and bias". Professor Sander Greenland, of the University of California, Los Angeles, an international leader in the application of statistics to problems in the health sciences, and a very tough critic, states on the web that this "book is excellent; a real breakthrough in texts on statistics in epidemiology, especially in its attention to causation and bias." My book has now received several citations in medical and epidemiological peer-reviewed journals.

My hourly rate for consulting is $310. I have testified once in the last four years at a deposition in the blood product litigation.

Nicholas P. Jewell, Ph.D.

June 21, 2006
Date

**FIGURE 1**

Protocol 203 All Thrombotic Events: 0—30 days of Follow-up



## FIGURE 2

Protocol 203 All Thrombotic Events: 0—60 days of Follow-up



**FIGURE 3**

Protocol 203 All Thrombotic Events: 0—120 days of Follow-up



**FIGURE 4**

Protocol 203 All Thrombotic Events: 0—6 months of Follow-up



**FIGURE 5**



Protocol 203 All Thrombotic Events: 0—1 year of Follow-up

## FIGURE 6

Protocol 203 All Thrombotic Events: 0—18 months of Follow-up



## FIGURE 7

Protocol 203 All Thrombotic Events: 0—2 years of Follow-up



**FIGURE 8**

Protocol 203 All Thrombotic Events: 0—3 years of Follow-up



Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  VIOXX                    :    MDL Docket No. 1657
                                 :
Liability litigation             :    Section L
                                 :
This document relates to         :    JUDGE FALLON
                                 :
    ALL ACTIONS                  :    Magistrate Knowles
                                 :

Siena Hotel
1505 East Franklin Street
Chapel Hill, NC  27514
Friday, January 20, 2006
9:13 a.m. - 3:21 p.m.

VIDEOTAPED DEPOSITION

OF

ROBERT H. FLETCHER, M.D.

Reported by:  April Reid, RPR, CLR
              Court Reporter
              Notary Public

Page 210

1  requirement to have that on record with the FDA.
2      Q.  Now, you're -- you would agree, sir, that
3  there is nothing in the APPROVe trial which
4  establishes -- withdrawn.
5      I want to turn to Dr. Jewell's analysis
6  that is attached to your report, if I could.
7      MR. ISMAIL:  Exhibit 8, please.
8      THE COURT REPORTER:  Nine.
9      MR. ISMAIL:  I'm sorry?
10     THE COURT REPORTER:  It is Exhibit 9.
11     MR. ISMAIL:  That's exactly what I
12  meant.
13     (THEREUPON, Exhibit 9 was marked for
14  identification).
15  BY MR. ISMAIL:
16     Q.  Do you recognize Exhibit 9, sir?
17     A.  Yes.
18     Q.  Have you ever met Dr. Jewell?
19     A.  No.
20     Q.  Have you ever spoken to him?
21     A.  No.
22     Q.  Other than reviewing his CV, which I saw
23  in your file, do you have any idea who he is?
24     A.  No.
25     Q.  Do you know what conflicts of interest

Page 211

1  he's working under?
2      A.  No.
3      Q.  Do you know whether he's ever published
4  any analysis of Vioxx in any peer review
5  publication?
6      A.  No.
7      Q.  I take it, you're not familiar with Dr.
8  Jewell's work other than what's shown on Exhibit 9?
9      A.  Well, other than is a big "other than"
10  because the way we understand what a person's
11  career and competencies and so on are is by reading
12  their CV commonly, and it is probably a better
13  reflection of what they know and can do than in
14  talking with them. So looking at the CV he looks
15  like a competent biostatistician.
16     Q.  But not someone you ever heard of before
17  you were provided Exhibit 9, correct?
18     A.  No.
19     Q.  I am correct?
20     A.  You are correct.
21     Q.  And do you know when it was you were
22  provided with Exhibit 9?
23     A.  I do not have an exact record of that. I
24  know it came in not very long ago. My guess would
25  be a couple weeks.

Page 212

1      MR. ISMAIL:  Hold on a sec. I lost my
2  mic. I don't want to have to do this again.
3      MR. BLACK:  Tarek, that's usually my
4  trick, not yours.
5      MR. ISMAIL:  You will have to teach me
6  what the trick part of that is.
7      MR. BLACK:  You learned it all too well.
8  You just did it.
9      MR. ISMAIL:  Where did it go?
10     MR. ISMAIL:  Let's go off the record
11  while I thrash around here.
12     THE VIDEOGRAPHER:  We're going off the
13  record at 2:29 p.m.
14     (Recess in Proceedings).
15     THE VIDEOGRAPHER:  We're going back on
16  the record at 2:29 p.m.
17  BY MR. ISMAIL:
18     Q.  We were talking about when it was you
19  first saw the Jewell analysis, sir.
20     And I'm going to show you your schedule of
21  hours, ask you to look to line 24 and see if you
22  can identify that as when you first reviewed the
23  Jewell analysis?
24     A.  Yes.
25     Q.  That's -- that -- and that's dated January

Page 213

1  11th. So -- and you spent one hour looking at it?
2      A.  That's what I estimated there, yes.
3      Q.  And it was two days before you submitted
4  your report, correct?
5      A.  That's right.
6      Q.  So let's look at -- have you seen any
7  other analysis of the cancer prevention trials of
8  VICTOR and ViP than Exhibit 9?
9      A.  Combined with APPROVe, no.
10     Q.  No, just separately.
11     A.  Just separately, no.
12     Q.  So either separate or combined?
13     A.  No.
14     Q.  Okay. Now, do you know what outcome Dr.
15  Jewell used?
16     A.  Dr. Jewell was using the term cardiac
17  events, but since I don't have the methods part of
18  his work I don't know precisely how he defined
19  cardiac events.
20     Q.  So you have no idea whether the end point
21  used by Dr. Jewell is a reasonable or proper one
22  for his analysis, correct?
23     A.  I don't know that -- those details of his
24  methods, no.
25     Q.  And do you know whether he was using

54 (Pages 210 to 213)

ae5c8835-7238-41bd-a838-318c269a3c40

Page 214

1  adjudicated or investigator-reported data?
2     A.  I do not.
3     Q.  Do you know where it is he got his data?
4     A.  I was told he got it from Merck.
5     Q.  Who told you that?
6     A.  Mr. Black.
7     Q.  So Mr. Black handed you this analysis from
8  Dr. Jewell and said Dr. Jewell got his data from
9  Merck?
10       Do I have it right?
11    A.  Well, something like that.  He sent it by
12  E-mail.
13    Q.  Did he explain the analysis in his E-mail?
14    A.  About what the outcome of events were and
15  that sort of thing, what the analysis was?
16    Q.  Anything.
17    A.  Well, what we discussed was the need for a
18  Kaplain-Meier time to event analysis that pulled
19  the three trials, and that's what I was led to
20  believe this is.
21    Q.  When did you discuss that with Mr. Black?
22    A.  Well, actually, I, perhaps a
23  month-and-a-half ago, talked about how valuable
24  that would be if you really wanted to try to -- and
25  understand whether the risk began early or not,

Page 215

1  that the pool analysis according to that protocol
2  would be enormously valuable, best available
3  information bearing on that question.
4        And it took a long time to get the
5  analysis done, and I was pleased to have a look at
6  it.
7     Q.  So you asked Mr. Black for a pooled
8  analysis of APPROVe, VICTOR and ViP, and you did
9  that about a month-and-a-half ago?
10    A.  Well, more precisely, I expressed early on
11  how valuable that would be in trying to understand
12  the figure 2.  And he told me about the Protocol
13  203, and we discussed how that might be analyzed;
14  and only just a few weeks ago did I see the results
15  of the analysis.
16    Q.  Right.
17       So Exhibit 9 is something essentially that
18  you asked for?
19    A.  I asked for this kind of analysis, yes.
20    Q.  And do you know whether an analysis of
21  APPROVe, VICTOR and ViP existed at the time you
22  made your request to Mr. Black?
23    A.  I don't -- I think I expressed the real
24  scientific need here to have more clinical trial
25  data to pool with APPROVe, to try and get more

Page 216

1  statistical precision on early events, and then
2  learned about the protocol, and then later saw the
3  protocol, and then substantially later saw this
4  analysis prepared by Professor Jewell.
5     Q.  Is it your understanding that Mr. Black
6  went out and retained Dr. Jewell to do the analysis
7  in Exhibit 9 upon your request?
8     A.  Oh.  I don't know whether he did it upon
9  my request.  Certainly to have a complete record of
10  what all was going on at Merck surrounding these
11  publications, the existence of that protocol makes
12  it something that people would like to know the
13  answer to.
14       And I had been told that while the
15  protocol was there, even though much time had
16  passed, the result -- the analysis had not been
17  done.
18    Q.  And you don't know what -- withdrawn.
19       Given your comments about the VIGOR
20  publication, you would certainly agree that Dr.
21  Jewell should have used the most up-to-dated --
22  up-to-date cardiovascular data from APPROVe, VICTOR
23  and ViP, correct?
24    A.  That would have been best, yes.
25    Q.  And you have no idea whether he did that,

Page 217

1  do you?
2     A.  I don't have any of the methods section of
3  this report.
4     Q.  And so you have no idea whether he used
5  the best, most up-to-date data, do you?
6     A.  I don't know what data he used.
7       MR. ISMAIL:  We need to switch the
8  tapes.
9       THE VIDEOGRAPHER:  This is end of tape
10  two of the video deposition of Robert
11  Fletcher, M.D.  We're going off the record
12  at 2:35 p.m.
13       (Recess in Proceedings).
14       THE VIDEOGRAPHER:  This is tape three of
15  Robert Fletcher, M.D.  we're going back on
16  the record at 2:36 p.m.
17  BY MR. ISMAIL:
18    Q.  Doctor, we were talking about Exhibit 9,
19  the analysis of Professor Jewell of APPROVe, VICTOR
20  and ViP, correct?
21    A.  Yes.
22    Q.  Do you know whether Professor Jewell ran
23  other analyses of these trials that are not
24  provided in Exhibit 9?
25    A.  No.  I have -- again, no -- no information

55 (Pages 214 to 217)

Page 218

1  on the methods he used.
2      Q.  Just like what you say with APPROVe, you
3  needed to see the investigator-reported data to
4  inform your analysis of the cardiovascular safety,
5  it would be important to know whether Professor
6  Jewell ran a bunch of other analyses that are not
7  provided in Exhibit 9, right?
8      A.  Yes.  I mean, I'd love to see all of his
9  analysis, plans and all the analysis he did which
10  these would probably be the most interesting.
11      Q.  Well -- but as you sit here today, you've
12  never seen them, right?
13      A.  No.
14      Q.  And, obviously, you cannot independently
15  confirm the accuracy of any of Dr. Jewell's
16  numbers, correct?
17      A.  No, I cannot.
18      Q.  And you haven't done anything to attempt
19  to confirm the analyses in Exhibit 9, correct?
20      A.  By contacting Dr. Jewell, for example?
21      Q.  Or looking at whatever data has been
22  provided to you by plaintiff's counsel.
23      A.  Well, I have no data on VICTOR and ViP,
24  so, no, I haven't been able to do any of that.
25      Q.  So you don't know, through your own work,

Page 219

1  whether any of the data presented by Dr. Jewell in
2  Exhibit 9 in fact are accurate, correct?
3      A.  That's correct.
4      Q.  Now, looking at the first page, there are
5  time periods broken down.  For example, 0 to 1
6  month, 0 to 2 months, et cetera.  Correct?
7      A.  Yes.
8      Q.  And do you understand those to be all the
9  events that occurred on Vioxx and placebo -- all
10  cardiac events that occurred on Vioxx and placebo
11  in that time frame?
12          Correct?
13      A.  Yes.
14      Q.  So all of -- so it is sort of a cumulative
15  reporting of events here, right?
16      A.  Yes.
17      Q.  So --
18      A.  Well, using the Kaplain-Meier approach.
19      Q.  Right.
20          So 0 to 1 month is -- reflects the
21  relative risk between Vioxx and placebo for cardiac
22  events, whatever those are, and that's 2.68, right?
23      A.  The -- that meaning the relative risk
24  being 2.68?
25      Q.  Right.

Page 220

1      A.  Yes.
2      Q.  And then 0 to 2 months includes all the
3  data that happened in the first month and then
4  additional data that happened in the second month?
5      A.  That's correct.
6      Q.  And the months here are not the months of
7  the study, but how long the patient -- time to
8  event for the patient, right?
9      A.  The period of time the patients that go
10  into that figure were observed, yes.
11      Q.  Okay.  So -- and you say the data in
12  Exhibit 9 is the best available data on the
13  cardiovascular safety of Vioxx, correct?
14      A.  Actually, what I said is this analysis
15  would be the best way to try and answer some of the
16  questions we had about the figure in the published
17  article.
18      Q.  Okay.  When we talk --
19      A.  This approach, I should say.
20      Q.  Right.
21          So when you say the figure in the
22  published article you're referring to the
23  Kaplan-Meier curve in the APPROVe publication,
24  correct?
25      A.  Yes.  Figure 2 in Exhibit 7.

Page 221

1      Q.  And you testified a moment ago that you
2  talked with Mr. Black -- bless you.
3          All right.  You talked with Mr. Black
4  about how valuable it would be if you really wanted
5  to try and understand whether the risk began early
6  or not to pool the analysis as set forth in the
7  protocol?
8      A.  Yes.
9          And that was actually in the -- when I
10  first mentioned it as a -- sort of disconnected
11  from anything I knew was happening, but just saying
12  that's what's needed.
13      Q.  Bless you.
14          All right.  So the valuable analysis to
15  see whether the risk occurs early or not that you
16  discussed with Mr. Black, we don't know if it was
17  done correctly or not, but it is shown in Exhibit
18  9, correct?
19      A.  That's correct.
20      Q.  So let's look at 0 to 1 year.  I was
21  actually looking at the first page.
22      A.  Oh.  All right.
23      Q.  The line entry for 0 to 1 year.
24          So this would be the relative risk of
25  cardiac events comparing Vioxx to placebo up to a

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

ae5c8835-7238-41bd-a838-318c269a3c40

Page 222

1   year on drug, correct?
2      A.  Correct.
3      Q.  And it is a relative risk of 1.5, correct?
4      A.  Yes.
5      Q.  And then there is a -- do you understand
6   the parenthesis there to be confidence intervals?
7      A.  I do.
8      Q.  And a 95 percent confidence interval,
9   correct?
10     A.  I think that's implied.  That's what it
11  usually is.  No.  He actually says it.  95 percent.
12     Q.  And, according to Dr. Jewell's analysis,
13  the 95 percent confidence interval up to one year
14  of use crosses the number one, correct?
15     A.  That's correct.
16     Q.  And so for up -- Dr. Jewell's data shows
17  up to one year on Vioxx, his analysis does not show
18  any difference between Vioxx and placebo with
19  respect to cardiac events, correct?
20        MR. BLACK:  Objection.
21        THE WITNESS:  No, that's -- no,
22  that's -- that would not be correct.
23        If you look at the figures and you look
24  at the relative risks you do show a
25  difference.  The question whether that could

Page 223

1   have been by chance just up to that point,
2   yes, it could have.  However, if you look at
3   that in context of the whole figure followed
4   up to three years, that becomes less a
5   plausible explanation.
6   BY MR. ISMAIL:
7      Q.  Well, we -- you can say with some degree
8   of confidence, sir, that up to one year on Vioxx
9   the relative risk of 1.51 is not statistically
10  significant, correct?
11        MR. BLACK:  Objection.
12        THE WITNESS:  That is correct, but the
13  problem is that's not the answer to the
14  question I or other scientists would have.
15  BY MR. ISMAIL:
16     Q.  Well, let's deal with the question I have.
17  So you would agree --
18     A.  Well, it is my testimony, is the problem.
19     Q.  I --
20     A.  I am trying to tell you what I think as a
21  scientist.
22     Q.  Great.  So let's -- you can tell me that
23  in response to the questions actually posed.
24     A.  I'll try.
25     Q.  The relative risk of 1.51 for up to one

Page 224

1   year on Vioxx is not statistically significant,
2   correct?
3      A.  That's correct.
4      Q.  And if you were reporting on the results
5   of Vioxx up to one year of use, based on Dr.
6   Jewell's pooled analysis you would say Dr. Jewell
7   failed to identify a statistically significant
8   difference between Vioxx and placebo up to one year
9   of use, correct?
10        MR. BLACK:  Objection.
11        THE WITNESS:  Yes, for what that means.
12  We could talk about what it means.
13  BY MR. ISMAIL:
14     Q.  Now, you go to -- up to 18 months of use
15  and you have a confidence interval -- you have --
16  first of all, you have a relative risk of 1.76,
17  right?
18     A.  Yes.
19     Q.  And a confidence interval that just ends
20  above 1?
21     A.  Yes.
22     Q.  So you would have a -- a -- potentially
23  have, we don't know for sure, but you would
24  potentially have a statistically significant
25  finding of a difference of 18 months if you pool

Page 225

1   all the data?
2      A.  That's what he found.
3      Q.  And that is borderline statistical
4   significance, we don't know if it is just below or
5   just above, but it's close?
6      Fair to say?
7         MR. BLACK:  Objection.
8         THE WITNESS:  Well, if we are going to
9   be as exact as we have at this time we say
10     that it is above.
11  BY MR. ISMAIL:
12     Q.  Okay.  Well, I thought you told me earlier
13  that confidence intervals don't precisely translate
14  to p-values.
15        MR. BLACK:  Objection.
16  BY MR. ISMAIL:
17     Q.  And so I didn't want to misstate --
18     A.  In that case what confidence intervals do
19  say is that the range within which the true effect
20  is likely to lie is somewhere between a relative
21  risk of 1.01 and 3.6.
22     Q.  Okay.  So in pooling the data which you
23  think provides the best available data as to
24  whether the risk appears in short-term use or not,
25  Dr. Jewell failed to find a statistically

ae5c8835-7238-41bd-a838-318c269a3c40

Page 226

1  significant risk up to one year and he found it at
2  a year-and-a-half?
3      A.  Those are correct facts, as you state
4  them.  They don't bear on what this -- these
5  analyses are telling me in any case.
6      Q.  But what I said is accurate, correct?
7      A.  What you said is accurate.
8      Q.  Now, how do you interpret or -- I'll give
9  you the floor.  You wanted to tell me how you as a
10  scientist read these data.  The microphone is all
11  yours.
12      A.  All right.  So even with the pool analysis
13  there are relatively few events, as there always
14  are, early on in follow-up and, therefore, a great
15  deal of statistical uncertainty until enough events
16  have finally accumulated, even with the three
17  trials, that you can begin to say that it's beyond
18  chance.
19          So then we want to try and bring to bear
20  on the interpretation of the shape of these curves,
21  whatever other information they provide for us.
22  And one bit of information is that the risk in the
23  Vioxx group exceeds that in the placebo after, in
24  this case, 15 days and stays above it throughout
25  all the rest of the time of follow-up and then

Page 227

1  after a period of time has occurred over a year, it
2  becomes statistically significant.
3          That means, to me, that it seems more
4  likely that the risk begins very early after
5  exposure based on these data, if they're done
6  correctly, then it would be that there's -- there's
7  no difference until 18 months exposure.
8      Q.  I'd like to go back over your prior answer
9  in a couple respects.
10          You said there is a great deal of
11  statistical uncertainty given the small number of
12  events early on in the follow-up.
13      A.  Yes.
14      Q.  What tells you there is a great deal of
15  statistic -- statistical uncertainty regarding the
16  relative risks reported early on in the study?
17      A.  Well, what is commonly referred to as
18  precision which is another way of describing
19  confidence intervals; that is, that at the very
20  early -- the first, 0 to 1 month period of time,
21  although the relative risk is 2.68; that is, the
22  best estimate is the risk is increased 2.68 fold,
23  the confidence intervals are very wide and,
24  therefore, it could be even lower than that,
25  substantially lower than that or a great deal

Page 228

1  higher than that.  And we can't really pin that
2  down without more events.  Specifically, you can't
3  either confirm or rule out definitively the degree
4  of risk at that time.
5      Q.  So, to you, the -- the span of the
6  confidence interval tells you what degree of
7  statistical certainty or not the relative risk has?
8      A.  Yes.
9      Q.  So you look to the zero to one-and-a-half
10  year mark and you have a span of -- I don't know
11  how you would reflect the 1 to -- 1.01 to 3.06?
12      A.  Yes.
13      Q.  That's a span of 2.05?
14      A.  Well, it is between those extremes, yes.
15      Q.  And that sort of degree of statistical
16  certainty holds true pretty much for the last two
17  time intervals shown here?
18      A.  Yes.  As is typically the case.  As there
19  are more events included in the analysis, the
20  degree of uncertainty diminishes and the confidence
21  intervals gets smaller.
22      Q.  But that degree of statistical uncertainty
23  shows up exactly the same way in the zero to one
24  year DataSet, doesn't it?
25      A.  Same way in what?  How do you mean that?

Page 229

1          MR. BLACK:  Objection.
2  BY MR. ISMAIL:
3      Q.  Well, the difference between 0.82 an 2.80
4  is the same difference that shows up 1.81 to 3.06?
5      A.  0.82?  Where are you?
6      Q.  Zero to one year.
7      A.  Zero to one year.  0.82, 1.80.  Yes.
8      Q.  So that degree -- the degree of
9  statistical certainty around the relative risk that
10  shows up at 18 months --
11      A.  We say it differently.
12      Q.  The relative risk finding at 18 months and
13  the statistical certainty there, is no more certain
14  than the finding at one year, correct?
15          MR. BLACK:  Objection.
16          THE WITNESS:  No.  I think it is.
17  BY MR. ISMAIL:
18      Q.  Why?
19      A.  Because you have more patients and events
20  in the analysis and, therefore, you have a little
21  better sense of just exactly where that is, more
22  time has passed.
23      Q.  You told me that the spread in the
24  confidence interval tells you the statistical
25  certainty of the finding?

58  (Pages 226 to 229)

ae5c8835-7238-41bd-a838-318c269a3c40

Page 230

1       MR. BLACK: Objection.
2       THE WITNESS: No. I said that it is
3  referred to as statistical precision. It
4  tells you --
5  BY MR. ISMAIL:
6       Q. Fine.
7       A. -- how precisely you know where that is
8  likely to be.
9       Q. Then let me restate my question.
10      The statistical precision of the one year
11 data is the same as the statistical precision of
12 the 18-month data?
13      A. Calculated how? By taking the difference
14 between those two?
15      Q. That's what I thought you told me.
16      A. No. I never talked about the difference
17 between those two.
18      The way this information is used, should
19 be, to say we have a 95 percent confidence that the
20 true value lies somewhere between the two extremes
21 stated, and the most likely magnitude of risk is
22 the relative risk found from the data.
23      Q. And the spread in the 95 percent
24 confidence interval demonstrates the statistical
25 precision or certainty of the relative risk

Page 231

1  finding, right?
2       A. The spread -- the confidence interval --
3       Q. Yeah.
4       A. -- is an expression of the statistical
5  certainty of the relative risk finding, yes.
6       Q. Well, you told me at one month you don't
7  have a high degree of confidence in that finding
8  because look how wide the confidence interval is?
9       A. Could be protective and could be very
10 harmful and is consistent with all of that.
11      Q. Right.
12      And you specifically made reference to
13 look how wide the confidence interval is, right?
14      MR. BLACK: Objection.
15      THE WITNESS: No. Not measured as one
16 subtracted from the other, but that it
17 reaches all the way down to protective and
18 all the way up to very great harm.
19 BY MR. ISMAIL:
20      Q. Fine.
21      A. Yes.
22      Q. And you have a narrower range in the
23 conference interval for the one year data, correct?
24      A. Yes.
25      Q. That data is much more precise than the

Page 232

1  one month data, correct?
2       A. Yes.
3       Q. And the one year data failed to
4  demonstrate a statistically significantly higher
5  risk on Vioxx, correct?
6       A. Or rule it out, yes.
7       Q. So you would agree that Dr. Jewell's
8  analysis does not demonstrate that there's a higher
9  degree of cardiovascular risk with Vioxx through
10 one year of use, correct?
11      MR. BLACK: Objection.
12      THE WITNESS: No. I wouldn't make that
13 conclusion. First of all, as you pointed
14 out, I would like to see the methods.
15      But this way of looking at the data
16 where you look at small chunks of time is
17 certainly interesting and doing statistical
18 testing or confidence intervals on is is also
19 interesting, but it isn't necessarily the
20 definitive way to look at these data.
21 BY MR. ISMAIL:
22      Q. Well, you're certainly not going to tell
23 me that Dr. Jewell's data in fact demonstrates an
24 increased risk, cardiovascular risk with Vioxx
25 through one year of use, are you?

Page 233

1       MR. BLACK: Objection.
2       THE WITNESS: Well, what I wish to say
3  is that his analysis suggests that a risk is
4  likely, that we don't know for sure that risk
5  exists, if the data are consistent with
6  substantial harm or some benefit; and that if
7  I were a physician and wise enough to
8  understand these curves I probably wouldn't
9  want to take that risk with my patient.
10 BY MR. ISMAIL:
11      Q. With respect to -- let's come to some
12 understanding of what you're saying Dr. Jewell's
13 data shows.
14      I understand you say that the absence of
15 statistical significance up to one year should not
16 be used to definitively prove the safety of Vioxx
17 in that time period?
18      A. It cannot prove safety or harm.
19      Q. Okay. So let's -- as I understand it --
20      A. Taken alone.
21      Q. All right. So up to one year of use Dr.
22 Jewell's analysis does not establish that that
23 duration of use on Vioxx has an increased
24 cardiovascular risk compared to placebo, correct?
25      MR. BLACK: Objection.

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

ae5c8835-7238-41bd-a838-318c269a3c40

Page 234

```
1        THE WITNESS: You say Dr. Jewell's
2   analysis. My view of Dr. Jewell's analysis
3   is all of it and not just this part, and
4   looking at the confidence intervals for these
5   just chunks.
6   BY MR. ISMAIL:
7        Q. Well --
8        A. It is the visual part, it is looking at
9   the curves as a whole, particularly with long
10  follow-up.
11       And does any of that prove that the risk
12  exists early? No.
13       Does any of it suggest it? Sure does, in
14  my opinion.
15       Does any of that mean that as a physician
16  taking care of a patient I would be worried about
17  the cardiovascular events early on? Yes, in the
18  absence of better data I'd say, well, I would be a
19  little worried about this.
20       Q. And you don't have any comparison to, say,
21  Celebrex?
22       A. I do not.
23       Q. Or any comparison to any other
24  prescription NSAID when it comes to the
25  cardiovascular safety?
```

Page 235

```
1        A. I am not a master of that information, no.
2        Q. And so you don't know whether the relative
3   risks or time to event data that Dr. Jewell's shows
4   is any different than any other prescription NSAID,
5   right?
6        MR. BLACK: Objection.
7        THE WITNESS: No, I have not reviewed
8   that literature.
9   BY MR. ISMAIL:
10       Q. Now, you said at figure 1 that, gee, there
11  is a difference at 15 days?
12       A. Figure 1. Okay.
13       MR. BLACK: Page 3.
14       THE WITNESS: Well, when I say there's a
15  difference, that's, of course, you know, with
16  a great deal of uncertainty.
17  BY MR. ISMAIL:
18       Q. Right.
19       A. I am just saying that the actual numbers
20  start to rise above the Vioxx over the placebo at
21  that point.
22       Q. You would flunk any student of yours who
23  came to you and said, ah-hah, figure 1 shows that
24  Vioxx cardiovascular risk shows up at 15 days,
25  right?
```

Page 236

```
1        A. Well, I wouldn't be very happy.
2        Q. Because that would be a flawed analysis of
3   Dr. Jewell's data, right?
4        A. It would be not good enough.
5        Q. And because, really, you're talking about
6   one extra event on Vioxx than placebo, right?
7        A. Well, that's not shown here. You could
8   guess it would be probably one event, yes.
9        Q. So in looking at the totality of Dr.
10  Jewell's data, would you agree that Dr. Jewell's
11  data, even in total, does not establish an
12  increased cardiovascular risk of Vioxx up to 30
13  days of use over placebo?
14       A. He -- this analysis cannot definitively
15  establish or rule out a risk at that time.
16       Q. Dr. Jewell's analysis can't be used one
17  way or the other on 30 days of use, right?
18       MR. BLACK: Objection.
19       THE WITNESS: Well, you were earlier
20  talking about the 0 to 30 days, and in this
21  question you're asking about Dr. Jewell's
22  analysis. I think there is more to be said
23  about 0 to 15 days given the entire analysis
24  than there is in just looking at the 0 to 30
25  days alone.
```

Page 237

```
1   BY MR. ISMAIL:
2        Q. Looking at the entire analysis, you cannot
3   use Dr. Jewell's data to establish an increased
4   risk of Vioxx over placebo up to 30 days of use,
5   correct?
6        A. Well, I mean, it depends on what you wish
7   to mean for establish.
8        What I'm saying is, no, I can't
9   definitively establish that, nor could anybody
10  else, I'm sure, but I would be worried and I might
11  act as if that's a risk based on these data, given
12  the totality of the information here.
13       Q. Okay. But as an epidemiologist or
14  clinical trialist, you would not suggest that Dr.
15  Jewell's data establishes an increase
16  cardiovascular risk of Vioxx over placebo in up to
17  30 days of use, correct?
18       MR. BLACK: Objection.
19       THE WITNESS: I would say that this
20  analysis shows that effect, but to -- if I
21  understand your meaning of the word
22  establish; that is, that it's now settled, we
23  know that forever, it's sure, no, this one
24  analysis could not do that. It is much more
25  likely than not that the risk is there.
```

60 (Pages 234 to 237)

ae5c8835-7238-41bd-a838-318c269a3c40

Page 238

1   BY MR. ISMAIL:
2       Q.   So would you agree that, let's say, at
3   eight days of use that Vioxx is cardio protective?
4       A.   No.
5       Q.   Well, gee, it's lower than placebo, sir.
6       A.   Well, recall, I wasn't making a lot of
7   that one event that raised the Vioxx line above the
8   placebo either.
9            And I was interpreting the earlier part of
10  this curve in relation to everything else that
11  followed and, specifically, the Vioxx rates were
12  higher after 15 days and remained so for the entire
13  period of time and after enough events had
14  accumulated, became statistically significant, so
15  that would be the context in which I would make
16  that assertion.
17      Q.   And it is a reasonable interpretation of
18  this data that the comparison of relative risk
19  between Vioxx and placebo changes over time along
20  with duration of use, right?
21           MR. BLACK:   Objection.
22           THE WITNESS:   I cannot tell that with my
23  eye.  Obviously the curves diverge from each
24  other and come back together somewhat and
25  then diverge some more.

Page 239

1            However, because of the play of chance,
2   that could -- that could occur even though
3   the underlying rates remain the same
4   throughout the entire curve.  So that would
5   require another analysis which I do not have.
6   BY MR. ISMAIL:
7       Q.   Well, one explanation of Dr. Jewell's data
8   is that the relative risk between Vioxx and placebo
9   changes based on the duration of use of Vioxx,
10  correct?
11      A.   That's a candidate explanation, yes.
12      Q.   And because Dr. Jewell's own data does not
13  establish a statistically significant difference up
14  to one year of use, you cannot say that Vioxx has
15  an increased cardiovascular risk over placebo in
16  that length of time?
17           MR. BLACK:   Objection.
18           THE WITNESS:   I would not say that.
19  BY MR. ISMAIL:
20      Q.   Okay.
21      A.   I do not worship at the alter of
22  statistical significance.  And the technology, I
23  think, that the scientists need to use all the
24  information available to them.  In this case that's
25  not the only information available here, these

Page 240

1   tests at this particular point in time.
2            And in the case of the myocardial
3   infarction which is, after all, a grave event err
4   on the side of being wrong and protecting people
5   rather than being wrong and neglecting risk.
6       Q.   But we have a period of time in which this
7   analysis was done well after the drug has been off
8   the market, correct?
9       A.   That's correct.
10      Q.   And so we're not talking about what a
11  cautious prescriber may be doing going forward
12  based on this data, we're talking about the sound
13  epidemiological review of this data, and up to one
14  year of use Dr. Jewell has failed to establish a
15  statistically significant increased cardiovascular
16  risk of Vioxx over placebo, correct?
17      A.   For those who value statistical
18  significance, then, yes, that's correct.  Over and
19  above all other information.
20      Q.   And we certainly don't know what other
21  information Dr. Jewell excluded, right?
22           MR. BLACK:   Objection.
23           THE WITNESS:   Well, we don't know how he
24  did the analysis.  We know there's other
25  information in the results he presented.

Page 241

1            With your earlier objection, quite correctly,
2   I don't know what the earlier analyses were.
3   BY MR. ISMAIL:
4       Q.   Right.
5            And you don't know whether any of his
6   curves at 15, 30 or 300 days have any accuracy to
7   them, right?
8            MR. BLACK:   Objection.
9            THE WITNESS:   I don't have his methods,
10  no.
11  BY MR. ISMAIL:
12      Q.   Are there any texts in clinical trial
13  design and analysis that you feel are particularly
14  authoritative?
15      A.   I think the most widely used throughout
16  the world is Friedman, Furberg & DeMets which is in
17  its, I think, third edition published last year;
18  and we use it in our course.
19      Q.   So you agree that it is an authoritative
20  text?
21      A.   It is an authoritative text.  One of the
22  best.
23      Q.   Are there any texts in medical journalism
24  that you feel are particularly authoritative?
25      A.   Hmmm.  There are a number of books about

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

ae5c8835-7238-41bd-a838-318c269a3c40



## Arbitblit, Donald C.

| | |
|---|---|
| **From:** | Arbitblit, Donald C. |
| **Sent:** | Monday, May 22, 2006 11:19 AM |
| **To:** | 'andrew.goldman@bartlit-beck.com' |
| **Cc:** | 'amyer@rcrlaw.net' |
| **Subject:** | Barnett |

Andy,
Mark Robinson has asked me to take the deposition of Merck' biostatistician/epidemiologist expert in the Barnett case. I understand it is set for May 31. Can you confirm the date and location? Also, I was told we would have a shortened time to review the expert's report to accommodate the witness' schedule. When do you expect to provide the report? Can you provide the witness' CV and bibliography today, so that at least that part of our preparation can begin?
Thanks,
Don Arbitblit

**EXHIBIT 3**





## Arbitblit, Donald C.

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Monday, May 22, 2006 11:59 AM |
| **To:** | Arbitblit, Donald C. |
| **Cc:** | amyer@rcrlaw.net |
| **Subject:** | RE: Barnett |

Don, we will get you the report on May 26.  The deposition will be in either Madison, Wisconsin or in our office in Chicago.  I do not have the CV and am not working with this witness.  We will get you the CV along with the report on Friday.

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

**From:** Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
**Sent:** Monday, May 22, 2006 1:19 PM
**To:** andrew.goldman@bartlit-beck.com
**Cc:** amyer@rcrlaw.net
**Subject:** Barnett

Andy,
Mark Robinson has asked me to take the deposition of Merck' biostatistician/epidemiologist expert in the Barnett case. I understand it is set for May 31. Can you confirm the date and location? Also, I was told we would have a shortened time to review the expert's report to accommodate the witness' schedule. When do you expect to provide the report? Can you provide the witness' CV and bibliography today, so that at least that part of our preparation can begin?
Thanks,
Don Arbitblit

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to postmaster@lchb.com

Email 2

**Arbitblit, Donald C.**

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Thursday, May 25, 2006 9:31 AM |
| **To:** | Arbitblit, Donald C. |
| **Subject:** | RE: Depo |

Will do


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.


-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Thursday, May 25, 2006 11:29 AM
To: andrew.goldman@bartlit-beck.com
Subject: Re: Depo


Thanks for the update. How about letting us know by the same date, June 1,
as to the Chicago or Madison location?

-----Original Message-----
From: Goldman, Andrew <andrew.goldman@bartlit-beck.com>
To: andrew.goldman@bartlit-beck.com <andrew.goldman@bartlit-beck.com>;
Arbitblit, Donald C. <DARBITBLIT@lchb.com>
CC: beachlawyer51@hotmail.com <beachlawyer51@hotmail.com>
Sent: Thu May 25 09:17:09 2006
Subject: RE: Depo

Our biostat's dep will be on June 12 in Chicago or Madison, WI.  You'll get
the report on the June 1 deadline.  I'll let you know the exact location as
we get closer.

Thanks,

Andy

1

Email 3

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

-----Original Message-----
From: Goldman, Andrew [mailto:andrew.goldman@bartlit-beck.com]
Sent: Thursday, May 25, 2006 10:04 AM
To: 'Arbitblit, Donald C.'
Cc: 'beachlawyer51@hotmail.com'
Subject: RE: Depo

Sorry for not getting back to you sooner.  Just waiting for confirmation
about whether the dep will be May 31 or later.  The witness is checking to
see his availability in June.   I'll let you know later today.

Andy


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.


-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Wednesday, May 24, 2006 5:38 PM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawyer51@hotmail.com
Subject: Depo


Andy,
Can you let me know who to contact re next week's deposition of the defense
biostatistician/epidemiologist? I am trying to make plans for travel and
hotel, and I don't yet know where to go.
Also, please pass along my request for electronic service of the Report and
accompanying materials at the same time as service is carried out as to Mark
Robinson.
Thanks

2

Email 4

Don

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to postmaster@lchb.com


This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to postmaster@lchb.com

3

Email 5

**Arbitblit, Donald C.**

| From: | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
|---|---|
| Sent: | Sunday, May 28, 2006 6:11 AM |
| To: | Arbitblit, Donald C. |
| Cc: | beachlawywer51@hotmail.com; amyer@rcrlaw.net |
| Subject: | RE: Jewel |

Don, can you please give us a few possible dates for Jewel's deposition? Thanks.


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited. Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.


-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Monday, May 22, 2006 7:26 PM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: Jewel




Attached is the report of Nicholas Jewell, Ph.D, referenced as Exhibit A to
the Supp. Report of Dr. Farquhar.
 <<Protocol203report.pdf>>

This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com.

Email 6

**Arbitblit, Donald C.**

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Tuesday, May 30, 2006 9:41 PM |
| **To:** | Arbitblit, Donald C. |
| **Cc:** | beachlawywer51@hotmail.com; amyer@rcrlaw.net |
| **Subject:** | RE: Jewel |

Don, I think you are mistaken and will tell you why in the next few days.
Andy


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Tuesday, May 30, 2006 2:24 PM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: RE: Jewel


Andy,
Professor Jewell is designated as a nontestifying expert under Rule
26(a)(4)(B). It is our understanding of the Rule and applicable decisions
that he is not subject to discovery in the absence of a "showing of
exceptional circumstances under which it is impracticable for the party
seeking discovery to obtain facts or opinions on the same subject by other
means." Professor Jewell's report is based on data from
3 Merck studies, provided by Merck during discovery in the course of the
litigation. Accordingly, Merck can obtain facts and opinions on the same
subject by the readily available means of having its own experts analyze the
same data. At the same time, Professor Jewell's report was provided as a
document "considered" by Dr. Farquhar in forming the opinions expressed in
his report, and we believe such production constitutes compliance with Rule
26 in regard to both Jewell and Farquhar.
If you believe we have misconstrued the applicable law, please explain.
Thanks, Don Arbitblit

-----Original Message-----
From: Goldman, Andrew [mailto:andrew.goldman@bartlit-beck.com] Sent: Sunday,
May 28, 2006 6:11 AM
To: Arbitblit, Donald C.
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: RE: Jewel


Don, can you please give us a few possible dates for Jewel's deposition?
Thanks.

1

Email 7

Andrew L. Goldman Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300 Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com Direct: (312) 494-4464 Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com] Sent: Monday, May
22, 2006 7:26 PM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawywer51@hotmail.com; amyer@rcrlaw.net
Subject: Jewel

Attached is the report of Nicholas Jewell, Ph.D, referenced as Exhibit A to
the Supp. Report of Dr. Farquhar.
 <<Protocol203report.pdf>>
This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

Email 8

**Arbitblit, Donald C.**

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Friday, June 02, 2006 10:33 AM |
| **To:** | Arbitblit, Donald C. |
| **Cc:** | 'Adam Mortara' |
| **Subject:** | Draft Jewell Motion to Compel.doc |

Don, here is a draft brief we are about to file to compel discovery and deposition of Dr. Jewell.  Please let me know ASAP if you are willing to reconsider your decision not to produce him for deposition.

Andy

<<...>>

6/26/2006

Email 9