## Arbitblit, Donald C.

**From:** Arbitblit, Donald C.
**Sent:** Friday, June 02, 2006 12:55 PM
**To:** 'andrew.goldman@bartlit-beck.com'
**Cc:** 'beachlawyer51@hotmail.com'; Gross, Jennifer; 'amyer@rcrlaw.net'; 'twacker@rcrlaw.net'
**Subject:** Jewell

Andy,

I have reviewed your draft motion to compel, and this is submitted in response.

First, attached is Professor Jewell's analysis concerning high-risk patients, which Dr. Farquhar referenced in his Supplemental Report and the Barnett Report. We do not claim work product privilege as to materials reviewed and relied upon by Dr. Farquhar in preparation of his reports. We agree that you are entitled to production of documents prepared by Professor Jewell that Dr. Farquhar considered in arriving at the opinions he has expressed in his reports. We agree that the *Intermedics* case you cite is applicable to expert discovery, and that documents considered by an expert in forming his opinions are discoverable, regardless of whether they are relied upon or rejected.

However, it remains our view of the facts and the law that exceptional circumstances do not exist to justify deposition or discovery from Professor Jewell, a nontestifying expert, where all of the data came from Merck, where the methods used to analyze the data are comparable or identical to those Merck itself has used and reported as to particular portions of the same data, and where Merck is capable of obtaining information on the same subject by other means. The *Long Term Capital Holdings* case does not stand for the open-ended proposition that a nontestifying expert who provides a report relied upon by the testifying expert is always subject to deposition and discovery. To the contrary, in that case the court relied on the facts that the assistants spent the majority of the time on the project and chose the data to input from among "hundreds of thousands of pages" of documents that they reviewed. Here, Professor Jewell used the specified data sets that Merck provided, and the statistical tests are identified in the reports. The *Dura* case states mere dicta on the issue of nontestifying experts, while the holding was addressed to the exclusion of untimely reports. We see no general support in the case law for the proposition that nontestifying experts may be deposed to see if they did their jobs "competently," and such a view would contradict Rule 26 by permitting this type of discovery without the requisite showing of exceptional circumstances.

Please let us know whether you wish to discuss this further.

Finally, you had agreed to let us know the location for the Kim depo by June 1, so we could make travel plans. Please let us know today, if at all possible.

Don Arbitblit

## ANALYSIS OF APPROVE DATA: VIOXX/PLACEBO AND HIGH RISK STATUS

The APPROVe data set consists of 2,586 individuals. In five of these the data of withdrawal is the same as the date of randomization to treatment so that these individuals play no role in subsequent data analysis. In the complete data set, 1,299 were randomized to Placebo and 1,287 to Vioxx.

A high-risk category was defined by considering whether an individual had any one (or more) of three binary conditions: being diabetic, classified as aspirin-indicated , and being classified as of high cardiac risk. Of the complete data set, 764 (approximately 30%) were classified as high-risk in this manner. As anticipated, by the randomization, about half of these high-risk individuals were assigned to Vioxx (405), and the remainder (359) to Placebo.

Using the data we then examined the risks (and, most importantly, the comparison of risks) for various adverse outcomes. The latter were considered in three related groups: (i) all events, (ii) cardiac events plus cerebrovascular events (i.e. excluding peripheral venous and arterial thrombosis events, and excluding all pulmonary embolisms), and (iii) cardiac events only (as in group (ii) but now also excluding ischemic cerebrovascular strokes, and transient ischemic attacks). In each case, we considered the Relative Risks associated with exposure to Vioxx for both the high-risk and low-risk groups separately and comparison between these two Relative Risks. The methods involved construction of Kaplan-Meier curves and application of the Cox proportional hazards model. The results are as follows:

### (i)    ALL EVENTS

There were a total of 72 adverse events observed. In the low-risk group, the Relative Risk for an event associated with assignment of Vioxx was 1.15 with a 95% confidence interval of (0.57—2.29). On the other hand, the same Relative Risk in the high-risk group was considerably higher, namely 2.87 with a 95% confidence interval of (1.40—5.86). The latter Relative Risk carries an associated p-value of 0.004.

Qualitatively it is apparent that the deleterious effect of Vioxx is more than 2.5 times worse in the high risk group as compared to the low-risk group. These two Relative Risks can be compared quantitatively by using a test for interaction, to address the question as to whether risk status significantly modifies the effect of Vioxx on the risk for an adverse event. This test yields a p-value of 0.07. The fact that this is not "significant" by conventional or mindless application of a 0.05 significance level has to viewed in the context that interaction tests are well-known to lack power and that type I errors here (incorrect assumption of interaction effects when none are truly present) are considered less serious than when testing for main effects of treatment, for example. For both these reasons, many statisticians recommend a significance level of 0.2 when examining

interactive effects (see Jewell (2004). We thus consider the evidence of an elevated Relative Risk associated with Vioxx in the high-risk group to be quite substantial.

As an aside, we note that designation of high-risk does in fact carry higher risk of an adverse outcome. In the placebo group, the Relative Risk arising from comparing high and low risk individuals is 1.74 with a 95% confidence interval of (0.79—3.84), reflecting a 75% increase in risk associated with having one or more of the high risk indicators. In the Vioxx group, the picture is startlingly different; here, the Relative Risk arising from comparing high and low risk individuals is 4.36 with a 95% confidence interval of (2.38—7.99), significantly different from one with an associated p-value < 0.001. This difference in effects reflects, of course, the same interaction discussed in the previous paragraph.

We now repeat these analyses on two subsets of the events which inevitably have smaller numbers of observed events and therefore less precision in the results.

(ii)   CARDIAC + CEROBROVASCULAR EVENTS

The number of observed cardiac and cerebrovascular events was 62. In the low-risk group, the Relative Risk for an event associated with assignment of Vioxx was 1.43 with a 95% confidence interval of (0.67—3.06). On the other hand, the same Relative Risk in the high-risk group was again substantially higher, namely 3.83 with a 95% confidence interval of (1.67—8.77). The latter Relative Risk carries a p-value of 0.001. A similar p-value of 0.086 was obtained for the test of interaction comparing these two Relative Risks. Again, the evidence is very striking regarding the effect modification following the same remarks regarding conventional levels of significance.

With regard to the impact of being in the high-risk group, for these adverse events, the Relative Risk arising from comparing high and low risk individuals is 1.63 in the placebo group with a 95% confidence interval of (0.64—4.13), reflecting a 63% increase in risk associated with having one or more of the high risk indicators. In the Vioxx group, the picture is again completely different; here, the Relative Risk arising from comparing high and low risk individuals is 4.35 with a 95% confidence interval of (2.32—8.14), significantly different from one with an associated p-value < 0.001. This difference in effects again reflects the interaction effects discussed in the previous paragraph.

(iii)   CARDIAC EVENTS ONLY

The number of observed cardiac events was 42 so that we would anticipate even lower levels of precision in our estimates of the Relative Risk here. In the low-risk group, the Relative Risk for an event associated with assignment of Vioxx was 1.82 with a 95% confidence interval of (0.60—5.57). On the other hand, the same Relative Risk in the high-risk group was yet again higher, namely 2.99 with a 95% confidence interval of (1.28—7.01). The latter Relative Risk carries a p-value of 0.012. However, in this case, the two Relative Risks are more similar and coupled with the loss of precision the test of interaction when comparing these two Relative Risks is 0.49.

Email 12

The effects of being in the high-risk group are most pronounced when studying cardiac events only: the Relative Risk arising from comparing high and low risk individuals in the placebo group is 3.88 with a 95% confidence interval of (1.23—12.22), reflecting an almost quadrupling of the risk of a cardiac event associated with having one or more of the high risk indicators (and with p-value 0.021). In the Vioxx group, the picture is again qualitatively different in that the risk associated with the high-risk factors is even higher; here, the Relative Risk arising from comparing high and low risk individuals is 6.37 with a 95% confidence interval of (2.84—14.32), significantly different from one with an associated p-value < 0.001. This difference in effects again reflects the interaction effects discussed in the previous paragraph although the difference is not as pronounced due to the fact that the Relative Risk is already so high in the placebo group.

## ADDENDUM TO VIGOR ANALYSIS OF HIGH RISK (ASPIRIN-INDICATED ANALYSIS)

In an earlier analysis, we showed that the Relative Risk for all confirmed thrombotic events events, comparing Vioxx to Naproxen, was 4.90 in the high-risk group (aspirin indicated), based on 18 events among 320 individuals (with a 95% confidence interval given by 1.42--16.93). I believe the summary figures for low-risk group (aspirin not indicated) reveals 30 events in the Vioxx group based on 2592 patient years of follow-up and 16 events in the Naproxen group based on 2596 patient years of follow up. These summary figures yield a Relative Risk associated with Vioxx of 1.88 with a 95% confidence interval of 1.02--3.44, and the p-value for testing whether this Relative Risk is 1.0 is 0.04.

A simple comparison of these two Relative Risks (the RR, 4.90, in the high-risk group is markedly higher than the RR in the low-risk group, 1.88 ) yields a p-value of 0.17. Most of the uncertainty in this comparison arises from the low numbers of individuals in the high-risk group, but again the p-value is suggestive of a strong interactive effect, given our earlier comments about power, and the similarity of what we found in the APPROVe data.

Email 13

VIGOR: Analysis of incidence of all confirmed thrombotic events in aspirin indicated group



Cox regression -- Breslow method for ties

No. of subjects =        320                Number of obs  =     320
No. of failures =        18
Time at risk    =     73827

                                      LR chi2(1)   =    8.49
Log likelihood  =  -92.397558          Prob > chi2  =   0.0036

| _t | Haz. Ratio | Std. Err. | z | P>|z| | [95% Conf. Interval] | |
|---|---|---|---|---|---|---|
| txid | 3.099073 | 2.51 | 0.012 | 1.418004 | 16.92653 | |

```
 __   /   __/ /   __/
__/ / /__/ / /__/   9.0  Copyright 1984-2005
```
Statistics/Data Analysis       StataCorp
                      4905 Lakeway Drive
     Special Edition       College Station, Texas 77845 USA
                      800-STATA-PC   http://www.stata.com
                      979-696-4600    stata@stata.com
                      979-696-4601 (fax)

30-student Stata for Windows (network) perpetual license:
      Serial number: 81990515369
         Licensed to:  School of Public Health
                    UC Berkeley

Notes:
      1. (/m# option or -set memory-) 10.00 MB allocated to data
      2. (/v# option or -set maxvar-) 5000 maximum variables
      3. New update available; type -update all-

. edit

. log
(closed)

. edit
(4 vars, 321 obs pasted into editor)

. save "C:\Documents and Settings\nick_jewell\My
Documents\VIGOR\VIGORhighriskFeb21.dta"
file C:\Documents and Settings\nick_jewell\My
Documents\VIGOR\VIGORhighriskFeb21.dta saved

. edit
- preserve

. gen txid=0

. replace txid=1 if trmt=="A"
(170 real changes made)

. summ  eventindicvasc by txid
variable by not found
r(111);

. summ  eventindicvasc, by txid
option by not allowed

r(198);

. table  eventindicvasc by  txid
variable by not found
r(111);

. table  eventindicvasc txid

```
-----------------------
eventindi |   txid
cvasc     |  0    1
----------+------------
        0 | 148  155
        1 |   3   15
-----------------------
```

. edit
- preserve

. stset  eventday, failure( eventindicvasc)

     failure event:  eventindicvasc != 0 & eventindicvasc < .
obs. time interval:  (0, eventday]
 exit on or before:  failure

```
--------------------------------------------------
   321  total obs.
     1  obs. end on or before enter()
--------------------------------------------------
   320  obs. remaining, representing
    18  failures in single record/single failure data
 73827  total analysis time at risk, at risk from t =        0
                     earliest observed entry t =        0
                         last observed exit t =      372
```

. stsgraph
unrecognized command: stsgraph
r(199);

. sts graph

     failure _d:  eventindicvasc
  analysis time _t:  eventday

. sts graph, by( txid)

```
      failure _d:  eventindicvasc
    analysis time _t:  eventday

. sts gen surv=survf, by( txid)
survf unknown function
r(198);

. sts gen surv = survf, by( txid)
survf unknown function
r(198);

. sts gen survf = s, by( txid)

. edit
- preserve

. gen cumf =1-survf
(1 missing value generated)

. edit
- preserve

. scatter cumf _t if txid==1

. scatter cumf _t if txid==1, c(L) msymbol(O)

. scatter cumf _t if txid==1, c(L) msymbol(o)

. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")
xtitle ("Days
> of Follow-up")
invalid '"Days of Follow-up'
invalid syntax
r(198);

. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")

. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")
xtitle("Days"
> )

. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")
xtitle("Days
> of Follow-up")
```

Email 17

```
. scatter cumf _t if txid==1, c(L) msymbol(o) ytitle("Cumulative Incidence Proportion")
xtitle("Days
> of Follow-up") || scatter cumf _t if txid==0, c(L) msymbol(oh) legend(label(1
"Vioxx")) legend(labe
> l(2 "Naproxen"))

. stcox  txid

      failure _d: eventindicvasc
   analysis time _t: eventday

Iteration 0:   log likelihood = -96.640258
Iteration 1:   log likelihood = -92.498625
Iteration 2:   log likelihood = -92.398166
Iteration 3:   log likelihood = -92.397558
Iteration 4:   log likelihood = -92.397558
Refining estimates:
Iteration 0:   log likelihood = -92.397558


Cox regression -- Breslow method for ties

No. of subjects =       320             Number of obs  =      320
No. of failures =        18
Time at risk   =      73827
                                LR chi2(1)   =     8.49
Log likelihood  =  -92.397558           Prob > chi2  =   0.0036
```

| _t | Haz. Ratio | Std. Err. | z | P>\|z\| | [95% Conf. Interval] | |
|---|---|---|---|---|---|---|
| txid | 4.899172 | 3.099073 | 2.51 | 0.012 | 1.418004 | 16.92653 |



## Arbitblit, Donald C.

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Friday, June 02, 2006 2:00 PM |
| **To:** | Arbitblit, Donald C. |
| **Cc:** | beachlawyer51@hotmail.com; Gross, Jennifer; amyer@rcrlaw.net; twacker@rcrlaw.net |

**Subject:** RE: Jewell

Thanks Don. We'll wait until after Farquhar's deposition before deciding whether to file our motion.

Kim's deposition will be at:

Otjen, Van Ert, & Weir S.C.
University Research Park
450 Science Drive
Ste 110
Madison, Wisconsin
(608) 238-9500

The deposition will start at 8:00 a.m. The witness must leave by 5:00 p.m. The dep is also noticed for the upcoming California trials.

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should be considered to be attorney work product and/or attorney-client privileged. This communication is the property of Bartlit Beck Herman Palenchar & Scott LLP and is intended only for the use of the addressee. If you are not the intended recipient, please notify the sender, delete the message, and note that any distribution or copying of this message is prohibited. Any discussion of tax matters contained herein is not intended or written to be used, and cannot be used, for the purpose of avoiding any penalties that may be imposed under Federal tax laws.

**From:** Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
**Sent:** Friday, June 02, 2006 2:55 PM
**To:** andrew.goldman@bartlit-beck.com
**Cc:** beachlawyer51@hotmail.com; Gross, Jennifer; amyer@rcrlaw.net; twacker@rcrlaw.net
**Subject:** Jewell

Email 19

Andy,

I have reviewed your draft motion to compel, and this is submitted in response.

First, attached is Professor Jewell's analysis concerning high-risk patients, which Dr. Farquhar referenced in his Supplemental Report and the Barnett Report. We do not claim work product privilege as to materials reviewed and relied upon by Dr. Farquhar in preparation of his reports. We agree that you are entitled to production of documents prepared by Professor Jewell that Dr. Farquhar considered in arriving at the opinions he has expressed in his reports. We agree that the *Intermedics* case you cite is applicable to expert discovery, and that documents considered by an expert in forming his opinions are discoverable, regardless of whether they are relied upon or rejected.

However, it remains our view of the facts and the law that exceptional circumstances do not exist to justify deposition or discovery from Professor Jewell, a nontestifying expert, where all of the data came from Merck, where the methods used to analyze the data are comparable or identical to those Merck itself has used and reported as to particular portions of the same data, and where Merck is capable of obtaining information on the same subject by other means. The *Long Term Capital Holdings* case does not stand for the open-ended proposition that a nontestifying expert who provides a report relied upon by the testifying expert is always subject to deposition and discovery. To the contrary, in that case the court relied on the facts that the assistants spent the majority of the time on the project and chose the data to input from among "hundreds of thousands of pages" of documents that they reviewed. Here, Professor Jewell used the specified data sets that Merck provided, and the statistical tests are identified in the reports. The *Dura* case states mere dicta on the issue of nontestifying experts, while the holding was addressed to the exclusion of untimely reports. We see no general support in the case law for the proposition that nontestifying experts may be deposed to see if they did their jobs "competently," and such a view would contradict Rule 26 by permitting this type of discovery without the requisite showing of exceptional circumstances.

Please let us know whether you wish to discuss this further.

Finally, you had agreed to let us know the location for the Kim depo by June 1, so we could make travel plans. Please let us know today, if at all possible.

Don Arbitblit

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to postmaster@lchb.com

Email 20

**Arbitblit, Donald C.**

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Tuesday, June 13, 2006 9:19 PM |
| **To:** | Arbitblit, Donald C. |
| **Subject:** | Jewell |

Don, after reviewing Dr. Farquhar's deposition, I believe it is vital that we obtain document discovery from and a deposition of Dr. Jewell. Dr. Farquhar is clearly relying on Dr. Jewell and our inability to cross-examine Dr. Jewell directly prejudices our ability to cross-examine Farquhar at trial.

(1) Dr. Farquhar repeatedly deferred to Jewell when it came to certain statistical inquiries and even suggested that Merck ask questions of Jewell. For example:

```
Q   Dr. Farquhar, I'm asking you about the
10   second page of Professor Lagakos' essay where he's
11   discussing the problem of multiple subgroup analyses
12   and the possibility of false positives.  The first
13   sentence of the last paragraph of the first column
14   of that page says: "One way to correct for the
15   inflated false positive rate when multiple subgroup
16   analyses are conducted is to apply a stricter
17   criterion than the usual P equals 0.05 for judging
18   the significance of each interaction test."
19        Do you see that?
20   A   I see that.
21        MR. ARBITBLIT:  Objection to form.
22        THE WITNESS:  And this --
23   BY MR. MORTARA:
24   Q   Dr. Farquhar -- the question is do you see
25   that?
0142
1        MR. ARBITBLIT:  Don't interrupt him.
2        THE WITNESS:  I see that.  As I said, I
3   see everything that's in here.  And this entire
4   paragraph, and all the implications of it, are grist
5   for the mill of a discussion with Professor Jewell.
6   Professor Jewell has his way of looking at life and
7   he may or may not agree with this paragraph.  I
8   can't say since I am not a biostatistician.  This is
9   statistician language.
10   BY MR. MORTARA:
11   Q   You rely on Professor Jewell for
```

12   information of this character, correct?
13          MR. ARBITBLIT:  Object to form.
14          THE WITNESS:  I rely on Professor Jewell
15   currently as my colleague in not only this
16   consultation on Vioxx but on other issues.
17          And I also -- well, I'll just add that the
18   previous colleague, who is now no longer with us,
19   was one of the individuals who trained Professor
20   Jewell.  And so there's a long legacy of my
21   connection to Jewell and a long legacy of my trust
22   in his skill, ability and wisdom.
23          And what I am saying to you now is this
24   long paragraph on the second page here, he would
25   need to be asked how he interprets that and whether
0143
1    or not it's in contradiction to what he has put in
2    his text; and if so, how would he handle what's been
3    done in the APPROVe study and in our particular
4    analyses of the 203.
5          I shouldn't have said APPROVe; I should
6    have said 203, and APPROVe as well.
7      Q   Dr. Farquhar, the plaintiffs' attorneys
8    are not going to let me ask questions of Dr. Jewell,
9    unfortunately.  You have relied on Dr. Jewell and
10   written things about significant interaction in your
11   report, and I'm asking you what your understanding
12   of Professor Lagakos' essay is with respect to what
13   the appropriate p-value for interaction is to use
14   when multiple subgroup analyses are performed.
15          Do you understand what Professor Lagakos
16   is talking about?
17          MR. ARBITBLIT:  Object to form.
18          THE WITNESS:  Well, you know, about six
19   answers ago, I said the entire topic of subgroup
20   analyses has been around for a long time, and I
21   return to this answer, and then I think I'll want to
22   say I've answered the questions regarding this topic
23   by saying I rely fully on Professor Jewell's
24   attitudes and concepts and beliefs and opinion about
25   this paragraph and how it applies to our analyses on
0144
1    203 and APPROVe and of VIGOR and of any of the other
2    studies that we've analyzed.
3    BY MR. MORTARA:
4      Q   Have you ever asked Professor Jewell what

5   he thinks of Professor Lagakos' views?
6           Did you say no?
7   A    Well --
8           MR. ARBITBLIT:  Object to form.
9           THE WITNESS:  I told you that I haven't
10  seen the Lagakos article, so I can't have discussed
11  this specific article with him.  I have had
12  discussions on topics related to interaction tests.
13  BY MR. MORTARA:
14     Q    Your report says on page 7 of your
15  supplemental report:  "Tests of significant
16  interaction may be appropriately set at levels
17  greater than P equals 0.05," correct?
18     A    Well, we discussed that some time ago and
19  I said this is Professor Jewell's view and I hold to
20  his views.
21     Q    Whereas Professor Lagakos says:  "One way
22  to correct for the inflated false positive rate when
23  multiple subgroup analyses are conducted is to apply
24  a stricter criterion than the usual P equals 0.05."
25          That means Professor Lagakos thinks you
0145
1   should go lower than 0.05 but Professor Jewell
2   thinks you can be higher than 0.05, correct?
3           MR. ARBITBLIT:  Object to form.  Assumes
4   facts not in evidence.
5           THE WITNESS:  Return to the fact that
6   Jewell has his beliefs and his way of analyzing data
7   and he may or may not have a fundamental difference
8   of opinion with Lagakos.  And I submit that a single
9   article taken out of context cannot answer that
10  question of whether there is a wide disparity
11  between those two gentlemen.
12  BY MR. MORTARA:
13     Q    Dr. Farquhar, the first full sentence in
14  the second column on that same page says:  "For
15  example, if 10 tests are conducted, each one should
16  use 0.005 as the threshold for significance."
17          Do you see that?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  I see the whole article and
20  I return to -- I prefer to rely on Professor Jewell
21  and any subsequent dissection of this article, my
22  answer is that I trust Professor Jewell's views on
23  all items.

Email 23

24  BY MR. MORTARA:
25      Q   Do you recall earlier telling me you
0146
1   thought at least ten subgroup analyses had been
2   performed in the APPROVe study?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  Ten subgroup analyses have
5   not been performed on the 203 study.  And --
6   BY MR. MORTARA:
7      Q   Dr. Farquhar, could you turn to page 6 of
8   your report.  And the Section C is entitled:
9   "Patients in APPROVe."
10         Do you see that?
11     A   Yes.
12     Q   Section C of your supplemental report is
13  not about Protocol 203, is it?
14     A   No.
15     Q   Dr. Farquhar, over ten subgroup analyses
16  have been performed on the APPROVe data and
17  Professor Lagakos thinks that you should use at
18  least 0.005 as the threshold for significance, if
19  not something lower; isn't that right?
20         MR. ARBITBLIT:  Object to form,
21  mischaracterizes the record.  Professor Lagakos has
22  never had anything to say about APPROVe.
23         THE WITNESS:  Boy, oh boy.  You know, my
24  answer is I'm trying to get away from Lagakos and on
25  to Jewell.  So any opinion that Lagakos has
0147
1   expressed, I'll say again is not -- is out of
2   context, and Professor Jewell has his reasons for
3   picking a certain method of analysis and its
4   interpretation, and I trust his views.  And I do
5   not, at this point, have any opinions to offer about
6   Lagakos.
7   BY MR. MORTARA:
8      Q   You trust Dr. Jewell and the jury's
9   supposed to trust you when you say you trust
10  Dr. Jewell, correct?
11         MR. ARBITBLIT:  Object to form.
12  Argumentative.
13         MR. MORTARA:  Withdrawn.
14         THE WITNESS:  I'm not concerning myself
15  with juries.  I'm concerning myself with trusting
16  Professor Jewell.

17  BY MR. MORTARA:
18      Q    Dr. Farquhar, do you know if plaintiffs'
19  attorneys are going to allow Dr. Jewell to explain
20  himself and his analysis?
21      A    My belief is that they would, yes. But I
22  haven't asked the attorneys if they have such a
23  plan.
24      Q    Do you think the plaintiffs' attorneys
25  should allow Dr. Jewell to come to trial and explain
0148
1  to the jury his analysis and explain, if he can,
2  Professor Lagakos' views?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  I have no informed opinion
5  on what should happen with juries.  I just don't
6  know anything about that field.  So --
7  BY MR. MORTARA:
8      Q    Dr. Farquhar, I'll withdraw the question
9  and ask you this: You talk about tests for
10  significant interaction in your report, correct?
11      A    Yes.
12      Q    You rely on Dr. Jewell for that analysis,
13  correct?
14      A    Correct.
15          MR. ARBITBLIT:  Object to form.
16  BY MR. MORTARA:
17      Q    In explaining the tests for significant
18  interaction that you disclose in your report, do you
19  think that Dr. Jewell would do a better job
20  explaining what this means and explaining how
21  Professor Lagakos' essay affects his views?
22      A    Do I think Jewell --
23      Q    Withdrawn.
24          Dr. Farquhar, do you think it's
25  appropriate to have Dr. Jewell explain himself as to
0149
1  what he meant by the appropriate P for significant
2  interaction that you're relying on?
3      A    Well, I would say if that is something
4  that you and other attorneys would like to do, then
5  fine.  He needs to speak for himself.
6      Q    Dr. Farquhar, you understand that --
7  withdrawn.
8          The last sentence of the first full
9  paragraph on the third column of the second page of

10   the Lagakos essay, says: "Post hoc subgroup
11   analyses undertaken because of an intriguing trend
12   seen in the results or selective reporting of
13   certain subgroup analyses can be especially
14   misleading."
15         Do you see that?
16         MR. ARBITBLIT:  Object to form.
17         THE WITNESS:  I see that, but please honor
18   my previous statements that anything in the Lagakos
19   paper which is contrary to Professor Jewell's modus
20   operandi and planning for analyses needs to say that
21   Jewell trumps Lagakos.  And I really -- I'm trying
22   to avoid further discussion about Lagakos.
23   BY MR. MORTARA:
24    Q   You're trying to avoid further discussion
25   of Professor Lagakos' essay, correct?
0150
1          MR. ARBITBLIT:  Object to form.
2          THE WITNESS:  I'm trying to elevate the
3    respect for Professor Jewell.
4    BY MR. MORTARA:
5     Q   Dr. Farquhar, do you agree or disagree
6    that "Post hoc subgroup analyses undertaken because
7    of an intriguing trend seen in the results or
8    selective reporting of certain subgroup analyses can
9    be especially misleading"?
10         MR. ARBITBLIT:  Object to form.
11         THE WITNESS:  I propose that that question
12   be asked for Professor Jewell and put into the
13   context of the APPROVe study and the specific
14   analyses that he and I performed.


(2) Furthermore, Farquhar did not know what data Jewell used in the protocol 203
analysis Dr. Farquhar relies on.  Farquhar also didn't know whether that data
included the VICTOR final data produced to plaintiffs at the beginning of May:

7     Q   The only person that knows what data
8    Dr. Jewell used in his Protocol 203 analysis is
9    Dr. Jewell, correct?
10    A   Yes, that's ultimately correct.

***


    Q   I would have to ask Dr. Jewell what data

21   he used for his Protocol 203?
22        A    Correct.  And where he got it, and when he
23   received it.

Please let me know if you will produce Dr. Jewell for deposition as well as the
standard documents that both sides experts' are producing.

Thanks,

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

## Arbitblit, Donald C.

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Tuesday, June 13, 2006 9:36 PM |
| **To:** | Arbitblit, Donald C. |
| **Subject:** | RE: Jewell |

Thanks

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Tuesday, June 13, 2006 11:31 PM
To: andrew.goldman@bartlit-beck.com
Subject: Re: Jewell


Andy,
I will discuss with Mark Robinson and get back to you tomorrow.
Don

-----Original Message-----
From: Goldman, Andrew <andrew.goldman@bartlit-beck.com>
To: Arbitblit, Donald C. <DARBITBLIT@lchb.com>
Sent: Tue Jun 13 21:19:11 2006
Subject: Jewell

Don, after reviewing Dr. Farquhar's deposition, I believe it is vital that
we obtain document discovery from and a deposition of Dr. Jewell.  Dr.
Farquhar is clearly relying on Dr. Jewell and our inability to cross-examine
Dr. Jewell directly prejudices our ability to cross-examine Farquhar at
trial.

(1) Dr. Farquhar repeatedly deferred to Jewell when it came to certain
statistical inquiries and even suggested that Merck ask questions of Jewell.
For example:

```
Q   Dr. Farquhar, I'm asking you about the
10  second page of Professor Lagakos' essay where he's
11  discussing the problem of multiple subgroup analyses
12  and the possibility of false positives.  The first
13  sentence of the last paragraph of the first column
14  of that page says:  "One way to correct for the
15  inflated false positive rate when multiple subgroup
16  analyses are conducted is to apply a stricter
17  criterion than the usual P equals 0.05 for judging
18  the significance of each interaction test."
19          Do you see that?
20      A   I see that.
21          MR. ARBITBLIT:  Objection to form.
22          THE WITNESS:  And this --
23  BY MR. MORTARA:
24      Q   Dr. Farquhar -- the question is do you see
25  that?
0142
1           MR. ARBITBLIT:  Don't interrupt him.
2           THE WITNESS:  I see that.  As I said, I
3   see everything that's in here.  And this entire
```

1

Email 28

```
 4   paragraph, and all the implications of it, are grist
 5   for the mill of a discussion with Professor Jewell.
 6   Professor Jewell has his way of looking at life and
 7   he may or may not agree with this paragraph.   I
 8   can't say since I am not a biostatistician.   This is
 9   statistician language.
10   BY MR. MORTARA:
11          Q     You rely on Professor Jewell for
12   information of this character, correct?
13          MR. ARBITBLIT:  Object to form.
14          THE WITNESS:  I rely on Professor Jewell
15   currently as my colleague in not only this
16   consultation on Vioxx but on other issues.
17          And I also -- well, I'll just add that the
18   previous colleague, who is now no longer with us,
19   was one of the individuals who trained Professor
20   Jewell.  And so there's a long legacy of my
21   connection to Jewell and a long legacy of my trust
22   in his skill, ability and wisdom.
23          And what I am saying to you now is this
24   long paragraph on the second page here, he would
25   need to be asked how he interprets that and whether
0143
 1   or not it's in contradiction to what he has put in
 2   his text; and if so, how would he handle what's been
 3   done in the APPROVe study and in our particular
 4   analyses of the 203.
 5          I shouldn't have said APPROVe; I should
 6   have said 203, and APPROVe as well.
 7          Q     Dr. Farquhar, the plaintiffs' attorneys
 8   are not going to let me ask questions of Dr. Jewell,
 9   unfortunately.  You have relied on Dr. Jewell and
10   written things about significant interaction in your
11   report, and I'm asking you what your understanding
12   of Professor Lagakos' essay is with respect to what
13   the appropriate p-value for interaction is to use
14   when multiple subgroup analyses are performed.
15          Do you understand what Professor Lagakos
16   is talking about?
17          MR. ARBITBLIT:  Object to form.
18          THE WITNESS:  Well, you know, about six
19   answers ago, I said the entire topic of subgroup
20   analyses has been around for a long time, and I
21   return to this answer, and then I think I'll want to
22   say I've answered the questions regarding this topic
23   by saying I rely fully on Professor Jewell's
24   attitudes and concepts and beliefs and opinion about
25   this paragraph and how it applies to our analyses on
0144
 1   203 and APPROVe and of VIGOR and of any of the other
 2   studies that we've analyzed.
 3   BY MR. MORTARA:
 4          Q     Have you ever asked Professor Jewell what
 5   he thinks of Professor Lagakos' views?
 6          Did you say no?
 7          A     Well --
 8          MR. ARBITBLIT:  Object to form.
 9          THE WITNESS:  I told you that I haven't
10   seen the Lagakos article, so I can't have discussed
11   this specific article with him.  I have had
```

2

12    discussions on topics related to interaction tests.
13    BY MR. MORTARA:
14         Q    Your report says on page 7 of your
15    supplemental report: "Tests of significant
16    interaction may be appropriately set at levels
17    greater than P equals 0.05," correct?
18         A    Well, we discussed that some time ago and
19    I said this is Professor Jewell's view and I hold to
20    his views.
21         Q    Whereas Professor Lagakos says; "One way
22    to correct for the inflated false positive rate when
23    multiple subgroup analyses are conducted is to apply
24    a stricter criterion than the usual P equals 0.05."
25              That means Professor Lagakos thinks you
0145
1    should go lower than 0.05 but Professor Jewell
2    thinks you can be higher than 0.05, correct?
3              MR. ARBITBLIT:  Object to form.  Assumes
4    facts not in evidence.
5              THE WITNESS:  Return to the fact that
6    Jewell has his beliefs and his way of analyzing data
7    and he may or may not have a fundamental difference
8    of opinion with Lagakos.  And I submit that a single
9    article taken out of context cannot answer that
10    question of whether there is a wide disparity
11    between those two gentlemen.
12    BY MR. MORTARA:
13         Q    Dr. Farquhar, the first full sentence in
14    the second column on that same page says:  "For
15    example, if 10 tests are conducted, each one should
16    use 0.005 as the threshold for significance."
17              Do you see that?
18              MR. ARBITBLIT:  Object to form.
19              THE WITNESS:  I see the whole article and
20    I return to -- I prefer to rely on Professor Jewell
21    and any subsequent dissection of this article, my
22    answer is that I trust Professor Jewell's views on
23    all items.
24    BY MR. MORTARA:
25         Q    Do you recall earlier telling me you
0146
1    thought at least ten subgroup analyses had been
2    performed in the APPROVe study?
3              MR. ARBITBLIT:  Object to form.
4              THE WITNESS:  Ten subgroup analyses have
5    not been performed on the 203 study.  And --
6    BY MR. MORTARA:
7         Q    Dr. Farquhar, could you turn to page 6 of
8    your report.  And the Section C is entitled:
9    "Patients in APPROVe."
10              Do you see that?
11         A    Yes.
12         Q    Section C of your supplemental report is
13    not about Protocol 203, is it?
14         A    No.
15         Q    Dr. Farquhar, over ten subgroup analyses
16    have been performed on the APPROVe data and
17    Professor Lagakos thinks that you should use at
18    least 0.005 as the threshold for significance, if
19    not something lower; isn't that right?

                                3

Email 30

20          MR. ARBITBLIT:  Object to form,
21 mischaracterizes the record.  Professor Lagakos has
22 never had anything to say about APPROVe.
23          THE WITNESS:  Boy, oh boy.  You know, my
24 answer is I'm trying to get away from Lagakos and on
25 to Jewell.  So any opinion that Lagakos has
0147
1 expressed, I'll say again is not -- is out of
2 context, and Professor Jewell has his reasons for
3 picking a certain method of analysis and its
4 interpretation, and I trust his views.  And I do
5 not, at this point, have any opinions to offer about
6 Lagakos.
7 BY MR. MORTARA:
8          Q    You trust Dr. Jewell and the jury's
9 supposed to trust you when you say you trust
10 Dr. Jewell, correct?
11          MR. ARBITBLIT:  Object to form.
12 Argumentative.
13          MR. MORTARA:  Withdrawn.
14          THE WITNESS:  I'm not concerning myself
15 with juries.  I'm concerning myself with trusting
16 Professor Jewell.
17 BY MR. MORTARA:
18          Q    Dr. Farquhar, do you know if plaintiffs'
19 attorneys are going to allow Dr. Jewell to explain
20 himself and his analysis?
21          A    My belief is that they would, yes.  But I
22 haven't asked the attorneys if they have such a
23 plan.
24          Q    Do you think the plaintiffs' attorneys
25 should allow Dr. Jewell to come to trial and explain
0148
1 to the jury his analysis and explain, if he can,
2 Professor Lagakos' views?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  I have no informed opinion
5 on what should happen with juries.  I just don't
6 know anything about that field.  So --
7 BY MR. MORTARA:
8          Q    Dr. Farquhar, I'll withdraw the question
9 and ask you this:  You talk about tests for
10 significant interaction in your report, correct?
11          A    Yes.
12          Q    You rely on Dr. Jewell for that analysis,
13 correct?
14          A    Correct.
15          MR. ARBITBLIT:  Object to form.
16 BY MR. MORTARA:
17          Q    In explaining the tests for significant
18 interaction that you disclose in your report, do you
19 think that Dr. Jewell would do a better job
20 explaining what this means and explaining how
21 Professor Lagakos' essay affects his views?
22          A    Do I think Jewell --
23          Q    Withdrawn.
24          Dr. Farquhar, do you think it's
25 appropriate to have Dr. Jewell explain himself as to
0149
1 what he meant by the appropriate P for significant

                              4

```
2     interaction that you're relying on?
3          A    Well, I would say if that is something
4     that you and other attorneys would like to do, then
5     fine.  He needs to speak for himself.
6          Q    Dr. Farquhar, you understand that --
7     withdrawn.
8               The last sentence of the first full
9     paragraph on the third column of the second page of
10    the Lagakos essay, says:  "Post hoc subgroup
11    analyses undertaken because of an intriguing trend
12    seen in the results or selective reporting of
13    certain subgroup analyses can be especially
14    misleading."
15              Do you see that?
16          MR. ARBITBLIT:  Object to form.
17          THE WITNESS:  I see that, but please honor
18    my previous statements that anything in the Lagakos
19    paper which is contrary to Professor Jewell's modus
20    operandi and planning for analyses needs to say that
21    Jewell trumps Lagakos.  And I really -- I'm trying
22    to avoid further discussion about Lagakos.
23    BY MR. MORTARA:
24          Q    You're trying to avoid further discussion
25    of Professor Lagakos' essay, correct?
0150
1           MR. ARBITBLIT:  Object to form.
2           THE WITNESS:  I'm trying to elevate the
3     respect for Professor Jewell.
4     BY MR. MORTARA:
5           Q    Dr. Farquhar, do you agree or disagree
6     that "Post hoc subgroup analyses undertaken because
7     of an intriguing trend seen in the results or
8     selective reporting of certain subgroup analyses can
9     be especially misleading"?
10          MR. ARBITBLIT:  Object to form.
11          THE WITNESS:  I propose that that question
12    be asked for Professor Jewell and put into the
13    context of the APPROVe study and the specific
14    analyses that he and I performed.
```

(2) Furthermore, Farquhar did not know what data Jewell used in the protocol
203 analysis Dr. Farquhar relies on.  Farquhar also didn't know whether that
data included the VICTOR final data produced to plaintiffs at the beginning
of May:

```
7           Q    The only person that knows what data
8     Dr. Jewell used in his Protocol 203 analysis is
9     Dr. Jewell, correct?
10          A    Yes, that's ultimately correct.
```

***

```
Q     I would have to ask Dr. Jewell what data
21    he used for his Protocol 203?
22          A    Correct.  And where he got it, and when he
23    received it.
```

Please let me know if you will produce Dr. Jewell for deposition as well as
the standard documents that both sides experts' are producing.

5

Email 32

Thanks,

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

*Email 33*

## Arbitblit, Donald C.

| | |
|---|---|
| **From:** | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| **Sent:** | Thursday, June 15, 2006 3:07 AM |
| **To:** | Arbitblit, Donald C. |
| **Cc:** | beachlawyer51@hotmail.com |
| **Subject:** | RE: Any word from Mark on Jewell? |

You are trying to take advantage of our request to depose Dr. Jewell.  We will object to any effort to produce a rebuttal expert report as they it is prohibited by the scheduling order (which supersedes any federal rule).

It is far too late to be giving us expert reports.

Let's discuss this after Avorn's deposition, which I am about to take.

Andy


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should be considered to be attorney work product and/or attorney-client privileged. This communication is the property of Bartlit Beck Herman Palenchar & Scott LLP and is intended only for the use of the addressee. If you are not the intended recipient, please notify the sender, delete the message, and note that any distribution or copying of this message is prohibited.  Any discussion of tax matters contained herein is not intended or written to be used, and cannot be used, for the purpose of avoiding any penalties that may be imposed under Federal tax laws.


-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Thursday, June 15, 2006 12:09 AM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawyer51@hotmail.com
Subject: Re: Any word from Mark on Jewell?


I spoke to Mark this afternoon about your email. Our intention is to serve a rebuttal expert report prepared by Dr. Jewell, and to provide him for deposition on the subjects as to which Dr. Farquhar referred to or relied upon Dr. Jewell, as well as any additional issues raised by the rebuttal report. By rule, we would have 30 days from June 1 to serve a rebuttal report, but we are willing to work with you on scheduling. We suggest getting a report to you by June 21, to give Dr. Jewell  time to review the transcript of Dr. Kim (not yet received) and to otherwise prepare his report, followed by a deposition in SF on June 28. I will be available to

1

Email 34

discuss this proposal tomorrow, if you like, or send me an email.

-----Original Message-----
From: Goldman, Andrew <andrew.goldman@bartlit-beck.com>
To: Arbitblit, Donald C. <DARBITBLIT@lchb.com>
Sent: Wed Jun 14 21:10:47 2006
Subject: Any word from Mark on Jewell?


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should
be considered to be attorney work product and/or attorney-client privileged.
This communication is the property of Bartlit Beck Herman Palenchar & Scott
LLP and is intended only for the use of the addressee. If you are not the
intended recipient, please notify the sender, delete the message, and note
that any distribution or copying of this message is prohibited.  Any
discussion of tax matters contained herein is not intended or written to be
used, and cannot be used, for the purpose of avoiding any penalties that may
be imposed under Federal tax laws.


This email message is for the sole use of the intended recipient(s) and may
contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply
email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to
postmaster@lchb.com

Email 35

## Arbitblit, Donald C.

| | |
|---|---|
| **From:** | Arbitblit, Donald C. |
| **Sent:** | Wednesday, June 21, 2006 9:55 PM |
| **To:** | 'Andrew.Goldman@bartlit-beck.com' |
| **Cc:** | 'beachlawyer51@hotmail.com' |
| **Subject:** | FW: Jewell Rebuttal Report |



Document1.pdf (5
MB)

Andy,

As mentioned in my previous email, attached is the rebuttal expert report of Dr. Jewell. We understand that you have stated objections to the submission of rebuttal reports, which were the subject of discussion with Judge Fallon on Monday. As noted at that time, we believe that we have the right to submit rebuttal reports under the Federal Rules. A rebuttal from Professor Jewell is particularly appropriate in light of the issues raised by defendant in the deposition of Dr. Farquhar, as well as the report and deposition of defense expert Dr. Kirn.

Please let us know whether you intend to take Professor Jewell's deposition. We had previously offered to make him available on June 28, and this offer still holds. He is also available on June 29. It is our intention to permit deposition of Professor Jewell without either side waiving its position as to the submission of rebuttal reports.

Don

1

Email 36

John W. Farquhar, M.D.

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF LOUISIANA
 3
 4   In re:  VIOXX
     PRODUCTS LIABILITY
 5   LITIGATION
 6
 7   GERALD BARNETT and CORRINE          )
     BARNETT,                           )
 8                                      )MDL Docket No. 1657
              Plaintiffs,               )
 9                                      )
     vs.                                )
10                                      )
     MERCK & CO., INC.,                 )
11                                      )
              Defendant.                )
12                                      )
     _____)
13
14
15
16      VIDEOTAPED DEPOSITION OF JOHN W. FARQUHAR, M.D.
17                San Francisco, California
18                     June 8, 2006
19
20
21
22
23
24   Reported by:
     DARCY J. BROKAW
25   RPR, CRR, CSR No. 12584
     Job No. 69492
```

EXHIBIT 4

John W. Farquhar, M.D.

Page 62

1    you know, other trials.

2         And that's what I've tried to do in my

3    supplementary report is pick a high-risk subgroup

4    that is more generally represented, representative

5    of the high-risk state in cardiovascular trials.

6    BY MR. MORTARA:

7         Q    You picked a high-risk subgroup in your

8    supplemental report that was not pre-specified in

9    the data analysis plan, correct?

10        A    That's not correct.  And I think at this

11   point, you know, I alluded to the increased

12   cardiovascular risk in Table 19, right.  I alluded

13   to that.

14        The subgroup analysis as we -- as I --

15   described it -- and "we" means Professor Jewell and

16   I -- says that diabetics were included -- but what

17   I'm saying to you now, and I have a document that

18   will clarify this, is that what is in the

19   supplemental report is, in fact, only the group

20   identified as increased cardiovascular risk.

21        Q    In the APPROVe study?

22        A    Right.

23        Q    When you did your analysis in your

24   supplemental report, you used the prespecified high

25   cardiovascular risk subgroup of the APPROVe study --

John W. Farquhar, M.D.

Page 63

1    A    Correct.

2    Q    -- as defined by Merck?

3    A    Correct.

4    Q    Dr. Farquhar, when assessing the

5    statistical reliability of a subgroup, how does one

6    use a P for interaction?

7    A    Well, there are two -- a P for interaction

8    is looking to see if there is a synergistic

9    relationship between the attribute in question and

10   the end point that has been studied.

11        So Professor Jewell is the individual who

12   performed that analysis for me, or for us, to the

13   extent that he's part of the report.  And his --

14   would you want to know more about the level of

15   p-value that -- is that what you're looking for?

16   Q    I'll ask another question.  We'll get

17   there.  Thank you, Dr. Farquhar.

18        When you assess the statistical

19   reliability of a subgroup, you look at the P for

20   interaction to see if it's above a certain number or

21   not, correct?

22   A    That's only one thing I look for.  The

23   first thing I look for is whether or not there is a

24   significant difference in the value of -- well, two

25   things.  The value of the Vioxx group at high risk

John W. Farquhar, M.D.

Page 71

1     Q     You assumed that cardiac events were

2  identified as a secondary end point of Protocol 203,

3  correct?

4     A     I'm going to -- I'm going to say yes but

5  one of the reasons that this supplement shows as

6  Figure 1, cardiac events, is that Mr. Barnett, the

7  case in whom I am, for whom, with whom, by whatever,

8  that I'm involved in his case, he represents an

9  individual with cardiac events.  And so this is

10  relevant to his case.

11     Q     The end point most relevant to Mr. Barnett

12  is cardiac events, in your opinion?

13     A     Yes.

14     Q     Dr. Farquhar, could you turn to page 5 of

15  your 2006 supplemental report.  And paragraph 8,

16  first sentence reads:  "Since all of the Protocol

17  203 studies were terminated on the same date,

18  (9/30/04), there was no apparent impediment to

19  simultaneously collecting the data and presenting

20  the pooled analysis of CV risk for all three trials,

21  as prespecified."

22          Do you see that?

23     A     Yes.

24     Q     Is the VICTOR study part of the Protocol

25  203?

John W. Farquhar, M.D.

Page 72

1      A    Yes.

2      Q    Who ran the VICTOR study?

3           MR. ARBITBLIT:  Object to form.

4           THE WITNESS:  Well, the investigators,

5    supported by Merck.

6    BY MR. MORTARA:

7      Q    Do you know if Merck was in control of the

8    data collection for the VICTOR study?

9           MR. ARBITBLIT:  Object to form.

10          THE WITNESS:  I'm assuming that the data

11   collected in all three studies was done

12   appropriately.

13   BY MR. MORTARA:

14     Q    That's not what I'm asking.  I'm asking:

15   Do you know if data collection for the VICTOR study

16   was done by Merck or by the University of Oxford?

17     A    Well, the data collection would be by the

18   investigators, as I said.

19     Q    Who controlled the VICTOR data, do you

20   know?

21          MR. ARBITBLIT:  Object to form.

22          THE WITNESS:  Controlled -- I don't

23   understand the word "controlled."

24   BY MR. MORTARA:

25     Q    Do you know when the VICTOR data became

John W. Farquhar, M.D.

1    final, sir?

2            MR. ARBITBLIT:  Object to form.

3            THE WITNESS:  Well, in order -- do I know

4    when it became final?

5            Thank you very much.

6            What this sentence says is the data, at

7    the time of termination, there was no impediment to

8    simultaneously collecting that data and reporting

9    it, and that's my statement.

10   BY MR. MORTARA:

11       Q    No impediment to whom, sir?  To Merck?

12           MR. ARBITBLIT:  Object to form.

13           THE WITNESS:  Well, no impediment to the

14   investigators and to Merck as well, because the

15   investigators are part of a Merck-sponsored study.

16   And if they don't have a relationship that -- where

17   one party knows when the study is terminated, then

18   that's a very strange situation.

19   BY MR. MORTARA:

20       Q    When did the VICTOR trial investigators

21   finalize the VICTOR trial data?

22           MR. ARBITBLIT:  Object to form.

23           THE WITNESS:  What this sentence is

24   talking about --

25

John W. Farquhar, M.D.

Page 74

1    BY MR. MORTARA:

2        Q    I'm not asking about this sentence, sir.

3             I'm asking you:  When did the VICTOR trial

4    data become final?  Do you know?

5        A    9/30/04.

6        Q    Have you asked plaintiffs' lawyers when

7    the VICTOR trial data became final?

8             MR. ARBITBLIT:  Object to form.

9             THE WITNESS:  Well, this sentence was

10   something that plaintiffs' lawyers have agreed to.

11   BY MR. MORTARA:

12       Q    Plaintiffs' lawyers told you that the

13   VICTOR trial data was final September 30th of '04;

14   is that correct?

15            MR. ARBITBLIT:  Object to form.

16            THE WITNESS:  Well, I think there's a

17   misunderstanding.  All of the trials needed -- okay.

18   They were all -- they were terminated in the sense

19   of what Protocol 203 -- getting Protocol 203

20   analyzed in a timely manner would require that all

21   three studies end at that time.

22            Now, if the investigators continued to

23   collect data as they have in APPROVe, then that's

24   supplementary data.

25

John W. Farquhar, M.D.

Page 75

1    BY MR. MORTARA:

2       Q    And if a patient comes in six months after

3    September 30th, 2004 and says, "I had an event with

4    my primary physician in March of '04," that could

5    still get counted in the data analysis plan,

6    couldn't it?

7               MR. ARBITBLIT:  Object to the form.

8               THE WITNESS:  The analysis that we

9    performed, Professor Jewell and I, on 203 was the

10   data of APPROVe; it didn't include the extension

11   data of APPROVe because it wasn't available.  It

12   included the VICTOR and the ViP data, as it was --

13   as -- it included the data that was available by

14   9/30/04.

15   BY MR. MORTARA:

16      Q    Dr. Farquhar, investigators do not perform

17   their data analysis until they've frozen their

18   statistical file, correct?

19              MR. ARBITBLIT:  Object to form.

20              THE WITNESS:  Well, the ViP data that we

21   used was available.

22   BY MR. MORTARA:

23      Q    Dr. Farquhar, my question is:  When

24   investigators are reporting results of a clinical

25   study, they do not do the statistical analysis until

John W. Farquhar, M.D.

1   the file is frozen, correct?

2           MR. ARBITBLIT:  Object to form.

3           THE WITNESS:  Well, it's frozen and then

4   there's -- "frozen" has a volitional element to it.

5   And if 203 is being assembled and analyzed and

6   reported in a timely manner, then data from all

7   three elements need to be included.

8   BY MR. MORTARA:

9       Q    The data from all three components of 203,

10  APPROVe, VICTOR and ViP, needs to be frozen before

11  Protocol 203 can be reported, correct?

12          MR. ARBITBLIT:  Object to form.

13          THE WITNESS:  "Frozen" is your word.  It

14  needs to be obtained.

15  BY MR. MORTARA:

16      Q    Do you understand what it means for data

17  to be frozen in a clinical trial?

18          MR. ARBITBLIT:  Object to form.

19          THE WITNESS:  Well, I just don't like the

20  word "frozen."  I think yes, I do know what that

21  means.

22  BY MR. MORTARA:

23      Q    It's a term used in randomized clinical

24  trials, correct?

25      A    Some people use that.  I don't.

John W. Farquhar, M.D.

1    Q    It's a term statisticians use, isn't it?

2    A    Some of them do, yes.

3    Q    And the way statisticians use the term

4  "frozen" is to mean the data has been collected and

5  the database is locked for analysis, correct?

6    A    Frozen and locked.  I mean, APPROVe is

7  doing an extension trial that required unfreezing

8  and unlocking and continuing to accumulate, and then

9  freezing and locking, and will it continue?  In

10  other words, it's a sequential manner.

11    Q    With that understanding, Dr. Farquhar,

12  Protocol 203 could not be completed until the

13  on-treatment results were obtained for APPROVe,

14  VICTOR and ViP, and that those three trials had had

15  their databases locked, correct?

16    A    What I'm saying is the investigators in

17  VICTOR and ViP had an obligation to freeze and

18  unlock and analyze their data in order to allow a

19  timely analysis of 203.

20         Now, what is missing in all of this is the

21  source of the ViP data that I was provided

22  represents data that had been analyzed and therefore

23  unlocked.  I've heard indirectly, and I don't know

24  much about it, that the investigators in Oxford had

25  some lag in data analysis.

John W. Farquhar, M.D.

1          But all I'm saying is the data that I was

2    provided on ViP was available to the plaintiffs'

3    lawyers.  And in order to find out the source of

4    that, we would need to get the MRK number and look

5    at it.

6        Q    Dr. Farquhar, you state in your

7    supplemental report that there was no apparent

8    impediment to simultaneously collecting the data and

9    presenting the pooled analysis of CV risk for all

10   three trials as prespecified --

11          (Reporter interruption.)

12   BY MR. MORTARA:

13       Q    There was no apparent impediment to

14   simultaneously collecting the data and presenting

15   the pooled analysis of CV risk for all three trials.

16          You said that in your report, didn't you?

17       A    Yes, I did.

18       Q    Now, if the VICTOR trial data wasn't

19   complete, that's an impediment, isn't it?

20          MR. ARBITBLIT:  Object to form.

21          THE WITNESS:  I'm sorry.  The APPROVe data

22   wasn't complete either.

23   BY MR. MORTARA:

24       Q    When did the VICTOR trial data become

25   final, sir?

John W. Farquhar, M.D.

Page 79

1           MR. ARBITBLIT:  Object to form.

2           THE WITNESS:  The data that I've used on

3     VICTOR was available to the plaintiffs' attorneys

4     and we would need to look at the MRK to see the date

5     that that represented.

6     BY MR. MORTARA:

7         Q     Have any of the plaintiffs' attorneys told

8     you that the VICTOR data did not become final until

9     early May 2006?

10          MR. ARBITBLIT:  Object to the form.

11    Mischaracterizes the record.

12    BY MR. MORTARA:

13        Q     Have you ever heard that the VICTOR data

14    became final in May 2006?

15          MR. ARBITBLIT:  Object to form.

16          THE WITNESS:  What I said earlier is that

17    I've been told that there were delays in obtaining

18    the VICTOR data, but what I said before and will say

19    again is the VICTOR data that appears in here as

20    part of 203 was obtained by the plaintiffs'

21    attorneys, and I am not aware of impediments to

22    their obtaining it, I'm not aware of the specific

23    details of what that Merck document has revealed,

24    and that would have to be explored with the

25    plaintiffs' attorneys.

John W. Farquhar, M.D.

1    I cannot furnish any more information

2   other than saying, as I have already, that when

3   APPROVe was terminated, then VICTOR and ViP needed

4   to have data available up to that time analyzed and

5   included.

6    Q    Dr. Farquhar, if the VICTOR trial data

7   only became final last month, it's possible that now

8   a Protocol 203 analysis could be performed with all

9   the final trial data, correct?

10    MR. ARBITBLIT:  Object to form.

11    THE WITNESS:  Well, I've gone through this

12   about four times, that the obligation of the

13   investigators is to assemble the data available at

14   that time.

15    Now, we're stuck on VICTOR.  I mean, you

16   can't terminate VICTOR after the date of this report

17   and say that's the only data of value.  The VICTOR

18   data that was available to the plaintiffs' attorneys

19   is what appears in Protocol 203 analysis.

20   BY MR. MORTARA:

21    Q    Who's responsible for reporting the VICTOR

22   trial data?

23    MR. ARBITBLIT:  Object to form.

24    THE WITNESS:  Well, fundamentally, the

25   investigators are responsible to do the appropriate

John W. Farquhar, M.D.

Page 81

1    thing.   And if this whole 203 plan was distorted and

2    violated from its original purpose, then whoever did

3    that has made a mistake.

4    BY MR. MORTARA:

5        Q    If the VICTOR trial investigators

6    collected data for the VICTOR trial from the period

7    that the trial ended, September 30th, 2004, up until

8    early May 2006, do you blame the VICTOR trial

9    investigators for delaying in their data analysis?

10           MR. ARBITBLIT:  Object to form.

11           THE WITNESS:  Okay.  This is May 22nd,

12   2006.  Are you saying that I should have had some

13   additional data on VICTOR?

14   BY MR. MORTARA:

15       Q    Dr. Farquhar, I'm only asking you whether

16   or not you know that the VICTOR trial data was made

17   final in 2006.

18           MR. ARBITBLIT:  Object to form.

19           THE WITNESS:  Well, what I said earlier is

20   I knew there were delays, but I don't know the exact

21   date when the investigators decided it was final.

22   But I'll repeat that the VICTOR data that appears in

23   this analysis was available to the plaintiffs'

24   attorneys, and I cannot tell you the cutoff date for

25   the events that are present in the data they

John W. Farquhar, M.D.

1    obtained.

2              In order to explore that, I would have to

3    read the Merck document that is responsible for that

4    data.

5    BY MR. MORTARA:

6        Q    Dr. Farquhar, do you think Merck delayed

7    analyzing Protocol 203 data?

8        A    Well, let me answer that by saying that

9    this is the first analysis of 203 data that has

10   appeared in a form like this, to the best of my

11   knowledge, and yes, I believe that it should have

12   been analyzed and reported much earlier.

13       Q    If the VICTOR trial investigators had

14   delays, as you described them, associated with their

15   data collection, is that Merck's fault?

16            MR. ARBITBLIT:  Object to form.

17            THE WITNESS:  Well, you know, you're

18   asking me what kind of relationship existed between

19   the investigators and Merck, and that I cannot

20   answer.  But I want to return to saying that what is

21   analyzed as VICTOR here was available to the

22   plaintiffs' attorneys prior to May 22nd of '06.

23   BY MR. MORTARA:

24       Q    You understand that --

25            MR. ARBITBLIT:  Don't interrupt him,

John W. Farquhar, M.D.

1   Counsel.  Let him finish.

2   BY MR. MORTARA:

3       Q    Are you finished?

4       A    Not quite.  I'm saying that it had to be

5   available before May 22nd, 2006 in order for it to

6   be analyzed by Professor Jewell and, you know,

7   created jointly in the form that it appears in the

8   supplemental report.

9            So the missing ingredient here is -- first

10  of all, you're asking me to know the relationship

11  between Merck and the investigators of VICTOR.

12  That, I can't say with any important knowledge at

13  all, other than having heard there was -- there were

14  some delays.

15           So I do not know when the data cut point

16  for VICTOR was that gave the data that appears in

17  this analysis.  In order to do so, we would have to

18  have plaintiffs' attorneys provide the documents

19  that they obtained with the VICTOR data.

20      Q    Do you know whether or not Dr. Jewell used

21  the final VICTOR data in his analysis?

22      A    If it didn't become available until

23  May 26th, he obviously used what was available prior

24  to that time.

25      Q    If it became available to plaintiffs'

John W. Farquhar, M.D.

Page 84

1    attorneys on May 5th, 2006, do you know if

2    Dr. Jewell used the final VICTOR data?

3           MR. ARBITBLIT:  Object to form.

4           THE WITNESS:  Well, again, you're asking

5    me a question that I have answered, I think, four or

6    five times.

7           The plaintiffs' attorneys would have to be

8    the one to tell you the cut point at the -- used in

9    the VICTOR data supplied to Jewell and to me.  And I

10   cannot give you that date.  I just can't.

11   BY MR. MORTARA:

12      Q    If it's correct that the VICTOR final data

13   was produced to plaintiffs on May 5th, 2006, you

14   don't know whether or not Dr. Jewell used that data?

15   Only Dr. Jewell knows that; is that correct?

16          MR. ARBITBLIT:  Object to form.

17          THE WITNESS:  Well --

18   BY MR. MORTARA:

19      Q    I'll ask it a different way.  Do you know

20   when Dr. Jewell performed his statistical analysis

21   of Protocol 203 for you?

22      A    Let's see what date is on his two things

23   that he's given us.

24          Here is --

25      Q    That's okay.  Dr. Farquhar, I'll just mark

John W. Farquhar, M.D.

1    them as exhibits, if you don't mind.

2         A    Okay.

3              MR. MORTARA:   I'll mark Jewell's Protocol

4    203 analysis as Exhibit 5 and you can use that one.

5                        (Exhibit No. 5 was marked for

6                         identification.)

7    BY MR. MORTARA:

8         Q    And this is -- Exhibit 5 is Dr. Jewell's

9    Protocol 203 analysis, correct?

10        A    Mm-hmm.

11        Q    Dr. Jewell didn't put his name anywhere on

12   the Protocol 203 analysis, did he?

13        A    No.

14        Q    Dr. Jewell didn't sign his Protocol 203

15   analysis, did he?

16        A    No.

17        Q    Dr. Jewell didn't date his Protocol 203

18   analysis, did he?

19        A    No.  And I'm trying to answer your

20   question when did it -- when did the analyses occur,

21   and I can't give you the exact date.  I'll put it

22   another way.  There was certainly a lot of desire to

23   finish the supplemental report, and getting it done

24   by May 22nd took a lot of hustling, and there was

25   some date prior to that when these analyses were