John W. Farquhar, M.D.

1    done.

2            Now, if the plaintiffs' attorneys had data

3    on VICTOR that they did not supply Professor Jewell

4    and me, then we need to ask them that question.  We

5    can't ask me that question because I don't have the

6    answer.

7        Q    The only person that knows what data

8    Dr. Jewell used in his Protocol 203 analysis is

9    Dr. Jewell, correct?

10       A    Yes, that's ultimately correct.

11       Q    And sitting here today, you don't know if

12   Dr. Jewell got an updated data package in May 2006

13   or not?

14       A    May 22nd.

15       Q    May 2006.

16       A    You know, I understand that.  I'm just

17   thinking of May 22nd and I'm trying to guess the

18   dates that these were produced.  I would think they

19   would likely have been in April but I can't be sure.

20       Q    I would have to ask Dr. Jewell what data

21   he used for his Protocol 203?

22       A    Correct.  And where he got it, and when he

23   received it.

24       Q    Thank you, Dr. Farquhar.

25       A    You're welcome.

John W. Farquhar, M.D.

Page 133

1    reclassification of these two patients, correct?

2              MR. ARBITBLIT:  Object to form.

3              THE WITNESS:  Well, you know, the meaning

4    of words, I have looked over the data and explored

5    its origins.  And so in that sense, I have added a

6    verification step.

7    BY MR. MORTARA:

8         Q    You didn't check Ms. Gross, the

9    plaintiff's lawyer's, work with respect to these two

10   patients on page 2 of Exhibit 7, did you?

11             MR. ARBITBLIT:  Object to form.

12             THE WITNESS:  I answered that.

13   BY MR. MORTARA:

14        Q    You didn't look at the adverse event

15   reports, did you?

16        A    I've answered the question.

17             MR. ARBITBLIT:  Object to form --

18             THE WITNESS:  -- about these data.

19   BY MR. MORTARA:

20        Q    Dr. Farquhar, turning back to your report,

21   Supplemental Report, page 7, the first full sentence

22   on page 7 reads:  "Because interaction tests divide

23   the population into subgroups for comparison, the

24   power to detect important differences is reduced."

25             Do you see that?

John W. Farquhar, M.D.

1      A     Yes.

2      Q     The next sentence reads:   "Therefore,

3   tests of significant interaction may be

4   appropriately set at levels greater than the P

5   equals 0.05 level commonly established for

6   significance testing primary effects."

7            Do you see that?

8      A     Yes.

9      Q     You cite Dr. Jewell's book for that

10  proposition, correct?

11     A     I cite his book and I cite his stated

12  reasons for having put that in the book since we

13  have discussed these issues.

14     Q     It's your opinion that when doing a

15  subgroup analysis, you can set a p for interaction

16  above 0.05 and still have it be significant,

17  correct?

18     A     You need to distinguish between tests of

19  interaction versus tests of significant differences

20  and Dr. Professor Jewell is only talking about the

21  test for interaction.

22     Q     I'm only talking about the test for

23  interaction too so I'll ask the question again.

24  It's your opinion that in a significant interaction

25  can be found with a p for interaction greater than

John W. Farquhar, M.D.

1    0.05 when doing a subgroup analysis, correct?

2         A    Professor Jewell's actual words are that

3    one should see p-values as high as .2 as indicative

4    of a possible relationship and that one should

5    not -- and now I'm paraphrasing -- have a slavish

6    devotion to a single p-value of .05 in judging

7    interaction terms.  This is -- now particularly

8    heightened if you're dealing with the possibility of

9    harmful effect.

10             Now, I think my conclusion is that I agree

11   with Professor Jewell and would also point out that

12   the p-values that we list are not as high as .2.

13   And later when we get to hypertension, I will draw

14   your attention to even lower p-values for

15   interaction.

16        Q    Dr. Farquhar, you rely on Dr. Jewell to

17   set the level of significant interaction to a p of

18   less than or equal to .2, approximately?

19             MR. ARBITBLIT:  Object to form.

20             THE WITNESS:  No.  I'm going to repeat and

21   then leave it at that.  I'm going to repeat that the

22   language he uses is that a p-value as high as .2

23   should be considered to point to the possibility of

24   a meaningful interaction.

25             And he doesn't say that he's going to like

1   .2 better than he'll like .1.  He just wants to draw

2   the line higher to indicate the importance of

3   scientists considering a p-value of greater than .05

4   when one is looking at the possibility of an

5   interaction.

6   BY MR. MORTARA:

7       Q    Scientists should consider p-values for

8   interaction above .05 still as meaningful and

9   significant, correct?

10              MR. ARBITBLIT:  Object to form.

11              THE WITNESS:  I have answered that.

12   BY MR. MORTARA:

13       Q    Dr. Farquhar, have you ever heard of Steve

14   Lagakos?

15       A    No.

16       Q    Do you read the New England Journal of

17   Medicine?

18       A    Sometimes.

19              MR. MORTARA:  Handing you what's marked as

20   Exhibit 8.

21                      (Exhibit No. 8 marked for

22                      identification.)

23   BY MR. MORTARA:

24       Q    Exhibit 8 is an essay from the New England

25   Journal of Medicine by Stephen Lagakos, published on

John W. Farquhar, M.D.

Page 137

1    April 20th, 2006; the title of which is:  "The

2    Challenge of Subgroup Analyses -- Reporting Without

3    Distorting."

4            Dr. Farquhar, have you ever seen this

5    essay on Subgroup Analyses?

6        A    No, but, you know, I've scanned it briefly

7    and this is not talking about interaction.  It's

8    talking about multiple testing.  And that warning

9    has been around for a long time.

10       Q    We'll get to that.

11           Dr. Farquhar, you've seen this before?

12       A    No, I haven't.

13       Q    Dr. Farquhar, I'll represent to you,

14   Professor Lagakos is the chairman of biostatistics

15   at Harvard University.  As you can see at the end of

16   the article, it says he's a professor, but he's also

17   the chairman.  The first sentence of the essay

18   reads:  "Subgroup analyses are an important part of

19   the analysis of a comparative clinical trial."

20           Do you see that?

21       A    Yes.  I see the whole article.

22       Q    The next sentence says:  "However, they

23   are commonly misinterpreted and can lead to further

24   research that is misguided or worse, to suboptimal

25   patient care."

John W. Farquhar, M.D.

1          Do you see that?

2       A    I see that.  I said I've seen it all and I

3   will then match you with Professor Jewell, who for

4   six years was Provost of the University of

5   California in Berkeley.

6          And so for the fact that Dr. Lagakos is

7   professor of biostatistics at the Harvard School of

8   Public Health doesn't mean that his opinion trumps

9   that of Professor Jewell.

10      Q    Thank you for telling me that about

11  Dr. Jewell.  One difference between Dr. Jewell and

12  Professor Lagakos, as far as you know, is that

13  Dr. Jewell is being paid by plaintiffs' lawyers and

14  Professor Lagakos is not, correct?

15          MR. ARBITBLIT:  Object to form.

16  Argumentative.

17          THE WITNESS:  That's really wild, you

18  know.  He wrote the book on his own.  We're citing

19  his opinions.

20  BY MR. MORTARA:

21      Q    Yes or no, Dr. Jewell is being paid by

22  plaintiffs' lawyers?

23          MR. ARBITBLIT:  Object to form.

24          THE WITNESS:  For what purpose?

25

John W. Farquhar, M.D.

1    BY MR. MORTARA:

2         Q    For his work in this case.

3              MR. ARBITBLIT:  Object to form.

4              THE WITNESS:  Is that -- but for his work

5    in this case, yes.

6    BY MR. MORTARA:

7         Q    Professor Lagakos goes on, could you turn

8    to the second page, and the last sentence, second to

9    the last sentence of the only full paragraph in the

10   first column on the second page reads:  "For

11   example, when treatments have identical efficacy,

12   the probability of finding at least one

13   statistically significant interaction test when ten

14   independent interaction tests are undertaken is

15   40 percent.  The more subgroup analyses conducted,

16   the higher the probability of one or more chance

17   findings that may be misinterpreted as clinically

18   directive."

19              Do you see that?

20              MR. ARBITBLIT:  Object to form.

21              THE WITNESS:  Well, as I say, I see the

22   whole article.

23   BY MR. MORTARA:

24        Q    Professor Lagakos is here talking about

25   the same test for interaction that you're talking

John W. Farquhar, M.D.

1    about on page 7 of your report, isn't he?

2            MR. ARBITBLIT:  Object to form.

3            THE WITNESS:  Not so far.

4    BY MR. MORTARA:

5      Q    What do you think Professor Lagakos means

6    by statistically significant interaction tests?

7      A    Yes, on that one sentence he's talking

8    about interaction, but -- fine.

9      Q    The problem Professor Lagakos is

10   identifying is that the more subgroup analyses you

11   do, the more likely it is you are to find a false

12   positive, correct?

13           MR. ARBITBLIT:  Object to form.

14           THE WITNESS:  What Professor Lagakos is

15   talking about, the danger of multiple testing, is a

16   concern of statisticians for decades.  He is

17   restating what I think is generally known.

18   BY MR. MORTARA:

19     Q    And Professor Lagakos is talking about the

20   appropriate p-value to use for interaction tests

21   when you have multiple subgroup analyses, correct?

22           MR. ARBITBLIT:  Object to form.

23           THE WITNESS:  His last sentence is:

24   "Ultimately, medical research and patients are best

25   served when subgroup analyses are well planned and

John W. Farquhar, M.D.

Page 141

1    appropriately analyzed and the conclusions and

2    recommendations about clinical practice are guided

3    by the strength of the evidence."

4          So I'm assuming that you agree that -- I'm

5    not supposed to use that.  But I believe that the

6    APPROVe investigators designed the study

7    appropriately.

8    BY MR. MORTARA:

9       Q    Dr. Farquhar, I'm asking you about the

10   second page of Professor Lagakos' essay where he's

11   discussing the problem of multiple subgroup analyses

12   and the possibility of false positives.  The first

13   sentence of the last paragraph of the first column

14   of that page says:  "One way to correct for the

15   inflated false positive rate when multiple subgroup

16   analyses are conducted is to apply a stricter

17   criterion than the usual P equals 0.05 for judging

18   the significance of each interaction test."

19         Do you see that?

20      A    I see that.

21         MR. ARBITBLIT:  Objection to form.

22         THE WITNESS:  And this --

23   BY MR. MORTARA:

24      Q    Dr. Farquhar -- the question is do you see

25   that?

John W. Farquhar, M.D.

Page 142

1            MR. ARBITBLIT:  Don't interrupt him.

2            THE WITNESS:  I see that.  As I said, I

3    see everything that's in here.  And this entire

4    paragraph, and all the implications of it, are grist

5    for the mill of a discussion with Professor Jewell.

6    Professor Jewell has his way of looking at life and

7    he may or may not agree with this paragraph.  I

8    can't say since I am not a biostatistician.  This is

9    statistician language.

10   BY MR. MORTARA:

11      Q    You rely on Professor Jewell for

12   information of this character, correct?

13           MR. ARBITBLIT:  Object to form.

14           THE WITNESS:  I rely on Professor Jewell

15   currently as my colleague in not only this

16   consultation on Vioxx but on other issues.

17           And I also -- well, I'll just add that the

18   previous colleague, who is now no longer with us,

19   was one of the individuals who trained Professor

20   Jewell.  And so there's a long legacy of my

21   connection to Jewell and a long legacy of my trust

22   in his skill, ability and wisdom.

23           And what I am saying to you now is this

24   long paragraph on the second page here, he would

25   need to be asked how he interprets that and whether

John W. Farquhar, M.D.

1   or not it's in contradiction to what he has put in

2   his text; and if so, how would he handle what's been

3   done in the APPROVe study and in our particular

4   analyses of the 203.

5           I shouldn't have said APPROVe; I should

6   have said 203, and APPROVe as well.

7       Q    Dr. Farquhar, the plaintiffs' attorneys

8   are not going to let me ask questions of Dr. Jewell,

9   unfortunately.  You have relied on Dr. Jewell and

10  written things about significant interaction in your

11  report, and I'm asking you what your understanding

12  of Professor Lagakos' essay is with respect to what

13  the appropriate p-value for interaction is to use

14  when multiple subgroup analyses are performed.

15          Do you understand what Professor Lagakos

16  is talking about?

17          MR. ARBITBLIT:  Object to form.

18          THE WITNESS:  Well, you know, about six

19  answers ago, I said the entire topic of subgroup

20  analyses has been around for a long time, and I

21  return to this answer, and then I think I'll want to

22  say I've answered the questions regarding this topic

23  by saying I rely fully on Professor Jewell's

24  attitudes and concepts and beliefs and opinion about

25  this paragraph and how it applies to our analyses on

John W. Farquhar, M.D.

Page 144

1    203 and APPROVe and of VIGOR and of any of the other

2    studies that we've analyzed.

3    BY MR. MORTARA:

4        Q    Have you ever asked Professor Jewell what

5    he thinks of Professor Lagakos' views?

6             Did you say no?

7        A    Well --

8             MR. ARBITBLIT:  Object to form.

9             THE WITNESS:  I told you that I haven't

10   seen the Lagakos article, so I can't have discussed

11   this specific article with him.  I have had

12   discussions on topics related to interaction tests.

13   BY MR. MORTARA:

14       Q    Your report says on page 7 of your

15   supplemental report:  "Tests of significant

16   interaction may be appropriately set at levels

17   greater than P equals 0.05," correct?

18       A    Well, we discussed that some time ago and

19   I said this is Professor Jewell's view and I hold to

20   his views.

21       Q    Whereas Professor Lagakos says:  "One way

22   to correct for the inflated false positive rate when

23   multiple subgroup analyses are conducted is to apply

24   a stricter criterion than the usual P equals 0.05."

25            That means Professor Lagakos thinks you

John W. Farquhar, M.D.

Page 145

1    should go lower than 0.05 but Professor Jewell

2    thinks you can be higher than 0.05, correct?

3            MR. ARBITBLIT:  Object to form.  Assumes

4    facts not in evidence.

5            THE WITNESS:  Return to the fact that

6    Jewell has his beliefs and his way of analyzing data

7    and he may or may not have a fundamental difference

8    of opinion with Lagakos.  And I submit that a single

9    article taken out of context cannot answer that

10   question of whether there is a wide disparity

11   between those two gentlemen.

12   BY MR. MORTARA:

13       Q    Dr. Farquhar, the first full sentence in

14   the second column on that same page says:  "For

15   example, if 10 tests are conducted, each one should

16   use 0.005 as the threshold for significance."

17           Do you see that?

18           MR. ARBITBLIT:  Object to form.

19           THE WITNESS:  I see the whole article and

20   I return to -- I prefer to rely on Professor Jewell

21   and any subsequent dissection of this article, my

22   answer is that I trust Professor Jewell's views on

23   all items.

24   BY MR. MORTARA:

25       Q    Do you recall earlier telling me you

John W. Farquhar, M.D.

1   thought at least ten subgroup analyses had been

2   performed in the APPROVe study?

3              MR. ARBITBLIT:  Object to form.

4              THE WITNESS:  Ten subgroup analyses have

5   not been performed on the 203 study.  And --

6   BY MR. MORTARA:

7       Q    Dr. Farquhar, could you turn to page 6 of

8   your report.  And the Section C is entitled:

9   "Patients in APPROVe."

10             Do you see that?

11      A    Yes.

12      Q    Section C of your supplemental report is

13  not about Protocol 203, is it?

14      A    No.

15      Q    Dr. Farquhar, over ten subgroup analyses

16  have been performed on the APPROVe data and

17  Professor Lagakos thinks that you should use at

18  least 0.005 as the threshold for significance, if

19  not something lower; isn't that right?

20             MR. ARBITBLIT:  Object to form,

21  mischaracterizes the record.  Professor Lagakos has

22  never had anything to say about APPROVe.

23             THE WITNESS:  Boy, oh boy.  You know, my

24  answer is I'm trying to get away from Lagakos and on

25  to Jewell.  So any opinion that Lagakos has

John W. Farquhar, M.D.

Page 147

1    expressed, I'll say again is not -- is out of

2    context, and Professor Jewell has his reasons for

3    picking a certain method of analysis and its

4    interpretation, and I trust his views.  And I do

5    not, at this point, have any opinions to offer about

6    Lagakos.

7    BY MR. MORTARA:

8        Q    You trust Dr. Jewell and the jury's

9    supposed to trust you when you say you trust

10   Dr. Jewell, correct?

11               MR. ARBITBLIT:  Object to form.

12   Argumentative.

13               MR. MORTARA:  Withdrawn.

14               THE WITNESS:  I'm not concerning myself

15   with juries.  I'm concerning myself with trusting

16   Professor Jewell.

17   BY MR. MORTARA:

18       Q    Dr. Farquhar, do you know if plaintiffs'

19   attorneys are going to allow Dr. Jewell to explain

20   himself and his analysis?

21       A    My belief is that they would, yes.  But I

22   haven't asked the attorneys if they have such a

23   plan.

24       Q    Do you think the plaintiffs' attorneys

25   should allow Dr. Jewell to come to trial and explain

John W. Farquhar, M.D.

Page 148

1    to the jury his analysis and explain, if he can,

2    Professor Lagakos' views?

3                MR. ARBITBLIT:  Object to form.

4                THE WITNESS:  I have no informed opinion

5    on what should happen with juries.  I just don't

6    know anything about that field.  So --

7    BY MR. MORTARA:

8        Q    Dr. Farquhar, I'll withdraw the question

9    and ask you this:  You talk about tests for

10   significant interaction in your report, correct?

11       A    Yes.

12       Q    You rely on Dr. Jewell for that analysis,

13   correct?

14       A    Correct.

15               MR. ARBITBLIT:  Object to form.

16   BY MR. MORTARA:

17       Q    In explaining the tests for significant

18   interaction that you disclose in your report, do you

19   think that Dr. Jewell would do a better job

20   explaining what this means and explaining how

21   Professor Lagakos' essay affects his views?

22       A    Do I think Jewell --

23       Q    Withdrawn.

24               Dr. Farquhar, do you think it's

25   appropriate to have Dr. Jewell explain himself as to

John W. Farquhar, M.D.

1    what he meant by the appropriate P for significant

2    interaction that you're relying on?

3         A    Well, I would say if that is something

4    that you and other attorneys would like to do, then

5    fine.  He needs to speak for himself.

6         Q    Dr. Farquhar, you understand that --

7    withdrawn.

8             The last sentence of the first full

9    paragraph on the third column of the second page of

10   the Lagakos essay, says:  "Post hoc subgroup

11   analyses undertaken because of an intriguing trend

12   seen in the results or selective reporting of

13   certain subgroup analyses can be especially

14   misleading."

15            Do you see that?

16            MR. ARBITBLIT:  Object to form.

17            THE WITNESS:  I see that, but please honor

18   my previous statements that anything in the Lagakos

19   paper which is contrary to Professor Jewell's modus

20   operandi and planning for analyses needs to say that

21   Jewell trumps Lagakos.  And I really -- I'm trying

22   to avoid further discussion about Lagakos.

23   BY MR. MORTARA:

24        Q    You're trying to avoid further discussion

25   of Professor Lagakos' essay, correct?

John W. Farquhar, M.D.

Page 150

1          MR. ARBITBLIT:  Object to form.

2          THE WITNESS:  I'm trying to elevate the

3    respect for Professor Jewell.

4    BY MR. MORTARA:

5      Q    Dr. Farquhar, do you agree or disagree

6    that "Post hoc subgroup analyses undertaken because

7    of an intriguing trend seen in the results or

8    selective reporting of certain subgroup analyses can

9    be especially misleading"?

10          MR. ARBITBLIT:  Object to form.

11          THE WITNESS:  I propose that that question

12   be asked for Professor Jewell and put into the

13   context of the APPROVe study and the specific

14   analyses that he and I performed.

15   BY MR. MORTARA:

16     Q    You can't answer that question, correct?

17          MR. ARBITBLIT:  Object to form.  Asked and

18   answered many times.

19   BY MR. MORTARA:

20     Q    You propose that I ask that question of

21   Professor Jewell at trial in front of the jury,

22   correct?

23          MR. ARBITBLIT:  Object to form.

24          THE WITNESS:  I don't have any proposals

25   for what happens at a jury trial.

John W. Farquhar, M.D.

Page 151

1    BY MR. MORTARA:

2         Q     Do you understand Professor Lagakos'

3    essay?

4              MR. ARBITBLIT:  Object to form.  Asked and

5    answered.

6              THE WITNESS:  Boy.  I've given you my

7    answers about Lagakos and Jewell.

8    BY MR. MORTARA:

9         Q     Are you qualified to read and interpret

10   what Professor Lagakos has written here about p for

11   significant interaction?

12        A     I've answered that.  Professor Jewell

13   would need to read this article in the context of

14   the APPROVe study and the analyses that he has done.

15        Q     Can you --

16        A     I don't -- I do not plan to give any more

17   opinions about Lagakos.  Lagakos is trumped by

18   Jewell.

19        Q     Do you have any basis for why Lagakos is

20   trumped by Jewell, other than your esteem for

21   Professor Jewell?

22             MR. ARBITBLIT:  Object to form.

23             THE WITNESS:  Well, I don't have the

24   details, but it was last year or the year before

25   that Jewell was given an honor by the American

John W. Farquhar, M.D.

1    Statistical Society or some similar group, and

2    whatever that honor was, it's an honor that I

3    presume that Lagakos has not had, and to answer your

4    question, I have great esteem for Jewell.

5            You know, there's competition between

6    Stanford and UC Berkeley, but occasionally we find

7    somebody at Berkeley who is held in very high

8    esteem, and that's where I hold Jewell.

9        Q    You agree, at least, that Professor Jewell

10   and Professor Lagakos appear to you to disagree on

11   the issue of the proper p-value to set for

12   interaction in subgroup analysis?

13           MR. ARBITBLIT:  Object to form.

14           THE WITNESS:  No, I really can't answer

15   that, because I've said that this article has to be

16   seen in the context of the specific analyses that

17   we've done on the APPROVe study.  And unless that is

18   done, it's just -- you can't draw any conclusions

19   about the Lagakos article in respect to what we have

20   done.

21   BY MR. MORTARA:

22       Q    Dr. Farquhar, could you go back to Exhibit

23   7.  Turn to the first page.

24       A    Mm-hmm.

25       Q    Earlier you said that you believe

John W. Farquhar, M.D.

Page 165

1    naproxen to COX-2 inhibitors?

2                MR. ARBITBLIT:  Object to form.

3                THE WITNESS:  "Randomized control trials,

4    recent meta-analyses implying the presence of more

5    than one such randomized trial comparing naproxen to

6    all other NSAIDs or only to COX-2" --

7    BY MR. MORTARA:

8        Q    Any COX-2 inhibitor.

9        A    I haven't seen any recent meta-analyses of

10   that sort.

11               MR. MORTARA:  We'll take a break.

12               THE VIDEOGRAPHER:  This concludes Tape 2.

13   We're going off the record.  The time is 2:14.

14                    (A brief recess was taken.)

15               THE VIDEOGRAPHER:  Here begins Tape 3 in

16   the deposition of John W. Farquhar.  On the record,

17   the time is 2:30.

18   BY MR. MORTARA:

19       Q    Dr. Farquhar, you've brought some

20   documents.  Do you have something to say?

21       A    Yes.  During the break, we had a memory

22   jog episode, and namely, I was reminded that I have

23   in fact seen the adverse event report.  And I don't

24   know whether to have any weak excuses or just to say

25   I forgot that I had them.

John W. Farquhar, M.D.

Page 166

1              In a certain sense, I guess I was thrown

2    off because this was a new creation, but

3    Mr. Arbitblit is very assiduous in showing me

4    everything that has appeared on the record, and so

5    what I've done is retrieved the two hypertensives.

6              And I also want to add that we can

7    recalculate at 28 if that's, you know, the final

8    opinion.  And we'll end up with very closely similar

9    results.

10       Q    It's now your testimony that these two

11   patients did not, in fact, have baseline

12   hypertension, correct?

13             MR. ARBITBLIT:  Object to form.

14             THE WITNESS:  No.  No.  I'm testifying

15   that one of them was aspirin-indicated, which means

16   that baseline -- that person had whatever you need

17   to become aspirin-indicated, so that could have been

18   hypertension plus something else, or it could have

19   been evidence of prior heart attack.  That, I can't

20   tell from the record.  But I take ASA-indicated to

21   mean a baseline risk factor.

22   BY MR. MORTARA:

23       Q    You testified earlier that

24   aspirin-indicated was the same, the exact same, as

25   history of symptomatic ASCVD.  Do you remember that?

John W. Farquhar, M.D.

Page 220

1    the extent to which they would find that persuasive.

2    But I don't know that, as I sit here, that I would

3    find the FDA is always completely up-to-date and

4    totally certain of their decisions.

5              MR. MORTARA:  Kronmal, I'm going to

6    mark -- when I find my stickers -- another Merck

7    submission to the FDA as Exhibit 13.

8                        (Exhibit No. 13 marked for

9                        identification.)

10             MR. ARBITBLIT:  Thank you.

11   BY MR. MORTARA:

12        Q    Exhibit 13 is a March 22nd, 2004

13   communication to the FDA from Merck.  It's Bates

14   labeled MRK-18940080062 to 81033.

15             Have you ever seen this document before,

16   Dr. Farquhar?

17        A    No, I haven't.  And you know, I have to go

18   back to remind you that I have relied on Kronmal as

19   the primary source for my opinions on Alzheimer's.

20   And there are two ways to look at that.  Including

21   that we can take the comments away that I've had on

22   Alzheimer's and leave the rest of it and come to the

23   same conclusions.  The way I read his data is it was

24   supportive.

25        Q    If the Alzheimer's studies, in fact, show

John W. Farquhar, M.D.

Page 221

1    no increase of cardiovascular risk for patients

2    taking Vioxx versus placebo, that's inconsistent

3    with the data from APPROVe, correct?

4              MR. ARBITBLIT:  Object to form.

5              THE WITNESS:  Well, we do have APPROVe and

6    VIGOR, and anything that adds to it is important.

7    Any analysis of the Alzheimer's studies would have

8    to delve deeply into the question of adherence to

9    protocol.  And it's just -- at this point, I back

10   away from firm conclusions about Alzheimer's and at

11   the moment I'm relying on the veracity and validity

12   of Kronmal's analyses.  So --

13        Q    It's important to know whether the

14   Alzheimer's studies showed an increased risk or not,

15   isn't it, in assessing whether the data is

16   consistent or inconsistent on the risks associated

17   with long-term use of Vioxx?

18             MR. ARBITBLIT:  Object to form.

19             THE WITNESS:  Well, as I have said, I see

20   Kronmal's data as the best available and

21   confirmatory to the rest of my report.  And in

22   answer to your question, if an -- if a study done as

23   well and as carefully as Kronmal's showed no effect

24   of long-term use of Vioxx, that would be information

25   that would decrease one's certainty of the

John W. Farquhar, M.D.

Page 222

1    generalizability of the Vioxx damage.

2            Now, we have data that Vioxx increased

3    blood pressures in the Alzheimer's study.  Any time

4    I see anything that increases blood pressure, I

5    would be hard put to predict that that group would

6    end up with no extra risk.

7    BY MR. MORTARA:

8        Q    Dr. Farquhar, could you turn to page 19 of

9    Dr. Kronmal's report.  And in the paragraph on that

10   page, it says, "I have reviewed the Company's

11   submissions to the FDA Advisory Committee in

12   February 2005 concerning the safety of rofecoxib as

13   determined in the Alzheimer's trials.  The

14   Alzheimer's trials showed a highly significant

15   increase in all-cause mortality, CHD, CHD mortality,

16   and an increased risk for the combined APTC end

17   point used by Merck that was not statistically

18   different from what was observed in VIGOR and

19   APPROVe."

20           Do you see that?

21       A    Yes, I do.

22       Q    Do you agree with Dr. Kronmal that the

23   Alzheimer's studies show a statistically significant

24   increase for cardiovascular events in the APTC end

25   point?

John W. Farquhar, M.D.

Page 223

1          MR. ARBITBLIT:  Object to form.

2          THE WITNESS:  Well, as a minor issue,

3    it -- at the moment it's my belief that he's using

4    APTC and means something closer to total cardiac

5    events, plus a certain proportion of total

6    cerebrovascular events, and that's not identical to

7    APTC, which, as I understand it, includes cerebral

8    hemorrhage.  So, you know, it's important to be sure

9    that he used the term APTC correctly.

10         Now if he didn't -- if he did use it

11   correctly, and I look at Table 3 and I don't see a

12   cerebral hemorrhage, I wouldn't know how to

13   interpret it.  But if he did or didn't, the results

14   certainly look -- certainly look as if Vioxx is

15   making these things worse.

16   BY MR. MORTARA:

17      Q    Dr. Farquhar, in reviewing that paragraph

18   that I just read to you on page 19, do you

19   understand Dr. Kronmal to be concluding that the

20   Alzheimer's trials showed a statistically

21   significant increase in APTC events as well as his

22   other conclusions?

23         MR. ARBITBLIT:  Object to form.

24         THE WITNESS:  Well, Paragraph 19, he's

25   talking about all-cause mortality, which is not part

John W. Farquhar, M.D.

Page 224

1    of APTC; he's talking about coronary heart disease

2    and coronary heart disease mortality.

3              Oh, yes, and then an increased risk for

4    the combined APTC end point.  So he did -- he did

5    include that.  And as I indicated to you, I'm not

6    certain that he included all the elements in the

7    APTC end point.

8    BY MR. MORTARA:

9        Q    As far as you know, however, Dr. Kronmal

10   has concluded that the Alzheimer's trials show a

11   statistically significant increase in APTC events,

12   patients taking Vioxx, correct?

13       A    Yes.

14       Q    Dr. Farquhar, can you now look at that

15   Merck submission I just gave you.  And could you

16   turn to page 16.

17             Page 16 is entitled:  "Relative Risk and

18   Associated 95 percent Confidence Interval, APTC

19   Endpoint, Results Tabulated by Rofecoxib Studies,

20   Placebo Controlled Data Set."

21             Do you see that?

22       A    Yes.

23       Q    And on the left side, you see under

24   "Study Block," there's one that says "ALZ."

25             Do you see that?



# Risk of Thrombotic Cardiovascular Adverse Events
## with Rofecoxib

A Report Prepared for

Merck & Co.

KyungMann Kim, Ph.D.

June 1, 2006

EXHIBIT 5

### 1.    Qualifications

I received my Ph.D. in Statistics from the University of Wisconsin-Madison in 1985. I am currently Professor of Biostatistics and Statistics and Associate Chair of the Department of Biostatistics and Medical Informatics at the University of Wisconsin-Madison and Director of Biostatistics Shared Resource and Co-director of Clinical Research Central Office at the University of Wisconsin Comprehensive Cancer Center. Prior to my current appointment, I was Assistant and Associate Professor of Biostatistics at Harvard University and Dana-Farber Cancer Institute (1988-1995), Visiting Associate Professor of Ophthalmology at Johns Hopkins University (Spring of 1995), and Associate Professor of Biostatistics at the University of Michigan and Director of Biostatistics at the University of Michigan Comprehensive Cancer Center (1995-1997).

I am an elected fellow of the American Statistical Association. Since 2000, I have been serving as an associate editor for *Biometrics*, an official journal of the International Biometric Society, which publishes many cutting-edge statistical methods for clinical trials. I also serve frequently as a referee for major statistical and clinical journals. Last year I served as a reviewer of an Institute of Medicine report on a very controversial AIDS clinical trial in Uganda. I was the chair of the Program Committee for the 27th Annual Meeting of the Society for Clinical Trials in 2006. I am very active in several professional organizations serving on student scholarship award committees.

I was a member of the Lung Cancer Concept Evaluation Panel of the Division of Cancer Treatment and Diagnosis, National Cancer Institute (NCI) (1999-2002), reviewing protocol concepts for all NCI-sponsored phase III randomized, controlled trials in lung cancer. I was a member of Subcommittee E on Cancer Epidemiology, Prevention and Control, NCI Initial Review Group (2001-2005), reviewing program project grant and large research project grant applications. I was a member of the Autoimmune Diseases Data and Safety Monitoring Board, National Institute of Allergy and Infectious Diseases (NIAID) (2000-2004) and have been serving as a member of the HIV/AIDS Therapeutic

Trials Data and Safety Monitoring Board, NIAID since 1998. I have served and am serving on a number of data monitoring committees of NIH, Department of Veterans Affairs and industry-sponsored clinical trials in cancer, autoimmune diseases, growth hormone deficiency syndrome, cardiovascular diseases including chronic heart failure, migraine, osteoporosis, and osteoarthritis, both as a member and a chair. Recently I have been appointed to serve on the Human Studies Review Board of the U.S. Environmental Protection Agency (EPA). This is a newly established Federal Advisory Committee to provide advice and recommendations to EPA on scientific and ethical issues in intentional human dosing studies for EPA regulatory purposes.

At the University of Wisconsin-Madison, I regularly teach graduate courses on statistical methods for clinical trials (Statistics 641) and for epidemiologic studies (Statistics 642), among others and supervise Statistics graduate students on their Ph.D. thesis dissertation. I have participated as a faculty in the annual Workshop on Methods for Clinical Trials Research organized jointly by the American Association for Cancer Research and the American Society for Clinical Oncology since 2004. I have given a number of short courses on sequential methods for clinical trials in the U.S. (Boston, MA, King of Prussia, PA, and St. Pete's Beach, FL) and Europe (Barcelona, Spain and Leuven, Belgium) and have participated in workshops on clinical trials methods as a faculty in the U.S., Hong Kong, Korea and Scotland. As such I am very knowledgeable about clinical trials and epidemiologic studies. In fact my entire professional career as a statistical scientist has revolved around clinical trials in a variety of diseases since 1985.

*Experience with COX-2 Inhibitors*

Of note, I initially served as a paid statistical consultant to then G. D. Searle/Pharmacia for the Adenoma Prevention with Celecoxib (APC) study during July 2000-February 2001 and as an independent statistician for the APC study in support of its data and safety monitoring board and in preparation of the primary publication during March 2001-January 2006. My effort was compensated by a subcontract to the University of

Wisconsin-Madison from the Strang Cancer Prevention Center, a New York institution with the NCI contract for the APC study. Because of this involvement, I have been following the literature on COX-2 inhibitors and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) very closely from 2000 as a statistical scientist.

In what follows, I have summarized some of the essential characteristics of randomized, controlled trials (RCTs) in drawing causal inferences regarding the effect of treatment on the observed outcomes and highlighted the strengths of RCTs and the limitations of observational studies. Also I have summarized my review of RCTs, systematic reviews and observational studies regarding the risk of thrombotic cardiovascular events associated with rofecoxib and other NSAIDs. Based on my expertise regarding statistical methods for RCTs and observational studies and on my review of the literature on rofecoxib's risk, I provide my conclusions and opinions.

I reserve the rights to revise and supplement my reviews provided in this report.

## 2.     Preamble on Cause and Effects

*Randomized, Controlled Trials*

In typical research studies, scientists are interested in understanding or even establishing what may have caused the observed phenomena, i.e., an inference on a causal relationship, otherwise known as the causal inference.  In clinical research setting, RCTs have been accepted as the gold standard in establishing risks and benefits of therapy, especially by regulatory agencies such as the U.S. Food and Drug Administration (FDA), the Japanese Pharmaceuticals and Medical Devices Agency, and the European Medicines Agency.  In essence, randomized, controlled trials are not very different from other randomized, controlled experiments in biological, physical, and social sciences.

In order to establish a causal relationship between the suspected cause, i.e., treatment, and the effects, i.e., outcomes measured in study participants in the randomized, controlled trials, the experimenter attempts to hold all essential elements of the trials comparable between the comparison groups, including the baseline characteristics of study participants and the way the effects are measured and recorded, with the only exception of treatment given to the comparison groups being different.  The treatment is assigned to the comparison groups using a randomization mechanism, in essence very much like tossing a coin, so that subjective manipulation of the treatment assignment is avoided, thus keeping the comparison groups comparable and the statistical comparison unbiased and valid.  With the treatment being the only known difference between the comparison groups, it is only logical to conclude that either the nature's chance or the treatment itself has produced the observed difference in the effects between the comparison groups.  The statistical hypothesis test with the observed significance level, the so-called *p*-value, is how the nature's chance of producing the observed difference in the effects is quantified using probability under the assumption that the treatment had nothing to do with the observed difference.  If this probability is significantly small, generally accepted as one out of 20, the conclusion is drawn that the treatment is the cause of the observed difference in the effects rather than the nature's chance at a significance level of 0.05.

Even with the most rigorous and careful planning of a trial, there is always a possibility that a factor or factors uncontrollable by the trial investigators can produce spurious results, meaning that findings from a single trial may not be definitive. This is precisely the reason why the U.S. Food and Drug Administration often requires two independent trials before it grants marketing approval of a new biopharmaceutical product.[1]

*Relative Risk*

A relative risk is a ratio of risk of an event for one group vs the other. As such, it is a summary of the characteristics of a population rather than the characteristics of an individual. A relative risk for a population is ordinarily given in terms of a point estimate and a 95% confidence interval. There is not certainty as to what the "true" relative risk is within this confidence interval. For example, a relative risk of 1.92 with a 95% confidence interval of 1.19-3.11 (as for all thrombotic events in APPROVe) tells us only that the true relative risk could be as small as 1.19 or as large as 3.11 and does not enable us to assign a probability to either of these two possibilities.

A relative risk for a population can be used as a point estimate of the risk of an individual within that population. But the confidence interval for such an estimate becomes significantly wider for an individual than for the population of patients with those characteristics. This is a mathematical consequence of the calculation of the confidence interval for the predicted relative risk. Therefore even if a relative risk for a population is statistically significant to a 0.05 significance level, it cannot tell you whether the risk for an individual is statistically significant.

---

[1] Food and Drug Administration. Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products. May 1998.

*Study Population, Pre-specified Endpoints and Statistical Analysis Plans*

As noted above, interpretation of the statistical significance of observed effects, e.g., the relative risk for thrombotic cardiovascular (CV) adverse events (CV/T events) in patients while taking rofecoxib in comparison to controls such as placebo or other NSAIDS, is only scientifically relevant in the setting of how the trial was designed in terms of subject population, pre-specified outcome measures and statistical analysis plans. It is only natural to perform post-hoc analyses to learn as much about the disease and the treatment under investigation as possible. But the findings from these post-hoc analyses can never be interpreted definitively, particularly as a proof of causal inference as they are by definition "data-driven" and only serve as generating hypotheses at best.

Unless there is a strong biological or clinical understanding, findings from a trial in one population of patients cannot be extrapolated to another population of patients. Findings from a trial are only relevant to the study subject population in the trial. For example, findings from a trial in patients with a history of colorectal adenomas in the Adenomatous Polyp PRevention On VIOXX™ (APPROVe) study cannot be readily extrapolated to patients with Alzheimer's disease (AD) and vice versa. This is primarily because these subjects and their conditions have different etiology, which are often unknown.

Scientific interpretation of the results from a trial is most relevant to the pre-specified endpoints of the trial. For example, in discussing CV/T events as a pre-defined and pre-specified endpoint of interest, one can draw scientifically valid conclusion only on CV/T events. Picking out an endpoint from composite endpoints, say myocardial infarction (MI) or stroke from the pre-specified CV/T events, may lead to scientifically invalid and misleading conclusions. This is because the practice is "data-driven" and post-hoc, and thus lessens the statistical validity of the conclusions drawn from such an analysis. Also statistical theory known as multiple comparisons tells us that chance alone will find spurious statistical significance when one looks at each of the component endpoints that make up a composite endpoint.

Another issue critical to the definition of an endpoint is the time frame in which the endpoint is observed. According to Merck's cardiovascular standard operating procedure for CV/T events for rofecoxib, only those CV/T events that were observed within 14 days after going off treatment were considered (R.9).[2] Depending on the time frame, a different number of events will be reported, and subsequently different results are obtained for comparison between randomized treatment groups. By increasing the window of follow-up, one will increase the power of a study by having more events included in the analysis. However, under the assumption that the risk of CV/T events is reduced off treatment, increasing the window of follow-up attenuates the treatment effect on the risk of CV/T events, as seen in the extension results from the APPROVe study reviewed later. Therefore, extending the window of follow-up makes it more likely that an on-drug risk could be obscured.

Any analyses used to draw causal inferences should be clearly specified in a prospective manner in the statistical analysis plans for the trial before the data from the trial are unblinded. Otherwise, one can manipulate the analysis to one's liking, driven by what has been known from the data. This is precisely the reason why the US FDA requires such a statistical analysis plan before randomization is revealed.

*Intent-to-Treat Analysis*

An intent-to-treat analysis refers to a method of data analysis for randomized, controlled trials in which all patients are analyzed according to their randomization, regardless of whether or not they completed or received that treatment.[3] This is considered to be the valid analysis according to two different accounts. The first is according to the statistical

---

[2] Merck & Co. Standard Operating Procedures for the Surveillance, Monitoring, and Adjudication of Acute Thromboembolic Vascular Events in Clinical Trials of COX-2-Specific Inhibitors. September 3, 1999.

[3] Friedman LM, Furberg CD, DeMets DL. *Fundamentals of Clinical Trials*, 3rd ed. Springer: New York, 1998.

account. As noted earlier, the basis for the calculation of the observed significance, the so-called p-value, is based entirely on randomization, as Sir Fisher noted in his famous lady tasting tea example. Typical significance tests are known to be equivalent to a randomization test, which provides a basis for calculation of the observed significance, i.e., p-value. The second is based on how clinical care occurs. What the randomized, controlled trial is testing is not the treatment itself, but rather the treatment strategy intended for the study patient population. One telltale sign of an intent-to-treat analysis is that it includes all randomized subjects regardless of whether they were eligible for the study, complied with the protocol therapy, or had protocol violations. In contrast, a subgroup analysis includes only a subset of the intent-to-treat analysis population.

*Subgroup Analysis*

As the word "subgroup" implies, a subgroup analysis refers to an analysis that includes only a subset of the study's intent-to-treat analysis population, i.e., all randomized subjects in a study. For example, an analysis of subjects taking aspirin in the APPROVe study is a subgroup analysis. However, the analysis of the Kaplan-Meier estimates at month 18 in the APPROVe study is not a subgroup analysis as the Kaplan-Meier estimates are based on all randomized subjects in the APPROVe study.

Findings from subgroup analyses are known to be unreliable to draw causal inferences and are hypothesis-generating at best. It is because of the fact that chance alone can produce statistically significant results in a subgroup when there is no difference between randomized treatment groups in the intent-to-treat analysis population.

A case in point is the Prospective Randomized Amlodipine Survival Evaluation (PRAISE I) study, the primary objective of which was to assess the long-term effect of amlodipine on morbidity and mortality among patients with advanced chronic heart failure.[4] In this

---

[4] Packer et al. Effect of amlodipine on morbidity and mortality in severe chronic heart failure. *N Engl J Med* 1996;335:1107-14.

**R.7 Reines et al. in *Neurology* 2004 (AD Therapeutic Study)**

The 091 study was designed to evaluate the therapeutic effect of rofecoxib in slowing the progression of dementia in patients with established AD. A total of 692 patients with mild or moderate AD aged 50 years of older were randomized from 31 study sites in the U.S. between February 1999 and September 1999 to receive rofecoxib 25 mg (346 pts) or placebo (346 pts) daily for 12 months. Any serious vascular events including cardiac, peripheral vascular, and cerebrovascular events were reviewed by independent blinded adjudication committees, who determined if they were confirmed events according to pre-specified case definitions as confirmed adjudicated events.

There were no protocol-drug related deaths during the study. Non-drug related deaths were reported in 11 patients, 9 on rofecoxib and 2 on placebo, while taking protocol treatment or within 14 days of the last dose. There were 4 confirmed adjudicated serious thrombotic vascular events on rofecoxib vs 11 such events on placebo, including one event outside of the 12-month window of the study. The incidence ratio of confirmed adjudicated serious thrombotic vascular events for rofecoxib was 0.36 (0.12-1.14) relative to placebo.

In summary, there was no increase in the serious thrombotic vascular events associated with rofecoxib 25 mg daily for 12 months as compared to placebo in patients with mild to moderate AD.

**R.8 Thal et al. in *Neuropsychopharmacology* 2005 (AD Prevention Study)**

The 078 study was designed to determine whether rofecoxib could delay a diagnosis of AD in patients with mild cognitive impairment. A total of 1,457 patients with mild cognitive impairment aged 65 years of older were randomized from April 1998 to March 2000 to receive rofecoxib 25 mg (725 pts) or placebo (732 pts) daily for up to 4 years. Any serious vascular events including cardiac, peripheral vascular, and cerebrovascular events were reviewed by independent blinded adjudication committees who determined if

they were confirmed events according to pre-specified case definitions as confirmed adjudicated events. A decision was made in October 2002 to terminate the study in April 2003, 11 months earlier than the scheduled March 2004 termination, based on the projection of the target number of 220 AD diagnosis. The average follow-up in this study was thus approximately 4 years.

There were 24 deaths (3.3%) on rofecoxib vs 15 deaths (2.1%) on placebo. There were 38 CV/T events on rofecoxib vs 36 on placebo, for an incidence ratio of 1.07 (0.68-1.66). Of note, given the observed number of CV/T events, the 078 study had adequate (greater than 80%) power to detect a relative risk of 2 or greater.

In summary, there was no increase in the risk of CV/T events for rofecoxib 25 mg daily for an average of 4 years in elderly patients with mild cognitive impairment.

**F.2 12/18/04 Interim Review by Lourdes Villalba and James Witter**

This interim review is based on the data submitted by Merck to FDA on March 30, 2004 from two studies, 091 (R.7) and 078 (R.9), reviewed above. The 091 study was a double-blind, randomized, placebo-controlled trial to evaluate the efficacy and safety of rofecoxib 25 mg daily for an average of 12 months to slow the progression of symptoms of AD in patient with possible or probable AD and $\geq 50$ years of age. The 078 study was a double-blind, randomized, placebo-controlled trial to evaluate the effects of rofecoxib 25 mg daily for an average of 4 years on the prevention of AD and cognitive decline in patients $\geq 65$ years of age with mild cognitive impairment. The mean duration of exposure to study drug as per the March 24, 2004 submission was 15 months and 16 months for rofecoxib and placebo, respectively for both studies combined.

With the data from the two studies combined, there were 42 pts with confirmed CV/T events after 1,661 PYR among 1,069 pts on rofecoxib and 48 pts with confirmed CV/T events after 1,917 PYR among 1,074 pts on placebo for a relative risk of 1.01 (0.67-1.53), indicating no difference in the risk between rofecoxib and placebo. The Kaplan-Meier

estimates of the survival curves are on top of each other, again indicating no difference in the risks between rofecoxib and placebo in an AD or pre-AD patient population.

R.9 Bresalier et al. *N Engl J Med* 2005 (APPROVe Study)

The Adenomatous Polyp PRevention On VIOXX™ (APPROVe) study was a randomized, placebo-controlled double-blind trial designed to determine whether three years of treatment with rofecoxib will reduce the risk of recurrent neoplastic polyps of the large bowel in patients with a history of colorectal adenomas. This publication reports on the cardiovascular outcomes associated with the long-term use of rofecoxib. A total of 2,586 patients were randomized between February 2000 and November 2001 from 108 study sites in 29 countries to receive either rofecoxib 25 mg or placebo daily. There were 1,287 pts on rofecoxib with 3,059 PYR and 1,299 pts on placebo with 3,327 PYR for an average treatment duration of 2.4 years on rofecoxib and 2.6 years on placebo. All investigator-reported serious adverse events that represented potential CV/T events were adjudicated by an external committee in a blinded fashion.

The major reported outcome was the adjudicated CV/T events, with the combined APTC endpoints as the secondary endpoint of the study. There were 46 (3.6%) vs 26 (2.0%) adjudicated CV/T events on rofecoxib and placebo, respectively, with an incidence rate of 1.50 per 100 person-years vs 0.78 per 100 person-years for a relative risk of 1.92 (1.19-3.11). The Kaplan-Meier estimates of the cumulative incidence of these events (Figure 2) begin to show a separation between rofecoxib and placebo after 18 months of treatment.

In summary, the findings appear to suggest long-term effects of rofecoxib on CV/T events in patients with a history of colorectal adenomas. There were similar results in relative risk and separation of the Kaplan-Meier estimates in the APC study in the same

patient population.[10]  Further, it is interesting to note that in Baron et al. (2003) in the same patient population as in the APPROVe and APC studies, aspirin, instead of showing cardioprotection, showed an increase in adverse thrombotic cardiovascular events in terms of MI, stroke and coronary revascularization.[11]  Finally, I note that another study with celecoxib in a colorectal adenoma population, PreSAP, recently also reported a cardiovascular risk difference.

## M.1 August 22, 2005 Report to Bob A. Rappaport from Philip L. Huang

This Merck report to FDA includes the complete final clinical study report for Protocol 201 (VIOXX™ in Prostate Cancer Prevention Study or ViP Study) and a memorandum summarizing the interim CV adverse event data for Protocol 145 (VIOXX™ In Colorectal Cancer Therapy: Defining of Optimal Regimen Study or VICTOR Study) as of 31 May 2005.

The ViP study is a phase III double-blind, randomized, placebo-controlled trial to evaluate the effects of rofecoxib in decreasing the risk of prostate cancer in men with prostate-specific antigen between 2.5 ng/mL and 10 ng/mL.  The trial was designed to enroll 15,000 pts to be treated up to 6 years, but was terminated prematurely due to the voluntary withdrawal of rofecoxib on 30 September 2004.  Since the study initiation in June 2003, a total of 4,741 pts were randomized to receive either rofecoxib 25 mg (2,369 pts) or placebo (2,372 pts) daily, with no subject receiving protocol treatment for more than 16 months.

After 2,201 PYR of treatment from 4,741 pts for a mean PYR of 5.5 months, there were 14 confirmed thrombotic cardiovascular serious adverse events (TCVSAE) on rofecoxib and 15 TCVSAEs on placebo for a relative risk of 0.95 (0.45-1.94), while there were 8

---

[10] Solomon et al.  Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma prevention.  *N Engl J Med* 2005;352:1071-80.
[11] Baron et al. A randomized trial of aspirin to prevent colorectal adenomas. *N Engl J Med* 2003;348:891-9.

between June 2000 and June 2002 and who did not use these drugs for at least 6 months prior, excluding naproxen users. The primary endpoint of the study was the APTC endpoints. An adjusted odds ratio of APTC endpoints was 1.09 (0.90-1.33) for COX-2 inhibitor use and 0.99 (0.76-1.30) for rofecoxib use, relative to NSAID use.

Kimmel et al. (O.6) report on a case-control study conducted to determine the effect of COX-2 inhibitors on risk for nonfatal MI. The 1,718 cases with a first, nonfatal MI leading to hospitalization were identified from 36 hospitals in a 5-county area, and the 6,800 controls were randomly selected from the same counties. Self-reported medication use was assessed through telephone interviews. An adjusted odds ratio for nonfatal MI was 1.16 (0.70-1.93) for rofecoxib use relative to no NSAID use. Nonselective NSAID use was associated with a reduced adjusted odds ratio of 0.61 (0.52-0.71) relative to no NSAID use. Also an adjusted odds ratio for rofecoxib use was 3.39 (1.37-8.4) relative to naproxen, a finding consistent with that in the VIGOR trial.

Graham et al. (O.7) report on a nested case-control study from a cohort of all patients aged 18-84 years from Kaiser Permanente treated with an NSAID between January 1, 1999 and December 31, 2001. Each case of serious coronary heart disease, defined as acute myocardial infarction requiring admission and sudden cardiac death, was risk-set matched with four controls for age, sex and region (north vs south California). During 2,302,029 person-years of follow-up from a cohort of 1,394,764 Kaiser Permanente enrollees, 8,143 cases and 31,496 controls were identified. An adjusted odds ratio for serious coronary heart disease for rofecoxib (all doses) was 1.34 (0.98-1.82) relative to remote use of NSAIDS: it was 1.23 (0.89-1.71) for rofecoxib 25 mg/day or less and 3.00 (1.09-8.31) for rofecoxib more than 25 mg/day.

Lévesque et al. (O.8) report on a nested case-control study based on a cohort of a random sample of 125,000 individuals 66 years of age and older newly treated with an NSAID between 1 January 1999 and 30 June 2002 from the Régio de l'Assurance-Maladie du Québec. Each case with a first hospitalization with a diagnosis of acute MI, nonfatal or

4.      Conclusions

I have reviewed the literature on the randomized, controlled trials and the observational studies involving rofecoxib supplemented by FDA memoranda and a Merck update in assessing the CV/T events occurring during rofecoxib use.  From my review of the totality of data from the literature, I conclude:

- There is no increased risk of CV/T events with short-term use of rofecoxib; and
- The risk of CV/T events with long-term use of rofecoxib is unclear based on conflicting data: an increased risk in colorectal adenoma patients, but no increased risk in Alzheimer's disease or pre-AD patients.

I offer the following potential explanations for the inconsistency in the long-term data:

- Play of chance; or
- Different patient population between colorectal adenoma and Alzheimer's disease.  These two populations may react differently to treatment with NSAIDs.

5.     **Compensation and Previous Testimony Experience**

I am compensated at a rate of $400 per hour.  I have not given expert witness testimony in the last four years.

KyungMann Kim, Ph.D.

Kyungmann Kim, Ph.D.

```
 1
 2   In re:  VIOXX                    MDL DOCKET NO. 1657
     PRODUCTS LIABILITY
 3   LITIGATION              SECTION L
 4                   JUDGE FALLON
 5   This document relates to
 6                   MAGISTRATE JUDGE KNOWLES
 7   GERALD BARNETT,,
 8           Plaintiff,
 9    -vs-
10   MERCK & CO., INC.,
11           Defendant.
12    Civil Action No. 2:06CV485
     = = = = = = = = = = = = = = = = = = = = = = = = = = =
13
14   CROSS NOTICED IN VARIOUS OTHER ACTIONS
          *  *  *
15   CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
          *  *  *
16
17
18                   Deposition of:
19           KYUNGMANN KIM, PH.D.
20           Madison, Wisconsin
             June 12, 2006
21
22
          Reported by:  Taunia Northouse, RDR, CRR
23
24
25
```

EXHIBIT 6

Kyungmann Kim, Ph.D.

Page 76

1          a peer review?

2                          MR. MORTARA:  Object to the form of

3                  the question.  Don, please don't get mad at

4                  me.  When you say authors of APPROVe, there's

5                  an APPROVe cardiovascular safety paper.

6                  There's the primary investigators in the

7                  study.  And there may or may not be an

8                  efficacy paper in the works.  I don't know.

9                  So could you just clarify what paper you're

10                 talking about.

11                         MR. ARBITBLIT:  All right.  I'll

12                 clarify.

13    Q    Doctor, do you intend to offer the opinion at

14         trial that the results of APPROVe showing a

15         statistically significant increased relative risk

16         of Vioxx versus placebo for thrombotic

17         cardiovascular events cannot be generalized to

18         other populations?

19    A    Yes.  I've seen the results of the APPROVe trial

20         published in the Bresalier publication.  And I've

21         seen the extension results that came out the

22         beginning of May.

23              So I understand the increased cardiovascular

24         thrombotic adverse events observed in that study.

25         But I also have seen the publication of

Kyungmann Kim, Ph.D.

```
 1        Alzheimer's disease study with comparable or even
 2        longer treatment with rofecoxib that did not show
 3        improved cardiovascular adverse events.
 4    Q   Now, you have not submitted that opinion about the
 5        generalized ability of APPROVe for peer review,
 6        have you?
 7    A   No, I have not.
 8    Q   And do you agree that the role of peer review is
 9        to keep unwarranted speculation out of the
10        scientific literature?
11    A   Would you please repeat that question.
12    Q   Yes.  Do you agree that one important role of peer
13        review is to keep unwarranted speculation out of
14        the scientific literature?
15    A   I'll have to qualify that statement in the sense
16        that certainly scientific literature would --
17        purports to present the valid conclusions, results
18        from the study and validly drawn conclusions.  But
19        we know scientific literature.  I mean, there are
20        different grade of qualities of scientific
21        literature.
22             So I guess the simple question to your --
23        answer to your question is yes.  But with the
24        caveat that there are different qualities of
25        publication.
```

Kyungmann Kim, Ph.D.

Page 104

1      the relative risk, APPROVe relative risk was 3.5.

2   Q   And have you ever seen the Kaplan-Meier cumulative

3      incidence curve of the events in the VICTOR trial?

4   A   I may have, but I don't recall.

5   Q   Now, with respect to Professor Jewell's analysis

6      of Vioxx data from the APPROVe, VICTOR, and VIP

7      studies Protocol 203 marked as Kim Exhibit 6, do

8      you have any knowledge as to whether Dr. Jewell

9      used something other than the final adverse event

10      data?

11   A   First of all, I find the document very difficult

12      to comprehend, and then I noted when I was

13      reviewing the document that this study does not

14      provide the primary analysis result.  What I see

15      is a snippet of various risks from the stated

16      cardiovascular endpoints of the Study 203.  So I

17      see this report as very incomplete.

18              MR. ARBITBLIT:  I'll move to strike

19          as nonresponsive.

20   Q   Do you know whether Dr. Jewell had the final

21      adverse event data when he prepared the analysis

22      in Exhibit 6?

23   A   I cannot answer that question affirmatively or

24      negatively.

25   Q   Do you know whether all confirmed cardiac events

Kyungmann Kim, Ph.D.

Page 124

```
1    A    I'll read it again.  "The changing effect of the
2         pattern over time was (P equals 0.01).  Findings
3         for the APPC endpoint was similar (table 3)."
4    Q    Now, are you aware, as you sit here today, that
5         the test of the proportional hazards assumption
6         was not statistically significant when performed
7         in the manner prescribed by the statistical data
8         analysis plan?
9                        MR. MORTARA:  Object to the form of
10            the question.
11                        (Exhibit No. 12 marked for
12                        identification)
13   Q    Dr. Kim, Exhibit 12 is a document dated May 30,
14        2006, entitled "Merck Corrects Description of a
15        Statistical Method Used in APPROVe Study."
16            Have you seen this before?
17   A    Yes, I have.
18   Q    Was this something you got yourself on line, or
19        was it provided to you by counsel?
20   A    I got this news through my advisor.  I mean not my
21        advisor, my boss.  He saw this and he alerted to
22        me, and I went to the Merck web page and I printed
23        them up.
24   Q    Did you have any discussion with your boss,
25        Dr. DeMets, about this press release other than
```

Kyungmann Kim, Ph.D.

Page 125

1          him alerting you to it?

2    A    A few days later a different sort of meeting, I

3          meet with him regularly as an associate chair of

4          the department.  We discussed that it didn't make

5          any difference qualitatively to the study results.

6    Q    What do you mean by qualitatively?

7    A    Because it doesn't change what is reported in the

8          study.

9    Q    Did Dr. DeMets know, had he seen the data analysis

10         plan when you had this discussion?

11   A    No.  But we -- I mean, the whole point of the

12         Merck's documentation is that they describe

13         something in the protocol, but they acknowledge

14         that actual test that was performed was different.

15         And so our conversation was that it didn't

16         materially change the study findings at all.

17   Q    You're aware that the P value was .07 rather than

18         .01 when the test was performed as prespecified

19         using the log-rank rather than linear time method;

20         correct?

21   A    That's correct.

22   Q    And the log-time method was specified in the data

23         analysis plan; correct?

24   A    That's correct.

25   Q    And when Merck used the prespecified method, the

Kyungmann Kim, Ph.D.

1      result was greater than P equals .05; correct?

2  A  It reads, "Analytical and graphical method will be

3      employed to verify the proportional hazards

4      assumption.  The primary method for testing the

5      proportional hazards assumption will be by

6      including the factor treatment log (time) in the

7      model; nonsignificance of this factor is not

8      inconsistent -- actually I read this statement

9      earlier.  So it states that nonsignificance of

10      this factor implies proportionality, constancy of

11      treatment effect over time.

12  Q  And so what happened was that when Merck reran the

13      data using the log time model, they determined

14      that the P value was 0.07; correct?

15  A  I don't know for a fact what happened.

16  Q  Take a look at Exhibit 12.

17  A  Yeah, they report a P value of .07.

18  Q  They reported a P value of .07 using the log time

19      method; correct?

20  A  Right, that's correct.

21  Q  So that result, according to the explicit terms of

22      the data analysis plan, implies proportionality,

23      i.e., constancy of treatment effect over time;

24      correct?

25  A  Yes.

```
 1                    MR. MORTARA:   Object to the form of
 2          the question.
 3   A   You have to understand the statistical test of
 4       hypothesis.  I think I spend some time in my own
 5       documentation.  These P values I joke to my
 6       statistical colleagues that we've been so
 7       successful to a point of where there's a lunacy
 8       going on out there.  People just look at people
 9       '05.  It's God given.  Science doesn't work that
10       way.  So they conducted I don't know how -- what
11       the sequence of events were with regard to this.
12       So they had the statement about tests of the
13       proportionality of the hazard, which as I stated
14       earlier, is a standard test that all of us do when
15       it comes time for time-to-events data analysis.
16       So what this Merck document acknowledges is that
17       although they reported a P value of .01 as if it
18       was done according to the log -- I mean, the tests
19       of the proportional hazard assumption, they
20       acknowledge that they end up using a different
21       test.  And when I saw this document, this was the
22       initial reaction I had with my boss.  You see a
23       curve that separates out like that, my initial
24       reaction to that is that of course there's no
25       proportionality in the hazard.  In fact, their
```

Kyungmann Kim, Ph.D.

1     extension study shows that through a various plot

2     of the hazard itself is a curve instead of the

3     Kaplan-Meier curve.

4          When I see a data set as presented in

5     figure 2 of the Bresalier's publication, the first

6     reaction I had was of course, I wouldn't use

7     the -- I mean in order, if I were interested in

8     whether this curve separates out or not, the

9     appropriate test is what they actually used.

10    Because it tests the interaction between time and

11    the treatment, which is what this curve seems to

12    indicate.  Whereas log-rank test was a test of the

13    proportionality of the hazard, so it addresses a

14    different scientific question.

15         So the P value they report as a .01 is

16    misleading in the sense that it was not "test of

17    the proportional hazard."  But this P value

18    correctly reflects the time-by-treatment effect,

19    which I think at this stage would be a more

20    interesting question.  You see a curve like this,

21    proportionality is out the window.  You don't have

22    to do a test.

23  Q   Now, you think they applied the right test even

24    though they didn't apply the test that was in the

25    data analysis plan; is that what you're saying?

Kyungmann Kim, Ph.D.

Page 129

1    A    Right, uh-huh.

2              MR. MORTARA:   Object to the form of

3          the question.

4    A    It's my sort of opinion as a statistical

5         scientist.  If I were looking -- if I were

6         analyzing the data like this, I would naturally do

7         the kind of test that they applied.

8    Q    And you would also do the same test on the results

9         of Protocol 203 for the combined study?

10   A    Not necessarily.

11   Q    Well, that's what's prespecified in Protocol 203

12        analysis plan; correct?

13   A    203 I thought they prespecified proportional

14        hazard test.

15   Q    Well, they prespecified a Kaplan-Meier test also,

16        didn't they?  Look at page 17.

17   A    Okay.  Oh, the test I'm talking about is not

18        Kaplan-Meier test.  Kaplan-Meier method is just a

19        method to describe that curve.  It has nothing to

20        do with the test.  So what they have done,

21        Kaplan-Meier analysis is what they have reported

22        here.  So I read Kaplan-Meier plots of cumulative

23        rates over time -- Kaplan-Meier plots of

24        cumulative rates over time will be compared in

25        nonparametric methods, such as the log-rank test

Kyungmann Kim, Ph.D.

Page 130

1    will be utilized to compare the survival curve,

2    which they have done.

3 Q  Which they have done for APPROVe but not for

4    Protocol 203; correct?

5 A  That I haven't seen, so I don't know whether they

6    have done or not.

7                   MR. ARBITBLIT:  Let's take a lunch

8        break.

9            (Recess for lunch)

10               (Exhibit Nos. 13 and 14 marked for

11                 identification)

12 By Mr. Arbitblit:  (Continuing)

13 Q  Good afternoon, Doctor.

14 A  Good afternoon.

15 Q  Did you have any discussions about your testimony

16    during the lunch break?

17 A  Yes, we had lunch.

18 Q  Did you talk about your testimony during lunch?

19 A  Not particularly.

20 Q  Well, not particularly or not at all, sir?

21 A  I guess he said I'm doing okay.

22 Q  Did you ask him any questions?

23 A  No.

24 Q  During the break we had a few things marked that I

25    don't feel we need to talk about but that I want

Kyungmann Kim, Ph.D.

1        to have as part of the record.

2    A   Sure.

3    Q   We've talked some about this already, but

4        Exhibit 14 appears to be a set of invoices that

5        were copied from your file.  Can you just please

6        quickly take a look through and confirm that that

7        is a complete set of your invoices.

8    A   Yes, it is.

9    Q   Except for what you're billing for preparation

10       yesterday and today attending the deposition?

11   A   That hasn't been billed yet.

12   Q   Right.  And the next document is 13, going

13       backwards somewhat, but Exhibit 13 is a set of

14       documents copied from your file.  Are these notes

15       that you've taken during the time you were

16       retained on the Vioxx matter since January 2006?

17   A   Yes.  It's complete, yes.

18   Q   Now, with respect to one of the notes on your

19       May 31st, 2006, meeting, that's the last page of

20       Exhibit 13 --

21   A   Yes.

22   Q   There's a note about Adam there.  Could you read

23       what you wrote there.

24   A   An example of a prediction for a population versus

25       an individual.  Confidence interval.

Kyungmann Kim, Ph.D.

Page 132

1    Q    And how did that subject come up?  Did you raise
2         it or did Adam raise it?  Excuse me, is Adam
3         Mr. Mortara?
4    A    Oh, Mr. Mortara asked me about the implication of
5         a relative risk from a study, and particularly as
6         it relates to a person.
7    Q    Was that something that had not appeared in your
8         report up to May 31st, 2006?
9    A    I think you are correct.
10   Q    And so the report that you signed on June 1st has
11        a paragraph on page 6, the second paragraph under
12        relative risk.
13   A    Yes, uh-huh.
14   Q    And was this paragraph intended to address the
15        point in your May 31st, 2006 --
16   A    That's correct.
17   Q    Please wait till I finish the question.
18   A    Oh, okay.
19   Q    Was the second paragraph of your report at page 6
20        intended to address the point raised in your note
21        of May 31st, 2006, with Mr. Mortara?
22   A    That's correct.
23   Q    As of May 31st, 2006, did you have at your
24        disposal any examples of what it was you were
25        trying to provide to Mr. Mortara?

Kyungmann Kim, Ph.D.

Page 133

```
 1    A    I checked a few textbooks, and I didn't find
 2         specific examples that addresses for relative
 3         risk.  But I found an example that was general
 4         regression modeling setting, so I sent him an
 5         email with a copy of the pages from the textbook.
 6    Q    And was that a textbook by Pagano?
 7    A    Yes.
 8    Q    Do you recall that Pagano used an example of head
 9         circumference in newborns?
10    A    That's right, uh-huh.
11    Q    Is that a continuous outcome variable?
12    A    Yes.
13    Q    In the sense that the size of newborns' head
14         circumference could be somewhere on a spectrum
15         from the smaller to the larger; correct?
16    A    That's correct.
17    Q    Did you -- withdraw that.  Is myocardial
18         infarction a binary outcome variable?
19    A    Yes, it is.
20    Q    And does a binary outcome variable mean that you
21         either have it or you don't?
22    A    That's correct.
23    Q    Now, is it correct that the risk for an individual
24         is not the same as the relative risk?
25    A    That's correct.
```

Kyungmann Kim, Ph.D.

Page 134

1    Q    With respect to a binary outcome such as

2         myocardial infarction, is it correct that the risk

3         is either one if you have that outcome or zero if

4         you don't?

5                   MR. MORTARA:   Object to the form of

6              the question.   It's vague as to time.

7    A    Would you please define "risk" in that setting.

8    Q    What does the word "risk" mean to you in that

9         setting?

10   A    Risk represents the risk of having specific

11        outcome, so for an individual, someone would

12        either get it or not.

13   Q    In that setting would the risk be one if the

14        individual got that outcome?

15   A    It's not the risk that if someone got the disease.

16        When we use the binary indicator, it could have

17        been one to ten.   It could have been one to .1.

18        It's just a place holder for whether a certain

19        event occurred or not.   We call that dichotomous

20        input.

21   Q    Is it correct that the relative risk is equal to

22        the incidence of the outcome in the exposed group

23        divided by the incidence of the outcome in the

24        unexposed group?

25   A    To clarify your remarks, relative risk in this

Kyungmann Kim, Ph.D.

Page 135

1    setting is used as a number of events divided by

2    the person year at risk of all the people who are

3    studied, divided by the same quantity for a

4    different group.

5  Q  Is the number of events divided by the person

6    years for that group a measure of the incidence

7    from that group?

8  A  We have to be very careful about the definition.

9    People typically use incidence for a subject

10   whether an event has occurred to the person or

11   not.  The quantity that you are talking about is

12   what we oftentimes refer to as incidence rate.

13 Q  Have you ever seen the term "individual confidence

14   interval" applied to a binary outcome in any

15   textbook?

16 A  Not for the binary outcome, no.

17 Q  Same question as to peer-reviewed publications.

18   Have you ever seen the term "individual confidence

19   interval" used in any peer-reviewed publication

20   with respect to a binary outcome?

21 A  No.

22 Q  Is it your understanding that the phrase

23   "individual confidence interval" is applicable to

24   continuous outcome variables rather than binary

25   outcome variables?

Kyungmann Kim, Ph.D.

```
 1   A   That's correct.

 2   Q   What is an attributable proportion of risk?

 3   A   Attributable proportion of risk.  It's the -- let

 4       me step back.  When you talk about a risk for a,

 5       some defined population, the attributable risk

 6       indicates the risk above and beyond the background

 7       risk for that population.

 8   Q   If you are talking about a study, a clinical trial

 9       where you have an exposed group and an unexposed

10       group, would the attributable proportion of risk

11       represent the percentage of the exposed group who

12       probably experienced the outcome of interest as a

13       result of the exposure rather than the causes that

14       make up the background rate?

15   A   So that's why we look at the relative risk, to

16       account for the background rate in the group that

17       did not receive the treatment or intervention

18       under consideration.

19   Q   Do you then use the relative risks to determine

20       the attributable proportion of risk that tells you

21       what percentage of the exposed group suffered the

22       outcome because of their exposure?

23   A   No.  It's not the percentage of people who suffer.

24       So you have a group of people who receive

25       intervention.  And based on the number of events
```

Kyungmann Kim, Ph.D.

Page 206

1      returning for colonoscopy.

2   Q  Do you agree with the statement that when a study

3      with low power fails to show a significant effect,

4      the results are more fairly described as

5      inconclusive than negative, the proof is weak

6      because power is low?

7                      MR. MORTARA:  Object to the form of

8          the question.

9   A  Would you please read that question again.

10  Q  Yes.  Do you agree with the statement that when a

11     study with low power fails to show a significant

12     effect, the results are more fairly described as

13     inconclusive than negative?  The proof is weak

14     because power is low?

15  A  I think that's a fair statement, yes.

16  Q  Do you agree that power is determined by a

17     calculation done before a trial begins?

18  A  That's typically how the study's designed, yes.

19  Q  Do you agree that sample size requirements are

20     sensitive to the magnitude of the treatment effect

21     you are trying to detect?

22  A  Absolutely.

23  Q  And does that mean that if you have set a lower

24     relative risk as your standard, how does that

25     affect the size of the population you need to

Kyungmann Kim, Ph.D.

Page 208

```
 1   Q    Page 23.   That was not -- what you state is, "Of
 2        note, given the observed number of cardiovascular
 3        thrombotic events, the 078 study had adequate,
 4        greater than 80 percent power to detect a relative
 5        risk of 2 or greater."  Did I read that correctly?
 6   A    That's correct.
 7   Q    And that was not a power calculation done before
 8        the trial, was it?
 9   A    No.   This is what is often referred to as a
10        post-hoc power.
11   Q    A what?
12   A    A post-hoc power, after the fact the study was
13        done.
14   Q    What assumptions did you use to calculate that
15        power?
16   A    The power calculation for a study like this where
17        you are enrolling patients over a long period of
18        time and follow them for event, you have to make a
19        number of assumptions.  So what I did in this case
20        is to make the assumption according to how the
21        number of subjects that were enrolled in the study
22        was recruited in terms of the duration of the
23        enrollment and the period of follow reported and
24        the number of events that was reported.  So this
25        is an exercise in trying to understand whether the
```

Kyungmann Kim, Ph.D.

Page 209

1       study had adequate power as if you are studying

2       the study from scratch.

3  Q  Now, you state in your last answer that one of the

4       assumptions had to do with duration of the

5       enrollment and the period of follow-up.

6  A  Yes.

7  Q  How does that affect the power calculation?

8  A  Because that determines how many events you end up

9       observing, so it determines the rate by which the

10      event is accumulated.  So the study was done.  We

11      had a total of 74 events observed during this

12      study.

13  Q  And what is the effect of the duration and the

14      rate of events on the power?

15  A  If you have a longer follow-up duration, the event

16      rate will be small given the fixed number of

17      events.  And if the study was done in a short

18      period of time with a fixed number of events,

19      event rate will be higher.

20  Q  How does that event rate being higher or lower

21      affect the power in terms of increasing it or

22      decreasing it?

23  A  The power itself depends on the number of events.

24      But in order for the calculation to be done, you

25      have to sort of mimic how the event was

Kyungmann Kim, Ph.D.

Page 210

1       accumulated over time and how many patients were

2       actually enrolled in the study.  So that's why you

3       need to know the enrollment rate and the follow-up

4       situation, minimum follow-up duration.

5              So what I did was to use a statistical

6       package that was commercially available, and so we

7       have the study duration and the number of subjects

8       and we have the number of observed events, and I

9       used the relative risk of 2 and what kind of power

10      it gives.

11   Q  Where is the output of the calculation that you

12      did?

13   A  We did a calculation on the fly on my machine.

14   Q  We meaning who?

15   A  At the meeting.

16   Q  You and the attorneys?

17   A  Right.  I mean, I did the calculation.  I mean, I

18      did the calculation in the presence of the

19      attorneys.

20   Q  And did you save the output?

21   A  I don't recall.  But it's not a hard calculation.

22   Q  That's easy for you to say.

23   A  Particularly when you use the published, or

24      commercially available tools.

25   Q  Now, would your -- as you've described the method

Kyungmann Kim, Ph.D.

Page 211

1    that you used, would your results be sensitive to

2    or not sensitive to the level of compliance in the

3    study subjects?

4    A    Here we didn't account for the compliance.  So the

5         assumption is that everyone who has been

6         randomized will be available for analysis one way

7         or the other.

8    Q    And if 61 percent of the Vioxx patients achieved

9         the prespecified level of compliance, what would

10        that do to the power to detect a relative risk of

11        2.0 at an 80 percent level?

12   A    Well --

13                    MR. MORTARA:  Object to the form of

14            the question.

15   A    You have to make specific assumptions about what

16        different levels of compliance does to the

17        relative risk.  I don't think we have that

18        information.

19   Q    Take a look at the Thal article, please.

20   A    Okay.

21   Q    Take a look at page -- excuse me.  I'll try to

22        find it for you.  Look at the results section.  Do

23        you see that in the first full paragraph of the

24        results section the statement appears that,

25        "61 percent of the 725 patients randomized to

Page 212

1       rofecoxib and 70.8 percent of the 723 patients

2       randomized to placebo had greater than or equal to

3       80 percent compliance during the time they were in

4       the study"?

5   A   Yes, I do.

6   Q   And how would that have affected your calculation

7       of power if you had accounted for it in the

8       calculation?

9   A   I have not because we don't have data indicating

10      what 80 percent compliance does to the relative

11      risk, so I cannot do that calculation.

12  Q   Did you assume that all 725 Vioxx and 732 patients

13      were available for the complete follow-up?

14  A   Remember we are looking at time-to-event data.   So

15      when those patients are not available, they get

16      censored.   It's not like they are lost to the

17      study.   So they make contribution to your person

18      year contribution.   So even though these people

19      get lost, the timed event data are always

20      available, and they make contribution to the

21      denominator in the incidence rate and the relative

22      risk calculation.

23          Now, for their AD cognition scale, if the

24      patient does not show up, they don't have the

25      data.   But with a timed event data, it's not like

Kyungmann Kim, Ph.D.

Page 217

```
 1        the author is Lawrence Freedman who authored a
 2        textbook with your boss, Dr. DeMets, correct?
 3        Please answer out loud.
 4    A   Yes.  I see a chapter written by -- oh, this is a
 5        different Lawrence Freedman.
 6    Q   It's a different Lawrence Freedman.
 7    A   Yes.
 8    Q   They're very common statisticianal names?
 9    A   No, the spelling is different.
10    Q   Is this a Lawrence Freedman whose name you
11        recognize or not?
12    A   I recognize both Freedmans.
13    Q   Do you recognize this Lawrence Freedman as someone
14        who's a reputable author in the field?
15    A   Yes, I would say so.
16    Q   And if you turn to page 11 in this randomized
17        article or chapter under the heading
18        Reducing Noncompliance, do you see the statement,
19        "Noncompliance also affects the design of a trial.
20        Its main effect is to reduce the treatment
21        difference that is observed in the trial, and, as
22        shown in figure 2-2, this in turn necessitates an
23        increase in the sample size to maintain good
24        statistical power".  Do you see that?
25    A   That's generally true.
```

Kyungmann Kim, Ph.D.

Page 250

1        significant increased risk based on the data?

2                        MR. MORTARA:  Object to the form of

3            the question.

4    A   The distinction is I never made a specific

5        statement about this general question, "rofecoxib

6        significantly increases the risk of cardiovascular

7        events."  I answered your question for a specific

8        study across a number of different disease

9        settings, including Alzheimer's disease data.

10   Q   Do you see any qualification of the statement --

11   A   No, I did not.

12   Q   -- from the study group in what the advisory

13       committee said?

14   A   No, I do not.

15   Q   Now, Doctor, do you intend to testify about the

16       British Medical Journal study by Kearney at trial?

17       And I'll represent that we've just been handed

18       this as something that you plan to address and

19       it's been added to your reference materials.

20   A   Yes.

21   Q   And without waiver of our rights to object or

22       further inquire about it, I'd like to know what it

23       is you plan to say about this study.

24                      MR. MORTARA:  Could you mark it as

25           an exhibit, please.

Kyungmann Kim, Ph.D.

Page 251

1        MR. ARBITBLIT:  Yes, we will.

2        (Exhibit No. 29 marked for

3            identification)

4    Q    So my question is what do you intend to say about

5         Exhibit 29 at trial?

6    A    Just as I have done with a number of randomized

7         clinical trials and observational studies, I would

8         like to update my report based on my review of

9         the, this meta-analysis of randomized controlled

10        clinical trials.

11   Q    Are you saying that you have not yet updated your

12        opinions and that you plan to supplement your

13        report, or did you have opinions you're prepared

14        to provide today?

15   A    I reviewed the data.  I mean, I've reviewed the

16        paper, that is, but I haven't had a chance to

17        update my report.

18   Q    Fair enough.

19            MR. ARBITBLIT:  Go ahead.

20

21                EXAMINATION

22   By Mr. Mortara:

23   Q    Dr. Kim, does the meta-analysis as Exhibit 29

24        support your opinions in this matter?

25            MR. ARBITBLIT:  Object to form,

Page 252

1                  asked and answered.

2    A    Repeat the question.

3    Q    Dr. Kim, are you relying on the meta-analysis

4         that's Exhibit 29 as support for your opinions in

5         your report?

6                      MR. ARBITBLIT:  Object to form,

7              asked and answered.

8    A    To me, this is one of the publications of a series

9         of literatures that I've reviewed.  The

10        meta-analysis of randomized clinical trials that

11        I've seen so far was largely done by people

12        affiliated with Merck, and I believe none of these

13        investigators are affiliated with Merck.  So I'm

14        just going to review this data and update my

15        report based on the findings in the study,

16        recognizing that the precept data reported in this

17        report is outdated, as you probably know.  The

18        precept data was updated at the American

19        Association for Cancer Research Meeting in April,

20        and they confirmed the findings from APC trial.

21             The other aspect that I was -- I have a copy

22        of mine.  Do you mind if I take a look at my copy?

23   Q    Go ahead and get your own copy if you want.

24   A    Because I have some notes written.

25             But one aspect of the report as featured in

Kyungmann Kim, Ph.D.

Page 253

1         figure 2 is that they looked at the Alzheimer data

2         and polyp data, and with the old precept data the

3         interaction between the treatment by disease type,

4         I believe, when updated will be even more strong,

5         indicating that there was signals in polyp

6         patients more strongly than what is presented,

7         indicating the inconsistency between polyp data

8         and the Alzheimer's disease data.

9    Q    Dr. Kim, does the BMJ meta-analysis support your

10        opinion that there's an inconsistency of data

11        between polyp data and Alzheimer's disease data?

12   A    Yes.

13                    MR. ARBITBLIT:   Object to form.

14   Q    Dr. Kim, if asked at trial about the BMJ

15        meta-analysis, will you offer the opinion that the

16        BMJ meta-analysis and specifically figure 2, which

17        you pointed out, supports your opinion that

18        there's an inconsistency of data between

19        Alzheimer's disease patients and polyp patients?

20                    MR. ARBITBLIT:   Object to form.

21   A    The figure 2 appears to indicate that the relative

22        risk for rofecoxib as compared to placebo in polyp

23        patients is different from the relative risk in

24        Alzheimer's disease.

25   Q    Doctor --

Downloaded from bmj.com on 5 June 2006



# Do selective cyclo-oxygenase-2 inhibitors and traditional non-steroidal anti-inflammatory drugs increase the risk of atherothrombosis? Meta-analysis of randomised trials

Patricia M Kearney, Colin Baigent, Jon Godwin, Heather Halls, Jonathan R Emberson and Carlo Patrono

BMJ 2006;332;1302-1308
doi:10.1136/bmj.332.7553.1302

---

Updated information and services can be found at:
http://bmj.com/cgi/content/full/332/7553/1302

---

These include:

| | |
|---|---|
| **Data supplement** | *"Further details"*<br>http://bmj.com/cgi/content/full/332/7553/1302/DC1 |
| **References** | This article cites 14 articles, 12 of which can be accessed free at:<br>http://bmj.com/cgi/content/full/332/7553/1302#BIBL |
| | 1 online articles that cite this article can be accessed at:<br>http://bmj.com/cgi/content/full/332/7553/1302#otherarticles |
| **Rapid responses** | 3 rapid responses have been posted to this article, which you can access for free at:<br>http://bmj.com/cgi/content/full/332/7553/1302#responses |
| | You can respond to this article at:<br>http://bmj.com/cgi/eletter-submit/332/7553/1302 |
| **Email alerting service** | Receive free email alerts when new articles cite this article - sign up in the box at the top right corner of the article |

---

**Topic collections**    Articles on similar topics can be found in the following collections

Systematic reviews (incl meta-analyses): examples (324 articles)
Other Cardiovascular Medicine (1947 articles)
Drugs: musculoskeletal and joint diseases (336 articles)
Adverse drug reactions (521 articles)

---

**Notes**

To order reprints of this article go to:
http://www.bmjjournals.com/cgi/reprintform

To subscribe to *BMJ* go to:
http://bmj.bmjjournals.com/subscriptions/subscribe.shtml

EXHIBIT 7

Downloaded from bmj.com on 5 June 2006

# Research

# BMJ

## Do selective cyclo-oxygenase-2 inhibitors and traditional non-steroidal anti-inflammatory drugs increase the risk of atherothrombosis? Meta-analysis of randomised trials

Patricia M Kearney, Colin Baigent, Jon Godwin, Heather Halls, Jonathan R Emberson, Carlo Patrono

### Abstract

**Objective** To assess the effects of selective cyclo-oxygenase-2 (COX 2) inhibitors and traditional non-steroidal anti-inflammatory drugs (NSAIDs) on the risk of vascular events.

**Design** Meta-analysis of published and unpublished tabular data from randomised trials, with indirect estimation of the effects of traditional NSAIDs.

**Data sources** Medline and Embase (January 1966 to April 2005); Food and Drug Administration records; and data on file from Novartis, Pfizer, and Merck.

**Review methods** Eligible studies were randomised trials that included a comparison of a selective COX 2 inhibitor versus placebo or a selective COX 2 inhibitor versus a traditional NSAID, of at least four weeks' duration, with information on serious vascular events (defined as myocardial infarction, stroke, or vascular death). Individual investigators and manufacturers provided information on the number of patients randomised, numbers of vascular events, and the person time of follow-up for each randomised group.

**Results** In placebo comparisons, allocation to a selective COX 2 inhibitor was associated with a 42% relative increase in the incidence of serious vascular events (1.2%/year v 0.9%/year; rate ratio 1.42, 95% confidence interval 1.13 to 1.78; P = 0.003), with no significant heterogeneity among the different selective COX 2 inhibitors. This was chiefly attributable to an increased risk of myocardial infarction (0.6%/year v 0.3%/year; 1.86, 1.33 to 2.59; P = 0.0003), with little apparent difference in other vascular outcomes. Among trials of at least one year's duration (mean 2.7 years), the rate ratio for vascular events was 1.45 (1.12 to 1.89; P = 0.005). Overall, the incidence of serious vascular events was similar between a selective COX 2 inhibitor and any traditional NSAID (1.0%/year v 0.9%/year; 1.16, 0.97 to 1.38; P = 0.1). However, statistical heterogeneity (P = 0.001) was found between trials of a selective COX 2 inhibitor versus naproxen (1.57, 1.21 to 2.03) and of a selective COX 2 inhibitor versus non-naproxen NSAIDs (0.88, 0.69 to 1.12). The summary rate ratio for vascular events, compared with placebo, was 0.92 (0.67 to 1.26) for naproxen, 1.51 (0.96 to 2.37) for ibuprofen, and 1.63 (1.12 to 2.37) for diclofenac.

**Conclusions** Selective COX 2 inhibitors are associated with a moderate increase in the risk of vascular events, as are high dose regimens of ibuprofen and diclofenac, but high dose naproxen is not associated with such an excess.

## Introduction

Traditional non-steroidal anti-inflammatory drugs (NSAIDs) are widely used to treat pain, but their long term use is limited by serious gastrointestinal side effects. Whereas NSAIDs inhibit the two recognised forms of prostaglandin G/H synthase (also referred to as cyclo-oxygenase), selective cyclo-oxygenase-2 (COX 2) inhibitors are selective inhibitors of the COX 2 isozyme.[1] As the anti-inflammatory effects of NSAIDs were believed to be mediated by inhibition of COX 2, and their gastrointestinal side effects by inhibition of COX 1, people hypothesised that selective COX 2 inhibitors would provide a safer alternative to traditional NSAIDs. However, although some studies have reported a lower incidence of upper gastrointestinal complications with selective COX 2 inhibitors than with traditional NSAIDs,[2 3] recent concerns about the cardiovascular safety of selective COX 2 inhibitors have limited their use.

Although the Vioxx gastrointestinal outcomes research (VIGOR) trial reported a fivefold increase in myocardial infarction among participants allocated to rofecoxib (20 rofecoxib v 4 naproxen; P < 0.001),[4] this difference might have occurred, at least in part, because high dose naproxen inhibits platelet aggregation throughout the dosing interval. However, the results of the adenomatous polyp prevention on Vioxx (APPROVe) trial, which was the first relatively large trial comparing a selective COX 2 inhibitor with placebo, indicated that rofecoxib increased the risk of vascular events by about twofold.[5] Soon afterwards, the adenoma prevention with celecoxib (APC) trial, comparing celecoxib with placebo, reported a similar excess.[6]

The accumulating evidence suggests that selective COX 2 inhibitors are associated with an increased risk of vascular events, but several important questions remain unanswered. Firstly, what is the magnitude of any excess risk of myocardial infarction, stroke, and vascular mortality? Secondly, is the excess risk of vascular events dose related, and is the size of this risk different in people who are also taking aspirin (which chiefly inhibits COX 1 at low doses)? Thirdly, are traditional NSAIDs (which also inhibit COX 2) associated with an increased risk of vascular events? We did a meta-analysis of randomised trials that compared a selective COX 2 inhibitor with placebo or a selective COX 2 inhibitor with a traditional NSAID in an attempt to answer these questions.

---

*A table, two extra figures, a statistical appendix, and extra references are on bmj.com*

Downloaded from bmj.com on 5 June 2006

Research

## Methods

We used three steps to identify prospective randomised controlled trials of a selective COX 2 inhibitor versus placebo, a selective COX 2 inhibitor versus a traditional NSAID, or both. First we approached the manufacturers of each of the selective COX 2 inhibitors—Merck (rofecoxib, etoricoxib), Novartis (lumiracoxib), and Pfizer (celecoxib, valdecoxib). Then we searched the Food and Drug Administration website for data presented at the Cardiorenal Advisory Committee meeting in February 2005. Finally, we used the modified Cochrane strategy[5] combined with the generic names of each of the individual selective COX 2 inhibitors as keywords to search Medline and Embase from January 1966 to April 2005.

Randomised trials involving at least four weeks' scheduled treatment were eligible if they included at least one comparison of a selective COX 2 inhibitor versus placebo or a selective COX 2 inhibitor versus a traditional NSAID and had recorded serious (that is, admitted to hospital or fatal) cardiovascular events. The pre-specified outcomes were "serious vascular event," as defined by the Antiplatelet Trialists' Collaboration (that is, non-fatal myocardial infarction, non-fatal stroke, or vascular death)[6]; fatal or non-fatal myocardial infarction; fatal or non-fatal stroke; and vascular death (including death from myocardial infarction or stroke). The manufacturers and individual investigators provided summary design details for each trial and information on the process (if any) by which vascular events were adjudicated. All of the manufacturers provided written confirmation that the data provided were complete: Pfizer had locked their data at 31 October 2004, whereas Merck and Novartis had locked their databases at the end of January 2005. We requested numbers of events and person time at risk for each trial, where available, but in a few cases we estimated data from published results or the Food and Drug Administration website.[7]

On the basis of the known pharmacokinetic and pharmacodynamic properties of the NSAIDs studied (which raised the hypothesis that naproxen might have aspirin-like antiplatelet effects), we prospectively specified that analyses of a selective COX 2 inhibitor versus NSAID were to be subdivided into those involving naproxen and those concerning other (non-naproxen) NSAIDs.

We derived rate ratios and their confidence intervals for each of the pre-specified comparisons by using the Peto "one step" approximation (see statistical appendix on bmj.com).[10] In figures and in the text, we have used 99% confidence intervals for individual comparisons to allow for the multiplicity of analyses, reserving 95% confidence intervals for subtotals.

## Results

### Study population
Tabular data were available from 138 randomised trials involving a comparison of a selective COX 2 inhibitor versus placebo or versus a traditional NSAID (or both), in which there were a total of 145 373 participants (see table on bmj.com).[w1-w138]

### Comparisons of selective COX 2 inhibitor versus placebo
Figure 1 shows meta-analyses of a selective COX 2 inhibitor versus placebo, subdivided by individual selective COX 2 inhibitor, for each of the primary outcomes. Overall, among 121 placebo controlled trials, 216 vascular events occurred during 18 490 person years of exposure to a selective COX 2 inhibitor (1.2%/year) compared with 112 during 12 639 person years of placebo (0.9%/year), corresponding to a 42% proportional increase in the incidence of a first serious vascular event (rate

ratio 1.42, 95% confidence interval 1.13 to 1.78; P=0.003). We found no evidence that the proportional excess incidence of vascular events varied among the different selective COX 2 inhibitors (heterogeneity $\chi^2$=4, df=4; P=1.0). However, as only two selective COX 2 inhibitors (rofecoxib and celecoxib) had recorded appreciable numbers of such outcomes, the power to identify any real differences that might exist between selective COX 2 inhibitors was limited. In the group of trials analysed, this proportional difference corresponded to an excess of 3 (95% confidence interval 1 to 5) people with a vascular event per 1000 allocated to a selective COX 2 inhibitor per year.

We found an almost twofold proportional increase in myocardial infarction (rate ratio 1.86, 1.33 to 2.59; P=0.0003) (fig 1), corresponding to an excess of 3 (1 to 4) people with myocardial infarction per 1000 allocated to a selective COX 2 inhibitor per year. We found no significant heterogeneity in the rate ratios for myocardial infarction among individual selective COX 2 inhibitors (heterogeneity $\chi^2$=1.0, df=4; P=0.9). We found no difference in the incidence of stroke (rate ratio 1.02, 0.71 to 1.47; P=0.9), corresponding to an absolute difference of 0 (−2 to 1)/1000/year, and the summary rate ratio for vascular death (1.49, 0.97 to 2.29; P=0.07), although it did not reach statistical significance, corresponded to an absolute excess of 1 (0 to 2)/1000/year.

### Duration
Of the 121 placebo controlled trials, nine were long term trials with one year or longer of scheduled treatment (mean 139 weeks) and 112 were shorter trials (mean 11 weeks). Around two thirds of the vascular events had occurred in the nine long term trials. In these long term trials, allocation to a selective COX 2 inhibitor was associated with a 45% increase in the incidence of vascular events (rate ratio 1.45, 1.12 to 1.89; P=0.005) (fig 2), with no significant heterogeneity between the event rate ratios in the trials (heterogeneity $\chi^2$=13.4, df=8; P=0.1).

### Dose
Too few vascular events were available to allow us to assess dose-response in placebo controlled trials of etoricoxib, lumiracoxib, or valdecoxib. For rofecoxib, 85% of vascular events among patients allocated to a selective COX 2 inhibitor occurred at a dose of 25 mg daily, with few events at lower or higher daily doses, so we could not evaluate dose dependence. For celecoxib, we found a significant trend towards an increased incidence of serious vascular events with higher daily doses (trend P=0.03) (fig A on bmj.com).

### Aspirin
Among the 84 placebo controlled trials that allowed concomitant use of aspirin for which data were available, we found no significant heterogeneity of the summary rate ratios for vascular events among aspirin users and non-users (heterogeneity $\chi^2$=0.9, df=1; P=0.9) (fig B on bmj.com). We found a similar lack of heterogeneity for myocardial infarction, stroke, and vascular death (data not shown).

### Comparisons of selective COX 2 inhibitor versus traditional NSAID
Overall, we found no significant difference in the incidence of a serious vascular event between participants allocated to a selective COX 2 inhibitor and those allocated to a traditional NSAID—340 vascular events during 33 260 person years of exposure to a selective COX 2 inhibitor (1.0%/year) versus 211 vascular events during 23 325 person years with a traditional

Downloaded from bmj.com on 5 June 2006

Research

NSAID (0.9%/year) (rate ratio 1.16, 0.97 to 1.38; $P = 0.1$) (fig 3). However, we found marked heterogeneity between the rate ratios for vascular events in trials comparing a selective COX 2 inhibitor with naproxen and those comparing a selective COX 2 inhibitor with a non-naproxen NSAID ($\chi^2 = 10.2$, df = 1; $P = 0.001$). We found similar heterogeneity for myocardial infarction ($\chi^2 = 4.3$, df = 1; $P = 0.04$), stroke ($\chi^2 = 3.6$, df = 1; $P = 0.06$), and vascular death ($\chi^2 = 5.3$, df = 1 $P = 0.02$).

*Any selective COX 2 inhibitor versus naproxen*
Overall, compared with naproxen, allocation to a selective COX 2 inhibitor was associated with a highly significant increase in the incidence of a vascular event (rate ratio 1.57, 1.21 to 2.03; $P = 0.0006$) and a twofold increased risk of a myocardial infarction (2.04, 1.41 to 2.96; $P = 0.0002$) (fig 3). We found no significant difference in the incidence of stroke (rate ratio 1.10, 0.73 to 1.65; $P = 0.7$) or of vascular death (1.47, 0.90 to 2.40; $P = 0.1$).

*Any selective COX 2 inhibitor versus a non-naproxen NSAID*
Overall, we found no significant difference in the incidence of a vascular event (rate ratio 0.88, 0.69 to 1.12; $P = 0.3$), myocardial infarction (1.20, 0.85 to 1.68; $P = 0.3$), or vascular death (0.67, 0.43 to 1.05; $P = 0.09$), but a selective COX 2 inhibitor was associated with a significantly lower incidence of stroke than any non-naproxen traditional NSAID (rate ratio 0.62, 0.41 to 0.95; $P = 0.03$) (fig 3). Comparisons of a selective COX 2 inhibitor with ibuprofen (rate ratio 0.85, 99% confidence interval 0.49 to 1.46; $P = 0.4$), a selective COX 2 inhibitor versus diclofenac (0.85, 0.56



Fig 1  Comparison of effects of different selective COX 2 inhibitors versus placebo on vascular events, myocardial infarction, stroke, and vascular death. Event numbers and person years of exposure, with corresponding mean annual event rates in parentheses, are presented for patients allocated to selective COX 2 inhibitor and placebo. Event rate ratios for subtotals, with 95% confidence intervals, are indicated by a diamond; rate ratios for individual selective COX 2 inhibitors, with 99% confidence intervals, are indicated by a square and horizontal line. Diamonds to the right of the solid line indicate hazard with a selective COX 2 inhibitor compared with placebo, but this is conventionally significant only if the diamond does not overlap the solid line

Downloaded from bmj.com on 5 June 2006

Research

to 1.27; P = 0.3), and a selective COX 2 inhibitor versus any other non-naproxen NSAID (2.21, 0.49 to 10.03; P = 0.2) yielded similar rate ratios for vascular events (test for heterogeneity $\chi^2 = 2.6$, df = 2; P = 0.3) (fig 3).

### Comparisons of traditional NSAID versus placebo

We combined direct estimates of treatment effect (from trials involving a comparison of an NSAID versus placebo) with indirect information (from a comparison of trials of a selective COX 2 inhibitor versus placebo and a selective COX 2 inhibitor versus NSAID) (see statistical appendix on bmj.com). The summary rate ratio for vascular events, in comparison with placebo, was 0.92 (95% confidence interval 0.67 to 1.26) for naproxen, 1.51 (0.96 to 2.37) for ibuprofen, and 1.63 (1.12 to 2.37) for diclofenac.

## Discussion

When we considered all the randomised trial data, selective COX 2 inhibitors were associated with a highly significant 1.4-fold increased risk of serious vascular events, largely due to a twofold increased risk of myocardial infarction. Although we found no significant excesses in the incidence of stroke or vascular death, the confidence intervals for each were wide, so we could not exclude a clinically important excess. If, as some people have suggested (on the basis of the delayed divergence of survival curves), the hazard emerges only after a year or 18 months,[4 5] then combining short term and long term trials might underestimate the effects of long term exposure to a selective COX 2 inhibitor. We were not able to assess time dependent variation in the rate ratio because we sought numbers of events and person time only for the whole period of follow-up in each trial. However, as figure 2 clearly shows, when all the long term trials

are considered, the summary rate ratio is similar to that from short term and long term trials combined and somewhat smaller than the twofold to threefold excess suggested by the combined results of the APC and APPROVe studies.[4 5]

Not all of the trials had independent adjudication of vascular events, so a bias towards the null is possible owing to non-differential misclassification of vascular outcomes in those trials without independent adjudication. As more than 70% of the vascular events occurred in trials that were adjudicated, the potential for misclassification is limited. Indeed, the summary rate ratio for a selective COX 2 inhibitor versus placebo among adjudicated trials was 1.45 (95% confidence interval 1.12 to 1.89), which is very similar to the estimate among all trials of 1.42 (1.13 to 1.78). A further potential source of bias was our prospective decision to limit eligibility to trials of at least four weeks' duration, because this resulted in the exclusion of two small short term randomised trials of parecoxib (the intravenously administered pro-drug of valdecoxib) and valdecoxib versus placebo among patients having coronary artery bypass grafting,[11 12] in which the rate of vascular events was increased threefold.[13] If these two trials had been included, the summary rate ratio for a selective COX 2 inhibitor versus placebo would have been 1.49 (1.20 to 1.85). Hence, although we cannot exclude the possibility that, at least in the context of vascular surgery, the proportional increase in risk of a vascular event is higher with parecoxib or valdecoxib than with other selective COX 2 inhibitors, the exclusion of these trials had a small effect on the overall summary rate ratio for a selective COX 2 inhibitor versus placebo.

The available data from placebo controlled trials were inadequate to allow assessment of whether the cardiovascular risks of selective COX 2 inhibitors are dose dependent (fig A on



| | Events/person years | | Rate ratio |
| Study | Allocated COX 2 inhibitor | Allocated placebo | COX 2 inhibitor : placebo |
|---|---|---|---|
| **Alzheimer's** | | | |
| 078 | 29/1369 | 29/1563 | |
| 091 | 4/300 | 11/367 | |
| t26 | 6/186 | 5/192 | |
| Alzcn | 6/122 | 2/111 | |
| 001 | 13/250 | 2/120 | |
| 002 | 1/24 | 2/13 | |
| Subtotal | 59/2251 | 51/2366 | |
| | (2.6%/year) | (2.2%/year) | |
| Heterogeneity between six trials: $\chi^2 = 7.7$, df=5, P=0.2 | | | |
| | | | |
| **Polyps** | | | |
| APPROVe | 34/3070 | 18/3534 | |
| APC | 35/4089 | 6/2053 | |
| PreSAP | 19/2794 | 12/1675 | |
| Subtotal | 88/9953 | 36/7272 | |
| | (0.9%/year) | (0.5%/year) | |
| Heterogeneity between three trials: $\chi^2 = 2.9$, df=2, P=0.2 | | | |
| | | | |
| Total | 147/12 204 | 87/9638 | |
| | (1.2%/year) | (0.9%/year) | |

Difference between treatment
effects in two subtotals: $\chi^2 = 2.9$, df=1, P=0.09
Heterogeneity within subtotals: $\chi^2 = 10.5$, df=7, P=0.2
Heterogeneity between nine trials: $\chi^2 = 13.4$, df=8, P=0.1

Favours COX 2 inhibitor · Favours placebo

Treatment effect P=0.005

0.1  0.25  0.5  1  2.5  5  10

**Fig 2** Comparison of effects of selective COX 2 inhibitors versus placebo among trials with scheduled duration of at least one year. Symbols and conventions are as in fig 1

Downloaded from bmj.com on 5 June 2006

Research

bmj.com). Although we found a weak trend towards larger risks with higher daily doses of celecoxib, this result was driven by the results of one trial.[5] We were also unable to determine reliably whether the cardiovascular effects of selective COX 2 inhibitors might differ among aspirin users and non-users (fig B on bmj.com).



Fig 3 Comparison of effects of selective COX 2 inhibitors versus traditional NSAIDs on vascular events, myocardial infarction, stroke, and vascular death. Symbols and conventions are as in fig 1. Some trials involved more than one NSAID comparator, so numbers of trials in subtotals are not a strict sum of numbers for each NSAID

Downloaded from bmj.com on 5 June 2006

Research

## Cardiovascular effects of traditional NSAIDs

As traditional NSAIDs inhibit the COX 2 enzyme, these drugs might also be associated with an increased risk of vascular events.[14] As NSAIDs were originally developed for the relief of pain, long term placebo controlled trials have not been done. A few traditional NSAIDs with prominent effects on the COX 1 isozyme, such as indobufen and flurbiprofen, have been tested as potential antiplatelet agents in small studies,[15 16] but no adequately powered long term randomised trials have assessed drugs without such antiplatelet effects. As the plasma half life of naproxen is around 14 hours, a regimen of 500 mg twice daily results in sustained inhibition of COX 1 dependent thromboxane biosynthesis, whereas both ibuprofen and diclofenac have much shorter half lives (one to two hours), and standard twice or three times daily regimens have only transient effects. We therefore hypothesised that the cardiovascular effects of naproxen would differ from those of non-naproxen NSAIDs. Our results indicated that high dose ibuprofen (800 mg three times daily) and high dose diclofenac (75 mg twice daily) were each associated with an increased risk of vascular events, but that the risks of high dose naproxen (500 mg twice daily) were substantially smaller. We had insufficient information to determine whether naproxen was protective. Uncertainty remains, however, as to whether the cardiovascular effects of standard (that is, lower) daily doses of these drugs would differ from those identified in this meta-analysis, and this is an important topic for future research.

## Estimating absolute risk

In this particular group of trials, allocation to a selective COX 2 inhibitor was associated with around three extra people having a vascular event per 1000 per year, with most of this excess attributable to myocardial infarction. The annual excess incidence associated with full compliance with a selective COX 2 inhibitor would be expected to be larger than this, however. In the APPROVe study, for example, approximately one third of randomised patients discontinued study treatment before the end of the study.[1] If this discontinuation rate was typical, the absolute excess incidence of vascular events produced by full compliance with a selective COX 2 inhibitor might be four or five additional patients having a vascular event per 1000 treated per year overall, with a smaller excess among those at lower than average risk (such as young women with rheumatoid arthritis) and a higher excess in those at above average risk (such as older patients with established atherosclerotic disease).

## Study limitations

The chief limitation of this study is the relatively small number of events available for analysis, which limits assessment of the hazards of the various different selective COX 2 inhibitors and traditional NSAIDs in particular clinical circumstances. We were also limited to analysing tabular summaries of data, which prevented us from assessing the timing of the hazard or variation in the rate ratio among particular subgroups of patients. Moreover, we limited attention to cardiovascular hazards, whereas the choice between different anti-inflammatory regimens also needs to take account of differences in their gastrointestinal effects. Some of these outstanding uncertainties may be resolved by a planned meta-analysis of data on individual patients from these trials.

## Conclusions

This meta-analysis has shown that selective COX 2 inhibitors are associated with a moderate increase in the risk of vascular events, as are high dose regimens of ibuprofen and diclofenac, but that



high dose naproxen is not associated with such an excess. As differences between anti-inflammatory regimens are likely to be small, very large randomised trials will be needed if we are to identify which anti-inflammatory drug regimens minimise the overall burden of adverse gastrointestinal and cardiovascular outcomes.

We acknowledge the help of Novartis (Patrice Matchaba, Xavier Gitton, Elena Ehrsam, Melvin Olson, Bernd Mellein, and Godehard Hoexter), Merck (Sean P Curtis and Judith Bolot), and Pfizer (Simon Lowry, George Sands, Rebecca Rosenstein, and Sharon Pan). We thank P S Aisen (Georgetown University), T Higuchi and K Sugihara (Tokyo Medical and Dental University), S Razzi (University of Siena), F K L Chan (Chinese University of Hong Kong), R K S Dionne (National Institutes of Health), C L Bassis (Rush Medical Centre), R S Phillipson (GlaxoSmithKline), R K Phillips (St Mark's Hospital) and the APC investigators for providing data from their trials.

Contributors: PMK, CB, and CP contributed to the idea for and design of the study, analysis and interpretation of data, and drafting and critical revision of the report. HH contributed to the assembly of the data and drafting and critical revision of the report. JG and JRE contributed to the analysis of the data. CB is the guarantor.

Funding: The Clinical Trial Service Unit is supported by a core grant from the UK Medical Research Council, by the British Heart Foundation, and by Cancer Research UK. CB is supported by the UK MRC. CP is supported by grants from the Italian Ministry of University and Research to the Center of Excellence on Aging of the "G d'Annunzio" University Foundation and from the Commission of the European Communities (EICOSANOX Project 005033). The authors retained full editorial control of the content of this paper.

Competing interests: The Clinical Trial Service Unit has a staff policy of not accepting honorariums or other payments from the drug industry, except for the reimbursement of costs to participate in scientific or advisory committee meetings. CB has had such costs reimbursed for attending meetings arranged by Bayer, Merck, Novartis, GlaxoSmithKline, and Astra-Zeneca. He is the lead investigator of the study of heart and renal protection, a study of cholesterol lowering in chronic kidney disease, which is sponsored by the University of Oxford and supported by an unrestricted grant from Merck. CP has received grant support from Bayer, Merck, and Pfizer. In addition, he has received honorariums for lecturing and consulting from Bayer and NiCox. PMK, JG, HH, and JRE have no competing interests. No funding was provided by any drug company for this project. None of the authors has any stockholdings in pharmaceutical companies, and none is involved in advising any organisation or individual on issues related to litigation.

1   FitzGerald GA, Patrono C. The coxibs, selective inhibitors of cyclooxygenase-2. N Engl J Med 2001;345:433–42.

Downloaded from bmj.com on 5 June 2006

Research

2  Bombardier C, Laine L, Reicin A, Shapiro D, Burgos-Vargas R, Davis B, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000;343:1520-8.

3  Schnitzer TJ, Burmester GR, Mysler E, Hochberg MC, Doherty M, Ehrsam E, et al. Comparison of lumiracoxib with naproxen and ibuprofen in the therapeutic arthritis research and gastrointestinal event trial (TARGET), reduction in ulcer complications: randomised controlled trial. Lancet 2004;364:665-74.

4  Bresalier RS, Sandler RS, Quan H, Bolognese JA, Oxenius B, Horgan K, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 2005;352:1092-102.

5  Solomon SD, McMurray JJ, Pfeffer MA, Wittes J, Fowler R, Finn P, et al. Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma prevention. N Engl J Med 2005;352:1071-80.

6  Patrono C, Garcia Rodriguez LA, Landolfi R, Baigent C. Low-dose aspirin for the prevention of atherothrombosis. N Engl J Med 2005;353:2373-83.

7  Robinson KA, Dickersin K. Development of a highly sensitive search strategy for the retrieval of reports of controlled trials using Pubmed. Int J Epidemiol 2002;31:150-3.

8  Antiplatelet Trialists' Collaboration. Collaborative overview of randomised trials of antiplatelet therapy—I: Prevention of death, myocardial infarction, and stroke by prolonged antiplatelet therapy in various categories of patients. BMJ 1994;308:81-106.

9  Levin B. Colecoxib in adenoma prevention—the PreSAP trial. Slide presentation at: Meeting of the FDA, Advisory Committee on COX-2 Inhibitors and NSAIDs, 16-18 February 2005, Gaithersburg, MD. Available at www.fda.gov/ohrms/dockets/ac/05/slides/2005-4090S1_09_FDA-Levin.ppt (accessed 2 Dec 2005).

10 Early Breast Cancer Trialists' Collaborative Group. Treatment of early breast cancer, worldwide evidence 1985-1990. Oxford: Oxford University Press, 1990.

11 Ott E, Nussmeier NA, Duke PC, Feneck RO, Alston RP, Snabes MC, et al. Efficacy and safety of the cyclooxygenase 2 inhibitors parecoxib and valdecoxib in patients undergoing coronary artery bypass surgery. J Thorac Cardiovasc Surg 2003;125:1481-92.

12 Nussmeier NA, Whelton AA, Brown MT, Langford RM, Hoeft A, Parlow JL, et al. Complications of the COX-2 inhibitors parecoxib and valdecoxib after cardiac surgery. N Engl J Med 2005;352:1081-91.

15 Furberg CD, Psaty BM, FitzGerald GA. Parecoxib, valdecoxib, and cardiovascular risk. Circulation 2005;111:249.

14 Baigent C, Patrono C. Selective cyclooxygenase 2 inhibitors, aspirin, and cardiovascular disease: a reappraisal. Arthritis Rheum 2003;48:12-20.

15 Brochier ML. Evaluation of flurbiprofen for prevention of reinfarction and reocclusion after successful thrombolysis or angioplasty in acute myocardial infarction: the flurbiprofen French trial. Eur Heart J 1993;14:951-7.

16 Fornaro G, Rossi P, Mantica PG, Caccia MR, Aralda D, Lavezzari M, et al. Indobufen in the prevention of thromboembolic complications in patients with heart disease: a randomised, placebo-controlled, double-blind study. Circulation 1993;87:162-4.

(Accepted 19 April 2006)

bmj.com 2006;332:1302

Clinical Trial Service Unit and Epidemiological Studies Unit, University of Oxford, Oxford OX3 7LF
Patricia M Kearney clinical research fellow
Colin Baigent reader in clinical epidemiology
Jon Godwin research fellow
Heather Halls research assistant
Jonathan R Emberson senior statistician

Department of Pharmacology, University of Rome "La Sapienza," Rome, Italy
Carlo Patrono professor of pharmacology

Correspondence to: C Baigent colin.baigent@ctsu.ox.ac.uk



### Table 13
### Relative Risk and Associated 95% CI
### TCVSAE Endpoint
### Results Tabulated by Rofecoxib Studies
### Placebo Controlled Data Set

| Study Block | Study No. | Rofecoxib | | | Placebo | | | Relative Risk[‡] (95% CI) |
|---|---|---|---|---|---|---|---|---|
| | | N | Cases/PYR[†] | Rate[†](95% CI) | N | Cases/PYR[†] | Rate[†](95% CI) | |
| RA | PN 068 | 332 | 2/49.05 | 4.08 (0.49, 14.73) | 168 | 0/24.46 | 0.00 (0.00, 15.08) | |
| | PN 096 | 459 | 4/97.01 | 4.12 (1.12, 10.56) | 301 | 0/58.02 | 0.00 (0.00, 6.36) | |
| | PN 097 | 612 | 0/136.55 | 0.00 (0.00, 2.70) | 299 | 0/62.14 | 0.00 (0.00, 5.94) | |
| | 098+103 | 219 | 0/54.87 | 0.00 (0.00, 6.72) | 221 | 1/56.21 | 1.78 (0.05, 9.91) | |
| | All RA | 1622 | 6/337.48 | 1.78 (0.65, 3.87) | 989 | 1/200.83 | 0.50 (0.01, 2.77) | 3.57 (0.43, 164.23) |
| OA | PN 029 | 378 | 3/45.60 | 6.58 (1.36, 19.23) | 145 | 0/16.32 | 0.00 (0.00, 22.61) | |
| | PN 033 | 446 | 2/65.69 | 3.04 (0.37, 11.00) | 69 | 1/9.45 | 10.59 (0.27, 58.99) | |
| | PN 040 | 486 | 1/72.37 | 1.38 (0.03, 7.70) | 74 | 0/10.67 | 0.00 (0.00, 34.57) | |
| | PN 044 | 381 | 4/154.02 | 2.60 (0.71, 6.65) | 177 | 0/52.01 | 0.00 (0.00, 7.09) | |
| | PN 045 | 388 | 3/156.97 | 1.91 (0.39, 5.59) | 194 | 3/60.96 | 4.92 (1.01, 14.38) | |
| | PN 058 | 174 | 1/21.08 | 4.74 (0.12, 26.43) | 52 | 0/6.14 | 0.00 (0.00, 60.07) | |
| | PN 083 | 98 | 0/20.95 | 0.00 (0.00, 17.61) | 100 | 0/21.16 | 0.00 (0.00, 17.43) | |
| | PN 085 | 424 | 1/61.31 | 1.63 (0.04, 9.09) | 208 | 0/27.88 | 0.00 (0.00, 13.23) | |
| | PN 136 | 390 | 5/56.26 | 8.89 (2.89, 20.74) | 196 | 0/26.92 | 0.00 (0.00, 13.70) | |
| | PN 136 | 399 | 1/95.36 | 1.05 (0.03, 5.84) | 816 | 0/200.79 | 0.00 (0.00, 1.84) | |
| | All OA | 3564 | 21/749.62 | 2.80 (1.73, 4.28) | 2031 | 4/432.29 | 0.93 (0.25, 2.37) | 2.84 (0.97, 8.38) |
| ALZ | PN 078 | 723 | 38/1360.87 | 2.79 (1.98, 3.83) | 728 | 36/1550.97 | 2.32 (1.63, 3.21) | |
| | PN 091 | 346 | 4/292.48 | 1.37 (0.37, 3.50) | 346 | 12/366.52 | 3.27 (1.69, 5.72) | |
| | PN 126 | 380 | 6/185.70 | 3.23 (1.19, 7.03) | 376 | 5/191.47 | 2.61 (0.85, 6.09) | |
| | All ALZ | 1449 | 48/1839.04 | 2.61 (1.92, 3.46) | 1450 | 53/2108.96 | 2.51 (1.88, 3.29) | 1.03 (0.70, 1.53) |
| OTH | PN 118 | 102 | 0/14.52 | 0.00 (0.00, 25.41) | 58 | 0/8.42 | 0.00 (0.00, 43.83) | |
| | PN 120 | 252 | 1/27.72 | 3.61 (0.09, 20.10) | 128 | 0/13.77 | 0.00 (0.00, 26.79) | |
| | PN 121 | 210 | 0/23.35 | 0.00 (0.00, 15.80) | 100 | 0/10.85 | 0.00 (0.00, 34.00) | |
| | PN 125 | 89 | 0/23.39 | 0.00 (0.00, 15.77) | 83 | 0/21.73 | 0.00 (0.00, 16.98) | |
| | PN 129 | 8 | 0/3.47 | 0.00 (0.00, 106.43) | 9 | 0/4.38 | 0.00 (0.00, 84.16) | |
| | All | 661 | 1/92.44 | 1.08 (0.03, 6.03) | 378 | 0/59.15 | 0.00 (0.00, 6.24) | |
| ALL COMBINED | | 7296 | 76/3018.58 | 2.52 (1.98, 3.15) | 4848 | 58/2801.23 | 2.07 (1.57, 2.68) | 1.26 (0.89, 1.78) |

OA = Osteoarthritis, RA = Rheumatoid Arthritis, ALZ = Alzheimers Studies, OTH = Other Studies
[†] Patient-years at risk.
[‡] Per 100 patient-years.
[‡] Relative risk to placebo using Cox model where the number of cases is at least 11; otherwise, relative risk is a ratio of rates.

Rofecoxib CV update --data through 10-June'03                    30

Confidential - Subject To Protective Order

MRK-I8940080095



CORRECTION

---

# CORRECTION

Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial (March 17, 2005;352:1092-1102). In the reported results, the test for proportionality of hazards used linear time rather than the logarithm of time that was specified in the Methods section. Analysis using the logarithm of time leads to the following changes:

The first complete paragraph on page 1097 should have read, "In a post hoc assessment, visual inspection of Figure 2 suggested that the Kaplan–Meier curves separated 18 months after randomization. However, the results of an overall test of the proportional-hazards assumption for the entire 36-month observation period did not reach statistical significance (P=0.07)."

Therefore, statements regarding an increase in risk after 18 months should be removed from the Abstract (the sentence "The increased relative risk became apparent after 18 months of treatment; during the first 18 months, the event rates were similar in the two groups" should be deleted, as should the sentence beginning "There was earlier separation . . . ") and from the Discussion section (the sentence "In post hoc analyses, the increased relative risk of adjudicated thrombotic events was first observed after approximately 18 months of treatment" should be deleted).

In addition, the first full paragraph on page 1100 should have read, "In our randomized, placebo-controlled trial, we found an increased risk of confirmed thrombotic events associated with the use of rofecoxib. Visual inspection of the Kaplan–Meier curves suggested that there was an increased frequency of thrombotic events associated with rofecoxib therapy after 18 months. Other investigators reported . . . ."

Downloaded from www.nejm.org on June 28, 2006 . For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

EXHIBIT 9