UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  VIOXX | § MDL Docket No. 1657 |
| | § |
| PRODUCTS LIABILITY LITIGATION | § SECTION L |
| | § |
| | § JUDGE FALLON |
| | § |
| Gerald Barnett | § MAG. JUDGE KNOWLES |
| vs. | § |
| Merck & Co., Inc. | § CASE NO. 02:06cv485 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

PAUL J. ROACH, M.D.

JUNE 13, 2006

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF PAUL J. ROACH, M.D., produced at
the instance of the Plaintiff, Gerald Barnett, in the
above-styled and numbered cause on the 13th day of June,
2006, at 12:30 P.M., before Micheal A. Johnson,
Certified Shorthand Reporter in and for the State of
Texas, reported by machine shorthand, at the law offices
of Fulbright & Jaworski, L.L.P., 600 Congress Avenue,
Suite 2300, Austin, Texas, pursuant to Notice of Oral
Deposition, and in accordance with the Federal Rules of
Civil Procedure.

Page 2

1         A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF
   GERALD BARNETT:
3
      Ted B. Wacker
4     ROBINSON, CALCAGNIE & ROBINSON
      620 Newport Center Drive, Suite 700
5     Newport Beach, California 92660
6     Cynthia L. Garber
      LOPEZ HODES RESTAINO MILMAN & SKIKOS
7     450 Newport Center Drive, Suite 200
      Newport Beach, California 92660
8
      Bert Black
9     LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
      100 Washington Avenue South, Suite 2200
10    Minneapolis, Minnesota 55401-2179
11
   ON BEHALF OF THE DEFENDANT
12 MERCK & CO., INC.:
13    Sean P. Brennan
      FULBRIGHT & JAWORSKI, L.L.P.
14    2200 Ross Avenue, Suite 2800
      Dallas, Texas 75201-2784
15
16
17
18
19
20
21
22
23
24
25

Page 3

1         INDEX OF PROCEEDINGS
2  PAUL J. ROACH, M.D., DEPOSITION
3  EXAMINATION                    PAGE
   BY MR. WACKER -------------------- 04
4
5
6       * * * * * * * *
7
8
         INDEX OF EXHIBITS
9
   PAUL J. ROACH, M.D., DEPOSITION
10
   EXHIBIT     DESCRIPTION OF EXHIBIT    PAGE
11
   NO. 1  Notice of Oral Deposition --------------- 04
12
   NO. 2  Dr. Roach Expert Binder ---------------- 15
13
   NO. 3  Billing Records From Dr. Roach ----------- 63
14
   NO. 4  Entire Records Produced by Dr. Roach ----- 63
15
   NO. 5  Dr. Zipes' Testing And Examination Records
16        Of Gerald Barnett ----------------------- 171
   NO. 6  Report of Douglas P. Zipes, M.D. --------- 201
17
   NO. 7  Handwritten Notes of Dr. Zipes ----------- 243
18
   NO. 8  "Coxibs and Cardiovascular Disease"
19        Article by Dr. FitzGerald ---------------- 249
20
   NO. 9  Handwritten Notes of Dr. Roach ----------- 259
21
   NO. 10 Bresalier Article ------------------------ 265
22
   NO. 11 E-mail From Martino Laurenzi ------------- 281
23
24
25

Page 4

1         P R O C E E D I N G S
2      (Deposition Exhibits Nos. 1-2 Marked.)
3         PAUL J. ROACH, M.D.
4  having been first duly sworn, testified as follows:
5         EXAMINATION
6  BY MR. WACKER:
7      Q. Good afternoon, Dr. Roach.
8      A. Good afternoon.
9      Q. Could you please state your full name for the
10 record.
11     A. Paul J. Roach.
12     Q. You've had your deposition taken on a number of
13 occasions?
14     A. Yes, I have.
15     Q. And I've handed you the notice of deposition,
16 which we've marked as Exhibit 1. Do you see that in
17 front of you?
18     A. Yes, I do.
19     Q. Let's go ahead and go through Attachment A. It
20 says No. 1, "All materials Dr. Roach has reviewed prior
21 to or since he was retained as an expert in this
22 litigation that relate to Vioxx."
23        Have you produced all of those materials?
24     A. Yes.
25     Q. And those are in the -- I think I've counted

Page 5

1  three banker's boxes?
2      A. Yes.
3      Q. And No. 2, "All materials on which Dr. Roach
4  relies as support for his opinions in the Vioxx
5  litigation."
6         You've produced all of those?
7      A. There may be other things as we begin to
8  discuss general cardiology issues that may not be per --
9  that may not be in those boxes.
10     Q. But as it relates to Vioxx-specific materials,
11 you've produced everything?
12     A. Yes.
13     Q. No. 3, "All work product (other than draft
14 reports) that Dr. Roach has prepared in the Vioxx
15 litigation."
16     A. Yes.
17     Q. Have you produced all those?
18        No. 4, "All statements reflecting time
19 Dr. Roach has spent on Vioxx-related work, including
20 invoices/bills he has submitted for payment. All notes
21 or other memoranda Dr. Roach has prepared in the Vioxx
22 litigation."
23        Have you produced all those?
24     A. Yes.
25     Q. Are there any others?

Page 6

1    A.  With regard to what?
2    Q.  Any of this category, bills or notes or
3  memoranda.
4    A.  There may have been bills pertaining to other
5  plaintiffs that were not submitted here today.
6    Q.  Okay.  In the Vioxx litigation?
7    A.  Yes.
8    Q.  Okay.  "All communications Dr. Roach has had
9  with any defense counsel in the Vioxx litigation."
10   A.  Yes.
11   Q.  Have you produced all those?
12   A.  Yes.
13   Q.  Now, you mentioned in your previous answer to
14  No. 4 that there may be bills regarding other cases that
15  you have reviewed in Vioxx, correct?
16   A.  Yes.
17   Q.  So what other cases have you reviewed other
18  than Mr. Barnett's case?
19   A.  There were two cases.
20   Q.  And what were -- what were the names of those
21  cases?
22   A.  Diaz and Kozic.
23   Q.  And?
24   A.  Kozic.
25       MR. BRENNAN:  Kozic.

Page 7

1        THE WITNESS:  Kozic.  I'm sorry.  Kozic.
2    Q.  (BY MR. WACKER)  All right.  And -- well, let
3  me just ask you this:  What -- what were your opinions
4  in those cases?
5    A.  I don't recall as we sit here.  It's been a
6  while since I've looked at them.
7    Q.  Did you prepare reports in those cases?
8    A.  No.
9    Q.  Did you make notes regarding those cases?
10   A.  No.
11   Q.  What did you do in those cases?
12   A.  I reviewed medical records, I was obviously
13  reviewing literature regarding Vioxx, and I was having
14  discussions with the attorneys.  I also reviewed some
15  deposition testimony in those cases.
16       MR. WACKER:  Okay.  All right.  What I'd
17  like to do, Sean, is request -- since we're requesting
18  all the information concerning Vioxx, I'd like to get
19  all that information concerning those two cases as well,
20  the Diaz and Kozic.
21       MR. BRENNAN:  The -- the invoices or --
22       MR. WACKER:  The invoices, everything he
23  reviewed that relates to those two particular cases.
24       MR. BRENNAN:  Okay.  I'll take that up with
25  Andy, but the -- the -- one of those cases is a Florida

Page 8

1  state court case and the other one has been dismissed,
2  but I'll --
3        MR. WACKER:  I just want to make sure I'm
4  comprehensive is all.  I just want to get everything
5  that he has --
6        MR. BRENNAN:  I think the only thing that
7  that would include would be the medical records of those
8  two cases.
9        MR. WACKER:  And that's -- that's why I
10  want to make the request so that there's no ambiguity.
11       MR. BRENNAN:  I guess just so that I'm
12  clear, do you want the medical records in those two
13  cases?
14       MR. WACKER:  I want to -- anything that
15  he's reviewed in those cases.
16       MR. BRENNAN:  Okay.
17       MR. WACKER:  Literature, records, whatever
18  it is.  I want to get everything.
19       MR. BRENNAN:  Okay.  I'll take that up with
20  Andy.
21       MR. WACKER:  Okay.
22   Q.  (BY MR. WACKER)  Now, were you designated as an
23  expert in the Kozic case?
24   A.  Yes.
25   Q.  Have you had your deposition taken in that

Page 9

1  case?
2    A.  No.
3    Q.  Is that deposition scheduled?
4    A.  Not that I'm aware of.
5    Q.  Now, you indicated that when I asked you
6  previously that you have not offered any opinions in
7  those cases.  Is that true?
8    A.  I didn't say that I have not offered any
9  opinions.  I don't recall as we sit here what I told the
10  lawyers that had asked me to review those cases.
11   Q.  Okay.  So in the Diaz case, did you tell the
12  lawyers representing Merck that Vioxx did not cause that
13  gentleman's heart attack?
14   A.  I don't remember what I told them.
15   Q.  Do you have notes at your office or somewhere
16  that would reflect what your opinions are or what you
17  told them?
18   A.  No.
19   Q.  How about in the -- in the Kozic case, have you
20  offered opinions in that case to the attorneys?
21   A.  I did.
22   Q.  And what were those opinions?
23   A.  I don't recall as I sit here today.
24   Q.  You have --
25   A.  I just don't remember.

## Page 10

1    Q.  You have no recollection about what your
2  opinions are in the Kozic case that's set for trial?
3    A.  No.  I'd have to go back and re-review
4  everything.  Again, it's been a while since I've looked
5  at that.
6    Q.  Well, let me just -- is it your opinion that
7  Vioxx contributed to that gentleman's incident?
8    A.  I didn't -- as I sit here now talking with you,
9  I did not think that it contributed to his -- to his
10  event.
11    Q.  Okay.  And what did he have?
12    A.  I believe that he presented -- and, again, I'm
13  talking off the top of my head because I haven't looked
14  at that case in a while -- he presented, I believe, with
15  either a small non-QA -- or I'd like to refer to them as
16  non-STL elevation MI or with unstable angina.
17    Q.  So it was your opinion in that case and the
18  opinion that you intend to express in that case that
19  Vioxx did not cause or contribute to that gentleman's
20  mild --
21    A.  As we sit here today without having an
22  opportunity to re-review the medical records, the
23  depositions and the other materials, that is true.
24    Q.  Now, let me just ask first broadly, how much
25  have you billed for your time in the Vioxx litigation?

## Page 11

1  And that's including everything that you've done.
2    A.  I would say if we go through the bills, we can
3  probably get a fairly good estimate of that or -- well,
4  not an estimate, a pretty good idea.  I would say
5  probably at least 150 to 200 hours.
6    Q.  And how much do you charge per hour?
7    A.  $400 an hour for review of records, meeting
8  with attorneys, you know, preparation of materials; $600
9  for testimony, whether that's deposition testimony or
10  trial testimony.
11    Q.  And the -- when you say 150 to 200 hours, does
12  that include this particular case as well as the other
13  two cases that you did review?
14    A.  That would be all-inclusive.
15    Q.  Can you separate out from that time, the 150 to
16  200 hours, how much was -- was specifically devoted to
17  this case?
18    A.  I can probably come to a fairly good estimate.
19    Q.  What is that?
20    A.  I would say probably at least -- well, let's
21  not use terms like "at least."  Around 30 to 35 hours,
22  perhaps as many as 40.
23    Q.  When were you first retained in the Vioxx
24  litigation?
25    A.  I first met with Joe Tomaselli sometime, I

## Page 12

1  believe, in April of 2005.
2    Q.  Okay.  And that's Mr. Tomaselli of the
3  Fulbright & Jaworski firm in Dallas?
4    A.  Yes.
5    Q.  Had you worked with Mr. Tomaselli before?
6    A.  I had met with him on one occasion before
7  several years earlier.
8    Q.  And what was that in reference to?
9    A.  That was in reference to Baycol litigation.
10    Q.  And were you retained in that Baycol litigation
11  by Mr. Tomaselli?
12    A.  No, I was not.
13    Q.  What -- describe further the circumstances
14  surrounding that meeting with Mr. Tomaselli and the
15  Baycol litigation.
16    A.  We had a meeting.  He had informed me that
17  Baycol -- that the maker of Baycol, which I believe is
18  Bayer, was involved in litigation over the -- over
19  Baycol.  And we met, discussed my general opinions, my
20  thoughts.  And that was the sum of the meeting.
21    Q.  And what were your general thoughts and
22  opinions regarding Baycol?
23    A.  I don't recall as we sit here.
24    Q.  Do you recall what you were asked to do in that
25  case?

## Page 13

1    A.  Ultimately, I wasn't asked to do anything.
2    Q.  Was that because your opinions were not
3  supportive of Baycol and Bayer?
4    A.  I don't know.
5        MR. BRENNAN:  Objection, calls for
6  speculation.
7    Q.  (BY MR. WACKER)  Well, were your opinions
8  supportive of the defense in that case?
9    A.  I don't remember.
10    Q.  Okay.  Any other meetings prior to your
11  retention of Vioxx litigation with Mr. Tomaselli?
12    A.  No.
13    Q.  Where -- where did that initial meeting take
14  place in the Baycol case?
15    A.  Here.
16    Q.  In Austin?
17    A.  Yes.
18    Q.  He came out to your office?
19    A.  No.  We met here at the Austin offices of
20  Fulbright & Jaworski.
21    Q.  And were you paid for your time by
22  Mr. Tomaselli regarding your brief meeting with him on
23  Baycol?
24    A.  Yes, I was.
25    Q.  How much did you earn in that litigation?

Page 14

1    A. I don't recall.
2    Q. Can you give me an approximation?
3    A. We met for maybe two to three hours at the
4  most.
5    Q. Now, you've also testified on behalf of the
6  Fen-Phen manufacturers, correct?
7    A. That's correct.
8    Q. And how much have you earned in that
9  litigation?
10   A. I have no idea. I'd have to go back and review
11 my billing records on that.
12   Q. Can you give me an approximation?
13   A. I'm hesitant to do that because I may miss the
14 mark.
15   Q. Well, can you give me a range?
16   A. Again, I'm hesitant to do that because I may
17 miss the mark.
18   Q. Well, can you give me some minimum at which
19 it's greater than?
20   A. It was probably greater than a $100,000.
21   Q. Was it greater than 300,000?
22   A. That I cannot say.
23   Q. And what -- what would you need to review to
24 refresh your recollection of that?
25   A. I would have to go back through billing

Page 15

1  records.
2    MR. WACKER: Okay. All right. So in order
3  to get a clear answer, Sean, I'm also going to request
4  from you or Andy information regarding his Vioxx
5  billing -- I'm sorry -- his Fen-Phen billing.
6    Q. (BY MR. WACKER) How many depositions have you
7  given in the past?
8    A. We can refer -- I believe you all had requested
9  or had -- well, not that you requested. It should be
10 attached to my expert report, the most recent
11 depositions, and then we can probably fill in from
12 there.
13   Q. Okay. Let's go ahead and review that. I've
14 marked as Exhibit 2 a binder which includes two expert
15 reports, your materials reviewed in the Gerald Barnett
16 case, your curriculum vitae and a list of the
17 depositions and trial testimony that was produced. If
18 you can go ahead and review that and make sure that's
19 all accurate.
20   MR. BRENNAN: Is there any significance to
21 these scribbling marks or anything?
22   MR. WACKER: I was going to mark them as
23 individual exhibits and I decided that he only had 30
24 stickers so I just better do one exhibit.
25   MR. BRENNAN: Okay.

Page 16

1    Q. (BY MR. WACKER) While you're reviewing that,
2  Doctor, are there any changes, corrections or amendments
3  that you wish to make to your expert report?
4    A. I haven't really had a chance to go back
5  through it, but as we sit here, I don't think so.
6    Q. And then you'll see the next document is
7  Dr. Paul Roach's materials reviewed. Are there any
8  changes, additions or corrections that you would like to
9  make to that list?
10   A. There should be records from Atlanta Medical
11 Associates or Atlanta Medical Clinic. And if I failed
12 to put those in my expert report, then to go back to
13 your previous question, I would like to make sure that
14 that's inserted in there. Yeah. That is actually in my
15 report, so I think that what I would refer to is my
16 report --
17   Q. What page -- what page of your report?
18   A. Page 15. In fact, there are a number of
19 medical records that I have reviewed that are not listed
20 on this medical records list. The first that caught my
21 eye was Atlanta Medical Associates. There's another set
22 of records from Northside Allergy, Asthma & Internal
23 Medicine, Metropolitan Atlanta Cardiology Associates,
24 Del Mazo Medical Services.
25   Q. Just so I'm clear, what you're referring to is

Page 17

1  on page 15 of your -- of your report all the records
2  there concerning Barnett should be also included on the
3  materials reviewed. Is that what you're getting at?
4    A. That's correct.
5    Q. Aside from the materials reviewed, the summary
6  of the materials reviewed, and the specific medical
7  records listed on page 15 of your report, are there any
8  other materials that --
9    A. Yes.
10   Q. -- you've reviewed?
11   A. I've looked at an echo tape of an echo that was
12 done on Mr. Barnett at the Krannert Institute of
13 Cardiology in Indianapolis. And I have looked at a
14 report generated by the doctor at that institution that
15 read the echo. I have read the reports of his stress
16 test, the report of the interpretation of his Cardiolite
17 scan, which is a part of the stress test, and I've also
18 read a report of the CT angiogram performed on
19 Mr. Barnett at the Krannert Institute of Cardiology in
20 Indianapolis.
21   Q. Okay. Any other materials that you wish to add
22 to your expert report?
23   A. Now, I received a -- I received a disk that had
24 the actual Cardiolite scan that was done on Mr. Barnett
25 at Krannert, but for some reason I could not get that to

## Page 18

1  open on my computer, nor any other computer that I took
2  it to. So I -- although I have that disk, I -- I was
3  unable to view it. And I believe there may have been a
4  disk that contained scans that were done on Mr. Barnett
5  prior to that. And, again, I was unable to open those
6  disks to look at those. But I have those disks in my
7  possession now. So I guess if you're asking
8  particularly did I get a chance to review them, no, but
9  I have them in my possession.
10     Q. Okay. Now, again, so the record's clear, which
11  specific --
12     A. Specifically, the scan --
13     Q. -- disks --
14     A. -- that -- or the disk that I still have in my
15  possession that I was unable to open up was the one done
16  at the Krannert Institute.
17     Q. And what specific test was that?
18     A. That was the nuclear imaging component of the
19  stress test.
20     Q. And you also mentioned one prior to that that
21  you were unable to open. Which one was that?
22     A. I believe that would have been the nuclear
23  scan -- either one or both of the scans done in 2000 and
24  2003.
25     Q. Okay. Anything else that you wish to --

## Page 19

1     A. Let me just make sure that --
2     Q. -- add to your report?
3     A. I'm sorry. I don't mean to talk over you.
4        Let me just make sure. You're talking about
5  with regard to records reviewed?
6     Q. I'm talking about any additions to your
7  materials reviewed that's part of your report.
8     A. Let me make sure that I understand your
9  question. Are you asking me on things that were
10  reviewed prior to the generation of the report that are
11  not contained in the document in Tab 3 or are you
12  talking about documents reviewed subsequent to the
13  generation of the report?
14     Q. Well, I'm talking about both. I want to know
15  if there's anything else that, as you sit here today,
16  you need to add to this list that you've reviewed.
17     A. Okay.
18     Q. In total.
19     A. In total. I -- let me just look through here a
20  little bit longer. I think we're complete with regard
21  to everything except those medical records that I talked
22  to you about.
23     Q. Okay.
24     A. The only other thing that I don't see in
25  here -- I'm sorry to keep -- I believe Dr. Curfman gave

## Page 20

1  two depositions. I'm just making sure that's in here.
2  I don't see the first deposition of Dr. Curfman, which I
3  believe was taken on the 21st of November, 2005.
4     Q. Okay. But that is in your stack of materials
5  that we're going to copy?
6     A. Yes.
7     Q. How many disks were given to you from --
8     A. Let me just make sure. I've got one more point
9  here. I believe Mr. Barnett was deposed twice. And I'm
10  not recalling whether the deposition taken on the 20th
11  was the first or the second, but there were two
12  depositions and I reviewed both of them.
13     Q. One was a much longer deposition, the other one
14  was a very short deposition?
15     A. Very short, yes.
16     Q. But you did review both of those?
17     A. I reviewed both of them.
18     Q. Any other additions to your materials reviewed?
19     A. I'm sorry. That deposition of Dr. Curfman is
20  in this list, which -- which -- of this literature list
21  rather than sub -- rather than being broken out under
22  the deposition testimony. So we've got that recorded in
23  here. And hang on before you have anything more.
24        I may be missing it as I go through here, but
25  there was a memo or a document generated by the FDA, I

## Page 21

1  believe, sometime in 2005, early 2005, which addressed
2  labelling changes for nonsteroidal anti-inflammatory
3  drugs. And if I had an opportunity to look at my file,
4  I can give you the author of that document. I'm just
5  not sure that I'm seeing it in this list.
6     Q. You talking about the -- the Seligman FDA memo
7  of April 5th -- April 6th, 2005?
8     A. If we can agree that that's the one where they
9  talked about changing the labelling on all nonsteroidals
10  or would you like me to just pull it out of the file
11  that I have and make sure that we're talking about the
12  same one? I believe that's correct. I just want to
13  make sure that we're talking about the same one.
14     Q. Let's go ahead and make sure you're accurate.
15     A. If you'll give me a chance, I'll go and look at
16  that and see if we've got it listed in here.
17        It's, yes, Seligman, if you want to look at
18  that.
19     Q. Okay.
20     A. Now, the other thing, too, as I looked through
21  the files, there were some articles that I'm not sure
22  are listed on this reference list, but I have to go back
23  and see. Let me just make sure they're there.
24     Q. Well, Doctor, just to shortcut this here,
25  whatever -- whatever is -- that you reviewed is in

Page 22

1   the -- are in these boxes?
2       A. That's correct.
3       Q. So what you're saying is anything that may have
4   slipped by putting it on there, it's in these boxes?
5       A. That's correct. With regard to Vioxx-specific
6   literature. And then there's some general literature as
7   well. I guess that I'm -- are you asking me did I
8   review other things over the course of the last several
9   years that might pertain to cardiovascular disease that
10  would have an impact on my opinions here today?
11      Q. First I just want to make sure that this list
12  is comprehensive about everything that you've reviewed.
13      A. As best I can tell from this brief review of
14  it, yes.
15      Q. Now, you mentioned some -- and -- and that's
16  true with respect to everything Vioxx-specific?
17      A. I'm not sure I understand the question.
18      Q. That's true with regard to every piece of
19  medical literature that specifically addresses Vioxx?
20  There's no -- there's no literature that discusses Vioxx
21  that you did not include in your -- in your reference
22  materials and/or your box of materials?
23      A. I don't think so. I think that's correct.
24      Q. So the other things that you're referencing
25  would just be general cardiovascular?

Page 23

1       A. Right. That I might review from, you know, day
2   to day in my usual course of business.
3       Q. Now, when were you first retained as an expert
4   in the Fen-Phen litigation?
5       A. Now, that, I think, would have been sometime in
6   1998.
7       Q. And that was on behalf of -- of one of the
8   manufacturers?
9       A. Yes.
10      Q. Which manufacturer?
11      A. Well, it's now known as Wyeth.
12      Q. And which firm was it that you were working
13  with?
14      A. I worked with several firms.
15      Q. Which of the firms that you worked with?
16      A. I've worked with Clark, Thomas & Winters. They
17  are a law firm based here in Austin. I've worked with
18  Vinson & Elkins. And I've worked with Arnold & Porter.
19      Q. Okay. And these are all defense firms?
20      A. They're law firms.
21      Q. They represent the manufacturer?
22      A. In that particular litigation, they did.
23      Q. Have you ever been an expert for a plaintiff in
24  any case?
25      A. Yes.

Page 24

1       Q. In how many cases?
2       A. I was an expert for a case in Iowa. That was
3   back in the mid-'90s. I have served as an expert in a
4   case that was to be filed in Mississippi. I don't know
5   what the disposition of that case was. I have served as
6   an expert for an attorney -- two attorneys here in
7   Austin and another attorney in Kansas City. And that's
8   just off the top of my head as we -- as we chat.
9       Q. Okay. So the case that was in -- that you
10  mentioned in the '90s, was that a pharmaceutical case?
11      A. No.
12      Q. Was that just a general personal injury case?
13      A. It was a medical malpractice case.
14      Q. And the case in Mississippi, what was that?
15      A. That, again, was a medical malpractice case
16  that I believe spun out of pharmaceutical litigation.
17  The lawyer that asked me to review it was involved in
18  Fen-Phen litigation and had actually deposed me and then
19  later on asked me to review that case.
20      Q. And that also involved a pharmaceutical?
21      A. Did not involve pharmaceutical issue. He was
22  not asking me to review a pharmaceutical issue. He was
23  asking me to testify -- or not to testify -- he was
24  asking me to review as to standard of care.
25      Q. And in that particular case, did you believe

Page 25

1   there was a breach of the standard of care?
2       A. I think as we looked at that case, there were
3   some issues with regard to standard of care, but I
4   didn't feel like that there was a -- let me back up.
5   Ultimately, I did not feel that the standard of care was
6   breached with regard to the physician who he was asking
7   me to review.
8       Q. All right. You also mentioned a case in Kansas
9   City?
10      A. Actually, that case is filed in court in Tulsa,
11  Oklahoma, but the attorney that I'm working with is
12  based in Kansas City.
13      Q. And who is that attorney?
14      A. Jeffrey Kuntz, K-u-n-t-z.
15      Q. What does that case involve?
16      A. It's a case of -- it's a medical malpractice
17  case involving failure to appropriately diagnose
18  congestive heart failure resulting in a subsequent death
19  of the patient.
20      Q. Is that listed on your -- on your deposition
21  trial testimony?
22      A. No. That deposition has been given since that
23  was generated.
24      Q. When was that deposition given?
25      A. That deposition was given last Thursday.

Page 26

1   Q. And Jeffrey Kuhn out of Kansas City --
2   A. Kuntz, K-u-n-t-z.
3   Q. And he's out of Kansas City?
4   A. Yes.
5   Q. What's the name of that case?
6   A. The case -- I don't know how it's specifically
7   titled. It's -- the plaintiff is Ella Thomas, who is
8   the sister of the deceased, who is Billie Fisher,
9   B-i-l-l-i-e F-i-s-h-e-r. I honestly do not know how
10  they've actually titled it for the purposes of the
11  litigation in Oklahoma.
12  Q. Any other cases where you've testified on
13  behalf of the plaintiff?
14  A. I haven't -- as I sit here -- let me think for
15  a second. No, but I've reviewed cases.
16  Q. But not testified?
17  A. Not testified.
18  Q. All right. Going through your deposition and
19  trial testimony list, can you identify on this list
20  whether you were testifying on behalf of plaintiff or
21  defense in each one of those cases?
22  A. Yes.
23  Q. Okay. Go ahead. Let's start at the top.
24  A. How do you want me to handle it? Do you want
25  me to read off the actual case number or shall we

Page 27

1   just --
2   Q. Let's just do it. How about Crater, were you
3   testifying for plaintiff or defense?
4   A. Defense.
5   Q. And Patterson?
6   A. Defense.
7   Q. Hinojosa?
8   A. Hinojosa, defense.
9   Q. How about the next one, Schneider?
10  A. Defense.
11  Q. Damood?
12  A. Defense.
13  Q. Smart?
14  A. Defense.
15  Q. Guerra?
16  A. Defense.
17  Q. Food Service Management?
18  A. Defense.
19  Q. Deanda?
20  A. Defense.
21  Q. And then there's a number of them listed here
22  that are all collectively referenced as 10/14/03.
23  And --
24  A. Those are all -- those are all diet drug
25  litigation cases, so that's defense.

Page 28

1   Q. Dankworth?
2   A. Defense.
3   Q. Garza?
4   A. Defense.
5   Q. Holloway?
6   A. Defense.
7   Q. Bice?
8   A. Defense.
9   Q. Campbell-Reese?
10  A. Defense.
11  Q. And Thota?
12  A. Defense.
13  Q. So would it be fair to say that better than 95
14  percent of your work as an expert has been on behalf of
15  the defense?
16  A. I think it's fair to characterize that the
17  majority is on behalf of the defendants.
18  Q. Well, the majority --
19  A. Well, if you want to say 95 percent, I'm not
20  going to argue with you.
21  Q. And, in fact, at least on the deposition and
22  trial testimony that you've listed here for this report,
23  it's a hundred percent, correct?
24  A. For the testimony that's listed there, yes,
25  it's 100 percent.

Page 29

1   Q. How many times have you testified in trial?
2   A. I've testified at trial in Iowa. And then I
3   believe we should have a complete listing of the trial
4   testimony in that document that you're looking at.
5   Q. The document says deposition and trial
6   testimony. So can you go through here in the same
7   fashion and let me know which of these were actual trial
8   testimony?
9   A. Yes. Just give me a second.
10  The -- and for some reason, it doesn't -- and
11  we probably need to make an amendment on this, and I
12  apologize. When I had somebody generate this list -- if
13  you look at the Estate of Mary E. Guerra versus Christus
14  Spohn, et al., the deposition --
15  Q. What's the date of that?
16  A. Date -- I'll read that to you. Date of 2/4/03.
17  I testified in that case at trial in July of 2003. I'm
18  sorry. Let's back up. I'm sorry. I have -- I have
19  those cases in my mind mixed up. That's not correct.
20  7/11/03, if you look at it, that's the case of
21  Mary Alice Deanda versus DeLorosa, that's the case that
22  I testified in Nueces County, Texas.
23  Q. In trial?
24  A. At trial.
25  Q. What was the date of that trial?

Page 30

1    A. Well, the date of my testimony was 7/11/03.
2    Q. Okay.
3    A. And if you look, it says "Deposition given
4  3/25/03."
5    Q. All right. Any other cases where you've
6  testified at trial?
7    A. Dankworth -- I'm sorry -- McDonald versus
8  Dankworth, the trial testimony would have been 4/14/04,
9  April 14th, '04.
10    Q. Any other testimony you've testified at trial?
11    A. Hang on. I'm getting there.
12       The Vickie Carol Campbell-Reese, 10/18/2004,
13  and that was in court in Upshur County, Texas.
14    Q. That was a Fen-Phen trial?
15    A. Yes, it was. That -- that is the trial
16  testimony per this document. And then as I mentioned,
17  there were two other cases that I'm now recalling. One
18  was in Iowa. I do not remember how that case was
19  styled. It would have been in Johnson County, Iowa.
20  And that testimony would have been either late '80s or
21  early '90s. Probably early '90s.
22    Q. And that was a malpractice case?
23    A. No. It was a testifying as to cause of death
24  of a patient who had been hit by -- his car had been hit
25  by a truck that was owned by a trucking company,

Page 31

1  suffered a broken ankle, subsequently weeks later
2  suffered a myocardial infarction. And the issue there
3  was whether the stress of the fractured ankle had
4  ultimately led to his myocardial infarction.
5    Q. And you were testifying on behalf of the
6  plaintiff or defendant?
7    A. Defendant.
8    Q. So your position was that the myocardial
9  infarction was not caused by the --
10    A. As we sit here 14 or 15 years later, yeah.
11    Q. Okay. Any other trial testimony other than
12  what you've indicated? And, again, just to summarize
13  what I've got down is the -- is the 7/11/03 Deanda, the
14  4/14/04 McDonald and the 10/18/04 Carol Campbell-Reese
15  and then finally this case in Iowa, Johnson County in
16  the '80s or '90s?
17    A. Yeah. And let's clarify this. There was no
18  deposition given in that US Federal Bankruptcy Court
19  case. I testified at trial -- or, actually, I don't
20  think it was a trial. I don't know exactly what they do
21  in bankruptcy court. I was asked to testify in front of
22  the judge.
23    Q. What date are you --
24    A. 2/20/03. Mills versus Food Service Management.
25    Q. What -- what was your role in that particular

Page 32

1  trial?
2    A. Again, cause of death expert.
3    Q. And what was the nature of that -- of that
4  case? What were they claiming?
5    A. Again, another orthopedic injury leading to
6  death. Their claim was that it was the actual
7  orthopedic injury that let to his death when, in fact,
8  he had had a myocardial infarction.
9    Q. So in your case, your -- your opinion was that
10  he died due to myocardial infarction?
11    A. Right.
12    Q. And not due to the orthopedic injury?
13    A. That's correct. And then I think --
14    Q. Let me just clarify that. Were they claiming
15  that the orthopedic injury contributed to the MI
16  resulting in the death?
17    A. I don't believe that was their contention. I
18  think they have an entirely different reasoning on that
19  case.
20    Q. All right. Any other trial testimony?
21    A. There was a trial here in Travis County
22  sometime summer of 2001, I'm going to say August of
23  2001. I was asked to testify again not as a standard of
24  care witness but as a expert in cause. And I don't know
25  who the plaintiff was. The defendant doctor -- hang on

Page 33

1  just a second and I'll give you his name. I'm blanking
2  on his name now. I'm sorry. I can't think of -- he's a
3  general surgeon here in town.
4    Q. You were testifying on behalf of the defense?
5    A. Yes.
6    Q. And what was the -- what were the nature of the
7  allegations in that case?
8    A. The allegation was that the woman had sudden
9  death due to aspiration.
10    Q. And what was your opinion?
11    A. My opinion was that she did not die of
12  aspiration, that this elderly nursing home patient had
13  sudden death due to an arrhythmia.
14    Q. Any other trial testimony?
15    A. I think that covers it.
16    Q. Have any of your opinions ever been excluded by
17  any state or federal court?
18    A. I wouldn't have any way of knowing. Not that
19  anybody's ever come back and told me, if that's what
20  you're asking me.
21    Q. However you would obtain that information.
22  Nobody's ever told you?
23    A. Nobody's ever told me, no.
24    Q. Have you ever had any disciplinary actions
25  against you?

Page 34

1    A. No.
2    Q. Have you ever been a defendant in a malpractice
3  case?
4    A. Yes.
5    Q. How many cases?
6    A. Three.
7    Q. And can you briefly describe the nature of
8  those cases?
9    A. Yes. One was in Iowa. The allegation was
10 failure to properly re-intubate a postoperative patient.
11 I was serving as an emergency room physician. I was
12 basically moonlighting when I was a fellow.
13    Q. And what was the overall resolution of the
14 case?
15    A. Summary judgment in my favor.
16    Q. And the second case?
17    A. Second case, I was named and then nonsuited in
18 a case involving a trauma patient at Brackenridge
19 Hospital. This was a case in the mid-'90s. Patient had
20 blunt chest trauma, was subsequently -- had an
21 echocardiogram done prior to being placed on
22 anticoagulation with Heparin. Subsequent to the
23 administration of the Heparin, developed pericardial
24 effusion tamponade and subsequent death. I was named
25 basically, I guess, because I had read the echo. After

Page 35

1  review of the facts of the case, I was nonsuited.
2    Q. And the third case?
3    A. Third case involved allegation of failure to
4  properly diagnose a lung cancer. It was a patient who
5  had come in through the emergency room at St. David's
6  Hospital here in Austin, Texas, was seen by the
7  emergency room physician and by me. We both read the
8  chest x-ray as being normal. Chest x-ray was
9  subsequently read by the radiologist as showing a small
10 tumor. That report was never forwarded to either that
11 doctor or to me. Furthermore, there was a violation of
12 the protocol as to how chest x-rays or any other x-ray
13 was to be reported back by the radiologist in the
14 hospital to the treating doctors. We went to trial on
15 that and were successful at trial.
16    Q. Did you sign any type of retainer agreement to
17 work in the Vioxx litigation?
18    A. No.
19    Q. In this particular case, you've met with Joe
20 Tomaselli initially back in April 2005; is that right?
21    A. With regard to this particular case, no.
22    Q. In -- in relation to Vioxx in general?
23    A. Yes.
24    Q. As of April 2005, prior to your meeting with
25 Mr. Tomaselli, had you formed any opinions as it relates

Page 36

1  to general causation concerning Vioxx?
2    A. I was generally aware of the issues regarding
3  COX-2 inhibitors based on what we knew from VIGOR that
4  had come out. And then certainly when the drug was
5  withdrawn from the market, it hit everybody's radar
6  screen. So I was generally aware of those issues at the
7  time that I met with Mr. Tomaselli.
8    Q. When you first met with Mr. Tomaselli and you
9  were generally aware of those issues, was it your
10 opinion at that time that Vioxx does increase the risk
11 of cardiovascular disease?
12    A. Are you talking about in April of 2005?
13    Q. Yes.
14    A. I think at that point in time, to be honest
15 with you, I would not have had enough information or
16 have reviewed enough things at that point in the detail
17 that I've reviewed them to today to have rendered a very
18 sound opinion one way or the other.
19    Q. Did you have any leanings one way or the other
20 whether you felt that there was -- that -- that based
21 upon your opinion as of April 2005, that Vioxx could
22 increase the risk of cardiovascular incidents?
23    A. I had no leanings one way or the other.
24    Q. Now, which was the first case that you actually
25 reviewed, individual case, the Diaz versus --

Page 37

1    A. Diaz case.
2    Q. Okay. And when did you start your review of
3  that case?
4    A. That would have been probably early in this
5  year, early 2006. And there may have been some review
6  that occurred late 2005. Again, I would have to look at
7  billing records to be -- to tell you exactly when that
8  review started.
9    Q. When did you first start your review of the
10 Kozic case?
11    A. That would have been probably March and maybe
12 only during March, as far as I know.
13    Q. Of 2006?
14    A. It may have even been earlier, yes. Again, I'm
15 hesitant if we're going to get into this and, you
16 know -- and you're going to hang me on this later on on
17 an exact date, then I'm going to ask you to just allow
18 me to fill it in at some point and I can be much more
19 accurate. If you're going to agree with me that you're
20 not going to make me say what I said today is absolutely
21 what I said, I can give you general time frames. But if
22 you want an exact date of when I looked at it, I'm going
23 to ask you to allow me to look back at my billing
24 records and fill that in.
25    Q. And that's part of why I wanted to ask through

Page 38

1  your attorney here that we get those records --
2      A. That's fine.
3      Q. -- so that we can -- we can make sure.
4      Now, when did you first start working
5  specifically on the Barnett case?
6      MR. BRENNAN: And just for the record, I'm
7  not his attorney. I'm representing Merck in this
8  matter.
9      A. I think if we looked at the billing records, we
10 could probably get a pretty good idea of that.
11     Q. (BY MR. WACKER) Okay. Well, why don't we go
12 ahead and do that. What's the -- why don't you go ahead
13 and check your billing records and determine when was
14 the first date that you started work on this case?
15     A. Okay.
16     MR. BRENNAN: Are you talking about when he
17 first started to look at Barnett specifically?
18     MR. WACKER: Yes.
19     A. It would appear, based on the billing records,
20 that the first time that I did any review of
21 Mr. Barnett's medical records would have been on the
22 13th of April, 2006. But before we -- let just me make
23 sure before we proceed forward that I haven't missed
24 something here. Okay.
25     Q. (BY MR. WACKER) April 13, 2006?

Page 39

1      A. Yes.
2      Q. And did Mr. Tomaselli call you and ask you to
3  review a case? Is that how that --
4      A. I don't recall how the -- the case came to me.
5  There either was a phone call or the records were sent.
6  I mean, ultimately, I received the records. I don't
7  know whether there was a phone call that preceded that
8  or not.
9      Q. Okay. You're -- you're referring to your
10 billing, which reflects April 13th, 2006, review of the
11 medical records of Gerald Barnett --
12     A. Yes.
13     Q. -- 1.8 hours; is that right?
14     A. Yes.
15     Q. And then a conference call with Joe Tomaselli
16 and Andy Goldman, RE: Barnett case --
17     A. Yes.
18     Q. -- 1.6 hours?
19     What did you and Mr. Tomaselli and Mr. Goldman
20 discuss during that conversation?
21     A. I don't recall as we sit here. I'm sure it's
22 probably some of the same things we're going to discuss
23 when we get further down the road here. But I don't --
24 off the top of my head, I can't tell you any of the
25 specifics. I'm sure that we talked about the -- the

Page 40

1  case in general.
2      Q. And what -- what opinions did you offer to
3  them?
4      A. I don't recall what opinions I offered to them
5  at that time. I think my opinions are what are in the
6  report now, but I don't recall what I talked with them
7  about at that time.
8      Q. Well, did your opinions evolve over time or did
9  they always stay the same?
10     A. Well, I think one's opinions always evolve over
11 time, but I don't think that they materially changed
12 from the time that I had that conversation with them to
13 today. But opinions can be refined based on additional
14 information.
15     Q. Now, up -- up through April 13th, 2006, when
16 you first looked at the Barnett case, you had reviewed
17 the general literature concerning Vioxx --
18     A. I had --
19     Q. -- and COX-2 inhibitors, correct?
20     A. I'm sorry. I didn't mean to speak over you.
21     I had covered -- I had reviewed some
22 literature, yes.
23     Q. You had reviewed enough general literature to
24 form an opinion as to whether you believe Vioxx
25 increased the risk of cardiovascular events?

Page 41

1      A. Yes.
2      Q. And what was your opinion in that regard?
3      A. I did not feel that it did.
4      Q. So it's your opinion, as you sit here today,
5  that you do not believe that Vioxx increases the risk of
6  cardiovascular events; is that true?
7      A. Yes.
8      Q. And breaking that out further, it's your
9  opinion that Vioxx does not increase the incidents of
10 myocardial infarction, true?
11     A. Correct.
12     Q. And it's also your opinion that Vioxx does not
13 increase the incidents of stroke, true?
14     A. True.
15     Q. It's also your opinion that Vioxx does not
16 increase the risk of death or sudden cardiac death?
17     A. Correct.
18     Q. And the basis of that opinion is set forth in
19 your report, correct?
20     A. That's correct.
21     Q. Is there anything else in terms of your -- the
22 opinions in your report -- well, let me strike the
23 question.
24     Are there any other opinions that are not
25 listed in your report that you intend to offer at trial?

Page 42

1    A. Well, that's difficult for me to say without
2  going back through the report and after having had an
3  opportunity to answer your questions.
4    Q. Well, let me just -- let me see if I can break
5  it down for you a little bit.
6    Are you -- have you been asked to -- to render
7  opinions regarding general causation?
8    A. Yes.
9    Q. And you've been asked to render opinions
10 regarding case-specific causation in the Barnett case?
11   A. Yes.
12   Q. Have you been asked to render any other
13 opinions besides those two broad issues?
14   A. Well, I've been asked to look at some of the
15 basic science issues around Vioxx.
16   Q. Well, let me see if I can clarify it further.
17   Have you been asked to render opinions as to
18 when Merck knew or should have known of the potential
19 for Vioxx causing an increased risk in cardiovascular
20 incidents?
21   A. No.
22   Q. Have you been asked to render opinions
23 regarding FDA rules or regulations?
24   A. No.
25   Q. Have you been asked to -- to opine whether any

Page 43

1  of the labels that were in the -- you know, concerning
2  Vioxx were adequate?
3    A. No.
4    Q. Have all of your bills been paid?
5    A. I submitted a bill -- let's see.  All of them
6  paid but these two.
7    Q. And you're handing me bills.  The first one is
8  2,600 and the next one is --
9    A. 26,000.
10   Q. 26,000.  The next one is 10,480; is that
11 correct?
12   A. That's correct.
13   Q. But those have been submitted?
14   A. They've been submitted.
15   Q. Let me just see that.
16   Now, some of these bills prior to April 13th,
17 2006, concern general meetings and review of Vioxx
18 materials, correct?
19   A. That's correct.
20   Q. And -- and at least as of -- prior to
21 April 13th, 2006, you hadn't actually been asked to
22 review the Barnett case?
23   A. Well, all I can tell you is based on my
24 billing, that's the date that I started my review.
25   Q. So what I'm get at is the bills prior to that

Page 44

1  would have been just general Vioxx review of literature?
2    A. General Vioxx plus the bills pertaining to the
3  other two cases that we've talked about.
4    Q. Okay.  Because I -- I thought you told me
5  before that the bills for the other two cases were not
6  included in this particular billing.
7    A. They're not.  The case specific bills, the
8  bills pertaining just to the review of those cases, is
9  not here.
10   Q. Okay.  So -- but the -- the general review of
11 Vioxx material that you apply to this case is equally
12 applicable to those cases?
13   A. I would think so, yes.
14   Q. So in other words, you didn't -- you just
15 billed at one time?  I mean, you're not billing general
16 Vioxx review on --
17   A. Well, if I go back and I review a piece of
18 literature and let's say it's to have a review of a
19 general issue, may have nothing to do with a particular
20 case, may have to do with making sure that everyone
21 understands what's going on here in terms of the trials,
22 the -- the science, the Epi studies, I may go back and
23 bill them again for the review of that literature even
24 though it doesn't pertain to a particular case.  So
25 there will be times that are going to arise where there

Page 45

1  will be bills for general review that have nothing to do
2  with a case -- a specific case.
3    Q. Okay.  Let me see if I can clarify.
4    When you, you know, billed your time -- and it
5  looks like the first billing date that I have here is
6  April 12th, 2005, meeting with Joe Tomaselli.  Do you
7  see that?
8    A. I'll just give you those back and keep those
9  out.  Yes.
10   Q. Okay.  So at that time you were not asked to
11 review the Barnett case, but you were just doing general
12 Vioxx literature review?
13   A. Yes.
14   Q. So how did you separate that general Vioxx
15 literature review for this case that you've now
16 submitted here today on the Barnett case versus your
17 general Vioxx review in the Diaz case or the Kozic case
18 or is that all encompassing?
19   A. Well, I think it -- I'm not sure that I can
20 actually do that.  If my review prior to being involved
21 in any specific case is my review of, say, for example,
22 the VIGOR study, then that goes under general review.
23 Okay.  I don't necessarily portion out nor have had any
24 reason to portion out 60 percent of my review that date
25 goes to this particular case or that particular case.

Page 46

1    What I am -- what I'm attempting to do in my
2   billing is to separate those things which are general
3   issues from those things which are specific to the case.
4   Now, to clarify that, yes, there may be times when I'm
5   looking at general issue literature and applying it to a
6   particular case. Under that circumstance, I might bill
7   it to that particular case.
8       Q. Fair enough. So the only thing that you've
9   done here today is just extract out your case specific
10  billing or -- or general literature billing that's
11  particular to that case for the Diaz and Kozic case?
12      A. And I try to do that as I go along in each
13  case.
14      Q. Okay. Now, what of the materials that you've
15  been provided -- or strike that.
16      What of the materials here in your -- in your
17  review of materials were actually provided by the
18  defense versus that you did on your own?
19      A. We could go back to the binders and that there
20  were certain things that I requested, there were certain
21  things that I tore out of journals. And that should be
22  fairly apparent based on the labels in those boxes.
23      Q. So, I mean, obviously, everything --
24      A. I can't go -- I can't go -- if you're asking me
25  to go through and do that on that, I'd have to go back

Page 47

1   over there and we could spend some time going back and
2   forth and --
3       Q. I don't want to do that. I -- I just want to
4   get some basic parameters here.
5       Obviously, everything that was case specific on
6   Barnett was provided to you by the law firm?
7       A. That's correct.
8       Q. And everything that is material that would not
9   be in the public literature concerning Vioxx, i.e.,
10  internal Merck documents, would be provided directly by
11  Merck?
12      A. Correct.
13      Q. And the deposition testimony which they have
14  marked as confidential would be provided by Merck?
15      A. Correct.
16      Q. And those are things that they provided to you?
17      A. Correct.
18      Q. And are there any specific deposition -- strike
19  that.
20      Is there any specific deposition testimony that
21  you requested?
22      A. No.
23      Q. Is there any specific deposition testimony
24  and/or internal Merck documentation that you wanted to
25  see but did not have a chance to look at?

Page 48

1       A. No.
2       Q. So, basically, when it comes to the -- the
3   literature that's been on the public purview, the
4   peer-reviewed literature, that was either provided
5   directly to you or in some instances you've retained on
6   your own?
7       A. I requested -- yeah -- well, or I requested
8   them simply to save myself time. I would ask one of
9   their paralegals to obtain articles for me.
10      Q. Did you do any of your own independent Medline
11  research?
12      A. To answer your question, I don't know that I
13  used Medline, but I did my own independent search.
14      Q. What do you use?
15      A. Well, I would read articles and then there
16  would be references in there. I would ask them to give
17  me the references that I wanted. Those review of those
18  articles then might generate more references. So that's
19  how I've approached it.
20      Q. Well, what I'm asking is did --
21      A. And there would be times when I might do a
22  Medline search. I don't recall specifically with regard
23  to what issues, but I can tell you that as I reviewed
24  articles, I would look for the references in those
25  articles and then ask that certain articles that were

Page 49

1   referenced be sent to me.
2       Q. Have you ever prescribed Vioxx?
3       A. I don't know that I have.
4       Q. Have you ever diagnosed, yourself, a
5   Vioxx-induced cardiovascular injury?
6       A. I can't say that I have.
7       Q. Well, and, in particular, you would not because
8   you don't believe that Vioxx increases the risk, right?
9       A. That's correct.
10      Q. Have you ever been a paid consultant or thought
11  leader or advocate for Merck?
12      A. No.
13      Q. Have you ever received any other funding or
14  payments from Merck outside of this Vioxx litigation?
15      A. No.
16      Q. Has your group ever been given any money by
17  Merck?
18      A. Not that I'm aware of.
19      Q. And what's the name of your group?
20      A. Texas Cardiovascular.
21      Q. So to your knowledge, Texas Cardiovascular has
22  never been paid directly by Merck for any reason?
23      A. Not that I'm aware of.
24      Q. How many doctors are in your group?
25      A. Over 30.

Page 50

1    Q. Do you know whether any of those other 30
2  doctors have been paid by Merck or advocates for Merck
3  in any way?
4    A. Not that I'm aware of.
5    Q. What -- you are an interventional cardiologist?
6    A. Yes.
7    Q. That's your training?
8    A. Yes.
9    Q. And --
10   A. Well, let me -- let me clarify that because I
11  don't want to make it sound like that's all I do.
12      I'm -- I'm a general cardiologist. I'm trained
13  in general cardiology and I had fellowship training in
14  interventional cardiology. I guess when you classify
15  us -- although I do interventional cardiology, I do not
16  hold myself out as someone who solely does
17  interventional cardiology.
18   Q. So you practice --
19   A. General cardiology.
20   Q. -- general cardiology?
21   A. With an emphasis in interventional or with a --
22  let's not even say an emphasis. I think that's a little
23  too strong. With an expertise in interventional
24  cardiology.
25   Q. In your daily -- describe your practice to me.

Page 51

1  You -- you obtain referrals on cardio -- you know,
2  cardiac patients?
3    A. You want to talk about how the referrals come
4  first?
5    Q. Well, no. I just want to talk about your
6  general -- I mean, in other words, do you -- do you see
7  patients, you know, generally in a, you know, internal
8  medicine-type practice as a primary care physician?
9    A. Yeah, let me -- without dancing around this
10  because I think I understand where you want to go with
11  this, I'm in a private practice, a group private
12  practice that specializes in cardiology. We cover all
13  of the specialties in cardiology. We cover general
14  cardiology, nuclear cardiology, electrophysiology,
15  transplant, interventional. And if I'm leaving
16  something out, it's covered. Across the board, we cover
17  all spectrums of clinical cardiology.
18      I consider myself to be primarily office-based
19  at this point in my career. I hold office on average
20  about four times a week. There are occasional Fridays
21  where I'm not in the office simply to have a longer
22  weekend. But I see patients in general four half days a
23  week. And during that half-day session, with the
24  assistance of my nurse practitioner, I'll see between 20
25  and 25 patients. During the time that I'm in the

Page 52

1  office, not only am I evaluating patients with the usual
2  evaluation and management process, I'm looking at
3  echocardiograms, I'm supervising stress tests, reading
4  EKGs. I also have a hospital base component to my
5  practice, primarily at Brackenridge Hospital here in
6  Austin, Texas. I work with the teaching program there,
7  which is now a part of the University of Texas Medical
8  Branch at Austin. They have a family practice program
9  and an internal medicine program associated with UTMB at
10  that hospital and I supervise those residents on rounds
11  and take consults from them.
12      In addition to seeing their patients in the
13  hospital, I have on-call responsibility for the
14  emergency room there. When I take call for my group, I
15  have on-call responsibilities for the group, which means
16  I'm responsible for fielding calls from other doctors,
17  patients, emergency rooms. I also would round on their
18  patients when I'm on call for them on the weekends. So
19  those are sort of the general kind of clinical
20  activities.
21      Now, in terms of procedure-based activities, I
22  set aside a day a week, typically it's Tuesday, to do --
23  to do scheduled elective procedures. So I try to line
24  those up so that they can be done on one day.
25      There will be other days during the week,

Page 53

1  whereas you're probably well aware with cardiology,
2  where you're going to end up having some people that
3  come to you by way of the hospital or come to you by way
4  of an emergency. And then those patients would be
5  scheduled on a timely basis depending on what they have.
6    Q. In terms of the procedures, what -- what
7  procedures are you performing?
8    A. I do right and left heart catheterizations, I
9  do diagnostic coronary angiography, I do diagnostic left
10  ventriculography. I do diagnostic peripheral angiograms
11  with the exception of carotid vessels and cerebral
12  vessels. I do interventional procedures in the
13  coronary -- on the coronary arteries, balloon
14  angioplasty and intracoronary stenting. I do peripheral
15  interventional procedures, ballooning, stenting and
16  atherectomy.
17   Q. Have you ever published any literature
18  concerning Vioxx or COX-2s?
19   A. No.
20   Q. Have you published any literature concerning
21  specifically atherogenesis?
22   A. No.
23   Q. Have you published any literature specific
24  concerning plaque rupture?
25   A. No.

Page 54

1    Q. Now, it says here that you are an author of a
2  book or chapter in your CV page 6 --
3    A. Yes.
4    Q. -- of the heart and heart lung trans --
5    A. Actually, Mike Winterford, when I was at Iowa,
6  asked me to author -- actually to write it. It was just
7  a little spiral. It's one of those little books that's
8  kind of a pocketbook.
9    Q. Is that a widely utilized --
10   A. I'm not aware --
11   Q. -- pocketbook?
12   A. I'm not aware that it is. It's a little kind
13 of -- I don't know if you're familiar with those little
14 spiral binder books that sometimes are little summaries
15 of things. It's --
16   Q. A little cheat sheet for docs?
17   A. I don't know if I'd call it a cheat sheet.
18 It's just sort of a summary. It's not -- certainly, I
19 don't want to hold that out as a -- as a chapter in a
20 large textbook like Braunwald or something like that. I
21 can tell you that that's the case.
22   Q. Doctor, I'm getting some notes here. But let
23 me just ask you, in the last month, if you can break it
24 down by month or if you can break it down by year, can
25 you tell us how many patients you've treated with an

Page 55

1  acute MI?
2    A. That's hard to say. Probably -- in the last
3  month, probably less than five for sure.
4    Q. How about in the last year?
5    A. In the last year, I don't know. I -- one --
6  one way we could get at it, if it's really critical, is
7  we can go back and look at cath lab reports and see
8  because that's generally how we're going to encounter
9  folks with acute MIs.
10   Q. And how about the number of cath --
11   A. Let me -- let me --
12   Q. How about the number --
13   A. Let me clarify --
14   Q. -- of cath -- okay. Go ahead.
15   A. Let me clarify that. Hang on just a second
16 because I don't want -- I want to clarify that.
17      THE REPORTER: Hold on just a second. I
18 really need for you to let him finish the question.
19   Q. (BY MR. WACKER) Yeah. Here's what we've got
20 to do. I've got to be able to finish the question and
21 you've got to be able to finish your answer. And I have
22 to let you finish your answer before I ask my next
23 question. He can only take down one of us talking.
24 We've been jumping over each other. Maybe me on you and
25 you -- you know, and vice versa. So for the benefit of

Page 56

1  the court reporter, we'll -- we'll try not to do that.
2    A. Can I do one thing to clarify, though, because
3  I don't want this to come back and be an issue later on
4  when I say we can get at it is through cath lab records?
5  One thing we also have to understand is that we will see
6  patients with myocardial infarctions who don't go to the
7  cath lab for whatever reason because we view that as a
8  small infarction or perhaps an infarction not due to a
9  thrombotic event or for whatever reason. So I don't
10 want to mischaracterize how I might have to go about
11 looking for those cases if it ever becomes an issue.
12   Q. And the last month or year, how many catheters
13 have you performed on patients with an acute MI?
14   A. Again, that's a difficult -- difficult
15 proposition or difficult question to answer right off
16 the top of my head. I probably do on the order of a
17 hundred to 125 coronary procedures a year. And a
18 certain percentage of those are going to be in people
19 with unstable coronary syndromes that we would call an
20 acute coronary syndrome. And within that, some of those
21 are going to be acute myocardial infarctions. So I
22 really am hesitant to tell you off the top of my head
23 how many acute myocardial infarctions I've actually
24 taken to the cath lab in the last year or how many that
25 I've actually seen in the last year. But I would say

Page 57

1  probably if you look at the -- the size of my practice
2  and where it's -- where I practice, I would say probably
3  on average you could figure one to two a month. It's
4  just not -- it's not as frequent as you would think.
5    Q. Do you hold yourself out as an expert in
6  radiology?
7    A. Depends on what aspect of radiology you're
8  talking about.
9    Q. Or what areas of radiology do you feel that
10 you're an expert?
11   A. Angiography.
12   Q. Any others?
13   A. Angiography of the coronary arteries,
14 angiography of the peripheral vessels with the
15 exception -- well, angiography of the renal arteries,
16 angiography of the lower extremity arteries. I consider
17 myself -- if you consider echocardiography to be a
18 radiology procedure, I would consider myself an expert
19 in that. I consider myself expert with regard to
20 reading of chest x-rays insofar as issues that pertain
21 to cardiovascular disease.
22   Q. Do you consider yourself or hold yourself out
23 as an expert in nuclear cardiology?
24   A. I do not. I generally can look at them and
25 derive information, but I do not read those on a daily

Page 58

1  basis.
2      Q.  And you are not an expert in pharmacology?
3      A.  I'm an expert in pharmacology only insofar as
4  how that might impact on clinical practice.  I consider
5  myself an expert insofar as I can look at literature,
6  understand the basic proposition that's being put forth
7  there and whether that would seem to be a reasonable
8  proposition or a proposition which may have some
9  clinical implication.
10     Q.  And you're -- you don't hold yourself out as an
11  expert in biostatistics, do you?
12     A.  I do not, but, again, sort of the same set of
13  guiding principles, I feel like I can look at a study
14  and try of derive what I need to from that study, but in
15  no way, shape or form am I an expert in biostatistics.
16     Q.  And you're not an expert in epidemiology?
17     A.  I am not, but, again, same set of principles
18  apply.
19     Q.  You're not an expert in rheumatology, family
20  practice or pain management?
21     A.  Do I hold myself out as a rheumatologist?  No.
22  Do I hold myself out as a pain management doctor?  No.
23  Do I hold myself out as a family practitioner?  No.
24     Q.  You're not an expert in FDA regulations?
25     A.  I am not.

Page 59

1      Q.  You're not an expert in drug warning labels?
2      A.  I am not.
3      Q.  Not an expert in cardio epidemiology?
4      A.  Again, if I'm not an epidemiologist, I'm
5  probably not an expert in cardio epidemiology.
6      Q.  Did you review Dr. Farquhar's report in this
7  case?
8      A.  I did not.
9      Q.  In your practice, what medical literature do
10  you subscribe to and what medical texts do you maintain
11  as -- and consider authoritative in your practice?
12     A.  With regard to the journals, we -- I receive
13  the Journal of the American College of Cardiology.  I
14  receive -- I actually get JAMA through -- by virtue of
15  the fact that I'm a member of the American Medical
16  Association.  I also receive the New England Journal of
17  Medicine.  I will from time to time, depending on an
18  issue that may arise, may look at circulation and may
19  look at other cardiology journals like the American
20  Heart Journal, American Journal of Cardiology.
21  Occasionally, may look at Lancet if there's a specific
22  issue pertinent to my practice.  With regard to
23  textbooks, Braunwald is considered sort of the standard
24  text in cardiology.  I'm blanking on the name.  There's
25  another guy who practiced out of Atlanta and I cannot

Page 60

1  think of the name of it.  That's also considered a
2  fairly authoritative text.
3      Q.  Do you have both of those texts in your office?
4      A.  We've got them over at the office.
5      Q.  Do you rely upon one over the other?
6      A.  Not necessarily.
7      Q.  You can --
8      A.  Textbooks --
9      Q.  You can remember Braunwald, but you don't
10  remember the other one?
11     A.  Yeah, I don't remember the other one.  The
12  problem with textbooks is, to be honest with you,
13  they're going to be sort of the historical in a sense.
14  They're not going to be necessarily cutting edge.  And I
15  don't mean to cast aspersions on the textbook.  Don't
16  misinterpret that.  But in terms of obtaining up-to-date
17  information, probably the textbook's going to be -- is
18  going to lag on that.
19         Now, with regard -- if you want to talk about
20  interventional, there are certain specific
21  interventional textbooks that exist out there.  Donald
22  Baine, who's at -- used to be at Boston, I think was an
23  author on one or an editor.  I don't think he was the
24  lead on that particular -- and I'm blanking on the name
25  of the guy.  I generally don't, at this point in my

Page 61

1  career, rely on a textbook of interventional cardiology
2  or a textbook of cardiac catheterization to make
3  decisions.  Those are very helpful during your
4  fellowship when you're trying to learn the techniques
5  and trying to get your basic footing.  As you move down
6  the road, generally those texts don't have as much value
7  to you.
8      Q.  How about specific journals that deal
9  specifically with interventional cardiology that are not
10  what you've already described?
11     A.  I don't generally -- a lot of those articles
12  tend to be case report articles that show up in a lot of
13  those interventional journals, and so they're of minimal
14  value in terms of drawing any conclusions about how to
15  treat a large population.  Usually, when there is an
16  issue in intervention cardiology which is an important
17  issue regarding whether a certain procedure should be
18  done or a type of anticoagulation regimen, those will
19  generally show up in the medical journals.  For example,
20  the New England Journal just recently published an
21  article looking at restenosis rates of stenting using
22  nitinol stance versus standard balloon angioplasty.  And
23  so that showed up obviously in a noncardiology journal.
24  It's a big issue and usually the big issues will show up
25  in those types of journals.

Page 62

1    Q. Have you ever been invited to be a consultant
2  to any FDA advisory committee?
3    A. No.
4    Q. Other than the pharmaceutical companies that
5  we've mentioned so far that you've done work for,
6  including Wyeth or its predecessors for Fen-Phen, Bayer
7  for Baycol and, you know, Merck for Vioxx, have you
8  worked with any other pharmaceutical companies?
9    A. Let me just take issue with your question. I
10  never did any work for -- on Baycol. And we met and
11  discussed the issues in general. I was never engaged
12  in -- in offering any opinions in that particular
13  litigation.
14    Q. Well, I think you said you --
15    A. I met with him, we discussed the general topic
16  and I was never contacted again. We talked about
17  hyperlipidemia in general, cholesterol in general,
18  statins in general.
19    Q. Okay.
20    A. And I was never asked to proceed beyond that.
21    Q. I mean, I'm just --
22    A. But with regard to --
23    Q. -- trying to be comprehensive.
24    A. Well, to answer your -- then to your question,
25  no.

Page 63

1    Q. Okay.
2      MR. BRENNAN: Don't talk over -- do your
3  best to not talk over him because the court reporter is
4  having a hard time.
5      THE WITNESS: I'm sorry.
6    Q. (BY MR. WACKER) You're very quick on the
7  uptake on the question, which is helpful to some extent
8  because we can get through the deposition quicker, but a
9  killer on the court reporter.
10      THE WITNESS: Can we take a break?
11      MR. WACKER: Yeah, please.
12      (Recess Taken From 1:45 p.m. To 2:05 p.m.)
13      (Deposition Exhibit No. 3 Marked.)
14    Q. (BY MR. WACKER) Okay. Doctor, we're back on
15  the record. What we've done is -- for the record is
16  marked your -- your billing and some of the
17  correspondence surrounding that billing as Exhibit 3.
18  Now, the other thing we're going to do is, as I
19  mentioned at the beginning, we're going to copy your
20  entire file, all the banker's boxes and we'll make that
21  Exhibit 4 to the deposition.
22      Doctor, if you could turn to the report, which
23  we have in there as Exhibit 2.
24      Dr. Roach, are there medications or drugs that
25  can increase the development of atherosclerosis?

Page 64

1    A. Cause atherosclerosis, medications or drugs?
2  As I sit here today, I can't think of one right off top
3  of my head.
4    Q. And the question was -- was a little bit
5  different than cause.
6      MR. WACKER: If we could read back the
7  question.
8      (Question Read Back.)
9      MR. BRENNAN: I'm going to object as vague.
10    A. Are you talking about in humans, animals or
11  both?
12    Q. (BY MR. WACKER) In humans.
13    A. In humans. As I sit here right now, I am not
14  aware of anything.
15    Q. And that's for both medications, meaning
16  pharmaceuticals, and/or drugs?
17    A. I mean, again, I just -- as I sit here thinking
18  about it, I can't think of anything immediately off of
19  the top of my head that I could immediately reference
20  that says, yes, this will -- if I understand your
21  question right -- initiate atherosclerosis.
22    Q. Well, I think the question is --
23    A. Well, could you repeat --
24    Q. -- increases the development of
25  atherosclerosis.

Page 65

1      MR. BRENNAN: Objection, vague.
2    A. Again, I guess I'm not trying to be difficult.
3  But you're talking about once it's established the
4  progression of it?
5    Q. (BY MR. WACKER) Yes.
6    A. I can't think of anything off the top of my
7  head right now.
8    Q. Do you know what percentage of the male
9  population age 58 undergo a bypass surgery?
10    A. The percentage of the population male under the
11  age of 58?
12    Q. That are 58 years old.
13    A. 58. I couldn't comment specifically to someone
14  at age 58.
15    Q. Can you comment on, you know, 58 -- say 55 to
16  58 or is there a specific range where you could make a
17  comment?
18    A. I'd really want to just look at some piece of
19  data. I'm sure that that data exists. I'm hesitant to
20  throw a number out.
21    Q. Did you look at that in your review of this
22  case?
23    A. I did not.
24    Q. Doctor, can you describe how COX-2 inhibitors
25  work?

Page 66

1     A. With regard to?
2     Q. Their pharmacology. Pharmacologically, how
3  does a COX-2 inhibitor function?
4     A. Basically, impairs the -- well, we -- we
5  colloquially refer to cyclooxygenase -- or, actually,
6  it's a -- it's a GH synthetase enzyme. COX-2 inhibits
7  cyclo -- the specific moiety called cyclooxygenase-2.
8  I'm not sure that I could tell you the exact detailed
9  biochemical mechanism of that, but the general notion is
10 that you have arachidonic acid, which is cleaved by a
11 phospholipase enzyme freeing up arachidonic acid. That
12 arachidonic acid is then converted by either
13 cyclooxygenase-1 or cyclooxygenase-2 to a number of
14 other moieties that are then converted to specific
15 prostanoids by enzymes at the tissue level.
16    Q. What are prostaglandins?
17    A. Prostaglandins are moieties that are
18 produced -- generally felt to be produced at the local
19 tissue level and act at the local tissue level.
20    Q. Does inhibition of COX-2 by a COX-2 inhibitor
21 drug decrease prostacyclin?
22    A. There is evidence that if you measure urinary
23 metabolites of prostacyclin, that it is -- there is a
24 decrease in the urinary metabolite production with
25 administration of COX-2. And I believe that has

Page 67

1  actually been demonstrated in human beings.
2     Q. Are you aware of evidence that COX-2 is found
3  in blood vessels?
4     A. I believe there is evidence that there may be
5  some COX-2 in endothelium.
6     Q. Now, on page 3 of your report, Doctor, if you
7  want to turn to page 3, in the second full paragraph,
8  which is the -- the larger paragraph, about
9  three-quarters of the way down, do you see where the
10 sentence starts, "Thus, based on the data the question
11 about the cause of the increased risk of myocardial
12 infarction associated with Vioxx use remained open"?
13    A. I see it.
14    Q. And then you state, "Was it due to random
15 chance, a reduction in the risk of myocardial infarction
16 in the group treated with the naproxen, an increased
17 risk of myocardial infarction in the group treated with
18 Vioxx, or some combination of the aforementioned
19 factors?" Do you see that?
20    A. Yes.
21    Q. And so following VIGOR, you're saying that
22 was the state of the knowledge concerning Vioxx at that
23 time, correct?
24    A. I'm not saying it was the total state of the
25 knowledge regarding Vioxx at that point in time. There

Page 68

1  had been other studies which had been done with Vioxx.
2     Q. You're saying that that was the state of the
3  knowledge in terms of the question regarding the results
4  of the VIGOR study?
5     A. No, I'm not saying that at all. I think you're
6  misinterpreting what I'm saying in the report. I'm
7  saying with regard to the data specifically generated by
8  the VIGOR study, those are the conclusions that you
9  could draw.
10    Q. So you would agree, then, that it would be
11 inappropriate to say that the difference in myocardial
12 infarctions from the VIGOR study was due to the
13 cardioprotective effect of naproxen without also saying
14 that there's a possibility that it's due to the
15 increased risk of Vioxx or a possibility of chance?
16 Would you agree with that?
17    A. That was a long question. I want to make sure
18 I understand it. Are you asking me based on this
19 particular study, that one could say it was due to a
20 reduced risk associated with naproxen 500 twice daily or
21 was it due to an increased risk with Vioxx 50 milligrams
22 per day, was it some combination of the two or was it
23 chance? Is that the question?
24    Q. I'm asking you --
25    A. I just want to make sure I understand.

Page 69

1     Q. I'm asking you based upon your conclusion that
2  you say that the question remained open and therefore
3  there were three possibilities. So if there's three
4  possibilities, it would be inappropriate for Merck to
5  say that it was just one of those possibilities?
6     A. I don't want you to --
7        MR. BRENNAN: Objection, calls for
8  speculation.
9     A. And I also don't want to mischaracterize what I
10 write in this report. This report says thus -- on
11 the -- on the date of the question about the cause
12 refers to my interpretation of this particular study.
13    Q. (BY MR. WACKER) So you would agree that if --
14 that's your interpretation, so you would agree that if
15 you were writing something about this study, if that's
16 your interpretation, it would be inappropriate to say
17 that the results from VIGOR were due to the
18 cardioprotective effect of naproxen --
19       MR. BRENNAN: Objection --
20    Q. (BY MR. WACKER) -- because you've listed these
21 other two explanations and you say the question remains
22 open, true?
23       MR. BRENNAN: Objection, mischaracterizes
24 the testimony.
25    A. Again, if we stay specifically to VIGOR, and

18 (Pages 66 to 69)