Page 70

1  we're not going to talk about anything else with this
2  line of questioning, then I think the only conclusion or
3  series of conclusions that you can draw are what we just
4  said. Either there was a cardioprotective effect of
5  naproxen, there's an increased risk with rofecoxib or
6  there's some combination of two or it's simply a play of
7  chance.
8     Q. (BY MR. WACKER)  We'll come back to that,
9  Doctor.
10    Doctor, are you aware of any studies in humans
11 comparing naproxen to placebo where it's been shown that
12 naproxen is cardioprotective?
13    A. If you're talking about a randomized controlled
14 trial specifically to address that issue, no.
15    Q. Now, in your report you say on page 3 -- I'm at
16 page 3 at the last sentence there on that same
17 paragraph. It says, "Merck subsequently changed the
18 labeling of Vioxx to inform prescribers about the
19 findings of the VIGOR Study."  Do you see that?
20    A. Yes.
21    Q. And when was that done?
22    A. I believe that was done sometime in 2002.
23    Q. And are you familiar with why there was a delay
24 from March 2000 to April 2002, why that delay occurred?
25    A. I don't know that I would characterize it as a

Page 71

1  delay and I don't know why it took that much time.
2     Q. Why wouldn't you characterize that as a delay?
3     A. I think delay has a -- the -- has a -- has a
4  somewhat pejorative meaning here. I think there is a
5  process that one would go through in terms of changing a
6  label. Whether there was a delay in the sense that one
7  was not looking at -- looking at doing that in an
8  expeditious fashion or not, I'm not aware of. I'm just
9  not aware of.
10    Q. On page 7 of your report, you discuss the
11 Konstam article, right?
12    A. Yes.
13    Q. And you're aware that he was a paid consultant
14 for Merck?
15    A. I was not aware of that.
16    Q. Were you ever provided -- and I didn't see it
17 in any of your materials, but were you ever provided
18 with the Shapiro meta-analysis done in October of 2002?
19    A. No.
20    Q. If there was a meta-analysis internal to Merck
21 that showed that based upon a review of all the studies
22 at that time that showed a doubling of the risk of
23 myocardial infarction, is that something that you would
24 want to be aware of?
25    MR. BRENNAN:  Objection to the extent it's

Page 72

1  an incomplete hypothetical and the question is vague.
2     A. I'd need to see it before I would comment on
3  it.
4     Q. (BY MR. WACKER)  But if that -- if that
5  existed, is that something that you'd want to know --
6     MR. BRENNAN:  Same objection.
7     Q. (BY MR. WACKER) -- in terms of your opinions
8  here today?
9     MR. BRENNAN:  Same objection.
10    A. I think, again, it would depend on whether it
11 materially is different than what I know today.
12    Q. (BY MR. WACKER)  But you don't know as you sit
13 here today?
14    A. No, I don't.
15    Q. On page 8 you also cite the Reicin study,
16 correct?
17    A. That's correct.
18    Q. And you're aware that she's a Merck employee?
19    A. I am.
20    Q. And did you take that into consideration in
21 your evaluation of the data that this was an article
22 written by one of Merck's own employees?
23    A. It didn't influence my interpretation of the
24 study.
25    Q. Doctor, on page 13, if you can turn to that

Page 73

1  page of your study of your report, at the -- at the
2  bottom in the second-to-last paragraph, you state, "In
3  summary, the epidemiologic studies provide conflicting
4  results which is not surprising given the inability of
5  such studies to control for multiple confounding
6  factors. Moreover, given the conflicting results, I do
7  not believe that any reliable conclusions can be drawn
8  from these studies."  Do you see that?
9     A. Yes, I do.
10    Q. So it's your -- it's your position, Doctor,
11 that based upon these studies, the meta-analysis and the
12 randomized -- randomized control clinical trial, that
13 you can't draw any reliable conclusions as to whether
14 Vioxx increases the risk of cardiovascular events; is
15 that true?
16    MR. BRENNAN:  Objection, mischaracterizes
17 his report.
18    A. You asked the question whether looking at the
19 randomized controlled trials, the meta-analysis and
20 epidemiology is different than what I stated here.
21 Let's again be very careful as we go through this. I'm
22 simply commenting on the epidemiologic studies in that
23 particular paragraph. I'm not commenting about the
24 randomized controlled trials and I'm not commenting
25 about the meta-analyses. So I still stand by what I say

Page 74

1  in this paragraph, that if all you had were the
2  epidemiologic studies, you could not draw any
3  conclusions.
4      Q.  (BY MR. WACKER) Okay.  Well, in this case we
5  had more than the epidemiologic studies, correct?
6      A.  That's correct.
7      Q.  We had the randomized controlled trials, right?
8      A.  That's correct.
9      Q.  And did you review those?
10     A.  I did.
11     Q.  Which ones did you review?
12     A.  The -- well, let's go back and just look at
13  them.  Reicin was a randomized controlled trial that
14  looked at -- and let me just go back through here.
15  Basically compared rofecoxib to placebo and then to
16  nonselected nonsteroidals, namely ibuprofen, diclofenac,
17  and then nabumetone.  I'm going to massacre that.  It's
18  n-a-b-u-m-e-t-o-n-e.  And what it looked at from the
19  cardiovascular risk standpoint was whether there was an
20  increased risk of thrombotic cardiovascular events.
21  When these drugs were used for a short period of time in
22  patients with osteoarthritis, the authors did not find
23  any increased risk relative to placebo, nor any
24  increased risk relative to these nonselective
25  nonsteroidal anti-inflammatories.  So that's one

Page 75

1  randomized controlled trial that I looked at.
2          Another randomized controlled trial that was
3  looked at was Lisse, and that's the ADVANTAGE study.
4  And, basically, again, this is a comparison between
5  Vioxx and Naprosyn or naproxen, primarily looking at GI
6  tolerability, but, again, looking at whether there's an
7  increased risk in this particular study population of
8  thrombotic -- or an increased risk of thrombotic
9  cardiovascular events in those using rofecoxib compared
10  to naproxen.  They did not show any difference between
11  the two groups in terms of thrombotic cardiovascular
12  events.
13         We can then look at Reines and another group --
14  or another author, Thal.  These two studies looked at
15  Alzheimer's patients.  Reines was a 12-month study with,
16  I believe, a three-month additional follow-on.  These
17  patients are randomized, either rofecoxib or placebo,
18  and they're basically looking at whether you can slow
19  the rate of progression of mild to moderate Alzheimer's
20  by administering a coxib drug.  They did look at
21  cardiovascular -- or let me specify -- thrombotic
22  cardiovascular events in that group, did not see any
23  increased risk amongst the users of rofecoxib or
24  placebo.
25         Thal looked at a slightly different group of

Page 76

1  patients, whether you could take patients who were
2  considered at risk for the development of Alzheimer's
3  disease and reduce that risk by administering a coxib,
4  namely rofecoxib.  Those patients were followed over a
5  four-year period.  And, again, there was no difference
6  in the thrombotic cardiovascular events in that
7  particular population.
8      Q.  Stopping you for a minute there.  What was the
9  all-cause mortality for the Alzheimer's studies?
10     A.  I would have to go back.  There's some FDA
11  documents that we could look at there and see.  Again,
12  off the top of my head, I can't tell you exactly what
13  that was.
14     Q.  Do you know if it was three to one greater for
15  Vioxx?
16     A.  I'd have to go back and look at that document.
17     Q.  Would that be important to you if it was?
18     A.  Well, all-cause mortality is a different thing
19  to get your hands around.  And so I don't know that it
20  necessarily helps me make a decision whether these
21  people are at increased risk for thrombotic
22  cardiovascular events or not.
23     Q.  How about the risk in the Alzheimer's study for
24  MI?
25     A.  Have we moved from the randomized trials now

Page 77

1  to --
2      Q.  Well, I just -- I'm breaking it up a little bit
3  here.
4      A.  Okay.  All right.  I'm sorry?
5      Q.  How about the Alzheimer's data for MI?
6      A.  Again, I don't think that there was any -- when
7  you look at the thrombotic cardiovascular events, I
8  don't think that any of these were statistically
9  significantly different between the two groups.
10     Q.  And specifically for MI?
11     A.  Correct.
12     Q.  With respect to the studies that you just
13  mentioned, the randomized control trials, what was the
14  power of those studies?
15         MR. BRENNAN:  Hold on a second.  You want
16  to know the power of each of the studies he's just
17  listed?
18         MR. WACKER:  Yes.
19     A.  Well, there has been a -- you know, I'm not
20  here to tell you those studies were necessarily powered
21  to determine whether there was a difference in
22  cardiovascular events.  It is my understanding that they
23  were not powered to look at that when they were
24  originally put into place.
25         The reason that these studies were then looked

1  at was because of the concern raised in the VIGOR study,
2  Merck instituted -- well, even before what we found in
3  the VIGOR study, Merck instituted a special operating
4  procedure to begin to look at cardiovascular events,
5  namely thrombotic cardiovascular events, in all of their
6  ongoing studies. These two studies -- they were
7  referred to by Merck internally as protocol 078 and
8  091 -- were part of that SOP.
9      Q. (BY MR. WACKER) Doctor, you would agree that
10  Merck was aware prior to the launch of Vioxx that there
11  was a potential for increased cardiovascular risk from
12  Vioxx?
13      A. I don't think --
14      MR. BRENNAN: Object to the extent it calls
15  for speculation.
16      A. I don't know whether they were or weren't.
17      Q. (BY MR. WACKER) Did you not review any studies
18  prior to the launch of Vioxx?
19      A. What types of studies?
20      Q. Any clinical trials that showed an increased
21  risk.
22      A. If you have one that you would like me to look
23  at, I'll be happy to look at.
24      Q. I'm asking you the question. Did you review
25  any clinical trials prior to the launch of Vioxx that

1  showed the potential for increased cardiovascular
2  events?
3      A. With Vioxx?
4      Q. Yes.
5      A. No.
6      Q. You mentioned a standard operating procedure
7  that Merck had put in place, correct?
8      A. Yes.
9      Q. Do you have that?
10      A. Do I have -- we can get it out of the binder.
11      Q. It's in the -- it's in the binders?
12      A. Yes, it is.
13      Q. Now, going back to my earlier question about
14  the randomized controlled clinical trials, what other
15  randomized controlled trials did you review?
16      A. Well, there were ongoing trials, VIP and --
17  VICTOR and VIP, that have -- as far as I know, have not
18  been published. They were looking at increased -- the
19  risk of increased throm -- cardiovascular -- thrombotic
20  cardiovascular events in those two populations of
21  patients.
22      VICTOR was a colon cancer population. VIP was
23  a prostate cancer population. Again, we've mentioned
24  the Alzheimer's trials. We've mentioned the
25  osteoarthritis trials. There were also some trials that

1  were done looking at osteo -- I'm sorry -- rheumatoid
2  arthritis patients, and I believe those were reviewed in
3  Konstam's meta-analysis. Also in Konstam's
4  meta-analysis, I think he also included some other
5  patients with acute low back pain.
6      Q. And you also reviewed the APPROVe trial?
7      A. I did review the APPROVe trial.
8      Q. And that showed an increased risk of
9  cardiovascular events?
10      A. In a colon adenoma -- well, an colon adenoma
11  polyp population, yes, there was an increased risk
12  beginning at about 18 months when they -- on -- in the
13  patients who took rofecoxib 25 a day versus the placebo.
14      Q. So you would agree that there is an increased
15  risk for Vioxx at 18 months?
16      MR. BRENNAN: Objection to the extent it
17  mischaracterizes his prior testimony.
18      A. That is one piece of data that suggests at 18
19  months there may be an increased risk. But when you
20  look at that data and also look at the Alzheimer's data,
21  those -- those two pieces of data are at conflict with
22  each other. There's no increased risk in the
23  Alzheimer's study. There is an increased risk in the
24  APPROVe.
25      Q. (BY MR. WACKER) Well, was the Alzheimer's

1  study long-term?
2      A. One of them was a four-year study.
3      Q. And so you're saying that the Alzheimer's study
4  didn't show any increased risk?
5      A. In terms of thrombotic cardiovascular events,
6  not that I'm aware of.
7      Q. So, basically, when you arrive at your
8  conclusion that Vioxx does not increase the risk, you
9  then discount the findings of the APPROVe study?
10      A. I do not.
11      Q. So how -- how do you juxtapose your opinion
12  that you find no increased risk when APPROVe does show
13  increased risk?
14      A. When we say "no increased risk," we're talking
15  about trying to make a decision after we've looked at
16  the totality of the data. I'm not here to argue with
17  you about the findings of the APPROVe trial. They are
18  what they are. They show that in that particular
19  population of patients, which is a colon adenoma
20  population, after 20 -- after 18 months of use of
21  25 milligrams of rofecoxib a day, there is an increased
22  risk in cardio -- in thrombotic cardiovascular events
23  and it was in the -- it was primarily myocardial
24  infarctions.
25      Q. Okay. But -- and you keep on referencing that

Page 82

1  in this population.  In the -- in the colon polyp, the
2  APPROVe trial, right?
3      A.  Yes.
4      Q.  And are you suggesting that that has some
5  significance to the analysis of that data?
6      A.  It may.
7      Q.  What is it?
8      A.  Well, I think anytime you look at a study, you
9  have to be aware of the population that it's done in and
10  whether that can then be extrapolated to a general
11  population.  If you -- and -- and I'll leave it there.
12      Q.  Well, the -- in that study you had one arm of
13  Vioxx users and the other arm was placebo?
14      A.  That's correct.
15      Q.  Both with the same underlying -- both out of
16  the same population, correct?
17      A.  A population of patients with colon adenomas.
18  I don't know for sure whether you can -- whether you
19  could say that if we did this in a generalized
20  population, whether you would achieve the same results.
21  I know it may seem like a little bit of a sticky point,
22  but when you look at various populations of patients,
23  you may get different results from the trial.  All I'm
24  saying is that this is a population of patients with
25  colon adenomas.  In that particular population, at 18

Page 83

1  months on drug, you've got about a -- basically about a
2  two-fold risk of myocardial infarction.
3      Q.  What was the relative risk for APPROVe at 18
4  months?
5      A.  I think it was -- are you saying after 18
6  months or at 18 months?
7      Q.  At 18 months.
8      A.  I'd have to go back.  There's some data that I
9  could look at.  If you're -- if you want to break it
10  down zero to 18 months, more than 18 months, I think,
11  would be different.  I think ultimately what they
12  decided over the course of the entire study is that the
13  risk was about two-fold.  The number that immediately
14  comes to my mind is about 1.96.  I may be mistaken.
15      Q.  Well, Doctor, are you suggesting that because
16  this was a study in colon polyp patients that there was
17  something amiss about that population so you couldn't
18  therefore extrapolate that data to the -- to the general
19  population?
20      A.  No, not at all.  Not at all.  I'm just saying
21  that it raises some concern.  When you look at a study,
22  you have to make sure that you're not overreaching.  You
23  have -- it raises a hypothesis.  Am I saying that that
24  explains everything there?  I don't think I can say
25  that.  But I think it does raise a -- you know, raises a

Page 84

1  hypothesis, is there something specific to this
2  population that would allow you to see these types of
3  results.
4      Q.  So going back to my earlier question when I
5  was -- when we were talking about the studies that you
6  reviewed, what you're saying is that based upon review
7  of the epidemiologic data, the meta-analysis and the
8  randomized controlled trials, you can't say that Vioxx
9  increases the cardiovascular risk, correct?
10      A.  Correct.
11      Q.  Now, if we turn to page 14 of your report.  Are
12  you with me?
13      A.  Yes.
14      Q.  It says here on page 14 at the bottom, it says,
15  "In conclusion, based on the totality of the data,
16  rofecoxib does not differ from the other NSAIDs, whether
17  COX-2 selective or nonselective, with regard to the
18  cardiovascular risk," correct?
19      A.  Correct.
20      Q.  So are you also saying that the other NSAIDs
21  and other COX-2s -- equally you can't say whether they
22  increase the risk the same as Vioxx?
23      A.  Based on the data that we have available to us,
24  no.
25      Q.  So you can't tell whether any NSAID or COX-2

Page 85

1  increases the cardiovascular risk?
2      A.  That's correct.
3      Q.  Doctor, why was Vioxx taken off the market?
4          MR. BRENNAN:  Object to the extent it calls
5  for speculation.
6      A.  I can't answer that.  And I'm not sure I would
7  say taken off the market.  It was voluntarily withdrawn
8  by Merck.
9      Q.  (BY MR. WACKER) Now, you reviewed the advisory
10  committee transcripts following the removal of Vioxx,
11  correct?
12      A.  Why don't we do this so that I don't get the
13  wrong notion here.  Can we just pull that document out
14  and look at it so that I know which one you're talking
15  about?
16      Q.  I'm talking about the February 2005 advisory
17  committee's transcript.
18      A.  Okay.
19      Q.  Is that part of the materials that you
20  reviewed?
21      A.  Yes.
22      Q.  And do you know what the vote was from the 32
23  members of the advisory committee as to whether Vioxx
24  increases the risk of cardiovascular events?
25      A.  I'd have to look at the -- there was a vote in

Page 86

1  there and it was 28 to zero. I don't know what they
2  were particularly voting on at that point. If you'd
3  like to show that to me, I'd like to actually review
4  that particular portion of the document that talks about
5  the vote.
6      Q. So as you sit here today, you're not familiar
7  with what the vote is?
8      A. Oh, I know what the vote was. I want to make
9  sure I understand what the vote was about.
10     Q. Well, is it your understanding that the vote
11 was 28 to zero that Vioxx does increase the risk of
12 cardiovascular --
13     A. I tell you what, if you'll give me an
14 opportunity to review the document -- there was a vote.
15 It was 28 to zero. I just want to make sure that that
16 vote that they were taking wasn't pertaining to some
17 other issue because a number of things were addressed in
18 that memorandum.
19     Q. We'll come back to that in a minute.
20        Doctor, on page 15 of your report, do you see
21 where it says in the second full paragraph, the last
22 sentence of that second paragraph says, "As testified to
23 by Dr. Mikola, Mr. Barnett had 'white-coat
24 hypertension' - a colloquial term used to describe blood
25 pressure elevations when visiting a doctor." Do you see

Page 87

1  that?
2      A. Yes, I do.
3      Q. Do you know whether Dr. Mikola had
4  Mr. Barnett's pre-2000 hypertension records when he made
5  that comment?
6      A. I don't know whether he did or didn't.
7      Q. Would that be important to you if he did or
8  didn't?
9      A. In regards to what?
10     Q. Whether he had white-coat hypertension.
11     A. Well, I have the -- I have available to me all
12 of his blood pressure measurements. Okay. So it's a
13 little unfair for me. I don't understand when you say
14 would it be important to me. Are you saying would it be
15 important for me with regard to how Dr. Mikola thought
16 or just important to me?
17     Q. Would it be important to you as it relates to
18 how Dr. Mikola thought about whether he had white-coat
19 hypertension?
20     A. Dr. Mikola is entitled to his opinion based on
21 the information he had available to him.
22     Q. And if he didn't have that pre-2000
23 hypertension records, that wouldn't diminish his opinion
24 in any way?
25     A. I don't --

Page 88

1      MR. BRENNAN: I'm going to object to the
2  extent it calls for speculation.
3      A. I don't know whether it would or wouldn't. He
4  made that -- he made that comment. He's obviously
5  making that comment based on what he knows. And for you
6  to ask me whether I could get into his thought process,
7  I can't. I can't get into his thinking.
8      Q. (BY MR. WACKER) Okay. Do you know when
9  Mr. Barnett started taking his own blood pressure
10 readings?
11     A. I don't know when he started to take his own
12 blood pressure readings.
13     Q. On page 15 the last sentence of the third full
14 paragraph, it says, "He continues to take Mobic
15 currently."
16     A. That's correct.
17     Q. Is that your understanding of his current
18 medication regimen?
19     A. No. My understanding is that he has stopped
20 Mobic.
21     Q. Doctor, are you claiming that there were any
22 violations of the standard of care for any of
23 Mr. Barnett's treating physicians in this case?
24     A. I am not.
25     Q. Doctor, what tests can a cardiologist use to

Page 89

1  diagnose and determine the extent of cardio -- coronary
2  artery disease?
3      A. Well, we can generally broadly classify them
4  into invasive or noninvasive tests. Noninvasive tests
5  will give us an inference as to whether a coronary
6  artery disease is present or not. And I will also sort
7  of have to qualify that now with the advent of CT
8  angiography if we classify that as a noninvasive test,
9  meaning we're not actually poking an artery. Then I
10 guess we can actually draw a direct -- we can get
11 actually a direct assessment of coronary artery disease
12 with that test. But let's start with what we've had
13 historically available to us.
14        We have historically had available to us stress
15 testing. And we can start with just plain treadmill
16 exercise stress testing was the first technique
17 available to us -- one of the first techniques available
18 to us to determine whether or not someone had
19 obstructive coronary artery disease.
20        Techniques were then later developed using
21 various nuclear -- nuclear medicine agents which get
22 tagged to red blood cells, which allow us to assess
23 blood flow to the heart muscle. And, basically, that
24 whole set of testing is still stress testing, but it's
25 referred to as nuclear stress testing. And that can be

Page 90

1  done either in an exercise fashion using a treadmill or
2  pharmacologically using different agents to either
3  induce vasodilation or to increase the double product --
4  the double product, which is the heart rate and the
5  blood pressure, in order to provide a stress to the
6  myocardium.
7       So the -- so the three broad sort of categories
8  of nuclear testing would be a nuclear exercise stress
9  test, an Adenosine nuclear stress test, and a Dobutamine
10 nuclear stress test. The common agent used today for
11 most nuclear stress tests is technetium and it goes by
12 the trade name of Cardiolite.
13      Now, again, within the noninvasive -- and some
14 people may take issue with my categorization of
15 noninvasive, but I'll call it noninvasive because it
16 doesn't require a trip to the cath lab. We now have
17 available to us CT angiography. CT angiography allows
18 us to have a direct visualization of the coronary
19 arteries, great vessels, cardiac chambers, and bypass
20 grafts. Although there have been some nice strides made
21 in there, I don't know that anybody accepts that -- that
22 the certainty of your knowledge about the coronary is as
23 good as it would be with a standard coronary angiogram
24 performed in the cath lab.
25      Then we can move to invasive tests of -- to

Page 91

1  evaluate coronary artery disease. And the test there is
2  a coronary angiogram performed by way of an arterial
3  puncture. Basically, that test entails injecting
4  contrast through a catheter into the coronary arteries
5  while you're taking cineangiograms and then basically
6  assessing the degree of obstruction of coronary artery disease based on
7  the degree of obstruction that you see.
8       Another invasive form of evaluation of coronary
9  artery disease is IVUS, which is intravascular
10 ultrasound. And the proponents of using intravascular
11 ultrasound have argued that you may not have luminal
12 obstruction in the setting of significant plaque
13 buildup, but you may be able to deduct significant
14 plaque buildup that doesn't cause luminal obstruction
15 when using this technique of intravascular ultrasound.
16      So I think in a clinical setting, those are
17 sort of the major tests that we have available to us to
18 diagnose coronary artery disease.
19      Q. Do cardiologists rely on and determine further
20 care of patients based on noninvasive nuclear stress
21 tests?
22      A. That's a very broad question, but generally,
23 yes, we can rely on it depending on the clinical
24 situation in which it's obtained.
25      Q. Do you order your patients or require your

Page 92

1  patients to have coronary angiograms every time
2  nuclear -- a nuclear study is negative?
3       A. Every time it's negative? I don't mean to --
4  do you mean positive?
5       Q. Negative.
6       A. If it's negative? I have in certain instances.
7  Not every time. But to answer your question, not every
8  time. That's correct.
9       Q. In what instances would you require a patient
10 to have a coronary angiogram when a nuclear test is
11 negative?
12      A. If your initial evaluation were to be negative
13 by the test -- and we have to understand the test says
14 what the test says -- then there's the reality in the
15 patient. If the patient continues to have symptoms
16 which raise your index of suspicion about underlying
17 coronary artery disease, you may wish to proceed forward
18 with an angiogram to either refute your suspicion or
19 confirm it.
20      So to summarize, there are going to be a
21 certain number of false negative exams, no exam is
22 perfect. There may be very significant coronary artery
23 disease in a patient who has a normal stress test. If
24 you feel based on your clinical assessment that you need
25 to know more about the patient's coronary anatomy and

Page 93

1  you haven't been given the information that you need
2  based on the Cardiolite scan or the stress test or
3  whatever other test you've used, you may wish -- you may
4  want to proceed with a coronary angiogram.
5       Q. Okay. So you mentioned that you may do that
6  based upon a patient's symptoms. What -- what symptoms
7  are you referring to?
8       A. You'll make that decision based not only on
9  their symptoms, but we can start with that. If, for
10 example, they were to continue to have symptoms
11 suggestive of exertional angio, that might be one
12 indication. If they were to later present after the
13 test had been done at some period of time with symptoms
14 consistent with unstable angina, you may wish to proceed
15 with the angiogram.
16      It would really depend on the clinical setting
17 in which you're making that decision. This is going to
18 be a dynamic process, and so you've got to constantly be
19 re-evaluating what's going on with the patient.
20      Q. All right. So it is important -- an important
21 component, the patient's response to the testing and the
22 nuclear results?
23      A. In terms of the decision to proceed with
24 angiography?
25      Q. Yes.

Page 94

1    A. Yes, I think it would depend on your -- on your
2  particular index of suspicion at that point in time and
3  the finding on the test.
4    Q. And the index of suspicion, you've covered
5  those factors for us in your previous answer?
6    A. That's hard to -- to put in a -- in that
7  particular answer that I just gave. I could give you --
8  if you wanted to throw out a scenario, I could probably
9  go through a series of scenarios and say that's one I
10  would press on forward with, that's one I'd probably
11  just follow and do watchful waiting. So it would depend
12  on the clinical situation.
13    Q. What are the indicators of a negative nuclear
14  stress test?
15    A. If you had normal profusion throughout the
16  test -- I mean, throughout the myocardium, we would
17  generally call that a negative exam. There may be other
18  instances where we find what we would consider to be
19  artifacts. And, in fact, I think we saw one in
20  Mr. Barnett's case where oftentimes it's reported that
21  there is a small fixed defect at the apex. We
22  oftentimes think of that as an artifactual finding.
23        You may have in certain patients, depending on
24  their body habitus, a fixed defect in the inferior wall
25  which would be due to diaphragmatic shadowing. In women

Page 95

1  sometimes you can have breast attenuation which will
2  give you a fixed defect. Now, in and of itself, you
3  would say that's an abnormal result, but if you
4  correlate it with the wall notion seen on the isotope
5  ventriculogram part of the nuclear test or you correlate
6  it with echo data or let's say you have cath data with a
7  ventriculogram, you may or -- you may be able, then, to
8  arbitrate that finding and say even though there's an
9  abnormality on the test, this is a normal exam.
10    Q. Well, some of the indicators of a negative
11  stress -- negative nuclear stress test include
12  reversible ischemia, correct?
13    A. Maybe we're not talking about the same thing
14  here. I just want to -- are you talking about -- let's
15  make sure we're talking about. Are we talking
16  about the actual pictures as one looks at them, says I'm
17  going to read the pictures completely in isolation or
18  are you talking about some of the fundamental factors
19  that can contribute to? And I went through some of
20  those fundamental factors that could contribute to a
21  false positive stress test.
22    Q. I'm talking about the fundamental factors.
23    A. I don't know what you mean by that. I mean --
24    Q. Well, use your definition. What are the
25  fundamental factors --

Page 96

1    A. If you're talking about the underlying
2  pathophysiology or physiology that results in the test
3  result, then we can talk about that. I guess I'm
4  confused. And I'm not trying to -- I'm not trying to be
5  difficult here. I guess I've now even confused myself
6  after this conversation.
7    Q. Well, let's -- let's do this. Let's take a
8  break here. We've been going for about an hour.
9    A. Okay.
10    (Recess Taken From 2:52 p.m. To 3:04 p.m.)
11    Q. (BY MR. WACKER) Doctor, what are the factors
12  that you would look for to determine whether there's
13  angiographic evidence of a clot?
14    A. You can actually -- in many instances in
15  patients with acute myocardial infarction, you can see
16  angiographic evidence of a thrombus. Typically, there
17  will be a characteristic lucency to the vessel at that
18  point. It's -- I almost hesitate to say it's almost
19  like an Aunt Minnie, you know it when you see it when
20  you've been in the cath lab a lot. You know, you kind
21  of know Aunt Minnie when you see her.
22        Oftentimes you will see thrombus at a site
23  where there does not appear to be particularly
24  significant underlying narrowing. It will look hazy or
25  it may just look almost like a little -- almost like a

Page 97

1  gelatinous little mass, but you really can't call it
2  gelatinous because it's a picture. It's not -- I'm not
3  trying to characterize it that way. Typically, it looks
4  like a haziness in the vessel.
5    Q. And do you agree that Mr. Barnett had that in
6  that area of the PDA?
7    A. Here's what I'll --
8        MR. BRENNAN: I'm going to object to the
9  extent the question's vague.
10    A. Okay. Here's what I'll agree with -- on --
11  with regard to Mr. Barnett, is that did he have a
12  thrombus? I think there is no doubt that there was a
13  thrombus there. In the setting of established
14  arthrosclerotic vascular disease, thrombus formation
15  is -- is the mechanism -- is generally thought to be the
16  mechanism for a myocardial infarction, not only
17  generally thought, in the vast majority of cases, that
18  is the mechanism for the myocardial infarction. That's
19  not to say that these patients with established
20  arthrosclerotic vascular disease can't have myocardial
21  infarction on the basis of some other mechanism.
22        Typically, we may refer to it as a,
23  quote/unquote, demand infarct where perhaps their heart
24  rate is very high and that leads to increased stress and
25  myocardial oxygen demand that can't be made because of

Page 98

1  obstruction. That could be a cause or you could have
2  severe anemia. But by and large, to summarize and to be
3  a little less longwinded, typically in a situation like
4  the one with Mr. Barnett, you would have a thrombotic
5  occlusion of the vessel.
6      Q. (BY MR. WACKER) Okay. So I just want to make
7  sure we're in agreement and that the record's clear.
8      You agree there is a clot or thrombus in that
9  area of the PDA?
10     A. Let me -- let me tell you what I'll agree to,
11 and I'm not really trying to be difficult with you.
12 There was -- there was a thrombus probably at that
13 point. Now, whether there was thrombus at some place
14 other than the PDA, I don't know. That looked like the
15 vessel, when you look at the films, that probably was
16 occluded at the time he had the infarction.
17     I don't -- I don't see a thrombus there
18 directly. I can infer that there's one there based on
19 the location of the myocardial infarction based on all
20 the information that we have. I would presume that's
21 where the thrombus was. Honestly, in a clinical
22 situation, we don't sit around worrying do I see a
23 thrombus or not. We assume there's a thrombus there and
24 we direct our therapy at eliminating that thrombus or
25 preventing progression of that thrombus.

Page 99

1      Q. Well, I just -- and I -- I know you're doing
2  your job here, but I just want to be very clear that
3  there's no disagreement that there is a thrombus or clot
4  in that area of the PDA.
5      A. I think in all likelihood there's probably a
6  thrombus at that site.
7      Q. Well, we'll come back to that here.
8      All right. Doctor, what is a Q wave?
9      A. A Q wave simply describes a finding on an EKG.
10 Q waves -- basically, when you look at the -- what's
11 called the QRS, which is a -- is basically our way of
12 recording the electrical activation of the ventricle,
13 the left ventricle, we typically talk about a Q wave, an
14 R wave, and an S wave. Usually, a Q wave implies a
15 downward deflection in the electrical activity, an
16 R wave is an upward deflection, and then the S wave
17 would be the subsequent down wave in the deflection.
18     Q. What is a pathologic Q wave on a 12-lead EKG?
19     A. A pathologic Q wave would refer to a Q wave
20 that we feel is significant enough to indicate
21 myocardial injury.
22     Q. What are the criteria for a pathologic Q wave?
23     A. I've always been taught that you need to have a
24 Q wave .04 milliseconds in duration when you're running
25 the EKG at a paper speed of 25 millimeters per second

Page 100

1  and that generally the Q wave should be about a third --
2  the magnitude of the Q wave should be about a third of
3  the ensuing R wave.
4      Q. What if there's no R wave?
5      A. Then we would call that pathological because
6  basically what you'd have is a QS, and we would consider
7  that pathological.
8      Q. And --
9      A. As long as it met the duration of the -- met
10 the criteria for duration.
11     Q. Let me see if I can get this.
12     A criteria for a pathologic Q wave are if
13 the -- if it's .4 --
14     A. Milliseconds.
15     Q. -- milliseconds by .4 what?
16     A. Well, .04 milliseconds in duration. And,
17 typically, the -- the paper speed that you're running a
18 standard EKG at goes at 25 millimeters per second. So
19 as long as we're all looking at the EKG and we see that
20 it's going at 25 millimeters per second, there are
21 little boxes on there that allow you to time that out.
22 So what you do is you look for a QRS width that's --
23 that's at least .04 milliseconds. And, you know, that's
24 generally considered in duration sufficient to meet
25 pathological Q wave. That's not -- you know, it's

Page 101

1  not -- I'm sorry -- it's necessary, but it's not
2  sufficient. Am I making myself clear?
3      Q. Well, and then it's -- it's two boxes deep?
4      A. I wouldn't say necessarily two boxes deep.
5  What -- what I was always taught was to look at the --
6  the magnitude of the Q wave and compare it to ensuing R
7  wave or if you -- the only time you wouldn't do that is,
8  as you pointed out, if there is what's called an RS,
9  meaning there is no subsequent R wave. I think as long
10 as it met duration criteria, that would be considered a
11 pathologic Q wave as well.
12     Q. Can pathologic Q waves develop as a result of
13 evolving myocardial infarctions?
14     A. Yes.
15     Q. Do you agree that pathologic Q waves can
16 resolve despite continuing myocardial scarring and wall
17 motion abnormalities?
18     A. Can they resolve?
19     Q. Yes.
20     A. Yeah, and I think we saw that in this case,
21 that they did resolve.
22     Q. Do you agree that the best test to assess the
23 LV function is a ventriculogram followed by an
24 echocardio -- echocardiography?
25     A. No, I wouldn't necessarily agree with that on

Page 102

1  first pass. I think we have a number of different
2  techniques that we can use. Echocardiography is
3  certainly a very good technique. If you're referring to
4  left ventriculography as it is performed in the cath
5  lab, that's a technique.
6       We now have available to us ventriculography
7  associated with CT angiography. And then you have
8  isotope ventriculography. And whether one is better
9  than the other would depend on a certain circumstance
10 and what you're looking for.
11     Q. And can you generally describe those
12 circumstances and what you'd be looking for?
13     A. Let's take echocardiography. Echocardiography
14 is going to give you -- if it's -- let's assume that the
15 echocardiogram is technically well-done. It will give
16 you a look at all of the walls of the left ventricle.
17 It will give you a look at anterior wall, lateral, give
18 you a look at the septum and it will give you a look at
19 the inferior wall on the bases of the heart as well.
20     It will also give you information about left
21 ventricular wall thickness. It will give you -- in
22 addition to looking at wall motion, you'll get the
23 information about the ejection fraction, which is the
24 squeezing function of the left ventricle. You can also
25 get information about diastolic or relaxation function

Page 103

1  of the left ventricle. So it gives you quite a bit of
2  the information on that particular test.
3       Now, you cannot necessarily get that sort of
4  information off of some of these other exams. Now, in
5  some -- and I'll add the one advantage to an
6  echocardiogram, if you can obtain it in a patient and
7  it's a reasonably good study from a technical
8  standpoint, there's no INIs in radiation associated with
9  it. So based on our understanding, as we sit here
10 today, there's really no risk to the patient of doing an
11 echocardiogram.
12      If we look at left ventriculograms, they will
13 often be a good test to do in somebody who may have a
14 lot of lung interference on the echo or who may be very
15 obese and they're not able to get good windows or get
16 good ultrasound exam of the -- of the myocardium. A
17 left ventriculogram might be a good choice. The problem
18 with the standard right anterior oblique left
19 ventriculogram is that you really can't make a call
20 about the septum or the lateral wall. Now, you can get
21 that if you have a biplane cath lab that allows you to
22 do what's called an LAO view. Then you can get views
23 about the septum and lateral wall, but in most cath labs
24 now they don't do that.
25      With regard to an isotope ventriculogram,

Page 104

1  it's -- the beauty of that test is it tends not to be
2  geometry dependent. In some instances in patients who
3  had myocardial infarction or who may have dilated
4  cardiomyopathies or enlargement of the heart, we may
5  tend to miss the degree of LV disfunction based on how
6  our brain processes our visualization of that picture.
7       An isotope ventriculogram is simply a -- a
8  count in systole and it's a count in diastole. And you
9  take diastole minus systole over diastole and it gives
10 you an ejection fraction. It's independent of the
11 geometry. CT angiography is a little bit newer, so I
12 can't comment to a great degree on that in terms of its
13 pitfalls and its -- and its strengths. I think the
14 strengths of CT angiography evaluation of left
15 ventricular function are that you can see all the walls,
16 you can see the thickness of the wall and you can get an
17 estimate of the ejection fraction. In fact, you can
18 actually calculate the ejection fraction off of the
19 software program, so it's not a visualization of the
20 ventricle. The thing that you can't get off of that is
21 diastolic function.
22     Q. What is the gold standard to determine function
23 of LV pump for purposes of prognostication?
24     A. Yeah, I'd have to go back and look at the
25 actual studies that were done to determine what the --

Page 105

1  what the test was that they used in that particular
2  study to determine -- to come to their conclusions.
3       I don't think that any of us in the clinical
4  arena disagree that if you have well-performed exams --
5  let's say we can all agree it's a well-performed exam,
6  and by the ejection fraction on the cath at 60 percent,
7  the ejection fraction on the echo at 60 percent and the
8  ejection fraction on the isotope ventriculogram is 60
9  percent, that it really matters how you come to that.
10      Now, if your question is what was the gold
11 standard test based on the studies that were done to
12 allow us to conclude that well-preserved left
13 ventricular function is a -- is a a -- is a good
14 prognostic finding or a prognostic marker, I'd have to
15 go back and look at the studies. I suspect that those
16 studies were done years ago. It was probably based on
17 left ventriculography. It just depends on historically
18 when they were done.
19     Q. Do you agree that a nuclear ventriculogram
20 underestimates a L V dysfunction?
21     A. Oh, I think that any of these tests can have
22 issues with regard to calculation of ejection fraction.
23 And so to -- I would be a little hesitant to say that it
24 can't do that because I know that it can. It can
25 also -- any of these tests is going to have a certain

Page 106

1 operating characteristic to it where you're going to
2 have false positives and false negatives, not only when
3 we talk about nuclear scans with regard to the
4 profusion, but you may over or underestimate left
5 ventricular function based on a particular study.
6     Q.  Would you agree that an echo is the best
7 noninvasive test?
8     A.  Again, that is a very broad question and it
9 would depend on the particular patient.  If you have
10 severe underlying lung disease or you're morbidly obese,
11 I would argue that an echocardiogram is probably not
12 going to be the best test.  In a thin person with good
13 echocardiographic windows, I think it is a good test.
14     To rank order them and say it is the best test
15 to simply look at ejection fraction, I think is a little
16 bit of an overreach.
17     Q.  Doctor, we can agree on this, that the -- the
18 cause of Mr. Barnett's myocardial infarction was due to
19 an acute thrombotic occlusion in the PDA more likely
20 than not, correct?
21     A.  Yes.
22     Q.  Now, let's take -- I know it's quick, we've
23 been going here for a short period of time, but I'm
24 going to try to weed through some of this stuff here.
25     MR. WACKER:  We can go off the record.

Page 107

1     (Recess Taken From 3:20 p.m. To 3:32 p.m.)
2     Q.  (BY MR. WACKER)  Doctor, I found this -- this
3 is trial testimony that you provided in that case of --
4 of Vickie Carol Campbell-Reese, one of the cases in
5 your -- in your report.  That was one of your cases you
6 testified, right --
7     A.  Yes.
8     Q.  -- at trial?
9     Now, I'll show this to you.
10     MR. WACKER:  And all I've got is one copy
11 and to your counsel -- Merck's counsel.
12     MR. BRENNAN:  Thank you.
13     Q.  (BY MR. WACKER)  And, basically, let me just
14 see if this helps your recollection regarding some
15 information here.
16     On page -- and, again, this is a trial
17 transcript from November 15th, 2004, in the case of
18 Campbell-Reese versus Wyeth in the Upshur County, Texas,
19 115th Judicial District.  It's a Fen-Phen case, correct?
20     A.  Yes.
21     MR. BRENNAN:  Are you going to mark this as
22 an exhibit or --
23     MR. WACKER:  We could.
24     MR. BRENNAN:  Okay.
25     MR. WACKER:  I mean, I don't -- I wasn't

Page 108

1 planning on it.
2     Q.  (BY MR. WACKER)  But, anyway, you'll see here,
3 Doctor, on page 110 of the transcript, it says:
4     QUESTION:  "You have been their expert
5 since 1999 or '98?"
6     ANSWER:  "Late '97-98.  I don't remember
7 when this got started."
8     You see that?
9     A.  Yes.
10     Q.  "And you have reviewed over a hundred cases for
11 them?"
12     The answer "Yes."
13     Do you see that?
14     A.  Yes.
15     Q.  And you agree with that?
16     A.  If that's what I said, I don't have any reason
17 to dispute it at this point.
18     Q.  Okay.  And then it says, "You have made -- I
19 think you told me in your deposition -- up to $300,000
20 testifying for them?"
21     ANSWER:  "Over the seven-year period,
22 that's correct."
23     A.  Okay.  The one thing I will say about this part
24 of --
25     Q.  Let me just ask you, first, do you agree that

Page 109

1 that was the answer you gave at that time?
2     A.  That's the answer that's recorded in this
3 transcript.
4     Q.  Okay.  And you stand by that answer today?
5     A.  I'm going to qualify it because, as you're
6 probably well aware, when you're standing in -- or
7 sitting in a courtroom and a lawyer is asking you and
8 you're not paying very close attention, to say
9 that I made 300,000 testifying for them, I would
10 disagree with that.  Did I make $300,000 working for
11 them?  That's certainly a possibility.  But testifying,
12 no.  And I think what I want to make clear, as we
13 sit here today, this is sitting in the courtroom, I'm
14 not necessarily listening to every word as carefully as
15 I should.  And so I think that is not correct as you
16 point out to me today.  If I were to go back and look at
17 the actual bills for testifying, it wouldn't be anywhere
18 close to that.
19     Q.  Okay.  But what you're qualifying, you're
20 saying you made at least $300,000?
21     A.  Here's what I will say based on my recollection
22 and what I -- you know, if I were to, you know, go back
23 and look at those billings, is it out of the realm of
24 possibilities that over that, you know, seven-year
25 period that I made $300,000 providing services to the

28 (Pages 106 to 109)

Page 110

1  law firms that were representing Wyeth, that's not out
2  of the realm of possibilities.  What is out of the realm
3  of possibilities is that I made $300,000 simply by
4  testifying.
5      Q.  Okay.  And it is true, you've stated this
6  earlier, that you -- you did review over 100 cases for
7  them as of November 15th, 2004?
8      A.  At that point I would stand by that.  I would
9  have to go back and look at it.  That wouldn't have
10 seemed unreasonable when you consider the volume of
11 litigation and the number of years that I was involved
12 in that.  I mean, recall that's a -- that's over a
13 seven-year period.
14     Q.  Now -- so earlier today when you were saying
15 that your -- you know, I was asking you questions about
16 your best estimate --
17     A.  Right.
18     Q.  -- in terms of, you know, what you've made from
19 Fen-Phen.  And the best number minimum, the floor that
20 you come up with, is a hundred thousand.
21     A.  Yes.
22     Q.  So this helps refresh your recollection that at
23 least as of 2004, it was at least 300,000?
24     A.  And, you know, this is exactly why I hesitate
25 to ever answer these questions without pulling the

Page 111

1  billing records is because inevitably this happens.  I
2  try to throw out what I consider to be an honest, best
3  estimate and somebody wants to pull something else out
4  later on.  And, unfortunately, what I've done now that
5  I'm going to have to live with for the rest of my life
6  is I've created a record that you-all are going pull out
7  at any particular point in time and say, "Well, guess
8  what, two or three years ago, you said this."  That's
9  why I as I go forward, I'm trying to be more careful
10 about the information that I give you.
11         And I would ask that you allow me to review my
12 billing records if this is critical to you and give you
13 that value if that's -- if that's important to you.
14     Q.  And we've already asked Merck's counsel for
15 that information.  So we -- we've asked them to produce
16 it.
17         All right.  Now, it would also be true,
18 Dr. Roach, that you continued to work in the Fen-Phen
19 litigation working for attorneys that represented Wyeth
20 well beyond November 15th, 2004?
21     A.  There was ongoing litigation after that.  My
22 role in it was dramatically diminished after that trial.
23 But as we sit here today, I will tell you the following:
24 I did do some work for them in 2005 and I have just
25 concluded some work for them in 2006.

Page 112

1      Q.  How much income did you earn -- did the
2  Fen-Phen litigation generate for you in 2005?
3      A.  I'm not even going to comment on that.  I'll
4  provide those billing records to you if it's important
5  and I'll provide the billing records from 2006 if it's
6  important.
7      Q.  Well --
8      A.  I'm hesitant to tell you because I don't even
9  recall off the top of my head.  I know that my role in
10 that litigation, I was not asked to look at as many
11 cases as I had been asked to look at over the previous
12 seven years.  It went down dramatically.
13     Q.  Okay.
14         MR. BRENNAN:  Let me handle the document
15 request and production.
16         THE WITNESS:  I understand.
17     Q.  (BY MR. WACKER)  Doctor, you know, this is my
18 one opportunity to ask you, so --
19     A.  I understand that.
20     Q.  -- I'm entitled to your best estimate as the
21 rules of law allow.  And I -- I would like to obtain
22 your best estimate of the amount of income that you
23 earned for the Fen-Phen litigation in 2005.
24     A.  And I'm trying to tell you that I can't, as we
25 sit here, give you even a close to an estimate.  I can

Page 113

1  tell you that my involvement in that went way down in
2  2005 and 2006.  And I am absolutely hesitant to throw a
3  number at you that is then later going to be reproduced
4  and say, "Well, you said this."  I can't tell you.  I'm
5  not trying to be disingenuous with you.  But honest to
6  God, if you -- I cannot tell you the dollar value.  If
7  you want to put a range on it, I could probably tell you
8  a range.
9      Q.  Well, let's do this.  Was it more or less than
10 25,000?
11     A.  Again, I don't want to -- to make that -- I
12 honestly can't tell you.
13     Q.  That's a range.  Is it more or -- more or less?
14     A.  And that's what I'm telling you.  We can sit
15 here for another ten hours and I honestly cannot tell
16 you because I can tell you -- I can't.
17     Q.  Doctor, you just asked me to -- you said -- you
18 just said, "If you want to give me a range," and I --
19     A.  How about less than 50,000?
20     Q.  Okay.  Okay.
21     A.  How about less than 50,000?
22     Q.  Okay.  That's all -- all right.  Now, how about
23 in 2006, same question?
24     A.  That would be even less.  How about less than
25 25,000?

Page 114

1    Q. All right. Fair enough. And, again, you've
2  agreed -- or what you want to do is produce those
3  billing records?
4    A. I tell you what, I'll -- I'll quit being a
5  lawyer and I'll just be a doctor and I'll let you guys
6  haggle about that.
7         MR. BRENNAN: Thank you.
8         THE WITNESS: You're welcome.
9         MR. WACKER: I didn't think we were
10  haggling, were we? I thought we were going to just
11  produce it.
12         MR. BRENNAN: Well, you requested it and
13  I'm going to let the people that need to consider it
14  consider it.
15         MR. WACKER: All right.
16    Q. (BY MR. WACKER) Dr. Roach, do you agree that
17  Mr. Barnett had no sustained hypertension between 1971
18  and January 4th, 2000, with the exception of a few high
19  normals associated with upper respiratory infection and
20  the flu?
21         MR. BRENNAN: I'm going to object to the
22  extent that question is compound and overly broad.
23         MR. WACKER: And I'm not big on this, but
24  I'll just say that under the Federal rules and under
25  Fallon's rules, all -- all you can do and all we can do

Page 115

1  is just say "objection." So that's all you can do is
2  just say "objection."
3         MR. BRENNAN: Okay.
4         MR. WACKER: So from -- for the future if
5  you can just limit it to just objection.
6    Q. (BY MR. WACKER) Okay.
7    A. I'm sorry. If you could repeat the question.
8    Q. Dr. Roach, would you agree that Mr. Barnett had
9  no sustained hypertension between 1971 and January 4th,
10  2000, with the exception of a few high normals
11  associated with upper respiratory infection and the flu?
12    A. As I sit here without reviewing records, I
13  would agree with that, yes.
14    Q. What is your definition of white-coat
15  hypertension?
16    A. White-coat hypertension, by my definition, is
17  elevated blood pressure in the setting of a visit or an
18  encounter with a healthcare provider.
19    Q. How is it diagnosed?
20    A. Generally speaking, you would diagnose it by
21  taking their blood pressure in the usual fashion, noting
22  that it's elevated, and then being able to compare that
23  blood pressure elevation to other blood pressure
24  measurements, whether those were blood pressure
25  measurements obtained in the setting of a healthcare

Page 116

1  encounter or blood pressure measurements taken by a
2  patient with a reliable blood pressure cuff in a
3  nonhealthcare setting.
4    Q. Would you agree that there is no evidence of
5  white-coat hypertension during that same interval, 1971
6  through January 4th, 2000?
7    A. I don't recall, as we sit here today, that
8  there were any elevated blood pressure -- or any blood
9  pressure measurements that were elevated during doctor
10  visits.
11    Q. Would you agree, in fact, that there was a
12  trend in the mobility of Mr. Barnett's blood pressure
13  which began only after taking Vioxx?
14    A. I don't know that I could agree with that
15  because you've got a very long string of data that
16  precedes his use of Vioxx. As you've already alluded
17  to, we have decades of data, whereas we only have a few
18  years of data after that. And so to characterize it
19  that it's definitely increased, I think, is not looking
20  at things the correct way.
21    Q. Well, when you have, as you pointed out,
22  decades of data --
23    A. Uh-huh.
24    Q. -- with no trend in those decades for increased
25  hypertension and then a trend of increased hypertension

Page 117

1  while on Vioxx, wouldn't that be evidence suggesting
2  that there's a trend on Vioxx?
3         MR. BRENNAN: I'm going to object to the
4  question being vague. When you're saying
5  "hypertension," are you just talking blood pressure
6  or --
7         MR. WACKER: Counsel, I made that specific
8  point --
9         MR. BRENNAN: I don't think -- I know
10  you're not right about the Federal rules. I don't know
11  if you're --
12         MR. WACKER: Judge Fallon's rules are
13  specific.
14         MR. BRENNAN: Okay.
15         MR. WACKER: It says objection.
16         MR. BRENNAN: Well --
17         MR. WACKER: And I can pull out the order.
18  I've got it here.
19         MR. BRENNAN: Well, if that's, in fact, the
20  case, I'm just -- you keep saying "hypertension," but
21  are you -- are you talking about readings of
22  hypertension?
23         MR. WACKER: You know, Counsel, if the
24  witness has a question, I'm sure he can -- he's pretty
25  well-qualified. He can -- he can address it. And I

Page 118

1 would again --
2     MR. BRENNAN: But I'm talking about for my
3 own personal so I understand the question that you're
4 asking.
5     MR. WACKER: I'm not asking you the
6 questions. I'm asking your -- your client the
7 questions, the doctor.
8     MR. BRENNAN: Okay. But he's not my
9 client, again.
10     MR. WACKER: All right.
11     THE WITNESS: Could you repeat it?
12     MR. WACKER: You want to read back that
13 last question.
14     (Question Read Back.)
15     A. Let me answer that before we get any further
16 down the pike. I'll take issue with the fact that
17 there's a trend or a note -- not the fact -- the notion
18 that there is this trend on Vioxx. There are some
19 elevated blood pressures that we see on Vioxx, but to
20 characterize it as a trend, I think, is -- is not what I
21 see. Not what I see.
22     Q. (BY MR. WACKER) Really?
23     A. Really.
24     Q. So let's just take the period between
25 January 2000 and his heart attack September 6th --

Page 119

1     A. Why don't we do this --
2     Q. No, I'm going to ask the questions, Doctor.
3 We're not going to get into this, you know, you tell me
4 what to do.
5     January 2000 to September 2002, okay, during
6 those 32 months, would you agree if there were more
7 elevations in his blood pressure than the 32 months that
8 preceded that?
9     A. Can I look at my records?
10     Q. Please do.
11     A. Thanks. And I apologize. You gave me the time
12 frames, if we could go back to those.
13     MR. WACKER: Could we read back the last
14 question.
15     (Question Read Back.)
16     A. January 2000 to --
17     Q. (BY MR. WACKER) September 6th, 2002.
18     A. Okay. So we're going January to September.
19     (Witness Reviews Document.)
20     MR. BRENNAN: Ted, I'm aware of that order,
21 except from the depositions I'm reading, it doesn't look
22 like many people are adhering to that. But if -- you
23 know, if you agree I'm not waving any of my objections,
24 I'll go with just objection from here on out.
25     MR. WACKER: I'm just saying I've -- you

Page 120

1 know, I've been at depositions where defense counsel
2 have made a big stink about that, not to me, but at a
3 deposition I've attended.
4     MR. BRENNAN: Okay.
5     MR. WACKER: So I just think fair is fair.
6     MR. BRENNAN: And I'm all for that. I just
7 want to make sure that everybody's...
8     MS. GARBER: Andy routinely says, "Object
9 to form." I know that's his objection every time, which
10 they have a reference in the order.
11     MR. BRENNAN: Okay. No, I'm aware of that.
12 I just -- I just saw a lot of situations where seems
13 like everybody's running off with a reservation, but...
14     THE WITNESS: Okay. I guess we can go
15 through these.
16     Q. (BY MR. WACKER) The question's still pending.
17     A. And the question is, do you see more spikes in
18 blood pressure from January of 2000 to September of
19 2002? Am I not -- maybe you should --
20     MR. WACKER: Let's have the question --
21     A. Yeah, read the question back because I want to
22 make sure I understand what you're asking.
23     (Question Read Back.)
24     A. It appears upon review that there are elevated
25 blood pressures and when we look at the actual total

Page 121

1 count, there's a slight increase in that number.
2     Q. (BY MR. WACKER) Would you agree that you know
3 more about Mr. Barnett's blood pressure history than
4 even Dr. Mikola did --
5     MR. BRENNAN: Objection, form.
6     Q. (BY MR. WACKER) -- at the time he was treating
7 Mr. Barnett?
8     A. I don't know what he knew and didn't know.
9     Q. Well, did you read his deposition?
10     A. I'd have to go back and see what he said. As
11 we sit here, I don't know what he knew or didn't know.
12     Q. So do you think that Dr. Mikola had all of
13 these blood pressures charted out and knew about those
14 prior to his first treating with Mr. Barnett in 2000?
15     A. I don't know.
16     Q. Are you aware that Mr. Barnett first purchased
17 a blood pressure machine in August 2002 after visiting
18 Dr. Mikola on August 20th, 2002?
19     A. I don't know when he bought the blood pressure
20 cuff.
21     Q. But you would agree that it's difficult or
22 impossible to take your own blood pressure without
23 having a cuff?
24     A. Oh, I would agree with you. I'm just saying I
25 don't know when he actually bought the blood pressure

Page 122

1  cuff.
2      Q.  But part of your opinion here is in reliance
3  upon Dr. Mikola's testimony that Mr. Barnett had
4  white-coat hypertension and that opinion was based, at
5  least in part, on the fact that Mr. Barnett was checking
6  his own blood pressures, right?
7          MR. BRENNAN:  Objection, form.
8      A.  I don't know that my opinion is based on that
9  chain of reasoning.
10     Q.  (BY MR. WACKER)  Well, didn't you cite
11  Dr. Mikola's testimony in your report?
12     A.  I did.  But that's not the totality of my
13  decision-making with regard to that.
14     Q.  That's one piece of evidence --
15     A.  I come to my -- I come to my independent
16  assessment.  Okay.  He's entitled to his independent
17  assessment and we happen to agree.
18     Q.  So -- but one piece of evidence that you cite
19  in your report is Dr. Mikola's testimony that he came to
20  the conclusion that it was white-coat hypertension
21  because of the fact that he believed Mr. Barnett was
22  testing his own blood pressure at home, true?
23     A.  Could you read the question back?
24     Q.  Yeah.  We'll have him read it back.
25          (Question Read Back.)

Page 123

1          MR. BRENNAN:  Objection, form.
2      A.  I'm not making that -- I'm not -- I'm not
3  making that final assessment based on that chain of
4  reasoning.  My report says, "As testified to by
5  Dr. Mikola, Mr. Barnett had white-coat hypertension, a
6  colloquial term used to describe blood pressure
7  elevations when visiting a doctor."  Basically, I'm
8  saying I agree with Dr. Mikola.  I'm not saying in this
9  report that I am relying on Dr. Mikola's testimony and
10  only his testimony -- well, let me put it to you this
11  way, that I'm only relying on Dr. Mikola's testimony to
12  come to my own conclusion about that.
13     Q.  (BY MR. WACKER)  Understood.  But the -- the
14  piece that you do rely upon, which is Dr. Mikola's
15  testimony that Mr. Barnett had white-coat hypertension,
16  his opinion, Dr. Mikola's, was based upon the fact that
17  he believed Mr. Barnett was checking his own blood
18  pressures.  Would you agree?
19     A.  I don't know how he -- I'd have to go back --
20  let me -- let me qualify that.  I'd have to go back and
21  look at his actual testimony to determine if that's how
22  he was -- was arriving at that conclusion.  But the
23  other thing that in the report I don't think is going to
24  come out --
25     Q.  Doctor, there's no question on that.

Page 124

1      A.  Okay.
2      Q.  Okay.  Well, here's -- Doctor, this is page
3  386, lines 13 through 25 and line -- and page 387, lines
4  1 through 4.  Let me -- before you do anything, let me
5  just read it into the record so that we know that --
6  okay.  This is Dr. Mikola's deposition, page 386, lines
7  13 through 25, and page 387, lines 1 through 4.
8          QUESTION:  "Did you notice at all, sir,
9  while Mr. Barnett was taking Vioxx his hypertension did
10  not increase?"
11         ANSWER:  "I would have to look at my
12  records.  Mr. Barnett had what we call white-coat
13  hypertension.  His blood pressures in the office were
14  generally elevated -- or frequently, not always, and
15  that's often attributed -- attributable to apprehension.
16  When I questioned him about it and he told me he had his
17  blood pressure checked other places, it was generally
18  normal, 120 over 80 range."
19     So outside the office, per his report, his
20  blood pressures weren't affected, right?  Is that the
21  testimony that you're relying upon?
22     A.  Let me see the piece again.  You asked me is
23  this the testimony that am I relying on with regard to
24  my comment in the report that Dr. Mikola gave him the
25  diagnosis of white-coat hypertension?

Page 125

1      Q.  Yes.
2      A.  Yes.
3      Q.  Okay.  Now, let me see that.  And the question
4  I have for you is, what evidence do you have, as you sit
5  here today, that Mr. Barnett had normal blood pressure
6  outside of Dr. Mikola's office?
7      A.  I have other measurements that we have taken
8  over various periods of time when he's at different
9  locations.  And I can go back and -- I have a table
10  here -- let me qualify this.  I have a table here where
11  I have recorded a number of blood pressures.  Some of
12  those blood pressures are from a place called Doctors
13  Care.  And so there's a number of blood pressure
14  readings from that particular healthcare provider.  And
15  I used those blood pressure measurements.
16     Q.  What time frame?
17     A.  Those start in January 4, 2000, and go all the
18  way through August 6, 2002.
19     Q.  Okay.  And that was at Doctors Care?
20     A.  Called Doctors Care.
21     Q.  And you're saying that some of those checked
22  out normal?
23     A.  Yes.
24     Q.  So if Mr. Barnett had white-coat hypertension
25  and he went to Doctors Care, wouldn't he have white-coat

Page 126

1  hypertension when he went to Doctors Care?
2      A.  Well, let's put it to you this way:  He didn't
3  have very -- he had mostly normal blood pressure
4  readings when he was at Doctors Care.  If you notice in
5  my report, I use the term, quote/unquote,
6  white-coat-type hypertension, meaning that he probably
7  has intermittent changes in blood pressure.  He has some
8  that are elevated, some that are normal.  By my review
9  of them, the majority are normal.  And I would not label
10 him as hypertensive based on the data that I have in
11 front of me.
12     Q.  Doctor, Vioxx can increase hypertension,
13 correct?
14         MR. BRENNAN:  Objection, form.
15     A.  Vioxx, as well as other coxibs and other
16 nonsteroidals, have been associated with increases in
17 blood pressure.
18     Q.  (BY MR. WACKER)  And so how did you go about --
19 when you did your review of his records, how did you go
20 about ruling out that Vioxx was a contributing factor in
21 his elevated blood pressures?
22     A.  Based on the totality of my review of his blood
23 pressures, I did not feel that he had elevated -- that
24 he had blood pressure elevations that would be labeled,
25 one, as hypertension; two, on multiple occasions there

Page 127

1  were explanations as to why those particular blood
2  pressure elevations might have occurred.
3         There were instances post initiation of Vioxx
4  when he was taking decongestants, when he was taking a
5  compound I believe called Metabolife, which has ephedra
6  in it which can cause vasoconstriction and would raise
7  blood pressure.  So there were a number of occasions
8  when there were other agents that he was taking that
9  could have been responsible for elevated blood pressure
10 and there may have been -- and there were probably
11 occasions where he had symptoms of upper respiratory
12 tract infection that could lead to elevated blood
13 pressure simply on the basis of increased adrenaline
14 levels and feeling uncomfortable.  So as I reviewed
15 that, that was my assessment of his blood pressures.
16     Q.  Okay.  Well, now I'm hearing two different
17 things, because now I'm hearing you say he had
18 white-coat hypertension, but -- and that explains the
19 blood pressure elevations, but it really wasn't that, it
20 was due to all these other medications and other things
21 going on.  So which is it?
22     A.  Could be a combination of both.
23     Q.  And it could be a combination of Vioxx too.
24 You can't rule that out, can you?
25     A.  I would have expected, had the Vioxx been the

Page 128

1  cause or contributor to his hypertension, to have seen a
2  sustained elevation in blood pressure.  He's taking it
3  on a daily basis.  My experience has been with patients
4  who take nonsteroidal anti-inflammatories and who have
5  either an increase in blood pressure, fluid accumulation
6  or edema, that that's generally not an intermittent
7  process.  It's a sustained process.  If Mr. Barnett had
8  been taking Vioxx intermittently, it may be a reasonable
9  explanation.  The fact that he takes it on a daily basis
10 and has blood pressures that go up and down and has
11 ready explanations for those -- those blood pressure
12 elevations based on other factors led me to conclude
13 that Vioxx was not contributing to his blood pressure
14 elevations.
15     Q.  And you're saying that -- that every time that
16 he had a blood pressure elevation between the time he
17 started Vioxx and the time of his heart attack, there
18 was another explanation?
19     A.  I'm not saying every time.
20     Q.  Doctor, the APPROVe studies showed blood
21 pressure spikes --
22     A.  It did.
23     Q.  -- at greater than three relative risk with
24 25 milligrams Vioxx, right?
25     A.  It did.

Page 129

1      Q.  And those were spikes?
2      A.  They were.
3      Q.  They weren't constant elevations as you've
4  described here, right?
5      A.  That's correct.
6      Q.  So that would provide you some evidence that
7  Vioxx can increase the risk of blood pressure spikes?
8      A.  In that -- that's basically a subset analysis,
9  and I'm not going to argue with the fact that it exists,
10 the data exists.  Is that a possibility?  Certainly.  Do
11 I think that it explains it completely?  No.
12     Q.  So you would agree it's a possibility?
13     A.  Certainly.
14     Q.  In fact, Doctor, if you look at your chart --
15 we've got one, but you can go ahead and look at your
16 own -- most of his blood pressure spikes, as you've
17 described them, while he was on Vioxx up until the time
18 of his heart attack were above any previous elevations
19 of blood pressure prior to his use of Vioxx, true?
20     A.  Let me look and see.
21         (Witness Reviews Document.)
22     A.  There are -- there are two occasions where he
23 has what I would say would be very substantial rises in
24 blood pressure.  One occurs after Vioxx and it's in the
25 setting of home blood pressure medications at the time

## Page 130

1  that he's having a myocardial infarction. So he's
2  uncomfortable, his blood pressure is going up, he goes
3  into the emergency room at grand strand, blood pressure
4  is still elevated.
5      There are other blood pressure measurements
6  prior to Vioxx where he has blood pressure elevations to
7  a similar degree that occur during an upper endoscopy
8  and esophageal dilation. So if you look at those two,
9  those are the two that with the largest spikes that I
10 see in my records. So in all fairness to you, I don't
11 want to sit there and say that he doesn't have --
12 that -- that I don't have an explanation for these blood
13 pressure spikes, but he had blood pressure spikes in
14 September -- on September 22nd, 1997, of a similar
15 degree to those which he experienced at home prior to
16 coming into the emergency room.
17     Q. (BY MR. WACKER) How about October 24th, 2000?
18     A. Let's see here. I have a measurement of 164
19 over 100. But, again, I would caution that we not
20 necessarily interpret that in isolation.
21     Q. And do you have an alternate explanation for
22 that blood pressure spike other than the potential for
23 Vioxx?
24     A. I'd have to look at the medical record. I
25 don't know exactly what -- what was going on on the 24th

## Page 131

1  of October, 2000.
2      Q. Do you want to go ahead and do that?
3      A. Sure. Can we go off the record?
4      Q. Yeah.
5      (Recess Taken From 4:12 p.m. To 4:20 p.m.)
6      MR. WACKER: Can we get the last question?
7      (Question Read Back.)
8      THE WITNESS: At that visit?
9      Q. (BY MR. WACKER) Right.
10     A. Unfortunately, unless I'm missing something
11 here, where you would normally see the blood pressure,
12 it just says, "Vital signs are noted." I'm not even
13 seeing a blood pressure recorded at that point.
14     Q. (BY MR. WACKER) Right. And what -- what are
15 you referring to?
16     A. We're talking about the October 24, 2000, visit
17 to Dr. Mikola. The record that I have in my binder does
18 not record a blood pressure.
19     Q. Where did you obtain the blood pressure reading
20 that you have in your yellow notes?
21     A. That's what I'm wondering. Because what I did
22 is I generated this -- as I generated this list, is I
23 went through every place where there was a blood
24 pressure recorded. Now, I did not, unfortunately, put
25 down where I got it from because I was trying to go

## Page 132

1  through them fairly expeditiously. So I honestly cannot
2  tell you where that came from or whether I misdated
3  the -- the blood pressure elev -- or misdated the date
4  that was associated with that blood pressure elevation.
5      MR. WACKER: All right. Let's go off the
6  record.
7      (Recess Taken From 4:22 p.m. To 4:23 p.m.)
8      Q. (BY MR. WACKER) Okay. Doctor, let's move to
9  the time frame of January 2000.
10     On January 19th, 2000, Mr. Barnett presented to
11 the emergency room complaining of atypical chest pain
12 and was ruled out for an acute myocardial infarction,
13 correct?
14     A. Yes, he did present with chest pain at that
15 time, was admitted to the hospital and myocardial
16 infarction was ruled out.
17     Q. And it was atypical chest pain?
18     A. I'd have to go back and look at the records,
19 but I think that was generally the -- the feeling.
20     Q. At that time, Dr. Swami recommended an exercise
21 stress test on an outpatient basis on discharge from the
22 hospital, correct?
23     A. Yes.
24     Q. Is it your belief that Mr. Barnett was
25 recommended for a coronary angiography which he refused?

## Page 133

1      A. There has been, I guess, some testimony
2  alluding to that. I could find nothing in the medical
3  records suggesting from a doctor that he should have a
4  coronary angiogram at that point in time.
5      Q. So you would agree that from the records,
6  anyway, that -- well, strike that.
7      You would agree that Mr. Barnett was compliant
8  and followed Dr. Swami's recommendations for further
9  care, correct?
10     MR. BRENNAN: Objection, form.
11     A. As best I can tell from my review of the
12 records, I think he complied with all of his doctors'
13 instructions.
14     Q. (BY MR. WACKER) Mr. Barnett had a Cardiolite
15 on January 24th, 2004, performed by Dr. Swami, correct?
16     A. That's correct.
17     Q. And as for the stress test portion, he had the
18 following: No chest pain, correct?
19     A. Correct.
20     Q. No ST changes?
21     A. Correct.
22     Q. No arrythmias?
23     A. Correct.
24     Q. Normal blood pressure response?
25     A. Correct.

Page 134

1    Q.  He reached 94 percent of age predicted max
2  heart rate?
3    A.  I would look back, but I have no reason to
4  quibble with that.  He went quite a ways on the stress
5  test.
6    Q.  Had excellent exercise tolerance?
7    A.  He has very good exercise tolerance.
8    Q.  And the stress test portion was entirely normal
9  and negative exercise stress -- stress test?
10   A.  The EKG part was negative.
11   Q.  Now, as to the profusion study, it showed only
12  a small area of lateral wall ischemia with stress,
13  correct?
14   A.  That's correct.
15   Q.  And that was reversible ischemia?
16   A.  Yes.
17   Q.  And he had a normal --
18   A.  Well, let me back up because you're mixing and
19  matching terms.  And maybe I don't need to qualify this.
20  When you use the term "reversible defect," that
21  describes the picture.  What underlies that reversible
22  defect is myocardial ischemia.  That's what exists in
23  the patient.  Okay?
24   Q.  He had a normal ejection fracture of 56
25  percent?

Page 135

1    A.  Yes.
2    Q.  Normal wall motion?
3    A.  Yes.
4    Q.  And, therefore, you would agree based upon
5  these findings that Mr. Barnett had an entirely negative
6  stress test, no clinical signs and symptoms of occlusive
7  coronary artery disease and a profusion scan which
8  showed only mild ischemia to a small area of the
9  lateral -- of the lateral wall, correct?
10   A.  No, I would disagree with the notion that his
11  exam in its entirety is normal or negative.  As I
12  mentioned earlier, the EKG portion of the exam is
13  negative.  The Cardiolite portion of the exam is
14  positive and would suggest obstructive disease.
15   Q.  Well, first, what is that based upon?
16   A.  What is what based upon?
17   Q.  Your opinion that he had obstructive coronary
18  disease.
19   A.  Based on the findings on the Cardiolite scan.
20  Based also on what we know about him subsequently.  And
21  I'll leave it at that.
22   Q.  Well, when we're back in 2000, we don't get to
23  treat him based upon information two years later?
24   A.  You're absolutely right.  But I think you asked
25  me how do I know that he had coronary disease at that

Page 136

1  point.  One, I have myocardial profusion imaging that
2  supports that; two, I know that within a matter of two
3  years we have angiographic data that shows that he has
4  coronary artery disease.
5    Q.  So part of your opinion, the second part, is
6  based upon retrospect?
7    A.  Yes.  And I'm not questioning anything that the
8  doctors did in terms of a clinical decision-making
9  process in 2000 based on that scan.
10   Q.  Would you agree that the coronary that --
11  strike that.
12      Would you agree that if there was coronary
13  disease, it was limited to mild disease on the left
14  system?
15   A.  No.
16   Q.  What's the basis of that disagreement?
17   A.  He could have had balanced disease that would
18  have prevented the striking profusion abnormalities that
19  you typically will see with single-vessel disease.
20   Q.  Well, you say he could have.  That's
21  speculation, right?
22   A.  Yes.
23   Q.  And the doctors at the time didn't diagnose him
24  with balanced disease, did they?
25   A.  They did not.  I would like to -- and I know

Page 137

1  you're probably not going to allow me.  I would like to
2  clarify.  I think you asked for my opinion as to what
3  would have allowed the finding on the scan, and I was
4  telling you that it was balanced disease.  And then you
5  asked -- forget it.
6      MR. WACKER:  Well, I'm going to move to
7  strike as nonresponsive.  No question pending.
8    Q.  (BY MR. WACKER)  All right.  Well, based upon
9  the entire study, you cannot reasonably conclude that
10  there was high-grade occlusive coronary artery disease
11  in January 2000, correct?
12   A.  I don't think that we can say conclusively one
13  way or the other.  And let me offer this as an
14  explanation for why the EKG part and the symptom part of
15  a treadmill may have been a false negative.  Up to the
16  point where Mr. Barnett had his myocardial infarction on
17  the 6th of September, he was asymptomatic.  He had no
18  symptoms suggestive of angina up to the point where he
19  had the myocardial infarction.
20      Now, unless we're going to argue that within
21  the few hours prior to his infarction he suddenly
22  developed severe obstructive disease, it would seem
23  untenable that you couldn't reason that this man could
24  walk around with severe three-vessel disease and not
25  have symptoms.

35  (Pages 134 to 137)

Page 138

1    So I think it's entirely plausible based on how
2   he presented in September to believe that he had severe
3   disease as far back as 2000 when he was evaluated at
4   that time.
5    Q. Except the one thing that's missing in that
6   equation is that you're ruling out and do not accept
7   that Vioxx could have played a role in progressing that
8   disease, true?
9    A. There -- that's absolutely right. You're
10  asking me do I think that Vioxx caused a profession of
11  his disease?
12   Q. Yes.
13   A. No, I do not believe that Vioxx played a role
14  in the progression of his disease.
15   Q. Right. So that's part of your opinion. Your
16  opinion is that you don't believe, Dr. Roach, that Vioxx
17  progressed his plaque?
18   A. That's correct.
19   Q. And where is that stated in your report?
20   A. The bottom line is that there is no evidence in
21  the scientific literature that suggests that Vioxx
22  causes progression or initiation of atherosclerosis in
23  human beings.
24   Q. Doctor, where is that stated in your report?
25  Where did you -- where did you opine that in your

Page 139

1   report?
2    A. I think that I have said in my report that I
3   did not feel that -- let me get the report. The final
4   paragraph, "In all reasonable, medical probability, it
5   is my opinion that Mr. Barnett's coronary artery disease
6   and myocardial infarction were not related to his use of
7   rofecoxib, but rather the result of his well-established
8   risk factors, such as hyperlipidemia and family history
9   with contributions from stress, age, and male gender."
10   Q. Well, that's a different answer to the question
11  I had. Where does it state in your report that you
12  prepared for this case that Vioxx --
13   A. I don't know how it's --
14   Q. -- that Vioxx does not increase the progression
15  of plaque or atherogenesis?
16        MR. BRENNAN: I'm going to object to form.
17  And, Paul, just -- again, y'all are starting to talk
18  over each other, so...
19   A. I don't know how I could make it anymore clear
20  than that. It says it's my opinion that his coronary
21  artery disease were not related to the use of rofecoxib.
22   Q. (BY MR. WACKER) Yeah, but the point is it does
23  not say -- it does not address the issue of whether
24  Vioxx increases atherogenesis, you don't -- you don't
25  address that in your report?

Page 140

1    A. I think that I do by saying that his coronary
2   artery disease is not related to his use of rofecoxib.
3    Q. I mean --
4    A. I don't know how else to say it. I mean --
5    Q. Well, that's a conclusion. You're pointing to
6   a conclusion in your report that doesn't address the
7   issue.
8    A. I think I've addressed the issue.
9    Q. So you -- that's -- that's how you address the
10  issue of whether -- a significant issue in this case is
11  Vioxx progressing plaque and increasing the propensity
12  for atherogenesis. And your -- your way to address that
13  is just by saying in a conclusory fashion that you don't
14  think that Vioxx contributed. That's your way of doing
15  it?
16   A. I think --
17        MR. BRENNAN: Objection, form.
18   A. I think we've reviewed a large body of
19  literature throughout the report and then we derive a
20  conclusion at the end of the report.
21   Q. (BY MR. WACKER) Incidentally, who prepared the
22  report?
23   A. I did.
24   Q. Did anybody assist you in the preparation?
25   A. No.

Page 141

1    Q. Were any of the attorneys involved in preparing
2   the report?
3    A. No.
4    Q. They provided you the information?
5    A. They provided some of the information. Some of
6   the information I got myself.
7    Q. Well, they provided you, for example,
8   Dr. Rayburn's report, right?
9    A. Dr. Rayburn? That was a -- I believe that was
10  a trial testimony report. Or not trial testimony. It
11  was -- I think there was some trial testimony of
12  Dr. Rayburn.
13   Q. Well, did you rely upon Dr. Rayburn's trial
14  testimony?
15   A. No, I did not. I had looked at it.
16   Q. Why did you list it in your report?
17   A. I think that the -- I'm not quite sure. I
18  think we listed that -- or I listed it for inclusive
19  purposes of all the things that I have looked at. But
20  I'm not relying upon Dr. Rayburn's trial testimony for
21  my opinions in this report.
22   Q. You're relying upon Dr. Flavahan's opinions,
23  you've got his report, right?
24   A. I've looked at Dr. Flavahan's report and I'm
25  not relying on his report for my opinion.