Page 142

Q. Is there any portion of his report that you're relying upon?
A. I've looked at his report. I agree with certain parts of his report. I'd have to look at his report again, if we want to, to go through it and see, you know, what I agree or disagree with, but I did not rely on his report to generate my report.
Q. So there's areas of Dr. Flavahan's report that you agree with and some areas that you disagree with?
MR. BRENNAN: Objection, form.
A. I -- I think in general I agree with his report.
Q. (BY MR. WACKER) There are areas where you disagree?
A. I don't know. That's probably an inartful way for me to say things. I have looked at his report. I generally agreed with his report.
Q. Did you agree with the methodology that he went about in preparing his report?
A. I don't know what methodology he used when he prepared his report.
Q. Well, in terms of reviewing the -- the scientific literature, you thought that was appropriate, right?
A. I know that he listed a number of references.

Page 143

Whether his approach is appropriate or not, I'll leave that to others to determine.
Q. You also reviewed the report of Dr. Zipes, true?
A. I did.
Q. And -- well, we'll come back to that.
Dr. Roach, if Mr. Barnett, as you indicated -- or you felt that he had three-vessel disease in 2000 -- well, strike that.
Dr. Roach, what evidence do you have as of January 24th, 2000, that Mr. Barnett had balanced disease?
A. I have no direct evidence for that. If we cut the analysis at that point and we're not allowed to look forward, I have no absolute evidence that allows me to tell you that he has balanced disease.
Q. Doctor, wouldn't you agree that the weight of the evidence, including the patient's signs and symptoms, his EKG response and his nuclear scan support the -- let me strike that question.
Doesn't the weight of the evidence, Doctor, including the patient's signs and symptoms, EKG response and nuclear scan substantially tilt towards little to mild disease as of January 24th, 2000?
A. Again, knowing what we know about Mr. Barnett,

Page 144

I think that we can say that the weight of all of the evidence points against him having mild disease at that point. Now, if we want to view that data in isolation, then perhaps we could draw that conclusion at that point in time and that certainly is probably what the doctor -- well, I'll stop there.
Q. Again, part of your opinion is that he must have had disease because of what showed up September 6th, 2002, right?
A. I have no other plausible explanation for his disease in 2002 other than the standard risk factors and progression of disease associated with that. I have reason to believe that he had established coronary artery disease in January of 2000.
Q. Well --
A. Now, I cannot tell you conclusively that the degree of disease that he had in January of 2000 was as severe as that as we saw in September of 2002, but I can tell you based on the degree of disease in 2002 if you extrapolate backwards based on our clinical experience and studies that have looked at trying to address progression of disease, that it would be a stretch to think that he went from very, very minimal disease to -- or no disease in January of 2000 to the type of disease that we see in 2002, September of 2002.

Page 145

Q. Except with the exception in the face of Vioxx, true?
A. Well, again, you or whoever wants to promote this notion that Vioxx causes progression or initiation of atherosclerosis. I am aware of no human studies that support that contention. And there is animal data which has attempted to raise hypotheses and look at this issue and that animal data is far, far, far from conclusive about initiation of atherosclerosis or atherogenesis or progression of atherosclerosis in animals.
Q. Well, we'll come back to that. You saw Dr. Fitzgerald's comments in the article in 2004, right?
A. I'd have to go back and look at the article that you're talking about and his -- and his comments and the context in which he makes them.
Q. Okay. We'll come back to that.
And when you say that you haven't seen any evidence to that effect, you've -- you've discounted the information in Dr. Zipes' report, right, on that issue?
A. Let me put it to you this way: My own independent review, I am aware of no human studies. I don't believe Dr. Zipes quotes any human studies.
Q. How about the APPROVe follow-up data, isn't that human study?
A. He's drawing a conclusion about a pathologic

process based on a clinical outcome. That is a stretch, and he knows it.

Q. Well, that --

A. What you're saying --

Q. Hold on.

A. Hold on. Let me make it very clear. Let me answer the question.

Q. Go ahead.

A. Let me answer the question.

Q. Go ahead.

A. You're asking me to derive a mechanism or to conclude a mechanism of a disease process -- a potential disease process based on a randomized clinical trial. That is not the way to get at that question. There have been other studies that have been done that if that's the question you want to answer, there are techniques out there that will allow you to answer that question. No study in humans has ever addressed that question.

Q. Well, that -- that's your opinion, but Dr. FitzGerald has disagreed with that. You've seen that, right?

A. He is hypothesizing.

Q. Well, we'll get to that article in a minute.

You've also seen --

A. But, again --



Q. You've -- let me just ask the question.

You've also seen -- after the APPROVe follow-up data was reported by Merck, the one-year follow-up data, you've also seen the comments that indicate that -- that the likely explanation is progression of atherogenesis from Dr. Nissen, right? You've seen that?

A. I haven't seen that.

Q. You've seen the comments by Dr. Furberg, right?

A. I have not.

Q. Okay. So there's two more physicians --

A. Well --

Q. -- that you disagree with?

A. And let me say, they're entitled to hypothesis generation. I know of no studies that have been done to address this issue in human beings, no human studies.

Q. And Merck never -- Merck never did one, did they?

A. And are you suggesting now that with the drug being withdrawn that they proceed in that direction?

Q. No. How about in 2001 when Dr. Epstein suggested that they do that, that they should have done that then? How about then?

A. I'm not --

MR. BRENNAN: Objection, form.

A. I hope not -- I am not aware of what



Dr. Epstein said with regard to that issue.

Q. (BY MR. WACKER) Well, you read his deposition, didn't you?

A. I did. It was a long deposition. There's a lot of issues in there. If you want to show it to me, I'll be happy to look at it.

Q. Well, they could have done it back in 2001 with -- the studies -- the studies that you're suggesting, they could have done back in 2001. In fact, they could have done that back before the drug was with -- was approved for -- for marketing, right?

MR. BRENNAN: Objection, form.

A. Could they have?

Q. (BY MR. WACKER) Yes.

A. They could have.

Q. And that was suggested by the Board of Scientific Advisors in their May 3rd, 1998, memo, wasn't it?

MR. BRENNAN: Objection, form.

A. Again, I would want look at what the Board of Advisors said. And we are talking now specifically about a study that evaluates progression of atherosclerosis in human beings on rofecoxib. I'm not a -- I would want to look at that Advisory Board memo to see exactly what they said.



Q. (BY MR. WACKER) Well, the point is they could have done it, right?

MR. BRENNAN: Objection, form.

A. Who could have done it?

Q. (BY MR. WACKER) Merck.

A. They could have done a lot of things.

Q. All right. Doctor, you are not an electrophysiologist, true?

A. I am not.

Q. And it's not part of your routine clinical practice or hospital practice to interpret EKGs; is that true?

A. That is absolutely false.

Q. So you do interpret EKGs?

A. I do.

Q. Even though you're an interventional cardiologist?

A. Cardiologists in general are trained to read EKGs. And it is not simply in the purview of an electrophysiologist to read EKGs. I read EKGs every day in my office. I read EKGs for a reading pool at Brackenridge Hospital on alternate weeks.

Q. I -- I mean, that's great, because they were -- the defense was making a big deal about Dr. Zipes on that issue.

So, anyway, do you think you're more experienced than Dr. Zipes in interpreting EKGs?
MR. BRENNAN: Objection, form.
A. I have no basis to make an opinion one way or the other. I will tell you that I interpret a lot of EKGs.
Q. (BY MR. WACKER) Do you think you've interpreted more EKGs than Dr. Zipes in your career?
MR. BRENNAN: Objection, form.
A. Again, I have no basis to -- to render an opinion one way or the other on that.
Q. (BY MR. WACKER) Would you agree that you know more about Mr. Barnett's overall care from everything you've reviewed, all his records, pre-Vioxx, post Vioxx, during Vioxx, than either of his treating physicians, Dr. Mikola or Dr. Bryan?
MR. BRENNAN: Objection, form.
A. Let me put it to you this way. I think I have a very good understanding of what's going on with Dr. Barnett and I'm not sure I need to editorialize whether I know more or they know more because I don't know what they know.
Q. (BY MR. WACKER) Well, you read their depositions to know what they know, right? I mean, they --



A. Okay. And let me comment on that. I --
Q. They didn't have all the records that you did. I mean, you have all his, you know, pre-Vioxx records. Dr. Mikola never saw him pre-Vioxx, right? True?
A. I think that's true.
Q. And Dr. Bryan only did the surgery and then saw him for a few follow-up visits post surgery, right?
A. That is correct.
Q. So you've seen Mr. Barnett's records post that period that Dr. Bryan saw him up until the time he saw Dr. Zipes in Indiana, true?
A. I have seen his records, yes.
Q. So that would give you a better understanding of Mr. -- Mr. Barnett's overall care than somebody like Dr. Bryan?
A. I'll take issue with that.
Q. So you don't -- you don't agree with that?
A. That he has any less understanding of the issues in Mr. Barnett than I do?
Q. That you have more of an understanding than he does because you've reviewed more than he has?
A. I don't know that you can look at something and say the more you review necessarily, the more you know. You may be able to review a very discrete body of information and know what you need to know and have as



good an understanding as someone who has reviewed a more extensive body of information.
Q. Well, as it relates to Vioxx, you certainly know more than he does because he didn't even review the Vioxx literature. So on that you would agree that you know more than he does?
A. Again, unless he said something in his deposition testimony, and I believe he did, that he said he did not necessarily review that in great detail, I would agree with you.
Q. And the same holds true with Dr. Mikola, who said he reviewed Vioxx literature for about two hours. You've certainly put more time into this than that?
A. I have.
Q. And the same holds true for Dr. Zipes?
A. That Dr. Zipes has put more time into it than the two of them?
Q. Yes.
A. Yes.
Q. Doctor, would you agree that on all the EKGs prior to the myocardial infarction September 2002, there is no pathologic -- or there are no pathologic Q waves in any of the EKGs?
A. I would agree with that.
Q. And the two EKGs that were done on



September 6th, 2002, don't show any pathologic Q waves?
A. Correct.
Q. On 9/7/2002, there is a small nondiagnostic Q wave in the inferior leads, correct?
A. There were Q waves in the inferior leads all along, none of which I considered to be pathologic.
Q. Okay. I'm just saying on 9/7/2002, there is a small nondiagnostic Q wave in the inferior lead?
A. Yes.
Q. On 9/11/2002 there is a pathologic Q wave in lead 2, 3 and ADF?
A. There were at least two pathologic Q waves. Let's just go ahead and look at them. I'm not here to quibble with you. There are pathologic Q waves, whether two or three, in the inferior leads.
Q. If you're not going to quibble, then let's not waste our time.
A. Well, if you're not going to make an issue of it, I'm not going to make an issue of it. If you're not going to quibble over whether there's two or three --
Q. No. So maybe we should look at it, but based upon the -- strike that.
Based upon the 9/11/02 EKG, this was a Q wave MI, correct?
A. No.

Page 154

Q. And what's the basis of that -- or what -- what was it?
A. You've got fluctuation in the EKG. You've got no Q waves, nine -- what, 697. 9/11 we have one EKG obtained which shows very small Q waves that I'll agree by technical definition are pathologic Q waves. Subsequent to that, we have normalization of the EKG.
Q. What's your explanation as to why that went away?
A. I don't know whether it had something to do with position when the EKG was obtained, body habitus. He's got -- he appears to have pericarditis on there. I'm not sure whether that's creating an issue with this. I'm not sure that I have a real good explanation for why it pops up and then why it disappears, but I can tell you that from a clinician's standpoint in terms of looking at all of this data in this particular patient and what I'm going to do with him based on all that data, it really doesn't change things.
Q. Okay. Doctor, you would agree that the development of a Q wave is consistent with the evolution of his infarction, correct?
A. Again, you would need to take the totality of the data, and I would ask you to explain to me what you mean by evolution of the myocardial infarction.

Page 155

Q. Well, since I'm not a doctor, we'll go with your definition. What's your definition of the evolution of his infarction?
A. An evolution of an infarction would be ongoing tissue necrosis. Okay. We don't really have any evidence in Mr. Barnett that he's got ongoing tissue necrosis at the time that that EKG was done. We have a series of cardiac enzymes that are obtained which show a rise and a fall in the CK and the CKMB, which is an acceptable way to time and size an infarct. We do not have anything subsequent to that, nor is there any reason to believe on a clinical basis that he had extension of the infarction or as you -- I can't remember the term you used -- the ongoing evolution of the infarction. There's no clinical evidence for that.
Q. Well, part of the issue here is that there were no EKGs -- further EKGs done after 9/7/02 up until the time of his bypass?
A. Correct.
Q. And --
A. We have no reason to -- to ask -- you know, if I'm looking at this from the standpoint of reviewing the doctors, I don't necessarily have an issue with that. It would be nice to have them, but I don't have an issue with it. We have a rise and fall in the cardiac

Page 156

enzymes. We have characterized the infarction. We've sized it. He has no clinical evidence as he's progressing through his hospitalization that we've had a significant extension of the infarction. The EKG that's obtained post bypass certainly has -- certainly shows us evidence of pericarditis, which you'll commonly see post bypass.
Q. But at least -- and I know you're careful not to criticize the doctors down there in South Myrtle Beach. But at least in -- in your practice here in -- in Austin, you would do serial EKGs?
A. Sometimes you would and sometimes you wouldn't. You do tests to guide your clinical endeavor.
Q. You would have done it in this case?
A. I don't know whether I would have done it in this case. I think they had evidence that they needed to characterize Mr. Barnett's myocardial infarction. Whether you want to characterize it as an Q wave or a ST-segmented elevation or whether I want to characterize it as a non-Q, it's a small infarction. It's a small infarction. So let's -- let's get to the heart of the issue here. Let's -- let's not quibble over what the EKG shows. Let's look at what's going on with him.
Q. Okay. So he had a --
A. I would --

Page 157

Q. He had a small Q wave?
A. No. I would -- I would have characterized him as having a small non-ST elevation myocardial infarction. That's how I would have signed him out.
Q. Well, I think you're not going to quibble with this. The absence of a Q wave doesn't mean -- or doesn't negate that there was damage --
A. No. I'm not saying --
Q. -- or hypokinesis?
A. I am not saying that at all.
Q. So you would agree that the absence of a Q wave -- even in the absence of a Q wave, you can still have damage?
A. I didn't say that he didn't. What I said is that he had a small non-ST elevation myocardial infarction.
Q. What is hypokinesis?
A. Hypokinesis just means a reduction in the contractility of the ventricular wall.
Q. And Mr. Barnett had that?
A. He did.
Q. And he still has that now, doesn't he?
A. Not by my read. Well, let's go back through those things too. It's not just --
Q. We'll come back to that. Go ahead.

A. Well, if we're going to come back to them, we'll just save it.

MR. BRENNAN: I mean, if you -- if you have an answer to finish, finish it.

A. Well, I think when we look at the -- at the data --

Q. (BY MR. WACKER) We're going to come back to the -- you know, is that where -- May 2006, we're going to get there, so just hang on. We'll be there in a minute.

A. Okay.

MR. WACKER: Let's take a couple minutes here to use the restroom. Off the record.

MR. BRENNAN: Sure.

(Recess Taken From 4:59 p.m. To 5:16 p.m.)

Q. (BY MR. WACKER) Doctor, the ventriculogram shows abnormal contractility of the inferior diaphragmatic wall, which is in the distribution pattern of the PDA branch. Do you agree?

MR. BRENNAN: Objection, form.

A. It shows there is some hypokinesis in the inferior wall. Typically, that would be fed by a branch of the right coronary artery or a branch of the circumflex artery. In this case it's the posterior ascending artery.



Q. (BY MR. WACKER) And Mr. Barnett had an elevated LVE BP of 16?

A. That's correct.

Q. And elevation of the LVE BP is consistent with myocardial -- myocardial injury, right?

A. It can be, yes.

Q. Do you agree that collateral vessels are induced by coronary artery occlusion?

A. What in -- they can be. Typically, the way we view the development of collaterals is to say that there's ischemia in a particular area that then causes a process of angiogenesis, which is the development of new vessels, that then feeds the vessel by way of a retrograde flow rather than an antegrade flow. Rather than coming the normal pathway, it comes by way of these collaterals.

Q. And the current state of the literature indicates that collaterals respond as early as 15 minutes to a few hours to a myocardial ischemia by opening preexisting channels.

A. I'd want to know where that came from, whether that's an animal study or whether that's a human study. It is a fairly well-held notion that clinically significant collaterals that you would see on an angiogram occur over a long period of time and it is



generally not viewed as an acute process.

Q. Here, let me just show you this study here. Are you familiar with a study by Shigetake Sasayama and Masatoshi Fujita?

A. Let me just take a look at it.

Q. It says here in this article, "There is ample evidence that collaterals respond to myocardial ischemia by opening preexisting channels," right?

A. I haven't seen it, so I can't comment on that. I want to make sure you're not mischaracterizing what they're saying in here.

(Witness Reviews Document.)

Q. (BY MR. WACKER) Just so we're clear as to the question, I'm just -- Doctor, would you agree that collaterals can respond as early as minutes to hours?

A. I'm not going to respond -- I'm not going to answer that without looking at this article.

Q. Well, I'm just wondering aside from the article are you aware of that in the literature that --

A. It's generally not something that we -- that we hold in a clinical notion -- as a clinical notion. And, again, there may be a difference -- there may be a difference between the recruitment of collaterals or opening up these channels in the actual development of the channel. That may be two different separate



processes, and that's why I'm taking the time to sort of go through this.

Q. Well, I guess do you dispute that collaterals can occur as early as minutes to hours?

MR. BRENNAN: Objection, form.

A. I -- I have not had an opportunity -- if -- I haven't had an opportunity to look at that -- this article --

Q. Well, let's just leave --

A. -- to --

Q. Let's leave the article aside.

A. Well, no. I mean, if the basis of -- of what you're asking me is this article and solely this article, then I would like at least an opportunity to look through the article to make sure that I understand exactly what the authors are concluding and -- and how they came to those conclusions and to make sure that we're not mischaracterizing what they're attempting to say.

Q. I'm -- I'm not by any means suggesting that this is the only article on the topic. I brought here six boxes worth of stuff. And, obviously, I couldn't bring every article on collaterals, but what I'm -- what I want to know is if you agree that -- that collaterals respond or can respond to myocardial ischemia within

minutes to hours?

(Witness Reviews Document.)

A. All right. And I'm sorry, the question was?

Q. (BY MR. WACKER) The question is, do you agree that collaterals can respond as early as 15 minutes -- or minutes to hours to myocardial ischemia?

A. I'm going to give a two-part answer because it's important not to misunderstand what's going on here.

Over a period of time, you may develop collateral circulation, which may or may not come into play. The issue addressed in the paper is in the presence of myocardial ischemia, can you then recruit those existing collaterals to profuse the jeopardized myocardium. And they conclude that that occurs.

Q. Okay. Well, that doesn't --

MR. WACKER: I'll object as nonresponsive.

Q. (BY MR. WACKER) It doesn't answer my question.

Do you -- is it your opinion that collaterals can respond as early as minutes to hours to myocardial ischemia by opening existing channels?

A. Preexisting collaterals, in other words, we are presuming collaterals exist, yes, they will open in response to ischemia.

Q. Now, you're saying collaterals exist. Aren't



you talking about preexisting channels?

A. And this is where we have to be very careful as we go through this. The issue is not the development of the collaterals, the issue is the recruitment of the collaterals to allow flow to an area that is jeopardized.

Q. Well, it says here there is ample evidence that collaterals respond to myocardial ischemia by opening preexisting channels, right?

A. Exactly. You're -- what's -- what they're saying is the collaterals exist. We now give an ischemic insult to a region that would be fed by those collaterals. Those collaterals now come into play to preserve the jeopardized myocardium. It does not say that within 15 minutes or two minutes or whatever of an ischemic insult that collaterals are developed and are recruited. What they're saying is these channels exist. Okay. And then when we impose an ischemic insult into that region, these collaterals, in response to that ischemia, open up and allow blood flow to go into that area.

That's a different notion than saying that ischemia causes the formation of those collaterals at that point in time. Those collaterals exist. They're then recruited in.



Q. Do you believe that collateral circulation formed in this case, in Mr. Barnett's case, as evident on the 9/6/02 angiogram?

A. Yes. He had collateral circulation, yes.

Q. And do you believe that that occurred acutely?

A. No.

Q. So it's your opinion that that occurred chronically?

A. Let me make sure that we're clear. The development of the collaterals takes a period of time. So you've got this anatomic basis, the collateral vessels. The recruitment of them could be, based on their analysis, an acute process where those vessels are now asked to come into play to preserve the myocardium. In other words, when you have sufficient antegrade flow so as not to cause ischemia, these collaterals may in a sense, for lack of a better term, may go dormant.

In the setting of a significant drop in antegrade profusion resulting in ischemia, these collaterals are recruited very quickly. And that's the notion I think that they're coming at there and I think that would be the notion that we see that supports what we see in a clinical setting in that patients who have collateral circulation generally have a limited amount of damage in the area of infarction compared to those



who don't have collateral circulation.

Q. So it's your opinion that the collaterals preexisted the myocardial infarction?

A. Yes. They did not occur at the time of the myocardial infarction. They existed. They were probably recruited at that point to allow better flow into that part of the myocardium, thus preventing Mr. Barnett from having a larger myocardial infarction.

Q. What evidence do you have that there was inferior wall ischemia requiring collateralization before the MI on 9/6/02?

A. Well, I think we have to look at the totality of the evidence. We don't ascribe to the notion that collaterals form at the time of the infarction. Collaterals have to preexist, then the collaterals are recruited in to allow for a dimunition of the ischemic effect.

So I can't point to anything in Mr. Barnett's case specifically that says I've got evidence based on a scan or I've got evidence based on an angiogram that preceded his event that says he had collaterals. But based on what we know about collateral circulation, we would -- we would know that those collaterals predated the day of the infarction.

Q. The collaterals that you're talking about were

Page 166

in the left coronary artery, right? I should -- strike that.
The collaterals that you're talking about were in the left coronary artery on that side of the heart, true?
A. No. His collaterals arise from the left coronary system and feed the posterior descending artery which arises from the right coronary system. So let me give you a little drill on that. You could have a --
Q. I don't need a drill, but you can explain it.
A. Okay. Poor choice of terms.
If you have an occlusion in the right coronary system significant enough over a period of time to cause the development of collaterals, you will begin to see the vessels coming from the left to the right. Okay.
On the other hand, let's say we have a significant occlusion in the left coronary system, one of the two vessels in the left coronary system, either the anterior descending artery or the circumflex artery. You may develop collaterals which arise in the right coronary artery and then feed the occluded or severely stenosed left coronary artery.
You can also have left to left coronary collateral circulation. A significant stenosis in either the circumflex or left anterior descending artery

Page 167

could give rise to collaterals that then feed the obstructive vessel. The nonobstructive vessel would feed the obstructive vessel.
Q. Okay. So in this case, it's your opinion that the collaterals were on the left side towards the left coronary artery and then fed the right coronary artery where the --
A. When we describe collateral circulation, you have to describe where it's coming from and where it's going to. In Mr. Barnett's case, the collateral -- or collaterals are arising from the left coronary system and feeding the posterior descending artery which is arising from the right coronary system.
Q. Okay. And on January 24th, 2000, what area of the heart was there shown an abnormality?
A. In the lateral wall.
Q. Which is on the left side or the right side?
A. Could be -- depending on the exact anatomy that you look at, could be fed by either a very large posterior lateral branch arising from the right coronary artery or could be fed by an obtuse marginal artery fed by the circumflex artery. So it would be -- it could be consistent with obstructive disease in either distribution depending on the anatomy.
Q. Okay. Mr. Barnett underwent testing in May of

Page 168

2006 at the Krannert Institute of Cardiology, correct?
A. That's correct.
Q. And you've reviewed those records?
A. I have reviewed the records and I have reviewed the echo tape or the -- a DVD of the echocardiogram performed on him.
Q. Now, you mentioned previously something you didn't review. What was that?
A. I was unable to open the DVD that had the images of his myocardial profusion scan. It opened, but it didn't give me usable pictures. There was some -- what appeared to be little cartoon -- not cartoons in the usual sense, but there was a number of different images on there, none of which that I would say had anything close to being a -- would look like anything close to a profusion scan.
Q. Did -- did that inhibition of your -- did -- strike that.
Did that inability on your part to review those in any way impede your ability to offer opinions in the case?
A. Well, the only way that it would impede would be insofar as if I looked at the scan and did not agree with the reader of the scan. That would be the only way.

Page 169

Q. Well, do you plan on doing that prior to trial?
A. If somebody could get me a copy that I could actually open up, I would like to look at it.
Q. So that's one thing that you want to do before a trial is look at that --
A. Yes.
Q. -- in a fashion that you can open it up?
A. Right.
Q. And you're not prepared to do that here today because you couldn't open it?
A. If -- I think your assistant -- I gave her the disk and asked her if she could open it up. And if it's open and you guys can show me, I'll take it. I'm not prepared to look at it today.
Q. Well, she did open it. I saw it, so...
A. Okay. And you saw profusion scans? I mean, it opens, it will show you images on there, none of which I could make heads nor tails out of.
Q. All right. Let me just state for the record that should you, you know, review those scans and intend to offer opinions at trial about those scans, then out of fairness we're entitled to depose you on those -- on that issue because we haven't been able to do that at this point.
MR. BRENNAN: Just this one point of

clarification. He did say that the only way it would affect his opinion at all would be is if his reading differed from the reading of the guy that generated the report.

MR. WACKER: Right. But we don't know -- we don't know what that answer is until he reviews it.

MR. BRENNAN: Correct. But I'm saying if he reviews it and agrees with the guy that generated the report, he's read the report.

MR. WACKER: Well, then -- then we're just going to want to confirm in a depo under oath that he agrees, and it would be very -- it would be a telephone depo, one question. We can get it done. If he disagrees, then we'll have some more questioning.

Q. (BY MR. WACKER) Okay?

A. I don't think it's my decision.

Q. No, it's not your decision. I'm just letting you know --

MR. BRENNAN: We'll cross that bridge if we get there.

MR. WACKER: Okay. Might need some collaterals to cross the bridge.

MR. BRENNAN: But they'll take a long time to form, so...

MR. WACKER: Not with our US Marines. They



build those bridges quick.

Q. (BY MR. WACKER) Okay. The -- well, okay. So the -- the examination that Mr. Barnett underwent in May of 2006 by Dr. Zipes showed permanent damage to the inferior wall of his heart, right?

A. I don't know if we can say that at this point. And I'll leave it at that.

Q. And what's the basis of your inability to say that at this point?

A. If we accept the readings of the nuclear scan -- and I'll go specifically to the profusion portion of that.

Q. Let me --

A. Moderate -- okay. I'm sorry.

Q. Show me where you're -- here, let's go off this and so that I can follow it on.

A. Okay.

(Deposition Exhibit No. 5 Marked.)

Q. (BY MR. WACKER) And just for the record, I've handed you Exhibit 5.

MR. BRENNAN: Just for the record, can he identify what Exhibit 5 is?

MR. WACKER: Yeah. Exhibit 5 is Dr. Zipes', you know, May 2006 testing and examination records.



A. If I could also just maybe perhaps expand that a little bit. It -- Deposition Exhibit 5 is the stress test report which includes the blood pressure tracings, the EKG tracings and a summary of those findings. It includes an interpretation of the myocardial profusion images which accompanied that stress test. It includes a report of a CT angiogram performed on Mr. -- CT angiogram of the coronary arteries and bypass grafts performed on Mr. Barnett on the 2nd of May. And it also includes a report of the echocardiogram performed on Mr. Barnett on the 2nd of May.

Q. (BY MR. WACKER) Let me ask you, Doctor, do you have any reason to believe that any of the information contained with any of the -- the reports that you just read is inaccurate?

A. In what way?

Q. In any way, broadly speaking.

A. My interpretation of the echocardiogram is different than their interpretation of the echocardiogram. I don't have any issue with their interpretation of the EKG tracings. I would have no way to verify their recording of the blood pressure or heart rate, but I would find that distinctly unusual that that wouldn't be recorded in a proper fashion.

I have no way to comment on the myocardial



profusion images because I could not open those -- those images on my computer. And I have no way to comment on the findings of the CT angiogram because images of that test were not made available to me.

Q. Okay. But the one area you did mention you had disagreement on which particular test?

A. The echocardiogram.

Q. And let's go -- let's -- let's start there. And what were the findings on the echocardiogram?

A. Do you want me to read their findings on the echocardiogram?

Q. Yes. Start with their findings.

A. Okay. This is an echocardiographic report --

Q. Let me just see where you're at there. Okay.

A. This is labeled as an echocardiographic report 2nd of May, 2006, 1:46 p.m. It's on Gerald Barnett. Referring physician is Dr. Zipes. There's some demographic information about Mr. Barnett and then it goes into a description of --

Q. Let's just get to the area where you disagree.

A. Okay. Well, let me read what they say because I think it will provide a framework for where we're going to disagree. Number -- we'll start with the chamber sizes. They say left atrial enlargement. I disagree with that.

Q. Hold on. I've got to get -- I've got to get on the same page.
A. Be right down at the bottom, second line from the bottom. And I may --
Q. Hold on. Let me just -- okay. Left atrial --
A. Left atrial -- I'm sorry -- they call it left atrial dilatation.
Q. And you disagree with that?
A. I do.
Q. What do you think it is?
A. I think that his left atrial size is normal based on both my view -- my review of the 2D examinations as well as the M-mode examinations. Interestingly, they're --
Q. I'm sorry, 2D?
A. 2D examination and M-mode examination.
Q. Okay.
A. And I'll point to you -- point out to you that there are a number of parameters at the top of this report that are what are called M -- well, some of them are M-mode parameters.
Q. Okay. Do you have a criticism or problem with those?
A. No. It appears to me that they say that the LA systolic, which would refer to the left atrial systolic



diameter LX -- I presume that's long axis view -- 3.7 centimeters. Normal in their laboratory is 2.1 to 3.7.
Q. Okay. So do you have -- it says LA systolic diameter LX 3.7?
A. I presume that's their way of reporting out the left atrial dimension in the parasternal long axis view using a M-mode measurement.
Q. So do you disagree with that?
A. Well, all I'm saying is that when they actually measured that, whoever measured this, that's within their normal limits for left atrial size. I --
Q. But it's at the upper bound?
A. It's within their normal limit at the upper bound. Secondly, I agree with them stating that normal global left ventricular systolic function.
Q. Sorry, that you agree with that?
A. I agree that --
Q. Well, I just want the areas where you disagree.
A. Oh, you just want the disagreements. Okay.
There may be a -- I think that it's -- although it was not prominent to my eye, that there could be paradoxical septal motion consistent with a postoperative state, so I'll agree with that.
I would disagree with the finding of a



hypokinetic midlateral wall.
Q. What's the basis for that disagreement?
A. My read of it. I just simply did not see any hypokinesis in the midlateral wall when I looked at the echo.
Q. And what -- how do you define what would determine a hypokinesis in that midlateral wall?
A. What you want to look at is -- is how well does the wall move off a defined point or how well does the myocardium thicken. It appeared to me that the myocardium in that area thickened and it moved in off of a reference point.
Q. Is that a, you know, judgment call or subjective analysis based upon a doctor reviewing it or are there parameters that are sort of set in stone?
A. Well, there are -- you know, there are guide -- well, I shouldn't say guidelines. We're taught to read these in a certain way. But to cut back to your question, that can be a -- a call that could be considered semiquantitative. There's no quantitative way for me to put this echo into a machine and say I measured it coming in so many millimeters and therefore it's truly contractile versus hypocontractile versus akinetic. So when you look at echos, it's really a semiquantitative evaluation.



Q. But it -- I mean, there is -- there is some exercise of judgment on a physician about --
A. On --
Q. -- about whether there's hypokinesis?
A. There could be, yes. There would be exercise of judgment.
Q. So, you know, two physicians reading the same report can come up with two different opinions and that's not -- that happens?
A. Two physicians reading the same echo, yes.
Q. So you're not -- what you're saying is you just don't agree with that --
A. You just asked me where I disagreed.
Q. Okay.
A. I'm not -- you know, I'm not questioning what they saw. If that's what they think they saw, that's fine. I'm not questioning anything about it. I'm just saying that's where I disagreed with them.
Q. I guess you're not questioning the individual reading, its integrity, in review --
A. Absolutely not.
Q. Okay.
A. They then talk about -- or whoever read this -- let's see. Who was the reader? Whoever the reader was. I can't pronounce his name or her name, but I'll just --

Page 178

it's in the report. Then talks about severe hypokinesis of a basal -- basal posterior and basal inferior walls when --

Q. I've lost you.

A. Next page.

Q. Where?

A. I'm sorry. Right over here.

Q. Okay.

A. There appears to be some angulation artifact in some views which may exaggerate that finding. In the peristernal short axis views, there appears to be an angulation of the transducer. Typically, when we look at the myocardium in the parasternal short axis view, we want an almost perfect donut look of the ventricle -- or -- or as close to a circle as we can get. This has an elliptical look to it. So it -- it would suggest that the angle of interrogation may be off a little bit. And that can lead to some errors in terms of assessing wall motion abnormality.

Q. So do you believe they made an error in their assessment?

A. Without me being able to -- to question the echocard -- well, in fact, by now I doubt that the technician would know whether they did that or not. You have to be able to look at it and see. Now, I'm not

Page 179

saying that for sure they did, but it raises that concern in my mind that the -- that the angle of interrogation may have been off a little bit.

Q. I -- here's the question: At the end of the day, can you say to a reasonable degree of medical probability that the diagnosis of severe hypokinesis in the basal posterior/basal inferior area's wrong?

A. Can I say that it's wrong?

Q. Yeah.

A. Based on what we've already talked about where reasonable physicians can disagree?

Q. Well, yeah.

A. No, I can't say that.

Q. Okay. That's just -- that's just an area where you disagree?

A. I disagree.

Q. And so what would your -- if you had to describe this, first of all, going up to the hypokinetic midlateral basal lateral, what would you -- how would you describe it?

A. Well, what I generally do as I generate an echo report is I dictate what it is we're doing and then I have a summary of findings. I generally start with cardiac chamber sizes. I then move to left ventricular wall thickness overall, left ventricular function with

Page 180

mention of any particular regional wall motion abnormalities and then an estimation of the ejection fraction. I then move to a --

Q. You -- it's a long-winded explanation to just -- I just want to find out what you would call that.

A. I'm sorry. I thought you asked me how I read -- or how I report these --

Q. No. I just want to know --

A. I'm sorry. I'm sorry.

Q. I just want know what you -- you said you disagree with the finding of hypokinetic midlateral basal lateral.

A. And then you asked me how I would report it out. I would -- I wouldn't even necessarily -- if it's not there, you wouldn't comment on it.

Q. Okay. So you just believe it's not there?

A. I don't see it.

Q. Okay.

A. But I don't want you to mischaracterize what I'm saying. When I dictate a report, I don't -- I don't -- if it's not there, I will make a comment that the left ventricular ejection fraction is normal. The estimated left ventricular ejection fraction is X. There are no regional wall motion abnormalities. I make

Page 181

a specific point to make that comment so that people know that I've looked at it and that there are no what we call regional wall motion abnormalities. This is what we would call a regional wall motion abnormality. It's a particular segment of the heart that's not functioning normally according to their read of it.

Q. So that --

A. And I disagree with that.

Q. You disagree with it?

A. I do not see this midlateral wall hypokinesis.

Q. And, again, was this -- was this particular cardiac study overread by another physician at that institution?

A. Well, it appears that the reader -- it says "conclusion" and it says "report by." And then there's a Jo. And can I just spell the last name? M-a-h-e-n-t-h-i-r-a-n, M.D. And then it says, "Edited by Debbie A. Green-Hess." I would presume that Debbie Green-Hess is a echo tech, what we refer to as the echo tech, the person that actually performs the study. I am assuming that the other -- the person who I listed as the doctor is the actual reader of the echocardiogram, the actual physician reading it.

Q. You lost me there.

A. Am I confusing you?

Page 182

Q. Well, you lost me in all those names.
Do you -- do you -- was this overread by another physician?
A. Oh, I'm sorry. I shouldn't have -- yeah, a physician read this.
Q. And then was it read again?
A. I don't know.
Q. Okay.
A. It's not indicated on this report. It looks to me like one person read the echo.
Q. Okay. All right. You want to mention some other areas where you felt there was disagreement?
A. Yes. With regard to the finding of diastolic dysfunction, I didn't see evidence for diastolic dysfunction based on what I could see on the echo tape.
Q. And, again, is that an area where reasonable physicians can disagree?
A. In this particular area, I think there is some evidence that would suggest that perhaps this was not acquired in the usual fashion. The -- when you use pulse wave doppler data to -- to determine diastolic dysfunction, you typically take the cursor and you place it below the mitral valve on the ventricular side of the chamber. Understand there's the left atrium which then empties into the left ventricle.

Page 183

The cursor is placed below the left -- below the mitral valve or right at the valve leads on the ventricular side, because what you're trying to obtain is information about the velocity of flow going into the left ventricle. In one instance that cursor is placed below the valve. And based on the characteristic wave form, the E to A ratio, the diastolic filling would appear to be normal. The cursor is then moved back to the -- at the level of the mitral valve and then above the level of the mitral valve and then that pattern reversed. And I don't think that can be used as a reliable wave form when you're trying to make a diagnosis of diastolic dysfunction. And I think that would be the areas of -- of disagreement.
Q. Okay. And that was all discussing the nuclear --
A. No. This is discussing the echocardiogram.
Q. I'm sorry. That's right. Do you have any reason to believe that the May 2nd, '06, nuclear stress test is inaccurate?
A. The E KG portion of the exam, I had an opportunity to review and I'm looking at it now as we talk. And I see nothing on this stress test -- or the EKG portion of the stress test that is -- my interpretation, let me summarize, is not different than

Page 184

their interpretation of the EKG portion.
I have no reason to believe or to question the voracity of their blood pressure and heart rate recordings. And I have not had an opportunity to review the nuclear scan, so I can't really comment on that.
Q. Well, looking at Exhibit 5 in total, is there anything in here where you are questioning the voracity of what was done?
A. Well, if -- well, I'm not questioning that anybody did this purposely improperly, if that's what you're getting at. I do have some issues with the angle of interrogation and perhaps where the pulse wave cursor is placed for the purposes of obtaining the mitral inflow pattern.
Q. Are you suggesting to the court that this was done intentionally by the technician to overstate the damages in the case?
A. No. In fact, I just said that. I said I did not -- I'm not making that contention. I'm just saying that I think there's some things that technically could have been performed perhaps a little differently and I'm not questioning why that happened. I'm not questioning whether they did it for the purposes of this litigation.
Q. Did you ever tell anything to Andy Goldman or the defense counsel that there was anything

Page 185

inappropriate that went on with regard to any of these, you know, tests that were performed?
A. Did I ever say that they were inappropriate? And by that, do you mean that it was purposefully done in a fashion to get a certain result?
Q. Right.
A. No.
Q. Okay. What -- what did you say to Mr. Goldman about these tests?
A. I basically gave -- I don't know that I ever talked to Mr. Goldman about this particular test.
Q. Who did you speak with?
A. I may have talked to Joe Tomaselli, I may have talked to -- I don't know whether Sean was there or not. I honestly don't remember who it was that would have wanted this particular piece of information.
Q. What -- what did you relate to them specifically about your views as to whether --
A. I felt --
Q. -- whether information was inaccurately recorded?
A. Oh, I don't know that I ever commented on that particularly. I just said basically I disagree with the -- with their interpretation of the findings of this echocardiogram.

Page 186

Q. And you've discussed those today?
A. Today, yes.
Q. And there's nothing else to discuss on that?
A. No.
Q. Do you believe that the nuclear studies suggested ischemia that should be further assessed with a coronary angiography?
A. Again, relying solely on their report, this would be suggestive of myocardial ischemia. It appears -- you know, I don't know because I cannot speak for their thinking. It appears that then to follow up on that, a CT angiogram was performed to assess the state of the native coronary arteries as well as the bypass grafts.
Q. On the CT angiogram, do you believe that this study suggests occlusive disease in any vein grafts?
A. It does.
Q. Which one?
A. The reader states that -- let's see here. The reader makes a comment "occluded vein graft." They do not comment to where this vein graft goes. Says, "There is no additional vein graft arising from the ascending aorta which has its origin more superior to the vein graft which extends to diagonal 2. This vein graft appears to be -- this vein graft appears is totally

Page 187

occluded shortly after its origin."
Q. Do you disagree with that finding?
A. I would have no way to agree or disagree since I don't have -- since I haven't had an opportunity to review the CT angiogram.
Q. And that's the one thing that you mentioned earlier that you wanted to do?
A. I would like to have the opportunity. This is little bit more difficult. The software for this is not going to be as easy as downloading the software for those other studies.
Q. Do you believe that the CT angiogram suggests progression of native disease?
A. I don't think we can make that comment based off of a CT angiogram.
Q. Do you believe that any of the May 6th tests were inappropriately altered or amended?
A. No.
Q. If you can turn, Doctor, to the CTA. Under the area of the right coronary artery.
A. Yes.
Q. Are you with me?
A. Uh-huh.
Q. First, can you read that for the record?
A. "Right coronary artery: The right -- the RCA

Page 188

contains calcified plaque proximately and calcified and noncalcified plaque in the mid and distal portion of the native vessel. There is mild to moderate narrowing without significant stenosis in the proximal right coronary artery. The distal right coronary artery is totally occluded. The posterior descending artery and posterior" -- well, "PDA," which is posterior descending artery, "and PLV," posterior lateral -- or posterior left ventricular "branches are patent."
Q. Okay. So the impression says, No. 1, "Native coronary artery disease as detailed above including a significant stenosis greater than 70 percent in a proximal OM-1."
A. Correct.
Q. Do you agree with that?
A. Do I agree that that's what they said? Yes.
Q. Well, do you agree with the finding?
A. I can't because I can't --
Q. Okay. That's the same --
A. Yeah. I mean, let me -- let me try to address that in another way. We all know that Mr. Barnett had a 50 percent left main stenosis at the time of his angiogram in September of 2002. The reader of this report states that the left main is widely patent without stenosis or plaque.

Page 189

Q. So what is your -- what is your opinion on that?
A. It's at odds with what we saw before.
Q. And then No. 2 says, "Three patent bypass grafts as detailed above. One vein graft is occluded."
A. That's what it says.
Q. And, again, at this point you have no reason to disagree with that?
A. Well, I'm questioning based on this read of the left main that says the left main is widely patent without stenosis or plaque. And we know from the angiogram that was performed in September of 2002 that he had a 50 percent left main stenosis.
Q. Any other basis?
A. It raises a concern. I would -- I can't -- I don't have anything else -- I suppose what we could do is go back and look at his angiogram report from 2002 and just try to match up what we see on that with what we see on this CT angiogram in terms of the native coronary vessels.
Q. At least it's possible that that could be wrong back in 2002?
A. Oh, I think highly unlikely. And I personally reviewed it and I completely agree with Dr. Caravan's assessment of what he saw on there and I agree with

Dr. Bryan's assessment of what he saw on there. So I think that's highly unlikely to be wrong.

Q. All right. And you haven't had a chance to review this one?

A. That's correct.

MR. BRENNAN: Ted, do you mind if we take a two-second break?

MR. WACKER: No. Go ahead.

(Recess Taken From 6:08 p.m. To 6:15 p.m.)

Q. (BY MR. WACKER) Now, Doctor, going back to this earlier issue about this, you know, allegation of some sort of nefarious conduct or, you know, whatever, I mean, that's where we were getting from -- you know, from the defense, that they wanted all these, you know, reports and all this. So I just want to clarify this because it's obviously disconcerting and I want to know what happened here.

But are you saying that there was anything nefarious that went on with this echocardio -- this cardiac echo?

A. No.

Q. Okay. Now -- and when it says -- like in the -- in the report where it says conclusion reported by Jo Mahenthiran, edited by Debbie A. Green-Hess, amended 3rd of May, you're not suggesting that the fact



that the echo is done on May 2nd, it was edited, that there was anything nefarious that went on?

A. I don't have any way to say one way or the other. I'm not -- I'm not suggesting that.

Q. You're not making that allegation?

A. I'm not making that allegation.

Q. And did you make that allegation to defense counsel?

A. No.

Q. So they came up with that on their own, I guess?

MR. BRENNAN: Objection, form.

MR. WACKER: That calls for speculation.

Q. (BY MR. WACKER) All right. On the myocardial profusion treadmill -- do you have that? Part of Exhibit 5.

A. Yes.

Q. The impression is abnormal myocardial profusion at rest and post stress, right?

A. I'm sorry. What page are we looking at that conclusion? Okay. I'll get to it. Thank you. Appreciate it. Hang on and let me get to my copy, and that way you can have yours. I'm now with you.

MR. BRENNAN: Can you read the question back, please?



MR. WACKER: I'll do it again.

Q. (BY MR. WACKER) Impression is abnormal myocardial profusion at rest and post stress?

A. That's correct.

Q. Do you agree with that finding?

A. That's how they report it, yes.

Q. Do you agree?

A. Well, again, I can't agree or disagree with anything other than their read because I haven't had an opportunity to look at the scan. But that's what they say.

Q. And it says, "Moderate area of mildly reduced profusion in the inferior and basal inferolateral segments which is partially REV. Rest images suggestive of mild stress induced ischemia." You see that?

A. Yes.

Q. What -- what does that mean?

A. Let me just -- let me read it in. It says, "Moderate area of mildly reduced profusion in the inferior and basal inferolateral segments which is partially reversible" -- I presume that's what they meant -- "rest images suggestive of mild stress induced ischemia." I'm not quite sure I'm following them there. I think if I can piece it together, what they're saying is that you're going to look at two things on this scan.



You're going to want to look at the size of the abnormality and you're going to want to look at the severity of the abnormality. And they're saying that there is a moderate area of mildly reduced profusion in the inferior and basal inferolateral segments. And then it looks like they want to make some sort of a comment that it's partially reversible.

Q. Now, is that just -- for the jury, is that the area where the damage was to the heart from the heart attack on September 6th, 2002?

A. There was not any --

MR. BRENNAN: Objection, form.

A. Okay. The area of hypokinesis on the left ventriculogram performed in September of 2002 showed a mid-inferior wall hypokinesis. So this is a little bit different than what we saw at that time.

Q. (BY MR. WACKER) How was it different?

A. It's in a different region. As you look at the heart, it's shaped like a bullet. The blunt end or the back end is called the base. That's where the valves are. As you go further out, you get to the apex. Okay. So the apex -- let's say you have the apex and you might have a distal segment, a mid segment at proximal and you might have a basal segment. They're commenting about findings in the -- they talk about the

inferior wall, but they don't specify where in the inferior wall. Then they talk about basal inferolateral segments. And then it says that -- and so I don't know where in that inferior wall they're talking about. They don't -- they don't quantify -- not quantify it. They don't qualify that any further.

Q. It says, "Septum motion consistent with post-op state, subtle basal inferior hypokinesis," right?

A. I'm sorry, on the scan?

Q. Yeah. The next one down.

A. Yeah. That's what they say. Which seems to be --

Q. What is --

A. I think -- it seems to be that they're repeating themselves, again, because they talk about -- no, I'm sorry. You're right. They say, "Septal motion consistent with post-op state. Subtle basal inferior hypokinesis." They're now describing the isotope ventriculogram, the assessment of the left ventricular function.

Q. Doctor, is all of this -- these tests consistent with the fact that Mr. Barnett has damage to his heart from the myocardial infarction of September 6th, 2002?

A. What we have to keep in mind here -- and I'll



qualify it in my answer -- is there are the tests and then there is the reality of what's going on in the patient. We cannot necessarily infer from the stress test -- or from the Cardiolite scan or the isotope ventriculogram -- part of the isotope -- or part of that Cardiolite scan that he necessarily has permanent damage or damage done to the heart that's irreversible.

By my echo reading, I would say that's probably not the case. We also have evidence from the CT angiogram which suggests or states that there is no left ventricular dysfunction. The conclusions by the reader of that particular study state that there is preserved global and regional left ventricular function. That's the summary. Prior to that they go through in detail each of the various things that they're looking at and they have a comment about cardiac function. The left ventricular function is qualitatively normal. There is normal systolic thickening of all segments of the left ventricular wall with no evidence of wall motion abnormality. So to -- to make a long-winded answer come to its conclusion, you have to take all of the data that you have before you make a statement that he has or has not had permanent damage done to the heart that's clinically significant.

Q. Well, what -- what is your opinion about the



damage that he has to his heart as of May 2006?

A. Based on my review of his echocardiogram, I feel that he has well-preserved left ventricular systolic function with a normal ejection fraction. And that based solely on -- because I have not had an opportunity to review the other pieces of data which are conflicting, but based on that echo read, I think that he has a good prognosis based on his left ventricular systolic function.

Q. And the -- that's based on the echo?

A. Right. And then if we were to take --

Q. Now, what if you just look at results from the tests that you haven't had an opportunity to look at?

A. Well, let's -- let's take those two tests and let's say that I don't get an opportunity to look at them. I would say that the -- the totality of the evidence here says that he's going to do well. His ejection fraction is well-preserved even on the isotope ventriculogram. That's the nuclear test. The overall left ventricular ejection fraction is normal.

Regardless of whether you agree with my reading of the echocardiogram or the doctor in Indiana's reading of the echocardiogram, his overall left ventricular ejection fraction is normal. That's a positive. So we've got two positives lined up.



The third positive that we've got lined up is we have an assessment of his left ventricular function on the CT angiogram and they state that his LV function is normal in its -- in total and that there are no regional wall motion abnormalities. So if we take all of that information together, I would contend that that should be reassuring that Mr. Barnett's prognosis is good.

Q. Good, but not excellent?

A. Well, let's be a little more precise. If we start looking at five-year survivals and things of that nature, I would certainly expect Mr. Barnett to be alive in five years as long as his cholesterol levels are well-controlled.

Q. So is that a good prognosis or an excellent prognosis?

A. I guess I'd say he has an excellent prognosis. I full well expect Mr. Barnett to be alive in five years.

Q. And so --

A. So I guess I'll change that and say that it's excellent.

Q. So your report says both good and excellent. So do you want to pick one or the other?

A. Why don't we come down with excellent, then.

Q. So you want to change -- you want to amend your report today?

A. Let's -- let's do this: I think that he's going to do very well. We can call it good, we can call it excellent. I full well expect him to be alive at five years and fully functional. And whether I'm inartful in the way that I've coined -- or -- or placed things is -- should not -- it doesn't change my opinion.

Q. Do you have any opinion as to whether Mr. Barnett suffered a heart attack -- a second heart attack after his September 6, 2002, heart attack?

A. I think on balance the evidence would suggest that that is not the case.

Q. And what do you base that on?

A. The echocardiographic findings based on my reading of the echocardiogram, the findings on the CT angiogram, those two things. No change in his EKG compared to his original EKGs, granting that there was a change on the EKG on the 11th, but a reversion back to a normal EKG subsequent, nor any clinical episodes that we would necessarily say fit with a myocardial infarction. So I think if we look at the assessment of LV function based on all the studies but in particular on the CT angiogram and the echocardiogram, you look at his EKG remaining the same and you see that there is really



no -- no charting in his records that would suggest that he had an event that would be consistent with a myocardial infarction.

Q. You agree that heart attacks don't happen in a moment, rather they happen over periods of hours if not longer, right?

A. Well, everything will have an initiation point. And so I guess I'm not quite sure I understand what your question is. Are you talking about the myocardial necrosis associated with the occlusion of the vessel.

Q. I'm just talking -- let's just stick with that statement. Heart attacks don't happen in a moment, right?

A. I don't even know how to respond to that. That doesn't sound like anything that any doctor that I've ever dealt with would use.

Q. And then -- but they happen over a period of hours if not longer, correct?

A. Again, I think we have to be very specific about what we're talking about. Are you talking about occlusion of the vessel or are you talking about the myocardial necrosis associated with the occlusion of the vessel?

Q. Either one.

A. You can have very abrupt occlusion of a



coronary artery. That can happen within a matter of minutes. You can have plaque rupture with resulting thrombosis in the vessel and that can occur very quickly. The myocardial necrosis, which is a result of that occlusion, takes place over a period of hours.

Q. Well, in Mr. Barnett's case, did his heart attack happen over a period of hours, if not days?

A. There is evidence if you look at the records, look at the recordings of the CK, CKMB and Troponin I, that the myocardial necrosis appear -- occurs over a period of time. I don't think anybody argues that myocardial necrosis is an instantaneous process in the setting of a thrombotic occlusion of a coronary artery. It's a process that depending on how long -- let's -- let's take a couple of different scenarios. If the vessel is occluded and remains occluded, then it will take hours for the complete necrosis of the myocardium subtended by that occluded artery. If that occlusion is intermittent, that process can go on longer or maybe arrested earlier.

Q. Yet after a heart attack, the heart muscle is no longer as healthy as it once was. So heart attacks can lead to other heart problems such as heart failure or arrhythmias, true?

A. Let me qualify that. You have to look at the



clinical significance of the myocardial infarction. I shouldn't say the clinical. You have to look at the degree of myocardial necrosis.

In Mr. Barnett's case, based on everything that we know about him, his myocardial infarction was relatively small and did not result in significant left ventricular impairment. There are some myocardial infarctions that occur resulting in substantial myocardial necrosis resulting in the things that you mentioned, left ventricular dysfunction, heart failure and subsequent risk of dysrhythmias.

Q. So you disagree that in general heart attacks can lead to other heart problems such as heart failure or arrhythmias?

A. I don't disagree. But, again, it depends on the size of the myocardial infarction.

(Deposition Exhibit No. 6 Marked.)

Q. (BY MR. WACKER) Dr. Roach, I've handed you Exhibit 6, which you recognize, correct?

A. Yes.

Q. This is a report that you've read, right?

A. Yes.

Q. And this is the report of Douglas Zipes, M.D., correct?

A. Yes. Dated May 22, 2000.

Q. Do you know Dr. Zipes?
A. I do not.
Q. Do you know that he's the editor of Braunwald's cardiology text that you subscribe to, right?
A. I saw in his report that he -- that is one of his duties -- or that he was at one time an editor. I guess he still is.
Q. Does his name appear in your Braunwald's edition of cardiology?
A. I don't know.
Q. Do you have any criticisms of Dr. Zipes' background and qualifications for offering the opinions that he has offered in this case?
MR. BRENNAN: Objection, form.
A. No.
Q. (BY MR. WACKER) Do you have any criticisms of the methodology in which he used to prepare his report and offer his opinions?
MR. BRENNAN: Objection, form.
A. I can't comment either way on that. I don't know the methodology that he used to prepare the report.
Q. (BY MR. WACKER) So since you don't know, then you have no criticisms, true?
A. That's not true.
Q. Well, then you do have criticisms?



A. I do.
Q. What are the criticisms?
A. Do you want to go through them?
Q. Well, I thought you just said you didn't know because --
A. You asked me about the methodology.
Q. The methodology.
A. I don't know how he went about preparing the report, if that's what you were referring to. There are things in his report that I disagree with.
Q. Well, aside from disagreeing with things in his report, do you agree that he appropriately reviewed the relevant peer-reviewed medical literature?
MR. BRENNAN: Objection, form.
A. He reviewed a substantial body of literature which is pertinent to this issue.
Q. (BY MR. WACKER) And do you agree that he reviewed the pertinent medical records of Mr. Barnett?
A. I presume that he did.
Q. Do you have any criticisms of things that Dr. Zipes did not review?
A. Not as I sit here.
Q. Have you made any notes of your criticisms of Dr. Zipes' report?
A. I have not.



Q. Well, let's just ask. What criticisms do you have of Dr. Zipes' report?
MR. BRENNAN: Objection, form.
A. It's a very open-ended question. I think in -- that in general I would disagree with -- well, let me take a look at his report for just a second before we get into that.
(Witness Reviews Document.)
A. Page 12. We'll stick with the general issues, I guess, first, page 12. "In summary, it is my opinion that Vioxx caused accelerated plaque buildup in Mr. Barnett's coronary arteries and a thrombus in the PDA that occluded this vessel and caused the heart attack. In addition, Vioxx caused plaque buildup that led to the C-A-B-G, CABG, surgery, and to his present cardiovascular state. It is important to remember that Mr. Barnett remained on Vioxx daily for two years after his heart attack and CABG surgery."
I have no issue with that particular sentence. The subsequent sentence, "It is my opinion that Vioxx continued to accelerate plaque buildup in his vessels during the two years after the heart attack." I disagree with that. Second paragraph --
Q. (BY MR. WACKER) Okay. So you're disagreeing with his conclusions, right?



A. I am disagreeing with his conclusion. Second paragraph, I am disagreeing with his conclusions in there with the exception -- or the statements in there with the exception that it is important to remember that Mr. Barnett remained on Vioxx daily for two years after his heart attack and CABG surgery.
Next paragraph, "Mr. Barnett had significant myocardial damage despite an EF, ejection fraction, of 60 percent. The basal segments of his heart show abnormal contractile patterns his previous MI that are likely permanent. Further, he only exercised nine and a half main during the stress test compared to 14 minutes in the past. In addition, despite the CABG, the nuclear imaging test -- nuclear imaging test showed a moderate area of mildly reduced profusion in the inferior and basal inferolateral segments of the left ventricle, which is partially reversible on rest images suggestive of mild exercise induced ischemia."
Q. You did --
A. I would -- I would take issue with the notion of saying that someone has significant myocardial damage despite an ejection fraction of 60 percent unless they wish to define what they mean by significant. But in general in the clinical arena, an ejection fraction of 60 percent is not consistent with significant myocardial

Page 206

damage.

Additionally, I would take issue with the fact that he states that his left ventricular -- or that the wall notion abnormality he sees is permanent without further investigation to determine whether there could be some ischemic component that can be relieved with revascularization. I don't think we can necessarily conclude that at this point.

And I'll go on if you want to --

Q. Let me just ask you this. This raises a question. Do you -- do you have any contention that Mr. Barnett purposefully did not perform to the best of his ability on the stress test?

A. No.

Q. So you're not suggesting that because he was only able to exercise nine and a half minutes, that that was in any way intentional on Mr. Barnett's part?

A. That's correct.

Q. And, in fact, his maximal rate in 2006 was actually at a -- at 67 percent whereas in 2003 it was -- it was lower at 66 percent?

A. I'm not sure what you're referring to when you say his maximal rate. Are you talking about his heart rate response?

Q. Yes.

Page 207

A. You said it was what in what year and what in the other year?

Q. 67 percent in May 2006 and only 66 percent in July 2003.

A. 66 and 67 percent are clinically insignificant and his heart rate response is blunted by the beta blocker therapy that he's been on ever since his myocardial infarction in September of 2002.

Q. So --

A. That's not an unexpected finding at all and doesn't influence my decision-making here or my assessment of his prognosis.

Q. So the allegation that he dogged his stress test on purpose, in your opinion, is unfounded?

A. I didn't say that he dogged his stress test. In fact, he did quite well on his stress test. To exercise for nine and a half minutes gives him a very good prognosis, and I have never said that he dogged his stress test.

Q. So, again, that's just some other area where -- anyway, never mind.

MR. WACKER: Not blaming you, Sean.

Q. (BY MR. WACKER) You want to continue on with other areas of criticism?

A. Oh, sure, I guess we can do that.

Page 208

MR. BRENNAN: Ted, do you want to go through this line by line or how do you want to --

MR. WACKER: Well, no, I just want to get -- I really want to focus on some of the major areas. You know, to go through it line by line, you know, might take us a while.

MR. BRENNAN: No, I --

MR. WACKER: But I --

Q. (BY MR. WACKER) What I want to do is I want to find out what some of the -- you know, your major areas of disagreement.

Let me -- let me just share with you, Doctor, I understand you and Dr. Zipes disagree on the ultimate conclusions, correct?

A. Correct.

Q. And his opinion is that Vioxx both contributed to his heart attack and his bypass surgery, correct? That's Dr. Zipes' opinion?

A. Well, I think his opinion goes even further than that. He makes the opinion that it contributed to his atherosclerosis. I'm a little hesitant to sit here and talk about general disagreements. I mean, obviously he and I disagree about a number of different points. I don't necessarily want to go through this document point by point, but if you have certain areas where you feel

Page 209

that it's important to highlight the differences between what -- where he and I disagree, I'd be happy to do that. Otherwise, I'm going to be forced to go through the document page by page and look -- and read it again and comment on it again.

Q. Let's do this. On page 13, Roman numeral V, he says, "Vioxx causes heart attacks." You disagree with that, right?

A. Yes, I do.

MR. BRENNAN: You're talking about the header?

MR. WACKER: Well, that's an opinion.

A. And I disagree with it.

MR. WACKER: It's a -- it's a heading, but it's also an opinion. Vioxx causes heart attacks.

Q. (BY MR. WACKER) So in your opinion, Doctor, there's no evidence that Vioxx causes heart attacks, true?

A. And I don't mean to be nitpicky, but I guess if we get down to cause would imply a mechanism that is known. Is there evidence that shows association with use of rofecoxib and myocardial infarction? Yes.

Q. So -- but, Doctor, you're -- you're saying that the only way that you can conclude if Vioxx causes heart attacks is if there's a known mechanism. Is that your

definition?

A. To be on firmest ground, yes. I mean, in the scientific -- you're giving me this incredulous look. We can say there's an association. You can use that term loosely if you want to, but if you want to have a cause-and-effect relationship in the medical or scientific arena, you should be able to show the mechanism that's responsible for the cause. I'm not here to tell you that there isn't an association and I'm not here to tell you that there isn't literature that shows that association between the use of rofecoxib and -- and a myocardial infarction. I guess the issue is the word "cause."

Q. Well, Doctor, does smoking cause lung cancer?

A. What we can say is that there is an association between smoking and the development of lung cancer.

Q. So we can't ever say that somebody smoking caused their heart attack, right?

A. Let me leave it to you this way. We accept that there is a association between smoking and myocardial infarction. It's accepted.

Q. But in your opinion, based upon your -- Dr. Roach's analysis, you -- you can't say that smoking causes heart attacks?

A. Again --



MR. BRENNAN: Objection, form.

A. If accepting how I want to use the term "cause," that would be correct. But it mischaracterizes how I feel about that issue. There is no question there is a relationship between smoking and the development of lung cancer and the development of cardiovascular disease.

Q. (BY MR. WACKER) And there's equally a relationship between Vioxx and increased myocardial infarction?

A. That is a subject of debate. There is some -- as I've mentioned before, there is some --

Q. Well --

A. May I finish?

Q. I'm sorry. Go ahead.

A. There is some evidence that suggests a relationship between those two, between the use of rofecoxib and myocardial infarction. On the other hand, there is evidence that would suggest that that is not the case.

Q. And what's the evidence that suggests it's not the case?

A. Well, again, I went through all of those studies before.

Q. But they all the showed an increased risk in



varying degrees, right?

A. No.

MR. BRENNAN: Objection, form.

A. Well, do we need to go back through them?

Q. (BY MR. WACKER) So you're --

A. I mean, I'm happy to go back through the studies again.

Q. You're saying that -- that there are -- are you saying that there's no studies --

A. No, I didn't say that. You're not -- you're not -- well, I'm not saying that.

Q. Okay.

A. I have said --

Q. Let me ask you this. Are there studies that show that Vioxx increases the risk of myocardial infarction?

MR. BRENNAN: Objection, form.

A. There are studies which show an increased rate of myocardial infarction associated with the use of rofecoxib.

Q. (BY MR. WACKER) And for you, Dr. Roach, that's not enough to say that Vioxx causes myocardial infarction?

A. Again, going back to how I use the word "cause" in these situations, that is correct.



Q. And that's based upon your own definition of cause?

A. I think it's not -- it's a -- well, that -- I'm not going to say how other people use that term. But I think there is a concern in general that if you use the term "cause," you now have an understood mechanism of what is happening.

Q. Okay. So -- all right. That -- so your use of the term "cause" and your understanding of the use of the term "cause" is defined as that not only is there a relationship between the agent and the event, but also that you know what the mechanism is?

A. That you have --

MR. BRENNAN: Objection, form.

A. That you have a plausible mechanism to -- to explain those events.

Q. (BY MR. WACKER) And in this case with Vioxx, we have that plausible mechanism, don't we?

A. We have theories about mechanisms. We don't have conclusive evidence about the mechanism.

Q. Well, we have -- it's not a theory. It's a -- it's a biologic plausibility that Vioxx decreases prostacyclin leaving thromboxane unopposed leading to basal constriction and platelet aggravation, right?

A. That's an oversimplification.