## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Vioxx | § | **MDL DOCKET NO. 1657** |
| **PRODUCTS LIABILITY** | § | |
| **LITIGATION** | § | **Section L** |
| | § | |
| | § | |
| **THIS DOCUMENT RELATES TO:** | § | **Judge Fallon** |
| **ROBERT G. SMITH**     v. | § | **Mag. Judge Knowles** |
| **MERCK & CO., INC.** | § | |
| **No. 2:05-CV-04379** | § | |
| | § | |

## <u>DECLARATION OF APRIL K. THOMSON</u>

APRIL THOMSON, by way of certification in lieu of affidavit, says:

1.  I am the Vice President of Scientific Evidence, Inc. In my position with Scientific Evidence, I am familiar with and have access to certain Scientific Evidence business records, and I testify based upon my personal knowledge of these records.

2.  On June 22, 2006, Scientific Evidence received a subpoena in the *Robert Smith v. Merck and Co., Inc.*, Civil Action No. 2:05-cv-04379. Through this subpoena, Merck demands the production of all documents relating to any communications between Scientific Evidence and Dr. Lemuel Moyé relating to his consulting and testifying in Vioxx litigation and "all" litigation. Merck also demands the production of all documents relating to any charges billed by Dr. Moyé relating to his consulting and testifying in Vioxx litigation and "all" litigation.

3.  Many of the documents Merck demands were previously produced during Dr. Moyé's June 2, 2006 deposition which was continued on June 16, 2006. To the extent Merck seeks documents that have not been produced, and to the extent such documents exist, producing the documents would be extraordinarily burdensome on Scientific


EXHIBIT
A

Evidence because of the time, resources and expense that would necessarily have to be expended in order to comply with the subpoena.

### Vioxx Related Billing Information

4.   On May 29, 2006, Merck noticed the deposition of Dr. Moyé in *Gerald Barnett v. Merck and Co., Inc.*, Civil Action No. 2:06-cv-485, and requested that Dr. Moyé produce a number of documents, many of which are the subject of the subpoena received by Scientific Evidence.

5.   In *Barnett*, Merck requested that Dr. Moyé produce "all statements reflecting time Dr. Moyé spent on Vioxx-related work, including invoices/bills he has submitted for payment." Scientific Evidence helped coordinate production of this data with Dr. Moyé in an effort to comply with Merck's request. All documents were promptly produced at Dr. Moyé's June 2, 2006 deposition. I am not aware of any assertion by Merck that Dr. Moyé failed to comply with the deposition notice in *Barnett* or that the information provided by Dr. Moyé was insufficient.

6.   Through the Scientific Evidence subpoena, Merck demands production of "any and all documents relating to charges billed by Lemuel A. Moye M.D., Ph.D. related to consulting (and testifying) in all Vioxx litigation." Scientific Evidence has previously produced this information to Merck via Dr. Moyé on June 2, 2006. Consequently, Scientific Evidence can only supplement any bills submitted by Dr. Moyé in the months of June and July, which Scientific Evidence is willing to do.

### Documents Relating to Communications Between
### Scientific Evidence and Dr. Moyé.

7.   Through the Scientific Evidence subpoena request nos. 1-4, Merck demands that Scientific Evidence produce all documents relating to any communications between

Scientific Evidence and Lemuel A. Moye, M.D., Ph.D related to consulting (and testifying) on all Vioxx litigation (and "all" litigation). To the extent Scientific Evidence provided Dr. Moyé with any materials to assist him in preparing for this litigation, or any materials upon which he has relied in formulating his opinions, those materials were produced by Dr. Moyé during his June 2, 2006 deposition in compliance with Merck's request.

8. To the best of my knowledge, Scientific Evidence has not provided Dr. Moyé with any new materials for this or any other litigation since his June 2, 2006 deposition. Therefore, there is no further information to be produced at this time.

9. Further, the majority of communications between Scientific Evidence and Dr. Moyé are oral communications. Scientific Evidence does not keep notes of its oral communications with Dr. Moyé. To the best of my knowledge, there are no existing letters between Scientific Evidence and Dr. Moyé. The only electronic communications between Scientific Evidence and Dr. Moyé involve scheduling for trials and depositions, and reminders to send his invoices. However, Scientific Evidence does not retain such electronic communications. Consequently, Scientific Evidence does not have in its possession any written or electronics communications with Dr. Moyé that are responsive to Merck's subpoena.

10. When a new scientific study is published, Scientific Evidence sends a group email to numerous experts with a copy of the study abstract and a statement that Scientific Evidence will provide a copy of the study upon request. While Dr. Moyé may have contacted Scientific Evidence to request an article or document related to litigation, Scientific Evidence does not track or document such requests. However, it is my

understanding that Dr. Moyé produced all documents and materials he received from Scientific Evidence during his June 2, 2006 deposition.

### Bills Submitted by Dr. Moyé on Non-Vioxx Related Matters

11. In subpoena request nos. 6 and 8, Merck demands that Scientific Evidence produce "any and all documents relating to charges billed by Lemuel Moye, M.D., Ph.D. related to consulting (and testifying) in all litigation." Compliance with this request would be both expensive and time consuming.

12. Scientific Evidence does not assign and store accounting and accounts payable invoices based on the person or entity submitting the bill. These bills are sorted based on the type of litigation. In other words, there is not a "Moyé/Invoices" folder where all documents responsive to this request are stored.

13. While it is difficult to speculate on the exact number of hours and the total cost which would be required to respond to this request, the time and expense would undoubtedly be excessive. I, or one of my staff members, will have to manually look through each and every invoice for each and every type of litigation for which Scientific Evidence has provided services. Someone will then have to cross-check all invoices to pull duplicates, because often times work on multiple types of litigation are submitted on one invoice. After all searches have been run and cross-referenced, I would have to redact any confidential and personal information relating to the particular person or entity referenced in each and every invoice.

14. The Scientific Evidence personnel who have the necessary knowledge and who are capable of running the searches and performing the cross-references and redaction that would be necessary in order to comply with Merck's subpoena are already occupied

with their regular projects and tasks.  To pull staff away from their essential day-to-day activities for the indeterminable number of days that it will take to accomplish this task will create an extremely difficult burden and cost for Scientific Evidence.  Further, our current accounting system was implemented in 2000.  It is unlikely that we would have information related to Dr. Moyé prior to 2000.

15.  Due to Scientific Evidence's standard procedure in its ordinary, every day course of business for the storage of invoices, retrieval of the non-Vioxx related documents would result in an extraordinarily burdensome, time consuming, and expensive task.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 17, 2006.

APRIL K. THOMSON

Witness my hand and Seal
State: TEXAS
County: Brazoria

On this 19 day, July, 2006 personally appeared
Thomson April Kay.



FERNANDO ROSALES
Notary Public, State of Texas
My Commission Expires
July 12, 2009

5



May 30 2006
4:05PM

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX® | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| | * | MAGISTRATE JUDGE |
| GERALD BARNETT and CORRINE | * | KNOWLES |
| BARNETT | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| V. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |

Civil Action No. 2:06cv485

* * * * * * * * * * * * * * * * * * * * * * * *

## NOTICE OF DEPOSITION OF LEMUEL A. MOYE

TO:  Mark P. Robinson, Jr.
    Robinson, Calcagnie & Robinson
    620 Newport Center Drive, 7th Floor
    Newport Beach, CA 92660

       and

    Russ Herman
    Herman, Herman, Katz & Cotlar
    Place St. Charles
    201 St. Charles Avenue, Office 4310
    New Orleans, LA 70170



EXHIBIT
B

PLEASE TAKE NOTICE that Defendant Merck & Co., Inc., will take the stenographic deposition of Lemuel A. Moye, M.D., PhD pursuant to the Federal Rules of Civil Procedure, on June 2, 2006, at 9:30 a.m. at the offices of Abraham, Watkins, Nichols, Sorrels, Matthews & Friend, 800 Commerce, Houston, Texas, before an officer authorized to take deposition and swear witness. The deposition will continue day to day until completed. The deponent is requested to produce the following documents listed on attachment "A".

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN LLP
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew L. Goldman
Hamilton H. Hill
Adam K. Mortara
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Attorneys for Merck & Co., Inc.

ATTACHMENT A

1. All materials Dr. Moye has reviewed prior to or since he was retained as an expert in this litigation that relate to Vioxx.

2. All materials on which Dr. Moye relies as support for his opinions in the Vioxx litigation.

3. All work product (other than draft reports) that Dr. Moye has prepared in the Vioxx litigation.

4. All statements reflecting time Dr. Moye has spent on Vioxx-related work, including invoices/bills he has submitted for payment. All notes or other memoranda Dr. Moye has prepared in the Vioxx litigation.

5. All communications Dr. Moye has had with any plaintiffs' counsel in the Vioxx litigation.

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing Notice of Deposition of Lemuel A. Moye has been served on Liaison Counsel Russ Herman by U.S. Mail and e-mail or by hand delivery and e-mail, upon plaintiff's counsel Mark P. Robinson by e-mail, and upon all parties electronically uploading same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this 29th day of May, 2006.

Dorothy H. Wimberly

## Exhibit C — Moyé Deposition Excerpts

Page 1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
      IN RE: VIOXX        :  MDL DOCKET NO.
 3    LITIGATION PRODUCTS :  1657
      LIABILITY LITIGATION :  SECTION L
 4                         :
      This document relates:  JUDGE FALLON
 5    To                   :
      GERALD BARNETT AND   :  MAGISTRATE JUDGE
 6    CORRINE BARNETT      :  KNOWLES
                V.         :
 7    MERCK & CO., INC.    :
                           :
 8    Civil Action No.     :
      2:06cv485            :
 9                    -  -  -
10                    June 2, 2006
11                    -  -  -
12            Oral deposition of LEMUEL A. MOYE,
13    M.D., Ph.D., held in the offices of
14    Abraham, Watkins, Nichols, Sorrels,
15    Matthew & Friend, 800 Commerce, Houston,
16    Texas, commencing at 9:30 a.m., on the
17    above date, before Linda L. Golkow, a
18    Federally-Approved Registered Diplomate
19    Reporter and Certified Shorthand
20    Reporter.
                      -  -  -
21            GOLKOW LITIGATION TECHNOLOGIES
                    Four Penn Center
22            1600 John F. Kennedy Boulevard
                      Suite 1210
23            Philadelphia, Pennsylvania 19103
                    877.DEPS.USA
24
```

[13:11-16]

Page 13
```
11           Q.    Who was the first person to
12    contact you to ask you to be an expert
13    witness on behalf of the plaintiffs?
14           A.    I think it was through
15    Scientific Evidence.  I'm a consultant
16    for that company.
```

[16:2-24]

Page 16
```
 2                 Q.    Let me back up a minute.
 3    And I apologize.  I'm working off of your
 4    -- we've been provided for the record
 5    with, what is it, 14 disks?
 6                 MS. COOK:  12.  Yes, 14.
 7    BY MR. PIORKOWSKI:
 8                 Q.    There's a total of 14 disks,
 9    I believe, by Mr. Sizemore.  One of them
```

EXHIBIT

C

```
10  is entitled Vioxx billing, I think, which
11  I'm assuming that contains your billing
12  records to date?
13        A.    Yes, sir.
14        Q.    Is that your understanding?
15        A.    Yes, it is.
16        Q.    Then there are 12 disks that
17  are marked as "Vioxx documents reviewed
18  by Dr. Moye" 1 through 12 of 12?
19        A.    Yes.
20        Q.    Right?  And then there's
21  another independent disk that's entitled
22  "Vioxx documents reviewed by Dr. Moye
23  ,"right?
24        A.    Yes.
```

[17:1-9]          Page 17

```
 1        Q.    We'll come back to what
 2  those are in a moment.  I apologize, I
 3  don't have this in hard copy.  I'm just
 4  getting it off the disk.
 5              Am I correct that your
 6  records reflect that the first time you
 7  billed any time on Vioxx was in February
 8  of 2005?
 9        A.    I believe that's right, yes.
```

[23:20-24:7]      Page 23

```
20        Q.    Who else works with you from
21  Scientific Evidence besides Dr. Hoepfel?

22        A.    Well, the only support
23  Scientific Evidence provides to me is
24  logistical support.  So, they collect
```
Page 24
```
 1  information for me.  And they will
 2  collect information on CDs, for example,
 3  and prepare the CDs that we have today.
 4  But to answer your question, April
 5  Thompson has been my chief contact person
 6  at Scientific Evidence, and her role for
 7  me has been administrative.
```

[34:11-35:20]     Page 34

```
11        Q.    Is it your understanding
12  that the invoices that we have which are
13  approximately $98,800 represents all of
14  your billing in Vioxx to date?
15        A.    That sounds -- the amount
16  sounds correct.  Yes.  I don't know how
17  inclusive the dates are.
18        Q.    Okay.
19              You don't know when that
20  would go up through?
21        A.    That's true.
22        Q.    In terms of the month of
```

```
23    May, what work have you done since the
24    completion of your MDL report, which was
Page 35
1    dated the 22nd?
2            A.    I've reviewed -- the
3    literature -- the material is voluminous,
4    and reading this material one time just
5    hasn't been sufficient for me.  So, I've
6    spent some time reviewing material that I
7    have already read.
8            Q.    Okay.
9                  Your rate for billing is how
10   much now?
11           A.    $400 an hour.
12           Q.    For reviewing materials?
13           A.    Yes.
14           Q.    Okay.
15                 So, if we were going to
16   figure out how much time you spent, it
17   would be roughly 100,000 divided by 400?
18           A.    Right.
19           Q.    So, what's that, 250 hours?
20           A.    250 hours, right.
```

[43:17-22]        Page 43

```
17                 Just to finish up here.
18   There were manuscripts that were sent to
19   me through Scientific Evidence that --
20   again, by "manuscripts," information that
21   was published in the peer-reviewed
22   literature that supplemented my review.
```

[45:16-47:4]      Page 45

```
16           Q.    You have in your report at
17   the end on Pages 106 through 110, you
18   have a list of references.  Do you see
19   that?
20           A.    Yes, sir.
21           Q.    Are all of the published
22   medical articles that you've reviewed
23   listed in these references?
24           A.    I hesitate to say that all
Page 46
1    of them are listed here.  I mean, I think
2    all of them would be on the CDs that you
3    have, but I don't want to suggest that
4    every single medical reference, reference
5    in the medical literature that I based my
6    opinion on is listed in the references.
7    I mean, I wish that were the case, but
8    there may have been a couple that got
9    away.
10           Q.    Okay.
11                 It's fair to say that while
12   you may have missed one or two, your
13   intent was to list all of the medical
14   articles that you reviewed or that you
```

```
15   thought were important in your
16   references?
17        A.   Yes, sir.
18        Q.   And if there's an article
19   that you looked at that's not in the
20   references, it would be on the CDs that
21   we referred to?
22        A.   I would say if there's an
23   article that I looked at and relied upon
24   and incorporated its ideas in any way,
Page 47
1   shape or form in my report, then it
2   should have been listed in the
3   references.
4        Q.   Okay.
```

[47:5-11]
```
Page 47
5             Now, did you review the
6   investigational new drug application?
7        A.   Yes, sir, I did.
8        Q.   How did you get access to
9   that?
10        A.   Scientific Evidence sent
11   that to me.
```

[71:21-72:8]
```
Page 71
21        Q.   I ask you to identify what
22   Exhibit 2 is.
23        A.   (Witness reviewing
24   document.)
Page 72
1             It is a compendium of the
2   material that I have been provided to
3   review related to the Vioxx litigation.
4        Q.   Is it your understanding
5   that all of the material that's contained
6   in Exhibit 2 is on the CDs that we've
7   been provided?
8        A.   Yes, sir.
```

[212:7-224:11]
```
Page 212
7        Q.   Before I get back to my
8   question on study 023, let me do some
9   housekeeping things.
10        A.   Sure.
11        Q.   I've marked as Exhibit 5,
12   and I think you've already got a copy,
13   Ted, documents that have been produced to
14   us that are represented as your time
15   records; is that right?
16        A.   Yes.
17        Q.   Does it appear to be an
18   accurate copy?
19        A.   Yes.
20        Q.   Let me just ask you, the
21   2/26 is the first involvement in Vioxx,
22   right?
```

```
23          A.    Right.
24          Q.    Where it says "FDA
Page 213
1    transcript review," that's the Advisory
2    Committee meetings you talked about?
3          A.    Yes, sir.
4          Q.    Okay.
5                You read all three of those
6    transcripts?
7          A.    I don't remember how many I
8    read.  Well, the 26th -- now, wait a
9    second.  26th was actually before, was it
10   not, the third Advisory Committee
11   meeting, was it not?  I'm just trying --
12         Q.    The third Advisory Committee
13   meeting was sometime in --
14         A.    March?
15         Q.    -- February of 2005.  I
16   don't remember which date.
17         A.    Okay.  All right.
18               I certainly read the first
19   two.  I don't know if I read the third
20   one.  I don't know if the third one was
21   available yet.  I certainly read the
22   first two.
23         Q.    All right.
24               And then you have -- on the
Page 214
1    next page it says, "Vioxx Review 2 Hour",
2    "Vioxx Review 3 Hour," and then there's a
3    meeting on March 4th.
4          A.    Right.
5          Q.    Okay.
6                What was the Vioxx review
7    two hours and three hours?  Any
8    indication what that is?
9          A.    Well, I would tell you that
10   the only -- what I would have had
11   available to review were published
12   manuscripts.
13         Q.    Okay.
14               So, other than published
15   manuscripts and what was on the FDA's
16   website, that really would have been the
17   limitations of your review at that time?
18         A.    Yes, sir.
19         Q.    And then the meeting we
20   talked about is the next entry, right?
21         A.    Right.
22         Q.    Then it says on the next
23   page -- well, let me be clear.
24               Did you not do anything
Page 215
1    between March 4th and then May 11th of
2    2005?
3          A.    Did lots of things, nothing
4    to do with Vioxx.
```

```
5            Q.     All right.
6                   It says, "Vioxx Prep 2
7    Hours," "Vioxx Prep 2 Hours," on the 11th
8    and the 29th.  What does "Vioxx prep"
9    mean as opposed to "Vioxx review"?
10           A.     Just synonymous.  So, I'm
11   still reviewing published literature.
12           Q.     All right.
13                  Then it goes from May 30,
14   2005 up to July 10, 2005?
15           A.     Yes.
16           Q.     Did you do anything related
17   to Vioxx in between those dates?
18           A.     No, sir.
19           Q.     Then it starts and it says,
20   "Affidavit Prep."
21           A.     Yes.
22           Q.     And then really until we get
23   down to the bottom of September, which is
24   September the 9th, all of the entries
```
Page 216
```
1    there refer to affidavit prep, right?
2            A.     Right.
3            Q.     Now, does that mean that you
4    started writing the report on July 10,
5    2005?
6            A.     Yes.
7            Q.     Okay.
8                   And all of these affidavit
9    prep entries are all related to the
10   writing of your report?
11           A.     Yes.
12           Q.     And then there's a break.
13   Did you issue -- let me back up.
14                  Between September 9, 2005
15   and December 9, 2005, did you do any work
16   related to Vioxx?
17           A.     No, sir.
18           Q.     Now, you have discussion
19   with one hour.  Is that a meeting with an
20   attorney?
21           A.     Yes.
22           Q.     Vioxx prep is just a review
23   of materials?
24           A.     Yes.
```
Page 217
```
1            Q.     "Review Biochemistry," what
2    does that mean?
3            A.     It just means review the
4    published biochemistry.
5            Q.     "Clinical Trial Review," you
6    have that broken out as a separate entry?
7            A.     Right.
8            Q.     What does that mean?
9            A.     Just means review of the
10   clinical trial manuscripts.
11           Q.     What about "Epi Review"?
```

12          A.     Epi review is a review of
13   the epidemiology underlies and the
14   epidemiologic -- underlies the
15   observational studies and the
16   observational studies themselves that
17   relate to Vioxx -- that relate to the
18   NSAIDs and COX-2 and cardiovascular
19   disease.
20          Q.     That's the only entry I see
21   on epi review three hours; is that right?
22          A.     That's the only one I see,
23   too.
24          Q.     "Manuscript Review," what
Page 218
1    does that mean?
2           A.     It just means I am reviewing
3    the manuscripts that are published.
4           Q.     Articles?
5           A.     Yes.
6           Q.     And then we're back to
7    affidavit prep.  That's more preparing
8    your report?
9           A.     Yes.
10          Q.     Then "Document Review,"
11   "Review of Materials," is that the same
12   thing?
13          A.     No.  Now, this is -- this is
14   now -- let's see.  I didn't do anything
15   on Vioxx from the end of 2005 until April
16   2006, April 8th.  At this point now I'm
17   reviewing other types of material.  I'm
18   reviewing material that's on the CDs.
19   I'm reviewing internal documents,
20   memoranda, internal reports.
21              So, the material now that
22   I'm reviewing is separate and apart from
23   the articles that I've been reviewing up
24   to this point.
Page 219
1           Q.     Do you know what materials
2    you were reviewing on April 9th and 10th?
3           A.     No.
4           Q.     How about the 11th through
5    the 13th?
6           A.     No.
7           Q.     "Meeting at Dave Matthews 2
8    Hours" on the 14th.  That's a meeting
9    here?
10          A.     Yes, sir.
11          Q.     Do you know who was in
12   attendance at that?
13          A.     Dave Matthews.  I think
14   there was another attorney who I don't
15   remember.
16          Q.     "Document Review," what
17   documents were those?
18          A.     Similar kinds of documents.

19 I think what happens typically is we have
20 a meeting and I express other documents
21 I'd like to review, and they get sent to
22 me.  Commonly they are there waiting by
23 the time I get home.  And I review those
24 subsequent to the meeting.  So, this
Page 220
1 cycle that we've got is a reflection of
2 that work pattern.
3   Q. "Study Review," what does
4 that mean, 4/18?
5   A. 4/18.  Same thing as a
6 protocol review that's coming up.
7 Looking at some of the clinical studies.
8   Q. "Curfman Depo Review," I
9 assume that means that's when you read
10 the depositions and the exhibits?
11   A. Yes, sir.
12   Q. "Approve New England Journal
13 Review 2 Hours."  What does that mean?
14   A. I'm sorry, you skipped down.
15 Okay.  APPROVe New England Journal
16 manuscript review and also additional
17 documents related to APPROVe.
18   Q. Okay.
19   Then it says, "Document
20 Review" from May 2000 -- May 5th down to
21 May 10th?
22   A. Yes.
23   Q. "Meeting With Attorneys" on
24 May 11?
Page 221
1   A. That's what that's supposed
2 to say.  Yes.
3   Q. What is that?  Do you
4 remember who you met with then?
5   A. Actually, Ted was here, Paul
6 was here.  I don't remember who else was
7 in attendance, but it was continued
8 discussions about my opinions and my
9 relating to them what additional material
10 I would need to review.
11   Q. What about 5/18?
12   A. 5/18?  Same thing.  Same
13 kind of pattern.  Same attorneys were
14 here and the same agenda for the meeting.
15   Q. Okay.
16   Now, I see on 5/22 through
17 5/29, or actually through 5/31, you still
18 have a lot of document reviews.  What
19 were those documents?
20   A. These are documents now,
21 these are e-mails, these are information
22 like Watson's report, review material
23 from reviewers to authors about
24 Vioxx-related manuscripts.
Page 222

1      Q.     What about the meeting on
2    5/31, was that to prepare for the
3    deposition?
4      A.     Yes.
5      Q.     Who was at that meeting?
6      A.     Paul was on the phone, I
7    think.  Ted was here.  One or two other
8    attorneys were here whose names I don't
9    remember.
10      Q.     Now, I don't see anything on
11    here about SAS file review.
12      A.     I haven't talked anything
13    about SAS file review.
14      Q.     Okay.
15             So, you've started to look
16    at it, but you haven't charged anything?
17      A.     What I have done, and the
18    modus operandi I wanted to use, I didn't
19    want to spend a lot of my time, spend a
20    lot of somebody else's money for an
21    unproductive review.  So, I did a cursory
22    examination and realized it was going to
23    be very complicated.  So, I reported
24    that, didn't charge for that, and had put
Page 223
1    it down for the time being.
2      Q.     Okay.
3             Now, when we talked about
4    your review of these documents in -- I
5    can't remember what exhibit it is, 2?  Is
6    that Exhibit 2?
7      A.     Yes.
8      Q.     Where on your time sheets
9    would all of this review be?  For
10    example, you have the depositions of
11    David Anstice and Briggs Morrison and
12    Eliav Barr and Barry Gertz?
13      A.     Yes.
14      Q.     Where would all of the
15    review of those materials be listed?
16      A.     It would start in April.
17      Q.     April of 2005?
18      A.     2006.
19      Q.     2006?  Okay.
20             So, prior to April of 2006,
21    you had not reviewed internal company
22    documents?
23      A.     Correct.
24      Q.     You had not reviewed company
Page 224
1    witness depositions?
2      A.     Correct.
3      Q.     You had not reviewed Dr.
4    Curfman's deposition?
5      A.     That also is correct.
6      Q.     You had not reviewed the
7    study protocols?

```
                8          A.     That's correct.  The
                9    unpublished study protocols, the
                10   unpublished FDA reports I had not
                11   reviewed, that's right.
```

[387:6-10]        Page 387
```
                6          Q.     You testified, I believe, in
                7    February of 2005 that you had made about
                8    $1.35 million in your work in fen-phen;
                9    is that right?
                10         A.     Yes.
```

[387:23-388:13]   Page 387
```
                23                What's your best estimate of
                24   how much you've made in the fen-phen
                Page 388
                1    litigation overall?
                2          A.     I don't know.  A little more
                3    than $1 million.
                4          Q.     Well, if you made 1.35 --
                5          A.     To me, that's a little more.
                6          Q.     What?
                7          A.     To me, that's a little more.
                8          Q.     I'm saying if you had 1.35
                9    in February of 2005 --
                10         A.     But see, even that was an
                11   estimate.  My overall estimate is
                12   somewhere between 1 and $1.5 million.
                13   That would be probably the best I can do.
```

[388:15-391:8]    Page 388
```
                15                What other litigation have
                16   you testified in as an expert over the
                17   last three years?
                18         A.     The last three years?
                19         Q.     Yes.
                20         A.     This is '06.
                21         Q.     Let me withdraw the question
                22   and see if I can expedite it.
                23         A.     Okay.
                24         Q.     You testified against
                Page 389
                1    Pfizer, right, in the Rezulin litigation?
                2          A.     Yes.  I just wasn't sure
                3    that was in the last three years or not.
                4          Q.     Okay.
                5                 Was Pfizer the defendant
                6    then or was somebody else the defendant?
                7          A.     No.  I think Pfizer was the
                8    defendant then.  My last Rezulin trial
                9    may have been in the spring of 2004 in
                10   California.  I don't remember.
                11         Q.     Do you see it on there
                12   anywhere?
                13                (Handing over document.)
                14         A.     Thanks.
                15                (Witness reviewing
```

```
16    document.)
17              I don't think so, no.
18       Q.   It's not on there?
19       A.   I don't think so.
20       Q.   But it should be on there?
21       A.   Yes.
22       Q.   Okay.
23              Do you know how many cases
24    you testified in against Pfizer?
Page 390
1        A.   For Pfizer?
2        Q.   Yes.
3        A.   I believe there were four.
4        Q.   Four?
5        A.   Four trials against Pfizer.
6        Q.   Okay.
7              And where were those?
8        A.   One was in Houston, one was
9     in Corpus, a third was in McAllen, and a
10    fourth was in Los Angeles.
11       Q.   And your testimony was on
12    behalf of plaintiffs for all of those
13    cases?
14       A.   Yes, sir.
15       Q.   All right.
16              Other than your testimony
17    against Pfizer and American Home Products
18    for Wyeth, have you been involved in any
19    other product cases?
20       A.   Yes, but to very limited
21    degrees.  I gave a deposition I think in
22    Lotronex.  That's all I remember.  I
23    investigated getting into some other
24    ones, but never did.
Page 391
1        Q.   Are you still involved in
2     diet drug cases today?
3        A.   I don't think so anymore,
4     but with fen-phen, one never knows.  So,
5     I would say I think I'm done with that.
6        Q.   You don't have any active
7     things on your calendar at this point?
8        A.   That's right.  That's right.
```

[391:9-14]
```
Page 391
9        Q.   Do you know how much money
10    you made, best estimate of how much money
11    you made in the Pfizer/Rezulin
12    litigation?
13       A.   No.  I don't have an
14    estimate today.
```

[416:9-417:21]
```
Page 416
9        Q.   Okay.  I was handed a copy of
10    your testimony this morning.  Is that -- does
11    that contain additional testimony from what
12    we discussed last week -- or on June 2nd?
```

13      A.      Yes, it does.
14      Q.      It does contain additional
15 information?
16      A.      Yes.
17      Q.      And what additional information
18 does it contain?
19      A.      It includes the testimony I
20 provided in the Rezulin cases, the deposition
21 and the trial testimony from Rezulin.
22      Q.      Okay.  And we -- those were not
23 on the version you had last -- a couple weeks
24 ago, right?
Page 417
1       A.      That's right, they weren't.
2       Q.      Okay.  Which ones are the
3 Rezulin ones?  Could you just identify them
4 for me?
5       A.      Sure.  Actually, they're all
6 the ones that mention Warner-Lambert, so
7 numbers 18, 19, 20, 21, 30.  Those are the
8 only ones I see.
9       Q.      Okay.
10      A.      And, of course, the Vioxx one's
11 on there as well.
12      Q.      And you added your deposition
13 from June 2nd?
14      A.      Right.
15              (Whereupon, Deposition Exhibit
16      Moye MDL 10, Testimony of Lemuel A.
17      Moye, M.D., Ph.D., was marked for
18      identification.)
19      Q       (BY MR. PIORKOWSKI)  Okay.  I'm
20 going to mark this as Moye Deposition
21 Exhibit 10.

[753:5-754:4]    Page 753
5               Do you know how much you've
6 been paid to date under this arrangement that
7 you've had with Scientific Evidence,
8 regardless of the litigation?
9       A.      Total amount, I don't know.
10      Q.      Several million?
11      A.      No.  I would -- I mean, I would
12 estimate less than 2 million.
13      Q.      Okay.  All right.  And that --
14 and that's principally for the fen-phen
15 litigation?
16      A.      Yes, sir.
17      Q.      The Rezulin litigation?
18      A.      Yes, sir.
19      Q.      Was there anything else, other
20 than the Vioxx litigation?
21      A.      Some small things that didn't
22 go to trial.  Lotronex, I gave a deposition
23 for.  I may have done a little bit of work on
24 Sulzer hip, but I didn't go to deposition or
Page 754

```
1    trial.  So, principally, it's been fen-phen
2    and Rezulin.
3         Q.    And --
4         A.    And then now Vioxx, of course.
```