# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE |
| GERALD D. BARNETT, | * | KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT MERCK & CO., INC.'S ("MERCK'S") OPPOSITION TO PLAINTIFF'S MOTION FOR ORDER EXCLUDING CERTAIN TESTIMONY OF PAUL ROACH, M.D. AND OBJECTIONS TO TESTIMONY BY PLAINTIFF'S EXPERTS THAT (1) PLAINTIFF HAD ONLY MILD ISCHEMIA IN JANUARY 2000, AND (2) VIOXX CAUSES OR ACCELERATES ATHEROSCLEROSIS

Plaintiff brings this motion in a last-minute attempt to exclude certain damaging testimony of Paul Roach, M.D., Merck's specific cause expert.  Dr. Roach is a cardiologist who opines, among other things, that: (i) just like Mr. Barnett's own treating cardiologist, Dr. Karavan, he believes that Mr. Barnett already had significant multi-vessel coronary artery disease ("CAD") by the time of his January 24, 2000 Cardiolite stress test – administered just after Mr. Barnett began taking Vioxx and two years before his heart attack; and (ii) Vioxx was not a contributing factor to Mr. Barnett's heart attack.  Plaintiff's motion is without merit.  As explained further below, Dr. Roach's opinions are supported by sufficient facts, are scientifically

reliable, and are all contained within his expert report.  Additionally, Dr. Roach is qualified to interpret the results of cardiac nuclear testing such as the Cardiolite stress test – and at least as well qualified in this discipline as any of plaintiff's retained expert cardiologists.  If Dr. Roach is not permitted to base his opinions about Mr. Barnett's condition on those tests, neither should plaintiff's experts be allowed to do so.[1]

Because they relate so directly to the issues raised in plaintiff's motion, Merck also uses this opportunity to assert two objections pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  First, Merck objects to testimony by plaintiff's experts that Mr. Barnett had only "minimal" ischemia at the time of his January 2000 Cardiolite stress test.  Such testimony is not based on sufficient facts or data, and is not the product of reliable methodology.  Second, Merck objects to testimony by plaintiff's experts that Vioxx accelerates the progression of atherosclerosis.  There is no scientific data or literature that supports this conclusion.  Nor can plaintiff show to a reasonable degree of medical probability that plaintiff's use of Vioxx accelerated the development of his atherosclerosis.

## II.    DR. ROACH'S TESTIMONY IS PROPER EXPERT OPINION.

### A.    Dr. Roach's Conclusion That Mr. Barnett Had Significant Multi-Vessel Coronary Artery Disease In 2000 Is Supported By Reliable Evidence.

Plaintiff bears the burden of proving both general and specific causation.  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005).  To prove specific causation, plaintiff must, among other things, exclude other plausible alternative causes of his injuries,

---

[1] Plaintiff also argues in his motion that the Court should not permit Dr. Roach to testify to matters about which Dr. Roach stated that he has no opinion.  Specifically, plaintiff argues that Dr. Roach should not opine on: (i) what and when Merck knew about the potential for Vioxx causing an increased risk in cardiovascular incidents; (ii) FDA rules or regulations; and (iii) drug
(*footnote continued next page*)

including naturally occurring atherosclerosis.  *See, e.g.*, *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 618 (E.D. La. 2003).  Mr. Barnett cannot carry this burden.  Plaintiff's own experts concede that Mr. Barnett's had significant CAD well before Mr. Barnett began using Vioxx.  Moreover, his own cardiologist, Dr. Karavan, believes that by early 2000 Mr. Barnett's atherosclerosis had significantly narrowed the major arteries supplying blood to his heart, leaving him with "balanced" ischemia.  Plaintiff seeks to exclude Dr. Roach's testimony to the same effect, arguing that it is nothing more than speculation.  Plaintiff is wrong.

On January 24, 2000 – over two years before his September 2002 heart attack and just after he began taking Vioxx – Mr. Barnett underwent a Cardiolite stress test, after complaining of chest pain.  (June 13, 2006 Deposition of Paul Roach, M.D. ("6/13/06 Roach Dep.") at 132:8-23, attached hereto as Ex. A.)  In a Cardiolite stress test, a nuclear isotope is injected into the patient's bloodstream.  An imaging device that can detect the nuclear material captures an image of the distribution of blood, or perfusion, in the heart.  Areas with insufficient blood flow, called ischemia, look different than those with normal blood flow.  Because different parts of the heart receive blood from different arteries, ischemia in a particular area will signal a blockage in a particular artery.  Typically, a Cardiolite stress test compares perfusion right after exercise with that at rest (stress testing).  People with ischemia have CAD.  *See* Michael A. Chizner, M.D., *Clinical Cardiology Made Ridiculously Simple* 139-44 (2004); *see also* (6/13/06 Roach Dep. at 88:25-90:12).

---

warning labels or whether the Vioxx labels were adequate.  (Pl.'s Mot. at 2.)  Merck did not designate Dr. Roach on these topics, and he will not offer opinions on them at trial.

822102v.1

As the illustrations in the attached text shows, the areas of ischemia look different on the Cardiolite scan than the areas with normal perfusion.  Because there is less blood flow to these areas, there are fewer radionuclides to be detected in the scan.  If, however, the three main arteries supplying blood to the heart are all partially blocked, the patient will have global or "balanced" ischemia.  All areas of the heart will look the same on the scan, potentially causing a false negative result.  Or, what may seem to be an area of moderate ischemia may actually be more severe than the scan indicates.

Mr. Barnett's own treating cardiologist, Dr. Karavan, testified that Mr. Barnett had balanced ischemia at the time of his January 2000 Cardiolite stress test, and that what had seemed like mild ischemia at the time actually was significant CAD involving the major cardiac arteries:

Q:    Am I right, Dr. Karavan, that a Cardiolite stress test is designed to see what areas of the heart are receiving less blood flow than other areas?

A:    That's right.

Q:    You're aware, sir, that if there is consistent similar blockage among the arteries in a person's body, a Cardiolite stress test might come back and say there's just mild ischemia?

A:    Correct.

Q:    So if a patient has 80 percent blockage in his LAD and 80 percent blockage in his RCA and 80 percent blockage in circumflex and 50 percent blockage in his left main and a little bit more blockage in his PDA, then the result that could come back from that test is mild lateral ischemia, correct?

…

A:    There – I still go by what I said – I've said all along.  I feel [Mr. Barnett] had three-vessel diffuse plaquing prior to when I saw him in 2002.  It takes years for it to develop so the odds are he had diffuse coronary artery plaquing in 2000 with his stress test, which can give you variable amounts of defects because of what we call balanced ischemia.

Q:    And when a patient has balanced ischemia or balanced plaque in their arteries, then a Cardiolite stress test might signal just mild ischemia?

A:    That's correct.

4

> Q:     One of the known limitations of a Cardiolite stress test is that balanced blockage of all major coronary arteries can actually show normal blood flow?
>
> A:     That would be correct.

(May 4, 2006 Deposition of Mark Karavan, M.D. at 182:2-183:13 (objection omitted), attached hereto as Ex. B; *id.* at 118:8-118:14 ("I would say given the results of this stress test, he had coronary artery disease."); *see also* June 9, 2006 Deposition of Douglas Zipes, M.D. ("6/9/06 Zipes Dep.") at 162:8-14, attached hereto as Ex. C;   April 25, 2006 Deposition of Michael Mikola, M.D. ("4/25/06 Mikola Dep.") at 237:24-238:2 (testifying he believed Mr. Barnett had CAD in January 2000 that had been developing over years), attached hereto as Ex. D.)

Dr. Roach has examined all of the available evidence concerning the condition of Mr. Barnett's heart.  Like Dr. Karavan, he reviewed: (i) Mr. Barnett's significant cardiac risk factors – including highly elevated LDL, or "bad" cholesterol; (ii) the undisputed evidence that by 2002 Mr. Barnett had severe multi-vessel CAD leading to quintuple bypass surgery; and (iii) the results of later testing, which confirmed Mr. Barnett's balanced CAD.   On the basis of this evidence, Dr. Roach has concluded that Mr. Barnett likely had significant multi-vessel CAD in 2000.  (6/13/06 Roach Dep. at 144:10-14; July 27, 2006 *Rough* Deposition of Paul Roach, M.D. ("7/27/06 Roach Dep.") at 428:1-429:18, attached hereto as Ex. E.)  Consistent with this view, Dr. Roach opined that, in light of the inherent limitations of the Cardiolite test and the other evidence in Mr. Barnett's medical records, the test likely showed a false negative – meaning that Mr. Barnett in fact had "balanced disease" among all his coronary vessels, which would have misleadingly appeared to be mild ischemia in the image.  (6/13/06 Roach Dep. at 136:12-137:25.)

In his motion, plaintiff seeks to exclude this testimony on the ground that it is "speculative."[2]   In support of this argument, plaintiff carefully selects a few lines from Dr. Roach's deposition testimony where, in response to plaintiff's counsel's question, "You say that he could have [had balanced disease].   That's speculation, right?", Dr. Roach replied, "Yes." (Pl.'s Mot. at 2-3.)   This is a classic case of taking one statement out of context to the exclusion of all the other testimony on the issue.   What plaintiff fails to mention in his motion is that Dr. Roach explained in detail, during a span of two lengthy depositions, the exact methodology and reasoning that he relied on in reaching his conclusion.   Immediately before the testimony cited by plaintiff, Dr. Roach explained his opinion as follows:   "[Y]ou asked me how do I know that he had coronary artery disease [in 2000].   One, I have myocardial perfusion imaging that supports that; two, I know that within a matter of two years we have angiographic data that shows that he has coronary artery disease."   (6/13/06 Roach Dep. at 135:24-136:4.)   Shortly thereafter, Dr. Roach offered the following to further explain his conclusion that the January 24, 2000 Cardiolite stress test could have been a false negative:

> Up to the point where Mr. Barnett had his myocardial infarction on the 6th of September [2002], he was asymptomatic.   He had no symptoms suggestive of angina up to the point where he had the myocardial infarction.   Now, unless we're going to argue that within the few hours prior to his infarction he suddenly developed severe obstructive disease, it would seem untenable that you couldn't reason that this man could walk around with severe three-vessel disease and not have symptoms.   So I think it's entirely plausible based on how he presented in September [2002] to believe that he had severe disease as far back as 2000 when he was evaluated at that time.

(6/13/06 Roach Dep. at 137:13-138:4.)

---

[2]  Because plaintiff – not Merck – bears the burden of excluding the possibility that his heart problems have resulted from naturally occurring atherosclerosis, Dr. Roach need not testify to a reasonable degree of medical certainty that Mr. Barnett in fact had significant multi-vessel CAD before he started taking Vioxx.   Rather, Dr. Roach need only show that the possibility cannot be

(*footnote continued next page*)

When Dr. Roach agreed to counsel's characterization of his opinion regarding Mr. Barnett's cardiovascular condition as of January 2000 as "speculation," all he was saying was that, because there was no direct evidence of the precise condition of Mr. Barnett's heart as of that date, it must be deduced from other data.  As plaintiff's own treating physicians and expert witnesses concede, the only way to know how much coronary artery disease Mr. Barnett had in January 2000 would be to have the results of an angiogram or cardiac catheterization – which we of course do not have.[3]  (*E.g.*, June 6, 2006 Deposition of Foster Bryan, M.D. at 104:15-22, 108:1-109:1 ("All I can say about him is I don't know . . . what he had in 2000.  I mean, I just – there's no cath.  There's no way to know."), 173:23-174:2, attached hereto as Ex. F; 6/9/06 Zipes Dep. at 163:1-164:14 (admitting angiograms are the "gold standard"); July 29, 2006 *Rough* Deposition of Jeffrey Popma, M.D. ("7/29/06 Popma Dep.") at 141:2-16 (admitting that stress tests only allow physicians to ascertain the "spectrum" of potential blockage within coronary arteries), 160:21-162:9 (admitting that his read of Mr. Barnett's January 2000 test is only an "informed estimation"), attached hereto as Ex. G.)  Dr Roach is simply stating the truth as to the state of the evidence of Mr. Barnett's coronary artery disease as of January 2000.

In short, Dr. Roach's testimony is not speculation, but rather proper expert opinion based on reliable evidence.  As he testified:

> I think that what we can stand very firmly on is that we know that he has coronary artery disease at that point in 2000. . . .  Based on the fact that we have a test that demonstrates ischemia, indicating that there is coronary artery disease, I would say that there was clearly disease present back in 2000.  Can I absolutely quantitate that for you?  No, because no cath was done to allow us to do that.  But do I feel confident that there was disease there that was significant and by my

excluded.

[3] That definitive evidence of the extent of Mr. Barnett's CAD as of January 2000 does not exist is not Merck's fault.  Dr. Mikola recommended that Mr. Barnett undergo cardiac catheterization, but this test was not performed at the time.  (4/25/06 Mikola Dep. at 207:16-208:12.)

> definition, perhaps a greater than 50% narrowing?   I feel confident based on knowing what I've seen in his 2002 cath.

(7/27/06 Roach Dep. at 374:22-377:14).   Merck should have the opportunity to present this testimony at trial and allow the jury to decide how much value to assign to it.   *See e.g.*, *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1089 (5th Cir. 1988) (in rejecting defendant boat manufacturer's argument in products liability action that plaintiff's expert should not have been allowed to indulge in "speculation" about the speed at which the allegedly defective boat struck a platform, the court explained:   "[the expert's] testimony on speed is more aptly characterized as an expert opinion, expressly allowed by the Federal Rules of Evidence.   FED. R. EVID. 702.   The facts on which [the expert] based his opinion as to speed were laid out before the jury; [the manufacturer] was free to argue – and did argue – that these facts were thin.")   But if this Court is inclined to exclude Dr. Roach's testimony on this subject as improper, then it should likewise exclude the testimony of plaintiff's experts, who rely on exactly this *same* evidence to minimize Mr. Barnett's ischemia as of January 2000.   (*See infra* at Part III.)   If it is speculation to say that Mr. Barnett may have had moderate to severe CAD in 2000 based on his subsequent severe balanced cardiovascular disease and a 2000 Cardiolite stress test that cannot detect balanced disease, then it necessarily must also be speculation to say, based on this same evidence, that he did not.

### B.   Dr. Roach Is Qualified To Interpret Results Of The Cardiolite Test.

Plaintiff argues that, because Dr. Roach testified that he does not hold himself out to be an expert on nuclear cardiology, he should be precluded from proffering opinions based on his interpretation of the results of Mr. Barnett's Cardiolite exams.   This is contrary to the law. Nothing in the federal rules requires a witness to be board-certified in a specific sub-specialty of medicine to render opinions with respect to tests that fall within that area.   All that the rules

require is for a proffered expert to have sufficient underlying knowledge on which to base his opinion.  FED. R. EVID. 702.  Dr. Roach testified that he can read such tests and derive information from them. (6/13/06 Roach Dep. at 57:22-58:1.)  Furthermore, Dr. Roach's descriptions of how these types of tests work and the results they yield, which he testified to at length in both of his depositions, demonstrate that he has a sufficient working understanding of Cardiolite stress tests to render reliable opinions.  (*See e.g.*, 6/13/06 Roach Dep. at 89:20-90:12 (explaining Cardiolite stress test in general); 7/27/06 Roach Dep. at 374:1-377:14 (discussing Mr. Barnett's 2002 Cardiolite stress test).)

Plaintiff's challenge to Dr. Roach's qualifications on this subject is disingenuous.  On his own behalf, plaintiff proffers Dr. Jeffrey Popma and Dr. Douglas Zipes to interpret the results of plaintiff's Cardiolite stress test.  Yet, by his own admission, Dr. Popma is not an "expert" in the area.  (*See* July 22, 2006 Deposition of Jeffrey Popma, M.D. ("7/22/06 Popma Dep.") at 533:10-18 ("Q:  Do you consider yourself an expert in interpreting Cardiolite stress tests?  A:  I don't.  I interpret them in my clinical practice; but in situations like this, I think the deference of this is to an expert . . . ."), attached hereto as Ex. H; *see also* 7/29/06 Popma Dep. at 153:1-11; 171:24-172:17 ("I'm not an expert in nuclear imaging . . . .").)  And Dr. Roach is at least as qualified as Dr. Zipes to read an interpret Cardiolite stress tests.  (*See* 6/9/06 Zipes Dep. at 13:17-14:16 ("Q: Do you consider yourself an expert in the interpretation of the May 2nd, 2006 nuclear stress test? A:  I am an expert in the sense that I am a general cardiologist and I review the films of my patients.  So in that sense, I am qualified to look at that stress test, but I am not a boarded expert in that area.").)   In short, given his background and experience as a practicing cardiologist, Dr. Roach is qualified to render opinions based on Mr. Barnett's January 2000 Cardiolite stress test.

822102v.1

C.      **Dr. Roach's Testimony That Vioxx Does Not Cause or Accelerate Atherogenesis Is Admissible.**

Plaintiff also incorrectly argues that the Court should exclude Dr. Roach's testimony that Vioxx does not "cause a progression of atherosclerosis" because Dr. Roach allegedly failed to include this opinion in his expert report. (Pl.'s Mot. at 3.) This is incorrect. Dr. Roach discusses atherosclerosis in depth in the first page of his report, including the risk factors for the development of atherosclerosis. (Expert Report of Paul Roach, M.D. ("Roach Rpt.") at 1, attached hereto as Ex. I.) His list of factors includes "family history, dyslipidemia, diabetes mellitus, hypertension, smoking, obesity, male gender, age, metabolic syndrome, and elevated blood levels of homocysteine." (*Id.*) Notably, Dr. Roach does not include Vioxx as one of these risk factors. Instead, he expressly concludes Mr. Barnett's CAD was *not* related to Vioxx. (*Id.* at p. 17 ("In all reasonable medical probability, it is my opinion that Mr. Barnett's coronary artery disease and myocardial infarction were not related to his use of rofecoxib, but rather the result of his well established risk factors, such as hyperlipidemia and family history with contributions from stress, age, and male gender."); *see also* 6/13/06 Roach Dep. at 138:5-140:20 (explaining same).) Furthermore, Dr. Roach testified that he reviewed the scientific literature addressing Vioxx and atherosclerosis to reach his conclusion regarding specific causation, and that he found no evidence linking Vioxx to atherosclerosis. (6/13/06 Roach Dep. at 140:9-20 (stating his reliance on scientific literature); 7/27/06 Roach Dep. at 418:2-425:6 (stating his opinion that the totality of the evidence supports his conclusion that Vioxx does not promote the progression of atherogenesis and explaining the evidence he considered in reaching this conclusion).) Plaintiff twice deposed Dr. Roach on his opinion that Vioxx did not cause or contribute to Mr. Barnett's atherosclerosis. He cannot now be heard to complain that this testimony is an unfair surprise and should be excluded.

### III.  MERCK'S OBJECTION TO TESTIMONY BY PLAINTIFF'S EXPERTS THAT PLAINTIFF HAD ONLY MILD ISCHEMIA IN JANUARY 2000.

Under Rule 702, expert opinion is admissible only "if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702.  Here, plaintiff's experts rely on the January 2000 Cardiolite stress test to support their conclusion that Mr. Barnett's ischemia was only "mild" or "minimal" at the time.  (*E.g.*, July 19, 2006 Deposition of Douglas Zipes, M.D. ("7/19/06 Zipes Dep.") at 353:16-19 (characterizing Mr. Barnett's ischemia in January 2000 as "very mild"); 417:6-16 ("He had mild, if any, lateral wall ischemia."), attached hereto as Ex. J; 7/29/06 Popma Dep. at 53:11-54:12 (characterizing Mr. Barnett's ischemia in January 2000 as "minimal" and "undetectable").)  But this testimony does not meet the requirements of Rule 702.  As evidenced by the testimony of plaintiff's own witnesses, it is well known in the medical community that "balanced" ischemia can mask CAD in a Cardiolite stress test – thereby making a negative result inherently unreliable.

Thus, plaintiff cannot show to a reasonable degree of medical probability that Mr. Barnett only had "minimal" or "mild" CAD before he started taking Vioxx.  As explained above, plaintiff's experts cannot rely on the 2000 Cardiolite stress test to exclude this possibility, particularly in light of the fact that Mr. Barnett eventually did have blockages in 5 vessels, resulting in 5-vessel bypass surgery in 2002.  The Court should exclude their testimony on this subject, which does not pass muster under Rule 702.

**IV.    MERCK'S OBJECTION TO TESTIMONY BY PLAINTIFF'S EXPERTS THAT VIOXX CAUSES OR ACCELERATES ATHEROSCLEROSIS.**

Finally, Merck objects to testimony by plaintiff's experts that Vioxx causes cardiovascular events by causing or accelerating atherosclerosis.[4]   (*See* June 8, 2006 Deposition of Egil Fosslien, M.D. ("6/8/06 Fosslien Dep.") at 109:4-7, 121:20-22, attached hereto as Ex. K; June 2, 2006 Deposition of Lemuel Moye ("6/2/06 Moye Dep.") at 320:7-321:22, attached hereto as Ex. L; 6/9/06 Zipes Dep. at 87:25-88:6.)  The very same studies discussed by Dr. Roach at his depositions show there is no support for this theory.  Given that it lacks scientific support, the Court should exclude any testimony.[5]

No study shows or even purports to show that Vioxx accelerates atherosclerosis in humans.  Animal and test-tube studies exploring this hypothesis are inconclusive at best, and indeed, several such studies have reported that administering Vioxx actually *slows* the development of atherosclerosis.  Plaintiff's experts, accordingly, can point to no valid evidence that Vioxx had an atherogenic effect in Mr. Barnett.[6]

---

[4] On July 3, 2006, Merck agreed to withdraw its Motion to Exclude Opinion Testimony that Vioxx Causes Atherosclerosis, in which Merck asserted substantially the same arguments as are advanced in this objection.  The parties agreed, however, that Merck's withdrawal of the motion did not mean that Merck was agreeing to waive its right to challenge the testimony of plaintiff's experts on this speculative theory at trial or on appeal.  This objection is reasserted here in part to preserve Merck's appellate rights.

[5] The plaintiff in the *Plunkett* trial agreed not to pursue this mechanism for precisely that reason. (See 2/16/2006 *Plunkett  v. Merck* Transcript at 2262:11-2263:2, attached hereto as Ex. M.)

[6] Expert testimony that Vioxx accelerates atherosclerosis has been properly excluded in previous Vioxx trials.  (*See* 03/14/2006 *Cona-McDarby v. Merck* Transcript  at 1182:13-1183:14, attached hereto as Ex. N (holding that the "extremely prejudicial" impact of testimony "that it is possible or biologically plausible that Vioxx can be, in fact, causing atherosclerosis" would outweigh such testimony's probative value).)

A.     **Plaintiff's Experts Concede The Lack of Scientific Support For Their Atherosclerosis Theory.**

Although plaintiff's experts purport to opine that animal studies show that Vioxx accelerates atherosclerosis, they acknowledge – as they must – the limitations to their opinion. For example, Dr. Epstein, whom plaintiff designated as a non-retained expert, admits that he is aware of studies showing precisely the opposite – *i.e.*, that Vioxx *reduces* the development of atherosclerosis:

> Q:     Are you aware of other mice studies that did study the effect of MF-tricyclic and Vioxx and other COX-2 inhibitors for a longer period of time than your study and found either that there was no effect on the size of the atherosclerotic plaque or that the COX-2 inhibitor actually reduced the size of the plaque?
>
> A:     Yes.

(May 30, 2006 Deposition of Stephen E. Epstein, M.D. ("5/30/06 Epstein Dep.") at 197:12-21, attached hereto as Ex. O.)  So does Dr. Zipes.  He testified:

> Q:     Are you aware of any studies in animals or humans that suggest that Vioxx does not cause atherosclerosis or its progression?
>
> A:     Yes.
>
> Q:     Like what?
>
> A:     One is by Oates.  And they suggested that it may be the timing as well as the duration of COX-2 inhibition that might affect the development of atherosclerosis.
>
> Q:     Are there other animal or human studies, sir, other than Oates that suggests that Vioxx does not cause atherosclerosis or its progression?
>
> A:     Yes, I can't really cite them to you, but yes.

(6/9/06 Zipes Dep. at 99:15-100:2.)

Where an expert can only speculate as to the *possible* mechanism by which a drug may be capable of causing injury, the expert's testimony is unreliable and, thus, inadmissible.  *Moore*, 151 F.3d at 279 ("In sum, [the expert] could cite no scientific support for his conclusion that

13

exposure to any irritant at unknown levels triggers this asthmatic-type condition.   Under the *Daubert* regime, trial courts are encouraged to exclude such speculative testimony as lacking any scientific validity."); *See also Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 311-12 (5th Cir. 1991) (holding that expert testimony that failure of coupling was caused by a construction defect or failure to label should be excluded as speculative in part because the expert did not determine which of several possible causes was most probable).   Accordingly, the Court should preclude any evidence or argument that Vioxx can accelerate the progression of atherosclerosis.

    **B.**    **None Of The Articles On Which Plaintiff's Experts Rely Establishes That Vioxx Can Accelerate the Progression of Atherosclerosis.**

Plaintiff's experts have no scientific basis to opine that Vioxx could accelerate the progression of atherosclerosis, or that it did so in the case of Mr. Barnett.  The only actual data regarding adverse plaque-related effects from administering COX-2 inhibitors are drawn from animal studies, most of which did not involve Vioxx.    But animal studies *cannot* establish causation in humans. *See, e.g.*, *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) (rejecting animal studies given difficulty extrapolating results to humans); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 197-98 & n.5 (5th Cir. 1996) (rat studies were "inconclusive" and "unreliable" and could not establish that chemical would have same effect in humans); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1480 (D.V.I.) (extrapolation from animal studies to humans to prove causation is "scientifically invalid" because, among other reasons, "different species can react differently to the same agent"), *aff'd*, 46 F.3d 1120 (3d Cir. 1994); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1241 (E.D.N.Y. 1985) (finding animal studies inadmissible in an action alleging health problems arising from exposure to herbicide "because they [the animal studies] involve different biological species"); *Maurer v.*

14

*Heyer-Schulte Corp.*, No. Civ.-A-92-3485, 2002 WL 31819160, at *3-4 (E.D. La. Dec. 13, 2002) (court "frowns upon the use of animal studies to predict carcinogenicity in humans").

Moreover, these studies did not even show an adverse link between any form of COX-2 inhibition and plaque in the animals used – much less a link between Vioxx specifically and plaque *in humans*. In fact, the one study that specifically involved Vioxx suggests that COX-2 inhibition might actually slow or reduce plaque formation – which has biological plausibility because of the role that COX-2-related inflammation plays in plaque phenomena.

For example, Dr. Zipes relies on the VIGOR and APPROVe studies to support his opinion. (6/9/06 Zipes Dep. at 85:17-86:5, 102:2-20.) The studies, however, say nothing about whether Vioxx can accelerate the progression of atherosclerosis. In fact, neither study even purported to examine the extent or progression of atherosclerosis in patients taking Vioxx or the comparator (naproxen in VIGOR and placebo in APPROVe).[7] And Dr. Zipes admits he is aware of no article interpreting VIGOR to say that the difference in CV results is attributable to a Vioxx-caused increase in atherosclerosis. (6/9/06 Zipes Dep. at 102:16-20.) He would have to say the same thing about APPROVe. Plaintiff's experts cannot rely on a study to support a proposition that the study does not even address.

Even assuming that animal studies were sufficient under *Daubert* to establish causation in humans – and they are not – the studies plaintiff's experts rely on do not support their position. The objective flaws in the animal studies plaintiff's experts cite further render the methods of those experts unreliable.

---

[7] Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial* (hereinafter "Bresalier"), NEW ENG. J. MED. March 17, 2005; 352:1092; Claire Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 NEW. ENG. J. MED.1520, Nov. 30, 2000.

The Egan study Dr. Zipes cites (6/9/06 Zipes Dep. at 85:17-86:12) also does not support plaintiff.  Again, the study did not involve humans, nor did it even involve Vioxx.  Instead, the authors administered a different COX-2 inhibitor, alone and in combination with a thromboxane receptor antagonist, to genetically altered mice.  Animal studies involving drugs other than Vioxx provide an insufficient basis for an opinion that Vioxx can accelerate atherosclerosis in humans.[8]  Even in mice, however – and putting aside that the study did not involve Vioxx – the authors did not find that COX-2 inhibition accelerated the development of atherosclerosis.  On the contrary, they found the *opposite*.  As the published article reports, the authors found that administration of a selective COX-2 inhibitor, either alone or in combination with a thromboxane receptor antagonist, "*failed to modify* disease progression" in mice.[9]

The Rudic article also does not support plaintiff.  Like the Egan study, the Rudic study also did not involve humans or Vioxx.  Instead, it involved mice genetically-engineered to produce lack a prostacyclin receptor[10] and mice that received numesulide, a COX-2 inhibitor that

---

[8] *Compare Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) (holding animal studies have "very limited usefulness" given difficulty extrapolating results to humans) *and Merrell Dow Pharmaceutical, Inc. v. Havner*, 953 S.W.2d 706, 729 (Tex. 1997) ("the only way to test whether data from nonhuman studies can be extrapolated to humans would be to conduct human experiments or to use epidemiological data") *with McClain*, 401 F.3d at 1246 (excluding expert's opinion that ephedrine causes vasospasms based on analogy to different drug and noting that "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced" (internal quotation marks and citations omitted) ).

[9] Egan, K., *Cyclooxygenase, Thromboxane, and Atherosclerosis: Plaque Destabilization by Cyooxygenase-2 Inhibition Combined with Thromboxane Receptor Antagonism*, CIRCULATION 2005: 111:334-42.

[10] No evidence suggests that COX-2 inhibition, by Vioxx or any other COX-2 inhibitor, reduces human prostacyclin production to zero.  Dr. FitzGerald's study, conducted with Merck researchers and later published, found that Vioxx reduced urinary prostacyclin metabolites by only about 50 percent.  (*See* Catella-Lawson, F., et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics and Vasoactive Ekosanoids*, J. PHARMACOL. AND EXP. THERAP. 1999 May; 289(2):735-41.)  This alone precludes any
*(footnote continued next page)*

822102v.1

is not related to Vioxx.  In one experiment, the researchers transplanted atherosclerotic arteries into the two groups of mice and measured the rate at which the transplanted tissues were rejected in both groups.  The results of this experiment have no relevance here because – in addition to the fact that this is a study of mice, not men – Mr. Barnett did not receive numesulide or coronary artery transplants.  In a second experiment, the researchers surgically narrowed the arteries in both groups of mice to simulate ischemia and reported that *neither* group experienced a "further . . . reduction in luminal diameter."[11]  The results of this latter experiment contradict plaintiff's theory that COX-2 inhibition can accelerate atherosclerosis.

Similarly, the 2002 Cheng study Dr. Zipes cites (6/9/06 Zipes Dep. at 85:17-86:12) did not involve the use of any COX-2 inhibitor.[12]  That study involved the use of mice genetically-engineered to have no prostacyclin receptor.  As such, this study yielded no data on the effect of COX-2 inhibition on plaque phenomena even in mice, much less in humans.  In fact, in addition to other potentially material differences between administering COX-2 inhibitors and genetic alteration, no one has shown that any COX-2 inhibitors reduce prostacyclin to zero in any part of the body of mice or man.

Finally, the Antman article cited by Dr. Zipes (6/9/06 Zipes Dep. at 85:23-86:15) also does not support plaintiff's theory.  In the article, the author merely reviews literature on COX-2 inhibitors prepared by others and address only in passing the hypothesis that COX-2 inhibition may be associated with the progression of atherosclerosis.  Indeed, Antman concedes that

---

scientifically reliable extrapolation from Dr. Rudic's mouse study to hypothetical clinical effects of Vioxx in humans.

[11]  Rudic et al., *COX-2-Derived Prostacyclin Modulates Vascular Remodeling*, CIRCULATION RESEARCH 2005; 96:1240-1247, at 1244.

[12]  Cheng *et al.*, *Role of prostacyclin in the cardiovascular response to thromboxane A2* (hereinafter "Cheng"), SCIENCE 2002 Apr. 19; 296(5567):539-41.

822102v.1

plaintiffs' theory "is currently controversial."[13]   Nor does the article report any original research supporting plaintiffs' theory.   On its face, this article provides no scientific support for an opinion that Vioxx can accelerate the progression of atherosclerosis.

In short, plaintiff's experts have improperly relied exclusively on animal studies, none of which actually support their theory.   Existing animal studies actually show that Vioxx actually retards the progression of atherosclerosis.   The Court therefore should exclude any testimony by plaintiff's experts that Vioxx can accelerate the progression of atherosclerosis.   *See*, *e.g.*, *Moore*, 151 F.3d at 278 (holding, in part, that experts' reliance on studies that did not support their conclusions was grounds for excluding the expert testimony).

## C.   Plaintiff's Experts Ignore Multiple Studies That Undermine Their Theory.

For example, earlier mouse studies by Olesen (2002) and Pratico (2001) found that administration of a potent experimental COX-2 inhibitor (not Vioxx) did not accelerate atherosclerosis.[14]   In an even more recent mouse study published in September 2005 by Burleigh and others (including noted pharmacologist Dr. John Oates),[15] the authors found that "[s]elective inhibition of COX-2" – this time using Vioxx as opposed to some other COX-2 inhibitor – in fact "reduces atherosclerosis in . . . mice."[16]   Notably, this finding was not isolated or unexpected, but replicated and expanded on the similar finding of an earlier published mouse

---

[13]   Antman et. al., *Cyclooxygenase Inhibition and Cardiovascular Risk* (Special Report), CIRCULATION 2005, 112:759-770, 760, attached hereto as Ex. F.

[14]   Olesen M, et al., *No effect of Cyclooxygenase Inhibition on Plaque Size in Atherosclerosis-prone Mice*, SCAND. CARDIOVASC. J., 2002 Dec;36(6):362-7; Pratico D, et al., *Acceleration of atherogenesis by COX-1 dependent prostanoid formation in low density lipoprotein receptor knockout mice*, PROC NATL ACAD SCI USA, 2001 Mar. 13;98(6):3358-63, Epub 2001 Mar 6.

[15]   Burleigh ME, et al., *Cyclooxygenase-2 Promotes Early Atherosclerotic Lesion Formation in ApoE-deficient and C57BL/6 Mice*, J MOL CELL CARDIOL, 2005 Sep. 39(3):443-52.

[16]   *Id.* at 446 (emphasis added).

822102v.1

study by the same authors.[17]   In both studies, the authors hypothesized that these results occurred because the anti-inflammatory properties of Vioxx reduced COX-2-associated inflammation involved in the atherosclerotic process.[18]   Finally, several recent studies in humans have suggested that COX-2 inhibition (including COX-2 inhibition from Vioxx) is associated with significantly reduced levels of C-reactive protein – considered a marker for progression of atherosclerosis with possible direct involvement in the atherosclerotic process.[19]   Again, these results reinforce the absence of reasonable or meaningful support in the scientific literature for *any* suggestion that Vioxx promotes or accelerates atherosclerosis in humans.

### D.  Plaintiff's Experts Have No Basis Upon Which to Opine that Vioxx Accelerated Mr. Barnett's Atherosclerosis.

Finally, there is no evidence regarding how – if at all – the use of Vioxx by plaintiff in this case impacted atherosclerosis.   In order to testify to a reasonable degree of medical probability that either plaintiff's use of Vioxx accelerated the development of his atherosclerosis, an expert would need at minimum to consider evidence of when the plaintiff's atherosclerosis began to develop – likely years if not decades before – and how rapidly it developed both before and after he began taking Vioxx.   As noted above, plaintiff's experts cannot legitimately exclude

---

[17] Burleigh ME, et al., *Cyclooxygenase-2 Promotes Early Atherosclerotic Lesion Formation in LDL Receptor-deficient Mice*, CIRCULATION, 2002 Apr. 16; 105(15):1816-23.

[18] *See* Ross, R., *Atherosclerosis – An Inflammatory Disease*, NEW ENG. J. MED., Jan.14, 1999; 340:115-26 (describing atherosclerosis as "an inflammatory disease").

[19] Bogaty P, et al., *Impact of Prolonged Cyclooxygenase-2 Inhibition on* Inflammatory *Markers, and Endothelial Function in Patients With Ischemic Heart Disease and Raised C-reactive Protein:  A Randomized Placebo Controlled Study*, CIRCULATION, 2004; 110:934-39; Monakier D, et al., *Rofecoxib, a COX-2 inhibitor, Lowers C-reactive Protein and Interleukin-6 Levels in Patients With Acute Coronary Syndromes* (hereinafter "Monakier"), CHEST, 2004 May;125(5):1610-5; *see also* Ridker P, et al., *Inflammation, Aspirin, and the Risk of Cardiovascular Disease in Apparently Healthy Men*, New Eng. J. Med., April 3, 1997; 336:973-79 (clinical finding of relationship between C-reactive protein and stroke and myocardial infarction).

the possibility that Mr. Barnett's atherosclerosis began well before he took Vioxx. No such evidence exists. Without a baseline, an expert cannot judge the impact of any hypothetical acceleration (if indeed any occurred), and the expert accordingly cannot, by definition, provide a reliable opinion that acceleration of atherosclerosis could have contributed to any injury.

The specific causation testimony plaintiff's experts provide amounts to nothing more than a temporal proximity argument – *i.e.*, Mr. Barnett ingested Vioxx during the period in which there was atherogenesis, ergo Vioxx must be the cause. (*E.g.*, 6/9/06 Zipes Dep. at 104:15-108:8.) Courts have rejected this primitive view of causation. *Moore*, 151 F.3d at 278 ("In the absence of an established scientific connection between exposure and illness . . . the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation.") Mr. Barnett had numerous risk factors that made him highly susceptible to atherosclerosis. Plaintiff's experts cannot – and, indeed, have not – ruled out the possibility that it was these factors, and not Vioxx, that caused Mr. Barnett's alleged injuries. The specific causation testimony of these experts as it relates to atherosclerosis should therefore be excluded.

## V.     CONCLUSION.

For the foregoing reasons, Merck respectfully requests that the Court: (1) deny plaintiff's Motion to exclude certain testimony of Dr. Paul Roach; and (2) sustain Merck's objections to (i) testimony by plaintiff's experts that plaintiff had only mild ischemia in January 2000, and (ii) testimony by plaintiff's experts that Vioxx causes or accelerates atherosclerosis.

Respectfully submitted,


*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

21

822102v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Opposition to Plaintiff's Motion for Order Excluding Certain Testimony of Paul Roach, M.D. and Objections to Testimony by Plaintiff's Experts That (1) Plaintiff Had Only Mild Ischemia in January 2000, and (2) Vioxx Causes or Accelerates Atherosclerosis has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pretrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 31st day of July, 2006.

*/s/ Dorothy H. Wimberly*_____

822102v.1