**Exhibit A - Excerpts from June 13, 2006 Roach Deposition**

• **Opposition to Roach Motion**

[1:1] - [1:25]          6/13/2006     Roach, Paul J. (Barnett pp. 1-286)

```
page 1
1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
2
3    IN RE:  VIOXX                    "  MDL Docket No. 1657
4    PRODUCTS LIABILITY LITIGATION    "  SECTION L
5                                     "  JUDGE FALLON
6    Gerald Barnett                   "  MAG. JUDGE KNOWLES
     vs.                              "
7    Merck & Co., Inc.                "  CASE NO. 02:06cv485
8
9             ********************************
10                     ORAL DEPOSITION OF
11                    PAUL J. ROACH, M.D.
12                        JUNE 13, 2006
13            ********************************
14
15
16        ORAL DEPOSITION OF PAUL J. ROACH, M.D., produced at
17   the instance of the Plaintiff, Gerald Barnett, in the
18   above-styled and numbered cause on the 13th day of June,
19   2006, at 12:30 P.M., before Micheal A. Johnson,
20   Certified Shorthand Reporter in and for the State of
21   Texas, reported by machine shorthand, at the law offices
22   of Fulbright & Jaworski, L.L.P., 600 Congress Avenue,
23   Suite 2300, Austin, Texas, pursuant to Notice of Oral
24   Deposition, and in accordance with the Federal Rules of
25   Civil Procedure.
```

[57:22] - [58:1]          6/13/2006     Roach, Paul J. (Barnett pp. 1-286)

```
page 57
22        Q.  Do you consider yourself or hold yourself out
23   as an expert in nuclear cardiology?
24        A.  I do not.  I generally can look at them and
25   derive information, but I do not read those on a daily
page 58
1    basis.
```

[88:25] - [90:12]          6/13/2006     Roach, Paul J. (Barnett pp. 1-286)

```
page 88
25        Q.  Doctor, what tests can a cardiologist use to
page 89
1    diagnose and determine the extent of cardio -- coronary
2    artery disease?
3        A.  Well, we can generally broadly classify them
4    into invasive or noninvasive tests.  Noninvasive tests
5    will give us an inference as to whether a coronary
6    artery disease is present or not.  And I will also sort
7    of have to qualify that now with the advent of CT
8    angiography if we classify that as a noninvasive test,
9    meaning we're not actually poking an artery.  Then I
10   guess we can actually draw a direct -- we can get
11   actually a direct assessment of coronary artery disease
12   with that test.  But let's start with what we've had
13   historically available to us.
14            We have historically had available to us stress
15   testing.  And we can start with just plain treadmill
16   exercise stress testing was the first technique
17   available to us -- one of the first techniques available
18   to us to determine whether or not someone had
19   obstructive coronary artery disease.
20            Techniques were then later developed using
21   various nuclear -- nuclear medicine agents which get
22   tagged to red blood cells, which allow us to assess
23   blood flow to the heart muscle.  And, basically, that
```



EXHIBIT

A

Blumberg No. 5119

1

Exhibit A - Excerpts from June 13, 2006 Roach Deposition

• Opposition to Roach Motion

```
24  whole set of testing is still stress testing, but it's
25  referred to as nuclear stress testing. And that can be
page 90
1   done either in an exercise fashion using a treadmill or
2   pharmacologically using different agents to either
3   induce vasodilation or to increase the double product --
4   the double product, which is the heart rate and the
5   blood pressure, in order to provide a stress to the
6   myocardium.
7           So the -- so the three broad sort of categories
8   of nuclear testing would be a nuclear exercise stress
9   test, an Adenosine nuclear stress test, and a Debutamine
10  nuclear stress test. The common agent used today for
11  most nuclear stress tests is technetium and it goes by
12  the trade name of Cardiolite.
```

[132:8] - [132:23]        6/13/2006     Roach, Paul J. (Barnett pp. 1-286)

```
page 132
8           Q.  (BY MR. WACKER)  Okay.  Doctor, let's move to
9   the time frame of January 2000.
10          On January 19th, 2000, Mr. Barnett presented to
11  the emergency room complaining of atypical chest pain
12  and was ruled out for an acute myocardial infarction,
13  correct?
14          A.  Yes, he did present with chest pain at that
15  time, was admitted to the hospital and myocardial
16  infarction was ruled out.
17          Q.  And it was atypical chest pain?
18          A.  I'd have to go back and look at the records,
19  but I think that was generally the -- the feeling.
20          Q.  At that time, Dr. Swami recommended an exercise
21  stress test on an outpatient basis on discharge from the
22  hospital, correct?
23          A.  Yes.
```

[135:24] - [136:4]        6/13/2006     Roach, Paul J. (Barnett pp. 1-286)

```
page 135
24          A.  You're absolutely right.  But I think you asked
25  me how do I know that he had coronary disease at that
page 136
1   point.  One, I have myocardial profusion imaging that
2   supports that; two, I know that within a matter of two
3   years we have angiographic data that shows that he has
4   coronary artery disease.
```

[136:12] - [137:25]        6/13/2006     Roach, Paul J. (Barnett pp. 1-286)

```
page 136
12          Would you agree that if there was coronary
13  disease, it was limited to mild disease on the left
14  system?
15          A.  No.
16          Q.  What's the basis of that disagreement?
17          A.  He could have had balanced disease that would
18  have prevented the striking profusion abnormalities that
19  you typically will see with single-vessel disease.
20          Q.  Well, you say he could have.  That's
21  speculation, right?
22          A.  Yes.
23          Q.  And the doctors at the time didn't diagnose him
24  with balanced disease, did they?
25          A.  They did not.  I would like to -- and I know
page 137
1   you're probably not going to allow me.  I would like to
2   clarify.  I think you asked for my opinion as to what
3   would have allowed the finding on the scan, and I was
4   telling you that it was balanced disease.  And then you
5   asked -- forget it.
```

**Exhibit A - Excerpts from June 13, 2006 Roach Deposition**

• Opposition to Roach Motion

```
6              MR. WACKER:  Well, I'm going to move to
7    strike as nonresponsive.  No question pending.
8        Q.  (BY MR. WACKER)  All right.  Well, based upon
9    the entire study, you cannot reasonably conclude that
10   there was high-grade occlusive coronary artery disease
11   in January 2000, correct?
12       A.  I don't think that we can say conclusively one
13   way or the other.  And let me offer this as an
14   explanation for why the EKG part and the symptom part of
15   a treadmill may have been a false negative.  Up to the
16   point where Mr. Barnett had his myocardial infarction on
17   the 6th of September, he was asymptomatic.  He had no
18   symptoms suggestive of angina up to the point where he
19   had the myocardial infarction.
20             Now, unless we're going to argue that within
21   the few hours prior to his infarction he suddenly
22   developed severe obstructive disease, it would seem
23   untenable that you couldn't reason that this man could
24   walk around with severe three-vessel disease and not
25   have symptoms.
```

[137:15] - [138:4]     6/13/2006      Roach, Paul J. (Barnett pp. 1-286)

```
page 137
15   a treadmill may have been a false negative.  Up to the
16   point where Mr. Barnett had his myocardial infarction on
17   the 6th of September, he was asymptomatic.  He had no
18   symptoms suggestive of angina up to the point where he
19   had the myocardial infarction.
20             Now, unless we're going to argue that within
21   the few hours prior to his infarction he suddenly
22   developed severe obstructive disease, it would seem
23   untenable that you couldn't reason that this man could
24   walk around with severe three-vessel disease and not
25   have symptoms.
page 138
1              So I think it's entirely plausible based on how
2    he presented in September to believe that he had severe
3    disease as far back as 2000 when he was evaluated at
4    that time.
```

[138:5] - [140:20]     6/13/2006      Roach, Paul J. (Barnett pp. 1-286)

```
page 138
5        Q.  Except the one thing that's missing in that
6    equation is that you're ruling out and do not accept
7    that Vioxx could have played a role in progressing that
8    disease, true?
9        A.  There -- that's absolutely right.  You're
10   asking me do I think that Vioxx caused a profession of
11   his disease?
12       Q.  Yes.
13       A.  No, I do not believe that Vioxx played a role
14   in the progression of his disease.
15       Q.  Right.  So that's part of your opinion.  Your
16   opinion is that you don't believe, Dr. Roach, that Vioxx
17   progressed his plaque?
18       A.  That's correct.
19       Q.  And where is that stated in your report?
20       A.  The bottom line is that there is no evidence in
21   the scientific literature that suggests that Vioxx
22   causes progression or initiation of atherosclerosis in
23   human beings.
24       Q.  Doctor, where is that stated in your report?
25   Where did you -- where did you opine that in your
page 139
1    report?
2        A.  I think that I have said in my report that I
3    did not feel that -- let me get the report.  The final
4    paragraph, "In all reasonable, medical probability, it
5    is my opinion that Mr. Barnett's coronary artery disease
```

Exhibit A - Excerpts from June 13, 2006 Roach Deposition

• Opposition to Roach Motion

```
6    and myocardial infarction were not related to his use of
7    rofecoxib, but rather the result of his well-established
8    risk factors, such as hyperlipidemia and family history
9    with contributions from stress, age, and male gender."
10        Q.  Well, that's a different answer to the question
11   I had.  Where does it state in your report that you
12   prepared for this case that Vioxx --
13        A.  I don't know how it's --
14        Q.  -- that Vioxx does not increase the progression
15   of plaque or atherogenesis?
16             MR. BRENNAN:  I'm going to object to form.
17   And, Paul, just -- again, y'all are starting to talk
18   over each other, so...
19        A.  I don't know how I could make it anymore clear
20   than that.  It says it's my opinion that his coronary
21   artery disease were not related to the use of rofecoxib.
22        Q.  (BY MR. WACKER)  Yeah, but the point is it does
23   not say -- it does not address the issue of whether
24   Vioxx increases atherogenesis, you don't -- you don't
25   address that in your report?
page 140
1         A.  I think that I do by saying that his coronary
2    artery disease is not related to his use of rofecoxib.
3         Q.  I mean --
4         A.  I don't know how else to say it.  I mean --
5         Q.  Well, that's a conclusion.  You're pointing to
6    a conclusion in your report that doesn't address the
7    issue.
8         A.  I think I've addressed the issue.
9         Q.  So you -- that's -- that's how you address the
10   issue of whether -- a significant issue in this case is
11   Vioxx progressing plaque and increasing the propensity
12   for atherogenesis.  And your -- your way to address that
13   is just by saying in a conclusory fashion that you don't
14   think that Vioxx contributed.  That's your way of doing
15   it?
16        A.  I think --
17             MR. BRENNAN:  Objection, form.
18        A.  I think we've reviewed a large body of
19   literature throughout the report and then we derive a
20   conclusion at the end of the report.
```

[144:10] - [144:14]    6/13/2006    Roach, Paul J. (Barnett pp. 1-286)

```
page 144
10        A.  I have no other plausible explanation for his
11   disease in 2002 other than the standard risk factors and
12   progression of disease associated with that.  I have
13   reason to believe that he had established coronary
14   artery disease in January of 2000.
```

[286:1] - [286:25]    6/13/2006    Roach, Paul J. (Barnett pp. 1-286)

```
page 286
1                   C E R T I F I C A T E
2
3              I, Micheal A. Johnson, Certified Shorthand
4    Reporter in and for the State of Texas, certify that on
5    the 13th day of June, 2006, I reported the Oral
6    Deposition of PAUL J. ROACH, M.D., after the witness had
7    first been duly cautioned and sworn to testify under
8    oath; said deposition was subsequently transcribed by me
9    and under my supervision and contains a full, true and
10   complete transcription of the proceedings had at said
11   time and place.
12             I further certify that I am neither counsel
13   for nor related to any party in this cause and am not
14   financially interested in its outcome.
15
16             GIVEN UNDER MY HAND AND SEAL of office on this
17   _____ day of _____, 2006.
```

**Exhibit A - Excerpts from June 13, 2006 Roach Deposition**

• Opposition to Roach Motion

| | |
|---|---|
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | _____ |
| | Micheal A. Johnson, CSR |
| 23 | Certified Shorthand Reporter |
| | Notary Public in and for the |
| 24 | State of Texas |
| 25 | |

Exhibit B - Excerpts from May 4, 2006 Karavan Deposition

• Opposition to Roach Motion

[1:] - [1:20]          5/4/2006        Karavan, Mark (Barnett)

page 1
     0001
1                    IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
2
3
4          IN RE:  VIOXX            * MDL Docket No. 1657
           PRODUCTS LIABILITY       *
5          LITIGATION               * Section L
                                    *
6          THIS DOCUMENT RELATES TO: * Judge Fallon
           GERALD BARNETT v. MERCK  * Mag. Judge Knowles
7
           ***************************
8
9
10         VIDEOTAPE
           DEPOSITION OF:MARK KARAVAN, MD
11
           DATE:        May 4, 2006
12
           TIME:        12:05 PM
13
           LOCATION:    Sheraton Myrtle Beach
14                      Convention Center Hotel
                        2101 North Oak Street
15                      Myrtle Beach, SC
16         TAKEN BY:    Counsel for Plaintiff
17         REPORTED BY: TERRI L. BRUSSEAU,
                        Registered Professional
18                      Reporter, CP, CRR
19
20


[118:8] - [118:14]     5/4/2006        Karavan, Mark (Barnett)

page 118
8          Q.   If Mr. Barnett had and he did an
9    ischemia diagnosis in January of 2000, does that
10   mean that he had coronary artery disease in January
11   of 2000?
12         A.   Yes, given his -- I would say given the
13   results of this stress test, he had coronary artery
14   disease in 2000.


[182:2] - [183:13]     5/4/2006        Karavan, Mark (Barnett)

page 182
2          Q.   Am I right, Dr. Karavan, that a
3    Cardiolite stress test is designed to see what
4    areas of the heart are receiving less blood flow
5    than other areas?
6          A.   That's right.
7          Q.   You're aware, sir, that if there is
8    consistent similar blockage among the arteries in a
9    person's body, a Cardiolite stress test might come
10   back and say there's just mild ischemia?
11         A.   Correct.
12         Q.   So if a patient has 80 percent blockage
13   in his LAD and 80 percent blockage in his RCA and
14   80 percent blockage in circumflex and 50 percent
15   blockage in his left main and a little bit more
16   blockage in his PDA, then the result that could
17   come back from that test is mild lateral ischemia,
18   correct?
19              MR. ROBINSON:  Objection.
20              THE WITNESS:  There -- I still go by



Exhibit B - Excerpts from May 4, 2006 Karavan Deposition

• Opposition to Roach Motion

```
21   what I said — I've said all along.  I feel he had
22   three-vessel diffuse plaquing prior to when I saw
23   him in 2002.  It takes years for it to develop so
24   the odds are he had diffuse coronary artery
25   plaquing in 2000 with his stress test, which can
page 183
1    give you variable amounts of defects because of
2    what we call balanced ischemia.
3    BY MR. GOLDMAN:
4         Q.   And when a patient has balanced
5    ischemia or balanced plaque in their arteries, then
6    a Cardiolite stress test might signal just mild
7    ischemia?
8         A.   That's correct.
9         Q.   One of the known limitations of a
10   Cardiolite stress test is that balanced blockage of
11   all major coronary arteries can actually show
12   normal blood flow?
13        A.   That would be correct.
```

[251:1] - [251:25]          5/4/2006      Karavan, Mark (Barnett)

```
page 251
1                   CERTIFICATE OF REPORTER
2         I, Terri L. Brusseau, Registered
3    Professional Reporter and Notary Public for the
4    State of South Carolina at Large, do hereby certify
5    that the foregoing transcript is a true, accurate,
6    and complete record.
7         I further certify that I am neither related
8    to nor counsel for any party to the cause pending
9    or interested in the events thereof.
10        Witness my hand, I have hereunto affixed my
11   official seal this 6th day of May, 2006 at
12   Charleston, Charleston County, South Carolina.
13
14
15
16                   _____
                     Terri L. Brusseau,
17                   Registered Professional
                     Reporter, CP, CRR
18                   My Commission expires
                     May 7, 2006.
19
20
21
22
23
24
25
```

Exhibit C - Excerpts from June 9, 2006 Zipes Deposition

• Opposition to Roach Motion

[1:] - [1:25]          6/9/2006      Zipes, Douglas (Barnett)

page 1
    0001
1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF LOUISIANA
3
4       In re:  VIOXX                      )
        PRODUCTS LIABILITY LITIGATION      ) MDL Docket No. 1657
5                                          )
        This document relates to           ) Section L
6                                          )
        GERALD BARNETT,                    ) Judge Fallon
7                                          )
                        Plaintiff,         ) Civil Action No.
8                                          ) 2:06cv485
                    vs                     )
9                                          )
        MERCK & CO., INC.,                 )
10                                         )
                        Defendant.         )
11      _____)
12
13
14
15              DEPOSITION OF DOUGLAS P. ZIPES, M.D.
16                    Newport Beach, California
17                     Friday, June 9, 2006
18
19
20
21
22      Reported by:
23      DIANA JANNIERE
        CSR NO. 10034
24      LA JOB No. 918528
        PHIL JOB No. 2211
25


[13:17] - [14:16]       6/9/2006      Zipes, Douglas (Barnett)

page 13
17      Q    Do you consider yourself an expert in the
18  interpretation of the May 2nd, 2006 nuclear stress test?
19      A    I am an expert in the sense that I am a general
20  cardiologist and I review the films of my patients.  So
21  in that sense, I am qualified to look at that stress
22  test, but I am not a boarded expert in that area.
23      Q    Okay.  When you say you are not a boarded
24  expert in that area, can you be a little more specific?
25  What are you an expert in?
page 14
1       A    Well, certification to become an expert is
2   provided by the American Board of Internal Medicine of
3   which I was chair some years ago.
4            They provide examinations for an individual to
5   take and the passage of which then confers board
6   certification.  As it happens, they do not provide a
7   certification in nuclear cardiology.  That is done by
8   another group.
9            Today an individual who then is a certified
10  nuclear cardiologist passes their examination.  I have
11  not taken that examination.
12      Q    So as I understand it, you have not become
13  certified as a nuclear --
14      A    Nuclear cardiologist.
15      Q    -- cardiologist?
16      A    That's correct.

Exhibit C - Excerpts from June 9, 2006 Zipes Deposition

• **Opposition to Roach Motion**

[85:17] - [86:15]       6/9/2006       Zipes, Douglas (Barnett)

page 85
17       Q       What studies, sir, do you say demonstrates that
18   Vioxx causes atherosclerosis or acceleration of
19   atherosclerosis?
20              MR. ROBINSON: Go to your notes.  It is not a
21   memory test.
22   BY MR. GOLDMAN:
23       Q       I just want you to tell me the studies.  I
24   don't want you to tell me what their findings are.
25              I just want you to tell me what studies in
page 86
1   animals or in humans you say show that Vioxx causes
2   atherosclerosis or a progression of atherosclerosis?
3       A       We can start with two clinical studies that I
4   think are extremely supportive and those are the
5   long-term APPROVe and 078 —
6       Q       What else?
7       A       — because they had intention to treat so —
8   you don't want me to go into that?
9       Q       Right.  Just identify the studies.
10       A       Okay.  Egan, Rudic, Kobayashi, Grosser, Chang,
11   Bulut — excuse me, the latter may not relate to
12   artherosclerosis.
13              The one by Bulut relates to the PGI-2 having a
14   vasodilatory effect.
15              Review article by Antman.  Review article by

[87:25] - [88:6]       6/9/2006       Zipes, Douglas (Barnett)

page 87
25              Am I right that one opinion that you plan to
page 88
1   give is that Vioxx causes heart attacks; right?
2       A       Yes.
3       Q       Another is that Vioxx is the only conceivable
4   cause of Mr. Barnett's heart attack by accelerating the
5   progression of his atherosclerosis?
6       A       Yes.

[99:15] - [100:2]       6/9/2006       Zipes, Douglas (Barnett)

page 99
15       Q       Are you aware of any studies in animals or
16   humans that suggest that Vioxx does not cause
17   atherosclerosis or its progression?
18       A       Yes.
19       Q       Like what?
20       A       One is by Oates.  And they suggested that it
21   may be the timing as well as the duration of COX-2
22   inhibition that might affect the development of
23   atherosclerosis.
24       Q       Are there other animal or human studies, sir,
25   other than Oates that suggests that Vioxx does not cause
page 100
1   atherosclerosis or its progression?
2       A       Yes, I can't really cite them to you, but yes.

[102:2] - [102:20]       6/9/2006       Zipes, Douglas (Barnett)

page 102
2       Q       Yes.  What evidence in the VIGOR study actually
3   showed that Vioxx increased the progression of
4   atherosclerosis in the patients of that study?
5       A       They developed infarcts.
6       Q       Is that the only way?
7       A       Well, they did not have serial stress tests or
8   angiograms, so that would be the only way.  In that
9   particular trial, they had a 5- to 1 infarct ratio

Exhibit C - Excerpts from June 9, 2006 Zipes Deposition

**• Opposition to Roach Motion**

```
           10  between Vioxx and Naproxen.  So --
           11      Q    And you think -- I'm sorry.
           12      A    So there is no other explanation really other
           13  than there is an increase in atherosclerosis.  And the
           14  process that goes on to plaque rupture, thrombosis, et
           15  cetera.
           16      Q    Are you aware of any article, sir, that
           17  interpreted the VIGOR results and said the reason for
           18  the difference in heart attacks was because Vioxx
           19  increases the progression of atherosclerosis?
           20      A    I don't know if they stated it in that fashion.
```

[104:15] - [108:8]       6/9/2006      Zipes, Douglas (Barnett)

```
           page 104
           15      Q    Is it your opinion that Vioxx continued to
           16  accelerate the plaque in Mr. Barnett's arteries after he
           17  had his heart attack?
           18      A    Absolutely.
           19      Q    What is your basis for that?
           20      A    At the July '03 stress test, Mr. Barnett had no
           21  fixed lesion, no wall motion abnormality, and an area of
           22  apical or mild lateral decrease in the fusion.
           23           On May 2nd, 2006, Mr. Barnett now has an area
           24  of fixed defect with anterior wall ischemia, wall motion
           25  abnormalities.  And by echo -- which is the first echo
           page 105
            1  that he has had, so we don't have comparisons -- he has
            2  got significant scar and wall motion abnormalities.
            3           He has got left atrial enlargement.  He has got
            4  a right ventricular pressure that is borderline
            5  elevated.  He has got right ventricular systolic
            6  dysfunction.  And by the CT angiogram and occluded
            7  graft -- vein graft and new lesions in his right
            8  coronary artery, that were not seen in the
            9  catheterization on September 9, 2002, so he has
           10  significantly advanced coronary atherosclerosis with
           11  mild cardial scar since his heart attack -- since his Q
           12  wave heart attack.
           13      Q    Have you finished telling me the basis for why
           14  you think Mr. Barnett -- Mr. Barnett's atherosclerosis
           15  progressed because of Vioxx after his heart attack?
           16      A    No, I am not finished.
           17           He has reduced exercise tolerance in that he
           18  walks 9 1/2 minutes versus the 14 and 15 minutes he was
           19  able to do on prior stress tests.
           20           He has abnormal left ventricular relaxation
           21  which is diastolic dysfunction by echo.  So the echo
           22  report shows left circumflex wall motion abnormalities,
           23  right coronary wall motion abnormalities; abnormal left
           24  ventricular diastolic dysfunction; left atrial
           25  enlargement; right ventricular systolic pressure 30- to
           page 106
            1  35, that I mentioned earlier; and then the significant
            2  wall motion abnormalities of hypokinesia in the
            3  mid-lateral and basal lateral left ventricle, severe
            4  hypokinesia in the basal posterior and basal anterior
            5  walls of his ventricle.
            6           So he has significant myocardial and coronary
            7  disease that has advanced from his myocardial infarction
            8  in September of '02.
            9      Q    Are you finished now telling me the basis?
           10      A    I think so.
           11      Q    Why do you think that Vioxx caused all of what
           12  you just described and how is it that Vioxx would have
           13  done that between July of 2003 and May of 2006?
           14      A    We need to start back in January of 2000.
           15  Because in January of 2000 -- January 24 -- Mr. Barnett
           16  has a stress test and he walked 15 minutes on that
           17  stress test.  He has by Cardiolite a mild area of
           18  lateral ischemia.
```

Exhibit C - Excerpts from June 9, 2006 Zipes Deposition

• Opposition to Roach Motion

```
19          And that is his only abnormality.  He has no
20  chest pain.  He has no ECG changes.  He has excellent
21  exercise tolerance.  He has normal blood pressure and
22  heart rate response, which tells me that he has mild
23  atherosclerosis and a risk assessment at that time by
24  multiple parameters.
25          And there are several equations that I actually
page 107
1   plugged him into, which showed that he has a risk of
2   myocardial infarction of 4 to 6 percent over 10 years.
3   So, at that time, he has got mild coronary disease
4   probably affecting one vessel.
5           In 32 months, he ends up with six vessel
6   coronary atherosclerosis and mild cardial infarction.
7   And from that time until May of '06, he now has
8   significant wall motion abnormalities -- all of the
9   things that I just told you -- and that is accelerated
10  atherosclerosis.
11          In an individual, who has total lipid control
12  from the time he starts Lipitor, which is his major risk
13  factor -- we can argue about family history and whether
14  it played a role or not -- but his major risk factor is
15  elevated lipids and that is under total control.  There
16  is no other explanation for his accelerated
17  atherosclerosis than Vioxx.
18          Now, he stops Vioxx in September of '04.  We
19  now know from the APPROVe trial follow-up and from 078,
20  that article, that individuals exposed to Vioxx continue
21  to be at risk following cessation of Vioxx.
22          The only way to explain that which was
23  suggested by Merck's consultant Fitzgerald, who said you
24  ought to look at the follow up of the APPROVe trial, is
25  to say that Vioxx has anatomically altered the coronary
page 108
1   arteries by causing atherosclerosis.
2           And therefore, even stopping the drug, if it
3   indeed does do what Fitzgerald suggested, would show
4   increased risk following stopping the drug.
5           And then, in addition, Mr. Barnett takes Vioxx
6   for two years after his mild cardioinfarction.  This, to
7   me, is absolute proof that Vioxx has caused the
8   accelerated atherosclerosis.
```

[162:8] - [162:14]      6/9/2006      Zipes, Douglas (Barnett)

```
page 162
8      Q    Is your position that Mr. Barnett did not have
9   coronary artery disease?
10     A    He probably did, but we don't have -- we only
11  have a stress test.
12     Q    Is it your opinion that he did not have
13  coronary artery disease on January 24th, 2000?
14     A    He probably did.
```

[163:1] - [164:14]      6/9/2006      Zipes, Douglas (Barnett)

```
page 163
1      Q    Is it well-known that Cardiolite stress tests
2   can underestimate the amount of coronary artery disease
3   in a patient?
4      A    It can.
5      Q    Is it true that peer-reviewed literature and
6   reputable textbooks have reported that if you have
7   balanced ischemia throughout the coronary arteries and
8   take a Cardiolite stress test, the result may very well
9   be that you have no ischemia or mild ischemia?
10     A    Based on the precise wording that you have
11  given me, yes.
12     Q    And that is one reason why angiograms --
13  cardiac catheterizations are a better predictor --
14  withdrawn.
```

Exhibit C - Excerpts from June 9, 2006 Zipes Deposition

• Opposition to Roach Motion

```
15          Because of the limitations of Cardiolite stress
16  tests, would you agree that angiograms are the only way
17  to know for sure just how much coronary artery disease
18  that Mr. Barnett had in January of 2000?
19     A    If you want to know the exact anatomy of the
20  coronary arteries and whether they -- or what degree
21  they are obstructed, then the answer to your question is
22  yes.
23          However, you added risk in that, and I hope we
24  come back to this.  Risk can be assessed by the response
25  to a Cardiolite stress test.
page 164
1      Q    I did not mention risk.
2      A    Okay.  I did.
3      Q    Is it true, Dr. Zipes, that an angiogram would
4  be the only way to determine for sure how much coronary
5  artery disease Mr. Barnett had in his arteries in
6  January of 2000?
7      A    Define "for sure."
8      Q    Certain.
9      A    I am totally comfortable that he had mild
10  ischemia -- minimal -- minimal coronary artery disease
11  based on the stress test.
12          To your question, coronary arteriograms are a
13  gold standard, but the response that he had allows me to
14  say that he had mild coronary artery disease.
```

[268:1] - [268:20]     6/9/2006     Zipes, Douglas (Barnett)

```
page 268
1           I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby certify:
3           That the foregoing proceedings were taken
4  before me at the time and place herein set forth; that
5  any witnesses in the foregoing proceedings, prior to
6  testifying, were placed under oath; that a verbatim
7  record of the proceedings was made by me using machine
8  shorthand which was thereafter transcribed under my
9  direction; further, that the foregoing is an accurate
10  transcription thereof.
11           I further certify that I am neither
12  financially interested in the action nor a relative or
13  employee of any attorney of any of the parties.
14           IN WITNESS WHEREOF, I have this date
15  subscribed my name.
16
17
                Dated: _____
18
19
                        Diana Janniere
20                      CSR No. 10034
```

Exhibit D - Excerpts from Mikola Deposition

• Opposition to Roach Motion

[1:] - [1:25]        4/25/2006    Mikola, Michael

page 1
    0001
1                    IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
2
3
4          IN RE:  VIOXX              * MDL Docket No. 1657
           PRODUCTS LIABILITY         *
5          LITIGATION                 * Section L
                                      *
6          THIS DOCUMENT RELATES TO:  * Judge Fallon
           GERALD BARNETT v. MERCK    * Mag. Judge Knowles
7
           ****************************
8
9
10         VIDEOTAPE
           DEPOSITION OF:MICHAEL MIKOLA, MD
11
           DATE:        April 25, 2006
12
           TIME:        8:27 AM
13
           LOCATION:    Law Offices of
14                      Motley Rice, LLC
                        28 Bridgeside Boulevard
15                      Mt. Pleasant, SC
16         TAKEN BY:    Counsel for Plaintiff
17         REPORTED BY: TERRI L. BRUSSEAU,
                        Registered Professional
18                      Reporter, CP, CRR
19
20
21             GOLKOW LITIGATION TECHNOLOGIES
22             Four Penn Center, Suite 1210
               1600 John F. Kennedy Blvd.
23             Philadelphia, PA 19103
               877.DEPS.USA
24
25


[207:16] - [208:12]     4/25/2006    Mikola, Michael

page 207
16         Q.    So you thought that -- that it was
17   possible that he would need a cardiac
18   catheterization in January of 2000, but as I
19   understand it, Mr. Barnett didn't want to go that
20   route?
21         A.    That's correct.
22         Q.    Why not?
23         A.    My best guess is he was just too scared
24   of the procedure.  With -- with a heart
25   catheterization when the cardiologist talks to the
page 208
1    patient about it, generally they'll quote odds of
2    about one to a thousand -- one to a thousand chance
3    of dying or one to 10,000.  Those statistics are
4    for all heart catheterizations and many of the
5    people that get heart catheterizations are in the
6    midst of an acute MI or an acute heart attack and
7    their risk is a lot higher, but Mr. Barnett was
8    quite anxious and didn't want to have the
9    catheterization done.
10         Q.    Did Mr. Barnett want to follow a more
11   conservative approach?
12         A.    That's correct.



EXHIBIT
D

1

Exhibit D - Excerpts from Mikola Deposition

**• Opposition to Roach Motion**

[237:24] - [238:2]          4/25/2006          Mikola, Michael

```
page 237
24        Q.    To be clear, Mr. Barnett in January of
25   2000 had coronary heart disease that had been
page 238
1    developing over years?
2        A.    I believe that's the case, yes, sir.
```

[414:1] - [414:23]          4/25/2006          Mikola, Michael

```
page 414
1                    CERTIFICATE OF REPORTER
2        I, Terri L. Brusseau, Registered
3    Professional Reporter and Notary Public for the
4    State of South Carolina at Large, do hereby certify
5    that the foregoing transcript is a true, accurate,
6    and complete record.
7        I further certify that I am neither related
8    to nor counsel for any party to the cause pending
9    or interested in the events thereof.
10       Witness my hand, I have hereunto affixed my
11   official seal this 1st day of May, 2006 at
12   Charleston, Charleston County, South Carolina.
13
14
15
16                   _____
                     Terri L. Brusseau,
17                   Registered Professional
                     Reporter, CP, CRR
18                   My Commission expires
                     May 7, 2006.
19
20
21
22
23
```

Exhibit E – Excerpts from July 27, 2006 Roach Deposition

• **Opposition to Roach Motion**

[287:] - [287:24]     7/27/2006     Roach, Paul J. - Vol. 2

```
page 287
  0287
 1                          UNITED STATES DISTRICT COURT
                             EASTERN DISTRICT OF LOUISIANA
 2
         In re:                     :
 3                                  :   MDL Docket No. 1657
         VIOXX PRODUCTS             :
 4       LIABILITY LITIGATION       :   SECTION L
                                    :
 5                                  :   JUDGE FALLON
                                    :
 6       Gerald Barnett             :   MAG. JUDGE KNOWLES
         v.                         :
 7       Merck & Co., Inc.          :   CASE NO. 02:06cv485
                                    :
 8       ————————————————
 9
10       ***_____***
11                       ORAL DEPOSITION OF
12                       PAUL ROACH, M.D.
13                          VOLUME 2
14                        July 27, 2006
15       ***_____***
16
17
18       REPORTED BY:  SUSAN P. MILLER, RDR, CRR, CBC
19
20
21
22
23
24
```

[374:22] - [377:14]     7/27/2006     Roach, Paul J. - Vol. 2

```
page 374
22       Q.   The RCA?
23       A.   The RCA.
24            So if one were to have significant
page 375
 1  narrowings in all three epicardial coronary
 2  arteries, one could have ischemia associated
 3  with those narrowings that may not necessarily
 4  show up on a perfusion scan because of the
 5  balanced nature of the disease.  The coronary
 6  artery disease is balanced.
 7            And I believe even Dr. Karavan
 8  addressed that at some point in his deposition
 9  when someone asked him, did you think that he
10  had balanced disease, and he said yes.
11            So I think that what we can stand
12  very firmly on is that we know that he has
13  coronary artery disease at that point in 2000.
14  Can we, with absolute certainty, tell you the
15  degree of stenoses in those vessels?  No.  But
16  do I feel comfortable telling you that he has
17  some degree of narrowing in all three of those
18  major blood vessels?  Yes.
19       Q.   Okay.  Let me ask you this:  When
20  you say "some degree," is there some amount —
21  let's take the right coronary artery.  As of
22  January 2000, what would be the range of
23  stenosis that you would predict at that time
24  for the right coronary artery?
page 376
 1       A.   Again, knowing everything that we
 2  now know about Mr. Barnett, I would say that
```



EXHIBIT
E

1

• Opposition to Roach Motion

```
3    it's highly likely that he had at least a 50%
4    stenosis in the right coronary artery, okay?
5    Or around that.
6              And when you say "right," let me
7    clarify, because we're talking about the right
8    and we're talking about the posterolateral and
9    the posterior descending. If you remember on
10   the cath films that were obtained in 2002,
11   there was relatively minor disease in the
12   proximal mid segment and some disease that was
13   not particularly significant in the distal part
14   of the right; and in the posterolateral branch,
15   there was described, I believe, by Dr. Karavan,
16   an 80% narrowing at the very proximal portion
17   of the posterolateral, and a complete occlusion
18   at the posterior descending artery.
19             I would think that based on what we
20   know about Mr. Barnett based on that 2002 cath,
21   he probably had more than 50% narrowing in that
22   posterolateral branch and probably more than
23   50% narrowing in that posterior descending
24   artery.
page 377
1         Q.   You're saying in 2000?
2         A.   Well, in 2000, yes, based on
3    everything that we know about him, okay?  Based
4    on the fact that we have a test that
5    demonstrates ischemia, indicating that there is
6    coronary artery disease, I would say that there
7    was clearly disease present back in 2000.
8              Can I absolutely quantitate that for
9    you?  No, because no cath was done to allow us
10   to do that.  But do I feel confident that there
11   was disease there that was significant and by
12   my definition, perhaps a greater than 50%
13   narrowing?  I feel confident based on knowing
14   what I've seen in his 2002 cath.
```

[418:2] - [425:6]          7/27/2006    Roach, Paul J. - Vol. 2

```
page 418
2         A.   I've looked at it, and I've rejected
3    that.
4         Q.   Why?
5         A.   I don't think that there's any
6    evidence in the literature that Vioxx causes
7    poor run-off; Vioxx causes poor surgical
8    technique, resulting in a stitch that could
9    cause the graft to close; that Vioxx causes
10   injury to the saphenous vein graft; that Vioxx
11   somehow alters competitive flow; or that Vioxx
12   causes atherosclerosis.
13        Q.   That's the one I want to talk to you
14   about.  What have you read -- sorry.
15             Have you read anything in the
16   literature that says Vioxx might cause or
17   accelerate atherosclerosis?
18             MR. BRENNAN:  Mark, again, this
19        is --
20             MR. ROBINSON:  We haven't gone
21        into this.
22             MR. BRENNAN:  This is stuff that
23        we've gone over for seven hours in a
24        deposition that took place over a
page 419
1    10-hour period.
2              MR. ROBINSON:  No, not on
3    atherosclerosis.  First of all, we have
4    an occlusion now.  We have a new event.
5              MR. BRENNAN:  And he has told you
6    that he doesn't know why that occlusion
```

Exhibit E - Excerpts from July 27, 2006 Roach Deposition

• Opposition to Roach Motion

```
7          occurred in these vein grafts.
8          Secondly, this is way beyond the scope
9          of this deposition.
10             MR. ROBINSON:  No, it's not.
11             MR. BRENNAN:  Yes, it is.
12             MR. ROBINSON:  We're going over
13         this vein graft occluding, which is --
14             MR. BRENNAN:  The scope of this
15         deposition included his analysis of the
16         June 10th, 2006 cath.  But what it did
17         not include is to get him to cite
18         articles or medical literature that
19         proves or disproves whether or not Vioxx
20         accelerates atherogenesis.
21             MR. ROBINSON:  Sean, I'm not
22         going to go deep.  I just want to get
23         the general drift of what his opinion is
24         on Vioxx and atherosclerosis.
page 420
1              MR. BRENNAN:  Will you be
2          satisfied if he says "I incorporate what
3          I said in my deposition," or the
4          previous part of the deposition?
5              MR. ROBINSON:  They mainly talked
6          about heart attacks there in the other
7          depo.  That's what I thought.
8              MR. BRENNAN:  Well, Ted from your
9          office took the deposition.  He had
10         Dr. Roach's report.  And that's not
11         entirely true.  Ted did examine him on
12         whether or not Vioxx accelerates
13         atherogenesis in the literature that
14         Dr. Roach had seen or not seen to
15         support that proposition.
16         Q.   (BY MR. ROBINSON) Let me ask it
17    this way:  Is there any study that you've
18    looked at since you wrote your report that
19    related to Vioxx and atherosclerosis?
20         A.   Could you ask that again?  I'm just
21    not quite sure I understand.
22         Q.   Is there any study that you have
23    looked at or read since you actually wrote your
24    report that related to Vioxx and
page 421
1    atherosclerosis?
2              MR. BRENNAN:  Again, Mark, I
3          mean, first of all — one of the first
4          questions you asked him is what he had
5          reviewed between his prior day of his
6          deposition and today, and he listed all
7          that for you.
8              MR. ROBINSON:  I understand.  I
9          agree.
10         Q.   (BY MR. ROBINSON)  I just want to
11    make sure there's no study you have reviewed
12    beyond what was in your report.
13         A.   I have reviewed literature, but I
14    have not seen any literature that draws a
15    link -- or let me put it to you this way.  Let
16    me be more precise.  I haven't seen any
17    literature that shows a cause-and-effect
18    relationship between the use of Vioxx and the
19    development or acceleration of atherosclerosis.
20         Q.   Okay.  But have you looked at any
21    literature since you wrote your report that
22    related to that subject matter?
23         A.   I have this feeling that we're
24    cross-talking, and I want to answer your
page 422
1    question and I want to answer it very
2    carefully.
3         Q.   Go ahead.
```

• Opposition to Roach Motion

```
4          A.   As I said before, I have seen no
5  literature that would lead me to conclude that
6  there is a causal relationship between the use
7  of Vioxx and the development of atherosclerosis
8  or the acceleration or progression of
9  atherosclerosis.
10         Q.   Okay.  Let me ask it real quick:
11 Since you actually gave your last deposition,
12 did you get a chance to look at a declaration
13 filed by Dr. Zipes that related to Vioxx and
14 atherosclerosis that was filed in this case?
15         A.   Are you talking about his
16 supplemental report?
17         Q.   Well, no.  This was one that was
18 filed for a Daubert hearing.  Maybe you didn't
19 see it.
20         A.   I may not have seen that.
21         Q.   Okay.  Let me ask you this:  Did you
22 read any articles by FitzGerald, Garret
23 FitzGerald, that related to Vioxx possibly .
24 causing atherosclerosis?
page 423
1              MR. BRENNAN:  Again, are we
2         talking about since the first day of his
3         deposition?
4         Q.   (BY MR. ROBINSON)  Since the first
5  date of your deposition.
6         A.   No.
7         Q.   Okay.  And let me ask it this way:
8  Since this is really the focal point of this
9  development from September 9th to July 10th,
10 and we have two caths, I want to just make sure
11 that there is not a study that you've looked at
12 that would say that maybe there is a
13 possibility that Vioxx could cause
14 atherosclerosis; is there any study like that?
15             MR. BRENNAN:  Mark, are you
16        basically asking him if there's any
17        change here, what caused the change?
18             MR. ROBINSON:  Well, no.  Let me
19        ask it this way.
20        Q.   (BY MR. ROBINSON)  Would you --
21 strike that.
22             Would Vioxx be one of the potential
23 risks for a development of the atherosclerosis
24 that occurred between September 9th and
page 424
1  July 10th, 2006?  When I say "September 9th," I
2  mean 2002.
3         A.   No.
4         Q.   Okay.  Why?
5         A.   I've seen no evidence that that's
6  the case or could be the case.
7         Q.   Have you read those animal studies
8  that showed that, that showed a buildup of
9  atherosclerosis in animals that were given a
10 COX-2 inhibitor?
11        A.   I'll refer you back to my original
12 portion of this deposition, because this isn't
13 the second deposition.
14        Q.   Sure.
15        A.   I believe that I went through that
16 with Mr. Wacker.
17        Q.   Yes.  And you said there is an
18 association.  Is that right?
19             MR. BRENNAN:  Objection, form,
20        mischaracterization of his testimony.
21        A.   I believe there was one study done
22 by Dr. Epstein, not using rofecoxib; and even
23 in Dr. Epstein's deposition, he could not
24 explain those findings relative to the findings
page 425
```

Exhibit E - Excerpts from July 27, 2006 Roach Deposition

• Opposition to Roach Motion

```
1   in other animal studies.
2           So based on the totality of the
3   evidence, I don't see anything that tells me
4   that there is a causal link between rofecoxib
5   use and development of atherosclerosis or
6   progression of atherosclerosis.
```

[428:1] - [429:18]      7/27/2006    Roach, Paul J. - Vol. 2

```
page 428
1   So do you think that he had single-vessel or
2   multi-vessel disease on 1/24?
3           A.   I think he had multi-vessel disease.
4   And let me make sure that -- again, I'm not
5   trying to slow this process down.  By
6   "multi-vessel disease," you mean some degree of
7   plaque in those vessels?
8           Q.   You know, I would say, yes, some
9   degree of plaque in the vessels, yes.
10          A.   Okay.  Then I would say there is
11  multi-vessel disease on --
12          Q.   Would you put an X on that one?
13          A.   Sure.
14          Q.   Okay.  So no single-vessel on 1/24?
15          A.   And while we're going through this,
16  one thing I want to make sure is very clear in
17  this exhibit is that if we're talking on these
18  percent stenoses in these native vessels,
19  there's no question we're talking about
20  atherosclerosis as the etiology.
21          But let's make it very clear that
22  when we get to bypass grafts, that the fact
23  that there are occlusions there is not
24  necessarily the result of atherosclerosis for
page 429
1   the factors that we've talked about previously
2   in the deposition.
3           Q.   Okay.  Let me ask it this way:  It's
4   not necessarily, but would you agree that it is
5   possible that the atherosclerosis did cause or
6   contribute to the two occluded vein grafts?
7           A.   I'll agree with all the other
8   cardiologists who have looked at these films,
9   including Dr. Zipes, Dr. Karavan, is that one
10  cannot say, with any degree of certainty,
11  exactly what caused it.  So I have listed, to
12  be fair, a series of possibilities.  So could
13  atherosclerosis be a possibility?  Yes.
14          Q.   Okay.  And you saw that Dr. Karavan
15  said that atherosclerosis was a possibility,
16  correct?
17          A.   Again, I'm agreeing with
18  Dr. Karavan.
```

[494:1] - [494:18]      7/27/2006    Roach, Paul J. - Vol. 2

```
page 494
1   STATE OF TEXAS    )
2               REPORTER'S CERTIFICATION
3           I, SUSAN PERRY MILLER, RDR, CRR, CSC,
4   Notary Public in and for the State of Texas,
5   hereby certify that the witness was duly sworn
6   and that this transcript is a true record of
7   the testimony given by the witness.
8           I further certify that I am neither
9   counsel for, related to, nor employed by any of
10  the parties or attorneys in the action in which
11  this proceeding was taken.  Further, I am not a
12  relative or employee of any attorney of record
13  in this cause, nor am I financially or
14  otherwise interested in the outcome of the
```

Exhibit E - Excerpts from July 27, 2006 Roach Deposition

• Opposition to Roach Motion

15  action.
16          Subscribed and sworn to on this 28th
17  day of July, 2006.
18

Exhibit F - Excerpts from Bryan Deposition

• Opposition to Roach Motion

[1:] - [1:25]          6/6/2006        Bryan, Foster Curtis M.D. (Barnett)

```
page 1
    0001
1                      UNITED STATES DISTRICT COURT
2                       EASTERN DISTRICT OF LOUISIANA
3
4          In re: VIOXX PRODUCTS LIABILITY LITIGATION
           GERALD BARNETT and CORRINE BARNETT,
5                           Plaintiffs,
                    vs.                    MDL Docket No. 1657
6          MERCK & CO., INC.,              C/A No. 2:06cv485
                           Defendant.
7
8          DEPOSITION OF:      FOSTER CURTIS BRYAN, II, M.D.,
9          DATE:               June 6, 2006
10         TIME:                1:30 p.m.
11         LOCATION:     Sheraton MYRTLE BEACH Convention Center
                         2101 North Oak Street
12                       Myrtle Beach, SC 29577
13         TAKEN BY:     Counsel for the Plaintiffs
14         REPORTED BY:  Roxanne M. Easterwood, RPR
15         VIDEOGRAPHER:  David Roberts
16         ---------------------------------------------
17
18
19
20
21
22
23
24
25
```

[104:15] - [104:22]          6/6/2006        Bryan, Foster Curtis M.D. (Barnett)

```
page 104
15              Q.   Now, you know from seeing Mr -- sorry.
16         Withdrawn.
17              The only way to know how much coronary
18         artery disease or blockage that Mr. Barnett had for
19         sure in January of 2000 would be to have the results
20         of an angiogram or a cardiac catheterization; is
21         that true?
22              A.   True.
```

[108:1] - [109:1]          6/6/2006        Bryan, Foster Curtis M.D. (Barnett)

```
page 108
1               Q.   So typically, would a patient like
2          Mr. Barnett who has this much occlusion or blockage
3          take years and years to develop it?
4                    MS. SHERBANEE:  Objection.  Calls for
5          speculation.
6                    THE WITNESS:  I would say the majority of
7          people, it takes years to develop this -- this much,
8          you know, these -- this degree of stenoses.
9          BY MR. GOLDMAN:
10              Q.   And by years, do you mean decades?
11                   MS. SHERBANEE:  Doctor, did you finish
12         your answer?
13                   MR. GOLDMAN:  I'm gonna let him finish.
14                   THE WITNESS:  I've seen it in two, three,
15         four years.  I've seen it in decades.  It varies
16         from patient to patient.  There are people who
17         have -- that I've operated on who've had what was
18         considered moderate disease at one time and three
19         years later we're seeing severe stenoses in an
20         artery that was called 50 percent.  It's, you know,
```



EXHIBIT
F

1

Exhibit F - Excerpts from Bryan Deposition

**• Opposition to Roach Motion**

```
21        80 or 90 later.  So, you know, three or four years
22        later.
23                  It's -- it's hard to say.  All I can say
24        about him is I don't know what his -- what he had in
25        2000.  I mean, I just -- there's no cath.  There's
page 109
1         no way to know.
```

[173:23] - [174:2]         6/6/2006         Bryan, Foster Curtis M.D. (Barnett)

```
page 173
23                  Q.   According to this report, can you
24        determine whether or not he had any -- he had any
25        left main disease?
page 174
1                   A.   No.  You cannot determine that from a
2         stress test.
```

[190:1] - [190:18]         6/6/2006         Bryan, Foster Curtis M.D. (Barnett)

```
page 190
1                   CERTIFICATE OF NOTARY PUBLIC & REPORTER
2                       I, Roxanne Easterwood, Registered
3         Professional Reporter and Notary Public for the
4         State of South Carolina at Large, do hereby certify
5         that the foregoing deposition is a true, accurate
6         and complete record.
7                       I further certify that I am neither
8         related to nor counsel for any party to the cause of
9         pending or interested in the events thereof.
10                      Witness my hand, I have hereunto affixed
11        my official seal this 6th day of June, 2006 at
12        Charleston, Charleston County, South Carolina.
13
14
15
16
                              Roxanne Easterwood, RPR
17                            My Commission Expires
                              February 1, 2015
18
```

Exhibit G - Excerpts from July 29, 2006 Popma Deposition

• Opposition to Roach Motion

[1:1] - [1:12]                 7/29/2006    Popma, Jeffrey (Barnett) (Rough)

page 1
1         July 29, 2006  Deposition of Jeffrey Popma, M.D.
2            This is an unedited draft transcript being
3         prepared on a realtime basis and may contain
4         stenographic outlines that are not translated
5         and/or incorrect English translations of words.
6            For these reasons, this transcript should not
7         be relied upon as an official transcript.
8            A final official transcript will subsequently
9         be prepared, checking the translated copy
10        against the raw data input from the reporter's
11        writer as well as various reference sources.
12

[53:11] - [54:12]              7/29/2006    Popma, Jeffrey (Barnett) (Rough)

page 53
11  Q.    Is it your position that Mr. Barnett had no
12        plaque in his coronary arteries as of
13        January 24th, 2000?
14  A.    He did not have significant plaque.
15  Q.    Did he have any plaque?
16  A.    He likely did.
17  Q.    Working with your opinion that Mr. Barnett had in
18        his coronary arteries as of January 24th, 2000,
19        are you able to estimate for me how much age and
20        elevated cholesterol contributed to the
21        formation of that plaque?
22  A.    I think that they were --- I think the amount of
23        significant arthrosclerotic plaque in 2000 was
24        minimal, of significant arthrosclerotic plaque.
page 54
1         It's likely the arrest throw that developed in
2         Mr. Barnett's arteries and every male and woman
3         in middle age was contributed to by the fact
4         that the cholesterol was elevated and by his
5         age.  So with respect to drilling down to the
6         specifics, there is likely some plaque
7         accumulation within his vessels, and we covered
8         this in the last deposition, but in terms of the
9         number of vessels whereby the arthrosclerosis
10        became significantly narrowing and causing
11        symptoms or signs of ischemia was almost
12        undetectable in the year 2000.

[141:2] - [141:16]             7/29/2006    Popma, Jeffrey (Barnett) (Rough)

page 141
2   Q.    But a Cardiolite stress test, to be clear, you
3         can't use a Cardiolite stress test to say I know
4         for certain there was 35 percent blockage in the
5         right coronary artery, 25 percent blockage in
6         the left anterior descending, and 50 percent in
7         the left circumflex, correct?
8   A.    In terms of its predictive value for the absence
9         of significant hemodynamically significant
10        coronary disease, I agree with your statement
11        that a well-performed maximum exercise test did
12        not demonstrate ischemia would be associated by
13        the sensitivity and specificity as this test is
14        defined with no significant blockages, 0 to
15        49 percent, and I can't predict where it is
16        within that spectrum.

EXHIBIT
G

Blumberg No. 5119

Exhibit G - Excerpts from July 29, 2006 Popma Deposition

**• Opposition to Roach Motion**

[153:1] - [153:11]    7/29/2006    Popma, Jeffrey (Barnett) (Rough)

```
page 153
1   Q.   Do you consider yourself an expert in the
2        interpretation of Cardiolite stress tests?
3   A.   I consider myself an expert of the angiographic
4        correlation with the findings on the Cardiolite
5        stress tests.  I think that the nuclear imaging
6        physicians are very well attuned to interpret
7        those.  I always look at those with them to make
8        sure I understand and can see what they see, but
9        the actual readings of the Cardiolite stress
10       tests are done by the nuclear imaging department
11       at the Brigham.
```

[160:21] - [162:9]    7/29/2006    Popma, Jeffrey (Barnett) (Rough)

```
page 160
21  Q.   Okay.  Can you tell me — and I believe I know
22       what your answer is, so this probably won't take
23       very long, but can you tell me what degree of
24       blockage was in each of Mr. Barnett's coronary
page 161
1        arteries as of January 24th, 2000?
2   A.   January 24th —
3   Q.   Actually, Doctor, I think it'll be easier if we
4        go through it vessel by vessel.  So I'm just
5        telling you where I'm going, but the first
6        question is what percent blockage was in
7        Mr. Barnett's proximal right coronary artery as
8        of January 24th, 2000?
9   A.   Are you asking me what I think or what I know?
10       Because if you asked me what I know, we don't
11       have an angiogram.  So if you ask me what I
12       think, I can give you estimates from what I
13       think, but if you ask me what I know, I don't
14       know, because the only way to know, as you have
15       pointed out, is by performing the cardiac
16       catheterization, which was not done.
17  Q.   So okay.  So if I were to walk you through this
18       whole thing, would it be speculation or would it
19       be an informed estimation?
20  A.   It would be an informed estimation.
21  Q.   Okay.  So give me your best estimate as to what
22       the degree of blockage was in Mr. Barnett's
23       proximal RCA as of January 24th, 2000 without
24       speculating.
page 162
1              MR. WACKER:  Objection.
2   A.   I have a hard time, you know -- I can globally
3        and save us some time -- that all of the
4        coronary tree would be between 0 and 49 percent
5        except something in the posterior lateral wall
6        that supplied a very small area of myocardium,
7        in which case somewhere in that zone in a small
8        area of distribution was a greater than
9        50 percent stenosis.
```

[171:24] - [172:17]    7/29/2006    Popma, Jeffrey (Barnett) (Rough)

```
page 171
24  Q.   The bottom row?
page 172
1   A.   -- the bottom row, you see the lateral wall on
2        the right, the septal wall, the apex, and the
3        base.  Now, I want to be clear about this.  I
4        don't see any large abnormalities.  I see what
5        I'm looking upon as a normal scan, which is what
6        I looked at before, and that's what I said to
7        Andy.
8              However, because I'm not an expert in
```

Exhibit G - Excerpts from July 29, 2006 Popma Deposition

• Opposition to Roach Motion

```
 9        nuclear imaging, because I see a normal scan, if
10        a pundit expert in that scan sees an
11        abnormality, then I'm willing to the defer to
12        the fact that the expert saw a mild abnormality
13        and give the worst description of the coronary
14        disease to the fact there was a mild wall
15        present, although I can't point to you anything
16        on these scans that I personally would call an
17        abnormality.
```

Exhibit H - Excerpts from July 22, 2006 Popma Deposition

• Opposition to Roach Motion

[430:] - [430:24]          7/22/2006     Popma. Jeffrey

                           page 430
                               0430
                           1
                           2              UNITED STATE DISTRICT COURT
                           3            EASTERN DISTRICT OF LOUISIANA
                           4                   In Re:  VIOXX
                           5                 MDL Docket No. 1657
                           6
                           7         PRODUCTS LITIGATION
                           8         SECTION L
                           9         JUDGE FALLON
                           10        This document relates to
                           11        GERALD BARNETT
                           12        AND CORRINE BARNETT
                           13                       Plaintiffs
                           14        V.
                           15        MERCK & CO., INC.
                           16                       Defendant
                           17        Civil Action No. 2:06cv485
                           18              - - - - - - - -
                           19        Deposition of Jeffrey John Popma, M.D.
                           20              Saturday, July 22, 2006
                           21
                           22          Golkow Litigation Technologies
                                         Four Penn Center, Suite 1210
                           23             Philadelphia, PA 19103
                                             877.DEPS.USA
                           24       Reporter:  Deborah Roth, RPR/CSR


[533:10] - [533:18]        7/22/2006     Popma. Jeffrey

                           page 533
                           10       Q.  Do you consider yourself an expert in
                           11   interpreting Cardiolite stress tests?
                           12       A.  I don't.
                           13               I interpret them in my clinical
                           14   practice; but in situations like this, I think
                           15   the deference of this is to an expert, and the
                           16   expert, you know, is reading mild wall
                           17   ischemia.  Whether it is mild or not, I think
                           18   the prognostic implications are the same.


[570:1] - [570:23]         7/22/2006     Popma. Jeffrey

                           page 570
                           1    COMMONWEALTH OF MASSACHUSETTS )
                           2    SUFFOLK, SS                   )
                           3
                           4    I, Deborah L. Roth, and Notary Public in and
                           5    for the Commonwealth of Massachusetts, do
                           6    hereby certify that there came before me on
                           7    July 22, 2006, the person hereinbefore named,
                           8    who was by me duly sworn to the truth
                           9    concerning any knowledge in this cause; that
                           10   that person was thereupon examined under oath,
                           11   and the examination reduced to typewriting;
                           12   and that the deposition is a true record of
                           13   the testimony given by the witness.
                           14   I further certify that I am neither related to
                           15   nor employed by any attorney or counsel
                           16   employed by the parties hereto or financially
                           17   interested in the action.
                           18   In witness whereof, I have hereunto set my
                           19   hand this 23rd day of July 2006.
                           20
                           21
                           22   DEBORAH ROTH, Notary Public



EXHIBIT
H

Exhibit H - Excerpts from July 22, 2006 Popma Deposition

• Opposition to Roach Motion

23  My commission expires: 2/7/08

### Expert Report of Paul Roach, M.D., F.A.C.C.

I am a cardiologist and have been practicing medicine for approximately 20 years. I am board certified in Internal Medicine and Cardiovascular Diseases by the American Board of Internal Medicine. My education, background and experience are more fully set forth in my curriculum vitae, a copy of which is attached to this report. My opinions as set forth in this report are based on my knowledge, training and experience as a medical doctor and cardiologist. Furthermore, these opinions are based on medical probability and supported by peer reviewed medical literature.

Myocardial infarction and stroke often occur in the setting of thrombosis of an artery. The underlying pathology which predisposes to thrombosis is atherosclerosis. Atherosclerosis is the leading cause of the death in the developed world. The established risk factors for the development of atherosclerosis are family history, dyslipidemia, diabetes mellitus, hypertension, smoking, obesity, male gender, age, metabolic syndrome, and elevated blood levels of homocysteine. Although not conclusively proven it has been suggested other factors such as stress and certain infectious agents such as Chlamydia pneumoniae and herpes virus may also lead to atherosclerosis, raising the concern that there are as yet unknown factors which lead to atherosclerosis. Additionally, there is evidence that certain disease states, like rheumatoid arthritis, are associated with an increased risk of developing cardiovascular disease. This observation suggests that other factors, in addition to the traditional risk factors are involved in the development atherosclerosis in rheumatoid arthritis as well as other forms of arthritis.

It is well accepted that local vascular injury (often related to shear stress), inflammation and oxidative stress contribute to the development of the disease. The lesions of atherosclerosis typically occur in large and medium-sized elastic and muscular arteries which feed the brain, heart and other organs. This process can result in progressive narrowing of an artery resulting in impaired blood flow to the target organ with resultant impairment of the function of that organ. Additionally, there can be acute thrombosis in the vessel resulting in cell death and acute impairment of the target organ. Myocardial infarction and stroke are examples of the latter process. The earliest anatomic finding in atherosclerosis is the fatty streak, which can be seen at an early age. The fatty streak is purely an inflammatory lesion. Typically atherosclerosis occurs as the result of deposition of lipid material in the arterial wall followed by a cellular mediated inflammatory response. This is associated with endothelial dysfunction which impairs the usual homeostatic mechanisms of the endothelium. Ongoing inflammation results in recruitment of additional macrophages and lymphocytes resulting in the release of various factors which result in further damage to the arterial wall with resultant necrosis. Eventually a fibrous cap will form over the area of lipid deposition and necrosis resulting in what is commonly referred to as a plaque. Endothelial dysfunction and/or rupture of the fibrous cap leads to platelet activation and subsequent thrombosis. It is this thrombosis that is often the cause of a myocardial infarction or stroke.

1

EXHIBIT
I

M006752501

Nonsteroidal anti-inflammatory drugs (NSAIDs) are commonly and widely used as analgesics and anti-inflammatory agents. They are used to treat many causes of pain as well as to reduce inflammation in the setting of arthritis. Certain types of NSAIDs have been investigated for their potential impact on the prevention or slowing of the development of Alzheimer's disease and the prevention certain cancers. NSAIDs have been classified into three broad classes: aspirin, non-selective NSAIDs, and selective cyclooxygenase-2 (COX-2) inhibitors, commonly referred to as coxibs. The nonselective NSAIDs inhibit both cyclooxygenase-1 (COX-1) and cyclooxygenase-2 (COX-2), with wide variation in their effectiveness at inhibiting one form or the other of cyclooxygenase. Low dose aspirin (e.g., 81mg) has been shown to be approximately 170 fold more potent in inhibiting COX-1 than COX-2. On the other hand, the coxibs have far greater potency at inhibiting COX-2 than COX-1.

All classes of NSAIDs inhibit prostaglandin G/H synthase, which has both cyclooxygenase and hydroperoxidase activity, and is colloquially referred to as cyclooxygenase. This is the enzyme that catalyzes the conversion of arachadonic acid to either prostaglandins or thromboxanes. Prostaglandin G/H synthase comes in two forms. COX-1 is felt to be expressed constitutively and is thought to mediate the production of prostaglandins which have cytoprotective effects, whereas COX-2 is felt to be inducible at sites of inflammation resulting in increased production of prostaglandins involved in pathophysiologic processes.

The inhibition of COX-2 is felt to have a greater impact on the reduction of inflammation, while COX-1 inhibition has been implicated in injury of the mucosa of the gastrointestinal tract, resulting in bleeding, ulcers and perforations. Additionally, the inhibition of COX-1 results in impairment of platelet function with increased bleeding. It is believed that the fact that low-dose aspirin selectively inhibits COX-1 most likely explains why even low-dose aspirin is associated with the aforementioned gastrointestinal side effects. There are multiple studies which address the efficacy of aspirin in both the primary and secondary reduction of myocardial infarction and stroke. Platelet thromboxane A2 (TXA2) is synthesized and released in response to various stimuli such as arachidonate and collagen. Thromboxane then results in irreversible platelet aggregation through an interaction with the TXA2 receptor on the platelet. It is this platelet aggregation which is an essential component of thrombosis. Platelet TXA2 production is a COX-1 mediated process. Aspirin irreversibly binds and acetylates a serine residue at position 529 of platelet COX-1 resulting in irreversible and permanent impairment of platelet TXA2 production and the ability of platelets to aggregate in response to TXA2. Since platelets are anucleate, the TXA2 mediated platelet aggregation is irreversible for the life of the platelet.

When given at doses as little as 81 mg per day aspirin results in a significant reduction in thrombosis mediated events like stroke and heart attack. Over the usual dosing range of aspirin there is no dose effect response with regard to platelet inhibition. Certain non-aspirin nonselective NSAIDs have been shown to reversibly bind the platelet COX-1 resulting in the impairment of platelet TXA2 production and thus platelet aggregation. Depending on the dose and frequency of administration of the particular drug there can

M00675250Z

be clinically significant impairment of platelets and an increased risk of bleeding. However not all nonselective NSAIDs impair platelet function to the same degree.

The development of coxibs was driven by the unsatisfactory side effect profile associated with nonselective NSAIDs, namely the aforementioned gastrointestinal bleeding, perforation and ulcer formation, leading to substantial morbidity and mortality. It was hypothesized that if an NSAID more selective for COX-2 inhibition could be developed that there would be just as effective reduction in pain and inflammation with far fewer gastrointestinal side effects. In May 1999, the COX-2 inhibitor rofecoxib (Vioxx) was granted FDA approval.

The Vioxx Gastrointestinal Clinical Outcomes Research (VIGOR) Study was published in 2000 and addressed the efficacy of Vioxx with regard to the reduction of gastrointestinal side effects. In this study, 8076 patients with rheumatoid arthritis were randomly assigned to the selective COX-2 inhibitor Vioxx 50 mg per day (twice the recommended chronic dose) or to the nonselective NSAID naproxen 500 mg twice daily. Although the two drugs had similar efficacy for the treatment of rheumatoid arthritis, the relative risk (RR) of gastrointestinal events was much lower with Vioxx (RR 0.5; 95% confidence interval [CI], 0.3, 0.6; P<.001). However, myocardial infarctions were more frequent in the patients treated with VIOXX (0.5%) compared to those treated with naproxen (0.1%). This result was statistically significant (RR 0.2; 95% CI 0.07, 0.58). There was no difference between the treatment groups with regard to stroke or death from myocardial infarction or stroke. The study protocol prohibited the use of aspirin. Vioxx was administered at twice the standard recommended dose and naproxen was given at a usual clinical dose. Four percent of the patients met FDA criteria for the use of aspirin for secondary prevention of cardiovascular events, namely history of myocardial infarction, angina, stroke, transient ischemic attack, angioplasty or coronary artery bypass grafting. These patients accounted for 38% of the patients who had a myocardial infarction. The VIGOR investigators noted that naproxen given at the doses specified in the study inhibited the production of $TXA_2$ by 95% and platelet aggregation by 88%. Thus, based on the data the question about the cause of the increased risk of myocardial infarction associated with Vioxx use remained open. Was it due to random chance, a reduction in the risk of myocardial infarction in the group treated with naproxen, an increased risk of myocardial infarction in the group treated with Vioxx, or some combination of the aforementioned factors? Merck subsequently changed the labeling of Vioxx to inform prescribers about the findings of the VIGOR Study.

There are a number of randomized, blinded, placebo and comparator controlled studies as well as one crossover open-label study which address whether naproxen given at the dose and frequency used in the VIGOR Study results in platelet inhibition similar to that seen with aspirin administration. '

Van Hecken et al. examined the effect of placebo, Vioxx 12.5 mg per day, Vioxx 25 mg per day, diclofenac 75 mg three times daily, ibuprofen 800 mg three times daily, sodium naproxen 550 mg twice daily, or meloxicam 15 mg per day on COX-1 and COX-2 inhibition using ex-vivo techniques and measurement of bleeding times in seventy-six

M000752503

healthy females with normal baseline platelet function. The study was partially blinded, randomized and placebo controlled. Parameters were measured at baseline and after six days of treatment. Mean-inhibition of COX-2 as measured by weighted average of lipopolysaccharide induced PGE2 generation was -2.4%, 66.7%, 69.2%, 77.5%, 93.9%, 71.4%, and 71.5% for placebo, Vioxx 12.5 mg, Vioxx 25 mg, meloxicam, diclofenac, ibuprofen, and naproxen, respectively. Corresponding values for COX-1 inhibition as measured by serum TXB2 (a serum metabolite of platelet TXA2) were -5.15%, 7.98%, 6.65%, 53.3%, 49.5%, 88.7%, and 94.9%. Vioxx (12.5mg and 25 mg), meloxicam, and diclofenac did not affect bleeding times, while ibuprofen and naproxen prolonged bleeding times on day 6 (p<0.002 for ibuprofen and naproxen vs. placebo).

Capone et al. performed a crossover open-label study of low dose aspirin (100 mg/day) or naproxen (500 mg/dl) administered to nine healthy subjects for six days. The effects on thromboxane and prostacyclin were assessed up to 24 hours after oral dosing. The administration of aspirin and naproxen caused a similar reduction in whole-blood TXB2 production, an ex-vivo measurement of platelet COX-1 activity, by 99+/-0.3% and 94+/-3%. The authors noted that naproxen 500mg twice daily caused persistent and complete suppression of platelet TXB2 production throughout the 12-hour dosing interval that was indistinguishable from that of low dose aspirin. Further, while aspirin had no effect on the production of urinary metabolite of PGI2, naproxen significantly reduced the urinary metabolite of PGI2.

Tuleja et al. used a double blind comparator-controlled study to evaluate the effect of Vioxx 25 mg twice daily, naproxen 500 mg twice daily, aspirin 75 mg per day or diclofenac 75 mg per day on serum thromboxane and serum prostacyclin production, using standard ex-vivo techniques, as well as on the bleeding-time at baseline and after seven days of treatment in forty-five healthy men. Aspirin, naproxen, and diclofenac caused a statistically significant increase in bleeding time, Vioxx had no effect on bleeding time. Naproxen, as well as aspirin, caused a significant reduction in thromboxane and prostacyclin production, whereas diclofenac decreased prostacyclin synthesis but had no effect on thromboxane production. Vioxx had no effect on prostacyclin or thromboxane synthesis. This study suggested that naproxen had anti-platelet effects similar to aspirin and that endothelial prostacyclin in healthy humans is COX-1 mediated.

Two randomized comparator-controlled trials conducted by Leese et al. examined the effects of two other coxibs, celecoxib and valdecoxib versus naproxen 500 mg twice daily on platelet function. One of the studies as a double-blind, randomized, comparator-controlled study of ten days duration conducted in twenty-four healthy subjects. A supra-therapeutic dose of celecoxib, 600 mg twice daily, was compared to naproxen 500 mg twice daily. Parameters were measured at baseline and after ten days. Ex-vivo platelet aggregation in response to standard agonists (collagen, arachidonate, or U46619 [a thromboxane A2 receptor]), bleeding time, and serum TXB2 levels were measured. Unlike celecoxib, naproxen reduced ex-vivo platelet aggregation and TXB2 levels, and increased bleeding time. Leese et al. also compared valdecoxib 40 mg twice daily, diclofenac 75 twice daily, naproxen 500 mg twice daily or placebo in a randomized,

A

MID0575204

double-blind, comparator and placebo-controlled trial designed to measure the effects of these drugs on platelet function. Sixty-two healthy subjects were enrolled. Ex-vivo measurements of platelet aggregation (response to arachidonate, collagen, and adenosine diphosphate), bleeding time, and serum TXB2 were measured at baseline and on day 8. Valdecoxib had no effect on any measurements of platelet function. Naproxen and diclofenac significantly reduced platelet aggregation to arachidonate and to a lesser extent collagen and adenosine diphosphate compared to placebo. Naproxen significantly reduced TXB2 levels.

Further, randomized double-blind placebo-controlled trials have looked at the anti-thrombotic effects of certain nonselective NSAIDs. Fornaro et al. performed a randomized double-blind placebo-controlled study to assess the efficacy of the nonselective NSAID indobufen 100mg twice daily on the prevention of embolic events of cardiac origin. All patients had heart disease and risk for cardiogenic emboli. The endpoints were stroke, transient ischemic attack, systemic embolism, and fatal myocardial infarction. The RR of an endpoint with indobufen compared to placebo was 0.35 (95% CI: 0.14, 0.89). This study suggested that indobufen could reduce the risk of cardiovascular events. Brochier studied the effect of flurbiprofen, another nonselective NSAID, on secondary prevention of myocardial infarction in patients treated with thrombolysis or percutaneous revascularization for myocardial infarction. Patients were treated with either flurbiprofen 50 mg twice daily or placebo. The reinfarction rate in the flurbiprofen group was 3% compared to 10.5% in the placebo group RR 0.285 (95% CI: 0.116, 0.649, p<0.001). Both these studies would suggest that nonselective NSAIDs can have a significant effect on the reduction of cardiovascular thromboembolic events.

Taken together these trials show that naproxen, as well as certain other NSAIDs, can exhibit strong anti-platelet effects similar to aspirin. Since aspirin has been demonstrated to exhibit substantial benefit in the primary and secondary prevention of stroke and heart attack, and that naproxen has anti-platelet effects similar to aspirin, it would seem reasonable that the difference in the rate of myocardial infarction is due to a protective effect of naproxen and the play of chance, rather than any adverse effect of Vioxx.

Prior to the publication the VIGOR Study theoretical concerns were raised about the potential pro-thrombotic potential of COX-2 inhibitors, based on the notion that selective COX-2 inhibition (in the relative absence of COX-1 inhibition) might result in reduced endothelial prostacyclin production without concomitant impairment of platelet thromboxane synthesis (sometimes referred to as the "FitzGerald hypothesis"). Prostacyclin (PGI2) is a potent vasodilator and inhibitor of platelet aggregation that is produced by prostacyclin synthase via the cyclooxygenase pathway of arachadonic acid metabolism. The balance between prostacyclin production and that of platelet TXA2, another product of the cyclooxygenase pathway that is involved in platelet aggregation, is felt to be important in the maintenance of vascular hemostasis.

Catella-Lawson et al. examined the effect of the selective COX-2 inhibitor MK-966 (Rofecoxib) and the nonselective COX inhibitor indomethacin on the production of serum thromboxane (TXB2), as well as the urinary metabolite of thromboxane (TX-M)

M006752505

and the urinary metabolites of prostacyclin (6-keto-PGF1a and PGI-M) in thirty-six older healthy subjects. MK-966 50 mg per day, indomethacin 50 mg three times per day or placebo was administered for two weeks. Platelet thromboxane synthesis was inhibited by indomethacin only. The urinary metabolites of prostacyclin were inhibited by both MK-966 and indomethacin and were unchanged by placebo. The data suggested that urinary prostacyclin production was COX-2 dependent. However, the exact source of the prostacyclin production could not be determined and this study therefore could not conclude that endothelial prostacyclin production was COX-2 mediated.

McAdam et al. examined the effect of celecoxib, a selective COX-2 inhibitor, and ibuprofen, a nonselective COX inhibitor, on the production of platelet derived thromboxane and prostacyclin in vivo. Thirty-seven healthy subjects were randomized to celecoxib (100 mg, 400 mg, or 800mg), ibuprofen 800mg, or placebo. Parameters were measured at several times over the ensuing twenty-four hours. Both serum and urinary metabolites of prostacyclin and platelet thromboxane were measured. The indomethacin inhibited the production of both the serum and urinary metabolites of prostacyclin and platelet derived thromboxane to a comparable degree. Celecoxib significantly inhibited the production of the urinary and serum metabolites of prostacyclin. Although there was some inhibition of the production of thromboxane metabolites with celecoxib it was much less pronounced. Placebo had no effect on the metabolite production of either prostacyclin or thromboxane. It was concluded that urinary prostacyclin production was mediated by COX-2. However, as with the study by Catella-Lawson, this study was not designed to determine the site of production of prostacyclin and therefore it could not be determined whether COX-2 inhibition affected endothelial prostacyclin production.

Indeed, other studies have examined the question of the effect of COX-2 inhibition on endothelial prostacyclin production. As referenced above, Tuleja et al. evaluated the effect of a selective COX-2 inhibitor (rofecoxib) and various nonselective COX inhibitors on the production of serum metabolites of thromboxane and prostacyclin at the site of microvascular injury in forty-five healthy subjects. The design of the study allowed for localization of the prostacyclin production to the endothelium. With administration of nonselective COX inhibitors there was inhibition of both thromboxane and prostacyclin metabolite production. There was no inhibition of thromboxane or prostacyclin metabolites with selective COX-2 inhibition, leading the authors to conclude that COX-1, and not COX-2, was the source of prostacyclin in the human endothelium.

Tsang et al. evaluated the effect of aspirin, a selective COX-1 inhibitor at low doses, on the production of prostacyclin (PGI2) in human aortas. Prostacyclin release by human aortic tissue was obtained at surgery was assessed in patients (n=23) with ischemic heart disease undergoing coronary artery bypass grafting (group 1), patients (n=14) undergoing surgery for aortic stenosis (group 2), patients (n=4) undergoing surgery for aortic insufficiency (group 3), and patients (n=8) with ischemic heart disease undergoing coronary bypass grafting who had taken aspirin (group 4). The latter group took 75-150 mg of aspirin daily for at least six months prior to surgery. The aortic stenosis and regurgitation groups served as controls in order to eliminate any effect that the presence of atherosclerosis would have on the analysis. The decreased aortic production of

M005752506

prostacyclin in group 4 patients compared to group 1 patients was pronounced (95%) and highly significant (p<0.002). This study supports the notion that human endothelial production of prostacyclin is a COX-1 mediated process.

Further, Wong et al. examined this issue using an animal model. The investigators evaluated the effect of two COX-2 inhibitors, rofecoxib and celecoxib, and the nonselective COX inhibitor indomethacin on the production of prostacyclin metabolites in rabbit aortic tissue. They found that Vioxx had no effect on the production of prostacyclin metabolite production in rabbit aortas, whereas indomethacin caused significant inhibition of prostacyclin metabolite production. This supports that endothelial prostacyclin production is COX-1 dependent.

Based on the concerns raised about the theoretical potential for adverse effects of COX-2 inhibitors, Merck initiated a standard operating procedure (SOP) to evaluate potential adverse cardiovascular events in any study involving rofecoxib initiated in or after the second quarter of 1998. The SOP was designed to monitor (through outside and independent adjudication) thrombotic vascular events such myocardial infarction, ischemic stroke, unstable angina, transient ischemic attacks, sudden death, pulmonary embolism, peripheral arterial thrombosis, peripheral and cerebrovascular venous thrombosis, and death associated with any of the aforementioned conditions. The VIGOR Study was the first trial to which the SOP was applied.

Konstam et al. performed a meta-analysis of the cardiovascular events in twenty-three phase IIb to V rofecoxib trials (including the VIGOR Study). Comparisons were made between patients taking rofecoxib, naproxen (a NSAID with near-complete inhibition of platelet function over its dosing interval), other nonselective NSAIDs (diclofenac, ibuprofen, and nabumetone), and placebo. These trials were designed to evaluate the effect of rofecoxib on rheumatoid arthritis, osteoarthritis, Alzheimer's prevention and treatment, and chronic low back pain. The major outcome measure was the combined end point used by the Antiplatelet Trialists' Collaboration (APTC). The endpoints were cardiovascular, hemorrhagic, and unknown deaths; nonfatal myocardial infarctions; and nonfatal strokes. More than 28,000 patients, representing >14,000 patient-years at risk were analyzed. When compared across all trials, the RR for an end point was 0.84 (95%: 0.51, 1.38) when comparing rofecoxib with placebo; 0.79 (95% CI: 0.40, 1.55) when comparing rofecoxib with non-naproxen NSAIDs; and 1.69 (95% CI: 1.07, 2.69) when comparing rofecoxib to naproxen. The analysis was repeated in patients at high risk or cardiovascular thrombotic events as defined by either two or more major risk factors for coronary artery disease (current smoker, diabetes, hypertension and/or hypercholesterolemia) or a prior history of a cardiovascular event. The RR for an endpoint was 1.04 (95% CI: 0.51, 2.12) when comparing rofecoxib to placebo; 0.96 (95% CI: 0.40, 2.29) when comparing non-naproxen NSAIDs to rofecoxib; and 1.88 (95%CI: 0.93, 3.81) when comparing rofecoxib to naproxen. It was concluded that rofecoxib did not result in an excess risk of thrombotic cardiovascular events when compared to placebo or non-naproxen NSAIDs. The differences between rofecoxib and naproxen were likely the result of the anti-platelet effects of naproxen (as described

M006752507

above). Further, it should be noted that Weir et al. updated this analysis by Konstam et al. and came to similar conclusions.

Reicin et al. examined the risk of thrombotic cardiovascular events in the rofecoxib IIb/III osteoarthritis trials. The endpoint was an adverse event, either an arterial or venous thrombotic event, as defined by the SOP, with a second analysis performed using the endpoint as defined by the APTC. This study looked at 5,435 participants in 8 phase IIb/III osteoarthritis trials that supported the original approval of rofecoxib. Rofecoxib was compared to placebo and nonselective NSAIDs (ibuprofen, diclofenac, or nabumetone). The RR of the primary endpoint was 1.15 (95% CI: 0.63, 2.09) when comparing nonselective NSAIDs to rofecoxib and 0.94 (95% CI: 0.31, 2.92) when comparing placebo to rofecoxib. The analysis did not change when aspirin indicated patients (history of stroke, transient ischemic attack, myocardial infarction, stable angina, unstable angina, coronary bypass grafting, or percutaneous coronary intervention) were evaluated separately. The RR in this analysis was 1.45 (95% CI: 0.53, 4.00) for nonselective NSAIDS compared to rofecoxib and 1.24 (95% CI: 0.02, 15.47) for rofecoxib compared to placebo. The analysis using the APTC end points was no different. The RR for an endpoint was 1.44 (CI: 0.65, 3.17) when comparing nonselective NSAIDs to rofecoxib and 1.42 (CI: 0.24, 6.22) when comparing placebo to rofecoxib. In summary, an analysis of the rofecoxib osteoarthritis studies showed no difference between rofecoxib, nonselective NSAIDS, and placebo with regard to the risk of cardiovascular thrombotic events.

Mukerjee et al. reached a different conclusion about the risk of cardiovascular events when they compared the myocardial infarction rates for celecoxib and rofecoxib (in CLASS and VIGOR, respectively) to the placebo arm of a meta-analysis of aspirin use. The study design was criticized because it compared absolute event rates from different studies. To be valid it would assume similar cardiovascular risks in the populations studied, as well as having the same study endpoints – two things which cannot be assured. The annualized myocardial infarction event rates for rofecoxib (0.74%) and for celecoxib (0.80%) are similar. The annualized myocardial infarction rate for the placebo arm of the aspirin trials meta-analysis was 0.52%. Targum in the FDA memorandum dated February 1, 2001, showed the annualized myocardial infarction rate for naproxen users in the VIGOR study to be 0.15%. Taken together this information would suggest a protective effect of naproxen with regard to prevention of myocardial infarction. The authors did not conclude that rofecoxib definitely caused an increased risk of thrombotic cardiovascular events, but rather reached the same conclusions as the authors of the VIGOR study. Further, Mukerjee et al. did not find any significant increase in risk of thrombotic cardiovascular events among users of rofecoxib in studies 090 and 085. However, one of the authors, Topol, later suggested in deposition testimony that the findings of study 090 (which is detailed in the Targum FDA memorandum, dated February 1, 2001) showed that rofecoxib was related to an increase in cardiovascular thrombotic events. His post hoc analysis of 090, which he talks about in his deposition, does not use a pair wise comparison of the cardiovascular events with rofecoxib use to event rates with nabumetone and placebo as called for in the protocol but rather he combines the nabumetone and placebo groups and compares the cardiovascular event

Q

M006752508

rates in the combined group to the rates in rofecoxib group, resulting in a different conclusion about event risk. Furthermore, in his deposition he states that 090 is important but reaches a different conclusion in the article stating that it is too small to make any meaningful conclusions.

Lisse et al. published a study which looked at the thrombotic cardiovascular events in the ADVANTAGE (Assessment of Differences between Vioxx and Naproxen to Ascertain Gastrointestinal Tolerability and Effectiveness) Study Group. This study enrolled 5557 patients with osteoarthritis with a mean age of 63 years. The patients were randomized to either rofecoxib 25 mg per day or naproxen 500 mg twice daily in a double blind controlled fashion. Approximately sixty percent of each group had a history of a cardiovascular event. Low-dose aspirin (<100 mg/day) was allowed if taken for cardiovascular prophylaxsis prior to randomization. The rofecoxib and naproxen groups did not significantly differ in the number of thrombotic cardiovascular events, as defined by the combined APTC end points, (10 [0.4%] vs. 7 [0.3%]; p>0.2, or in adjudicated confirmed thrombotic events (9 [0.3%] vs. 12 [0.4%] p>0.2). Five myocardial infarctions occurred in the rofecoxib group and one in the naproxen (p>0.2). There were no strokes in the rofecoxib group and six in the naproxen group, all thrombotic (p=0.015).

Reines et al. performed a study to examine the effect of rofecoxib on the rate of progression of mild to moderate Alzheimer's disease in 692 patients aged 50 years or older. They were randomized to receive either rofecoxib 25 mg per day or placebo for a period of 12 months. The number of confirmed adjudicated serious thrombotic vascular events during the twelve month period was lower in the rofecoxib group (4 events) compared to the placebo group (11 events; 1 additional event occurred in a patient on placebo during months 13 to 15).

Thal et al. used a randomized, double-blind, placebo-controlled study to determine whether rofecoxib would slow the onset of Alzheimer's disease in patients with mild cognitive impairment. A total of 1457 patients aged 65 years or greater were randomized to either rofecoxib 25 mg per day or placebo for 4 years. The number of confirmed thrombotic events during the four year period was similar in the two groups (38 in the rofecoxib group and 36 in the placebo group). Four patients on rofecoxib suffered fatal myocardial infarctions and another two had cardiac arrests while taking the drug. Three patients on placebo suffered a fatal myocardial infarction and none had a cardiac arrest.

Juni et al. examined the risk of myocardial infarction with use of rofecoxib compared to nonselective NSAIDs and placebo by performing a meta-analysis on randomized controlled trials. I should not that the Alzheimer's studies were excluded from their analysis. They concluded that the RR for Vioxx for myocardial infarction with rofecoxib use was 2.30 (95% CI: 1.22, 4.33). It should be noted that this analysis was with respect to rofecoxib versus any comparator and excluded certain randomized trials from the analysis. However, according to Table 2 in the article, the RR for rofecoxib compared to placebo was 1.04 (95% CI: 0.34, 3.12); 1.55 (95% CI: 0.55, 4.36) when compared to non-naproxen NSAIDS; and 2.93 (95% CI: 1.36, 6.33) when compared to naproxen. Thus, in actuality, their results did not differ from the results of Konstam et al. and Weir et al., in

0

M0067525099

that, there did not appear to be an increased risk with rofecoxib compared to placebo and non-naproxen NSAIDs, but there was a difference in cardiovascular events when rofecoxib was compared to naproxen.

Several epidemiologic studies have looked at the effect of nonselective NSAID and coxib use on the risk of thromboembolic cardiovascular events. Watson et al. (2002) examined the risk of acute thromboembolic (myocardial infarction, sudden death, and stroke) events in patients with rheumatoid arthritis (RA) taking naproxen. This study was a population-based, case-controlled study, using patients from the UK General Practice Research Data Base (GPRD). Those patients with a current prescription for RA had a reduced risk of major acute thromboembolic events relative to those with no prescription in the past year. The RR was 0.61 (95% CI: 0.39, 0.94), whereas past use was 0.87 (95% CI: 0.65, 1.16).

Rahme et al. (2002) evaluated the association between naproxen use acute myocardial infarction in a population of elderly patients in Quebec using a case-control study. They showed that concurrent naproxen use reduced the risk of acute myocardial infarction compared to those using other NSAIDs. The RR was 0.79 (95% CI: 0.63, 0.99). This effect was seen only in those who had filled at least two consecutive thirty day prescriptions.

Solomon et al. (2002) performed a case-controlled study of patients with myocardial infarctions using a healthcare data base that contained all prescriptions, diagnoses and procedural information on patients enrolled in the New Jersey Medicare and Medicaid programs. Although NSAID users had the same risk of myocardial infarction as nonusers, those who used naproxen had a significant reduction in the risk of myocardial infarction RR 0.84 (95% CI: 0.72, 0.98).

Ray et al. (Jan 2002) came to a different conclusion about the cardio-protective effects of naproxen by examining non aspirin NSAID use in the Medicaid population in Tennessee. They found no effect on acute myocardial infarction or coronary heart disease death when NSAIDs were compared to placebo. The RR for naproxen was 0.96 (CI: 0.92, 1.16), ibuprofen 1.15 (95% CI: 1.02, 1.28), and other non-aspirin NSAIDs 1.02 (95% CI: 0.92, 1.16). When naproxen was directly compared with ibuprofen the RR was 0.83 (95% CI: 0.69, 0.98).

Ray et al. (October 2002) performed another retrospective cohort study in the TennCare program. Compared to current users, they found no increased risk with ibuprofen, naproxen, celecoxib, rofecoxib 25mg RR 1.03 (95% CI: 0.78, 1.35), and rofecoxib 50mg RR 1.70 (95% CI: 0.98, 2.95). An increased risk was found with rofecoxib 50mg compared to new users during the study RR 1.93 (95% CI: 1.09, 3.43).

Mamdani et al. (2003) conducted a population based retrospective cohort study using health care data from Ontario, Canada. They identified new users of coxibs and nonselective NSAIDs who were over the age of sixty-six. Relative to control subjects, there were no differences in acute myocardial infarction risk for new users of celecoxib

10

MD067252510

RR 0.9 (95% CI: 0.7, 1.2), rofecoxib RR 1.0 (95% CI: 0.8, 1.4), naproxen RR 1.0 (95% CI: 0.6, 1.7) or non-naproxen nonselective NSAIDs RR 1.2 (95% CI: 0.9, 1.4).

Solomon et al. (2004) performed a matched case control study of patients with myocardial infarction using a database of Pennsylvania and New Jersey Medicare beneficiaries. The authors did not find a statistically significant increase in risk for MI when rofecoxib was compared to no current use OR 1.14 (95% CI: 1.00-1.31). It is interesting to note that in this study, statins were found not to be cardioprotective and hormone replacement therapy was found to be cardioprotective.

Graham et al. (2005) performed a nested case-control study using data from Kaiser Permanente in California. Cases of myocardial infarction and sudden death were matched with controls. Current exposure to coxibs and nonselective NSAIDs was compared to remote exposure to any NSAID, and rofecoxib was compared to celecoxib. For all doses of rofecoxib versus celecoxib the odds ratio (OR) was 1.59 (95% CI: 1.10, 2.32), for rofecoxib 25 mg/day or less 1.47 (95% CI: 0.99, 2.17), for rofecoxib greater than 25 mg/day 3.58 (95% CI: 1.27, 10.11). However, when rofecoxib was compared to remote use, there was no statistically significant increased risk for all doses of rofecoxib OR 1.34 (95% CI: 0.98, 1.82) or rofecoxib 25mg/day or less OR 1.23 (95% CI 0.89, 1.71). There was an increase risk for rofecoxib greater than 25mg, but the number of events was small. For naproxen use versus remote NSAID use the OR was 1.14 (95% CI: 1.00, 1.30).

Kimmel et al. (2005) used a case-control study to examine the risk of nonfatal myocardial infarction among users of celecoxib compared to users of non-aspirin NSAIDs and those who did not use non-aspirin NSAIDs. The OR for celecoxib compared to nonusers was 0.43 (95%CI: 0.23, 0.79), for rofecoxib compared to nonusers was 1.16 (95% CI: 0.70, 1.93). When rofecoxib was compared to naproxen, the OR was 3.39 (95% CI: 1.37, 8.40).

Levesque et al. (2005) evaluated the risk of acute myocardial infarction in users of coxibs and nonselective NSAIDs compared to placebo in residents of Quebec, Canada. The study was a retrospective, population-based cohort study using a time-matched, nested case-control approach. Those who used rofecoxib compared to nonusers of a NSAID the RR was 1.24 (95% CI: 1.05, 1.46). There was no evidence for elevated risk with current use of celecoxib RR 0.99 (95% CI: 0.85, 1.16), non-naproxen NSAIDs RR 1.00 (CI: 0.73, 1.37), naproxen RR 1.17 (95% CI: 0.75, 1.84), and meloxicam RR 1.06 (CI: 0.49, 2.30).

Levesque et al. (2006) also looked at a population similar to the one in the study mentioned above to assess the timing of the onset of cardiovascular events with the use of coxibs. They found the risk of myocardial infarction was highest following the first-time use of rofecoxib, RR 1.67 (95% CI: 1.21, 2.30), with events occurring a median of nine days after starting the drug. This finding was not replicated for first-time users of celecoxib. Repeated exposure to rofecoxib was not associated with an increased risk of myocardial infarction, RR 1.29 (95% CI: 0.98, 1.40). The same was seen with celecoxib. Although the risk of myocardial infarction remained elevated for up to seven days after

11

M005752511

the discontinuation of rofecoxib RR 1.23 (95% CI: 1.05, 1.44) it returned to baseline beginning eight days after the drug was discontinued RR 0.82 (95% CI: 0.61, 1.09).

Hippisley-Cox and Coupland (2005) compared the risk of myocardial infarction in patients taking coxibs and nonselective NSAIDs. The study was a nested case-control. There was an increased risk with use of rofecoxib OR 1.32 (95% CI: 1.09, 1.61), diclofenac OR 1.55 (95% CI: 1.39, 1.72) and with ibuprofen OR 1.24 (95% CI: 1.11, 1.39). Increased risk was also seen with naproxen, other nonselective NSAIDS, as well as other COX-2 inhibitors.

Johnsen et al. (2005) used a case-controlled study to examine the risk of myocardial infarction among users of coxibs and non-selective NSAIDs (including naproxen) compared to nonusers. The coxibs and nonselective NSAIDs, with the exception of naproxen, were associated with an increased risk of myocardial infarction. The adjusted RR for myocardial infarction for users of rofecoxib compared to nonusers of NSAIDs was 1.80 (95% CI: 1.47, 2.21). Increased risk was also found with users of other COX-2 selective inhibitors and other non-aspirin users.

Shaya et al. (2005) compared the risk of cardiovascular thrombotic events with use of coxibs and nonselective NSAIDs. The OR for cardiovascular thrombotic events for users of coxibs versus non-naproxen nonselective NSAIDS was 1.09 (95% CI: 0.90, 1.33). For rofecoxib only, the OR was 0.99 (95% CI: 0.76, 1.30).

Harrison-Woolrych et al. (2005) using a prospective, longitudinal, observational cohort study, showed no difference in the incidence of cardiovascular thrombotic events when comparing rofecoxib to celecoxib. The age adjusted RR for celecoxib use versus rofecoxib was 0.94 (95% CI: 0.51, 1.70).

Velentgas et al. (2005) performed a retrospective cohort study amongst users of rofecoxib, celecoxib, and the nonselective NSAIDs, ibuprofen and diclofenac. Compared to ibuprofen or diclofenac the RR of rofecoxib use was 1.35 (95% CI: 1.09, 1.68). Interestingly, higher doses of rofecoxib (26 to 50 mg/day) were not associated with an increased risk RR 0.81 (95% CI: 0.41, 1.60).

Kasliwal et al. (2005) performed a retrospective analysis of thromboembolic events in users of rofecoxib and celecoxib using an observational cohort technique, namely prescription event monitoring (PEM). The rofecoxib and celecoxib PEM cohorts contained 15,268 and 17,458 patients, respectively. The adjusted RRs for rofecoxib compared to celecoxib were 1.04 (95% CI: 0.50, 2.17) for cardiovascular thromboembolic events, 1.43 (95% CI: 0.86, 2.38) for cerebrovascular thromboembolic events, and 0.36 (95% CI: 0.01, 1.34) for peripheral venous thromboembolic events.

Andersohn et al. (2006) conducted a nest case-control study using the GPRD to determine whether the purported increased risk of myocardial infarction associated with COX-2 use was a class effect. They compared the rate of myocardial infarction in users of both COX-2 selective and nonselective NSAIDs to nonusers of either class of drug.

M00575512

Etoricoxib was associated with a RR of 2.09 (95% CI: 1.10, 3.97), rofecoxib 1.29 (95% CI: 1.02, 1.63), celecoxib 1.56 (CI: 1.22, 2.00), and diclofenac 1.37 (CI: 1.17, 1.59). For valecoxib the RR was 4.69 (95% CI: 0.61, 34.51). The authors concluded that the increased risk of myocardial infarction was a class effect.

Chan et al. (2006) conducted a prospective cohort study to examine the effect of NSAIDs and acetaminophen on the risk of major cardiovascular events (nonfatal myocardial infarction, fatal coronary heart disease, nonfatal and fatal stroke). They found no increase in the risk of these events in a cohort of 70,791 women examined over a 12 year period if the use of NSAIDs or acetaminophen was less than 22 months. For use of 22 months or more the RR among NSAID users compared to nonusers was 1.44 (95% CI: 1.27, 1.65). The RR for acetaminophen users was 1.35 (95% CI: 1.14, 1.59). The authors concluded that frequent use of either NSAIDs or acetaminophen was associated with an increased risk of major cardiovascular events.

Huang et al, (2006) used an observational study to examine the risk of acute myocardial infarction (AMI), angina, stroke, and transient ischemic attack (TIA) in long-term users of rofecoxib and celecoxib compared to meloxicam. Patients in the study used the drugs for at least 180 days. Compared with meloxicam users, celecoxib users had lower hazard ratios (HR) for the development of AMI (HR 0.78, 95% CI: 0.63, 0.96) and stroke (HR 0.81, 95% CI: 0.70, 0.93). Rofecoxib users had no higher event rates than the users of meloxicam. Further, there was no significant difference between rofecoxib and celecoxib. Not surprisingly, the authors found that having had an event in the year prior to drug use was significant predicator of a subsequent event.

Solomon et al. (2006) examined the risk of cardiovascular events in users of coxibs, NSAIDs and nonusers in a longitudinal cohort of Medicare beneficiaries enrolled in a state-run prescription drug plan. The coxibs included rofecoxib, celecoxib, and valdecoxib. The NSAIDs were diclofenac, ibuprofen, naproxen, and a composite of all other NSAIDs. When compared to non-users, rofecoxib users had a RR of 1.15 (95% CI: 1.06, 1.25), whereas naproxen users had a RR of 0.75 (95% CI: 0.62, 0.92). No other coxib or NSAID was associated with a significant increase or decrease in cardiovascular events.

In summary, the epidemiologic studies provide conflicting results which is not surprising given the inability of such studies to control for multiple confounding factors. Moreover, given the conflicting results, I do not believe that any reliable conclusions can be drawn from these studies.

The Adenomatous Polyp Prevention on Vioxx (APPROVe) Trial was conducted to evaluate the hypothesis that three years of treatment with rofecoxib 25 mg per day would reduce the risk of recurrent of adenomatous polyps among patients with a history colorectal adenomas. As part of the SOP, cardiovascular events were assessed. The RR for thrombotic cardiovascular events in the rofecoxib group was 1.92 (95% CI: 1.19, 3.11). Furthermore, the Kaplan-Meier event plot shows that the separation in events did not occur until after 18 months of use.

MDG6752513

Two studies, which were terminated early because of the voluntary withdrawal of rofecoxib, were analyzed for cardiovascular event rates. VIP was a double-blinded, randomized, placebo-controlled, multi-center study to evaluate the effect of rofecoxib in decreasing the risk of prostate cancer. The planned study population of 15,000 was randomized to either rofecoxib 25 mg per day or placebo. Patients with low dose aspirin use were randomized equally. The study was initiated on June 24, 2003 and was intended to run for 72 months. The study was terminated in September 2004, when Merck voluntarily withdrew rofecoxib. At the time of termination 4,741 patients had been enrolled. The mean duration of treatment was 5.12 months. Cardiovascular events were analyzed using confirmed thrombotic cardiovascular serious adverse events (TCVSAE) as defined by the SOP as well as by applying APTC criteria. Using the TCVSAE criteria there were 15 (0.63%) events in the placebo group and 14 (0.59%) events in the rofecoxib group resulting in rates of 1.36 and 1.27, respectively. When examined using the APTC criteria there 9 (0.38%) events in the placebo group and 8 (0.34%) in the rofecoxib group. VICTOR (VIOXX in Colorectal Therapy: Definition of Optimal Regime) was designed to examine the effect of rofecoxib on the recurrence of colorectal carcinoma. At the time of termination a total 2434 patients were enrolled with equal numbers assigned to either rofecoxib 25 mg per day or placebo. Cardiovascular events were analyzed using both the TCVSAE and APTC criteria while on treatment and within 14 days after discontinuation of treatment. Using the TCVSAE criteria there were 14 (1.15%) events in the rofecoxib group and 4 (0.33%) events in the placebo group. When APTC endpoints were used there were 9 (0,74%) events in the rofecoxib group and 3 (0.25%) events in the placebo group.

An April 6, 2005, FDA memorandum provided a summary of the available data about the cardiovascular risk of NSAIDs. It concluded that COX-2 selective NSAIDs do not differ from non-selective NSAIDs with regard to risk of serious cardiovascular events and that there is no rank order in risk with the approved COX-2 selective NSAIDs (i.e. celecoxib, rofecoxib, and valdecoxib) and non-selective NSAIDs. In short, the FDA concluded that any cardiovascular event risk is a class effect.

Furthermore, short-term use of NSAIDs, particularly at low doses, does not appear to confer an increased risk of cardiovascular events (with the exception of valdecoxib in hospitalized patients immediately post-operative from coronary artery bypass surgery). It was also concluded that chronic use COX-2 selective NSAIDs does not confer an increased risk of cardiovascular events compared to non-selective NSAIDs with the possible exception of naproxen. Aspirin is the only agent that is an exception to the class effect, since aspirin use has been demonstrated to be associated with a reduction in cardiovascular events.

In conclusion, based on the totality of the data, rofecoxib does not differ from other NSAIDs, whether COX-2 selective or non-selective, with regard to cardiovascular risk. The evidence supports that with short-term use there is no increased risk of cardiovascular events and that long-term use has a risk no different from than other NSAIDs, with the exception of naproxen and aspirin. I should note, however, that the

M006752514

randomized trial data with respect to long-term use of Vioxx is inconsistent: increased risk shown in the APPROVe study, but no increased risk in the Alzheimer's studies.

I have reviewed the medical records of Gerald D.Barnett from Cardiology/Gastroeneterology Associates of Myrtle Beach, P.A., Myrtle Beach, S.C., Grand Strand Medical Center, Myrtle Beach, S.C., Carolina Health Specialists, Myrtle Beach, S.C., Military Medical Records, Luther Williams, M.D., F.Curtis Bryan, M.D., Michael McCaffrey, M.D., Carl Miller, D.C., Loris Healthcare System, Seacoast Medical Center, Atlanta Medical Associates, Northside Allergy, Asthma and Internal Medicine, Metropolitan Atlanta Cardiology Consultants, P.C., DelMazo Medical Services as well as various other medical records provided by the plaintiff, the pharmacy records from Merck-Medco, Bi-Lo Pharmacy, Kroger Pharmacy (Myrtle Beach, S.C.); the Plaintiff Profile Form, dated 09/29/05, the Supplemental Plaintiff Profile, dated 03/01/06, the First Amended Plaintiff Profile Form, dated 03/06/06; a DVD of the catheterization films performed on Mr. Barnett on 09/09/02, the report of the treadmill SPECT myocardial perfusion study performed on Mr. Barnett on 05/02/06as well as the EKG tracings of the stress test, the DVD of myocardial perfusion images from the stress test performed on 05/02/06, the DVD of the echocardiogram performed on Mr. Barnett on 05/02/06; the deposition of Mark Karavan, M.D., the deposition of Michael Mikola, M.D., the deposition of Gerald Barnett, the report of Douglas Zipes, M.D., the report of Jeffrey Popma, M.D., the supplemental report of Douglas Zipes, M.D., dated May 30, 2006.

Mr. Barnett is a 62 year old man (DOB 01/30/1944) who suffers from coronary artery disease, gastroesophageal reflux disease, a hiatal hernia with a Schatzki's ring, erosive gastritis, osteoarthritis, cervical spine disc herniation, and hyperlipidemia. Mr. Barnett carries a diagnosis of hypertension and takes anti-hypertensive medications, but does not have documentation of prolonged elevations of blood pressure. While Mr. Barnett's medical history contains fluctuations in his blood pressure, both before and during his use of Vioxx, there are numerous causes for such fluctuations, including stress, exercise, pain, medications or stimulants. As well, many daily activities can cause blood pressure to fluctuate. As testified to by Dr. Mikola, Mr. Barnett had "white-coat hypertension"--a colloquial term used to describe blood pressure elevations when visiting a doctor.

Mr. Barnett also carries a diagnosis of elevated homocysteine levels, although documentation of such elevated levels is lacking. When evaluated by Timothy J. Cornnell, M.D. on 09/17/97 it was noted that "He (Mr. Barnett) is always under a lot of stress." His father suffered a myocardial infarction at age 62 (some records suggest age 55) and ultimately died at age 68 of a myocardial infarction. According to the medical records, his mother has had transient ischemic attacks (TIAs) and his sister had multiple TIAs prior to the age of 50. It appears Mr. Barnett took Vioxx 25mg/qd from approximately January 2000 through September of 2004. Previous to his Vioxx use, Mr. Barnett took Feldene. Subsequent to his Vioxx use, Mr. Barnett took Celebrex and Mobic. He continues to take Mobic currently.

Mr. Barnett was hospitalized in January 2000 with chest pain. On January 24, 2000, he was evaluated with an exercise cardiolite stress test. The test was supervised and

15

M006752515

interpreted by Vaishali Swami, M.D. He completed 15 minutes of a Bruce protocol with no chest pain. The EKG tracings showed inferolateral T-wave inversion at peak exercise. The Cardiolite images showed a small mild perfusion defect in the lateral wall which is consistent with obstructive coronary artery disease. I need to point out that while this test showed that Mr. Barnett already had comary artery disease, the true extent of the heart disease can be underestimated on the Cardiolite stress test if many of the vessels have a significant degree of narrowing. After this test, Mr. Barnett was not catheterized and efforts were made to manage his condition through medications. Mr. Barnett, however, was not placed on aspirin therapy, which, as referenced above, is known to reduce events in a primary prevention setting.

On September 6, 2002, he presented to Grand Strand Medical Center with chest pain and was hospitalized. A series of EKGs and cardiac enzymes were obtained. There were non-specific EKG changes and a slight rise in the cardiac enzymes with the peak troponin I level being 1.4 ng/ml (nl. 0.00-0.59 ng/ml). Although he technically suffered a non-ST elevation myocardial infarction, the troponin I levels would be consistent with minimal and clinically insignificant myocardial necrosis. As a matter of fact, there was an absence of clinically relevant myocardial damage on the left ventriculogram performed on Mr. Barnett on September 9, 2002. Additionally, the EKGs that were taken after Mr. Barnett's coronary event but prior to his surgery revealed no pathologic Q waves. While Q waves appear on the EKG taken after his surgery this finding is inconsistent with and absence from subsequent EKGs. Thus, the Q waves present on the September 11, 2002 EKG are not evidence of clinically significant myocardial damage resulting from Mr. Barnett's September 6, 2002 event.

On September 9, 2002, Mr. Barnett was evaluated with a left heart catheterization with coronary angiography and left ventriculography. This was performed and interpreted by Mark Karavan, M.D. The angiograms were read by Dr. Karavan as showing a 50% stenosis in the distal left main coronary artery, and 80% stenosis in the mid left anterior descending artery, an 80% stenosis in the first diagonal artery, a 70- 80% stenosis in the proximal circumflex artery with severe diffuse disease in the obtuse marginal artery arising from the circumflex artery, an 80% stenosis in the ramus intermedius branch, diffuse irregularities in the mid portion of the right coronay artery with complete occlusion of the posterior descending artery arising from the right coronary artery with collateral filling from the left system, as well as an 80% stenosis in the proximal segment of the posterolateral branch arising from the right coronary artery. The finding of coronary collaterals suggests long-standing severe disease. The left ventricular ejection fraction was estimated at 50%, which is normal. I concur with Dr. Karavan's interpretation of the angiograms and the left ventriculogram, based on my review of the DVD of the angiograms and the left ventriculogram. Given the finding of a significant left main stenosis (i.e., 50% or greater), Mr. Barnett was compelled to have surgery. There is ample evidence in the medical literature that survival is improved with coronary artery bypass grafting in the setting of significant left main coronary artery disease, defined as a 50% or greater stenosis. Successful coronary artery bypass grafting was performed by Dr. F. Curtis Bryan on September 10, 2002. Mr. Barnett's post-operative course was uneventful, and he was discharged from the hospital on September 14, 2002.

16

M000675256516

On July, 18, 2003, he was evaluated for chest pain with an exercise cardiolite stress test, which was supervised and interpreted by Dr. Swami. Mr. Barnett completed 15 minutes of exercise using a Bruce protocol with no chest pain or EKG changes. The perfusion images showed a mild decrease in apical perfusion which is of no clinical significance, Additionally, the left ventricular ejection fraction was calculated to be 58%, which is normal. The findings of this study would confer an excellent prognosis for Mr. Barnett, given his excellent exercise capacity, preserved left ventricular function and lack of any clinically significant perfusion abnormalities.

Mr. Barnett was evaluated on May 2, 2006, with an exercise cardiolite stress test. Using a Bruce protocol he exercised for nine minutes and thirty seconds with no chest pain or EKG changes. The cardiolite images showed mildly reduced perfusion in the inferior and basal inferolateral segments. The left ventricular systolic function was normal with the left ventricular ejection fraction calculated to be 60%. Septal wall motion was consistent with a post-operative state. Additionally, there was subtle basal inferior hypokinesis. Again these findings would predict a good prognosis. He has well preserved left ventricular function, normal exercise tolerance, and no evidence for clinically significant myocardial ischemia.

In all reasonable medical probability, it is my opinion that Mr. Barnett's coronary artery disease and myocardial infarction were not related to his use of rofecoxib, but rather the result of his well established risk factors, such as hyperlipidemia and family history with contributions from stress, age, and male gender. It is also my opinion that in spite of his coronary artery disease and prior myocardial infarction his prognosis is excellent as long as his risk factors are appropriately managed. This is based on his well preserved left ventricular function (60%), lack of clinically significant ischemia, and excellent exercise tolerance.

I reserve the right to supplement this report and my opinions should additional information become available for my review.

My billable rate is $400 per hour for record review, and $600 per hour for testimony.

Paul Roach, M.D., F.A.C.C.
June 1, 2006

M006752517

# CURRICULUM VITAE

## PAUL J. ROACH, M.D., F.A.C.C.

**ADDRESS:**            TEXAS CARDIOVASCULAR
1015 E. 32nd Street, Suite 508
Austin, Texas 78705

**PERSONAL DATA:**

| | |
|---|---|
| Married: | Elaine Demetrion |
| Children: | Max, Nicholas |
| Citizenship: | United States of America |
| Birth Date: | September 21, 1958 |

**EDUCATION:**

| | |
|---|---|
| 1991-1992 | Interventional Cardiology Fellow, Department of Internal Medicine, University of Iowa Hospitals and Clinics, Iowa City, Iowa |
| April 1991 | Visiting Cardiology Fellow UTAH Cardiac Transplant, Salt Lake City, Utah |
| 1988-1991 | Cardiology Fellow Department of Internal Medicine University, Iowa Hospitals and Clinics, Iowa City, Iowa |
| 1988-1989 | Chief Resident Department of Internal Medicine University of Iowa Hospitals and Clinics, Iowa City, Iowa |
| 1984-1987 | Resident, Internal Medicine Department of Internal Medicine University of Iowa Hospitals and Clinics, Iowa City, Iowa |
| 1984 | Northwestern University Medical School M.D. |
| 1980 | St. Louis University, St. Louis, Missouri. B.A., Summa Cum Laude |
| 1987-1988 | Fellow, Clinical Decision Making New England Medical Center, Boston Massachusetts |

## ACADEMIC APPOINTMENTS:

| | |
|---|---|
| 1992-Present | Adjunct Faculty, Department of Health, Education, and Kinesiology, The University of Texas, Austin, Texas |
| 1991-1992 | Associate, Cardiovascular Disease, Department of Internal Medicine, University of Iowa Hospitals and Clinics, Iowa City, Iowa. |

M005752518

CURRICULUM VITAE
PAUL J. ROACH, M.D.
Page 2

## OTHER EMPLOYMENT PERTAINING TO CURRENT PROFESSIONAL APPOINTMENTS:

| | |
|---|---|
| 1996-Present | Texas Cardiovascular Consultants |
| 1994-1996 | Cardiologist, Central Texas Cardiology |
| 1993-1994 | Cardiologist, Austin Diagnostic Clinic |
| 1992 | Founding Partner of Cardiovascular Specialists of Austin |

## CERTIFICATES AND LICENSURE:

### Certification

| | |
|---|---|
| November 1991 | Diplomate, ABIM, Cardiovascular Diseases, #115628 |
| September 1987 | Diplomate, American Board of Internal Medicine, #115628 |
| July 1985 | Diplomate, National Board of Medical Examiners, #249559 |

### Licensure

| | |
|---|---|
| | Texas Controlled Substance, Certificate #50081094 |
| | Iowa DEA #1233323 |
| | Federal DEA #AR2776029 |
| June 1992 | Texas State License #J1370 |
| June 1987 | Massachusetts State License #57773, Currently Inactive |
| September 1985 | Illinois State License #036071547, Currently Inactive |
| 1995-1996 | Iowa State License #24912 |

## PROFESSIONAL AFFILIATIONS:

| | |
|---|---|
| Member | American Medical Association |
| Fellow | American College of Cardiology |
| Member | American Heart Association Clinical Cardiology |
| Member | Texas Medical Association |
| Member | Travis County Medical Society |

M006752519

CURRICULUM VITAE
PAUL J. ROACH, M.D.
Page 3

## PROFESSIONAL ACTIVITIES (BOARDS, EDITORSHIPS, ETC.):

President, 1994          American Heart Association

President-Elect, 1993    Capital Area Division

Board Member, 1992       Austin, Texas

## HOSPITAL COMMITTEES AND APPOINTMENTS:

2006              Chief of Staff Brackenridge Hospital, Austin, Texas

2006              Member, Clinical Quality Committee, Seton Network, Austin, Texas

2006              Member, Seton Network Board of Trustees, Austin, Texas

2006              Member, Seton Network Medical Executive Committee, Austin, Texas

2005-Present      Member, Brackenridge Hospital Medical Executive Committee, Austin, Texas

2005              Member, Seton Network Credentialing Committee, Austin, Texas

2005              Vice-Chief of Staff Brackenridge Hospital, Austin, Texas

1995              Chairman, Internal Medicine Medical Care Evaluation Committee, Brackenridge Hospital, Austin, Texas

1995              Chairman, Medical Records Committee, Brackenridge Hospital, Austin, Texas

1994-Present      Member, Ex Officio, Medical Executive Committee, Brackenridge Hospital, Austin, Texas

1994-Present      Director, Special Procedures Committee, Brackenridge Hospital, Austin, Texas

1994-Present      Chairman, Special Procedures Committee, Brackenridge Hospital, Austin, Texas

1992-Present      Internal Medicine Medical Care Evaluation Committee, Brackenridge Hospital, Austin, Texas

1992-Present      ICU Planning Committee, Brackenridge Hospital, Austin, Texas

MDL675252520

CURRICULUM VITAE
PAUL J. ROACH, M.D.
Page 4

## HONORS AND AWARDS:

| | |
|---|---|
| 1992-1993 | Consultant of the Year, Central Texas Medical Foundation, Austin, Texas |
| 1979 | Phi Beta Kappa |
| 1978 | Alpha Sigma Nu |

## TEACHING ACTIVITIES:

| | |
|---|---|
| 1992-Present | Volunteer Faculty, Central Texas Medical Foundation, Austin, Texas |
| 1991-1992 | Cardiac Catheterization Laboratory, UIHC and VAMC, Iowa City, Iowa |
| 1991-1992 | Transplant Services, UIHC, Iowa City, Iowa |
| 1989-1990 | General Medicine Service, VAMC and UIHC |

## CONFERENCES, GRAND ROUNDS, JOURNAL CLUBS, ETC.

| | |
|---|---|
| 1995 | "Women's Issues and Heart Disease," Women and Heart Disease Conference, American Heart Association, Capital Area Division, Austin, Texas (2/3) |
| 1995 | "Treatment of Cardiogenic Shock," Brackenridge Nursing Education Conference, Austin, Texas (2/9) |
| 1994 | "Risk Factors for Coronary Disease in Women," Women and Heart Disease Conference, American Heart Association, Capital Area Division, Austin, Texas (2/24) |
| 1992 | "Heart Transplantation: State of the Arthritis," University of Iowa Nursing Conference (3/13) |
| 1992 | "Heart Transplantation: The Iowa Experience," Cardiology Grand Rounds, Iowa City, Iowa (2/26) |
| 1991 | "New Concepts in the Management of Acute Myocardial Infarction," Family Practice Seminar, Broadlawn's Polk County Medical Center, Des Moines, Iowa (8/13) |
| 1990 | "Coronary Artery Disease Following Cardiac Transplantations," Cardiology Grand Rounds, UIHC, Iowa City, Iowa (11/21) |
| 1990 | "Myocardial Infarction Expansion," Cardiology Grand Rounds, UIHC, Iowa City, Iowa (3/14) |

M00675252l

## CONFERENCES, GRAND ROUNDS, JOURNAL CLUBS, ETC. (continued)

1989        "Division and Analysis: Risk of Surgeons Acquiring HIV Infections,"
Clinical Epidemiology and Health Services Research Conference, UIHC,
Iowa City, Iowa (4/28)

## CURRENT HOSPITAL APPOINTMENTS:

Brackenridge Hospital, 601 East 15th Street, Austin, Texas,

Columbia St. David's Hospital, 919 East 32nd Street, Austin, Texas

Seton Hospital, 1101 West 38th Street, Austin, Texas

Columbia St. David's South Hospital, 901 West Ben White Blvd., Austin, Texas

Seton Southwest, 7900 FM 1826, Austin, Texas

## BIBLIOGRAPHY:

### Papers Published

Roach, P.J., Fleming, C., Hagen, M.D., and Pauker, S.O.: Prostatic Cancer in a Patient with
Asymptomatic HIV Infection. Med. Decis. Making, 8:132-144, 1988.

Ferguson, D.W., Berg, W.J., Sanders, J.S., Roach, P.J., Kempf, J.S., and Kienzle, M.G.:
Sympathoinhibitory Responses to Digitalis Glycosides in Hart Failure Patients. Direct
Evidence From Sympathetic Neural Recordings, Circulation, 80:65-77, 1989.

Roach, P.J., Berg, W.J., Sanders, J.S., Kempf, J.S., Ebert, T.J., Mark, A.L., and Ferguson, D.W.:
Pathophysiologic Levels of Atrial Natriuretic Factor Fail to Attenuate Reflex Control of
Sympathetic Activity in Man. J. Am. Coll. Cardiol., 15:1318-1330, 1990.

Oren, R.M., Roach, P.J., Schobel, H.P., Berg, W.J., and Ferguson, D.W.: Sympathetic Responses
of Patients with Congestive Hearth Failure to Cold Pressor Stimulus. Am. J. Cardiol.,
67:993-1001, 1991.

Schobel, H.P., Oren, R.M., Roach, P.J., Mark, A.L., and Ferguson, D.W.: Contrasting Effaces of
Digitalis and Dobutamine on Baroreflex Sympathetic Control in Normal Humans.
Circulation, 84:1118-1129, 1991.

Roach, P.J., Volpp, B.D., Lemmer, J.H., Jr., Vandenberg, B.F., Kerber, R.E., and Ferguson, D.W.:
Infected Atrial Myxoma Presenting as Acute Respiratory Failure – A Rare Presentation of
an Uncommon Cardiac Tumor. Clin. Intensive Care, 2:299-304, 1991.

Ferguson, D.W., Berg, W.J., Roach, P.J., Oren, R.M., and Mark, A.L.: Effects of Heart Failure on
Baroreflex Control of Sympathetic Neural Activity. Am. J. Cardiol., 69:523-531, 1992.

M005752522

### Books and/or Chapters

Roach, P.J.: Heart and Heart-Lung Transplantation. In: Manual of Clinical Problems in Cardiology - 4th Ed., Hillis, L.D., Lang, R.A., and Winniford, M.W. (Eds.), Little Brown, Boston, MA.

### Abstracts

Berg, W.J., Roach, P.J., Sanders, J.S., Kienzle, M.G., and Ferguson, D.W.: Relative Effects of Inotropic Agents on Autonomic Mechanisms in Human Heart Failure. FASEB J., 3:A248, 1989.

Roach, P.J., Berg, W.J., Sanders, J.S., Kempf, J.S., Ebert, T.J., Mark, A.L., and Ferguson, D.W.: Pathophysiologic Levels of Atrial Natriuretic Factor Fail to Attenuate Reflex Control of Sympathic Activity in Man. FASEB J., 3:A1015, 1989.

Ferguson, D.W., Roach, P.J., and Kempf, J.S.: Hemodynamic Correlates of Sympathetic Neural Excitation in Patients with Moderate to Severe Heart Failure. Clin. Res., 37:876A, 1989.

Schobel, H.P., Oren, R.M., Roach, P.J., Berg, W.J., Kempf, J.S., Mark, A.L., and Ferguson, D.W.: Digitalis Potentintes Cardiopulmonary Baroreflex Control of Sympathetic Activity in Normal Man. Circulation, 82 (Suppl. III):III-632, 1990.

Oren, R.M., Zavala, D.C., Schobel, H.P., Berg, W.J., Roach, P.J., Kempf, J.S., and Ferguson, D.W.: Resting Muscle Sympathetic Nerve Activity Predicts Exercise Capacity in Human Heart Failure. Circulation, 82 (Suppl. III):III-692, 1990.

Schobel, H.P., Oren, R.M., Roach, P.J., Mark, A.L., and Ferguson, D.W.: Contrasting Effects of Digitalis and Dobutamine on Cardiopulmonary Baroreflex Control of Sympathetic Activity in Normal Humans. Clin. Res., 38:854A, 1990.

Oren, R.M., Roach, P.J., Berg, W.J., Schobel, H.P., and Ferguson, D.W.: Resting Muscle Sympathetic Nerve Activity Correlates with Right Rather than Left Ventricular Ejection Fraction in Human Heart Failure. J. Am. Col. Cardiol., (In press), 1991.

Oren, R.M., Schobel, H.P., Roach, P.J., Weiss, R.M., Stanford, W., Mark, A.L., and Ferguson, D.W.: Importance of Atrial Baroreceptors in Cardiopulmonary Baroreflex Control of Sympathetic Responses in Normal Man. Clin. Res., 39:261A, 1991.

M0067S2S23

## PAUL J. ROACH, M.D.
## DEPOSITION AND TRIAL TESTIMONY

| Date | Case |
|------|------|
| 6/4/02 | Cause No. CJ-97-1664; *Jackie Crater and David Crater v. A.H. Robins Company, et al.*, Muskogee, Oklahoma |
| 7/19/02 | Civil Action No. 00-20981; *Carolyn Patterson v. American Home Products Corporation, et al.;* In the United States District Court for the Eastern District of Pennsylvania (MDL No. 1203) |
| 1/16/02 | Cause No. 99-2679-G; *Manuel Hinojosa, et al. v. Christus Spohn Hospital*; In the 319th Judicial District Court of Nueces County, Texas |
| 8/30/02 | Cause No. 01-310-C368; *Dorris Schneider, et al. v. Dr. Arnulfo Cisneroz, et al.*; In the 368th Judicial District of Williamson County, Texas |
| 10/15/02 | *Michael Damood v. Metroplex Hospital*; Bell County, Texas |
| 12/10/02 | Cause No. 02-04-40259-CV; *Linda Smart v. American Home Products, et al.;* In the 79th Judicial District Court of Jim Wells County, Texas |
| 2/4/03 | Cause No. 01-3655D; *Estate of Mary E. Guerra v. Christus Spohn, et al.*; In the 105th Judicial District Court of Nueces County, Texas |
| 2/20/03 | *Mills v. Food Service Management, Inc.*; U.S. Fed. Bankruptcy Court, Judge Frank Monroe |
| 7/11/03 | Cause No. 01-1580E; *Mary Alice Deanda v. DeLorosa, et al.*; In the 148th Judicial District Court of Nueces County. (Deposition given 3/25/03.) |
| 10/14/03 | Case No. 2:02-CV-20209-HB; *Irene Saucedo, et al. v. Wyeth Ayerst Laboratories, et al.*; In the United States District Court for the Eastern District of Pennsylvania (MDL No. 1203); Case No. 2:02-CV-20195-HB; *Barbara Miles, et al. v. Wyeth Ayerst Laboratories, et al.*; In the United States District Court for the Eastern District of Pennsylvania (MDL No. 1203);; Case No. 2:02-CV-20209-HB *Eddie Nicholson, et al. v. Wyeth Ayerst Laboratories, et al.*; In the United States District Court for the Eastern District of Pennsylvania (MDL No. 1203) |
| 1/7/04 & 4/14/04 | *McDonald v. Dankworth*, Williamson County, Texas |
| 1/20/04 | Case No. 2:03-CV-20100-HB; *Lucidio Garza v. Wyeth Ayerst Laboratories, et al.*; In the United States District Court for the Eastern District of Pennsylvania (MDL No. 1203) |

-1-

| | |
|---|---|
| 7/30/04 | Case No. 2:02-CV-20210-HB; *Sherry Holloway, et al. v. Wyeth Ayerst Laboratories, et al.*; In the United States District Court for the Eastern District of Pennsylvania (MDL No. 1203); Case No. 2:02-CV-20213-HB; *Freddie Welborn, et al. v. Wyeth Ayerst Laboratories, et al.*; In the United States District Court for the Eastern District of Pennsylvania (MDL No. 1203) |
| 9/8/04 | Case No. 02-0390; *Diane Bice, et al. v. American Home Products Corporation, et al.*; In the 71st Judicial District Court, Harrison County, Texas |
| 10/18/04 | Case No. 254-02; *Vickie Carol Campbell-Reese, et al. v. Wyeth-Ayerst Laboratories Company, et al.*; In the 115th Judicial District Court, Upshur County, Texas |
| 3/22/05 | *Young v. Thota*, Wichita County, Texas |

M006752525

Exhibit J - Excerpts from July 19, 2006 Zipes Deposition

• Opposition to Roach Motion

[270:] - [270:24]        7/19/2006    Zipes, Douglas v.2 (Barnett)

page 270
        0270
1                 UNITED STATES DISTRICT COURT
2                 EASTERN DISTRICT OF LOUISIANA
3
     In re:  VIOXX PRODUCTS LIABILITY
4    LITIGATION
5    MDL Docket No. 1657   Section L
                           Judge Fallon
6                          Magistrate Judge Knowles
7    This document relates to:
8    GERALD BARNETT and CORRINE BARNETT,
9                          Plaintiffs,
          v.
10
     MERCK & CO., INC.,
11                         Defendant.
12   Civil Action No. 2:06cv485
13
14                     -   -   -
15                   July 19, 2006
16                     -   -   -
17
18                   DEPOSITION OF
19              DOUGLAS P. ZIPES, M.D.
20
21                     -   -   -
22             GOLKOW LITIGATION TECHNOLOGIES
               1600 John F. Kennedy Boulevard
23                   Suite 1210
             Philadelphia, Pennsylvania  19103
24                   (877) DEPS-USA


[353:16] - [353:19]        7/19/2006    Zipes, Douglas v.2 (Barnett)

page 353
16           Q.    And did Mr. Barnett have mild
17   lateral wall ischemia in January of 2000?
18           A.    He did as read out; it's very
19   mild.


[417:6] - [417:16]        7/19/2006    Zipes, Douglas v.2 (Barnett)

page 417
6            Q.    Do you agree that patients
7    for decades who have had severe coronary
8    artery disease have faced the same risks you
9    just identified, future myocardial
10   infarctions, sudden death, vein occlusions,
11   and coronary occlusion?
12           A.    Yes.  But we also know that
13   Mr. Barnett, at the time of his stress test
14   in 2000 had no evidence of any of these
15   things.  He had mild, if any, lateral wall
16   ischemia.


[469:1] - [470:15]        7/19/2006    Zipes, Douglas v.2 (Barnett)

page 469
1        STATE OF INDIANA          )
                                   )  SS:
2        COUNTY OF MORGAN          )
3                        I, Rebecca J. Swinney,
4    RMR-FCRR, a Notary Public in and for the
5    County of Morgan, State of Indiana at large,
6    do hereby certify that DOUGLAS ZIPES, M.D.,
7    the deponent herein, was by me first duly


EXHIBIT
J
Blumberg No. 5119

Exhibit J - Excerpts from July 19, 2006 Zipes Deposition

• Opposition to Roach Motion

```
8    sworn to tell the truth, the whole truth, and
9    nothing but the truth in the aforementioned
10   matter;
11                   That the foregoing deposition
12   was taken on behalf of the Defendant pursuant
13   to the Indiana Rules of Trial Procedure;
14                   That said deposition was
15   taken down in stenograph notes and afterwards
16   reduced to typewriting under my direction,
17   and that the typewritten transcript is a true
18   record of the testimony given by the said
19   deponent; and that the signature of said
20   deponent to his or her deposition was
21   requested;
22                   That the parties were
23   represented by their counsel as
24   aforementioned.
page 470
1                    I do further certify that I
2    am a disinterested person in this cause of
3    action; that I am not a relative or attorney
4    of either party, or otherwise interested in
5    the event of this action, and am not in the
6    employ of the attorneys for either party.
7                    IN WITNESS WHEREOF, I have
8    hereunto set my hand and affixed my notarial
9    seal this 20th day of July, 2006.
10
11
12
                     _____
                     Rebecca J. Swinney, RMR-FCRR
13                   CSR No. 94-R-1047
                     Notary Public
14
15   My Commission Expires:
     March 9, 2007
```

Exhibit K - Excerpts from Fosslien Deposition

• Opposition to Roach Motion

[1:] - [1:24]          6/8/2006      Fosslien, Egil (Barnett)

```
page 1
    0001
1                  IN THE UNITED STATES DISTRICT COURT
2                     EASTERN DISTRICT OF LOUISIANA
3
4          IN RE:  VIOXX                        )
5          PRODUCTS LIABILITY LITIGATION )
6                                               ) MDL Docket
7          This document relates to:      ) No. 1657
8          GERALD BARNETT and             ) Section L
9          CORRINE BARNETT,               )
10                          Plaintiffs,   ) Judge Fallon
11             -vs-                        )
12         MERCK & CO., INC.,             ) Magistrate Judge
13                          Defendant.    ) Knowles
14                                         )
15         Civil Action No. 2:06cv485     )
16
17
18              THE DEPOSITION OF EGIL FOSSLIEN, M.D.
19
20                         June 8, 2006
21
22
23
24
```

[109:4] - [109:7]      6/8/2006      Fosslien, Egil (Barnett)

```
page 109
4          Q.    Okay.  As I read your report I
5     understand you have the opinion that Vioxx causes
6     atherogenesis.  Is that fair?
7          A.    Accelerates atherogenesis, that's fair.
```

[121:20] - [121:22]    6/8/2006      Fosslien, Egil (Barnett)

```
page 121
20               It's your opinion that Vioxx increases
21     atherogenesis.  True?
22         A.    Yes.
```

[353:1] - [354:13]     6/8/2006      Fosslien, Egil (Barnett)

```
page 353
1          STATE OF ILLINOIS )
2                            )  SS:
3          COUNTY OF DU PAGE )
4               I, CORINNE T. MARUT, C.S.R. No. 84-1968,
5     a Notary Public within and for the County of
6     DuPage, State of Illinois, and a Certified
7     Shorthand Reporter of said state, do hereby
8     certify:
9               That previous to the commencement of the
10    examination of the witness, the witness was duly
11    sworn to testify the whole truth concerning the
12    matters herein;
13              That the foregoing deposition transcript
14    was reported stenographically by me, was thereafter
15    reduced to typewriting under my personal direction
16    and constitutes a true record of the testimony
17    given and the proceedings had;
18              That the said deposition was taken
19    before me at the time and place specified;
20              That the reading and signing by the
21    witness of the deposition transcript was agreed
22    upon as stated herein;
```



EXHIBIT

K

Exhibit K - Excerpts from Fosslien Deposition

**• Opposition to Roach Motion**

```
23              That I am not a relative or employee or
24       attorney or counsel, nor a relative or employee of
page 354
1        such attorney or counsel for any of the parties
2        hereto, nor interested directly or indirectly in
3        the outcome of this action.
4              IN WITNESS WHEREOF, I do hereunto set my
5        hand and affix my seal of office at Chicago,
6        Illinois, this 12th day of June, 2006.
7
8
9
10              CORINNE T. MARUT, C.S.R. No. 84-1968
11              Notary Public, DuPage County, Illinois.
12              My commission expires August 15, 2009.
13
```

Exhibit L - Excerpts from June 2, 2006 Moye Deposition

• Opposition to Roach Motion

[1:] - [1:23]          6/2/2006      Moye, Lemuel A.

page 1
    0001
1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
2
        IN RE: VIOXX        :  MDL DOCKET NO.
3       LITIGATION PRODUCTS :  1657
        LIABILITY LITIGATION :  SECTION L
4                           :
        This document relates:  JUDGE FALLON
5       To                  :
        GERALD BARNETT AND  :  MAGISTRATE JUDGE
6       CORRINE BARNETT     :  KNOWLES
                  v.        :
7       MERCK & CO., INC.   :
                            :
8       Civil Action No.    :
        2:06cv485           :
9                       -  -  -
10                    June 2, 2006
11                      -  -  -
12              Oral deposition of LEMUEL A. MOYE,
13      M.D., Ph.D., held in the offices of
14      Abraham, Watkins, Nichols, Sorrels,
15      Matthew & Friend, 800 Commerce, Houston,
16      Texas, commencing at 9:30 a.m., on the
17      above date, before Linda L. Golkow, a
18      Federally-Approved Registered Diplomate
19      Reporter and Certified Shorthand
20      Reporter.
                        -  -  -
21              GOLKOW LITIGATION TECHNOLOGIES
                      Four Penn Center
22              1600 John F. Kennedy Boulevard
                       Suite 1210
23              Philadelphia, Pennsylvania 19103
                      877.DEPS.USA


[320:7] - [321:22]     6/2/2006      Moye, Lemuel A.

page 320
7           Q.    Now, we started off talking
8   about your having two mechanisms that you
9   were discussing, and you told me in
10  addition, you had this destabilization
11  that was part of your opinion, right?
12          A.    Right.  Destabilization, I
13  mentioned that.  And also I need to
14  mention the potential for atherosclerosis
15  generation separate and apart from the
16  effect of elevated blood pressures.
17          Q.    Well, that's not in your
18  report either.
19          A.    I understand that.  Neither
20  was the fissure rupture, but I should
21  have put those in.
22          Q.    What scientific evidence do
23  you have to show that Vioxx causes
24  atherosclerosis promotion other than in
page 321
1   the context of hypertension?
2           A.    Let me see my -- I'm sorry.
3   What paragraph of my report are we
4   talking about?
5           Q.    24.
6           A.    24.
7               MR. WACKER:  That's where
8           you discuss it, but don't just


EXHIBIT
L

Exhibit L - Excerpts from June 2, 2006 Moye Deposition

**• Opposition to Roach Motion**

```
 9          limit yourself to that.
10               THE WITNESS:  Right, yes.
11               The best information I have
12          is the work done by Dr.
13          FitzGerald.
14     BY MR. PIORKOWSKI:
15          Q.    Dr. FitzGerald doesn't say
16     anywhere that it causes atherosclerosis,
17     does he?
18          A.    Well, he talks about the
19     possibility that atherosclerosis might be
20     caused by Vioxx, and, in fact, suggested
21     a test that might be carried out that
22     would answer this question that he posed.
```

[396:1] - [396:21]       6/2/2006       Moye, Lemuel A.

```
page 396
 1          C E R T I F I C A T E
 2
 3          I, LINDA L. GOLKOW, a Notary
       Public and Certified Shorthand Reporter
 4     of the State of New Jersey, do hereby
       certify that prior to the commencement of
 5     the examination, LEMUEL A. MOYE, M.D. was
       duly sworn by me to testify to the truth,
 6     the whole truth and nothing but the
       truth.
 7
 8          I DO FURTHER CERTIFY that the
       foregoing is a verbatim transcript of the
 9     testimony as taken stenographically by
       and before me at the time, place and on
10     the date hereinbefore set forth, to the
       best of my ability.
11
12          I DO FURTHER CERTIFY that I am
       neither a relative nor employee nor
13     attorney nor counsel of any of the
       parties to this action, and that I am
14     neither a relative nor employee nor such
       attorney or counsel, and that I am not
15     financially interested in the action.
16
17
18
19     _____
       LINDA L. GOLKOW, CSR
20     Notary Number:  1060147
       Notary Expiration:  1-2-08
21     CSR Number:  30XI176200
       Dated:  June 9, 2006
```

## Exhibit M - Excerpts from Plunkett Trial

• **Opposition to Roach Motion**

[2056:] - [2056:25]      2/16/2006      Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

```
page 2056
    2056
1                            UNITED STATES DISTRICT COURT
2                            EASTERN DISTRICT OF LOUISIANA
3
4
5
        IN RE: VIOXX PRODUCTS             *
6       LIABILITY LITIGATION             *    MDL DOCKET NO. 1657
                                          *
7                                         *
        THIS DOCUMENT RELATES TO          *    NEW ORLEANS, LOUISIANA
8       CASE NO. 05-4046:                 *
                                          *
9       EVELYN IRVIN PLUNKETT, ET AL      *    FEBRUARY 16, 2006
                                          *
10      VERSUS                            *
                                          *    8:30 A.M.
11      MERCK & CO., INC.                 *
        * * * * * * * * * * * * * * *
12
13
                            VOLUME IX - DAILY COPY
14                          JURY TRIAL BEFORE THE
                            HONORABLE ELDON E. FALLON
15                          UNITED STATES DISTRICT JUDGE
16
17      APPEARANCES:
18
        FOR THE PLAINTIFF:                BEASLEY ALLEN CROW METHVIN
19                                        PORTIS & MILES
                                          BY:  ANDY D. BIRCHFELD, JR., ESQ.
20                                             LEIGH O'DELL, ESQ.
                                          234 COMMERCE STREET
21                                        POST OFFICE BOX 4160
                                          MONTGOMERY, ALABAMA 36103
22
23      FOR THE PLAINTIFF:                LEVIN, PAPANTONIO, THOMAS,
                                          MITCHELL, ECHSNER & PROCTOR
24                                        BY:  TROY RAFFERTY, ESQ.
                                          316 SOUTH BAYLEN STREET, SUITE 600
25                                        PENSACOLA, FLORIDA 32502
```

[2262:11] - [2263:2]      2/16/2006      Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

```
page 2262
11                  MR. BECK:  YOUR HONOR, AT THIS TIME WE HAVE A
12      STIPULATION, IF YOUR HONOR COULD EXPLAIN WHAT THAT IS TO THE
13      JURY BEFORE I DO.
14                  THE COURT:  OFTENTIMES, MEMBERS OF THE JURY, IN ORDER
15      TO SHORTEN THE TRIAL FOR YOU, RATHER THAN PUT ON EVIDENCE OR
16      RATHER THAN DISCUSS ISSUES WHICH ARE NOT PART OF THE CASE, THE
17      PARTIES WILL GET TOGETHER AND AGREE THAT IF A WITNESS WAS
18      CALLED THIS IS WHAT THEY WOULD SAY, OR AN ISSUE IS NO LONGER
19      RELEVANT IN THE CASE OR IS NOT IN THE CASE.  THAT'S A
20      STIPULATION.  YOU ARE TO ASSUME THAT THAT IS A FACT.  ONCE IT'S
21      STIPULATED TO BY AND BETWEEN COUNSEL, YOU ASSUME THAT IS A
22      FACT.
23                  MR. BECK:  YOUR HONOR, THE STIPULATION IS THAT THE
24      PARTIES HAVE AGREED THAT VIOXX DID NOT CAUSE PLAQUE FORMATION
25      IN MR. IRVIN.
page 2263
1                   THE COURT:  ARE YOU AGREEABLE WITH THAT STIPULATION?
2                   MR. BIRCHFIELD:  YES.
```



EXHIBIT

M

Blumberg No. 5119

Exhibit N - Excerpts from Cona/McDarby Trial

• **Opposition to Roach Motion**

[1024:] - [1024:25]        3/14/2006     Cona-McDarby Trial

```
page 1024
    1024
 1                        SUPERIOR COURT OF NEW JERSEY
                          ATLANTIC COUNTY/CIVIL DIVISION
 2       ----------------------------x
         THOMAS CONA AND JOYCE CONA,    DOCKET NO. ATL-L-3553-05MT
 3               PLAINTIFFS,
                    VS.
 4       MERCK & CO.,INC.,
                 DEFENDANT.
 5       ----------------------------x
         JOHN MCDARBY,              DOCKET NO. ATL-L-1296-05MT
 6               PLAINTIFF,
                    VS.
 7       MERCK & CO., INC.,              - TRIAL -
                 DEFENDANT.
 8       ----------------------------x
                 PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
 9                       1201 BACHARACH BOULEVARD
                         ATLANTIC CITY, NJ 08401
10
                 DATE:   March 14, 2006
11
         B E F O R E:
12               THE HONORABLE CAROL E. HIGBEE, P.J.Cv.
13       TRANSCRIPT ORDERED BY:
             W. MARK LANIER, ESQUIRE
14           CHRISTY D. JONES, ESQUIRE
         A P P E A R A N C E S:
15
             W. MARK LANIER, ESQUIRE
16           THE LANIER FIRM
             JERRY KRISTAL, ESQUIRE
17           ROBERT GORDON, ESQUIRE
             WEITZ & LUXENBERG
18               ATTORNEYS FOR PLAINTIFFS CONA & McDARBY
19           CHRISTY D. JONES, ESQUIRE
             BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
20           KEVIN J. DUNNE, ESQUIRE
             SEDGWICK, DETERT, MORAN & ARNOLD, LLP
21           MICHAEL BROCK, ESQUIRE
             HOPE FRIEWALD, ESQUIRE
22           DECHERT, LLP
                 ATTORNEYS FOR THE DEFENDANT
23           *       *       *       *       *       *
                         REGINA A. TELL, CSR-CRR-RPR
24                       OFFICIAL COURT REPORTER
                         1201 BACHARACH BOULEVARD
25                       ATLANTIC CITY, NJ 08401
```

[1182:13] - [1183:14]      3/14/2006     Cona-McDarby Trial

```
page 1182
13           And the reason I'm not allowing it is because
14   there is basically a prejudicial versus probative
15   analysis, and even though it is probative on supporting
16   his opinion, it could I think, be admissible for that,
17   I think it would be extremely prejudicial to allow him
18   to say that it is possible that it has increased
19   atherosclerosis because it doesn't carry that position
20   because on damages that would suggest -- could suggest
21   to the jury if they accepted that or believed that that
22   somehow they could use it to determine that, in fact,
23   VIOXX caused atherosclerosis as opposed to causing a
24   heart attack, and that there is an atherosclerotic
25   condition that Mr. Cona now has which was either -- and
page 1183
 1   counsel for plaintiff has assured me they weren't, he
```



EXHIBIT

N

Blumberg No. 5119

1

• Opposition to Roach Motion

```
 2    wasn't going to say it was only from that -- but it had
 3    been increased or worsened as a result of the taking of
 4    VIOXX.  And I'm not going to allow that testimony.  I
 5    think that would be extremely prejudicial and I think
 6    it would be not something that I could deal with a
 7    curative instruction.  Not a curative instruction, but
 8    an instruction that it is being admitted for one
 9    purpose and not the other.
10            Therefore, I'm not going to allow the
11    testimony by the expert, and I'm instructing him not to
12    speak about that it is possible or biologically
13    plausible that VIOXX can be, in fact, causing
14    atherosclerosis.  All right?
```

Exhibit O - Excerpts from Epstein Deposition

• Opposition to Roach Motion

[1:1] - [1:24]        5/30/2006    Epstein, Stephen MD - (Barnett)

page 1
1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE EASTERN DISTRICT OF LOUISIANA
3                      -  -  -
4        IN RE:  VIOXX       :MDL DOCKET NO.
         PRODUCTS LIABILITY  :1657
5        LITIGATION          :Case:
                             :2:06-cv-00485-EEF-DK
6                            :Section L
         THIS DOCUMENT RELATES :
7        TO: GERALD BARNETT V. :
         MERCK               :
8                      -  -  -
9                    May 30, 2006
10                     -  -  -
11              Videotape deposition of STEPHEN E.
12       EPSTEIN, M.D., held in the offices of
13       Zuckerman Spaeder, LLP, 1800 M Street,
14       NW, Washington, D.C. 20036-5802,
15       commencing at 9:10 a.m., on the above
16       date, before Denise D. Bach, a Federally
17       Approved Reporter for the United States
18       District Court and a Certified Shorthand
19       Reporter, License No. 30X10009330.
20                     -  -  -
21
22              GOLKOW LITIGATION TECHNOLOGIES
                Four Penn Center, Suite 1210
23             1600 John F. Kennedy Boulevard
               Philadelphia, Pennsylvania 19103
24                    (877) DEPS-USA


[197:12] - [197:21]        5/30/2006    Epstein, Stephen MD - (Barnett)

page 197
12          Q.    Are you aware of other mice
13   studies that did study the effect of
14   MF-tricyclic and Vioxx and other COX-2
15   inhibitors for a longer period of time
16   than your study and found either that
17   there was no effect on the size of the
18   atherosclerotic plaque or that the COX-2
19   inhibitor actually reduced the size of
20   the plaque?
21          A.    Yes.


[296:1] - [296:23]        5/30/2006    Epstein, Stephen MD - (Barnett)

page 296
1        C E R T I F I C A T E
2            I hereby certify that the
3    proceedings and evidence noted are
4    contained fully and accurately in the
5    notes taken by me on the deposition of
6    the above matter, and that this is a
7    correct transcript of the same.
8
9
10
11
12         _____
           DENISE D. BACH, CSR
13
14         DATE:_____
15
16
17
18         (The foregoing certification



EXHIBIT
O

Exhibit O - Excerpts from Epstein Deposition

• Opposition to Roach Motion

19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23