

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT LOUISIANA

Ronald Montgomery, Debra Schultz, Jim
Blake, Cynthia Castleberry, Justine Clark
for decedent Idella Skipwith, Jack
Donovan, Jeff Ryta, Carol Green, Joanne
Scharpf, Florence Jenerjohn, Mildred
Coopwood for decedent Bryant Hudson ,
Doris Little, Ethel Niewolny, Helen
Johnson for decedent Everett Johnson

                Plaintiffs,

    v.

**MERCK & CO. INC.,**

                Defendant.

Cause No.

MDL No. 1657

## AMENDED COMPLAINT

COME NOW Plaintiffs, and for their amended complaint against Merck & Co., Inc.,

allege as follows:

1. This action is brought by plaintiffs, seeking damages for personal injuries and

economic damages suffered as a result of a defective and dangerous pharmaceutical product,

Vioxx, which was manufactured, marketed, distributed and/or sold by Merck & Co. Inc.  This

action seeks monetary damages for personal injuries.

2. Ronald Montgomery is a citizen of the State of Wisconsin.  Because of his use of

Vioxx, he suffered a heart attack and related injuries.  Vioxx caused or was a contributing cause

of his health problems.

480247 / 004128

___ Fee_____
___ Process_____
X  Dktd _____
✓ CtRmDep_____
___ Doc. No_____

3. Ethel Niewolny is a citizen of the State of Wisconsin. Because of her use of Vioxx, she suffered a heart attack and related injuries. Vioxx caused or was a contributing cause of her health problems.

4. Joanne Scharpf is a citizen of the State of Wisconsin. Because of her use of Vioxx, she suffered a heart attack and related injuries. Vioxx caused or was a contributing cause of her health problems.

5. Florence Jenerjohn is a citizen of the State of Wisconsin. Because of her use of Vioxx, she suffered a stroke and related injuries. Vioxx caused or was a contributing cause of her health problems.

6. Debra Schultz is the surviving spouse of Robert Schultz and brings this action on her behalf pursuant to Wis. Stat. § 895.04 (2006). Debra Schultz is a citizen of the State of Wisconsin. Decedent Robert Schultz was a citizen of the State of Wisconsin. Because of his use of Vioxx, he suffered a heart attack, which caused his wrongful death. Vioxx caused or was a contributing cause to his wrongful death.

7. Jim Blake is a citizen of the State of Wisconsin. Because of his use of Vioxx, he suffered a stroke and related injuries. Vioxx caused or was a contributing cause of his health problems.

8. Cynthia Castleberry is a citizen of the State of Wisconsin. Because of her use of Vioxx, she suffered a stroke and related injuries. Vioxx caused or was a contributing cause of her health problems.

9. Justine Clark is the survivor of Idella Skipwith and brings this action on her behalf pursuant to Wis. Stat. § 895.04 (2006). Justine Clark is a citizen of the State of Wisconsin.

Decedent Idella Skipwith was a citizen of the State of Wisconsin. Because of her use of Vioxx, she suffered a heart attack, which caused her wrongful death. Vioxx caused or was a contributing cause to her wrongful death.

10. Jack Donovan is a citizen of the State of Wisconsin. Because of his use of Vioxx, he suffered a stroke and related injuries. Vioxx caused or was a contributing cause of his health problems.

11. Jeff Ryta is a citizen of the State of Wisconsin. Because of his use of Vioxx, he suffered a stroke and related injuries. Vioxx caused or was a contributing cause of his health problems.

12. Carol Green is a citizen of the State of Wisconsin. Because of her use of Vioxx, she suffered a stroke and related injuries. Vioxx caused or was a contributing cause of her health problems.

13. Mildred Coopwood is the survivor of Bryant Hudson and brings this action on his behalf pursuant to Wis. Stat. § 895.04 (2006). Mildred Coopwood is a citizen of the State of Wisconsin. Decedent Bryant Hudson was a citizen of the State of Wisconsin. Because of his use of Vioxx, he suffered a heart attack, which caused his wrongful death. Vioxx caused or was a contributing cause to her wrongful death.

14. Doris Little is a citizen of the state of Wisconsin. Because of her use of Vioxx, she suffered strokes and related injuries. Vioxx caused or was a contributing cause for her health problems.

15. Helen Johnson is the surviving spouse of Everett Johnson and brings this action on her behalf. Helen Johnson is a citizen of the state of Wisconsin. Decedent Everett Johnson was

a citizen of the state of Wisconsin. Because of her use of Vioxx, she suffered a heart attack and stroke, which caused her wrongful death. Vioxx caused or was a contributing cause to her wrongful death.

### JURISDICTION AND VENUE

16.  There is federal subject matter jurisdiction based on diversity of citizenship because plaintiffs and defendant are citizens of different states and the amount-in-controversy requirement exceeds $75,000 for each plaintiffs' claim.

17.  Venue is proper in this District Court based on Pretrial Order No. 11 *in re* Vioxx Product Liability Litigation No. 1657.

18.  The applicable statute of limitations is tolled based on defendants' fraudulent concealment of the dangers and adverse side effects of Vioxx, respectively, from plaintiffs as more fully stated herein. Additionally, for the reasons stated herein, defendant Merck is equitably estopped from raising the statute of limitations defense.

### PARTIES-VIOXX

19.  The Defendant, Merck & Co., Inc. (hereinafter "Merck" or "defendant Merck," is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, White House Station, New Jersey 08889.

20.  At all times relevant hereto, Defendant Merck was engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or indirectly through third parties or related entities, the pharmaceutical drug, Vioxx throughout the United States.

480247 / 004128

4

21. As more particularly pleaded below, plaintiffs maintain that Vioxx is defectively designed, inadequately tested, dangerous to human health, and lacked proper warnings as to the dangers associated with its use.

## FACTUAL BACKGROUND-VIOXX

22. Vioxx is the brand name of rofecoxib, one of a class of drugs called "prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain. Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce prostaglandins.

23. Vioxx is a COX-2 inhibitor, which is designed to produce prostaglandins at inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

24. Defendant Merck submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-042 by the FDA.

25. Defendant Merck also submitted an Application to Market a New Drug for Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea. This application was denoted NDA 21-052 by the FDA.

26. On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NDA") for rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.

27. At the time the drug was approved by the FDA the labeling for rofecoxib stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."

28. The "Warnings" section of the labeling for rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (GI) Effects -- Risk of GI Ulceration, Bleeding, and Perforation."

29. Defendant Merck submitted NDA-007 with the goal of establishing a gastrointestinal ("GI") safety claim for rofecoxib. In conjunction with the NDA, Defendant Merck performed the Vioxx GI Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

30. The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

31.  In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and stroke. Not only did Merck do nothing to further accurately publish these studies, or warn consumers, but it denied the results with respect to hypertension in the official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside, Lessons Emerge From COX-2 Trials*, in August 2000, page 3.

32.  Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping profits obtained through its non-disclosure and concealment.  Merck engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced Merck's financial stability to the detriment of its consumers.  As a result of Merck's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated approximately 23 percent share of the market.

33.  Merck continued to profit from its scheme by withholding information from Plaintiffs, the consuming public, and the health care industry. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with Vioxx consumption over naproxen consumption.

34.  On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing what had been concealed by Merck.  The study revealed that the relative risk of developing a confirmed adjudicated

thrombotic cardiovascular event (defined in the article as myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks) among Vioxx users in Merck's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See* Mukhisjee, D., et al., *Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors*, J.A.M.A. 286:8, 954-959, Aug. 22/29, 2001.  In addition, the annualized myocardial infarction rates for Vioxx users compared to placebo revealed a statistically significant increase among Vioxx users.

35.  In the JAMA study, the authors stated that by decreasing PGI2 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PGI2, potentially leading to an increase in thrombotic cardiovascular events.  In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?*, J.A.C.C., 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al., *Role of Prostacyclin in the Cardiovascular Response to Thromboxane A2*, Journal of Science, V. 296:539-541, Apr. 19, 2002.

36.  On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to

8

Raymond V. Gilmartin, President and CEO of Defendant Merck, relating to "promotional

activities and materials for the marketing of Vioxx (rofecoxib) tablets."

37.  The Warning Letter stated that Defendant Merck had "engaged in a promotional

campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were

observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus,

misrepresents the safety profile for Vioxx."  The letter further states:

> Specifically, your promotional campaign discounts the fact that in
> the  VIGOR study, patients on Vioxx were observed to have a four
> to five fold increase in myocardial infarctions (MIs) compared to
> patients on the comparator non-steroidal anti-inflammatory drug
> (NSAID), Naprosyn (naproxen).

38.  The eight (8) page Warning Letter outlines, in detail, the conduct of Defendant

Merck that supports the FDA's issuance of the Warning Letter, and makes the following

"**Conclusions and Requested Actions**:"

> The promotional activities and materials described above minimize
> the potentially serious Cardiovascular findings that were observed
> in the VIGOR study, minimize the Vioxx / Coumadin drug
> interaction, omit crucial risk information associated with Vioxx
> therapy, contain unsubstantiated comparative claims, and promote
> unapproved uses. On December 16, 1999, we also objected to your
> dissemination of promotional materials for Vioxx that
> misrepresented Vioxx's safety profile, contained unsubstantiated
> comparative claims, and lacked fair balance.
>
> Due to the seriousness of these violations, and the fact that your
> violative promotion of Vioxx has continued despite our prior
> written notification regarding similar violations, we request that
> you provide a detailed response to the issues raised in this Warning
> Letter on or before October 1,2001.
>
> This response should contain an action plan that includes a
> comprehensive plan to disseminate corrective messages about the
> issues discussed in this letter to the audiences that received these

misleading messages. This corrective action plan should also
include:

    1.    Immediately ceasing all violative promotional
        activities, and the dissemination of violative
        promotional materials for Vioxx.

    2.    Issuing a "Dear Healthcare provider" letter
        to correct false or misleading impressions
        and information. This proposed letter should
        be submitted to us for review prior to its
        release. After agreement is reached on the
        content and audience, the letter should be
        disseminated by direct mail to all healthcare
        providers who were, or may have been
        exposed to the violative promotion.

    3.    A written statement of your intent to comply
        with "1" and "2" above.

39.  On April 11, 2002, the FDA approved a supplemental application for the use of
Vioxx (rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved
indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor"
letter, and a new patient package insert. The labeling and the "Dear Doctor" letter contained
information concerning the results of the VIGOR study.

40.  Further, the "Dear Doctor" letter, approved in conjunction with the revisions to the
Vioxx labeling, outlines the changes to the Vioxx labeling.

41.  The revised "Patient Information" sheet does not add any information about the
results of the VIGOR study."

42.  The "Patient Information" sheet is the only written document that is provided to a
patient for whom Vioxx is prescribed.

43.  Both the initial labeling and the revised labeling are ineffective because they do not

properly advise physicians and patients of the potential cardiovascular and/or cardiothrombotic

side effects of Vioxx.

44.  Despite knowledge of the ineffectiveness of the warnings, and despite knowledge

that Vioxx may cause serious cardiovascular and/or cardiothrombotic side effects, defendant

Merck has concealed and/or downplayed the dangers associated with Vioxx, and continued to

market the drug in the United States and abroad.  In its 2001 Annual Report, for example,

Defendant Merck states:

> The Company also noted that a number of federal and state
> lawsuits, involving individual claims as well as purported class
> actions, have been filed against the Company with respect to *Vioxx*.
> . . . The lawsuits include allegations regarding gastrointestinal
> bleeding and cardiovascular events. The Company believes that
> these lawsuits are completely without merit and will vigorously
> defend them.

45.  Further, in its January 23, 2001 8-K filing with the Securities and Exchange

Commission, Defendant fails to mention the cardiac and cardiothrombotic findings of the

VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr.
> Gilmartin said. "Our five key products, **VIOXX**, ZOCOR,
> COZAAR/HYZAAR*, FOSAMAX and SINGULAIR, drove
> Merck's performance for the year and created a powerful platform
> for growth." These products accounted for 57% of Merck's
> worldwide human health sales for 2000 and 61% for the fourth
> quarter.
>
> "Each of the five medicines offers unique competitive advantages,"
> Mr. Gilmartin said. **VIOXX**, a once-a-day medicine, is the only
> COX-2 indicated in the United States both for osteoarthritis and
> acute pain. Since its extraordinarily successful 1999 launch,
> **VIOXX** has become the world's fastest growing branded

11

prescription arthritis medicine, and it is already Merck's second
largest-selling medicine. In the United States, **VIOXX** now
accounts for approximately 50 percent of new prescriptions in the
COX-2 class, despite being second to market in this class in the
United States. **VIOXX** achieved $2.2 billion in sales for the full
year 2000, with $700 million in the fourth quarter.

A Food and Drug Administration (FDA) Advisory Committee
meeting is scheduled for Feb. 8 to review labeling changes Merck
has requested based on the strong results of the VIGOR Study.
This 8,000-patient gastrointestinal outcomes research study, in
which **VIOXX** reduced the risk of serious gastrointestinal
complications by half compared to the NSAID naproxen, was
published in November in THE NEW ENGLAND JOURNAL OF
MEDICINE. Another study, presented in November, showed that
**VIOXX** significantly reduced moderate-to-severe acute pain after
dental surgery to a greater degree compared to codeine combined
with acetaminophen.

46.  Despite the foregoing, Defendant Merck continued to represent to consumers that

Vioxx was safe, and that any cardiovascular and/or cardiothrombotic side effects are not

associated with the drug, until Merck withdrew Vioxx from the market in September 2004.

Merck also downplayed any potential cardiovascular and/or cardiothrombotic side effects of the

drug, promoting it as safer and more efficacious than other medications approved for treatment of

similar conditions.

47.  Defendant Merck knew of the cardiothrombotic effects and increased risk of

cardiovascular events caused by Vioxx use, yet failed to warn of these dangers to plaintiffs, its

customers, healthcare providers or the public.

48.  Pursuant to prescriptions received from their treating physician, plaintiffs regularly

purchased and ingested Vioxx for various periods of time.  Plaintiffs now suffer from heart

attacks, strokes, transient ischemic attacks ("TIAs"), coronary artery disease, althersclerosis, blood clots, and other diseases caused by the use of Vioxx.

49. Vioxx is primarily prescribed to reduce pain from inflammation. However, the defendants failed to conduct sufficient research in manufacturing and marketing Vioxx to determine the severity of the drugs' potential side effects.  Defendants also withheld adverse reports or gave incorrect information about such reports that they had received about side effects such as heart attacks and strokes.  As a result of defendants' failure and the undisclosed defects of Vioxx, plaintiffs have sustained heart attacks, strokes, TIAs, and other ill-effects.

50. Defendant Merck & Company, Inc. is a New Jersey corporation with its principal place of business located in New Jersey.  Merck is engaged in the business of producing, marketing and distributing pharmaceutical products for sale to the general public and is the manufacturer of Rofecoxib, distributed under the brand-name Vioxx.  Merck conducts business, and at all times relevant hereto, it developed, manufactured and sold the pharmaceutical drug Vioxx.

## COUNT I

### Strict Products Liability/Defective Design -- Against Merck

Come now plaintiffs and for Count I of their amended complaint against defendant Merck allege:

51. Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

52. Defendant Merck designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Vioxx which it knew would be used by plaintiffs and others.

53. At the time Vioxx was manufactured and sold to plaintiffs by Merck, it was defective in design and unreasonably dangerous, subjecting users to risks of heart attacks, strokes, and other illnesses which exceeded the benefits of the products, and for which other safer products were available.

54. Alternatively, when the Vioxx products were manufactured and sold to plaintiffs by defendant Merck, the products were defective in design and formulation, making use of the products more dangerous than other drugs for pain relief.

55. The Vioxx sold to plaintiffs reached plaintiffs without substantial change. Plaintiffs were unaware of the dangerousness of the products until after their use and the development of heart attack, strokes, transient ischemic accidents, blood clots, and other related illnesses. Plaintiffs ingested the Vioxx without making any changes or alterations.

56. As a direct and proximate result of the defective and dangerous design of Vioxx, plaintiffs have been damaged.

57. Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

## COUNT II

### Strict Products Liability/Failure to Warn -- Against Merck

Come now plaintiffs and for Count II of their amended complaint against defendant Merck allege:

58. Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

59. The Vioxx manufactured and supplied by Merck was unaccompanied by proper and adequate warnings regarding all adverse side effects associated with the use of Vioxx, and the comparative severity and duration of the adverse effects.  The warnings given by Merck did not accurately reflect the symptoms, type, scope or severity of the side effects.

60. Merck failed to perform adequate testing and study of Vioxx prior to marketing it or properly analyze and warn based on its VIGOR study.  Such adequate testing, study or analysis of the VIGOR study would have shown that Vioxx possessed serious life threatening side effects, with respect to which full and proper warnings accurately and fully reflecting symptoms, type of illness, scope and severity should have been given with respect to the use of Vioxx.

61. Merck also failed to act properly on adverse reports it received about Vioxx, and failed to properly study Vioxx pre-market as well as post market and analyze and follow up on its VIGOR study as well as other studies.

62. Merck also failed to effectively warn users and physicians that numerous other methods of pain relievers, including Ibuprofen, Naproxen, and/or aspirin were safer.

63. Merck failed to give adequate post-marketing warnings or instructions for the use of Vioxx because after Merck knew or should have known of the risk of injury from Vioxx use, Merck failed to provide adequate warnings to users or consumers and continued to aggressively promote the product to doctors, hospitals, and directly to consumers.

64.  As a direct and proximate result of defendant Merck's failure to warn of the potentially severe side effects of the Vioxx products, as well as the other conduct mentioned in this Count, plaintiffs have been damaged.

65.  Merck's conduct was done with conscious disregard for the safety of the users of Vioxx, justifying an award of punitive damages.

## COUNT III
### Negligent Design--Against Merck

Come now plaintiffs and for Count III of their amended complaint against defendant Merck allege:

66.  Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

67.  Defendant Merck designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Vioxx which it knew would be used by plaintiffs and others.

68.  At the time Vioxx was manufactured and sold to plaintiffs by Merck, it was defective in design and unreasonably dangerous, subjecting users to risks of heart attacks, strokes, blood clots, and other illnesses which exceeded the benefits of the products, and for which other safer products were available.

69.  Alternatively, when the Vioxx products were manufactured and sold to plaintiffs by defendant Merck, the products were defective in design and formulation, making use of the products more dangerous than other drugs for pain relief.

70. The Vioxx sold to plaintiffs reached plaintiffs without substantial change.  Plaintiffs were unaware of the dangerousness of the products until after their use and the development of heart attacks, strokes, and other related illnesses.  Plaintiffs ingested the Vioxx without making any changes or alterations.

71. In designing and testing Vioxx, Merck failed to exercise the ordinary care that a careful and prudent drug manufacturer would exercise in the same or similar circumstances.

72. As a direct and proximate result of the negligent design of Vioxx, plaintiffs have been damaged.

73. Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

## COUNT IV

### Negligence, Failure to Warn--Against Defendant Merck

Come now plaintiffs and for Count IV of their amended complaint against defendant Merck, allege:

74. Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth in this Count.

75. Defendant Merck owed a duty to warn of any dangerous defects or side effects; a duty to assure their products did not cause users unreasonable and dangerous risks, reactions, and side effects; and a duty to provide adequate post market surveillance and warnings as it learned of Vioxx's substantial dangers.

76. Defendant Merck breached its duty of reasonable care to plaintiffs in that defendant Merck failed to:

480247 / 004128                               17

a. Conduct sufficient testing which, if properly performed, would have shown that Vioxx had serious side effects, including heart attacks, strokes, hypertension, altherslcosis, blood clots, and other serious side effects, and warn users of those risks; and/or

b. Include adequate warnings with the Vioxx products that would alert users to the potential risks and serious side effects of the drugs; and/or

c. Warn plaintiffs that use of Vioxx carried a risk of death or permanent disability from heart attack, strokes, blood clots, other cardiovascular disorders and other serious side effects; and/or

d. Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Vioxx; and/or

e. Other appropriate warnings.

77. Defendant Merck knew or should have known that Vioxx caused unreasonably dangerous risks and serious side effects of which the general public would not be aware. Defendant Merck nevertheless advertised, marketed and promoted their products knowing there were safer methods and products for pain control.

78. As a direct and proximate result of defendant Merck's negligence and breaches of their duty of reasonable care, plaintiffs have been damaged.

79. Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

## COUNT V
### Negligent Misrepresentation–against defendant Merck

Come now plaintiffs and for Count V of their amended complaint against defendant Merck, allege:

80.  Plaintiffs reallege the allegations in the preceding paragraphs as if fully set out herein.

81.  Defendant Merck misrepresented to plaintiffs and/or their treating physicians the potential serious cardiovascular findings that were observed in the VIGOR study, minimized the Vioxx/Coumadin drug interaction, omitted crucial risk information associated with Vioxx, misrepresented Vioxx safety profile and represented that Vioxx was safe, and that any cardiovascular and/or cardiothrombotic side effects were not associated with the drug.

82.  These representations were made with the actual knowledge of Merck.

83.  The representations set forth *supra* were material to plaintiffs and/or their treating physicians to prescribe and maintain plaintiffs' prescription of Vioxx.

84.  The representations were made either without knowing of the truth or falsity of the representations or defendant Merck knew or should have known that the representations being made were false and, therefore, defendant Merck failed to exercise reasonable care in making the representations in the scope and course of their employment in marketing Vioxx to individual consumers, plaintiffs' treating physicians, hospitals, and other health care providers.

85.  The defendant Merck intended for plaintiffs and/or their treating physicians to rely upon the material misrepresentations to induce them to initially prescribe Vioxx and continue plaintiffs on Vioxx.

86. Plaintiffs justifiably relied on the representations which were made directly to them or made to their treating physicians, with defendant Merck knowing that plaintiffs were in a limited group who defendant Merck knew would rely upon the information.

87. As a direct result of defendant Merck's negligent misrepresentation, plaintiffs were injured. The negligent misrepresentations caused or contributed to cause plaintiffs' damages.

88. Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

**COUNT VI**

**Fraudulent Omission/Concealment–against defendant Merck**

Come now plaintiffs and for Count VI of their amended complaint against defendant Merck allege:

89. Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

90. Defendant Merck had actual knowledge of the cardiothrombotic effects of Vioxx. Despite having knowledge of the cardiothrombotic effects of Vioxx, Defendant Merck engaged in a pattern and conduct of actively concealing and omitting to disclose those effects when marketing Vioxx to doctors, health care providers, and to the general public for direct advertisements.

91. At the time these omissions were made, defendant Merck had knowledge of the substantial and significant cardiothrombotic effects of Vioxx.

92. Defendant Merck omitted to inform plaintiffs of the true cardiothrombotic and other adverse health effects of Vioxx. They further downplayed the results of various studies showing

the cardiothrombotic effects and explaining the cardiothrombotic effects of Vioxx as set forth in

the VIGOR study;  they withheld adverse reports or gave incorrect information about the reports

they received about the side effects of Vioxx such as heart attacks and strokes.  They further

instructed and had a training manual for their sales force to dodge and mislead doctors when they

asked questions about the cardiothrombotic effects of Vioxx.

93.  Defendant Merck failure to disclose material facts constituted fraudulent

concealment.

94.  Defendant Merck, itself and by and through its agents, had a duty to speak because

they had superior knowledge regarding the adverse health effects of Vioxx as set forth herein.

95.  The information not disclosed by defendant Merck was unavailable to plaintiffs

and/or their treating health care professionals.  Defendant Merck knew the information was

unavailable yet approved and participated in instructing their agents, servants and employees not

to disclose this information in order to promote the sales of Vioxx over other Cox 2 inhibitors as

well as any non-steroidal anti-inflammatory such as Ibuprofen, Naproxin, and/or aspirin.

96.  Plaintiffs were diligent in attempting to seek the information by consulting with their

physicians.

97.  The information not disclosed by defendant Merck was not within the reasonable

reach of plaintiffs and/or their treating physicians and was not discoverable by plaintiffs and/or

their treating physicians in the exercise of reasonable care.

98.  The non-disclosed information was material, defendant Merck knew they were not

disclosing complete information and intended that plaintiffs and/or their treating physicians act

upon the non-disclosed information in the manner reasonably contemplated.

99. Plaintiffs and/or their treating physicians were ignorant as to the undisclosed information and had a right to rely on full disclosure.

100. If plaintiffs and/or their treating physicians had known the complete information, they would not have prescribed and/or plaintiffs would not have taken Vioxx as evidenced by Merck withdrawing it from the market in September 2004.

101. Defendant Merck's conduct was done with conscious disregard for the safety of users of Vioxx, including plaintiffs, justifying an award of punitive damages.

**COUNT VII**

**BREACH OF IMPLIED WARRANTY-VIOXX**

Come now plaintiffs and for Count VII of their amended complaint against defendant Merck allege:

102. Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if set forth at length herein.

103. When Merck placed the Vioxx into the stream of commerce, Merck knew of the use for which the drug was intended and impliedly warranted to consumers including Plaintiffs that the use of Vioxx was a safe and acceptable means of relieving pain and impliedly warranted that the product was of merchantable quality and safe for its intended use.

104. Plaintiffs relied upon Merck and its judgment when they purchased and utilized Vioxx.

105.  Vioxx was not of merchantable quality and was not safe or fit for its intended use because it was unreasonably dangerous as more fully set forth herein and incapable of satisfying the ordinary purpose for which it was intended, and because it caused serious injury to Plaintiffs.

106.  As a direct and proximate result of the dangerous and defective condition of Vioxx, plaintiffs were injured, including incurring economic damage in the form of medical expenses.

107.  Plaintiffs are entitled to recover from Merck for all damages caused by the defective product including, but not limited to, damages for pain, suffering, mental anguish, emotional distress, loss of the capacity to enjoy life, lost past and future income and incurred expense.

### COUNT VIII

### BREACH OF EXPRESS WARRANTY-VIOXX

Come now plaintiffs and for Count VIII of their amended complaint against defendant Merck allege:

108.  Plaintiffs repeat and re-allege the allegations of the prior paragraphs as if set forth at length herein.

109.  At all relevant times, Merck expressly warranted to Plaintiffs by statements made by Merck or its authorized agents, orally or in written publications, package labels, and/or inserts, that the Vioxx was safe, effective, fit, and proper for its intended use. The express warranties include, but were not limited to:

110.  Vioxx is used in adults for:

a. relief of the pain and inflammation (swelling and soreness) of

osteoarthritis (arthritis from wear and tear on your bones and your

joints);

b. relief of the pain and inflammation of rheumatoid arthritis in adults

(arthritis caused by a condition where your immune system attacks

your joints);

c. management of short-term pain;

d. treatment of menstrual pain (pain during women's monthly periods);

e. treatment of migraine headache attacks with or without aura

111.  In utilizing Vioxx, Plaintiffs relied upon the skill, judgment, representations,

and express warranties of Merck.

112.  The express warranties and representations made by Merck were false in

that Vioxx was not safe and was not fit for the use for which it was intended.

113.  As a direct and proximate result of the dangerous and defective condition of

Vioxx, plaintiffs were damaged, including incurring economic damages in the form

of medical expenses.

114.  Plaintiffs are entitled to recover from Merck for all damages caused by the

defective product including, but not limited to, damages for pain, suffering, mental

anguish, emotional distress, loss of the capacity to enjoy life, lost past and future income

and incurred expense.

WHEREFORE, each plaintiff demands judgments in their favor against defendant Merck

for:

A.  A fair and just amount of actual damages in an amount to be proved at trial that exceeds the jurisdictional amount of this Court;

B.  Costs of suit;

C.  Pre-judgment and post-judgment interest;

D.  Punitive damages in a fair and reasonable amount to punish and deter defendants and others from engaging in the wrongful conduct; and

E.  Such other and further relief as the Court deems just and proper under the circumstances.

JEFFREY J. LOWE, PC

By: _____

Jeffrey J. Lowe
Francis J. "Casey" Flynn
Attorney for Plaintiff
8235 Forsyth, Suite 1100
St. Louis, Missouri 63105
(314) 678-3400
Fax: (314) 678-3401

John Carey
Joseph P. Danis
David Bauman
Sarah Hale
CAREY & DANIS, LLC
8235 Forsyth Boulevard, Suite 1100
St. Louis MO 63105
Telephone: 314-725-7700
Facsimile: 314-721-0905

Charles Lampin
Kell Lampin LLC
4700 Mexican Rd.

480247 / 004128

St. Peters, Missouri 63376
636-498-4000

T. Evan Schaeffer
Andrea B. Lamere
SCHAEFFER & LAMERE, P.C.
5512 Godfrey Road
Highway 67, Suite B
Godfrey, IL 62035
618-467-8200

Evan Buxner
Walther Glenn Law Offices
10 S. Brentwood Blvd., Suite 102
St. Louis, MO 63105
314-725-9595
Fax: 314-725-9597