Final Avorn Direct

141:13 Sherwood, were you in the process of
141:14 doing any research on the issue of the
141:15 effect of NSAIDs on the heart?
141:16      A.   Yes.  As a matter of fact,
141:17 Dr. Solomon in my division and I had
141:18 already become interested in this
141:19 question of regular nonsteroidals and the
141:20 heart.  And we realized that there was
141:21 essentially no literature out there in
141:22 humans that suggested that the older
141:23 nonsteroidals like naproxen or Motrin or
141:24 ibuprofen can protect the heart.
142: Page 142
142: 1          And Dr. Solomon and I
142: 2 decided it would be interesting to look
142: 3 at whether that was something you could
142: 4 find.  If there was such a massive
142: 5 protective effect of naproxen as was
142: 6 found in VIGOR, you'd think that you
142: 7 would be able to find that in a study
142: 8 looking at tens of thousands of people,
142: 9 and we have databases in our division in
142:10 which we have information about
142:11 medication use and hospitalizations and
142:12 doctor visits for hundreds of thousands
142:13 of people, although we have their names
142:14 and identifiers stripped off.  But we can
142:15 look at all the people who were
142:16 prescribed any drug and see if their rate
142:17 of heart attacks was higher or lower than
142:18 the rate of heart attacks of people
142:19 either not taking that drug or taking
142:20 another drug.
142:21          And so I believe we had been
142:22 talking about that throughout 2000.  Our
142:23 interest in it was increased in the
142:24 spring of 2000 when the initial VIGOR
143: Page 143
143: 1 findings were released.  And then, of
143: 2 course, when they were published in the
143: 3 New England Journal in 2000, we decided
143: 4 that this was definitely something that
143: 5 we wanted to proceed on just because it
143: 6 seemed like an important question.  If
143: 7 naproxen was that great and no one had
143: 8 ever discovered it before, maybe that
143: 9 would be something that was worth
143:10 knowing.
143:11      Q.   And did you do that study?
143:12      A.   Yes, we did.
143:13      Q.   Did you perform what we call
143:14 an epidemiologic study that studied the
143:15 question of naproxen's effect on the
143:16 heart?
143:17      A.   Yes, we did.

Final Avorn Direct

AVORN 14613    146:13-147:3

146:13    Q.    And, in fact, did you
146:14 publish a study, the study results that
146:15 came out of this epidemiologic study that
146:16 we just talked about?
146:17    A.    Yes, we did.
146:18    Q.    And it's all right just for
146:19 the purposes of this deposition, I know
146:20 you studied a lot of drugs in the context
146:21 of that particular study, if I call it
146:22 the naproxen study?
146:23    A.    That's fine.
146:24    Q.    Okay.
147: Page 147
147: 1        Did you --
147: 2        You published it -- do you
147: 3 remember where it was published, Doctor?

Avorn 14711    147:11-147:16

147:11        It was published in the
147:12 Archives of Internal Medicine in 2002, in
147:13 May of 2002.
147:14    Q.    Are you the senior author on
147:15 the paper?
147:16    A.    That's right.

AVORN 14722    147:22-148:16

147:22    Q.    And what, if any,
147:23 conclusions did you and Dr. Solomon reach
147:24 regarding naproxen?
148: Page 148
148: 1    A.    Well, overall, we found that
148: 2 nonsteroidals in general like Motrin and
148: 3 so forth taken as a group did not seem to
148: 4 have any important protective effect on
148: 5 the heart. But when you looked at
148: 6 naproxen separately, it had a very modest
148: 7 reduction in the risk of heart disease in
148: 8 people who took it compared to the
148: 9 comparison patients who were similar in
148:10 all other ways. That is, there was about
148:11 a 16 percent reduction in the risk of
148:12 heart attack, which is a pretty small
148:13 reduction.
148:14    Q.    Did you address the findings
148:15 of VIGOR in the context of this article?
148:16    A.    Yes, we did.

AVORN 14912    149:12-151:14

149:12    Q.    Would you please go to the
149:13 section where that is addressed? And if
149:14 you go down to the last paragraph, I

Final Avorn Direct

149:15 think that's where that is.
149:16      A.   Yes.  Right.
149:17           In the end of the
149:18 discussion, "To place the effect of
149:19 naproxen in perspective, in a large
149:20 randomized trial of daily aspirin use in
149:21 primary prevention, patients in the
149:22 intervention arm experienced a 44%
149:23 reduction in the risk of acute myocardial
149:24 infarction" or heart attack.  "Therefore,
150: Page 150
150: 1 it would be false to equate the more
150: 2 modest effect of naproxen," that is a 16
150: 3 percent reduction as compared to a 44
150: 4 percent reduction, "it would be false to
150: 5 equate the more modest effect of naproxen
150: 6 suggested in this study with the
150: 7 cardioprotection afforded by aspirin."
150: 8      Q.   Would you tell the members
150: 9 of the jury in a very simple way what you
150:10 were saying there about the VIGOR study?
150:11      A.   Yes.  What we said in that
150:12 paper that came out in 2002 was that the
150:13 very, I guess you could say wimpy effect
150:14 of naproxen in protecting the heart of
150:15 just reducing the rate by 16 percent was
150:16 in no way big enough to account for what
150:17 would have had to have been an 80 percent
150:18 reduction in risk to give you that 5 to 1
150:19 difference that was seen between Vioxx
150:20 and naproxen in the VIGOR study.
150:21 Naproxen would have had to have been the
150:22 most magical drug to protect your heart
150:23 that was ever invented, and we didn't
150:24 find that.
151: Page 151
151: 1      Q.   And you wrote this in 2002,
151: 2 correct?
151: 3      A.   Right.
151: 4      Q.   And was that before you and
151: 5 I had ever met on the issue of Vioxx?
151: 6      A.   Right.  And in fact, let me
151: 7 look at -- the paper, it says lower on
151: 8 that page, was accepted for publication
151: 9 in January 31st, 2002, which meant that
151:10 we would have written it in 2001.
151:11      Q.   And is this consistent with
151:12 your reaction to Dr. Sherwood's comment
151:13 about the effect of naproxen in early
151:14 2001?

Avorn 15116     151:16-155:3

151:16           THE WITNESS:  That's right.
151:17 BY MR. TISI:
151:18      Q.   Okay.

Final Avorn Direct

151:19        Doctor, were the results of
151:20 this paper actually presented before it
151:21 was actually published?
151:22      A.   Yes, it was.  Dr. Solomon
151:23 presented them at the International
151:24 Society for Pharmacoepidemiology
152: Page 152
152: 1 meetings.
152: 2      Q.   The International Society
152: 3 for Pharmacoepidemiology, is that the
152: 4 international society that you had been a
152: 5 president of?
152: 6      A.   That's right.
152: 7      Q.   Okay.
152: 8        And do you remember actually
152: 9 that presentation?
152:10      A.   Yes.
152:11      Q.   And who made the
152:12 presentation?
152:13      A.   Dr. Solomon did.
152:14      Q.   Do you remember when it was
152:15 in relationship to this paper?
152:16      A.   Yes.  The meetings occur in
152:17 August, and so given that we finished the
152:18 paper in late'01, this would have been
152:19 the August '01 presentation.
152:20      Q.   And do you recall, do you
152:21 have any specific recollection whether
152:22 there were any people from Merck in the
152:23 audience to hear the presentation on your
152:24 naproxen study?
153: Page 153
153: 1      A.   Yes, there were.
153: 2      Q.   Okay.
153: 3        Do you remember who was in
153: 4 the audience from Merck to hear your
153: 5 presentation about the effect of
153: 6 naproxen?
153: 7      A.   One person I remember
153: 8 clearly, because we talked about it right
153: 9 at the end of the presentation, was Dr.
153:10 Harry Guess; who at that time was the
153:11 head of epidemiology at Merck.
153:12      Q.   What, if anything, was
153:13 presented to the audience, including Dr.
153:14 Guess, about the likelihood of Vioxx
153:15 being cardiotoxic as a result of your
153:16 study which you presented?
153:17      A.   In the presentation, I
153:18 recall that Dr. Solomon -- clearly what
153:19 was interesting was what does this mean
153:20 about the VIGOR findings.  And I recall
153:21 that Dr. Solomon said essentially what is
153:22 in the paper that we later wrote on that
153:23 topic later that year, that we had found
153:24 only a very small effect, about 16

Final Avorn Direct

154: Page 154
154: 1 percent of reduction from naproxen, and
154: 2 that that made it unlikely that naproxen
154: 3 was the reason that -- that a
154: 4 cardioprotective effect of naproxen was
154: 5 the reason to explain this five-fold
154: 6 increase in heart attacks in the Vioxx
154: 7 group of patients in the VIGOR study
154: 8 compared to the naproxen group of
154: 9 patients. And that, therefore, the only
154:10 other possible explanation was if it
154:11 wasn't that naproxen was preventing heart
154:12 attacks, the only other logical
154:13 possibility was that Vioxx was causing
154:14 heart attacks.
154:15      Q.   And this was in mid-2001?
154:16      A.   The presentation was in
154:17 August of 2001, and we finished the
154:18 work -- actually, we finished the work
154:19 that summer.
154:20      Q.   And you personally spoke to
154:21 Dr. Guess about these results?
154:22      A.   Yes. The reason I spoke
154:23 with Dr. Guess was that Dr. Solomon had
154:24 been in touch with Dr. Cannuscio at Merck
155: Page 155
155: 1 since actually the beginning of 2001,
155: 2 because he had indicated to her that he
155: 3 thought this was --

Avorn 15508    155:8-157:24

155: 8      A.   -- that there was an issue
155: 9 which we had been discussing in our
155:10 division that this needed to be studied
155:11 subsequent to the VIGOR paper. And I
155:12 instructed Dr. Solomon to see whether
155:13 this was something which a study could be
155:14 funded by anybody. And one of the
155:15 difficulties about adverse effects
155:16 research is that FDA doesn't have hardly
155:17 any money to spend on them and the
155:18 National Institutes of Health doesn't
155:19 spend that much money on them. And
155:20 often, if you are a scientist studying
155:21 drug side effects, as we are, one needs
155:22 to go to the manufacturer of the drug and
155:23 say, we think this is an important issue
155:24 in relation to the drug that you're
156: Page 156
156: 1 making, and we want to do a study.
156: 2           And as I said earlier, we've
156: 3 often had perfectly fine relationships
156: 4 with companies. Sometimes a company will
156: 5 come to us and say we think there may be
156: 6 a problem with our drug, would you study

Final Avorn Direct

156: 7 it for us so that we can know what's true
156: 8 about our drug.  We had a very good
156: 9 experience with a Parkinson's drug not
156:10 long ago in that way.
156:11          And so I asked Dr. Solomon
156:12 to talk with people at Merck, and as it
156:13 turns out, Dr. Cannuscio had recently
156:14 graduated from the Harvard School of
156:15 Public Health in epidemiology and then
156:16 went to work for Merck, so, she was kind
156:17 of a conduit for our communications with
156:18 Merck.  And nothing had come of those
156:19 discussions even though he was trying
156:20 hard.
156:21          And so I took Dr. Guess
156:22 aside as Dr. Cannuscio's boss at that
156:23 pharmacoepi meeting in August of 2001,
156:24 and sort of chief to chief, and I said,
157: Page 157
157: 1 Harry, my guy has been talking to your
157: 2 person and it doesn't seem to be getting
157: 3 anywhere.  We think this issue is
157: 4 important, and we now can study Vioxx as
157: 5 well as naproxen, because when we first
157: 6 did this study, Vioxx was new enough on
157: 7 the market that there weren't enough
157: 8 people actually taking it for us to be
157: 9 able to do a big population study.  But
157:10 by the time it was getting to be the
157:11 summer of 2001, it was being very heavily
157:12 promoted, and the number of people taking
157:13 it was on the rise.
157:14          And I told Dr. Guess that I
157:15 thought that this really was something
157:16 that ought to move forward, because we
157:17 could do a study very much like the study
157:18 that we're looking at now, but instead of
157:19 looking at naproxen and the older
157:20 nonsteroidals, we would be able to have
157:21 the same design and to look at Vioxx and
157:22 Celebrex as well and answer that question
157:23 in a large population to try to get to
157:24 the bottom of this.

Avorn 15806     158:6-162:9

158: 6          MR. TISI:  I'm going to show
158: 7 you what I would like to have
158: 8 marked as Exhibit Number 17.
158: 9          - - -
158:10          (Whereupon, Deposition
158:11          Exhibit Avorn-17, Memo dated
158:12          8.28.01, MRK-ACC0018681 -
158:13          MRK-ACC0018692, was marked for
158:14          identification.)
158:15                    - - -

Final Avorn Direct

158:16 BY MR. TISI:
158:17     Q.   I'm going to represent that
158:18 this document came from the Merck files.
158:19 It is Bates Number MRK-ACC0018681.
158:20          It's a memo from a gentleman
158:21 by the name of Doug Watson to various
158:22 people.  These are some of the people
158:23 you've mentioned here in your testimony
158:24 here today?
159: Page 159
159: 1     A.   Right.
159: 2     Q.   And it includes some of the
159: 3 papers, actually, some of the
159: 4 presentations that were made at that
159: 5 meeting in mid-2001?
159: 6     A.   Right.
159: 7     Q.   If you'd go to Page 1 -- the
159: 8 document that ends with 686.  Is that the
159: 9 paper that Dr. Solomon presented?
159:10     A.   Yes.
159:11     Q.   Okay.
159:12          And following that is some
159:13 notes that Dr. Guess made of that
159:14 meeting.  Do you see that?
159:15     A.   Right.  Handwritten notes.
159:16     Q.   Have you had an opportunity
159:17 to read this, Doctor?
159:18     A.   Yes.
159:19     Q.   Is this something --
159:20          Just to be fair, is this
159:21 something I presented to you -- is this a
159:22 document you had ever seen at the time of
159:23 your involvement with Vioxx in mid-2001?
159:24     A.   No.
160: Page 160
160: 1     Q.   Okay.
160: 2          And do you see at the bottom
160: 3 of the second page where it says, "The
160: 4 Conclusion"?
160: 5     A.   Yes.
160: 6     Q.   Okay.
160: 7          Would you go to the next
160: 8 page, two pages down, please.  Keep
160: 9 going.  One more.
160:10     A.   Actually, a couple more.
160:11     Q.   One more.
160:12          Now, have you read this,
160:13 Doctor?
160:14     A.   Yes.
160:15     Q.   Does this appear to comport
160:16 with your recollection of Dr. Solomon's
160:17 presentation at that meeting?
160:18     A.   Correct.
160:19     Q.   Would you please read the
160:20 conclusion as recorded by Dr. Guess?
160:21     A.   Yes.

Final Avorn Direct

160:22        "NSAIDs as group, no effect.
160:23 Naproxen, 16-20% decrease in risk.
160:24 Hypothesis that selective" that is
161: Page 161
161: 1 selective COX-2 inhibitors like Vioxx,
161: 2 "may increase risk."
161: 3     Q.   Is this something --
161: 4          Does this comport with your
161: 5 recollection of what you and Dr. Guess
161: 6 talked about?
161: 7     A.   Absolutely.
161: 8     Q.   Did you consider it
161: 9 important in mid-2001 to specifically
161:10 study the relationship between COX-2s and
161:11 heart attacks?
161:12     A.   Yes.
161:13     Q.   Why?
161:14     A.   Because there are a couple
161:15 of reasons, the largest of which was the
161:16 VIGOR study, which, as I said, had been
161:17 published in November of 2000, had been
161:18 kind of announced, the findings, in
161:19 spring of 2000, and here was sitting out
161:20 there this finding that five times more
161:21 people in the Vioxx group were having
161:22 heart attacks than people in the naproxen
161:23 group, and that seemed like an important
161:24 public health issue that somebody should
162: Page 162
162: 1 look at.
162: 2     Q.   How much does a study like
162: 3 that you discussed with Dr. Guess cost?
162: 4     A.   Oh, about 5 or $600,000.
162: 5     Q.   And how long does such a
162: 6 study typically take?
162: 7     A.   If we pull out all the stops
162: 8 and can proceed real quickly, we can do
162: 9 it in about a year or less.


Avorn 16304    163:4-166:19


163: 4          I'm going to show you what
163: 5          I'd like to have marked as Exhibit
163: 6          Number 18.
163: 7              - - -
163: 8          (Whereupon, Deposition
163: 9      Exhibit Avorn-18, E-mails,
163:10      MRK-ABY0020300, was marked for
163:11      identification.)
163:12              - - -
163:13 BY MR. TISI:
163:14     Q.   Following the meeting, the
163:15 ISPE meeting in August of 2001, did you
163:16 have followup contacts with Merck
163:17 regarding the proposed study to study
163:18 Vioxx and heart attacks?

Final Avorn Direct

163:19    A.   Frequently.
163:20    Q.   Okay.
163:21         When you say "frequently,"
163:22 what do you mean?
163:23    A.   That there was ongoing
163:24 discussion from -- really from the
164: Page 164
164: 1 beginning of 2001, I believe, that it was
164: 2 February of 2001 when I asked Dr. Solomon
164: 3 to begin those conversations through
164: 4 until actually the publication of the
164: 5 paper in 2004.
164: 6    Q.   And is this an e-mail that
164: 7 you recall?
164: 8    A.   Yes.
164: 9    Q.   Okay.
164:10         Did you have any role in
164:11 this e-mail exchange?
164:12    A.   Yes.  I urged Dr. Solomon or
164:13 instructed Dr. Solomon to please move
164:14 things along as best he could with Merck.
164:15 Once there was an expression of interest
164:16 in such a study, to please get it
164:17 finalized so that we could actually get
164:18 the funding we needed to do the work.
164:19    Q.   Okay.
164:20         Could you please go down to
164:21 the e-mail from Dr. Solomon.  First of
164:22 all, is that an e-mail that you received
164:23 in the normal course of business?
164:24    A.   Yes.  It was cc'd to me.
165: Page 165
165: 1    Q.   Okay.
165: 2         Is this an e-mail that you
165: 3 directed Dr. Solomon to send to Merck?
165: 4    A.   Yes.
165: 5    Q.   And would you please --
165: 6         Who is it sent to?
165: 7    A.   It was sent by Dr. Solomon
165: 8 to Dr. Cannuscio, who, as I mentioned,
165: 9 was the epidemiologist that had trained
165:10 in our neighborhood and then went to work
165:11 as a Merck staffer.
165:12    Q.   Okay.
165:13         And would you please read
165:14 for the record what Dr. Solomon, at your
165:15 direction, told Dr. Cannuscio?
165:16    A.   Sure.  So, this is September
165:17 of 2001, which would have been a month
165:18 after the pharmacoepi meeting in which I
165:19 spoke with Dr. Guess and Dr. Solomon
165:20 presented our findings and about eight
165:21 months or seven or eight months after he
165:22 had initiated his first contact with Dr.
165:23 Cannuscio.
165:24         It says, "Dear Carolyn, I

Page 38

Final Avorn Direct

166: Page 166
166: 1 was pleased to hear last week that Merck
166: 2 is indeed prepared to move forward with
166: 3 support of our study on NSAIDs, COX-2s,"
166: 4 including Vioxx, "and MI," which is heart
166: 5 attack, "but as I mentioned when we
166: 6 spoke, after so many months we really
166: 7 need at least an e-mail note from you
166: 8 indicating that the commitment is truly
166: 9 there.  We will need to forego other
166:10 possible sources of support for this
166:11 project to work with Merck, and given how
166:12 long it has taken thus far, we're nervous
166:13 about rejecting other possibilities
166:14 without any written indication of
166:15 commitment."
166:16      Q.    Let me stop you there,
166:17 Doctor.
166:18          What was your purpose in
166:19 writing this to Dr. Cannuscio?

Avorn 16703     167:3-168:4

167: 3          I told Dr. Solomon to
167: 4 essentially, after so many months from
167: 5 February to September, particularly on
167: 6 the heels of the meeting with Dr. Guess
167: 7 in August, to basically tell them to fish
167: 8 or cut bait, that I felt this was an
167: 9 important project to do, that there were
167:10 important clinical and public health
167:11 issues at stake, and that we had been
167:12 working along with Merck or trying to
167:13 based on their indicating to us that they
167:14 were kind of interested in supporting the
167:15 study.
167:16          But so many months later, I
167:17 told Dr. Solomon to write a note saying,
167:18 look, if you guys aren't going to really
167:19 fund this study, we need to know that so
167:20 we can look for funding from somewhere
167:21 else since we don't like to peddle the
167:22 same study to a lot of different people
167:23 and hope that somebody will accept it.
167:24 And so it was basically I asked him to
168: Page 168
168: 1 write a fish or cut bait memo to Merck.
168: 2      Q.    And that's what this memo
168: 3 was?
168: 4      A.    Yes.


Avorn Part 2 (Multi-clip)
Avorn 16923     169:23-173:20

169:23          What was Dr. Cannuscio's

Page 39

Final Avorn Direct

169:24 response to your fish or cut bait memo,
170: Page 170
170: 1 as you called it?
170: 2      A.   The note that she sent to
170: 3 both Dr. Solomon and to me on September
170: 4 17th about two hours after Dr. Solomon's
170: 5 note to her was that they -- she had --
170: 6 we, I can't know who "we" was, but
170: 7 somebody at Merck had presented the idea
170: 8 of the study that we had proposed to
170: 9 several groups within Merck, and that she
170:10 said that there was interest in working
170:11 with us to develop a complete protocol,
170:12 present the detailed protocol to Merck's
170:13 scientific review committee, and to
170:14 basically discuss having a contract.
170:15           And then she mentioned in
170:16 that last paragraph, "I have spoken with
170:17 Harry Guess, who heads the epidemiology
170:18 department." "Though Harry and I are not
170:19 authorized to finalize a contract to
170:20 support a research project of this scale,
170:21 we wish to affirm our interest in
170:22 pursuing with you the steps outlined
170:23 above." And so basically it was an
170:24 agreement to have further discussions
171: Page 171
171: 1 about having an agreement.
171: 2      Q.   Okay.
171: 3           Doctor, at about the time
171: 4 that you were involved with the
171: 5 discussions with Dr. Cannuscio, were you
171: 6 aware that the company was in discussions
171: 7 with the Food & Drug Administration about
171: 8 what would go into the label on the
171: 9 results of VIGOR?
171:10      A.   No.
171:11      Q.   Doctor, I did provide you
171:12 material that was sent to the Food & Drug
171:13 Administration.  Have I showed you this
171:14 before today's deposition?
171:15      A.   Yes.
171:16      Q.   Have you had an opportunity
171:17 to take a look at it?
171:18      A.   Yes.
171:19      Q.   Is this a letter that was
171:20 sent to the -- appear to be a letter sent
171:21 to the Food & Drug Administration in part
171:22 referring to your study results on the
171:23 naproxen study?
171:24      A.   Yes.  It was sent by Merck
172: Page 172
172: 1 by Dr. Silverman, I believe.
172: 2      Q.   Okay.
172: 3           Can you turn to Page 3 of
172: 4 that cover letter that was sent to the

Final Avorn Direct

172: 5 Food & Drug Administration.
172: 6     A.   (Witness complies.)
172: 7     Q.   And the top part of it
172: 8 refers to "Thrombotic Cardiovascular
172: 9 Data," and has some discussion about the
172:10 VIGOR study.  Do you see that, Doctor?
172:11     A.   Yes.
172:12     Q.   Okay.
172:13          If you'd go down to the
172:14 second full paragraph --
172:15     A.   Yes.
172:16     Q.   -- is there a reference to
172:17 your study?
172:18     A.   Yes, there is.
172:19     Q.   Okay.
172:20     :    Would you tell us where that
172:21 is, Doctor?
172:22     A.   Yes.  That would be
172:23 beginning on line 4, the last word of the
172:24 line, "The."  Okay.
173: Page 173
173: 1          Shall I read it?
173: 2     Q.   Yes.  Sure.
173: 3     A.   "The concept that there are
173: 4 differences among NSAIDs is supported by
173: 5 external epidemiologic data from three
173: 6 separate studies that utilized different
173: 7 clinical databases, indicating that the
173: 8 use of naproxen, but not other NSAIDs, is
173: 9 cardioprotective."  And then it is
173:10 references 2, 3 and 4, and ours is
173:11 reference 4.
173:12          "Among these studies, is a
173:13 U.S. study of over 22,000 patients in New
173:14 Jersey by a Boston academic group
173:15 unaffiliated with industry."  And that's
173:16 us.
173:17     Q.   Doctor, having read this
173:18 document, do you have any impression
173:19 about what was being conveyed to the FDA
173:20 about your study?

Avorn 17322     173:22-174:21

173:22          THE WITNESS:  Well, it's not
173:23     an impression.  It's what they
173:24     say.  What they say is that our
174: Page 174
174: 1     study shows that naproxen protects
174: 2     the heart.  And in the context of
174: 3     what is on the rest of the page,
174: 4     it is justification for the notion
174: 5     that Vioxx does not cause heart
174: 6     attacks, naproxen prevents them.
174: 7 BY MR. TISI:
174: 8     Q.   Did they specifically single

Page 41

Final Avorn Direct

174: 9 out your study as being, quote,
174:10 independent?
174:11     A.   Yes.
174:12     Q.   Doctor, were you aware at
174:13 the time that Merck was using your study
174:14 results that were presented to Dr. Guess
174:15 in August of 2001 to suggest that the
174:16 results of VIGOR were the result of the
174:17 cardioprotective effect of naproxen?
174:18     A.   No, I was not aware of that
174:19 at the time.
174:20     Q.   If you had been aware of
174:21 that, what would your reaction have been?

Avorn 17424    174:24-176:2

174:24          THE WITNESS:  Well, I can
175: Page 175
175: 1      tell you what my reaction is right
175: 2      now, which is I'm indignant that
175: 3      they took a finding of ours that
175: 4      was very clearly communicated,
175: 5      that is, the very modest effect of
175: 6      protection of the hearts that we
175: 7      found with naproxen, which we
175: 8      explicitly said was not enough to
175: 9      explain the increase in heart
175:10     attacks in the naproxen/Vioxx
175:11     comparison in VIGOR, that Dr.
175:12     Guess was in the room when we
175:13     presented that, and I now
175:14     understand, even wrote down, that
175:15     we hypothesized that what really
175:16     was probably going on was an
175:17     increased risk from the selective
175:18     COX-2, or Vioxx, as an explanation
175:19     of the VIGOR study.
175:20          I am upset right now, and I
175:21     was the first time I saw this, to
175:22     : know that they were essentially
175:23     distorting our scientific findings
175:24     to justify exactly the opposite
176: Page 176
176: 1      position from what we have said
176: 2      both in writing and in public.

Avorn 17612    176:12-176:18

176:12          Looking at that document, is
176:13 that a fair and accurate representation
176:14 of the science that you presented to Dr.
176:15 Guess at the ISPE meeting in August of
176:16 2001?
176:17     A.   No, it's a distortion of
176:18 what was presented.

Final Avorn Direct

Avorn 17701      177:1-178:1

177: 1          You mentioned the study that
177: 2 we talked about before, the published
177: 3 version of this study.  Have you on other
177: 4 occasions said that the results of your
177: 5 study does not explain cardioprotective
177: 6 -- does not explain the results that were
177: 7 seen in VIGOR?
177: 8      A.   Yes.  There are a number of
177: 9 times in the course of early 2000 where I
177:10 stated that.
177:11      Q.   Okay.
177:12          Would you go to another
177:13 article that I have in your book, Exhibit
177:14 Number 14?
177:15      A.   Yes.
177:16      Q.   Do you recognize that,
177:17 Doctor?
177:18      A.   Yes.  That is a paper that
177:19 was published in a journal called
177:20 "Pharmacoepidemiology and Drug Safety"
177:21 describing a panel that I was invited to
177:22 be on at another meeting of the
177:23 Pharmacoepidemiology Society that was
177:24 held in Edinborough in Scotland in August
178: Page 178
178: 1 of 2002.


D AVORN 17802      178:2-178:23

178: 2      Q.   And among the co-authors is
178: 3 a gentleman by the name of Dr. Wayne Ray?
178: 4      A.   Correct.
178: 5      Q.   Who is Dr. Ray?
178: 6      A.   Dr. Ray is a very respected
178: 7 pharmacoepidemiologist, probably one of
178: 8 the best in the field, who is a professor
178: 9 at Vanderbilt University.
178:10      Q.   And David Graham, do you see
178:11 he's represented there as well?
178:12      A.   Yes.  Dr. Graham is a
178:13 physician and epidemiologist at the Food
178:14 & Drug Administration.
178:15      Q.   Okay.
178:16          And Dr. Solomon is there as
178:17 well?
178:18      A.   Right.
178:19      Q.   Don't want to leave Dr.
178:20 MacDonald out.  Who is Dr. MacDonald?
178:21      A.   Tom MacDonald is a
178:22 pharmacoepidemiologist who works in
178:23 Scotland.


Avorn 17824      178:24-179:16

Final Avorn Direct

178:24     Q.   And, of course, you are
179: Page 179
179: 1 listed there as well?
179: 2     A.   Right.
179: 3     Q.   Did you anywhere indicate,
179: 4 again, your feelings about the naproxen
179: 5 hypothesis as an explanation of VIGOR?
179: 6     A.   Yes, I did.
179: 7     Q.   Okay.
179: 8        Would you please go to the
179: 9 last page of the document, please?
179:10     A.   Yes.  The last full page?
179:11     Q.   Actually the last full page.
179:12     A.   Yes.
179:13     Q.   Okay.
179:14        Would you tell the members
179:15 of the jury what you wrote in 2000, and I
179:16 guess this is 2003?


Avorn 18002     180:2-181:6


180: 2        Right.  In brief, the key
180: 3 sentence there is, "These studies," which
180: 4 reviews what was known at the time,
180: 5 "suggest that any potential protective
180: 6 effect of naproxen does not fully account
180: 7 for the findings in the VIGOR study."
180: 8     Q.   And what were you trying to
180: 9 convey there in this article that was
180:10 published in 2002 -- 2003, excuse me.
180:11     A.   Right.  But based on
180:12 statements that we made in August of
180:13 2002, and this was pretty much a
180:14 transcript of what we had said at that
180:15 point.  That we reviewed as a group the
180:16 existing data about evidence relating to
180:17 cardiac outcomes from nonsteroidal drugs.
180:18 And we discussed the dramatic increase in
180:19 rate of heart attack in VIGOR in people
180:20 taking naproxen -- in people taking Vioxx
180:21 compared to naproxen and the hypothesis
180:22 that had been offered by Merck that that
180:23 was because naproxen protects your heart.
180:24        And in that August of '02
181: Page 181
181: 1 symposium, all of us, I think, were in
181: 2 accord since we all signed off on this,
181: 3 "These studies suggest that any potential
181: 4 protective effect of naproxen does not
181: 5 fully account for the findings in the
181: 6 VIGOR study."


Avorn 18123     181:23-181:24


181:23     Q.   What were you trying to
181:24 communicate there in this sentence?

Final Avorn Direct

Avorn 18205     182:5-183:8

182: 5          THE WITNESS:  Okay.
182: 6          What I said was, there are
182: 7      only -- and the context of the
182: 8      proceeding paragraph, there's only
182: 9      two ways that you can explain a
182:10      five-fold difference in heart
182:11      attack between group A and group B
182:12      in a randomized trial.  Either the
182:13      people in the group that has the
182:14      higher number of heart attacks
182:15      were given a drug that causes
182:16      heart attacks, or the people in
182:17      the group given the comparison
182:18      drug got a drug that prevents
182:19      heart attacks or perhaps some
182:20      combination of the two.
182:21          And what that sentence says
182:22      is that you can't explain the
182:23      five-fold increase in number of
182:24      heart attacks in VIGOR seen in
183: Page 183
183: 1      people given Vioxx by the data
183: 2      that were available at the time
183: 3      about naproxen preventing heart
183: 4      attacks because it just wasn't
183: 5      there.
183: 6 BY MR. TISI:
183: 7      Q.   And did you draw any
183: 8 conclusions from that?

Avorn 18315     183:15-184:2

183:15      A.   The only logical -- this was
183:16 discussed widely from the podium, I
183:17 recall it vividly.  The only logical
183:18 alternative is that if it is not because
183:19 naproxen is preventing heart attacks or
183:20 if only a teeny fraction of the
183:21 difference can possibly be expected, be
183:22 explained by that, then the only other
183:23 logical possibility is that Vioxx caused
183:24 heart attacks.
184: Page 184
184: 1      Q.   Is that the same thing you
184: 2 told Dr. Guess in mid-2001?

AVORN  18405     184:5-184:20

184: 5          THE WITNESS:  In mid-2001, I
184: 6      told Dr. Guess that I thought that
184: 7      was an important question that
184: 8      needed to be addressed.
184: 9 BY MR. TISI:

Page 45

Final Avorn Direct

184:10      Q.   All right.  Moving forward.
184:11           Let's go back to your
184:12 negotiations with Merck to do your study.
184:13           Following the September fish
184:14 or cut bait e-mail with Dr. Cannuscio,
184:15 September 2001 fish or cut bait memo with
184:16 Dr. Cannuscio, did they execute a
184:17 contract?
184:18      A.   Not for many, many months
184:19 until later did they finally actually
184:20 sign the contract.

AVORN  18907    189:7-189:15

189: 7      Q.   Okay.
189: 8           Doctor, did there come a
189: 9 time that the contract was actually
189:10 signed?
189:11      A.   Yes.  My recollection is
189:12 that it was in April of 2002, about 15
189:13 months after the initial conversation
189:14 that Dr. Solomon had with Dr. Cannuscio
189:15 that the contract was eventually signed.

AVORN  19024    190:24-191:9

190:24           Are you aware that at the
191: Page 191
191: 1 time that Merck executed the contract for
191: 2 your study on April 24th, 2002 that Merck
191: 3 had just received two weeks prior the
191: 4 approval for the new label that did not
191: 5 contain a cardiovascular warning?
191: 6      A.   I was not aware of that.
191: 7      Q.   Doctor, are you familiar
191: 8 with the term "First, do no harm"?
191: 9      A.   Yes.

Avorn 19307    193:7-194:20

193: 7      Q.   Doctor, before we broke, I
193: 8 showed you a public affairs plan for the
193: 9 GI label change for Vioxx dated March
193:10 23rd, 2001.
193:11      A.   Right.
193:12      Q.    Have you seen that before?
193:13 I've shown you that in context of showing
193:14 you documents for litigation here.
193:15      A.   That's right.
193:16      Q.   Okay.
193:17           Would you please turn to the
193:18 page containing the Bates range 20167.
193:19 Do you see that?
193:20      A.   Yes.
193:21      Q.    See "Overall Communication
193:22 Objectives."  Do you see that?

Final Avorn Direct

193:23    A.   Yes.
193:24    Q.   Do you see the first bullet
194: Page 194
194: 1 point?
194: 2    A.   Yes.
194: 3    Q.   Would you please tell the
194: 4 members of the jury what it says?
194: 5    A.   It says "Do no harm."
194: 6    Q.   Can you read the rest?
194: 7    A.   Yes.
194: 8         "Refrain from proactively
194: 9 generating coverage that jeopardizes
194:10 label negotiations and/or that links
194:11 Vioxx to cardiovascular adverse events."
194:12    Q.   Doctor, were you concerned
194:13 in 2001 and 2002 about the delay in
194:14 actually getting your study off the
194:15 ground?
194:16    A.   Very concerned.
194:17    Q.   Do you have any explanation
194:18 for Merck's inability to execute a
194:19 contract until after the label was
194:20 approved for Vioxx?

Avorn 19424    194:24-195:13

194:24         THE WITNESS:  At that time,
195: Page 195
195: 1     I had no understanding of the
195: 2     label discussions that were going
195: 3     on.  I just was concerned that
195: 4     either this was a very big company
195: 5     that couldn't get out of its own
195: 6     way and make a decision in less
195: 7     than a year on an important study,
195: 8     or perhaps, and I vividly recall
195: 9     raising this possibility with Dr.
195:10     Solomon, perhaps the foot dragging
195:11     was intentional because they
195:12     really didn't want the study to
195:13     get done.

Avorn 19524    195:24-196:3

195:24         First of all, was that what
196: Page 196
196: 1 was on your mind at the time, that there
196: 2 was a concern there was foot dragging on
196: 3 the part of the company?

Avorn 19608    196:8-196:17

196: 8         THE WITNESS:  We had
196: 9     conversations on almost a biweekly
196:10     basis about why is it taking so
196:11     long.

Final Avorn Direct

196:12 BY MR. TISI:
196:13     Q.    Okay.
196:14          Now, Doctor, I assume that
196:15 once the contract was signed, you got
196:16 right to work on actually doing the
196:17 study; is that correct?

Avorn 19619    196:19-200:4

196:19          THE WITNESS:  We -- that was
196:20 our plan, but...
196:21 BY MR. TISI:
196:22     Q.    What happened?
196:23     A.    There was -- I learned a
196:24 lesson, which is that I had learned with
197: Page 197
197: 1 discussions with other pharmaceutical
197: 2 companies to never allow the funding to
197: 3 be contingent upon their acceptance of
197: 4 the work product because that, in effect,
197: 5 would give a company censorship over what
197: 6 we were able to publish.  And we managed
197: 7 every step of the way except for one to
197: 8 not have as any of the benchmarks in the
197: 9 contract any words like "produce a
197:10 manuscript that is acceptable to Merck"
197:11 or "produce data that are satisfactory to
197:12 Merck" because I learned not to do that.
197:13          The thing I hadn't learned
197:14 yet but learned from this was that as one
197:15 of the -- as the only benchmark that was
197:16 there in the beginning was language, and
197:17 it's in the contract, and perhaps I
197:18 should actually refer to the contract,
197:19 the first milestone or benchmark was,
197:20 payment to our hospital to fund the
197:21 research "will be made upon acceptance of
197:22 a detailed protocol."
197:23          And it turns out that --
197:24 that's not a mistake I'll make again.  It
198: Page 198
198: 1 turns out that Merck's acceptance of the
198: 2 protocol even after more than a year of
198: 3 discussion about getting the contract
198: 4 signed, took another nine months before
198: 5 they actually accepted the protocol.
198: 6          MR. TISI:  Doctor, I'm going
198: 7     to hand you a group of documents
198: 8     that I'm going to collectively
198: 9     refer to as Exhibits 23A through,
198:10     I think it's K.
198:11          - - -
198:12          (Whereupon, Deposition
198:13     Exhibit 23A-K, Study protocols,
198:14     was marked for identification.)
198:15          - - -

Page 48

Final Avorn Direct

198:16 BY MR. TISI:
198:17      Q.   Doctor, is this -- what are
198:18 those, Doctor?
198:19      A.   This is a succession of
198:20 study protocols that we submitted to
198:21 Merck and which Merck then was not
198:22 satisfied with and then resubmit -- asked
198:23 us to make this change or that change,
198:24 often matters that seemed to us to be
199: Page 199
199: 1 relatively modest to trivial, but each
199: 2 step of the way we were told, no, you
199: 3 need to fix that, you need to change
199: 4 that.  And this is what occupied the
199: 5 better part of 2002 before we could
199: 6 actually get their okay to start doing
199: 7 the work.
199: 8      Q.   How long did it take
199: 9 Harvard and Merck to agree on the
199:10 protocol of the study?
199:11      A.   Well, the first one in your
199:12 pile is dated June 7th, 2002, which was
199:13 relatively soon after the contract was
199:14 signed in the end of April.  And then
199:15 there's another one dated September 4th,
199:16 2002, and then another revision dated --
199:17 let's see, there's several revisions,
199:18 "Comments from Dan from 10-1," another
199:19 revision October 4th; October 22nd;
199:20 October 24th; another revision dated
199:21 October 31st, and then changed November
199:22 6th; another one from November 12th;
199:23 another one from December 17th; and
199:24 another one from February 2003.
200: Page 200
200: 1      And this was unprecedented
200: 2 in my many years of research, that there
200: 3 would be this long a period before a
200: 4 company signs off on a research protocol.

AVORN  20309    203:9-206:22

203: 9      Q.   Doctor, the protocols that I
203:10 laid in front of you, after those
203:11 protocols in early 2003, did you actually
203:12 get to start the study?
203:13      A.   Well, no.  Part of what
203:14 Merck asked us to do during this many,
203:15 many months of negotiation was they asked
203:16 us to go back and review the individual
203:17 patient records for a sample of the
203:18 subjects in our study to see if the
203:19 people that we were studying as having
203:20 heart attacks actually had heart attacks.
203:21      And we pointed out to Merck
203:22 that that was a question that had been

Final Avorn Direct

203:23 studied by other groups previously and
203:24 that there was pretty good evidence in
204: Page 204
204: 1 the medical literature that a combination
204: 2 of diagnosis codes and hospital codes
204: 3 virtually always meant that the person
204: 4 had had a heart attack. And Merck's
204: 5 response was, no, we really want to be
204: 6 sure, and so go out and validate, have
204: 7 people go down to Pennsylvania, get in
204: 8 contact with the hospitals, have them
204: 9 pull the patient's actual medical records
204:10 and check to see if they really had heart
204:11 attacks.
204:12      Q.    Doctor, you've done -- how
204:13 many studies have you done with this
204:14 particular database that you're talking
204:15 about here?
204:16      A.    Dozens.
204:17      Q.    Have you ever had any
204:18 company ask you to do the kind of
204:19 validation that Merck asked you to do?
204:20      A.    No.
204:21      Q.    Did you actually do what
204:22 Merck asked you to do?
204:23      A.    We had to.
204:24      Q.    What did you do?  What
205: Page 205
205: 1 happened?
205: 2      A.    We hired a professional
205: 3 review organization to go down to
205: 4 Pennsylvania, we established a protocol
205: 5 for how they would review the charts, the
205: 6 criteria from the World Health
205: 7 Organization about how you define a heart
205: 8 attack, and we gave them the list of a
205: 9 sample of patients.  And they went and
205:10 pulled each one of their medical records,
205:11 which was both an expensive and a time
205:12 consuming process.  And they then
205:13 confirmed that indeed in about 93 or 94
205:14 percent of the cases, they had heart
205:15 attacks, which is about as good as any
205:16 validation study gets.
205:17      Q.    Doctor, who conducted the
205:18 independent validation?
205:19      A.    It was a company that was a
205:20 professional review organization.  I
205:21 think they were called KeyPro, which is a
205:22 group sanctioned by the government to go
205:23 in and inspect hospital records.
205:24      Q.    And did they find any
206: Page 206
206: 1 problem with what you did?
206: 2      A.    No.  They found that we had
206: 3 a remarkably high rate of validation.

Final Avorn Direct

206: 4     Q.   Okay.
206: 5           And when you finally got the
206: 6 approval and the contract was signed and
206: 7 all of the protocols were done and the
206: 8 independent evaluation was done and all
206: 9 those things, did you finally get to do
206:10 your study?
206:11     A.   No.
206:12     Q.   What happened?
206:13     A.   Merck told us that we could
206:14 not proceed until we had an independent
206:15 epidemiologist come in and review the
206:16 protocol as an outsider and also review
206:17 all the programming code that our
206:18 programmers had written to do the
206:19 analyses.
206:20     Q.   And who was that?  Who did
206:21 that?
206:22     A.   That was Dr. Rhonda Bohn.


AVORN  21007    210:7-211:2


210: 7     Q.   Did she find any problems
210: 8 with your codes and the things she was
210: 9 asked to do?
210:10     A.   No.
210:11     Q.   Okay.
210:12           Now, Doctor, did there
210:13 finally come a time where you actually
210:14 had an opportunity to do the study?
210:15     A.   Yes.  By spring of 2003,
210:16 we -- there was finally no other concerns
210:17 that Merck had and we were given a green
210:18 light to proceed.
210:19     Q.   And did you actually do the
210:20 data analysis at that time?
210:21     A.   Yes.
210:22     Q.   And what did you find?
210:23     A.   We found that there was a
210:24 significant increase in the risk of heart
211: Page 211
211: 1 attack in patients taking Vioxx compared
211: 2 to comparator drugs.


AVORN  21203    212:3-213:15


212: 3           Let me ask you these
212: 4 questions.
212: 5           Did Merck have input into
212: 6 the design of the study?
212: 7     A.   Yes, in that they would not
212: 8 let us proceed until they were perfectly
212: 9 satisfied with the protocol.
212:10     Q.   And did they indicate that
212:11 they were satisfied with the protocol in
212:12 the end of the day?

Page 51

Final Avorn Direct

212:13     A.   Yes.  They signed off on the
212:14 protocol.
212:15     Q.   Okay.
212:16          Did they have one of
212:17 their --
212:18          Did they have any employees
212:19 who they employed working on the study?
212:20     A.   Yes.  Dr. Cannuscio was a
212:21 key member of the project team, and she
212:22 was a Merck employee.
212:23     Q.   All right.
212:24          Now, I put in front of you a
213: Page 213
213: 1 document entitled "The Relationship
213: 2 Between COX-2 Inhibitors and Acute
213: 3 Myocardial Infarction" dated May 5th,
213: 4 2003.  Would you tell me what this is?
213: 5     A.   Yes.  This is just the
213: 6 tables, basically the data as we had it
213: 7 in May of 2003 from the study.
213: 8     Q.   Okay.
213: 9          In an overview, what did it
213:10 tell the people at Merck about the
213:11 results of your study of the -- the
213:12 epidemiologic study?
213:13     A.   That we found an increased
213:14 rate of heart attacks in people taking
213:15 Vioxx compared to comparison drugs.

AVORN  21421     214:21-216:9

214:21     Q.   Okay.
214:22          Now, the results that you
214:23 saw here, from a public health
214:24 standpoint, did you consider them to be
215: Page 215
215: 1 important findings?
215: 2     A.   Yes.
215: 3     Q.   Why?
215: 4     A.   Because in there -- let me
215: 5 just turn to the page with the data on it
215: 6 as it was eventually published.  We found
215: 7 that in the final tables, there was a
215: 8 significant increase in the risk of heart
215: 9 attack that we found with Vioxx compared
215:10 to with Celebrex.  We also found that it
215:11 was particularly high in people who were
215:12 taking higher doses of Vioxx.  And that
215:13 seemed like an important finding.  The
215:14 data for the high-dose Vioxx versus
215:15 high-dose Celebrex was a 70 percent
215:16 increase, or almost a doubling of the
215:17 risk of heart attack in our patient
215:18 population.
215:19     Q.   Did you find an increased
215:20 risk with low dose?

Page 52

Final Avorn Direct

215:21    A.   Yes.
215:22    Q.   Did you find an increased
215:23 risk at less than 30 days?
215:24    A.   Yes.
216: Page 216
216: 1    Q.   Did you find an increased
216: 2 risk at 30 to 90 days?
216: 3    A.   Yes.
216: 4    Q.   And was that increased risk
216: 5 seen whether you were comparing it to
216: 6 Celebrex or other NSAIDs?
216: 7    A.   We found it with a wide
216: 8 variety of comparison drugs or
216: 9 nonexposures.

AVORN  21701    217:1-217:15

217: 1    Q.   Okay.
217: 2         Doctor, did there come a
217: 3 time where you sought to write these
217: 4 results up in an abstract?
217: 5    A.   Yes.
217: 6    Q.   Did you speak to Dr.
217: 7 Cannuscio about doing that?
217: 8    A.   Yes.  The terms of our
217: 9 contract were that we would allow them to
217:10 see what we were publishing, although
217:11 they did not have the right to censure it
217:12 or to hold it back, but as a courtesy, we
217:13 agreed to let them see what we were going
217:14 to submit and give them a period of time
217:15 to comment.

AVORN  21801    218:1-218:6

218: 1    Q.   Okay.
218: 2         Doctor, did there come a
218: 3 time where there was discussion about
218: 4 whether or not Dr. Cannuscio would
218: 5 actually be on the paper?
218: 6    A.   Yes.

AVORN  21919    219:19-219:21

219:19    Q.   Doctor, did you --
219:20         I've handed you what I've
219:21 had marked as Exhibit 27.

AVORN  22014    220:14-223:14

220:14    Q.   Does this include the
220:15 abstract that was written by your
220:16 division?
220:17    A.   Correct.
220:18    Q.   And there's an e-mail there
220:19 as well, correct?

Page 53

Final Avorn Direct

220:20     A.   Right.
220:21     Q.   What does the e-mail say
220:22 about the tables?  It says, "These tables
220:23 all suggest that the higher adjusted odds
220:24 ratios seen in shorter duration use is
221: Page 221
221: 1 not confined to high....risk users."
221: 2 What does that --
221: 3     A.   "High dosage users."
221: 4     Q.   "High dosage users."
221: 5          What does that mean?
221: 6     A.   That's a note from Dr.
221: 7 Solomon to Dr. Cannuscio pointing out
221: 8 something about our findings, which is
221: 9 that this was not just about people
221:10 taking high-dose Vioxx, this was about
221:11 people taking regular dose Vioxx as well.
221:12     Q.   Okay.
221:13          And was there further
221:14 discussion about the co-authorship of the
221:15 paper?
221:16     A.   Yes.
221:17     Q.   Okay.
221:18          Would you please read that?
221:19     A.   Yes.  In Paragraph 2, Dr.
221:20 Solomon writes, "I would like to discuss
221:21 your co-authorship on the paper.  You
221:22 have contributed substantially to the
221:23 project and I am very comfortable with
221:24 you being a co-author, assuming that you
222: Page 222
222: 1 are comfortable with its content.  In
222: 2 light of our findings, there may be
222: 3 aspects of the paper that will be
222: 4 problematic from Merck's perspective.
222: 5 You may be in a difficult position as a
222: 6 Merck employee and a co-author."
222: 7     Q.   Stop right there, Doctor.
222: 8          What did you and Dr. --
222: 9          What was your concern as
222:10 reflected in this paragraph?
222:11     A.   Well, this, again, was a
222:12 note that he sent to Dr. Cannuscio at my
222:13 suggestion to convey to her that we did
222:14 feel that she was a member of the project
222:15 team, but that we were both worried, now
222:16 that the study had shown that Vioxx did
222:17 increase the risk of heart attack, would
222:18 that be a problem for Merck and would
222:19 that be problematic for her to have her
222:20 name on the paper.
222:21     Q.   Did you actually present
222:22 this paper --
222:23          Did you actually present
222:24 this at a professional meeting?
223: Page 223

Page 54

Final Avorn Direct

223: 1      A.   Dr. Solomon presented it in
223: 2 the fall of 2003 at the American College
223: 3 of Rheumatology.
223: 4              - - -
223: 5          (Whereupon, Deposition
223: 6      Exhibit Avorn-28, ARC 2003
223: 7      Presentation MRK-AAD0333175 -
223: 8      MRK-AAD0333207, was marked for
223: 9      identification.)
223:10              - - -
223:11 BY MR. TISI:
223:12      Q.   I'm handing you what's
223:13 marked as Exhibit Number 23.
223:14      A.   Yes.


Avorn 22622    226:22-227:15


226:22      Q.   Doctor, is this the abstract
226:23 that was presented in -- at the
226:24 association --
227: Page 227
227: 1      A.   The American.
227: 2      Q.   -- the American College of
227: 3 Rheumatology in 2003?
227: 4      A.   Correct.
227: 5      Q.   Okay.
227: 6          And is this the results of
227: 7 your study, your Merck-funded study?
227: 8      A.   Correct.
227: 9      Q.   Okay.
227:10          And does it have Carolyn
227:11 Cannuscio's name on the top?
227:12      A.   Yes, it does.
227:13      Q.   Does it have your name on
227:14 the top?
227:15      A.   Yes, it does.


AVORN 22802    228:2-228:9


228: 2      Q.   Okay.
228: 3          Doctor, did there come a
228: 4 time when you sought to convert this
228: 5 abstract into an actual published
228: 6 article?
228: 7      A.   Yes.
228: 8      Q.   And did you do that?
228: 9      A.   Yes.


AVORN 22820    228:20-229:21


228:20          Did you submit that
228:21 manuscript to Merck for its comment?
228:22      A.   Yes, we did.
228:23      Q.   Okay.
228:24          Did they have an opportunity
229: Page 229

Page 55

Final Avorn Direct

229: 1 to make comments?
229: 2      A.   Yes.
229: 3      Q.   Did you accept some
229: 4 comments?
229: 5      A.   We accepted some and we
229: 6 didn't accept others.
229: 7      Q.   Okay.
229: 8          Would you describe for us
229: 9 the comments that Merck did not accept?
229:10     A.   You mean that we did not
229:11 accept?
229:12     Q.   You did not accept that
229:13 Merck --
229:14     A.   Right, sure.
229:15          There were some helpful
229:16 comments that Merck made about making
229:17 things clearer.  We accepted those.  And
229:18 then there were others which we felt
229:19 would deemphasized the importance or
229:20 the extent of our findings, and we tended
229:21 to not accept those.


D AVORN 23017    230:17-232:14


230:17     Q.   Would you please tell us
230:18 what was rejected by you that Merck had
230:19 suggested?
230:20     A.   Sure.  As best I can recall,
230:21 there were, for example, in the abstract
230:22 of the paper, as it was eventually
230:23 presented, there was one finding that
230:24 demonstrated an increased risk of Vioxx,
231: Page 231
231: 1 and the statistical significance of that
231: 2 was a p-value of .054.  Now, let me
231: 3 explain what that means.
231: 4          A p-value of .05 or 5
231: 5 percent means that there's a 95 percent
231: 6 certainty that the finding you are
231: 7 reporting was not the result of chance.
231: 8 And that is a benchmark that is often
231: 9 used, it's not engraved in stone, but it
231:10 is a convenient benchmark that people
231:11 often use to understand how likely it is
231:12 that this was not just the result of
231:13 happenstance.
231:14          And one of our findings had
231:15 a p-value of 0.54, which means that
231:16 instead of a 95 percent certainty or
231:17 likelihood that this was not the result
231:18 of chance, there was instead of 95
231:19 percent, 94.6 percent likelihood that
231:20 this was not the result of chance.  We
231:21 felt that given particularly the public
231:22 health importance of heart attack and the
231:23 widespread use of this drug that that

Page 56

Final Avorn Direct

231:24 needed to be in the abstract.
232: Page 232
232: 1          Merck objected that this
232: 2 was, quote, not a significant finding
232: 3 because it was a 94.6 percent probability
232: 4 that it was not chance instead of a 95
232: 5 percent and said we should take it out of
232: 6 the abstract.
232: 7          They also told us that we
232: 8 should change the way we described that
232: 9 finding as a numerical difference that
232:10 was not significant or something to that
232:11 effect. And we disagreed on both points.
232:12     Q.   And did you have discussions
232:13 with Merck about this?
232:14     A.   Yes.

AVORN 23215    232:15-233:1

232:15     Q.   And did there come a time
232:16 where you had to make a decision about
232:17 what remained in the paper and what did
232:18 not remain in the paper?
232:19     A.   Yes. Dr. Solomon and I
232:20 discussed this on an almost daily basis
232:21 at that point.
232:22     Q.   Okay.
232:23          And did you actually submit
232:24 the paper as you wished it to be?
233: Page 233
233: 1     A.   Yes.

D AVORN 23302    233:2-233:9

233: 2     Q.   And was it accepted for
233: 3 publication?
233: 4     A.   Yes. It was initially sent
233: 5 to the New England Journal and JAMA, and
233: 6 they passed on it, and it was eventually
233: 7 accepted in Cardiology -- I'm sorry, in
233: 8 Circulation, which is the number one
233: 9 cardiology journal in the world..

Avorn 23310    233:10-233:21

233:10     Q.   And did anything unusual
233:11 happen at about the time of the
233:12 publication of the article that we've
233:13 been talking about?
233:14     A.   Yes. As the article was in
233:15 galley on page proof, which is the
233:16 printed version of the article that is
233:17 sent back to the authors to make sure
233:18 there's no typos, we received a phone
233:19 call from Dr. Santanello instructing us
233:20 to remove Dr. Cannuscio's name from the

Final Avorn Direct

233:21 paper.

AVORN 24102    241:2-241:6

241: 2         Did her name come off the
241: 3 paper?
241: 4      A.   Her name came off the paper,
241: 5 and I reluctantly agreed to let that
241: 6 happen.

AVORN 24312    243:12-244:19

243:12      Q.   Did you acknowledge Dr.
243:13 Cannuscio in any other way in that paper?
243:14      A.   Yes.  I wrote an
243:15 acknowledgment that I asked Dr. Solomon
243:16 to include in the paper.
243:17      Q.   And you did that?
243:18      A.   Yes.  That was my  -- those
243:19 are my words.
243:20         Because I felt that leaving
243:21 aside the ethics of it, here was a young
243:22 woman starting out her career who was
243:23 about to have a paper in the best
243:24 cardiology journal in the world and that
244: Page 244
244: 1 she deserved to be a co-author of.  And I
244: 2 was concerned, almost in my faculty role,
244: 3 that here somebody's hard work was being
244: 4 snatched away from her.
244: 5         So, I wrote that language
244: 6 that indicated there was an unnamed
244: 7 epidemiologist who had worked with us, as
244: 8 it says, "Actively in the study design,
244: 9 statistical analysis, and interpretation
244:10 of the date and preparation of the
244:11 manuscript," which are, in fact, the
244:12 criteria for authorship.  And while we
244:13 are forbidden from using Dr. Cannuscio's
244:14 name, I wanted her to be able to refer to
244:15 that as she went on in her career and say
244:16 that was really me.  And so we did put
244:17 the acknowledgment that I wrote at the
244:18 end of the paper, but still respected her
244:19 wishes to be not listed as a co-author.

Avorn 24504    245:4-247:4

245: 4      Q.   Now, Doctor, this article
245: 5 was then published in Circulation?
245: 6      A.   That's right.
245: 7         MR. TISI:  Okay.
245: 8         And I'm going to show you
245: 9     what I would like to have marked
245:10     as Exhibit 30.
245:11             - - -

Page 58

Final Avorn Direct

245:12        (Whereupon, Deposition
245:13     Exhibit Avorn-30, Bulletin
245:14     4-21-04 MRK-AAR0069284, was
245:15     marked for identification.)
245:16             - - -
245:17 BY MR. TISI:
245:18     Q.   And you testified before,
245:19 and I just want to refer you to that
245:20 testimony, that you felt this was an
245:21 important public health issue that your
245:22 study was addressing?
245:23     A.   I've said that, and I felt
245:24 that, and I feel that.
246: Page 246
246: 1     Q.   Okay.
246: 2        Now, let me show you what I
246: 3 have had marked as Exhibit Number 29 --
246: 4        THE COURT REPORTER:   30.
246: 5 BY MR. TISI:
246: 6     Q.   30.  I will represent to you
246: 7 that it is a bulletin being used for
246: 8 detailers detailing Vioxx.
246: 9     A.   You mean the sales
246:10 representatives?
246:11     Q.   The sales representatives.
246:12     A.   For Merck?
246:13     Q.   Yes.
246:14        And it's dated April 21st,
246:15 2004.
246:16     A.   Correct.
246:17     Q.   Do you see that, Doctor?
246:18        And does it refer to your
246:19 particular study?
246:20     A.   Yes.
246:21     Q.   And it's called an "Obstacle
246:22 Response."  Do you see that?
246:23     A.   Right.
246:24     ; Q.   Did you consider your paper
247: Page 247
247: 1 an obstacle?
247: 2     A.   No.
247: 3     Q.   You're smiling.  Why do you
247: 4 smile?


Avorn 24707    247:7-247:15


247: 7        THE WITNESS:  Because it was
247: 8     an important finding about the
247: 9     risks of a very, very widely-used
247:10     drug in relation to a very common
247:11     and important and dangerous side
247:12     effect that was only an obstacle,
247:13     I suppose, from the perspective of
247:14     Vioxx sales, but it was not an
247:15     obstacle in terms of science.