U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED $ 3 06

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| This document relates to | * | MAG. JUDGE KNOWLES |
| | * | |
| Gerald Barnett v. Merck & Co, Inc. | * | CASE NO. CA 06-485 |

### Notice of Filing Deposition Testimony
### of Edward M. Scolnick, M.D.

Plaintiff Gerald Barnett, by and through his attorneys, hereby gives notice of filing the

final transcript of the deposition testimony of Edward M. Scolnick. This testimony was played

during the trial of this cause on August 2 and 3, 2006. A transcript is attached as Exhibit "A."

Respectfully submitted,

Dated: August 2, 2006                    By: _____

Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Dr., 7th Floor
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

Andy D. Birchfield, Jr.
P. Leigh O'Dell
BEASLEY, ALLEN, CROW
METHVIN, PORTIS & MILES

Fee_____
Process_____
X Dktd_____
CtRmDep_____
Doc. No._____

1

P.O. Box 4160
234 Commerce Street
Montgomery, Alabama  36103-4160
Telephone:  (334) 269-2343
Facsimile: (334) 954-7555

Donald C. Arbitblit
LIEFF, CABRASER, HEIMANN and
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Counsel for Plaintiff

Russ M. Herman
Leonard A. Davis
Stephen J. Herman
HERMAN HERMAN KATZ
& COTLER, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70013
Telephone: (504) 581-4892
Facsimile: (504) 561-6024

Christopher A. Seeger
SEEGER WEISS
One William Street
New York, New York 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
**Co-Lead Counsel**

**PLAINTIFFS' LIAISON COUNSEL**

Richard J. Arsenault, Esquire
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court, P.O. Box 1190
Alexandria, LA 71301-1190
(318) 487-9874 (telephone)
(318) 561-2591 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

Gerald E. Meunier, Esquire
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
& WARSHAUER, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (telephone)
(504) 528-9973 (telecopier)

Shelley Sanford, Esquire
GOFORTH, LEWIS, SANFORD LLP
2200 Texaco Heritage Plaza
1111 Bagby
Houston, TX 77002
(713) 650-0022 (telephone)
(713) 650-1669 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Drew Ranier, Esquire
RANIER, GAYLE & ELLIOT, L.L.C.
1419 Ryan Street
Lake Charles, LA 70601
(337)494-7171 (telephone)
(337) 494-7218 (telecopier)

Elizabeth J. Cabraser, Esquire
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (telecopier)

Mark Robinson, Esquire
ROBINSON, CALCAGNIE & ROBINSON
620 Newport Center Drive
7th Floor
Newport Beach, CA 92660
(949) 720-1288 (telephone)
(949) 720-1292 (telecopier)

Thomas R. Kline, Esquire
KLINE & SPECTER, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 (telephone)
(215) 772-1371 (telecopier)

Christopher V. Tisi, Esquire
ASHCRAFT & GEREL
2000 L Street, N.W.
Suite 400
Washington, DC 20036-4914
(202) 783-6400 (telephone)
(307) 733-0028 (telecopier)

**PLAINTIFF'S STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Notice of Filing Deposition Testimony of Edward M. Scolnick has been served on Defendants' Liaison Counsel, Phillip A. Wittmann, Merck's Counsel, Andrew L. Goldman, and Plaintiffs' Liaison Counsel, Russ Herman, by U.S. Mail and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced, in accordance with Pretrial Order No. 8A, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 3rd day of August, 2006.

/s/ MARK P. ROBINSON, JR.
Mark P. Robinson, Jr.
Kevin F. Calcagnie
Carlos A. Prietto, III
Ted B. Wacker
Lexi W. Myer
ROBINSON, CALCAGNIE & ROBINSON

4

Scolnick 1-30-03 (Multi-clip)
ES 10217      102:17-102:22

102:17                Merck Research Labs publishes the Merck
102:18 Manual, does it not?
102:19        A.      The Merck Manual is published by a group
102:20 of people who publish the Merck Manuals, and I'm not
102:21 certain at this point, organizationally, where that
102:22 group actually sits.

ES 10402      104:2-106:3

104: 2        Q.      Doctor, I asked before we broke if you
104: 3 were familiar with the Merck Manual.
104: 4        A.      Yes, I am.
104: 5        Q.      Okay.  And are you familiar with
104: 6 Dr. Robert Berkow?
104: 7        A.      I was familiar with Dr. Robert Berkow.
104: 8        Q.      Is Dr. Berkow -- is Dr. Berkow passed
104: 9 away?
104:10        A.      I believe he's retired.
104:11        Q.      He's retired?
104:12        A.      Many years since he was head of the
104:13 Merck Manual.  I don't recall the exact time, how
104:14 many.
104:15        Q.      Okay.  What was -- prior to his
104:16 retirement, what was Dr. Berkow's position at Merck
104:17 Research Labs?
104:18        A.      To the best of my recollection, he was
104:19 in charge of the publication of the Merck Manual, and
104:20 that was his primary role.
104:21        Q.      Okay.  Is your -- in your position --
104:22 well, let me back up.
104:23                Did he retire from Merck Research Labs
104:24 after you took over as president of Merck Research
104:25 Labs?
105: Page 105
105: 1        A.      Yes, I believe that he did.
105: 2        Q.      Okay.
105: 3        A.      Yes.
105: 4        Q.      How much overlap was there?
105: 5                Do you know when he retired?
105: 6        A.      I don't recall exactly when he retired.
105: 7 There were several years of overlap.
105: 8        Q.      Okay.
105: 9                Did you -- did you have interaction with
105:10 him while he was with Merck Research Labs?
105:11        A.      A few occasions, very few.
105:12        Q.      As a president of Merck Research Labs,
105:13 did you have any oversight on the Merck Manual?
105:14        A.      No, none whatsoever.
105:15        Q.      Did you have any input at all?
105:16        A.      No, not to the best of my recollection.
105:17        Q.      To your recollection -- your
105:18 recollection, did you and Dr. Berkow ever speak about
105:19 anything at Merck -- anything, at any time, about the
105:20 Merck Manual or the publication or inclusion of
105:21 information in the Merck Manual?
105:22        A.      I don't recall any conversations with
105:23 Dr. Berkow about the content of any specific item

```
105:24 published in the Merck Manual.
105:25      Q.      Okay.
106: Page 106
106: 1            Let me review with you the foreword of
106: 2 that book, and I want to ask you just some general
106: 3 questions first about the -- about the manual.
```

ES 10703      107:3-107:10

```
107: 3            I will represent that Exhibit Number 3
107: 4 is a copy of the front cover the book, the
107: 5 publisher's page, the list of contributors of the
107: 6 Merck Manual, Sixteenth Edition, publish date 1992,
107: 7 Library of Congress catalog card number, 1-31760, and
107: 8 that all pages that are stapled together as Exhibit
107: 9 Number 3 came directly from the Sixteenth Edition of
107:10 the Merck Manual.
```

ES 10716      107:16-108:10

```
107:16      Q.      Let me go to the foreword with you,
107:17 Doctor.
107:18      A.      Uh-huh, yes.
107:19      Q.      First of all, have you ever used the
107:20 Merck Manual as a reference?
107:21      A.      I can't say that I've never used it, but
107:22 it's been rare that I've ever looked at it.
107:23      Q.      But it's not disputed that Merck
107:24 Research Labs and Merck & Company puts this out for
107:25 use by physicians, nurses or by the general public?
108: Page 108
108: 1 It's sold to the general public, is it not?
108: 2      A.      I believe it's sold to the general
108: 3 public.
108: 4      Q.      Okay.
108: 5            I want you to follow down with me about
108: 6 four lines before the end of the first paragraph,
108: 7 okay, where it starts the sentence, "Today."
108: 8            Tell me if I read this correctly.
108: 9 "Today, the manual is one of the most widely used
108:10 medical texts in the world."
```

ES 10906      109:6-109:19

```
109: 6      Q.      Okay.  Tell me if I read this correctly.
109: 7            "Today, the manual is the most widely
109: 8 used medical text in the world.  While the book has
109: 9 grown to about 2800 pages, its primary purpose
109:10 remains the same, to provide useful clinical
109:11 information to practicing physicians, medical
109:12 students, interns, residents and other health care
109:13 professionals."
109:14      A.      You've accurately read it.
109:15      Q.      Okay.
109:16            And as a publication from the company
109:17 that you're with, is this -- do you -- can I take
109:18 this to be a statement from the company that this is
109:19 what they're claiming this book to be?
```

D ES 10920      109:20-109:21

```
109:20                MR. MAYER:  You're asking him about this
109:21 1992 edition?
```

ES 10922    109:22-110:9

```
109:22                MR. MICELI:  Well, I'm going to go in
109:23 and talk about the 1999 one in a bit, but this is all
109:24 we're talking about right now.
109:25      A.      Well, the Merck -- the group that
110: Page 110
110: 1 publishes the Merck Manual is part of Merck &
110: 2 Company.
110: 3                I can't go beyond that in my statement
110: 4 with regard to Merck's guaranteeing or endorsing what
110: 5 is in the Merck Manual.  Merck is a company.
110: 6      Q.      I'm not asking for any guarantees, but
110: 7 what I'm -- you, as a former executive, and now
110: 8 you're the president --
110: 9      A.      Emeritus.
```

D ES 11010    110:10-110:21

```
110:10      Q.       -- emeritus of Merck Research Labs
110:11 and -- do you still have your Board position with
110:12 them?
110:13      A.      No, I am no longer a Board member.
110:14      Q.      And are you any longer an executive vice
110:15 president?
110:16      A.      No, no.
110:17      Q.      You're now devoting your entire time to
110:18 the research and development of drugs to treat -- is
110:19 it Alzheimer's?
110:20      A.      Neuropsychiatric illnesses.
110:21      Q.      Neuro.  Okay.
```

ES 11022    110:22-111:2

```
110:22                The Merck Manual is produced by Merck &
110:23 Company and/or Merck Research Laboratories, and
110:24 presents itself to be an authoritative treatise to
110:25 practicing physicians, medical students, interns,
111: Page 111
111: 1 residents and other health care professionals,
111: 2 doesn't it?
```

ES 11109    111:9-113:7

```
111: 9      A.      Yes.  I really can't answer the question
111:10 the way you're phrasing it.
111:11                The Merck Manual was published by the
111:12 group that oversees its publication.
111:13                It has an Editorial Board, which is
111:14 designated on the frontage page of the 1992 edition,
111:15 which reviews the chapters in the manual that are
111:16 written by the persons who are part of the group that
111:17 publishes the Merck Manual, and that review group
111:18 interacting with the group who publishes the manual
111:19 are responsible for being accurate in the manual, and
111:20 that's the way I've always viewed this manual.
```

```
111:21      Q.     Okay.
111:22             In your research, have you ever had the
111:23 opportunity to consult this manual?
111:24      A.     As I said, I don't recall ever having
111:25 consulted the manual.
112: Page 112
112: 1             It's possible I looked at it once or
112: 2 twice for something, but I certainly didn't use it as
112: 3 a reference book.
112: 4      Q.     Okay.  I want to go to the second
112: 5 paragraph.  I'm just going to read the first
112: 6 sentence, and tell me if I read this correctly,
112: 7 because I want to make sure I understand it.
112: 8             "Fewer physicians now attempt to manage
112: 9 the whole range of medical disorders that can occur
112:10 in infants, children and adults, but those who do
112:11 must have available a broad spectrum of current and
112:12 accurate information."
112:13             The second sentence says, "Specialists
112:14 require precise information about subjects outside
112:15 their areas of expertise," and the last two lines,
112:16 and I know that I'm splitting a sentence here -- I'll
112:17 just read it -- the last sentence.
112:18             "Keeping up with the rapid and
112:19 extraordinary advances in cellular and molecular
112:20 biology, molecular genetics and medical technology is
112:21 more challenging than ever, but the Merck Manual
112:22 continues to try to meet these needs, addressing only
112:23 details --" excuse me "-- excluding only details of
112:24 surgical procedures."
112:25      A.     Again, that's what it says, yes.
113: Page 113
113: 1      Q.     Okay.
113: 2             Let me go to the second page of that
113: 3 foreword.
113: 4             I want you to read the first full
113: 5 paragraph to yourself, and let me know when you're
113: 6 done, and we'll want to talk to you about a few
113: 7 things in it.

ES 11308      113:8-113:20

113: 8      A.     I've read the first paragraph.
113: 9      Q.     Okay.
113:10      A.     The first full paragraph.
113:11      Q.     Right.  The statement in this paragraph,
113:12 I'm just going to pull out a couple of key statements
113:13 that I see.
113:14             "Sections of that book were then sent
113:15 out -- sent to outside experts, who had nothing to do
113:16 with its preparation, to solicit their most candid
113:17 criticism."
113:18             That sounds to me like the beginning of
113:19 the peer-review process.
113:20             Would you agree with that?

ES 11322      113:22-114:11

113:22      A.     I think that is a form of peer review.
113:23      Q.     Okay.
```

```
113:24              Dropping down a few lines, it says,
113:25 "Their manuscripts were painstakingly edited by our
114: Page 114
114: 1 inhouse staff to obtain every valuable morsel of
114: 2 knowledge while eliminating sometimes elegant but
114: 3 unneeded words."
114: 4      A.    I can read what you're reading.
114: 5      Q.    Sir, and is that again more of the
114: 6 distillation process of peer-reviewing, taking the
114: 7 most candid criticisms and distilling down those
114: 8 things that are most needed and cutting out those
114: 9 things that are -- trying to think how we put
114:10 that -- eliminating sometimes elegant but unneeded
114:11 words?
```

ES 11414      114:14-115:7

```
114:14      A.    That part of the process is the
114:15 Editorial Board's opinion about the comments they're
114:16 getting back from the reviewers, yes.
114:17      Q.    Certainly.
114:18              And then the last two sentences or three
114:19 sentences, it says, "The authors then rework, modify
114:20 and polish their manuscripts.  Almost all of the
114:21 manuscripts were revised at least six times.  15 to
114:22 20 revisions were not uncommon.  We believe that no
114:23 other medical text undergoes as many reviews and
114:24 revisions as the Merck Manual does."
114:25              And I read that correctly, didn't I?
115: Page 115
115: 1      A.    Yes, you did.
115: 2      Q.    And that -- those segments of that
115: 3 paragraph that I've pulled out basically characterize
115: 4 and describe what at least the editors of this book
115: 5 published by the company you were aligned with, or
115: 6 worked with, believed it to be the most peer-reviewed
115: 7 and distilled piece of medical text in the world.
```

ES 11510      115:10-116:3

```
115:10      A.    Yeah.  I think the paragraph says that
115:11 this is a highly peer-reviewed book that tries to be
115:12 clear and accurate in what it represents to people
115:13 who would read it.
115:14              I think that's how I understand this
115:15 paragraph.
115:16      Q.    And it explains the mechanisms of how
115:17 that is done by saying that sometimes six revisions,
115:18 but even, at times, 15 to 20, if necessary?
115:19      A.    The statement that you read says,
115:20 "Almost all of the manuscripts were revised at least
115:21 six times.  15 to 20 revisions were not uncommon."
115:22      Q.    Yes.  And in your professional
115:23 experience, the purpose for doing that, those
115:24 revisions, the sending it back to the editor, the
115:25 rewriting it 10, 15 times, maybe 20, is so that you
116: Page 116
116: 1 can weed out either bad science, improper opinions,
116: 2 or maybe something that's been disproven by recent
116: 3 scientific discovery?
```

ES 11608        116:8-117:21

116: 8        Q.        I'm not saying the reason that is done.
116: 9 I'm saying that is the reason that we have peer
116:10 review, so that we can have some, albeit
116:11 confidential, discourse between professionals to get
116:12 to the very heart of the scientific issues.
116:13        A.        I would like to separate in my answer
116:14 peer review in general, which you're discussing and
116:15 we've discussed before --
116:16        Q.        Yes, sir?
116:17        A.        -- and at least my understanding of the
116:18 Merck manual's aim.
116:19                As you pointed out, The Merck Manual is
116:20 read widely and is even available to lay persons
116:21 without a special medical background, and I believe
116:22 that The Merck Manual, in its various revisions and
116:23 reviews, that a significant part of the purpose of
116:24 those reviews was to try to get language and
116:25 expression of the wide variety of complex fields that
117: Page 117
117: 1 you've noted, so that it was clearly written and
117: 2 understandable to a wide audience.
117: 3                That's a slightly different purpose than
117: 4 a technical peer review journal.
117: 5        Q.        Well, I understand.
117: 6        A.        Okay.
117: 7        Q.        And for that reason, Merck publishes
117: 8 about four or five different Merck manuals, don't
117: 9 they?
117:10        A.        They publish four or five different
117:11 Merck Manuals because the audience and the content of
117:12 those manuals is somewhat different, and at this
117:13 point, I can't recall exactly what manuals cover
117:14 what.
117:15        Q.        Okay.
117:16                But there is a Merck Manual for
117:17 diagnosis and therapy, which is what we have in front
117:18 of you.  A portion of it is in front of you.
117:19        A.        I don't see the rest of the title --
117:20        Q.        Okay.
117:21        A.        -- but that -- I assume you're correct.

ES 11802    ·118:2-118:14

118: 2        Q.        Okay.  It's on this page, Doctor, that
118: 3 says, "Sixteenth Edition, Merck Manual of Diagnosis
118: 4 and Therapy."
118: 5        A.        Okay.  Thank you.
118: 6        Q.        Okay?  And there's a Merck Manual for
118: 7 geriatrics?
118: 8        A.        Yes.  I believe so.
118: 9        Q.        And there's a Merck Manual for household
118:10 use, so that when they're writing to the audience of
118:11 people like myself, who don't have medical training,
118:12 we can understand it.
118:13        A.        There's a manual that's written for a
118:14 broader audience.  That's correct.

ES 11820      118:20-119:4

```
118:20           If you could turn to the copy of page
118:21 2664.
118:22      A.   Yes.
118:23      Q.   Under the subheading, "Hematologic
118:24 Effects."  This is from a section, I'll represent to
118:25 you, in the book.
119: Page 119
119: 1      A.   Yes.
119: 2      Q.   There's prostaglandins, thromboxanes
119: 3 and -- I can't pronounce that last word --
119: 4 leukotrines?
```

ES 11911      119:11-119:20

```
119:11      A.   "Prostaglandins, Thromboxanes and
119:12 Leukotrines."
119:13      Q.   Trines.  Okay.  I'd like to go back to
119:14 2664.
119:15           We've already covered some of this, but
119:16 there's a reason for me doing this in this context.
119:17           If you look at the last sentence of
119:18 the -- well, if you'll just read the first paragraph
119:19 to yourself, please.
119:20      A.   The first paragraph?
```

ES 11924      119:24-121:17

```
119:24      A.   I've completed reading that paragraph.
119:25      Q.   And that paragraph ends with something
120: Page 120
120: 1 we've already discussed, and that is that
120: 2 prostaglandins or  -- excuse me.  Thromboxane A2 is a
120: 3 potent platelet aggregator and vasoconstrictor and is
120: 4 synthesized primarily in the platelets or by the
120: 5 platelet?
120: 6      A.   That's correct.
120: 7      Q.   Okay.
120: 8      A.   That's what the paragraph says.
120: 9      Q.   And that is a correct -- it would be a
120:10 correct statement to say thromboxane is a potent
120:11 platelet aggregator, independently of the rest of it.
120:12 Correct?
120:13      A.   That would be correct.
120:14      Q.   It would be correct to say independently
120:15 of this statement that thromboxane A2 is a potent
120:16 vasoconstrictor as well.  Correct?
120:17      A.   I can't attest to its potency as a
120:18 vasoconstrictor.  It is a vasoconstrictor.
120:19      Q.   Okay.
120:20      A.   And since 1992, there are many other
120:21 vasoconstrictors and vasodilators, and I don't know,
120:22 today, whether thromboxane A2 would be characterized
120:23 exactly that way, so --
120:24      Q.   We're going to get to that in just a
120:25 bit.
121: Page 121
121: 1           At the bottom of the -- at the bottom of
121: 2 the page going one, two, three, four lines up, and
```

```
121: 3 one word with the sentence that starts with "This."
121: 4          Now, you can read the whole section if
121: 5 you'd like.  I don't want to take things out of
121: 6 context, but I don't want to --
121: 7     A.    Do you want me to read that?
121: 8     Q.    Yes.  You don't have to read it out
121: 9 loud, but I just want you -- if you want to read the
121:10 whole "Hematologic Effects" section so we know in
121:11 what context we're talking about.
121:12     A.    Okay.  I've read it.  Thank you.
121:13     Q.    Okay.
121:14          Would it be fair to say that that short
121:15 section describes the relationship that prostacyclin
121:16 and thromboxane A2 play in both platelet aggregation
121:17 and in vasoconstriction?
```

ES 12124      121:24-122:20

```
121:24     A.    The paragraph describes a relationship
121:25 between thromboxane A2 and prostacyclin, yes.
122: Page 122
122: 1     Q.    Okay.  And vasoconstriction and platelet
122: 2 aggregation?
122: 3     A.    That's what the paragraph discusses,
122: 4 yes.
122: 5     Q.    In lay terms, what is platelet
122: 6 aggregation?
122: 7     A.    Platelet aggregation is the clumping
122: 8 together of platelets, in -- an early step in the
122: 9 formation of clots.
122:10     Q.    Okay.
122:11     A.    It can be reversible.  It cannot be
122:12 reversible.
122:13     Q.    Okay.
122:14          What is vasoconstriction in lay terms?
122:15     A.    Vasoconstriction, in lay terms, is
122:16 narrowing of small -- usually, small vessels in the
122:17 arterial tree.
122:18          That would be generally what
122:19 vasoconstriction would mean.  It can also apply to
122:20 veins.
```

D ES 12221      122:21-123:1

```
122:21     Q.    Okay.
122:22          What is -- well, could the -- and this
122:23 is -- let me -- the relationship between platelet
122:24 aggregation and vasoconstriction is -- plays an
122:25 important role in hemodynamic -- in hemodynamic
123: Page 123
123: 1 integrity.  Correct?
```

D ES 12304      123:4-123:10

```
123: 4     A.    I'm not sure that I would describe it
123: 5 exactly that way, no.
123: 6     Q.    Okay.
123: 7          If you have platelet aggregation coupled
123: 8 with vasoconstriction, would you agree with me that
123: 9 the likelihood of an occlusive event, be it a heart
```

123:10 attack or a stroke, is greater?

D ES 12313      123:13-123:17

123:13      A.      I wouldn't be able to draw any
123:14 conclusion about what was going on in a given animal
123:15 or a person's vascular tree based on just those two
123:16 comments.
123:17      I think that's too incomplete.

ES 12318      123:18-124:13

123:18      Q.      Well, there are many factors that can go
123:19 into whether a person has a stroke or a heart attack,
123:20 and I understand that.
123:21      What we're talking about, when we talk
123:22 about platelet aggregation, we're talking about the
123:23 beginning of platelets clumping together to form a
123:24 clot.
123:25      Correct?
124: Page 124
124: 1      A.      That's correct.
124: 2      Q.      And vasoconstriction is the inability of
124: 3 an artery or a vein to expand, but instead stay
124: 4 constricted or become smaller.  Right?
124: 5      A.      That is also correct.
124: 6      Q.      And there are enzymes within our body
124: 7 that regulate the dilation or the constriction of
124: 8 arteries and veins?
124: 9      A.      There are many enzymes and hormones that
124:10 regulate that process, in addition to, included in
124:11 that group are thromboxane and prostacyclins.
124:12      There are many other factors that affect
124:13 that process.

D ES 12414      124:14-124:16

124:14      Q.      There are, and that's not -- I'm not
124:15 here to argue that point with you.
124:16      A.      Right.

ES 12417      124:17-124:20

124:17      Q.      But we do know that thromboxane A2 and
124:18 prostacyclin affect vasoconstriction and platelet
124:19 aggregation?
124:20      A.      That's correct.

ES 12501      125:1-125:10

125: 1      Let me show you what I'm going to mark
125: 2 as Deposition Exhibit Number 4, and I'm going to make
125: 3 my same representation.
125: 4      This is The Merck Manual, Seventeenth
125: 5 Edition, which was published, by the second page of
125: 6 that exhibit, in 1999, and you can flip through and
125: 7 review all of the pages if you'd like.  It has the
125: 8 same general foreword, although somewhat cut, but I
125: 9 want to draw your -- ultimately draw your attention
125:10 to the last page of that exhibit.

ES 12608      126:8-126:15

126: 8      Q.      If you look at that index at page 2818
126: 9 with me, and you may want to, just for your own
126:10 benefit, have the Sixteenth Edition at hand if you'd
126:11 like.
126:12              But if -- and I'll represent to you that
126:13 this -- that I went back to the -- if you look at the
126:14 Sixteenth Edition side by side, the last page of the
126:15 document --

D ES 12616      126:16-126:18

126:16      A.      The very last page that you've stapled
126:17 together?
126:18      Q.      Yes.  The index.

ES 12623      126:23-127:1

126:23              On the Sixteenth Edition, page 2834,
126:24 between thrombotic, thrombocytopenic purpura and
126:25 thrush is where you find thromboxane discussed.
127: Page 127
127: 1 Correct?

ES 12711      127:11-127:18

127:11      A.      Yes, it appears in the alphabetical
127:12 listing in the index --
127:13      Q.      Okay.
127:14      A.      Between thrombotic thrombocytic purpura
127:15 and thrush.
127:16      Q.      And in the Seventeenth Edition, between
127:17 thrombotic, thrombocytopenic purpura and thrush, what
127:18 is -- is there an entry for thromboxanes?

ES 12722      127:22-128:19

127:22      A.      The index in the Seventeenth Edition has
127:23 thrombotic thrombocytopenic purpura-hemolytic-uremic
127:24 syndrome, glomerulonephritis and then thrush.
127:25              I see no comment on this page about
128: Page 128
128: 1 thromboxane.
128: 2      Q.      Between the publication of the Sixteenth
128: 3 Edition in 1992 and the publication of the
128: 4 Seventeenth Edition in 1999, was there any
128: 5 ground-breaking research that was done with regard to
128: 6 whether or not thromboxane was a potent
128: 7 vasoconstrictor and vasodilator -- or excuse me --
128: 8 vasoconstrictor and platelet aggregator?
128: 9      A.      I can't answer your question.
128:10      Q.      All right.
128:11      A.      I don't know.
128:12      Q.      It's my understanding, correct me if I'm
128:13 wrong, from the FDA regs that govern how
128:14 pharmaceutical companies -- I'm not trying to make a
128:15 legal statement here, but it's my understanding that
128:16 it's the obligation of the company to keep up with

```
128:17 the medical literature that impacts upon the drugs
128:18 that your company markets and manufactures.
128:19             Is that a generalization?
```

ES 12903      129:3-129:19

```
129: 3       A.     I can't answer your question.   I
129: 4 would -- I would make the comment that the page in
129: 5 the Seventeenth Edition that is not handed out here
129: 6 by you is the page in the Sixteenth Edition, which
129: 7 goes through the many external peer reviews that the
129: 8 Sixteenth Edition went through.
129: 9             To the best of my knowledge, The Merck
129:10 Manual is still peer-reviewed by many external
129:11 experts.
129:12       Q.     Oh, I -- that wasn't my question.
129:13       A.     It's not simply published by Merck &
129:14 Company.   It's reviewed by external experts, as you
129:15 so nicely pointed out in the Sixteenth Edition.
129:16       Q.     Certainly.   I'm trying to point out
129:17 though, and I'm just trying to find out, there's
129:18 obviously a reason why the prostacyclin thromboxane
129:19 section was removed between 1992 and 1999 --
```

ES 13004      130:4-130:10

```
130: 4       Q.     There was a reason why it was pulled.
130: 5 Whether it had anything to do with Vioxx or not, I
130: 6 don't know, but I want to know is, are you aware of
130: 7 any -- of any research, ground-breaking research that
130: 8 would change the correctness of what is stated in the
130: 9 Sixteenth Edition about thromboxanes and
130:10 prostacyclins and prostaglandins?
```

ES 13016      130:16-131:12

```
130:16       A.     The only answer that I can give you to
130:17 the general question you've asked about, but not the
130:18 way you've phrased the question, is that to the best
130:19 of my recollection, very, very little research or
130:20 attention in the medical literature has been paid to
130:21 thromboxane and prostacyclin since the mid-'80s and
130:22 early '90s.
130:23             In fact, probably very -- I would -- I
130:24 don't know for certain, but I believe that the topic
130:25 had received very little attention between 1992 and
131: Page 131
131: 1 1999 in the medical literature.
131: 2       Q.     Okay.
131: 3       A.     Because its importance was not clear in
131: 4 the medical literature.
131: 5       Q.     Okay.
131: 6       A.     And --
131: 7       Q.     Would you --
131: 8       A.     And in your terms, no new discoveries
131: 9 had been made which gave it prominence.
131:10       Q.     Right.   I understand.
131:11             Do you believe that that's the reason
131:12 why it was removed from the Sixteenth Edition?
```

ES 13115      131:15-132:2

131:15      A.      I have no idea why it was removed from
131:16 the Seventeenth Edition compared to the Sixteenth
131:17 Edition index.
131:18      Q.      Okay.
131:19      A.      I have no idea why it was removed.
131:20      Q.      Okay.
131:21      A.      I have never heard anything about why it
131:22 was removed.
131:23      Q.      Okay.
131:24              But you would agree with the accuracy of
131:25 the statements of what thromboxane and prostacyclin
132: Page 132
132: 1 are, and what they do in our vascular system as it is
132: 2 stated briefly in the Sixteenth Edition?

ES 13206      132:6-132:7

132: 6      A.      My comments earlier on that paragraph
132: 7 remain accurate.

ES 13301      133:1-133:8

133: 1              I want you to just review it to
133: 2 yourself, and I want to make sure that we can agree
133: 3 that the book that's published by Merck & Company
133: 4 that we're looking at, or the portion that we're
133: 5 looking at, is factually and scientifically accurate,
133: 6 although it may be brief and there may be other
133: 7 exquisite points that we haven't discussed, but what
133: 8 is stated is accurate.

ES 13310      133:10-134:23

133:10      A.      What I would answer to your question is
133:11 the paragraph that you and I discussed together
133:12 beginning with the words "Following" and where the
133:13 word "thromboxane" and "PGI" are discussed is a
133:14 generally accurate paragraph.
133:15      Q.      What about the preceding paragraph that
133:16 starts with "PGI 1"?
133:17              Is that a generally accurate paragraph?
133:18      A.      The paragraph before that begins with
133:19 "PGE-1"?
133:20      Q.      "PGE-1," the first paragraph below
133:21 "Hematologic Effects."
133:22      A.      Yes.
133:23      Q.      Is that a generally accurate paragraph?
133:24      A.      I think, in 1992, this was generally
133:25 true.
134: Page 134
134: 1              I'm not sure every word in the paragraph
134: 2 is accurate, but it's generally true.
134: 3      Q.      Okay.  And, in 1992, Naproxen was being
134: 4 used -- was widely used as an NSAID, was it not?
134: 5      A.      I think Naproxen was available.  I -- I
134: 6 don't know exactly how widely used it was.  It was
134: 7 certainly used as an NSAID.
134: 8      Q.      Fair enough.

```
134: 9              In the bottom or the last paragraph
134:10 three lines up states: "Low-dose aspirin
134:11 administration, 81 to 325 milligrams, is widely used
134:12 for preventive therapy in patients with angina,
134:13 post-myocardial infarction or stroke and in patients
134:14 with incipient risks for these catastrophes --"
134:15      A.     Yes.
134:16      Q.     "-- abnormal plasma, lipid, smokers,
134:17 positive family history," et cetera.  Correct?
134:18      A.     That is correct.
134:19      Q.     Okay.
134:20              And in 1992, when The Merck Manual was
134:21 published, it didn't want to tell anybody -- it
134:22 didn't publish to the world that aspirin and Naproxen
134:23 are used for that prophylactic purpose?
```

ES 13425      134:25-135:2

```
134:25      A.     There's no commentary about Naproxen in
135: Page 135
135: 1 this paragraph in the 1992 edition of The Merck
135: 2 Manual.  There is a commentary on aspirin.
```


Scolnick Part 1 (3-22-05) (Multi-clip)
Scolnick 1505      15:5-15:7

```
15: 5      Q.     Are you Dr. Ed Scolnick?
15: 6      A.     Yes, I'm Dr. Edward
15: 7   Scolnick.
```

Scolnick 2213      22:13-22:18

```
22:13      Q.     Are you the Edward M.
22:14 Scolnick, President of Merck Research
22:15 Labs and then the Executive Vice
22:16 President Science and Technology for
22:17 Merck & Company?
22:18      A.     Yes, I am.
```

Scolnick 47.2-48.2      47:2-48:2

```
47: 2      Q.     Well, let me suggest it to
47: 3 you if you'll look at Exhibit Number 4.
47: 4              I'll bet you've seen this
47: 5 e-mail lately getting ready for your
47: 6 deposition, haven't you?
47: 7      A.     I don't recall seeing this
47: 8 e-mail before right now.
47: 9      Q.     You don't recall seeing this
47:10 e-mail before?
47:11      A.     I do not recall seeing this
47:12 e-mail before.
47:13      Q.     All right.  Well, if you'll
47:14 look down at your message dated December
47:15 5th, 2001, it's about an analyst who is
47:16 going to stand up in public and say
47:17 something negative about Vioxx.  And
47:18 you're the fellow who wrote, "David if he
47:19 says this I will boil him in oil at the
```

```
47:20   meeting." That's what you said, isn't
47:21   it?
47:22           A.    That is the e-mail you're
47:23   referring to, yes.
47:24           Q.    Does that mean, yes, you
47:ESQUIRE DEPOSITION SERVICES
48: 48
48: 1   said it?
48: 2           A.    That is my e-mail.
```

Scolnick 49.1-49.10        49:1-49:10

```
49: 1                   So, you were saying you were
49: 2   going to boil this fellow in oil because
49: 3   this was an analyst who was going to
49: 4   stand up and suggest that maybe Vioxx
49: 5   causes CV events, heart attacks, strokes,
49: 6   things like that; right?
49: 7           A.    I don't recall the details
49: 8   of his report.  I have not seen this
49: 9   e-mail, and I don't recall the details of
49:10   this at all.
```

Scolnick 52.2-52.21        52:2-52:21

```
52: 2           Q.    Well, if you'll look behind
52: 3   you'll see what it is that upset you.
52: 4   It was this fellow named somebody, hang
52: 5   on, his name is at the end, Richard
52: 6   Stover, who prepared a reanalysis of
52: 7   Merck's meta-analysis.  Do you see where
52: 8   it says that?
52: 9           A.    That is the title for the
52:10   article that you're referring to.
52:11           Q.    Now, those are a lot of big
52:12   words for nonscientist people.  But just
52:13   between you and me, what this really is
52:14   is it's a stock analyst, someone who
52:15   advises the investment community on
52:16   whether to buy or sell stock, and he's
52:17   basically examining some of what you guys
52:18   had been telling people about the safety
52:19   of your drug, isn't he?
52:20           A.    He's talking about the VIGOR
52:21   study and Vioxx, yes.
```

Scolnick 58.17-58.24        58:17-58:24

```
58:17           Q.    Okay.  And that's why you
58:18   said "David if he says this I will boil
58:19   him in oil at the meeting."  You didn't
58:20   want that kind of talk out there, did
58:21   you?
58:22           A.    I didn't want -- having read
58:23   this memo, I didn't want an inaccurate
58:24   statistical analysis of our data.
```

Scolnick 6803        68:3-68:4

```
68: 3           Q.    I want to show you Scolnick
```

```
68: 4     Exhibit Number 7.  We're going to come
```

Scolnick 6811     68:11-68:18

```
68:11           Q.    Do you see your June 1, 1998
68:12     e-mail?
68:13           A.    Yes, I do.
68:14           Q.    You did threaten to quit,
68:15     didn't you?
68:16           A.    I was upset with a
68:17     particular marketing person.  I was --
68:18     and that is the thrust of this e-mail.
```

Scolnick 69.01-69.15     69:1-69:15

```
69: 1           Q.    Well, when you said "If you
69: 2     lose I will leave, because I will not be
69: 3     able to have any respect for this
69: 4     company," that's threatening to quit,
69: 5     isn't it?
69: 6           A.    The e-mail is accurate.
69: 7           Q.    No.  That wasn't my
69: 8     question.
69: 9                 I said, when you say in your
69:10     e-mail, "If you lose I will leave,
69:11     because I will not be able to have any
69:12     respect for this company," you're
69:13     threatening to quit, aren't you?
69:14           A.    I accept that
69:15     interpretation.
```

Scolnick 069.23-070.12     69:23-70:12

```
69:23           Q.    You're saying "Merck
69:24     marketing for once has to compete and
69:ESQUIRE DEPOSITION SERVICES
70: 70
70: 1     win.  If you do not beat Pfizer," which
70: 2     is who Searle was at the time; right?  If
70: 3     you don't beat Celebrex, that's what it
70: 4     means; right?
70: 5           A.    Yes, that's correct.
70: 6           Q.    "If you do not beat PFIZER
70: 7     2/1 MERCK should throw in the towel and
70: 8     just give up and hand the company over to
70: 9     someone else.  If YOU," all capitals,
70:10     "lose I will leave, because I will not be
70:11     able to have any respect for this
70:12     company."  You didn't threaten them to
```

Scolnick 070.13-071.12     70:13-71:12

```
70:13     boil them in oil, but you were pretty
70:14     upset with them, weren't you?
70:15           A.    It is a pointed e-mail.
70:16           Q.    Because you were upset;
70:17     weren't you?
70:18           A.    That is correct.
70:19           Q.    You were upset also because
70:20     of some study issues, research issues;
```

```
70:21     weren't you?
70:22          A.     I don't recall what you're
70:23     referring to.
70:24          Q.     Look at what it says at the
70:ESQUIRE DEPOSITION SERVICES
71: 71
71: 1     start.  You're saying that the reason
71: 2     y'all were three months behind Searle,
71: 3     the reason you were losing the race is
71: 4     because people in marketing "demanded a
71: 5     label that said we cause no ulcers."
71: 6     And then the budgets were so high that
71: 7     nobody could get the money that they
71: 8     needed for the study.  And that's why
71: 9     y'all were behind?  That's what you say;
71:10     isn't it?
71:11          A.     That is what the memo says,
71:12     yes.
```

Scolnick 7807      78:7-78:12

```
78: 7          Q.     Bottom line is, you were
78: 8     saying marketing needs to stop their
78: 9     demands and just get out there and
78:10     compete and win for once; right?
78:11          A.     That's what my memo
78:12     indicates.
```

Scolnick 7906-7911      79:6-79:11

```
79: 6          Q.     Sir, y'all weren't ready to
79: 7     go to market with your product, with
79: 8     Vioxx, when Celebrex hit the market?
79: 9     Y'all got beat; right?
79:10          A.     Celebrex got to the market
79:11     first.  That is correct.
```

Scolnick 9623      96:23-97:5

```
96:23          Q.     Well, we looked at an
96:24     exhibit a few minutes ago, the 1998 one
96:ESQUIRE DEPOSITION SERVICES
97: 97
97: 1     where you said that y'all were killing
97: 2     basic research again at Merck, once
97: 3     again.  That's because y'all needed more
97: 4     money.  You didn't have enough money in
97: 5     the budget; right?
```

Scolnick 9803      98:3-98:9

```
98: 3          Q.     All right.  So, now you'll
98: 4     agree with me in 1998 y'all didn't have
98: 5     enough money in your budget to do all the
98: 6     research you wanted to do.  True?
98: 7          A.     That is true.  That is
98: 8     always true of any really productive
98: 9     research laboratory.
```

Scolnick 10113      101:12-101:20

```
101:12    BY MR. LANIER:
101:13        Q.    Well, sir, you weren't in
101:14    marketing yourself, were you?
101:15        A.    No.
101:16        Q.    Well, why did you keep
101:17    dabbling in the marketing end?  Why were
101:18    you sending broadside e-mails to people,
101:19    because y'all were too slow on the
101:20    marketing?
```

Scolnick 10123      101:23-102:3

```
101:23            THE WITNESS:  I was
101:24    competitive, and we had a terrific
101:ESQUIRE DEPOSITION SERVICES
102: 102
102: 1    drug, and I wanted the company to
102: 2    present that drug well to
102: 3    physicians.
```

Scolnick 11503      115:3-115:10

```
115: 3        Q.    So, you had all the
115: 4    resources you needed to do the right
115: 5    studies, and if the studies weren't done,
115: 6    it was your fault for not doing them
115: 7    because you had the money.  Is that what
115: 8    you're telling me?
115: 9        A.    We had sufficient resources
115:10    to study Vioxx.
```

Scolnick 11805      118:5-118:11

```
118: 5        Q.    If you thought that there
118: 6    was an issue that needed debunking, you
118: 7    certainly knew how to order to get a
118: 8    study immediately to debunk the issue and
118: 9    destroy credibility, didn't you?
118:10        A.    And to find out if we were
118:11    wrong.
```

Scolnick 11818      118:18-119:3

```
118:18        Q.    That wasn't my question,
118:19    sir.  I said, you could have done a
118:20    study, and you could have ordered one to
118:21    be done with speed on the issue of
118:22    cardiovascular problems, heart attacks
118:23    and strokes, couldn't you?
118:24        A.    There was no reason to do
118:ESQUIRE DEPOSITION SERVICES
119: 119
119: 1    such a study before Vioxx went to market
119: 2    based on all of the data, huge NDA, over
119: 3    5,000 patients studied.
```

Scolnick 11910      119:10-119:23

```
119:10    question.  My question is simple.  You
```

```
119:11   certainly could have ordered a study for
119:12   risks of heart attacks and strokes before
119:13   you put the Vioxx drug on the market,
119:14   couldn't you?
119:15           A.    If there had been a reason
119:16   to do that, I could have done that.
119:17           Q.    By the same token, any day
119:18   that Vioxx had been on the market, the
119:19   second it occurred to you that there
119:20   might be a problem with heart attacks and
119:21   strokes, you could have ordered
119:22   immediately a speed study to be done;
119:23   couldn't you?
```

Scolnick 12002     120:2-120:5

```
120: 2               THE WITNESS:  I could have
120: 3           asked or ordered a study to be
120: 4           done if I had thought there was a
120: 5           cardiovascular risk with Vioxx.
```

Scolnick 12023     120:23-121:23

```
120:23   to justify selling the drug.  I'm asking
120:24   you, did you ever order a specific study
120:ESQUIRE DEPOSITION SERVICES
121: 121
121: 1   about heart attacks and strokes?
121: 2           A.    I did not order a specific
121: 3   study.  I urged the group to come up with
121: 4   study designs after VIGOR to further
121: 5   examine the question that was raised by
121: 6   the VIGOR study.
121: 7           Q.    Well, sir, what about VALOR,
121: 8   did you have anything to do with talk
121: 9   about doing the VALOR study?
121:10           A.    VALOR?
121:11           Q.    Yes, sir.
121:12           A.    I don't recognize the term.
121:13   I'm sorry.
121:14           Q.    Did you know that your
121:15   company at one point contemplated and
121:16   actually went pretty far in designing the
121:17   idea of doing a study specifically to
121:18   look at heart attack, strokes, CV risks?
121:19           A.    Yes.  Several study designs
121:20   were considered.
121:21           Q.    And one of them had approval
121:22   and was about to be done when it was
121:23   cancelled.  Did you know that?
```

Scolnick 12201     122:1-122:3

```
122: 1               THE WITNESS:  One of the
122: 2           studies that I'm aware of was not
122: 3           given final approval.
```

Scolnick 12205     122:5-122:9

```
122: 5           Q.    Why not?
```

```
122: 6            A.    Because when the study was
122: 7    reviewed, several people objected to the
122: 8    design of the study, that it was not a
122: 9    good scientific study to do.
```

D ES  12210     122:10-122:15

```
122:10            Q.    So, you had the need for the
122:11    study, you just didn't design a good one.
122:12    Is that fair to say?
122:13            A.    We considered many study
122:14    designs before the approved design was
122:15    conceptualized.
```

Scolnick 12801     128:1-128:22

```
128: 1            Q.    Well, the truth is, the
128: 2    essential study that needed to be done
128: 3    for Vioxx was an outcomes study for heart
128: 4    attacks and strokes; right?
128: 5            A.    The study that would
128: 6    measure, as a predefined endpoint, heart
128: 7    attacks and strokes was an important
128: 8    study for Vioxx.
128: 9            Q.    Not an important.  It was,
128:10    at least in the world of things back in
128:11    2001, the only essential study for Vioxx,
128:12    wasn't it?
128:13            A.    It was an essential study to
128:14    do for Vioxx.
128:15            Q.    That wasn't my question.
128:16            The only essential study;
128:17    true?
128:18            A.    It wasn't the only essential
128:19    study to do.  It was --
128:20            Q.    That's what you said.
128:21            A.    It was a very important
128:22    study.
```

Scolnick 13609     136:9-136:12

```
136: 9            Q.    Well, certainly by the year
136:10    2000 you knew that there was an issue
136:11    about heart attacks and strokes, weren't
136:12    you?
```

Scolnick 13615     136:15-136:17

```
136:15            THE WITNESS:  The VIGOR
136:16    study was available in the year
136:17    2000.
```

Scolnick 14109     141:9-142:7

```
141: 9            MR. LANIER:  We're marking
141:10    that as Exhibit Number 13.
141:11    BY MR. LANIER:
141:12            Q.    If you'll look down at the
141:13    third question, that's the one I want you
141:14    to look at.
```

```
141:15        A.    Uh-huh.
141:16        Q.    "Why did Merck undertake
141:17   the," APPROVe, "trial?"
141:18        A.    Uh-huh.
141:19        Q.    Merck prepared an answer to
141:20   that. Nowhere in that answer does it say
141:21   to see if people are having heart attacks
141:22   and strokes, does it?
141:23        A.    The answer to the question
141:24   does not refer to the cardiovascular
141:ESQUIRE DEPOSITION SERVICES
142: 142
142: 1   outcome part of the study.
142: 2        Q.    I'm sorry.  That's a long
142: 3   answer. Are you just saying, yes, you're
142: 4   right, it doesn't say heart attacks and
142: 5   strokes?
142: 6        A.    There's nothing about heart
142: 7   attacks and strokes in that answer.
```

Scolnick 14602    146:2-146:5

```
146: 2              You, Dr. Scolnick, knew
146: 3   Vioxx was causing heart attacks and
146: 4   strokes by the time of March 2000; true?
146: 5        A.    Not true.
```

D ES  14606    146:6-146:10

```
146: 6        Q.    Well, we at least know that
146: 7   you're getting reports of it, that you're
146: 8   having summarized out of thousands of
146: 9   reports, right, Exhibit 10?
146:10        A.    Again, I've --
```

D ES  14613    146:13-147:4

```
146:13              THE WITNESS: -- tried to
146:14              explain to you the fact that when
146:15              a drug goes on the market, adverse
146:16              experience reports are reported on
146:17              every drug, including Vioxx.  And
146:18              the challenge for analyzing those
146:19              reports is to try to figure out
146:20              whether they're happening by
146:21              chance associated with the drug or
146:22              whether the drug is actually
146:23              causing the adverse experiences
146:24              reported in the reports.
146:ESQUIRE DEPOSITION SERVICES
147: 147
147: 1              And we did this -- we did
147: 2              this routinely and very, very
147: 3              carefully for every drug we ever
147: 4              brought on the market.
```

Scolnick 14707    147:7-147:12

```
147: 7   jury, as of March 2000, you, Edward
147: 8   Scolnick, knew that the CV events, the
```

```
147: 9    heart attacks and strokes, were clearly
147:10    there, and you, Edward Scolnick, knew
147:11    that they were mechanism-based with
147:12    Vioxx?
```

Scolnick 14716     147:16-147:21

```
147:16         Q.    True?
147:17         A.    That was my very first
147:18    reaction when I saw the data from the
147:19    VIGOR trial.
147:20         Q.    You knew it from the get-go.
147:21    It was your first reaction; right?
```

Scolnick 14724     147:24-148:2

```
147:24             THE WITNESS:  It was my
147:ESQUIRE DEPOSITION SERVICES
148: 148
148: 1         first reaction before other data
148: 2         was available.
```

Scolnick 14817     148:17-148:24

```
148:17         Q.    Sir, it is in March of 2000;
148:18    isn't it?
148:19         A.    Yes, it is.
148:20         Q.    And you said to everybody,
148:21    Alan Nies, Alise Reicin and Deborah
148:22    Shapiro certain things, didn't you?
148:23         A.    I did.  It says, "I just
148:24    received and went through the data."
```

Scolnick 14908     149:8-150:2

```
149: 8         Q.    And you don't step out and
149: 9    say something unless you know it's true
149:10    and right.  Do you remember that?
149:11         A.    I don't remember saying what
149:12    you've just quoted me as saying.
149:13         Q.    I think your exact words
149:14    were, you hold yourself to a very high
149:15    standard.  Do you remember that?
149:16         A.    Yes, I do remember that.
149:17         Q.    And so you sent this e-mail
149:18    to everybody, and you said that you
149:19    received and you went through the data;
149:20    right?
149:21         A.    Uh-huh.  That's what it
149:22    says.
149:23         Q.    And I'm sure you did that
149:24    thoroughly.  You didn't do a half slop
149:ESQUIRE DEPOSITION SERVICES
150: 150
150: 1    job; did you?
150: 2         A.    I don't think so.
```

Scolnick 15105     151:5-151:12

```
151: 5             THE WITNESS:  Excuse me.  If
```

```
151: 6              I can just look at the memo for
151: 7          one second.  "Pubs" in this
151: 8          context is talking about
151: 9          perforations, ulcers and bleeds
151:10          associated with the study.
151:11   BY MR. LANIER:
151:12          Q.    Okay.  Thank you.
```

Scolnick 15113    151:13-151:22

```
151:13              "There is no doubt about
151:14   the" perforations, ulcers and bleeds
151:15   "data."  Then look at your next sentence.
151:16   "The CV events are," what's that word?
151:17          A.    The sentence reads, "The
151:18   cardiovascular events are clearly there."
151:19          Q.    They're clearly there.  That
151:20   was your choice of words; wasn't it?
151:21          A.    This is my e-mail.  That is
151:22   correct.
```

Scolnick 15123    151:23-152:16

```
151:23          Q.    So, after you studied the
151:24   data, you went through it, you sent a
151:ESQUIRE DEPOSITION SERVICES
152: 152
152: 1   memo out to everybody, even though you
152: 2   hold yourself to a high standard, telling
152: 3   everybody that the CV events are clearly
152: 4   there, and that was March of 2000, wasn't
152: 5   it?
152: 6          A.    Yes, it is.
152: 7          Q.    And you never sent out an
152: 8   order at that point in time for a CV
152: 9   outcomes study, did you?
152:10          A.    We -- I did not send out an
152:11   order for a CV outcomes study.  We took
152:12   many immediate actions to try to
152:13   understand the cardiovascular events,
152:14   since we couldn't conclude what was going
152:15   on in the trial because there was no
152:16   placebo in the trial.
```

Scolnick 15607    156:7-156:10

```
156: 7              1999, I wrote, "Push Vioxx
156: 8   to market by May 22nd or" Merck will be
156: 9   "'a different company.'"  That's what you
156:10   said in 1999; right?
```

Scolnick 15613    156:13-156:19

```
156:13              THE WITNESS:  It accurately
156:14          reflects our earlier discussion.
156:15   BY MR. LANIER:
156:16          Q.    Then also in 1999 you sent
156:17   out the e-mail that said if we can't beat
156:18   Celebrex two to one, you're going to quit
156:19   or leave the company.  True?
```

Scolnick 156.21-156.23        156:21-156:23

```
156:21              THE WITNESS:  You reflected
156:22          my e-mail and some of my
156:23          sentiments in that e-mail.
```

Scolnick 157.10-157.14        157:10-157:14

```
157:10              The drug Vioxx did go to
157:11      market in 1999, and y'all marketed it
157:12      before the VIGOR study was finished;
157:13      true?
157:14          A.    Yes, that's correct.
```

D ES   15715      157:15-158:14

```
157:15          Q.    You couldn't afford to wait
157:16      for that VIGOR study to get done; could
157:17      you?
157:18          A.    No, that's not true.  That
157:19      was a study that was planned for being
157:20      done after the drug was approved and was
157:21      going to provide additional data about
157:22      gastrointestinal safety for the drug.
157:23          Q.    But, sir, the VIGOR study,
157:24      you could not afford to wait until it was
157:ESQUIRE DEPOSITION SERVICES
158: 158
158: 1      over to market your drug, because if you
158: 2      waited, Merck would be a different
158: 3      company.  You never would have made May
158: 4      22nd of '99; right?
158: 5          A.    The VIGOR study was not
158: 6      required to market the drug.
158: 7          Q.    I'm not asking did the FDA
158: 8      require it.  I'm talking about, did you
158: 9      market the drug before you got the VIGOR
158:10      results in?
158:11          A.    Yes, we did.  The VIGOR
158:12      trial was never planned as part of the
158:13      very large NDA for the initial approval
158:14      of Vioxx.
```

D ES   15918      159:18-159:20

```
159:18          Q.    Then also in the year 2000,
159:19      you never ordered or had done a CV
159:20      specific study; true?
```

D ES   15923      159:23-160:6

```
159:23              THE WITNESS:  We
159:24          immediately, upon having the VIGOR
159:ESQUIRE DEPOSITION SERVICES
160: 160
160: 1      results, did many additional data
160: 2      analyses on studies that we had to
160: 3      try to interpret the meaning of
160: 4      the VIGOR results.  And we did, in
```

```
160: 5          the end, come up with a study to
160: 6          measure cardiovascular outcomes.
```

Scolnick 16010      160:10-160:13

```
160:10          Q.    I said, very simple
160:11  question, sir.  It's a simple note.
160:12  2000, you never did a CV specific study;
160:13  true?
```

Scolnick 16016      160:16-160:23

```
160:16              THE WITNESS:  We did not do
160:17  a study where cardiovascular
160:18  outcomes were a primary endpoint.
160:19  We did do a study where
160:20  cardiovascular outcomes were a
160:21  predefined endpoint in our studies
160:22  to gather additional
160:23  cardiovascular outcomes data.
```

Scolnick 16120      161:20-161:23

```
161:20          Q.    Okay.  That's my point.  So,
161:21  you never did, never, one single study
161:22  where the primary outcome was, does it
161:23  cause heart attacks or strokes; right?
```

Scolnick 16202      162:2-162:3

```
162: 2              THE WITNESS:  You're
162: 3          correct.
```

Scolnick 16223      162:23-163:8

```
162:23          Q.    Sir, simple question.  Did
162:24  you change your warning label and tell
162:ESQUIRE DEPOSITION SERVICES
163: 163
163: 1  people about the VIGOR results in the
163: 2  year 2000?  Yes or no?
163: 3          A.    We told people about the
163: 4  VIGOR results immediately after they
163: 5  became available to us.
163: 6          Q.    Okay.
163: 7          A.    And we submitted an NDA to
163: 8  the FDA to change our label.
```

Scolnick 22606      226:6-226:10

```
226: 6          Q.    Do you have Exhibit 18 in
226: 7  front of you?
226: 8          A.    Yes, I do.
226: 9          Q.    It's the day before your "to
226:10  do" list, isn't it, the 13th?
```

Scolnick 22615      226:15-226:17

```
226:15              THE WITNESS:  Yes.  It's the
226:16          day before this memo on the "to
```

```
226:17          do" list.
```

Scolnick 22707     227:7-227:9

```
227: 7              Q.   Four days away from your
227: 8   initial conclusion that Vioxx was causing
227: 9   heart attacks and strokes; right?
```

Scolnick 22711     227:11-228:14

```
227:11              THE WITNESS:  Four days from
227:12          my initial memo with my initial
227:13          conclusion, yes.
227:14   BY MR. LANIER:
227:15          Q.   All right.
227:16              Now, already by four days
227:17   later, you have got Ms. Reicin scouring
227:18   the medical literature trying to find a
227:19   study somewhere that indicates that
227:20   NSAIDs helped your heart; right?
227:21          A.   That was one of the
227:22   questions that I asked the team when they
227:23   suggested that NSAIDs could be
227:24   cardioprotective.
227:ESQUIRE DEPOSITION SERVICES
228: 228
228: 1          Q.   And the only study she was
228: 2   able to find -- by the way, it is
228: 3   singular, there was only one study she
228: 4   could find; true?
228: 5          A.   That's what the e-mail says,
228: 6   yes.
228: 7          Q.   In fact, why don't you read
228: 8   that sentence where I've highlighted
228: 9   "Only study."
228:10          A.   "Alan and Ed:  Below is
228:11   attached the abstract from the only study
228:12   I could find which assessed the potential
228:13   cardioprotective effects of an NSAID.
228:14   Alise."
```

Scolnick 22902     229:2-229:8

```
229: 2          Q.   Did it occur to you that
229: 3   people were taking the drug that could be
229: 4   having these heart attacks, or is that
229: 5   what you meant when you said it's sad or
229: 6   it's a shame, but it's a low incidence,
229: 7   you just didn't figure there would be
229: 8   that many of them?
```

Scolnick 22911     229:11-229:19

```
229:11              THE WITNESS:  As I've
229:12          stated, my initial conclusion was
229:13          that Vioxx was causing heart
229:14          attacks in patients.  After
229:15          discussions of this article and
229:16          extensive other data that we had
229:17          available to ourselves in our own
```

```
229:18          trials, I concluded that I was not
229:19          correct in my initial conclusion.
```

Scolnick 23021    230:21-230:23

```
230:21          Q.    I'm going to hand you a
230:22   document marked Exhibit 19.  Do you have
230:23   it in front of you?
```

Scolnick 23120    231:20-233:5

```
231:20          Q.    First of all, this
231:21   well-respected Carlo Patrono said that he
231:22   does not think that you can attribute the
231:23   increase in heart attacks and strokes to
231:24   the fact that the other people were
231:ESQUIRE DEPOSITION SERVICES
232: 232
232: 1   taking naproxen, and it must be good for
232: 2   your heart.  Fair to say?
232: 3          A.    That's what he writes, yes.
232: 4   That's what the person reflects on his
232: 5   comments.
232: 6          Q.    And then there are a number
232: 7   of reasons given why it can't be that
232: 8   naproxen is good; right?
232: 9          A.    What it says is, he
232:10   questions whether the magnitude of the
232:11   effects seen in VIGOR is consistent with
232:12   naproxen being cardioprotective.
232:13          Q.    Well, he said, first of all,
232:14   "There is a weak pharmacological basis."
232:15   Do you see where it said that?
232:16          A.    Yes, I do.
232:17          Q.    What that means to you and
232:18   me and folks who read this stuff more
232:19   than we probably should is that there's
232:20   really not a good medical science
232:21   pharmacy reason for saying it's naproxen.
232:22   That's what that means, doesn't it?
232:23          A.    It refers to the
232:24   pharmacology of the drug, and that's his
232:ESQUIRE DEPOSITION SERVICES
233: 233
233: 1   interpretation.
233: 2          Q.    And then it says, "No
233: 3   epidemiological evidence."  Do you see
233: 4   where it says that?
233: 5          A.    Yes, I do.
```

Scolnick 23314    233:14-234:3

```
233:14          Q.    Well, do you see the word
233:15   "no"?
233:16          A.    I do see that.
233:17          Q.    How many are there, if it
233:18   says there's no evidence?  How much
233:19   evidence is there?
233:20          A.    I see his comment.  I don't
233:21   know the details of his review that he
```

```
233:22    refers to here.
233:23              Q.    Well, when he says there's
233:24    no evidence, don't you think that means
233:ESQUIRE DEPOSITION SERVICES
234: 234
234: 1    zero?
234: 2              A.    I think that's a plausible
234: 3    explanation, yes.
```

Scolnick 23404     234:4-234:18

```
234: 4              Q.    Otherwise you think he'd use
234: 5    the word "some" or "a little" or "few" or
234: 6    "lots"?
234: 7              A.    He's talking about
234: 8    conventional nonsteroidals as part of his
234: 9    sentence.  And we actually agree with
234:10    that except for naproxen.
234:11             Q.    So, but you agree with the
234:12    statement even for naproxen, that there's
234:13    no epidemiological evidence that naproxen
234:14    is safe; right?  I mean, not safe, good
234:15    for the heart?
234:16             A.    There had been no prior data
234:17    to suggest that naproxen was
234:18    cardioprotective.
```

Scolnick 23420     234:20-235:5

```
234:20    next sentence.  He says, "Additionally"
234:21    which I guess means another reason, yet
234:22    another reason; right?
234:23             A.    Yes.
234:24             Q.    "Additionally the magnitude
234:ESQUIRE DEPOSITION SERVICES
235: 235
235: 1    of the effect," in other words, how many
235: 2    more heart attacks you were causing,
235: 3    "would not be plausible even if" you'd
235: 4    been comparing it to aspirin.  He says
235: 5    that; doesn't he?
```

Scolnick 23507     235:7-235:17

```
235: 7                   THE WITNESS:  He talks about
235: 8    the aspirin, yes, the comparator
235: 9    to aspirin.
235:10    BY MR. LANIER:
235:11             Q.    He says, "In fact,
235:12    in...three different trials, aspirin has
235:13    shown no effect on the primary prevention
235:14    of stroke, while we have seen a 50% lower
235:15    incidence of stroke in the naproxen arm
235:16    of VIGOR"; right?
235:17             A.    That's what he says.
```

Scolnick 23613     236:13-236:23

```
236:13             Q.    Well, you were hoping
236:14    naproxen helped the heart just like
```

```
236:15    aspirin did; right?
236:16         A.    We weren't hoping anything.
236:17    We were concluding based on this study
236:18    that you've referred to and all the other
236:19    analysis versus placebo and other NSAIDs,
236:20    that except for this naproxen study,
236:21    there was no evidence for an imbalance of
236:22    cardiovascular events attributable to
236:23    Vioxx.
```

Scolnick 23703    237:3-237:7

```
237: 3         Q.    Sir, what y'all were putting
237: 4    forth there as an idea was that naproxen
237: 5    helps the heart just like aspirin does;
237: 6    right?
237: 7         A.    Or -- yes, that's correct.
```

D ES   23708    237:8-239:3

```
237: 8         Q.    But the truth be told, even
237: 9    aspirin, if you'd used aspirin, even
237:10    aspirin couldn't help the heart as much
237:11    as naproxen would have to to come up with
237:12    these results; right?
237:13         A.    Aspirin, to my knowledge,
237:14    had never been studied in this kind of
237:15    patient population.
237:16         Q.    That wasn't my question,
237:17    sir.
237:18               My point is, y'all had so
237:19    many more heart attacks and strokes in
237:20    your Vioxx group than the naproxen, that
237:21    if the real reason why is because
237:22    naproxen was helpful, that naproxen would
237:23    have to be two, three, four times better
237:24    for you than even aspirin; right?
237:ESQUIRE DEPOSITION SERVICES
238: 238
238: 1         A.    I can't conclude that.
238: 2    Aspirin has not been studied in patients
238: 3    with rheumatoid arthritis in this kind of
238: 4    trial.  There was no way to make that
238: 5    quantitative comparison.
238: 6         Q.    Well, naproxen hadn't been
238: 7    studied in any other trials to show that
238: 8    it was cardioprotective.  It never had
238: 9    been shown that in any of the testing
238:10    ever done; true?
238:11         A.    That is true, and I've tried
238:12    to explain to you why that study could
238:13    not have been done.
238:14         Q.    Well, sir, that study is
238:15    going to be an end result of every study
238:16    with naproxen.  You're always going to --
238:17    when you study naproxen, you're going to
238:18    compare the favorable outcomes on a
238:19    cardio basis with those that don't;
238:20    right?
238:21         A.    Not compared to placebo to
```

```
238:22    really be able to answer that question.
238:23         Q.    Fine.   Compared to other
238:24    NSAIDs; true?
238:ESQUIRE DEPOSITION SERVICES
239: 239
239: 1         A.    If naproxen had been studied
239: 2    that way, then some day it could have
239: 3    been achieved.
```

Scolnick 268.13-268.17      268:13-268:17

```
268:13         Q.    Just make sure we're on the
268:14    same page.  If we look at Exhibit 23, you
268:15    even sent a memo to this to the CEO and
268:16    to the president of Merck back in January
268:17    of 2001, didn't you?
```

Scolnick 26901a      269:1-269:21

```
269: 1         A.    Yes.
269: 2         Q.    You said you "want to point
269: 3    out to all of you at one time that, 1.
269: 4    there is no way to prove that in patients
269: 5    with rheumatoid arthritis that ALL of the
269: 6    difference between Vioxx and naproxen is
269: 7    due to the benefit of naproxen."  That's
269: 8    what you said, isn't it?
269: 9         A.    That's right.  And all is
269:10    capitalized.
269:11         Q.    And then you capitalize this
269:12    whole next phrase.  "IT IS IMPOSSIBLE TO
269:13    PROVE THIS."  Didn't you?
269:14         A.    That's what the e-mail says.
269:15         Q.    That's what you said, isn't
269:16    it?
269:17         A.    Yes, it is.  It is.
269:18         Q.    Then you capitalize for
269:19    emphasis this next sentence.  "IT IS
269:20    IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."
269:21         A.    That's exactly what I said.
```

Scolnick Part 2 (4-29-05) (Multi-clip)
Scolnick 1014      10:14-10:16

```
10:14         Q.    You retired from Merck Research Labs
10:15    in 2003; correct?
10:16         A.    That is correct.
```

Scolnick 2714a      27:14-27:17

```
27:14              In the late '80s and early '90s, you
27:15    were also the president of Merck Research Labs;
27:16    right?
27:17         A.    Yes.
```

Scolnick 2824      28:24-29:2

```
28:24         Q.    At that point in time you did have
28:25    some concerns about what the prospects would be for
```

28:ESQUIRE DEPOSITION SERVICES
29: Confidential - Subject to Protective Order  29
29: 1    Merck in the late '90s and 2000 as several drugs
29: 2    were coming off patent; right?

Scolnick 2904      29:4-29:6

29: 4              THE WITNESS:  I had concerns.  It was
29: 5    a way off, but, yes, I certainly remember vague
29: 6    thoughts about that.

Scolnick 2913      29:13-29:16

29:13              Q.        You have to anticipate that drugs
29:14    would be coming off patent maybe ten years down the
29:15    road and seek to have new drugs to fill the drugs
29:16    that were once proprietary of the company?

Scolnick 2918a      29:18-30:4

29:18              THE WITNESS:  That is correct.
29:19    BY MR. BUCHANAN:
29:20              Q.        Because once a drug becomes generic
29:21    or goes off patent, then other competitors can enter
29:22    the market and seek to take market share; correct?
29:23              A.        That's correct.
29:24              Q.        Okay.  So, in the early '90s you knew
29:25    that beginning in 2000 and 2001, Merck would have
29:ESQUIRE DEPOSITION SERVICES
30: Confidential - Subject to Protective Order  30
30: 1    several drugs going off patent; correct?
30: 2              A.        The one that comes to mind
30: 3    immediately is Mevacor, but I don't recall the other
30: 4    drugs at this point.

Scolnick 3213      32:13-33:20

32:13                        All these drugs were significant
32:14    drugs for Merck?
32:15              A.        Yes.
32:16              Q.        Several of these were blockbuster
32:17    drugs for Merck; right?
32:18              A.        They were large selling drugs, yes.
32:19              Q.        Well, "blockbuster" has a meaning or
32:20    a connotation in the industry, doesn't it?
32:21              A.        "Blockbuster" means usually a very
32:22    large drug, very large sales drug.
32:23              Q.        Traditionally it meant more than a
32:24    billion dollars in sales; true?
32:25              A.        That is one interpretation given to
32:ESQUIRE DEPOSITION SERVICES
33: Confidential - Subject to Protective Order  33
33: 1    it.
33: 2              Q.        So, several of these drugs were
33: 3    blockbuster drugs.  You'd agree with that?
33: 4              A.        Yes.
33: 5              Q.        Okay.
33: 6                        Several of these drugs, even if you
33: 7    can't remember all of them, were going off patent in
33: 8    2000, 2001, 2002; correct?

```
33: 9                A.      I'm not sure which ones, but some
33:10    drugs were going off patent at that point.
33:11                Q.      Well, you recall being concerned
33:12    about what the future will hold in 2000/2001 when
33:13    all these drugs were going off patent; correct?
33:14                A.      Yes.
33:15                Q.      You were concerned about that in the
33:16    early '90s?
33:17                A.      Yes.
33:18                Q.      And you were trying to design new
33:19    drugs to fill the void that would be left by these
33:20    drugs when they went off patent?
```

Scolnick 3324      33:24-33:25

```
33:24                THE WITNESS:  We were trying to
33:25    develop and discover new drugs that would do that.
```

Scolnick 3408a      34:8-34:17

```
34: 8                Q.      One of the drugs that was going to be
34: 9    filling the void left by these other drugs when they
34:10    went off patent was Vioxx; true?
34:11                A.      Vioxx was going to fill the void, but
34:12    in the early '90s, Vioxx -- I believe Vioxx was not
34:13    even on the Merck radar screen.  I don't even think
34:14    we had thought of the project at that point.  I
34:15    don't -- I don't recall the date when the Vioxx
34:16    project started.
34:17                                   -  -  -
```

Scolnick 3613a      36:13-36:18

```
36:13                Q.      There's a reference to Dr. Peppi
36:14    Prasit.  Do you see that?
36:15                A.      Dr. Peppi Prasit.
36:16                Q.      Prasit.  He was a scientist at your
36:17    labs in Montreal; correct?
36:18                A.      Yes, a chemist.
```

Scolnick 3711      37:11-37:18

```
37:11                Q.      You see the date referenced here.
37:12    It's July 1992; correct?
37:13                A.      Yes, I do.
37:14                Q.      Does that refresh your recollection
37:15    as to when Merck started considering investigating
37:16    selective NSAIDs?
37:17                A.      Yes, it does.  I had not recalled we
37:18    started this project this early.
```

Scolnick 4206      42:6-42:9

```
42: 6                So, you put a lot of resources within
42: 7    Merck Research Labs onto this particular project;
42: 8    correct?
42: 9                A.      Yes, that is correct.
```

Scolnick 43.11      43:11-43:19

```
43:11          Q.      And you encouraged Dr. Prasit and his
43:12   staff to pursue the Vioxx project with all resources
43:13   that were available at Merck Frosst; true?
43:14          A.      That is correct.
43:15          Q.      Okay.
43:16                  You knew how important this drug
43:17   could be for the company; right?
43:18          A.      I knew that this could be a very
43:19   important project, yes.
```

Scolnick 47.06     47:6-47:8

```
47: 6          Q.      You wanted to be the first to market
47: 7   with this selective COX-2 inhibitor; correct?
47: 8          A.      Yes.
```

Scolnick 8703     87:3-87:9

```
87: 3          Q.      All right, sir.  I want to get back
87: 4   to something.  I want to turn back to 1998.  I want
87: 5   to talk about the period prior to the time when
87: 6   Merck had Vioxx approved.  Okay?  Do you remember
87: 7   when Vioxx was approved?
87: 8          A.      I believe it was late 1999, middle of
87: 9   1999.
```

Scolnick 9806     98:6-98:10

```
98: 6                  For the record, it is an e-mail from
98: 7   you to a series of individuals, Alan Nies, Beth
98: 8   Seidenberg, Tom Simon, Robert Silverman.  Sir, are
98: 9   all of those people Merck employees?
98:10          A.      Yes, they were.
```

Scolnick 9922a     99:22-100:13

```
99:22          Q.      So, what you did here was you sent
99:23   these folks on your Vioxx development team and some
99:24   regulatory personnel an analyst report; correct?
99:25          A.      That appears to be correct.
99:ESQUIRE DEPOSITION SERVICES
100: Confidential - Subject to Protective Order 100
100: 1          Q.      Okay.
100: 2                  You sent it with high importance?
100: 3          A.      That's what it's marked.
100: 4          Q.      It was real important they saw this
100: 5   analyst report?
100: 6          A.      It's marked high importance.
100: 7          Q.      Do you make it a practice, sir, to
100: 8   send Wall Street analyst reports to employees who
100: 9   are on projects within Merck?
100:10          A.      I sent a variety of information to
100:11   them, sometimes analyst reports which had relevant
100:12   information, sometimes scientific articles.  I send
100:13   a variety of things to my employees.
```

Scolnick 11222     112:22-112:24

```
112:22                 So, it is, in fact, accurate to state
112:23   that in 1998 Merck had declining sales in several of
```

```
112:24        its key franchises; correct?
```

Scolnick 11301      113:1-113:13

```
113: 1                    THE WITNESS:  I've answered your
113: 2        question.
113: 3        BY MR. BUCHANAN:
113: 4             Q.        I would like you to answer that
113: 5        question, please.
113: 6             A.        Some of its franchises had declining
113: 7        sales.
113: 8             Q.        And they were key franchises?
113: 9             A.        And some of them were key.
113:10             Q.        Okay.
113:11                       You also had several drugs going off
113:12        patent in the near future; right?
113:13             A.        Correct.
```

D ES  11512      115:12-115:16

```
115:12             Q.        Well, when you sent this, were you
115:13        sending it as a scientist, sir?
115:14             A.        Yes, because it was in my capacity as
115:15        head of the research laboratories to these people
115:16        who reported to the research laboratories.
```

Scolnick 11517a      115:17-116:11

```
115:17             Q.        You thought it was important to tell
115:18        your employees that Merck's base business was
115:19        eroding?
115:20             A.        Yes.
115:21             Q.        You thought it was important to tell
115:22        them that Merck had several products going off
115:23        patent?
115:24             A.        They knew that.  This was to
115:25        reemphasize that.
115:ESQUIRE DEPOSITION SERVICES
116: Confidential - Subject to Protective Order 116
116: 1             Q.        You thought it was important to tell
116: 2        them that several of the recently launched products
116: 3        had not been as successful as anticipated?
116: 4             A.        I wanted to provide them the
116: 5        information in this document, yes, that's correct.
116: 6             Q.        You thought it was important to tell
116: 7        them that several of the recently launched products
116: 8        weren't as successful as you anticipated they'd be;
116: 9        right?
116:10             A.        That's what's in here, and I wanted
116:11        to provide them that information.
```

Scolnick 11718      117:18-118:3

```
117:18             Q.        They are the people who you would
117:19        hope would be able to facilitate a speedy approval
117:20        of your drug; correct?
117:21             A.        That is part of their responsibility.
117:22        Part of their jobs, yes.
117:23             Q.        And that's part of why you provided
117:24        this e-mail to them; right?
```

```
117:25              A.      Yes.
117:ESQUIRE DEPOSITION SERVICES
118: Confidential - Subject to Protective Order 118
118: 1              Q.          You wanted them to know how important
118: 2    it was that this drug proceed quickly through the
118: 3    regulatory approval process; right?
```

Scolnick 11806      118:6-118:9

```
118: 6                      THE WITNESS:  Yes.
118: 7    BY MR. BUCHANAN:
118: 8              Q.          It was essential to the financial
118: 9    success of the firm; right?
```

Scolnick 11811      118:11-118:18

```
118:11                      THE WITNESS:  It was essential to
118:12    Merck.  It was important to Merck, yes.
118:13    BY MR. BUCHANAN:
118:14              Q.      Okay.
118:15                      And, in fact, it was not only
118:16    essential, but Vioxx's success was necessary to
118:17    preserve Merck and Merck Research Labs period;
118:18    correct?
```

Scolnick 11821      118:21-118:22

```
118:21                      THE WITNESS:  That is what I said in
118:22    my e-mail.
```

Scolnick 11824      118:24-119:1

```
118:24              Q.      That's true; right?
118:25              A.      I believe it is an exaggeration, but
118:ESQUIRE DEPOSITION SERVICES
119: Confidential - Subject to Protective Order 119
119: 1    it has some truth.
```

Scolnick 12217      122:17-123:7

```
122:17                      Well, at this point in time, October
122:18    1998, what did you know about Vioxx's potential to
122:19    cause cardiovascular risks or cardiovascular
122:20    problems?
122:21              A.      I don't recall exactly what we knew
122:22    at this point.  There was no evidence at all in the
122:23    Vioxx development program at this point that Vioxx
122:24    caused cardiovascular risks.
122:25              Q.      What do you mean by that, "caused
122:ESQUIRE DEPOSITION SERVICES
123: Confidential - Subject to Protective Order 123
123: 1    cardiovascular risks"?
123: 2              A.      There was no evidence to say that
123: 3    Vioxx caused a cardiovascular risk.
123: 4              Q.      Well, you're not saying that in
123: 5    individual trials preapproval that you didn't see
123: 6    imbalances between cardiovascular risks in Vioxx and
123: 7    the comparator drugs, are you?
```

Scolnick 12309a      123:9-123:14

```
123: 9                    THE WITNESS:  Before the drug was
123:10    approved?
123:11    BY MR. BUCHANAN:
123:12        Q.      Yes.
123:13        A.      I don't recall any such data.  So, if
123:14    it was there, I certainly don't recall it.
```

D ES  12911     129:11-129:21

```
129:11                    THE WITNESS:  No, actually, that is
129:12    not the conclusion that anyone drew or was certain
129:13    of.  The question was raised as to what the source
129:14    of that metabolite was in the source of the
129:15    prostacyclin and whether it was systemic or whether
129:16    it was not systemic.
129:17    BY MR. BUCHANAN:
129:18        Q.      I see.  So, if it was systemic, that
129:19    would mean that prostacyclin that was produced
129:20    ordinarily in the vasculature was being suppressed
129:21    by Vioxx; true?
```

D ES  12923     129:23-130:3

```
129:23                    THE WITNESS:  I don't think anyone
129:24    had any evidence nor felt that prostacyclin was
129:25    produced in the vasculature.  No one really knew
129:ESQUIRE DEPOSITION SERVICES
130: Confidential - Subject to Protective Order 130
130: 1    where prostacyclin was produced exactly, in what
130: 2    organs, and the relationship of any of that to the
130: 3    metabolite in the urine.  None of that was known.
```

Scolnick 13005     130:5-130:11

```
130: 5        Q.      But you did conduct a clinical trial
130: 6    in 1997 with an individual named Garret FitzGerald;
130: 7    correct?
130: 8        A.      Yes.
130: 9        Q.      And he ran a clinical trial that
130:10    showed that Vioxx suppressed the urinary metabolites
130:11    of prostacyclin; correct?
```

Scolnick 13013     130:13-130:17

```
130:13                    THE WITNESS:  Yes.
130:14    BY MR. BUCHANAN:
130:15        Q.      One of the conclusions that was drawn
130:16    by your consultants was that Vioxx was suppressing
130:17    systemic prostacyclin; correct?
```

Scolnick 13020a     130:20-130:22

```
130:20                    THE WITNESS:  I don't believe they
130:21    drew that conclusion.  I think they raised that
130:22    question.
```

Scolnick 13109     131:9-131:11

```
131: 9                    And if that was happening, there was
```

```
131:10      a risk that Vioxx could cause thrombotic events in
131:11      humans; true?
```

Scolnick 13113a      131:13-131:20

```
131:13                THE WITNESS:  There was a theory that
131:14      that could occur with no evidence ever garnered to
131:15      substantiate or refute that theory.
131:16      BY MR. BUCHANAN:
131:17          Q.     Now, that theory was put forth after
131:18      the drug was marketed or before the drug was
131:19      marketed?
131:20          A.     Long before Vioxx ever existed.
```

Scolnick 14123      141:23-142:1

```
141:23          Q.     You weren't allowed to go out and
141:24      tell doctors through your sales representatives that
141:25      Vioxx reduced the serious clinical side effects
141:ESQUIRE DEPOSITION SERVICES
142: Confidential - Subject to Protective Order 142
142: 1      associated with traditional NSAIDs; right?
```

Scolnick 14205      142:5-142:9

```
142: 5                THE WITNESS:  Serious
142: 6      gastrointestinal side effects?
142: 7      BY MR. BUCHANAN:
142: 8          Q.     Yes.
142: 9          A.     That is correct.
```

Scolnick 15117      151:17-152:4

```
151:17          Q.     If you had conducted a CV outcomes
151:18      trial in 1998, started it in 1998, that would have
151:19      slowed down the approval process for the drug; true?
151:20          A.     That is true.
151:21          Q.     If you told the FDA, we're
151:22      concerned, we may have a potential cardiovascular
151:23      issue with the drug, we'd want to do a CV safety
151:24      study, that would have slowed down the approval
151:25      process?
151:ESQUIRE DEPOSITION SERVICES
152: Confidential - Subject to Protective Order 152
152: 1          A.     That would have.  We gave the FDA all
152: 2      of the data, including Garret FitzGerald's data, in
152: 3      the NDA and all the other analyses we did
152: 4      preapproval.
```

D ES   15205      152:5-152:9

```
152: 5          Q.     You didn't give him the result of a
152: 6      CV outcomes trial preapproval; right?
152: 7          A.     We gave them an analysis of all the
152: 8      cardiovascular events in our NDA, which showed no
152: 9      evidence that Vioxx caused CV events.
```

Scolnick 15212      152:12-152:13

```
152:12          Q.     You didn't give them the results from
```

152:13        a CV outcomes trial preapproval, did you?

Scolnick 15215a      152:15-152:24

    152:15                    THE WITNESS:  There was no -- we did
    152:16    not do a separate CV outcomes trial preapproval.
    152:17    BY MR. BUCHANAN:
    152:18          Q.        So, you couldn't give them the data
    152:19    from such a trial?
    152:20          A.        I've answered your question.
    152:21          Q.        You couldn't give them the data from
    152:22    such a trial?  Could you answer that?
    152:23          A.        Yes.
    152:24          Q.        Thank you.

Scolnick 17405      174:5-174:17

    174: 5    what's the Data Safety Monitoring Board, sir, in
    174: 6    general terms?
    174: 7          A.        In general terms, it's an external
    174: 8    group that monitors the safety of the Merck trials,
    174: 9    for all trials or many trials.
    174:10          Q.        And you have a different group for
    174:11    each trial or the same group for all trials?
    174:12          A.        I think it's a different group for
    174:13    each trial because the clinical expertise is --
    174:14    different clinical trials, different clinical
    174:15    expertise.
    174:16          Q.        Did the VIGOR trial have a DSMB?
    174:17          A.        Yes, it did.

Scolnick 17421      174:21-175:9

    174:21          Q.        To be clear in the DSMB's function,
    174:22    the DSMB has access to unblinded data during the
    174:23    conduct of clinical trials if they want it; correct?
    174:24          A.        Yes, I believe that's true.
    174:25          Q.        Because their function is to ensure
    174:ESQUIRE DEPOSITION SERVICES
    175: Confidential - Subject to Protective Order 175
    175: 1    the safety of patients in those clinical trials, at
    175: 2    least one of their functions; true?
    175: 3          A.        Yes.
    175: 4          Q.        Okay.
    175: 5                    Do you recall that the DSMB in the
    175: 6    VIGOR trial sent a letter to Merck stating that they
    175: 7    wanted the cardiovascular events in the VIGOR trial
    175: 8    separately analyzed as compared to other safety
    175: 9    analyses the company was doing?

Scolnick 17516a      175:16-175:17

    175:16                    THE WITNESS:  I became aware of that
    175:17    memo long after it was sent to people at MRL.

Scolnick 17804      178:4-178:7

    178: 4          Q.        When you saw that letter from Dr.
    178: 5    Weinblatt to Dr. Reicin, did that letter suggest to
    178: 6    you that Merck may have a cardiovascular issue with

```
 178: 7      Vioxx?

Scolnick 17809a      178:9-178:13

 178: 9                    THE WITNESS:  When I saw that letter,
 178:10      I wondered what had been in Dr. Weinblatt's mind
 178:11      when he sent the letter, and that's what I wondered.
 178:12      I hadn't seen the letter.  I don't know what was in
 178:13      his mind.

Scolnick 17902      179:2-179:12

 179: 2             Q.      You've never spoken to him?
 179: 3             A.      I don't recall speaking to Dr.
 179: 4      Weinblatt.
 179: 5             Q.      Never called him up after you got the
 179: 6      results of the VIGOR trial and asked what concerned
 179: 7      you and the data you were looking at during the
 179: 8      conduct of the trial?
 179: 9             A.      No, I never called Dr. Weinblatt.
 179:10             Q.      Never asked Dr. Weinblatt why you
 179:11      allowed the trial to continue in the face of the
 179:12      cardiovascular events in the trial?

Scolnick 17914      179:14-179:16

 179:14                    THE WITNESS:  No.  I didn't.  I
 179:15      didn't know what data he had.  I never dealt
 179:16      directly with DSMBs.

Scolnick 20322      203:22-204:20

 203:22             Q.      Before our break, we were talking
 203:23      about -- at least a few moments before our break we
 203:24      were talking about your March 9, 2000 e-mail.  Do
 203:25      you recall that testimony?
 203:ESQUIRE DEPOSITION SERVICES
 204: Confidential - Subject to Protective Order 204
 204: 1             A.      Yes, I do.
 204: 2             Q.      That was the e-mail where you
 204: 3      identified that the CV events were "clearly there."
 204: 4      Right?
 204: 5             A.      Yes.
 204: 6             Q.      That it appeared to be "mechanism
 204: 7      based" as you "worried it was."  Right?
 204: 8             A.      That's what the e-mail says, yes.
 204: 9             Q.      And you said it was also "real."
 204:10      Right?
 204:11             A.      Yes.
 204:12             Q.      Then we talked about what Merck and
 204:13      you did in response to your initial concerns about
 204:14      the CV issues with Vioxx; right?
 204:15             A.      Yes.
 204:16             Q.      Now, over a period of weeks, you
 204:17      reached the conclusion, contrary to your March 9th
 204:18      e-mail, that it wasn't Vioxx that was causing the
 204:19      problems, it was naproxen that was protecting
 204:20      against the problems; is that right?

Scolnick 20422      204:22-205:10
```

```
204:22                  THE WITNESS:  That's correct.
204:23    BY MR. BUCHANAN:
204:24        Q.       You reached that conclusion in, what,
204:25    18 days?
204:ESQUIRE DEPOSITION SERVICES
205: Confidential - Subject to Protective Order 205
205: 1        A.       Within that period of time.
205: 2        Q.       Well, Merck issued a press release to
205: 3    the public on March 27, 2000 letting them know about
205: 4    the CV events in the trial as well as the GI events
205: 5    in the trial; correct?
205: 6        A.       Yes.
205: 7        Q.       And you stated at that point in time
205: 8    that you believed that the explanation for the
205: 9    difference between the two arms was the
205:10    cardioprotective effect of naproxen; correct?
```

Scolnick 20517     205:17-205:18

```
205:17                  THE WITNESS:  Yes, that's basically
205:18    what the press release said.
```

Scolnick 20706     207:6-207:8

```
207: 6        Q.       So, within 18 days, you had made a
207: 7    complete 180 in your view as to the cause of the CV
207: 8    events in the VIGOR trial; right?
```

Scolnick 207.12-207.15     207:12-207:15

```
207:12        A.       Yes.  I thought the explanation which
207:13    best explained the results was naproxen's
207:14    cardioprotective activity based on data analysis,
207:15    literature analysis, as I've stated.
```

Scolnick 20908     209:8-209:11

```
209: 8        Q.       Did you bring in anybody who wasn't
209: 9    on the Merck payroll to look at the data from the
209:10    VIGOR trial before you reached the decision that
209:11    naproxen was cardioprotective?
```

Scolnick 20914a     209:14-210:3

```
209:14                  THE WITNESS:  As I've stated, I
209:15    didn't bring in an outside consultant.  I do not
209:16    know who the team might have consulted as outside
209:17    investigators.
209:18    BY MR. BUCHANAN:
209:19        Q.       But you're pretty sure, though, if
209:20    you had told your team, I want to get this data
209:21    looked at by somebody independent of Merck, they
209:22    could have done that; right?
209:23        A.       They could have done it.  I don't
209:24    know whether -- I don't that they didn't do it.
209:25        Q.       But you do know you didn't tell them
209:ESQUIRE DEPOSITION SERVICES
210: Confidential - Subject to Protective Order 210
210: 1    to do it?
```

```
210: 2           A.      I did not.  I did not, that is
210: 3    correct.
```

D ES  23104      231:4-231:8

```
231: 4           Q.      Sir, did you ever just do a
231: 5    calculation to figure out what the implication to
231: 6    the public could be that were using your drug if
231: 7    your drug really was cardiotoxic, as you thought on
231: 8    March 9?
```

D ES  23112      231:12-231:15

```
231:12                   THE WITNESS:  The answer to your
231:13    question, I didn't make that calculation.  I
231:14    considered patient safety, as I always have, and all
231:15    the data supported our hypothesis.
```

Scolnick 231.17     231:17-232:4

```
231:17           Q.      Did you consider the implications to
231:18    the sales of the drug if your initial conclusion was
231:19    the final conclusion?
231:20           A.      Of course.  And that was not part of
231:21    my reason for reaching my conclusion.
231:22           Q.      What was the implication to sales of
231:23    the drug if your initial conclusion was, in fact,
231:24    the final conclusion?
231:25           A.      Sales of the drug would be
231:ESQUIRE DEPOSITION SERVICES
232: Confidential - Subject to Protective Order 232
232: 1    significantly curtailed.  The sales of the drug
232: 2    would be curtailed.  Even with the publicly
232: 3    available information, sales of the drug would be
232: 4    curtailed.
```

D ES  23205      232:5-232:7

```
232: 5           Q.      So, you knew --
232: 6           A.      And we made all of the data available
232: 7    instantly anyway.
```

Scolnick 23208      232:8-232:11

```
232: 8           Q.      Did you ever tell the public your
232: 9    initial conclusion?
232:10           A.      I did not because I thought it was an
232:11    error.
```

D ES  23212      232:12-232:14

```
232:12           Q.      Did you ever send an e-mail out to
232:13    the people on this e-mail list and let them know,
232:14    guys, I think I made a mistake?
```

D ES  23216      232:16-232:19

```
232:16                   THE WITNESS:  Substantial period of
232:17    time later with even more analysis, I told them that
232:18    I thought they had done a great job and that I was
```

```
232:19      confident in the safety of the drug.

Scolnick 23221a      232:21-233:9

232:21            Q.      Did you ever send an e-mail at the
232:22   end of March 2000 saying, boy, I was way off on
232:23   this --
232:24            A.      No, I did --
232:25            Q.      -- I feel very comfortable with the
232:ESQUIRE DEPOSITION SERVICES
233: Confidential - Subject to Protective Order 233
233: 1   data now?
233: 2            A.      I did not send that in an e-mail like
233: 3   that, no.
233: 4            Q.      In fact, at the end of March, you
233: 5   were still worried, weren't you?
233: 6            A.      Yes, I was, even though I had reached
233: 7   what I thought was the right conclusion.  I always
233: 8   worried about the safety of our drugs, and I
233: 9   continued to worry about it.

D ES  23310      233:10-233:19

233:10            Q.      But you weren't so worried to tell
233:11   the FDA, were you?
233:12            A.      The FDA had all the data.  The FDA
233:13   has competent scientists and can judge the data for
233:14   themselves.  They knew that this was a new finding
233:15   potentially for naproxen.  They could interpret the
233:16   data for themselves, and had they been concerned,
233:17   they would have expressed that to us and told us if
233:18   they were that concerned with the aggregate of data,
233:19   do something differently.

Scolnick 23323      233:23-234:2

233:23            Q.      Did you tell the FDA you were
233:24   worried?
233:25            A.      I didn't speak to the FDA, and I
233:ESQUIRE DEPOSITION SERVICES
234: Confidential - Subject to Protective Order 234
234: 1   don't know what the regulatory affairs people told
234: 2   the FDA.

Scolnick 23523      235:23-236:1

235:23                    You don't think the FDA or the
235:24   medical community would have been interested in what
235:25   you, Ed Scolnick, were worried about with respect to
235:ESQUIRE DEPOSITION SERVICES
236: Confidential - Subject to Protective Order 236
236: 1   Vioxx?

Scolnick 23603      236:3-236:8

236: 3                    THE WITNESS:  If the FDA had wanted
236: 4   to ask me, they would have asked me, and I
236: 5   communicated with members of the medical community
236: 6   in consultants' meetings.  I don't know what the
236: 7   medical community as a whole or the public as a
```

```
 236: 8    whole would have liked to know.
```

Scolnick 23618      236:18-236:24

```
 236:18        Q.      So, you're saying that if the FDA had
 236:19    wanted to figure out what you were thinking in terms
 236:20    of concerns about Vioxx, they could have asked you?
 236:21    Is that it?
 236:22        A.      The FDA could have asked me any time
 236:23    if they wanted to.  They had all the data available
 236:24    to them.
```

D ES  23625      236:25-237:5

```
 236:25        Q.      And if they asked you, you would have
 236:ESQUIRE DEPOSITION SERVICES
 237: Confidential - Subject to Protective Order 237
 237: 1    told them you were worried?
 237: 2        A.      I would have told them my concerns,
 237: 3    what we did, what conclusions we reached.
 237: 4        Q.      Would you have told them you were
 237: 5    worried?
```

D ES 23709      237:9-237:10

```
 237: 9                THE WITNESS:  I would have told them
 237:10    my concerns --
```

D ES  23713      237:13-237:18

```
 237:13                THE WITNESS:  -- or my worries and
 237:14    what the data was and what our conclusions were and
 237:15    had a dialogue with them if they had asked me.  My
 237:16    regulatory affairs people routinely have discussions
 237:17    like that with the FDA.  They are my instrument for
 237:18    dealing with the FDA.
```

Scolnick 23720b      237:20-238:8

```
 237:20        Q.      Well, ultimately there was an
 237:21    Advisory Committee held in February 2001; right?
 237:22        A.      I think that date is correct.
 237:23        Q.      And it was to consider certain of the
 237:24    clinical trial data from VIGOR; right?
 237:25        A.      Yes.
 237:ESQUIRE DEPOSITION SERVICES
 238: Confidential - Subject to Protective Order 238
 238: 1        Q.      And in particular, GI safety; right?
 238: 2        A.      Yes.
 238: 3        Q.      As well as CV safety; true?
 238: 4        A.      Correct.
 238: 5        Q.      GI being gastrointestinal?
 238: 6        A.      Yes.
 238: 7        Q.      CV being cardiovascular?
 238: 8        A.      Correct.
```

Scolnick 24004a      240:4-240:9

```
 240: 4        Q.      You never told the FDA at any point
 240: 5    in time to the best of your knowledge that your
```

```
240: 6        initial conclusion was that the CV events seen in
240: 7        the VIGOR trial were mechanism based and
240: 8        attributable to Vioxx?
240: 9              A.      I never told them that.
```

Scolnick 24218      242:18-242:21

```
242:18        Q.      Merck submitted a proposed label to
242:19        FDA sometime in 2000; right?
242:20              A.      Yes.  I believe within three months
242:21        of having the VIGOR data.
```

Scolnick 24322      243:22-244:14

```
243:22                      So, at the end of March of 2000,
243:23        Merck issues a press release and tells the world the
243:24        favorable properties of Vioxx found in the VIGOR
243:25        trial as it relates to GI effects; correct?
243:ESQUIRE DEPOSITION SERVICES
244:Confidential - Subject to Protective Order 244
244: 1              A.      That is correct.
244: 2        Q.      Also discloses that there's an
244: 3        increased number of -- excuse me -- a decreased
244: 4        number of cardiovascular effects in the naproxen arm
244: 5        of the VIGOR trial; right?
244: 6              A.      That's correct.
244: 7        Q.      You didn't tell the public that there
244: 8        was an increased number of cardiovascular events in
244: 9        the Vioxx arm; right?
244:10              A.      The press release was not worded that
244:11        way, that is correct.
244:12        Q.      Okay.  Because that would have
244:13        suggested that Vioxx had actually increased the
244:14        risk; right?
```

Scolnick 24416      244:16-244:17

```
244:16                      THE WITNESS:  It might have suggested
244:17        that, and we didn't believe that.
```

D ES   24419      244:19-244:25

```
244:19        Q.      You were trying to convey to people
244:20        that it was, in fact, naproxen that was reducing the
244:21        risk?  That's why you reported the numbers that way?
244:22              A.      We were -- had concluded that it was
244:23        naproxen which had lowered the risk, and the press
244:24        release expressed our view, and it stated this was a
244:25        new finding for naproxen.
```

Scolnick 24504      245:4-245:7

```
245: 4        Q.      You were trying to convey to people
245: 5        that it was, in fact, naproxen that was reducing the
245: 6        risk of cardiovascular events in the VIGOR trial;
245: 7        true?
```

Scolnick 24509      245:9-245:10

```
245: 9                      THE WITNESS:  True.  That's the way
```

```
245:10      the press release was worded, as I stated before.
```

Scolnick 24517      245:17-245:25

```
245:17          Q.      Doctor, before we go on, even two
245:18      weeks after you issued the press release, you,
245:19      Merck, issued the press release announcing the VIGOR
245:20      results, Dr. Ed Scolnick was still personally
245:21      worried about what the results from VIGOR really
245:22      meant; true?
245:23          A.      That's correct.
245:24          Q.      And you were worried that Vioxx was
245:25      actually causing cardiovascular events; true?
```

Scolnick 24602      246:2-247:19

```
246: 2              THE WITNESS:  I was worried that we
246: 3      couldn't exclude an effect of Vioxx, although the
246: 4      major effect, I was convinced, was due to naproxen.
246: 5      BY MR. BUCHANAN:
246: 6          Q.      And you actually told your staff that
246: 7      you personally were actually in minor agony over the
246: 8      issue; true?
246: 9          A.      True.
246:10          Q.      And you told your staff that we're
246:11      not going to know the answer until we do an outcomes
246:12      trial; right?
246:13          A.      That we were not going to know -- we
246:14      were not going to be able to exclude an effect of
246:15      Vioxx until we did an outcomes trial.
246:16          Q.      You told your staff, your project
246:17      team, we will not know for sure what is going on
246:18      until we do an outcomes trial; true?
246:19          A.      True.
246:20          Q.      And you wanted to do a big outcomes
246:21      trial; right?
246:22          A.      Yes.  That's correct.
246:23          Q.      Not some pooled analysis; right?
246:24          A.      That's correct.
246:25          Q.      You wanted to do a 10,000 patient
246:ESQUIRE DEPOSITION SERVICES
247: Confidential - Subject to Protective Order 247
247: 1      study on Vioxx, 10,000 people on a comparator agent;
247: 2      true?
247: 3          A.      True.  That's correct.
247: 4          Q.      You were advocating using Tylenol as
247: 5      the comparator agent; right?
247: 6          A.      That was my idea, yes.
247: 7          Q.      You wanted to do a 20,000 person
247: 8      study in April of 2000 to evaluate the
247: 9      cardiovascular safety of Vioxx; right?
247:10          A.      Correct.
247:11          Q.      It was going to be a head-to-head
247:12      trial, Tylenol on one arm, Vioxx on the other;
247:13      right?
247:14          A.      That's correct.
247:15          Q.      And when did you run that trial?
247:16          A.      The project team told me that was a
247:17      trial that could not be done because patients
247:18      couldn't be kept on Tylenol who had osteoarthritis
```

247:19     for that long a period of time.

D ES  24720     247:20-248:9

247:20         Q.     Is that right?
247:21         A.     That's what --
247:22         Q.     You can't --
247:23         A.     Tylenol is not sufficient as a
247:24     painkiller to patients with osteoarthritis, and,
247:25     therefore, the trial could not be done, and I had to
247:ESQUIRE DEPOSITION SERVICES
248: Confidential - Subject to Protective Order 248
248: 1     accept that because they felt that way unanimously,
248: 2     very strongly, that you couldn't do the trial, and
248: 3     if the alternative was to do it against another
248: 4     comparator nonsteroidal, it might not give as clear
248: 5     an answer.  And so we were in a conundrum about what
248: 6     trial to do at that point.
248: 7         Q.     Well, you were the boss; right?
248: 8         A.     I never asked them to do a trial that
248: 9     they thought was undoable.

Scolnick 25209a     252:9-253:18

252: 9             Let's look at this e-mail, then, from
252:10     April 12, 2000 from you to Dr. Reicin.  You wrote
252:11     this late at night; right?
252:12         A.     Yes.  It's dated 10:42 p.m.
252:13         Q.     You sent it with high importance;
252:14     true?
252:15         A.     True.
252:16         Q.     And you wrote:  "Hi Alise.  I have
252:17     been trading e-mails with Doug Greene in real time."
252:18     Who is Doug Greene?
252:19         A.     Doug Greene at the time was head of
252:20     the clinical, regulatory and statistics department
252:21     at Merck, which is usually referred to as
252:22     development.
252:23         Q.     "We all are online too late.  I will
252:24     tell you my worry quotient is high.  I actually am
252:25     in minor agony."  Do you see that?
252:ESQUIRE DEPOSITION SERVICES
253: Confidential - Subject to Protective Order 253
253: 1         A.     I do.
253: 2         Q.     You wrote that?
253: 3         A.     I did.
253: 4         Q.     You meant it?
253: 5         A.     I did.
253: 6         Q.     "What I really want to do is a 10000
253: 7     versus 10000 patient study in mild - moderate OA
253: 8     Tylenol versus Vioxx with PRN" -- is that
253: 9     preventative?
253:10         A.     No.  It means use if you need.
253:11         Q.     "With PRN low dose ASA."  Is that
253:12     aspirin?
253:13         A.     Yes.
253:14         Q.     "For those judged to need it."
253:15             Sir, are you telling me that you
253:16     couldn't do a long-term study in patients with even
253:17     mild osteoarthritis, Tylenol versus Vioxx?

```
253:18          A.      That's what my team told me.
```

Scolnick 25325     253:25-254:4

```
253:25          Q.      You continue.  "WE WILL NOT KNOW FOR
253:ESQUIRE DEPOSITION SERVICES
254: Confidential - Subject to Protective Order 254
254: 1   SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY.
254: 2   PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC
254: 3   MEETING."  You wrote that in all caps; right?
254: 4          A.      I did.
```

D ES   25405     254:5-254:8

```
254: 5          Q.      When did you do a CV outcomes study
254: 6   of any design comparing Vioxx to a comparator agent
254: 7   with the primary endpoint being cardiovascular
254: 8   events?
```

D ES   25410     254:10-254:18

```
254:10          THE WITNESS:  After debating many
254:11   protocols, we decided that we wanted -- the only way
254:12   we would answer any lingering doubt was to do it
254:13   against placebo and finally came up with a protocol
254:14   for doing that.
254:15   BY MR. BUCHANAN:
254:16          Q.      Right.  You didn't design a specific
254:17   trial with a predetermined endpoint to monitor
254:18   cardiovascular events, though; did you?
```

D ES   25420     254:20-254:23

```
254:20          THE WITNESS:  We did not do that.  We
254:21   aggregated three large trials with a predefined
254:22   endpoint to be cardiovascular mortality with an
254:23   ample power to look for cardiovascular events.
```

Scolnick 26323     263:23-264:8

```
263:23          Q.      Sir, I'm passing you over what we
263:24   just marked as exhibit, I think it's 7, to your
263:25   deposition.  It's entitled, "VIOXX Outcomes Study
263:ESQUIRE DEPOSITION SERVICES
264: Confidential - Subject to Protective Order 264
264: 1   Potential Designs."  For the record, it is
264: 2   MRK-ABT0014818 to 827.  Do you recognize this as a
264: 3   slide set, sir?
264: 4          A.      That's what it looks like it is.
264: 5          Q.      Okay.  It's entitled, "VIOXX Outcomes
264: 6   Study Potential Designs."  It is a PowerPoint
264: 7   printout.  Is that what it looks like to you?
264: 8          A.      More or less.
```

Scolnick 26421     264:21-265:13

```
264:21          Q.      This document summarizes several
264:22   different outcomes studies concerning cardiovascular
264:23   issues that were being considered in or around April
264:24   of 2000; true?
```

```
264:25              A.     Yes.
264:ESQUIRE DEPOSITION SERVICES
265: Confidential - Subject to Protective Order 265
265: 1              Q.     One of the outcomes studies that was
265: 2     being considered was the Vioxx versus Tylenol study;
265: 3     true?
265: 4           .  A.     Yes.
265: 5              Q.     There's some pros and cons listed
265: 6     there; right?
265: 7              A.     Yes.
265: 8             .Q.     One of the pros is, "This study
265: 9     directly addresses the question of the CV safety of
265:10     COX-2 inhibitors."  Do you see that?
265:11              A.     Yes.
265:12              Q.     I read that right; correct?
265:13              A.     Yes.
```

Scolnick 26625      266:25-267:17

```
266:25              Q.     Okay.  There's two cons that are
266:ESQUIRE DEPOSITION SERVICES
267: Confidential - Subject to Protective Order 267
267: 1     listed here; right?
267: 2              A.     Yes.
267: 3              Q.     One is, "Demonstration of a CV
267: 4     difference would likely be due to a COX-2 CLASS
267: 5     effect but would put VIOXX at extreme disadvantage
267: 6     to celebrex and negate existing OA and Alzheimers
267: 7     data."  Do you see that?
267: 8              A.     I do.
267: 9              Q.     The next point was there was a
267:10     possibility that you detect "small differences from
267:11     Tylenol in GI safety," and that would be of concern;
267:12     true?
267:13              A.     That's what it says.
267:14              Q.     Okay.  You were concerned that if you
267:15     went head-to-head Vioxx versus Tylenol, you might
267:16     highlight some favorable GI safety properties of
267:17     Tylenol.  Isn't that right?
```

Scolnick 26719      267:19-268:1

```
267:19                     THE WITNESS:  That's what this says.
267:20     I wasn't concerned about that.  That's what this
267:21     says.
267:22     BY MR. BUCHANAN:
267:23              Q.     Okay.
267:24                     There was also a possibility that you
267:25     might be wrong, and the cardiovascular effects seen
267:ESQUIRE DEPOSITION SERVICES
268: Confidential - Subject to Protective Order 268
268: 1     in VIGOR was really due to Vioxx; right?
```

Scolnick 26803b     268:3-268:4

```
268: 3                     THE WITNESS:  That's what this says
268: 4     as a con for the study.
```

Scolnick 26816      268:16-268:21

```
268:16              So, it wouldn't have been unethical
268:17   to do a trial of Vioxx versus Tylenol?
268:18        A.       What I said is it would be undoable
268:19   based on other input people gave me because Tylenol
268:20   would not relieve pain enough to be monotherapy in
268:21   such a trial.
```

D ES  26822      268:22-269:10

```
268:22              Q.       So, someone was speculating that if
268:23   you did Vioxx versus Tylenol, people may fall out of
268:24   the Tylenol arm over time because it was
268:25   ineffective; is that right?
268:ESQUIRE DEPOSITION SERVICES
269: Confidential - Subject to Protective Order 269
269: 1              A.       Yes.  Not speculating, but saying it
269: 2   just as in -- the same manner as on this slide, that
269: 3   was another point brought up many times during the
269: 4   discussion.
269: 5              Q.       Well, that's what I'm wondering.   I
269: 6   don't see it on this slide.  Do you see that point
269: 7   raised on this slide, sir?
269: 8              A.       I do not, but it was something people
269: 9   talked about.  Not all points of meetings are on our
269:10   slides.
```

Scolnick 27002a      270:2-270:17

```
270: 2              Now, apart from just asking your
270: 3   internal folks and thinking about yourself what type
270: 4   of CV study could be done, you actually consulted
270: 5   with some people from outside Merck; right?
270: 6        A.       Several.
270: 7              Q.       Okay.  You asked them whether a CV
270: 8   study could be designed to evaluate the
270: 9   cardiovascular safety of Vioxx, didn't you?
270:10        A.       I asked them what kind of study could
270:11   be designed, yes.
270:12              Q.       You actually spoke with a John Oates
270:13   about whether a trial could be done to test the CV
270:14   safety of Vioxx; right?
270:15        A.       I don't remember all the people that
270:16   our group talked to.  Dr. Oates was one of our
270:17   consultants on our board of advisors.
```

Scolnick 27110      271:10-271:24

```
271:10              Q.       Wasn't it Dr. Oates' view right after
271:11   the VIGOR data was released that you had to do
271:12   another trial comparing Vioxx with aspirin and
271:13   naproxen to see whether Vioxx was cardiotoxic?
271:14        A.       I don't remember.  I really don't
271:15   remember.
271:16              Q.       Do you remember that study design
271:17   being proposed?
271:18        A.       I remember that among several study
271:19   designs, yes.
271:20              Q.       Did you ever do that study?
271:21        A.       That study was not done.
271:22              Q.       You never did a study like that;
```

```
271:23      right?
271:24              A.      That study was not done.
```

Scolnick 27521      275:21-275:25

```
275:21              Q.      Do you remember Merck dealing with
275:22      Dr. Topol in 2001 concerning the design of a CV
275:23      outcome trial?
275:24              A.      I believe Merck research scientists
275:25      dealt with Dr. Topol, yes.
```

Scolnick 27606      276:6-276:11

```
276: 6              Q.      You'd agree he's a respected
276: 7      cardiologist?
276: 8              A.      He has a significant reputation in
276: 9      cardiology.
276:10              Q.      He's a respected cardiologist, sir?
276:11              A.      He has a significant reputation.
```

Scolnick 27620      276:20-276:22

```
276:20              Q.      Do you respect Dr. Topol?
276:21              A.      I think there are some things he's
276:22      done in science which have not held up to be true.
```

D ES  27702      277:2-277:3

```
277: 2              Q.      Do you respect Dr. Topol?  Yes or no?
277: 3              A.      I think he --
```

D ES  27707      277:7-277:17

```
277: 7              Q.      Can you answer my question yes or no,
277: 8      sir?
277: 9              A.      I have mixed thoughts about his
277:10      publication record, so, I can't answer your
277:11      question.
277:12              Q.      Did you have mixed thoughts about his
277:13      publication record back in 2001?
277:14              A.      I can't recall.
277:15              Q.      Did you only have a mixed view of his
277:16      publication record after he started to publish
277:17      articles negative to Vioxx?
```

D ES  27719      277:19-278:2

```
277:19              THE WITNESS:  No.  No.
277:20      BY MR. BUCHANAN:
277:21              Q.      Well, what are you referring to then
277:22      concerning Dr. Topol's mixed publication record?
277:23              A.      I'm referring, one, to his
277:24      meta-analysis of the Vioxx data, which was, I've
277:25      been told by statisticians I respect, a completely
277:ESQUIRE DEPOSITION SERVICES
278: Confidential - Subject to Protective Order 278
278: 1      flawed analysis, and some of his genetics work which
278: 2      has been proven to be wrong.
```

Scolnick 27804      278:4-278:6

```
278: 4                    So, one of the things that you based
278: 5    your mixed view of Dr. Topol on is the negative
278: 6    study he published concerning Vioxx; correct?
```

Scolnick 27808a      278:8-279:5

```
278: 8                    THE WITNESS:  Base it not on the
278: 9    negative study, base it on the methods which he used
278:10    to do the methods -- the negative study.
278:11    BY MR. BUCHANAN:
278:12          Q.      Let's be clear about what we're
278:13    talking about.
278:14                   In August of 2001, Dr. Topol
278:15    published a study in the Journal of the American
278:16    Medical Association; true?
278:17          A.      True.
278:18          Q.      That study was raising caution about
278:19    the potential for COX-2 inhibitors like Vioxx and
278:20    Celebrex to cause cardiovascular events; true?
278:21          A.      That's what that study claimed to
278:22    have shown.
278:23          Q.      And you're saying that you have
278:24    spoken to statisticians that challenge the work of
278:25    Dr. Topol in terms of its statistical rigor.  Is
278:ESQUIRE DEPOSITION SERVICES
279: Confidential - Subject to Protective Order 279
279: 1    that what you're saying?
279: 2          A.      That's exactly what I'm saying.
279: 3          Q.      Did you tell Dr. Topol that?
279: 4          A.      I've never discussed anything
279: 5    directly with Dr. Topol.
```

Scolnick 27910      279:10-279:12

```
279:10          Q.      Well, did you know that some of your
279:11    scientists went out to talk to Dr. Topol about that
279:12    article even before it was published?
```

Scolnick 27914a      279:14-279:23

```
279:14                   THE WITNESS:  I believe that Dr.
279:15    Reicin told me that she and Dr. Demopoulos, who was
279:16    a cardiologist by training, were going out to see
279:17    him to discuss the article.
279:18    BY MR. BUCHANAN:
279:19          Q.      And they went out to see him before
279:20    the article in the Journal of the American Medical
279:21    Association was published; right?
279:22          A.      I believe they did.  I believe that's
279:23    what Dr. Reicin told me.
```

Scolnick 28009      280:9-280:14

```
280: 9          Q.      And the objective was that Dr. Topol
280:10    would not publish the article in the form it
280:11    currently existed because that was negative to
280:12    Vioxx; true?
280:13          A.      Because it was inaccurately done
280:14    statistically.
```

Scolnick 28202      282:2-282:16

282: 2            Q.      Well, the Journal of the American
282: 3    Medical Association has editors; right?
282: 4            A.      Yes, it does.
282: 5            Q.      I mean, Dr. Topol just didn't just
282: 6    publish this article in JAMA by himself; right?
282: 7            A.      That is correct.
282: 8            Q.      There were editors at JAMA who
282: 9    reviewed the article; right?
282:10            A.      I don't know who reviewed the
282:11    article.
282:12            Q.      Well, in your experience, sir, in the
282:13    peer-reviewed medical literature, there are editors
282:14    at medical journals; true?
282:15            A.      There are, but I don't know how that
282:16    article was reviewed or who reviewed it.

Scolnick 28301      283:1-283:5

283: 1            Q.      You would agree, sir, that it would
283: 2    be unusual for a journal like JAMA not to have an
283: 3    article like that peer reviewed?
283: 4            A.      It would be unusual, but I don't know
283: 5    what they did.

Scolnick 28311      283:11-283:13

283:11                    In fact, Merck actually issued a
283:12    press release preemptively to challenge the results
283:13    from that JAMA article, didn't they?

Scolnick 28316a      283:16-283:17

283:16                    THE WITNESS:  I don't recall at all
283:17    whether that was done.

Scolnick 28405      284:5-284:17

284: 5    if we can get that out.  The peer-reviewed medical
284: 6    literature is the vehicle through which -- is a
284: 7    vehicle through which scientific opinion is
284: 8    exchanged; true?
284: 9            A.      Correct.
284:10            Q.      And the standard way of responding to
284:11    scientific opinion expressed in scientific
284:12    literature is to respond in scientific literature to
284:13    that particular issue raised; true?
284:14            A.      True.
284:15            Q.      It is not standard practice to
284:16    respond to an opinion in a medical article with a
284:17    press release disparaging an article; true?

Scolnick 28420      284:20-285:15

284:20                    THE WITNESS:  That's not the usual
284:21    practice.  I don't recall what Merck did.
284:22    BY MR. BUCHANAN:
284:23            Q.      Is that a practice you endorse?

```
284:24              A.       Absolutely not.
284:25              Q.       The appropriate way to respond is in
284:ESQUIRE DEPOSITION SERVICES
285: Confidential - Subject to Protective Order 285
285: 1      the medical journal itself; true?
285: 2              A.       That is an appropriate way to
285: 3      respond.
285: 4              Q.       You could write a letter to the
285: 5      editor; right?
285: 6              A.       Yes, correct.
285: 7              Q.       You can submit your own article?
285: 8              A.       Correct.
285: 9              Q.       Or you can publish a competing
285:10      article in another journal; right?
285:11              A.       Correct.
285:12              Q.       But one of the things that you think
285:13      would be unusual is to issue a press release to
285:14      respond to an article in the medical literature;
285:15      true?
```

Scolnick 28517      285:17-285:20

```
285:17                       THE WITNESS:  It would be unusual.
285:18      BY MR. BUCHANAN:
285:19              Q.       And just not right?
285:20              A.       It would be --
```

Scolnick 28522      285:22-286:1

```
285:22                       THE WITNESS:  It is not a standard
285:23      way of doing it.
285:24      BY MR. BUCHANAN:
285:25              Q.       And certainly nothing you'd endorse?
285:ESQUIRE DEPOSITION SERVICES
286: Confidential - Subject to Protective Order 286
286: 1              A.       That is correct.
```

Scolnick 29311      293:11-293:20

```
293:11              Q.       But May of 2001, you were still
293:12      interested in a trial to evaluate the CV safety of
293:13      Vioxx; true?
293:14              A.       That is true.  I constantly wanted to
293:15      garner additional data to what we already had to
293:16      further prove what we had concluded.
293:17              Q.       And nobody had come up with an idea
293:18      by 2001 of a CV study that could be done to evaluate
293:19      the cardiovascular safety of Vioxx?  That's your
293:20      testimony?
```

Scolnick 29323      293:23-294:2

```
293:23                       THE WITNESS:  As the discussions
293:24      evolved, what everybody focused on was a study
293:25      versus placebo, and no placebo-controlled trial had
293:ESQUIRE DEPOSITION SERVICES
294: Confidential - Subject to Protective Order 294
294: 1      yet been brought forth that people were satisfied
294: 2      with the design on.
```

```
Scolnick 29608        296:8-296:9

  296: 8          Q.      Do you remember the VALOR trial, sir?
  296: 9          A.      I don't remember that name, no.

Scolnick 29625        296:25-297:19

  296:25          Q.      Dr. Scolnick, I just passed you over
296:ESQUIRE DEPOSITION SERVICES
297: Confidential - Subject to Protective Order 297
297: 1   what we marked as Exhibit 10 to your deposition.  It
297: 2   is Bates stamped MRK-ABA0003490 to 3491.  It is a
297: 3   letter from a Carlo Patrono; correct?
297: 4          A.      Yes.  It's from Dr. Patrono.
297: 5          Q.      Ever seen this before?
297: 6          A.      I don't recall.
297: 7          Q.      Who is Dr. Braunwald?
297: 8          A.      Braunwald is a well-known
297: 9   cardiologist at Peter Bent Brigham Hospital.
297:10          Q.      Here in Massachusetts?
297:11          A.      Yes.
297:12          Q.      That's affiliated with Harvard; is
297:13   that right?
297:14          A.      Yes, it is.
297:15          Q.      Merck was actually speaking to
297:16   Dr. Braunwald about running a VALOR trial; right?
297:17          A.      That's what this letter suggests.  I
297:18   remember Dr. Braunwald making suggestions, but I
297:19   don't remember the details involved.

Scolnick 29824        298:24-299:11

  298:24          Q.      Well, do you recall at the end of
  298:25   2001 there was increased urgency to do a
298:ESQUIRE DEPOSITION SERVICES
299: Confidential - Subject to Protective Order 299
299: 1   cardiovascular study; true?
299: 2          A.      There was, because a number of
299: 3   people, scientists and others, still were
299: 4   questioning whether Vioxx had been a contributor in
299: 5   the VIGOR trial as opposed to naproxen being
299: 6   beneficial.
299: 7          Q.      People were still worried about
299: 8   whether Vioxx was causing cardiovascular events;
299: 9   true?
299:10          A.      There were some people who still were
299:11   raising that question.

Scolnick 30012        300:12-301:10

  300:12                  I may have asked you this, but did
  300:13   you run the VALOR trial?
  300:14          A.      No, I don't think the VALOR trial was
  300:15   run.
  300:16          Q.      Why not?
  300:17          A.      I don't remember why the VALOR trial
  300:18   wasn't run.  This sounds like a pretty complicated
  300:19   trial to me, and I don't remember why it wasn't run.
  300:20          Q.      Was money an issue?
  300:21          A.      I don't remember why the VALOR trial
```

```
300:22      wasn't run.  As I said, this seems like a fairly
300:23      complicated paragraph here from Dr. Patrono to Dr.
300:24      Braunwald, so, I'm not able to figure this out
300:25      quickly.
300:ESQUIRE DEPOSITION SERVICES
301: Confidential - Subject to Protective Order 301
301: 1          Q.      Do you see the third paragraph?  It
301: 2      reads, "I have serious reservations about the role
301: 3      of the Sponsor."  The sponsor would be Merck?
301: 4          A.      Presumably.
301: 5          Q.      "I have serious reservations about
301: 6      the role of the Sponsor in monitoring and
301: 7      termination of the study, as well as in the
301: 8      statistical analysis of the results."  Do you see
301: 9      that?
301:10          A.      I do.


Scolnick 30515a      305:15-305:19


305:15                  Following the Advisory Committee in
305:16      2001, a series of negotiations took place with FDA
305:17      concerning the label for Vioxx; right?
305:18          A.      Yes, a very long time before we
305:19      actually got a label from them.


Scolnick 31121      311:21-313:3


311:21          Q.      I want to pass you over what we just
311:22      marked as Exhibit 11 to your deposition.  It's an
311:23      e-mail dated January 31st, 2001 from you to Mr.
311:24      Gilmartin and Mr. Anstice.  The subject is "Monday
311:25      MC."  Do you see that?
311:ESQUIRE DEPOSITION SERVICES
312: Confidential - Subject to Protective Order 312
312: 1          A.      Yes.
312: 2          Q.      "MC" refers to management committee?
312: 3          A.      Yes.
312: 4          Q.      It is Bates stamped MRK-ACR0008985.
312: 5                  You write, I guess it's the second
312: 6      sentence or so:  "The Vigor meeting is next
312: 7      thursday.  On Monday I will show you the essence, an
312: 8      update, of the data that supports Vioxx is safe in
312: 9      the Cv sense.  But I want to point out to all of you
312:10      at one time that 1. there is no way to prove that in
312:11      patients with rheumatoid arthritis that," and you
312:12      put this in all caps, "ALL of the difference between
312:13      Vioxx and naproxen is due to the benefit of
312:14      naproxen."  Do you see that.
312:15          A.      I do.
312:16          Q.      Then you continue.  "IT IS IMPOSSIBLE
312:17      TO PROVE THIS."  That's all caps; right?
312:18          A.      Yes.
312:19          Q.      And you continue further.  "IT IS
312:20      IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."  That's
312:21      what you wrote; right?
312:22          A.      I did.
312:23          Q.      And that was -- that was your feeling
312:24      as of January 31st, 2001?
312:25          A.      Yes.  That's just what I've just told
312:ESQUIRE DEPOSITION SERVICES
```

313: Confidential - Subject to Protective Order 313
313: 1      you again.
313: 2                Q.        A week before the Advisory Committee?
313: 3                A.        Yes.

Scolnick 31325a      313:25-314:15

313:25               Q.        You continue, "Knowing what is about
313:ESQUIRE DEPOSITION SERVICES
314: Confidential - Subject to Protective Order 314
314: 1      to happen, managing the short term fall out, and
314: 2      facing and managing any longer term consequences."
314: 3      "Short term fall out," what are you thinking about
314: 4      there?
314: 5                A.        When all the data is presented again,
314: 6      people will raise questions whether we can prove the
314: 7      negative completely and, therefore, will question
314: 8      whether they should use Vioxx or not.
314: 9                Q.        "Short term fall out" also refers to
314:10      potential impact on Merck stock; right?
314:11               A.        I don't know.  I think I had in mind
314:12      just the effects on Vioxx.
314:13               Q.        Well, the effects of Vioxx would
314:14      include decreased sales of Vioxx; true?
314:15               A.        Yes.

Scolnick 31511      315:11-315:24

315:11               Q.        Well, did you think that negative
315:12      labeling for Vioxx would have an adverse effect on
315:13      Vioxx sales?
315:14               A.        Certainly.
315:15               Q.        Did you think that if there was a CV
315:16      warning for Vioxx, that that would have a negative
315:17      effect on Vioxx sales?
315:18               A.        Certainly, but I didn't expect a CV
315:19      warning based on the data.
315:20               Q.        Did you think that if there was a CV
315:21      warning on Vioxx, that would also have an effect on
315:22      Merck stock?
315:23               A.        Certainly.  But as I've said, I did
315:24      not expect a CV warning.

Scolnick 32206      322:6-325:17

322: 6               Q.        And you really thought it was a
322: 7      challenge in your team to convince the FDA and the
322: 8      Advisory Committee that Vioxx didn't have a
322: 9      cardiovascular problem; true?
322:10               A.        We had all the data which said that
322:11      we didn't have a problem, and we wanted to make sure
322:12      we could present all that data, sure.
322:13               Q.        But it wasn't just a challenge, it
322:14      was almost impossible; right?
322:15               A.        It was impossible to prove the
322:16      negative, which I pointed out in my e-mail note.  It
322:17      was possible to present all the data which supported
322:18      our position.
322:19               Q.        Well, the Advisory Committee went
322:20      well from your perspective; true?

```
322:21          A.      Yes.  Quite well.
322:22          Q.      Your team did a fantastic job; true?
322:23          A.      Yes.
322:24          Q.      And they made the FDA look like
322:25     "grade d high school students."  Isn't that what you
322:ESQUIRE DEPOSITION SERVICES
323: Confidential - Subject to Protective Order 323
323: 1     said?
323: 2          A.      I did in an e-mail note, yes.  I
323: 3     regret those words, but we did a good job.
323: 4          Q.      You meant them when you wrote it?
323: 5          A.      It was -- I meant them.  It was an
323: 6     allusion to something that had happened a few years
323: 7     ago, but I did write those words.
323: 8          Q.      This is the same FDA that you
323: 9     respect?
323:10          A.      Yes.
323:11          Q.      This is the same FDA that's
323:12     responsible for the public safety?
323:13          A.      That's correct.
323:14          Q.      This is the same FDA that's
323:15     responsible for evaluating the cardiovascular data
323:16     concerning your drug?
323:17          A.      Yes.
323:18          Q.      And you were proud that your team
323:19     made the FDA look like grade D high school students;
323:20     true?
323:21          A.      I wrote those words.  I regret the
323:22     choice of words.  I wrote those words.
323:23          MR. BUCHANAN:  Let's mark as Exhibit
323:24     12, I think, the e-mail you were referring to, sir.
323:25              -  -  -
323:ESQUIRE DEPOSITION SERVICES
324: Confidential - Subject to Protective Order 324
324: 1                    (Whereupon, Deposition Exhibit
324: 2                    Scolnick-12, E-mails, MRK-ACT0018064,
324: 3                    was marked for identification.)
324: 4              -  -  -
324: 5          THE WITNESS:  Yes.
324: 6     BY MR. BUCHANAN:
324: 7          Q.      Dr. Scolnick, I just passed you over
324: 8     Exhibit 12 to your deposition.  It is an e-mail, two
324: 9     e-mails, the earliest of which is an e-mail from you
324:10     to several folks, subject, "Today."  It's Bates
324:11     stamped MKR-ACT0018064.  It's dated Thursday,
324:12     February 8, 2001, 9:10 p.m. is the time.  Do you see
324:13     that?
324:14          A.      Yes, I do.
324:15          Q.      You wrote this the day of the
324:16     February 2001 Advisory Committee?
324:17          A.      I don't remember the date of the
324:18     meeting.
324:19          Q.      You wrote "To ALL" --
324:20          A.      It looks like it is the same day.
324:21          Q.      "To ALL:  I bit my nails all day."
324:22     You're referring to you listening to the Advisory
324:23     Committee?
324:24          A.      Either listening or being there.  I
324:25     don't remember whether I was there or I viewed it.
324:ESQUIRE DEPOSITION SERVICES
```

```
325: Confidential - Subject to Protective Order 325
325: 1           Q.      If you didn't go, you did listen?
325: 2           A.      Yes.
325: 3           Q.      You said, "You all were FANTASTIC."
325: 4    You wrote that in all caps; right?
325: 5           A.      Yes.
325: 6           Q.      You then wrote that "You made them
325: 7    look like grade d high school students."   Right?
325: 8           A.      That's what the memo says.
325: 9           Q.      You say, "and you won big huge and
325:10    completely."  True?
325:11           A.      That's what I said.
325:12           Q.      You wrote that?
325:13           A.      Yes.
325:14           Q.      You note at the end of this that your
325:15    team should, "enjoy and bask in the warmth of having
325:16    done an impossible job superbly."  Is that right?
325:17           A.      That's what I wrote.


Scolnick 32607     326:7-326:10

326: 7                   You agree it is not very flattering
326: 8    to refer to the agency responsible for protecting
326: 9    the public health as it relates to drugs as "grade d
326:10    high school students."


Scolnick 32612a    326:12-326:16

326:12                   THE WITNESS:  No, it is not
326:13    flattering.  As I said, it came from an allusion to
326:14    an earlier event related to the crux of an Advisory
326:15    Committee meeting, and it was inappropriate in this
326:16    context.


Scolnick 32910a    329:10-329:24

329:10           Q.      So, after this Advisory Committee in
329:11    February of 2001, you got a letter from the FDA
329:12    saying that they were conditionally approving
329:13    Merck's supplemental new drug application; right?
329:14           A.      At some point we got a letter back
329:15    from them, yes.
329:16           Q.      You didn't like the tone of the
329:17    letter, though, did you?
329:18           A.      We didn't like the tone, and we
329:19    didn't like the content.  As I said earlier, they
329:20    ignored all the GI data.  They completely left it
329:21    out.  They left out the Alzheimer's data, and they
329:22    had a warning, despite what had happened at the
329:23    Advisory Committee, where no warning was suggested
329:24    based on all the data, or voted for.


Scolnick 33112     331:12-331:18

331:12           Q.      For the record, Dr. Scolnick, I've
331:13    just passed you what we've marked as Exhibit 13 to
331:14    your deposition.  It's a two-page series of e-mails
331:15    Bates stamped MRK-ACR0009151 to 9152.  Doctor, you
331:16    are, in fact, an author and recipient on several of
331:17    these e-mails; true?
```

```
331:18          A.      Yes.

Scolnick 33209    332:9-332:25

332: 9          Q.      You didn't like the tone of the
332:10   approvable letter you got from Merck's supplemental
332:11   NDA; true?
332:12          A.      That's correct.  I don't remember
332:13   what was in it at this point, so, it's very hard to
332:14   respond to your question.
332:15          Q.      I'll just read the first sentence.
332:16   "To ALL:  I am sure you imagine my reaction to the
332:17   tone of the letter.  The open ended request for
332:18   safety updates is a filibuster."  Do you see that?
332:19          A.      Yes.
332:20          Q.      What's a filibuster?
332:21          A.      It's a delaying tactic.
332:22          Q.      So, you thought the FDA was trying to
332:23   delay approval of your supplemental NDA request to
332:24   get safety information?
332:25          A.      That's what I wrote.

Scolnick 33311    333:11-334:12

333:11          Q.      You viewed this is as a delay tactic
333:12   by the FDA?  Is that your testimony?
333:13          A.      That's what I was worried about.
333:14          Q.      Then you state, "When will you find
333:15   out what they have done for our competitor?  If by
333:16   any chance they get a better label now and we are
333:17   asked for this much more data, I will be in Janet's
333:18   office the next day."  Do you see that?
333:19          A.      Yes.
333:20          Q.      Your competitor would be Celebrex?
333:21          A.      Yes.
333:22          Q.      The manufacturer of Celebrex?
333:23          A.      Yes.
333:24          Q.      Okay.
333:25          You were concerned that the
333:ESQUIRE DEPOSITION SERVICES
334: Confidential - Subject to Protective Order 334
334: 1   manufacturers of Celebrex were going to get an
334: 2   approved label before Vioxx was going to get an
334: 3   approved label?
334: 4          A.      For GI outcomes, yes, that's what I
334: 5   think I was concerned about.
334: 6          Q.      And if that happened, you were going
334: 7   to go down there to the FDA and see Janet the next
334: 8   day; is that right?
334: 9          A.      That is what I said in the memo.
334:10          Q.      Who is Janet?
334:11          A.      Janet was Janet Woodcock, who was, I
334:12   believe, the head of the drug part of the FDA.

Scolnick 33420    334:20-334:24

334:20          Q.      So, you felt you could go down there
334:21   to Janet's office, and you could tell her to
334:22   straighten things out and make sure that Merck's
334:23   label got approved on the terms you wanted it
```

```
  334:24      approved on?
```

Scolnick 33501      335:1-335:4

```
  335: 1                   THE WITNESS:  I don't know exactly
  335: 2      what I was thinking.  I certainly wanted to advocate
  335: 3      on Merck's behalf if this were to happen.  That's
  335: 4      what this memo says.
```

Scolnick 33512      335:12-335:15

```
  335:12            Q.    Sir, is that the way it's supposed to
  335:13      work, when you want to address a labeling request
  335:14      with the FDA, you go down, and you go into Janet
  335:15      Woodcock's office to address it?
```

Scolnick 33518      335:18-335:25

```
  335:18                   THE WITNESS:  The head of the drug
  335:19      office can be involved in labeling negotiations.
  335:20      BY MR. BUCHANAN:
  335:21            Q.    Is that who Janet Woodcock was?
  335:22            A.    I believe at the time she was head of
  335:23      the drug approval part of the FDA as opposed to
  335:24      vaccines and other parts of the FDA, I believe, but
  335:25      I'm not certain.
```

Scolnick 33601a      336:1-336:8

```
  336: 1            Q.    So, in other words, if the FDA
  336: 2      perchance decided to give the Celebrex manufacturers
  336: 3      the label they had sought before you got it, you
  336: 4      were going to go down to the, what's this, the head
  336: 5      of drug approval and complain?  Is that your
  336: 6      testimony?
  336: 7            A.    That was -- that's what this note
  336: 8      implies.
```

Scolnick 34024      340:24-341:5

```
  340:24            Q.    You said that you weren't just going
  340:25      to stop with Janet; right?
  340:ESQUIRE DEPOSITION SERVICES
  341: Confidential - Subject to Protective Order 341
  341: 1            A.    That's what this says.
  341: 2            Q.    You said you'd go beyond if you
  341: 3      needed to with other contacts you'd made in HHS;
  341: 4      right?
  341: 5            A.    That's what this says.
```

Scolnick 34117      341:17-341:20

```
  341:17                   So, you'd go over Janet's head if you
  341:18      needed to?
  341:19            A.    In order to make scientific points
  341:20      which I felt strongly about.
```

D ES  34121      341:21-342:5

```
  341:21            Q.    I understand.
```

```
341:22                    If you felt strongly and Janet didn't
341:23    give you the answers you wanted, you would go above
341:24    Janet's head; right?
341:25           A.     I would argue the science that we
341:ESQUIRE DEPOSITION SERVICES
342: Confidential - Subject to Protective Order 342
342: 1    based our -- particularly, I think, talking about
342: 2    the GI labeling of the drug.  We had pristine data
342: 3    about the GI safety -- the improved GI safety of
342: 4    Vioxx which had not been acknowledged in the
342: 5    approvable letter, to the best of my knowledge.
```

Scolnick 34301       343:1-343:11

```
343: 1                    I see the last sentence here you say,
343: 2    "I have never seen being nice to the FDA-except on
343: 3    rare occasions-pay off."  You wrote that?
343: 4           A.     Yes.
343: 5           Q.     You meant it?
343: 6           A.     Yes.
343: 7           Q.     It's a true statement?
343: 8           A.     It was my feeling.
343: 9           Q.     True statement when you wrote it,
343:10    sir?
343:11           A.     It is my feeling when I wrote it.
```

Scolnick 35312a     353:12-353:25

```
353:12           Q.     Then you say, "One cannot deal with
353:13    them in a rational way."  Right?
353:14           A.     That's what I said.
353:15           Q.     And rational way was your way; right?
353:16           A.     No.  Rational way was the way we had
353:17    been trying to deal with them when we submitted the
353:18    supplemental NDA, with all of the data that was
353:19    supported at the Advisory Committee meeting.
353:20           Q.     Right.
353:21                    To be clear, what the FDA was asking
353:22    for was additional safety information in their
353:23    approvable letter; true?
353:24           A.     That's what the memo implies.  I do
353:25    not know nor recall what was in that request.
```

Scolnick 35415       354:14-354:19

```
354:14    BY MR. BUCHANAN:
354:15           Q.     The bottom line is that the FDA,
354:16    looking for additional data on Vioxx in connection
354:17
```