## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 2:05-CV-04379 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| ROBERT G. SMITH, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE THE TESTIMONY OF DAVID GRAHAM, M.D.[1]

### (MOTION IN *LIMINE* NO. 4)

In *Barnett v. Merck,* this Court allowed plaintiff to present, over Merck's objections, Dr. Graham's expert opinions on various topics.  Merck requests that the Court reconsider its ruling on several of those topics.

---

[1] Merck incorporates by reference its prior motions on this subject.  (*See* Motion of Merck For Order Excluding Testimony of David Graham, M.D. (Motion in *Limine* No. 6), filed in *Barnett v. Merck* on June 16, 2006 (Record Docket No. 5312); Motion of Merck to Exclude Evidence of and Reference to Estimates of Dr. David Graham (Motion in *Limine* No. 8), filed in *Plunkett v. Merck* on Jan. 30, 2006 (Record Docket No. 3030).)

First, Dr. Graham was allowed to testify that Vioxx caused between 88,000 to 144,000 excess cases of serious coronary events – an opinion completely unrelated to the findings of the study Dr. Graham actually conducted.  As the gatekeeper for unreliable expert testimony, this Court should exclude such testimony because the basis for Dr. Graham's opinion that Vioxx caused these excess events is unreliable.  Second, Dr. Graham was allowed to offer opinions criticizing the FDA and the regulatory process.  Although this country's government is divided into three branches that act as a system of checks and balances, the judicial branch (by way of a jury trial) cannot find Merck liable based on testimony that the FDA performed an inadequate risk/benefit analysis because it is influenced by the pharmaceutical industry.  Finally, this Court should reconsider its prior rulings allowing Dr. Graham's testimony (i) comparing Vioxx to a loaded gun and the statistical concept of confidence levels to Russian Roulette; (ii) about phenylpropanolamine, a drug not manufactured by Merck; and (iii) about the Prescription Drug User Fee Act.  This testimony should be excluded under Federal Rules of Evidence 401-403 because it has little or no relevance in this case and is highly prejudicial and inflammatory.

I.      **DR. GRAHAM'S EXCESS EVENT OPINION MUST BE EXCLUDED BECAUSE IT IS UNRELIABLE, IRRELEVANT, AND UNDULY PREJUDICIAL.**

    A.      **Federal Rule of Evidence 702 and *Daubert* Require this Court to Scrutinize Opinion Testimony to Determine it is Both Reliable and Relevant.**

Determination of whether opinion testimony is reliable is governed by the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) and by Rule 702 as amended in the wake of that decision.  In *Daubert,* the Court made clear that the district courts must act as gatekeepers to ensure that expert testimony is both *relevant* and *reliable*.  509 U.S. at 589.  As the "gatekeeper," the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is

822926v.1

scientifically valid." *Id.* at 592-93.  The proponent of the opinion testimony must establish that it is based on sufficient facts or data and must "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable."  *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  If it does not pass this test, the opinion testimony must be excluded.  *Id.* at 279.  The admissibility of Dr. Graham's opinion that Vioxx caused between 88,000 to 140,000 excess cardiac events is subject to *Daubert* and Federal Rule of Evidence 702.[2]

**B.     Dr. Graham's Opinion does not Satisfy the Reliability or Relevance Requirements Established by *Daubert* and Federal Rule of Evidence 702.**

The Graham study is a retrospective analysis of data from Kaiser Permanente's California database.  (Graham Study at 1.)  Based on his retrospective analysis of that data, Dr. Graham found that the use of Vioxx at the 25 mg dose was not associated with an increased risk of cardiovascular events such as heart attacks.  (*Id.* at 4, Table 3.)  Despite this finding, Dr. Graham now opines that Vioxx use caused some 88,000 to 140,000 excess cases of cardiac events in the United States and that approximately 44% of these excess cases were fatal.  (*Id.* at 6; (Deposition of David Graham, M.D. ("Graham Dep.") at 203:9-205:6, attached as Ex. A.)  This estimate, however, is not based on any analysis of the Kaiser Permanente data, nor is it connected in any way to the findings of his study, which  was published in The Lancet.  Instead, Dr. Graham derived his excess event estimate through a series of manipulative calculations based on data from four *entirely different* studies.

---

[2] The alleged scientific basis for Dr. Graham's excess event estimate is found in David J. Graham et al., *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study, available at* http://image.thelancet.com/ extras/05art1005web.pdf (Jan.

(*footnote continued next page*)

3

Dr. Graham's opinion that Vioxx caused between 88,000 to 140,000 excess cases of serious coronary events in the general population is not admissible simply because this statement is found in an article he wrote and had published in The Lancet.  *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316 (11th Cir. 1999) ("[S]crutiny by one's peers does not insure admissibility.  Again, it is well established that 'publication . . . is not a sine qua non of admissibility.'") (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. at 593); *Jones v. U.S.*, 933 F. Supp. 894, 899 & n.8 (N.D. Cal. 1996) (rejecting expert's reliance on statistically insignificant data to prove causation notwithstanding that articles reporting such data were published in peer-reviewed journals).[3]  Rather, Federal Rule of Evidence 702 requires the Court to determine that the opinion is "based upon sufficient facts or data" and "the product of reliable principles and methods."  Because Dr. Graham's estimate is scientifically unreliable and simply wrong, the Court should exclude it and any reference to it.[4]

1.    Dr. Graham's Excess Event Estimate Is Unreliable.

Dr. Graham's opinion that Vioxx caused between 88,000 to 140,000 excess events is unreliable and must be excluded because the methodology he used was flawed.  *See Moore*, 151 F.3d at 279 (courts "are encouraged" to exclude expert testimony that is speculative and lacking in scientific validity).  Indeed, Dr. Graham conceded that the excess event estimate was not intended to be an accurate number:

---

25, 2005) (hereinafter the "Graham Study").

[3] Indeed, Dr. Graham's peer reviewers at the FDA urged him to take the excess event calculation out of his article.  (Graham Dep. at 410:1-23.)

[4] For similar reasons, the Court should exclude any evidence of or reference to any other excess event estimates regarding Vioxx.  In his deposition, for example, Dr. Graham testified that his estimate is lower than the estimates of "some other folks."  (Graham Dep. at 463:5-10.)  Dr. Graham could not identify who these "other folks" were or how they derived their estimates.

4

> And we put a number in our paper, and what we were more concerned with was the public health impact of Vioxx exposure than we were with what were the particular numbers, *recognizing that the particular numbers could be different than the range that we gave,* but that was our best estimate at what we thought was likely to be the case.

(Graham Dep. at 430:6-15 (emphasis added).)

Dr. Graham manufactured this estimate through a series of calculations that involved multiplying the relative risk of heart attacks among Vioxx users as reported in the VIGOR[5] and APPROVe[6] studies by the rate of heart attacks in patients receiving other therapies, which he derived from data reported in the CLASS Study[7] and a 2002 observational study performed by plaintiff's expert Professor Wayne A. Ray.[8]  He then applied an overall fatality rate associated with heart attacks in the general population.  (Graham Dep. at 152:21-154:1, 402:20-405:11; 419:12-422:11; Graham Study at 6.)  Dr. Graham's estimate is flawed in multiple respects.

*First*, the estimate is based on a misleading calculation unwarranted by the underlying data.  As the chart below demonstrates, the actual rate of heart attacks among Vioxx users in the VIGOR and APPROVe studies from which he derived the multipliers for his calculation was *lower* than the rate of heart attacks reported for the patients in the CLASS and Ray studies, which provided the baseline for his computation.  (Graham Dep. at 428:13-19, 432:22-433:1

[5] Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis* (hereinafter "Bombardier"), N. ENGL. J. MED. 343:1520 (2000).

[6] Bresalier et al., *Cardiovascular Events Associated with Rofecoxib in Colorectal Adenoma Chemoprevention Trial*, N. ENGL. J. MED. 352:1092 (2005) (hereinafter "Bresalier").

[7] The CLASS study compared Celebrex to ibuprofen and diclofenac, two traditional NSAIDs. *See* F.E. Silverstein et al., *Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study – a randomized controlled study* (hereinafter the "Class Study"), JAMA 2000, 284: 1247-55.

[8] The Ray study compared Vioxx to other NSAIDs.  *See* W.A. Ray et al., *COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease* (hereinafter the (*footnote continued next page*)

5

822926v.1

("Q:  And, again, the real life heart attack rate in both VIGOR and APPROVe was lower than what you say is the normal background rate for people who are not taking any medicine at all, right?  A:  That's correct. . . . Q: . . . VIGOR and APPROVe both had lower rates than your background rates, correct?  A:  Yes.").)

| Comparison of Heart Attack Rates In Studies Relied on by Dr. Graham | | |
|---|---|---|
| Study | Rate (per thousand patient years) | Patient Group |
| VIGOR | 7.4[9] | 50mg Vioxx users |
| APPROVe | 6.9[10] | 25mg Vioxx users |
| CLASS | 7.9[11] | Ibuprofen/diclofenac users |
| Ray | 12.4[12] | NSAID users and non-users |

In other words, while Dr. Graham purports to find an excess number of heart attacks associated with Vioxx use, the underlying data that he relies on for this proposition show the exact *opposite* – namely, that Vioxx users had *fewer* heart attacks than users of other NSAIDs. Given this data, Dr. Graham has no legitimate scientific basis for his opinion that Vioxx caused between 88,000 to 140,000 excess events in the general population.  The Court can and should exclude it.  *See, e.g., Joiner*, 522 U.S. at 146 ("[C]onclusions and methodology are not entirely

---

"Ray Study"), LANCET 2002, 360: 1071-73.

[9] (Graham Dep. at 421:5-18.)

[10] (*Id.* at 423:17-424:24.)

[11] CLASS Study at 1247.

[12] Ray Study at 1072.

822926v.1

distinct from one another. . . .   A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 587 (5th Cir. 2004) ("A court may rightfully exclude expert testimony where a court finds that an expert has extrapolated data, and there is too great an analytical gap between the data and the opinion proffered." (internal quotation marks omitted)); *see also Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997) ("[A]n expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology.").

*Second*, Dr. Graham's excess event estimate is inconsistent with the data he relies on.  As explained above, Dr. Graham's excess event estimate is derived from a calculation of numbers from four different studies.  Only two of those studies involved patients taking Vioxx:  VIGOR and APPROVe.  The APPROVe study, however, did not find *any* increased risk of adverse cardiovascular events associated with short-term, continuous use (like the plaintiff's) of Vioxx at the 25 mg dose.[13]  Moreover, neither VIGOR or APPROVe demonstrated an increased risk of death.[14]

*Third*, Dr. Graham's excess event estimate is not supported by his findings from the Kaiser Permanente data that he analyzed and published in The Lancet.  Dr. Graham conceded that the Kaiser Permanente data demonstrated *no* statistically significant increased risk of heart attacks or deaths associated with the use of Vioxx at the 25 mg dose.  (Graham Study at 4, Table

---

[13] Bresalier at 1092.  In addition, because VIGOR compared Vioxx against naproxen rather than placebo, it cannot be determined whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (1) a cardiovascular risk associated with high-dose Vioxx; (2) a cardio-protective effect associated with naproxen; or (3) chance, either in whole or in part.

[14] Bresalier at 1092; Bombardier at 1523.

3.)   His testimony in a case where the primary question is whether plaintiff's short-term, continuous use of Vioxx caused injury is irrelevant and at odds with the Kaiser Permanente data, which was the basis for his published article.

Because Dr. Graham's calculation was flawed and he cannot conclude to any degree of scientific certainty that Vioxx use was associated with an excess number of heart attacks or sudden cardiac deaths, this opinion must be excluded.[15]

  2.      Dr. Graham's Opinion that Vioxx Caused Excess Events in the General Population Is Irrelevant to Whether Vioxx Caused Plaintiff's Injury.

Dr. Graham's excess event estimate is irrelevant.  It has no tendency in reason to prove that plaintiff's use of Vioxx caused *his* alleged heart attack.  *See Mobil Exploration & Producing v. A-Z/Grant Int'l Co.*, CIV. A. Nos. 91-3124, 91-4056, 1996 WL 194931, at *5 (E.D. La. Apr. 22, 1996) (excluding evidence of prior unrelated incidents because such evidence addressed problems with no apparent connection to plaintiff's case and if admitted would lead to a mini-trial, confuse the jury, and waste time); *Lowry v. Seaboard Airline R. Co.*, 171 F.2d 625, 627 (5th Cir. 1948) (noting risks of diversion posed by litigating facts of prior unrelated incidents and observing that "[f]ixing the blame in another case would not fix it in this one").

Dr. Graham found *no* statistically significant increased risk of heart attacks or deaths associated with the use of Vioxx at the 25 mg dose.  (Graham Study at 4, Table 3.)  Mr. Smith used Vioxx primarily at the 25 mg dose.  Because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," Dr.

---

[15] Moreover, the fact that cardiovascular mortality rates have been declining for years – and continued to do so while Vioxx was on the market – highlights the unreliable nature and irrelevance of Dr. Graham's estimate.  (*See* American Heart Association, Heart Disease and Stroke Statistics – 2005 Update.)

822926v.1

Graham's excess event estimate has no relevance to this case. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005).

Even if Dr. Graham's excess event estimate had some relevance, the Court still should exclude any evidence of or reference to it on the ground that it is unduly prejudicial and confusing. Plaintiff's only purpose in seeking the admission of this evidence is to inflame the jury's passions against Merck. Indeed, plaintiff apparently hopes that if the jury learns that Vioxx supposedly caused tens of thousands of excess heart attacks and related deaths, then it will conclude that Vioxx must have caused plaintiff's alleged heart attack as well. Federal Rule of Evidence 403 was designed to prevent such tactics. Under Rule 403, evidence is unfairly prejudicial, and thus inadmissible, if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, triggers other mainsprings of human action, or may cause a jury to base its decision on something other than the established propositions of the case." *Moore*, 126 F.3d at 692. Courts are advised to exclude as unduly prejudicial evidence that has an "undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." *See* Advis. Comm. Note to FED. R. EVID. 403. That is the case here.

If jurors are allowed to hear Dr. Graham's opinion that Vioxx resulted in 88,000 to 140,000 excess cases of heart attacks, 44% of them supposedly fatal, they might be inclined to believe – without regard to the specific facts of plaintiff's medical history or claimed Vioxx use – that plaintiff's use of Vioxx must have caused his alleged heart attack. That would be a manifestly unfair result since, as explained above, Dr. Graham's estimate in fact has no tendency to prove that Vioxx caused or contributed to *plaintiff's* alleged injuries since Dr. Graham did not purport to find an increased risk of cardiac events when Vioxx was used at the 25 mg dose.

822926v.1

Accordingly, evidence of or reference to Dr. Graham's excess event estimate would not assist the trier of fact to decide any issue that is relevant to this case. Rather, it would serve only to inflame the jury's emotions and foster resentment of Merck. For the foregoing reasons, the Court can and should exclude any evidence of or reference to Dr. Graham's excess event estimate.

## II.   DR. GRAHAM'S TESTIMONY CRITICIZING THE FDA IS PREEMPTED, IRRELEVANT, AND UNDULY PREJUDICIAL.

### A.   This Trial is not the Proper Forum to Present Dr. Graham's Disapproval of the FDA.

Much of Dr. Graham's testimony is an elaboration of why and how he believes the FDA is "broken." (Graham Dep. at 37:18-22.) For example, Dr. Graham testifies that:

- "FDA views industry as its primary customer, as its client. And this gets transmitted to the management. *That's how management gets selected, by how well they get along with industr*y." (Graham Dep. at 110:22-111:3 (emphasis added).)

- The division directors within the Office of New Drugs "*pick people* [to serve on Advisory Committees] who they know from the field and frequently [they] will talk with those people[16] about upcoming Advisory Committee meetings and the type of direction that they wish that advisory meeting to go in." (*Id.* at 112:2-8; *see also id.* at 194:17-22 (claiming the FDA tried to "suppress publication of [his] paper.").)

- "FDA is not functioning in the independent and objective interests of what's best for the public, that it is really functioning first and foremost for a service of its primary customer and client, the industry." (*Id.* at 124:4-10 (describing the message behind two of Dr. Graham's cartoons criticizing the FDA); *see also* 175:10-21 (testifying about the "FDA's response, which in my experience has been to downplay or ignore those risks and to let things get

---

[16] This testimony must also be excluded on the ground that it constitutes inadmissible hearsay. (*See also id.* at 111:8-11 ("These are phrases that are frequently used within FDA to describe the relationship that is desired between the regulator and the regulated.").) For the same reason, Dr. Graham's testimony about the "financial attachments [the FDA Advisory Committee has] to industry" must be excluded. (*Id.* at 112:9-14 ("it's been in the newspaper quite a bit that a third of FDA Committee members have financial ties to industry").)

worse"); 85:1-86:9 (same).)

- "Vioxx is the single greatest drug safety catastrophe in the history of this country" and "Vioxx is a terrible tragedy and a profound regulatory failure." (*Id.* at 37:8-37:14; 36:21-37:1.)

In short, plaintiff seeks to convince the jury that it should second-guess the structure and decisions of the FDA based on the ruminations of a single FDA employee.[17]  Such testimony plainly conflicts with the federal regulatory scheme Congress has established to regulate drug safety.

Pursuant to *Buckman*, all of this testimony is preempted under federal law and for good reason.  There are real dangers in permitting juries to impose their judgments on the adequacy of the drug approval process under state-law standards.  In discharging that task, the FDA strikes "a somewhat delicate balance of statutory objectives."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001).  As the Supreme Court has held, "we think this sort of litigation would exert an extraneous pull of the scheme established by Congress, and it is therefore pre-empted by that scheme."  *Id.* at 353.

If anyone is to second-guess the FDA, it is Congress, not a jury who is presented with selected testimony of Dr. Graham.  Indeed, Dr. Graham has no basis to attack the thorough review of all the available information that the FDA conducted in making its decisions.  He admits he was not involved in the FDA's approval or labeling decisions for Vioxx.  (Graham Dep. at 272:5-19.)  Dr. Graham's opinion is not based on the information available to the FDA or

---

[17]Dr. Graham's satiric cartoons that criticize the FDA are but one of several examples of the type of political criticism that does not belong in this trial. (*See* Graham Dep. at 120:18-122:6  ("It's a cartoon.  On the left side it's side effects.  On the right side it says the lifeguard is the FDA, 'Hey, how am I supposed to hear his request for a new drug approval with all your screaming?' And the pharmaceutical company is to the right.  Were you making a point, sir?  Yes, I was. . . . . This, in my view, crystallizes the situation that we have in the United States today and why I said

*(footnote continued next page)*

11

Merck during the relevant time period.  It is nothing more than an opinion that disagrees with the FDA in hindsight.  Such testimony is irrelevant to whether the risks alleged by plaintiff were known or reasonably knowable to Merck.  Moreover, the prejudice from this improper testimony plainly outweighs any probative value.

**B.     The Court Should Exclude Other Irrelevant and Unduly Prejudicial Testimony.**

Dr. Graham also testified to matters that are entirely irrelevant to the Vioxx litigation. This testimony should be excluded under Federal Rules of Evidence 401, 402, and 403.

1.     Analogizing Vioxx to a Loaded Gun and Referring to the FDA's Use of Generally-Accepted Statistical Methods as Russian Roulette Is Improper and Inflammatory.

This Court should exclude Dr. Graham testimony analogizing Vioxx to a loaded gun and the FDA's use of standard confidence levels in its risk-benefit analysis to a game of Russian Roulette:

> A:  [L]et's play Russian roulette.  Now, we're going to put 95 bullets in the gun, so we are 95 percent certain that this drug causes whatever adverse reaction we're talking about.  Let's just say this drug causes liver failure.  This drug causes heart attacks.  We're 95 percent certain.
>
> Q:  That's the current test?
>
> A:  Right.  So, we put 95 bullets in, and we play Russian roulette.  And at that point, the FDA says, we believe you, the gun is loaded, the drug isn't safe. Let's take five bullets out of the chamber.  Now we have 90 bullets in the chamber.  So there's only 90 percent chance that when I pull the trigger, a bullet is going to come out of the gun.  FDA says the gun is not loaded.

(Graham Dep. at 119:1-23.)  In rejecting the 95% confidence level employed by the FDA and the scientific community at large to assess statistical significance, Dr. Graham likened drug safety to Russian roulette.  Statistical significance is a measure of whether the results of a test or experiment may be due to chance.  This testimony does not explain the concept of drug safety,

---

that the United States was defenseless against another Vioxx."); *see also id*. at 123:6-124:10.)

which requires an analysis of the drug's benefits in relation to its risks.  Moreover, in discussing this generally-accepted statistical concept, there is no place for equating percentage points to bullets in a gun.  It would be improper to allow plaintiff to inject an emotional element into this generally-accepted statistical concept.   Accordingly, this testimony should be excluded as improper and inflammatory.  *See* Fed. R. Evid. 401-03.

> 2.   This Case is not about the Drug PPA, and Merck Should not be Forced to Litigate when the FDA Knew about Risks Associated with PPA.

The basis for Dr. Graham's opinion that "there is an institutional bias in the FDA which prevents the FDA from protecting Americans against unsafe drugs" is that the FDA took over a decade to pull another prescription drug, phenylpropanolamine ("PPA"), off the market:

> Q:  Tell the members of the jury what the basis is for that statement.
>
> A:  Well, all you have to do . . . to see it crystal clear is to look at the drugs that have come off the market.  These are drugs where FDA approved them, and by approving them said the drugs were safe and effective . . . If we examine how long it takes from when the signal of the problem emerges to when the drug comes off the market, you will see that that is measured in years, sometimes in decades.   With phenylpropanolamine, PPA, a drug product present in virtually every cough/cold preparation in the country, it was in over-the-counter diet aids to help people lose weight, was associated with hemorrhagic stroke primarily in young women, and this was known since 1984.  However, it wasn't until about 2000 or 2001 that FDA finally removed that product from the market.  In the meantime, the company that made PPA or the companies that made PPA continued to make profits, and patients continued to be harmed.

(*Id.* at 85:4-86:9.)  This type of irrelevant testimony must be excluded.  This case is not about PPA and Merck should not be forced to litigate whether the FDA "knew since 1984" that PPA was associated with hemorrhagic stroke.  Fed. R. Evid. 401-03.

> 3.   Dr. Graham's Belief that Congress' Enactment of the Prescription Drug User Fee Act Caused the FDA to Favor the Pharmaceutical Industry Should be Excluded.

Dr. Graham's discussion and characterization of the Prescription Drug User Fee Act

("PDUFA"), which was enacted by Congress in 1992, is likewise irrelevant and unduly prejudicial. PDUFA requires pharmaceutical companies to pay fees when it submits, for example, a new drug application or requests other services from the FDA.[18]  *See* 21 U.S.C. § 379h.  Dr. Graham believes that PDUFA has caused "the preapproval people [to] look for reasons to say yes to a drug."  (Graham Dep. at 95:22-96:1.)  This testimony must be excluded for three distinct reasons.

First, Dr. Graham's opinion constitutes improper state of mind testimony as to the group of people who decide whether a drug is safe and effective.  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (rejecting expert testimony "on the intent, motives or states of mind of corporations, regulatory agencies and others" because they "have no basis in any relevant body of knowledge or expertise"); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20, 2000).  Second, this testimony is based on inadmissible hearsay.  Dr. Graham is not involved with the approval of drugs and testified that his belief that "preapproval people look for reasons to say yes to a drug" is based on the alleged statements of other FDA employees:

> These are remarks that have been passed in internal meetings that I have been present at.  . . .  And since I have gone public with my Senate testimony, I have *been approached now by probably 10 or 15 medical reviewers from different components of CDER with stories of* being pressured to change their reviews where they thought a drug should not be approved, but where management was telling them you must now say yes to that drug.

(*See* Graham Dep. at 97:4-17 (emphasis added).)  Third, this type of testimony is a criticism of the FDA that is preempted by *Buckman*.  *See infra* Part I(C).

---

[18] In 1992, Congress enacted PDUFA to address the FDA's staffing needs so it could process the paperwork it received in a timely manner.  102 P.L. 571, 102 (findings by Congress that PDUFA should be enacted because "the public health will be served by making additional funds available for the purpose of augmenting the resources of the Food and Drug Administration").

822926v.1

**III.    CONCLUSION.**

For the reasons stated above, the Court should exclude certain unreliable, irrelevant, and unduly prejudicial portions of Dr. Graham's deposition testimony.

822926v.1

Dated:  August 7, 2006

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
Carrie A. Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Richard B. Goetz
Ashley A. Harrington
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

And

Douglas R. Marvin
Robert A. Van Kirk
Emily Thacher-Renshaw
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

Attorneys for Merck & Co., Inc.

16

822926v.1

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing Memorandum in Support of Merck's Motion to Exclude Testimony of David Graham, M.D. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 7th day of August, 2006.


*/s/ Dorothy H. Wimberly*

822926v.1