Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

[1008:] - [1008:25]     2/10/2006   Plunkett II Trial - Vol. 05

```
page 1008
    1008
1                        UNITED STATES DISTRICT COURT
2                        EASTERN DISTRICT OF LOUISIANA
3
4
5
     IN RE: VIOXX PRODUCTS            *
6    LIABILITY LITIGATION            *      MDL DOCKET NO. 1657
                                      *
7                                     *
     THIS DOCUMENT RELATES TO         *      NEW ORLEANS, LOUISIANA
8    CASE NO. 05-4046:               *
                                      *
9    EVELYN IRVIN PLUNKETT, ET AL    *      FEBRUARY 10, 2006
                                      *
10   VERSUS                          *
                                      *      8:30 A.M.
11   MERCK & CO., INC.               *
     * * * * * * * * * * * * * * *
12
13
                        VOLUME V - DAILY COPY
14                       JURY TRIAL BEFORE THE
                      HONORABLE ELDON E. FALLON
15                   UNITED STATES DISTRICT JUDGE
16
17   APPEARANCES:
18
     FOR THE PLAINTIFF:           BEASLEY ALLEN CROW METHVIN
19                                  PORTIS & MILES
                                  BY:  ANDY D. BIRCHFELD, JR., ESQ.
20                                     LEIGH O'DELL, ESQ.
                                  234 COMMERCE STREET
21                                POST OFFICE BOX 4160
                                  MONTGOMERY, ALABAMA 36103
22
23   FOR THE PLAINTIFF:           LEVIN, PAPANTONIO, THOMAS,
                                    MITCHELL, ECHSNER & PROCTOR
24                                BY:  TROY RAFFERTY, ESQ.
                                  316 SOUTH BAYLEN STREET, SUITE 600
25                                PENSACOLA, FLORIDA 32502
```

[1116:2] - [1135:25]     2/10/2006   Plunkett II Trial - Vol. 05

```
page 1116
2                AND, YOU KNOW, THE FDA, IS A BUREAUCRACY.  IT TAKES
3    TIME TO DO THINGS.  IT'S NOT A GOOD THING TO WAIT FOR THE FDA
4    TO LOOK THROUGH ALL THE DATA IF IT'S A SERIOUS SAFETY HAZARD
5    AND PEOPLE REALLY NEED TO KNOW ABOUT IT RIGHT AWAY.
6                SO THAT'S THE WHOLE PURPOSE OF THIS REGULATION IS TO
7    GET THE INFORMATION OUT THERE AS QUICKLY AS POSSIBLE, LET THE
8    FDA LOOK AT IT AFTER IT'S OUT THERE.  IF THEY WANT TO MAKE ANY
9    CHANGES, THEY DO IT AT THAT POINT.
10   Q.   SO IF A COMPANY WANTS TO STRENGTHEN A WARNING OR ADD TO A
11   WARNING, THEY CAN DO IT; CORRECT?
12   A.   THAT'S WHAT THIS -- I MEAN, THE REGULATION SAYS,
13   THAT THIS PARTICULAR RULE IS SPECIFICALLY FOR THE PURPOSE OF
14   ADDING OR STRENGTHENING A CONTRAINDICATION, WARNING,
15   PRECAUTION, OR ADVERSE REACTION.
16   Q.   IF THEY WANT TO SUBTRACT OR TAKE AWAY A WARNING, THAT'S A
17   DIFFERENT SITUATION?
18   A.   TAKING AWAY A WARNING, IF THEY WANT TO TAKE IT OUT, WELL,
19   THE FDA WANTS TO LOOK AT THAT FIRST, SO THAT REQUIRES A PRIOR
20   APPROVAL.  YOU CAN'T DECIDE YOU'RE GOING TO TAKE OUT A WARNING,
```



EXHIBIT

A

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
21        YOU'RE GOING TO TAKE OUT INFORMATION ABOUT A SERIOUS ADVERSE
22        REACTION ON YOUR OWN AND JUST START DISTRIBUTING THE LABEL.
23        FDA WANTS TO MAKE SURE THEY KNOW WHAT YOU'RE DOING, AND SO
24        TAKING IT OUT REQUIRES PRIOR APPROVAL.
25        Q.    AND THEY DO THIS SO THEY CAN START SUBMITTING -- THEY CAN
page 1117
1         START DISTRIBUTING THE LABEL AND WARNING DOCTORS AS LONG AS
2         THEY SUBMIT AN APPLICATION AT THE TIME THAT THEY DO THAT,
3         CORRECT?
4         A.    IF THEY HAVE NEW INFORMATION ABOUT A SERIOUS SAFETY
5         HAZARD, THEY SUBMIT -- THEY PUT IT IN LABELING, THEY GET IT OUT
6         THERE, AND THEY SUBMIT AN APPLICATION TO THE FDA AT THE SAME
7         TIME.
8         Q.    AT ANY POINT BETWEEN MAY OF 1999 AND APRIL OF 2002, DID
9         MERCK EVER UTILIZE -- IS THIS SOMETHING -- LET ME BACK UP.  IS
10        THIS WHAT'S CALLED A CHANGE BEING EFFECTED?
11        A.    THAT'S THE NAME OF THE REGULATION, A CHANGES BEING
12        EFFECTED.  CHANGES OF LABELING, CHANGES BEING EFFECTED.
13        Q.    NOW, AT ANY TIME DURING MAY OF 1999 AND APRIL OF 2002, DID
14        MERCK EVER SUBMIT A CHANGE BEING EFFECTED TO ADD A
15        CARDIOVASCULAR WARNING?
16        A.    NO, NEVER DID.
17        Q.    IN FACT, WELL -- SPECIFICALLY, DID THEY DO IT AFTER THEY
18        GOT THE VIGOR RESULTS IN MARCH OF 2000?
19        A.    NO, THEY DID NOT.  NOT TO ADD A CARDIOVASCULAR WARNING.
20        CARDIOVASCULAR WARNING.
21        Q.    IN FACT, AFTER THE VIGOR RESULTS BECAME KNOWN TO MERCK IN
22        MARCH OF 2000, DID THEY SUBMIT A NEW LABEL TO THE FDA?
23        A.    THEY SUBMITTED A NEW LABEL PROPOSAL IN JUNE OF 2000, ABOUT
24        TWO MONTHS AFTER THEY TOLD THE FDA ABOUT THE VIGOR RESULTS.
25        Q.    SO THEY DID SUBMIT SOMETHING TO THE FDA, BUT IT WASN'T
page 1118
1         WHAT WE CALL A CBE; CORRECT?
2         A.    IT WAS NOT A CBE TO PUT A WARNING IN LABELING, NO, IT WAS
3         NOT.
4         Q.    WHY IS IT IN JUNE OF 2000 THAT MERCK COULD NOT HAVE
5         UTILIZED THAT CHANGE BEING EFFECTED REGULATION?
6         A.    WELL, IT COULD HAVE.  IF IT WANTED TO PUT A WARNING IN
7         LABELING ABOUT CARDIOVASCULAR RISKS, IT COULD HAVE DONE THAT AT
8         THAT POINT, BUT IT DID NOT DO THAT.  AND THE REASON THAT WHAT
9         IT SUBMITTED WAS NOT A CHANGES BEING EFFECTED, A CHANGES BEING
10        EFFECTED SUBMISSION THAT THEY COULD HAVE PUT IN ON THEIR OWN
11        PRIOR TO APPROVAL WAS BECAUSE THEY WERE TRYING TO TAKE OUT A
12        WARNING.
13        Q.    OKAY.  NOW, BEFORE WE GET INTO THAT, I WANT TO DRAW YOUR
14        ATTENTION FIRST TO, IN YOUR BOOKLET OF EXHIBITS, PLAINTIFF'S
15        EXHIBIT 1.0234, WHICH HAS ALREADY BEEN INTRODUCED INTO
16        EVIDENCE.
17        A.    OKAY.
18        Q.    AND HAVE YOU REVIEWED THAT DOCUMENT?
19        A.    YES, I HAVE.
20        Q.    AND DO YOU SEE THE FRONT PAGE?
21              MR. RAFFERTY:  IF YOU CAN JUST BLOW UP THE WRITING
22        THERE ON THE SIDE SO WE CAN ALL SEE IT.
23        BY MR. RAFFERTY:
24        Q.    "ORIGINAL LABEL SUBMISSION FOR VIGOR."  DID I READ THAT
25        CORRECTLY?
page 1119
1         A.    RIGHT.
2         Q.    NOW, IN THIS -- THIS IS THE ORIGINAL LABEL SUBMISSION THAT
3         WAS SUBMITTED BY MERCK TO THE FDA AFTER THEY GOT THE VIGOR
4         CARDIOVASCULAR RISKS, CORRECT?
5         A.    THAT'S CORRECT.
6         Q.    NOW, IF YOU WOULD TURN TO THE WARNING SECTION, WHICH IS
7         LOCATED ON PAGE 13.
8         A.    YES.
9         Q.    PAGE 13?
10        A.    I'M THERE.
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
11      Q.   I'M WAITING FOR THE -- MAKE SURE THAT THE JURY CAN FOLLOW
12      US.
13           MR. RAFFERTY:   NOW, IF YOU WILL BLOW UP THE WARNING
14      SECTION THERE, PLEASE.
15      BY MR. RAFFERTY:
16      Q.   OKAY.  WHAT ARE ALL THESE LINES OUT?  WHAT DOES THAT MEAN?
17      A.   THAT'S MERCK'S PROPOSAL TO CROSS OUT ALL THIS INFORMATION
18      ABOUT A WARNING.
19      Q.   SO MERCK, IN JUNE OF 2000, AFTER IT GETS THE VIGOR
20      RESULTS, INCLUDING THE CARDIOVASCULAR RISKS, THE WARNING THAT
21      THEY SUBMIT TO THE FDA IS TAKING OUT THE GASTROINTESTINAL
22      WARNING THAT HAD BEEN THERE; CORRECT?
23      A.   THIS IS, BY FAR, THE LARGEST CHANGE THEY ARE MAKING IN
24      THIS LABELING.  IT'S ALL TO ELIMINATE A WARNING.
25      Q.   AND IF YOU CAN JUST KEEP SCROLLING DOWN, ALL THE WAY DOWN
page 1120
1       THROUGH THE BOTTOM OF THE PAGE, WHICH INCLUDES THE ENTIRETY OF
2       THE GASTROINTESTINAL WARNING.  NOW, ANYWHERE IN THIS JUNE IN
3       THE WARNING SECTION, IS THERE A PROPOSAL BY MERCK TO PUT THE
4       VIGOR CARDIOVASCULAR RISKS IN THERE, IN THE WARNING SECTION?
5       A.   NO, THERE IS NO PROPOSAL TO PUT CARDIOVASCULAR RISKS IN A
6       WARNING SECTION.
7       Q.   AND IS THERE ANY RECOMMENDATION IN THIS PROPOSAL FROM
8       MERCK IN JUNE OF 2000 TO PUT THE CARDIOVASCULAR RISKS IN THE
9       PRECAUTION SECTION?
10      A.   NO, THERE IS NOT.
11      Q.   WHAT ABOUT IN THE CONTRAINDICATION SECTION?
12      A.   THERE IS NO CONTRAINDICATION ABOUT CARDIOVASCULAR RISKS OF
13      VIOXX.
14      Q.   IN FACT, IF YOU WOULD TURN TO PAGE 12, THE ONLY PLACE
15      MERCK -- WELL, WE'RE GOING TO TALK ABOUT A COUPLE OF OTHER
16      THINGS, BUT IN THIS SECTION, WHICH IS THE -- I BELIEVE IT'S THE
17      CLINICAL STUDIES SECTION; IS THAT CORRECT?
18      A.   THAT'S CORRECT.  YES.
19      Q.   TELL THE JURY WHAT THE SIGNIFICANCE IS OF THE CLINICAL
20      STUDY SECTION OF A LABEL.
21      A.   WELL, THE CLINICAL STUDY, WE'VE TALKED ABOUT THE SECTIONS
22      OF LABELING THAT CONCERN ADVERSE DRUG REACTIONS AND SAFETY
23      HAZARDS.  THOSE ARE THE SAFETY CONTRAINDICATIONS, WARNINGS AND
24      ADVERSE REACTIONS.  THERE IS ALSO A SECTION OF THE LABELING
25      THAT DESCRIBES THE RESULTS OF CLINICAL STUDIES, AND SO THIS IS
page 1121
1       THE CLINICAL STUDY SECTION WHERE THE RESULTS OF STUDIES ARE
2       DISCUSSED.
3       Q.   AND IN YOUR EXPERIENCE AS A MEDICAL OFFICER AT THE FDA --
4       STRIKE THAT.  LET ME BACK UP.  THE JURY HEARD FROM DR. SCHIRMER
5       YESTERDAY THAT HIS PRACTICE WAS TO REVIEW THE WARNINGS,
6       PRECAUTIONS, CONTRAINDICATIONS SECTIONS ON THE LABEL.
7       A.   THAT'S CORRECT.
8       Q.   IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF YOUR
9       EXPERIENCE AT THE FDA, THAT THAT'S WHAT PHYSICIANS ARE
10      CONCERNED WITH?
11      A.   WHEN THEY ARE CONCERNED WITH ADVERSE REACTIONS, THEY LOOK
12      AT WARNINGS, CONTRAINDICATIONS, PRECAUTIONS; THAT'S CORRECT.
13      Q.   NOW, I WOULD LIKE TO ASK YOU:  IF MERCK HAD CHOSEN TO
14      CHANGE OR PUT THE CARDIOVASCULAR RISKS ASSOCIATED WITH VIOXX
15      INTO THE WARNING LABEL IN JUNE OF 2000, COULD THEY HAVE DONE
16      THAT WITHOUT GETTING PRIOR FDA APPROVAL?
17      A.   THEY CERTAINLY COULD HAVE.
18      Q.   AND THEN, IF THEY ALSO WANTED TO TAKE OUT THE GI WARNING,
19      AS THEY DID ON PAGE 13, COULD THEY HAVE FILED A SEPARATE
20      APPLICATION TO GO THROUGH THE REGULAR AND NORMAL APPLICATION
21      PROCESS?
22      A.   IT WOULD CERTAINLY BEEN QUITE USUAL AND PERMISSIBLE FOR
23      THERE TO HAVE BEEN TWO SUPPLEMENTAL APPLICATIONS:  ONE TO
24      PROPOSE TAKING OUT THE GI WARNING, WHICH WOULD HAVE REQUIRED
25      PRIOR APPROVAL; AND ONE TO PUT IN A CARDIOVASCULAR WARNING,
page 1122
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
1         WHICH COULD HAVE BEEN DONE WITHOUT PRIOR APPROVAL.
2         Q.   NOW, IN REGARDS TO THE CHANGES BEING EFFECTED STATUTE, IS
3         THIS A SITUATION WHERE -- WELL, IN YOUR REVIEW OF THE MATERIALS
4         THAT YOU REVIEWED IN FORMING YOUR OPINIONS, DO YOU KNOW IF
5         MERCK EVER AVAILED THEMSELVES OR TOOK ADVANTAGE OF THIS CHANGES
6         BEING EFFECTED REGULATION?
7         A.   IN THIS CASE?
8         Q.   NOT PERTAINING TO THE CARDIOVASCULAR RISKS, BUT HAS MERCK
9         USED THE CHANGES BEING EFFECTED REGULATION FOR OTHER PURPOSES?
10        A.   YES, THEY DID.  ON AT LEAST ONE OCCASION THAT I'M AWARE
11        OF.
12        Q.   SO THIS WASN'T A SITUATION WHERE MERCK DIDN'T KNOW ABOUT
13        THE CBE?
14        A.   WELL, MERCK CERTAINLY KNEW ABOUT THE CBE REGULATION.  ALL
15        PHARMACEUTICAL COMPANIES KNOW ABOUT THAT.
16        Q.   LET ME ASK YOU A QUESTION ABOUT THE LABELING AND THE POWER
17        OF THE FDA IN REGARDS TO LABELING.  DOES THE FDA HAVE THE
18        ABILITY OR THE POWER TO ORDER A LABEL CHANGE?
19        A.   THERE ARE CERTAINLY VERY EXTREME SITUATIONS IN WHICH A
20        COMPANY -- IN WHICH THE FDA CAN FORCE A LABEL CHANGE.  FOR
21        EXAMPLE, THE FDA CAN DECLARE -- TRY TO DECLARE A DRUG AN
22        IMMINENT SAFETY HAZARD, AND THAT INVOLVES GOING TO COURT,
23        GETTING A JUDGE TO AGREE.  IT INVOLVES THE INTERRUPTION OF THE
24        DISTRIBUTION OF THE DRUG.  IT'S A VERY EXTREME MEASURE.  AND
25        IT'S, FOR ALL PRACTICAL PURPOSES, NOT USED VERY MUCH AT ALL
page 1123
1         BECAUSE IT TAKES -- FIRST OF ALL, IT TAKES A VERY LONG TIME.
2              FOR EXAMPLE, IF THE FDA IS CONCERNED ABOUT A SERIOUS
3         ADVERSE REACTION AND THE INFORMATION GETTING OUT THERE, USING
4         THE MOST EXTREME MEASURES IN GOING TO COURT AND ARGUING IN
5         COURT AND SEIZING THE DRUG CAN ACTUALLY TAKE A LOT LONGER.
6              SO THERE ARE CERTAIN VERY EXTREME SITUATIONS WHICH
7         ARE VERY RARELY USED IN WHICH THE FDA CAN FORCE A LABEL CHANGE.
8         BUT IN ALMOST ALL SITUATIONS, IT'S A MATTER OF NEGOTIATION WITH
9         THE COMPANY AND TRYING TO GET THE COMPANY TO GO ALONG WITH WHAT
10        THE FDA THINKS OUGHT TO BE DONE.
11        Q.   SO, PRACTICALLY SPEAKING, I GUESS, IN THE REAL WORLD, IS
12        THERE THE ABILITY OF THE FDA TO ORDER A RAPID LABEL CHANGE OF A
13        WARNING?
14        A.   ORDER?  PRACTICALLY IT IS NOT A QUESTION OF THE FDA BEING
15        ABLE TO ORDER IT.  THE FDA HAS TO NEGOTIATE PRACTICALLY ALMOST
16        ALL THE TIME, EXCEPT IN VERY RARE INSTANCES.
17        Q.   NOW, IN OCTOBER -- LET ME BACK UP HERE A LITTLE BIT ON THE
18        TIME LINE.  IN JUNE OF 2000 IS THE PROPOSAL FOR MERCK TO TAKE
19        OUT THE GI WARNING; IS THAT CORRECT?
20        A.   THAT'S CORRECT.
21        Q.   BUT THERE IS STILL NO WARNING OF CARDIOVASCULAR RISKS?
22        A.   NO WARNING OF CARDIOVASCULAR RISKS.
23        Q.   NO PRECAUTION OF CARDIOVASCULAR RISKS?
24        A.   NO PRECAUTION.
25        Q.   IN BETWEEN JUNE OF 2000, WHEN THIS IS SUBMITTED, AND APRIL
page 1124
1         OF 2002, WHEN THE NEW LABEL IS PUT INTO PLACE, DOES THE FDA
2         INQUIRE OR ASK MERCK FOR FURTHER INFORMATION?
3         A.   YES.
4         Q.   AND THAT'S IN REGARD TO THEIR JUNE 2000 REQUEST?
5         A.   YES.
6         Q.   WHAT WAS IT THAT THEY HAD ASKED FOR?
7         A.   WELL, THEY ASKED FOR A NUMBER OF THINGS, BUT PROBABLY THE
8         MOST SIGNIFICANT THING IS THEY WANTED INFORMATION ABOUT A STUDY
9         CALLED "ADVANTAGE."
10        Q.   AND ARE YOU FAMILIAR WITH THE ADVANTAGE STUDY?
11        A.   I'M SOMEWHAT FAMILIAR WITH THE ADVANTAGE STUDY, YES.
12        Q.   AND IN THE ADVANTAGE STUDY, WHAT RELEVANCE, WHAT -- IS IT
13        UNUSUAL FOR THE FDA TO REQUEST ADDITIONAL INFORMATION WHEN THEY
14        GET A SUBMISSION FOR THESE TYPES OF CHANGES, TAKING THE GI
15        WARNING OUT AND THESE TYPES OF THINGS?
16        A.   IT'S VERY COMMON FOR THE FDA TO ASK FOR ADDITIONAL
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
17        INFORMATION AND ADDITIONAL ANALYSES.
18        Q.  IF YOU WILL, I WOULD LIKE YOU TO TURN IN YOUR NOTEBOOK TO
19        PLAINTIFF'S EXHIBIT 1.1170.
20        A.   I'LL BE WITH YOU IN JUST A SECOND.
21        Q.   ARE YOU THERE?
22        A.   GIVE ME THAT NUMBER AGAIN.
23        Q.   I'M SORRY.  1.1170.  IT IS A FAX DATED NOVEMBER 27, 2000.
24        A.   YES.  I'M THERE.
25        Q.   AND IS THAT FROM THE -- IS THAT A FAX REQUEST FROM THE
page 1125
1         FOOD & DRUG ADMINISTRATION?
2         A.   YES.  A FAX TO MERCK.
3         Q.   AND IT'S TO A ROBERT SILVERMAN, M.D., AT MERCK?
4         A.   THAT'S CORRECT.
5         Q.   AND AT THE BOTTOM IT IS SIGNED BY SOMEONE BY THE NAME OF
6         SANDY?
7         A.   SANDY VULCAN, YES.
8         Q.   THAT IS ONE OF THE PEOPLE INVOLVED IN THE REVIEW OF THIS
9         SUPPLEMENTAL NDA?
10        A.   I BELIEVE SHE WAS THE PROJECT COORDINATOR FOR THE FDA ON
11        THIS.  ACTUALLY, THEY CALL THEM CONSUMER SAFETY OFFICERS.
12             MR. RAFFERTY:  YOUR HONOR, I FAILED TO DO THIS.  AT
13        THIS TIME I WILL MOVE INTO ADMISSION PLAINTIFF'S
14        EXHIBIT 1.1170.
15             MR. ISMAIL:  NO OBJECTION.
16             THE COURT:  LET IT BE ADMITTED.
17        BY MR. RAFFERTY:
18        Q.   NOW, IF YOU WOULD TURN OVER TO PAGE 3, NUMBER 6.
19        MS. VULCAN OF THE FDA IN THIS REQUEST IS SAYING -- WHAT IS SHE
20        REQUESTING?
21        A.   PROVIDE THE FINAL REPORT FOR STUDY 102.  THAT'S ADVANTAGE.
22        Q.   AND IN PARTICULAR, IS SHE LOOKING FOR -- WHAT INFORMATION
23        OUT OF ADVANTAGE IS SHE INTERESTED IN?
24        A.   WELL, SHE -- SHE WANTS THE COMPLETE STUDY REPORT IN
25        THIS -- IN THIS REQUEST.
page 1126
1         Q.   AND IN THE BOTTOM PARAGRAPH THERE DOES SHE SAY, "PLEASE
2         PROVIDE ANALYSES OF SERIOUS GASTROINTESTINAL AND CARDIOVASCULAR
3         THROMBOTIC EVENTS SIMILAR TO THE ONES PERFORMED IN THE VIGOR
4         STUDY"?
5         A.   YES.  "AND PLEASE PROVIDE SEPARATE ANALYSIS BY ASPIRIN
6         USE."
7         Q.   AND THIS IS NOVEMBER 27, 2000; CORRECT?
8         A.   THAT'S CORRECT.
9         Q.   DID MERCK PROVIDE THAT INFORMATION TO THE FDA?
10        A.   WELL, EVENTUALLY IT GOT THERE, BUT IT TOOK A VERY LONG
11        TIME.  THIS WAS A FAX THAT WAS SENT IN NOVEMBER OF 2000, AND
12        THE COMPLETE STUDY REPORT WAS NOT FULLY PROVIDED UNTIL JULY OF
13        THE FOLLOWING YEAR.  SO IT WAS A VERY LONG TIME.
14        Q.   AT THIS TIME, DOCTOR, I WOULD LIKE YOU TO REFER TO
15        DOCUMENT 1.1230.
16             MR. RAFFERTY:  COREY, JUST HOLD ON ONE SECOND BEFORE
17        YOU PUT THAT UP.
18        BY MR. RAFFERTY:
19        Q.   LET ME KNOW WHEN YOU GET THERE.  I HAVE SHOULD HAVE GOTTEN
20        YOU A BIGGER BINDER.
21        A.   OKAY.  I'M THERE.
22        Q.   IS THAT A DOCUMENT FROM THE FOOD & DRUG ADMINISTRATION TO
23        ROBERT SILVERMAN?
24        A.   YES.
25        Q.   DATED APRIL 6, 2001?
page 1127
1         A.   YES.
2         Q.   IS THAT WHAT OFTENTIMES IS REFERRED TO AS AN "APPROVABLE
3         LETTER"?
4         A.   IT'S CALLED AN APPROVABLE LETTER, YES.
5         Q.   AND ARE YOU FAMILIAR WITH APPROVABLE LETTERS?
6         A.   YES, I AM.
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
 7      Q.    THROUGH YOUR WORK AT THE FDA?
 8      A.    YES.
 9      Q.    AND IS THIS SOMETHING THAT'S COMMON AND CUSTOMARY FOR THE
10      FDA TO SEND OUT?
11      A.    YES.
12            MR. RAFFERTY:   AT THIS TIME, YOUR HONOR, I MOVE INTO
13      ADMISSION 1.1230.
14            MR. ISMAIL:   NO OBJECTION.
15            THE COURT:   LET IT BE ADMITTED.
16      BY MR. RAFFERTY:
17      Q.    I DRAW YOUR ATTENTION, DOCTOR, TO PAGE 1 OF THE DOCUMENT,
18      1.1230.
19            MR. RAFFERTY:   AND IF YOU CAN BLOW UP, PLEASE, COREY,
20      "WE HAVE COMPLETED THE REVIEW OF THESE APPLICATIONS."
21      BY MR. RAFFERTY:
22      Q.    DOCTOR, THIS IS APRIL OF 2001, AND IF YOU WILL READ DOWN:
23      "WE HAVE COMPLETED THE REVIEW OF THESE APPLICATIONS AS AMENDED,
24      AND THEY ARE APPROVABLE.   BEFORE THESE APPLICATIONS MAY BE
25      APPROVED, HOWEVER, IT WILL BE NECESSARY FOR YOU TO ADDRESS THE
page 1128
 1      FOLLOWING."   NOW, FIRST OF ALL, IN REGARDS TO THE USE OF THE
 2      WORDS "APPROVE" AND "APPROVABLE," WHAT IS THE SIGNIFICANCE OF
 3      THAT?
 4      A.    OKAY.   THIS IS ACTUALLY IMPORTANT TO UNDERSTAND, BECAUSE
 5      THE FDA REALLY USES THE APPROVABLE LETTER TO SET FORTH A LIST
 6      OF REQUIREMENTS THAT THE COMPANY HAS TO MEET.   IN OTHER WORDS,
 7      WHAT THEY ARE SAYING IN AN APPROVABLE LETTER IS, YEAH, YOU'VE
 8      GOT ALL OF THE PARTS OF THE APPLICATION THAT YOU NEED TO GET AN
 9      APPROVAL, BUT THERE IS INFORMATION THAT SHOULD BE SUBMITTED AS
10      PART OF ALL THESE PARTS THAT WE NEED TO HAVE TO COMPLETE THE
11      EVALUATION OF THIS APPLICATION.   AND SO APPROVABLE LETTERS
12      REALLY ARE A LIST OF FURTHER REQUIREMENTS, THINGS THAT THE FDA
13      NEEDS TO HAVE TO GO AHEAD WITH THE APPROVAL PROCESS.   AND ONE
14      SHOULD NOT CONFUSE AN APPROVABLE LETTER WITH APPROVAL LETTER.
15      THE APPROVAL LETTER IS THE ACTUAL APPROVAL.   THE APPROVABLE
16      LETTER IS REALLY A LIST OF FURTHER REQUIREMENTS.
17      Q.    DOCTOR, THIS THE APRIL 6, 2001, AND IF YOU WOULD LOOK DOWN
18      AFTER IT SAYS, "IT WILL BE NECESSARY FOR YOU TO ADDRESS THE
19      FOLLOWING:   "ARE THEY STILL REQUESTING THE ADVANTAGE DATA?
20      A.    THEY ARE STILL REQUESTING THE ADVANTAGE DATA.
21      Q.    SO AS OF THIS TIME, WHICH IS APRIL -- LET ME MOVE IT OVER
22      HERE BECAUSE I'M RUNNING OUT OF ROOM -- APRIL 2001, THE FDA IS
23      STILL REQUESTING ADVANTAGE DATA FROM MERCK; CORRECT?
24      A.    THAT'S CORRECT.
25      Q.    AND IF YOU WILL FOLLOW ALONG WITH ME, I'M GOING TO ASK YOU
page 1129
 1      A QUESTION ABOUT THESE REQUESTS.   THEY SAY, "WE CONSIDER A FULL
 2      AND COMPLETE REVIEW OF ALL RELEVANT DATA ESSENTIAL TO THE
 3      SAFETY EVALUATION FOR THESE SUPPLEMENTS.   THEREFORE, WE
 4      CONSIDER REVIEW OF THE ADVANTAGE TRIAL, STUDY 102, NECESSARY IN
 5      ORDER TO MORE ADEQUATELY INTERPRET THE CARDIOVASCULAR AND
 6      OVERALL SAFETY RESULTS IN THE VIGOR STUDY AND PROVIDE ADEQUATE
 7      LABELING INFORMATION.   PLEASE SUBMIT THE COMPLETE STUDY REPORT
 8      FOR ADVANTAGE TRIALS, STUDY 102, INCLUDING THE CASE REPORT
 9      TABULATIONS AND THE CASE REPORT FORMS FOR OUR REVIEW.   WE
10      ACKNOWLEDGE RECEIPT ON MARCH 30, 2001, OF YOUR PARTIAL RESPONSE
11      TO THIS REQUEST.   PLEASE REFER TO PREVIOUS INFORMATION REQUESTS
12      ON NOVEMBER 27, 2000, AND FEBRUARY 28, 2001."   DID I READ THAT
13      ACCURATELY?
14      A.    THAT'S CORRECT.
15      Q.    DOCTOR, AS OF APRIL 6, 2001, IT APPEARS AS THOUGH,
16      ACCORDING TO THIS LETTER, THAT THE FDA HAD REQUESTED
17      INFORMATION ON AT LEAST TWO OCCASIONS TO GET THE ADVANTAGE
18      DATA, CORRECT?
19      A.    THAT'S CORRECT.   THEY REQUESTED THEM IN FEBRUARY AND
20      NOVEMBER.
21      Q.    SO NOVEMBER 27 IS THE FIRST ONE.   I FORGOT TO PUT THAT ON
22      THE TIME LINE.   OKAY.   NOW, JUST TO KIND OF COMPLETE THE
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
23      LABELING TIME LINE HERE, DID THE FDA ULTIMATELY PROPOSE A LABEL
24      IN RESPONSE TO THE JUNE 2000 REQUEST FROM MERCK?
25      A.   YES.   THE LABELING CAME -- THE FDA CAME UP WITH ITS OWN
page 1130
1       LABEL PROPOSAL.
2       Q.   AT THIS TIME, I WOULD LIKE YOU TO TURN TO PLAINTIFF'S
3       EXHIBIT 1.0091 IN YOUR NOTEBOOK.  DO YOU RECOGNIZE THAT?  I'M
4       SORRY, DOCTOR.  I THOUGHT YOU WERE THERE.  I APOLOGIZE.
5       A.   NOT QUIT THAT FAST.  YES, I SEE THIS MAP.
6       Q.   AND THIS IS THE FDA'S PROPOSAL IN TERMS OF THE WARNINGS,
7       CORRECT?
8       A.   YES.   THE FDA HAS A MARKED UP A LABEL WRITTEN BY MERCK,
9       AND IN THE MARKUP THE FDA INDICATES ITS OWN PROPOSAL FOR
10      LABELING.
11      Q.   AND IN THIS PROPOSAL -- LET ME BACK UP.
12           MR. RAFFERTY:  AT THIS TIME, YOUR HONOR, I WOULD MOVE
13      INTO ADMISSION 1.0091.
14           MR. ISMAIL:  NO OBJECTION, YOUR HONOR.
15           THE COURT:  LET IT BE ADMITTED.
16           MR. RAFFERTY:  THANK YOU, YOUR HONOR.
17      BY MR. RAFFERTY:
18      Q.   IN THIS PROPOSAL IN OCTOBER OF 201 FROM THE FDA, DOES THE
19      FDA PROPOSE TO PUT CARDIOVASCULAR WARNINGS OR PUT RISK OF
20      CARDIOVASCULAR ADVERSE EFFECTS IN THE WARNING SECTION OF THE
21      LABEL?
22      A.   YES, IT DOES.  IT PROPOSES A CARDIOVASCULAR WARNING FOR
23      VIOXX.
24      Q.   AND IF YOU WOULD PLEASE TURN TO PAGE 857 -- THE BATES
25      NUMBER 8572.
page 1131
1       A.   OKAY.
2           MR. RAFFERTY:  AND COREY, IF YOU WOULD PLEASE BLOW UP
3       THAT TOP SECTION.
4       BY MR. RAFFERTY:
5       Q.   IS THAT THE PROPOSAL FROM THE FDA IN REGARDS TO THE
6       CARDIOVASCULAR RISKS?
7       A.   YES.  THIS IS THE FDA'S PROPOSAL FOR A CARDIOVASCULAR RISK
8       WARNING.
9       Q.   AND ON THIS DATE, MERCK -- I APOLOGIZE.  LET ME BACK UP
10      FOR JUST ONE SECOND.  AT ANY TIME BETWEEN APRIL -- I'M SORRY,
11      JUNE OF 2000 AND APRIL OF 2002, DID MERCK EVER PROPOSE TO SEND
12      OUT UNDER A CBE THE CARDIOVASCULAR RISKS IN THE WARNING
13      SECTION?
14      A.   NO, MERCK NEVER DID.
15      Q.   I WOULD LIKE TO DRAW YOUR ATTENTION NOW TO DOCUMENT
16      1.01098, WHICH HAS ALREADY BEEN MARKED INTO EVIDENCE.
17      A.   YES.
18      Q.   THIS IS AN E-MAIL ON NOVEMBER 8, 2001, FROM ED SCOLNICK,
19      WHO THE JURY HAS HEARD FROM, TO DOUG GREENE -- I'M SORRY, YES,
20      DOUG GREENE AND BONNIE GOLDMAN, AND CC-ING PETER KENT (SPELLED
21      PHONETICALLY); IS THAT CORRECT?
22      A.   YES.
23      Q.   AND IF YOU WOULD, LOOK ABOUT HALFWAY DOWN.  LET'S JUST
24      START AT THE TOP.  IT'S A SHORT E-MAIL.  IN THIS E-MAIL,
25      DR. SCOLNICK, WHO -- YOU KNOW WHO DR. SCOLNICK IS?
page 1132
1       A.   YES.  HE WAS THE DIRECTOR OF MERCK RESEARCH LABS.
2       Q.   BONNIE, TWICE IN MY LIFE I'VE HAD TO SAY TO THE FDA THAT
3       LABEL IS NOT ACCEPTABLE.  WE WILL NOT, UNDER ANY CIRCUMSTANCES
4       ACCEPT IT.  NOW, IN REGARDS TO THAT PHRASE RIGHT THERE, IS THAT
5       GETTING BACK TO WHAT YOU WERE TALKING ABOUT IN TERMS OF THE
6       POWER OF THE FDA TO ACTUALLY ORDER A LABEL CHANGE?
7       A.   THAT'S RIGHT.  HE'S TALKING ABOUT THE LABEL PROPOSAL FOR
8       THE CARDIOVASCULAR WARNING THAT THE FDA MADE, AND HE SAYS THAT
9       WE WON'T ACCEPT IT.
10      Q.   THEN HE GOES ON TO SAY, "ONCE, WHEN THEY WANTED A BLACK
11      BOX WARNING FOR ANGIOEDEMA" -- I THINK I SAID THAT RIGHT,
12      ANGIOEDEMA -- "IN VASOTEC IN 1985 AND ONCE IN 1989, WHEN STEVE
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
13          FRED WANTED A WARNING ABOUT POTENTIAL COLON CANCER IN THE
14          PRILOSEC LABEL, YOU WILL -- AND "WILL" IS IN CAPITALS -- "HAVE
15          TO DO THAT ON THE WARNING FOR VIOXX, I ASSURE YOU THAT YOU
16          WILL."  DID I READ THAT CORRECTLY?
17          A.    THAT'S CORRECT.
18          Q.    "AND I ASSURE YOU I WILL NOT SIGN OFF ON ANY LABEL THAT
19          HAS A CARDIAC WARNING."
20          A.    THAT'S CORRECT.
21          Q.    "THE DATA REVIEW YESTERDAY CONVINCES ME THAT WE DO NOT
22          HAVE AN UNSAFE DRUG, AND I AM WILLING, IF NEEDED, TO SPEND
23          SEVERAL HOURS ONE-ON-ONE WITH ANYONE AT THE FDA GOING THROUGH
24          THE DATA UNTIL THEY IN FACT DID."  IS THAT --
25          A.    THAT'S RIGHT.
```
page 1133
```
1           Q.    SO AFTER -- AND THIS IS AFTER THE FDA PROPOSES THE CV
2           WARNING IN OCTOBER OF 2001, CORRECT?
3           A.    THIS IS A COUPLE -- A FEW WEEKS AFTER THE FDA PROPOSES A
4           CARDIOVASCULAR WARNING FOR VIOXX THAT WE HAVE THIS E-MAIL WHICH
5           SAYS "I WON'T ACCEPT IT" -- THAT "WE WON'T ACCEPT IT."
6           Q.    AND IF I COULD, IN THE APRIL 2002 WARNING, HAVE YOU
7           REVIEWED A COPY OF WHAT THE APRIL 2002 WARNING ACTUALLY -- OR
8           LABEL ACTUALLY INDICATES?
9           A.    I REVIEWED THE APRIL 2002 LABEL, YES.
10          Q.    AND IS THAT LOCATED -- IF YOU WOULD, TURN TO 1.0466.
11          A.    YES.
12          Q.    IS THAT THE APRIL 2002 LABEL?
13          A.    JUST CHECKING THE DATE ON IT.  YES, IT IS.
14          Q.    OKAY.  NOW, LET ME ASK YOU THIS, ANOTHER VERY SPECIFIC
15          QUESTION.  I'M GOING TO ASK YOU IF AGREE OR DISAGREE WITH THIS
16          STATEMENT:  "THE ADVISORY COMMITTEE SAYS WE DON'T KNOW WHAT THE
17          EXPLANATION IS, BUT THE INFORMATION SHOULD BE PUT ON THE LABEL.
18          SO MERCK MAKES A REVISED LABEL REQUEST RIGHT AFTER THIS, THE
19          NEXT MONTH, SO WE CAN DO EXACTLY WHAT THE ADVISORY COMMITTEE
20          HAS SUGGESTED THAT WE DO.  THIS IS AROUND APRIL OF 2001.  IT'S
21          NOT UNTIL SEPTEMBER OF 2001 THAT ANYBODY FROM THE FDA STAFF
22          GETS BACK TO US WITH THEIR SUGGESTION ON THE LANGUAGE.  IN THE
23          MEANTIME, MR. IRVIN PASSED AWAY BEFORE THE FDA STAFF EVER CAME
24          BACK WITH THEIR SUGGESTION."  NOW, IS THIS -- THE JURY KNOWS --
25          HAS OBSERVED EVIDENCE TO THE FACT THAT IT WAS IN APRIL OF 2001
```
page 1134
```
1           THAT MR. IRVIN WAS PRESCRIBED THE MEDICATION, MAY OF 2001 --
2                       MR. ISMAIL:  OBJECTION, YOUR HONOR.
3                       THE COURT:  SUSTAINED.  YOU'VE GOT TWO QUESTIONS
4           BEFORE HIM.  YOU READ SOMETHING AND THEN YOU WENT TO ANOTHER
5           QUESTION.
6                       MR. RAFFERTY:  I APOLOGIZE, YOUR HONOR.  I'LL
7           REPHRASE IT.
8           BY MR. RAFFERTY:
9           Q.    AT ANY TIME DURING THE MARCH 2000 TO APRIL 2002, COULD --
10          IN YOUR EXPERT OPINION, COULD MERCK HAVE SUBMITTED A CHANGE
11          BEING EFFECTED AND CHANGED THE WARNING ON VIGOR?
12                      MR. ISMAIL:  OBJECTION.
13                      THE COURT:  ASKED AND ANSWERED.  I'VE SUSTAINED THE
14          OBJECTION.  WE'VE ALREADY COVERED THAT, COUNSEL.
15                      MR. RAFFERTY:  IF I COULD JUST HAVE ONE MOMENT, YOUR
16          HONOR?
17                      THE COURT:  SURE.
18                      MR. RAFFERTY:  I'M SORRY, YOUR HONOR.  CO-COUNSEL
19          JUST REMINDED ME THAT I DIDN'T GET AN ANSWER TO THE QUESTION
20          YOU SAID THAT I HAD PENDING AS TO WHETHER HE DISAGREED WITH IT
21          OR DISAGREED WITH IT.
22                      THE COURT:  THE STATEMENT THAT HE MENTIONED, DO YOU
23          AGREE OR DISAGREE WITH IT?  WHAT WAS THE...
24                      MR. RAFFERTY:  I'M GOING TO PULL IT BACK OUT, YOUR
25          HONOR.  I APOLOGIZE.
```
page 1135
```
1           BY MR. RAFFERTY:
2           Q.    WELL, LET ME JUST -- I'LL TELL YOU WHAT.  LET ME JUST
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
3        SCRATCH THAT QUESTION AND ASK YOU:  DID MERCK HAVE TO WAIT FOR
4        THE FDA TO APPROVE THE LABEL CHANGE BEFORE SUBMITTING IT AND
5        GETTING IT OUT TO THE DOCTORS?
6             MR. ISMAIL:  OBJECTION, ASKED AND ANSWERED.
7             THE COURT:  IT HAS BEEN, BUT I'LL LET HIM ASK THAT
8        LAST QUESTION.
9        BY MR. RAFFERTY:
10       Q.   DID THEY HAVE TO WAIT?
11       A.   NO, THEY DID NOT HAVE TO WAIT.
12             MR. RAFFERTY:  THAT'S ALL I'VE GOT.
13             THE COURT:  DO YOU NEED TO OFFER ANY DOCUMENTS?
14             MR. RAFFERTY:  THAT LAST ONE, I THINK, WAS ALREADY
15       IN.
16             THE DEPUTY CLERK:  466?
17             MR. RAFFERTY:  OH, I'M SORRY.  YOU'RE RIGHT.  I DO
18       NEED TO OFFER PLAINTIFF'S 1.0466.
19             THE COURT:  WHAT IS THAT?
20             MR. RAFFERTY:  THAT IS THE 2002 LABEL.
21             THE COURT:  ANY OBJECTION TO THAT?
22             MR. ISMAIL:  NO OBJECTION.
23             THE COURT:  LET IT BE ADMITTED.  WE'LL STOP HERE,
24       MEMBERS OF THE JURY, AND RETURN AT 1:30.  WE'LL STAND IN RECESS
25       UNTIL 1:30.
```

[1137:1] - [1194:9]     2/10/2006   Plunkett II Trial - Vol. 05

```
page 1137
1                         AFTERNOON SESSION
2                         (FEBRUARY 10, 2006)
3             (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE
4        TRANSCRIBED BY TONI DOYLE TUSA, OFFICIAL COURT REPORTER.)
5             THE DEPUTY CLERK:  EVERYONE RISE.
6             THE COURT:  BE SEATED, PLEASE.  YOU MAY
7        CROSS-EXAMINATION.
8             (WHEREUPON, RICHARD M. KAPIT, HAVING BEEN DULY SWORN,
9        TESTIFIED AS FOLLOWS.)
10                        CROSS-EXAMINATION
11       BY MR. ISMAIL:
12       Q.   DR. KAPIT, DO YOU RECALL THAT YOU WERE FIRST CONTACTED TO
13       SERVE AS AN EXPERT IN THIS LITIGATION IN SEPTEMBER 2005?
14       A.   YES, THAT'S RIGHT.
15       Q.   YOU WERE CONTACTED BY MR. BLACK; IS THAT CORRECT?
16       A.   THAT'S CORRECT.
17       Q.   YOU HAD WORKED PREVIOUSLY WITH MR. BLACK IN OTHER
18       LITIGATION, CORRECT?
19       A.   THAT'S RIGHT.
20       Q.   DID YOU ALSO RECALL THAT, WHEN YOU WERE CONTACTED, YOU
21       WERE INFORMED THAT YOU HAD TO HAVE AN EXPERT REPORT PREPARED BY
22       SEPTEMBER 26?
23       A.   THAT'S ABOUT RIGHT.
24       Q.   IN FACT, YOU DID NOT HAVE VERY MUCH TIME BETWEEN THE
25       MOMENT THAT MR. BLACK FIRST CONTACTED YOU AND WHEN YOU WERE DUE
page 1138
1        TO SERVE YOUR EXPERT REPORT.
2        A.   THAT'S TRUE.
3        Q.   YOU'VE DONE THIS BEFORE, SIR, AND YOU UNDERSTAND THAT AN
4        EXPERT REPORT IN A LITIGATION SUCH AS THIS IS REQUIRED TO
5        INCLUDE ALL YOUR OPINIONS THAT YOU INTEND TO OFFER IN THE
6        LITIGATION, CORRECT?
7        A.   YES.
8        Q.   NOW, AS WE TALKED ABOUT THIS MORNING --
9        A.   MAY I ASK FOR A CLARIFICATION ABOUT THAT?  I MEAN, THERE
10       WERE TWO DEPOSITIONS, AND SO THERE WAS SOME ADDITIONAL WORK
11       THAT I LOOKED AT BETWEEN THOSE TWO DEPOSITIONS.
12       Q.   RIGHT.  BUT YOUR REPORT DID NOT CHANGE, ONE WORD, CORRECT?
13       A.   THAT'S RIGHT.
14       Q.   NOW, AS WE DISCUSSED THIS MORNING, WHEN YOU WERE AT THE
15       AGENCY, YOU DID NOT WORK ON VIOXX, IN PARTICULAR, OR ANY OF THE
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
16       COX-2 DRUGS, RIGHT?
17       A.    ONLY INSOFAR AS THOSE DRUGS WERE CO-MEDICATIONS IN ADVERSE
18       REACTIONS THAT I EVALUATED.
19       Q.    RIGHT.  BUT WITH RESPECT TO LABELING DECISIONS, NDA
20       REVIEW, IND REVIEW, THAT WAS NOT SOMETHING THAT YOU DID WHEN
21       YOU WERE AT FDA WITH RESPECT TO VIOXX.
22       A.    THAT'S RIGHT.
23       Q.    AS WE DISCUSSED AS WELL, YOU ALSO DID NOT HAVE ANY
24       CLINICAL EXPERIENCE WITH THIS CLASS OF DRUGS PRIOR TO THE TIME
25       THAT MR. BLACK CONTACTED YOU IN SEPTEMBER, CORRECT?
page 1139
1        A.    I DID NOT PRESCRIBE THEM.
2        Q.    DO YOU RECALL, SIR, THAT AFTER YOU WERE FIRST CONTACTED,
3        YOU ATTENDED A MEETING WITH SEVERAL PLAINTIFF LAWYERS?
4        A.    YES.
5        Q.    THAT MEETING, SIR, YOU -- AT THE TIME OF THAT MEETING, OR
6        AT THE START OF THAT MEETING, YOU HAD NOT REVIEWED ANY
7        DOCUMENTS YET RELEVANT TO THE CASE, CORRECT?
8        A.    I THINK THAT'S TRUE, YES.
9        Q.    ALL RIGHT, SIR.  I'M GOING TO HAND TO YOU WHAT WE HAVE
10       MARKED AS DEFENSE EXHIBIT, FOR IDENTIFICATION PURPOSES ONLY,
11       1104.  DO YOU RECOGNIZE THAT DOCUMENT, SIR?
12       A.    YES.
13       Q.    TELL THE JURY WHAT IT IS.
14       A.    THESE ARE NOTES THAT I TOOK AT THE MEETING WITH THE
15       PLAINTIFF'S LAWYERS.
16       Q.    HOW MANY PLAINTIFF LAWYERS WERE AT THIS MEETING, SIR?
17       A.    ABOUT HALF A DOZEN.
18       Q.    WHERE WAS THE MEETING HELD?
19       A.    IN WASHINGTON.  I DON'T REMEMBER EXACTLY WHERE.
20       Q.    SO IF I HAVE THE SCENE CORRECTLY, IT'S YOU, WHO HAD JUST
21       BEEN RETAINED TO BE AN EXPERT IN THE CASE WITHOUT HAVING
22       REVIEWED ANY MATERIALS AS OF THE START OF THE MEETING, AND HALF
23       A DOZEN OR SO PLAINTIFF LAWYERS, RIGHT?
24       A.    YES.
25       Q.    THESE, EXHIBIT 1104, CONTAIN YOUR PERSONAL NOTES OF THAT
page 1140
1        MEETING, CORRECT?
2        A.    YES.
3        Q.    SO ALL THE NOTES IN EXHIBIT 1104 WERE TAKEN AT THE MEETING
4        IN SEPTEMBER WHEN YOU WERE FIRST GETTING ACQUAINTED WITH YOUR
5        EXPERT OPINIONS IN THIS CASE, CORRECT?
6        A.    YES.
7        Q.    NOW, BECAUSE YOU HAD NOT YET REVIEWED ANY DOCUMENTS IN THE
8        CASE, YOU HAD NOT FORMED FROM YOUR OWN WORK AND REVIEW THE
9        OPINIONS YOU INTENDED TO OFFER IN THE CASE, CORRECT?
10       A.    THAT'S RIGHT.
11       Q.    NOW, SO THE DATE OF THE MEETING -- THIS IS YOUR
12       HANDWRITTEN NOTE UP AT THE TOP?
13       A.    THAT'S CORRECT.
14       Q.    THAT WOULD BE FOR SEPTEMBER 12, 2005?
15       A.    THAT'S RIGHT.
16       Q.    THIS WAS A TWO-DAY MEETING, WASN'T IT, SIR?
17       A.    A DAY AND A HALF, YOU'RE RIGHT.
18       Q.    SO THE FIRST DAY WAS ON SEPTEMBER 12 AND THE SECOND DAY
19       WAS SEPTEMBER 13?
20       A.    YES.
21       Q.    THAT IS SOME 13 OR 14 DAYS BEFORE YOU HAD TO GET YOUR
22       EXPERT REPORT SERVED, CORRECT?
23       A.    THAT'S CORRECT.
24       Q.    YOU HAD NO OPINIONS AS OF THE START OF THE MEETING,
25       CORRECT?
page 1141
1        A.    YES.
2        Q.    MR. SIZEMORE, HE IS ONE OF THE PLAINTIFF LAWYERS WHO WAS
3        THERE?
4        A.    YES.
5        Q.    THEN, OF COURSE, MR. BLACK WAS THERE, THE PERSON WHO FIRST
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
6         CONTACTED YOU?
7         A.    YES.
8         Q.    DO YOU RECALL THE OTHER PLAINTIFF LAWYERS WHO SHOWED UP AT
9         THAT MEETING?
10        A.    I'M AFRAID THAT I CAN'T TELL YOU THEIR NAMES OFFHAND.
11        Q.    NOW, YOU UNDERSTOOD, SIR, THAT THE PURPOSE OF THIS MEETING
12        WAS FOR THESE PLAINTIFF LAWYERS TO GIVE YOU GUIDANCE AS TO WHAT
13        WAS TO BE INCLUDED IN YOUR EXPERT REPORT, CORRECT?
14        A.    WELL, I WOULDN'T PHRASE IT QUITE THAT WAY.  THEY WERE TO
15        TELL ME THE SUBJECTS THAT THEY WANTED ME TO ADDRESS.
16        Q.    JUST THE SUBJECTS, SIR?
17        A.    YES.
18        Q.    LET ME ASK THIS QUESTION:  DID MR. BLACK GIVE YOU ANY
19        GUIDANCE ABOUT WHAT ISSUES TO ADDRESS IN YOUR REPORT?  WHAT IS
20        YOUR ANSWER TO THAT QUESTION?
21        A.    THEY TOLD ME THE ISSUES THAT WERE OF CONCERN TO THEM.
22        Q.    SO YOU AGREE, SIR, THAT THIS MEETING WITH THE HALF-DOZEN
23        PLAINTIFF LAWYERS TWO WEEKS BEFORE YOUR REPORT IS DUE WAS TO
24        GIVE YOU GUIDANCE AS TO WHAT WAS TO BE INCLUDED IN YOUR REPORT,
25        CORRECT?
page 1142
1         A.    WELL, I WANT TO MAKE CLEAR, WHEN YOU SAY THAT, THEY WERE
2         NOT -- AND I WOULD NOT HAVE LET THEM TELL ME WHAT MY OPINIONS
3         WOULD BE.  THEY DID TELL ME AND I WAS INTERESTED TO KNOW WHAT
4         SUBJECTS THEY WANTED ME TO ADDRESS.
5         Q.    YOU WOULD NOT LET THEM TELL YOU WHAT YOUR OPINIONS WOULD
6         BE --
7         A.    I WOULD NOT HAVE LET THEM DO THAT.
8         Q.    -- BECAUSE THAT'S WRONG, ISN'T IT, SIR?
9         A.    THEY'RE MY OPINIONS.  I WANT TO COME TO THEM ON MY OWN
10        BASIS BASED ON THE DOCUMENTS THEY GIVE ME.
11        Q.    THAT WOULD BE WRONG, WOULDN'T IT, SIR, TO LET THE
12        PLAINTIFF LAWYERS TELL YOU WHAT YOUR OPINIONS ARE GOING TO BE?
13        A.    THAT'S THE WAY I WORK.
14        Q.    NOW, DIDN'T YOU TESTIFY AT YOUR DEPOSITION THAT ALL THESE
15        PLAINTIFF LAWYERS WERE GIVING YOU THEIR GUIDANCE SO FAST THAT
16        YOU HAD A HARD TIME GETTING IT ALL DOWN?
17        A.    I LISTENED TO THEM FOR A WHILE AND, YEAH, I TOLD THEM AT
18        SOME POINT, "LISTEN, THIS IS GOING NOWHERE.  LET ME TELL YOU
19        HOW I THINK I CAN ADDRESS YOUR CONCERNS."
20        Q.    YOU, OF COURSE, STILL HADN'T REVIEWED ANY DOCUMENTS IN THE
21        CASE, RIGHT, DOCTOR?
22        A.    YEAH.  AND I'M GLAD YOU ASKED THIS, BECAUSE WHAT I PUT
23        DOWN WAS AN OUTLINE THAT INDICATED, ASSUMING THAT THE DOCUMENTS
24        SHOWED WHAT THEY CLAIM IT SHOWED, THIS IS WHAT I FELT I MIGHT
25        DO AS FAR AS AN OUTLINE WENT.
page 1143
1         Q.    OKAY.  SO THE PLAINTIFF LAWYERS TOLD YOU CERTAIN FACTS
2         THAT THEY THOUGHT WERE PERTINENT TO THE CASE, RIGHT?
3         A.    THEY CERTAINLY DID POINT OUT CERTAIN FACTS THAT THEY
4         THOUGHT WERE PERTINENT.
5         Q.    BECAUSE YOU DID NOT HAVE ENOUGH TIME TO GO OUT AND DO YOUR
6         OWN INVESTIGATION AS TO THE FACTS --
7         A.    NOT AT THAT MEETING.
8         Q.    I'M SORRY.  WE ARE TALKING AT THE SAME TIME.  COULD YOU
9         PLEASE WAIT.
10              SO THE ANSWER TO MY QUESTION IS YOU DID NOT HAVE
11        ENOUGH TIME TO GO OUT AND DO YOUR OWN REVIEW TO LEARN THE FACTS
12        OF THE CASE, CORRECT?
13        A.    NO.  YOU'RE RIGHT.  AS OF THE TIME OF THAT MEETING,
14        ANYTHING THAT I SAID IN TERMS OF MY OWN VIEW ABOUT WHAT MIGHT
15        BE INCLUDED IN MY REPORT WAS HYPOTHETICAL, BASED ON THE
16        ASSUMPTION THAT, WHEN I REVIEWED THE DOCUMENTS, THAT IT BORE
17        OUT WHAT THEY WERE TELLING ME.
18        Q.    SIR, IT'S NOT JUST THAT YOU DIDN'T KNOW WHETHER WHAT THEY
19        WERE TELLING YOU WAS TRUE; YOU DIDN'T KNOW WHETHER WHAT THEY
20        WERE TELLING YOU WAS COMPLETE.  CORRECT?
21        A.    THAT'S TRUE.
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
22      Q.    SO YOU WERE GETTING ONE SIDE'S PRESENTATION OF THE FACTS
23   OF THE CASE, CORRECT?
24      A.    YES.
25      Q.    YOU DID NOT HAVE ENOUGH TIME TO GO OUT AND DO YOUR OWN
page 1144
1    INVESTIGATION PRIOR TO THE SUBMISSION OF YOUR REPORT TO FIND
2    THE FULL STORY; ISN'T THAT RIGHT, SIR?
3       A.    WELL, THE DOCUMENTS THAT I REVIEWED WERE EXPLANATORY ON
4    THEIR FACE.  IN OTHER WORDS, THERE ARE CERTAIN DOCUMENTS THAT
5    EXPLAIN FULLY WHAT THEY MEAN, AND SO THOSE ARE THE DOCUMENTS
6    THAT I RELIED ON, THE ONES THAT ARE CLEAR IN TERMS OF WHAT THEY
7    PRESENT.
8       Q.    THE DOCUMENTS THAT THE PLAINTIFF LAWYERS CHOSE TO GIVE
9    YOU, CORRECT?
10      A.    WELL, I MEAN, THERE ARE A LOT OF DOCUMENTS -- THERE ARE
11   HUNDREDS AND THOUSANDS OF DOCUMENTS CONNECTED TO THIS CASE.  I
12   RELIED ON THE ONES THAT HAD FACE VALIDITY.  IT WAS CLEAR FROM
13   THOSE DOCUMENTS WHAT THEY WERE SAYING AND THAT, AS FAR AS THOSE
14   DOCUMENTS WENT, THEY WEREN'T COMPLETELY INFORMATIVE ABOUT THE
15   PARTICULAR ISSUE THE DOCUMENT ADDRESSED.
16      Q.    DOCTOR, EVERY DOCUMENT REVIEWED WITH RESPECT TO VIOXX AND
17   THE FDA REVIEW PRIOR TO THE SUBMISSION OF THE EXPERT REPORT IS
18   WHAT THE PLAINTIFF LAWYERS CHOSE TO GIVE YOU IN THAT 14-DAY
19   WINDOW; ISN'T THAT RIGHT?
20      A.    I RECEIVED DOCUMENTS FROM THE PLAINTIFFS' LAWYERS, TRUE.
21   I DID NOT RECEIVE DOCUMENTS FROM THE DEFENSE LAWYERS, BUT THE
22   DOCUMENTS THAT I RELIED ON WERE EXPLANATORY IN THEMSELVES.
23      Q.    SO THE PLAINTIFF LAWYERS TOLD YOU ONE SIDE OF THE STORY,
24   AND YOU THEN, DURING THIS TWO-DAY MEETING, DECIDED YOU WERE
25   GOING TO OUTLINE YOUR EXPERT REPORT; IS THAT RIGHT?
page 1145
1       A.    I LOOKED AT THE DOCUMENTS THAT THEY PROVIDED FOR ME, I
2    LOOKED AT THE DOCUMENTS THAT WERE IN THEMSELVES EXPLANATORY OF
3    WHAT THOSE DOCUMENTS TALKED ABOUT, AND I BASED MY REPORT ON
4    THOSE EXPLANATORY DOCUMENTS.  IF THERE WERE DOCUMENTS THAT WERE
5    NOT CLEAR AS TO WHAT THEY SAID, I WOULD NOT HAVE INCLUDED THEM
6    IN MY REPORT.
7       Q.    DID YOU EVER COME TO LEARN THAT THE FOLKS WHO WERE GIVING
8    YOU YOUR VIOXX EDUCATION LEFT OUT SOME KEY FACTS?
9       A.    WELL, YOU WOULD HAVE TO EXPLAIN WHAT THAT MEANS.
10      Q.    DID YOU EVER COME TO LEARN THAT THE FOLKS WHO WERE GIVING
11   YOUR EDUCATION ABOUT VIOXX AND THE GUIDANCE FOR YOUR REPORT
12   LEFT OUT SOME KEY INFORMATION THAT WAS RELEVANT TO YOUR
13   OPINION?
14      A.    I ASSUME THAT YOU'RE GOING TO POINT OUT SOME INFORMATION.
15   I'M NOT GOING TO AGREE WITH YOUR CHARACTERIZATION AT THIS POINT
16   UNTIL I SEE WHAT INFORMATION YOU HAVE IN MIND.
17      Q.    WELL, WE'LL COME BACK TO THAT IN A MINUTE, SIR, BUT TURN
18   TO PAGE 3, IF YOU WOULD.  THESE ARE YOUR NOTES, RIGHT?
19      A.    YES.
20      Q.    THESE ARE YOUR NOTES OF WHAT YOUR OPINIONS ARE GOING TO BE
21   IN THE CASE BASED ON IF YOU CAN CHECK OUT WHAT THE PLAINTIFF
22   LAWYERS WERE TELLING YOU AT THE MEETING, RIGHT?
23      A.    IF THE DOCUMENTS THEY GIVE ME CONFIRM WHAT THEY SAY IT
24   SHOWS, THESE ARE MY SUGGESTIONS AS TO HOW A REPORT MIGHT BE
25   OUTLINED.
page 1146
1       Q.    SO TAKING THIS ONE PAGE AS AN EXAMPLE, THE LAWYERS AT THE
2    MEETING BROUGHT UP THE POST-VIGOR LABEL CHANGE, RIGHT?
3       A.    WHICH LINE ARE YOU REFERRING TO NOW?
4       Q.    I'M IN LINE 4, NEAR THE BOTTOM.
5       A.    YES.
6       Q.    IN SUBPART C, YOU MAKE REFERENCE TO THIS CBE LABELING
7    CHANGE MECHANISM, RIGHT?
8       A.    THAT'S CORRECT.
9       Q.    THE CBE CHANGE IS THIS PROCEDURE THAT YOU AND MR. RAFFERTY
10   SPENT SOME TIME TALKING ABOUT THIS MORNING.
11      A.    THE ABILITY OF A COMPANY TO PUT AN IMPORTANT SAFETY
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
12        INFORMATION IN A LABEL IMMEDIATELY.  THAT'S WHAT WE ARE TALKING
13        ABOUT HERE.
14        Q.   RIGHT.  SO, AT THIS MEETING, BEFORE YOU LOOKED AT ANY
15        DOCUMENTS IN THE CASE, YOU ARE PUTTING DOWN YOUR OUTLINE FOR
16        YOUR EXPERT REPORT THAT MERCK COULD HAVE DONE A CHANGES BEING
17        EFFECTED LABEL CHANGE AFTER THE VIGOR TRIAL WAS UNBLINDED;
18        ISN'T THAT CORRECT, SIR?
19        A.   CERTAINLY, THAT WAS AN ISSUE THAT NEEDED TO BE LOOKED AT
20        AND ADDRESSED IN MY REPORT.  IF THERE WAS A REASON FOR MERCK TO
21        PUT A CBE IN LABELING AND THEY DID NOT, THAT WAS IMPORTANT FOR
22        ME TO KNOW AND FOR ME TO PUT IN MY REPORT.
23        Q.   WELL, SIR, THE PLAINTIFF LAWYERS WEREN'T GIVING YOU
24        GUIDANCE TO WRITE A REPORT TO SAY THAT MERCK COULD NOT DO A CBE
25        CHANGE AFTER VIGOR, RIGHT?
page 1147
1         A.   I'M SORRY.  WHAT YOU'RE GETTING --
2         Q.   THE LAWYERS AT THE MEETING WANTED YOU TO WRITE A REPORT
3         THAT SAID MERCK COULD HAVE DONE A CBE CHANGE AFTER VIGOR; ISN'T
4         THAT CORRECT, SIR?
5         A.   THEY WANTED ME.
6                   MR. RAFFERTY:  I'M GOING TO OBJECT, YOUR HONOR.
7                   THE COURT:  LET HIM EXPLAIN IT.  HE IS UNDER
8         CROSS-EXAMINATION.  YOU CAN ANSWER, SIR.
9                   THE WITNESS:  THEY WANTED ME TO WRITE A REPORT WHICH
10        CONSIDERED CBES AS A SUBJECT OF MY REPORT, WHETHER MERCK DID OR
11        DID NOT DO THAT; AND IF MERCK DID NOT DO THAT, THAT WOULD HAVE
12        BEEN CERTAINLY IMPORTANT FOR ME TO WRITE IN MY REPORT.
13        BY MR. ISMAIL:
14        Q.   THEN YOU WROTE A REPORT AND THEN CAME TO TESTIFY TODAY
15        THAT, LO AND BEHOLD, IT WAS YOUR OPINION MERCK COULD DO A CBE
16        CHANGE POST-VIGOR; IS THAT RIGHT?
17        A.   IT'S CERTAINLY MY OPINION AND THE REGULATIONS OF THE FDA.
18        Q.   TURN TO PAGE 131 OF THIS DOCUMENT, PLEASE.  IT'S THE ONE
19        THAT SAYS "TED WACKER" AT THE TOP.
20        A.   YES.
21        Q.   NOW, MR. WACKER WAS ANOTHER ONE OF THESE HALF-DOZEN
22        PLAINTIFF LAWYERS GIVING YOU GUIDANCE AT THE MEETING?
23        A.   YES.
24        Q.   I THINK YOU TESTIFIED AT YOUR DEPOSITION THAT THIS ONE
25        PAGE IN THIS EXHIBIT IS ACTUALLY WRITTEN BY MR. WACKER.
page 1148
1         A.   THAT'S CORRECT.
2         Q.   SO MR. WACKER IS AT THE MEETING AND HE DECIDES HE IS GOING
3         TO TAKE IT UPON HIMSELF TO WRITE OUT AN OUTLINE FOR YOUR
4         REPORT?
5         A.   YES.
6         Q.   HE GIVES THIS TO YOU AT THE MEETING, CORRECT?
7         A.   YES, HE DOES.
8         Q.   HE WRITES, FOR EXAMPLE, IN ROMAN NUMERAL V -- OR VI, "I
9         GUESS THAT IS, "MERCK CAN" -- DO YOU SEE THAT LITTLE ARROW
10        THERE POINTING UP?
11        A.   THAT'S RIGHT.
12        Q.   YOU UNDERSTOOD THAT TO MEAN "INCREASE"?
13        A.   I PAID NO ATTENTION TO THIS DOCUMENT.  I HAVE NO IDEA WHAT
14        IT SAYS.  I DID NOT LOOK AT IT.  IT HAD NO ROLE IN ANYTHING I
15        DID.
16        Q.   SO YOUR TESTIMONY TODAY IS THAT MR. WACKER IS AT THE
17        MEETING AND HE GIVES YOU THIS OUTLINE FOR YOUR REPORT --
18        A.   AND I IGNORED IT.
19        Q.   -- AND YOU NEVER LOOKED AT IT.
20        A.   I IGNORED IT.
21        Q.   BUT YOU DID KEEP IT FOR US, RIGHT?
22        A.   WELL, I MEAN, IT WAS STAPLED IN THE GROUP OF PAPERS THAT I
23        HAD FROM THIS MEETING.  I PAID NO ATTENTION TO IT.
24        Q.   BUT YOU CAN AGREE THAT MR. WACKER IS TELLING YOU AT THIS
25        MEETING THAT, IN YOUR REPORT THAT HE IS GIVING YOU GUIDANCE ON,
page 1149
1         THAT YOU WERE TO SAY THAT MERCK CAN INCREASE THE WARNING LABEL
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
 2        ANY TIME AND THEN C.F.R. BLANK?
 3        A.    I PAID NO ATTENTION TO WHAT MR. WACKER WROTE OR SAID, AND
 4        HE WAS NOT THE ONLY PERSON AT THAT MEETING THAT I PAID NO
 5        ATTENTION TO.
 6        Q.    THEN IMMEDIATELY ABOVE THAT, IN ROMAN NUMERAL V, "SCOLNICK
 7        E-MAIL MERCK."  OBVIOUSLY, YOU DIDN'T KNOW DR. SCOLNICK BEFORE
 8        THE MEETING, RIGHT?
 9        A.    ACTUALLY, YOU KNOW, THIS IS ABOUT THE FIRST TIME I'M
10        READING THIS PAGE.
11        Q.    YOU WERE ASKED QUESTIONS ABOUT THIS DOCUMENT AT YOUR
12        DEPOSITION, WEREN'T YOU?
13        A.    I SAID IT WAS WRITTEN BY MR. WACKER.
14        Q.    ALL RIGHT.  MR. WACKER GAVE YOU THE DOCUMENT, NOT ME,
15        RIGHT?
16        A.    THAT'S RIGHT.
17        Q.    SO, IN ROMAN NUMERAL V, MR. WACKER WRITES FOR THE OUTLINE
18        OF YOUR OPINIONS TO MAKE MENTION OF THE SCOLNICK E-MAIL THAT
19        SAYS "ABSOLUTELY WILL NOT SIGN OFF ON CV WARNING."  RIGHT?
20        A.    I PAID NO ATTENTION TO THIS DOCUMENT.
21        Q.    IS THAT WHAT MR. WACKER SAID TO YOU?
22        A.    THAT'S WHAT THE WORDS SAY HERE.
23        Q.    OF ALL THE E-MAILS THAT YOU TALKED ABOUT WITH THIS JURY
24        TODAY, IT'S THAT E-MAIL, ISN'T IT?
25        A.    LET ME EXPLAIN HOW I DID THIS.  I WAS GIVEN A LARGE NUMBER
page 1150
 1        OF DOCUMENTS TO LOOK THROUGH.  IT WAS AN AWFUL LOT TO DO IN A
 2        COUPLE WEEKS, BUT I DID LOOK THROUGH THEM.  I LOOKED THROUGH
 3        THEM ONE BY ONE.  I MADE NOTES ON EVERY ONE IN A SPREADSHEET,
 4        AND YOU HAVE A COPY OF THAT SPREADSHEET, AND THIS E-MAIL IS ONE
 5        OF THE E-MAILS ON THAT SPREADSHEET.
 6              SO I LOOKED AT THAT E-MAIL, BUT I LOOKED AT IT AS
 7        PART OF -- I THINK IT WAS ABOUT 80 DIFFERENT DOCUMENTS THAT I
 8        LOOKED AT AND MADE SEPARATE NOTES ON MY OWN.
 9              AS A RESULT OF THAT WORK, I CONSIDERED THIS E-MAIL
10        SIGNIFICANT.  IT HAD NOTHING TO DO WITH ANYTHING MR. WACKER
11        SAID ON HERE, AND AS I SAID TO YOU SEVERAL TIMES NOW, AND I'LL
12        SAY IT TO YOU AGAIN, I PAID NO ATTENTION TO THIS PAGE.
13        Q.    YOU GOT THE E-MAIL FROM THE PLAINTIFF LAWYERS, DIDN'T YOU,
14        SIR?
15        A.    I GOT 80-SOMETHING DOCUMENTS, PLUS CDS.
16        Q.    RIGHT.
17        A.    I WENT THROUGH THOSE 80 DOCUMENTS ONE BY ONE AND SELECTED
18        ON MY OWN WHICH ONES I THOUGHT WERE IMPORTANT.
19        Q.    YOU WOULD AGREE THAT THE ONE YOU CHOSE TO TALK ABOUT TODAY
20        IS THE VERY ONE THAT MR. WACKER TOLD YOU TO TALK ABOUT BACK AT
21        YOUR FIRST MEETING?
22        A.    NOW, COUNSEL FOR THE PLAINTIFF ASKED ME ABOUT THIS
23        DOCUMENT.  I DIDN'T CHOOSE TO TALK ABOUT IT TODAY MYSELF.
24        Q.    LET'S TALK ABOUT THE DRUG DEVELOPMENT PROCESS, SIR.  YOU
25        WOULD AGREE THAT THE FDA EMPLOYEES EXPERIENCED SCIENTISTS TO
page 1151
 1        REVIEW NEW DRUG APPLICATIONS, WOULDN'T YOU?
 2        A.    YES.
 3        Q.    AT LEAST WITH RESPECT TO YOUR TENURE AT FDA, YOU
 4        CONSIDERED, AS PART OF YOUR RESPONSIBILITIES, KEEPING UP ON THE
 5        MEDICAL AND SCIENTIFIC LITERATURE ADVANCEMENTS IN YOUR FIELD,
 6        RIGHT?
 7        A.    I TRIED TO DO THAT WHEN I WAS A REVIEWER, YES.
 8        Q.    CERTAINLY, IT'S YOUR IMPRESSION THAT THE OTHER SCIENTISTS
 9        AT FDA ALSO TOOK THAT AS THEIR RESPONSIBILITY, TO KEEP UP TO
10        DATE ON SCIENCE, RIGHT?
11        A.    I'M SURE ALL FDA REVIEWERS TRY TO KEEP UP ON THE MEDICAL
12        LITERATURE.
13        Q.    NOW, FDA HAS THE RESPONSIBILITY TO APPROVE ALL
14        PRESCRIPTION DRUGS IN THIS COUNTRY BEFORE THEY ARE SOLD; IS
15        THAT CORRECT?
16        A.    THAT'S CORRECT.
17        Q.    A MANUFACTURER CANNOT SELL A PRESCRIPTION DRUG LEGALLY IN
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
18          THE UNITED STATES WITHOUT FDA APPROVAL, CORRECT?
19          A.   THAT'S CORRECT.
20          Q.   TO OBTAIN FDA APPROVAL, MANUFACTURERS ARE REQUIRED TO
21     PROVE THAT A MEDICINE IS BOTH SAFE AND EFFECTIVE FOR THE
22     PROPOSED INDICATION, CORRECT?
23          A.   NO, THAT'S REALLY NOT CORRECT, AND I'M GOING TO HAVE TO
24     GIVE YOU A LITTLE BIT OF AN ELABORATE ANSWER.
25          Q.   WELL, BEFORE YOU DO, LET ME ASK THIS PRECISE QUESTION
page 1152
1      FIRST:  WHO MAKES THE DETERMINATION THAT A DRUG IS SAFE AND
2      EFFECTIVE?
3           A.   THE FDA MAKES THE DETERMINATION THAT THE LABELING AND
4      INFORMATION EVALUATED WITH RESPECT TO A DRUG ARE SUFFICIENT SO
5      THAT, IN THEIR JUDGMENT, THE BENEFITS OUTWEIGH THE RISKS AND
6      THAT THE LABELING IS SUFFICIENT FOR A PHYSICIAN TO USE THE DRUG
7      SAFELY AND EFFECTIVELY IN TREATMENT.
8           Q.   TO OBTAIN FDA APPROVAL, MANUFACTURERS ARE REQUIRED TO
9      PROVE THAT THE DRUG IS BOTH SAFE AND EFFECTIVE FOR ITS PROPOSED
10     INDICATION, CORRECT?
11          A.   I DON'T BELIEVE THAT'S CORRECT.
12          Q.   DOCTOR, WERE YOU DEPOSED IN A DIFFERENT LITIGATION RELATED
13     TO THE DRUG PAXIL ON JANUARY 24, 2005?
14          A.   YES, I WAS.
15          Q.   I'M READING FROM PAGE 230, LINE 10.  DOCTOR, WERE YOU
16     ASKED THIS QUESTION AND DID YOU GIVE THIS SWORN TESTIMONY UNDER
17     OATH:
18               "Q.  AND TO OBTAIN FDA APPROVAL, MANUFACTURERS ARE
19          REQUIRED TO PROVE THAT THE DRUG IS BOTH SAFE AND EFFECTIVE
20          FOR ITS PROPOSED INDICATION, CORRECT?
21               "A.  YES."
22          A.   WELL --
23          Q.   WOULD YOU LIKE TO SEE IT, SIR?
24          A.   NO, I WOULD LIKE -- I DON'T NEED TO SEE IT, BUT I WOULD
25     LIKE TO EXPLAIN IT.
page 1153
1           Q.   THE QUESTION, SIR, IS:  WAS THAT YOUR SWORN TESTIMONY?
2           A.   APPARENTLY, I SAID THAT IN SWORN TESTIMONY, BUT I WOULD
3      LIKE TO EXPLAIN A LITTLE BIT MORE ABOUT THAT.
4                THE COURT:  YOU CAN EXPLAIN, SIR.  GO AHEAD.
5                THE WITNESS:  I WANT TO MAKE CLEAR THAT PROOF -- I'M
6      NOT SURE THE CONTEXT IN WHICH I WAS ASKED THAT QUESTION I USED
7      THE WORD "PROOF," BUT IF PROOF IMPLIES THAT THE FDA ESTABLISHES
8      WITH CERTAINTY THE SAFETY AND EFFECTIVENESS OF A DRUG, THEN
9      THAT ANSWER THAT I GAVE -- AND I GAVE IT WITH GOOD INTENTIONS,
10     BUT THAT ANSWER IS INCORRECT.
11               BECAUSE THE FDA, AT THE TIME A DRUG IS APPROVED,
12     DOES NOT KNOW WITH CERTAINTY AMOUNTING TO PROOF THAT A DRUG IS
13     SAFE AND EFFECTIVE.  IN FACT, THERE IS A GREAT DEAL THE FDA
14     DOES NOT KNOW ABOUT THE SAFETY AND EVEN ABOUT THE EFFECTIVENESS
15     OF A DRUG AT THE TIME AN APPROVAL DECISION IS RENDERED.
16     BY MR. ISMAIL:
17          Q.   ARE YOU THROUGH EXPLAINING THAT ANSWER?
18          A.   YES.
19          Q.   NOW, THE FIRST THING THAT HAPPENS IN THE DRUG APPROVAL
20     PROCESS, AS YOU EXPLAINED THIS MORNING, IS THE FILING OF
21     SOMETHING CALLED AN IND, CORRECT?
22          A.   THAT'S CORRECT.
23          Q.   THIS STANDS FOR AN INVESTIGATIONAL NEW DRUG APPLICATION,
24     CORRECT?
25          A.   THAT'S CORRECT.
page 1154
1           Q.   A MANUFACTURER HAS TO FILE AN IND BEFORE IT IS ALLOWED TO
2      UNDERTAKE HUMAN TESTING IN THE UNITED STATES, CORRECT?
3           A.   THAT'S CORRECT.
4           Q.   THE IND IS BASED ON YEARS OF RESEARCH BEFORE IT'S FILED,
5      CORRECT?
6           A.   USUALLY IT IS A FEW YEARS OF RESEARCH, YES.
7           Q.   IT IS BASED ON ANIMAL TESTING AND LABORATORY TESTING TO
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
8         SHOW THAT A PROPOSED MEDICINE IS SAFE FOR HUMAN TESTING, RIGHT?
9         A.    THE FDA HAS TO MAKE A JUDGMENT THAT THE ANIMAL TESTING AND
10        LABORATORY TESTING IS SUFFICIENT TO BEGIN TO EXAMINE THE SAFETY
11        IN HUMAN BEINGS.
12        Q.    DO YOU KNOW, SIR, THAT THE IND FOR VIOXX WAS FILED WITH
13        THE FDA IN 1994?
14        A.    ACTUALLY, I DIDN'T KNOW THE YEAR, BUT I WILL CERTAINLY
15        ACCEPT YOUR WORD FOR IT.
16        Q.    YOU CERTAINLY WOULD EXPECT THAT THE VIOXX IND WAS
17        SUPPORTED BY YEARS OF ANIMAL AND LABORATORY TESTING, CORRECT?
18        A.    I DON'T HAVE ANY REASON TO DOUBT THAT, NO.
19        Q.    WHEN YOU WERE AT FDA, ONE OF THE THINGS YOU DID WAS
20        DETERMINE WHETHER MANUFACTURERS' INDS WERE ADEQUATE TO ALLOW
21        FURTHER DEVELOPMENT OF THE MEDICINE, CORRECT?
22        A.    IT CERTAINLY WAS MY JOB TO EVALUATE INDS AND I CERTAINLY
23        MADE DECISIONS AS TO WHETHER COMPANIES SHOULD BE ALLOWED TO GO
24        FORWARD AND TEST NEW MEDICATIONS IN HUMAN BEINGS.  I WANT TO
25        EMPHASIZE HOW PROVISIONAL THAT JUDGMENT IS.
page 1155
1                FOR EXAMPLE, IN THE EXECUTION OF AN IND, THE FIRST
2         STUDIES THAT ARE DONE ARE USUALLY SINGLE-DOSE STUDIES DONE IN
3         THE HEALTHIEST VOLUNTEERS.  NOW, WHY IS THAT DONE?  WHY IS THAT
4         DONE LIKE THAT?
5                MR. ISMAIL:  YOUR HONOR, MY QUESTION WAS DID HE
6         REVIEW INDS AT FDA.
7                THE COURT:  YES.  LET'S STICK WITH THE QUESTION,
8         DOCTOR, AND LET'S MOVE ON.
9         BY MR. ISMAIL:
10        Q.    SIR, THE REASON WHY YOU DON'T KNOW THE DATE OF THE VIOXX
11        IND IS BECAUSE YOU'VE NEVER READ IT, RIGHT?
12        A.    I WAS ASKED TO DEAL WITH LABELING ISSUES IN THE
13        POST-MARKETING PERIOD.
14        Q.    SO WITH RESPECT TO FDA'S DECISION TO ALLOW CLINICAL
15        TESTING OF VIOXX AND THE WORK MERCK DID FOR YEARS BEFORE THE
16        IND WAS FILED, YOU DIDN'T LOOK AT ANY OF THAT, RIGHT?
17        A.    AS YOU POINTED OUT, I HAD A SHORT TIME TO WORK IN, AND MY
18        FOCUS WAS ON LABELING ISSUES OCCURRING AFTER APPROVAL, MAINLY
19        IN RESPECT TO DATA DEVELOPED IN VIGOR, AND SO I DID NOT EXAMINE
20        PREAPPROVAL STUDIES DONE OR PREAPPROVAL SUBMISSIONS DONE AS
21        PART OF THE VIOXX PACKAGE.
22        Q.    WELL, LET ME EXPLAIN THAT SOME MORE, SIR.  THE IND WAS
23        FILED IN 1994 AND, OBVIOUSLY, FDA ALLOWED MERCK TO TEST THE
24        DRUG IN CLINICAL TRIALS, CORRECT?
25               MR. RAFFERTY:  YOUR HONOR, I OBJECT.  IT'S OUTSCOPE
page 1156
1         THE SCOPE OF DIRECT.
2                THE COURT:  IT HAS SOMETHING TO DO WITH CREDIBILITY.
3         I WILL ALLOW IT.
4                THE WITNESS:  WOULD YOU REPEAT THE QUESTION.
5         BY MR. ISMAIL:
6         Q.    OBVIOUSLY, FDA ALLOWED MERCK TO PROCEED WITH HUMAN TESTING
7         AFTER THE FILING OF THE IND?
8         A.    YES.
9         Q.    DO YOU KNOW, SIR, THAT THE NDA FOR VIOXX WAS FILED IN
10        1998?
11        A.    YES.
12        Q.    AN IND'S A NEW DRUG APPLICATION, CORRECT?
13        A.    THAT'S CORRECT.
14        Q.    SO, IN THIS CASE, THERE'S A FOUR-YEAR PERIOD BETWEEN THE
15        TIME FDA ALLOWED CLINICAL TESTING AND THE TIME THAT THE NEW
16        DRUG APPLICATION WAS FILED, CORRECT?
17        A.    THAT'S CORRECT.
18        Q.    ORDINARILY, BETWEEN THE FILING OF AN IND AND AN NDA,
19        THERE'S LOTS OF INTERACTION BETWEEN MANUFACTURERS AND THE FDA,
20        CORRECT?
21        A.    YEAH, THERE CAN BE A FAIR AMOUNT OF INTERACTION.
22        Q.    WELL, WITH RESPECT TO THE CLINICAL TRIALS, THE FDA REVIEWS
23        THE PROTOCOLS THAT THE MANUFACTURER IS PROPOSING FOR THE
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
24        DEVELOPMENT OF A DRUG, CORRECT?
25        A.    THAT'S CORRECT.
page 1157
1         Q.    THE FDA HAS THE ABILITY TO APPROVE THE INVESTIGATORS TO BE
2         USED IN THOSE CLINICAL TRIALS, CORRECT?
3         A.    YES, THE FDA DOES THAT TOO.
4         Q.    IN FACT, IT'S COMMONPLACE FOR THE FDA TO ACTUALLY GO OUT
5         AND AUDIT CLINICAL INVESTIGATORY SITES THAT A MANUFACTURER IS
6         USING IN THE CLINICAL PROGRAM, CORRECT?
7         A.    AT THE TIME THE NDA IS FILED, THE FDA DOES AUDIT SOME OF
8         THE SITES AT WHICH THE TESTING, THE HUMAN TESTING, IS DONE;
9         THAT'S TRUE.
10        Q.    NOW, THERE'S ALSO MEETINGS BETWEEN MANUFACTURERS AND THE
11        FDA TO DETERMINE THE ADEQUACY OF THE CLINICAL TRIAL DEVELOPMENT
12        PROGRAM, CORRECT?
13        A.    THERE ARE MEETINGS.  YOU'RE TALKING ABOUT MEETINGS PRIOR
14        TO THE NDA?
15        Q.    YES.  END OF PHASE II MEETINGS.
16        A.    THERE ARE PRE-NDA MEETINGS.
17        Q.    SO THE MANUFACTURER AND THE FDA GET TOGETHER -- THE
18        SCIENTISTS FOR THE MANUFACTURER AND THE SCIENTISTS FROM FDA --
19        TO GO OVER THE CLINICAL PROGRAM THAT THE MANUFACTURER IS
20        PROPOSING FOR THE DRUG, CORRECT?
21        A.    THAT'S RIGHT.
22        Q.    YOU DIDN'T REVIEW ANY OF THAT IN THIS CASE, DID YOU, SIR?
23        A.    I WAS ASKED TO DEAL WITH SAFETY ISSUES THAT AROSE, NOT
24        DURING THE PREAPPROVAL PERIOD, BUT IN THE POST-APPROVAL PERIOD.
25        Q.    SO THE ANSWER IS I'M CORRECT?
page 1158
1         A.    YOU'RE CORRECT THAT I DID NOT REVIEW PREAPPROVAL
2         DOCUMENTS.
3         Q.    NOW, YOU AND MR. RAFFERTY TALKED ABOUT NEW DRUG
4         APPLICATIONS.  DO YOU RECALL THAT THIS MORNING?
5         A.    THAT'S RIGHT.
6         Q.    MANUFACTURERS MUST INCLUDE IN THE NDA ADEQUATE TESTING TO
7         SHOW THAT A DRUG IS SAFE FOR THE USE RECOMMENDED IN THE
8         PROPOSED LABELING, CORRECT?
9         A.    YES.  SO LONG AS WE UNDERSTAND BY THE WORD "SHOW" THAT
10        THERE IS STILL A LOT OF UNCERTAINTY ABOUT SUCH THINGS.
11        Q.    NOW, YOU TOLD THE STORY EARLIER ABOUT HOW YOU WERE A
12        REVIEWER FOR THE PROZAC NDA.  DO YOU RECALL?
13        A.    THAT'S CORRECT.
14        Q.    I THINK YOU TOLD THE JURY YOU WERE SITTING IN YOUR OFFICE
15        AND SOMEBODY WHEELS IN THOUSANDS OF PAGES OF DOCUMENTS.
16        A.    YES, THAT'S RIGHT.
17        Q.    YOU WERE NOT THE ONLY REVIEWER OF THE PROZAC NDA.
18        A.    I WAS THE SAFETY REVIEWER.
19        Q.    YOU WERE NOT THE ONLY REVIEWER OF THE PROZAC NDA, CORRECT?
20        A.    THERE WAS A REVIEWER FOR THE CHEMISTRY, CHEMICAL IDENTITY
21        OF THE DRUG; THERE WAS A REVIEWER FOR THE ANIMAL PHARMACOLOGY;
22        THERE WAS A STATISTICIAN; AND THERE WAS A PERSON WHO REVIEWED
23        THE EFFICACY.  I REVIEWED THE SAFETY.
24        Q.    TOXICOLOGY REVIEW?
25        A.    THAT'S THE -- THE TOXICOLOGY REVIEW AND PHARMACOLOGY
page 1159
1         REVIEW ARE THE SAME REVIEW.
2         Q.    SO JUST SO THE JURY UNDERSTANDS EXACTLY WHAT HAPPENS AT
3         FDA WHEN A NEW DRUG APPLICATION ARRIVES AT THE DOOR, THE AGENCY
4         TAKES DIFFERENT PIECES OF THE APPLICATION AND GIVES IT TO
5         SPECIALISTS IN THAT FIELD, CORRECT?
6         A.    WELL, IT'S NOT EXACTLY LIKE THAT.  AT THE TIME, THE
7         CHEMISTRY REVIEWER AND THE PHARMACOLOGY REVIEWER HAVE REALLY
8         DONE ALL OF THEIR WORK PRIOR TO THE ACTUAL SUBMISSION OF THE
9         NDA.  ONCE THE NDA IS SUBMITTED, IT'S THE MEDICAL REVIEWER AND
10        THE STATISTICAL REVIEWER THAT REALLY CARRY THE BALL.
11        Q.    ALL RIGHT.  SO THERE'S LOTS OF REVIEW THAT GOES ON BY
12        SPECIALISTS AT FDA IN PARTICULAR DISCIPLINES.  WOULD YOU AGREE
13        WITH THAT?
```

## Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
14      A.    AT THE TIME THE NDA IS FILED, IT'S REALLY THE MEDICAL
15      REVIEWER AND, TO SOME EXTENT, THE STATISTICAL REVIEWER THAT DO
16      THE WORK.
17      Q.    THE FDA REVIEW OF A NEW DRUG APPLICATION IS A RIGOROUS
18      PROCESS, WOULD YOU AGREE, SIR?
19      A.    WELL, "RIGOR" IS A WORD THAT HAS MANY DEGREES.  WE TRY TO
20      BE AS RIGOROUS AS POSSIBLE AT THE NDA, BUT AS WE DISCUSSED,
21      IT'S A HUGE DOCUMENT AND THE FDA HAS A LOT TO LOOK THROUGH.
22            AND ALSO, I MIGHT ADD THAT AN FDA REVIEWER SUCH AS
23      MYSELF ALSO HAS A LOT OF OTHER RESPONSIBILITIES AT THE SAME
24      TIME.  SO WE HOPE THAT OUR REVIEW IS RIGOROUS.  I CANNOT SAY
25      THAT ALL FDA REVIEWS ARE UNIFORMLY RIGOROUS OR AS RIGOROUS AS
page 1160
1       THEY COULD POSSIBLY BE.
2             I ALSO WANT TO MAKE THE POINT HERE THAT SUPPLEMENTARY
3       NDAS ARE NOT REVIEWED NEARLY AS RIGOROUSLY AS NDAS THEMSELVES.
4       Q.    THE FDA REVIEW PROCESS FOR AN NDA IS ONE OF THE MOST
5       RIGOROUS IN THE WORLD, CORRECT?
6       A.    WE TRY TO BE RIGOROUS AT THE NDA.  AS IN ANY HUMAN
7       ENTERPRISE, THERE ARE DEGREES OF THAT.  IT DEPENDS A LOT ON
8       COMPETING, DEMANDS FOR TIME.  IT DEPENDS A LOT ON THE
9       COMPLEXITY OF THE APPLICATION.
10            IF YOU ARE ASKING IF EVERY SINGLE PAGE IS REVIEWED
11      RIGOROUSLY AND EVERYTHING POSSIBLE IS EVALUATED RIGOROUSLY, I'M
12      AFRAID THE FDA, AS ANY HUMAN AGENCY, IS GOING TO FALL SHORT OF
13      THAT KIND OF STANDARD.
14      Q.    WELL, WITH RESPECT TO THIS DRUG, YOU DON'T KNOW HOW
15      RIGOROUS THE REVIEW IS OR WAS BECAUSE YOU NEVER READ THE NDA,
16      DID YOU, SIR?
17      A.    IN THIS PARTICULAR CASE, I DID NOT READ PREAPPROVAL
18      DOCUMENTS.
19      Q.    YOU DIDN'T READ -- TELL THE JURY WHAT AN INTEGRATED
20      SUMMARY OF SAFETY IS.
21      A.    IT'S PART OF THE NDA THAT SYNTHESIZES ALL THE ADVERSE
22      REACTIONS THAT OCCUR IN ALL THE PATIENTS THAT TAKE THE DRUG
23      PRIOR TO SUBMISSION OF THE FDA, ANALYSES THEM IN TERMS OF
24      CATEGORIES, IN TERMS OF SEVERITY, IN TERMS OF HOW MANY PEOPLE
25      WERE DISCONTINUED DUE TO ADVERSE REACTIONS.  IT'S A SUMMARY OF
page 1161
1       ALL THE ADVERSE REACTIONS SUFFERED BY THE PATIENTS WHO TOOK THE
2       DRUG AS PART OF THE FDA DEVELOPMENT PROGRAM.
3       Q.    YOU DID NOT REVIEW THE VIOXX INTEGRATED SUMMARY OF SAFETY
4       TO DETERMINE THE ADEQUACY OF THE SUBMISSION OR THE RIGOR OF THE
5       FDA REVIEW, DID YOU, SIR?
6       A.    ABOUT FIVE TIMES NOW I SAID I DID NOT APPROVE PREAPPROVAL
7       DOCUMENTS BECAUSE I WAS ASKED TO POST-APPROVAL ISSUES.  I CAN
8       SAY THAT AGAIN AND AGAIN IF YOU'D LIKE.
9       Q.    ALL RIGHT.  LET ME SEE IF YOU AGREE WITH THIS:  YOU CANNOT
10      SAY THAT MERCK DID ANYTHING WRONG WITH RESPECT TO THE
11      SUBMISSION OF THE NDA FOR VIOXX, CAN YOU, SIR?
12            MR. RAFFERTY:  I OBJECT.  HE HAS TESTIFIED HE HASN'T
13      REVIEWED THE DOCUMENTS.  IT'S OUTSIDE THE SCOPE OF DIRECT.
14            MR. ISMAIL:  WELL, YOUR HONOR, HE'S THE ONE --
15            THE COURT:  HE'S UNDER CROSS EXAMINATION.  I WILL
16      OVERRULE THE OBJECTION.
17            MR. ISMAIL:  TONI, CAN YOU --
18            THE COURT:  THE DOCTOR HAS SAID THAT NOW A NUMBER OF
19      TIMES.
20            (WHEREUPON, THE PREVIOUS QUESTION WAS READ OUT LOUD.)
21            THE WITNESS:  YOU'RE ASKING ME TO ANSWER THAT AGAIN.
22
23      BY MR. ISMAIL:
24      Q.    WE DIDN'T HEAR THE ANSWER THE FIRST TIME, SO IF YOU DON'T
25      MIND.
page 1162
1       A.    AS I SAID MANY TIMES NOW, I DID NOT REVIEW PREAPPROVAL
2       DOCUMENTS WITH RESPECT TO VIOXX.
3       Q.    SIR, YOU TOLD MR. RAFFERTY THAT VIOXX WAS SUBJECT TO AN
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
4      EXPEDITED REVIEW, CORRECT?
5      A.   YES.
6      Q.   IF YOU DIDN'T LOOK AT ANY DOCUMENTS, HOW DID YOU KNOW
7      THAT?
8      A.   I AM NOT ACTUALLY SURE WHERE I GOT THAT PARTICULAR PIECE
9      OF INFORMATION.
10     Q.   THE LAWYERS TOLD YOU, RIGHT?
11     A.   IT'S POSSIBLE TAT THERE WAS A DOCUMENT; IT'S POSSIBLE THE
12     LAWYERS TOLD ME.
13     Q.   THE APPLICATION FOR AN EXPEDITED REVIEW WOULD HAVE BEEN
14     PART OF THIS PREAPPROVAL PROCESS YOU SAY YOU HAVEN'T LOOKED AT,
15     RIGHT?
16     A.   I DID NOT REVIEW PREAPPROVAL DOCUMENTS.
17     Q.   ALL RIGHT.  SO GOING BACK TO THIS EXPEDITED REVIEW, THAT'S
18     NOT A PROCESS THAT THE FDA INVENTED FOR VIOXX, WAS IT?
19     A.   NO.   THERE ARE A NUMBER OF DRUGS THAT QUALIFY FOR
20     EXPEDITED REVIEW.
21     Q.   RIGHT.  IF A MANUFACTURER APPLIES FOR AN EXPEDITED REVIEW,
22     THE FDA HAS THE RIGHT OR RESPONSIBILITY TO SAY NO IF THE FDA
23     FEELS THAT IT'S INAPPROPRIATE, CORRECT?
24     A.   THAT'S RIGHT.
25     Q.   EVEN AFTER GRANTING EXPEDITED REVIEW, THE FDA CAN SAY, "WE
page 1163
1      ARE GOING TO REVOKE THE EXPEDITED REVIEW AND TAKE MORE TIME ON
2      THE NDA", CORRECT?
3      A.   HAS TO GIVE A GOOD REASON FOR THAT, BUT YES, THE FDA CAN
4      DO THAT.
5      Q.   AN EXPEDITED REVIEW WAS GRANTED BY THE FDA FOR CLINICALLY
6      IMPORTANT DRUGS, CORRECT?
7      A.   DRUGS THAT SERVE AN UNMET MEDICAL NEED, YES.
8      Q.   WE KNOW THE FDA MADE THAT DETERMINATION WITH RESPECT TO
9      VIOXX, CORRECT?
10     A.   THAT'S RIGHT.
11     Q.   YOU DO NOT CRITICIZE THE FDA'S DECISION TO GRANT EXPEDITED
12     REVIEW IN THIS CASE, CORRECT?
13     A.   I AM NOT CRITICIZING THE FDA'S DECISIONS IN THIS CASE.
14     Q.   BECAUSE YOU DID NOT REVIEW THE PREAPPROVAL DOCUMENTS, YOU
15     CANNOT SAY THAT THE EXPEDITED REVIEW OF VIOXX HAD ANY IMPACT ON
16     THE RIGOR OF THE FDA REVIEW, CORRECT?
17     A.   WELL, WAIT A SECOND.  NO.  I MEAN, I DON'T THINK THAT YOU
18     CAN -- I CAN'T SAY ANYTHING SPECIFIC ABOUT THE VIOXX REVIEW,
19     BUT I CAN SAY THAT REVIEWING A COMPLEX NEW DRUG APPLICATION IN
20     A SIX-MONTH PERIOD OF TIME PLACES EXTRAORDINARY DEMANDS ON FDA
21     REVIEWERS.   I CAN SAY THAT IN A GENERAL SENSE.
22     Q.   RIGHT.  BUT YOU CAN'T GIVE ANY OPINION WITH RESPECT TO THE
23     REVIEW OF VIOXX BECAUSE YOU HAVEN'T LOOKED AT THE DOCUMENTS.
24     A.   I HAVE NOT REVIEWED PREAPPROVAL DOCUMENTS WITH REGARD TO
25     VIOXX.
page 1164
1      Q.   NOW, SIR, YOU TALKED A GREAT DEAL ABOUT FDA'S REVIEW OF
2      LABELING, CORRECT?
3      A.   YES.
4      Q.   NOW, THE FDA HAS ULTIMATE AUTHORITY TO APPROVE EVERY WORD,
5      EVERY COMMA, AND EVERY DOT IN A PRESCRIPTION MEDICATION LABEL,
6      CORRECT?
7      A.   THE FDA HAS TO APPROVE LABELING, YES.
8      Q.   THAT'S NO DIFFERENT WITH RESPECT TO VIOXX, CORRECT?
9      A.   THAT'S CORRECT.
10     Q.   THE FDA DECISION TO APPROVAL LABELING IS BASED ON EVIDENCE
11     SUBMITTED BY THE MANUFACTURER AS WELL AS THE FDA'S APPROVAL OF
12     OTHER MATERIAL; ISN'T THAT CORRECT?
13     A.   LET ME EXPLAIN SOMETHING ABOUT THIS APPROVAL PROCESS.  THE
14     MANUFACTURER SUBMITS LABELING FOR REVIEW BY THE FDA.  THE FDA
15     GOES OVER THAT LABELING AND CONSIDERS EVIDENCE IN ITS DECISION
16     TO APPROVE IT.
17         IN OTHER WORDS, THE FDA DOES NOT WRITE THE LABELING;
18     THE MANUFACTURER WRITES THE LABELING.  THE FDA CONSIDERS WHAT
19     THE MANUFACTURER HAS PROPOSED AND TAKES EVIDENCE INTO ACCOUNT
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
20      IN MAKING AN APPROVAL DECISION.
21      Q.   WELL, THE FDA IS NOT LIMITED SOLELY TO THE INFORMATION
22      SUBMITTED BY THE MANUFACTURER, CORRECT?  IT CAN RELY ON OTHER
23      INFORMATION THAT EXISTS IN THE WORLD OF SCIENCE, CORRECT?
24      A.   YES.
25      Q.   YOU HAVE ALREADY TOLD THE JURY THAT IT WAS YOUR EXPERIENCE
page 1165
1       AT FDA THAT THE SCIENTISTS THERE DID A GOOD JOB KEEPING UP WITH
2       THE STATE OF THE SCIENCE IN THEIR RESPECTIVE FIELD, CORRECT?
3       A.   SCIENTISTS DO, I BELIEVE, TRY TO KEEP UP WITH THE SCIENCE
4       IN THEIR RESPECTIVE FIELD.
5       Q.   WHEN THE FDA APPROVES A PRESCRIPTION DRUG LABEL, IT IS
6       DETERMINED THAT THE LABEL IS NOT FALSE OR MISLEADING IN ANY
7       WAY, RIGHT?
8       A.   YES, IT DOES -- IT IS DETERMINED THAT THE -- RIGHT.  THEY
9       MAKE THE DECISION THAT THE LABEL IS NOT FALSE OR MISLEADING.
10      Q.   THE FDA APPROVES LABELS WHEN IT BELIEVES THAT THE LABEL
11      REFLECTS KNOWN WARNINGS OR KNOWN RISKS THAT EXIST AT THE TIME
12      OF THE APPROVAL, CORRECT?  LET ME SAY THAT AGAIN.
13      A.   YEAH, PLEASE.
14      Q.   I TRANSPOSED SOME WORDS.  WHEN THE FDA APPROVES A LABEL,
15      IT DOES SO ONLY WHEN IT DETERMINES THAT THE LABEL ADEQUATELY
16      WARNS ABOUT THE KNOWN RISKS AT THAT TIME, CORRECT?
17      A.   WELL, "ADEQUATELY WARNS," THAT'S THE PHRASE THAT YOU USED
18      JUST THEN, AND THE FDA PROPOSED A WARNING IN REGARD TO VIOXX;
19      AND THE LABEL THAT WAS EVENTUALLY PROPOSED DID NOT CONTAIN THAT
20      WARNING, BUT THE FDA WANTED IT TO CONTAIN A WARNING.  SO, AT
21      SOME POINT, THE FDA -- IN APRIL OF 2002, THE FDA MADE A
22      JUDGMENT THAT, WELL, THEY WERE GOING TO ACCEPT IT AS A
23      PRECAUTION RATHER THAN A WARNING.  BUT THE FDA WANTED THE
24      WARNING.
25      Q.   SIR, SEE IF YOU CAN ANSWER THIS QUESTION GENERALLY.  THE
page 1166
1       FDA APPROVES A LABEL WHEN IT DETERMINES, BASED ON THE KNOWN
2       SCIENTIFIC EVIDENCE, THAT APPROPRIATE WARNINGS ARE DRAFTED TO
3       EXPRESS THE KNOWN RISKS.
4       A.   YOUR QUESTION IS WHAT?
5       Q.   IS THAT CORRECT?
6       A.   IN A GENERAL SENSE, YES, IT'S CORRECT.  BUT I WANT TO MAKE
7       IT CLEAR THAT THE FDA WANTED A WARNING IN THIS LABEL AND, AFTER
8       LONG AND ARDUOUS NEGOTIATIONS WITH THE COMPANY, FINALLY SETTLED
9       ON A PRECAUTION.
10      Q.   RIGHT.  WE'LL GET TO THAT IN A MINUTE, DOCTOR.
11      A.   OKAY.
12      Q.   YOU CERTAINLY WOULD AGREE THAT THERE ARE RISKS THAT ARE
13      UNKNOWN TO BOTH THE MANUFACTURER AND FDA AT THE TIME OF THE
14      DRUG'S APPROVAL, RIGHT?
15      A.   YES, THERE ARE RISKS THAT ARE UNKNOWN.  THAT'S WHAT I
16      TOUCHED ON EARLIER WHEN I ELABORATED ON YOUR WORD "PROOF"
17      THERE, THAT PROOF DOES NOT MEAN THAT -- THAT PROOF HAS TO BE
18      UNDERSTOOD, THAT THERE'S STILL A LOT THAT'S UNKNOWN.  AMONG
19      THESE THINGS THAT ARE UNKNOWN ARE WHAT YOU ARE TALKING ABOUT
20      NOW, THAT RISKS REMAIN UNKNOWN AT THE TIME OF APPROVAL.
21      Q.   CERTAINLY, YOU WOULD AGREE, SIR, THAT, IT IS COMMON FOR
22      LABELS TO CHANGE OVER TIME AS INFORMATION AS TO SAFETY BECOMES
23      AVAILABLE TO FDA, THE MEDICAL COMMUNITY, AND THE MANUFACTURER?
24      A.   YES, THAT'S TRUE.  LABELS OFTEN -- AND THAT'S THE RULE.
25      THEY WILL -- DO CHANGE.  ALMOST ALL LABELS CHANGE OVER TIME.
page 1167
1       Q.   NOW, LET ME PUT UP THE TIME LINE THAT YOU DID WITH
2       MR. RAFFERTY EARLIER.
3            SO WE HAVE THIS WHOLE PERIOD OF NINE YEARS OF DRUG
4       DEVELOPMENT INVOLVING VIOXX THAT YOU HAVE NO OPINIONS ABOUT,
5       RIGHT?
6       A.   I REVIEWED NO DOCUMENTS ABOUT THAT.
7       Q.   AND THEN YOU STARTED HERE IN MAY 1999 UPON THE APPROVAL OF
8       THE MEDICINE, RIGHT?
9       A.   YES.
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
10    Q.    APPROVAL BY THE FDA MEANS THAT THE AGENCY, AFTER REVIEWING
11    THE NEW DRUG APPLICATION, DETERMINES THAT VIOXX WAS SAFE AND
12    EFFECTIVE FOR ITS PROPOSED USE, CORRECT?
13    A.    ON THE BASIS OF THE INFORMATION DEVELOPED UP TO THAT POINT
14    IN TIME.
15    Q.    RIGHT.  NOW, SIR, YOU'RE NOT AWARE OF ANY CLINICAL TRIAL
16    PRIOR TO MARCH OF 2000 THAT SHOWED AN INCREASED RISK OF
17    MYOCARDIAL INFARCTIONS WITH VIOXX COMPARED TO ANY OTHER DRUG,
18    CORRECT?
19    A.    THOSE STUDIES WERE NOT ABLE TO SHOW WHETHER THERE WAS A
20    CARDIOVASCULAR RISK WITH VIOXX.
21    Q.    SO YOU'RE NOT AWARE OF ANY CLINICAL TRIAL BEFORE MARCH OF
22    2000 THAT SHOWED INCREASED CARDIOVASCULAR RISK WITH VIOXX
23    COMPARED TO ANY OTHER DRUG, RIGHT?
24    A.    THEY DIDN'T SHOW THAT BECAUSE THEY WEREN'T POWERED TO SHOW
25    SUCH A THING.
page 1168
1     Q.    BUT WE CAN AGREE THAT THERE WAS NO TRIAL THAT, IN FACT,
2     SHOWED SUCH A RISK.  CAN WE AGREE WITH THAT, SIR?
3     A.    THAT'S OBVIOUS BECAUSE, IF THEY ARE NOT POWERED, THEY ARE
4     NOT GOING TO SHOW IT.
5     Q.    ALL RIGHT.  SO THERE'S NO CLINICAL EVIDENCE BETWEEN MAY
6     '99 AND MARCH OF 2000 OF AN INCREASED CARDIOVASCULAR RISK WITH
7     VIOXX, RIGHT?
8     A.    THAT'S RIGHT.  THE INFORMATION CAME OUT TO A STATISTICALLY
9     SIGNIFICANT DEGREE WITH THE VIGOR STUDY.
10    Q.    RIGHT.  I THINK YOU TOLD THE JURY THAT MERCK LEARNED OF
11    THE VIGOR TRIAL IN THE FIRST QUARTER OF 2000.
12    A.    YES.
13    Q.    THEN YOU SAID MERCK THAT INFORMED FDA IN MARCH OF 2000?
14    A.    YES.
15    Q.    THEY ACTUALLY HAPPENED IN THE SAME MONTH, RIGHT, DOCTOR?
16    A.    AT SOME POINT -- OBVIOUSLY, MERCK LOOKED AT THE DATA
17    BEFORE THEY INFORMED FDA, SO AT SOME POINT IN THAT FIRST
18    QUARTER, THEY BECAME AWARE OF THE DATA.
19    Q.    DID THE PLAINTIFF LAWYERS IN YOUR EDUCATION MEETING BACK
20    IN SEPTEMBER TELL YOU THAT THE VIGOR TRIAL WAS UNBLINDED ON
21    MARCH 9, 2000?
22    A.    THE DRUG WAS UNBLINDED IN THE SENSE THAT THEY KNEW THAT
23    GROUP A TOOK ONE DRUG AND GROUP B ANOTHER, BUT ACTUALLY, THE
24    COMPANY WAS FULLY AWARE THAT THERE WAS GROUP A AND GROUP B FOR
25    A NUMBER OF YEARS, AND THEY WERE FOLLOWING ADVERSE REACTIONS
page 1169
1     OCCURRING IN EITHER GROUP A OR GROUP B.
2           NOW, MAYBE THEY DID NOT UNBLIND GROUP A OR B, BUT
3     ACTUALLY IT'S OFTEN NOT DIFFICULT TO FIGURE OUT WHICH GROUP IS
4     WHICH.  SO THEY WERE FOLLOWING ADVERSE REACTIONS BY GROUP
5     THROUGH THE ENTIRE CONDUCT OF THE VIGOR TRIAL.
6     Q.    DID YOU JUST SAY MERCK KNEW GROUP A AND GROUP B FOR A
7     NUMBER OF YEARS IN THE VIGOR TRIAL?
8     A.    YEAH, THEY KNEW THAT THERE WAS A GROUP A AND A GROUP B.
9     Q.    HOW LONG WAS THE TRIAL, DOCTOR?
10    A.    I DON'T KNOW EXACTLY HOW LONG IT WAS.  IT WAS A COUPLE
11    YEARS LONG.
12    Q.    SO YOU THINK THE VIGOR TRIAL WAS A COUPLE YEARS LONG?
13    A.    YEAH.
14    Q.    NO ONE TOLD YOU AT YOUR EDUCATION MEETING BACK IN
15    SEPTEMBER THAT, THE VIGOR TRIAL, THE AVERAGE LENGTH OF USE WAS
16    NINE MONTHS?
17    A.    THE AVERAGE LENGTH OF USE.  THAT DOESN'T MIND -- I MEAN,
18    THERE'S RECRUITMENT, THERE'S TREATMENT, AND THERE'S FOLLOW-UP.
19    SO THE TRIAL IS LONGER THAN THE AVERAGE LENGTH OF USE.
20    Q.    YOU DON'T KNOW, SIR, FROM YOUR REVIEW OF ANY DOCUMENTS IN
21    THIS CASE IS THAT MERCK KNEW OF A DIFFERENCE IN CARDIOVASCULAR
22    RISK BETWEEN VIOXX AND ANY DRUG PRIOR TO MARCH OF 2000,
23    CORRECT?
24    A.    WELL, I KNOW HOW THESE STUDIES ARE DONE, AND I KNOW THAT
25    THEY KNEW THERE WERE TWO GROUPS, GROUP A AND GROUP B, AND THEY
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

page 1170
1       MONITORED ADVERSE REACTIONS BY GROUP.  NOW, THOSE GROUPS MAY
2       NOT HAVE BEEN UNBLINDED, BUT IF YOU WANT TO KNOW THE REALITY,
3       THEY CAN FIGURE OUT PRETTY EASILY WHICH GROUP IS WHICH.
4       Q.    CAN YOU ANSWER MY QUESTION NOW?
5       A.    I'M SORRY.  WHAT'S YOUR QUESTION?
6       Q.    MY QUESTION WAS:  YOU DO NOT KNOW FROM REVIEW OF ANY
7       DOCUMENTS WITH RESPECT TO VIOXX THAT MERCK KNEW OF ANY
8       DIFFERENCE IN CARDIOVASCULAR EVENTS BETWEEN VIOXX AND NAPROXEN
9       PRIOR TO MARCH OF 2000?
10      A.    I DON'T KNOW OF ANY -- I DO NOT KNOW THAT FROM ANY OF THE
11      DOCUMENTS, THAT'S TRUE.
12      Q.    WHEN YOU WROTE YOUR REPORT IN THIS CASE BACK IN SEPTEMBER,
13      YOU DID NOT KNOW THAT MERCK HAD SOUGHT A LABELING CHANGE FOR
14      VIGOR IN JUNE OF 2000, CORRECT?
15      A.    I WAS NOT -- I DID HAVE A DOCUMENT AT THAT PARTICULAR TIME
16      THAT INDICATED FDA HAD MARKED UP A LABELING PROPOSAL IN
17      OCTOBER -- IN OCTOBER OF 2001, FDA MARKED UP A PRIOR LABELING
18      PROPOSAL THAT MERCK HAD SUBMITTED.  I DID NOT KNOW WHEN THAT
19      PROPOSAL WAS SUBMITTED.
20      Q.    ALL RIGHT.  LET ME MAKE SURE I ACTUALLY GET AN ANSWER TO
21      THE QUESTION.  WHEN YOU FORMED YOUR OPINIONS AND WROTE YOUR
22      REPORT IN THIS CASE, YOU DID NOT KNOW THAT MERCK SOUGHT A
23      LABELING CHANGE IN JUNE OF 2000 TO INCLUDE THE VIGOR
24      CARDIOVASCULAR RESULTS; ISN'T THAT TRUE, DOCTOR?
25      A.    I DON'T BELIEVE THAT'S CORRECT.  MERCK DID NOT SEEK TO
page 1171
1       INCLUDE THE VIGOR CARDIOVASCULAR RESULTS IN THE JUNE 2000
2       LABEL; IT SOUGHT TO TAKE OUT THE GI WARNING.
3       Q.    SIR, YOU SHOWED THE JURY AND WENT OVER WITH MR. RAFFERTY
4       THAT THE CARDIOVASCULAR DATA FROM VIGOR WERE INCLUDED IN THE
5       CLINICAL TRIAL SECTION OF THE JUNE 2000 PROPOSED LABEL.  DO YOU
6       RECALL SAYING THAT THIS MORNING?
7       A.    YES.
8       Q.    OKAY.  SO GOING BACK TO MY QUESTION, WHEN YOU FORMED YOUR
9       OPINION IN THIS CASE REGARDING MERCK'S DILIGENCE WITH RESPECT
10      TO LABELINGS, YOU WERE NOT AWARE THAT MERCK SOUGHT A LABEL
11      CHANGE IN JUNE OF 2000 TO INCLUDE THE VIGOR CARDIOVASCULAR
12      RESULTS; ISN'T THAT CORRECT?
13      A.    WELL, AS I SAY, I HAD THIS DOCUMENT THAT THE FDA PUT OUT
14      IN OCTOBER OF 2001.  THAT DOCUMENT HAD A MARKUP OF A LABEL
15      SUBMISSION THAT MERCK MADE.  IN MY OPINION, THAT LABEL
16      SUBMISSION WAS INADEQUATE AS FAR AS EXPRESSING ANY INFORMATION
17      ABOUT CARDIOVASCULAR RISKS.  SO I DIDN'T KNOW THE EXACT DATE
18      THAT THAT SUBMISSION WAS SENT TO THE FDA; THAT'S TRUE.
19      Q.    SIR, WHEN YOU WROTE YOUR REPORT AND FORMED YOUR OPINIONS,
20      YOU THOUGHT MERCK DID NOTHING BETWEEN MARCH OF 2000 AND OCTOBER
21      OF 2001 WITH RESPECT TO VIGOR LABELING; ISN'T THAT TRUE?
22      A.    I DID REVIEW DOCUMENTS IN THE ORIGINAL DOCUMENTS THAT I
23      WAS GIVEN IN WHICH THE FDA SUBMITTED A LABELING PROPOSAL, AND
24      THAT LABELING PROPOSAL TOOK THE FORM OF MARKING UP A PRIOR
25      MERCK LABELING PROPOSAL.  SO I KNEW THEY SUBMITTED A LABELING
page 1172
1       PROPOSAL.
2       Q.    SIR, DID YOU TESTIFY ON SEPTEMBER 30, 2005 -- FIRST THE
3       QUESTION:
4                   "Q.  DO YOU KNOW AS YOU SIT HERE TODAY WHETHER MERCK
5             EVER DID SUBMIT TO THE FDA PROPOSED LABEL CHANGES AFTER
6             THE UNBLINDING OF VIGOR AND BEFORE OCTOBER 2001?"
7                   "A.  I DON'T KNOW THAT AT THIS TIME."
8       Q.    ISN'T THAT CORRECT?
9       A.    LET ME GO OVER WHAT I WAS SAYING.
10      Q.    WELL, FIRST CAN YOU TELL THE JURY WHETHER THAT WAS YOUR
11      SWORN TESTIMONY.
12      A.    I ACCEPT YOUR WORD THAT THAT WAS MY SWORN TESTIMONY.  WHAT
13      I AM SAYING IS THAT I WAS AWARE, AS PART OF THE DOCUMENTS THAT
14      I REVIEWED FOLLOWING THAT MEETING WITH THE LAWYERS, THAT THERE
15      WAS AN FDA MARKUP OF A PRIOR MERCK LABEL, AND I MADE THE

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
16      JUDGMENT THAT THAT PRIOR MERCK LABEL -- AND I DID NOT KNOW --
17      IT WAS NOT DATED, SO I DID NOT KNOW WHEN IT WAS SUBMITTED.  BUT
18      I MADE A JUDGMENT THAT THAT PRIOR MERCK LABEL WAS INADEQUATE AS
19      FAR AS EXPRESSING ANY CARDIOVASCULAR RISKS.
20      Q.    SIR, THAT'S AN OPINION YOU REACHED AFTER SOMEONE EXPLAINED
21      TO YOU YOU WERE WRONG WHEN YOU TESTIFIED AT YOUR DEPOSITION
22      THAT THERE WAS NO MERCK INITIATIVE ON LABELING AFTER THE VIGOR
23      TRIAL.
24      A.    I MADE -- NO.  YOU ARE INCORRECT.
25      Q.    SIR, HOW DID YOU LEARN ABOUT THE -- WELL, LET ME ASK THIS
page 1173
1       QUESTION.  DO YOU REMEMBER THIS MORNING --
2       A.    I WOULD LIKE TO EXPLAIN WHY YOU ARE INCORRECT.
3       Q.    I WITHDREW MY QUESTION.  DO YOU REMEMBER THIS MORNING YOU
4       AND MR. RAFFERTY KEPT TALKING ABOUT THIS JUNE 2000 LABELING
5       PROPOSAL?
6       A.    YES.
7       Q.    YOU REMEMBER YOU TESTIFIED AT YOUR DEPOSITION YOU DIDN'T
8       THINK THERE WAS A MERCK LABEL PROPOSAL BETWEEN MARCH OF 2000
9       AND OCTOBER OF 2001?
10      A.    IT'S TRUE THAT I WAS NOT AWARE OF DATES BECAUSE THIS
11      DOCUMENT THAT THE FDA MARKED UP WAS NOT DATED, AND SO I
12      ANSWERED THAT QUESTION -- WHEN I ANSWERED THAT QUESTION, I WAS
13      UNCERTAIN.
14      Q.    CORRECT.
15      A.    BUT I DID EXAMINE THAT DOCUMENT AND I DID MAKE THE
16      JUDGMENT THAT THE FDA MARKUP OF THE MERCK LABEL WAS INADEQUATE
17      AS FAR AS EXPRESSING CARDIOVASCULAR WARNINGS.
18      Q.    RIGHT.  BUT WHEN YOU FORMED YOUR OPINIONS ABOUT MERCK'S
19      DILIGENCE HERE, YOU DIDN'T KNOW THERE WAS ANY MERCK INITIATIVE
20      BETWEEN MARCH OF 2000 AND OCTOBER 2001.
21      A.    I DID NOT KNOW THE DATES THAT IT CAME OUT, YES.
22      Q.    RIGHT.  WHEN THE HALF-DOZEN PLAINTIFF LAWYERS, BACK IN
23      SEPTEMBER, WERE GIVING YOU GUIDANCE ABOUT YOUR REPORT, THAT WAS
24      A FACT THEY LEFT OUT, WASN'T IT, DOCTOR?
25      A.    I WENT THROUGH THOSE DOCUMENTS MYSELF.
page 1174
1       Q.    RIGHT.  WELL, LET'S ANSWER MY QUESTION.  WHEN THE
2       PLAINTIFF LAWYERS WERE GIVING YOU GUIDANCE ABOUT WHAT TO
3       INCLUDE IN YOUR REPORT, THEY DID NOT TELL YOU THAT MERCK HAD
4       UNDERTAKEN ANY LABELING INITIATIVE BETWEEN MARCH OF 2000 AND
5       OCTOBER 2001; ISN'T THAT CORRECT?
6       A.    ACTUALLY, I DON'T REMEMBER.  WHAT I REMEMBER FROM THAT
7       MEETING WAS THAT THEY WANTED ME TO ADDRESS CERTAIN ISSUES.  AT
8       THAT MEETING, THEY ALSO GAVE ME 80-SOMETHING DOCUMENTS TO LOOK
9       THROUGH.  I WENT THROUGH THOSE 80-SOMETHING DOCUMENTS MYSELF, I
10      CAME TO MY OWN CONCLUSIONS ABOUT WHAT THEY MEANT, AND I WROTE
11      MY OWN REPORT.
12      Q.    THE DOCUMENTS THAT THE LAWYERS CHOSE TO GIVE YOU FAILED TO
13      ALERT YOU THAT MERCK HAD DONE ANYTHING IN THIS PERIOD OF TIME,
14      RIGHT?
15      A.    THE DOCUMENT THAT I GOT IN REGARDS TO THIS LABELING THAT
16      WAS MARKED UP BY THE FDA WAS INDEED UNDATED, AND THAT WAS A
17      DISADVANTAGE TO ME, IT WAS.
18      Q.    NOW, IN RESPONSE TO A MANUFACTURER'S REQUEST FOR A LABEL
19      CHANGE, THE FDA CAN ASSIGN DIFFERENT PRIORITY REVIEW PERIOD.
20      ISN'T THAT CORRECT?
21      A.    YES.
22      Q.    THEY CAN ASSIGN A STANDARD REVIEW PERIOD OR THEY CAN
23      ASSIGN A PRIORITY EXPEDITED REVIEW, CORRECT?
24      A.    WELL, IN THIS PARTICULAR CASE, IT IS NOT A PRIORITY
25      REVIEW.  "PRIORITY REVIEW REPORTING" IS A TERM THAT IS RESERVED
page 1175
1       FOR AN NDA.  AN NDA CAN GET A PRIORITY REVIEW.
2              YOU USED THE WORD "EXPEDITED," AND I WOULD LIKE TO
3       EXPLAIN WHAT THE WORD "EXPEDITED" MEANS IN THIS CONTEXT; THAT
4       A -- CERTAIN KINDS OF SUPPLEMENTS LIKE, FOR EXAMPLE,
5       SUPPLEMENTS WHICH THE MANUFACTURER WISHES TO CANCEL A WARNING,
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
 6        REQUIRED FDA PRIOR REVIEW, AND A MANUFACTURER CAN REQUEST AN
 7        EXPEDITED PRIOR REVIEW OF, FOR EXAMPLE, A REQUEST TO TAKE OUT A
 8        WARNING.
 9        Q.    YOU ALREADY TESTIFIED THAT THE JUNE 2000 LABEL PROPOSAL BY
10        MERCK DID IN FACT INCLUDE THE CARDIOVASCULAR DATA FROM VIGOR,
11        CORRECT?
12        A.    IT INCLUDED SOME CARDIOVASCULAR DATA FROM VIGOR, YES.
13        Q.    DO YOU KNOW, SIR, WHETHER OR NOT MERCK SOUGHT AN EXPEDITED
14        REVIEW BY FDA OF THAT PROPOSED LABEL CHANGE?
15        A.    THE CLINICAL STUDIES SECTION WAS PRIMARILY -- WELL, THE
16        LABEL SUBMISSION THAT CONTAINED THIS VERY MINIMAL INFORMATION
17        ABOUT CARDIOVASCULAR EVENTS AND NO INFORMATION ABOUT THE RISKS,
18        WHICH ALSO CONTAINED IN THE SAME SUBMISSION THE REQUEST THAT
19        THE NDA ELIMINATE A WARNING, THAT MERCK WANTED AN EXPEDITED
20        REVIEW AND OBVIOUSLY THEY WANTED THE WARNING TAKEN OUT AS SOON
21        AS POSSIBLE.
22        Q.    DO YOU NOW KNOW, SIR, THAT MERCK SOUGHT AN EXPEDITED
23        REVIEW BY FDA TO APPROVE A LABEL THAT WOULD HAVE INCLUDED THE
24        CARDIOVASCULAR INFORMATION FROM VIGOR?
25        A.    AND THE MAIN THING THAT IT WOULD HAVE INCLUDED WAS THE
page 1176
 1        ELIMINATION OF A WARNING THAT MERCK WANTED TO HAVE TAKEN OUT.
 2        Q.    SIR --
 3        A.    SO YOUR IMPLICATION HERE THAT THE CARDIOVASCULAR PART OF
 4        THIS WAS THE REASON THEY ASKED FOR EXPEDITED REVIEW, I MEAN,
 5        THAT'S HIGHLY IMPLAUSIBLE.  THEY HAD A BIG GASTROINTESTINAL
 6        WARNING THAT THEY WANTED TAKEN OUT.
 7                MR. ISMAIL:  YOUR HONOR, MY QUESTION WAS VERY SIMPLE.
 8                THE COURT:  DOCTOR, LET'S SEE IF WE CAN STICK WITH
 9        THE QUESTION.  WE HAVE TO FINISH SOMETIME SOON.
10                MR. ISMAIL:  YES, SIR.  I'M DOING THE BEST I CAN.
11        BY MR. ISMAIL:
12        Q.    THE QUESTION, SIR:  DO YOU NOW KNOW THAT MERCK SOUGHT
13        EXPEDITED REVIEW OF THE JUNE 2000 PROPOSED LABELING THAT WOULD
14        HAVE INCLUDED CARDIOVASCULAR DATA FROM THE VIGOR TRIAL?  YES OR
15        NO.
16        A.    THAT'S ONE OF THE THINGS THAT THE NEW LABEL WOULD HAVE
17        INCLUDED.
18        Q.    DO YOU KNOW WHAT FDA'S RESPONSE WAS TO MERCK'S REQUEST TO
19        EXPEDITE REVIEW OF THE PROPOSED LABEL THAT WOULD HAVE INCLUDED
20        THE CARDIOVASCULAR DATA?
21        A.    THE FDA DID NOT GRANT IT AND THE --
22        Q.    I THINK THAT ANSWERS THE QUESTION.
23        A.    THAT WAS A SMALL PART OF THAT LABEL AND ONE THAT DIDN'T
24        TALK ABOUT ANY RISKS.
25                MR. ISMAIL:  MOVE TO STRIKE, YOUR HONOR.
page 1177
 1                THE COURT:  IT'S GRANTED.
 2        BY MR. ISMAIL:
 3        Q.    DOCTOR, YOU -- BY THE WAY, WHEN DID YOU FIND OUT THAT
 4        MERCK, IN FACT, HAD SOUGHT A LABELING CHANGE IN JUNE 2000?
 5        A.    SOMETIME WITHIN THE LAST MONTH OR TWO.  I'M NOT SURE
 6        EXACTLY WHEN IT WAS.
 7        Q.    ALL RIGHT.  SO SOMEONE POINTED THAT OUT TO YOU?
 8        A.    YES.
 9        Q.    DID YOU TESTIFY THIS MORNING THAT YOU HEARD OR READ
10        DR. SCHIRMER'S TESTIMONY THAT HE READS THE CONTRAINDICATIONS,
11        WARNINGS, AND PRECAUTIONS SECTION OF A LABEL?
12        A.    YES, I DID.  SOMEONE TOLD ME THAT HE DID SAY THAT.
13        Q.    ALL RIGHT.  SO YOU WEREN'T ACTUALLY IN COURT WHEN
14        DR. SCHIRMER WAS TESTIFYING.
15        A.    NO.
16        Q.    YOU DIDN'T READ THE TRANSCRIPT?
17        A.    NO.
18        Q.    ONE OF THE LAWYERS TOLD YOU THAT THE TESTIMONY OCCURRED
19        AND THEY WERE GOING TO ASK YOU ABOUT IT ON THE STAND?
20        A.    THEY MENTIONED TO ME THAT'S WHAT HE SAID.
21        Q.    RIGHT.
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
22    A.    AND I HEARD THAT DURING CONVERSATIONS -- ACTUALLY, I DON'T
23    KNOW IF THEY WERE TELLING IT TO ME OR TALKING AMONG EACH OTHER,
24    BUT I HEARD THAT.
25    Q.    RIGHT.  THEY ASKED YOU THE QUESTION TODAY.  IT WASN'T A
page 1178
1     SURPRISE TO YOU WHEN MR. RAFFERTY ASKED YOU TO CONFIRM THAT
2     DR. SCHIRMER REVIEWED THE PRECAUTIONS, WARNINGS, AND
3     CONTRAINDICATIONS SECTIONS, RIGHT?
4     A.    I DIDN'T THINK THAT WAS THE MAIN POINT OF THAT QUESTION,
5     BUT I HAPPEN TO HAVE KNOWN THAT FACT.
6     Q.    ALL RIGHT.  SO YOU KNOW, SIR, THAT THE APRIL 2002 LABEL
7     THAT WAS APPROVED BY FDA HAD THE VIGOR CARDIOVASCULAR DATA IN
8     THE PRECAUTIONS SECTION?
9     A.    YEAH.  I GUESS THE FDA AGREED TO PUT IT THERE.
10    Q.    RIGHT.  SO WHATEVER YOU THINK ABOUT WHERE THE CV DATA
11    SHOULD HAVE GONE, WE CAN AT LEAST AGREE --
12    A.    NOT JUST ME; THE FDA.
13    Q.    WELL, THE FDA, SIR, IS THE ONE THAT APPROVED THE LABEL --
14    A.    THEY WANTED IT IN WARNINGS.
15    Q.    THE FDA APPROVED THE LABEL, CORRECT?
16    A.    EVENTUALLY.
17    Q.    THE FDA APPROVED A LABEL THAT INCLUDED THE CARDIOVASCULAR
18    DATA IN THE PRECAUTIONS SECTION, CORRECT?
19    A.    YES.
20    Q.    NOW, DID THE LAWYERS TELL YOU OR DID YOU OVERHEAR THEM
21    TALKING THAT DR. SCHIRMER TESTIFIED THAT, AFTER THE
22    CARDIOVASCULAR DATA WAS IN THE PRECAUTIONS SECTION, HE KEPT
23    PRESCRIBING VIOXX?
24    A.    I BELIEVE I DID HEAR SOMETHING LIKE THAT, YES.
25    Q.    NOW, YOU AND MR. RAFFERTY WERE TALKING ABOUT A DIFFERENT
page 1179
1     EXPERIENCE MERCK HAD WITH RESPECT TO VIOXX AND THIS QUESTION OF
2     CHANGES BEING EFFECTED LABEL CHANGES.  DO YOU RECALL THAT?
3     A.    "A DIFFERENT EXPERIENCE"?  I'M NOT SURE WHAT YOU MEAN.
4     Q.    I THINK YOU TOLD MR. RAFFERTY THAT YOU SAW DOCUMENTS IN
5     THIS CASE TO SHOW YOU THAT MERCK KNEW HOW TO DO A CHANGES BEING
6     EFFECTED IF IT WANTED TO.
7     A.    MERCK CERTAINLY KNEW THAT.
8     Q.    YOU MADE SPECIFIC REFERENCE TO AN APPLICATION THAT MERCK
9     FILED IN THAT REGARD, RIGHT?
10    A.    YES.
11    Q.    THAT WAS WITH RESPECT TO VIOXX, CORRECT?
12    A.    YES.
13    Q.    DO YOU RECALL WHAT THE CIRCUMSTANCES WERE, AT LEAST WITH
14    RESPECT TO WHAT MERCK SOUGHT TO DO THROUGH, THAT CHANGES BEING
15    EFFECTED APPLICATION?
16    A.    MERCK SOUGHT TO ADD A STATEMENT TO WARNINGS.
17    Q.    ARE YOU SURE ABOUT THAT?
18    A.    I'M NOT COMPLETELY SURE ABOUT THAT.
19    Q.    I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS DEFENDANT'S
20    EXHIBIT 942.  DID YOU GET A CHANCE TO LOOK AT THAT DOCUMENT,
21    SIR?
22    A.    THIS IS A LONG DOCUMENT.  WOULD YOU LIKE TO POINT ME TO
23    THE PARTS THAT YOU WANT ME TO FOCUS ON.
24    Q.    THE LETTER ON PAGE 2 IS A GOOD PLACE TO START.
25    A.    GO AHEAD.
page 1180
1     Q.    LET ME ASK THIS:  DO YOU RECOGNIZE EXHIBIT 942 AS THE
2     CHANGES BEING EFFECTED APPLICATION THAT MERCK SUBMITTED TO THE
3     AGENCY ON A DIFFERENT ISSUE REGARDING VIOXX?
4     A.    I DID NOT REVIEW THIS WHOLE DOCUMENT.
5     Q.    DID YOU REVIEW ANY OF IT?
6     A.    I THINK I MAY HAVE SEEN A PAGE OR TWO FROM IT.  BUT AGAIN,
7     I'M NOT COMPLETELY SURE ABOUT THAT.
8     Q.    WHEN YOU TOLD MR. RAFFERTY THAT YOU HAD SEEN A DOCUMENT IN
9     THIS CASE --
10    A.    YES.
11    Q.    -- WHICH SHOWED YOU THAT MERCK KNEW HOW TO DO A CHANGES
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
12        BEING EFFECTED LABEL CHANGE --
13        A.   THAT'S CORRECT.
14        Q.   -- DID YOU OR DID YOU NOT SEE A DOCUMENT?
15        A.   I SAW A PAGE OR TWO, WHICH MAY BE FROM THIS DOCUMENT, BUT
16        I JUST SAW A PAGE OR TWO.
17        Q.   WELL, DID YOU SEE THE FRONT OF IT WHERE IT SAYS "VIOXX,"
18        RIGHT?
19        A.   I'M SORRY.  WHICH PAGE WERE WE ON?
20        Q.   I'M ON THE COVER LETTER DATED OCTOBER 6, 1999.
21        A.   OKAY.
22        Q.   WE SEE THIS IS A VIOXX CHANGES BEING EFFECTED?
23        A.   CHANGES BEING EFFECTED SUPPLEMENT.
24        Q.   IS THIS THE ONE PAGE YOU LOOKED AT THAT SUPPORTED YOUR
25        TESTIMONY THIS MORNING?
page 1181
1         A.   NO.  I LOOKED AT A PAGE THAT HAD TO DO WITH THE CHANGES
2         THAT MERCK WAS PROPOSING.
3         Q.   WELL, DO YOU RECOGNIZE AT LEAST THE FORM OF THIS
4         APPLICATION, EXHIBIT 942, AS A CHANGES BEING EFFECTED
5         APPLICATION?
6         A.   YES, THIS IS A CHANGES BEING EFFECTED APPLICATION.
7         Q.   NOW, THIS IS A BIG DOCUMENT, SIR, AND YOU'VE SEEN THESE
8         BEFORE, RIGHT, IN OTHER CONTEXTS?
9         A.   YES.
10        Q.   WHAT THE MANUFACTURER DOES FOR THE AGENCY IS IT INCLUDES
11        THE EXISTING LABELING AND THEN INCLUDES A MARKUP OF THE
12        PROPOSED CHANGES, RIGHT?
13        A.   YES.  THAT'S WHAT I SAW WAS A MARKUP OF PROPOSED CHANGES,
14        A COUPLE OF PAGES FROM THE MARKUP OF PROPOSED CHANGES.
15        Q.   THAT BEGINS ON PAGE -- IT'S BATES PAGE 416.
16        A.   RIGHT.  YES.
17        Q.   OKAY.
18        A.   I SAW -- THIS IS MUCH CLOSER TO THE PART I LOOKED AT, YES.
19        Q.   IF YOU THUMB THROUGH THIS DOCUMENT THEREAFTER, IF I'M
20        DOING THIS RIGHT, I'M LOOKING FOR SOME RED-LINE CHANGES TO THE
21        DOCUMENT TO HIGHLIGHT WHERE THE CHANGES ARE.  RIGHT?
22        A.   YES.  CAN YOU POINT ME TO THOSE?
23        Q.   WELL, FIRST GO TO PAGE 10 OF THE MARKUP WHERE IT SAYS
24        "WARNINGS."
25              IT'S ON THE SCREEN, SIR, IF THAT CAN HELP DIRECT YOUR
page 1182
1         ATTENTION.
2         A.   YES.
3         Q.   THAT STARTS THE WARNING SECTION OF THE LABEL?
4         A.   THAT'S CORRECT.
5         Q.   THEN WE GO FORWARD AND SEE THERE ARE NO CHANGES IN THIS
6         CHANGES BEING EFFECTED APPLICATION, RIGHT?  ON THE WARNINGS
7         SECTION.
8         A.   I DO NOT SEE ANY CHANGES IN THE WARNINGS, RIGHT.
9         Q.   ALL RIGHT.  THEN WE GO TO PRECAUTIONS.  THAT'S THE NEXT
10        SECTION, RIGHT?
11        A.   RIGHT.
12        Q.   WE THUMB THROUGH THAT AND WE ARE LOOKING FOR THE CHANGE,
13        RIGHT?
14        A.   YES, WE ARE LOOKING FOR THE CHANGE, AND I DON'T SEE IT
15        YET.
16        Q.   WHEN YOU GET TO PAGE 15, AND THERE IT IS.  DO YOU SEE IT
17        THERE AT THE TOP?
18        A.   YES.  THE DOUBLE UNDERLINE IS THE NEW LANGUAGE.  IS THAT
19        WHAT YOU ARE REFERRING TO, THE LANGUAGE THAT'S
20        DOUBLE-UNDERLINED THERE?
21        Q.   CORRECT.  THIS IS IN A SECTION CALLED "DRUG INTERACTIONS,"
22        RIGHT?
23        A.   YES, THAT'S CORRECT.
24        Q.   THIS IS WITH RESPECT TO A DRUG KNOWN AS WARFARIN?
25        A.   YES.
page 1183
1         Q.   THAT'S COUMADIN?
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
2       A.    AN INTERACTION WITH WARFARIN, RIGHT, YES.
3       Q.    RIGHT.  SO THIS IS IN NOT THE WARNINGS SECTION, NOT THE
4       CONTRAINDICATION SECTION, BUT IN THIS DRUG INTERACTION SECTION,
5       RIGHT?
6       A.    YOU'RE CORRECT, THAT'S WHERE IT WAS.
7       Q.    MERCK IS PROPOSING HERE TO ADD ONE SENTENCE, RIGHT?
8       A.    THERE IS A SENTENCE HERE -- GO AHEAD.
9       Q.    ALL RIGHT.  THEN, JUST TO MAKE SURE WE UNDERSTAND ALL THE
10      CHANGES BEING PROPOSED HERE, IF YOU TURN THE PAGE, THE MERCK,
11      THERE, THE DOUBLE UNDERLINE, WANTED TO ADD TO THE LABEL, A
12      1-800 NUMBER FOR FOLKS TO CALL IN IF THEY HAD CONCERNS ABOUT
13      TAKING THE DRUG WHILE THEY WERE PREGNANT, RIGHT?
14      A.    UH-HUH.
15      Q.    IF YOU GO FORWARD, NO CHANGES FOR A WHILE UNTIL WE GET TO
16      A SECTION CALLED "POST-MARKETING EXPERIENCE," AND THEN WE SEE
17      ONE ADDITIONAL SENTENCE MORE THAT MERCK SOUGHT TO INCLUDE,
18      RIGHT?
19      A.    YES.
20      Q.    NOW, LIKE, TAKE, FOR EXAMPLE, THIS "POST-MARKETING
21      EXPERIENCE" SENTENCE.  THAT WAS INCREASING THE SAFETY
22      INFORMATION CONTAINED IN THE LABEL, RIGHT?
23      A.    I AM NOT SURE THIS IS THE DOCUMENT THAT I'VE SEEN.  THE
24      DOCUMENT THAT I SAW HAD A CHANGE TO ANAPHYLACTIC REACTIONS.
25      DOES THIS DOCUMENT HAVE A CHANGE TO ANAPHYLACTIC REACTIONS?
page 1184
1       Q.    I'LL GIVE YOU A SECOND TO LOOK AND YOU CAN TELL ME.
2       A.    IT DOESN'T SEEM TO HAVE ANY CHANGES IN ANAPHYLACTIC, AND
3       THAT IS PART OF WARNINGS.
4             SO WHAT I HAD SEEN IS A DOCUMENT WHICH INVOLVED A
5       CHANGE TO THE ANAPHYLACTIC REACTION SECTION OF WARNINGS.  I
6       HAVE NOT SEEN THIS DOCUMENT BEFORE.
7       Q.    ALL RIGHT.  NOW THAT YOU HAVE REVIEWED IT, YOU SAW THAT,
8       IN THIS OCTOBER 1999 CHANGES BEING EFFECTED APPLICATION, MERCK
9       SOUGHT TO ADD ONE SENTENCE TO A DRUG INTERACTION WITH WARFARIN,
10      A 1-800 NUMBER, AND THIS ONE SENTENCE HERE IN POST-MARKETING
11      EXPERIENCE.  RIGHT?
12      A.    YES.
13      Q.    BASED ON YOUR REVIEW OF THIS DOCUMENT, SIR, AND THE PRIOR
14      TESTIMONY, DO YOU THINK THIS IS THE TYPE OF CHANGE THAT CAN BE
15      EFFECTED THROUGH A CBE APPLICATION?
16      A.    IT APPEARS TO BE A POSSIBLE CBE, YES.
17      Q.    WELL, SIR, THIS IS FAR LESS OF A CHANGE TO THE VIOXX LABEL
18      THAN WOULD HAVE BEEN CALLED FOR BY PUTTING IN A BRAND-NEW
19      SECTION ON CARDIOVASCULAR RISKS AND DETAILING ALL THE DATA FROM
20      VIGOR AND ALL THE OTHER DATA THAT EXISTED AS OF THAT TIME ON
21      VIOXX; ISN'T THAT RIGHT?
22      A.    I HAVE NEVER SEEN THIS DOCUMENT BEFORE.  I DO NOT WANT TO
23      MAKE ANY STATEMENT SUCH AS YOU'RE MAKING WITHOUT HAVING A
24      CHANCE TO REVIEW THIS DOCUMENT AND WHAT ITS IMPLICATIONS ARE.
25            I DO WANT TO SAY THAT REGULATIONS ARE VERY SPECIFIC
page 1185
1       AND GUIDELINES ARE VERY SPECIFIC THAT CBE APPLICATIONS CAN BE
2       DONE FOR WARNINGS, CONTRAINDICATIONS, AND PRECAUTIONS --
3       Q.    CERTAINLY TO ADD ONE --
4       A.    -- AND SHOULD BE DONE.  NOW, WHAT HAPPENED IN THIS
5       PARTICULAR CASE, I DON'T KNOW.  I'VE NEVER SEEN THIS DOCUMENT
6       BEFORE.
7       Q.    SO WHEN YOU WERE TALKING ABOUT THIS ONE EXPERIENCE WITH
8       VIOXX AND THE CHANGES BEING EFFECTED, YOU WERE THINKING ABOUT
9       SOMETHING ELSE?
10      A.    THAT'S RIGHT.
11      Q.    I GUESS WE'LL FIND OUT WHAT HAPPENED WITH THIS STORY FOR
12      ANOTHER WITNESS.
13            MR. BIRCHFIELD:  OBJECTION.
14            THE COURT:  MOVE TO STRIKE.
15            MR. ISMAIL:  YES, SIR.  JUST GIVE ME ONE SECOND, YOUR
16      HONOR.
17            THE COURT:  OKAY.
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
18        BY MR. ISMAIL:
19        Q.   NOW, ON THE TIME LINE THAT YOU DID WITH MR. RAFFERTY, WE
20        KNOW SOMETIME AFTER JUNE 2000 MERCK SOUGHT AN EXPEDITED REVIEW
21        OF THE LABEL CHANGE, RIGHT?
22        A.   OF THE LABEL CHANGE THEY PROPOSED AT THAT TIME, YES.
23        Q.   DO YOU RECALL THAT WAS IN AUGUST OF 2000 THAT MERCK SOUGHT
24        EXPEDITED REVIEW?
25        A.   OH, I'M NOT SURE EXACTLY WHEN THEY SOUGHT THE EXPEDITED
page 1186
1         REVIEW.
2         Q.   ALL RIGHT, DOCTOR.
3         A.   BUT THEY SUBMITTED THE PROPOSAL IN JUNE AND YOU'RE TELLING
4         ME THAT THEY HAD ASKED FOR EXPEDITED IN AUGUST.
5         Q.   WELL, YOU KNOW THERE'S SOME DATE MISSING FROM THE TIME
6         LINE WITH RESPECT TO MERCK SEEKING AN EXPEDITED REVIEW, RIGHT?
7         A.   I DON'T KNOW WHEN MERCK ACTUALLY SUBMITTED THAT REQUEST.
8         Q.   ALL RIGHT.  THEN WE SEE SOME OTHER DATES ON HERE.  AM I
9         CORRECT, SIR, THAT YOU AND MR. RAFFERTY DID NOT INDICATE ANY
10        ADDITIONAL MERCK-INITIATED LABEL CHANGES BETWEEN JUNE OF 2000
11        AND APRIL OF 2002?
12        A.   THERE WAS A LABEL CHANGE THAT CAME OUT FOLLOWING THE
13        ADVISORY COMMITTEE MEETING IN FEBRUARY.  I BELIEVE IT WAS
14        SUBMITTED IN MARCH 2001.
15        Q.   ALL RIGHT.  SO, FOR SOME REASON, THERE'S A DATE MISSING
16        FROM THIS TIME LINE OF ANOTHER LABEL CHANGE SOUGHT BY MERCK,
17        RIGHT?
18        A.   YES.
19        Q.   YOU SAY THAT WAS IN MARCH 2001?
20        A.   I BELIEVE SO.
21        Q.   DID YOU LOOK AT THAT LABEL CHANGE?
22        A.   YES.
23        Q.   WHEN YOU TESTIFIED BACK IN SEPTEMBER THAT MERCK DID
24        NOTHING BETWEEN MARCH OF 2000 AND APRIL -- SORRY.  WHEN YOU
25        TESTIFIED BACK IN SEPTEMBER THAT MERCK DID NOTHING BETWEEN
page 1187
1         MARCH 2000 AND OCTOBER 2001, YOU DIDN'T KNOW ABOUT THE MARCH
2         2001 LABEL, CORRECT?
3         A.   ONCE AGAIN, I WAS NOT CLEAR ON THE DATE OF THE FDA MARKUP
4         OF THAT PRIOR MERCK LABEL, SO I WAS NOT AWARE OF THE DATES THAT
5         THIS HAPPENED.
6         Q.   WELL, THERE ARE TWO LABELS, SIR.
7         A.   RIGHT.
8         Q.   SO YOU DESCRIBED SOME DOCUMENT IN YOUR FILE THAT YOU
9         DIDN'T KNOW THE DATE OF BACK WHEN YOU WERE FORMING YOUR
10        OPINIONS, RIGHT?
11        A.   RIGHT.
12        Q.   YOU TOLD US 20 MINUTES AGO THAT YOU LATER LEARNED THAT WAS
13        THE JUNE 2000 APPLICATION, RIGHT?
14        A.   I BELIEVE, ACTUALLY, IT WAS THE MARCH 2001 APPLICATION
15        THAT WAS MARKED UP.
16        Q.   SO YOU DIDN'T HAVE THE JUNE 2000 APPLICATION IN YOUR FILES
17        WHEN YOU FORMED YOUR OPINIONS IN THIS CASE?
18        A.   I BELIEVE THAT IT WAS NOT.  I BELIEVE IT WAS THE MARKUP OF
19        THE MARCH 2001.
20        Q.   OKAY.  WELL, THANK YOU FOR THAT CLARIFICATION.  SO WHEN
21        YOU AND MR. RAFFERTY WENT THROUGH THIS JUNE 2000 APPLICATION
22        THIS MORNING AND YOU GAVE YOUR OPINIONS ON IT TO THIS JURY,
23        THOSE ARE NOT OPINIONS YOU HAD BACK WHEN YOU ACTUALLY WROTE
24        YOUR REPORT, RIGHT?
25        A.   AT THE TIME I WROTE THE ORIGINAL REPORT, NO.
page 1188
1         Q.   SO YOU TESTIFIED IN SEPTEMBER THAT YOU DIDN'T KNOW OF ANY
2         OTHER MERCK-INITIATED LABEL CHANGES AND NOW YOU KNOW THAT THERE
3         WERE IN FACT TWO MERCK-INITIATED LABEL CHANGES, RIGHT?
4         A.   I BELIEVE WHAT I WAS ASKED THIS MORNING WAS WHETHER THERE
5         WERE WARNINGS, PRECAUTIONS, OR CONTRAINDICATIONS ADDRESSING
6         CARDIOVASCULAR RISKS AT ANY TIME, AND I CERTAINLY KNEW AS OF
7         THIS MORNING THAT THEY WERE NOT THERE.
```

## Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
 8      Q.    SIR, WE'VE ALREADY LOOKED AT YOUR TESTIMONY FROM SEPTEMBER
 9      WHERE YOU SAID YOU WERE NOT AWARE OF ANY MERCK-INITIATED LABEL
10      CHANGES, WHEN YOU FORMED YOUR OPINIONS IN THIS CASE, BETWEEN
11      MARCH AND OCTOBER.  DO YOU RECALL THAT?
12      A.    BETWEEN MARCH 2000?
13      Q.    AND OCTOBER 2001.
14      A.    AND OCTOBER 2001.  I KNEW THAT THERE WAS ONE.  I SAW THAT
15      THERE WAS ONE.  I WASN'T SURE OF THE DATE OF IT.
16      Q.    SIR, DO I HAVE TO SHOW YOU YOUR DEPOSITION AGAIN WHERE YOU
17      WERE ASKED SPECIFICALLY BY COUNSEL:
18                  "Q.  ARE YOU AWARE OF ANY MERCK-INITIATED LABEL
19            CHANGES BETWEEN MARCH 2000 AND OCTOBER 2001?"
20                  "A.  I'M NOT AWARE OF ANY."
21      A.    I WAS NOT AWARE OF THE DATE THAT THAT DOCUMENT WAS
22      SUBMITTED.
23      Q.    FINE.  SO THAT, YOU NOW SAY, IS THE MARCH 2001 CHANGE?
24      A.    I BELIEVE IT'S THE MARCH ONE.
25      Q.    THAT LABEL CHANGE IS NOT ON MR. RAFFERTY'S TIME LINE,
page 1189
 1      RIGHT?
 2      A.    APPARENTLY NOT.
 3      Q.    DO YOU KNOW WHY COUNSEL CHOSE NOT TO SHARE THAT WITH THE
 4      JURY?
 5      A.    I DO NOT.
 6      Q.    SIR, DO YOU KNOW WHERE THE CARDIOVASCULAR INFORMATION FROM
 7      VIGOR APPEARS IN THE MARCH 2001 LABEL CHANGE -- I'M SORRY,
 8      LABELING APPLICATION?
 9      A.    I THINK I KNOW, BUT WOULD YOU PERHAPS SHOW IT TO ME AND I
10      CAN CHECK FOR SURE?
11      Q.    WHEN WAS THE LAST TIME YOU SAW IT?
12      A.    TODAY, PROBABLY, SOMETIME.
13            MR. ISMAIL:  CAN WE PLEASE PULL UP THE MARCH 2001
14      LABELING APPLICATION SO I CAN DO SOMETHING UP HERE.
15      BY MR. ISMAIL:
16      Q.    SIR, THIS IS WHAT WE HAVE MARKED AS DEFENDANT'S 943.  DO
17      YOU RECOGNIZE THAT AS THE MARCH 2001 LABELING APPLICATION FILED
18      BY MERCK, THE SECOND LABELING APPLICATION FILED BY MERCK, TO
19      INCLUDE THE CARDIOVASCULAR INFORMATION FROM VIGOR?
20      A.    RIGHT.
21      Q.    YOU DO RECOGNIZE IT?
22      A.    YES.
23      Q.    OKAY.  SO WHEN YOU GOT THIS DOCUMENT, IT WAS MISSING THE
24      DATE AND THE E-MAIL AND ALL THAT?
25      A.    YES.
page 1190
 1      Q.    DO YOU WANT TO TURN TO PAGE 10.  SEE THE PRECAUTIONS
 2      SECTION THERE?
 3      A.    RIGHT, THAT'S WHERE I THOUGHT IT WAS.  I WANTED TO MAKE
 4      SURE.
 5      Q.    THEN IF YOU TURN TO PAGE 12 --
 6      A.    GO AHEAD.
 7      Q.    -- DO YOU SEE THAT IN MARCH OF 2001 MERCK SOUGHT A LABEL
 8      CHANGE TO ADD TO THE PRECAUTIONS SECTION THE CARDIOVASCULAR
 9      DATA FROM VIGOR?
10            THE COURT:  IT'S ON THE BOARD, SIR.  SECOND
11      PARAGRAPH.
12      A.    THIS IS NOT ON PAGE 12 THAT I HAVE HERE.  OKAY.  GO AHEAD.
13      BY MR. ISMAIL:
14      Q.    SO THE QUESTION WAS:  DO YOU SEE THAT, IN THE MARCH 2001
15      LABELING APPLICATION BY MERCK, MERCK IS SEEKING PERMISSION TO
16      INCLUDE THE CARDIOVASCULAR INFORMATION FROM VIGOR IN THE
17      PRECAUTIONS SECTION?
18      A.    THIS INCLUDES CARDIOVASCULAR INFORMATION, THERE'S NO
19      QUESTION ABOUT IT.  WHAT IT DOES NOT INCLUDE IS A STATEMENT
20      THAT THERE'S A CARDIOVASCULAR RISK OR THAT THERE POSSIBLY MAY
21      BE A CARDIOVASCULAR RISK ASSOCIATED WITH VIOXX.
22            IN FACT, IF WE LOOK JUST BEYOND THE PART THAT YOU'VE
23      HIGHLIGHTED IN YELLOW, AS NOTED IN THE PRODUCT CIRCULAR,
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
24        "NAPROXEN MAY DECREASE PLATELET AGGREGATION AND PROLONG
25        BLEEDING TIME."  IN OTHER WORDS, THIS OCCURS IN A SECTION THAT
page 1191
1         IMMEDIATELY GOES ON TO SUGGEST THAT THE FACTOR INVOLVED HERE IS
2         THAT NAPROXEN IS PROTECTIVE; WHEREAS IT COULD HAVE SUGGESTED
3         THAT VIOXX COULD HAVE BEEN THE CAUSE OF THIS, AS, IN FACT, WE
4         KNOW NOW IT IS THE CAUSE.
5                    MR. ISMAIL:  MOVE TO STRIKE, YOUR HONOR.
6                    THE COURT:  GRANTED.
7                    MR. ISMAIL:  YOUR HONOR, I JUST HAVE A FEW MORE
8         QUESTIONS.
9                    THE COURT:  OKAY.
10        BY MR. ISMAIL:
11        Q.   SIR, YOU KNOW, AS YOU'RE SITTING HERE TODAY, THAT MERCK
12        SOUGHT TO INCLUDE THE CARDIOVASCULAR INFORMATION FROM THE VIGOR
13        TRIAL IN THE PRECAUTIONS SECTION IN MARCH 2001?  YES OR NO.
14        A.   THIS IS A SMALL BIT OF CARDIOVASCULAR INFORMATION.  THERE
15        IS MUCH MORE CARDIOVASCULAR INFORMATION FROM THE VIGOR TRIAL.
16        THE FDA WANTED TABLES PUT IN, AND THERE ARE NO TABLES HERE.  SO
17        THIS IS A SMALL BIT OF INFORMATION WHICH DOES NOT ADEQUATELY
18        CONVEY ANY SENSE OF RISK ASSOCIATED WITH VIOXX.
19                    MR. ISMAIL:  YOUR HONOR, CAN I ASK THE WITNESS BE
20        INSTRUCTED TO ANSWER THE QUESTION?
21                    THE WITNESS:  THIS IS A SMALL BIT OF INFORMATION.
22                    THE COURT:  DOCTOR, LISTEN TO THE QUESTION AND TRY TO
23        FOCUS ON THE ANSWER.  IF NEED BE, COUNSEL ON REDIRECT WILL
24        BRING OUT MATTERS.
25                    THE WITNESS:  OKAY.
page 1192
1         BY MR. ISMAIL:
2         Q.   ALL RIGHT.  SO THE QUESTION, SIR, IS:  DO YOU NOW KNOW
3         THAT IN MARCH OF 2001 MERCK SOUGHT TO INCLUDE THE
4         CARDIOVASCULAR INFORMATION FROM VIGOR IN THE PRECAUTIONS
5         SECTION?
6         A.   I OBJECT TO YOUR CHARACTERIZATION OF IT AS "THE
7         CARDIOVASCULAR INFORMATION."  THERE IS A LOT OF CARDIOVASCULAR
8         INFORMATION.
9                    MR. ISMAIL:  YOUR HONOR.
10                    THE WITNESS:  TO CHARACTERIZE THIS SMALL SENTENCE AS
11        "THE CARDIOVASCULAR INFORMATION" --
12                    THE COURT:  OKAY.  THANK YOU, DOCTOR.  THANK YOU.
13                    MR. ISMAIL:  I THINK WE KNOW THE ANSWER TO THE
14        QUESTION, SO LET ME MOVE ON.
15        BY MR. ISMAIL:
16        Q.   YOU RECALL FROM EITHER HEARING IT DIRECTLY FROM THE
17        PLAINTIFF LAWYERS OR OVERHEARING THEM TALK AMONGST THEMSELVES
18        THAT THIS IS THE VERY SECTION DR. SCHIRMER TESTIFIED HE WOULD
19        LOOK IN A PRODUCT LABEL, RIGHT?
20                    MR. RAFFERTY:  OBJECTION.
21                    THE COURT:  WE'VE BEEN OVER THAT ALREADY.  ASKED AND
22        ANSWERED.  I SUSTAIN THE OBJECTION.
23        BY MR. ISMAIL:
24        Q.   DO YOU SEE HERE THAT THE CARDIOVASCULAR INFORMATION
25        DISCLOSES A 5-TO-1 DIFFERENCE WITH RESPECT TO MYOCARDIAL
page 1193
1         INFARCTIONS BETWEEN VIOXX AND NAPROXEN?
2         A.   YES, IT DOES.
3         Q.   DID THE PLAINTIFF LAWYERS TELL YOU YESTERDAY OR DID YOU
4         OVERHEAR THEM TALKING ABOUT THAT, HAD DR. SCHIRMER KNOWN OF A
5         FOUR- OR FIVEFOLD DIFFERENCE, HE WOULDN'T HAVE PRESCRIBED THE
6         MEDICINE?
7         A.   I DID NOT HEAR THEM SAY THAT.
8                    MR. ISMAIL:  JUST GIVE ME ONE SECOND, YOUR HONOR.  I
9         BELIEVE I'M FINISHED.
10                    THE COURT:  WE'LL TAKE A BREAK AFTER THE REDIRECT.
11                    MR. ISMAIL:  I'LL BE VERY BRIEF, YOUR HONOR.  YOUR
12        HONOR, WHILE I'M FLIPPING THROUGH MY OUTLINE, WE MOVE THE
13        ADMISSION OF EXHIBIT 943, THE MARCH 2001 LABELING CHANGE.
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE

```
14                    MR. RAFFERTY:  NO OBJECTION, YOUR HONOR.
15                    THE COURT:  LET IT BE ADMITTED.
16                    MR. ISMAIL:  NO FURTHER QUESTIONS.  THANK YOU.
17                         REDIRECT EXAMINATION
18         BY MR. RAFFERTY:
19         Q.    MR. ISMAIL WAS JUST TALKING TO YOU ABOUT THIS MARCH '01
20         PROPOSED LABEL AND IT BEING THE SECTION THAT DR. SCHIRMER READ,
21         ACCORDING TO -- IS THIS THE TYPE OF THING, IF MERCK HAD WANTED
22         TO IN MARCH OF '01, COULD THEY HAVE DONE A CBE WITH THIS LABEL,
23         INCREASE THE PRECAUTION, AND SEND IT OUT TO THE DOCTORS LIKE
24         DR. SCHIRMER?
25         A.    THEY COULD HAVE DONE THAT.
     page 1194
1          Q.    DID THEY DO THAT?
2          A.    NO, THEY DID NOT.
3          Q.    IN FACT, AFTER MARCH 2001, DID THE FDA PROPOSE A LABEL TO
4          THEM THAT HAD THE ACTUAL VIGOR DATA IN THE WARNINGS SECTION AND
5          NOT IN THE PRECAUTIONS SECTION?
6                    MR. ISMAIL:  REPEATING DIRECT, YOUR HONOR.
7                    THE COURT:  YOU OPENED IT.  I OVERRULE THE OBJECTION.
8          ASKED AND ANSWERED.
9                    THE WITNESS:  YES.
```

[2320:] - [2320:25]     2/17/2006  Plunkett II Trial - v.10 - Closings, Jury Charge, Verdict

```
     page 2320
          2320
1                         UNITED STATES DISTRICT COURT
2                         EASTERN DISTRICT OF LOUISIANA
3
4
5
          IN RE: VIOXX PRODUCTS            *
6         LIABILITY LITIGATION            *      MDL DOCKET NO. 1657
                                          *
7                                         *
                                          *
          THIS DOCUMENT RELATES TO        *      NEW ORLEANS, LOUISIANA
8         CASE NO. 05-4046:               *
                                          *
9         EVELYN IRVIN PLUNKETT, ET AL    *      FEBRUARY 17, 2006
                                          *
10        VERSUS                          *
                                          *      8:30 A.M.
11        MERCK & CO., INC.               *
          * * * * * * * * * * * * * * *
12
13
                              VOLUME X - DAILY COPY
14                            JURY TRIAL BEFORE THE
                              HONORABLE ELDON E. FALLON
15                         UNITED STATES DISTRICT JUDGE
16
17        APPEARANCES:
18
          FOR THE PLAINTIFF:              BEASLEY ALLEN CROW METHVIN
19                                        PORTIS & MILES
                                          BY:  ANDY D. BIRCHFELD, JR., ESQ.
20                                             LEIGH O'DELL, ESQ.
                                          234 COMMERCE STREET
21                                        POST OFFICE BOX 4160
                                          MONTGOMERY, ALABAMA 36103
22
23        FOR THE PLAINTIFF:              LEVIN, PAPANTONIO, THOMAS,
                                          MITCHELL, ECHSNER & PROCTOR
24                                        BY:  TROY RAFFERTY, ESQ.
                                          316 SOUTH BAYLEN STREET, SUITE 600
25                                        PENSACOLA, FLORIDA 32502
```

Exhibit A - Plunkett Trial Excerpts

• Smith MIL - CBE
[2336:17] - [2338:24]     2/17/2006   Plunkett II Trial - v.10 - Closings, Jury Charge, Verdict

page 2336

17          NOW, ONE OF THE ISSUES HERE IN THIS CASE IS WHAT
18     COULD HAVE MERCK DONE?  WHAT COULD THEY HAVE DONE WHEN THEY GOT
19     THE VIGOR RESULTS THAT SHOWED A FIVE-FOLD INCREASE IN HEART
20     ATTACKS?  MERCK COMES IN AND SAYS -- AND THEY HAD
21     DR. ARROWSMITH-LOWE TELL YOU -- "HEY, THERE IS NO WAY THAT A
22     DRUG COMPANY CAN COME IN AND STRENGTHEN THE WARNING.  THEY
23     COULDN'T HAVE MADE THIS LABEL CHANGE WITHOUT THE FDA'S
24     APPROVAL."  REMEMBER THAT'S WHAT SHE SAYS.
25          IF YOU'LL REMEMBER, WHAT SHE DOES IS THEY WALK

page 2337

1     THROUGH THESE STEPS AND THEY SAY -- REMEMBER IN JUNE OF 2000
2     THAT MERCK ASKED FOR AN EXPEDITED REVIEW OF THE WARNING LABEL?
3     REMEMBER THAT?  WHAT THEY DID -- YOU'LL SEE THAT.  LET'S PULL
4     THAT UP FOR THEM.  IF YOU TAKE A LOOK AT WHAT MERCK DID, THEY
5     ASKED FOR A LABEL CHANGE THAT WOULD DELETE THE WARNING FOR GI
6     PROBLEMS.  THEY WANTED TO DELETE THOSE PROBLEMS FROM THEIR
7     WARNING LABEL.  YOU CAN'T DO THAT WITHOUT PRIOR APPROVAL.
8     THAT'S CLEAR.  THAT'S WHAT DR. RICHARD KAPIT SAID.  BUT YOU CAN
9     ADD OR STRENGTHEN A LABEL.  YOU HEARD IT.  YOU HEARD THE
10     TESTIMONY WHERE HE READ THE REGULATIONS, THE RULES, THE LAW
11     ABOUT WHAT YOU CAN DO WITH A LABEL CHANGE, "CHANGES IN THE
12     LABELING TO ACCOMPLISH ANY OF THE FOLLOWING" -- IT CAN BE DONE,
13     IT CAN BE DONE WITHOUT APPROVAL -- "TO ADD OR STRENGTHEN A
14     CONTRAINDICATION, A WARNING, PRECAUTION, OR ADVERSE EVENT."
15          IF YOU WANT TO STRENGTHEN A WARNING, IF YOU WANT
16     TO WARN PATIENTS ABOUT A DANGER WITH YOUR DRUG, THE FDA -- THEY
17     ARE HELPING PROTECT THE AMERICAN PUBLIC.  THEY ARE NOT GOING TO
18     KEEP YOU FROM DOING THAT.  NOW, THEY ARE GOING TO MAKE YOU COME
19     TO THEM AND GET PERMISSION BEFORE YOU LESSEN A WARNING; BUT TO
20     STRENGTHEN IT, YOU CAN DO THAT.  THAT'S THE MISSION OF THE FDA,
21     TO PROTECT THE PUBLIC.  YOU CAN DO THAT.  YOU CAN ADD IT TO THE
22     WARNING SECTION.  YOU CAN STRENGTHEN A WARNING SECTION.
23          SO MERCK IS TRYING TO CONFUSE THE ISSUE HERE.
24     THEY ARE TRYING TO SAY, "YEAH, THIS LABEL THAT WE SUBMITTED TO
25     THE FDA RIGHT AFTER VIGOR, WHERE WE WANTED THEM TO DELETE THE

page 2338

1     GI, WELL, WE COULDN'T DO THAT."  YOU SEE ALL OF THESE CHANGES.
2     YOU HEARD DR. ARROWSMITH-LOWE LOOK AT THE BIG PROPOSED LABEL
3     AND ALL OF THOSE CHANGES -- WELL, ALL OF THOSE CHANGES THAT
4     YOU'LL GET TO SEE IN THE JURY ROOM, ALL OF THOSE CHANGES --
5     99 PERCENT OF THEM DEALT WITH TAKING OUT THE GI RISKS.  THEY
6     DEALT WITH THE GI.  ONLY A SMALL PART DEALT WITH THE CV ISSUE,
7     AND IT DIDN'T -- YOU CAN SEE IT.  YOU CAN SEE IT.  IT DID NOT
8     SAY THAT THERE IS AN INCREASED RISK WITH VIOXX OR A POTENTIAL
9     THAT IT IS PROTHROMBOTIC.  YOU'LL GET TO LOOK AT THAT, BUT
10     PLEASE DON'T BE CONFUSED BY WHAT MERCK HAS TRIED TO DO ON HERE
11     BY TAKING OUT THE GI WARNING WITH STRENGTHENING THE HEART
12     ATTACK RISKS.  DON'T GET CONFUSED WITH THAT BECAUSE THEY COULD
13     HAVE ADDED OR STRENGTHENED THE WARNING.  THEY COULD HAVE ADDED
14     THE HEART ATTACK RISK TO THE WARNING SECTION AND THEN, IN A
15     SEPARATE MATTER, TAKEN UP WITH THE FDA GETTING THE GI RISK OUT.
16     MERCK FAILED TO WARN, AND THAT EVIDENCE IS UNDISPUTED.
17          THE FDA CANNOT FORCE MERCK TO MAKE THAT LABEL
18     CHANGE.  THAT'S WHAT DR. RICHARD KAPIT TOLD YOU.  THAT'S ALSO
19     WHAT YOU HEARD FROM THE DEPUTY DIRECTOR AT THE FDA.  SHE
20     TESTIFIED BEFORE CONGRESS IN A HEARING, "WE DON'T HAVE THE
21     AUTHORITY TO FORCE A LABEL CHANGE."  ALL THEY CAN DO IS
22     NEGOTIATE.  THEY CAN'T FORCE IT.
23          MERCK HAD THE ABILITY TO MAKE THAT CHANGE AND
24     THEY CHOSE NOT TO.  WHY?  WHY WOULD MERCK NOT WANT IT?  YOU SAW