Exhibit A - Grefer Deposition Excerpts

• Smith MIL - Marketing

[1:] - [2:32]          6/29/2006   Grefer, Michael A. (Discovery Deposition)

```
page 1
-------------------------------------------------- PAGE00001 --------
1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF LOUISIANA
3         - - - - - - - - - - - - - - - -
4    ROBERT G. SMITH                    :
5                                       :
6              Plaintiff,               :
7         vs.                           : Case No. 2:05-CV-04379
8                                       :
9    MERCK & CO., INC.                  :
10                                      :  DISCOVERY DEPOSITION
11            Defendant.                :
12        - - - - - - - - - - - - - - -
13           Deposition of: MICHAEL A. GREFER, M.D.
14           Taken:         By the Defendant
15                          Pursuant to notice & subpoena
16           Date:          Thursday, June 29, 2006
17           Time:          Commencing at 9:11 AM
18           Place:         Commonwealth Orthopaedic
19                          Center
20                          200 South Hill Medical Center
21                          525 Alexandria Pike
22                          Southgate, Kentucky  41071
23           Before:        Luke T. Lavin, RDR, CRR
24                          Notary Public - Commonwealth
25                          of Kentucky
page 2
1    APPEARANCES:
2         On behalf of the Plaintiff:
3              James L. Wright, Esq.
4              Watts Law Firm
5              One Congress Plaza
6              111 Congress Avenue, Suite 1070
7              Austin, Texas  78701
8              Phone:  (512) 479-0500
9         On behalf of the Defendant:
10             Jonathan B. Skidmore, Esq.
11             Robert A. Blackwell, Esq.
12             Fulbright & Jaworski L.L.P.
13             2200 Ross Avenue, Suite 2800
14             Dallas, Texas  75201-2784
15             Phone:  (214) 855-8000
16             Carrie A. Jablonski, Esq.
17             Bartlit, Beck, Herman, Palenchar & Scott
18             LLP
19             Courthouse Place
20             54 West Hubbard Street
21             Chicago, Illinois  60610
22             Phone:  (312) 494-4451
23         On behalf of the Deponent:
24             Beverly R. Storm, Esq.
25             Arnzen, Wentz, Molloy, Laber & Storm
26             600 Greenup Street
27             P.O. Box 472
28             Covington, Kentucky  41012-0472
29             Phone:  (859) 431-6100
30    Also present:
31    Sherry L. Music, Videographer.
32                         - - -
```

[85:7] - [85:12]       6/29/2006   Grefer, Michael A. (Discovery Deposition)

```
page 85
7         Q.   You don't look at internal company
8    documents ever, do you?
9         A.   I never have, no, sir.
10        Q.   And that's not the type of information
```



EXHIBIT

A

Blumberg No. 5119

Exhibit A - Grefer Deposition Excerpts

• Smith MIL - Marketing

11  you base prescribing decisions on?
12        A.   No, sir, not routinely.

[96:1] - [96:26]        6/29/2006    Grefer, Michael A. (Discovery Deposition)

page 96
1                    C E R T I F I C A T E
2   COMMONWEALTH OF KENTUCKY:
3                          SS:
4   COUNTY    OF    CAMPBELL:
5        I, Luke  T.  Lavin, a duly qualified and commis-
6   sioned  notary  public in and for the Commonwealth of
7   Kentucky, do hereby certify that prior to the giving
8   of  his  deposition, the within   named Michael A.
9   Grefer, M.D., was  by me first  duly sworn to testify
10  the  truth, the whole  truth, and nothing  but  the
11  truth; that the foregoing pages constitute a true and
12  correct  transcript of  testimony given  at said time
13  and place  by said deponent; that said deposition was
14  taken  by me  in stenotypy  and transcribed  under my
15  supervision; that  I am  neither a  relative  of  nor
16  attorney  for any of  the parties to this litigation,
17  nor relative of nor employee of any of their counsel,
18  and have no interest whatsoever in the result of this
19  litigation.
20        IN WITNESS WHEREOF, I  hereunto set my hand  and
21  official  seal  of office, at  Cincinnati, Ohio, this
22  1st day of July 2006.
23  _____
24                    Luke T. Lavin, RDR-CRR, Notary
25                    Public, Commonwealth of Kentucky
26  My commission expires:

Exhibit B - Grefer Deposition Excerpts

• Smith MIL - Marketing

[1:1] - [1:25]          6/29/2006    Grefer, Michael A. (Trial Deposition)

```
page 1
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3        - - - - - - - - - - - - - - -
 4     ROBERT G. SMITH              :
 5                                  :
 6              Plaintiff,          :
 7        vs.                       : Case No. 2:05-CV-04379
 8                                  :
 9     MERCK & CO., INC.            :
10                                  :    TRIAL DEPOSITION
11              Defendant.          :
12        - - - - - - - - - - - - - - -
13         Deposition of: MICHAEL A. GREFER, M.D.
14              Taken:      By the Plaintiff
15              Date:       Thursday, June 29, 2006
16              Time:       Commencing at 11:20 AM
17              Place:      Commonwealth Orthopaedic
18                          Center
19                          200 South Hill Medical Center
20                          525 Alexandria Pike
21                          Southgate, Kentucky  41071
22              Before:     Luke T. Lavin, RDR, CRR
23                          Notary Public - Commonwealth
24                          of Kentucky
25                                    Pages:  1 - 67.
```

[15:3] - [15:6]          6/29/2006    Grefer, Michael A. (Trial Deposition)

```
page 15
 3         A.    I changed him to Vioxx because he was
 4     not getting the relief that I would have liked him to
 5     have gotten from the diclofenac, and so I switched
 6     him to Vioxx.
```

[67:1] - [67:26]          6/29/2006    Grefer, Michael A. (Trial Deposition)

```
page 67
 1                C E R T I F I C A T E
 2     COMMONWEALTH OF KENTUCKY:
 3                      SS:
 4     COUNTY   OF   CAMPBELL:
 5          I, Luke  T.  Lavin, a duly qualified and commis-
 6     sioned  notary  public in and for the Commonwealth of
 7     Kentucky, do hereby certify that prior to the giving
 8     of  his  deposition, the  within  named  Michael  A.
 9     Grefer, M.D., was  by me first  duly sworn to testify
10     the  truth, the  whole  truth, and  nothing  but  the
11     truth; that the foregoing pages constitute a true and
12     correct  transcript  of  testimony given at said time
13     and place  by said deponent; that said deposition was
14     taken  by me  in stenotype and transcribed  under my
15     supervision; that  I am  neither a  relative of  nor
16     attorney  for any of  the parties to this litigation,
17     nor relative of nor employee of any of their counsel,
18     and have no interest whatsoever in the result of this
19     litigation.
20          IN WITNESS WHEREOF, I hereunto set  my hand  and
21     official  seal  of office, at  Cincinnati, Ohio, this
22     1st day of July 2006.
23                      _____
24                      Luke T. Lavin, RDR-CRR, Notary
25                      Public, Commonwealth of Kentucky
26     My commission expires:
```



EXHIBIT

B

Exhibit C - Grefer Deposition Excerpts

• Smith MIL - Marketing

[68:1] - [68:25]          7/27/2006     Grefer, Michael A. - Vol. 2

```
page 68
 1
 2
 3                          UNITED STATES DISTRICT COURT
 4                          EASTERN DISTRICT OF LOUISIANA
 5
 6      - - - - - - - - - - - - - - -
        ROBERT G. SMITH              :
 7                                   :
                    Plaintiff,       :
 8           vs.                     : Case No. 2:05-CV-04379
                                     :
 9      MERCK & CO., INC.            :
                                     :
10              Defendant.           :
        - - - - - - - - - - - - - - -
11
12                              Trial Deposition - Volume II
13           Deposition of:  MICHAEL A. GREFER, M.D.
14           Taken:          By the Defendant
15           Date:           Thursday, July 27, 2006
16           Time:           Commencing at 9:14 AM
17           Place:          Commonwealth Orthopaedic
                             Center
18                           200 South Hill Medical Center
                             525 Alexandria Pike
19                           Southgate, Kentucky  41071
20           Before:         Wendy Welsh, RDR, CRR
                             Notary Public - Commonwealth
21                           of Kentucky
22
23
24
25
```

[113:17] - [114:7]        7/27/2006     Grefer, Michael A. - Vol. 2

```
page 113
17           Q.   And if that was truly the state of the
18  science at that time, then any letters that -- going
19  back and forth between Merck and the FDA or statements
20  at one time or another by some consultant is not
21  information you would be relying upon to make your
22  prescribing decision?
23                MR. WRIGHT:  Object to the form.
24           A.   I -- I -- I never -- I never did see it,
25  and that's -- that's the answer to the question.  So I
page 114
 1  couldn't have -- it couldn't have affected my
 2  prescribing situation.
 3           Q.   Nor is that the type of information you
 4  would generally rely upon to make your prescribing
 5  decision?
 6                MR. WRIGHT:  Object to the form.
 7           A.   I never -- I never see it.
```

[125:3] - [125:7]         7/27/2006     Grefer, Michael A. - Vol. 2

```
page 125
 3           Q.   You typically do not look to internal
 4  company documents and dialogue between the FDA and
 5  companies, to make prescribing decisions?
 6                MR. WRIGHT:  Object to the form.
 7           A.   Correct.
```



EXHIBIT
C

Exhibit C - Grefer Deposition Excerpts

**• Smith MIL - Marketing**

[134:16] - [134:23]     7/27/2006     Grefer, Michael A. - Vol. 2

page 134
16          Q.    And you expect the sales reps to provide
17    you information, but you as the physician take the
18    information you have, along with your experience and
19    qualifications, and -- and with that you make decisions
20    based upon the science as you understand it rather than
21    what a sales rep might tell you anyway about a drug?
22          A.    With -- with the information that I have
23    available to me, yes.

[136:1] - [136:25]     7/27/2006     Grefer, Michael A. - Vol. 2

page 136
1                    C E R T I F I C A T E
2    COMMONWEALTH OF KENTUCKY:
                              SS:
3    COUNTY    OF    CAMPBELL:
4          I, Wendy L. Welsh, a duly qualified and commis-
5    sioned notary public in and for the Commonwealth of
6    Kentucky, do hereby certify that prior to the giving of
7    his deposition, the within    named Michael A.
8    Grefer, M.D., was by me first duly sworn to testify
9    the truth, the whole truth, and nothing but the
10   truth; that the foregoing pages constitute a true and
11   correct transcript of testimony given at said time
12   and place by said deponent; that said deposition was
13   taken by me in stenotypy and transcribed under my
14   supervision; that I am neither a relative of nor
15   attorney for any of the parties to this litigation,
16   nor relative of nor employee of any of their counsel,
17   and have no interest whatsoever in the result of this
18   litigation.
19         IN WITNESS WHEREOF, I hereunto set my hand and
20   official seal of office, at Cincinnati, Ohio, this
21   28th day of July 2006.
22
23                         _____
                           Wendy L. Welsh, RDR-CRR, Notary
                           Public, Commonwealth of Kentucky
24
     My commission expires:
25   May 3, 2009.

Exhibit D - Baumgartner Deposition Excerpts

• Smith MIL - Marketing

[1:1] - [1:25]          2/25/2005    Baumgartner, Susan - 2/25/2005 (NJ, CA)

```
page 1
 1               SUPERIOR COURT OF NEW JERSEY
                  LAW DIVISION - ATLANTIC COUNTY
 2                    - - -
 3  IN RE:   VIOXX LITIGATION : CASE NO. 619
 4  --------------------------------------------------
 5       SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    COUNTY OF LOS ANGELES
 6
     Coordination Proceeding Special Title (Rule 1550(b)
 7
     This Document Applies to  : CASE NO. JCCP NO. 4247
 8  All VIOXX CASES            : (Assigned to the Hon.
                               : Peter D. Lichtman)
 9
                      - - -
10                  CONFIDENTIAL
               SUBJECT TO PROTECTIVE ORDER
11
12                    - - -
                 February 25, 2005
13                    - - -
14        Videotape deposition of SUSAN L.
15  BAUMGARTNER, Pharm.D., held in the offices of
16  Hughes, Hubbard & Reed, One Battery Plaza, New York,
17  New York, commencing at 9:28 a.m., on the above
18  date, before Linda L. Golkow, a Federally-Approved
19  Registered Diplomate Reporter and Certified
20  Shorthand Reporter.
21                    - - -
22
23           ESQUIRE DEPOSITION SERVICES
             1880 John F. Kennedy Boulevard
24                  15th Floor
             Philadelphia, Pennsylvania 19103
25                (215) 988-9191
```

[28:23] - [41:3]        2/25/2005    Baumgartner, Susan - 2/25/2005 (NJ, CA)

```
page 28
23       Q.      Let's go to this Exhibit, Number 2.
24  You were one of the authors of this memo; is that
25  right?
page 29
 1       A.      Yes.
 2       Q.      The subject is "Advocate Development
 3  Opportunity: Physicians to Neutralize."  Did I read
 4  that right?
 5       A.      Yes.
 6       Q.      This is dated July 1st, 1999; right?
 7       A.      Correct.
 8       Q.      So, you were then up and running as a
 9  marketing manager at that time?
10       A.      Yes.
11       Q.      Let me do this.  I've got an Exhibit
12  Number 3 that I want to give you.
13                    - - -
14               (Whereupon, Deposition Exhibit
15               Baumgartner-3, "Merriam Webster Online"
16               (neutralize) (1 page), was marked for
17               identification.)
18                    - - -
19               MR. ROBINSON:  I'll give George one,
20  too.
21               MR. TSOUGARAKIS:  Thank you.
22  BY MR. ROBINSON:
23       Q.      We just went to the Merriam-Webster
24  Dictionary, and we have the definition for the word
```


EXHIBIT
D

**Exhibit D - Baumgartner Deposition Excerpts**

• Smith MIL - Marketing

```
25  "neutralize."  Do you see that there?
page 30
 1                  MR. TSOUGARAKIS:  Exhibit 3, do you
 2  want to identify what it is, Mr. Robinson.
 3                  MR. ROBINSON:  Yes.  It's from the
 4  Merriam-Webster Dictionary Online, and it's a
 5  definition or the definitions of the word
 6  "neutralize."
 7                  MR. TSOUGARAKIS:  The question is.
 8  BY MR. ROBINSON:
 9          Q.      I'd like to go down the list of
10  definitions.  Do you see where it says number 1:
11  "To make chemically neutral."  Now, that wasn't what
12  you were doing when you said "neutralize" here;
13  right?
14          A.      Right.
15          Q.      Number 2 said:  "To counteract the
16  activity or affect of:  make ineffective <propaganda
17  that is difficult to neutralize>  b:  Kill,
18  destroy."  Is that what you were doing here?
19          A.      No.
20          Q.      Well, let me ask you, were you trying
21  to counteract the activity or effect of the doctors
22  who were speaking out against Vioxx?
23                  MR. TSOUGARAKIS:  I will object to
24  the form.  You can answer.
25                  THE WITNESS:  Definitely not.  The
page 31
 1  use of the word "neutralize" in this relates to
 2  bringing those physicians to a more neutral or
 3  balanced position.
 4  BY MR. ROBINSON:
 5          Q.      But, in effect -- do you see where it
 6  says to "make ineffective"?  You certainly were
 7  trying to make their positions ineffective; right?
 8          A.      No, we were --
 9                  MR. TSOUGARAKIS:  Object to the form.
10  You can answer.
11                  THE WITNESS:  -- actually trying to
12  make them more effective by providing accurate and
13  balanced information for them to evaluate and come
14  to conclusions.
15  BY MR. ROBINSON:
16          Q.      Let ask you this.  Did you happen to
17  -- I'm sure you read the article in the New York
18  Times that just came out about three weeks ago about
19  this neutralization?
20          A.      Yes, I did.
21          Q.      Let me see if I have a copy of it
22  here.
23                          -  -  -
24                  (Whereupon, Deposition Exhibit
25                  Baumgartner-4, "Marketing of Vioxx:  How
page 32
 1                  Merck Played Game of Catch-up," NY Times
 2                  Reprint, 2-11-05, was marked for
 3                  identification.)
 4                          -  -  -
 5  BY MR. ROBINSON:
 6          Q.      We'll give you Exhibit Number 4,
 7  which is that New York Times article here.
 8                  MR. TSOUGARAKIS:  We're marking this
 9  as Baumgartner Exhibit Number 4.
10                  MR. ROBINSON:  4.
11                  MR. TSOUGARAKIS:  Thank you.
12  BY MR. ROBINSON:
13          Q.      I'm going to just ask you some
14  questions about it.  I'm sure -- as you said, you
15  read it, but I want to see if certain statements
16  that are made are true.
17                  I want to go to the second paragraph
18  on Page 1 of Exhibit 4 where it says, "In 1999, the
```

Exhibit D - Baumgartner Deposition Excerpts

• Smith MIL - Marketing

19 company's new pain drug, Vioxx, was beaten to
20 pharmacy shelves by a competing drug, Celebrex." Is
21 that a true statement?
22      A.      Yes.
23      Q.      Then it says, "Merck apparently hoped
24 that nationally known rheumatologists like Dr. Roy
25 Altman could help it catch up," I guess to
page 33
1 Pharmacia; right?
2               MR. TSOUGARAKIS: Object to the form.
3               THE WITNESS: I can't speculate. I
4 think that's the author's statement.
5 BY MR. ROBINSON:
6       Q.      Well, let me ask you. Is it true
7 that you wanted to get rheumatologists like Dr. Roy
8 Altman to support Vioxx as a product?
9       A.      Yes.
10      Q.      Then it says, "At a dinner that year
11 in Miami, a Merck executive asked Dr. Altman what it
12 would take to win his support." Did that happen?
13      A.      I don't know.
14      Q.      Well, who was the person that was
15 confronting Dr. Altman in Miami?
16      A.      I don't know.
17      Q.      You don't know that?
18      A.      No.
19              MR. TSOUGARAKIS: That is the
20 doctor's statement. You didn't read that part about
21 -- it says "the doctor recalled."
22 BY MR. ROBINSON:
23      Q.      But you don't know that was a Merck
24 executive that actually was talking to Dr. Altman?
25      A.      No.
page 34
1       Q.      Did you ever get a document where you
2 were told that someone had contacted Dr. Altman?
3       A.      I may have.
4       Q.      But you don't remember who was
5 charged with the responsibility of talking to Dr.
6 Altman down in Miami?
7               MR. TSOUGARAKIS: Object to the form.
8 You can answer.
9               THE WITNESS: There are many
10 instances where Merck executives speak with either
11 physicians who are experts in different areas or who
12 are prescribing physicians, but in this instance,
13 I'm not sure who that was.
14 BY MR. ROBINSON:
15      Q.      Who were the -- do you know who were
16 people that were talking to physicians down in Miami
17 on behalf of Merck?
18      A.      No.
19      Q.      Then it says, "Dr. Altman said he
20 told the executive that he wanted to run a clinical
21 trial involving Vioxx, and, later, Merck put up
22 25,000 for it." Is that true?
23      A.      I don't know.
24      Q.      You don't know that he got 25,000?
25      A.      It's reported in here, but I don't
page 35
1 know. I don't have that experience.
2       Q.      Well, when you went through these
3 documents, did you see the spreadsheet that showed
4 "Show me the money" right after Dr. Altman's name?
5       A.      I did see that.
6       Q.      Well, did you -- that was a Merck
7 document; correct?
8       A.      Correct.
9       Q.      That was a document that was given to
10 you; correct?
11      A.      It was information that was provided
12 to me that I summarized.

**Exhibit D - Baumgartner Deposition Excerpts**

• Smith MIL - Marketing

```
13        Q.      And right next to Dr. Altman's name
14  was "Show me" -- it said "Show me the money,"
15  right, on that document?
16        A.      I think it was in a section of the
17  document.
18        Q.      It says "Show me the money."
19        A.      It does.
20        Q.      That was something that you had in
21  1999 as a marketing manager for Merck?
22                MR. TSOUGARAKIS: Had that document.
23  BY MR. ROBINSON:
24        Q.      You had that document?
25        A.      I did.
page 36
1         Q.      As far as you know, the money, the
2   25,000 went to this clinical trial that Dr. Altman
3   wanted to run; correct?
4                 MR. TSOUGARAKIS: Object to the form.
5                 THE WITNESS: I don't know that.
6   BY MR. ROBINSON:
7         Q.      I want to skip down to -- it says,
8   "Merck's dinner with Dr. Altman, internal company
9   documents show, was a brief stop in a long-running
10  campaign by Merck to enlist the support of doctors
11  for Vioxx, or, at the least, to defuse their support
12  for Celebrex - to 'neutralize' them as the documents
13  put it."  Did I read that right?
14        A.      Yes.
15        Q.      So, would you agree that's a true
16  statement?
17        A.      I'm not familiar with the dinner with
18  Dr. Altman --
19        Q.      Was the rest of it true?
20        A.      -- but I am familiar with our
21  efforts to gain support for Vioxx based on the
22  provision of information.
23        Q.      So, this statement would be true, as
24  far as you know, except for the dinner portion;
25  correct?
page 37
1         A.      I wouldn't agree with that either
2   because of the "defuse" the support for Celebrex.
3         Q.      So, you did not attempt to get
4   advocates to "defuse" the support for Celebrex?
5         A.      We attempted to give them the
6   information that would allow them to support the
7   product.  And the data in our opinion showed that
8   Vioxx had advantages, and we wanted it to be
9   considered based on its therapeutic merits and also
10  as an option for treating patients in pain.
11                        - - -
12                (Whereupon, Deposition Exhibit
13                Baumgartner-5, E-mail, 4-29-99,
14                "Physicians to Neutralize,"
15                MRK-AFI0201399, was marked for
16                identification.)
17                        - - -
18  BY MR. ROBINSON:
19        Q.      Let me go to Exhibit Number 5.  Is
20  Exhibit Number 5 one of the documents that you
21  reviewed over the last couple of months?
22        A.      Yes.
23        Q.      So, this is a memo from you to
24  Leonardo Mendez; right?  The Bates Number is
25  AFI0201399.  Is that correct, that's the Bates
page 38
1   Number?
2         A.      I wasn't watching.
3                 MR. TSOUGARAKIS: That's the number
4   in the lower -- you read it correctly.
5                 MR. ROBINSON: Thank you.
6   BY MR. ROBINSON:
```

• Smith MIL - Marketing

```
 7        Q.        Now, it says -- strike that.
 8                  You wrote this memo in April of 1999;
 9    is that right?
10        A.        That's what the date --
11        Q.        So, you had just come aboard with the
12    Merck marketing team, right, at that time?
13                  MR. TSOUGARAKIS:  I'll object to the
14    form.
15                  THE WITNESS:  I worked with the
16    marketing of Vioxx prior to joining the marketing
17    team on another team, and I don't remember exactly
18    if this April 29 time frame was with the previous
19    team or with the marketing team.
20    BY MR. ROBINSON:
21        Q.        But you started on Vioxx, what, in
22    July of 1998?
23        A.        Correct.
24        Q.        But you weren't really -- were you
25    marketing at that time?
page 39
 1        A.        It was a group called the market
 2    integration team that supported marketing in their
 3    planning.
 4        Q.        Now, were you neutralizing doctors
 5    from July of 1998 through April of 1999?
 6                  MR. TSOUGARAKIS:  Object to form.
 7    You can answer.
 8                  THE WITNESS:  It looks like we
 9    collected this information in the early 1999 time
10    frame.
11    BY MR. ROBINSON:
12        Q.        Do you see where it says, "Leo, As we
13    discussed, attached is the list of 'problem'
14    physicians that we must, at a minimum, neutralize."
15    That's what you wrote; right?
16        A.        Yes.
17        Q.        Who were the physicians that you were
18    saying must be neutralized?
19        A.        The physicians on this list included
20    prominent physicians and prescribing physicians who
21    were not supportive of Merck and/or Vioxx, and they
22    may also have been supportive of Celebrex.  And
23    those were the individuals that were captured, some
24    of whom we did not have relationships with, we
25    didn't have access to, and those are the individuals
page 40
 1    that we collected information about.
 2        Q.        Let me show you down at the last
 3    paragraph there.  You say, "We'll keep these
 4    individuals top of mind for any upcoming programs
 5    and activities, but we need to find out exactly
 6    what's needed and then put in place a specific
 7    action plan."  Did I read that right?
 8        A.        Yes.
 9        Q.        So, basically you are going to give
10    these doctors, these problem physicians, perks, put
11    them on upcoming programs and activities; right?
12                  MR. TSOUGARAKIS:  Object to the form
13    of the question.
14                  THE WITNESS:  No.  The programs and
15    activities that are referred to include things like
16    consultants meetings, which means understanding the
17    perspective.  These were individuals who held a
18    perspective different than our own, so, we
19    definitely wanted to hear what they had to say,
20    understand their questions and concerns.
21                  The other thing in finding out
22    exactly what's needed is finding out why they were
23    not at a neutral or balanced position.  So, finding
24    out if they didn't have the right information or if
25    they didn't have complete information or if they
page 41
```

**Exhibit D - Baumgartner Deposition Excerpts**

• Smith MIL - Marketing

    1   were looking for a resource in the company, whether
    2   it was a scientist or another individual, to discuss
    3   the product with them.

[62:5] - [69:11]    2/25/2005   Baumgartner, Susan - 2/25/2005 (NJ, CA)

page 62
    5       Q.    So, basically, number 10 is a
    6   document that you reviewed before you came here
    7   today; right?
    8       A.    Yes.
    9       Q.    This is a memo that you wrote to Dr.
  10  Sherwood in October of 2000; right?
  11      A.    Yes.
  12      Q.    And you gave him sort of a chronology
  13  regarding Dr. Singh; right?
  14      A.    Correct.
  15      Q.    Now, if we review the bidding, then
  16  next in order, time-wise, would be the January 19
  17  letter -- actually, there's a date on it, January
  18  19, received by Raymond Gilmartin. Do you see this,
  19  the Fries letter?
  20      A.    Yes.
  21      Q.    And then after that would have been
  22  this Anstice memo of January 23rd, but there's a fax
  23  date on it of 2/5, February 5th; right?
  24      A.    Right.
  25      Q.    Then the fourth document is Exhibit
page 63
    1   8, your handwritten note, that lists these nine
    2   doctors; right?
    3          MR. TSOUGARAKIS:  Object to the form.
    4   You can answer.
    5          THE WITNESS:  Yes.
    6   BY MR. ROBINSON:
    7       Q.    Now, just going back to the Fries
    8   memo, number 9, at Page 2 at the bottom, and then at
    9   Page 3 at the top, they list -- or Dr. Fries lists
  10  Dr. Singh, Dr. Lipsky, Dr. Whelton, Dr. Petri, Dr.
  11  Yocum, Dr. Simon, Dr. McMillen and Dr. Stillman.  Am
  12  I right?
  13      A.    Yes.
  14      Q.    And then, of course, he signs the
  15  letter himself; right?
  16      A.    Yes.
  17      Q.    So, those same eight doctors plus Dr.
  18  Fries are listed in your note of February 7; right?
  19      A.    Yes.
  20      Q.    And after that, it says "Compilation
  21  in one report - all reports, NSC, tomorrow end of
  22  day for initial 5 -- end of week for rest."  Did I
  23  read that right?
  24      A.    Yes.
  25      Q.    So, basically you at that time
page 64
    1   clearly were told about the Fries letter; right?
    2          MR. TSOUGARAKIS:  Object to the form.
    3          THE WITNESS:  I can't -- I don't know
    4   how this information can lead to that conclusion,
    5   and I don't remember --
    6   BY MR. ROBINSON:
    7       Q.    I'm just asking you the truth.  Did
    8   you read the Fries -- strike that.
    9          Did you hear about the Fries letter
  10  when you wrote this interlineation on February 7,
  11  2001?
  12      A.    I don't remember what I knew at the
  13  time, but this is the first time I've seen that
  14  Fries letter.
  15      Q.    Did someone tell you that Dr. Fries
  16  listed Dr. McMillen, Dr. Singh, Dr. Whelton, Dr.

• Smith MIL - Marketing

```
17  Simon, Dr. Stillman, Dr. Yocum, Dr. Lipsky and Dr.
18  Petri in his letter?
19          A.      I don't remember.
20          Q.      So, you were being asked to collect
21  information on these eight doctors and Dr. Fries,
22  and you didn't know why?
23                  MR. TSOUGARAKIS:  Object to the form.
24                  THE WITNESS:  I don't remember at the
25  time.  It's not inconceivable that I would have been
page 65
1   asked to do something and not understand the
2   background behind it.
3   BY MR. ROBINSON:
4           Q.      If we go to the Fries exhibit, which
5   is Exhibit Number 9, and go to that paragraph that I
6   referred to at the bottom of page 2, it says, "Even
7   worse were the allegations of Merck damage control
8   by intimidation, often with a pattern of going to
9   the Dean or Department Head with complaints of
10  anti-Merck bias and always alleging unbalanced
11  anti-Vioxx presentations."  Did I read that right?
12          A.      Yes.
13          Q.      And then it says, "This has happened
14  to at least eight investigators:  Dr. Singh; Dr.
15  Peter Lipsky, now research chief at the Arthritis
16  Institute; Dr. Andrew Whelton of Hopkins; Dr.
17  Michelle Petri of Hopkins; Dr. David Yocum of
18  Tucson, currently head of the FDA advisory panel;
19  Dr. Lee Simon of Harvard; Dr. James McMillen; and
20  Dr. Thomas Stillman.  I suppose I was mildly
21  threatened myself, although I have never spoken or
22  written on these issues."  Did I read that right?
23          A.      Yes.
24          Q.      Now, you just happened to list those
25  nine people in your record of daily events
page 66
1   approximately two weeks after Dr. Fries sent this
2   memo to Mr. Gilmartin, who is the head of your
3   company?
4                   MR. TSOUGARAKIS:  I'll object to the
5   form.
6                   THE WITNESS:  I don't remember why
7   they were listed in my planner.  If I look at this
8   today, it looks like I was running a report of any
9   input coming in to our national service center,
10  which is our 800 line where we collect information,
11  but that's all I can get from that document.
12  BY MR. ROBINSON:
13          Q.      Well, I mean, you've got a star -- do
14  you see that star over there, you've got a circle
15  and a check and a box over there; right?
16          A.      Yes.
17          Q.      And plus an arrow.  It was a pretty
18  important assignment; wasn't it?
19                  MR. TSOUGARAKIS:  Object to the form.
20                  THE WITNESS:  I don't remember at the
21  time.
22  BY MR. ROBINSON:
23          Q.      Well, in the same memo you've got
24  reference to David Anstice attending; right?  So,
25  he's involved; right?
page 67
1           A.      That reference is for him potentially
2   attending our rheumatology consultant meeting
3   which --
4           Q.      Who is Sandy Reiss?
5           A.      She was a director on our marketing
6   team.
7           Q.      Was she above you or below you?
8           A.      Above, but I didn't report to her.
9           Q.      Did she work for Mr. Anstice?
10          A.      (Witness nods.)
```

**Exhibit D - Baumgartner Deposition Excerpts**

• Smith MIL - Marketing

```
11        Q.      Yes.  You can say yes.
12        A.      Yes, eventually.  Up the chain.
13        Q.      So, basically Sandy Reiss on behalf
14  of Mr. Anstice told you to dig some dirt up on these
15  eight -- these nine doctors; right?
16                MR. TSOUGARAKIS:  Object to the form.
17                THE WITNESS:  I don't remember what
18  she told me or if she told me anything.
19  BY MR. ROBINSON:
20        Q.      These are all reputable doctors.  I
21  mean, you've read Dr. Fries' report; right?  Or his
22  letter?
23                MR. TSOUGARAKIS:  Baumgartner Exhibit
24  9.
25  BY MR. ROBINSON:
page 68
1         Q.      Correct?
2         A.      I did.  I just read it.
3         Q.      Yes.  Baumgartner-9; right?
4         A.      (Witness nods.)
5         Q.      These are people that you did medical
6   research on; right?  That was part of your job
7   duties?
8         A.      I --
9                 MR. TSOUGARAKIS:  Object to the form.
10                THE WITNESS:  Can you clarify your
11  question?
12  BY MR. ROBINSON:
13        Q.      Well, your job was to either do it
14  yourself or have other people do research on what
15  went on with regard to Vioxx with regard to Dr.
16  McMillen, Dr. Singh, Dr. Whelton, Dr. Simon, et
17  cetera?
18        A.      My responsibility was to conduct
19  market research with these individuals, to talk with
20  them about their perspectives on the product, what
21  questions they had, what concerns they had.
22        Q.      Well, let me ask you this.  When you
23  say that you're going to -- "tomorrow," we'll have
24  "end of day for initial 5" and "end of week for the
25  rest," you weren't going to talk to them and
page 69
1   interface with them, you were actually digging
2   information up on them; right?
3         A.      I don't remember exactly what that
4   refers to.
5         Q.      Well, you said "Compilation in one
6   report - all reports."  You were trying to dig
7   information up on these people; correct?
8                 MR. TSOUGARAKIS:  I'll object to the
9   form.
10                THE WITNESS:  I don't remember what
11  this reference in my planner refers to.
```

[288:1] - [288:25]     2/25/2005    Baumgartner, Susan - 2/25/2005 (NJ, CA)

```
page 288
1                         CERTIFICATE
2
3                 I, LINDA L. GOLKOW, a Notary Public
4   and Certified Shorthand Reporter of the State of New
5   Jersey, do hereby certify that prior to the
6   commencement of the examination, SUSAN L.
7   BAUMGARTNER, Pharm.D. was duly sworn by me to
8   testify to the truth, the whole truth and nothing
9   but the truth.
10                I DO FURTHER CERTIFY that the
11  foregoing is a verbatim transcript of the testimony
12  as taken stenographically by and before me at the
13  time, place and on the date hereinbefore set forth,
14  to the best of my ability.
```

**Exhibit D - Baumgartner Deposition Excerpts**

• Smith MIL - Marketing

```
15              I DO FURTHER CERTIFY that I am
16  neither a relative nor employee nor attorney nor
17  counsel of any of the parties to this action, and
18  that I am neither a relative nor employee of such
19  attorney or counsel, and that I am not financially
20  interested in the action.
21              _____
22              LINDA L. GOLKOW, CSR
                Notary Number:  1060147
23              Notary Expiration:  1-2-08
                CSR Number:  30XI176200
24              Dated:  March 8, 2005
25
```

Exhibit E - Anstice Deposition Excerpts

• Smith MIL - Marketing

[:] - [:25]          3/16/2005     Anstice, David - (Ernst and DiPietro pp. 1-314)

```
page
                Confidential - Subject to Protective Order 1
 1              SUPERIOR COURT OF NEW JERSEY
                LAW DIVISION - ATLANTIC COUNTY
 2                         -    -    -
     IN RE:   VIOXX LITIGATION        CASE NO. 619
 3   --------------------------------------------------
                    CAUSE NO. 19961*BH02
 4                         -    -    -
     CAROL ERNST, INDIVIDUALLY   :  IN THE DISTRICT COURT OF
 5   AND AS PERSONAL            :
     REPRESENTATIVE OF THE      :
 6   ESTATE AND HEIRS OF ROBERT :
     CHARLES ERNST, DECEASED;   :
 7   R. CHARLES ERNST;          :
     ANGELA F. ERNST,           : BRAZORIA COUNTY, TEXAS
 8            v.                :
     MERCK & CO., INC.,         :
 9   HARVEY RESNICK, M.D. AND    :
     R/D CLINICAL RESEARCH,     :
10   INC., BRENT H. WALLACE     :
     M.D.                       : 23RD JUDICIAL DISTRICT
11   --------------------------------------------------
     PHILIP & CYNTHIA DiPIETRO  :  COURT OF COMMON PLEAS
12            (h/w)             :  DELAWARE COUNTY
               Plaintiffs,      :
13            v.                :
     MERCK & CO., INC.,         :
14            AND               :
     ROBERT F. CROWELL, D.O.,   :
15            AND               :
     BROOKHAVEN MEDICAL         :  CIVIL ACTION
16   ASSOCIATES                 :  NO: 04-19198
                           -    -    -
17
                        CONFIDENTIAL
18              SUBJECT TO PROTECTIVE ORDER
19                         -    -    -
                        March 16, 2005
20                         -    -    -
21       Videotape deposition of DAVID W. ANSTICE.
22
23              ESQUIRE DEPOSITION SERVICES
                        15th Floor
24              1880 John F. Kennedy Boulevard
                Philadelphia, Pennsylvania 19103
25                    (215) 988-9191
```

[191:2] - [191:14]   3/16/2005     Anstice, David - (Ernst and DiPietro pp. 1-314)

```
page 191
 2                MR. WEISS:  I have -- I'm going to
 3   mark the next exhibit.  What number is it?  22.
 4                         -    -    -
 5       (Exhibit Anstice 22 marked for identification.)
 6                         -    -    -
 7   BY MR. WEISS:
 8       Q.        It's an e-mail from you to a number
 9   of people dated February 23, 1998, AB 10001556 with
10   attachments behind it.  I think it's 22.
11                This is a document reviewed in
12   preparation for your deposition, isn't it?
13       A.        Let me look at this document.  I
14   don't recall seeing this in deposition preparation.
```



EXHIBIT

E

1

**Exhibit E - Anstice Deposition Excerpts**

• Smith MIL - Marketing
[193:18] - [196:19]         3/16/2005    Anstice, David - (Ernst and DiPietro pp. 1-314)

page 193
18        Q.    Your words -- why don't you read the
19   first sentence of this e-mail?
20        A.    "Battle is now joined with Pfizer in
21   another major therapeutic area and one which is
22   CRITICAL to Merck from 2000 onwards."
23        Q.    Were you assembling an Army of Merck
24   people and consultants to beat Pfizer in the
25   marketplace?
page 194
1         A.    We knew that this would be a very
2    competitive area, and yes, we were developing plans
3    which would make us competitive with the competition
4    in this market.
5         Q.    And the competition was Pfizer?
6         A.    Pfizer, which was partnering with
7    Searle or Pharmacia as it subsequently became.
8         Q.    And you authorized $50 million for
9    war games to beat out Celebrex in the marketplace.
10   Correct?
11        A.    I don't know what you're referring to
12   when you say --
13        Q.    You never heard of the war games for
14   Celebrex as a line item expense?
15        A.    No, that's not something I recall.
16        Q.    We'll get to that. By the way, you
17   never heard the expression "war games"?
18        A.    I've heard the expression "war
19   games."
20        Q.    And what are war games as it relates
21   to the drug industry?
22        A.    I imagine that they're simulations of
23   a competitive match.
24        Q.    Now, you state in the third sentence,
25   "We simply CANNOT LOSE...," and you make in bold
page 195
1    could not lose, "...in any single market in The
2    Americas."
3         A.    Correct.
4         Q.    Why?
5         A.    This was a -- part of my role is to
6    be -- is to be leading our team, and I wanted each
7    of our groups to be focused on the competitive
8    battle ahead, and for them to try and achieve the
9    superior market share versus our competition. And
10   the markets I'm referring to here are Canada, Latin
11   America and the U.S.
12        Q.    Need to have opinion leaders with
13   you. That's what you say. Correct?
14        A.    "We need to have opinion leaders with
15   us," correct.
16        Q.    And part of obtaining opinion leaders
17   is to give the research grants. Correct?
18        A.    No.  Opinion leaders -- that is not
19   correct.  Opinion leaders are people that are
20   selected, by their own disease community, as being
21   leaders in that area.  One of the important tasks of
22   Merck as a marketer was to work with those opinion
23   leaders and try and ensure that they had complete
24   information about our products knowing that they
25   would also have information about other products.
page 196
1         Q.    Would you take them to seminars,
2    opinion leaders, to try to educate them?
3              MR. RABER:  Objection to form.
4              THE WITNESS:  We had a variety of
5    ways in which we worked with opinion leaders, we had
6    both pre and post the Vioxx introduction.  The ways
7    in which we worked with them prior to introduction
8    was consistent with Merck policies, which set out

Exhibit E - Anstice Deposition Excerpts

• Smith MIL - Marketing

9   the way in which we could work with opinion leaders.
10  BY MR. WEISS:
11      Q.       And you'd have meetings in resorts
12  and you'd pay for the rooms.
13              MR. RABER:  Objection to form.
14  BY MR. WEISS:
15      Q.       Correct?
16      A.       We had meetings with opinion leaders
17  as consultants in different capacities.  Some of
18  those meetings may have been held in hotels which
19  could be labeled resorts.

[296:18] - [300:25]   3/16/2005   Anstice, David - (Ernst and DiPietro pp. 1-314)

page 296
18      Q.       Are you denying that Louis Sherwood
19  was sent out to neutralize Whelton and Simon and
20  Singh?
21      A.       He was not sent out to neutralize
22  people.  He, based on requests that he received from
23  our organization, that these physicians were
24  misrepresenting in our view the way that Merck had
25  disclosed data, he rang them up and had heated
page 297
1   discussions with them, but he was not trying to
2   neutralize them.  He was trying to ask them to be
3   reasonable in their public comments.  He was not
4   trying to stop them from presenting two sides of an
5   argument.  He was simply asking them to be clear
6   about the fact that Merck was disclosing data.
7       Q.       It's wrong to threaten institutions
8   like Stanford because a professor has the temerity
9   to speak his mind about what he perceived to be
10  wrongful conduct on the part of Merck?
11      A.       Merck does not intimidate doctors.
12      Q.       And when you received Dr. Fries'
13  letter accusing Merck of that, what did you do?
14      A.       I immediately -- that was a very,
15  very important letter to receive.  He's a very
16  important professor of medicine.  And I took
17  immediate action to understand the basis of his
18  concerns and to phone him personally, which I did
19  within certainly a very brief period of time after I
20  received my copy of that letter.
21      Q.       What else did you do?
22      A.       I spoke to -- I spoke to Dr. Sherwood
23  and asked him for his version of the events that Dr.
24  Fries had set out in the letter to Mr. Gilmartin.  I
25  also spoke to Dr. Greene in our research group and
page 298
1   asked him to participate in a discussion with Dr.
2   Fries to make sure that he received any and all data
3   that he wanted from Merck.
4       Q.       And that's Douglas Greene.  Correct?
5       A.       Douglas Greene, head of our clinical
6   research group.
7       Q.       Physician.  Correct?
8       A.       A physician, correct.
9       Q.       Louis Sherwood, a physician.
10  Correct?
11      A.       Dr. Sherwood is a physician, yes.
12      Q.       Did you do an investigation inside of
13  Merck to determine whether Dr. Sherwood was being
14  fair and truthful in the confidential memorandum he
15  sent to you?
16      A.       I did not do such an investigation.
17  I reviewed the letter from Dr. Fries.  I reviewed
18  Dr. Sherwood's letter, I talked to some people about
19  what was going on.  I concluded that there was a lot
20  of to-ing and fro-ing between -- certainly Dr.
21  Sherwood had made calls.  That there were certainly

## Exhibit E - Anstice Deposition Excerpts

**• Smith MIL - Marketing**

```
22   some heated calls.  And I quickly concluded that I
23   could not -- I did not want to investigate with the
24   doctors that Dr. Fries was representing in his
25   letter, he indicated that he was representing those
page 299
1    doctors.  I rang Dr. Fries and said that after -- I
2    spoke to him perhaps three times, but I rang him
3    after I received the note from Dr. Sherwood.  And I
4    said you have your version of events, which is
5    important, I have received a different -- somewhat
6    different version here.  I think that this matter
7    has -- we have to move forward and that it is
8    critical that Merck not be in this situation.  I
9    think it reflects poorly on Merck that you need to
10   send us this letter.  I do not believe that Dr.
11   Sherwood was engaged in intimidatory behavior at
12   all.  However, I have asked him to step aside from
13   future communications with doctors in this area.
14   And I assure you that I will use all of my efforts
15   in this organization to see that events like this
16   don't occur going forward.
17        Q.      Is this noted in Dr. Sherwood's
18   personnel file?
19        A.      His personnel file for?
20        Q.      Yeah, that this interaction he had
21   with --
22        A.      I don't --
23        Q.      Let me finish --
24                With Dr. Fries cast a negative light
25   on Merck, as you just put it?
page 300
1        A.      I don't believe it was.
2        Q.      Should it have been?
3        A.      I drew the conclusion at the time
4    that it did not need to be included in his personnel
5    record.
6        Q.      Now, who told Dr. Sherwood to go out
7    and visit Dr. Fries?
8        A.      I don't believe that at the end of
9    the day he did visit Dr. Fries.  I offered to visit
10   Dr. Fries.  Dr. Greene --
11        Q.      I take it back.
12        A.      Dr. Greene offered to visit Dr.
13   Fries.  Dr. Fries thanked both of us and said
14   that -- and in the end he asked me to meet with Dr.
15   Singh, which I did, and Dr. Greene was also asked to
16   send information but to not fly out to meet with
17   him.
18        Q.      I misspoke.  I'm sorry.  Who told Lou
19   Sherwood to go see Dr. Singh?
20        A.      I don't believe he did see Dr. Singh
21   at the end of the day.
22        Q.      He did see Dr. Peter Lipsky, didn't
23   he?
24        A.      I don't -- I don't remember that
25   name.
```

[310:1] - [310:25]     3/16/2005    Anstice, David - (Ernst and DiPietro pp. 1-314)

```
page 310
1                     C E R T I F I C A T E
2
                 I hereby certify that the witness was duly
3    sworn by me and that the deposition is a true record
     of the testimony given by the witness.
4
5                It was requested before completion of the
     deposition that the witness, DAVID W. ANSTICE, have
6    the opportunity to read and sign the transcript.
7
8              - - - - - - - - - - - -
```

Exhibit E - Anstice Deposition Excerpts

• Smith MIL - Marketing

```
                        Linda Rossi Rios
 9              Dated:  March 16, 2005
10
11
12
13
14
15
16
17              (The foregoing certification of this
18    transcript does not apply to any reproduction of the
19    same by any means, unless under the direct control
20    and/or supervision of the certifying reporter.)
21
22
23
24
25
```

## Exhibit F - Anstice Deposition Excerpts

• Smith MIL - Marketing

[315:1] - [315:25]     3/17/2005    Anstice, David - (Ernst and DePietro pp. 315-663)

```
page 315
1                   SUPERIOR COURT OF NEW JERSEY
                    LAW DIVISION:  ATLANTIC COUNTY
2
                              -  -  -
3   IN RE:
            VIOXX LITIGATION   CASE NO. 619
4   ----------------------------------------------
                     CAUSE NO. 19961*BH02
5                             -  -  -
    CAROL ERNST, INDIVIDUALLY :  IN THE DISTRICT COURT
6   OF
    AND AS PERSONAL           :
7   REPRESENTATIVE OF THE     :
    ESTATE AND HEIRS OF ROBERT:
8   CHARLES ERNST, DECEASED;  :
    R. CHARLES ERNST;         :
9   ANGELA F. ERNST,          :  BRAZORIA COUNTY, TEXAS
            v.
10  MERCK & CO., INC.,        :
    HARVEY RESNICK, M.D. AND  :
11  R/D CLINICAL RESEARCH,    :
    INC., BRENT H. WALLACE    :
12  M.D.                      :  23RD JUDICIAL DISTRICT
    ----------------------------------------------
13  PHILIP & CYNTHIA DIPIETRO :  COURT OF COMMON PLEAS
            (h/w)             :  DELAWARE COUNTY
14          Plaintiffs        :
            v.                :
15  MERCK & CO., INC.         :
            AND               :
16  ROBERT F. CROWELL, D.O.   :
            AND               :
17  BROOKHAVEN MEDICAL        :  CIVIL ACTION
    ASSOCIATES                :  NO: 04-19198
18                            -  -  -
                      CONFIDENTIAL
19             SUBJECT TO PROTECTIVE ORDER
20                            -  -  -
                        March 17, 2004
21                            -  -  -
22          Continued videotape deposition of DAVID W.
    ANSTICE.
23
                     ESQUIRE DEPOSITION SERVICES
24          1880 John F. Kennedy Boulevard
                        15th Floor
25          Philadelphia, Pennsylvania 19103
                      (215) 988-9191
```

[455:12] - [463:20]     3/17/2005    Anstice, David - (Ernst and DePietro pp. 315-663)

```
page 455
12          Q.    Sir, you've seen this document before
13  that I have.  It may be incomplete but --
14          A.    No.  I have not seen this document
15  before.
16          Q.    This is the first day, sitting here
17  today, that you've seen the Dodge Ball document.
18  That's what you're saying?
19          A.    That is what I'm telling you, yes.
20          Q.    Are you shocked by this document that
21  I'm showing you today?
22          A.    Well, I haven't had time -- could I
23  look at the document?
24          Q.    Well, you can, but can I just ask you
25  a question about the first page?  What do you think
page 456
```



EXHIBIT

F

Exhibit F - Anstice Deposition Excerpts

▪ Smith MIL - Marketing

```
 1      about a document called Dodge Ball when you're
 2      selling drugs to doctors?  Just what's your
 3      impression of that?
 4           A.      But who is this document addressed to
 5      and for what purpose?
 6           Q.      Well, let me represent to you it was
 7      used in training of your sales reps, and assume
 8      that.  I'm not asking you to testify to it.  Assume
 9      it.
10              MR. RABER:  I'm going to object to
11      the form.  And, again, no foundation.  This document
12      is incomplete.
13              MR. SEEGER:  We'll deal with his
14      objection later, sir.
15      BY MR. SEEGER:
16           Q.      If this were a document used in
17      training sales reps at your company, are you
18      horrified by the title?
19           A.      Not necessarily.
20           Q.      That doesn't bother you?  Do you know
21      the game of Dodge Ball?  Did you play that as a kid?
22           A.      No, I did not.
23           Q.      Well, let me explain it to you.
24      Maybe you don't know what the game is.
25           A.      Somebody has explained it to me since
page 457
 1      the article in the press.
 2           Q.      What did they explain to you?
 3           A.      That somebody throws a ball and you
 4      try not to let it hit you.
 5           Q.      What happens when it hits you?
 6           A.      I don't know.
 7           Q.      You're out?  You're out of the game;
 8      right?
 9           A.      Okay.
10           Q.      Okay.  So, knowing that, we've got
11      that out of the way, is this something that you
12      would condone or approve of?
13              MR. RABER:  Objection to form.
14      BY MR. SEEGER:
15           Q.      A document like this?
16           A.      But I don't have enough information
17      on which to answer your question.
18           Q.      Take your time and read the document
19      if you'd like.  Go right ahead.
20           A.      (Witness reviewing document.)
21           Q.      Sir, you've seen it?
22           A.      Yes.
23           Q.      Now, could I just ask you to do one
24      thing so that the jury understands what we're
25      talking about.  Could you hold the document up so
page 458
 1      the jury can see the document we're looking at?
 2           A.      (Witness complies.)
 3           Q.      Thank you very much, sir.
 4              MR. RABER:  Please note my objection
 5      that this document is incomplete.
 6              MR. SEEGER:  Okay.
 7              MR. RABER:  Are you going to ask
 8      him -- well, never mind.  It is incomplete.  I'll
 9      stand on the objection.
10              MR. SEEGER:  Why don't you let me ask
11      the questions, and you will object, and I'll try to
12      work with your objection.
13      BY MR. SEEGER:
14           Q.      When you learned that the company
15      was, in fact, using a document like this, what did
16      you do?  What was your reaction?
17              MR. RABER:  Objection to form, no
18      foundation.
19              THE WITNESS:  My reaction was to
20      understand it better.  And I had the opportunity to
```

### Exhibit F - Anstice Deposition Excerpts

• Smith MIL - Marketing

```
21      do that without general counsel, who explained what
22      the context of this document was.
23      BY MR. SEEGER:
24          Q.      Well, I don't want to know what your
25      general counsel told you, but what's your
page 459
1       understanding of the document?
2           A.      My understanding I have gleaned, and
3       this was a broad statement --
4           Q.      By the way, I'm sorry, I just want to
5       be clear, because I am --
6                   MR. RABER:  Let me understand.  I
7       believe that what he's referring to was a statement
8       not made in a privileged --
9                   THE WITNESS:  It is not privileged.
10      He talked to a group of people.
11      BY MR. SEEGER:
12          Q.      Who was in the group?
13          A.      It was a webcast.
14          Q.      Okay.  So, you're just repeating what
15      the general counsel has already told people on a
16      webcast?
17          A.      That's my knowledge of what this
18      document is.
19          Q.      I just want to be clear, because
20      that's not my question.  Let me ask you the
21      question.
22                  You're the head of Merck marketing;
23      correct?
24          A.      Yes.
25          Q.      What's your reaction to that
page 460
1       document?
2           A.      I don't understand what the
3       particular purpose of the document is, and until I
4       understand that, I can't answer that question.
5           Q.      You're okay with the fact your sales
6       reps played a game called Dodge Ball in connection
7       with their training on how to sell your drug Vioxx?
8       You're okay with that?
9                   MR. RABER:  Objection to form.
10                  THE WITNESS:  My understanding is
11      that that is their training.  And part of their
12      training is to learn answers to commonly asked
13      questions.  And so if there's a training technique
14      which uses a commonly understood game, that can be
15      very -- that can be acceptable.
16      BY MR. SEEGER:
17          Q.      How do you ensure the integrity of
18      what your sales reps tell doctors without you seeing
19      these materials?
20          A.      Because people in our organization
21      get training materials, they are consistent with our
22      label, and the training people send them out based
23      on all of the procedures that we have.
24          Q.      Well, let me ask you this.
25                  Go to the second page.  Doctor
page 461
1       says -- here's a question from a doctor; correct?
2       Can we agree that's a doctor's question?
3                   MR. RABER:  Objection to form.
4                   THE WITNESS:  It says that --
5       BY MR. SEEGER:
6           Q.      At the bottom.
7           A.      It is a comment, yes.
8           Q.      That's a comment.  Let me read the
9       comment, as you describe it.  "I am concerned with
10      the potential edema that occurs with Vioxx."  At the
11      top of the page it says, "Dodge Ball."  Did I read
12      that correctly?
13          A.      Yes.
14          Q.      We agreed that Dodge Ball is when the
```

Exhibit F - Anstice Deposition Excerpts

• Smith MIL - Marketing

```
15     kids are in the gymnasium and you throw a ball and
16     you dodge it; correct?
17          A.     That's my understanding.
18          Q.     So, tell me, how does a responsible
19     sales rep, how does a responsible company use a
20     document like this to teach its sales reps how to
21     answer doctors' questions?
22                 MR. RABER:  Objection to the form.
23                 THE WITNESS:  But if this was simply
24     the training technique to ensure that
25     representatives were adequately equipped to answer
page 462
1      this question, that could be quite acceptable.  This
2      is not an instruction, at least as I understand it.
3      This is not an instruction to our representatives to
4      not answer questions.
5      BY MR. SEEGER:
6          Q.     All right.  Let me just help you with
7      that one.
8                 Can you go back to the first page?
9      We can spend all day on this one.  Do you see the
10     word at the very bottom with the exclamation point.
11     Could you please tell the jury what that says at the
12     bottom in big, black bold letters.  What's that
13     word?
14          A.     "Dodge."
15          Q.     You're comfortable.  So, if you had
16     seen this in 1999, if this were a document being
17     used by the company in 1999, you would be perfectly
18     comfortable with this?
19                 MR. RABER:  Objection to the form of
20     the question.  You are asking him about an
21     incomplete document.
22                 MR. SEEGER:  Yes.
23                 THE WITNESS:  I just don't have the
24     context.  I may or may not have been comfortable
25     with it.
page 463
1      BY MR. SEEGER:
2          Q.     Let's assume that this document were
3      only the front page.  In a pharmaceutical company
4      where you sell drugs to doctors that treat patients,
5      drugs are a serious thing; correct?  Drugs are
6      serious?
7          A.     Very serious.
8          Q.     Drugs have side effects?
9          A.     Have benefits and they have risks.
10         Q.     And you've got reps selling the drug
11     to doctors that we established are not doctors
12     themselves for the most part; correct?
13         A.     Correct.
14         Q.     You're comfortable with a document
15     called "Dodge Ball" in the training of your sales
16     reps?
17         A.     I'm comfortable with training
18     techniques that make it helpful for representatives
19     to learn information that they should and should not
20     be imparting to physicians.
```

[659:1] - [659:25]     3/17/2005    Anstice, David - (Ernst and DePietro pp. 315-663)

```
page 659
1                      CERTIFICATE
2
3                 I, LINDA L. GOLKOW, a Notary Public
4      and Certified Shorthand Reporter of the State of New
5      Jersey, do hereby certify that prior to the
6      commencement of the examination, DAVID W. ANSTICE
7      was duly sworn by me to testify to the truth, the
8      whole truth and nothing but the truth.
9                 I DO FURTHER CERTIFY that the
```

Exhibit F - Anstice Deposition Excerpts

• Smith MIL - Marketing

```
10    foregoing is a verbatim transcript of the testimony
11    as taken stenographically by and before me at the
12    time, place and on the date hereinbefore set forth,
13    to the best of my ability.
14                    I DO FURTHER CERTIFY that I am
15    neither a relative nor employee nor attorney nor
16    counsel of any of the parties to this action, and
17    that I am neither a relative nor employee of such
18    attorney or counsel, and that I am not financially
19    interested in the action.
20                    _____
21                    LINDA L. GOLKOW, CSR
                      Notary Number:  1060147
22                    Notary Expiration:  1-2-08
                      CSR Number:  30XI176200
23                    Dated:  March 21, 2005
24
25
```

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

[390:1] - [390:25]          5/17/2005      Scolnick, Edward M. (NJ, DiPietro)

```
page 390
 1                          SUPERIOR COURT OF NEW JERSEY
                            LAW DIVISION - ATLANTIC COUNTY
 2                              -  -  -
         IN RE:   VIOXX LITIGATION : CASE NO. 619
 3
         ------------------------------------------------
 4
         PHILIP & CYNTHIA DIPIETRO :  COURT OF COMMON PLEAS
 5              (h/w)             :   DELAWARE COUNTY
                Plaintiffs        :
 6              v.                :
         MERCK & CO., INC.        :
 7              AND               :
         ROBERT F. CROWELL, D.O.  :
 8              AND               :
         BROOKHAVEN MEDICAL       :   CIVIL ACTION
 9       ASSOCIATES               :   NO: 04-19198
                                -  -  -
10
                            CONFIDENTIAL
11                   SUBJECT TO PROTECTIVE ORDER
12
                               -  -  -
13                          May 17, 2005
                               -  -  -
14
15              Continued videotape deposition of EDWARD M.
16       SCOLNICK, M.D., held in the Hyatt Regency Hotel, One
17       Avenue de Lafayette, Boston, Massachusetts,
18       commencing at 9:06 a.m., on the above date, before
19       Linda L. Golkow, a Federally-Approved Registered
20       Diplomate Reporter and Certified Shorthand Reporter.
21
22                             -  -  -
23                   ESQUIRE DEPOSITION SERVICES
                     1880 John F. Kennedy Boulevard
24                          15th Floor
                     Philadelphia, Pennsylvania 19103
25                          (215) 988-9191
```

[600:22] - [635:20]          5/17/2005      Scolnick, Edward M. (NJ, DiPietro)

```
page 600
22           Q.      The third item there is "A
23       cardiovascular card to handle the thromboembolic
24       events issue."  Do you see that?
25           A.      Yes, I do.
page 601
 1           Q.      It says, "It compares cardiovascular
 2       thromboembolic AEs for VIOXX comparator NSAIDs...and
 3       placebo."  Do you see that?
 4           A.      Yes.
 5           Q.      And then a bunch of the NSAIDs that
 6       are compared across the nine osteoarthritis trials
 7       are referenced there; right?
 8           A.      Correct.
 9           Q.      You've seen that cardiovascular card,
10       haven't you?
11           A.      I don't recall it.
12           Q.      Okay.  Well, the next paragraph says,
13       "Copies of the renal card, cardiovascular card, and
14       the Rossat paper are attached."  Do you see that?
15           A.      I do.  I still don't recall.
16           Q.      Any reason to doubt that Ms. Dixon
17       was telling the truth when she said she was giving
18       you these things for your review?
19                   MR. RABER:  Objection to the form.
```



EXHIBIT
G

1

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

```
20              THE WITNESS:  She was giving them to
21   me.  I don't think I was given them for review.  I
22   think she says in the paragraph that the
23   representatives already have this information.  I
24   don't recall these cards, and I don't recall
25   discussing the cards with her at all.
page 602
1    BY MR. BUCHANAN:
2         Q.      Do you recall going to the meeting in
3    Whitehouse Station?
4         A.      I don't recall even going to the
5    meeting.  I didn't -- I don't, actually, recall
6    going to the meeting.
7         Q.      I take it you don't doubt that you
8    did?
9         A.      I don't know whether I did or I
10   didn't.  I don't recall going to the meeting.
11                     -  -  -
12                (Whereupon, Deposition Exhibit
13                Scolnick-31, "Cardiovascular System
14                Clinical Profile in Osteoarthritis
15                Studies,"  MRK-AAR0033237 -
16                MRK-AAR0033243, was marked for
17                identification.)
18                     -  -  -
19   BY MR. BUCHANAN:
20        Q.      Sir, I'm passing you what we've just
21   marked as Exhibit 31 to your deposition.  It is a
22   copy of a document entitled "Cardiovascular System,
23   Clinical Profile In Osteoarthritis Studies."  It's
24   Bates stamped MRK-AAR0033237 through 243.
25                Do you recall this document, sir?
page 603
1         A.      I don't.
2         Q.      Have you ever seen the cardiovascular
3    card before?
4         A.      I don't recall ever having seen the
5    cardiovascular card, as I just finished telling you.
6         Q.      Okay.
7                I would like to direct your
8    attention, please, to Page 241, those little numbers
9    in the corner.  Do you see the title there, it says,
10   "Overall Mortality Rates"?
11        A.      Yes.
12        Q.      It says, "Overall mortality and
13   cardiovascular mortality."  Do you see that?
14        A.      Yes, I do.
15        Q.      Okay.  It says, "Events per 100
16   Patient-Years."  Do you see that?
17        A.      Yes.
18        Q.      What does that mean, "Events per 100
19   Patient-Years"?
20        A.      It means events calculated taken into
21   account the number of patients and the length of
22   exposure.  It is a calculation that's made in
23   biostatistics frequently.
24        Q.      Okay.  Do you see that heading "Total
25   mortality"?
page 604
1         A.      Yes.
2         Q.      In the table?
3         A.      Yes.
4         Q.      There's a total mortality number for
5    Vioxx, isn't there?
6         A.      Yes.
7         Q.      It says .1; right?
8         A.      Yes.
9         Q.      And there's a total mortality for
10   NSAIDs.  It says 1.1; right?
11        A.      Yes.
12        Q.      So, the rate of cardiovascular
13   mortality is, what, 11 times higher on NSAIDs
```

**Exhibit G - Scolnick Deposition Excerpts**

• Smith MIL - Marketing

```
14      according to this chart; right?
15              MR. PERSCHETZ:  I'm sorry.  I thought
16      you were asking about the total mortality.
17              THE WITNESS:  This says overall
18      mortality rates, so I don't —
19              MR. PERSCHETZ:  And then you asked
20      him about cardiovascular mortality.
21              MR. BUCHANAN:  I appreciate the
22      clarification, Counsel.  Thank you.
23              Let's strike the last question and
24      try it again.
25      BY MR. BUCHANAN:
page 605
1       Q.      So, the rate of total mortality is 11
2       times higher on traditional NSAIDs as compared to
3       Vioxx according to this cardiovascular card; true?
4       A.      This — in our osteoarthritis
5       clinical trials, this is the data that's in this
6       table.  I don't recall the table.  I don't know how
7       the calculations were made.
8       Q.      Well, this was the mortality data
9       that sales representatives were given to use when
10      speaking with physicians; true?
11      A.      I don't know what they were given.
12      This memo indicates — the prior memo indicates they
13      were given a variety of information, and now you've
14      given me this.  I don't know whether this refers to
15      this or not, since I don't remember having ever seen
16      it.
17      Q.      I take it, sir, that you'd agree that
18      the most important data to the physician in terms of
19      safety is total mortality.
20      A.      I'm not sure whether that's the most
21      important data.  It is important data, and
22      physicians should have the overall safety profile of
23      the drug and some explanation for it.
24      Q.      Well, it's certainly important that
25      physicians and patients be given accurate data on
page 606
1       the total mortality rates for Vioxx as compared to
2       other comparators in the clinical trials; true?
3       A.      I would think that's true.
4                       - - -
5               (Whereupon, Deposition Exhibit
6               Scolnick-32, "Bulletin for Vioxx: New
7               Resource: Cardiovascular Card,"
8               MRK-AAR0038843 — MRK-AAR0038848, was
9               marked for identification.)
10                      - - -
11      BY MR. BUCHANAN:
12      Q.      Sir, let me pass over to you what
13      we're marking as Exhibit 32 to your deposition.
14              MR. BUCHANAN:  Counsel, I think I may
15      have a different version of this.  Could you read
16      the Bates Numbers into the record?
17              MR. PERSCHETZ:  MRK-AAR0038843
18      through 48.
19              MR. BUCHANAN:  Thank you.
20      BY MR. BUCHANAN:
21      Q.      Doctor, what I've just passed over
22      and what we marked as Exhibit 32 to your deposition
23      is a document entitled "Bulletin for VIOXX, NEW
24      RESOURCE:  Cardiovascular Card."  Do you see that
25      heading?
page 607
1       A.      Yes, I do.
2       Q.      Okay.
3               You recognize this is a communication
4       out to the sales force?
5       A.      I don't know.  It says, "All Field
6       Personnel with Responsibility for VIOXX."  I don't
7       recall ever having seen this document or even one
```

**Exhibit G - Scolnick Deposition Excerpts**

• Smith MIL - Marketing

```
8       like it.
9          Q.      Do you understand field personnel to
10      be sales force?
11         A.      I would understand it to potentially
12      include sales force, but I don't know who else this
13      might include.
14         Q.      Okay.
15                 I just want to turn your attention,
16      please, to Page 847. Do you see the narrative there
17      that's describing Page 4, the CV card?
18         A.      I do.
19         Q.      Okay. If you'd look at the CV card,
20      which was the prior exhibit, you see the Page 4
21      actually matches up, doesn't it?
22         A.      It's pretty small type here.  I
23      couldn't be positive.
24         Q.      I'm having a hard time with my eyes
25      on that, too.
page 608
1                  Do you recognize these to be the same
2       pages, sir? At least with a quick visual review.
3          A.      I honestly couldn't tell you except
4       for overall mortality rates, which I can read on
5       both tables.  I can't read the table under Page 4
6       that you've given me.
7          Q.      Okay.
8                  Well, how about in the guide to the
9       sales force which we've just marked as Exhibit 32.
10      It states, "Use this page to show physicians that in
11      terms of mortality, which is most important to the
12      physician and their patients, the rate for total
13      mortality and cardiovascular mortality was low."  Do
14      you see that?
15         A.      Yes, I can read that.
16         Q.      Your understanding, sir, is that this
17      particular CV card and this training document was to
18      be used by field representatives in assuring doctors
19      that from a death perspective, Vioxx was better than
20      other NSAIDs; true?
21         A.      I don't know that — the words that
22      you've just cited don't say that that's what these
23      people were supposed to say.  It says that the rate
24      was low.  The numbers in the prior table, and I
25      can't read this, indicate that it was lower than
page 609
1       other NSAIDs.  There's no claim for statistical
2       significance of that.  I can see in the table I can
3       read, but I can't read the small table.
4          Q.      Well, sir, if the numbers weren't
5       statistically significant, would that be important?
6          A.      It would be a reasonable thing to
7       present as part of the table.
8          Q.      And if the numbers weren't
9       statistically significant, that would tell a
10      physician that there's that no way to know one way
11      or the other whether Vioxx is better or worse than
12      placebo or other NSAIDs in terms of mortality; true?
13         A.      Yes.  The words state simply that the
14      — what is stated here is, what is "most important
15      to physicians and their patients, the rate" of X and
16      Y "was low."  That's what the words say, supposed to
17      be conveying.  I'm just reading the words that you
18      gave me on the document.
19         Q.      That's fine, sir. And let's look at
20      the prior document, which is the actual
21      cardiovascular card.
22                 Do you see anything in the portion of
23      Page 4 that reflects "Overall Mortality and
24      Cardiovascular Mortality" that talks about whether
25      these results are statistically significant or not?
page 610
1          A.      I do not.
```

**Exhibit G - Scolnick Deposition Excerpts**

• Smith MIL - Marketing

```
2          Q.     And sir --
3          A.     I do not see any reference to that.
4          Q.     Would you agree, sir, that it would
5     be misleading to suggest that Vioxx had a reduced
6     frequency of death as compared to other NSAIDs if
7     the results were not statistically significant?
8          A.     I would agree with that.
9          Q.     And we can also agree that there's no
10    statement about statistical significance on this
11    chart as it relates to overall mortality; true?
12         A.     On this very chart, there's no
13    statement about statistical significance that I can
14    quickly see.
15         Q.     By this point in time, sir, the VIGOR
16    results were already in; right?
17         A.     What was the date again of this, I'm
18    sorry, this cardiovascular card?
19         Q.     Well, the cardiovascular card was
20    sent to the field representatives on April 28, 2000.
21    Do you see this document, sir, I previously gave
22    you?
23         A.     Yes.  Just -- yes.  April 28, 2000,
24    yes.
25         Q.     The VIGOR results were in already;
page 611
1     right?
2          A.     Yes.
3          Q.     In fact, there were more deaths on
4     Vioxx than on naproxen in the VIGOR trial, isn't
5     that true?
6          A.     I can't remember.
7          Q.     Sir, why don't you take a look at
8     Exhibit 19 we marked earlier today.  I'm sorry, sir,
9     wrong slide show.
10                Sir, I'm going to pass you back
11    Exhibit 22, which is the exhibit I was trying to
12    refer to.
13                Do you see a table in Exhibit 2 --
14    excuse me -- in Exhibit 22 listing the death data
15    from the VIGOR trial?
16         A.     Yes.  Yes, I do.
17         Q.     How many people died on Vioxx in the
18    VIGOR trial, sir?
19         A.     22, for an 0.5 percent rate.
20         Q.     22 people died on Vioxx in the VIGOR
21    trial?
22         A.     In -- for an 0.5 percent, yes.
23         Q.     How many people died in the naproxen
24    arm?
25         A.     15 for 0.4 percent.
page 612
1          Q.     So, seven more people died on
2     naproxen than on Vioxx in the VIGOR trial;
3     correct?
4          A.     I think you stated it backwards, but
5     you might want to think about what you said.
6          Q.     I would.  Thank you.
7                 I'll withdraw the last question.
8                 Seven more people died on Vioxx in
9     the VIGOR trial than died on naproxen; correct?
10         A.     That's what this page says, yes.
11         Q.     Okay.
12                That's, what, about 45 percent, 50
13    percent more, in terms of number of people who died
14    on Vioxx compared to naproxen?
15         A.     Given the percents, which is 0.5 and
16    0.4, it looks to me like it is about 20 percent
17    difference and, again, there's no indication of
18    statistical significance here, the same point you
19    made to me earlier.
20         Q.     Okay.
21                Well, did you see that data on the
```

• Smith MIL - Marketing

```
22    VIGOR deaths in the cardiovascular card?
23         A.      No, I did not.
24         Q.      It's not, in fact, true, when you
25    look at the listing of the VIGOR data, that people
page 613
 1    die 11 times more frequently on traditional NSAIDs
 2    as compared to Vioxx, is it?
 3                 MR. RABER:  Objection to the form.
 4                 THE WITNESS:  The data that is in one
 5    of these tables that you showed me shows 1.1 on
 6    NSAIDs and excludes naproxen and includes
 7    diclofenac, ibuprofen and nabumetone, according to
 8    the legend to the table.  And this is comparing
 9    Vioxx to naproxen.  So, this is talking about
10    NSAIDs, and this is talking about naproxen, so...
11    BY MR. BUCHANAN:
12         Q.      Well, naproxen is an NSAID, isn't it?
13         A.      Yes, but it's different kind of
14    NSAID, as you know, we felt strongly.
15         Q.      I'm sorry, sir.
16         A.      It's a different kind of NSAID.
17         Q.      I understand that.
18                 Well, where in the cardiovascular
19    card that sales representatives were supposed to use
20    to address total mortality, an important issue for
21    physicians, does the cardiovascular card address the
22    deaths in the VIGOR trial?
23         A.      I don't see that on this document
24    that you showed me.
25         Q.      Well, do you see it on another
page 614
 1    cardiovascular card?
 2         A.      I haven't seen any cardiovascular
 3    cars -- cards, to the best of my recollection, and
 4    so, I can't comment, can't answer your question,
 5    except that I haven't seen it, haven't seen such
 6    cards.
 7         Q.      We can agree that the cardiovascular
 8    card you're looking at from April 28, 2000 doesn't
 9    have any mortality data from the VIGOR trial; true?
10         A.      It certainly doesn't in the table
11    you've shown me.
12         Q.      Then it's not accurate to say as of
13    April 28, 2000 that Vioxx -- excuse me -- that
14    traditional NSAIDs, based on the company's clinical
15    trials, have an 11 times greater rate of death than
16    Vioxx?
17                 MR. PERSCHETZ:  Objection, asked and
18    answered.
19                 MR. RABER:  Objection to the form.
20                 THE WITNESS:  When we discussed the
21    table, I think I answered your question.  We've
22    agreed that the words don't say that it's lower, and
23    there's no indication of statistical significance.
24    That's the only conclusions I can draw.
25    BY MR. BUCHANAN:
page 615
 1         Q.      You were still using this card a year
 2    later, weren't you?  Merck?
 3         A.      I'm glad you clarified that.
 4         Q.      Why is that?  Why are you glad?
 5         A.      Because you did not refer to me.  I
 6    don't dispense these cards.
 7         Q.      You don't endorse it either, do you?
 8         A.      I don't dispense it.  That's all I've
 9    said.  It is not a matter of endorsing it or not.
10    It is not a card that I dispense nor prepare.
11         Q.      Well, sir, you would agree that the
12    statement of the mortality risk with the drug as of
13    April 28, 2000 reflected in the CV card is not
14    accurate?
15                 MR. PERSCHETZ:  Objection to form.
```

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

```
16              THE WITNESS:  The data that's here is
17      data garnered, presumably garnered from clinical
18      trials with the drug and is accurate.  The table
19      does not state that it is -- whether it is or isn't
20      statistically significant as we've discussed, and
21      that's the only comment I can make.  It doesn't
22      include the data that you said it doesn't include
23      from another trial.
24      BY MR. BUCHANAN:
25          Q.      So, what you're saying is the
page 616
1       information in there appears to be accurate, but
2       it's not complete?
3                   MR. RABER:  Objection to the form.
4                   MR. FERSCHETZ:  Object to the form.
5                   THE WITNESS:  It doesn't include the
6       VIGOR data.  It's complete data from the clinical
7       trials alluded to, I presume, in the table that's
8       prepared.
9       BY MR. BUCHANAN:
10          Q.      The CV card you're looking at is
11      misleading as to its portrayal of mortality risk
12      with the drug as to what the company knows in April
13      2000; correct?
14                  MR. FERSCHETZ:  Object to the form.
15                  THE WITNESS:  I think the data is
16      accurate in this table.  As we've discussed, the
17      data does not include the data from this other table
18      in the VIGOR trial.
19      BY MR. BUCHANAN:
20          Q.      That's not my question, sir.
21              The CV card you're looking at is
22      misleading as to its portrayal of the mortality risk
23      with Vioxx as compared to other NSAIDs based on what
24      the company knew in April 2000; true?
25                  MR. FERSCHETZ:  Object to the form.
page 617
1                   THE WITNESS:  I would say that
2       there's other data that was not presented, but I
3       would not say this data is misleading.  This data is
4       accurate as data in this card.  I presume it's
5       accurate from real clinical data.
6       BY MR. BUCHANAN:
7           Q.      Well, sir, the conclusion that could
8       be reasonably drawn from this chart is that Vioxx is
9       associated with a reduced risk of death as compared
10      to traditional NSAIDs; true?
11                  MR. RABER:  Object to form.
12                  THE WITNESS:  Without statistical
13      significance, I would not draw that conclusion, and
14      I can't comment on anyone else who would read the
15      table.
16      BY MR. BUCHANAN:
17          Q.      And you wouldn't go out there telling
18      physicians about data on deaths that was not
19      statistically significant; correct?
20          A.      I would have this data -- if this
21      data is accurate, I see nothing wrong in presenting
22      it and noting that it is not statistically
23      significant.
24          Q.      Well, you had an opportunity to fix
25      that, though; right?
page 618
1           A.      I, to my knowledge, never had an
2       opportunity to fix that.
3           Q.      Well, you did get that memo from
4       Wendy Dixon in May of 2000; right?
5           A.      I did.  I do not recall this table.
6       I do not recall being asked to comment on the
7       validity or veracity of this table or the
8       completeness of this table.
9           Q.      You got that memo from Wendy Dixon
```

### Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

```
10        that included several attachments including the CV
11        card; right?
12                    MR. PERSCHETZ:  Objection, asked and
13        answered.
14                    THE WITNESS:  I don't know what the
15        actual attachments were.  I don't remember them, and
16        I don't remember this table.
17        BY MR. BUCHANAN:
18            Q.       All right, sir, we'll have an
19        opportunity to speak to Wendy Dixon and ask her if
20        she sent you those attachments.
21            A.       Well —
22                    MR. PERSCHETZ:  There's no question.
23                    MR. RABER:  There's no question.
24                    THE WITNESS:  Okay.  Excuse me.
25        BY MR. BUCHANAN:
page 619
1             Q.       Do you doubt she sent them to you?
2                     MR. PERSCHETZ:  Objection, asked and
3         answered.
4                     THE WITNESS:  I don't recall seeing
5         the attachments.
6         BY MR. BUCHANAN:
7             Q.       Okay.
8                      Well, whether or not they were sent
9         to you, one thing is clear, you didn't take any
10        steps to correct any mortality data concerning
11        Vioxx; true?
12                    MR. RABER:  Objection to the form.
13                    MR. PERSCHETZ:  Object to the form of
14        the question.
15                    THE WITNESS:  To the best of my
16        recollection, I did not see those cards and,
17        therefore, have no way to comment on what I would or
18        wouldn't have done.
19        BY MR. BUCHANAN:
20            Q.       So, if Wendy Dixon says otherwise,
21        she's not telling the truth?
22                    MR. RABER:  Objection to the form.
23                    MR. PERSCHETZ:  Object to the form of
24        the question.
25                    THE WITNESS:  I can't comment on
page 620
1         that.
2         BY MR. BUCHANAN:
3             Q.       Well, what are you saying then, sir?
4             A.       I can't comment on what Wendy Dixon
5         did or didn't do or would or wouldn't say.  I've
6         told you what my recollection is.
7             Q.       Okay.
8                      THE VIDEOTAPE TECHNICIAN:  This
9         completes Videotape 2.  Off the record, 2:23 p.m.
10                          -   -   -
11                      (Whereupon, a recess was taken from
12                    2:23 p.m. until 2:25 p.m.)
13                          -   -   -
14                      (Whereupon, Deposition Exhibit
15                    Scolnick-33, "Bulletin for Vioxx Action
16                    Required: Response to New York Times
17                    Article," MRK-AAR0007240 —
18                    MRK-AAR0007248, was marked for
19                    identification.)
20                          -   -   -
21                      THE VIDEOTAPE TECHNICIAN:  This is
22        Videotape Number 3.  Back on the record, 2:25 p.m.
23        BY MR. BUCHANAN:
24            Q.       Sir, I'm going to pass you over what
25        we've just marked as Exhibit 33 to your deposition.
page 621
1         For the record, it is a document dated May 23, 2001
2         entitled "Bulletin for VIOXX:  Action Required:
3         Response to New York Times Article."  For the
```

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

```
 4       record, it is Bates stamped MRK-AAR 7240 to 48.
 5               Sir, have you ever seen this before?
 6       A.      I don't recall ever seeing this.
 7       Q.      Sir, do you remember an article being
 8   published in the New York Times critical —
 9   withdrawn.
10               Sir, do you remember an article in
11   the New York Times, May 2001, raising concerns about
12   the cardiovascular safety of Vioxx?
13       A.      I don't recall a specific article.
14   It could have occurred.  I don't recall it.
15       Q.      This particular bulletin for Vioxx
16   went out to Merck sales representatives; true?
17       A.      It says, "To:  All Field
18   Representatives with Responsibility for VIOXX."
19       Q.      Okay.
20               Your understanding, sir, is that
21   these are sent out to sales representatives to
22   assist them in responding to issues in the field
23   with regard to Merck products?
24       A.      The purpose, it says, "To provide you
25   with important background information," for this --
page 622
 1   for the "cardiovascular effects of VIOXX," yes.
 2       Q.      Now, I noticed when you were reading
 3   the purpose paragraph, sir, you stopped before
 4   "obstacle responses."  Do you see that, "obstacle
 5   responses"?
 6       A.      Yes.  "To provide important
 7   background...obstacle responses and faxable PIR," I
 8   don't know what that means, "instructions in the
 9   event you were questioned by customers about the CV
10   effects of Vioxx."
11       Q.      What's an obstacle response, sir?
12       A.      I don't know.
13       Q.      What's an obstacle?
14       A.      An obstacle is something that needs
15   to -- gets in somebody's way.
16       Q.      Cardiovascular concerns with Vioxx,
17   that's an obstacle?
18               MR. RABER:  Objection to form.
19               THE WITNESS:  I don't believe it's an
20   obstacle, no, because we didn't believe Vioxx caused
21   cardiovascular effects.
22   BY MR. BUCHANAN:
23       Q.      Do you see, sir, in Obstacle Response
24   38, we can't actually read the obstacle, you can see
25   the response there talking about the cardiovascular
page 623
 1   profile of the drug.  Do you see that?
 2       A.      Are you talking about the paragraph
 3   below -- on the bottom of the first page?
 4       Q.      Yes.
 5       A.      (Witness reviewing document.)
 6               I've seen -- yeah, I've read the
 7   paragraph now.
 8       Q.      Sir, does that reflect your
 9   understanding that, in fact, cardiovascular issues
10   were an obstacle in the selling of Vioxx?
11               MR. RABER:  Objection to form.
12               THE WITNESS:  The paragraph simply
13   states that there are press reports about incidence
14   rates in two separate studies and gives data that
15   reflects the apparent information of the two
16   different studies.  The paragraph doesn't per se say
17   anything about obstacles.
18   BY MR. BUCHANAN:
19       Q.      Well, sir, as Merck's top scientist,
20   do you take seriously the importance of Merck sales
21   representatives communicating accurate and complete
22   information to physicians?
23       A.      I believe that Merck's sales force
```

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

```
24      should communicate all information to the sales
25      force.  I had no direct responsibility for what the
page 624
1       sales force did or didn't do.
2             Q.      Sir, do you see at the bottom of the
3       first page here, it says, "If the doctor asks you
4       further for the incidence of MI" -- that's heart
5       attacks again; right?
6             A.      Yes.
7             Q.      -- "from the osteoarthritis studies
8       presented in the package insert for Vioxx tell them:
9       'In the clinical'" trials for -- "'In the clinical
10      osteoarthritis trials for Vioxx reported in our
11      package insert, the incidence of MI was less than
12      0.1% with VIOXX.'"  Do you see that?
13            A.      Yes, I do.
14            Q.      Then it continues.  "Use your CV card
15      to show the data on studies involving VIOXX and
16      various NSAIDs on overall mortality and CV mortality
17      rates."  Do you see that?
18            A.      Yes, I do.
19            Q.      And again, the NSAIDs referenced are
20      ibuprofen, diclofenac and nabumetone?
21            A.      Nabumetone.
22            Q.      Thank you.
23            A.      Yes.
24            Q.      Then it continues under this "use
25      your CV card" section, it says in quotes, "'Doctor,
page 625
1       As you can see, Cardiovascular Mortality as reported
2       in over 6,000 patients was Vioxx .1 vs. NSAIDs .8
3       vs.  Placebo 0.'"  Do you see that?
4             A.      I do.
5             Q.      By May 2001, Merck already had the
6       data from the Alzheimer's trials concerning
7       mortality; right?
8                     MR. RABER:  Objection to form.
9                     THE WITNESS:  I believe we looked at
10      documents from March 2001 with overall mortality.
11      BY MR. BUCHANAN:
12            Q.      But the CV card is still telling
13      doctors about the incidence of mortality in the
14      osteoarthritis trials; is that right?
15            A.      This statement is about
16      cardiovascular mortality, that's what's printed here
17      on this page.
18            Q.      In fact, we looked at the data from
19      mortality from the Alzheimer's trials this morning;
20      right?
21            A.      I think we looked at total mortality.
22      We didn't get a chance to break it down into the
23      various categories.
24            Q.      Oh, I see.
25                    Well, let's look at the CV card.  Do
page 626
1       you have that CV card handy, sir?
2             A.      I'm not quite sure which document you
3       are looking at.
4             Q.      That's this one.
5                     MR. PERSCHETZ:  What's the exhibit
6       number, please?
7                     THE WITNESS:  This one.
8                     (Handing over document.)
9                     MR. PERSCHETZ:  31; right?
10                    MR. BUCHANAN:  Yes.
11                    THE WITNESS:  I have it.
12                    MR. PERSCHETZ:  Is that Exhibit 31?
13      BY MR. BUCHANAN:
14            Q.      Sir, can you tell me the exhibit
15      number?
16            A.      31.
17            Q.      Okay.  Could you look at the CV card,
```

• Smith MIL - Marketing

```
18    again, Page 4, "Overall Mortality Rates."
19                  Could you tell me in this table, sir,
20    how Merck broke down the cause of death?
21         A.    I'm sorry.  Which table do you want
22    to look at?
23         Q.    I'm sorry.  It's under the heading
24    "Overall mortality."
25         A.    Oh, "Overall Mortality Rates."  Yes,
page 627
1    yes.  Good.
2         Q.    Can you tell me looking at the
3    overall mortality rate table how Merck broke down
4    the mortality rates between the different trials
5    that are being compared here?
6         A.    I do not know.
7         Q.    Well, you don't see any breakdown for
8    deaths from pneumonia under NSAIDs, do you?
9         A.    I don't see any breakdown on this
10   table, no.
11        Q.    You don't see any breakdown here for
12   death from a car accident; right?
13        A.    No.  What I do see is that this
14   number is driven by cardiovascular mortality, 0.8
15   versus 0.1 out of 1.1.
16        Q.    Right.  You don't see any effort here
17   to subgroup total mortality into each of the causes
18   of death from all of the osteoarthritis trials and
19   provide that to doctors in the CV card, do you?
20        A.    That information is not here.
21        Q.    So, when you were out there talking
22   to doctors about the mortality incidence seen in
23   Vioxx trials, you weren't breaking down mortality
24   into a bunch of subcategories, were you?
25                  MR. PERSCHETZ:  Object to the, "you."
page 628
1    Object to the form of the question.
2    BY MR. BUCHANAN:
3         Q.    Merck.  Merck wasn't doing that when
4    they were breaking down cardiovascular mortality,
5    sir?
6         A.    There's no information about breaking
7    down cardiovascular mortality on this chart.
8         Q.    It's only when you were trying --
9    when Merck was trying to explain away the
10   Alzheimer's deaths, isn't that right?
11                  MR. PERSCHETZ:  Object to the form of
12   the question.
13                  MR. RABER:  Form.
14                  THE WITNESS:  I wasn't responsible
15   for putting this table together, so, I can't comment
16   on what was done and why this data is or isn't
17   presented.  That's all I can say.
18   BY MR. BUCHANAN:
19        Q.    And even though Ms. Dixon's memo
20   purports to have sent it to you, you don't think you
21   got it?
22                  MR. PERSCHETZ:  Object to the form,
23   and asked and answered.
24                  MR. RABER:  Objection.
25   BY MR. BUCHANAN:
page 629
1         Q.    You can answer.
2         A.    I don't recall the documents
3    associated with her memo.  I don't recall whether I
4    did see them.  I don't recall whether I didn't see
5    them.  I certainly don't recall them.
6                      -  -  -
7                  (Whereupon, Deposition Exhibit
8                  Scolnick-34, E-mails, 8-22-01,
9                  MRK-AFI0136524, was marked for
10                 identification.)
11                     -  -  -
```

**Exhibit G - Scolnick Deposition Excerpts**

• Smith MIL - Marketing

```
12    BY MR. BUCHANAN:
13         Q.    We're up to 34, sir.  I'm going to
14    pass you over what we just marked as 34 to your
15    deposition.  For the record, we're looking at a
16    one-page document, MRK-AFI0136524.  It is a couple
17    of e-mails dated August 22nd, 2001 and August 22,
18    2001.
19               Sir, I note you're not copied on
20    these e-mails.  Do you see your name anywhere on
21    them?
22         A.    I don't see my name anywhere on them.
23         Q.    Okay.
24               Who is Susan Baumgartner?
25         A.    I don't know.
page 630
1          Q.    You note on the subject line, it
2     says, "FYI:  CV Card (1 year) Revalidation for use
3     in Promotion."  Do you see that?
4          A.    Yes.  That's the subject matter of
5     the memo.
6          Q.    Well, sir, would you expect by the
7     summer of 2001 for that CV card to have been updated
8     to take account of the Alzheimer's data?
9                MR. RABER:  Objection to form.
10               THE WITNESS:  I would think the CV
11    card would have updates of all available data.  I
12    don't know what's on it.  I can't tell what this is
13    about.
14    BY MR. BUCHANAN:
15         Q.    Okay.
16               Well, you would expect it to include
17    the data from VIGOR; right?
18               MR. RABER:  Objection to form.
19               THE WITNESS:  Yes.
20    BY MR. BUCHANAN:
21         Q.    You'd expect it to include the death
22    data from the Alzheimer's trials you took a look at
23    in the spring of 2001; right?
24         A.    Certainly the CV data, if this is a
25    CV card, yes.
page 631
1          Q.    Well, that particular CV card
2     actually included total mortality data as well;
3     right?
4          A.    I don't know what this particular
5     revalidated CV card included.  I've never seen it.
6          Q.    Do you doubt that that card is in the
7     same form as the other CV card we looked at?
8          A.    I don't doubt it.  I don't know it.
9     I've never seen it.
10         Q.    Okay.  We can at least agree that
11    mortality data is the most important data to the
12    physicians and the patients; right?
13               MR. FERSCHETZ:  Objection, asked and
14    answered.
15               THE WITNESS:  It is an important
16    piece of information.  It should be included in the
17    totality of information.
18    BY MR. BUCHANAN:
19         Q.    And that's important information that
20    should have been included in a CV card used by sales
21    representatives to respond to physician inquiries
22    concerning the safety of the drug?
23               MR. RABER:  Object to the form.  Are
24    you asking for his personal opinion?  When you say
25    that it should have been included, what do you mean
page 632
1     by that, his personal opinion?
2                MR. BUCHANAN:  Counsel, the question
3     is clear.
4                MR. RABER:  Well, it's not.
5                MR. BUCHANAN:  I move to strike the
```

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

```
6    colloquy.
7                 MR. RABER:  I'm asking for
8    clarification.
9                 MR. BUCHANAN:  I think the question
10   is clear.  You can object to form.
11                MR. RABER:  I object to form.  It's
12   not clear to me what you mean by that.
13                MR. BUCHANAN:  Thank you.
14                Okay.  I'll ask a new question.
15   BY MR. BUCHANAN:
16        Q.      Mortality information, total
17   mortality information is important information that
18   should have been included in the CV card that was
19   used by sales representatives to respond to
20   physician inquiries concerning the drug; true?
21                MR. RABER:  Objection to form.
22                THE WITNESS:  I think a CV card
23   should have contained all cardiovascular-related
24   information from the variety of data sources Merck
25   has, and —
page 633
1    BY MR. BUCHANAN:
2         Q.      Would —
3         A.      — if there was mortality data
4    associated with those trials, each of the trials and
5    what the data was in each of the trials.
6         Q.      Okay.
7                 Just so I'm clear in that last
8    answer, sir, are you stating that when the company
9    issued its CV cards, it should have included all of
10   the mortality data the company had at the point in
11   time it was releasing those CV cards.
12                MR. RABER:  Objection to the form.
13                MR. PERSCHETZ:  Objection to the
14   form.
15                THE WITNESS:  I think that would have
16   been something that could have been done.  I don't
17   know the content of this card or what was or wasn't
18   on this card.
19   BY MR. BUCHANAN:
20        Q.      My question, sir, was whether the CV
21   card should have included all the mortality data the
22   company had in its possession and had analyzed at
23   the point in time when it released the CV card?
24                MR. RABER:  I'm going to have to
25   object to form and again ask for clarification.  Are
page 634
1    you asking his personal opinion?
2                 MR. BUCHANAN:  Counsel, just raise an
3    objection.  Just raise an objection.
4                 MR. RABER:  I don't understand.
5                 MR. BUCHANAN:  That's the way the
6    rules work.
7                 MR. RABER:  Well —
8                 MR. BUCHANAN:  That's the way the
9    rules work.
10                MR. RABER:  — I have an obligation
11   under the rules to state the basis of my objection
12   and I want — I want —
13                MR. BUCHANAN:  I understand.  Object
14   to form, and I've heard it.
15                I'll read back the question.
16   BY MR. BUCHANAN:
17        Q.      My question, sir, was whether the CV
18   card should have included all the mortality data the
19   company had in its possession and had analyzed at
20   the point in time when it released the CV card?
21                MR. PERSCHETZ:  Since you are asking
22   about the CV card, I just want to get it straight.
23   Do you mean to ask about total mortality or just CV
24   mortality?
25                MR. BUCHANAN:  I'm asking about total
```

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

page 635
1       mortality.
2                   MR. PERSCHETZ:  Okay.  I object.
3                   MR. RABER:  Objection to form.
4       BY MR. BUCHANAN:
5           Q.      You can answer, sir.
6           A.      I think an ideal card would have had
7       CV data, CV mortality, total mortality, for all the
8       studies available.
9                   MR. KLINE:  Objection, nonresponsive,
10      should have.
11                  THE WITNESS:  That's my -- that's my
12      --
13                  MR. PERSCHETZ:  He said an ideal
14      card.
15                  THE WITNESS:  -- ideal card.
16                  MR. PERSCHETZ:  I think he's answered
17      the question.
18                  THE WITNESS:  That's how I would have
19      done it.  You asked my personal opinion.  That's
20      what I personally think.

[636:4] - [645:3]    5/17/2005    Scolnick, Edward M. (NJ, DiPietro)

page 636
4           Q.      Okay.  Are you familiar with the
5       Dodge Ball training exercise?
6           A.      I have only read about that
7       subsequently in newspaper reports.
8           Q.      Were you aware of it when you were at
9       Merck?
10          A.      No.
11          Q.      Do you endorse it?
12                  MR. RABER:  Objection to form.
13                  THE WITNESS:  I don't know the
14      content of it, so, I can't comment on it.  I've only
15      read newspaper reports.
16      BY MR. BUCHANAN:
17          Q.      Well, in those newspaper reports, you
18      saw that physician inquiries are referred to as
19      obstacles; true?
20          A.      Some of the newspaper reports -- some
21      of the newspaper reports referred to the obstacles,
22      yes.
23          Q.      Well, sir, do you view doctor
24      questions as obstacles?
25          A.      I do not view doctor questions as
page 637
1       obstacles.
2           Q.      Do you view doctor questions as
3       something that should be dodged?
4           A.      I do not view doctor questions as
5       something that can be dodged.  I don't know what was
6       in -- I do not know what was in the memos about
7       Dodge Ball.
8           Q.      Sir, would you endorse the practice
9       of dodging doctor questions concerning the safety of
10      Vioxx?
11          A.      I would not endorse such a practice.
12          Q.      So, as I understand your testimony,
13      sir, as the senior-most scientist within Merck, you
14      had no knowledge of how the sales force was trained
15      to respond to questions concerning the safety of
16      Vioxx that may have been raised by physicians; is
17      that true?
18          A.      That is correct.  I was not involved
19      in preparing or approving material for the sales
20      force, nor did I know what they were using.
21          Q.      You undertook no steps as the
22      senior-most scientist at Merck to monitor that
23      activity?

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

```
24          A.      There were large numbers of people in
25     other parts of medical affairs and legal and
page 638
1      marketing that monitored and prepared marketing
2      material.  I was not involved in doing that.
3           Q.      Sir, are you familiar with the
4      practice of neutralizing physicians who take
5      exception to the safety of Merck products?
6                   MR. RABER:  Objection to form.
7                   THE WITNESS:  Again, I've read
8      newspaper reports that refer to that.  I have no
9      firsthand knowledge of that.
10     BY MR. BUCHANAN:
11          Q.      Do you endorse that activity, sir?
12          A.      Do I endorse what activity?
13          Q.      The activity of neutralizing the
14     views of physicians who aren't consistent with
15     Merck's views.
16          A.      No, I do not endorse that in the
17     abstract way you've put it.
18          Q.      Have you heard of Dine and Dash?
19          A.      Excuse me?
20          Q.      Have you heard of a program called
21     Dine and Dash?
22          A.      Vaguely, but I don't remember what it
23     means.
24          Q.      It is a program where sales
25     representatives would pay for meals for physicians
page 639
1      on a takeout basis at restaurants, meet then at the
2      restaurants and giving some literature in the
3      process.  Have you heard of that practice?
4                   MR. RABER:  Objection to the form.
5                   THE WITNESS:  Not in those details,
6      no.  I vaguely heard the terms, but I never knew
7      what they meant.
8      BY MR. BUCHANAN:
9           Q.      Do you think exchanging information
10     at a takeout window, sir, is a good way to convey
11     information about the safety and efficacy of Merck
12     products?
13          A.      Exchanging information over a meal is
14     a reasonable way to do it.  I don't know the details
15     of how it was done.
16          Q.      How about with a takeout bag of food?
17                  MR. RABER:  Objection to form.
18                  THE WITNESS:  If I were sitting at a
19     desk with two takeout bags of food talking to a
20     physician, perfectly reasonable way to communicate
21     information.
22     BY MR. BUCHANAN:
23          Q.      So, you're fine with Dine and Dash as
24     I've explained it?
25                  MR. PERSCHETZ:  Objection.
page 640
1                   THE WITNESS:  I didn't define --
2                   MR. RABER:  Objection to the form.
3                   THE WITNESS:  I didn't define Dine
4      and Dash the way you did.  You asked me about
5      takeout bags.  I gave you an example of where it
6      would be appropriate.  I don't know what was done in
7      Dine and Dash.
8      BY MR. BUCHANAN:
9           Q.      All right.
10                  When did you first hear of Dine and
11     Dash?
12          A.      I can't remember.
13          Q.      While you were at Merck?
14          A.      Yes.  I think I heard the term when I
15     was at Merck.
16          Q.      Have you ever heard of physician
17     preceptorships?
```

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

```
18          A.      No, I don't think I've ever heard
19    that term at all.
20          Q.      Have you ever heard of the practice
21    of paying a physician to spend some time with them
22    in the office?
23          A.      No, I've never heard about that.
24          Q.      Do you think that's a good idea, to
25    pay a physician, for Merck to pay a physician for
page 641
1     one of its sales representatives to spend some time
2     with a physician who may or may not prescribe Vioxx?
3                   MR. RABER:  Objection to form.
4                   THE WITNESS:  You mean -- just let me
5     understand your hypothetical.  You say paying a
6     physician just to gain access to his office to talk
7     to him?
8     BY MR. BUCHANAN:
9           Q.      Yes.
10          A.      If that was done, I don't endorse
11    that.  I don't know what was done.
12          Q.      You're familiar with the fact that
13    Vioxx was marketed by a direct-to-consumer campaign;
14    true?
15          A.      Yes.
16          Q.      One of the most expensive
17    direct-to-consumer campaigns for a pharmaceutical
18    product in history; true?
19          A.      I don't know that for a fact.
20          Q.      Well, when you were sitting on the
21    board of directors, did you ever discuss how much
22    money Merck was spending on the direct-to-consumer
23    campaign for Vioxx?
24          A.      I don't recall that discussion.
25          Q.      You got financial information when
page 642
1     you were a board member; right?
2           A.      Some.  I don't remember the details
3     of a marketing campaign for DTC for Vioxx.
4           Q.      You never heard that Merck spent more
5     than $100 million a year on its direct-to-consumer
6     campaign for advertisements to consumers?
7                   MR. RABER:  Objection to form.
8                   THE WITNESS:  I don't believe I've
9     ever known that number -- I ever knew the number.  I
10    don't recall the number.
11    BY MR. BUCHANAN:
12          Q.      I take it you didn't have any role in
13    connection with the decision to direct-to-consumer
14    market Vioxx to end users?
15          A.      I did not.  I did not play a role in
16    media or approaches that were used to market Vioxx.
17          Q.      Do you endorse that decision?
18                  MR. PERSCHETZ:  Which decision?  I'm
19    not sure what you are asking about.
20    BY MR. BUCHANAN:
21          Q.      To direct-to-consumer market Vioxx.
22          A.      I think that direct-to-consumer
23    marketing of Vioxx or other products is a medium.
24    I've never been generally enthusiastic about
25    direct-to-consumer marketing, so, that's about the
page 643
1     only comment I can make.
2           Q.      In those direct-to-consumer ads, did
3     you ever tell folks about the mortality data you
4     saw --
5                   MR. PERSCHETZ:  "You."
6                   MR. BUCHANAN:  Thank you.  Appreciate
7     it, Counsel.
8     BY MR. BUCHANAN:
9           Q.      In those direct-to-consumer ads, did
10    you ever see any disclosure of the mortality data
11    from the Alzheimer's trials?
```

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

12      A.      I don't recall seeing that in the few
13  ads that I saw on television.
14      Q.      You never saw Dorothy Hamill say,
15  caution, Vioxx has been found to increase the risk
16  of death in two placebo-controlled trials in a
17  statistically significant way?
18      A.      No, I never saw her say that.
19      Q.      That's not a very attractive
20  statement from a marketing perspective; right?
21      A.      It's not an attractive statement.  I
22  never saw her say that.
23      Q.      Sir, you'd agree with me that if you
24  put a statement like that in an ad, that wouldn't
25  help sales, would it?

page 644
1       A.      It probably would not.  There are
2   disclaimers in the DTC ads about safety of the drug.
3   I don't recall that one being in there.
4       Q.      In fact, you'd express -- you'd
5   expect that you would sell less of a drug like Vioxx
6   as compared to Celebrex if you disclosed that you
7   had two placebo-controlled trials that demonstrated
8   a statistically significant increased risk of death?
9               MR. PERSCHETZ:  In DTC ads?
10              MR. BUCHANAN:  Yes.
11              MR. RABER:  Objection to the form.
12              THE WITNESS:  I would expect that.
13  BY MR. BUCHANAN:
14      Q.      Merck's stock price had a nice run up
15  in the first few years after Vioxx was introduced to
16  the market; isn't that true?
17              MR. PERSCHETZ:  Object to the form of
18  the question.
19              THE WITNESS:  Merck's stock price
20  went up associated with the approval of Vioxx, yes.
21  BY MR. BUCHANAN:
22      Q.      Did you understand what I meant when
23  I said, "had a nice run-up"?
24              MR. PERSCHETZ:  It doesn't matter.  I
25  still object.

page 645
1               MR. BUCHANAN:  I'm just asking him.
2               THE WITNESS:  I understand that.
3   What I think you meant is that the price went up.

[723:1] - [723:25]      5/17/2005      Scolnick, Edward M. (NJ, DiPietro)

page 723
1                       CERTIFICATE
2
3               I, LINDA L. GOLKOW, a Notary Public
4   and Certified Shorthand Reporter of the State of New
5   Jersey, do hereby certify that prior to the
6   commencement of the examination, EDWARD M. SCOLNICK,
7   M.D., was duly sworn by me to testify to the truth,
8   the whole truth and nothing but the truth.
9               I DO FURTHER CERTIFY that the
10  foregoing is a verbatim transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth,
13  to the best of my ability.
14              I DO FURTHER CERTIFY that I am
15  neither a relative nor employee nor attorney nor
16  counsel of any of the parties to this action, and
17  that I am neither a relative nor employee of such
18  attorney or counsel, and that I am not financially
19  interested in the action.
20              _____
21              LINDA L. GOLKOW, CSR
                Notary Number:  1060147
22              Notary Expiration:  1-2-08

Exhibit G - Scolnick Deposition Excerpts

• Smith MIL - Marketing

CSR Number:  30XI176200
Dated:  May 23, 2005

23
24
25