Exhibit A - Grefer Deposition Excerpts

• Smith MIL - Omnibus

[68:] - [68:25] 7/27/2006 Grefer, Michael A. - Vol. 2

page 68

0068

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

- - - - - - - - - - - - - - -
ROBERT G. SMITH :
:
Plaintiff, :
vs. : Case No. 2:05-CV-04379
:
MERCK & CO., INC. :
:
Defendant. :
- - - - - - - - - - - - - - -

Trial Deposition - Volume II
Deposition of: MICHAEL A. GREFER, M.D.
Taken: By the Defendant
Date: Thursday, July 27, 2006
Time: Commencing at 9:14 AM
Place: Commonwealth Orthopaedic Center
200 South Hill Medical Center
525 Alexandria Pike
Southgate, Kentucky 41071
Before: Wendy Welsh, RDR, CRR
Notary Public - Commonwealth of Kentucky

[100:1] - [100:14] 7/27/2006 Grefer, Michael A. - Vol. 2

page 100

Q. -- with Mr. Wright? Now, you had never seen that before?
A. No.
Q. I mean, you typically would not see any correspondence between a drug manufacturer and the FDA?
A. Correct.
Q. That's not something you would use to make prescribing decisions?
A. I would never have seen it.
Q. As a matter of fact, you even testified earlier that, you know, the information in that letter would not have impacted your prescribing decision for Mr. Smith; do you recall that?
A. Because I didn't see it; that's right.

[101:5] - [101:8] 7/27/2006 Grefer, Michael A. - Vol. 2

page 101

Q. And to make it clear, this warning letter would have -- would have had no impact on your prescribing decision for Mr. Smith?
A. No, sir.

EXHIBIT
A

Exhibit A - Grefer Deposition Excerpts

• Smith MIL - Omnibus

[113:17] - [114:7] 7/27/2006 Grefer, Michael A. - Vol. 2

page 113

Q. And if that was truly the state of the science at that time, then any letters that -- going back and forth between Merck and the FDA or statements at one time or another by some consultant is not information you would be relying upon to make your prescribing decision?
MR. WRIGHT: Object to the form.
A. I -- I -- I never -- I never did see it, and that's -- that's the answer to the question. So I

page 114

couldn't have -- it couldn't have affected my prescribing situation.
Q. Nor is that the type of information you would generally rely upon to make your prescribing decision?
MR. WRIGHT: Object to the form.
A. I never -- I never see it.

[125:3] - [125:7] 7/27/2006 Grefer, Michael A. - Vol. 2

page 125

Q. You typically do not look to internal company documents and dialogue between the FDA and companies, to make prescribing decisions?
MR. WRIGHT: Object to the form.
A. Correct.

[136:1] - [136:25] 7/27/2006 Grefer, Michael A. - Vol. 2

page 136

C E R T I F I C A T E

COMMONWEALTH OF KENTUCKY:
SS:
COUNTY OF CAMPBELL:

I, Wendy L. Welsh, a duly qualified and commissioned notary public in and for the Commonwealth of Kentucky, do hereby certify that prior to the giving of his deposition, the within named Michael A. Grefer, M.D., was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by me in stenotypy and transcribed under my supervision; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, and have no interest whatsoever in the result of this litigation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office, at Cincinnati, Ohio, this 28th day of July 2006.

______________________________
Wendy L. Welsh, RDR-CRR, Notary Public, Commonwealth of Kentucky

My commission expires:
May 3, 2009.

**Exhibit B - Grefer Deposition Excerpts**

**• Smith MIL - Omnibus**

[1:] - [1:25] 6/29/2006 Grefer, Michael A. (Trial Deposition)

page 1

------------------------------------------------ PAGE00001 --------

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

- - - - - - - - - - - - - - -

ROBERT G. SMITH :
:
Plaintiff, :
vs. : Case No. 2:05-CV-04379
:
MERCK & CO., INC. :
: TRIAL DEPOSITION
Defendant. :

- - - - - - - - - - - - - - -

Deposition of: MICHAEL A. GREFER, M.D.
Taken: By the Plaintiff
Date: Thursday, June 29, 2006
Time: Commencing at 11:20 AM
Place: Commonwealth Orthopaedic Center
200 South Hill Medical Center
525 Alexandria Pike
Southgate, Kentucky 41071
Before: Luke T. Lavin, RDR, CRR
Notary Public - Commonwealth of Kentucky

Pages: 1 - 67.

[56:16] - [59:2] 6/29/2006 Grefer, Michael A. (Trial Deposition)

page 56

Q. Was it ever brought to your attention by the Merck representatives that the FDA had sent a warning letter to Merck in September of 2001 regarding its marketing of Vioxx?

A. No.

(Plaintiff's Exhibit 4 was marked for identification.)

Q. Let me hand you Exhibit Number 4, and I'll represent to you that Exhibit Number 4 is a copy of the warning letter that was sent to Merck in

page 57

September of 2001.

MR. SKIDMORE: I need to object to the extent that this exhibit is -- exhibit is irrelevant to any specific issue for this doctor, that he's not seen the entire context, and it lacks foundation in this case and contains hearsay, and he has no personal knowledge of this document.

MR. WRIGHT: Can I have all of those objections to the FDA document that you showed him a little while ago?

MR. SKIDMORE: Yeah. You can make any objection you want.

MR. WRIGHT: All right.

Let the record reflect that there was a slight delay.

Q. Did the Merck sales representatives advise you that in September of 2001 that the FDA stated that there are no -- quote, there are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's --

What is that next word, Doctor? Why

EXHIBIT
B

**Exhibit B - Grefer Deposition Excerpts**

• **Smith MIL - Omnibus**

don't you just read the rest of the sentence.

A. It says -- it says, "In fact... there are no adequate and well-controlled studies of

page 58

naproxen that support your assertion that naproxyn's transient inhibition of platelet aggregation is pharmocodynamically comparable to aspirin or clinically effective in decreasing the risk of MIs. Therefore, your" misrepresentation -- I'm sorry. "Therefore your representation that naproxen prolongs" beating time -- "bleeding time and inhibits platelet" incidentally -- "identically to aspirin is misleading, and it minimizes the potential" serious-- "seriousness of this finding."

I was not told that, no.

Q. If you had been told that, would it have affected your decision to prescribe Vioxx to a patient like Garry Smith who had not had a problem with using other NSAIDs other than Vioxx?

A. I'm -- I'm not so sure that would have affected it. The reason being, again, because there was -- there -- there's no definite evidence one way or another as far as that's concerned, you know. And, again, you know, and that still does not reflect the people that were -- that were aspirin indicated, also.

So basically that type of thing -- I was not told that to begin with, and I'm not so sure, having been told that, because there's really nothing

page 59

definitive there, it would have changed my prescribing situation.

[67:1] - [67:26] 6/29/2006 Grefer, Michael A. (Trial Deposition)

page 67

C E R T I F I C A T E

COMMONWEALTH OF KENTUCKY:

SS:

COUNTY OF CAMPBELL:

I, Luke T. Lavin, a duly qualified and commissioned notary public in and for the Commonwealth of Kentucky, do hereby certify that prior to the giving of his deposition, the within named Michael A. Grefer, M.D., was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by me in stenotypy and transcribed under my supervision; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, and have no interest whatsoever in the result of this litigation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office, at Cincinnati, Ohio, this 1st day of July 2006.

Luke T. Lavin, RDR-CRR, Notary Public, Commonwealth of Kentucky

My commission expires:

**Exhibit C - Plunkett Trial Excerpts**

**• Smith MIL - Omnibus**

[1156:] - [1156:25] 12/5/2005 Irvin Plunkett Trial

page 1156

1156

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX PRODUCTS * 
LIABILITY LITIGATION * MDL DOCKET NO. 1657
*
*
THIS DOCUMENT RELATES TO * HOUSTON, TEXAS
CASE NO. 05-4046: *
*
EVELYN IRVIN PLUNKETT, ET AL * DECEMBER 5, 2005
*
VERSUS *
* 8:30 A.M.
MERCK & CO., INC. *
* * * * * * * * * * * * * * * * *

VOLUME VI
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: BEASLEY ALLEN CROW METHVIN PORTIS & MILES
BY: JERE LOCKE BEASLEY, ESQ.
ANDY D. BIRCHFEILD, JR., ESQ.
LEIGH O'DELL, ESQ.
J. PAUL SIZEMORE, ESQ.
FRANK WOODSON, ESQ.
234 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103

FOR THE PLAINTIFF: ROBINSON, CALCAGNIE & ROBINSON
BY: MARK P. ROBINSON, JR., ESQ.
620 NEWPORT CENTER DRIVE
NEWPORT BEACH, CALIFORNIA 92660

[1446:9] - [1450:1] 12/5/2005 Irvin Plunkett Trial

page 1446

MR. BIRCHFIELD: YOUR HONOR, WE ALSO OFFER PLAINTIFF'S EXHIBIT 1.0006. IT'S THE WARNING LETTER THAT'S FROM THE FDA, DDMAC DIVISION, TO RAY GILMARTIN, THE CEO OF MERCK, IN SEPTEMBER OF 2001. WE HAVE AN AGREEMENT THAT WE DO NOT NEED TO OFFER A WITNESS IN ORDER TO ESTABLISH THE FOUNDATION FOR THAT DOCUMENT. WE HAVE A DISAGREEMENT AS TO ITS ADMISSIBILITY.

MR. BECK: YES, YOUR HONOR. I AGREED WITH MR. BIRCHFIELD THAT WE WOULD ABIDE BY YOUR HONOR'S RULING ON ADMISSIBILITY, ALTHOUGH I WANTED TO BE HEARD BRIEFLY ON THAT. I ALSO HAD AN AGREEMENT WITH MR. BIRCHFIELD THAT IF YOUR HONOR DETERMINED THAT IT WAS ADMISSIBLE AND RELEVANT IN THE CASE, IT COULD COME IN WITHOUT THE NECESSITY OF A WITNESS LAYING A FOUNDATION. MR. BIRCHFIELD, IN RETURN, AGREED THAT IF YOUR HONOR RECEIVES IT INTO EVIDENCE THAT HE WILL NOT HAVE ANY OBJECTION TO HAVING THE RESPONSE TO THAT FROM MERCK AND THE FDA'S REPLY TO MERCK INTRODUCED IN EVIDENCE. WE'LL FIGURE OUT

page 1447

THE NUMBERS LATER. SO, YOUR HONOR, IF I COULD TAKE JUST ONE MINUTE?

THE COURT: SURE.

**Exhibit C - Plunkett Trial Excerpts**

• **Smith MIL - Omnibus**

MR. BECK: I KNOW YOUR HONOR HAS THOUGHT ABOUT IT BEFORE AND NOW YOU HAVE HEARD A LITTLE MORE CONTEXT IN THE TRIAL. THIS IS A SEPTEMBER 2001 LETTER FROM THE FDA. IT IS FIVE OR SIX MONTHS AFTER MR. IRVIN PASSED AWAY. IT IS HEARSAY. IT'S NOT A FINAL AGENCY ACTION. WHILE IT MIGHT GO TO STATE OF MIND, IN AN APPROPRIATE CASE, TO WHAT SOMEBODY HAD NOTICE OF, IT DOESN'T GO TO STATE OF MIND IN THIS CASE BECAUSE IT CAME FIVE OR SIX MONTHS AFTER MR. IRVIN'S DEMISE. THEREFORE, THERE'S NO EXCEPTION TO THE HEARSAY RULE FOR IT. IT IS IRRELEVANT IN THIS CASE, YOUR HONOR, BECAUSE IT CAME TO US AFTER MR. IRVIN HAD ALREADY USED VIOXX AND HAD PASSED AWAY.

EQUALLY IMPORTANT, YOUR HONOR, THE SUBJECT OF THE LETTER, WHICH I KNOW THAT YOU'RE FAMILIAR WITH, DEALS WITH PROMOTIONAL ACTIVITIES BY MERCK THAT HAVE NOTHING TO DO WITH THIS CASE. DR. SCHIRMER TESTIFIED THE OTHER DAY THAT HE DID NOT RECEIVE ANY OF THESE MATERIALS THAT ARE THE SUBJECT OF THE LETTER AND THAT HE WAS NEVER DETAILED OR VISITED BY ANY MERCK REPRESENTATIVE CONCERNING VIOXX, SO THAT NONE OF THOSE PROMOTIONAL ACTIVITIES TOUCHED ON THE PRESCRIBING DOCTOR IN ANY WAY. IT IS IRRELEVANT. THEN, YOUR HONOR, ANY ARGUABLE RELEVANCE WOULD BE SO ATTENUATED THAT IT WOULD BE OUTWEIGHED BY THE PREJUDICIAL EFFECT UNDER RULE 403.

page 1448

THE COURT: OKAY.

MR. BIRCHFIELD: YOUR HONOR, LET ME ADDRESS THOSE IN ORDER. FIRST, IN REGARD TO THE HEARSAY EXCEPTION, IT IS AN EXCEPTION TO THE HEARSAY RULE UNDER 803(B). THE COURT HAS, OVER OBJECTION, ALLOWED INTO EVIDENCE SEVERAL FDA DOCUMENTS ON THAT GROUND, INCLUDING DOCUMENTS THAT MERCK HAS OFFERED TO SAY THAT VIOXX IS SAFE AND EFFECTIVE.

IN REGARDS TO THE FACT THAT IT WAS ISSUED IN SEPTEMBER OF 2001, THAT IS TRUE THAT COMES AFTER DICKY IRVIN'S DEATH, BUT THE TOPIC OF THAT WARNING LETTER TO MERCK SPANS A PERIOD OF NEARLY TWO YEARS, A YEAR AND A HALF, CERTAINLY ENCOMPASSING THE TIME LEADING UP TO DICKY IRVIN'S DEATH. IT INCLUDES NOT ONLY PROBLEMS, PROMOTIONAL ACTIVITIES THAT ARE DIRECTED SPECIFICALLY TO A DOCTOR, BUT IT INCLUDES THEIR PRESS RELEASES. IT INCLUDES THEIR ACTIVITIES TO MINIMIZE THE SERIOUS CARDIOVASCULAR EFFECTS OF VIOXX.

WHILE DR. SCHIRMER DID SAY THAT HE DID NOT RECALL ANY SPECIFIC, DETAILED ENCOUNTERS REGARDING VIOXX, HE DID TALK TO HIS PEERS ABOUT VIOXX. THAT'S THE WAY DOCTORS WORK AND GETS THAT VALUABLE INFORMATION. SO IT'S NOT AS THOUGH THERES NO NEXUS BETWEEN MERCK'S ACTIVITIES AND THE EVENTS OF THIS CASE AND IT CLEARLY IS EVIDENCE. IT SHOWS THE STATE OF MIND OF MERCK BECAUSE IT INVOLVES ACTIVITIES THAT ARE GOING ON PRIOR TO DICKY IRVIN'S DEATH WHERE THEY ARE ENGAGING IN FALSE AND MISLEADING CONDUCT, ACCORDING TO THE FDA, THAT MINIMIZES

page 1449

THE SERIOUS CARDIOVASCULAR EFFECTS OF VIOXX.

THE COURT: I DO UNDERSTAND THE ISSUE. WITH REGARD TO HEARSAY, I DON'T SEE ANY PROBLEM. IT'S AN 803(8) QUESTION, THAT IS AN EXCEPTION TO THE HEARSAY RULES. COUNSEL MAKES A POINT, HOWEVER, WITH REGARD TO THE FACT THAT IT COMES AFTER THE INCIDENT.

THE DIFFICULTY IN THIS PARTICULAR CASE TO SLICE THAT CLOSELY IS THAT A LOT OF THE DOCUMENTS THAT MAY COME AFTERWARD REALLY HAVE TO DO WITH CONDUCT THAT PRECEDED THE DOCUMENT. WE SEE THAT OFTEN IN THIS CASE WITH REGARD TO MEDICAL PERIODICALS THAT HAVE BEEN WRITTEN SUBSEQUENT TO THE INCIDENT, BUT THEY RECORD AND BASE THEIR FINDINGS ON MATTERS THAT PREDATED THE INCIDENT.

IN THIS PARTICULAR CASE, PART OF THE PLAINTIFF'S POSITION IS THAT VIOXX WAS RUSHED TO THE MARKET, THAT THERE WAS AN INTEREST IN GETTING IT OUT THERE QUICKLY AND THAT THERE WAS A LOT OF DISCUSSION AND, ACCORDING TO THEM, PRESSURE PUT ON THE FDA AND OTHERS TO GET THIS DONE. I THINK IT'S RELEVANT TO THAT ASPECT OF THE CASE, BUT I DO THINK THAT WE OUGHT TO PUT EVERYTHING IN. I THINK THE DEFENDANT OUGHT TO HAVE A RIGHT TO CONTEXTUALIZE IT AND SEE WHAT HAS GONE ON SINCE THE WARNING HAS COME OUT. I THINK IT'S PART OF THE WHOLE MATTER. I'VE LOOKED AT IT. I FEEL THAT, IN THE INTEREST OF JUSTICE, IT IS RELEVANT

**Exhibit C - Plunkett Trial Excerpts**

- **Smith MIL - Omnibus**

UNDER 401. I THINK WHEN YOU GET BOTH SIDES OF IT AND PUT IT CONTEXTUALLY, IT WILL NOT BE PREJUDICIAL UNDER 403. SO I WILL

page 1450

ALLOW IT, PROVIDED THAT THE WHOLE MATTER COMES IN.

**Exhibit D - Plunkett Trial Excerpts**

• **Smith MIL - Omnibus**

[2056:] - [2056:25] 2/16/2006 Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

page 2056
2056

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX PRODUCTS LIABILITY LITIGATION * MDL DOCKET NO. 1657
THIS DOCUMENT RELATES TO CASE NO. 05-4046: * NEW ORLEANS, LOUISIANA
EVELYN IRVIN PLUNKETT, ET AL * FEBRUARY 16, 2006
VERSUS * 8:30 A.M.
MERCK & CO., INC. *
* * * * * * * * * * * * * * * *

VOLUME IX - DAILY COPY
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: BEASLEY ALLEN CROW METHVIN PORTIS & MILES
BY: ANDY D. BIRCHFELD, JR., ESQ.
LEIGH O'DELL, ESQ.
234 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103

FOR THE PLAINTIFF: LEVIN, PAPANTONIO, THOMAS, MITCHELL, ECHSNER & PROCTOR
BY: TROY RAFFERTY, ESQ.
316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FLORIDA 32502

[2073:8] - [2089:2] 2/16/2006 Plunkett II Trial - v.09 - Reicin, A-Lowe, SchirmerA, Wheeler

page 2073
Q. AND THE FDA, THROUGH THE DDMAC DIVISION, ISSUED A WARNING LETTER TO MERCK IN REGARDS TO ITS SALES AND PROMOTIONAL ACTIVITIES REGARDING VIOXX, CORRECT?
A. IN RELATION TO A FEW SPECIFIC ACTIVITIES, THAT'S CORRECT.
Q. LET ME SHOW YOU WHAT'S MARKED AS PLAINTIFF'S EXHIBIT 1.0006. DOCTOR, YOU RECOGNIZE THAT AS THE WARNING LETTER THAT MERCK RECEIVED --
A. YES, I DO.
Q. -- FROM DDMAC REGARDING VIOXX?
MR. BIRCHFIELD: YOUR HONOR, AT THIS TIME WE OFFER PLAINTIFF'S EXHIBIT 1.006.
MR. ISMAIL: SUBJECT TO OUR PREVIOUS --
THE COURT: SUBJECT TO THE OBJECTION, I'LL ADMIT IT.
THE CLERK: WHAT WAS THAT NUMBER?
MR. BIRCHFIELD: MIKE, WOULD YOU PUT UP 1.006.
BY MR. BIRCHFIELD:
Q. ON THE FRONT PAGE THERE, DOCTOR, WE SEE THAT THIS IS A WARNING LETTER, HUGE BLACK LETTERS RIGHT THERE. RIGHT?
page 2074



Exhibit D - Plunkett Trial Excerpts

• Smith MIL - Omnibus

A. THAT'S CORRECT.
Q. AND YOU UNDERSTAND THAT, I MEAN, A WARNING LETTER FROM THE FDA, THAT'S A SERIOUS MATTER, ISN'T IT?
A. WE TAKE THEM VERY, VERY SERIOUSLY.
Q. AND THIS IS A LETTER THAT IS ADDRESSED TO RAYMOND V. GILMARTIN, CORRECT?
A. THAT IS CORRECT.
Q. AND HE'S THE PRESIDENT AND CEO OF MERCK & COMPANY, CORRECT?
A. CORRECT.
Q. AND THEN WE LOOK IN THE FIRST PARAGRAPH, STARTING THERE IN THE MIDDLE: "AS PART OF ITS ROUTINE MONITORING AND SURVEILLANCE PROGRAM" -- ARE YOU WITH ME, DOCTOR?
A. YEAH, I CAN SEE IT ON THE SCREEN. THANK YOU.
Q. "AS PART OF ITS ROUTINE MONITORING AND SURVEILLANCE PROGRAM, THE DIVISION OF DRUG MARKETING, ADVERTISING, AND COMMUNICATION" -- THAT'S DDMAC, CORRECT?
A. THAT'S CORRECT.
Q. -- "HAS REVIEWED YOUR PROMOTIONAL ACTIVITIES AND MATERIALS AND HAS CONCLUDED THAT THEY ARE FALSE, LACKING IN FAIR BALANCE OR OTHERWISE MISLEADING." CORRECT?
A. THAT'S CORRECT.
Q. "IN VIOLATION OF THE FEDERAL FOOD, DRUG & COSMETIC ACT, (THE ACT) AND APPLICABLE REGULATIONS." CORRECT?
A. CORRECT.

page 2075

Q. AND THEN THEY CONTINUE: "IN DESCRIBING YOUR ACTIVITIES THERE, YOU HAVE ENGAGED IN A PROMOTIONAL CAMPAIGN FOR VIOXX THAT MINIMIZES THE POTENTIALLY SERIOUS CARDIOVASCULAR FINDINGS THAT WERE OBSERVED IN VIGOR" -- CORRECT?
A. THAT'S WHAT IT SAYS.
Q. -- "AND THUS MISREPRESENTS THE SAFETY PROFILE FOR VIOXX." RIGHT?
A. THAT'S WHAT IT SAYS.
Q. -- "SPECIFICALLY, YOUR PROMOTIONAL CAMPAIGN DISCOUNTS THE FACT THAT, IN THE VIGOR STUDY, PATIENTS ON VIOXX WERE OBSERVED TO HAVE A FOUR- TO FIVE-FOLD INCREASE IN MYOCARDIAL INFARCTIONS" -- HEART ATTACKS, RIGHT?
A. THAT'S CORRECT.
Q. -- "COMPARED TO PATIENTS ON THE COMPARATOR NONSTEROIDAL ANTI-INFLAMMATORY DRUGS OR NSAIDS." RIGHT?
A. CORRECT.
Q. NAPROSYN, NAPROXEN?
A. UH-HUH (AFFIRMATIVE RESPONSE)
Q. THE FDA IS TELLING MERCK, THE PRESIDENT AND CEO OF MERCK, THAT YOUR CAMPAIGN, YOUR PROMOTIONAL CAMPAIGN, EXPLAINING AWAY THE VIGOR RESULTS BY USING NAPROXEN IS MISLEADING, CORRECT?
A. I THINK YOU SLIGHTLY MISCHARACTERIZED IT. THEY ARE TALKING ABOUT A FEW VERY SPECIFIC INCIDENTS WHICH ARE OUTLINED IN THE LETTER.
Q. BUT THE MESSAGE IS THAT YOUR CAMPAIGN THAT EXPLAINS AWAY

page 2076

THE VIGOR RESULTS USING NAPROXEN, THAT CAMPAIGN MINIMIZES THE POTENTIALLY SERIOUS CARDIOVASCULAR FINDINGS IN VIGOR, CORRECT?
A. AGAIN, I THINK THE WAY YOU SLIGHTLY WORDED IT WAS A SLIGHT MISCHARACTERIZATION OF WHAT THEY SAID.
Q. "ALTHOUGH THE EXACT REASON" -- LET'S CONTINUE WITH THE NEXT PARAGRAPH. "ALTHOUGH THE EXACT REASON FOR THE INCREASED RATE OF MI'S OBSERVED IN THE VIOXX TREATMENT GROUP IS UNKNOWN, YOUR PROMOTIONAL CAMPAIGN SELECTIVELY PRESENTS THE FOLLOWING HYPOTHETICAL EXPLANATION FOR THE OBSERVED INCREASE IN MI'S." CORRECT?
A. THAT'S WHAT IT SAYS, YES.
Q. "YOU ASSERT THAT VIOXX DOES NOT INCREASE THE RISK OF MI'S AND THAT THE VIGOR FINDING IS CONSISTENT WITH NAPROXEN'S ABILITY TO BLOCK PLATELET AGGREGATION LIKE ASPIRIN." CORRECT?
A. CORRECT.
Q. "THAT IS A POSSIBLE EXPLANATION, BUT YOU FAILED TO

Exhibit D - Plunkett Trial Excerpts

- Smith MIL - Omnibus

DISCLOSE THAT YOUR EXPLANATION IS HYPOTHETICAL." CORRECT?
A. THAT IS WHAT THAT SAYS.
Q. "HAS NOT BEEN DEMONSTRATED BY SUBSTANTIAL EVIDENCE," CORRECT?
A. YES.
Q. "AND THAT THERE IS ANOTHER REASONABLE EXPLANATION THAT VIOXX MAY HAVE PROTHROMBOTIC PROPERTIES." CORRECT?
A. THAT'S WHAT THAT SAYS.
Q. BUT THAT'S NOT WHAT YOU'RE TELLING THE AMERICAN PUBLIC AND DOCTORS, CORRECT?

page 2077

A. I'M NOT SURE I UNDERSTAND THE QUESTION.
Q. YOU WERE TELLING DOCTORS AND THE AMERICAN PUBLIC THAT NAPROXEN EXPLAINS THE VIGOR RESULTS, AND YOU WERE NOT GIVING THEM THE OTHER REASONABLE EXPLANATION THAT VIOXX MAY HAVE PROTHROMBOTIC PROPERTIES?
A. AGAIN, I THINK THAT'S A MISCHARACTERIZATION OF THE WAY WE WERE PRESENTING THE DATA.
Q. LET'S GO TO THE NEXT PAGE, DOCTOR, IN THE SECOND PARAGRAPH. "YOUR MINIMIZING THESE POTENTIAL RISKS AND MISREPRESENTING THE SAFETY PROFILE FOR VIOXX RAISED SIGNIFICANT PUBLIC HEALTH AND SAFETY CONCERNS." CORRECT?
A. THAT'S CORRECT.
Q. "YOUR MISREPRESENTATION OF THE SAFETY PROFILE FOR VIOXX IS PARTICULARLY TROUBLESOME BECAUSE WE HAVE PREVIOUSLY, IN AN UNTITLED LETTER, OBJECTED TO PROMOTIONAL MATERIALS FOR VIOXX THAT ALSO MISREPRESENTED VIOXX SAFETY PROFILE." CORRECT?
A. THAT'S WHAT THAT SAYS, YES.
Q. AND, DOCTOR, THE MESSAGE THAT YOU WERE SENDING TO THE WORLD, THAT THE FIVE-FOLD INCREASE IN HEART ATTACKS IS EXPLAINED BY NAPROXEN, DID PRESENT A SERIOUS PUBLIC HEALTH AND SAFETY CONCERN, RIGHT?
A. NO. I THINK THAT'S A MISCHARACTERIZATION.
Q. WELL, DOCTOR, IF DOCTORS KNOW THAT THERE IS A REASONABLE EXPLANATION FOR THE VIGOR RESULTS, THAT IS, VIOXX IS PROTHROMBOTIC, THAT WOULD HAVE MAJOR IMPLICATIONS ON HOW THEY PRESCRIBE THE DRUG, WOULDN'T THEY?

page 2078

A. I THINK OUR PLACEBO-CONTROLLED DATA AT THE TIME JUST WAS NOT CONSISTENT WITH THAT. WE PRESENTED THE RESULTS, WE SAID THERE WAS A DIFFERENCE, AND WE GAVE WHAT WE THOUGHT WAS THE BEST UNDERSTANDING OF THE TOTALITY OF THE DATA THAT WE HAD AT THAT TIME. BUT EVERYONE COULD SEE THAT THERE WAS A DIFFERENCE IN THE EVENT RATES.
Q. WELL, DOCTOR, WE'RE NOT TALKING ABOUT SELLING CARS. WE'RE TALKING ABOUT PRESCRIPTION MEDICATIONS THAT HAVE SERIOUS HEALTH CONSEQUENCES.
MR. ISMAIL: OBJECTION, ARGUMENTATIVE.
THE COURT: I'LL ALLOW IT. IT'S UNDER CROSS.
THE WITNESS: YOU ARE CORRECT, AND WE TAKE THAT RESPONSIBILITY SERIOUSLY.
BY MR. BIRCHFIELD:
Q. AND AT THE TIME THAT YOU WERE PROMOTING NAPROXEN AS EXPLAINING AWAY THE VIGOR RESULTS, THERE WAS ONLY A HYPOTHETICAL THAT THAT COULD EXPLAIN IT, CORRECT?
A. I THINK THAT YOU'RE MISCHARACTERIZING WHAT WE DID.
Q. WELL, THE FDA SAID IT'S ONLY HYPOTHETICAL, CORRECT?
A. THEY SAID -- WELL, IF YOU READ WHAT THEY SAID, BOTH ARE HYPOTHETICAL.
Q. AND YOU ONLY GAVE ONE SIDE OF THE HYPOTHETICAL, DIDN'T YOU?

page 2079

A. AGAIN, I THINK THAT'S A MISCHARACTERIZATION.
Q. AND NOW TOP SCIENTISTS SAY THAT WE NOW KNOW NAPROXEN IS NOT CARDIOPROTECTIVE, CORRECT?
A. I AGAIN THINK THAT'S NOT CORRECT. IN FACT, IF YOU LOOK AT WHAT WAS SAID AT THE FDA ADVISORY, MANY OF THEM SAID THEY THOUGHT NAPROXEN COULD BE CARDIOPROTECTIVE, AND THAT'S WHAT THE

Exhibit D - Plunkett Trial Excerpts

• Smith MIL - Omnibus

FDA LETTER SAID AS WELL.
Q. SAYING THAT NAPROXEN COULD BE CARDIOPROTECTIVE IS A LONG WAY FROM SAYING THAT NAPROXEN IS CARDIOPROTECTIVE AND EXPLAINS AWAY THE HEALTH RISKS SEEN IN VIGOR, CORRECT?
A. AND WE NEVER SAID THAT EITHER.
Q. WELL, YOU ONLY GAVE ONE SIDE OF THE EQUATION, DIDN'T YOU?
A. AGAIN, I THINK YOU'RE MISCHARACTERIZING WHAT WE DID.
Q. WE'VE SEEN THE PRESS RELEASE AND IT SAYS YOU'RE CONFIRMING CARDIOVASCULAR SAFETY.
A. YOU HAVE TO PUT THIS IN THE CONTEXT. THAT IS CORRECT, THAT IS WHAT THE TITLE SAYS. IT WAS A RESPONSE TO NEWS REPORTS THAT SAID, "DOES VIOXX INCREASE THE RATE OF HEART ATTACKS?" AND WE WERE SAYING THESE WERE THE RESULTS, BUT WE BELIEVE, IN FACT, THAT THE DIFFERENCE WAS BECAUSE NAPROXEN WAS CARDIOPROTECTIVE. I STILL BELIEVE THAT THAT'S WHAT WE SAW IN VIGOR.
Q. BUT YOU DO ACKNOWLEDGE THAT TOP SCIENTISTS ACROSS THE WORLD NOW SAY THAT NAPROXEN IS NOT CARDIOPROTECTIVE. WE KNOW THAT NOW, CORRECT?

page 2080

A. I DON'T KNOW WHO YOU ARE REFERRING TO. MANY SAY THEY DO BELIEVE IT IS CARDIOPROTECTIVE.
Q. LET'S GO TO PAGE 3 IN THE LETTER, DOCTOR. ARE YOU WITH ME?
A. YES.
Q. IN THE MIDDLE, WE HAVE MINIMIZATION OF MI RESULTS: "STATEMENTS MADE DURING THE PROMOTIONAL AUDIO CONFERENCES IDENTIFIED ABOVE MINIMIZE THE POTENTIALLY SERIOUS MI RISK THAT MAY BE ASSOCIATED WITH VIOXX THERAPY, CORRECT?
A. THAT IS WHAT THAT SAYS.
Q. AND THAT'S REFERENCING AUDIO CONFERENCES THAT WERE GIVEN BY DR. HOLT; IS THAT CORRECT?
A. THAT IS CORRECT.
Q. AND HE WAS GIVING AUDIO CONFERENCES ON BEHALF OF MERCK; IS THAT CORRECT?
A. THAT IS CORRECT.
Q. HE WAS PAID BY MERCK TO GIVE THESE AUDIO CONFERENCES TO DOCTORS?
A. I DON'T KNOW THE -- THAT'S VERY POSSIBLE. I DON'T KNOW THE DETAILS OF THE RELATIONSHIP.
Q. WELL, HE SIGNED A CONTRACT, A SPEAKER CONTRACT, WITH MERCK, CORRECT, IN JUNE OF 1999?
A. THAT'S VERY POSSIBLE. I DON'T KNOW.
Q. AND HE SAYS THAT IN THESE AUDIO CONFERENCES -- THAT'S WHERE HE'S TALKING TO DOCTORS ABOUT VIOXX, RIGHT?

page 2081

A. THAT'S MY UNDERSTANDING.
Q. AND IN THESE CONFERENCES, HE'S MINIMIZING THE POTENTIALLY SERIOUS MI RISKS THAT MAY BE ASSOCIATED WITH VIOXX THERAPY, CORRECT?
A. THAT'S WHAT THAT SAYS HERE.
Q. AND DO YOU KNOW IF MERCK INVESTIGATED TO SEE WHETHER OR NOT DR. HOLT WAS ACTUALLY DOING THAT?
A. WE TOOK THESE ALLEGATIONS VERY, VERY SERIOUS. WHAT HE HAD SAID OR WHAT WAS SAID THAT HE SAID DURING THOSE CONFERENCES WOULD HAVE BEEN AGAINST OUR POLICIES, AND WE BROKE OFF ANY RELATIONSHIP WITH HIM. WE DID NOT USE HIM AGAIN.
Q. AND DO YOU KNOW WHAT HE WAS SAYING THAT WAS MINIMIZING THE SERIOUS CARDIOVASCULAR RISKS?
A. ONLY WHAT'S SAID HERE. I WASN'T AT THE AUDIO CONFERENCES AND I'VE NEVER HEARD -- I NEVER HEARD THEM.
Q. WAS HE SAYING THAT NAPROXEN EXPLAINS AWAY THE VIGOR RESULTS?
A. AGAIN, I HAVEN'T READ THIS IN A WHILE, SO WE WOULD HAVE TO READ IT. I COULDN'T TELL YOU EXACTLY WHAT HE SAID.
Q. ALL RIGHT. WE'LL CONTINUE. "FOR EXAMPLE" -- THE SECOND SENTENCE IN THAT PARAGRAPH: "FOR EXAMPLE, IN YOUR JUNE 21, 2000, AUDIO CONFERENCE, YOU BEGIN YOUR DISCUSSION WITH THE MI

**Exhibit D - Plunkett Trial Excerpts**

• **Smith MIL - Omnibus**

RATES OBSERVED IN THE VIGOR STUDY BY STATING, WHEN YOU LOOKED AT THE MI RATE, THE RATE WAS DIFFERENT FOR THE TWO GROUPS. THE MI RATE FOR VIOXX WAS .04 PERCENT, AND IF YOU LOOKED AT THE

page 2082

NAPROSYN ARM" -- THAT'S THE SAME AS NAPROXEN, RIGHT?
A. THAT'S CORRECT.
Q. -- "IT WAS .1 PERCENT, SO THERE WAS A REDUCTION IN MI'S IN THE NAPROSYN GROUP." CORRECT?
A. THAT'S WHAT THAT SAYS, YES.
Q. AND THAT'S THE SAME STATEMENT THAT MERCK HAS MADE IN YOUR PRESS RELEASES THAT WERE ISSUED RIGHT AFTER THE TIME VIGOR WAS RELEASED, RIGHT?
A. WE DID SAY THERE WAS A REDUCTION IN THE RATE OF MI'S ON NAPROXEN COMPARED WITH VIOXX, THAT'S TRUE.
Q. SO THIS MESSAGE THAT HE'S GIVING WAS CONSISTENT WITH WHAT MERCK WAS GIVING, CORRECT?
A. I THINK THAT PARTICULAR STATEMENT, THAT PARTICULAR -- BUT I THINK SOME OF THE OTHER PARTS OF IT WERE NOT CONSISTENT, NO.
Q. "YOU PRESENT YOUR EXPLANATION" -- CONTINUING IN THAT PARAGRAPH, "YOU THEN PRESENT YOUR EXPLANATION AS TO WHY THE VIOXX TREATMENT ARM HAD AN INCREASED RATE OF MI'S COMPARED TO THE NAPROXEN TREATMENT ARM. SPECIFICALLY, YOU STATE" -- AND THEN THERE'S THE QUOTE, 'VIOXX IS A WONDERFUL, EFFECTIVE, SELECTIVE COX-2 INHIBITOR THAT INHIBITS COX-2, BUT, AT THE DOSES USED, DOES NOT INHIBIT COX-1. SO THEREFORE, WITHOUT THE COX-1 INHIBITION, YOU DON'T INHIBIT PLATELETS; YOU DON'T PROLONG BLEEDING TIME; AND, THEREFORE, IT CANNOT BE USED AS A CARDIOVASCULAR PROTECTIVE DRUG." RIGHT?
A. CORRECT.

page 2083

Q. "NAPROXEN, ON THE OTHER HAND, IS A WONDERFUL PLATELET INHIBITOR. PROLONGS BLEEDING TIME AND INHIBITS PLATELETS IDENTICALLY TO ASPIRIN." CORRECT?
A. THAT'S WHAT THAT SAYS, YES.
Q. "OBVIOUSLY, THE BINDING WITH NAPROXEN IS REVERSIBLE AND WITH ASPIRIN IT IS IRREVERSIBLE, BUT THE EFFECT ON PLATELETS AND BLEEDING TIME IS IDENTICAL IN TERMS OF ITS EFFECT AND, THEREFORE, FUNCTIONS AS A WONDERFUL DRUG FOR CARDIOVASCULAR PROPHYLAXIS." SO, BASICALLY, THE MI RATES ARE IN SYNC WITH WHAT WE KNOW ABOUT VIOXX AND WHAT WE KNOW ABOUT NAPROXEN -- NAPROSYN, CORRECT?
A. CORRECT.
Q. BUT THEN THE FDA COMMENTS ON -- WELL, FIRST OF ALL, WHEN DR. HOLT IS GIVING THESE CONFERENCES ON BEHALF OF MERCK, THESE AUDIO CONFERENCES TO DOCTORS, DOES MERCK HAVE AN EMPLOYEE THAT MONITORS THESE CONFERENCES?
A. MY UNDERSTANDING IS THAT IS THE POLICY.
Q. SO SOMEONE WOULD HAVE BEEN MONITORING THESE CONFERENCES WHEN DR. HOLT WAS MAKING THESE CLAIMS, CORRECT?
A. I BELIEVE THAT'S THE CASE.
Q. BUT MERCK DIDN'T TERMINATE HIS CONTRACT UNTIL THE FDA ISSUED THIS WARNING LETTER, CORRECT?
A. MY UNDERSTANDING IS THE EMPLOYEE PROBABLY SHOULD HAVE ALERTED SOMEONE THAT DR. HOLT HAD GONE BEYOND WHAT OUR POLICIES WERE, BUT I DON'T BELIEVE HE DID.

page 2084

Q. WELL, IN WHAT WAY WAS HE GOING BEYOND YOUR POLICIES?
A. WHEN WE HIRE SOMEONE LIKE THIS TO GIVE TALKS ON OUR BEHALF, THEY ARE TO USE SLIDES THAT ARE APPROVED BY MEDICOLEGAL TO ENSURE THEY ARE CONSISTENT WITH OUR LABEL. IT'S MY UNDERSTANDING THAT DR. HOLT DID NOT USE THOSE SLIDES. HE USED HIS OWN SLIDES.
Q. WELL, DID MEDICOLEGAL -- AND THAT'S A DEPARTMENT WITHIN MERCK, RIGHT?
A. THAT'S CORRECT.
Q. DID MEDICOLEGAL REVIEW AND APPROVE THE PRESS RELEASES THAT MERCK ISSUED?
A. OUR -- THERE ARE PEOPLE FROM BOTH THE MEDICAL SIDE AND THE

**Exhibit D - Plunkett Trial Excerpts**

• Smith MIL - Omnibus

LEGAL SIDE THAT DO REVIEW PRESS RELEASES.
Q. AND LET'S SEE WHAT THE FDA SAYS ABOUT THE STATEMENTS THAT DR. HOLT WAS MAKING. "IN FACT, THE SITUATION IS NOT CLEAR AT ALL. THERE ARE NO ADEQUATE AND WELL-CONTROLLED STUDIES OF NAPROXEN THAT SUPPORT YOUR ASSERTION." THAT'S MERCK'S ASSERTION, RIGHT?
A. I THINK THAT'S WHAT THEY ARE REFERRING TO.
Q. "THAT NAPROXEN'S TRANSIENT INHIBITION OF PLATELET AGGREGATION" -- "TRANSIENT INHIBITION OF PLATELET AGGREGATION," THAT MEANS IT JUST LASTS FOR A SHORT WHILE, RIGHT?
A. THAT'S WHAT THEY ARE SAYING HERE.
Q. YOU AGREE WITH THAT?
A. WELL, I DON'T AGREE WITH THAT FOR NAPROXEN. WE SHOWED

page 2085

THAT YESTERDAY, WHERE IBUPROFEN MIGHT BE TRANSIENT, BUT ACTUALLY NAPROXEN MAINTAINS ITS INHIBITION THROUGHOUT THE WHOLE CYCLE.
Q. NAPROXEN, THE EFFECT THAT IT HAS ON PLATELETS IS REVERSIBLE, RIGHT?
A. THAT I AGREE WITH. IT IS REVERSIBLE BUT NOT TRANSIENT.
Q. AS OPPOSED TO ASPIRIN. AND ASPIRIN HAS AN IRREVERSIBLE EFFECT, RIGHT?
A. THAT'S CORRECT.
Q. THAT MEANS THAT IT PROVIDES THAT PROTECTION OVER THE LIFE OF THE PLATELET, CORRECT?
A. THAT'S CORRECT.
Q. NOW, IT CONTINUES: "TRANSIENT INHIBITION OF PLATELET AGGREGATION IS PHARMACODYNAMICALLY COMPARABLE TO ASPIRIN OR CLINICALLY EFFECTIVE IN DECREASING THE RISKS OF MI'S. THEREFORE, YOUR REPRESENTATION THAT NAPROXEN PROLONGS BLEEDING TIME AND INHIBITS PLATELETS IDENTICALLY TO ASPIRIN IS MISLEADING." RIGHT?
A. I SEE THAT.
Q. "AND MINIMIZES THE POTENTIAL SERIOUSNESS OF THIS FINDING. AS YOU KNOW" -- AND WE GO TO THE NEXT PAGE -- "THE REASON FOR THE DIFFERENCE BETWEEN VIOXX AND NAPROXEN HAS NOT BEEN DETERMINED." IS THAT RIGHT?
A. THAT'S CORRECT.
Q. IT ALSO -- "IT IS ALSO POSSIBLE THAT VIOXX HAS

page 2086

PROTHROMBOTIC PROPERTIES." CORRECT?
A. THAT IS CORRECT.
Q. "ALSO, THE MI RATE THAT YOU REPORT FOR VIOXX IS INACCURATE. THE MI RATE FOR VIOXX IN THE VIGOR STUDY WAS 20 MI'S AMONG 4,047 PATIENTS." THAT'S .5 PERCENT, CORRECT?
A. THAT'S CORRECT.
Q. AND NOT .4 PERCENT AS YOU STATED, CORRECT?
A. THAT'S WHAT THAT SAYS.
Q. AND THAT'S BASED ON THOSE 17 MI'S VERSUS THE THREE ADDITIONAL MI'S THAT CAME IN AFTER FEBRUARY 10, RIGHT?
A. I BELIEVE THAT'S WHAT THEY ARE REFERRING TO.
Q. "YOUR MINIMIZATION OF THE SERIOUSNESS OF THE MI RATES OBSERVED IN THE VIOXX TREATMENT ARM OF THE VIGOR TRIAL IS FURTHER REINFORCED IN YOUR AUDIO CONFERENCES BY YOUR DISCUSSION OF A RETROSPECTIVE ANALYSIS OF THIS TRIAL." CORRECT?
A. I SEE THAT.
Q. AND, DOCTOR, IF YOU'LL TURN TO PAGE 6, PLEASE. GO DOWN TO THE BOTTOM WHERE IT SAYS, "PRESS RELEASE." ARE YOU THERE, DOCTOR?
A. I SEE THAT, YES.
Q. AND IT SAYS, "WE HAVE IDENTIFIED A MERCK PRESS RELEASE ENTITLED 'MERCK CONFIRMS FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF VIOXX.'" CORRECT?
A. THAT'S CORRECT.
Q. AND IT'S DATED MAY 22, 2001, RIGHT?

page 2087

A. CORRECT.
Q. THE HEADING OF THAT, OF THAT PRESS RELEASE, IS DATED MAY

Exhibit D - Plunkett Trial Excerpts

• Smith MIL - Omnibus

22, 2001. IT IS ALSO THE HEADING OF THE PRESS RELEASE THAT WAS ISSUED AUGUST 28, 2000, A YEAR BEFORE, CORRECT?
A. THAT'S CORRECT.
Q. SO MERCK -- "WE HAVE IDENTIFIED A MERCK PRESS RELEASE ENTITLED, 'MERCK CONFIRMS CARDIOVASCULAR SAFETY OF PROFILE OF VIOXX,' DATED MAY 22, 2001, THAT IS ALSO FALSE OR MISLEADING FOR SIMILAR REASONS STATED ABOVE." RIGHT?
A. THAT'S WHAT THAT SAYS, YES.
Q. "ADDITIONALLY, YOUR CLAIM IN THE PRESS RELEASE THAT VIOXX HAS A FAVORABLE CARDIOVASCULAR SAFETY PROFILE IS SIMPLY INCOMPREHENSIBLE." CORRECT?
A. THAT'S WHAT THAT SAYS.
Q. THAT'S THE FDA'S LANGUAGE, CORRECT?
A. CORRECT.
Q. ABOUT YOUR CLAIM ABOUT VIOXX HAVING A FAVORABLE CARDIOVASCULAR SAFETY PROFILE, CORRECT?
A. CORRECT. BECAUSE YOU'LL SEE THEY MISUNDERSTOOD IT AND THOUGHT WE WERE CLAIMING THAT VIOXX WAS SUPERIOR TO NSAIDS.
Q. "THE IMPLICATION THAT VIOXX'S CARDIOVASCULAR PROFILE IS SUPERIOR TO OTHER NSAIDS IS MISLEADING. IN FACT, SERIOUS CARDIOVASCULAR EVENTS WERE TWICE AS FREQUENT IN THE VIOXX TREATMENT GROUP" -- I'M SORRY, "AS IN NAPROXEN TREATMENT GROUP." CORRECT?

page 2088

A. CORRECT.
Q. "101 TO 46," RIGHT?
A. CORRECT.
Q. "IN THE VIGOR STUDY." AND, DOCTOR, WHEN THE FDA ISSUED THIS WARNING LETTER THAT DESCRIBES MERCK'S PRESS RELEASES CONFIRMING CARDIOVASCULAR SAFETY PROFILE OF VIOXX AS SIMPLY INCOMPREHENSIBLE IN SAYING THAT YOUR CLAIM THAT NAPROXEN EXPLAINS THE VIGOR RESULTS IS FALSE AND MISLEADING, DID MERCK STOP MAKING THOSE CLAIMS AT THAT TIME?
A. WELL, I THINK YOU MIXED TWO THINGS THERE. THAT'S NOT -- YOU MIXED UP TWO THINGS. THAT'S NOT EXACTLY WHAT THEY WERE SAYING ABOUT THE PRESS RELEASE. THEY WERE CONCERNED ABOUT THE TITLE IN THE PRESS RELEASE WHERE WE SAID IT CONFIRMS. THEY THOUGHT WE WERE TRYING TO SAY THAT WE WERE SUPERIOR. WHEN WE SPOKE TO THEM AND WE EXPLAINED THAT THIS WAS IN RESPONSE TO MEDIA REPORTS, THEY THEN UNDERSTOOD THE CONTEXT AND THEY DID NOT ASK US TO TAKE ANY ACTION WITH RESPECT TO THE PRESS RELEASE.
Q. WELL, DOCTOR, WHEN YOU HAVE A PRESS RELEASE, AND THE HEADING SAYS, "MERCK CONFIRMS FAVORABLE CARDIOVASCULAR SAFETY PROFILE OF VIOXX," YOU DON'T THINK THAT THAT SENDS A MESSAGE THAT "WE HAVE A CARDIOVASCULAR PROFILE THAT'S BETTER THAN OTHERS"?
A. WE CERTAINLY WERE NOT TRYING TO SEND THAT MESSAGE. IF YOU READ THE FIRST SENTENCE, IT EXPLAINED THAT IT WAS IN RESPONSE

page 2089

TO MEDIA REPORTS SAYING QUITE THE OPPOSITE, SAYING THAT VIOXX COULD INCREASE THE RATE OF HEART ATTACKS.

**Exhibit E - Plunkett Trial Excerpts**

• Smith MIL - Omnibus

[1:] - [1:25] 11/29/2005 Irvin Plunkett Trial

page 1
0001

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX PRODUCTS LIABILITY LITIGATION * MDL DOCKET NO. 1657

THIS DOCUMENT RELATES TO CASE NO. 05-4046: * HOUSTON, TEXAS

EVELYN IRVIN PLUNKETT, ET AL * NOVEMBER 29, 2005

VERSUS * 8:30 A.M.

MERCK & CO., INC. *

* * * * * * * * * * * * * * * * *

VOLUME I
JURY TRIAL BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: BEASLEY ALLEN CROW METHVIN PORTIS & MILES
BY: JERE LOCKE BEASLEY, ESQ.
ANDY D. BIRCHFELD, JR., ESQ.
J. PAUL SIZEMORE, ESQ.
234 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103

FOR THE PLAINTIFF: ROBINSON, CALCAGNIE & ROBINSON
BY: MARK P. ROBINSON, JR., ESQ.
620 NEWPORT CENTER DRIVE
NEWPORT BEACH, CALIFORNIA 92660

[12:6] - [12:7] 11/29/2005 Irvin Plunkett Trial

page 12

FROM THEM. HE SHOULD BE ABLE TO TESTIFY AS TO WHAT MERCK KNEW AND WHEN THEY KNEW IT.

EXHIBIT
E

**Exhibit F - Topol Deposition Excerpts**

• **Smith MIL - Omnibus**

[1:1] - [1:24] 11/22/2005 Topol, Eric (MDL)

page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX LITIGATION: MDL DOCKET
NO. 1657

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
- - -

Coordination Proceeding: CASE NO. JCCP
Special Title : JCCP NO. 4247
(Rule 1550(b)) :
:
This Document Applies :
To All :
VIOXX CASES

- - -

CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

- - -

November 22, 2005

- - -

Videotape deposition of ERIC J. TOPOL, M.D., held in the InterContinental Hotel, 9801 Carnegie Place, Cleveland, Ohio 44106, commencing at 9:41 a.m., on the above date, before Linda L. Golkow, a Federally-Approved Registered Diplomate Reporter and Certified Shorthand Reporter.

- - -

GOLKOW LITIGATION TECHNOLOGIES
Four Penn Center - Suite 1210
1600 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
1.877.DEPS.USA

[27:4] - [28:4] 11/22/2005 Topol, Eric (MDL)

page 27

Q. You are -- what is your current position, sir?

A. I'm Provost of the Cleveland Clinic Lerner College of Medicine, Chief Academic Officer of the Cleveland Clinic, and also the chairman of the Department of Cardiovascular Medicine of the Cleveland Clinic.

Q. Take them one at a time. Identify each one of those positions, and tell me very briefly what they entail.

A. The Provost of the medical college is providing the oversight of this college of medicine, which had its beginning just three years ago, and it's part of Case Western Reserve University.

The chief academic officer responsibility is responsible for all research and education here at this



**Exhibit F - Topol Deposition Excerpts**

**• Smith MIL - Omnibus**

academic medical center, and I've been chairman of the department of

page 28

cardiovascular medicine since 1991, and this is a large department, one of the largest departments in cardiovascular medicine in the country.

[542:9] - [542:15] 11/22/2005 Topol, Eric (MDL)

page 542

Q. You're not an expert in warnings and labeling under the Food & Drug Administration guidelines, are you, sir?

A. Well, I'm certainly familiar with them. I wouldn't call myself an expert, no.

[643:1] - [643:24] 11/22/2005 Topol, Eric (MDL)

page 643

C E R T I F I C A T E

I, LINDA L. GOLKOW, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination, ERIC J. TOPOL, M.D. was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

LINDA L. GOLKOW, CSR
Notary Number: 1060147
Notary Expiration: 1-2-08
CSR Number: 30XI176200

Exhibit G - Grefer Deposition Excerpts

• Smith MIL - Omnibus

[1:] - [1:25] 6/29/2006 Grefer, Michael A. (Discovery Deposition)

page 1

------------------------------------------------------------ PAGE00001 --------

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
- - - - - - - - - - - - - - -
ROBERT G. SMITH :
:
Plaintiff, :
vs. : Case No. 2:05-CV-04379
:
MERCK & CO., INC. :
: DISCOVERY DEPOSITION
Defendant. :
- - - - - - - - - - - - - - -
Deposition of: MICHAEL A. GREFER, M.D.
Taken: By the Defendant
Pursuant to notice & subpoena
Date: Thursday, June 29, 2006
Time: Commencing at 9:11 AM
Place: Commonwealth Orthopaedic Center
200 South Hill Medical Center
525 Alexandria Pike
Southgate, Kentucky 41071
Before: Luke T. Lavin, RDR, CRR
Notary Public - Commonwealth of Kentucky

[81:9] - [82:4] 6/29/2006 Grefer, Michael A. (Discovery Deposition)

page 81

Q. The fact that in VIGOR it originally reported a four to one or .4 percent MI rate of Vioxx compared to -- to .1 for naproxen and that, after all the events ran, it changed to .5 versus .1, would that have had any impact on your prescribing decisions back then?

A. I don't think so.

Q. And as a matter of fact, I think it has to do with three heart attacks, MIs, that came in after the cutoff date that were later reported?

A. I believe I've read that somewhere, yes, sir.

Q. And that there has been some controversy with the journal over that. You've probably read about that.

A. I have.

Q. And would you agree that that likely

page 82

would not have made any difference in your prescribing decision back in October of 2002?

MR. WRIGHT: Object to the form.

A. I really don't think it would have.

[96:1] - [96:26] 6/29/2006 Grefer, Michael A. (Discovery Deposition)

page 96

C E R T I F I C A T E

COMMONWEALTH OF KENTUCKY:
SS:
COUNTY OF CAMPBELL:

I, Luke T. Lavin, a duly qualified and commissioned notary public in and for the Commonwealth of Kentucky, do hereby certify that prior to the giving of his deposition, the within named Michael A. Grefer, M.D., was by me first duly sworn to testify the truth, the whole truth, and nothing but the



**Exhibit G - Grefer Deposition Excerpts**

- **Smith MIL - Omnibus**

truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by me in stenotypy and transcribed under my supervision; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, and have no interest whatsoever in the result of this litigation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office, at Cincinnati, Ohio, this 1st day of July 2006.

______________________________
Luke T. Lavin, RDR-CRR, Notary Public, Commonwealth of Kentucky

My commission expires: