# EXHIBIT A

9 Ex A MIL 9 Humeston Trial 10-07-05

3313

SUPERIOR COURT OF NEW JERSEY ATLANTIC COUNTY/CIVIL DIVISION DOCKET NO. ATL-L-2272-03MT

-----------------------------x

FREDERICK HUMESTON, et al.,

PLAINTIFFS,

VS. STENOGRAPHIC TRANSCRIPT OF:

MERCK & CO.,INC.,

- TRIAL -

DEFENDANT.

-----------------------------x

PLACE: ATLANTIC COUNTY CIVIL COURTHOUSE
1201 BACHARACH BOULEVARD
ATLANTIC CITY, NJ 08401

DATE: OCTOBER 7, 2005

B E F O R E:

THE HONORABLE CAROL E. HIGBEE, P.J.Cv.

TRANSCRIPT ORDERED BY:
DIANE P. SULLIVAN, ESQUIRE
DAVID R. BUCHANAN, ESQUIRE

A P P E A R A N C E S:

DAVID R. BUCHANAN, ESQUIRE
CHRISTOPHER SEEGER, ESQUIRE SEEGER, WEISS, LLC
ATTORNEYS FOR THE PLAINTIFFS

DIANE P. SULLIVAN, ESQUIRE
DECHERT, LLP
STEPHEN D. RABER, ESQUIRE WILLIAMS AND CONNOLLY, LLP CHRISTY D. JONES, ESQUIRE
BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC ATTORNEYS FOR THE DEFENDANT

* * * * * * *

REGINA A. TELL, CSR-CRR-RPR
OFFICIAL COURT REPORTER
1201 BACHARACH BOULEVARD ATLANTIC CITY, NJ 08401

3314

Colloquy

P R O C E E D I N G S

THE COURT: You can be seated.

In addition to discussing this issue of Dr. Morrison's testimony on the record yesterday

counsel met with the Court, we discussed it in chambers for a long period of time. I stayed here late last night reviewing the transcript, rereading the transcript, rereading everything else that I have been given, anything I thought might be pertinent to the issue, and this morning I was given about 85 pages of additional information from the defendants in opposition to plaintiffs' motion to strike, and I have reviewed that, and, in addition, I have reviewed the -- although quickly skimming it really -- the deposition of Dr. Gaziano.

All right. At this point, counsel, do you want to make your motion for relief and they can make their opposition?

MR. BUCHANAN: Yes, Your Honor. The arguments have been fairly well laid out orally both privately and on the record earlier yesterday. The concern, Your Honor is fundamentally whether the witness -- whether we had notice of what the witness was going to be testifying to in these arenas. You have seen the testimony and the highlights plaintiffs

have provided in that area. He was asked specifically about what studies supported his conclusions on particular issues at deposition. None of the testimony that was elicited yesterday was ever elicited in response to those questions. I'm referring specifically to his deposition on December 18th, 2003, Page 72, 73 where he was asked about the prostacyclin

hypothesis and whether it had been refuted or accepted. He stated that it has never been confirmed, and I would suggest at least with regard to VIOXX its been refuted. The witness was asked what studies refuted that hypothesis. Then he went on to highlight the clinical data on VIOXX, as we have gone through the entire development program has never shown at least any increased thrombotic risk to patients who take VIOXX, the impression clearly because the witness with respect to the viability of the so-called prostacyclin/thromboxane hypothesis turned on at least in his eyes the reflection in the clinical trial results of any increased risk of cardiovascular events.

That's certainly not what we heard yesterday. And we didn't hear in any of his prior testimony an extrapolation from animal studies in bunny hearts and people that there's no COX-2 in the endothelial lining of humans or that, therefore, VIOXX would not be

expected to have an impact on the human vasculature. We provided the specific sites to Your Honor from the prior transcripts. There's also a reference from the February 16th, 2005 transcript. We highlighted yesterday -- I'll highlight it again. Page 165 and 166 where there was the discussion about plaque ruptures, what role plaque ruptures have in the formation of a thrombus. And he basically disqualified himself as somebody knowledgeable in this area and said, again, so this is not my area of expertise, so I'm giving you

sort of what I remember from cardiovascular physiology from 10 years ago.

He then goes on later in the same page on 166 and, again, talking about the formation of clots via prostacyclin and thromboxane he said, again, outside my area of expertise. I don't think the jury is left with the impression yesterday that any of what he was talking about was beyond his area of expertise, and this is right in the same area that he was examined on only six months ago.

As Your Honor is aware, too, in our conversations yesterday about this matter you know both as side-bar and privately we were certainly left with the impression that the particular studies he was testifying to there were three animal studies that he

walked through from the '98 -- maybe it was '97 but '98, '99 time frame prior to approval. We were led to believe that the witness actually had personal knowledge about those, and that he was not testifying as an expert in this litigation that this was, in fact, information that he was familiar with prior to the time that he came into this court. Of course, we were surprised it hadn't been elicited in prior testimony. The suggestion was we hadn't asked the right questions, but --

THE COURT: Mary, can you take this back to Chris? Go ahead. I'm sorry.

MR. BUCHANAN: That's fine, Your Honor. We heard, you know, through Your Honor's voir dire, and, frankly, we were surprised to hear that the studies that he highlighted, you know, the first two or three of those were those that were shown to him subsequent to his deposition and in preparation for testimony. Um, that's expert testimony, Your Honor. There should have been an expert disclosure if they intended to use even somebody who may have fact testimony, but they wanted to extend him as an expert, we were entitled to expert disclosure as to his opinions, and, frankly, entitled to probe them of that particular witness. We're entitled to know what he is going to say and the

pertinent issues to this case, and, frankly, given his prior testimony we thought the scope of his knowledge had been neatly confined to the preapproval period and certainly not animal studies or mechanism of action items that he expressly disclaimed knowledge of in his deposition.

Your Honor, this is further complicated, I think, by the fact that Mr. Morrison is highlighted in defendant's opening statement as the face of Merck. He sat here for three weeks. He is called as the first witness. They extend the first witness beyond his scope of knowledge while on the VIOXX team to animal studies. They use him to expressly rebut an expert which was improper. They use him as an expert, period, on areas that are beyond his area of expertise, and the

prejudicial effect of it is substantial. It shouldn't have happened. We tried to raise that, and I think, Your Honor, plaintiffs, frankly, until the voir dire were under the impression that he was, in fact, exposed to these animal studies as part of his role in the project team. And I think we're all surprised to learn that that wasn't the case.

He doesn't have personal knowledge. There's a 601 problem testifying as to matters that he did not observe, wasn't a witness to, doesn't have personal

knowledge to. Then if you want to extend that to the 702 issue whether he is an expert there's been no disclosure of expert opinion in the case. There was no opportunity to explore this with him and he has done things, frankly, that are beyond what other witnesses in the case who are pharmacologists have done.

So from a surprise perspective, Your Honor, we took depositions, we probed into his areas of expertise. We thought we understood what the basis of his views on particular issues were. It is pretty clear that his views are now different. That's a surprise. It is also pretty clear that they have used him as an expert in this case, which was improper without an expert disclosure. Now the defendants have raised one other issue, and that's that, you know this is lay opinion, and this may be the proper subject of lay opinion.

Well, you know, the classic examples of lay

opinion, Your Honor, somebody observing a speeding car, well, you know, how fast do you think he was going, okay, based on things that you witnessed at the time. Extrapolating personal observations to an opinion based on personal observations. This, Your Honor, is taking information that the witness testified to he was shown three months ago in preparation for today in drawing

conclusions about it. He took animal studies even -- let's take the rabbit study because that's one I think he said he was exposed to in 2000 or 2001. What he did yesterday was he extrapolated expressly or impliedly the conclusions of that to humans. He said that that rabbit study shows an absence of COX-2 in normal endothelium, and there may be some in dysfunctional endothelium or endothelium that's got atherosclerosis. But, in fact, when you put VIOXX in the test tubes with this endothelium you don't see a result, you don't see an effect. So from that we know VIOXX doesn't affect prostacyclin in the endothelium. Then if you remember at the conclusion of the morning he got up on the board and he said, okay, so we're going to look at other organ systems where this prostacyclin metabolite in the urine must have been from, okay. He extrapolated from the rabbit study to humans to go through, and let's rule out where else it is coming from.

Remember he had the lung, he had, I think, it was the uterus or the ovaries. He had some other organ systems on the board that he was going to go to, next I

assume, after lunch, but he plainly extrapolated from an animal study that he was exposed to in 2000 or 2001 to what Merck's next steps were in this process. He is telling the story of what Merck did when he wasn't

involved in it. That's not lay opinion. It is not proper. It is expert testimony. It should have been in a disclosure, and his testimony should be stricken, Your Honor.

Thank you.

MR. RABER: Good morning, Your Honor, I don't want to repeat everything we said yesterday or everything that's in our brief, and I don't intend to do that. I want to address a couple of things that Mr. Buchanan has said, however.

On the notice question Mr. Buchanan pulled out Pages 73 and 74 from the December 18th, 2003 deposition and said that the witness was asked -- let me make sure I get this right, he was asked specifically about studies that supported the view that the prostacyclin in the endothelium doesn't come from COX-1, and I would like to look at what the transcript actually says because the right questions were clearly not asked.

On Page 73 this is the page Mr. Buchanan was referring to, the question is, Has that hypothesis ever been confirmed or refuted. It has never been confirmed, and I would suggest that at least with regards to VIOXX it's been refuted. Question, what

studies have refuted that hypothesis? Answer, all of

the data. If you combine all of the studies that have ever been done with VIOXX, and he goes on and answers the question that way. Here is what's interesting. Here's what's interesting on the next page. On Page 74. He said, So I would say the hypothesis that was put in place at least with regards to partial inhibition of prostacyclin has been refuted. Then the question is, To your knowledge has Merck designed or begun conducting a study to test that hypothesis specifically. Your Honor, that's the right question. That's the right question, but look what happens. We have an objection to form. The witness says, Maybe you can ask that question again, and the questioner gives up. Let me ask it a different way. I'm kind of jumping ahead, and he goes on and he never asks the question. He never asks the question that he started to ask there. And the witness clearly does not have an obligation in a deposition to volunteer information. He goes on and he says, Let me do it this way, and he puts in front of him an exhibit, and it is Exhibit Number 5, and he starts talking about something called the pink sheet, changes the subject and moves on.

So I don't think the description of what happened at that deposition is in accord with what's actually in the transcript.

The second thing we have is this suggestion that no pharmacologist could testify that as to what Dr. Morrison said yesterday and that they were hearing it for the first time in the trial and that they were surprised. Well, on April 1st of 2005 we deposed Dr. Alan Nies, and there's no dispute that Alan Nies is a pharmacologist. He was the head of pharmacology at the University of Colorado Medical School for several years before he came to Merck. He wrote sections of the textbook on pharmacology that medical students like Dr. Morrison studied, and Dr. Morrison, as he said yesterday, learned pharmacology from Alan Nies in his job.

Dr. Nies was asked Page 429 to 431 whether Merck ever sponsored or supported any studies that were along the lines of those suggested by FitzGerald, Oates and Patrono he says, Well, Merck did studies. There's a lab in Montreal that was equipped to do the types of measurements. He said Merck did studies in animal models in that laboratory and those were actually ongoing at this time, meaning 1998, 1999. How are those studies similar or different? He goes on to say that we were trying to directly look at the blood vessel to see whether the lining of the blood vessel, the endothelium it is called, was the source of

prostacyclin that was made by COX-2. That's -- and he

says in animals you can actually get those blood vessels and look at them directly. He is talking about the rabbit study there. What those animal studies show. Witness says, In normal animals the major source, if not the only source, of prostacyclin in the endothelium is from COX-1 that was not touched by VIOXX.

I submit, Your Honor, that is almost identical to what Dr. Morrison said when he was describing the results of the rabbit study. Granted, there was a question that said a hypothetical that said, well, if there was a plaque rupture what effect would prostacyclin -- how would prostacyclin or how would VIOXX affect that, and he said there would be no effect.

But I'll note that there was no objection to that question at the time it was made, and so we're faced with a situation where -- excuse me, we're in a prejudicial spot, Your Honor, where having no objection to that question, the jury goes home, we revisit the issue, and we have gone out on this limb and to have the limb cut off behind us would be extremely prejudicial.

I would also note that when I asked to put up

3325

Colloquy

the specific rabbit slide I said are those results summarized anywhere in Defense Exhibit 316? That is the rabbit study, and the chart that we looked at. I

said, Any objection to putting this on the Elmo? I'm sorry which document are you talking about? Exhibit 316. Then he says, Well, Your Honor, I have the same objection to the extent it is with this witness, but, you know, I'm not sure that gets resolved by putting it up on the Elmo. This study he is at least involved with. This one he isn't -- he can talk about it. Defense counsel -- or plaintiffs' counsel said he can talk about it. So we put it up on the slide. Your Honor said, Is this a VIOXX study? Yes. I'll allow it by Merck.

So, Your Honor, it would be extremely prejudicial under these circumstances to after these questions have been asked after plaintiffs' counsel has said it is okay to talk about it, after it has been ruled that we can talk about it to then let Dr. Morrison and me walk out to the end of that limb and have it sawed off behind us, and I fear that the prejudicial impact would be great to us, and that there clearly is no surprise. Dr. Morrison was asked questions about these issues, but there was no specific follow-up to say, well, tell me about the animal

studies or tell me what specific studies you're talking about. If there's any foundation question about Dr. Morrison we can clearly cure that with other witnesses, Dr. Gertz, for example, whose name is on all those memos, who can establish that that information was known to the VIOXX project team when those memos

were done in 1998 and 1999.

And, finally, to the extent there's any question, any question about Dr. Morrison's qualifications to talk about pharmacology I think he pointed out very clearly yesterday what his role is and working for a pharmaceutical company that's what you do, you do pharmacology. And I would also note that Dr. Morrison has a patent for a COX-2 inhibitor to treat prostate cancer, and that patent clearly involves and relies on the pharmacology of a COX-2 inhibitor.

So I think this notion that Dr. Morrison is not qualified or has no knowledge of pharmacology, again, is not supported by the records. And as he pointed out he did see the rabbit study contemporaneously, and with regard to the other three studies he said he did not see the data when it came out but that he had communications and conversations with the project team members at that time and knew about those results.

So for all those reasons, Your Honor, we believe that his testimony is not expert testimony. It is permissible fact testimony about what Merck did and what the information told Merck. It comes in under Rule 701 as an opinion from somebody who has personal knowledge based on either conversations or looking at the data, and the other side clearly had notice of this issue, and it would be extremely prejudicial to

instruct the jury in any manner to disregard any portion of his testimony.

MR. BUCHANAN: Your Honor, just a couple more points. Specifically, turning back to the December 18, 2003 transcript of Dr. Morrison the question that was asked was, Has the hypothesis, the prostacyclin/thromboxane hypothesis ever been confirmed or refuted? He said, It has never been confirmed, and I would suggest at least with regard to VIOXX it has been refuted. He then noted what studies have refuted that hypothesis, and he said, All of the data. If you combine all the studies that have ever been done with VIOXX which from biochemical studies we had done, okay, biochemical and then he continues to talk about clinical data. Not an animal study referenced in that answer.

Counsel is criticizing a lack of follow-up.

There's no reference to animal studies. That's what he is saying refutes it. That's what he testified to yesterday, that there's nothing in the blood -- there's no COX-2 in the endothelium. Now, look, if they want to call Dr. Nies, if they want to play his videotape deposition testimony that's all fine, okay, it really comes down to this particular witness, what his scope of knowledge is, whether he had that scope of knowledge from at the time, okay, not two months ago getting ready for today, okay, what was in his wheel house of information getting ready as an employee of Merck, not

as a corporate representative who they want to walk through the whole VIOXX story. And that's precisely what they did yesterday, and it was improper.

And I want to highlight the comment by counsel that an absence of an objection and because of that now they're on a limb getting ready to be sawed off. We were all under the impression that this was based on his experience in the project team in '98 and '99. We raised those objections early on. They were highlighted on several occasions. The Court was assured by representations implicitly that that was the case, and it wasn't the case. We learned that on voir dire at 4:00 yesterday. We didn't learn that in chambers when we spoke for an hour and a half yesterday

about it. We learned it here from the witness.

I'm sure that defense counsel was aware of that when the questions were being asked. We weren't aware of that, and Your Honor wasn't aware of that, and now they want to use that as a basis to permit improper testimony to go to the jury. That's not the right result. It is prejudicial. It absolutely is prejudicial. They're the only ones who knew the circumstances through which he had the information he did. They exploited it on the stand with an absence of knowledge on our part and Your Honor's part, and they shouldn't be entitled to benefit from it now because the questions have been asked and answered.

There's one other point, I think, Your Honor. The extrapolation that Dr. Morrison did yesterday from particular animal studies that he may have been aware of to humans, okay, and the ticking through the different organ systems as they were ruling things out as they were doing that there's no testimony he was involved in that process at Merck for these particular trials. That's information based on studies and now he is telling the story. That is expert testimony. It is summary testimony from a witness who wasn't involved in that tick list at the time. He couldn't have been. He was off the project team at that point in time, and he

was using studies that he was just shown for the first time two, three months ago. That is expert testimony, not lay opinion testimony and not fact testimony. It is expert testimony, and it needed to be disclosed. This isn't the right witness for it. It should be stricken.

MR. RABER: Two things, Your Honor. He did have personal knowledge. He told you although he was not on the VIOXX project team after the drug was approved he continued working on another COX-2 inhibitor and kept abreast of what was going on with VIOXX, and in that context learned about and reviewed the rabbit study in either 2000 or 2001.

And as to extrapolation to humans, you know, I suppose they could infer that they could cover that on cross-examination, but I did not ask him anything

about humans. I have gone back and looked at the transcript. It doesn't talk about humans. It is clear in the transcript he is talking about the rabbit study, what the rabbit study showed, the dog study, what the dog study showed. And, you know, again, I would just point out that their entire expert testimony on this issue from Dr. Lucchesi comes from a doctor who has never been licensed to treat any patient, any human being in the world ever, and all of his studies are in

dogs, so I don't understand this talk about how you can object to using data from animal studies for mechanistic purposes when their only expert relies entirely on animal data. They can use animal data, we can't. That doesn't make sense to me, Your Honor.

MR. BUCHANAN: Your Honor, just one point. I'm sorry to keep doing this, but, first of all, the issue isn't Dr. Lucchesi. He served expert reports. They were offered depositions of Dr. Lucchesi on his expert opinions, okay? They had the opportunity to discover what the bases were, whether they disagree with them or not, they had the opportunity to explore his extrapolation from animal studies to humans, okay, so let's just take that off the table.

But the one thing that does highlight it is expert testimony. That's exactly what that highlights. That testimony came in in plaintiffs' case through an expert. Here it is coming in through, quote, "a fact

witness" which isn't proper, and I want to note, Your Honor, they say he got this information through his involvement on another project team in 2000, 2001. I don't think it was until April or May of this year that we even got documents on another COX-2. There was a motion for a protective order, a motion to compel that was filed in the summer of 2004 relating to other Merck

drugs. If we had inquired as to, well, what did you learn in the other project teams in February of 2005 would we have gotten those answers? It wasn't until April of this year that any Arcoxia information was produced. I don't know if that's the other -- I do remember he testified it was, but now we're charged with not having asked questions about a subject matter that was foreclosed at the time of his deposition. That's not proper either.

MR. RABER: Your Honor, that's just not a fair characterization.

MR. BUCHANAN: It is.

MR. RABER: I have a Bates stamped document that was produced two years ago that the subject is Rabbit Aorta Prostacyclin Study dated March 16th, 1999 circulated to the VIOXX project team. This document was given to them in discovery more than a year ago, so the idea that they say they didn't have this stuff that's just not true. It is just not true. They had it. These documents have been on our exhibit list from day one. They have had this information. They just

didn't ask him the right questions about it.

MR. BUCHANAN: Your Honor, the issue is not the document. Nobody takes issue with what is in the medical literature. It is his use of the document as a

person who, frankly, shouldn't be using it as a nonexpert extrapolating from it and telling the jury what it means.

I mean, I appreciate counsel's statement that they didn't elicit a specific question to suggest that it was humans you could extrapolate to, but, come on, if the word "human" didn't appear in that testimony we all knew what we were talking about. He extrapolated to it, and he went through all the organ systems, we could rule out the endothelium. We could rule out there's COX-2 in the rabbit's endothelium, what was the next testimony? Talking about lungs were we ruling out there was COX-2 in the rabbit's lungs is the next question? They were talking about people. It is not really -- it is not really consistent with the testimony to suggest that Dr. Morrison wasn't trying to get the jury to infer that those rabbit findings directly applied to human endothelium, which is expert testimony.

THE COURT: Do you have the Lucchesi -- I couldn't find where you gave the documents to Lucchesi. Do you have that?

MR. RABER: I have some of that. I don't have -- I couldn't find in the record the listing of

the various documents, but --

Colloquy

THE COURT: I just want to know if you saw it.

MR. RABER: Yes, but I do have where he did testify a little bit about some of the studies.

THE COURT: The dog studies.

MR. RABER: Mr. Seeger said, I have a handful of these, I'm not going to ask you about all of them, I want to ask you about a couple of them. That's what the transcript says. I have got it right here.

THE COURT: I saw that.

MR. SEEGER: We're not disputing --

THE COURT: Yesterday you were saying I gave him this and gave the number, but I didn't see it in the record, but that doesn't mean it didn't happen, okay.

MR. SEEGER: It wasn't handed to me. I'm not disputing it is on the rabbit study. It was not one of the studies I was given.

MR. RABER: I would dispute that.

MR. SEEGER: I'm not going to argue about that, but it was the dog studies, and if you remember Dr. Lucchesi's testimony I handed him the stack and he said all of these, A, don't involve VIOXX and, B, don't test for thrombosis, and I had him go through the studies. Those were the ones I was given, but, again,

I'm not disputing it was on the exhibit list. Can I just say one brief statement because to the extent we have a courtroom full of people and counsel continues to refer to Dr. Lucchesi as somebody who never treated patients, he is a man who has received 38 years of continuous funding from the United States government, spent 10 years as a merit award winner, I think he earned his stripes in pharmacology and doesn't deserve to be torn down.

THE COURT: This case was filed in 2003, and we have spent -- I have spent a lot of time since then with the attorneys for defense and the attorneys for the plaintiffs. We have had monthly meetings with you. We have gone through all of the discovery, and we spent all that time up until the day of the trial because the purpose of this trial was to make sure that we had a fair trial under the New Jersey standards. And the New Jersey standards -- and it is not the same in every state. Some states allow a lot more than we do as far as surprise, but in New Jersey everything is supposed to be disclosed. You have to identify your expert witnesses. You have to identify their reports. You have to say what they're going to testify to. They're deposed on their reports. The other side has the opportunity to hire other experts to counter expert

reports. There's very specific rules that are designed

for one purpose and one purpose only, and that is so that everybody knows what everybody else is going to be able to produce at trial, and there's no question that that's basic.

In this case we have Dr. Morrison coming on as the first witness. And I have looked at the information that was provided today by counsel. Yesterday on the record counsel acknowledged that there were -- plaintiffs' counsel said there was really no expert that could address this issue. Defense counsel on the record said that they agreed that none of their nine experts mentioned this issue. This morning they have shown me where one of their experts did, in fact, refer to it, referred to an article about it. And that's in the volumes of stuff I got.

And in the millions of documents that were produced these animal studies were produced along with those other documents, and they were included on the exhibit list with hundreds of other exhibits. It has been consistently through the case Dr. Scolnick testified, plaintiffs played different people's testimony, that there was a FitzGerald hypothesis, and the plaintiffs and Dr. Lucchesi and their experts one after another have basically said that that hypothesis

came to fulfillment, and they have based their entire case on that.

The defense has taken the position, it appears to me, through everything I have seen over the

last year and a half, that it is just a hypothesis, nothing is confirmed, that it was possible but not necessarily -- it wasn't proven. It was proven -- some things prove it, some things don't prove it, and they can't prove that this hypothesis is true.

Yesterday Dr. Morrison took the stand, and it was never represented at any time that he was an expert witness, and, in fact, counsel for the defense repeatedly told me he wasn't an expert witness. He was a fact witness. He was the project manager for VIOXX up until 1999. He was to testify about what Merck knew and didn't know about the risks of VIOXX. He was going to testify about the e-mail that he wrote and what he meant by it and what he said. And, certainly, he had the right to do those things.

But what he did was go way beyond that, and, quite frankly, I felt sick yesterday afternoon, and I felt sick last night when I looked over the transcript and I talked about this with counsel, and I realized how I had gotten sucked into this because my job as a judge is to make sure that there's a fair field here.

That's all I have to do. I have to make sure that the right evidence gets in and the witnesses that are called to testify within the realm of evidence and within the realm of what's fair under the Court rules, and I feel that I was mislead repeatedly yesterday during that testimony. And because I was mislead repeatedly I allowed in things that never should have

come in, and that really makes me -- it doesn't even make me angry, it makes me sad.

A case where everybody supposedly wanted to try this case on the science, everybody wanted to get here and try this case on the facts. Nobody, you know, please, Judge, don't let in any evidence that shouldn't come in, and I have been very scrupulous in trying to keep out evidence that both sides wanted in, and I have ruled on both sides. I have kept out lots of things that the plaintiffs wanted in, lots of things that the defense wanted in that I thought weren't focused and weren't on the evidence and weren't proper under the rules for various reasons. It is not a free for all. You don't get to just throw in anything you want into the pot. You have to have given notice to the other side, and you have to have informed the Court and your adversary of what you're doing.

In the case of Summit Trust versus Baxt,

B-A-X-T, the Supreme Court states that the mandate of New Jersey court rules is that fair dealing with opposing parties is an absolute requirement even in an adversary system. There has to be fair dealing. There has to be fair representations. I have to rely on the attorneys who make representations to me that they're officers of the Court, that they're making true representations, that they're letting me know what the facts are, and that I'm making my rulings based on what

they say to me.

So what happened in this case? Mr. Morrison gets called as defense's first witness. Before he gets called defendants have allowed him to be deposed. Plaintiffs have taken his deposition. In his deposition, which I had not read in its entirety, he had said repeatedly that he was not qualified as an expert in pharmacology, that his -- that his physiology training was 10 years old -- was from back when he was in school basically was what he was saying, 10 years ago. He said that he wasn't qualified to give opinions on things like these studies, and he talked about the hypothesis, and as far as I'm concerned he was specifically asked what he knew about that hypothesis, what he knew about studies that didn't -- and, you know, when you try to argue to me, counsel, that at one

point he says all the data, well, when he took his dep he didn't know about all the data. He didn't know about all the data because he had never even seen the animal studies he testified to yesterday, and there was no way I had a hint of that until after the jury was sent home.

As a matter of fact, in the transcript yesterday as soon as he started testifying Mr. Seeger objected. Well, you know, a lot of times attorneys object for a lot of reasons, so he comes over to the bench, and I'm like what are you objecting to and he says, I expect this witness to testify on documents. I

don't expect him to come in here and try to pass himself off as a pharmacological expert. They have their expert witnesses. He should limit his testimony. Mr. Raber responds, He is here to testify as to what he thought at the time. Why he wrote what he did and what we're talking about why he wrote what he did in the nineties. The e-mail that he wrote in the nineties. He is here to testify as to what he thought at the time.

Well, that's certainly appropriate testimony, so I basically told Mr. Seeger that I wasn't going to let him use the pharmacological book because he wasn't an expert, so he couldn't lecture on pharmacology but

that he could answer questions.

And Mr. Raber goes on in the next page he needs to be able to testify as to what was in his mind when he was writing the e-mail. He has to say what he meant. He has to testify as to what he meant and what was in his mind. Okay. So now I'm assuming that his testimony is based on what he knew in the nineties and what he was thinking in those -- at that time. And that is certainly relevant testimony, and it is important testimony.

Then again later in the deposition he is asked about studies, and Mr. Seeger says he doesn't do these type of studies, he wasn't involved with that Page 29. This is the other transcript. He wasn't involved with that. And Mr. Raber says to the witness,

Do you have personal knowledge of the protocols that were done at Merck such as bleeding time, and he says, I have personal knowledge. I have reviewed all of that data as I gave talks about it at Merck.

And then Mr. Seeger says he shouldn't be allowed to give an expert opinion, and Mr. Raber says I'm not asking for an expert opinion, he is just being called as a fact witness to testify to the facts of what Merck was considering, what it knew, what it did and didn't do.

And then later he is asked a question which seems like an innocuous question, it is not objected to. You say, Without COX-1 inhibition you'll get more thrombotic event and kill the drug, what are you referring to there? And then he starts on a long answer, and as part of that answer he says -- he goes on to talk about the studies and the -- and he says there's no pharmacological reason why VIOXX would cause this. Later he talks about there's a number of things that led me to believe what I said when I wrote the e-mail. He starts criticizing what Dr. Lucchesi said. And then he goes on basically to describe the studies, animal studies and the rabbit study and in great detail with charts and diagrams and drawings to explain to the jury not only that this was only a hypothesis, but that it has been absolutely proven false what the plaintiffs have tried to prove and that everything that they had testified to in their case is untrue based on my review

of these animal studies, the dog and rabbit studies. He basically says nothing Lucchesi said is accurate, he was wrong, dead wrong, and he was wrong because there is no COX-2 in the endothelium. There is no -- or COX-2 isn't responsible for prostacyclin being produced in the endothelium, and, as a matter of fact, he says repeatedly there's no COX-2 machinery in the blood

vessels.

And that strikes at the very heart of plaintiffs' case. It is critical information which is brought which if brought out by the proper expert with proper notice might be perfectly appropriate but was certainly not appropriate with this witness, unless he was talking about what he knew at the time and what his thoughts were at the time. And, again, on Page 74 when we're nearing the end Mr. Seeger is objecting again, He is not an expert in this field, judge, using this article wouldn't be appropriate. This is proper to show what Merck did in response to the FitzGerald theory, what they considered. It explains their conduct, Mr. Raber said to me.

Mr. Seeger again later they're trying to do stuff with him that they can't do with an expert and that's what the problem is. And then we get to the objection, and I think at this point we're actually talking about the rabbit study, and he says, Mr. Seeger says, You need to have an expert. I can cross his

expert, but what am I going to do with him? And Mr. Raber says, This is something he looked at. This is what he did.

And then he was asked did Merck do any tests in animals, yes. And then he asks him, And what

questions were you trying to answer about the urine cup. We were trying to figure out -- he says, We were trying to figure out, now I find out he wasn't involved in the studies at all, didn't do them and not only didn't do them, which was really revealed during his testimony, but he didn't even see them. He had never seen them in the 1990's. He had never seen them until 2005 for most of them. And for the one study he had seen it when he was working on something other than VIOXX. He was the project manager for VIOXX, and these animal studies were never shown to him, and these animal studies were never shown to him, none of them were shown while he was the project manager.

And I understand counsel for defense has said today, Oh, he was told about them, he had conversations about them. Well, I asked the witness about that. I asked him did you ever see any documents, how were you told about the studies, did you get memos about them. I mean, I didn't ask him just did you see the raw data. I asked him did you see the data, did you see the studies, did you get anything, how did you get it. Well, I had some conversations with some people who told me they were doing some kind of animal studies,

and that's a heck of a lot different than him saying he knew what it was.

The impression he gave -- not the impression, his statements yesterday confirmed that he really had never looked at these animal studies until right before the trial. And the rabbit study was something he had never looked at until after he was sent over to do a different COX, so it has nothing to do with what the VIOXX team knew or didn't know when they were working on VIOXX.

Did Merck do animal studies to try to answer this question? Yes, and then he goes through each of the studies. And, again, Mr. Seeger objects. Your Honor, could he just establish that he had involvement in it and I allow him to testify because I believe him that he has involvement at least to the degree that if he is not doing the study, which I knew he didn't do at least I assume he is talking about it and has memos on it and has been discussing it and has the study itself and has looked at it because if this is the key study that proves that VIOXX is safe wouldn't you think the VIOXX project team wouldn't have known about it? I mean, he testified he didn't see it.

I mean, I think it was a reasonable assumption for me to assume, and I don't think it was just an assumption, I think I was told repeatedly that he was involved. And, again, when Mr. Seeger later

Colloquy

says we need some foundation, I need to know what he knows about this. Mr. Raber says, Your Honor, this witness is a co-author on the paper, he is a co-author on the FitzGerald paper, he is talking about the study Merck did to answer the questions that were raised. What more foundation do we need? And, again, that leads me to believe he is talking about what he knew as a fact witness at that time.

Repeatedly in this transcript Mr. Raber says he is not an expert, we're not calling him as an expert, he is a fact witness. And his ultimate opinion that there's no way that VIOXX can affect this blood vessel because it doesn't even have COX-2 machinery appears to be far beyond anything that any expert has said or any other witness has said, and I understand that counsel has other quotes in here and I have read them from people who -- from Nies or Nies and from Gertz, but none of them have the strong language that he has, the guy who didn't even see these studies. And then Mr. Raber says to him after he is done talking about all these studies, Okay, and when did the scientists at Merck actually have this data. Early in 1999. Well, I guess some scientists in Merck had the data in early 1999, but Dr. Morrison didn't. Dr. Morrison hadn't seen any of that data in 1999. This

question certainly suggests to the jury that he had.

It certainly suggests to the jury that the scientists at Merck working on VIOXX of which he was the project manager knew about this, and, yet, afterwards he admits to me, and, candidly, and I don't really fault Dr. Morrison, he was shown these studies and asked to testify to them. But to try to present to the jury the idea that these were known to him in 1999 or at least -- and that's what the implication is in the testimony, and that's what the implication was to me, and that's why it was allowed to go to the jury because it was supposed to be what Merck factually knew or didn't know at the time, and what it really was was expert testimony elicited after the fact by someone who was never named as an expert whose testimony was never provided.

His testimony differs very substantially from his deposition. Referring to the Supreme Court case 2001 of Gerald McKenny versus Jersey City Medical Center in this case a witness a defense counsel found out a witness was going to change her testimony and say something different than she said in deposition. The Supreme Court of our state stated as recently as 2001, A party has a continuing duty to disclose the opinions of its experts. Where an attorney knows his client or

3348
Colloquy

a material witness, which this certainly is, intends to

deviate from his deposition testimony in a crucial way, which this certainly was, the attorney has an ethical obligation to convey that fact to his adversary. New Jersey's procedures for discovery are designed to eliminate surprise at trial requiring a litigant to disclose the fact upon which a cause of action or defense is based. The search for truth is paramount. The outcome of litigation should depend on the merit -- on its merits in light of all the available facts, not on the craftiness of the parties or the guideline of their counsel. An attorney is under a duty to apprise his adversary where he obtains information upon the basis of which he knows that his witness' prior dep was incorrect or while it was correct will no longer be true, and certainly where it is going to -- and it basically talks about differing from what they were going to say before.

I have considered the case law, I have considered the transcript. I have talked to counsel for hours. I have considered the new submissions, and it is my ruling that the entire testimony of Dr. Morrison will be stricken from the record, that the jury will be advised that they cannot consider any of his opinions and we'll proceed. If you want to call

Dr. Morrison as a witness you're going to have to play his deposition. That's the only way you'll be able to present his testimony as it existed before he was shown things and reviewed studies that he had never reviewed

before this case started. The only way to be fair to try to figure out how to do this I was going to consider having you start over and call him back to the stand. That won't work. You can't do that now based on what's happened. The only way you could present Morrison's testimony is to produce his video deposition. If you want to play his deposition for the jury then they can see every single thing that was his opinion before this trial started, and that's fair. They can see what defense counsel and what plaintiffs' counsel knew he was going to say before he came to court, which is fair.

What he won't be allowed to say is a bunch of additional things that were not revealed to counsel, that are outside the scope of his testimony, so you have a choice at this point that Dr. Morrison is not going to testify in this case again except by his videotape.

So you have two choices, counselor. You either call Dr. Morrison by videotape now or you call your next witness, and I'm going to take a short break

so you can decide.

MR. RABER: May I be heard?

MS. SULLIVAN: We would like to make a record, your Honor.

THE COURT: No, you may not.

MS. SULLIVAN: Your Honor, we need to make a record.

THE COURT: No, counselor, you don't need to make a record.

MS. SULLIVAN: Yeah, we do, Your Honor.

THE COURT: You made a record for hours. Counsel, you talk before I speak not after.

MS. SULLIVAN: Your Honor, you have permitted them to testify.

THE COURT: You talk before I speak, not after.

MS. SULLIVAN: You have allowed plaintiffs' experts to talk about things over our objection beyond the scope of their expert report. Dr. DePace talked about the prostacyclin/thromboxane hypothesis --

THE COURT: Miss Sullivan, Miss Sullivan --

MS. SULLIVAN: -- over our objection, even though it is outside the scope of his expert report.

THE COURT: Miss Sullivan, sit down and be quiet.

MS. SULLIVAN: Your Honor, you talk about --

THE COURT: Miss Sullivan, sit down.

MS. SULLIVAN: -- fairness and fair hearing. What is going on here is not fair, and it is not right.

THE COURT: Miss Sullivan, sit down.

MS. SULLIVAN: You talk about Dr. Kronmal as an expert --

THE COURT: Miss Sullivan, sit down.

MS. SULLIVAN: Dr. Kronmal talked --

THE COURT: Sit down.

MS. SULLIVAN: -- about opinions way beyond the scope of his report --

THE COURT: Miss Sullivan, sit down or I will have you taken out of the courtroom.

MS. SULLIVAN: -- over objections.

THE COURT: Sit down. Miss Sullivan, I gave you an opportunity to argue. I gave you all the opportunity you wanted. I sat here and said tell me what you want to tell me about this issue. I looked at 85 pages of your submission. I listened to you yesterday for hours. You have every right to tell me anything you want and to make your record before I rule. You have no right to do it afterwards. Once I rule it is over and then you can make your record to the Appellate Division.

MR. RABER: Your Honor, I just would like to address the ethical issues that were raised.

THE COURT: We can address them in the back.

MR. RABER: I would like to do it on the record.

THE COURT: You can put it on the record later.

(Break taken.)

THE COURT: You can be seated. Counsel you want to put something on the record?

MS. SULLIVAN: Yes. In light of Your Honor's ruling to strike Dr. Morrison's testimony Merck with

like to move for reconsideration and request that the Court reconsider its ruling, given the foundation that Mr. Morrison did lay. There is no dispute that Merck did these animal studies. Dr. Morrison testified he specifically reviewed the rabbit study and he was in discussions concerning the other two as part of the VIOXX development team as it relates to the other two.

We think the Court's ruling is disproportionate in light of the fact that Dr. Morrison -- his testimony involved matters in addition to the animal studies, and to strike the entirety of his testimony, including testimony about e-mails and things unrelated to the animal studies is

disproportional, and precluding his testimony is a drastic and unfair and materially prejudice sanction, so we would ask the Court to reconsider its ruling.

If the Court is not inclined to do that, Your Honor, we would ask the Court stay its ruling so Merck can take an emergent appeal to the Appellate Division this afternoon or over the weekend so the Appellate Division can rule whether any striking or sanction is appropriate, and, if so, what the appropriate remedy would be.

We also would ask, Your Honor, that Merck be permitted to submit an offer of proof as to what Dr. Morrison's additional testimony would be beyond the animal studies he talked about. We would like to put Dr. Morrison back on the stand as a Merck scientist as

part of a project development team, so that he can in defense of the serious charges against Merck talk to the jury about some of the things Merck did and what Merck knew and what the science was at the time. And to prevent Merck from doing that, and to prevent Merck from defending itself by putting on one of the scientists involved in the VIOXX development program is material prejudice, Your Honor, so we would like at least to put on an offer of proof as to what Dr. Morrison's testimony would have been in that

regard.

And, Your Honor, if the Court is going the refuse to reconsider and also refuse the request for the stay we would like to ask for a mistrial in view of the material prejudice to Merck that an instruction to this jury striking the entirety at Dr. Morrison's testimony presents.

Thank you, Your Honor.

MR. BUCHANAN: Your Honor, it is, indeed, a drastic remedy and an appropriate remedy. Substantial prejudice here is that the testimony was allowed to go to the jury based on the explicit and implicit representations that he had knowledge that he did not. Then his subsequent testimony on expert issues extrapolating from animal studies to human studies only served to further highlight the expert nature of the testimony of which plaintiffs have no knowledge at the time prior to trial this testimony would be elicited

based on both his deposition testimony and the absence of any expert report on the topic.

The remedy is drastic. It is appropriate. There's no way to shield the jury, I think, notwithstanding the instruction, from that improper testimony. Your Honor's remedy, I think, is the appropriate one and really the best we can do at this

point. The plaintiffs believe we have been prejudiced. We hope the curative instruction will ameliorate that, but, frankly, there's no basis to soften that in any way by allowing Mr. Morrison to testify to other matters of which he was not present for or to the extent that he was present for matters that should come in through his videotaped deposition because he has been, frankly, taking the VIOXX role over the last several months, and that's the proper subject of expert testimony not fact testimony. The motion for reconsideration should be denied. And you have already afforded the defense an opportunity to play excerpts of his deposition testimony to the extent they wish to do so. That's an appropriate remedy.

THE COURT: There's no question it is a strong remedy, and there's no question that it took me a long time to reach it, and that's why we recessed yesterday, and I thought about it overnight. There's no question there's some prejudice to Merck. I think there's been more prejudice to Mr. Humeston, and that in the end there's been a lot more prejudice to the

plaintiff by the testimony than there will be to the defense if the testimony is stricken.

And I really don't think I have any other option at this point, other than to strike the

testimony. I did indicate this morning that -- and I can't pick through it, I tried to try to pick sections that I can tell the jury -- I don't even know how I would do it. I would have to read them the transcript and say, you can remember this and then read them another part and say you can't remember this. It just really wouldn't work. I considered that.

The only alternative I think I have at this point is to strike the testimony. I do -- I have indicated that you could play Dr. Morrison's testimony. I will consider -- the only other thing that I'm willing to reconsider is that, and I'm willing to consider whether there's anything that's not in his deposition that he needs to testify to, something that's not covered by his deposition that you intended to cover with him, and if that's the case I'll consider what it is and how important it is and whether it can be covered by other witnesses or, most important, if it is not covered in his deposition, and in that case I may allow him to resume the stand and tell the jury that they should consider his testimony at this point as part of the evidence, the testimony that they hear at that point. So I'll consider that.

The request for a stay is denied. We're

going to proceed. You can certainly go to the

Appellate Division at the end of the day. This is not the kind of issue the Appellate Division usually deals with, quite frankly, but you can certainly try. I'm not going to hold up the trial for it. I'm going to order that the testimony be stricken and that the jury disregard it. The motion for a mistrial is denied, and, as I said, I'm sure you're going to need an order to go to appeal. At the next break I'll file an order, and if you want to take a written appeal you can do so.

You can bring the jury in.

THE COURT: You can be seated. Ladies and gentlemen, I apologize for the delay. I know you have been here a long time. I hope you found -- I know you enjoy each other's company, Mary tells me, so at least, hopefully, you're not having a terrible time sitting in there waiting for us. There's legal issues. It is not anybody's fault. It is just things come up, and I have to spend time on them.

I made a legal determination about the testimony yesterday of Dr. Briggs Morrison should be stricken from the record. You, therefore, are not to consider any of his testimony. Any testimony that I strike from the record is not evidence. It should not be considered by you in your deliberations. This means that even though you may remember the testimony you

should not use it in your deliberations or even in your own thought process as far as analyzing what the verdict should be. You have to disregard that testimony. You shouldn't consider why. It doesn't matter. It is a legal decision. And you shouldn't -- I am trusting you'll be able to do that. It is sort of a difficult instruction to follow, obviously. We know that you can't forget something, but I believe that if you're instructed by me to not consider it as part of the evidence that you'll do that. And that's my instruction.

All right. We'll proceed, and counsel is going to call a witness at this time.

MS. SULLIVAN: Yes, Your Honor. Merck would like to call Merck scientist, Dr. Alan Nies, by video.

(Whereupon, the video was played for the jury.)

THE COURT: We don't have his picture. Is this Dr. Scolnick?

MR. RABER: No.

THE COURT: No problem. Take a minute and deal with it.

(Whereupon, the videotape is played for the jury.)

MR. RABER: Can we stop? This is the wrong

3359

Colloquy

document. It may be the top of an e-mail chain.

THE COURT: All right. Why don't we take a break and you can fix it.

(Break taken.)

THE COURT: You can be seated. You got it fixed, counselor?

MR. RABER: Yes. What it was we have an e-mail that has a message on top and not below. We fixed it, and we're going to start again with the document.

THE COURT: Okay. You can bring in the jury.

MR. RABER: And one more about scheduling, we have -- there's probably only another minute left of this and maybe 10 minutes of theirs, and we're at a point with Scolnick where we haven't quite worked out all of the things that need to go to Your Honor, so given the hour, I don't know if we want to end today with 10 -- the remaining 10 minutes here. We're prepared to have a live witness on Tuesday, Tuesday morning.

THE COURT: How long is Scolnick?

MR. RABER: He is at least an hour and 15 minutes.

MR. BUCHANAN: Probably it could take the typical 20 minutes for us to work out the objections

with Your Honor and then the 10 minutes to fix the tape, so, realistically, the jury wouldn't start hearing it until --

MR. RABER: 4:00 probably.

MR. BUCHANAN: 45 minutes from now.

THE COURT: Okay. We'll do it Monday, I guess. So who is your witness Monday?

MR. RABER: We're not sure exactly who, but we'll let them know 48 hours is what we have been operating on before Tuesday.

MR. BUCHANAN: We'll be on pins and needles until Sunday morning, Your Honor.

THE COURT: You can bring the jury in.

(The jury enters the courtroom.)

THE COURT: You can be seated.

MR. RABER: Okay. We have squared away our technical problem, and we're going to start with the document again, Your Honor.

THE COURT: Okay.

(Whereupon, the videotape is played for the jury.)

MR. RABER: Your Honor, that concludes our portion. I understand the plaintiff has some video they wish to play, as well.

MR. SEEGER: Your Honor, it is only about

four or five minutes.

(Whereupon, the videotape is played for the jury.)

THE COURT: That's it?

MR. SEEGER: That is it.

THE COURT: Okay. You can get the lights. I hate to do this, but counsel has advised me that we'll have a full day on Tuesday, and we'll start with a live witness on Tuesday hopefully.

MS. SULLIVAN: Yes, Your Honor.

THE COURT: But there's another tape that they need to edit and a couple other things we have to do, so I'm going to let you go for the day. I'll ask you to report on Tuesday at 9:30. It is a long weekend but I hope you enjoy it, and don't talk to anybody about the case. Enjoy your weekend. We'll see you 9:30 on Tuesday.

(The jury leaves the courtroom.)

MR. RABER: I would like a moment to address a couple things from this morning.

THE COURT: You can.

MR. RABER: Your Honor, as Your Honor knows, I was admitted especially to practice in this court under the pro hac vice procedures in New Jersey, and I consider it a privilege to be here.

I also want to assure Your Honor that I take my duties as an Officer of the Court very seriously, and I feel that some of the statements that were made this morning suggesting conduct on my part, I don't think there's a basis for that, Your Honor, with all due respect, and the gist of it seemed to be that there was somehow misleading statements about the witness' personal knowledge of the events about which he

testified, and, Your Honor, this morning said that Dr. Morrison was the head of the VIOXX project team and that it was, therefore, unusual that he wouldn't get documents in that capacity. He was not the head of the VIOXX project team; Alan Nies was. Dr. Morrison worked for Barry Gertz. He worked for Dr. Nies, and so I think the suggestion that someone in Dr. Morrison's position would necessarily have gotten those documents I don't think is supported, Your Honor, by the position that he had at that time.

THE COURT: I stand corrected on that point. I don't think it makes any difference in anything I ruled.

MR. RABER: I also note that when Your Honor described the basis for Dr. Morrison's lack of personal knowledge he testified yesterday that his first exposure to the results were in conversations with

other Merck scientists, Dr. Nies, Dr. Gertz and they described to me that in follow-up to Garret's paper some of the basic scientists were doing additional animal experiments to understand where the urinary PGI-M came from, and they explained, and, obviously, I was an author on the paper. We knew what the possibilities were, and they explained to me that there were scientists in the pharmacology group doing animal experiments to rule out those possibilities that we had hypothesized, and they conveyed to me at that point it looked like those were all being ruled out. And then

the next question they were working out is where in the body does the prostacyclin come from. So that was communicated to me in day-to-day business working at Merck with Dr. Gertz and Dr. Nies.

Your Honor, that's what the transcript says. I know Your Honor has an interpretation of how strong that is. I would simply state that that is a clear statement from the witness of personal knowledge based on his day-to-day work at Merck, his day-to-day communication with his supervisors, and the suggestion that there was no factual basis for me asking him questions on the grounds that he had no personal knowledge I do not think is supported by the record, and I can assure Your Honor that I'm here taking my

duties as an officer of the Court seriously. I will contend to conduct myself in that matter, and I appreciate having the opportunity to say these things.

THE COURT: Okay. I'll see you Tuesday, and if you can do the -- if you can come back with anything on Scolnick so we can get that done that would be helpful.

MR. BUCHANAN: We'll come right back, Your Honor.

(End of proceedings.)

3365

C E R T I F I C A T I O N

I, REGINA A. TELL, C.S.R., C.R.R., License Number 30X100161000, an Official Court Reporter in and for the State of New Jersey, do hereby certify the foregoing to be prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript to the best of my knowledge and ability.

9 Ex A MIL 9 Humeston Trial 10-07-05

_____________________ 10-7-05
Regina A. Tell, CSR-CRR Official
Court Reporter Atlantic County
Courthouse
Mays Landing, New Jersey

Page 49