```
                              Final Blake

Blake Direct (Multi-clip)
Blake 1112      11:12-11:13

   11:12        Q.      Okay.  Good morning, Mrs. Blake.
   11:13        A.      Good morning.  How are you?

Blake 1319      13:19-13:21

   13:19        Q.      All right.  You are currently working
   13:20 for Merck, correct?
   13:21        A.      Yes, I am.

D Blake 1322    13:22-13:24

   13:22        Q.      What is your current title?
   13:23        A.      I am senior director for Merck
   13:24 Vaccines, Public Affairs.

Blake 1605      16:5-16:8

   16: 5        Q.      Okay.  And when you were hired as a
   16: 6 full-time Merck employee, what were you hired as?
   16: 7        A.      I was hired as a public affairs
   16: 8 associate.

Blake 1614      16:14-16:15

   16:14        Q.      And that was specifically what date?
   16:15        A.      December 1993.  I think it might have

Blake 1818      18:18-19:2

   18:18        Q.      So from, say '9 -- what was your job
   18:19 title from 1997 through 2001?
   18:20        A.      It varied, but for most of that time,
   18:21 I was a manager of public affairs.
   18:22        Q.      Manager.  Okay.  And who did you work
   18:23 for?
   18:24        A.      There I worked for a number of
   18:25 people.  Primarily Jan Weiner, who was the head of
   19: Page 19
   19: 1 that group.  Sometimes I worked directly for her,
   19: 2 other times I worked for other people in between.

Blake 2214      22:14-23:2

   22:14                When is the first time you became
   22:15 involved with the drug Vioxx or its predecessor,
   22:16 while working for Merck?
   22:17        A.      I started work on Vioxx, I did some
   22:18 help when I wasn't directly responsible for it, in
   22:19 the middle of 1999.
   22:20        Q.      Okay.
   22:21        A.      Sometime in the spring, early summer
   22:22 of 1999.  And I was assigned Vioxx in the fall of
   22:23 1999.
   22:24        Q.      So in the fall of 1999, you say you
   22:25 were "assigned Vioxx".  What does that mean?
   23: Page 23
   23: 1        A.      Um-hmm.  I became the manager with
   23: 2 responsibility for Vioxx.
```

```
                                       Final Blake
D Blake 2303      23:3-23:4

   23: 3       Q.     In the United States only or --
   23: 4       A.     In the United States only.

Blake 2318      23:18-23:22

   23:18              As it related to Vioxx, what was your
   23:19 exact title?
   23:20       A.     Manager.
   23:21       Q.     Manager?
   23:22       A.     U.S.H.H. Public Affairs.

Blake 2605      26:5-26:19

   26: 5       Q.     All right. Epidemiology. Did you
   26: 6 manage epidemiologic issues related to Vioxx?
   26: 7       A.     I worked with Merck Research Labs as
   26: 8 well as others on epidemiological studies, as I --
   26: 9 in terms of drafting public affairs materials. Yes,
   26:10 I did that.
   26:11       Q.     Okay. And what people within Merck
   26:12 Research Laboratories did you deal with concerning
   26:13 those issues?
   26:14       A.     It could range based on the
   26:15 individual study. If it was an epidemiological
   26:16 study, it would gen -- I would generally speak with
   26:17 Nancy Santanello and Alise Reicin, as well as
   26:18 perhaps others in their department, but it depended
   26:19 on the situation.

Blake 2709      27:9-27:20

   27: 9       Q.     Before I get to that, describe for me
   27:10 generally what your job responsibilities were as
   27:11 manager, U.S.H.H., of public affairs for Vioxx.
   27:12       A.     Essentially in that position I had
   27:13 responsibility for interactions with the news media
   27:14 related to Vioxx and also for public affairs
   27:15 programs related to disease awareness.
   27:16       Q.     What does that mean, the last part?
   27:17       A.     The disease awareness part? We
   27:18 worked with third-party groups to implement programs
   27:19 that encouraged consumers to talk to their doctor
   27:20 about osteoarthritis, if they had it.

Blake 3302      33:2-33:6

   33: 2       Q.     When you worked for public affairs,
   33: 3 there would be various tools that you would use to
   33: 4 get the word out when you needed to concerning
   33: 5 Vioxx, correct?
   33: 6       A.     Yes.

Blake 3311      33:11-33:19

   33:11       Q.     Who was in charge of press releases
   33:12 for Vioxx?
   33:13       A.     Well, ultimately the public affairs
   33:14 department is responsible for developing and getting
   33:15 the appropriate approvals and issuing news releases
   33:16 in consultation with the various reviewers,
   33:17 including medical/legal board.
```

Final Blake
```
33:18      Q.      But who was in charge? Where did the
33:19 buck stop --
```

Blake 3325     33:25-34:7

```
33:25              THE WITNESS: In terms of where the
34: Page 34
34: 1 buck stopped, ultimately Merck Research Labs and
34: 2 legal have the final say in terms of whether or not
34: 3 a news release is issued.
34: 4 BY MR. PLACITELLA:
34: 5      Q.      Who is responsible for drafting the
34: 6 press releases and putting them in final form?
34: 7      A.      Public affairs.
```

D Blake 3418     34:18-34:24

```
34:18      Q.      Could the press releases go out
34:19 without your approval?
34:20      A.      Without my approval?
34:21      Q.      Um-hmm.
34:22      A.      Ultimately, the final sign-off of
34:23 press releases is really Merck Research Labs and
34:24 legal.
```

Blake 3514     35:14-36:4

```
35:14      Q.      What is a standby statement?
35:15      A.      Standby statements are documents that
35:16 we create if we anticipate getting questions about
35:17 something that we would need to respond to within
35:18 public affairs.
35:19      Q.      And who was it intended that the
35:20 standby statements would be used by?
35:21      A.      Standby statements are intended to be
35:22 used by public affairs people in their interactions
35:23 with the news media as well as investor relations
35:24 for their interactions with analysts.
35:25      Q.      Were they ever given to people within
36: Page 36
36: 1 Merck for responding to interviews?
36: 2      A.      With the news media?
36: 3      Q.      Correct.
36: 4      A.      Yes.
```

Blake 3621     36:21-37:21

```
36:21      Q.      What about video news releases, were
36:22 they a tool used for getting the word out?
36:23      A.      Yes, we used video news releases as
36:24 well.
36:25      Q.      And the video news releases, who was
37: Page 37
37: 1 the person primarily responsible within public
37: 2 affairs for the video news releases related to
37: 3 Vioxx?
37: 4      A.      Well, that too could vary based on
37: 5 who had responsibility for a given project. Often,
37: 6 I had responsibility, and it would always go through
37: 7 medical/legal board. They had the final say.
37: 8      Q.      In fact, you were involved with media
37: 9 training for the video news releases and interviews
37:10 at various points in time related to Vioxx, true?
```

```
                                            Final Blake
37:11      A.     Yes, I did media training.
37:12      Q.     And interviews with spokespersons for
37:13 Merck, was that a tool that was used for getting the
37:14 word out related to Vioxx?
37:15      A.     Merck people participated in
37:16 interviews about Vioxx, yes.
37:17      Q.     What about spokespersons versus --
37:18 did you have spokespersons that you hired that were
37:19 non-Merck employees to get the word out related to
37:20 Vioxx?
37:21      A.     Yes.

Blake 3808      38:8-38:23

38: 8      Q.     Okay. Did you use websites as a
38: 9 vehicle for getting the word out related to Vioxx?
38:10      A.     Within public affairs?
38:11      Q.     Um-hmm.
38:12      A.     Yes, we did.
38:13      Q.     And what websites did you use?
38:14      A.     Some -- if I'm remembering correctly,
38:15 and I apologize, it was a long time ago, we had a
38:16 disease awareness website in conjunction with the
38:17 Arthritis Foundation around the Speaking of Pain
38:18 program. And I can't remember the URL for that.
38:19 The content was also on the Arthritis Foundation's
38:20 website. It might even still be there.
38:21             And then, in addition to that, some
38:22 of the public affairs materials, I believe, were on
38:23 Vioxx.com.

Blake 4107      41:7-41:20

41: 7      Q.     Did marketing have -- did marketing
41: 8 also have to approve your press releases before they
41: 9 were sent out?
41:10      A.     They were reviewed again.
41:11      Q.     And who was that? Who approved your
41:12 press releases in marketing?
41:13      A.     That would also vary by the news
41:14 release. My primary point of contact for many
41:15 things was Carrie Bourdow on the marketing team, but
41:16 some things would also be reviewed by her bosses as
41:17 well as the vice president of the marketing team.
41:18      Q.     Did that include Wendy Dixon?
41:19      A.     Yes, Wendy was the vice president at
41:20 the time, if I remember correctly.

Blake 4123      41:23-42:17

41:23             Public affairs was really responsible
41:24 for communications concerning Vioxx to the general
41:25 public, correct?
42: Page 42
42: 1      A.     No, to the news media.
42: 2      Q.     Only to the news media?
42: 3      A.     The news media is the primary
42: 4 audience. The programs that we work on and the
42: 5 materials we create are intended for use by the news
42: 6 media. Now, we talked before about the disease
42: 7 education program. That involves working with
42: 8 consumer groups and also had a media component to it
42: 9 as well.
```

```
                                        Final Blake
42:10       Q.      Well, you call it public affairs,
42:11 correct?
42:12       A.      That is the name of our department,
42:13 yes.
42:14       Q.      Meaning that you understood that the
42:15 messages that you were issuing would ultimately --
42:16 were ultimately intended to reach the public,
42:17 correct?
```

Blake 4220      42:20-43:2

```
42:20               THE WITNESS:  Our news releases go to
42:21 the news media who then communicate to the public.
42:22 BY MR. PLACITELLA:
42:23       Q.      The purpose of your reaching the news
42:24 media wasn't so they took the press releases and
42:25 video materials home and put them on -- in a shelf,
43: Page 43
43: 1 right?
43: 2       A.      That is correct.
```

Blake 4323      43:23-44:13

```
43:23       Q.      The -- you understood that the
43:24 messages that you were delivering were ultimately
43:25 intended for the public to see, correct?
44: Page 44
44: 1       A.      Well -- I apologize, it's hard to
44: 2 answer the question that way just because, I mean,
44: 3 the materials that we create go to the news media,
44: 4 who then are responsible for the stories that they
44: 5 write, and they have other sources besides Merck.
44: 6               So it would be exceedingly rare for a
44: 7 news release just to go -- to be seen by the general
44: 8 public.  It goes to the news media, who then writes
44: 9 their stories.  So, but, yes, ultimately they go to
44:10 the public --
44:11       Q.      All right.  I'll --
44:12       A.      The story is seen by the public, but
44:13 the news release is not necessarily.
```

Blake 4414      44:14-44:16

```
44:14       Q.      But the purpose of the news tools
44:15 that we've discussed is to communicate Merck's
44:16 message to the public ultimately, true?
```

Blake 4418      44:18-45:6

```
44:18               THE WITNESS:  Yes.
44:19 BY MR. PLACITELLA:
44:20       Q.      Okay.  And, in fact, you issued your
44:21 press releases online as well, didn't you?
44:22       A.      We distribute our news releases
44:23 through various news wire services.  We change them
44:24 during the course of time.  And they also appeared
44:25 on Merck.com.
45: Page 45
45: 1       Q.      Right.
45: 2       A.      So --
45: 3       Q.      So if somebody was searching for
45: 4 Vioxx, let's say, they could very well see your
45: 5 press releases on Merck.com, correct?
```

```
                                          Final Blake
  45: 6        A.      They could, yes.

Blake 4520     45:20-45:23

  45:20        Q.      Okay. And as somebody who worked in
  45:21 the office of medical/legal, you recognized, did you
  45:22 not, that all of the tools that we've discussed were
  45:23 governed by the FDA labeling law, true?

Blake 4601     46:1-46:17

  46: 1                THE WITNESS: Yes, I'm familiar with
  46: 2 that.
  46: 3 BY MR. PLACITELLA:
  46: 4        Q.      Okay. In other words -- and labeling
  46: 5 includes not just a package insert, it includes your
  46: 6 press releases, your video news releases, anything
  46: 7 you'd give out to the public, right?
  46: 8        A.      Well, when I said labeling before, I
  46: 9 was referring specifically to the product
  46:10 information.
  46:11        Q.      You're aware that your press releases
  46:12 and other tools were governed by the FDA labeling
  46:13 law, true?
  46:14        A.      Yes, I'm aware that public affairs
  46:15 materials are governed by FDA regulations.
  46:16        Q.      Okay. And that law required that all
  46:17 of your materials be fairly balanced, correct?

Blake 4620     46:20-46:21

  46:20                THE WITNESS: Within FDA regulations,
  46:21 yes, there's an expectation for fair and balanced.

Blake 4623     46:23-47:2

  46:23        Q.      Okay.
  46:24        A.      But, ultimately -- I just do want to
  46:25 clarify that -- you know, as part of the
  47: Page 47
  47: 1 medical/legal board review process, I mean, that's
  47: 2 where those decisions get made.

Blake 4707     47:7-47:11

  47: 7        Q.      Well, you were part of the
  47: 8 medical/legal review, so you had some knowledge
  47: 9 about the regulations that pertain to what was
  47:10 necessary to comply with the FDA's laws, correct?
  47:11        A.      With -- yes. Within --

Blake 4805     48:5-48:12

  48: 5        A.      -- what my job was within the office
  48: 6 of medical/legal.
  48: 7                I was the liaison to the FDA in terms
  48: 8 of sending them promotional materials for their
  48: 9 pre-review, for example, for the products that I
  48:10 worked on. I reviewed those materials as they came
  48:11 through, but that was once they had already gone
  48:12 through medical/legal board.

Blake 4813     48:13-48:15
```

Final Blake

```
48:13        Q.       Okay.
48:14        A.       I was not a sign-off on any
48:15 materials.
```

Blake 4818        48:18-49:2

```
48:18                You were generally aware of what the
48:19 FDA rules were concerning labeling and public
48:20 affairs materials, correct?
48:21        A.       Generally.  But, again, I'm not a
48:22 lawyer or doctor.
48:23        Q.       But that was part of your job to
48:24 know, correct?
48:25        A.       It was part of my job to be familiar
49: Page 49
49: 1 with, but I would not call myself an expert in any
49: 2 way.
```

Blake 4906        49:6-49:10

```
49: 6        Q.       It was part of your job to know and
49: 7 understand what the rules were concerning what you
49: 8 could say and not say in public affairs materials,
49: 9 true?
49:10        A.       To understand, yes.
```

Blake 5214        52:14-52:20

```
52:14        Q.       Well, you understand as the director
52:15 or manager of public affairs that it's your
52:16 responsibility to make sure, from your perspective,
52:17 that the information that's contained in your
52:18 materials that's sent out into the public, that it
52:19 contains the truth and the whole truth, not half the
52:20 truth, correct?
```

Blake 5223        52:23-52:24

```
52:23                THE WITNESS:  Yes, our materials are
52:24 truthful.  I recognize that as our responsibility.
```

Blake 5417        54:17-54:19

```
54:17                MR. PLACITELLA:  Let me have this
54:18 marked as P-1.  This is the only one I don't have
54:19 multiple copies of, so I apologize.
```

Blake 5424        54:24-55:1

```
54:24        Q.       I'm going to show you what's been
54:25 marked P-1 for identification and ask you if you
55: Page 55
55: 1 have ever seen this before?
```

Blake 5502        55:2-55:6

```
55: 2        A.       Okay.  I believe that this is a field
55: 3 communication document, but I may be wrong.
55: 4        Q.       Have you ever seen it before?
55: 5        A.       I believe so.
55: 6        Q.       Okay.  Can you turn to Page 44.
```

```
                                            Final Blake
Blake 5507      55:7-55:13

   55: 7       A.      Um-hmm.  Yes.
   55: 8       Q.      See where it says, "General
   55: 9 Principles of Promotion"?
   55:10       A.      Um-hmm.
   55:11       Q.      This is a Merck document, by the way,
   55:12 correct?
   55:13       A.      Yes.

Blake 5601a     56:1-56:5

   56: 1       Q.      Okay.  And here it says, "General
   56: 2 Principles of Promotion.  FDA regulations impose
   56: 3 five main principles on promotion."
   56: 4               Do you see that?
   56: 5       A.      Yes, I do.

Blake 5716      57:16-58:10

   57:16       Q.      It says, "A promotional claim may not
   57:17 be interpreted in a false or misleading manner by a
   57:18 significant minority of prescribers."
   57:19               Did I read that correctly?
   57:20       A.      Yes.
   57:21       Q.      Okay.  It then says, "Inclusion of
   57:22 proper balance.  There must be appropriate weight
   57:23 given to all clinically relevant information, that
   57:24 is, the risks and benefits, that can affect a
   57:25 physician's prescribing practices."
   58: Page 58
   58: 1               Did you understand that to be the
   58: 2 case?
   58: 3       A.      That's what it says, yes.
   58: 4       Q.      Okay.  Then it says, "Absence of
   58: 5 omissions of relevant information.  Promotional
   58: 6 material, when taken as a whole, is inadequate if it
   58: 7 does not tell the whole truth, i.e., unfavorable
   58: 8 information may not be omitted."
   58: 9               Correct?
   58:10       A.      Yes.

Blake 5817      58:17-59:2

   58:17       Q.      "Support by adequate clinical
   58:18 studies.  Promotion may not promote the product in a
   58:19 light more favorable than shown by data obtained
   58:20 from clinical experience."
   58:21               Did I read that correctly?
   58:22       A.      Yes.
   58:23       Q.      Did you understand that these were
   58:24 the general principles that guided you in
   58:25 constructing promotional materials for the product
   59: Page 59
   59: 1 Vioxx?
   59: 2       A.      Yes, I'm familiar with those.

Blake 6012      60:12-60:16

   60:12       Q.      So in terms of your understanding, if
   60:13 a company indicates that a drug does not have side
   60:14 effects, when there's credible scientific evidence
   60:15 to the contrary, that would be false and misleading,
```

```
                                     Final Blake
   60:16 from your understanding?

Blake 6019     60:19-60:22

   60:19                THE WITNESS: From my understanding?
   60:20 BY MR. PLACITELLA:
   60:21        Q.    Yes.
   60:22        A.    Yes.

Blake 6217     62:17-62:19

   62:17                One of your missions as it related to
   62:18 the drug Vioxx was to minimize the attention given
   62:19 to heart attack issues, correct?

Blake 6222     62:22-63:7

   62:22                THE WITNESS: One of my
   62:23 responsibilities as the -- one of the public affairs
   62:24 people responsible for Vioxx was once the VIGOR
   62:25 results came out and the media reported again and
   63: Page 63
   63: 1 again on the cardiovascular findings of VIGOR was to
   63: 2 -- there was so much coverage on the cardiovascular
   63: 3 findings, to bring that essentially back into
   63: 4 balance, because that's what they reported on all
   63: 5 the time, and MRL, based on their analysis, didn't
   63: 6 believe that to be the case. It was my job to talk
   63: 7 about that to the news media.

Blake 6312     63:12-63:14

   63:12        Q.    Your mission, yes or no, that you
   63:13 were to accomplish was to minimize the attention
   63:14 given to heart attack issues as it related to Vioxx?

Blake 6317     63:17-64:2

   63:17                THE WITNESS: I apologize, I wouldn't
   63:18 characterize that as my mission.
   63:19 BY MR. PLACITELLA:
   63:20        Q.    One of your jobs was to convince the
   63:21 world that there was no reason to believe that Vioxx
   63:22 caused heart attacks, true?
   63:23        A.    Based on Merck Research Labs'
   63:24 assessment, because, you know, they're the ones who
   63:25 know the data and understand the data. That was my
   64: Page 64
   64: 1 job to communicate that to the news media, my
   64: 2 interactions, but it was based on their assessment.

Blake 6424     64:24-65:2

   64:24        Q.    To convince -- it was your job to
   64:25 tell the news media that there was no reason to
   65: Page 65
   65: 1 believe that Vioxx caused heart attacks, can we
   65: 2 agree on that?

Blake 6505     65:5-65:12

   65: 5                THE WITNESS: It was -- well, I mean,
   65: 6 it's important to keep in mind that the news media
                              Page 9
```

```
                                             Final Blake
     65: 7 are a highly independent body, and it was my job to
     65: 8 convey to them Merck's perspective.  Sometimes I did
     65: 9 that directly, sometimes we had people from Merck
     65:10 Research Labs who did that, and ultimately reporters
     65:11 put together a complete story based on our
     65:12 perspective as well as others.  And that included --

Blake 6524     65:24-65:24

     65:24          Q.       Can you answer that question?

Blake 6602     66:2-66:3

     66: 2                   THE WITNESS:  Yes.  With Merck
     66: 3 Research Labs.

Blake 6702     67:2-67:3

     67: 2                   MR. PLACITELLA:  Can we have this
     67: 3 marked P-2 or P-Blake-2, however you want it.

Blake 6802     68:2-68:11

     68: 2                   THE WITNESS:  My responsibility was
     68: 3 to interact with the news media, which throughout
     68: 4 most of 2000 was a lot of discussion about the
     68: 5 cardiovascular findings in the VIGOR trial.
     68: 6 BY MR. PLACITELLA:
     68: 7          Q.       You keep saying the news media, but
     68: 8 your whole point was to get the information that you
     68: 9 wanted out to the public, you didn't do it just so
     68:10 the news media was going to take it home and put it
     68:11 on a shelf, right?

Blake 6814     68:14-69:7

     68:14                   THE WITNESS:  As a public affairs
     68:15 person, I mean, the news media is who I interact
     68:16 with.  I don't interact with the general public.
     68:17 So, I mean, that's -- that's where interactions
     68:18 were.  Yes, they communicate to the broader public,
     68:19 but they are the ones who have complete control over
     68:20 what it is that they report.  It's my job to convey
     68:21 to them Merck's perspective.
     68:22 BY MR. PLACITELLA:
     68:23          Q.       Right.  And that's my point.  But
     68:24 your hope was that in communicating to the news
     68:25 media, they would communicate your message, in turn,
     69: Page 69
     69: 1 to the public, true?
     69: 2          A.       Yes.
     69: 3          Q.       Okay.  Now, I want to show you P-2.
     69: 4 This is your performance review form?
     69: 5          A.       Um-hmm.
     69: 6          Q.       Do you recognize this?
     69: 7          A.       Yes.

Blake 6919     69:19-69:22

     69:19          Q.       Here it says that for the year 2000,
     69:20 your accomplishments concerning the VIGOR study were
     69:21 -- included minimizing the attention to heart attack
     69:22 issues, correct?
```

Final Blake

Blake 7008     70:8-70:19

```
70: 8         Q.       See where it says, "Accomplishments
70: 9 include" and then underneath it, it says "VIGOR"?
70:10 Do you see where it says "VIGOR"?
70:11         A.       Yes. I'm sorry, that was the
70:12 paragraph I was reading.
70:13         Q.       Okay. And part of your
70:14 accomplishment, which meant your mission, right, was
70:15 to minimize the attention to heart attack issues,
70:16 correct?
70:17         A.       Well, it does include that language,
70:18 yes, but this is done at the end of the year, not at
70:19 the beginning of the year.
```

Blake 7021     70:21-71:6

```
70:21         A.       So when -- well, when you talk about
70:22 mission, that implies that it started at the
70:23 beginning of the year. And this was written at the
70:24 end of 2000, after almost all of the media coverage
70:25 was around the cardiovascular findings from the
71: Page 71
71: 1 VIGOR trial.
71: 2                  So it was my job to include Merck's
71: 3 perspective in those stories based on what Merck
71: 4 Research Labs said, bringing it from the point of
71: 5 overemphasis. So I think where it talks about
71: 6 balanced coverage, I mean, that was really the goal.
```

D Blake 7107     71:7-71:14

```
71: 7         Q.       All right. Let me ask the question
71: 8 again this way. The ultimate success in your job as
71: 9 it related to heart attack issues and Vioxx was to
71:10 keep it out of the news altogether, correct?
71:11         A.       No, I wouldn't characterize it in
71:12 that way, no.
71:13         Q.       Okay. So one of your accomplishments --
71:14         A.       I'm sorry, can I finish?
```

D Blake 7113     71:13-71:14

```
71:13         Q.       Okay. So one of your accomplishments --
71:14         A.       I'm sorry, can I finish?
```

D Blake 7118     71:18-71:25

```
71:18         Q.       Go ahead.
71:19         A.       Because almost all of the media
71:20 coverage about Vioxx in the year 2000 was around the
71:21 cardiovascular findings from VIGOR. I often tried
71:22 to talk to reporters about the GI findings from
71:23 VIGOR, but really their attention was all on the
71:24 cardiovascular findings. So it was getting it
71:25 balanced.
```

Blake 7201     72:1-72:12

```
72: 1         Q.       Okay. And every time they asked you
72: 2 a question, your job was to tell them no, Vioxx does
72: 3 not cause heart attacks, and we have the proof,
```

```
                                   Final Blake
72: 4 right?
72: 5          A.      Based on Merck Research Labs'
72: 6 assessment.
72: 7          Q.      Correct?
72: 8          A.      That was Merck Research Labs'
72: 9 assessment, yes.
72:10          Q.      So -- and do you track, by the way,
72:11 for the first year the number of media impressions
72:12 where the Merck message got out?

Blake 7215      72:15-72:24

72:15                  THE WITNESS:  It's hard to track.  We
72:16 do sometimes try and track that type.  Certainly for
72:17 the year 2000, for Vioxx, that would have been very
72:18 hard because there was so much coverage of the VIGOR
72:19 study.
72:20 BY MR. PLACITELLA:
72:21          Q.      You had never heard that there were
72:22 at least a million -- a billion media impressions
72:23 related to Vioxx with Merck's message in the year
72:24 2000?

Blake 7301      73:1-73:9

73: 1                  THE WITNESS:  Well, actually, it
73: 2 wouldn't -- most of the media coverage in 2000 was
73: 3 around cardiovascular findings from VIGOR, if I
73: 4 remember correctly.  That's certainly what it felt
73: 5 like.
73: 6 BY MR. PLACITELLA:
73: 7          Q.      A billion impressions, had you ever
73: 8 heard that?
73: 9          A.      I've heard that before, yes.

Blake 7402      74:2-74:5

74: 2          Q.      In fact, it was the Merck message for
74: 3 the billion media impressions, whenever asked, that
74: 4 Vioxx does not cause heart attacks, correct?
74: 5          A.      That was Merck Research Labs, yes.
```

Total Length - 00:22:44