UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 2:05-CV-04379 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| ROBERT G. SMITH, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * | | |

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
FOR ORDER EXCLUDING  TESTIMONY OF JOHN D. ABRAMSON, M.D.**

**(EXPERT CHALLENGE NO. 1)**

Among a myriad of topics outside his expertise, Plaintiff's expert Dr. John Abramson proposes to testify that Merck failed to provide adequate information to prescribing physicians concerning the safety of Vioxx® and that, based on his review of clinical studies, the benefits of using Vioxx were outweighed by the risks.  Merck moves to exclude any testimony from Dr. Abramson concerning:

- the adequacy of the safety information in the Vioxx label or in Merck's marketing materials or related public disclosures, based on Dr. Abramson's admitted lack of expertise in these areas;

- the relative risks and benefits of using Vioxx, given that this testimony is based on VIGOR's clinical trial design and the interpretation of the results of Merck's clinical studies, two areas outside Dr. Abramson's expertise; and

- what Dr. Abramson predicts plaintiff's prescribing physician would or would not have done in different hypothetical situations, as such testimony is irrelevant speculation and not the proper subject of expert testimony.

Even if Dr. Abramson had the requisite training, experience or knowledge to opine on these subjects, which he does not, his opinions should nevertheless be excluded because he has neither a reliable scientific basis for them nor has he used a proven methodology to generate them.

Specifically, Dr. Abramson opines "that Merck failed to communicate to physicians, healthcare providers and consumers in an unbiased, balanced manner the true overall and cardiovascular risks associated with Vioxx that were known to them." (Expert Report of Dr. Abramson ("Report") at ¶ 16, attached as Ex. A.) He further concludes "that the true risks of Vioxx outweighed the benefits and there were safer alternatives on the market" (*id*.), on the basis of his interpretation of the "VIGOR" study. (Deposition of John Abramson ("Abramson Dep.") at 338:16-22, attached as Ex. B.) As discussed *infra*, Dr. Abramson has a complete lack of expertise in the labeling and marketing of prescription drugs, in the administration, design, or analysis of clinical pharmaceutical studies, or even in internal medicine, gastroenterology, or cardiology – all critical fields for weighing the risks and benefits of a drug such as Vioxx.

In fact, Dr. Abramson seeks to testify about a grab bag of topics outside his expertise, most of which concern Merck documents, including: the behavior of Merck marketing representatives; Merck advertisements, including celebrity endorsements; Merck marketing

2

824023v.1

training materials, including "obstacle handling tools" such as the "Cardiovascular Card"; corporate behavior, specifically his opinion of Merck's intent as reflected by its marketing and other internal company communications; the design or implementation of clinical studies; the interpretation of the results of clinical studies; and what other physicians would or would not have done in hypothetical situations. Merck asks the Court to prevent plaintiff from using Dr. Abramson in this "shotgun" approach to discuss Merck documents, a practice that will not aid the jury.

I.     **LEGAL STANDARD.**

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-5 of the Motion of Defendant Merck & Co., Inc. ("Merck") for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis, filed concurrently herewith and incorporated herein by reference.

II.     **DR. ABRAMSON IS NOT QUALIFIED TO OPINE THAT THE INFORMATION PROVIDED BY MERCK'S MARKETING OR IN THE VIOXX LABEL WAS INADEQUATE.**

Dr. Abramson seeks to offer his opinion that "Merck did not adequately warn physicians of the risk of heart attacks in people like Garry Smith." (Abramson Dep. at 317:1-3.) This opinion is based on Dr. Abramson's views of Merck clinical studies, in particular the results of the VIGOR study and Merck's reporting of those results. (Abramson Dep. at 317:4-319:4.) Similarly, Dr. Abramson speculates that plaintiff's prescribing physician, Dr. Grefer, would not have prescribed Vioxx to plaintiff if he had received the information Dr. Abramson, in hindsight, claims Merck's marketing and labeling failed to adequately disseminate.[1] (Report at ¶ 15.)

---

[1] Plaintiff had the opportunity to depose Dr. Grefer in this case. Allowing Dr. Abramson to speculate as to what Dr. Grefer would "probably" have done under different circumstances – especially where Plaintiff had the opportunity to ask Dr. Grefer questions directly – is not the

(*footnote continued next page*)

3

Dr. Abramson may not testify about the adequacy of the safety information provided by Merck in the labeling or marketing of Vioxx as he, by his own admission, lacks the requisite knowledge and expertise. *See, e.g., Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (holding that an expert witness may not testify on matters outside his field of expertise; trial court properly excluded property appraisal testimony because the witness was not a licensed appraiser or real estate broker and lacked training or formal schooling in appraisal methods). As plaintiffs cannot establish that Dr. Abramson has the requisite expertise to opine on the adequacy of the information provided in Merck's labels or the marketing of Vioxx, any testimony he offers on these subjects should not be allowed.

### A.    Dr. Abramson is Not an Expert on Labeling

Dr. Abramson's testimony demonstrates his lack of expertise in pharmaceutical labeling. He admits that he has not reviewed the FDA's labeling regulations. (Abramson Dep. at 115:13-16.) When asked about the label's inclusion of the cardiovascular data from the VIGOR study, Dr. Abramson complains that the data was not in the warnings section. (Abramson Dep. at 302:7-19.) He also admits, however, that he does not know exactly how the FDA makes the decision of what information appropriately goes in the warnings section, as opposed to the precautions section. (Abramson Dep. at 120:7-13.) This is unsurprising given his utter lack of labeling experience at any point in his medical career:

> Q.   Have you reviewed the FDA's labeling requirements in connection with your review of this case?
>
> A.   Not that I recall.
>
> Q.   Had you ever read the FDA labeling regulation for pharmaceutical products for any reason?

---

subject of proper expert testimony.

4

> A. Not that I recall.
>
> Q. Have you ever consulted with the FDA on any issue concerning labeling of a pharmaceutical product?
>
> A. No.
>
> Q. Have you ever consulted with a pharmaceutical company concerning the labeling of a pharmaceutical product?
>
> A. No.
>
> Q. Have you ever drafted a product label for a pharmaceutical product?
>
> A. No.
>
> Q. Have you ever had any involvement with respect to drafting, revising or modifying a pharmaceutical product label for any drug?
>
> A. No.

(Abramson Dep. at 115:13-116:11.) Similarly, Dr. Abramson has never been an employee of or consultant to the FDA and has never been a member of an FDA advisory committee. (Abramson Dep. at 107:11-21.)

The creation or modification of a pharmaceutical warning label is not an area for those without specific expertise. Indeed, the FDA itself has repeatedly discussed the complexities and potential pitfalls involved in crafting an appropriate label. For example, the FDA recently noted that "labeling that includes theoretical hazards . . . can cause meaningful risk information to lose its significance . . . . Overwarning, just like underwarning, can similarly have a negative effect on patient safety and public health." 71 Fed. Reg. 3922, 3935 (Jan. 24, 2006) (internal quotation marks and citations omitted). Based on its expertise in this area, the FDA appropriately believes it is the best arbiter of what should and should not be included in a warning label. As the FDA recently stated:

> Another misunderstanding of the act encouraged by State law actions is that FDA labeling requirements represent a minimum safety standard. According to many courts, State law serves as an appropriate source of supplementary safety

5

> regulation for drugs by encouraging or requiring manufacturers to disseminate risk information beyond that required by FDA under the act.  In fact, FDA interprets the act to establish both a "floor" and a "ceiling," such that additional disclosures of risk information can expose a manufacturer to liability under the act if the additional statement is unsubstantiated or otherwise false or misleading. Given the comprehensiveness of FDA regulation of drug safety, effectiveness, and labeling under the act, additional requirements for the disclosure of risk information are not necessarily more protective of patients.  Instead, they can erode and disrupt the careful and truthful representation of benefits and risks that prescribers need to make appropriate judgments about drug use. Exaggeration of risk could discourage appropriate use of a beneficial drug.

*Id.* at 3934-35 (citations omitted).  These statements by the FDA in the Federal Register constitute an advisory opinion that is entitled to great deference.  *See* 21 C.F.R. § 10.85(d)(1) and (e); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 865 (1984); *NVE Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 196 (3d Cir. 2006) (overturning trial court's refusal to give "normal" deference to the "legal and factual determinations the FDA made during rulemaking").  The FDA regarded the VIGOR CV data as inconclusive.  In April 2002, it approved Vioxx as safe and effective for treatment of rheumatoid arthritis and revised the precaution section of the label – not the warning section – to read that the "significance of the [VIGOR and Alzheimer's cardiovascular data] is unknown."  (*See* Vioxx Label No. 9183810, attached as Ex. C.)

Dr. Abramson is not an expert in the labeling of pharmaceuticals and should not be allowed to offer any opinion testimony on the adequacy or appropriateness of the Vioxx label.[2]

---

[2] To the extent that plaintiff relies on Dr. Abramson's testimony to claim that that the Vioxx label was inadequate – for example because it lists the VIGOR information in the "Precautions" section of the label instead of the "Warnings" section or because the FDA was allegedly misled in approving that label – his claims are preempted by federal law.  The FDA has determined that because state-law claims like plaintiff's prevent the FDA from maintaining strict control over label content and format, they are preempted by the FDA's labeling regulations.  *See* 71 Fed. Reg. at 3923-35 (preemption applies, inter alia, to claims like plaintiff's that are "based on the failure to include in labeling or advertising a statement the substance of which the FDA has

(*footnote continued next page*)

B.  **Dr. Abramson is Not an Expert on Marketing or Marketing Requirements.**

Dr. Abramson is widely critical of Merck's marketing of Vioxx, including making accusations that Merck marketing representatives failed to provide adequate information to physicians to make informed decisions about the risk-benefit analysis in prescribing Vioxx to patients. (Abramson Dep. at 341:13-342:23.) In particular, he opines that Merck's marketing of Vioxx prevented Mr. Smith's prescribing doctor from being able to make an informed decision. (Abramson Dep. at 343:3-11.)

Dr. Abramson, however, has no experience in the marketing of pharmaceutical products or in studying the effectiveness of marketing in communicating safety information. Indeed, he cannot attest to any experience working with either the FDA or any pharmaceutical company concerning the marketing of pharmaceutical products:

> Q.  Have you ever been a consultant to the FDA with respect to reviewing marketing material, direct to consumer advertising?
>
> A.  No.
>
> Q.  Have you ever been a consultant to any regulatory agency with respect to direct to consumer advertising or marketing materials?
>
> A.  No.
>
> Q.  Do you have any experience in working with or for pharmaceutical companies in terms of reviewing advertising or marketing material on any pharmaceutical products?
>
> A.  No.

---

prohibited"). *See also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (2001) (permitting state-court juries to impose their judgments on the adequacy of the drug approval process under state-law standards "would exert an extraneous pull on the scheme established by Congress" to protect the public); *Colacicco v. Apotex, Inc.*, Civ. A. No. 05-5500, 2006 U.S. Dist. LEXIS 34127, at *65 (E.D. Pa. May 25, 2006) (plaintiff's state-law failure to warn claims were preempted because the drug approval "process required that the labeling be the same as that approved for the innovator drug" and "the FDA would have deemed any post-approval enhancements 'false or misleading'").

(Abramson Dep. at 97:4-17.)  He admits that he has never consulted with a pharmaceutical company or medical device manufacturer about sales or marketing issues in any way.  (Abramson Dep. at 128:11-22.)  In fact, Dr. Abramson has not even read the regulations governing direct-to-consumer advertising in connection with his opinions.  (Abramson Dep. at 98:17-20.)  Tellingly, when asked why he believes he is qualified to offer an opinion on what "physicians knew and needed to know about Vioxx when prescribing Vioxx," Dr. Abramson could only point to a two year fellowship he completed over twenty years ago.  (Abramson Dep. at 319:22-321:2.)

Dr. Abramson is unqualified to testify about the adequacy of the information provided in the marketing of Vioxx.  To the extent his testimony seeks to convey his opinions on this subject it should be excluded.

**III.    DR. ABRAMSON IS NOT QUALIFIED TO OPINE ON THE RELATIVE RISKS OF VIOXX OR THE ADEQUACY OF MERCK'S CLINICAL STUDIES.**

Plaintiff seeks to introduce Dr. Abramson's testimony that the risks of Vioxx outweighed the benefits, an opinion he offers on the basis of his interpretation of clinical trials.  (Abramson Dep. at 338:16-22.)  In particular, he opines that "the VIGOR study showed us that Vioxx, Garry Smith's taking Vioxx instead of naproxen tripled his risk of a heart attack."  (Abramson Dep. at 337:24-338:22.)

Dr. Abramson makes these assertions though his experience with the design and implementation of clinical trials is plainly lacking:

> Q.    Have you ever been the principal investigator in a clinical trial involving a pharmaceutical product or medial device?
>
> A.    No.
>
> Q.    Have you ever been an associate investigator on a clinical trial involving a pharmaceutical product or medical device?
>
> A.    No.

Q. Have you ever been a research associate on a clinical trial involving a pharmaceutical product or a medical device?

A. No.

Q. Have you ever had any personal involvement in conducting a clinical trial on a pharmaceutical product or a medical device?

A. No.

Q. Have you ever had responsibility for designing a clinical trial for a pharmaceutical product or a medical device?

A. No.

Q. Have you ever been consulted about study design for a clinical trial for a pharmaceutical product or a medical device?

A. No.

(Abramson Dep. at 70:5-71:3.)  Dr. Abramson also admits that he has never been listed as an author on a peer-reviewed article publishing the results of a clinical trial or had responsibility for selecting clinical investigators for a clinical trial.  (Abramson Dep. at 72:19-73:1.)  Nor has he published a paper about clinical trial developments or conducting clinical trials.  (Abramson Dep. at 345:4-7.)[3]

In addition, Dr. Abramson can cite no significant experience in the interpretation of clinical data: he is not a biostatistician, his expert report identifies no experience in the interpretation of clinical trials, he has never prepared or edited a manuscript for publication summarizing the results of a clinical trial (Abramson Dep. at 71:4-20), he has never been a

---

[3] Despite his own obvious lack of expertise, Dr. Abramson apparently discounts the work and opinions of the experts who had served on the FDA Advisory Committee on Vioxx, admitting at his deposition that he simply could not remember what the conclusions and recommendations were of the cardiologists who were on the advisory committee reviewing the clinical trials of Vioxx.  (Abramson Dep. at 255:14-256:4.)

member of a Data Safety Monitoring Board ("DSMB"), he has never had any responsibility relating to a DSMB in connection with a clinical trial, he does not know any physicians who served on the DSMB for any Vioxx studies, and in fact has never even spoken to such a person. (Abramson Dep. at 88:21-90:3.) He also admits that he has never served on an institutional review board and never even performed research that needed to be approved by an institutional review board. (Abramson Dep. at 90:21-91:2.)

Nor can Dr. Abramson point to any experience in designing or executing epidemiological studies:

> Q. Have you ever been an employee of a Contract Research Organization?
>
> A. No.
>
> Q. Have you ever consulted with a pharmaceutical company about scientific research?
>
> A. No.
>
> Q. Have you ever consulted with a pharmaceutical company about the design of epidemiologic studies?
>
> A. No.

(Abramson Dep. at 127:22-128:7.)

Not only does Dr. Abramson lack the experience to meaningfully interpret the selective clinical data he reviewed, his broad opinion that the risks of Vioxx outweigh its benefits – apparently in every patient – ignores the individualized nature of such an assessment. As even Dr. Abramson agrees, patients require an individualized risk/benefit analysis before every drug prescription is made. (Abramson Dep. at 159:4-13.) And that analysis requires that myriad factors must be taken into consideration, including the expected benefit of the drug, the safety risks associated with the drug, and whether alternative medications are available and the risks and benefits of those medications. (Abramson Dep. at 159:14-161:6.) A patient's particular

medical history and profile, such as the degree of immobility and pain from arthritis, cardiovascular health, propensity for gastrointestinal problems, and similar issues must all be taken into account. Yet Dr. Abramson, who is not board certified in internal medicine, cardiology, rheumatology, or in gastroenterology (Abramson Dep. at 68:22-70:4), and who admits that drug prescriptions require *individualized* risk assessment, persists making sweeping generalizations about the risks of prescribing Vioxx outweighing the benefits.[4]

Dr. Abramson has failed to exhibit the requisite expertise to offer his interpretation of the Vioxx clinical data, and even failed to take the opportunity at his deposition to explain why the cardiology experts on the FDA Advisory Committee – the same committee that concluded that the significance of the VIGOR CV results was unknown – were wrong while he, a general practitioner with scant knowledge of the subject, was right. (Abramson Dep. at 255:14-256:4.) Dr. Abramson should not be allowed to offer his opinions on the purported risks involved in using Vioxx or his unqualified interpretations of clinical studies on which his opinions are based.

### IV. DR. ABRAMSON'S OPINIONS ARE NOT SUPPORTED BY RELIABLE EVIDENCE.

Before expert testimony may be admitted under Federal Rule of Evidence 702, the proponent of the testimony must demonstrate that the opinion is based on reliable evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That is, even if plaintiff could establish that Dr. Abramson actually had expertise to opine on the adequacy of the warnings Merck provided concerning Vioxx, or the safety profile of Vioxx based on clinical data, he must then "demonstrate that the expert's findings and conclusions are based on the scientific method,

---

[4] In addition to the overbroad generalizations underlying Dr. Abramson's overall risk/benefit opinion, his opinions concerning what prescribing choice Mr. Smith's physician purportedly would have made, had he been presented with allegedly different risk information, is pure speculation and should not be permitted.

824023v.1

and, therefore, are reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  The testimony Dr. Abramson proffers cannot withstand this basic level of scrutiny.

> **A.      Dr. Abramson's Opinions on Merck's Provision of Safety Information are Not Supported by Reliable Evidence.**

Dr. Abramson's opinion that Merck "failed to communicate to physicians, healthcare providers and consumers in an unbiased, balanced manner the true overall and cardiovascular risks associated with Vioxx that were known to them," and that this "influenced the prescribing habits of physicians and healthcare providers and deprived them of the right to make educated, informed decisions about the risks and benefits of prescribing Vioxx to their patients" (Report at ¶ 16),  is unsupported by reliable evidence or methodology and should be excluded.  *See, e.g. Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (excluding expert testimony on inadequate warnings because the expert had not tested the effectiveness of alternative warning); *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (excluding expert testimony on inadequate warnings because the expert had provided no basis for his belief that such warnings would be effective).

First, Dr. Abramson provides no basis for his opinions on what information physicians must know to make educated decisions in prescribing a drug.  Despite his opinion that the information provided by Merck was not adequate to inform such decisions, he admits that he has never conducted any study to evaluate the information physicians need to make clinical decisions.  (Abramson Dep. at 93:22-25.)  Yet, Dr. Abramson claims that he was in a better position to make a prescribing decision for plaintiff than plaintiff's prescribing physician Dr. Grefer.  (Abramson Dep. at 347:13-348:9.)

Second, Dr. Abramson cannot provide any reliable evidence that Merck failed to provide available safety information diligently, and certainly provides no evidence that Merck

"disseminated misleading and inaccurate information regarding the risks associated with Vioxx." (Report at ¶ 16.) As discussed, *supra*, Dr. Abramson's opinions on the dangers of Vioxx supposedly known prior to its withdrawal from the market are based entirely on the results of the VIGOR study. (Abramson Dep. at 338:16-22.) In reality, Merck provided the VIGOR data to the FDA and the medical community *promptly* after the results were available. On March 23, 2000, two weeks after it received the unblended VIGOR data, Merck faxed a summary of the results to the FDA. On March 27, 2000, Merck *issued a press release* disclosing both the gastrointestinal and cardiovascular findings. Merck presented the VIGOR data at major medical conferences held in May, June, and October 2000, and participated in the November 2000 publication of the VIGOR study results in the *New England Journal of Medicine*. In July 2000, Merck sent the FDA a proposed label change incorporating the VIGOR results.

Finally, Mr. Smith's own prescribing doctor, Dr. Grefer, has testified that, because of the Vioxx label and Merck's marketing representatives, he not only knew about the VIGOR results and the fact that there were more myocardial infarctions in the Vioxx wing of the study, but his understanding of those results was the same as that of the FDA: "the science wasn't clear about the reason for the difference in myocardial – nonfatal myocardial infarctions between patients on Vioxx and those on naproxen." (July 27, 2006 Deposition of Michael A. Grefer at 98:13-25, 99:16-20, attached as Ex. D.)

> **B.    Dr. Abramson's Opinions on the Risks and Benefits of Vioxx are Not Supported by Reliable Evidence.**
>
>> 1.    **Dr. Abramson's Opinions are Litigation Generated and Contrary to FDA and Independent Scientific Findings.**

Despite Dr. Abramson's lack of expertise in cardiology or in designing or interpreting clinical trials, Dr. Abramson's opinion that Vioxx was an "unreasonably dangerous" drug for Mr.

13

Smith is based on his interpretation of a clinical study, as he claims that "the VIGOR study showed us that Vioxx, Garry Smith's taking Vioxx instead of naproxen tripled his risk of a heart attack."[5] (Abramson Dep. at 337:24-338:22.)  Clearly, however, this opinion was not shared by members of the 2001 FDA Advisory Committee, which did not recommend such "tripled risk" language be included on the Vioxx label nor by the FDA, which disagreed with Dr. Abramson's conclusions and instead concluded the significance of the data was unknown.

In short, Dr. Abramson's opinion on the relative risks and benefits of Vioxx was derived for, and generated by, this litigation.  Indeed, the litigation driven nature of Dr. Abramson's opinions is demonstrated by the fact that, although he testified he believed Vioxx posed a cardiovascular safety risk as early as 2001, he never wrote to or communicated with the FDA concerning the alleged safety issues before becoming a retained expert for the plaintiffs in 2004. (Abramson Dep. at 147:18-148:3, 299:14-21, 334:4-18.)

> 2. **Dr. Abramson's Opinions Concerning VIGOR are Inapplicable to Mr. Smith.**

Dr. Abramson's opinions applying the results from VIGOR to this case are so removed from the actual scientific data they should be excluded as irrelevant.  Scientific testimony is irrelevant when there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003) (*quoting Joiner*, 522 U.S. at 146).  Instead, when expert

---

[5] Also purportedly in support of his opinion, at the end of his deposition Dr. Abramson referred to a meta-analysis of Merck's Vioxx trials, an analysis that did not meet the "test of heterogeneity" and did not appear in his expert report. (Abramson Dep. at 354:1-355:19.)

testimony is demonstrated to be speculative and lacking scientific validity, trial courts "are encouraged" to exclude it. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998).

In reality, the VIGOR study cannot be relied on to show that Mr. Smith's use of Vioxx posed a significant cardiovascular risk. VIGOR involved patients regularly taking a 50 mg dose of Vioxx, which is twice the dose taken by Mr. Smith.[6] Also, VIGOR involved an elderly population with rheumatoid arthritis, while Mr. Smith did not have rheumatoid arthritis and cannot be described as elderly.[7] Finally, VIGOR did not compare Vioxx against a placebo, and in fact was not a study designed to assess cardiovascular risk. Based on the results of VIGOR, it is actually impossible to determine whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (1) a cardiovascular risk associated with *high-dose* Vioxx; (2) a cardio-protective effect associated with naproxen; or (3) chance, either in whole or in part.[8] The FDA concurred with this conclusion when it approved the 2002 Vioxx label, which incorporated the VIGOR results. (*See* Ex. C.)

As Dr. Abramson's opinions on the Vioxx clinical data are speculative and lacking scientific validity, they should be excluded. *Moore*, 151 F.3d at 279.

---

[6] Claire Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 NEW. ENG. J. MED. 1520 (Nov. 30, 2000).

[7] Wolfe, et al., *The Mortality of Rheumatoid Arthritis, Arthritis & Rheumatism* (08/19/93); Myllykangas-Luosujarvi, *et al., Mortality in Rheumatoid Arthritis, Arthritis & Rheumatism* (12/95).

[8] *See* Patrono, FitzGerald et al., *Platelet Active Drugs: The Relationships Among Dose, Effectiveness, and Side Effects*, CHEST 2004; 126:234S-264S ("While the cause of the apparent excess risk of MI in [VIGOR] cannot be conclusively established, a combination of some cardioprotective effect of naproxen and the play of chance does seem to offer a plausible explanation for these unexpected findings." ).

## V. CONCLUSION.

Dr. Abramson lacks the necessary qualifications to testify about the adequacy of Merck's labeling or marketing of Vioxx, the appropriate interpretation of clinical trials of Vioxx, or to make predictions about plaintiff's prescribing physician's behavior. Moreover, his proposed testimony is not supported by reliable evidence or methodology. Accordingly, Merck respectfully requests that the Court exclude Dr. Abramson's testimony on these subjects.

Dated: August 14, 2006

Respectfully submitted,

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
Carrie A. Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Richard B. Goetz
Ashley A. Harrington
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

And

824023v.1

Douglas R. Marvin
Robert A. Van Kirk
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029


Attorneys for Merck & Co., Inc.

17

824023v.1

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Memorandum in Support of Motion of Merck for Order Excluding Testimony of John D. Abramson, M.D. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 14th day of August, 2006.

                                              */s/ Dorothy H. Wimberly*
                                              Dorothy H. Wimberly, 18509
                                              STONE PIGMAN WALTHER
                                              WITTMANN L.L.C.
                                              546 Carondelet Street
                                              New Orleans, Louisiana  70130
                                              Phone:  504-581-3200
                                              Fax:     504-581-3361
                                              dwimberly@stonepigman.com

                                              Defendants' Liaison Counsel