**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISANA,**
**NEW ORLEANS DIVISION**

| | | |
|---|---|---|
| **IN RE VIOXX PRODUCTS** | ) | |
| **LIABILITY LITIGATION** | ) | **MDL DOCKET No. 1657** |
| | ) | |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | |
| | ) | |
| **ALL ACTIONS** | ) | |
| | ) | |

## EXPERT WITNESS REPORT AND DECLARATION OF JOHN DAVID ABRAMSON, M.D.

**I, John David Abramson, MD, hereby state as follows:**

### QUALIFICATIONS

1.  I am a medical doctor licensed to practice medicine in the state of Massachusetts since 1982. I have been Board Certified in Family Medicine and a Diplomate of the American Board of Family Practice since 1982. I graduated cum laude from Harvard College in 1970 with a degree in Social Relations. I attended Dartmouth Medical School and graduated with a degree in Medicine from Brown Medical School in 1976. I performed my internship at the University of North Carolina from 1976-1977. I then served as a primary care physician in the National Health Service Corp of the U.S. Public Service in Monroe County, West Virginia (1977-1979). I completed my residency at Case Western Reserve University from 1979 to 1981. I also completed a Robert Wood Johnson Fellowship in Family Medicine at Case Western University from 1980-1982, earning a Master of Science in Family Practice degree. During this two year fellowship, which included study of epidemiology, statistics, research design and health policy, I

received training in the interpretation of scientific data. Additionally, I was a Senior Research Associate on the Faculty of the Institute for Health Policy, Heller School, Brandeis University from 1992-1993, during which I participated in a project that explored local control of health care resources to optimize allocation and health outcomes. I served as Chair of the Department of Family Practice at Lahey Clinic in Burlington Massachusetts from 1994-2001. I have been a clinical instructor at Harvard Medical School since 1997. In recent years I have published on health policy and the growing commercial bias in the scientific evidence that doctors rely on to guide their clinical practice (see bibliography listed on attached CV). Before Vioxx was removed from the market and before I was consulted in any litigation involving Vioxx, I had spent hundreds of hours researching the safety and efficacy of COX-2 inhibitors including Vioxx and Celebrex, and had completed a book chapter about the safety and efficacy of Vioxx and Celebrex. Based on my education, training and experience in medicine, epidemiology, statistics and research design, I believe I am qualified to testify regarding the risks and benefits of drugs (including Vioxx), and the design and analysis of data in clinical studies pertaining to Vioxx and other anti-inflammatory drugs. I am further qualified to testify regarding the type and form of delivery of information physicians need and expect regarding the efficacy and safety profiles of drugs (including Vioxx) to make informed decisions about prescribing and impact on patient care.

2. Throughout my 26 years as a physician, I have had first hand experience in multiple practice arenas that further qualifies me to render opinions in this litigation. My first experience as a primary care doctor was in a rural health clinic in Appalachia with the National Health Service Corps, then a part of the U. S. Public Health Service. From 1982-2002 I practiced family medicine in Hamilton, Massachusetts. As a treating physician, I was responsible for the evaluation, care

and treatment of numerous patients for both wellness care and disease diagnosis, treatment and management. I have prescribed many different drugs including Vioxx and other NSAIDS in the scope of my clinical practice for over two decades and have first hand experience regarding the type and content of information as physician needs to make informed decisions about prescribing drugs to a patient (including Vioxx and other NSAIDS), including performing risk/benefit analyses and evaluating safety and efficacy of drugs for a given patient. I carefully read medical journals both as a practicing physician—to keep up to date on the latest developments that would impact the care and treatment of my patients, and as a researcher—to evaluate the quality of the scientific evidence presented therein.

3.   I also have experience with the health care industry. From 1986-1993 I served as Associate Medical Director of Pru-Care of Massachusetts. I am currently the Executive Director of Health Management for Acordia Complete Health, a Wells Fargo Company.  In that role I participate in designing health benefits for self-insured companies that reflect the best scientific evidence about effective health care: integrating the best of medical science, predictive health modeling, and the largely untapped health  benefits of helping people to adopt healthier lifestyles.

4.   Teaching has also been an important lens through which I have observed and experienced the changes in medicine that have taken place throughout my career. I have taught both medical students and postgraduate students and also lectured as an invited speaker regarding the the growing challenge to clinicians trying to make informed decisions about optimal pharmacotherapy for their patients. My academic appointments include serving as a clinical instructor in ambulatory care and prevention at Harvard Medical School since 1997. From 1993-1995 I was the Chair of the Graduate Medical Education Committee (Family Practice Residency) at Beverly Hospital. I have also served as a Mentor for First year

medical students in the Primary Care Mentorship Program at Harvard Medical
School and also as a Preceptor in the Primary Care Clerkship Program at Harvard
Medical School. I continue to serve as a tutor in the Primary Care Clerkship
Program there. In these roles, I have taught students how to critically interpret
and integrate medical literature and data into a risk/benefit analysis for
prescribing drugs to patients.

5. The issue of public health and health policy and how doctors process information
from various sources has been of importance and interest to me throughout my
career as a physician. Because of the changes that I was observing in American
medicine and experiencing in my own practice, I left clinical practice to devote
full time to research this topic, specifically in regard to the pharmaceutical
industry and its impact on public health, public safety, and the quality of
American health care.  Since the beginning of 2002 I have been researching,
writing, lecturing, and teaching about how the information and misinformation
about drugs and other medical products available to practicing physicians
impacts their medical decisions and the overall quality, effectiveness, and cost of
American health care.

6. As noted in my curriculum vitae, I have been invited to lecture at medical
schools, hospital Grand Rounds and health insurers about the growing
commercial influence on the production and dissemination of medical
information available to physicians, the public, and health policy makers.

7. Thus, based on my education, training, two decades of clinical practice and my
independent research, I have unique knowledge and understanding and am
qualified to testify regarding how pharmaceutical company sponsored research
and marketing affects doctors' decisions, patients' expectations and the overall
quality and effectiveness of medical care. Prior to being consulted in this
litigation, I published articles and a book on this subject as listed on my CV. A

true and correct copy of my curriculum vitae, further outlining my education, training, publications, and experience, as well as my hourly rate is attached as Exhibit 1.

8. The opinions expressed in this affidavit are my own and are based on my education, training, research and experience, my review of the peer-reviewed medical literature, and on corporate documents and depositions produced in this litigation by Merck. A list of the articles, depositions and documents upon which I relied in forming my opinions are attached as Exhibit 2 and are incorporated into my opinions stated below. My opinions as stated in this affidavit are stated to a reasonable degree of medical probability.

9. Any testimony I have given within the past 4 years as an expert either at deposition or at trial will be listed on Exhibit 3, attached.

## BACKGROUND

10. Vioxx, a selective cyclooxygenase-2 inhibitor, was approved by the FDA in 1999 for the treatment of arthritis, acute pain, and primary dysmenorrhea. When Vioxx was approved, I was engaged in active clinical practice of family medicine and had patients diagnosed with these conditions.

11. In response to the intense advertising to consumers, many of my patients came to me requesting prescriptions for Vioxx. This led me to engage in further research of these drugs. The results of a Merck sponsored study, VIGOR, comparing the safety of Vioxx and naproxen, another NSAID, were published in the November 23, 2000 issue of the New England Journal of Medicine. Though this article reported more myocardial infarctions in the patients exposed to Vioxx, the authors (all 13 of whom were either employees of or had financial ties to Merck) concluded that this finding was due to the cardioprotective properties of naproxen, that Vioxx did not significantly increase the risk for heart attack in people without a previous history of cardiovascular disease, and that Vioxx

offered the advantage of causing significantly fewer GI complications than naproxen. In 2001, I began more in depth research regarding this finding and discovered the data from the VIGOR study that Merck had submitted to the FDA, which demonstrated significantly more serious cardiovascular complications in the people taking Vioxx—whether or not they had a previous history of cardiovascular disease—and that Merck's argument that it wasn't Vioxx that caused but naproxen that protected from heart attack to be without reasonable scientific basis and clinically misleading. This prompted me to engage in yet more research on this issue. My long term personal interest in public health and safety and a concern about the growing misrepresentation of research by drug and other medical industries and its negative impact on American health care led me to spend hundreds of hours over the next three years researching this issue in general and Vioxx specifically.

## GENERAL OPINIONS

12. In the United States, pharmaceutical companies are primarily responsible for documenting the safety, efficacy, and optimal use of their drugs. The standard in the medical community is, therefore, to expect unbiased, balanced, and reasonably complete information regarding the risks and benefits of prescription drugs (in the form of scientific articles, continuing education, clinical practice guidelines, and marketing communications) from the pharmaceutical companies that manufacture and market them. Merck failed to meet this standard and instead systematically minimized the risks associated with Vioxx and overstated its benefits in both the medical articles it funded and in its communications to physicians, other healthcare providers and consumers, thus depriving them of the right to make educated, informed decisions about the true risks and benefits of Vioxx. Physicians had both a right and a need for Merck to be forthright and thorough in communicating the clinical risks of Vioxx as well as the benefits.

Having reviewed corporate depositions, documents, Congressional and governmental hearing briefs and materials and underlying clinical trial data, it is my opinion that there was much information that Merck had and knew was critical to physician decision making that was not communicated to doctors. Instead, the information that was reported to physicians was misleading and at times knowingly without scientific basis. For example:

a.　As early as 1996 Merck officials were aware that selective Cox-2 inhibition by Vioxx could potentially increase the risk of thrombotic cardiovascular (CV) events—a risk that might be mitigated by allowing people at high risk of developing cardiovascular problems to take prophylactic aspirin.  Yet corporate documents reveal that in 1996 Merck officials also understood that in order to accentuate the primary theoretical GI advantage of Vioxx, patients in clinical trials should not be allowed to take aspirin. (Aspirin would increase the risk of adverse GI events such as bleeding and ulcers more in patients taking Vioxx than in patients taking other NSAIDs.)  A 1996 memo discussed Merck's dilemma: in trials disallowing the use of aspirin, "there is a substantial chance that significantly higher rates" of cardiovascular problems would manifest in the Vioxx group. Merck was thus aware of the potential risk of increased thrombotic CV events and was strategizing to design trials that would minimize this risk and maximize the potential GI advantage of Vioxx even during its pre-approval development phase..

b.　In an email dated 2-25-97 (over 2 years prior to the approval and marketing of Vioxx), Dr. Briggs Morrison wrote to Merck colleagues that he "would allow low dose aspirin – I know this has been discussed to death but real world is on it, so why exclude AND without COX-1

inhibition you will get more thrombotic events and kill the drug."
Merck came up with a solution that would avoid the use of aspirin (and
the risk of neutralizing any potential GI benefit of Vioxx) and minimize
the increased CV complications that might result from not allowing
people to take aspirin during the clinical trials of Vioxx: exclude people
who qualify for prophylactic aspirin from the major clinical trials.
This tactic could—at the same time—avoid blunting the potential GI
benefit and minimize potential CV risk of Vioxx by excluding people
at high risk of CV complications. And this is exactly the way that the
pre-approval osteoarthritis studies, the VIGOR trial, and the
Alzheimer's studies were designed—people with recent CV disease or
qualifying for prophylactic aspirin were excluded from these studies.
Although this strategy increased the likelihood of Merck's studies
casting Vioxx in a favorable light, there were three problems:  First, it
created unrepresentative, not "real world" study populations so that the
results of these studies should have been applied only to similar low-
CV risk patients.  Second, it ignored the recommendations from
Merck's own scientists and medical advisors to systematically examine
cardiovascular risk in studies of all of its COX-2 drugs, including
Vioxx.  And third, it didn't work: despite creating an artificially low-
CV risk population, the people in the VIGOR trial taking Vioxx still
developed significantly more CV complications and serious
complications overall than the people taking naproxen.  As a physician
and prescriber, it is my opinion that it would have been far more
responsible to have killed the drug than risk killing the patient.

c.     The Scientific Advisor's Meeting Programmatic Review May 3-May 6,
1998 contains an entire section describing the mechanism whereby

Vioxx could promote destabilization of plaque and promote thrombotic CV events: by selectively decreasing prostacyclin production, COX-2 inhibitors might enhance "the probability that a coronary plaque rupture would lead to myocardial infarction or ischemic ventricular fibrillation.") (Anstice Exhibit 10 MRK-AEI0002734 TO 2746).  Yet when Merck's worst fears were realized and the increased risk of thrombotic events became evident in the VIGOR trial, Merck attempted to hide the true risk of CV events associated with use of Vioxx and failed to communicate this risk to physicians, healthcare providers and consumers in a forthright and timely manner.

d.    The VIGOR trial (Vioxx Gastrointestinal Outcomes Research) was a clinical trial of over 8000 patients with rheumatoid arthritis who were randomly assigned to take Vioxx or naproxen, which was at the time the most commonly used NSAID used to treat rheumatoid arthritis. The trial was sponsored by Merck, with all 13 of the authors either employed by Merck or having financial ties to Merck. The data demonstrated that serious thrombotic CV events (including coronary events, cerebrovascular events,  and peripheral blood clots) in the VIGOR trial occurred 2.4 times more frequently in Vioxx users than in naproxen users (P=0.016). Merck conveyed to physicians in a press release and in the New England Journal of Medicine article that reported the findings of the VIGOR study  that this result was due to the cardioprotective properties of naproxen, despite Merck's being aware that there was no published scientific basis for this statement. Dr. Alise Reicin, a Merck employee directly involved in this trial and a co-author of the NEJM article, looked unsuccessfully for corroboration from the medical literature to support the theory that naproxen reduced

the risk of CV complication (MRK-ABH0017355, Reicin to Skolnick 3-13-00). Further, Merck was informed on March 28, 2000 that its own consultant, Dr. Carlo Patrono, did not believe that naproxen could have reduced CV events enough to explain the difference between CV events occurring in Vioxx users vs. naproxen users (Anstice Exhibit 16: memo from Martino Laurenzi to Merck officials, including Alise Reicin, then forwarded to Merck executives). Merck thus had knowledge from its own employees and consultants that there was no scientific evidence in March 2000 for dismissing the greater number of serious cardiovascular complications occurring in the VIGOR study among patients taking Vioxx as the consequence of a cardioprotective property of naproxen as opposed to cardiovascular harm caused by Vioxx.  Despite this knowledge and also knowing that the underlying study data demonstrated an increased cardiovascular risk in Vioxx users which overshadowed any presumed GI benefit, Merck "confirmed the favorable cardiovascular safety profile of Vioxx" in a press release one month later dated April 28, 2000. Regarding the findings of the VIGOR clinical trial, Merck stated in a press release that while fewer heart attacks occurred in the naproxen users, "this result is consistent with naproxen's ability to block platelet aggregation." (Merck press release dated 4-28-00, MRK-PRL0000122) As stated above, there was no scientific basis for making this statement, which misled physicians regarding the true CV risk associated with Vioxx use.

e.      Results of the VIGOR study were published in the November 23, 2000 issues of The New England Journal of Medicine, one of physicians' most widely read and trusted medical journals. Again, despite knowing

from its own employees and consultants—at least one of whom was a co-author of this very article—that there was no reasonable scientific basis for the theory that the increased incidence of CV events seen in Vioxx users was due to the cardioprotective nature of naproxen, Merck nonetheless proffered this as the sole explanation of the finding of increased heart attacks in the people taking Vioxx in the VIGOR trial in its November 23, 2000 NEJM article.

f.    Further, the article by Susan Jick, published in July 2000 in Pharmacotherapy 30(7):741-744 showed that naproxen was not, in fact, cardioprotective in comparison to other NSAIDS. Despite Jick's study having been available to Merck 4-5 months prior to publication of the VIGOR article in November 2000, Merck failed to modify its unfounded explanation for the excess CV risk seen with Vioxx in that study--that naproxen was cardioprotective—and failed even to cite this highly relevant study in its NEJM article.  At the same time, Merck failed to inform physicians of the more plausible explanation of the increased number of CV complications in general and MIs in particular that occurred in people taking Vioxx in the VIGOR trial—expressed by its own scientific advisors two years earlier—that by selectively inhibiting prostacyclin without also inhibiting thromboxane, Vioxx could exert a prothrombotic effect.  Informing doctors in its November 2000 NEJM article of the significant increase in the risk of CV complications, whether or not patients had a previous history of heart disease, and of the potential mechanism to explain the increased CV risk associated with Vioxx would have been the right thing for Merck to do.  But it was not done.  Instead, Merck's failure to report CV events in toto and overall serious adverse events and its unfounded

explanation of the significantly increased risk of myocardial infarction in people taking Vioxx in its VIGOR study left physicians and healthcare providers misinformed about the true and significant risks associated with use of Vioxx.

g.     Merck-supported publications and sales reps should have communicated the increased cardiovascular risk demonstrated in the VIGOR trial to physicians and healthcare providers in a timely and accurate manner. Instead, Merck-supported scientific publications consistently tried to show that Vioxx was safe. And Merck documents show that its sales reps were specifically instructed not to discuss the results of the VIGOR trial and to avoid bringing up the CV risk issue. Instead, Merck's sales reps were given "obstacle handling" tools, including a "Cardiovascular Card" that substituted far less "hardy" scientific data and failed to discuss the VIGOR CV risk results.  Rather than performing the educational role that Merck claimed, its sales reps were instructed specifically how to "Dodge" health care providers' concerns about the safety of Vioxx and incentivized to increase Vioxx sales.  (MRK-AAR0007240-MRK-AAR0007248, MRK-AAR0021103-MRK-AAR0021108).

h.     In further violation of the standard requiring support of full, honest and forthright disclosure of the risks and benefits of their drug, Merck instituted a campaign to "neutralize" non-Vioxx supporting physicians as evidenced in the email from Susan Baumgartner to Leonardo Mendez  dated 4-29-99. In this document, titled "Physicians to Neutralize", a list of "problem" physicians "that we must, at a minimum, neutralize" is attached. Instead of encouraging open and honest communication by clinical experts regarding the product, Merck

initiated efforts to both suppress and win over physicians who expressed concern and negative opinions regarding Vioxx. And on the consumer side, Merck retained celebrity athletes such as Dorothy Hamill and Bruce Jenner at a cost of millions of dollars to communicate a positive emotional message and create the impression that Vioxx was, in some unspecified way, superior to other NSAIDs, many of which could be purchased without a prescription, while at the same time not reasonably presenting the serious dangers of Vioxx of which Merck was aware.

i.   Documents attached on Exhibit 2 demonstrate that Merck focused its efforts on defusing and obfuscating instead of disclosing the cardiovascular and overall risks of Vioxx. Margie McGlynn's email to Alise Reicin and copied to Ed Scolnick dated 5-25-00 (prior to publication of VIGOR) is evidence for this point. In this memo, Ms. McGlynn states "Alise, attached are 2 analysts reports which most clearly demonstrate the success of our efforts to defuse the CV risk issue for Vioxx. You played a major role in making this happen..." (MRK-NJ0320174)

j.   The Division of Marketing, Advertising and Communications (DDMAC) of the FDA sent Merck a formal Warning Letter dated 9-17-01 in response to serious marketing violations of Vioxx and the persistence of its "violative promotion of Vioxx" despite the FDA's "prior written notification regarding similar violations." The FDA specifically cited the title of Merck's press release "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," as "simply incomprehensible" in the face of the data from the VIGOR study. (Letter from Thomas W. Abrams dated 9-17-01, Director, DDMAC,

> FDA to Raymond Gilmarten, President and CEO Merck & Co., Inc.)
> Yet Merck continued to instruct its sales force to focus on efficacy—
> which had never been shown to be superior to two Advil or Aleve
> tablets bought over the counter—and use the CV card to handle
> obstacles such as CV risk when questioned by physicians through its
> launch of marketing programs like Project Offense.

13. The standard in the medical community is also to expect that a drug has been
adequately tested in the populations in which its manufacturer seeks the
indication for usage to ensure that the drug's overall benefits outweigh the risks
of ingestion for that population. As stated above, Merck knew as early as 1996
that Vioxx had the potential to increase CV thrombotic events. As such, the
clinical trials should have been designed to monitor closely for the occurrence of
this serious and potentially fatal set of adverse events. Review of documents
contains evidence that instead, Merck designed clinical trials such as the VIGOR
trial with the goal of minimizing cardiovascular adverse events and exaggerating
any potential GI benefit. Merck's decision making regarding the design of the
VIGOR trial is a case in point supporting this opinion.

  a. In response to the 2-25-97 email by Dr. Morrison noted above in which
  he expressed that by not using aspirin in a trial you may get more
  thrombotic events and kill the drug , Dr. Alise Reicin of Merck
  responded "I HEAR YOU! This is a no win situation. The relative risk
  may be as high as 2-4 fold. Yet the possibility of increased CV events
  is of great concern (I just can't wait to be the one to present those
  results to senior management!) What about the idea of excluding high
  risk CV patients- i.e. those that have already had an MI, CABG or
  PTCA? This may decrease the CV event rate so that a difference
  between the two groups would not be evident. The only problem would

be-Would we be able to recruit any patients?" This exclusion was implemented for the pre-approval osteoarthritis trials as well as the VIGOR and Alzheimer's disease trials—gathering scientific data on the CV risk of Vioxx from artificially constructed study populations designed to minimize the CV risk of Vioxx while creating results that were not applicable to the "real world" population of people to whom Merck intended to and did market Vioxx.

b.   The VIGOR trial was designed such that patients who had experienced a CVA within 2 years of the study or an MI within the year prior to enrollment were excluded and only 4% of the patients qualified for low dose aspirin (and therefore being at increased risk for CV events). A natural population of people requiring ongoing anti-inflammatory therapy would realistically include 20-40% of people taking low-dose aspirin. Thus the CV risk of the people included in the VIGOR trial was successfully minimized.

c.   Further, 56% of the patients enrolled in the VIGOR study were taking steroids to control their arthritis concurrent with their NSAID. Among the real world of people taking Vioxx and other NSAIDS, outside the artificial context of this drug study, only 6% or fewer are concurrently taking steroids with NSAIDS (Graham, Kaiser-Permanente study, Lancet 2005). The disproportionately high number of patients in the VIGOR study on steroids skews the results by exaggerating any potential GI benefit of Vioxx.

d.   Another example of Merck's minimizing or hiding the CV risk of Vioxx is demonstrated by their actions with the Data Safety Monitoring Board (DSMB) for the VIGOR study. The DSMB was aware at both its second and third meetings that significantly more people in "Group A"

were developing serious CV complications perhaps "due to a cardioprotective effect of Treatment B" and that "no cardiovascular analysis plan was in place for VIGOR or Vioxx." On 12-20-99, in a letter to Dr. Reicin, the DSMB had requested that a plan be developed to analyze and report the thrombotic CV complications that occurred in the VIGOR study. This letter from Dr. Weinblatt of the DSMB states "due to the interest about COX 2 inhibitors and their potential role in vascular events, we recommend that an analysis plan be developed to analyze adjudicated serious vascular events in the VIGOR trial separately from any other planned analyses of these data." Despite the importance to clinicians and patients of knowing the truth about the CV risk data, Merck Management made a request to the VIGOR Data Safety Monitoring Board (DSMB) on 1-24-00 that a separate analysis of the VIGOR data not be performed. The DSMB appropriately rejected Merck's request not to do a separate analysis on the CV events from VIGOR. (MRK-NJ0071309; MRK-AAX0002760;MRK-NJ0243719; MRK-NJ0243720) Nonetheless, when Merck published the results of its VIGOR study in the NEJM, the complete CV data was simply not presented. Instead Merck presented data on myocardial infarctions alone—a post hoc endpoint the significance of which was further misrepresented.

e.  Thus, this clinical trial was designed and carried out in a population such that CV events were minimized, GI benefit was exaggerated and the true risk and benefit were not tested in the population the drug was intended to treat. Even so, the larger design of the VIGOR trial is to be commended: Merck tested the safety of Vioxx "head-to-head" against the specific NSAID and the specific dose that was being used most to

treat rheumatoid arthritis, naproxen 500 mg twice a day. Despite the unrepresentative population included in this trial, had Merck disclosed the comprehensive CV data in the NEJM article and its communications with physicians or other health care providers — which it did not—these results would have provided a clear and unambiguous answer to the question that mattered most to clinicians: Is Vioxx a safer and/or more effective NSAID treatment for rheumatoid arthritis than the current treatment of choice? The answer, when one had access to the complete data, despite the unrepresentative population, came back loud and clear: Overall Vioxx is significantly more dangerous than naproxen and no more effective. Merck's failure to disclose the comprehensive CV and overall safety data and dissemination of misleading data, as described above, left health care providers, even those reading the scientific articles in their most trusted journals, unaware of the true risks associated with Vioxx use. The bottom line is that after Merck was aware that Vioxx was significantly more dangerous and no more effective than naproxen, Merck continued its aggressive sales and marketing campaign for Vioxx without disclosing the true CV and overall risks while emphasizing alleged GI benefit and efficacy, such that American doctors prescribed about $7 billion worth of Vioxx that caused an estimated 100,000 heart attacks and deaths.

f.     The manufacturer of a new drug has the most knowledge and control over all aspects of the drug and is responsible for disclosing and disseminating information regarding the true risks and benefits of the drug to physicians, healthcare providers, consumers and governmental agencies. The GAO report of March 31, 2006, titled "Improvement

Needed in FDA's Postmarket Decision-making and Oversight Process," was requested by Sen. Charles Grassley and Representative Joe Barton in large part because of concerns about the FDA's handing of Vioxx. The GAO report found that FDA has limited access to postmarketing safety data, noting that "FDA's access to postmarket clinical trial and observational data, however, is limited by its authority and available resources." Furthermore, the GAO found that FDA Office of Drug Safety's ability "to provide effective oversight so that the FDA can ensure that safety concerns are addressed and resolved in a timely manner" is limited by structural impediments within the FDA. As the FDA is currently structured, consumers, physicians and healthcare providers must rely on the drug manufacturers to be forthright, honest and thorough regarding disclosure of the safety and efficacy data on their drugs.

14. The standard in the medical community is to expect that all trials, especially those demonstrating adverse effects of a drug and adverse safety information, be published and the information be disseminated honestly and completely to physicians in a timely manner so that physicians can make informed decisions regarding whether or not to prescribe the drug to a given patient or at all. In the case of Vioxx, Merck failed to meet this standard and instead, suppressed the publication of studies that revealed adverse safety information regarding the overall risks and cardiovascular risks of Vioxx. Merck also failed to warn physicians of the true overall risks and cardiovascular risks associated with Vioxx, especially in comparison to other treatment alternatives.

a.   In the VIGOR trial, review of the complete data from the internal documents demonstrates that the incidence of serious thrombotic CV events and CV deaths overshadowed the incidence of serious GI events

and deaths. Yet the conclusion expressed in Merck's publication of the VIGOR results in the NEJM was only that treatment with Vioxx was associated with fewer clinically significant GI events than treatment with naproxen – again exaggerating the benefits and minimizing the risks in a biased and unbalanced manner. (In fact, even this claim of significantly greater GI safety for Vioxx was only true for the 56% of patients in the study who were also taking steroids for their arthritis. The GI benefit of Vioxx was not significant for the 44% of patients not taking steroids concurrently.) In this study, Vioxx users experienced 21 fewer serious GI complications than those who took naproxen but they experienced 27 more serious cardiovascular events. The manuscript includes a table and a "time to event plot" showing the GI events. An analogous table and plot for cardiovascular events were not included in the article, in fact the numbers and comparative risk of cardiovascular events were not even reported in the published manuscript. Instead, the only CV data included in the NEJM article were the post hoc outcome measure of heart attacks alone. Thus, Merck failed to ensure that physicians were informed of the true incidence of serious CV risks associated with Vioxx despite the fact that Merck both funded the study and had financial relationships with all 13 of the NEJM article's authors.

b.      Other important outcome measures in clinical trials are overall serious adverse events and hospitalizations. In the VIGOR trial, there were 21% more serious adverse events (causing hospitalization, prolongation of hospitalization, permanent disability, cancer or death) among those taking Vioxx  (P=0.013). And overall there were 28% more hospitalizations in patients taking Vioxx than in those taking naproxen.

Specifically, there were 20 fewer GI hospitalizations and 41 more CV
hospitalizations
(www.fda.gov.lilac.une.edu/ohrms/dockets/ac/01/slides/3677s2_06_vill
alba.PPT). Neither of these important findings was reported in the
NEJM article though the data was known to Merck. Merck failed to
warn physicians about the true incidence of overall risk of serious
adverse events and hospitalizations associated with use of Vioxx, again
despite funding the study, having access to the data and having two
Merck employees coauthoring the manuscript.

c.   Merck was aware of, but failed to include in its NEJM report, three
heart attacks that occurred in the VIGOR trial (MRK-AJA0119085-
MRK-AJA0119087, 5-26-00 email to Alise Reicin). Deborah Shapiro
of Merck confirmed in her deposition that she knew around the end of
May 2000 that the statement in the November 23,  2000 NEJM article,
"the difference in the rate of myocardial infarction between groups was
not significant" for patients without a previous history of heart disease
was "no longer true," (presumably based on these 3 additional heart
attacks). Yet the NEJM article was published with this false
statement—falsely reassuring doctors that in patients without a
previous history of CV disease prescribing Vioxx instead of naproxen
did not increase their patients' risk of heart attack, when exactly the
opposite was true. Merck scientists—two of whom were listed as
authors on the NEJM article—knew six months earlier that this
statement was simply not true. Part of Merck's justification for
excluding these three heart attacks from the NEJM article is that the
prespecified cutoff date for CV events in the VIGOR trial was February
10, 2000. To put this in perspective, the "prespecified cutoff date" had

not been identified at the inception of the trial, but only three days earlier, on February 7, 2000. Furthermore CV events stopped being included in the analysis of data that was published in the NEJM on February 10, 2000, but data from the rest of the study including GI complications continued to be collected until the end of the study on March 9, 2000.

d.     Despite the above evidence of increased overall risk, cardiovascular risk, and heart attack risk occurring in the VIGOR trial with use of Vioxx instead of naproxen, Merck failed to warn physicians and health care providers about the true CV and overall risk and failed to change the labeling for Vioxx to disclose these risks in a timely and accurate manner.

## CASE SPECIFIC OPINIONS

15.    I have reviewed medical records, depositions and information pertaining to Robert Garry Smith, including the records of the prescribing physician/healthcare providers in this case. The records and depositions reflect that Mr. Smith ingested Vioxx from October 2, 2002 until the date of his heart attack on February 17, 2003. It is my opinion based on the information that was reasonably available and had been provided to the prescriber (Dr. Michael Grefer) at the time of his care and treatment of Mr. Smith that Dr. Grefer did not act unreasonably in prescribing Vioxx to Mr. Smith. It is my opinion that had Dr. Grefer been provided honest and complete information by Merck about Vioxx that he probably would not have prescribed Vioxx to Garry Smith in October 2002. It is my opinion that the true risks of Vioxx use for Gary Smith outweighed the benefits, especially given the fact that there were reasonable, safer alternatives available to him on the market at the time.

## CONCLUSIONS

16.     It is my opinion, based on my education, training, experience and review of the
literature and documents listed on Exhibit 2 that Merck failed to communicate to
physicians, healthcare providers and consumers in an unbiased, balanced manner
the true overall and cardiovascular risks associated with Vioxx that were known
to them. It is further my opinion based on review of documents and depositions
listed on Exhibit 2 that Merck disseminated misleading and inaccurate
information regarding the risks associated with Vioxx.  Merck's actions as
described above in this affidavit unreasonably influenced the prescribing habits of
physicians and healthcare providers and deprived them of the right to make
educated, informed decisions about the risks and benefits of prescribing Vioxx to
their patients. Merck's actions thus deprived patients of the right to make
informed decisions about their healthcare and exposed them unnecessarily to
excess risk of serious harm and injury, including heart attack and death. It is also
my opinion that the prescribing physician/healthcare provider in this case acted
reasonably based on the information available to them at the time of their care and
treatment of this Plaintiff.  It is my opinion that the true risks of Vioxx
outweighed the benefits and there were safer alternatives on the market.

17.     I reserve the right to expound upon my opinions as stated in this affidavit and to
respond as necessary to other areas or topics raised in deposition or trial. As new
information and literature becomes available, I reserve the right to supplement my
opinions.


Further, Affiant sayeth not.


July 11, 2006
_____
Date

LOOSE ACKNOWLEDGEMENT ATTACHED

_____
John David Abramson, M.D.

STEVEN ROBERT McCLENAGHAN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 8, 2011

On this _____11_____ day of _Ju ly_____, 20 06 ,
Before me, the undersigned notary public, personally appeared

_____John David Abramson)_____

Proved to the through satisfactory evidence of identification, which were: _Massachusetts Driver License_____, to be the person who swore or affirmed to me that the person whose name is signed on the preceding or attached document  and acknowledged to me that he/she signed it voluntarily for its stated purpose.

_Steven Robert McClenaghan_____

Steven Robert McClenaghan, Notary Public
My Commission Expires December 8, 2011

STEVEN ROBERT McCLENAGHAN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 8, 2011