Exhibit A - Kronmal Deposition Excerpts

- Smith - Kronmal Motion

[:1] - [:25]      6/7/2006    Kronmal, Richard A.

```
page
1    ROBERT MCFARLAND,                       )
                                             )
2                       Plaintiff,           ) SUPERIOR COURT OF
                                             ) NEW JERSEY LAW
3              vs.                           ) DIVISION: ATLANTIC
                                             ) COUNTY
4    MERCK & CO., INC.,                      )
                                             ) No. ATL-L-0199-04-MT
5                       Defendant.           )
     _____  )
6                                            )
                                             )
7    PATRICIA HATCH, Administrator of        )
     the Estate of STEPHEN HATCH,            )
8    Deceased and PATRICIA HATCH, In         ) SUPERIOR COURT OF
     Her Own Right,                          ) NEW JERSEY LAW
9                                            ) DIVISION: ATLANTIC
                                             ) COUNTY
10                      Plaintiff,           )
                                             ) No. ATL-L0403-05-MT
11                                           )
                                             )
12             vs.                           )
                                             )
13                                           )
                                             )
14   MERCK & CO., INC.,                      )
                                             )
15                                           )
                                             )
16                      Defendant.           )
                                             )
17   _____  )
18
19
20           DEPOSITION OF RICHARD A. KRONMAL, PH.D.
21                         June 7, 2006
22                      Seattle, Washington
23
24
25
```

[53:22] - [57:20]    6/7/2006    Kronmal, Richard A.

```
page 53
22  Q   And you made a mistake in your report, didn't you?
23              MR. BUCHANAN:  Excuse me.  You're
24      talking over each other.  I'm going to interpose an
25      objection.  I'm going to object to form.
page 54
1       You can answer.
2   A   The answer is, those are not important differences.
3   Q   (By Mr. Raber)  Sir, you made a mistake in your
4       report.
5   A   I did.  I miscopied that number, yes.
6   Q   And you not only miscopied it.  You made a statement
7       about the fact that the numbers were virtually
8       identical.
9   A   They're still virtually identical.  That statement is
10      still true.  So whether it's 1.92 or 1.86, it's the
11      same thing.  It's all within --
12  Q   But you got the numbers wrong.
13  A   I miscopied that number, as I said that.
14  Q   All right.  Looking at Page 5 of your report, you
```

**Exhibit A - Kronmal Deposition Excerpts**

• **Smith - Kronmal Motion**

```
              15     say -- I'm sorry.  Page 5 of your extension, you say
              16     that "For the APTC endpoint, the on-drug" --
              17             MR. TISI:  I'm sorry.  Where are
              18     you, Steve?
              19             MR. RABER:  Last paragraph on
              20     Page 5.
              21  Q  (By Mr. Raber)  "For the APTC endpoint, the on-drug
              22     relative risk was increased from from 2.06 in the NEJM
              23     paper to the ITT RR of 2.36 now."
              24             MR. BUCHANAN:  Okay.  Your question?
              25  Q  (By Mr. Raber)  Are you with me, what you said in your
page 55
1            report?
2         A  Yeah.
3         Q  And the APTC number from APPROVe is 2.06; correct?
4         A  That's correct.
5         Q  And you said that it increases to 2.36 on the ITT;
6            correct?
7         A  That's correct.
8         Q  And you've commented on that by saying that "This
9            indicates that the off-drug contribution to the ITT RR
10           was actually greater than seen during the on-drug RR
11           for the APTC endpoint"; correct?
12        A  Yes.
13        Q  You were making the argument that this shows that when
14           you add the off-drug deaths, the relative risk gets
15           higher; right?
16                    MR. BUCHANAN:  Objection.  Form.
17              You said "deaths," by the way.
18        A  I was basically commenting that it was larger.  That's
19           a fact.
20        Q  (By Mr. Raber)  In fact, you're wrong, aren't you,
21           Doctor?
22        A  I don't know I'm wrong.  Why am I wrong now?
23        Q  Because the ITT relative risk for the APTC endpoint
24           actually decreased when you add the off-drug data,
25           didn't it?
page 56
1         A  What are you referring to specifically?
2         Q  Look at Table B9, sir, of the Merck data to the FDA.
3                    MR. BUCHANAN:  Objection.  Form.
4         Q  (By Mr. Raber)  Do you see that?  Can you tell us what
5            that table shows for the relative risk for the APTC
6            endpoint for ITT population at week 210?
7         A  Shows 1.86.
8         Q  Right.  That APTC number decreased; correct?
9         A  You're right.  I don't know -- I can't figure out what
10           I did.
11        Q  Your addendum is wrong, isn't it?
12        A  It's certainly wrong on that number.
13        Q  And the conclusions you drew from those numbers are
14           wrong, aren't they?
15                    MR. BUCHANAN:  Objection.  Form.
16        A  I'd really need to look at the documents I had at the
17           time, because I just can't believe I would miscopy
18           that number.  So I want to look back and see what
19           actual documents I was looking at.
20        Q  (By Mr. Raber)  It's a pretty big mistake, isn't it?
21                    MR. BUCHANAN:  Objection.  Asked and
22           answered.
23        A  I made a mistake, obviously.  If the -- you know, I...
24        Q  (By Mr. Raber)  You're shaking your head.
25                    MR. BUCHANAN:  Objection to the
page 57
1            characterization.
2         Q  (By Mr. Raber)  You were shaking your head.
3         A  I was, because I don't understand where I got that
4            number.  And I know that I copied it from a Merck
```

**Exhibit A - Kronmal Deposition Excerpts**

• **Smith - Kronmal Motion**

```
             5     report, from this -- from this thing.
             6         So the question is, did I have another preliminary
             7     version and this is the later version and they
             8     changed?  I don't know.  At this point in time, I
             9     can't --
            10  Q  Could it just be possible that Dr. Kronmal made a
            11     mistake rather than Merck changing numbers?  Is it
            12     possible?
            13  A  I'm capable of making mistakes.  It's possible.  I
            14     obviously made a mistake in copying the number 1.92,
            15     that you previously pointed out.
            16  Q  And not only did you make a mistake, but you made a
            17     conclusion that is incorrect.
            18              MR. BUCHANAN:  Objection.
            19  A  If I made a mistake, that conclusion was incorrect.
            20     That's correct.
```

[65:4] - [68:16]        6/7/2006    Kronmal, Richard A.

```
         page 65
            4   Q  Excuse me.  How did you calculate a relative risk for
            5      2.07 for MIs in the APPROVe base study?
            6   A  I took the data file that I had from the APPROVe study
            7      and I calculated it.
            8   Q  How many events were there in the Vioxx arm and the
            9      placebo arm?
           10   A  I don't remember.  I don't remember.
           11   Q  Is it possible that you made a mistake?
           12              MR. BUCHANAN:  Objection.
           13   A  It's always possible to make mistakes.  Obviously I've
           14      already made some, apparently.  At least one for sure.
           15      And the other one, probable.
           16   Q  (By Mr. Raber)  Would you agree with me that just in
           17      looking at this data, that if the MIs off-drug are ten
           18      to six, that it would be unusual for that to increase
           19      a relative risk that's greater than two?
           20   A  It would be.
           21   Q  Does that suggest to you that maybe you made a
           22      mistake?
           23   A  It's unlikely, for the following reason:  That I just
           24      took the data that was in that file and ran the
           25      analyses.  And that is a standard process.  That
         page 66
            1      doesn't mean it's inconceivable, but it's fairly
            2      unlikely.
            3   Q  Could you have written down the wrong data or the
            4      wrong numbers?
            5   A  That's conceivable, but unlikely, for the following
            6      reason:  I don't tend to write down the numbers.  I
            7      tend to paste them in.  And -- from the analysis
            8      files.  So again -- but, you know, given that I've
            9      made some of these mistakes, yeah, it's possible.
           10   Q  Is it possible that you double counted some heart
           11      attacks?
           12              MR. BUCHANAN:  Objection.  Asked and
           13      answered.
           14   A  No, not unless they were in the file twice.
           15   Q  (By Mr. Raber)  All right.  Let's look further down on
           16      Page 4 of your addendum.  You say, "The results for
           17      hard CHD are quite similar."
           18   A  That's correct.
           19   Q  "The RR is 2.45 compared to the on-drug RR of 2.17."
           20   A  Yes.
           21   Q  And what you've concluded from that is that the
           22      relative risk increased from 2.17 up to 2.45 when you
           23      added the off-drug data for MI and sudden cardiac
           24      death; correct?
           25   A  That's correct.
```

**Exhibit A - Kronmal Deposition Excerpts**

• **Smith - Kronmal Motion**

```
                         page 67
                         1   Q   Now, if you would look, please, at Table B5.
                         2   A   Yeah.  Yeah.
                         3   Q   Do you see that the number of events for sudden
                         4       cardiac death plus myocardial infarction, it's
                         5       fourteen for Vioxx and eleven for placebo?
                         6   A   That is also correct.
                         7   Q   Now, in looking at those numbers, does that suggest to
                         8       you that when you add fourteen versus eleven events,
                         9       that a relative risk that starts out above two is not
                         10      going to get bigger?
                         11  A   That's --
                         12                  MR. BUCHANAN:  Objection.  Form.
                         13  A   That's correct also.
                         14  Q   (By Mr. Raber)  Does it appear to you that you've made
                         15      a mistake in your statements and calculations relating
                         16      to the results for hard CHD in your addendum?
                         17  A   What it suggests to me is that the file I had was not
                         18      correct or not up to date.
                         19  Q   So you're going to blame the file?
                         20                  MR. BUCHANAN:  Objection to form.
                         21  A   I'm not blaming anything.  I'm just saying that's the
                         22      only explanation for it.  It's the only logical
                         23      explanation.
                         24  Q   (By Mr. Raber)  It appears to me that your statement
                         25      in the fourth paragraph on Page 4 of your addendum is
                         page 68
                         1       incorrect.
                         2           Would you agree with that?
                         3                   MR. BUCHANAN:  Objection.
                         4   A   I don't know.  I haven't looked at the -- I mean, all
                         5       I can say is that the file I had gave those results.
                         6           Now, if there was a more recent file -- and there
                         7       are more recent files -- that give a different result,
                         8       then I'll say that whatever that different result is,
                         9       is the result.
                         10          I'm not trying to make up data here.  This is what
                         11      I had.  And --
                         12  Q   (By Mr. Raber)  But you're drawing -- go ahead.
                         13  A   And if they're wrong, then of course everything
                         14      follows from that.
                         15  Q   And your conclusions would be wrong, as well?
                         16  A   They would be different.
```

[92:5] - [93:25]         6/7/2006    Kronmal, Richard A.

```
                         page 92
                         5   Q   (By Mr. Raber)  Okay.  But your opinion here about
                         6       stopping the trial is your personal opinion?
                         7   A   Well, everything is somebody's personal opinion, but
                         8       it's based on my experience as a clinical trial expert
                         9       over -- over four decades, and extensive reading of
                         10      the literature over that period, and being involved in
                         11      multiple data safety monitoring boards where some of
                         12      these issues have come up.
                         13  Q   Further down on Page 2, you make a reference that
                         14      permitting 078 to continue also violated the informed
                         15      consent provisions of the Declaration of Helsinki.
                         16          Do you see that?
                         17  A   Yes, I do.
                         18  Q   And again, that standard relates to risks and
                         19      benefits; correct?
                         20  A   Well, it --
                         21                  MR. BUCHANAN:  Objection.  Form.
                         22  A   It certainly -- it says potential hazards.  And, I
                         23      mean, it doesn't have to --
                         24  Q   (By Mr. Raber)  It also said anticipated deaths.
                         25  A   Yeah, both.  They should know about both.
```

**Exhibit A - Kronmal Deposition Excerpts**

- **Smith - Kronmal Motion**

```
                              page 93
                              1   Q   So it's a risk/benefit determination that needs to be
                              2       made; correct?
                              3   A   Not necessarily.  They have to be informed about
                              4       potential benefits and the potential risks.
                              5                   MR. BUCHANAN:  Belated objection to
                              6       the form.
                              7   Q   (By Mr. Raber)  Right.  And your opinion here that
                              8       Merck violated the informed consent provisions is a
                              9       subjective one --
                              10                  MR. BUCHANAN:  Objection.
                              11                  MR. TISI:  Objection.
                              12  Q   (By Mr. Raber)  -- based on your own analysis of risk
                              13      and benefit?
                              14  A   No.  It is based on the statement of the Helsinki that
                              15      they should have been informed of the risks and the
                              16      benefits both.  They were not informed.  It's not a
                              17      ratio issue.
                              18  Q   That's your opinion.
                              19  A   No.  It's what the says.
                              20  Q   Your conclusion from that, that Merck violated it, is
                              21      your opinion?
                              22                  MR. BUCHANAN:  Objection.
                              23  A   Well, everything is somebody's -- is my opinion.
                              24      Obviously I can't write down something that isn't my
                              25      opinion.
```

[94:22] - [94:25]          6/7/2006    Kronmal, Richard A.

```
                              page 94
                              22  Q   Did the FDA ever conclude that Merck violated the
                              23      informed consent standards of the Declaration of
                              24      Helsinki in connection with study No. 078?
                              25  A   As far as I know, they didn't.
```

[139:14] - [139:17]        6/7/2006    Kronmal, Richard A.

```
                              page 139
                              14  Q   (By Mr. Raber)  Well, but back to VIGOR, it was your
                              15      opinion that VIGOR should have -- that the label
                              16      should have had a stronger warning?
                              17  A   That's true.
```

[146:10] - [148:8]         6/7/2006    Kronmal, Richard A.

```
                              page 146
                              10  Q   Your opinion is that, based on the VIGOR data, it
                              11      would have been unethical to do the Alzheimer's study
                              12      and the APPROVe study; correct?
                              13                  MR. BUCHANAN:  Objection.  Are you
                              14      referring to his report or just --
                              15                  MR. RABER:  Testimony.
                              16                  MR. BUCHANAN:  Oh.  I'll object.
                              17  A   Well, number one, I don't know that I've said that.  I
                              18      don't believe I would have.  But if you can point to
                              19      where I said it, I'll be glad to look at it.
                              20          I think that --
                              21                  MR. BUCHANAN:  He's going to show
                              22      you.
                              23                  THE WITNESS:  Okay.
                              24  Q   (By Mr. Raber)  Okay.  Look at Page 245, Line 15, and
                              25      read 245, Line 15, read that question and answer.
                              page 147
                              1                   MR. BUCHANAN:  You can read whatever
                              2       you like.
                              3                   MR. RABER:  I'm sorry, David?  He
                              4       can read whatever he likes?
```

**Exhibit A - Kronmal Deposition Excerpts**

• **Smith - Kronmal Motion**

```
                            5                  MR. BUCHANAN:  Yes.
                            6                  MR. RABER:  I'm just directing him
                            7     to refresh his recollection.
                            8                  MR. BUCHANAN:  I understand.  He's
                            9     allowed to read the surrounding sentences for context.
                           10     He's perfectly entitled to do that.
                           11                  MR. RABER:  What you're doing is
                           12     improper.
                           13                  MR. BUCHANAN:  It's not improper at
                           14     all.
                           15  A  That's not the question that was asked, nor my
                           16     response.  It has nothing to do with -- it doesn't say
                           17     anything about Alzheimer's.  It doesn't say anything
                           18     about APPROVe.
                           19        Oh, I see.  You're saying the answer to the next
                           20     question.  I'm sorry.
                           21  Q  (By Mr. Raber)  No.  Page 245 --
                           22  A  I didn't use the word "ethical."  He did.  But anyway,
                           23     I couldn't have done the Alzheimer's study, I couldn't
                           24     have done the APPROVe study --
                           25  Q  (By Mr. Raber)  Based on your interpretation.  And you
                           page 148
                            1     did use the word "ethical," didn't you?
                            2  A  Yes.
                            3                  MR. BUCHANAN:  You can read keeping.
                            4  Q  (By Mr. Raber)  So what you said under oath is that
                            5     based on the VIGOR results, you could not have done
                            6     either the Alzheimer's studies or the APPROVe studies;
                            7     correct?
                            8  A  That's correct.
```

[163:6] - [163:16]        6/7/2006    Kronmal, Richard A.

```
                           page 163
                            6        In your 2005 report, you recall that you said that
                            7     the trend was unfavorable in the Vioxx group regarding
                            8     death in the VIGOR study?
                            9  A  Yes.
                           10                  MR. BUCHANAN:  Objection.  Asked and
                           11     answered.
                           12  Q  (By Mr. Raber)  And you admitted that using the word
                           13     "trend" was sloppy and you shouldn't have used it?
                           14  A  Well, I didn't use the word "sloppy," but I agree that
                           15     it shouldn't have been used, yes.  It was not very
                           16     precise.
```

[164:22] - [165:16]       6/7/2006    Kronmal, Richard A.

```
                           page 164
                           22  Q  (By Mr. Raber)  Page 77, Line 5.  77, Line 5,
                           23     question:  "I'm just trying to understand your use of
                           24     the word trend."
                           25        Answer:  "Well, I was sloppy -- it was sloppy
                           page 165
                            1     there."
                            2  A  Okay.  That's fine.
                            3  Q  Then you go on to say in Line 11 through 13 that "I
                            4     shouldn't have used it there."
                            5  A  Yes.  I mean, I never disagreed with that.  I just
                            6     didn't remember using the word "sloppy."
                            7  Q  But you used it again in your 2006 report, didn't you?
                            8  A  What?
                            9  Q  The word "trend" to describe Vioxx and deaths in the
                           10     VIGOR study.
                           11  A  If I did, it was inadvertent.  I meant to take it out.
                           12  Q  Please look at Exhibit 1.
                           13  A  No, I believe you when you said if I did.  I have no
                           14     reason to disbelieve you on that.  I just -- my point
```

**Exhibit A - Kronmal Deposition Excerpts**

- **Smith - Kronmal Motion**

```
                    15      is that I wouldn't have -- if I'd have noticed it, I
                    16      would have taken it out.
```

[212:12] - [212:21]     6/7/2006     Kronmal, Richard A.

```
            page 212
            12  Q    (By Mr. Raber)  And you told us this morning that if
            13       you had a statistically significant result in a
            14       placebo-controlled trial, that that means there's
            15       causation; true?
            16                  MR. BUCHANAN:  Objection to form.
            17  A    It's evidence of causation.  It doesn't mean there
            18       were, because it could be chance.
            19  Q    (By Mr. Raber)  But it's statistically significant.
            20  A    I know.  It still could be chance.  Statistically
            21       significant results occur by chance.
```

[261:6] - [261:11]      6/7/2006     Kronmal, Richard A.

```
            page 261
            6   Q    And when you have differences that are not
            7        statistically significant, it's inappropriate to make
            8        causal inferences?
            9   A    That's correct.  If it was not statistically
            10       significant, it would be inappropriate.  That's what I
            11       said there, and I still say it.
```

[:1] - [:25]            6/7/2006     Kronmal, Richard A.

```
            page
                     STATE OF WASHINGTON )    I, Karmen M. Fox, CCR, RPR, CRR,
            2                            ) ss CCR # 1935, a duly authorized
                     County of Pierce    )    Notary Public in and for the State
            3                                 of Washington, residing at
                                              Milton, do hereby certify:
            4
            5
                              That the foregoing deposition of RICHARD A.
            6        KRONMAL, PH.D., was taken before me and completed on June 7,
                     2006, and thereafter was transcribed under my direction;
            7        that the deposition is a full, true and complete transcript
                     of the testimony of said witness, including all questions,
            8        answers, objections, motions and exceptions;
            9                 That the witness, before examination, was by me
                     duly sworn to testify the truth, the whole truth, and
            10       nothing but the truth, and that the witness reserved the
                     right of signature;
            11
                              That I am not a relative, employee, attorney or
            12       counsel of any party to this action or relative or employee
                     of any such attorney or counsel and that I am not
            13       financially interested in the said action or the outcome
                     thereof;
            14
                              That I am herewith securely sealing the said
            15       deposition and promptly delivering the same to
                     Attorney Stephen D. Raber.
            16
                              IN WITNESS WHEREOF, I have hereunto set my hand
            17       and affixed my official seal this 8th day of
                     June, 2006.
            18
            19
            20
            21                              _____
                                            Karmen M. Fox, CCR, RPR, CRR
            22                              Notary Public in and for the State
```

**Exhibit A - Kronmal Deposition Excerpts**

- **Smith - Kronmal Motion**

```
                                        of Washington, residing at
     23                                 Milton.
     24
     25
```

# IN RE VIOXX LITIGATION

# ADDENDUM TO REPORT OF RICHARD A. KRONMAL

**May 23, 2006**

# Addendum to the Report of Richard A. Kronmal

### Introduction

This addendum supplements my Report, submitted on April 7, 2006 (the "Report"), in the following areas:

- Updates to the Alzheimer's section of the Report; and

- Updated analyses of the APPROVe study, including analyses of the data from the study extension.

I have not yet updated the section of my Report concerning Protocol 203 to incorporate the recently produced APPROVe extension data and Oxford VICTOR data, but specifically reserve the right to do so.

### Updates to Alzheimer's Analysis

The following material should be inserted after the second paragraph on page 22 of the Report:

Merck did consider instituting a DSMB for study 078. An urgent meeting was called to discuss this issue (MRK-AFW0019561). This was followed by a meeting at which it was decided by Merck that a DSMB was unnecessary (MRK-NJ0333568). However, had a DSMB been formed, a reasonable DSMB would have been compelled to take immediate steps, including terminating the trial, to protect the patients in the study who never consented to the extreme risks seen in that trial. Evidence for this is the actions taken by the ESMB of the Merck APPROVe study. The APPROVe ESMB recommended termination of the APPROVe trial based on results that were less extreme than was the situation for the Alzheimer's trials. A member of the APPROVe ESMB and a Merck consultant when asked about the decision to terminate the APPROVe trial said:

> *"The reason we recommended termination was that we felt the patients in the APPROVe study were not aware of this and had not been consented to this adverse effect. So, in our judgment, you know, from an ethical viewpoint if you were going to continue you would have to go back and re-consent them and that certainly wasn't practical at that point in time. So, that is the specific reason we*

*recommended termination."*
*(http://www.fda.gov/ohrms/dockets/ac/05/transcripts/2005-4090T1.htm)*

Applying this same logic to the Alzheimer's 078 study would have resulted in a DSMB stopping the trial. In my years of experience with many clinical trials (and the DSMBs associated with such trials), study 078 could not be reasonably continued in the face of such information. One could not reasonably ask patients to consent to a trial of a drug that had a statistically significant 3 fold increased risk of death associated with it for a speculative benefit. Nor would a reasonable DSMB or IRB charged with protecting patients exposed to the therapy permit the continuation of such a study.

In my opinion, Merck's failure to notify the appropriate organizations of the possible excess risk of death from taking rofecoxib and their decision to not terminate the study sharply deviates from accepted clinical trial practice. The decision by Merck to continue study 078 is in direct violation of the principles of the *DECLARATION OF HELSINKI* that provides the standards for the conduct of medical research involving human subjects. To emphasize the widespread acceptance of this standard, I have provided three website references to this document, one from the FDA, one from the Office of Human Subjects Research of the U.S. National Institutes of Health, and one from the World Medical Association (WORLD MEDICAL ASSOCIATION DECLARATION OF HELSINKI Ethical Principles for Medical Research Involving Human Subjects, http://www.fda.gov/oc/health/helsinki89.html, http://ohsr.od.nih.gov/guidelines/helsinki.html , or http://www.wma.net/e/policy/b3.htm ). Merck indicates on its website that they follow the tenets of the Declaration of Helsinki (http://www.merck.com/cr/science_innovation_and_quality/drug_development_process/clinical_trials/). Continuing the trial when there was strong evidence of excess mortality associated with the use of rofecoxib violated section I.4, which states: *"Biomedical research involving human subjects cannot legitimately be carried out unless the importance of the objective is in proportion to the inherent risk to the subject."* This principle holds at all times during the trial and is a primary reason why DSMBs are widely utilized to monitor clinical trials. In April of 2001, there was a three times excess risk of mortality associated with the use of rofecoxib, a risk that far exceeded any likely benefits of the therapy for the subjects in the trial. Thus, by allowing the study to continue and thereby exposing the study subjects to the risk of premature death, Merck failed in its duty to the study subjects as specified in I.4.

Permitting study 078 to continue also violated the informed consent provisions of the Declaration of Helsinki by not informing the Alzheimer's study participants of the VIGOR MI results and the Alzheimer's mortality results. Section I.9 of the declaration states:

> "In any research on human beings, each potential subject must be adequately informed of the aims, methods, anticipated benefits and potential hazards of the study and the discomfort it may entail."

2

The Alzheimer's 078 study informed consent (MRK-AFK0205452) contains the following provision:

> ***"NEW FINDINGS***
> *You will be told of any significant new findings developed during the course of this study which may relate to your willingness to continue your participation."*

Nowhere in the informed consent was there any mention of the adverse events seen in VIGOR, nor was there any mention of the excess mortality seen in the 091 and 078 trials. These 'significant new findings' were not conveyed to the participants in the Alzheimer's study 078 at any time. Further, all patients still in the trial were reconsented in 2002 and at that time they were not informed about the findings in VIGOR or the early mortality findings in the two Alzheimer's trials.

On Dec. 5, 2001, the FDA sent a letter to Merck asking for the answer to a question they had about the ethics of continuing study 078 based on the excess mortality seen in study 091. The question posed to Merck was:

> *"Please clarify whether the safety monitoring board and the IRB overseeing these studies are aware of the excess in total cause mortality in the Vioxx 25 mg group as compared to placebo (p=0.026) and the trend against Vioxx 25 mg on CV mortality compared to placebo.*
>
> *Have these oversight groups commented on the ethics of continuing study 078 in light of the mortality data ..."*

The letter is important from two standpoints. First, it shows that the FDA was concerned about the ethics of continuing study 078 and that they were unaware of the lack of a DSMB for the study. It further indicates that the FDA was not aware of the statistically significant excess of mortality seen in 078 and shown in the Chen report.

Merck was far from forthcoming in their response to the FDA (MRK-AAF0005014). It did not provide the ITT results shown in the Chen report. Instead the Company reiterated the on-drug mortality experience. Merck indicated that it hadn't informed the IRB's of the findings because the study investigators remain blinded to the study results. This response demonstrates that Merck withheld the crucial information concerning the ITT mortality analyses from the IRB's and the FDA.

**APPROVe Extension Analyses**

I have now analyzed the extended follow-up from the APPROVe study. The analysis below duplicates what I did in my Report with the addition of data from the follow-up that is now available. It is important to note that the extension did more than add additional follow-up time and events; it also made an intent-to-treat (ITT) analysis for

3

CV events possible for APPROVe. The extended follow-up included all trial participants who the investigators were able to contact and who agreed to the follow-up. This comprised 84% of the originally randomized participants.

For the analyses presented below I have included all available events and follow-up through 210 weeks from each study participant's entry date. This corresponds to the primary analysis specified in the Merck statistical analysis plan for the extension. As was done in my original Report, I present below the results for MI and hard CHD (MI + sudden cardiac death). I used the same statistical methods described in my Report.

For MI, the RR comparing rofecoxib to placebo is 2.11 ($p=0.018$, CI=1.13-3.90). This is a small increase in relative risk compared to the result for the "on-drug" analysis (RR= 2.07). The MI event rate curves are shown in Figure 1 of this addendum. Note that there is no evidence from the curves that the excess risk of MI starts after 18 months. Rather, it is clear that the curves separate within the first 6 months of follow-up. Merck's contention, founded on its post hoc analysis, that there is no excess risk for CV events until after 18 months of continuous use is not supported by these data. A statistical test for equality of RR across time is *not* rejected (proportional hazards $p=0.43$) and thus there is no statistical support for the Merck 18 month argument.

The results for hard CHD are quite similar. The RR is 2.45 ($p=0.004$, CI=1.34-4.47) compared to the on-drug RR of 2.17. The test for equality of RR across time is *not* rejected (proportional hazards $p=0.47$). Again, there is no evidence in support of Merck's contention that the risk associated with rofecoxib use is only manifest after 18 months of continuous use.

As I have discussed in my Report, Merck has based many of its arguments about the safety of rofecoxib on results using the APTC and thrombotic endpoints. Specifically, the Company's contention that the increased risk is only for patients who use rofecoxib for 18 months is based on an analysis of these endpoints. In the APPROVe report in the New England Journal of Medicine (NEJM), Merck supports this claim by presenting the event rate curves for the thrombotic endpoint and by doing a test for proportional hazards for the thrombotic endpoint. They report that this test was significant at the $p=0.01$ level. However, as I also discussed in my Report, this was based on a test done after examining the data and wasn't a prespecified hypothesis in the APPROVe protocol or statistical analysis plan. Such tests are not considered by the scientific community as being proof of an effect, rather at best they are considered only worthy of consideration as hypotheses for which confirmation would be needed in other studies before they would be accepted. The result for MI and for hard CHD didn't support this hypothesis and the results from the MI meta-analysis clearly contradicted it since it showed increased risk in studies of less than 1 year of duration.

The follow-up data from the APPROVe extension provides overwhelmingly convincing evidence that the 18 month hypothesis is not supportable even based on the APPROVe data. The additional follow-up not only tallied events that occurred during the one year extension, it also ascertained events that occurred during the first three years of the study

4

in participants who Merck did not follow for the entire period because they dropped out due to side effects or for other reasons. Thus, for the first three years of the study, the data now reflects more closely the ITT analyses that are the scientific standard for clinical trial results. Merck provided these analyses to the FDA in May of 2006 (MRK-S04020112023).

One of the striking findings shown in this report is that even for the thrombotic and APTC endpoint, the appearance of no increased RR for the first 18 months is no longer present and the test for proportional hazards is no longer near significant. This is shown in the two figures (B1, page 15 and B5, page 24 of the FDA submission) below for the thrombotic and APTC endpoint. Merck reports that the p-values of the test of proportional hazards are 0.75 for both the thrombotic and APTC endpoints. These p-values show that there is no statistical support for any deviation from a constant RR over the follow-up time, *e.g.,* the Merck 18 month hypothesis is no longer supported by the APPROVe data.

Finally, the extension also supports the possibility, first suggested by the Alzheimer's 078 trial results, that the elevated risk associated with rofecoxib might extend beyond the time when the patient stopped taking rofecoxib. In the Alzheimer's trial, this was seen in the continuation of an increased risk of both CHD and all cause mortality in the patients off drug. In the APPROVe trial, this argument is supported by the fact that the RR observed including the extension is virtually identical to that seen for the on drug analyses. For example, for thrombotic events, the on-drug RR reported in the NEJM paper is 1.86 (p=0.008). The ITT RR now is 1.74 (p=0.004), slightly reduced but with a smaller more significant p-value. For the APTC endpoint, the on-drug relative risk was increased from 2.06 in the NEJM paper to the ITT RR of 2.36 now. This indicates that the off-drug contribution to the ITT RR was actually greater than seen during the on-drug RR or the APTC endpoint. The overall implication of this is that it is likely that rofecoxib does some damage to the body that persists for some time after the drug is discontinued.

*/s/ Richard A. Kronmal*
Richard A. Kronmal, PhD

5

Figure 1. Cumulative MI rates by treatment in APPROVe for 210 weeks of follow-up.



Figure 2. Cumulative CHD rates by treatment in APPROVe for 210 weeks of follow-up.



6



Figure B1   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Kaplan Meier Plot

| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1221 | 1187 | 1152 | 1131 | 1117 | 1092 | 1032 | 989 |
| Placebo | 1300 | 1247 | 1224 | 1189 | 1173 | 1157 | 1133 | 1071 | 1027 |



Figure B5 All Patients – Confirmed APTC Events – Week 210 Censoring - Kaplan-Meier

| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1220 | 1188 | 1158 | 1140 | 1125 | 1102 | 1042 | 1002 |
| Placebo | 1300 | 1249 | 1228 | 1196 | 1181 | 1165 | 1140 | 1079 | 1036 |