**IN RE VIOXX LITIGATION**

**REPORT OF RICHARD A. KRONMAL**

## I.      QUALIFICATIONS

My name is Richard A. Kronmal.  I am a Biostatistician, Professor of Biostatistics and Professor of Statistics at the University of Washington in Seattle, Washington.  I was previously the Chairman of the Biomathematics Group at the University of Washington in Seattle, Washington from 1973 to 1985.  As described in greater detail in my curriculum vitae, a true and accurate copy of which is attached hereto, my career has focused on the use of statistics in evaluating data gathered in clinical trials and epidemiological studies.

I earned my Ph.D. in Biostatistics from the University of California, Los Angeles in 1964.  During the course of my studies I was awarded a United States Public Health Fellowship (1961 to 1963).  I have received a Research Career Development Award, from the Public Health Service from 1968 to 1972.  In 1981, I was elected a Fellow of the American Statistical Association.  I am also a member of the Biometric Society.

I have been appointed to several Data Safety Monitoring Boards (DSMB).  The purpose of these boards is to ensure the safety of patients participating in clinical trials.  I am currently the Chair of the DSMB of two trials for the Corcept Corporation; one is a trial of a drug to treat psychotic depression and the other uses the same drug for the treatment of patients with Alzheimer's disease.  In addition, I am currently a member of the DSMB for an Aerogen Corporation study of a drug to prevent ventilator-associated pneumonia.  I was previously the Chair of the DSMB of the Genentec TPA in stroke studies, Chair of the DSMB of the Medtronic Physio-Control Biphasic Waveform for Internal Defibrillation Clinical Study, Chair of the Intrabiotics Corporation study of a drug to prevent Vanomycin resistant pneumonia and Chair of the DSMB for the Knoll Ancrod studies in the treatment of stroke.  I was a member of the DSMB of the Bristol Meyers Squibb OPERA Study and for the Syntex studies of a drug for the prevention and treatment of stroke.  I have also been a statistical consultant for numerous industry studies conducted by several corporations, including, but not limited to: Genentech, ICOS, DuPont, Knoll Pharmaceuticals, NeoRex, Bristol-Myers Squibb, Wyeth Ayerst, HeartStream, Intrabiotics and AstraZeneca.  I am currently a consultant to FoldRx, Northstar and Corcept.

I was an Associate Editor and Member of the Editorial Advisory Board of the *Statistical Methods in Medical Research* journal. I was a member of Advisory Board of *Screening*, the official journal of the International Society for Neonatal Screening. I was previously an Associate Editor of the *Journal of Statistical Computation and Simulation* (1986-1989). I have reviewed medical research papers for many medical journals, including but not limited to the *Journal of the American Medical Association*, *The New England Journal of Medicine*, *Circulation*, and *Stroke*.

I have previously been a member of the Epidemiology and Disease Control Study Section of the National Institute of Health (NIH) (1984-1988). I was also a member of the Food and Drug Administration (FDA) Advisory Committee on Cardiovascular and Renal Diseases (1979 - 1983 (Chairman 1983)).

I have been the author or co-author of over 200 peer reviewed articles. These articles have been published in numerous medical journals including: *The New England Journal of Medicine*, the *Archives of Internal Medicine*, *Diabetes Care*, *Statistics in Medicine*, and the *Journal of the American Medical Association*. The complete list of my published materials, including the co-authors of the papers listed above is included in my curriculum vitae attached hereto.

## II.   ASSIGNMENT AND GENERAL CONCLUSIONS

I was requested to review Merck's clinical trial data much in the same way that I would have done had I been asked to do so by Merck. In this regard, I was asked to use generally accepted statistical methods to determine whether there was statistical evidence of cardiovascular risk associated with rofecoxib, and if so, to assess the magnitude, character, and frequency of that risk. In this regard, I was asked to pay particular attention to the data collected for the following rofecoxib clinical trials:

- The Vioxx Gastrointestinal Outcomes Research (VIGOR) trial
- The meta-analysis of rofecoxib clinical trials conducted by Merck in 2001
- The Alzheimer's studies (Protocols 78 and 91)
- The APPROVe trial (prevention of recurrence of colon polyps)
- The VIP and VICTOR trials

I was also asked to consider whether the results seen in the VIGOR trial were consistent from a statistical perspective with the data concerning any cardiovascular protective effects that naproxen may have.

Finally, I was asked to review and compare the overall statistical analysis of the Merck clinical trials contained in the rofecoxib label and render an opinion as to whether that information accurately reflected the totality of cardiovascular risk for rofecoxib as reflected in the clinical trial data files that I reviewed.

In presenting the analysis below, I reviewed the data files, analysis code, and data reports for the clinical trials at issue, and compared and validated my results with published and unpublished reports of the data. The Merck data files lacked documentation that, in my experience, ordinarily accompanies such data files and would have enabled me to quickly review the data. As I continue to review the data (or review newly provided data), I reserve the right to supplement and refine my report. I was also provided with and have reviewed other documents and information which bear upon and provide context to my findings and opinions, including peer-reviewed literature published in medical and scientific journals, documents obtained from FDA websites, internal Merck documents, and various depositions of Merck employees.

The basis for my conclusions and opinions expressed in this report is derived from my education, training, research, experience, expertise, review of internal Merck clinical data and documents, testimony of Merck researchers, FDA documents, and a review of relevant peer-reviewed medical and scientific literature.

As set forth more fully below, from a statistical standpoint, there was strong evidence—as early as the spring of 2000—that rofecoxib posed substantial risk to the heart and cardiovascular system. As demonstrated in the VIGOR trial, cardiovascular risk was apparent whether the endpoint was serious cardiovascular disease, or whether measured by myocardial infarctions (MI) or hypertension. Moreover, there was an unfavorable trend against the safety of rofecoxib for congestive heart failure and death. In analyzing the results of VIGOR, I have also considered whether these statistical results could have been reasonably explained by the data available concerning the effect of naproxen on these same cardiovascular endpoints. At the time the VIGOR results were

revealed, there was no persuasive scientific evidence that the cardiovascular results seen in that trial could be reasonably attributed to a protective effect of naproxen.

I have also reviewed the original data for the clinical trial meta-analysis that was performed by Merck and presented to the FDA in February 2001, and which was ultimately published in the journal *Circulation* in October 2001. Using standard statistical methods, the data from the rofecoxib clinical trials did not disprove or undermine the evidence of cardiac risk seen in the VIGOR trial. Rather, my review of the meta-analysis data revealed that there was a statistically significant adverse cardiovascular risk for rofecoxib, particularly myocardial infarctions, in this combined analysis.

I have also reviewed the data from the completed Alzheimer's clinical trials. In this regard, I note that it was postulated that the result of these trials cast doubt on the evidence of cardiovascular risk seen in the VIGOR trial. From my review of the data, this is not accurate. The Alzheimer's data support the proposition that rofecoxib carries substantial increased cardiovascular risk, including myocardial infarction and sudden cardiac death. Further, when the incidence of death on rofecoxib is compared to placebo, there is a statistically significant and substantial increased risk of death on rofecoxib. The results of the Alzheimer's trials are far from reassuring as to the cardiovascular and overall safety of rofecoxib.

I have also reviewed the data files from the APPROVe study—the trial that ultimately led to withdrawal of the drug. As with the other clinical trial data that I reviewed, APPROVe demonstrated a serious increased cardiovascular risk with rofecoxib. Analysis of that data revealed no evidence that the cardiovascular risks of rofecoxib were confined to any period of time.

Finally, I have done two new meta-analyses of the data from the Merck clinical trials. The first uses the data from APPROVe, VIP and VICTOR with the endpoints of MI, hard CHD (MI and sudden cardiac death) and thrombotic events as defined in the Merck statistical analysis plan for this analysis. This analysis plan was proposed by Merck under the designation of Protocol 203, for the analyses of cardiovascular safety for the three aforementioned trials. The second meta-analysis uses the data from all of the studies for MI, thus supplementing the original Merck meta-analyses with the full data

from the Alzheimer's studies and APPROVe, VIP and VICTOR.  The results of both of these meta-analyses demonstrate conclusively that rofecoxib increases the risk of both MI and hard CHD by over two-fold.

Based on the rofecoxib clinical trial database, I have concluded that there was a strong, unambiguous and objective statistical evidence from at least early 2000 that rofecoxib was capable of causing a spectrum of serious cardiovascular diseases.  This evidence was only strengthened by additional clinical trial evidence that accumulated thereafter.  I have also concluded that the summary presentation of this data in the peer-reviewed literature and in the rofecoxib label was inconsistent with the overall clinical trial results that I observed in the clinical trial data files reviewed.  Given this, Merck's representations about the clinical trials had the potential to mislead physicians about the frequency, character, severity, and spectrum of cardiovascular events associated with rofecoxib.

In connection with my work on this matter, I have been compensated at the rate of $500 per hour.

## III.   REVIEW OF ROFECOXIB CLINICAL TRIAL DATA

### VIOXX Gastrointestinal Outcomes Research Study (VIGOR)

VIGOR was a randomized clinical trial in patients with rheumatoid arthritis conducted under two identical protocols in the United States and abroad.  A total of 8076 patients were randomized to either rofecoxib 50 mg daily or naproxen 1000 mg daily.  The median follow-up time for the trial was 9 months (maximum = 13 months).  The primary endpoint of the trial was confirmed upper gastrointestinal events adjudicated by a blinded panel.  Patient visits were at 6 weeks, 4 months, and every 4 months until study termination.  The last patient exited the trial in early 2000, and the data was unblinded shortly thereafter, on or about March 9, 2000.  Adverse events were reported spontaneously to investigators; certain cardiovascular events were also adjudicated by a blinded panel.

The data were collected by the investigators on case report forms which Merck translated into a series of SAS data files. Individual patients were identified by protocol, site, and allocation number. Data made available for analysis included separate data tables with demographic information about the patients, adverse events, gastrointestinal events, vital statistics, efficacy data, and laboratory test findings. The data files were analyzed for this report using the STATA program and generally accepted statistical procedures for analyzing clinical trial data of this kind.

The most striking result in the VIGOR trial was the substantial excess of MIs in the rofecoxib group compared to the naproxen group. There were 20 MIs (0.494%) in the rofecoxib group and only 4 (0.099%) in the placebo group. Figure 1 shows the cumulative MI rate curves comparing rofecoxib to naproxen. The relative risk from a Cox proportional hazards model is 5.0 (p<0.005, 95% CI=1.7 - 14.6). Thus, it is unlikely that this is a chance finding. The rates per 1000 person years are 7.4 for rofecoxib and 1.5 for naproxen.

**Figure 1.**



-6-

The incidence of death in VIGOR was 22/4047 (0.54%) and 15/4209 (0.37%), for rofecoxib and naproxen respectively.  The difference was not statistically significant but in light of the MI results should have been concerning.  The cumulative mortality over time are shown in Figure 2.

**Figure 2.**



In addition, excess cases of congestive heart failure were also seen among patients taking rofecoxib. Congestive heart failure is a serious medical condition that results in considerable limitation of activities, frequent hospitalization, and has a median survival of about 5 years.  In VIGOR, there were 19 cases of CHF in the rofecoxib group compared to 9 in the naproxen group.  This corresponds to a relative risk of >2.0.  While the p-value is slightly above the 0.05 level that is used to judge statistical significance, the p=0.065 observed is a strong signal of an association between rofecoxib and CHF risk.  In addition, 15 of the 28 reported CHF cases were judged to be serious adverse events.  Of these, 12 were in the rofecoxib group and 3 in the naproxen group (p<0.025), a statistically significant increased risk.  Further, 6 patients discontinued therapy due to CHF in the rofecoxib group compared to 0 patients in the naproxen group.

The incidence of hypertensive adverse events in the rofecoxib arm of VIGOR was also striking. In VIGOR, a hypertensive adverse event was loosely defined as "Hypertension-related adverse experiences reported in this study included the terms: blood pressure increased, borderline hypertension, diastolic hypertension, hypertension, hypertension uncontrolled with medication, hypertensive crisis, labile hypertension, systolic hypertension, and uncontrolled hypertension." (taken from the sponsor's FDA briefing document). This is a "loose" definition because the term does not distinguish between a new hypertensive event and the exacerbation of preexisting hypertension. In the later case, an increase in blood pressure would likely require either an increase in the dose of the blood pressure lowering medication that the patient is taking, or the addition or substitution of a new drug. For the patient who is free of hypertension, an increase in blood pressure might be sufficient to require instituting blood pressure lowering therapy.

Figures 3 and 4 show the cumulative rates over time of a hypertensive adverse event for the two treatment groups for the patients without and with hypertension at baseline, respectively. In both figures rapid rise of the event curve near 12 months is a result of very few patients still be under observation at the that time so that the few events that occur cause a large and misleading increase in the event rates.

**Figure 3.**



**Figure 4.**



Importantly, the rate of hypertension adverse events is 35/1000 person years greater in the rofecoxib treatment patients without hypertension at baseline (p.<0.0003) and 92/1000 greater in those with hypertension at baseline (p.< 0.00001) than for naproxen treated patients.  That is for every 1000 patients taking rofecoxib for one year it is estimated that there would be an additional 35 non-hypertensive patients with a hypertensive adverse event, and among the patients with hypertension, 92 <u>additional</u> hypertensive adverse events than would have occurred in these patients had they been taking naproxen.

The results of the VIGOR trial provide convincing, statistically significant evidence that rofecoxib was responsible for an increased risk for myocardial infarction and hypertension.  The data also suggest the strong possibility that rofecoxib might increase the risk for congestive heart failure and death.  These data were all the more striking because—as a result of Merck's exclusion criteria—the majority of the patient population in VIGOR (like many of the rofecoxib clinical trials) were not considered to be at high risk of suffering a cardiovascular event.

The presentation of the VIGOR results in The New England Journal of Medicine (Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000;343:1520-8) was misleading.  The significant excess risk of MI on rofecoxib was reported as follows: "Myocardial infarctions were less common in the naproxen group than in the rofecoxib group (0.1 percent vs. 0.4 percent; ... relative risk, 0.2; . . ." The reported incidence rates are inaccurate; the actual rates for naproxen and rofecoxib were 0.1 percent and 0.5 percent respectively.  Second, the reporting of the relative risk as 0.2 is counter-intuitive and highly unusual when compared to how the relative risk for an adverse event is typically reported.  The relative risk for an adverse event should be presented as the risk for the experimental agent (rofecoxib) compared to the risk for the comparator agent (naproxen), which would be a relative risk of 5.0 in this case. Moreover, at a minimum, the method by which relative risks for adverse events are computed in the presentation of trial data should be done consistently across adverse events.  In the reporting of the VIGOR results, the authors changed the method used depending on the adverse event being reported.

-10-

The statistically significant increased risk of hypertensive adverse events seen in VIGOR with rofecoxib is similarly concerning. Hypertension is a serious health concern. It is a disease and an established risk factor for myocardial infarction, CHF, and stroke. From my review of the data, the incidence of hypertensive adverse events in the rofecoxib arm of the VIGOR trial posed an unacceptable risk. The increase in hypertensive adverse events for rofecoxib users compared to naproxen users in the VIGOR trial is beyond that reported in the medical literature for other NSAIDs and Cox 2 inhibitors. Yet, there is only limited discussion of the magnitude or importance of this increase in the reports to the FDA. Further, in *The New England Journal of Medicine* publication, there is no mention of the rates and character of this adverse event.

In addition, the findings for CHF in this study should have resulted in a review of the other clinical trial experience with rofecoxib by Merck and in an increased vigilance on its part in future clinical trials for this event. At a minimum, those results should have been published in the VIGOR paper published in *The New England Journal of Medicine*. This was not done.

The incidence of death in VIGOR was 22/4047 (0.54%) and 15/4209 (0.37%), for rofecoxib and naproxen respectively. This corresponds to a relative risk of 1.46 (non-significant). Contrary to the way other adverse events were reported in *The New England Journal of Medicine*, Merck did not report the relative risk for mortality. Rather, Merck reported the frequency of deaths as 0.5 and 0.4, for rofecoxib and naproxen respectively. In so doing, Merck rounded down the death rate for rofecoxib and rounded up the death rate for naproxen, a technique that reduced the apparent difference in deaths and understated the relative risk among treatments in the trial.

Merck's response to the cardiovascular findings in VIGOR was to assure the medical community that instead of rofecoxib causing the increased risk of cardiovascular events seen in VIGOR; it was naproxen that was reducing them. The foundation of that argument was the hypothesis that users of naproxen would experience a cardioprotective benefit similar to that seen with the use of aspirin. At the time the VIGOR results were released, there was no clinical trial or epidemiological evidence supporting this assertion. This statement also raises an important statistical question: *if it were true* that naproxen

has anti-platelet effects similar to aspirin, would this effect be sufficient to explain the excess risk seen for rofecoxib in VIGOR?

Substantial clinical trial data on the protective effect of aspirin for myocardial infarction exists.  As described below, Merck, in re-analyzing the cardiovascular events seen in its rofecoxib trials, used a combined endpoint employed by the Antiplatelet Trialists' Collaboration (APTC) when analyzing cardiovascular events suffered by those taking anti-platelet regimens.  The APTC reported that "Among low risk recipients of 'primary prevention' a significant reduction of one third in non-fatal myocardial infarction was, however, accompanied by a non-significant increase in stroke. Furthermore, the absolute reduction in vascular events was much smaller than for high risk patients despite a much longer treatment period (4.4% antiplatelet therapy vs. 4.8% control; five year benefit only about four per 1000 patients treated) and was not significant (P=0.09)."  [Prevention of death, myocardial infarction, and stroke by prolonged antiplatelet therapy in various categories of patients. (Antiplatelet Trialists' Collaboration) (Collaborative Overview of Randomized Trials of Antiplatelet Therapy, part 1). British Medical Journal, Jan 8, 1994 v308 n6921 p81(26)]  While there are differing estimates of the cardioprotective effect of aspirin, the APTC estimate does not include recent studies reflecting smaller effect.  However, even if one accepted the Company's hypothesis and naproxen was *as effective as* aspirin at preventing myocardial infarction as reported by the APTC, we would expect that rofecoxib would have a relative risk of 1.33 compared to naproxen.  The observed relative risk of 5.0 for MIs is statistically significantly different from 1.33 (p=0.01).  Thus, we have strong evidence that a protective effect of naproxen was an unlikely explanation for the dramatically increased incidence of myocardial infarctions in the VIGOR trial.

More recently Juni, et al reported in *Lancet* the results of a meta-analysis of myocardial infarction risk for rofecoxib in randomized clinical trials in patients with musculoskeletal disorders.  [Risk of cardiovascular events and rofecoxib: a cumulative meta-analysis. (Juni, P, Nartely L, Reichenbach S, et al.) . Lancet, Nov 5, 2004 v364,p2021]  Juni also conducted a meta-analysis of the pharmacoepidemiological studies of naproxen that address the issue of a possible protective effect of naproxen.  The results

of Juni's analyses show a small and marginally significant relative risk of MI on naproxen of 0.86, clearly inconsistent with the observed 0.20 relative risk from VIGOR.

In short, it was unreasonable for Merck to presume that the VIGOR trial brought a previously unseen cardioprotective effect of naproxen, rather than the more obvious and rational conclusion that rofecoxib significantly increased the risk of myocardial infarctions.

On December 8, 2005, the New England Journal of Medicine published an "Expression of Concern" (Expression of Concern: Bombardier et al., "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," N Engl J Med 2000;343:1520-8) regarding the accuracy and completeness of the original VIGOR publication in the NEJM in 2000. This was a very serious action taken by NEJM, that was based on some of the omissions of results that I reported on above. Generally, an "Expression of Concern" is issued by a medical journal when "allegations of scientific misconduct or breach of publication ethics" have been made. I have only been able to locate 4 other times such an action was taken over the last five years. The non-Merck and Merck authors of the VIGOR paper responded to the Expression of Concern with a defense based on the fact that inaccuracies in the reporting of events didn't change any conclusions and that the data on the MI events that were not reported were reported to Merck 6 days after the date that they had specified as the cutoff date for analyses for the paper. This defense is wrong on both counts. First, as is clearly pointed out by the NEJM, the additional events do in fact change the results in a meaningful way because there is a difference in the magnitude of the relative risk, its statistical significance and the interpretation of the subgroup (aspirin indicated or not) in which the events occurred. Second, there was ample time for Merck to make the changes to the paper required to fully and accurately report the results. It is immaterial whether or not in the author's opinion the inclusion of these results would change the interpretation. The reported data should be accurate and complete. The cut-off date for analyses is not inviolate and accuracy and completeness always takes precedence. The NEJM rejected the response of Merck and the non-Merck authors and reaffirmed their Expression of Concern. As I described above, the omissions of critical serious side effect data was

much more widespread than even the NEJM is aware.  The omission of the hypertension and CHF results was as serious as the omission of the MI and other CVD data.

### Pooled-Analysis of OA, RA, Alzheimer's and Low Back Pain Trials

In 2001, Merck published in the journal *Circulation* the result of a pooled analysis of cardiovascular thrombotic events in 23 separate clinical trials in rofecoxib and a variety of comparator agents, including placebo, naproxen, diclofenac, nabumetone, and ibuprofen. The analysis included rofecoxib doses of 12.5, 25 and 50 mg per day and a wide range of durations of 4 weeks or greater.  The principal endpoint was an aggregate of cardiovascular, hemorrhagic and sudden/unknown death together with non-fatal myocardial infarction and non-fatal stroke, known as the Anti-Platelet Trialists' Collaboration endpoint (ATPC).  Some of the underlying adverse events were adjudicated by a blinded panel and some were not.  Only events that occurred within 14 days of stopping the study agent were included in the Merck meta-analysis.

As set forth above, the VIGOR trial presented strong scientific evidence that rofecoxib was capable of causing a spectrum of cardiovascular events—primarily, myocardial infarctions.  In that context, it was appropriate and expected that Merck review its other rofecoxib clinical trials to determine whether these findings were seen across trials.  However, Merck's meta-analysis, as published in the journal *Circulation* in October 2001 (and presented to the FDA Advisory Committee in February 2001), suffers from considerable shortcomings.

In particular, given the strong signal for an increased risk of MI seen in the VIGOR trial, MI would have been a natural endpoint to use for any meta-analysis of the cardiovascular safety of rofecoxib.  Such a meta-analysis was done by Merck in October 2000, showing a statistically significant doubling of risk of MI in the rofecoxib users in the NSAID comparator trials (MRK-NJOO70395). This result was not published in the October 2001 *Circulation* article or presented to the FDA in February 2001.  Based on my review of the pertinent data files, the authors of the *Circulation* article had access to the data that I used for the analyses presented above and in fact had specific files identified for analyses of MIs alone.

-14-

Merck's meta-analyses relied on the APTC composite endpoint to assess cardiovascular risk. The use of composite endpoints like the APTC endpoint—which was designed to measure efficacy and risks in a very different setting—has the effect of diminishing the apparent relative risk if some of the outcomes are unrelated to rofecoxib use. In the "View and Reviews" section of the journal Neurology, Albers presents a discussion of the use of composite endpoints for the evaluation of anti-platelet therapies [*Neurology* 2000;54:1022-1028]. He points out that "In fact, the use of a combined endpoint may lead to an underestimate of therapeutic benefits when patients at high risk for one particular endpoint are studied." While his discussion is about the evaluation of the benefits of treatment, the same principle holds for the evaluation of the detrimental effects of a therapy. In a search of the medical literature using PubMed and Google Scholar, I was able to find only one paper (other than those from the APTC group and Merck) that used the APTC endpoint, and that was a paper published in 2005 describing the cardiovascular safety results for another Cox 2 inhibitor, lumiracoxib.

The meta-analysis also could not detect excess risk that is not present until after long term exposure to the drug (referred to by the FDA statistical reviewer as non-constant risk ratio).[1] This consideration is particularly important with respect to the published meta-analysis because much of the data relied upon in the analysis came from short-term studies that would have little ability (in statistical terms, "power") to detect the excess risk for rofecoxib. Thus, in the present context, the initial diluting effect of relying on APTC endpoints for a cardiovascular safety analysis is further increased by the inclusion of data from underpowered short studies.

Merck produced the data files used for the meta-analysis published in *Circulation*, and the production included two data files containing adjudicated and unadjudicated data for the myocardial infarction and APTC events. For the meta-analysis presented here, all of the trials were combined for the purpose of estimating the rate of myocardial infarction in rofecoxib versus all of the control therapies used in various trials. As is typical for meta-analyses, this analysis estimates the relative risk of myocardial infarction for all of

---

[1] The event rate curves for VIGOR are suggestive of an increasing relative risk with increasing exposure to rofecoxib. Thus, studies with short follow-up times would have little ability to detect the excess risk for rofecoxib.

the studies combined.  A test for heterogeneity of the relative risk between study groups was carried out.

Table 1 below shows the relative risk of myocardial infarction for rofecoxib versus the control agent by the disease group studied (Arthritis and non-Arthritis).  For the arthritis study grouping the RR for rofecoxib is 2.24, p<0.003 level.  For the non-arthritis grouping the RR= 1.27 which is not statistically significant. It should be noted that the confidence intervals for the two disease groups overlap considerably, suggesting that any apparent differences between study populations could be a result of chance.  A test for differences in the effect of rofecoxib in the two disease groups is non-significant (p=0.23).  An analysis done by dose also shows no statistically significant evidence of a dose effect.  Thus, with respect to this analysis, there is no statistically compelling evidence that the effect of rofecoxib varies by dose or medical condition of the patient population.  However, the lack of significance does not rule out that there are important differences; it simply indicates that the data are not sufficient to conclude that such effects exist.  It is worth noting that the follow-up time was very short for most of the studies (median of 3.4 and 11.9 months for the arthritis and non-arthritis groups, respectively) which has the effect of making it impossible for these studies to estimate any long term effects of rofecoxib on the risk of MI.

| Table 1. Relative Risk of Myocardial Infarction by Study Population | | | | |
|---|---|---|---|---|
| Study Population | Relative Risk | 95% Confidence Interval | | p-value |
| Arthritis Patients | 2.24 | 1.31 | 3.84 | 0.003 |
| Non-Arthritis | 1.27 | 0.57 | 2.84 | |
| **Overall Estimate (stratified)** | **1.89** | **1.22** | **2.94** | **0.004** |

*Blank entry indicates non-significant

Figure 5 (limited to 12 months of follow-up because of small number of patients followed beyond that time point) shows the unadjusted cumulative MI rates for rofecoxib and control. There was no statistically significant deviation from the Cox proportional hazards assumption. This indicates as is shown in Figure 5, that the relative risk is fairly constant over time. The lack of statistical significance of these tests does not rule out either heterogeneity of risk or non-proportional hazards, but these data do not support a conclusion that these exist.

**Figure 5.**



Merck's meta-analysis also suffered from several more general methodological limitations. In particular, the meta-analyses pooled (i) studies of different lengths (4-86 weeks), with most patients being exposed under 6 months, (ii) different doses (12.5, 25, and 50mg), (iii) multiple comparators—both placebo and active agents, and (iv) different patient disease states. With respect to an earlier version of the meta-analysis that was prepared by Merck for the February 2001 FDA Advisory Committee, the FDA expressed many of the same criticisms.

My re-analysis of Merck's meta-analysis necessarily suffers from the same limitations as Merck's analysis because it is based on the same data with the exception that I did not use the APTC endpoint. By using MI as the endpoint, my analysis is not subject to the dilution effect due to including in the composite endpoint, events that were not associated with rofecoxib use. Thus, while the limitations apparent in Merck's APTC meta-analysis are also present in my myocardial infarction analysis, the latter analysis still provides the relevant evidence as to whether rofecoxib increases the risk of myocardial infarction.

In another meta-analysis authored by Juni, et al. (investigators who were not connected to Merck) and published in *Lancet*, the authors reached similar results to those reported here based on summary data available from the FDA and peer-reviewed literature for the Merck rofecoxib studies in patients with chronic musculoskeletal disorders (arthritis). They describe their results and conclusions as follows: "By the end of 2000 (52 myocardial infarctions, 20 742 patients) the relative risk from randomized controlled trials was 2·30 (95% CI 1·22–4·33, p=0·010), and 1 year later (64 events, 21 432 patients) it was 2·24 (1·24–4·02, p=0·007). There was little evidence that the relative risk differed depending on the control group (placebo, non-naproxen NSAID, or naproxen; p=0·41) or trial duration (p=0·82)." As seen in table 1, my analyses verify Juni's results for the arthritis studies included in Juni's report.

In conclusion, the meta-analyses reported by Merck are extremely limited in their ability to either support or refute the finding from VIGOR. However, when the analyses use myocardial infarction as the endpoint—the logical choice for a primary endpoint in light of the VIGOR results—rofecoxib demonstrates a statistically significant and clinically important increased risk for myocardial infarction across all trials. As will be shown later in this report, the trials that were completed after the Merck meta-analyses show almost identical excess MI risks associated with rofecoxib use.

### Alzheimer's Studies (Protocols 078 and 091)

Merck conducted three clinical trials to assess the effects of rofecoxib on Alzheimer's disease. (Protocols 126 and 78 were terminated prior to completion.)

Protocol 078 enrolled 1457 patients over age 65 with mild cognitive impairment and randomized them to blinded treatment with rofecoxib 25 mg or placebo. The planned duration of the study was 48 months, but only 13.6% of the subjects completed the study while taking the agent to which they were randomized. The primary endpoint was conversion to Alzheimer's disease. Merck reported that significantly more patients taking rofecoxib were diagnosed with new onset Alzheimer's disease than those taking a placebo.

Protocol 091 involved 692 patients over age 50 diagnosed with possible or probable Alzheimer's and randomized them to blinded treatment with rofecoxib 25 mg or placebo. The planned duration of the study was 12 months. The primary endpoint was

reduction in cognitive decline measured by the Alzheimer's Disease Assessment Scale. The company reported no difference between treatment groups upon completion. In both trials the company collected investigator-reported adverse events and adjudicated certain cardiovascular events and all deaths.  Merck also conducted in early 2001 an interim analysis of cardiovascular endpoints for inclusion in the meta-analysis prepared by the company.

My analysis relied on the raw data files the company produced that included data files with the pertinent patient demographic, concomitant medication, adverse event, vital signs, efficacy measurements, and laboratory test results. As with previously examined trials, the data were in the form of SAS data files, tables, program code, value, and variable labels. The data differed from that available from the earlier Merck trials in that adverse event information was available not only for the on-drug period but for off-drug follow-up on some patients.   With the exception of the APPROVe trial, only the Alzheimers trials followed patients off drug in the study.

The focus of my analyses will be on CHD events and mortality. For study 078, I will also briefly describe the results for the primary endpoint of progression to Alzheimer's Dementia (AD).

Before showing the results of my analyses, I will present the results from an analysis reported in April of 2001 by a Merck statistician, Joshua Chen PhD in a memo (MRK-ACR004) to Raymond Bain, PhD, also a Merck employee.  At the time of the Chen memo, study 091 had finished.  The title of the Chen memo was MRK-0966 Combined Mortality Analyses Protocol 091 + Protocol 078.

Chen's analyses were directed to the question of whether there was evidence of an effect of rofecoxib on mortality. The tables below (tables 1.2a and 1.2b), extracted from the Chen memo, shows the mortality data from both studies. The data shown are for an intent-to-treat (ITT) analysis that includes all deaths within the study period of 12 months +14 days in study 091 (median follow-up of 1 year) and in study 078 up to last follow-up + 14 days (median follow-up 1.7 years). As shown in the tables, in study 091 there were 13 deaths in the rofecoxib and 3 in the placebo subjects; for study 078 there were 21 deaths in the rofecoxib and 9 in the placebo subjects.

**Table 1.2a 0-12 Month ITT Analysis For Protocol 091**

|  | MK-0966 (N=346) | Placebo (N=346) |
|---|---|---|
| Number of Deaths (%) | 13 (3.8) | 3 (0.9) |
| Number of Discon* (%) | 77 (22.3) | 70 (20.2) |
| Number still in Study (%) | 256 (74.0) | 273 (78.9) |
| * Discontinuation of study before 12-month AND alive 14 days after discontinuation | | |

**Table 1.2b ITT Analysis For Protocol 078**

|  | MK-0966 (N=723) | Placebo (N=732) |
|---|---|---|
| Number of Deaths (%) | 21 (2.9) | 9 (1.2) |
| Number of Discon* (%) | 290 (40.1) | 259 (35.4) |
| Number still in Study (%) | 412 (57.0) | 464 (63.4) |
| * Discontinuation of study AND alive 14 days after discontinuation | | |

Chen then carried out analyses that accounted for the exposure time of the subjects in the two treatment arms and estimated the hazard ratio (referred to hereafter as the relative risk, RR) using the Cox proportional hazards model. He did a separate analysis for each study as well as an analysis for the two studies combined.

Chen reported in study 091 that after adjustment for age and gender, the RR of death for a rofecoxib subject compared to a placebo subject was 4.43 (95% confidence interval of 1.26-15.53), which is statistically significant at the $p<0.01$. In study 078 he reported that after adjustment for age and gender, the RR of death for a rofecoxib subject compared to a placebo subject was 2.55 (95% confidence interval 1.17-5.56, p-value $<0.02$). He also reported on analyses that supported combining the two groups for a pooled analysis.

The table below (reproduced from the Chen memo) shows mortality from the pooled analysis. There are 34 deaths in the rofecoxib group and 12 in the placebo group.

**Table 1.2.2 Mortality Frequency (Combined ITT Analysis)**

| Number of Deaths (%) | MK-0966 (N=1069) | Placebo (N=1078) |
|---|---|---|
| Total * | 34 (3.2) | 12 (1.1) |
|    Protocol 091 (AD) ** | 13 (38.2%) | 3 (25%) |
|    Protocol 078 ** | 21 (61.8%) | 9 (75%) |
| * total number of deaths in each treatment arm (% number of patients in the treatment arm) | | |
| ** number of deaths from individual protocol (% total deaths in the treatment arm) | | |

After adjustment for age, gender and protocol, the Cox model gives, a RR for death comparing rofecoxib to placebo of 2.99 (95% confidence interval of 1.55 to 5.77). This RR is significant at the $p<0.001$ level. Thus the data from the two Alzheimer's studies provide strong evidence of a major mortality excess associated with taking rofecoxib – a startling three-fold increase in the risk of death.

When I first saw the Chen memo, I assumed that Merck must have immediately notified the study Data Safety Monitoring Board (DSMB) and the FDA of this finding. However, neither of these actions was taken. The original protocol for Protocol 078 indicated that the study was to be monitored by a DSMB. However, soon after the study was started Merck filed a protocol amendment with the FDA (and I presume the Institution Review Boards of the study centers) that removed the DSMB. Thus, there was no one external to Merck who was monitoring the trial to protect the welfare of the trial participants.

The FDA has a role in the protection of the welfare of the participants, but this role is dependent on the company providing the necessary data for them to evaluate. The submission of individual adverse event reports by the company over time is insufficient to enable active trial monitoring.  FDA depends on the company and/or the DSMB (if there is one) to alert them if there is evidence of a possible harmful effect of the drug under study. Merck did not notify the FDA of the results of Chen's analyses. Further, the IRBs of the participating study sites should have been alerted to the possible detrimental effect of rofecoxib on mortality, as the IRBs are entrusted with protection of the welfare of people from their center who are in the trial. Merck did not notify the IRBs about the findings in the Chen memo. Study 078 continued for about 2 years; during that time there were approximately 8 additional excess deaths in the rofecoxib treated patients compared to placebo (20 rofecoxib versus 12 placebo, based on the difference in the numbers in the Chen report compared to the final totals from study 078).

In my opinion, Merck's failure to notify the appropriate organizations of the possible excess risk of death from taking rofecoxib sharply deviates from accepted clinical practice and constitutes gross scientific misconduct.

In July 2001, Merck filed with the FDA, a SUR (MRK-01420145856) for rofecoxib. At that time they reported data on the mortality findings from study 091 and 078. Their report of the mortality results lacked clarity and effectively hid the magnitude of the mortality difference seen so clearly in the Chen memo. In the FDA review of the data presented in the SUR the following table is shown that summarizes the mortality data from the Alzheimer's studies.

FDA Table 22.  Deaths in Alzheimer's studies

| Study # | Rofecoxib 25 mg N= 1448 | | | Placebo N= 1451 | | |
|---|---|---|---|---|---|---|
| | n/Pt Years of exposure | | | n/Pt Years of exposure | | |
| 091 | 15/301 | | | 8/366 | | |
| 078 | 14/996 | | | 8/1098 | | |
| 126 | 4/165 | | | 3/169 | | |
| | n | (%) | | n | (%) | |
| Total* | 33 | (2.3) | | 20 | (1.4) | |
| CVT[1] | 8 | (0.6) | | 4 | (0.3) | |
| Other[2] | 24 | (1.7) | | 16 | (1.1) | |

Both the results in the SUR and in Chen's memo were based on a data files prepared in March of 2001.  Thus, the results from both analyses should be very similar. A comparison of this table 22 with table 1.2.2 from the Chen memo shows considerable disagreement. However, in checking the data files from the two Alzheimer's studies I have been able to largely resolve these discrepancies.  For both study 091 and 078, Chen produced tables based on the ITT population. Thus, all deaths were included, even those that occurred when the subject wasn't taking the drug, as long as the study was ongoing. For study 091, Chen limited his analyses to the 12 months (+ 14 days) of the study when it was still a parallel design study, e.g. patients were randomly allocated to rofecoxib and placebo.

After the 12 month period, 90% of the rofecoxib group was switched to placebo, with the remainder staying on rofecoxib with three months of additional follow-up. In table 22 above, Merck included deaths that occurred during or <u>after</u> the extra 3-month period.  Thus, for study 091, Merck effectively reported an ITT analysis by including all deaths. However, for study 078, Merck did not include all of the deaths; rather they only included deaths that occurred within 14 days from the last dose of drug taken by the

-23-

patient. Had this rule been applied for study 091, the reported deaths would have been distributed as 9 rofecoxib versus 2 placebo.

However one looks at it, the presentation of the data as summarized in Table 22 is a serious misrepresentation of the mortality data from the two studies. An unbiased, clear presentation of the results would have shown the ITT findings along the lines done by Chen. Clearly, had the results been presented as was done by Chen, the level of concern in the FDA and the broader medical community would have been far greater. In my view, the serious mortality concerns identified in these trials was cause to stop trial 078.

Merck scientists claimed in the medical literature and in reports to the FDA that the Alzheimer's studies were reassuring with respect to cardiovascular safety of rofecoxib. Even as late as January 2005, Kim and Reicin (Merck employees) in a letter to the editor of Lancet criticized the report by Juni on the excess risk of MI associated with rofecoxib. They state in reference to the Alzheimer's studies that, "The results of these trials show no difference between rofecoxib (Vioxx) and placebo" [The Lancet, Vol 365, Jan 1, 2005].

My analyses (below) of the data show that Merck again failed to accurately report the significant adverse data from these studies to the medical community and the FDA. Table 2 shows the results of my analyses. The relative risk of myocardial infarction on rofecoxib was 1.52 compared to placebo (p = 0.21). However, this analysis underestimates the true risk for MI because many of the events recorded as sudden deaths were likely concurrent with or preceded by an MI, but classified as a sudden death. This is because most sudden deaths occur unobserved, so there is inadequate documentation available to determine if an MI or arrhythmia or both was the cause of the death. As a result, those MIs were not counted in Merck's analyses as MIs. Thus a better indication of the risk of a heart disease event is the broader category of "hard" CHD defined as MI plus sudden death. This endpoint is widely used in cardiovascular studies. It was used in the Merck-sponsored trial of Zocor (Scandinavian Simvastatin Survival Study Group: Randomized trial of cholesterol lowering in 4444 patients with coronary heart disease: the Scandinavian Simvastatin Survival Study (4S). *Lancet* 344:1383–1389, 1994).

In my analyses, I have also included as a hard CHD and heart disease death endpoint, three subjects who were recorded as having unknown (or 'insufficient data') as the cause of death and had an adverse event of MI noted for the hospitalization at which the death occurred. Merck did not count these events in any of their analyses as cardiac events. The relative risk of hard CHD was 1.89 (p < 0.05). The relative risk for fatal heart disease was 4.61 (p < 0.002). These findings cannot be interpreted as being "reassuring" with respect to the CHD risk associated with rofecoxib.

**Table 2.** Relative Risks for Alzheimer's Studies

| Endpoint | Relative Risk | Confidence Interval | | p-value |
|---|---|---|---|---|
| MI | 1.52 | 0.78 | 2.94 | 0.21 |
| Hard CHD (MI + Sudden Cardiac Death) | 1.89 | 1.08 | 3.33 | <0.05 |
| Heart Disease Mortality | 4.61 | 1.73 | 12.23 | <0.002 |
| All Cause Mortality | 2.13 | 1.36 | 3.33 | <0.001 |

In addition, treatment with rofecoxib was associated with statistically significant excess total mortality in the rofecoxib group, indicating that treatment shortened life in this patient population. For deaths from all causes, the relative risk of death for rofecoxib treatment was 2.13 (p < 0.001). In January 2001, in an email addressed to other Merck scientists, Shapiro (a Merck statistician) discusses the possibility of doing an ITT analysis of mortality for all of the rofecoxib studies. In the memo she states about the Alzheimer's deaths that, "But the count not excluding late deaths was 30 rofe to 10 placebo."

The time-to-event curves, Figures 6, 7 and 8, show the cumulative event rates for hard CHD, heart disease deaths, and total mortality, respectively. The over four-fold excess risk for CHD death and two-fold excess risk of total mortality in those taking rofecoxib compared to those on placebo was striking and the finding robust.

Figure 6.



Figure 7.



Figure 8



In a search of the files provided by Merck I was able to locate a file that included mortality data from all of the studies included in the published meta-analyses. This file was among the files in a folder entitled "meta-analysis." I did an analysis of all-cause mortality (information on the cause of death was not included in the file). There were 56 deaths in subjects taking rofecoxib and 26 in subjects taking the comparator agents, giving a RR = 1.73 ($p<0.025$). The Alzheimer's studies deaths agreed with what was presented in the Shapiro email.

In addition, in March 1, 2001 a report was written that presented a cataloging of the causes of the deaths in the Alzheimer's studies by three Merck physicians, Dr. Chodakewitz, Dr. Beck and Dr. Barr (MRK-AAX000696- MRK-AAX000705). The table 2 below is reproduced from this report. Note that there are 8 rofecoxib and 2 placebo cardiovascular deaths, a four fold difference. In addition, among the deaths classified in the table as other/unknown, 7 rofecoxib and 3 placebo deaths were listed with cardiovascular causes in appendix 2 of the document.

Table 2:  Deaths on drug (Including 14 days after discontinuation of drug) in MK-0966 studies 078, 091 and 126 based on secondary categorization

| Category of Death | Study | MK-0966 | Placebo |
|---|---|---|---|
| Cardiovascular[1] | 078 | 3 | 0 |
| | 091 | 3 | 1 |
| | 126 | 2 | 1 |
| | Total | 8 | 2 |
| Respiratory[1,2] | 078 | 1 | 0 |
| | 091 | 4 | 0 |
| | 126 | 0 | 0 |
| | Total | 5 | 0 |
| Cancer | 078 | 1 | 4 |
| | 091 | 0 | 0 |
| | 126 | 0 | 1 |
| | Total | 1 | 5 |
| Other/Unknown | 078 | 8 | 3 |
| | 091 | 2 | 1 |
| | 126 | 1 | 1 |
| | Total | 11 | 5 |
| | Overall Total | 25 | 12 |

Deaths listed for study 091 occurred during month 0-12,
study 078 is ongoing, study 126 is currently being discontinued, deaths listed for both studies are as of 3/01
[1] based on blinded assessment by Eliav Barr, MD
[2] based on blinded assessment of deaths due to pneumonia Jeff Chodakewitz, MD

Thus, as early as January of 2001, Merck scientists were aware of the excess mortality associated with rofecoxib across all of their studies and that much of this excess was due to cardiovascular causes. These results were not presented in any of the published meta-analyses nor were they presented to the FDA. On the contrary, in the July 2001 SUR (page 101), it is stated that, "Therefore, review of the deaths does not identify a specific increased risk with rofecoxib." This statement is false.

Merck submitted a Clinical Safety Report (CSR) to the FDA in November 2003 on the results from study 078 (MRK-12690007833). In addition, Merck summarizes the mortality and cardiovascular risk results from the Alzheimer's studies in their background document for the FDA Advisory Committee in February 2005. Finally, Merck and the investigators for studies 078 and 091 present the Alzheimer's results in

-28-

journal articles (Reines et al., Neurology 2004 and Thal et al., Neuropsychopharmacology 2005). The publication of the results of this trial, however, was incomplete and inaccurate.

In Merck's summary document for the 2003 CSR (MRK-AHP0085928) the following statement is made concerning the results of study 078: "There were no unexpected safety results in this study compared to what is in the current label …" This statement is selective and misleading. This pattern of basing statements about the safety of rofecoxib on the on-drug data and not mentioning the full ITT results is repeated in all of Merck's presentations and publications. In the CSR (page 212), Merck states that "All deaths were adjudicated, whether they occurred on or off of study medication, … . Statistical analyses of all-cause mortality and thrombotic cardiovascular mortality were performed only for patients on-drug … ." Even when Merck does statistical analyses for the on-drug period they fail to present the survival curves or the Cox model RR's and associated statistical tests. Instead they present incidence rates and confidence intervals but not the statistical tests for differences in the rates (page 187). The one time that they do a statistical test for the on-drug death rates, they state it is not statistically significant (page 127). They come to this conclusion by computing the test based on the proportion of patients in each group who died rather than on the incidence rates (which accounts for exposure time). This is not the correct test to use for data of this type. .

On page 130 of the SUR, Merck presents the proportion of patients who died for the ITT population; however they don't present the incidence rates, survival curves, or RRs. They do a test of the proportions and do indicate that it is statistically significant but otherwise ignore this finding. In the final section of the CSR, Merck states that "Rofecoxib 25mg was generally well tolerated in patients with MCI."

The Company's submissions and presentations in connection with the 2005 Advisory Committee concerning the data from these trials did not reflect the substantial CHD and all-cause mortality risk associated with rofecoxib as determined by the trials. Once again Merck failed to present an ITT analysis. In Table 25 of Merck's Advisory Committee Briefing Document (page 117, MRK-AFK 02235712), the cardiovascular and mortality risk of rofecoxib is understated by omitting the events that occurred off-treatment. Table 3 shows the results for the ITT data compared to the results in Table 25

-29-