# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 2:05-CV-04379** | * | |
| | * | **MAGISTRATE JUDGE KNOWLES** |
| **ROBERT G. SMITH**, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| **MERCK & CO., INC.**, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC.  ("MERCK")
### TO EXCLUDE TESTIMONY OF WAYNE A. RAY, PH.D.

### (EXPERT CHALLENGE NO. 9)

## I.      INTRODUCTION.

This Court already has recognized that plaintiff's expert, Wayne A. Ray, Ph.D., is neither a medical doctor nor an expert in FDA regulatory matters and that he cannot testify to matters requiring expertise in either field.   (*See* Nov. 18, 2005 Order and Reasons at 32-33.)  Nevertheless, Professor Ray – a statistician who holds degrees in biostatistics and computer science – seeks to offer opinions that require extensive medical and pharmacological knowledge and that far exceed his area of expertise.  He also offers opinions that have no scientific support.

Merck asks that the Court reaffirm its *Plunkett* ruling that Professor Ray is not qualified to opine on specific causation or what doctors allegedly should have done in lieu of prescribing

Vioxx to their patients, and that he is similarly unqualified to second-guess the FDA's decisions

or question the adequacy of Merck's interactions and submissions to the FDA.  Merck also asks

that the Court preclude Professor Ray from offering his views about what Merck *should have*

*done* (as compared to what it was legally obligated to do) and his personal opinions regarding

Merck's ethics, motives, or state of mind, on the grounds that such views and opinions are not

appropriate subjects for "expert" testimony.  (Although Merck moved to exclude this testimony

in *Plunkett*, the Court never ruled on Merck's motion as Professor Ray never purported to offer

such opinions at trial.)  Finally, Merck asks that the Court reconsider Merck's request, which the

Court denied in *Plunkett*, to preclude certain additional opinions of Professor Ray.   These

opinions are improper, and Professor Ray is unqualified to give them, as follows:

- Professor Ray cannot opine on plaintiff's general causation theory – that using 25 mg Vioxx for less than four months can cause thrombotic CV events – because he identifies no (nor could he identify any) reliable scientific evidence to support that theory.

- Professor Ray admittedly is unqualified to opine on the mechanism(s) by which Vioxx supposedly increases CV risk.

- Professor Ray cannot opine on whether Vioxx's alleged CV risk is greater for patients with high baseline risk of myocardial infarction because the relative risks he relies on for this proposition are based on *post hoc* subgroup analysis and therefore are not scientifically reliable.

- Professor Ray lacks the requisite qualifications to assess Vioxx's overall risks and benefits, and whether there are "safer alternatives" to Vioxx.

In sum, each of Professor Ray's opinions is inadmissible, either because he is

unqualified to give the opinion and/or because the opinion lacks the requisite degree of

reliability.

## II.    THE LEGAL STANDARD.

The legal standard for the admission of expert testimony in federal court is set forth at

pages 3-5 of the Motion of Defendant Merck & Co., Inc. for Order Excluding Opinion

2

Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis, filed concurrently herewith and incorporated herein by reference. As discussed below, Professor Ray's proposed expert testimony fails to meet these legal standards and therefore must be excluded.

## III.   PRIOR RULINGS.

In its November 18, 2005 Order in *Plunkett*, this Court held that:  (i)  "Professor Ray is adequately qualified to testify as to whether short-term use of Vioxx increases the risk of adverse cardiovascular disease";   (ii) "Professor Ray is qualified to opine that Vioxx accelerates atherosclerosis"; (iii) "He is not qualified to testify as to the risk-benefit analysis performed by medical doctors"; (iv) "He is lacking in the necessary training to testify as to what doctors should have done and to . . . specific cause"; and (v) Professor Ray may not testify as to his disapproval of the FDA's actions because he "is not an expert in FDA regulatory matters . . . [and] does not have experience in this field."  (November 18, 2005 Order at 32-33.)  The Court reserved ruling, but never was required to rule, on whether Professor Ray could testify about what Merck should have done or about Merck's state of mind.[1]

In January 2006, prior to the *Plunkett II* trial, Professor Ray prepared an updated expert report and was deposed on his additional opinions and their bases.  In light of Professor Ray's new opinions and testimony, Merck moved the Court to also preclude Professor Ray from testifying about (i) the viability of the FitzGerald hypothesis, (ii) Vioxx's risk/benefit analysis, and (iii) whether there are "safer alternatives" than Vioxx for patients.  The Court denied Merck's motion in its February 2, 2006 Order.  (February 2, 2006 Order at 11.)

## IV.   PROFESSOR RAY MAY NOT TESTIFY OR OPINE ABOUT MR. SMITH OR SPECIFIC CAUSATION.

Given his lack of medical training, this Court has already held that Professor Ray has no

---

[1] Professor Ray did not attempt to offer opinions on these subjects in either the *Plunkett I* or the *Plunkett II* trial.

823917v.1

basis to testify about the specific cause of a plaintiff's injury.  (November 18, 2005 Order at 32-33.)  Indeed, his expert report is completely silent on Mr. Smith.  Further, Professor Ray has recently testified that he does not claim to be offering opinions on specific causation.  (July 13, 2005 Deposition of Wayne A. Ray, Ph.D. in *Humeston v. Merck*, Case Code No. 619 (Superior Court of New Jersey, Atlantic County) ("Ray *Humeston* Dep.") at 241:9-242:13, attached hereto as Ex. A (testifying that his opinion on "the probability that an event was caused by rofecoxib . . . won't be based upon an analysis of any clinical information on the individual patient.").)  Professor Ray is therefore barred from offering any opinions or testimony concerning Mr. Smith or specific causation.

## V.     PROFESSOR RAY CANNOT OPINE ON WHAT DOCTORS SHOULD PRESCRIBE TO PATIENTS, VIOXX'S RISK-BENEFIT ANALYSIS OR SAFER ALTERNATIVES.

As the Court noted in its November 18, 2005 *Daubert* Order, Professor Ray "is not a medical doctor" and "is not qualified to testify as to the risk-benefit analysis performed by medical doctors."  (Nov. 18, 2005 Order and Reasons at 32.)  Yet Professor Ray has nonetheless opined that there were safer alternatives than Vioxx for reducing gastrointestinal (GI) risks associated with naproxen and other NSAIDs, and that those alternatives "tipp[ed] the overall balance of benefit versus risk in favor of naproxen."  (January 11, 2006 Report of Wayne A. Ray, Ph.D. at 18, attached hereto as Ex. B.)  Specifically, Professor Ray claims that "given the findings of the VIGOR study, a much less risky strategy for patients would be to use naproxen with a drug such as a PPI [proton pump inhibitor]."  (*Id.*)  But, as this Court already found, Professor Ray lacks both the qualifications and scientific support for this opinion.[2]

---

[2] In addition, to the extent that Professor Ray is attempting to second-guess the FDA's decisions about Vioxx post-VIGOR, his testimony is preempted by *Buckman Co. v. Plaintiff's Legal Comm.* 531 U.S. 341 (2001).

823917v.1

Professor Ray is not a medical doctor; he is not a gastroenterologist, rheumatologist, internist, or other doctor who prescribes a pain reliever like Vioxx. Rather, he is an epidemiologist with a doctorate in computer science. (September 2, 2004 Deposition of Wayne A. Ray taken in *Stubblefield v. Merck,* Case Code No. H-02-CV-3139 (U.S. District Court for the Southern District of Texas) ("Ray *Stubblefield* Dep.") at 5:14-19, attached hereto as Ex. C.) Professor Ray is not qualified to opine on the risk-benefit analysis medical doctors make when determining whether to prescribe any medication to a particular patient. He has testified that he does not and cannot make decisions regarding patient treatment. (Ray *Stubblefield* Dep. at 119:7-19; 121:2-4.) Decision-making concerning the risks and benefits of a particular medication for a particular patient lies at the heart of medical training; physicians balance risks and benefits of every medical treatment as applied to an individual patient. Professor Ray is completely lacking in such training, and he cannot supplant the medical judgment of medical doctors and the thousands of physicians who, aware of the VIGOR results, continued to prescribe Vioxx. He similarly lacks the qualifications to opine on whether, after VIGOR, there were safer alternatives than Vioxx for patients at risk of GI complications from NSAID use.

In addition to not being qualified to opine in this area, Professor Ray offers no scientifically reliable basis for his opinions that Vioxx's risks outweighs its benefits and that use of a PPI with naproxen, or any NSAID, would reduce the GI risk. Instead, Professor Ray predicates his risk-benefit opinion solely on his observation that in VIGOR, the difference in serious adverse CV events favoring naproxen slightly exceeded the difference in serious adverse gastrointestinal events favoring Vioxx. (Dec. 2, 2005 *Plunkett* Tr. at 848:11-25[3], attached hereto

---

[3] Specifically, Professor Ray testified as follows:

> Q:   Do you have an opinion whether the risks of Vioxx in causing heart attacks and death outweighs the GI benefits?

823917v.1

as Ex. D; Ray Rpt. at 17-18.)   VIGOR, however, compared a common therapeutic dose of naproxen (1000 mg per day) with *double* the maximum recommended chronic dose of Vioxx (50 mg per day).  Vioxx's maximum recommended chronic dose – and the dose predominantly used by Mr. Smith – was 25 mg per day.  As the FDA has noted, "[t]he higher dose of rofecoxib was used in the VIGOR trial to provide a 'worst case' estimate of the risk of serious GI bleeding for rofecoxib in comparison to naproxen."  (Apr. 6, 2005 FDA Decision Memo ("FDA Memo") at 9 n.5, attached hereto as Ex. E.)

A comparison based on a clinical trial designed to produce a "worst case" estimate of adverse gastrointestinal effects of Vioxx using a non-recommended dose does not and cannot constitute reliable scientific evidence that the risks of Vioxx outweighed its benefits.  Such a comparison says nothing about the comparative risks and benefits of Vioxx when used, as Mr. Smith typically used it, at the recommended dose of 25 mg.  Tellingly, when Professor Ray reviewed the VIGOR data in 2000, he urged caution on the 50 mg dose but raised no questions about the safety of the 25 mg dose.  (Dec. 2, 2005 *Plunkett* Tr. at 800:4-14.)   His own observational study, published in 2002, found no increased risk from 25 mg (*id.* at 779:11-15, 779:25-780:12), a conclusion consistent with all the placebo-controlled clinical trial data available up to that time, including the interim CV results of Merck's two large Alzheimer's studies.  (*E.g.*, Dec. 1, 2005 *Plunkett* Tr. at 673:24-675:10.)  Professor Ray thus has no reliable

---

. . .

[A.]   The findings of the VIGOR study clearly show that it was.  There were 9.4 extra cases of serious cardiovascular disease per thousand patients, and 7.8 serious ulcer complications prevented.  So it's more serious heart disease caused than ulcers prevented.  And that's pretty clear-cut.

(Dec. 2, 2005 *Plunkett* Tr. at 848:16-25.)

basis for opining that the risks of Vioxx at 25 mg per day (the dose used by Mr. Smith) outweighed its benefits.

Further, there is no reliable scientific evidence to support Professor Ray's opinion that use of a PPI with naproxen, or any NSAID, would reduce GI risk and amount to a "safer alternative" than Vioxx.  In his January 2006 report, Professor Ray opines that overall "naproxen is a safer drug than [Vioxx]" (Ray Rpt. at 18-19) and that "given the findings of the VIGOR study, a much less risky strategy for patients would be to use naproxen with a drug such as a PPI [proton pump inhibitor]" (Ray Rpt. at 18.).  Yet he cannot point to a single study that supports his theory.

> Q:  Doctor, are there any studies that you're aware of that demonstrate that use of a PPI with naproxen, or any NSAIDs for that matter, would reduce the risk of lower gastrointestinal bleeding, lower tract gastrointestinal bleeding?
>
> A:  I'm not aware of any such studies.

(Ray *Humeston* Dep. at 155:4-10.)  At his most recent deposition on January 19, 2006, Professor Ray further acknowledged that there are no studies that compare the safety of the combined use of PPIs and NSAIDs with the safety of Vioxx (or any other COX-2 inhibitor) and also conceded that PPIs themselves have "serious side effects," including "substantial morbidity and mortality."

> Q:  Is that a true statement that you're not aware of any studies that have been conducted comparing the relative . . . gastrointestinal safety of coxibs versus NSAIDs plus PPIs?
>
> A:  Not adequately powered ones.
>
> . . .
>
> Q:  Fair to say that we don't know whether or not yet from a gastrointestinal perspective [that PPIs] are as safe or not as using coxibs when used in conjunction with NSAIDs?
>
> A:  We don't have a direct comparison of the two; that's correct.
>
> Q:  . . . Have you done a study of the side effects of PPIs?

7

> A: No.
>
> Q: They – there are serious side effects of PPIs, true?
>
> A: Absolutely.
>
> Q: That include some things that have substantial morbidity and mortality, fair?
>
> A: Yeah.  We have to distinguish between the proven ones and the suspected ones.

(Jan. 19, 2006 Deposition of Wayne A. Ray ("Jan. 19, 2006 Ray Dep.") at 185:25-187:5, attached hereto as Ex. F.)  Thus Professor Ray admits that he has no basis to opine that traditional NSAIDs combined with PPIs provide a safer alternative.

The FDA likewise has confirmed that there is no support for Professor Ray's theory that use of PPIs with NSAIDs provides a safer alternative than Vioxx.  The FDA explicitly found that the overall benefit of "other strategies for reducing the risk of GI bleeding following chronic NSAID use (*e.g.*, concomitant use of a non-selective NSAID and a proton pump inhibitor)" remain uncertain.  (FDA Memo at 2.)  The FDA also found that, from a CV standpoint, traditional NSAIDs are not necessarily safer than COX-2 inhibitors (*id.* at 1-2, 10-11), and that Vioxx was the only approved COX-2 selective drug shown to reduce the risk of serious GI bleeding compared to chronic use of a non-selective NSAID (*id.* at 2).  Moreover, the FDA noted that this "[i]mproved GI tolerability . . . is an important issue from an individual patient and public health perspective and is, at least in part, a valid rationale for maintaining a range of options in the NSAID class from which physicians and patients may choose." (*Id.* at 11-12.) The suggestion that the combination of a non-selective NSAID and a proton pump inhibitor would be clinically superior to Vioxx is pure speculation and Professor Ray has no basis for offering such an opinion.

823917v.1

VI.   **PROFESSOR RAY MAY NOT TESTIFY REGARDING HIS DISAPPROVAL OF THE ACTIONS TAKEN BY THE FDA.**

Moreover, the Court found that Professor Ray "may not testify to his disapproval of [regulatory] actions taken by the FDA" because "he does not have experience in this field." (*Id.* at 33.)   Accordingly, Professor Ray should be precluded from offering any opinions on the availability of alternative therapies that should have caused the FDA to remove Vioxx from the market after learning the VIGOR results in 2000 or that the handling of Vioxx shows "weaknesses of the present drug regulatory system in the U.S." (Ray *Humeston* Dep. at 73:15-74:8). First, as this Court recognized, Professor Ray is not an expert in FDA regulatory matters. Second, he is not entitled to supplant the judgment of the FDA in balancing the benefits and risks of drugs from the regulatory perspective.   Third, Professor Ray does not address in any meaningful way the range of considerations that would properly inform such a decision by the FDA, rendering any opinion he might offer on the subject wholly unreliable.

It is undisputed that the FDA never sought to restrict the availability of Vioxx after learning the VIGOR results.   Merck provided all of the data concerning VIGOR to the FDA, and in February 2001 the FDA convened an Advisory Committee of outside experts to consider this data.   The Advisory Committee concluded that the VIGOR CV results could not be generalized and recommended further study.   (Arthritis Advisory Committee Meeting Minutes, dated February 8, 2001, *available at* http://www.fda.gov/ohrms/dockets/ac/01/transcripts/3677t2.rtf.)   The committee also noted the importance of the unambiguously favorable gastrointestinal results from VIGOR, and the fact that no other Cox-2 inhibitor had demonstrated such results in a controlled clinical trial.   (*Id.*)

While Professor Ray may disagree with the findings of the FDA's Advisory Committee or the conclusions of the FDA itself, or believe that the FDA should have acted differently in

823917v.1

2001, this disagreement is not proper testimony. Such decisions are expressly delegated by Congress to the specialized regulatory judgment of the FDA, and criticisms of such judgments are not properly the subject of expert testimony. Moreover, any such criticism would be beyond Professor Ray's expertise.[4]

## VII. PROFESSOR RAY'S TESTIMONY CONCERNING MERCK'S ALLEGED FAILURE TO MEET SUBJECTIVE NORMATIVE STANDARDS IS NEITHER RELEVANT NOR RELIABLE UNDER RULE 702.

In his report and past testimony, Professor Ray has opined as to what Merck *should have* done based on his subjective standards of what standards *should* be followed by pharmaceutical companies. For example, in his report, Professor Ray writes:

> When the VIGOR findings were revealed, the most prudent interpretation of the data was that rofecoxib increased the risk of serious coronary heart disease. . . . Even if this had not been proven conclusively at the time the VIGOR findings were released, the principle of acting conservatively to protect patient health would require assuming rofecoxib had potential adverse cardiovascular effects until reliable data demonstrated otherwise.
>
> * * *
>
> Trials could have been rapidly initiated in patients at high risk of cardiovascular disease to clarify this matter. . . . Following the "first do no harm" principle, rofecoxib use should have been severely curtailed while these studies were being conducted.

(Ray Rpt. at 20-21.) (emphases added).

This type of subjective normative testimony is unreliable under *Daubert*. In *In re Welding Fume Products Liability Litigation*, the federal court addressed this exact question of

---

[4] Professor Ray does not explicitly claim that Merck withheld information from the FDA, although he did testify that he thought Merck's characterization of the ADVANTAGE trial "appeared to be a deliberate withholding of data, deplorable conduct." (Ray *Humeston Dep.* at 55:20-56:7.) To the extent he is referring to an alleged withholding of data from the FDA, such testimony would be directly barred by *Buckman*, in which the Supreme Court found that the issue of whether disclosures to the FDA are sufficient and issues of alleged fraud on the FDA are within the exclusive province of the FDA. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).

823917v.1

whether to allow expert testimony regarding whether defendants had acted as they "*should have.*"  Order, *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-1700, MDL 1535, 2005 WL 1868046, at *18 (N.D. Ohio Aug. 8, 2005).  The proffered expert purported to identify principles "to which … all modern businesses should adhere," and the court refused to allow the testimony:

> No right-minded person would disagree with the aspirational character of [the expert's] ethical principles. But the critical question for the jury in this case is whether the defendant corporations did what the law *required* them to do, not whether, from a societal perspective, they did what an "ethical corporation" *should have* done. [The expert's] opinions regarding the latter, accordingly, will tend to misdirect the finder of fact.

*Id.*, at *20.  The court held that the subjective standards articulated by the expert "set [] out a standard in excess of what the law requires; this is unlikely to 'assist the trier of fact to understand the evidence or to determine a fact in issue'" as required by Rule 702.  *Id.*

Professor Ray also proffers inflammatory characterizations of Merck's failure to follow his subjective standards, calling Merck's conduct "reprehensible," "deplorable," and "ethic[ally] questionable."  For example, in another Vioxx-related case, Professor Ray testified:

> Q:  And do you recall in any of those academic contexts that you've just listed giving or expressing an opinion about the conduct of Merck with respect to Vioxx?
>
> A:  Yes, I do.
>
> Q:  And what have you said?
>
> A:  ***That their conduct was deplorable***.
>
> Q:  And what was your basis for that opinion or that statement?
>
> A:  The aggressive -- what ***I consider to be*** the biased presentation of the VIGOR data and the failure to heed the signal that came out of VIGOR, and the aggressive marketing despite the strong signal of cardiovascular risk.

(Ray *Humeston* Dep. at 55:4-18 (emphasis added).)

In addition to being inflammatory, this type of testimony is irrelevant to the issue the jury

823917v.1

must decide – whether Merck met its *legal* obligations to plaintiff.  Testimony by an expert about whether conduct meets his proposed standard of morality does nothing to advance fact-finding concerning whether that conduct conformed to the requirements of the law.  As the court in *In re Rezulin* explained:  "While the defendants may be liable in the court of public opinion, or before a divine authority for any ethical lapses, expert opinion as to the ethical character of their actions simply is not relevant to these lawsuits."   309 F. Supp. 2d 531, 542-45 (S.D.N.Y. 2004) (excluding expert testimony on subjective ethical standards because it was: "(1) unreliable because purely speculative; (2) unhelpful to the fact-finder because irrelevant in a case where liability is premised on legal, not ethical, standards; and (3) likely to prejudice and confuse fact-finders concerning the pertinent legal standards"); *id.* at 557 (testimony on legal obligations would "usurp … the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it"); *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir.1999) (admitting expert testimony was abuse of discretion when opinion had no apparent underlying support); *DiBella v. Hopkins*, No. 01 Civ 11779 (DC), 2002 U.S. Dist. LEXIS 20856, at *12 (S.D.N.Y. Oct. 30, 2002) ("business ethics" expert testimony inadmissible in commercial dispute because "dispute here is not over what is ethical.  Rather, the dispute is over what happened."), *aff'd* 403 F.3d 102 (2d Cir. 2005).

Here, there is no scientific "reasoning or methodology underlying" Professor Ray's assertions concerning Merck's purported moral "reprehensibility" or to support Professor Ray's prescription about what Merck *should have done*.  As Professor Ray admitted in deposition, his personal opinions have no basis in any peer-reviewed scientific literature:

> Q: . . . According to generally accepted practice, the risk ratios should have been calculated in the same manner for serious coronary heart disease and myocardial infarctions. ***Doctor, with respect to that last sentence that I just read you, which begins with according to generally accepted practice, what***

> ***is the basis for your statement?***
>
> A:  My more than 25 years experience as an epidemiological researcher.
>
> Q:  ***Can you point me to peer reviewed literature or treatises that make the statement you make, in words or substance?***
>
> A:  ***I cannot.***

(Ray *Humeston* Dep. at 155:21-156-10 (emphasis added).)

Indeed, not only does Professor Ray admit that his opinions are lacking in scientific reasoning or methodology, but they are not even based on his own interpretation of the relevant facts.  Professor Ray admitted that his opinions about Merck's allegedly "deplorable conduct" are based on appearance and conjecture – *i.e.*, what media sources suggested had "appeared" to be "deliberate withholding."  (Ray *Humeston* Dep. at 55:20-56:7.)  And when asked for the basis of his opinion that "the ethics of the VIGOR trial were questionable," he acknowledged that it was based only one Merck employee's characterization of the VIGOR study as "a human animal study experiment."  (Ray *Humeston* Dep. at 67:9-23.)

Professor Ray's opinions of what the FDA or Merck should have done, and his subjective characterizations of Merck's actions, have no place in this litigation.   Expert testimony concerning subjective ethical and normative standards is inadmissible under Rule 702 and *Daubert*.  Accordingly, Professor Ray's testimony in this regard should be excluded.

## VIII.  PROFESSOR RAY MAY NOT TESTIFY AS TO MERCK'S STATE OF MIND, MOTIVE, OR PERCEIVED "BIAS."

Throughout his report, Professor Ray, explicitly and by implication, asserts opinions as to Merck's state of mind and, specifically, on what Merck knew or must have known about the alleged risks of Vioxx.  On their face, the comments included may appear factual.  (*See* Ray Rpt. at 4 (claiming "widespread concern" about Vioxx's safety was raised in 2000); Ray Rpt. at 9 ("Even prior to rofecoxib's withdrawal, serious questions were raised about its safety."); Ray

Rpt. at 16 ("more than two years before rofecoxib was withdrawn from the market, a large, published study provided data that raised substantial doubt about the 'naproxen hypothesis'"); Ray Rpt. at 29 (asserting that results of studies demonstrating increased risk were available to Merck "prior to the decision to withdraw rofecoxib").) But Professor Ray's factual assertions are themselves conclusions, which he then uses to imply that Merck knew or should have known facts related to the risks of Vioxx and it misled the public through biased studies and misinformation.[5]

Professor Ray then uses that imputed knowledge to claim that Merck acted in bad faith by not removing Vioxx from the market earlier or, at a minimum, reducing its availability: "Following the 'first do no harm' principle, [Vioxx] use should have been severely curtailed while these studies were being conducted." (Ray Rpt. at 21.) Professor Ray uses that same assumption concerning Merck's knowledge to opine that scientists involved in Merck-funded studies were biased and that Merck improperly influenced results of studies, essentially opining that Merck committed scientific fraud:

> Q: *Are you suggesting, apart from Juni, are you suggesting in separating out the studies that were funded by Merck or which you say have funding from Merck, are you suggesting that those studies are somehow biased or tainted because of the presence of funding from the company, from Merck?*
>
> A: *I'm suggesting that's a possibility that must be considered.*
>
> Q: Do you have personal knowledge, sir, or do you have any knowledge that Dr. Kimmel, the lead author on one of the studies listed on your chart was in any way biased in favor of Merck in conducting the study which is reflected on your chart?
>
> A: *The study analysis is biased in a way that would favor the naproxen hypothesis, and that's explained in a subsequent section of my report, so whether that bias was a result of Merck funding or other factors, I don't know, but the bias is there and it favors the naproxen hypothesis supported*

---

[5] Professor Ray's conclusion that the information was widely known is inconsistent with plaintiff's failure to warn claim as there is no duty to warn of known dangers.

> ***by Merck***.

Q:  Same question for Dr. Rahme?

A:  Same answer.

Q:  How about Dr. Watson, his staff, is it your testimony that the funding of that study by Merck improperly influenced the results?

A:  I have reservations about some of the methods of that study.  To the extent to which that was influenced by the funding source, I have no personal knowledge, but I do have reservations about the methods.

. . .

A:  ***What I'm saying is this.   There is a bias in the study that favors the naproxen hypothesis promoted by Merck, and that the study was partially funded by Merck, so that's what I'm saying***.

(Ray *Humeston* Dep. at 166:5-167:12, 169:1-5 (emphasis added).)   Aside from the facial absurdity of Professor Ray's argument, it is belied by the fact that the September 2004 Adenomatous Polyp Prevention on Vioxx (APPROVe) study, which led to Merck's September 30, 2004 withdrawal of Vioxx from the market, was funded by Merck.  (Ray Rpt. at 9, 23-24.)

Rule 702 provides for introduction of "scientific, technical, or other specialized knowledge" that will "assist the trier of fact."   Professor Ray has no qualifications or "specialized" expertise in divining a company's knowledge or state of mind (or the state of mind of authors of studies).   As the court in another failure-to-warn case reasoned when rejecting similar expert testimony regarding corporate intent and state of mind:

> The witnesses are qualified in particular scientific disciplines.  These disciplines do not include knowledge or even experience in the manner in which corporations and the pharmaceutical marketplace react, behave or think regarding their nonscientific goals of maintaining a profit-making organization that is subject to rules, regulations, standards, customs and practices among competitors and influenced by shareholders or public opinion.

*In re Diet Drugs*, No. MDL 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20, 2000); *see also In re Rezulin*, 309 F. Supp. 2d at 546 (rejecting expert testimony "on the intent,

motives or states of mind of corporations, regulatory agencies and others" because they "have no basis in any relevant body of knowledge or expertise").

Expert testimony under Rule 702 and *Daubert* must have an objective and empirical foundation; it cannot consist of subjective, moralistic conjecture by an expert.   As the Supreme Court explained in *Kumho Tire*, the goal is to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."   526 U.S. at 152.  Subjective, moralistic testimony lacks the same assurances of relevance and reliability that empirically verifiable specialized knowledge provides.   When expert testimony lacks this reliability by straying from specialized knowledge and lacking supporting authority, it is properly excluded.  *See Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir.1999).  Not only is it irrelevant, but it presents a threat of unfair prejudice and jury confusion because an expert often appears inherently credible to a jury and, therefore, the jury more readily accepts the testimony. *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (expert testimony regarding legal questions was inadmissible because the "mystique" surrounding the term "expert" made the jury "susceptible to adopting the expert's conclusion rather making its own decision"); *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir. 1979) (courts have expressed a fear that "proffered expert testimony [will] create a substantial danger of undue prejudice and confusion because of its aura of special reliability and trustworthiness").

Professor Ray has no reliable bases for his conclusions regarding Merck's state of mind, motives, or his perceived bias in certain Merck scientific studies.  Therefore, his testimony fails to satisfy Rule 702 and must be excluded.

IX.    **PROFESSOR RAY DOES NOT HAVE A RELIABLE SCIENTIFIC BASIS TO OPINE ON PLAINTIFF'S GENERAL CAUSATION THEORY.**

Professor Ray asserts that "to a reasonable degree of scientific certainty, short-term use of rofecoxib increases the risk of serious coronary heart disease." (Ray Rpt. at 36.) Professor Ray claims four "lines of evidence" demonstrate an increased CV risk with less than 18 months' Vioxx use:  (1) biological plausibility; (2) short-term studies of other COX-2 inhibitors; (3) data from clinical trials of Vioxx for shorter periods of use; and (4) data from epidemiologic studies for shorter periods of use. (Ray Rpt. at 30–31.) But these "lines of evidence" do not support the plaintiff's general causation theory that 25 mg Vioxx use for four months can cause thrombotic CV events.

A.    No Reliable Scientific Evidence Supports Professor Ray's Assumed Theory of Biological Plausibility.

Professor Ray recognizes that no one has identified the mechanism by which Vioxx allegedly increases the risk of serious coronary disease. (Ray Rpt. at 10; Jan. 19, 2006 Ray Dep. at 122:3–18.) At his earlier deposition, Professor Ray claimed that there are "several" plausible mechanisms by which Vioxx could increase CV risk (Ray *Humeston* Dep. at 119:14-120:8), and he identified the FitzGerald hypothesis and hypertension as equally plausible mechanisms (*id*. at 126:5-23). Notwithstanding his admitted lack of certainty, in his report, Professor Ray relies on the FitzGerald hypothesis to prop up his theories that short-term Vioxx use increases CV risk and accelerates atherosclerosis. (Ray Rpt. at 31.) The FitzGerald hypothesis, however, does not constitute reliable scientific evidence for either theory.

Dr. FitzGerald hypothesized in an article published in 1999 that *if* COX-2 inhibitors reduced prostacyclin levels in blood vessels – a question his study could neither assess nor determine – then such drugs *might* promote increased clotting and, therefore, increased CV risks since they do not simultaneously interfere with the normal production of thromboxane, a known

17

vasoconstrictor.[6]  But, as Dr. FitzGerald has recognized on multiple occasions since the 1999 publication, his hypothesis remains just that – a hypothesis – that remains unproven.  In a follow-up article published in 2002, Dr. FitzGerald further explained that "[t]he clinical sequela of inhibiting prostacyclin activity in the absence of concomitant inhibition of [thromboxane] **are not currently clear**" and that "for the present, the **perception** of a cardiovascular hazard in humans exceeds the evidential basis for this notion."[7]

Nor is Dr. FitzGerald alone in conceding that his hypothesis remains unproven.  After observing that selective COX-2 inhibitors were associated with an increased risk of adverse CV events, the FDA confirmed this fact in April 2005:

> **It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized.**  As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (i.e., ibuprofen, diclofenac) in studies of substantial size and duration.  Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible.  **Taken together, these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.**

(FDA Memo at 8 (emphasis added).)  Thus, the FitzGerald hypothesis remains speculative and cannot form the basis for Professor Ray's biological plausibility assumption.

Professor Ray also relies on the unproven FitzGerald hypothesis to opine that Vioxx is capable of accelerating the rate of atherosclerosis.  (Ray Rpt. at 11.)  But because the FitzGerald hypothesis is entirely speculative and scientifically unreliable, it cannot form the basis for this

---

[6] Catella-Lawson et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids*, J. PHARM. AND EXP. THERP. 1999; 289:735–741.
[7] FitzGerald, GA, "Cardiovascular Pharmacology of Nonselective Nonsteroidal Anti-inflammatory Drugs and Coxibs: Clinical Considerations," *Am J Cardiol* 2002; 89 (suppl):26D, 32D (emphasis added).

823917v.1

acceleration opinion.[8]  Setting aside the unproven FitzGerald hypothesis, and as explained in Merck's concurrently filed Atherosclerosis Motion, there is no reliable scientific evidence to support the theory that Vioxx accelerates atherosclerosis.  Professor Ray, therefore, should be precluded from giving such an opinion.

**B.**     Short-Term Studies of *Other* COX-2 Inhibitors Do Not Constitute Reliable Scientific Evidence.

Professor Ray next points to data involving COX-2 inhibitors other than Vioxx – celecoxib, lumiracoxib, and valdecoxib/parecoxib – and asserts that "[i]t now is evident that the suppression of [prostacyclin] synthesis" (*i.e.*, the FitzGerald hypothesis) "is a class effect of the coxibs"; "there also is a class effect with regard to increased risk of serious cardiovascular disease."  (Ray Rpt. at 31.)  Professor Ray further identifies two placebo-controlled trials of parecoxib, in conjunction with valdecoxib, and declares that the "data *conclusively* demonstrate that the increased risk of serious cardiovascular disease conferred by a coxib can occur with very short duration of use . . . ."  (Ray Rpt. at 32.)  But this "line of evidence" about drugs *other than Vioxx* cannot support Professor Ray's opinion concerning Vioxx for several reasons.

First, as set forth above, the FitzGerald hypothesis is speculative and cannot form the basis for Professor Ray's "class effect" premise.  Second, Professor Ray opines that "plausible mechanisms . . . may vary according to the individual coxib."  (Ray Rpt. at 10.)  In such circumstances, an increase in CV risk with one drug hardly means that a different drug – operating in a different way – is associated with an increased risk.  Third, the Supreme Court has held that data involving one drug cannot prove that a different drug causes harm.  *See*, *e.g.*, *Gen.*

_____

[8]  Recently, Professor Ray testified that he would not offer opinions about the mechanisms by which Vioxx may increase CV risk (Ray *Humeston* Dep. at 114:18-24.) and that he could not identify which mechanism causes Vioxx's alleged increased risk of MIs (Jan. 19, 2006 Ray Dep. at 122:3-18).  The Court should preclude Professor Ray from opining on the acceleration theory, particularly given the absence of reliable supporting data.

823917v.1

*Elec. Co. v. Joiner*, 522 U.S. 136, 145-46 (1997) (where issue was whether PCBs caused lung cancer, rejecting studies finding increases in lung cancer deaths associated with exposure to particular type of mineral oil and not mentioning PCBs); *see also, McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1246 (11th Cir. 2005) (excluding expert's opinion that ephedrine causes vasospasms based on analogy to different drug and noting that "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced" (internal quotation marks and citation omitted)).  Studies involving patients taking different drugs, at different dosages and for different durations, are not a reliable basis on which to opine that 25 mg Vioxx taken short-term has a prothrombotic effect.

    **C.**    <u>No Randomized Clinical Trial Demonstrates an Increased CV Risk Associated With Short-Term Use of 25 mg Vioxx.</u>

Professor Ray also claims that clinical trials show an increased CV risk with short-term use of Vioxx, relying on Professor's Kronmal's reanalysis of Merck's clinical trial data.  (Ray Rpt. at 34.)   But that reanalysis, even if scientifically reliable (which it is not), does not demonstrate that 25 mg of Vioxx can cause thrombotic CV events during the first several months of use.  Professor Kronmal's reanalysis was conducted for purposes of this litigation; it has not been published, and it has not been peer-reviewed by others in the field.  These facts alone render it unreliable under *Daubert*.  *See, e.g., Daubert v. Merrell Dow Pharms.*, 951 F.2d 1128, 1130-31 (9th Cir. 1991), *overruled on other grounds by* 509 U.S. 579 (1993) ("[T]he reanalysis of epidemiological studies is generally accepted by the scientific community only when it is subjected to verification and scrutiny by others in the field. . . .  Plaintiffs' reanalysis do not comply with this standard; they were unpublished, not subjected to the normal peer review process, and generated solely for use in litigation." (citation omitted)).

**D.** No Reliable Epidemiologic Studies Demonstrate An Increased CV Risk Associated With Vioxx 25 mg Short-Term Use.

Finally, Professor Ray identifies five epidemiologic studies that he claims support his opinion on short-term use: (1) Solomon, (2) Johnsen, (3) Kimmel, (4) Graham, and (5) Levesque. (Ray Rpt. at 36.) None of these retrospective observational studies is adequate to support plaintiff's general causation theory that use of Vioxx for only a few months increases CV risk. Notably, Professor Ray himself published studies in 2002 and 2005 in peer-reviewed journals based on administrative records from two different patient databases finding that "there was no evidence of a raised risk" of coronary heart disease in patients taking Vioxx "at doses of 25 mg of less" over an average of nearly one year.[9]

## X. PROFESSOR RAY IS UNQUALIFIED TO OPINE ON THE MECHANISM BY WHICH VIOXX SUPPOSEDLY INCREASES CV RISK.

Professor Ray conceded that "[he] ha[s]n't read studies and do[es]n't know enough to distinguish between the various competing mechanisms" (Ray *Humeston* Dep. at 119:14-120:8.) Notwithstanding his admitted lack of expertise, Professor Ray's most recent report suggests that he may attempt to opine on details about the mechanism by which Vioxx purportedly causes a prothrombotic state and increases the risk of heart attack – details that require scientific knowledge far beyond Professor Ray's expertise. Specifically, Professor Ray may seek to opine that it is not only plausible that COX-2 inhibitors reduce prostacyclin in the human body (as posited by the FitzGerald hypothesis) but also that COX-2 inhibitors actually reduce prostacyclin in human vasculature. He claims that "Merck has argued that coxibs don't necessarily affect

---

[9] Ray W et. al, *Cox-2 selective non-steroidal anti-inflammatory drugs and the risk of serious coronary heart disease: an observational cohort study*, THE LANCET 2002: 360:1071-73; Graham D et. al, *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study*, THE LANCET, 2005: 365:475-481, 478.

823917v.1

arterial prostacyclin, given that [FitzGerald's studies showed only that patients treated with Vioxx contained lower levels of a metabolite of prostacyclin in the urine]. However, recent studies confirm that the effect of [Vioxx] is on arterial prostacyclin." (Ray Rpt. at 31.) Professor Ray lacks the qualifications or scientific basis to proffer an opinion on this subject.

Professor Ray is not a pharmacologist and does not consider himself an expert in pharmacokinetics. (Jan. 19, 2006 Ray Dep. at 121:3-13, 193:12-194:8.) He concedes that he lacks knowledge of pharmacology beyond that necessary to evaluate whether a mechanism is plausible. (*Id.* at 121:3-13, 193:12-194:8.) Therefore, he has no qualifications to opine about whether Vioxx actually suppresses prostacyclin in the human vasculature. His testimony also demonstrates that he plainly lacks the knowledge, let alone expertise, needed to proffer such opinions. Professor Ray admitted, for example, that he does not know how much prostacyclin must be suppressed before one could observe a clinical effect. (*Id.* at 115:22-116:10.) Professor Ray also admits that he does not know anything about the period of time Vioxx purportedly impacts prostacyclin, noting that the issue relates to the drug's pharmacokinetics and is not a question he has examined. (*Id.* at 114:19-23, 123:1-24.)

Moreover, there is no reliable scientific evidence supporting the theory that Vioxx suppresses prostacyclin in the vasculature. Professor Ray cites two articles for the proposition that "recent studies confirm the effect of [Vioxx] is on arterial prostacyclin." (Ray Rpt. at 31.) But neither is adequate. The first is a study performed on genetically altered mice.[10] Notably, the mice were *not* exposed to Vioxx or any other COX-2 inhibitor. The study showed only that total elimination of prostacyclin activity caused by genetic elimination of prostacyclin receptors impacted mouse vasculature. Putting aside that the study analyzed mice and not humans, it did

---

[10] *See* Ray Rpt. at 31, citing Rudic, RD, et al., *COX-2 Derived prostacyclin modulates vascular remodeling*, Circ Res 2005; 96:1240-1247.

823917v.1

not show anything about whether Vioxx actually suppresses prostacyclin in the vasculature or whether mere reductions in prostacyclin (as opposed to its elimination) would have any clinical significance.[11]   On the contrary, pharmacological studies in which the subjects (both animal and human) were actually exposed to Vioxx suggest that Vioxx does *not* reduce prostacyclin in the vasculature.[12]   These studies all suggested that COX-1 rather than COX-2, appears to be the source of prostacyclin in the blood vessels.  *Id.*

The second article cited by Professor Ray similarly does not support his claim that COX-2 inhibitors suppress prostacyclin in the vasculature.  Specifically, Professor Ray points to a review article by Dr. Patrono noting the hypothesis that "vascular [prostacyclin] is derived predominantly from COX-2."[13]   Dr. Patrono, however, cites only to FitzGerald's studies analyzing the reduction of prostacyclin metabolites in the urine.  These studies do not establish that COX-2 inhibition reduces prostacyclin in the vasculature.  Rather, they acknowledge that the question is unanswered.[14]   Dr. Patrono's citation of these urine studies in a review article adds nothing new to the analysis and certainly does not support the theory that vascular prostacyclin is derived predominantly from COX-2.  Professor Ray's purported reliance on these articles for a

---

[11]  Also Professor Ray is not a medical doctor and therefore qualified to opine on clinical significance.

[12]  Wong E, et al., *Effects of COX-2 Inhibitors on Aortic Prostacyclin Production in Cholesterol-Fed Rabbits*, ATHEROSCLEROSIS 2001 Aug; 157(2):393-402; Singer II, et al., *COX-1 Is the Major Isoform of Cyclooxygenase Co-Localized with Prostacyclin Synthase in Normal Dog Aortic Endothelium*, INFLAMM RES 2003; 52:588, IS/18 (abstract); Tuleja E, et al., *Effects of Cyclooxegenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site of Microvascular Injury in Healthy Men*, ARTERIOSCLER THROMB VASC BIOL. 2003 Jun 1; 23(6):1111-15.

[13]  Patrono C, et al., *Low-dose aspirin for the prevention of atherothrombosis*, N. Engl. J. Med. 2005; 353:2373-2383.

[14]  *See, e.g.,* Catella-Lawson F, et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics and Vasoactive Ekosanoids*, J. PHARMACOL. EXP. THE. 1999 May; 289(2):735-41.

823917v.1

proposition they do not support simply underscores his lack of expertise in pharmacology.  He has no basis to offer any opinions about the FitzGerald hypothesis's pharmacological viability.

## XI.    PROFESSOR RAY'S OPINION THAT VIOXX HAD GREATER EFFECTS ON HIGH-RISK USERS IS UNRELIABLE.

Professor Ray claims that "the available data suggest the risk [of serious coronary heart disease] may [be] even greater for patients with high baseline risk of myocardial infarction." (Ray Rpt. at 28.)  The relative risks he relies on for this proposition are based on *post hoc* subgroup analysis and therefore are not scientifically reliable.  Professor Ray uses three relative risk statistics: 1) from VIGOR the risk for patients who meet the FDA criteria for aspirin propylaxis; 2) from APPROVe the risk for patients with heart disease symptoms, and 3) from APPROVe the risk for patients with diabetes.  (Ray Rpt. at 27.)

Several recent scientific articles specifically addressing cardiological clinical trials indicate that subgroup analyses are unreliable even in large data sets.[15]  There is scientific consensus that such analyses must be conducted and interpreted with great caution.  (Parker 2006 at 580; *see* also Sleight at 1 ("Analysis of subgroup results in a clinical trial is surprisingly unreliable, even in a large trial.").)  When subgroup analyses are not prespecified, their results should be regarded as merely "hypotheses, requiring confirmation in subsequent studies." (Parker 2006 at 580; *see* also Hernández at 260 ("subgroup analysis is a secondary, hypothesis-

---

[15] *See* Adrián V. Hernández et al., *Subgroup analyses in therapeutic clinical trials: Are most of them misleading?* ("Hernández"), AM. HEART J. 2006, 151:257-64; Stephen W. Lagakos, *The Challenge of Subgroup Analyses - Reporting without Distorting* ("Lagakos"), N. ENGL. J. MED. 2006, 354:1667-69; Andrea B. Parker & C. David Naylor, *Interpretation of subgroup results in clinical trial publications: Insight from a survey of medical specialists in Ontario, Canada* ("Parker 2006"), AM. HEART J. 2006, 151:580-88; Andrea B. Parker & C. David Naylor CD, *Subgroups, treatment effects, and baseline risks: Some lessons from major cardiovascular trials* ("Parker 2000"), AM. HEART J. 2000, 139:952-61; Peter Sleight, *Debate: Subgroup analyses in clinical trials - fun to look at, but don't believe them!* ("Sleight"), CURR. CONTROL TRIALS CARDIOVASC. MED. 2000, 1:25-27.

823917v.1

generating exercise to stimulate further research"); Lagakos at 1668 ("Post hoc subgroup analyses undertaken because of an intriguing trend seen in the results or selective reporting of certain subgroup analyses can be especially misleading.").)

Moreover, a *post hoc* analysis cannot prove a causal relationship.[16]  Again, it is simply a tool to generate hypotheses for future study.  (*See* Elliott H.L., *Post hoc analysis: use and dangers in perspective*, J. OF HYPERTENSION 1996, 14 (suppl 2):S21-S25 at S21 ("*Post hoc* analysis is of major importance in the generation of hypotheses.  However, the hypothesis is created by the analysis and has not been proved by any 'experiment'.").)  Here, the *post hoc* analysis of patients who experienced high blood pressure simply creates the hypothesis that such patients are at higher risk of CV events on Vioxx than the general population; it does nothing to prove it.  Similarly, the *post hoc* analysis of persons with symptomatic atherosclerotic CV disease cannot prove that the risks were higher for these patients.  Indeed, if such analyses were sufficient, every spurious finding in every clinical trial would be self-proving.

"The results of a *post hoc* analysis should be viewed with considerable skepticism and, in advance of confirmation by other appropriately designed prospective studies, should not be regarded as definitive proof."  *Id.* at S21.  Indeed, the APPROVe CSR warns against relying on potentially spurious subgroup analyses: "Caution must be exercised when interpreting these post hoc results."  (APPROVe CSR at 27, attached hereto as Ex. G.)  For Professor Ray to argue that the subgroup analyses in APPROVe and VIGOR proves that patients with other risks factors for CV disease are at an increased risk for serious coronary heart disease is improper.  The Court should exclude all such evidence and argument.

---

[16] In fact, "employing the results of group-based studies of risk to make a causal determination for an individual plaintiff is beyond the limits of epidemiology."  *See* Fed. Judicial Ctr., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2005) at 481.

## XII.   CONCLUSION.

For all the forgoing reasons and the reasons discussed in Merck's moving papers in related trials, Merck respectfully requests that the Court grant its motion to exclude Professor Ray's testimony in its entirety.

Dated:  August 14, 2006

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
Carrie A. Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Richard B. Goetz
Ashley A. Harrington
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

And

823917v.1

Douglas R. Marvin
Robert A. Van Kirk
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029


Attorneys for Merck & Co., Inc.



## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Motion of Merck to Exclude Testimony of Wayne A. Ray, Ph.D. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 14th day of August, 2006.

_/s/ Dorothy H. Wimberly_____
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

823917v.1