# ROFECOXIB AND SERIOUS CORONARY HEART DISEASE

*Report to*

Seeger Weiss LLP

## Wayne A. Ray, Ph.D.

*Professor of Preventive Medicine*
*Director, Division of Pharmacoepidemiology*

*Department of Preventive Medicine*
*Vanderbilt University School of Medicine*
*A 1124 Medical Center North*
*Nashville, TN 37232*

M006B06300

# A. Qualifications

My name is Wayne A. Ray. I am currently a Professor of Preventive Medicine at Vanderbilt University School of Medicine. I am Director of the Division of Pharmacoepidemiology and of the Master of Public Health Program. Below is a brief summary of my qualifications and experience. Attached is a complete *curriculum vitae* that lists all of my publications, including those within the past ten years.

I have been deposed or given testimony on six occasions in the past 4 years:

Deposition for Baycol, July 2004;

Deposition for Vioxx, Stubblefield, September 2004;

Deposition for Fenphen, February 2005

Deposition for Vioxx, Ernst, March 2005

Deposition for Vioxx, Humeston, July 2005

Testimony for Vioxx, Plunkett, December 2005

My current fee for serving as a consulting or testifying expert is $500 per hour.

I have carried out pharmacoepidemiologic research for thirty years and am actively involved in the design, execution and analysis of numerous pharmacoepidemiologic studies. I am a Fellow of the International Society for Pharmacoepidemiology (ISPE). I am the Principal Investigator for the Vanderbilt Center for Education and Research on Therapeutics, funded by a grant from the federal Agency for Health Care Quality and Research. I am also the Principal Investigator for a Cooperative Agreement with the Food and Drug Administration. In performing my duties, I am continuously required to evaluate and design studies that determine whether or not there is evidence that a medication causes an adverse reaction.

I have published more than 150 manuscripts in the peer reviewed literature. Most of these articles are pharmacoepidemiologic investigations that concern the adverse and beneficial effects of medications. Several of these have been published in *The New England Journal of Medicine*, *The Journal of the American Medical Association*, *The Annals of Internal Medicine*, and *Lancet*.

I review articles for numerous leading medical journals. These include *New England Journal of Medicine, Journal of the American Medical Association, Lancet, Annals of Internal Medicine, Science, British Medical Journal, Circulation, American Journal of Medicine, American Journal of Epidemiology, Journal of Clinical Epidemiology, Epidemiology, Journal of the American Geriatrics Society, Journal of Gerontology:  Medical Sciences, The Gerontologist,*

M00GB06301

*Report of Wayne A. Ray, Ph.D.*                                   *11 January 2006  3*

*American Journal of Public Health, Statistics in Medicine, Medical Care, Chest, Bone and Mineral Research,* and *Neuron.*

In my role as Principal Investigator for the Cooperative Agreement with the Food and Drug Administration, I have met regularly with FDA officials from the Center for Drug Studies. My work involves rapid identification and confirmation of adverse medication reactions and assessment of appropriateness of medication use. When potential medication problems develop, I frequently am contacted by the FDA to provide advice or perform studies.

I have served as an *ad hoc* committee member on two occasions for FDA Advisory Committees, providing expertise in study design methodology. I have consulted with the FDA concerning the impact and effect of a "black box" warning on clinical practice.

I have served as a member of several NIH and CDC study section panels in which I was required to carefully evaluate the methodology of studies submitted for potential federal research funding.

I have participated as an expert in the deliberations of numerous national organizations concerned with evaluating research methodology, including the Institute of Medicine.

I have been the Principal Investigator on 31 research grants, funded by the National Institutes of Health, the Centers for Disease Control, the Food and Drug Administration, the Agency for Health Care Quality and Research, non-profit organizations, and pharmaceutical companies. I have been a co-investigator on numerous other grants.

I founded the Masters of Public Health Program at Vanderbilt University and currently am the Program Director. I have consistently taught courses in advanced epidemiology in the MPH program. I have trained numerous students in the use of epidemiologic methods for research and have supervised Master's and Ph.D. theses.

I have conducted several studies of the gastrointestinal and cardiovascular safety of the NSAIDs and coxibs, medications that are of interest in this matter. These have been published in the peer reviewed scientific literature including *The Annals of Internal Medicine* and *The Lancet.*

The basis for my opinions expressed herein is derived from my education, training, research, experience, expertise, and review of the peer-reviewed medical literature and other publicly available documents concerning the treatment of musculoskeletal disorders, the NSAIDs, the coxibs, and cardiovascular illness.

*Report of Wayne A. Ray, Ph.D.*                                    *11 January 2006  4*

## B. Objectives

   Musculoskeletal problems are common and produce pain and inflammation that has adverse clinical, social, and economic consequences. Until 1998, the most common medications to treat these symptoms were the *non-steroidal anti-inflammatory drugs* (NSAIDs), such as naproxen. However, all of the NSAIDs increased the risk of stomach ulcers, which rarely can have serious, life-threatening consequences.

   The *coxibs* are a subclass of NSAIDs that were first introduced into clinical practice in 1998. They have efficacy similar to NSAIDs, but were hypothesized to be less likely to cause ulcers. Thus, it was hoped that these medications would provide a safer alternative to the NSAIDs. Rofecoxib (Vioxx), one of the first of these agents, was introduced in the U.S. in 1999. However, widespread concern about rofecoxib's safety was raised in 2000 when the results of the VIGOR clinical trial showed a 5-fold increased risk of myocardial infarctions and a nearly 3-fold increased risk of serious coronary heart disease relative to patients taking naproxen.  On September 30 of 2004, it was withdrawn from the market by its manufacturer, Merck & Co., because a second large clinical trial that was placebo-controlled confirmed the increased risk of myocardial infarctions and serious coronary heart disease.[1]

   I have been asked to address the following issues in this report:

1. Does rofecoxib increase the risk of myocardial infarctions and serious coronary heart disease?

2. If increased risk is present, what is the magnitude of this risk?

3. If increased risk is present, is it also present for short duration use, defined as that of less than 30 days.

   I have based my analysis of these questions on scientifically reliable evidence provided in the peer-reviewed, published scientific literature and other authoritative sources. In evaluating this literature, I have used generally accepted clinical research and epidemiologic methods. The conclusions I offer herein are based on information and methodology that are accurate to a reasonable degree of scientific and medical certainty.

M006B06303

*Report of Wayne A. Ray, Ph.D.* *11 January 2006  5*

## C. Analysis and Conclusions

## 1. NSAIDs

### 1.1 HISTORY

Musculoskeletal problems and the associated pain and inflammation have been an inevitable part of the human condition. These problems can result from acute trauma (sports injuries, accidents, etc.) or from chronic degenerative diseases such as osteoarthritis or rheumatoid arthritis.

One of the earliest remedies for pain and inflammation came from the bark of the willow tree and other plants. In the 19th century, the active ingredient, *salicin* (a derivative of *salix*, the Latin name for willow and the botanical name of the genus), was isolated. In 1897, the German chemist Felix Hoffman, an employee of Bayer Industries, synthesized acetylsalicylic acid, or aspirin,[2] an event considered by some as the dawn of the modern age of pharmacotherapy.

For many decades, aspirin was the leading non-narcotic analgesic. It provided some relief of fever, pain, and inflammation. Although not free of side-effects, it was relatively safe, particularly when compared to the other alternatives for treatment of pain and inflammation. The narcotic analgesics were more potent analgesics, and thus found more use for severe pain. However, these opioid derivatives were addictive and had other undesirable side effects. In 1951, cortisone was successfully synthesized from soybeans. This structural relative of the sex hormones, or *corticosteroid*, had more potent anti-inflammatory activity than aspirin, but also had serious side effects which limited its long-term use to patients with the most severe symptoms. Thus, there was a search for aspirin-like drugs that had greater efficacy in pain and inflammation at doses that could be tolerated.

In 1963, indomethacin was introduced for the treatment of rheumatoid arthritis.[3] This compound was like aspirin in that it relieved pain and inflammation, but did not have the adverse effects of either narcotic analgesics or corticosteroids. At doses that could be tolerated, it had greater potency than aspirin. Soon, the introduction of similar compounds followed, including ibuprofen (1969) and naproxen (1976). Because of the popularity of these medications, other companies raced to find similar compounds. By 1995, there were more than 20 such drugs on the market.

This class of compounds came to be known as *non-steroidal anti-inflammatory drugs* or NSAIDs. The "anti-inflammatory" refers to one of their major properties, the reduction of inflammation. The "non-steroidal" differentiates them from the corticosteroids, the other commonly used anti-inflammatory drugs. By the early 1990s, these drugs were used by millions of persons in the U.S.,[2,4-6] particularly those 65 years of age and older. At that time,

M00EB06304

approximately 40% of people 65 years or older filled at least one prescription for an NSAID each year, and on any given day, approximately 13% were taking a prescription NSAID.[4,7]

## 1.2 MECHANISM OF ACTION

In 1971, Vane and colleagues discovered that aspirin inhibited the synthesis of prostanoids. These are a class of compounds derived from lipids (fatty substances) that mediate a wide variety of physiologic functions throughout the body.  The prostanoids include a group of compounds known as prostaglandins as well as thromboxane $A_2$.[8,9]

There is now considerable evidence[3,10] that among the many functions mediated by prostaglandins are the body's response to pain and inflammation.  Injurious stimuli (mechanical, heat, etc.) have been shown to trigger their release.  Prostaglandins promote edema and blood flow into the injured region.  There is evidence that they are involved in hyperalgesia, or a state in which the injured region becomes more sensitive to pain.  Thus, it is now understood that the efficacy of NSAIDs in relieving pain and reducing inflammation is closely related to their suppression of prostaglandin synthesis.

## 1.3 NSAID GASTROPATHY

NSAIDs, although considered relatively safe, had one particularly troublesome adverse effect:  an increased risk of serious upper gastrointestinal disease or *gastropathy*, which includes peptic ulcers, upper gastrointestinal bleeding, perforated ulcers, and obstructions.[2] Clinical reports of patients taking aspirin who later had bleeding or perforated ulcers led to the suspicion that aspirin was involved.  By the 1940's, there was research demonstrating that aspirin could damage the gastric mucosa, the moist inner lining of the stomach.  By the 1970's, data from epidemiologic studies demonstrated that aspirin use definitely increased the risk of gastropathy.[11]

During the 1970s, the use of several non-aspirin NSAIDs became common and use of these far surpassed that of aspirin.  For many years, it was controversial as to whether or not these drugs increased gastropathy risk.  However, in the 1980s, several epidemiologic studies[4,12-16] demonstrated that they did increase risk.  Not only was there increased risk, but the magnitude of that increase was high.  The data showed that the NSAIDs increased the risk 4 to 6 times and that this risk increased with the dose of the drug.

This risk was not an important factor for many patients (such as younger persons) because their baseline risk of upper gastrointestinal disease  was low.[15,16]  However, for elderly patients or other persons with elevated baseline risk, NSAID gastropathy was an important clinical consideration.

The discovery that NSAIDs were potent inhibitors of the synthesis of prostaglandins (see §1.4) led to better understanding of their upper gastrointestinal toxicity.[2]  It became known that

M006B06305

prostaglandins are involved in defending the stomach from the potentially harmful effects of gastric acid. Thus, inhibition of prostaglandin synthesis leads to decrease of gastrointestinal mucosa, decrease in mucosal blood flow, and to a decrease in production of bicarbonate, which acts to neutralize gastric acid.[2]

## 1.4 COXIBS

The high rate of upper gastrointestinal side effects of NSAIDs led to a search for agents with similar efficacy that were safer. One approach was the co-administration of another medication to prevent the NSAID side-effect. Misoprostol, a prostaglandin $E_1$ analogue, has been proven effective in preventing NSAID gastropathy.[17,18] Histamine-2 receptor antagonists ($H_2RA$) decrease production of gastric acid and, in adequate doses, can prevent gastric and duodenal ulcers.[18] Proton-pump inhibitors (PPIs), the class of drugs to which omeprazole (Prilosec) belongs, effectively suppress the production of gastric acid[19] and have been shown to be very effective in preventing NSAID gastropathy.[18,19]

Another option is use of acetaminophen (Tylenol), not an NSAID, which provides effective relief for pain.[20,21] However, there is some evidence that certain NSAIDs provide better control for certain symptoms, particularly those related to inflammation.[22] Thus, substantial research was focused upon the development of an NSAID that conferred lower risk of gastropathy.

This research led to the class of medications now known as the *coxibs*. All prostanoid synthesis relies on an intermediate enzyme, known as *cyclooxygenase*,[3,9] abbreviated as COX. This enzyme is inhibited by NSAIDs, which is thought to be responsible for both their therapeutic and adverse effects. The key discovery in the development of coxibs was that there were at least two types of COX, COX-1 and COX-2, each of which could catalyze prostanoid synthesis (Figure 1).

M00GB06306

*Report of Wayne A. Ray, Ph.D.*                                    *11 January 2006  8*

COX-1 is thought to be primarily involved in routine cell functioning (some references refer to COX-1 as "housekeeping"), partly because the COX-1 enzyme is usually present ("constitutive") in cells.  It is involved, among other functions, in protecting the stomach lining.[2,9] In contrast, COX-2 is thought to be produced as part of the physiologic response to unusual events ("inducible").  Thus, it is believed that COX-2 is part of the mechanism that produces pain and inflammation in response to injury.

This discovery led to the synthesis of compounds that were much stronger inhibitors of COX-2 than COX-1.  The hypothesis was that these would retain the NSAID effect of relieving pain and inflammation (due to their inhibition of COX-2), but would not cause gastrointestinal disease (because they were weak inhibitors of COX-1).  These new compounds were known as coxibs, which distinguished them from the older NSAIDs.



**Figure 1** NSAIDs/coxibs and the synthesis of prostanoids.  Sources, Fitzgerald and Patrono, 2001; Sanderson *et al* 2005; Wolfe, 1999.

## 1.5 ROFECOXIB

Rofecoxib was one of the first two coxibs developed and was approved by the FDA in May of 1999.  Another coxib, celecoxib (Celebrex), had been approved in December of 1998.  At present, there are 4 other coxibs in clinical use:  valdecoxib (Bextra, now with marketing suspended), parecoxib (Dynastat, an injectable pro-drug for valdecoxib, not approved in the U.S.), etoricoxib (Arcoxia, not yet approved in U.S.), and lumiracoxib (Prexige, not yet approved in U.S.).

The primary uses of rofecoxib include two broad classes of disorders that cause pain/inflammation: acute conditions (such as dental surgery or dysmenorrhea) where the therapeutic objective is short-term relief of symptoms, and chronic musculoskeletal disorders (particularly osteoarthritis, rheumatoid arthritis, and low back pain) where the goal is control of

M00EB06307

*Report of Wayne A. Ray, Ph.D.*                                        *11 January 2006  9*

symptoms over longer periods.   For both acute[23] and chronic[22-26]indications, rofecoxib has an efficacy that is generally equivalent to that of NSAIDs such as ibuprofen and naproxen.

Rofecoxib was available in three doses, 12.5mg, 25mg, and 50mg. Clinical trials demonstrated that the 25mg dose has greater efficacy than that of 12.5mg.  However, the data from published studies[24-26] reported that the doses higher than 25mg are no more effective than 25mg, although for acute pain (such as post-dental surgery), the onset of analgesia may be more rapid with the 50mg dose.

In September of 2004, an interim analysis was performed in the Adenomatous Polyp Prevention on Vioxx (APPROVe) study, a randomized, double-blind, placebo-controlled study of 25mg of rofecoxib for cancer chemoprevention.  Patients on rofecoxib had a nearly three-fold increased risk of serious coronary heart disease (CHD), which includes myocardial infarctions, sudden cardiac death, and unstable angina[a].[27]  On September 30, Merck withdrew the drug from the market.  Given rofecoxib's widespread use, Graham and colleagues estimated that it caused as many as 100,000 excess myocardial infarctions, including up to 40,000 deaths.[28]

Even prior to rofecoxib's withdrawal, serious questions were raised about its safety.  The primary issue has been the potential for increased risk of serious coronary heart disease and other adverse cardiovascular effects, which ultimately led to the removal from the market.  There were 3 lines of evidence that rofecoxib could increase risk of serious coronary heart disease:

1.  Pharmacologic properties of the drug;

2.  Clinical trials that included serious coronary heart disease and other cardiovascular disease as endpoints;

3.  Epidemiologic investigations of rofecoxib's safety.

Each of these is reviewed in detail in the following sections.

## 2.  Pharmacologic Properties and Risk of Serious CHD

There is considerable interest in the pharmacologic mechanisms by which rofecoxib increases the risk of serious coronary heart disease.  The leading candidate mechanisms are related to the creation of an imbalance by differentially suppressing the synthesis of two

---

[a]Coronary heart disease refers to diseases related to the narrowing or obstruction of the coronary arteries, which supply blood to the myocardium, or muscle of the heart.  Among the most serious manifestations of coronary heart disease are myocardial infarction, sudden cardiac death, and unstable angina.  Because these share the same underlying mechanism, it is standard practice in clinical trials and epidemiologic studies to use serious coronary heart disease as an endpoint.  In many studies, this endpoint is defined as myocardial infarction and sudden cardiac death.

M00EB06308

prostanoids (Figure 1):  thromboxane $A_2$ ($TXA_2$) and prostacyclin ($PGI_2$).[29]  However, other plausible mechanisms have been proposed, which may vary according to the individual coxib.[30]

## 2.1 THROMBOXANE $A_2$

The efficacy of low-dose aspirin for preventing myocardial infarctions and other serious coronary heart disease is currently understood to be due to an important anti-thrombotic effect of inhibition of prostanoid synthesis.[31]  $TXA_2$ is part of the body's mechanism for response to excess bleeding, which includes promoting clotting activity through the aggregation of platelets and constricting blood vessels.  $TXA_2$ also can promote the proliferation of vascular smooth muscle cells.[29]  As part of this process, platelets utilize endogenous COX-1 to synthesize $TXA_2$ in response to physiologic stimuli.

In an irreversible chemical reaction, aspirin inactivates the platelet's supply of COX-1.  Because platelets cannot manufacture COX-1, this inhibits the capacity of platelets to synthesize $TXA_2$ for the 8-10 day life of the platelet.  This occurs even with very low-doses of aspirin, lower than those generally effective for relief of pain or inflammation.  Thus, even though the half-life (the time for the body to eliminate one-half of a drug's dose) of aspirin is only a few hours, platelet aggregation is inhibited for several days.

This property of aspirin is the leading explanation of its efficacy for secondary prevention of coronary heart disease.[32]  In contrast, other NSAIDs, such as ibuprofen and naproxen, only reduce $TXA_2$ synthesis while they are present in the blood and the magnitude of the reduction is related to their dose.  Because there is not a linear relationship between $TXA_2$ synthesis and platelet aggregation, the magnitude and duration of the anti-thrombotic effect of non-aspirin NSAIDs is controversial.[9]

Platelets are not thought to contain material amounts of COX-2.  Thus, the suppression of platelet $TXA_2$ synthesis has not been demonstrated to occur with coxibs.[29,33]

## 2.2 PROSTACYCLIN

In the vascular endothelium, prostacyclin ($PGI_2$) opposes the action of $TXA_2$.  Thus, it inhibits platelet aggregation, causes vasodilation, and prevents the proliferation of smooth-muscle cells.[29]  Initially, the synthesis of endothelial $PGI_2$ was thought to be dependent upon COX-1, which is expressed constitutively in the endothelium.  However, in the mid-1990s it became known that COX-2 was the dominant source of $PGI_2$[29] and published investigations demonstrated that coxibs inhibited synthesis of $PGI_2$.[34]  This finding later was confirmed for several individual coxibs, including rofecoxib.[35]

If COX-2 is not constitutively present in the vascular endothelium, how can a coxib affect endothelial synthesis of $PGI_2$?  The work of Fitzgerald and colleagues suggests that transient

M00GB06309

hemodynamic factors, such as shear stress, favor the endothelial production of COX-2.[29]

Thus, a leading explanation for the increased risk of serious coronary heart disease conferred by rofecoxib is the creation of an imbalance by differential suppression of the synthesis of $TXA_2$ and $PGI_2$. Coxibs suppress the latter, but not the former. This would tend to favor the thrombogenesis in the coronary arteries, increase the risk of hypertension, and promote atherosclerosis. Any one of these effects, alone or in combination, would tend to increase the risk of serious coronary heart disease. As Fitzgerald notes:[29]

> *"Thus, a single mechanism, depression of prostaglandin $I_2$ formation, might be expected to elevate blood pressure, accelerate atherogenesis, and predispose patients receiving coxibs to an exaggerated thrombotic response to the rupture of an atherosclerotic plaque."*

## 3. Clinical Trials

The gold standard for evaluation of medications is the randomized controlled trial, or RCT. This involves random assignment of patients to the study groups. These will consist of the drug under study and one or more comparison groups, which may include either an alternative drug for treatment of the same medical condition, or an inactive compound known as placebo. If properly conducted, any differences in outcomes between the treatment conditions reflects differences between the treatments per se; randomization produces groups that are comparable with respect to other patient factors. Furthermore, clinical trials collect data on both beneficial and adverse effects of the medication. This permits an assessment of whether the benefits of a medication outweigh any risks. Thus, properly conducted RCTs provide the best evidence for whether or not a drug has a net beneficial effect.[36]

Data from clinical trials must be analyzed according to the *intention to treat* principle.[37] This means that data must be analyzed according to the groups into which patients were initially placed and for the entire followup period, regardless of what happens to the treatment assignment during the trial. When patients change treatments in a trial--for example, switching from one drug to another or stopping treatment--it might seem attractive to analyze that patient according to their current treatment status. However, it now is known that switching groups or stopping treatment often is a marker for patients at high or low risk and that not preserving the original assignment will introduce bias, removing the advantage of an RCT.[36]

A major limitation of clinical trials is related to the concept of *statistical power*.[36] Power refers to the capacity of a study to detect an adverse effect, given that a drug confers excess risk for that effect. Power thus is defined as the probability that the analysis will detect a true effect[a].

---

[a]The formal definition of power is 1-Probability[Type II error], or 1-β. Type II error is defined as concluding that an effect does not exist, given that it truly does. Thus, power is only defined prior to when a study is conducted and for non-significant findings. If a finding is statistically significant, then the concern is Type I error, or stating that an effect is present when it is not.

M00GBC6310

*Report of Wayne A. Ray, Ph.D.*                                    *11 January 2006   12*

Power is expressed as a percentage from 0% to 100%; 0% means that a study can never be statistically significant (as in a study with 1 person in each group) and 100% means that a study will always detect a true effect. It is a generally accepted precept of clinical research that reliable analyses should have a power of at least 80% or better.[36-38] That is, given that an effect exists, the study will detect it at least 4 times out of 5.

The power of a study depends upon the background frequency, or *incidence*, of an adverse effect, the magnitude of the excess risk conferred by the drug, the sample size of the study, both in terms of numbers of patients and length of followup, and the level of statistical significance used to decide whether or not a finding is due to chance. Power must be considered when a study reports a finding of no statistically significant difference between the treatments. That finding could be due to either lack of a true difference or insufficient statistical power. In an extreme case, a study with two persons, one assigned to each treatment, would never report a statistically significant difference between the treatments, regardless of how different they actually were.

We now can review the totality of the RCT data for rofecoxib. Apart from very short-term trials early in drug development or for acute pain indications, these trials include:

1.  The VIGOR trial in rheumatoid arthritis (§3.1);

2.  The ADVANTAGE trial in osteoarthritis  (§3.2);

3.  The totality of the trials for chronic musculoskeletal problems and pain  (§3.3);

4.  The APPROVe trial for preventing colonic polyps  (§3.4);

5.  The trials in Alzheimer's disease and related conditions  (§3.5);

6.  The recently terminated cancer chemoprevention trials, VICTOR and VIP  (§3.6).

This review will provide the best evidence, from the totality of the data, of whether or not rofecoxib increases the risk of serious coronary heart disease. It also will provide the best estimate of the magnitude of rofecoxib's effect on this disease.


## 3.1 THE VIGOR TRIAL

### 3.1.1 Rationale

The entire rationale for the development and marketing of the coxibs was to provide patients with medications that were safer than the NSAIDs. Neither the theory underlying their

M006B06311

*Report of Wayne A. Ray, Ph.D.*                                    *11 January 2006  13*

development nor the clinical trials of their efficacy provided evidence that these drugs were more effective than NSAIDs. Thus, the primary justification for the use of a coxib would be that it conferred lower risk of gastropathy than an NSAID.

Initially, this hypothesis was tested using endoscopy to identify ulcers. These studies demonstrated that the occurrence of gastroduodenal ulcers detected by endoscopy was less frequent among patients taking rofecoxib than among patients receiving certain NSAIDs.[39,40]

However, the clinical importance of these "endoscopic ulcers" was controversial. Many of these ulcers, which often are small and asymptomatic, might heal spontaneously and never cause the patient problems. Furthermore, one of the effects of COX-2 inhibition is interference with wound healing.[41,42] This suggested that rofecoxib could inhibit the healing of small, asymptomatic lesions, which in turn could increase incidence of gastropathy.

Thus, the rofecoxib label was required to contain standard language warning of the risks of NSAID-gastropathy until a clinical trial was conducted that demonstrated rofecoxib users had a lower rate of clinically important gastropathy.[a] This led Merck to design and conduct a trial intended to demonstrate a clinically meaningful safety advantage for rofecoxib..

## 3.1.2 Design

The VIOXX Gastrointestinal Outcomes Research Study (VIGOR)[43] trial recruited patients with rheumatoid arthritis who were expected to receive NSAID therapy for up to 1 year. Patients were randomized to receive either 50mg of rofecoxib or 1000mg of naproxen daily. There was no acetaminophen arm, often recommended for patients with chronic musculoskeletal disease who are at high risk of NSAID gastropathy.[44]

The trial sought to exclude patients who were taking other drugs that might dilute the possible gastrointestinal benefits of rofecoxib *vis a vis* naproxen. Patients were not allowed to take aspirin. Because even the low doses used for preventing serious coronary heart disease cause gastropathy,[2] allowing these patients in the trial would have increased the rate of gastropathy among rofecoxib users. Similarly, use of other drugs that can cause gastropathy, including anticoagulants, ticlopidine, and cyclosporin, was not allowed. Patients also were not allowed to take drugs that would have reduced the risk of gastropathy in the naproxen arm. These included misoprostol, PPIs, and $H_2$RAs in gastroprotective doses. Patients at high risk of cardiovascular disease, based upon history of cerebrovascular events, myocardial infarction, or coronary bypass, also were excluded from the trial.

---

[a]See U.S. Food and Drug Administration. Approved product label for VIOXX (rofecoxib tablets and oral suspension) May 20, 1999.

M00EB06312

*Report of Wayne A. Ray, Ph.D.*                    *11 January 2006  14*

### 3.1.3 Efficacy and Gastrointestinal Safety

Both rofecoxib and naproxen showed similar efficacy in controlling the symptoms associated with rheumatoid arthritis. Using the Global Disease Activity Score, the patient's assessment of the severity of the symptoms, there was a reduction (meaning fewer symptoms) of 0.51 for rofecoxib vs 0.53 for naproxen.

Rofecoxib users also had a lower incidence of clinically diagnosed adverse gastrointestinal effects. These patients had 2.1 confirmed adverse gastrointestinal effects per 100 patient years of followup versus 4.5 per 100 for naproxen users (p<.001). The reduced risk was present for the serious events, which were those classified as perforation, obstruction, or severe bleeding by a committee of experts unaware of the patient's treatment assignment. There were 0.6 events per 100 patient-years for rofecoxib users versus 1.4 per 100 patient-years for naproxen users (p=.005).

### 3.1.4 Serious Coronary Heart Disease

An important finding of VIGOR was a substantially increased risk of serious coronary heart and cardiovascular disease in the rofecoxib group (Table 1). Several types of disease were assessed. These included fatal and nonfatal myocardial infarctions, serious coronary heart disease, and serious

**Table 1** VIGOR: Myocardial infarctions, serious coronary heart disease, and serious cardiovascular disease

|  | Naproxen | Rofecoxib |
|---|---|---|
| N patients | 4029 | 4027 |
| Person-Years[1] | 2714 | 2694 |
| **Myocardial infarctions** | | |
| N[3] | 4 | 20 |
| Rate/1000 P.Y. | 1.47 | 7.42 |
| Relative Risk | 1 | 5.04 |
| p-value[4] | | .003 |
| **Serious Coronary Heart Disease** | | |
| N[3] | 10 | 28 |
| Rate/1000 P.Y. | 3.68 | 10.39 |
| Relative Risk | 1 | 2.82 |
| p-value[4] | | .005 |
| **Serious Cardiovascular Disease** | | |
| N[6] | 20 | 45 |
| Rate/1000 PY | 7.4 | 16.8 |
| Relative Risk | 1 | 2.27 |
| p-value[4] | | .002 |

[1]Source: Calculated from data presented by Weir *et al, Am Heart J* 2003;146:591.
[2]Includes fatal MIs, see Targum review 1 Feb 2001.
[3]Source: ibid
[4]Method: z-statistic using large-sample formula for the standard error of the log of the rate-ratio.
[5]Source: Targum review 1 Feb 2001. Includes MIs, sudden death, and unstable angina.
[6]Source: Mukhjerjee *et al, JAMA* 2001;286:954

M006B06313

*Report of Wayne A. Ray, Ph.D.*                                    *11 January 2006  15*

cardiovascular disease[a].

Among rofecoxib users, there were 20 myocardial infarctions whereas there were 4 for naproxen users. The relative risk was 5.04 (p=.003); that is, rofecoxib 50mg users were more than 5 times as likely to have a myocardial infarction as were naproxen users.

Serious coronary heart disease[b] included the myocardial infarctions, sudden cardiac death, and unstable angina. In the rofecoxib group there were 28 cases of serious coronary heart disease versus 10 in the naproxen group (Table 1). The relative risk for rofecoxib patients was 2.82 (p=.005).

Serious cardiovascular disease was a broader endpoint that included a variety of conditions. In addition to serious coronary heart disease, it included cerebrovascular disease (primarily ischemic strokes) as well as peripheral vascular disease (such as deep-vein thrombosis). The latter is somewhat controversial since the etiology of these may be different from that of coronary and cerebrovascular events.

There were 45 patients[c] in the rofecoxib and 20 patients in the naproxen groups with serious cardiovascular events (Table 1). Thus, rofecoxib conferred a relative risk of 2.27 (p=.002) for these events.

## 3.1.5 The Naproxen Hypothesis

The VIGOR study demonstrated that when rofecoxib (at least in the 50mg dose) was compared to naproxen, the former produced a 2.8-fold increased risk of serious coronary heart disease and a 5-fold increased risk of acute myocardial infarction. Merck attributed these findings to a pronounced protective effect of naproxen. The VIGOR trial publication[43] obscured the risk associated with rofecoxib. For gastrointestinal outcomes, the relative risk ratios used rofecoxib as the numerator and naproxen as the denominator, resulting in ratios less than 1 indicating the expected lower rate of gastrointestinal disease in the rofecoxib arm. According to generally accepted practice, the risk ratios should have been calculated in the same manner for serious coronary heart disease and myocardial infarctions. Had this been done, they would have

---

[a]The data presented here are for cardiovascular events that were confirmed by adjudication. There were many events not confirmed by adjudication. For example, the Targum (FDA) memo of 1 February 2001 notes that there were a total of 65 and 33 serious cardiovascular events for rofecoxib and naproxen, respectively, referred to adjudication, of which 46 (45 patients) and 20 were confirmed. To the extent that failure to adjudicate an event was based upon incomplete information, often the case in large clinical trials, this will cause the rates of adjudicated cases of cardiovascular disease to underestimate the true rates.

[b]The publication of Bombardier *et al* presenting the VIGOR results did not included information on serious coronary heart disease. The data here were obtained from the Targum (FDA) memo of 1 February 2001 in which serious coronary heart disease is referred to as "cardiac events".

[c]These patients had 46 events, which is the number listed in Targum's 1 February 2001 memo.

M00EBO6314

*Report of Wayne A. Ray, Ph.D.*                              *11 January 2006  16*

shown, for example, the 5-fold increased risk[a]. Instead, the risk ratios were inverted, with naproxen as the numerator and rofecoxib as the denominator. This yielded a number less than 1, with the finding described as a protective effect of naproxen.

Subsequent publications with funding from Merck,[35,45,46] proffered the interpretation that the VIGOR findings were due to a cardio-protective effect of naproxen. Merck continued this practice until rofecoxib was withdrawn from the market and, even following withdrawal, continued to support the "naproxen hypothesis" in some publications.[47,48]

Following publication of the VIGOR results, the hypothesis of whether or not naproxen prevented myocardial infarctions and serious coronary heart disease was tested in epidemiologic studies. A protective effect of a magnitude sufficient to explain the VIGOR findings would be manifested as relative risks of 0.20 and 0.35 for myocardial infarctions and serious coronary heart disease, respectively. This is a much more pronounced effect than that of aspirin,[32] which was seen in epidemiologic studies long before clinical trials were conducted.[49] Thus, if naproxen had a cardio-protective effect of sufficient magnitude to explain the VIGOR findings, epidemiologic studies would be capable of detecting it.

In January of 2002, we published the findings of a large epidemiologic investigation of naproxen in *The Lancet*.[50] This study, with 6362 cases of serious coronary heart disease (myocardial infarction or sudden cardiac death), reported no protective effect of naproxen (Table 2, relative risk of 0.95, not statistically significant). Thus, more than two years before rofecoxib was withdrawn from the market, a large, published study provided data that raised substantial doubt about the "naproxen hypothesis".

There now are 14 published epidemiologic studies[b] assessing the cardio-protective effect of naproxen (Table 2).[28,50-62] Using standard meta-analysis techniques,[63] the pooled estimate of the relative risk is 0.97 (95% CI, 0.91-1.03, p = .33), showing that naproxen is not cardioprotective.

---

[a]Actually the VIGOR publication would have only shown a 4-fold increased risk because 3 myocardial infarctions, all in the VIOXX group, were not reported, even though Merck was aware of these while the publication was being revised (see *New England Journal of Medicine, 29 December 2005, p 2813*).

[b]The study of Graham *et al* was published after APPROVe but its findings were presented at an international scientific meeting (International Conference on Pharmacopepidemiology) in August of 2004.

M00GB06315

*Report of Wayne A. Ray, Ph.D.*                                    *11 January 2006  17*

**Table 2**  Epidemiologic studies of naproxen and serious coronary heart disease

| Study | Setting | Dates | Endpoint[1] | N | Relative Risk | 95% CI | | |
|-------|---------|-------|-------------|---|---------------|--------|--|--|
| Watson, 2002 | UK GPRD | 01/88-12/99 | AMI | 435 | 0.57 | 0.31 | - | 1.06 |
| Rhame, 2002 | Quebec | 01/92-12/94 | AMI | 14163 | 0.79 | 0.63 | - | 0.99 |
| Kimmel, 2004 | Philadelphia | 05/98-04/01 | AMI[2] | 1055 | 0.48 | 0.28 | - | 0.82 |
| Jick, 2000 | UK GPRD | 01/96-12/98 | AMI | 27 | 1.00 | 0.30 | - | 3.30 |
| Ray, 2002a | Tennessee | 01/87-12/98 | SCHD | 6362 | 0.95 | 0.82 | - | 1.09 |
| Solomon, 2002 | New Jersey | 01/91-12/95 | AMI | 4425 | 0.84 | 0.72 | - | 0.98 |
| Schlienger, 2002 | UK GPRD | 01/92-08/97 | AMI | 3319 | 0.68 | 0.42 | - | 1.13 |
| Ray, 2002b | Tennessee | 01/99-06/01 | SCHD | 5316 | 0.92 | 0.73 | - | 1.16 |
| Mamdani, 2003 | Ontario | 04/98-3/01 | AMI | 701 | 1.00 | 0.60 | - | 1.70 |
| García Rodríguez, 2004 | UK GPRD | 01/97-12/00 | SCHD | 4975 | 0.89 | 0.64 | - | 1.24 |
| Graham, 2005 | California | 01/99-12/01 | SCHD | 8143 | 1.14 | 1.00 | - | 1.30 |
| Levesque, 2005 | Quebec | 1/99-6/02 | AMI | 2844 | 1.17 | 0.75 | - | 1.84 |
| Hippisley-Cox, 2005 | UK general practices | 08/00-07/04 | SCHD[3] | 9218 | 1.27 | 1.01 | - | 1.60 |
| Johnson, 2005 | Denmark | 1/00-12/03 | AMI | 10280 | 1.50 | 0.99 | - | 2.29 |
| *Pooled Estimate* | | | | | 0.97 | 0.91 | - | 1.03 |

[1]AMI = Acute myocardial infarction, SCHD = Serious coronary heart disease, which is AMI and sudden cardiac death.
[2]Includes only non-fatal AMIs.
[3]Includes out-of-hospital deaths if these were coded as due to AMI

Further confirmation of the lack of a naproxen protective effect was provided by data recently released from an ongoing NIA randomized placebo-controlled trial of celecoxib and naproxen in Alzheimer's disease (ADAPT). Although detailed data are not yet available, there was no cardioprotective effect for the naproxen arm; indeed, these patients were reported to have an increased rate of cardiovascular events relative to patients receiving placebo.[a]

### 3.1.6  Do VIOXX Cardiovascular Risks Outweigh Ulcer Benefits?

The VIGOR data showed that increased occurrence of serious cardiovascular disease in users of rofecoxib more than offset the reductions in serious gastrointestinal disease (Table 3).  In the rofecoxib group, there were 9.4 excess cases of serious cardiovascular disease per 1000 person-years versus a reduction of 7.8 cases of serious gastrointestinal disease.  Thus, these patients

---

[a]See NIH press release of 20 December 2004 (http://www.nih.gov/news/pr/dec2004/od-20.htm).  The release notes " In addition, however, data from the ADAPT trial indicated an apparent increase in cardiovascular and cerebrovascular events among the participants taking naproxen when compared with those on placebo".

actually had more cases of serious disease (either cardiovascular or gastrointestinal) than did naproxen users.  Furthermore, cardiovascular disease such as myocardial infarction usually has much more serious long-term consequences than gastrointestinal disease such as a peptic ulcer. Indeed, a published decision analysis shows that users of rofecoxib 50mg have lower life expectancy than do users of naproxen 1000mg.[64]  Thus, the data from this large randomized trial, considered the best form of evidence upon which to base clinical practice,[36] demonstrate the inferior overall safety of rofecoxib compared to naproxen.

This was recognized by a comment from an FDA reviewer, Dr. Targum, who noted that the overall findings of VIGOR point to naproxen as the "preferred drug", in spite of its recognized risk of peptic ulcer disease [a]. Furthermore, the risk of ulcers in NSAID users is substantially reduced by concurrent use of misoprostol, PPIs, or adequate-dose $H_2$RAs, all very safe medications.[18,44,65,66] Thus, given the findings of the VIGOR study, a much less risky strategy for patients would be to use naproxen with a drug such as a PPI. The PPI should substantially reduce gastrointestinal disease (patients were not allowed to take these in the VIGOR trial), further tipping the overall balance of benefit versus risk in favor of naproxen.

Apart from VIGOR, there is no other study that has demonstrated a  benefit of rofecoxib versus an NSAID with regard to serious, clinically important upper gastrointestinal disease.  As recognized by all parties, this is the only generally accepted proof of the better gastrointestinal safety profile of a coxib [b].  One might speculate that rofecoxib was safer than an NSAID in populations different

**Table 3** VIGOR trial: Comparison of serious gastrointestinal and cardiovascular disease, per 1000 patient years of followup

|  | Naproxen | Rofecoxib |
|---|---|---|
| N patients | 4029 | 4027 |
| Person-Years[1] | 2714 | 2694 |
| **Serious Cardiovascular Disease** | | |
| N[2] | 20 | 45 |
| Rate/1000 PY | 7.4 | 16.8 |
| Excess cases/1000 PY | 0 | 9.4 |
| **Serious Gastrointestinal Disease** | | |
| N[3] | 37 | 16 |
| Rate/1000 PY | 13.7 | 5.9 |
| Excess cases/1000 PY | 0 | -7.8 |

[1]Source: Calculated from data presented by Weir et al, *Am Heart J* 2003;146:591.
[2]Source: Mukhjerjee *et al, JAMA* 2001;286:954
[3]Source: Bombardier *et al, NEJM* 2000;343:1520

---

[a]Memo of 1 February 2001, p. 35.

[b]See Merck Memorandum Regarding VIOXX Science Issues, 21 October 2005, p20, in which it is stated *"Only Vioxx is clinically proven to reduce serious GI bleeding.  As a group, coxibs reduce the incidence of GI ulcers as compared to traditional NSAIDs but only Vioxx has been shown to reduce the risk of serious GI bleeding as compared to traditional NSAIDs"*

M00GB0G317

from that of the VIGOR trial, such as persons at high risk of upper gastrointestinal disease and low risk of cardiovascular disease. However, there have been no definitive trials in such populations. Thus, according to generally accepted scientific standards, the best evidence to date is that naproxen is a safer drug than rofecoxib[c].

### 3.1.7 The 25mg Dose

The efficacy of rofecoxib is due to inhibition of the synthesis of prostanoids (§1.4). Mechanistic studies indicate that a leading explanation for the cardiotoxicity of rofecoxib is a consequence of this same property (§2). This information was known by Merck scientists, at least in part, at the time the VIGOR findings were released.[46] Thus, it was quite possible that doses that suppressed prostanoid synthesis sufficiently to be efficacious also were toxic. The efficacy studies in arthritis patients had found that the anti-inflammatory/analgesic effect of the 25mg dose is similar to that of the 50mg dose (see §1.5). This thus raised a strong signal, or basis for concern, that the lower doses were cardiotoxic. This concern was buttressed by the fact that $PGI_2$, involved in the possible mechanisms for cardiotoxicity, also is one of the prostaglandins that mediates inflammation.[67]

Given these data, after the VIGOR trial results became known, a prudent course of action would have been to consider that all clinically efficacious doses had the same effect as the 50mg dose. This would have entailed severely curtailing the use of all doses. If there was a reasonable scientific basis for assuming the lower doses were safe, then urgent studies could have been mounted to confirm its safety. As the editor of *The New England Journal of Medicine* states in a 2005 editorial:[68]

> *"However, when these clinical trials showed an increased risk of myocardial infarction, rather than consider this finding a major danger signal, the manufacturers designed trials to show efficacy for other indications and enhanced the cardiovascular safety monitoring in these subsequent trials. It is a sobering thought that although the number of deaths and cardiovascular events attributable to COX-2 inhibitors remains in dispute, had trials designed to test the question of cardiovascular toxicity directly been launched in 1999 and executed with urgency, substantial morbidity and perhaps a substantial number of deaths could have been prevented."*

---

[c]A post hoc analysis of the VIGOR data has been published (Gastroenterology 2003;124:288–292)showing that the rofecoxib arm had lower rates of lower gastrointestinal disease than did the naproxen arm. However, this post hoc analysis, while suitable for hypothesis generation, does not confirm a benefit of rofecoxib for this endpoint. As the authors themselves note: *"this was a post hoc analysis of a prospective double-blind trial; the trial was not designed specifically to evaluate lower GI events. For this reason, a large prospective outcomes study designed to examine lower GI events will be required to confirm our findings."*

M00GB06318

*Report of Wayne A. Ray, Ph.D.*                                    *11 January 2006  20*

### 3.1.8  Conclusion

When the VIGOR findings were revealed, the most prudent interpretation of the data was that rofecoxib increased the risk of serious coronary heart disease.  At that time, there were no published clinical trials or epidemiologic studies showing a cardioprotective effect of naproxen and the theoretical basis for such an effect was limited at best.  Thus, a 2.8-fold excess of serious coronary heart disease in patients taking rofecoxib logically would suggest that rofecoxib increased the risk of this serious adverse effect.  Even if this had not been proven conclusively at the time the VIGOR findings were released, the principle of acting conservatively to protect patient health[a] would require assuming rofecoxib had potential adverse cardiovascular effects until reliable data demonstrated otherwise.  As noted by the editor of *The New England Journal of Medicine* in an editorial accompanying the publication of the APPROVe trial results,[68]

> *"As we apply new science to develop new medicines, we must not forget that our first job is to do no harm."*

There now is substantial evidence that naproxen has no material cardioprotective effect.  However, the question does remain whether, prior to the APPROVe trial report, the naproxen hypothesis had sufficient scientific credibility to confidently assume that it explained the VIGOR findings.

At its inception, the naproxen hypothesis was speculative and controversial. Naproxen had been available for nearly 25 years and used by many millions of patients.  However, there were no published studies showing that it reduced risk of serious coronary heart disease.  A further basis for skepticism was that the argument advanced by Merck, based upon studies of platelet aggregation,[35] logically implied that naproxen was at best as cardioprotective as low-dose aspirin.[9]  However, studies of aspirin [32,48] have demonstrated only a 20-25% reduction in serious coronary heart disease[b], not the 65-80% reduction required to explain the VIGOR trial

---

[a]A reasonable doubt about medication safety often is the basis for public health action.  This can include withdrawal of the drug or restriction of use until more definitive data are available.  The specific action depends upon the severity of the adverse effect, the ultimate benefit of the drug to the patient, and the availability of alternative therapies. See for example, Dr. Leo Lutwak's statement at the 28 September 1995 meeting of the FDA Endocrinologic and Metabolic Drugs Advisory Committee Hearing that reviewed dexfenfluramine.

*"Now for proof of efficacy, we demand very strict criteria: placebo-controlled, double-blind studies conducted under very careful conditions for long periods of time.  Safety data generally are much softer.  If evidence of lack of safety, suspicion is often enough to raise questions."*  p233-234

[b]The 20%-25% reduction is for "secondary prevention", that is patients who have high risk of cardiovascular disease because they have already experienced an event.  As Patrono *et al* (2004) note:

*"Long-term aspirin therapy confers a conclusive net benefit on the risk of subsequent MI, stroke, or vascular death among subjects with an intermediate-to-high risk of vascular complications. These include patients with chronic stable angina, patients with prior MI, patients with unstable angina and patients with TIA or minor stroke as well as other high-risk categories. The proportional effects of long-term aspirin therapy on vascular events in these different clinical settings are rather homogenous, ranging between a 20% and a 25% odds reduction based on an overview of*

M00GB06319

*Report of Wayne A. Ray, Ph.D.*                *11 January 2006 21*

findings.[69] As Topol notes:[48]

> *"the magnitude of the effect would be unlikely to exceed that of aspirin, at a 25 percent reduction of heart attacks. Instead, in the VIGOR trial, there was a 500 percent increase in heart attacks. This makes any "naproxen hypothesis" of cardioprotection mathematically indefensible."*

Trials could have been rapidly initiated in patients at high risk of cardiovascular disease to clarify this matter.   These could have included trials of rofecoxib vs acetaminophen in arthritis patients at high risk of heart disease or rofecoxib vs naproxen+PPI in such patients[a].  Indeed, prominent experts suggested these types of studies.[69,70]  Following the "first do no harm" principle, rofecoxib use should have been severely curtailed while these studies were being conducted.

## 3.2 THE ADVANTAGE TRIAL

The  ADVANTAGE study (Table 4) was a Merck-sponsored 12 week trial of 25 mg rofecoxib vs 1000 mg naproxen in patients with osteoarthritis.[71,72] The average duration of the study was 69 days.   In the initial publication of the study,[71] there were 5 AMIs in the rofecoxib group and 1 in the naproxen group.  However, this article did not mention the sudden cardiac deaths.  Furthermore, there was controversy concerning the way in which Merck had classified these deaths, with

**Table 4** ADVANTAGE Trial, Serious Coronary Heart Disease

|  | Naproxen | Rofecoxib |
|---|---|---|
| N patients | 2772 | 2785 |
| Serious Coronary Heart Disease | | |
| N | 3 | 10 |
| Risk/1000 | 1.08 | 3.59 |
| Relative Risk | 1 | 3.32 |
| p-value[1] |  | .07 |

[1]Calculated with z-statistic using large-sample formula for the standard error of the log of the risk-ratio

---

*all randomized trials".*

However, many patients in the VIGOR trial would be considered as a lower risk, or "primary prevention" population.  The cardio-protective effects of aspirin may be lower in this population; indeed, a recent large placebo controlled trial in women found no protective effect for myocardial infarctions or cardiovascular deaths (NEJM 2005;352:1293).  Thus, the protective effect of aspirin (and by Merk's reasoning, naproxen)  for serious coronary heart disease in the VIGOR population, of whom 54% had no history of cardiac disease (see Targum memo) and 80% were female, should be less than the generally accepted 20%-25% reduction.

[a]One might ask what would be different about this than VIGOR.  One element of Merck's explanation for the VIGOR findings was that the trial prohibited aspirin use and sought to exclude patients for whom aspirin was indicated.  However, a substantial number of aspirin-eligible patients enrolled in the trial.  Thus, the reasoning was that  naproxen "replaced" aspirin in that arm of the trial and the protective effect emerged.  In a trial of high-risk cardiovascular disease patients, all would be using aspirin, so, according to the Merck interpretation, the putative anti-platelet effects of naproxen would be irrelevant.

M006B06320

*Report of Wayne A. Ray, Ph.D.*                              *11 January 2006  22*

evidence of under-reporting[a].

Table 4 shows the data for the ADVANTAGE trial, with the cases of serious coronary heart disease as determined by the FDA[b].  The patients in the rofecoxib group have a 3.32 fold increased risk (p=.07).

## 3.3 ALL TRIALS FOR CHRONIC MUSCULOSKELETAL DISORDERS AND PAIN

Jüni and colleagues conducted a meta-analysis of rofecoxib trials, with a particular focus on acute myocardial infarction.  The analysis was conducted by independent researchers and was published in *The Lancet* on 4 December 2004.[73]

The meta-analysis identified all randomized controlled trials with publically available data in adult patients with chronic musculoskeletal disorders (the only approved indication for non-short-term use of rofecoxib) that compared rofecoxib in doses of 12.5 to 50 mg with placebo or other NSAID.  This thus excluded trials for acute pain indications, which are typically of very short duration, and other diseases in which NSAID/coxib therapy was experimental, such as Alzheimer's[74] and cancer chemoprevention.  Ultimately, 18 randomized controlled trials with 25,273 patients met the study criteria.

The findings demonstrated that rofecoxib produced a 2.24-fold increased risk of acute myocardial infarction (p=.007).  This finding was evident by mid-2000, when the relative risk for rofecoxib became statistically significant.

**Table 5**  Meta-analysis of rofecoxib clinical trials for chronic musculoskeletal disorders.

|  | Relative Risk (95% CI) | p, hetero-geneity |
|---|---|---|
| All comparisons | 2.24 (1.24-4.02) | |
| **Type of Control** | | |
| Placebo | 1.04 (0.34-3.12) | 0.41 |
| Naproxen | 2.93 (1.36-6.33) | |
| Other NSAID | 1.55 (0.55-4.36) | |
| **Daily Dose of Rofecoxib** | | |
| 12.5 mg | 2.71 (0.99-7.44) | 0.69 |
| 25 mg | 1.37 (0.52-3.61) | |
| 50 mg | 2.83 (1.24-6.43) | |
| **Duration of Trial** | | |
| 6+ months | 2.17 (1.03-4.59) | 0.82 |
| <6 months | 2.33 (0.90-6.03) | |
| **External Endpoints Committee** | | |
| Yes | 3.88 (1.88-8.02) | 0.011 |
| No/unclear | 0.79 (0.29-2.13) | |
| Source:  Jüni *et al*, *Lancet* 364:2021 | | |

[a]As reported in the New York Times, 24 April 2005, one of the sudden cardiac deaths was reported by Merck as a death of unknown cause.  Initially, a Merck scientist classified the death as due to a myocardial infarction; however, after senior Merck officials objected to this classification, it was listed as an "unknown" cause.  An FDA reviewer later reclassified this case as a sudden cardiac death.

[b]Villalba memo, End of Review November 28, 2001, cases adjudicated as serious coronary heart disease

M00EB06321