UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 2:05cv04379 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| ROBERT G. SMITH, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
FOR ORDER EXCLUDING TESTIMONY OF JOHN W. FARQUHAR, M.D.**

**(EXPERT CHALLENGE NO. 6)**

I.   **INTRODUCTION AND SUMMARY OF PRIOR CHALLENGES TO DR.
FARQUHAR'S TESTIMONY.**

The plaintiffs in each of the three MDL cases set for trial have designated Dr. Farquhar, a

cardiologist and epidemiologist, as an expert witness.  However, Dr. Farquhar has yet to testify

in any trial, as explained below.[1]

---

[1] Plaintiff may call Dr. Farquhar by deposition in this case.  To the extent he does, Merck has
concurrently filed wholesale objections to Dr. Farquhar's deposition designations from discovery
depositions in other cases.

Plaintiffs in *Plunkett v. Merck* designated Dr. Farquhar as an expert witness to testify at trial and provided Merck with Dr. Farquhar's first expert report in this MDL, dated Sept. 26, 2005 ("Initial Report").  The Initial Report addresses general causation issues and states on its face that it is applicable to all cases in this MDL.  (*See* Expert Report of John W. Farquhar, M.D., attached hereto as Ex. A.)  Merck filed a motion to exclude Dr. Farquhar's testimony and addressed why the Court should do so in its memorandum in support of its Motion To Exclude Testimony Of John W. Farquhar, M.D., filed in *Plunkett v. Merck* on Oct. 21, 2005 (Record Docket No. 1515), and in its reply memorandum in support of that motion filed Nov. 9, 2005 (Record Docket No. 1515.)  The Court denied Merck's motion as to causation opinions and reserved ruling on whether Dr. Farquhar could testify about Merck's alleged knowledge and state of mind.  The Court did not specifically address whether Dr. Farquhar could give testimony amounting to value judgments about Merck's conduct.  (*See* Order and Reasons, filed in *Plunkett v. Merck* Nov. 18, 2005 (Record Docket No. 1516).)  Following the disposition of Merck's motion, plaintiffs elected not to call Dr. Farquhar to testify in the initial trial, and they did not even designate him as an expert witness in connection with the retrial of the *Plunkett* case in January 2006.

Plaintiff in *Barnett v. Merck* also designated Dr. Farquhar as an expert witness, and Dr. Farquhar submitted two additional expert reports on general causation that are again applicable to all cases in the MDL – one styled Supplemental Expert Report Of John W. Farquhar, M.D., dated May 22, 2006 ("Supplemental Report," attached hereto as Ex. B.), and the other entitled Supplemental/Rebuttal Expert Report of John W. Farquhar, M.D., dated June 22, 2006 ("Rebuttal Report," attached hereto as Ex. C.)  Merck again filed a motion challenging the admissibility of his testimony, but later withdrew the motion before the scheduled hearing.  As a

2

result, the Court did not rule on Merck's motion.  Plaintiff's counsel subsequently informed Merck's counsel that Dr. Farquhar would not testify in the *Barnett* trial, which is ongoing as of the date of the present motion.

Dr. Farquhar is again a designated expert witness in the instant case, *Smith v. Merck.*  Dr. Farquhar's three reports collectively make up an all-purpose compendium of opinions on general causation that encompass many more issues than will even be relevant in any given case.  He asserts that Vioxx® "causes cardiovascular disease. . . , including heart attacks, strokes, transient ischemic attacks. . . , peripheral edema and congestive heart failure." (Initial Report at ¶18.)  He also opines that Vioxx causes hypertension (*id.*) and asserts that the risk of heart attack associated with taking Vioxx begins when the patient first takes Vioxx and continues throughout the period of usage (*id.* at ¶¶ 176-183).

Merck respectfully disagrees with the Court's ruling in *Plunkett* that Dr. Farquhar's testimony on general causation would be admitted.  For the reasons stated here and in the prior briefing in *Plunkett* and *Barnett,* which Merck incorporates here by reference, Merck urges the Court to determine that Dr. Farquhar's anticipated testimony on general causation is not scientifically reliable and must be excluded under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), and other rules of evidence.  Dr. Farquhar's own testimony unequivocally demonstrates that such opinions are not based on reliable scientific evidence.

Dr. Farquhar also purports to opine on the state of Merck's knowledge and understanding of the risks allegedly associated with Vioxx and to make value judgments about the "appropriateness" of Merck's conduct.  (Initial Report at ¶¶ 21, 185-199.)  All testimony concerning what Merck knew should also be excluded under Rule 702.  Such testimony is

3

without foundation, is not based on any specialized knowledge that Dr. Farquhar has, and will not assist the trier of fact.  Finally, Dr. Farquhar's subjective normative judgments must be excluded; such opinions are irrelevant and will not assist the jury in finding the facts necessary to determine whether Merck's conduct met the applicable legal standards.

## II.     THE LEGAL STANDARD.

The legal standard for the admission of expert testimony in this Court is set forth at pages 3-5 of the Memorandum In Support of the Motion of Merck for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis, filed concurrently herewith and incorporated herein by reference.

## III.    DR. FARQUHAR'S OPINIONS ON GENERAL CAUSATION DO NOT HAVE A RELIABLE SCIENTIFIC BASIS.

Dr. Farquhar's cumulative reports attempt to show that there is an elevated risk of a thrombotic cardiovascular event from Vioxx use that begins early and continues throughout the time it is taken, regardless of the duration of use.  (*E.g.,* Supplemental Report at ¶¶ 1-6.)  In an effort to overcome the absence of clinical trial data to support his opinion, Dr. Farquhar has changed tack more than once in the course of his reports and depositions in this MDL.[2]  But Dr. Farquhar's shift of focus and his attendant reinterpretation (and misinterpretation) of data cannot compensate for the fundamental absence of reliable scientific support for his opinion.

### A.     Dr. Farquhar's Opinion That Short-Term Use Of Vioxx Causes Cardiovascular Disease Is Based On A Misinterpretation Of Merck's Clinical Studies And Therefore Lacks A Reliable Scientific Basis.

Dr. Farquhar's assertion that Vioxx causes cardiovascular disease when used for any duration is based primarily on his analysis of the results of the APPROVe trial and other clinical

---

[2] Dr. Farquhar has been deposed in the MDL on three separate occasions: October 10, 2005; June 8, 2006; and July 19, 2006, on the third occasion in connection solely with *Barnett v. Merck.*

824097v.1

trials that Merck conducted.  (*See, e.g.,* Initial Report at ¶¶ 71-157, 200; Supplemental Report at ¶¶ 2-31.)  For the reasons discussed below and in Merck's prior briefing in other MDL cases, the selective data from the Merck studies upon which he relies do not supply a reliable scientific basis for his opinion.

1.      <u>Combined Data From The APPROVe, VICTOR, and ViP Studies Are Not Reliable Scientific Support For Dr. Farquhar's Opinion.</u>

Dr. Farquhar's most recent attempt to prove an elevated risk from Vioxx at all durations of use consists of his Supplemental Report in tandem with a report from Professor Nicholas Jewell, a biostatistician, the purports to pool cardiac event data from the APPROVe, VICTOR, and ViP studies and to analyze it in accordance with Protocol 203.  (*See* Analysis of Vioxx Data From the APPROVe, VICTOR, & ViP Studdies – Protocol 203 ("Jewell Report"), attached hereto as Ex. D.)  Merck intended Protocol 203 to be a combined analysis of thrombotic cardiovascular events in the APPROVe, VICTOR, and ViP studies, which were randomized, placebo-controlled clinical studies of patients at risk of developing, respectively, adenomatous colon polyps (APPROVe), recurrent colon cancer (VICTOR) , or prostate cancer (ViP).   All three studies were designed to run for several years but were terminated prematurely in September 2004 when Merck withdrew Vioxx from the market.  As Dr. Farquhar acknowledges, this meant that VICTOR and ViP, both of which began later than APPROVe, ran only for short periods of time, ten months in the case of VICTOR, and five months in the case of ViP.  (*See* Initial Report at ¶¶ 129, 131.)  As a result of the early termination, there was substantially fewer thrombotic events than had been envisaged when Protocol 203 was designed.  The Merck Data Analysis Plan for Protocol 203 contemplated that a combined analysis of cardiac events in all three studies would be conducted only when each study had run its full pre-specified course.  It thus is misleading for Dr. Farquhar and Professor Jewell to assert – in an apparent effort to

5

bolster the persuasiveness of the analysis – that the Jewell statistical work was based on Protocol 203 or is simply following Merck's pre-specified analysis. (*See., e.g.*, Supplemental Report at ¶ 1.) Professor Jewell and Dr. Farquhar have in fact engaged in a *post hoc* analysis, not, as they attempt to suggest, the combined analysis that was pre-specified when the studies were designed.[3]

In any event, given the period of Vioxx usage presented in this case – a maximum of 4 ½ months[4] – Professor Jewell's calculations of relevant risk do not constitutae scientifically reliable evidence of causation. They do not show a statistically significant risk after either four or six months of use, the only time periods potentially relevant in this case, given the length of time that Mr. Smith took Vioxx before his heart attack in February 2003. Professor Jewell concluded that from 0 to four months of use the relative risk of a cardiac event was 1.42 (95 % confidence

---

[3] Initially, Dr. Farquhar, lacking any data from studies showing a statistically significant increased risk from short-term use of Vioxx, was forced to fall back on a "generalization" that when there is an outcome that shows an increased risk at the end of a study, one may assume that that increased risk applies throughout the course of the study: "[T]here's a generalization that when you end up with a relative risk at the end of the trial, you *assume* it applies throughout. (October 10, 2005 Deposition of John W. Farquhar ("10/10/05 Farquhar Dep.") at 194:14-196:24, attached hereto as Ex. E (emphasis added; objections and colloquy omitted).) This "generalization" is not only contrary to fact; it is also not "scientific knowledge" and cannot establish legal causation. *See Daubert*, 509 U.S. 579, 589-90 ("The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation."). *Cf. Anderson v. Bristol Myers Squibb Co.*, No. H-95-0003, 1998 U.S. Dist. LEXIS 23259, at *15-16 (S.D. Tex. Apr. 17, 1998) (rejecting argument that medical expert's opinions should be excluded only if unreliable and irrelevant in light of theories and techniques within the physician's clinical discipline). Professor Jewell's calculations did not, however, supply the needed proof.

[4] Mr. Smith took Vioxx (at the 25 mg dose, except for four 50 mg samples provided to him in early October 2002) from October 2002 until, at the latest, February 17, 2003, the date of his heart attack. (*See* SmithR-PlProfileForm-00006-00007, SmithR-PPR-00013, SmithR-PPR-00001, SmithR-Walmart-00005, SmithR-Walmart-00005, and SmithR-PPR-00001, attached collectively hereto as Ex. F.)

824097v.1

interval 0.63, 3.19) (Jewell Report at 1.).  He concluded that the relative risk of such an event from 0 to six months of use was 1.35 (95 % confidence interval 0.64,2.86) (*Id.*).

Neither risk is statistically significant.  Dr. Farquhar himself acknowledged, in testimony that plaintiff has designated to be played to the jury in this case, that a relative risk is statistically significant if the lower bound of the confidence interval exceeds one.  That is not the case with either the four-month or six-month calculation.  (*See* June 8, 2006 Deposition of John W. Farquhar ("Farquhar 6/8/06 Dep.") at 37:12-38:12, attached hereto as Ex. G.)

As Merck has explained most recently in a memorandum supporting a motion in *limine* filed in this case, statistically insignificant data cannot be relied on to establish causation.  (*See* Memorandum In Support Of Omnibus Motion Of Merck & Co., Inc. ("Merck") For Order Excluding Evidence And Testimony On Issues Previously Addressed By The Court, filed August 7, 2006 (Record Docket No. 6125) at 6-8.)

Moreover, neither the four-month nor the six-month calculation shows a doubling of the risk.  An epidemiologic study cannot establish causation by a preponderance of the evidence unless it shows that the agent in question more than doubles the risk of injury.  *See, e.g., Deluca v. Merell Dow Pharms., Inc.,* 911 F.2d 941, 958-59 (3d Cir. 1990);  It follows that an expert's testimony on causation should not be admissible when based on a study that does not show more than a doubling of the risk.  *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1321 (9th Cir. 1995 (upon remand from United States Supreme Court)(noting that studies relied on by epidemiologists that did not state that the relevant risk was greater than two "would not be helpful, and indeed would only serve to confuse the jury.").  *See also Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1315 & n. 16 (11th Cir. 1999) ("The threshold for concluding that an agent more likely than not caused a disease is 2.0.");  *Chambers v. Exxon Corp.,* 81 F. Supp. 2d

661, 665 (M.D. La. 2000) ("What is significant in this case is that the substantial body of epidemiological evidence demonstrates that [exposure to benzene] [does] not double the risk….").  Simply put, it will not assist the jury, within the meaning of Rule 702, for an expert to present risk calculations that cannot possibly establish medical causation.

        2.      <u>Dr. Farquhar's Attempt to Use APPROVe Data To Support His Opinion Regarding Elevated Risk At all Durations Of Use Is Not Based On A Sound Methodology.</u>

Dr Farquhar and Professor Jewell's most recent analysis of data from APPROVe alone also fails to follow a methodology that can pass muster under the *Daubert* and Rule 702 analysis. In his Supplemental Report, Dr. Farquhar opines that APPROVe participants who were at high baseline risk for cardiovascular events at the start of the study had a statistically significant higher relative risk of cardiovascular events from taking Vioxx.  (*See* Supplemental Report at ¶¶ 1, 11-16 and Figure 3.)  He bases this opinion on Professor Jewell's *post hoc* analysis primarily of data from a subgroup analysis of APPROVe participants contained in the Cardiac Safety Report ("CSR") that Merck submitted to the FDA in June 2005.  (*See id*. at ¶ 11.)  APPROVe participants were categorized as being at "high cardiovascular risk" either because they had symptomatic atherosclerotic cardiovascular disease at the start of the study or at least two specified risk factors for coronary artery disease.[5]

Subgroup analyses often serve a useful purpose.  They can be used, for example, to generate hypotheses or identify subjects for further study.  As a recent New England Journal of Medicine article noted, however, overstating a subgroup analysis can misinform.  *See* Lagakos

---

[5]Dr. Farquhar's earlier analysis of "high risk" APPROVe participants – *i.e.*, those with a prior history of symptomatic atherosclerotic disease or diabetes – does not support his opinion. Although this "high risk" subgroup shows a higher relative risk than the overall study population, Dr. Farquhar acknowledged that the confidence interval for even this subgroup falls below 1.0 *at 18 months*, which means that any increased risk is *not* statistically significant. (Initial Report at 32 n.3.)

8

S.W., *The Challenge of Subgroup Analyses – Reporting without Distorting*, NEW ENGLAND J. MED. April 2006; 354:16; 1667-1669 at 1669.  That is what has happened here.  Whatever their utility in other contexts, subgroup analyses cannot supply scientifically reliable evidence of medical causation – a fundamental burden that plaintiff must carry in this action to establish liability.  Any testimony by Dr. Farquhar that relies on the *post hoc* analysis of the subgroup of patients on Vioxx in APPROVe  should be excluded.

It is a fundamental scientific principle that a *post hoc* analysis cannot prove a causal relationship.  Instead, it is a tool to generate hypotheses for future study.  "Post hoc analysis is of major importance in the generation of hypotheses.  However, the hypothesis is created by the analysis and has not been proved by any 'experiment'."  *See* Elliott H.L., *Post hoc analysis: use and dangers in perspective*, JOURNAL OF HYPERTENSION 1996, 14 (suppl 2):S21-S25 at S21.  Here, the *post hoc* analysis of patients who were in the "high risk" group at most creates the hypothesis that such patients are at higher risk of cardiovascular events on Vioxx than the general population.  It does not constitute proof that such patients are in fact at higher risk.

Even if it were not unreliable because of its *post hoc* nature and the small numbers involved, this subgroup analysis is still subject to the problem of data dredging.  The Merck CSR from which Professor Jewell and Dr. Farquhar took data about "high risk" participants contained thirteen subgroup analyses for thrombotic cardiovascular events in APPROVe.  (*See* APPROVe Cardiac Safety Report at 277, attached hereto as Ex. H.)  Again according to a recent New England Journal of Medicine article, there is nearly a 50% chance of at least one false positive result from this many subgroup analyses.  *See* Lagakos S.W., *The Challenge of Subgroup Analyses*, *supra*, at 1668-69 ("[W]hen treatments have identical efficacy, the probability of finding at least one "statistically significant" interaction test when 10 independent interaction

9

tests are undertaken is 40 percent"). The reason is that the subgroup analyses in APPROVe accepted a 5% error rate when identifying a relative risk as statistically significant. (*See* APPROVe CSR at 277 (using a 95% confidence interval).) But a 5% error risk repeated 13 times amounts to a 49% risk of finding a false "significant" relative risk in one of the subgroups. The scientifically and statistically proper evaluation for such a subgroup analysis would use at least a 99% confidence interval (1% error rate) for each subgroup to correct for the data dredging problem. *See* Lagakos S.W., *The Challenge of Subgroup Analyses, supra*, at 1668.

In short, expert testimony that presents a *post hoc* subgroup analysis as proof of causation should be excluded because that is not a scientifically valid use of such data, and because it would be confusing to the jury and unfairly prejudicial to Merck. To the extent that plaintiff seeks to show that he is within the "high-risk" subgroup that was the subject of this analysis, therefore, plaintiff should be precluded from offering the testimony of Dr. Farquhar that is based on this flawed analysis.[6]

---

[6] Before Professor Jewell performed his sub-group analyses, Dr. Farquhar admitted that there was no statistically significant difference in adjudicated cardiovascular events in  the Vioxx group and the placebo group in APPROVe during the first six months of use:

> Q.     …[W]ill you agree that there is no statistically significant separation of those events between Vioxx and placebo within the first eighteen months?
>
> ….
>
> [A.]    Well, Mr. Parker, there's no statistically significant difference, but there is a difference, and the relative risk is 1.18 at six months.

(10/10/05 Farquhar Dep. at 190:16-23.)    In fact, Dr. Farquhar's earlier analysis of APPROVe data for the incidences of heart attack, sudden death, and unstable angina did not reveal a statistically significant difference between the rates of occurrence of those events in the Vioxx and placebo groups until after nearly three years.  (*Id.* at 270:24-271:15.)

10

3.     Other Merck Studies Likewise Do Not Support Dr. Farquhar's Opinion.

**VIGOR.**  Dr. Farquhar also cannot look to the VIGOR study to support his opinion.  The VIGOR participants took Vioxx only at the 50 mg dose for a duration of nine months.   Here, by contrast, except for four sample 50 mg tablets her received at the outset, Mr. Smith took Vioxx at the 25 mg dose, for at most 4 ½ months.   The VIGOR participants comprised an elderly population with rheumatoid arthritis, itself a risk factor for fatal cardiovascular events, as Dr. Farquhar acknowledged.  (*See* 10/10/05 Farquhar Dep. at 98:21-99:12, 126:22-127:10.)  VIGOR did not compare Vioxx to placebo but instead to naproxen, making it impossible to determine whether the higher rate of cardiovascular events seen in the Vioxx arm by the end of the study was attributable to the prolonged use of Vioxx at the 50 mg dosage, a cardioprotective effect of naproxen, or chance.

**Alzheimer's Studies.**  In the first of these two studies, the number of confirmed serious cardiovascular events was greater in the placebo arm than in the Vioxx arm – an outcome that plainly does not support Dr. Farquhar's opinion.   The second study, in which the median duration of Vioxx usage was 94 weeks, did not reveal a statistically significant difference in the number of heart attacks and cardiac arrests that occurred within the Vioxx group as compared to the placebo group.

**ADVANTAGE.**  Like VIGOR, this study compared Vioxx to naproxen, not placebo, and it did not reveal a statistically significant disparity in the incidence of thrombotic cardiovascular events that occurred in the Vioxx and naproxen groups, as Dr. Farquhar himself acknowledges. (10/10/05 Farquhar Dep. at 296:4-297:18.)

**B.    The Observational Studies That Dr. Farquhar Reviewed Do Not Supply A Reliable Scientific Basis For His Opinions.**

Dr. Farquhar also relies, to a much lesser extent, on data from five observational studies that he contends "amplify, complement, and verify the conclusions reached from the [randomized clinical trials]."[7]   (Initial Report at ¶¶ 158-64.)   Merck addressed in detail the reasons why those studies do not supply a scientifically reliable basis for Dr. Farquhar's opinion on cardiovascular risk in its briefing in *Plunkett v. Merck.* In the interest of brevity, instead of repeating that discussion here, Merck  incorporates its prior briefing by reference,[8]  For the Court's convenience, Merck has appended to this memorandum a summary of the reasons why those studies do not provide reliable scientific support for Dr. Farquhar's opinions.

---

[7] Daniel Solomon *et al., Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults,* CIRCULATION 2004 MAY; 109: 2068-2073; W. Ray *et al., Cox-2 selective non-steroidal anti-inflammatory drugs and the risk of serious cononary heart disease: an observational cohort study,* THE LANCET 2002: 360:1071-73; David J. Graham, *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study, available at* http://image.thelancet.com/extras/05art1005web.pdf (Jan. 25, 2005); Levesque, L.E., *The Risk for Myocardial Infarction with Cycloxygenase-2 Inhibitors: A Population Study of Elderly Adults,* ANN. OF INTERN. MED. 2005; 142: 481-489; Mamdani, M. *et al., Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of acurte mycardial infarction in the elderly,* ARCH. INTERN. MED. 2003 Feb. 24; 163(4):481-6.

Dr. Farquhar himself was dismissive of the significance of these studies in particular and observational studies in general.  He testified that "[a]nything that is involved in observational epidemiology has less relevance [than] different kinds of data that comes out of the randomized control trials."  (10/10/05 Farquhar Dep. at 16:14-17:16.)  He also observed that he "was not interested in being pinned down on observational epidemiology.  It's not [an] important part of my total report."  (*Id.* at 290:2-4.)

[8] *See* Merck & Co's Memorandum In Support Of Motion To Exclude Evidence Of Plaintiff's Experts Regarding Causation, filed in *Plunkett v. Merck* on Oct. 21, 2005 (Record Docket No. 1515) at 31-33; Appendix Of Studies Relied On By Plaintiff's Experts, filed in *Plunkett v. Merck* on Oct. 21, 2005 (Record Docket No. 1515) at 11-22; Memorandum In Support Of Merck & Co., Inc.'s Motion To Exclude Testimony Of John W. Farquhar, M.D., filed in *Plunkett v. Merck* on Oct. 21, 2005 (Record Docket No. 1122) at 11-14.

824097v.1

**C.      Dr. Farquhar's Causation Opinion Is Inadmissible Because He Does Not Offer A Scientifically Valid Explanation For The Mechanism By Which He Contends That The Short-Term Use Of Vioxx Causes Cardiovascular Disease.**

Dr. Farquhar's opinion that short-term usage of Vioxx causes a prothrombotic state rests upon the unproven assumption that Vioxx ingestion, by selectively inhibiting COX-2, results in an imbalance between prostacyclin and thromboxane.  (Farquhar Report at ¶ 58.)  Nothing in his background or experience, however, allows him to render such an opinion.  Dr. Farquhar admits that he does not consider himself an expert on the issue of prostacyclin/thromboxane imbalances.  (10/10/06 Farquhar Dep. at 63:18-21.)   Nor is he prepared to examine the scientific evidence in support of prostacyclin thromboxane imbalances, which is also known as the "FitzGerald hypothesis." (*Id.*  at 67:6-24)

Indeed, initially Dr. Farquhar took the position that, as an epidemiologist, he does not need to know the internal mechanism for thrombus formation:

 Q.   Okay.  Doctor, does the term "Fitzgerald hypothesis" have any meaning to you?

A.     I'm going to give you a fairly long answer on that.

Q.     The first question is yes or no.

A.     Yes.  It has a lot of meaning to me.

Q.     All right.

A.      I think the main point I want to get across as an epidemiologist*, I need not spend a lot of time on the question of the internal mechanisms by which a thrombus appears.*

*It isn't – it isn't part of the data that I'm examining to – examining to draw conclusions that are relevant to – to Vioxx.*

I – I have great respect for Dr. Fitzgerald.  I – I agree with the proposition that there is very likely a propensity for thrombosis induced by Vioxx, but just to make the – the point clear, cardiologists when they think about coronary artery

13

824097v.1

> disease and its complications, they don't start with the word thrombosis, thrombogenesis.
>
> They start with the atherosclerosis and atherosclerotic plaques and hemorrhage into such plaques or erosion of such plaques with the idea that thrombus formation is secondary to the primary event.
>
> So the data I have in front of me has to do with principally the appearance of serious heart disease and its complications.

(10/10/06 Farquhar Dep. at 59:5-60:7 (emphasis added).)   But, where admissible evidence in a trial is the question, Dr. Farquhar is wrong.  To give the causation testimony he seeks to give, Dr. Farquhar must provide a reliable explanation of the physiological process by which he contends Vioxx forms thrombi.[9]

To establish causation in a pharmaceutical case, the trial court's "task" is to determine whether the expert's opinion "tied" the defendant's product "by some specific train of medical evidence" to the alleged injury.  *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999).  To accomplish this task, an expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]."  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005).  The Fifth Circuit explained this requirement as follows:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Black*, 171 F.3d at 314.

---

[9] The article reporting on mice studies that Dr. Farquhar refers to in his Supplemental Report (Cheng *et al., Cyclooxygenase, Microsomal Prostaglandin E Sythase-1, and Cardiovascular Function*, J. CLIN. INVEST. 2006; doi:10:1172/JCI27540) does not provide any support for this mechanism theory for the reasons explained in Merck's concurrently-filed Memorandum In Support Of its Motion for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis

Thus, an expert's mere assertion that he or she "knows" that Vioxx can cause sudden death is scientifically unreliable in the absence of an "explanation of why or how it happen[ed]." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003). Indeed, without a reliable explanation of the specific mechanism by which Vioxx supposedly causes sudden cardiac death, plaintiff's experts cannot conclude to any degree of medical certainty that Vioxx has this effect. As this Court explained:

> In this case, Drs. Shell and Eckberg have discovered an event, but not a cause. They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of Daubert and Black, their testimony is unreliable.

*In re Propulsid Prods. Liab. Litig.,* 261 F. Supp. 2d at 617; *see also McClain*, 401 F.3d at 1253 ("Here, [plaintiffs' experts have not] offered a reliable explanation of the physiological process by which Metabolife causes heart attacks and ischemic strokes, *i.e.,* establish general causation. . . . In the absence of such a foundation for a differential diagnosis analysis, a differential diagnosis generally may not serve as a reliable basis for an expert opinion on causation in a toxic tort case."). Because Dr. Farquhar has no reliable scientific basis to describe the mechanism by which he claims Vioxx increases cardiovascular risk after short term use, his testimony on medical causation must be excluded.

## IV.    TESTIMONY FROM DR. FARQUHAR ADDRESSING MERCK'S KNOWLEDGE AND STATE OF MIND OR WHETHER MERCK ACTED "APPROPRIATELY" SHOULD BE EXCLUDED UNDER RULE 702.

Dr. Farquhar did not confine himself to opinions on medical causation. He is also poised to give his personal views on the state of Merck's knowledge and understanding of alleged risks associated with Vioxx. (*See, e.g.,* Initial Report at ¶ 21 ("By no later than December 1997, Merck *knew* that Vioxx caused an imbalance in the levels of chemicals in the body that regulate clotting…." [emphasis added]); *id.* at ¶¶ 185-199.) And his reports are rife with value judgments

824097v.1

on the appropriateness or propriety of Merck's actions.  As just one example of the latter, in his Supplemental Report he asserts: "I agree with Dr. Curfman that the related studies of Protocol 203 should have been made known to the editors of the NEJM."  (Supplemental Report at ¶ 10 (emphasis added); *see also id.* at ¶ 24; Initial Report at ¶¶ 191-194, 196-197, 199.)

Plaintiff may respond, as the plaintiff did in *Plunkett*, that there is no intention to elicit value judgments and testimony about Merck's alleged knowledge and state of mind from Dr. Farquhar.  However, the content of Dr. Farquhar's various reports strongly suggests that that is exactly what he intends to testify about, either explicitly or in the guise of giving medical or scientific testimony.  He should be precluded from giving any such testimony, even if the Court permits him to testify on issues of medical causation.  Dr. Farquhar possesses no expertise or specialized knowledge and no foundation in personal knowledge that qualifies him to address Merck's knowledge or state of mind.  He repeatedly draws inferences from his review of internal Merck documents selected by plaintiffs' counsel, many of which may be the same documents that are admitted into evidence and that the jury will see.  (*E.g.,* 10/10/05 Farquhar Dep. at 56:20-57:13.)  In doing this, he invades the exclusive province of the jury, yet at the same time, his personal conclusions will not assist the jury in any respect.  Similarly, whether or not Dr. Farquhar agrees with Dr. Curfman or any other individual is irrelevant in this action, and the expressions of agreement and the other value judgments he is eager to make will again not assist the jury.  As discussed more fully in Merck's concurrently-filed Motion for Order Excluding Testimony of Jerry Avorn, M.D., incorporated herein by reference[10], expert witnesses are routinely prohibited from providing testimony regarding the "intent, motives or states of mind of corporations, regulatory agencies and others," because they "have no basis in any

---

[10] Merck also incorporates by reference its prior briefing in *Plunkett v. Merck* addressing Dr. Farquhar's inadmissible views on Merck's knowledge, state of mind, and ethics.

824097v.1

relevant body of knowledge or expertise." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004); *see also In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d --, 616.   They are also precluded from giving subjective testimony on ethics for similar reasons.  *See, e.g., In re Rezulin*, 309 F. Supp. 2d at 542-45   (expert testimony on subjective ethical standards was "(1) unreliable because purely speculative; (2) unhelpful to the fact-finder because irrelevant in a case where liability is premised on legal, not ethical, standards, and (3) likely to prejudice and confuse fact-finders concerning the pertinent legal standards").

## V.   THE COURT SHOULD PRECLUDE DR. FARQUHAR FROM RELATING THE CONCLUSIONS OF RICHARD KRONMAL BECAUSE SUCH TESTIMONY WOULD BE CUMULATIVE.

Dr. Farquhar should not be permitted to offer any opinion that two Merck-conducted randomized clinical trials involving patients with Alzheimer's disease, Protocol 078 and Protocol 091, showed any significant difference in adverse cardiovascular events among patients taking Vioxx versus those on placebo.  (*See* Initial Report at ¶ ¶ 132-137, 156.)  Dr. Farquhar made it clear in his deposition that he relies solely on reports from Richard Kronmal – himself a designated expert in this case – for his opinion based on the Alzheimer's studies.  (6/8/06 Farquhar Dep. at 212:4-18.)  Dr. Farquhar has not looked at the peer-reviewed articles on these two studies, and he cannot say how Professor Kronmal's analysis differs from that of the investigators who conducted the trials.  (*Id*. at 217: 7-10 ("At this point, I have to say that my conclusions about Alzheimer's are based on Kronmal.  I didn't put time into assessing the literature beyond what Kronmal had.")

If the Court allows the testimony of  Professor Kronmal, it would be entirely cumulative and wasteful of the Court's time and resources for Dr. Farquhar to testify about the same subject matter.   See FED. R. EVID. 403.  "It is well established that evidence which is merely repetitious and cumulative of testimony already introduced may be excluded by the court."

824097v.1

*Meadows v. Walker Drilling Co. v. Phillips Petroleum Co.,* 417 F.2d 378, 382 (5th Cir. 1969).

The Fifth Circuit has noted that "[w]e do want to discourage attorneys from parading additional

experts before the court in the hope that the added testimony will improve on some element of

testimony by the principal expert." *Leefe v. Air Logistics, Inc.,* 876 F.2d 409, 410-11 (5th Cir.

1989) (affirming district court's exclusion of testimony a medical expert on the ground that the

testimony was cumulative).  Here too, no valid purpose would be served by a parade of experts

from plaintiff who simply repeat the same conclusions.   Accordingly, if the Court permits

plaintiff to introduce the testimony of Professor Kronmal, the Court should exclude cumulative

testimony of Dr. Farquhar on the same subject.[11]

## VI.     CONCLUSION.

For all the reasons stated in this memorandum and in Merck's briefing addressing Dr.

Farquhar's testimony in connection with the previous MDL trials, Merck respectfully requests

that the Court exclude Dr. Farquhar's testimony.

---

[11]The Court should also not permit Dr. Farquhar to assert that Vioxx is the most hypertensive of the NSAIDs or "the most dangerour drug in its class."    (*See* Initial Report at ¶ 42.)   It is irrelevant, and, even more fundamentally, Dr Farquhar's deposition testimony established that he has no reliable scientific basis for any such assertion.   Time and again he testified that it was his "guess" or "suspicion" that Vioxx had a greater propensity to cause hypertension than any other NSAID.  (*E.g.,* 6/8/06 Farquhar Dep. at 244:18-246:14.)  For example, he stated, "At the moment, I suspect that Vioxx stands out among all the NSAIDs in its blood pressure effect.  But at the moment, I cannot be certain whether valdecoxib and a few others might be similarly disposed.  (6/8/06 Farquhar Dep. at 245:25-246:4.)  Yet he admitted that he had seen evidence comparing Vioxx's hypertensive effect to only five other NSAIDs (diclofenac, ibuprofen, indomethacin, Celebrex®, and naproxen), not to all of the prescription drugs in this class available in the United States.  He had seen no clinical study comparing the hypertensive effect of the following prescription NSAIDs to that of Vioxx: diflunisal, etodolac, fenoprofen, flubiprofen, ketoprofen, mefanamic acid, meloxicam (Mobic®), nabumetrine (Relafen®), oxaprozin (Daypro®), piroxicam (Feldene®), sulindac (Clinoril®), and tolmetin.  (6/8/06 Farquhar Dep. at :289:25-292:23.)  *See* Center for Drug Evaluation and Research, United States Food and Drug Administration, Medication Guide for Non-Steroidal Anti-Inflammatory Drugs (NSAIDs), available at http://www.fda.gov/cder/drug/infopage/COX2/NSA/medguide.htm.  Dr. Farquhar's speculative assertion that Vioxx is worse than all other such drugs in this respect is not scientifically reliable and should be excluded on that basis.   It should also be excluded under Rule 403 as it would plainly be unfairly prejudicial for the jury to hear his unsupported belief.

824097v.1

Dated: August 14, 2006

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
Carrie A. Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Richard B. Goetz
Ashley A. Harrington
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

And

Douglas R. Marvin
Robert A. Van Kirk
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

824097v.1

Attorneys for Merck & Co., Inc

## Appendix of Observational Studies Relied On By Dr. Farquhar

**Solomon**.  Dr. Farquhar relies on a retrospective observational study, conducted by Dr. D. H. Solomon in 2003, that was based on a review of patient records in a Medicare database. There are several reasons why the Solomon study does provide support for Dr. Farquhar's opinion regarding short-term use, including the following:

- It did not report a statistically significant increased risk of myocardial infarction from Vioxx at any dose as compared to no current NSAID use or NSAID use generally.

- It anomalously found that Vioxx "may include a period of elevated risk" for cardiovascular events, when compared to Celebrex®, during the first 30 days of use, but not after 90 days.

- Its findings conflict with years of randomized controlled clinical data showing no increased risk associated with the short-term use of Vioxx – including data from APPROVe and other studies.  *See* Declaration of J. Michael Gaziano, M.D., M.P.H. in Support of Merck's Motions to Exclude Evidence, at ¶ 54.

- Dr. Solomon himself concedes that there are "important potential limitations" to his study, including "the potential for bias by unmeasured confounders" as well as "residual confounding by factors that were incompletely assessed in this administrative database, such as severity of cardiovascular risk factors."

Causation Testimony Brief, App. of Studies at 10-12.

**Graham.**  Dr. Farquhar cites a 2005 study by Graham that purports to find an increased risk of heart attacks and sudden cardiac death associated with the use of Vioxx as compared to Celebrex.  But Graham's analysis is deeply flawed[12] and cannot apply to this case for at least the following reasons:

---

[12] Dr. Farquhar admitted that he has a "generic objection" to observational studies such as that done by Graham that consist of a retrospective analysis of data obtained from insurance companies.  (Farquhar Dep. at 132:8-23.)  Such studies, unlike randomized clinical trials, "are subject to confounding" and do not supply the same degree of assurance as clinical trials.  (*Id.*)

824097v.1

- Most significantly, the Graham study found no increased risk of heart attack from taking Vioxx at the 25 mg dose.  (Farquhar Dep. at 290:14-19.)

- Graham did not purport to evaluate the relative risk associated with Vioxx in the first 30 days of use.  Instead, the mean duration of Vioxx use prior to the occurrence of a study event was almost four months.

- Graham acknowledged that, because of the limited power of his study, he was "unable to fully address whether the cardiovascular risk associated with rofecoxib varied by duration of use."

- Graham's estimates of the excess number of fatal and non-fatal heart attacks supposedly attributable to Vioxx are inconsistent with results of the APPROVe study, which show no increased risk of adverse cardiovascular events or death associated with the use of Vioxx at the 25 mg dose during the first 18 months, and with the results of the VIGOR study, which show no increased risk of heart attacks associated with the use of Vioxx at the 50 mg dose during the first month of use.

- Graham's estimates also are inconsistent with the findings of his own study, which likewise show no statistically significant increased risk of adverse cardiovascular risks associated with the use of 25 mg Vioxx (odds ratio of 1.23, with a confidence interval of 0.89 – 1.71).

Causation Testimony Brief, App. of Studies at 14-16.

**Ray.**  This 2002 observational study found *no* increased cardiovascular risk from taking Vioxx at the 25 mg dose – the dose that Mr. Irvin took.  *See* Causation Testimony Brief, App. of Studies at 13-14.   Not only does this study not provide reliable scientific support for Dr. Farquhar's opinion, but it flatly contradicts his opinion.

**Levesque.**  This 2005 study found only a marginal 1.24 elevated risk of myocardial infarction, with a confidence interval ranging from 1.02 to 1.43 – a result that under *Daubert* is insufficient to support causation testimony.  *See* Causation Testimony Brief, App. of Studies at 17-18.   The authors themselves noted that the use of the study was limited for various reasons, including the lack of control for significant risk factors.  *See id.*

824097v.1

**Mamdani.**  This 2003 study likewise does not support Dr. Farquhar's opinion in this case; indeed, the findings are directly contrary to Dr. Farquhar's opinion:

- The study did not find a statistically significant difference in the number of heart attacks between new users of Vioxx compared to non-users of other NSAIDs.  Indeed, Mamdani notes that "[t]he findings of this observational study suggest no increase in the short-term risk of [acute] MI among users of selective cyclooxygenase 2 inhibitors as commonly used in clinical practice."

- Mamdani did not distinguish between patients taking Vioxx at the 25 mg or 50 mg dose.  Thus, it cannot be determined whether the study has any relevance to Mr. Irvin, who took Vioxx at the 25 mg dose only.

- It appears that the participants in this study took Vioxx for an average of six months, which far exceeds Mr. Irvin's brief exposure.

Causation Testimony Brief, App. of Studies at 18-19.

**Ingenix.**  Dr. Farquhar also inappropriately relies on the Ingenix study:

- The study did not distinguish between individuals who took Vioxx at the 25 mg or 50 mg doses during the first 30 days when compared against use of ibuprofen/diclofenac, making it inapplicable to a purely 25 mg cases, such as Mr. Irvin's.

- Even this combined dose comparison was statistically insignificant for heart attacks and sudden cardiac death (CI = 0.98-2.34).

- The study's author notes that the study has several "limitations," including reliance on pharmacy records to determine exposure levels and "[r]esidual confounding by other unmeasured factors such as smoking, body mass index, diet and exercise."

Causation Testimony Brief, App. of Studies at 19-20.

**Nussmeier**.  This 2005 study has nothing to do with Vioxx.  It did not evaluate Vioxx at the 25 mg dose (or any other dose).  Instead, it evaluated different dosages of different drugs – valdecoxib and parecoxib.  Causation Testimony Brief, App. of Studies at 21.  A study involving

different dosages of different drugs is plainly not a reliable basis for an opinion that Vioxx at the

25 mg dose supposedly has a thrombotic effect.[13]

---

[13] Insofar as valdecoxib and parecoxib are concerned, the Nussmeier study did not even show a statistically significant difference in the rate of cardiovascular adverse events between patients receiving one or both of these therapies and patients receiving placebo (confidence intervals include 1.0).  Causation Testimony Brief, App. of Studies at 21.  Thus, not only does the study have nothing to do with Vioxx, it does not permit a finding of causation of adverse cardiovascular events with respect to the actual NSAIDs under examination.

824097v.1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum In Support of Motion of Merck For Order Excluding Testimony of John W. Farquhar, M.D. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 14th day of August, 2006.

                                        /s/ Dorothy H. Wimberly
                                        Dorothy H. Wimberly, 18509
                                        STONE PIGMAN WALTHER
                                        WITTMANN L.L.C.
                                        546 Carondelet Street
                                        New Orleans, Louisiana  70130
                                        Phone:  504-581-3200
                                        Fax:     504-581-3361
                                        dwimberly@stonepigman.com

                                        Defendants' Liaison Counsel