UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 2:05-CV-04379 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| ROBERT G. SMITH, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * | | |

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
<u>FOR ORDER EXCLUDING TESTIMONY OF RICHARD M. KAPIT, M.D.</u>**

**(EXPERT CHALLENGE NO. 5)**

In the re-trial of *Plunkett v. Merck*, the Court allowed Richard M. Kapit, M.D. to testify as an expert on FDA labeling regulations and to offer his opinion that Merck could have unilaterally added the VIGOR data to the Vioxx® label.  In this case, however, plaintiff began taking Vioxx six months after the VIGOR results were incorporated into Merck's FDA-approved

Vioxx label. Therefore, the sufficiency of the Vioxx label before April 2002, and most of Dr. Kapit's testimony, is irrelevant to this case.[1]

In addition, this motion addresses the expert report Dr. Kapit prepared after he testified in *Plunkett II*. That report contains new opinions on several topics that have nothing to do with Dr. Kapit's expertise in the FDA approval process or labeling regulations. Specifically, Merck seeks to exclude:

(1) New opinions about the intent and state of mind of Merck and the FDA;

(2) Criticisms that (a) the FDA missed something when it approved the Vioxx® New Drug Application ("NDA"), and (b) the FDA serves industry before the public health; and

(3) Opinions that merely parrot the conclusions of Drs. Graham, Curfman, Farquhar, Jewell, and Avorn.

None of these topics are proper subjects for expert testimony.[2]

## I.   THE LEGAL STANDARD.

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-5 of the Memorandum in Support of the Motion of Merck for Order Excluding Opinion Testimony by Plaintiff's Experts That Vioxx Accelerates Atherosclerosis, filed concurrently herewith and incorporated herein by reference.

---

[1] (*See* Merck's Motion to Exclude Testimony or Argument that Merck (1) Should or Could Have Unilaterally Changed the Vioxx Label to Include the VIGOR Data; or (2) "Dragged Its Feet" to Prevent the VIGOR Data from Being Added to the Vioxx Label (Motion in *Limine* No. 2), filed August 7, 2006 (Record Docket No. 6122 ).)

[2] Plaintiff may call Dr. Kapit by deposition in this case. To the extent he does, Merck has concurrently filed wholesale objections to Dr. Kapit's deposition designations from discovery depositions in other cases.

## II. TESTIMONY AND OPINIONS ON WHETHER MERCK COULD HAVE UNILATERALLY ADDED THE VIGOR DATA TO THE VIOXX LABEL BEFORE APRIL 2002 ARE IRRELEVANT.

Unlike the other Vioxx cases that have been tried, in this case plaintiff did not start taking Vioxx until October 2002, six months *after* the VIGOR data was incorporated into Merck's FDA-approved label for Vioxx. As the Court knows, Merck received the unblinded VIGOR data in March 2000 and filed a supplemental application to change the Vioxx label in June 2000. The FDA denied Merck's request for expedited review and, in November 2000, requested gastrointestinal and cardiovascular data from the ADVANTAGE trial. (Feb. 10, 2006 *Plunkett v. Merck* Transcript ("*Plunkett* Tr.") at 1123:25-1126:8, attached as Ex. A.) During the time it took to submit the completed analysis from the ADVANTAGE trial (which included 5,000 patients at 600 different sites), the FDA convened an Advisory Committee to discuss the significance of the VIGOR results. *See* FDA website, "Sequence of Events with VIOXX, since opening of IND", at http://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4090B1_04_E-FDA-TAB-C.htm (last accessed August 14, 2006). Thereafter, the FDA and Merck had several discussions about the significance of the available data and what the Vioxx label should say about that data. In April 2002, the FDA approved the label that is at issue in this case.

In *Plunkett*, Dr. Kapit testified that Merck could and should have used the "Changes Being Effected" or "CBE" procedure to unilaterally strengthen the Vioxx label so as to provide faster notice to doctors that VIGOR demonstrated a statistically significant risk of cardiovascular events. (*Plunkett* Tr. at 1106:22-1134:11.) This was a relevant issue in *Plunkett* because Mr. Irvin passed away before VIGOR data was added to the Vioxx label in April 2002. Therefore, plaintiff could argue that if the Vioxx label had included the VIGOR data about adverse cardiovascular events, Mr. Irvin's prescribing physician would not have prescribed the drug. In this case, plaintiff cannot make that argument since the VIGOR data was added to the FDA-

3

approved label six months before he received his first Vioxx prescription. (*See* Merck's Motion in *Limine* No. 2.) Thus, Dr. Kapit's testimony that Merck could and should have used the CBE procedure to add the VIGOR data to the label is irrelevant to this case and should be excluded.[3]

### III. DR. KAPIT'S NEW OPINIONS ABOUT THE STATE OF MIND OR INTENT OF MERCK OR THE FDA SHOULD BE PRECLUDED.

Before the *Plunkett* trial began, this Court ordered that Dr. Kapit could not testify to Merck's state of mind. *Plunkett v. Merck & Co., Inc. (In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565, 595 (E.D. La. 2005) ("Lastly, regarding Merck's state of mind, Dr. Kapit may not testify as to what Merck was thinking."). Although not addressed in *Plunkett*, this Court's ruling should extend to: (i) Dr. Kapit's new opinions about the FDA's state of mind; and (ii) Dr. Kapit's characterizations of what Merck and the FDA *intended* by their statements in various communications.

Specifically, Dr. Kapit has offered the following new opinions, which are improper and should be precluded:

- The FDA was frustrated with Merck and had "a lot of feeling that Merck was being less than forthcoming at times." (June 19, 2006 Deposition of Richard M. Kapit, M.D. ("Kapit 6/19/06 Dep.") at 83:19-84:6 (characterizing communications from the FDA to Merck), attached hereto as Ex. B.)

- Merck did not conduct a study powered to answer whether Vioxx causes cardiovascular events because it was motivated to make more money.[4]

---

[3] Likewise, Dr. Kapit's testimony and opinion that Merck "dragged its collective feet" is also irrelevant and should be excluded. These two topics comprised approximately 85% of Dr. Kapit's testimony in the re-trial of *Plunkett*. (*See Plunkett* Tr. at 1106:2-1135:11; 1162:25-1194:2.)

[4] In *Plunkett*, Dr. Kapit admitted that prior to VIGOR, no Vioxx study demonstrated a statistically significant risk of cardiovascular events, but claimed the studies "didn't show that because they weren't powered to show such a thing." (*Plunkett* Tr. at 1167:15-1168:9.) This testimony should also be excluded because the topic of study design is beyond Dr. Kapit's expertise.

>   (*Id.* at 191:8-195:9 (admitting this conclusion is not beyond the ken of the average jury – "*it's not difficult to draw the conclusion*" that Merck was motivated by money based on its projected loss of revenue (emphasis added)); May 23, 2006 Expert Report of Richard M. Kapit, M.D. ("Kapit 5/23/06 Rpt.") at ¶¶ 106, 108, 166, attached hereto as Ex. C.)

- The VIGOR data was not put in the Vioxx label at an earlier date because Merck "dragged its feet." (Kapit 5/23/06 Rpt. at ¶ 124; Kapit 6/19/06 Dep. at 226:16-230:5 (testifying that he believes Merck "dragged its feet" based on his review of communications between Merck and the FDA about how the VIGOR data should be presented in the Vioxx label).)

- Merck affirmatively made labeling proposals to incorporate VIGOR because it "wanted to preempt FDA action. . . . [Merck] wanted to preempt any other FDA action that might occur." (Kapit 6/19/06 Dep. at 296:6-23.)

- "[T]he main point of [Merck's request for expedited review of its proposed label incorporating the VIGOR results] from Merck's point of view was to highlight the gastrointestinal benefit." (*Id.* at 303:6-23; *see also id.* at 309:11-14 (testifying "Merck "wanted to highlight the GI benefit, which was the real reason" for the expedited review); 320:13-23; *Plunkett* Tr. at 1118:8-12 (testifying that "the reason that what [Merck] submitted was not a . . . changes being effected submission . . . was because they were trying to take out a warning.").)

- "Before FDA sent the October 2001 draft [label incorporating the VIGOR results] to Merck, *it knew that Merck was not going to be happy with that draft*." (Kapit 6/19/06 Dep. at 332:11-20 (emphasis added) (admitting "I don't know that for sure, but they probably knew that Merck wasn't going to like it.").)

Dr. Kapit's opinions constitute improper state of mind and intent testimony. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (rejecting expert testimony "on the intent, motives or states of mind of corporations, regulatory agencies and others" because they "have no basis in any relevant body of knowledge or expertise"). Under Federal Rule of Evidence 702, a defendant's intent or state of mind are not proper topics for expert testimony. As one court noted in excluding expert testimony in a similar failure-to-warn case:

> The witnesses are qualified in particular scientific disciplines. These disciplines

>do not include knowledge or even experience in the manner in which corporations and the pharmaceutical marketplace react, behave or think regarding their nonscientific goals of maintaining a profit-making organization that is subject to rules, regulations, standards, customs and practices among competitors and influenced by shareholders or public opinion.

*In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20, 2000).

Dr. Kapit seeks to usurp the role of the jurors by offering his opinion on Merck and FDA documents and opining as to what he divines to be the intent behind the documents and the state of mind of the authors. Jurors are fit to conduct such an analysis and reach their own conclusions based on a review of the documents. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1112 (11th Cir. 2005) (An expert may not simply tell the jury how to interpret evidence that is within the understanding of lay jurors.). Dr. Kapit's characterization of Merck's conduct is not based on "scientific, technical, or other specialized knowledge," nor is this testimony necessary to "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. It is pure advocacy that "does no more than counsel for plaintiff will do in argument, *i.e.*, propound a particular interpretation of [Merck's] conduct." *See In re Rezulin*, 309 F. Supp. 2d at 551 (internal quotation marks and footnote omitted); *id.* at 541 ("Rule 702 ensures that expert witnesses will not testify about lay matters which a jury is capable of understanding and deciding without the expert's help." (citation and internal quotation marks omitted)).

Accordingly, this Court should find, as other courts have, that such "expert" testimony about Merck's and the FDA's intent and motives would invade the province of the jury and must be precluded.

824087v.1

## IV. THIS TRIAL IS NOT THE PROPER FORUM FOR DR. KAPIT'S CRITICISMS OF THE FDA.

Congress (not the jury) is the *only* body that can address Dr. Kapit's allegations that: (i) FDA Medical Officers do not conduct a sufficiently rigorous review of New Drug Applications because they are not given sufficient time; and (ii) the FDA serves the interests of pharmaceutical companies first. Dr. Kapit's criticism of the FDA should be excluded for two reasons.

First, Dr. Kapit's criticism of the FDA is irrelevant and should be excluded under Federal Rule of Evidence 403. Merck is the defendant in these cases, not the FDA. Dr. Kapit's criticism of the FDA would divert the jury's attention from a fair evaluation of the pertinent factual and legal issues it must decide in this case. *See* FED. R. EVID. 401-03. Second, any suggestion that the FDA was not sufficiently rigorous in its evaluation and approval of Vioxx would infringe on the carefully-constructed regulatory scheme for drug approval protected by *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). Pursuant to *Buckman*, such testimony is preempted under federal law and for good reason. Permitting state-court juries to impose their judgments on the adequacy of the drug approval process under state-law standards "would exert an extraneous pull on the scheme established by Congress" to protect the public. *Id.* at 353.

### A. Dr. Kapit's Opinion That FDA Reviewers Do Not Have Sufficient Time To Review New Drug Applications Is Inapplicable Or Speculative To The Facts Of This Case, Is Unreliable, And Unduly Prejudicial.

Based on his interpretation of a survey of FDA employees, Dr. Kapit revised his expert report to add the following new opinions:

- "FDA reviewers will [not] necessarily be able to discern safety problems from raw data submitted by sponsors as part of required NDA [New Drug Application] documents" (Kapit 5/23/06 Rpt. at ¶ 30); and

7

- The "FDA may occasionally slip up" and "the FDA review process may occasionally miss a problem entirely." (*Id.* at ¶ 31; *see* Kapit 6/19/06 Dep. at 206:18-23 ("in fact, the reality is that [the FDA] often falls short."); 211:15-19 (same); 215:8-20 (same).)

Dr. Kapit's opinions should be excluded under Federal Rule of Evidence 403. First, Dr. Kapit's opinion is pure speculation. As he states in his report, the best he can say is that "[i]t is *quite possible* that the FDA review process may occasionally miss a problem entirely."[5] (Kapit 5/23/06 Rpt. at ¶ 31.) Second, the basis for Dr. Kapit's opinion, a 2003 report based on a survey the Office of Inspector General conducted, is unreliable. (*Id.*; Kapit 6/19/06 Dep. at 95:10-12.) The survey was of FDA employees who are reviewers for the Center of Drug and Research Evaluation. (*Id.*) Only 47% of the employees who received the survey responded. (*Id.* at 103:12-21.) Of that 47%, 58% agreed "that the allotted six-month time for a priority review [such as the Vioxx review] is inadequate." (*Id.* at 95:3-9.)

The survey's low response rate renders the conclusions inherently unreliable. A survey where less than half the people responded must account for nonresponse bias. (Michael J. Saks, et al., ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 371 (2d ed. Fed. Jud. Ctr. 2005-06) ("Reference Manual") ("nonresponse often is not random").) According to the Reference Manual, "[i]f the response rate drops below 50%, the survey should be regarded with significant caution as a basis for precise quantitative statements about the population from which

---

[5] This testimony is also irrelevant since Dr. Kapit refused to confirm whether he will link this statement to Vioxx. (Kapit 6/19/06 Dep. at 94:17-95:1 (When asked whether he would testify that the "FDA missed a problem when it reviewed the Vioxx NDA," he answered, "Conceivably that could come up, but at the present time, I'm not planning to do that.").) This failure to confirm his opinion also violates Federal Rules of Civil Procedure 26 and 37(c)(1), requiring a party to disclose expected expert witness testimony and stating that a party that does not disclose its expert witness's opinions "shall not, unless such failure is harmless, be permitted to use" such opinions. Accordingly, Dr. Kapit should be precluded from testifying to opinions that might be forthcoming for the first time at trial.

8

the sample was drawn." (*Id.* at 371-72.) The survey Dr. Kapit relies on had a response rate of 47%, but he makes no effort to consider whether the large nonresponse rate may have biased the results. (Kapit 6/19/06 Dep. at 95:13-23.) When the response rate is low, it is important to consider the significance of which people are most willing to participate in a survey. When a survey does not include the response of those not interested enough to participate, it is very likely that the representativeness of the results are skewed and therefore unreliable.

More importantly, it is irrelevant what 47% of the FDA employees generally thought about whether the time allotted for priority reviews was adequate. The only relevant fact is whether the FDA employees who actually reviewed the Vioxx NDA thought they had adequate time to do so. Dr. Kapit lacks any evidence that the medical officers who reviewed the Vioxx NDA felt the six-month review period was inadequate. (*Id.* at 106:15-107:1 (admitting the survey "does not assess the scientific merit of the decisions that FDA has made").) He did not talk with the medical officers who reviewed the Vioxx NDA and the FDA has never said it made a mistake by approving Vioxx as safe and effective based on the scientific and medical evidence available in 1999. (*Id.* at 95:20-96:16; 97:11-98:3.) Moreover, this survey is unreliable because it was conducted four years after the Vioxx NDA was reviewed and approved. There is no indication of whether FDA employee attitudes about the time allotted to conduct priority reviews for NDAs has changed between 1999 (when Vioxx was reviewed) and 2003 (when this survey was conducted).

Any belief that the FDA did not adequately review the Vioxx NDA would be based on speculation and unfounded inferences, not substantial evidence. Accordingly, Dr. Kapit's testimony that FDA reviewers do not have sufficient time to complete an adequate review of NDAs should be excluded.

### B. Dr. Kapit's Opinion That FDA Serves Industry Is Based On Nothing More Than Hearsay.

In his deposition, Dr. Kapit testified that he is "aware that in recent years, . . . there are people at the FDA that do view [their job as serving the pharmaceutical industry]." (Kapit 6/19/06 Dep. at 77:9-78:5.) The apparent basis for his opinion is:

> [A] friend I had for many years at the FDA, he was in the division of advertising, and when I knew him back in the Center for Drugs, he would not have thought of what he did as serving the industry; he would have thought of what he did as serving the public. And I heard him say not too long ago that his view of what he does now is serving the industry. So there are some people that view FDA as serving the industry.

(*Id.* at 78:6-19.) Dr. Kapit's opinion admittedly is based on nothing more than an inadmissible and unreliable hearsay statement. In addition, his criticism of whether the FDA "serves industry" is irrelevant to this case and preempted by *Buckman*. Accordingly, Dr. Kapit's criticism that the FDA serves industry before the public health should be excluded.

### V. DR. KAPIT'S OPINIONS THAT MERELY PARROT PLAINTIFF'S OTHER EXPERTS ARE IMPROPER AND SHOULD BE EXCLUDED.

If permitted, Dr. Kapit plans to parrot the conclusions reached by five of plaintiff's experts (four of whom are designated to testify in this trial): Drs. Graham, Curfman, Farquhar, Jewell, and Avorn. This Court has previously stated that an expert may not simply repeat or adopt the findings of another expert. *Plunkett v. Merck & Co., Inc. (In re Vioxx Prods. Liab. Litig.)*, 414 F. Supp. 2d 574, 580-81 (E.D. La. 2006) ("[c]heerleading the testimony of another editor or a medical publication does not constitute expert testimony. The Plaintiff's attorneys can argue for Dr. Curfman and the New England Journal of Medicine just as well as Dr. Fletcher."). Moreover, such testimony must be excluded when the expert does not attempt to assess the validity of the opinions on which he relies. *In re TMI Litig.*, 193 F.3d 613, 715-16 (3d Cir. 1999) (finding blind reliance by expert on other expert opinions demonstrates flawed

methodology); *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732-33 (10th Cir. 1993) (excluding expert opinion relying on another expert's report because witness failed to demonstrate a basis for concluding report was reliable and showed no familiarity with methods and reasons underlying the hearsay report).

Dr. Kapit is not qualified to offer the opinions reached by plaintiff's other experts. To allow Dr. Kapit to parrot those opinions serves no purpose and is nothing more than an attempt to enhance the credibility of plaintiff's other experts.

### A. Dr. Kapit's Use of Dr. Graham's Estimate of Excess Heart Attacks Is Improper.

Dr. Kapit uses Dr. Graham's estimate of excess heart attacks and death allegedly caused by Vioxx to opine that "during [the] years [that passed before the VIGOR data was added to the label], in all likelihood, tens of thousands of patients had heart attacks related to Vioxx." (Kapit 5/23/06 Rpt. at ¶ 122.) Dr. Kapit testified that this number came from Dr. Graham's estimate of excess events:[6]

> Q:   . . . In paragraph 122 of your expert report, . . . it refers to epidemiological studies. . . . Which studies are you referring to in that paragraph?
>
> A:   I think the main one is Graham's study.
>
> Q:   Any others?
>
> A:   There are others, but that's the one I have mostly in mind. I don't think that was the only one that indicated that.
>
> Q:   As you sit here today, though, you can't name any of the others?
>
> A:   Graham is the one that I certainly had most clearly in mind when I wrote that sentence.

---

[6] This testimony should also be excluded because it is based on an unreliable methodology, as explained at pages 2 through 10 of the Memorandum in Support of Merck's Motion for Order Excluding Testimony of David Graham, M.D., filed August 7, 2006 (Record Docket No. 6120).

(Kapit 6/19/06 Dep. at 225:7-226:1.)  Dr. Kapit relies on Graham's estimate for why Merck should have unilaterally changed the Vioxx label to discuss the cardiovascular findings from the VIGOR study.  (*Id.* at 310:15-311:3 (testifying that use of the Changes Being Effected ("CBE") procedure might have been "unorthodox" to incorporate the VIGOR results, "but we're talking about huge risk.  Graham, et al., talked about a hundred thousand heart attacks.").)

For two reasons, Dr. Kapit should be precluded from offering opinions based on Dr. Graham's estimates.  First, Dr. Kapit admits he did no independent analysis or research to confirm these figures.  (*Id.* at 226:8-15.)  Second, Dr. Kapit uses Dr. Graham's figures to support his opinion that Merck should have used the CBE procedure to unilaterally change the Vioxx label in 2000 and 2001.  (*Id.* at 310:15-311:12.)  Dr. Graham's figures, however, were not published until 2005 – long after Vioxx was taken off the market.  (David J. Graham et al., *Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs:  nested case-control study*, *available at* http://image.thelancet.com/ extras/05art1005web.pdf (Jan. 25, 2005).)

> **B.     Dr. Kapit Should Not Be Allowed To Parrot Dr. Curfman's Testimony About The "Controversy" Concerning Merck's Publication Of The VIGOR Results In The New England Journal Of Medicine.**

Dr. Kapit's new expert report contains discussion about Merck's publication of the VIGOR results in the *New England Journal of Medicine*:  "Merck never informed the journal about the missing data [and] the journal published an editorial criticizing the omission of the information in the article."  (Kapit 5/23/06 Rpt. at ¶134; *see also id.* at ¶ 162 ("the information Merck made available to the medical community through the *New England Journal of Medicine* was misleading in that it did not accurately communicate the number and rate of myocardial

12

infarctions in patients taking Vioxx.").)  Dr. Kapit did not work for the *New England Journal of Medicine* and admits that his recitation of these facts is based on what Dr. Curfman said:

> Q: In paragraphs 133 and 134 of your expert report, you added a discussion of Merck's October 13, 2000 submission as well as referring to, in paragraph 134, the controversy with the *New England Journal of Medicine*?
>
> A: That's right, yes.
>
> \*   \*   \*
>
> Q: And are you planning to offer any opinions at trial about this subject?
>
> A: Well, yes. . . . there's some important information about it, that there were three myocardial infarctions that were at issue, *which Dr. Curfman, who is an editor of the New England Journal, said that they should have been apprised of by Merck before publication* . . .

(Kapit 6/19/06 Dep. at 323:22-325:17 (emphasis added).)  In addition, Dr. Kapit testified that he will point out during trial that "two of the authors for the . . . article were from Merck . . . .  That Merck's participation in that calls into question the degree to which Merck was willing to be forthcoming completely about the information on myocardial infarctions."  (*Id.* at 328:19-329:8.)

Dr. Kapit is not an expert in this area and there is no reason he should be allowed to simply repeat Dr. Curfman's opinions about Merck's conduct.  (*See id.* at 327:7-16 (admitting never having been an editor or served on the editorial board of a medical journal).)

**C.  Dr. Kapit Admits He Is Not Qualified To Perform The Statistical Analysis Conducted By Plaintiff's Other Experts, Dr. Farquhar and Dr. Jewell.**

In his report, Dr. Kapit explains that data from three Vioxx studies was "made available to the plaintiffs in this litigation, and a statistician and an epidemiologist retained by the plaintiffs . . . have analyzed the Protocol 203 data."  (Kapit 5/23/06 Rpt. at ¶ 180.)  Dr. Kapit then goes on to discuss the results of that study.  (*Id.* at ¶¶ 181-83; *see also* Kapit 6/19/06 Dep. at 351:17-

824087v.1

352:14 (testifying "I'm planning to offer the opinions that are stated in [Dr. Farquhar's] report . . . this analysis confirms that the effect begins early.").)

Dr. Kapit, however, is not qualified to discuss Protocol 203 and it would be inappropriate to allow him to parrot the conclusions of Drs. Farquhar and Jewell.[7]  Dr. Kapit admits that he has not seen any of the underlying data from the three studies that are analyzed in Protocol 203, but has only reviewed the other experts' analysis of that data.  (Kapit 6/19/06 Dep. at 357:4-17; 361:10-362:2 (admitting he is "relying on the expertise and the results of these two men" and that he "can't do statistical tests, or I should not do statistical tests myself").)

### D.  Dr. Kapit Should Not Be Allowed To Parrot Dr. Avorn's Testimony.

Finally, Dr. Kapit should not be allowed to parrot the opinions of Dr. Avorn, which were expressed in an editorial.[8]  Specifically, Dr. Kapit opines that what "[Dr. Avorn] wrote in one comment is particularly noteworthy:

> In the case of [Vioxx] . . . [t]here were already ample signs in preapproval studies of possibly increased cardiovascular risk and even a document (and statistically significant) 5-fold increase in myocardial infarctions rates [sic] in a trial published soon after marketing began.  The problem was not that these risks were not detected early enough; it was that they were not acted on appropriately, but the manufacturer or by the FDA, once they were noted.

(Kapit 5/23/06 Rpt. at ¶ 184; *see also* Kapit 6/19/06 Dep. at 368:6-369:13.)  Dr. Kapit's repetition of Dr. Avorn's opinions of Merck's conduct is not proper expert testimony and should be prohibited.

---

[7] Plaintiff has designated Dr. Farquhar, a statistician, as an expert witness who will offer testimony in this trial.  Merck's objections to Dr. Farquhar's opinions are addressed in greater detail in the concurrently-filed Memorandum in Support of the Motion of Merck for Order Excluding Testimony of John W. Farquhar, M.D.

[8] Plaintiff has designated Dr. Avorn as an expert witness who will provide testimony in this trial. Merck's objections to Dr. Avorn's opinions are addressed in greater detail in the concurrently-
(*footnote continued next page*)

## VI. CONCLUSION.

For the reasons stated above, the Court should preclude Dr. Kapit from offering opinions that (i) Merck could or should have changed the Vioxx label to add the VIGOR data before April 2002; (ii) implicate the intent and state of mind of Merck and the FDA; (iii) imply the FDA missed something when it approved the Vioxx NDA or that the FDA serves the pharmaceutical industry and not the public; and (iv) merely parrot plaintiff's other experts.

Dated: August 14, 2006

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
Carrie A. Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

---

filed Memorandum in Support of the Motion of Merck for Order Excluding Testimony of Jerry Avorn, M.D.

Richard B. Goetz
Ashley A. Harrington
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:    213-430-6407

And

Douglas R. Marvin
Robert A. Van Kirk
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:    202-434-5029


Attorneys for Merck & Co., Inc.

824087v.1

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum in Support of Merck's Motion to Exclude Testimony of Richard M. Kapit, M.D. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 14th day of August, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel