## Exhibit A - Plunkett Trial Testimony Excerpts

• **Kapit Motion**

[1008:] - [1008:25]    2/10/2006   Plunkett II Trial - Vol. 05

```
page 1008
     1008
 1                         UNITED STATES DISTRICT COURT
 2                         EASTERN DISTRICT OF LOUISIANA
 3
 4
 5
        IN RE: VIOXX PRODUCTS          *
 6      LIABILITY LITIGATION           *    MDL DOCKET NO. 1657
                                       *
 7                                     *
        THIS DOCUMENT RELATES TO       *    NEW ORLEANS, LOUISIANA
 8      CASE NO. 05-4046:              *
                                       *
 9      EVELYN IRVIN PLUNKETT, ET AL   *    FEBRUARY 10, 2006
                                       *
10      VERSUS                         *
                                       *    8:30 A.M.
11      MERCK & CO., INC.              *
        * * * * * * * * * * * * * *    *
12
13
                              VOLUME V - DAILY COPY
14                            JURY TRIAL BEFORE THE
                             HONORABLE ELDON E. FALLON
15                         UNITED STATES DISTRICT JUDGE
16
17      APPEARANCES:
18
        FOR THE PLAINTIFF:             BEASLEY ALLEN CROW METHVIN
19                                       PORTIS & MILES
                                       BY:  ANDY D. BIRCHFELD, JR., ESQ.
20                                         LEIGH O'DELL, ESQ.
                                       234 COMMERCE STREET
21                                     POST OFFICE BOX 4160
                                       MONTGOMERY, ALABAMA 36103
22
23      FOR THE PLAINTIFF:             LEVIN, PAPANTONIO, THOMAS,
                                         MITCHELL, ECHSNER & PROCTOR
24                                     BY:  TROY RAFFERTY, ESQ.
                                       316 SOUTH BAYLEN STREET, SUITE 600
25                                     PENSACOLA, FLORIDA 32502
```

[1105:2] - [1105:17]    2/10/2006   Plunkett II Trial - Vol. 05

```
page 1105
 2      Q.   WHAT IS THE TYPICAL TIME FRAME FOR A MEDICAL OFFICER TO
 3      REVIEW AN NDA?
 4      A.   WELL, THAT'S CHANGED OVER THE YEARS.  NOW, WHEN I REVIEWED
 5      THE PROZAC NDA, I HAD TWO YEARS.  BUT THAT HAS SHORTENED QUITE
 6      A BIT AND RIGHT NOW MOST DRUGS PROBABLY ARE REVIEWED IN A YEAR,
 7      APPROXIMATELY, AND THERE IS A CERTAIN CLASS OF DRUGS THAT ARE
 8      GIVEN WHAT'S CALLED "PRIORITY REVIEWS" THAT ARE REVIEWED IN SIX
 9      MONTHS NOWADAYS.
10      Q.   AND SO THE MEDICAL OFFICER BASICALLY HAS A DEADLINE TO
11      MEET?
12      A.   MEDICAL OFFICERS NOW HAVE DEADLINES.  AS IT HAPPENS, WHEN
13      I WAS DOING NDAS, I DID NOT HAVE OFFICIAL DEADLINES, BUT THEY
14      DO NOW.
15      Q.   IS THE APPLICATION ANY DIFFERENT FOR PRIORITY REVIEW?
16      A.   NO.  IT'S A FULL APPLICATION.  AND AGAIN, IT'S A VERY
17      COMPLICATED, LENGTHY DOCUMENT.
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

**• Kapit Motion**

[1106:2] - [1106:21]     2/10/2006   Plunkett II Trial - Vol. 05

```
page 1106
 2      Q.   LET'S KIND OF SET THE STAGE HERE.  WHEN WAS VIOXX FIRST
 3      APPROVED AND MARKETED TO DOCTORS THROUGHOUT THE COUNTRY?
 4      A.   1999.
 5      Q.   MAY OF 1999?
 6      A.   MAY OF 1999.
 7      Q.   AND AT THAT TIME, MERCK HAD A PARTICULAR LABEL ON THE
 8      DRUG, CORRECT?
 9      A.   YES.  YES, LABEL IS REQUIRED AT THE TIME OF APPROVAL.
10      Q.   JUST SO WE'RE CLEAR, WHEN WE TALK ABOUT THE LABEL, WHAT
11      ARE WE TALKING ABOUT?
12      A.   BASICALLY, IT'S THE DIRECTIONS THAT DESCRIBE THE USES OF
13      THE DRUG, THE ADVERSE REACTIONS, THE CONTRAINDICATIONS, THE
14      WARNINGS, THE PRECAUTIONS, THE DOSAGES.  ALL THE THINGS THAT
15      ARE REQUIRED IN ORDER FOR A PHYSICIAN TO USE A DRUG SAFELY AND
16      EFFECTIVELY IN MEDICAL PRACTICE.
17      Q.   AND IN TERMS OF THE -- I THINK THE JURY YESTERDAY HEARD
18      ABOUT THE PHYSICIANS' DESK REFERENCE, THE PDR.  IS THAT THE
19      DOCUMENT THAT CONTAINS THE DRUG LABELS?
20      A.   BASICALLY THE PDR IS SIMPLY ALL THE DRUG LABELS PUT
21      TOGETHER FOR DRUGS THAT ARE IN USE AT A GIVEN TIME.
```

[1106:22] - [1135:11]     2/10/2006   Plunkett II Trial - Vol. 05

```
page 1106
22      Q.   OKAY.  NOW, IN REGARDS TO THE LABEL FOR VIOXX, WAS THERE
23      AT SOME POINT A DIFFERENT LABEL THAN THE ONE THAT MERCK
24      ORIGINALLY HAD ON THE MAY 1999?
25      A.   YES, THERE WAS AT SOME POINT.
page 1107
 1      Q.   AND DO YOU REMEMBER WHEN THAT WAS?
 2      A.   THAT WAS IN APRIL OF 2002.
 3      Q.   APRIL 2002.  OKAY.  SO FROM MAY 1999 UNTIL APRIL 2002, IT
 4      HAD THE SAME LABEL ON IT; IS THAT CORRECT?
 5      A.   THAT'S RIGHT.
 6      Q.   I WOULD LIKE TO HAVE YOU TURN IN YOUR BOOK TO
 7      EXHIBIT 1.0464, IF I COULD.  ARE YOU THERE, DOCTOR?
 8      A.   YES, I AM.
 9      Q.   DO YOU RECOGNIZE THAT DOCUMENT?
10      A.   YES.
11      Q.   AND DOES THAT APPEAR TO BE A COPY OF THE LABEL THAT WAS IN
12      EFFECT FROM MAY 1999 UNTIL APRIL 2002?
13      A.   YES, IT IS.
14           MR. RAFFERTY:  AT THIS TIME, YOUR HONOR, WE WOULD
15      OFFER PLAINTIFF'S EXHIBIT 1.464.
16           THE COURT:  ANY OBJECTION?
17           MR. ISMAIL:  NO OBJECTION.
18           THE COURT:  LET IT BE RECEIVED AND MARKED.
19      BY MR. RAFFERTY:
20      Q.   DOCTOR, HAVE YOU SEEN THIS LABEL?
21      A.   YES, I HAVE.
22      Q.   IS THERE ANYTHING IN THIS LABEL WITH REGARD TO THE
23      CARDIOVASCULAR WARNING?
24      A.   THERE IS NO CARDIOVASCULAR WARNING IN THIS LABEL.
25      Q.   IS THERE ANYTHING IN THIS LABEL REGARDING A CARDIOVASCULAR
page 1108
 1      RISK MENTIONED IN THE PRECAUTIONS SECTION?
 2      A.   THERE IS NO CARDIOVASCULAR RISK MENTIONED IN THE
 3      PRECAUTION.
 4      Q.   IS THERE ANYTHING ABOUT THE CARDIOVASCULAR RISK ASSOCIATED
 5      WITH VIOXX IN THE CONTRAINDICATIONS SECTION?
 6      A.   THERE IS NO CONTRAINDICATION ABOUT CARDIOVASCULAR RISKS.
 7      Q.   IS THERE ANYTHING THAT WOULD ALERT ANY PHYSICIAN THAT'S
 8      PRESCRIBING THIS DRUG TO THE FACT THAT THERE ARE CARDIOVASCULAR
 9      RISKS ASSOCIATED WITH VIOXX?
10      A.   THERE IS NOTHING IN THIS LABELING THAT WOULD ALERT A
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
11      PHYSICIAN AS TO A CARDIOVASCULAR RISK WITH VIOXX.
12      Q.   NOW, SO FROM MAY 1999 ALL THE WAY UNTIL APRIL 2002 -- I'M
13      JUST GOING TO WRITE THIS UP HERE -- NO CV, FOR CARDIOVASCULAR,
14      WARNING, PRECAUTION, OR CONTRAINDICATION.  IS THAT CORRECT?
15      A.   THAT IS CORRECT.
16      Q.   NOW, LET'S TALK FOR JUST A FEW MINUTES ABOUT THOSE
17      PHRASES:  "WARNINGS, PRECAUTIONS, AND CONTRAINDICATIONS."  WHAT
18      DO THOSE MEAN IN TERMS OF DRUG LABELING?
19      A.   OKAY.
20      Q.   I GUESS LET'S TAKE THEM ONE AT A TIME.  FIRST OF ALL, THE
21      WARNING SECTION, WHAT IN TERMS OF THE DRUG LABELING IS THE
22      WARNING SECTION?
23      A.   WELL, WARNINGS ARE SUPPOSED TO DESCRIBE SERIOUS ADVERSE
24      REACTIONS AND SAFETY HAZARDS ASSOCIATED WITH A DRUG.  THEY
25      INDICATE A VERY HIGH LEVEL OF CONCERN ABOUT A PROBLEM WITH
page 1109
1       RESPECT TO A DRUG.
2       Q.   IS THE WARNING SECTION CONSIDERED TO BE A -- ONE OF THE
3       BIGGER ALERTS TO A PHYSICIAN IF THERE IS SOMETHING IN THE
4       WARNING SECTION?
5       A.   IT IS ONE OF -- IT IS A SECTION OF LABELING THAT
6       PHYSICIANS WOULD PAY VERY CLOSE ATTENTION TO WHENEVER THEY
7       CONSIDER PRESCRIBING A DRUG.
8       Q.   NOW, WHAT TYPES OF INFORMATION SHOULD GO INTO THE
9       WARNINGS?  WELL, WHAT TYPES OF ADVERSE EVENTS SHOULD GO INTO
10      THE WARNINGS SECTION?
11      A.   SERIOUS ADVERSE DRUG REACTIONS AND SAFETY HAZARDS.  AND
12      THEY SHOULD BE PUT IN LABELING AS SOON AS THAT THERE IS
13      REASONABLE EVIDENCE THAT SUCH A SERIOUS ADVERSE DRUG REACTION
14      OR SAFETY HAZARD EXISTS.  THERE IS NO -- AND THERE IS NO NEED
15      THAT CAUSALITY BE PROVED, JUST THAT THERE IS AN ASSOCIATION
16      WITH A DRUG FOR A SERIOUS SAFETY HAZARD.
17      Q.   DR. KAPIT, ARE THERE ACTUAL RULES AND REGULATIONS THAT
18      HAVE BEEN PROMULGATED BY THE FDA THAT PERTAIN TO WHAT MATERIAL
19      AND WHEN THAT MATERIAL SHOULD GO INTO A PRODUCT WARNING?
20      A.   YES.
21      Q.   ARE YOU FAMILIAR WITH THAT REGULATION?
22      A.   YES, I AM.
23      Q.   AND HAS THAT REGULATION BEEN CODIFIED IN WHAT WE CALL THE
24      CODE OF FEDERAL REGULATIONS?
25      A.   YES, IT HAS.
page 1110
1       Q.   DOCTOR, AT THIS TIME I WOULD LIKE YOU TO TURN TO?  CFR
2       201.57, AND YOU CAN TELL ME WHEN YOU'VE GOTTEN THERE.
3       A.   OKAY.  I AM THERE.
4       Q.   AND IF YOU WOULD, TURN TO SUBSECTION E, WHICH IS ON?  PAGE
5       3 OF THE COPY I'VE GOT.
6       A.   YES.  I'M AT THAT POINT NOW.
7       Q.   AND DO YOU SEE SUBSECTION E, "WARNINGS"?
8       A.   YES, I DO.
9       Q.   AND IF HE CAN BLOW THAT UP DOWN TO THE -- NOW, IS THIS THE
10      RULE THAT YOU WERE JUST DESCRIBING FOR JURY?
11      A.   YES, THAT'S WHAT I WAS REFERRING TO.
12      Q.   AND UNDER SUBSECTION E "WARNINGS," IT INDICATES:  "UNDER
13      THIS SECTION HEADING, THE LABELING SHALL DESCRIBE SERIOUS
14      ADVERSE REACTIONS AND POTENTIAL SAFETY HAZARDS."  DID I READ
15      THAT CORRECTLY?
16      A.   THAT'S CORRECT.
17      Q.   WHAT IS THE SIGNIFICANCE OF THAT?
18      A.   WELL, THE SIGNIFICANCE IS THAT YOU WANT TO -- YOU WANT
19      DOCTORS TO BE AWARE OF SERIOUS SAFETY PROBLEMS ASSOCIATED WITH
20      THE USE OF THE DRUGS THEY PRESCRIBED.  SO THIS IS A VERY
21      IMPORTANT SECTION OF LABELING IN ORDER TO USE A DRUG SAFELY AND
22      EFFECTIVELY.
23      Q.   IS THE WORD -- IN TERMS OF WHICH TYPES OF SAFETY HAZARDS,
24      IT SAYS "POTENTIAL."  WHAT DOES THAT MEAN IN TERMS OF YOUR
25      EXPERIENCE AS AN FDA MEDICAL OFFICER?
page 1111
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
1        A.    WELL, POTENTIAL SAFETY HAZARDS MEAN THERE IS AN
2     ASSOCIATION BETWEEN A DRUG AND A SERIOUS ADVERSE REACTION.  IT
3     CAN BE FROM A VARIETY OF DIFFERENT SOURCES, CERTAINLY CLINICAL
4     TRIALS, PAPERS IN THE LITERATURE, ADVERSE DRUG REACTIONS
5     REPORTED TO THE FDA.  BUT AN ASSOCIATION EXISTS AND THAT IT'S
6     NOT NECESSARY TO APPROVE THAT THERE IS A CAUSAL RELATIONSHIP
7     BUT JUST THAT THERE IS A REASONABLE ASSOCIATION BETWEEN A
8     SERIOUS HAZARD AND A DRUG.
9        Q.    OKAY.  AND LET'S -- I GUESS LET'S GO ON TO THAT POINT
10    WHICH IS JUST BELOW THAT.  IT SAYS, "THE LABELING SHALL BE
11    REVISED."  AND THIS IS IN REGARDS TO WHEN THE LABEL SHOULD BE
12    REVISED TO ADD A SERIOUS OR POTENTIAL SAFETY HAZARD, CORRECT?
13       A.    YES.
14       Q.    AND IT SAYS THAT "THE LABELING SHALL BE REVISED TO INCLUDE
15    A WARNING AS SOON AS THERE IS REASONABLE EVIDENCE OF AN
16    ASSOCIATION OF A SERIOUS HAZARD WITH A DRUG.  A CAUSAL
17    RELATIONSHIP NEED NOT HAVE BEEN PROVED."
18       A.    YES.  AND THIS IS A VERY IMPORTANT PART OF THIS REGULATION
19    BECAUSE, IF YOU DO HAVE A SERIOUS ADVERSE REACTION, SOMETHING
20    THAT CAN AFFECT PATIENTS WHO ARE TAKING THE DRUG, YOU WANT THAT
21    INFORMATION PUT IN THE LABELING AS SOON AS POSSIBLE SO DOCTORS
22    CAN BE AWARE OF IT AS SOON AS POSSIBLE.
23          I MEAN, WE'RE TALKING ABOUT ADVERSE REACTIONS THAT
24    CAN CAUSE SERIOUS ILLNESS, ADVERSE REACTIONS THAT MIGHT EVEN BE
25    FATAL.  AND SO THE POINT, WHEN IT SAYS PUT IT IN AS SOON AS YOU
page 1112
1     HAVE THIS ASSOCIATION, IS THAT YOU WANT TO GET IT IN THERE AS
2     QUICKLY AS POSSIBLE.
3        Q.    AND WHEN WE TALK ABOUT PUTTING IT IN THERE AS QUICKLY AS
4     POSSIBLE, WHOSE RESPONSIBILITY IS THAT TO PUT THAT IN THE
5     WARNING?
6        A.    IT'S THE COMPANY'S RESPONSIBILITY.  IT'S THE COMPANY'S
7     LABEL.  THE COMPANY WRITES THE LABEL.  IT'S THE COMPANY'S
8     PRODUCT.  THE COMPANY IS SELLING THIS PRODUCT, AND IT'S THE
9     COMPANY'S RESPONSIBILITY, WHEN THEY KNOW OF A SERIOUS SAFETY
10    HAZARD ASSOCIATED WITH THEIR DRUG, TO GET THIS INFORMATION IN
11    LABELING AS SOON AS POSSIBLE.
12       Q.    NOW, I ALSO WANT TO TALK FOR JUST A MOMENT BECAUSE I WANT
13    TO SKIP -- OR GO BACK, ACTUALLY, TO THE TIME LINE FOR JUST A
14    SECOND.  THE JURY HAS HEARD A LOT ABOUT SOMETHING REFERRED TO
15    AS THE VIGOR STUDY.  ARE YOU FAMILIAR WITH THE VIGOR STUDY?
16       A.    YES.
17       Q.    AND WHEN DID THE RESULTS OF THE VIGOR STUDY BECOME KNOWN
18    TO MERCK?
19       A.    WELL, MERCK BECAME AWARE OF THE RESULTS OF THE VIGOR STUDY
20    IN THE FIRST QUARTER OF 2000, AND THEY NOTIFIED THE FDA ABOUT
21    THE RESULTS IN MARCH OF 2000.
22       Q.    SO MARCH 2000, IT'S SAFE TO SAY, VIGOR KNOWN TO MERCK.
23       A.    IT WAS CERTAINLY KNOWN BY THAT TIME BECAUSE, CLEARLY, THEY
24    HAD TO KNOW ABOUT IT BEFORE THEY TOLD THE FDA.  SO THEY KNEW
25    ABOUT THE RESULTS FOR A WHILE.
page 1113
1        Q.    NOW, DOCTOR, I WANT TO ASK YOU A VERY SPECIFIC QUESTION.
2     I WANT TO ASK YOU IF YOU AGREE WITH THIS STATEMENT:  "WE GOT
3     THE VIGOR RESULTS IN MARCH OF 2000.  IN JUNE OF 2000, WE ASKED
4     THE FDA IF WE COULD PUT A NEW LABEL ON.  YOU HAVE TO GET THE
5     FDA APPROVAL.  YOU CAN'T JUST CHANGE THE LABEL.  YOU HAVE TO
6     GET THE FDA'S APPROVAL FOR A NEWER LABEL."  DO YOU AGREE OR
7     DISAGREE WITH THAT STATEMENT?
8        A.    NO.  THAT STATEMENT IS FALSE.  IT'S INCORRECT.  IF WE ARE
9     TALKING ABOUT A WARNING OR A PRECAUTION OR ANY SERIOUS SAFETY
10    HAZARD, THE REGULATIONS PERMIT AND OBLIGATE THE COMPANY TO PUT
11    THAT WARNING IN LABELING -- OR THAT SERIOUS SAFETY HAZARD IN
12    LABELING AS SOON AS POSSIBLE.  THEY CAN DO IT WITHOUT FDA
13    APPROVAL.
14       Q.    AND ARE THERE ACTUAL RULES AND REGULATIONS THAT HAVE BEEN
15    PROMULGATED BY THE FDA THAT PERTAIN TO THE COMPANY'S
16    RESPONSIBILITY TO CHANGE THE LABEL?
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
17        A.   YES, THERE ARE.
18        Q.   AND ARE YOU FAMILIAR WITH THAT RULE AND REGULATION?
19        A.   YES.
20        Q.   IS THAT A RULE AND REGULATION THAT YOU WERE AWARE OF AND
21        THAT YOU UTILIZED IN YOUR WORK AT THE FDA'S AND MEDICAL REVIEW
22        OFFICE?
23        A.   I WAS THOROUGHLY FAMILIAR WITH IT.  I REVIEWED MANY
24        APPLICATIONS MADE BY PHARMACY COMPANIES TO PUT ADVERSE
25        REACTIONS AND WARNINGS IN LABELING AS SOON AS POSSIBLE.  IT WAS
page 1114
1         PART AND PARCEL OF MY WORK DURING THE ENTIRE PERIOD THAT I WAS
2         WITH THE FDA.
3         Q.   AT THIS TIME, DOCTOR, I WOULD LIKE TO REFER YOU IN YOUR
4         NOTEBOOK TO THE SECTION ENTITLED 21 CFR SECTION 314.70.
5         A.   YES.
6         Q.   IS THIS A COPY OF THAT RULE THAT YOU WERE REFERRING TO?
7         A.   YES, IT IS.
8         Q.   AND ON PAGE -- I BELIEVE IT'S PAGE 3 OF MY COPY,
9         SUBSECTION 6, ON THE RIGHT-HAND SIDE.
10        A.   YES.
11        Q.   IT INDICATES THAT "THE AGENCY MAY DESIGNATE A CATEGORY OF
12        CHANGES FOR THE PURPOSE OF PROVIDING THAT THE -- IN THE CASE OF
13        A CHANGE IN SUCH CATEGORY, THE HOLDER OF AN APPROVE
14        APPLICATION," IS THAT REFERRING TO A NEW DRUG APPLICATION,
15        DOCTOR?
16        A.   THAT'S RIGHT.  THE HOLDER OF AN APPROVED NEW DRUG
17        APPLICATION.
18        Q.   "MAY COMMENCE DISTRIBUTION OF THE DRUG PRODUCT," AND WHEN
19        WE TALK ABOUT THAT, WE ARE TALKING ABOUT THE LABEL?
20        A.   YEAH.  WE ARE TALKING ABOUT ACTUALLY THE DRUG PRODUCT WITH
21        A NEW LABEL.
22        Q.   OKAY.  "INVOLVED UPON RECEIPT BY THE AGENCY OF A
23        SUPPLEMENT FOR THE CHANGE."
24        A.   THAT'S CORRECT.
25        Q.   "THESE CHANGES INCLUDE BUT ARE NOT LIMITED TO" -- AND THEN
page 1115
1         IF YOU GO DOWN TO SUBSECTION 3 --
2         A.   I'M THERE.
3         Q.   -- "CHANGES IN THE LABELING TO ACCOMPLISH ANY OF THE
4         FOLLOWING:  TO ADD OR STRENGTHEN A CONTRAINDICATION, WARNING,
5         PRECAUTION, OR ADVERSE REACTION?
6         A.   YES.
7         Q.   NOW, WHAT, IN TERMS OF YOUR WORK AS A MEDICAL OFFICER AT
8         THE FDA, IS THIS SOMETHING THAT DRUG MANUFACTURERS LIKE MERCK
9         ARE AWARE OF?
10        A.   THEY CERTAINLY ARE.
11        Q.   WHILE YOU WERE AN FDA MEDICAL OFFICER, DID DRUG
12        MANUFACTURERS SUCH AS MERCK TAKE IT AND USE THIS?
13        A.   I SAW THIS REGULATION BEING USED HUNDREDS OF TIMES DURING
14        THE TIME THAT I WAS AT THE FDA.
15        Q.   AND WHAT IS THE PURPOSE, IN YOUR EXPERIENCE, IN YOUR
16        OPINION AS AN FDA MEDICAL OFFICER, OF THIS REGULATION?
17        A.   WELL, THE PURPOSE -- WHAT IT SAYS IS THAT YOU CAN GET THE
18        LABELING CHANGE OUT THERE, AND THEN THE FDA CAN LOOK AT IT AND
19        DECIDE WHETHER TO APPROVE IT AFTERWARD.  THE POINT IS IF YOU'VE
20        GOT A SERIOUS SAFETY HAZARD, IF YOU'VE GOT A SERIOUS ADVERSE
21        REACTION, YOU WANT THE INFORMATION OUT THERE AS SOON AS
22        POSSIBLE SO THAT DOCTORS CAN BE AWARE OF IT AS SOON AS
23        POSSIBLE.  AND THE -- THE REGULATION PERMITS THE COMPANY TO PUT
24        IT OUT THERE AS SOON AS POSSIBLE, AND SO IT'S TO GET THIS
25        INFORMATION OUT QUICKLY WHEN THERE IS A SERIOUS SAFETY HAZARD,
page 1116
1         YOU WANT TO GET THE INFORMATION OUT THERE GO QUICKLY.
2              AND, YOU KNOW, THE FDA, IS A BUREAUCRACY.  IT TAKES
3         TIME TO DO THINGS.  IT'S NOT A GOOD THING TO WAIT FOR THE FDA
4         TO LOOK THROUGH ALL THE DATA IF IT'S A SERIOUS SAFETY HAZARD
5         AND PEOPLE REALLY NEED TO KNOW ABOUT IT RIGHT AWAY.
6              SO THAT'S THE WHOLE PURPOSE OF THIS REGULATION IS TO
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
7        GET THE INFORMATION OUT THERE AS QUICKLY AS POSSIBLE, LET THE
8        FDA LOOK AT IT AFTER IT'S OUT THERE.  IF THEY WANT TO MAKE ANY
9        CHANGES, THEY DO IT AT THAT POINT.
10       Q.   SO IF A COMPANY WANTS TO STRENGTHEN A WARNING OR ADD TO A
11       WARNING, THEY CAN DO IT; CORRECT?
12       A.   THAT'S WHAT THIS -- I MEAN, THE REGULATION THAT YOU READ,
13       THAT THIS PARTICULAR RULE IS SPECIFICALLY FOR THE PURPOSE OF
14       ADDING OR STRENGTHENING A CONTRAINDICATION, WARNING,
15       PRECAUTION, OR ADVERSE REACTION.
16       Q.   IF THEY WANT TO SUBTRACT OR TAKE AWAY A WARNING, THAT'S A
17       DIFFERENT SITUATION?
18       A.   TAKING AWAY A WARNING, IF THEY WANT TO TAKE IT OUT, WELL,
19       THE FDA WANTS TO LOOK AT THAT FIRST, SO THAT REQUIRES A PRIOR
20       APPROVAL.  YOU CAN'T DECIDE YOU'RE GOING TO TAKE OUT A WARNING,
21       YOU'RE GOING TO TAKE OUT INFORMATION ABOUT A SERIOUS ADVERSE
22       REACTION ON YOUR OWN AND JUST START DISTRIBUTING THE LABEL.
23       FDA WANTS TO MAKE SURE THEY KNOW WHAT YOU'RE DOING, AND SO
24       TAKING IT OUT REQUIRES PRIOR APPROVAL.
25       Q.   AND THEY DO THIS SO THEY CAN START SUBMITTING -- THEY CAN
page 1117
1        START DISTRIBUTING THE LABEL AND WARNING DOCTORS AS LONG AS
2        THEY SUBMIT AN APPLICATION AT THE TIME THAT THEY DO THAT,
3        CORRECT?
4        A.   IF THEY HAVE NEW INFORMATION ABOUT A SERIOUS SAFETY
5        HAZARD, THEY SUBMIT -- THEY PUT IT IN LABELING, THEY GET IT OUT
6        THERE, AND THEY SUBMIT AN APPLICATION TO THE FDA AT THE SAME
7        TIME.
8        Q.   AT ANY POINT BETWEEN MAY OF 1999 AND APRIL OF 2002, DID
9        MERCK EVER UTILIZE -- IS THIS SOMETHING -- LET ME BACK UP.  IS
10       THIS WHAT'S CALLED A CHANGE BEING EFFECTED?
11       A.   THAT'S THE NAME OF THE REGULATION, A CHANGES BEING
12       EFFECTED.  CHANGES OF LABELING, CHANGES BEING EFFECTED.
13       Q.   NOW, AT ANY TIME DURING MAY OF 1999 AND APRIL OF 2002, DID
14       MERCK EVER SUBMIT A CHANGE BEING EFFECTED TO ADD A
15       CARDIOVASCULAR WARNING?
16       A.   NO, NEVER DID.
17       Q.   IN FACT, WELL -- SPECIFICALLY, DID THEY DO IT AFTER THEY
18       GOT THE VIGOR RESULTS IN MARCH OF 2000?
19       A.   NO, THEY DID NOT.  NOT TO ADD A CARDIOVASCULAR WARNING.
20       CARDIOVASCULAR WARNING.
21       Q.   IN FACT, AFTER THE VIGOR RESULTS BECAME KNOWN TO MERCK IN
22       MARCH OF 2000, DID THEY SUBMIT A NEW LABEL TO THE FDA?
23       A.   THEY SUBMITTED A NEW LABEL PROPOSAL IN JUNE OF 2000, ABOUT
24       TWO MONTHS AFTER THEY TOLD THE FDA ABOUT THE VIGOR RESULTS.
25       Q.   SO THEY DID SUBMIT SOMETHING TO THE FDA, BUT IT WASN'T
page 1118
1        WHAT WE CALL A CBE; CORRECT?
2        A.   IT WAS NOT A CBE TO PUT A WARNING IN LABELING, NO, IT WAS
3        NOT.
4        Q.   WHY IS IT IN JUNE OF 2000 THAT MERCK COULD NOT HAVE
5        UTILIZED THAT CHANGE BEING EFFECTED REGULATION?
6        A.   WELL, IT COULD HAVE.  IF IT WANTED TO PUT A WARNING IN
7        LABELING ABOUT CARDIOVASCULAR RISKS, IT COULD HAVE DONE THAT AT
8        THAT POINT, BUT IT DID NOT DO THAT.  AND THE REASON THAT WHAT
9        IT SUBMITTED WAS NOT A CHANGES BEING EFFECTED, A CHANGES BEING
10       EFFECTED SUBMISSION THAT THEY COULD HAVE PUT IN ON THEIR OWN
11       PRIOR TO APPROVAL WAS BECAUSE THEY WERE TRYING TO TAKE OUT A
12       WARNING.
13       Q.   OKAY.  NOW, BEFORE WE GET INTO THAT, I WANT TO DRAW YOUR
14       ATTENTION FIRST TO, IN YOUR BOOKLET OF EXHIBITS, PLAINTIFF'S
15       EXHIBIT 1.0234, WHICH HAS ALREADY BEEN INTRODUCED INTO
16       EVIDENCE.
17       A.   OKAY.
18       Q.   AND HAVE YOU REVIEWED THAT DOCUMENT?
19       A.   YES, I HAVE.
20       Q.   AND DO YOU SEE THE FRONT PAGE?
21             MR. RAFFERTY:  IF YOU CAN JUST BLOW UP THE WRITING
22       THERE ON THE SIDE SO WE CAN ALL SEE IT.
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
23      BY MR. RAFFERTY:
24      Q.    "ORIGINAL LABEL SUBMISSION FOR VIGOR."  DID I READ THAT
25      CORRECTLY?
page 1119
1       A.    RIGHT.
2       Q.    NOW, IN THIS -- THIS IS THE ORIGINAL LABEL SUBMISSION THAT
3       WAS SUBMITTED BY MERCK TO THE FDA AFTER THEY GOT THE VIGOR
4       CARDIOVASCULAR RISKS, CORRECT?
5       A.    THAT'S CORRECT.
6       Q.    NOW, IF YOU WOULD TURN TO THE WARNING SECTION, WHICH IS
7       LOCATED ON PAGE 13.
8       A.    YES.
9       Q.    PAGE 13?
10      A.    I'M THERE.
11      Q.    I'M WAITING FOR THE -- MAKE SURE THAT THE JURY CAN FOLLOW
12      US.
13            MR. RAFFERTY:  NOW, IF YOU WILL BLOW UP THE WARNING
14      SECTION THERE, PLEASE.
15      BY MR. RAFFERTY:
16      Q.    OKAY.  WHAT ARE ALL THESE LINES OUT?  WHAT DOES THAT MEAN?
17      A.    THAT'S MERCK'S PROPOSAL TO CROSS OUT ALL THIS INFORMATION
18      ABOUT A WARNING.
19      Q.    SO MERCK, IN JUNE OF 2000, AFTER IT GETS THE VIGOR
20      RESULTS, INCLUDING THE CARDIOVASCULAR RISKS, THE WARNING THAT
21      THEY SUBMIT TO THE FDA IS TAKING OUT THE GASTROINTESTINAL
22      WARNING THAT HAD BEEN THERE; CORRECT?
23      A.    THIS IS, BY FAR, THE LARGEST CHANGE THEY ARE MAKING IN
24      THIS LABELING.  IT'S ALL TO ELIMINATE A WARNING.
25      Q.    AND IF YOU CAN JUST KEEP SCROLLING DOWN, ALL THE WAY DOWN
page 1120
1       THROUGH THE BOTTOM OF THE PAGE, WHICH INCLUDES THE ENTIRETY OF
2       THE GASTROINTESTINAL WARNING.  NOW, ANYWHERE IN THIS JUNE IN
3       THE WARNING SECTION, IS THERE A PROPOSAL BY MERCK TO PUT THE
4       VIGOR CARDIOVASCULAR RISKS IN THERE, IN THE WARNING SECTION?
5       A.    NO, THERE IS NO PROPOSAL TO PUT CARDIOVASCULAR RISKS IN A
6       WARNING SECTION.
7       Q.    AND IS THERE ANY RECOMMENDATION IN THIS PROPOSAL FROM
8       MERCK IN JUNE OF 2000 TO PUT THE CARDIOVASCULAR RISKS IN THE
9       PRECAUTION SECTION?
10      A.    NO, THERE IS NOT.
11      Q.    WHAT ABOUT IN THE CONTRAINDICATION SECTION?
12      A.    THERE IS NO CONTRAINDICATION ABOUT CARDIOVASCULAR RISKS OF
13      VIOXX.
14      Q.    IN FACT, IF YOU WOULD TURN TO PAGE 12, THE ONLY PLACE
15      MERCK -- WELL, WE'RE GOING TO TALK ABOUT A COUPLE OF OTHER
16      THINGS, BUT IN THIS SECTION, WHICH IS THE -- I BELIEVE IT'S THE
17      CLINICAL STUDIES SECTION; IS THAT CORRECT?
18      A.    THAT'S CORRECT.  YES.
19      Q.    TELL THE JURY WHAT THE SIGNIFICANCE IS OF THE CLINICAL
20      STUDY SECTION OF A LABEL.
21      A.    WELL, THE CLINICAL STUDY, WE'VE TALKED ABOUT THE SECTIONS
22      OF LABELING THAT CONCERN ADVERSE DRUG REACTIONS AND SAFETY
23      HAZARDS.  THOSE ARE THE SAFETY CONTRAINDICATIONS, WARNINGS AND
24      ADVERSE REACTIONS.  THERE IS ALSO A SECTION OF THE LABELING
25      THAT DESCRIBES THE RESULTS OF CLINICAL STUDIES, AND SO THIS IS
page 1121
1       THE CLINICAL STUDY SECTION WHERE THE RESULTS OF STUDIES ARE
2       DISCUSSED.
3       Q.    AND IN YOUR EXPERIENCE AS A MEDICAL OFFICER AT THE FDA --
4       STRIKE THAT.  LET ME BACK UP.  THE JURY HEARD FROM DR. SCHIRMER
5       YESTERDAY THAT HIS PRACTICE WAS TO REVIEW THE WARNINGS,
6       PRECAUTIONS, CONTRAINDICATIONS SECTIONS ON THE LABEL.
7       A.    THAT'S CORRECT.
8       Q.    IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF YOUR
9       EXPERIENCE AT THE FDA, THAT THAT'S WHAT PHYSICIANS ARE
10      CONCERNED WITH?
11      A.    WHEN THEY ARE CONCERNED WITH ADVERSE REACTIONS, THEY LOOK
12      AT WARNINGS, CONTRAINDICATIONS, PRECAUTIONS; THAT'S CORRECT.
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

13    Q.    NOW, I WOULD LIKE TO ASK YOU:  IF MERCK HAD CHOSEN TO
14    CHANGE OR PUT THE CARDIOVASCULAR RISKS ASSOCIATED WITH VIOXX
15    INTO THE WARNING LABEL IN JUNE OF 2000, COULD THEY HAVE DONE
16    THAT WITHOUT GETTING PRIOR FDA APPROVAL?
17    A.    THEY CERTAINLY COULD HAVE.
18    Q.    AND THEN, IF THEY ALSO WANTED TO TAKE OUT THE GI WARNING,
19    AS THEY DID ON PAGE 13, COULD THEY HAVE FILED A SEPARATE
20    APPLICATION TO GO THROUGH THE REGULAR AND NORMAL APPLICATION
21    PROCESS?
22    A.    IT WOULD CERTAINLY BEEN QUITE USUAL AND PERMISSIBLE FOR
23    THERE TO HAVE BEEN TWO SUPPLEMENTAL APPLICATIONS:  ONE TO
24    PROPOSE TAKING OUT THE GI WARNING, WHICH WOULD HAVE REQUIRED
25    PRIOR APPROVAL; AND ONE TO PUT IN A CARDIOVASCULAR WARNING,
page 1122
1     WHICH COULD HAVE BEEN DONE WITHOUT PRIOR APPROVAL.
2     Q.    NOW, IN REGARDS TO THE CHANGES BEING EFFECTED STATUTE, IS
3     THIS A SITUATION WHERE -- WELL, IN YOUR REVIEW OF THE MATERIALS
4     THAT YOU REVIEWED IN FORMING YOUR OPINIONS, DO YOU KNOW IF
5     MERCK EVER AVAILED THEMSELVES OR TOOK ADVANTAGE OF THIS CHANGES
6     BEING EFFECTED REGULATION?
7     A.    IN THIS CASE?
8     Q.    NOT PERTAINING TO THE CARDIOVASCULAR RISKS, BUT HAS MERCK
9     USED THE CHANGES BEING EFFECTED REGULATION FOR OTHER PURPOSES?
10    A.    YES, THEY DID.  ON AT LEAST ONE OCCASION THAT I'M AWARE
11    OF.
12    Q.    SO THIS WASN'T A SITUATION WHERE MERCK DIDN'T KNOW ABOUT
13    THE CBE?
14    A.    WELL, MERCK CERTAINLY KNEW ABOUT THE CBE REGULATION.  ALL
15    PHARMACEUTICAL COMPANIES KNOW ABOUT THAT.
16    Q.    LET ME ASK YOU A QUESTION ABOUT THE LABELING AND THE POWER
17    OF THE FDA IN REGARDS TO LABELING.  DOES THE FDA HAVE THE
18    ABILITY OR THE POWER TO ORDER A LABEL CHANGE?
19    A.    THERE ARE CERTAINLY VERY EXTREME SITUATIONS IN WHICH A
20    COMPANY -- IN WHICH THE FDA CAN FORCE A LABEL CHANGE.  FOR
21    EXAMPLE, THE FDA CAN DECLARE -- TRY TO DECLARE A DRUG AN
22    IMMINENT SAFETY HAZARD, AND THAT INVOLVES GOING TO COURT,
23    GETTING A JUDGE TO AGREE.  IT INVOLVES THE INTERRUPTION OF THE
24    DISTRIBUTION OF THE DRUG.  IT'S A VERY EXTREME MEASURE.  AND
25    IT'S, FOR ALL PRACTICAL PURPOSES, NOT USED VERY MUCH AT ALL
page 1123
1     BECAUSE IT TAKES -- FIRST OF ALL, IT TAKES A VERY LONG TIME.
2             FOR EXAMPLE, IF THE FDA IS CONCERNED ABOUT A SERIOUS
3     ADVERSE REACTION AND THE INFORMATION GETTING OUT THERE, USING
4     THE MOST EXTREME MEASURES IN GOING TO COURT AND ARGUING IN
5     COURT AND SEIZING THE DRUG CAN ACTUALLY TAKE A LOT LONGER.
6             SO THERE ARE CERTAIN VERY EXTREME SITUATIONS WHICH
7     ARE VERY RARELY USED IN WHICH THE FDA CAN FORCE A LABEL CHANGE.
8     BUT IN ALMOST ALL SITUATIONS, IT'S A MATTER OF NEGOTIATION WITH
9     THE COMPANY AND TRYING TO GET THE COMPANY TO GO ALONG WITH WHAT
10    THE FDA THINKS OUGHT TO BE DONE.
11    Q.    SO, PRACTICALLY SPEAKING, I GUESS, IN THE REAL WORLD, IS
12    THERE THE ABILITY OF THE FDA TO ORDER A RAPID LABEL CHANGE OF A
13    WARNING?
14    A.    ORDER?  PRACTICALLY IT IS NOT A QUESTION OF THE FDA BEING
15    ABLE TO ORDER IT.  THE FDA HAS TO NEGOTIATE PRACTICALLY ALMOST
16    ALL THE TIME, EXCEPT IN VERY RARE INSTANCES.
17    Q.    NOW, IN OCTOBER -- LET ME BACK UP HERE A LITTLE BIT ON THE
18    TIME LINE.  IN JUNE OF 2000 IS THE PROPOSAL FOR MERCK TO TAKE
19    OUT THE GI WARNING; IS THAT CORRECT?
20    A.    THAT'S CORRECT.
21    Q.    BUT THERE IS STILL NO WARNING OF CARDIOVASCULAR RISKS?
22    A.    NO WARNING OF CARDIOVASCULAR RISKS.
23    Q.    NO PRECAUTION OF CARDIOVASCULAR RISKS?
24    A.    NO PRECAUTION.
25    Q.    IN BETWEEN JUNE OF 2000, WHEN THIS IS SUBMITTED, AND APRIL
page 1124
1     OF 2002, WHEN THE NEW LABEL IS PUT INTO PLACE, DOES THE FDA
2     INQUIRE OR ASK MERCK FOR FURTHER INFORMATION?

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
3       A.   YES.
4       Q.   AND THAT'S IN REGARD TO THEIR JUNE 2000 REQUEST?
5       A.   YES.
6       Q.   WHAT WAS IT THAT THEY HAD ASKED FOR?
7       A.   WELL, THEY ASKED FOR A NUMBER OF THINGS, BUT PROBABLY THE
8       MOST SIGNIFICANT THING IS THEY WANTED INFORMATION ABOUT A STUDY
9       CALLED "ADVANTAGE."
10      Q.   AND ARE YOU FAMILIAR WITH THE ADVANTAGE STUDY?
11      A.   I'M SOMEWHAT FAMILIAR WITH THE ADVANTAGE STUDY, YES.
12      Q.   AND IN THE ADVANTAGE STUDY, WHAT RELEVANCE, WHAT -- IS IT
13      UNUSUAL FOR THE FDA TO REQUEST ADDITIONAL INFORMATION WHEN THEY
14      GET A SUBMISSION FOR THESE TYPES OF CHANGES, TAKING THE GI
15      WARNING OUT AND THESE TYPES OF THINGS?
16      A.   IT'S VERY COMMON FOR THE FDA TO ASK FOR ADDITIONAL
17      INFORMATION AND ADDITIONAL ANALYSES.
18      Q.   IF YOU WILL, I WOULD LIKE YOU TO TURN IN YOUR NOTEBOOK TO
19      PLAINTIFF'S EXHIBIT 1.1170.
20      A.   I'LL BE WITH YOU IN JUST A SECOND.
21      Q.   ARE YOU THERE?
22      A.   GIVE ME THAT NUMBER AGAIN.
23      Q.   I'M SORRY.  1.1170.  IT IS A FAX DATED NOVEMBER 27, 2000.
24      A.   YES.  I'M THERE.
25      Q.   AND IS THAT FROM THE -- IS THAT A FAX REQUEST FROM THE
page 1125
1       FOOD & DRUG ADMINISTRATION?
2       A.   YES.  A FAX TO MERCK.
3       Q.   AND IT'S TO A ROBERT SILVERMAN, M.D., AT MERCK?
4       A.   THAT'S CORRECT.
5       Q.   AND AT THE BOTTOM IT IS SIGNED BY SOMEONE BY THE NAME OF
6       SANDY?
7       A.   SANDY VULCAN, YES.
8       Q.   THAT IS ONE OF THE PEOPLE INVOLVED IN THE REVIEW OF THIS
9       SUPPLEMENTAL NDA?
10      A.   I BELIEVE SHE WAS THE PROJECT COORDINATOR FOR THE FDA ON
11      THIS.  ACTUALLY, THEY CALL THEM CONSUMER SAFETY OFFICERS.
12           MR. RAFFERTY:  YOUR HONOR, I FAILED TO DO THIS.  AT
13      THIS TIME I WILL MOVE INTO ADMISSION PLAINTIFF'S
14      EXHIBIT 1.1170.
15           MR. ISMAIL:  NO OBJECTION.
16           THE COURT:  LET IT BE ADMITTED.
17      BY MR. RAFFERTY:
18      Q.   NOW, IF YOU WOULD TURN OVER TO PAGE 3, NUMBER 6.
19      MS. VULCAN OF THE FDA IN THIS REQUEST IS SAYING -- WHAT IS SHE
20      REQUESTING?
21      A.   PROVIDE THE FINAL REPORT FOR STUDY 102.  THAT'S ADVANTAGE.
22      Q.   AND IN PARTICULAR, IS SHE LOOKING FOR -- WHAT INFORMATION
23      OUT OF ADVANTAGE IS SHE INTERESTED IN?
24      A.   WELL, SHE -- SHE WANTS THE COMPLETE STUDY REPORT IN
25      THIS -- IN THIS REQUEST.
page 1126
1       Q.   AND IN THE BOTTOM PARAGRAPH THERE DOES SHE SAY, "PLEASE
2       PROVIDE ANALYSES OF SERIOUS GASTROINTESTINAL AND CARDIOVASCULAR
3       THROMBOTIC EVENTS SIMILAR TO THE ONES PERFORMED IN THE VIGOR
4       STUDY"?
5       A.   YES.  "AND PLEASE PROVIDE SEPARATE ANALYSIS BY ASPIRIN
6       USE."
7       Q.   AND THIS IS NOVEMBER 27, 2000; CORRECT?
8       A.   THAT'S CORRECT.
9       Q.   DID MERCK PROVIDE THAT INFORMATION TO THE FDA?
10      A.   WELL, EVENTUALLY IT GOT THERE, BUT IT TOOK A VERY LONG
11      TIME.  THIS WAS A FAX THAT WAS SENT IN NOVEMBER OF 2000, AND
12      THE COMPLETE STUDY REPORT WAS NOT FULLY PROVIDED UNTIL JULY OF
13      THE FOLLOWING YEAR.  SO IT WAS A VERY LONG TIME.
14      Q.   AT THIS TIME, DOCTOR, I WOULD LIKE YOU TO REFER TO
15      DOCUMENT 1.1230.
16           MR. RAFFERTY:  COREY, JUST HOLD ON ONE SECOND BEFORE
17      YOU PUT THAT UP.
18      BY MR. RAFFERTY:
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
19      Q.   LET ME KNOW WHEN YOU GET THERE.  I HAVE SHOULD HAVE GOTTEN
20      YOU A BIGGER BINDER.
21      A.   OKAY.  I'M THERE.
22      Q.   IS THAT A DOCUMENT FROM THE FOOD & DRUG ADMINISTRATION TO
23      ROBERT SILVERMAN?
24      A.   YES.
25      Q.   DATED APRIL 6, 2001?
page 1127
1       A.   YES.
2       Q.   IS THAT WHAT OFTENTIMES IS REFERRED TO AS AN "APPROVABLE
3       LETTER"?
4       A.   IT'S CALLED AN APPROVABLE LETTER, YES.
5       Q.   AND ARE YOU FAMILIAR WITH APPROVABLE LETTERS?
6       A.   YES, I AM.
7       Q.   THROUGH YOUR WORK AT THE FDA?
8       A.   YES.
9       Q.   AND IS THIS SOMETHING THAT'S COMMON AND CUSTOMARY FOR THE
10      FDA TO SEND OUT?
11      A.   YES.
12           MR. RAFFERTY:  AT THIS TIME, YOUR HONOR, I MOVE INTO
13      ADMISSION 1.1230.
14           MR. ISMAIL:  NO OBJECTION.
15           THE COURT:  LET IT BE ADMITTED.
16      BY MR. RAFFERTY:
17      Q.   I DRAW YOUR ATTENTION, DOCTOR, TO PAGE 1 OF THE DOCUMENT,
18      1.1230.
19           MR. RAFFERTY:  AND IF YOU CAN BLOW UP, PLEASE, COREY,
20      "WE HAVE COMPLETED THE REVIEW OF THESE APPLICATIONS."
21      BY MR. RAFFERTY:
22      Q.   DOCTOR, THIS IS APRIL OF 2001, AND IF YOU WILL READ DOWN:
23      "WE HAVE COMPLETED THE REVIEW OF THESE APPLICATIONS AS AMENDED,
24      AND THEY ARE APPROVABLE.  BEFORE THESE APPLICATIONS MAY BE
25      APPROVED, HOWEVER, IT WILL BE NECESSARY FOR YOU TO ADDRESS THE
page 1128
1       FOLLOWING."  NOW, FIRST OF ALL, IN REGARDS TO THE USE OF THE
2       WORDS "APPROVE" AND "APPROVABLE," WHAT IS THE SIGNIFICANCE OF
3       THAT?
4       A.   OKAY.  THIS IS ACTUALLY IMPORTANT TO UNDERSTAND, BECAUSE
5       THE FDA REALLY USES THE APPROVABLE LETTER TO SET FORTH A LIST
6       OF REQUIREMENTS THAT THE COMPANY HAS TO MEET.  IN OTHER WORDS,
7       WHAT THEY ARE SAYING IN AN APPROVABLE LETTER IS, YEAH, YOU'VE
8       GOT ALL OF THE PARTS OF THE APPLICATION THAT YOU NEED TO GET AN
9       APPROVAL, BUT THERE IS INFORMATION THAT SHOULD BE SUBMITTED AS
10      PART OF ALL THESE PARTS THAT WE NEED TO HAVE TO COMPLETE THE
11      EVALUATION OF THIS APPLICATION.  AND SO APPROVABLE LETTERS
12      REALLY ARE A LIST OF FURTHER REQUIREMENTS, THINGS THAT THE FDA
13      NEEDS TO HAVE TO GO AHEAD WITH THE APPROVAL PROCESS.  AND ONE
14      SHOULD NOT CONFUSE AN APPROVABLE LETTER WITH APPROVAL LETTER.
15      THE APPROVAL LETTER IS THE ACTUAL APPROVAL.  THE APPROVABLE
16      LETTER IS REALLY A LIST OF FURTHER REQUIREMENTS.
17      Q.   DOCTOR, THIS THE APRIL 6, 2001, AND IF YOU WOULD LOOK DOWN
18      AFTER IT SAYS, "IT WILL BE NECESSARY FOR YOU TO ADDRESS THE
19      FOLLOWING:  "ARE THEY STILL REQUESTING THE ADVANTAGE DATA?
20      A.   THEY ARE STILL REQUESTING THE ADVANTAGE DATA.
21      Q.   SO AS OF THIS TIME, WHICH IS APRIL -- LET ME MOVE IT OVER
22      HERE BECAUSE I'M RUNNING OUT OF ROOM -- APRIL 2001, THE FDA IS
23      STILL REQUESTING ADVANTAGE DATA FROM MERCK; CORRECT?
24      A.   THAT'S CORRECT.
25      Q.   AND IF YOU WILL FOLLOW ALONG WITH ME, I'M GOING TO ASK YOU
page 1129
1       A QUESTION ABOUT THESE REQUESTS.  THEY SAY, "WE CONSIDER A FULL
2       AND COMPLETE REVIEW OF ALL RELEVANT DATA ESSENTIAL TO THE
3       SAFETY EVALUATION FOR THESE SUPPLEMENTS.  THEREFORE, WE
4       CONSIDER REVIEW OF THE ADVANTAGE TRIAL, STUDY 102, NECESSARY IN
5       ORDER TO MORE ADEQUATELY INTERPRET THE CARDIOVASCULAR AND
6       OVERALL SAFETY RESULTS IN THE VIGOR STUDY AND PROVIDE ADEQUATE
7       LABELING INFORMATION.  PLEASE SUBMIT THE COMPLETE STUDY REPORT
8       FOR ADVANTAGE TRIALS, STUDY 102, INCLUDING THE CASE REPORT
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

**• Kapit Motion**

```
 9        TABULATIONS AND THE CASE REPORT FORMS FOR OUR REVIEW.  WE
10        ACKNOWLEDGE RECEIPT ON MARCH 30, 2001, OF YOUR PARTIAL RESPONSE
11        TO THIS REQUEST.  PLEASE REFER TO PREVIOUS INFORMATION REQUESTS
12        ON NOVEMBER 27, 2000, AND FEBRUARY 28, 2001."  DID I READ THAT
13        ACCURATELY?
14        A.    THAT'S CORRECT.
15        Q.    DOCTOR, AS OF APRIL 6, 2001, IT APPEARS AS THOUGH,
16        ACCORDING TO THIS LETTER, THAT THE FDA HAD REQUESTED
17        INFORMATION ON AT LEAST TWO OCCASIONS TO GET THE ADVANTAGE
18        DATA, CORRECT?
19        A.    THAT'S CORRECT.  THEY REQUESTED THEM IN FEBRUARY AND
20        NOVEMBER.
21        Q.    SO NOVEMBER 27 IS THE FIRST ONE.  I FORGOT TO PUT THAT ON
22        THE TIME LINE.  OKAY.  NOW, JUST TO KIND OF COMPLETE THE
23        LABELING TIME LINE HERE, DID THE FDA ULTIMATELY PROPOSE A LABEL
24        IN RESPONSE TO THE JUNE 2000 REQUEST FROM MERCK?
25        A.    YES.  THE LABELING CAME -- THE FDA CAME UP WITH ITS OWN
page 1130
 1        LABEL PROPOSAL.
 2        Q.    AT THIS TIME, I WOULD LIKE YOU TO TURN TO PLAINTIFF'S
 3        EXHIBIT 1.0091 IN YOUR NOTEBOOK.  DO YOU RECOGNIZE THAT?  I'M
 4        SORRY, DOCTOR.  I THOUGHT YOU WERE THERE.  I APOLOGIZE.
 5        A.    NOT QUIT THAT FAST.  YES, I SEE THIS MAP.
 6        Q.    AND THIS IS THE FDA'S PROPOSAL IN TERMS OF THE WARNINGS,
 7        CORRECT?
 8        A.    YES.  THE FDA HAS A MARKED UP A LABEL WRITTEN BY MERCK,
 9        AND IN THE MARKUP THE FDA INDICATES ITS OWN PROPOSAL FOR
10        LABELING.
11        Q.    AND IN THIS PROPOSAL -- LET ME BACK UP.
12                  MR. RAFFERTY:  AT THIS TIME, YOUR HONOR, I WOULD MOVE
13        INTO ADMISSION 1.0091.
14                  MR. ISMAIL:  NO OBJECTION, YOUR HONOR.
15                  THE COURT:  LET IT BE ADMITTED.
16                  MR. RAFFERTY:  THANK YOU, YOUR HONOR.
17        BY MR. RAFFERTY:
18        Q.    IN THIS PROPOSAL IN OCTOBER OF 201 FROM THE FDA, DOES THE
19        FDA PROPOSE TO PUT CARDIOVASCULAR WARNINGS OR PUT RISK OF
20        CARDIOVASCULAR ADVERSE EFFECTS IN THE WARNING SECTION OF THE
21        LABEL?
22        A.    YES, IT DOES.  IT PROPOSES A CARDIOVASCULAR WARNING FOR
23        VIOXX.
24        Q.    AND IF YOU WOULD PLEASE TURN TO PAGE 857 -- THE BATES
25        NUMBER 8572.
page 1131
 1        A.    OKAY.
 2                  MR. RAFFERTY:  AND COREY, IF YOU WOULD PLEASE BLOW UP
 3        THAT TOP SECTION.
 4        BY MR. RAFFERTY:
 5        Q.    IS THAT THE PROPOSAL FROM THE FDA IN REGARDS TO THE
 6        CARDIOVASCULAR RISKS?
 7        A.    YES.  THIS IS THE FDA'S PROPOSAL FOR A CARDIOVASCULAR RISK
 8        WARNING.
 9        Q.    AND ON THIS DATE, MERCK -- I APOLOGIZE.  LET ME BACK UP
10        FOR JUST ONE SECOND.  AT ANY TIME BETWEEN APRIL -- I'M SORRY,
11        JUNE OF 2000 AND APRIL OF 2002, DID MERCK EVER PROPOSE TO SEND
12        OUT UNDER A CBE THE CARDIOVASCULAR RISKS IN THE WARNING
13        SECTION?
14        A.    NO, MERCK NEVER DID.
15        Q.    I WOULD LIKE TO DRAW YOUR ATTENTION NOW TO DOCUMENT
16        1.01098, WHICH HAS ALREADY BEEN MARKED INTO EVIDENCE.
17        A.    YES.
18        Q.    THIS IS AN E-MAIL ON NOVEMBER 8, 2001, FROM ED SCOLNICK,
19        WHO THE JURY HAS HEARD FROM, TO DOUG GREENE -- I'M SORRY, YES,
20        DOUG GREENE AND BONNIE GOLDMAN, AND CC-ING PETER KENT (SPELLED
21        PHONETICALLY); IS THAT CORRECT?
22        A.    YES.
23        Q.    AND IF YOU WOULD, LOOK ABOUT HALFWAY DOWN.  LET'S JUST
24        START AT THE TOP.  IT'S A SHORT E-MAIL.  IN THIS E-MAIL,
```

Exhibit A - Plunkett Trial Testimony Excerpts

• **Kapit Motion**

```
25        DR. SCOLNICK, WHO -- YOU KNOW WHO DR. SCOLNICK IS?
page 1132
1         A.   YES.  HE WAS THE DIRECTOR OF MERCK RESEARCH LABS.
2         Q.   BONNIE, TWICE IN MY LIFE I'VE HAD TO SAY TO THE FDA THAT
3         LABEL IS NOT ACCEPTABLE.  WE WILL NOT, UNDER ANY CIRCUMSTANCES
4         ACCEPT IT.  NOW, IN REGARDS TO THAT PHRASE RIGHT THERE, IS THAT
5         GETTING BACK TO WHAT YOU WERE TALKING ABOUT IN TERMS OF THE
6         POWER OF THE FDA TO ACTUALLY ORDER A LABEL CHANGE?
7         A.   THAT'S RIGHT.  HE'S TALKING ABOUT THE LABEL PROPOSAL FOR
8         THE CARDIOVASCULAR WARNING THAT THE FDA MADE, AND HE SAYS THAT
9         WE WON'T ACCEPT IT.
10        Q.   THEN HE GOES ON TO SAY, "ONCE, WHEN THEY WANTED A BLACK
11        BOX WARNING FOR ANGIOEDEMA" -- I THINK I SAID THAT RIGHT,
12        ANGIOEDEMA -- "IN VASOTEC IN 1985 AND ONCE IN 1989, WHEN STEVE
13        FRED WANTED A WARNING ABOUT POTENTIAL COLON CANCER IN THE
14        PRILOSEC LABEL, YOU WILL -- AND "WILL" IS IN CAPITALS -- "HAVE
15        TO DO THAT ON THE WARNING FOR VIOXX, I ASSURE YOU THAT YOU
16        WILL." DID I READ THAT CORRECTLY?
17        A.   THAT'S CORRECT.
18        Q.   "AND I ASSURE YOU I WILL NOT SIGN OFF ON ANY LABEL THAT
19        HAS A CARDIAC WARNING."
20        A.   THAT'S CORRECT.
21        Q.   "THE DATA REVIEW YESTERDAY CONVINCES ME THAT WE DO NOT
22        HAVE AN UNSAFE DRUG, AND I AM WILLING, IF NEEDED, TO SPEND
23        SEVERAL HOURS ONE-ON-ONE WITH ANYONE AT THE FDA GOING THROUGH
24        THE DATA UNTIL THEY IN FACT DID." IS THAT --
25        A.   THAT'S RIGHT.
page 1133
1         Q.   SO AFTER -- AND THIS IS AFTER THE FDA PROPOSES THE CV
2         WARNING IN OCTOBER OF 2001, CORRECT?
3         A.   THIS IS A COUPLE -- A FEW WEEKS AFTER THE FDA PROPOSES A
4         CARDIOVASCULAR WARNING FOR VIOXX THAT WE HAVE THIS E-MAIL WHICH
5         SAYS "I WON'T ACCEPT IT" -- THAT "WE WON'T ACCEPT IT."
6         Q.   AND IF I COULD, IN THE APRIL 2002 WARNING, HAVE YOU
7         REVIEWED A COPY OF WHAT THE APRIL 2002 WARNING ACTUALLY -- OR
8         LABEL ACTUALLY INDICATES?
9         A.   I REVIEWED THE APRIL 2002 LABEL, YES.
10        Q.   AND IS THAT LOCATED -- IF YOU WOULD, TURN TO 1.0466.
11        A.   YES.
12        Q.   IS THAT THE APRIL 2002 LABEL?
13        A.   JUST CHECKING THE DATE ON IT.  YES, IT IS.
14        Q.   OKAY.  NOW, LET ME ASK YOU THIS, ANOTHER VERY SPECIFIC
15        QUESTION.  I'M GOING TO ASK YOU IF AGREE OR DISAGREE WITH THIS
16        STATEMENT:  "THE ADVISORY COMMITTEE SAYS WE DON'T KNOW WHAT THE
17        EXPLANATION IS, BUT THE INFORMATION SHOULD BE PUT ON THE LABEL.
18        SO MERCK MAKES A REVISED LABEL REQUEST RIGHT AFTER THIS, THE
19        NEXT MONTH, SO WE CAN DO EXACTLY WHAT THE ADVISORY COMMITTEE
20        HAS SUGGESTED THAT WE DO.  THIS IS AROUND APRIL OF 2001.  IT'S
21        NOT UNTIL SEPTEMBER OF 2001 THAT ANYBODY FROM THE FDA STAFF
22        GETS BACK TO US WITH THEIR SUGGESTION ON THE LANGUAGE.  IN THE
23        MEANTIME, MR. IRVIN PASSED AWAY BEFORE THE FDA STAFF EVER CAME
24        BACK WITH THEIR SUGGESTION." NOW, IS THIS -- THE JURY KNOWS --
25        HAS OBSERVED EVIDENCE TO THE FACT THAT IT WAS IN APRIL OF 2001
page 1134
1         THAT MR. IRVIN WAS PRESCRIBED THE MEDICATION, MAY OF 2001 --
2                   MR. ISMAIL:  OBJECTION, YOUR HONOR.
3                   THE COURT:  SUSTAINED.  YOU'VE GOT TWO QUESTIONS
4         BEFORE HIM.  YOU READ SOMETHING AND THEN YOU WENT TO ANOTHER
5         QUESTION.
6                   MR. RAFFERTY:  I APOLOGIZE, YOUR HONOR.  I'LL
7         REPHRASE IT.
8         BY MR. RAFFERTY:
9         Q.   AT ANY TIME DURING THE MARCH 2000 TO APRIL 2002, COULD --
10        IN YOUR EXPERT OPINION, COULD MERCK HAVE SUBMITTED A CHANGE
11        BEING EFFECTED AND CHANGED THE WARNING ON VIGOR?
12                  MR. ISMAIL:  OBJECTION.
13                  THE COURT:  ASKED AND ANSWERED.  I'VE SUSTAINED THE
14        OBJECTION.  WE'VE ALREADY COVERED THAT, COUNSEL.
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
15              MR. RAFFERTY:  IF I COULD JUST HAVE ONE MOMENT, YOUR
16         HONOR?
17              THE COURT:  SURE.
18              MR. RAFFERTY:  I'M SORRY, YOUR HONOR.  CO-COUNSEL
19         JUST REMINDED ME THAT I DIDN'T GET AN ANSWER TO THE QUESTION
20         YOU SAID THAT I HAD PENDING AS TO WHETHER HE DISAGREED WITH IT
21         OR DISAGREED WITH IT.
22              THE COURT:  THE STATEMENT THAT HE MENTIONED, DO YOU
23         AGREE OR DISAGREE WITH IT?  WHAT WAS THE...
24              MR. RAFFERTY:  I'M GOING TO PULL IT BACK OUT, YOUR
25         HONOR.  I APOLOGIZE.
page 1135
1          BY MR. RAFFERTY:
2          Q.   WELL, LET ME JUST -- I'LL TELL YOU WHAT.  LET ME JUST
3          SCRATCH THAT QUESTION AND ASK YOU:  DID MERCK HAVE TO WAIT FOR
4          THE FDA TO APPROVE THE LABEL CHANGE BEFORE SUBMITTING IT AND
5          GETTING IT OUT TO THE DOCTORS?
6               MR. ISMAIL:  OBJECTION, ASKED AND ANSWERED.
7               THE COURT:  IT HAS BEEN, BUT I'LL LET HIM ASK THAT
8          LAST QUESTION.
9          BY MR. RAFFERTY:
10         Q.   DID THEY HAVE TO WAIT?
11         A.   NO, THEY DID NOT HAVE TO WAIT.
```

[1118:8] - [1118:12]   2/10/2006   Plunkett II Trial - Vol. 05

```
page 1118
8          THAT POINT, BUT IT DID NOT DO THAT.  AND THE REASON THAT WHAT
9          IT SUBMITTED WAS NOT A CHANGES BEING EFFECTED, A CHANGES BEING
10         EFFECTED SUBMISSION THAT THEY COULD HAVE PUT IN ON THEIR OWN
11         PRIOR TO APPROVAL WAS BECAUSE THEY WERE TRYING TO TAKE OUT A
12         WARNING.
```

[1123:25] - [1126:8]   2/10/2006   Plunkett II Trial - Vol. 05

```
page 1123
25         Q.   IN BETWEEN JUNE OF 2000, WHEN THIS IS SUBMITTED, AND APRIL
page 1124
1          OF 2002, WHEN THE NEW LABEL IS PUT INTO PLACE, DOES THE FDA
2          INQUIRE OR ASK MERCK FOR FURTHER INFORMATION?
3          A.   YES.
4          Q.   AND THAT'S IN REGARD TO THEIR JUNE 2000 REQUEST?
5          A.   YES.
6          Q.   WHAT WAS IT THAT THEY HAD ASKED FOR?
7          A.   WELL, THEY ASKED FOR A NUMBER OF THINGS, BUT PROBABLY THE
8          MOST SIGNIFICANT THING IS THEY WANTED INFORMATION ABOUT A STUDY
9          CALLED "ADVANTAGE."
10         Q.   AND ARE YOU FAMILIAR WITH THE ADVANTAGE STUDY?
11         A.   I'M SOMEWHAT FAMILIAR WITH THE ADVANTAGE STUDY, YES.
12         Q.   AND IN THE ADVANTAGE STUDY, WHAT RELEVANCE, WHAT -- IS IT
13         UNUSUAL FOR THE FDA TO REQUEST ADDITIONAL INFORMATION WHEN THEY
14         GET A SUBMISSION FOR THESE TYPES OF CHANGES, TAKING THE GI
15         WARNING OUT AND THESE TYPES OF THINGS?
16         A.   IT'S VERY COMMON FOR THE FDA TO ASK FOR ADDITIONAL
17         INFORMATION AND ADDITIONAL ANALYSES.
18         Q.   IF YOU WILL, I WOULD LIKE YOU TO TURN IN YOUR NOTEBOOK TO
19         PLAINTIFF'S EXHIBIT 1.1170.
20         A.   I'LL BE WITH YOU IN JUST A SECOND.
21         Q.   ARE YOU THERE?
22         A.   GIVE ME THAT NUMBER AGAIN.
23         Q.   I'M SORRY.  1.1170.  IT IS A FAX DATED NOVEMBER 27, 2000.
24         A.   YES.  I'M THERE.
25         Q.   AND IS THAT FROM THE -- IS THAT A FAX REQUEST FROM THE
page 1125
1          FOOD & DRUG ADMINISTRATION?
2          A.   YES.  A FAX TO MERCK.
3          Q.   AND IT'S TO A ROBERT SILVERMAN, M.D., AT MERCK?
4          A.   THAT'S CORRECT.
```

Exhibit A - Plunkett Trial Testimony Excerpts

• **Kapit Motion**

5       Q.   AND AT THE BOTTOM IT IS SIGNED BY SOMEONE BY THE NAME OF
6       SANDY?
7       A.   SANDY VULCAN, YES.
8       Q.   THAT IS ONE OF THE PEOPLE INVOLVED IN THE REVIEW OF THIS
9       SUPPLEMENTAL NDA?
10      A.   I BELIEVE SHE WAS THE PROJECT COORDINATOR FOR THE FDA ON
11      THIS.  ACTUALLY, THEY CALL THEM CONSUMER SAFETY OFFICERS.
12           MR. RAFFERTY:  YOUR HONOR, I FAILED TO DO THIS.  AT
13      THIS TIME I WILL MOVE INTO ADMISSION PLAINTIFF'S
14      EXHIBIT 1.1170.
15           MR. ISMAIL:  NO OBJECTION.
16           THE COURT:  LET IT BE ADMITTED.
17      BY MR. RAFFERTY:
18      Q.   NOW, IF YOU WOULD TURN OVER TO PAGE 3, NUMBER 6.
19      MS. VULCAN OF THE FDA IN THIS REQUEST IS SAYING -- WHAT IS SHE
20      REQUESTING?
21      A.   PROVIDE THE FINAL REPORT FOR STUDY 102.  THAT'S ADVANTAGE.
22      Q.   AND IN PARTICULAR, IS SHE LOOKING FOR -- WHAT INFORMATION
23      OUT OF ADVANTAGE IS SHE INTERESTED IN?
24      A.   WELL, SHE -- SHE WANTS THE COMPLETE STUDY REPORT IN
25      THIS -- IN THIS REQUEST.
page 1126
1       Q.   AND IN THE BOTTOM PARAGRAPH THERE DOES SHE SAY, "PLEASE
2       PROVIDE ANALYSES OF SERIOUS GASTROINTESTINAL AND CARDIOVASCULAR
3       THROMBOTIC EVENTS SIMILAR TO THE ONES PERFORMED IN THE VIGOR
4       STUDY"?
5       A.   YES.  "AND PLEASE PROVIDE SEPARATE ANALYSIS BY ASPIRIN
6       USE."
7       Q.   AND THIS IS NOVEMBER 27, 2000; CORRECT?
8       A.   THAT'S CORRECT.

[1162:25] - [1194:2]      2/10/2006   Plunkett II Trial - Vol. 05

page 1162
25      Q.   EVEN AFTER GRANTING EXPEDITED REVIEW, THE FDA CAN SAY, "WE
page 1163
1       ARE GOING TO REVOKE THE EXPEDITED REVIEW AND TAKE MORE TIME ON
2       THE NDA", CORRECT?
3       A.   HAS TO GIVE A GOOD REASON FOR THAT, BUT YES, THE FDA CAN
4       DO THAT.
5       Q.   AN EXPEDITED REVIEW WAS GRANTED BY THE FDA FOR CLINICALLY
6       IMPORTANT DRUGS, CORRECT?
7       A.   DRUGS THAT SERVE AN UNMET MEDICAL NEED, YES.
8       Q.   WE KNOW THE FDA MADE THAT DETERMINATION WITH RESPECT TO
9       VIOXX, CORRECT?
10      A.   THAT'S RIGHT.
11      Q.   YOU DO NOT CRITICIZE THE FDA'S DECISION TO GRANT EXPEDITED
12      REVIEW IN THIS CASE, CORRECT?
13      A.   I AM NOT CRITICIZING THE FDA'S DECISIONS IN THIS CASE.
14      Q.   BECAUSE YOU DID NOT REVIEW THE PREAPPROVAL DOCUMENTS, YOU
15      CANNOT SAY THAT THE EXPEDITED REVIEW OF VIOXX HAD ANY IMPACT ON
16      THE RIGOR OF THE FDA REVIEW, CORRECT?
17      A.   WELL, WAIT A SECOND.  NO.  I MEAN, I DON'T THINK THAT YOU
18      CAN -- I CAN'T SAY ANYTHING SPECIFIC ABOUT THE VIOXX REVIEW,
19      BUT I CAN SAY THAT REVIEWING A COMPLEX NEW DRUG APPLICATION IN
20      A SIX-MONTH PERIOD OF TIME PLACES EXTRAORDINARY DEMANDS ON FDA
21      REVIEWERS.  I CAN SAY THAT IN A GENERAL SENSE.
22      Q.   RIGHT.  BUT YOU CAN'T GIVE ANY OPINION WITH RESPECT TO THE
23      REVIEW OF VIOXX BECAUSE YOU HAVEN'T LOOKED AT THE DOCUMENTS.
24      A.   I HAVE NOT REVIEWED PREAPPROVAL DOCUMENTS WITH REGARD TO
25      VIOXX.
page 1164
1       Q.   NOW, SIR, YOU TALKED A GREAT DEAL ABOUT FDA'S REVIEW OF
2       LABELING, CORRECT?
3       A.   YES.
4       Q.   NOW, THE FDA HAS ULTIMATE AUTHORITY TO APPROVE EVERY WORD,
5       EVERY COMMA, AND EVERY DOT IN A PRESCRIPTION MEDICATION LABEL,
6       CORRECT?

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
7    A.   THE FDA HAS TO APPROVE LABELING, YES.
8    Q.   THAT'S NO DIFFERENT WITH RESPECT TO VIOXX, CORRECT?
9    A.   THAT'S CORRECT.
10   Q.   THE FDA DECISION TO APPROVAL LABELING IS BASED ON EVIDENCE
11   SUBMITTED BY THE MANUFACTURER AS WELL AS THE FDA'S APPROVAL OF
12   OTHER MATERIAL; ISN'T THAT CORRECT?
13   A.   LET ME EXPLAIN SOMETHING ABOUT THIS APPROVAL PROCESS.  THE
14   MANUFACTURER SUBMITS LABELING FOR REVIEW BY THE FDA.  THE FDA
15   GOES OVER THAT LABELING AND CONSIDERS EVIDENCE IN ITS DECISION
16   TO APPROVE IT.
17        IN OTHER WORDS, THE FDA DOES NOT WRITE THE LABELING;
18   THE MANUFACTURER WRITES THE LABELING.  THE FDA CONSIDERS WHAT
19   THE MANUFACTURER HAS PROPOSED AND TAKES EVIDENCE INTO ACCOUNT
20   IN MAKING AN APPROVAL DECISION.
21   Q.   WELL, THE FDA IS NOT LIMITED SOLELY TO THE INFORMATION
22   SUBMITTED BY THE MANUFACTURER, CORRECT?  IT CAN RELY ON OTHER
23   INFORMATION THAT EXISTS IN THE WORLD OF SCIENCE, CORRECT?
24   A.   YES.
25   Q.   YOU HAVE ALREADY TOLD THE JURY THAT IT WAS YOUR EXPERIENCE
page 1165
1    AT FDA THAT THE SCIENTISTS THERE DID A GOOD JOB KEEPING UP WITH
2    THE STATE OF THE SCIENCE IN THEIR RESPECTIVE FIELD, CORRECT?
3    A.   SCIENTISTS DO, I BELIEVE, TRY TO KEEP UP WITH THE SCIENCE
4    IN THEIR RESPECTIVE FIELD.
5    Q.   WHEN THE FDA APPROVES A PRESCRIPTION DRUG LABEL, IT IS
6    DETERMINED THAT THE LABEL IS NOT FALSE OR MISLEADING IN ANY
7    WAY, RIGHT?
8    A.   YES, IT DOES -- IT IS DETERMINED THAT THE -- RIGHT.  THEY
9    MAKE THE DECISION THAT THE LABEL IS NOT FALSE OR MISLEADING.
10   Q.   THE FDA APPROVES LABELS WHEN IT BELIEVES THAT THE LABEL
11   REFLECTS KNOWN WARNINGS OR KNOWN RISKS THAT EXIST AT THE TIME
12   OF THE APPROVAL, CORRECT?  LET ME SAY THAT AGAIN.
13   A.   YEAH, PLEASE.
14   Q.   I TRANSPOSED SOME WORDS.  WHEN THE FDA APPROVES A LABEL,
15   IT DOES SO ONLY WHEN IT DETERMINES THAT THE LABEL ADEQUATELY
16   WARNS ABOUT THE KNOWN RISKS AT THAT TIME, CORRECT?
17   A.   WELL, "ADEQUATELY WARNS," THAT'S THE PHRASE THAT YOU USED
18   JUST THEN, AND THE FDA PROPOSED A WARNING IN REGARD TO VIOXX;
19   AND THE LABEL THAT WAS EVENTUALLY PROPOSED DID NOT CONTAIN THAT
20   WARNING, BUT THE FDA WANTED IT TO CONTAIN A WARNING.  SO, AT
21   SOME POINT, THE FDA -- IN APRIL OF 2002, THE FDA MADE A
22   JUDGMENT THAT, WELL, THEY WERE GOING TO ACCEPT IT AS A
23   PRECAUTION RATHER THAN A WARNING.  BUT THE FDA WANTED THE
24   WARNING.
25   Q.   SIR, SEE IF YOU CAN ANSWER THIS QUESTION GENERALLY.  THE
page 1166
1    FDA APPROVES A LABEL WHEN IT DETERMINES, BASED ON THE KNOWN
2    SCIENTIFIC EVIDENCE, THAT APPROPRIATE WARNINGS ARE DRAFTED TO
3    EXPRESS THE KNOWN RISKS.
4    A.   YOUR QUESTION IS WHAT?
5    Q.   IS THAT CORRECT?
6    A.   IN A GENERAL SENSE, YES, IT'S CORRECT.  BUT I WANT TO MAKE
7    IT CLEAR THAT THE FDA WANTED A WARNING IN THIS LABEL AND, AFTER
8    LONG AND ARDUOUS NEGOTIATIONS WITH THE COMPANY, FINALLY SETTLED
9    ON A PRECAUTION.
10   Q.   RIGHT.  WE'LL GET TO THAT IN A MINUTE, DOCTOR.
11   A.   OKAY.
12   Q.   YOU CERTAINLY WOULD AGREE THAT THERE ARE RISKS THAT ARE
13   UNKNOWN TO BOTH THE MANUFACTURER AND FDA AT THE TIME OF THE
14   DRUG'S APPROVAL, RIGHT?
15   A.   YES, THERE ARE RISKS THAT ARE UNKNOWN.  THAT'S WHAT I
16   TOUCHED ON EARLIER WHEN I ELABORATED ON YOUR WORD "PROOF"
17   THERE, THAT PROOF DOES NOT MEAN THAT -- THAT PROOF HAS TO BE
18   UNDERSTOOD, THAT THERE'S STILL A LOT THAT'S UNKNOWN.  AMONG
19   THESE THINGS THAT ARE UNKNOWN ARE WHAT YOU ARE TALKING ABOUT
20   NOW, THAT RISKS REMAIN UNKNOWN AT THE TIME OF APPROVAL.
21   Q.   CERTAINLY, YOU WOULD AGREE, SIR, THAT, IT IS COMMON FOR
22   LABELS TO CHANGE OVER TIME AS INFORMATION AS TO SAFETY BECOMES
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
23        AVAILABLE TO FDA, THE MEDICAL COMMUNITY, AND THE MANUFACTURER?
24        A.   YES, THAT'S TRUE.  LABELS OFTEN -- AND THAT'S THE RULE.
25        THEY WILL -- DO CHANGE.  ALMOST ALL LABELS CHANGE OVER TIME.
page 1167
1         Q.   NOW, LET ME PUT UP THE TIME LINE THAT YOU DID WITH
2         MR. RAFFERTY EARLIER.
3              SO WE HAVE THIS WHOLE PERIOD OF NINE YEARS OF DRUG
4         DEVELOPMENT INVOLVING VIOXX THAT YOU HAVE NO OPINIONS ABOUT,
5         RIGHT?
6         A.   I REVIEWED NO DOCUMENTS ABOUT THAT.
7         Q.   AND THEN YOU STARTED HERE IN MAY 1999 UPON THE APPROVAL OF
8         THE MEDICINE, RIGHT?
9         A.   YES.
10        Q.   APPROVAL BY THE FDA MEANS THAT THE AGENCY, AFTER REVIEWING
11        THE NEW DRUG APPLICATION, DETERMINES THAT VIOXX WAS SAFE AND
12        EFFECTIVE FOR ITS PROPOSED USE, CORRECT?
13        A.   ON THE BASIS OF THE INFORMATION DEVELOPED UP TO THAT POINT
14        IN TIME.
15        Q.   RIGHT.  NOW, SIR, YOU'RE NOT AWARE OF ANY CLINICAL TRIAL
16        PRIOR TO MARCH OF 2000 THAT SHOWED AN INCREASED RISK OF
17        MYOCARDIAL INFARCTIONS WITH VIOXX COMPARED TO ANY OTHER DRUG,
18        CORRECT?
19        A.   THOSE STUDIES WERE NOT ABLE TO SHOW WHETHER THERE WAS A
20        CARDIOVASCULAR RISK WITH VIOXX.
21        Q.   SO YOU'RE NOT AWARE OF ANY CLINICAL TRIAL BEFORE MARCH OF
22        2000 THAT SHOWED INCREASED CARDIOVASCULAR RISK WITH VIOXX
23        COMPARED TO ANY OTHER DRUG, RIGHT?
24        A.   THEY DIDN'T SHOW THAT BECAUSE THEY WEREN'T POWERED TO SHOW
25        SUCH A THING.
page 1168
1         Q.   BUT WE CAN AGREE THAT THERE WAS NO TRIAL THAT, IN FACT,
2         SHOWED SUCH A RISK.  CAN WE AGREE WITH THAT, SIR?
3         A.   THAT'S OBVIOUS BECAUSE, IF THEY ARE NOT POWERED, THEY ARE
4         NOT GOING TO SHOW IT.
5         Q.   ALL RIGHT.  SO THERE'S NO CLINICAL EVIDENCE BETWEEN MAY
6         '99 AND MARCH OF 2000 OF AN INCREASED CARDIOVASCULAR RISK WITH
7         VIOXX, RIGHT?
8         A.   THAT'S RIGHT.  THE INFORMATION CAME OUT TO A STATISTICALLY
9         SIGNIFICANT DEGREE WITH THE VIGOR STUDY.
10        Q.   RIGHT.  I THINK YOU TOLD THE JURY THAT MERCK LEARNED OF
11        THE VIGOR TRIAL IN THE FIRST QUARTER OF 2000.
12        A.   YES.
13        Q.   THEN YOU SAID MERCK THAT INFORMED FDA IN MARCH OF 2000?
14        A.   YES.
15        Q.   THEY ACTUALLY HAPPENED IN THE SAME MONTH, RIGHT, DOCTOR?
16        A.   AT SOME POINT -- OBVIOUSLY, MERCK LOOKED AT THE DATA
17        BEFORE THEY INFORMED FDA, SO AT SOME POINT IN THAT FIRST
18        QUARTER, THEY BECAME AWARE OF THE DATA.
19        Q.   DID THE PLAINTIFF LAWYERS IN YOUR EDUCATION MEETING BACK
20        IN SEPTEMBER TELL YOU THAT THE VIGOR TRIAL WAS UNBLINDED ON
21        MARCH 9, 2000?
22        A.   THE DRUG WAS UNBLINDED IN THE SENSE THAT THEY KNEW THAT
23        GROUP A TOOK ONE DRUG AND GROUP B ANOTHER, BUT ACTUALLY, THE
24        COMPANY WAS FULLY AWARE THAT THERE WAS GROUP A AND GROUP B FOR
25        A NUMBER OF YEARS, AND THEY WERE FOLLOWING ADVERSE REACTIONS
page 1169
1         OCCURRING IN EITHER GROUP A OR GROUP B.
2              NOW, MAYBE THEY DID NOT UNBLIND GROUP A OR B, BUT
3         ACTUALLY IT'S OFTEN NOT DIFFICULT TO FIGURE OUT WHICH GROUP IS
4         WHICH.  SO THEY WERE FOLLOWING ADVERSE REACTIONS BY GROUP
5         THROUGH THE ENTIRE CONDUCT OF THE VIGOR TRIAL.
6         Q.   DID YOU JUST SAY MERCK KNEW GROUP A AND GROUP B FOR A
7         NUMBER OF YEARS IN THE VIGOR TRIAL?
8         A.   YEAH, THEY KNEW THAT THERE WAS A GROUP A AND A GROUP B.
9         Q.   HOW LONG WAS THE TRIAL, DOCTOR?
10        A.   I DON'T KNOW EXACTLY HOW LONG IT WAS.  IT WAS A COUPLE
11        YEARS LONG.
12        Q.   SO YOU THINK THE VIGOR TRIAL WAS A COUPLE YEARS LONG?
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
13      A.   YEAH.
14      Q.   NO ONE TOLD YOU AT YOUR EDUCATION MEETING BACK IN
15 SEPTEMBER THAT, THE VIGOR TRIAL, THE AVERAGE LENGTH OF USE WAS
16 NINE MONTHS?
17      A.   THE AVERAGE LENGTH OF USE.  THAT DOESN'T MIND -- I MEAN,
18 THERE'S RECRUITMENT, THERE'S TREATMENT, AND THERE'S FOLLOW-UP.
19 SO THE TRIAL IS LONGER THAN THE AVERAGE LENGTH OF USE.
20      Q.   YOU DON'T KNOW, SIR, FROM YOUR REVIEW OF ANY DOCUMENTS IN
21 THIS CASE IS THAT MERCK KNEW OF A DIFFERENCE IN CARDIOVASCULAR
22 RISK BETWEEN VIOXX AND ANY DRUG PRIOR TO MARCH OF 2000,
23 CORRECT?
24      A.   WELL, I KNOW HOW THESE STUDIES ARE DONE, AND I KNOW THAT
25 THEY KNEW THERE WERE TWO GROUPS, GROUP A AND GROUP B, AND THEY
page 1170
1  MONITORED ADVERSE REACTIONS BY GROUP.  NOW, THOSE GROUPS MAY
2  NOT HAVE BEEN UNBLINDED, BUT IF YOU WANT TO KNOW THE REALITY,
3  THEY CAN FIGURE OUT PRETTY EASILY WHICH GROUP IS WHICH.
4       Q.   CAN YOU ANSWER MY QUESTION NOW?
5       A.   I'M SORRY.  WHAT'S YOUR QUESTION?
6       Q.   MY QUESTION WAS:  YOU DO NOT KNOW FROM REVIEW OF ANY
7  DOCUMENTS WITH RESPECT TO VIOXX THAT MERCK KNEW OF ANY
8  DIFFERENCE IN CARDIOVASCULAR EVENTS BETWEEN VIOXX AND NAPROXEN
9  PRIOR TO MARCH OF 2000?
10      A.   I DON'T KNOW OF ANY -- I DO NOT KNOW THAT FROM ANY OF THE
11 DOCUMENTS, THAT'S TRUE.
12      Q.   WHEN YOU WROTE YOUR REPORT IN THIS CASE BACK IN SEPTEMBER,
13 YOU DID NOT KNOW THAT MERCK HAD SOUGHT A LABELING CHANGE FOR
14 VIGOR IN JUNE OF 2000, CORRECT?
15      A.   I WAS NOT -- I DID HAVE A DOCUMENT AT THAT PARTICULAR TIME
16 THAT INDICATED FDA HAD MARKED UP A LABELING PROPOSAL IN
17 OCTOBER -- IN OCTOBER OF 2001, FDA MARKED UP A PRIOR LABELING
18 PROPOSAL THAT MERCK HAD SUBMITTED.  I DID NOT KNOW WHEN THAT
19 PROPOSAL WAS SUBMITTED.
20      Q.   ALL RIGHT.  LET ME MAKE SURE I ACTUALLY GET AN ANSWER TO
21 THE QUESTION.  WHEN YOU FORMED YOUR OPINIONS AND WROTE YOUR
22 REPORT IN THIS CASE, YOU DID NOT KNOW THAT MERCK SOUGHT A
23 LABELING CHANGE IN JUNE OF 2000 TO INCLUDE THE VIGOR
24 CARDIOVASCULAR RESULTS; ISN'T THAT TRUE, DOCTOR?
25      A.   I DON'T BELIEVE THAT'S CORRECT.  MERCK DID NOT SEEK TO
page 1171
1  INCLUDE THE VIGOR CARDIOVASCULAR RESULTS IN THE JUNE 2000
2  LABEL; IT SOUGHT TO TAKE OUT THE GI WARNING.
3       Q.   SIR, YOU SHOWED THE JURY AND WENT OVER WITH MR. RAFFERTY
4  THAT THE CARDIOVASCULAR DATA FROM VIGOR WERE INCLUDED IN THE
5  CLINICAL TRIAL SECTION OF THE JUNE 2000 PROPOSED LABEL.  DO YOU
6  RECALL SAYING THAT THIS MORNING?
7       A.   YES.
8       Q.   OKAY.  SO GOING BACK TO MY QUESTION, WHEN YOU FORMED YOUR
9  OPINION IN THIS CASE REGARDING MERCK'S DILIGENCE WITH RESPECT
10 TO LABELINGS, YOU WERE NOT AWARE THAT MERCK SOUGHT A LABEL
11 CHANGE IN JUNE OF 2000 TO INCLUDE THE VIGOR CARDIOVASCULAR
12 RESULTS; ISN'T THAT CORRECT?
13      A.   WELL, AS I SAY, I HAD THIS DOCUMENT THAT THE FDA PUT OUT
14 IN OCTOBER OF 2001.  THAT DOCUMENT HAD A MARKUP OF A LABEL
15 SUBMISSION THAT MERCK MADE.  IN MY OPINION, THAT LABEL
16 SUBMISSION WAS INADEQUATE AS FAR AS EXPRESSING ANY INFORMATION
17 ABOUT CARDIOVASCULAR RISKS.  SO I DIDN'T KNOW THE EXACT DATE
18 THAT THAT SUBMISSION WAS SENT TO THE FDA; THAT'S TRUE.
19      Q.   SIR, WHEN YOU WROTE YOUR REPORT AND FORMED YOUR OPINION,
20 YOU THOUGHT MERCK DID NOTHING BETWEEN MARCH OF 2000 AND OCTOBER
21 OF 2001 WITH RESPECT TO VIGOR LABELING; ISN'T THAT TRUE?
22      A.   I DID REVIEW DOCUMENTS IN THE ORIGINAL DOCUMENTS THAT I
23 WAS GIVEN IN WHICH THE FDA SUBMITTED A LABELING PROPOSAL, AND
24 THAT LABELING PROPOSAL TOOK THE FORM OF MARKING UP A PRIOR
25 MERCK LABELING PROPOSAL.  SO I KNEW THEY SUBMITTED A LABELING
page 1172
1  PROPOSAL.
2       Q.   SIR, DID YOU TESTIFY ON SEPTEMBER 30, 2005 -- FIRST THE
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
3          QUESTION:
4                    "Q.  DO YOU KNOW AS YOU SIT HERE TODAY WHETHER MERCK
5               EVER DID SUBMIT TO THE FDA PROPOSED LABEL CHANGES AFTER
6               THE UNBLINDING OF VIGOR AND BEFORE OCTOBER 2001?"
7                    "A.  I DON'T KNOW THAT AT THIS TIME."
8          Q.  ISN'T THAT CORRECT?
9          A.  LET ME GO OVER WHAT I WAS SAYING.
10         Q.  WELL, FIRST CAN YOU TELL THE JURY WHETHER THAT WAS YOUR
11         SWORN TESTIMONY.
12         A.  I ACCEPT YOUR WORD THAT THAT WAS MY SWORN TESTIMONY.  WHAT
13         I AM SAYING IS THAT I WAS AWARE, AS PART OF THE DOCUMENTS THAT
14         I REVIEWED FOLLOWING THAT MEETING WITH THE LAWYERS, THAT THERE
15         WAS AN FDA MARKUP OF A PRIOR MERCK LABEL, AND I MADE THE
16         JUDGMENT THAT THAT PRIOR MERCK LABEL -- AND I DID NOT KNOW --
17         IT WAS NOT DATED, SO I DID NOT KNOW WHEN IT WAS SUBMITTED.  BUT
18         I MADE A JUDGMENT THAT THAT PRIOR MERCK LABEL WAS INADEQUATE AS
19         FAR AS EXPRESSING ANY CARDIOVASCULAR RISKS.
20         Q.  SIR, THAT'S AN OPINION YOU REACHED AFTER SOMEONE EXPLAINED
21         TO YOU YOU WERE WRONG WHEN YOU TESTIFIED AT YOUR DEPOSITION
22         THAT THERE WAS NO MERCK INITIATIVE ON LABELING AFTER THE VIGOR
23         TRIAL.
24         A.  I MADE -- NO.  YOU ARE INCORRECT.
25         Q.  SIR, HOW DID YOU LEARN ABOUT THE -- WELL, LET ME ASK THIS
page 1173
1          QUESTION.  DO YOU REMEMBER THIS MORNING --
2          A.  I WOULD LIKE TO EXPLAIN WHY YOU ARE INCORRECT.
3          Q.  I WITHDREW MY QUESTION.  DO YOU REMEMBER THIS MORNING YOU
4          AND MR. RAFFERTY KEPT TALKING ABOUT THIS JUNE 2000 LABELING
5          PROPOSAL?
6          A.  YES.
7          Q.  YOU REMEMBER YOU TESTIFIED AT YOUR DEPOSITION YOU DIDN'T
8          THINK THERE WAS A MERCK LABEL PROPOSAL BETWEEN MARCH OF 2000
9          AND OCTOBER OF 2001?
10         A.  IT'S TRUE THAT I WAS NOT AWARE OF DATES BECAUSE THIS
11         DOCUMENT THAT THE FDA MARKED UP WAS NOT DATED, AND SO I
12         ANSWERED THAT QUESTION -- WHEN I ANSWERED THAT QUESTION, I WAS
13         UNCERTAIN.
14         Q.  CORRECT.
15         A.  BUT I DID EXAMINE THAT DOCUMENT AND I DID MAKE THE
16         JUDGMENT THAT THE FDA MARKUP OF THE MERCK LABEL WAS INADEQUATE
17         AS FAR AS EXPRESSING CARDIOVASCULAR WARNINGS.
18         Q.  RIGHT.  BUT WHEN YOU FORMED YOUR OPINIONS ABOUT MERCK'S
19         DILIGENCE HERE, YOU DIDN'T KNOW THERE WAS ANY MERCK INITIATIVE
20         BETWEEN MARCH OF 2000 AND OCTOBER 2001.
21         A.  I DID NOT KNOW THE DATES THAT IT CAME OUT, YES.
22         Q.  RIGHT.  WHEN THE HALF-DOZEN PLAINTIFF LAWYERS, BACK IN
23         SEPTEMBER, WERE GIVING YOU GUIDANCE ABOUT YOUR REPORT, THAT WAS
24         A FACT THEY LEFT OUT, WASN'T IT, DOCTOR?
25         A.  I WENT THROUGH THOSE DOCUMENTS MYSELF.
page 1174
1          Q.  RIGHT.  WELL, LET'S ANSWER MY QUESTION.  WHEN THE
2          PLAINTIFF LAWYERS WERE GIVING YOU GUIDANCE ABOUT WHAT TO
3          INCLUDE IN YOUR REPORT, THEY DID NOT TELL YOU THAT MERCK HAD
4          UNDERTAKEN ANY LABELING INITIATIVE BETWEEN MARCH OF 2000 AND
5          OCTOBER 2001; ISN'T THAT CORRECT?
6          A.  ACTUALLY, I DON'T REMEMBER.  WHAT I REMEMBER FROM THAT
7          MEETING WAS THAT THEY WANTED ME TO ADDRESS CERTAIN ISSUES.  AT
8          THAT MEETING, THEY ALSO GAVE ME 80-SOMETHING DOCUMENTS TO LOOK
9          THROUGH.  I WENT THROUGH THOSE 80-SOMETHING DOCUMENTS MYSELF, I
10         CAME TO MY OWN CONCLUSIONS ABOUT WHAT THEY MEANT, AND I WROTE
11         MY OWN REPORT.
12         Q.  THE DOCUMENTS THAT THE LAWYERS CHOSE TO GIVE YOU FAILED TO
13         ALERT YOU THAT MERCK HAD DONE ANYTHING IN THIS PERIOD OF TIME,
14         RIGHT?
15         A.  THE DOCUMENT THAT I GOT IN REGARDS TO THIS LABELING THAT
16         WAS MARKED UP BY THE FDA WAS INDEED UNDATED, AND THAT WAS A
17         DISADVANTAGE TO ME, IT WAS.
18         Q.  NOW, IN RESPONSE TO A MANUFACTURER'S REQUEST FOR A LABEL
```

Exhibit A - Plunkett Trial Testimony Excerpts

• **Kapit Motion**

```
19        CHANGE, THE FDA CAN ASSIGN DIFFERENT PRIORITY REVIEW PERIOD.
20        ISN'T THAT CORRECT?
21        A.   YES.
22        Q.   THEY CAN ASSIGN A STANDARD REVIEW PERIOD OR THEY CAN
23        ASSIGN A PRIORITY EXPEDITED REVIEW, CORRECT?
24        A.   WELL, IN THIS PARTICULAR CASE, IT IS NOT A PRIORITY
25        REVIEW.  "PRIORITY REVIEW REPORTING" IS A TERM THAT IS RESERVED
page 1175
1         FOR AN NDA.  AN NDA CAN GET A PRIORITY REVIEW.
2                 YOU USED THE WORD "EXPEDITED," AND I WOULD LIKE TO
3         EXPLAIN WHAT THE WORD "EXPEDITED" MEANS IN THIS CONTEXT; THAT
4         A -- CERTAIN KINDS OF SUPPLEMENTS LIKE, FOR EXAMPLE,
5         SUPPLEMENTS WHICH THE MANUFACTURER WISHES TO CANCEL A WARNING,
6         REQUIRED FDA PRIOR REVIEW, AND A MANUFACTURER CAN REQUEST AN
7         EXPEDITED PRIOR REVIEW OF, FOR EXAMPLE, A REQUEST TO TAKE OUT A
8         WARNING.
9         Q.   YOU ALREADY TESTIFIED THAT THE JUNE 2000 LABEL PROPOSAL BY
10        MERCK DID IN FACT INCLUDE THE CARDIOVASCULAR DATA FROM VIGOR,
11        CORRECT?
12        A.   IT INCLUDED SOME CARDIOVASCULAR DATA FROM VIGOR, YES.
13        Q.   DO YOU KNOW, SIR, WHETHER OR NOT MERCK SOUGHT AN EXPEDITED
14        REVIEW BY FDA OF THAT PROPOSED LABEL CHANGE?
15        A.   THE CLINICAL STUDIES SECTION WAS PRIMARILY -- WELL, THE
16        LABEL SUBMISSION THAT CONTAINED THIS VERY MINIMAL INFORMATION
17        ABOUT CARDIOVASCULAR EVENTS AND NO INFORMATION ABOUT THE RISKS,
18        WHICH ALSO CONTAINED IN THE SAME SUBMISSION THE REQUEST THAT
19        THE NDA ELIMINATE A WARNING, THAT MERCK WANTED AN EXPEDITED
20        REVIEW AND OBVIOUSLY THEY WANTED THE WARNING TAKEN OUT AS SOON
21        AS POSSIBLE.
22        Q.   DO YOU NOW KNOW, SIR, THAT MERCK SOUGHT AN EXPEDITED
23        REVIEW BY FDA TO APPROVE A LABEL THAT WOULD HAVE INCLUDED THE
24        CARDIOVASCULAR INFORMATION FROM VIGOR?
25        A.   AND THE MAIN THING THAT IT WOULD HAVE INCLUDED WAS THE
page 1176
1         ELIMINATION OF A WARNING THAT MERCK WANTED TO HAVE TAKEN OUT.
2         Q.   SIR --
3         A.   SO YOUR IMPLICATION HERE THAT THE CARDIOVASCULAR PART OF
4         THIS WAS THE REASON THEY ASKED FOR EXPEDITED REVIEW, I MEAN,
5         THAT'S HIGHLY IMPLAUSIBLE.  THEY HAD A BIG GASTROINTESTINAL
6         WARNING THAT THEY WANTED TAKEN OUT.
7                 MR. ISMAIL:  YOUR HONOR, MY QUESTION WAS VERY SIMPLE.
8                 THE COURT:  DOCTOR, LET'S SEE IF WE CAN STICK WITH
9         THE QUESTION.  WE HAVE TO FINISH SOMETIME SOON.
10                MR. ISMAIL:  YES, SIR.  I'M DOING THE BEST I CAN.
11        BY MR. ISMAIL:
12        Q.   THE QUESTION, SIR:  DO YOU NOW KNOW THAT MERCK SOUGHT
13        EXPEDITED REVIEW OF THE JUNE 2000 PROPOSED LABELING THAT WOULD
14        HAVE INCLUDED CARDIOVASCULAR DATA FROM THE VIGOR TRIAL?  YES OR
15        NO.
16        A.   THAT'S ONE OF THE THINGS THAT THE NEW LABEL WOULD HAVE
17        INCLUDED.
18        Q.   DO YOU KNOW WHAT FDA'S RESPONSE WAS TO MERCK'S REQUEST TO
19        EXPEDITE REVIEW OF THE PROPOSED LABEL THAT WOULD HAVE INCLUDED
20        THE CARDIOVASCULAR DATA?
21        A.   THE FDA DID NOT GRANT IT AND THE --
22        Q.   I THINK THAT ANSWERS THE QUESTION.
23        A.   THAT WAS A SMALL PART OF THAT LABEL AND ONE THAT DIDN'T
24        TALK ABOUT ANY RISKS.
25                MR. ISMAIL:  MOVE TO STRIKE, YOUR HONOR.
page 1177
1                 THE COURT:  IT'S GRANTED.
2         BY MR. ISMAIL:
3         Q.   DOCTOR, YOU -- BY THE WAY, WHEN DID YOU FIND OUT THAT
4         MERCK, IN FACT, HAD SOUGHT A LABELING CHANGE IN JUNE 2000?
5         A.   SOMETIME WITHIN THE LAST MONTH OR TWO.  I'M NOT SURE
6         EXACTLY WHEN IT WAS.
7         Q.   ALL RIGHT.  SO SOMEONE POINTED THAT OUT TO YOU?
8         A.   YES.
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
 9      Q.   DID YOU TESTIFY THIS MORNING THAT YOU HEARD OR READ
10      DR. SCHIRMER'S TESTIMONY THAT HE READS THE CONTRAINDICATIONS,
11      WARNINGS, AND PRECAUTIONS SECTION OF A LABEL?
12      A.   YES, I DID.  SOMEONE TOLD ME THAT HE DID SAY THAT.
13      Q.   ALL RIGHT.  SO YOU WEREN'T ACTUALLY IN COURT WHEN
14      DR. SCHIRMER WAS TESTIFYING.
15      A.   NO.
16      Q.   YOU DIDN'T READ THE TRANSCRIPT?
17      A.   NO.
18      Q.   ONE OF THE LAWYERS TOLD YOU THAT THE TESTIMONY OCCURRED
19      AND THEY WERE GOING TO ASK YOU ABOUT IT ON THE STAND?
20      A.   THEY MENTIONED TO ME THAT'S WHAT HE SAID.
21      Q.   RIGHT.
22      A.   AND I HEARD THAT DURING CONVERSATIONS -- ACTUALLY, I DON'T
23      KNOW IF THEY WERE TELLING IT TO ME OR TALKING AMONG EACH OTHER,
24      BUT I HEARD THAT.
25      Q.   RIGHT.  THEY ASKED YOU THE QUESTION TODAY.  IT WASN'T A
page 1178
 1      SURPRISE TO YOU WHEN MR. RAFFERTY ASKED YOU TO CONFIRM THAT
 2      DR. SCHIRMER REVIEWED THE PRECAUTIONS, WARNINGS, AND
 3      CONTRAINDICATIONS SECTIONS, RIGHT?
 4      A.   I DIDN'T THINK THAT WAS THE MAIN POINT OF THAT QUESTION,
 5      BUT I HAPPEN TO HAVE KNOWN THAT FACT.
 6      Q.   ALL RIGHT.  SO YOU KNOW, SIR, THAT THE APRIL 2002 LABEL
 7      THAT WAS APPROVED BY FDA HAD THE VIGOR CARDIOVASCULAR DATA IN
 8      THE PRECAUTIONS SECTION?
 9      A.   YEAH.  I GUESS THE FDA AGREED TO PUT IT THERE.
10      Q.   RIGHT.  SO WHATEVER YOU THINK ABOUT WHERE THE CV DATA
11      SHOULD HAVE GONE, WE CAN AT LEAST AGREE --
12      A.   NOT JUST ME; THE FDA.
13      Q.   WELL, THE FDA, SIR, IS THE ONE THAT APPROVED THE LABEL --
14      A.   THEY WANTED IT IN WARNINGS.
15      Q.   THE FDA APPROVED THE LABEL, CORRECT?
16      A.   EVENTUALLY.
17      Q.   THE FDA APPROVED A LABEL THAT INCLUDED THE CARDIOVASCULAR
18      DATA IN THE PRECAUTIONS SECTION, CORRECT?
19      A.   YES.
20      Q.   NOW, DID THE LAWYERS TELL YOU OR DID YOU OVERHEAR THEM
21      TALKING THAT DR. SCHIRMER TESTIFIED THAT, AFTER THE
22      CARDIOVASCULAR DATA WAS IN THE PRECAUTIONS SECTION, HE KEPT
23      PRESCRIBING VIOXX?
24      A.   I BELIEVE I DID HEAR SOMETHING LIKE THAT, YES.
25      Q.   NOW, YOU AND MR. RAFFERTY WERE TALKING ABOUT A DIFFERENT
page 1179
 1      EXPERIENCE MERCK HAD WITH RESPECT TO VIOXX AND THIS QUESTION OF
 2      CHANGES BEING EFFECTED LABEL CHANGES.  DO YOU RECALL THAT?
 3      A.   "A DIFFERENT EXPERIENCE"?  I'M NOT SURE WHAT YOU MEAN.
 4      Q.   I THINK YOU TOLD MR. RAFFERTY THAT YOU SAW DOCUMENTS IN
 5      THIS CASE TO SHOW YOU THAT MERCK KNEW HOW TO DO A CHANGES BEING
 6      EFFECTED IF IT WANTED TO.
 7      A.   MERCK CERTAINLY KNEW THAT.
 8      Q.   YOU MADE SPECIFIC REFERENCE TO AN APPLICATION THAT MERCK
 9      FILED IN THAT REGARD, RIGHT?
10      A.   YES.
11      Q.   THAT WAS WITH RESPECT TO VIOXX, CORRECT?
12      A.   YES.
13      Q.   DO YOU RECALL WHAT THE CIRCUMSTANCES WERE, AT LEAST WITH
14      RESPECT TO WHAT MERCK SOUGHT TO DO THROUGH, THAT CHANGES BEING
15      EFFECTED APPLICATION?
16      A.   MERCK SOUGHT TO ADD A STATEMENT TO WARNINGS.
17      Q.   ARE YOU SURE ABOUT THAT?
18      A.   I'M NOT COMPLETELY SURE ABOUT THAT.
19      Q.   I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS DEFENDANT'S
20      EXHIBIT 942.  DID YOU GET A CHANCE TO LOOK AT THAT DOCUMENT,
21      SIR?
22      A.   THIS IS A LONG DOCUMENT.  WOULD YOU LIKE TO POINT ME TO
23      THE PARTS THAT YOU WANT ME TO FOCUS ON.
24      Q.   THE LETTER ON PAGE 2 IS A GOOD PLACE TO START.
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
25      A.   GO AHEAD.
page 1180
1       Q.   LET ME ASK THIS:  DO YOU RECOGNIZE EXHIBIT 942 AS THE
2       CHANGES BEING EFFECTED APPLICATION THAT MERCK SUBMITTED TO THE
3       AGENCY ON A DIFFERENT ISSUE REGARDING VIOXX?
4       A.   I DID NOT REVIEW THIS WHOLE DOCUMENT.
5       Q.   DID YOU REVIEW ANY OF IT?
6       A.   I THINK I MAY HAVE SEEN A PAGE OR TWO FROM IT.  BUT AGAIN,
7       I'M NOT COMPLETELY SURE ABOUT THAT.
8       Q.   WHEN YOU TOLD MR. RAFFERTY THAT YOU HAD SEEN A DOCUMENT IN
9       THIS CASE --
10      A.   YES.
11      Q.   -- WHICH SHOWED YOU THAT MERCK KNEW HOW TO DO A CHANGES
12      BEING EFFECTED LABEL CHANGE --
13      A.   THAT'S CORRECT.
14      Q.   -- DID YOU OR DID YOU NOT SEE A DOCUMENT?
15      A.   I SAW A PAGE OR TWO, WHICH MAY BE FROM THIS DOCUMENT, BUT
16      I JUST SAW A PAGE OR TWO.
17      Q.   WELL, DID YOU SEE THE FRONT OF IT WHERE IT SAYS "VIOXX,"
18      RIGHT?
19      A.   I'M SORRY.  WHICH PAGE WERE WE ON?
20      Q.   I'M ON THE COVER LETTER DATED OCTOBER 6, 1999.
21      A.   OKAY.
22      Q.   WE SEE THIS IS A VIOXX CHANGES BEING EFFECTED?
23      A.   CHANGES BEING EFFECTED SUPPLEMENT.
24      Q.   IS THIS THE ONE PAGE YOU LOOKED AT THAT SUPPORTED YOUR
25      TESTIMONY THIS MORNING?
page 1181
1       A.   NO.  I LOOKED AT A PAGE THAT HAD TO DO WITH THE CHANGES
2       THAT MERCK WAS PROPOSING.
3       Q.   WELL, DO YOU RECOGNIZE AT LEAST THE FORM OF THIS
4       APPLICATION, EXHIBIT 942, AS A CHANGES BEING EFFECTED
5       APPLICATION?
6       A.   YES, THIS IS A CHANGES BEING EFFECTED APPLICATION.
7       Q.   NOW, THIS IS A BIG DOCUMENT, SIR, AND YOU'VE SEEN THESE
8       BEFORE, RIGHT, IN OTHER CONTEXTS?
9       A.   YES.
10      Q.   WHAT THE MANUFACTURER DOES FOR THE AGENCY IS IT INCLUDES
11      THE EXISTING LABELING AND THEN INCLUDES A MARKUP OF THE
12      PROPOSED CHANGES, RIGHT?
13      A.   YES.  THAT'S WHAT I SAW WAS A MARKUP OF PROPOSED CHANGES,
14      A COUPLE OF PAGES FROM THE MARKUP OF PROPOSED CHANGES.
15      Q.   THAT BEGINS ON PAGE -- IT'S BATES PAGE 416.
16      A.   RIGHT.  YES.
17      Q.   OKAY.
18      A.   I SAW -- THIS IS MUCH CLOSER TO THE PART I LOOKED AT, YES.
19      Q.   IF YOU THUMB THROUGH THIS DOCUMENT THEREAFTER, IF I'M
20      DOING THIS RIGHT, I'M LOOKING FOR SOME RED-LINE CHANGES TO THE
21      DOCUMENT TO HIGHLIGHT WHERE THE CHANGES ARE.  RIGHT?
22      A.   YES.  CAN YOU POINT ME TO THOSE?
23      Q.   WELL, FIRST GO TO PAGE 10 OF THE MARKUP WHERE IT SAYS
24      "WARNINGS."
25           IT'S ON THE SCREEN, SIR, IF THAT CAN HELP DIRECT YOUR
page 1182
1       ATTENTION.
2       A.   YES.
3       Q.   THAT STARTS THE WARNING SECTION OF THE LABEL?
4       A.   THAT'S CORRECT.
5       Q.   THEN WE GO FORWARD AND SEE THERE ARE NO CHANGES IN THIS
6       CHANGES BEING EFFECTED APPLICATION, RIGHT?  ON THE WARNINGS
7       SECTION.
8       A.   I DO NOT SEE ANY CHANGES IN THE WARNINGS, RIGHT.
9       Q.   ALL RIGHT.  THEN WE GO TO PRECAUTIONS.  THAT'S THE NEXT
10      SECTION, RIGHT?
11      A.   RIGHT.
12      Q.   WE THUMB THROUGH THAT AND WE ARE LOOKING FOR THE CHANGE,
13      RIGHT?
14      A.   YES, WE ARE LOOKING FOR THE CHANGE, AND I DON'T SEE IT
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
15      YET.
16      Q.   WHEN YOU GET TO PAGE 15, AND THERE IT IS.  DO YOU SEE IT
17      THERE AT THE TOP?
18      A.   YES.  THE DOUBLE UNDERLINE IS THE NEW LANGUAGE.  IS THAT
19      WHAT YOU ARE REFERRING TO, THE LANGUAGE THAT'S
20      DOUBLE-UNDERLINED THERE?
21      Q.   CORRECT.  THIS IS IN A SECTION CALLED "DRUG INTERACTIONS,"
22      RIGHT?
23      A.   YES, THAT'S CORRECT.
24      Q.   THIS IS WITH RESPECT TO A DRUG KNOWN AS WARFARIN?
25      A.   YES.
page 1183
1       Q.   THAT'S COUMADIN?
2       A.   AN INTERACTION WITH WARFARIN, RIGHT, YES.
3       Q.   RIGHT.  SO THIS IS IN NOT THE WARNINGS SECTION, NOT THE
4       CONTRAINDICATION SECTION, BUT IN THIS DRUG INTERACTION SECTION,
5       RIGHT?
6       A.   YOU'RE CORRECT, THAT'S WHERE IT WAS.
7       Q.   MERCK IS PROPOSING HERE TO ADD ONE SENTENCE, RIGHT?
8       A.   THERE IS A SENTENCE HERE -- GO AHEAD.
9       Q.   ALL RIGHT.  THEN, JUST TO MAKE SURE WE UNDERSTAND ALL THE
10      CHANGES BEING PROPOSED HERE, IF YOU TURN THE PAGE, THE MERCK,
11      THERE, THE DOUBLE UNDERLINE, WANTED TO ADD TO THE LABEL, A
12      1-800 NUMBER FOR FOLKS TO CALL IN IF THEY HAD CONCERNS ABOUT
13      TAKING THE DRUG WHILE THEY WERE PREGNANT, RIGHT?
14      A.   UH-HUH.
15      Q.   IF YOU GO FORWARD, NO CHANGES FOR A WHILE UNTIL WE GET TO
16      A SECTION CALLED "POST-MARKETING EXPERIENCE," AND THEN WE SEE
17      ONE ADDITIONAL SENTENCE MORE THAT MERCK SOUGHT TO INCLUDE,
18      RIGHT?
19      A.   YES.
20      Q.   NOW, LIKE, TAKE, FOR EXAMPLE, THIS "POST-MARKETING
21      EXPERIENCE" SENTENCE.  THAT WAS INCREASING THE SAFETY
22      INFORMATION CONTAINED IN THE LABEL, RIGHT?
23      A.   I AM NOT SURE THIS IS THE DOCUMENT THAT I'VE SEEN.  THE
24      DOCUMENT THAT I SAW HAD A CHANGE TO ANAPHYLACTIC REACTIONS.
25      DOES THIS DOCUMENT HAVE A CHANGE TO ANAPHYLACTIC REACTIONS?
page 1184
1       Q.   I'LL GIVE YOU A SECOND TO LOOK AND YOU CAN TELL ME.
2       A.   IT DOESN'T SEEM TO HAVE ANY CHANGES IN ANAPHYLACTIC, AND
3       THAT IS PART OF WARNINGS.
4            SO WHAT I HAD SEEN IS A DOCUMENT WHICH INVOLVED A
5       CHANGE TO THE ANAPHYLACTIC REACTION SECTION OF WARNINGS.  I
6       HAVE NOT SEEN THIS DOCUMENT BEFORE.
7       Q.   ALL RIGHT.  NOW THAT YOU HAVE REVIEWED IT, YOU SAW THAT,
8       IN THIS OCTOBER 1999 CHANGES BEING EFFECTED APPLICATION, MERCK
9       SOUGHT TO ADD ONE SENTENCE TO A DRUG INTERACTION WITH WARFARIN,
10      A 1-800 NUMBER, AND THIS ONE SENTENCE HERE IN POST-MARKETING
11      EXPERIENCE.  RIGHT?
12      A.   YES.
13      Q.   BASED ON YOUR REVIEW OF THIS DOCUMENT, SIR, AND THE PRIOR
14      TESTIMONY, DO YOU THINK THIS IS THE TYPE OF CHANGE THAT CAN BE
15      EFFECTED THROUGH A CBE APPLICATION?
16      A.   IT APPEARS TO BE A POSSIBLE CBE, YES.
17      Q.   WELL, SIR, THIS IS FAR LESS OF A CHANGE TO THE VIOXX LABEL
18      THAN WOULD HAVE BEEN CALLED FOR BY PUTTING IN A BRAND-NEW
19      SECTION ON CARDIOVASCULAR RISKS AND DETAILING ALL THE DATA FROM
20      VIGOR AND ALL THE OTHER DATA THAT EXISTED AS OF THAT TIME ON
21      VIOXX; ISN'T THAT RIGHT?
22      A.   I HAVE NEVER SEEN THIS DOCUMENT BEFORE.  I DO NOT WANT TO
23      MAKE ANY STATEMENT SUCH AS YOU'RE MAKING WITHOUT HAVING A
24      CHANCE TO REVIEW THIS DOCUMENT AND WHAT ITS IMPLICATIONS ARE.
25           I DO WANT TO SAY THAT REGULATIONS ARE VERY SPECIFIC
page 1185
1       AND GUIDELINES ARE VERY SPECIFIC THAT CBE APPLICATIONS CAN BE
2       DONE FOR WARNINGS, CONTRAINDICATIONS, AND PRECAUTIONS --
3       Q.   CERTAINLY TO ADD ONE --
4       A.   -- AND SHOULD BE DONE.  NOW, WHAT HAPPENED IN THIS
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
5        PARTICULAR CASE, I DON'T KNOW.  I'VE NEVER SEEN THIS DOCUMENT
6        BEFORE.
7        Q.   SO WHEN YOU WERE TALKING ABOUT THIS ONE EXPERIENCE WITH
8        VIOXX AND THE CHANGES BEING EFFECTED, YOU WERE THINKING ABOUT
9        SOMETHING ELSE?
10       A.   THAT'S RIGHT.
11       Q.   I GUESS WE'LL FIND OUT WHAT HAPPENED WITH THIS STORY FOR
12       ANOTHER WITNESS.
13              MR. BIRCHFIELD:  OBJECTION.
14              THE COURT:  MOVE TO STRIKE.
15              MR. ISMAIL:  YES, SIR.  JUST GIVE ME ONE SECOND, YOUR
16       HONOR.
17              THE COURT:  OKAY.
18       BY MR. ISMAIL:
19       Q.   NOW, ON THE TIME LINE THAT YOU DID WITH MR. RAFFERTY, WE
20       KNOW SOMETIME AFTER JUNE 2000 MERCK SOUGHT AN EXPEDITED REVIEW
21       OF THE LABEL CHANGE, RIGHT?
22       A.   OF THE LABEL CHANGE THEY PROPOSED AT THAT TIME, YES.
23       Q.   DO YOU RECALL THAT WAS IN AUGUST OF 2000 THAT MERCK SOUGHT
24       EXPEDITED REVIEW?
25       A.   OH, I'M NOT SURE EXACTLY WHEN THEY SOUGHT THE EXPEDITED
page 1186
1        REVIEW.
2        Q.   ALL RIGHT, DOCTOR.
3        A.   BUT THEY SUBMITTED THE PROPOSAL IN JUNE AND YOU'RE TELLING
4        ME THAT THEY HAD ASKED FOR EXPEDITED IN AUGUST.
5        Q.   WELL, YOU KNOW THERE'S SOME DATE MISSING FROM THE TIME
6        LINE WITH RESPECT TO MERCK SEEKING AN EXPEDITED REVIEW, RIGHT?
7        A.   I DON'T KNOW WHEN MERCK ACTUALLY SUBMITTED THAT REQUEST.
8        Q.   ALL RIGHT.  THEN WE SEE SOME OTHER DATES ON HERE.  AM I
9        CORRECT, SIR, THAT YOU AND MR. RAFFERTY DID NOT INDICATE ANY
10       ADDITIONAL MERCK-INITIATED LABEL CHANGES BETWEEN JUNE OF 2000
11       AND APRIL OF 2002?
12       A.   THERE WAS A LABEL CHANGE THAT CAME OUT FOLLOWING THE
13       ADVISORY COMMITTEE MEETING IN FEBRUARY.  I BELIEVE IT WAS
14       SUBMITTED IN MARCH 2001.
15       Q.   ALL RIGHT.  SO, FOR SOME REASON, THERE'S A DATE MISSING
16       FROM THIS TIME LINE OF ANOTHER LABEL CHANGE SOUGHT BY MERCK,
17       RIGHT?
18       A.   YES.
19       Q.   YOU SAY THAT WAS IN MARCH 2001?
20       A.   I BELIEVE SO.
21       Q.   DID YOU LOOK AT THAT LABEL CHANGE?
22       A.   YES.
23       Q.   WHEN YOU TESTIFIED BACK IN SEPTEMBER THAT MERCK DID
24       NOTHING BETWEEN MARCH OF 2000 AND APRIL -- SORRY.  WHEN YOU
25       TESTIFIED BACK IN SEPTEMBER THAT MERCK DID NOTHING BETWEEN
page 1187
1        MARCH 2000 AND OCTOBER 2001, YOU DIDN'T KNOW ABOUT THE MARCH
2        2001 LABEL, CORRECT?
3        A.   ONCE AGAIN, I WAS NOT CLEAR ON THE DATE OF THE FDA MARKUP
4        OF THAT PRIOR MERCK LABEL, SO I WAS NOT AWARE OF THE DATES THAT
5        THIS HAPPENED.
6        Q.   WELL, THERE ARE TWO LABELS, SIR.
7        A.   RIGHT.
8        Q.   SO YOU DESCRIBED SOME DOCUMENT IN YOUR FILE THAT YOU
9        DIDN'T KNOW THE DATE OF BACK WHEN YOU WERE FORMING YOUR
10       OPINIONS, RIGHT?
11       A.   RIGHT.
12       Q.   YOU TOLD US 20 MINUTES AGO THAT YOU LATER LEARNED THAT WAS
13       THE JUNE 2000 APPLICATION, RIGHT?
14       A.   I BELIEVE, ACTUALLY, IT WAS THE MARCH 2001 APPLICATION
15       THAT WAS MARKED UP.
16       Q.   SO YOU DIDN'T HAVE THE JUNE 2000 APPLICATION IN YOUR FILES
17       WHEN YOU FORMED YOUR OPINIONS IN THIS CASE?
18       A.   I BELIEVE THAT IT WAS NOT.  I BELIEVE IT WAS THE MARKUP OF
19       THE MARCH 2001.
20       Q.   OKAY.  WELL, THANK YOU FOR THAT CLARIFICATION.  SO WHEN
```

Exhibit A - Plunkett Trial Testimony Excerpts

• **Kapit Motion**

```
21        YOU AND MR. RAFFERTY WENT THROUGH THIS JUNE 2000 APPLICATION
22        THIS MORNING AND YOU GAVE YOUR OPINIONS ON IT TO THIS JURY,
23        THOSE ARE NOT OPINIONS YOU HAD BACK WHEN YOU ACTUALLY WROTE
24        YOUR REPORT, RIGHT?
25        A.   AT THE TIME I WROTE THE ORIGINAL REPORT, NO.
page 1188
1         Q.   SO YOU TESTIFIED IN SEPTEMBER THAT YOU DIDN'T KNOW OF ANY
2         OTHER MERCK-INITIATED LABEL CHANGES AND NOW YOU KNOW THAT THERE
3         WERE IN FACT TWO MERCK-INITIATED LABEL CHANGES, RIGHT?
4         A.   I BELIEVE WHAT I WAS ASKED THIS MORNING WAS WHETHER THERE
5         WERE WARNINGS, PRECAUTIONS, OR CONTRAINDICATIONS ADDRESSING
6         CARDIOVASCULAR RISKS AT ANY TIME, AND I CERTAINLY KNEW AS OF
7         THIS MORNING THAT THEY WERE NOT THERE.
8         Q.   SIR, WE'VE ALREADY LOOKED AT YOUR TESTIMONY FROM SEPTEMBER
9         WHERE YOU SAID YOU WERE NOT AWARE OF ANY MERCK-INITIATED LABEL
10        CHANGES, WHEN YOU FORMED YOUR OPINIONS IN THIS CASE, BETWEEN
11        MARCH AND OCTOBER.  DO YOU RECALL THAT?
12        A.   BETWEEN MARCH 2000?
13        Q.   AND OCTOBER 2001.
14        A.   AND OCTOBER 2001.  I KNEW THAT THERE WAS ONE.  I SAW THAT
15        THERE WAS ONE.  I WASN'T SURE OF THE DATE OF IT.
16        Q.   SIR, DO I HAVE TO SHOW YOU YOUR DEPOSITION AGAIN WHERE YOU
17        WERE ASKED SPECIFICALLY BY COUNSEL:
18             "Q.  ARE YOU AWARE OF ANY MERCK-INITIATED LABEL
19             CHANGES BETWEEN MARCH 2000 AND OCTOBER 2001?"
20             "A.  I'M NOT AWARE OF ANY."
21        A.   I WAS NOT AWARE OF THE DATE THAT THAT DOCUMENT WAS
22        SUBMITTED.
23        Q.   FINE.  SO THAT, YOU NOW SAY, IS THE MARCH 2001 CHANGE?
24        A.   I BELIEVE IT'S THE MARCH ONE.
25        Q.   THAT LABEL CHANGE IS NOT ON MR. RAFFERTY'S TIME LINE,
page 1189
1         RIGHT?
2         A.   APPARENTLY NOT.
3         Q.   DO YOU KNOW WHY COUNSEL CHOSE NOT TO SHARE THAT WITH THE
4         JURY?
5         A.   I DO NOT.
6         Q.   SIR, DO YOU KNOW WHERE THE CARDIOVASCULAR INFORMATION FROM
7         VIGOR APPEARS IN THE MARCH 2001 LABEL CHANGE -- I'M SORRY,
8         LABELING APPLICATION?
9         A.    I THINK I KNOW, BUT WOULD YOU PERHAPS SHOW IT TO ME AND I
10        CAN CHECK FOR SURE?
11        Q.   WHEN WAS THE LAST TIME YOU SAW IT?
12        A.   TODAY, PROBABLY, SOMETIME.
13             MR. ISMAIL:  CAN WE PLEASE PULL UP THE MARCH 2001
14        LABELING APPLICATION SO I CAN DO SOMETHING UP HERE.
15        BY MR. ISMAIL:
16        Q.   SIR, THIS IS WHAT WE HAVE MARKED AS DEFENDANT'S 943.  DO
17        YOU RECOGNIZE THAT AS THE MARCH 2001 LABELING APPLICATION FILED
18        BY MERCK, THE SECOND LABELING APPLICATION FILED BY MERCK, TO
19        INCLUDE THE CARDIOVASCULAR INFORMATION FROM VIGOR?
20        A.   RIGHT.
21        Q.   YOU DO RECOGNIZE IT?
22        A.   YES.
23        Q.   OKAY.  SO WHEN YOU GOT THIS DOCUMENT, IT WAS MISSING THE
24        DATE AND THE E-MAIL AND ALL THAT?
25        A.   YES.
page 1190
1         Q.   DO YOU WANT TO TURN TO PAGE 10.  SEE THE PRECAUTIONS
2         SECTION THERE?
3         A.   RIGHT, THAT'S WHERE I THOUGHT IT WAS.  I WANTED TO MAKE
4         SURE.
5         Q.   THEN IF YOU TURN TO PAGE 12 --
6         A.   GO AHEAD.
7         Q.   -- DO YOU SEE THAT IN MARCH OF 2001 MERCK SOUGHT A LABEL
8         CHANGE TO ADD TO THE PRECAUTIONS SECTION THE CARDIOVASCULAR
9         DATA FROM VIGOR?
10             THE COURT:  IT'S ON THE BOARD, SIR.  SECOND
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
11        PARAGRAPH.
12        A.    THIS IS NOT ON PAGE 12 THAT I HAVE HERE.  OKAY.  GO AHEAD.
13        BY MR. ISMAIL:
14        Q.    SO THE QUESTION WAS:  DO YOU SEE THAT, IN THE MARCH 2001
15        LABELING APPLICATION BY MERCK, MERCK IS SEEKING PERMISSION TO
16        INCLUDE THE CARDIOVASCULAR INFORMATION FROM VIGOR IN THE
17        PRECAUTIONS SECTION?
18        A.    THIS INCLUDES CARDIOVASCULAR INFORMATION, THERE'S NO
19        QUESTION ABOUT IT.  WHAT IT DOES NOT INCLUDE IS A STATEMENT
20        THAT THERE'S A CARDIOVASCULAR RISK OR THAT THERE POSSIBLY MAY
21        BE A CARDIOVASCULAR RISK ASSOCIATED WITH VIOXX.
22              IN FACT, IF WE LOOK JUST BEYOND THE PART THAT YOU'VE
23        HIGHLIGHTED IN YELLOW, AS NOTED IN THE PRODUCT CIRCULAR,
24        "NAPROXEN MAY DECREASE PLATELET AGGREGATION AND PROLONG
25        BLEEDING TIME."  IN OTHER WORDS, THIS OCCURS IN A SECTION THAT
page 1191
1         IMMEDIATELY GOES ON TO SUGGEST THAT THE FACTOR INVOLVED HERE IS
2         THAT NAPROXEN IS PROTECTIVE; WHEREAS IT COULD HAVE SUGGESTED
3         THAT VIOXX COULD HAVE BEEN THE CAUSE OF THIS, AS, IN FACT, WE
4         KNOW NOW IT IS THE CAUSE.
5               MR. ISMAIL:  MOVE TO STRIKE, YOUR HONOR.
6               THE COURT:  GRANTED.
7               MR. ISMAIL:  YOUR HONOR, I JUST HAVE A FEW MORE
8         QUESTIONS.
9               THE COURT:  OKAY.
10        BY MR. ISMAIL:
11        Q.    SIR, YOU KNOW, AS YOU'RE SITTING HERE TODAY, THAT MERCK
12        SOUGHT TO INCLUDE THE CARDIOVASCULAR INFORMATION FROM THE VIGOR
13        TRIAL IN THE PRECAUTIONS SECTION IN MARCH 2001?  YES OR NO.
14        A.    THIS IS A SMALL BIT OF CARDIOVASCULAR INFORMATION.  THERE
15        IS MUCH MORE CARDIOVASCULAR INFORMATION FROM THE VIGOR TRIAL.
16        THE FDA WANTED TABLES PUT IN, AND THERE ARE NO TABLES HERE.  SO
17        THIS IS A SMALL BIT OF INFORMATION WHICH DOES NOT ADEQUATELY
18        CONVEY ANY SENSE OF RISK ASSOCIATED WITH VIOXX.
19              MR. ISMAIL:  YOUR HONOR, CAN I ASK THE WITNESS BE
20        INSTRUCTED TO ANSWER THE QUESTION?
21              THE WITNESS:  THIS IS A SMALL BIT OF INFORMATION.
22              THE COURT:  DOCTOR, LISTEN TO THE QUESTION AND TRY TO
23        FOCUS ON THE ANSWER.  IF NEED BE, COUNSEL ON REDIRECT WILL
24        BRING OUT MATTERS.
25              THE WITNESS:  OKAY.
page 1192
1         BY MR. ISMAIL:
2         Q.    ALL RIGHT.  SO THE QUESTION, SIR, IS:  DO YOU NOW KNOW
3         THAT IN MARCH OF 2001 MERCK SOUGHT TO INCLUDE THE
4         CARDIOVASCULAR INFORMATION FROM VIGOR IN THE PRECAUTIONS
5         SECTION?
6         A.    I OBJECT TO YOUR CHARACTERIZATION OF IT AS "THE
7         CARDIOVASCULAR INFORMATION."  THERE IS A LOT OF CARDIOVASCULAR
8         INFORMATION.
9               MR. ISMAIL:  YOUR HONOR.
10              THE WITNESS:  TO CHARACTERIZE THIS SMALL SENTENCE AS
11        "THE CARDIOVASCULAR INFORMATION" --
12              THE COURT:  OKAY.  THANK YOU, DOCTOR.  THANK YOU.
13              MR. ISMAIL:  I THINK WE KNOW THE ANSWER TO THE
14        QUESTION, SO LET ME MOVE ON.
15        BY MR. ISMAIL:
16        Q.    YOU RECALL FROM EITHER HEARING IT DIRECTLY FROM THE
17        PLAINTIFF LAWYERS OR OVERHEARING THEM TALK AMONGST THEMSELVES
18        THAT THIS IS THE VERY SECTION DR. SCHIRMER TESTIFIED HE WOULD
19        LOOK IN A PRODUCT LABEL, RIGHT?
20              MR. RAFFERTY:  OBJECTION.
21              THE COURT:  WE'VE BEEN OVER THAT ALREADY.  ASKED AND
22        ANSWERED.  I SUSTAIN THE OBJECTION.
23        BY MR. ISMAIL:
24        Q.    DO YOU SEE HERE THAT THE CARDIOVASCULAR INFORMATION
25        DISCLOSES A 5-TO-1 DIFFERENCE WITH RESPECT TO MYOCARDIAL
page 1193
```

**Exhibit A - Plunkett Trial Testimony Excerpts**

• **Kapit Motion**

```
1          INFARCTIONS BETWEEN VIOXX AND NAPROXEN?
2          A.   YES, IT DOES.
3          Q.   DID THE PLAINTIFF LAWYERS TELL YOU YESTERDAY OR DID YOU
4          OVERHEAR THEM TALKING ABOUT THAT, HAD DR. SCHIRMER KNOWN OF A
5          FOUR- OR FIVEFOLD DIFFERENCE, HE WOULDN'T HAVE PRESCRIBED THE
6          MEDICINE?
7          A.   I DID NOT HEAR THEM SAY THAT.
8                    MR. ISMAIL:  JUST GIVE ME ONE SECOND, YOUR HONOR.  I
9          BELIEVE I'M FINISHED.
10                   THE COURT:  WE'LL TAKE A BREAK AFTER THE REDIRECT.
11                   MR. ISMAIL:  I'LL BE VERY BRIEF, YOUR HONOR.  YOUR
12         HONOR, WHILE I'M FLIPPING THROUGH MY OUTLINE, WE MOVE THE
13         ADMISSION OF EXHIBIT 943, THE MARCH 2001 LABELING CHANGE.
14                   MR. RAFFERTY:  NO OBJECTION, YOUR HONOR.
15                   THE COURT:  LET IT BE ADMITTED.
16                   MR. ISMAIL:  NO FURTHER QUESTIONS.  THANK YOU.
17                        REDIRECT EXAMINATION
18         BY MR. RAFFERTY:
19         Q.   MR. ISMAIL WAS JUST TALKING TO YOU ABOUT THIS MARCH '01
20         PROPOSED LABEL AND IT BEING THE SECTION THAT DR. SCHIRMER READ,
21         ACCORDING TO -- IS THIS THE TYPE OF THING, IF MERCK HAD WANTED
22         TO IN MARCH OF '01, COULD THEY HAVE DONE A CBE WITH THIS LABEL,
23         INCREASE THE PRECAUTION, AND SEND IT OUT TO THE DOCTORS LIKE
24         DR. SCHIRMER?
25         A.   THEY COULD HAVE DONE THAT.
page 1194
1          Q.   DID THEY DO THAT?
2          A.   NO, THEY DID NOT.
```

**Exhibit B - Kapit Deposition Excerpts**

• **Kapit Motion**

[1:] - [1:24]        6/19/2006   Kapit, Richard (Barnett)

```
page 1
    0001
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
2
                         - - -
3
               IN RE:   VIOXX LITIGATION:  MDL DOCKET
4                          NO. 1657
5                          - - -
6          This Document Relates To
7          GERALD BARNETT AND CORRINE BARNETT
                         Plaintiffs,
8                  VS.
           MERCK & CO., INC.,
9                      Defendants.
10                         - - -
11                     CONFIDENTIAL
12             SUBJECT TO PROTECTIVE ORDER
13                         - - -
14          VIDEOTAPED DEPOSITION UNDER ORAL
                      EXAMINATION OF
15
               RICHARD M. KAPIT, M.D.
16
                    Washington, D.C.
17
                  Monday, June 19, 2006
18
                         - - -
19
           REPORTED BY:  DEBRA J. WEAVER, RPR, CRR,
20                         CSR
21                         - - -
22              GOLKOW LITIGATION SERVICES
                    Four Penn Center
23            1600 John F. Kennedy Boulevard
                      Suite 1210
24            Philadelphia, Pennsylvania 19103
```

[77:9] - [78:5]        6/19/2006   Kapit, Richard (Barnett)

```
page 77
9          Q.    Does the FDA serve the
10  pharmaceutical industry?
11              MR. BLACK:  Objection.
12              THE WITNESS:  You know, this
13          is a -- this is a -- I think it's
14          a matter of debate.  I think that
15          there was a time when I worked for
16          the Center of Drugs -- Center for
17          Drugs, when someone -- when people
18          at the FDA would not have looked
19          at what they do that way, that
20          they would have thought, and I
21          would have thought, that there was
22          an inherent difference between a
23          regulator and the industry that it
24          regulates.  And so one cannot say
page 78
1          that the regulator serves that
2          industry.  Now, I'm also aware
3          that in recent years, actually,
4          there are people at the FDA that
5          do view what they do in that way.
```

**Exhibit B - Kapit Deposition Excerpts**

**• Kapit Motion**

[78:6] - [78:19]          6/19/2006    Kapit, Richard (Barnett)

```
page 78
6        Actually, there was a friend I had
7        for many years at the FDA, he was
8        in the division of advertising,
9        and when I knew him back in the
10       Center for Drugs, he would not
11       have thought of what he did as
12       serving the industry; he would
13       have thought of what he did as
14       serving the public.  And I heard
15       him say not too long ago that his
16       view of what he does now is
17       serving the industry.  So there
18       are some people that view FDA as
19       serving the industry.  I think in
```

[83:19] - [84:6]          6/19/2006    Kapit, Richard (Barnett)

```
page 83
19       but sent a letter.  And so they
20       didn't come out and say, hey,
21       you're withholding this stuff, but
22       they certainly implied, what is
23       taking so long?  Get this stuff
24       in.  And they certainly indicated
page 84
1        some level of frustration.  So --
2        so, in the exact words you put it,
3        no, but that doesn't mean that
4        there wasn't a lot of feeling that
5        Merck was being less than
6        forthcoming at times.
```

[94:17] - [95:1]          6/19/2006    Kapit, Richard (Barnett)

```
page 94
17          Q.   Are you offering any
18   opinions in this case on whether FDA
19   missed a problem when it reviewed the
20   Vioxx NDA?
21          MR. BLACK:  Objection.
22          THE WITNESS:  Conceivably
23   that could come up, but at the
24   present time, I'm not planning to
page 95
1        do that.
```

[95:3] - [95:9]          6/19/2006    Kapit, Richard (Barnett)

```
page 95
3          Q.   If you look at paragraph 31
4    of your report, you say that "58 percent
5    of FDA reviewers believed that the
6    allotted six-month time for a priority
7    review (such as the Vioxx review) is
8    inadequate," correct?
9          A.   Yes.
```

[95:10] - [95:12]          6/19/2006    Kapit, Richard (Barnett)

```
page 95
10          Q.   You base that figure on the
11   inspector general's report, right?
12          A.   Yes.
```

**Exhibit B - Kapit Deposition Excerpts**

• **Kapit Motion**

[95:13] - [95:23]        6/19/2006    Kapit, Richard (Barnett)

```
page 95
13        Q.    You didn't do anything on
14   your own to confirm that number, did you,
15   sir?
16        A.    No.
17        Q.    You didn't conduct any of
18   your own surveys of FDA reviewers?
19        A.    No.
20        Q.    Did you speak to any FDA
21   reviewers about their feelings on the
22   six-month review?
23        A.    No.
```

[95:20] - [96:16]        6/19/2006    Kapit, Richard (Barnett)

```
page 95
20        Q.    Did you speak to any FDA
21   reviewers about their feelings on the
22   six-month review?
23        A.    No.
24        Q.    Now, the comment about the
page 96
1    reviewers feeling pressured to complete a
2    six-month review, that's a general
3    comment not specific to Vioxx?
4        A.    Yes.
5        Q.    I mean, you don't know one
6    way or the other whether the Vioxx
7    reviewers felt this way?
8        A.    No, I don't.
9        Q.    You haven't communicated
10   with any of the Vioxx reviewers?
11       A.    That's right.
12       Q.    You didn't see any comments
13   in writing or in their medical officer
14   reviews where they said they needed more
15   time to review the Vioxx NDA?
16       A.    No, I don't think so.
```

[97:11] - [98:3]         6/19/2006    Kapit, Richard (Barnett)

```
page 97
11       Q.    Now, as far as -- as far as
12   you know, sir, the FDA has never said
13   that they made a mistake in approving
14   Vioxx, have they?
15            MR. BLACK:  Objection.
16            THE WITNESS:  No, the FDA
17            has never characterized what
18            happened as a mistake on their
19            part.
20   BY MR. ROTHMAN:
21       Q.    And they've never said in
22   sum or in substance that they shouldn't
23   have approved Vioxx, true?
24            MR. BLACK:  Objection.
page 98
1            THE WITNESS:  I'm not aware
2            of them using those words with
3            respect to Vioxx.
```

[103:12] - [103:21]      6/19/2006    Kapit, Richard (Barnett)

```
page 103
12       Q.    And even though it was
13   anonymous, only 47 percent of the
```

Exhibit B - Kapit Deposition Excerpts

• **Kapit Motion**
```
14   reviewers who got the survey completed it
15   and sent it back in?
16        A.    That's not bad for a survey,
17   as far as I understand surveys go, a
18   47 percent response rate.
19        Q.    You understand that there
20   was a 47 percent response rate?
21        A.    Uh-huh.
```

[106:15] - [107:1]      6/19/2006   Kapit, Richard (Barnett)
```
page 106
15        Q.    This inquiry does not assess
16   the scientific merit of the decisions
17   that FDA has made?  Do you agree with
18   that statement or not?
19           MR. BLACK:  Objection.
20           THE WITNESS:  I believe I
21        said that.
22   BY MR. ROTHMAN:
23        Q.    You agree with that
24   statement?
page 107
1        A.    Yes.
```

[191:8] - [195:4]      6/19/2006   Kapit, Richard (Barnett)
```
page 191
8            THE WITNESS:  No.  I said
9            that it was -- they didn't do a
10           study that was adequately powered
11           to answer that question.  They did
12           write a protocol, Protocol 203,
13           which would have been the study
14           adequately powered in Vioxx
15           against placebo to answer that
16           question, but they never -- never
17           performed such a study.
18   BY MR. ROTHMAN:
19        Q.    Why didn't they perform such
20   a study?
21           MR. BLACK:  Objection.
22           THE WITNESS:  Why did they
23           not perform such a study?
24   BY MR. ROTHMAN:
page 192
1        Q.    Yes.  Do you have an opinion
2    on that?
3        A.    I suspect that they were --
4           MR. BLACK:  Objection.  Go
5        ahead and answer, if you can.
6           THE WITNESS:  I'm sorry,
7        Bert?
8           MR. BLACK:  Just an
9        objection to the form of the
10       question.  Go ahead and answer it,
11       if you can.
12          THE WITNESS:  It was an
13          extremely competitive market for
14          pain relievers, for NSAIDs.  Merck
15          was in competition, intense
16          competition, with Pfizer's
17          Celebrex, and it's clear that a --
18          that if Vioxx had been associated
19          with an elevated risk of heart
20          attacks, that it would have --
21          that Vioxx's market share for
22          COX-2s would have suffered.  And
```

Exhibit B - Kapit Deposition Excerpts

• **Kapit Motion**

```
23        the explanation that they gave --
24        they ended up giving as a result
page 193
1         of this inadequate, quote, pooling
2         of prior studies, which supposedly
3         justified the naproxen
4         explanation, basically declared
5         that their drug was innocent and
6         not causing the excess heart
7         attacks.  We now know that that's
8         not true.  But at the time it made
9         it a lot easier for Merck to try
10        to maintain the market share of
11        Vioxx vis-a-vis Celebrex.  And I
12        certainly think that that must
13        have been a factor in why they
14        didn't do an adequate study.
15   BY MR. ROTHMAN:
16        Q.    Have you seen any written
17   documents that support that opinion, that
18   Merck considered the market share versus
19   Celebrex as a factor?
20        A.    Yes.  I've reviewed certain
21   internal projections Merck made about the
22   decrement in sales that would result from
23   labeling that attributed the excess heart
24   attacks to Vioxx, and over -- one
page 194
1    document that's very dramatic projected
2    that over a period of several years Merck
3    would lose four, $5 billion in sales.  So
4    that certainly supports that opinion, I
5    believe.
6         Q.    Does it say anywhere in that
7    document that you're referring to not to
8    do a placebo-controlled study along the
9    lines of the one you've described?
10        MR. BLACK:  Objection.
11        THE WITNESS:  Well,
12        there's -- there's -- I mean --
13        I'm sorry.  I don't mean to laugh.
14        But you're asking whether a
15        document that says we're going to
16        lose $5 billion in sales should in
17        the same document say we therefore
18        should not do the study to find
19        out the answer.  The company is
20        not going to prepare a document to
21        that effect.  But it's not
22        difficult to draw the conclusion
23        that a company that's going to
24        lose billions of dollars by what
page 195
1         the document says is a label
2         change that attributes the problem
3         to Vioxx, that that has some
4         effect on the company's behavior.
```

[206:18] - [206:23]     6/19/2006   Kapit, Richard (Barnett)

```
page 206
18        review clock.  So, again, what
19        you're talking about is an ideal
20        situation that we would like to
21        think the FDA does but, in fact,
22        the reality is that it often falls
23        short.
```

### Exhibit B - Kapit Deposition Excerpts

**• Kapit Motion**

[211:15] - [211:19]     6/19/2006     Kapit, Richard (Barnett)

```
page 211
15              THE WITNESS:  What I said is
16      that this represents an ideal
17      statement and that the reality of
18      actual FDA work falls short of
19      this.  It doesn't say that the
```

[215:8] - [215:20]     6/19/2006     Kapit, Richard (Barnett)

```
page 215
 8      Q.    Do you think that it often
 9  doesn't happen in practice?
10      A.    Yes, it often doesn't happen
11  in practice.  That's the truth.  The FDA,
12  as any human enterprise, falls short.
13  And because it is such a complex and
14  intricate set of decisions, and there are
15  so many factors that go into it, it
16  rarely happens that this ideal is lived
17  up to a hundred percent.  And there are
18  times when it falls -- the Agency falls
19  very short, unfortunately, as much as I
20  regret to say it.
```

[225:7] - [226:1]     6/19/2006     Kapit, Richard (Barnett)

```
page 225
 7      Q.    Okay.  In paragraph 122 of
 8  your expert report, which we've marked as
 9  Exhibit 2, it refers to epidemiological
10  studies.
11      A.    Yes.
12      Q.    Okay.  Which studies are you
13  referring to in that paragraph?
14      A.    I think the main one is
15  Graham's study.
16      Q.    Any others?
17      A.    There are others, but that's
18  the one I have mostly in mind.  I don't
19  think that was the only one that
20  indicated that.
21      Q.    As you sit here today,
22  though, you can't name any of the others?
23      A.    Graham is the one that I
24  certainly had most clearly in mind when I
page 226
 1  wrote that sentence.
```

[226:8] - [226:15]     6/19/2006     Kapit, Richard (Barnett)

```
page 226
 8      Q.    But you're relying on Dr.
 9  Graham?
10      A.    Right.
11      Q.    You haven't done any
12  independent work to confirm --
13      A.    No.
14      Q.    -- these figures, correct?
15      A.    Right.
```

[226:16] - [230:5]     6/19/2006     Kapit, Richard (Barnett)

```
page 226
16      Q.    Now, in paragraph 124 of
17  your report, you say that "Merck dragged
18  its collective feet about the label
```

### Exhibit B - Kapit Deposition Excerpts

• **Kapit Motion**

```
19   change"?
20        A.    Yes.
21        Q.    And what is the basis for
22   that opinion?
23        A.    What's the -- it's a lot of
24   what happened during the period of two
page 227
1    years that, first of all, when Merck
2    submitted a label in June of 2000, this
3    was the first label submission after the
4    VIGOR study results had come out, the
5    cardiovascular information in the
6    labeling was minimal and so that, first
7    of all, it immediately put in play that
8    there would have to be a lot of
9    negotiations.  At the time that Merck
10   submitted the June label to the FDA
11   following VIGOR, as I mentioned in
12   previous testimony, it could have put the
13   information in labeling right away
14   through the submission of a changes being
15   effected.  Merck didn't do that.  Then
16   after that, the FDA, in October of -- no,
17   first in November of 2000, the FDA asked
18   for additional information, particularly
19   the ADVANTAGE study, that would have
20   addressed the cardiovascular effects of
21   Vioxx in a lower dose of 25 milligrams
22   and against placebo in a study that might
23   shed light on the standard dose and did
24   not suffer from the problem of a lack of
page 228
1    placebo comparator in VIGOR.  And I've
2    discussed how Merck took, from that point
3    on, a total of about eight months to
4    finally come through with that data.  And
5    then after that, when the FDA proposed a
6    label in October, which was much stronger
7    in terms of cardiovascular events,
8    cardiovascular information, Merck
9    objected vehemently to putting it in
10   there.  And Dr. Scolnick wrote an e-mail
11   that said he will never accept it in
12   warnings.
13            And I must say that,
14   certainly, the cardiovascular reviewer,
15   Dr. Targum, thought it ought to be in
16   warnings and FDA's initial proposal
17   should have put it in warnings -- would
18   have put it in warnings, and I certainly
19   think that heart attacks, the possibility
20   of heart attacks, ought to be in
21   warnings.  But Merck objected a great
22   deal.  And there was a back-and-forth of
23   negotiations that went on for another six
24   months before they finally came to a
page 229
1    result.
2            So all in all, it was a
3    two-year period from the time that the
4    results of VIGOR came out until the time
5    that the label finally ended up including
6    this information.  And it's stuff that
7    Merck could have put in right away if
8    they had chosen to do so.  And so putting
9    that all together, it seems to me it's
10   fair to call it dragging their feet.  And
11   that's what I did.
```

Exhibit B - Kapit Deposition Excerpts

• **Kapit Motion**

```
12          Q.    Okay.  Have you seen any
13  statements or comments by the FDA where
14  the FDA says that Merck dragged its feet?
15          A.    No, I didn't.  The FDA did
16  not say that.  Although, there is a very
17  interesting memo that FDA wrote.  It's an
18  internal memo and I've reviewed it, and I
19  think it's the period -- it may be the
20  early months of 2002, I believe.  And in
21  it they make it very clear that Merck
22  resisted.  The exclusive language in this
23  FDA memo that Merck resisted label
24  changes and that this made it a very
page 230
1   difficult process.  And I can pull that
2   up, if you'd like.  And so drag its feet,
3   no, they didn't use exactly that term,
4   but they certainly wrote a memo that says
5   kind of the same thing.
```

[296:6] - [296:23]     6/19/2006   Kapit, Richard (Barnett)

```
page 296
6           THE WITNESS:  Do I have an
7           opinion about the timing of the
8           submission?  It seems to me that
9           Merck, for a variety of reasons,
10          wanted to preempt FDA action.
11          They wanted to get something on
12          the table as quickly as possible,
13          something which emphasized the GI
14          benefit and, in fact, minimized
15          the cardiovascular question and
16          made the statement that naproxen
17          was the reason for any difference.
18          And so they wanted to put that on
19          the table as quickly as possible
20          and preempt any other FDA action
21          that might occur.  And so it was
22          important for them to get it out
23          there quickly.
```

[303:6] - [303:23]     6/19/2006   Kapit, Richard (Barnett)

```
page 303
6           You're aware that Merck
7   asked for a priority review of this
8   supplement?
9           MR. BLACK:  Objection.
10          THE WITNESS:  Yes.
11  BY MR. ROTHMAN:
12          Q.    And that would be --
13  whatever the time frame, we can assume
14  that that would be a faster review than
15  the standard review?
16          A.    Remember, the main point of
17  this supplement from Merck's point of
18  view was to highlight the
19  gastrointestinal benefit.
20          Q.    Merck asked for a quicker
21  review of this supplement?
22          A.    They wanted to get that
23  gastrointestinal benefit out there.
```

[309:11] - [309:14]     6/19/2006   Kapit, Richard (Barnett)

```
page 309
```

**Exhibit B - Kapit Deposition Excerpts**

• **Kapit Motion**

```
11  June 29th.  They didn't have to rush that
12  in unless, of course, they wanted to
13  highlight the GI benefit, which was the
14  real reason.
```

[310:15] - [311:12]    6/19/2006    Kapit, Richard (Barnett)

```
page 310
15       Q.     -- is it your opinion that
16  Merck should have done a CBE in that
17  prior -- that subsequent period after
18  June 29th, 2000?
19            MR. BLACK:  Objection.
20            THE WITNESS:  My opinion is
21       yes.  And let me -- let me explain
22       my opinion.  That maybe it would
23       have been a somewhat unorthodox
24       thing to do, but we're talking
page 311
1        about huge risk.  Graham, et al.,
2        talked about a hundred thousand
3        heart attacks.  So even if it
4        would have been a bit unorthodox
5        to do it that way, the medical --
6        the medical necessity for getting
7        that information out there would
8        have justified even something that
9        was unorthodox to do.  And, yes, I
10       think that it -- that Merck should
11       have put that CBE out there as
12       soon as possible.  I think it
```

[320:13] - [320:23]    6/19/2006    Kapit, Richard (Barnett)

```
page 320
13       Q.     Was Merck required to submit
14  this label on March 2nd of 2001?
15       A.     No.
16       Q.     This is something that Merck
17  did on its own?
18       A.     Again, it was doing a
19  similar thing as it did the previous
20  June, of preempting the discussion with a
21  submission that in fact played down the
22  cardiovascular risks and played up the GI
23  benefits.
```

[323:22] - [325:17]    6/19/2006    Kapit, Richard (Barnett)

```
page 323
22       Q.     In paragraphs 133 and 134 of
23  your expert report, you added a
24  discussion of Merck's October 13, 2000
page 324
1   submission as well as referring to, in
2   paragraph 134, the controversy with the
3   New England Journal of Medicine?
4        A.     That's right, yes.
5        Q.     Okay.  Have you reviewed the
6   New England Journal of Medicine's
7   expression of concern?
8        A.     Yes.
9        Q.     And have you reviewed the
10  New England Journal of Medicine's
11  affirmation?
12       A.     Affirmation of its concern,
13  yes.
```

**Exhibit B - Kapit Deposition Excerpts**

• **Kapit Motion**

```
14        Q.    Okay.  Where did you obtain
15 those documents?
16        A.    I think it was the web.
17        Q.    Is that something you saw on
18 your own or something that counsel
19 directed you to?
20        A.    I think initially counsel
21 directed me to it, yes.
22        Q.    Did you review the responses
23 of the article's authors?
24        A.    Yes.
page 325
1         Q.    You reviewed both the
2  response by the Merck authors and also
3  the response by the non-Merck authors?
4         A.    That's right.
5         Q.    And are you planning to
6  offer any opinions at trial about this
7  subject?
8         A.    Well, yes.  I think there is
9  some important -- there's some important
10 information about it, that there were
11 three myocardial infarctions that were at
12 issue, which Dr. Curfman, who is an
13 editor of the New England Journal, said
14 that they should have been apprised of by
15 Merck before publication and that Merck
16 had enough time to publish -- to apprise
17 them before publication.
```

[327:7] - [327:16]        6/19/2006    Kapit, Richard (Barnett)

```
page 327
7         Q.    Have you ever served on the
8  editorial board of a medical journal?
9         A.    No.  But I've read many
10 articles.
11        Q.    Have you ever been an editor
12 of a medical journal?
13        A.    I actually was asked to be
14 an editor at one point, but I didn't
15 really follow up on it.  But, no.  The
16 answer is no.
```

[328:19] - [329:8]        6/19/2006    Kapit, Richard (Barnett)

```
page 328
19        Q.    Do you plan to offer any
20 other opinions about the New England
21 Journal of Medicine article or expression
22 of concern?
23        A.    I think -- I think that -- I
24 mean, I think that -- I think basically
page 329
1  it would be related to the -- Merck's --
2  because two of the authors for the
3  Bombardier article were from Merck, I
4  believe it was two or three, that Merck's
5  participation in that calls into question
6  the degree to which Merck was willing to
7  be forthcoming completely about the
8  information on myocardial infarctions.
```

[332:11] - [332:20]        6/19/2006    Kapit, Richard (Barnett)

```
page 332
11        Q.    Before FDA sent the
```

Exhibit B - Kapit Deposition Excerpts

**• Kapit Motion**

```
12    October 2001 draft to Merck, it knew that
13    Merck was not going to be happy with that
14    draft?
15         A.    Yeah, it probably did.
16         MR. BLACK:  Objection.
17         THE WITNESS:  I don't know
18    that for sure, but they probably
19    knew that Merck wasn't going to
20    like it.  And, of course,
```

[351:17] - [352:14]    6/19/2006   Kapit, Richard (Barnett)

```
page 351
17         Q.    Okay.  The next section of
18    your report refers to an analysis of
19    Protocol 203 data, correct?
20         A.    What paragraph are we at
21    now?  Paragraph 178?
22         Q.    It starts at paragraphs 178
23    through 183.
24         A.    Yes.
page 352
1          Q.    And you're referring here to
2     an analysis that was done by a
3     statistician and epidemiologist retained
4     by the plaintiffs?
5          A.    Yes.
6          Q.    And you -- were you planning
7     to offer opinions at trial about this
8     analysis?
9          MR. BLACK:  Objection.
10         THE WITNESS:  I'm planning
11    to offer the opinions that are
12    stated in this report, that this
13    analysis confirms that the effect
14    begins early.  And I may also
```

[357:4] - [357:17]    6/19/2006   Kapit, Richard (Barnett)

```
page 357
4          Q.    And you say that "the data
5     on a sufficient number of patients
6     treated in these studies before drug
7     withdrawal has been made available to the
8     plaintiffs in this litigation."
9          A.    Yes.
10         Q.    Have you seen that data?
11         A.    I've seen the plaintiffs'
12    analysis.
13         Q.    Right.  I'm asking if you've
14    seen the underlying data?
15         A.    I don't believe I've seen
16    the underlying data.  Just the
17    plaintiffs' analysis of it.
```

[361:10] - [362:2]    6/19/2006   Kapit, Richard (Barnett)

```
page 361
10         Q.    But let me ask you this,
11    have you done any work to independently
12    analyze or confirm the analysis that you
13    received to which we've been referring?
14         A.    No.  I'm relying on the
15    expertise and the results of these two
16    men.
17         Q.    Okay.  And are you a
18    statistician?
```

Exhibit B - Kapit Deposition Excerpts

**• Kapit Motion**

```
19        A.    No, I'm not.  But I can
20  certainly -- I can't do statistical
21  tests, or I should not do statistical
22  tests myself.  I wouldn't presume to do
23  it.  But I certainly understand what they
24  mean when they're done.  And to that
page 362
1  extent, I feel qualified to rely on their
2  opinion.
```

[368:6] - [369:13]        6/19/2006   Kapit, Richard (Barnett)

```
page 368
6        Q.    Now, you also added a
7  section of your report that discusses an
8  editorial circulation by Dr. Jerry Avorn?
9        A.    Yes.
10       Q.    How did that editorial come
11  to your attention?
12       A.    Again, I'm not completely
13  sure whether it came from the journal
14  itself or was provided by Mr. Black.
15       Q.    Have you ever met Dr. Avorn?
16       A.    Not personally, no.
17       Q.    Have you communicated with
18  him?
19       A.    No.
20       Q.    Did you know that he's a
21  plaintiffs' expert in the Vioxx
22  litigation?
23       A.    I was aware of his having
24  some participation in the -- I wasn't
page 369
1  specifically aware of what he was doing,
2  but that there was -- he wasn't
3  necessarily without interest in this
4  question.
5        Q.    Have you read any of Dr. --
6  have you read Dr. Avorn's expert report?
7        A.    No, I have not.
8        Q.    Did Dr. Avorn ever work at
9  the FDA as far as you know?
10       A.    Not so far as I know, no.
11       Q.    And you're citing to an
12  editorial that he wrote, correct?
13       A.    Correct, yes.
```

[403:1] - [403:22]        6/19/2006   Kapit, Richard (Barnett)

```
page 403
1            C E R T I F I C A T E
2
3
4            I hereby certify that the
witness was duly sworn by me and that the
5  deposition is a true record of the
testimony given by the witness.
6
7            It was requested before
completion of the deposition that the
8  witness, RICHARD M. KAPIT, M.D., have the
opportunity to read and sign the
9  deposition transcript.
10
11
            DEBRA J. WEAVER, RPR, CRR, CSR
12           NJ CSR License No. XI 01614
            DE Certification No. 183-RPR
```

**Exhibit B - Kapit Deposition Excerpts**

• **Kapit Motion**

```
13              (Expires 1/31/08)
        Dated :  June 26, 2006
14
15              (The foregoing certification
16  of this transcript does not apply to any
17  reproduction of the same by any means,
18  unless under the direct control and/or
19  supervision of the certifying shorthand
20  reporter.)
21
22
```