UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  VIOXX PRODUCTS LIABILITY LITIGATION | * MDL Docket No. 1657 |
| | * |
| | * SECTION L |
| This document relates to | * |
| | * JUDGE FALLON |
| ALL ACTIONS | * |
| | * MAGISTRATE JUDGE KNOWLES |
| | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EXPERT REPORT OF RICHARD M. KAPIT, MD

### Table of Contents

I.  Background ........................................................................................ 3

    A.  Compensation ........................................................................... 4

    B.  Qualifications and Experience ................................................... 4

II.  Documents Reviewed ...................................................................... 6

III.  The FDA: What It Is and What It Does ............................................ 7

    A.  Clinical Trials Done by Companies ............................................ 7

    B.  FDA Depends on Completeness of Information and Honesty of Companies ................................................................................ 7

IV.  Pharmaceutical Companies' Duties to Warn About Adverse Drug Reactions ....... 9

    A.  Pertinent Regulations ............................................................... 9

        1.  21 CFR 201.57(e) ............................................................ 10

        2.  21 CFR 314.70 (c)(6)(iii)(A) ............................................ 10

        3.  Example of a Company Carrying Out These Obligations as Required ........................................................................ 11

1

M003376467

V.      Labeling ........................................................................................... 11

        A.      Label Is the Primary Communication with Medical Providers. .............. 11

        B.      FDA Cannot Force Label Changes Without Drastic Measures............... 11

VI.     Merck's Vioxx Has a Problem ...................................................... 13

        A.      Pre-Approval Indications of a Cardiovascular Problem ...................... 13

        B.      Approval of Vioxx Without Proff of a GI Benefit.............................. 14

        C.      The VIGOR Trial Results............................................................... 14

        D.      Merck's Assessment of VIGOR ..................................................... 15

        E.      Merck's Precautions With Doctors and Patients Involved in Its Own
                Studies ...................................................................................... 17

                1.      The Press Release of March 27, 2000 .............................. 17

                2.      Merck Modifies Its Study Protocols................................. 17

        F.      What Merck Should Have Done With Other Doctors and Patients.......... 18

                1.      Advise Doctors and Patients of the Uncertainly and Potential
                        Problem............................................................................ 18

                2.      Recommend the Action Merck Took with Patients in Its Studies  19

        G.      Why Merck Did Not Take Such Actions with Other Doctors and
                Patients ..................................................................................... 20

VII.    What Merck Did Instead of Alerting the Medical Community About the Risks of
        Vioxx ............................................................................................... 21

        A.      Merck Orders Sales Representatives Not to Discuss the VIGOR Study. . 21

        B.      Merck Repeatedly Implicates Naproxen, Not Vioxx............................. 21

        C.      Merck Asserts and Advertises the Cardiovascular Safety of Vioxx ........ 22

        D.      Merck Promotes Vioxx GI Safety While Playing Down Risks............... 22

M003376468

E.   The History of the Vioxx Label Change Negotiations.............................23

  1.   Merck Could Have Made Label Changes Immediately ...............23

  2.   Merck's Initial Label Change Proposal, June 29, 2000...............24

  3.   Merck's Submission of October 13, 2000 ....................................24

  4.   Merck's Delays Prolong the FDA Effort to Add Cardiovascular
       Safety Data to the Label...........................................................25

  5.   FDA and the Arthritis Advisory Committee Determine that the
       Vioxx Label Sould Address the Cardiovascular Safety Issues
       Shown by the VIGOR Study.....................................................26

  6.   Merck's Label Submission of March 16, 2001..........................26

  7.   FDA Initiates Formal Label Discussions....................................27

  8.   On November 8, 2001, Merck Rejects FDA's Labeling Proposal
       and Submits Its Label Response...............................................28

  9.   After Six Months of Intense Negotiations, Merck and FDA Agree
       on a Label.................................................................................29

  10.  Why Did Merck Resist?............................................................29

VIII.   Recent Developments .................................................................30

   A.   Advisory Committee Votes Unanimously for CV Alert.........................30

   B.   FDA Memo on the Safety of NSAIDs,  April 6,  2005............................31

   C.   Analysis of Protocol 203 Data.............................................33

   D.   Editorial in *Circulation* May 9, 2006.....................................33

IX.   Conclusions ...............................................................34

## I.   Background

1.    I am a medical doctor, licensed to practice medicine in Maryland.  For nearly 30 years I worked in various capacities for the Government of the United States – at the National Institute of Mental Health, the Veterans Administration, the District of Columbia, the National Institute on Drug Abuse, and the Food and Drug Administration.

M003376469

For 16 years, I was a clinical reviewer at the Food and Drug Administration, where I reviewed data on clinical trials and medical use of drugs and biologicals. I made recommendations about agency actions on submissions from pharmaceutical manufacturers and academic investigators. These submissions included numerous Investigational New Drug Applications (INDs), New Drug Applications (NDAs), Biologics Licensing Applications (BLAs), and postmarketing surveillance reports.

2.      While employed at the FDA, I made recommendations about unapproved and approved pharmaceuticals, about the adequacy of INDs and NDAs supporting the approval of pharmaceuticals, about labeling, and about postmarketing surveillance reports related to pharmaceuticals. My recommendations often focused on whether the pharmaceuticals were safe for use in human beings.

3.      In a former capacity, when I worked for the District of Columbia, I testified in court more than 100 times. In these instances I was working either for the Bureau of Forensic Psychiatry of the D.C. Government or in private forensic psychiatric practice. I made recommendations to courts in the District of Columbia and Maryland (both local and federal) about the mental state of criminal defendants, specifically about competency, criminal responsibility, dangerousness, need for mental health treatment, and related matters.

### A.      Compensation

4.      I charge $250 per hour for all my time in connection with any kind of legal or forensic work, whether testimony, research and report preparation, or travel.

### B.      Qualifications and Experience

5.      The following paragraphs summarize my qualifications and experience. For completeness, I have attached copies of my curriculum vitae and resume to this document. (Exhibits A and B). Together, the C.V. and resume contain the most complete list of my publications that I can compile.

6.      2002-Present – President, MD-Writer, Inc.: Research, preparation, and composition of medical and scientific articles for newspapers, magazines, and other publishers; consulting on matters related to pharmaceuticals and their adverse effects.

Over the last four years, I have also been involved in a number of litigations. These included two criminal matters in which I gave testimony in court:

North Carolina v. Hall

South Carolina v. Pittman

M003376470

In addition, I have been deposed and/or testified in several tort litigation matters:

In re Baycol Products Litigation

In re Paxil Products Litigation

Witczak v. Pfizer

Cartwright v. Pfizer

Zikis v. Pfizer

Plunkett v. Merck

7.   1991-2002 – Medical Officer, GS-15, Division of Epidemiology, Office of Biostatistics and Epidemiology, Center for Biologics Evaluation and Research, Food and Drug Administration, Rockville, MD 20852: Evaluation and analysis of adverse drug reactions of licensed biological medicines and vaccines.  Member of review teams of new Biologics Licensing Applications (BLAs and PLAs).  GS-15 is the highest rank of Civil Service employees below the Senior Executive Service.

8.   1990-1991 – Medical Officer, GS-15, Clinical Trials Branch, Medication Development Division; National Institute on Drug Abuse; Alcohol, Drug Abuse and Mental Health Administration, Rockville, MD 20857: Development of medications to treat substance abuse.

9.   1984-1989 – Medical Officer, GS-15, Division of Neuropharmacological Drug Products, Office of Drug Evaluation I, Center for Drug Evaluation and Research, Food and Drug Administration, Rockville, MD 20857: Medical review (including clinical safety review) of investigational new drug applications (INDs), new drug applications (NDAs), and postmarketing surveillance reports.  Among the new drug applications that I reviewed was one that has had an unusually large impact on pharmaceutical treatment – Prozac.

10.   1980-1984 – Forensic Psychiatrist, private practice, Washington DC and Maryland.

11.   1979-1984 – Medical Officer, GS-15, Bureau of Forensic Psychiatry, Department of Human Services, Government of the District of Columbia, Washington DC 20001.

12.   1972-1975 – National Institute of Mental Health, Overholser Division of Training and Research, St. Elizabeths Hospital, Washington, DC 20032: Resident in Psychiatry.

13.   1972 – M.D. New York University School of Medicine, New York, NY 10016.

14.     1967 – B.A. from Columbia College, Columbia University, New York, NY 10027.

15.     AWARDS:

1994 FDA Cash Award.

1994 FDA Commendable Service Award – This award was given for "superior performance and leadership in development of improved procedures for post-marketing surveillance."

1995 FDA Group Recognition Award for MedWatch – This award was given for work in analyzing and communicating adverse reaction information regarding certain therapeutic products.

16.     TRAINING IN EPIDEMIOLOGY:

Johns Hopkins University School of Hygiene and Public Health, Master of Public Health program: Courses in epidemiology, public health, and statistics. Forty credits.

17.     CERTIFICATION:

National Board of Psychiatry and Neurology, 1978.

18.     PROFESSIONAL SOCIETIES:

American Academy of Pharmaceutical Physicians

American Association for the Advancement of Science

American College of Clinical Pharmacology

American Medical Writers Association

Crohn's and Colitis Foundation of America

D.C. Science Writers Association

FDA Alumni Association

International Society of Pharmacoepidemiology

## II.     Documents Reviewed

19.     See Appendix and Attachment C.

M003376472

### III.    The FDA: What It Is and What It Does

20.    In the United States, the process of new drug development is regulated by the Food and Drug Administration, whose mission it is to promote and protect the health of Americans.

### A.    Clinical Trials Done by Companies

21.    At the outset, it should be understood that despite the existence of the FDA, almost all drug development work goes on without the direct participation or supervision of this agency.  The work is generally carried out by pharmaceutical manufacturers, who perform research in their own laboratories and conduct human clinical trials in their own facilities or those of clinical research companies and institutions under contract.

22.    The FDA assumes regulatory authority over the process at such time as a pharmaceutical company applies to the agency for permission to develop a particular chemical entity into a new drug.  This request is known as an Investigational New Drug (IND) application.

23.    Prior to filing an IND application, a pharmaceutical company engages in preparation, identification, characterization, purification, synthesis, biochemical investigation, biological activity research, and animal investigations of the compound entirely without FDA oversight.  However, once the IND application is received by the agency and the company is given approval to go forward, then FDA regulations and guidelines influence the drug development process, and agency reviewers receive information and exercise oversight on the research.  For this reason, a prudent company will conduct research according to agency regulations and requirements even prior to FDA involvement.

### B.    FDA Depends on Completeness of Information and Honesty of Companies

24.    The FDA's new drug review process requires submission of extensive and detailed data by the sponsor of an NDA, which is most often the pharmaceutical manufacturing company.

25.    In order to make a medically appropriate decision about the approval of new drug, the FDA expects and relies upon the completeness and accuracy of the data provided by the sponsor.  This important point cannot be overstated.  Since the FDA does not develop data on its own, the agency is exquisitely dependent on the forthrightness, completeness, and honesty of the sponsor.  Without such behavior by the pharmaceutical company, the FDA has no sound basis upon which to perform its vital mission of promoting and protecting the public health of the country.

M0033764473

26    The language of federal regulations, which have the force of law, assumes that the pharmaceutical company submits accurate and complete information in all sections of an NDA. But particularly in regard to data on safety,

> The applicant [i.e., the sponsor] shall submit an integrated summary of *all available information about the safety of the drug product,* including pertinent animal data, demonstrated *or potential adverse effects of the drug,* clinically significant drug/drug interactions, and other safety considerations, such as data from epidemiological studies of related drugs. 21 CFR § 314.50(d)(5)(vi)(*a*) [Italics added.]

27.    Moreover, as new information becomes available, the sponsor is required to update the data originally submitted.

> The applicant shall, under section 505(i) of the act, update periodically its pending application with *new safety information learned about the drug that may reasonably affect the statement of contraindications, warnings, precautions, and adverse reactions* in the draft labeling and, if applicable, any Medication Guide required under part 208 of this chapter. These "safety update reports" are required to include the same kinds of information (from clinical studies, animal studies, and other sources) and are required to be submitted in the same format as the integrated summary in paragraph (d)(5)(vi)(a) of this section. 21 CFR § 314.50(d)(5)(vi)(*b*)

28.    The inclusive language of the CFR is intended to alert sponsors that submission of safety information is not merely a passive requirement to pass along the investigators' data to the agency. Companies are expected to accurately analyze the data and inform the agency of the actual and potential significance and relevance of the information. For instance, in order to report epidemiologic studies of related drugs, the company must actively survey the medical and scientific literature for potentially related information, pick out relevant articles, analyze such information, and report results of such efforts.

29.    During my many years of work at the FDA, I encountered numerous instances of companies bringing safety matters to agency's attention, when they came upon such information in the course of monitoring data related to their drugs. It was clear that *proactive efforts to bring safety matters forward for agency consideration constitutes the standard of practice of ethical pharmaceutical companies.*

30.    It should not be assumed that FDA reviewers will necessarily be able to discern safety problems from raw data submitted by sponsors as part of required NDA documents. Like any human enterprise, the FDA review process may be affected by competing demands for reviewers' attention, the acumen and perspicacity of individual

M00337647.4

reviewers, prior expectations about actions and effects of a particular class of drugs, and a host of factors that might impede the review process.

31.    It is quite possible that the FDA review process may occasionally miss a problem entirely. Many reviewers have described the increasing workload and time pressures at the agency. Indeed, in 2003 the Office of Inspector General of the Department of Health and Human Services issued a report that addressed this problem. The report covered the years in which Vioxx was approved. It surveyed FDA reviewers and concluded that "workload pressures increasingly challenge the effectiveness of the review process." In particular, the report noted that 58% of FDA reviewers believed that the allotted 6 month time for a priority review (such as the Vioxx review) is inadequate. Because FDA may occasionally slip up, if a sponsor knows about a problem, the company has the affirmative obligation to bring the matter before the FDA. Without such initiatives taken by ethical pharmaceutical companies, the FDA cannot properly perform its mission.

### IV.    Pharmaceutical Companies' Duties to Warn About Adverse Drug Reactions

32.    Pharmaceutical companies play a critical role in the American health care systems. In 2000, on average, more than 15 prescriptions per patient were filled per year, according to one study (*Fink and Byrns; 2004: Annals of Family Medicine 2: 488-93*). Because of their crucial health function, pharmaceutical companies operate in a position of confidence and trust in relation to the American people. In consequence of their position of trust, these companies incur obligations to American patients and the health care practitioners who treat them.

33.    These obligations compel pharmaceutical companies to ensure the safety of the medications they sell to the American public. To this end, the companies should make available to practitioners and patients all information needed for the safe use of the medications they sell *as soon as such information is known*. It is critical, in particular, that the companies make available all information about significant and serious adverse reactions to their drugs.

### A.    Pertinent Regulations

34.    The obligations of drug companies are codified in regulations promulgated by the Food and Drug Administration (FDA). Thus pharmaceutical companies are governed by regulatory obligations as well as ethical and medical ones.

35.    The following two regulations are specifically relevant to a pharmaceutical company's obligation to provide information about adverse drug reactions:

M00337647S

### 1.     21 CFR 201.57(e)

36.     This regulation stipulates a company's duty to warn about serious drug-related hazards.

> Warnings: The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.

37.     This regulation means that a company must issue a warning about a serious hazard as soon as there is reasonable evidence that such hazard exists. The company should not wait until there is scientific proof that its medication causes the hazard.

### 2.     21 CFR 314.70 (c)(6)(iii)(A)

38.     This regulation, known as *Changes Being Effected (CBE)*, stipulates that a company has the ability (and, therefore, the obligation) to change the product information (label) for a drug to provide such information without prior approval by the FDA. In particular, without prior approval, a company may

> add or strengthen a contraindication, warning, precaution, or adverse reaction.

39.     This regulation obligates a company to issue a warning, precaution, or adverse reaction notification as soon as it possesses reasonable evidence that a problem is related to its drug. The company should not wait until the FDA approves the information. The relevant FDA Guidance Document in effect during most of the time Vioxx was on the market affirms that a CBE "should be submitted" for a label change [Reg 1]. As an indication of the importance the FDA attaches to this regulation, a more recent version of this Guidance Document directs that a CBE "must be submitted" for such a label change [Reg 2].

40.     This regulation is intended to provide doctors and patients with important safety information as soon as possible – without any delay that could result from the time needed for the FDA to review the notification.

41.     A company should issue a warning, precaution, or notification of adverse reaction in a variety of formats. First, such information should be included in the *prescribing information* for the medication. Second, the company's *sales representatives* should discuss such information with the doctors and health care providers whom they call upon, in order to make sure that these practitioners are aware of the hazard. Third, the company should include information about significant hazards in *advertisements* to the public and the medical profession. Fourth, the company should send *letters* to doctors and other health care professionals ("Dear Health Care Professional" letters). Fifth, the company should add relevant information to the *"Information for Patients"* documents.

M003376476

### 3.  Example of a Company Carrying Out These Obligations as Required

42.  On August 22, 2003, the pharmaceutical company Wyeth issued a precaution about hostility and suicidality in children and adolescents treated with its drug Effexor, an antidepressant drug. In a letter to health care professionals, the company wrote:

> In pediatric clinical trials there were increased reports of hostility and, especially in Major Depressive Disorder, suicide related events such as suicidal ideation and self-harm.

43.  Wyeth issued this important information a year before the FDA required it. Moreover, at the time the company issued this notification, proof that Effexor causes hostility and suicidality in children and adolescents was lacking. In 2004, the FDA reviewed numerous pediatric studies of SSRI treatment and a key FDA official stated in September 2004 that causality had been established.

## V.  Labeling

### A.  Label Is the Primary Communication with Medical Providers

44.  One of a pharmaceutical company's primary methods of communicating important safety information is through the drug label, which may also be called the package insert (PI) or product information.

45.  Drug labeling should contain adequate directions to *use a drug safely* and must not contain *false or misleading statements*. In addition to information about the drug substance, its effects and intended use, directions are required to include information about dangers associated with the drug, specifically, contraindications, warnings, precautions, and adverse reactions. All these terms are defined by various regulations.

46.  The FDA considers the labeling the most important and most official information about a drug, and the agency reviews all labeling carefully. The FDA must approve final labeling before any new drug product is approved. And the agency must also eventually approve new labeling or changes to labeling. [21 CFR 201]

47.  The FDA's power to regulate labeling derives from its power to seize a drug product and remove it from the market if the agency considers the drug mislabeled.

### B.  FDA Cannot Force Label Changes Without Drastic Measures

48.  If the FDA determines that a drug is not properly labeled, it considers the drug misbranded. The agency will then request the company to change the label and submit new labeling for review by the agency.

M00337647?

49    Sometimes there are significant disagreements between the pharmaceutical company and the FDA about what labeling should say about the drug. Such disagreements are almost always short-lived and quickly resolved.

50.    In my experience, which included hundreds of labeling decisions, resolutions of disagreements between the agency and the company never took more than a few days or weeks at the outside. In cases where the issue concerned human safety, such as warnings, precautions, or adverse reactions, the FDA almost always prevailed. I do not remember any substantial disagreement on safety matters, where the FDA did not have final say.

51.    Nevertheless, writing labeling always involved a negotiation with the company. Companies usually deferred to the FDA because of fears of adverse publicity, loss of reputation, or enforcement actions, if disagreements over safety issues remained unresolved.

52.    Occasionally, however, disagreements can remain unresolved. In that case, if jawboning by the FDA and deference on the company's part does not produce a resolution, as a practical matter the enforcement actions the FDA can take are limited.

53.    The FDA could request the company to recall the drug. [21 CFR 7.40]. If the company refuses, the only alternative is for the FDA to seize the drug as an "imminent hazard to public health." [21 CFR 2.5]

54.    Clearly, seizing a drug is a very drastic step. Doing so disrupts the treatment of patients who are taking the medicine. The action disturbs doctors and the medical profession generally. It places significant burdens on the health care system and on the pharmaceutical company.

55.    As a practical matter, the FDA tries to avoid declaring an imminent hazard whenever possible. Because of this reality, if a pharmaceutical company wishes to resist FDA proposals, it can refuse to implement the agency's recommendations. In effect, it dares the FDA to take action.

56.    Testifying before Congress on Vioxx, Dr. Sandra Kweder, Acting Director of the FDA's Office of New Drugs, described the limits of FDA's authority, particularly in relation to the negotiations over Vioxx.

> Dr. Kweder: We don't have the authority to tell a company, "This is how your label has to look. This is the language that needs to go into your label. Here's where it goes. End of story. We have to negotiate with the company the specific language of how things should be worded, placement, those kinds of things.
>
> Senator Murray: So you were talking to them.
>
> Dr. Kweder: Correct.

M003376478

Senator Murray: Did they reject that wording?

Dr. Kweder: I would say they rejected our proposals.

## VI.   Merck's Vioxx Has a Problem

### A.   Pre-Approval Indications of a Cardiovascular Problem

57.    Even before Vioxx was approved, a clinical study of the drug pointed to a potential adverse effect of Vioxx in increasing the risk of CV/T events.  Study 023 of the effects of Vioxx on the kidney was completed in 1997 and subsequently reported in the medical literature [145].  Although it was primarily a kidney investigation, the results of Study 023 suggested that Vioxx reduces the level of an important hormone called prostacyclin, which is also present in blood vessels.  Prostacyclin reduces the clotting of blood platelets and is anti-thrombotic.  But because Vioxx is a selective COX-2 drug, it does not reduce the level of a vascular hormone called thromboxane, which is pro-thrombotic.  The study suggested that together these two effects of Vioxx might well increase the risk of cardiovascular thromboses, including myocardial infarctions. [146]

58.    A board of Merck scientific advisors that met in May 1998 was sufficiently concerned about this finding of Study 023 that it recommended the company conduct systematic examination of coronary thrombotic events in all future Vioxx trials.  Specifically the scientific advisors recommended that the company develop criteria for such events, analyze the occurrence of these events as a planned endpoint, and perform a meta-analysis of these events that pooled the results of all future Vioxx studies.  Despite this recommendation by its own scientific advisors, Merck submitted the NDA for approval of Vioxx in November 1998 before completing any such studies or analyses.  Moreover, Merck never performed a study designed to assess cardiovascular risk as a primary endpoint, nor did it perform the recommended meta-analysis, not even by the time of the withdrawal of Vioxx more than five years later.

59.    Merck included a report of Study 023 in NDA 21-042 for Vioxx, as required by regulations.  But although the prostacyclin issue was mentioned in the study report, little was said about it there.  Merck reported a statistically significant decrease in prostacyclin in the absence of a decrease in thromboxane on Vioxx, but the company also stated that the clinical implications of the findings were unknown.  This comment fell short of full disclosure, because Merck knew of the potential serious adverse effect that cardiovascular thrombosis might increase. [146]

60.    Moreover, Merck should have reported the findings and the serious clinical implications in other sections of the NDA, too.  An obvious place to bring up the subject would have been in Vol. 1.94, the General Safety Overview, in section 1.7, entitled "Potential Risks Based Upon Specific Cyclooxygenase-2 Inhibition."  If the possibility of increasing CV/T events as a result of specific COX-2 inhibition is not a risk deserving of mention in this section, then what is?  Yet Merck did not say a word about it here. [142]

M00337647P

### B.    Approval of Vioxx Without Proof of a GI Benefit

61.    On May 20, 1999, the FDA approved Merck's new drug application for Vioxx [0.1]. The drug was approved after a rapid, priority review lasting only six months. Such reviews are intended for drugs for serious conditions that have the potential to address an unmet medical need.

62.    It was hoped that Vioxx, a specific inhibitor of the inflammatory protein COX-2, would prove advantageous compared to older analgesic/anti-inflammatory agents that inhibit COX-2 and a similar protein COX-1, which protects the lining of the GI tract. The older drugs, which include aspirin, naproxen, and other non-steroidal anti-inflammatory drugs (NSAIDs), are used for treatment of chronic pain, especially the pain of arthritis. Older NSAIDs may cause gastrointestinal (GI) pain and injury to the lining of the GI tract.

63.    The reason for the optimism was that Vioxx, by targeting the COX-2 protein that is found in sites of inflammation (such as occur in arthritis), would have less effect on the COX-1 protein that protects GI tract. It was hoped that Vioxx would be safer in terms of GI adverse reactions.

64.    However, it was not long before serious problems with Vioxx emerged.

65.    The studies Merck submitted to the FDA in support of the Vioxx New Drug Application (NDA) did not sufficiently demonstrate that Vioxx caused fewer GI adverse reactions. The FDA reviewer, Dr. Villalba, wrote that analyses of ulcerations, bleeds and perforations were "not demonstrative of clinically significant differences between rofecoxib [Vioxx], ibuprofen and diclofenac," two older NSAID drugs [2].

66.    In order to try to prove that Vioxx was less toxic to the GI tract, Merck decided to do another study comparing Vioxx to the older NSAID naproxen. The study began before Vioxx was approved, but was still underway after the drug was on the market. This study was called VIGOR for "Vioxx Gastrointestinal Outcomes Research."

### C.    The VIGOR Trial Results

67.    In the VIGOR study, Vioxx did show less GI toxicity than the older NSAID naproxen. But the study also showed that Vioxx was associated with more serious cardiovascular adverse reactions, especially myocardial infarctions and other potentially fatal events.

68.    The first results of the VIGOR study became available March 2000. According to a timeline later prepared by FDA, in June 2000 an analysis of the cardiovascular/thrombotic (CV/T) adverse events, mostly MIs, showed that these severe reactions occurred in five times as many patients on Vioxx as on naproxen.

14

M003376480

69.     This five-fold association with heart attacks and other potentially fatal CV/T events was a very serious problem for Vioxx. MIs are almost always much more serious adverse reactions than ulcers or GI pain. MIs have a greater potential to cause death.

70.     Eventually – it took four years – Merck decided to withdraw Vioxx from the market due to these cardiovascular adverse reactions. In order to understand what happened and why it took so long, we have look at Merck's actions after VIGOR.

### D.     Merck's Assessment of VIGOR

71.     Dr. Edward Scolnick, who was President of Merck Research Labs and, in that capacity, supervisor of the Vioxx program, had reason to worry about the cardiovascular effects of Vioxx for at least a couple of years, even before the results of VIGOR were in hand.

72.     The reason was that COX proteins stimulate the production of another protein called prostacyclin, which reduces blood clotting. This fact can be found in the 1992 Merck Manual, a respected reference published by the company itself.

73.     In addition, as described above (*See* Section VI.A.), Merck sponsored Study 023 on the effects of selective COX-2 inhibition on kidney function. It showed that Vioxx reduced blood levels of prostacyclin. This study indicated that in the kidney and other organs, including blood vessels, COX-2 plays a role in prostacyclin production, and inhibition of COX-2 by Vioxx suppresses prostacyclin. If so, Vioxx might increase blood clotting and cause MIs and other CV/T events. The study was submitted to a medical journal of pharmacology before Merck submitted the NDA to the FDA. In the article, the authors wrote that "Prostacyclin formation by the vasculature is of functional importance. . . . It remains to be established whether treatment with specific Cox-2 inhibitors will suppress this response."

74.     This study implied a possible role for Vioxx in causing the increased CV/T event rate in VIGOR. In a revealing document written by Dr. Scolnick after the drug was taken off the market ("Vioxx, a Scientific Review"), he wrote that the results of this study were know to him and Merck since 1997. Scolnick wrote that because of the findings of this study, on being told the results of VIGOR, he thought that Vioxx had caused the elevated rate of cardiovascular events. [82]

75.     Dr. Scolnick's comment and the words of the authors of the pharmacology article (who included three Merck researchers) show that he and Merck were aware of this problem in 1997, and they still were concerned about it as late as 2000, when the results of VIGOR Became available.

76.     Despite these findings, at the time the VIGOR results came out, the Merck project team supervised by Dr. Scolnick chose to rely on an alternative explanation for the higher rate of MIs on Vioxx. In addition to protecting the GI tract lining, the COX-1 protein promotes blood clotting. Since the comparator drug, naproxen, inhibits COX-1, it

M003376481

theoretically might reduce blood clotting. By reducing clotting, naproxen might be reducing CV/T adverse reactions. (However, according to FDA reviewers, there is no good evidence from placebo-controlled clinical studies that naproxen actually does this -- see below.)

77    According to Dr. Scolnick, in order to resolve the dilemma of which explanation of the elevated Vioxx rate of CV/T events was correct – whether Vioxx was causing clots or naproxen was reducing them – the project team examined two ongoing studies of Vioxx in Alzheimer's disease. In these studies, Vioxx was compared to a placebo; so if an elevated Vioxx rate of CV/T events occurred in those studies, it would show that Vioxx was causing the clots.

78.    On examining the Alzheimer's study results, they found no elevated rate of CV/T events in the Vioxx group. From that time on, Merck chose to put forward the alternative explanation -- naproxen prevented rather than Vioxx caused clots – in all the official statements from the company. According to Merck, in the VIGOR study significantly fewer CV/T events, including MIs, occurred in the naproxen group; this was consistent with naproxen's ability to block clot formation. [76]

79.    But there were problems with this explanation from Merck. The company itself admitted that such an effect of naproxen had never before been observed in a clinical study. [76] Merck's own cardiovascular consultant, Dr. Patrono, e-mailed a Merck official stating that he did not believe the VIGOR results could be attributed to naproxen benefit. [60] Moreover, when the FDA reviewers considered this explanation, they discounted it. The NDA reviewer, Dr. Villalba, said the Alzheimer's studies were not large enough or designed to assess cardiovascular risk. [15] The FDA consultant in the agency's cardiovascular division objected that no placebo-controlled studies had shown a naproxen benefit to be true. [6.4]

80.    Merck did support its conclusion that naproxen protects against rather than Vioxx causes heart attacks and other CV/T events with other studies besides the Alzheimer's trials. But the bottom line was that *the truth was not known.* Merck's research director, Dr. Scolnick, admitted this. In an e-mail a number of months after the VIGOR study was analyzed, he wrote to Raymond Gilmartin, Merck's CEO,

> it is impossible to know that in patients with rheumatoid arthritis that ALL of the difference between Vioxx and naproxen is due to the benefit of naproxen. IT IS IMPOSSIBLE TO PROVE THIS; IT IS IMPOSSIBLE TO KNOW THIS WITH CERTAINTY. [Caps in original] [59]

81.    Mr. Gilmartin himself, in testimony on Vioxx before Congress in 2004, said in a prepared statement that it was impossible to know from the VIGOR study whether naproxen was having a beneficial effect or Vioxx was having a negative effect. [78]

82.    The lack of an answer to this dilemma raised a serious question about how best to treat patients. If Vioxx causes a greater a number of heart attacks, then doctors should be

M003376482

informed of that fact, because they would need to decide whether to treat patients at risk for heart attacks with Vioxx. But if naproxen causes a decrease in the frequency of heart attacks because of a protective effect, then doctors would not need to worry about heart-attack prone patients taking Vioxx.

83. To put out the claim publicly that Merck knew that difference was due to naproxen benefit was to advise doctors that *it was OK to treat patients at high cardiovascular risk with Vioxx*. We now know that the evidence shows Vioxx does cause increased rates of CV/T events, and Merck withdrew Vioxx because of that. But at that time, the answer was not known.

84. So what did Merck do?

### E.   Merck's Precautions With Doctors and Patients Involved in Its Own Studies

#### 1.   The Press Release of March 27, 2000

85. What Merck did was tell news reporters, doctors, financial analysts, and others that the benefit of naproxen was what reduced the frequency of heart attacks and CV/T events in the naproxen group in the VIGOR study.

86. Merck put out a press release intended for the news media and stock analysts and investors that contained the assertion

> . . . . significantly fewer thromboembolic [CV/T] events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation [clotting]. [76]

87. The announcement did *not* say there was any question about this or that another possibility was that Vioxx increased cardiovascular events.

88. In an important way, this press communication from the company lies at *the heart of the questions about what Merck did and did not do about the CV toxicity of Vioxx*. I will discuss what Merck *should* and *should not* have done in Section IV.F. of this report.

#### 2.   Merck Modifies Its Study Protocols

89. The press release also stated that Merck was notifying doctors under contract to the company who were investigators in studies of Vioxx. [76] In addition to notifying its investigators, the company also amended the protocols of all Vioxx studies to allow the addition of low-dose aspirin where appropriate. [0.1] In doing this in June 2000, shortly after the VIGOR results came out, Merck was changing its studies of Vioxx so that participating doctors could give aspirin to their patients at risk for CV/T problems.

M003376483

90.    This was an important and revealing action on Merck's part, because if Vioxx was truly no hazard to high-risk patients, then there was no reason for Merck to do anything at all.

91.    Merck did take action to allow its own doctors – those the company had hired to do investigations of Vioxx – to add aspirin to patients' regimens because the company wanted to reduce the CV/T risk to the patients participating in its own investigations. This was one of the *very first things* the company did upon learning that the Vioxx patients were having more heart attacks, and it is therefore clear that the company was worried about the elevated rate in that group of patients.

92.    But what about all the other doctors prescribing Vioxx and all the other patients who were taking Vioxx throughout the United States. *What about them? Didn't they have reason for concern also?*

93.    If the company was concerned about the patients on Vioxx in its studies, why shouldn't physicians everywhere have been concerned about patients on Vioxx also?

**F.    What Merck Should Have Done With Other Doctors and Patients**

    **1.    Advise Doctors and Patients of the Uncertainly and Potential Problem**

94.    The first thing Merck had an obligation to do – for all the doctors and patients throughout the country who were prescribing or taking Vioxx – was to inform them that there was a serious medical question about the safety of Vioxx.

95.    Even the Merck doctor who was in charge of the Vioxx program and the CEO of the company knew that it was impossible be certain that the increased heart attacks and other CV/T events in the Vioxx group were not due to Vioxx.  That is what every other doctor needed to know, too.

96.    Doctors needed to know that there was a possibility that their patients on Vioxx might be at greater of risk of CV/T events because of taking Vioxx.  This was especially true for patients who already had elevated risk of cardiovascular disease or already had the actual disease.

97.    FDA regulations make special provisions for warning the medical profession when there is a serious question about the safety of a drug, even if there is no proof that the drug causes the reaction.  An FDA regulation states:

    Warnings.  Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur.  The labeling shall be revised to include a

M003376484

warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved. [21 CFR 201.57]

98.      Another related regulation states that companies "may add or strengthen a warning, precaution, or adverse reaction" before getting FDA approval [21 CFR 314.70]. The purpose of this regulation is to allow drug companies to move forward as quickly as possible with alerting the medical profession to serious safety problems.

99.      Merck ought to have put out a public statement that made the problem clear. Because of the seriousness of the problem, a letter to all health care professionals would have been appropriate.  Such a letter should have honestly told these medical providers something like this:

- In a Merck clinical trial, patients receiving Vioxx had an increased rate of cardiovascular thrombotic events compared to patients receiving naproxen.

- At present it is unknown whether this indicates an increased risk of cardiovascular thromboses on Vioxx or a decreased risk of such events on naproxen.

- Because of the uncertainty, doctors with patients on Vioxx may wish to consider the risks and benefits of Vioxx in their patients at for cardiovascular thrombotic events.

100.    In addition to putting out public information, Merck should have changed the label of Vioxx to warn about this problem.  This was the action recommended by the FDA cardiovascular reviewer after she had reviewed the VIGOR data, i.e., that a warning be put in labeling. [5] According to the regulation, Merck did not have to wait for the FDA to recommend this.  The company could have done it on its own, and should have done it on its own.

101.    The company should also have instructed their sales representatives to inform the doctors they visited and discuss the issues with them.  These sales people often develop familiar relationships with the doctors on their routes and can be very effective in conveying information.  If the sales people had no effect, the companies wouldn't use them.  And if a salesman told a doctor about a problem with his own company's drug, you can be sure the doctor would have listened.

## 2.    Recommend the Action Merck Took With Patients in Its Studies

102.    The next thing Merck should have done was something it also chose to do with the doctors and patients in its own studies: advice about the use of aspirin.  Merck did this in its own investigations to protect the patients.  It modified its protocols to allow the

M003376485

investigators to put patients on aspirin if the patients were at cardiovascular risk, and it sent notices to all the investigators. *But again, what about all the other patients throughout the country?  Didn't they need to be protected, too?*

103.    Merck did state in the March press release that it had notified its investigators of protocol modifications to allow aspirin, but that is not the same thing as directly advising doctors to consider aspirin for their patients.  Moreover, the statement about notifying investigators followed sentences of the paragraph that implied that naproxen was protective and Vioxx absolved of blame.

104.    Eventually, two years later, after long negotiations with the FDA (more about this below), Merck did put a statement in Vioxx labeling that anti-clotting therapies such as aspirin should be considered for patient with cardiovascular risk.  But the company did not need to wait two years.  It could have put such a statement in the Precautions section immediately.  Moreover Merck could have added a fourth bullet, such as the following one, to the preceding three in a letter sent to medical providers.

> Since Vioxx does not protect patients against cardiovascular thromboses and may possibly increase the risk, doctors may wish to consider the addition of aspirin to the regimens of patients taking Vioxx.

### G.    Why Merck Did Not Take Such Actions with Other Doctors and Patients

105.    It is impossible to know the hearts and minds of the Merck doctors and executives who chose not to take the actions I discussed in the preceding section, and I do not claim to be able to say why they acted as they did.  But two important facts should be taken into account in considering why Merck did not inform the medical community right away that (1) it was possible that Vioxx was causing the elevated rate of CV/T events, and (2) that doctors should consider aspirin for their patients on Vioxx.

106.    The first fact is that there were many other analgesic and anti-inflammatory agents on the market.  Vioxx had lots of competition.  If Merck put out that Vioxx might be causing such serious problems as heart attacks, it was possible that it would lose market share or even be widely rejected.

107.    The second fact was that the main selling point of Vioxx was that it was safer on the GI tract.  Aspirin, however, is known to often irritate the GI tract and cause ulcers.  About a year and a half later, *The Medical Letter*, a respected newsletter on drugs commented that taking aspirin might have protected against cardiovascular thromboses, but it would also diminish the apparent advantage of gastrointestinal safety.  In other words, if Merck advised doctors to consider aspirin for Vioxx patients, that would detract from the main selling point of the drug.

108.    In addition, as discussed below, financial considerations played a role in the course Merck chose to take.

M003376486

VII.   What Merck Did Instead of Alerting the Medical Community About the
Risks of Vioxx

A.   Merck Orders Sales Representatives Not to Discuss the VIGOR Study

109.   In the previous section, I described how useful it would have been to have
Merck's sales representatives discuss the VIGOR study with the physicians on their beat.
In fact, Merck did the opposite of this at one point.  According to a congressman, whose
committee held hearings on Merck and Vioxx, in February 2001, the company issued a
bulletin to its 3000 sales people.  The bulletin ordered, "DO NOT INITIATE
DISCUSSIONS ON ... THE RESULTS OF THE . . . VIGOR STUDY."  It advised that if
a physician inquired about VIGOR, the sales representative should talk about the
gastrointestinal benefit of Vioxx and then say, "I cannot discuss the study with you." [18]

B.   Merck Repeatedly Implicates Naproxen, Not Vioxx

110.   In previous sections, I also noted that by pushing the claim that the elevated rate
of CV/T events was due to the protective effect of naproxen and not harmful effects of
Vioxx, Merck was distorting the truth that the cause had not been pinned down and
Vioxx might well be the cause.  And the company was diverting physicians from
considering the risks that Vioxx might cause to some of their patients.  I described how
FDA reviewers and Merck's own consultant cast doubt on the company's explanation.
[6.4, 15, 60]

111.   Nevertheless, Merck consistently maintained and put out statements that
protection due to naproxen was the explanation.

112.   The company implied this in three press releases. [63, 76, 84]  The first one,
previously cited, came out shortly after the VIGOR study results came out.  It declared
that the results were "consistent with naproxen's ability to block platelet aggregation."
Merck repeated this statement in press releases May and August 2001, even though in
February, the FDA reviewers at an FDA advisory committee meeting had objected that
the claim was unsubstantiated.

113.   In September 2001, the FDA division that monitors advertising issued a warning
letter to the company. [7]  The agency accused Merck of sponsoring six audio
conferences on Vioxx for doctors that were "false or misleading in that they minimized
the MI results of the VIGOR study."  The letter charged that Merck was claiming:

Vioxx does not increase the risk of MIs & that the VIGOR finding is consistent
with naproxen ability to block platelet aggregation like aspirin.

M003376487

The FDA continued:

> That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

114. Merck was also sending out the naproxen explanation in response to queries from doctors about the issue. A "Dear Doctor" form letter issued in May 2000 made this claim about naproxen. The letter was probably sent out to many physicians.

### C.   Merck Asserts and Advertises the Cardiovascular Safety of Vioxx

115. Merck also repeatedly issued statements and sponsored advertisements claiming that Vioxx had a safe cardiovascular profile. The company did this so many times that it is not possible to list here more than a small fraction of all the company's claims.

116. The press releases of May and August 2001 were headlined, "Merck confirms the cardiovascular safety profile of Vioxx," and "Merck stands behind the cardiovascular safety profile of Vioxx." Of course Merck knew that there were serious questions about these claims, and that the hearts of many patients taking Vioxx might be at risk. [63, 84]

117. Merck created a "Cardiovascular Card" for sales people to hand out to doctors. The card did not discuss the VIGOR study but asserted the cardiovascular safety of Vioxx based on earlier studies. [85] A "Dear Doctor" letter confirming cardiovascular safety was sent out to large numbers of physicians to counteract questions raised by an article about Vioxx in the Journal of the American Medical Association. [71]

118. Merck asserted the claim of cardiovascular safety at scientific meetings. [7] One such meeting was the FDA advisory committee meeting in February 2001 [1], where the claims was directly questioned by FDA reviewers, after which the advisors voted overwhelmingly to recommend that the cardiovascular information from VIGOR be transmitted to physicians. However, on the very next day, Merck ordered its sales force not to discuss the advisory committee meeting. [18]

119. The warning letter from the advertising division of the FDA in September 2001 cited the advisory committee meeting and objected that Merck was trying to minimize the results of the VIGOR study. [7]

### D.   Merck Promotes Vioxx GI Safety While Playing Down Risks

120. In numerous advertisements and other promotional material, as well as letters to doctors, Merck emphasized the gastrointestinal benefits of Vioxx while down playing the cardiovascular risks. There is little doubt that Merck took this unbalanced approach in hundreds and probably thousands of communications. The company would put

22

M003376488

information about GI benefits in the leading paragraphs of its Vioxx communications and only bring up cardiovascular safety further on.

121.   At an internal meeting in September 2001, FDA officials discussed Vioxx labeling and recommended balanced information on Vioxx that "de-emphasized the GI safety advantage in the Vioxx label". [0.1] This occurred about the same time that the warning letter about advertising accused the company issuing advertisements that were "false, lacking in fair balance." The letter also noted that the company was failing to present the Warning in labeling about the possibility of serious gastrointestinal toxicity in patients taking Vioxx and it was making unsubstantiated claims of superiority to other NSAID drugs [7]

### E.   The History of the Vioxx Label Change Negotiations

122.   Two years and one month passed between the time that Merck became aware of the cardiovascular results of the VIGOR study in March 2000 and the time Merck changed the product label for Vioxx in April 2002 to incorporate information about the serious risk of heart attacks.  Epidemiological studies have indicated that during those years, in all likelihood, tens of thousand of patients had heart attacks related to Vioxx.

123.   It did not have to take nearly so long.  If Merck had changed the label sooner, and warned doctors and patients earlier, it is very likely that many of those heart attacks might have been avoided.

124.   There is good evidence that suggests that Merck dragged its collective feet about the label change, concerned about the fierce competition for market share with the competitor drug Celebrex.  This section discusses the history of the two years in which Merck negotiated with the FDA about changing the Vioxx label.

### 1.   Merck Could Have Made Label Changes Immediately

125.   In a previous section of this report, I explained that one of the first things Merck should have done upon analyzing the results of the VIGOR was to inform doctors about the problem of heart attacks by changing the product label (*See* Section VI.F.).  Merck could have changed the label almost IMMEDIATELY.  Doing so would have been entirely appropriate because of the serious nature of the problem, and it would likely have prevented many serious illnesses and saved many lives.

126.   An FDA regulation called "Changes Being Effected" allows pharmaceutical companies to add important safety information even before getting FDA approval.  (*See above* Section IV.A. for statements of the applicable regulation and another that stipulates that a Warning be added to safety information in the label as soon as the evidence of a serious hazard becomes available.)  So Merck could have added information about the risk of heart attacks on Vioxx as soon as April or May 2000.

M003376489

2. **Merck's Initial Label Change Proposal, June 29, 2000**

127.   On June 29, 2000, Merck submitted the first supplement for new proposed labeling for the VIGOR study to FDA. The supplement contained new labeling for both the gastrointestinal AND the cardiovascular results. But almost all the changes in this proposed label concerned the gastrointestinal results of VIGOR, which demonstrated a benefit for Vioxx.

128.   It is understandable why Merck would have wanted to add both these changes to the product label at the same time. The cardiovascular results indicated a serious hazard, and Merck would naturally have wanted a significant benefit to promote in the same label to compensate for the hazard and sustain Vioxx's market appeal.

129.   But it didn't have to be done that way. FDA regulations require prior approval to change a label to add a unique benefit or to add results of a new investigation. But the regulations also permit – and guidelines encourage – *immediate* addition of a new serious safety hazard. So Merck could have submitted two labeling supplements instead of one: One supplement, with simple and straightforward wording, could have alerted doctors right away to the high rate of heart attacks in the VIGOR study. Another longer and more complex supplement could have proposed new wording for the *Clinical Studies* section and added information on the gastrointestinal benefit.

130.   Because Merck submitted both changes in one supplement (the gastrointestinal and cardiovascular results), a long FDA review was required, a process that involved protracted negotiations and eventually took two years to complete. In the meantime, the medical community saw no label changes.

131.   Moreover, the cardiovascular information in the single supplement was weak. In the safety sections of the label, there was no Warning about heart attacks or other CV/T events. In contrast, it its first response to this supplement, the FDA proposed a strong Warning. Merck did add information to the Precautions section but stated there *only* that patients who required aspirin for cardiovascular prophylaxis should continue on such treatment, since Vioxx has no anti-platelet effect. Only at the end of the clinical studies section, after pages of information about the GI benefit of Vioxx – and not in any of the safety sections – did Merck propose wording that explained how patients on Vioxx had four times the number of heart attacks as patients on naproxen in the VIGOR study.

132.   Clearly, this was an inadequate label proposal from the standpoint of cardiovascular safety. And the fact that it was proposed with such a weakness probably prolonged the label negotiating process.

3. **Merck's Submission of October 13, 2000**

133.   On this date, Merck submitted the label document with the 6/29/00 changes again. The company did not reconsider the changes and did not alter the proposal. The

M003376490

submission, however, is of some interest because in the cover letter, Merck informed the FDA of eleven additional cardiovascular serious adverse reactions in the VIGOR study. Three of these were myocardial infarctions on Vioxx. There were no additional myocardial infarctions on naproxen. These additional adverse reactions were not included in the initial VIGOR results submitted in the spring.

134.    These previously unreported MIs have caused controversy, because an article on the VIGOR study written with Merck's assistance (two of the authors were Merck employees) and published in the New England Journal of Medicine on November 23, 2000 – more than a month after this FDA submission – did not include these adverse reactions. Moreover, Merck never informed the journal about the missing data. On December 29, 2005, having learned of the missing MIs through documents in litigation, the journal published an editorial criticizing the omission of the information in the article. On March 16, 2006, the journal reaffirmed its expression of concern in response to letters from the authors of the article.

### 4.    Merck's Delays Prolong the FDA Effort to Add Cardiovascular Safety Data to the Label

135.    In order to develop a label that more adequately addressed cardiovascular safety issues, the FDA asked Merck to submit results of another study, completed about the same time as VIGOR. Called ADVANTAGE, the study also compared Vioxx to naproxen but used a lower dose of Vioxx (25 mg) and allowed aspirin prophylaxis for patients with cardiovascular risk factors. The agency wanted to find out if this study also showed an excess number of MIs in the Vioxx group.

136.    The FDA had to request Merck to submit the report of the ADVANTAGE study four times. The first request was made in November 2000 [54]. Following an advisory committee meeting on Vioxx in February 2001 (*See below* Section VII.E.5.), the company apparently still had not submitted the study report, and FDA repeated the request on February 14, a week after the meeting [55].

137.    The company responded by asking the FDA to explain and justify the request. The FDA answered that it was a large study of an "approved chronic dose without restrictions on aspirin." On February 28, the FDA sent the request as a letter in addition to a fax, and noted that the advisory committee remarked on the importance of the information. [56] This indicates that the FDA had been provoked by the delay and felt the need to make a more forceful request.

138.    Even after the agency provided a clear letter and obvious justification, the company took a month to submit the data. And even then it was not complete, lacking certain data sets and patient records [57]. The agency requested the missing data sets in April (*See* Section VII.E.7*)*, a fourth request.

M003376491

5.  **FDA and the Arthritis Advisory Committee Determine that the Vioxx Label Should Address the Cardiovascular Safety Issues Shown by the VIGOR Study**

139.    From the moment that Merck first reported the results of the VIGOR, FDA reviewers worked diligently to analyze the results and the health implications of the study.  The agency was sufficiently concerned to call a meeting of the Arthritis Advisory Committee in February 2001 to discuss VIGOR and make recommendations about what to do about it.  The meeting lasted two days, with the first day devoted to Celebrex, and the second day to Vioxx.

140.    At the meeting FDA reviewers made presentations asserting that the study raised serious questions about the cardiovascular safety of Vioxx.  In contrast, Merck made presentations asserting that Vioxx was safe and that CV/T events were not caused by Vioxx but prevented by naproxen.  FDA called Merck's explanation into question.

141.    The advisory committee overwhelmingly recommended the CV/T results of the VIGOR study be communicated to the medical profession [18].  Following this recommendation, FDA continued analyzing the Vioxx cardiovascular data in order to add a warning to the drug label.  More than a year passed between the advisor's recommendation and the actual inclusion of the information in the label in April 2002.  During that time Merck and FDA negotiated the wording of the label.  As a former FDA reviewer, I do not remember any other post-approval labeling discussion that took so long to resolve.

6.  **Merck's Label Submission of March 16, 2001**

142.    One might suppose that after the advisory committee *overwhelmingly* recommended the inclusion of the Vioxx cardiovascular data in the label, that Merck would submit a proposal prominently displaying this information.  If so, one would suppose wrong.

143.    In the previous label proposal of June 29, 2000, the company had devoted a long paragraph in the *Clinical Studies* section to the VIGOR data on myocardial infarctions.  In the *Use with Aspirin* subsection, five sentences analyzed the rates of MIs, pointing out that overall rate of MIs on Vioxx was four times that on naproxen, while among the patients not indicated for aspirin prophylaxis, the rate of MIs on Vioxx was double that on naproxen.  The company reported statistical means, differences and confidence intervals.

144.    In the label proposal of March 16, 2001 [158a, elec], Merck deleted this information from the *Clinical Studies* section altogether.  Instead the company gave more prominence to the GI safety of Vioxx.  The first paragraph of the VIGOR study information, which described the GI benefit of Vioxx, was doubled in length.  The subsection on *Use with Aspirin* was shortened to contain only statements about the effect of aspirin used with Vioxx on GI toxicity.

145.   Merck moved the VIGOR cardiovascular information near the end of the *Precautions* section. The *Cardiovascular Effects* subsection of *Precautions* followed four other subsections, which were probably much less important. Moreover in the *Cardiovascular Effects* precaution, only one sentence in the second paragraph, reported the VIGOR data of a five-fold increase in the overall rate of MIs on Vioxx. This one sentence occurred among nine other sentences that discussed – not the VIGOR data – but the use of aspirin, the effect of naproxen on platelets, and the results of other studies that showed little difference in the rate of MIs.

146.   It can be fairly said that five weeks after the advisory committee recommendation, Merck shortened the VIGOR cardiovascular information to a single sentence and buried it in information about aspirin.

### 7.   FDA Initiates Formal Label Discussions

147.   The FDA began its formal effort to add the VIGOR cardiovascular data with an *approvable letter* to the company on April 6, 2001. [58] It was called an "approvable letter," but the agency often uses such letters to set forth a list of requirements for reaching final approval. In this case, the subject in question was the label change to incorporate the cardiovascular data in VIGOR, as the advisory committee had recommended two months earlier.

148.   In the approvable letter, FDA requested a complete safety update of Vioxx. The agency also noted the incompleteness of Merck's response to the request for the ADVANTAGE study report, which lacked certain data sets, and again asked for a complete report.

149.   Merck finally submitted the requested information three months later in July.

150.   After reviewing all the information (including VIGOR, ADVANTAGE, and other studies), FDA proposed its first VIGOR-related labeling on October 15 2001. [0.1] It took another half year before negotiations were completed and the FDA approved the label changes.

151.   The October 2001 FDA proposal added a lot to the Vioxx label, an indication that the agency was very concerned about the CV safety issue. It added a long discussion of the VIGOR study to the *Clinical Studies* section. More than a page of the additions – including two tables – presented the cardiovascular data. The section began by asserting a "significant increased risk of development of serious cardiovascular thrombotic events in patients taking Vioxx." It also included a statement on cardiovascular events in ADVANTAGE, in which nine cardiac events (including five MIs) occurred on Vioxx compared to three cardiac events (one MI) on naproxen.

152.   But most importantly, FDA added a strong *Warning* to the label. It began, "*Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic*

M003376493

*events . . .*" [italics added]  And the second paragraph began, "The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with Vioxx 50 mg . . ."

153.    The *Warning* was exactly what doctors and patients needed to know.  Patients at risk of cardiovascular events needed to be careful about taking Vioxx.  FDA was clear about this and attributed the risk to Vioxx in the *Warning*.  But instead of adding a clear warning, Merck still sought to bury the information.

## 8.    On November 8, 2001, Merck Rejects FDA's Labeling Proposal and Submits Its Label Response

154.    On the day after receiving the FDA labeling proposal,  an email from Merck's research director,  Dr. Scolnick,  to another Merck official,  David Anstice,  stated, "Be assured we will not accept this label."  Anstice responded, "We will fight and see where we get."  Scolnick returned, "thye are bastards [sic]."

155.    Not surprisingly, on November 8, 2001, Merck rejected FDA's labeling proposal.

156.    In the letter, Merck stated that it "strongly disagrees with FDA with respect to many of the labeling recommendations.  And the company returned FDA's proposal with cross outs and markups to show how it wanted to change it.  It is instructive to see what Merck wanted out.  Among the cross outs were the following statements.

- In the Clinical study section: "The VIGOR study demonstrated a significant increase in the risk of development of serious CV/T events."

- In the Warnings section: "Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events . . ."

- In the Warnings section: "The risk of development myocardial infarction in the VIGOR study was five-fold higher in patients treated with Vioxx. . . .  The finding was consistent in smaller and shorter studies." [52]

157.    Merck wanted to state in the clinical study section only that there was a significant *difference* (not *increase*) in the incidence of MIs between Vioxx and naproxen, and the company wanted to move the information to Precautions rather than put it in Warnings.

158.    In my opinion, information about an increased rate of so serious an event as myocardial infarction belongs in Warnings, not Precautions.  That is also what the FDA's cardiovascular reviewer recommended.  Merck response to the FDA would have watered down the impact of the label changes, and it delayed the implementation.

M003376494