**The Expert Report of Jerry Avorn, M.D.**
**March 20th, 2006**

**And each page thereof is confidential-subject**
**to protective order.  See Pre-Trial Order #13**
**in re: Vioxx MDL #1657.**

Confidential-Subject to Protective Order

**Expert report of Jerry Avorn. M.D.**
**March 20, 2006**

## I. Credentials

I am a Professor of Medicine at Harvard Medical School and Chief of the Division of Pharmacoepidemiology and Pharmacoeconomics in the Department of Medicine at the Brigham and Women's Hospital, one of Harvard's main teaching hospitals. I attended Columbia University as an undergraduate; my medical training was at Harvard Medical School, where I received the M.D. degree in 1974. In 1977 I completed a residency in internal medicine at the Beth Israel Hospital in Boston, another Harvard teaching hospital. I have been teaching at Harvard Medical School continuously since the 1970s, and am currently responsible for most of the teaching in pharmacoepidemiology there and at the Brigham and Women's Hospital; I also lecture on that subject at the Harvard School of Public Health. I am writing the chapter on pharmacoepidemiology for the revised edition of a textbook by faculty at our university, *Principles of Pharmacology,* the text used in the course on that topic at Harvard.

The division I founded in the Department of Medicine comprises a staff of 22, including eleven faculty members. We perform research on the benefits, side effects, and cost-effectiveness of medications; the determinants and outcomes of physician prescribing choices; and the relationship between the pharmaceutical industry, the government, and physicians in shaping medication use, with particular reference to drug marketing and the communication of risk and benefit information to physicians and patients. Our division is supported from a variety of sources, primarily peer-reviewed grants from the National Institutes of Health. We have also received research grants from various pharmaceutical companies, including Merck. My research has been published in numerous medical journals, including *The New England Journal of Medicine, the Journal of the American Medical Association,* and *Circulation,* among others. I am an author of over 200 papers in the medical literature on these topics, and have been identified as one of the most highly cited authors in the field of social sciences (including epidemiology) and medicine. In 2004, my book, *Powerful Medicines: the Benefits, Risks, and Costs of Prescription Drugs,* was published by Knopf and was well reviewed in both the lay and medical press.

In addition to pharmacoepidemiologic studies measuring medication risks, a major focus of my research has been to understand how physicians evaluate the benefits and risks of alternative medications in making their prescribing decisions, and how those decisions can be improved. We have published a number of major papers in this area, and the topic forms the basis of much of my teaching at Harvard Medical School, the Harvard School of Public Health, and other institutions nationally and internationally. One component of that work involves providing physicians and patients with evidence-based, non-commercial summaries of the medical literature to help them make more accurate drug-use decisions. We have studied this approach in several settings in multi-state randomized controlled trials and reported the results of these interventions in *The New*

1

Confidential-Subject to Protective Order

*England Journal of Medicine* and several other journals. We also perform such prescribing quality-improvement activities at the Brigham and Women's hospital to educate the interns, residents, and Harvard medical students in training there, and last year my colleagues and I began a large program funded by the state of Pennsylvania to provide this kind of evidence-based medication information for practicing physicians throughout that state on an ongoing basis. In addition to my own research and educational activities in this area, I have consulted internationally on the development and evaluation of programs based on my research that are designed to provide doctors with accurate, unbiased information about drug benefits and risks in countries including Canada, Great Britain, and Australia.

Since my residency I have practiced internal medicine as well as geriatrics in the ambulatory and inpatient settings at several Harvard teaching hospitals; I presently serve as senior attending physician on the General Medicine Service at the Brigham and Women's Hospital, where I supervise and teach interns, residents, and medical students.

## II. The present assignment

I was asked by plaintiffs' attorneys to consider the question of whether rofecoxib (Vioxx) increases the risk of cardiovascular disease, and to assess the methods by which Merck evaluated and managed this issue throughout the development and marketing of Vioxx.  In performing these tasks I relied on publications from the peer-reviewed medical literature, publicly available material from the Food and Drug Administration, and other documents (including internal Merck communications) provided by counsel. I relied on these materials as well as my education, experience, and research, and I employed standard methodologies that are generally accepted in the scientific community.

## III.  Available evidence prior to FDA approval of Vioxx

Merck's withdrawal of Vioxx (rofecoxib) in September 2004 was followed by numerous statements from company officials that they were astonished at the unanticipated finding that their drug could double the risk of heart attack or stroke. But inspection of information available in the public domain and of internal company documents provides clear evidence that Merck officials had been aware of this risk for years and failed to take reasonable action to address it.

Merck consistently promoted the advantage of its selective cox-2 inhibitor as retaining the favorable effects of suppressing the "bad" cox-2 (so as to reduce pain and inflammation) without suppressing the "good" effects of cox-1 (thus maintaining the gastric mucosa).  But there was evidence as early as the 1990s that this good/bad formulation was an oversimplification of reality. Early papers made it clear that a selective cox-2 inhibitor could also suppress vital functions of cox-2 (e.g., prevention of clot formation) along with the more harmful ones (pain and inflammation). Such selective suppression would leave potentially dangerous functions of cox-1 (promotion of clot formation) relatively spared, and thus imbalanced.

2

Confidential-Subject to Protective Order

This knowledge was clearly in place when Merck was developing Vioxx. An internal memorandum from October 1996 describes a very early clinical trial of the new drug compared to placebo (Protocol 017).  Even though the trial lasted only six weeks, the committee reviewing the trial results noted that "[a]dverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina...increase in blood pressure)." A plan was described to test the drug in a study in which patients would be given low-dose aspirin to protect against these cardiovascular side effects, but to my knowledge Merck never conducted any clinical trial pro-actively designed to address the crucial topic of the cardiovascular risk and safety of Vioxx in patients taking aspirin.

In 1996, Merck began planning a large-scale gastrointestinal outcomes study (which later evolved into the VIGOR trial), comparing Vioxx to a traditional NSAID. These early documents make clear that Merck anticipated an increase of cardiovascular events in patients taking Vioxx. Internal memos during this period make it clear that Merck was attempting to design a study that would demonstrate favorable results for its drug's g.i. safety, while minimizing the potential for finding more adverse cardiovascular outcomes in the Vioxx arm — whether those events were the result of Vioxx increasing cardiac risk or because Vioxx would not provide cardioprotection (having no effect on platelet function) to a population at risk for such events. A Merck scientist, Tom Musliner, wrote candidly that the new drug was likely to increase cardiac risk compared to a traditional NSAID if patients in the proposed study were not given aspirin to protect their hearts:

> there is a substantial chance that significantly higher rates of CV [cardiovascular] AE [adverse event] events (MIs, angina, strokes, TIAs, etc.) will be observed in the selective Cox-2 inhibitor group compared to the standard NSAID group, as summarized in the preceding section.

 He stated the study design option starkly: "Prohibit use of low-dose aspirin and accept the risk of observing significant differences in CV rates [i.e., more heart attacks in the Vioxx group]." In the next sentence, Musliner suggested a way to obscure this problem:

> One could attempt to minimize between-group differences [in CV event rates] by excluding patients at high risk (i.e., with prior MI, angina, stroke, TIA, atrial fibrillation, valvular heart disease, peripheral vascular disease, etc.).

The company was still debating possible study designs in 1997 when Merck scientists commented on a draft protocol for what was then known as the "GI Outcomes Trial." Dr. Briggs Morrison of Merck argued that patients should be allowed to take low-dose aspirin in the trial, because "without COX-1 inhibition [that aspirin would provide] you will get more thrombotic events and kill the drug." Dr. Alise Reicin responded the same day:

3

Confidential-Subject to Protective Order

> Low dose aspirin – I HEAR YOU! This is a no win situation!… the
> possibility of increased CV events is of great concern – (I just can't
> wait to be the one to present those results to senior management!).
> What about the idea of excluding high risk CV patients – i.e., those
> that have already had an MI, CABG, or PTCA? This may decrease the
> CV event rate so that a difference between the two groups would not
> be evident.

Basic principles of medical research, as well as sound science, make it clear that one
should not design a clinical trial with the pre-specified intention of masking negative
outcomes.

> The next day, Brian Daniels responded to the same e-mail group:

> It is clear to me that the program will be severly [sic] hurt if the
> megatrial [VIGOR] shows a win in PUBs [gastrointestinal
> perforations, ulcers, and bleeds] and a loss in MI/CVA [heart attack
> and stroke]. That is what we are setting up by not allowing ASA
> [aspirin].

These 1996 - 1997 memos indicated that the Merck officials who designed the
drug's clinical trial program were aware of the drug's potential for cardiovascular harm.
These documents suggest that Merck knew it would be putting patients at an increased
risk for cardiovascular events in the Vioxx arm of the planned study, either because of a
prothrombotic effect of Vioxx or because of the prohibition of cardioprotective use of
aspirin. Arthritis patients (both RA and OA) are generally at higher risk of heart disease,
but Merck decided to prohibit low-dose aspirin because of concern that its use could
reduce or eliminate the postulated difference in gastrointestinal bleeding rates. The final
trial design served to showcase that selling-point while putting patients in the Vioxx arm
at increased risk of cardiovascular events. When the study was published almost exactly
four years after the Musliner memo, it indeed found an increase in cardiovascular events
in the Vioxx arm as had been anticipated by its planners in 1996.

Concern about excess cardiovascular events in patients given Vioxx was not
limited to studies in which it was compared to older NSAIDs. To evaluate other study
results that suggested Vioxx may increase the risk of cardiovascular events, the company
conducted a comprehensive internal review of its clinical trial data in February 1998.
This study found a significant increase in cardiovascular events in patients enrolled in
Vioxx trials, as compared to patients in other trials who had been given placebo. This was
an admittedly crude study, because the Vioxx trials were still blinded and therefore
included *all* study arms (including any comparator drugs as well as placebo), and
compared event rates with the placebo-only arms of different trials. This is not an optimal
alternative to actual randomized trial data testing the hypothesis directly, since such a
cross-study design can produce differences that might not persist when more
appropriately designed trials were done. But in the absence at that point of adequate
information from such trials, the Watson analysis provided a comparison that the

4

Confidential-Subject to Protective Order

company felt was appropriate to conduct in 1998, and was one important source of information available to it at that time. Knowing what it knew then, Merck did not respond to this analysis as a potentially important signal to guide the planning of future clinical trials to determine whether this risk would be refuted or borne out. In the first instance of a pattern repeated several times in later years, company officials dismissed the findings and explained away the results of the comparisons it had requested by suggesting that the higher number of cardiovascular events occurring in patients in the Vioxx studies was not caused by an increase in these problems caused by the drug, but rather by an unusually low rate of such events in the placebo comparator patients. That reaction is a telling one, which indicates the company's response at the time to bad news about its potential blockbuster, and is more important than the subsequent re-analyses of these crude data. Of course, later findings from large randomized clinical trials – even though they had not been designed to address this question – did confirm the pattern of increased cardiovascular risk of Vioxx in relation to placebo.

In May 1998, six months before the Vioxx NDA was filed, the company sought a Programmatic Review from a board of expert scientific advisors it brought together to review the development of the new drug. The advisors' written report warned that greater inhibition of the cox-2 enzyme "could lead to adverse effects of inhibiting COX-2 that are not predictable based on experience with current NSAIDs." They drew the company's attention to three separate mechanisms through which Vioxx could cause serious cardiac complications: fostering the development of lipid-rich plaques in the coronary arteries, destabilizing those plaques and making them "rupture-prone," and the resulting thrombotic occlusion of those arteries (the mechanism causing most heart attacks). The outside panel's report went into considerable detail on how the specific pharmacology of Vioxx could cause this problem by inhibiting the anti-thrombotic effects of cox-2 (particularly by reducing levels of prostacyclin, known to reduce clot formation) while leaving the clot-producing effects of cox-1 (primarily mediated via thromboxane) relatively unaffected.

Taking the concern beyond the level of theory, Merck's external Scientific Advisory Board told the company about specific evidence already in place that made this outcome even more likely: Vioxx was known to reduce the levels of a metabolite (by-product) of prostacyclin.

> By removing this potent inhibitor of platelet aggregation [prostacyclin], the probability that a coronary plaque rupture would lead to myocardial infarction [heart attack] or ischemic ventricular fibrillation [potentially fatal heart rhythm disorder] is enhanced. More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality.

In its May 1998 report, the outside experts strongly urged Merck to evaluate these possibilities with clinical trials and other studies specifically designed to assess the

Confidential-Subject to Protective Order

possible increased risk of Vioxx in causing heart attack, noting that such research studies should be "actively pursued."

In September 1998, two months before submission of the Vioxx NDA, a letter was sent to Dr. Martino Laurenzi of Merck from Carlo Patrono, M.D., a Professor of Pharmacology at an Italian university. He wrote to follow up on a prior discussion he had had with Dr. Laurenzi about the need for the company to do further research on the potential cardiac effects of Vioxx. He noted that there were many open questions concerning "the potential cardiovascular implications of COX-2 expression and inhibition," and said that the company needed to do studies to clarify this question: "I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

Dr. Patrono's letter was passed on to Dr. Alan Nies at Merck Research Laboratories. Later that month, on September 29, 1998, Dr. Nies sent a memo to colleagues at the company about Dr. Patrono's proposed research and to "the PGIM issue," referring to the prostacyclin metabolite. The same problem had been noted by Dr. John Oates, the respected head of Clinical Pharmacology at Vanderbilt University. Concerning Dr. Patrono's letter, Dr. Nies wrote:

> His thoughts are similar to those of John Oates who called me a couple of weeks ago wanting to study Vioxx in patients with atherosclerosis/hyperlipidemia and elevated Tx [thromboxane] metabolite excretion. I told John we would not be doing any clinical studies at this time. When these drugs are available, many investigators will probably do such studies with or without our help/consent.

I am not aware that Merck ever commissioned any clinical trials to clarify the potentially crucial issue of cox-2 inhibition increasing the risk of cardiac events, even though the company considered doing such studies (see below) and then decided not to follow through on them.  A variety of study designs specifically designed to address the cardiac risk issue would have been practical as well as ethical and could have been initiated as early as 2000, or even earlier. Instead, Merck's failure to conduct such studies bolstered its ongoing claims that it was not aware of sufficient clinical trial data to demonstrate this risk, right up until the day it withdrew the drug from the market.

It is widely understood that once approval has been granted, FDA has very limited regulatory authority to compel a company to begin a new clinical trial for an existing indication. However, a responsible company would have initiated its own targeted study or studies to clarify a potential risk as important as this, even if not required to do so by the government.

The NDA [21-042] submitted by the company to the FDA in November 1998 contained data that indicated a clear increase in adverse events in the "cardiovascular system" category, whether the drug was being compared to placebo or to established non-

6

Confidential-Subject to Protective Order

selective NSAIDs. Most prominent were higher rates of hypertension and edema caused by Vioxx, and these were noted by the FDA reviewer:

> There is an unequivocal association between [Vioxx] administration and the occurrence of cardiovascular and renal effects…Of note, in most of the studies the identified cardiovascular and renal toxicities associated with [Vioxx], when administered at a dose ranging from 25 to 50 mg daily, occur at a higher rate than with the other tested [NSAID] comparators.

I am not aware of any evidence that Merck communicated the risks identified by its own board of scientific advisors to FDA in the agency's initial review of the Vioxx application. The FDA's evaluation of the drug's potential safety problems related to selective inhibition of cox-2 makes no mention of this evidence.

When the NDA data were reviewed by FDA in May 1999, an FDA reviewer noted that of the subjects selected by the company for enrollment in its studies of patients with osteoarthritis, only 20% were 65 or older even though this condition is primarily a disease of the elderly, making it difficult to know how common such problems would be once the drug was in actual use.  The reviewers also observed that assessment of such risks was complicated by the fact that Merck excluded from its studies any patients with a recent heart attack or angina or a stroke or transient ischemic attack within the prior two years. Along with the under-representation of patients over 65 in the osteoarthritis studies, this probably served to obscure the detection of cardiovascular complications. Despite this, a substantially higher number of cardiovascular thromboembolic events had been seen in patients randomized to Vioxx vs. placebo, even in relatively brief studies.

## IV. Additional clinical trial evidence of risk following FDA approval of Vioxx

### A. The VIGOR trial

The VIGOR study was a randomized controlled trial of Vioxx compared with an older non-steroidal anti-inflammatory drug, naproxen. It was designed by Merck to produce evidence that Vioxx caused less gastrointestinal toxicity than traditional NSAIDs. In light of the biological concerns noted above, when the overall plan for analyzing data from the company's clinical cox-2 trials was first being developed in late 1998 and early 1999 Dr. Douglas Watson, a Merck statistician, proposed an "Analysis Strategy for the Incidence of Serious Thromboembolic Events in the COX-2 Inhibitor Program." His memo recommended that the company track summary statistics and incidence rates of adverse cardiovascular events in each treatment group. Yet he went on to recommend that "No formal statistical hypothesis testing will be performed."  This would be an odd analytical approach given the importance of the problem being studied, because such a plan would obscure rather than clarify the drug's role in causing these side effects.

7

Confidential-Subject to Protective Order

Watson then suggested that adverse events be divided into three plausible categories of outcomes – primary, secondary, and tertiary. The first would include fatal and non-fatal MI, unstable angina, and fatal and non-fatal ischemic stroke; this would be an appropriate set of primary outcomes in keeping with much of the clinical trial literature. The second included other reasonable categories of arterial thromboembolic events. The tertiary category was to include thrombotic events occurring in the veins, which have a different pathology from that of primary concern for the cox-2 drugs. Watson's original proposal was to study each category separately, which would have made sense in light of the different mechanisms causing arterial vs. venous thrombosis.

In the minutes of the CDOC meeting of January 6, 1999, the committee accepted his odd recommendation that no statistical testing be performed. But it rejected the idea of studying arterial and venous thrombotic events separately in the primary analysis, relegating such comparisons to a subsidiary status. Instead, it directed Dr. Watson "to exclude plans to conduct separate analyses of event types" in the main analysis. In addition to being pathologically very different from arterial thrombotic events (e.g., MI, ischemic stroke), some venous thrombotic events are quite common (e.g., deep vein thrombophlebitis), so their inclusion in the main analysis of outcomes in a drug with known potential for arterial clots would likely obscure that causal relationship.

Internal Merck documents indicate that as the VIGOR trial was being conducted, the company's scientists were aware that patients enrolled in the Vioxx arm could well have a higher rate of serious arterial embolic events. On January 9, 2000, Michael Gresser wrote a memo titled "stroke outcomes" to Elliot Ehrich, George Robertson, and Mervyn Turner. In it he warned that "if our worst fears concerning the prostacyclin business have any foundation in reality they [patients randomized to receive Vioxx] could have a higher incidence [of stroke]…." Yet despite the substantial pre-existing causes for concern about increased CV toxicity in the Vioxx arm of the study, Merck's initial plan for analysis of the trial data would have obscured rather than clarified any such relationship.

Despite the concern by many in the scientific community about a possible cox-2-thrombosis risk, on January 12 Doug Watson reported to Gresser, Ehrich, Robertson, Turner, and Alise Reicin:

> It has been decided within MRL [Merck Research Laboratories] that analyses of that data [CV serious adverse events] will be confined to descriptive analyses and calculation of incidence rates for blocks of studies, but no formal comparisons among treatments will be done. None of these analyses will be done for another year yet.

Alise Reicin responds that there was a plan for CV events to be assessed in VIGOR. But the following day (January 13, 2000) Doug Watson, who had been central to the company's prior analyses of CV events with Vioxx, writes to others at Merck:

**8**

Confidential-Subject to Protective Order

See Alise's message below. I am confused by her statement "As part of the VIGOR DAP [data analysis plan], we plan to look at the CV events separately. Tom Capizzi is currently writing up the type of analyses [sic] which will be done.

Such plans have not been discussed with me previously. What exactly are you planning and is the intent to use adjudicated events?

The following day Watson wrote to Reicin to express his confusion: "I have looked at the VIGOR DAP and see that such an analysis is not listed as primary, secondary, or exploratory… I don't recall this ever be [sic] discussed with me or at any meetings where I was present. In the section on Aes [adverse events] it does not list these as a prespecified analysis." These memos were written two months before the VIGOR data were to be unblinded, astonishingly late for such a crucial question to remain unresolved.

On January 17, 2000, Capizzi sends a widely circulated memo in which he reports that the VIGOR data analysis plan is "undergoing revisions":

…we received senior management approval not to pursue a CV DAP…When the DSMB [the study's external Data Safety Monitoring Board] was notified that there was no program wide plan, the DSMB requested that we analyze the adjudicated CV data for VIGOR (their request seemed to be based on the size of VIGOR and the importance of the CV issue with respect to COX 2 agents).

Watson responds,

The idea that we would do this runs counter to the directives I had previously received from CDOC regarding analyses of adjudicated vascular events. As a result, the procedures in the SOP [standard operating procedure] are not set up in such a way as to get the events adjudicated on the kind of timeline this requires, and doing so will be difficult at this point.

On January 17, 2000, Harry Guess, head of epidemiology at Merck, sent an urgently worded memo to George Williams and others at the company, entitled "VIGOR Cardiovascular Event Adjudications: Alert on a potential problem." It read, in part:

The DSMB for VIGOR decided in December [one month earlier] that analyses should be conducted of cardiovascular events in VIGOR…. The issue about which I wanted to alert you is that we (Epidemiology) might not be able to get the cardiovascular (CV) events adjudicated in time to meet the VIGOR frozen file date of April 24. As of today, we have 58 potential CV events, of which only 5 have been adjudicated. Of the remaining 53 potential events, we have documentation in Epidemiology on 27 of them, so we will need to get the documentation sent in on the other 26. We estimate that by Feb 10 we might have a

**9**

Confidential-Subject to Protective Order

total of about 70 CV events in both treatment groups of 088 and 09 combined. Alise has proposed Feb 10 as the cut off for this analysis. The most important problem is that it might not be feasible to get the committees to adjudicate all events by early April….We in Epidemiology are not staffed to get this volume of extra CV events processed between now and April while meting all other commitments, including keeping up with the GI PUB events [perforations, ulcers, and bleeds] on VIGOR.

On January 18, 2000, Capizzi reports on a new plan for analyzing CV events in VIGOR:

We currently have in the revised plan that the adjudicated events will be the primary assessment. I will add statement that explicitly states that no between group differences, tests or confidence intervals will be provided for the unadjudicated events in questions [sic]. This will protect us should the events not be adjudicated in time for the CSR.

Watson responds later that day that given the small number of events that will be available for analysis, "and that not all of them will be confirmed by adjudication, there will not be much precision in the analysis no matter what we do."

At the very best, the disarray and last-minute changes to the data analysis plan for such an important, expected, and potentially damaging side effect of Vioxx reflect terrible planning on the company's part for studying such a serious problem. Whether or not the company was ultimately successful in completing the adjudications on time, the plan to restrict the analysis to only those cardiac events that had been completely adjudicated, while explicitly excluding analyses of unadjudicated cases, would severely limit the number of events available for study. This in turn would curtail the analytical power of these comparisons, thus reducing the chance that a statistically significant increase in CV events could be detected in the Vioxx group. This analytic strategy was particularly problematic in light of the company's knowledge that serious difficulties were expected in getting all the cases processed in time.

The *NEJM* article describing the results of the trial, which appeared in November 2000, reported that VIGOR had achieved its main purpose. It found that while Vioxx had analgesic efficacy identical to that of naproxen, patients randomized to the Vioxx group had fewer gastrointestinal complications than those taking naproxen. Yet there was a 5-fold increase in cardiac events in the patients given Vioxx. In presenting the study results, the company took the unusual step of attributing this difference to a ***reduction*** of heart attacks by naproxen rather than an increase in risk caused by Vioxx. This was done despite the fact that such a supposed protective naproxen effect on the heart was primarily theoretical, and had never been demonstrated in any clinical trial. The FDA review of these data pointed out that naproxen was only a *transient* inhibitor of the clot-promoting substance thromboxane, and that the cardioprotective effect Merck claimed for it had never been demonstrated in a placebo-controlled trial. Moreover, such a dramatic effect of naproxen in preventing MIs would be far greater than that ever seen with

**10**

Confidential-Subject to Protective Order

aspirin, considered the "gold standard" agent for cardioprotection. Soon after publication of the VIGOR results my colleagues and I group conducted a very large observational study of patients taking naproxen and did not find evidence of such a huge cardioprotective effect in an enormous population of typical NSAID users; other observational studies have reached the same conclusion.

A key aspect of the company's "naproxen hypothesis" was that it was effectively replacing aspirin in the trial for patients who required it (but which the VIGOR design prohibited). Yet FDA's analysis at the time (Targum) reported an increase in CV events with Vioxx even in patients in whom aspirin was not indicated.

In fact, when one compares all serious adverse events seen in VIGOR (either gastrointestinal events or cardiovascular events), these occurred with equal frequency in both study groups. Indeed, the number of additional serious cardiac events in the Vioxx group was actually *greater* than the number of serious gastrointestinal events prevented. Clinically, this overall disadvantage of Vioxx is even more worrisome because non-fatal cardiovascular events such as MI and stroke can produce irreversible damage to the heart or brain, whereas non-fatal drug-induced gastrointestinal side effects are usually readily treated with cessation of the offending product and transfusions (if any are needed at all), and commonly do not produce lasting damage. As one FDA reviewer noted concerning the VIGOR results, in view of the overall findings "one can argue that naproxen would be the preferred drug compared to Vioxx."

My colleagues and I have conducted several studies of physicians' perception of risk vs. benefit and how these assessments shape their prescribing decisions; this has been an important theme of my unit's research work for over two decades. Fair and balanced depictions of the risk profile of Vioxx – that it is no more effective an analgesic than existing NSAIDs, and that in comparison with naproxen it will produce more serious CV events than it will prevent g.i. events – does not yield an attractive risk-benefit profile for Vioxx. Had such a balanced risk-benefit relationship been accurately presented to physicians, the drug would not have been prescribed at the blockbuster level of use which it quickly attained. Simple common sense would lead to the same conclusion. Further, the likelihood that the relative g.i. advantage of Vioxx is negated by low-dose cardioprotective aspirin use (see below) would remove even this reason for using the drug, had it been more widely known.

In its presentations of the VIGOR results, Merck adopted a clear strategy of emphasizing the gastrointestinal superiority of Vioxx while minimizing its cardiac risk. From the early phases of its cox-2 development program, the company had hoped that any increase in cardiovascular risk caused by these drugs would be offset by their capacity to reduce gastrointestinal risk. This was the entire *raison d'etre* for Vioxx, since there was never any evidence it had better analgesic efficacy than numerous NSAIDs already on the market. But if greater efficacy is not an issue, evaluation of any drug requires a careful comparison of *all* the adverse events it causes – those for which it may have an advantage over competing therapies, as well as those for which it may be worse. In the mid-1990s it was reasonable to consider the possibility that a selective cox-2

11

Confidential-Subject to Protective Order

inhibitor might be a useful drug to have available if its reduction of serious harm from gastrointestinal bleeding clearly outweighed the other side effects it might increase. But in its clinical trials, presentations to the FDA, and communications with prescribing physicians and with patients, Merck consistently distorted this crucial comparison by systematically minimizing the drug's cardiovascular risk while emphasizing its purported gastrointestinal advantage. A draft of the VIGOR paper initially described the increased rate of serious cardiac events as "unexpected," to which one of the co-authors added this comment in a working copy of the manuscript: "Is this unexpected? Not really…" A suggestion made by one of the co-authors of the article that the drug's g.i. benefits "be balanced against the risk of MI's" was not included in the draft submitted to the journal or the final, published manuscript.

As noted, the increased rate of heart attacks in the Vioxx group during the VIGOR study was more marked than was initially known: it was subsequently revealed that after the study report had been submitted to the New England Journal of Medicine, Merck learned of additional MIs that occurred during the study in the Vioxx arm of the trial. Even though Merck had this information months before the manuscript was published, it failed to provide this information to the journal. In addition, the originally submitted draft of the article discussed the potential for the drug to be prothrombotic, but this warning did not appear in the published version of the article.  A table depicting cardiovascular outcomes was deleted from the final manuscript; the information was instead presented in a much more low-profile way by inserting it into the text as rounded percentages of *risk differences* rather than relative risks, which diminished its impact. Finally, in a highly unorthodox decision that deviates from usual procedures for analyzing clinical trial data, late in the study Merck officials imposed an earlier data cut-off point for adverse cardiovascular events (expected to be higher in the Vioxx arm) than they used for ascertaining gastrointestinal outcomes (expected to favor Vioxx). That is, they ordered that data collection stop earlier on the anti-Vioxx outcomes than on the pro-Vioxx outcomes.

When these facts became known to the editors of NEJM, they took the unusual step of publicly chastising the authors in an editorial "Expression of Concern" published in December, 2005.  Even after receiving a response from the study authors published in March 2006, the journal's editors reiterated their concern in a second published statement that reaffirmed their belief that the study data had been handled improperly.

The first public announcement of the VIGOR results by Merck came in a press release on March 27, 2000.  It attributed the elevated rate of cardiac events seen in patients given Vioxx to "naproxen's ability to block platelet aggregation," although there was no compelling evidence for such an enormous naproxen effect. In an internal memo dated March 9, 2000, Dr. Edward Scolnick wrote,

"The CV [cardiovascular] events are clearly there….this is real….It is a shame but it is a low incidence and it is mechanism-based as we worried it was. Oates and Alan and barry were right about the metabolite

Confidential-Subject to Protective Order

> meanings i.e. urine Pg [prostaglandin] data….This will limit the class
> somewhat…."

To clarify the cardiac risk issue, he notes that the company could conduct "the tylenol
study we discussed to further assess safety….Endpoint studies tell the truth." However,
no endpoint trials were ever done that were specifically designed to determine "the truth"
concerning the drug's cardiac risk.

In preparing for public reaction to announcement of the results of the VIGOR
study, the company prepared a Draft Standby Statement in March 2000. A section for
internal company use noted,

> The implications for the arthritis & analgesia franchises are high… We
> should (hopefully) position this as applying only to patients with RA
> [rheumatoid arthritis], only with the highest dose of Vioxx, and
> underscore the substantial benefits of Vioxx compared to traditional
> NSAIDs (Langman, JAMA; VIGOR). If possible, we should position
> things as a 'reduction in events with naproxen vs rofecoxib,' rather than
> an 'increase in CVD events with Vioxx vs naproxen.'

The 4- to 5-fold increase in heart attacks is then re-depicted as a "2-fold decrease in the
risk of certain cardiovascular events" in patients taking the comparator drug. This draft
document does demonstrate, however, that Merck initially intended to disclose that
Vioxx could be prothrombotic.  Yet this language does not appear in the press releases
discussing the VIGOR study and does not appear to have been disseminated to the public
or medical community at all.

A "Q&A" section appended to the draft standby statement posed several potential
questions from the press and suggested answers. In response to the boldfaced question,
**"What does this mean for Vioxx? How can you promote a product that increases
heart attacks and strokes?"** the proposed answer contains the following misleading and
incorrect statement:

> This [increased rate of cardiovascular adverse events] has only been
> seen in this one study of high-dose rofecoxib in patients with RA, who
> may be particularly suseptable [sic] to the cardioprotective effects of
> naproxen or at an increased risk of thrombotic-type events when
> treated with a COX-2 specific inhibitor, as opposed to patients with
> OA or other conditions…The clinical trials and postmarketing
> experience with VIOXX in OA and other conditions otherwise show
> no evidence of any adverse effect on CV SAEs [cardiovascular serious
> adverse events].

Additional language in the draft statement indicating that the drug could pose particular
risk to patients vulnerable to coagulation problems was never, to my knowledge,

13

Confidential-Subject to Protective Order

disseminated by Merck to physicians or patients in any labeling, press release, or promotional materials.

The Merck staff who prepared the draft Q&A provided a final, telling question that might be asked by the media: "**Over a year ago, scientists at the U. of Pennsylvania (Fitzgerald et al) published a report in PNAS suggesting there might be an increased risk of cardiovascular events in patients taking coxibs, due to changes in levels of certain prostaglandins. Were they right?"**

### B. Additional data of increased risk from other randomized trials

Although Merck depicted the VIGOR results as a one-of-a-kind anomaly, several other randomized controlled clinical trials conducted by the company also documented increased risk with Vioxx. Protocol 090 was conducted by Merck in 1998 and 1999, with the final study results reported internally the following year. Although the company claimed it had never observed an increase in cardiovascular events with Vioxx except in comparison with the supposedly cardio-protective naproxen, Protocol 090 enrolled 978 patients and tested Vioxx against nabumetone, a non-selective NSAID, as well as against placebo. A relatively low dose of Vioxx was used (12.5 mg), and each patient was given the drug for just 6 weeks. Yet significantly higher rates were seen with Vioxx compared to nabumetone, placebo, or both in the following categories: one or more adverse experiences; serious adverse experiences; and study discontinuation due to an adverse experience, a drug-related adverse experience, or a serious adverse experience. (Unconventionally, this calculation included events in patients in the nabumetone and placebo groups who dropped out of the study prior to randomization – an unusual way of counting that served to diminish the effect of higher event rates in the Vioxx group.)

When Merck measured side effect rates in each group among aspirin users vs. non-users, the pattern of higher adverse events with Vioxx compared to both comparison groups was found in aspirin users as well as in non-users. In all patients in Protocol 090, the rate of serious cardiovascular events was 3-fold higher in the Vioxx group as compared to either the nabumetone group or the placebo group. This included a heart attack and two strokes in the Vioxx group within the 6-week study period, and none in either of the comparison groups. To my knowledge the results of this trial have never been published.

ADVANTAGE was an even larger study of approximately 5,500 patients with osteoarthritis randomly allocated to receive either 25 mg Vioxx or 1000 mg naproxen. The initial analysis restricted the CV outcome to MI, and there is evidence of internal re-assignment by Merck employees of at least one probable cardiac death to "unknown cause." However, when FDA used a more comprehensive outcome definition of serious coronary heart disease and re-adjudicated these outcomes, it found a relative risk of 3.2 for Vioxx use. This study had lasted for only 12 weeks. Although the ADVANTAGE trial was completed at about the same time as VIGOR (early 2000), a preliminary report of its findings was not provided to FDA until December of that year, and final data was not submitted until mid-2001.

14

Confidential-Subject to Protective Order

On October 18, 2000, Dr. Deborah Shapiro of Merck presented a meta-analysis of all the company's existing data on cardiovascular outcomes from its collected Vioxx clinical trials. For the outcome of myocardial infarction (heart attack), her data depict substantially increased risks seen in 4 of the 5 studies reviewed, including a tripling of risk in ADVANTAGE, a near-doubling of risk in a study labeled "RA," and a quintupling of risk (5-fold increase) in VIGOR. All in all, the summary statistic revealed a doubling of risk across all 5 groups of studies that was statistically significant. I am not aware that an analysis reporting on the endpoint of myocardial infarction was ever provided to the FDA or to the medical community.

Following the release of VIGOR, Merck had put forward several explanations for why the study's findings of increased cardiovascular risk should be discounted: the study was done in rheumatoid arthritis patients, who might be unrepresentative; subjects were prohibited from using aspirin, casting Vioxx in a worse light; the comparison drug was naproxen, which was massively cardioprotective; and Vioxx was used in a higher-than-usual dose.  But in 2000, other large randomized controlled trials conducted by Merck undercut each of these proposed explanations. ADVANTAGE did use naproxen as a comparator, but studied a lower dose of Vioxx (25 mg) in patients with osteoarthritis, not RA, and aspirin use was allowed. Protocol 090 used placebo as a comparator, studied OA patients, used a low dose of Vioxx (12.5 mg), and also allowed aspirin use. Both studies showed an increase in CV risk with Vioxx. (For completeness, it should be noted that Protocol 085 did not demonstrate an increased CV risk. Nevertheless, the availability in 2000 of three other large randomized studies [VIGOR, ADVANTAGE, and 090], using a variety of doses, populations, and comparator drugs, should clearly have raised an alarm within Merck that the VIGOR findings could not be dismissed so readily.)

As our research unit was conducting its own epidemiological studies of Vioxx risk, colleagues at Merck noted on several occasions that it was unlikely that the drug caused any important cardiac risk because no such problem had been seen in several studies of Vioxx used to prevent or treat Alzheimer's disease. But in the largest of these for which outcome data are available (Protocol 078), there was substantial evidence of harm, although it was obscured in the published results (Thal et al) by a variety of unconventional and inappropriate analytic approaches. The outcome of "serious thrombotic vascular events" included venous thromboses, not usually included in analyses of cardiovascular thrombotic events (which are in the arteries, not the veins). Rather than use the universally accepted intention-to-treat approach to analysis (which had been pre-specified by Merck in the study's data analysis plan), the authors instead stopped counting adverse outcomes two weeks after a patient ended use of the drug. But a subsequent analysis of data submitted to the FDA, performed after Vioxx was withdrawn, found an increase in the risk of serious coronary heart disease in the Vioxx group compared to placebo. To my knowledge, Merck did not provide a complete and accurate account of these study outcomes to FDA until after the drug had been taken off the market.

15

Confidential-Subject to Protective Order

Of greatest concern, the mortality rate of subjects given Vioxx in Merck's Alzheimer's studies was double that seen in subjects randomized to placebo. Having practiced and taught geriatrics for many years, I am aware that ascertainment of causes of death in an elderly patient (as most of these study subjects were) can be very problematic. Older people are likely to have multiple co-existing illnesses, and it is well documented that MIs in the elderly often present "silently" – that is, without the typical pain or shortness of breath that are likely to accompany an MI in a middle-aged patient. It has been estimated that about a third of MIs may present in this manner in older patients. As a result, a serious MI may be mis-diagnosed as another condition, and a cardiac death may not be recognized as such as readily as in a younger patient. Death has been called "the clearest outcome in drug research" in that its existence need not be adjudicated. It is therefore of particular concern that a doubling of the death rate was seen in Merck's Alzheimer's studies of Vioxx, which it often cited as evidence of the safety of its drug. Re-analysis of serious cardiac event rates by those outside Merck did in fact indicate an increase risk in patients given Vioxx.

Event adjudication has been more problematic in Merck's studies of Vioxx than in any other drug evaluations I am aware of. In November 2001, FDA was reviewing the results of the ADVANTAGE study comparing Vioxx with naproxen. The agency found that it had to re-adjudicate the data the company presented on adverse cardiovascular outcomes; in 12 events (in a total of 21 patients) the FDA found that Merck had under-estimated the number of adverse cardiovascular events that had occurred in Vioxx patients and over-estimated the number of such events in the naproxen group. It found no instances in which the errors went in the opposite direction. The FDA review stated that the available evidence indicated that adding low-dose aspirin to Vioxx may not eliminate the excess cardiovascular risk seen in the study, but that it could eliminate the drug's relative advantage in reducing gastrointestinal side effects. If that were the case, it would negate virtually all of the drug's clinical and economic advantage over older NSAIDs.

A year after the publication of VIGOR, despite public statements discounting the likelihood that Vioxx caused an increase in cardiac events, internal Merck correspondence revealed that senior officials were quite aware of the problem. In a memo of November 21, 2001 circulated among senior company officials, Dr. Scolnick wrote,

> I think the question we should answer now is NOT whether Vioxx or any Coxib is safe for Cv outcomes. I think the question NOW is what is the best antiplatelet regimen to use with a Coxib. I think that is THE medical question and if we answer it, the problem will dissipate.

He then proposes two studies that would combine Vioxx with antiplatelet agents in order to negate its apparent clot-forming properties: "If you think it through this will answer the questions that are medically needed." To my knowledge, no such large-scale clinical trials were ever conducted by the company.

Coincidentally, in the same month (November 2001), Dr. Scolnick was among ten Merck scientists who received a memo describing the initial results of the Vioxx Low-

16

Confidential-Subject to Protective Order

Dose Aspirin Endoscopy Study (Protocol 136). This study randomized 1,200 patients to one of four groups: Vioxx plus low-dose aspirin, low-dose aspirin alone, placebo, or ibuprofen (Motrin), a non-selective NSAID. All underwent g.i. endoscopy to assess ulcer formation. After 12 weeks, the Vioxx plus low-dose aspirin group had about twice the rate of ulcer formation as the placebo or aspirin-alone groups – a rate that was virtually indistinguishable from that in the group taking the older NSAID ibuprofen (Motrin). Thus, in one large patient group in whom gastroprotection would be the most important – those who would require low-dose aspirin to prevent heart disease – the study showed Vioxx to be no better than a much older, cheaper NSAID.   Despite the fact that it was negotiating revisions to the Vioxx label with FDA concerning GI safety, Merck did not disclose the results of Protocol 136 to the agency until after the revised label was approved in April 2002.  This study was not published until 2003.

The APPROVe study which resulted in the eventual withdrawal of Vioxx from the Market in September 2004 had never been designed to answer the question of cardiac risk. In testing Vioxx to determine whether it slowed the progression of colonic polyps, it excluded patients with recent cardiac disease, and had a mean subject age of 59. This was far lower than the age at which cardiovascular adverse events would be most likely to be detected, and far lower than the mean age at which Vioxx was being used and heavily marketed. Nonetheless, the study did reveal a doubling of risk of heart attack or stroke even in this relatively healthy population. Even here the company's presentation of the data was distorted. Merck has consistently maintained that there was no risk evident until 18 months into the trial. (At that point, the divergence of the curves was attributed to an unusual "flattening out" of the event curve for placebo rather than to an increase in the event rate with Vioxx.)

However, inspection of event rates for all adverse cardiovascular events reveals that the curves separate much earlier, as do data for investigator-reported events. Because this was a double-blind placebo-controlled trial one would not expect such investigator-reported outcomes to be biased for or against the drug. Nevertheless, in the final editing stages of the paper a Merck representative suggested deleting mention of all investigator-reported events prior to submission of the paper to *The New England Journal of Medicine,* even though such events were specified as secondary endpoints for analysis in the study protocol.  While Merck did include another secondary endpoint in the published version of the trial (APTC), it did not include the analysis of investigator-reported events which was unfavorable to the drug.

## V. VALOR: an aborted clinical trial

By 2001, Merck was in possession of a substantial number of warning signals about the cardiovascular risk of Vioxx. These included the biological evidence that the drug could inhibit a key cardioprotective substance (prostacyclin) while not inhibiting its clot-inducing counterpart (thromboxane); the data reporting increased occurrence of heart disease events in its early randomized trials; the recommendations of its own scientific advisors about the need to look into this likely complication; and the striking 5-fold increase in MI seen in VIGOR. In response to these issues, the company began to plan a

Confidential-Subject to Protective Order

study designed to address this central problem: The Vioxx Cardiovascular Outcomes Study, known as VALOR.

Senior Merck officials began considering such a study almost immediately after the problematic VIGOR MI data were unblinded. On April 12, 2000, Dr. Scolnick sent the following e-mail to Dr. Reicin:

> We are all online too late. I will tell you my worry quotient is high. I actually am in minor agony. What I really want to do is a 10,000 vs 10,000 patient study in mild-moderate OA Tylenol vs Vioxx with prn [as-needed] low dose asa [aspirin] for those judged to need it. Safety first primary endpoint and efficacy secondary or co primary. WE WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY. PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC MEETING. Thanks / Ed   [emphasis in original]

Plans were developed for a study designed specifically to clarify the Vioxx-CV relationship, and by February 2002 a protocol had been developed that would have enrolled 10,000 patients to be given Vioxx and 10,000 to receive placebo, and compare rates of cardiovascular ischemic events between the two groups. Study documents considered the possibility that "a 3 mmHg increase in systolic BP results in small resultant increase in CV events" in the Vioxx arm. In a Merck presentation dated February 27, 2002, the logic behind the study hypothesis was listed as follows:

> **Issues Associated with current Design and Hypothesis:**
> **Several mechanisms by which VIOXX could hypothetically be associated with elevated risk vs. placebo:**
> **-- increase in blood pressure**
> **-- reduction in prostacyclin to a greater degree than ASA [aspirin] alone**
> **-- loss of ischemic preconditioning**
> **-- increase in plaque burden**
> **-- non-COX-2 mediated mechanisms**

VALOR would have reflected typical clinical practice much better than VIGOR had, in that all patients would be given low-dose aspirin for cardioprotection, as well as a gastric acid inhibitor (omeprazole) to protect against g.i. toxicity. Merck scientists presented sound justifications for studying the drug compared to placebo: "placebo comparison provides clear assessment of CV profile of rofecoxib; answers most important clinical question; most efficient use of resources; most timely result."  The company identified study centers throughout the world and brought them on-line to plan for subject recruitment. The first patients were scheduled to begin participation in June 2002, and enrollment of each subject would be for 13 months.

But the study was never begun. In March 2002 Merck announced that it "has decided to defer the VALOR Trial at the current time" and suspended further recruitment

Confidential-Subject to Protective Order

of outside researchers to enroll subjects. To my knowledge, no study designed to test the cardiovascular risks of Vioxx was ever conducted.

## VI. Observational studies of Vioxx and risk

A total of eight observational studies have appeared in the literature addressing the relationship between Vioxx and cardiovascular events, including one from our group on which I was senior author (Solomon, 2004). Ours was the one of the largest of the studies, and included over 10,000 MI outcomes. Seven of the eight published observational studies found a statistically significant increase in the risk of serious coronary heart disease events for Vioxx, ranging from a 25% increase to a 272% increase when all doses were considered. (The eighth study [Mamdani, 2002] was substantially smaller that the others and had important methodological limitations which my colleagues and I discussed at the time of its publication, including exclusion of all cox-2 or NSAID patients who did not fill two successive prescriptions, exclusion of all users who were on a study drug for less than 30 days, and inappropriate adjustment for cardiovascular disease markers that may have actually been caused by one of the study drugs.) Of the four studies which assessed risk as a function of dose, all four found a greater level of risk at a higher dose.

## VII. Inaccurate communication of risks to physicians

Despite the fact that the five-fold increase in MI risk had been found in the VIGOR study soon after the drug was marketed, the official Vioxx labeling contained no adequate warning of cardiovascular risk in for the first several years the drug was on the market. Even after the label was changed, it still did not accurately portray the risks compared to the benefits of Vioxx in a manner that would have permitted physicians or others to make an informed assessment of whether to use the drug.

Instead of providing accurate risk-benefit information to guide physicians, Merck prepared several training tools to arm its sales force against the difficult questions doctors might ask about the product. One interesting example, called "Dodgeball," taught Merck sales representatives how to overcome physician concerns about the drug's side effects. The strategy the company recommended for handling questions about heart attack seems to emphasize distraction rather than education:

> **Question:** *If the physician is concerned about a potential increase in the risk of MI, how would you respond?*
> **Response:** *Doctor, once daily VIOXX has no effect on platelet aggregation. Once daily VIOXX (R) is therefore is [sic] not a substitute for aspirin for cardiovascular prophylaxis. However, once daily VIOXX 50 mg had no effect on the anti-platelet activity of low dose (81 mg daily) aspirin.*

There is no way in which this can be construed to be a fair and helpful response to a doctor's simple question about the risk of a potentially life-threatening side effect.

19

Confidential-Subject to Protective Order

As late as September 2000, months after presenting data on elevated cardiac risk to FDA (but not to NEJM), the company was still using the lower figure of 0.4% in its official communications to physicians who inquired about this issue. This pattern of deceptive presentation of risk data to physicians is also illustrated in the "Cardiovascular Card," a sales tool prepared for Merck representatives to use with physicians concerned about the risk of cardiac events caused by Vioxx. Used from May 2000 until April 2002, the card presents known cardiac risks in a misleading manner. It presents a cardiovascular safety profile for Vioxx that appears to be similar to other NSAIDs and to placebo. However, while this "teaching aid" purported to include cardiovascular safety data from Merck's osteoarthritis (OA) trials, it apparently did not include information from other completed OA trials that contradicted this favorable profile (e.g., ADVANTAGE, 085, and 090). Further, the card suggested that the incidence of mortality with Vioxx was more favorable than for placebo, even though other studies had demonstrated a statistically significant increased risk of mortality associated with Vioxx compared to placebo.

Finally, by excluding safety data from other studies, the card fails to present or even consider critical information from the VIGOR study. Assessments of a drug's safety are best done by considering all randomized trial data available, regardless of the underlying purpose of a given study. It is inappropriate to provide only selected, most favorable study results in response to doctor's questions about cardiovascular safety and mortality. The most complete and current information on these topics should have been provided to physicians in any "teaching tool" with this purpose. At a minimum, the Cardiovascular Card should have been recalled by Merck because it contained an incomplete and misleading safety profile. Instead, as late as August 2001, by which time considerable additional information about the drug's risk had become available, the Cardiovascular Card was formally "re-validated" by the company for continuing use in promoting Vioxx, and steps were taken by Merck to make it easier for its sales staff to order large supplies of the cards to reassure physicians about the drug's safety. In doing so, the company undercut a key component of the safe use of drugs in medical practice – the doctor's ability to fairly balance benefit and risk in making prescribing decisions.

By May 2001, in response to a New York Times article on the cardiac risk of Vioxx, Merck issued a bulletin to its sales force in which it instructed them: "***DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE [VIGOR] STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX.***" The bulletin goes on to advise the sales force to state that the incidence of MI with Vioxx is less than 0.1%, and that cardiovascular mortality caused by other NSAIDs is 8 times greater than that seen with Vioxx. It instructs Merck representatives to present the data in the "Cardiovascular Card" to physicians concerned about Vioxx risks (see above), even though it contained a highly selected and distorted depiction of the totality of that risk.

A response to a paper published in August 2001 in *The Journal of the American Medical Association* provided another opportunity for Merck to deny that there was any

Confidential-Subject to Protective Order

increased cardiovascular risk with Vioxx. In a widely circulated press release, the company stated,

> The relative risks of serious cardiovascular events were similar with Vioxx and placebo, and with Vioxx and the widely prescribed NSAIDs ibuprofen, diclofenac, and nabumetone.

Merck made this statement even though it had completed clinical trials which provided very different evidence. After noting that "Patient safety is of paramount importance to Merck," the statement goes on to dismiss the increased rate of heart attack seen with Vioxx in VIGOR by noting, "This is the first time this result has been observed" -- even though by mid-2001 the company had seen the results of several of its own trials which pointed in exactly this direction.

## VIII. Negotiations with FDA over labeling and promotion

Beginning soon after the results of VIGOR were presented to the FDA, the agency had attempted to get Merck to change the company's official labeling of the drug to more accurately reflect the growing body of data about its cardiac risk. In fact in an early review of the VIGOR data one FDA reviewer noted, *"It would be difficult to imagine inclusion of the VIGOR results in the rofecoxib labeling without mentioning cardiovascular safety results in the study descriptions as well as the Warnings sections."* Instead of proactively revising its product label to accurately and prominently reflect this problem, as concern increased about the cardiac risks of Vioxx in March 2001 the company prepared a "Public Affairs Plan" discussing the best way to frame the problem. At first glance, one slide about the campaign seems compatible with the core values of medicine, with the following precept presented first: "Do no harm." However, the rest of that bullet-point provides a very different meaning for that concept: **"refrain from proactively generating coverage that jeopardizes label negotiations and/or that links Vioxx to CV adverse events."** The slide continues: **"Vigilantly defend the brand."** This does not seem compatible with the full and open discussion of risks and benefits that physicians and patients require in order to make appropriate drug choices.

As label negotiations were proceeding with the FDA, the company appears to have had a great deal of concern about the effect of a possible label change on increasing physician awareness of the product's cardiovascular hazards. The level of risk depicted in a product's official labeling can heavily influence a drug's sales. An internal marketing graph prepared by Merck dated July 12, 2001 labeled "Upside/Downside Sales Forecast" presented company staff with three estimates of potential annual sales, in billions of dollars, depending on the outcome of negotiations with FDA about the Vioxx label. The "upside" scenario predicts a 25% increase in sales by 2006 if "CV Labeling Milder; No Prothrombotic language." However, a reduction in sales of 50% is projected by 2006 if the FDA were to require a "black box warning" about cardiovascular risk rather than a milder "precaution." The difference between the two projections on the graph is approximately $1.2 billion in annual sales. If such calculations had influenced the

21

Confidential-Subject to Protective Order

company's position in its discussions with FDA about the proper warnings to appear on the drug's labeling, that would have been inappropriate.

Merck's mis-communications to physicians about Vioxx had become so egregious that in September 2001 the company's CEO, Mr. Gilmartin, received an unusually strongly worded Warning Letter from the FDA. It read, in part:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and this, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)...
>
> Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile... Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen.

Throughout 2001, Merck continued its intense and protracted negotiations with FDA over proposed changes to the drug's labeling. There was controversy within Merck about making the data from the ADVANTAGE study available to FDA, and it appears to have taken the company a year and a half after it obtained the study results (and multiple requests by the agency) before complete safety data from that trial were actually transmitted to FDA. In April 2001, Dr. Scolnick had expressed concern about FDA's requests for more safety data:

> The open ended request for safety updates [from FDA] is a filibuster...I have never seen being nice to the FDA – except on rare occasions – pay off....This division is devious and antagonistic. One cannot deal with them in a rational way...I think giving them [the data from] Advantage was not wise. The alzheimer's data vs placebo is helpful. Advantage is not....we will end up with bad labeling....I realize I can be paranoid and I sometimes overreact but I am not trusting of this [FDA] group.

By October 2001, FDA requested the company to add a warning that would more accurately depict the cardiac risks found in the VIGOR and ADVANTAGE studies over 18 months earlier. In my view, the warning language FDA proposed was a fair representation of the risk information that had been provided to the FDA at the time, and would have helped alert physicians to the CV risks that had become apparent.

22

Confidential-Subject to Protective Order

(Importantly, the FDA was not yet fully aware of the significant and persisting increase in mortality risk with Vioxx vs. placebo that occurred in Merck's Alzheimer's Disease trials, if results were calculated in the usual intention-to-treat method of analysis.) However, the company resolutely and repeatedly resisted having such a warning appear prominently on the Vioxx label. In a memo on October 15, 2001, reacting to the latest FDA proposal for such a label change, Dr. Scolnick wrote to David Anstice, "David Be assured we will not accept this label." Anstice responds, "We knew it would be UGLY and it is. We'll fight back, and see where we get."  Around midnight, Scolnick answers: "it is ugly cubed thye [they] are bastards"

Two weeks later Scolnick writes that he will not sign off on the new label until it is acceptable to him: "we need a statement now that will be a substitute for what the fda will not relent on i.e. the unknown about CV risks." The Merck team comes up with an alternative to FDA's proposal.  In it, instead of a prominent warning the information about elevated cardiovascular risk would be placed deep in the lengthy official wording much less visibly and would read: "The basis for the difference in cardiovascular event rates with VIOXX vs. naproxen observed in VIGOR, and the lack of such a difference between VIOXX and placebo or other NSAID comparators in other studies, is not understood." Scolnick declared that this alternative language was "a good start."

As discussions about the label proceeded within the company in the fall of 2001, Scolnick wrote to Douglas Greene, Bonnie Goldmann, and Peter Kim:

> twice in my life I have had to say to the FDA 'That label is unacceptable, we will not under any circumstances accept it.'…You WILL have to do that on the cardiac warning for Vioxx. I assure you that you will. And I assure you I will NOT sign off on any lable [sic] that had a cardiac warning.

This provides a strikingly clear statement of Merck's intention at the highest levels of the company to block a change in the product description that would have presented physicians with an accurate depiction of the drug's risk. The company's position was in clear opposition to the decisions expressed in the February 2001 meeting and formal vote of the FDA Advisory Committee, whose members had voiced strong concerns that the cardiovascular risk of Vioxx be more accurately reflected in its labeling. Even in the absence of a negotiated agreement with FDA concerning the contents of its official label, there is no reason Merck could not have notified physicians or consumers about the emerging data about the risks of Vioxx. Companies are permitted to provide updated information about risk in materials for to doctors and patients without obtaining prior FDA approval, but Merck did not do so. To the contrary, it continued to use misleading depictions of risk (through the "Cardiovascular Card" and other communications noted above) to minimize a very real problem with their product.

The revised cardiac risk labeling which FDA proposed to Merck was quite fair and reasonable in light of a comprehensive review of the data available at that time, and would have provided reasonable guidance to physicians attempting to balance the drug's

23

Confidential-Subject to Protective Order

benefits and risks.  By contrast, the revised label that Merck eventually produced in April 2002 continued to de-emphasize the importance of the cardiovascular risk of Vioxx in a manner that would have been misleading to a physician trying to make a reasoned prescribing decision about Vioxx vs. a traditional NSAID or other alternative. Merck's intense struggle with the FDA over this issue does not appear compatible with its public statements that the company was committed to making the most accurate information on Vioxx available to physicians and the public.

## IX. Additional material

I will also present evidence concerning the experience of my research team in its work on our Merck-funded epidemiological study of the relationship between Vioxx and heart attack that was ultimately published in the cardiology journal *Circulation* in 2004.

## X. Post-withdrawal developments

Four months after Vioxx was taken off the market, the FDA convened an Advisory Committee meeting in February 2005 to consider all the evidence it then had available concerning the cardiac risk of the cox-2 drugs and traditional NSAIDs. After lengthy discussion and review of that extensive collection of materials, committee members were asked whether they believed that Vioxx was a cause of cardiovascular disease events. Without exception, all panel members answered "Yes."  The committee members were then asked whether Vioxx should be made available for use, and if so, under what circumstances. Based on their review of all the data, about half of the reviewers said it should never be used in any patients. Nearly all the others said that such use should be permitted only under restricted circumstances. Restrictions proposed by these Advisory Committee members included limiting its use to children only (who would be at reduced risk of cardiac complications), allowing only the lowest dose (12.5 mg) on the market, strengthening the warnings on the drug's label to include a "black box" highlighting its cardiovascular risk, allowing its use only as a second- or third-choice drug after safer agents had been tried, limiting its duration of use, recommending close monitoring of patients for cardiovascular complications such as elevation in blood pressure, and having patients give explicit "informed consent" before taking the drug, acknowledging their awareness of its capacity to induce cardiovascular harm. Only 2 FDA Advisory Committee members voted to allow Vioxx back onto the market with no additional restrictions. These determinations are a comprehensive reflection of the evaluation of a large number of medical experts convened by FDA to review all the information then available to the agency and to the general public.

## XI. Summary and conclusions

Taken together, the available scientific evidence makes it clear that Vioxx is an independent risk factor that increases the risk of cardiovascular disease at all commonly used doses and durations.  The risk begins early after drug use starts, is higher with greater doses, and persists over time. Evidence of this risk was available prior to the initial marketing of Vioxx, and was reinforced by repeated clinical trial findings and

Confidential-Subject to Protective Order

highly consistent epidemiological data. The doubling of the rate of cardiovascular events that emerges from numerous clinical trials of Vioxx – whether compared to other NSAIDs or to placebo – places the drug in the category of a major risk factor for these events. Despite the evidence, Merck consistently ignored or dismissed the clear signals of cardiac risks attributable to Vioxx. This strategy began early in the drug's clinical development and continued until the day the drug was removed from the market. In the face of ample evidence of potential hazard that continued to accumulate throughout the late 1990s and up until the moment the drug was recalled, the company failed to aggressively mount the studies that could have clarified such risk. It presented the data that did emerge in a distorted manner to the public, to the FDA, and to physicians.

The opinions expressed above are based upon my education, training, research, and expertise, as well as my review of peer reviewed medical scientific and regulatory literature and relevant documents and testimony produced during the discovery process. I may supplement this report if necessary based upon receipt of additional information received during the course of the litigation. My usual consulting fee is $750 per hour for review and consultation, but I am accepting no personal compensation for my work on this case.

_____

Jerry Avorn, M.D.

March 20, 2006

**Materials Considered**:

1.  Amendment to NDA 21-042 - MRK-01420163696 - MRK-01420163721
2.  (Draft) Comparison of the Effects of Rofecoxib, a Highly Selective-Inhibitor of COX 2, and Naproxen (a dual COX-1/COX-2 inhibitor) on the Incidence of Clinically Important Upper Gastrointestinal Events: Results from the VIGOR Trial by Claire Bombardier, et al.,  - MRK-AAB0109412 - MRK-AAB0109447
3.  Letter from Claire Bombardier to NEJM attaching the manuscript entitled "Comparison of the Effects of Rofecoxib, a Highly Selective-Inhibitor of COX 2, and Naproxen (a dual COX-1/COX-2 inhibitor) on the Incidence of Clinically Important Upper Gastrointestinal Events: Results from the VIGOR Trial," dated 5/18/00 -  MRK-NJ0245555 -  MRK-NJ0245604.
4.  Draft GI Outcomes Study Protocol - MRK-NJ0315784 - - MRK-NJ0315837
5.  Email from D. Blois, dated 10/15/00 - MRK-AAX0008560 - MRK-AAX0008581
6.  Email from E. Russo to A. Schechter, et al., dated 12/21/01 - MRK-AAX0009235 - MRK-AAX0009257
7.  Email from J. Bull to J. Jenkins, et al., dated 4/11/02 - FDACDER007813 - FDACDER007844
8.  Email from L. Villalba to D. Throckmorton, dated 9/30/01 - FDACDER010143 - FDACDER010149
9.  Excerpts from Alise Reicin 10/11/05 Transcript, pages 3522-3526
10. Excerpts from David Anstice 9/26/05 Transcript, pages 2016-2017
11. Deposition transcripts of Edward Scolnick, dated 3/22/05, 3/19/05, 4/29/05, 5/17/05, 6/1/05, & 8/16/05
12. Deposition transcripts of Gregory Curfman, dated 11/21/05 & 1/24/06
13. Deposition transcript of Eric Topol, dated 11/22/05
14. Fax from B. Gould to N. Braunstein, dated 6/7/02 - MRK-AAF0008508 - MRK-AAF0008512
15. Fax from B. Gould to R. Silverman, dated 6/22/01 - MRK-AAF0004045
16. Fax from B. Gould to R. Silverman, dated 9/28/01 - MRK-AAF0004250
17. Fax from B. Gould to R. Silverman, dated 9/26/01 - MRK-AAF0004251
18. Fax from B. Gould to R. Silverman, dated 9/7/01 - MRK-ABW0008489
19. Fax from the FDA to R. Silverman, dated 7/13/01 - MRK-ACD0075472 - MRK-ACD0075473
20. FDA Teleconference Minutes for 3/20/02 - MRK-AAF0008519 - MRK-AAF0008529
21. Folkendt Report, dated 11/27/00 - MRK-NJ0069724- MRK-NJ0069726
22. GI Label Change for Vioxx Public Affairs Plan, dated 3/23/01 - MRK-ADJ0020162 - MRK-ADJ0020183
23. Highlights of Vioxx Labeling Changes Proposed by HFD-550 - FDACDER034122 - HFD-550 - FDACDER034128
24. Letter from L. Goldkind to Silverman, dated 2/28/01 - MRK-01420031266 - MRK-01420031268
25. Letter from M. Griffin to D. Watson, dated 10/16/01 - MRK-NJ0185865 - MRK-NJ0185867

Confidential-Subject to Protective Order

26.    Letter from R. Silverman to Bull, dated 3/15/01 - MRK-AAF0003775 - MRK-AAF0003776

27.    Letter from R. Silverman to Bull, dated 8/30/01 - MRK-AAF0003926 - MRK-AAF0003927

28.    Letter from R. Silverman to Bull, dated 5/25/01 - MRK-AAF0003986 - MRK-AAF0003988

29.    Letter from R. Silverman to Bull, dated 6/14/01 - MRK-AAF0004013 - MRK-AAF0004014

30.    Letter from R. Silverman to Bull, dated 7/26/01 - MRK-AAF0004126 - MRK-AAF0004129

31.    Letter from R. Silverman to Bull, dated 3/16/01 - MRK-NJ0265338 - MRK-NJ0265362

32.    Fax from S. Folkendt to R. Silverman, dated 6/6/01 - MRK-AAF0003997 - MRK-AAF0003998

33.    Memo from D. Watson, dated 10/24/01 - MRK-NJ0185864

34.    Memo from E. Wong to D. Riendeau, dated 3/16/99 - MRK-AEG0023306

35.    Memo from G. Block to Scolnick, dated 3/21/01 - MRK-NJ0333225 - MRK-NJ0333235

36.    *Doubts are Raised on the Safety of 2 Popular Arthritis Drugs* by Melody Petersen, The New York Times, dated 5/22/01 – MRK-ABH0003185 – MRK-ABH0003188

37.    Ingenix Epidemiology's Draft Manuscript on Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 2/27/04 – MRK-ABY0153857 – MRK-ABY0153880

38.    Ingenix Epidemiology's Draft Manuscript on Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 9/27/04 - MRK-ABY0164090 - MRK-ABY0164115

39.    Effects of Cyclooxygenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site f Microvascular Injury in Healthy Men by Ewa Tuleja, et al., Arterioscler Thromb Vasc Biol., dated June '03 - MRK-ADY0005464 - MRK-ADY0005468

40.    Comparative Inhibitory Activity of Rofecoxib, Meloxican, Diclofenac, Ibuprofen, and Naproxen on COX-2 versus COX-1 in Healthy Volunteers by Anne Van Hecken, et al., Journal of Clinical Pharmacology, '00 - MRK-AAD0305229 - MRK-AAD0305240

41.    Vioxx Project Team Agenda & Minutes, dated 11/10/00 - MRK-ABF0004419 - MRK-ABF0004442

42.    Excerpts from Vioxx Preliminary CV Meta-Analysis – MRK-NJ0070364 -MRK-NJ0070397

43.    Excerpts from Long Range Operating Plan: 2002-2007, dated 7/15/02 MRK-ABI0011027- MRK-ABI0011081

44.    Excerpts from NDA - MRK-ABS0066396- MRK ABS0067019

45.    Excerpts from FDA Medical Officer Review of NDA - MRK-ADI0005375

46.    Excerpts from Draft Manuscript entitled "Cardiovascular Events Associated with Rofecoxib in a 3-Year Randomized Colorectal Adenoma Chemorprevention Trial" – MRK-AGO0076955 - MRK-AGO0076990

2

Confidential-Subject to Protective Order

47.  Excerpts from APPROVe CSR - MRK-S0420051001 - MRK-S0420053185 (P1.1034)
48.  Excerpts from APPROVe Trial CV Safety Report – MRK-S0420051232 - MRK-S0420051330 (P1.1117)
49.  Excerpts from VIGOR sNDA – MRK-00420008087 - MRK-00420008117 (P1.1132)
50.  Excerpts from U.S. Long Range Operating Plan, dated 7/12/01 – MRK-ABI0008659 - MRK-ABI0008683 (P1.1135)
51.  Excerpts from Protocol 090. – MRK-NJ0170152 - MRK-NJ0170511 (P1.1186)
52.  Excerpts from COX-2 FDA Advisory Committee Meeting – MRK-AFK0232972 - MRK-AFK0233029 (P1.1238)
53.  Excerpts from FDA review of NDA 21-042 and NDA 21-052 – MRK-AFV0341732 - MRK-AFV0341794 (P1.1245)
54.  Excerpts from VIGOR Reviews – MRK-AFV0341795 - MRK-AFV0341881 (P1.1246)
55.  Email from Edward Scolnick to David Anstice, dated 10/18/01 – MRK-ABW0004799 - MRK-ABW0004799 (P1.0002)
56.  Email from Brian F. Daniels to Thomas Simon, et al., dated 2/26/97 – MRK-NJ0315892 - MRK-NJ0315894 (P1.0004)
57.  Warning letter from Thomas Abrams to Raymond Gilmartin, dated 9/17/01 – MRK-ABA0003277- MRK-ABA0003284 (P1.0006)
58.  Vioxx Dodgeball – MRK-AAR0019773 - MRK-AAR0019786 (P1.0007)
59.  CV Card – MRK-AAR0019055 - MRK-AAR0019060 (P1.0008)
60.  VICTOR KM Plot--Confirmed Thrombotic CV events, dated 2/1/05 – MRK-AFK0190651 - MRK-AFK0190651 (P1.0015)
61.  VICTOR KM Plot--APTC event, dated 2/1/05 MRK-AFK0190652 - MRK-AFK0190652 (P1.0016)
62.  Vioxx Preliminary Cardiovascular Meta-Analysis Slide Set by Deborah Shapiro, dated 10/18/00 – MRK-NJ0070364 - MRK-NJ0070397 (P1.0017)
63.  FDA-MRL Meeting NDA 21-042/S-007: VIGOR Re: Protocol 069 Minutes, dated 4/11/01 - MRK-01420099060 - MRK-01420099061 (P1.0021)
64.  Analyses of Unadjudicated and Adjudicated Thromboembolic Adverse Experiences – MRK-AAB0108912 - MRK-AAB0108932 (P1.0029)
65.  Bulletin for Vioxx Action Required: Response to New York Times Article, dated 5/23/01 – MRK-AAR0007240 - MRK-AAR0007248 (P1.0061)
66.  Obstacle Jeopardy – MRK-AAR0010111 - MRK-AAR0010126 (P1.0064)
67.  Bulletin for Vioxx: Action Required: Response to JAMA, "Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors", dated 8/21/2001 - MRK-AAR0021103 - MRK-AAR0021108 (P1.0068)
68.  Deaths in MK-0966 Studies 078, 091, 126 – MRK-AAX0000696 - MRK-AAX0000705 (P1.0076)
69.  Memo from G. Block and S. Reines to Edward Scolnick, dated 4/8/01 – MRK-AAX0000752 - MRK-AAX0000776 (P1.0079)
70.  Memo from Thomas Musliner to B. Friedman, A. Nies and R. Spector, dated 11/21/06 – MRK-AAX0002413 - MRK-AAX0002420 (P1.0082)

3

Confidential-Subject to Protective Order

71. Letter from Carlos Patrono to Martino Laurenzi, dated 9/9/98 – MRK-ABC0002199 - MRK-ABC0002200 (P1.0108)

72. Email from Douglas Greene to Alan Nies, dated 12/3/01 – MRK-ABC0034124 - MRK-ABC0034124 (P1.0119)

73. Memo on protocol 136 results, dated 11/20/01 – MRK-ABC0035654 - MRK-ABC0035657 (P1.0120)

74. A. Nies email to Stone, dated 11/20/01 – MRK-ABC0035680 (P1.0121)

75. Research Management Committee No. 96-10 -- Blue Bell, dated 10/10/96 – MRK-ABC0048699 - MRK-ABC0048706 (P1.0122)

76. Email from Edward Scolnick to Deborah Shapiro et al., dated 3/9/00 – MRK-ABH0016219 (P1.0132)

77. Letter from David Anstice to Thomas Abrams, dated 10/1/01 – MRK-ABI0003148 - MRK-ABI0003155 (P1.0151)

78. Press Release - Merck confirms favorable CV safety profile of Vioxx, dated 5/22/01 – MRK-ABI0003228 - MRK-ABI0003230 (P1.0152)

79. Nies Handwritten Memo Re: Carlo Patrono, dated 9/29/98 – MRK-ABK0311068 (P1. 0167)

80. Plan to Evaluate the Incidence of Cardiovascular SAEs in the Phase IIb/III Vioxx (MK-0966) Osteoarthritis Clinical Trials, dated 9/30/97 – MRK-ABS0037036 - MRK-ABS0037048 (P1.0198)

81. Email from Lawson to Reines, dated 3/1/02 – MRK-ABS0344100 P1.0211

82. Email from Douglas Watson to Thomas Capizzi, et al., dated 1/18/00 – MRK-ABT0022650 - MRK-ABT0022657 (P1.0221)

83. Dear Doctor letter from John Yates, dated 10/30/03 – MRK-ABX0071232 - MRK-ABX0071233 (P1.0243)

84. Email from R. Bain to Ramey, dated 9/29/01 – MRK-ABY0019451 - MRK-ABY0019452 (P1.0246)

85. Ingenix paper 2-17 version, dated 9/3/04 – MRK-ABY0164039 - MRK-ABY0164060 (P1.0263)

86. Email from Deborah Shapiro to Eliav Barr, et al., dated 1/29/02 – MRK-ACF0004015 - MRK-ACF0004016 (P1.0278)

87. Attachments to Casola to Abrams letter, dated 11/19/01 – MRK-ACI0013241 - MRK-ACI0013246 (P1.0288)

88. Email from Edward Scolnick to Douglas Greene, dated 4/9/01 – MRK-ACR0009151 - MRK-ACR0009152 (P1.0300)

89. Email from Edward Scolnick to Douglas Greene, dated 3/22/01 – MRK-ACR0014502 - MRK-ACR0014503 (P1.0309)

90. Bulletin for Vioxx / Background and obstacle responses on retrospective observational analysis - / Solomon article No. COX 04-023, dated 4/21/04 – MRK-ADB0046424 - MRK-ADB0046427 (P1.0340)

91. D. Watson email re: Solomon Cox2 and MI Manuscript Accepted to Circ, dated 2/10/04 – MRK-ADC0003100 - MRK-ADC0003104 (P1.0344)

92. Ingenix Draft Final Report "Cardiovascular Risk of COX-2 Inhibitors and Other NANSAIDs, dated 12/15/03 – MRK-ADC0032522 - MRK-ADC0032573 (P1.0346)

4

93.   Email from Adam Schechter to Thomas Cannell, et al., dated 11/22/01 – MRK-ADG0035340 (P1.0352)

94.   PIR - Use of Vioxx with Low Dose Aspirin, dated 5/17/02 – MRK-ADZ0017722 - MRK-ADZ0017729 (P1.0369)

95.   Scientific Advisors' Meeting May 3 -  May 6, 1998 Programmatic Review Vioxx Program, dated 5/6/98 – MRK-AEI0002734 - MRK-AEI0002746 (P1.0386)

96.   Email from Barry J. Gertz to Peter S. Kim, et al., dated 4/30/03 – MRK-AFJ0003506 - MRK-AFJ0003510 (P1.0425)

97.   PIR - Vioxx 50 mg, dated 5/14/01 – MRK-BDN0000081 - MRK-BDN0000098 (P1.0452)

98.   PIR - Results of VIGOR trial, dated 9/2/00 – MRK-HND0000189 - MRK-HND0000193 (P1.0456)

99.   Vioxx Label Nov. '99, dated 11/1/99 – MRK-LBL0000035 - MRK-LBL0000038 (P1.0463)

100.  Vioxx Final Label April 2002, dated 4/19/02 - MRK-NJ0094478 - MRK-NJ0094493  (P1.0484)

101.  Email from Douglas Watson to Alise Reicin, et al., dated 1/18/00 – MRK-NJ0120249 - MRK-NJ0120250 (P1.0490)

102.  Email from Alise Reicin to Eliave barr and Deborah Shapiro, dated 3/14/00 – MRK-NJ0121088 - MRK-NJ0121089 (P1.0494)

103.  Email from E. Barr to D. Shapiro, dated 9/19/00 – MRK-NJ0123880 - MRK-NJ0123882 (P1.0501)

104.  A. Reicin email to E. Barr, dated 11/8/00 – MRK-NJ0124427 - MRK-NJ0124428 (P1.0502)

105.  MRL Clinical Study Report: Protocol 90, dated 6/15/00 – MRK-NJ0170152 - MRK-NJ0170274 (P1.0513)

106.  MRL Epidemiology Department Technical Report No. EP07006.005.98 Final Results of an Analysis of the Incidence of Cardiovascular SAEs in the Phase IIb/III VIOXX Osteoarthritis Clinical Trials, dated 2/2/98 – MRK-NJ0272249 - MRK-NJ0272272 (P1.0532)

107.  Press Release - Merck Informs Investigators of Preliminary Results of Gastrointestinal Outcones Study with Vioxx, dated 3/27/00 – MRK-PRL0000114 - MRK-PRL0000115 (P1.0581)

108.  Email from Edward Scolnick to Karen Grosser, dated 11/1/01 – MRK-AFO0128716 (P1.0729)

109.  MRL Clinical Study Report, Multicenter Study: A Double-Blind, Placebo Controlled Study to Evaluate Safety and Tolerability and Preliminarily Assess Clinical Efficacy of MK-0966 in Patients With Osteoarthritis of the Knee (Protocol 010) – MRK-OS420045657 - MRK-OS0420046186 (P1.0967)

110.  MRL Clinical Study Report, Multicenter Study: A Double-Blind, Placebo Controlled Study to Assess Safety and Tolerability and Preliminarily Evaluate Efficacy of L-748,731 in Patients with Rheumatoid Arthritis (Protocol 017) – MRK-AFL0010627 - MRK-AFL0010817 (P1.0968)

111.  Memo from Eric Maller to Michelle Johnson, dated 5/14/02 – MRK-ABS0415817 (P1.1074)

Confidential-Subject to Protective Order

112. Email from Edward Scolnick to Douglas Greene, dated 11/8/01 – MRK-AFJ0001537 (P1.1098)

113. Excerpts of 10/13/00 sNDA for VIGOR, dated 10/13/00 – MRK-N0520004121 - MRK-N0520004172 (P1.1133)

114. Letter from Jonca Bull to Robert Silverman, dated 4/6/01 – MRK-NJ0274184 - MRK-NJ0274187 (P1.1209)

115. Fax from Barbara Gould to Philip Huan, dated 2/2/05 – MRK-S0420050651 (P1.1214)

116. Memo from Deborah Shapiro to Alise Reicin et al., dated 7/5/00 – MRK-NJ0071320 - MRK-NJ0071332 (P1.1231)

117. Memo from Lourdes Villalba to Brian Harvey – (P1.1253)

118. Version 2 Standby Statement 0 Vioxx and Cardiovascular Events in VIGOR, dated 3/1/00 – MRK-S0420112006 - MRK-S0420112007 (P1.1256)

119. SA Reines, et al., Rofecoxib/No effect on Alzheimer's disease in a 1-year, randomized, blinded, controlled study, Neurology, Vol. 62, Pgs 66-71 – MRK-ADY0006485 - MRK-ADY0006490 (P2.0021)

120. BJ Gertz et al. , Selective COX-2 inhibition and cardiovascular effects: A Review of the rofecoxib development program, American Heart Journal, Vol 146, Issue 4, Pgs 591-604 – MRK-ADY0006153 - MRK-ADY0006166 (P2.0022)

121. Bresalier, Robert et al., Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial, The New England Journal of Medicine, Pg. 1-11, (February 14, 2005) – (P2.0167)

122. Claire Bombardier, et al, Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, The New England Journal of Medicine, Vol 343, Pg. 1520-1528, dated 11/23/00 – MRK-ABA0001301 – MRK-ABA0001309 (P2.0183)

123. Thal, LJ, Ferris, SH et al., A Randomized, Double-Bind, Study of Rofecoxib with Mild Cognitive Impairment, Neuropsychopharmacology Vol. 30, 1204-1215, advance online publication, 2 March 2005; http://www.nature.com/npp/journal/v30/n6/abs/1300690a.html - (P2.0202)

124. Bombardier, C. et. al, Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, N. Eng. J. Med, Vol 343, No. 21, 1520 (Nov. 23, 2000) – MRK-ABA0001301 - MRK-ABA0001309 (P2.0146)

125. Lisse, J., et al, Gastrointestinal Tolerability and Effectiveness of rofecoxib verses Naproxen in the Treatment of Osteoarthritis, Ann. Inter. Med 2003; 139:539-546 (October 7, 2003)

126. Advisory Committee Briefing Packet :VIGOR (February 8, 2001) – MRK-ABW0000581 - MRK-ABW0000607 (P1.1084)

127. FDA Medical Officer review by Lourdes Villalba, dated 3/31/01 – MRK-AFV0341574 - MRK-AFV0341594 (P1.1243)

128. VIGOR/RA SNDA Reviews, dated 7/21/01 – MRK-AFV0341732 - MRK-AFV0341794 (P1.1245)

129. Reviewer Comments: New England Journal of Medicine, dated 2/9/05 – 2005 NEJM 000013

6

Confidential-Subject to Protective Order

130. NEJM Manuscript 05-0493-Author's responses to Reviewer's Comments – MRK-AFN0052502 - MRK-AFN0052523 (P1.0755)

131. Investigator Reported AE, Myer Kaplan Curves (excerpts)

132. E-mail from Marvin Konstam to C. Lines, dated 2/2/05 – MRK-AHD0075697

133. Memo from J. Chen to R. Bain, dated 4/4/01 – MRK-AAX0000725 - MRK-AAX0000751 (P1.0078)

134. Author's Responses to Reviewer's Comments – MRK-AAC0146909

135. Protocol 145 (VICTOR) Memo – MRK-I8940096438

136. Excerpt of CSR 201 – MRK-I89400096448

137. Brochier, M.L., Evaluation of Flurbuprofen for Prevention of Reinfarction and Reocculusion after Successful Thrombosis or Angioplasty in Acute Myocardial Infarction, Eur. Heat J. (1993) 14, 951-957 – MRK-NJ0146547 - MRK-NJ0146553 (P2.0208)

138. Fornaro, G., Induprofen in the Prevention of Thromboembolic Complications in Patients with Heart Disease, Circulation, 1993:87:167-169

139. Konstam, M. A. et al. Cardiovascular Thrombotic Events in Controlled Clinical Trials of Rofecoxib, Circulation 2001: 104: 2280-2288 – MRK-ABA0004431 - MRK-ABA0004440 (P2.0133)

140. E-Mail String, Morrison, Shapiro, Bolognese, et al. – MRK-ACF0005697 - MRK-ACF0005699 (P1.0281)

141. Mukhergee, et al, Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, JAMA, Vol 286, No 8, 954-959 (August 2002) – MRK-ADJ0035003 - MRK-ADJ0035008 (P2.0032)

142. Reicin, AS, et al, Comparison of Cardiovascular Thrombotic Events in Patients With Osteoarthritis Treated with Rofecoxib Verses Nonselective Nonsteroidal Anti-inflammatory Drugs (Ibuprofen, Docofenac and Nabumatone), Am. J. Cardiol. 2002; 89: 204-209 – MRK-ABT0018283 - MRK-ABT0018288 (P2.0104)

143. E-mail from Reicin to Sperling, dated 4/20/01 – MRK-ABK0156786 - MRK-ABK0156808 (P1.1225)

144. Juni, P., et al, Risk of cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis, Lancet, Vol 364, 2021 (Dec. 4 , 2004) – MRK-ABI0013854 - MRK-ABI0013862 (P2.0126)

145. FDA Medical Officer Review (Villalba)(Cardiovascular Data in Alzheimer's Studies–078, 091 and 126, dated 3/12/02

146. FDA Medical Officer Review in Alzheimer's Studies 078 and 091 (Villalba), dated 12/18/04

147. Memo from Joshua Chen to Raymond Bain, dated 5/1/01 – MRK-ABY0030000 - MRK-ABY0030030 (P1.0255)

148. Ray, W. et al. COX 2 Selective Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease, Lancet, Vol. 360, 1071-73 (October 5, 2002) – MRK-ADY0004478 - MRK-ADY0004480 (P2.0025)

149. Mamdami, M., et al., Effect of Selective Cyclooxygenase 2 Inhibitors and Naproxen on Short Term Risk of Acute Myocardial Infarction in the Elderly, Arch. Intern. Med., 2003; 163; 481-486 – MRK-ABH0002262 - MRK-ABH0002266 (P2.0103)

7

Confidential-Subject to Protective Order

150.   Solomon, et al, <u>Relationship Between Selective Cyclooxygenase-2 Inhibitors and Acute Myocardial Infarction in Older Adults</u>, Circulation, 2004; 109: 2068-2073 – MRK-ADY0006986 - MRK-ADY0006991 (P2.0017)

151.   Graham, D.J, <u>Risk of Acute Myocardial Infarction and Sudden cardiac Death in Patients Treated with Cyclo-0xygenase 2 selective and Non-selective Non-Steroidal Anti Inflammatory Drugs: Nested Case Control Study</u>, Lancet Vol, 365, 475 (Feb 2, 2005) – MRK-ACO0144158 - MRK-ACO0144164 (P2.0050)

152.   Levesque, L., et al, <u>The Risk of Myocardial Infarction with Cyclooxyegenase-2 Inhibitors: A Population Study in Healthy</u> Adults, Ann. Inter. Med. 2005, 142(7) - MRK-AHD0004828 - MRK-AHD0004837 – (P2.0007)

153.   Kimmel, S.E., <u>The effects of non-Selective Non-Aspirin Non-Steroidal Anti-Inflammatory Medications on the risk of Nonfatal Myocardial Infarction and their Interaction with Aspirin</u>, J. Am. Cardiol 2004; 43: 985-990 – MRK-ABY0089726 - MRK-ABY0089731 (P2.0064)

154.   Walker, et al (IGENIX), <u>Cardiovascular Risk of COX-2 Inhibitors and Other NSAIDS</u> (Draft Final Report–Nov. 25, 2003)(Unpublished)

155.   Solomon, D., <u>Nonsteroidal Anti-inflammatory Drug Use and Acute Myocardial Infarction</u>, Archives in Inter. Med. Vol. 162, 1099 (May 27, 2002) – MRK-ADY0003732 - MRK-ADY0003737 (P2.0026)

156.   Ray, W., et al, <u>Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease: An Observational Cohort Study,</u> Lancet, Vol. 359, 118 (January 12, 2002) – MRK-ABT0015857 - MRK-ABT0015862 (P2.0105)

157.   Watson, D.J., <u>Lower Risk of Thromboembolic Cardiovascular Events with Naproxen Among Patients with Rheumatoid Arthritis,</u> Arch, Intern. Med. Vol 162, 1105 (May 27, 2002) – MRK-AEF0000847 - MRK-AEF0000851 (P2.0016)

158.   Garcia Rodriguez, L, et al, <u>Differential Effects of Aspirin and Non-Aspirin Nonsteroidal Anti-inflammatory Drugs in the Primary Prevention of Myocardial Infarction in Postmenopausal Women</u>, Epidemiology, Vol 11(4), 382-387 (July 2000) – (P2.0185)

159.   Garcia Rodriguez, L, et al, <u>Nonsteroidal Anti-inflammatory Drugs and the Risk of Myocardial Infarction in the General Population, Circulation,</u> 2004: 109: 30-00-3006 – (P2.0191)

160.   Rahme E. <u>Association between Naproxen Use and Protection against Acute Myocardial Infarction,</u> Arch., Int. Med., 2002:162; 1111-1115 – MRK-ABS0386560 - MRK-ABS0386564 (P2.0111)

161.   Van Hecken, A, et al <u>Comparative Inhibitory Activity of rofecoxib, Meloxicam, Diclofinac, Ibuprofen and Naproxen on COX 2 verses COX-1 in Healthy Volunteers</u>, J. Clin Pharm, 2000; 40; 1109-1120 – MRK-ABA0002280 - MRK-ABA0002291 (P2.0138)

162.   Catella-Lawson, et al. <u>Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics and Vasoactive Ecosanoids,</u> J. Pharm. Exper. Ther 289(2): 735-742 (May 1999) – (P2.0189)

163.   Tuleja, E. <u>Effects of Cyclooxenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site of Microvasculare Injury in Healthy Men</u>, Arterioscler. Thromb. Vasc. Biol., 2003; 23; 1111-1115 – (P2.0213)

8

Confidential-Subject to Protective Order

164.  Study to Evaluate he Thrombotic Potential of COX 2 Inhibition in an Animal Model (African Green Monkey)(unpublished) - MRK-NJ0221477-89
165.  E-mail String on African Green Monkey data, dated 7/10/01 - MRK-NJ0198045-7
166.  Slide on African Green Monkey Study - MRK-ABH0019277-99
167.  Slide Presentation: Mechanism Based Adverse Cardiovascular Events and Specific Inhibitors of COX-2, Garret FitzGerald, MD (Presentation to 2005 Advisory Committee)
168.  Verna, et al, Cyclooxegenase-2 Blockade does Not Impair Endothelial Vasodilator Function in Healthy Volunteers, Circulation, 2002: 104: 2879-82
169.  McAdam, B., et al., Contribution of Cyclooxegenase-2 to Elevate Biosynthesis of Thromboxane A2 and Prostacyclin in Cigarette Smokers, Circulation, 2005, 112:1024-1029
170.  Capone, et al., Clinical Pharmacology of Platelet Monocyte and Vascular Cyclooxegenase Inhibition by Naproxen and low-Does Aspirin in Health Subjects
171.  Fitzgerald and Patrono, The Coxibs, Selective Inhibitors of Cyclooxegenase-2, N. Eng. J. Med Vol 345, No. 6 (Aug. 9.2001) – MRK-ABI0003298 - MRK-ABI0003307 (P2.0127)
172.  FitzGerald, G, Coxibs and Cardiovascular Disease, N. Eng J. Med 35:117 (October 21, 2004) – (P2.0174)
173.  FDA Document, Sequence of Events with Vioxx Since Opening IND
174.  FDA Document, FDA Review of cardiovascular and renal Safety by Pelayo, dated 4/30/99
175.  FDA Document, Excerpts from Primary Review of NDA 21-042-Osteoarthritis by Villalba, dated May 1999
176.  FDA Document, Summary and Transcript of FDA Advisory Committee Meeting (Feb 16,17, 18, 2005)
177.  FDA Document, Memorandum from J. Jenkins to Galson, dated 4/6/05

Confidential-Subject to Protective Order

## Curriculum Vitae

updated: December,  2004

| | |
|---|---|
| Name: | Jerome L. Avorn |

Office Address:  Division of Pharmacoepidemiology and Pharmacoeconomics
Brigham and Women's Hospital
1620 Tremont Street, suite 3030
Boston, MA  02120

Home Address:  5 Circuit Road
Chestnut Hill, MA 02467

Place of Birth:  New York, New York

Education:

| 1969 A.B. | Columbia University, New York |
|---|---|
| 1974 M.D. | Harvard Medical School, Boston |

Postdoctoral Training:

| 1972-74 | Fellow in Social Studies (Medical Sociology), Harvard College |
|---|---|
| 1974-75 | Intern in Medicine, The Cambridge Hospital, Cambridge, Massachusetts |
| 1974-77 | Clinical Fellow in Medicine, Harvard Medical School |
| 1975-77 | Resident in Internal Medicine, Beth Israel Hospital, Boston, Massachusetts |

Licensure and Certification:

| 1974 | National Board of Medical Examiners |
|---|---|
| 1974 | Massachusetts License Registration |
| 1977 | Diplomate, American Board of Internal Medicine |
| 1988 | Certification in Geriatric Medicine, American Board of Internal Medicine |

Academic Appointments:

| 1977-79 | Instructor in Preventive and Social Medicine, Harvard Medical School |
|---|---|
| 1979-85 | Assistant Professor of Social Medicine and Health Policy, Harvard Medical School |
| 1985-90 | Associate Professor of Social Medicine, Harvard Medical School |
| 1990-2004 | Associate Professor of Medicine, Harvard Medical School |
| 2004-present | Professor of Medicine, Harvard Medical School |

Hospital Appointments:

Beth Israel Hospital

| 1977-84 | Assistant in Medicine, Department of Medicine |
|---|---|
| 1984-87 | Assistant Physician, Department of Medicine |
| 1987-89 | Associate Physician, Department of Medicine |
| 1989-94 | Physician, Department of Medicine |

Confidential-Subject to Protective Order

Brigham and Women's Hospital

      1986-1992    Associate Physician, Department of Medicine
      1992-present  Physician, Department of Medicine

Hospital Clinical Responsibilities:

| | |
|---|---|
| 1977-1981 | Attending physician (General Internal Medicine), Beth Israel Hospital |
| 1981-1992 | Attending physician (Geriatrics and Internal Medicine), Beth Israel Hospital |
| 1992-1998 | Attending physician (Geriatrics and General Medicine), Brigham and Women's Hospital |
| 1998-present | Attending physician (General Medicine Service), Brigham and Women's Hospital |

Major Administrative Responsibilities:

| | |
|---|---|
| 1978-1980 | Director, Division of Geriatrics, Harvard School of Public Health |
| 1978-1980 | Program Director, Geriatric Curriculum Development Project, Harvard School of Public Health |
| 1982-1983 | Director, Geriatric Drug Education Program, Department of Public Health, Commonwealth of Massachusetts |
| 1982-1984 | Director, Program in Ethics and Geriatrics, a joint project of The Hastings Center and Harvard Medical School |
| 1985-1987 | Chair, Task Force on Determinants of Antibiotic Utilization, National Institutes of Health |
| 1979-1980 | Director, Harvard Medical School Long-Term Care Gerontology Center Program |
| 1986-present | Director, Program for the Analysis of Clinical Strategies |
| 1990-1995 | Harvard Geriatric Research and Training Center: Director of Epidemiology, Data Management, and Health Services Research Core |
| 1998-present | Chief, Division of Pharmacoepidemiology and Pharmacoeconomics, Department of Medicine, Brigham and Women's Hospital. |

Major Committee Assignments and Other Positions:

    National and Regional

| | |
|---|---|
| 1978-81 | Professional Advisory Committee, Department of Elder Affairs, Commonwealth of Massachusetts |
| 1979 | Study section on long-term care gerontology centers, Administration on Aging, Department of Health, Education and Welfare |
| 1982-83 | Advisor on drug utilization studies, National Center for Health Services Research, National Institutes of Health |
| 1983-84 | Peer reviewer, Robert Wood Johnson Foundation, Program for Hospital Initiatives in Long-term Care |
| 1983-85 | Working group on "The Aging Society," The Carnegie Corporation |
| 1985-93 | Peer reviewer for Medications and Aging program, The John A. Hartford Foundation |

Confidential-Subject to Protective Order

| 1989 | Peer reviewer, Gerontology and Geriatrics Review Group, National Institute on Aging, National Institutes of Health |
| 1989-91 | U.S. Congress, Office of Technology Assessment: Advisory Panel on Government Policy and Pharmaceutical Research and Development |
| 1990-94 | Advisory Panel on Geriatrics, U.S. Pharmacopeia |
| 1997-99 | Advisory Panel on Outcomes and Cost-Effectiveness, U.S. Pharmacopeia |
| 2000- | Consultant in Pharmacoepidemiology, Food and Drug Administration |
| 2002-03 | Member, National Committee for Quality Assurance (NCQA) Advisory Panel on Medication Management in the Elderly |

Harvard Medical School

| 1977-80 | Committee on Geriatrics |
| 1978-80 | Teaching Committee, Department of Preventive and Social Medicine |
| 1980-88 | Executive Committee, Division on Aging |
| 1980-84 | Malpractice consultant, Harvard Risk Management Foundation |
| 1981-88 | Working Group on Health Policy and Aging, Division of Health Policy Research and Education |
| 1986-88 | Faculty Council |
| 1997-98 | Faculty Advisor, William Bosworth Castle Society |
| 1997-98 | Member, Geriatrics Interest Group, Francis Weld Peabody Society |
| 1998-2002 | Subcommittee on Teaching Evidence-Based Medicine and Therapeutics |
| 2001-02 | Committee on development of new postdoctoral course in clinical pharmacology (responsible for pharmacoepidemiology component) |
| 2003- | Search committee for a faculty appointment in pharmacoepidemiology, Harvard School of Public Health |

Beth Israel Hospital

| 1976-77 | Committee on House Officer Education, Department of Medicine |
| 1980-81 | Chair, Committee on Medical Research, Division of General Medicine |
| 1983-92 | Pharmacy and Therapeutics Committee |
| 1986-87 | Laboratory Board |
| 1986-92 | Transfusion Committee |
| 1987-92 | Chair, Pharmacy and Therapeutics Committee |

Brigham and Women's Hospital

| 1992-present | Pharmacy and Therapeutics Committee |
| 1993-98 | Chair, Medication Education and Management Committee |
| 1993-95 | Chair, Technology Assessment Committee |
| 1994-95 | Chair, Drug Therapy Cost Reduction Committee, Partners Healthcare System |
| 1996-97 | Clinical Practice Standards Committee |
| 1996-2000 | Order Entry Clinical Advisory Group / Clinical Software Oversight Committee |
| 1998-2000 | Clinical Executive Committee |
| 1998-2002 | Advisory Committee, Department of Medicine |
| 1999-present | Education Council |
| 2002-present | Faculty Standing Committee on Resident Research |
| 2002-present | Executive Committee, Department of Medicine |

Confidential-Subject to Protective Order

Professional Society Involvement:

| | |
|---|---|
| 1978-94 | Gerontological Society of America (clinical medicine section) |
| 1979-81 | Research Group on Ethics and Health Policy of the Institute of Society, Ethics, and the Life Sciences (The Hastings Center) |
| 1981-82 | Public Policy Committee, The Gerontological Society of America |
| 1981-82 | Task Force on Ethical Issues and Medical Technology, The Hastings Center |
| 1982- | American Geriatrics Society |
| 1984-89 | Fellow, The Hastings Center |
| 1988-89 | Institute of Medicine, Forum on Drug Development and Regulation: Working Group on Geriatric Pharmacology |
| 1988-90 | Institute of Medicine, Committee on Health Promotion and Disability Prevention in Aging |
| 1990-91 | Chair, panel on Drug Utilization Review Interventions, American Society for Clinical Pharmacology and Therapeutics |
| 1994-98 | Board of Advisors, Center for the Study of Drug Development, Tufts University |
| 1998 | Advisory Panel on Methodology in Pharmacoeconomics, International Society for Pharmacoeconomics and Outcomes Research |
| 2002 | Invited opening plenary presentation, International Society for Pharmacoeconomics and Outcomes Research |

International Society for Pharmaco-Epidemiology:

| | |
|---|---|
| 1995-98 | Board of Directors |
| 1995-97 | Task Force on Standards for Research Methods in the Epidemiologic Evaluation of Drugs |
| 1995-97 | Program Chair, XIII International Conference on Pharmaco-Epidemiology |
| 1996-99 | Ad Hoc Committee on Privacy and Epidemiologic Research |
| 1997-98 | President of the Society |
| 1998-99 | Chair, Nominating Committee |
| 2002- | Fellow of the Society |
| 2002 | Invited opening plenary presentation |

Other National and International Contributions:

| | |
|---|---|
| 1981-85 | Board of Directors, The Harvard Public Interest Health Foundation |
| 1982-83 | Director, Curriculum Development Project in social medicine, The Aga Khan Medical College, Karachi, Pakistan |
| 1982-88 | Consultant in geriatric medicine and epidemiology, The Greater New York Blood Program |
| 1983-91 | Physician advisor and program evaluator (geriatric pharmacology and policy), American Association of Retired Persons |
| 1985-86 | Expert Panel on Prescription Drug Use, Blue Cross of Massachusetts |
| 1988-89 | Member, Massachusetts Drug Formulary Commission |

4

Confidential-Subject to Protective Order

| | |
|---|---|
| 1988-90 | Advisor to the Inspector General, U.S. Department of Health and Human Services, on drug coverage and quality assurance in federal programs |
| 1989-1994 | Clinical Director, Optimal Therapeutics Program, Blue Cross-Blue Shield of Massachusetts |
| 1992 | Advisor to President Clinton's transition team on prescription medication policy |
| 1997-1998 | Chair, National Collaborative on Improving Prescribing Practices, Institute for Healthcare Improvement |
| 1997-2000 | Co-Founder and Board of Directors member, The Ad Hoc Committee to Defend Health Care [Massachusetts] |
| 1999-2000 | Steering committee, Massachusetts Citizens' Initiative Petition to Reform Health Care |
| 2000-2001 | Expert Advisor on antibiotic prescribing and bacterial resistance, World Health Organization (WHO) Global Strategy for Containment of Antimicrobial Resistance |
| 2001-present | Member, Technical Advisory Group, State of Pennsylvania Department of Aging, Pharmaceutical Assistance Contract for the Elderly |

Editorial Boards and Editorships:

| | |
|---|---|
| 1981-84 | Journal of Gerontology (Editorial Board) |
| 1990-99 | UPDATE, A Quarterly Review of Geriatric Pharmacology (Editor) |
| 1992-1996 | Journal of Gerontology (Associate Editor, Clinical Medicine) |

Journal Reviewer:

| | |
|---|---|
| 1985-present | New England Journal of Medicine (ad hoc reviewer) |
| 1987-present | Journal of the American Medical Association (ad hoc reviewer) |

Awards and Honors:

| | |
|---|---|
| 2002: | Highly Cited Researcher: Identified by Institute for Scientific Information based on Medline citations as one of the most frequently cited investigators within the category of Social Science and Medicine during the period 1981 – 1999 (top one-half of 1% of all published researchers). |

5

Confidential-Subject to Protective Order

## TEACHING, CLINICAL, AND RESEARCH CONTRIBUTIONS

With accelerating progress in new drug development and rising pressures to contain the costs of health care, educating physicians about appropriate prescribing decisions has become increasingly important. The focus of my work has been on defining patterns of medication use by physicians and patients; quantifying the benefits, risks, and costs of specific drugs to help build an evidence-base for rational prescribing; and developing, implementing, and rigorously testing innovative educational approaches to improve prescribing practices.

I have addressed these problems in several complementary ways, including: (1.) creating new approaches to teaching physicians about optimal drug use, and then testing these approaches in randomized controlled multi-site studies; (2.) developing new methods for computer-assisted analysis of large population databases to measure patterns and predictors of physician prescribing practices, as well as to study adverse drug events and patient non-compliance; (3.) measuring the effect of changes in reimbursement policies on physician prescribing and patient outcomes; and (4.) conducting cost-effectiveness analyses of specific medications. Together, these studies have resulted in new ways to improve drug use and clinical outcomes. Programs based on this work have been implemented locally, nationally, and internationally.

One method I developed, known as "academic detailing," uses medical-school-based educational outreach to improve physician prescribing and reduce drug use that is not pharmacologically optimal or cost-effective. This intervention merges evidence-based analysis of appropriate drug use with the effective adult-learning and behavior-change strategies that have been used by pharmaceutical companies to change physicians' prescribing practices. My colleagues and I have evaluated its effectiveness in several randomized controlled trials involving physicians in primary care practice in four states, doctors and other caregivers in nursing homes, general practitioners in Europe, and house officers at the BWH. These studies have shown that the approach is effective in educating clinicians about rational prescribing and improving medication use. My work in this area has been a synthesis of teaching and research. It has now been widely replicated and adopted by large health care systems, drug benefit managers, governmental health services in Great Britain, Canada, and Australia, and in the developing world.

Teaching has been a central focus of my career since my first year as a student at HMS, when I developed a student-initiated course in some of these areas, described below. In the more than 30 years since I have worked in several domains to develop teaching programs at HMS and its affiliated institutions.  I created new courses on health care delivery at Harvard College (medical sociology; aging and society), the Harvard School of Public Health (geriatrics and health policy), and HMS (forerunners to the "Patient-Doctor" and "Clinical Commons" courses). I continue to teach at HMS (pharmacology, geriatrics), HSPH (epidemiology), the Harvard Program in Clinical Effectiveness (health policy, pharmaco-epidemiology), and BWH (while serving as Attending Physician on the General Medicine Service and as described further below).

In 1998 my teaching, clinical, and research activities came together when I was asked to establish a Division of Pharmacoepidemiology and Pharmacoeconomics within the Department

Confidential-Subject to Protective Order

of Medicine at BWH. In this role, I developed several new programs to teach physicians and medical students about appropriate and cost-effective prescribing, including: (1.) implementing a new curriculum of lectures and monthly teaching rounds for interns and residents on proper medication use and drug cost-effectiveness analysis; (2.) using the hospital's automated order-entry system to produce interactive computer guidelines that improve drug use decisions at the time they are being made; (3.) establishing and editing a new series of publications to teach house officers and medical students about evidence-based medication choices; (4.) developing a program that supports fellows in Infectious Diseases to serve as "academic detailers" who are deployed to provide "just-in-time" education when problematic antibiotic orders are written; (5.) creating a new system for evaluating the benefits, risks, and costs of drugs proposed for hospital formulary inclusion; (6.) conducting epidemiologically rigorous assessment of current in-patient drug use practices and identifying areas in need of educational intervention. The Division is coming to be viewed as a model for integrating evidence-based medication use and cost-effective prescribing into the teaching programs and clinical activities of academic departments of medicine.

Confidential-Subject to Protective Order

**SELECTED FUNDING INFORMATION:**

**National Institutes of Health:**

| | | |
|---|---|---|
| 1979-1981 | NIH / NCHSR / R01 | PI |
| | Demarketing and administrative strategies in drug prescribing. | |
| 1983-1985 | NIH / AHCPR / R01 | PI |
| | Analysis of a successful strategy to improve prescribing. | |
| 1985-1990 | NIH / AHCPR / R01 | PI |
| | Improving the accuracy of transfusion decisionmaking. | |
| 1986-1988 | NIH / NIA / R01 | PI |
| | Medication use as a risk factor for falls in the elderly. | |
| 1986-1988 | NIH / AHCPR / R01 | Co-Investigator |
| | Impact of payment restrictions on physician decisions. | |
| 1986-1988 | NIH / NIMH / R01 | PI |
| | Staff expectation as a mediator of functional status in nursing homes. | |
| 1988-1991 | NIH / FDA / R01 | PI |
| | Population-based surveillance of adverse drug reactions. | |
| 1988-1991 | NIH / AHCPR / R01 | Co-Investigator |
| | Unintended outcomes of health care cost containment. | |
| 1989-1991 | NIH / NEI / R01 | PI |
| | Epidemiology of topical beta-blocker side effects in elderly. | |
| 1990-1995 | NIH / NIA / P01 | Project Director |
| | Geriatric Research and Training Center: Data Management and Epidemiology Core. | |
| 1992-1993 | NIH / NIA / RO1 | PI |
| | Drug-induced parkinsonian symptoms. | |
| 1994-1995 | NIH / NIA / PO1 | Co-Investigator |
| | Geriatric Research and Training Center-Research & Development Core: Effects of benzodiazepine and other CNS-active drugs on hospitalized patients. | |

8

Confidential-Subject to Protective Order

1993-1997     NIH / NIA / R01                          Co-Investigator
              Missing and mismeasured data in studies of the elderly.

1994-1998     NIH / NIA / K08                          Sponsor
              Clinical Investigator Award; Antihypertensives and the elderly.
              (M. Monane, M.D., M.P.H.)

1995-1996     NIH / NIA / PO1                          Co-Investigator
              Older Americans Independence Center-Research & Development Core:
              Clinical trial of outcomes of anti-hypertensive medication reduction.

1995-1999     NIH / NIA / T32                          Co-Program Director
              Training program in epidemiologic research on aging.

1996-1998     NIH / AHCPR / R01                        Co-PI
              Prevention of adverse drug effects in the nursing home setting.

1996-1999     NIH / NIDA / R01                         PI
              Risky geriatric benzodiazepine use: Predictors and trends.

1996-1999     NIH / AHCPR / R01                        PI
              Nephrologist care and outcomes in renal insufficiency.

1991-1996     NIH / NIA / K08                          Sponsor
              Clinical Investigator Award; Drug-induced illness in the elderly: NSAIDs
              as a model. (J. Gurwitz, M.D.)

1999-2004     NIH / NIMH / KO1                         Sponsor
              Clinical Investigator Award:  Appropriateness and compliance in
              depression treatment (P. Wang, M.D., Dr.P.H.).

2000-2004     NIH / NIA / T32                          Program co-Director
              Training Program in Epidemiologic Research on Aging.

2000-2002     NIH / AHRQ / RO1                         co-Investigator
              Consequences of drug cost-sharing in the elderly.

2000-2001     NIH / NIA / RO3                          PI
              Drugs and aging: Demographic, clinical, and cost data.

2000-2001     NIH / NIA / RO1                          co-PI
              Evaluating drug benefit policy changes in geriatric practice.

2002-2006     NIH / NIMH / R01                         PI
              Outreach and treatment for depression in the labor force  (subcontract)

9

Confidential-Subject to Protective Order

| 2002-2005 | NIH / NIA / R01 | co-PI |
| | Medication use, comorbidity, and outcomes in older people. | |

| 2002-2007 | NIH / NIAMS / K 23 | sponsor |
| | A randomized, controlled trial of an intervention to improve the management of osteoporosis. (Dan Solomon, M.D., M.P.H.) | |

| 2002-2005 | NIH / NIDA / R01 | co-PI |
| | Pain medication use and risk factors for opioid dependency | |

| 2002 – 2004 | NIH / NIAMS / R55 | co-PI |
| | Why is cardiac risk increased in rheumatoid arthritis? | |

| 2003 - 2007 | NIH / NIA / RO1 | co-PI |
| | Effects of income-based drug charges on older patients | |

| 2003 – 2007 | NIH / AHRQ / RO1 | co-PI |
| | Consequences of drug cost sharing: A new randomized trial | |

**Other Federal Support:**

| 1978-1980 | Administration on Aging | Program Director |
| | Curriculum development in aging and public health | |

| 1984-1985 | HCFA | Co-Investigator |
| | Economic and clinical consequences of three drug cost containment strategies in Medicaid. | |

| 1985-1987 | Veterans Administration | Co-Investigator |
| | Central nervous system effects of beta-blockade in the elderly. | |

| 1988-1991 | Veterans Administration | Co-Investigator |
| | Systemic effects of beta-blocking medications used for glaucoma. | |

**Foundation Support:**

| 1982 | Robert Wood Johnson Foundation | PI |
| | Medication-induced disability: Its nature, extent and prevention. | |

| 1982-1984 | Blue Cross of Massachusetts Foundation | PI |
| | Preventing inappropriate medication use in hospitals: A demonstration. | |

10

Confidential-Subject to Protective Order

| 1983-1984 | AARP-Andrus Foundation | PI |

1983-1984    AARP-Andrus Foundation                    PI
             Clinical effects of medication use in the elderly.

1983-1986    The Commonwealth Fund                      Project Director
             Diagnosis and drug treatment of incontinence in the elderly: Epidemiology
             and health services research.

1985-1988    John A. Hartford Foundation                PI
             Clinical and economic consequences of improving the use of medications
             in nursing homes.

1988-1991    John A. Hartford Foundation                PI
             Medications and aging: Research and education in geriatric pharmacology.

1988-1995    American Federation for Aging Research     Program Director
             Fellowship program in geriatric clinical pharmacology.

1992-1993    John A. Hartford Foundation                PI
             Improving medication use in the nation's elderly.

1998-2000    The Medical Foundation                     Sponsor
             Faculty development award in clinical epidemiology
             (E. Knight, M.D., M.P.H.).

2002 – 2007  The Arthritis Foundation                   co-PI
             Improving osteoporosis care: Development and randomized controlled
             testing of patient and physician educational interventions

2003 – 2007  The Arthritis Foundation                   co-PI
             Biologic therapies and DMARDs in rheumatoid arthritis:  Ensuring their
             safe and appropriate use

**Other Support:**

1989-1991    Alcon Laboratories                         PI
             Population-based study of adverse systemic effects in patients treated for
             glaucoma.

1989-1992    Ocean Spray Cranberries                    PI
             Prevention of urinary tract infections in nursing home residents.

1992-1993    Johnson & Johnson - Merck                  PI
             Clinical and policy analysis of over-the-counter use of histamine
             antagonists.

11

Confidential-Subject to Protective Order

| | | |
|---|---|---|
| 1993 | Kabi Pharmacia | PI |
| | Cost-effectiveness of thrombolytic therapy in acute myocardial infarction. | |
| | | |
| 1993 | Armour Pharmaceuticals | PI |
| | Cost-effectiveness analysis of prophylactic treatment for hemophilia. | |
| | | |
| 1995 | Dupont | Co-Investigator |
| | Risk management issues in medication use in the elderly. | |
| | | |
| 1993-1997 | Ocean Spray Cranberries | PI |
| | Preventing recurrent urinary tract infections. | |
| | | |
| 1994-1997 | American Heart Association | Preceptor |
| | Patterns and outcomes of antihypertensive therapy in the elderly. | |
| | | |
| 1996-1997 | Searle | PI |
| | Health care utilization among NSAID users. | |
| | | |
| 1996-1999 | Bristol-Myers Squibb | PI |
| | Hypertension and medication use: Defining the patient's perspective. | |
| | | |
| 1996-1999 | Baxter International | PI |
| | Cost of inhibitor development in hemophilia. | |
| | | |
| 1997-1999 | Eli Lilly | PI |
| | Racial differences in antidepressant use. | |
| | | |
| 1997-2000 | Bristol-Meyers Squibb | PI |
| | Cardiac functional status and health care utilization following thrombolysis for acute myocardial infarction. | |
| | | |
| 1997-2003 | Bristol-Meyers Squibb | PI |
| | Pravastatin as primary prevention in elderly subjects: cost-effectiveness analysis and outcomes research. | |
| | | |
| 1999-2000 | Speywood Pharmaceuticals | PI |
| | A pharmacoeconomic analysis of the treatment of patients with inhibitors to factor VIII. | |
| | | |
| 1999-2000 | Pharmacia | PI |
| | Adverse cardiac and CNS effects of anticholinergic drugs used for incontinence in the elderly. | |
| | | |
| 2000-2001 | Pharmacia | PI |
| | Excessive sedation and accidents in patients with Parkinson's Disease. | |

12

Confidential-Subject to Protective Order

| 2001-2002 | Pfizer | co-PI |
|---|---|---|
| | Epidemiology of COX-2 inhibitor use and hypertension | |

| 2001-2002 | Novo-Nordisk | PI |
|---|---|---|
| | Cost-effectiveness analysis of recombinant factor VII in the treatment of bleeding disorders. | |

| 2001-2002 | Pfizer | PI |
|---|---|---|
| | Adverse events in hospitalized patients receiving systemic anti-fungal medication. | |

| 2002-2004 | Merck | co-PI |
|---|---|---|
| | Risk of acute myocardial infarction in patients taking COX-2 inhibitors and conventional NSAIDs. | |

| 2003 – 2006 | GlaxoSmithKline | PI |
|---|---|---|
| | Post-marketing surveillance and risk management of alosetron in older patients. | |

Confidential-Subject to Protective Order

**REPORT OF TEACHING:**

**Harvard College**

> 1972-1974        Tutor in Medical Sociology (Social Relations)
>
> In collaboration with Paul Starr (then a graduate student in sociology at Harvard), developed a new offering for Harvard college students in the Social Relations Program.  Topics covered included the social and political organization of the health care delivery system, the sick role, and the aging patient.
>
> *8 undergraduates; 3 hours/week preparation, 3 contact hours/week*
>
> 1979-1980        Our Future Selves: Aging in Society
>
> While director of the Division of Geriatrics at the Harvard School of Public Health (see below), developed and taught a new course for Harvard and Radcliffe undergraduates dealing with the social, cultural, and political aspects of aging in western societies.
>
> *15-20 undergraduates; 2 hours/week preparation, 2 contact hours/week*

**Harvard Medical School**

1969-1971      Course director, student-initiated Curriculum in Social Medicine

> As an HMS I student, developed a first-year course to introduce students to aspects of medicine which were not at that time covered in the HMS curriculum.  Topics covered included health economics and policy, epidemiology, medical ethics, and legal medicine. Lectures by visiting faculty were coordinated with the biomedical content of the curriculum; course became integrated into the standard HMS I "core" curriculum.

> *175 medical students; 2 hours/week preparation, 1 contact hour/week*

> A second course, offered in the HMS II year in conjunction with the introduction to clinical medicine course, covered aspects of patient care and the doctor-patient relationship that were not part of the standard ICM curriculum.  These included lectures by visiting faculty on physician-patient communication, alcoholism and drug abuse, human sexuality, and death and dying.

> *30 medical students; 2 hours/week preparation, 1   contact hours/week*

1977-1980     Preventive and Social Medicine 724a.0: Social Theory, Human Values, and their Relation to Medical Care

14

Confidential-Subject to Protective Order

Designed and taught this introductory course, which for several years was the main introductory course in the Department of Preventive and Social Medicine at HMS.  Topics covered included: health policy, culture and disease, history of medicine, and societal aspects of medication use.

*25 medical students; 4 hours/week preparation, 2 contact hours/week*

1983-1984      Member, New Pathway Life Cycle Curriculum Design Group

1983-1984      Member, New Pathway Educational Methods Committee

1985-present  Annual teaching in the Division on Aging Continuing Medical Education course in geriatric medicine (pharmacotherapy in the elderly)

*200-300 practicing physicians; 1 hour preparation, 1 contact hour annually*

1996- 2001    Core lecture to HMS I on Geriatric Medicine

*100-150 medical students; 1 hour preparation, 1.5  contact hours annually*

1996- 2002    Core lecture to HMS III on Appropriate Prescribing (Patient-Doctor III)

*100-150 medical students; 1 hour presentation; 1.5 contact hours annually*

1998- 2002    Member, Subcommittee on Evidence-Based Medicine and Therapeutics

1998-present  Lecture on Geriatric Pharmacology in HMS I Principles of Pharmacology course

*100-150 medical students; 3 hours preparation, 1 contact hour [nominated as best lecture in course]*

2002-            Day-long module on pharmaco-epidemiology and pharmacoeconomics in new course, "Pharmacology for the Clinical Investigator."

*40 clinical and research fellows; 8 hours preparation, 7 contact hours*

**Harvard School of Public Health**

1979-1981      Health Policy and Management 213a, Issues in Geriatric Health Care

In developing the Division of Geriatrics at HSPH, established a curriculum on health care for the elderly for the Department of Health Policy and Management.  This course provided an

15

Confidential-Subject to Protective Order

overview of the impact of changing demography on the age distribution and health care needs of the population, and an introduction to aspects of health policy most relevant to care of the elderly (Medicaid, Medicare, long-term care, etc.).

*10-25 graduate students; 4 hours/week preparation, 2 contact hours/week*

1979-1980     Health Policy and Management 214b, Ethics and Geriatric Policy

Developed and taught this course with Professor Norman Daniels of the Philosophy Department at Tufts University.  It addressed the ethical issues surrounding care of the elderly, including: determination of competency to refuse care, the "right to die," informed consent in a demented patient, ethical aspects of benefit-cost analysis and cost-containment, and intergenerational distribution of health care resources.

*8-12 graduate students; 3 hours/week preparation, 2 contact hours/week*

1978-80     Director, Geriatric Curriculum Development Project, Harvard School of Public Health

Was responsible for the conceptualization, development and dissemination of a series of free-standing case studies to bring concepts in geriatric care into the curricula of schools of public health and medicine in the U.S  Working with faculty and staff at HSPH, prepared case studies on issues including hospice care, quality-based reimbursement incentives, epidemiologic and economic aspects of screening for disease in the elderly, geriatric foster care programs, the role of the courts in maintaining quality standards in nursing homes, use of nurse-practitioners in geriatric delivery systems, mental health coverage under Medicare, and quality assurance in prescribing for the elderly.

1994-1996     Health Policy and Management 267c: Health and Medical Care in an Aging Population

Overview of geriatrics and health care delivery (developed and taught with Drs. John Delfs and Mark Monane) covering policy issues in Medicare and Medicaid, nursing home regulation, capitation, demographic changes, and pharmaco-epidemiology.  Course received a "perfect" evaluation by students in 1995-96 academic year.

*7-22 graduate students; 1 hour/week preparation, 2 contact hours/week*

2000-present   Epidemiology of Aging

Quantitative analysis of patterns of medication use, effectiveness, and adverse events in the elderly.

*14 – 20 graduate students; 1 hour preparation, 2 contact hours*

16

Confidential-Subject to Protective Order

2001-present   Epidemiology 235d. Health Services Epidemiology

Application of epidemiologic methods to health services research and to intervention trials designed to improve the quality of physician prescribing practices.

*14-20 graduate students; 1 hour preparation, 2 contact hours. [Lecture received highest student evaluation in course]*

**Beth Israel Hospital**

1978-1982       Preventive and Social Medicine 724b.0: The Doctor-Patient Relationship

An extension of the earlier student-initiated course designed to supplement the HMS Introduction to Clinical Medicine curriculum, this course became a required component of ICM for all students taking this rotation at the Beth Israel Hospital.  Prepared and delivered lectures on topics including compliance, confidentiality, the clinical interview, care of the elderly patient, and functioning as part of a health care team.  The course was consistently one of the highest-rated components of Beth Israel ICM course.  Many aspects of this course were later integrated into the New Pathway curriculum at HMS.

*20-30 medical students; 3 hours/week preparation, 1 hour/week contact time*

1982-1992       Director, Beth Israel Hospital Drug Information Program

Established and led a program for assembling and disseminating current information on selected topics in drug therapy.  Brief monographs were prepared with BI faculty covering the indications for and rationale use of clindamycin, histamine antagonists, vancomycin, cefazolin, triazolam, metronidazole, and other drugs.  Also developed a new structured antibiotic order form to improve the prescribing of parenteral antibiotic therapy throughout the hospital.  The effect of this intervention was tested in a time-series analysis (see reference 19 in bibliography); form has been replicated in numerous institutions throughout the country.

**Brigham and Women's Hospital**

1992-present   Director, Medication Education and Management Program (1992-1997) / Director of educational activities of the Division of Pharmacoepidemiology and Pharmacoeconomics (1998 – present)

On coming to BWH I established a program to educate house officers, fellows, and attending physicians on evidence-based and cost-effective pharmacotherapy.  Through work with local clinical experts, the program assesses new drugs proposed for formulary inclusion, develops guidelines for medication use, and prepares educational materials to explain the

17

Confidential-Subject to Protective Order

pharmacology, pathophysiology, and clinical trial evidence behind these recommendations. Since 1998, this work has continued through the Division of Pharmacoepidemiology and Pharmacoeconomics. Monographs have been produced on: diltiazam for tachyarrhythmia; indications for histamine$_2$ receptor antagonists; ketorolac in post-operative analgesia; neuromuscular blocking agents in intensive care; and proper use of second and third generation cephalosporins. I also developed and edit a series of original eduational materials for house officers and staff on current topics in pharmacotherapy; a complete list of the 20 titles developed so far appears at the end of the bibliography. These are distributed to house officers and faculty throughout the hospital and are also disseminated electronically on the Partners Handbook.

In addition, my Division is helps develop the content and implementation of drug-related order entry components in the hospital's on-line order entry system. Computer-based drug interventions have included guidelines on: human growth hormone use in surgical or burn patients; third generation cephalosporins; age-specific dosing for psychoactive medications; intravenous proton-pump inhibitors; COX-2 nonsteroidal anti-inflammatory drugs; fluoroquinolone antibiotics; granulocyte colonoy-stimulating factor; and activated protein C (drotrecogin alfa). Other order-entry work has developed, implemented, and evaluated a set of algorithms to convert intravenous medications to oral use when clinically appropriate for drugs with high bioavailability.

With the Infectious Diseases Division, we developed and periodically update new guidelines for antibiotic use which are disseminated hospital-wide and are also electronically. In 2003, a new program was begun with the BWH Hospitalist Service in which my Division takes responsibility once each month for the combined attending rounds of the four General Medicine Service teams and provides case-specific teaching about a selected topic on appropriate medication use.

1993-present        Annual lectures to house officers on topics in pharmacology

   *25-35 house officers per year, 1.0 hour preparation, 1 contact hour annually*

1995-present        Faculty, Evidence-Based Medicine Journal Club

   *20-25 house officers, 6 hours preparation, 2-3 contact hours annually*

1996-present        Approach to the Geriatric Patient, Introduction to Clinical Medicine course

   *30-40 medical students; 1 hour preparation, 1-2 contact hours annually*

1996-2000        Core faculty, Epidemiology course, Clinical Effectiveness Program

   *30-40 fellows and junior faculty per year; 2-3 hours preparation, 16 contact hours/year*

Confidential-Subject to Protective Order

1996-present        Lectures on pharmacoepidemiology, and on health policy and drug use, Clinical Effectiveness Program

*70-90 fellows and junior faculty per year, 3 hours preparation, 4 contact hours annually*

1998-present        Developed lecture series for house officers on rational prescribing and cost-effectiveness analysis.

1999-present        Oversaw design, implementation, and evaluation of academic detailing program to reduce excessive use of broad-spectrum antibiotics in Department of Medicine; the effectiveness of this new program was documented in radomized controlled trial published in *Archives of Internal Medicine* in 2001 (see bibliography). The program has now been implemented on an ongoing, operational basis as an innovative peer-education program. It employs senior residents trained by our Division with input from Infectious Disease consultants, using case-based educational outreach to target inappropriate antibiotic orders as soon as they are written.


**Advisory and supervisory responsibilities**

1977-1992  Clinical supervision of medical students, house officers, and fellows in general internal medicine and geriatrics, Beth Israel Hospital

*3-5 medical students, 4-6 house officers, 0-1 fellow per year*

1977-1997  Annual precepting of HMS Introduction to Clinical Medicine students on history and physical examination, with emphasis on the geriatric patient

*3-5 medical students; 2 contact hours per year*

1980-present   Dissertation supervision for Harvard doctoral students:

Health Policy and Management Department, HSPH: 5 *doctoral students*

Epidemiology Department, HSPH: *2 doctoral students, 4 post-doctoral students*

Harvard University joint M.D.-Ph.D. program: *2 doctoral students*

1983-1998        Harvard Fellowship Program in Geriatric Medicine

*served as primary research mentor for 8 fellows*

1988-1989        Preceptor for Patient-Doctor component of New Pathway curriculum

*6 medical students; 2 hours/week preparation, 2 contact hours/week*

**19**

Confidential-Subject to Protective Order

1992-present   Supervision of medical students, house officers, and fellows as attending
               physician on general medicine service, Brigham and Women's Hospital

     *1-2 medical students and 3-5 house officers, one month per year*

1992-1997      Supervision of fellows on geriatric consultation service, BWH

     *1 fellow, 1-3 months per year*

1993-present   Brigham and Women's Hospital, medical residency program:
               direct one-on-one research supervision of senior medical residents during 4-6
               month research rotation

     *2 residents each year for 4-6 months each; 3-6  contact hours per week throughout year*

1996-1998      Faculty preceptor, General Medicine Division, Brigham and Women's Hospital

     *Supervised 3-4 house officers per session once a week, 2-3 months/year*

1997-1998      Faculty advisor, Castle Society, Harvard Medical School

**20**

Confidential-Subject to Protective Order

**ADVISEES AND TRAINEES (partial list):**

| Trainee name, years | Research topic | Current position |
|---|---|---|
| Stephen Soumerai, Sc.D. Predoctoral/Postdoctoral 1979-92 | Improving prescribing practices; pharmaceutical health policy | Professor of Ambulatory Care and Prevention, HMS |
| Daniel Everitt, M.D. Postdoctoral 1983-86 | Geriatric pharmacology | Director, Clinical Research, SmithKline Beecham Pharmaceuticals |
| May Reed, M.D. Predoctoral 1983-86 | Geriatrics; health services research | Associate Professor of Medicine, University of Washington, Seattle |
| Lee Learman, M.D., Ph.D. Predoctoral 1983-87 | The effect of expectations on clinical outcomes | Assistant Professor of Obstetrics, Gynecology and Reproductive Sciences, UCSF |
| Lawrence Cohen, M.D., Ph.D. Predoctoral 1984-88 | Cross-cultural definitions of dementia | Professor of Medical Anthropology, University of California, Berkeley |
| Mark Beers, M.D. Postdoctoral 1985-87 | Geriatric pharmacology | Executive Director of Geriatrics, Merck & Co.; Editor-in-Chief, The Merck Manuals |
| Susanne Salem-Schatz, Sc.D. Predoctoral/Postdoctoral 1985-90 | Health services research; clinical decisionmaking | Assistant Professor of Medicine, HMS, CHMC |
| Roselie Bright, Sc.D. Predoctoral/Postdoctoral 1986-89 | Pharmacoepidemiology | Epidemiologist, Center for Devices, Food and Drug Administration |
| Jerry Gurwitz, M.D. Postdoctoral 1986-96 | Adverse drug effects in the elderly | Professor of Medicine, U. Mass. Medical School; Director, Meyers Primary Care Research Institute |
| Paul Campbell, Sc.D. Predoctoral 1986-87 | The role of hospital management in altering physician practice patterns | Lecturer on Management, Department of Health Policy & Management, Harvard School of Public Health |
| Tom McLaughlin, Sc.D. Predoctoral 1986-88 | Diffusion of innovation in new drug technologies | Assistant Professor, Ambulatory Care and Prevention, HMS |
| Mark Monane. M.D., M.S. Postdoctoral 1989-96 | Adverse drug effects and compliance | Director of Geriatric Medication Management, Merck-Medco |

21

Confidential-Subject to Protective Order

| | | |
|---|---|---|
| Susan Kalish, M.D., M.P.H.<br>Postdoctoral<br>1992-95 | Cost-effectiveness analysis of medications | Assistant Professor of Medicine, Boston University Medical School |
| Rhonda Bohn, Sc.D.<br>Predoctoral<br>1991-2000 | Pharmacoepidemiology, cost-effectiveness analysis | Instructor in Medicine, BWH/HMS |
| Daniel Solomon, M.D., M.P.H.<br>Postdoctoral<br>1994-present | Health care technology assessment | Assistant Professor of Medicine, BWH/HMS |
| Carole Flamm, M.D.<br>Postdoctoral<br>1994-96 | Cost-effectiveness of neuro-imaging studies in dementia and stroke | Senior Consultant, Technology Evaluation Center, Blue Cross-Blue Shield Association |
| Philip Wang, M.D., Dr.P.H.<br>Postdoctoral<br>1994-present | Utilization and side effects of psychoactive medications | Assistant Professor of Medicine, BWH/HMS |
| Johanne Monette, M.D., M.S.<br>Postdoctoral<br>1994-96 | Cross-national comparisons of drug utilization and outcomes | Assistant Professor of Medicine, McGill University |
| Cynthia X. Pan, M.D.<br>Postdoctoral<br>1996-97 | Racial differences in medication use and outcomes | Assistant Professor of Medicine, Mount Sinai Medical School |
| Eric Knight, M.D., M.P.H.<br>Postdoctoral<br>1997-99 | Epidemiology and outcomes of cardiovascular drug use in the elderly | Instructor in Medicine, Harvard Medical School |
| Minalkumar Patel, M.D.<br>Postdoctoral<br>1997-2001 | Cost-effectiveness analysis of medications | Chief Medical Director for Quality Management, Blue Cross and Blue Shield of New Jersey |
| Anick BÛrard, Ph.D.<br>Postdoctoral<br>1998-2000 | Use and outcomes of drugs in rheumatology | Assistant Professor of Epidemiology, University of Montreal |
| David Ganz<br>Predoctoral<br>1998-2001 | Decision analytic studies of therapeutic choices in cardiovascular disease | Fellow in Geriatric Medicine, UCLA (graduated HMS with honors based on research with JA) |
| Joshua Benner, Pharm.D., Sc.D.<br>Postdoctoral<br>1999-2002 | Cost-effectiveness of and compliance with medications | Director of Health Economics, ValueMedics Research, Inc. |
| Wolfgang Winkelmayer, M.D.,Sc.D.<br>Postdoctoral<br>2000-present | Clinical outcomes in patients with end-stage renal disease | Instructor in Medicine, BWH / HMS |

22

Confidential-Subject to Protective Order

| Michael Fischer, M.D.<br>Postdoctoral<br>1999-present | Improving house officer prescribing; adverse effects of antihypertensives | Instructor in Medicine, BWH / HMS |
| Sebastian Schneeweiss, M.D., Sc.D.<br>Postdoctoral<br>2000-present | Health service utilization and clinical effects of changes in drug reimbursement policies | Assistant Professor of Medicine, BWH / HMS |
| Charles Morris, M..D.<br>Postdoctoral<br>2001-present | Exclusion of elderly from clinical trials; education for appropriate prescribing | Instructor in Medicine, BWH / HMS |
| Yuka Kiyota, M.D., M.P.H.<br>Postdoctoral<br>2001-2002 | Adverse effects of antifungal agents and of antiparkinsonian medications | House officer and clinical fellow, Yale Medical School |

23

Confidential-Subject to Protective Order

## BRIEF DESCRIPTION OF SELECTED REFERENCES

**Avorn J, Soumerai SB.  Improving drug-therapy decisions through educational outreach:  A randomized controlled trial of academically based "detailing."  N Engl J Med 1983; 308:1457-1463.**

This paper represents the first publication of the approach I developed that used a new kind of educational outreach to teach physicians how to improve their drug-use decisions. It was based on the observation that advocates of data-driven, appropriate medication use generally did not communicate proactively or compellingly with typical practitioners.  By contrast, pharmaceutical manufacturers were very effective in changing physicians' behavior, but did so primarily to promote particular products.  I hypothesized that prescribing could be improved by adapting the effective behavior-change approach of the private sector and using it instead to disseminate instruction about evidence-based therapeutics.  Shortly after completion of my residency, I formulated this approach in my first RO1 application and submitted it to what was then the National Center for Health Services Research (later AHCPR/AHRQ).  The grant was funded, and as the project grew I hired Stephen Soumerai, then a master's degree student at HSPH, to work with me on the project.

The intervention was tested in a randomized trial involving 435 physicians in four states, and sought to reduce mis-use of three drug groups: antibiotics used for viral infections, ineffective cerebral and peripheral "vasodilators," and propoxyphene (Darvon)-containing analgesics. Physicians randomized to the experimental intervention were visited in their offices by pharmacists whom we trained in the pharmacology of the target drug groups as well as in behavior-change strategies, adult learning theory, and social marketing concepts. Actual prescribing practices were tracked through analysis of each state's Medicaid paid claims tapes for the prescriptions written by each physician in the experimental and control groups.

The trial demonstrated significant reductions in inappropriate prescribing by the doctors randomized to the experimental group, using an intention-to-treat analysis. It has often been cited as one of the first studies to use a rigorous trial design to measure the impact of a medical education intervention on so large a scale. In a formal benefit-cost analysis (ref. 9) we further showed that the approach saved twice as much as it cost to implement. The intervention, which I named "academic detailing," is now in widespread use in the U.S., Europe, and the developing world.  It has spawned a substantial literature of its own which demonstrated its effectiveness in many clinical situations in a wide variety of health care systems. The Cochrane Collaborative now maintains an ongoing evidence-based review of the literature describing such programs, which it terms "educational outreach visits."

24

Confidential-Subject to Protective Order

**Avorn J, Soumerai SB, Taylor W, Wessels M, Janousek J, Weiner M.  Reduction of incorrect antibiotic use through a structured antibiotic order form.  Arch Int Med 1988; 148:1720-1724.**

In the mid-1980s, I established an educational program at the Beth Israel Hospital to improve medication use there. This paper reports on the component of that work aimed at teaching physicians to prescribe antibiotics more appropriately. The goal was to provide physicians with real-time feedback to guide prescribing decisions *before* a problematic drug order had been entered, a precursor to today's computerized order-entry systems.  I developed a quasi-"interactive" paper-based structured order form for antibiotics. When a drug was chosen, the form provided the ordering physician with prompts concerning pharmacokinetics and dosages, as well as educational messages about appropriate use.  These were modified periodically to reflect changing resistance patterns and new areas of problematic antibiotic utilization at the hospital.  Using interrupted time-series analysis, we demonstrated that the introduction of the form significantly improved use of targeted antibiotics, and also resulted in substantial cost savings. A follow-up study documented that the improved antibiotic prescribing that resulted was not associated with any adverse clinical outcomes.  This approach has since been adopted in a number of other hospitals throughout the country.

Confidential-Subject to Protective Order

**Avorn J, Dreyer P, Connelly K, Soumerai SB.  Use of psychoactive medication and the quality of care in rest homes:  Findings and policy implications of a state-wide study.  N Engl J Med 1989; 320:227-32.**

Effective approaches to improve medication use require rigorous definition of how drugs are used in a given setting. The problem of suboptimal drug use in elderly patients has been a central theme of my research and educational activities. Throughout the 1980s, board-and-care facilities in Massachusetts ("rest homes") increasingly came to care for two particularly vulnerable populations: frail elderly affected by the shortage of nursing home beds, and de-institutionalized patients with chronic mental illness who lacked community-based alternatives for care. More and more of these people were being housed in board-and-care facilities that had not been designed and were not being reimbursed to care for such complex residents. Little was known about the quality of medication use or the training needs of staff in these homes. To define this problem more clearly and lay the groundwork for policy changes, I developed a state-wide educational assessment that was implemented with the help of the Massachusetts Department of Public Health. We performed a population-based evaluation of the knowledge of staff concerning the medications they were administering. Our study documented that psychoactive drugs were being dispensed, and patients evaluated, by caretakers who had minimal understanding of safe or appropriate drug use.  The findings of this survey helped bring about changes in state policies that mandated higher educational and regulatory standards in facilities caring for these vulnerable residents.

26

Confidential-Subject to Protective Order

**Soumerai SB, Ross-Degnan D, Avorn J, McLaughlin TJ.  Effects of Medicaid drug-payment limits on admission to hospitals and nursing homes.  N Engl J Med 1991; 325:1072-1077.**

In an attempt to contain costs, for an 11-month period the New Hampshire Medicaid program limited all Medicaid recipients to a maximum of three prescriptions per month. The program was carried out solely through quotas and rationing, with no education about cost-effectiveness or other evidence-driven guides to prescribing. Assessment of this policy was taken on by Dr. Soumerai and other faculty in my research unit; in an earlier NEJM paper (ref. 17) we had demonstrated the negative impact of this "cap" on physicians' ability to prescribe appropriately for their chronically ill indigent patients.

In this paper, we documented the consequences of such rationing on physician prescribing, by measuring the health care outcomes of the affected Medicaid patients in New Hampshire. We compared them with a comparable group of chronically ill patients we identified in the New Jersey Medicaid program, whose medication use was not subjected to any such cap. Using survival analysis, we showed that the New Hampshire cohort had a significantly greater rate of nursing-home institutionalization, hospital care, or death in compared to the New Jersey cohort.  This pattern of differential survival ended when the cap policy was abandoned, although its effects persisted for the excess patients who reached one of these adverse endpoints in New Hampshire. The additional costs required by such institutional care offset any savings in drug expenditures that the policy generated. This paper has become one of the most often-cited studies of the adverse impact of economic constraints on drug use, and their effects on clinical status, health care utilization, and expenditures.

27

Confidential-Subject to Protective Order

**Avorn J, Soumerai SB, Everitt DE, Ross-Degnan D, Beers MH, Sherman D, Salem-Schatz SR, Fields D.  A randomized trial of a program to reduce the use of psychoactive drugs in nursing homes.  N Engl J Med 1992; 327:168-173.**

Of all health care settings in which drugs are used, the nursing home has been one of the most problematic. This paper reports on my application of the "academic detailing" approach to the problem of excessive psychoactive drug use in long-term care settings. The study was designed as a randomized controlled trial; it was carried out in 12 Massachusetts nursing homes caring for 850 patients. In the institutions we randomized to the intervention group, doctors, nurses, and aides received a series of interactive educational visits, curriculum materials, lectures, and "un-advertisements" we designed. The program taught clinicians about appropriate use of sedating medications in frail elderly patients, and presented data on side effects, preferred agents if any were used, and geriatric dosing guidelines. We also provided information on alternatives to inappropriate use of benzodiazepines, neuroleptics, and hypnotics in such patients.

After we collected detailed information on all drugs prescribed in all facilities, we trained a research assistant (blinded to study design and group assignment) to assess patients in all facilities before and after the intervention period.  We showed that the intervention succeeded in significantly reducing the burden of excessive psychoactive drug use in the experimental homes compared with controls, without deterioration in the behavior of residents.  In addition, patients who had previously been taking neuroleptics performed significantly better on a detailed test of memory in the experimental homes as compared with comparable patients in the control homes.

Confidential-Subject to Protective Order

**Avorn J, Gurwitz JH, Bohn RL, Mogun H, Monane M, Walker A. Increased incidence of levodopa therapy following metoclopramide use. JAMA 1995; 274:1780-1782.**

One of the most difficult problems in educating physicians about the use of drugs in older patients is to help them distinguish between drug side effects and the onset of a new disease process, which may then be unnecessarily treated with still other medications. I hypothesized that this might occur if the extra-pyramidal side effects of a drug such as metoclopramide (Reglan) were mistakenly attributed to new-onset idiopathic Parkinson's disease. Little previous work had been done on this question other than a clinical study we had published previously (ref. 59), and a companion study published in *The American Journal of Medicine* which quantified this problem in relation to haloperidol (ref. 65).

In the present study, I employed the relational pharmacoepidemiology database we developed to identify all patients over age 65 who began treatment with dopaminergic antiparkinsonian agents such as Sinemet (L-dopa/carbidopa). We then measured whether such treatment was initiated more frequently in metoclopramide users. Because metoclopramide (and related neuroleptics) block dopaminergic receptors in the brain, this is not an appropriate initial strategy for management of these symptoms, and strongly suggests that a misdiagnosis of idiopathic Parkinson's disease had been made. The hypothesis was confirmed with the documentation of a three-fold increase in the initiation of use of L-dopa in patients taking metoclopramide, even after controlling for potential confounders using multivariable regression techniques. The availability of detailed information on dose and duration of therapy on all prescriptions in the database also made it possible to describe a dose-response curve in this population-based study, as well as to identify specific patient risk factors associated with this form of preventable iatrogenic problem. These findings, as well as the related papers cited, were then integrated into teaching programs in geriatric pharmacology both in our own unit as well as nationally.

**29**

Confidential-Subject to Protective Order

**Avorn J, Monette J, Lacour A, Monane M, Mogun H, Bohn RL, LeLorier J. Persistence of use of lipid-lowering medications: a cross-national study.  JAMA 1998;279:1458-1462.**

Optimal prescribing requires an understanding of how well patients are adhering to the prescribed regimen, and development of methods to assess and ultimately improve such use.  In earlier work (refs. 17, 34), we had demonstrated the adverse outcomes of economic restriction of such coverage. However, physicians still remain unaware of the magnitude of non-compliance among their patients even when economic constraints are absent.  In this paper, we documented that even in the presence of adequate medication coverage, patients still often failed to take prescribed medications as directed. Using the case of lipid-lowering drugs, we studied the persistence of medication use among patients in three different health care contexts, each of which provided comprehensive pharmacy benefits coverage: a province-wide program in Quebec that covered all medication costs for all residents over 65, the Medicaid program of New Jersey, and that state's Pharmacy Assistance for the Aged and Disabled program, which covers drug costs for non-indigent elderly.

We found that despite marked differences in the health care financing systems of the United States and Canada, patterns of compliance were similar and equally low in both countries.  Within the 12-month period studied, patients prescribed lipid-lowering drugs filled only enough medication to have drug available to them for 60% of the year on average.  Compliance was significantly worse for the bile acid resins and niacin than for the HMG-CoA reductase inhibitors.  When we extended followup for five years beyond the original study period, only 52% of the surviving patients who had been prescribed a lipid-lowering drug were still on therapy.  In comparing the two U.S. populations, we found that even in the face of complete coverage for all prescription costs, poorer patients (those in Medicaid) were significantly more likely to have compliance problems that than less poor patients (those in the PAAD program), even after controlling for other differences in demographic and clinical characteristics between the two groups.

This work has had important implications for physician education about prescribing, as well as for health policy. First, it documented the very high level of non-compliance across multiple populations, and identified predictors of which patients are more likely to stop taking recommended therapies. This work has also become part of the current debate on medication reimbursement policy for the elderly, since it demonstrates that as important as adequate drug coverage is, other aspects of the health care delivery system must also work well (e.g., the physician-patient relationship, education programs, compliance surveillance systems) to ensure optimal medication use.

Confidential-Subject to Protective Order

**Solomon DH, van Houten L, Glynn RJ, Baden L, Curtis K, Schrager H, Avorn J. Academic detailing to improve use of broad-spectrum antibiotics at an academic medical center. Arch Intern Med 2001; 161:1897-1902.**

Antibiotic use has long been an area in need of physician education, but suboptimal use continues to be a problem. In hospital settings, a particularly important issue is the overuse of broad-spectrum agents, which can encourage the development of bacterial resistance. With the creation of the Division of Pharmacoepidemiology and Pharmacoeconomics at BWH, I had the opportunity to further develop the educational outreach approach described above, and to apply it to a new prescribing area (inpatient antibiotic use) in a different clinical setting (the teaching hospital). With other faculty and staff in my division, we developed an algorithm that used the hospital's clinical information system that began with identification of all orders for two often-overused broad-spectrum antibiotics (ceftazidime and levofloxacin) as soon as they were written. We then developed a set of decision rules with colleagues from the Infectious Diseases Division to define situations in which such use might be inappropriate. Information on the order was then sent to an ID physician or specially trained clinical pharmacist for review of the primary medical record. If the order still appeared unnecessary, the responsible house officer was contacted for an on-the-spot interactive educational session on rational antibiotic use, usually within 24 hours of the original order. The program was modeled on my earlier "academic detailing" work (NEJM 1983 and NEJM 1992), modified for use in an academic in-patient setting.

To evaluate the effect of the intervention, we randomly allocated 17 teams on the medical services at BWH to receive the new intervention or to serve as controls. We used the hospital's computer system to track all use of the two broad-spectrum antibiotics on each service. We showed that over an 18-week study period, the services randomized to the intervention group had 41% fewer days of unnecessary antibiotic use than did the control teams (P < .001). No adverse clinical events were found.  As a result of this study, this approach has been adopted for use as an ongoing quality-improvement program at BWH.

Confidential-Subject to Protective Order

**Benner JS, Glynn RJ, Mogun H, Neumann PJ, Weinstein MC, Avorn J. Long-term persistence in use of statin therapy in elderly patients.  JAMA 2002; 288:455-461.**

In a previous paper in JAMA (see above, ref. 90), we had demonstrated poor compliance with statin use among indigent patients in the U.S. and in the entire elderly population of Quebec. The present paper, produced by Dr. Benner as part of his doctoral dissertation work under my mentorship, extended those findings by following up a larger U.S. cohort for a period of ten years. In defining the medication use behavior of 34,501 patients, it became the largest and longest-duration study of statin use in the literature, and one of the largest studies of compliance published for any drug. We found that only 26% of patients begun on a statin were still compliant after five years, with most of the drop-off occurring in the first 12 months of therapy. We then identified several predictors of poor compliance that can be used by physicians and health care systems to target patients at particularly high risk of stopping use of this important class of medications. These included nonwhite race, poverty (even though all patients studied had full drug coverage), older age, depression, and impaired cognitive function. Of particular relevance to clinical education programs, the analysis also found that non-compliance was likeliest in patients with less severe cardiovascular morbidity at the time of initiation of therapy, and in patients who had ischemic coronary events while on treatment. These findings will next be integrated into compliance-enhancing interventions that will focus on patients identified as being at highest risk.

Confidential-Subject to Protective Order

**Morris CA, Avorn J.  Internet marketing of herbal products. JAMA 2003; 290; 1505 – 1509.**

Communication with physicians about therapies has become more complicated with the proliferation of direct-to-consumer promotion of treatments of all kinds, and the increase in patients' use of alternative medicine approaches. Both developments have important implications for prescribing, and for how doctors can be taught to work with their patients in this intense new environment. Dr. Morris is a junior faculty member in the division of Pharmaco-epidemiology with an interest in medical education, working under my direct supervision. To systematically define the content and quality of facts about herbally-derived medications that are disseminated through the internet, we employed the five most commonly used search engines to evaluate the information provided about the eight herbal supplement products most widely used for medical purposes. Regulation of statements made in medicinal promotion of all kinds is a key aspect of information-transfer, and one goal of this study was to assess the enforcement of rules that govern the claims made in such advertising to patients and to doctors.

We identified 443 informational web sites for analysis; three quarters of these were retail sites. Of these, 81% made therapeutic claims that frequently violated federal regulations concerning promised clinical effects. Half of the sites that made health claims failed to include the legally required disclaimer that the products had not been reviewed by FDA, and did not purport to treat or prevent any disease.

In the present environment, educating physicians about rational therapy also requires educating them about the alternative treatments their patients may be taking, and about the accuracy of the information they and their patients are exposed to. An editorial written by the editors of JAMA to accompany our paper cited it as evidence of the need for regulatory reforms to require alternative medicine products to meet the same standards of efficacy and safety currently required for prescription drugs.

Confidential-Subject to Protective Order

## BIBLIOGRAPHY

### BOOK:

Avorn, J. Powerful Medicines: the Benefits, Risks, and Costs of Prescription Drugs. New York, Knopf, 2004.

### ORIGINAL ARTICLES:

1. Lieff J, Avorn J, Caddell H, Anderson H, Gorlin P, Kennedy S, Goodwin V, Verlenden L.  Attitudes of the medical profession toward drug abuse.  Amer J Publ Health 1973; 63:1035-1039.

2. Avorn J, Soumerai S.  Demarketing strategies in prescription drug use.  Ann World Assn Med Informatics 1981; 1:13-16.

3. Avorn J, Soumerai S.  Use of computer-based Medicaid drug data to analyze and correct inappropriate medication use.  J Med Systems 1982; 6:377-386.

4. Avorn J, Langer E.  Induced disability in nursing home patients: A controlled trial.  J Am Geriat Soc 1982; 30:397-400.

5. Avorn J, Chen M, Hartley R.  Scientific vs. commercial sources of influence on physician prescribing behavior.  Am J Med 1982; 73:4-8.

6. Soumerai S, Avorn J.  Perceived health status, morale, and activity in urban retirees: A randomized controlled trial of part-time employment.  J Gerontol 1983; 38(3):356-362.

7. Avorn J, Soumerai SB.  Improving drug-therapy decisions through educational outreach:  A randomized controlled trial of academically based "detailing."  N Engl J Med 1983; 308:1457-1463.

8. Avorn J.  Drug policy in the aging society.  Health Affairs 1983; 2:23-32.

9. Avorn J.  Benefit and cost analysis in geriatric care.  N Engl J Med 1984; 310: 1294-1301.

10. Soumerai SB, Avorn J.  Efficacy and cost-containment in hospital pharmacotherapy.  Milbank Mem Fund Quart 1984; 62:447-474.

11. Soumerai SB, Avorn J.  Economic and policy analysis of university-based drug "detailing."  Med Care 1986; 24:313-331.

12. Avorn J, Everitt DE, Weiss S.  Increased antidepressant use in patients prescribed beta-blockers.  JAMA 1986; 225:357-360.

Confidential-Subject to Protective Order

13. Cleary PD, Rogers TF, Singer E, Avorn J, et al.  Health education about AIDS among seropositive blood donors.  Hlth Educ Quart 1986; 13:317-329.

14. Avorn J, Niessen LC.  Relationship of long bone fractures and water fluoridation.  Gerodont 1986; 2:175-9.

15. Avorn J.  Drug innovation and public policy.  Hlth Affairs 1986; 5(2):124-127.

16. Soumerai SB, Avorn J.  Predictors of physician prescribing change in an educational experiment to improve medication use.  Med Care 1987; 25:210-221.

17. Pindyck J, Avorn J, Kurian M, Reed M, Iqbal MJ, Levine SJ.  Blood donation by the elderly.  JAMA 1987; 257:1186-1188.

18. Campion EW, Avorn J, Reder VA, Olins NJ.  Overmedication of the low weight elderly.  Arch Int Med 1987; 147:945-947.

19. Sherman DS, Avorn J, Campion EW.  Cimetidine use in nursing homes: Prolonged therapy and excessive doses.  J Am Geriat Soc 1987; 35:1023-1027.

20. Soumerai SB, Avorn J, Gortmaker S, Ross-Degnan D.  Payment restrictions for prescription drugs in Medicaid: Effects on therapy, cost, and equity.  New Engl J Med 1987; 317:550-556.

21. Soumerai SB, Avorn J, Gortmaker S, Hawley S.  Effect of government warnings on propoxyphene use and overdose deaths.  Am J Publ Health 1987; 77:1518-1523.

22. Avorn J, Soumerai SB, Taylor W, Wessels M, Janousek J, Weiner M.  Reduction of incorrect antibiotic use through a structured antibiotic order form.  Arch Int Med 1988; 148:1720-1724.

23. Beers M, Avorn J, Soumerai SB, Everitt DE, Sherman DS, Salem S.  Psychoactive medication use in intermediate-care facility residents.  JAMA 1988; 260:3016-3020.

24. Cleary P, Singer E, Rogers T, Avorn J, Vandevanter N, Soumerai SB, Perry S, Pindyck J.  Sociodemographic and behavioral characteristics of HIV antibody-positive blood donors.  Am J Publ Hlth 1988; 78:953-7.

25. Avorn J, Dreyer P, Connelly K, Soumerai SB.  Use of psychoactive medication and the quality of care in rest homes:  Findings and policy implications of a state-wide study.  N Engl J Med 1989; 320:227-32.

26. Schwartz RK, Soumerai SB, Avorn J.  Physician motivations for non-scientific drug prescribing.  Soc Sci & Med 1989; 28:577-582.

Confidential-Subject to Protective Order

27. Soumerai SB, McLaughlin T, Avorn J.  Improving drug prescribing in primary care: A critical analysis of the experimental literature.  Milbank Quart 1989; 67:268-317.

28. Buchwald D, Soumerai SB, Vandevanter N, Wessels MR, Avorn J.  Effect of hospital-wide change in clindamycin dosing schedule on clinical outcomes.  Rev Infec Dis 1989; 11:619-624.

29. Bright RA, Avorn J, Everitt DE.  Medicaid data as a resource for epidemiologic studies: strengths and limitations.  J Clin Epi 1989; 42:937-945.

30. Soumerai SB, Ross-Degnan D, Gortmaker S, Avorn J.  Withdrawing payment for non-scientific drug therapy:  Intended and unexpected effects of a large-scale natural experiment.  JAMA 1990; 263:831-839.

31. Everitt DE, Avorn J, Baker MW.  Clinical decisionmaking in the evaluation and treatment of insomnia.  Am J Med 1990; 89:357-362.

32. Learman, LA, Avorn J, Everitt DE, Rosenthal R.  Pygmalion in the nursing home: The effects of caregiver expectation on patient outcomes.  J Am Geriat Soc 1990; 38:797-803.

33. Gurwitz J, Avorn J, Ross-Degnan D, Lipsitz LA.  Nonsteroidal anti-inflammatory drug-associated azotemia in the very old.  JAMA 1990; 264:471-475.

34. Salem-Schatz SR, Avorn J, Soumerai SB.  Influence of clinical knowledge, organizational context, and practice style on transfusion decision making.  JAMA 1990; 264:476-483.

35. Everitt DE, Soumerai S, Avorn J, Klapholz H, Wessels M.  Changing antimicrobial prophylaxis through education aimed at senior department leaders.  Infec Control Hosp Epidem 1990; 11:578-583.

36. Soumerai SB, Avorn J.  Principles of educational outreach ("academic detailing") to improve clinical decisionmaking. JAMA 1990; 263:549-556.

37. Avorn J, Everitt DE, Baker MW.  The neglected medical history and therapeutic choices for abdominal pain. Arch Int Med 1991; 51:694-698.

38. Everitt DE, Fields D, Avorn J, Soumerai S.  Resident behavior and staff distress in the nursing home.  J Am Geriatrics Soc 1991; 39:792-798.

39. Soumerai SB, Ross-Degnan D, Avorn J, McLaughlin TJ.  Effects of Medicaid drug-payment limits on admission to hospitals and nursing homes.  N Engl J Med 1991; 325:1072-1077.

36

Confidential-Subject to Protective Order

40.  JH, Avorn J.  The ambiguous relationship between aging and adverse drug reactions.  Ann Intern Med 1991; 114:956-966.

41. Avorn J, Soumerai SB, Everitt DE, Ross-Degnan D, Beers MH, Sherman D, Salem-Schatz SR, Fields D.  A randomized trial of a program to reduce the use of psychoactive drugs in nursing homes.  N Engl J Med 1992; 327:168-173.

42. Kuchel GA, Avorn J, Reed MJ, Fields D.  Cardiovascular responses to phlebotomy and sitting in middle-aged and elderly subjects.  Arch Int Med 1992; 152:366-70.

43. Gurwitz JH, Col N, Avorn J.  Exclusion of elderly and women from clinical trials in acute myocardial infarction.  JAMA 1992; 268:1417-1422.

44. Gurwitz JH, Avorn J, Ross-Degnan D, Choodnovskiy I, Ansell J.  Aging and the anticoagulant response to warfarin.  Ann Intern Med 1992; 116:901-904.

45. Beers MH, Avorn J, Soumerai S, Hawley, SL, Drobnyk G.  Computer-assisted drug data collection. J Med Syst 1992; 16:1-6.

46. Gurwitz JH, Bohn R, Glynn RJ, Avorn J.  Antihypertensive drug therapy and initiation of treatment for diabetes mellitus.  Ann Intern Med 1992; 118:273-278.

47. Monane M, Avorn J, Beers MH, Everitt DE.  Anticholinergic drug use and bowel function in nursing home patients.  Arch Int Med 1993; 153:633-638.

48. Cleary PD, Van Devanter N, Rogers TF, Singer E, Shipton-Levy R, Steilen M, Stuart A, Avorn J, Pindyck J.  Depressive symptoms in blood donors notified of HIV infection.  Am J Publ Health 1993; 83:534-539.

49. Gurwitz JH, Glynn R, Monane M, Everitt DE, Gilden D, Smith N, Avorn J.  Treatment for glaucoma: Adherence by the elderly.  Am J Publ Health 1993; 83:711-716.

50. Avorn J, Glynn RJ, Gurwitz JH, Bohn RL, Monane M, Everitt DE, Gilden D, Choodnovskiy I.  Adverse pulmonary effects of topical ʊΩ΄ϒZblockers used in the treatment of glaucoma.  J Glaucoma 1993; 2:158-165.

51. Soumerai SB, Salem-Schatz S, Avorn J, Casteris CS, Ross-Degnan D, Popovsky MA.  A controlled trial of educational outreach to improve blood transfusion practice.  JAMA 1993; 270:961-966.

52. Salem-Schatz SR, Avorn J, Soumerai SB. Influence of knowledge and attitudes on the quality of physicians' transfusion practice. Med Care 1993; 31:868-78.

53. Soumerai S, Avorn J, Taylor W, Wessels M, Maher D, Hawley S. Improving choice of prescribed antibiotics through concurrent reminders in an educational order form.

Confidential-Subject to Protective Order

Med Care 1993; 31:552-8.

54. Glynn RJ, Gurwitz JH, Bohn RL, Monane M, Choodnovskiy I, Avorn J.  Old age and race as determinants of initiation of glaucoma therapy.  Am J Epidemiol 1993; 138:395-406.

55. Gurwitz JH, Bohn RL, Glynn RJ, Monane M, Mogun H, Avorn J.  Glucocorticoids and the risk for initiation of hypoglycemic therapy.  Arch Int Med 1994; 154:97-101.

56. Avorn J, Monane M, Gurwitz JH, Glynn RJ, Choodnovskiy I, Lipsitz LA.  Reduction of bacteriuria and pyuria after ingestion of cranberry juice.  JAMA 1994; 271:751-754.

57. Pickering TD, Gurwitz JH, Zaleznik D, Noonan JP, Avorn J.  The appropriateness of oral fluoroquinolone prescribing in the long-term care setting.  J Am Geriatr Soc 1994; 42:28-32.

58. Monane M, Bohn RL, Gurwitz JH, Glynn R, Avorn J.  Non-compliance with congestive heart failure therapy in the elderly.  Arch Int Med 1994; 154:433-437.

59. Avorn J, Monane M, Everitt DE, Beers MH, Fields D.  Clinical assessment of extra-pyramidal signs in nursing home patients given antipsychotic medication.  Arch Int Med 1994; 154:1113-7.

60. Monane M, Bohn RL, Gurwitz JH, Glynn RJ, Choodnovskiy I, Avorn J.  Topical glaucoma medications and cardiovascular risk in the elderly.  Clin Pharmacol Ther 1994; 55:76-83.

61. Harari D, Gurwitz JH, Avorn J, Choodnovskiy I, Minaker KL.  Constipation: assessment and management in an institutionalized elderly population.  J Am Geriatr Soc 1994; 42:947-952.

62. Gurwitz JH, Avorn J, Bohn RL, Glynn RJ, Monane M, Mogun H.  Initiation of antihypertensive treatment during nonsteroidal anti-inflammatory drug therapy.  JAMA 1994; 272:781-6.

63. Glickman L, Bruce EA, Caro FG, Avorn J.  Physicians' knowledge of drug costs for the elderly.  J Am Geriatr Soc 1994; 42:992-6.

64. Gurwitz JH, Field TS, Glynn RJ, Manson JE, Avorn J, Taylor JO, Hennekens CH.  Risk factors for non-insulin-dependent diabetes mellitus requiring treatment in the elderly.  J Am Geriatr Soc 1994; 42:1235-1240.

65. Avorn J, Bohn R, Mogun H, Gurwitz J, Monane M, Everitt D, Walker A.  Neuroleptic drug exposure and treatment of parkinsonism in the elderly: a case-

38

Confidential-Subject to Protective Order

control study.  Am J Med 1995; 99:48-54.

66. Monane M, Gurwitz JH, Lipsitz LA, Glynn RJ, Avorn J.  Epidemiologic and diagnostic aspects of bacteriuria: a longitudinal study in elderly women.  J Am Geriat Soc 1995; 43:618-922.

67. Monane M, Glynn RJ, Gurwitz JH, Bohn RL, Levin R, Avorn J.  Trends in medication choices for hypertension in the elderly: the decline of the thiazides.  Hypertension 1995; 125:1045-1051.

68. Ross-Degnan D, Soumerai S, Avorn J, Bohn RL, Bright R, Aledort LM.  Hemophilia home treatment: Economic analysis and implications for health policy.  Intl J of Technol Assess Hlth Care 1995; 11:327-344.

69. Kalish S, Gurwitz JH, Krumholz H, Avorn J.  A cost-effectiveness model of thrombolytic therapy for acute myocardial infarction.  J Gen Intern Med 1995; 10:321-330.

70. Kalish SC, Bohn RL, Mogun H, Glynn RJ, Gurwitz JH, Avorn J.  Antipsychotic prescribing patterns and the treatment of extrapyramidal symptoms in older people.  J Am Geriat Soc 1995; 43:967-973.

71. Avorn J, Gurwitz JH, Bohn RL, Mogun H, Monane M, Walker A. Increased incidence of L-dopa therapy following metoclopramide use. JAMA 1995; 274:1780-1782.

72. Harari D, Gurwitz JH, Choodnovskiy I, Avorn J, Minaker KL.  Correlates of regular laxative use in frail elderly persons.  Am J Med 1995; 99:513-518.

73. Avorn J, Gurwitz JH.  Drug use in the nursing home.  Ann Intern Med 1995; 123:195-204.

74. Cleary PD, VanDevanter N, Steilen M, Stuart A, Shipton-Levy R, McMullen W, Rogers TF, Singer E, Avorn J, Pindyck J.  A randomized trial of an education and support program for HIV-infected individuals.  AIDS Rsch 1995; 9:1271-1278.

75. Monane M, Glynn R, Avorn J. The effect of sedative-hypnotic use on sleep symptoms in elderly nursing home residents.  Clin Pharmacol Ther 1996; 59:83-92.

76. Gurwitz JH, Everitt DE, Monane M, Glynn RJ, Choodnovskiy I, Beaudet MP, Avorn J.  The impact of ibuprofen on the efficacy of antihypertensive treatment with hydrochlorothiazide in elderly persons.  J Gerontol: Med Sci 1996; 51A:M74-M79.

77. Harari D, Gurwitz JH, Avorn J, Bohn RL, Minaker KL.  Bowel habit in relation to age and gender: findings from the National Health Interview Survey and clinical

Confidential-Subject to Protective Order

implications.  Arch Int Med 1996; 156:315-320.

78. Monane M, Kanter DS, Glynn RJ, Avorn J.  Variability in length of hospitalization for stroke: the role of managed care in an elderly population.  Arch Neurol 1996; 53:875-880.

79. Monane M, Bohn RL, Gurwitz JH, Glynn RJ, Levin R, Avorn J.  Compliance with antihypertensive therapy: the role of age, gender, and race.  Am J Public Health 1996; 86:1805-1808.

80. Kalish S, Bohn RL, Avorn J.  Policy analysis of the conversion of histamine-2 antagonists to over-the-counter use.  Med Care 1997; 35:32-48.

81. Monane M, Gurwitz JH, Bohn RL, Glynn RJ, Levin R, Monette J, Avorn J.  The impact of thiazide diuretics on the initiation of lipid-reducing agents in older people: a population-based analysis.  J Am Geriatr Soc 1997; 45:71-75.

82. Harari D, Avorn J, Bohn RL, Mogun H, Minaker K.  How do older persons define constipation?  Implications for therapeutic management.  J Gen Intern Med 1997; 12:63-66 .

83. Gurwitz JH, Monette J, Rochon PA, Eckler MA, Avorn J.  Atrial fibrillation and stroke prevention with warfarin in the long-term care setting.  Arch Intern Med 1997; 157:978-984.

84. Huttin C, Avorn J.  Drug expenditures for hypertension: an empirical test of an economic model in a French population.  Cah Sociol Demogr Med 1997; 37:33-52.

85. Monane M, Bohn RL, Gurwitz JH, Glynn RJ, Levin R, Avorn J.  The effects of initial drug choice and comorbidity on antihypertensive therapy compliance: results from a population-based study in the elderly.  Am J Hypertens 1997; 10:697-704.

86. Gurwitz JH, Bohn RL, Glynn RJ, Avorn J.  Thiazide diuretics and the initiation of anti-gout therapy.  J Clin Epidemiol 1997; 8:953-959.

87. Monette J, Gurwitz JH, Rochon PA, Avorn J.  Physician attitudes concerning warfarin for stroke prevention in atrial fibrillation: results of a survey of long-term care paractitioners.  J Am Geriatr Soc 1997; 45:1060-1065.

88. Monette J, Mogun H, Bohn RL, Avorn J.  Concurrent use of antiulcerative agents. J Clin Gastroenterol 1997; 24:207-213.

89. Gurwitz JH, Yeomans SM, Glynn RJ, Lewis BE, Levin R, Avorn J.  Noncompliance in the managed care setting: the case of medical therapy for glaucoma.  Med Care 1998;36:357-369.

Confidential-Subject to Protective Order

90. Avorn J, Monette J, Lacour A, Monane M, Mogun H, Bohn RL, LeLorier J. Persistence of use of lipid-lowering medications: a cross-national study.  JAMA 1998;279:1458-1462.

91. Bohn RL, Avorn J, Glynn RJ, Choodnovskiy I, Haschemeyer R, Aledort LM. Prophylactic use of factor VIII: an economic evaluation.  Thromb Haemost 1998;79:932-937.

92. Brown NJ, Griffin MR, Ray WA, Meredith S, Beers MH, Marren J, Robles M, Stergachis A, Wood AJ, Avorn J.  A model for improving medication use in home health care patients.  J Am Pharm Assoc 1998;38:696-702.

93. Glynn RJ, Monane M, Gurwitz JH, Choodnovskiy, Avorn J.  Agreement between drug treatment and a discharge diagnosis of diabetes mellitus in the elderly.  Amer J Epi 1999;149:541-549.

94. Solomon DH, Katz JN, Bohn RL, Mogun H, Avorn J. Non-occupational risk factors for carpal tunnel syndrome. J Gen Intern Med 1999;14:310-314.

95. Pan CX, Glynn RJ, Mogun H, Choodnovskiy I, Avorn J.  Definition of race and ethnicity in the elderly in Medicare and Medicaid.   J Am Geriatr Soc 1999;47:730-733.

96. Glynn RJ, Monane M, Gurwitz JH, Choodnovskiy I, Avorn J.  Aging, comorbidity, and reduced rates of drug treatment for diabetes mellitus.  J Clin Epi 1999;52:781-790.

97. Knight EL, Glynn RJ, McIntyre KM, Mogun H, Avorn J.  Predictors of decreased renal function in patients with CHF during ACE inhibitor therapy.  Amer Heart J 1999;138:849-855.

98. Bohn RL, Colowick AB, Avorn J.  Probabilities, costs, and outcomes: methodologic issues in modeling hemophilia treatment.  Haemophilia 1999;5:374-378.

99. Bohn RL, Gurwitz JH, Yeomans SM, Glynn RJ, Pasquale LR, Walker AM, Avorn J. Which patients are treated for glaucoma? An observational analysis.  J Glauc 2000; 9:38-44.

100. Ganz DA, Kuntz KM, Jacobson GA, Avorn J.  Cost-effectiveness of HMG Co-A reductase inhibitors in older patients with prior myocardial infarction.  Ann Intern Med 2000; 132:780-787.

101.  Bérard A, Solomon DH, Avorn J.  Patterns of drug use in rheumatoid arthritis.  J

41

Confidential-Subject to Protective Order

Rheum 2000;96:1648-55.

102. Wang PS, Walker A, Tsuang M, Orav EJ, Levin R, Avorn J.  Strategies for improving comorbidity measures based on Medicare and Medicaid claims data.  J Clin Epi 2000; 53:571-578.

103. Avorn J, Solomon DH.  Cultural and economic factors that (mis)shape antibiotic utilization: the non-pharmacologic basis of therapeutics.  Ann Intern Med 2000; 133:128-35.

104. Knight EL, Glynn RJ, Levin R, Ganz DA, Avorn J.  Failure of evidence-based medicine in the treatment of hypertension in older patients. J Gen Intern Med 2000; 133:128-35.

105. Colowick AB, Bohn RL, Avorn J, Ewenstein B. Immune tolerance induction in hemophilia patients with inhibitors: Costly can be cheaper.  Blood 2000; 96:1698-702.

106. Ganz DA, Glynn RJ, Mogun H, Knight EL, Bohn RL, Avorn J. Adherence to guidelines for oral anticoagulation after venous thrombosis and pulmonary embolism. J Gen Intern Med 2000; 15:  776-781.

107. Wang PS, Solomon DH, Mogun H, Avorn J.  HMG-CoA reductase inhibitors and the risk of hip fractures in elderly patients.  JAMA 2000; 283:3211-3216.

108. Gurwitz JH, Field TS, Avorn J, McCormick D, Jain S, Eckler M, Benser M, Edmondson AC, Bates DW.  Incidence and preventability of adverse drug events in nursing homes.  Am J Med 2000; 109:87-94.

109. Van Eijk ME, Bahri P, Dekker G, Herings RM, Porsius A, Avorn J, De Boer A. Use of prevalence and incidence measures to describe age-related prescribing of antidepressants with and without anticholinergic effects.  J Clin Epi 2000; 53:645-51.

110. Fields TS, Gurwitz JH, Avorn J, McCormick D, Jain S, Eckler M, Benser M, Bates DW.  Risk factors for adverse drug events among nursing home residents.  Arch of Intern Med 2001; 161:1629-34.

111. Van Eijk ME, Krist LF, Avorn J, Porsius A, de Boer A.  Do the research goal and databases match?  A checklist for systematic approach.  Health Policy 2001; 58: 263-74.

112. Solomon DH, Stone PH, Glynn RJ, Ganz DA, Gibson CM, Terry R, Avorn J.  Use of risk stratification to identify patients with unstable angina likeliest to benefit from an invasive versus conservative management strategy. J Amer Coll Cardiol

Confidential-Subject to Protective Order

2001; 38:969-976.

113. Wang PS, Walker AM, Tsuang MT, Orav EJ, Levin RL, Avorn J.  Antidepressant use and the risk of breast cancer.  J Clin Epi 2001; 54:728-734.

114. Knight E, Bohn R, Wang P, Glynn RJ, Mogun H, Avorn J.  Predictors of uncontrolled hypertension in ambulatory patients.  Hypertension 2001; 38:809-814.

115. Van Eijk ME, Avorn J, Porsius AJ, De Boer A.  Reducing prescribing of highly anticholinergic antidepressants for elderly people:  a randomised trial of group versus individual academic detailing.  BMJ 2001; 322: 654-657.

116. Wang PS, Walker A, Tsuang M, Orav EJ, Levin R, Avorn J. Finding incident breast cancer cases through U.S. claims data and a state cancer registry. Cancer Causes and Control 2001; 12:257-265.

117. Knight EL, Avorn J. Quality indicators for appropriate medication use in the care of the vulnerable elderly.  Ann Intern Med 2001;135:703-710.

118. Wang PS, Bohn RL, Glynn RJ, Mogun H, Avorn J. Hazardous benzodiazepine regimens  in the elderly: effects of half-life, dosage, and duration on risk of hip fracture. Amer J Psychiat 2001;158:892-898.

119. Solomon DH, van Houten L, Glynn RJ, Baden L, Curtis K, Schrager H, Avorn J. Academic detailing to improve use of broad-spectrum antibiotics at an academic medical center. Arch Intern Med 2001;161:1897-1902.

120. Wang PS, Bohn RL, Glynn RJ, Mogun H, Avorn J.  Zolpidem use and hip fractures in the elderly. J Amer Geriat Soc 2001; 49:1685-1690.

121. Schneeweiss S, Seeger J, Maclure M, Wang P, Avorn, J, Glynn RJ: Performance of comorbidity scores to control for confounding in epidemiologic studies using claims data. Am J Epidemiol 2001; 154: 854-64.

122. Winkelmayer WC, Glynn RJ, Levin R, Owen W, Avorn J: Late referral and modality choice in end-stage renal disease. Kidney Int 2001; 60:1547-1554.

123. Glynn RJ, Knight EL, Levin R, Avorn J. Paradoxical relations of drug treatment with mortality in older persons. Epidemiol 2001;12:682-689.

124. Schneeweiss S, Seeger JD, Maclure M, Wang PS, Avorn J, Glynn RJ. Performance of comorbidity scores to control for confounding in epidemiologic studies using claims data.  Am J Epidemiol 2001;154:854-64.

125. Winkelmayer WC, Glynn RJ, Levin R, Owen W, Avorn J.   Determinants of delayed nephrologist referral in patients with chronic kidney disease. Am J Kidney Dis 2001; 38:1178-1184.

43

Confidential-Subject to Protective Order

126. Wang PS, Glynn RJ, Ganz DA, Schneeweiss S, Levin R, Avorn J.  Clozapine use and the risk of diabetes mellitus.  J Clin Psychopharm 2002; 22:236-243.

127. Ewenstein BM, Avorn J, Putnam KG, Bohn RL.  Porcine factor VIII: Pharmacoeconomics of inhibitor therapy.  Haemophilia 2002; 8 suppl 1: 13-16.

128. Wang PS, Bohn RL, Knight E, Glynn RJ, Mogun H, Avorn J. Noncompliance with antihypertensive medications: the impact of depressive symptoms and psychosocial factors. J Gen Intern Med  2002; 17:504-511.

129. Wang PS, Levin R, Zhao SZ, Avorn J. Urinary antispasmodic use and the risks of ventricular arrhythmia and sudden death in elderly patients. J Amer Geriat Soc 2002; 50: 117-124.

130. Solomon DH, Ganz DA, Avorn J, Knight EL, Glynn RJ, Gibson CM, Stone PH.  Which patients with unstable angina or non-Q-wave myocardial infarction should have immediate cardiac catheterization?  A clinical decision rule for predicting who will fail medical therapy.  J Clin Epi 2002; 55:121-128.

131. Avorn J, Benner J, Ford I, Ganz DA, Gaw A, Glynn RJ, Jackson J, Lagaay AM, Schneeweiss S, Walley T, Wang PS.  Measuring the cost-effectiveness of lipid-lowering drugs in the elderly: the outcomes research and economic analysis components of the prosper trial.  Controlled Clin Trials 2002; 23: 757-773.

132. Solomon DH, Glynn RJ, Levin R, Avorn J.  Nonsteroidal anti-inflammatory drug use and acute myocardial infarction.  Arch Intern Med 2002; 162:1099-1104.

133. Winkelmayer WC, Glynn RJ, Levin R, Mittleman MA, Pliskin JS, Avorn J.  Late nephrologist referral and access to renal transplantation.  Transplantation 2002; 73:1918-1923.

134. Avorn J, Winkelmayer WC, Bohn RL, Levin R, Glynn RJ, Levy E, Owen W.  Delayed nephrologist referral and inadequate vascular access in patients with advanced kidney failure.  J Clin Epi 2002; 55:711-716.

135. Winkelmayer WC, Owen W, Glynn RJ, Levin R, Avorn J.  Preventive health care measures before and after start of renal replacement therapy.  J Gen Int Med 2002; 17:588-595.

136. Wang PS, Walker AM, Tsuang MT, Orav EJ, Glynn RJ, Levin RL, Avorn J.  Dopamine antagonists and the development of breast cancer.  Arch Gen Psychiatry 2002; 59:1147-1154.

137. Schneeweiss S, Hasford J, Göttler M, Hoffmann A, Riethling A-K, Avorn J:  Hospital admissions caused by adverse drug reactions: A longitudinal population-based study. Euro J Clin Pharm 2002; 58:285-291.

Confidential-Subject to Protective Order

138. Avorn J, Bohn RL, Levy E, Levin R, Owen WF, Winkelmayer WC, Glynn RJ: Nephrologist care and mortality in patients with chronic renal insufficiency. Arch Intern Med 2002; 162:2002-2006.

139. Benner JS, Glynn RJ, Mogun H, Neumann PJ, Weinstein MC, Avorn J. Long-term persistence in use of statin therapy in elderly patients. JAMA 2002; 288:455-461.

140. Winkelmayer WC, Glynn RJ, Mittleman MA, Pliskin JS, Levin R, Avorn J: Comparing mortality of elderly patients on hemodialysis versus peritoneal dialysis: a propensity score approach. J Am Soc Nephrol 2002; 13:2353-2362.

141. Mantel-Teeuwisse AK, Verschuren WMM, Klungel OH, Kromhout D, Lendeman AD, Avorn J, Porsius AJ, de Boer A. Undertreatment of hypercholesterolaemia: a population-based study. Br J Clin Pharmacol 2003; 55: 389-397.

142. Winkelmayer WC, Owen WF, Levin R, Avorn J: A propensity analysis of late vs. early nephrologist referral and mortality on dialysis. J Am Soc Nephrol; 2003; 14:486-492.

143. Partridge A, Wang P, Winer E, Avorn J. Non-adherence to adjuvant tamoxifen therapy in women with primary breast cancer. J Clin Oncol 2003; 21: 602-606.

144. Winkelmayer WC, Levin R, Avorn J: The nephrologist's role in the management of calcium-phosphorus metabolism in patients with chronic kidney disease. Kidney Int 2003; 63:1836-1842.

145. Winkelmayer WC, Glynn RJ, Levin R, Avorn J: Hydroxyethyl starch and change in renal function in patients undergoing coronary artery bypass graft surgery. Kidney Int 2003; 64:1046-1049.

146. Fischer MA, Solomon DS, Teich JM, Avorn J. Conversion from intravenous to oral medications: assessment of a computerized intervention for hospitalized patients. Arch Intern Med 2003; (in press).

147. Winkelmayer WC, Levin R, Avorn J: Chronic kidney disease as a risk factor for bleeding complications after coronary artery bypass surgery. Am J Kidney Dis 2003; 41:84-89.

148. Fischer MA, Avorn J. Economic consequences of under-use of generic drugs: evidence from Medicaid and implications for prescription drug benefit plans. Health Serv Res 2003; 38: 1051-1063.

149. Solomon DH, Katz JN, Carrino JL, Schaffer JL, Bohn RL, Mogun H, Avorn J. Trends in knee magnetic resonance imaging: 1991-1995. Med Care 2003; 41: 687-692.

150. Schneeweiss S, Wang PS, Avorn J, Glynn RJ: Improved comorbidity adjustment for predicting mortality in Medicare populations. Health Serv Res 2003; 38: 1103-20.

Confidential-Subject to Protective Order

151. Desai AS, Solomon DH, Stone PH, Avorn J. Economic consequences of routine coronary angiography in low and intermediate risk patients with unstable angina. Amer J Cardiol 2003; 92: 363-367.

152. Wang PS, Benner JS, Glynn RJ, Winkelmayer WC, Mogun H, Avorn J. How well do patients report non-compliance with antihypertensive medications? a comparison of self-report vs. filled prescriptions. Pharmacoepidemiol Drug Safety 2003; (in press).

153. Fischer MA, Avorn J. Potential savings from increased use of generic drugs in the elderly: What the experience of Medicaid and other insurance programs means for a Medicare drug benefit.  Pharmacoepidemiol Drug Safety 2003; (in press).

154. Solomon DH, Glynn RJ, Levin R, Bohn R, Avorn J.  The hidden costs of NSAIDs in older patients.  J Rheumatol 2003;30:792-780.

155. Warsi A, LaValley MP, Wang PS, Avorn J, Solomon DH. Arthritis self-management education programs: a meta-analysis of the effect on pain and disablity. Arthritis Rheum 2003; 48: 2207-2213.

156. Solomon DH, Avorn J, Warsi A, et al. Which patients with knee problems are likely to benefit from surgery? Development of a clinical prediction rule. Arch Intern Med 2003 (in press).

157. Solomon DH, Finkelstein JS, Katz JN, Mogun H, Avorn J. Underuse of osteoporosis medications in elderly patients with fractures. Am J Med 2003;15:398-400.

158. Avorn J, Patel M, Levin R, Winkelmayer WC: Hetastarch and bleeding complications after coronary artery surgery. Chest 2003; 124:1437-1442.

159. Schneeweiss S, Wang PS, Avorn J, Maclure M, Levin R, Glynn RJ: Consistency of performance ranking of comorbidity adjustment scores in Canadian and U.S. health care utilization data. J Gen Intern Med 2003 (in press)

160. Solomon DH, Schneeweiss S, Glynn RJ, Levin R, Avorn J: Determinants of selective COX-2 inhibitor prescribing: Are patient or physician characteristics more important? Am J Med 2003; 115: 715-720.

161. Wang PS, Schneeweiss S, Glynn RJ, Mogun H, Avorn J. Use of the case-crossover design to study prolonged drug exposures and insidious outcomes. Ann Epidemiol 2003 (in press).

162. Warsi A, Wang PS, LaValley, Avorn J, Solomon DH. Self-management education programs in chronic disease. Arch Intern Med 2004; 164:1641-1649.

Confidential-Subject to Protective Order

163. Parr KG, Patel MA, Dekker R, Levin R, Glynn R, Avorn J, Morse DS. Multivariate predictors of blood product use in cardiac surgery. J Cardiothorac Vasc Anesth 2003; 17:176-181.

164. Morris CA, Avorn J.  Internet marketing of herbal products.  JAMA 2003; 290:1505-9.

165. Gilligan T, Wang PS, Levin R, Kantoff PW, Avorn J. Racial differences in screening for prostate cancer in the elderly. Arch Intern Med (in press).

166. Solomon DH, Schneeweiss S, Glynn RJ, Kiyota Y, Cannuscio CC, Levin R, Mogun H, Avorn J. The relationship between selective COX-2 inhibitors and acute myocardial infarction in older adults. Circulation 2004 (in press).

167. Bohn RL, Aledort LM, Putnam KG, Ewenstein BM, Mogun H, Avorn J. The economic impact of factor VIII inhibitors in patients with haemophilia. Haemophilia 2004; 10: 1-6.

168. Morris, CA, Cabral D, Cheng H, Katz JN, Finkelstein JS, Avorn J, Solomon DH. Patterns of bone mineral density testing: current guidelines, testing rates and interventions.  J Gen Intern Med 2004 (in press).

169. Avorn J, Schneeweiss S, Knight E, Ganz DA. Therapeutic delay and reduced functional status six months after thrombolysis for acute myocardial infarction. Amer J Cardiol 2004 (in press).

170. Solomon DH, Schneeweiss S, Levin R, Avorn J. the relationship between COX-2 specific inhibitors and hypertension. Hypertension 2004; 2004; 44:140-145.

171. Avorn J, Schneeweiss S, Sudarsky LR, Benner J, Kiyota Y, Levin R, Glynn RJ. Sudden uncontrollable somnolence and medication use in Parkinson's disease. Arch Neurol 2004 (in press).

172. Higashi T, Shekelle PG, Solomon DH, Knight EL, Roth C, Chang JT, Kamberg CJ, MacLean C, Young RT, Adams J, Reuben DB, Avorn J, Wenger NS. The Quality of Pharmacological Care for Community-Dwelling Vulnerable Older Patients in Managed Care Organizations. Ann Intern Med 2004 (in press).

173. Schneeweiss S, Glynn RJ, Tsai EH, Avorn J, Solomon DH: Assessment of bias by unmeasured confounders in pharmacoepidemiologic claims data studies using external data. Epidemiology 2004 (in press).

174. Schneeweiss S, Maclure M, Carelton B, Glynn RJ, Avorn J. Clinical and economic consequences of  a reimbursement restriction of nebulised respiratory therapy in adults: direct comparison of randomized and observational evaluations. BMJ 2004 (in press).

Confidential-Subject to Protective Order

175. Fischer MA, Avorn J. Economic implications of evidence-based prescribing for hypertension: Can better care cost less?  JAMA 2004; 291: 1850-1856.

176. Solomon DH, Schneeweiss S, Glynn RJ, Kiyota Y, Levin R, Mogun H, Avorn J. The relationship between selective cox-2 inhibitors and acute myocardial infarction in older adults. Circulation 2004; 109:2068-2073.

177. Schneeweiss S, Wang PS, Avorn J, Maclure M, Levin R, Glynn RJ: Consistency of performance ranking of comorbidity adjustment scores in Canadian and U.S. health care utilization data. J Gen Intern Med 2004;19:444-450.

178. Solomon DH, Finkelstein JS, Wang PS, Avorn J. Statin lipid-lowering drugs and bone mienral density. Pharmacoepi Drug Safety 2004 (in press).

179. Solomon DH, Morris C, Cheng H, Cabral D, Katz JN, Finkelstein JS, Avorn J. Medication use patterns for osteoporosis: an assessment of guidelines, treatment rates, and quality improvement interventions. Mayo Clinic Proc (in press).

Confidential-Subject to Protective Order

**REVIEWS, CHAPTERS, EDITORIALS, etc.:**

1. Avorn J.  Beyond dying:  Experiments with drugs in easing the transition from life.  Harper's Magazine 1973; 246:54-64.

2. Avorn J.  The future of doctoring:  Information technology and health care delivery.  The Atlantic Monthly 1974; 234:71-79.

3. Avorn J.  The role of cocaine in treating intractable pain in terminal disease.  In: Jeri R, ed.  Cocaine:  Proceedings of the Interamerican seminar of medical and sociological aspects of cocoa and cocaine.  Lima, Peru:  Pan-American Health Organization, 1979: 227-235.

4. Avorn J.  Nursing home infections:  The context (editorial).  N Engl J Med 1981; 305:759-760.

5. Avorn J.  Ethics and experts:  A physician's perspective.  Hastings Center Report 1982; 12(3):11-12.

6. Langer E, Avorn J.  Impact of the psychosocial environment of the elderly on behavioral and health outcomes.  In:  Chellis R, Seagle J, eds.  Congregate housing for older people.  Lexington, MA:  D.C. Heath and Co, 1982.

7. Avorn J.  Beyond the bedside:  The social context of geriatric practice.  In: Rowe J and Besdine R, eds.  Health and disease in old age.  Boston: Little, Brown and Co., 1982.

8. Avorn J, Lamy P, Vestal R.  Prescribing for the elderly.  Patient Care 1982; 16(12):14-62.

9. Avorn J.  Needs, wants, demands, and interests: Their intersection in medical practice and health policy.  In: Bayer R, ed.  In search of equity.  New York:  Plenum Press, 1983.

10. Avorn J.  Biomedical and social determinants of cognitive impairment in the elderly.  J Am Geriat Soc 1983; 31(3):137-143.

11. Avorn J.  Medications and the elderly: Testimony before a joint session of the Committees on Aging of the U.S. Senate and House of Representatives.  In: The Congressional Record.  Washington, DC: Government Printing Office, 1983; S Hrg 98-392:50-57, 75, 82-84.

12. Avorn J, Soumerai SB.  A new approach to reducing sub-optimal drug use (editorial).  JAMA 1983; 250:1752-1753.

Confidential-Subject to Protective Order

13. Avorn J.  Containing the costs of improper prescribing.  Business and Health 1984; 1(4):35-39.

14. Avorn J.  Geriatric drug epidemiology and health services research based on large-scale computerized datasets.  In: Moore SR, Teal TW, eds.  Geriatric drug use: Clinical and social perspectives.  New York: Pergamon Press, 1985.

15. Avorn J.  Medicine, health, and the geriatric transformation.  Daedalus: J Am Acad Art Sci 1986; 115:211-225.  Reprinted in: Pifer A and Bronte L, eds.  Our aging society:  Paradox and promise.  New York:  W. W. Norton, 1986.

16. Avorn J.  The prescribing practices of physicians.  In: Maronde R, ed.  Clinical pharmacology and therapeutics.  New York: Springer Verlag, 1986.

17. Everitt DE, Avorn J.  Drug prescribing for the elderly.  Arch Int Med 1986; 146:2393-2396.

18. Avorn J.  Prescription medication use in geriatrics: Economic considerations.  Testimony before the Select Committee on Aging, U.S. House of Representatives.  In: The Congressional Record.  Washington, D.C.:  Government Printing Office, 1986.

19. Pindyck J, Avorn J, Cleary P, et al.  Notification of anti-LAV/HTLV-III positive blood donors:  Psychosocial, counseling and care issues.  In: Petricciana JA, ed.  AIDS: The Safety of Blood and Blood Products.  New York:  John Wiley & Sons, 1987.

20. Avorn J, et al.  Information and education as determinants of antibiotic use.  Rev Infec Dis 1987; 9(3):S286-S296.

21. Everitt DE, Avorn J.  Accidents and therapeutic prescription drugs.  Public Health Reports 1987; 102(6):620-622.

22. Avorn J.  Pharmacology and geriatric practice.  Clin Pharmacol Ther 1987; 42(6):674-676.

23. Soumerai S, Quick J, Avorn J.  Changing the unchangeable:  Principles and experiences in improving prescribing accuracy.  World Pediatrics and Child Care 1987; 3:287-291.

24. Avorn J.  Adverse medication reactions, drug epidemiology, and the care of the elderly.  Testimony before the Special Committee on Aging, U.S. Senate.  In:  The Congressional Record.  Washington, D.C.:  Government Printing Office, 1988.

25. Avorn J.  Geriatric pharmacology.  In:  Rowe JW, Besdine R, ed.  Geriatric Medicine.  Boston:  Little, Brown and Co., 1988.

Confidential-Subject to Protective Order

26. Avorn J, Soumerai SB, Salem SR, Popovsky M.  Documenting and correcting inappropriate use of blood products.  In: Kurtz SA, Summers S. eds.  Improving Transfusion Practice.  Arlington, VA: American Association of Blood Banks, 1989:21-30.

27. Avorn J.  Detection and prevention of drug-induced illness.  J Clin Res Drug Dev 1989; 3:5-13.

28. Avorn J, Gurwitz J.  Principles of pharmacology.  In: Cassel C, Riesenberg D, eds.  Geriatric Medicine (2nd edition).  New York: Springer-Verlag, 1990.

29. Everitt DE, Avorn J.  Systemic effects of medications used to treat glaucoma.  Ann Intern Med 1990; 112:120-125.

30. Gurwitz J, Avorn J.  Old age: Is it a risk for adverse drug reactions?  Agents and Actions (Supplement) 1990; 13-25.

31. Gurwitz J, Soumerai SB, Avorn J.  Improving medication prescribing and utilization in the nursing home.  J Am Geriat Soc 1990; 38:542-552.

32. Avorn J. Clinical geriatrics and life care: Ethical and health policy considerations. In: Chellis RD, Grayson PJ, eds. Life care: A long-term solution? Lexington, Mass: D.C. Heath, 1990.

33. Soumerai SB, McLaughlin TJ, Avorn J. Quality assurance for drug prescribing. Qual Assur Hlth Care 1990; 2:37-58.

34. Avorn J.  The elderly and drug policy: Coming of age.  Health Affairs 1990; 9:6-19.

35. Avorn J.  The role of medications.  In: Berg R, Cassell J, eds.  Health promotion and disability prevention in the second fifty: Report of a Committee of the Institute of Medicine.  Washington, D.C.:  National Academy Press, 1990.

36. Avorn J.  Claims data as a resource for pharmaco-epidemiology (editorial).  Epidemiology 1990; 1:98-100.

37. Avorn J.  Reporting drug side effects: signals and noise (editorial).  JAMA 1990; 1:98-100.

38. Avorn J.  Epidemiology in Plato's cave: Claims data and clinical reality (editorial). J Clin Epi 1991; 44:867-869.

39. Avorn J et al. Intervention: The use of drug utilization review outcomes. Clin Pharmacol Therap 1991; 50:633-635.

51

Confidential-Subject to Protective Order

40. Avorn J.  Pedagogic interventions in medication use. In: Wessling A (ed).  Auditing drug therapy.  Stockholm: Apoteksbolaget, 1992.

41. Avorn J, Monane M.  Documenting, understanding, and fixing psychoactive drug use in the nursing home.  Annu Rev Gerontol Geriat 1992; 12:163-82.

42. Avorn J.  Improving the quality and cost-effectiveness of prescribing. Pharmacoeconomics 1992; Suppl 1:45-48.

43. Monane M, Gurwitz JH, Monane S, Avorn J.  Compliance issues in medical practice. Hosp Phys 1993: 29(4):35-39.

44. Monane M, Gurwitz JH, Avorn J.  Pharmacotherapy with psychoactive medications in the long-term care setting: Challenges, management, and future directions. In: Smyer M, ed.  Mental Health and Aging. New York: Springer Publishing Company, 1993.

45. Bohn RL, Avorn J.  Cost-effectiveness - can it be measured? Semin Hematol 1993; 30 (3) suppl 2:20-23.

46. Kalish S, Gurwitz JH, Avorn J.  Anticoagulant therapy in the elderly.  Primary Cardiology 1993; 19:34-42.

47. Ray W, Griffin M, Avorn J.  Evaluating drugs after approval for clinical use.  N Engl J Med 1993; 329:2029-2032.

48. Gurwitz JH, Monane M, Avorn J.  Polypharmacy and appropriate prescribing.  In: Reuben DB, Yoshikawa TT, eds.  Geriatrics Review Syllabus: A Core Curriculum in Geriatric Medicine, second edition.  New York: American Geriatrics Society, 1993.

49. Gurwitz JH, Monane M, Avorn J.  Principles of pharmacology. In: Reuben DB, Yoshikawa TT, eds.  Geriatrics Review Syllabus: A Core Curriculum in Geriatric Medicine, second edition. New York: American Geriatrics Society, 1993.

50. Avorn J.  Comparative data on the effectiveness of drugs and devices: A pressing need of doctors, patients, and payors. Testimony before the House Subcommittee on Regulation, Business Opportunities, and Technology.  In: The Congressional Record. Washington, D.C.: Government Printing Office, 1993.

51. Avorn, J.  Balancing costs, efficacy, and side effects.  PharmacoEconomics 1994; 6:63-66.

52. Bohn RL, Avorn J.  Reimbursement for hemophilia care in the United States: Current policies and future considerations.  Semin Hematol 1994; 31 (2) suppl 2:26-28.

Confidential-Subject to Protective Order

53. Monane M, Gurwitz JH, Avorn J.  Medication use and the elderly (review).  The Gerontologist 1994; 34:272-274.

54. Avorn J.  Medications and the elderly: current status and opportunities.  Health Affairs 1995; 14:276-278.

55. Avorn J.  Bringing science to the bedside: A prerequisite for quality of care and cost containment in treating the nation's elderly.  Testimony before the Select Committee on Aging, U.S. Senate.  Washington, DC: Government Printing Office, 1995.

56. Monette J, Gurwitz JH, Avorn J.  Epidemiology of adverse drug events in the nursing home setting.  Drugs and Aging 1995; 7:203-211.

57. Avorn J.  The prescription as final common pathway.  Intl J Technol Assess Hlth Care 1995; 11(3):384-390.

58. Avorn J.  Drug regulation and drug information -- Who should do what to whom?  (editorial) Am J Publ Hlth 1995; 85:18-19.

59. Avorn J.  Are we treating people well?  [Outcomes research, cost-effectiveness, and the federal health budget]  (op-ed article) The Washington Post, May 28, 1995.

60. Avorn J.  Practice-based outcomes research: crucial, feasible, and neglected (editorial).  Pediatrics 1996; 97:113-114.

61. Avorn J, Gurwitz JH.  Principles of pharmacology.  In: Geriatric Medicine, Third Edition.  Cassel CK, Cohen G, Larsen E, et al (eds.)  New York: Springer-Verlag 1996.

62. Avorn J.  Drug use in academic medical centers in an era of ferment.  Pharmaco-economics 1996; 10:124-129.

63. Avorn J.  The effect of cranberry juice on the presence of bacteria and white blood cells in the urine of elderly women.  What is the role of bacterial adhesion?  Adv Exp Med Biol 1996; 408:185-186.

64. Andrews EB, Avorn J, Bortnichak EA, et al.  Guidelines for good epidemiology practices for drug, device, and vaccine research in the United States. Pharmacoepidem Drug Safety 1996; 5:333-338).

65. Gurwitz JH, Monane M, Monane S, Avorn J.  Polypharmacy.  In: Quality Care for the Nursing Home Resident.  Lipsitz L, Morris JN (eds.); Mosby Lifeline, Hanover, MD, 1996.

Confidential-Subject to Protective Order

66. Monane M, Avorn J.  Medications and falls; causation, correlation, and prevention.  Clinics in Geriatric Medicine 1996; 12:847-858.

67. Avorn J.  Putting adverse drug events into perspective (editorial). JAMA 1997; 277:341-342.

68. Avorn J, Salzman C.  Prescribing of psychotropic drugs for the elderly:  Epidemiologic and policy considerations.  In: Salzman C, (ed.)  Clinical Geriatric Psychopharmacology, 3rd Edition.  New York: McGraw Hill 1977.

69. Gurwitz JH, Rochon P, Avorn J.  Optimizing drug therapy in the elderly.  P & T 1997; 331-347.

70. Agretelis J, Avorn J, Blatt CM, et al. For our patients, not for profits: A call to action.  JAMA 1997;278:1733-1738.

71. Avorn J.  Including the elderly in clinical trials (editorial). Brit Med J 1997; 315:1033-1034.

72. Avorn J.  Depression in the elderly -- falls and pitfalls (editorial).  N Engl J Med 1998; 339: 918-920.

73. Knight EL, Avorn J.  Use and abuse of drugs in older persons.  The Gerontologist 1999; 39:109-111.

74. Knight E, Avorn J.  Urinary tract infections in the elderly.  In: UTIs in the female.  Stanton W (ed.).  London: Martin Dunitz Publishers, 2000.

75. Avorn J.  Post-modern drug evaluation and the deconstruction of evidence-based regulation.  Pharmaco-economics 2000; 18 suppl 1:  15-20.

76. Avorn J, Barrett JF, Davey PG, McEwen SA, O'Brien TF, Levy SB. World Health Organization Global Strategy for Containment of Antimicrobial Resistance: Synthesis of Recommendations by Expert Policy Groups.  Geneva: World Health Organization, 2001.

77. Avorn J.  Unhealthy aging:  Functional and socioeconomic impact.  Eur Heart J 2001; 3 suppl N:N3-5.

78. Avorn J.  Improving medication use in the elderly: Getting to the next level (editorial).  JAMA 2001; 286:2866-2868.

79. Avorn J. Drug risks. In: Drug Benefits and Risks, ed. C.J. van Boxtel. Sussex (England): John Wiley & Sons, 2001.

80. Partridge AH, Avorn J, Wang PS, Winer EP.  Adherence to therapy with oral antineoplastic agents.  J Natl Cancer Inst 2002; 94:652-661.

Confidential-Subject to Protective Order

81. Wang PS, Walker AM, Avorn J.  The pharmacoepidemiology of psychiatric medications.  In:  Tsuang MT, Tohen M, eds.  Textbook of psychiatric epidemiology, second edition.  Wiley, New York, 2002.

82. Schneeweiss S, Maclure M, Dormuth C, Avorn J: Pharmaceutical cost containment with reference pricing: Time for refinements. Can Med Assoc J 2002; 167:1250-1251.

83. Avorn J. Balancing the cost and value of medications: the dilemma facing clinicians. Pharmacoeconomics 2002; 20 suppl 3: 67-72.

84. Schneeweiss S, Maclure M, Dormuth C, Avorn J: Pharmaceutical cost containment with reference pricing: time for refinements. Can Med Assoc J 2002;167:1250-1251.

85. Avorn J, Gurwitz JH, Rochon P.  Principles of pharmacology.  In:  Geriatric Medicine, 4th edition.  Cassel C et al, eds.  New York:  Springer, 2003, pp. 65 – 81.

86. Ray WA, MacDonald TM, Solomon DH, Graham DJ, Avorn J. COX-2 selective non-steroidal anti-inflammatory drugs and cardiovascular disease. Pharmacoepidemiol Drug Safety 2003; 12: 67-70.

87. Avorn J, Wang PS. Prescribing psychotropic drugs for the elderly: Epidemiologic and policy considerations. In: Salzman, C, ed. Clinical Geriatric Psychopharmacology, 4th edition. New York: McGraw-Hill (in press).

88. LeLorier J, Vander Stichele RH, Avorn J, Beard K, Hallas J, Henry DA. Bringing epidemiology into drug utilization research. Pharmacoepidemiol Drug Saf 2003; 12: 153-156.

89. Wang PS, Schneeweiss S, Avorn J: Recent developments in psychopharmacoepidemiology. Curr Opin Psychiat 2003 (in press).

90. Ray WA, MacDonald TM, Solomon DH, Graham DJ, Avorn J. COX-2 selective non-steroidal anti-inflammatory drugs and cardiovascular disease. Pharmacoepidemiol Drug Saf 2003; 12: 67-70.

91. Solomon DH, Avorn J. Pharmacoepidemiology and rheumatic diseases. Curr Opin Rheumatol 2003; 15: 122-126.

92. Avorn J. Advertising and prescription drugs: promotion, education, and the public's health. Health Affairs 2003; W3:104-108.

Confidential-Subject to Protective Order

**CORRESPONDENCE:**

1.      Avorn J, Soumerai SB.  Changing patterns of drug prescription.  N Engl J Med 1983.

2.      Soumerai SB, Avorn J.  Physician education and cost containment.  JAMA 1985; 253:13.

3.      Avorn J, Everitt DE.  Beta-blockers and depression.  JAMA 1986; 255:3249-3250.

4.      Soumerai SB, Avorn J.  Changing prescribing practices through individual continuing education.  JAMA 1987; 257:487.

5.      Avorn J, Soumerai SB.  Psychoactive medication in rest homes.  N Engl J Med 1989; 321:54-55.

6.      Avorn J.  Use of psychoactive drugs in nursing homes.  N Engl J Med 1992; 327:1392-3.

7.      Avorn J, Monane M, Gurwitz, JH, Glynn RJ, Choodnovskiy I, Lipsitz LA. Reduction of bacteriuria and pyuria using cranberry juice.  JAMA 1994; 272:589.

8.      Monane M, Bohn RL, Gurwitz JH, Glynn RJ, Avorn J.  Heart failure and noncompliance in the elderly.  Arch Int Med 1994; 154:2109-10.

9.      Dillon K, Putnam K, Avorn J.  Death from irreversible pulmonary hypertension associated with short-term use of fenfluramine and phentermine.  JAMA 1997; 278:1320.

10.     Avorn J.  Acetaminophen toxicity in an urban county hospital.  N Engl J Med 1998; 338:543-544.

11.     Avorn J. Drug use and the elderly. Wall Street Journal, July 2001.

12.     Solomon DH, Glynn RJ, Avorn J.  Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease.  Lancet 2002; 360: 90.

13.     Solomon DH, Avorn J. Do gastroprotective drugs prevent NSAID toxicity? J Rheumatol 2003; 30:203.

14.     Winkelmayer W, Avorn J. Stable creatinine clearance using large-dose hetastarch versus reduced GFR. Kidney Int 2000; 65: 1111-1112.

15.     Solomon DH, LaValley MP, Wang PS, Avorn J. What are the real effects of the arthritis self-management program on pain and disability? (reply) Arthritis Rheum 2004;50:1012-1013.

Confidential-Subject to Protective Order

Confidential-Subject to Protective Order

**EDUCATIONAL MATERIALS AND CLINICAL COMMUNICATIONS**

*The following physician education materials ("unadvertisements") were created as part of the first randomized controlled study of "academic detailing" (NEJM 1983). They have been widely disseminated since.*

"Vasodilators and intermittent claudication"

"Cerebral blood flow and senile dementia"

"The limited analgesic effects of Darvon"

"Rational management of uncomplicated urinary tract infection"

"Cost implications of commonly used antibiotics"

*As part of that program, educational materials for laypersons were also produced, for physicians to distribute to their patients instead of unnecessary prescriptions. These too have had widespread distribution nationally in programs designed to reduce unnecessary medication use:*

"Common sense about the common cold"

"Exercise and 'bad circulation'"

"Why your doctor recommended 'plain aspirin'"

"Improving mental function in the elderly"

*The following materials were written for the Beth Israel Hospital drug information program during the period 1982-1990, with the assistance of other BI faculty.  The effect on prescribing of the structured antibiotic order form and the educational materials used with it is described in Avorn et al, Arch Int Med 1988.*

Structured antibiotic order form with information on drug choice, bacterial sensitivities, and pharmacokinetics

"Clindamycin:  Proper use of the hospital's costliest drug"

"Oral metronidazole:  A first consideration in anaerobic infections"

"The vancomycin avalanche:  Improving utilization of a crucial drug"

"Ciprofloxacin:  A potent new oral antibiotic"

"Triazolam:  A forgettable drug?"

58

Confidential-Subject to Protective Order

"Cefazolin:  A Q8H antibiotic"

"I.V.$H_2$ blockers:  Too much of a good thing?"

*Nursing Home Psychoactive Drug Education Project:  These materials were written for the randomized controlled trial of academic detailing in long-term care facilities, described in Avorn et al, NEJM 1992.  Since then, they have been distributed as part of educational programs in geriatric psychopharmacology throughout the country.*

Antipsychotic medications, tardive dyskinesina, and Parkinson's disease

Sedative-hypnotic use and sleep in the elderly

Anticholinergic side effects and tricyclic antidepressants

Medications as a cause of urinary incontinence

Unwanted sedation with neuroleptic use

Side effects of sedatives in the elderly:  confusion, letharghy, falls, and disorientation

*The following booklets were produced through the BWH Medication Education and Management Committee, with the participation of other faculty at BWH.  Dr. Avorn defined the topic and overall content of each booklet, and edited each:*

"$H_2$ blockers" (1993)

"Ketorolac:  Novel analgesic or just another NSAID?"  (1994)

"Ofloxacin:  BWH's new fluoroquinolone" (1995)

"Rational use of second and third generation cephalosporins" (1995)

"Treating supraventricular tachyarrhythmias" (1995)

"Neuromuscular blocking agents in the intensive care unit" (1995)

"Anti-secretory agents" (1997)

*From 1998 to the present, initiated and served as series editor for the following materials produced with BWH faculty for the Hospital's Medication Education Program. Most of these are also posted on the Partners Handbook website.*

Glycoprotein IIb/IIIa inhibitors and low-molecular weight heparin: a rational approach to new treatment for ischemic heart disease (December 1998)

59

Confidential-Subject to Protective Order

GCSF does not improve patient outcomes in febrile neutropenia (January 1999, rev. June 2002)

Reassessing albumin use (June 1999, rev. February 2002), including a clinical algorithm flowsheet.

COX-2 inhibitors: Who *really* needs them? (March 2001, rev.April 2003)

The emerging threat of bacterial resistance (July 2001, rev. October 2002)

When p.o. is just as good as i.v.(July 1999)

H2 Blockers and proton pump inhibitors: reducing acid rationally (August 1999)

Optimal fluconazole use: Coping with the ambiguity of fungal culture results (February 2001, rev. February 2003)

Oral hypoglycemic agents (January 2000)

Drugs and the elderly: Wielding the double-edge sword (September 2001)

Linezolid (Zyvox): a new antibiotic class to treat resistant Gram-positive organisms (June 2000)

Digesting the new data on acid reduction: a neutral view (September 2000, rev. July 2002)

Rational management of agitation in the elderly and acutely ill: a brief orientation (October 2000)

Boosting the 'crit: Optimal use of erythropoietin (January 200, rev. 2003)

A new perspective on severe sepsis  (April 2001)

Getting the straight DOPE on drugs at the Brigham: *D*ata *O*n *P*rescribing *E*ffectively, from the *D*ivision *O*f *P*harmaco-*E*pidemiology (June 2001)

Saving vancomycin (September 2001, rev. November 2002)

Levofloxacin: too broad-spectrum? (September 2001)

Ceftazidime's limited uses (September 2001, rev. October 2002)

New treatment for severe septic shock: Promising benefits, important risks (Nov 2001)

First-line antibiotic therapy (May 2002)

Transfusion guidelines: Proper use of a precious resource (June 2003)

Managing diabetes in hospitalized patients (June 2003)

60

Confidential-Subject to Protective Order

Antifungal therapy: Phases of treatment (August 2003)

Confidential-Subject to Protective Order

**Exhibit B - Avorn Deposition Excerpts**

• **Smith - Avorn Motion**

[433:1] - [433:23]    6/16/2006   Avorn, Jerry (Barnett)

```
page 433
1                        UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA
2                         MDL DOCKET NUMBER:  1657
                                   SECTION L
3
         In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4        GERALD BARNETT AND CORRINE BARNETT,
5               Plaintiffs,
6             VS                          CIVIL ACTION NUMBER:
                                          2:06cv485
7        MERCK & CO., INC.,
8               Defendant.
         ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
9
                              CONTINUING DEPOSITION OF
10
                              JERRY AVORN, M.D.
11
                                   VOLUME II
12
                              June 16, 2006
13                             8:38 a.m.
14                       Sheraton Boston Hotel
                          39 Dalton Street
15                       Boston, Massachusetts
16       Laurie J. Driggers, Notary Public, Certified Shorthand Reporter, Realtime
         Professional Reporter
17       and Certified Realtime Reporter within and for the Commonwealth of Massachuset
18
19
20
21
22
23
```

[453:12] - [453:23]    6/16/2006   Avorn, Jerry (Barnett)

```
page 453
12   Q.   Dr. Avorn, you remember yesterday
13   we were talking about a number of
14   documents written by Dr. Scolnick or Dr.
15   Musliner or Dr. Reicin, internal Merck
16   documents that you're relying on for your
17   opinions, right?
18   A.   Yes.
19   Q.   Am I right, sir, that you don't
20   have any personal knowledge of the facts
21   described in those documents; you're just
22   relying on those documents, true?
23   A.   Correct.
```

[454:10] - [455:4]    6/16/2006   Avorn, Jerry (Barnett)

```
page 454
10   A.   I have, indeed, read Dr. Ray's
11   report --
12   Q.   Mm-hmm.
13   A.   -- and been impressed by it.  And
14   I believe that my awareness of Dr.
15   Kronmal's analysis of the Alzheimer's data
16   was as it was reported in Dr. Ray's
17   report, as well as -- I think that was my
18   primary awareness of Dr. Kronmal's data.
```

**Exhibit B - Avorn Deposition Excerpts**

• **Smith - Avorn Motion**

```
19      So, yes, I did read it.  I did
20  take it seriously, and it did inform me
21  about the Kronmal evaluation of the
22  Alzheimer data.
23  Q.    As I understand your testimony, Dr.
24  Avorn, you are relying on a portion of Dr.
page 455
1   Ray's expert report where he describes an
2   analysis that was conducted by another
3   plaintiff's expert witness, Dr. Kronmal?
4   A.    That's correct.
```

[455:5] - [455:21]        6/16/2006    Avorn, Jerry (Barnett)

```
page 455
5   Q.    I'm right, though, sir, that you
6   don't identify and the plaintiffs' lawyers
7   in this case didn't identify either Dr.
8   Ray's report or Dr. Kronmal's report on
9   the list of materials you considered in
10  forming your opinions?
11  A.    Okay.  The list was prepared by
12  plaintiffs' counsel, and --
13  Q.    I can represent to you I've looked
14  at it, and there's no reference to Dr. Ray
15  or Dr. Kronmal.
16  A.    No, I understand that.  But I'm
17  saying having not prepared this list, I'm
18  telling you that I did read and believe
19  Dr. Ray's expert testimony.  And if it was
20  not listed as a report transmitted to me,
21  I think that was an omission by counsel.
```

[504:21] - [505:7]        6/16/2006    Avorn, Jerry (Barnett)

```
page 504
21  Q.    What are you relying on for your
22  opinion that there was an increase in
23  mortality between Vioxx and placebo in the
24  Alzheimer's trials, sir?
page 505
1   A.    I honestly can't remember what the
2   source was, but I believe that they were
3   sources apart from Dr. Ray and Dr. Kronmal
4   in the reporting of the mortality data
5   from the Alzheimer's studies.  And I
6   simply can't remember where I got that
7   from.
```

[678:5] - [678:10]        6/16/2006    Avorn, Jerry (Barnett)

```
page 678
5   Q.    Have you ever approved a label as
6   an FDA employee, sir?
7   A.    No.
8   Q.    Have you ever prepared a label as
9   an employee of a pharmaceutical company?
10  A.    No.  Thank goodness.
```

[696:8] - [696:18]        6/16/2006    Avorn, Jerry (Barnett)

```
page 696
8   Q.    And you don't know the
9   circumstances about why Merck decided that
10  the cardiovascular information is more
11  properly in the precaution section, right?
12  A.    Do I know why Merck made a given
```

Exhibit B - Avorn Deposition Excerpts

• **Smith - Avorn Motion**

```
                    13  decision?
                    14  Q.    Mm-hmm.
                    15  A.    I have my opinion about that, but I
                    16  do not have personal experience from
                    17  having been in the company when the
                    18  decision was made.
```

[758:13] - [759:7]     6/16/2006   Avorn, Jerry (Barnett)

```
                    page 758
                    13  Q.    Have you done any research studying
                    14  the reasons why doctors who prescribe
                    15  Vioxx made a decision to prescribe it?
                    16  A.    No.
                    17  Q.    And you can't say, sir, for any
                    18  given doctor in any of the Vioxx cases in
                    19  which your deposition might be played
                    20  whether the doctors who prescribed the
                    21  plaintiffs Vioxx did so because of
                    22  interactions they had with sales
                    23  representatives or advertisements that
                    24  Merck prepared, true?
                    page 759
                    1   A.    I have done research and published
                    2   a paper on doctors' influences in terms of
                    3   scientific versus commercial influences,
                    4   and demonstrated that commercial influences
                    5   are important drivers of what doctors
                    6   prescribe.  It did not involve Vioxx as a
                    7   drug.
```

[771:1] - [771:24]     6/16/2006   Avorn, Jerry (Barnett)

```
                    page 771
                    1        COMMONWEALTH OF MASSACHUSETTS
                    2
                    3    I, LAURIE J. DRIGGERS, a Certified
                    4   Shorthand Reporter and Notary Public in
                    5   and for the Commonwealth of Massachusetts,
                    6   do hereby certify that the witness whose
                    7   deposition is hereinbefore set forth, was
                    8   duly sworn and that such deposition is a
                    9   true record of the testimony given by the
                    10  witness.
                    11   I further certify that I am neither
                    12  related to or employed by any of the
                    13  parties in or counsel to this action, nor
                    14  am I financially interested in the outcome
                    15  of this action.
                    16   In witness whereof, I have hereunto set
                    17  my hand and seal this    day of
                    18  2006.
                    19
                    20
                    21
                    22    Laurie J. Driggers, CSR, RPR, CRR
                    23  Notary Public
                    24  My commission expires October 16, 2009
```

**Exhibit C - Avorn Deposition Excerpts**

• **Smith - Avorn Motion**

[1:] - [1:24]          6/15/2006    Avorn, Jerry (Barnett)

```
page 1
    0001
1                                   UNITED STATES DISTRICT COURT
                                    EASTERN DISTRICT OF LOUISIANA
2                                     MDL DOCKET NUMBER:  1657
                                            SECTION L
3
              In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4             GERALD BARNETT AND CORRINE BARNETT,
5                   Plaintiffs,
6             vs.                                CIVIL ACTION NUMBER:
                                                   2:06cv485
7             MERCK & CO., INC.,
8                   Defendant.
              ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
9
                                       DEPOSITION OF
10
                                    JERRY AVORN, M.D.
11
                                     June 15, 2006
12                                     8:36 a.m.
13                                Sheraton Boston Hotel
                                      39 Dalton Street
14                              Boston, Massachusetts 02199
15            Susan A. Romano, Notary Public, Register Merit Reporter and Certified
               Realtime Reporter within and for the Commonwealth of Massachusetts
    15
16
17
18
19
20
21
22
23
24
```

[24:14] - [24:24]          6/15/2006    Avorn, Jerry (Barnett)

```
page 24
14   Q.   What expert reports have you read,
15   sir, that the plaintiffs' lawyers gave you
16   to read?
17   A.   Okay.  To the best of my
18   recollection, there was one from Dr. Ray,
19   there was one from Dr. Kromholz.  I've
20   seen material from Dr. Kronmal.  I don't
21   know that it was in the form of his
22   report per se, but I'm aware of his work
23   in this case.  I've seen the testimony of
24   Dr. Curfman.
```

[25:23] - [26:12]          6/15/2006    Avorn, Jerry (Barnett)

```
page 25
23   Q.   Which expert reports have you
24   reviewed in the Vioxx litigation, Doctor?
page 26
1    A.   Okay.
2         MR. TISI:  Reviewed or
3    presented?  Your original question was,
4    were you sent any, and then your next
5    question was which ones you have reviewed.
```

**Exhibit C - Avorn Deposition Excerpts**

• **Smith - Avorn Motion**

```
6    He may not have reviewed all we sent him.
7         BY MR. GOLDMAN:
8    Q.   Reviewed.
9    A.   Right.  Reviewed Dr. Ray's,
10   reviewed Dr. Kromholz's, and reviewed
11   material from Dr. Kronmal, but not -- I
12   don't believe the report itself.
```

[31:8] - [31:21]         6/15/2006   Avorn, Jerry (Barnett)

```
page 31
8    Q.   What material of Dr. Kronmal's did
9    you review?
10   A.   Analyses of data, as I recall,
11   particularly related to the Alzheimer's
12   study, in terms of the outcomes in that
13   trial -- in those trials.
14   Q.   Are you relying on anything Dr.
15   Kronmal prepared in your opinions?
16   A.   Yes.
17   Q.   What are you relying on?
18   A.   The analyses.  And they were the
19   most -- they were reflected in Dr. Ray's
20   expert opinion as well of Dr. Kronmal's
21   analyses of the Alzheimer's data.
```

[56:22] - [57:1]         6/15/2006   Avorn, Jerry (Barnett)

```
page 56
22   Q.   You wouldn't consider yourself to
23   be an expert in the state of mind of a
24   pharmaceutical company, right?
page 57
1    A.   Right.
```

[59:13] - [60:12]        6/15/2006   Avorn, Jerry (Barnett)

```
page 59
13   Q.   So I take that to mean you don't
14   consider yourself an expert in determining
15   pharmaceutical companies' intent?
16   A.   Well, I think that's a very
17   problematic question for a lot of ways.
18   One is there are no standards for
19   determining expertise, and it's not like
20   you're board certified in pharmaceutical
21   company intent.
22        Secondly, the concept of intent
23   implies knowing something about the
24   intrapsychic processes of a company, and
page 60
1    companies don't have intrapsychic
2    processes.
3        So I think one can look at
4    behaviors of individuals in companies, and
5    one can make very plausible conclusions
6    about the goals that those behaviors were
7    designed to achieve.
8        But the way you phrased it, since
9    nobody can get inside the head of a
10   company, since companies don't have heads,
11   no one can be an expert in that, the way
12   you phrased the question.
```

[164:20] - [165:4]       6/15/2006   Avorn, Jerry (Barnett)

```
page 164
```

Exhibit C - Avorn Deposition Excerpts

• **Smith - Avorn Motion**

```
20   Q.   Can you say, sir, under oath, that
21   you are aware of what the doctors who are
22   treating -- were treating the patients in
23   the Vioxx litigation knew, actually knew,
24   about the potential cardiovascular effects
page 165
1    of Vioxx?
2                 MR. TISI:  Objection.
3    A.   Of course I can't get into the head
4    of a given doctor that I've never met.
```

[180:2] - [180:14]      6/15/2006   Avorn, Jerry (Barnett)

```
page 180
2                 When you say that you were asked to
3    assess the methods by which Merck
4    evaluated and managed the cardiovascular
5    issue during the time that Vioxx was
6    developed and while it was on the market,
7    are you basically offering your opinion
8    about what Merck knew about any potential
9    cardiovascular risks, what Merck did or
10   didn't do in response to what you believe
11   they knew, and whether you believe that
12   Merck's actions or inactions were
13   reasonable?
14   A.   Correct.
```

[191:7] - [191:15]      6/15/2006   Avorn, Jerry (Barnett)

```
page 191
7    Q.   What statistics have you applied to
8    demonstrate that Merck's conduct concerning
9    Vioxx was unreasonable?
10   A.   Well, it's not like there's a
11   statistical test for reasonable behavior.
12   But what I mean is that there -- in
13   looking at study results, one needs to
14   know enough statistics to be able to
15   interpret the importance of the findings.
```

[192:17] - [193:17]      6/15/2006   Avorn, Jerry (Barnett)

```
page 192
17   Q.   Do you believe that jurors are
18   capable of evaluating Merck's conduct in
19   coming to a conclusion about whether
20   Merck's conduct was reasonable or
21   unreasonable?
22   A.   In some ways yes and in some ways
23   no, and let me explain.  They would not
24   be able to understand what acceptable
page 193
1    standards of behavior in the medical
2    community are because they're not doctors,
3    or about interpreting the meaning of
4    certain findings because they're not
5    pharmacoepidemiologists.  So there are some
6    important technical things which a juror,
7    on his or her own, could not be able to
8    interpret.
9                 And then there are other things
10   which any person with common sense can
11   interpret, as in if you saw a particular
12   signal of a problem what would a
13   reasonable company do.  So there's --
14   There's the two kinds.
```

### Exhibit C - Avorn Deposition Excerpts

• **Smith - Avorn Motion**

```
15        And the latter I think a juror
16 could handle on their own.  The former, I
17 think, requires some expert interpretation.
```

[279:6] - [279:15]     6/15/2006   Avorn, Jerry (Barnett)

```
page 279
6    Q.   Is it your testimony that when
7  Vioxx was on the market, the marketing
8  people believed that Vioxx causes heart
9  attacks?
10   A.   I can't indicate what people
11 believed or didn't believe.  What I can
12 indicate is that there was information
13 available to Merck, because Merck generated
14 most of it, indicating a higher risk of
15 heart attacks in people taking its drug.
```

[326:23] - [327:2]     6/15/2006   Avorn, Jerry (Barnett)

```
page 326
23   Q.   Have you ever worked for the FDA as
24 an employee?
page 327
1    A.   I've been on advisory committees,
2  but I've not been an employee.
```

[428:1] - [429:1]     6/15/2006   Avorn, Jerry (Barnett)

```
page 428
1             CERTIFICATE
2       COMMONWEALTH OF MASSACHUSETTS
3             SUFFOLK SS.
4   I, SUSAN A. ROMANO, Certified Shorthand
5  Reporter No. 119393, Registered Merit
6  Reporter and Notary Public in and for the
7  Commonwealth of Massachusetts, do hereby
8  certify that the witness whose deposition
9  is hereinbefore set forth, was duly sworn
10 and that such deposition is a true record
11 of the testimony given by the witness.
12  I further certify that I am neither
13 related to or employed by any of the
14 parties in or counsel to this action, nor
15 am I financially interested in the outcome
16 of this action.
17  In witness whereof, I have hereunto set
18 my hand and seal this 19TH day of June
19 2006.
20 .
21 .
22
23
24   Susan A. Romano, Notary Public
page 429
1    My commission expires April 21, 2006
```