**Expert Report of Cornelia Pechmann**

**I, Cornelia Pechmann, declare as follows:**

1.  My name is Dr. Cornelia (Connie) Pechmann. I am a full professor of marketing with
    tenure at The Paul Merage School of Business, University of California, Irvine
    (U.C.I.). I have been a faculty member at U.C.I. since 1988. I have a PhD in
    Marketing Management, a Masters Degree in Business Administration (M.B.A.) and
    a Masters Degree in Psychology, all from Vanderbilt University in Nashville,
    Tennessee. My PhD dissertation, on comparative advertising effects, was awarded the
    national Alden G. Clayton dissertation award in 1987. My Bachelors Degree is from
    Bucknell University in Lewisburg, Pennsylvania, where I majored in Psychology and
    Spanish and I graduated Summa Cum Laude. I grew up in Binghamton, New York.

2.  I am an expert in integrated marketing communications campaigns. By integrated
    marketing communications campaign, I mean: "a concept of marketing
    communications planning that recognizes the added value of a comprehensive plan
    that evaluates the strategic roles of a variety of communications disciplines – for
    example, general advertising, direct response, sales promotion and public relations –
    and combines these disciplines to provide clarity, consistency, and maximum
    communications' impact through the seamless integration of discrete messages."
    (American Association of Advertising Agencies, cited in Kotler's Marketing
    Management 9th Edition, 1997, p. 630; Exhibit 1,). From 1998 to 2004, I assisted with
    the largest integrated social marketing communications campaign in U.S. history, the
    U.S. Office of National Drug Control Policy's National Youth Anti-Drug Media

1



Campaign. Specifically, I worked about one day a week as a consultant to the advertising agency that was responsible for the Anti-Drug campaign, Ogilvy & Mather. I was involved in virtually all aspects of the campaign including strategic planning, message development, and advertising research. I developed the method for and oversaw the advertising copy test research that was used to pretest all of the ads. In addition, I helped to oversee the advertising tracking (monitoring) research that was conducted to measure the effects of the television ads on consumers. I worked as a consultant to the Anti-Drug campaign during approximately the same time frame as the Vioxx campaign. Further, Ogilvy Public Relations which was responsible for Vioxx's public relations campaign is a sister company to the company I worked for, Ogilvy & Mather. Ogilvy & Mather and Ogilvy Public Relations are members of the WPP Group, one of the largest communication services companies in the world.

3. I have served as a consultant or an advisory panel member for several other major integrated marketing communications campaigns, including the campaign used by the U.S. Census Bureau to increase response rates to the 2000 household census, and the youth smoking prevention campaigns of the State of Massachusetts, the State of California, and the University of Vermont.

4. In my academic research, I have developed a national and international reputation for my work on controversial forms of advertising and their effects on consumers. By controversial forms of advertising, I mean advertising that receives a high degree of scrutiny and criticism by the public, nonprofit groups, the press, the courts, and/or the government. I have attained this reputation primarily due to my work in two areas: "comparative advertising" which identifies and attacks competing brands by name

2

using their trademarks, and "tobacco-related advertising" which includes both cigarette advertising by tobacco companies and counter-advertising by health groups. My research on tobacco-related advertising has been funded by six research grants from California's Tobacco Related Disease Research Program.

5. I am an expert in misleading advertising and in the role of the U.S. federal and state governments in identifying and preventing misleading advertising, particularly the FTC (Federal Trade Commission) but also the FDA (Food and Drug Administration). I have published peer-reviewed articles that discuss the FTC's role in identifying and preventing misleading advertising. (See article #13 and article #26 on my Curriculum Vita, which is attached as Exhibit 2.) Also, I helped to prepare the American Psychological Association's response to the FDA's proposed regulations restricting the sale and distribution of cigarettes and smokeless tobacco products to protect children and adolescents. (See Consulting on my Curriculum Vita.)

6. I am an expert in experimental and quasi-experimental research designs and statistics, and I teach a PhD-level course on these topics. Some of the statistical tools and techniques that I teach in this course are: ANOVA, MANOVA, ANCOVA, t-tests, binary logistic regression, odds ratios, chi square tests, z tests, multiple linear regression, reliability analyses, power analyses, repeated measures, statistical significance, p-values, and control or baseline groups. I have employed each of these techniques in my research and I have published articles based on each of these techniques in peer-reviewed marketing and/or public health journals. I also have expertise in factor analysis and cluster analysis.

3

7. I also have expertise in reviewing medical journal articles and reports. I chaired and remain a member of the UCI Council on Research, Computing and Library Resources (CORCLR), which reviews research proposals from the entire campus including the medical school. I was a member and then the vice-chair of the UCI Institutional Review Board (IRB), which reviews research protocols to ensure human subjects are protected. Many of the protocols that I reviewed involved medical research. I am a founding member of, and have received funding from, the UCI TTURC or Transdisciplinary Tobacco Research Center, which facilitates transdisciplinary tobacco research involving neuroscientists, pharmacologists, medical doctors, epidemiologists, psychologists, pubic policy researchers and marketers.

8. I have over 50 refereed publications in academic journals, books and conference proceedings on topics related to advertising and/or consumer behavior. My 2002 Journal of Consumer Research article about cigarette advertising and adolescents was awarded the journal's "best paper in 2002" award. I have been nominated to be the editor of the Journal of Public Policy and Marketing and I have edited a special issue of that journal.

9. I am a member of numerous professional marketing and public health associations including the American Marketing Association, American Public Health Association, American Psychological Association, Association for Consumer Research, Society for Consumer Psychology, and American Academy of Advertising. I serve on the review boards of major academic journals including the Journal of Consumer Research, Journal of Public Policy and Marketing, and Media Psychology. I serve as an ad hoc reviewer for major marketing, medical and public health journals including

Journal of Marketing, Journal of the American Medical Association, and American Journal of Public Health.

10. My Curriculum Vitae which is attached as Exhibit 2 provides additional information about my credentials, including my academic affiliations, awards and honors, courses taught, education, theses, grants, refereed publications, presentations at academic conferences, invited presentations, media coverage of my research, other professional activities, professional affiliations, and consulting.

11. Within the past five years (2001-2006), I was a consultant to Wilmer Cutler Pickering Hale & Dorr in Washington DC on behalf of American Legacy Foundation for a case brought by Lorillard. I also served as a consultant to plaintiff's counsel in two California class action tobacco cases (Daniels and Brown). My other prior service as an expert witness is listed in my Curriculum Vitae.

12. For my work as a consultant on this case, I charge $350 per hour.

13. My report is comprised of two parts. The main body of my report states my opinions regarding Merck's integrated marketing communications campaign for Vioxx and the bases for those opinions. To form my opinions, I reviewed thousands if not tens of thousands of pages of documents provided to me by the law firm of Robinson, Calcagnie & Robinson. These documents were mainly from depositions, deposition exhibits and custodial files associated with Merck's top marketing, sales and public relations executives (e.g., Anstice, Blake, Cannell, Gilmartin, Kaufman, Krahe, McKines, Scolnick, Weiner), Merck's advertising and marketing research firms (e.g., Ogilvy, Millward Brown, DDB, dtw, Impact Rx, Ziment), and Plaintiff Barnett and his physicians. I also spoke to a former Vioxx sales representative.

14. I used my expertise in marketing constructs, marketing research tools, marketing metrics, advertising metrics, pharmaceutical marketing metrics and pharmaceutical marketing terms to formulate my opinions regarding Merck's integrated marketing communications campaign for Vioxx. The lists below provide examples of my areas of expertise.  I also used my statistical expertise (cited above) in formulating my opinions. As a testifying expert, I will use my expertise in these topics to help jurors understand the documents, testimony, strategy and tactics pertaining to Merck's integrated marketing communications campaign for Vioxx. Based on my academic training and my experience both as a teacher and as a consultant, I believe that the jurors will require assistance from someone with knowledge in my areas of expertise to understand the documents, testimony, strategy and tactics pertaining to Merck's integrated marketing communications campaign for Vioxx.  My areas of marketing expertise include the following:

a.  Marketing constructs: Integrated marketing communications, market segmentation, target market or target audience, primary target, secondary target, spillover, untargeted, consumer market map, strategic planning, marketing planning, communications planning, branding, brand differentiation, situational analysis, competitive analysis, profitability analysis, core or primary marketing message, secondary marketing message, reasons to believe, competitive counter-selling, advertising clutter.

b.  Marketing research tools: Consumer tracking, physician tracking, copy testing, concept copy, whitecard concept, storyboard, roughcut or film, blinded vs. branded, verbatim, attribute belief tracking, attribute importance tracking, derived

attribute importance, imagery-behavior assessment, control or baseline group, focus group, consumer panel, physician panel, mall intercept, qualitative research, quantitative research, random digit dialing, diagnostic questions, forced exposure.

c. Marketing metrics: Market share, market size, brand penetration, product class penetration, weekly sales volume, sales volume forecast, launch curve, brand sales gap, brand attribute gap, percentage change versus last period, percentage change versus year ago (yag).

d. Advertising metrics: Unaided and aided advertising recall (or advertising awareness), proven advertising recall, unaided and aided brand recall, share of advertising voice, GRP, TRP, unaided and aided verbatims regarding message recall, preferred concept, emotional claim ranking, functional claim ranking, main (message) stand out, main impression, other impression, total impression (main + other), aided versus unaided impression, attribute rating or belief strength, behavioral intent, net action rate, top box rating, top 2 box rating, advertising norm.

e. Pharmaceutical marketing: patient volume, total patients, new to market (NTM) patients, re-initiated patients, switch volume, physician contact volume or volume of details, share of details (attention), efficacy and safety perceptions, efficacy and safety brand attribute comparisons and gaps.

f. Pharmaceutical marketing terms: PIR = Professional Information Request, OBR = Office Based Representative (physician sales representative), TRx = total prescriptions, NRx = new prescriptions, PCP = primary care physician, QD = once daily, BID = twice daily, TID = three times daily, PRN = as needed, MOA =

7

mechanism of action, DDMAC = FDA Division of Drug Marketing, Advertising and Communication, obstacle handler, obstacle response guide, fair balance, fair balance copy, product claim ad, help-seeking ad, reminder ad, detail piece.

15. In addition, I used my expertise in identifying misleading advertising to formulate my opinions regarding Merck's integrated marketing communications campaign for Vioxx. There is a substantial body of literature and substantial published research on what constitutes misleading advertising, and marketing experts are frequently used to help identify misleading advertising in legal cases, because: "What is truth? That simple, age-old question may elicit a simple answer from some people. But in the real world of complex communications, truth has many levels and involves a number of issues." Hence, the term "misleading" is a term of art in marketing. The standard definition of "misleading" as stated in a major advertising textbook is as follows: "A higher standard of truth than avoiding explicit lies, is providing full information so that the audience can fully understand the limitations of the claim. Failure to provide full information could lead to an understanding that runs contrary to fact. A misleading claim is one that by omission or choice of words suggests a meaning that contradicts fact." (Advertising and Sales Promotion Strategy, Tellis, 1998, page 37; Exhibit 3.) On September 17, 2001 the FDA sent Merck a WARNING LETTER that characterized several of Merck's marketing communications for Vioxx as "false or misleading." Based on the FDA's letter to Merck, the FDA employs a definition of "misleading" that is very similar to the definition I will use. The FDA's WARNING LETTER to Merck stated as follows: "You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were

observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four- to five-fold increase in myocardial infarctions (MIs) [heart attacks] compared to patients on the comparator nonsteroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen). Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic [blood clot-producing] properties." (Exhibit 4, page 1.) The letter also noted: "There are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation [blood clots] is pharmacologically comparable to aspirin or clinically effective in decreasing the risk of MIs [myocardial infarctions]... It is also possible that Vioxx has pro-thrombotic [heart-attack inducing] properties."

16. Appendix A to my report discussed in greater detail my opinion regarding what Merck's marketing executives knew or should have known about Vioxx's potential cardiovascular risk and my bases for that opinion. To form that opinion, I reviewed thousands of pages of documents provided by the law firm of Robinson, Calcagnie &

Robinson on Vioxx's potential cardiovascular risk, some of which are cited in Appendix A. I also used my statistical expertise (cited above) and my academic experience in reviewing medical journal articles and reports.

17. Appendix B to my report discusses the FDA regulations regarding prescription drug advertisements. I reviewed these regulations carefully as I prepared this report. I also spoke to an FDA official.

18. **My overall opinion on this case can be summarized as follows. In a study called VIGOR completed in March 2000, Merck learned that 5 out of every 1000 patients on Vioxx had a heart attack, as compared to 1 patient out of every 1000 on naproxen. In other words, in the VIGOR study, 4,000 people took Vioxx and 20 of them suffered heart attacks; whereas 4,000 people took naproxen and 4 of them suffered heart attacks. Yet Merck sold about 9.5 billion dollars worth of Vioxx primarily in the U.S. but also worldwide from March 2000 until September 2004 when the drug was removed from the market. In 2001, Vioxx was the 8th best selling prescription drug in the U.S. How did Merck sell so much Vioxx, given Vioxx's significant cardiovascular risk potential? Merck devised and implemented an unprecedented integrated marketing communications campaign for Vioxx. The campaign was highly sophisticated, coordinated, and well funded; it was a textbook example of an integrated marketing communications campaign. For instance, in 2001, Merck spent $410 million to market Vioxx in the U.S., including $160 million in direct-to-consumer advertising. Merck's integrated marketing communications campaign for Vioxx was perfect, except on the most important dimension of all: The campaign was**

**misleading. Instead of acknowledging Vioxx's cardiovascular risk potential, the campaign was expressly designed to neutralize concerns about Vioxx's cardiovascular risk potential. As a result, Merck's integrated marketing communications campaign for Vioxx created artificially high demand for Vioxx. Demand for Vioxx was inflated by about $437 million per year, or $1.75 billion over four years, based on Merck's own estimates.**

19. My specific opinions regarding Merck's integrated marketing communications campaign for Vioxx are as follows:

    a.  Plaintiff Barnett's physician Dr. McCaffrey was misled by Merck's integrated marketing communications campaign for Vioxx. Merck's campaign failed to give Dr. McCaffrey adequate warning that Vioxx posed a potential cardiovascular risk.

    b.  Plaintiff Barnett's physician Dr. Mikola (Dr. Mikolajczyk) was misled by Merck's integrated marketing communications campaign for Vioxx. Merck's campaign failed to give Dr. Mikola adequate warning that Vioxx posed a potential cardiovascular risk.

    c.  Plaintiff Barnett was misled by Merck's integrated marketing communications campaign for Vioxx. Merck's campaign failed to give Plaintiff Barnett adequate warning that Vioxx posed a potential cardiovascular risk.

    d.  Merck's company policy was to provide physicians, consumers and the general public with a complete and accurate account of its drug's benefits and risks, and Merck executives knew or should have known that Vioxx posed a potential cardiovascular risk, but Merck did not disclose this fact to physicians, consumers or the general public. In fact, Merck's integrated marketing communications

campaign for Vioxx was expressly designed to neutralize or defuse any concerns of physicians, consumers or the general public that Vioxx might pose a potential cardiovascular risk.

e.  As part of its misleading integrated marketing communications campaign for Vioxx, Merck used press releases that were expressly designed to neutralize the concerns of physicians, consumers, and the general public that Vioxx posed a potential cardiovascular risk.

f.  As part of its misleading integrated marketing communications campaign for Vioxx, Merck sales representatives provided physicians with promotional (detail) pieces that were expressly designed to neutralize physicians' concerns that Vioxx posed a potential cardiovascular risk. These promotional (detail) pieces also emphasized Vioxx's "safety profile in elderly patients" even though Vioxx posed a significantly higher potential cardiovascular risk in elderly patients with preexisting cardiovascular problems.

g.  Merck commissioned research that demonstrated that physicians were confused by the cardiovascular information in the Vioxx promotional (detail) pieces shown to physicians by Vioxx sales representatives. Yet Merck continued to use these confusing promotional pieces.

h.  Merck's misleading integrated marketing communications campaign for Vioxx was targeted at the elderly and at physicians who cared for the elderly, because the elderly were heavy users of pain relievers. Merck targeted the elderly even though many of them had preexisting cardiovascular problems, and Vioxx posed a

significantly higher potential cardiovascular risk for those with preexisting cardiovascular problems.

i.  As part of its misleading integrated marketing communications campaign for Vioxx, Merck sales representatives were instructed to use "Obstacle Handlers" expressly designed to neutralize physicians' concerns that Vioxx posed a potential cardiovascular risk.

j.  As part of its misleading integrated marketing communications campaign for Vioxx, Merck sales representatives were instructed to use a "Cardiovascular Card" that was expressly designed to neutralize physician's concerns that Vioxx posed a potential cardiovascular risk.

k.  Even after the Vioxx label changed in April 2002, and information about the VIGOR study was included on the Vioxx product label, Merck instructed Vioxx sales representatives to use cardiovascular "Obstacle Handlers" and to emphasize Vioxx's cardiovascular safety.

l.  As part of its misleading integrated marketing communications campaign for Vioxx, Merck created a videotape called "Be the Power," which was expressly designed to motivate sales representatives to neutralize physicians' concerns that Vioxx posed a potential cardiovascular risk.

m.  As part of its misleading integrated marketing communications campaign for Vioxx, Merck disseminated copies of a 2000 New England Journal of Medicine article on the VIGOR study to physicians. Merck then instructed Vioxx sales representatives to describe the study to physicians in a way that would neutralize physicians' concerns that Vioxx posed a potential cardiovascular risk.

13

n.   As part of its misleading integrated marketing communications campaign for Vioxx, Merck paid a consultant to conduct promotional audio conferences for physicians that misrepresented the VIGOR study findings regarding Vioxx's potential cardiovascular risk. Further, Merck sales representatives misrepresented the VIGOR study conclusions at scientific meetings. These activities generated a WARNING LETTER from the FDA.

o.   As part of its misleading integrated marketing communications campaign for Vioxx, Merck sent letters to physicians and other health care professionals that were expressly designed to neutralize physicians' concerns that Vioxx posed a potential cardiovascular risk. Merck sent these letters to physicians who requested valid scientific information about Vioxx's potential cardiovascular risk. Merck also sent these letters in mass mailings to health care professionals in order to diffuse bad press about Vioxx's potential cardiovascular risk.

p.   As part of its misleading integrated marketing communications campaign for Vioxx, Merck created an "Efficacy Confidence" money-back guarantee program that was expressly designed to reassure physicians that Vioxx was safe from a cardiovascular standpoint and safe in the elderly, so that physicians would write new prescriptions for Vioxx. The campaign also included direct-to-consumer ads designed to persuade consumers to ask their physicians for Vioxx.

q.   Merck's marketing executives purchased extensive marketing research to ensure their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing physicians' concerns that Vioxx posed a potential cardiovascular risk.

14

r.  As part of Merck's misleading integrated marketing communications campaign, Merck direct-to-consumer advertisements emphasized Vioxx's efficacy at reducing pain and Vioxx's convenience because patients needed to take just one pill a day. None of the Vioxx direct-to-consumer advertisements disclosed that Vioxx might cause heart attacks or related problems, even after the April 2002 Vioxx label change that added the VIGOR study findings to the product label.

s.  Merck's marketing executives purchased extensive marketing research to ensure their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing consumers' concerns that Vioxx posed a potential cardiovascular risk.

t.  Merck's misleading integrated marketing communications campaign for Vioxx was expressly designed to neutralize the concerns of physicians, consumers, and the general public that Vioxx posed a potential cardiovascular risk in order to minimize the negative revenue and profit effects of disclosing Vioxx's potential cardiovascular risk.

20. The bases for these opinions are stated below. Most of the documents that I used in forming these opinions are attached as exhibits. As further documents are released, I will review them and if necessary elaborate on my opinions.  I will begin by discussing my opinions that Plaintiff's physicians Dr. McCaffrey and Dr. Mikola and Plaintiff Barnett were misled by Merck's integrated marketing communications campaign for Vioxx.

21. **Plaintiff Barnett's physician Dr. McCaffrey was misled by Merck's integrated marketing communications campaign for Vioxx. Merck's campaign failed to**

15

**give Dr. McCaffrey adequate warning that Vioxx posed a potential cardiovascular risk.**

a.  Dr. McCaffrey gave Plaintiff Barnett four sample Vioxx pills and a Vioxx prescription in December 1999. Plaintiff Barnett filled Vioxx prescriptions provided by Dr. McCaffrey on January 7, 2000; April 6, 2000; July 10, 2000; and October 5, 2000 using the pharmacy Merck Medco. In sum, Dr. McCaffrey gave Plaintiff Barnett Vioxx prescriptions for the period of December 1999 through December 2001. (McCaffrey deposition, dated 5/3/06, page 34, line 21, page 44, lines 21-22, page 123, lines 1-3, page 126, lines 10-13, and page 164, lines 3-4; Exhibit 5.)

b.  Dr. McCaffrey was approached by Merck's Vioxx sales representatives 374 times from 1999 to 2004. A document with reference to "Customer McCaffrey, Michael" lists these encounters.  (See Exhibit 6, pages 1-11.) Also, Vioxx sales representatives provided Dr. McCaffrey's offices with about 8,435 free samples of Vioxx from 1999 through 2004.

    i.  "Q. And is it true, sir, that for Vioxx you had approximately 374 contacts with the Merck sales reps ... during the period Vioxx was on the market? ... From '99 through 2004. A. Once a week at least.  Most reps have to see me every week." (Exhibit 5, page 117, lines 3-17.)

    ii.  "Q. And in addition, is it true that from 1999 through 2004, you were given 8,435 Vioxx samples by Merck? A. That's probably correct ..." (Exhibit 5, page 117, lines 24-25 and page 118, lines 1-2.)

c.  Merck's Vioxx sales representatives repeatedly told Dr. McCaffrey that Vioxx was safe.  A document entitled "Call Notes" with reference to "Customer McCaffrey, Michael" lists the messages that Vioxx sales representatives conveyed to Dr. McCaffrey from 6/99 to 12/00, prior to and during the time that Dr. McCaffrey was providing Vioxx prescriptions to Plaintiff Barnett. In at least three meetings with Dr. McCaffrey in 1999, Merck's Vioxx sales representatives focused on the "3 s's of vioxx" meaning Vioxx's strength, safety and simplicity. (See Exhibit 7, pages 1-6.)

d.  Dr. McCaffrey stated that Merck never warned him that Vioxx might cause heart attacks until Merck took Vioxx off the market in September 2004:  "Q. During the two years that you prescribed Vioxx for Mr. Barnett, were you ever given a warning by Merck that Vioxx caused heart attacks? A. No, sir." (Exhibit 5, page 228, lines 19-23.)

e.  Dr. McCaffrey was confused by Merck's new Vioxx label introduced in April 2002 that included the VIGOR study's cardiovascular risk information, and by the Merck sales representative's discussion of that label.

    i.  MCCAFFREY [referring to the Vioxx label introduced in April 2002]: "A. I remember looking at this at the time. I remember the rep I was sitting with and when we were talking about it, but at the time, we didn't know. Q. You didn't know whether it was Vioxx that was causing … [the heart attacks] A. We had no idea." (Exhibit 5, page 221, lines 24-25 and page 222, lines 1-11.)

ii. "MCCAFFREY [referring to the Vioxx sales representative's discussion of the Vioxx label introduced in April 2002] ... "he says, I don't how to make heads or tails out of this." (Exhibit 5, page 227, lines 19-20.)

iii. MCCAFFREY [looking at the Vioxx label introduced in April 2002]: "... I don't see any evidence saying that Vioxx is causing heart attacks." (Exhibit 5, page 228, lines 2-4.)

22. **Plaintiff Barnett's physician Dr. Mikola was misled by Merck's integrated marketing communications campaign for Vioxx. Merck's campaign failed to give Dr. Mikola adequate warning that Vioxx posed a potential cardiovascular risk.**

a. Dr. Mikola prescribed Vioxx to Plaintiff Barnett from about December 2001 until Vioxx was withdrawn from the market in September 2004. Plaintiff Barnett suffered a heart attack on September 6, 2002. (Mikola deposition dated 4/25/06, page 29, lines 2-25, page 101, lines 14-25, page 102, lines 1-25, page 103, lines 1-25, page 104, lines 1-21, and page 255 lines, 17-19; Exhibit 8)

b. Dr. Mikola was approached by Merck's Vioxx sales representatives 332 times from 1999 to 2004. A document with reference to "Customer Mikola, Michael" lists these encounters. (See Exhibit 9, pages 1-10.)

c. Merck's Vioxx sales representatives repeatedly told Dr. Mikola that Vioxx was safe. The document entitled "Call Notes" with reference to "Customer Mikola, Michael" lists the messages that Vioxx sales representatives conveyed to Dr. Mikola from 2/99 to 11/02. (Exhibit 10, pages 1-3.) In at least 12 meetings with Dr. Mikola, the Vioxx sales representatives focused on Vioxx's safety, or the "3

s's of vioxx" meaning Vioxx's strength, safety and simplicity. An additional visit to Dr. Mikola on 08/31/01 focused on Vioxx's "Safety in Elderly."

d. Dr. Mikola stated that Merck never warned him that Vioxx might cause heart attacks until Merck took Vioxx off the market in September 2004.

    i. "Q. You would expect that Merck would advise you of the potential of one of their drugs like Vioxx to increase the risk of cardiovascular [problems]? A. I would think that they would make me aware of it, yes, sir. Q. And that didn't happen while you were treating Mr. Barnett? A. Not to my recollection, no, sir." (Exhibit 8, page 372, lines 2-10.)

    ii. "Q. When you were reading from the [Merck] press release, it said, quote, this result is consistent with Naproxen's ability to block platelet aggregation [i.e., the comparator drug's ability to prevent heart attacks in the VIGOR study]. Do you remember that statement? A. Yes, sir. Q. Now, was this the general message that you were given during 2000, 2001, 2002 by the Merck sales reps that contacted you? ... THE WITNESS: That I don't recall specifically. That is the impression that I got from the conclusion of the VIGOR trial." (Exhibit 8, page 54, lines 16-25 and page 55, lines 1-2.)

e. Dr. Mikola received at least two letters from Merck that were expressly designed to neutralize concerns that Vioxx posed a potential cardiovascular risk, and at least one letter was received before Plaintiff Barnett's heart attack in Sept. 2002.

    i. On January 22, 2002, Merck sent a letter to Dr. Mikola in response to his inquiry concerning Vioxx and Celebrex. The letter "identified the following studies as they relate to the efficacy and safety of rofecoxib (VIOXX) and

celecoxib (Celebrex)." (Exhibit 11, page 1.) This Merck letter was expressly designed to neutralize concerns that Vioxx posed a potential cardiovascular risk. In addition, the letter represented that Vioxx was safer than Celebrex, in terms of its potential cardiovascular risk.  Pages 7-8 presented data from a study by Whelton et al. showing that patients taking Celebrex rather than Vioxx were significantly more likely to experience edema and increased systolic blood pressure. Page 8 also presented data from a study by White et al. showing that patients taking Celebrex rather than placebo were significantly more likely to experience increased systolic and diastolic blood pressure. Merck's letter to Dr. Mikola was misleading and incomplete because it did not include the VIGOR study or any other study that had found that Vioxx posed a potential cardiovascular risk. The letter selectively presented research indicating Vioxx had favorable cardiovascular and cardiorenal profiles.

ii. Merck sent another letter to Dr. Mikola on March 28, 2003 in response to "your inquiry concerning the development of cardiovascular thrombotic events" in elderly patients taking Vioxx. (See Exhibit 12, pages 1-6.) The first three pages of Dr. Mikola's letter present an unpublished Merck study by Reicin et al that was favorable to Vioxx. Page 3 states: "The authors concluded that in elderly patients followed up to 3 years, rofecoxib (Vioxx) 25 mg once daily had a comparable cardiovascular safety profile compared with placebo." The letter then provided information from the April 2002 Vioxx label change about the VIGOR study and related studies. This Dear Doctor

letter was misleading and incomplete because it selectively presented research indicating Vioxx had a favorable cardiovascular profile.

23. **Plaintiff Barnett was misled by Merck's integrated marketing communications campaign for Vioxx. Merck's campaign failed to give Plaintiff Barnett adequate warning that Vioxx posed a potential cardiovascular risk.**

    a.   Plaintiff Barnett saw Merck's direct-to-consumer ads for Vioxx, and these ads played a role in his decision to accept his physician's advice to start taking Vioxx. The ads did not warn him that Vioxx might cause heart attacks: "Q. You relied on your doctor's judgment in deciding to take Vioxx; correct? A.... when he said, 'Go to Vioxx' I said, 'Well, I would rather be on Celebrex.' He said, 'No, I want you on Vioxx.' And he was insistent. I thought, 'Well, it sounded great on TV and he's insisting on it, and he's taking me off something that works, so, you know, this probably would be great.'" (Barnett deposition dated 4/20/06, page 250, lines 22-25 and page 251 lines 1-11; Exhibit 13.)

    b.   Plaintiff Barnett also testified that the Vioxx direct-to-consumer ads played a role in his decision to continue taking Vioxx: "A. Yeah, I remember the Vioxx ads ... my own impression from those were, 'Oh, boy that's good. I take that, and it makes you feel real good, real confident. ...'" (Exhibit 13, page 249, lines 24-25 and page 250, lines 1-8.)

24. **Merck's company policy was to provide physicians, consumers and the general public with a complete and accurate account of its drug's benefits and risks, and Merck executives knew or should have known that Vioxx posed a potential cardiovascular risk, but Merck did not disclose this fact to physicians,**

consumers or the general public. In fact, Merck's integrated marketing communications campaign for Vioxx was expressly designed to neutralize or defuse any concerns of physicians, consumers or the general public that Vioxx might pose a potential cardiovascular risk.

a. Baumgartner, a Merck marketing executive who was responsible for conducting marketing research on physicians' perceptions of Vioxx starting in mid 1998, stated the following in her deposition: "Q: Tell me why that's important that a doctor that might be prescribing Vioxx have accurate information. Why is that important? A: We want physicians to be fully informed about the products. Q: And why is it important that they be fully informed about the products? A: So they can use the products appropriately ... and make the right decisions about the use of the product." (Baumgartner deposition dated 9/30/05, page 22, line 24 and page 23, lines 1-19; Exhibit 14.)

b. Blake, the public affairs manager for Vioxx in the USA from 1999-2001 with responsibility for issuing the Vioxx press releases, stated the following in her deposition: "Q: Well, you understand that as director or manager of public affairs that it is your responsibility to make sure, from your perspective, that the information that's contained in your materials that's sent out into the public, that it contains the truth and the whole truth, not half the truth, correct? ... THE WITNESS: Yes, our materials are truthful. I recognize that as our responsibility." (Blake deposition dated 11/29/05, page 52, lines 14-24; Exhibit 15.)

c. Krahe, Merck's senior business director in Southern California from 1996 through at least 2002, and a member of Merck's national cross-functional team for Vioxx,

stated the following in her deposition. "THE WITNESS: Our job, the sales representative position, is to communicate to the physician, and it is the physician who actually makes the prescribing decision for the patient … what they do is they provide information to the physicians so that the physician can make the prescribing decision … BY MR. ROBINSON: Q. And I think you said previously that they are supposed to be truthful with the physicians? A. It is absolutely important that they are truthful with the physicians. Absolutely. Q. So, they are not supposed to be giving half truths to the physicians, right? A. That would not be what a representative does, no. Q. They are supposed to give the whole truth? A. That is correct, sir." (Krahe deposition dated 2/24/06, page 289, lines 19-24 and page 290, lines 1-23; Exhibit 16.)

d.  Dr. Demopoulos, who was employed by Merck from 1996 to 2003, and was the senior director of cardiovascular clinical research at Merck when Vioxx was being marketed, acknowledged that many Merck executives knew that Vioxx posed a potential cardiovascular risk: "Q. And you knew at Merck that one of the reasons, at least the VIGOR study showed an increase in heart attack risk with Vioxx, you knew one of the possible explanations was Vioxx was causing clots, right? … THE WITNESS: That was one of several possible explanations. BY MR. LANIER: And it was a possible explanation that you knew about consciously in your mind as a possibility back when you were the senior director of heart research at Merck, right? A. I and others within Merck stated that as a possibility. Q. Right. Because it wasn't just you, everybody at Merck knew that one of the possibilities for why the VIGOR study showed what it showed is your

Vioxx was causing the clotting, right? A. We enumerated that among the possibilities." (Demopoulus deposition dated 2/13/06, page 27, lines 3-25 and page 28, lines 1-4; Exhibit 17.) (See Appendix A for related evidence.)

e. Blake, the public affairs manager for Vioxx in the USA from 1999-2001 with responsibility for issuing the Vioxx press releases, indicated that rather than disclosing Vioxx's cardiovascular risk potential to the public, it was her job to keep Vioxx's cardiovascular risk potential out of the news. In fact, in Blake's 2000 performance review she was praised for accomplishing her mission "to minimize the attention to heart attack issues" in Vioxx's press coverage. (Exhibit 15, page 64, lines 6-20.) A Merck document entitled "2000 Year-End Media Analysis" provides further details. In 2000, Merck's public affairs group conveyed 1 billion positive messages about Vioxx in the U.S.A.; they did not convey that Vioxx posed a potential cardiovascular risk: "Through proactive programming, Public Affairs communicated positive messages for the brand ..." and "Vioxx was represented in coverage totaling over one billion media impressions." Note that one billion media impressions means that each U.S. household had the opportunity to see about 5 news stories about Vioxx in 2000 (200 million U.S. households x 5 stories = 1 billion). (Exhibit 18, pages 1-2.)

f. In a document entitled "2001 Profit Plan for Vioxx©," Merck stated that a key strategic objective of the 2001 Vioxx campaign was to "Neutralize safety concerns around hypertension, edema, and MI" (heart attacks)." In the same document, Merck described its communication objectives for each specific physician group, and repeatedly stated that a key goal was to convey Vioxx's

"Comparable Safety v. Celebrex and NSAIDs [nonsteroidal anti-inflammatory pain relieving drugs]." This safety message was paramount because: "High coxib [VIOXX-prone] physicians tend to view VIOXX as slightly better on efficacy, while having some level of concern relative to non-GI safety (hypertension, edema, MI) [myocardial infarctions, i.e., heart attacks]." (Exhibit 19, pages 13, 17-19.)

g.   Another Merck document entitled "Annual Plan Vioxx 2002 Review Oct. 9, 2001" stated that a key behavioral objective of Vioxx's 2002 integrated marketing communications campaign was to ensure that "Physicians prescribe VIOXX for all patients needing pain relief, independent of ... CV risk factors, because VIOXX does not increase risk of MI [heart attack] or stroke." (Exhibit 20, page 7.)

h.   Krahe, Merck's senior business director in Southern California from 1996 through at least 2002, and a member of Merck's national cross-functional team for Vioxx, stated that Merck sales representatives never disclosed Vioxx's cardiovascular risk potential to physicians. The Krahe transcript reads as follows: "BY MR. ROBINSON: From mid-1999 when Vioxx was launched, through September 30[th] of 2004, is it your understanding that the sales reps never communicated to the doctors that Vioxx caused heart attacks or strokes? ... WITNESS. From the time frame that the product was launched, there was no indication that Vioxx caused heart attack or strokes. So, the communication would not have been to physicians that it caused heart attacks or strokes, because we didn't believe that to be true." (Exhibit 16, page 299 lines 14-24 and page 300 lines 1-6.)

25. **As part of its misleading integrated marketing communications campaign for Vioxx, Merck used press releases expressly designed to neutralize the concerns of physicians, consumers, and the general public that Vioxx posed a potential cardiovascular risk.**

   a.   Merck funded a Vioxx Gastrointestinal Outcomes Research study or VIGOR study that was completed in March 2000. In that study, patients who took Vioxx were significantly more likely to have suffered heart attacks and related cardiovascular problems than patients who took the comparator drug naproxen (Aleve). Many of the patients who were taking Vioxx and then suffered heart attacks or related problems seemed to have preexisting cardiovascular problems. (For details about the VIGOR study findings, see Appendix A.)

   b.   On March 27, 2000, Merck issued a press release designed to neutralize concerns that the VIGOR study showed that Vioxx posed a potential cardiovascular risk. Instead of disclosing that Vioxx might cause heart attacks and related problems, Merck's press release reassured physicians, consumers and the general public that Vioxx did not cause heart attacks or related problems. Specifically, Merck's press release characterized the VIGOR study findings as evidence that the comparator drug naproxen (Aleve) prevented heart attacks. The press release stated: "significantly fewer thromboembolic events [blocked blood vessels caused by dislodged blood clots] were observed in patients taking naproxen in this GI [gastrointestinal] outcomes study, which is consistent with naproxen's ability to block platelet aggregation [blood clots]." (Exhibit 21, page 1.)

c.   An April 28, 2000 Merck press release also was designed to neutralize concerns that Vioxx posed a potential cardiovascular risk: "In response to speculative news reports, Merck & Co., Inc. today confirmed the favorable cardiovascular safety profile of Vioxx© ..." (Exhibit 22, page 1.)

d.   On February 8, 2001, Merck issued a press release entitled "FDA Arthritis Committee Reviews Merck's Application for Revised Labeling for Vioxx Based on Vioxx Gastrointestinal Outcomes Study" that included the following misleading representation: "In extensive discussions, the [FDA] Advisory Committee explored this finding [the higher rate of heart attacks in the Vioxx group], other studies of Vioxx, and possible explanations for this result in VIGOR. In the completed osteoarthritis trials and on-going clinical trials with Vioxx 12.5 mg, 25 mg, and 50 mg in 30,000 patients, there was no difference in the incidence of cardiovascular events, such as heart attacks, among patients taking Vioxx, other NSAIDs [nonsteroidal anti-inflammatory pain relieving drugs] and placebo." (Exhibit 23, page 2.)  In point of fact, the FDA Advisory Committee had concluded just the opposite: "Several other studies (085, 090, and 102) to be noted later in this review, suggest trends towards higher rates of myocardial infarction [heart attack] in the rofecoxib [Vioxx] group compared to active control groups." (FDA Advisory Committee Report, February 8, 2001, Exhibit 24, page 12.)

e.   Merck issued another press release on May 22, 2001 after a New York Times newspaper article suggested that Vioxx might pose a cardiovascular risk. Merck's press release stated: "Merck Confirms Favorable Cardiovascular Safety Profile of

Vioxx." (Exhibit 25, page 1.) On September 17, 2001 the FDA sent Merck a
WARNING LETTER that cited Merck's May 22, 2001 press release, describing it
as "false or misleading" and stating that "your claim in the press release that
Vioxx has a 'favorable cardiovascular safety profile' is simply incomprehensible,
given the rate of MI [myocardial infarctions] and serious cardiovascular events
compared to naproxen." (Exhibit 4, page 6.)

26. **As part of its misleading integrated marketing communications campaign for
Vioxx, Merck sales representatives provided physicians with promotional
(detail) pieces expressly designed to neutralize physicians' concerns that Vioxx
posed a potential cardiovascular risk. These promotional (detail) pieces also
emphasized Vioxx's "safety profile in elderly patients" even though Vioxx posed
a significantly higher potential cardiovascular risk in elderly patients with
preexisting cardiovascular problems.**

a.   Merck's campaign to physicians was very well funded. For instance, in Merck's
"2001 Profit Plan for Vioxx©," Merck reported that it would spend about $410
million on the Vioxx 2001 integrated marketing communications campaign. This
would include $239 million on physicians, $11 million on managed care, and
$160 million on consumers. (Exhibit 19, page 40.) Merck's Vioxx promotions
were projected to reach 95% of targeted physicians about once a month. (Exhibit
19, pages 18-19.)

b.   During most if not all the time Vioxx was on the market, Merck's core marketing
messages to physicians included the following: "Once Daily VIOXX (rofecoxib).
Strength. Safety. QD Simplicity." (QD stands for once daily dosing.) Physicians

repeatedly saw and heard these core messages. These core messages were
included in virtually all the Vioxx promotional (detail) pieces the Vioxx sales
representatives showed to physicians. These core messages also were emphasized
in the sales representatives' interactions with physicians. Safety was, without a
doubt, a core promotional message for Vioxx. Vioxx's purported "safety profile
in elderly patients" was especially emphasized.

c.  A March 2000 Vioxx promotional piece for physicians, which featured an elderly
woman, Liz Goodman, provides an example of what physicians saw. (Exhibit 26,
pages 1-21). The tagline at the bottom of virtually every page stated the Vioxx
core messages: "Strength, safety, QD Simplicity." Page 14 stated: "Liz Goodwin,
85. OA [osteoarthritis] in multiple joints. History of sulfonamide allergy. Has
trouble remembering medication schedules. For both osteoarthritis and acute pain
in adults. Once-Daily Power. Very VIOXX." Page 15 stressed Vioxx's "safety
profile in elderly patients" and pointed out that "OA [osteoarthritis] trials included
large numbers of elderly patients" and that "No substantial differences in safety
were observed between older and younger patients." The promotional piece went
on to state that "In a specific six-week study of patients 80 years of age or older,
174 OA [osteoarthritis] patients who received VIOXX demonstrated a safety
profile similar to that of younger patients." It continued: "As with all NSAIDs
[nonsteroidal anti-inflammatory pain relieving drugs], VIOXX should be used
with caution in patients with fluid retention, hypertension, or heart failure."
However, the overall message of the promotional piece was that Vioxx was safe

to use in the elderly, more effective than other nonsteroidal pain relievers, and simpler to use.

d.  A November 2001 Vioxx promotional piece for physicians that stated "REACH FOR THE POWER OF ONCE DAILY VIOXX" on the front cover provides another example of what physicians saw. (Exhibit 27, pages 1-24). The first section emphasized Vioxx's powerful pain relief. Page 20 discussed Vioxx's "safety profile in elderly patients" and contained the same information included in the March 2000 promotional piece discussed above. Page 24 stated "No Effect on Platelet (blood-clotting) Function" and in small print "In healthy volunteers." It went on to state "Vioxx 50 mg had no effect on platelet aggregation" and a chart showed "**4.1%** Placebo (n=12), **0.8%** VIOXX 50 mg qd (n=12)." Additional text stated: "VIOXX is not a substitute for aspirin for cardiovascular prophylaxis [disease prevention]." However, the overall message of the promotional piece was that Vioxx provided superior pain relief and was safe to use in the elderly.

e.  Two promotional (detail) pieces the Vioxx sales representatives used with physicians during the first quarter of 2003 showed an older woman and an older man with arms raised in a V on the front covers. (See Exhibit 28 and Exhibit 29.) The promotional piece with the older woman on the front cover featured a chart on page 2 that stated "OA [osteoarthritis] Trials Included Large Numbers of Elderly Patients Treated with VIOXX 41% $\geq$ 65 years (n=1,455), $\geq$ 75 years (n=460), $\geq$ 80 years (n=174)" and stated that "No substantial differences in safety and effectiveness were observed between older and younger patients," though it noted that "Greater sensitivity in some older patients cannot be ruled out." Page 3

stated: "ELDERLY PATIENTS ACCOUNT FOR MORE THAN 50% OF THE
USE OF VIOXX FOR OA [osteoarthritis]" and included a chart that showed
"Percentage of Use of VIOXX for OA in Elderly Patients Since 1999, 29% 65-74
years, 27% ≥ 75 years." The last page stated: "Over 69 million total prescriptions
written since May 1999." It also included "Selected safety information" such as
"Because of its lack of effects on platelets, VIOXX is not a substitute for aspirin
for cardiovascular prophylaxis [disease prevention]" and "Caution should be
exercised when VIOXX is used in patients with a medical history of ischemic
heart disease [obstruction of the blood vessels]." However, the overall message of
the promotion piece was that Vioxx was safe to use in the elderly and provided
superior pain relief.  (See Exhibit 28, page 2.)

f.   The promotional piece used with physicians in the first quarter of 2003 which had
the older man on the front cover stated on page 7: "REDUCTIONS EVENTS VS.
NAPROXEN. OTHER SAFETY DATA FROM VIGOR" and included a table
from the new Vioxx label regarding the VIGOR study that showed "serious
cardiovascular thrombotic adverse effects" over time. (Exhibit 29, pages 1-12.)
An additional column of data was provided that did not appear in the Vioxx label.
That additional column of data emphasized that cardiovascular mortality was
comparable for Vioxx (7) versus the comparator drug naproxen (6).
Cardiovascular data from two placebo-controlled studies, which were included in
the Vioxx label, were also shown. In bold print, the promotional piece stated:
"The significance of the CV findings from these 3 studies (VIGOR and 2 placebo-
controlled studies) is unknown. Because of its lack of effects on platelets, VIOXX

31

is not a substitute for aspirin for CV prophylaxis [disease prevention]. Caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease." The overall message of the promotional piece was that Vioxx provided superior pain relief and was safe to use in the elderly.

27. **Merck's misleading integrated marketing communications campaign for Vioxx was targeted at the elderly and at physicians who cared for the elderly, because the elderly were heavy users of pain relievers. Merck targeted the elderly even though many had preexisting cardiovascular problems, and Vioxx posed a significantly higher potential cardiovascular risk for those with preexisting cardiovascular problems.**

a.   The Merck document entitled "2001 Profit Plan for Vioxx©" shows that the Vioxx campaign's primary "target audience" was "physicians treating patients with OA [osteoarthritis] and chronic pain." (See Exhibit 19, page 16.)

b.   To monitor the beliefs and behaviors of patients with osteoarthritis and other chronic pain, Merck commissioned a consumer tracking study called the "Awareness and Action Study;" it was also sometimes called the "Chronic Pain Study." The study was conducted by a marketing research firm called Millward Brown from about May 2000 through at least December 20003. Millward Brown conducted telephone interviews of consumers who said that they experienced chronic pain. Interviews were conducted 7 days a week, 12 months a year, and about 3600 interviews were completed annually. Most of the consumers who were interviewed either had arthritis or frequent back pain. (See Exhibit 30, Millward Brown "VIOXX Annual Review 2002 – 2003 January – December," page 5; see

also Exhibit 31a, "Awareness, Action & Attributes for the A & A Franchise, T. Hayden June 5, 2002" page 3.) Based on the December 2000 findings, the average age of those interviewed was 55. About 26% were 65 years of age or older, and 50% were 55 years of age or older.  (See Exhibit 32, "Vioxx Chronic Pain Study Dec. 1-17, 2000," page 4.)

c.  Merck's "Awareness and Action Study" showed that a high percentage of the Vioxx target patient population of chronic pain sufferers had preexisting cardiovascular problems. In 2002, approximately 43% to 53% of Vioxx users had hypertension (a cardiovascular disease with high blood pressure as its primary symptom). In 2002, approximately 12% to 22% of Vioxx users had heart disease. (See Exhibit 31b, "Hayden slides and Back up, pages 8-9.)

**28. As part of its misleading integrated marketing communications campaign for Vioxx, Merck sales representatives were instructed to use "Obstacle Handlers" expressly designed to neutralize physicians' concerns that Vioxx posed a potential cardiovascular risk.**

a.  Merck prepared a written document for the Vioxx sales representatives entitled "Obstacle Response Guide Vioxx. Victory. In It to Win It" which gave precise instructions on how to respond to physicians' concerns about Vioxx. In the "List of Obstacles," obstacle 23 was: "I am concerned about the cardiovascular effects of VIOXX." The Vioxx sales representatives were instructed to ask physicians "What is your specific concern?" If the physician responded "VIOXX increases the risk of MI [myocardial infarctions, i.e., heart attacks]" the sales representative was instructed to state: "Doctor, once daily VIOXX has no effect on platelet

aggregation, and therefore would not be expected to demonstrate reductions in MI or other CV [cardiovascular] events. Agents such as low-dose aspirin are routinely prescribed for CV patients for their effect on the inhibition of platelet aggregation. Therefore, once daily VIOXX© is not a substitute for aspirin for cardiovascular prophylaxis [disease prevention]. However, once daily VIOXX 50 mg had no effect on the anti-platelet activity of low dose (81 mg daily) aspirin when the two were given together." The guide then stated:  "If probed further: Offer to submit a PIR [Professional Information Request]." (Exhibit 33a, pages 38-39; also Exhibit 33b, pages 38-39.)

b.  Obstacle #32 stated: "Celebrex must be a safer agent. Unlike VIOXX, Celebrex outcomes data did not show any increases in myocardial infarctions [heart attacks] or stroke." Vioxx sales representatives were instructed to respond as follows: "The design of the studies differed in a number of significant respects and therefore the results of the two studies cannot be compared. So, let me tell you about the data for VIOXX from our OA [osteoarthritis] clinical trials at the 12.5 mg and 25 mg doses. In an extensive review of all of our Phase II OA clinical trials, VIOXX did not show an increase in the incidence of thromboembolic events [blocked blood vessels caused by dislodged blood clots] compared to placebo or the comparator NSAIDS [nonsteroidal anti-inflammatory pain relieving drugs]." (Exhibit 33a, page 54; also Exhibit 33b, page 54.)

c.  Obstacle #38 was: "The competition has been in my office telling me that the incidence of heart attacks [or cardiovascular events] is greater with VIOXX than with Celebrex" OR "I just read [or heard] a news story stating that VIOXX has a

34

higher incidence of heart attacks than Celebrex." Vioxx sales representatives were told to answer as follows: "Doctor, there are no head-to-head studies comparing the cardiovascular profile of the two drugs. As a result, you cannot compare the drugs and conclude that one drug has fewer events than the other. What you may be referring to is press reports of the incidence rates in two separate studies. In the VIOXX GI [gastrointestinal] Outcomes Trial (VIGOR), the incidence of MI [heart attack] was 0.4% with VIOXX and 0.1% with naproxen [Aleve]. Upon further analysis, four percent of patients in the VIOXX GI Outcomes Study had experienced a cardiac event such as a heart attack or stroke before entering the study and thus met the established criteria for the use of aspirin for secondary CV prophylaxis [disease prevention]. In the remaining 95% of the patients for whom aspirin was not indicated for secondary CV prophylaxis, the incidence of MI was lower – 0.2% for VIOXX and 0.1% for naproxen. This difference was not statistically significant. In a separate GI outcomes trial of Celebrex, the CLASS  study, Searle has reported that the incidence of MI was 0.5% with Celebrex … Again, doctor, I want to emphasize that the results of two different studies can't be compared, and that's particularly true here when you have studies of differing duration and in different patient populations." (Exhibit 33a, page 5 and page 60; also Exhibit 33b, page 5 and page 60, Exhibit 33c, page 1, Exhibit 33d, page 1.)

29. **As part of its misleading integrated marketing communications campaign for Vioxx, Merck sales representatives were instructed to use a "Cardiovascular**

**Card" expressly designed to neutralize physicians' concerns that Vioxx posed a
potential cardiovascular risk.**

a. On April 28, 2000, Merck announced to its Vioxx sales representatives that it had
a "new resource" for them to use with physicians, a handout that was referred to
as the Cardiovascular Card. This resource was labeled "In Response to Your
Questions. Cardiovascular System. Clinical Profile in Osteoarthritis Studies."
(Exhibit 34, pages 1-6.) The phrase "In Response to your Questions" indicates
that it was an Obstacle Handler or an Obstacle Response Guide. Vioxx sales
representatives were instructed use the Cardiovascular Card whenever a physician
had a concern about Vioxx's potential cardiovascular risk, since this concern
posed an obstacle in terms of persuading the physician to prescribe Vioxx.
Merck's instructions to the Vioxx sales representatives regarding how to use the
Cardiovascular Card were labeled "A Roadmap to the CV Card." (Exhibit 35a,
pages 1-4; also Exhibit 35b, pages 1-2 and Exhibit 35c, pages 1-2.)

b. Page 1 of the "Roadmap to the CV Card" stated: The CV Card will assist you in
addressing your HI COXIB [Vioxx-prone] or HI NSAID [nonsteroidal anti-
inflammatory drug-prone] physician's questions about the cardiovascular effects
of VIOXX. Use this resource as an obstacle handling tool only, when your
physicians ask you about the cardiovascular effects of VIOXX or express concern
regarding the cardiovascular effects of VIOXX based on the VIOXX GI
Outcomes Research trial (VIGOR)." (Exhibit 35a, page 1.)

c. Page 2 of the Cardiovascular Card described the "baseline cardiovascular
characteristics" of the patients in the osteoarthritis studies that were featured on

the card. (Exhibit 34, page 2.) This page indicated that many of the patients who had participated in the Vioxx studies were at a high risk for cardiovascular problems, and were elderly. The patients' mean or average age was 63 years, and the age range was 39 years to 93 years. Page 12 of the "Roadmap to the CV Card" instructed Vioxx sales representatives on how to use this information: "Use page 2 [of the CV Card] to show your physicians that patients who were at risk for cardiovascular disease were not excluded from the OA [osteoarthritis] studies with VIOXX. In fact, many patients who were included in the study had risk factors for cardiovascular disease. For example, 39% of patients had hypertension prior to their enrollment in the study." (Exhibit 35a4, page 12.)

d.  On Page 3 of the Cardiovascular Card, a table entitled "Cardiovascular Thromboembolic Adverse Events [events caused by blocked blood vessels due to dislodged blood clots]" showed: "Placebo, **2.9 [events]**; VIOXX 12.5 mg, **3.2 [events]**; VIOXX 25 mg, **2.6 [events]**; VIOXX 50 mg, **3.3 [events]**." A chart showed the rate of MI [myocardial infarctions, heart attacks] to be "**0.6** VIOXX, **0.5** NSAIDs, **1.4** placebo." The NSAIDs or nonsteroidal anti-inflammatory pain relievers were said to "include ibuprofen, diclofenac, and nabumetone." (Exhibit 34, page 3.) Page 2 of the "Roadmap to the CV Card" instructed the Vioxx sales representatives on how to use this information: "explain to the physician that the rates [of thromboembolic adverse events] were low in all studies and for all groups, and were comparable to placebo." (See Exhibit 35a4, page 23.)

e.  On page 4 of the Cardiovascular Card, a table entitled "Overall Mortality and Cardiovascular mortality" showed: "Total mortality: VIOXX **0.1**, NSAIDs **1.1**,

Placebo **0.0**. Cardiovascular mortality: VIOXX **0.1**, NSAIDs **0.8**, Placebo **0.0**."

(Exhibit 34, page 4.) Page 3 of the "Roadmap to the CV Card" instructed Vioxx

sales representatives on how to use this information: "show physicians that in

terms of mortality, which is most important to the physicians and their patients,

the rate for total mortality and cardiovascular mortality were low." (See Exhibit

35a4, page 34.)

   f.   The FDA did not approve for use on the Vioxx label the compilation of

osteoarthritis studies featured on Merck's Cardiovascular Card. The FDA did not

believe this information was adequately informative, as is evidenced by the

FDA's conference minutes on the subject: "MERCK: Proposed to include absence

of CV [cardiovascular] signal in OA [osteoarthritis] phase IIbIII studies. FDA:

Lack of differences seen in a meta-analysis of phase IIbIII studies are not

adequately informative to warrant inclusion in the label. Phase IIbIII studies

included trials of different design, size and duration, using different doses of

VIOXX and different comparators." (See Exhibit 36, FDA-Merck Teleconference

Minutes, February 8, 2002, page 2.)

   g.  Merck's Cardiovascular Card also was incomplete because it did not include the

VIGOR study, which was released in March 2000, before the Cardiovascular

Card was issued.

   h.  An uninformative and incomplete Cardiovascular Card was used for two years,

from April 2000 through April 2002. (See Exhibit 37, Waxman Report, page 28.)

Whenever the press tried to convey that Vioxx posed a potential cardiovascular

risk, Merck sent bulletins to its sales representatives instructing them to show

concerned physicians the Cardiovascular Card and to stress Vioxx's heart safety. For example, on May 23, 2001, one day after an unfavorable New York Times story about Vioxx, Merck sent out a "Bulletin for VIOXX: Action Required: Response to New York Times Article" that stated: "Use your CV Card to show the data on studies involving VIOXX and various NSAIDS (ibuprofen, diclofenac, and nabumetone) on overall mortality and CV mortality rates. 'Doctor, As you can see, Cardiovascular Mortality as reported in over 6,000 patients was VIOXX .1 vs. NSAIDS .8 vs. Placebo 0…'" (Exhibit 38a, page 2; also Exhibit 38b, page 2 and Exhibit 38c, page 2.)

i.   Merck also issued an August 21, 2001 bulletin instructing Vioxx sales representatives on how to diffuse physicians' concerns about the Journal of the American Medical Association article on Vioxx and cardiovascular risk, and instructed the sales representatives to use Obstacle Response #38 and the Cardiovascular Card. (See Exhibit 39a, pages 1-2; also Exhibit 39b, pages 1-2 and Exhibit 39c, pages 1-2.)

30. **Even after the Vioxx label changed in April 2002 and information about the VIGOR study was included on the Vioxx product label, Merck instructed Vioxx sales representatives to use cardiovascular "Obstacle Handlers" and to emphasize Vioxx's cardiovascular safety.**

a.   On April 11, 2002, Merck issued a "Bulletin for VIOXX: Action Required: Label Change for VIOXX GI Outcomes Research Study and RA Indication: Obstacle Responses …" (Exhibit 40a, page 1; also Exhibit 40b, page 1.) This bulletin discussed new Obstacle Responses to be used once the Vioxx label was changed

in April 2002. The bulletin listed the following obstacle that physicians might raise: "I have heard that the VIOXX GI Outcomes Research Study showed an incidence of CV [cardiovascular] events for VIOXX that was 5 times that seen for naproxen." The Vioxx sales representatives were told to review the cardiovascular studies on the Vioxx label, and to conclude: "Doctor, based on this data, Merck firmly stands behind the overall effectiveness and CV [cardiovascular] safety of VIOXX." The bulletin listed a second obstacle that physicians might raise: "Why is there a difference seen in MIs [heart attacks] between naproxen and VIOXX?" The Vioxx sales representatives were told to review the cardiovascular studies on the Vioxx label, and to conclude: "Because of its lack of platelet effects, VIOXX is not a substitute for aspirin for cardiovascular prophylaxis [disease prevention] ... Doctor, based on this data, Merck firmly stands behind the overall effectiveness and CV [cardiovascular] safety of VIOXX." (Exhibit 40a, pages 2-3; also Exhibit 40b, pages 2-3.)

b. In 2002, Vioxx Executive Marketing Director, Cannell, prepared a presentation wherein he explained how Vioxx sales representatives should discuss the inclusion of the VIGOR study on the new Vioxx label: "Confidently Address Non-GI Safety Issues [regarding] CV in Vigor. Step 1 – Review data in label. Step 2 – Review precautions section of label for placebo-controlled trials. Step 3 – Significance unknown. Step 4 – Merck stands behind the overall CV safety of Vioxx©." (See Exhibit 41, Cannell PowerPoint, page 18.) The presentation emphasized that Vioxx's potential cardiovascular risk was listed merely as a precaution on the label and that a precaution was "Information about any special

care to be exercised for the safe and effective use of a drug. . . ." The presentation
noted that Vioxx's potential cardiovascular risk was not listed as a warning on the
Vioxx label, and that warnings were "serious adverse reactions and potential
safety hazards," (See Exhibit 41, pages 24-25.)

31. **As part of its misleading integrated marketing communications campaign for
Vioxx, Merck created a videotape called "Be the Power," which was expressly
designed to motivate sales representatives to neutralize physicians' concerns that
Vioxx posed a potential cardiovascular risk.**

    a.  Merck's "Be the Power" training videotape for Vioxx sales representatives
featured a whiney elderly woman who represented an obstacle that might prevent
physicians from prescribing Vioxx. (See Exhibit 42.) This elderly woman stated
that she had "safety concerns" and was "afraid Vioxx causes MIs [heart attacks]."
A Vioxx sales representative exclaimed: "But that's not true!" and the woman
replied: "I didn't say I was true. I said I was an obstacle. Oh, I'm also worried that
Vioxx causes hypertension." The sales representative then asked: "Have you been
talking with this sleazy joker [pointing to the competitor]? Oh great. That's
exactly what the competition wants, to side track us with obstacles so we won't
have time to focus on our efficacy and GI [gastrointestinal] risk awareness
message."

    b.  A Merck employee then told the Vioxx sales representatives: "You were too slow
in there. You've got to handle obstacles quickly: 2 efficacy messages, 2 GI risk
messages, appropriate balancing information, and then close." Thus the Vioxx
sales representatives tried to combat the obstacles more effectively, saying: "Let's

clean up this place." In response to the whiney elderly women, a Vioxx sales representative stated, "The risk of hypertension and edema in older OA [osteoarthritis] patients can be reduced by starting with the minimal dose 12.5 milligrams." The obstacles returned, however, and a Vioxx representative remarked, "That's the thing about obstacles; they come back." The videotape warned, "the obstacles are still alive among thousands of physicians."

    c.   One goal of the videotape was to motivate Vioxx sales representatives to continue to address physicians' cardiovascular concerns forcefully, even though the representatives had already addressed those concerns in many prior meetings. Another goal of the videotape was to reassure Vioxx sales representatives that physicians' and patients' cardiovascular concerns about Vioxx were baseless.

**32. As part of its misleading integrated marketing communications campaign for Vioxx, Merck disseminated copies of a 2000 New England Journal of Marketing article on the VIGOR study to physicians. Merck then instructed the Vioxx sales representatives to describe the study to physicians in a way that would neutralize physicians' concerns that Vioxx posed a potential cardiovascular risk.**

    a.   In 2002, Merck purchased 500,000 reprints of a 2000 New England Journal of Medicine article by Bombardier et al. on the VIGOR study to disseminate to physicians. (See Exhibit 43, page 1.) The VIGOR study was designed to study Vioxx's gastrointestinal safety, but it had documented that Vioxx posed a potential cardiovascular risk. (For details about the VIGOR study findings, see Appendix A.)

b.   Merck disseminated a training manual dated March 2, 2002 that instructed its sales representatives on how to discuss this article with physicians. A page entitled "Bombardier et al. Reprint - Key Points" states: "Now let's learn some key points from the Bombardier et al. reprint. Remember, in accordance with Merck policy, you may only discuss information from the reprint that it is consistent with the product labeling." However, the training manual goes on to state: "Citation/ Summary Item 4 Text: Four percent of the patients in the study met the FDA criteria for the use of aspirin for secondary cardiovascular prophylaxis but were not receiving low-dose aspirin therapy. These patients accounted for 38% of the patients in the study who had MIs [heart attacks]. In the remaining patients, the incidence of myocardial infarction was 0.2% for patients treated with rofecoxib [Vioxx] and 0.1% for the patients treated with naproxen." (Exhibit 44, page 8-9.)

c.   The VIGOR study description contained in the Merck training manual discussed above was not approved for use in the new Vioxx label. The FDA did not allow Merck to state in the Vioxx label that "Four percent of the patients in the [VIGOR] study met the FDA criteria for the use of aspirin" or that "These patients accounted for 38% of the patients in the study who had MIs [heart attacks]." As far back as February 8, 2001, the FDA had warned Merck that the validity of this analysis was unclear. The FDA stated: "The validity of this retrospective identification of patients is unclear. By protocol [study design], patients with active cardiovascular disease were excluded. The investigator's clinical judgment at the time of enrollment appears to be more relevant than a

43