retrospective chart review." (See Exhibit 24, page 10.) Nevertheless, Merck instructed its sales representatives to emphasize this analysis in order to continue to reassure physicians that Vioxx posed no potential cardiovascular risk.

33. **As part of its misleading integrated marketing communications campaign for Vioxx, Merck paid a consultant to conduct promotional audio conferences for physicians that misrepresented the VIGOR study findings regarding Vioxx's potential cardiovascular risk. Further, Merck sales representatives misrepresented the VIGOR study conclusions at scientific meetings. These activities generated a WARNING LETTER from the FDA.**

a.   After the VIGOR study was released, Merck hired Dr. Holt as a consultant to create misleading audio conferences for physicians to reassure them of Vioxx's cardiovascular safety. Dr. Holt's misleading presentations triggered a WARNING LETTER from the FDA dated September 17, 2001 which stated: "We are aware of six promotional audio conferences, presented on behalf of Merck by Peter Holt, MD that are in violation of the Act and its implementing regulations. These conferences were ... moderated by Merck employees." The FDA characterized Holt's seminars as "false and misleading" and stated: "There are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation [blood clots] is pharmacologically comparable to aspirin or clinically effective in decreasing the risk of MIs [myocardial infarctions]... It is also possible that Vioxx has pro-thrombotic [blood clot-producing] properties." (See Exhibit 4, page 3.)

b. In its September 17, 2001 WARNING LETTER to Merck, the FDA also stated that Merck sales representatives had mischaracterized the VIGOR study at scientific meetings. "Merck sales representatives have engaged in false or misleading promotional activities that also mischaracterize the potentially serious MI [heart attack] events observed in the VIGOR trial. Specifically, Merck sales representatives made false or misleading statements to DDMAC [FDA Division of Marketing, Advertising and Communications] reviewers at two different professional meetings ... your representatives stated that Vioxx had a greater MI rate in the VIGOR trial because naproxen is cardioprotective." (See Exhibit 4, page 7.)

34. **As part of its misleading integrated marketing communications campaign for Vioxx, Merck sent letters to physicians and other health care professionals that were expressly designed to neutralize physicians' concerns that Vioxx posed a potential cardiovascular risk. Merck sent these letters to physicians who requested valid scientific information about Vioxx's potential cardiovascular risk. Merck also sent these letters in mass mailings to health care professionals to diffuse bad press about Vioxx's potential cardiovascular risk.**

a. In Merck's Obstacle Handling Guides such as its "Bulletin for VIOXX: Action Required: Label Change for VIOXX GI Outcomes Research Study and RA Indication: Obstacle Responses ..." Vioxx sales representatives were told: "If the physician continues to have questions following this review of the labeling, submit a PIR [Professional Information Request]." (Exhibit 40a, page 3; also Exhibit 40b, page 3.)

b.  Merck's March 28, 2003 letter to Dr. Mikola (Dr. Mikolajczyk) shows the type of response that a physician received in response to a PIR [Professional Information Request] about Vioxx's potential cardiovascular risk. (See Exhibit 12, pages 1-6.) The first three pages of Dr. Mikola's letter present an unpublished Merck study by Reicin et al that was favorable to Vioxx. Page 3 states: "The authors concluded that in elderly patients followed up to 3 years, rofecoxib (Vioxx) 25 mg once daily had a comparable cardiovascular safety profile compared with placebo." The letter then provided information from the April 2002 Vioxx label change about the VIGOR study and related studies. This Dear Doctor letter was misleading and incomplete because it selectively presented research indicating Vioxx had a favorable cardiovascular profile.

c.  Merck also sent out unsolicited Dear Doctor letters to reassure physicians about Vioxx's cardiovascular safety profile whenever there was bad press on this issue. For example, Merck sent out an unsolicited Dear Doctor letter sometime after September 2000 that stated: "You may have heard reports through the media or from your patients about the safely profile of VIOXX© ..." (Exhibit 45). The letter went on to present the same inconclusive and misleading studies that were included on Merck's Cardiovascular Card, suggesting that Vioxx was at least as safe as or even safer than NSAIDS [nonsteroidal anti-inflammatory pain relieving drugs] and a placebo from a cardiovascular standpoint (see above information on the Cardiovascular Card). These studies were never approved for use on the Vioxx label. The Dear Doctor letter also was incomplete because it did not include the VIGOR study findings, even though that study showed that patients

who took Vioxx had significantly more heart attacks than those who took the comparator drug naproxen (Aleve).

d. Immediately after the Journal of the American Medical Association article on COX-2 inhibitors such as Vioxx was published in August 2001, Merck sent an unsolicited Dear Healthcare Provider letter to health care providers to neutralize the article's effects. (Exhibit 46, page 1.) The letter stated: "You and your patients may have seen recent reports in the media regarding the cardiovascular profile of agents that specifically inhibit COX-2. These reports are based on an article published in the August 22-29, 2001, *Journal of the American Medical Association.* The article reviews selected data on VIOXX that have been available in the medical and scientific communities for almost 18 months. The article is not based on any new clinical study. Merck & Co. Inc. stands behind the overall and cardiovascular safety profile and the favorable gastrointestinal (GI) profile of VIOXX ..."

35. **As part of its misleading integrated marketing communications campaign for Vioxx, Merck created an "Efficacy Confidence" money-back guarantee program expressly designed to reassure physicians that Vioxx was safe from a cardiovascular standpoint and safe in the elderly, so that physicians would write new prescriptions for Vioxx. The campaign also included direct-to-consumer ads designed to persuade consumers to ask their physicians for Vioxx.**

a. For at least two years beginning in early 2002, Merck purchased monthly marketing research reports called "A&A [analgesic and anti-inflammatory pain reliever] Attribute Tracker" from a company called Ziment. Ziment created these

reports by paying a panel (group) of representative physicians to rate the attributes of different pain relievers (Vioxx, Celebrex, etc.) on numerical scales, and to record the number of prescriptions that they wrote for each brand. For instance, physicians were asked: "How well does 'safe to use in elderly' describe Vioxx, 1=Does Not Describe At All, 10=Describes Very Well." (See Exhibit 47 entitled VIOXX© Monthly EAR [early assessment and response], August 2002, Michael Stanton, dated October 8, 2002, page 6.) Every six months, a "derived importance analysis" was conducted to determine which attributes were "really important in the Rx [prescription] decision-making process without directly asking for [attribute] importance ratings." (See Exhibit 48 entitled "A New Paradigm for Understanding Physician Behavior Christopher Posner," page 6.)

b.  The research showed that, by about 2001, physicians began to differentiate between Vioxx and Celebrex on non-gastrointestinal safety issues such as cardiovascular risk and safety in the elderly. Merck executive Posner explained the research findings as follows: "A Derived Importance analysis in 2001 suggested that non-GI [gastrointestinal] safety was becoming a key [brand] differentiator" and that "High Coxib/Celebrex physicians place a premium on non-GI safety in choosing between Vioxx© and Celebrex." The results were similar in 2002: "From the derived importance 2002 analysis, it appears some physicians do feel stronger in the 'non-GI safety' advantage for Celebrex and this does impact their preferences." In 2002, the attributes that were important to physicians' prescribing decisions in order of their derived importance were: "Does not cause edema (9.9/10)," "Does not cause significant increases in blood

pressure (9.1)," "Does not increase the risk of myocardial infarction [heart attack] or stroke (7.0)" and "Is safe to use in the elderly (3.7)." Overall, the research "suggests Celebrex would be used preferentially in select 'at-risk' populations," that it was "likely this preferential use of Celebrex would be a subset of chronic [patients] presenting a more meaningful revenue downside" and so "the most important attributes that must be defended are non-GI safety attributes." The "Possible Implication" was to "Prevent movement off-center on non-GI safety." (See Exhibit 48, pages 8-12.)

c.  In August 2002, Merck's marketing executives introduced a marketing program called "Efficacy Guarantee" that was designed to bolster physicians' and consumers' confidence in Vioxx. The program guaranteed patients their money back if they were not completely satisfied with Vioxx and was targeted primarily at physicians, but also at consumers. (See Exhibit 49, Merck's April 31, 2002 memo on the "Efficacy Guarantee" program.) Merck's memo indicates that the primary goal of its "Efficacy Guarantee" program for Vioxx was to convey the drug's efficacy. However, another important goal was to convey Merck's overall confidence in Vioxx. Merck's April 31, 2002 memo on "Efficacy Guarantee" program explains the program's "two primary purposes: 1) Fortify the Efficacy perception of Vioxx©, especially with the entry of a new in-class competitor, Bextra, and b) Create field sales (OBR [office based representative] driven) confidence and enthusiasm for Vioxx in 2S." The memo justified the program in part based on the fact that "New agents, such as Bextra, are viewed as safer and more effective." (See Exhibit 49, page 1.)

d.  Merck's Executive Director of Marketing for Vioxx, Cannell, wrote in a July 28,
    2002 memo: "Why are we Launching the Confidence Program?" and then
    responded "It reinforces the fact that Merck is confident in and fully stands
    behind VIOXX." (See Exhibit 50, page 1.) In a 2002 presentation, Cannell stated
    that "Market Research" showed that "Physicians thought the Efficacy Guarantee
    Program conveyed Merck's confidence in Vioxx©" and that "... on average,
    physicians qualitatively estimated Vioxx© might receive an additional 10-15
    prescriptions out of 100 prescriptions for Cox-2 inhibitors." (See Exhibit 41, page
    71.)

e.  Ads for consumers and physicians that promoted the "Efficacy Guarantee"
    program suggested that the program provided a complete satisfaction guarantee.
    In other words, any dissatisfied consumer could get his or her money back. An
    "Efficacy Guarantee" ad for consumers stated in the headline: "Here's something
    that's guaranteed to make you feel better." Underneath, the ad stated "THE
    VIOXX EFFICACY GUARANTEE. Just one little pill can relieve your pain and
    stiffness all day and night. In fact, we're so confident it will help relieve your
    arthritis pain that we are offering a money-back guarantee if you are not
    completely satisfied." (See consumer ad, Exhibit 51, page 1.)

f.  An "Efficacy Guarantee ad for physicians stated in the headline: "ARTHRITIS
    PAIN RELIEF WITH VOXX ONCE DAILY GUARANTEED." Underneath, the
    ad stated: "√ CONFIDENCE – Merck is so confident about the power of VIOXX,
    we guarantee satisfaction or a refund. If your patient is dissatisfied, they'll receive
    a full refund ..." "√ CONVENIENCE – For you and your patients. If your patient

is not completely satisfied, they need only to provide a pharmacy receipt for a 30-day prescription of VIOXX 12.5 or 25 mg qd [once daily dose] to receive a refund. You submit the receipt with the signed reimbursement form. Patient receives refund directly from Merck." <u>(See one page physician ad, Exhibit 52.)</u> In at least some of the ads for physicians, fine print clarified that the program provided a "guarantee of efficacy for Vioxx against arthritis pain" and that "refunds will not be given if patients discontinue therapy due to other reasons, such as side effects." <u>(See two-page physician ad, Exhibit 53, page 1.)</u> However, the ads gave the general impression that Merck was offering a money-back guarantee if patients were not "completely satisfied."

g.  By offering this "Efficacy Guarantee" program for Vioxx, and offering consumers complete satisfaction or their money back, Merck succeeded in bolstering physicians' confidence in Vioxx's safety profile including its cardiovascular safety profile. The program's effects on physicians' beliefs about Vioxx and their prescribing behavior are summarized in Exhibit 44, the "VIOXX© Monthly EAR" dated October 8, 2002.  Slide 3 on page 2 states "Issue #1: VIOXX© Market Share Performance, Promotion, and Attitudes" and states "The rate of decline of NRx [new prescriptions] for VIOXX has slowed recently." It also states that "Recall of Efficacy Confidence increased to levels near those of the core messages for VIOXX within one week of launch, without impacting recall of the core messages," and that "Improvement for VIOXX was seen on several safety attributes." <u>(See Exhibit 47, page 2.)</u>  Several additional slides indicate that the "Efficacy Guarantee" program had an immediate and discernible impact in

terms of bolstering physicians' beliefs about the cardiovascular safety of Vioxx, and persuading physicians to prescribe more Vioxx.  (See Exhibit 47.)

i. "In August, more physicians rated VIOXX and Celebrex equally in the MI [heart attack]/Stroke attribute, which could have contributed to the narrowing of the NRx [new prescription] share gap between VIOXX and Celebrex." (Exhibit 47, Slide 15, page 8.)

ii. "In August, significant changes were seen in the percentage of physicians that rated VIOXX© and Bextra the same in the [Safe for the] Elderly and MI/Stroke attributes." (Exhibit 47, Slide 16, page 8.)

iii. "In August, the mean rating for VIOXX on the Safe for the Elderly attribute stabilized and the gap between VIOXX and Celebrex/Bextra narrowed." (Exhibit 47, Slide 17, page 9.)

iv. "The mean rating for VIOXX on the Blood Pressure attribute increased [improved] in August, and the gap between VIOXX and Celebrex, Bextra, and Naproxen narrowed." (Exhibit 47, Slide 18, page 9.)

v. "Ratings on the edema attribute declined less for VIOXX© than for the other tracked products in August." (Exhibit 47, Slide 19, page 10.)

vi. "In August, New to Market Chronic patients increased for VIOXX© BY 0.5%, while NTM [new to market] patients decreased for Celebrex by 3.5% and increased for Bextra by 8.8%." (Exhibit 47, Slide 39, page 20.)

vii. "More chronic patients switching to Bextra came from Celebrex than from VIOXX© in August 2002." (Exhibit 47, Slide 43, page 22.)

h.  A Merck report entitled "Operations Review for VIOXX January 31, 2003"
showed that the Efficacy Confidence program was extended through 2003, and
was referred to as "Confidence II: Total Satisfaction Guaranteed." (Exhibit 54,
pages 47-48.)48-49.) A graph shows that "2002 Promotional Campaigns for
VIOXX lead to NRx [new prescription] volume rebounds" and the 2002
campaigns are listed as: "Efficacy Confidence," "Divide and Conquer," and
"Project Jump Start." Another graph shows "VIOXX has narrowed the NRx share
gap with Celebrex." (Exhibit 54, pages 51, 45-46.)31 and 45.) The report also
indicates that the consumer promotions for Vioxx were working well: "Consumer
requests drive brand choice: Consumers are generally knowledgeable, willing to
ask for a brand by name, and highly influential in physicians' brand choice. Brand
awareness of 85% among targets. Physicians honor 90% of requests for VIOXX.
Net action is 27%." (Exhibit 54, page 57.) The report also notes that: "VIOXX
Controllable Income exceeded the original Profit Plan by 11%," and shows that
Vioxx's controllable income in 2002 was $1,494 million (i.e., nearly $1.5 billion).
(Exhibit 54, page 27.)

36. **Merck's marketing executives purchased extensive marketing research to
ensure that their misleading integrated marketing communications campaign for
Vioxx was effective at neutralizing physicians' concerns that Vioxx posed a
potential cardiovascular risk.**

a.  Merck purchased monthly marketing research reports that "tracked" physicians'
recall of the messages the Vioxx sales representatives were communicating to
them, physicians' beliefs about Vioxx and its competitors, and physicians'

prescribing behavior. In 2001, Merck purchased these reports from a company called "dtw Marketing Research Group." In 2002, Merck purchased these reports from a company called "Impact Rx." A document entitled "Promotion Message Recall Data" contains data from dtw Marketing Research Group for the period of September to October 2001. The document shows how each member of a physician panel responded to the following written survey question: "What did the sales representative tell you about the product" with the product being Vioxx. (A physician panel is a group of representative physicians who agree to participate in marketing research surveys on a regular basis, in exchange for being paid.) About 166 physicians wrote down what they recalled the Merck sales representatives saying about Vioxx. The findings indicate as follows:

i.   About 20% or 1 in 5 physicians recalled that the Merck sales representatives stated that Vioxx did not cause heart attacks or other cardiovascular problems.

- "Safe and effective and not associated with cardiac deaths." (Exhibit 55, page 4.)

- "Safe from a cardiovascular standpoint." (Exhibit 55, page 5.)

- "More effective than codeine. Much less edema and HTN [hypertension] than thought or purported by competitors. Does not cause heart disease." (Exhibit 55, page 6.)

- "There is no cardiovascular risk from using Vioxx." (Exhibit 55, page 10.)

- "Safe and not a cardiovascular danger and in the 50 mg [dose] as effective as percocet for pain control." (Exhibit 55, page 11.)

ii.  A substantial number of physicians recalled that Merck sales representatives criticized studies concerning Vioxx and cardiovascular risk, stating the studies were weak, or merely showed either that Vioxx wasn't cardioprotective, or naproxen (Aleve) was cardioprotective.

- "The study showing cardiac problems with Vioxx was not well done. Safe for pts [patients]. Good pain relief." (Exhibit 55, page 5.)

- "Very successful drug, safe, effective and does not contribute to heart disease as some recent articles suggested." (Exhibit 55, page 6.)

- "It does not increase the risk for heart attacks. He discussed the study used to make this deduction. Was a study comparing Naprosyn to Vioxx. It was intended to look at GI [gastro-intestinal] effects, therefore all patients taking preventive aspirin were excluded. Since Naprosyn has some platelet inhibiting activity, naturally one would expect a lower incidence of MIs [heart attacks] in this group ..." (Exhibit 55, page 7.)

- "Showed safety data that heart risk was mostly increased in patients who stopped their aspirin while taking Vioxx. ... So there has not yet been any study showing increase risk of stroke or heart disease with Vioxx if people continue to use their usual meds ..." (Exhibit 55, page 10.)

- "... talked about the recent published study which seemed to imply that Vioxx caused heart attacks. He said that the study was worthless, that what it really showed [was] that Vioxx does not have any anti-platelet effect. That patients taking Vioxx who are at high risk for heart attacks and strokes should take a baby aspirin every day." (Exhibit 55, page 10.)

iii. A substantial number of physicians recalled that Merck sales representatives characterized concerns about Vioxx and cardiovascular risk as "media hype."

- "Despite all the negative publicity about Vioxx it is a safe and effective medication." (Exhibit 55, page 4.)

- "That Merck felt that the recent press about Vioxx was inaccurate. Vioxx is not cardioprotective but it does not cause heart attacks." (Exhibit 55, page 5.)

- "No cardiac detriment – Bad reporting by press. It's just that it doesn't prevent [heart attacks] since there is no platelet action…." (Exhibit 55, page 6.)

- "Stroke issue is not new and is being blown out of proportion." (Exhibit 55, page 6.)

- "Safe despite media hype regarding cardiovascular morbidity/mortality." (Exhibit 55, page 7.)

iv. Only one physician recalled being told by a Merck sales representative that Vioxx might cause heart attacks, that "It did increase the risk of heart disease or heart attacks." (Exhibit 55, page 11.) Several physicians recalled talking to Merck sales representatives about Vioxx and cardiovascular risk but did not state that they were warned that Vioxx might cause heart attacks or strokes. Some mentioned that studies were ongoing, e.g., "Ongoing studies about stroke and Vioxx." (Exhibit 55, page 4.)

b. A Merck analysis entitled "Awareness, Action & Attributes for the A & A Franchise" shows that Merck had succeeded in neutralizing the physicians'

concerns about Vioxx's potential cardiovascular risk that had been raised by the

May 2001 New York Times article on the VIGOR study. The document states:

'Some safety and efficacy attributes registered a significant change in the period

surrounding the NY Times article 5/22/01. Nearly all attributes for Vioxx dropped

between June and July of 2001, but have recovered since then." (See Exhibit 31a,

page 27.)

c.  A Merck report entitled "VIOXX Monthly EAR [early assessment and response]

November 2001" indicated that Merck had neutralized the physicians' concerns

about Vioxx that had been raised by the August 2001 Journal of the American

Medical Association article on COX-2's potential cardiovascular risk. A chart

showed that Vioxx's share of new prescriptions in the analgesic and anti-

inflammatory market had declined from 17.3% in July 2001 to 15% in September

2001. However, by November 2001, Vioxx's share had risen to 15.5% and

showed a strong positive trajectory. (Exhibit 56, page 8.)

d.  A Merck report entitled "VIOXX Monthly EAR November 2001" contained

results from the dtw tracking study of physicians, for the time period from

September through December 2001, regarding how physicians responded to the

question: "Which of the product features listed below were discussed by the sales

representative?" From 20% - 33% of the participating physicians responded that

Vioxx sales representatives had discussed whether Vioxx "Is safe to use in the

elderly," and 18% to 47% of the participating physicians responded that they had

discussed that Vioxx "Does not increase the risk of myocardial infarction [heart

attack] or stroke." (Exhibit 56, page 17.) The report also showed a corresponding

increase in physicians' "Mean rating for VIOXX© on 'Does not increase the risk of MI [heart attack]/stroke' attribute increased versus Celebrex among High coxib [Vioxx-prone] Physicians." (Exhibit 56, page 24.) From August to November 2001, when physicians were asked how well the statement "Does not increase the risk of MI or stroke" described Vioxx, the mean response was 6.7 on a 10 point scale where 10=describes very well and 0=does not describe at all. Although Naproxen received a higher 7.7 rating, Vioxx's 6.75 rating was still favorable because it was well above the midpoint of 5. (Exhibit 56, page 38.)

e.  A Merck document entitled "Project 'Power Play'" indicates that physicians continued to give Vioxx a favorable rating on cardiovascular safety in 2003. In January 2003, when physicians were asked how well the statement "No increased risk of MI [heart attack]/stroke" described Vioxx, the mean response was 6.5 rating on a 10 point scale, where 10=describes very well and 0=does not describe at all. Although Naproxen received a higher 7.9 rating, Vioxx's 6.5 rating was still favorable because it was well above the midpoint of 5. On the attribute of "Safe for Elderly" Vioxx received a rating of 7.0, which was much better than Naproxen's 4.9 rating. (Exhibit 57, pages 7.)

f.  Yet another Merck report entitled "April 2003 EAR Core Meeting Vioxx" showed that Vioxx continued to do well in 2003, and that the marketing messages for Vioxx remained unchanged. Specifically, the report stated that Vioxx's share of total coxib prescriptions "was 37.6% in April 2003, beating plan of 36.6%." (Exhibit 58, page 7.) The report also stated "Efficacy, Safety, and Tolerability continue to be the top Vioxx messages recalled by PCPs [primary care

physicians]." A chart showed that, from May 2002 to May 2003, 34% to 47% of the primary care physicians interviewed recalled that a Vioxx sales representative told them Vioxx was "Safe in the Elderly." (Exhibit 58, page 29.)

g.  Merck also tested the two promotional (detail) pieces used with physicians during the first quarter of 2003. The front cover of these pieces showed an older woman and an older man with arms raised in a V. (See Exhibit 28 and Exhibit 29.) A research firm conducted 31 in-depth interviews with physicians in Maryland and Arizona in November 2002. A standard research method was employed. The findings were summarized in a report entitled "Market Research Findings. VIOXX© 1S03 Detail Piece Assessment." (Exhibit 59, page 1.) The physicians who were interviewed perceived VIOXX as "a little less safe (causing hypertension and edema) than other Coxibs." However, "Most pointed to being confused about CV [cardiovascular] risk, but mostly around the bad press and the patient perception of the issue." (Exhibit 59, pages 2, 4 and 6.) When shown the detail piece with the older woman (piece A) that emphasized Vioxx's safety profile in elderly patients, physicians "responded positively" and stated that they "like that it focuses on the use of VIOXX in the elderly – a population avoided due to safety issues." However, "some physicians would like the company to address the CV safety issue." (Exhibit 59, pages 7, 11.) The research also assessed physicians' reactions to the cardiovascular information that appeared in the detail piece with the older man (piece B). The research found: "Physicians do not know how to interpret the information regarding the CV data – to some, it appears to contain conflicting results. Some said that they would have to see more

information, some said they have never believed VIOXX has CV [cardiovascular] issues, and yet cannot, and will not, fight patients who might ask for another COXIB by name. Only one physician (in Scottsdale) said that he proactively warns he [his] patients, and rarely starts any patients on Vioxx." The market research report noted that "information perceived missing from this detail" included a "better explanation of CV mortality data." (Exhibit 59, pages 16-17.)

37. **As part of Merck's misleading integrated marketing communications campaign, Merck's direct-to-consumer advertisements emphasized Vioxx's efficacy at reducing pain and Vioxx's convenience, because patients needed to take just one pill a day. None of the Vioxx direct-to-consumer advertisements disclosed that Vioxx might cause heart attacks or related problems, even after the April 2002 Vioxx label change which added the VIGOR study findings to the product label.**

a. In 2000, Vioxx was the most heavily advertised prescription drug in the U.S. That year, Merck spent an estimated $161 million on direct-to-consumer advertising for Vioxx. (Rosenthal et al. New England Journal of Medicine article, February 14, 2002, Exhibit 60, page 501.)

b. Spending on Vioxx was also high in 2001. The "2001 Profit Plan for Vioxx©" reported that Merck would spend about $410 million on Vioxx's 2001 integrated marketing communications campaign. This would include $160 million on consumers. (Exhibit 19, page 40.) The Vioxx direct-to-consumer television ads were projected to reach 80% of targeted households 1.7 times a week for 35 weeks or 8 months (80 x 1.7 x 35 = approx. 4,680 GRPS). (Exhibit 19, page 26.)

c.  In describing its communication objectives for consumers in its "2001 Profit Plan for Vioxx," Merck stated that the goal was to get them to "Believe that Vioxx offers a safety/tolerability advance over traditional medications" and to "Advocate VIOXX to physicians and friends" or to spread positive word-of-mouth about Vioxx. (Exhibit 19, page 14.)

d.  Prior to the April 2002 Vioxx label change, none of the Vioxx direct-to-consumer television or print advertisements contained any warning that Vioxx posed a potential cardiovascular risk. The advertisements said nothing about heart attacks or related concerns. (e.g., see Dorothy Hamill "Along with all the Great Memories" print advertisement issued March 2001, Exhibit 61, pages 1-2.)

e.  The FDA recommended that the Vioxx product label be changed to include a cardiovascular warning. (See Appendix A for the full text of the FDA's proposed warning.) If a cardiovascular warning had been included in the new Vioxx product label, Merck would have had to prominently convey such a warning in all Vioxx television and print advertisements. However, Merck executives put intense pressure on the FDA and persuaded the agency to allow them to move Vioxx's cardiovascular risk information from the "warning" section to the "precaution" section of the new Vioxx label. An October 15 -16, 2001 email correspondence between Merck's top medical executive Scolnick and Merck's top marketing executive Anstice included the following comments. Scolnick wrote: "David, Be assured we will not accept this label [with the cardiovascular warning]." Anstice responded: "Ed, Thanks.I just received a copy 5 minutes ago and will digest it tonight. We knew it would be UGLY and it is. We'll fight back

and see where we get ..." Scolnick responded: "it is ugly cubed. thye are bastards." (Exhibit 62, page 1.)

f.   By convincing the FDA to move the cardiovascular risk information about Vioxx into the "precaution" section of the label, Merck avoided having to put any cardiovascular risk information in the Vioxx television advertisements. Further, Merck avoided having to prominently feature cardiovascular risk information in the Vioxx print advertisements. Instead, Merck simply put some vague and ambiguous cardiovascular information in the fine print of the Vioxx print advertisements.

g.   After the April 2002 Vioxx label change, the Vioxx direct-to-consumer print advertisements did finally mention something about Vioxx and heart attacks, but the information was vaguely worded and ambiguous. In fine print, the print advertisements said: "Heart attacks and similar serious events have been reported in patients taking VIOXX." (e.g., see Dorothy Hamill "Morning Routine" print advertisement issued August 2003, Exhibit 63, page 2.) This statement suggests that some people who took Vioxx also had heart attacks or similar serious problems, but that these problems may not have been caused by Vioxx. The Vioxx print advertisements never stated that Vioxx might have caused heart attacks, and thus failed to warn consumers of this risk.

38. **Merck's marketing executives purchased extensive marketing research to ensure their misleading integrated marketing communications campaign for Vioxx was effective at neutralizing consumers' concerns that Vioxx posed a potential cardiovascular risk.**

a.  After the FDA had recommended that a cardiovascular warning be included on the new Vioxx label (see Appendix A), Merck commissioned consumer research to assess the "business risk" of including such a warning in its advertisements. Merck also studied how to word or phrase any required cardiovascular warning, so that the warning "would not keep us from our product claim." This research is discussed in a Merck document entitled "VIGOR DTC (direct-to-consumer advertising) Strategy Meeting June 7[th], 2001." The document states that research was done to: "Assess business risk of new fair balance in product claim" and states that the following potential cardiovascular warning would be tested: "People who need to take asa [aspirin] with VIOXX are at greater risk of developing stomach ulcers. VIOXX is not a substitute for prevention of heart attack. Rarely, heart attacks have been reported." The document noted that "All of this is dependent upon final [Vioxx] label. Assume qualitative and quantitative research will confirm that additional balance does not keep us from product claim. If incorrect, reassess media options (Reminder) and Help Seeking advertising." (Exhibit 64, page 14.) In other words, if Merck's research showed that including a cardiovascular warning in Vioxx ads detracted from the ads' product claims, Merck would stop using Vioxx product claim ads altogether. Instead, Merck would revert to using "reminder" ads and "help-seeking" ads, which would not require warnings. Reminder ads remind people of a product (e.g., Vioxx). Help-seeking ads tell people to talk to their physicians if they suffer from particular medical problems. Since reminder ads and help seeking ads do not contain product claims, they do not require warnings.

b. A Merck document entitled "VIGOR Updated June 29[th], 2001" noted that once the Vioxx product label was changed to include the VIGOR study, Vioxx ads might need to include a cardiovascular fair balance warning. The document explained that one warning had already been tested, which stated: "Rarely, heart attacks have been reported." The research showed that "Although another serious side effect, it did not overwhelm the product benefits." (Exhibit 65, ~~page 7.~~)**pages 6-7.)** Note that the cardiovascular information that Merck ultimately included in its print ads for Vioxx used somewhat similar wording.

c. Merck also commissioned "copy test" studies of its Vioxx television and print ads from a marketing research firm called Millward Brown. Merck commissioned this research to ensure that its advertisements were as persuasive as possible, and did not contain side effect information that would deter consumers from "taking action" in terms of finding out more about Vioxx or requesting a Vioxx prescription. Merck sometimes copy tested Celebrex ads as well. Celebrex was Vioxx's main competitor. Merck wanted to ensure that its Vioxx advertisements were at least as persuasive as those of Celebrex, and at least as innocuous in terms of the risk information conveyed. Some of the findings are discussed below.

   i. A Merck document entitled "Vioxx© DTC [direct-to-consumer advertising] Research Review Doug Black and Alan Heaton February 17, 2000" discusses some of the research findings regarding Vioxx's direct-to-consumer advertisements. The research found that: "Approximately 60 Percent of Consumers Reported that Seeing [the Vioxx television advertisement] Stairs/Bath Would Increase their Interest in Learning More about Vioxx©."

(Exhibit 66, page 30.) The findings also indicated that: "Side Effects were NOT the Main Idea that Consumers were Taking Away [from the television advertisement]" and that "As with the TV Ads, Side Effects were NOT the Main Idea that Consumers were Taking Away From the Vioxx© Print Ads." The document noted that: "Consumers are concerned about side effects, but it does not significantly affect motivation [to visit or call their doctor for information about Vioxx]." (Exhibit 66, pages 32, 33 and 36.) The document concluded that Vioxx's direct-to-consumer advertisements were highly effective: "Consumer awareness of ads for Vioxx© rose significantly in January 2000 which added to ... Significant increases in awareness of the brand which is associated with ... Higher patient-initiated action for Vioxx©. Once patients take action, there is a high conversion rate to the brand for which they initiated action." (Exhibit 66, page 23.) Details were also provided: "At initial read, approximately 40% of the patients receiving Rx for Coxibs in late 1999/early 2000 engaged in some patient-initiated action" and "When a consumer takes action for a brand, an Rx [prescription] is received almost 9 times out of 10. In addition between 70 and 90% of the time the Rx is filled for the Coxibs [Vioxx/Celebrex]." (Exhibit 66, pages 17-19.)

ii. A Merck document entitled "Consumer Perceptions of Side Effects for Vioxx© 'Stairs/Bath' and CELEBREX 'Bicycle' Alan Heaton March 7, 2000" describes the results of a copy test study to test the Stairs/Bath and Bicycle ads. The research showed that "Consumers are concerned about side effects for both Vioxx© and CELEBREX" but "Concern about side effects [as

conveyed in these ads] does not appear to affect intended action for either product." (Exhibit 67, pages 1-2.) The consumers who participated in the copy test study of these ads were asked: "Do you recall seeing or hearing any mention of side effects from Vioxx/Celebrex in the commercial?" and "What side effects do you remember?" The most common responses were related to stomach or bleeding risks, or liver or kidney risks. Consumers did not mention heart attacks or related problems because these risks weren't included in the ads. Consumers were also asked: "How strongly does the [Vioxx] commercial give you the impression Vioxx is safe to use" and 41% responded: "strongly gave that impression." (Exhibit 67, pages 11- 12.)

d. Merck also commissioned a tracking study of mostly elderly consumers who suffered from chronic pain. The findings indicate that most of these consumers were aware of Vioxx. Also, Vioxx's image as a 'brand that you trust" remained largely untainted through at least 2003. The study did document a gradual decrease in the number of consumers with cardiovascular problems who requested Vioxx prescriptions, and a gradual increase in the number of consumers on Vioxx who asked to be taken off it due to safety concerns. However, by early 2002, Merck had managed to stabilize the situation and stem further losses. Some of the findings are discussed below.

i. Merck's consumer tracking study, which was called the "Awareness and Action Study," was conducted by Millward Brown from May 2000 through at least 2003. (See earlier discussion of this study.) The study monitored on a monthly basis what percent of consumers were aware of Vioxx, asked their

physicians for Vioxx, filled Vioxx prescriptions, or asked to be taken off of Vioxx and why.

ii. Merck's consumer tracking study found that among the primary consumer target audiences, awareness of Vioxx was very high. In December 2003, 87% of arthritic sufferers were aware of Vioxx. By comparison, 93% of them were aware of Tylenol, which was a far more established nonprescription brand. Also, 38% of arthritis sufferers had tried Vioxx as compared to 73% for Tylenol. Sixteen percent currently used Vioxx as compared to 39% for Tylenol. (See Exhibit 30, pages 13-15.) Also in 2003, 59% of arthritic sufferers were aware of Vioxx's advertising; 60% were aware of Tylenol's advertising. (Exhibit 30, page 46.)

iii. Merck's consumer tracking study also examined Vioxx's "brand imagery." The study found that 40% of arthritic sufferers perceived Vioxx as a "brand that you trust" in 2002 as compared to 41% in 2001. Similarly, 44% of arthritis sufferers perceived Vioxx as a brand that is "prescribed for millions of patients" in both 2002 and 2001. (Exhibit 30, page 79.)

iv. Finally, Merck's consumer tracking study showed that "the number of patients being treated for heart disease and asking for VIOXX or Celebrex remains similar but is trending down" and a graph showed a downward trend starting about May 2001 when the unfavorable New York Times article about Vioxx appeared, which lasted through April 2002. Another graph of the same time period documented a gradual increase in the "percentage of respondents who have asked their doctors to be taken off VIOXX" and noted that this

percentage was "significantly higher when compared to those who have asked their doctor to be taken off of CELEBREX." (See Exhibit 31a, pages 8 and 10.) However, this report and a later report documented that consumer requests to be taken off Vioxx had stabilized by mid 2002 and remained stable through December 2003. (See Exhibit 31a, page 27 and Exhibit ~~19.~~30, pages 33-36.)

39. **Merck's misleading integrated marketing communications campaign for Vioxx was expressly designed to neutralize the concerns of physicians, consumers, and the general public that Vioxx posed a potential cardiovascular risk in order to minimize the negative revenue and profit effects of disclosing Vioxx's potential cardiovascular risk.**

   a.  Merck had a strong motive for representing and suggesting that Vioxx did not pose a potential cardiovascular risk. In its "2001 Profit Plan for Vioxx©," Merck estimated that there was a low probability that it would be "unable to neutralize safety/tolerability issues" but, if it did not succeed, Vioxx's 2001 sales would be reduced by $437 million. (Exhibit 19, pages 38 and 43.) A $437 million (i.e., $.4 billion) loss in sales in 2001 would have been highly problematic. That $437 million was more than Vioxx's 2001 entire marketing budget of $410 million, and that $437 million amounted to 27% of Vioxx's 2000 total sales of $1.6 billion. (Exhibit 19, pages 36 and 40.) A loss of $437 million each year for four years (2000 – 2004) amounts to a total loss of 1.75 billion dollars.

   b.  A Merck graph entitled "Analgesic & Anti-Inflammatory Key Sensitivities Upside/Downside Sales Forecast (Constant $ millions) VIOXX©" dated 7/12/01

estimates that Vioxx sales would be reduced by about $500 million dollars per year if Vioxx's potential cardiovascular risk was included as a warning rather than as a product-class precaution on the Vioxx label. A $500 million loss in sales, relative to base sales of $2 billion, amounts to a 25% annual reduction in sales ($.5M/$2M = 25%). Also, a $500 million loss in sales each year for five years (2002 – 2006) amounts to a total loss of $2.5 billion in sales. (Exhibit 68, page 17.)

c.  Yet another Merck document estimated that Merck would save $229 million dollars by simply delaying by four months the Vioxx label change that would add the VIGOR study and its findings about Vioxx's cardiovascular risk potential. A Merck document entitled "Profit Plan 2002 - Merck A&A Franchise" stated: "The second key driver impacting the forecast is the CV [cardiovascular] label change expected due VIGOR and CLASS. Although this event was anticipated to occur in February 2002 (and was modeled as such), recent discussions with the FDA indicate it may be as soon as October [2001]… The impact to VIOXX sales is $-229 million." (Exhibit 69a, page 4.)

d.  Vioxx's U.S. sales were consistently strong until the drug was removed from the market. Vioxx sales generally either met or exceeded Merck's expectations. According to Merck's own documents, Vioxx sales amounted to 1.61 billion dollars in 2000, 1.84 billion dollars in 2001, and 1.92 billion dollars in 2002. (Exhibit 69a, page 13 and Exhibit 54, page 26.) Independent estimates from research firms indicate that Vioxx sales amounted to 1.5 billion dollars in 2000 (or roughly 1.1 billion dollars after the VIGOR study was released in March

2000), 2.0 billion dollars in 2001, 2.5 billion dollars in 2002, 2.5 billion dollars in 2003, and 1.4 billion dollars in 2004. In sum, Merck sold about $9.5 billion dollars worth of Vioxx primarily in the U.S. but also worldwide from March 2000 until September 2004 when the drug was removed from the market. In 2001,Vioxx was the 8th best selling prescription drug in the U.S. (Exhibit 69b, page13; Exhibit 69c, page 45; Exhibit 69d, page 62; and Exhibit 69e, page 1.)

e.  Anstice, who was in charge of Merck marketing in America from 1994 through 2002, answered questions in his deposition regarding Vioxx's importance to Merck's profitability as follows: "Q. So, y'all went from the middle of the pack in '94 to the largest pharmaceutical company in the world in '97, but you had major drugs like Pepcid going off patent in 2000/2001. I'm correct so far; right? A. Yes. Q. And those drugs going off patent represented a significant percentage of your sales; true? A. Correct. Q. So, it was important y'all get some replacement products like Vioxx to make the money, right? A. New products are always important in our business. Q. Well, but those products like Vioxx, you saw it as something that replaced the revenue y'all were going to lose; right? A. That's the normal course of our business, yes. Q. So, the timing of this, and by "this" I mean selling the Vioxx, is very important to your company; wasn't it? A. Yes, it was important." (Anstice deposition dated 3/17/04, page 596, lines 8-25 and page 597, lines 1-5; Exhibit 70.)

40. In sum, Merck's misleading integrated marketing communications campaign was expressly designed to neutralize the concerns of physicians, consumers, and the general public that Vioxx posed a potential cardiovascular risk. The evidence also

indicates that Merck stood to profit and did profit a substantial amount from misleading physicians, consumers, and the general public about Vioxx's cardiovascular risk potential. Patients requested Vioxx prescriptions that they otherwise would not have requested, and physicians wrote Vioxx prescriptions that they otherwise would not have written.

41. I declare under penalty of perjury that the foregoing is true and correct, and that I could testify competently if called as an expert witness.

42. Executed on May 22, 2006, in Manhattan Beach, California.


_____

Cornelia Pechmann                                                 Date

APPENDIX A:

MERCK'S KNOWLEDGE OF VIOXX'S CARDIOVASCULAR RISK

POTENTIAL

**I, Cornelia Pechmann, opine that Merck's marketing executives knew or should have known that Vioxx posed a potential cardiovascular risk.** I form this opinion based in part on the documents discussed below.

1.  Merck funded a Vioxx Gastrointestinal Outcomes Research study or VIGOR study which was completed in March 2000 and published in the New England Journal of Medicine in November 2000. In the VIGOR study, patients with rheumatoid arthritis were randomly assigned to take either Vioxx or naproxen (Aleve) daily for about 9 months. The VIGOR study found a statistically significant four-fold (.4 vs. .1) increase in the heart attack rate for Vioxx (rofecoxib) versus the comparator drug naproxen (Aleve), a standard NSAID or nonsteroidal anti-inflammatory pain-relieving drug." (Exhibit 71, page 1526.) ... "This difference was primarily accounted for by the high rate of myocardial infarction [heart attacks] among the 4 percent of the study population with the highest risk of myocardial infarction, for whom low dose aspirin is indicated [but aspirin was not provided]. The difference in the rates of myocardial infarction between the rofecoxib [Vioxx] and naproxen groups was not significant among patients without indications of aspirin therapy." (Exhibit 71, page 1526.) Hence, based on the VIGOR study, Merck knew or should have known that Vioxx posed a potential cardiovascular risk to all patients, and that Vioxx's risk potential was greatest among patients with preexisting cardiovascular problems.

72

2.  The Vioxx heart attack rates reported in the November 2000 New England Journal of
    Medicine article were in fact understated. Three heart attacks had occurred among
    low risk (no aspirin indicated) Vioxx patients, which had not been included in the
    article. When these three heart attacks were included, Vioxx's heart attack rate was
    actually 0.5% as compared to 0.1% for naproxen (Aleve), or five times higher. In
    other words, 5 out of every 1000 patients on Vioxx suffered a heart attack, as
    compared to 1 patient out of every 1000 on naproxen. Another way to look at is as
    follows: In the VIGOR study, 4,000 people took Vioxx and 20 of them suffered heart
    attacks; whereas 4,000 people took naproxen and 4 of them suffered heart attacks.
    Even among the low baseline risk (no aspirin indicated) patients, those taking Vioxx
    were three times more likely to have suffered a heart attack than those taking
    naproxen (Aleve). This three-fold increase was marginally statistically significant.
    The corrected results were published in the New England Journal of Medicine on
    December 29, 2005 by the journal editors as an "expression of concern" which stated
    the following:

    i.   "It now appears, however, from a memorandum dated July 5, 2000, that was
         obtained by subpoena in the Vioxx litigation and was made available to the
         *Journal*, that at least two of the authors knew about the three additional
         myocardial infarctions [heart attacks] at least two weeks before the authors
         submitted the first of two revisions" and that "there was ample time to include
         the data…""Lack of inclusion of the three events resulted in an
         understatement of the difference in risk of myocardial infarction between the
         rofecoxib [Vioxx] and naproxen [Aleve] groups" and also "resulted in the

misleading conclusion that there was a difference in the risk of myocardial infarction between the aspirin indicated and aspirin not indicated groups." … "In addition, the [Merck] memorandum of July 5, 2000 contained other data on cardiovascular adverse effects that we believe would have been relevant to the article." … We have asked the authors to submit a correction to the Journal." (Exhibit 72, pages 2813-2814.)

ii. The authors of the 2000 New England Journal of Medicine article wrote a rejoinder and claimed that "our original article followed appropriate clinical trial principles and does not require a correction." (Exhibit 73, page 1196.) In response, the New England Journal of Medicine editors reaffirmed their expression of concern, and made two more arguments:

iii. "The authors state that these events [three additional heart attacks in the Vioxx group] did occur during the [clinical] trial but did not qualify for inclusion in the article because they were reported after a 'prespecified cutoff date' for the reporting of cardiovascular events. This date, which the sponsor [Merck] selected shortly before the trial ended, was one month earlier than the cutoff date for the reporting of gastrointestinal events. This untenable feature of the trial design, which inevitably skewed the results, was not disclosed to the editors or the academic authors of the study." (Exhibit 74, page 1193.)

iv. "More than four months before the article was published, at least two of its authors were aware of critical data on an array of adverse cardiovascular events that were not included in the VIGOR article. These data, which should have raised concern about the potential cardiovascular toxicity of rofecoxib

74

[Vioxx], was part of an internal Merck memorandum [dated July 5, 2000]…
The data indicate that there were 47 confirmed serious thromboembolic events
[blocked blood vessels caused by dislodged blood clots] in the rofecoxib
(Vioxx) group and 20 in the naproxen group… Prevention of one complicated
gastrointestinal event was offset by the occurrence of about one serious
thromboembolic event… Because these data were not included in the
published article, conclusions regarding the safety of rofecoxib were
misleading." (Exhibit 74, page 1193.)

3. A September 17, 2001 FDA WARNING LETTER to Merck stated the correct heart
   attack rate that had been observed in the VIGOR study among the low baseline risk
   (no aspirin indicated) patients who comprised 96% of the sample: "the MI [heart
   attack] rate for Vioxx in this subpopulation was 12 MIs among 3877 patients (0.3%)
   as compared to 4 MIs among 3878 patients (0.1%) for naproxen." (Exhibit 4, page 4.)

4. In the November 2000 New England Journal of Medicine article about the VIGOR
   study, the authors suggested that the larger number of heart attacks for Vioxx vs.
   naproxen might be due to the fact that naproxen prevented heart attacks rather than
   that Vioxx caused heart attacks. This was Merck's "naproxen hypothesis." However,
   on February 1, 2001, FDA medical reviewer Dr. Targum concluded the following
   about the VIGOR study and Merck's naproxen hypothesis: "This Medical Reviewer is
   concluding that there is an increased risk of cardiovascular thrombotic [blood clot-
   related] effects, particularly myocardial infarction [heart attacks] in the rofecoxib
   [Vioxx] group compared with the naproxen [Aleve] group." … "The sponsor claims
   that the difference in myocardial infarctions between the two groups is primarily due

to the antiplatelet [clot-fighting] effects of naproxen. This hypothesis is not supported by any prospective placebo-controlled trials with naproxen." (Exhibit 75, page 34, emphasis in original.) Targum's overall conclusion was: "It would be difficult to imagine inclusion of VIGOR results in the rofecoxib [Vioxx] labeling without mentioning cardiovascular safety results in the study description as well as the Warnings section." (Exhibit 75, page 37.)

5. The FDA's Arthritis Advisory Committee also discounted Merck's naproxen hypothesis in a February 8, 2001 report: "The sponsor's explanation for the excess of cardiovascular thrombotic [blood clot-related] events in the VIGOR study is the potent antiplatelet aggregation [anti-blood clot] effect of naproxen. However, unopposed thromboxane production leading to an increase in CV thrombotic events cannot be discarded as a potential explanation of the VIGOR findings. There are several arguments against the beneficial naproxen effect being the sole explanation for these findings ... " (Exhibit 24, page 12.)11.) In addition, the FDA Advisory Committee noted: "Several other studies (085, 090, and 102) to be noted later in this review, suggest trends towards higher rates of myocardial infarction [heart attack] in the rofecoxib [Vioxx] group compared to active control groups." (Exhibit 24, page 12.) As a result of these concerns, the FDA did not permit Merck to include its "naproxen hypothesis" in the Vioxx label.

6. Anstice, who was in charge of Merck marketing in America from 1994 through 2002, acknowledged the following in his deposition: "there were no studies conducted with naproxen to show or not show that it was cardioprotective." (See Exhibit 76 page 706, lines 19-21.)

7.  Dr. Scolnick, President of Merck Research Labs and then the Executive Vice President of Science and Technology for Merck while Vioxx was on the market, disclosed his knowledge of Vioxx's cardiovascular risk in a March 9, 2000 email message entitled "vigor." He wrote: "The CV [cardio-vascular] events are clearly there ... this is real... It is a shame but it is a low incidence and it is mechanism based as we worried it was." (Exhibit 77, page 1.)

8.  After the VIGOR study was completed in March 2000 and documented that Vioxx posed a statistically significant cardiovascular risk potential, every patient who participated in a study of Vioxx was given the following warning: "A recent study of VIOXX© ... 50 mg once daily compared to naproxen 500 mg twice daily resulted in less ulcers ... In that same study, among patients treated with naproxen, certain cardiovascular events (e.g., heart attack, stroke) occurred less frequently as compared to those treated with [Vioxx]." (Dept. of Veteran Affairs Memo, April 4, 2000; Exhibit 78, Page 10.)

9.  On October 15, 2001, the FDA recommended the following warning be included on the Vioxx product label: "Warning/Cardiovascular Disease: Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events such as those with a history of myocardial infarction [heart attack] and angina and in patients with pre-existent hypertension and congestive heart failure. The risk of developing myocardial infarction in the VIGOR study was five fold higher in patients treated with VIOXX 50 mg (0.5%) as compared to patients treated with naproxen (0.1%) (See Special Studies, VIGOR). The finding was consistent in a smaller and shorter study using Vioxx 25 mg that allowed the use of low dose ASA [aspirin] (See

Special Studies, ADVANTAGE). Prospective, well powered, long term studies required to compared the incidence of serious CV events in patients taking VIOXX versus NSAID comparators other than naproxen have not been performed." (Exhibit 79, page 12.)

10. On October 15, 2001, the FDA recommended that the following clinical study be included on the Vioxx product label: "Study 102/903 (ADVANTAGE study). Advantage was a 3-month trial that compared the use of Vioxx 25 mg to naproxen 500 mg twice a day in patients with osteoarthritis (N=5,500). It showed a similar pattern of overall GI [gastrointestinal] and CV safety observed in VIGOR. This study allowed the use of low dose APA [aspirin]. There was one complicated PUB in the VIOXX 25 mg group compared to four complicated PUBS in the naproxen group. There were nine cardiac events (five MI [heart attacks], one unstable angina and 3 sudden deaths) in the VIOXX 25 mg group, compared to 3 cardiac events (2 unstable angina, one MI) in the naproxen group." (Exhibit 79, page 8.)

11. In April 2002, the following precaution was added to the Vioxx product label: "Precaution/Cardiovascular Effects: "The information below should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease. In VIGOR, a study of 8076 patients (mean age 58, VIOXX n=4047, naproxen n=4029) with a median duration of exposure of 9 months, the risk of developing a serious cardiovascular thrombotic event was significantly higher in patients treated with VIOXX 50 mg once daily (n=45) as compared to patients treated with naproxen 500 mg twice daily (n=19). In VIGOR, mortality due to cardiovascular thrombotic events (7 vs. 6, VIOXX vs. naproxen,

respectively) was similar between the treatment groups … In a placebo-controlled database derived from 2 studies with a total of 2142 elderly patients (mean age 75, VIOXX n=1067, placebo n=1075) with a median duration of exposure of approximately 14 months, the number of patients with serious cardiovascular thrombotic events was 21 vs 35 for patients treated with VIOXX 25 mg daily versus placebo, respectively. In these same 2 placebo-controlled studies, mortality due to cardiovascular thrombotic events was 8 vs 3 for VIOXX versus placebo, respectively. The significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown. Prospective studies specifically designed to compare the incidence of serious CV events in patients taking VIOXX versus NAID comparators or placebo have not been performed." (Exhibit 80, page 3.)

12. Very early on, even before the VIGOR study, Merck executives were concerned about Vioxx's potential cardiovascular risk. An email exchange among Merck executives dated Feb. 25 and 26, 1997 entitled "RE: GI OUTCOMES [VIGOR] TRIAL PROTOCOL" included the following statements. Merck executive Morrison stated "would allow low dose aspirin [in the VIGOR study] – I know this has been discussed to death, but real world is everyone is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill drug." Merck executive Reicin replied: "Low Dose Aspirin- I HEAR YOU! This is a no win situation! … the possibility of increased CV [cardiovascular] events is of great concern –(I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients … This may decrease the CV event rate so that a difference between the two groups would not be

evident." Merck executive Daniels' response was: "It is clear to me that the program will be severely hurt if the megatrial shows a win in PUBs [perforations, ulcers and bleeding] and a loss in MI/CVA [heart attacks, etc.]. That is what we are setting up by now allowing ASA [aspirin]." (Exhibit 81, pages 1-2.) Note that, in the end, Reicin's suggestion prevailed in that the VIGOR study excluded high risk cardiovascular patients, but contrary to Reicin's hope the VIGOR study showed a significantly significant increase in heart attacks for Vioxx versus the comparator drug naproxen.

13. A report of the Merck Scientific Advisors' Meeting on May 3-6, 1998 about the "Vioxx Program" articulates some of the early concerns that were raised about Vioxx's cardiovascular risk potential. The report states: "An alternative hypothesis is that prostacyclin biosynthesis in the vasculature is inhibited by Vioxx ... By removing this potent inhibitor of platelet aggregation, the probability that a coronary plaque rupture would lead to myocardial infarction [heart attack] ... is enhanced. More information is clearly needed to address these hypotheses and the other questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality.... It is therefore proposed that coronary events be predetermined endpoints in all future controlled trials with Vioxx ..." (Exhibit 82, pages 13-14.)

APPENDIX B

FDA REGULATIONS REGARDING PRESCRIPTION DRUG ADVERTISEMENTS

1.  By "advertising" the FDA refers to any aspect of an integrated marketing
    communications campaign, regardless of the target audience (health care
    professional, consumer or the general public) or the medium (print or broadcast
    advertisement, press release, card of brochure used by sales representatives, direct
    mailing, seminar, conference, etc.): "The agency interprets the term "advertisement' to
    include information (other than labeling) that originates from the same source as the
    product and that is intended to supplement or explain the product." (Federal Register
    Vol. 60, No. 158, Aug. 16, 1995, Exhibit 83, page 1.) A Sept. 2001 FDA WARNING
    LETTER to Merck, stating that the Vioxx integrated marketing communications
    campaign violated FDA regulations, confirms the FDA's broad definition of
    "advertising." The FDA WARNING LETTER referred to Merck's press release,
    audio conferences, and sales representatives' statements at professional meetings.
    (FDA WARNING LETTER to Merck, dated Sept. 17, 2001, Exhibit 4.)

2.  The Code of Federal Regulations Part 202 Prescription-drug Advertisements (21 CFR
    202.1) requires that all print advertisements contain detailed, comprehensive, and
    accurate risk information. All broadcast advertisements must discuss major side
    effects, warnings, precautions, and contraindications and either include a "brief
    summary" with more comprehensive risk information or tell consumers where they
    can obtain that risk information, such as from their physician. Section e1 states as
    follows: "When required. *All advertisements for any prescription drug* ("prescription

81

drug" as used in this section means drugs defined in section 503(b)(1) of the act and §
201.105, applicable to drugs for use by man and veterinary drugs, respectively),
except advertisements described in paragraph (e)(2) of this section, *shall present a*
*true statement of information in brief summary relating to side effects,*
*contraindications (when used in this section "side effects, contraindications" include*
*side effects, warnings, precautions, and contraindications and include any such*
*information under such headings as cautions, special considerations, important*
*notes, etc.) and effectiveness. Advertisements broadcast through media such as radio,*
*television, or telephone communications systems shall include information relating to*
*the major side effects and contraindications of the advertised drugs in the audio or*
*audio and visual parts of the presentation and unless adequate provision is made for*
*dissemination of the approved or permitted package labeling in connection with the*
*broadcast presentation shall contain a brief summary of all necessary information*
*related to side effects and contraindications."* (Exhibit 84, page 2.)

3.  The Code of Federal Regulations Part 202 Prescription-drug Advertisements (21 CFR
    202.1) states that advertisements cannot represent or suggest that a product is safer or
    better than what is on the product's approved label, not even on the basis of published
    literature, because this would be misleading and imbalanced. Section 6 and 6i state:
    *"An advertisement for a prescription drug is false, lacking in fair balance, or*
    *otherwise misleading, or otherwise violative of section 502(n) of the act, among other*
    *reasons, if it: (i) Contains a representation or suggestion, not approved or permitted*
    *for use in the labeling, that a drug is better, more effective, useful in a broader range*
    *of conditions or patients (as used in this section patients means humans and in the*

82

*case of veterinary drugs, other animals), safer, has fewer, or less incidence of, or less*
*serious side effects or contraindications than has been demonstrated by substantial*
*evidence or substantial clinical experience (as described in paragraphs (e)(4)(ii)(b)*
*and (c) of this section) whether or not such representations are made by comparison*
*with other drugs or treatments, and whether or not such a representation or*
*suggestion is made directly or through use of published or unpublished literature,*
*quotations, or other references."* (Exhibit 84, page 5.)

4. Section 6ii of the Code of Federal Regulations Part 202 Prescription-drug
   Advertisements (21 CFR 202.1) specifically disallows advertisements that contain
   misleading comparative or quantitative information about a product's safety, not
   approved as part of the label. Section 6ii states that an advertisement violates the
   regulation if it: "Represents or suggests that a prescription drug is safer or more
   effective than another drug in some particular when the difference has not been
   demonstrated by substantial evidence. An advertisement for a prescription drug may
   not, either directly or by implication, e.g., by use of comparative test data or reference
   to published reports, represent that the drug is safer or more effective than another
   drug, nor may an advertisement contain a quantitative statement of safety or
   effectiveness (a) unless the representation has been approved as part of the labeling in
   a new drug application or biologic license ...." (Exhibit 84, page 8.)9.)

5. Section 6iii of the Code of Federal Regulations Part 202 Prescription-drug
   Advertisements (21 CFR 202.1) specifically disallows advertisements with outdated
   information or opinions, stating that an advertisement is in violation if it: "Contains
   favorable information or opinions about a drug previously regarded as valid but

which have been rendered invalid by contrary and more credible recent information, or contains literature references or quotations that are significantly more favorable to the drug than has been demonstrated by substantial evidence or substantial clinical experience." (Exhibit 84, page 5.)

6.  Section 6iv of the Code of Federal Regulations Part 202 Prescription-drug Advertisements (21 CFR 202.1) specifically disallows advertisements from selectively reporting information in order to represent or suggest that the product is safer than has been demonstrated, stating that an advertisement is in violation if it: "Contains a representation or suggestion that a drug is safer than it has been demonstrated to be by substantial evidence or substantial clinical experience, by selective presentation of information from published articles or other references that report no side effects or minimal side effects with the drug or otherwise selects information from any source in a way that makes a drug appear to be safer than has been demonstrated." (Exhibit 84, page 5.)

7.  Section 5iii of the Code of Federal Regulations Part 202 Prescription-drug Advertisements (21 CFR 202.1) specifically disallows advertisements from making material omissions, stating that an advertisement is in violation if: "It fails to reveal facts material in the light of its representations or material with respect to consequences that may result from the use of the drug as recommended or suggested in the advertisement." (Exhibit 84, page 5.)

8.  The FDA's Division of Drug Marketing, Advertising and Communications "Guidance for Industry Using FDA-Approved Patient Labeling in Consumer-Directed Print Advertisements" (Draft) discusses patient labels and states that such labels can

sometimes be used as a basis for risk disclosures in print advertisements, but only if they comprehensively and accurately identify the product's most serious and most common risks. This FDA guidance describes patient labels as follows: "In addition to professional labeling, some prescription drugs and biological products have FDA-approved labeling written for patients using the product. Such labeling generally contains information describing the product's risks and benefits, although some labeling describes the risks more fully than others. Generally, patient labeling does not fulfill the brief summary [print advertising] requirement because it does not always address 'each specific' risk included in the labeling written for health care professionals. Patient labeling is designed to communicate in understandable language the most important information patients need to use the product appropriately." The FDA guidance document goes on to state: "FDA intends to object to the use of approved patient labeling as a brief summary for DTC [direct-to-consumer] print advertisements if the labeling does *not* comprehensively address the product's most serious and most common risks." It then states that: "FDA does not intend to object to the use of FDA-approved patient labeling to fulfill the brief summary requirement for DTC print advertisements if the labeling is reprinted in full and discusses in consumer-friendly language the following information from the advertised product's approved physician labeling: All the contraindications; All the warnings; All the major precautions; All other frequently occurring side effects that are likely to be drug-related." (Exhibit 85, page 4.)3.)

9. The FDA's Division of Drug Marketing, Advertising and Communications "Frequently Asked Questions" document regarding Consumer-Directed

Advertisements states that whereas the approved physician label can be a basis for consumer-directed advertising, it is not the ultimate standard. The ultimate standard is that the advertisement cannot be false or misleading, omit material facts, or lack fair balance between effectiveness and risk. The document states: "Typically, print advertisements will include a reprinting of the risk-related sections of the product's approved labeling (also called full prescribing information or the package insert). Sponsors, however, can write this risk information in language appropriate for the targeted audience; FDA encourages this approach. *In addition to the specific disclosure requirements, advertisements cannot be false or misleading or omit material facts. They also must present a fair balance between effectiveness and risk information. FDA has consistently required that appropriate communication of effectiveness information includes any significant limitations to product use.*" (Exhibit 86, page 1.)

10. The FDA's Division of Drug Marketing, Advertising and Communications "Frequently Asked Questions" document regarding Consumer-Directed Advertisements states that the FDA does not approve advertisements prior to their use, except in rare circumstances not applicable in this case. The document states: "The applicant shall submit specimens of mailing pieces and any other labeling or advertising devised for promotion of the drug product.... at the time of initial dissemination of the labeling and at the time of initial publication of the advertisement...." The document also states: "Does FDA approve advertisements and promotional labeling before use by the company? No, except for accelerated approval products and, in rare instances, when FDA may require pre-approval of promotional

86

materials as part of an enforcement action. However, DDMAC provides opinions on proposed advertisements and labeling pieces before use upon request by an applicant." (Exhibit 86, page 1.)4-5.)

11. An internal Merck policy statement indicates that its policy was to send very few of its advertisements to the FDA prior to their use. In advance of new product launches and major label changes, Merck sent press releases and physician-targeted advertisements and mailings which was "usually a small percentage of the total launch campaign." Merck's stated policy was to send most press releases and advertisements to the FDA after these materials were already used or in use. Based on Merck's stated policy, it appears that many of Vioxx's promotional materials were never sent to the FDA such as article reprints for physicians, and cards and brochures that sales representatives used with physicians. (Merck document "Frequently Asked Questions about DDMAC and Promotion Compliance," Exhibit 87, pages 1-3.)

12. The FDA commission has stated on record that "these [the FDA] labeling regulations do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The addition to labeling and advertising of additional warnings, as well as countraindications, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals [e.g., "Dear Doctor" letters containing such information] is not prohibited by these regulations. As stated above the act and FDA regulations require a warning in drug labeling as soon as a hazard is associated with the use of a drug. (Federal Register, Vol. 44, No. 124, June 26, 1979, Exhibit 88, page 37447.)