## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: VIOXX PRODUCTS LIABILITY LITIGATION** | **MDL No. 1657** |
| | **Section L** |
| | **Judge Eldon E. Fallon** |
| | **Magistrate Judge Daniel E. Knowles, III** |

**THIS DOCUMENT RELATES TO:**
  *Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379

---

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S OMNIBUS MOTION TO EXCLUDE EVIDENCE AND TESTIMONY ON ISSUES PREVIOUSLY ADDRESSED BY THE COURT,  AND PLAINTIFF'S MOTION TO STRIKE

(Plaintiff's Opposition to Defendant's Motion to Exclude No. 6)

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff R. Garry Smith, by and through his undersigned counsel, asks this Court to deny Defendant Merck & Co., Inc.'s ["Merck"] Omnibus Motion to Exclude Evidence and Testimony on Issues Previously Addressed by the Court, (hereafter, "Merck's Omnibus Motion") and Plaintiff's Motion to Strike.  In support thereof, Plaintiff would show as follows:

### PLAINTIFF'S MOTION TO STRIKE

Apparently, Merck believes in recycling.

To that end, it seeks to rehash a gaggle of motions to exclude what this Court has already heard before and, for the most part, denied.  Worse, it does not even bother to reargue the motions. Instead, it states its position and purports to incorporate by reference a large pile of briefs it apparently filed in other Vioxx cases.  Worst still,  it has not attached or filed those referenced briefs with its current motion.  Instead, it has left counsel and the Court to search the internet or other case

1

files to track down these materials.

When this problem was pointed out to counsel for Merck and copies requested, Merck's response was effectively "go fish."  Not only was the response highly unprofessional, but Merck's failure to attach these exhibits, especially when requested to do so, violates both the federal and local rules.[1]  With a mere week to respond to Merck's motions, counsel for Plaintiff should not have to spend its time locating Merck's briefing.  For these reasons, Plaintiff moves to strike all prior briefing referenced in Merck's motion at pages 4, 5, 6, 7-8 and 10.[2]

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S OMNIBUS MOTION TO EXCLUDE EVIDENCE AND TESTIMONY ON ISSUES PREVIOUSLY ADDRESSED BY THE COURT

### INTRODUCTION

Despite the pile of paper it would have the Court collect in support of its motions, Merck provides this Court with no new reason for it to change any of its prior adverse rulings on Merck's motions to exclude "informal" FDA communications, the testimony of Dr. Topol (with a few exceptions excluding specific parts of his testimony discussed below), adverse event and case

---

[1] Under Fed. R. Civ. P. 10(c), if a party incorporates a document by referring to it, the document **must be** attached to the pleading or motion as an exhibit.  *See, e.g., Shelter Mut. Ins. Co. v. Public Water Sup. Dist.*, 747 F.2d 1195, 1198 (8th Cir. 1984); *see* Local Rule 5.7.05W, "Attachments and Exhibits," "Exhibits and attachments may be filed electronically when permissible under the Federal Rules and Local Rules;" however, the rule means filed **in the same case.**  There is no indication that any of the referenced documents were designated by Merck as applying in all cases pursuant to this Court's pretrial order, dated Feb. 17, 2005, nor is there any agreement or portion of this Court's pretrial order that permits Merck to avoid its minimal obligations or common courtesy.  Finally, even if Merck does comply with the rules next time, it should not be permitted to "pile on," that is, simply to list dozens of old motions and, by doing so, force Plaintiff to respond in a truncated period of time, and worse, force the Court to slog through hundreds of pages filed in a doomed and inadequate effort to preserve the record.  If Merck actually wants to make an argument on the merits, let it do so.  If it wants simply to multiply the proceedings and the Court's homework to obtain some tactical advantage, the Court should consider sanctions.

[2] At the time Plaintiff's counsel requested these materials, it informed Merck that it would file a motion to strike if Merck did not comply with the federal and local rules.  Merck did not comply; however, counsel for Merck has graciously agreed to comply with the federal and local rules in the future.

reports, or global *Daubert* and relevance objections.  For that reason alone, the Court should not even consider doing so.

Only two motions, addressing to so-called Fries letter and that involving The New England Journal of Medicine's "Expression of Concern,"[3] merit discussion.  That the Court has recently sustained some of Merck's ***objections*** to Dr. Topol's tesimony as hearsay or on the basis of leading questions only demonstrates the inappropriateness of Merck's broadbrush motion to exclude categories of testimony and the necessity for ruling on the admissibility of his testimony based upon specific objections.  For the reasons that follow, Merck's motions to exclude relating to such evidence should be denied.

## DISCUSSION

### I.      Merck Has Filed No Motion in Limine; Therefore, if It Loses Its Motion to Exclude, It is Entitled to No Other Protection From the Introduction of Such Evidence

Merck has styled this motion as one to exclude alone.  At best, it includes a reference to a motion in limine in a parenthetical under the title of its motion to exclude.  It seeks no order in limine in its prayer for relief.  As the result, should the Court deny its motion to exclude, Merck is entitled to no other relief from Plaintiff's efforts to introduce such evidence at trial.

This Court should be loathe to exclude evidence prematurely, particular the sweeping rulings Merck seeks here.  A premature determination of evidentiary issues, in the absence of a developed trial record, could unfairly prejudice Plaintiff.[4]

---

[3]Merck actually  misrepresents the Court's ruling on its motion to exclude by the NEJM letter stating, in its chart, that the motion was granted in the *Plunkett* case, when it was denied. The only restriction the Court made was not allowing it to be read into the record.

[4]*See In re Diet Drugs*, 369 F.3d 293, 314 (3rd Cir. 2004)("unduly sterilizing a party's trial presentation can unfairly hamper her ability to shape a compelling and coherent exposition of the facts."); *Old Chief v. United States*, 519 U.S. 172, 187 (1997)("evidence thus has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support

## II.     Merck's Scattershot Motions to Exclude Are Inappropriate When Used to Usurp the Jury's Role in Determining Questions of Fact

Merck's scattershot attempt to exclude broad categories of evidence in this case is entirely misplaced and inappropriate.  Basically, Merck has requested that the Court exclude any and all relevant evidence that even remotely contradicts the carefully crafted fiction Merck will try to spin about Vioxx at trial.  This is not the purpose of the motion to exclude or in limine.  *See United States v. Feola*, 651 F.Supp. 1068, 1129 9S.D.N.Y. 1987) ("it would be improper for this court to speculate as to the circumstances that might surround the introduction of this evidence at trial, specifically, the adequacy of the foundation . . . the probative value weighed against the potential prejudicial impact in light of the evidence presented, and the purpose for which such a statement will be introduced at the time."), *aff'd*, 875 F.2d 857 (2nd Cir. 1989).

The Fifth Circuit has noted: "[w]hen evidence is challenged solely on the ground that it is irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401 – it must be without probative value as to *any* fact of consequence to the determination of the action.  If it is relevant as to any issue, it is relevant to the action and is not inadmissible under Rule 402."  *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F.Supp. 587, 599 (E.D.La. 1993)(quoting *Lubbock Feed lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 167 (5th Cir. 1980)(emphasis in original).  Thus, Merck must establish that the evidence it seeks to have be excluded on relevancy grounds is *not* relevant to *any* issue in the case, not simply the issues it thinks are important. It has not done so.

## III.    This Court Should Deny or Defer Merck's Motion Concerning the 2005 NEJM "Expression of Concern"

Merck argues that the NEJM  "Expression of Concern" is not relevant to the questions at

conclusions but to sustain the willingness of jurors to draw inferences, whatever they may be, necessary to reach an honest verdict").

issue in this case, is hearsay and prejudicial.  Merck's argument are without merit.

### A.   The "Expression of Concern" Is Admissible Under Rule 803(6).

Federal Rule of Evidence 803(18) states:

> (18) **Learned treatises.**  To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.  If admitted, the statements may be read into evidence but may not be received as exhibits.

It is without question that *The New England Journal of Medicine* is a reliable authority.  It is one of the premier medical periodicals in the world.  Numerous experts in this case have testified to that fact.  *See Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994).  In fact,  the Court may take judicial notice that *The New England Journal of Medicine* is a reliable authority in the medical field. Testimony regarding other articles published in *The New England Journal of Medicine* has been allowed during previous trials.

The "Expression of Concern" is a statement made in a periodical of reliable authority. Plaintiff's experts have relied on the "Expression of Concern."  The "Expression of Concern" was written by Dr. Gregory Curfman, Dr. Stephen Morrissey, and Dr. Jeffrey Drazen, all editors of *The New England Journal of Medicine*.  The "Expression of Concern" was peer-reviewed.  *See* Dep. of Dr. Gregory Curfman, at 77-78 (Jan. 24, 2006), attached as Exhibit "A."  The "Expression of Concern" is authoritative.  Therefore, evidence relating to the "Expression of Concern" should be allowed.

In accordance with Rule 803(18), it is understood that the article itself should not be admitted into evidence.  Testimony regarding the "Expression of Concern," however, should be allowed.  In

addition, in conjunction with that testimony, Plaintiff should be allowed to publish the document to the jury.

### B.   The "Expression of Concern" is Relevant Even  in Plaintiff's Case in Chief

In March 2000, after receiving the VIGOR results, Merck became aware that the VIGOR trial showed that those patients taking Vioxx experienced five times more heart attacks than those taking Naproxen.  Merck was put on notice (though 090 and other studies should have done this already) that there were serious cardiovascular (CV) safety concerns associated with Vioxx.

In November 2000, the VIGOR results were published in *The New England Journal of Medicine,* and Merck's star witness, Dr. Alise Reicin, was one of the co-authors of the study.  The "Expression of Concern" and Dr. Gregory Curfman's testimony reveals, however, the actual results of the VIGOR study were significantly misstated, that is, the authors understated the number of heart attacks experienced by patients taking Vioxx by three.  Thus, "the fact that these three myocardial infarctions were not included made certain calculations and conclusions in the article incorrect." Gregory D. Curfman, et al., "Expression of Concern: Bombardier, et al, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, N Engl J Med 2000; 343:1520-8." N Engl J Med 2005; 353:2813-4, at 2813, attached as Exhibit "B."

Dr. Reicin has testified at most of the Vioxx trials thus far.  She is, for all intents and purposes, Merck's corporate face and Vioxx's staunchest defender.  Thus, evidence relating to the validity and honesty of her work is directly relevant to her credibility and professional competence or that of any Merck witness who sponsored the study or championed its results.  When Dr. Reicin or any similar Merck witness takes the stand or when any Plaintiff's witness is cross examined about her article or the idea that Merck was open and honest about disclosing the risks of Vioxx, this matter becomes relevant and admissible under Rule 402.  *See also* FED.R.EVID. 106 (optional

completeness).  This is true despite Merck's argument that  Dr. Grefer allegedly did not rely upon the change in number of heart attacks reported alone in making his decision to prescribe Vioxx to Mr. Smith.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1004 (5th Cir. 1998); *U.S. v. Chavful*, 100 Fed.Appx. 226, 231 (5th Cir. 2004); FED.R.EVID. 401.  "Thus, if probative of ***any*** fact that is of consequence to the determination of the action, evidence is relevant within the meaning of the Federal Rules, and is therefore admissible." *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 267 (5th Cir. 1980)(internal quotation omitted)(emphasis added).  To say that evidence is irrelevant in the sense that it lacks probative value therefore means that it does not justify *any* reasonable inference as to the fact in question.  *See* McCormick on Evidence, § 185 at 544 (3rd dd. 1984)(emphasis added).  Conversely, if evidence does support the existence of a specific fact, even obliquely, it is relevant.

The VIGOR article misrepresented vital safety data to physicians and the healthcare community.  Merck and Dr. Reicin championed that lie and continue to do so to this day.  As the result, such evidence cannot be unduly prejudicial.  Instead, Merck richly deserves all the prejudice that properly flows from deceiving to the scientific community about a dangerous drug**.**

**IV.     This Court Should Deny Merck's Motion Concerning the So-Called Fries Letter or, At the Very Least,  Not Exclude It in Its Entirety**

Merck seeks to exclude in its entirety a letter from Dr. James Fries ("Fries letter"), a

California physician and professor at Stanford University's School of Medicine, to then-Merck CEO, Raymond V. Gilmartin.  *See* P. 1.0179, attached as Exhibit "C."  In it, Dr. Fries complains that Merck had failed to disclose to doctors Vioxx safety data and had attacked academics, including Dr. Fries himself, who questioned the drug's safety.  *See id.* at 4.  In addition, Dr. Fries also relates his first-hand experience with a Merck employee, Dr. Louis Sherwood, during which Dr. Fries himself felt threatened and intimidated.  *See id*. at 1-3.  Additionally, Dr. Fries reported the results of his own personal investigation into Merck's conduct.  *See id*.

Merck objects on hearsay, relevance and Rule 403 grounds**.**

### A.    The Fries Letter Should Be Admitted Because Any Alleged Hearsay It Contains is Subject to Recognized Exceptions or is Not Hearsay

Hearsay concerns out-of-court statements, not out-of-court actions.  Thus, Dr. Fries' own complaints about Merck's actions and his own investigation of its conduct cannot constitute hearsay.

Similarly, his statements concerning his encounter with Dr. Sherwood cannot be excluded on hearsay grounds because Dr. Sherwood is a Merck employee.  As such, his statements are considered admissions of Merck under Rule 801(d)(2).  Moreover, such statements are not offered for their truth but only to demonstrate how they made Dr. Fries and other physicians feel.  *See* FED. R. EVID. 801(c).  Thus, even idle threats are admissible to show their impact on Dr. Fries.  *See United States v. Tinsley*, 172 Fed. Appx. 431, 441; 2006 U.S. App. LEXIS 7571 (3d Cir., Jan. 31, 2006) ("evidence of the purported threats was not hearsay"); *United States v. Saada*, 212 F.3d 210 (3d Cir. 2000).  The Court explained: "The testimony was not offered to establish the truth of any threat of harm, but to establish the threat was made. . ."

In the alternative, if the Court finds that the letter contains hearsay, Plaintiff submits that the letter is admissible under the business record exception to the hearsay rule.  FED. R. EVID. 803(6).

Under 803(6), records of regularly conducted activity such as reports or letters are admissible if: 1) the memorandum or report is made at or near the time the information was transmitted; 2) by a person with knowledge; 3) if kept in the regular course of business; and 4) it was the regular practice of the business activity to make such a letter.

The letter was written at or near the time of observation, by a person with actual knowledge. Clearly, Dr. Fries had personal knowledge of the information contained in the letter; indeed, the information contained in the letter was obtained as a result of his own personal investigation. Plaintiff assumes that Dr. Fries kept the letter in his ordinary course of business. The letter was written on the Stanford School of Medicine letterhead and, as such, bears the indicia of correspondence regularly written and maintained in the academic, medical community. Merck does not dispute that deans, department heads, and noted physicians from medical schools correspond with drug companies all the time.

Whether evidence is admissible under rule 803(6) is "chiefly a matter of trustworthiness." *Mississippi River Grain Elevator, Inc. v. Bartlett & Co. Grain*, 659 F.2d 1314, 1319 (5th Cir. 1981); *see also United States v. Morrow*, 177 F.3d 272, 295 (5th Cir.)(per curiam), *cert. denied*, 120 S.Ct. 333 (1999); *United States v. Box*, 50 F.3d 345, 355-356 (5th Cir. 1995); *United States v. Veytia-Bravo*, 603 F.2d 1187, 1188-1189 (5th Cir. 1979), *cert. denied*, 100 S.Ct. 686 (1980). Plainly, the letter is trustworthy, comes from a credible source, and was not written in anticipation of litigation. Indeed, in support of its claims that the Fries letter is confidential, Merck has previously submitted an affidavit from Dr. Fries that attested to the fact that he wrote the letter with the intention that Merck would be on notice of his concerns and respond accordingly.

### B.     The Fries Letter is Relevant

Merck claims that the Fries letter is irrelevant if offered to show that Merck was "attacking"

critics of its drug, Vioxx.  In making this argument, Merck fails to disclose the full nature of the documents.  First, the Fries letter is a four-page document which makes no mention of "attacks" by Merck employees until the last page.  The letter is primarily devoted to alerting Merck of the serious concerns Dr. Fries and other notable research physicians have about the company's disclosure of Vioxx clinical data.  The letter gives specific examples regarding the lack of information Merck has provided about the safety of Vioxx following the VIGOR study and explains that several investigators and speakers have felt harassed by Merck employees when they raised safety concerns with respect to the drug.

The question is whether Merck had a duty to warn people like Mr. Smith and his physicians, whether Merck knew the safety information was not reaching its target audience and whether Merck directly or indirectly placed misinformation about the risks associated with Vioxx into the marketplace.  With respect to failure to warn, the duty arises when the Defendant knew or should have known of the need to issue a warning.  *See GIIR Energy Corp. v. Carboline Co.*, 744 F. Supp. 1405, 1407 (E.D. La. 1990).  To establish duty to warn, the plaintiff must prove a manufacturer had knowledge of the harmful and dangerous nature of the drug.  *See id.*  Plaintiff anticipates Merck will defend this case by arguing it fully discharged its duty to warn.  As such, Plaintiff should be permitted to offer evidence showing that Merck was on notice that members of the medical community thought Merck was failing to disclose safety data related to Vioxx and that the safety data was not reaching the people who needed it to make informed prescribing decisions.

The Fries letter demonstrates that Merck was on notice of Vioxx's dangers.  The letter is relevant, fits within recognized exceptions to the hearsay rule, and should be admitted into evidence.

    **C.**       **The Fries Letter Will Not Cause Unfair Prejudice, Jury Confusion, or Undue**

**Delay**

The Fries letter is not unduly prejudicial under Rule 403.  Evidence is unduly prejudicial only when "its probative value is *substantially* outweighed by the danger of unfair prejudice." *U.S. v. Delgado*, 903 F.2d 1495, 1503-04 (11th Cir. 1990); *see also U.S. v. Cerullo*, 435 F.2d 142, 143 (5th Cir. 1970).  "'Unfair prejudice' cannot be simplistically defined as evidence having adverse effects on a party's case; rather, it is an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *See Cauchon v. United States*, 824 F.2d 908, 914 (11th Cir. 1987) (citations omitted); *see also Delgado*, 903 F2d at 1504.  The letter's probative value is not outweighed by the danger of unfair prejudice.  Moreover, "Rule 403 rulings are best made at the time of trial when the Court may balance relevant factors before it." *Minshew v. Brown*, NO. 95-2507, 1996 WL 601436 (E.D. La. 1996) (Fallon, J.).

**V.    This Court Should Deny Merck's Motion Concerning the NEJM "Expression of Concern" or, At the Very Least Not Exclude It in Its Entirety**

**A.    The "Expression of Concern" is Relevant**

Merck argues that the "Expression of Concern" is not relevant to the questions at issue in this case.  Merck's argument is without merit.

Plaintiff began taking Vioxx in January 2000, months prior to the VIGOR results becoming public.  In March 2000, after receiving the VIGOR results, Merck became aware that the VIGOR trial showed that those patients taking Vioxx experienced five times more heart attacks than those taking naproxen.  Merck was put on notice (though 090 and other studies should have done this already) that there were serious cardiovascular (CV) safety concerns associated with Vioxx.  This evidence reveals Merck's notice and knowledge of the cardiovascular safety dangers associated with Vioxx.

11

In November 2000, the VIGOR results were published in *The New England Journal of Medicine* with Merck's Dr. Alise Reicin as one of the co-authors of the study. From the "Expression of Concern" and Dr. Gregory Curfman's testimony, it is clear that the number of heart attacks reported in the study were incorrect. The authors understated the number of heart attacks experienced by patients taking Vioxx by three. "The fact that these three myocardial infarctions were not included made certain calculations and conclusions in the article incorrect." Gregory D. Curfman, et al., "Expression of Concern: Bombardier, et al, "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis, N Engl J Med 2000; 343:1520-8." N Engl J Med 2005; 353:2813-4, at 2813 (Exhibit "B.")

The VIGOR article misrepresented vital safety data to physicians and the healthcare community. Evidence relating to the "Expression of Concern" is clearly relevant to Plaintiff's failure to warn and defect claims. For Merck to suggest otherwise is simply disingenuous.

**B.** **The "Expression of Concern" Is Admissible Under Rule 803(6)**

Federal Rule of Evidence 803(18) states:

> (18) **Learned treatises.** To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

It is without question that *The New England Journal of Medicine* is a reliable authority. It is one of the premier medical periodicals in the world. Numerous experts in this case have testified to that fact. *See Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994). It is believed that the Court has taken judicial notice that *The New England Journal of Medicine* is a reliable authority in the medical field.

Testimony regarding other articles published in *The New England Journal of Medicine* has been allowed during previous trials.

The "Expression of Concern" is a statement made in a periodical of reliable authority. Plaintiff's experts have relied on the "Expression of Concern." The "Expression of Concern" was written by Dr. Gregory Curfman, Dr. Stephen Morrissey, and Dr. Jeffrey Drazen, all editors of *The New England Journal of Medicine*. The "Expression of Concern" was peer-reviewed. *See* Dep. of Dr. Gregory Curfman, at 77-78 (Jan. 24, 2006)(Exhibit "A"). The "Expression of Concern" is authoritative. Therefore, evidence relating to the "Expression of Concern" should be allowed.

In accordance with Rule 803(18), it is understood that the article itself should not be admitted into evidence. Testimony regarding the "Expression of Concern," however, should be allowed. In addition, in conjunction with that testimony, Plaintiff should be allowed to publish the document to the jury.

### C. Admission of Evidence Relating to the "Expression of Concern" Would Not Cause Undue Prejudice, Confusion, or Waste Time

Merck's alternative argument that evidence of the "expression of concern" should be excluded under Rule 403, should also be rejected. Unfair prejudice within the context of Rule 403 "means an undue tendency to suggest (a) decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of the Advisory Committee on Proposed Federal Rules of Evidence, Rule 403 at 102. *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

In relevant part, Federal Rule of Evidence 403 directs that relevant evidence is inadmissible if its probative value is ***substantially*** outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. Fed. R. Evid. 403. The careful use of "substantially" demonstrates the emphasis placed on this balancing test. "Rule 403

is an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence." *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994).  As this court has noted, "Rule 403 rulings are best made at the time of trial when the court may balance relevant factors before it."  *Minshew v. Brown*, NO. 95-2507, 1996 WL 601436 (E.D.La. 1996) (Fallon, J.).

Evidence relating to the "Expression of Concern" is clearly relevant to Plaintiff's failure to warn and defect claims because it shows Merck's continuing attempt to downplay the risks of Vioxx which continued even *after* references to cardiovascular risks were included on its label.  Such evidence will not result in confusion to the jury.  Moreover, the documents and evidence is clearly related to Dr. Reicin's credibility and Merck's central defense that it fully disclosed the dangers, if any, of Vioxx to the public.

## VI.    The Court Should Once Again Deny Merck's Motion Concerning the FDA's Warning Letters

Such evidence, which was admitted in both *Plunkett v. Merck* trials, is highly relevant, and is properly admissible for multiple purposes including: demonstrating that Merck's warnings were inadequate and that Merck was on notice that its promotional activities contributed to this inadequacy; rebutting claims of good character; rebutting claims of efficacy or safety of Vioxx based on the FDA's "approval" or blessing; impeachment purposes; showing Defendant's intent and/or state of mind; demonstrating a routine business practice, and pattern of of misconduct for purposes of punitive damages

In its motion Merck focuses on portions of the testimony of the Plaintiff's prescribing physicians while arguing that Merck's conduct could not have affected their prescribing decisions.  However, the subject documents have relevance independent of issues relating to Dr. Grefer.  The

September 17th, 2001 letter from the FDA is relevant and probative on the issue of notice to Merck that its marketing or sales or press releases or statements to doctors affirmatively overstated the cardiovascular safety of Vioxx. It demonstrates that Merck was aware that the Naproxen hypothesis was being used to explain away the five fold increase in heart attacks in Vioxx users over placebo shown in the VIGOR study. It also shows that Merck was aware that this was inappropriate, improper and misleading, and that this conduct should have been discontinued.

In essence, these are precisely the messages that Plaintiff contends Merck was making to doctors and the public about Vioxx and cardiovascular safety, including using the Naproxen excuse to try to erase and explain away the five to one risk for heart attack shown in the VIGOR results. This document is therefore relevant and admissible to show that Merck knew that its entire message about Vioxx and cardiovascular risks, and the VIGOR study and Naproxen, which was being presented to the public by its employees and agents, was minimizing serious risks, and was therefore, inappropriate and misleading, not to mention violative of the FDCA.

The September 17th, 2001 letter from the FDA demonstrates that Dr. Grefer was misled in the same manner that Merck was trying to mislead physicians who were listening to Dr. Holt's message. Dr. Holt's misleading message was in fact Merck's message, and therefore this document should be admitted into evidence in this case.

A.    **Relevant Facts**

Merck focuses most of its energy on arguing for the exclusion of the September 17, 2001 warning letter issued by Dr. Thomas W. Abrams, R.Ph., MDA, then acting Director of the Division of Drub Marketing, Advertising and Communications for the FDA, to Merck President and CEO, Raymond V. Gilmartin. In the letter Dr. Abrams admonished Merck to cease and remediate promotional activities dating back to June of 2000 that the FDA found misleading in regards to

Vioxx.  Merck acknowledges that this letter was admitted by the Court in both *Plunkett v. Merck* trials on the ground it was relevant to the plaintiff's contention that Merck rushed Vioxx to the market.  That same contention is made by the Plaintiff here, and the Court's reasoning is equally applicable here.

In the September 17, 2001 warning letter, the FDA advised Merck of its finding that Merck had engaged in misrepresentation regarding the risks associated with Vioxx during six (6) audio-conferences (led by its national speaker, Dr. Peter Holt), one (1) press release ("Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx"), and in three (3) oral presentations made by Merck sales representatives (one at the Annual Meeting of the Maryland Pharmacists Association and two at the Annual Meeting of the American Society of Health-Systems Pharmacists).

In Plaintiff's Complaint and through motion practice, Plaintiff has properly plead and alleged that Merck designed and initiated a marketing campaign that would impact physicians and consumers both directly and indirectly.  Merck's marketing campaign, which included the hiring of its national speaker, Dr. Peter Holt, was designed to create a "buzz" among the public and medical community by which Vioxx's alleged benefits were promoted while simultaneously minimizing concerns and negative data relevant to its cardiovascular risks sufficient to establish, increase and maintain a multi-billion dollar market share at the expense of, and irrespective of, human safety and life.

Dr. Abrams' September 17, 2001 warning letter and other FDA communications generically referenced in Merck's Motion in Limine No. 6 are directly relevant to establish Merck's efforts to foist a dangerous drug onto the market at the expense of patient safety, including the safety of Mr. Smith, by failing to properly and adequately warn of the risks associated with Vioxx, a drug which, but for Merck's failure to warn, would never have been prescribed by Plaintiff's physician Dr.

Grefer, nor ingested by Mr. Smith. Moreover, such evidence goes directly to issues relating to the adequacy of Merck's warning and is further relevant and admissible: to rebut claims of good character and/or drug efficacy or safety; for impeachment purposes; for showing Defendant's motive, intent, and/or state of mind; and for showing a pattern and practice of misconduct for purposes of punitive damages.

### B.    Relevance of FDA Warning Letters Addressing Merck's Marketing Scheme for Vioxx

In this litigation, Plaintiff asserts that Merck failed to adequately warn (and in so doing, affirmatively misled) consumers, physicians and other members of the medical community, including Plaintiff, regarding the safety and efficacy of Vioxx. This goal was accomplished chiefly in two ways. First, Merck spent millions of dollars on direct-to-consumer advertising to generate a "buzz" about Vioxx and to insure that patients would request Vioxx prescriptions from their physicians. Second, Merck promoted the drug directly to physicians fought on four fronts: 1) Merck sought out highly respected physicians - who had influence in the medical community and with the FDA - to advocate the drug as part of its medical education program; 2) Merck sought to use the financial gain and prestige associated with its medical programs to influence individual physicians' opinions and prescribing habits with respect to the drug; 3) Merck disseminated misleading sales and promotional materials - including its product labeling and product information circulars - directly to individual physicians; and 4) Merck disseminated misleading safety and efficacy information through "press releases" and other communications to the medical community. The September 17, 2001 FDA warning letter along with other FDA communications directly support Plaintiff's claims that Merck failed to provide adequate warnings, and refute Merck's arguments or defenses that it acted appropriately under the facts of the case.

However, Merck attempts to assert several arguments in support of its contention that evidence regarding Dr. Abrams' warning letter and other FDA communications regarding Merck's marketing or promotional activities are somehow irrelevant.  Merck has not satisfied its burden of establishing that evidence of the FDA communications regarding Merck's acts and omissions are "without probative value as to any fact of consequence to the determination of the action."  *See Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F.Supp. 587, 599 (E.D.La. 1993).

## VII.   The Court Should Deny Merck's Motion Concerning Dr. Topol's Testimony in its Entirety

As Merck has provided this Court with no new reason to change its routine rulings denying Merck's Motions to exclude, it need not discuss them here.  Moreover, Merck does not include in its actual motion any reference to the objections this Court allegedly sustained in *Barnett.*  For these reasons and those set forth in Plaintiff's Memorandum on Opposition to Motion of Merck & Co., Inc. to Exclude Testimony of Eric. J. Topol, M.D, filed in *Gerald Barnett v. Merck & Co.*, Case No. 02:06CV00485, In re: Vioxx Products Liability Litigation, MDL Docket No. 1657, U.S. District Court, Eastern District of Louisiana, and ***actually*** attached and incorporated herein as Exhibit "D," Merck's motion should be denied once again.

## VIII.   The Court Should Once Again Deny Merck's Motion Concerning Adverse Event and Case Reports

Merck also reprises its inadequate motion to exclude generally adverse events reports and documents like it.  Merck once again argues that adverse event reports ("AERs") including data reported by clinical investigators, be excluded on the basis of relevancy, hearsay, and Federal Rule of Evidence 403.

Two primary issues in this case are Merck's notice of adverse events associated with Vioxx and, in light of its knowledge, Merck's failure to properly warn about the dangerous side effects

associated with Vioxx.  The role of AER, including reports made by clinical investigators, are central to the issues in this case, namely, notice to the company of adverse events and Merck's continuing duty to monitor and warn about these events.  Clinical trial adverse event investigation and post-marketing surveillance are critical components of all pharmaceutical companies' duties in maintaining a safety profile of a specific drug for meeting the company's responsibilities to physicians and patients as well as reporting to the FDA.

<strong>A       Evidence of Adverse Event Reports is Admissible</strong>

AERs and clinical trial investigator reports do not fall within the definition of hearsay under Rule 801 to the extent that they are not being offered to prove the truth of the matter asserted. Primarily, Plaintiff intends to offer AERs and investigator data reports to prove notice and Merck's failure to warn to properly investigate, evaluate, and resolve cardiovascular safety risk.

Merck's suggestion that the FDA has cautioned about the reliability of AERs and other anecdotal reports does not negate the fact that Merck had knowledge of such AERs, similar to the injury suffered by Mr. Smith which resulted in his injury, and failed to exercise its duty to investigate such claims.  Furthermore, Merck's assertions that AERs or investigator data are scientifically unreliable and inadmissible, and that opinion testimony based on such reports should also be inadmissible, is unfounded.  Merck proceeds in its motion to string cite cases that ostensibly stand for this proposition.

In the cases cited by Merck, AERs or case reports were excluded as evidence where the AERs or case reports were scant in number or were the sole support for the expert's testimony. Neither situation is at issue in the present case because there are countless AERs and/or case reports on point.  Case reports have long-standing use as evidenced by publication of such reports in peer-reviewed scientific journals.  *See  Caraker v. Sandoz Pharmaceuticals Corp.*, 172 F.Supp.2d 1046,

19

1050 (S.D.Ill. 2001)(where the court declined to allow an expert to rely solely on a scant number of case reports, but acknowledges that an overwhelming amount of case reports, [without additional support] showing a temporal proximity between a very specific drug and a very specific adverse event might be enough to make a general causation conclusion sufficiently reliable).

Moreover, the AERs and Clinical Investigator data kept by Merck are also admissible under the business records exception to the hearsay rule and as admissions by a party. *See generally Martinkovic v. Bangash*, 1987 WL 28400 (explaining that receipt of adverse event reports and records maintained of them are admissible against defendants as either records of regularly conducted business under Fed.R.Evid. 703(6) or as defendant's admissions under FED.R.EVID. 801(d)(2)). For purposes of notice, the reports in Merck's database are sufficiently trustworthy to fall within the exceptions to the hearsay rule.

Additionally, AERs are admissible as an exception to the hearsay rule for statements made for purposes of medical diagnosis or treatment, because an important purpose of the AER program or clinical investigator reports is to identify whether the cause of an adverse reaction is due to the ingestion of a drug. FED. R. EVID. 803(4).

**B.      Adverse Event Reports are Admissible When They Involve Incidents Sufficiently Similar to Place Defendant on Notice of Danger**

The requirement of similarity of circumstances is relaxed where evidence, such as AERs or clinical investigator reports, is offered to show that a defendant had notice of a danger rather than where the prior incidents are directed at proving actual negligence. *Kehm v. Procter & Gamble Manufacturing Co.*, 724 F.2d 613, 626 (8th Cir. 1983)(explaining how it is up to the jury to decide what weight to give complaints from other customers). Further, "[u]nder Fed.R.Evid. 401, evidence of similar occurrences 'might be relevant to the defendant's notice, magnitude of the danger

involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, [or] the standard of care, and causation.'" *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338-39 (5th Cir. 1980), *cert. denied*, 449 U.S. 1112 (1981)).  To the extent experts rely on the number of AERs, the Defendant will have ample opportunity to counter this evidence and explain dissimilarities.

### C.    Adverse Event Reports Satisfy Rule 403

Given the fact that AERs including investigator reports are being presented by Plaintiff as admissible non-hearsay, as well as hearsay that falls within the exceptions above, AERs are relevant evidence a jury should be permitted to consider in determining the issue of notice.  Merck is free to offer testimony regarding the importance and underlying procedure involved with AERs or with their self-proclaimed "adjudication process" begun in 1998.  *See Bendi v. McNeil-P.P.C., Inc.*, 6 F.3d 1378, 1385 (4th Cir. 1995)(explaining how the probative value of these reports was not outweighed by the danger of unfair prejudice, because the reports were highly probative on the issue of notice and defendant was free to offer testimony rebutting their significance).  Similarly, Plaintiff will be able to show that the 1998 adjudication program was not a method for assessing causation, but instead was part of Merck's pattern of ignoring its duty to properly investigate cardiovascular risk, and burying any such evidence.  That Merck would not seek to hide behind this self-preservation adjudication process as a basis for excluding evidence of the actual cardiovascular adverse event reports during the clinical trials is not surprising, but it should not be countenanced. Specifically, such evidence is directly relevant and admissible to support Plaintiff's challenge of Merck's adjudication process and how it handled these early signals of the cardiovascular risk

Merck argues that a jury may accord more weight to AERs simply because they are collected by a federal agency and might confuse the jury by placing Merck in a bad light.  As noted above, there is a relaxed standard for admitting AERs and other anecdotal evidence, including testimony

based on such evidence when used to show notice on behalf of the defendant rather than to prove negligence.  To the extent the evidence may be considered by the jury for one purpose but not another, the issuance of a limiting instruction at trial can resolve any potential concern of prejudice or confusion.  *See O.L. Maudlin v. Upjohn Co.*, 697 F.2d 664, 648 (5th Cir. 1983)(explaining how a limiting instruction by the Court as to the use of AERs in determining notice, prevented possible jury confusion and/or prejudice with regard to AERs which report injuries other than the one at issue).  Further, the time and testimony that would be necessary for Merck to deny notice of voluminous AERs would be minimal, at best, and not meet the level of undue delay under Rule 403.  The fact that Merck received and kept records of investigator reports and AERs relating the ingestion of Vioxx goes directly to the issue of awareness of the dangerous propensities of its prescription drug.

D.      **All AERs and Investigator Reports Are Relevant to Show Merck's Course of Conduct and Conscious Disregard for the Safety of the Consumer**

This Court should allow AERs and investigator data received by Merck into evidence, at least up to the date of Mr. Smith's injury.  Events up to this date show Merck's awareness and continuing failure to warn doctors and consumers about the injuries suffered by Mr. Smith.  AERs not only serve as a monitoring function for the pharmaceutical manufacturer, but proper notation and forwarding of the information found in the AERs serves as a tool for doctors in determining when to prescribe and how to monitor the prescription drug in question.  The fact that all of the AERs do not relate to Mr. Smith's injury does not negate the fact that every AER, especially those related to cardiovascular injuries and stroke, could and would be used in a doctor's analysis as related to the prescribing and monitoring of those ingesting the drug.  And the investigator data is relevant to many issues including Merck's duty to investigate, Merck's duty to warn in its initial product

labeling, and Merck's motive to manipulate other trials.

Furthermore, AERs relating to Vioxx are relevant to Merck's course of conduct and conscious disregard of the safety of the consumer. Where punitive damages are sought, evidence of events occurring subsequent to the incident in question is highly probative on the issue of conscious disregard for the safety of others. Despite the fact that a defendant's conduct may not have had a possible effect on the particular plaintiff, evidence of related conduct by the defendant, which amounted to a conscious disregard for the safety of others is entirely relevant to the issue of punitive damages.

## IX. The Court Should Once Again Deny Merck's Non-Specific Motions Excluding for the Most Part Unspecified "Irrelevant" and "Unreliable" Medical and Scientific Evidence

Merck once against files a motion in which it apparently seeks to preserve its *Daubert* and relevance objections to all the bad stuff to which it would otherwise have to object. Merck's motion is hopelessly inadequate. While it gives some examples, it does not otherwise identify the evidence to which its motion is directed. On that ground alone, the Court is correct is denying it.

Merck claims it is being specific when it makes reference to "statistically insignificant data" and "investigator-reported data" without tying its objection to any specific piece of evidence. The Court and Plaintiff's counsel can only hope Merck was attempting irony in making such a statement. Merck does object specifically to "all cause mortality" figures from Vioxx clinical trials but does not object to them on any valid ground. Merck first claims they are "inflammatory" then complains because this "*all cause* mortality" data includes deaths from causes other than Vioxx then claims that  including these deaths in such "all cause mortality" data would confuse a jury. Merck is apparently the only one confused enough to believe that any "all cause mortality" data is unreliable unless it includes only deaths from a single cause. *That* would be confusing. Moreover, Merck does

23

not explain how discussing a death from electrocution, if it is even discussed at all, is somehow going to prejudice unduly Merck.

The Alzheimer's disease clinical trial involving Vioxx data related to mortality is highly relevant to issues of notice, a duty to investigate, a duty to warn, and the unreasonableness of Merck's conduct in marketing and selling the drug. Perhaps for that reason, this Court and others have routinely denied Merck's motions.

A.     **Testimony Regarding the Studies and Data at Issue Should Not Be Precluded; Particularly Where, As Here, Plaintiff's Experts Have Relied on Such Studies in Forming Their Opinions**

The Federal Rules of Evidence control the admission of expert testimony in this case. *Doddy v. Osy USA, Inc.*, 101 F.3d 448, 459 (5th Cir. 1996). Rule 702 governs the admission of expert testimony and provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702.

The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, FED.R.EVID. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. *Bocanegra v. Vicmar Services, Inc.*, 320 F.3d 581 (5th Cir. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 506 U.S. 579, 591-92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 584.

The Supreme Court has provided five, non-exclusive factors to consider when assessing

24

whether a methodology is scientifically reliable.  These factors are "(a) whether the expert's theory can be or had been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."  *Id.* at 584-85 (citing *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1193)); *Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998)(en banc).

As the *Bocanegra* court stated, "the test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue."  *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct 1167, 143 L.Ed.2d 238 (1999)).  The party seeking to have the district court admit expert testimony must demonstrate that the expert's finding and conclusions are reliable, but need not show that the expert's findings and conclusions are correct. *Id.* at 585.

The Fifth Circuit has noted that "the *Daubert* analysis should not supplant trial on the merits."  *Mathis*, 302 F.3d at 461 (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002)).  "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.* (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786).

In addition, "whether an expert's testimony is reliable is a fact-specific inquiry."  *See Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 583-584 (5th Cir. 2004)(citing *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 617-18 (5th Cir. 1999)).  The broad generalization made by Merck in the motions in limine make such required factual inquiry impossible until trial, where the context and facts related to the evidence sought to be introduced may be analyzed by the

Court.

The types of material that Merck seeks to exclude, published studies, clinical study data, and adverse event reports, are of the type that is regularly relied upon by experts and clearly admissible under Federal law. *See id.* Plaintiff submits that the Court should permit his experts to testify and consider, in the overall context of their testimony, whether they have established that any test, article, clinical data or adverse event report that they rely on is "reliable."  Without testimony establishing whether the evidence at issue is representative of that which experts in the field typically rely on, a ruling on whether this, or any other evidence should be excluded is premature.

For all of these reasons, the Court was absolutely correct in concluding that Merck's "shot-gun" motion is just  too vague and broad to grant.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the court deny Merck's motion.

Dated:  August 14, 2006

Respectfully submitted,

Drew Ranier
Louisiana Bar No. 8320
**RANIER, GAYLE & ELLIOT LLC**
1419 Ryan Street
Lake Charles, Louisiana 70601
(337) 494-7171; fax (337) 494-7218

/s/ Grant Kaiser
Grant Kaiser
Texas Bar No. 11078900
**THE KAISER FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 223-0000; fax (713) 223-0440

Walter Umphrey
Texas Bar No. 20380000
**PROVOST UMPHREY LAW FIRM LLP**
490 Park Street
Beaumont, Texas 77701
(409) 835-6000; fax (409) 838-8888

Mikal Watts
Texas Bar No. 20981820
**THE WATTS LAW FIRM LLP**
Tower II Building, 14th Floor

26

555 North Carancahua Street
Corpus Christi, Texas 78478
(361) 887-0500; fax (361) 887-0055

James L. "Larry" Wright
Texas Bar No. 22038500
**THE WATTS LAW FIRM LLP**
111 Congress Avenue, Suite 1010
Austin, Texas 78701
(512) 479-0500; fax (512) 473-0328

John Eddie Williams, Jr.
Texas Bar No. 21600300
Jim Doyle
Texas Bar No.6094450
**WILLIAMS BAILEY LAW FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-2200; fax (713) 643-6226

ATTORNEYS FOR PLAINTIFF ROBERT G. SMITH

**CERTIFICATE OF CONFERENCE**

The parties have attempted to confer regarding the matters raised in this motion but have been unable to resolve the matter.

/s/ Grant Kaiser
Grant Kaiser

27

<u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 14th day of August, 2006.


                            /s/ Grant Kaiser
                            Grant Kaiser
                            **THE KAISER FIRM LLP**
                            8441 Gulf Freeway, Suite 600
                            Houston, Texas 77017
                            (713) 230-0000; fax (713) 230-0440
                            gkaiser@thekaiserfirm.com



cc      By email only:

        Robert Van Kirk            rvankirk@wc.com
        **Williams & Connolly LLP**
        725 Twelfth Street Northwest
        Washington, D.C.  20005
        (202) 434-5000; fax (202) 434-5029

        Carrie A. Jablonski            carrie.jablonski@bartlit-beck.com
        **Bartlit, Beck, Herman, Palenchar & Scott LLP**
        54 West Hubbard Street, Suite 300
        Chicago, Illinois 60610
        (312) 494-4400; fax (312) 494-4440