# EXHIBIT E

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

------------------------------x

IN RE:                          : MDL No. 1657

VIOXX PRODUCTS LIABILITY        : Section L

LITIGATION                      : Judge Eldon E. Fallon

                                : Magistrate Judge

                                : Daniel E. Knowles, III

------------------------------x

THIS DOCUMENT RELATES TO:

  Robert G. Smith v. Merck & Co., Inc.

  Case No. 2:05-CV-04379


        Videotaped Deposition of RONALD MARKS, PH.D.

                 Washington, D.C.

             Thursday, August 10, 2006

                    9:22 a.m.

Job No.: 22-84057

Pages 1 - 217

Reported by: Alda Mandell, RPR

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 2

1      Videotaped Deposition of RONALD MARKS,
2   PH.D , held at the offices of:
3
4       FULBRIGHT & JAWORSKI
5       Market Square
6       801 Pennsylvania Avenue, Northwest
7       Suite 500
8       Washington, D. C.  20004
9       (202)662-0200
10
11      Pursuant to agreement, before Alda Mandell,
12   Registered Professional Reporter and Notary Public of
13   the District of Columbia.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

APPEARANCES

ON BEHALF OF PLAINTIFF:
    AVRAM JOSEF BLAIR, ESQUIRE
    WILLIAMS BAILEY LAW FIRM
    8441 Gulf Freeway
    Suite 600
    Houston, Texas  77017-5051
    (800)220-9341

ON BEHALF OF MERCK & COMPANY, INC.:
    RONN B. KREPS, ESQUIRE
    FULBRIGHT & JAWORSKI, LLP
    2100 IDS Center
    80 South Eighth Street
    Minneapolis, Minnesota  55402
    (612)321-2810

Also Present:  ANTHONY DELAGLIO

Page 4

CONTENTS
EXAMINATION OF RONALD MARKS, PH.D.         PAGE
    By Mr Blair                 6
    By Mr Kreps                 210

EXHIBITS
(Attached to the Transcript)

PLAINTIFF'S                                   PAGE
1   Notice of Deposition            6
2   Report of Ronald Marks, Ph.D - 7/21/06   6
3A  Disk with materials received by      To be
    Dr. Marks prior to July 21, 2006   provided
3B  Disk with materials received by      To be
    Dr. Marks after July 21, 2006      provided
4   Bills of Ronald Marks           10, 22
5   Supplemental Materials Reviewed Since   87
    July 21, 2006
6   Summary of Vioxx and Related Clinical   90
    Research Information Known in 1999
7   Description of Naprosyn         144
8   Vioxx Preliminary Cardiovascular   159
    Meta-Analysis
9   Memorandum - 4/6/05 - Jenkins and   194
    Seligman to NDA files
10  Statement                       202

Page 5

EXHIBITS (Continued)

11   Statement                      203
12   Statement                      203
13   Statement                      206
14   Statement                      209

LEGALINK - HOUSTON
(888) 513-9800

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 6

1    (Exhibits 1 and 2 were marked for identification
2  and were attached to the transcript.)
3        P R O C E E D I N G S
4        THE VIDEO OPERATOR:  Here begins tape number
5  one in the deposition of Ronald Marks, Ph.D., in the
6  matter of Vioxx Products Liability Litigation pending
7  in the United States District Court, Eastern District
8  of Louisiana.  Case number 2:05-CV-04379.
9        Today's date is August 9th, 2006.  The time
10  is 9:22 a.m.  This video deposition is taking place at
11  the office of Fulbright and Jaworski, 801 Pennsylvania
12  Avenue, Northwest, Washington, D.C.  Would the counsel
13  please identify themselves and state whom they
14  represent.
15        MR. BLAIR:  Avram Blair with the Williams
16  Bailey Law Firm representing the plaintiff, Gary
17  Smith.
18        MR. KREPS:  Ron Kreps with Fulbright &
19  Jaworski representing Merck.
20        THE VIDEO OPERATOR:  The court reporter
21  today is Alda Mandell.  Would the reporter please
22  swear in the witness.
23        RONALD MARKS, Ph.D.
24  having been duly sworn, testified as follows:
25

Page 7

1  BY MR. BLAIR:
2    Q    Good morning, Dr. Marks.
3    A    Good morning.
4    Q    My name's Avram Blair and you understand I
5  represent Mr. Gary Smith in the lawsuit brought
6  against Merck.
7    A    Yes.
8    Q    And would you kindly state your full and
9  complete name.
10    A    Ronald George Marks.
11    Q    What's your date of birth?
12    A    July 27th, 1948.
13    Q    And your current address, home address?
14    A    2736 Northwest 22nd Terrace, Gainesville,
15  Florida, 32605.
16    Q    What is your current work address?
17    A    That's my work address also.
18    Q    What's your social security number?
19    A    This is going to be a public record.  Do I
20  need to put my social security on a document --
21    Q    Well, what we can do --
22    A    -- that's going to become a public record?
23    Q    -- is you can just give it to me.
24    A    I'm happy to give it to you.
25    Q    That's fine if you're uncomfortable doing

Page 8

1  that.
2    A    I'd just rather not put it on a record
3  that's going to be --
4    Q    I have no problem with that.
5    A    -- circulated.
6    Q    Most of the time --
7        MR. KREPS:  That's fine.
8        MR. BLAIR:  -- these things just disappear
9  into the ether anyway.
10    A    Sure.
11  BY MR. BLAIR:
12    Q    If you'd do that, that will be great.
13    A    I'm happy to do that.
14    Q    Okay.  Dr. Marks, I brought with me a copy
15  of the notice for this deposition which I've marked as
16  Exhibit 1.  Do you have a copy of that notice?
17    A    Yes.
18    Q    And you understand you're here to give
19  testimony as a paid expert for Merck in this case?
20        MR. KREPS:  Object to the form of the
21  question.
22        MR. BLAIR:  Is that correct?
23    A    Yes.
24  BY MR. BLAIR:
25    Q    If you look at Exhibit A to this notice, you

Page 9

1  were asked to bring certain things to your deposition.
2  Do you recall receiving and reviewing this Exhibit A?
3    A    I saw it yesterday.
4    Q    And did you make an effort to bring the
5  documents that were requested --
6    A    Yes.
7    Q    -- that are responsive to Exhibit A?
8    A    Yes.
9    Q    One of the things you were asked to bring
10  was all materials that you reviewed prior to or since
11  you were retained as a paid expert for Merck in the
12  Vioxx litigation.  Did you do that?
13    A    Yes.
14    Q    What did you bring with you?
15    A    I brought with me ten notebooks that contain
16  all the material that I have reviewed and that is
17  summarized in Exhibits B and C of my report.  I
18  brought with me a copy of my invoices.  And I also
19  brought additional materials that I have reviewed
20  since July 12th when my report was submitted.
21        MR. BLAIR:  Can we, counsel, go ahead and
22  agree to mark as Exhibit 3 to this deposition a CD
23  copy of the materials that Dr. Marks has talked about?
24        MR. KREPS:  Yes.  We'll put that -- I'll get
25  the CD in here.  I know it's here in the office

3  (Pages 6 to 9)

VIDEOTAPED DEPOSITION OF RONALD  MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 10

1  somewhere so I'll get it in here and we'll mark it as
2  Exhibit 3.
3       MR. BLAIR:  Whether it's received today or
4  if you have to give it to the reporter tomorrow,
5  that's fine with me.  If you can't do it today.  But
6  with that agreement, I appreciate that.
7       Let's talk about the bill listing that you
8  brought with you today.  I'll mark that as Exhibit 4
9  to your deposition.
10      (Exhibit 4 was marked for identification and
11  was attached to the transcript.)
12  BY MR. BLAIR:
13      Q   Do you have a copy of the bill listing that
14  you brought?
15      A   Yes.
16      Q   Can you tell me when were you first retained
17  and asked to be a paid expert for Merck in this case?
18      A   My first communication was a phone call that
19  I got from Ron Kreps I believe somewhere in the middle
20  of November.  Sometime in November.
21      Q   And that would have been November of 2000
22  and --
23      A   -- '5.
24      Q   -- '5?  Is that right?  Had you worked with
25  Mr. Kreps before?

Page 11

1   A   Yes, I had.
2   Q   In what capacity?
3   A   In the year 2004 I worked with Mr. Kreps and
4   his law firm on PPA litigation.
5   Q   And Mr. Kreps' law firm is the law firm of
6   Fulbright & Jaworski?
7   A   Yes.
8   Q   And PPA litigation, what did you do -- what
9   is PPA?
10  A   Phenylpropanolamine is a compound that had
11  been in cough cold medicines and litigation had arisen
12  around the use of PPA.
13  Q   And were you a paid expert in the PPA
14  litigation?
15  A   I worked with Fulbright & Jaworski
16  representing Bayer.
17  Q   And Bayer was the defendant drug company in
18  that litigation?
19  A   Yes.
20  Q   Did you testify in PPA litigation?
21  A   One time.
22  Q   When did you do that?
23  A   It was in October of '04 I believe.  I'm
24  pretty sure it was October.
25  Q   Where did you testify for Bayer in that PPA

Page 12

1   drug case?
2   A   It was in El Paso, Texas.
3   Q   Did you ever give any depositions in --
4   A   Yes.
5   Q   -- that El Paso case?
6   A   Yes.
7   Q   Did you give just one deposition in that
8   case?
9   A   No.  Oh, in that case?  Yes.
10  Q   Have you given other depositions as a paid
11  expert in PPA drug litigation --
12  A   Yes.
13  Q   -- aside from that El Paso case?
14  A   Yes.
15  Q   And when did you do that?
16  A   To be correct and complete, if I can pull a
17  notebook, I would have those dates and --
18  Q   Feel free.
19  A   I'm sorry.  That will be here.  I have it
20  right here.  I gave a deposition in the Svoboda case
21  S-V-O-B-O-D-A.
22  Q   Just -- let me cut you off for one second.
23  Are you looking at your -- the exhibits attached to
24  your expert report in this case?
25  A   Yes.  It's in Exhibit A.

Page 13

1   Q   I recall that being at the end somewhere.
2   A   Yes.
3   Q   Exhibit A, is that right?  Okay.  That's
4   February 6, 2004, that's right?
5   A   Yes.
6   Q   Okay.  And then did you also testify as a
7   paid expert for the defendant Bayer in a case brought
8   by a Mr. Lefkowitz?
9   A   In deposition, yes.
10  Q   Okay.  We already talked about your
11  testimony as a paid expert for the drug company Bayer
12  in the Valverde case, right?  Is that El Paso?
13  A   Yes.
14  Q   I see three deposition testimonies as a paid
15  expert for Bayer  Is that the total?
16  A   There's one more.  Right below Valverde,
17  Murphy.
18  Q   Sorry.  I missed that  I see that.  Are
19  those four a complete list of deposition testimony as
20  a paid expert for Bayer?
21  A   Yes.
22  Q   And how many of those cases was Mr. Kreps
23  involved in, the lawyer who's with you here today on
24  behalf of Merck?
25  A   Well, I'm not sure I know how to answer

4  (Pages 10 to 13)

LEGALINK - HOUSTON
(888) 513-9800

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 14

1  that. I'm not sure that Mr. Kreps was involved
2  directly in any of those cases.
3     Q   Not as a party obviously.
4     A   I mean I had -- there were other people that
5  I communicated with much more than Mr. Kreps. I knew
6  Mr. Kreps in that case but he was not the primary
7  person I interacted with. So I really don't know
8  exactly how to answer your question because I had
9  on-and-off dialogue with Mr. Kreps.
10    Q   Now, how did you come to work with Mr. Kreps
11 in PPA litigation?
12    A   I was actually in PPA -- let me think.
13 There was a lawyer who is now part of Fulbright &
14 Jaworski who had previously been with a law firm that
15 was I guess acquired or merged with Fulbright &
16 Jaworski. So there was a lawyer who knew me from a
17 previous law firm in New York and I guess they were
18 looking for statisticians for the PPA litigation and
19 he referred my name to Lance Shea who was in this
20 Washington, D.C. Fulbright office.
21    Q   Before we move on to that lawyer, as a paid
22 expert for the defendant Bayer in PPA litigation, what
23 were your opinions just generally that you gave in
24 depositions and at trial?
25    MR. KREPS: Object to the form of the

Page 15

1  question.
2     A   Well, my central opinion that I formed based
3  on my review of the scientific literature regarding
4  PPA was that there was not sufficient evidence to show
5  that PPA caused hemorrhagic stroke.
6  BY MR. BLAIR:
7     Q   So your basic opinion was that this drug,
8  PPA, did not cause stroke.
9     A   Hemorrhagic stroke. Yes.
10    Q   And you gave that opinion on behalf of the
11 defendant Bayer which is a drug company, right?
12    A   Yes.
13    Q   Now, you said, moving away from PPA, that
14 you were introduced to the law firm of Fulbright and
15 Jaworski or at least Mr. Kreps through another lawyer
16 in New York, is that right?
17    A   Yes.
18    Q   What's the name of that lawyer?
19    A   Jim -- and I can't remember his last name
20 right now because I mean I haven't dealt with him in
21 years now. Maybe it will pop into my head during the
22 course of the day but I can't remember his name right
23 now. I mean if it's important, I'm sure I can find
24 it. I can't remember off the top of my head. He's
25 in -- I know he's in the New York office.

Page 16

1     Q   Of Fulbright?
2     A   Yes.
3     Q   What did you work with Jim on?
4     A   A previous case a number of years ago where
5  I worked with Jim and his law firm for plaintiff
6  Gillette against defendant Optiva.
7     Q   That was a corporate case, right? It was a
8  dispute between businesses?
9     A   Yes.
10    Q   It wasn't a personal injury case, right?
11    A   No.
12    Q   So you weren't testifying for any plaintiff
13 that was claiming personal injury damages, right?
14    A   Not in that case.
15    Q   Let's move back to your list of bills for
16 your work as a paid expert in Vioxx litigation that we
17 marked as Exhibit 4. The first page appears to be
18 bills for December through mid January, is that right?
19    A   Yes.
20    Q   It was about $30,000?
21    A   Yes.
22    Q   What cases were you working on back then?
23    A   No cases.
24    Q   Just getting up to speed on --
25    A   Reviewing the scientific literature.

Page 17

1     Q   -- the science. And then there's -- the
2  next bill is for January through February. It's
3  43,000 some odd --
4     A   No. It was 14,000.
5     Q   I'm sorry. 14,000 and we have a running
6  total of 43,000, is that right?
7     A   Correct.
8     Q   What cases were you working on then?
9     A   None.
10    Q   The next bill is 21,000, is that right?
11    A   Yes.
12    Q   Is that a running bill? Is that a running
13 total or is that --
14    A   No.
15    Q   Shall we add that to the 43?
16    A   Add that to the 43.
17    Q   So we're out to about 64,000 roughly? Did I
18 do that math right? I'm not so good at it
19    A   That's right.
20    Q   And then we got -- we move into April. I
21 see 64,000. And then we have another 35,000?
22    A   My bill was 35,000.
23    Q   I see. And then in addition to that, you
24 had to hire some other people to help you with your
25 review?

5  (Pages 14 to 17)

VIDEOTAPED DEPOSITION OF RONALD   MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 18

1    A  Well, that was where I was given the data
2  from the various Merck studies and I subcontracted the
3  data analysis work to another group.
4    Q  What's the name of that group?
5    A  It's a company called InfoTech in
6  Gainesville, Florida.
7    Q  And you're listed on InfoTech's web site as
8  a consultant?
9    A  I'm an associate consultant. Yes
10    Q  So your total bill then for your work,
11  including the services, the statistical services that
12  you subcontracted out, for the month of April was
13  approximately $100,000?
14    A  Yes
15    Q  And shall we add that then to the 64,000?
16    MR. KREPS: Object to form
17    A  Well, with the understanding --
18    MR. BLAIR: The running total.
19    A  With the understanding that I didn't receive
20  all that money.
21  BY MR. BLAIR:
22    Q  If we want to just talk about the money that
23  you got, we'd add the 35 to the 64.
24    A  Yes.
25    Q  So we'd come up with approximately 100,000

Page 19

1  total.
2    A  Yes.
3    Q  Okay. And then -- then we have the next
4  bill which is another 27,000 to you and another 16,000
5  charged to or by InfoTech.
6    A  Yes.
7    Q  Is that right? So the total to you at this
8  point was now 127,000.
9    A  Yes
10    Q  Give or take a few bucks. Now, at anytime
11  during this period in May were you working on any
12  cases as opposed to just doing general reading?
13    A  Well, by now certainly -- oh. By June 6.
14  No. Because that would have been through May.
15  Probably not.
16    Q  Now return to June and we have another bill
17  for you of approximately 23,000, right?
18    A  Yes.
19    Q  So that takes us out to a total of 150,000
20  to you.
21    A  Yes.
22    Q  Now, by June are you working on any cases?
23    A  By now my sense would be that we would have
24  identified that we wanted to get my report completed
25  by July for the Smith case.

Page 20

1    Q  And then finally we move to the last -- last
2  page which looks like July expenses, is that right?
3    A  Yes.
4    Q  We have another 27,000, right?
5    A  Yes
6    Q  So total money that you've made as a paid
7  expert for Merck would be $177,000 give or take a few
8  bucks.
9    A  And subtracting out the expenses, the travel
10  and business expenses. Yes.
11    Q  To be fair, the expenses are a trivial part
12  of that total. Do you agree?
13    MR. KREPS: Object to form.
14    A  We didn't add them up. I don't know how
15  much they are. I just wanted to clarify the record.
16  BY MR. BLAIR:
17    Q  Well, if there's $700 for a plane ticket to
18  Atlanta, $700 for a plane ticket to Atlanta, 2 grand
19  for a plane ticket to Houston, 500 bucks for a plane
20  ticket to Tampa, and 2 grand for a plane ticket to
21  Washington, they're not over $6,000. Would you agree?
22    A  Yes  If that's what the numbers are
23    Q  All right. Well, you've got your numbers in
24  front of you. Do you have any reason to disagree with
25  that?

Page 21

1    A  That's fine.
2    Q  All right. So we're talking about,
3  excluding travel expenses, a total to you of about 170
4  grand.
5    A  Yes.
6    Q  Do you disagree with that?
7    A  No.
8    Q  The vast majority of which is money that you
9  billed before you worked on any case
10    A  Correct
11    Q  I notice there's no business entity that's
12  billing for this money that you've submitted. Do you
13  have a business entity, a DBA or a consultancy or any
14  kind of a corporation that you bill through?
15    A  I just do it as an individual.
16    Q  Okay.
17    MR. KREPS: I'm so sorry to interject but I
18  saw you writing notes on that. I see that's a marked
19  copy of the exhibit.
20    MR. BLAIR: I was writing notes on it. You
21  know what?
22    MR. KREPS: I'll go and get a clean copy.
23    MR. BLAIR: I'll get you -- I'll get you a
24  clean copy.
25    THE WITNESS: You want this one?

6  (Pages 18 to 21)

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

### Page 22

1    MR. KREPS: We can put a sticker on that
2  one.
3         MR. BLAIR: You know what I'll do? I'll do
4  that. Where's my copy pile?
5         (Exhibit 4 was re-marked).
6         MR. KREPS: What are Exhibits 1 and 2?
7         MR. BLAIR: One is the notice. Two is the
8  report which we haven't talked about yet.
9         MR. KREPS: Okay
10        MR. BLAIR: I haven't thrown it over there
11  yet but I will. So I don't write on it again, let me
12  set it up here.
13  BY MR. BLAIR:
14    Q  All right. So we talked about the $170,000
15  I guess in total that you billed as a paid expert in
16  Vioxx litigation. How much money did you earn as a
17  paid expert in PPA litigation working for the drug
18  company Bayer?
19    A  I really -- I have no idea.
20    Q  No idea at all?
21    A  I worked on it for about a year with them
22  I would hate to guess. I mean I would be speculating
23  if I --
24        MR. KREPS: He doesn't want you to guess.
25        MR. BLAIR: We'll take a break.

### Page 23

1         THE VIDEO OPERATOR: We're going off --
2         (Discussion off the record)
3  BY MR. BLAIR:
4    Q  Now, you don't have any idea how much you
5  made --
6    A  It would be --
7    Q  -- as a paid expert for Bayer?
8    A  -- a pure guess.
9    Q  Was it more than 100,000?
10    A  I don't know.
11    Q  Is it more than $250,000?
12    A  No.
13    Q  You've been designated as an expert in
14  Mr. Smith's case. Have you been designated as we sit
15  here today in any other cases?
16    A  No.
17    Q  Individual Vioxx cases.
18    A  No.
19    Q  Let's look at your expert report which we've
20  marked as Exhibit 2. And I'd like to talk to you
21  about your work in other litigation, not Vioxx
22  litigation. So if we can, we can look at -- look at
23  the back where you listed that. I think it's page 21.
24    A  Yes. I'm there.
25    Q  Now, when you prepared this report you

### Page 24

1  understood this would be used in court, right?
2    A  Yes.
3    Q  And did you do your best to make sure it was
4  complete and accurate?
5    A  Yes
6    Q  To the best of your knowledge, is it
7  complete and accurate?
8    A  I believe so.
9    Q  And on page 21 you listed your trial
10  testimony in the past four years, right?
11    A  Yes.
12    Q  And your depositions in the past four years,
13  is that right?
14    A  Yes.
15    Q  Okay  Is there a reason why you only listed
16  the past four years?
17    A  Because I'm really uncertain of the complete
18  correctness going back before four years so I wanted
19  to restrict it to at least where I was comfortable
20  that it was complete and correct.
21    Q  Why are you uncertain?
22    A  I'm sorry?
23    Q  Why are you uncertain?
24    A  Well, because I was a full-time professor at
25  a university, I didn't do very much expert witness

### Page 25

1  work and I didn't keep records of depositions or trial
2  testimony. So I may not remember everything I've done
3  before four yours ago.
4    Q  Okay. Well, if we can, let's do the best --
5  what I ask you to do is do the best with your memory
6  as it is and let's go back to, say, 1980. In the
7  1980's, starting with the year 1980, what work did you
8  do if any as a paid expert?
9    A  There are two cases that I served as an
10  expert witness somewhere in the 1980's
11    Q  Okay.
12    A  And the one I remember most vividly would
13  have been in Bendectin.
14    Q  Bendectin, is that another drug?
15    A  Bendectin was a drug that was on the market,
16  a very widely used popular drug for morning sickness
17  in pregnant women.
18    Q  Is it on the market today?
19    A  No
20    Q  And you were a paid expert in Bendectin
21  litigation?
22    A  Yes.
23    Q  Is that right? And for whom?
24    A  For the company that manufactured Bendectin
25    Q  And do you remember the name of that

7 (Pages 22 to 25)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

## Page 26

1  company?
2      A  Well, understand companies have merged so
3  much. At one time it was MarionMerrillDow. I'm not
4  sure if what was his exact name the year I worked.
5      Q  It was a drug company?
6      A  It was a drug company.
7      Q  And you testified for the drug company, is
8  that right?
9      A  Well, I ended up not testifying it turned
10  out. I did do a deposition.
11      Q  You did or you did not?
12      A  I'm pretty sure I did a deposition. I was
13  going to testify in the case and at the last minute
14  the case -- I don't know if the right word was
15  cancelled -- but the case fell apart and there were no
16  more Bendectin cases.
17      Q  Okay. And in your work as a paid expert for
18  that drug company in the Bendectin litigation, what
19  was your basic opinion that you gave in your
20  deposition?
21      A  That Bendectin did not cause birth defects
22  in children.
23      Q  And was that based upon your sort of global
24  assessment of the literature?
25      A  Yes.

## Page 27

1      Q  So that was one of the cases in which you
2  testified as a paid expert for in the 80's, is that
3  right? The Bendectin cases?
4      A  Yes.
5      Q  And what was the other case that you worked
6  on in the 80's?
7      A  There was an age discrimination lawsuit
8  filed by a person in Orlando against -- I believe it
9  was GE in Orlando. GE had laid off a number of
10  employees. And this employee sued GE for age
11  discrimination.
12      Q  What lawyer did you work with -- what lawyer
13  for the drug company did you work with in Bendectin?
14      A  I have no idea. I'm pretty sure it was --
15      Q  What law firm?
16      A  I'm sorry?
17      Q  I'm sorry. I'm pretty sure --
18      A  I'm pretty sure it was an Orlando law firm.
19  I remember working in Orlando. But I have no idea who
20  was the firm or who was the lawyer.
21      Q  Now, your -- do you keep a copy of your old
22  depositions by the way?
23      A  No. Once cases are over, I usually get rid
24  of everything.
25      Q  Do you remember where that case was pending,

## Page 28

1  that Bendectin case, that you gave a deposition in?
2      A  I believe it was Orlando.
3      Q  Is it state court or federal court?
4      A  I have no idea.
5      Q  You don't remember the name of the lawyer
6  you worked with or the law firm you worked with?
7      A  No.
8      Q  Do you remember the name of the plaintiff?
9      A  No.
10      Q  Do you remember anything about that case
11  that would help anyone to find a copy of your other --
12  the deposition that you gave in that case?
13      A  It was the last lawsuit that was ready to go
14  to trial and it didn't go to trial. So it was at the
15  very end of the Bendectin sequence of trials.
16      Q  Do you remember the name of the judge
17  presiding?
18      A  No.
19      Q  Do you remember the name of the plaintiff's
20  lawyer?
21      A  No.
22      Q  Or law firm?
23      A  No.
24      Q  Do you remember the name of any of the other
25  experts in the case?

## Page 29

1      A  This was over 20 years ago. I have no
2  memory of --
3      Q  Okay.
4      A  -- any of the individuals who might have
5  been involved in that.
6      Q  Okay. Now, the age discrimination case that
7  you worked on in the 80's, that was not a personal
8  injury case, right?
9      A  No.
10      Q  Do you remember the name of the law firm
11  that you worked with in that case?
12      A  No.
13      Q  Did you give a deposition in that case?
14      A  I would say I probably did because I was
15  scheduled to testify in court for the plaintiff.
16      Q  Do you have a copy of that deposition?
17      A  No.
18      Q  Do you remember the name of the plaintiff?
19      A  No.
20      Q  Do you remember whether it was pending in
21  state or federal court?
22      A  No.
23      Q  Do you remember the law firms for either
24  party?
25      A  No.

LEGALINK - HOUSTON
(888) 513-9800

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 30

1    Q   Are those the only two cases that you worked
2  on in the 80's as a paid expert?
3    A   Those are the only two that come to mind.
4    Q   Let's move into the 90's. Beginning with
5  1990, what work did you do as a paid expert?
6    A   I did one other age discrimination case
7  somewhere in the early to mid the 90's and I don't
8  remember much about it. It was an individual who was
9  suing I believe Palm Beach County, one of the Southern
10 Florida counties, for age discrimination and his
11 termination. He had no money so I ended up helping
12 him for free. I did a little work for him. And I did
13 a video deposition because they couldn't afford for me
14 to come to Miami. So they came to Gainesville, did
15 the deposition, and I believe I also did a video court
16 testimony in Gainesville.
17   Q   Do you remember the name of the plaintiff?
18   A   No.
19   Q   Do you remember the name of the plaintiff's
20 law firm?
21   A   No.
22   Q   Do you remember the name of the defense
23 attorneys or the defendant's law firm?
24   A   No.
25   Q   Do you have a copy of that deposition?

Page 31

1    A   No.
2    Q   Now, that was not a case in which an
3  individual was actually seeking any kind of recovery
4  for personal injury, right?
5    A   It was an age discrimination lawsuit.
6    Q   Not a personal injury case, right?
7    A   Well, I'm just not going to get into that
8  because I -- I don't know if you would consider losing
9  your job personal injury or not. You know.
10   Q   Well, it wasn't a case where somebody
11 claimed that physically, you know, they had been
12 harmed, their heart had been hurt or something like
13 that, right?
14   A   They claimed they had lost their job due to
15 their age.
16   Q   Okay. All right. After the age
17 discrimination case, when was your next work as a paid
18 expert?
19   A   The next that I remember was the case that
20 we talked about a while ago that was in New York
21 federal court which was Gillette versus Optiva.
22   Q   Okay. And that was the commercial case we
23 talked about, right?
24   A   Yes.
25   Q   And what law firm did you work with in that

Page 32

1  case?
2    A   I don't remember the name but it was the law
3  firm -- Jim Neale, N-E-A-L-E, was the lawyer in New
4  York who introduced me to Lance Shea. And whatever
5  law firm Jim Neale was with in New York in 1989 or
6  '90, whenever this case came about, that's the law
7  firm I worked with. There was also a D.C. law firm
8  that headed up the case. The firm in New York was
9  working with the firm in New York --
10       MR. KREPS:  In D.C.
11       THE WITNESS:  I'm sorry. In D.C.
12   A   The firm in New York that Jim Neale was with
13 was working with the D.C. firm that was heading up
14 Gillette's case.
15 BY MR. BLAIR:
16   Q   Did you say N-E-A-L, Neal?
17   A   N-E-A-L-E. Jim Neale.
18   Q   N-E-A-L-E. Okay. And you said the lawyer
19 Neale introduced you to Lance Shea?
20   A   When you asked me earlier about how I got
21 into PPA --
22   Q   Yeah.
23   A   -- Jim Neale gave my name to Lance Shea
24 who's in the Washington office of Fulbright Jaworski.
25   Q   How do you spell Lance Shea's name?

Page 33

1    A   S-H-E-A.
2    Q   And so Lance Shea is with Fulbright &
3  Jaworski who represents Merck in this case, right?
4    A   Yes.
5    Q   And you worked with him -- you then worked
6  with Mr. Shea in PPA litigation?
7    A   That's correct.
8    Q   And you testified as a paid expert for the
9  defendant Bayer?
10   A   Yes.
11   Q   After the commercial case that you worked
12 on, Gillette Versus Optiva, what was your next work as
13 a paid expert?
14   A   There are -- there are two other depositions
15 that I remember that aren't on this list because they
16 occurred I believe in early -- early 2000's. One
17 was -- it's called a smoking cessation case. Someone
18 who had stopped smoking for over 20 years and
19 developed cancer.
20   Q   Uh-huh. And what were the names of the
21 plaintiffs in those cases, those smoking cases?
22   A   It was a lady. Her last name was Mehlman,
23 M-E-H-L-M-A-N. There may be two N's at the end. I'm
24 not sure. But her last name was Mehlman.
25   Q   Okay. Where was that case pending?

9 (Pages 30 to 33)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

### Page 34

1    A  I believe that was in New Jersey.
2    Q  What was the name of the other -- the
3  plaintiff in the other case?
4    A  The other case was Routh, R-O-U-T-H.
5    Q  And where was that?
6    A  That was in Miami.
7    Q  And Routh was a smoking cessation case?
8    A  No. Routh was a flight attendant who had
9  developed lung cancer and was suing for the cause of
10  her lung cancer being her flight attendant status.
11    Q  Now, you told us about these -- it sounds
12  like two tobacco cases, is that right?
13    A  Yes.
14    Q  Okay. And who were you testifying for as a
15  paid expert in those cases?
16    A  For the defendant, R.J. Reynolds.
17    Q  You were testifying as a paid expert for the
18  tobacco company?
19    A  For R.J. Reynolds.
20    Q  Is R.J. Reynolds a tobacco company?
21    A  Yes. I believe so.
22    Q  Do you know what brands R.J. Reynolds makes
23  as cigarettes?
24    A  I really don't remember.
25    Q  And in those two tobacco cases which you

### Page 35

1  testified in as a paid expert, what was your opinion?
2    A  I gave depositions in those two cases. I
3  didn't testify in court.
4    Q  Okay.
5    A  In the -- in the Mehlman case she had
6  stopped smoking for I believe it was 21 years before
7  she developed -- I believe she developed lung cancer.
8  And the majority of the published scientific
9  literature shows that when you've stopped smoking for
10  18 years, that your risk of developing lung cancer
11  returns to virtually that of a never smoker.
12    Q  So in the Mehlman case, as a paid expert for
13  the tobacco company, you sort of did a global
14  assessment of the literature and formed the opinion
15  and gave the opinion that the plaintiff's lung cancer
16  was not caused by her prior smoking, is that right?
17      MR. KREPS: Object to the form of the
18  question.
19    A  I didn't give an opinion as to her cause
20  I'm not an M.D. But my opinion was that from an
21  epidemiological and statistical standpoint, the
22  published scientific literature for the population of
23  former smokers, once you've smoked -- once you've
24  ceased or stopped smoking for over 18 years, your risk
25  of developing lung cancer is virtually that of a non

### Page 36

1  smoker.
2    Q  So did you give the opinion then that based
3  upon your global review and assessment of the
4  epidemiological literature, that this distant prior
5  history of smoking did not cause lung cancer? Is that
6  what you gave?
7    A  In the population of former smokers, there's
8  not substantial -- well, the published literature is,
9  in my opinion, fairly complete that former smokers --
10  the population of former smokers who have stopped
11  smoking for more than 18 years have the risk of lung
12  cancer essentially that of a never smoker.
13    Q  So in that case you were testifying that
14  based upon your global assessment of the scientific
15  literature, given the facts in the plaintiff's case,
16  her cancer did not come from having smoked. Is that
17  the testimony you gave?
18    A  I don't make a statement about an individual
19  person. An M.D. would make a statement about an
20  individual person. I represented the epidemiology,
21  literature.
22    Q  Okay. So you testified then that everybody
23  like the plaintiff in that case with that set of
24  relevant facts who got cancer, that their cancer would
25  not have caused -- would not have been caused by

### Page 37

1  smoking, is that right?
2      MR. KREPS: Object to --
3      MR. BLAIR: Is that what you testified to?
4    A  I think I've answered that question.
5  BY MR. BLAIR:
6    Q  Did you testify in any way, shape or form in
7  the Mehlman case that the plaintiff's lung cancer was
8  unlikely to have been caused by smoking 20 years
9  earlier?
10    A  I think I've answered that question.
11    Q  Okay. You've given the best answer you can,
12  the most honest and truthful and thorough answer?
13    A  I've given the answer that summarized my
14  opinion in the Mehlman case.
15    Q  Okay. Let's talk about the Routh case.
16  Now, that was in Miami did you say?
17    A  Yes.
18    Q  And that was a case brought by a flight
19  attendant?
20    A  Yes.
21    Q  Or a group of flight attendants? Or do you
22  remember?
23    A  No. This was an individual flight
24  attendant.
25    Q  And were you testifying for R.J. Reynolds in

LEGALINK - HOUSTON
(888) 513-9800

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 38

1  that case?
2      A  Yes.
3      Q  The tobacco company?
4      A  Yes.
5      Q  And you were a paid expert for the tobacco
6  company in that case too?
7      A  I was paid for my time.  Yes.
8      Q  Was that a smoking-cessation case?
9      A  No.
10      Q  So it was a little bit different?
11      A  It was different.
12      Q  Okay.  What was the nature of that case?
13      A  The flight attendant had developed lung
14  cancer and she felt that her lung cancer was caused by
15  smoke in the cabin of the airplanes in which she
16  worked.
17      Q  Okay.  And what opinion did you give as a
18  paid expert for the tobacco company in that flight
19  attendant case?
20      A  Well, I reviewed the published literature on
21  diseases in flight crews.  Sometimes you had to use
22  whole flight crews, not just flight attendants,
23  because the literature is not as complete as it is in
24  some other areas.  But when you review the literature
25  of diseases and conditions in flight attendants, you

Page 39

1  very, very rarely see lung cancer in flight
2  attendants.  The diseases that occur in flight crews
3  due to professional and occupational risks are
4  entirely different than cancer risks.
5      Q  Was that a different set of literature that
6  you reviewed in the flight attendant cases as opposed
7  to the New Jersey smoking-cessation case?
8      A  Yes.
9      Q  And as a paid expert for the tobacco
10  company, did you perform a sort of global assessment
11  of that literature for the flight attendant case?
12      A  Yes.  For flight attendants and for flight
13  crews which would include flight attendants but also
14  include the pilots and other crew members.
15      Q  Okay.  And based upon your assessment and
16  review of the literature in the flight attendant case,
17  did you give an opinion that plaintiff's cancer was
18  not caused by smoking?
19          MR. KREPS:  Object to form.
20          MR. BLAIR:  Or exposure to tobacco smoke?
21          MR. KREPS:  To the form of the question.
22      A  I gave an opinion that based on the totality
23  of the published scientific literature, there was not
24  an established link between lung cancer and flight
25  crews.

Page 40

1  BY MR. BLAIR:
2      Q  You mean exposure to tobacco smoke?
3      A  Well --
4      Q  Not flight crews.
5      A  Well, I really -- the opinion was that there
6  was virtually no lung cancer in flight crews.  The
7  incidence rate of lung cancer in flight crews was
8  certainly not above the incidence of cancer in the
9  general population.
10      Q  Okay.  And so in conclusion, the opinion you
11  gave then was that the flight attendant's lung cancer
12  was unlikely to have been caused by exposure to
13  tobacco smoke.  Is that a fair summary?
14          MR. KREPS:  Object to the form of the
15  question.
16      A  I didn't give an opinion specific to the
17  flight attendant in that case.  I gave an opinion
18  regarding the summary of the published scientific
19  literature on the relationship between lung cancer
20  risks in flight crews versus the general population.
21      Q  You were in that case giving an opinion in
22  support of the tobacco company's argument that that
23  flight attendant's lung cancer wasn't caused by her
24  exposure to tobacco smoke, right?
25      A  I don't know how the defendant used what I

Page 41

1  said in a deposition.  I didn't testify at trial so I
2  really don't know what happened.
3      Q  Well, you understood that was the point of
4  your testimony, right?
5          MR. KREPS:  Object to the form of the
6  question.
7      A  The point of my --
8          MR. BLAIR:  I mean -- right?
9      A  The point of my testimony was to provide
10  information on the relationship between cancer
11  incidence in flight crews, and specifically flight
12  attendants if possible, and lung cancer risk.
13  BY MR. BLAIR:
14      Q  Okay  So the opinion you gave was based
15  upon your scientific review for all people with that
16  flight attendant  The scientific literature didn't
17  demonstrate that exposure to tobacco smoke caused
18  cancer  Is that a fair summary of your testimony?
19          MR. KREPS:  Object to the form of the
20  question.
21      A  For the cohort of flight attendants and
22  flight crews that were included in the research that
23  had been published in the scientific literature, there
24  was no evidence of an excess of lung cancer risk in
25  flight crews above that of the general population.

11 (Pages 38 to 41)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 42

BY MR. BLAIR:
1  Q  Are those the -- now, we talked about
2  Mehlman, the smoking-cessation case, and Routh, the
3  flight attendant case, in which you were a paid expert
4  for the tobacco company. But were there any other
5  cases in which you were a paid expert for the tobacco
6  companies?
7  A  Sitting here today, those are the ones --
8  that's the total recollection of my involvement.
9  Q  Do you have any other documents that could
10  sort of jar your opinion or that you could look at to
11  see if you've given any other testimony within the
12  past four years?
13  A  I don't think so because I mean I don't keep
14  records on any -- I mean in fact I retired from the
15  university a year and a half ago. I mean I really got
16  rid of all of my university files. And anything I did
17  as expert witness I get rid of when a case has ended.
18  Q  What about the Lucas case?
19  A  Well, the Lucas case is on here.
20  Q  Did we talk about it already?
21  A  No. But you were asking me -- I thought you
22  were asking me about cases that weren't on here.
23  Q  Oh, okay. All right.
24  A  I'm sorry.

Page 43

1  Q  All right. Well, we'll move forward. We'll
2  move forward. Now, Routh, you said that was in 2000,
3  that flight attendant case?
4  A  It was in the early 2000's somewhere.
5  Q  Okay. Do you remember the year?
6  A  It was in the early 2000's. I don't know.
7  Q  I mean clearly if it had been within the
8  past four years it should have been on your list,
9  right, that you turned over and signed?
10  A  Probably. Yes.
11  Q  So we talked about the two cases then, the
12  tobacco cases that were not on your list that you
13  turned over --
14  MR. KREPS: Object to form.
15  MR. BLAIR: -- having been -- to the best of
16  your recollection as you sit here today, occurred more
17  than four years ago. What's the next case you did as
18  a paid expert?
19  THE WITNESS: Next case when?
20  MR. BLAIR: Next litigation after these two
21  tobacco cases, Mehlman and Routh.
22  A  Well, the other one -- I mean the others are
23  on my list. I don't remember any others -- I'm not
24  sure if you're asking about my list.
25  MR. BLAIR: Yeah. I want to move into your

Page 44

1  list now.
2  THE WITNESS: Okay.
3  BY MR. BLAIR:
4  Q  Let's do it this way. Let's do this it this
5  way. We've got your list that you turned over, right?
6  A  Yes --
7  Q  And we've talked about Bendectin which is a
8  drug --
9  A  Yes.
10  Q  -- company case. And we talked about some
11  age discrimination cases and we talked about a
12  commercial case and now we've talked about two
13  testimonies on behalf of tobacco companies. Is that a
14  complete list of cases that are not on your expert
15  report?
16  MR. KREPS: Object to the form of the
17  question.
18  A  That I can remember sitting here today.
19  BY MR. BLAIR:
20  Q  Okay. Now let's look at your expert report.
21  A  Okay.
22  Q  By the way, what were the names of the
23  attorneys that you worked with in the smoking cases,
24  tobacco cases?
25  A  Neil Kodsi.

Page 45

1  Q  Which case was that?
2  A  Probably each of them that I mentioned. I
3  believe it was Neil.
4  Q  Neil Kodsi? How do you spell that?
5  A  K-O-D-S-I.
6  Q  K-O-D-S-I. Okay. And who is Mr. Kodsi
7  with, what law firm?
8  A  At the time he was with Womble Carlyle.
9  Q  Who is he with now?
10  A  He's moved. I can't remember the name of
11  the law firm. He's with a different law firm. He's
12  in Miami. I can't remember the name of the law firm.
13  Maybe it will pop into my head.
14  Q  Have you done any more work with Mr. Kodsi
15  since those two smoking cases?
16  A  No.
17  Q  Do you remember how much money you were paid
18  by the tobacco companies for your work as a paid
19  expert?
20  MR. KREPS: Object to the form of the
21  question.
22  THE WITNESS: For those three cases?
23  MR. BLAIR: Mehlman, Routh and we haven't
24  talked about Lucas yet.
25  A  My sense is it wouldn't have been more than

12  (Pages 42 to 45)

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 46

1    $20,000. I mean the Routh especially was minimal.
2    BY MR. BLAIR:
3       Q    20,000 each?
4       A    Possibly.
5       Q    So 60,000 for all three including
6    depositions and that literature review and --
7       A    Well, the Routh I remember -- the Routh I
8    remember just was not a lot of work. It was -- the
9    Mehlman and the Lucas -- see, the Lucas was the same
10   literature as Mehlman. They were the same types of
11   cases. So I had one literature review on the smoking
12   cessation that was used for both.
13      Q    Okay.
14      A    And the literature review for the Routh was
15   fairly minimal.
16      Q    Okay.
17      A    So --
18      Q    Now, Lucas was in Florida, right?
19      A    Yes.
20      Q    Okay. And Mehlman was in New Jersey?
21      A    I believe so.
22      Q    Okay. And both Mehlman and Lucas were
23   smoking cessation cases that we talked about, right?
24      A    Yes.
25      Q    And you were talking about whether the

Page 47

1    scientific literature showed an association between
2    cancer like the plaintiffs had and their prior smoking
3    history, is that right?
4          MR. KREPS:  Object to form of the question.
5          THE WITNESS:  I'm sorry. Can you ask that
6    again? I missed the beginning.
7    BY MR. BLAIR:
8       Q    In both those cases --
9       A    Mehlman and Lucas.
10      Q    -- Mehlman and Lucas, the issue was the
11   plaintiffs' cancer and the scientific literature and
12   their prior history of smoking, is that right?
13      A    Yes
14      Q    Okay. And in the Routh case it was a flight
15   attendant case and the issue was literature with
16   flight attendants and airline crews and exposure to
17   smoke inside airplanes, is that right?
18      A    Yes.
19      Q    And you think you made $60,000 total for all
20   of those? Is that what you're saying?
21      A    I don't know. I mean that was so long ago
22      Q    It was?
23      A    In my life that was a long time ago.
24      Q    Okay
25      A    I don't remember.

Page 48

1       Q    Okay. Do you have any bills from that
2    period at all --
3       A    No.
4       Q    -- or anything like that?
5       A    No.
6       Q    Do you have any copies of the depositions
7    you gave or anything like that?
8       A    No.
9       Q    Have any trial transcripts? Were there any
10   trials in those cases?
11      A    The Lucas.
12      Q    Okay. So you went to trial in Lucas?
13      A    Yes.
14      Q    Okay. Do you remember the names of the
15   plaintiff's attorneys in Lucas?
16      A    No.
17      Q    Do you remember the name of the trial
18   attorney for the tobacco company that you were working
19   with in Lucas?
20      A    No.
21      Q    Was it Womble Carlyle?
22      A    I'm not sure.
23      Q    Law firm?
24      A    I'm not sure.
25      Q    Have we covered all of your work in trial or

Page 49

1    in deposition or anywhere else as a witness for
2    tobacco companies or paid expert --
3       A    As I can remember sitting here today --
4       Q    Okay.
5       A    -- that's the totality of my expert witness
6    experience total.
7       Q    Have you ever done any consulting for any
8    tobacco companies not on this list?
9       A    No. I'm almost positive no but I'll just
10   say as I sit here today, no, because in some of this
11   litigation other tobacco companies were involved so I
12   don't think I worked for any other company but I mean
13   there were other companies involved in some of this
14   litigation.
15      Q    Well, let me ask the question as broadly as
16   I can then so we get a complete answer. I want to be
17   sure I ask the question right. Have you ever done any
18   work for which you appeared as a witness or have been
19   paid any money by any tobacco company for anything
20   that is not on this list, page 21 of your report, or
21   that we haven't already discussed in this deposition?
22      A    Not that I remember sitting here today.
23      Q    Okay. All right. So after you did the work
24   as a paid expert for the tobacco companies, what was
25   the next set of cases that you worked on?

13 (Pages 46 to 49)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 50

1    A  Well, I wouldn't characterize it as I worked
2  for this group and then I went on to another group and
3  then I went on -- that's not the way I was working.
4  If someone called me and asked my opinion, I was -- if
5  I had the time when I was a university professor, I
6  gave them that opinion. I mean the Lucas case came
7  after some other work that I had done for Gillette in
8  their case and so --
9    Q  I'm sorry. Lucas --
10    A  I'd just like to make that clarification.
11    Q  Well, Lucas is unrelated to Gillette, isn't
12  it?
13    A  Yes.
14    Q  Gillette's that commercial case with
15  whatever different lawyers and different companies,
16  right?
17    A  To me it was an expert witness case so I
18  don't distinguish it or the type of case that it is
19  from other cases.
20    Q  I just want to make sure I didn't
21  misunderstand there was some connection between Lucas
22  and your work on Gillette.
23    A  No. No connection at all.
24    Q  All right. So after you finished working
25  for the tobacco companies on those three cases we've

Page 51

1  discussed, Mehlman, Routh and Lucas, what was the next
2  case that you worked on?
3    MR. KREPS: Object to the form of the
4  question.
5    A  From the record here it looks like after
6  Lucas, the next expert witness work I did was for
7  Proctor & Gamble in 2004.
8  BY MR. BLAIR:
9    Q  Okay. And what kind of case was the Proctor
10  & Gamble case that's listed on -- is that the case
11  that's listed here on --
12    A  Yes. July 2004.
13    Q  What kind of case was that?
14    A  I gave court testimony and the depo in that
15  was April of 2004.
16    Q  Okay. That was a commercial case, not a
17  personal injury case?
18    A  It was -- Colgate was suing Proctor &
19  Gamble.
20    Q  Those are two big companies, right?
21    A  Yes.
22    Q  Okay. And you were testifying for one of
23  the companies?
24    A  Proctor & Gamble.
25    Q  Okay. And it was not a case involving any

Page 52

1  personal injury allegations, right?
2    A  No.
3    Q  Okay. Do you remember -- it looks like you
4  gave a deposition and testified. Do you have a copy
5  of that deposition or your trial transcript?
6    A  No. I believe in that case they actually
7  asked us -- asked me to return everything after the
8  trial was over.
9    Q  And what lawyers did you work with on that
10  case?
11    A  I worked with Harold -- the firm is Kramer
12  Levin Naftalis in New York. I want to get his name
13  right so -- I don't want to say it until I get it
14  right. I know I'll think of it. I keep talking to
15  him as Harold so I don't remember his last name. But
16  he's a senior partner in Kramer Levin Naftalis in New
17  York.
18    Q  Okay. How did you meet the lawyer in New
19  York?
20    A  I actually got a phone call from one of the
21  biostatisticians at Proctor & Gamble and when the
22  litigation was going on, they realized they needed a
23  biostatistician and so I know a number of the
24  biostatisticians at Proctor & Gamble. They've known
25  me for many years. So they called me and asked if I

Page 53

1  had the time and the interest working with them to
2  form an opinion. And at the time it was actually -- I
3  was looking for something to do. I was cutting back
4  at the university so I agreed to look into the issues
5  in their case.
6    Q  How did you meet Mr. Kodsi, the lawyer for
7  the tobacco companies that you worked with, or become
8  involved as a paid expert for the tobacco companies?
9    MR. KREPS: Object to the form of the
10  question.
11    MR. BLAIR: You understand the question?
12    A  Yeah. I'm trying to think how I met Mr.
13  Kodsi. I had done some consulting work for Womble and
14  I met Mr. Kodsi through that.
15  BY MR. BLAIR:
16    Q  Is the consulting work for Womble something
17  that you were paid money to do?
18    A  Yes.
19    Q  Okay. As a statistician --
20    A  Yes.
21    Q  -- like the rest of these cases?
22    A  Yes.
23    Q  And when did you -- have we already
24  discussed that work for Womble, that law firm?
25    A  No. Because I mean that wasn't deposition

14 (Pages 50 to 53)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 54

1  or trial work. That was --
2      Q   Who were you working for?
3      A   I forget the name. Jeff -- it was a long
4  time ago. It was Jeff. It was in their office I
5  think in Greensboro.
6      Q   Okay. That's the name of the lawyer at
7  Womble you were working with on this prior consulting?
8      A   Yes.
9      Q   Okay. What was the nature of the
10 consulting?
11     A   They asked my opinion on a number of
12 different cases based on this published scientific
13 literature and I gave them some opinions.
14     Q   Were any of those -- well, did any of that
15 work ever get publicly announced anywhere?
16     A   Well, I don't know if they publicly
17 announced it. I mean they hired me to give them
18 opinions and I don't know what they did with those
19 opinions.
20     Q   Was any of that work for drug companies?
21     A   For drug companies?
22     Q   Yeah. I mean were you being paid through
23 the law firm Womble Carlyle and this Mr. Jeff to
24 consult on issues for drug companies?
25     A   I'd have to say no because I mean I don't

Page 55

1  really understand the question.
2      Q   Well, you said you were doing --
3      A   I understand --
4      Q   -- some consulting for Womble Carlyle, this
5  law firm, right?
6      A   Yes
7      Q   And they asked you to look at some cases.
8  That's what you said, right?
9      A   Well, not necessarily cases but issues that
10 were related to cases. So I mean there might have
11 been some times where they'd say here's a case, you
12 know, what do you think the scientific literature
13 shows about this. So I wasn't involved in cases but I
14 consulted with them somewhat where they would ask my
15 opinions.
16     Q   Without telling me the substance of any of
17 your consulting work on those cases if it wasn't
18 public, were you consulting on drug cases for that
19 group? Drug issues, pharmaceutical --
20     A   No.
21     Q   -- personal injury? Any kind of --
22     A   No drug cases. No.
23     Q   Like we're here today to talk about.
24     A   No. No.
25     Q   And were you consulting for any tobacco

Page 56

1  companies for Womble Carlyle back before you met Mr.
2  Kodsi?
3      A   No.
4      Q   Okay. So it was unrelated -- were they
5  personal injury cases that you were consulting for
6  Womble Carlyle?
7      A   Well, they were cases that -- they were
8  cases that they had with R.J. Reynolds.
9      Q   So there was tobacco work -- before you met
10 Mr. Kodsi and worked with him on the three cases we
11 talked about, you had done some paid consulting --
12     A   Consulting. Yes.
13     Q   -- work by the tobacco companies?
14     A   Yes.
15     Q   Okay. And so how did you first get involved
16 in being -- doing paid expert work or consulting for
17 the tobacco companies if it wasn't -- it would have
18 been this Jeff guy in Womble Carlyle that I guess --
19 was he your first contact?
20     A   He was the senior fellow that I did, you
21 know, give opinions to when they would ask my opinion
22 on cases.
23     Q   Okay. So when did you first get involved
24 doing paid consulting work for tobacco companies?
25 What year?

Page 57

1      A   It would have been in the second half of the
2  1990's. 1977, '78, '79. In there.
3      Q   Well, '97, '98? '99. You said latter half
4  of 1990's. '78, '79.
5      A   19 -- somewhere in the late 1970's, mid to
6  late 1970's. Oh. No. No. No. '90s. '97, '98, '99
7  Somewhere in the late 1990's.
8      Q   All right. Let me ask it again and we'll
9  clean it all up. What year did you begin doing paid
10 consulting work for tobacco companies?
11     A   Somewhere in the late -- mid to late 1990's.
12     Q   Okay. And how did you first get involved
13 with the tobacco companies?
14     A   They contacted me and asked me if I would
15 consult and give them opinions on certain issues in
16 cases.
17     Q   Who contacted you?
18     A   Again I'd have to go back and think of the
19 name of the fellow that I talked to first. Jeff is
20 the fellow that I talked with -- he was the senior guy
21 that I dealt with so I'd have to go back and think
22 about the name of the man who made the original contact.
23     Q   Was it somebody at one of the tobacco
24 companies that contacted you or was it --
25     A   No. It was Womble.

15 (Pages 54 to 57)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 58

1    Q   Somebody -- it was a lawyer at the law firm
2  of Womble Carlyle --
3    A   Right.
4    Q   -- in North Carolina --
5    A   Right.
6    Q   -- that contacted you first --
7    A   Right.
8    Q   -- to do work --
9    A   Right.
10   Q   -- for the tobacco companies?
11   A   Right.
12   Q   And that was in the mid to late 1990's?
13   A   Yes.
14   Q   And you did some consulting work for the
15 tobacco companies for a while, is that right?
16   A   Well, I would just say it was on and off.
17 They would ask my opinions.
18   Q   How much money did they pay you over that
19 time period for your consulting work, the tobacco
20 companies?
21   A   I can't -- that was six, seven, eight, nine
22 years ago. I don't remember.
23   Q   Okay. Was it $100,000, $250,000?
24   A   You mean altogether?
25   Q   Yes.

Page 59

1       MR. KREPS:  Objection to form.
2    A   It would have been -- it would have been
3  100,000 -- I mean it would have been at least 100,000
4  but I don't think it would have been 250.
5  BY MR. BLAIR:
6    Q   Okay. So --
7    A   I mean that's the best I can do with a
8  range.
9    Q   -- somewhere between 100,000 and $250,000?
10   A   Yes.
11   Q   Now, is that in addition to the money you
12 were paid for your actual testimony on the tobacco
13 cases that we talked about?
14      MR. KREPS:  Objection to the form of the
15 question.
16   A   That would not -- well, again, that would
17 have been, yes, for let's say consulting work.
18 BY MR. BLAIR:
19   Q   Right. So we have 100 to 250 for the
20 consulting work.
21   A   Right.
22   Q   And then we have some number for the actual
23 cases we discussed earlier.
24   A   Right.
25   Q   Lucas, Routh and Mehlman?

Page 60

1    A   It's Routh, R-O-U-T-H. It's spelled
2  R-O-U-T-H but it's pronounced Ruth (phonetic) I
3  believe.
4    Q   All right. Mehlman --
5    A   Lucas.
6    Q   -- Lucas and Routh?
7    A   Right.
8    Q   And you think maybe $20,000 for each of
9  those cases you got?
10   A   That's a very rough guess.
11   Q   Okay. Could it be more?
12   A   It could be.
13   Q   Could it be a lot more?
14   A   It's not 250,000. You'd like to use that
15 number. It's not 250,000. Maybe -- maybe it's 100.
16   Q   So 100 to 250,000 for those cases?
17   A   No. No. No. No. I don't think I don't
18 think it's over 100. I don't think so.
19   Q   Okay. Is that all -- now, you said there
20 were other tobacco companies involved that you were
21 working for aside from R.J. Reynolds --
22   A   No. No. No. That's not true and I
23 probably shouldn't have been said that but the way you
24 asked your question -- in these three litigations R.J.
25 Reynolds was not the only defendant so there were

Page 61

1  multiple tobacco companies as defendants. I didn't
2  work for them but I would have met them. I don't
3  understand the legal profession so I don't know if it
4  could be interpreted that I was working for another --
5  another tobacco firm because they were a co-defendant
6  with R.J. Reynolds in one or more of these cases.
7    Q   I just --
8    A   I don't understand --
9    Q   I just really want to know who paid your
10 bills. Let's put it that way.
11   A   Oh. Womble always paid my bills and it was
12 for R.J. Reynolds. That's clearly my relationship.
13   Q   Okay. Now, were you billing through a
14 professional entity at the time?
15   A   No.
16   Q   Okay. You said that your bills for Vioxx
17 were to have been submitted individually. Have you,
18 for any of your paid expert work, ever submitted bills
19 through any other kind of entity other than yourself
20 under another business name, anything that --
21   A   I have a checking account which is me.
22   Q   Okay.
23   A   It's called Datacon, D-A-T-A-C-O-N.
24   Q   Okay.
25   A   But it is no different than me, Ronald

16 (Pages 58 to 61)

VIDEOTAPED DEPOSITION OF RONALD   MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 62

1 Marks.
2     Q   The bills you gave me today don't say
3 Datacon on them.
4     A   Right.  Because I am Datacon.
5     Q   Okay.  Some old bills that I guess you had
6 said Datacon.
7     A   There were times that I -- when I was a
8 university professor I felt it was important to keep
9 my university income separate from my outside income
10 and expenses.  It was mainly for expense -- to manage
11 expenses correctly.
12    Q   Right.
13    A   So I set up a checking account and when I
14 was a university professor I might have billed more
15 often then through Datacon but it simply was a
16 checking account that I had to keep my outside
17 expenses and income separate from my university
18 income.
19    Q   And when did you keep this checking account,
20 this Datacon account, from what years -- what years to
21 what years?
22    A   Oh, I had it probably for a long time.  I
23 might have had it for Bendectin.  I don't know.
24    Q   Okay.  What bank did you do -- do you bank
25 with?

Page 63

1        MR. KREPS:  Objection to form.
2        THE WITNESS:  Right now?  Banks have merged.
3 I mean I don't know.  It's with Bank of America --
4 it's at Bank of America now.
5 BY MR. BLAIR:
6     Q   It's at Bank of America.  Okay.  Where?
7 What office?  What banking office?
8     A   Gainesville.
9     Q   What address?  What street?
10       MR. KREPS:  Objection to form.  Counsel, is
11 there any relevance to this?
12       MR. BLAIR:  Yeah.  It has -- this account
13 clearly has bills relating to the witness's prior work
14 as he just testified to.
15       MR. KREPS:  So what?  How is that relevant?
16       MR. BLAIR:  You sought all the bills from
17 the providers for our experts.  I mean you're hard
18 pressed to deny -- including subpoenaed them.  So I
19 think, given the circumstances, you're hard pressed to
20 deny the relevance.
21 BY MR. BLAIR:
22    Q   What's the street where you bank at?
23    A   The -- well, I mean there's offices all over
24 town.  I bank at a number of different ones.  It's the
25 Bank of America in Gainesville, Florida.

Page 64

1     Q   Okay.
2     A   The office I would use most often would be
3 on what's called 23rd Avenue.  I don't know the street
4 address but it's 23rd Avenue.
5     Q   Back in the 1980's, what was the name of the
6 bank where you had this Datacon account?
7     A   I really don't know.
8     Q   Did you ever move the account?
9     A   I don't think so but I don't know.
10    Q   Okay.  Was it an account in your name or in
11 Datacon's name?
12    A   The name of the account -- the name on the
13 account is Datacon.
14    Q   Okay.
15    A   But it's me.  There's nothing that goes into
16 it or comes out of it other than my income and
17 expenses to keep that straight.
18    Q   Is Datacon D-A-T-A-C-O-N?
19    A   Yeah.
20    Q   Is that right?  Okay.  Is it Inc. or LLP or
21 PC or --
22    A   To be honest, I don't know.  I've had it for
23 so long.  I put my income and expenses in and out.  I
24 don't think it's incorporated.  It's not an LLC so I
25 mean --

Page 65

1     Q   Okay.
2     A   I formed it more than ten years ago.
3     Q   Okay.
4     A   Maybe considerably more than ten years ago.
5     Q   Okay.  And to the best of your knowledge,
6 you haven't moved that account during those ten years?
7 Okay.  Let's talk about your expert work for Sherwin
8 Williams.  Do you see that?
9     A   Yes.
10    Q   Now, you testified on behalf of the
11 defendant Sherwin Williams?
12    A   Yes.
13    Q   And what kind of litigation was that?
14    A   This is litigation which I'm pretty sure is
15 in state court.  This is in the state of Rhode Island
16 where the state has sued the paint companies for
17 suggesting that lead-based paints on older apartments
18 that still exist cause cognitive -- cognitive
19 deficiencies in children.
20    Q   You're talking about brain damage in babies,
21 right, basically?
22    A   No.
23    Q   No?  That's not what we're talking about?
24    A   You're not talking about babies.  You're
25 talking about --

17 (Pages 62 to 65)

VIDEOTAPED DEPOSITION OF RONALD   MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 66

1    Q   Infants?
2    A   -- children.
3    Q   Brain damage in children. That's what we're
4  talking about, right?
5    A   Well, I've never heard it expressed as brain
6  damage but --
7    Q   Okay. How would you phrase it?
8    A   Well, it's looking at cognition.
9    Q   That means thinking, right?
10    A   Uh-huh. Yes.
11    Q   Okay. And it's thinking difficulties?
12    A   It's less IQ development. Lower IQ in
13  children with more exposure is the claim.
14    Q   In other words, lead paint causes dumber
15  kids?
16    A   I wouldn't phrase it that way but --
17    Q   Okay. Well, who did you testify for in that
18  case?
19    A   Sherwin Williams.
20    Q   Is that the defendant?
21    A   Yes.
22    Q   Okay. What was your opinion that you gave
23  as a paid expert for the defendant Sherwin Williams?
24        MR. KREPS: Object to the form of the
25  question.

Page 67

1  BY MR. BLAIR:
2    Q   You were a paid expert, right, for Sherwin
3  Williams?
4    A   I was paid for my work.
5    Q   Okay. And what was your opinion?
6    A   My opinion was that the scientific
7  literature did not show that exposure to lead paint in
8  buildings influences IQ --
9    Q   Okay.
10    A   -- or cognition.
11    Q   In other words, thinking.
12    A   IQ or cognition.
13    Q   Okay. And did you do a global assessment of
14  the literature on -- scientific literature on the link
15  if any between lead paint and cognition or lower IQ?
16    A   Yes.
17    Q   Okay. And based upon that global assessment
18  as a paid expert for Sherwin Williams, did you come to
19  the opinion that lead paint did not cause lower IQ?
20    A   I came to the conclusion that the published
21  scientific evidence overall did not lead to a
22  conclusion that exposure to lead paint reduced IQ.
23    Q   Okay. What was the name of the lawyer you
24  worked with for the defendant Sherwin Williams in the
25  lead paint litigation?

Page 68

1    A   Laura Ellsworth.
2    Q   And what law firm is Laura Ellsworth with?
3    A   Jones Day.
4    Q   How did you get hooked up with Laura
5  Ellsworth at Jones Day?
6    A   I got introduced to them I believe it was
7  two years ago and my daughter was doing an internship
8  at Jones Day her second summer after law school and
9  the lawyer that she was working with commented that
10  they were looking for a statistical expert for this
11  particular -- well, I don't know if it was this
12  particular litigation, but the lead paint litigation.
13  And my daughter gave my name to that attorney who
14  called me and we chatted a while and she asked me if
15  I'd be interested in looking into this case and I said
16  yes.
17    Q   Is your daughter a lawyer?
18    A   Now she is. Yes.
19    Q   And who does she work for?
20    A   Jones Day.
21    Q   She works for the law firm that represented
22  the paint company --
23    A   Yes.
24    Q   -- that you testified for?
25    A   In deposition. Yes.

Page 69

1    Q   Okay. Did you testify at trial in that
2  case?
3    A   No.
4    Q   Do you know why you weren't called to
5  testify at trial?
6    A   No.
7    Q   Okay. You do know the case went to trial?
8    A   Yes.
9    Q   Have you ever met Peter Blakeley?
10    A   I don't believe so.
11    Q   Have you ever worked with the law firm of
12  Arnold & Porter?
13    A   I've heard that name of a law firm but I
14  don't know that I've worked for them.
15    Q   Do you have a copy of your deposition from
16  the lead paint litigation?
17    A   I would probably still have that because the
18  case is still active.
19    Q   Okay. Where would you have that?
20    A   In my office at home.
21    Q   How much money were you paid by the
22  defendant Sherwin Williams for your work in lead
23  paint?
24    A   Over the course of the year and a half from
25  when I started --

18 (Pages 66 to 69)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

## Page 70

```
1     Q   Uh-huh.
2     A   -- to today?
3     Q   Uh-huh.
4     A   I hate to guess.  I mean if you want to do
5  big ranges, 100 to 150 maybe.
6     Q   Were those Datacon bills or were they bills
7  like the Vioxx bills?
8     A   My sense would be that they would be like
9  the Vioxx bills.  My name.
10    Q   Would that have gone into -- would that
11  money have gone into the Datacon account?
12    A   Yes.
13    Q   So whether the bills come out with Datacon's
14  name on it or not, you still use that account, is that
15  right?
16    A   Yes.
17    Q   Okay.  Do you keep your checking statements
18  for that account?
19    A   My checking statements.
20    Q   Yeah.  Your account statements.
21    A   The monthly statements?
22    Q   Yeah.
23    A   I keep them for a while.  I don't know how
24  long.  I know you don't have to keep them forever.  So
25  just like everything else, you run out of space to
```

## Page 71

```
1  store paper.
2     Q   Sure.  Okay.  Do you know do you have them
3  for four years, five years, six years?
4     A   I would probably have them for the last
5  four, five, six years.
6     Q   Okay.
7     A   Possibly.
8     Q   We talked about the lead paint litigation.
9  What was the next litigation that you were involved in
10  as a paid expert?
11    A   Well, kind of -- the next would have been I
12  guess the AstraZeneca versus Tap, the deposition.
13    Q   Okay.  That looks like a lawsuit between two
14  drug companies.
15    A   Yes.
16    Q   Was there a personal injury case at all?
17    A   No.
18    Q   Do you remember how much money you were paid
19  for that?
20    A   It would have been in the fall of '05.  It
21  actually -- it came up pretty quickly and I reviewed
22  some data and wrote a report so I mean it certainly
23  wouldn't have been six figures.  I don't know whether
24  it was 20 or 30.  Less than 50 I'm pretty sure.
25    Q   Okay.  Somewhere between let's say 10 and
```

## Page 72

```
1  50,000?
2     A   Yes.
3     Q   Okay.  I didn't ask you how much money did
4  you get for your Proctor & Gamble work?
5     A   In the 2004 case against Colgate?
6     Q   Yeah.
7     A   Let me think.  That went on -- that started
8  it early in '04 and ended in July.  So that would have
9  been about six months.  There was a good bit of
10  research to do there.  Again broad ranges
11    Q   Sure.
12    A   Forty to -- 40 to 80.
13    Q   Forty to 80,000.  Okay.  And then it looks
14  like, according to your resume here, that you did some
15  more work for Proctor & Gamble in 2006, is that right?
16    A   Yes.
17    Q   Okay.  Another commercial case or lawsuit
18  between drug companies?
19    A   Yes
20    Q   Okay.  And how much money were you paid for
21  that work in 2006 for the Proctor & Gamble drug
22  company?
23    A   That actually came up pretty quickly and I
24  did the review and report pretty quickly.  So that
25  would have been about a three, at the most, four month
```

## Page 73

```
1  effort probably.  So I would say the same range as the
2  AstraZeneca.
3     Q   Ten to 50,000?
4     A   Well, no, it would be a little higher
5  because I did both a deposition and trial and there
6  was definitely more review work, so 30 to 70.
7     Q   And then for Bayer, that's all that PPA
8  litigation we started talking about, right?
9     A   Yes
10    Q   That's a drug and the issue was whether it
11  caused strokes?
12    A   Yes.
13    Q   And you testified several times several
14  cases including at least once in trial, right?
15    A   Yes.
16    Q   And how much money did you get paid by the
17  drug company, Bayer, for that work?
18       MR. KREPS:  Object to the form of the
19  question.
20    A   I was involved in that case for altogether
21  about a year.  In the range of 70 to 120,000.
22  BY MR. BLAIR:
23    Q   Have we covered all of your prior paid
24  expert work that you can remember as you sit here
25  today?
```

19 (Pages 70 to 73)

VIDEOTAPED DEPOSITION OF RONALD  MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 74

1    A   Yes.
2    Q   Now, have you done some other work for drug
3  companies in addition to court, you know, litigation
4  paid expert work?
5    A   Yes. I've listed some of that in my report.
6    Q   Okay. Where? Where is that listed?
7    A   At the beginning of the report.
8    Q   Okay.
9    A   I think page one. Bottom of page one.
10    Q   Okay. There's some other drug companies
11  there. There's Unilever Research, SmithKline,
12  Somerset. See that?
13    A   Yes.
14    Q   Those are all drug companies, right?
15    A   Yes.
16    Q   Okay. And we've already talked about
17  Proctor & Gamble. What is Braun Oral Care?
18    A   Well, Braun Oral Care is part of Gillette
19  and I was for a while a consultant on their advisory
20  board for their dental products.
21    Q   How much money altogether have you been paid
22  by these various drug companies for your work?
23    A   Well, I mean this goes back, for Unilever
24  research, 15 or 20 years.
25    Q   Okay.

Page 75

1    A   I mean very little. Over that 20 years I
2  didn't work for them every year. I tried to list here
3  the different drug companies that I worked with.
4    Q   Okay. Are there other drug companies that
5  are not here that --
6    A   There easily could be that I've done a
7  little bit of consulting for. I don't have a
8  long-term consulting relationship with any drug
9  company where I'm on retainer to work with them, you
10  know, so many days a week or a month every year.
11    Q   Okay.
12    A   I consulted with Unilever back in the 80's
13  and 90's off and on, you know, a little bit.
14    Q   How much money did they pay you for that?
15    A   I might have made 5,000 a year. Maybe ten
16  in a very busy year. But the average -- the average
17  of the years I would do work for Unilever would have
18  been 3, 4, $5,000 maybe, a couple of days of work here
19  and there.
20    Q   Okay.
21    A   And I would say the same for the rest of
22  these.
23    Q   So over the 20 years -- let's say the last
24  20 years -- how much money total have you made on
25  these various drug companies for your non litigation

Page 76

1  work?
2    A   I'm not even going to guess at that because
3  it was never a lot because I was a full-time professor
4  at the university and I did not spend much time away.
5  But I did like to some activities because if
6  you're good at what you do, outsiders should want to
7  consult with you. And that was the university's
8  position. So I supplemented my income by 10 or 20 or
9  30 percent every year.
10    Q   Okay.
11    A   On average.
12    Q   Okay.
13    A   Some years were higher --
14    Q   That's a good way --
15    A   -- than others.
16    Q   -- to think about it.
17    A   Okay
18    Q   And what is 10 to 20, 30 percent a year on
19  average?
20      MR. KREPS: Objection to form.
21      MR. BLAIR: How much?
22    A   On average it would have been altogether 40
23  to 50 percent.
24  BY MR. BLAIR:
25    Q   So you think the average is 40 to 50 percent

Page 77

1  of your salary over those years? Is that what you're
2  saying?
3    A   Something like that.
4    Q   Okay. Well, how much money is that?
5      MR. KREPS: Objection to form.
6      MR. BLAIR: You can answer.
7    A   I would have to figure that out. I'm not
8  going to guess at that number. You're asking me to go
9  back like 20, 25 years --
10      MR. BLAIR: Take the last five years.
11      THE WITNESS: -- and project that?
12  BY MR. BLAIR:
13    Q   All right. Is it 50 percent or 40 to 50
14  percent over the last four, five years for your non
15  litigation work for drug companies?
16    A   Well, the last four or five -- well, the
17  last two to three years would be higher because I was
18  winding down at the university and actually started
19  taking more time off. I started cutting my time back
20  while I was still there. So it's going to be higher
21  my last two or three years at the university
22  Certainly my last year at the university I wasn't
23  there a lot. So very different circumstances at
24  different parts of my career at the university and
25  since then.

LEGALINK - HOUSTON
(888) 513-9800

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD   MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 78

1    Q    Well, I mean let's just take conservative
2    estimates. The 40 to 50 percent figure, is that
3    average or would you rather use 30 percent of your
4    salary?
5        MR. KREPS: Objection to form.
6    A    I think I've answered how much money I've
7    made and who I worked for. To fine tune it more I
8    can't do.
9    BY MR. BLAIR:
10    Q    Okay. I just want a dollar figure. You
11    haven't given me any dollar figures for your non
12    litigation work as an expert. Now, you've been paid
13    some money by a bunch of drug companies over the years
14    for other work, right?
15        MR. KREPS: Well, objection to form.
16    Objection to the preamble. He did give you some
17    dollar figures
18        MR. BLAIR: I didn't get any that I know of.
19        MR. KREPS: Yeah, you did. He said 5,000
20    some years. He gave you some dollar figures.
21    BY MR. BLAIR:
22    Q    Well, is it 5,000 a year from each of these
23    companies or is it a total of 40,000 a year let's say?
24    What is it?
25        MR. KREPS: Objection to form.

Page 79

1    BY MR. BLAIR:
2    Q    I won't hold you to it. Let's put it that
3    way. I just want a range. Give me a good faith
4    estimate as you sit here today.
5    A    And you're talking now about my consultation
6    with industry outside of expert witness work.
7    Q    Yes.
8    A    Professional biostatistical advice on design
9    and analysis
10    Q    For drug companies. Yes.
11    A    I would say -- and during my academic -- the
12    hay day of my academic career.
13    Q    Give me it all. Yeah
14    A    I would say 20 to 30 percent. Could be a
15    little higher. Let's make it 20 to 40 percent.
16    Q    All right. Twenty to 40 percent. You
17    figure we're talking about -- are we talking being
18    about let's say 40,000 a year for 20 years --
19    A    Well --
20    Q    50,000 a year for 20 years?
21    A    I mean as a statistician -- I'm not having a
22    hard time answering this --
23    Q    You are. You're a numbers guy.
24    A    But that's the problem. I mean the numbers
25    change a lot and early in my career I didn't make as

Page 80

1    much salary.
2    Q    Sure.
3    A    Late in my career I made more.
4    Q    I understand that. Sure.
5    A    The years were up and down so --
6    Q    Give me an average.
7    A    They were different things. Some years I
8    did expert witness and I didn't do much. My point is
9    with these companies over a period of time -- I didn't
10    work for all these companies every year.
11    Q    I understand
12    A    So --
13    Q    Have you made half a million dollars from
14    your non litigation work for drug companies over the
15    course of your career?
16    A    For non litigation?
17    Q    Yes.
18    A    I would seriously doubt that.
19    Q    Okay   Have you made $250,000 over the
20    course of -- over --
21    A    Over --
22    Q    -- your career?
23    A    Over --
24    Q    From drug companies?
25    A    Over 20 or 25 years?

Page 81

1    Q    Yes.
2    A    I doubt if it's more than that. You know,
3    maybe -- if I want to go out on a limb, maybe -- yeah.
4    Because that's 10,000 a year.
5    Q    It is.
6    A    I mean I don't think -- I don't believe I
7    averaged more than 10,000 a year for consulting work
8    with these companies
9    Q    Okay.
10    A    I don't believe so.
11    Q    Was your work for those companies billed to
12    Datacon?
13    A    Well, it would have run through that
14    checking account. Whether it was billed to me
15    personally --
16    Q    All right.
17    A    -- or Datacon, that was the account from the
18    time I set it up that all of my consulting would have
19    gone through because I would have had to keep it
20    straight for tax purposes.
21    Q    And when you received the money for
22    consulting work outside of your litigation work from drug
23    companies, did the drug companies cut you the checks?
24    A    Yes.
25    Q    Okay. So there would be checks actually

LEGALINK - HOUSTON
(888) 513-9800

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

**Page 82**

1  written by the drug companies to that account that
2  were deposited there, is that right?
3     A   Yes.
4     Q   Okay. Let's talk about your report.
5        MR. KREPS: Counsel, if you're going to
6  start into the meat of it, can we take a couple minute
7  break?
8        MR. BLAIR: Oh, absolutely. Sure. No
9  worries. Any time you need to take a break, Doctor,
10  you just go ahead and let me know and I'll be happy to
11  do that.
12        THE WITNESS: Sure. That's fine.
13        THE VIDEO OPERATOR: We are going off the
14  record. The time is 10:50 a.m.
15        (A recess was taken.)
16        THE VIDEO OPERATOR: This marks the
17  beginning of tape number two. We're back on the
18  record. The time is 11:05 a.m.
19  BY MR. BLAIR:
20     Q   Are you ready to continue, Doctor?
21     A   Yes.
22     Q   Dr. Marks, you mentioned that you're not
23  currently on retainer for -- I think it was some drug
24  companies we were talking about. And that reminded me
25  to ask you are you on retainer today for any tobacco

**Page 83**

1  company?
2     A   No.
3     Q   Have you been on retainer for tobacco
4  companies since your testimony?
5     A   No.
6     Q   Do you have any kind of agreement in place
7  that would prohibit you from testifying against
8  tobacco companies as a paid expert?
9     A   No.
10     Q   Do you think that cigarette smoke causes
11  cancer?
12     A   Yes.
13     Q   When did you come to that conclusion?
14     A   I really don't know. Quite a few -- many
15  years ago.
16     Q   What's many years?
17        MR. KREPS: Object to form.
18     A   I don't know.
19  BY MR. BLAIR:
20     Q   1990, 1980, 1970?
21     A   Not that far back.
22     Q   When did you first form the opinion that
23  tobacco smoke causes cancer?
24     A   I don't know.
25     Q   Can you give us a range? 1995?

**Page 84**

1        MR. KREPS: Objection. Calls for
2  speculation. He said he doesn't know, counsel.
3  BY MR. BLAIR:
4     Q   That was what you did -- looked at as a paid
5  expert for tobacco companies for years, right?
6     A   No. No. I have not looked at the published
7  literature for smoking and lung cancer.
8     Q   Okay. When did you come to the opinion,
9  since you didn't look at the published literature,
10  that tobacco smoke causes cancer?
11     A   I don't know.
12     Q   Do you think it was before 1990?
13     A   I will say this. It was certainly more than
14  five or ten years ago.
15     Q   Okay. So certainly in the early 1990's you
16  would have already formed the opinion that tobacco
17  smoke causes cancer?
18     A   Quite possibly.
19     Q   Okay. I mean sitting here today you'd have
20  to be -- I mean -- by the late 1990's -- let's put it
21  that way -- you'd have to be a lunatic to say that
22  tobacco smoke doesn't cause cancer, right?
23        MR. KREPS: Objection to form.
24     A   In the late 1990's I certainly believed that
25  smoking caused lung cancer.

**Page 85**

1  BY MR. BLAIR:
2     Q   Okay. Pretty much the whole world would
3  have agreed by then. Would you agree?
4        MR. KREPS: Objection to form.
5     A   I'm not sure what the whole world agrees to.
6  BY MR. BLAIR:
7     Q   Okay. Let's put it this way. By the late
8  1990's it would have been in your opinion absurd to
9  testify that tobacco smoke does not cause cancer.
10     A   I can tell you that in the late 1990's I
11  would have not testified to that.
12     Q   Okay. And it would have been wrong to do
13  so, right?
14        MR. KREPS: Objection to form.
15     A   I would not have testified to that.
16  BY MR. BLAIR:
17     Q   No way.
18     A   I would not have testified to that.
19     Q   Okay. And it would have been wrong to do
20  so, right?
21     A   I've answered that question.
22     Q   Let's move on and look at your report. You
23  know, before we do that, we've covered all of your
24  prior expert work that you can remember sitting here
25  today, paid expert work, right?

22 (Pages 82 to 85)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 86

1     A  I believe so.
2     Q  Up until we get into Vioxx, right?
3     A  I believe so.
4     Q  Okay.  Have you ever testified for any real
5  plaintiff seeking recovery for personal injury from
6  any drug company, testified for the plaintiff as
7  opposed to the defendant drug company?
8     A  No.
9     Q  Have you ever testified for any real
10  plaintiff seeking recover for personal injury from any
11  product manufacturer of any type?
12     A  No.
13     Q  Let's look at Exhibit 2, your report.  Are
14  all of the opinions that you intend to give at trial
15  in this report which we marked as Exhibit 2?
16     A  I believe so.  As of today, yes.
17     Q  And you understand that part of the reason
18  we're here today, the purpose of the deposition here
19  today, is for you to give me, on behalf of Mr. Smith,
20  a complete and accurate description of the opinions
21  that you intend to give at trial.  Is that your
22  understanding?
23     A  Yes
24     Q  You've done this for many years, right?
25        MR. KREPS: Objection to form.

Page 87

1     A  My vita shows how many times I've done it.
2  BY MR. BLAIR:
3     Q  All right.  And did you carefully consider
4  the opinions in your expert report in Mr. Smith's
5  case, this Vioxx case --
6     A  Yes.
7     Q  -- before you signed it?
8     A  Yes
9     Q  Now, you brought with you today a copy of or
10  a list of supplemental materials that you reviewed, is
11  that right?
12     A  Yes.
13        MR. BLAIR: I'll mark that as Exhibit 5 to
14  your deposition. .
15        (Exhibit 5 was marked for identification and
16  was attached to the transcript.)
17  BY MR. BLAIR:
18     Q  Does your review of any of these
19  supplemental materials change in any way the opinions
20  that you put in your expert report that we marked as
21  Exhibit 2?
22     A  No.
23     Q  Does it expand or add new opinions that you
24  left out of your original report?
25        MR. KREPS: Objection to form.

Page 88

1        MR. BLAIR: Let me rephrase it.
2  BY MR. BLAIR:
3     Q  Do these supplemental materials expand or
4  add new opinions to your expert report that are not in
5  it that you intend to give at trial?
6     A  Not as I sit here today.
7     Q  All right.  Now, the supplemental materials
8  you reviewed, you would have reviewed those after
9  July 21st when you signed your expert report?
10     A  Well, a few exceptions.  A few of these are
11  things that I didn't find -- I had them and -- I did
12  review a few of these before.  The very first three --
13  the very first two on the list, those two Merck
14  releases, I had those for a long time.  But they had
15  just gotten separated from all my other materials.
16     Q  Okay.
17     A  And clearly the first report, which is my
18  summary of work material, I've obviously had that for
19  quite a while but it just didn't get in the materials
20  that I submitted by July 12th.  So some of this I
21  definitely read before July 12th.  If it was left out,
22  it was just an oversight.  And it's conceivable that a
23  few of these others I had started reviewing some of
24  these reports or documents but wouldn't have completed
25  or wouldn't have really had it influence my report.

Page 89

1     Q  Okay.  Well, which materials here did you
2  not have prior to completing your expert report in
3  July?
4     A  Clearly, most of them.
5     Q  Okay
6     A  I've separated out the three that I know I
7  did have.  A few others of these I might have had but
8  either didn't review them yet or had started -- it's a
9  continuing process.
10     Q  Okay.  Well, one of the things says summary
11  of Vioxx and related clinical research information
12  known 1999 to 2005 by you undated.
13     A  Right.
14     Q  What is that?
15     A  That's the document that is basically my
16  work product that I developed over time.
17     Q  (Indicating)
18     A  Yes.  As I started the scientific review.
19     Q  Okay.  And we'll mark that as Exhibit 6 to
20  your deposition.  Is this actually your own notes
21  about the various scientific literature --
22     A  Yes.
23     Q  -- regarding Vioxx?
24
25     A  Yes.  I typed that up as I reviewed the

23  (Pages 86 to 89)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 90

1   science.
2       (Exhibit 6 was marked for identification and
3   was attached to the transcript.)
4   BY MR. BLAIR:
5       Q   Okay. Clearly you had that when you filled
6   out your --
7       A   Yes.
8       Q   -- expert report. Do you have any other
9   draft reports or work product of any kind related to
10  your paid expert work in Vioxx?
11      A   No.
12      Q   Were there ever any draft reports of your
13  expert report for Mr. Smith?
14      A   Well, there were earlier versions because
15  the report grew and that report grew as I reviewed
16  more material.
17      Q   Okay. Where are those earlier versions?
18      A   They're underneath this. You just continue
19  to grow the file that you're working on.
20      Q   I haven't seen any earlier version or draft
21  of your July 21st, 2006 expert report we marked as
22  Exhibit 2. Is there one?
23      A   No.
24      Q   Was there ever one?
25      A   The report evolved over time.

Page 91

1       Q   Okay.
2       A   I didn't sit down and write that report in
3   one day.
4       Q   Right.
5       A   So obviously it evolved over time but it was
6   one working document.
7       Q   Okay. So there are no existing prior drafts
8   of this expert report for Mr. Smith, is that right?
9       A   Yes.
10      Q   All right. Obviously you were working with
11  Merck's lawyers in preparing this report, right?
12      A   I prepared the report. I shared it with
13  them.
14      Q   Right. You've been doing this for years.
15  You need to get data from them, for example, and
16  documents, right, in order to formulate your opinions.
17  You need to get data and documents from Merck's
18  lawyers in order to help you formulate your opinions,
19  right?
20      A   They provided me some materials that I
21  requested. Yes.
22      Q   Okay. Did you request the materials by name
23  or did they give you a selection of materials? Let me
24  rephrase that
25      A   It was both.

Page 92

1       Q   Okay. So Merck's lawyers gave you some
2   materials and then you requested other materials, is
3   that right?
4       A   And I went and got some materials on my own.
5   Those were the three ways.
6       Q   Okay. Did you ask the Merck lawyers for all
7   the relevant materials that they had in their
8   possession that would help you as a statistician look
9   at the science regarding Vioxx and cardiovascular
10  events?
11      A   That's a pretty broad question because it
12  would depend on what you mean by relevant materials
13  I certainly asked them for the materials that I felt
14  were relevant to what I was trying to do in my
15  scientific evaluation of the information.
16      Q   With respect to your supplemental material
17  list, which is Exhibit 5 that you didn't have, let me
18  ask you this. On the second page in the protocol
19  section did you have any of those things when you
20  filled out your report for Mr. Smith?
21      A   I believe I had two through five in my
22  possession but I have not looked at them. They were
23  on a -- they were sent to me on a disk so I hadn't
24  looked at them yet
25      Q   Okay.

Page 93

1       A   I had the disk, hadn't looked at them. Is
2   that clear?
3       Q   Yes.
4       A   Yes.
5       Q   Okay. What's different about number one
6   that you don't remember having yet?
7       A   I'm not sure if it came -- it was probably
8   on the disk with the others. Maybe all five came on a
9   disk
10      MR. BLAIR: Are we talking about same disk
11  that's going to be produced at this deposition and
12  we've marked as Exhibit 3?
13      MR. KREPS: No. The disk that have here is
14  a disk that contains everything that's in these boxes,
15  the ten binders, that he talked about.
16      MR. BLAIR: Where's the disk -- if you don't
17  mind, I'll speak to your counsel. Where's the disk
18  that was sent to Dr. Marks prior to him writing his
19  July 2006 report?
20      MR. KREPS: Fair question. I don't know
21  That may well be at his office.
22  BY MR. BLAIR:
23      Q   Where is that disk, Doctor?
24      A   I have it.
25      Q   Did you bring it with you today?

24  (Pages 90 to 93)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 94

1    A   No.
2    Q   Okay.
3        MR. KREPS:  And counsel, I can check if
4    those items are also on this disk.
5        MR. BLAIR:  Well, I'm assuming those items
6    are on the disk you brought with you today since my
7    understanding is that the disk you brought with you
8    today includes all -- everything that's on the
9    supplemental list. But maybe that's wrong.
10       MR. KREPS:  I don't know that it is. I
11   think it includes everything that he brought with him
12   today. You know, a disk version of everything he
13   brought with him today. But to the extent -- I don't
14   know if hard copies of those exist here or not today.
15   BY MR. BLAIR:
16       Q   Okay. Let's do it this way then. What I
17   would ask for, Doctor, that you provide us with,
18   through your counsel obviously, is the disk that you
19   got before you wrote your July 21st, 2006 expert
20   report.
21       A   The disk that had these reports --
22       Q   No.
23       A   -- on it.
24       Q   No. The disk that was sent to you that you
25   got before you wrote your July 21st, 2006 expert

Page 95

1    report that contains all the material, my
2    understanding is, that you got from Merck.
3        MR. KREPS:  No. No. No. That's a
4    misunderstanding.
5        MR. BLAIR:  Okay.
6        MR. KREPS:  He got a disk that had those
7    items on it, just those items he just referenced. I
8    think that's his testimony, that --
9        MR. BLAIR:  Well, let's do it this way.
10   BY MR. BLAIR:
11       Q   What did you get from Merck and in what form
12   did you get it in order to prepare your July 21st,
13   2006 expert report?
14       A   That's a broad question. Can you narrow it
15   down?
16       Q   No. I want to know what you got. Did you
17   get a CD --
18       A   I've got --
19       Q   Multiple CD's?
20       A   Well, over time I've gotten multiple CD's
21       Q   Okay. Do you have those CD's with their
22   dates on them? Do they have dates on them, the CD's?
23       A   No.
24       Q   Do you have those CD's?
25       A   Some of the material, which would have been

Page 96

1    the datasets, I returned to Merck. Others I have at
2    home.
3        MR. BLAIR:  Okay. What I'd ask for,
4    counsel, is a complete set of the disks that this
5    witness actually received, preferably with the dates
6    that he received it.
7        MR. KREPS:  I can certainly get you a
8    complete set of what he's received.
9        MR. BLAIR:  And then the other thing I'd ask
10   for is a different set of data that he received after
11   July 21st, 2006 so that we know which data he had in
12   his possession when he wrote his expert report and
13   which data he only received afterwards. All right?
14   Can we agree to mark that as Exhibit 3 to the
15   deposition? You can just provide that.
16       MR. KREPS:  Two sets --
17       MR. BLAIR:  Yes.
18       MR. KREPS:  Okay
19       MR. BLAIR:  Yes. Distinguish it and we'll
20   throw it in and mark it as Exhibit 3.
21       MR. KREPS:  Yes. You will have two disks
22   that will be Exhibit 3. One will be materials he
23   received prior to July 21. And the second disk, which
24   we'll do as 3B, will be -- 3A will be pre July 21, 3B
25   will be post July 21.

Page 97

1        MR. BLAIR:  Great.
2    BY MR. BLAIR:
3        Q   Obviously you understand the point of the
4    question, Doctor, is to find out what you had in your
5    possession when you formed the opinions that are in
6    your expert report. You understand that?
7        A   Okay.
8        Q   Okay. Let's talk about your overall
9    opinion. It's a report that, at least in substance,
10   spans approximately 16 pages. Can you tell me what's
11   your overall opinion in this case that you're prepared
12   to give to the jury?
13       A   My overall opinion is as it's stated at the
14   end of my report.
15       Q   That's the conclusion section?
16       A   Yes.
17       Q   All right. Well, let's look at that.
18   That's page 14. Is it fair to say that your overall
19   opinion is that, based upon your independent review of
20   the scientific literature as a paid expert for Merck,
21   that Vioxx does not increase the risk of heart
22   attacks?
23       A   Yes.
24       Q   And are you also prepared to give the
25   overall opinion, based upon your review as a paid

25 (Pages 94 to 97)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 98

1  expert for Merck, that Naprosyn, another drug, is
2  cardioprotective?
3      MR. KREPS: Objection to the form of the
4  question.
5      A  As a proven scientific fact, I'm not sure
6  that's conclusively proven.
7  BY MR. BLAIR:
8      Q  Okay. So it's still in the range of
9  speculation in your opinion?
10     MR. KREPS: Objection to form.
11     A  There's been a lot of scientific discussion
12  about naproxen. There's been a good bit of scientific
13  study. There's been the studies that Merck has run
14  and used naproxen as a comparator group. So there's a
15  lot of information. I certainly think -- well, I am
16  not totally convinced that it's a proven scientific
17  fact that naproxen is cardioprotective in all cases.
18  BY MR. BLAIR:
19     Q  Okay. Let's do it this way. Can you
20  testify in this case to a reasonable degree of medical
21  certainty based upon your experience and training,
22  that Naprosyn, which -- you're pronouncing it
23  naproxen -- is cardioprotective, yes or no?
24     A  I stated in my report that I believe in
25  VIGOR naproxen was cardioprotective. And I believe

Page 99

1  that.
2      Q  My question's different. Are you going to
3  testify to this jury, based upon your experience and
4  training to a reasonable degree of medical certainty,
5  that Naprosyn is cardioprotective?
6      MR. KREPS: Objection.
7      MR. BLAIR: Based upon your review as an
8  epidemiologist of the scientific literature.
9      MR. KREPS: Objection to the form of the
10  question.
11     A  I think I answered that question.
12  BY MR. BLAIR:
13     Q  You told me about one study that you talked
14  about that Merck did with Vioxx which was VIGOR. I
15  want your opinion based upon your review of all of the
16  studies and all of the literature which is referenced
17  in the appendix to your expert report and in your
18  supplemental materials list that you've given us here
19  today. Can you testify to a reasonable degree of
20  medical certainty that Naprosyn is cardioprotective?
21  Yes or no.
22     A  I answered that question previously
23     Q  Okay. So you've given the best answer that
24  you can to that question as you sit here today?
25     A  I believe so.

Page 100

1      Q  And you can't answer it yes or no.
2      A  I previously answered that question.
3      Q  Okay. So you're not going to testify that
4  naproxen is cardioprotective to a reasonable degree of
5  medical certainty?
6      MR. KREPS: Objection to the form of the
7  question.
8      A  I think I've answered that question.
9  BY MR. BLAIR:
10     Q  Why can't you testify to a reasonable degree
11  of medical certainty that naproxen is
12  cardioprotective?
13     A  I believe -- I believe the evidence in the
14  scientific literature leads a lot of credence to
15  naproxen being cardioprotective. I think that it
16  depends on -- well, I think the literature is still
17  not conclusive on naproxen
18     Q  Is the literature sufficient for you as a
19  scientist and a trained epidemiologist to draw a
20  conclusion to a reasonable degree of medical certainty
21  that naproxen is cardioprotective?
22     A  Well, I think I've answered that
23     Q  If you'd do me the courtesy of answering it
24  again, yes or no.
25     MR. KREPS: Objection to the form of the

Page 101

1  question.
2      A  As I stated in my report, and I stand by
3  what I stated in my report, I do believe that
4  naproxen, because of its properties, that it was
5  cardioprotective in VIGOR.
6  BY MR. BLAIR:
7      Q  And that's the best answer you can give to
8  that question about whether Naprosyn is
9  cardioprotective to a reasonable degree of medical
10  certainty?
11     A  I've answered that question.
12     Q  Okay. Is Ibuprofen cardioprotective in your
13  opinion based upon your experience and training?
14     A  Well, not based on my training but I haven't
15  reviewed enough of the literature to have a definitive
16  opinion on Ibuprofen.
17     Q  Okay. Now, overall you say you're going to
18  give the opinion that Vioxx does not cause heart
19  attacks, right?
20     A  Yes.
21     Q  I guess is your conclusion that some of the
22  scientific studies we're going to talk about show a
23  positive association between Vioxx and heart attacks
24  and some of them show a negative association?
25     A  I'm sorry. I apologize. I missed the

26  (Pages 98 to 101)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD   MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 102

1  beginning of that. Can you ask it again?
2    Q   Based upon your review of the literature, is
3  it your opinion that some of the studies on Vioxx show
4  a positive association with an increased risk of heart
5  attack and some of them don't?
6    A   Well, there certainly is one that showed a
7  positive association on heart attack.
8    Q   Okay. And are there others that in your
9  opinion do not show an association between Vioxx and
10  an increased risk of heart attack?
11    A   Out of all the studies Merck did? Is that
12  what you're asking?
13    Q   Yes.
14    A   I would say so.
15    Q   So basically your opinion is looking at all
16  the studies, that they sort of cancel out and
17  therefore you can't conclude that Vioxx causes heart
18  attacks? Is that basically your opinion?
19    A   Well, I prefer to look at the reasons why
20  any studies that might have had an association might
21  have shown that rather than just make the global
22  statement that you just made.
23    Q   Well, I was looking at your conclusion
24  section of your report where you talk about criteria
25  for establishing causation. Right? And you talk

Page 103

1  about VIGOR and APPROVe. Those are two studies,
2  right?
3    A   Yes.
4    Q   Which you say are the only two studies to
5  identify statistically significant results for CV
6  thrombotic events and heart attack. Both negative for
7  Vioxx. By that you mean that both of those studies
8  showed a positive association between Vioxx and heart
9  attack, right?
10    A   Yes.
11    Q   Okay. And then you talk about your
12  explanations for the results of those studies. And
13  then you talk about other studies. In other words,
14  complete data -- actually in the next page, top
15  paragraph. And you compare those studies. You say
16  none in the many additional prospective studies on
17  Vioxx show any clear statistical associations. You
18  see that?
19    A   Yes. I see that.
20    Q   Okay. So that's what I was talking about.
21  There are some studies that show a positive
22  association in your opinion and other studies that in
23  your opinion don't show a positive association.
24  That's what you wrote, right?
25    A   Yes.

Page 104

1    Q   Okay. And in your opinion, based upon your
2  review of all the studies then, is it your opinion
3  that the positive studies and the negative studies
4  sort of cancel out and so that's, you know, the basis
5  for your opinion that you can't say Vioxx causes heart
6  attacks?
7      MR. KREPS: Objection to form.
8    A   I don't think I use those words. That --
9  BY MR. BLAIR:
10    Q   Okay. Let's talk about the various kinds of
11  scientific studies. You talk in the first page of
12  your report about evidence-based medicine I think. Do
13  you recall that?
14    A   Yes.
15    Q   What is evidence-based medicine?
16    A   Evidence-based medicine is reviewing the
17  information that's available, looking at a question of
18  association, and from the totality of information,
19  what conclusion can be drawn.
20    Q   Is there sort of a hierarchy of scientific
21  studies that scientists use to determine whether, for
22  example, a drug causes a particular disease?
23    A   I believe so.
24    Q   And in your opinion what is the hierarchy of
25  scientific studies from the most reliable and best to

Page 105

1  the least reliable and worst?
2    A   Well, as I stated in my report, the
3  randomized clinical trial generally is considered the
4  highest form of science in that it provides the most
5  information.
6    Q   Sometimes called the gold standard?
7    A   Some people refer to it as the gold
8  standard.
9    Q   Okay.
10    A   And that would be followed by what I would
11  call a prospective cohort study.
12    Q   Okay.
13    A   And that would be followed by then the
14  retrospective studies, retrospective cohorts, and
15  case-controlled studies.
16    Q   Your expert report I think distinguishes
17  between two types of studies, randomized clinical
18  trials -- the gold standard, the most reliable -- and
19  what you call epidemiological studies. Do you recall
20  that?
21    A   Yes.
22    Q   And for epidemiological studies, are those
23  the second two types of studies that you just
24  described in your hierarchy?
25    A   It was a third.

27  (Pages 102 to 105)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 106

1   Q  Just a third?
2   A  Yes.
3   Q  So that would include retrospective cohort
4 and case-controlled studies?
5   A  Yes
6   Q  You say that epidemiological studies are --
7 you wrote in your report -- less rigorous and have
8 more potential for bias. Do you see that? That's
9 page two.
10   A  Yes. I see that.
11   Q  Can you explain that a little bit more,
12 about why epidemiological studies are less rigorous
13 and have more potential for bias?
14   A  The main reason is that the data already
15 exists. The data is not collected as part of a
16 prospective protocol to answer a question on data
17 that's going to be generated to answer that question.
18   Q  Okay. And why does that create more bias or
19 less rigor?
20   A  Because you don't know why people were
21 taking the drugs that they took. They weren't part of
22 a protocol where either that was assigned by
23 scientists or where they made a choice and were
24 followed forward. For whatever reason they chose --
25 for whatever reason they were prescribed the medicine

Page 107

1 that's in the database but you don't know much about
2 if they got it, if they took it or why they got that
3 particular medicine over another medicine.
4   Q  And why does that make the results less
5 reliable for those epidemiological studies as compared
6 to randomized clinical trials?
7   A  Because there's -- there's potential -- the
8 potential for bias is because we don't know why they
9 took the drugs they took or even if they took the
10 drugs they took. There could be a good bit of
11 misinformation. That clinical trials are designed in
12 such a way to -- I won't say eliminate -- but minimize
13 those types of issues that could explain the answer
14 rather than it being a drug effect.
15   Q  Would you rely upon the result of an
16 epidemiological study over the result of a randomized
17 clinical trial?
18   A  Of a single study?
19   Q  Yes
20   A  Well, I think the clinical trial would
21 generally be acceded more rigorous and -- and get
22 more consideration than the epidemiological study.
23   Q  So if the question is reliability, it's
24 generally accepted in your field that the results of
25 randomized clinical trials are more reliable than the

Page 108

1 results of an epidemiological study. You agree?
2   A  Yes.
3   Q  Then you went on and you wrote retrospective
4 studies -- retrospective cohort studies and
5 case-controlled studies are especially prone to bias.
6 Do you see that?
7   A  Yes.
8   Q  Tell us why retrospective studies are
9 especially prone to bias in your opinion.
10   A  Well, that's the answer I just gave.
11   Q  Okay. Sort of like showing up on the scene
12 after the fact and looking around at the data? Is
13 that looking backwards, retrospective study?
14   A  That's one way of putting it.
15   Q  Okay. You write findings from such studies
16 are generally considered to be hypothesis generating.
17 Do you see that?
18   A  Yes.
19   Q  What does it mean for a study to be
20 hypothesis generating?
21   A  Typically retrospective studies, they serve
22 a purpose, they can produce useful information, and
23 when they produce statistically significant results or
24 results that are interesting to the researchers,
25 you've now raised a question about is this association

Page 109

1 or relationship that's been shown, is it true. So
2 typically the researchers would not believe this to be
3 the truth coming from a retrospective study but it's
4 raised a question that you would now go and design a
5 prospective study to carry out to try to validate
6 whether that answer coming from the retrospective
7 study can be confirmed in a prospective study.
8   Q  Okay. So by hypothesis generating you mean,
9 for example, from a retrospective epidemiological
10 study, you'd get a theory or an idea that something
11 may be true.
12   A  Yes.
13   Q  And then you'd go study, right?
14   A  Yes.
15   Q  So it's basically a speculation that
16 something may be true based upon the results. And
17 then you go and you try and prove that with more
18 reliable types of studies. Is that right?
19   A  That's one way of stating it.
20   Q  Did you read Dr. Kim's expert report?
21   A  I did read it.
22   Q  Dr. Kim is a paid expert for Merck -- you
23 understand that -- in this case?
24   A  Yes.
25   Q  Okay. Dr. Kim's report I think says that

28 (Pages 106 to 109)