VIDEOTAPED DEPOSITION OF RONALD   MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

## Page 110

1  the FDA typically requires two randomized clinical
2  trials to prove that a particular drug has a
3  particular benefit. Do you recall that?
4      A. I don't specifically recall reading that but
5  I wouldn't disagree with that.
6      Q. That was my question. Do you disagree with
7  that based upon your experience and training, that two
8  randomized clinical trials would be proof of a -- of
9  an association, if you will, between a drug and
10  outcome?
11      MR. KREPS: Objection to the form of the
12  question.
13      A. Well, it's a requirement of the FDA to get a
14  product approved.
15  BY MR. BLAIR:
16      Q. Okay. You're aware of that based upon your
17  experience and training as you sit here?
18      A. That's my understanding.
19      Q. Okay. Are epidemiological studies sometimes
20  called observational studies?
21      A. Yes.
22      Q. It's just another term, right?
23      A. Yes.
24      Q. Do you agree that the New England Journal Of
25  Medicine is a topnotch journal?

## Page 111

1      A. Yes.
2      Q. Is there a more prestigious journal, medical
3  journal, in the entire United States that you're aware
4  of, in your opinion?
5      A. I guess I would say I believe there's two or
6  three journals that people consider the top two or
7  three journals and whether New England Journal is
8  number one or two, you know, you can quibble on that.
9  But it certainly is in the very top tier of journals
10  in the world.
11      Q. Okay. What are the other two that are in
12  the top tier?
13      A. JAM is considered topnotch and Lancet.
14      Q. Okay. JAM is the Journal of the American
15  Medical Association?
16      A. Yes.
17      Q. And the Lancet is a medical journal
18  published in the United Kingdom, right?
19      A. Yes.
20      Q. Those three are basically the cream of the
21  crop in the world in medical science and literature.
22      A. I believe that's -- most people would agree
23  with that.
24      Q. Okay. And you believe that?
25      A. I agree with that.

## Page 112

1      Q. Okay. Looking at page three of your expert
2  report, you reference eight double-blind
3  placebo-controlled active -- and active comparator
4  randomized clinical trials that Merck paid for for
5  Vioxx, right?
6      MR. KREPS: Objection to form.
7      A. Yes.
8  BY MR. BLAIR:
9      Q. Did you review the data for all of those
10  randomized clinical trials?
11      A. I reviewed the summary results.
12      Q. Okay. So you didn't actually look at the
13  data itself, did you?
14      A. No.
15      Q. Did you perform any of your own statistical
16  analyses on the data itself for any of those eight
17  randomized clinical trials?
18      A. No.
19      Q. Let's look at page four of your report.
20  Here you talk about one of the randomized clinic
21  trials, the gold standard trials, right?
22      MR. KREPS: Objection to form.
23      MR. BLAIR: That's VIGOR, right?
24      A. VIGOR is described on page four, yes.
25

## Page 113

1  BY MR. BLAIR:
2      Q. And that's a randomized clinical trial.
3      A. Yes.
4      Q. That's one of the gold standard trials,
5  right? It is of the type that is the gold standard.
6      A. Yes.
7      Q. And based upon your expert review, can we
8  agree that the VIGOR results show at least a
9  500 percent increase in heart attack risk for Vioxx
10  users as compared with, in this case, Naprosyn users?
11      A. That's one way of stating it.
12      Q. Do you agree with that?
13      A. That is one way of stating it. I don't
14  disagree with it --
15      Q. Okay.
16      A. -- as a true statement.
17      Q. Okay. And was that increase in heart attack
18  risk statistically significant?
19      A. Yes, it was.
20      Q. Okay. Did Merck use an intention-to-treat
21  analysis for VIGOR?
22      A. I believe so.
23      Q. Would that have been appropriate --
24      A. Yes.
25      Q. -- to do so in your opinion? Would it have

29 (Pages 110 to 113)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

**Page 114**

1  been inappropriate not to use an intention-to-treat
2  analysis?
3      MR. KREPS: Objection to form.
4      A  Well, what would have been appropriate is
5  what they had agreed to with the FDA.
6  BY MR. BLAIR:
7      Q  Okay. Based upon your experience and
8  training, would it have been inappropriate not to use
9  an intention-to-treat analysis for the VIGOR data?
10     MR. KREPS: Objection to form.
11     A  Well --
12     MR. BLAIR:  To design a study to use an
13  intention-to-treat analysis.
14     A  Well, I don't -- I can't say what Merck's
15  plans were when they designed this back in whenever it
16  was, 1998 or -- or 1997 or '98, whenever it was. And
17  I would say whatever they and the FDA agreed to would
18  be the appropriate analysis.
19  BY MR. BLAIR:
20     Q  Okay. Is it good or bad, based upon your
21  experience and training, to use an intention-to-treat
22  analysis in a study like VIGOR?
23     A  They are -- that is an appropriate analysis.
24     Q  An appropriate or inappropriate?
25     A  Appropriate.

**Page 115**

1      Q  Okay.
2      A  Quite appropriate.
3      Q  Quite --
4      A  Quite commonly done.
5      Q  Quite commonly done.
6      A  Yes.
7      Q  Is it a good thing to do?
8      A  Yes.
9      Q  Okay. Why is it good to use an
10  intention-to-treat analysis in a study like VIGOR?
11     A  In a study like VIGOR you want to make sure
12  that you run the study as completely and correctly as
13  possible. And so an intention to treat involves all
14  patients who were randomized in the study in -- in the
15  final analysis. So if you have a lot of dropouts in a
16  study -- it's mainly meant to try to get people
17  running studies to minimize dropouts. Okay. Because
18  a protocol analysis run on a study where there are a
19  lot of dropouts can lead to false information. So the
20  ITT is meant to include information on everybody and
21  it actually works on making it tougher on the sponsor
22  to prove a product is effective is the end result.
23     Q  Okay. So does using an intention-to-treat
24  analysis make a study result more reliable?
25     MR. KREPS: Objection to form.

**Page 116**

1      THE WITNESS:  Are you talking about for a
2  primary efficacy outcome?
3      MR. BLAIR:  For a primary end point or for a
4  secondary end point.
5      THE WITNESS:  For an efficacy end point or a
6  safety end point?
7      MR. BLAIR:  Either.
8      THE WITNESS:  The answer is different.
9      MR. BLAIR:  Okay.  For a safety end point.
10     A  An ITT analysis makes it more difficult to
11  document safety.
12  BY MR. BLAIR:
13     Q  Okay. How so?
14     A  Because for the same reason that it makes it
15  tougher to prove efficacy, it makes it -- it basically
16  makes it harder to get statistical significance.
17     Q  Okay. Maybe I misunderstood. I'm sure I
18  did. I thought you said that using an ITT, which is
19  an intention-to-treat analysis, would make the results
20  for safety purposes more robust or reliable. Is that
21  right?
22     A  We didn't say for safety purposes. You just
23  said in the context of a clinical trial.
24     Q  Okay. Well, let's talk about -- let's talk
25  about in the context of a clinical trial generally,

**Page 117**

1  which is what I thought we were talking about, and now
2  apparently there's a distinction in your opinion
3  between whether you're talking about a safety outcome
4  or an adverse effect outcome. And I want to hear
5  about that. But generally for a clinical trial, does
6  using an intention-to-treat analysis make the results
7  of the trial more reliable?
8      A  Well, I would say it depends on what you're
9  looking at, what your end point is. It makes it -- it
10  makes it tougher to get statistical significance.
11     Q  Well, hypothetically let's say what we're
12  talking about is efficacy, the beneficial effect of a
13  drug. If you use an intention-to-treat analysis,
14  you'll have some patients who have a beneficial effect
15  from the drug but they don't finish the trial, they
16  didn't finish the study. Right?
17     A  Well, they don't finish the study.
18     Q  But up to that point they would have
19  documented beneficial effect. Hypothetically, right?
20     A  They would have documented their effect.
21     Q  Yes. And I'm supposing in this case that
22  it's beneficial for the drug. It shows that the drug
23  works. The documentation they have up to that point.
24     A  Okay. That's your supposition.
25     Q  Right. And using this hypothetical, if you

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 118

1  use an intention-to-treat analysis, do you count those
2  people who dropped out but who showed a good result
3  while they were in the study -- do you count those
4  people in the results?
5      A  You count them period in the results.
6      Q  And do you count the benefit that they
7  demonstrated while they were in the study as part of
8  the study results?
9      A  You count them in the results.
10     Q  Okay.  And if were talking about an adverse
11  effect of a drug -- again same hypothetical -- where
12  you have a patient in the study who doesn't finish the
13  study but has an adverse event -- let's say they have
14  a heart attack and so they don't finish the study.
15  Hypothetically.  Okay?  Can we agree with this
16  hypothetical?
17     A  They have a heart attack so that's why they
18  drop out of the study?
19     Q  Right.
20     A  Okay.
21     Q  Okay.  They don't finish the study.  Would
22  you count them as a heart attack in the study?
23     A  Well, yes.  They had a heart attack in the
24  study.
25     Q  Okay.  When would it be -- can you give me a

Page 119

1  hypothetical where you're dealing with an adverse
2  outcome like a heart attack where, when you use an
3  intention-to-treat analysis, the person who suffered
4  the adverse event would be counted in the results and
5  when you don't use an intention-to-treat analysis,
6  they're not counted in the results.
7         MR. KREPS:  Objection to the form of the
8  question.
9         THE WITNESS:
10        MR. BLAIR:  Can you explain that?
11        THE WITNESS:  I'm sorry.  I didn't follow
12  that question.
13  BY MR. BLAIR:
14     Q  Well, explain to me how an
15  intention-to-treat analysis makes a difference in how
16  you count outcomes in a study.
17     A  How --
18     Q  For safety first and then for adverse events
19  later.
20        MR. KREPS:  Objection to the form of the
21  question.
22  BY MR. BLAIR:
23     Q  I thought there was a distinction you were
24  trying to draw between the two.
25     A  Between safety and adverse events?

Page 120

1      Q  Yes, for --
2      A  Adverse events --
3      Q  -- an intention-to-treat analysis.
4      A  -- are what get reported to FDA.
5      Q  We're not talking about adverse event
6  reporting.  I'm talking about outcomes in a study
7  obviously, like heart attacks or a hypertensive event
8  or something like that.
9      A  I'm sorry.  Your question asked about safety
10  and adverse events.  That's why I wasn't clear.
11     Q  I'm sorry if that was unclear.  Let's do it
12  this way.  Let's start over.  What difference does
13  using an intention-to-treat analysis make over not
14  using an intention-to-treat analysis in a study like
15  VIGOR?
16     A  It makes it harder to get statistical
17  significance.
18     Q  And can you explain that in more detail?
19     A  As I explained earlier, as subjects drop out
20  and the study goes less and less according to the
21  protocol and you now have people who are outside of
22  the study contributing to the end point but not having
23  the full effect of their study regimen can end up
24  creating additional events in people who aren't
25  getting the drug effect and it makes it harder to get

Page 121

1  statistical significance for that reason.
2      Q  That's if you use an intention-to-treat
3  analysis.  Is that right?
4      A  Yes.
5      Q  Okay.  And is that -- you drew a distinction
6  earlier between a safety outcome or an efficacy
7  outcome and a safety outcome.
8      A  Yes.
9      Q  Can you elaborate on that distinction?
10     A  For an efficacy outcome typically the
11  sponsor of the product is trying to get approval for
12  their product by showing that the product is
13  effective.
14     Q  Okay.
15     A  The intention to treat puts an additional
16  burden on the sponsor to establish that efficacy, if
17  it really exists, by having people drop out of the
18  study and not continuing to get the benefit of the
19  study drug as compared to the comparator drug.
20     Q  Okay.  And for safety what does the use of
21  an intention-to-treat analysis result in?
22     A  The problem with intention to treat, just
23  like it makes it harder to get statistical
24  significance on the sponsor to show efficacy, it would
25  then make it harder to get statistical significance to

31 (Pages 118 to 121)

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 122

1  show if there is a safety problem.
2       MR. KREPS: Counsel, I need to take a real
3  short break for a quick call if I can.
4       MR. BLAIR: Okay. I'll represent to you I'm
5  not going to take forever.
6       MR. KREPS: Okay. Let me just -- I think I
7  have somebody holding or trying to reach me.
8       MR. BLAIR: Go for it. Can we can go off
9  the record again?
10      THE VIDEO OPERATOR: We're going off the
11  record. The time is 11:52 a.m.
12      (A recess was taken.)
13  BY MR. BLAIR:
14      Q  Dr. Marks, you were asked to bring any
15  demonstrative exhibits which you might have prepared
16  for use in the Vioxx case. Did you bring any of
17  those?
18      A  We haven't -- I haven't worked on that yet.
19      Q  Do you plan to do that?
20      A  Well, I would assume I'll work with the
21  attorneys as we get close to trial to figure out the
22  demonstratives to use in court.
23      Q  Okay. Do you have any documentation
24  concerning any communications with Merck's lawyers at
25  all?

Page 123

1       A  No.
2       Q  Letters, blah blah blah. That sort of
3  thing?
4       A  No.
5       Q  All right. Let's look at page four of your
6  report again. Talking about the VIGOR study. You
7  write VIGOR was the first Merck clinical trial to
8  identify a signal for a potential cardiovascular
9  effect. Did I read that correctly?
10      A  Yes.
11      Q  Tell me why VIGOR identifies a signal for
12  Merck about potential cardiovascular problems with
13  Vioxx.
14      A  It was the first study conducted by Merck
15  that had a statistically significant -- that showed a
16  statistically significant association between the use
17  of Vioxx and a cardiovascular end point.
18      Q  Okay. And that's based upon your
19  independent review of the Merck data that the Merck
20  lawyers gave to you?
21      A  And that I collected on my own.
22      Q  Okay. Obviously if there were an earlier
23  study, clinical trial, that Merck did that showed a
24  statistically significant cardiovascular problem for
25  Vioxx, you would have expected the Merck lawyers to

Page 124

1  give that to you, right?
2       A  Sure.
3       Q  But to your knowledge they didn't, if there
4  was one?
5       MR. KREPS: Objection to form.
6       A  To my knowledge, I have the materials that
7  are in my exhibits.
8  BY MR. BLAIR:
9       Q  And you didn't see any, is that right?
10      A  I didn't see any --
11      Q  You didn't see any other earlier studies
12  than VIGOR that showed a potential cardiovascular
13  problem that Merck did?
14      A  Not that showed a proven association or a
15  significant association.
16      Q  Okay. Then you write such a review of Merck
17  clinical trials by the VIGOR authors found no
18  difference of rates of MI -- that's heart attack --
19  between Vioxx and comparator groups. Did I read that
20  correctly?
21      A  Yes.
22      Q  What review are you talking about?
23      A  Well, that relates to heart attack -- that
24  goes to my Table 2 which is -- well, it relates to --
25  hold on. Yeah. It was a review of the cumulative

Page 125

1  data from their clinical trials that they had done to
2  that point in time. And then it included VIGOR with
3  that.
4       Q  What review are you talking about?
5       A  Can I pull the paper?
6       Q  Sure. Whatever it is. I mean you can just
7  tell me the name. If you know the name of the review
8  or study or -- I don't know what you're talking about.
9       MR. KREPS: If you want to look at a
10  document, you certainly are entitled to do that.
11      MR. BLAIR: Yes. Absolutely. I mean what I
12  don't know is what document you're referring to and
13  that's what I'm asking you.
14      THE WITNESS: What I want to do is pull the
15  VIGOR publication because it says here the Merck -- a
16  review of Merck clinical trials by the VIGOR authors.
17      MR. BLAIR: Uh-huh. That's what you wrote.
18  You want me just to give it to you? I've got a copy
19  here. But you can use your own.
20      THE WITNESS: Well, I prefer to use my own.
21  BY MR. BLAIR:
22      Q  Go ahead. Are you talking about the actual
23  manuscript?
24      A  Yes.
25      Q  Oh, okay. That's what I wanted to know.

32 (Pages 122 to 125)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 126

1  You don't need to pull it.
2      A  Okay.
3      Q  You're talking about the manuscript itself,
4  Bombardier manuscript.
5      A  Yes.
6      Q  So you're not talking about an internal
7  review by Merck statisticians that might have occurred
8  incorporating the VIGOR data?
9      A  It says by the VIGOR authors. So I'm
10 referencing there the Bombardier paper.
11     Q  That's what I wanted to know. Thank you.
12 All right. Then you go on and you talk about the
13 Alzheimer's studies.
14     A  Right.
15     Q  Well, before you do that actually, you talk
16 about some other studies like Sanmuganathan on page
17 five. Do you see that?
18     A  Yes.
19     Q  Okay. What are you going to tell the jury
20 about your review of that study?
21     MR. KREPS: Objection to the form of the
22 question.
23     A  The same thing that's in the report.
24 BY MR. BLAIR:
25     Q  Okay. Do you have any criticisms as an

Page 127

1  epidemiologist to the study in any way?
2      A  Of the Sanmuganathan publication?
3      Q  Yes.
4      A  I really don't remember it in detail that I
5  would have criticisms to say right now. I can review
6  the paper and tell you what criticisms. I basically
7  used it to get the numbers from.
8      Q  Okay. Do you remember what the baseline
9  characteristics were for the patients in that study?
10     A  Well, it itself is not a study. It's
11 reporting the results from four other studies.
12     Q  I understand. It's a manuscript, right,
13 reporting results of studies?
14     A  Yes.
15     Q  All right. Do you remember -- with respect
16 to the four other studies that that paper reported on,
17 do you remember the baseline characteristics of the
18 patients, whether they were similar across the
19 studies?
20     A  I don't know -- they weren't exactly
21 similar. There were some differences.
22     Q  Do you remember whether the dosage of
23 aspirin that was given to the patients were the same
24 across those studies?
25     A  I don't remember that. I'd have to pull the

Page 128

1  paper.
2      Q  Do you remember whether the duration of the
3  usage of aspirin was similar across those studies?
4      A  I don't remember that.
5      Q  Do you remember whether the heart attack was
6  measured the same way across the studies?
7      A  No.
8      MR. KREPS: Objection to the form of the
9  question.
10     A  No.
11     MR. BLAIR: What's the basis for the
12 objection?
13     MR. KREPS: It's vague. A heart attack was
14 measured the same way did you say?
15     MR. BLAIR: Yeah. That's what those studies
16 -- am I wrong? That's what you're citing the studies
17 for, right, heart attack rate?
18     MR. KREPS: I didn't hear you say rate. I
19 thought you said the heart attack was measured the
20 same way.
21 BY MR. BLAIR:
22     Q  Right. The definition -- you understood my
23 question, right? The question was do you remember
24 whether the definition of heart attack was the same
25 across the four studies that the paper that you cited

Page 129

1  relied upon.
2      A  And I don't remember that.
3      Q  Would you agree that when you're going to
4  compare the results of studies, two different studies,
5  and particularly the event rates of, for example,
6  heart attack across various studies, that it's
7  important to consider whether the patient populations
8  in the studies have the same baseline characteristics?
9      A  Well, you would try to do your best to make
10 the studies as comparable -- the information as
11 comparable as possible.
12     Q  Okay. Why is that important, that the
13 information be as comparable as possible?
14     A  Well, the more comparable, the more the
15 numbers should apply exactly or more closely to what
16 you were looking for.
17     Q  Would you say that the same is true for
18 dosing of drugs used on patients if the purpose is to
19 compare the results across studies?
20     MR. KREPS: Objection to form
21     A  To the extent that you can create comparable
22 groups, you absolutely try to do that.
23 BY MR. BLAIR:
24     Q  And is it important to have a comparable or
25 comparable similar dose used of a drug in patients

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 130

1 across studies if the purpose is to compare the
2 results of those studies?
3     A  You try to get as similar a comparator group
4 as you can to whatever it is you're trying to compare.
5     Q  And the more similar the dose, for example,
6 of a drug, the more reliable any comparisons that can
7 be made across the studies?
8     A  Possibly.
9     Q  And the more similar the baseline
10 characteristics of the patients in two studies, the
11 more reliably one can draw conclusions or compare the
12 two studies, is that right?
13     A  Sure.
14     Q  The same is true for the duration of
15 exposure.  Would you agree?
16     A  Sure.
17     Q  And the same is true with respect to
18 measuring end points or actual events themselves.
19 Would you agree that you need to have as similar as
20 possible a definition of an end point like heart
21 attack in order to draw comparisons across studies?
22     A  You strive to make your comparisons as fair
23 as possible.
24     Q  And the converse is also true with respect
25 to all of those things.  Would you agree?  In other

Page 131

1 words, to the extent that there are big differences in
2 the definitions of events or the doses of drugs used
3 or the durations of drugs used, the characteristics of
4 the patients in two studies, the less reliable any
5 comparison is between the two studies.
6     MR. KREPS:  Objection to the form of the
7 question.
8     MR. BLAIR:  Wouldn't you agree?
9     A  Well, the more closely you would certainly
10 look at comparisons.  Sure.
11 BY MR. BLAIR:
12     Q  In other words, the less reliable the
13 comparison would be.
14     A  Well, maybe, maybe not.  I think that's
15 quite a generalization so I'm not sure that's
16 universally true.
17     Q  Okay.  So you wouldn't say that having
18 similarity then would be more -- would make a
19 comparison more reliable, would you?
20     A  Again, not necessarily always.  It
21 depends -- there's a lot of other things that go into
22 the study, as we talked earlier.  Clinical trials
23 versus retrospective studies.
24     Q  What kind of a -- well, let's talk about the
25 next study you cite which is Strand.  You see that?

Page 132

1     A  Yes.
2     Q  Okay.  Now, just to be fair, Strand is not a
3 Vioxx manuscript, is it?
4     A  I don't believe so.
5     Q  Okay.  And Sanmuganathan is not a Vioxx
6 manuscript, is it?
7     A  I don't believe so.
8     Q  And the next study says Howes, right?
9     A  Yes.
10     Q  Not a Vioxx study, right?
11     A  Yes.  Correct.
12     Q  And the next study you cite is CLASS, right?
13     A  Yes.
14     Q  And that's not a Vioxx study either, is it?
15     A  Correct
16     Q  Okay.  And basically you just cite all these
17 other studies that we just discussed to talk about the
18 rate of heart attack in those studies, right, by
19 comparison with the rate of heart attack in VIGOR for
20 example?
21     A  Yes.
22     Q  And have you done a methodical comparison of
23 the definition of heart attack used in all those
24 studies with VIGOR?
25     A  No, I have not.

Page 133

1     Q  As you sit here today, you have no idea
2 whether the definition of heart attack is the same?
3     A  I would leave that to the cardiology
4 experts.
5     Q  Okay.  Do you have any criticisms of the
6 methodology used in any of the studies that are
7 reported under the manuscripts that you cite in this
8 paragraph on page five, Sanmuganathan, Strand, Howes,
9 or CLASS?
10     A  Well, I have to go back and look at them
11 more closely.
12     Q  Any real weaknesses stand out in your mind
13 as an epidemiologist based on your experience and
14 training?
15     A  I would need to go back and look at them
16 more closely.
17     Q  Do you remember how many patients were in
18 those studies?
19     A  Well, the CLASS study was a clinical trial
20 and my sense is it was in the same range of sample
21 size as VIGOR.
22     Q  Okay.
23     A  The others are like summary articles of
24 other studies.  They're not particular studies
25 themselves.

34  (Pages 130 to 133)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 134

1    Q.  Okay.  So they're just basically summaries.
2  They're not even descriptions of their own clinical
3  trials.  What do you mean, summaries?
4    A.  The Strand, the Howes, and the Sanmuganathan
5  are studies that are bringing together information
6  from other sources in the published scientific
7  literature to bring additional insight into the
8  relationship or the information needed to review or
9  evaluate the Cox-2 inhibitors.
10   Q.  Well, in your opinion, right?  I mean you
11  believe it's important to look at those studies to
12  evaluate the Cox-2's, right?
13   A.  Well, these are the articles that came to
14  light in my review of the published scientific
15  literature and I thought they contributed relevant
16  information to that knowledge base.
17   Q.  Okay.  Did you look in your review at Study
18  Protocol 090 funded by Merck, carried out by Merck?
19   A.  I do have access to that and I have seen
20  that data.
21   Q.  Is it referenced in your report anywhere?
22   A.  The only place it's mentioned, it is
23  mentioned at the bottom of page three.  I'm sorry.
24  No.  Wait.  I thought I had mentioned it one place in
25  here.  Yeah.  I'm sorry.  Page six at the bottom.

Page 135

1    Q.  You put it in a footnote, is that right?
2    A.  That it was included in the Konstam analysis
3  and I had seen it.
4    Q.  And you write 090 did not identify an
5  excessive risk of heart attacks and strokes.  Did I
6  read that correctly?
7    A.  Yes.
8    Q.  Okay.  Are you saying that 090 study
9  protocol that you talk about in the footnote here did
10  not identify an excess risk of heart attacks?
11   A.  That's what it says.  Yes.
12   Q.  Okay.  You wrote and strokes.  I'm trying to
13  ask whether you added the two together for some
14  reason
15   A.  I'd have to pull the article and look at it
16  to --
17   Q.  You think there's an article?
18   A.  Well, I reference here where Topol
19  referenced -- some of this information I got out of
20  the New England Journal of Medicine where Topol
21  presented this information.
22   Q.  Okay.  Topol -- Dr. Topol is a very well
23  known doctor, isn't he?
24   A.  He's a well known cardiologist.  Yes.
25   Q.  Right.  He was the head of the Cleveland

Page 136

1  Clinic, wasn't he?
2    A.  That's my understanding.
3    Q.  How would the Cleveland Clinic rate in terms
4  of reputation among cardiology institutions?
5    A.  That question should be asked of a
6  cardiologist.
7    Q.  Now, as you sit here today, do you know
8  whether Merck ever published the results of Study 090?
9    A.  I'm not sure.
10   Q.  Do you know whether they ever had any of
11  their employees publish a manuscript about the results
12  like they did other studies?
13   A.  I'm not sure.
14   Q.  Did you do any independent analysis of Study
15  090 to determine whether indeed it did show an excess
16  risk of heart attacks?
17   A.  Did I do my own data analysis --
18   Q.  Yeah.
19   A.  -- of the raw data?  No.
20   Q.  Did you see any analysis by any of Merck's
21  employees done on Study 090 --
22       MR. KREPS: Objection.
23       MR. BLAIR: -- regarding excess risk of
24  heart attacks?
25       MR. KREPS: Objection to the form of the

Page 137

1  question.
2    A.  I don't remember exactly.  I mean I have
3  looked at a number of analyses that I've gotten
4  from -- that were done by Merck employees.
5  BY MR. BLAIR:
6    Q.  Okay  Study 090 was a randomized clinical
7  trial, wasn't it?
8    A.  I believe so
9    Q.  It's a gold standard study, right?
10   A.  It was a randomized global trial.  Sure.
11   Q.  Okay.  Do you know what year that study was
12  carried out as you sit here today?
13   A.  I'm not sure
14   Q.  Now, you wrote in your report that VIGOR was
15  the first study that was evidence of a signal of a
16  potential problem to Merck, right?
17   A.  Yes.
18   Q.  Okay.  If Study 090 was carried out earlier
19  than VIGOR and it showed a statistically significant
20  increased risk of heart attack, then obviously VIGOR
21  wouldn't have been the first study, right?
22       MR. KREPS: Objection to form.
23   A.  If that occurred according to the protocol.
24  BY MR. BLAIR:
25   Q.  Okay.  As you sit here today, you have not

35 (Pages 134 to 137)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 138

1  done any analysis of the Study 090 data, is that
2  right?
3      A   Not my own independent data analysis.
4      Q   You can't recall any analysis by Merck
5  statisticians that the Merck lawyers gave to you of
6  Study 090 as you sit here today?
7      A   Not off the top of my head. No.
8      Q   You haven't seen a copy of any publication
9  about the results of Study 090, right?
10     A   Not as I sit here today.
11     Q   If Study 090 did show a statistically
12  significant increased risk of heart attack, as you
13  wrote in your report about VIGOR, should Merck have
14  taken action?
15         MR. KREPS: Objection to the form of the
16  question.
17     A   If I see such information, I will put it in
18  context with the other information I have and decide
19  if I would need to make any changes in my -- what I've
20  stated.
21  BY MR. BLAIR:
22     Q   Okay. Are you familiar with the concept of
23  a trivial risk of exposure?
24     A   Yes.
25     Q   Something called ARE?

Page 139

1      A   Yes.
2      Q   And are you able to calculate it based upon
3  odds ratios, relative risk ratios?
4      A   It can be computed from relative risks and
5  odds ratios. Sure.
6      Q   Okay. And for example, if we were to take
7  the VIGOR results with respect to heart attack, what
8  was the odds ratio from VIGOR for heart attack?
9      A   It was a relative risk. It was not an odds
10  ratio. The relative risk was five.
11     Q   Five. Okay. How would you calculate an
12  attributable risk of exposure using the relative risk
13  of five from VIGOR?
14     A   I believe it's the relative risk minus one
15  divided by the relative risk.
16     Q   Okay. And so that would be -- 80 percent
17  would be a typical expression for the risk
18  attributable to Vioxx?
19         MR. KREPS: Objection to the form of the
20  question.
21     A   Well, that would be the computation based on
22  the observed relative risk in VIGOR.
23  BY MR. BLAIR:
24     Q   This is a calculation that's commonly done
25  in your field, right? This is not a new or novel

Page 140

1  calculation, right?
2      A   Correct.
3      Q   All right. And so typically you'd express
4  that attributable risk of exposure as a percentage,
5  right, once calculated?
6      A   Yes. That's the definition.
7      Q   Right. Okay. And if we use the VIGOR data,
8  that would be 80 percent, right?
9      A   Based on the estimated relative risk of
10  five.
11     Q   Okay. And what -- in your own words, what
12  does attributable risk of exposure of 80 percent mean?
13     A   Well, by --
14     Q   Using the VIGOR data.
15     A   By the raw definition of that attributable
16  risk, it would say that in that study 80 percent of
17  the observed heart attacks were attributable to Vioxx.
18  By the raw definition of the term.
19     Q   Okay. I notice that nothing in your report
20  talks about the Framingham data. You're familiar with
21  the Framingham data.
22     A   Yes, I am.
23     Q   Okay. Tell me about the Framingham study.
24  What is it?
25     A   Well, it's I believe the largest public

Page 141

1  health epidemiological study that has been going on in
2  the United States since I believe somewhere in the
3  1940's or early 50's. Still going on.
4      Q   And the data -- it's a study on a city up in
5  Massachusetts, isn't it?
6      A   Framingham.
7      Q   Okay. And for over 50 years or thereabouts
8  the health of the population of Framingham has been
9  followed. Right?
10     A   Yes.
11     Q   Okay. And data's been collected, right?
12     A   Yes.
13     Q   And would you agree that most scientists in
14  your field will recognize that data to be reliable
15  data today?
16     A   Well, as reliable as data can be in an
17  observational, you know, epidemiological study.
18     Q   The data is used by scientists all over the
19  world on a regular basis, right, the Framingham data?
20     A   Well, I'm not sure I know that for a fact.
21     Q   Okay. Certainly you would recognize the
22  data for your own purposes in epidemiology as reliable
23  data. I guess that's my question.
24     A   The Framingham study is certainly as
25  reliable as a public health epidemiological study can

36 (Pages 138 to 141)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 142

1  be. That's -- I would certainly agree with that.
2      Q   Okay. Are you familiar with the data from
3  the Framingham study on coronary heart disease and
4  heart attack?
5      A   Well, I mean I'm sure there's an awful lot
6  of published data on heart attacks or on
7  cardiovascular issues from the Framingham studies so
8  I'm not sure exactly what you'd be referring to.
9      Q   Okay. Have you done any work or made any
10  effort to compare the VIGOR attributable risk of
11  exposure of 80 percent for Vioxx to the risk of
12  hypertension from the Framingham study?
13      A   No. I have not.
14      Q   Same question for aging. Have you made any
15  effort to compare the risk attributable to Vioxx for
16  heart attack to the risk attributable to aging --
17      A   No, I have not.
18      Q   -- from the Framingham study? How about
19  cigarette smoking?
20      A   No, I have not.
21      Q   Okay. How about diabetes?
22      A   No, I have not.
23      Q   High cholesterol?
24      A   No, I have not.
25      Q   Is one of the purposes for doing a

Page 143

1  randomized clinical trial to look for an unexpected
2  problem with a drug?
3      A   Sure.
4      Q   How long has naproxen been on the market in
5  the United States?
6      A   I think, from my reading of some of the
7  science on naproxen, it's been on the mark at least 20
8  years.
9      Q   How many randomized clinical trials have
10  been done for the purpose of determining whether
11  naproxen is cardioprotective?
12      A   I think, from my reading of the literature
13  that's in this report, I believe zero.
14      Q   How many randomized clinical trials show a
15  statistically significant positive result that
16  naproxen is cardioprotective?
17      A   I'm sorry. I missed the beginning of that.
18  Can you repeat it?
19      Q   How many randomized clinical trials show a
20  statistically significant result that naproxen is
21  cardioprotective?
22      A   Well, the answer would have to be zero since
23  the previous question the answer was zero that there
24  were any clinical trials run.
25      Q   Okay. So with respect to naproxen and the

Page 144

1  theory that it's cardioprotective, there's not a
2  single randomized clinical trial that's ever been done
3  that's shown a statistically significant result, a
4  positive association, correct?
5      A   Based on the articles that I've read that
6  are in my Exhibit B, I would not disagree with that.
7      Q   You've looked at the naproxen labeling,
8  right, the current labeling?
9      A   No, I really haven't.
10      Q   You haven't seen it?
11          MR. BLAIR: We'll mark a copy of the
12  labeling as Exhibit Number 7.
13          (Exhibit 7 was marked for identification and
14  was attached to the transcript.)
15  BY MR. BLAIR:
16      Q   What does Exhibit 7 appear to be, Doctor?
17      A   It has a Roche title at the top. And then
18  it has a couple rows with I'm assuming different names
19  for Naprosyn, prescription only, and then a
20  description on page one.
21      Q   Have you looked at drug labeling before?
22      A   No.
23      Q   Never in your career? You never looked at
24  drug labeling?
25      A   Not as an expert. No.

Page 145

1      Q   Okay. So certainly there's never been a
2  label approved by the FDA that advertises that
3  naproxen is cardioprotective. You have no reason to
4  disagree with that?
5          MR. KREPS: Objection to the form of the
6  question.
7      A   I have no knowledge of that one way or the
8  to the other.
9          MR. BLAIR: Okay. Throw that away.
10  BY MR. BLAIR:
11      Q   Now, let's talk about page six of your
12  report. And this is the Konstam pooled analysis,
13  right?
14      A   Yes.
15      Q   Was this subsequently published under a
16  different lead author's name later? Do you recall?
17      A   I don't know what you mean by republished.
18  There was an update.
19      Q   Okay. Who was the lead author on the
20  update?
21      A   Weir. W-E-I-R.
22      Q   Okay. Who did this -- first off, this is
23  what's called a meta-analysis, right, or wrong?
24      A   Well, I would call it a pooled analysis.
25      Q   Pooled analysis. Okay. So were any Merck

37 (Pages 142 to 145)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD   MARKS,   PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

## Page 146

1  employees involved in this pooled analysis?
2      A   My guess would be that the employees would
3  have run the analysis for Konstam
4      Q   Okay.  Merck employees, right?
5      A   Well, they had the data so --
6      Q   Okay.
7      A   I don't know for sure.  I shouldn't guess.
8  So I don't know.
9      Q   Does it matter to you as a scientist
10  whether, let's say, the employees of a drug company do
11  an analysis and write a manuscript about results?  Do
12  you think there's any chance for bias, increased risk
13  for bias --
14          MR. KREPS:  Objection --
15          MR. BLAIR:  -- in that situation?
16          MR. KREPS:  Sorry.  Objection to the form of
17  the question.
18      A   I guess I would say no more than for any
19  other study.
20  BY MR. BLAIR:
21      Q   Okay.  So do you think that being a paid
22  employee of a drug company creates any kind of bias
23  for the employee to write manuscripts or publish data
24  that is written in a way that appears to be favorable
25  to the drug or the company?

## Page 147

1      A   I may be wrong but I don't believe Konstam
2  was a Merck employee.
3      Q   Okay.  Do you think that getting away from
4  Konstam and any of the other authors on his
5  analysis -- do you think as a general matter that
6  there's any increased risk for bias when the employees
7  of a drug company write a manuscript and publish the
8  study, that the study might, you know, be unduly
9  favorable to the drug or the company?
10      A   In my experience, I don't believe there's
11  any more potential for bias in the case you just
12  described than other scientists doing analyses.
13      Q   Okay.  Did the Konstam analysis exclude
14  mortality rates?
15      A   I'd have to go back and look.
16      Q   You can't recall as you sit here today?
17      A   Not off the top of my head.
18      Q   Do you know why the end point of APTC was
19  chosen by the authors for their pooled analysis?
20      A   Well, it represented what they believed to
21  be the appropriate individual end points that would be
22  of potential concern and where they would want to
23  capture data.
24      Q   Have you ever seen another study in which
25  APTC was an end point?

## Page 148

1      A   The APC study.
2      Q   Aside from the study from which that end
3  point came from?
4      A   No.  I said the APC study.
5      Q   Oh.  The APC study.  Which study was that?
6      A   That's the one that came out in '05 with the
7  latest results on Celebrex.
8      Q   Okay.  And who published -- whose data was
9  that?  Can you recall?
10      A   That was data on Celebrex from Pfizer.
11      Q   And that was --
12      A   Or actually --
13      Q   Was that published in the UK?  I thought it
14  was Lumivacoxib or whatever.  Are you sure about that?
15      A   Maybe I'm missing one.
16      Q   Well, let's set aside other Cox-2 studies.
17  It's my belief there is one other Cox-2 study which
18  was published after Vioxx litigation began that used
19  the APTC end point.  Do you disagree with that?  Do
20  you recall such a study?
21      A   Well, to be honest, I'm not sure.  I haven't
22  focused on which other studies have used APTC.
23      Q   Okay  So you haven't looked to see whether,
24  for example, there were any other studies that used
25  this APTC end point?

## Page 149

1      A   Again I don't know off the top of my head
2  the list of studies that may have used APTC.  I'm
3  happy to find that information if we need it but I
4  don't know off the top of my head.
5      Q   Okay.  Do you know whether the Konstam
6  pooled analysis, whether the data that was used, as
7  opposed to the manuscript itself, showed a two to
8  three times increased risk of death in Vioxx users as
9  compared to all the other --
10      A   I'm sorry  Can you re-ask that?
11      Q   Do you know whether the pooled analysis data
12  supporting Konstam's pooled analysis actually
13  demonstrated two to three times greater risk of death
14  in Vioxx users?
15      A   As compared to --
16      Q   Well, there are a bunch of other comparator
17  drugs in the various studies that were pulled, right?
18      A   Well, that's why I've asked the question.
19  There are a bunch --
20      Q   All of them.  If you combine them.  If you
21  pool them like Konstam did.
22      A   Oh.  Well, see, I don't agree with the
23  statement you just made when you say as Konstam did.
24  I don't think Konstam did combine all the studies.
25      Q   For death.

LEGALINK - HOUSTON
(888) 513-9800

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD   MARKS,   PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

## Page 150

1      A   Well, I don't even remember that he analyzed
2   death in the paper.
3      Q   Right. So you haven't done any of your own
4   analysis to look at it to see whether the data that he
5   pooled actually demonstrate an increased risk of
6   death, right?
7      A   Off the top of my head sitting here, I'm not
8   aware of that. I don't remember seeing that analysis
9   in the paper.
10      Q   Do you know if Dr. Reicin is an author?
11      A   I'm not sure.
12      Q   Of Dr. Konstam's analysis and the Weir
13   update?
14      A   I'm not sure. There were quite a few
15   authors on the paper.
16      Q   Okay. Do you know whether Dr. Reicin was
17   involved in making sure Vioxx was safe before Merck
18   sold it to millions of Americans?
19          MR. KREPS: Objection to the form of the
20   question.
21      A   I believe she was a Merck employee. I
22   really don't know her role.
23   BY MR. BLAIR:
24      Q   Do you think the VIGOR results are due to
25   chance in your opinion, based upon your experience and

## Page 151

1   training?
2      A   I believe that's one of the less likely
3   explanations.
4      Q   Okay. Would it have been appropriate in
5   your opinion for Merck to do a randomized clinical
6   trial specifically designed to look at the
7   cardiovascular safety of Vioxx?
8      A   Well, that would certainly be ideal. The
9   question would be how do you design such a trial and
10   run it fairly.
11      Q   Have you ever -- well, back in 2000 let's
12   say, when the VIGOR data came out, would it have been
13   appropriate for Merck to do that?
14      A   Well, that's the difficulty. You have this
15   signal and now will you design a study and recruit
16   people, you know, and put them on a placebo. Because
17   that's what you really would have wanted, is a
18   placebo-controlled trial.
19      Q   Right.
20      A   So are you going to take people at
21   cardiovascular risk and put them on a placebo?
22      Q   Okay. Well, do you think it would have been
23   appropriate then or inappropriate for Merck to do a
24   trial to actually prospectively determine whether
25   Vioxx caused heart attacks based upon the signal that

## Page 152

1   VIGOR represented?
2          MR. KREPS: Objection to the form of the
3   question.
4      A   Well, I'm not sure that -- as I state in my
5   report, I don't believe that any one study proves
6   causation. But there was certainly a lot of
7   discussion from what I've read about doing such a
8   study and options were considered and Merck came up
9   with a solution or with an option that seemed to
10   answer the cardiovascular question.
11   BY MR. BLAIR:
12      Q   What option was that?
13      A   That would have been Protocol 203.
14      Q   Okay. Was Protocol 203 carried out?
15      A   Well, it was started.
16      Q   Okay. When was it started?
17      A   Well, there's three studies. So APPROVe was
18   already under way.
19      Q   Okay.
20      A   And the other two studies, ViP and VICTOR, I
21   guess started around early '04 maybe?
22      Q   When did you first learn about Protocol 203?
23      A   Well, sometime during my review here.
24      Q   Did you reference it in your report?
25      A   No.

## Page 153

1      Q   Why not?
2      A   Well, there wasn't an analysis available. I
3   was aware of the protocol but there wasn't an
4   analysis.
5      Q   Now, protocol -- did you get any data from
6   Protocol 203 at all from Merck?
7          MR. KREPS: Objection to the form of the
8   question.
9      A   I have now received datasets which
10   supposedly represent the ViP and VICTOR data. I
11   haven't looked at them yet.
12          MR. BLAIR: Okay.
13          THE WITNESS: When you get a chance -- I'd
14   just like a two minute break when you get a chance.
15          MR. BLAIR: Sure. Let's do one thing more
16   and then we'll take about five or ten minutes. Will
17   that work?
18          THE WITNESS: I need two minutes.
19          THE VIDEO OPERATOR: We're going off the
20   record. The time is 12:40 p.m.
21          (A recess was taken.)
22          THE VIDEO OPERATOR: We're back on the
23   record. The time is 12:46 p.m.
24   BY MR. BLAIR:
25      Q   Dr. Marks, you said that Protocol 203 was an

39 (Pages 150 to 153)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD   MARKS,   PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 154

1   appropriate kind of study to assess the safety of
2   Vioxx, right?
3       A   I believe so.
4       Q   Okay. And did the Merck lawyers tell you
5   whether their employees had done any statistical
6   analyses of that data?
7       A   I'm not aware of that.
8       Q   You reviewed Dr. Zipes's report and
9   Dr. Kronmal's report, right?
10      A   What was the first name?
11      Q   Zipes. Z-I-P-E-S.
12      A   No. That name's not ringing a bell. Is it
13   on my list or --
14      Q   It's not actually. Kronmal is.
15      A   Kronmal I reviewed.
16      Q   Yeah. That's right. Let me show you --
17   this is a table taken from Dr. Kronmal's report of
18   Protocol 203. I'm sure you'll recognize it. Do you
19   recall seeing that in Dr. Kronmal's report? It's his
20   analysis of the Protocol 203 data.
21      A   I mean if you say so. It says it's Zipes'
22   report and I haven't seen Zipes' report so --
23      Q   You see it says taken from Dr. Kronmal's
24   report?
25      A   Oh. Yes.

Page 155

1       Q   And actually I have Kronmal's report here if
2   you need to look at it and refresh your recollection.
3   But here it is. Page 38 of Kronmal's report. Why
4   don't we do that instead. I think that's it. See if
5   that's it. Is that the same?
6       A   Yes.
7       Q   You've reviewed that, right?
8       A   I've seen it. Yes.
9       Q   Do you have any reason to disagree with
10   Dr. Kronmal's analysis as you sit here today?
11      A   Well, as I sit here today, I don't know
12   whether this represents the data from Protocol 203 or
13   exactly how he analyzed it. So I mean I see the
14   figure and acknowledge that it's Dr. Kronmal's figure.
15      Q   Do you intend to do any additional research
16   or your own analysis before trial for the data that
17   make up Protocol 203?
18      A   The Protocol 203 stuff is pretty new to me
19   so --
20      Q   I just want to know whether you're going to
21   show up at trial with an opinion about it.
22      A   As of today I haven't analyzed it.
23      Q   Okay.
24      A   As of today, I don't even know if the data
25   is final. I mean I don't know enough about the

Page 156

1   finality to know if an appropriate analysis from my
2   perspective can be done and reported.
3       Q   Okay. You understand that if you do intend
4   to offer any opinions about Protocol 203, they're not
5   in your report and we'd ask you to present those to us
6   prior to trial.
7       A   Absolutely.
8       Q   And if that does happen, obviously to the
9   extent that it's allowed by the court, we'll need to
10   talk to Dr. Marks about it
11          MR. BLAIR: Counsel? Do you agree?
12          MR. KREPS: Understood. Well, counsel, I
13   mean -- it's certainly understood if he has
14   affirmative opinions about it, obviously if he's asked
15   about something on cross or if something comes up
16   during trial that the court allows him to rebut one of
17   your experts --
18          MR. BLAIR: Well --
19          MR. KREPS: -- that will be up to the court
20   to decide.
21          MR. BLAIR: You know, if he's going to show
22   up having not done any review for this deposition of
23   the data and then show up, whether on cross or
24   otherwise, and tell the world that he has done a
25   review and prepared his own analysis and it's new to

Page 157

1   us, I don't think that's fair rebuttal.
2           MR. KREPS: We can dispute that.
3           MR. BLAIR: All right.
4           MR. KREPS: Obviously he's going to continue
5   to review matters.
6   BY MR. BLAIR:
7       Q   Okay. Do you know whether Merck ever gave
8   The New England Journal of Medicine the data from
9   Protocol 203 before the approved study was published?
10      A   By that do you mean the actual raw data
11   points?
12      Q   Yes.
13      A   I doubt if they did.
14      Q   Do you know whether Merck's own internal
15   employees had done a statistical analysis of the data
16   on Protocol 203 way back before APPROVe was submitted
17   for publication?
18      A   I don't know that.
19      Q   Okay. To the best of your knowledge as you
20   sit here today, has Merck or Merck's lawyers given you
21   any such analysis that was done by their statisticians
22   way back before APPROVe was even submitted for
23   publication?
24      A   I don't believe I've seen that.
25      Q   We talked about the Konstam analysis which

40 (Pages 154 to 157)

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 158

1  is a pooled analysis. Are you aware of Dr. Shapiro's
2  analysis of certain randomized clinical trials that
3  was performed on October 18th, 2000?
4      A   Yes. I am aware of that.
5      Q   Okay. Have you reviewed it?
6      A   Yes.
7      Q   Do you have any reason to disagree with
8  Dr. Shapiro's analysis?
9      A   No.
10     Q   Now, Dr. Shapiro was a statistician that
11  worked for Merck, right?
12     A   That's my understanding.
13     Q   Did the pooled analysis done by Merck and
14  Dr. Shapiro show statistically significant increased
15  risk of heart attack in Vioxx users?
16     A   You're talking about for which study or
17  studies?
18     Q   Well, her analysis. Her memo. The studies
19  are referenced.
20     A   That's what I'm saying. She covered a lot
21  of material in her analysis. I was just wondering
22  exactly what you were referring to.
23     Q   Well, here's my question. We'll mark a copy
24  of her analysis as Exhibit 8 to your deposition.
25         (Exhibit 8 was marked for identification and

Page 159

1  was attached to the transcript.)
2  BY MR. BLAIR:
3      Q   You've seen this, right? Part of your
4  materials that are identified --
5      A   Yes.
6         THE COURT REPORTER: Part of the
7  materials --
8         MR. BLAIR: That are identified in his
9  review list.
10  BY MR. BLAIR:
11     Q   What's the overall result for the relative
12  risk of heart attack with a 95 percent confidence
13  interval?
14     A   The total cohort is what you're referring
15  to.
16     Q   Yes.
17     A   The relative risk was 2.02. The confidence
18  interval was 1.14 to 3.55.
19     Q   Is that statistically significant?
20     A   Yes.
21     Q   So this analysis by Dr. Shapiro in October
22  of 2000 at Merck shows a statistically significant
23  increased risk of heart attack, doesn't it?
24     A   That's what this one page shows.
25     Q   And it's a pooled analysis, right?

Page 160

1      A   It's a pooled analysis of I believe the
2  article -- the individual studies listed above the
3  total cohort.
4      Q   Okay. Was this analysis ever published, to
5  your knowledge?
6      A   Well, the Konstam analysis was their pooled
7  analysis that was published.
8      Q   Later they published the Konstam paper,
9  right?
10     A   Yes. That was the --
11     Q   Dr. Reicin published --
12     A   -- pooled analysis.
13     Q   This was a different analysis, right?
14         MR. KREPS: Objection to the form of the
15  question.
16         MR. BLAIR: From the Konstam analysis, isn't
17  it?
18     A   Well, I'm not sure if this is exactly the
19  same papers or studies that went into Konstam but
20  Konstam was the pooled analysis that was reported.
21  BY MR. BLAIR:
22     Q   Okay. My question is was this result as
23  reported here the statistically significant result
24  done by a Merck statistician, to your knowledge, ever
25  published?

Page 161

1      A   This one specific result here for total
2  cohort I don't remember seeing in the published
3  literature.
4      Q   Okay. Now, as long as we're talking about
5  pooled analysis, you talked about Dr. Juni's analysis,
6  is that right?
7      A   Yes.
8      Q   And I think you said that it was wrong
9  because the pooled analysis had different comparative
10  drugs in part?
11     A   In part.
12     Q   Okay. Does that make his analysis
13  unreliable in your opinion?
14         MR. KREPS: Objection to form.
15     A   Well, I consider his analysis to have a
16  number of weaknesses.
17  BY MR. BLAIR:
18     Q   You rely on a pooled analysis by
19  Dr. Levesque, right, in your report?
20     A   Well, I report results that she showed from
21  her study. I wouldn't say that I rely on it.
22     Q   Okay. You're not relying on it?
23     A   It is part of my reference pool of
24  information.
25     Q   Are you or are you not relying on it?

41 (Pages 158 to 161)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 162

1    A  I would ask your definition of reliance.
2    Q  Do you consider it to be reliable so that
3  you could formulate opinions to a reasonable degree of
4  medical certainty based upon your experience and
5  training?
6    A  What do you mean by reliable?
7    Q  For any opinions you're going to give in
8  this case.
9    A  I use Levesque the same way I use all the
10  other articles, to learn information about what's in
11  the published science to form my opinion.
12    Q  Does the Levesque paper pool studies with
13  different comparator drugs?
14    A  I'm not sure if it does or not.
15    Q  I think you said Dr. Juni's analysis was bad
16  in part because he failed to include the Alzheimer's
17  studies, is that right?
18    A  I considered that to be a weakness of his
19  analysis.
20    Q  Did Dr. Juni include the APPROVe study?
21    A  I believe he did.
22    Q  Okay.
23    A  Wait. Wait. Juni came out before APPROVe
24  came out.
25    Q  Uh-huh.

Page 163

1    A  So I'm not totally sure now. But I believe
2  Juni would have come out before APPROVe results were
3  available. Unless he knew them before they came out
4  in publication. So I'm not positive.
5    Q  You say the Alzheimers studies were good for
6  Vioxx in that they failed to show an increased risk of
7  heart attack, right?
8    A  Well, it was leaving out articles that
9  really could and should have been included in that
10  analysis.
11    Q  Okay. And was APPROVe as a study, was that
12  good or bad for Vioxx in terms of increased risk?
13    A  I don't know what you mean by good or bad
14  for Vioxx.
15    Q  Well, in your report you wrote negative,
16  that were proven VIGOR were negative for Vioxx. Do
17  you recall that?
18    A  Yes.
19    Q  Okay. You want me to use the term negative
20  instead of bad?
21    A  Well, it identified a signal.
22    Q  Okay.
23    A  That was the lingo I used earlier.
24    Q  All right. Was APPROVe negative or positive
25  for Vioxx?

Page 164

1    A  It was a negative statistical result.
2    Q  Okay. And was APPROVe included in Juni's
3  analysis?
4    A  I'm not going to say with 100 percent
5  certainty because I'd have to go back and look, but
6  it's quite possible it was not.
7    Q  Now, when you talked about, you know, the
8  importance of doing like a Protocol 203 to look at the
9  safety of Vioxx -- and I think you said it was
10  appropriate for Merck to do that, right?
11    A  Yes.
12    Q  Okay. Have you ever heard of VALOR?
13    A  Spell it.
14    Q  The VALOR study. V-A-L-O-R.
15    A  I have heard that term.
16    Q  Where did you hear that term?
17    A  I really am not sure. I've seen it in some
18  document I believe in my readings but I'm not sure
19  where.
20    Q  Have you ever seen any data from the VALOR
21  study?
22    A  I don't believe so.
23    Q  Do you know what the VALOR study was?
24    A  No.
25    Q  Did Merck's lawyers tell you anything about

Page 165

1  the VALOR study?
2    A  I don't believe so.
3    Q  Ever seen a manuscript about the results of
4  any VALOR study that Merck wanted done?
5    A  I'm not sure where -- I have heard the term
6  VALOR and I'm not sure where I heard it.
7    Q  Ever heard of a study called the Vioxx
8  Cardiovascular Outcome Study?
9    A  Say that again.
10    Q  The Vioxx Cardiovascular Outcome Study.
11    A  I -- I don't believe so.
12    Q  Okay. Do you claim that the Alzheimer's
13  studies in your report, two of which were -- reports
14  of two of which were published by Drs. Thal and
15  Reines, among other Merck employees I think -- I think
16  you claim those show no increased cardiovascular risk
17  for Vioxx users, is that right?
18    A  I believe that's what I stated.
19    Q  Were those studies adequately powered to
20  detect a statistically significant increased risk of
21  heart attack?
22    A  Individually quite possibly, no.
23    Q  Okay. Did you do your own analysis to
24  determine whether those studies were statistically
25  powered to detect a statistically significant

42 (Pages 162 to 165)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 166

1  increased risk of heart attack?
2       MR. KREPS: Objection to the form of the
3  question.
4       A  No: I did not do my own power analysis.
5  BY MR. BLAIR:
6       Q  Did any of these studies exclude some
7  high-risk cardiovascular people?
8       A  I don't remember.
9       Q  I think earlier you said you thought it
10 might be unethical for Merck to give Vioxx to people
11 who had high cardiovascular risk --
12      A  No.
13      Q  -- in order to carry out a study?
14      A  I don't believe I said that.
15      Q  You suggested that with respect to Protocol
16 203, there might be some issue with designing a study
17 like that?
18      MR. KREPS: Objection to the form of the
19 question.
20      A  I don't remember that discussion. Not at
21 all
22 BY MR. BLAIR:
23      Q  Okay. You say that Merck should have done
24 additional investigation when they got VIGOR in your
25 report, right, which you claim is the first randomized

Page 167

1  clinical trial Merck had that showed a statistically
2  significant increased risk of heart attack, right?
3       A  Merck had a signal and Merck needed to
4  respond to that signal.
5       Q  And I think you said that Protocol 203 is
6  one such study that would have been appropriate,
7  right?
8       A  Yes. That's true.
9       Q  Now, that's a pooled analysis, not a
10 randomized clinic trial, right?
11      A  It's going to be a pooled analysis of three
12 randomized clinical trials. Yes.
13      Q  Do you think it would have been appropriate
14 for Merck to do a randomized clinical trial
15 specifically looking at cardiovascular outcomes based
16 upon the results of VIGOR?
17      A  We talked about that earlier  I think I
18 answered that question.
19      Q  I'm sorry. You did? What was your answer?
20 I apologize.
21      A  Well, I think there was a lot of discussion
22 about what future studies should be run and what
23 studies could be run to best and fairly evaluate the
24 cardiovascular risk
25      Q  Okay. And I remember you saying something

Page 168

1  about there being an issue with respect to giving
2  Vioxx in such a study to patients that were at a high
3  cardiovascular risk.
4       A  No. That's not what I said.
5       Q  Okay. I misunderstood you. What did you
6  say?
7       A  I said that one of the issues that
8  complicated developing the right study was, in a
9  population of cardiovascular risk patients, giving a
10 placebo because the comparator group they wanted was a
11 placebo-controlled trial.
12      Q  Okay. And so the question was how do you do
13 such a study and not give, in your opinion, aspirin,
14 for example, to patients, is that right?
15      A  It's unethical to withhold treatment from
16 patients who would normally get treatment for a
17 disease or a condition.
18      Q  So in your opinion it would have been
19 unethical to do a study comparing Vioxx and placebo to
20 determine whether there was an increased risk of heart
21 attack in patients who had preexisting cardiovascular
22 problems?  Is that what you're saying?
23      A  It certainly could be.  Yes.
24      Q  Okay.  But is it in your opinion?
25      MR. KREPS: Objection to the form of the

Page 169

1  question.
2       A  Well, I would not want to be involved in a
3  clinical trial that was withholding treatment from
4  patients who had an identified disease or condition
5  for which effective and safe treatments were
6  available.
7  BY MR. BLAIR:
8       Q  Okay. So you think that Merck was right
9  never to do a study actually testing Vioxx versus
10 placebo on high-risk cardiovascular patients?
11      MR. KREPS: Objection  Form of the
12 question
13      A  I was not a party to the discussions that
14 went on around that time that were discussing how to
15 best get the correct answer to the cardiovascular
16 question. So I don't know how that was done.
17 BY MR. BLAIR:
18      Q  Okay. Was APPROVe a study that involved a
19 comparison of Vioxx and placebo?
20      A  Yes.
21      Q  By the way, as long as we're on the topic of
22 the Alzheimer's studies, which you say don't show a
23 statistically increased risk of cardiovascular
24 problems in Vioxx users, did you ever see an analysis
25 by Dr. Chin, a Merck statistician?

43 (Pages 166 to 169)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD   MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 170

1    A  I've heard of it.  I might have seen it
2  once.  I don't have it in my list of materials.
3    Q  You don't have it in the list of materials
4  on your -- that you gave us for this case, right?
5    A  Correct.
6    Q  Okay.  Why did you not include it in your
7  list of materials if you've seen it?
8    A  My understanding is it's an interim analysis
9  so it would have limited value.
10    Q  So you just left it off?
11    A  I looked at the final results from the
12  study.
13    Q  Do you know when Dr. Chin did his, as you
14  say, interim analysis for Merck?
15    A  I'm not sure of that.
16    Q  Okay.  Did that analysis show any problems
17  with Vioxx?
18    A  I don't remember.
19    Q  Okay.  Do you recall whether that analysis
20  by Dr. Chin, the Merck statistician, showed a
21  statistically significant increased risk of death in
22  Vioxx users?
23    A  It's my understanding that in the Chin memo,
24  whatever the analysis was, there was a statistically
25  significant difference shown.

Page 171

1    Q  Is death an important outcome?
2    A  Sure.
3    Q  Do a lot of people suffer sudden death from
4  hearts attacks?
5    A  That's out of my area of expertise.
6    Q  Let's talk about APPROVe.  Was that a
7  randomized clinical trial?
8    A  Yes, it was.
9    Q  It's the gold standard trial, right?
10    A  Yes.
11    Q  Okay.  Did it result in Vioxx being taken
12  off the market?
13    A  The decision to withdraw Vioxx was made when
14  the results from APPROVe were known.
15    Q  Did APPROVe find a statistically
16  significant -- significant increased risk of heart
17  attack with Vioxx use?
18    A  Did you say statistically significant?
19    Q  Yes.
20    A  Yes.
21    Q  Sorry about that.  Did it find a
22  statistically significant increased risk of death and
23  heart attack with Vioxx use?
24    A  I'd have to look at the paper to see that.
25  I don't remember the -- I don't remember what

Page 172

1  mortality results were in the publication.
2    Q  You say that the statistically significant
3  increased risk of heart attack demonstrated by APPROVe
4  is wrong although it's consistent with VIGOR because,
5  in your words, the placebo-event rate is quote,
6  surprising and unrealistic and quote, unexpected and
7  abnormal.  Do you recall writing that?
8    A  Yes.
9        MR. KREPS:  Objection to the form of the
10  question.
11        MR. BLAIR:  What's the basis?  I was reading
12  from his report.
13        MR. KREPS:  No, you weren't.  At the
14  preamble you weren't reading from his report I don't
15  think.
16  BY MR. BLAIR:
17    Q  Did I fairly state what's reflected on page
18  ten of your report, Doctor?
19    A  Would you -- why don't you read it one more
20  time.
21    Q  Sure.  I think you said that the
22  statistically significant increased risk of APPROVe in
23  your opinion was wrong because the placebo-event rate
24  was surprising and unrealistic and unexpected and
25  abnormal.

Page 173

1    A  Where --
2        MR. KREPS:  Objection to form.
3        THE WITNESS:  Let me just follow you so we
4  are agreeing on the --
5        MR. BLAIR:  Sure.
6        THE WITNESS:  -- wording.
7        MR. BLAIR:  Sure.  Go ahead.  Take your
8  time.
9        THE WITNESS:  Where are you?
10        MR. BLAIR:  I'll highlight it for you.  I'll
11  highlight it for you.
12        MR. KREPS:  So the record's clear, where did
13  you read that he said the statistically significant
14  result was wrong?
15        MR. BLAIR:  Well, that's what that whole
16  paragraph was about.
17        MR. KREPS:  Oh, I thought you said you were
18  reading the word wrong in there.
19        MR. BLAIR:  No.  I'm reading surprising and
20  unrealistic, the quotations I gave, and unexpected and
21  abnormal.
22    A  Those are the words in my report.  Yes.
23  BY MR. BLAIR:
24    Q  Okay.  And what do you base -- well, you
25  actually claimed that the results are wrong -- they're

44  (Pages 170 to 173)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 174

1  surprising and unrealistic and unexpected and abnormal
2  because they're due to some 18-month issue. Right?
3      MR. KREPS: Objection to form.
4      A  I haven't stated that they're due to an
5  18-month issue.
6  BY MR. BLAIR:
7      Q  I'm sorry. I thought that you wrote -- for
8  MI -- the preceding sentence -- the placebo group
9  incidence rate in the second 18 months was one-third
10 the rate for the first 18 months.
11     A  Yes.
12     Q  This result is surprising blah blah blah and
13 unrealistic.
14     A  Yes.
15     Q  All right. So basically you're blaming it
16 on -- some 18-month issue is the basis for the
17 surprise and unrealism.
18     MR. KREPS: Objection to form.
19     MR. BLAIR: Right?
20     A  I'm not sure I would characterize it as
21 blaming it on an 18-month issue.
22 BY MR. BLAIR:
23     Q  Okay. How would you characterize it?
24     A  Well, the results are un -- the results for
25 the placebo group are unexpectedly low period. But

Page 175

1  it's exacerbated in the period from 19 to 36 months
2  which is clearly seen from Figure 2 in the Bresalier
3  publication.
4      Q  Do you know whether Merck had previously
5  published an 18-month defense that ultimately was
6  debunked as a statistical error on Merck's part?
7      A  I don't know what you mean by an 18-month
8  defense.
9      Q  Any claim that there was only excess risk
10 after 18 months, for example. Are you familiar with
11 that?
12     A  Yes. Merck --
13     Q  Merck claimed that, right?
14     A  The Bresalier publication made that point.
15 Yes.
16     Q  Okay. And is that analysis in support of
17 Merck's claim, that there's only an excess risk after
18 18 months as it was published in the Bresalier
19 publication, is that statistically accurate?
20     A  I'm sorry. I just need to make sure I
21 understand your question. Can you restate it
22 possibly?
23     Q  Sure. I think -- and correct me if I'm
24 wrong -- that the claim that was made in the
25 publication, the Bresalier publication, was that there

Page 176

1  was only excess risk after 18 months, correct?
2      A  Yes.
3      Q  Okay. As a matter of statistics, based upon
4  your review, is that claim supported as it was
5  originally published in the Bresalier publication?
6      A  Yes.
7      Q  What's a subgroup? What's subgroup analysis
8  in the field of statistics?
9      A  A subgroup analysis generally speaking would
10 be where you take a subset of the subjects in your
11 study and perform a specific analysis on them.
12     Q  Okay. Generally speaking is subgroup
13 analysis generally accepted in your field to be
14 reliable?
15     A  Well, again I'm not sure what you mean by
16 reliable.
17     Q  For the purpose of forming opinions to a
18 reasonable degree of scientific certainty. For
19 example, can you draw reliable conclusions about
20 adverse outcomes of a drug from subgroup analysis in
21 your opinion?
22     A  Maybe under the right circumstances.
23     Q  What are the circumstances?
24     A  Well, I mean that's a very big question that
25 there's not a simple yes or no answer to. Subgroup

Page 177

1  analyses is a big area. There's a lot of discussion
2  of it in, you know, the scientific literature. So I
3  need to know a little more specifics, if you're going
4  to ask a question about it, what it is you're
5  referring to.
6      Q  How about this. All things being equal,
7  which is a more reliable result, a result that's
8  derived from subgroup analysis or a result that is not
9  derived from subgroup analysis?
10     A  I can't answer that. It depends on some
11 other -- on some other parts that you need to ask
12 about a question like that. Subgroup analyses you
13 need more definition.
14     Q  What's an improper subgroup?
15     A  I have no clue what an improper subgroup is.
16     Q  No clue? You never heard that term of art
17 in your field?
18     A  Improper subgroup?
19     Q  Yes.
20     A  I don't know that I've heard that term.
21     Q  Are there any hazards or dangers of doing
22 subgroup analysis?
23     A  Sure.
24     Q  What are they?
25     A  Well, certainly one is if you do too many

45  (Pages 174 to 177)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 178

1  subgroup analyses or if you do post hoc subgroup
2  analyses
3      Q   You said the first one was what?  The second
4  was post hoc subgroup analysis was a danger.
5      A   And doing too many subgroup analyses.
6      Q   Let's talk about too many subgroup analyses.
7  Why is that a danger?
8      A   Because the more analyses that you perform,
9  the more likely you are to get statistical
10  significance when it really is not true.
11     Q   And what's the danger with post hoc subgroup
12  analysis?
13     A   Because oftentimes when subgroup analyses
14  are done after the fact, they're done because
15  someone's already observed something in the data that
16  looks like it might be different.  So when you put a
17  statistical test on it, you have an inflated chance of
18  getting statistical significance but it's not -- it's
19  not a fair, objective and unbiased analysis.
20     Q   Okay.  Now, you did an analysis of your own
21  on the APPROVe data, right, for the purpose -- that is
22  reflected in your report?
23     A   Yes.
24     Q   Okay.  You did a subgroup analysis, didn't
25  you, with respect to your 18-month explanation that's

Page 179

1  reflected on page ten?
2      A   Well, that's a little different than a
3  subgroup analysis  That's -- I used all the patients
4  A subgroup analysis is different.
5      Q   You actually divided the patients into two
6  groups, those -- you looked at the behaviors before 18
7  months and the behaviors after 18 months, right?
8      A   But I disagree with the sentence you just
9  stated or the question you just asked.
10     Q   In your mind what you did here is not
11  subgroup analysis of any kind?
12     A   I don't believe it's a subgroup analysis as
13  we've been discussing it for the last few minutes.
14     Q   Okay.  Well, how would you describe dividing
15  up your analysis and looking at event rates pre 18
16  months and event rates after 18 months if it's not a
17  subgroup analysis?
18     A   I would call it a subset analysis.
19     Q   Subset analysis?
20     A   Yes
21     Q   That's a term of art in your fields?
22     A   I believe so.
23     Q   A subset analysis?
24     A   I understand it.
25     Q   Is it different from subgroup?

Page 180

1  I'm asking --
2      A   To me it is.
3      Q   Okay.  But in the published literature can I
4  find a distinction in the terms -- I mean the stuff
5  you rely on in your own field of statistics --
6      A   Yes
7      Q   -- can I find a definition of a subset
8  analysis that's consistent with what you did here and
9  that's different from a subgroup analysis?
10     A   I don't know if you can find that or not.
11     Q   As you sit here today, can you cite any
12  textbooks for that distinction --
13     A   No.
14     Q   -- in terms, subset and subgroup?
15     A   No.
16     Q   Did you put any literature in your citations
17  attached to your report that support the distinction
18  between the subset analysis, which you say you did,
19  and what's commonly understood to be subgroup analysis
20  in your field?
21     A   No, I did not.
22     Q   Have you ever heard any other epidemiologist
23  distinguish subset analysis from subgroup analysis?
24     A   To be honest, I haven't spent a lot of
25  thought on when I talk to colleagues about how I use

Page 181

1  the term subgroup or subset or a lot of other terms.
2  There seems to be a lot more focus on it here than
3  there is in the real world.
4      Q   Whatever kind of analysis that you've done
5  here for this 18-month opinion that you've written on
6  page ten of your report, whether it's a subgroup
7  analysis or a subset analysis, it's clearly a post hoc
8  analysis, right?
9      A   Well, in one way it's post hoc and in
10  another way it's not post hoc
11     Q   All right  How is it not post hoc?
12     A   Well, it was -- it was arrived at from a
13  previous test that, when that test is statistically
14  significant, it requires an additional analysis  So
15  the fact that this was planned to be done if the
16  previous test was statistically significant means it
17  was planned to be done.
18     Q   You're saying that an 18-month analysis was
19  planned?
20     A   I didn't say that.
21     Q   Okay  I'm curious.  Maybe I misunderstood
22  you.  Okay.  Was it planned to be done or was there
23  some other analysis that was planned to be done?
24     A   A follow-up analysis to the previous
25  analysis to this would be required when the first

46 (Pages 178 to 181)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 182

1  analysis is statistically significant.
2      Q   There was a follow-up analysis, right?
3      A   Yes.
4      Q   That analysis was itself post hoc, right?
5  That's why it's a follow-up.
6      A   Well, but it was -- it was planned that such
7  an analysis, a follow-up analysis, would be done if
8  the first analysis reached statistical significance.
9      Q   That was prospectively planned back when
10  APPROVe was started?
11      A   I believe so.
12      Q   If back when APPROVe was started no 18-month
13  analysis was planned, then the follow-up analysis
14  would be by definition post hoc.
15      A   I disagree with that.
16      Q   Okay.  Now, you've published before and
17  carried out drug trials, right?
18      A   I've published before on what?
19      Q   Clinical.  Have you designed and helped to
20  carry out randomized clinical trials?
21      A   Yes.
22      Q   Okay.  You know what the difference is
23  between a primary end point and a secondary end point,
24  right?
25      A   Yes

Page 183

1      Q   Okay.  And you've published papers about the
2  results of the trials that you've done, right?
3      A   Yes.
4      Q   And designed?
5      A   Yes.
6      Q   All right.  And in the papers that you
7  publish, do you typically publish the primary end
8  points?
9      A   Yes.
10      Q   Results?  Do you publish the secondary end
11  point results?
12      A   Yes.
13      Q   Is that standard practice?
14      A   Yes.
15      Q   Is it standard --
16      A   I would add that it wouldn't necessarily all
17  be in one publication.
18      Q   Okay.
19      A   If a study is too large or maybe some end
20  points take longer, it may be multiple publications.
21  But if your protocol includes these defined end
22  points, then eventually all would be published.
23      Q   They all should be published.  That's
24  standard protocol, right?
25      A   Yes.

Page 184

1      Q   All right.  It's not standard protocol just
2  to not publish the secondary end point in a randomized
3  clinical trial because you don't like the result,
4  right?
5      A   Well, I'm not going to say -- I'm going to
6  add that maybe there are reasons for some studies to
7  not publish all of their end points, okay?  I don't
8  want to say universally.  But generally speaking, you
9  report on the end points that you defined up front.
10      Q   Have you -- with respect to the APPROVe
11  study, have you seen the investigator-reported
12  cardiovascular event --
13      A   No.
14      Q   -- secondary end point published?
15      A   Oh.  No
16      Q   Are you aware that investigator-reported
17  cardiovascular events were a prospectively determined
18  end point of the APPROVe study?
19      A   Well, I'm not sure of that only because I
20  only recently got the protocols and so I don't
21  remember all the details of the protocol.
22      Q   What do you mean you only recently got the
23  protocols?
24      A   Those were the protocols we talked about a
25  while ago that I just got on disk --

Page 185

1      Q   Okay.
2      A   -- a few weeks ago.
3      Q   So after you've filled out your report for
4  Gary Smith?
5      A   Yes.
6      Q   All right.  So you actually hadn't looked at
7  the protocols for the studies when you filled out your
8  report --
9      A   Yes.
10      Q   -- for Dr. Smith?  And you don't know
11  whether, with respect to the APPROVe study as you sit
12  here today, whether Merck did publish all of the
13  prospectively declared end points in the manuscript,
14  do you?
15      A   I don't know for sure.
16      Q   You don't know whether Merck complied with
17  standard protocol to publish all those end points, do
18  you?
19          MR. KREPS: Objection to form.
20      A   I don't know what Merck has published.  I
21  don't know what the original end points exactly were.
22          MR. BLAIR: Let's take a break.  Let's
23  change the tapes.
24          THE VIDEO OPERATOR: We are going off the
25  record. The time is 1:21 p.m.

47 (Pages 182 to 185)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 186

1      (A recess was taken.)
2      THE VIDEO OPERATOR: This marks the
3   beginning of tape number three. We are back on the
4   record. The time is 1:25 p.m.
5   BY MR. BLAIR:
6      Q   The White study that you reference at the
7   beginning of your report, Doctor -- you recall that
8   study?
9      A   Yes.
10     Q   Is that a post hoc analysis?
11     A   The White study I recollect being a pooled
12  analysis.
13     Q   Is it a post hoc pooled analysis I guess?
14     MR. KREPS: Object to form.
15     A   Well, it certainly is an analysis of a
16  combination of studies after they have been completed.
17  My sense would be that a protocol would have -- well,
18  I'm surmising and I don't know -- I shouldn't be
19  surmising so --
20  BY MR. BLAIR:
21     Q   Okay. Now, you've done a lot of studies and
22  you've published some papers about your randomized
23  clinical trials that you've done, right?
24     A   Yes.
25     Q   Is it important when you publish a paper to

Page 187

1   fully set forth the methodology that you used?
2      A   Well, given the constraints of the amount of
3   space available to publish an article, you can't put
4   in all the details so --
5      Q   Certainly you'd want to describe your
6   methodology though, right?
7      A   You describe the methodology as completely
8   as you can in the allotted space.
9      Q   Okay. And you submit your data to the
10  extent you're able to, right?
11     A   You provide your analyses.
12     Q   You -- you describe the data in your
13  publication. That's my question.
14     A   Yes.
15     Q   Okay. So for example, if you're going to
16  make a conclusion about whether there's an increased
17  risk of heart attack on a drug or whether there is
18  demonstrated cardioprotective effect of a drug, you
19  would provide the data in, let's say, table form, that
20  proves that, that supports your analysis in your
21  manuscript. Right?
22     A   Yeah.
23     MR. KREPS: Objection to form.
24  BY MR. BLAIR:
25     Q   That's standard practice, right?

Page 188

1      A   Well, I just have to correct one thing.
2   Your use of the term data would be very different than
3   my use. Okay? So I just need to clarify. Data
4   summary or data analysis or data results. Not just
5   data.
6      Q   You're right. That's an important
7   distinction. What I'm talking about, you put tables
8   describing the data in the paper, right, so you can
9   see how a statistical analysis was performed and how
10  the data supports it, right?
11     MR. KREPS: Object to the form of the
12  question.
13     A   You summarize your data in different ways
14  but tables is one form of summarizing your data for
15  the reading audience.
16  BY MR. BLAIR:
17     Q   Okay. Okay. Or you put the data in text,
18  in the text of the paper?
19     A   Summaries. Data summaries or data results.
20     Q   Good point. Good point.
21     A   And there's other formats too. I mean --
22     Q   Right.
23     A   -- the key is to summarize your data.
24     Q   Okay. Now, what is the point of actually
25  summarizing the data that you actually used in order

Page 189

1   to come up with your conclusions? What's the point of
2   putting that information in a manuscript?
3      A   So the reading audience sees the results of
4   your study.
5      Q   Is part of the point also so that the
6   reading audience can look at your methodology and look
7   at your summary of your data and replicate the results
8   if they'd like to?
9      A   Sure.
10     Q   That's the scientific method, right?
11     A   Yes.
12     Q   What you want to do is you want to have
13  enough information so that you can replicate the
14  results that are claimed. Right?
15     A   Yes.
16     Q   And you need to put enough information in a
17  manuscript in order to enable a qualified scientist to
18  attempt to replicate your work, right?
19     A   Well, I would suggest that in most published
20  papers there's not enough information there to
21  actually be able to replicate a study exactly the way
22  it was done. And that's due to space constraints.
23     Q   Okay. But there's certainly -- wouldn't you
24  agree in most published studies there's a full summary
25  of the data together with, as much as possible, a

48 (Pages 186 to 189)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 190

1  description of the methods used to carry out the
2  analysis?
3      A    What I will certainly agree to is in the
4  space available to describe the study, you put the
5  most relevant information there for your reading
6  audience to understand what you did and if they would
7  choose to try and replicate that.
8      Q    Okay. All right. And for example, what's
9  some of the information that you'd need in a
10  typical -- let's talk about the VIGOR paper for
11  example. By way of example, what information's
12  important to have in VIGOR that's in the manuscript?
13      A    Well, there's the materials and methods
14  section.
15      Q    Right.
16      A    That's a very standard section --
17      Q    Okay.
18      A    -- where you describe your patient
19  population from which you're sampling. You describe
20  your randomization technique. You describe the data
21  you're collecting. You describe the end points and
22  the primary and secondary, if there are such things,
23  inclusion, exclusion criteria. I mean it goes on and
24  on.
25      Q    Right.

Page 191

1      A    You're summarizing your protocol in the
2  materials and methods section and in the statistical
3  analysis description before you begin showing your
4  results.
5      Q    Okay. Right. So typically you'd expect to
6  find in a paper -- that you would regard as reliable
7  in the scientific literature -- you'd expect to find a
8  materials and methods section and a statistical
9  analysis section, describing all the things you just
10  talked about. Right?
11      A    That's standard in a scientific publication.
12      Q    And would you agree that it's the presence
13  of those things that makes the results claimed
14  reliable, together with the peer review process?
15      A    I don't know if that -- if providing that
16  information, I don't think that necessarily makes your
17  results reliable.
18      Q    Okay.
19      A    It describes how you design and ran your
20  study to produce the data that supposedly is
21  represented in the analysis that you're showing.
22      Q    Have you ever seen the Watson report?
23      A    Yes. That's in my files.
24      Q    Okay. Do you have any opinions about it
25  that you intend to give at trial?

Page 192

1      A    Well --
2      Q    From 1998
3      A    My overview of the Watson report is that
4  was -- it was a statistical reporting of a comparison
5  of results from VIGOR that were available at the time
6  and that were still blinded as compared to two
7  historical control groups.
8      Q    Okay. And what were the results of the
9  Watson report, in your opinion, with respect to the
10  safety of Vioxx?
11      A    What were -- I'm sorry?
12      Q    What were the results in the Watson report
13  with respect to the safety of Vioxx or any increased
14  risk of cardiovascular events in Vioxx users?
15      A    Well, Watson's overall conclusion was that
16  there was no overall safety issue based on that review
17  of the available data at that time and compared to
18  historical controls.
19      Q    Did you actually look at the data that was
20  in -- reflected in the Watson report, the data tables?
21      A    I looked at -- I mean I looked at the -- I
22  looked at the tables that were in the Watson report.
23  Yes.
24      Q    Okay. All right. The ADVANTAGE study, do
25  you plan to talk about that at trial?

Page 193

1      A    Not to any extent beyond what's in my report
2  where it's just kind of --
3      Q    Where is it in your report?
4      A    Well, I mean to the point that it's part of
5  the combined results from Merck studies.
6      Q    Where did you talk about that?
7      A    Well, only where it's combined --
8      Q    Are you talking about Konstam?
9      A    Yeah. Where it's combined with other
10  studies like in Konstam.
11      Q    Okay. Have you reviewed the study, the
12  ADVANTAGE study?
13      A    I've reviewed the scientific publication.
14      Q    Have you seen the FDA review of the study?
15      A    I probably have. That would have been quite
16  a while ago.
17      Q    Do you agree that a post hoc subgroup
18  analysis should be considered no more than hypothesis
19  generating?
20      A    Generally speaking, yes.
21      Q    And by hypothesis generating -- we covered
22  this earlier -- that's like a theory or a guess,
23  right?
24      A    The same --
25          MR. KREPS: Object to form.

49 (Pages 190 to 193)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 194

1    A   The same definition as we had earlier for
2   post hoc.
3   BY MR. BLAIR:
4    Q   Okay. Let's talk about the April 2005 FDA
5   memo. Have you seen that?
6    A   Yes.
7    Q   I think it's referenced as a material you've
8   reviewed. I'll mark that as Exhibit -- I'll just hand
9   it to you. We'll mark that as Exhibit 9 to your
10  deposition.
11       (Exhibit 9 was marked for identification and
12  was attached to the transcript.)
13  BY MR. BLAIR:
14   Q   You have a copy of Exhibit 9 in front of
15  you, Doctor?
16   A   Yes.
17   Q   Do you intend to talk about this at trial?
18   A   If asked about it. It's not in my report.
19   Q   I agree. It's not in your report, right?
20  Do your opinions in any way depend upon this
21  memorandum?
22   A   Well, I think this memorandum strengthens my
23  opinion.
24   Q   Are you relying upon this memorandum in
25  supporting the opinions that you intend to show up and

Page 195

1   give at trial?
2    A   I guess I'll give the same answer I gave
3   earlier. I have reviewed -- I have reviewed this and
4   it's part of my overall information base that has led
5   to the forming of my opinions.
6    Q   I think I'm entitled to an answer to the
7   question, yes or no, for the purpose of notice. Are
8   you relying upon this report in support of the
9   opinions that you intend to give at trial?
10   A   I don't understand your legal use of the
11  word relying here. I've reviewed the material. Okay.
12  It's a valid report from the FDA --
13   Q   Okay.
14   A   -- that I have reviewed that discusses Vioxx
15  and conclusions that can be made about Vioxx in April
16  of 2005. And I think from that extent I use it in the
17  conclusions that I formed.
18   Q   Have you ever worked at the FDA?
19   A   No.
20   Q   Are you holding yourself out as an expert on
21  the FDA policies and procedures?
22   A   No.
23   Q   Did you have anything whatsoever to do with
24  the writing of this April 2005 memo?
25   A   No.

Page 196

1    Q   Are there any -- what in particular in this
2   memorandum do you intend to talk about at trial?
3    A   Well, I'm not sure what I would talk about.
4   I don't know what I'm going to talk about at trial. I
5   can summarize my thoughts on this if you like but --
6    Q   Well, as you sit here today, are you able to
7   tell me what opinions you're going to give about this
8   memorandum at all, if any, at trial?
9        MR. KREPS: Object to form.
10   A   What I can say today sitting here is the
11  opinions I plan to give at trial for sure are those
12  that are expressed in my report.
13  BY MR. BLAIR:
14   Q   Okay. Well, there's nothing in your report
15  I think that references any specific opinions from
16  this memorandum. Do you agree?
17   A   My report does not reference directly this
18  memorandum.
19   Q   Okay. Would you agree this is what's
20  called -- it's a summary statement from the FDA?
21   A   I don't see summary statement on here so I'm
22  not sure if that's the lingo or not. I won't --
23   Q   Well, it says executive summary on the front
24  page.
25       MR. KREPS: I'll object to form

Page 197

1    A   That's an executive summary of the --
2        MR. BLAIR: I agree.
3    A   -- nineteen page report.
4   BY MR. BLAIR:
5    Q   Okay. Do you see any -- can you tell me
6   what data the FDA used to come to any of the
7   conclusions that are in this report?
8    A   Not definitively. No.
9    Q   The data's not there. It's not in the
10  report, correct?
11   A   It's not in the report.
12   Q   So for example, with respect to what we were
13  talking about earlier, there's nowhere in this report
14  where there's any data of the type that would normally
15  be found in a published peer review manuscript,
16  correct?
17   A   This isn't being put out as a published peer
18  review manuscript.
19   Q   I'm establishing the obvious. You're right.
20  Do you agree with me?
21   A   I agree that this, what I'm looking at right
22  now, which has memorandum at the top, is not a
23  scientific publication.
24   Q   Okay. You have looked at the whole thing
25  before today, right? It's listed --

50 (Pages 194 to 197)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD  MARKS,  PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 198

1     A   I have seen this.
2     Q   And it's not a scientific publication,
3   right?
4     A   I also need to correct that this is only
5   half of the report. Only the odd numbered pages are
6   in here.
7     Q   You know, that's a good point. We'll talk
8   to the copier later about that. But you looked at the
9   whole thing including the even numbered pages before
10   you showed up today, right?
11     A   Yes, I have.
12     Q   Okay. Including the odd and the even
13   numbered pages. This is not --
14     A   I only point that out so it's -- in case
15   it's been made --
16     Q   It's an oversight --
17     A   -- an exhibit.
18     Q   -- on behalf of my copier obviously.
19   Including all the pages, odd and even, based upon your
20   prior review, you agree this is not a scientific
21   report?
22     A   Correct.
23     Q   All right. There's no data in it, right?
24     A   There's no -- well, it doesn't appear, at
25   least on the odd numbered pages, that they're

Page 199

1   presenting many statistical results.
2     Q   Okay. There's no materials and methods
3   section.
4     A   No. Clearly not.
5     Q   There's no statistical analysis section
6   where the methods for the analysis are described,
7   correct?
8     A   Correct.
9     Q   There's not anything in here that would
10   allow you as a scientist to go back and replicate or
11   attempt to replicate the results that are claimed to
12   support the conclusions that are in this document,
13   right?
14     A   It would take a lot more information than
15   this document to do so.
16     Q   Do you anticipate continuing to work in
17   tobacco litigation?
18     A   I don't know. I have nothing currently
19   going. I haven't worked in a number of years on
20   anything so --
21     Q   Now, when again did you say you formed your
22   opinion that tobacco smoke causes cancer?
23     MR. KREPS: Objection. Asked and answered.
24     A   Well, just to be clear, my opinion on that
25   is as a personal citizen of the world, not as a

Page 200

1   biostatistician.
2     MR. BLAIR: I'm sorry?
3     A   I have not reviewed the scientific
4   literature at all.
5   BY MR. BLAIR:
6     Q   Okay. You haven't done any independent
7   research on -- scientific literature regarding any
8   linkage between tobacco smoke and cancer?
9     A   I have never done that research or review.
10     Q   Do you think as a citizen of the world that
11   anyone can credibly testify in the late 90's that
12   tobacco smoke did not cause cancer?
13     MR. KREPS: Object to the form of the
14   question.
15     A   I don't know -- I don't know what other
16   people might do in the late 1990's and what they might
17   testify about anything. I'm not going to speak for
18   other people.
19   BY MR. BLAIR:
20     Q   Okay. What about for yourself?
21     A   I don't -- I do not believe that I testified
22   that -- I do not believe that I testified that tobacco
23   smoke does not cause cancer.
24     Q   I mean it would be nutty to do so, right, in
25   the late 1990's at least?

Page 201

1     A   I am telling you that I don't believe I
2   testified to that.
3     Q   Would it be completely nutty to do so?
4     A   I'm not getting into those types of
5   descriptions.
6     MR. BLAIR: Let's just take three minutes.
7   I think I'm just about done. Let me just review my
8   notes.
9     THE VIDEO OPERATOR: We are going off the
10   record. The time is 1:42 p.m.
11     (A recess was taken.)
12     THE VIDEO OPERATOR: We're back on the
13   record. The time is one 1:43 p.m.
14   BY MR. BLAIR:
15     Q   Doctor, in summary for your opinions -- we
16   discussed this when we began your deposition --
17     MR. BLAIR: What is this, Exhibit 11? Is
18   that next?
19     THE COURT REPORTER: Oh gosh. Nine is it?
20     MR. BLAIR: Ten, 11? We'll go 10.
21     (Exhibit 10 was marked for identification
22   and was attached to the transcript.)
23   BY MR. BLAIR:
24     Q   We began your deposition talking about your
25   summary of overall opinions, right?

51 (Pages 198 to 201)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD   MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 202

1    A  Yes.
2    Q  And I think you testified that one of your
3  opinions that you're going to give the jury, based
4  upon your independent review of the scientific
5  literature, is that Vioxx causes or does not cause an
6  increase in heart attacks, right?
7    A  Yes.
8    Q  Okay.  I've marked as Exhibit 10 a statement
9  that says Vioxx causes an increase in heart attacks.
10  Do you see that?
11    A  Yes.
12    Q  Do you reject that opinion?
13    A  I disagree with that statement.
14    Q  All right  The other thing I think you're
15  going to -- you said you'd talk about is an opinion
16  that naproxen causes a decrease in heart attacks or is
17  cardioprotective.
18    MR. KREPS: Object to form.
19  BY MR. BLAIR:
20    Q  Do you agree with that statement?
21    A  I don't think I said that.
22    Q  With respect to naproxen, what's going to be
23  your testimony?
24    A  I think we've gone over that in great
25  detail.

Page 203

1    Q  Okay.  Do you think naproxen is associated
2  with a decrease in heart attacks?
3    A  I think that's a true statement.
4    (Exhibit 11 was marked for identification
5  and was attached to the transcript.)
6  BY MR. BLAIR:
7    Q  Okay.  I've marked as Exhibit 11 a document
8  that says naproxen is associated with a decrease in
9  heart attacks. Do you see that?
10    A  Yes.
11    Q  Do you agree with that statement?
12    A  Yes.
13    Q  Has the association between naproxen and
14  decrease in heart attacks ever been proven in a single
15  randomized clinical trial to your knowledge?
16    A  I don't believe so in a single randomized
17  clinical trial.
18    (Exhibit 12 was marked for identification
19  and was attached to the transcript.)
20  BY MR. BLAIR:
21    Q  I've marked as Exhibit 12 a statement that
22  says no association proven in a single randomized
23  clinical trial.  Do you agree with that?
24    A  I think that sentence needs more words added
25  to it. But the sentence that's there I would not

Page 204

1  agree with.
2    Q  For naproxen?
3    A  If you add naproxen.
4    Q  Well, if I add for naproxen and
5  cardioprotectiveness, would that work?
6    MR. KREPS: Object to the form of the
7  question.
8  BY MR. BLAIR:
9    Q  What do you want to write here for your
10  opinion? No association proven in a single randomized
11  clinical trial for naproxen being cardioprotective.
12  Is that fair?
13    MR. KREPS: Object to the form of the
14  question. Do you want him to summarize his opinion on
15  naproxen?
16    MR. BLAIR: Yeah. I think we've already
17  done it but he's testified --
18    MR. KREPS: We've done that. We did that at
19  the beginning of the depo.
20  BY MR. BLAIR:
21    Q  But is this right or not?
22    A  Well, I'm just going to suggest you write
23  the sentence and I will tell you -- I've told you why
24  I don't agree with that.
25

Page 205

1    Q  Okay.  Let me show you Exhibit 12.  It says
2  now no association proven in a single randomized
3  clinical trial for naproxen. Do you disagree with
4  that?
5    A  You still need more information.
6    Q  For naproxen and cardioprotection.
7    MR. KREPS: I'll object to the form of the
8  question.
9  BY MR. BLAIR:
10    Q  Do you agree with this now as it's written,
11  Doctor?
12    A  I'm sorry. I still think it's too broad.
13    Q  Okay. What would you add to make it a
14  statement you could agree with?
15    A  If you changed cardioprotection to MI.
16    Q  You mean protection from heart attack or
17  decrease in --
18    A  Heart attack.
19    Q  -- heart attack risk?
20    A  The focus on heart attack.
21    Q  And heart attack. Okay. Now as written, do
22  you agree that Exhibit 12 accurately reflects your
23  opinion that there's no association proven in a single
24  randomized clinical trial for naproxen and heart
25  attack?

52  (Pages 202 to 205)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 206

1       MR. KREPS: Object to the form of the
2   question.
3       A   Based on the answers I gave earlier, given
4   the literature that I've reviewed, I believe that I
5   agree with that statement.
6       (Exhibit 13 was marked for identification
7   and was attached to the transcript.)
8   BY MR. BLAIR:
9       Q   Okay. And with respect to Vioxx -- I've
10  marked as Exhibit 13 a statement that says association
11  repeatedly proven in randomized clinical trials for
12  Vioxx and heart attack. Do you agree with that?
13      A   Can I hold it?
14      Q   (Handing)
15      A   That would depend on your use of the word
16  repeatedly
17      Q   Well, I'm going to mean -- use that to mean
18  more than once.
19      MR. KREPS: Objection to the form of the
20  question.
21  BY MR. BLAIR:
22      Q   We've got APPROVe and VIGOR, right?
23      A   I would agree -- well, I would not agree
24  with this sentence the way it's written.
25      Q   Okay. How would you change it?

Page 207

1       A   I would agree with the sentence if you
2   changed repeatedly proven to shown twice.
3       Q   Okay. Shown twice in randomized clinical
4   trials.
5       A   Let me see.
6       Q   Right? Now you agree with it, right?
7       A   Can I change one word?
8       Q   What do you want to change now?
9       MR. KREPS: If you don't agree with him,
10  don't say you agree with him.
11      MR. BLAIR: I already changed it. I mean I
12  thought that was it but --
13      THE WITNESS: Well --
14      MR. BLAIR: -- if you want to change it
15  again, fine.
16      MR. KREPS: Counsel, if you want him to say
17  what his opinion is, let him give you his opinion.
18  BY MR. BLAIR:
19      Q   Do you agree with the statement as it's
20  written there now, association shown --
21      A   No, I don't.
22      Q   -- twice in randomized --
23      A   No.
24      Q   -- clinical trials for Vioxx and heart
25  attack?

Page 208

1       A   No.
2       Q   Why not?
3       A   Well, because it depends on how you define
4   shown.
5       Q   Okay. Statistical significance.
6       A   In terms of rigorously conducted per
7   protocol clinical trials, the evaluation has been --
8   the association has been shown in two studies. I
9   agree with that statement.
10      Q   Okay. Would you agree with the statement
11  that the association has been shown twice to a
12  statistically significant degree in randomized
13  clinical trials between Vioxx and heart attack?
14      A   I agree with the statement I just gave.
15      Q   I'm asking you a different statement.
16      A   I'm not going -- I don't agree with that
17      Q   You don't agree that the association
18  has been shown twice in randomized clinical trials --
19      A   I don't --
20      Q   -- to a statistically significant degree
21  between Vioxx and heart attack?
22      A   I don't think that statement is clear
23  enough. I agree with the statement I just made a
24  minute ago.
25      Q   All right. And what was your statement

Page 209

1   again?
2       A   Can you read it back so it's the way I gave
3   it?
4       THE COURT REPORTER: "In terms of rigorously
5   conducted per protocol clinical trials, the evaluation
6   has been -- the association has been shown in two
7   studies. I agree with that statement."
8       MR. BLAIR: Okay. Let me write that down.
9   Hold on. Hold on. Almost done here. We reject 13
10  after we modified it and we'll do -- mark as 14 a
11  statement that says -- let me see it.
12      (Discussion off the record)
13      (Exhibit 14 was marked for identification
14  and was attached to the transcript.)
15  BY MR. BLAIR:
16      Q   Doctor, I've written down what you said
17  earlier and I've marked as Exhibit 14 what you said.
18  And it said in terms of rigorously conducted per
19  protocol clinical trials, the association has been
20  shown in two studies. We're talking about Vioxx and
21  heart attack. Did I --
22      A   Right. Given the addition of Vioxx and
23  heart attacks there, I will agree with that statement
24      Q   Okay. You agree with this statement
25      A   Because that agrees with my report.

53 (Pages 206 to 209)

1023e766-4e84-4819-8e83-eca81dddb4dd

VIDEOTAPED DEPOSITION OF RONALD   MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

## Page 210

1    Q. Okay. Right. For Vioxx and heart attack.
2  Okay. So Exhibit 14 now, as written, you would agree
3  with, is that right?
4    A. Yes.
5    Q. That's the final copy. We won't make any
6  changes. And Doctor, have all of the opinions that
7  you've given today and that you reflected in your
8  expert report, do all those opinions follow what
9  you -- what you believe to be principals of
10  evidence-based medicine?
11    A. Yes.
12    MR. BLAIR: Thank you, Doctor. I have no
13  further questions at this time and I look forward to
14  seeing you at trial.
15    THE WITNESS: Thank you.
16    EXAMINATION BY COUNSEL FOR MERCK & COMPANY
17  BY MR. KREPS:
18    Q. Dr. Marks, I want to ask a couple of
19  questions. Go back to Exhibit 9. Counsel put in
20  front of you this April 6th, 2005 memorandum by Dr.
21  Jenkins and Dr. Seligman of the FDA. In talking about
22  that, you said it was not a scientific publication in
23  same sense that a peer reviewed manuscript in a
24  journal is. Do you recall that testimony?
25    A. Yes.

## Page 211

1    Q. Have you done anything to investigate
2  whether this is an authoritative publication out of
3  the FDA?
4    A. No.
5    Q. You don't know to what extent the FDA or FDA
6  experts use or rely on this document, do you?
7    MR. BLAIR: Form. Form, foundation. The
8  basis for my objection is the witness has already
9  disclaimed knowledge of the FDA and assumes,
10  improperly I believe, that the FDA has reached any
11  conclusions or that that document has any specific
12  role.
13    MR. KREPS: I'll re-ask it.
14  BY MR. KREPS:
15    Q. Doctor, you don't know one way or the other
16  if FDA experts have used, relied on or would use or
17  rely on this as an authoritative statement of FDA
18  position?
19    MR. BLAIR: Same objections and calls for
20  speculation.
21    A. I don't know that.
22  BY MR. KREPS:
23    Q. Dr. Marks, one other topic. One of these
24  handwritten statements that counsel just put in front
25  of you talks about naproxen being associated with a

## Page 212

1  decrease in heart attacks. Do you see that,
2  Exhibit 11?
3    A. Yes.
4    Q. In what study that you looked at was
5  naproxen associated with a decrease in heart attacks?
6    A. Well, I'm thinking of the observational
7  studies where the results for naproxen compared to
8  other groups where the odds ratios were less than one
9  on heart attack data.
10    Q. And then VIGOR was a randomized clinical
11  trial, correct?
12    A. Yes.
13    Q. And in that study, the VIGOR study, the rate
14  of people who had heart attacks who were on naproxen
15  was reported, correct?
16    A. Sure.
17    Q. And you've analyzed that data as well,
18  correct?
19    A. Sure.
20    MR. KREPS: I have no further questions.
21    MR. BLAIR: No further questions. Thank
22  you.
23    THE VIDEO OPERATOR: We are going off the
24  record. The time is 1:57 p.m.
25    (Signature having not been waived, the

## Page 213

1  deposition was concluded at 1:57 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

54  (Pages 210 to 213)

VIDEOTAPED DEPOSITION OF RONALD MARKS, PH.D.
CONDUCTED ON THURSDAY, AUGUST 10, 2006

Page 214

1      ACKNOWLEDGMENT OF DEPONENT
2      I, RONALD MARKS, Ph.D., do hereby
3   acknowledge that I have read and examined the
4   foregoing testimony, and the same is a true, correct
5   and complete transcription of the testimony given by
6   me and any corrections appear on the attached Errata
7   sheet signed by me
8
9
10   _____
11      (DATE)              (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 216

1           ERRATA SHEET
2   IN RE: VIOXX PRODUCTS LIABILITY LITIGATION
3   RETURN BY: _____
4   PAGE   LINE   CORRECTION AND REASON
5   ____   ____   _____
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24  ____   ____   _____
25  (DATE)        (SIGNATURE)

Page 215

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Alda Mandell, Registered Professional
3   Reporter, the officer before whom the foregoing
4   proceedings were taken, do hereby certify that the
5   foregoing transcript is a true and correct record of
6   the proceedings; that said proceedings were taken by
7   me stenographically and thereafter reduced to
8   typewriting under my supervision; and that I am
9   neither counsel for, related to, nor employed by any
10  of the parties to this case and have no interest,
11  financial or otherwise, in its outcome
12      IN WITNESS WHEREOF, I have hereunto set my hand
13  and affixed my notarial seal this 10th day of August
14  2006.
15  My commission expires:
16  July 31, 2012
17
18
19  _____
20  NOTARY PUBLIC IN AND FOR THE
21  DISTRICT OF COLUMBIA
22
23
24
25

Page 217

1      ERRATA SHEET CONTINUED
2   IN RE: VIOXX PRODUCTS LIABILITY LITIGATION
3   RETURN BY: _____
4   PAGE   LINE   CORRECTION AND REASON
5   ____   ____   _____
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24  ____   ____   _____
25  (DATE)        (SIGNATURE)

55 (Pages 214 to 217)

1023e766-4e84-4819-8e83-eca81dddb4dd