# EXHIBIT F

The NEW ENGLAND JOURNAL of MEDICINE

# CORRESPONDENCE

## Adverse Cardiovascular Effects of Rofecoxib

TO THE EDITOR: The recent public disclosure of data from a 12-month extension study of the Adenomatous Polyp Prevention on Vioxx (APPROVe) trial[1] provides new insights into the effect of rofecoxib on cardiovascular events. These new data reveal the full results of both the original study and the extension phase, including data tables and Kaplan–Meier curves. In the original article, the APPROVe investigators reported event rates using an unusual censoring rule in which events were excluded if they occurred more than 14 days after the study drug was stopped. All data in the new report are assessed by a conventional intention-to-treat analysis. This new report also provides analysis that uses several different end points, including the widely used end point of the Antiplatelet Trialists' Collaboration (APTC) study.[2]

The original article included a post hoc hypothesis that curves for confirmed thrombotic events would not begin to diverge until after 18 months of exposure to rofecoxib. However, all intention-to-treat analyses in the newly released report show that the event curves begin to diverge much earlier, generally within four to six months. The most useful Kaplan–Meier curves, involving intention-to-treat analysis of the APTC end point, show divergence after only three months of exposure to rofecoxib (Fig. 1). Figure 2 shows the intention-to-treat analysis for confirmed thrombotic cardiovascular events. The Adenoma Prevention with Celecoxib (APC) study, a trial otherwise similar in design, reported data in which the intention-



**Figure 1.** Kaplan–Meier Estimates of the Cumulative Incidence of Confirmed APTC Events in the Rofecoxib and Placebo Groups, According to the Intention-to-Treat Principle.

I bars represent 95 percent confidence intervals.



**Figure 2.** Kaplan–Meier Estimates of the Cumulative Incidence of Confirmed Thrombotic Cardiovascular Events in the Rofecoxib and Placebo Groups, According to the Intention-to-Treat Principle.

I bars represent 95 percent confidence intervals.

Downloaded from www.nejm.org on June 26, 2006. For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

to-treat approach was used, with no censoring of delayed events.[3]

Since patients who stopped the study drug early are likely to be people who had adverse reactions such as hypertension, heart failure, or renal dysfunction, they represent a particularly vulnerable group. It is now clear that the approach of censoring events that occurred more than 14 days after drug discontinuation had a significant effect on the results of the APPROVe trial.

In a report of a serious drug-safety problem, even if the original study design prespecified censoring of late events, it is particularly important to provide alternative analyses if such analyses suggest a substantially different conclusion.

Steven E. Nissen, M.D.
Cleveland Clinic Foundation
Cleveland, OH 44195

1. Bresalier RS, Sandler RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 2005;352:1092-102.
2. Antiplatelet Trialists' Collaboration. Collaborative overview of randomised trials of antiplatelet therapy — I: Prevention of death, myocardial infarction, and stroke by prolonged antiplatelet therapy in various categories of patients. BMJ 1994;308:81-106. [Erratum, BMJ 1994;308:1540.]
3. Solomon SD, McMurray JJ, Pfeffer MA, et al. Cardiovascular risk associated with celecoxib in a clinical trial for colorectal adenoma prevention. N Engl J Med 2005;352:1071-80.

TO THE EDITOR: An update of the APPROVe trial data is now available. It contains additional information about events in the subgroup of participants whose data were censored if they had an event more than 14 days after early discontinuation of the study medication. With the addition of 12 thrombotic events that occurred more than 14 days after the study drug was stopped but within 36 months after randomization, it is now possible to analyze the three-year event data according to the intention-to-treat principle. Eight of the "new" events were in the rofecoxib group, and these events had a clear effect on the published survival curve for rofecoxib (Fig. 2 of the original article). The curve is now more linear, and the narrowing of the distance between the rofecoxib and placebo curves at 18 months is almost gone. Statistical analysis shows no evidence of deviation from the proportional hazard over time.

The release of the new data raises questions. At the time the APPROVe trial was submitted and published, was the complete data set available to the authors for an intention-to-treat analysis? Did they perform a proportionality test of the three-year event data before publication?

Curt D. Furberg, M.D., Ph.D.
Wake Forest University School of Medicine
Winston-Salem, NC 27157
cfurberg@wfubmc.edu

Editor's note: This letter was submitted before the error corrected in this issue of the Journal was discovered.

DRS. BRESALIER AND BARON RESPOND: In their letters, Drs. Nissen and Furberg are presumably referring to a preliminary analysis of new data that was released by Merck to the Food and Drug Administration on May 11, 2006. Both writers comment on possible differences between that analysis, conducted by Merck, and the one presented in our report. Dr. Furberg further asks whether data regarding prolonged follow-up after the discontinuation of treatment were available at the time of our report and whether a test for proportionality of hazards was performed for it.

The original APPROVe protocol included event follow-up of patients only during treatment and for 14 days afterward. All these data were included in our report. Vital-status monitoring through the end of anticipated treatment was also performed. The decision to perform a systematic event follow-up that covered the period more than 14 days after the discontinuation of therapy was motivated by the cardiovascular findings reported in September 2004. This additional follow-up, which required submission of a formal protocol revision to the human-subjects committee at each participating center, was initiated in the winter of 2004–2005. Thus, the additional safety data were not available at the time our article was published and have only been compiled for analysis in the past few months.

Dr. Nissen characterizes the censoring of event data after 14 days as "unusual." Our impression is that such follow-up is actually common and is usually conservative, since it avoids the dilution of a "toxicity signal" that may occur when an active drug is discontinued.[1,2]

Dr. Furberg implies that our analysis was not an intention-to-treat analysis. This is true, in the sense that we did not follow patients more than 14 days after they discontinued treatment. However, all cardiovascular events observed during the study follow-up were assigned to treatment groups

Downloaded from www.nejm.org on June 26, 2006 . For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.

CORRESPONDENCE

according to the original randomized assignments, according to the intention-to-treat principle. As noted above, the data for an analysis incorporating longer monitoring after the discontinuation of treatment were not available until April 28, 2006. Dr. Furberg also asks for information regarding a test for proportionality of hazards on the "three-year event data." We presented such a test in the original report, noting that the modeling for the test for proportionality of hazards contained a treatment-by-log(time) term, with a P value of 0.014. That P value was actually derived from a model that used a treatment-by-time term. The P value derived from the treatment-by-log(time) term was 0.07 (a correction notice appears in this issue of the Journal[3]).

Clearly, an in-depth analysis of the extended experience of the patients in the APPROVe Trial is indicated, and it is under way. It will include an independent statistical analysis of the cardiovascular data. Until that is completed and a formal report is peer-reviewed, speculations regarding what will be found are premature and may be misleading. However, it is clear that the main conclusion of the article— that "among patients with a history of colorectal adenomas, the use of rofecoxib was associated with an increased cardiovascular risk"—is unaffected.

Robert S. Bresalier, M.D.
University of Texas MD Anderson Cancer Center
Houston, TX 77030

John A. Baron, M.D.
Dartmouth Medical School
Hanover, NH 03755

for the authors of the APPROVe trial

1. ICH-E1A. Guideline for industry. The extent of population exposure to assess clinical safety: for drugs intended for long-term treatment of non-life-threatening conditions. International Conference on Harmonization, March 1995:1-4. (Accessed June 16, 2006, at http://www.fda.gov/Cder/guidance/iche1a.pdf.)
2. Council for International Organizations of Medical Sciences (CIOMS). Management of safety information from clinical trials: report of CIOMS Working Group VI. Geneva: World Health Organization, April 2005:189.
3. Correction to: Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 2006;355:221.

Downloaded from www.nejm.org on June 26, 2006 . For personal use only. No other uses without permission.
Copyright © 2006 Massachusetts Medical Society. All rights reserved.