COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                    5/31/2006

73. Thus, it was believed, that just as NSAIDS were developed to block all COX activity, that further refinement of medical therapy could produce a COX-2 inhibitor. Such a therapy, it was felt, would reduce the inflammatory response, while leaving vascular coagulability unchanged and the protective gastrointestinal lining intact.

74. Early Investigation of the COX-2 inhibitors: The true effects of a therapy emerge over time, where the speed at which knowledge is gained is related to the experience of the medical community with the therapy. Pre-approval studies of the COX-2 inhibitors revealed definite efficacy, but minimal benefit above and beyond the medications that were already available. However, when evidence of harm emerges, however inconsistently, regardless of whether it appears in either the pre-marketing or post-marketing environment, the burden of proof shifts. Specifically, the appearance of harm requires that the sponsor 1) look for definitive evidence of harm in an ethical way and 2) acknowledge that the risk-benefit balance is beginning to change as evidence of new risk emerges. This requires greater efficacy to offset the greater risk. The threshold of significance for harmful effects is much less extreme than that for determining efficacy.

75. Undoubtedly, exploratory analyses demonstrating harm may not be generalizable. However, the ethical credo of "First do no harm," requires a patient protective response to this potential new hazard. An appropriate response includes but is not limited to 1) additional analyses that can, in an ethical fashion, determine if the initial finding represents a result that can be generalized to the population at large, and 2) an immediate recalibration of the risk-benefit balance, tipping this balance in the direction of greater harm.

aspirin. COX-1 is selectively inhibited by low-dose aspirin in activated platelets.* However, since COX-2 activity is preserved in the presence of aspirin, and the produced $PGI_2$ decreases blood coagulability, the effect of aspirin is to shift the haemostatic balance to an anti-thrombotic state.

80. Thus, inhibition of COX 2 suppresses $PGI_2$ formation, blocking the anti-aggregatory effect of $PGI_2$, making the blood more coagulable. This effect should attenuate the anti-aggregatory effect of aspirin. In mechanistic animal studies, the beneficial effect of aspirin was blocked by celecoxib. In addition, the vasodilator effect of $PGI_2$ derived from the endothelium of the coronary vessel and vasodilatory response to application of arachidonic acid was reduced significantly when compared to controls [7]. Because of these results, the authors expressed concern regarding the possibility of an increased risk of acute vascular events in patients receiving COX-2 inhibitors, especially in individuals with underling inflammatory disorders, including coronary artery disease. This bolstered the theoretical argument that COX-2 inhibitors might increase the likelihood of serious thrombotic adverse events.

81. The scientific motivation for this prescient concern is clear. COX-2 inhibition would reduce the anti-thrombotic effect of PGI2. By not suppressing COX-1, the thromboxane $A_2$ activity would proceed, tipping the hemostatic balance to a procoagulation state. However, the interaction between the COX enzyme system and hemostasis is complicated by the different potencies that the COX-2 inhibitory agents have on COX- inhibition, i.e., COX-2 inhibitors can also be COX-1 inhibitors. In one study, the COX inhibitors were directly evaluated for their differential COX-1/COX-2 inhibitory activity. The main aim

---

* This occurs by acetylation of the hydroxyl group of a serin residue near the COX active site. Aspirin's COX-1 inhibitory action persists for the lifetime of the platelet. Recovery of the effect is strictly a function of platelet turnover

not just that cardiovascular serious adverse events could be anticipated with rofecoxib, but that they understood the mechanism by which they would be produced. They accepted the causal link between rofecoxib and cardiothrombotic adverse events before the drug was approved.

85. On Thursday, October 10, 1996, before rofecoxib was approved, a review of protocol 017 was described (MRK-ABC0048706). In this review the following statement appears "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure), documenting the potential for cardiovascular adverse effects caused by rofecoxib."

86. On November 11, 1996, before rofecoxib was approved, Dr. Musliner anticipated that there would be 25% more adverse cardiovascular events with rofecoxib (Memo: Subject- Anticipated consequences of NSAID anti-platelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial – Page 5.). Dr. Musliner also stated the rofecoxib-induced increased cardiovascular event rate might be expected "due to the absence of anti-platelet effect for the selective Cox-2 inhibitor," and "would create a negative aspect to the results and leave open the question (reasonable or unreasonable) whether the drug might in some other way be contributing to such events." The concern about an increased cardiovascular adverse event profile was well established years before the drug was approved, requiring adequate testing

87. However, rather than design a clinical trial that was designed to fully elaborate the risks and benefits of rofecoxib, Merck designed VIGOR to underestimate the true risk rofecoxib for increasing cardiovascular events. A concern about possibility of rofecoxib

90. On February 2, 1998, before rofecoxib was approved, Dr. Watson's final results on the analysis of cardiovascular SAE's in the Phase IIb/III Vioxx osteoarthritis clinical trials was received. This was a detailed analysis demonstrating that rofecoxib produced more cardiovascular events in the VIOXX program. This analysis demonstrated that the incidence ratio of cardiovascular serious adverse events was 19.4/1000 in men and 15.5/1000 in women. The overall incidence rate for women was elevated when compared to FOSAMAX controls with a relative risk of 2.16 and a 95% confidence interval of 1.14 – 3.94. On page 2, the description of the results of protocol 023 states, "These findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events) page 2. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's than the placebo group in protocol 010 (page 1 following executive summary). The next sentence which states there is no evidence of an increased incidence of such events ignores the findings from protocol 010. This analysis revealed a signal to Merck that the thromboembolic events whose occurrence was anticipated by the understanding by which rofecoxib worked. Given the *a priori* concern about the relationship between rofecoxib and cardiovascular events, this was clear signal that Merck missed.

91. The inappropriate interpretation of the Watson report reveals a substantial, persistent inconsistency in Merck's philosophy toward rofecoxib-induced cardiovascular events. From 1996-98, their were well documented points at which Merck receives advice about the likelihood that rofecoxib produces cardiovascular events. Clearly Merck absorbed this message because it was repeated by key Merck personnel. Merck's understanding of this

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D                                       5/31/2006

eral facets of the potential cardiovascular implications of Cox-2 expression and inhibition." In addition, he said (page 2), "Because companies making non-selective Cox-2 inhibitors are likely to emphasize the cardiovascular implications of specific Cox-2 inhibitors, I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

95. On September 29, 1998, before rofecoxib was approved, Dr. Nies penned a handwritten note in which he tells Dr. Oates and Dr. Patrono that Merck will not do the kinds of studies that the two experts have proposed to explore the cardiovascular risks of rofecoxib. He anticipated that the drugs would become available without the need for the safety testing Drs. Oates and Patrono warned were so necessary.

96. This body of information demonstrates that before rofecoxib was approved, the mechanism by which it produced harmful cardiovascular events had been elucidated, and signals of cardiovascular events had occurred. Merck's pre approval testing program was incomplete.

97. On May 20, 1999, the month Vioxx was approved, the FDA Medical Officer Review reflected concern about rofecoxib's cardiovascular risk. He noted that the cardiovascular trends and that a larger databases was needed to assess CV safety. He also commented on the relatively small number of patients that Merck exposed to Vioxx prior to approval.

## Clinical Studies

98. Clinical Studies: When considering the evidence to support or disprove a hypothesis, one must consider the quality of evidence available on the subject matter. Randomized controlled trials are generally accepted as the gold standard for assessing efficacy of medicines, a justifiable conclusion assuming that the clinical trials were well conducted and

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                             5/31/2006

domly. The primary endpoint for the principal analysis of the study was the combined endpoint of perforation, obstruction and severe upper gastrointestinal bleeding.

102. The evaluation of this endpoint demonstrated 121 confirmed upper gastrointestinal events in the naproxen group (3.0%) and 56 (1.4%) in the rofecoxib group, reflecting a 50% reduction, with a $p$-value < 0.001. This trial demonstrated using acceptable methodology that the COX-2 inhibitor rofecoxib could reduce the incidence of upper gastrointestinal events compared to a nonselective COX inhibitor.

103. The rate of myocardial infarction was greater in the rofecoxib group than in the naproxen group (0.4 percent to 0.1 percent, relative risk 0.2, 95 percent confidence interval 0.1 to 0.7). This bald reversal in the computation of the relative risk[*] fails to hide the fact that rofecoxib was associated with a substantially greater incidence of myocardial infarction. Additionally, thirty eight percent of these patients should have been taking aspirin based on clinical indications; this subset of patients was an increased risk of having a myocardial infarction.[†]

104. Fortunately, a separate analysis of adjudicated cardiovascular events from the VIGOR study [11] provided a detailed evaluation of the overall serious adverse events data (death, hospitalization or extension of hospitalization, and/or any life-threatening events or serious disability). This evaluation revealed that the majority of the thrombotic events

---

[*] At this juncture, it must be pointed out that the reporting of these adverse event results in VIGOR was unusually insipid. The benefit of therapy was stated in a way that was beneficial to the sponsor (i.e. relative risk for GI injury is less than 1, illustrating a benefit of rofecoxib), yet the harmful effect of rofecoxib on the myocardial infarction rate is stated not as an elevated relative risk, but again as a relative risk less than one. This is inconsistent, misleading, and produces unnecessary and predictable confusion if one tries to weigh risk vs benefit of rofeoxib in this population. In addition, the numbers of patients with heart attacks are not reported, a frankly glaring and shocking omission in a manuscript purporting to make a contribution to the modern clinical literature. The investigators were supported by Merck as stated on page 1527 of the manuscript) and all parties must share responibility for this singularly misleading and meretricious description of cardiovascular adverse events

[†] Patients were permitted to take low dose aspirin when this result was revealed at the end of the study.

years after commercial approval had been granted. In addition, the cardiovascular data reported in that article were incomplete.

107. A clearer evaluation of the VIGOR cardiovascular results is provided in the Merck cardiovascular update from VIGOR from Deborah Shapiro to Drs. Alise Reicin, Eliav Barr, and Dennis Erb on July 5, 2000. In addition, Figure 1 of this document demonstrates a clear separation in the Kaplan-Meier time to event curves for confirmed thromboembolic cardiovascular serious adverse events in VIGOR demonstrating the increased risk of thromboembolic events on VIGOR when compared to Naproxen occurred early in follow-up (less than two months of follow-up time) Table 3 demonstrated 47 thrombotic events in 4047 patients takes rofecoxib (1.2%) versus 20 thrombotic events in 4029 patients (0.5%), excess risk associated with rofecoxib. A review of adjudicated cardiovascular events (Table 4, revealed 45 events in 4047 patients (1.67 per 100 patient years) in patients treated with rofecoxib, 19 in 4029 patients on naproxen (0.70 per 100 patient years. The relative risk of events in rofecoxib group to those in the naproxen group is $1/0.42 = 2.38$ and 95% CI is $1/0.72 - 1/0.25$, or 1.39 to 4.00, based on the Cox analysis results from Table 4.

108. Neither the VIGOR authors nor the sponsors updated the data in the article that appeared in the New *England Journal of Medicine* in November 2000 with the new safety data, a critical ethical omission. Even if one accepts that the occurrence of the three additional heart attacks did not occur before a pre-specified data cut-off date, the three events were known in August 2000, several months before the appearance of the manuscript in the New England Journal of Medicine in November 23, 2000. It would have been easy for the investigators to add a statement in this manuscript, acknowledging the three addi-

rofecoxib increases the risk of cardiovascular disease, but that the control therapy naproxen decreases the risk of this class of illnesses.

112. However, this idea was not accepted before VIGOR in the many years during which this drug was on the market. Specifically, while data from randomized controlled trials have documented that aspirin is an effective anti-thrombotic agent for primary as well as secondary prevention of thromboembolic events, trials evaluating the effects of nonselective NSAIDS on the occurrence of cardiovascular disease have not affirmed there own purported benefit; the findings are inconclusive. In these trials on nonselective NSAIDS, the question of whether the degree of COX-1 selectivity (known to vary from drug to drug) translated into clinically detectable cardiovascular protection (as is achieved by aspirin with its characteristic irreversible inhibition of COX-1) has not been addressed.

113. A review of four epidemiologic studies with different designs and populations suggesting no overall effect of nonselective NSAIDS including naproxen [15]. The results of this review included prepublication material from Ray which itself was subsequently published in full [16]. The authors concluded that none of the NSAIDS included in the study should be used for cardioprotection.

114. Even though Merck argued that the cardiovascular effect in VIGOR could be explained by the beneficial effect of naproxen, and email from Dr. Reicin to Dr. Scolnick revealed that Dr. Scolnick was in "minor agony" over the issue, and that he wanted a cardiovascular study. Dr. Scolnick was not convinced that naproxen "benefits" explained the VIGOR findings. However, even after outside consultants advised Merck to do a CV study (in an email from DiBasttiste to Exposito on March 9, 2002), the study was not carried out.

the Kaplan-Meier curves demonstrated an early separation between the event rates of these events between the two groups.

117. *VIP*: VIP- Protocol 201 was designed to determine if rofecoxib 25 mg could help prevent prostate cancer. The study recruited 4741 patients of the anticipated 15,000-sample size. The study was approved on May 4, 2004, but was terminated prematurely due rofecoxib's withdrawal from the market. There were 13 myocardial infarctions in this study 7 in the rofecoxib group, six in the placebo group. There were 26 vascular disorders in the rofecoxib group and 10 in the placebo group, and 19 patients in the rofecoxib group and 2 in the placebo group  When the analysis is restricted to specific drug related clinical adverse experiences (incidence $\geq 0.0\%$ in one or more treatment groups, there were 9 in the rofecoxib group and 4 in the placebo group. Five cases of coronary artery occlusion/myocardial infarction/ischemia/silent myocardial infarction occurred in the rofecoxib group. There were none in the placebo group. There were nine APTC events in the placebo group and eight in the rofecoxib group, respectively

118. *Alzheimer studies*: The Alzheimer studies (Protocols 078, 091, and 126) revealed excess deaths in patients on rofecoxib when compared to placebo. In 078, there were 13 deaths in rofecoxib compared to 7 on placebo. (8 versus 2 cardiovascular deaths on/off drug). In protocol 091, there were 9 rofecoxib deaths to 2 placebo (6 versus 4 cardiovascular deaths on/off drug), and in protocol 126 there were 3 rofecoxib deaths versus 3 placebo (2 rofecoxib cardiovascular deaths, versus 2 placebo on/off drug).

119. *APPROVe*: The APPROVe study [17] must be set apart from VIGOR and CLASS in that the evaluation of COX-2 inhibitor exposure and cardiovascular disease was prospectively declared and the analysis prospectively planned  APPROVe was designed to provide a

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    5/31/2006

and nonfatal myocardial infarction, unstable angina, sudden death from cardiac causes, fatal and nonfatal ischemic stroke, transient ischemic attack, peripheral arterial thrombosis, peripheral venous thrombosis, and pulmonary embolus were measured. However, the endpoint used was the APTC combined endpoint (i.e., death from cardiovascular, hemorrhagic, and unknown causes, nonfatal myocardial infraction, and nonfatal ischemic or hemorrhagic stroke. Monitoring and analysis were prospectively declared.

123. During the trial, there were more patients discontinued from rofecoxib than placebo due to adverse events. When the trial ended, patients in the rofecoxib group had an increase risk of confirmed thrombotic events. Specifically, there were 46 patients in the rofecoxib group that had confirmed thrombotic events, versus 26 patients in the placebo group. (RR 1.92, 95% confidence interval 1.19 – 3.11, $p = 0.008$). The risk for cardiac events (RR 2.80 95% CI 1.44–5.45) and cerebrovascular events (RR 2.80, 95% CI 1.44 – 5.45) was substantially higher. Representing substantial risk.

124. Even though the increased risk was seen throughout the duration of follow-up in AP-PROVe, some have posited that the harmful thromboembolic does not emerge until after patients have been followed for longer than 18 months.

125. This conclusion is epidemiologically unsound for several reasons. First, the evaluation of the putative 18-month effect is the result of a subgroup analysis. Subgroup analyses, i.e., the process by which an effect in the overall cohort is adumbrated by effects in subsets of the patient has been shown to be unreliable. The findings in the ELITE trials demonstrate the misleading conclusion drawn from subgroup analyses (discussed in the Appendix of this report).

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                5/31/2006

tive risk in the rofecoxib group compared to placebo was 9.59 (95% confidence interval 1.26 to 416 for patients with a history of cardiovascular disease. It was also elevated among diabetics (6.10: 95% confidence interval 1.36 to 56.1). An evaluation of the APPROVe cardiovascular safety data revealed that there was early separation of the event curves when investigator reported cardiovascular events were considered. Thus, the most robust conclusion from APPROVe is that cardiotoxicity is apparent, and appears early.

132. In addition, the rofecoxib group had a greater proportion of patients with hypertension related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In 1998, one of the fears voiced by the Merck Scientific Advisory Panel was that Cox-2 inhibitors could accelerate atherosclerosis. This would occur by fostering the development of lipid rich plaque or the destabilization of the plaque's fibrous cap. In 2004, Dr. FitzGerald wrote an article entitled Coxibs and Cardiovascular Disease [18] On page 1711 of that manuscript, he stated. "Patients in the APPROVe study should continue to be followed. This will allow some estimate of how quickly the developed risk may dissipate. Give the relatively short half-lives of these compounds, such a dissipation may occur rapidly. On the other hand, if treatment has accelerated atherosclerosis, the offset of risk may be more gradual." Dr. FitzGerald stated an a priori hypothesis, recognizing that the continued follow-up of the APPROVe patients would answer the salient question he posed.

133. An initial evaluation of the follow-up analysis that Dr FitzGerald called for became available in 2006 The follow-up analysis of the APPROVe data provided by Merck

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D  5/31/2006

ated with rofecoxib explains the prolonged increased risk of fatal/nonfatal myocardial infarction.

136. Epidemiologic studies are not the most persuasive evidence; however they do help to extend the context in which the effect of the study can be anticipated. Several observational studies were carried out to examine the effect of COX-2 inhibitor therapy on the occurrence of cardiovascular disease

137. Solomon [19] carried out an observational study utilizing the Medicare beneficiaries who received prescription medications through the Pennsylvania Pharmaceutical Assistance Contract for the Elderly or the New Jersey Pharmaceutical Association Program for the Aged and Disabled during 1998, 1999, and 2000. Patients with a life threatening illness such as HIV/AIDS, malignance, or coagulopathy were excluded, as were patients with an AMI that was not the principal discharge diagnosis.

138. Cases were defined as acute myocardial infarction (AMI) if this diagnosis was listed as one of the first three top diagnoses in a hospitalization that was between three days and 180 days. To increase the stability of the estimate of cardiac events in the control group, four control patients were matched to each case. Date of hospitalization was the index date for each case. Controls had to have the same (or nearly the same) age, and have the same gender and month of the index date as the case to which they were matched

139 Once cases and controls were identified, their antecedent exposure to COX-2 inhibitor therapy was ascertained. Exposure was based on celecoxib or rofecoxib on the index date Dose and duration categories were defined for each exposure. Covariates were demographic and morbidity measures. Mean age of all patients was over eighty years. Thus, any findings of this study face difficulty in generalizing to younger cohorts In ad-

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.

5/31/2006

pre-marketing randomized controlled trials assessing the efficacy of rofecoxib [21]. However, the authors themselves acknowledge that the combined sample size of each treatment group, together with the low number of serious thromboembolic events reduces any illumination this study might shine on the exposure-disease relationship of interest. This is the classic underpowered environment, which forces us to discount the findings of no relationship between COX-2 inhibitor use and cardio-embolic disease in this study. Its null findings are merely uninformative.

144. The third evaluation also investigated this topic, but assessed thromboembolic events across 23 randomized controlled trials in over 28,000 patients with any of osteoarthritis, rheumatoid arthritis, Alzheimer's disease, or chronic back pain. The researchers concluded that the risk of a cardiovascular thromboembolic events was similar between rofecoxib and placebo cohorts and the non-naproxen NSIAD groups, but were significantly higher when compared to the naproxen cohort. They argue that these results support the cardioprotective effect of naproxen.

145. This cohort, completed in September 2000 has been followed and a resulting manuscript appeared describing the publication of the additional adjudicated data by Weil et. al. [22] The pooled analyses when repeated with the new data were unchanged.

146. Population based pharmacoepidemiologic studies aim to identify and quantify adverse events from the treatment experiences of the population and examine that population for characteristic features in order to learn and inform from these experiences. Such studies usually include far more patients than randomized controlled trials, but suffer from bias and confounding. They do not alter with the prescribing practice of the physician, nor do they require strict inclusion and exclusion criteria. Therefore they are more representative

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D                                                    5/31/2006

tients who were reported to have taken study drugs for less than 30 day were excluded. The effect of this exclusion on the relative risk of myocardial infarction in unclear.

150. Two observational studies were carried out in the United Kingdom. Users of rofecoxib, celecoxib, and melocixam were compared [25] and [26] (melocixam is less COX-2 selective than either of rofecoxib or celecoxib. After adjusting for age and gender, these two studies revealed a statistically significant higher rate of cerebrovascular thromboembolic events for both rofecoxib and celecoxib when compared with melocixam, but a statistically significant lower rate of peripheral venous thrombotic events for the rofecoxib cohort compared with melocixam, but neither revealed a difference in the rate of cardiovascular thromboembolic event group.

151. A major source of information on suspected medication exposure-disease relationships is the post marketing database held by pharmacovigilence units, including those of the regulatory community and manufacturers. There are problems of selection and confounding by indication, as well as recall bias, and information bias. Such data provides a complimentary perspective on adverse reaction frequency with randomized controlled studies and observational studies. They are derived from national populations and operate over the timeline of the drug, include drug use in the hospital as well as the general practice and ambulatory setting. They are useful for signal generation.

152. Commonly, the data that comprises these individual cases is incomplete. The source of the information is inhomogeneous and there is no accepted a priori threshold for reporting. Such voluntary reporting schemes are useful in signal generation or detection, but have important limitations in science.