COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D                                    5/31/2006

153. An independent study of adverse reactions primarily adverse renal effects reported for rofecoxib (n = 2720) versus celecoxib (n=8434) reported to the WHP UMC up until the middle of 2000[27]. The SOH Uppsala Monitoring Centre in Sweden maintains a database of spontaneous reports received from the national monitoring centers worldwide. Suspected adverse reactions are coded onto the WHP database. Signal score processing uses a collection of sophisticated techniques includes Bayes procedures. Although the focus was on renal events, thromboembolic disease was examined. The strength of association between rofecoxib and thromboembolic disease was greater than that for celecoxib. However, the authors concluded that there was no association. One possible explanation for these null results was that patients with renal disease are more likely to have symptomatic cardiovascular disease. However, this was an ecologically based argument and no case-by-case examination took place.

154. In Canada, spontaneous reports are submitted to the regulatory authorities, health Canada through the Canadian Adverse Drug Reaction Monitoring Program [28]. They reported that they had received by October 2001 70 cardiovascular/cerebrovascular cases out of 528 total reports) for celecoxib, and 68 out of 348 for rofecoxib. Seven of the cases reported on celecoxib were fatal. Of these, two were cerebral hemorrhage in patients also taking warfarin. However, prevalence of the thromboembolic events was not computed from those at risk, not only from all events. This does not address the relative risk of the medications in the general public.

155. Meta Analyses: The interpretation of meta-analyses is problematic. They purport to combine studies, and through the increased sample size and number of events, identify a highly reliable estimate of effect size. However, complications quickly arise to vacate

tions with dissimilar cardiovascular risk and they compared unequivalent doses of rofecoxib and celecoxib. The sample sizes of the studies differed widely, ensuring that VIGOR's findings would exert undue influence on the effect ascribed to the findings. Finally, a number of studies that found no relationship between rofecoxib and thrombotic events were excluded. These limitations in addition to the invocation of the random research paradigm, limit the generalizability of post hoc meta-analyses.

158  Risk-Benefit Analysis: Risk benefit analysis is the comparison of the risks of therapy to the therapy's benefits. This can be considered on the macroscopic (societal) level as well as on the microscopic (patient level). The tools used for each of these evaluations are different and thus these two perspectives must be viewed differently.

159. Risk-benefit analysis on the macroscopic scale considers the relative risks to the society when assessed against the benefits to society i.e., the population of patients taking COX-2 inhibitors. In this calculation, the benefits of COX-2 inhibitors are assessed primarily in the degree to which they reduce pain, and the degree to which these agents reduce gastrointestinal adverse effects. It is recognized that neither moderate doses of NSAIDS nor moderate doses of aspirin produce this combination of pain relieve without GI distress. Estimates are that more than 100,000 hospitalizations and 16,500 deaths each year in the United States occur as a result of NSAID use. Since is was believed that the COX-2 inhibitors avoided this extent of GI disease, it is claimed that their use provides an important societal benefit in patients with chronic pain. However, recent evidence reveals that the Cox-2 inhibitors are associated with upper gastrointestinal illnesses. In addition, the acknowledgement that they are the producing cause of cardiovascular thrombotic disease dramatically and unfavorably tilts the risk-benefit balance.

review this; each patient-practitioner couple provides its own unique risk-benefit metric in the decision as to whether a patient should accept COX-2 inhibitor therapy. In patients with chronic arthritic pain, a combination of Tylenol (low or high dose) and low dose aspirin or NSAIDS provides substantial analgesia without GI distress. Should upper GI symptoms appear, the dosing of aspirin or NSAIDS can be reduced, or even temporarily discontinued. There is no established increased risk of thromboembolic disease with low or high dose Tylenol, or low or moderate aspirin use. Therefore the use of COX-2 inhibitor therapy confers no advantage for these patients.

164. However, the greater risk of serious thromboembolic events with COX-2 inhibitor adversely tips the risk-benefit balance. To offset this greater risk, greater benefit must be achieved when compared to therapies that 1) are not associated with thromboembolic adverse events, and 2) do not produce a significant increase in upper GI events.

165. However, implicit in the individual risk-benefit assessment that each physician-patient pair undertakes is the assumption that each of the practitioner and the patient have access to all relevant facts available on risk and benefit are available to those who must make the final decision. Patients and physicians have the right to make an independent assessment of the risk of therapy. The requisite for the discharge of this right is that they each have access to all risks and benefits of the intervention. This implies that the absence of complete disclosure of the risks of a therapy produces flawed decisions about the implementation of the therapy.

## Failure to Warn

166 FDA Expertise: I have attended more than 20 meetings of the Cardio-Renal Advisory Committee to the Food and Drug Administration (F.D.A.), and I have served for four years

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                          5/31/2006

and the pharmaceutical industry is a collaborative one, and has suggested that the efforts of both the F.D.A. and the pharmaceutical industry be viewed as one of joint partnership.

172. *Modernization Act*: This emphasis can been seen in the F.D.A. Modernization Act, which provided a set of streamlined procedures for the sponsor and F.D.A. to follow, helping to insure a prompt and efficient review of a new drug application (NDA). These procedures have substantially reduced the time it took the F.D.A. to complete the review of a sponsor's application for a new drug approval. This pivotal move to streamline the administrative review process was a direct response to complaints from both the pharmaceutical industry, and, to some extent, from segments of the public that the F.D.A. was not responsive enough to the need for the swift introduction of safe and effective medications. The F.D.A. correctly recognized that the timely delivery of these new medications was essential for maintenance of the public health.

173. *Collaboration:* In order for the F.D.A.-pharmaceutical industry collaborative process to work, the F.D.A. and the Sponsor must work together to demonstrate the efficacy and safety of the compounds. Contrary to public perception, the F.D.A. is not a central laboratory. It generally does not carry out independent testing of the products submitted to it by the pharmaceutical industry for approval. The F.D.A. does not independently execute clinical trials to study in an independent manner the safety and effectiveness of new compounds. The F.D.A. instead receives the crucial information about the effects of a drug from outside sources. The F.D.A. has developed skill in identifying relevant information for the effects of a drug. Several of these sources include the general medical literature, and research reports from academic investigators, and research study results which are sponsored by other institutions e.g. the National Institutes of Health, (NIH). However, the

the F.D.A. The F.D.A. considers both the content of the advisory committee's deliberations and committee's answers to the F.D.A. posed questions very seriously. However, the advisory committee can only render its most informed and effective judgments when it is also the beneficiary of open, honest, accurate and timely reporting from both the F.D.A. and the sponsor. To this end, the sponsor spends months preparing briefing packets for the advisory committee, and weeks in intense practice sessions preparing for the meeting.

176. *Decision Processes:* The decision process of the F.D.A. and its external advisory committees is built on a foundation of the open, accurate and timely dissemination of scientific evidence concerning the mechanism of drug action, the drug's effectiveness, and the drug's safety profile. When this foundation is solid, the process will swiftly identify and rapidly approve drugs that are safe, effective, and meet a medical need. During this process, the public is protected from compounds that either have no efficacy or are unsafe, these inferior products being removed from further consideration. The maintenance and promotion of the public health depend on the integrity of this system. If either the sponsor or the F.D.A. engage in dishonest or deceptive practices, the process begins to erode, and the public suffers. This occurs either through the delay in the approval of safe and effective compounds that meet a medical need, or through the publics direct exposure to ineffective and dangerous compounds. The F.D.A. cannot make timely, informed decisions when the sponsor denies them information.

177. *Material Information*: Embedded in this body of procedures are the channels through which accurate, relevant, and material information describing the drugs actions is promptly communicated to practicing physicians and through the physicians to their patients. After the F.D.A. approves the drug and the sponsor to the medical community ad-

threatening side effects because such a compound cannot be used safely and effectively. By definition an adequate label cannot be written for Rofecoxib since the drug cannot be used safely and effectively. The particular defects in the Vioxx label are as follows.

181. An adequate label must contain complete statements about the effectiveness of the compound. The data for the analgesic effect of Vioxx did not state that was of the same effectiveness as standard NSAIDS.

182. 21 CFR Parts 201 and 202 states, "The Commissioner also advises that these labeling requirements do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The additional labeling and advertising of additional warnings, as well as contraindication, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., 'Dear Doctor' letters containing such information) is not prohibited by these regulations.

183. However, Merck did not provide adequate warnings. On February 25, 1996 in an email from Brian F. Daniels to Thomas Simon, et. Al, regarding GI Outcomes Trial Protocol, he states, "Would allow low dose ASA real world everyone is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill drug" With this comment, not only does Merck recognize that without COX-1 inhibition, rofecoxib will increase cardiovascular thrombotic events, but also that patients should take low dose ASA while on rofecoxib. Yet, this warning never appeared in the rofecoxib label.

184. The attitude toward the FDA, whose only mission is ensure that only safe and effective compounds are used by the public was antagonistic. On May 14, 1999, in an email form Scolnick to Blois, Goldmann regarding the Vioxx US label, he states "I think the ONLY

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                              5/31/2006

189. On June 29, 2000, the Vioxx sNDA (supplemental new drug application) with Dennis Erb's letter to Central Document Room of the FDA for submission of labeling supplement to NHDA 21-042 based on VIGOR GI results. In this document, Merck argues that VIGOIR reinforces the need for concomitant aspirin use is some patients. Merck submitted protocols 085 and 090. However did not change the label adding the warning about required aspirin use.

190. On July 5, 2000, a memo from the statistician Deborah Shapiro Alise Reicin revealed that Merck knew it was not publishing all of the myocardial infarctions that occurred in VIGOR in the *New England Journal of Medicine* that would not be published until November 2000. They had the opportunity to update the data but refused to take it.

191. On November 8, 2000, in an email from Reicin to Barr involving a hypertensive patient, Dr. Barr believes a hypertension-related death in ADVANTAGE should have been classified as an MI, stating in an email timed at 11:43AM "Common things being common, the clinical scenario is likely to be an MI." He then explained the definition of sudden death and unexplained death in an email timed at 12:58 PM. However, Dr. Reicin challenged him, saying, "I still strongly feel that this should not be an MI-.." However, she went further than that, saying the death should be classified as "unknown". Specifically, she stated, "...I would prefer unknown cause of death so that we don't raise concerns." This statement's egregious insensitivity to the importance of identifying appropriate safety monitories speaks for itself.

192. On October 18, 2000, Deborah Shapiro, Merck statistician carried out a preliminary meta-analysis that demonstrated an increased CV risk. Specifically, this report showed that Vioxx more than doubled the risk of MI related to all NSAIDS, and that this increase was sta-

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.    5/31/2006

This information was withheld from both the 1999 Advisory Committee and the 2001 Advisory Committee, as well.

197. On September 17, 2001, the FDA sent a Warning letter from Abrams to Gilmartin regarding Vioxx. That letter stated that Merck's promotional activities were "false, lacking in fair balance or otherwise misleading." It also stated," your claim in the press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible."

198. Nevertheless, on November 6, 2001, in a draft letter to Jonca Bull regarding the Amendment to the Supplemental New Drug Application, Merck expressed strong disagreement with FDA's initial October 15, 2001 labeling proposal, which it argues is unprecedented. Merck argues for labeling information tempering any commentary on CV/T data from VIGOR.

## Misleading the FDA

199. Regulation Sec. 14.171: Utilization of an advisory committee on the initiative of FDA. (f) Presentation of all relevant information about the matter will be made in open session unless it relates to an IND the existence of which has not previously been disclosed to the public as defined in Sec. 20.81 or is otherwise prohibited from public disclosure under part 20 and the regulations referenced therein. Sections 314.430 and 601.51 determine whether, and the extent to which, relevant information may be made available for public disclosure, summarized and discussed in open session but not otherwise made available for public disclosure, or not in any way discussed or disclosed in open session or otherwise disclosed to the public.

200. Merck mislead the FDA at the FDA Advisory Committee Meeting. On April 20, 1999, the FDA Arthritis Advisory Committee met to discuss the consideration of whether Vioxx

tee was never told about the increased cardiovascular risk associated with rofecoxib at this critical juncture in the FDA's deliberations for the approval of rofecoxib.

202. On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory Committee in public session that there was no evidence from an examination of their Phase IIb/III database of excess cardiovascular events. A similar statement was also made on page 56. This was false. The Watson report on which that was based clearly demonstrated excess cardiovascular events in women, and in most of the age ranges examined in men. This information was withheld from both the 1999 Advisory Committee as well. The Merck FDA Advisory Committee Background Information Packet dated February 8, 2001 was incomplete. On page 9 of that document (Section 2.2.1.1. Rationale for the Choice of Patient Population in VIGOR), no description of the rationale for only including patients who were not at high risk for cardiovascular disease. The critical information intimated in an email on November 11, 1996 by Dr. Reicin stating the plan of "excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" was not included in the Advisory Committee Packet. This critical information that altered the VIGOR study, blocking its ability to fairly assess the risk associated with rofecoxib was not shared with the FDA at this critical decision point in the FDA review process. In addition, Tables 6 and 7 of the Watson report, which demonstrated a clear signal of the cardiovascular danger of rofecoxib was omitted from this critical document on which the FDA reviewers relied.

This affidavit will be amended as additional relevant information becomes available, and, if appropriate, upon completion of my evaluation of the SAS APPROVe datasets.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                5/31/2006

then any ensuring discussion is based on a fantasy. These questions are of direct relevance to the COX inhibitor literature, which is replete with studies of different designs, different sensitivities, and widely disparate results.

209. *Sampling Error and Significance Testing* Sample-based research is the study of a sample obtained from a population. Different samples, obtained from the same population, contain different individuals with different experiences an{ XE "p value:and sampling error" }d therefore contain different results. Sampling error is simply this sample-to-sample variability. The symbol $\alpha$, representing the type I error is the specific sample error that allows a population to generate a sample which contains a spurious relationship that is not seen in the population.

210. Clinical trial investigators recognize that there are many reasons why the positive findings of clinical experiment may be misleading. For example, they may have selected a population of patients in whom the therapy works but the inclusion and exclusion criteria of the study were too restrictive. The dose of the medication chosen may be effective, but it produces too many side effects. The blinding of the procedure may have been ineffective, leading to a more diligent search for endpoints among the subjects randomized to placebo therapy. These are all problems with the execution of the trial. They can be anticipated and the trial designed to remove them as obstacles to the trial's success. However, there is one problem that, no matter how well the clinical trial is designed, cannot be removed as the generator of false positive results — chance alone. This is a $\alpha$ error.

211. Statistical significance addresses the possibility that sampling error has produced the positive findings in the sample. If an $\alpha$ (or type I) error occurs, then there is no effect of the therapy in the population, but the population produced a sample in which, just through

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                                5/31/2006

reasonable degree of certainty, the positive results of the trial represent a true population finding.[a]

214. *Statistical Power*: Statistical power, like *p*-values, is a phenomenon of sampling error. The circumstance in which statistical power is relevant in the interpretation of a research program involving the investigation of COX inhibition is when the trial results are not positive, but null; no treatment effect is seen.{ XE "power (statistical):definition" } Of course, there are many systematic explanations for a null finding (the wrong exposure level to the active intervention is but one of many possible circumstance). However, another possible explanation is sampling error. In this circumstance, the therapy is effective in the population. However, the population produced a sample by chance alone in which the therapy was ineffective. This is a type II or beta error. Power is defined as one minus the type II error. High statistical power translates into a low type II error rate.

215. Consideration of statistical power has important implications for the COX literature, since the occurrence of a type II error makes it impossible to assess the implications of a null finding. Specifically, if a study does not find a relationship between exposure to a COX inhibitor and cardiovascular disease, low statistical power means that it is quite likely that, even if there were a relationship between COX inhibition and cardiovascular disease, the study would not have found it. Therefore the null finding must not be treated as implying a null relationship in the population, but as a non-informative finding. This is the justification for the creed "Absence of evidence is not evidence of absence." Specifically, this means that absence of evidence (of a relationship between COX inhibition and cardiovascular disease) need not be evidence of absence (of this relationship existing in the popula-

---

[a] We will have much more to say about the interpretation of *p*-values

## Appendix B: Determining Causality in Medicine

219. Clinical investigation has been a human endeavor for over two thousand years. The most common building block in the edifice of health study is the { XE "case reports" }{ XE "case series" }case report. A case report is a summary of a single patient's findings and the communication of those findings to the medical community. A case series is a collection of case reports, linked together by a common thread (e.g., all of the patients were seen by the same doctor, or each of the patients was exposed to the same agent, e.g., quinine).

220. It is easy to understand how the growth of general medical knowledge has been propelled by the use of case reports. The delivery of healthcare has been governed by the interaction between a single, concerned, responsible provider and his patient. This relationship is private and privileged. However, it has historically been conducted in isolation, by physicians and nurses widely separated from each other. The idea of a community was well established. However, the concept of a medical community (i.e., a collection of practitioners who worked together to jointly expand their knowledge base) was one that took many generations to develop.

221. Therefore, medical care was delivered for hundreds of years by practitioners, who, working alone with incomplete knowledge, made decisions that directly affected the lives of their patients, and indirectly, their patients' families and communities. The one, natural learning tool these physicians could use was the active sharing of their experiences among themselves. This served to expand their expertise, suggest alternative approaches to healthcare, and extend their knowledge. This shared experience is at the heart of the case report.

222. The core thesis of this approach was best captured by{ XE "Celsus" } Celsus (circa A.D. 25) [32], who stated that "Careful men noted what generally answered the better, and then

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D                                    5/31/2006

cal community. A { XE "causation" }causal relationship, on the other hand, signifies that the exposure excites the production of the outcome. This more powerful, directed relationship incites the medical and regulatory communities to action. For example, the conclusion that exposure to citrus fruits reversed the symptoms of scurvy incited action by the British navy to mandate the storage of fresh fruit in the provisions of its crews for long sea voyages [36]. On the other hand, links between the use of cutting and bleedings and the remission of yellow fever were merely associative. Thus, when we as physicians examine a case report's details, we sift through the provided clinical descriptions in order to discern if the relationship between the exposure and the outcome is either causative or associative.

226. Epidemiologists are specialists who identify the determinants or causes of disease. They have developed criteria that would be useful in ascertaining whether an exposure causes (i.e., excites the production of) the disease. Elaborated by Sir Austin Bradfor{ XE "Hill, Bradford:and causality tenets" }d Hill [37], these tenets are based on a common sense approach to determining causality and are remarkably free from complicated mathematical arguments. These criteria acknowledge that more disease cases in the presence of the risk factor than in its absence raise a causal suspicion. In addition, determining that greater exposure (either by dose or duration) to the risk factor produces a greater extent of disease amplifies our sense that the exposure is controlling the disease's occurrence and/or severity. These two features are important characteristics of a cause–effect relationship.

227. Other questions posed by Hill permit us to explore the "believability" of the relationship. Is there a discernible mechanism by which the risk factor produces the disease? Have other researchers also shown this relationship? Are there other examples that help us to understand the current exposure–disease relationship? The nine precise Bradford Hill criteria