# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 06-0485** | * | |
| | * | **MAGISTRATE JUDGE** |
| **GERALD D. BARNETT**, | * | **KNOWLES** |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| **MERCK & CO., INC.**, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF RENEWED MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

Now that both sides have rested, it is clear that plaintiff failed to present legally sufficient evidence for the jury to find in his favor.  Among other things, Mr. Barnett failed to present scientifically reliable evidence establishing general causation.  Although that issue is addressed first in this motion, the Court may choose to focus instead on the deficiencies of proof that are unique to this case.  Plaintiff's unproven theory that Vioxx accelerates atherosclerosis, the extraordinary concessions of plaintiff's treating physicians and experts, and the other peculiar facts of this case require the Court to enter judgment in favor of Merck as a matter of law, for the following reasons:

- *Insufficient Evidence of Medical Causation.*  As a predicate to prevailing on any of his causes of action, Mr. Barnett would have to prove that his use of Vioxx accelerated his atherosclerosis and caused his heart attack.  That would require

scientifically reliable evidence of general and specific causation. Mr. Barnett has shown neither. In fact, the record reveals there is:

- *Insufficient General Causation Evidence*. Plaintiff's experts relied on a constellation of studies to opine that Vioxx can accelerate atherosclerosis and cause heart attacks. Most lack statistical significance and they are insufficient – taken alone or *in toto* – to satisfy the requirement that causation be proved with sound scientific evidence. Moreover, plaintiff did not prove his claimed mechanism of injury: that Vioxx accelerates atherosclerosis. His own experts conceded that they are unaware of any studies showing that Vioxx causes or accelerates atherosclerosis in humans. Both his retained expert, Dr. Zipes, and his non-retained expert, Dr. Epstein, also conceded that the animal studies plaintiff relies on: (1) cannot be generalized to humans, (2) for the most part do not involve Vioxx, and (3) are in conflict.

- *Insufficient Specific Causation Evidence*. Plaintiff's treating cardiologist, Dr. Karavan, testified that Mr. Barnett had significant Coronary Artery Disease ("CAD") before he ever took Vioxx, and that his plaque and heart attack were the result of the natural progression of his heart disease. His retained expert, Dr. Popma, conceded that the cause of Mr. Barnett's supposedly rapid acceleration of atherosclerosis is "unexplained." Dr. Zipes, plaintiff's specific cause expert, based his opinion on an impermissible *post hoc ergo propter hoc* analysis: Mr. Barnett's otherwise unexplained rapid plaque buildup must result from Vioxx because it occurred after he started taking the drug and Dr. Zipes supposedly is at a loss for any other explanation. Plaintiff also failed to rule out the possibility that his atherosclerosis progression and heart attack were not the result of plausible causes other than Vioxx, most notably the natural progression of his pre-existing CAD.

- *Insufficient Evidence that Merck Failed to Warn*. As discussed below, the jury has no legally sufficient basis to find for plaintiff on his claims for strict liability/failure to warn, negligence, or deceit by concealment:

  - *No "Known" or "Knowable" Risk*. Under South Carolina law, Merck had no duty to warn of unproven risks. The most plaintiff could establish on this score was that during the time Mr. Barnett took Vioxx there was some evidence of an "association" between Vioxx and cardiovascular disease, but that Vioxx's role in causing cardiovascular events was the subject of intense scientific debate. That is not enough to require a warning.

  - *The VIGOR risks were known by the medical community and Mr. Barnett's doctors*. Even if the VIGOR results provided sufficiently certain evidence of causation to constitute a "known" risk – and they did not – Merck sufficiently disclosed them to the FDA and the medical community. As plaintiff's own witnesses made abundantly clear, the VIGOR results were well known throughout the medical community and were the subject of an ongoing scientific debate. There is no evidence that

2

plaintiff's prescribing physicians were not adequately warned.  Both Dr. Mikola and Dr. Karavan were well aware of the VIGOR results, but kept Mr. Barnett on the drug nonetheless.  No further disclosure was required.

- *The warning was adequate*.  Merck promptly provided the VIGOR results to the FDA, made them known to the public, and published them in the *New England Journal of Medicine*.  Upon approval by the FDA, Merck added the VIGOR information to the Vioxx label.  Plaintiff's expert, Dr. Moye, admits that the VIGOR data is accurately disclosed in the 2002 label.  He quibbles that the information was in the wrong section of the label, but that is a distinction without a difference.

- *No proximate or "but for" causation*.  In order for plaintiff to prevail, he would have to prove that Merck's alleged failure to warn was a proximate, or "but for," cause of his allegedly accelerated atherosclerosis and heart attack.  He has not done so.  Mr. Barnett did not prove that a different warning would have changed his doctors' prescribing decision.

In sum, because plaintiff has failed to introduce evidence raising a triable issue on any of his claims, the Court should enter judgment in favor of Merck.  In the alternative, Merck requests that the Court enter judgment on each of the causes of action plaintiff has failed to prove.

## I.   THE LEGAL STANDARD.

A motion for judgment as a matter of law should be granted if, "after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'"  *Aetna Cas. & Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV. P. 50).  "[A] party has been fully heard when he rests his case."  *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 610 (5th Cir. 2004).  At that time, or after both sides have rested, the court "may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated."  FED. R. CIV. P. 50(a)(1).   "A mere scintilla of evidence is insufficient to present a question for the jury."  *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999).  Instead, "[t]here must be a conflict in substantial evidence to create a jury question."  *Id.*

3

II.   **MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE PLAINTIFF DID NOT PROFFER LEGALLY SUFFICIENT EVIDENCE TO PROVE MEDICAL CAUSATION.**

In order to prevail on any of his claims, Mr. Barnett was required to establish that Vioxx was a substantial contributing factor in accelerating his atherosclerosis and causing his heart attack.  *See Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 498 (D.S.C. 2001) (applying South Carolina law) (a plaintiff "must show that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result" (citation omitted)); *cf. McCarty v. Kendall Co.*, 120 S.E.2d 860, 863 (S.C. 1961) (causation established where a doctor testified that immobilization was a "contributing factor to a large degree" to the plaintiff's injuries); *see also* RESTATEMENT (SECOND) OF TORTS § 431 (1965) ("The actor's negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in bringing about the harm . . . .").  Plaintiff has failed to meet this burden.  Because there is no legally sufficient evidence to show that Vioxx was the proximate cause of Mr. Barnett's alleged injuries, the Court should enter judgment in Merck's favor as a matter of law.

Proving medical causation is a two-step process: plaintiff must prove both general and specific causation.  General causation requires proof that Vioxx *can* cause heart attacks, while specific causation requires proof that Vioxx *did* cause Mr. Barnett's heart attack.  *See, e.g.*, *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005).  Under South Carolina law, "[w]here a medical causal relation issue is not one within the common knowledge of the layman," neither general nor specific causation can be shown without expert medical testimony. *Goewey v. United States*, 886 F. Supp. 1268, 1279 (D.S.C. 1995) (applying South Carolina law); *see also Disher v. Synthes (U.S.A.)*, 371 F. Supp. 2d 764, 773 (D.S.C. 2005) (applying South Carolina law) ("[I]n order to survive summary judgment on the causation issue, plaintiff must not only proffer the testimony of a competent medical expert, but the testimony of a competent

4

medical expert who will testify . . . that the result in question most probably came from the cause alleged" (citation and internal quotation marks omitted)).

Although plaintiff was required to prove both general and specific causation, he proved neither. Instead, he offered the speculative and unreliable testimony of expert witnesses – Drs. Avorn and Zipes – who opined, without reliable foundation, that Vioxx "causes a higher number of heart attacks" (8/1/06 Tr. at 352:5-16 (Test. of Dr. Avorn)) and that they "c[ould] come up with no other answer" to explain the progression of Mr. Barnett's atherosclerosis (8/8/06 Tr. at 1734:15-1735:14) (Test. of Dr. Zipes)). Yet, it is well-established that "[a] mere possibility of . . . causation is not enough, and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." PROSSER ON TORTS 245 (3d ed. 1964); *accord Fitzgerald v. Manning*, 679 F.2d 341, 348 (4th Cir. 1982). Because plaintiff has proffered no legally sufficient evidence to show that Vioxx both could have and did cause his alleged injuries, all of his claims – whether grounded in negligence, strict liability, or concealment – necessarily fail.

A.    **The Record Contains No Legally Sufficient Evidence of General Causation.**

Plaintiff has failed to satisfy his burden to prove general causation, for two reasons. First, he has introduced no relevant and reliable studies to show that use of Vioxx at the 25 mg dose causes heart attacks. The vast majority of the studies upon which his experts rely do not and cannot show a statistically significant association between Vioxx and increased risk. In fact, these experts could only point to one placebo-controlled, randomized, clinical trial – the APPROVe study – that shows a statistically significant increase in a combined cardiovascular endpoint at the 25 mg dose. But as plaintiff's expert, Dr. Moye, points out, a single study cannot prove causation. (8/3/06 Tr. at 799:6-19.) Moreover, Dr. Zipes conceded that the APRROVe follow-up data is inconsistent with his theory that Vioxx accelerates atherosclerosis. None of

these studies, including APPROVe, establishes any relationship between Vioxx and acceleration of atherosclerosis.

Second, studies showing a statistical association are insufficient to prove causation. As discussed below, plaintiff was also required to prove a biologically plausible mechanism by which Vioxx caused his claimed injury. He has not done so.

> **1.     Plaintiff introduced only one statistically significant study showing an association between Vioxx at the 25 mg dose and an increased risk of cardiovascular events.**

Plaintiff's causation experts opined that use of Vioxx at the 25 mg dose can cause heart attacks, but the data on which they relied do not support their opinion. The sum of these experts' testimony on general causation is as follows:

- Dr. Avorn testified that "Vioxx does cause heart disease, specifically heart attacks, in human beings." (8/1/06 Tr. at 351:19-25.) To support this opinion, he cited VIGOR, Protocol 090, ADVANTAGE, and APPROVe, all of which, in Dr. Avorn's opinion, "showed a higher rate of heart attacks and other cardiovascular outcomes in patients given Vioxx." (*Id.* at 351:19-353:12.) He also relied on epidemiological studies – such as his own study, published in *Circulation* in 2004.

- Dr. Zipes testified that Vioxx accelerates atherosclerosis. (8/8/06 Tr. at 1685:18-23.) He bases this opinion primarily on a series of studies performed on generically altered mice, as well as some of the same clinical trial data relied upon by Dr. Avorn.

This testimony is no evidence of general causation. It is well settled that scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that it is "derived by the scientific method" and "supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Daubert v. Merril Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). It is also true that there must be an appropriate "fit" between the scientific testimony and the specific facts of the case. *Id.* at 591-92; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 606 (E.D. La. 2003). Scientific testimony is irrelevant

6

when there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here, plaintiff's causation experts could point to only one statistically significant, placebo controlled, clinical trial study showing that Vioxx, at the same dose taken by Mr. Barnett, is associated with an increased the risk of cardiovascular events. And, as Dr. Moye suggested, one study is not enough. The FDA often requires more than one confirmatory study to prove that use of a drug produces an adverse effect. (8/3/06 Tr. at 778:16-23 ("Sometimes the FDA will require multiple [Phase III] confirmation studies. The just don't want one study; they want two studies.").) Further, the APPROVe follow-up data shows no statistically significant association between Vioxx cardiovascular events.

Because the testimony of plaintiff's causation experts was not supported by legally sufficient scientific evidence – in other words, statistically significant studies that show that Vioxx is associated with acceleration of atherosclerosis and an increased risk of cardiovascular events – plaintiff did not prove general causation and his claims should not go to the jury.

**2.    Plaintiff Presented No Evidence Of Any Biologically Plausible Mechanism By Which Vioxx Could Accelerates Atherosclerosis.**

In a drug or toxic tort case, a statistical association between injury and exposure cannot prove causation absent proof of a biologically plausible mechanism by which exposure to the drug or suspected toxin causes injury. *See Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999). Biological plausibility "depends upon existing knowledge about *the mechanisms* by which the disease develops." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 522 (emphasis added). As the Fifth Circuit said in *Food Lion*:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

7

*Food Lion*, 171 F.3d at 314.  As this Court put it:

> In this case, at best, Drs. Shell and Eckberg have discovered an event, but not a cause.  They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . .  They have theories but they have no proof to support those theories. . . . Under the prevailing logic of Daubert and Black, their testimony is unreliable.

*Propulsid*, 261 F. Supp. 2d at 617; *accord McClain*, 401 F.3d at 1253 (expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]").  Without proof of *how* an agent can cause a disease, there can be no proof that the agent in fact *does* cause the disease.  *In re Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("'[n]ot knowing the mechanism whereby a particular agent causes a particular effect'" can be "'fatal to a plaintiff's claim'" where there is no "'sufficiently compelling proof that the agent must have caused the disease *somehow*'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995)).

In this case, plaintiff's expert, Dr. Zipes, proposes one theory for how Mr. Barnett's use of Vioxx supposedly could have caused, and in this case did cause, his heart attack:  the acceleration of atherosclerosis theory.  (8/8/06 Tr. at 1666:11-24, 1679:3-5, 1685:18-23.)

### a.   Plaintiff's Experts Concede The Lack of Scientific Support For Plaintiff's Acceleration Theory.

Although Dr. Zipes claims that animal studies show that Vioxx accelerates atherosclerosis, both he and Dr. Epstein, whom plaintiff designated as a non-retained expert, acknowledge – as they must – the limitations of any such opinion.  For example, Dr. Epstein repeatedly cautioned against extrapolating the results of studies in mice to humans, warned against using studies involving drugs other than Vioxx to draw conclusions about Vioxx, and readily admitted that he is aware of studies showing precisely the opposite – *i.e.*, that Vioxx

8

*reduces* the development of atherosclerosis.  (8/5/06 Tr. at 1224:9-1225:14, 1232:5-21.)   Even

Dr. Zipes made the same concessions.  (8/8/06 Tr. at 1796:14-20.)

> **b.** **None Of The Articles That Plaintiff's Experts Rely On Establishes That Vioxx Can Accelerate the Progression of Atherosclerosis.**

Plaintiff's experts have no scientific basis to opine that Vioxx could accelerate the

progression of atherosclerosis, or that it did so in the case of Mr. Barnett.  For example, Dr.

Zipes relies on the VIGOR and APPROVe trials to support his opinion.  These trials, however,

say nothing about whether Vioxx can accelerate the progression of atherosclerosis.  In fact,

neither even purported to examine the extent or progression of atherosclerosis in patients taking

Vioxx or the comparator (naproxen in VIGOR and placebo in APPROVe).  There is no article

interpreting VIGOR that says that the difference in CV results is attributable to a Vioxx-caused

increase in atherosclerosis.  The same is true of APPROVe.  An opinion based on a study that

does not even address the subject of the opinion is not sufficient evidence to support a finding for

plaintiff; a verdict cannot be based on the mere *ipse dixit*  of an expert.

The only actual data regarding adverse plaque-related effects from administering COX-2

inhibitors are drawn from animal studies, most of which did not involve Vioxx.    But animal

studies *cannot* establish causation in humans. *See, e.g., Brock v. Merrell Dow Pharms., Inc.*, 874

F.2d 307, 313 (5th Cir. 1989) (rejecting animal studies given difficulty extrapolating results to

humans); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 197-98 & n.5 (5th Cir. 1996) (rat

studies were "inconclusive" and "unreliable" and could not establish that chemical would have

same effect in humans); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1480 (D.V.I.)

(extrapolation from animal studies to humans to prove causation is "scientifically invalid"

because, among other reasons, "different species can react differently to the same agent"), *aff'd*,

46 F.3d 1120 (3d Cir. 1994); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1241

(E.D.N.Y. 1985) (finding animal studies inadmissible in an action alleging health problems arising from exposure to herbicide "because they [the animal studies] involve different biological species"); *Maurer v. Heyer-Schulte Corp.*, No. Civ.-A-92-3485, 2002 WL 31819160, at *3-4 (E.D. La. Dec. 13, 2002) (court "frowns upon the use of animal studies to predict carcinogenicity in humans").

Moreover, these studies did not even show an adverse link between any form of COX-2 inhibition and plaque in the animals used – much less a link between Vioxx specifically and plaque *in humans*.  In fact, the two studies that specifically involved Vioxx suggest that COX-2 inhibition might actually slow or reduce plaque formation – which has biological plausibility because of the role that COX-2-related inflammation plays in plaque phenomena.

Even assuming that animal studies were sufficient under *Daubert* to establish causation in humans – and they are not – the studies Dr. Zipes relies on do not support his position.  The objective flaws in these studies show his methods are unreliable.  For example, the Egan study Dr. Zipes cites not only did not involve humans, it did not even involve Vioxx.  (8/8/06 Tr. at 1797:2-3.)  Instead, the authors administered a different COX-2 inhibitor, alone and in combination with a thromboxane receptor antagonist, to genetically altered mice.  Animal studies involving drugs other than Vioxx provide an insufficient basis for an opinion that Vioxx can accelerate atherosclerosis in humans.[1]  Even in mice, however – and putting aside that the study

---

[1] *Compare Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) (holding animal studies have "very limited usefulness" given difficulty extrapolating results to humans) *and Merrell Dow Pharmaceutical, Inc. v. Havner*, 953 S.W.2d 706, 729 (Tex. 1997) ("the only way to test whether data from nonhuman studies can be extrapolated to humans would be to conduct human experiments or to use epidemiological data") *with McClain*, 401 F.3d at 1246 (excluding expert's opinion that ephedrine causes vasospasms based on analogy to different drug and noting that "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced" (internal quotation marks and citations
(*footnote continued next page*)

did not involve Vioxx – the authors did not find that COX-2 inhibition accelerated the development of atherosclerosis.  On the contrary, they found the *opposite*.  As the published article reports, the authors found that administration of a selective COX-2 inhibitor, either alone or in combination with a thromboxane receptor antagonist, "*failed to modify* disease progression" in mice.[2]

Like the Egan study, the Rudic study Dr. Zipes relies on also did not involve humans or Vioxx.  Instead, it involved mice genetically-engineered to lack a prostacyclin receptor[3] and mice that received numesulide, a COX-2 inhibitor that is not related to Vioxx.  In one experiment, the researchers transplanted atherosclerotic arteries into the two groups of mice and measured the rate at which the transplanted tissues were rejected in both groups.  The results of this experiment have no relevance here because – in addition to the fact that this is a study of mice, not men – Mr. Barnett did not receive numesulide or coronary artery transplants.  In a second experiment, the researchers surgically narrowed the arteries in both groups of mice and reported that *neither* group experienced a "further . . . reduction in luminal diameter."[4]  The

---

omitted)).

[2] Egan, K., *Cyclooxygenase, Thromboxane, and Atherosclerosis: Plaque Destabilization by Cycooxygenase-2 Inhibition Combined with Thromboxane Receptor Antagonism*, CIRCULATION 2005: 111:334-42.

[3] This effectively reduced available prostacyclin to zero.  No evidence suggests that COX-2 inhibition, by Vioxx or any other COX-2 inhibitor, reduces human prostacyclin production to zero.  (8/8/06 Tr. at 1798:13-1799:9.)  Dr. FitzGerald's study, conducted with Merck researchers and later published, found that Vioxx reduced urinary prostacyclin metabolites by only about 50 percent.  *See* Catella-Lawson, F., et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics and Vasoactive Ekosanoids*, J. PHARMACOL. AND EXP. THERAP. 1999 May; 289(2):735-41.  This alone precludes any scientifically reliable extrapolation from Dr. Rudic's mouse study to hypothetical clinical effects of Vioxx in humans.

[4] Rudic et al., *COX-2-Derived Prostacyclin Modulates Vascular Remodeling*, CIRCULATION RESEARCH 2005; 96:1240-1247, at 1244.

823885v.1

results of this latter experiment contradicts plaintiff's theory that COX-2 inhibition can accelerate atherosclerosis.

Similarly, the Cheng study (2002) did not involve the use of any COX-2 inhibitor.[5]  That study involved the use of mice genetically-engineered to have no prostacyclin receptor.  As such, this study yielded no data on the effect of COX-2 inhibition on plaque phenomena even in mice, much less in humans.  In fact, in addition to other potentially material differences between administering COX-2 inhibitors and genetic alteration, no one has shown that any COX-2 inhibitors reduce prostacyclin to zero in any part of the body of mice or man.

Finally, the 2005 Antman article cited by Dr. Zipes also does not support plaintiff's theory.  (8/8/06 Tr. at 1794:21-1795:18.)  In the article, the author merely reviews literature on COX-2 inhibitors prepared by others and address only in passing the hypothesis that COX-2 inhibition may be associated with the progression of atherosclerosis.  Indeed, Antman concedes that plaintiff's theory "is currently controversial."[6]  Nor does the article report any original research supporting plaintiffs' theory.  On its face, this article provides no scientific support for an opinion that Vioxx can accelerate the progression of atherosclerosis.

In short, Dr. Zipes has improperly relied on animal studies, none of which actually support plaintiff's theory.  Moreover, as discussed below, existing animal studies actually show that Vioxx *retards* the progression of atherosclerosis in mice.

---

[5]  Cheng et al., *Role of prostacyclin in the cardiovascular response to thromboxane A2* (hereinafter "Cheng"), SCIENCE 2002 Apr. 19; 296(5567):539-41.

[6]  Antman et. al., *Cyclooxygenase Inhibition and Cardiovascular Risk* (Special Report), CIRCULATION 2005, 112:759-770, 760.

823885v.1

### c.     Plaintiff's Experts Ignore Multiple Studies That Undermine Their Theory.

Dr. Zipes inexplicably dismisses various animal studies that either have rejected plaintiff's theory or, in some cases, reported that Vioxx in fact *slowed* the development of atherosclerosis.  (8/8/06 Tr. at 1692:21-25 ("Not every animal study supports these findings. There are also some that suggest that perhaps COX-2 inhibition might be beneficial.  And that's okay. . . .") (Test. of Dr. Zipes).)

For example, earlier mouse studies by Olesen (2002) and Pratico (2001) found that administration of a potent experimental COX-2 inhibitor (not Vioxx) did not accelerate atherosclerosis.[7]  In an even more recent mouse study published in September 2005 by Burleigh and others (including noted pharmacologist Dr. John Oates),[8] the authors found that "[s]elective inhibition of COX-2" – this time using Vioxx as opposed to some other COX-2 inhibitor – in fact "reduces atherosclerosis in . . . mice."[9]  Notably, this finding was not isolated or unexpected, but replicated and expanded on the similar finding of an earlier published mouse study by the same authors.[10]  In both studies, the authors hypothesized that these results occurred because the anti-inflammatory properties of Vioxx reduced COX-2-associated inflammation involved in the atherosclerotic process.[11]  Finally, several recent studies in humans have suggested that COX-2

---

[7] Olesen M, et al., *No effect of Cyclooxygenase Inhibition on Plaque Size in Atherosclerosis-prone Mice*, SCAND. CARDIOVASC. J., 2002 Dec;36(6):362-7; Pratico D, et al., *Acceleration of atherogenesis by COX-1 dependent prostanoid formation in low density lipoprotein receptor knockout mice*, PROC NATL ACAD SCI USA, 2001 Mar. 13;98(6):3358-63, Epub 2001 Mar 6.

[8] Burleigh ME, et al., *Cyclooxygenase-2 Promotes Early Atherosclerotic Lesion Formation in ApoE-deficient and C57BL/6 Mice*, J MOL CELL CARDIOL, 2005 Sep. 39(3):443-52.

[9] *Id.* at 446 (emphasis added).

[10] Burleigh ME, et al., *Cyclooxygenase-2 Promotes Early Atherosclerotic Lesion Formation in LDL Receptor-deficient Mice*, CIRCULATION, 2002 Apr. 16; 105(15):1816-23.

[11] *See* Ross, R., *Atherosclerosis – An Inflammatory Disease*, NEW ENG. J. MED., Jan.14, 1999;
(*footnote continued next page*)

823885v.1

inhibition (including COX-2 inhibition from Vioxx) is associated with significantly reduced levels of C-reactive protein – considered a marker for progression of atherosclerosis with possible direct involvement in the atherosclerotic process.[12]   Again, these results reinforce the absence of reasonable or meaningful support in the scientific literature for *any* suggestion that Vioxx promotes or accelerates atherosclerosis in humans.

> **B.   Plaintiff Has Failed to Prove Specific Causation.**

Finally, there is no scientifically valid evidence proving that Mr. Barnett's use of Vioxx accelerated his atherosclerosis or caused his heart attack.  The specific causation opinion of Dr. Zipes offers amounts to nothing more than a temporal proximity argument – *i.e.*, Mr. Barnett ingested Vioxx during the period in which there was atherogenesis, *ergo* Vioxx must be the cause.  (*E.g.*, 8/8/06 Tr. at 1734:15-1735:14.)   Courts have rejected this primitive view of causation.  *Moore v. Ashland Chem. Ins.*, 151 F.3d 269, 278 (5th Cir. 1998) ("In the absence of an established scientific connection between exposure and illness . . . the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation.");  *McClain*, 401 F.3d at 1245  ("The post hoc ergo propter hoc fallacy assumes casuality from temporal sequence.  It literally means after this, because of this. It is called a fallacy because  it makes an assumption based on the false inference that a temporal

---

340:115-26 (describing atherosclerosis as "an inflammatory disease").

[12] Bogaty P, et al., *Impact of Prolonged Cyclooxygenase-2 Inhibition on Inflammatory Markers, and Endothelial Function in Patients With Ischemic Heart Disease and Raised C-reactive Protein:  A Randomized Placebo Controlled Study*, CIRCULATION, 2004; 110:934-39; Monakier D, et al., *Rofecoxib, a COX-2 inhibitor, Lowers C-reactive Protein and Interleukin-6 Levels in Patients With Acute Coronary Syndromes* (hereinafter "Monakier"), CHEST, 2004 May;125(5):1610-5;  *see also* Ridker P, et al., *Inflammation, Aspirin, and the Risk of Cardiovascular Disease in Apparently Healthy Men*, New Eng. J. Med., April 3, 1997; 336:973-79 (clinical finding of relationship between C-reactive protein and stroke and myocardial infarction).

823885v.1

relationship proves a causal relationship.  As the Court of Appeals for the District of Columbia explained in a similar context: in essence, the requirement of adequate documentation in scientific literature ensures that decision makers will not be misled by the post hoc ergo proper hoc fallacy – the fallacy of assuming that because a biological injury occurred after a spill, it must have been caused by the spill." (citations and internal quotations   marks omitted)). Plaintiff's experts cannot – and have not – ruled out the possibility that it was these factors, and not Vioxx, that caused Mr. Barnett's alleged injuries.

Moreover, Mr. Barnett cannot prevail on his failure to warn claims because he has failed to eliminate other possible causes of his atherosclerosis and heart attack, most notably the natural progression of his pre-existing CAD.  To establish specific causation, plaintiff must "rule out" the possibility that his heart attack was caused by something *other* than Vioxx.  *Medalen v. Tiger Drylac U.S.A., Inc.*,  269 F. Supp. 2d 1118, 1139 (D. Minn. 2003) ("Having failed to "rule out" other factors for the Plaintiff's skin cancer, the Plaintiff has not established a submissible showing of causation"); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.,* 22 F. Supp. 2d 942, 963 (E.D. Ark. 1998), *aff'd,* 191 F.3d 858 (8th Cir.1999) (recognizing that an expert must "rule in" the suspected cause as well as "rule out" other possible causes); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000) (affirming grant of summary judgment in favor of defendant manufacturer where plaintiff "failed to 'rule out' all other possible causes."); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (excluding expert testimony because "[t]he defendants pointed to some likely alternative cause and the expert offered no reasonable explanation as to why he or she still believed that defendant's actions were a substantial factor in bringing about plaintiff's illness").

Plaintiff has failed to carry this burden.  More specifically, it is undisputed that Mr. Barnett had pre-existing atherosclerosis and multiple risk factors that could have caused his heart attack.  These factors include:

- *Age*:  Mr. Barnett was 58 years old at the time of his heart attack;
- *Family History*:  Mr. Barnett's father suffered a heart attack at age 55 or 62 and ultimately died of a second heart attack at age 68, Mr. Barnett's mother suffers from hypertension and had several transient ischemic attacks ("TIAs"), and his sister had multiple TIAs before the age of 50;
- *High Cholesterol*:  Mr. Barnett suffered from hyperlipidemia for which he began taking Lipitor in 2000;
- *Stress*:  Mr. Barnett suffered from stress and anxiety, due to his job as an FBI agent and his wife's experience with cancer;
- *Gender*:  Mr. Barnett is male; and
- *Smoking*:  Mr. Barnett was exposed to his wife's secondhand smoke.

Doctors  Karavan and Mikola say Mr. Barnett had CAD before he took Vioxx and his problems more likely than not result from natural progression of his illness.  Indeed, Dr. Popma testified that the cause of Mr. Barnett's condition is "unexplained."  (8/7/06 Tr. at 1495:19-22.) Dr. Zipes also conceded that Mr. Barnett had atherosclerotic disease before he started taking Vioxx.

Although Dr. Zipes proclaimed that he reviewed Mr. Barnett's medical records and could not explain what happened so it must be Vioxx, it is not enough for an expert to proclaim that he has ruled out other possible causes – he must also give a "good explanation as to why his or her conclusion remain[] reliable" despite the existence of these alternative risk factors.  *Magistrini*, 180 F. Supp. 2d at 609.  Because plaintiffs' experts have not done so here, Merck is entitled to judgment as a matter of law.

823885v.1

## IV.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S FAILURE TO WARN CLAIMS.

### A.   Plaintiff Cannot Prevail On His Strict Liability Or Negligence Claims.

Strict liability requires a plaintiff to prove that the defendant "did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution." *Carlin v. Super. Ct. (Upjohn Co.)*, 13 Cal. 4th 1104, 1112 (1996); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230-31 (4th Cir. 1984) (applying South Carolina law).  Although plaintiff brings claims for failure to warn under both strict liability and negligence theories, courts have long recognized that in prescription drug cases "[t]he standard for liability under strict liability and negligence is essentially the same:  was the warning adequate?"  *Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 858 (4th Cir. 1980); *see also Klem v. E.I. DuPont De Nemours & Co.*, 19 F.3d 997, 1003 (5th Cir.1994); *Chambers v. G.D. Searle & Co.*, 441 F. Supp. 377, 381 (D. Md. 1975); *Basko v. Sterling Drug. Inc.*, 416 F.2d 417, 426 (9th Cir. 1969); *Feldman v. Lederle*, 479 A.2d 374 (N.J. 1984); *Smith v. E.R. Squibb & Son, Inc.*, 273 N.W. 2d 476 (Mich. 1979); *Ortho v. Champman*, 388 N.E.2d 541 (Ind. App. 1979).

In South Carolina, the distinction between strict liability and negligence is further blurred by the state's statutory adoption of the Restatement (Second) of Torts § 402A, comment k.  S.C. CODE ANN. § 15-73-30 ("Comments to § 402A of the Restatement of Torts, Second, are incorporated herein by reference thereto as the legislative intent of this chapter.")  Ordinarily, negligence requires plaintiff to prove that the manufacturer had knowledge of the risk before liability for failure to warn attaches, *Livingston v. Noland Corp.*, 293 S.C. 521, 525 (1987), while strict liability imputes such knowledge without the need for proof, *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d at 489 n.5.  Under comment k, however, a manufacturer of an

823885v.1

"unavoidably unsafe" product will not be held strictly liable if it has provided adequate warnings of potential risks that are "known or reasonably knowable."  *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230-31 (4th Cir. 1984).[13]   Because comment k imports a knowledge requirement in determining liability for such products, the analysis under strict liability and negligence becomes identical.  *Werner v. Upjohn Co.*, 628 F.2d 848, 858 (4th Cir. 1980) (when comment k applies, "[t]he standard for liability under strict liability and negligence is essentially the same"); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1353-54 (3d Cir. 1992) (analysis of liability under comment k is the same for strict liability and negligence).

Comment k also defeats plaintiff's "negligence" claim.  Because drugs are "unavoidably unsafe" products under South Carolina law, *Brooks*, 750 F.2d at 1230-31, the only issue remaining on the table under comment k is whether Vioxx was "accompanied by proper directions and warnings."  RESTATEMENT (SECOND) OF TORTS § 402A cmt. k (1965).  This issue is already tendered, however, in plaintiff's separate strict liability claim for failure to warn, and in these circumstances an independent "negligence" claim is superfluous and should be dismissed.  *Cf. Hackett v. G.D. Searle & Co. (Hackett I)*, 246 F. Supp. 2d 591, 595 (W.D. Tex.

---

[13] Prescription drugs have been determined to be "unavoidably unsafe" products for the purpose of comment k and South Carolina law:

> Certain products, particularly ethical [i.e., prescription] drugs and medical devices, often cause unwanted side effects despite the fact that they have been carefully designed and properly manufactured.  In section 402A terminology, such products are deemed 'unavoidably unsafe,' but are not defective or unreasonably dangerous if they are marketed with proper directions for use or include adequate warnings of potential side effects.

*Brooks*, 750 F.2d at 1230-31 (footnote omitted).

18

2002) (granting summary judgment on design defect claim in COX-2 prescription drug case involving Celebrex where application of comment k left only a duplicative warning claim).

Moreover, the sufficiency of the warning in this case must be evaluated under "learned intermediary doctrine." *Brooks v. Medtronic. Inc.*, 750 F.2d 1227, 1230-31 (4th Cir. 1984) (predicting that the Supreme Court of South Carolina would follow this well established rule of law); *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) (applying South Carolina law) ("It is plain that [plaintiff's failure to warn] claim is governed by the "learned intermediary" doctrine); 2 MADDEN & OWEN ON PRODUCTS LIABILITY § 22:9 at 568 (3d ed. 2000) ("the learned intermediary doctrine has gained virtually unanimous adoptions").  This doctrine recognizes the reality that doctors are in a better position than pharmaceutical manufacturers to evaluate the suitability of a drug for a particular patient.  As a result, the manufacturer's duty to warn extends only to the prescribing physician and not to the ultimate consumer.  *Id.*  The Fifth Circuit explained the policy behind the learned intermediary doctrine as follows:

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both the patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.

*Reyes v. Wyeth Labs.*, 498 F.2d 1264, 1276 (5th Cir. 1974).

As will be explained, Mr. Barnett's failure to warn claims fail as a matter of law.  First, Merck had no duty to warn Mr. Barnett's physicians of risks that were either unproven or uncertain at the time the prescription was rendered.  Second, whether it was required to or not

19

under South Carolina law, Merck advised the FDA and the medical community of the VIGOR results, and upon approval by the FDA, included the VIGOR data in its label.  There is no evidence that any of Mr. Barnett's prescribing physicians was not adequately warned or did not otherwise have sufficient information.   In fact, Dr. Mikola admitted having independent knowledge of these risks, meaning that Merck's warning was adequate and any alleged failure to warn was not the proximate cause of Mr. Barnett's injury.  So too with Dr. Karavan.  Third, Mr. Barnett failed to meet his burden of showing that a different warning would have changed his physicians' decisions to prescribe Vioxx.  Finally, such claims are preempted by federal law because the warnings that Mr. Barnett complains of were expressly approved by the FDA.

### 1.     Merck Had No Duty To Warn Of Unproven Or Uncertain Risks.

Under South Carolina law, a manufacturer has a duty to warn of only known or reasonably knowable risks.  *Brooks*, 750 F.2d at 1230-31.  As explained above, plaintiff has not – and cannot – prove to reasonable degree of medical certainty whether or how Vioxx causes heart attacks.   Merck cannot be held liable for failing to warn of the existence of an unsubstantiated and speculative risk.  *Id.*

In addition, even plaintiff's own experts concede that in the relevant time period when Barnett was taking Vioxx, the causal relationship between Vioxx and cardiovascular risks was an unsettled question.  Dr. Avorn, for example, stated that the first time there was evidence of an *association* between Vioxx and cardiovascular events was after the VIGOR study in Spring 2000:

> Q:  Dr. Avorn, do you have an opinion that you hold to a reasonable degree of medical certainty as to when there was reasonable evidence of an association between Vioxx and heart attacks?
>
> A:  Yes.
>
> Q:  What is that opinion?

> A:  That said, I have such an opinion, and it is that by the time the data from the VIGOR study were available to Merck, which would have been the Spring of 2000, combining the VIGOR data with the evidence from the other clinical trials, all of which Merck had conducted itself, coupled with the guidance that Merck had sought and received from its own board of scientific advisors, coupled with the pharmacologic evidence that was out there in the literature prior to that point, by the spring of 2000 the burden of evidence was enough to suggest that there was, indeed, a reason for concern that Vioxx was *associated* with heart attack and other cardiovascular disease in humans.

(8/1/06 Tr. at 365:18-366:10 (emphasis added).)  However, as Dr. Moye explained at trial, an *association* does not amount to a causal relationship:

> Q:  What's the difference – we've heard reference to association and causation. In terms of an exposure to true nature relationship, what's the difference between an association and causation?
>
> A:  The difference is in association, there is just a harmless simultaneous occurrence.  For example, I'm ashamed of this, but I confess, I have a new love for these little tootsie rolls. Let's say I had one, I took one and I instantly had a stroke.  Okay.  They both occur at the same time.  But does that mean that that tootsie roll caused the stroke?   There are several things that could cause a stroke.  I may have had the stroke regardless of whether I had the tootsie roll that day or not.  That's an example of a mere association.  The two are related just in timing.

(8/3/06 Tr. at 799:6-19.)  It is undisputed that as soon as the APPROVe data became available – which is what Dr. Avorn points to as "evidence" of causation – Merck withdrew Vioxx from the market. (8/1/06 Tr. at 352:5-21.)  But even if the APPROVe data constituted sufficient evidence of causation to trigger Merck's duty to warn – which it doesn't – it is undisputed that before the APPROVe study, the issue of causation was unsettled and the subject of debate in the medical community.

Merck had no duty under state tort law to warn of uncertain risks of cardiovascular injury.  The Fourth Circuit's holding in *Doe v. Miles Labs., Inc.,* 927 F.2d 187 (4th Cir. 1991) illustrates this rule.  In that case, plaintiff contracted HIV through a plasma injection.  At the time

21

that she received the injection there was the suggestion that HIV could be spread by blood products but there was no medical consensus on the issue.  The court ruled that:

> [W]e do not believe that hindsight opinions are sufficiently probative to dispute the absence of a medical consensus that AIDS was borne by blood, thereby presenting a genuine issue of material fact.  If pharmaceutical companies were required to warn of every suspected risk that could *possibly* attend the use of a drug, the consuming public would be so barraged with warnings that it would undermine the effectiveness of these warnings.  Hence, we find that the risks then known to be associated with the use of Koyne were not explicit enough to expect Miles to have known or foreseen them in September of 1983.

*Id.* at 194-95 (emphasis in the original).  Similarly,  the California Supreme Court in *Finn v. G. D. Searle & Co.*, 35 Cal. 3d 691, 701 (Cal. 1984) stated:

> The quality of evidence supporting a causal connection between product and injury may range from extremely vague to highly certain.  Knowledge of a potential side effect which is based on a single isolated report of a possible link between a prescription drug and an injury may not require a warning.  If we overuse warnings, we invite mass consumer disregard and ultimate contempt for the warning process.  Moreover, both common sense and experience suggest that if every report of a possible risk, no matter how speculative, conjectural, or tentative, imposed an affirmative duty to give some warning, a manufacturer would be required to inundate physicians indiscriminately with notice of any and every hint of danger, thereby inevitably diluting the force of any specific warning given.

*Id.* at 701 (internal quotation marks and citations omitted).  As explained above, during the relevant period, there was no medical consensus about the cardiovascular risks of Vioxx.  Thus, Merck was not required to give warnings of these risks.

Finally, because Mr. Barnett suffered a heart attack (as opposed to some other harm), the only risk that he can complain Merck failed to warn against is the risk of cardiovascular events. *See In re Rezulin Prods. Liab. Litig.,* 331 F. Supp. 2d 196, 200 (D.N.Y. 2004) (explaining in a failure to warn case that "[w]here, as here . . . the plaintiff suffered no injury of which the manufacturer failed to warn, there is no claim"); *see also* Dobbs, THE LAW OF TORTS 1018 (2001) ("[T]he injury suffered must be within the class of injury that the warning requirement

823885v.1

was meant to avoid.").  Thus, the fact that Merck did not warn about the all-cause mortality data in the Alzheimer's studies is irrelevant because those studies did not show any significant increase in cardiovascular risks.

  **2.  Mr. Barnett's Doctors' Independent Knowledge Of The Cardiovasular Risks Associated With Vioxx Negates Plaintiff's Failure to Warn Claims.**

   It is well-settled that when a prescribing physician has independent knowledge of the risks associated with a drug from sources other than the manufacturer, an absent or allegedly inadequate warning is not the cause of the plaintiff's injury. *See Odom v. G. D. Searle & Co.*, 979 F.2d at 1003 (applying South Carolina law; affirming summary judgment for manufacturer in failure to warn case in part because physician had independent knowledge of the risks); *see also Stanback v. Parke. Davis & Co.*, 657 F.2d 642 (4th Cir. 1981) (holding that manufacturer is not liable for failure to warn when doctor knew of risk and said it was not his practice to warn); *Plummer v. Lederle Labs.*, 819 F.2d 349 (2d Cir. 1987) (finding no causation when doctor failed to warn even though knew of risk of polio); *Kirsch v. Picker Int'l., Inc.*, 753 F.2d 670 (8th Cir. 1985) (affirming directed verdict because physician knew of cancer risk related to X-ray treatment); *Mampe v. Ayerst Labs.*, 548 A.2d 798 (D. C. App. 1988) (holding manufacturer was not liable where prescribing physician acquired knowledge of risks from a variety of other sources); *Dunn v. Lederele Labs.*, 328 N.W.2d 576 (Mich. App. 1982) (finding no proximate cause where physician had knowledge of the risks associated with a drug); *Leibowitz v. Ortho Pharm. Corp.*, 307 A.2d 449 (Pa. Super. 1973) (finding no causal nexus where physician had other sources of information).  Stated simply, the common-sense rule is that "[n]o one needs notice of that which he already knows." *Lindsay v. Ortho Pharm. Corp.*, 637 F.2d 87, 92 (2d Cir. 1980) (internal quotation marks and citations omitted).

In this case, the medical community knew of the risks associated with Vioxx. Merck provided the results of the VIGOR study to the FDA and the medical community soon after it received the results. The results were publicized in the *New England Journal of Medicine* in November 2000. There is no evidence that the prescribing physicians were unaware of the VIGOR data. Dr. Mikola read the VIGOR article at that time and knew that there were four times as many heart attack events in the Vioxx arm of VIGOR study compared to the Naproxen arm. (8/04/06 Tr. 958:17-959:2).[14] Because VIGOR compared Vioxx to Naproxen rather than placebo, he understood that "it was impossible to know for sure whether Vioxx was causing the heart attacks in the VIGOR study." (*Id.* at 960:13-961:15.) Moreover, he was aware that the interpretation of the VIGOR results was the subject of "much debate" in the medical community and that some in the medical community questioned "whether Naproxen was the appropriate explanation for VIGOR results." (*Id.* at 960:8-962:4). Based on all he knew during the time he prescribed Vioxx to Mr. Barnett, he believed the benefits of Vioxx outweighed the risks. (*Id.* at 961:16-20).

Similarly, Dr. Karavan testified that he had been aware since medical school of the possible relationship between NSAID's and cardiovascular risks. He also was familiar with the VIGOR study and the debate surrounding it during the time that Mr. Barnett took Vioxx.

### 3. Plaintiff Has Failed To Show That A Different Warning Would Have Changed His Doctors' Prescribing Decisions.

In pharmaceutical cases, the plaintiff has the burden of proving both that a warning defect existed and that the inadequate warning was the proximate cause of the injury. *Odom*, 979 F.2d

---

[14] He also testified that it probably would not have made any difference to him if Merck had included three additional heart attacks that occurred after the cutoff date of the study. (*Id.* at 959:8-23).

823885v.1

at 1003 (citing *Thomas v. Hoffman-LaRoche, Inc.,* 949 F.2d 806, 812 (5th Cir. 1992).   Applying

this rule, the court in *Odom* affirmed a grant of summary judgment on a failure-to-warn claim in

favor of the manufacturer of an IUD (birth control device) when plaintiff's physician stated that

he would still prescribe the device despite his knowledge of the risks associated with it.  *Id.*  The

court explained that "[e]ven viewing the facts most favorably to [plaintiff], we cannot escape the

district court's conclusion that [physician] would have prescribed the . . . IUD no matter how

carefully [defendant manufacturer] refined the phrasing of its warning."  *Id.*  In short, the

plaintiff had failed to meet her burden because the "[prescribing physician's] testimony makes

clear that such a warning would not have changed his decision to prescribe the IUD."  *Id.* at

1003-04.

   This case warrants the same conclusion.  There is no evidence that a different warning

could have changed Mr. Barnett's doctors' decisions to prescribe Vioxx to him.  Dr. Mikola

admitted at trial that he continued to prescribe Vioxx to Mr. Barnett even *after* he read the 2002

label (which contained the VIGOR data regarding cardiovascular risks) *and* after Mr. Barnett had

his quintuple bypass surgery:

> Q:  I've handed you what I've marked as exhibit 44.
>
> A:  Yes, sir.
>
> Q:  A package insert that is dated April of 2002, approved by the Food & Drug Administration.  Okay?
>
> A:  Yes, sir.
>
> Q:  When you were prescribing Vioxx to Mr. Barnett, in April 2002 time frame, were you familiar with the risks and benefits in the label that was in existence at the time?
>
> A:  Yes, sir.
>
> Q:  So you would have been familiar with the information contained in exhibit 44?
>
> A:  Yes, sir.
>
> Q:  And then, further down, where it says "other safety findings, cardiovascular

safety," do you see that it indicates the VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events in patients treated with Vioxx 50 milligrams once daily as compared to patients treated with naproxen 500 milligrams twice daily?

A: Yes, sir.

Q: You understood that information back in November of 2000 when you read the VIGOR study; right?

A: Yes, sir.

Q: And if you look on the right-hand column, the "precautions," under "cardiovascular effects," the "information below should be taken into consideration and caution should be exercised when Vioxx is used in patients with a medical history of ischemic heart disease."  And it continues to describe the VIGOR study.  Did you see that?

A: Not yet.

Q: Right-hand column under "precautions," "cardiovascular effects."

A: Oh, yes.

. . .

Q: That is information you knew in April of 2002; right?

A: Yes, sir.

Q: Are you weighing the risks and benefits of Vioxx based on how they're described in the package, in other words, when you're deciding whether to prescribe Vioxx for Mr. Barnett?

A: That's one part of the decision-making process.

. . .

Q: Based on that, you felt that the benefits of Vioxx outweighed the risks for Mr. Barnett?

A: I thought – I thought that the risk-to-benefit ratio was acceptable for Mr. Barnett.

(8/4/06 Tr. at 964:16-969:5; *see also id.* at 970:1-15:  Q:  And when you were prescribing Vioxx to Mr. Barnett – now, this is after his heart attack in March of 2003 – you understood this information and you believed that the benefits of Vioxx outweighed the risks?  A:  Yes, sir.  At the doses prescribed, yes, sir.")  Because plaintiff cannot satisfy his burden of showing that a

26

different warning would have changed his doctors' minds, Merck is entitled to judgment as a matter of law.

**B.     Plaintiff's Claims Are Preempted By Federal Law.**

Plaintiff's claims that the FDA-approved Vioxx labels were inadequate – including, most notably, the label added to Vioxx in April 2002 to reflect the results of the VIGOR study – are also preempted by feral law.  Plaintiff asserts, for example, that the label added to Vioxx in April 2002 was inadequate because, *inter alia*, it lists the VIGOR information in the "Precautions" section of the label instead of the "Warnings" section.  (8/3/06 Tr. at 834:1-835:21.)

In making this argument, however, plaintiff ignores that the label layout and contents reflect the balance the FDA struck in approving the post-VIGOR label.   The FDA has determined that because state-law claims like plaintiff's prevent the FDA from maintaining strict control over label content and format, they are preempted by the FDA's labeling regulations. *See* 71 Fed. Reg. at 3923-35 (preemption applies, inter alia, to claims like plaintiff's that are "based on the failure to include in labeling or advertising a statement the substance of which the FDA has prohibited").  *See also Colacicco v. Apotex, Inc.*, Civ. A. No. 05-5500, 2006 U.S. Dist. LEXIS 34127, at *65 (E.D. Pa. May 25, 2006) (plaintiff's state-law failure to warn claims were preempted because the drug approval "process required that the labeling be the same as that approved for the innovator drug" and "the FDA would have deemed any post-approval enhancements 'false or misleading'").  For this reason too, Merck is entitled to judgment as a matter of law.

**C.     Plaintiff Cannot Prevail On His Deceit By Concealment Claim.**

Like his negligence claim, plaintiff's deceit claim is premised on the allegation that Merck failed to provide adequate warnings regarding the potential cardiovascular effects

associated with Vioxx.  (Complaint at ¶¶ 48, 49.)  As such, it is nothing more than a duplicative failure to warn claim.  In fact, as one court put it, "the only valid claim in a prescription drug suit is th[at] defendants failed to adequately warn the plaintiff's prescribing physician about the drug, which caused the plaintiff's injuries."  *Hackett v. G.D. Searle & Co.*, No. A-01-CA-399-SS, 2002 U.S. Dist. LEXIS 16246, at *7 (W.D. Tex. June 25, 2002) (in a personal injury suit involving the prescription drug Celebrex, granting summary judgment on claims of breach of express and implied warranties, intentional and negligent misrepresentation and fraud, and intentional infliction of emotional distress on this ground).

*In re Norplant Contraceptive Products Liability Litigation v. American Home Products Corp.*, 955 F. Supp. 700, 710 (E.D. Tex. 1997) is illustrative of this point.  In that case, plaintiffs brought suit against the makers of Norplant under theories of strict liability, negligence, misrepresentation, breach of implied warranty of merchantability, and alleged violations of the Texas Deceptive Trade Practices Act ("DTPA").  *Id.* at 702–03.  The court explained,

> The gravamen of all of Plaintiffs' causes of action, including misrepresentation and violations of the DTPA, is that Wyeth failed to adequately warn of or disclose the severity of Norplant's side effects.  Therefore, the learned intermediary doctrine applies to all of Plaintiffs' causes of action…. [W]hether the failure to warn is couched as an affirmative misrepresentation or a misrepresentation by concealment, the allegation collapses into a charge that the drug manufacturer failed to warn.

*Id.* at 709.  The court reasoned, in part, that "[i]f the [learned intermediary] doctrine could be avoided by casting what is essentially a failure to warn claim under a different cause of action…, then the doctrine would be rendered meaningless."  *Id.  See also, e.g., Talley v. Danek Med., Inc.*, 179 F.3d 154, 162-63 (4th Cir. 1999);  *Catlett v. Wyeth, Inc.*, 379 F. Supp. 2d 1374, 1381 (M.D.Ga., 2004);  *Alexander v. Danek Med., Inc.*, 37 F. Supp. 2d 1346, 1350 (M. D. Fla., 1999).

So, too, in this case.  As explained above, the learned intermediary doctrine clearly applies to plaintiff's failure to warn claim.  To allow plaintiff to avoid application of the doctrine

28

by recasting his failure to warn claim under alternate theories such as fraud or negligence would effectively defeat the important purpose of the doctrine – to shield manufacturers from liability when adequate warnings have been given to an intermediary who understands the propensities and dangers involved in the use of a given drug. *See Wyeth-Ayerst Labs. Co. v. Medrano*, 28 S.W.3d 87, 94 (Tex. App.–Texarkana 2000) (applying the learned intermediary doctrine to "all of [plaintiff's] causes of action" against the manufacturer of Norplant); *Talley, Inc.*, 179 F.3d at 162-63 (fraud claims barred because the learned intermediary doctrine applied); *Catlett*, 379 F. Supp. 2d at 1381 (learned intermediary doctrine encompasses any fraud, fraudulent concealment or misrepresentation claim related to prescription drugs); *Alexander*, 37 F. Supp. 2d at 1350 (approving of defendant's argument that failure to warn claims brought under the theories of negligence, strict liability and fraud fail because of the application of the learned intermediary doctrine).

Even if the fraud claim was not duplicative, plaintiff cannot prevail on this theory. Under South Carolina law, plaintiff must prove, *inter alia*, that: (1) Merck made a false and material misrepresentation; and (2) the hearer reasonably relied on the truth of that representation. *See Regions Bank v. Schmauch*, 582 S.E.2d 432, 444-45 (S.C. Ct. App. 2003). Plaintiff cannot make either showing. Plaintiff has not proven that Mr. Barnett's prescribing physicians relied on Merck's alleged failure to warn. *See Jones v. Danek Med., Inc.*, No. Civ.A. 4:96-3323-12, 1999 WL 1133272, at *8 (D.S.C. Oct. 12, 1999) (applying South Carolina law). There is no such evidence. As noted above, Dr. Mikola admitted that he prescribed Vioxx to Mr. Barnett even after reading the 2002 label and even after Mr. Barnett had his heart attack. This testimony makes clear that Dr. Mikola would not have changed his prescribing decision even if Merck had given an earlier warning regarding cardiovascular risks.

Plaintiff's complete failure of proof on the issues of omissions and reliance entitles Merck to judgment as a matter of law on the deceit claim.

## IV.    CONCLUSION.

For the reasons stated above, the Court should enter judgment in favor of Merck, pursuant to Rule 50 of the Federal Rules of Civil Procedure.  In the alternative, the Court should enter judgment on each of the causes of action plaintiff has failed to prove in his case.

Respectfully submitted,

_/s/ Dorothy H. Wimberly_____

Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

And

823885v.1

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Attorneys for Merck & Co., Inc.

823885v.1

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Merck's Renewed Motion for Judgment as a Matter of Law has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 15th day of August, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

823885v.1