UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| | Section L |
| | Judge Eldon E. Fallon |
| | Magistrate Judge Daniel E. Knowles, III |

THIS DOCUMENT RELATES TO:
*Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379
_____

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF WAYNE RAY, Ph. D.**
_____

*(Defendant's Expert Challenge No. 9)*

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff R. Garry Smith files this Memorandum in Opposition to Defendant's Motion to Exclude Testimony of Wayne Ray, Ph.D. In support thereof, Plaintiff would show as follows:

**INTRODUCTION**

Plaintiff has designated Wayne A. Ray, Ph. D. to testify regarding pharmacoepdemiologic issues related to the ingestion of Vioxx, including: whether Vioxx causes an increased risk of myocardial infarction and serious coronary heart disease; the magnitude of the risk presented by Vioxx; and whether that increased risk is

present for short duration use.

This Court in *Plunkett* recognized that Wayne A. Ray, Ph. D., is not a medical doctor; however, in *Plunkett*, the Court ruled on the very narrow issue as to whether Dr. Ray can testify to

1

matters requiring the expertise held by a medical doctor or in FDA regulatory matters. *See* Exhibit C at pp. 32 - 33. Over Merck's objection in *Plunkett* and now, the *Plunkett* Court permitted nevertheless Dr. Ray to testify on the following matters:

- Professor Ray may opine on Plaintiff's general causation theory – that using 25 mg Vioxx for less than four months can cause thrombotic CV events;

- Professor Ray may opine on the mechanism(s) by which Vioxx increases CV risk;

- Professor Ray can offer his opinion that Vioxx's CV risk is greater for patients with high baseline risk of myocardial infarction; and

- Professor Ray has the requisite qualifications to assess Vioxx's overall risks and benefits, and whether there are "safer alternatives" to Vioxx.

Dr. Ray is qualified to render opinions in these matters. The opinions offered by Dr. Ray are both scientifically reliable and relevant to the issues expected to be presented to a jury in this matter. Therefore, Defendant's motion to exclude Dr. Ray's testimony must be denied.

## DISCUSSION

### I.    LEGAL STANDARDS

The *Daubert* trilogy of cases, *Daubert, General Electric Co. v. Joiner*; (522 U. S. 136, 118 S. Ct. 512, 517 - 519 (1997)) and *Kumho Tire Co. v. Carmichael*, (526 U. S. 137 (1999)) have made the district judge the "gatekeeper who must pass on the reliability and relevance of proffered evidence pursuant to Federal Rule of Evidence 702."[1] Rule 702 takes into account the trilogy and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

---

[1] *Manual for Complex Litigation*, 472 (4th ED. 2004).

>facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. . .

FED. R. EVID. 702.  This Rule establishes general standards for determining the reliability of expert testimony.  The Rule "not only requires that the testimony be relevant, but also that it be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the witness applied those principles and methods reliably to the facts of the case."[2]  Rule 702, as interpreted by the Supreme Court, requires that before an expert may be permitted to express an opinion on *any* issue, the following requirements must be satisfied:

1. The expert must be ***qualified*** to express the opinion;

2. The expert's opinion must be ***reliable***;

3. The expert's opinion must be ***relevant;*** and

4. The expert's opinion must be ***otherwise admissible***.[3]

Further, Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure states the following:

>Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the patty regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness.. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefot; the data or other information considered by the witness". . .

The *Daubert* Court went on to identify several considerations which might bear on whether the testimony in question is scientifically valid and trustworthy, including:

1. whether the theory or technique has been tested;

---

[2]*Id.* at 484.

[3]*See* FED. R. EVID. 702; *Daubert*, 509 U. S. 588, 590 - 595.

3

2. whether the theory or technique can be or has been peer reviewed or published;

3. the known or potential error rate;

4. the 'existence and maintenance of standards controlling the technique's operation'; and

5. the general acceptance by the relevant scientific community and the testimony's degree of acceptance therein.[4]

However, following both the *Joiner* and *Kumho* decisions, the considerations to be evaluated by the district judge were expanded in order to assist in determining the reliability of expert testimony. The following are some examples:

1. Whether the expert is testifying about matters growing naturally and directly out of research independent of litigation;

2. Whether the expert has engaged in any improper extrapolation, for example, drawing an unsupported conclusion from animal studies to humans;

3. Whether the expert has taken into account all possible alternative explanations;

4. Whether the expert has been as careful as she would be in her regular professional work as in paid litigation;

5. Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give;

6. Whether the expert has relied on anecdotal evidence, such as case studies, or whether the expert has relied on other types of scientifically reliable evidence;

7. Whether there is a temporal relationship between the exposure event and the subsequent injury;

8. The relationship of the technique used by the expert to established methodologies;

9. The expert's qualifications to use the methodology; and

10. The non-litigation uses to which the methodology has been put.

---

[4]*Manual for Complex Litigation*, *supra* at 476 - 77 (footnote omitted).

The person seeking to admit expert testimony bears the burden of proving reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chemical, Inc.*, F. 3d 269, 276 (5th Cir. 1998) (en banc).

By reasoned interpretation of the foregoing rules, Dr. Ray is qualified to render opinions in this matter in accord with those in his Expert Report. *See* Exhibit A. Dr. Ray's opinions are reliable, relevant and would aide the jury in understanding the issues in this case. Therefore, Defendant's motion to exclude Dr. Ray's testimony should be denied.

## II.     DR. RAY IS QUALIFIED TO OPINE ABOUT GENERAL CAUSATION

Dr. Ray is a Professor of Preventative Medicine at Vanderbilt University School of Medicine in Nashville, Tennessee. *See* Exhibit A. Dr. Ray is Director of the Division of Pharmacoepidemiology and of the Master of Public Health programs. *Id.* Dr. Ray holds a doctoral degree in Computer Sciences from Vanderbilt, a master's degree in Biostatistics and a bachelor's degree in Mathematics from the University of Washington. *Id.* Dr. Ray has conducted pharmacoepidemiologic research for thirty years and is actively involved in the design, execution and analysis of numerous pharmacoepidemiologic studies. *Id.*

Dr. Ray is a Fellow of the International Society for Pharmacoepidemiology (ISPE). He is the Principal Investigator for Vanderbilt Center for Education and Research on Therapeutics, funded by a grant from the federal Agency for Health Care Quality and Research. He is also the Principal Investigator for a Cooperative Agreement with the FDA. *Id.*

Dr. Ray is familiar with evaluating and critiquing scientific methods for peer-reviewed journals. Dr. Ray has, himself, published more than 150 manuscripts in peer-reviewed literature, including articles addressing Vioxx specifically. *Id.* Dr. Ray also reviews manuscripts for leading

medical journals, such as: *The New England Journal of Medicine; Journal of the American Medical Association*; *The Lancet*; *The Annals of Internal Medicine*; *Science*; *British Medical Journal*; *Circulation*; *American Journal of Medicine*; *American Journal of Epidemiology*; *Journal of Clinical Epidemiology*; *Journal of the American Geriatrics Society*; *Journal of Gerontology*; *Medical Sciences*; *The Gerontologist*; *American Journal of Public Health*; *Statistics in Medicine*; Medical Care; *Chest*; *Bone and Mineral Research*; and *Neuron*. *Id.*

Dr. Ray meets regularly with FDA officials from the Center for Drug Studies relating to adverse drug reactions and assessment of medicines. *Id.* He has served as an advisor to the FDA and on ad hoc committees. *Id.* Dr. Ray has been the Principal Investigator on 27 research grants funded by federal agencies, non-profit organizations and pharmaceutical companies, and has been a co-investigator on numerous other grants. *Id.* Dr. Ray has conducted numerous studies of the gastrointestinal safely and cardiovascular safety of non-steroidal anti-inflammatory drugs and coxibs. *Id.*

As the *Plunkett* Court ruled,[5] Dr. Ray's education, training and experience demonstrate that he is imminently qualified to render opinions regarding pharmacoepidemiologic issues related to the ingestion of Vioxx, including:

- whether Vioxx causes an increased risk of myocardial infarctions and serious coronary heart disease;
- the magnitude of the risk presented by Vioxx; and
- whether that increased risk is present for short duration use.

Defendant's motion to exclude is simply an attempt to further suppress the safety concerns raised

---

[5]*See* Exhibit C, pp. 27 - 33.

6

by ingestion of Vioxx, especially in the case of Mr. Smith.

### III. DR. RAY'S OPINIONS ARE BASED UPON SCIENTIFICALLY RELIABLE EVIDENCE.

Contrary to the representations made by Merck in its motion, Dr. Ray's opinions are based upon scientifically reliable evidence. Scientifically reliable evidence indicates that Vioxx causes an increased risk of serious coronary heart disease with short duration usage.

Defendant Merck does not dispute that there is a clinical link between Vioxx and increased risks for cardiovascular events. Defendant Merck would prefer, however, to limit the window for such increased risks to persons who ingest Vioxx for at least eighteen (18) months.

As presented in "Plaintiff's Memorandum in Support of Motion to Exclude Opinion Testimony that Vioxx Cannot Cause Adverse Thrombotic Events Unless Ingested Eighteen (18) Months or Longer," there is ample, scientifically reliable, evidence that Vioxx causes an increased risk of serious coronary heart disease with short duration usage. *See* Exhibit D. As Dr. Ray opines, Merck's "18-month hypothesis" is a *post hoc* subgroup analysis that is not generally accepted by relevant epidemiological and scientific community. In addition, the *post hoc* subgroup analysis is underpowered and has an error rate that gives the 18-month hypothesis an only 1 in 5 (20%) chance of accurately detecting the risk of cardiac events by duration in this subgroup. Based upon these critical failings, the factual bases, data, principles, methods and applications employed by Merck's experts in offering the 18-month hypothesis are not reliable.

Contrary to Merck's claims, the results of the *post hoc* subgroup analysis are inconsistent with the results of prior and subsequent clinical trials and epidemiological studies. Thus, the analysis is so contrary to the available data that there is too large an analytical gap between the data and the opinion offered. Moreover, no Merck expert has offered support for the biological plausibility of

an 18-month threshold as no evidence exists in the entire body of published Cox-2 scientific research to support it.

A *post hoc* subgroup analysis is particularly susceptible to misleading interpretations. One seminal article addressing this issue was published in the *Journal of the American Medical Association* in l991.[6] According to the authors, a subgroup analysis, even if relatively large, leads to comparisons concerning individual subgroups that are woefully lacking in power. *Id.* Power refers to the probability of a statistical analysis to detect an effect. *See* Exhibit A at § 6. As noted by Dr. Ray, it is a generally accepted precept of clinical research that reliable analyses should have a power of at least 80% or better so that, given an effect exists, the analysis will detect it at least 4 times out of 5. Failure of sufficient power renders any such analysis unreliable. *Id.* at § 7. Merck's own proffered cardiology expert, Dr. Craig Pratt, testified that APPROVe was not powered to answer the question of duration.[7]

In addition to Dr. Ray, others have challenged Merck's "duration" argument. Dr. Peter Juni, and colleagues published in the medical journal, *Lancet*, that the 18-month hypothesis by Merck had only a 20% power to detect an increased risk of 2 or greater.[8] At 20%, the hypothesis would have an only 1 in 5 chance to detect an effect and falls well short of the generally accepted methodology of a minimum power of 80% for a reliable analysis.

Unlike Merck's ill-conceived efforts to shield itself from liability, Dr. Ray's opinions regarding increased risk with short term duration are based upon scientifically reliable evidence.

---

[6]Yusuf, S., Wittes, J., Probstfield, J., Tyroler, HA, *Analysis and Interpretation of Treatment Effects in Subgroups of Patients in Randomized Clinical Trials*, JAMA 1991; 266:93 - 98.

[7]*See* Deposition Testimony of Craig Pratt, M. D., 115:2 - 116:2.

[8]Juni, P., *Discontinuation of Vioxx*, Lancet 2005; 365 (January 1):23 - 28.

Increased risk following short term duration of Vioxx is biologically plausible. Studies confirm that there is a significant decrease in $PGI_2$ within fourteen (14) days of ingestion of Vioxx. *Id.* The risk of serious coronary heart disease conferred by Vioxx is present within days of usage. *Id.*

The increased risk for serious cardiovascular disease is consistent in other Coxibs. *Id.* at §6.2. Defendant cites to *General Elec. Co. v. Joiner*, 522 U. S. 136, 145 - 46 (1997) to suggest that information regarding other Coxibs is inappropriate and inapplicable. In *Joiner,* the Court determined that the studies cited by the experts were dissimilar in that the dosage and causation were not identical. *Id.* at 144 - 146. The studies cited by Dr. Ray are not "so dissimilar to the facts presented in this litigation." Dr. Ray cites to short-term studies of celecoxib, lumiraxocib and valdecoxib/parecoxib, all of which are indicated to reduce pain and all of which demonstrate an increased risk for serious cardiovascular disease. *See* Exhibit A at § 6.2.

Defendant cites to *Rider v. Sandoz Pharm. Corp.,* 295 F. 3d 1194, 1201 (11th Cir. 2002) for the proposition that Dr. Ray does not have scientifically reliable evidence of an increased risk of cardiovascular disease following ingestion of Vioxx. Unlike plaintiffs in *Rider*, 295 F. 3d at 1199 - 1200, Dr. Ray does not merely rely upon case reports for patients who suffered injuries subsequent to taking Vioxx. Dr. Ray relies upon peer-reviewed, scientifically sound clinical trials to demonstrate a clear cause and effect relationship between ingesting Vioxx and suffering an increased risk for serious cardiovascular disease. *See* Exhibit A at § 6.2 and 6.3. In fact, Dr. Ray relies upon Merck's VIGOR study to indicate that there is a profoundly increased risk for serious cardiovascular disease caused by short durations of use. *Id.* Time to event curves within VIGOR results indicate a divergence, within two-months, for acute MIs. *Id*. Similarly, pooled analyses of twenty-three (23) clinical trials for Vioxx reveal an increased risk within the first month of usage. *Id.*

In addition, epidemiologic studies for Vioxx demonstrate a strong relationship between Vioxx and increased risk for serious cardiovascular risks during short term duration. Two epidemiologic studies that had sufficient sample size to assess duration of Vioxx use were conducted by Dr. Daniel Solomon and colleagues and Dr. Soren Johnsen and colleagues.[9] Solomon, in a study funded by Merck, showed that the risk associated with Vioxx ingestion was highest within the first 90 days.[10] Johnsen reported that the risk for new users, those within 1 - 30 days, was 2.52.[11] These findings provide strong evidence that the risk is not limited to durations of 18 months or longer.[12] In addition, three other published studies show that the risk is present for short-term users.[13]

Merck simply cannot run away from this scientifically reliable evidence. Dr. Ray has provided support for his opinions with sufficient data or reliable principles. See *McClain v. Metabolife, Inc.*, 401 F. 3d 1233, 1240 - 46. Dr. Ray's opinions are reliable, relevant and would aide the jury in understanding the issues in this case. Therefore, Defendant's motion to exclude Dr. Ray's testimony should be denied.

---

[9] *See* Exhibits E and F.

[10] *See* Exhibit E. See Exhibit A, § 6.4.

[11] *See* Exhibit F. See Exhibit A, § 6.4.

[12] *See* Exhibit A, § 6.4.

[13] *Id.* citing *Kimmel, et al.*, *Graham, et al.*, and *Levesque, et al.*

**CONCLUSION**

For the reasons stated herein, Dr. Ray's opinions meet the scientific standards for expert testimony.  Dr. Ray's opinions are reliable, relevant and would aide the jury in understanding the issues in this case.  Plaintiff respectfully requests that the Court deny Defendant's motion to exclude Dr. Ray's testimony.


Dated:  August 21, 2006

                Respectfully submitted,


| | |
|---|---|
| Drew Ranier<br>Louisiana Bar No. 8320<br>**RANIER, GAYLE & ELLIOT LLC**<br>1419 Ryan Street<br>Lake Charles, Louisiana 70601<br>(337) 494-7171; fax (337) 494-7218 | /s/ Grant Kaiser<br>Grant Kaiser<br>Texas Bar No. 11078900<br>**THE KAISER FIRM LLP**<br>8441 Gulf Freeway, Suite 600<br>Houston, Texas 77017<br>(713) 223-0000; fax (713) 223-0440 |
| Walter Umphrey<br>Texas Bar No. 20380000<br>**PROVOST UMPHREY LAW FIRM LLP**<br>490 Park Street<br>Beaumont, Texas 77701<br>(409) 835-6000; fax (409) 838-8888 | Mikal Watts<br>Texas Bar No. 20981820<br>**THE WATTS LAW FIRM LLP**<br>Tower II Building, 14th Floor<br>555 North Carancahua Street<br>Corpus Christi, Texas 78478<br>(361) 887-0500; fax (361) 887-0055 |
| James L. "Larry" Wright<br>Texas Bar No. 22038500<br>**THE WATTS LAW FIRM LLP**<br>111 Congress Avenue, Suite 1010<br>Austin, Texas 78701<br>(512) 479-0500; fax (512) 473-0328 | John Eddie Williams, Jr.<br>Texas Bar No. 21600300<br>Jim Doyle<br>Texas Bar No.6094450<br>**WILLIAMS BAILEY LAW FIRM LLP**<br>8441 Gulf Freeway, Suite 600<br>Houston, Texas 77017<br>(713) 230-2200; fax (713) 643-6226 |

ATTORNEYS FOR PLAINTIFF ROBERT G. SMITH

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 21st day of August, 2006.

    /s/ Grant Kaiser
    Grant Kaiser
    **THE KAISER FIRM LLP**
    8441 Gulf Freeway, Suite 600
    Houston, Texas 77017
    (713) 230-0000; fax (713) 230-0440
    gkaiser@thekaiserfirm.com

cc    By email only:

    Robert Van Kirk    rvankirk@wc.com
    **Williams & Connolly LLP**
    725 Twelfth Street Northwest
    Washington, D.C.  20005
    (202) 434-5000; fax (202) 434-5029

    Carrie A. Jablonski    carrie.jablonski@bartlit-beck.com
    **Bartlit, Beck, Herman, Palenchar & Scott LLP**
    54 West Hubbard Street, Suite 300
    Chicago, Illinois 60610
    (312) 494-4400; fax (312) 494-4440