# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| | Section L |
| | Judge Eldon E. Fallon |
| | Magistrate Judge Daniel E. Knowles, III |

THIS DOCUMENT RELATES TO:
*Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379

## PLAINTIFF'S MOTION TO EXCLUDE ARGUMENT OR OPINION TESTIMONY THAT AN INCREASED RISK OF HEART ATTACK EXISTS ONLY AFTER 18 MONTHS OF VIOXX USE

Plaintiff, R. Garry Smith, files this motion and memorandum to exclude argument or opinion testimony to the effect that an increased risk of heart attack exists only after 18 months of Vioxx use.

### I.   INTRODUCTION

Defendant Merck should be precluded from arguing or offering testimony to the effect that an increased risk of heart attack exists only after 18 months of Vioxx use. Plaintiff anticipates that Merck witnesses will testify, and counsel will argue, that an excess risk of heart attack requires 18 months of Vioxx use. Such argument or testimony is misleading and scientifically baseless and should be excluded under Rule 702 of the Federal Rules of Evidence.

### II.   FACTUAL BACKGROUND

This action for personal injuries arises from Plaintiff, R. Garry Smith's use of Vioxx, which Plaintiff contends caused a heart attack on February 17, 2003, damaging his heart. Mr. Smith was

approximately 52 years old when his doctor prescribed him Vioxx on October 12, 2002. He had been taking the drug for approximately 4 months at the time of his heart attack.

## III. LEGAL STANDARDS

Federal Rule of Evidence Rule 702 governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme court's opinion in *Daubert v. Merrell Dow Pharmaceutical,* 508 U.S. 576, 133 S. Ct. 2786, 125 L. Ed.2d 469 (1993). In *Daubert,* the Supreme Court held that trial court should serve as the gatekeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id.* at 589, 113 S. Ct. 2786.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Id.* at 592093, 113 S. Ct. 2786. In *Daubert,* the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* at 592093, 113 S. Ct. 2786. These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 138, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999).

In addition to the five factors laid out in *Daubert,* a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.,* 171 F.3d 308, 312 (5th Cir. 1999). Some of these factors may include: (1) whether the expert's opinion is based on

incomplete or inaccurate dosage on duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) has conducted independent of the litigation. *See e.g., id.* at 313; *Moore v. Ashland Chem., Inc.,* 141 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.,* 243 F. Supp.2d 672, 678 (W.D. Tex. 2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert,* 509 U.S. at 593, 113 S. Ct. 2786. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 188 S. Ct. 512, 139, L.Ed.2d 508 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore,* 151 F.3d at 275-76. The focus is not on the result of conclusion, but on the methodology. *Id.* The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper. *Id*

The trial court is the gatekeeper of scientific evidence. *Daubert,* 509 U.S. at 596, 113 S. Ct. 2756. It has a special obligation to ensure that any and all expert testimony meets these standards. *Id.* Accordingly, it must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. *Id.* at 592-93, 113 S. Ct. 2786. In making this assessment, the trial court need not take the expert's word for it. *Joiner,* 522 U.S. at 147, 118 S. Ct. 512. Instead,

when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it. *Moore,* 1512 F.3d at 279.

## DISCUSSION

### Merck's 18-Month Defense is Scientifically Unreliable

Defendant Merck should be precluded from arguing or offering testimony to the effect that an increased risk of heart attack exists only after 18 months of Vioxx use. Any such testimony or argument should be excluded, since it is speculative, based on unreliable methodology, and contrary to the prevailing scientific consensus that Vioxx imposes increased risk shortly after ingestion.

### A. No peer-reviewed literature supports merck's 18-month claim - the APPROVe manuscript

The only peer-reviewed literature Merck offers to its 18-month claim is the APPROVe Manuscript, with which the Court is already familiar. *See* Bresalier R., et al. *Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial (APPROVe Trial)*, New England Journal of Medicine, February 21, 2005, attached as Exhibit "A". The APPROVe Trial terminated in September of 2004 and resulted in the removal of Vioxx from the market. Unfortunately, the manuscript published in the New England Journal of Medicine misstates the results of the trial to support a legal defense to claims brought by users of Vioxx for less than 18 months. In particular, Figure 2 of the manuscript describes curves for thrombotic events in patients exposed to Vioxx vs. placebo. The two curves appear to separate at 18 months. The text below figure 2 states:

> In a post hoc analysis, the difference between the two groups in the incidence of thrombotic events was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months. The changing pattern of the treatment effect over time was confirmed by a failed test for proportionality of hazards (P=.01).

*Id.* at 6. The manuscript further concludes that the increased risk of thrombosis was limited to "long-term use" and "not evident during the first 18 months of the trial." *Id.* at 8.

After the publication of these claims, the world discovered that the Merck authors had applied an erroneous logarithm, in contravention of prescribed statistical and generally-accepted methods, in order to calculate the P-value supporting Merck's 18 month defense. On July 13, 2006, The New England Journal of Medicine published a correction applying appropriate statistical methods. *See* Correction, *Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial (APPROVe Trial)*, the New England Journal of Medicine, July 13, 2006, attached as Exhibit "B". In the corrected manuscript, **the New England Journal of Medicine expunged every claim limiting increased risk to post 18 month exposure**, writing:

> [S]tatements regarding an increase in risk after 18 months should be removed from the Abstract (the sentence "the increased relative risk became apparent after 18 months of treatment; during the first 18 months, the event rates were similar in the two groups" should be deleted, as should the sentence beginning "There was earlier separation. . .") and from the Discussion section (the sentence "In post hoc analyses, the increased relative risk of adjudicated thrombotic events was first observed after approximately 18 months of treatment" should be deleted).

*Id.* The propriety of the correction by the Journal, and the fact of statistical error committed by Merck in its "18 month" analysis, are uncontested. Thus, there is no peer-reviewed literature, offered or extant, that supports Merck's claim.

**B.      Merck's 18-month analysis is based upon scientifically unreliable methodology**

Merck's flawed statistics are themselves the result of "post-hoc subgroup analysis." The testimony of Plaintiff's epidemiologist, Dr. Lemuel Moye, will demonstrate that subgroup analysis has been proven to be scientifically unreliable. *See* Appendix D to Expert Report of Dr. Lemuel Moye, May 31, 2006, attached as Exhibit "C". Furthermore, "improper subgroup" analysis is even

more unreliable. *Id.* at paragraphs 125-129. An "improper subgroup" is different from a "proper subgroup." An improper subgroup is a subgroup whose membership cannot be ascertained at baseline, such as the members of the placebo group in APPROVe who had cardiovascular events after 18 months of exposure. *Id.*

Merck's expert epidemiologist, Dr. Ronald Marks, was recently deposed in the *Smith* case. Dr. Marks continues to rely upon the false 18-month statistical defense published by Merck in the original APPROVe manuscript. *See* Expert Report of Ronald G. Marks, July 21, 2006, at p. 10, attached as Exhibit "D". Specifically, Dr. Marks' bases his opinion on Figure 2 of the manuscript, which is known to be misleading. *See* Deposition of Ronald G. Marks, August 10, 2006, at p. 174:15 – 176:06, attached as Exhibit "E". Dr. Marks relies upon the original, uncorrected manuscript, despite admitting that the post-hoc analysis done by the Merck authors was not fair, unbiased, or objective:

> Q.    And what's the danger with post hoc subgroup analysis?
>
> A.    Because oftentimes when subgroup analyses are done after the fact, they're done because someone's already observed something in the data that looks like it might be different. So when you put a statistical test on it, you have an inflated chance of getting statistical significance but it's not -- it's not a fair, objective and unbiased analysis.

*Id.* at p. 178:11 – 178:19. Dr. Marks defined subgroup analysis as taking "a *subset* of the subjects in your study and perform[ing] a specific analysis on them." *Id.* at p. 176:07 – 176:11. Yet Dr. Marks denied Merck's 18-month defense constituted subgroup analysis. Rather, according to Dr. Marks, Merck's defense is "subset analysis." *Id.* at p. 179:14 – 180:21. Dr. Marks could not cite a single published piece of literature in his field to support his novel distinction between "subgroup" and "subset" analysis. *Id.* Dr. Marks has "no clue" that an "improper subgroup" is a defined term in the field of epidemiology. *Id.* at 177:14 – 177:15.

C.   Merck's 18-month theory has been tested – and proven wrong

The publication of the corrected APPROVe manuscript was accompanied by a statistically sound set of graphs like Figure 2 in the original publication. *See* Nissen, Steven E.; M.D., *Adverse Cardiovascular Effects of Rofecoxib*, New England Journal of Medicine, July 31, 2006, attached as Exhibit "F". These graphs demonstrate significant increased risk with Vioxx use long before 18 months. *Id.*

The published, peer-reviewed graphs by Dr. Nissen are consistent with the analysis of Plaintiff's expert epidemiologist. For example, Dr. Richard Kronmal's calculations from APPROVe reveal elevated risk of heart attack within the first few month of use. *See* Expert Report of Dr. Richard Kronmal, Figures 8 and 9, Page 35, attached as Exhibit "G". These calculations by Dr. Kronmal, based upon Merck's own data, are not disputed.

Finally, the data from Merck's Protocol 203, which incorporated the APPROVe data, disprove Merck's 18 month defense. Another graph of this data, never published by Merck, shows the excess risk of heart attack from Vioxx "starts soon after beginning therapy and continues throughout follow-up." *Id.* at p. 38.

D.   Merck's experts have done no analysis independent of litigation and articulate no mechanism by which the 18-month premise is true

At his deposition, Merck's expert Dr. Marks did not disagree with Dr. Kronmal's analysis in any way, having done no analysis of his own. Deposition of Ronald G. Marks, August 10, 2006, at p. 154:01 – 154:22, attached as Exhibit "E". Dr. Marks provided no biologically plausible mechanism by which excess risk could magically manifest at 18 months. There is none. As Dr. Lemuel Moye writes, the lack of any mechanism is strong evidence that Merck's 18 month defense is wrong. *See* Expert Report of Dr. Lemuel Moye, May 31, 2006, paragraph 128 (Exhibit C).

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff requests that the Court preclude Defendant Merck from arguing or offering expert testimony an increased risk of heart attack exists only after 18 months of Vioxx use.

Dated:  August 14, 2006

Respectfully submitted,

Drew Ranier
Louisiana Bar No. 8320
**RANIER, GAYLE & ELLIOT LLC**
1419 Ryan Street
Lake Charles, Louisiana 70601
(337) 494-7171; fax (337) 494-7218

/s/ Grant Kaiser
Grant Kaiser
Texas Bar No. 11078900
**THE KAISER FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 223-0000; fax (713) 223-0440

Walter Umphrey
Texas Bar No. 20380000
**PROVOST UMPHREY LAW FIRM LLP**
490 Park Street
Beaumont, Texas 77701
(409) 835-6000; fax (409) 838-8888

Mikal Watts
Texas Bar No. 20981820
**THE WATTS LAW FIRM LLP**
Tower II Building, 14th Floor
555 North Carancahua Street
Corpus Christi, Texas 78478
(361) 887-0500; fax (361) 887-0055

James L. "Larry" Wright
Texas Bar No. 22038500
**THE WATTS LAW FIRM LLP**
111 Congress Avenue, Suite 1010
Austin, Texas 78701
(512) 479-0500; fax (512) 473-0328

John Eddie Williams, Jr.
Texas Bar No. 21600300
Jim Doyle
Texas Bar No. 6094450
**WILLIAMS BAILEY LAW FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-2200; fax (713) 643-6226

ATTORNEYS FOR PLAINTIFF ROBERT G. SMITH

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 14th day of August, 2006.

/s/ Grant Kaiser
Grant Kaiser
**THE KAISER FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-0000; fax (713) 230-0440
gkaiser@thekaiserfirm.com

cc    By email only:

Robert Van Kirk       rvankirk@wc.com
**Williams & Connolly LLP**
725 Twelfth Street Northwest
Washington, D.C. 20005
(202) 434-5000; fax (202) 434-5029

Carrie A. Jablonski       carrie.jablonski@bartlit-beck.com
**Bartlit, Beck, Herman, Palenchar & Scott LLP**
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
(312) 494-4400; fax (312) 494-4440