# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX | ) | MDL Docket No. 1657 |
| | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | SECTION L |
| | ) | |
| | ) | JUDGE FALLON |
| This document relates to: | ) | |
| | ) | MAGISTRATE JUDGE KNOWLES |
| ALL ACTIONS | ) | |
| | ) | |

## EXPERT WITNESS REPORT OF RICHARD M. KAPIT, MD

### Table of Contents

I.   Background ........................................................................................................... 4

   A.   Compensation ............................................................................................. 4

   B.   Summary of C.V. and resume .................................................................... 4

II.  Documents Reviewed ............................................................................................ 7

III. The FDA: What It Is and What It Does ................................................................. 7

   A.   Clinical trials done by companies .............................................................. 7

   B.   FDA depends on completeness of information and honesty of companies 7

IV.  Pharmaceutical Companies' Duties to Warn About Adverse Drug Reactions –
     Pertinent Regulations ............................................................................................ 9

   A.   21 CFR § 201.57(e) .................................................................................... 9

   B.   21 CFR § 314.70(c)(6)(iii)(A) .................................................................... 10

   C.   Example of a company carrying out these obligations as required .......... 10

| | | | |
|---|---|---|---|
| V. | Labeling | | 11 |
| | A. | The label is the primary communication with medical providers | 11 |
| | B. | FDA cannot force label changes without drastic measures | 11 |
| VI. | Merck's Vioxx Has a Problem | | 12 |
| | A. | The VIGOR trial results | 13 |
| | B. | Merck's assessment of VIGOR | 13 |
| | C. | Merck's precautions with doctors and patients involved in its own studies | 15 |
| | | 1. The press release of March 27, 2001 | 15 |
| | | 2. Merck modifies its study protocols | 16 |
| | D. | What Merck should have done with other doctors and patients | 16 |
| | | 1. Advise doctors and patients of the uncertainty and potential problems | 16 |
| | | 2. Recommend the action Merck took with doctors and patients in its studies | 18 |
| | E. | Why Merck did not take such actions with other doctors and patients | 18 |
| VII. | What Merck Did Instead | | 19 |
| | A. | Merck orders sales representatives not to discuss the VIGOR study with doctors | 19 |
| | B. | Merck repeatedly implicates naproxen, not Vioxx | 19 |
| | C. | Merck asserts and advertises the cardiovascular safety of Vioxx | 20 |
| | D. | Merck promotes Vioxx GI safety while playing down risks | 21 |
| | E. | Merck resists label changes proposed by FDA | 21 |
| | | 1. FDA determines that label must address VIGOR results and include precautions | 21 |

|   |   |   |
|---|---|---|
|   | 2. | FDA begins by requesting additional information and analysis ... 22 |
|   | 3. | FDA initiates label discussions ................................................. 22 |
|   | 4. | Merck protests, resists, and rejects FDA's labeling proposal ........ 23 |
|   | 5. | After six months of intense negotiations, Merck and FDA agree on label ........................................................................................ 23 |
| VIII. | Conclusions ................................................................................................ 24 |

## EXPERT WITNESS REPORT OF RICHARD M. KAPIT, MD

### I.     Background.

1.     I am a medical doctor, licensed to practice medicine in Maryland. For nearly 30 years I worked in various capacities for the Government of the United States – at the National Institute of Mental Health, the Veterans Administration, the District of Columbia, the National Institute on Drug Abuse, and the Food and Drug Administration. For 16 years, I was a clinical reviewer at the Food and Drug Administration, where I reviewed data on clinical trials and medical use of drugs and biologicals. I made recommendations about agency actions on submissions from pharmaceutical manufacturers and academic investigators. These submissions included numerous Investigational New Drug Applications (INDs), New Drug Applications (NDAs), Biologics Licensing Applications (BLAs), and postmarketing surveillance reports.

2.     While employed at the FDA, I made recommendations about unapproved and approved pharmaceuticals, about the adequacy of INDs and NDAs supporting the approval of pharmaceuticals, about labeling, and about postmarketing surveillance reports related to pharmaceuticals. My recommendations often focused on whether the pharmaceuticals were safe for use in human beings.

3.     In a former capacity, when I worked for the District of Columbia, I testified in court more than 100 times. In these instances I was working either for the Bureau of Forensic Psychiatry of the D.C. Government or in private forensic psychiatric practice. I made recommendations to courts in the District of Columbia and Maryland (both local and federal) about the mental state of criminal defendants, specifically about competency, criminal responsibility, dangerousness, need for mental health treatment, and related matters

### A.     Compensation.

4.     I charge $250 per hour for all my time in connection with any kind of legal or forensic work, whether testimony, research and report preparation, or travel.

### B.     Summary of C.V. and resume.

5.     The following paragraphs summarize my qualifications and experience as set forth in my curriculum vitae and resume. For completeness, copies of those documents are attached as Exhibits A and B. Together, the C.V. and resume contain the most complete list of my publications that I can compile.

> 2002-Present  President, MD-Writer, LLC.: Research, preparation, and composition of medical and scientific articles for newspapers, magazines, and other publishers; consulting on matters related to pharmaceuticals and their adverse effects.

4

I have also been involved in a number of litigations. These included two criminal matters in which I gave testimony in court:

    North Carolina v. Hall

    South Carolina v. Pittman

In addition, I have been deposed in several tort litigation matters:

    In re Baycol Products Litigation

    In re Paxil Products Litigation

    Witczak v. Pfizer

    Cartwright v. Pfizer

    Zilkis v. Pfizer

<u>The trial and deposition testimony listed above is the only such testimony I have given over the last four years.</u>

<u>1991-2002</u>    Medical Officer, GS-15, Division of Epidemiology, Office of Biostatistics and Epidemiology, Center for Biologics Evaluation and Research, Food and Drug Administration, Rockville, MD 20852: Evaluation and analysis of adverse drug reactions of licensed biological medicines and vaccines. Member of review teams of new Biologics Licensing Applications (BLAs and PLAs). GS-15 is the highest rank of Civil Service employees below the Senior Executive Service.

<u>1990-1991</u> Medical Officer, GS-15, Clinical Trials Branch, Medication Development Division; National Institute on Drug Abuse; Alcohol, Drug Abuse and Mental Health Administration, Rockville, MD 20857: Development of medications to treat substance abuse.

<u>1984-1989</u>    Medical Officer, GS-15, Division of Neuropharmacological Drug Products, Office of Drug Evaluation I, Center for Drug Evaluation and Research, Food and Drug Administration, Rockville, MD 20857: Medical review (including clinical safety review) of investigational new drug applications (INDs), new drug applications (NDAs), and postmarketing surveillance reports. Among the new drug applications that I reviewed was one that has had an unusually large impact on pharmaceutical treatment – Prozac.

<u>1980-1984</u>    Forensic Psychiatrist, private practice, Washington DC and Maryland.

5

<u>1979-1984</u>    Medical Officer, GS-15, Bureau Of Forensic Psychiatry, Department of Human Services, Government of the District of Columbia, Washington DC 20001.

<u>1972-1975</u>    National Institute of Mental Health, Overholser Division of Training and Research, St. Elizabeths Hospital, Washington, DC 20032: Resident in Psychiatry.

<u>1972</u>   M.D. from New York University School of Medicine, New York, NY 10016.

<u>1967</u>   B.A. from Columbia College, Columbia University, New York, NY 10027.

AWARDS

1994 FDA Cash Award

1994 FDA Commendable Service Award – This award was given for "superior performance and leadership in development of improved procedures for post-marketing surveillance."

1995 FDA Group Recognition Award for MedWatch – This award was given for work in analyzing and communicating adverse reaction information regarding certain therapeutic products.

TRAINING IN EPIDEMIOLOGY

Johns Hopkins University School of Hygiene and Public Health, Master of Public Health program: Courses in epidemiology, public health, and statistics. Forty credits.

CERTIFICATION:   National Board of Psychiatry and Neurology, 1978.

PROFESSIONAL SOCIETIES:

American Academy of Pharmaceutical Physicians

American Association for the Advancement of Science

American College of Clinical Pharmacology

American Medical Writers Association

Crohn's and Colitis Foundation of America

6

D.C. Science Writers Association

FDA Alumni Association

International Society of Pharmacoepidemiology

## II.    Documents Reviewed.

See Exhibit C.

## III.   The FDA: What It Is and What It Does.

6.      In the United States, the process of new drug development is regulated by the Food and Drug Administration, whose mission it is to promote and protect the health of Americans.

### A.    Clinical trials done by companies.

7.      At the outset, it should be understood that despite the existence of the FDA, almost all drug development work goes on without the direct participation or supervision of this agency. The work is generally carried out by pharmaceutical manufacturers, who perform research in their own laboratories and conduct human clinical trials in their own facilities or those of clinical research companies under contract.

8.      The FDA assumes regulatory authority over the process at such time as a pharmaceutical company applies to the agency for permission to develop a particular chemical entity into a new drug. This request is known as an Investigational New Drug (IND) application.

9.      Prior to filing an IND application, a pharmaceutical company engages in preparation, identification, characterization, purification, synthesis, biochemical investigation, biological activity research, and animal investigations of the compound entirely without FDA oversight. However, once the IND application is received by the agency and the company is given approval to go forward, then FDA regulations and guidelines influence the drug development process, and agency reviewers receive information and exercise oversight on the research. For this reason, an ethical and prudent company will conduct research according to agency regulations and requirements even prior to FDA involvement.

### B.    FDA depends on completeness of information and honesty of companies.

10.     The FDA's new-drug review process requires submission of extensive and detailed data by the sponsor of an NDA, which is most often the pharmaceutical manufacturing company.

7

11. In order to make a medically appropriate decision about the approval of new drug, the FDA expects and relies upon the completeness and accuracy of the data provided by the sponsor. This important point cannot be overstated. Since the FDA does not develop data on its own, the agency is exquisitely dependent on the forthrightness, completeness, and honesty of the sponsor. Without such ethical behavior by the pharmaceutical company, the FDA has no sound basis upon which to perform its vital mission of promoting and protecting the public health of the country.

12. The language of federal regulations assumes that the pharmaceutical company submits accurate and complete information in all sections of an NDA. But particularly in regard to data on safety,

> The applicant [i.e., the sponsor] shall submit an integrated summary of *all available information about the safety of the drug product*, including pertinent animal data, demonstrated or potential adverse effects of the drug, clinically significant drug/drug interactions, and other safety considerations, such as data from epidemiological studies of related drugs. 21 CFR § 314.50(d)(5)(vi)(*a*) [Italics added.]

13. Moreover, as new information becomes available, the sponsor is required to update the data originally submitted.

> The applicant shall, under section 505(i) of the act, update periodically its pending application with new safety information learned about the drug that may reasonably affect the statement of contraindications, warnings, precautions, and adverse reactions in the draft labeling and, if applicable, any Medication Guide required under part 208 of this chapter. These "safety update reports" are required to include the same kinds of information (from clinical studies, animal studies, and other sources) and are required to be submitted in the same format as the integrated summary in paragraph (d)(5)(vi)(*a*) of this section. 21 CFR § 314.50(d)(5)(vi)(*b*)

14. The inclusive language of the CFR is intended to alert sponsors that submission of safety information is not merely a passive requirement to pass along the investigators' data to the agency. Companies are expected to accurately analyze the data and inform the agency of the significance and relevance of the information. For instance, in order to report epidemiologic studies of related drugs, the company must actively survey the medical and scientific literature for potentially related information, pick out relevant articles, analyze such information, and report results of such efforts.

15. During my many years of work at the FDA, I encountered numerous instances of companies bringing safety matters to the agency's attention when they came upon such information in the course of monitoring data related to their drugs. It was is clear that

8

<u>pro-active efforts to bring safety matters forward for agency consideration constitutes the standard of practice of ethical pharmaceutical companies.</u>

16. It should not be assumed that FDA reviewers will necessarily be able to discern safety problems from raw data submitted by sponsors as part of required NDA documents. Like any human enterprise, the FDA review process may be affected by competing demands for reviewers' attention, the acumen and perspicacity of individual reviewers, prior expectations about actions and effects of a particular class of drugs, and a host of factors that might impede the review process. It is quite possible that the FDA review process may occasionally miss a problem entirely. Consequently, if a sponsor knows about a problem, the company has the affirmative obligation to bring the matter before the FDA. Without such initiatives taken by ethical pharmaceutical companies, the FDA cannot properly perform its mission.

### IV. Pharmaceutical Companies' Duties to Warn About Adverse Drug Reactions -- Pertinent Regulations.

17. Pharmaceutical companies play a critical role in the American health care system. In 2000, on average, more than 15 prescriptions per patient were filled per year, according to one study (*Fink and Byrns; 2004: <u>Annals of Family Medicine</u> 2: 488-93*). Because of their crucial health function, pharmaceutical companies operate in a position of confidence and trust in relation to the American people. In consequence of their position of trust, these companies incur medical and ethical obligations to American patients and the health care practitioners who treat them.

18. These medical and ethical obligations compel pharmaceutical companies to ensure the safety of the medications they sell to the American public. To this end, the companies should make available to practitioners and patients all information needed for the safe use of the medications they sell *as soon as such information is known*. It is critical, in particular, that the companies make available all information about significant and serious adverse reactions to their drugs.

19. The medical and ethical obligations of drug companies are reflected in regulations promulgated by the Food and Drug Administration (FDA). Thus pharmaceutical companies are governed by regulatory obligations as well as ethical and medical ones.

20. The following two regulations are specifically relevant a pharmaceutical company's obligation to provide information about adverse drug reactions:

### A. 21 CFR § 201.57(e).

21. This regulation stipulates a company's duty to warn about serious drug-related hazards.

9

Warnings: The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.

22. This regulation means that a company must issue a warning about a serious hazard as soon as there is reasonable evidence that such hazard exists. The company should not wait until there is proof that its medication causes the hazard.

### B. 21 CFR § 314.70(c)(6)(iii)(A)

23. This regulation stipulates that a company has the ability (and, therefore, the obligation) to provide such information without prior approval by the FDA. In particular, without prior approval, a company may

add or strengthen a contraindication, warning, precaution, or adverse reaction.

24. This regulation obligates a company to issue a warning, precaution, or adverse reaction notification as soon as it possesses reasonable evidence that a problem is related to its drug. The company should not wait until the FDA approves the information.

25. This regulation is intended to provide doctors and patients with important safety information as soon as possible – without any delay that could result from the time needed for the FDA to review the notification.

26. A company should issue a warning, precaution, or notification of adverse reaction in a variety of formats. First, such information should be included in the prescribing information for the medication. Second, the company's sales representatives should discuss such information with the doctors and health care providers whom they call upon, in order to make sure that these practitioners are aware of the hazard. Third, the company should include information about significant hazards in advertisements to the public and the medical profession. Fourth, the company should send letters to doctors and other health care professionals ("Dear Health Care Professional" letters). Fifth, the company should add relevant information to the "Information for Patients" documents.

### C. Example of a company carrying out these obligations as required.

27. On August 22, 2003, the pharmaceutical company Wyeth issued a precaution about hostility and suicidality in children and adolescents treated with its drug Effexor, an antidepressant drug similar to Pfizer's Zoloft. In a letter to health care professionals, the company wrote:

In pediatric clinical trials there were increased reports of hostility and, especially in Major Depressive Disorder, suicide related events such as suicidal ideation and self-harm.

10

28. Wyeth issued this important information a year before the FDA required it. Moreover, at the time the company issued this notification, proof that Effexor causes hostility and suicidality in children and adolescents was lacking. In 2004, the FDA reviewed numerous pediatric studies of SSRI treatment and a key FDA official stated in September 2004 that causality had been established.

## V. Labeling.

### A. The label is the primary communication with medical providers.

29. One of a pharmaceutical company's primary methods of communicating important safety information is through the drug label, which may also be called the package insert (PI) or product information.

30. Drug labeling should contain adequate directions to *use a drug safely* and must not contain *false or misleading statements*. In addition to information about the drug substance, its effects and intended use, directions are required to include information about dangers associated with the drug, specifically, contraindications, warnings, precautions, and adverse reactions. All these terms are defined by various regulations.

31. The FDA considers the labeling the most important and most official information about a drug, and the agency reviews all labeling carefully. The FDA must approve final labeling before any new drug product is approved. And the agency must also eventually approve new labeling or changes to labeling. [21 CFR § 201]

32. The FDA's power to regulate labeling derives from its power to seize a drug product and remove it from the market if the agency considers the drug mislabeled.

### B. FDA cannot force label changes without drastic measures.

33. If the FDA determines that a drug is not properly labeled, it considers the drug misbranded. The agency will then request the company to change the label and submit new labeling for review by the agency.

34. Sometimes there are significant disagreements between the pharmaceutical company and the FDA about what labeling should say about the drug. Such disagreements are almost always short-lived and quickly resolved.

35. In my experience, which included hundreds of labeling decisions, resolution of disagreements between the agency and the company never took more than a few days or weeks at the outside. In cases where the issue concerned human safety, such as warnings, precautions, or adverse reactions, the FDA almost always prevailed. I do not remember any substantial disagreement on safety matters, where the FDA did not have final say.

36. Nevertheless, writing labeling always involved a negotiation with the company. Companies usually deferred to the FDA because of fears of adverse publicity, loss of

11

reputation, or enforcement actions, if disagreements over safety issues remained unresolved.

37. Occasionally, however, disagreements can remain unresolved. In that case, if jawboning by the FDA and deference on the company's part does not produce a resolution, as a practical matter the FDA's enforcement authority is limited.

38. The only actions the FDA might take that do not depend on the voluntary compliance of the company involve taking the company to court or seizing the drug as an "imminent hazard to public health." [21 CFR § 2.5]

39. Testifying before Congress on Vioxx, Dr. Sandra Kweder, Acting Director of the FDA's Office of New Drugs, described the limits of FDA's authority, particularly in relation to the negotiations over Vioxx.

> Dr. Kweder: We don't have the authority to tell a company, "This is how your label has to look. This is the language that needs to go into your label. Here's where it goes. End of story." We have to negotiate with the company the specific language of how things should be worded, placement, those kinds of things.
>
> Congresswoman: So you were talking to them [i.e. Merck].
>
> Dr. Kweder: Correct
>
> Congresswoman: Did they reject that wording?
>
> Dr. Kweder: I would say they rejected our proposals.

## VI. Merck's Vioxx Has a Problem.

40. On May 20, 1999, the FDA approved Merck's new drug application for Vioxx [0.1]. The drug was approved after a rapid, priority review lasting only six months. Such reviews are intended for drugs for serious conditions that have the potential to address an unmet medical need.

41. It was hoped that Vioxx, a specific inhibitor of the inflammatory protein cox-2, would prove advantageous compared to older analgesic/anti-inflammatory agents that inhibit cox-2 and a similar protein, cox-1, which protects the lining of the GI tract. The older drugs, which include aspirin, naproxen, and other non-steroidal anti-inflammatory drugs (NSAIDs), are used for treatment of chronic pain, especially the pain of arthritis. Older NSAIDs may cause gastrointestinal (GI) pain and injury to the lining of the GI tract.

42. The reason for the optimism was that Vioxx, by targeting the cox-2 protein that is found in sites of inflammation (such as occur in arthritis), would have less effect on the

12

cox-1 protein that protects GI tract. It was hoped that Vioxx would be safer in terms of GI adverse reactions.

43. However, it was not long before serious problems with Vioxx emerged.

44. The studies Merck submitted to the FDA in support of the Vioxx New Drug Application (NDA) did not sufficiently demonstrate that the drug caused fewer GI adverse reactions. The FDA reviewer, Dr. Villalba, wrote that analyses of ulcerations, bleeds and perforations were "not demonstrative of clinically significant differences between rofecoxib [Vioxx], ibuprofen and diclofenac," two older NSAID drugs [2].

45. In order to try to prove that Vioxx is less toxic to the GI tract, Merck decided to do another study comparing Vioxx to the older NSAID naproxen. The study began before Vioxx was approved, but was still underway after the drug was on the market. This study was called VIGOR for "Vioxx Gastrointestinal Outcomes Research."

### A. The VIGOR trial results.

46. In the VIGOR study, Vioxx did show less GI toxicity than the older NSAID naproxen. But the study also showed that Vioxx was associated with more serious cardiovascular adverse reactions, especially myocardial infarctions (MIs, heart attacks) and other potentially fatal events.

47. The first results of the VIGOR study became available March 2000. According to a timeline prepared by FDA, in June 2000, an analysis of the cardiovascular/thrombotic (CV/T) adverse events, mostly MIs, showed that these severe reactions occurred in five times as many patients on Vioxx as on naproxen.

48. This five-fold association with heart attacks and other potentially fatal CV/T events was a very serious problem for Vioxx. MIs are almost always much more serious adverse reactions than ulcers or GI pain. MIs have a greater potential to cause death.

49. Eventually – it took four years – Merck decided to withdraw Vioxx from the market due to these cardiovascular adverse reactions. In order to understand what happened and why it took so long, we have look at Merck's actions after VIGOR.

### B. Merck's assessment of VIGOR.

50. Dr. Edward Scolnick, who was President of Merck Research Labs and, in that capacity, supervised the Vioxx program, had reason to worry about the cardiovascular effects of Vioxx for at least a couple of years, even before the results of VIGOR were in hand.

51. The reason was that cox proteins stimulate the production of another protein called prostacyclin, which reduces blood clotting. This fact can be found in the Merck Manual, a respected reference published by the company itself. A 1997 study sponsored

13

by Merck had shown that Vioxx reduced the levels of prostacyclin. This indicated that cox-2 plays a role in prostacyclin production, and by inhibiting cox-2, Vioxx could increase blood clotting and cause MIs and other CV/T events. [82]

52. This study implied a role for Vioxx in causing the increased CV/T event rate in VIGOR. In a revealing document by Dr. Scolnick ("Vioxx: A Scientific Review," written less than a year ago) he wrote that on being told the results of VIGOR, he thought that Vioxx had caused the elevated rate of cardiovascular events.

53. Nevertheless, at the time the VIGOR results came out, the Merck project team supervised by Dr. Scolnick chose to rely on an alternative explanation. In addition to protecting the GI tract lining, the cox-1 protein promotes blood clotting. Since the comparator drug, naproxen, inhibits cox-1, it theoretically might reduce blood clotting. By reducing clotting, naproxen might be reducing CV/T adverse reactions. (However, according to FDA reviewers, there is no good evidence from placebo-controlled clinical studies that naproxen actually does this – see below.)

54. According to Dr. Scolnick, in order to resolve the dilemma of which explanation of the elevated Vioxx rate of CV/T events was correct – whether Vioxx was causing clots or naproxen was reducing them – the project team examined two ongoing studies of Vioxx in Alzheimer's disease. In these studies, Vioxx was compared to a placebo; so if an elevated Vioxx rate of CV/T events occurred in those studies, it would show that Vioxx was causing the clots.

55. On examining the Alzheimer's study results, they found no elevated rate of CV/T events in the Vioxx group. From that time on, Merck chose to put forward the alternative explanation – naproxen prevented rather than Vioxx caused clots – in all the official statements from the company. According to Merck, in the VIGOR study significantly fewer CV/T events, including MIs, occurred in the naproxen group; and this was consistent with naproxen's ability to block clot formation. [76]

56. But there were problems with this explanation from Merck. The company itself admitted that such an effect of naproxen had never before been observed in a clinical study. [76] Merck's own cardiovascular consultant, Dr. Patrono, e-mailed a Merck official stating that he did not believe the VIGOR results could be attributed to naproxen benefit. [60] Moreover, when the FDA reviewers considered this explanation, they discounted it. The NDA reviewer, Dr. Villalba, said the Alzheimer's studies were not large enough or designed to assess cardiovascular risk. [15] The FDA consultant in the agency's cardiovascular division objected that no placebo-controlled studies had shown a naproxen benefit to be true. [6.4]

57. Merck did support its conclusion that naproxen protects against rather than Vioxx causes heart attacks and other CV/T events with other studies besides the Alzheimer's trials. But the bottom line was that *the truth was not known.* Merck's research director, Dr. Scolnick, admitted this. In an e-mail a number of months after the VIGOR study was analyzed, he wrote to Raymond Gilmartin, Merck's CEO,

14

it is impossible to know that in patients with rheumatoid arthritis that ALL of the difference between Vioxx and naproxen is due to the benefit of naproxen. IT IS IMPOSSIBLE TO PROVE THIS; IT IS IMPOSSIBLE TO KNOW THIS WITH CERTAINTY. [Caps in original] [59]

58.     Mr. Gilmartin himself, in testimony on Vioxx before Congress in 2004, said in a prepared statement that it was impossible to know from the VIGOR study whether naproxen was having a beneficial effect or Vioxx was having a negative effect. [78]

59.     Not knowing the answer to the dilemma Gilmartin described raised a serious question about how best to treat patients. If Vioxx causes a greater number of heart attacks, then doctors should be informed of that fact, because they need to decide whether to treat patients at risk for heart attacks with Vioxx. But if the increased frequency is due to the protective effect of naproxen, then doctors would not need to worry about heart-attack prone patients taking Vioxx.

60.     To put out the claim publicly that Merck knew the difference was due to naproxen benefit was to advise doctors that *it was OK to treat patients at high cardiovascular risk with Vioxx*. We now know the evidence shows Vioxx does cause increased rates of CV/T events, and Merck withdrew Vioxx because of that. But at that time, the answer was not known.

61.     So what did Merck do?

   **C.     Merck's precautions with doctors and patients involved in its own studies.**

   **1.     The press release of March 27, 2000.**

62.     What Merck did was tell news reporters, doctors, financial analysts, and others that the benefit of naproxen was what reduced the frequency of heart attacks and CV/T events in the naproxen group in the VIGOR study.

63.     Merck put out a press release intended for the news media and stock analysts and investors that contained the assertion

   ...significantly fewer thromboembolic [CV/T] events were observed in patients taking naproxen in this GI outcomes study, which is consistent with naproxen's ability to block platelet aggregation [clotting]. [76]

64.     The announcement did *not* say there was any question about this or that another possibility was that Vioxx increased cardiovascular events.

15

65. In an important way, this press communication from the company lies at *the heart of the questions about what Merck did and did not do about the CV toxicity of Vioxx*. I will discuss what Merck should and should not have done in section V of this report.

### 2. Merck modifies its study protocols.

66. The press release also stated that Merck was notifying doctors under contract to the company who were investigators in studies of Vioxx. [76] In addition to notifying its investigators, the company also amended the protocols of all Vioxx studies to allow the addition of low-dose aspirin where appropriate. [0.1] In doing this in June 2000, shortly after the VIGOR results came out, Merck was changing its studies of Vioxx so that participating doctors could give aspirin to their patients at risk for CV/T problems.

67. This was an important and revealing action on Merck's part, because if Vioxx was truly no hazard to high-risk patients, then there was no reason for Merck to do anything at all.

68. Merck did take action to allow its own doctors – those the company had hired to do investigations of Vioxx – to add aspirin to patients' regimens because the company wanted to reduce the CV/T risk to the patients participating in its own investigations. This was one of the *very first things* the company did upon learning that the Vioxx patients were having more heart attacks, and it is therefore clear that the company was worried about the elevated rate in that group of patients.

69. But what about all the other doctors prescribing Vioxx and all the other patients who were taking Vioxx throughout the United States. *What about them? Didn't they have reason for concern also?*

70. If the company was concerned about the patients on Vioxx in its studies, why shouldn't physicians everywhere have been concerned about patients on Vioxx also?

### D. What Merck should have done with other doctors and patients.

#### 1. Advise doctors and patients of the uncertainty and potential problems.

71. The first thing Merck had an obligation to do – for all the doctors and patients throughout the country who were prescribing or taking Vioxx – was to inform them that there was a serious medical question about the safety of Vioxx.

72. Even the Merck doctor who was in charge of the Vioxx program and the CEO of the company knew that it was impossible be certain that the increased heart attacks and other CV/T events in the Vioxx group were not due to Vioxx. That is what every other doctor needed to know, too.

16

73.     Doctors needed to know that there was a possibility that their patients on Vioxx might be at greater of risk of CV/T events because of taking Vioxx. This was especially true for patients who already had elevated risk of cardiovascular disease or already had the actual disease.

74.     FDA regulations make special provisions for warning the medical profession when there is a serious question about the safety of a drug, even if there is no proof that the drug causes the reaction. An FDA regulation states:

> Warnings. Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved. [21 CFR § 201.57]

75.     Another related regulation states that companies "may add or strengthen a warning, precaution, or adverse reaction" before getting FDA approval [21 CFR § 314.70]. The purpose of this regulation is to allow drug companies to move forward as quickly as possible with alerting the medical profession to serious safety problems.

76.     Merck ought to have put out a public statement that made the problem clear. Because of the seriousness of the problem, a letter to all health care professionals would have been appropriate. Such a letter should have honestly told these medical providers something like this:

- In a Merck clinical trial, patients receiving Vioxx had an increased rate of cardiovascular thrombotic events compared to patients receiving naproxen.

- At present it is unknown whether this indicates an increased risk of cardiovascular thromboses on Vioxx or a decreased risk of such events on naproxen.

- Because of the uncertainty, doctors with patients on Vioxx may wish to consider the risks and benefits of Vioxx in their patients at risk for cardiovascular thrombotic events.

77.     In addition to putting out public information, Merck should have changed the label of Vioxx to warn about this problem. This was the action recommended by the FDA cardiovascular reviewer after she had reviewed the VIGOR data, i.e., that a warning be put in labeling. [5] According to the regulation, Merck did not have to wait for the FDA to recommend this. The company could have done it on its own.

78. The company should also have instructed their sales representatives to inform the doctors they visited and discuss the issues with them. These sales people often develop familiar relationships with the doctors on their routes and can be very effective in conveying information. And if a salesman told a doctor about a problem with his own company's drug, you can be sure the doctor would have listened.

### 2. Recommend the action Merck took with doctors and patients in its studies.

79. The next thing Merck should have done was something it chose to do with the doctors and patients in its own studies: advise about the use of aspirin. Merck did this in its own investigations to protect the patients. It modified its protocols to allow the investigators to put patients on aspirin if the patients were at cardiovascular risk, and it sent notices to all the investigators. *But again, what about all the other patients throughout the country? Didn't they need to be protected, too?*

80. Merck did state in the March press release that it had notified its investigators of protocol modifications to allow aspirin, but that is not the same thing as directly advising doctors to consider aspirin for their patients. Moreover, the statement about notifying investigators followed sentences of the paragraph that implied that naproxen was protective and Vioxx absolved of blame.

81. Eventually, two years later, after long negotiations with the FDA (more about this below), Merck did put a statement in Vioxx labeling that anti-clotting therapies such as aspirin should be considered for patients with cardiovascular risk. But the company did not need to wait two years. It could have put such a statement in the Precautions section immediately. Moreover, Merck could have added a fourth bullet, such as the following one, to the preceding three in a letter sent to medical providers.

   o   Since Vioxx does not protect patients against cardiovascular thromboses and may possibly increase the risk, doctors may wish to consider the addition of aspirin to the regimens of patients taking Vioxx.

### E. Why Merck did not take such actions with other doctors and patients.

82. It is impossible to know the hearts and minds of the Merck doctors and executives who chose not to take the actions I discussed in the preceding section, and I do not claim to be able to say why they acted as they did. But two important facts should be taken into account in considering why Merck did not inform the medical community right away that (1) it was possible that Vioxx was causing the elevated rate of CV/T events, and (2) that doctors should consider aspirin for their patients on Vioxx.

83. The first fact is that there were many other analgesic and anti-inflammatory agents on the market. Vioxx had lots of competition. If Merck put out that Vioxx might be causing such serious problems as heart attacks, it was possible that it would lose market share or even be widely rejected.

84. The second fact was that the main selling point of Vioxx was that it was safer on the GI tract. Aspirin, however, is known to often irritate the GI tract and cause ulcers. About a year and a half later, *The Medical Letter*, a respected newsletter on drugs commented that taking aspirin might have protected against cardiovascular thromboses, but it would also diminish the apparent advantage of gastrointestinal safety. [83] In other words, if Merck advised doctors to consider aspirin for Vioxx patients, that would detract from the main selling point of the drug.

### VII. What Merck Did Instead.

#### A. Merck orders sales representatives not to discuss the VIGOR study with doctors.

85. In the previous section, I described how useful it would have been to have Merck's sales representatives discuss the VIGOR study with the physicians on their beat. In fact, Merck did the opposite of this at one point. According to a congressman, whose committee held hearings on Merck and Vioxx, in February 2001, the company issued a bulletin to its 3000 sales people. The bulletin ordered, "DO NOT INITIATE DISCUSSIONS ON ... THE RESULTS OF THE ... VIGOR STUDY." It advised that if a physician inquired about VIGOR, the sales representative should talk about the gastrointestinal benefit of Vioxx and then say, "I cannot discuss the study with you." [18]

#### B. Merck repeatedly implicates naproxen, not Vioxx.

86. In previous sections, I noted that by pushing the claim that the elevated rate of CV/T events was due to the protective effect of naproxen and not the harmful effects of Vioxx, Merck was distorting the truth that the cause had not been pinned down and Vioxx might well be the cause. And the company was diverting physicians from considering the risks that Vioxx might cause to some of their patients. I described how FDA reviewers and Merck's own consultant cast doubt on the company's explanation. [6.4, 15, 60]

87. Nevertheless, Merck consistently maintained and put out statements that protection due to naproxen was the explanation.

88. The company implied this in three press releases. [63, 76, 84] The first one, previously cited, came out shortly after the VIGOR study results came out. It declared that the results were "consistent with naproxen's ability to block platelet aggregation." Merck repeated this statement in press releases May and August 2001, even though in February, the FDA reviewers had objected that the claim was unsubstantiated at an FDA advisory committee meeting.

89. In September 2001, the FDA division that monitors advertising issued a warning letter to the company. [7] The agency accused Merck of sponsoring six audio

19