conferences on Vioxx for doctors that were "false or misleading in that they minimized the MI results of the VIGOR study." The letter charged that Merck was claiming:

> Vioxx does not increase the risk of MIs & that the VIGOR finding is consistent with naproxen ability to block platelet aggregation like aspirin.

90.    The FDA continued:

> That is possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

91.    Merck was also sending out the naproxen explanation in response to queries from doctors about the issue. A "Dear Doctor" form letter issued in May 2000 made this claim about naproxen. The letter was probably sent out to many physicians. [21]

### C.    Merck asserts and advertises the cardiovascular safety of Vioxx.

92.    Merck also repeatedly issued statements and sponsored advertisements claiming that Vioxx had a safe cardiovascular profile. The company did this so many times that it is not possible to list here more than a small fraction of all the company's claims.

93.    The press releases of May and August 2001 were headlined, "Merck confirms the cardiovascular safety profile of Vioxx," and "Merck stands behind the cardiovascular safety profile of Vioxx." Of course, Merck knew that there were serious questions about these claims, and that the hearts of many patients taking Vioxx might be at risk. [63, 84]

94.    Merck created a "Cardiovascular Card" for sales people to hand out to doctors. The card did not discuss the VIGOR study but asserted the cardiovascular safety of Vioxx based on earlier studies. [85] A "Dear Doctor" letter confirming cardiovascular safety was sent out to large numbers of physicians to counteract questions raised by an article about Vioxx in the Journal of the American Medical Association. [71]

95.    Merck asserted the claim of cardiovascular safety at scientific meetings. [7] One such meeting was the FDA advisory committee meeting in February 2001 [1], where the claim was directly questioned by FDA reviewers, after which the advisors voted unanimously to recommend that the cardiovascular information from VIGOR be transmitted to physicians. However, on the very next day, Merck ordered its sales force not to discuss the advisory committee meeting. [18]

96.    The warning letter from the advertising division of the FDA in September 2001 cited the advisory committee meeting and objected that Merck was trying to minimize the results of the VIGOR study. [7]

**D.      Merck promotes Vioxx GI safety while playing down risks.**

97.      In numerous advertisements and other promotional material, as well as letters to doctors, Merck emphasized the gastrointestinal benefits of Vioxx while down playing the cardiovascular risks. There is little doubt that Merck took this unbalanced approach in hundreds and probably thousands of communications. The company would put information about GI benefits in the leading paragraphs of its Vioxx communications and only bring up cardiovascular safety further on.

98.      At an internal meeting in September 2001, FDA officials discussed Vioxx labeling and recommended balanced information on Vioxx that "de-emphasized the GI safety advantage in the Vioxx label". [0.1] This occurred about the same time that the warning letter about advertising charged the company with issuing advertisements that were " false, lacking in fair balance." The letter also noted that the company was failing to present the Warning in labeling about the possibility of serious gastrointestinal toxicity in patients taking Vioxx, and it was making unsubstantiated claims of superiority to other NSAID drugs [7]

**E.      Merck resists label changes proposed by FDA.**

**1.      FDA determines that label must address VIGOR results and include precautions.**

99.      Beginning when Merck first reported the results of the VIGOR study to the FDA in the spring of 2000, reviewers at the agency worked diligently to analyze the results and the health implications of the study. The FDA was sufficiently concerned to call a meeting of the Arthritis Advisory Committee in February 2001 to discuss VIGOR and make recommendations about what to do about it.

100.      At the meeting FDA reviewers made presentations asserting that the study raised serious questions about the cardiovascular safety of Vioxx. In contrast, Merck made presentations asserting that Vioxx was safe and that CV/T events were not caused by Vioxx but prevented by naproxen. FDA called Merck's explanation into question.

101.      Following the unanimous recommendations of the advisors that the results of the VIGOR study be communicated to the medical profession [18], the agency undertook to include the VIGOR results in labeling. The process took more than a year. The labeling discussions between Merck and the FDA did not reach resolution until April 2002. As a former FDA reviewer, I think this seems unduly long. I do not remember any other post-approval labeling discussion that took so long to resolve.

102.      There is evidence that Merck may not have been fully cooperative and may have taken longer than necessary to respond to the FDA's labeling initiative.

### 2.    FDA begins by requesting additional information and analysis.

103.    An example of an interaction between the agency and the company occurred in relation to the ADVANTAGE study of Vioxx in long-term treatment of a large number of patients.  The FDA had to request Merck to submit the report of this study three times.

104.    The first request was made in November 2000.  Following the advisory committee meeting in February 2001, the company apparently still had not submitted the study report, and FDA repeated the request a week after the meeting.

105.    This was a reasonable request and may have reflected the agency's need to pin down the risk factors in the occurrence of CV/T events.

106.    The company responded by asking the FDA to explain and justify the request. The FDA answered that it was a large study of an "approved chronic dose without restrictions on aspirin."  This time the FDA sent the request as a letter in addition to a fax, and noted that the advisory committee remarked on the importance of the information. This indicates that the FDA had been provoked by the delay and felt the need to show some muscle.

107.    Even after the agency provided a clear letter and obvious justification, the company took a month to submit the data.  Even then it was not complete, lacking certain data sets and patient records.  In all it took more than four months from the original request. [55-57]

### 3.    FDA initiates label discussions.

108.    The FDA began the labeling process with an approvable letter to the company on April 6, 2001. [58]  It was called an approvable letter, but the agency often uses such letters to set forth a list of requirements for reaching final approval.  In this case, the subject in question was a label change to incorporate the cardiovascular data in VIGOR, as the advisory committee had recommended two months earlier.

109.    In the approvable letter, FDA requested a complete safety update of Vioxx.  The agency also noted the incompleteness of Merck's response to the request for the ADVANTAGE study report, and again asked for a complete report.

110.    Merck submitted the information three months later in July.  After reviewing the information, FDA initiated labeling formal label discussions on October 15. [0.1]

111.    It took another half year before negotiations were completed and the FDA approved the label changes.  It is important to bear in mind that Merck could have changed the label to add warnings and precautions immediately after the advisory committee meeting.  So the time from the meeting to the label change was more than a year.

22

**4.     Merck protests, resists, and rejects FDA's labeling proposal.**

112.    On the day after receiving the FDA labeling proposal, an e-mail from Merck's research director, Dr. Scolnick, to another Merck official, David Anstice, stated, "Be assured we will not accept this label." Anstice responded, "We will fight and see where we get." Scolnick returned, "thye are bastards [sic]."

113.    Not surprisingly, on November 8, 2001, Merck rejected FDA's labeling proposal.

114.    In the letter, Merck stated that it "strongly disagrees with FDA with respect to many of the labeling recommendations." And the company returned FDA's proposal with cross outs and markups to show how it wanted to change it. It is instructive to see what Merck wanted out. Among the cross outs were the following statements.

   o     In the Clinical study section: "The VIGOR study demonstrated a significant increase in the risk of development of serious CV/T events."

   o     In the Warnings section: "Vioxx should be used with caution in patients at risk of developing cardiovascular thrombotic events...."

   o     In the Warnings section: "The risk of development myocardial infarction in the VIGOR study was five-fold higher in patients treated with Vioxx.... The finding was consistent in smaller and shorter studies." [52]

115.    Merck wanted to state in the clinical study section only that there was a significant *difference* (not *increase*) in the incidence of MIs between Vioxx and naproxen, and the company wanted to move the information to Precautions rather than put it in Warnings.

116.    In my opinion, information about an increased rate of so serious an event as myocardial infarction belongs in Warnings, not Precautions. That is also what the FDA's cardiovascular reviewer recommended. Merck response to the FDA would have watered down the impact of the label changes, and it delayed the implementation.

**5.     After six months of intense negotiations, Merck and FDA agree on label.**

117.    Faxes went back and forth between the FDA and Merck. Months passed by. During the exchanges, Merck protested FDA's intention to put the VIGOR data in labeling with adverse reactions broken down by body system. [4.1] Such information would have added additional important safety information.

118.    In regard to the FDA's wish to put the cardiovascular information in the Warning section, in an internal Merck email on November 8, 2001 to the Merck executives Greene and Goldman, Dr. Scolnick wrote:

twice in my life I have had to say to the FDA, "That label is unacceptable, we will not under any circumstances accept it."

119.    After difficult negotiations, the agency and the company finally came to agreement on April 11, 2002. Merck prevailed about putting the cardiovascular section in Precautions rather than Warnings. So Dr. Scolnick had his way. [Package Insert 2002]

120.    It is important to bear in mind that the long labeling discussions concerned Vioxx patients who were at risk of heart attacks and other very serious CV/T events. During these discussions millions of patients were taking Vioxx. It is almost certain that some Vioxx patients died before Merck put the VIGOR information in labeling during the year that the FDA was asking for additional information and negotiating label changes with the company. In all probability, most patients who died were at risk for CV/T events, and many of them might have been put on less toxic drugs if the company had cooperated and moved more expeditiously to disseminate the information.

121.    The FDA was right: Vioxx is a pro-thrombotic drug. It is a pity that it took longer than necessary to put out this information.

**VIII.   Conclusions.**

122.    In June 2005, the New England Journal of Medicine published a commentary by Congressman Henry Waxman, who held Congressional hearings prompted by the history of Vioxx, into serious safety issues in association with approved medicines. [18]

123.    Mr. Waxman began by noting that in 2000 the VIGOR study had shown that Vioxx was associated with four times as many myocardial infarctions as naproxen. Yet Vioxx remained on the market for four more years with robust sales eventually exceeding 100 million prescriptions.

124.    The committee wanted to understand how this could happen.

125.    In the commentary, Mr. Waxman focused on marketing practices of pharmaceutical companies and Merck, in particular, which directed its "sales force to provide clinicians with a distorted picture of the relevant scientific evidence."

126.    Merck told sales people not to discuss the VIGOR trial when physicians inquired about it. It created a "Cardiovascular Card" which provided a misleading picture of the evidence on Vioxx.

127.    It required sales representatives to show doctors only scientific study results that provide "solid evidence as to why [doctors] should prescribe Merck products." The company hired medical opinion leaders to speak at medical education meetings to provide favorable views of Merck products. It counseled sales people to use subliminal sales techniques on doctors.

128.    In reviewing documents for my report, I saw examples of the practices Mr.
Waxman described. Repeatedly Merck's scientific presentations and press releases
distorted the causation of myocardial infarctions and other cardiovascular/thrombotic
events, asserting that they were reduced by naproxen rather than caused by Vioxx.

129.    In the end, Merck withdrew Vioxx from the market. A second clinical trial was
halted before completion because the data showed an increased risk of serious
cardiovascular events, including heart attacks and strokes, in patients taking Vioxx." [17]

130.    Prior to the withdrawal, Vioxx's huge sales numbers had shown that the Merck
sales force had been successful. The company's effort to convince doctors that Vioxx
was safe succeeded. In consequence, it is certain that many patients suffered severe
cardiovascular thromboses unnecessarily, and many of those patients died. [16, 0.1, 86]

The opinions herein are expressed to a reasonable degree of certainty, based on generally accepted principles of drug safety, evaluation, and review. As further information becomes available to me, I will revise and add to my opinions as appropriate.

Richard M. Kapit, M.D.

ENDNOTE REFERENCES

| End Note No. | Document | Author/Source | Date |
|---|---|---|---|
| 0.1 | Timeline: Sequence of events with Vioxx since opening of IND | FDA for Adv Cmte. 2005 | |
| 1.0 | Summary of Benefits and Risks | Merck | 3/26/99 |
| 2.0 | NDA 21-042 Vioxx Osteoarthritis Medical Officers Review EXCERPTS ONLY | M. Villalba, MD, FDA | 5/30/99 |
| 4.1 | Merck to J Bull, Act. Dir, DAAODP | Merck | |
| 5.0 | Cardio-Renal (HFD-110) consult on rofecoxib | S. Targum, MD, HFD-110 | 2/01/01 |
| 6.4 | Cardio-Renal review for package | FDA- S. Targum, MD, HFD-110 | 2/08/01 |
| 7.0 | Warning Letter from FDA to Merck re advertising | FDA- T. W. Abrams, Director, DDMAC | 9/17/01 |
| 15.0 | Interim Review of NDA 21-042 re Alzheimer studies | L. Villalba, MD, FDA | 12/18/04 |
| 16.0 | Article: Risk of acute myocardial infarction and sudden cardiac death wth Use of Cox-2 selective and nonselective NSAIDS | Graham et al. Risk of acute myocardial infarction and sudden cardiac death in patients treated with cyclo-oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study. | 2/5/05 |
| 17.0 | Public Health Advisory on W/D of Vioxx | FDA | 9/30/04 |
| 18.0 | The Lessons of Vioxx - Drug Safety and Sales | Henry A Waxman, JD, D.-Calif., in NEJM | 6/23/05 |
| 21.0 | Doctor Response to Inquiry Letter on subject of VIGOR | Merck, J. M. Melin, MD, associate director, medical services | 5/24/00 |
| 52.0 | Merck's rejection of FDA label changes | | 11/06/01 |
| 55.0 | FDA information request re: NDA 21-042/S-007 | | 2/14/01 |
| 56.0 | FDA information request re: NDA 21-042/S-007 | | 2/28/01 |
| 57.0 | FDA information request re: NDA 21-042/S-007 | | 3/30/01 |
| 58.0 | Approvable letter for S-007 | | 4/06/01 |
| 59.0 | Email Scolnick->Gilmartin (Merck) | | 1/31/01 |
| 60.0 | Email Reicin -> Nies (Merck) | | 3/28/00 |
| 63.0 | Press Release - Favorable cardiovascular safety profile of Vioxx | | 5/22/01 |
| 71.0 | Tab 78 - Red # 71 on disk | | 8/30/01 |
| 76.0 | Press release of preliminary results of VIGOR | | 3/27/00 |
| 78.0 | Prepared statement of Gilmartin to Senate Cmte on Finance | | 11/18/04 |
| 82.0 | Vioxx: A Scientific Review | E. Scolnick, Vioxx project | 1/01/05 |

| End Note No. | Document | Author/Source | Date |
|---|---|---|---|
| | | director at Merck | |
| 83.0 | Medical Letter article on VIGOR | | 11/12/01 |
| 84.0 | Press Release - Merck stands behind the cardiovascular safety profile of Vioxx. | | 8/21/01 |
| 85.0 | Cardiovascular Card pp8-12 | | 4/28/00 |
| 86.0 | Bressalier et. NEJM 2005 | | 2/28/05 |