## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: VIOXX PRODUCTS LIABILITY LITIGATION** | **MDL No. 1657** |
| | **Section L** |
| | **Judge Eldon E. Fallon** |
| | **Magistrate Judge Daniel E. Knowles, III** |

**THIS DOCUMENT RELATES TO:**
   *Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379

---

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF JERRY AVORN, M. D.

---

*(Defendant's Expert Challenge No. 7)*

**TO THE HONORABLE JUDGE OF SAID COURT:**

### <u>INTRODUCTION</u>

Plaintiff R. Garry Smith, by and through his undersigned counsel, ask this Court to deny Defendant, Merck & Co., Inc.'s [Merck's] motion to exclude testimony of Jerry L. Avorn, M. D. (hereafter "Merck's Motion re: Avon") as a "generic" expert in all Federal MDL actions.  In support thereof, Plaintiff would show as Follows:  In addition, the PSC has designated Dr. Avorn on behalf of any plaintiff in any action pending in the states of New Jersey and California who wishes to adopt his testimony, and who have coordinated with these Federal Multi-district proceedings.  In *Barnett v. Merck & Co., Inc.*, defendant Merck & Co., Inc., ("Merck") filed a motion for an order excluding Dr. Avorn's testimony under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (l993).[1]

---

[1]Plaintiff understands that the court does not presume to rule on the admissibility of non-*Daubert* issues that may be decided differently by various State court judges under different circumstances or even

This Court denied Merck's motion and permitted Dr. Avorn to testify (*See* July 25, 2006 Tr. in *Barnett v. Merck*, pp. 4:15 - 19). Merck makes exactly the same shop-worn arguments here. *See* Def. Mem., pp. 1 - 2, (Exhibit A).

In its motion, Merck generally challenges Dr. Avorn's proposed testimony on the grounds that his opinions are either "improper" or "outside the scope of his area of expertise." *Id.* According to Merck, all of Dr. Avorn's testimony is nothing more than "'spin' – counsel's attempt to put their arguments before the jury under the guise of expert testimony." *Id.* at 2. Merck goes on to request that this Court exclude his testimony with respect to four specific areas. *First*, Merck challenges Dr. Avorn's factual knowledge with respect to the scientific testing and marketing of Vioxx. (Exhibit A at 3). *Second*, Merck objects to Dr. Avorn's opinions as to the knowledge generated by and imparted by Merck concerning the risks and benefits of Vioxx given the state of science at various points in time. (*Id.* at 6). *Third*, Merck challenges Dr. Avorn's testimony concerning Merck's failure to provide the medical community with complete and accurate information about the risks (and benefits) associated with Vioxx. *Id.* at 8 - 9. *Fourth*, Merck challenges Dr. Avorn's opinions on the inadequacy of the various Vioxx labels in a manner that is medically and scientifically

---

other federal judges under a different factual situation. This issue was addressed by Judge Bechtle in *In re: Re Diet-Drugs*:

> The preservation depositions are especially important in the MDL sense because in most trials before the transferor courts, Drs. Avorn and Rubin will not appear live, but will be offered by videotape before a jury. This presents the court with several concerns involving judicial administration. First the court recognizes that this testimony will be offered, presumably, in hundreds of cases where the Federal Rules of Evidence will apply. However, the state substantive law applied by those transferor courts may he different.

*In re Diet Drug Product Liability Litig.*, WE 8769000 (E.D. Pa.), attached hereto as Exhibit B. This problem is compounded in this instance because this deposition is cross-noticed in California and New Jersey, where the Federal Rules of Evidence, and, in particular, the precedent set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, do not apply.

reasonable given the state of the science. *Id.* at 10 - 11. None of Merck's challenges withstand scrutiny under *Daubert* as this Court has already recognized.

At the outset, it must be noted that Dr. Avorn is a widely published Professor of Medicine at Harvard University, and is Chief of the Division of Phamacoepidemiology and Pharmacoeconomics at the Brigham and Women's Hospital in Boston Massachusetts. *See Curriculum Vitae of Jerome L. Avorn, M. D.* (Exhibit C). Dr. Avorn is considered one of the world's leading authorities on: (1) epidemiology; (2) pharamcoepidemiology (the study of the risks and benefits of drugs); and (3) how physicians evaluate the benefits and risks of medications in making prescribing decisions. *Id.* He has published over 200 original articles, book chapters, editorials on these and other topics in the peer-reviewed medical journals, including *Circulation, The New England Journal of Medicine, The Journal of the American Medical Association,* and *Hypertension. Id.* Additionally, Dr. Avorn has advised the United States Congress, the President of the Unites States and the Food and Drug Administration ("FDA") on drug utilization issues, and has been at the forefront on implementing evidence-based educational programs for physicians. *Id.*

Contrary to Merck's claims, Dr. Avorn's opinions concerning Vioxx and other nonsteroidal anti-inflammatory drugs ("NSAIDs") are neither "ex post facto," nor are they a result of being a "paid" expert in this litigation. Among other things, Dr. Avorn has conducted original research on the cardiovascular safety and other risks and benefits of NSAIDs, naproxen and cyclooxygenase-2 ("Cox-2") inhibitors, including Vioxx (rofecoxib). All of this original research occurred long before Dr. Avorn ever agreed to be an expert in Vioxx litigation, as reflected in his Expert Report, curriculum vitae, and discovery deposition testimony on June 15 - 16, 2006, all of which are further addressed *infra*. Indeed, Dr. Avorn was even funded by ***Merck itself***, who hired him to perform a

cardiovascular study on Vioxx.  That research was published in the eminent cardiovascular journal, *Circulation*, before Vioxx was withdrawn.  *See,* Solomon, DH, Avorn, JL, et al., *The Relationship Between Selective Cox-2 Inhibitors and Acute Myocardial Infarction in Older Adults, Circulation* 2004; 109:2068 - 2073.  (Exhibit D).  This, of course, makes him unique among most of the experts in this case in that his opinions are not "ex post facto."

Also unique among the experts in this litigation, **Dr. Avorn does not accept compensation for his expert activities.**  Rather, he asks that any funds be donated to an irrevocable charitable trust which funds, in part, programs to disseminate to medical doctors evidence-based information on drug benefits and risks, with the objective of improving the prescribing practices of physicians.

Contrary to Merck's assertions in its memorandum, Dr. Avorn is clearly qualified to testify to: (1) the risks and benefits of Vioxx, as he has studied this as part of his academic work; (2) the risk and benefits of Vioxx compared to other NSAIDs, as he has studies this in the normal course of his professional life; (3) the state of knowledge about the cardiovascular risks of Vioxx, as he was a participant in developing that knowledge; (4) the reasonableness of Merck's response to the scientific and medical information concerning Vioxx; (5) the reasonableness of the steps taken by Merck to study the cardiovascular effects of Vioxx and; (6) the medical and scientific accuracy of the label and other promotional information disseminated by Merck.  Dr. Avorn has also previously been found qualified to render the kinds of opinions that Plaintiff expects will be the subject of his testimony in this case.  *See In Re Diet Drug Product Liability Litigation*, Exhibit B, ("Dr. Avorn [is] qualified to render an opinion as to the label's accuracy and, it follows from that, the extent to which inaccuracies and omissions could either deprive a reader or mislead a reader are or were at the time the labeling was published");  S*ee also In Re Phenylpropanolamine Product Liability Litigation*, 99

F.Supp. 1230 (W. D. Wash. 2003) (approving the testimony of Jerry Avorn using *Daubert* standard.).

## I.     THE QUALIFICATIONS OF JERRY AVORN, M. D.

Merck's challenge to Dr. Avorn's proposed testimony rests on a misrepresentation of the substance of Dr. Avorn's opinions, when his opinions were conceived, and his bases for those opinions.  Not surprisingly, Merck has failed to acknowledge Dr. Avorn's extensive background and life's work in the scientific areas to which he will be offered to testify.

Dr. Avorn is among a small handful of an international authorities in the fields of pharamacoepidemiology, NSAIDs, and Cox-2 inhibitors, and the prescribing practices of physicians. The fact that his qualifications are unassailable most likely accounts for Merck's failure to even mention his background, his research or even the fact that Merck itself sought Dr. Avorn's expertise in designing and carrying out studies on the cardiovascular risks of Vioxx.  Dr. Avorn's qualifications as an expert witness are imparted by his work in the domains of academia, scientific consulting for pharmaceutical companies, including Merck, and scientific consulting to the PSC in the present litigation, all of which draws upon his scholarship as a scientist, researcher, author and medical clinician.  Because the assumptions that underlie Merck's present motion are not informed, they must be dispelled before the Court can engage in a meaningful *Daubert* analysis.

### A.     Academic Qualifications.

Currently, Dr. Avorn is a Professor of Medicine at Harvard Medical School, Exhibit C at 1. He is also the Chief of the Division of Pharmacoepidemiology and Pharmacoeconomics in the Department of Medicine.  He is also the Director of the Program for the Analysis of Clinical Strategies at the Brigham and Women's Hospital, an affiliate of the Harvard Medical School, *Id*. at

2.  Dr. Avorn is also the Past President for the International Society for Pharmacoepidemiology ("ISPE").  *Id.* at 3.  For the past 5 years, he has been a consultant to the FDA on issues relating to Phamacoepidemiology.  *Id.* at 3.  He has received funding from the National Institutes of Health ("NIH") on issues relating to drug prescribing, NSAID-induced illnesses in the elderly, and cardiac risks in patients suffering from Rheumatoid Arthritis,  *Id.* at 8 - 10.  He has received grants from numerous pharmaceutical companies, including Johnson & Johnson, **Merck**, Bristol- Meyers Squibb, Searle, and Pfizer. *Id.* at 11 - 13.  These include grants from Pfizer and Merck to study the cardiovascular effects of Cox-2 inhibitors, including their respective products Celebrex and Vioxx. *Id.* at 13.

In addition to his work as an epidemiologist with a focus on drug safety issues, Dr. Avorn has been at the forefront in improving how physicians make choices for their patients based upon an analysis of the risks and benefits of indicated treatments.  In this regard, Dr. Avorn has been a member of the Forum on Drug Development and Regulation; Working Group on Geriatric Pharmacology; The Expert Panel on Prescription Drug Use,  Blue Cross of Massachusetts; Member of the Massachusetts Drug Formulary Commission; and the Chair of the National Collaborative on Improving Prescribing Practices, Institute for Healthcare Improvement. *Id.* at 4 - 5.  He has testified repeatedly before the United States Congress, and has been a consultant to the President of the United States on issues related to Drug Policy.  *Id.* at 52, no. 11 (Testimony before the U. S. House of Representatives); 53, no. 24 (Testimony before the U. S. Senate); 5 (Advisor to President Clinton's Transition team on Prescription Medication Policy).

It is fair to say that Dr. Avorn has devoted his professional career to studying the risks and benefits of drugs (phamacoepidemiology), researching how to better define the risks and benefits

of drugs through scientific study and investigation, researching how physicians use the information

on risk and benefit in treating patients, and the effect of commercial influences on prescribing habits.

He has been identified as one of the "Most Frequently Cited Investigators" in the category of Social

Science and Medicine for the period of 1981 - 1999 (top half of 1% of all published researchers).

*Id.* at 5.  He has authored over 200 original articles on these topics.  These include no less than 14

articles relating to NSAIDs and Cox-2 risks, all of which were published before being involved in

litigation:

- Avorn, et al., *Nonsteroidal Anti-Inflammatory Drug-Associated Azoteia in the Very Old*, JAMA 1990; 264:471 - 475.

- Avorn, et al., *Initiation of Antihypertensive Treatment During Nonsteroidal Anti-Inflammatory Drug Therapy*, JAMA 1994; 272:781 - 786.

- Avorn, J., et al., *Patterns of Drug Use in Rheumatoid Arthritis*, J. Rheum. 2000; 96:1648 - 1655.

- Avorn, J., et al., *Nonsteroidal Anti-Inflammatory Drug Use and Acute Myocardial Infarction*, Arch. Intern. Med. 2002; 1962:1099 - 1104.

- Avorn, J., et al., *The Hidden Cost of NSAIDs in Older Patients*," J. Rhumatol. 2003; 30:772 - 780.

- Avorn, J., et al., Determinants of Selective COX-2 Prescribing; Are Patient or Physician Characteristics More Important?, AM J. Med. 2003, 115:715 - 720.

- Avorn, J., et al., *The Relationship Between Selective COX-2 Inhibitors and Acute Myocardial Infarction in Older Adults*, Circulation 2004; 109:2068 - 2073.

- Avorn, J., et al.,*The Relationship Between COX-2 Specific Inhibitors and Hypertension*, Hypertension 2004; 44:140 - 145.

- Avorn, J., et al., *Adjusting for Unmeasured Confounders in Phamacoepidemiologic Claims Data Using External Information:  The Example of COX-2 Inhibitors and Myocardial Infarction*, Epidemiology 2005; 16:17 - 24.

- Avorn, J., et al., *Medicaid Prior Authorization Programs and the Use of Cyclooxigenase-2 Inhibitors*, N. Eng. J. Med. 2004; 351:2187 - 2194.

- Avorn, J., et al., *Analytic Strategies to Adjust Confounding Using Exposure Propensity Scores and Disease Risk Scores: Nonsteroidal Anti-Inflammatory Drugs and Short-Term Mortality in the Elderly*, Am. J. Epidemiology 2005; 161 :891 - 898.

- Avorn, J., et al., *Medicare Database Review Found that Physician Preferences Increasingly Outweighed Patient Characteristics as Determinants of First-Time Prescriptions for COX-2 Inhibitors*, J. Clin. Epidemiol. 2005; 58:98 - 102.

- Avorn, J., et al., *Cardiovascular Outcomes in New Users of Coxibs and Nonsteroidal Anti-Inflammatory Drugs; High Risk Subgroups and Time Course of Risk*, Arthritis Rhum., 2006 May; 54(5):1378 - 89.

- Avorn, et al., *COX-2 Selective Non-Steroidal Anti-Inflammatory Disease*, Pharmacoepidemiol. Drug Safety, 2003; 12:67 - 70 (Commentary).

*See*, Avorn Curriculum Vitae (Exhibit C).

Dr. Avorn has also been asked to write Editorials and Commentaries in *The New England Journal of Medicine*, *Circulation and the Archives of Internal Medicine* on the relationships between the safety of pharmaceutical drugs – including Vioxx – and FDA approval.[2]

In addition to his specific NSAID/Cox-2 research, a substantial portion of Dr. Avorn's research and clinical contributions has been in "defining patterns of medication use by physicians and patients; quantifying the benefits, risks and costs of specific drugs to help build an evidence base for rational prescribing; and developing, implementing and rigorously testing innovative educational

---

[2] *See*, Avorn, J., *FDA Standards - Good Enough For Government Work?*, N. Engl. J. Med., 2005; 969 - 72; Avorn, J., et al., *Coxibs, Science and the Public Trust* (editorial) Arch. Intern. Med. 2005; 165:158-60;  Avorn J., *Highlights and a Hidden Hazard  – FDA's New Labeling Regulations*, New Engl. J. Med. 2006 June 8; 354(23):2409-11; Avorn, J., *Evaluating Drug-Effects in the Post Vioxx World: There Must be a Better Way* (Editorial), 2006 May 9, 113(18): 2173-6.

approaches to improve prescribing practices. . ." *See* Exhibit C at 6.  In this regard, Dr. Avorn has

conducted and published the following seventeen (17) studies and articles on the issue of prescribing

practices.  Some of this independent research includes specific study of the prescribing patterns of

COX-2 inhibitors (noted with an "*"), including Vioxx. All of the research was done before he was

retained as an expert for this litigation:

- Avorn, J., et al., *Scientific vs. Commercial Sources of Influence on Physician Prescribing Behavior*, Am. J. Med. 1982; 73:4 - 8. (Prescribing Practices).

- Avorn, J., et al., *Improving Drug Therapy Decisions Through Educational Outreach: A Randomized Controlled Trial of Academically Based "Detailing"*, N. Eng. J. Med. 1983; 308:1457 - 1463.

- Avorn, J., et al., *Economic Policy Analysis of University Based Drug "Detailing,"* Med. Care 1986; 24:313 - 331.

- Avorn, J., et al., *Predictors of Physician Prescribing Change in an Educational Experiment to Improve Medication Use*, Med. Care 1987; 25:210 - 221.

- Avorn, J., et al., *Effect of Government Warnings on Proxyphene Use and Overdose Deaths*, Am. J. Pub. Health 1987; 77:1518 - 1523.

- Avorn, J., et al., Physician Motivations for Non-Scientific Drug Prescribing, Soc. Sci. & Med., 1989; 28:577 - 582.

- Avorn, J., et al., *Improving Drug Prescribing in Primary Care; A Critical Analysis of the Experimental Literature*, Milbank Quart.1989; 67:268 - 317.

- Avorn, J., *Clinical Decision-making in the Evaluation and Treatment of Insomnia*, Am. L. Med. 1990.

- Avorn, J., *Principles of Educational Outreach ("Academic Detailing") to Improve Clinical Decision-making*, JAMA 1990; 263:547 - 556.

- Avorn, J., et al., *Failure of Evidence Based Medicine in the Treatment of Hypertension in Older Patients*, J. Intern. Med. 2000; 133:128 - 35.

- Avorn, J., et al., *Academic Detailing to Improve the Use of Broad-Spectrum Antibiotics at an Academic Medical Center*, Arch. Intern. Med. 2001; 161:1897 - 1902.

9

- Avorn, J., et. al., *Determinants of Selective COX-2 Prescribing; Are Patient or Physician Characteristics More Important?*, AM. J. Med. 2003; 115:715 - 720. (*)

- Avorn, J., et al., *Medicare Database Review Found that Physician Preferences Increasingly Outweighed Patient Characteristics as Determinants of First-Time Prescriptions for COX-2 Inhibitors*, J. Clin. Epidemiol. 2005; 58:98 - 102 (*)

- Avorn, J., et. al, *Explained Variation in a Model of Therapeutic Decision-making is Partitioned Across Patient, Physician and Clinic Factors*, J. Clin. Epidemiol. 2006 Jan 59(1):18 - 25.

- Avorn, J., *The Prescribing Practices of Physicians*, In: Maronde R. Rd. Clinical Pharmacology and Therapeutics, New York, Sprinber Verlag 1986 (Book Chapter).

- Avorn, J., et al., *For our Patients, Not for Profits: A Call to Action*, JAMA 1997; 278:1733 - 1738.

- Avorn, J., *Advertising and Prescription Drugs, Promotion, Education and the Public Health*, Health Affairs 2003; W3; 104-108 (Commentary).

Not content to simply study and publish the effect of communicating evidence based risks and benefits and their effect on prescribing practices, Dr. Avorn has worked with various state governments and other jurisdictions to implement programs that would counterbalance the commercial influences that penetrate out health care delivery system. As described in his curriculum vitae:

One method I developed, known as academic detailing, used medical school based educational research to improve physician prescribing and reduce drug use that is not pharmacologically optimal or cost-effective.  This intervention merges evidence-based analysis of appropriate drug use with cost effective adult learning and behavior-change strategies that have been used by pharmaceutical companies to change physicians prescribing practices.  My colleagues and I have evaluated its effectiveness in several randomized controlled trials involving physicians in primary care practice in four states, doctors and caregivers in nursing homes, general practitioners in Europe, and house officers at BWH. These studies have shown that the approach is effective in educating clinicians about rational prescribing and improving medication use. My work in this area has been a synthesis of teaching and research.  It has now been widely replicated and adopted by large health care systems, drug benefit managers, governmental health services in Great Britain, Canada, Australia and in the developing world.

10

*Id.* at 6 ("Teaching, Clinical and Research Contributions").  Indeed, as set forth below, the money

that Dr. Avorn receives from the sale of his book, "Powerful Medicines; The Benefits, Risks and

Costs of Prescription Drugs" (New York, Knopf, 2004) and for his expert consulting fees goes to

foundations that would help physicians understand the true benefits and risks of the drugs that they

prescribe.  Transcript of Discovery Deposition Testimony of Dr. Avorn, Exhibit E at 63.

A final indicator of Dr. Avorn's devotion to the communication of the evidence-based risks

and benefits of pharmaceuticals is that which he communicates to his own students at Brigham and

Women's Hospital.  Dr. Avorn, in his practice as a supervisor of medical interns and residents,

taught them about the risks of Cox-2 inhibitors, including Vioxx, well before Vioxx litigation even

existed, and also before he agreed to consult for the PSC in this litigation:

> Q.    Did your advice about whether interns and residents at your hospital change
> over the years in terms of whether you thought they should prescribe Vioxx?
>
> A.    Yes.
>
> Q.    Can you tell me, sir, at what point you advised, if at all, internists and
> residents at your hospital to stop prescribing Vioxx?
>
> A.    Well, when Vioxx was first marketed, in fact, before Vioxx was first
> marketed, Dr. Solomon and I, as part of our role at the Brigham, prepared an
> educational document for the physicians at the Brigham, since that was one
> of our division's responsibilities that we knew that the COX-2s were about
> to be marketed and we knew that they were about to be marketed very
> heavily.  So before they were available for use, we put together a document
> advising Brigham physicians how to approach these drugs when they became
> available.  So that would have been in 1999, I guess, around then.  *And our
> recommendation was that they should be used very sparingly, and because
> they were no more effective than older nonsteroidals, their only virtue would
> be the potential for less GI toxicity, and that therefore their use should be
> reserved for patients at risk for gastrointestinal hemorrhage.  And so the
> initial message, even before the drugs were marketed was they should be
> used on a limited basis, primarily in patients who particularly needed
> gastroprotection.  And then over the next few years, as data began to appear
> in the literature about cardiovascular risk, particularly the VIGOR paper of*

*2000 – which I bet we'll get to talk about – we indicated that that was a very
worrisome property of, at least of Vioxx, and that that would temper the use
of that drug even further, because the risk might exceed the benefit.*

Q.    Did you ever tell residents or internists at your hospital not to prescribe
      Vioxx under any conditions?

A.    Yes.

Q.    When?

A.    In 2003 – Both Dr. Solomon and I are members of the pharmacy and
      therapeutics committee at our hospital which governs drug use there – and
      at that point, there had already been the VIGOR paper out. Dr. Ray's paper
      had appeared in the Lancet. Our own findings were coming together on our
      own research. And we told the pharmacy and therapeutics committee that we
      were concerned about the safety of Vioxx, and that we felt that it should – it
      was at that point the preferred COX-2 drug at the Brigham – and we felt that
      it should not be in that status, and, in fact, it probably should not be used.

Q.    When in 2003 did you tell the pharmacy and therapeutics committee that you
      didn't think that Vioxx should remain on their formulary?

A.    Okay. What we said was that it should not be the preferred drug and that it
      – our recommendation was it should not be used, especially since Celebrex
      seemed to not carry the same degree of cardiovascular risk. And I would say
      that it would have been in the second half of 2003. But – yeah, that's as near
      as I can recollect the timing, would have been the second half of '03.

Q.    Did you advise the pharmacy and therapeutics committee at any point not to
      prescribe Vioxx to patients at high risk of cardiovascular disease?

A.    We did not limit the warning to patients at high risk of cardiovascular
      disease, because I've never been convinced that the data indicate that the risk
      – the cardiovascular risk of Vioxx – is limited to patients at high risk of
      cardiovascular disease. So we indicated that we thought it was a risky drug
      for any patient.

Exhibit E at pp. 44:8 - 51:2.

**B.    Expert Consulting Activities For Merck.**

Merck attempts to minimize Dr. Avorn's views on the risk and benefits of Vioxx by calling

his opinions on Merck's reasonableness "ex post facto." In fact, nothing could he further from the truth. Dr. Avorn made his views well-known to Merck when he was contracted *by Merck itself* to perform a study on the cardiovascular safety of Vioxx. As Merck is also well- aware, Dr. Avorn has also expressed his views in his publications that he issued long before he was ever involved as an expert witness in Vioxx litigation.

For example, Dr Avorn immediately questioned the so-called "naproxen hypothesis" as the explanation of the five-fold increase in cardiovascular events seen in the VIGOR study. Id. at 359. This occurred in 2000 immediately after the VIGOR results were published. Furthermore, he expressed his concern about the validity of the "naproxen hypothesis" to Merck Senior Management in early 2001. *Id.* at 195 - 196. Unlike Merck, however, Dr. Avorn and his colleagues immediately took action to study whether naproxen was indeed cardioprotective, and whether the magnitude of that cardioprotection could possibly explain the VIGOR results. *Id.* at 195 - 199. They conducted an independent study in 2001 that looked at NSAID use (including naproxen) and acute myocardial infarction. *Id.* at 414 - 418.[3] The results of this independent study by Dr. Avorn and his colleagues were presented at the International Society of Pharmacoepidemiology Meeting in August 2001, and were published in May of 2002. *See*, Avorn, J., et al., *Nonsteroidal Anti-Inflammatory Drug Use and Acute Myocardial Infarction*, Arch. Intern. Med. 2002; 162:1099 - 1104, Exhibit F (hereinafter referred to as the "NSAID/MI study").

In this paper – again published long before Vioxx litigation – Dr. Avorn acknowledged the VIGOR controversy and the naproxen-hypothesis put forward by Merck. *Id.* at 1099. After doing

---

[3]The Cox-2 inhibitors were not included in this original study because they had been in use for only a short period of time.

so, however, he indicated that he found only a small 16% reduction in heart attack associated with

naproxen – not nearly large enough to explain the magnitude of the results seen in VIGOR:

> The data reported herein are also compatible with a small reduction in the risk of
> AMI.  To place this effect in perspective, in a large randomized trial of daily aspirin
> use in primary prevention, patients in the intervention arm experienced a 44%
> reduction in the risk of AMI. ***Therefore it would be false to equate the more modest
> effect of naproxen, suggested in this study with the cardioprotection afforded by
> Aspirin.***

*Id.* at 1104. (emphasis added).  In 2003 – again before being involved in the Vioxx litigation – Dr.

Avorn wrote that "[t]hese studies suggest that any potential protective effect of ***naproxen does not***

***fully account for the findings in the VIGOR study***."  *See*, Avorn J., et al., *COX-2 Selective*

*Non-Steroidal Anti-Inflammatory Drugs and Cardiovascular Disease*, Phamacoepidemiology and

Drug Safety 2003; 12:67 - 70, (Exhibit G), *see also* Exhibit E at 262 - 276.

Faced with the data that naproxen was not the explanation for the VIGOR results and

Merck's intransigence on that issue, Dr. Avorn proposed that Merck fund a similar study, this time

involving the Cox-2 drugs Celebrex and Vioxx.  *Id.* at 292 - 315.  After negotiations with Merck,

the study was finally funded.  Merck had input into the design and conduct of the study. *Id.*; *see also*

*Id.* at 422.  The study was not designed to generate a hypothesis about the cardiac risk of Vioxx, but

rather to finally test the hypothesis that Vioxx increases the risk of cardiovascular events in humans.

*Id.* at 404 - 405.  One of Merck's own epidemiologists, Dr. Cannuseio, was even an active

participant in the design of the study, its implementation, and in collecting and analyzing its results.

The study results, which became available in 2003, confirmed that there was indeed a risk of

myocardial infarction associated with Vioxx compared to no NSAID use and Celebrex. <u>See</u> Exhibit

D.[4]  When the study was published, Merck decided to distance itself from its own study and it forced

its author to remove herself from the manuscript's authorship.  *Id.*

From 2000 through 2004, Dr. Avorn remained outspoken about the risks of Vioxx and

Merck's failure to warn and test.  In an editorial that appeared in the Archives of Internal

Medicine in January 2005 – still before the PSC's first contact with Dr. Avorn regarding the

Vioxx litigation[5] – Dr. Avorn stated that:

- "While naproxen's potential cardiovascular protection might have accounted for some of the risk difference [in VIGOR], this possibility was speculative and clearly did not exonerate rofecoxib.  Yet Merck aggressively championed cardioprotective effect of naproxen as a sufficient explanation for the higher myocardial infarction rate seen in the VIGOR participants randomized to placebo . . . ."

- "[T]he cardiovascular risk of rofecoxib was apparent in at least 2000, a year after the drugs approval."

- The 2002 label was inadequate because the "only action taken was the addition of a statement to the package insert that 'caution should he exercised when Vioxx is used in patients with a risk of ischemic heart disease.' However, it was not known that the presumed cardiovascular risk of rofecoxib was limited to patients with cardiovascular disease."

- "Yet by placing this warning on a list of several cautions and not in a black box, the FDA almost assured that the caution would have little influence on clinical practice. The absence of a black box also allowed Merck to continue its enormous direct-to-consumer advertising campaign."

---

[4]In a subsequent study, Dr. Avorn also found that "Rofecoxib use was associated with an increased relative risk of new onset hypertension; this was not seen in patients taking Celecoxib."  *See*, *Relationship Between COX-2 Specific Inhibitors and Hypertension*, Hypertension 2004; 44:140 - 145, (Exhibit H).

[5]Exhibit E at pp. 34 - 35.

- "[VIGOR and other observational trials] warranted aggressive and timely follow-up by both the FDA and Merck, including new clinical trials specifically targeting this question as well as an immediate pharmacoepidemiologic investigation of the relationship.  This was not done."

Avorn, J., *Coxibs, Science and the Public Trust*, Arch. Int. Med., Vol. 165, Jan 24, 2005, (Exhibit I). These opinions were not "ex post facto" opinions from one of plaintiff's "paid experts."  Rather, these opinions were formed by Dr. Avorn's factual involvement with Merck while Vioxx was on the market.

As for Dr. Avorn's being a "paid" expert he has made it clear that he "does not accept compensation for this [expert] work"  *See*, Exhibit E at 63.  Rather, any monies received from expert work and the sales of his book are donated to an irrevocable charitable trust.  Among the recipients of that money is the Commonwealth of Pennsylvania, which has initiated a program "in which physicians are given information about the risks and benefits and costs of drugs that is noncommercial based on research in this area so that they have an alternative to a pharmaceutical company advertising as a sources of information."  *Id.* at 64 - 69.

C.   <u>Expert Consulting For the PSC,</u>

The first time that Dr. Avorn agreed to consult for litigation purposes regarding Vioxx was in May 2005, long after most of Dr. Avorn's scholarship on Vioxx and NSAIDs was published.  <u>Id.</u> at 34.  Prior to that time, Dr. Avorn had actually rejected being involved in Vioxx litigation.  <u>Id.</u> Indeed, his initial agreement was to function not as an expert witness, but as a "*fact witness*" only. *Id.* at 40 (emphasis added).

Subsequent to that time, however, Dr. Avorn did agree to expand his proposed testimony beyond being a "fact witness" to include "expert testimony," and that he would review additional materials supplied by the PSC.  These materials included, among other things, published papers,

study reports, and statistical analyses prepared by Merck, study protocols and data analysis plans for analyzing cardiovascular events in the Vioxx clinical trials, depositions, FDA medical officer reviews, and internal Merck documents reflecting what Merck knew or believed at various points in time.  See Expert Report of Jerome Avorn, M. D., (Exhibit J).  According to Dr. Avorn's report, he was tasked with addressing "the question of whether rofecoxib (Vioxx) increases the risk cardiovascular disease, and to assess the methods by which Merck evaluated and managed this issue throughout the development and marketing of Vioxx."  *Id.* at 2.  In his deposition, he further explained that this necessarily involved assessing the reasonableness of the studies performed to evaluate the risks and benefits of Vioxx, and Merck's chosen communications of the risks and benefits to physicians.  Exhibit E at 176.

To accomplish his assessment, Dr. Avorn drew upon his multi-faceted education, experience, research, and teaching in a number of overlapping areas of scientific and medical expertise:

Q.   What areas of science, Dr. Avorn, would you consider yourself to be an expert in?

A.   Internal medicine, pharmacoepidemiology, pharmacoeconomics, the determinants of physician prescribing practices, methods of influencing physician prescribing, determinants of patient medication use and methods of influencing them, cost effectiveness of pharmaceuticals, and pharmaceutical policy or health policy as it relates to medication use.  And in addition, geriatric medicine and geriatric pharmacology.  That's all that I can think of.

Q.   Let me ask the question again.  Other than the areas you just mentioned, Dr. Avorn, are there other areas of science you consider yourself to be an expert in?

A.    No.

Q.   Do you consider yourself to be an expert, sir, in pharmacology?

A.   To the extent that it relates to both the rational use of drugs and

17

pharmacoepidemiology and cost effectiveness, yes.  To the extent that I am not a clinical pharmacologist, no.

\* \* \* \*

Q.    You wouldn't consider yourself to he an expert in the state of mind of a pharmaceutical company, right?

A.    Right.

Q.    You wouldn't consider yourself to be an expert in the conduct of any pharmaceutical company, true?

A.    I don't agree with that statement.

Q.    What –

A.    That is, I do consider myself to have expertise in that area.

Q.    Why do you consider yourself to be an expert in the conduct of a pharmaceutical company?

A.    For a number of reasons.  One is that the behavior of a pharmaceutical company in relation to risk and benefit has a great deal to do with pharmacoepidemiology and with the outcomes of drugs.  And I've written extensively on – in the New England Journal of Medicine and Circulation in JAMA, in my book, in health affairs, on the actions of pharmaceutical companies in relation to the study, follow-up, promotion of their drugs.  So I do consider myself to have expertise in that area.

Q.    I understand you've got experience, Dr. Avorn, in how drug companies promote their drugs.  Do you consider that to be the same thing as being an expert in the conduct of a pharmaceutical company?

\* \* \* \*

A.    Yes.  Because it's not just about promotion; it's also about the way a company evaluates risks and benefits of its products and communicates those – that information to physicians and to patients.  That's all part of the conduct of the company, as you phrase it.

Q.    What pharmaceutical companies have you evaluated to make an assessment of how you view their conduct?

18

A.    Merck, Glaxo, in which I felt they behave appropriately and honorably in the context of a study that we're doing with them on one of their drugs. Pfizer. It's – We don't study companies per se except in the present context. We study primarily drugs. But when it's a sole source manufacturer, that involves studying the company as well.

Exhibit E at pp. 54 - 59.

In this regard, Dr. Avorn amplified the opinions he reached prior to his involvement in

the present litigation. These include:

- The fact that there were objective reasons to be concerned about the cardiovascular safety of Vioxx based on the pre-approval clinical trials, the mechanistic studies and the reports of Merck's advisors. It is his opinion that a reasonable and prudent scientist would have conducted pre-approval human studies to assess that risk. Exhibit J at 6. He testified that it was a breach of the standard of care not to have done those studies. Exhibit E at 184.

- He opined (as he had done before being retained as an expert) that a reasonable and prudent company, faced with the results of the VIGOR study and the magnitude of the result verses naproxen, would have concluded that Vioxx was a risk factor for cardiovascular disease. Exhibit J at 11; Exhibit E at 439 - 441. He testified that this was particularly true when the results of VIGOR were coupled with the results of Study 090 and ADVANTAGE. *See* Exhibit J at 14.

- He opined that the risks of Vioxx outweighed the benefits given the lack of unique benefit in treating pain, and the cardiovascular risk. Indeed, he will testify that, on balance, naproxen was the preferred drug. *Id.* at 11.

- He opined that the designs of the Merck clinical trials were flawed to the extent that they were not properly designed to identify and quantify the cardiovascular risk of Vioxx. Exhibit J at 3; Exhibit E at 286 - 289. He will also testify that, from a scientific standpoint, it was unreasonable for Merck to resist providing a warning for myocardial infarction that was proposed by the FDA and that such a warning would have more accurately and appropriately advised physicians of the risks of Vioxx, at least for the cardiac risk seen in VIGOR and ADVANTAGE. Exhibit J at 17; 22 - 23.

- He opined that the 2000 and 2002 Vioxx label was medically and scientifically inaccurate on the risk of MI, hypertension, mortality and other risk. Exhibit J at 19; Exhibit E at 420 - 421. He will also testify that the information disseminated by Merck in articles, detailing, direct to consumer advertising was unreasonable in that it was inadequate to fairly provide balanced information on the risk of Vioxx. Exhibit J at 20 - 21; Exhibit E at 739 - 741.

- He opined that there was no "class effect" for myocardial infarction or hypertension for NSAIDs and Cox-2s. Exhibit E at 213 - 214.

- He will testify that Vioxx causes myocardial infarction, irrespective of dose or duration. Exhibit J at 19; Exhibit E at 752 - 754.

## II.   DR. AVORN'S OFFERED EXPERTISE IS DERIVED FROM HIS SCIENTIFIC, TECHNICAL, OR OTHER SPECIALIZED KNOWLEDGE.

Whatever can be said about Merck's motion, one fact is clear – it is not a proper Daubert challenge at all. Rather than a serious challenge to his qualifications or of his methods, Merck attacks his conclusions. In short, it is a preview of the kind of cross-examination Merck might conduct in order to attack his credibility. This, however, was never the function of Federal Rule of Evidence 703 or of the *Daubert* opinion. In a statement that aptly describes what is at stake here, the Second Circuit noted that:

> Trial judges must exercise sound discretion as gatekeepers of expert testimony under Daubert. [Defendant], however, would elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul – separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.

*McCullock v. H. B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995).

Plaintiffs do not take issue with Merck's characterization of the *Daubert* test or of the Federal Rules of Evidence. Through a series of misrepresentations and false premises, however; and under the guise of making a *Daubert* challenge, Merck asks the court to disqualify one of the most well-credentialed and most highly regarded epidemiologists and expert on Cox-2 drugs in humans

20

from testifying that the statement contained that Merck's response and explanations for VIGOR, ADVANTAGE, and other studies were unreasonable, and that its communications about the potential rsks were misleading and scientifically invalid.  Rather than addressing Dr. Avorn's qualifications or his methodology, Merck has chosen to categorize all of his expert conclusions as uninformed, "personal" opinions on "non-scientific" issues, disregarding, of course, Dr. Avorn's personal fact-based knowledge with respect to scientific studies of Vioxx and Merck's decision-making regarding the product prior to its withdrawal from the market.  In spite of Merck's best efforts, Dr. Avorn is precisely the kind of expert who is qualified under FRE 702 and *Daubert* to speak regarding the scientific and medical issues for which his testimony is offered.

Importantly, prior Courts have rejected the very arguments that Merck raises here.  In the *Diet Drug Litigation*, Dr. Avorn was identified as an expert.  *See* Exhibit B.  In *Diet Drugs*, the PSC identified Dr. Avorn to testify on several issues, including his opinions about the accuracy of the diet drug labels in communicating the risk.  There, unlike here, Dr. Avorn did not have personal knowledge of the issues in the case and was a "pure" expert witness.  Nevertheless, the parties and the Court agreed that Dr. Avorn was "fully qualified within [his] discipline and [can] testify concerning the risks and benefits of the diet drugs at issue." *Id.* at *11.  Despite this expertise, the defendant contended that Dr. Avorn should not have been permitted to "recount" plaintiff's documents and he should not have been able to comment on the accuracy of the manufacturer's label and its explanation of the risks and benefits.  The Court properly rejected both arguments.

In rejecting the manufacturer's so-called "*Daubert* challenge" on the use of documents, the Court said that Dr. Avorn's use of ***facts and documents*** was likely permissible. *Id.* at 8 (emphasis added) ("If a document that is being read or paraphrased is in fact admitted into evidence (i.e., if it

is relevant and admissible and there is no Rule 403 balancing reason to preclude it) presumably the trial judge will allow [the expert to] speak to it.").  Further, the Court allowed Dr. Avorn to testify to the medical and scientific accuracy of the label and its effectiveness in communicating the risk:

> Dr. Avorn [is] fully qualified to opine on the medical facts and science regarding the risks and benefits of the diet drugs in question and to compare that knowledge with what was provided in the text of labeling and warnings on the diet drugs in question. ***In other words, Dr. [] Avorn, [is] qualified to render an opinion as to the label's accuracy and, it follows from that, the extent to which inaccuracies and omissions could either deprive a reader or mislead a reader are or were at the time the labeling was published.***

*Id.* at *11 (emphasis added).  *See also Smith v. Wyeth*, 278 F.Supp.2d 684, 701 - 702 (E. D. N. C. 2003) (Plaintiff's biostatistics expert, Lemuel Moye, M. D. can testify to the applicable standard of care for pharmaceutical companies and can testify to the medical and scientific accuracy of product labels).  Dr. Avorn should likewise be permitted to offer similar testimony with regard to Vioxx.

## A.   Dr. Avorn's Factual Knowledge With Respect To the Scientific Testing and Marketing of Vioxx Renders His Testimony Regarding Vioxx Proper.

Merck incorrectly asserts in its brief that "[t]here is no evidence that Dr. Avorn has any personal knowledge of any of the facts he has included in his narrative of the case, other than knowledge acquired from his review of the documents given to him by plaintiff's counsel in anticipation of this litigation."  Exhibit A at 6.  Defendant simply ignores the statement in his expert report that states that "I will also present evidence concerning the experience of my research team in its work with our Merck funded epidemiologic study of the relationship between Vioxx and heart attack that was ultimately published in the cardiology journal *Circulation* in 2004." Exhibit J at 24.

As set forth extensively, *supra*, Dr Avorn has been intimately involved as a contributor to the "Vioxx story," and was so years before he was called upon by the PSC to consult with regard

to this litigation.  Dr. Avorn conducted research, funded by Merck and presented to Merck, on the risk of acute myocardial infarction in patients taking Cox-2 inhibitors and conventional NSAIDs. In that research, funded by Merck, Dr. Avorn tested the effects of Vioxx.  "These studies, together with [expert's] extensive experience and work in this area, provide sufficient, reliable scientific data upon which [expert] may base his conclusions. . . . " *See Glaser v. Thompson Medical Co., Inc.*, 32 F.3d 969 at 975.

Moreover, Dr. Avorn's use of his and Merck's own testing to form the bases for his opinions regarding Merck's conduct is admissible, as "reliability is further established when his opinions are viewed in the context with [defendant's] own documents."  *See Allapattah Services, Inc. v. Exxon Corp.*, 61 F.Supp.2d 1335, 1353 (S. D. Fla. 1999).  In light of Dr. Avorn's experience as a fact witness with first-hand knowledge of the scientific findings from Merck's pharmaceutical test results, Dr. Avorn's opinions regarding the "Vioxx story" are admissible.

**B.**      **Dr. Avorn Properly Opines as to the Knowledge Generated By and Imparted to Merck About the Risks and Benefits of Vioxx Given the State of Science at Various Points in Time.**

Merck proposes to straitjacket Dr. Avorn by suggesting that he cannot testify to what Merck "knew or should have known" about the risks of Vioxx.  Exhibit A at 6.  Nor does Merck want to allow Dr. Avorn to recount facts in evidence that relate to the body of data that was available between 1996 and 2004.  *Id*. at 3.  Defendant terms such evidence impermissible evidence on "corporate intent."  Quite simply, this argument flies in the face of law and common sense.  Just as plaintiff's other witnesses like Dr. Curfman, Dr. Graham. Dr. Ray and Dr. Topol are distinguishable

from those paid "ex post facto" experts retained by Merck, so is Dr. Avorn.[6] Similar to these other

plaintiff's witnesses, Dr. Avorn, has personal knowledge of the body of data available at various

points in time regarding the effects of Cox-2 inhibitors, NSAIDs, and Vioxx, by way of his own

contributions to that body of work.  He is a prime candidate for explaining to the jury the multiple

and sometimes inconsistent pieces of information available to Merck, as well as what Merck chose

to ignore.

There is no comparison between an expert who gives testimony about what a defendant

should have done with reasonable prudence with an expert who attempts to get into the mind of a

defendant and describe corporate intent.  Indeed, it is necessary for an expert to explain what was

known or knowable at particular points in time and what a reasonable and prudent response to that

knowledge would be.  That is classic standard of care testimony that is central to cases like this.  In

order to do this, an expert must not only review the public literature but also non-public documents

like FDA medical officer reviews of Vioxx, FDA Advisory Committee hearing transcripts; non-

public Clinical Study Reports prepared by Merck, internal statistical analyses prepared by Merck

and internal e-mails from Merck scientists.  As the Court explained in the *Smith* case, when a similar

objection was made:

> Defendants criticism of Dr. Moye's preparation is curious.  Dr. Moye has
> reviewed the FDA Advisory Committee Hearings for Redux as well as the majority
> of the medical literature in forming his opinion.  The Court takes judicial notice that

---

[6]Like Dr. Topol and Dr. Ray, Dr. Avorn was a consultant for Merck at the time that Vioxx was on the market.  Conspicuously, Merck has declined to call any of its consultants to support its cause.  For example, Merck has not called Dr. Fitzgerald, Dr. Konstam, Dr. Bombardier (the lead author for VIGOR), Dr. Bresalier (the lead author for APPROVe) or others to testify concerning the science or Merck's conduct.  Rather, Merck is content to call experts who had little or no involvement with Merck and whose opinions "were "developed solely for purpose of litigation" and to disparage those (like Drs. Curfman, Topol, Graham and Avorns) who have fact-based real-time knowledge of the events at issue in this litigation at the time of their occurrence.

> this process is not unusual, but rather how experts go about developing an opinion within their discipline. Given Dr. Moye's educational background, as well as his experience as a clinical trial investigator and consultant, his qualifications in this area are beyond question.

278 F.Supp. 701 (emphasis added).

Indeed, Dr. Avorn uses documents to further support his pre-litigation objective opinion that Merck reacted to the VIGOR results (and other evidence) in an unreasonable and untimely manner. For example, he relies on the FDA medical officer review of Dr. Targum to support his view that it was unreasonable to believe that the alleged cardioprotective properties of naproxen explained the results of VIGOR. *See* Exhibit J at 11. Similarly, he uses the FDA's proposed warning language to demonstrate his opinion that the watered-down precaution given by Merck in the 2002 label was medically and scientifically incomplete and misleading. *See* Exhibit E at 421 - 423. Similarly, he uses Merck's own statistical analyses of the mortality seen in its Alzheimer's studies to demonstrate that Merck knew of serious problems with Vioxx and did not communicate it.[7] Id. at 500 - 504. By way of a final example, Dr Avorn uses Merck's own marketing analysis of the effect of adding a warning to convey increased risk of cardiovascular events to support his view that a warning would have had a meaningful effect of changing prescribing choices of doctors. Id. at 460 - 463. In all of

---

[7]Dr. Avorn does ***not*** rely solely on reports from Richard Kronmal and Wayne Ray for his opinion that the "Alzheimer's studies" showed elevated risk of cardiovascular events associated with Vioxx, as Merck has informed this Court in its brief in support of its Supplemental Motion of June 23, 2006 filed in the *Barnett* case. Dr. Avorn has, in fact, conducted his own independent review of materials pertaining to this topic, as indicated in his Report (Exhibit J at 15 - 16); these materials were disclosed on the Materials Considered list that was submitted with his Report of March 20, 2006. Further, the primary source of Dr. Avorn's testimony in this regard is a document from Merck's own scientist, Dr. Chen. Of note is that Merck did not supplement any of its previous arguments demonstrating that there is no merit to, for example, their complaint that Dr. Avorn has considered testimony as to Merck's "motive and intent." One would have assumed that if there was any testimonial support for the generic motion that they filed, they would have cited it; that Merck did not do so undercuts whatever strength that the motion had. The fact is that Dr. Avorn's testimony fits squarely within his expertise and is fully consistent with *Daubert*.

these instances, he properly uses Merck's evidence to support his views without ever attempting to impute motive for Merck's failures.

In an apparent attempt to bolster its motion to strike portions of Dr. Avorn's testimony, Merck repeatedly attempted to goad Dr. Avorn into stating that his opinions were not objective, but that he was interpreting issues of Merck's so-called "corporate intent" and "motive." In no instance did Dr. Avorn take Merck's bait. For example:

> Q.    Do you consider yourself to be an expert in determining a pharmaceutical company's intent?
>
> A.    I think no one – Its difficult to know intent. One can only know about behaviors.

Dr. Avorn refused to engage in any speculation regarding Merck's internal decision-making or motives, and testified that his opinions were objective and based on what was reasonable and prudent under the circumstances. *See*, *e.g.*, Exhibit E at 184 - 185; 414 - 415; and 438 - 441.[8] Furthermore, Dr. Avorn explained how his testimony regarding this topic would be informative for a jury. *Id.* at 192 - 193. As such, Dr. Avorn's testimony regarding "what Merck knew or should have known" is appropriate.

> **C.    Dr. Avorn's Testimony Concerning Merck's Failure to Provide the Medical**

---

[8]Of course, Dr. Avorn can describe the interactions between his team at Harvard and Merck concerning Vioxx. For example, Dr Avorn has published that:

> We participated with our colleagues in a large observational study sponsored by Merck. Epidemiologists from Merck helped work out several details of the study protocol and signed off on all aspects of the study design. However, when our results demonstrated an elevated risk of acute myocardial infarction with rofecoxib, Merck required a coauthor that was an employee of the company to remove her name from the article immediately prior to publication. Even after funding and agreeing with the design of the study, Merck publicly discredited our findings because of "serious limitations to the analysis."

Exhibit J at 159.

**Community With Complete and Accurate Information About the Risks (and Benefits) Associated with Vioxx is Permissible.**

Merck challenges Dr. Avorn's ability to testify that the information revealed about Vioxx' risks and benefits to the medical community was scientifically incomplete and inaccurate. Exhibit A at 8 - 9.  This is clearly within the scope of his expertise, as ordered by Judge Bechtle in *In Re Diet Drugs Product Liability Litigation*. *See* Exhibit B.  As set forth above, the Court in *Diet Drugs* found Dr. Avorn "fully qualified to opine as to the fact and science regarding the risks and benefits of the diet drugs in question. . . . "  *Id.* at *11.  In addition, he further found that Dr. Avorn was:

> qualified to render an opinion as to the label's completeness, accuracy, – and it follows from that – the extent to which inaccuracies or omissions could either deprive or mislead a reader of what the risks and benefits of the diet drugs at issue are or were at the time the labeling was published.

*Id.*  (emphasis added).

The basis for Dr. Avorn to provide such testimony is even more compelling in this case than it was in *Diet Drugs*.  In *Diet Drugs*, Dr Avorn was not a percipient witness and had not done independent research into the risks and benefits of the diet drugs in question.  By contrast, Dr. Avorn has contributed significantly to the scientific understanding of the risks of NSAIDs, Cox-2 inhibitors and Vioxx.  These occurred through numerous studies, articles and lectures on the topic, as outlined extensively, *supra* at 7 - 8.  Further, the Court in *Diet Drugs* was apparently not made aware of Dr. Avorn's significant independent research into the factors (commercial and non-commercial) that drive physician prescribing practices that is presented in this motion, as also outlined extensively *supra* at 9 - 10.  Dr. Avorn's first hand knowledge of the scientific effects of Vioxx and the business handling measures taken by Merck are substantial and, moreover, admissible.

**D.**     **Dr. Avorn Provides Appropriate Testimony Concerning FDA's Labeling Proposal and its Rebuke of Merck's Promotional Materials.**

Merck takes issue with Dr. Avorn's opinions that the information provided by Merck to the FDA about Vioxx, and the format in which it was provided, were inadequate and misleading, and that Merck possessed important information regarding cardiovascular risk that it did not reveal in a complete and timely manner to the FDA, nor to prescribing physicians of Vioxx, nor to the consuming public at large.  Merck contends Dr. Avorn's opinions regarding its negotiations with FDA and its labeling of Vioxx is inadmissible under *Daubert*.  However, *Daubert* does not preclude evidence of misrepresentations to and concealment from the FDA. Further, *Daubert* does not preclude evidence of misrepresentations to and concealment from doctors and consumers of the drug, particularly where an expert is qualified to testify regarding the effects of such misrepresentations on the prescribing practices of physicians, as well as the effects of such misrepresentations on Vioxx's profitability.

Merck also argues that Dr. Avorn's opinions are based not on an interpretation of the regulations that govern submission of information to the FDA, but on his own personal views. However, the actual testimony cited, infra, shows that Dr. Avorn was not attempting to interpret the regulations, nor was he challenging them.  Rather, he is critical of the manner in which Merck responded to evidence of cardiovascular risk associated with Vioxx in the clinical trials. There is nothing speculative regarding the opinions shared by Dr. Avorn, Exhibit E at 413 - 416; 421 - 422.

Merck further seeks to exclude Dr. Avorn's opinions as to "whether the Vioxx label provided adequate information to health professionals," and whether the risk information provided on a prescription drug label "can heavily influence a drug's sales."  However, it is precisely these kinds of scientific and non-scientific influences that Dr. Avorn has studied in relationship to physician prescribing habits.  As evidenced by Dr. Avorn's report, he is critical of the labeling

28

content that accompanied Vioxx, specifically the fact that the label did not clearly and explicitly inform physicians that the drug was contraindicated for individuals with preexisting cardiovascular conditions.  Exhibit J at 19; Exhibit E at 163 - 164.  As set forth by Judge Bechtle in *In Re Diet Drugs*, this is a scientific opinion that he is qualified to give.  Dr. Avorn also opines that the label misrepresented the severity of reported adverse effects and it failed to present an accurate representation of the risk of cardiovascular effects, such as acute myocardial infarction, caused by the drug.  Exhibit J at 22 - 23; Exhibit E at 424.  This testimony is entirely proper. The Court in *In Re Diet Drugs* did not preclude "generalizations about the thoughts, habits and considerations of physicians, patients and regulators."  The experts were precluded from testifying "as to what doctors think," but not from testifying as to the "label's completeness" and "accuracy," and the "extent to which any inaccuracies or omissions could deprive or mislead a reader."  Exhibit B at *11.

It is also inappropriate to preclude Dr. Avorn from giving testimony that touches upon FDA issues where they overlap with pharmacoepidemiologic principles.  Since Merck is raising such issues in its defense to this case, it is likely to raise issues regarding its interactions with FDA in examining Dr. Avorn.  Moreover, while Dr. Avorn, having not worked at FDA, is not a technical "regulatory" expert, there are areas where his expertise in pharmacoepidemiology necessarily and inextricably overlaps with regulatory issues pertaining to drugs.  In his deposition, he explained:

Q.     Are you an expert, Dr. Avorn, in FDA regulations?

A.     To the extent that my expcrtise about drug risks and benefits relate very closely to FDA decisions, yes.  Am I a regulatory attorney?  No.

Q.     But you believe that you are an expert in FDA guidelines concerning drug labeling?

A.     We – We have written on that topic, and I, again, to the extent that is about phamacoepidemiology and data on risks and benefits, yes.

29

Exhibit E at 194 - 195; *see also Id*. at 674 - 678.  Later in his deposition, he gave a concrete example

where his expertise overlapped with FDA regulation:

> Q.     Okay, Doctor, I am going to hand this to you (Exhibit 23 – Food and Drug
>        Administration, Section 201.57).
>
> A.     (Deponent reviewing exhibit.).
>
> Q.     First of all there is a highlighted section there. Could you read it into the
>        record please?
>
> A.     Sure.  This is the Food – it is labeled Food and Drug Administration, HHS,
>        Section 201.57.
>
> Q.     Okay.
>
> A.     And –
>
> Q.     The section is highlighted?
>
> A.     Yes, and under heading (e) warnings, "The label shall be revised to include
>        a warning as long as there is a reasonable evidence of an association between
>        an hazard with a drug, semicolon, causation need not be proved, period."
>
> Q.     Okay.  Just taking that language alone, okay, if that language appears in any
>        other context other than in a regulation, just taking the language, if it
>        appeared in an article, if it appeared in a textbook, if it appeared in a
>        presentation you had, would that language be something you would be
>        familiar with?
>
> A.     Yes.  I have seen that language many times.
>
> Q.     Okay.  Is this language that is a phamacoepidemiologic concept: a reasonable
>        evidence of an association?
>
> A.     Yes, I think that pharmacoepidemiology is all about reasonable evidence,
>        determining associations, serious hazards and causal relationships. That is the
>        substance of [pharmacoepidemiology].
>
> Q.     Are you – Do you consider yourself an expert in interpreting the scientific
>        and medical concepts embodied in that language?

A.       Yes.  In fact, that language cannot be operational without having mastery of concepts such as reasonable evidence, serious hazards and causal relationship.

Q.       And is that something that, in your experience, the average layperson understands those concepts without guidance from people such as yourself?

A.       They cannot.

*Id.* at 723 - 725.

Without any explanation, Merck also proposes that Dr. Avorn cannot comment on the FDA's rebuke of Merck's promotional material, which relies on the so-called naproxen hypothesis.  Surely, Dr. Avorn can rely on such a statement to support his opinion that the naproxen hypothesis was never a rational explanation for VIGOR.

Finally, Merck argues that Dr. Avorn is not permitted to testify regarding the effects of drug labels, and changes thereto, on the prescribing practices of doctors, all of which contribute to the sales of a drug.  As discussed extensively, Dr. Avorn is an international expert in this domain, *supra* at 5 - 10.  Thus, Dr. Avorn's testimony regarding FDA's labeling proposal and its rebuke of Merck's promotional materials is admissible.

## **CONCLUSION**

The Court should examine and evaluate Dr. Avorn's testimony as presented, rather than as characterized by Merck.  Dr. Avorn's exemplary qualifications, including his academic and professional achievements and his own factual contribution to the "Vioxx story" render him qualified to testify regarding the aforementioned issues in this litigation.  Plaintiff Smith therefore requests that this Court deny Merck's motion to exclude the testimony of Dr. Avorn.

Dated:  August 21, 2006

Respectfully submitted,

31

Drew Ranier
Louisiana Bar No. 8320
**RANIER, GAYLE & ELLIOT LLC**
1419 Ryan Street
Lake Charles, Louisiana 70601
(337) 494-7171; fax (337) 494-7218

Walter Umphrey
Texas Bar No. 20380000
**PROVOST UMPHREY LAW FIRM LLP**
490 Park Street
Beaumont, Texas 77701
(409) 835-6000; fax (409) 838-8888

James L. "Larry" Wright
Texas Bar No. 22038500
**THE WATTS LAW FIRM LLP**
111 Congress Avenue, Suite 1010
Austin, Texas 78701
(512) 479-0500; fax (512) 473-0328

/s/ Grant Kaiser
Grant Kaiser
Texas Bar No. 11078900
**THE KAISER FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 223-0000; fax (713) 223-0440

Mikal Watts
Texas Bar No. 20981820
**THE WATTS LAW FIRM LLP**
Tower II Building, 14th Floor
555 North Carancahua Street
Corpus Christi, Texas 78478
(361) 887-0500; fax (361) 887-0055

John Eddie Williams, Jr.
Texas Bar No. 21600300
Jim Doyle
Texas Bar No.6094450
**WILLIAMS BAILEY LAW FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-2200; fax (713) 643-6226

ATTORNEYS FOR PLAINTIFF ROBERT G. SMITH

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 21st day of August, 2006.


          /s/ Grant Kaiser
          Grant Kaiser
          **THE KAISER FIRM LLP**
          8441 Gulf Freeway, Suite 600
          Houston, Texas 77017
          (713) 230-0000; fax (713) 230-0440
          gkaiser@thekaiserfirm.com


cc      By email only:

      Robert Van Kirk      rvankirk@wc.com
      **Williams & Connolly LLP**
      725 Twelfth Street Northwest
      Washington, D.C.  20005
      (202) 434-5000; fax (202) 434-5029

      Carrie A. Jablonski      carrie.jablonski@bartlit-beck.com
      **Bartlit, Beck, Herman, Palenchar & Scott LLP**
      54 West Hubbard Street, Suite 300
      Chicago, Illinois 60610
      (312) 494-4400; fax (312) 494-4440