# EXHIBIT E

Jerry Avorn, M.D.

Page 1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2                       MDL DOCKET NUMBER:   1657
                              SECTION L
3
     In re:  VIOXX PRODUCTS LIABILITY LITIGATION
4    GERALD BARNETT AND CORRINE BARNETT,

5            Plaintiffs,

6        VS.                        CIVIL ACTION NUMBER:
                                        2:06cv485
7    MERCK & CO., INC.,

8            Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - -
9
                            DEPOSITION OF
10
                         JERRY AVORN, M.D.
11
                          June 15, 2006
12                          8:36 a.m.

13                    Sheraton Boston Hotel
                         39 Dalton Street
14               Boston, Massachusetts 02199

15   Susan A. Romano, Notary Public, Register Merit Reporter and Certified
     Realtime Reporter within and for the Commonwealth of Massachusetts
15

16

17

18

19

20

21

22

23

24

Jerry Avorn, M.D.

Page 2

1       APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3  CHRISTOPHER V. TISI, ESQUIRE
4  JENNIFER L. ORENDI, ESQUIRE
5    Ashcraft & Gerel
6    2000 L Street, N.W., Suite 400
7    Washington, District of Columbia 20036
8    202.783.6400
9    cvtisi@aol.com
10
11  JEFFREY S. GRAND, ESQUIRE
12    Seeger Weiss, LLP
13    One William Street
14    New York, New York 10004-2502
15    212.584.0700
16    jgrand@seegerweiss.com
17
18  ON BEHALF OF THE DEFENDANT:
19  ANDREW L. GOLDMAN, ESQUIRE
20    Bartlit Beck Herman Palenchar & Scott, LLP
21    54 West Hubbard Street, Suite 300
22    Chicago, Illinois 60610
23    312.494.4400
24    andrew.goldman@bartlit-beck.com

Page 3

1       DEPOSITION OF JERRY AVORN, M.D
2              JUNE 15, 2006
3         PROCEEDINGS:
4       JERRY AVORN, M.D., the deponent,
5  having been satisfactorily identified and
6  duly sworn by the Notary Public, was
7  examined and testified as follows:
8         EXAMINATION
9       BY-MR.GOLDMAN:
10  Q.   Good morning, sir.
11  A.   Good morning.
12  Q.   Can you please state your name for
13  the record?
14  A.   Yes.  It is Jerry Avorn, A-V-O-R-N.
15       MR. TISI:  I don't mean to
16  be -- I need to get a couple things on
17  the record, if you don't mind.
18       MR. GOLDMAN:  Sure.
19       MR. TISI:  Let me tic some
20  of them off.
21       First of all, my name is Chris
22  Tisi.  I'm here on behalf of the
23  plaintiff's hearing committee for multi
24  district litigation.  I've also been asked

Page 4

1  to represent the California coordinated
2  proceedings in this litigation.
3       With me is Jennifer Orendi from my
4  office, an attorney from my office, and
5  Jeff Grand, who is representing the New
6  Jersey coordinated proceedings before Judge
7  Higbee.
8       My understanding of this is by
9  agreement -- I don't know if all the
10  cross-notices went out, because we had a
11  last minute hearing with the judge
12  yesterday in California -- but that this
13  is a discovery deposition for all of those
14  cases.
15       So that we don't have any
16  misunderstanding later on, this is
17  considered to be a cross-noticed deposition
18  in all three of those jurisdictions.
19       Number 2 is, we're going to try --
20  I'm going to -- I don't know what the
21  rules are in California on objections, but
22  I'm going to abide by Judge Fallon's rules
23  -- and I expect everybody to do the same
24  -- about I'm preserving objections for the

Page 5

1  time of -- for later on.  My only
2  objections are going to be to form or if
3  there is a misleading question in any
4  fashion.
5       I understand just -- hopefully, the
6  rules may be different in New Jersey,
7  Jeff, but can we have an agreement that
8  objections for one are objections for all?
9         MR. GOLDMAN:  Sure.
10         MR. TISI:  Okay.  I also
11  wanted to make sure, Andy, that it was on
12  the record that when we got your notice of
13  deposition asking for documents to be
14  produced, we endeavored, as best as we
15  could, to produce documents, produce them
16  before the deposition this morning.
17  Several binders.  I'm sure you'll go
18  through them.
19       I also have produced a recent copy
20  of Dr. Avorn's CV, which I sent to you
21  yesterday, as well as -- I think -- and I
22  went through this very quickly yesterday,
23  but I want to put on the record that Dr.
24  Avorn I think has, in addition to the

Jerry Avorn, M.D.

Page 6

1    documents you see there, reviewed the
2    cardiovascular standard operating procedure
3    as well as an e-mail that I have here. I
4    don't know how important it is, but it is
5    an e-mail. It's a March 5th -- Excuse me
6    -- February 5th, 2001, e-mail, MRK ACT
7    0009918.
8          I just do that to be try to be as
9    complete as possible. Obviously, we'll do
10   our best. We don't always succeed, but we
11   always do our best.
12         There were also some -- Just so you
13   know, in the binders there, there were
14   some expert reports that he had seen of
15   others on the plaintiff and defense side.
16   I don't know if he's reviewed them or not,
17   but they're in the binders there. I've
18   seen them. I want to make sure you're
19   aware that he has actually seen those.
20         MR. GOLDMAN: Which expert
21   reports?
22         MR. TISI: I have no --
23   Quite frankly, I didn't send them to him,
24   but I know he's seen them. So they may

Page 7

1    have come from Jeff's office or somebody
2    else's office.
3          MR. GOLDMAN: Okay.
4          MR. TISI: But you can see
5    them, and I want to make sure that you
6    know that they're out there. I think he
7    is -- you could ask him, but I think he's
8    seen Dr. Ray's report. I think he's seen
9    some of the defense expert reports. I
10   don't know who they are.
11         But I just want to make sure all
12   that is on the record so there is no
13   misunderstanding about it, and that you
14   have everything that I hope that we have
15   been able to provide for you
16         MR. GOLDMAN: Just one
17   comment, Chris, on the materials that you
18   have provided.
19         I have prepared for the deposition,
20   based on the materials considered that was
21   attached to the list that was attached to
22   Dr. Avorn's report from March 2006. I
23   understand those are materials that he's
24   relying on, and you did tell me about

Page 8

1    these two additional documents, the e-mail
2    that you just read into the record and the
3    CV SOP.
4          MR. TISI: Those are my
5    notes, but --
6          MR. GOLDMAN: Oh, sorry.
7          MR. TISI: That's okay.
8    This is not under standard operating
9    procedure.
10         THE WITNESS: Close.
11         MR. GOLDMAN: And --
12         MR. TISI: He was also --
13         MR. GOLDMAN: In terms of
14   expert reports, I don't believe any of the
15   expert reports were identified in the
16   materials considered, so I'm not prepared
17   to examine Dr. Avorn on that.
18         MR. TISI: You could do
19   that. I'll also tell you there was a
20   supplement that was sent to Mr. Cohen of
21   documents received, and I think that went
22   in on June 8th. Whether it was
23   communicated to you, I don't know. But
24   there was a letter with some additional

Page 9

1    documents that you can put on the record
2    if you want to. So you've had those for
3    a while. I don't know whether they've
4    gotten to you or not, but that's what you
5    got.
6          MR. GOLDMAN: No, I have
7    not seen it --
8          MR. TISI: Okay. Well, I
9    can give you --
10         MR. GOLDMAN: -- so at a
11   break if you can hand me the letter.
12         MR. TISI: I can give you a
13   copy that I printed it out from my
14   computer. It doesn't have the letterhead,
15   but it is a letter dated June 8th, 2006,
16   to Charles Cohen at Hughes, Hubbard &
17   Reed. And I can read, if you want, the
18   documents that are in there.
19         MR. GOLDMAN: Sure.
20         MR. TISI: There are only
21   six or seven, maybe ten of them.
22   FDA medical officer review,
23   MRK-ABX0023672 to ABX0002404. There's an
24   e-mail from Scolnick to Reicin, April

Jerry Avorn, M.D.

Page 10

1    12th, 2000, MRK-NJ0121906 to NJ012170907.
2         Actually, why don't I just do this:
3    Why don't I just attach a copy of the
4    letter. It's not the official copy, but
5    it is a copy, and we can -- we can attach
6    that as an exhibit.
7         I also note on the back that
8    there's the approved follow-up data as
9    well as the press release you all issued
10   on the correction, and the improve is in
11   there as well. So that's there. And I
12   will attach to it -- if you wish to
13   attach it as an exhibit, we can certainly
14   do that.
15              MR. GOLDMAN: Yeah.
16              MR. TISI: It is —
17   Understanding that this is a printout from
18   my personal computer. It does not have
19   the letterhead and all that stuff. Do you
20   want to attach that as an exhibit?
21              MR. GOLDMAN: Yeah. Let's
22   do it later.
23              MR. TISI: Fine. Okay.
24   I'm sorry.

Page 11

1              MR. GOLDMAN: That's okay.
2              MR. TISI: What is his
3    name? Go ahead.
4              BY MR. GOLDMAN:
5    Q. Dr. Avorn, my name is Andy Goldman.
6    I represent Merck. We haven't met before
7    today, right?
8    A. That's right.
9    Q. I know you've given depositions
10   before, sir. Let me just review the
11   general process.
12        I'm going to be asking you
13   questions, and if you don't understand my
14   questions, please ask me to rephrase. I'll
15   be happy to do that. Okay?
16   A. Will do.
17   Q. If you don't ask me to rephrase,
18   I'll just assume that you understood my
19   question. Fair?
20   A. Right.
21   Q. If you need to take a break, Dr.
22   Avorn, for any reason, let me know, and
23   we'll be happy to do that.
24   A. Right.

Page 12

1    Q. Is there any reason, sir, that you
2    can't give accurate testimony here today?
3    A. There's no such reason.
4    Q. You're not on any medication, no
5    physical ailments or medical reason you
6    can't give accurate testimony?
7    A. No. It's freezing in here, but
8    aside from that, everything is fine.
9    Q. The one other rule that I would
10   appreciate -- I'll try to do it if you do
11   it -- let me finish my question before you
12   start your answer, and I'll try to not
13   interrupt your answer.
14   A. Sounds good.
15   Q. Can you tell me, sir, what you did
16   to prepare for today's deposition?
17   A. Yes. I reviewed a huge volume of
18   material that plaintiffs' lawyers had sent
19   me. I also have been working in this
20   general area of nonsteroidal
21   anti-inflammatory drugs and their effects
22   since the early 1990s, and so my
23   familiarity with that field was in some
24   meaningful way preparation for this as

Page 13

1    well.
2         I follow that literature in the
3    medical journals, and I contribute to that
4    literature, and our group does research in
5    this area, and so that was also a kind of
6    preparation for today as well.
7         And of course, with the events in
8    the Vioxx case being so prominent in the
9    media, I've also read with interest lay
10   accounts of the Vioxx story over the years
11   as it has unfolded.
12        And in addition, I should say that
13   I've met with plaintiffs' counsel on a
14   couple of occasions to discuss my opinions
15   with them.
16   Q. When did you meet with plaintiffs'
17   counsel and who did you meet with?
18   A. Okay. I met with Mr. Tisi and Mr.
19   Grand. I'll first give you the names, and
20   then we can reconstruct the dates. Mr.
21   Tisi, Mr. Grand, Mr. Buchanan.
22        There was an early meeting with Mr.
23   Seeger. And the most recent of those
24   meetings was yesterday, and there have

Jerry Avorn, M.D.

Page 14

1  been other meetings that I could go back
2  to my calendar and get you the dates of,
3  that have occurred over the last year or
4  so.
5      Q.  Would you do that for me before
6  tomorrow's deposition?
7      A.  Sure.
8      Q.  Other than meeting with Mr. Tisi,
9  Mr. Grand, Mr. Buchanan, Mr. Seeger, do
10  you know whether you've met with any other
11  plaintiffs' lawyer in the Vioxx litigation?
12          MR. TISI:  Just for
13  clarification, Ms. Orendi was with us
14  yesterday as well.
15          THE WITNESS:  I'm sorry.
16          MR. TISI:  That's okay.
17      A.  Yes.  Of course.  And in addition,
18  there was a gentleman from Washington that
19  came -- when Mr. Seeger came last year,
20  whose name I would recognize, but can't
21  recall.  And I've had chats, but not
22  actual meetings, with John Ristaino, whom
23  I know in a variety of connections in
24  relation to pharmacoepidemiology meetings

Page 15

1  and so forth.  I don't think we've ever
2  actually had a meeting about this.
3      And I think I've had no other
4  meetings per se with others that I can
5  recall at the moment, unless there's
6  others that counsel remembers that I don't
7  remember.
8          MR. TISI:  Your memory
9  controls, Doctor.
10          THE WITNESS:  Okay.  Okay.
11          BY MR. GOLDMAN:
12      Q.  Tell me about your meeting
13  yesterday, sir.  How long did you meet and
14  what did you talk about?
15      A.  All day, and it was to review the
16  details of my report in preparation for
17  today's discovery deposition.
18      Q.  Whose idea was it to meet?
19      A.  I think all along we had planned
20  that before the preservation -- before the
21  discovery deposition we would get together
22  and discuss what was going to happen
23  today.  And so it was kind of a mutual
24  understanding that would occur.

Page 16

1      Q.  When you say that you reviewed the
2  details of your report with plaintiffs'
3  counsel yesterday, can you be more
4  specific?
5      A.  Sure.  The report, as you know, was
6  submitted on March 20th.  We went through
7  page by page to make sure that there were
8  no errors in it, to make sure that we
9  were -- that I was clear on what the
10  relevant evidence was behind each of the
11  points that I had made, to discuss where
12  -- if you were to ask me about, you know,
13  on what basis do you say that, that I'd
14  be able today in an efficient way to get
15  you the source document on which that was
16  based and so forth.
17      Q.  Did you talk about questions that I
18  might ask?
19      A.  Sure.
20      Q.  Can you tell me about the questions
21  that the plaintiffs' lawyers anticipated I
22  might ask?
23      A.  Well, it was not specific questions
24  as much as helping me to understand the

Page 17

1  purposes of a discovery deposition as
2  compared to a preservation deposition, and
3  that the goal, I guess, for the defense
4  today is to understand the dimensions of
5  what I'm going to say and on what basis I
6  would be saying it, and any weak points, I
7  guess, in my arguments, so that you and, I
8  guess, plaintiffs' counsel as well, can
9  prepare for the next deposition, which
10  would be the preservation deposition.
11      Q.  Did the plaintiffs' lawyers tell
12  you the types of questions that I might
13  ask substantively about your report?
14      A.  Mostly generically as in defense
15  will try to depict Merck's actions as
16  reasonable and defensible, and that they
17  will describe Merck's behavior as having
18  been responsible throughout.  It was more
19  that generic kind of approach.
20      Q.  And did you take issue with that
21  concept that Merck's conduct was
22  responsible throughout the time Vioxx was
23  on the market?
24      A.  Well, as you know, I don't -- I

Golkow Litigation Technologies · 1 877.DEPS.USA

Jerry Avorn, M.D

Page 18

1  don't feel that that's the case. Correct.
2  Q. Did you practice any questions and
3  answers yesterday?
4  A. Practice -- not practice questions
5  in a role play kind of way. But, for
6  example, in the material that Mr. Tisi
7  just showed you, just as one example, the
8  memo from Dr. Scolnick in which he said
9  that he was pleased that everybody was so
10 concerned about patient safety, you know,
11 that that might be presented to me as
12 counterevidence that -- to demonstrate that
13 Merck was always concerned foremost about
14 patient safety, and what was my reaction
15 to that. And I indicated that my reaction
16 was that previous and subsequent memos
17 didn't seem consistent with that view.
18    So that was the kind of -- you
19 know, what would you -- what's your
20 reaction to this kind of evidence. Because
21 I had -- I had asked to be made aware of
22 the defense's counter arguments to each of
23 these points, so that I would not hear
24 about them for the first time today, and I

Page 19

1  wanted to make sure that I gave Merck a
2  fair shake, in terms of knowing any
3  exculpatory evidence that might be out
4  there that would perhaps modify my
5  opinions.
6    And I -- as we'll discuss later,
7  asked for that consistently so that I
8  would be able to see not just the material
9  that painted Merck in a bad light, but
10 also any evidence that would paint Merck
11 in a better light, both, as I said, to be
12 fair, and also so I don't -- I didn't get
13 surprised today with something that I'd
14 never seen before.
15 Q. Do you believe that the plaintiffs'
16 lawyers gave you all of the evidence, as
17 you put it, that would show that Merck's
18 conduct was responsible and that might
19 demonstrate that your opinions in this
20 case are not completely accurate?
21 A. I asked for that information. I
22 trust them. I would like to believe
23 that's what they did, and we'll find out
24 as time goes on if there's anything else

Page 20

1  that I'm not aware of.
2  Q. The e-mail that you were shown
3  yesterday from Dr. Scolnick by plaintiffs'
4  counsel, had you seen that e-mail before
5  you formed your opinions in this case?
6  A. I don't recall having seen that
7  before.
8  Q. And so that I understand, you
9  specifically asked plaintiffs' counsel
10 before you wrote your report to see all
11 the exculpatory evidence that Merck might
12 have to try to establish that Merck was
13 acting responsibly during the time Vioxx
14 was on the market; is that right?
15 A. Throughout the process, yes. "All"
16 is a loaded word, because I'm sure that
17 when there are millions of pages of
18 documents, there are things that I have
19 not seen. But I wanted to be sure that I
20 got a fair view of the countervailing
21 evidence.
22 Q. Why was it important to you to get
23 a fair view of the countervailing evidence
24 concerning Merck's conduct concerning

Page 21

1  Vioxx, sir?
2    MR. TISI: Objection. Asked
3  and answered.
4  A. Shall I go ahead and answer?
5  Q. Yeah.
6  A. Two reasons. One is, I think
7  that's the right thing to do, and secondly
8  I know that although these seem to be very
9  responsible plaintiffs' attorneys, in my
10 experience with them, nonetheless there's
11 always a risk that a plaintiff's attorney,
12 just like a defense attorney, might
13 present primarily or only their side of
14 the story. And I, as a person who I think
15 is seen as a responsible observer of the
16 pharmaceutical industry, wanted to make
17 sure that I was seeing all sides of the
18 question before I came up with an opinion.
19 Q. Did the plaintiffs' lawyers show
20 you any of the opening or closing
21 arguments that Merck has presented in any
22 of the trials to date?
23 A. I don't think I've seen any
24 materials from any trial on either side.

6 (Pages 18 to 21)

Jerry Avorn, M.D.

Page 22

1    I have followed them in the press, but I
2    didn't see it from plaintiffs' lawyers.
3    Q.  Okay.  Did you review documents
4    with plaintiffs' counsel yesterday, other
5    than the e-mail that Mr. Tisi showed you
6    concerning Dr. Scolnick?
7    A.  Oh, we reviewed tons of documents
8    yesterday.
9    Q.  Were those documents you had with
10   you or that plaintiffs' attorneys brought?
11   A.  They were all documents that I had
12   seen previously.
13   Q.  Have you spoken with any other
14   plaintiffs' expert witnesses in this case?
15        MR. TISI:  Objection.
16   Vague.
17        BY MR. GOLDMAN:
18   Q.  Since you've been retained as an
19   expert witness, Dr. Avorn, have you met
20   with or spoken with any of the experts who
21   have been retained by plaintiffs in the
22   Vioxx litigation?
23        MR. TISI:  Can I ask for
24   clarification, or do you want me to just

Page 23

1    stay out of the way on this one?
2         BY MR. GOLDMAN:
3    Q.  Well, do you understand the
4    question?
5    A.  Yeah.  It's an easy answer.  And
6    that is, I have not discussed this case
7    with any other plaintiffs' witnesses.
8         There are plaintiffs' witnesses
9    that I have had brief chats with on other
10   matters, like Dr. Curfman, but we have not
11   discussed anything related to this case.
12   Q.  So you and Dr. Curfman haven't
13   talked about the expression or concern or
14   anything about the VIGOR publication?
15   A.  That is correct.  I'm trying to
16   recall whether -- since I don't know all
17   of plaintiffs' witnesses, I can't be
18   certain as to whether there may be other
19   people that I have discussed this with.
20   Although in general, I have not discussed
21   this case with people in general.
22        I think the one person that I've
23   discussed it with, more as a piece of our
24   research than as a case, has been Dr.

Page 24

1    Solomon in my division, who, as I
2    understand, is not a witness in the case.
3    Q.  Have you had any discussions with
4    somebody by the name of Dr. Kronmal?
5    A.  I have not had discussions with
6    him.
7    Q.  Have you spoken with Dr. Ray about
8    the Vioxx cases since you were retained as
9    an expert?
10        MR. TISI:  You're talking
11   about Dr. Wayne Ray?
12        MR. GOLDMAN:  Yes.
13   A.  No.
14   Q.  What expert reports have you read,
15   sir, that the plaintiffs' lawyers gave you
16   to read?
17   A.  Okay.  To the best of my
18   recollection, there was one from Dr. Ray,
19   there was one from Dr. Kromholz.  I've
20   seen material from Dr. Kronmal.  I don't
21   know that it was in the form of his
22   report per se, but I'm aware of his work
23   in this case.  I've seen the testimony of
24   Dr. Curfman.

Page 25

1    Q.  I'm actually talking right now
2    about expert reports.
3         MR. TISI:  Okay.  And --
4    A.  Okay.
5         MR. TISI:  Let me -- I'm
6    not sure he knows who's an expert -- I
7    mean, clearly by answering Dr. Curfman's,
8    he doesn't know who's a percipient
9    witness, an expert, or defense expert, as
10   a matter of fact.
11        BY MR. GOLDMAN:
12   Q.  You understand that the plaintiffs'
13   attorneys in the Vioxx litigation have
14   retained expert witnesses who have
15   submitted reports in various cases, right?
16   A.  Correct.
17   Q.  And did the plaintiffs' lawyers
18   send you any reports that were actually
19   written by expert witnesses who you
20   understood were retained by the plaintiffs'
21   lawyers?
22   A.  Yes.
23   Q.  Which expert reports have you
24   reviewed in the Vioxx litigation, Doctor?

7 (Pages 22 to 25)

Golkow Litigation Technologies - 1.877.DEPS.USA

Jerry Avorn, M.D.

Page 26

1    A.  Okay.
2         MR. TISI:  Reviewed or
3    presented?  Your original question was,
4    were you sent any, and then your next
5    question was which ones you have reviewed.
6    He may not have reviewed all we sent him.
7         BY MR. GOLDMAN:
8    Q.  Reviewed.
9    A.  Right.  Reviewed Dr. Ray's,
10   reviewed Dr. Kromholz's, and reviewed
11   material from Dr. Kronmal, but not -- I
12   don't believe the report itself.
13        And I could be more complete if I
14   were to look at a list of what was sent,
15   and then I could identify which of those
16   come to mind.  The ones I've mentioned are
17   the ones that come to mind most
18   prominently.  There may have been others
19   in the list of materials sent me.  I
20   could look and say, yeah, that was an
21   important one, that was not an important
22   one.  But these are the most important
23   ones that come to mind at present.
24        MR. TISI:  And just to be

Page 27

1    clear, Andy, in the documents that we
2    produced to you at your request this
3    morning, I believe, if I'm not mistaken,
4    Jeff, there's a CD with --
5         MR. GRAND:  Actually I have
6    that with me.
7         MR. GOLDMAN:  A CD with
8    what?
9         MR. TISI:  Expert reports.
10        MR. GRAND:  Some of the
11   defense expert reports that were served in
12   New Jersey litigation cases in Farmington
13   to Hatch.
14   A.  But I can add that those arrived
15   while I was in Australia, from which I've
16   just gotten back on Sunday, for two weeks,
17   and I have not looked at that CD.  It
18   arrived while I was away, and I got back
19   on Sunday.  And so while I received it, I
20   have not looked at it.
21   Q.  Am I right, then, Dr. Avorn, that
22   you have not reviewed any expert reports
23   that were generated by experts who have
24   been retained by Merck?

Page 28

1    A.  That was not the question you
2    asked.
3    Q.  I'm following up on the answer you
4    just gave.
5    A.  Right.  That does not follow from
6    the answer I just gave.
7    Q.  Have you reviewed any expert
8    reports that were written by experts for
9    Merck?
10   A.  I'm trying to recall what was sent,
11   and, again, it would help if I could take
12   a look at what was sent to me, and I
13   could refresh my memory, since a lot of
14   this was done over --
15   Q.  If you need to take a look, you
16   can.  There's binders behind me.
17   A.  Okay.  How about the list of
18   materials sent?  Would that be -- That
19   would be easier than going through all the
20   binders.
21        MR. TISI:  Can I --
22        MR. GOLDMAN:  One second,
23   Chris.
24   ///

Page 29

1         BY MR. GOLDMAN:
2    Q.  Are you referring to the list of
3    materials considered that's attached to
4    your report?  Is that what you're thinking
5    of?
6    A.  Yeah.  The list that defense
7    provided for you to use of everything we
8    sent to Dr. Avorn.
9    Q.  The list that plaintiffs' lawyers
10   provided to us?
11   A.  Right.
12   Q.  Okay.
13   A.  Right.  And then I could scan that
14   and -- because it also, as Mr. Tisi said,
15   I don't always recall whether a statement
16   that I read was made by an expert or by
17   -- or in a deposition.
18        MR. TISI:  Can I also add
19   this.  We did provide you those -- Dr.
20   Avorn's binders kind of as a courtesy so
21   that you can take a look at them, and you
22   asked for them.  But if he needs to refer
23   to this stuff, I don't want -- Can I --
24   Have you reviewed those enough?  Can I

Jerry Avorn, M.D.

## Page 30

1  bring them over here so that he can --
2  MR. GOLDMAN: Sure.
3  MR. TISI: -- you know, refer
4  to them? I mean, I don't want to take
5  them away from you, if you want to take a
6  look at them.
7  MR. GOLDMAN: That's fine.
8  MR. TISI: Okay.
9  BY MR. GOLDMAN:
10  Q. I've handed you, Dr. Avorn, the
11  list of materials considered that's
12  attached to your report.
13  A. Right.
14  MR. TISI: And I told you
15  there was a supplement file, which you
16  have a copy of as well. It's on your box
17  over there. It doesn't have anything you
18  asked for, but just to be clear.
19  A. (Witness viewing documents). Okay.
20  As I look at this, my impression is that
21  the defense-related materials was -- that
22  I've seen was from depositions rather than
23  from expert reports, as near as I can
24  tell.

## Page 31

1  Q. And am I right, Dr. Avorn, that the
2  expert reports that the plaintiffs' lawyers
3  sent you, that were written by Merck's
4  experts, were sent to you after you
5  generated your report and arrived while
6  you were in Australia?
7  A. That's my understanding.
8  Q. What material of Dr. Kronmal's did
9  you review?
10  A. Analyses of data, as I recall,
11  particularly related to the Alzheimer's
12  study, in terms of the outcomes in that
13  trial -- in those trials.
14  Q. Are you relying on anything Dr.
15  Kronmal prepared in your opinions?
16  A. Yes.
17  Q. What are you relying on?
18  A. The analyses. And they were the
19  most -- they were reflected in Dr. Ray's
20  expert opinion as well of Dr. Kronmal's
21  analyses of the Alzheimer's data.
22  Q. We're going to get to the
23  Alzheimer's data later, okay?
24  A. Okay.

## Page 32

1  MR. TISI: And just so you
2  know, I'm trying to be helpful here. I
3  don't think he was provided with any -- he
4  certainly wasn't provided with any of Dr.
5  Kronmal's reports nor his supplemental
6  report follow- up APPROVe stuff.
7  MR. GOLDMAN: Okay.
8  MR. TISI: It was, I
9  believe, just so you're aware, because I
10  know there were several Kronmal reports,
11  and I want to make sure you know what --
12  A. It was the data from Dr. Kronmal
13  that was cited by Dr. Ray in Dr. Ray's
14  report.
15  Q. Did you review any analysis
16  prepared by Kronmal, Dr. Kronmal, other
17  than what was cited in Dr. Ray's report?
18  A. I can't recall whether what I
19  reviewed from him was what was generated
20  by him or what was cited by Dr. Ray.
21  Q. Am I right, sir, that you don't
22  have any intention of --
23  MR. TISI: Should I get
24  this?

## Page 33

1  MR. GOLDMAN: Yeah.
2  (Interruption)
3  BY MR. GOLDMAN:
4  Q. Dr. Avorn, do you have any
5  intention of appearing in any Vioxx
6  trials?
7  A. My intention is only that whatever
8  is videotaped in the preservation
9  deposition is presented. I do not intend
10  to appear personally.
11  (Exhibit-1, Curriculum Vitae of Dr.
12  Avorn, marked for identification).
13  BY MR. GOLDMAN:
14  Q. I've handed you, Dr. Avorn, a copy
15  of a CV that we were provided yesterday.
16  You see it's dated June 2006, and I've
17  marked this as Exhibit 1. Do you see
18  that?
19  A. (Witness viewing document). Yes.
20  MR. TISI: Just to be
21  clear, we did provide you an earlier
22  version of this as well.
23  MR. GOLDMAN: Yes.
24  ///

9 (Pages 30 to 33)

Golkow Litigation Technologies - 1.877.DEPS.USA

BY MR. GOLDMAN:
Q. I just want to make sure, sir, that the CV that is marked Exhibit 1 is an accurate updated description of your background, experience, publications.
A. To the best of my knowledge, yes.
Q. When were you first contacted by plaintiffs' attorney in the Vioxx litigation?
A. Just about a year ago. I think it was around May of '05.
Q. Who contacted you?
A. Mr. Tisi was the -- Let me back up. I have, over the last few years, been getting calls from a variety of attorneys asking if I would become involved in the Vioxx litigation, and for most of that time, I said probably not. And it was only I think in May of '05 that Mr. Tisi persuaded me that it would be a good thing for me to become involved on behalf of the plaintiffs.
Q. Did you agree in May of 2005, then, to be retained as an expert witness for

the plaintiffs?
A. Yes.
Q. Why had you declined to be an expert witness in the Vioxx litigation before, and then decided to be an expert for the plaintiffs in May of 2005?
A. Mostly it was around being busy with other commitments, and I know this kind of involvement can be a real time sink. And the paperback version of my book, which was substantially revised, was being put together in early '05. And in late '04, there was the first edition of the book, and not to mention a lot of other kind of media involvement that was keeping me very busy, and I just couldn't see finding enough time to do this until the original issue of the book had subsided and the paperback revisions had been completed. And so by spring of '05, that was a reasonable time.
And also the fact that it was Mr. Tisi, who is somebody that I've known and worked with in the past, made me more

willing to do it than other attorneys that called out of the blue and asked me to get involved.
Q. When did you first meet Mr. Tisi?
A. Actually several years earlier, because we worked together on the Rezulin litigation.
Q. Did you work as an expert witness with Mr. Tisi in cases involving Rezulin?
A. Yes.
Q. Okay. Was your meeting with Mr. Tisi in May of 2005 in person or by phone?
A. It began with a phone call, and there was then a personal meeting, and I can't recall whether it was in May or June, but it was around the spring of '05 that we did get together in person.
Q. Were other attorneys there with Mr. Tisi?
A. Well, there was one early meeting -- and I could go back and check the dates -- in which there was Mr. Tisi and Mr. Buchanan and Mr. Seeger. I don't know

that Mr. Grand was at that first meeting. And that would have been in spring or summer of '05.
Q. Can you tell me about that meeting?
A. That was a meeting in which they came up to Boston and discussed the position that plaintiffs' attorneys had about the Vioxx matter and set forth their -- their case and asked if I would help them with the case.
Q. And you said that you would?
A. Yes.
Q. Was it your understanding that you were being retained as an expert witness in the spring of 2005 by the Seeger Weiss firm?
A. What I indicated was that I would work only with one set of lawyers, and I would do only one preservation deposition, and I did not intend to testify in individual cases all over the country, and that it was up to the attorneys to figure out among themselves how to make that work on their end.

| Page 38 | Page 40 |
|---|---|
| 1     And so I have remained ignorant,<br>2 happily ignorant to the issue of how much<br>3 is New Jersey versus MDL versus some other<br>4 combination, because I frankly never have<br>5 been able to understand how those things<br>6 work.<br>7     So I indicated to Mr. Tisi and to<br>8 Mr. Seeger that they should figure that<br>9 out among themselves, and I would talk to<br>10 one group and one group only.<br>11     Q. So when you agreed in the spring of<br>12 '05 to be an expert witness for the<br>13 plaintiffs, you were agreeing to be an<br>14 expert witness for Mr. Seeger's firm, for<br>15 the plaintiffs' steering committee in the<br>16 federal litigation, but you just wanted to<br>17 deal with one particular attorney<br>18 throughout the process?<br>19     A. Not one particular attorney, but<br>20 one group of attorneys who may represent<br>21 different constituencies, so long as they<br>22 worked out among themselves how to<br>23 collaborate with each other.<br>24     Q. Am I right, then, Dr. Avorn, that | 1     A. Yes.<br>2     Q. And now I'm talking about your<br>3 meeting in the spring of 2005.<br>4     A. Yes. And I can't be sure whether<br>5 I'm referring to that meeting or a<br>6 subsequent meeting, but there was some<br>7 question initially.<br>8      (Discussion off the record).<br>9     A. At those early meetings — and<br>10 there would have been more than one -- the<br>11 original question was whether I was to<br>12 become involved primarily as a fact<br>13 witness around our own studies of Vioxx<br>14 and of nonsteroidals in general and heart<br>15 disease, or whether I would serve as an<br>16 expert witness and take a broader view or<br>17 both.<br>18     And so a lot of the early<br>19 conversation was around that. And in the<br>20 very first conversations, there was no<br>21 provision to me of materials about Merck's<br>22 activities because of the expectation that<br>23 I was going to be just a fact witness on<br>24 matters of research. And then over time, |

| Page 39 | Page 41 |
|---|---|
| 1 in the spring of 2005, you were agreeing<br>2 to be an expert witness for Mr. Seeger's<br>3 firm, for the plaintiffs' steering<br>4 committee in the federal litigation; your<br>5 only condition was that you work with one<br>6 particular group of attorneys that would<br>7 represent different constituencies?<br>8     A. Correct. And by group I don't mean<br>9 firm. I mean some may represent the MDL<br>10 or some may represent New Jersey cases,<br>11 and that's up to them to figure out.<br>12     Q. Did you take any notes of your<br>13 meeting in the spring of 2005 with the<br>14 plaintiffs' lawyers?<br>15     A. No.<br>16     Q. Did you keep any materials that<br>17 they presented to you?<br>18     A. I don't think they presented any<br>19 materials to me at that meeting.<br>20     Q. When you say that the plaintiffs'<br>21 lawyers discussed their position with you<br>22 or the plaintiffs' position with you, can<br>23 you be a little bit more specific about<br>24 that? | 1 it became clear that a better plan would<br>2 be for me to appear as both a fact<br>3 witness and an expert witness, and that's<br>4 when the materials began to get sent.<br>5     MR. TISI: Can we take that<br>6 break so I can make the phone call?<br>7     MR. GOLDMAN: Sure.<br>8     (Off the record at 9:12 a.m.)<br>9     (Recess taken).<br>10     (On the record at 9:13 a.m.)<br>11     BY MR. GOLDMAN: ·<br>12     Q. Have you ever worked with any of<br>13 the plaintiffs' lawyers in the Vioxx<br>14 litigation to help them identify what you<br>15 perceive to be strong cases for the<br>16 plaintiffs?<br>17     A. You mean the individual patients?<br>18     Q. Yes.<br>19     A. No.<br>20     Q. Have you met with any of the<br>21 plaintiffs' lawyers in the Vioxx litigation<br>22 to discuss their strategy and have input<br>23 into their strategy in the Vioxx<br>24 litigation? |

Jerry Avorn, M.D.

Page 42

1   A   You mean in particular cases?
2   Q.  No.  As a whole.
3   A.  I'm not clear what you mean by
4   strategy.
5   Q.  Have you ever given any of the
6   plaintiffs' attorneys any advice about a
7   good way to present their side of the
8   story in the Vioxx litigation?
9   A.  Only as reflected in my report.
10  Q.  Have you made any effort to help
11  identify Vioxx cases where you believed a
12  high relative risk would apply to a
13  particular plaintiff?
14  A.  No.
15  Q.  Do you have any written retention
16  agreements?
17  A.  No.
18  Q.  Tomorrow, after you tell me what
19  meetings you had as reflected in your
20  calendar, we'll go through some of those
21  additional meetings with the plaintiffs'
22  lawyers. Okay?
23  A.  When you say go through --
24  Q.  Talk about.

Page 43

1   A.  Okay.
2   Q.  You are licensed to practice
3   medicine, right?
4   A.  Right.
5   Q.  And what are you board certified
6   in, sir?
7   A.  Internal medicine.
8   Q.  Do you have any board certification
9   in cardiology --
10  A.  No.
11  Q.  -- subspecialty?
12  A.  No.
13  Q.  Can you tell me about how much time
14  you spend taking care of patients?
15  A.  I spent many years being a primary
16  care doctor on the faculty at -- when I
17  was at the Beth Israel Hospital. More
18  recently, since I've got a division to
19  run, I don't do primary care anymore, but
20  I supervise one of the wards at the
21  Brigham and Women's Hospital for several
22  weeks a year every year.
23  Q.  When would you say you stopped
24  actually taking care of patients, sir?

Page 44

1   A.  I found that I did not have the
2   time to be an active primary care doctor
3   at the same time I was developing a
4   division and writing papers and writing
5   grants.
6   Q.  And when was that?
7   A.  That would have been in the mid
8   1990s.
9   Q.  Have you ever advised patients to
10  use COX-2 inhibitors?
11          MR. TISI:  Objection.
12  Vague.
13  A.  When you say advised patients, you
14  mean as their primary care doctor?
15  Q.  Have you, as a doctor, recommended
16  to any individual that he or she use COX-2
17  inhibitors?
18  A.  Most of my recommendations have
19  been via interns and residents over the
20  last number of years, since I'm not a
21  primary care provider.  And I've certainly
22  talked with interns and residents making
23  recommendations about the use or nonuse of
24  COX-2 inhibitors and other nonsteroidals.

Page 45

1   Q.  Did your advice about whether
2   interns and residents at your hospital
3   change over the years in terms of whether
4   you thought they should prescribe Vioxx?
5   A.  Yes.
6   Q.  Can you tell me, sir, at what point
7   you advised, if at all, internists and
8   residents at your hospital to stop
9   prescribing Vioxx?
10  A   Well, when Vioxx was first
11  marketed, before Vioxx was first
12  marketed, Dr. Solomon and I, as part of
13  our role at the Brigham, prepared an
14  educational document for the physicians at
15  the Brigham, since that was one of our
16  division's responsibilities, that we knew
17  that the COX-2s were about to be marketed
18  and we knew that they were about to be
19  marketed very heavily.
20  So before they were available for
21  use, we put together a document advising
22  Brigham physicians how to approach these
23  drugs when they became available  So that
24  would have been in 1999, I guess, around

Jerry Avorn, M.D.

Page 46

1    then.
2        And our recommendation was that
3    they should be used very sparingly, and
4    because they were no more effective than
5    older nonsteroidals, their only virtue
6    would be the potential for less GI
7    toxicity, and that therefore their use
8    should be reserved for patients at risk of
9    gastrointestinal hemorrhage.
10       And so the initial message, even
11   before the drugs were marketed, was they
12   should be used on a limited basis,
13   primarily in patients who particularly
14   needed gastroprotection.
15       And then over the next few years,
16   as data began to appear in the literature
17   about cardiovascular risk, particularly the
18   VIGOR paper of 2000 -- which I bet we'll
19   get to talk about -- we indicated that
20   that was a very worrisome property of, at
21   least of Vioxx, and that that would temper
22   the use of that drug even further, because
23   the risk might exceed the benefit.
24   Q.   Did you ever tell residents or

Page 47

1    internists at your hospital not to
2    prescribe Vioxx under any conditions?
3    A.   Yes.
4    Q.   When?
5    A.   In 2003 -- both Dr. Solomon and I
6    are members of the pharmacy and
7    therapeutics committee at our hospital
8    which governs drug use there -- and at
9    that point, there had already been the
10   VIGOR paper out. Dr. Ray's paper had
11   appeared in the Lancet. Our own findings
12   were coming together on our own research.
13   And we told the pharmacy and therapeutics
14   committee that we were concerned about the
15   safety of Vioxx, and that we felt that it
16   should -- it was at that point the
17   preferred COX-2 drug at the Brigham -- and
18   we felt that it should not be in that
19   status, and, in fact, it probably should
20   not be used.
21   Q.   When in 2003 did you tell the
22   pharmacy and therapeutics committee that
23   you didn't think that Vioxx should remain
24   on their formulary?

Page 48

1    A.   Okay. What we said was that it
2    should not be the preferred drug and that
3    it -- our recommendation was it should not
4    be used, especially since Celebrex seemed
5    to not carry the same degree of
6    cardiovascular risk.
7        And I would say that it would have
8    been in the second half of 2003. But --
9    yeah, that's as near as I can recollect
10   the timing, would have been the second
11   half of '03.
12   Q.   Do you still have a copy of the
13   educational document that you prepared for
14   your residents and internists in 1999?
15   A.   Yes. There is one in my office.
16   Q.   Would you bring that for me
17   tomorrow? That would be helpful.
18   A.   Sure. Let me make a list of what
19   I need to bring.
20       MR. TISI: I'll make the
21   list for you --
22       THE WITNESS: Okay.
23       MR. TISI: -- and we'll
24   certainly discuss whether we'll produce

Page 49

1    these things, obviously, if you have
2    another mechanism to do that. But I
3    suspect we'll be able to locate them and
4    produce them.
5        BY MR. GOLDMAN:
6    Q.   Did you prepare any revisions to
7    this educational document for internists
8    and residents at your hospital over time?
9    A.   No. I believe that it was
10   something which we prepared only when the
11   drugs were initially made available, and
12   then what we did over time was to urge
13   the pharmacy and therapeutics committee to
14   revise the computer ordering system that
15   we have at the Brigham to make Vioxx not
16   recommended. But we, at that point, did
17   not -- we were no longer issuing the
18   print-based document, because we felt that
19   a more efficient thing to do would be to
20   change the system ordering system prompts.
21   Q.   Did you ever --
22       MR. TISI: That's prompts?
23       THE WITNESS: Yes.
24       MR. TISI: P-R-O-M-P-T-S?

13 (Pages 46 to 49)

Jerry Avorn, M.D.

Page 50

1       THE WITNESS: Prompts,
2   right.
3       BY MR. GOLDMAN:
4       Q.   Did you ever advise the pharmacy
5   and therapeutics committee at your hospital
6   to change their status of Celebrex, in
7   terms of whether that was a preferred
8   drug?
9       A.   Well, it never was a preferred
10  drug, so it was nothing to modify.
11      Q.   Did you ever inform the pharmacy
12  and therapeutics committee at Brigham and
13  Women's that you believed Celebrex carried
14  a cardiovascular risk?
15      A.   Oh, we -- we discussed all of that
16  data in detail as it was emerging in --
17  over the last few years.
18      Q.   What have you told the pharmacy and
19  therapeutics committee at your hospital
20  about the cardiovascular risk concerning
21  Celebrex?
22      A.   That among the COX-2 inhibitors is
23  -- was and is our impression -- our being
24  mine and Dr. Solomon's -- that Vioxx

Page 51

1   carried the most substantial cardiovascular
2   risk, and that Bextra, now off the market,
3   Valdecoxib, also carried important
4   cardiovascular risk for -- particularly for
5   patients who were post cardiac surgery,
6   and that Celebrex -- that there was
7   evidence for a cardiovascular risk with
8   Celebrex, but it was a more limited risk
9   that was seen primarily in higher doses
10  than are commonly used, and that of the
11  COX-2s, it was the drug which seemed to
12  confer the lowest cardiovascular risk, but
13  that that risk was not zero.
14      Q.   Did you advise the pharmacy and
15  therapeutics committee at any point not to
16  prescribe Vioxx to patients at high risk
17  of cardiovascular disease?
18      A.   We did not limit the warning to
19  patients at high risk of cardiovascular
20  disease, because I've never been convinced
21  that the data indicate that the risk --
22  the cardiovascular risk of Vioxx is
23  limited to patients at high risk of
24  cardiovascular disease. So we indicated

Page 52

1   that we thought it was a risky drug for
2   any patient.
3       Q.   As to Celebrex, Dr. Avorn, did you
4   ever tell the pharmacy and therapeutics
5   committee at your hospital that they ought
6   not prescribe Vioxx -- I'm sorry --
7   Celebrex to patients at high risk of
8   cardiovascular disease?
9       A.   No.
10      Q.   Back in 1999, when you advised
11  residents and internists at your hospital,
12  through this educational document, that
13  they should use COX-2 inhibitors on a
14  limited basis, am I right that your basis
15  for that recommendation was not that COX-2
16  inhibitors carried a cardiovascular risk?
17      A.   I think in 1999 the concern was
18  more their very great expense with no
19  countervailing benefit, as opposed to a
20  specific worry about cardiovascular disease
21  in 1999.
22      Q.   In 1999, when you were advising
23  your internists and residents at Brigham
24  and Women's Hospital that they ought to

Page 53

1   prescribe COX-2 inhibitors on a limited
2   basis -- and that would include both Vioxx
3   and Celebrex -- your advice was not based
4   on any potential increased cardiovascular
5   risk, true?
6       MR. TISI:  Objection.  Asked
7   and answered.
8       A.   Yeah.  The materials we're talking
9   about were created before the drugs were
10  even on the market.  But yes, that's true.
11      Q.   Have you given any advice to the
12  pharmacy and therapeutics committee at your
13  hospital about any cardiovascular risks
14  associated with traditional NSAIDs?
15      A.   In the course of the discussions
16  that we've had over many months about this
17  category of drug, that issue has come up,
18  and our group actually did one of the
19  first papers demonstrating the risk of
20  hypertension with Ibuprofen back in the
21  1990s, and we discussed the fact that
22  there is clearly a cardiovascular effect
23  of older nonsteroidals as well.
24      And our view, as shared -- as we

14 (Pages 50 to 53)

Jerry Avorn, M.D.

Page 54

1    shared with the P and T committee, was
2    that that risk was -- appeared, from what
3    we know, to be more modest and less well
4    documented than the risk associated with
5    the COX-2s, particularly Vioxx.
6        Q.   Do you believe that traditional
7    nonsteroidal anti-inflammatory drugs carry
8    a risk of -- a cardiovascular risk?
9        A.   Well, in the sense that we know
10   that they raise blood pressure, they do,
11   and in the sense that we know that they
12   increase the risk of congestive heart
13   failure and peripheral edema, they do.
14       The evidence about precipitating
15   cardiac events, such as MIs, is much more
16   limited because there are very few studies
17   in which -- randomized studies comparing
18   them to placebo.
19       Q.   What areas of science, Dr. Avorn,
20   would you consider yourself to be an
21   expert in?
22       A    Internal medicine,
23   pharmacoepidemiology, pharmacoeconomics, the
24   determinants of physician prescribing

Page 55

1    practices, methods of influencing physician
2    prescribing, determinants of patient
3    medication use and methods of influencing
4    them, cost effectiveness of
5    pharmaceuticals, and pharmaceutical policy
6    or health policy as it relates to
7    medication use.  And in addition,
8    geriatric medicine and geriatric
9    pharmacology.
10       Q.   Any other areas?
11           MR. TISI:  Isn't that
12   enough?
13       BY MR. GOLDMAN:
14       Q.   That's quite a few.
15           MR. GOLDMAN:  Off the
16   record.
17       (Discussion off the record).
18       A.   That's all that I can think of.
19       Q.   Let me ask the question again.
20   Other than the areas you just mentioned,
21   Dr. Avorn, are there other areas of
22   science you consider yourself to be an
23   expert in?
24       A.   No.

Page 56

1        Q.   Do you consider yourself to be an
2    expert, sir, in pharmacology?
3        A.   To the extent that it relates to
4    both the rational use of drugs and
5    pharmacoepidemiology and cost
6    effectiveness, yes.  To the extent that I
7    am not a clinical pharmacologist, no.
8        Q.   You wouldn't consider yourself to
9    be an expert in prostaglandins or the
10   clotting cascade, true?
11       A.   I'm not an expert in that.
12       Q.   And you're not an expert in
13   prostacyclin and thromboxane and any
14   imbalance that might result from a COX-2
15   inhibitor, true?
16           MR. TISI:  Objection to
17   form. Vague.
18       A.   I'm not an expert in that.  To the
19   extent that it impacts on the areas that I
20   do have expertise in, I know something
21   about it.  But I'm not an expert.
22       Q.   You wouldn't consider yourself to
23   be an expert in the state of mind of a
24   pharmaceutical company, right?

Page 57

1        A.   Right.
2        Q.   You wouldn't consider yourself to
3    be an expert in the conduct of any
4    pharmaceutical company, true?
5        A.   I don't agree with that statement.
6        Q.   What --
7        A.   That is, I do consider myself to
8    have expertise in that area.
9        Q.   Why do you consider yourself to be
10   an expert in the conduct of a
11   pharmaceutical company?
12       A.   For a number of reasons.  One is
13   that the behavior of a pharmaceutical
14   company in relation to risk and benefit
15   has a great deal to do with
16   pharmacoepidemiology and with the outcomes
17   of drugs.
18       And I've written extensively on --
19   in the New England Journal of Medicine and
20   circulation in JAMA, in my book, in health
21   affairs, on the actions of pharmaceutical
22   companies in relation to the study,
23   follow-up, promotion of their drugs.  So I
24   do consider myself to have expertise in

15 (Pages 54 to 57)

Jerry Avorn, M.D.

Page 58

1   that area.
2     Q.  I understand you've got experience,
3   Dr. Avorn, in how drug companies promote
4   their drugs. Do you consider that to be
5   the same thing as being an expert in the
6   conduct of a pharmaceutical company?
7          MR. TISI:  Object to the
8   word conduct. He may be using it in
9   different ways. But go ahead.
10    A.  Yes. Because it's not just about
11  promotion; it's also about the way a
12  company evaluates risks and benefits of
13  its products and communicates those --
14  that information to physicians and to
15  patients. That's all part of the conduct
16  of the company, as you phrase it.
17    Q.  What pharmaceutical companies have
18  you evaluated to make an assessment of how
19  you view their conduct?
20    A.  Merck, Glaxo, in which I felt they
21  behave appropriately and honorably in the
22  context of a study that we're doing with
23  them on one of their drugs. Pfizer.
24         It's -- We don't study companies

Page 59

1   per se except in the present context. We
2   study primarily drugs. But when it's a
3   sole source manufacturer, that involves
4   studying the company as well.
5     Q.  Do you consider yourself to be an
6   expert in determining a pharmaceutical
7   company's intent?
8          MR. TISI:  Objection to
9   form.
10    A.  I think no one -- It's difficult to
11  know intent. One can only know about
12  behaviors.
13    Q.  So I take that to mean you don't
14  consider yourself an expert in determining
15  pharmaceutical companies' intent?
16    A.  Well, I think that's a very
17  problematic question for a lot of ways.
18  One is there are no standards for
19  determining expertise, and it's not like
20  you're board certified in pharmaceutical
21  company intent.
22         Secondly, the concept of intent
23  implies knowing something about the
24  intrapsychic processes of a company, and

Page 60

1   companies don't have intrapsychic
2   processes.
3          So I think one can look at
4   behaviors of individuals in companies, and
5   one can make very plausible conclusions
6   about the goals that those behaviors were
7   designed to achieve.
8          But the way you phrased it, since
9   nobody can get inside the head of a
10  company, since companies don't have heads,
11  no one can be an expert in that, the way
12  you phrased the question.
13    Q.  Well, you wouldn't consider
14  yourself to be an expert in determining
15  the intent of individuals who work at
16  pharmaceutical companies, true?
17    A.  Primarily their behaviors, and
18  inferences can then be drawn, with some
19  degree of plausibility, about the intent
20  that those behaviors may reflect. But
21  primarily all that anyone can observe is
22  the behavior.
23    Q.  Other than observing the behavior
24  of a pharmaceutical company, Dr. Avorn,

Page 61

1   you don't consider yourself an expert in
2   determining the intent of individuals who
3   work at pharmaceutical companies; is that
4   fair to say?
5     A.  Not exactly. I think it's
6   analogous to saying if somebody comes upon
7   a person in the subway and raises a knife
8   to stab them -- as happened yesterday in
9   New York -- you don't need board
10  certification to know that that person had
11  intent to harm them. One can observe only
12  the raising of the hand with a knife, and
13  one cannot prove that one knows what's in
14  the head of a person. But it's pretty
15  obvious what the intent was.
16         And so in that sense, there is no
17  expertise that is documentable, but it
18  comes down to common sense, drawing a
19  connection between a behavior and an
20  intent.
21    Q.  You would agree that anybody can
22  look at somebody in the subway raising a
23  knife up and be able to conclude whether
24  or not that person intends to harm the

16 (Pages 58 to 61)

Jerry Avorn, M.D.

Page 62

1    victim?
2    A.  Yes.
3    Q.  You don't have to be a board
4    certified doctor in internal medicine or a
5    pharmacoepidemiologist to make that
6    assessment, true?
7    A.  Correct.
8    Q.  And the same is true for
9    determining the intent of a pharmaceutical
10   company?
11        MR. TISI:  Objection.
12   A.  It's less clear cut than a person
13   going to stab somebody, but I think a
14   similar argument can be made.
15   Q.  Have you ever worked for a
16   pharmaceutical company, sir?
17   A.  Not as an employee.  We've received
18   grants from pharmaceutical companies.
19   Q.  To do research?
20   A.  Yes.
21   Q.  How much time would you say, Dr.
22   Avorn, you've spent working as an expert
23   in the Vioxx litigation?
24        MR. TISI:  Objection.

Page 63

1    Vague.
2    A.  Up to the end of calendar '05, I
3    believe it was about 125 hours.  And
4    there's been another, I would guess, 200
5    hours since then.
6    Q.  How much are you charging the
7    plaintiffs' lawyers to be an expert in the
8    Vioxx litigation?
9    A.  I don't accept any compensation for
10   this work.  I request if they want, they
11   can make a donation to a charitable fund
12   from which I derive absolutely no benefit.
13   Q.  What's the name of the charitable
14   fund that you request the plaintiffs'
15   lawyers donate money to?
16   A.  The Fidelity Charitable Gift Fund.
17   Q.  Have you submitted any invoices to
18   the plaintiffs' lawyers to date?
19   A.  I submitted one a long while ago
20   through the end of '05, which hasn't yet
21   been -- nothing has been -- no checks have
22   been issued as a result of that invoice.
23   Q.  Do you know how much the invoice
24   was?

Page 64

1    A.  It was for about 90,000 -- some odd
2    thousand dollars for about 125 hours.  We
3    can get you the exact numbers.
4    Q.  You're charging $750 an hour; is
5    that right?
6    A.  It's not a charge, but that's what
7    my normal hourly rate is.
8    Q.  I read in your book "Powerful
9    Medicines" -- I think I read it in there
10   -- that the revenues that you generate
11   from sales of that book go to a
12   foundation --
13   A.  Right.
14   Q.  -- is that true?
15   A.  Right.
16   Q.  What's the name of the foundation?
17   A.  Well, thus far, the revenues have
18   also gone to the Fidelity Charitable Gift
19   Fund, pending the IRS approval of the
20   501(c)(3) status of the foundation, which
21   just occurred in the last month.  So now
22   -- now the revenues will be directed
23   there.
24   .Q.  What's the name of the foundation?

Page 65

1    A.  The Alosa Foundation, A-L-O-S-A.
2    Q.  What does the Alosa Foundation do?
3    A.  It exists to provide information on
4    rational and appropriate medication use to
5    doctors and students and patients.
6    Q.  How does it accomplish that?
7    A.  Well, one activity at the moment is
8    a project being supported by the
9    Commonwealth of Pennsylvania in which
10   physicians are given information about the
11   risks and benefits and costs of drugs that
12   is noncommercial based on a lot of earlier
13   research in this area.  So they have an
14   alternative to a pharmaceutical company
15   advertising as a source of information.
16   Q.  Does the Alosa Foundation have any
17   employees?
18   A.  It has a number of contractors,
19   primarily pharmacists and nurses in the
20   state of Pennsylvania, who go out to visit
21   doctors as supported by the state of
22   Pennsylvania.
23   Q.  Do any of your family members work
24   for the Alosa Foundation?

17 (Pages 62 to 65)

Jerry Avorn, M.D.

Page 66

1    A.  There are no -- It has no paid
2    employees.
3    Q.  Does the Alosa Foundation have any
4    directors?
5    A.  Yes.
6    Q.  Are any of the directors related to
7    you?
8    A.  Yes.  The directors are Dr.
9    McNagny, the medical foundation, Dr.
10   Strafford of Tufts Medical School, Ms.
11   Davis at Brandeis.  There's one -- There's
12   five.  And the person who kind of convenes
13   it but receives no payment is my wife,
14   whose name is Karen Tucker.
15   Q.  Does your wife receive any
16   compensation at all for her assistance in
17   the Alosa Foundation?
18   A.  Absolutely none whatsoever.  Nobody
19   does.
20   Q.  Have you taken a tax deduction at
21   all, Dr. Avorn, for the expert witness
22   work you've done in the past?
23   A.  No.
24   Q.  Do you know whether the directors

Page 67

1    of the Alosa Foundation have the power to
2    amend or repeal the bylaws of Alosa
3    Foundation?
4    A.  I -- I'm not sure of this, but I
5    think any foundation, the directors and
6    principal could amend the bylaws.  The
7    bylaws currently state that no officer
8    shall receive any compensation.
9    Q.  Do the bylaws of the Alosa
10   Foundation state that directors can receive
11   reasonable compensation for services?
12   A.  No.  No -- No compensation.
13   Q.  What is PACE?
14   A.  PACE is the pharmaceutical
15   assistance contract for the elderly, which
16   is a program run by the state of
17   Pennsylvania to cover the medication costs
18   of elderly patients in Pennsylvania.  It's
19   a sub unit of the Pennsylvania state
20   department of aging.
21   Q.  Does the PACE contract have any
22   relationship to you?
23   A.  The PACE --
24   Q.  Withdrawn.  Are you involved with

Page 68

1    PACE in any way?
2    A.  Sure.  That is the division of the
3    state of Pennsylvania government that is
4    responsible for the program I mentioned,
5    of getting information to doctors about --
6    and patients about drug use.
7    Q.  Is that the -- Is PACE the
8    organization that's committed $3 million to
9    the Alosa Foundation?
10   A.  Right.  It's not an organization.
11   It's a division of the government.  But
12   yes.
13   Q.  How are you being paid right now as
14   you testify here today, Dr. Avorn?
15   A.  Do you mean for this testimony?
16   Q.  No.  For your time here.  Are you
17   being paid at all?
18   A.  No.
19   Q.  Are you taking away time that you
20   would be spending working on grant
21   projects or other things at your
22   university?
23   A.  The rules at Harvard are that one
24   can spend up to 20 percent of one's time

Page 69

1    doing nonuniversity related work.
2    Q.  How much time do you think you
3    spend doing nonuniversity related work?
4    A.  Oh, it's well under 20 percent of
5    my time.
6    Q.  Is it fair to say, Dr. Avorn, that
7    you've been a long time critic of the
8    pharmaceutical industry?
9         MR. TISI:  Objection.
10   A.  I think a long time observer would
11   be a fairer way to state it.
12   Q.  You wouldn't consider yourself a
13   critic of the pharmaceutical industry?
14   A.  I am -- I'm often critical.
15   Q.  Are you also often critical of the
16   Food and Drug Administration?
17   A.  Yes, I am.
18   Q.  Are you also critical of the drug
19   approval process?
20   A.  Yes, I am.
21   Q.  Are you also critical of the way in
22   which adverse events are monitored after
23   drugs come to market?
24   A.  Yes, I am.

18 (Pages 66 to 69)