Jerry Avorn, M.D.

Page 70

1    Q.   Have you taken public position,
2   sir, that there should be no limits on the
3   amount of money that plaintiffs should
4   recover or could recover in product
5   liability cases?
6         MR. TISI:  Objection.
7   Relevance.
8    A.   I don't recall that I've ever
9   stated it in as many words, but I — So
10   if you could rephrase the question.  I
11   don't recall having said that in as many
12   words.
13    Q.   Have you said publicly, Dr. Avorn,
14   that you don't believe there should be a
15   cap on the amount of recovery a plaintiff
16   can receive in product liability
17   litigation?
18         MR. TISI:  Objection.
19    A.   I don't recall making that
20   statement, but if you cite it for me, I'd
21   be happy to look at it and tell you if
22   I've said it.
23    Q.   Do you believe there should be a
24   cap when it comes to the amount of

Page 71

1   recovery a plaintiff can recover in
2   product liability litigation?
3         MR. TISI:  Objection.
4   Relevance.
5    A.   I don't think there should be.  But
6   I'm not an expert on that.
7    Q.   Have you said publicly that you are
8   opposed to any effort by the Food and Drug
9   Administration to preclude plaintiffs from
10   recovering money in product liability
11   litigation in situations where plaintiffs
12   cannot prove that the pharmaceutical
13   company committed fraud?
14         MR. TISI:  Objection.
15    A.   I believe that's accurate.
16    Q.   Okay.  Have you publicly praised
17   the jury that returned a verdict for the
18   plaintiffs in the first Vioxx case in
19   Texas?
20         MR. TISI:  Objection.
21    A.   I don't recall making such a
22   statement, but if you show it to me, I'd
23   be happy to tell you if I really said
24   that.

Page 72

1    Q.   Were you pleased when the jury
2   returned a verdict for the plaintiffs in
3   the first Vioxx trial?
4         MR. TISI:  Objection.
5    A.   I don't get involved in thinking
6   about individual cases in this litigation.
7    Q.   You didn't have a reaction one way
8   or the other when the jury came back
9   against Merck in the first trial?
10         MR. TISI:  Objection.
11    A.   I honestly can't recall, because I
12   really don't get into the specific details
13   of individual plaintiffs, because there are
14   so many ins and outs of their particular
15   situation.  So I just don't remember what
16   my reaction was.
17    Q.   Have you followed with interest the
18   Vioxx trials?
19    A.   Yes.
20    Q.   Have you had any reaction when
21   other juries have come back and returned
22   verdicts in Merck's favor?
23    A.   As I said, the prevailing view that
24   I have is that each individual plaintiff

Page 73

1   is different, and I've made a point of not
2   delving into the particular clinical
3   characteristics of any one plaintiff,
4   because frankly, I don't have the time or
5   the interest.
6    Q.   Why do you believe that each
7   particular plaintiff in the Vioxx
8   litigation is different?
9    A.   They are different people with
10   different histories of Vioxx use, different
11   other aspects of their cases  And that's
12   one of the reasons that I have decided not
13   to become involved in anything at the
14   individual patient level.
15    Q.   When you say that plaintiffs in the
16   Vioxx litigation are different, are you
17   saying that some plaintiffs in the Vioxx
18   litigation, in your view, had heart
19   attacks because of Vioxx, and other
20   plaintiffs had heart attacks for other
21   reasons?
22         MR. TISI:  Objection.
23    A.   No.  I'm not saying that.
24    Q.   Is it your view that Vioxx caused

19 (Pages 70 to 73)

Jerry Avorn, M.D.

Page 74

1  or contributed to every heart attack
2  suffered by any person who used Vioxx?
3      MR. TISI:  Objection.
4      A.  I, as I said before, don't get into
5  specific clinical issues of particular
6  individual patients.
7      Q.  But is it your position globally,
8  sir, that Vioxx caused or contributed to
9  heart attacks experienced by anybody who
10  used Vioxx while it was on the market?
11      A.  I don't have a position on that.
12      Q.  When did you start testifying for
13  plaintiffs in pharmaceutical litigation?
14      A.  I think I've only done it in about
15  five or so cases.  I think actually my
16  first testimony was on behalf of Pfizer.
17  It would have been perhaps as far back as
18  the 1980s.  The company was being sued by,
19  in my view, an irresponsible plaintiff,
20  who claimed that the Pfizer's drug -- I
21  think it was streptomycin; that Pfizer was
22  at fault because its streptomycin caused
23  deafness in a child who was given it.
24      And Pfizer's position, with which I

Page 75

1  agreed, was that they had adequately
2  warned of the risks of their drug, and
3  that it was misuse of the drug by the
4  physician rather than a problematic
5  labeling of the drug by the company that
6  was the problem.
7      And they -- As I recall, they
8  approached Harvard Medical School and asked
9  for help in making their case, and somehow
10  the medical school identified me as
11  somebody who thought about these issues,
12  and I was happy to defend -- help Pfizer
13  defend itself against those claims. And I
14  think that was the first case I became
15  involved in.
16      Q.  What was the name of that case?
17      A.  Oh, God.  I don't know.  I'm sure
18  you folks have databases.  You can look
19  this up.  It was in Florida, and it would
20  have been, I think in the '80s, and that's
21  all I can recall.
22      Q.  Did you testify in that case in a
23  deposition?
24      A.  I -- As far as whether it was

Page 76

1  deposition or at trial, I honestly can't
2  recall.  But I did testify.
3      Q.  Do you have any recollection at all
4  of the name of the lawyer who represented
5  Pfizer?
6      A.  Actually I can tell you that --
7  yeah.  It was -- Holland & Knight was the
8  firm, and it was in their Miami office in
9  the '80s.  And I think that was my first
10  encounter with this business.  And it was
11  on behalf of a drug company.
12      Q.  But you don't remember the name of
13  the lawyer at Holland & Knight?
14      A.  No.
15      Q.  Have you testified on behalf of a
16  pharmaceutical company since the 1980s?
17      A.  No.
18      Q.  Have you testified on behalf of
19  plaintiffs in pharmaceutical litigation
20  since the 1980s?
21      A.  Yes.  I think about four or five
22  cases.
23      Q.  Can you tell me the names of the
24  cases where you've testified for plaintiffs

Page 77

1  in product liability cases?
2      A.  Sure.  It was about Rezulin, which
3  was Troglitazone.  Another was the
4  Fenfluramine or Redux, the diet pills
5  cases was the second.  PPA or
6  Phenylpropylamine, was the third.  And I
7  believe I -- I believe I became involved
8  with the Baycol cerivastatin case.  And I
9  think -- I think those are the ones that
10  I recall.  If there's any others that you
11  are aware of, I can confirm or refute.
12      Q.  Have you been approached to
13  represent or testify on behalf of Pfizer
14  in the Bextra litigation?
15      A.  No.
16      Q.  Have you been approached to testify
17  on behalf of Pfizer in the Celebrex
18  litigation?
19      A.  No.
20      Q.  Have you been approached by any
21  pharmaceutical company since the 1980s to
22  serve as an expert witness?
23      A.  No.
24      Q.  In the Fen-Phen litigation and the

20 (Pages 74 to 77)

Jerry Avorn, M.D.

Page 78

1 Rezulin litigation, the Baycol litigation,
2 the PPA litigation, and now in the Vioxx
3 litigation, did you testify in each case
4 that each of those drugs was defective?
5     A.   Defective is a legal firm that I
6 wouldn't presume to define.  I think I
7 testified in each case that its risks
8 exceeded its benefits.
9     Q.   Did you testify in each of the
10 cases mentioned before, Fen-Phen, Rezulin,
11 Baycol, PPA and now Vioxx, that the
12 manufacturers of those drugs failed to
13 warn properly?
14     A.   Yes.
15     Q.   Did you testify in each of those
16 cases that the drug manufacturer knew
17 about the risks that ultimately led to
18 those drugs being withdrawn before
19 approval?
20     A.   Before approval.  I think the main
21 point of the testimony in each of those
22 cases was -- There are always signals of
23 potential problems.  I think the issue was
24 not was there or wasn't there a risk, but

Page 79

1 how did the company work out that risk and
2 study it and warn about it.
3     Q.   When you say that there are always
4 signals of potential problems, what do you
5 mean?
6     A.   That it's not just --
7             MR. TISI:  Can I ask, are
8 we talking about in those cases or in --
9             MR. GOLDMAN:  Fair point.
10             MR. TISI:  -- any drug, any
11 one, at any time?
12             BY MR. GOLDMAN:
13     Q.   Dr. Avorn, when you were referring
14 to your previous testimony about Fen-Phen,
15 Rezulin, Baycol, PPA and now Vioxx, you
16 said there are always signals of potential
17 problems.  Can you be more specific?
18     A.   Yes.  That it's not merely about
19 whether there was an observation of a
20 potential risk prior to marketing.  It's
21 also about whether those signals were
22 appropriately taken into account and worked
23 up with subsequent studies and
24 communications.

Page 80

1     Q.   I'm not sure I understand how that
2 answer relates to my question about there
3 always being signals of potential problems.
4     A.   That I don't advocate the view that
5 if somebody can find evidence that there
6 once was a patient or an animal, prior to
7 marketing, who had a certain problem, that
8 that automatically makes a company guilty
9 for -- if that problem turns out to be
10 important clinically later.
11             I think what matters is whether
12 that evidence, for which there are
13 frequently lots of examples for lots of
14 drugs, is studied and acted on
15 appropriately, as opposed to there once
16 was a rat who had, you know, a heart
17 valve problem and you should have done --
18 you know, you should have taken the drug
19 off the market.  That -- I don't hold to
20 that extreme view.
21     Q.   Is it your position that Merck was
22 aware of a potential cardiovascular risk
23 of Vioxx before Vioxx was approved by the
24 FDA?

Page 81

1     A.   Yes.
2     Q.   What's your basis for that?
3     A.   The evidence -- there's ample --
4 there's many sources, but they include the
5 findings and recommendations of its
6 scientific advisory committee, for example,
7 that met, I believe, in 1998, and
8 indicated a variety of concerns about
9 potential cardiovascular toxicity.
10             I think key in your question was
11 the word potential.  I'm not saying that
12 there was grounds for the drug never ever
13 could have been marketed, but there were
14 clear warnings that because of the
15 pharmacology of COX-2 inhibition, selective
16 COX-2 inhibition, that there was clear
17 reason to worry, that was stated at that
18 time and presented to Merck by its own
19 advisory committee prior to launch.
20     Q.   Did the Board of Scientific
21 Advisors tell Merck in 1998 that there
22 might be potential adverse effects from
23 Vioxx, but that Vioxx might also offer
24 benefits --

21 (Pages 78 to 81)

Jerry Avorn, M.D.

Page 82

1    A.   Yes.
2    Q.    -- to the heart?
3    A.   Yes, they did.
4    Q.   Would you agree, Dr. Avorn, that at
5    the time Vioxx came to market, it had not
6    been established that Vioxx increased the
7    risk of cardiovascular events?
8    A.   The word "established" is important
9    there, because it has to do with what one
10   means by established.
11        I think what's fair to say is that
12   at the time that Vioxx was marketed, there
13   was worrisome pharmacological evidence
14   based on studies in animals and humans.
15   There were worrisome signals from
16   preapproval trials that should have raised
17   great concern about the potential for
18   cardiovascular risk.
19        That risk was not absolutely nailed
20   down at the time of launch, but there was
21   already evidence from both human and
22   animal and lab studies indicating that
23   this was an important potential problem
24        MR. TISI: Andy, we've been

Page 83

1    going about an hour and a half --
2        MR. GOLDMAN: Sure.
3        MR. TISI: Can we agree to
4    take periodic breaks? I mean, I don't
5    want to interrupt your flow, if you're in
6    a particular area.
7        MR. GOLDMAN: No. Let me
8    just see --
9        MR. TISI: I'm sorry. Did
10   I interrupt?
11       THE WITNESS: You're
12   interrupting my flow -- my flow for my
13   bladder, which I would love be able to do.
14       MR. GOLDMAN: Let the record
15   reflect there's a lot of hugging going on.
16       MR. TISI: Oh, come on.
17       MR. GOLDMAN: I'm just
18   kidding.
19       MR. TISI: I sure hope so.
20       (Off the record at 9:57 a.m.)
21       (Recess taken).
22       (On the record at 10:03 a.m.)
23       MR. GRAND: I just want to
24   preserve for the record, I mean, I

Page 84

1    understand that for purposes of the MDL
2    that the scope of production for expert
3    materials and communications and
4    conversations between Dr. Avorn and
5    attorneys is broader in federal litigation
6    than it is in New Jersey, and so I didn't
7    interrupt when you were proceeding through
8    that line of questioning, but I just want
9    to preserve for the record New Jersey's
10   objection.
11       BY MR. GOLDMAN:
12   Q.   Did you have any discussions with
13   counsel about your testimony or anything
14   about this process at the break, sir?
15   A.   No. Only the temperature of the
16   room.
17   Q.   That's what I figured.
18        You just testified a minute ago,
19   Dr. Avorn, that at the time that Vioxx was
20   launched in May of 1999, there was already
21   evidence from human and animal and lab
22   studies that there was an important
23   potential cardiovascular problem with
24   Vioxx. Do you remember that testimony?

Page 85

1    A.   Yes.
2    Q.   Would you please tell me just the
3    names, or a very brief description, of the
4    human studies that you believe showed a
5    cardiovascular problem with Vioxx before
6    the drug was launched?
7        MR. TISI: Obviously,
8    actually I think you misstated -- you
9    recharacterized his answer in your
10   question. He used the word potential; you
11   didn't.
12       BY MR. GOLDMAN:
13   Q.   Dr. Avorn, can you tell me the
14   names of the human studies that you
15   believed, before Vioxx was launched, showed
16   an important potential cardiovascular
17   problem with Vioxx?
18   A.   In humans now?
19   Q.   Start with humans.
20   A.   Okay. And I may need to refer to
21   some of the books. But as indicated in
22   my report, Protocol 017, there was a memo
23   from October of '96, 1996, of a six-week
24   trial, which is, of course, a very short

22 (Pages 82 to 85)

Jerry Avorn, M.D.

Page 86

1  trial, in which the committee at Merck
2  that reviewed the trial noted adverse
3  events of most concern. Quote, Adverse
4  events of most concern were in the
5  cardiovascular system, e.g., MI, unstable
6  angina, increase in blood pressure, close
7  quote.
8      Q.  Dr. Avorn, just so I make myself
9  clear --
10     A.  Right.
11     Q.  -- I just want you to refer to the
12 protocol and not any description --
13     A.  Oh, okay.
14     Q.  -- of the study for now.
15     MR. TISI:  Actually, your
16 question was, if you can identify the name
17 of the study or describe the studies was
18 your question, if you go back and take a
19 look at it.
20     BY MR. GOLDMAN:
21     Q.  And you just did both and -- So
22 let me start over, okay?
23     MR. TISI:  No, wait a
24 second. I think he attempted to describe

Page 87

1  the study.
2      BY MR. GOLDMAN:
3      Q.  We're going to explore all the
4  studies, Dr. Avorn, okay?
5      A.  Okay.
6      Q.  I just want you to identify the
7  names of the human studies that you claim
8  occurred before Vioxx came to market in
9  the United States that showed an important
10 potential cardiovascular problem.
11     A.  Okay. So I've mentioned Protocol
12 017.
13     Q.  Mm-hmm.
14     A.  There was also the cyclosporine
15 excretion study, which I consider a human
16 study in that it was measuring levels of
17 the cyclosporine -- I'm sorry --
18 prostacyclin, not cyclosporine --
19 prostacyclin excretion in humans which was,
20 at the time, seen as, potentially, a
21 marker of a problematic cardiovascular
22 risk.
23     Q.  There you're talking about the
24 FitzGerald study?

Page 88

1      A.  Yes. And there were some others
2  that I can give you the names of, if I
3  refer to the binders, because I don't have
4  the protocol numbers memorized, but I just
5  yank those.
6      (Off the record at 10:07 a.m.)
7      (Discussion off the record).
8      (On the record at 10:13 a.m.)
9      A.  We've talked about Protocol 017.
10 Okay.
11     In addition, the material from the
12 new drug application that was submitted in
13 1998, there were a number of pieces of
14 evidence from clinical trials that were
15 part of the application to the FDA for
16 approval of Vioxx which raised that
17 concern.
18     I think the NDA was Number 21-042.
19 And we can come back to that if you just
20 want me to name them at the moment.
21     Q.  I want to know the specific studies
22 that you're saying were done before
23 approval that showed potential
24 cardiovascular risk for Vioxx. And so far

Page 89

1  you've named 017. What's the second one?
2      A.  Okay.
3      (Witness viewing documents). Okay.
4  I'm looking at a string of them within the
5  NDA, and if necessary, I can go back and
6  identify which of them. It's basically --
7  all right. It's a number of clinical
8  trials, and I can identify which of the
9  three digit numbers we mean. It will just
10 take a second.
11     (Witness viewing documents).
12     Okay. The issue here is that the
13 NDA -- the FDA report or evaluation of the
14 NDA as summarized by Dr. Pelayo -- in
15 '98-'99, refers to the collection of
16 studies, and makes conclusions from a
17 variety of humans based on a variety of
18 human studies, and I can, if you want,
19 refer back to which protocols Dr. Pelayo
20 was referring to and which statements.
21 But the overview itself refers to the
22 studies that were in the NDA packet. So
23 would you want me to go back and --
24     Q.  What statement are you referring to

23 (Pages 86 to 89)

Jerry Avorn, M.D.

1  by Dr Pelayo?
2    A.  Okay.  Oh, several.  Okay.  But in
3  brief, we're talking about the statement
4  from Dr. Pelayo that was data.  The NDA
5  was received in December of '98, and the
6  review was completed in April of '99.  And
7  so statements of the kind -- of the
8  following kind in which he talks about
9  concern that patients may be at high risk
10  for thromboembolic cardiovascular adverse
11  experiences --
12    Q.  What page are you on?
13    A.  Okay.  Why is there no page number
14  here?  Do they not have page numbers?
15  How come they don't have page numbers?
16       MR. GOLDMAN:  Off the
17  record, please.
18       (Off the record at 10:17 a.m.)
19       (Discussion off the record).
20       (On the record at 10:17 a.m.)
21    A.  Okay.  So that was -- all right.
22  I'm having trouble even finding a section
23  number here.  All right.  Maybe giving you
24  table numbers would be helpful.

1       So for example, Tables 44 through
2  47, for example, referring to Studies 044
3  and 045, look at the proportion of
4  patients with hypertension or edema-type
5  adverse experiences.  Okay.  So that I
6  think is pretty concrete.
7       Table 44, Studies 44 and 45, in
8  whichTtable 44 looks like hypertension and
9  -- looks at hypertension and edema, as
10  does Table 45, but that is study Number
11  034C.
12       Table 47, in which he lumps
13  together all the six month OA studies as a
14  group.  And then there's some studies by
15  creatinine, which is different.
16       And then again, Table 52, which is
17  called thromboembolic adverse events, all
18  OA trials, and that's where it becomes
19  difficult to know -- to be able to
20  specify, although we could with time, all
21  the OA trials submitted as part of the new
22  drug application.  And again, there's a
23  higher rate of thromboembolic adverse
24  events.

1    Q.  In what?
2    A.  In Rofecoxib, compared to
3  Ibuprofen, compared to Nabumetone.  Then
4  he gets into nervous system.
5       So if it would be helpful, we could
6  go through all of the specific studies
7  cited by Dr. Pelayo in his review.  But
8  some of them are study specific, some of
9  them refer to tables, which have summaries
10  in them.
11       Okay.  But -- So in general, the
12  NDA studies submitted as part of the new
13  drug application -- and I can provide more
14  -- all of the studies, since he sometimes
15  summarizes them, include -- and again, I'm
16  not saying every one of these studies was
17  referred to -- but the studies that Dr.
18  Pelayo relied on in his impression were
19  Protocols 010, 029, 033, 040, 058, 034,
20  035, 044, 045, 029C, 034C.
21       And again, I'm not saying that
22  every one of those studies provides that
23  information, but they were referred to
24  sometimes in groups of studies.  And we

1  can go back over each one of those
2  protocols if you want.  But if we're just
3  naming them now?
4    Q.  (Counsel nodded).
5    A.  Okay.  So they were the NDA studies
6  that Merck -- Well, I'll just leave that
7  here for now.
8    Q.  And it's your testimony, Dr. Avorn,
9  that the studies that were submitted as
10  part of the NDA demonstrate a potential
11  cardiovascular problem with Vioxx?
12    A.  Yes.  Not every one, but there were
13  studies that were part of the NDA package,
14  yes.
15       Okay.  We talked about 017 before.
16  And if we're just enumerating, I'll just
17  keep enumerating.  Okay.
18       (Witness viewing documents).  I'm
19  just looking now to see if there were any
20  others that -- protocol numbers that I
21  might have missed.  My impression now is
22  that that's the bulk.
23    Q.  Are you aware of any other studies,
24  other than the ones you have just

24 (Pages 90 to 93)

Jerry Avorn, M.D.

Page 94

1 identified, that you say show a potential
2 cardiovascular problem with Vioxx prior to
3 the time it was approved?
4   A. Well, that's a different question
5 from what you asked a minute ago, because
6 you asked a minute ago for human studies.
7   Q. Yes. I'm talking about -- Are you
8 aware of any other human studies, other
9 than those that you just mentioned, which
10 you say show a potential cardiovascular
11 problem with Vioxx prior to approval?
12   A. There may be a study whose protocol
13 number I don't recognize. But barring
14 that, no.
15   Q. What animal studies do you say were
16 done prior to the time Vioxx was approved
17 that you believe showed an important
18 potential cardiovascular problem with
19 Vioxx?
20   A. Okay. There was the -- A number
21 of studies out of Dr. FitzGerald's lab. I
22 think Dr. Catella-Lawson had such a paper.
23   Q. About animals?
24   A. I don't recall whether her --

Page 95

1 whether Catella-Lawson's paper was animal
2 or human. It was the -- It was the
3 literature summarized by the Scientific
4 Advisory Board, which I can go to their
5 report, because they -- they refer to
6 animal studies, and let me just pull that
7 out.
8   Q. Is that your source for the animal
9 studies, that you're aware of that show --
10   A. Well, no. I know -- I know that
11 there was also animal literature in the
12 clinical pharmacology literature.
13     I did not focus on animal studies
14 per se, except to know that they were
15 animal studies that had raised this
16 concern.
17   Q. Have you, yourself, looked at any
18 animal studies to see whether they show
19 any potential cardiovascular problem with
20 Vioxx prior to approval?
21   A. Yes. And I -- my recollection is
22 that there are animal studies that showed
23 increases in Thromboxane and reductions in
24 prostacyclin. I can't give you the

Page 96

1 citation right now, but I could come up
2 with it by tomorrow.
3   Q. Would you do that for me?
4   A. Sure.
5     THE WITNESS: And you're
6 making a list of all the stuff I've got
7 to do, right? Okay.
8     BY MR. GOLDMAN:
9   Q. Can you tell me all of the lab
10 studies that you say show an important
11 potential cardiovascular problem with Vioxx
12 before approval?
13   A. But I would lump lab and animal
14 together, and I would like to be able to
15 just get back to you with those specific
16 citations tomorrow.
17   Q. Okay. And will you agree, Dr.
18 Avorn, that if I -- if I permit you to
19 take the time to find the names of those
20 studies, that you will do that on your
21 own --
22   A. Yes
23   Q. -- without the assistance of
24 counsel?

Page 97

1   A. Yes. Although I may ask them where
2 in this pile of many, many binders
3 something is likely to be filed. But I --
4 It will be studies that I've read before.
5   Q. Have you ever taken the position
6 that for a drug that's been withdrawn from
7 the market, the manufacturer warned
8 appropriately about the risks?
9   A. For a drug that's -- has been
10 withdrawn from the market?
11     MR. TISI: You mean in
12 litigation or in literature or personal?
13 What kind of communication are you talking
14 about?
15   A. I don't -- I don't think that I
16 have taken such a position.
17   Q. Have you ever taken the position
18 that a drug company acted responsibly if a
19 drug that was manufactured by that company
20 was subsequently withdrawn?
21   A. Yes In the case of Lotronex made
22 by Glaxo, Alosetron, A-L-O-S-E-T-R-O-N, is
23 the trade -- is the generic name, that the
24 company behaved responsibly in withdrawing

25 (Pages 94 to 97)

Jerry Avorn, M.D.

Page 98

1  it from the market, and in its
2  reintroduction later on with a lot of
3  safeguards.
4  Q. For any drug that has been
5  withdrawn and remains withdrawn from the
6  market, have you ever taken the position
7  that the drug company acted responsibly?
8      MR. TISI: Objection to
9  form.
10  A. I can't recall an example of that.
11  Q. Are all drugs dangerous, sir?
12      MR. TISI: Objection to
13  form.
14  A. It all depends.
15  Q. On what?
16  A. On whether the risks that they have
17  are acceptable in light of the benefits
18  that they produce.
19  Q. Do all drugs have risks?
20  A. Yes.
21  Q. Do you take drugs that have serious
22  risks?
23  A. Yes.
24  Q. Like what and what risks?

Page 99

1      MR. TISI: Objection. I
2  don't think you have to give your personal
3  medication.
4  A. I take low dose aspirin, which
5  carries the risk of bleeding. That's my
6  whole medical regimen.
7  Q. Do you take low dose aspirin
8  because you know that it's
9  cardioprotective?
10  A. Yes.
11  Q. Would you agree, Dr. Avorn, that
12  you've made statements in your book called
13  Powerful Medicines that you did not make
14  when Vioxx was on the market?
15      MR. TISI: Objection.
16  A. I don't understand the question.
17  Q. Would you agree, sir, that the
18  positions that you've taken with respect
19  to the Powerful Medicines book that you've
20  published are different, occasionally, than
21  the positions you took when Vioxx was on
22  the market?
23      MR. TISI: Well, objection.
24  A. You said the --

Page 100

1      MR. TISI: Objection. Let
2  me place an objection. Vague. Not
3  referring to a specific statement.
4  Go ahead.
5  A. Well, your question was the
6  positions I've taken with respect to
7  Powerful Medicines.
8  Q. Mm-hmm.
9  A. Well, that's asking me about
10  positions I've taken about my book. I
11  don't think that's what you mean.
12  Q. Dr. Avorn, in your book called
13  Powerful Medicines, do you take positions
14  that you did not take when Vioxx was on
15  the market?
16      MR. TISI: Objection, for
17  the reason stated.
18  A. No, I don't agree with that. In
19  fact, that book was written while Vioxx
20  was on the market. So that's an
21  impossible situation.
22  Q. When was the book actually written?
23  A. It was written in '03. It was
24  published in '04. But most of the text was

Page 101

1  written in '03. And it was actually out
2  in distribution by the spring and summer
3  of '04, which was before Vioxx was
4  withdrawn.
5  Q. Is it your testimony that you wrote
6  the section about Vioxx in your Powerful
7  Medicines book while Vioxx was on the
8  market?
9  A. Of course. The book was published
10  before Vioxx was removed from the market.
11  Q. Let me hand you, Dr. Avorn, your
12  report in this case.
13      MR. GOLDMAN: I'll mark that
14  as Exhibit 2.
15      MR. TISI: I think he has a
16  copy. Just mark it if you want.
17      (Exhibit-2, Expert Opinion Report
18  prepared by Dr. Avorn, marked for
19  identification).
20      BY MR. GOLDMAN:
21  Q. Is Exhibit 2 the expert report that
22  you have submitted in the MDL, federal
23  litigation, and in the New Jersey state
24  court litigation?

26 (Pages 98 to 101)

Jerry Avorn, M.D.

Page 102

1   A. Yes.
2       MR. TISI: And the
3   California coordinated litigation as well,
4   Counsel.
5   A. It's the report -- It's the one and
6   only report I wrote.
7   Q. Who wrote this report, sir?
8   A. I wrote all of it myself.
9   Q. When did you start drafting it?
10  A. Oh, I would guess in early '06.
11  Q. And did you finish drafting it on
12  March 20th, 2006, when you signed it, or
13  shortly around that time?
14  A. It was around the 20th or -- yeah.
15  Yeah, of course. If I signed it on the
16  20th, it was about the 20th, yes.
17  Q. Did the plaintiffs' lawyers assist
18  you in preparing your report?
19  A. All of the writing is my own. I
20  created it from scratch, and did not have
21  it edited or modified by any attorneys at
22  all. I discussed it with them, and they
23  would indicate if they thought that I had
24  a fact wrong or something like that. But

Page 103

1   it was all my own work.
2   Q. Did the plaintiffs' attorneys ever
3   provide you with any comments about any
4   draft reports that you generated?
5   A. Yes. We would -- I -- there were
6   not many drafts, but I -- there was an
7   earlier version which we talked about, and
8   they said that they found some pieces
9   unclear and so forth. But this is
10  substantially what I wrote.
11  Q. Is the report that you submitted in
12  this case, the 25-page report,
13  substantially the same as the first draft
14  that you wrote?
15  A. Yes.
16  Q. Did the plaintiffs' attorneys
17  suggest any substantive changes to your
18  report?
19  A. Nothing substantive.
20  Q. Did the plaintiffs' lawyers suggest
21  that you add any substantive remarks to
22  your report?
23  A. It was more things they suggest
24  that I shouldn't have in there.

Page 104

1   Q. What did the plaintiffs' lawyers
2   tell you you shouldn't have in your
3   report?
4   A. Well, they pointed out that I had
5   no way of knowing individual people's
6   intentions, and they pointed out I was not
7   an expert in ethics, and that those were
8   things which be inappropriate to
9   have in such a report.
10  Q. Anything else?
11  A. No. That's -- Those are the main
12  areas.
13      MR. GOLDMAN: Let me mark
14  two documents. The first is Exhibit 3,
15  and it's the notice of deposition that was
16  served in the New Jersey cases. And
17  Exhibit 4 is the amended notice of
18  deposition that was served in the federal
19  cases.
20      MR. TISI: Do you have a
21  copy of those? Because I haven't seen the
22  New Jersey one, actually.
23      (Exhibit-3, Notice of Deposition in
24  the New Jersey cases; Exhibit-4, Amended

Page 105

1   Notice of Deposition in the Federal cases,
2   marked for identification).
3       BY MR. GOLDMAN:
4   Q. Dr. Avorn, I'm just going to ask
5   you to start with Exhibit --
6       MR. TISI: Can you just
7   give me a moment to look at this?
8       MR. GOLDMAN: Sure.
9       MR. TISI: Can I just make
10  note -- Yeah. Can I make note for the
11  record that the New Jersey -- I'm looking
12  at the -- This is the first time I ever
13  saw it -- that this notice was served on
14  June 14th, which is yesterday. What's
15  today, the 15th? Do we know what time it
16  was served and uploaded yesterday?
17      MR. GOLDMAN: I do not
18  know. I just know that Merck's attorneys
19  in the New Jersey litigation supplied me
20  with this notice.
21      MR. TISI: Okay. Well, let
22  me just make for the record that we have
23  agreed for this deposition to occur. I
24  think you and I had conversations down in

27 (Pages 102 to 105)

Jerry Avorn, M.D.

Page 106

1  New Orleans at the last status conference
2  over a month ago, we had a notice of a
3  deposition the day before the deposition
4  that I've never seen before today.
5         MR. GOLDMAN: I won't ask
6  about it.
7         MR. TISI: I'm going to
8  make an objection.
9         MR. GOLDMAN: I won't even
10  ask about the particular notice. Let's
11  talk about the notice --
12         MR. TISI: No. Let's --
13  Let me just make sure that we're clear
14  about that. The notice in the federal
15  litigation was issued on the 12th day of
16  June 2006, which is --
17         MR. GOLDMAN: That's the
18  amended notice.
19         MR. TISI: I'm sorry. We
20  never got a notice before that.
21         MR. GOLDMAN: Well, we
22  served a notice. But anyway, go ahead.
23         MR. TISI: Anyway, you know,
24  my position has been -- and you and I

Page 107

1  have e-mailed back and -- that we had very
2  short notice to compile -- we did the best
3  we could to compile the information you
4  requested.
5         I just want to make note for the
6  record that these are -- certainly the New
7  Jersey one is something I've never seen,
8  and I don't think counsel from New Jersey
9  has ever seen it.
10         BY MR. GOLDMAN:
11  Q. Dr. Avorn, my only question is
12  going to be on the fourth page of Exhibit
13  4.
14         MR. TISI: Exhibit 4.
15  Which one are we talking about? The
16  federal one?
17         MR. GOLDMAN: Yeah, the
18  federal one.
19  A. All right.
20  Q. Do you see there are five
21  categories of documents, and I want to go
22  through these and ask you whether you have
23  provided me with all the documents in your
24  possession that are responsive to these

Page 108

1  requests, and if you haven't, when you
2  think you can provide me with that
3  information. So the first is --
4  A. Before you go on, let me also point
5  out I've never seen this document before
6  just now.
7  Q. For the record, I have had an
8  agreement with Mark Robinson, who is on
9  the plaintiffs' steering committee in the
10  MDL, that all plaintiffs' experts will
11  provide responsive documents at their
12  depositions. So that's been a long-time
13  understanding --
14         MR. TISI: I -- Let me --
15         BY MR. GOLDMAN:
16  Q. I understand, Dr. Avorn, you
17  haven't seen it, but that's not my fault.
18         MR. TISI: And let me --
19  Well, it isn't a matter of fault. This
20  is a matter of fairness.
21         I have not been involved in Mark
22  Robinson's case, okay? Just like you were
23  unaware of what happened in New Jersey, on
24  the New Jersey notice. I did get an

Page 109

1  e-mail for you, okay, and I did go through
2  this -- this notice with the doctor. You
3  know, I didn't give him a copy of the --
4  In an effort to comply with your
5  request --
6         MR. GOLDMAN: I gotcha.
7         MR. TISI: -- I provided four
8  -- at least four bankers' boxes of
9  documents today before the deposition for
10  over -- over -- they compiled four boxes.
11  I took them out of the boxes -- so that
12  you could go through them. You asked me to
13  come in early, and I did.
14         MR. GOLDMAN: Let me just
15  -- Let me just cut you off, Chris. I'm
16  not blaming you for not producing
17  everything today, okay?
18         MR. TISI: We produced
19  everything -- I can tell you the one thing
20  we did not produce that you -- if you
21  want me to help you with that.
22         MR. GOLDMAN: Let me go
23  through these items, okay?
24         MR. TISI: That's fine.

Jerry Avorn, M.D.

Page 110

1    BY MR. GOLDMAN:
2       Q.   Dr. Avorn, have you provided to
3    your -- the plaintiffs' lawyers in this
4    case or brought here today for me, Number
5    1, "All materials you've relied -- you've
6    reviewed prior to or since you were
7    retained as an expert in this litigation
8    that relate to Vioxx"?
9       A.   Right.  The attorneys brought all
10   the materials --
11      Q.   Okay.
12      A.   -- today.  And to the best of my
13   knowledge, they brought everything.
14      Q.   Number 2, "All materials in which
15   you rely --
16           MR. TISI:  Can I make an
17   objection -- Now that he's given his
18   answer, can I make an objection that
19   obviously he follows some literature on
20   his own which may not be included in these
21   documents.
22      A.   Right.  And newspaper accounts and
23   other -- right.  But anything that is not
24   in, sort of, public domain; medical

Page 111

1    journals, the New York Times.
2       Q.   Number 2 says, "All materials on
3    which you rely as support for your
4    opinions in the Vioxx litigation."  Have
5    those been provided to me?
6       A.   To my knowledge, yes.
7            MR. TISI:  The only -- The
8    only caveat I make, Counsel, is I notice
9    you have not asked him for information
10   related to a study that he conducted
11   before being involved in litigation.  He
12   did not produce all of those, if there are
13   such documents.
14      A.   In other words, our research back
15   in the '90s --
16           MR. TISI:  Research and
17   those kinds of things.
18           THE WITNESS:  Right.  But
19   those have been in binders that I've
20   reviewed with you, so I believe that those
21   were materials that you shared with the
22   defense.
23           MR. TISI:  Right.
24           THE WITNESS:  You know, our

Page 112

1    papers, and, you know --
2            MR. TISI:  I can explain.
3    I don't want to explain in front of you.
4    I'll explain to Counsel, and we can --
5            BY MR. GOLDMAN:
6       Q.   Okay.  Number 3 says, "All work
7    product other than draft reports that you
8    have prepared in the Vioxx litigation."
9       A.   Right.
10      Q.   Have you given those to me?
11      A.   Right.  It's just this  Yes.
12   Just the --
13      Q.   Just your final report?
14      A.   Correct.
15      Q.   "All statements reflecting time
16   you've spent on Vioxx-related work,
17   including invoices, and all notes or other
18   memos you've prepared in the Vioxx
19   litigation."  Have those been provided to
20   me?
21      A.   There's only one invoice thus far,
22   and Mr. Tisi has a copy of it.  I could
23   try to get a copy of it, if I go back to
24   my office later today.

Page 113

1            MR. TISI:  I'll provide it
2    to you.
3            MR. GOLDMAN:  Okay.
4            BY MR. GOLDMAN:
5       Q.   And five, "All communications you
6    have had with any plaintiffs' lawyer in
7    the Vioxx litigation."  That would include
8    e-mails, sir.  Do you have -- Have you
9    provided all of your e-mails to and from
10   or other correspondence between you and
11   any plaintiffs' lawyer in the Vioxx
12   litigation?
13      A.   Yeah.  The only e-mails were can we
14   -- you know, can I call you tomorrow, can
15   we meet on a certain day.
16           And I generally just get rid of my
17   e-mails, because I have limit on my e-mail
18   storage capacity that shuts me off from
19   sending out future e-mails.  So if it's
20   something of no consequence, like can we
21   talk to you tomorrow, I delete it.  But
22   there were no substantive e-mails ever,
23   anyway.
24      Q.   So you never receive any

29 (Pages 110 to 113)

Jerry Avorn, M.D.

Page 114

1    substantive e-mails from any plaintiffs'
2    lawyer in the Vioxx litigation?
3       A.   Correct.  And let me explain that
4    more fully.
5            While I was traveling in Australia
6    over the last two weeks, there were one or
7    two documents that Mr. Tisi sent me --
8    that I believe he has made available to
9    you -- that had to do with the approved
10   follow-up studies that were -- that just
11   came to light in the last couple of weeks.
12   And I believe those were the only e-mails
13   that contained any substance, apart from
14   can I call you next Tuesday.
15      Q.   When were you provided with the
16   follow-up APPROVe studies, sir?
17      A.   Over the last two weeks, because I
18   remember getting them from Australia --
19      Q.   When did you --
20      A.   -- or on the way to Australia.  It
21   would have been, you know, in the last two
22   weeks in May or first week in June.
23      Q.   When did you review the APPROVe
24   follow-up data?

Page 115

1       A.   Well, there were several iterations
2    of it.  The material -- I certainly
3    reviewed what I saw in the press.
4            There was something which the
5    Associated Press reporter sent to me,
6    apart from this litigation, which she sent
7    to me I think the day that it was in the
8    media.  I looked at that then.
9            And then the additional material
10   that Mr. Tisi sent me, I would have
11   reviewed in the last week or two of May,
12   or maybe the first few days of June.
13          MR. TISI:  I can represent
14   to you what those were, if you would
15   prefer me to do that.
16      A.   And to my recollection, those are
17   the only substantive e-mails that I've
18   ever gotten from Mr. Tisi.
19          MR. TISI:  Do you want --
20   Do you want me to represent what they
21   were, or no, you don't know or you don't
22   care?
23          MR. GOLDMAN:  I don't care
24   right now.

Page 116

1          MR. TISI:  Okay.
2          BY MR. GOLDMAN:
3       Q.   Dr. Avorn, am I right that when you
4    wrote your report in this case, you did
5    not rely on any approved follow-up data?
6       A.   Correct.
7       Q.   And you're not relying on any
8    approved follow-up data for your opinions,
9    true?
10      A.   Well, now that I've seen them, I
11   have opinions about them that contribute
12   to what I believe today.
13          MR. GOLDMAN:  Okay.  We're
14   going to take the position that those are
15   -- in both New Jersey and in the MDL and
16   in California, any opinions that Dr. Avorn
17   has about the approved follow-up data have
18   not been disclosed to us, and I'm not
19   going to explore those, because I haven't
20   been given an --
21          MR. TISI:  You do so at
22   your own peril, Counsel, because -- Let me
23   just -- Let me just make absolutely clear
24   about -- about -- about this, so that you

Page 117

1    are forewarned is forearmed, as they say.
2            We have been asking for the
3    follow-up APPROVe data, as you know, in
4    the MDL for months.  We got those --
5          MR. GOLDMAN:  Let's keep
6    this short, Chris.  I don't want to limit
7    my time --
8          MR. TISI:  I'm going to
9    keep it short.  I understand.  But you
10   can take the position you want.  I don't
11   want to put you in a bad position here.
12          We got those, we turned them over
13   to Dr. Avorn immediately.  We provided you
14   with a -- with a supplemental list of
15   documents relied upon on June 8th.  You had
16   those documents.  Whether you got them
17   from your people or not is not my concern.
18          MR. GOLDMAN:  You provided
19   those in the New Jersey litigation; you
20   did not provide anything like that to me
21   in the MDL.
22          MR. TISI:  Well, you take
23   what position you want.  You're here on
24   behalf of the New Jersey litigation as

30 (Pages 114 to 117)

Jerry Avorn, M.D.

Page 118

1  well, Counsel, correct?
2          MR. GOLDMAN:  Yes.
3          MR. TISI:  Fair enough.  Go
4  ahead.
5          BY MR. GOLDMAN:
6     Q.  The additional -- Well, let me ask
7  you, Dr. Avorn.  In your report, you've
8  got a list of materials considered, and
9  today I was given an amended supplemental
10  list of materials considered that's dated
11  June 8th of 2006.
12          MR. GOLDMAN:  If I
13  understand you, Chris, that you served
14  this on one of the attorneys in the New
15  Jersey litigation?
16          MR. TISI:  No.  That's
17  actually not true.  We served it on your
18  coord -- you have a person, as you know,
19  who coordinates the science expert stuff
20  for California, MDL and New Jersey
21  litigation.
22          MR. GOLDMAN:  What's his
23  name?
24          MR. TISI:  Charlie Cohen.

Page 119

1          MR. GOLDMAN:  Okay.
2          MR. TISI:  We served it on
3  Charlie Cohen on behalf of all the
4  litigation.
5          BY MR. GOLDMAN:
6     Q.  Dr. Avorn, I want to just make sure
7  that this now ten-page materials
8  considered --
9     A.  Mm-hmm.
10     Q.  -- which I'm going to attach as a
11  separate exhibit.
12          MR. TISI:  Would you do me
13  a favor, Counsel, and attach the cover
14  letter as well, just for completeness
15  purposes?
16          MR. GOLDMAN:  Yeah.
17          MR. TISI:  Thank you.
18          (Exhibit-5, Letter of Additional
19  Materials Numbered 178 through 188, marked
20  for identification).
21          BY MR. GOLDMAN:
22     Q.  Exhibit 5 is a cover letter from
23  Dave Buchanan -- it's not signed, but I
24  understand it's printed off from Mr.

Page 120

1  Tisi's computer -- to Charlie Cohen, and
2  it includes additional materials numbered
3  178 through 188.
4          MR. TISI:  Go to the second
5  page.  It refers to APPROVe follow-up as
6  well.
7          BY MR. GOLDMAN:
8     Q.  And the last item is the APPROVe
9  follow-up data.  Okay?
10     .   Is the list of materials that's
11  attached as Exhibit 5, sir, the list of
12  materials that you have considered in
13  forming your opinions?
14     A.  If there's something supplemental
15  to what I'm holding here -- okay.  Okay.
16  With the important proviso that I have no
17  way of knowing whether, you know, every
18  Bates number and every document that I've
19  reviewed is listed in this, I would defer
20  to counsel as to whether they represent
21  that it's a complete list of everything I
22  got.
23          MR. TISI:  And, Counsel, let
24  me just also be clear, because I don't

Page 121

1  want there to be any misinterpretation
2  here.
3     I also mentioned the standard
4  operating procedures at the beginning of
5  the deposition and the e-mail which you
6  questioned Dr. Avorn about earlier.
7     There are, as you know, and as you
8  asked me, a pile of documents for you to
9  take a look at, if you want to double
10  check.  But we have brought to you the
11  things that we believe Dr. Avorn has
12  relied upon.
13          BY MR. GOLDMAN:
14     Q.  The list, Dr. Avorn, that I just
15  handed you, Exhibit 5, plus the CV SOP,
16  and this one e-mail that Mr. Tisi brought
17  to my attention earlier, those are the
18  materials you've considered in forming your
19  opinions, true?
20     A.  As I said, if that represents what
21  has been in all the boxes that I've been
22  sent by counsel, then it is true.
23     Q.  Who prepared the Materials
24  Considered list?

31 (Pages 118 to 121)

Jerry Avorn, M.D.

Page 122

1    A.  Counsel.
2    Q.  Did you review it at all?
3    A.  I've looked at it, yes. And I
4   said, Gee, there's a lot of documents
5   here, and many of them look like documents
6   that I've read. But given that there's
7   hundreds of them, I can only hope that
8   they were complete in their list of
9   providing numbers on everything they sent
10  me.
11   Q.  Did you confirm that you actually
12  reviewed each of the items listed on
13  Exhibit 5, sir?
14   A.  Did I look at every one saying yes,
15  I've seen that, I've seen that, I've seen
16  that? As I said, looking at it, they
17  look like the materials I've seen. I have
18  not lined up every one of the several
19  hundred documents and sort of checked off
20  whether it is one that I've seen.
21      I assume that when they say they
22  sent it to me, they were being correct in
23  saying they sent it to me.
24   Q.  Have you reviewed all of the

Page 123

1   materials on Exhibit 5?
2      MR. TISI:  Objection. Asked
3   and answered.
4    A.  If it reflects what was sent to me
5   in the boxes, yes.
6    Q.  So you've reviewed everything the
7   plaintiffs' lawyers have sent you in this
8   litigation?
9    A.  Yes. The one caveat I mentioned
10  earlier was that the CD that arrived a few
11  days ago while I was out of the country I
12  have not yet even put in the computer.
13   Q.  The materials that were produced
14  here for me to review, which we will copy
15  tonight, include five binders that have
16  177 tabs, and they're called Materials
17  Considered by Dr. Avorn --
18   A.  Mm-hmm.
19   Q.  -- right?
20   A.  Right.
21   Q.  And then you've produced three
22  additional binders; one says Vioxx Science
23  Compendium, and there are two volumes of
24  that. And then a third binder that says

Page 124

1   Deposition Transcripts of Dr. Scolnick, and
2   there are three depositions listed there.
3   Do you see that?
4    A.  (Witness viewing document).
5   There's many more binders than that.
6   There's this one on the floor.
7    Q.  Well, let me start with what I
8   just --
9    A.  Okay. Well, I just --
10   Q.  Is that right?
11   A.  They are there, yes.
12   Q.  So we've got the five binders
13  through tabs 177; we've got the two
14  binders of Vioxx Science Compendium; we've
15  got the one binder of deposition
16  transcripts of Dr. Scolnick; and then we
17  have another binder that's dated February
18  14, 2006, that's called Additional
19  Documents. Right?
20   A.  Right.
21      MR. TISI:  Just keep that
22  off the floor.
23      THE WITNESS:  Okay.
24   A.  But there are also all those other

Page 125

1   binders.
2    Q.  No. But these --
3    A.  No. These are mine.
4      MR. GOLDMAN:  Off the
5   record.
6      (Off the record at 10:49 a.m.)
7      (Discussion off the record).
8      (On the record at 10:49 a.m.)
9      BY MR GOLDMAN:
10   Q.  To be clear, Dr. Avorn, the
11  materials that you have relied on in
12  forming your opinions are contained in the
13  five binders that go up to Tab 177; the
14  two binders that are called Vioxx Science
15  Compendium; the binder that has three
16  deposition transcripts of Dr. Scolnick, and
17  the binder that's called Additional
18  Documents dated February of 2006, true?
19  Just start with that.
20   A.  All right. Let me give a better
21  answer --
22   Q.  Okay.
23   A.  -- than true or false. My
24  understanding, coming in today, was that

32 (Pages 122 to 125)

Jerry Avorn, M.D.

1    plaintiffs' counsel were bringing with them
2    copies of everything that they had sent
3    me.
4    Q.   Mm-hmm.
5    A.   And that some, but not all, were
6    represented in the five binders that
7    you've just referred to.
8        And I have no way of knowing
9    whether in addition to the binders you've
10   just described, whether the other binders
11   that they brought, which Mr. Tisi said was
12   his copies of everything, whether there is
13   material in there that they have sent me
14   that is different from what is in these
15   five.
16       MR. GOLDMAN:  Chris, are the
17   materials -- are the binders I just
18   identified all the materials considered by
19   Dr. Avorn that are identified in the
20   Materials Considered --
21       MR. TISI:  No.  That's --
22   I'm trying to tell you that, and you keep
23   cutting me off.
24       There's a -- There's a pile of

1    binders -- There's a pile of information
2    here that is in addition.  Okay?  He has
3    stuff displayed out in front of him on his
4    desk.  There's stuff over there.
5        MR. GOLDMAN:  Time out.
6        MR. TISI:  There's a CD.
7    Well, you're asking me and I'm giving you
8    an answer.
9        MR. GOLDMAN:  I'm starting
10   with the binders.
11       MR. TISI:  Okay  Let me
12   answer your question in a way to make this
13   clear.
14       There are five binders that he has,
15   okay, that consists of the documents on
16   his, quote, reliance list.  There are three
17   binders over here which you have
18   identified.  There is overlap between
19   these two --
20       MR. GOLDMAN:  Fine.
21       MR. TISI:  -- okay?  We
22   have produced those, and he has reviewed
23   those.
24       MR. GOLDMAN:  Okay.  And

1    there are -- There's a stack of documents
2    -- I'm not going to go through in detail
3    -- but there's an additional stack of
4    documents that we're going to copy here
5    that he has also considered, true?
6        MR. TISI:  He's also -- He
7    has also considered.
8        MR. GOLDMAN:  Okay.
9        MR. TISI:  There's also
10   stuff over there that he's considered on
11   the table.
12       MR. GOLDMAN:  That's part of
13   the pile.
14       MR. TISI:  Part of the
15   pile, but I just want to make sure --
16   You're rolling your eyes, but I just want
17   to make sure you have everything.  I'm
18   trying to be fair
19       MR. GOLDMAN:  I do  I'm
20   comfortable that I see what's in the room,
21   and I just want to make sure that what I
22   am going to copy tonight is the materials
23   that Dr. Avorn has been provided.
24       MR. TISI:  That's what he's

1    been provided.
2        MR. GOLDMAN:  Fine.
3        MR. TISI:  And that's also
4    a key point, because as you know, he is
5    the percipient witness in this case, so he
6    hasn't had materials that are not provided
7    for which he has.  He has documents for
8    which he is the percipient witness, which
9    he has.
10       BY MR. GOLDMAN:
11   Q.   Dr. Avorn, on the list of Materials
12   Considered, which is marked as Exhibit 5,
13   there is a reference --
14   A.   Wait.  Wait.  Let me pull it out.
15   Exhibit 5, yeah.  Okay.
16   Q.   -- on Number 9, to excerpts from
17   Alise Reicin -- October 11 --
18   A.   I'm sorry.  Page .5 did you say?
19   Q.   Exhibit 5 --
20   A.   Exhibit 5.
21   Q.   -- Number 9 on the Materials
22   Considered.
23   A.   Okay.
24   Q.   Do you see on Exhibit 5, which is

33 (Pages 126 to 129)

Jerry Avorn, M.D.

Page 130

1   the Materials Considered, a reference in
2   Number 9 to excerpts from Dr. Reicin's
3   October 11, 2005, trial transcript?
4      A.   (Witness viewing document).  I see
5   that.
6      Q.   Did you review the four pages that
7   the plaintiffs' lawyers sent to you from
8   Dr. Reicin's trial transcript in the
9   Humeston case?
10     A.   I have reviewed statements made by
11  Dr. Reicin.  I have no way of knowing
12  whether it was Pages 3522 through 3526.
13     Q.   Have you --
14     A.   But if you show me it to me, I'll
15  be happy to tell you if it looks familiar.
16     Q.   Have you reviewed Dr. Reicin's
17  deposition testimony in its entirety?
18     A.   I don't believe that I have.  I
19  don't recall.
20          MR. GOLDMAN:  Let me mark
21  Exhibit 6.
22          (Exhibit-6, Excerpt of Testimony
23  from the Humeston Trial, marked for
24  identification).

Page 131

1          BY MR. GOLDMAN:
2      Q.   This is -- These are the pages, on
3   the second page of this document, from the
4   Humeston trial.  If you look at Pages
5   3522 to 3526.  Did you review those, sir?
6          MR. TISI:  Take your time
7   and read it, Doctor.
8          THE WITNESS:  Mm-hmm.
9      A.   (Witness viewing document).
10     Q.   Have you finished reading through
11  Pages 32 --
12          MR. TISI:  He's not
13  finished.  Clearly, he's reading, Counsel.
14          BY MR. GOLDMAN:
15     Q.   No.  Dr. Avorn, you're going beyond
16  what --
17     A.   I'm sorry.  Where do you want me
18  to stop?
19     Q.   I wanted you to look at Pages 3522
20  --
21     A.   Yes.
22     Q.   -- second page --
23     A.   Yeah.
24     Q.   -- through 3526, which is on the

Page 132

1   third page, and I saw that you read that
2   testimony.  Okay.
3          Did you read that before today,
4   sir?
5      A.   I am aware of all of the facts
6   that are described in it, about the
7   labeling and the discussions and the
8   studies and so forth.  I don't recall
9   whether I saw it from Dr. Reicin's
10  testimony or e-mails or other sources.
11     Q.   You don't know, as you sit here
12  today, whether you read the four pages of
13  Dr. Reicin's testimony that the plaintiffs'
14  lawyers sent you, right?
15     A.   Right.
16     Q.   Did the plaintiffs' lawyers send
17  you a complete copy of Dr. Reicin's either
18  trial testimony or any of her depositions
19  in the Vioxx litigation?
20     A.   I don't think I've seen Dr.
21  Reicin's trial testimony.
22     Q.   Or depositions, true?
23     A.   That's my recollection.
24     Q.   On Exhibit 5, there's also a

Page 133

1   reference to David Anstice and excerpts
2   from his deposition, Pages 2016 --
3      A.   Can you tell me what number?
4      Q.   Number 10.
5      A.   Right.
6      Q.   2016 to 2017.
7          MR. GOLDMAN:  I'm going to
8   mark that as Exhibit 7.
9          (Exhibit-7, Excerpts of David
10  Anstice's Testimony, marked for
11  identification).
12          BY MR. GOLDMAN:
13     Q.   This is -- These are excerpts from
14  the Humeston trial in New Jersey.  And if
15  you could read the two pages, sir, 2016 to
16  2017.
17     A.   Okay.
18          (Witness viewing document).
19     Q.   Please stop reading at the last
20  line of 2017.
21     A.   I will do that.  I just needed to
22  read 2015 to find out what in the world
23  2016 was about.
24     Q.   You wouldn't know what Page 2016

34 (Pages 130 to 133)

Jerry Avorn, M.D.

Page 134

1    was about unless the plaintiffs' lawyers
2    had sent you Page .2015, true?
3        A.   No.  In reading a document de novo,
4    it's a little unhelpful to ask me to begin
5    reading it in the middle, and then expect
6    me to understand what the context is.  So
7    I needed to read the one page before it.
8    And I will take my time in doing so, if
9    it's all right with you.
10       Q.   Sure.
11       A.   (Witness viewing document).  Okay.
12   I've read it.
13       Q.   Did you read Pages .2016 and 2017
14   of Dr. Anstice's testimony in the Humeston
15   trial before today?
16       A.   I'm familiar with everything he
17   describes, but I don't believe that I read
18   about it in his Humeston testimony.
19       Q.   Am I right, Dr. Avorn, that for you
20   to be able to understand what is described
21   on Page .2016, you needed to go to 2015
22   for context; is that true?
23       A.   Well, that's a ludicrous question,
24   because Page .2016 begins, "Yes, in her

Page 135

1    opinion," and how in the world am I
2    supposed to know what "Yes, in her
3    opinion" refers to, if I don't look at the
4    lines before it?
5        Q.   So is it fair to say, sir, that
6    without providing you Page .2015, Dr.
7    Avorn, you wouldn't know what doctor —
8    what Mr. Anstice was testifying about in
9    the beginning of Page .2016?
10       A.   Even if I had sat in the courtroom
11   and heard Dr. Anstice saying this, I would
12   not have been able to know the context,
13   months later, without looking at the
14   preceding page.
15       Q.   Do you see on Page .2017 that Mr.
16   Anstice is asked a question at Line 22:
17   "They're included in the label, you put
18   them in different sections, but there's
19   nothing in the warning section of this
20   label, correct, sir?"  Do you see that?
21       A.   (Witness viewing document).  I see
22   that.
23       Q.   And here you understand that what
24   is being asked of Mr. Anstice is whether

Page 136

1    there are cardiovascular results from the
2    VIGOR trial in the warning section of the
3    package insert for Vioxx, right?
4        A.   Right.
5            MR. TISI:  Objection.
6            BY MR. GOLDMAN:
7        Q.   Do you see that Mr. Anstice starts
8    his answer, "We did not believe, based on
9    the analysis of the --" and that's where
10   Page .2017 stops.
11       A.   Yes.
12       Q.   He continues on 2018, "VIGOR and
13   the other data that it was appropriate to
14   put it in the warning section which would
15   in effect mean that it was a known effect
16   of Vioxx, we did not believe that that was
17   the case."  Do you see that, sir?
18       A.   (Witness viewing document).  I see
19   that.
20       Q.   Would you have wanted to know, when
21   you read Mr. Anstice's excerpts of his
22   deposition testimony, the rest of his
23   answer?
24       A.   When you say the rest of his

Page 137

1    answer, what do you mean?
2        Q.   I mean his answer at the end of
3    Page .2017 was cut off; it has one line,
4    and the rest of his answer is on Page
5    .2018.  Would you have liked to have seen
6    Page .2018?
7        A.   No.  I'm aware of Merck's position
8    about this matter.  It's been said by many
9    people from Merck in many different
10   settings.  And it is the standard Merck
11   position on this.
12       Q.   Do you think that the plaintiffs'
13   lawyers should have sent to you the entire
14   deposition of Mr. Anstice, or are just a
15   few pages sufficient, from your
16   perspective?
17           MR. TISI:  Objection.
18       A.   I think if there had been new
19   information in it other than I had been --
20   I had seen in all the other materials that
21   I was sent, it would have been useful to
22   see.  But there's nothing here that was
23   new.
24       Q.   Did you read all of the deposition

35 (Pages 134 to 137)

Jerry Avorn, M.D.

Page 138

1    transcripts of Dr. Scolnick that the
2    plaintiffs' lawyers sent you?
3        A.  I've -- I received all of it, and
4    I read through it, and I read through
5    virtually all of it.
6        Q.  Did you review the deposition
7    transcript of Mr. -- Dr. Curfman?
8        A.  Yes.
9        Q.  Both transcripts?
10       A.  Only the first one.  I think the
11   second one hadn't occurred, or if it did,
12   I didn't see it as of when I put together
13   my report.
14       Q.  So when you had prepared your
15   report in this case on March 20th of 2006,
16   you had reviewed the March 22nd, 2005,
17   transcript of Dr. Curfman, but you had not
18   reviewed the January 24th, 2006, transcript
19   of Dr. Curfman; is that correct?
20           MR. TISI:  What was the
21   date for the first one, Counsel?  Because
22   I think you said March, and I think it
23   was November.
24           MR. GOLDMAN:  Let me ask it

Page 139

1    again.
2           BY MR. GOLDMAN:
3        Q.  Am I right, Dr. Avorn, that when
4    you prepared your report in this case in
5    March of 2006, you had reviewed Dr.
6    Curfman's first deposition from November of
7    2005, and you had not reviewed his
8    deposition from January of 2006?
9        A.  That's correct.
10       Q.  Have you ever reviewed Dr.
11   Curfman's deposition from January of 2006?
12       A.  No.
13       Q.  There's also a reference in your
14   Materials Considered to the deposition of
15   Dr. Topol.  Do you see that?
16       A.  (Witness viewing document).  If you
17   tell me where it is, I can --
18       Q.  It's Number 13.
19       A.  Oh, I'm sorry.  The Materials
20   Considered.
21       Q.  Yes.
22       A.  Let me go to the Materials
23   Considered.
24       Q.  Trust me.

Page 140

1        A.  What's that?
2        Q.  Trust me.
3        A.  No.  But -- Okay.  Yes.
4        Q.  Did you review the deposition of
5    Dr. Topol?
6        A.  I believe I did.
7        Q.  Why?
8        A.  Why do I believe, or why did I
9    review it?
10       Q.  Why did you review it?
11       A.  Why did I review it?  Because I
12   tried to review all the materials counsel
13   sent me.
14       Q.  Are you relying on anything Dr.
15   Topol testified to in your -- forming your
16   opinion, sir?
17       A.  I don't believe so.  I'm relying on
18   materials he's written in the medical
19   literature, but not from his deposition.
20       Q.  Do you agree that Dr. Topol took
21   positions in his deposition that he did
22   not take when Vioxx was on the market?
23           MR. TISI:  Objection.
24       A.  I haven't tracked what he said at

Page 141

1    what point in time.
2        Q.  Have you reviewed any of Mr.
3    Anstice's complete deposition or trial
4    testimony?
5        A.  I don't recall seeing his trial
6    testimony, and I do not clearly recall
7    specifics from his deposition.
8        Q.  Well, isn't it true you weren't
9    sent Mr. Anstice's entire deposition, were
10   you, sir?
11       A.  I --
12       Q.  Any of them?
13           MR. TISI:  Answer.
14       A.  I have no way of recalling whether
15   -- the completeness of what was sent to me
16   about Mr. Anstice.
17       Q.  Do you see that your Materials
18   Considered refers to excerpts of a
19   transcript of David Anstice?
20       A.  (Witness viewing document).  Yes.
21       Q.  And there's nowhere on this
22   Materials Considered that indicates that
23   the plaintiffs' lawyers sent you Mr.
24   Anstice's complete deposition or trial

36 (Pages 138 to 141)

Jerry Avorn, M.D.

Page 142

1 testimony?
2 A. That's correct.
3 Q. Let's talk about Dr. Topol for a
4 minute, since you read his deposition.
5 MR. TISI: You have a copy
6 of it there, if you want to refer to it.
7 THE WITNESS: Okay. Sure.
8 BY MR. GOLDMAN:
9 Q. Were you --
10 A. I'd like to have it in front of me
11 when we do that, so if you --
12 Q. I'm not going to refer to any
13 pages.
14 A. Oh, okay. All right.
15 Q. Were you aware, sir, that Dr. Topol
16 consulted for a hedge fund that shorted
17 Merck stock during the time that he was
18 criticizing Vioxx?
19 MR. TISI: Objection.
20 Objection. Calls for facts not in
21 evidence. Go ahead.
22 BY MR. GOLDMAN:
23 Q. Were you aware of that?
24 A. My understanding is that that's a

Page 143

1 -- without using the legal term slanderous
2 loosely -- an unfair depiction of what Dr.
3 Topol's involvement was, because, as I
4 understand it, he was a consultant to that
5 hedge fund but was in no way involved with
6 or aware of any of their shorting of Merck
7 stock. He was providing them with his
8 expert opinion about various drugs.
9 But the implication that he was
10 somehow doing so in order to profit
11 personally from the decline of Merck stock
12 is, I find, rather offensive.
13 Q. How do you know that Dr. Topol was
14 not aware that the hedge fund was shorting
15 Merck stock while he was out there
16 criticizing Vioxx?
17 A. From the Times -- the New York
18 Times accounts of his involvement -- the
19 relationship, and also from conversations
20 with colleagues. And I think it was also
21 written up somewhere else that I don't
22 recall.
23 And what was -- What was clear from
24 my reading of those accounts was that it

Page 144

1 was a -- an unfair depiction or
2 implication that he was somehow doing this
3 for personal gain.
4 Q. Do you blame Merck for any
5 suggestion in the media that Dr. Topol was
6 consulting for a hedge fund that was
7 shorting Merck stock while he was out
8 there criticizing Vioxx?
9 A. No.
10 MR. TISI: Objection. We
11 do, however.
12 MR. GOLDMAN:
13 Q. Do you agree, sir, that --
14 MR. GOLDMAN: You do?
15 MR. TISI: I do. Go ahead.
16 MR. GOLDMAN: Doesn't
17 surprise me.
18 BY MR. GOLDMAN:
19 Q. The --
20 MR. TISI: Want me to
21 produce Dr. Reicin's brother for a
22 deposition?
23 BY MR. GOLDMAN:
24 Q. Dr. Avorn, is it important, sir --

Page 145

1 MR. TISI: And we're still
2 talking about Dr. Topol? Well, withdrawn.
3 BY MR. GOLDMAN:
4 Q. Is it important, Dr. Avorn, that a
5 scientist disclose his financial or
6 consulting relationship to a journal if
7 that relationship might be perceived as a
8 conflict of interest?
9 A. Yes.
10 Q. Why is it important for a scientist
11 or an author to report a consulting
12 relationship or an expert witness
13 relationship to a journal when writing an
14 article?
15 A. So that reviewers or editors or
16 readers can be aware of the possibility of
17 bias.
18 Q. And why is that important?
19 A. Because there is concern that
20 people who have financial relationships
21 with, let's say, a pharmaceutical company,
22 might tend to depict the properties of
23 that drug differently than if they had no
24 financial ties to the company.

37 (Pages 142 to 145)

Jerry Avorn, M.D.

Page 146

1      Q.  If Dr. Topol, sir, were consulting
2  with the plaintiffs' lawyers as a
3  consultant or an expert witness, do you
4  agree that he should have disclosed that
5  relationship to the journal that published
6  his article?
7          MR. TISI:  Objection.
8  Outside the scope of --
9      A.  What journal --
10         MR. TISI:  Let me make an
11  objection.
12      It's excluded, therefore it's
13  outside the scope of what we are here for
14  today, so let me object to that. Go ahead.
15      A.  I would need to know what article
16  and what journal. If there was an article
17  about fishing, no.
18      Q.  If you were an expert witness in a
19  case and -- for the plaintiffs, and you
20  were writing an article about the subject
21  matter of that litigation, would you alert
22  the journal to that relationship?
23      A.  I do.
24      Q.  I want to ask you if you've read

Page 147

1  any of the following sworn testimony by
2  Merck witnesses, okay?  Are you with me?
3      A.  Yes.
4      Q.  Briggs Morrison. Dr. Briggs
5  Morrison.
6      A.  I've read e-mails by Briggs
7  Morrison. I don't remember reading a
8  deposition.
9      Q.  Have you ever read the deposition
10  testimony of Dr. Musliner?
11      A.  I'm aware of it, because I remember
12  discussing it with counsel. I don't
13  remember whether my knowledge of it is
14  based on discussions with counsel or
15  having read the actual deposition.
16      Q.  What did plaintiffs' counsel tell
17  you about the deposition of Dr. Musliner?
18      A.  That it was important for me to
19  understand, in quoting Dr. Musliner's
20  correspondence and memos, that he was not
21  stating that he was convinced that Vioxx
22  itself caused cardiovascular risk, but
23  rather that his concern in writing that
24  memo was that Vioxx would look bad in

Page 148

1  comparison with a drug that was
2  cardioprotective.
3      And they wanted me to understand
4  that the Musliner statements were not
5  quite as egregious they would seem if one
6  didn't know that.
7      Q.  Did you decide to then go look at
8  Dr. Musliner's deposition testimony to
9  confirm that what you were being told by
10  the plaintiffs' lawyers was an accurate
11  reflection of what he said?
12      A.  I assumed that what they told me
13  was correct.
14      Q.  Would it be wrong, therefore, Dr.
15  Avorn, for somebody to suggest at a trial
16  that Dr. Musliner, back in the mid 1990s,
17  believed that Vioxx could cause heart
18  attacks?
19          MR. TISI:  Objection. Calls
20  for speculation. Calls for facts not in
21  evidence. Go ahead.
22      A.  It would have everything to do with
23  exactly how that was stated.  That is, he
24  was concerned in the mid 1990s that in

Page 149

1  various trial designs that were being
2  discussed, Vioxx patients randomized to
3  Vioxx could be expected to have more heart
4  attacks than patients randomized to the
5  other drug.
6      Q.  What's your basis for saying that?
7      A.  His memo.
8      Q.  Okay. Is it your testimony, Dr.
9  Avorn, that Dr. Musliner, in the mid
10  1990s, believed that Vioxx was
11  prothrombotic and could cause heart
12  attacks?
13          MR. TISI:  Objection. Asked
14  and answered.
15      A.  I cannot know what his beliefs were
16  at the time. I can only know that he said
17  in writing that he thought the patients
18  randomized with Vioxx in a given trial
19  design would have more heart attacks.
20      Q.  But based on what the plaintiffs'
21  lawyers told you Dr. Musliner testified to
22  in his deposition, do you now understand
23  that Dr. Musliner did not think that Vioxx
24  would cause heart attacks --

38 (Pages 146 to 149)