Jerry Avorn, M.D.

Page 150

1   MR. TISI: Objection.
2   BY MR. GOLDMAN:
3   Q.   -- in the mid 1990s?
4   MR. TISI: Objection.
5   A.   I understood at the time that I
6   wrote my report that he felt that the
7   Vioxx group would have more MIs, and that
8   that could either be the result of the
9   other group having fewer MIs, or a
10  prothrombotic effect of Vioxx.
11       And I cannot know what -- which of
12  those two was more prevalent in his mind.
13  But I can easily believe that if he felt
14  only that the other group would have fewer
15  MIs, that that would create the same
16  outcome.
17  Q.   When you're reading Dr. Musliner's
18  memo, as you put it, you're not applying
19  any expertise when you're interpreting the
20  memo, are you, sir?
21       MR. TISI: Which aspect of
22  it, Counsel?
23  A.   I don't understand the question.
24  Q.   Is your interpretation of Dr.

Page 151

1   Musliner's memo, sir --
2   A.   Why don't we just refer to that?
3   Q.   -- your personal opinion, or do you
4   believe that you are using expertise when
5   you are interpreting Dr. Musliner's memo?
6   A.   All right. Let me just find the
7   portion of his memo that I'm citing.
8       I don't agree with your statement.
9   I think that -- that reading a statement
10  about the design of a clinical trial in
11  relation to adverse events is exactly what
12  I have expertise in. So no, I don't
13  agree with your contention.
14  Q.   Whether or not Dr. Musliner
15  believed that Vioxx was prothrombotic and
16  could cause heart attacks is something
17  that a juror could determine based on
18  reading the document and not something
19  that you need to help them understand,
20  true?
21       MR. TISI: Objection.
22  Objection. Calls for a legal ruling by a
23  judge in the context of a deposition. Go
24  ahead.

Page 152

1   A.   I think that I'm perfectly
2   competent and have expertise to comment on
3   statements about trial design and the
4   expected results of a trial given
5   comparison Group A versus comparison Group
6   B.
7   Q.   Do you believe that you have
8   expertise, sir, in telling the jury what
9   Dr. Musliner thought would happen in these
10  clinical trials concerning any
11  cardiovascular effects of Vioxx?
12  A.   I have expertise in interpreting
13  what he read -- I'm sorry -- what he
14  wrote.
15  Q.   That wasn't my question.
16  A.   Oh.
17       MR. TISI: Well, Counsel --
18  Go ahead.
19  A.   I think to the extent that he --
20  what he wrote reflects what he thought,
21  which seems a pretty safe assumption, yes,
22  I think that I can comment on what he
23  wrote in his memorandum.
24  Q.   Do you think it's obvious from the

Page 153

1   memorandum that Dr. Musliner wrote that he
2   believed that Vioxx was either
3   prothrombotic and would cause heart attacks
4   or that a comparator would actually
5   prevent heart attacks?
6       MR. TISI: Objection.
7   A.   He clearly believed one or the
8   other of those.
9   Q.   Am I right, sir, that whether he
10  believed that Vioxx was cardioprotective or
11  that a comparator was -- Sorry.
12  Withdrawn.
13       Whether Dr. Musliner believed that
14  Vioxx was prothrombotic or a comparator
15  was cardioprotective is an interpretation
16  that a juror can make, true?
17       MR. TISI: Objection.
18  BY MR. GOLDMAN:
19  Q.   You don't have any particular
20  expertise in --
21       MR. TISI: Objection.
22  You're asking him to sit in the role of a
23  judge, Counsel.
24       MR. GOLDMAN: Just object.

39 (Pages 150 to 153)

Jerry Avorn, M.D.

Page 154

1  Please object to the form.
2      MR. TISI: That's a totally
3  inappropriate question
4      BY MR. GOLDMAN:
5  Q.  Dr. Avorn, do you believe you have
6  expertise in determining Dr. Musliner's
7  state of mind and what he thought about
8  the potential of Vioxx to cause heart
9  attacks in the mid 1990s?
10     MR. TISI: Different
11 question. You may answer.
12 A.  I have expertise in interpreting
13 what he wrote. I do not have expertise
14 about his state of mind
15 Q.  Let me ask you if you've read any
16 of the depositions of the following
17 witnesses: Brian Daniels?
18 A.  Doesn't ring a bell.
19 Q.  Doug Watson?
20 A.  I've read a lot of material by Dr.
21 Watson. I've heard him make
22 presentations. I can't recall having read
23 a deposition from Dr. Watson.
24 Q.  Did the plaintiffs' lawyer send you

Page 155

1  the deposition of Dr. Nies?
2  A.  I don't -- Again, I remember
3  reading what Dr. Nies has written -- had
4  written at the time. I don't recall a
5  deposition.
6  Q.  Do you remember reading the
7  deposition of any of the following people:
8  Elliot Ehrich, E-H-R-I-C-H, Mervin Turner,
9  Harry Guess, Debra Shapiro, Ray Gilmartin
10 or Peter Kim?
11 A.  No.
12 Q.  Am I right, sir, all of the
13 materials that are identified in your
14 Materials Considered list were selected by
15 the plaintiffs' lawyers and sent to you by
16 the plaintiffs' lawyers, true?
17 A.  With the exception or the proviso
18 that I asked them to also send me evidence
19 that the other side would find helpful so
20 that I could see it from them rather than
21 -- or before today rather than at today.
22 Q.  Do you think the plaintiffs'
23 lawyers sent you information that you
24 would find helpful in understanding Merck's

Page 156

1  position in this case?
2  A.  Yes.
3  Q.  You have published research in
4  Circulation, right?
5  A.  Yes.
6  Q.  Is that a prestigious journal?
7  A.  Yes.
8  Q.  Peer reviewed?
9  A.  Yes.
10 Q.  They are fairly selective at
11 Circulation in the articles that they
12 decide to publish, right?
13 A.  Yes.
14 Q.  When you submit articles to
15 journals, and peer reviewers have suggested
16 changes, do you consider their suggestions?
17 A.  You have to, if you want the paper
18 to be published.
19 Q.  If you don't agree to make the
20 changes that a journal asks you to make,
21 then the journal can just decide not to
22 publish your paper, right?
23 A.  Right, although you also can
24 explain why you don't want to make those

Page 157

1  changes, and that will often suffice.
2  Q.  But ultimately, if a journal like
3  the New England Journal of Medicine or
4  Circulation decides they're not happy with
5  the content of a publication or they want
6  the authors to describe data in a certain
7  way, they can decide not to publish the
8  document, true?
9  A.  Correct.
10     MR. TISI: Objection.
11     BY MR. GOLDMAN:
12 Q.  You've done research concerning the
13 communication of risk and benefit
14 information to physicians and patients,
15 right, Dr. Avorn?
16 A.  Yes.
17 Q.  Have you done any specific research
18 on Vioxx, other than as an expert witness
19 in this case?
20 A.  Do you mean the communication of
21 risk and benefit?
22 Q.  Yes.
23 A.  Well, we've -- I've been
24 responsible for a program that

40 (Pages 154 to 157)

Jerry Avorn, M.D.

Page 158

1  operationally does provide risk and benefit
2  information to patients and doctors in our
3  Pennsylvania work about Vioxx, and —
4  Well, not Vioxx specifically, but about
5  COX-2s.
6  Q. Have you done any research or
7  published any study where you analyze
8  Merck's communications about cardiovascular
9  risks of Vioxx?
10 A. Research about Merck's
11 communications?
12 Q. Mm-hmm.
13 A. Well, I have published an editorial
14 in Circulation in which I talked about the
15 presentation of data about risks and
16 benefits of Vioxx that came out just about
17 a month or so ago. So in a sense, that
18 was an article in a peer review journal
19 about the communication of risk of Vioxx.
20     There was also a segment of a paper
21 that Dr. Solomon and I published about the
22 use of COX-2s before Vioxx was withdrawn,
23 in which we looked at the influence of
24 physician practice, and wrote about the

Page 159

1  fact that the heavy promotion of Vioxx by
2  its manufacturer may have or probably did
3  influence the patterns of use of Vioxx in
4  explaining our findings. So in that
5  sense, yes.
6  Q. So as I understand it, you've
7  analyzed Merck's promotional efforts and
8  concluded that they may have or probably
9  did influence prescribing habits; is that
10 your testimony?
11 A. Yes.
12 Q. While Vioxx was on the market, did
13 you do any research or publish any
14 articles talking about the way Merck
15 communicated potential cardiovascular risks
16 of Vioxx?
17     MR. TISI: Objection.
18 A. I don't believe that we did
19 research on Merck's communication at that
20 time.
21 Q. Have you ever spoken with a doctor
22 from South Carolina named Dr. Mikola about
23 Vioxx?
24 A. How do you spell that name?

Page 160

1  Q. M-I-K-O-L-A.
2  A. No.
3  Q. Have you ever spoken with Dr.
4  McCaffrey about Vioxx?
5  A. No.
6  Q. Have you ever spoken with any
7  doctors to your knowledge who prescribed
8  Vioxx to plaintiffs in the Vioxx
9  litigation?
10 A. Not to my knowledge, no.
11 Q. Have you ever spoken with a doctor
12 named Dr. Jose Caceres, C-A-C-E-R-E-S, in
13 California?
14 A. No.
15 Q. Have you ever spoken with Dr.
16 Richard Shaw, who is a doctor in
17 California?
18 A. No.
19 Q. Have you ever spoken with any
20 doctor who took care of patients in the
21 state of New Jersey about their decision
22 to prescribe Vioxx to any of the
23 plaintiffs in this litigation?
24 A. No.

Page 161

1  Q. Is the same true for doctors in
2  Texas, California and every other state in
3  the United States?
4  A. Yes.
5  Q. Is it fair to say, Dr. Avorn, that
6  you do not know what the doctors in a
7  particular Vioxx case knew about the
8  cardiovascular risks, if any, of Vioxx?
9  A. Well, I know what doctors in
10 general knew and -- in the sense that I'm
11 aware of what doctors in general knew.
12 It's a safe bet that specific doctors were
13 likely to have known the same thing.
14 Q. How are you aware of what doctors
15 generally knew about the cardiovascular
16 risk, if any, of Vioxx?
17 A. Because I'm aware of all of the
18 sources of information that they could
19 have conceivably seen, whether it was the
20 labeling or information in the media or
21 promotional materials or marketing
22 campaigns or direct consumer advertising
23 they would have seen. And that's -- and
24 articles in the literature.

41 (Pages 158 to 161)

Jerry Avorn, M.D.

Page 162

1  So because I am aware of everything
2  that they would have seen, I have a pretty
3  good idea of what they did or didn't know.
4  Q. So you have a pretty good idea of
5  what doctors in general knew about any
6  potential cardiovascular risks of Vioxx,
7  even though you haven't spoken with any
8  doctors who prescribe Vioxx?
9      MR. TISI: That's not what
10  the question was, Counsel. In litigation
11  is the question you said. That's not
12  fair.
13  A. Yeah. I never said I -- I never
14  said I have not spoken to any doctors who
15  have ever prescribed Vioxx.
16  What I've said was that I have not
17  spoken to individual doctors involved in
18  the cases that are in trial.
19  Q. Is it fair to say, then, Dr. Avorn,
20  that you don't know what any of the
21  specific doctors in the Vioxx cases knew
22  about potential cardiovascular risks
23  associated with Vioxx?
24      MR. TISI: Objection.

Page 163

1  A. That's not fair to say.
2  Q. You believe, that even though
3  you've never spoken with them, you know
4  what particular doctors knew about the
5  potential cardiovascular effects of Vioxx?
6  A. No. What I said was that I'm
7  aware of the information that was
8  available to any doctor in America, and
9  because -- because what is known to any
10  doctor is only going to come from what's
11  in the label, what's in the marketing
12  campaign, what's in the promotion, what's
13  in the literature and what's in the direct
14  consumer advertising, as well as perhaps
15  their own clinical experience.
16  There's no way that people can know
17  things apart from those channels. And
18  I've done research on the influence of
19  different channels of communication to
20  doctors, whether it's promotional or
21  scientific, in shaping their knowledge and
22  their prescribing.
23  And so in the sense that I know
24  what Merck was saying about Vioxx or

Page 164

1  wasn't saying and I know what was in the
2  literature the doctors might have read, I
3  can have a pretty good impression of what
4  doctors in general were aware of in
5  relation to Vioxx.
6  Q. What did Dr. McCaffrey or Dr.
7  Mikola know about the potential risks of
8  cardiovascular -- Sorry. Withdrawn.
9  What did Dr. Mikola or Dr.
10  McCaffrey know about the potential
11  cardiovascular risks of Vioxx?
12      MR. TISI: Objection.
13  A. Only what was in the label or the
14  promotional materials or the literature.
15  That I can say with certainty.
16  Q. Do you know whether Dr. Mikola or
17  Dr. McCaffrey read any of the promotional
18  materials for Vioxx?
19  A. No.
20  Q. Can you say, sir, under oath, that
21  you are aware of what the doctors who are
22  treating -- were treating the patients in
23  the Vioxx litigation knew, actually knew,
24  about the potential cardiovascular effects

Page 165

1  of Vioxx?
2      MR. TISI: Objection.
3  A. Of course I can't get into the head
4  of a given doctor that I've never met.
5  Q. So the answer is no?
6      MR. TISI: Objection.
7  A. But I can know what doctors in
8  general knew.
9  Q. I didn't ask about doctors in
10  general.
11  A. But given that these specific
12  doctors are a subset of doctors in
13  general, that's a relevant answer.
14  Q. Do you plan, in your trial
15  testimony, sir, to tell the jurors what
16  you believe the doctors in any particular
17  case knew about the cardiovascular risks
18  of Vioxx?
19      MR. TISI: Objection.
20  A. I will be able to comment with some
21  authority on what information was available
22  to physicians and presented to physicians,
23  and that is a very strong and accurate
24  predictor of what any given doctor had

42 (Pages 162 to 165)

Jerry Avorn, M.D.

Page 166

1  available to him.
2  Q. You work on providing
3  evidence-based noncommercial summaries of
4  medical literature to doctors to help them
5  make accurate drug use decisions, right?
6  A. Correct.
7  Q. And when you provide evidence-based
8  noncommercial summaries of medical
9  literature, do you make it a point to
10 provide unbiased and objective views?
11 A. That's what we try to do.
12 Q. Why is it important to provide
13 objective unbiased views when it comes to
14 the medical literature about a particular
15 drug or class of drugs?
16 A. So that a doctor can get
17 information that's not driven by the need
18 to sell a particular product.
19 Q. Do you feel that your expert report
20 here, sir, contains an objective unbiased
21 review of the medical literature concerning
22 Vioxx?
23 A. I feel that it does.
24 Q. Do you agree, sir, that Celebrex,

Page 167

1  Ibuprofen, Feldene and over the counter
2  Advil are all essentially the same drug?
3  A. No.
4  Q. Do you believe that COX-2
5  inhibitors were underused by doctors?
6  A. No.
7  Q. Do you believe that Vioxx was
8  underused by doctors?
9  A. No.
10 Q. Do you believe, sir, that for
11 patients who had serious risk of cardio --
12 Withdrawn.
13     Do you believe that for patients
14 who had serious risk of gastrointestinal
15 problems, that those patients didn't use
16 COX-2 inhibitors enough?
17     MR. TISI: Objection.
18     BY MR. GOLDMAN:
19 Q. Let me ask it a different way.
20 A. Okay.
21 Q. Dr. Avorn, do you agree, sir, that
22 for patients who had risk factors for GI
23 problems, Vioxx and COX-2 inhibitors in
24 general were underused?

Page 168

1      MR. TISI: Objection.
2  A. All right. Let me try to answer
3  that.
4      When it appeared, as it did when
5  the drugs were first marketed, that they
6  had a meaningful gastroprotective effect,
7  and there was less evidence available
8  about their cardiac risk, the impression
9  that I, and many of my colleagues had and
10 that we actually wrote in a paper, was
11 that if there were patients who had
12 important gastrointestinal risk and that
13 they were not on a gastroprotective drug,
14 that that was a problem.
15     I now believe that that was not the
16 case, because we now understand that the
17 cardiovascular risk of those drugs exceeded
18 whatever gastroprotective benefit they
19 offered. But that was not clear when they
20 first were marketed.
21 Q. Well, there was no evidence to
22 suggest that the cardiovascular risks, if
23 any, of Vioxx outweighed the benefits that
24 it offered for patients who had the

Page 169

1  potential for gastrointestinal problems
2  when Vioxx came to the market, true?
3  A. Well, actually, I should modify my
4  last sentence. That was not clear to me at
5  the time the drugs were marketed.
6      I do believe that there was
7  evidence already in place at the time that
8  Vioxx was marketed, of which I was
9  unaware, since it was within the NDA
10 materials that FDA had, that even at the
11 moment of marketing, the cardiovascular
12 risks provided a harm that outweighed the
13 gastrointestinal benefit.
14 Q. Did the FDA have all the clinical
15 and animal studies that were done on Vioxx
16 before it approved Vioxx?
17 A. I think there were studies that
18 were not available to FDA in a timely
19 manner, and I would need to go back and
20 look at what they had when. But ADVANTAGE
21 came to them late. The mortality data
22 from the Alzheimer studies --
23 Q. I'm talking about approval.
24 A. Right.

Jerry Avorn, M.D.
Page 170

1  Q. Let me ask my question again.
2  A. Okay.
3  Q. When the FDA approved Vioxx for
4  marketing in the United States, sir, in
5  May of 1999, did they have all of the
6  clinical studies and animal studies on
7  Vioxx?
8  MR. TISI: Objection.
9  A. I know that there were studies that
10 FDA received later than they should, and I
11 cannot comment on whether that was pre or
12 post approval. I simply don't recall.
13 Such as ADVANTAGE And I don't remember
14 the dates that ADVANTAGE was completed in
15 relation to the dates of approval. But
16 for now, I'm willing to say I cannot
17 identify a specific study that FDA did not
18 have.
19 Q. As you sit here today, Dr. Avorn,
20 you're unaware of any study that Merck
21 withheld from the FDA or they did not have
22 when they decided to approve Vioxx for use
23 in the United States, right?
24 A. Right I think that was a problem

Page 171

1  later, but not at the time of approval, to
2  my knowledge.
3  Q. And we'll talk about what you
4  thought later.
5  A. But not at the time of approval, to
6  my knowledge.
7  Q. I really want to ask you to stick
8  to my question --
9  A. Okay.
10 Q. -- and not insert these things
11 about what happened later. Okay?
12 A. Okay.
13 Q. Dr. Avorn, at the time Vioxx was
14 approved in the United States by the FDA,
15 are you aware of any clinical study or
16 animal study that Merck withheld from the
17 FDA?
18 A. I cannot name such a study.
19 Q. The FDA, you understand, has
20 experienced scientists who work there,
21 right?
22 A. Yes.
23 Q. And the FDA is very experienced in
24 evaluating the risks and benefits of

Page 172

1  medicine, right?
2  MR. TISI: Objection.
3  A. Experienced, but I would say not
4  always competent.
5  Q. Do you believe the people who
6  evaluated the risks and benefits of Vioxx
7  when they approved Vioxx for use were
8  competent?
9  A. I believe there was a competent
10 evaluation.
11 Q. Did the FDA conclude, when Vioxx
12 was brought to the market, that the
13 benefits outweighed the risks?
14 A. Yes.
15 Q. Did the FDA continue to approve
16 Vioxx as safe and effective and believed
17 the benefits outweighed the risks all the
18 way till the time Vioxx was withdrawn?
19 A. I can't --
20 MR. TISI: Objection to the
21 phrase -- what the FDA believed. Go
22 ahead.
23 A. I can't comment on FDA's beliefs,
24 but you're right that that was their

Page 173

1  formal position.
2  Q. Are you aware of an informal
3  position that the FDA felt --
4  A. No, but you are asking me to say
5  what a federal agency believes, and I
6  don't think federal agencies can believe
7  things.
8  Q. Based on your observations of the
9  behavior of the Food and Drug
10 Administration, do you agree, sir, that
11 the FDA repeatedly approved Vioxx as safe
12 and effective while it was on the market?
13 A. Based on my observation of the
14 behavior of FDA, as reflected in memos by
15 FDA personnel who were reviewing Vioxx, I
16 get the clear impression of ongoing
17 worries about cardiovascular safety, from
18 the moment the drug was approved, until
19 the moment that it was withdrawn.
20 MR. GOLDMAN: Can you repeat
21 my question?
22 (Record read).
23 BY MR. GOLDMAN:
24 Q. Can you answer that question, sir?

44 (Pages 170 to 173)

Jerry Avorn, M.D.

Page 174

1   A. Yes.
2         MR. TISI: Objection. I
3   think he answered it. Go ahead.
4   A. There's -- There's no such -- a
5   concept as repeated approval.
6   Q. Did the FDA approve Vioxx as safe
7   and effective on multiple occasions while
8   it was on the market?
9   A. It only approved it once. Drugs
10  don't get approved over and over.
11  Q. Did the FDA approve Vioxx for use
12  for different indications while Vioxx was
13  on the market?
14  A. Yes.
15  Q. You did a study, I think, in
16  2002-2004 time frame, where you received a
17  grant by the NIH, concerning cardiac risk
18  in rheumatoid arthritis patients. Do you
19  remember that?
20  A. There was -- The paper was Dr.
21  Solomon. It was the first health -- in
22  the Circulation. Is that the one you
23  mean?
24  Q. This is -- I can't remember if he

Page 175

1   was on it or not. But let me ask it a
2   different way.
3         MR. TISI: Do you want a
4   copy of his CV so you can identify it?
5         BY MR. GOLDMAN:
6   Q. Do you remember doing any research,
7   Dr. Avorn, about cardiac risk in patients
8   who had rheumatoid arthritis?
9   A. Well, I know that Dr. Solomon did a
10  paper on that topic, but he did it with
11  another group, and I'm not even sure that
12  I was a co-author of it.
13  Q. Are you aware that patients with
14  rheumatoid arthritis have an increased risk
15  of heart attacks?
16  A. Yes.
17  Q. Just by having the disease
18  rheumatoid arthritis patients are,
19  unfortunately, at higher risk of
20  experiencing heart attacks, right?
21  A. Correct.
22  Q. Do you know what the magnitude of
23  the risk is that the patients who have
24  rheumatoid arthritis face compared to

Page 176

1   somebody who doesn't have rheumatoid
2   arthritis with respect to heart attacks?
3   A. Not off the top of my head.
4   Q. Are people with osteoarthritis
5   generally at higher risk of heart disease
6   than those that don't have osteoarthritis?
7   A. Yes.
8   Q. Do you know what the magnitude of
9   the increased risk is of the patients with
10  osteoarthritis for having heart disease
11  than patients who don't have
12  osteoarthritis?
13  A. Not off the top of my head.
14        MR. GOLDMAN: Let's take a
15  break.
16      (Off the record at 11:37 a.m.)
17      (Recess taken).
18      (On the record at 11:47 a.m.)
19        BY MR. GOLDMAN:
20  Q. Were you asked to answer two
21  principle questions by the plaintiffs'
22  lawyers when you were retained as an
23  expert?
24  A. Yes. But on re-reading my report,

Page 177

1   I realized that there were a couple of
2   subtasks within that evaluated and managed
3   issue having to do with how they managed
4   the risk benefit issue and communicated
5   it, and I kind of compressed it into
6   manage. But yes.
7   Q. The first question that you were
8   asked to answer was whether Vioxx
9   increased the risk of -- you wrote
10  cardiovascular disease?
11  A. Right.
12  Q. What do you mean by increase the
13  risk of cardiovascular disease?
14  A. Well, broadly, cardiovascular
15  disease would include myocardial
16  infarction, cerebral vascular disease,
17  including stroke, but also hypertension,
18  congestive heart failure.
19  Q. Anything else?
20  A. Those are the main components.
21  Q. So as I understand what you're
22  going to do in your trial deposition, Dr.
23  Avorn, you're going to testify about
24  general causation; that you believe Vioxx

45 (Pages 174 to 177)

Jerry Avorn, M.D.

Page 178

1 increases the risk of heart attacks and
2 strokes, right?
3   A. And other cardiovascular disease,
4 right.
5   Q. Do you know a plaintiff named Mr.
6 Gerald Barnett?
7   A. No.
8   Q. Have you ever reviewed Mr.
9 Barnett's medical records?
10   A. No.
11   Q. Do you know Stephen Hatch?
12   A. No.
13   Q. Did you know Stephen Hatch before
14 he passed away?
15   A. No. We can maybe save time by
16 saying I don't know or get involved with
17 any specific plaintiffs.
18   Q. Okay.
19       MR. TISI: And you've
20 actually said -- tried to say that a
21 couple times.
22       THE WITNESS: Right.
23       BY MR. GOLDMAN:
24   Q. And you haven't reviewed the

Page 179

1 medical records of any of the plaintiffs
2 in the Vioxx litigation, right?
3   A. Correct.
4       MR. TISI: Would it help
5 you if I made a global representation?
6 Supposedly that will cut down some of your
7 time.
8       MR. GOLDMAN: No. I'm not
9 going to go through the specific -- If
10 you're going to say general stuff?
11       MR. TISI: No. I'm going
12 -- What I'm going to say is he has not
13 reviewed any medical records or any
14 particular plaintiff. He will not be
15 offered as an expert on behalf of any
16 individual plaintiff other than on -- in
17 court.
18       MR. GOLDMAN: Okay.
19       MR. TISI: Hopefully they
20 won't say, did you speak to the doctors?
21 Did you look at the plaintiffs? We've
22 avoided all that.
23       BY MR. GOLDMAN:
24   Q. When you say you were asked the

Page 180

1 question about -- Withdrawn.
2       When you say that you were asked to
3 assess the methods by which Merck
4 evaluated and managed the cardiovascular
5 issue during the time that Vioxx was
6 developed and while it was on the market,
7 are you basically offering your opinion
8 about what Merck knew about any potential
9 cardiovascular risks, what Merck did or
10 didn't do in response to what you believe
11 they knew, and whether you believe that
12 Merck's actions or inactions were
13 reasonable?
14   A. Correct.
15   Q. What does assess methods mean?
16   A. Can you show me where you're
17 referring?
18   Q. The second question you were asked
19 was to assess the methods. It's on --
20   A. Correct. Assess what Merck did.
21   Q. Can you be a little more specific?
22   A. Sure. Evaluate and manage are two
23 different pieces. Evaluate it is how
24 Merck worked up the question of

Page 181

1 cardiovascular risk, in term of studies
2 that it did or did not do. And manage
3 would include how it dealt with the risk
4 in terms of how it communicated to doctors
5 and to patients.
6   Q. Do you believe you know all of the
7 studies that Merck did to assess the
8 question of whether Vioxx increases the
9 risk of cardiovascular disease?
10   A. There could well be studies that
11 I'm not aware of.
12   Q. You don't know what Merck did in
13 response to the FitzGerald urine study
14 about prostacyclin and Thromboxane, right?
15   A. I know that animal studies were
16 conducted, but I don't know that I am
17 aware of all of them. I do believe I
18 have a clear handle on the human studies
19 that were done.
20   Q. But you don't know any of the
21 pharmacologic studies or any of the animal
22 studies that Merck did to try to test the
23 FitzGerald hypothesis, if you will?
24   A. I'm sure I don't know all of them.

46 (Pages 178 to 181)

Jerry Avorn, M.D.

Page 182

1  Q. When you say that you are going to
2  assess how Merck managed the question of
3  cardiovascular risk, you said that that
4  would include how Merck dealt with the
5  risk in terms of how it communicated to
6  doctors and to patients, right?
7  A. Correct.
8  Q. How do you know how Merck
9  communicated to doctors and to patients
10 the potential cardiovascular risks
11 associated with Vioxx?
12 A. Because everything the company is
13 legally permitted to say to doctors and to
14 patients needs to be a reflection of what
15 is approved by the FDA. And also we have
16 copies of their ads, copies of their
17 statements, copies of their internal
18 documents about their plans for
19 communication. And the materials that
20 they sent out to patients are obviously in
21 the public domain.
22 Q. Well, is it your testimony, Dr.
23 Avorn, that you've reviewed all of the
24 advertisements about Vioxx, the statements

Page 183

1  that Merck has made about Vioxx, all the
2  relevant internal documents at Merck that
3  you believe reflect the communications that
4  Merck had concerning any potential
5  cardiovascular risk of Vioxx?
6  A. Well, I've seen many, many of the
7  ads, and many, many of the statements.
8  I'm sure there may be some ads or -- and
9  I'm sure there are internal statements
10 that I haven't seen.
11 Q. What scientific methodology are you
12 using when you are assessing the methods
13 of Merck's managing of the cardiovascular
14 problem, as you put it?
15 A. Okay. Again, there's the -- the
16 generating of new data and the
17 communication, which are really two -- two
18 separate pieces.
19       There's a growing understanding
20 that a big piece of -- of rational drug
21 use and drug stewardship is about managing
22 risk. And so there are expectations about
23 what -- in the -- in the medical
24 community, particularly in the pharmacoepi

Page 184

1  community, about what's inappropriate
2  action to take in relation to signals in
3  terms of further studies that need to be
4  done.
5        And there's also general consensus
6  about fairness and accuracy and depiction
7  of information to patients and doctors.
8  Q. Are you saying there's a standard
9  that you're actually applying when you are
10 assessing Merck's methods of dealing with
11 the cardiovascular risks?
12 A. There's not a written down standard
13 that one can Xerox, but there is a
14 consensus, I think, within the medical
15 community about what's reasonable behavior.
16 Q. What source can you point me to
17 that would show that there's a consensus
18 in the medical community about what would
19 constitute reasonable behavior by a drug
20 company?
21 A. Well, in -- there is a document
22 called -- that I helped to write the first
23 version of. Something like Guidelines for
24 Appropriate Pharmacoepidemiologic Practice.

Page 185

1  I -- I can't remember. It's in my CV.
2  That was published by the International
3  Society for Pharmacoepidemiology, of which
4  I was president at one point, that sets
5  forth kind of good pharmacoepidemiologic
6  practice in working up and evaluating
7  risks. So that's -- that's one piece.
8        And I believe it was -- it was revised in
9  the last year or two.
10       There are a variety of -- of
11 standards for appropriate -- Well, there
12 are standards that are not necessarily
13 written down, but they have to do with
14 fair and accurate communication.
15       There is actually legislation --
16 and I don't claim to be a regulatory
17 authority -- but there is legislation,
18 regulatory language in place about duty to
19 warn and so forth that is in FDA's
20 regulatory mandate as well. So those
21 would be two kinds of examples of
22 standards.
23 Q. Are drug companies subject to
24 strict FDA regulatory requirements?

Jerry Avorn, M.D.

Page 186

1   MR. TISI: Objection.
2   A. Not strict enough, in my view.
3   Q. Does the FDA regulate the conduct
4   of pharmaceutical companies in terms of
5   drug approval and post marketing?
6   A. Post marketing? Just post
7   marketing --
8   Q. Post marketing.
9   A. -- behavior? To the latter, no.
10  I think there's -- there's clear evidence
11  that FDA does not have much of a
12  regulatory handle on post marketing,
13  certainly post marketing research.
14  Q. So when you're talking about
15  assessing the methods of Merck's management
16  and evaluation of the cardiovascular issue,
17  you are talking about describing Merck's
18  conduct, and then why you believe that
19  conduct constitutes unreasonable behavior?
20  A. Correct.
21  Q. Is there any objective standard,
22  sir, that you can point me to, that would
23  show how a pharmaceutical company is
24  supposed to evaluate and manage a safety

Page 187

1   issue?
2   A. Well, I just mentioned the
3   Guidelines for Good Pharmacoepidemiologic
4   Practice. What --
5   Q. Let me stop you there.
6       MR. TISI: Are you going to
7   come back and let him finish his answer?
8   Go ahead.
9       BY MR. GOLDMAN:
10  Q. Finish the answer. Tell me, Dr.
11  Avorn, all the places where I can find an
12  objective standard about how a
13  pharmaceutical company should evaluate and
14  manage a safety issue.
15      MR. TISI: Objection. Asked
16  and answered.
17  A. Okay. For the third time, I will
18  cite the recommendations or the guidelines
19  published by the International Society for
20  Pharmacoepidemiology called Guidelines for
21  Appropriate -- for Good
22  Pharmacoepidemiologic Practice. That's my
23  recollection of the title. As I said, I
24  helped to write initially.

Page 188

1   There -- So in terms of -- There
2   also are various papers that have been
3   written by people like Professor Ray. He
4   had a good paper that was in the New
5   England Journal earlier this year, I
6   believe, on evaluating drug safety.
7       I had a paper that I wrote with
8   him in the New England Journal back in
9   1993, I believe -- it's in my CV -- about
10  evaluating drugs once they are on the
11  market or some title like that. Alasdair
12  Wood has also written about appropriate
13  safety evaluation of drugs.
14      So there are many papers in the
15  literature in which experts in the field
16  have laid out -- including myself, have
17  laid out what is appropriate assessment of
18  risk for marketed drugs.
19  Q. Do any of the sources that you just
20  described indicate how a drug company
21  should respond to a particular safety
22  issue?
23  A. Yes.
24  Q. When you referenced the Guidelines

Page 189

1   for Good Pharmacoepidemiologic Practice --
2   A. Right.
3   Q. -- can you briefly tell me what
4   that is about?
5   A. Sure. The goal, back when we wrote
6   it, was to provide a companion to the
7   guidelines that exist for good clinical
8   trial practice, good manufacturing
9   practice, so that there would be something
10  written down in which a company or other
11  interested party could find recommendations
12  about what's the right way to deal with
13  post marketing surveillance, workup of
14  safety signals and so forth.
15  Q. And you believe that the Guidelines
16  for Good Pharmacoepidemiologic Practice,
17  Dr. Ray's article in the New England
18  Journal of medicine, your article with Dr.
19  Ray in 1993, and articles that Alasdair
20  Wood has written demonstrate that there's
21  a consensus in the medical community about
22  how pharmaceutical companies should act?
23      MR. TISI: I think you're
24  missing one that he mentioned, but I

48 (Pages 186 to 189)

Jerry Avorn, M.D.

Page 190

1 won't...
2 MR. GOLDMAN: Okay.
3 A. Yeah. That -- There -- Dr. Strom
4 has written about this. Dr. Sady. Yeah.
5 I think if you take all of those together,
6 there is a general picture that emerges.
7 There's always going to be differences.
8 Q. Have you identified any of those
9 sources, sir, that you mentioned in your
10 Materials Considered?
11 MR. TISI: Counsel,
12 objection.
13 A. Well, my -- my CV has the
14 Guidelines for Good Epidemiological
15 Practices in it. But no, that -- that
16 would be just in the rubric of -- of
17 general medical behavior.
18 Q. Have you evaluated the conduct of
19 pharmaceutical companies other than Merck?
20 A. Yes.
21 Q. Was that in the context of being an
22 expert witness?
23 A. And other contexts as well.
24 Q. Have you ever -- Withdrawn.

Page 191

1 Are you applying any statistical
2 methods, sir, when you're evaluating
3 Merck's conduct in this case?
4 MR. TISI: Objection.
5 A. Certainly statistics play a role in
6 looking at data, yes.
7 Q. What statistics have you applied to
8 demonstrate that Merck's conduct concerning
9 Vioxx was unreasonable?
10 A. Well, it's not like there's a
11 statistical test for reasonable behavior.
12 But what I mean is that there -- in
13 looking at study results, one needs to
14 know enough statistics to be able to
15 interpret the importance of the findings.
16 Q. What is the test for reasonable
17 behavior by a drug company?
18 A. Like I just said, there is no test
19 that you can apply a Chi-square to and see
20 if it passes or fails.
21 Q. I'm not talking about a statistical
22 test.
23 A. Okay.
24 Q. Any test -- Withdrawn.

Page 192

1 MR. TISI: He identified
2 reasonable behavior; isn't that correct?
3 BY MR. GOLDMAN:
4 Q. Is there a test, sir, that you're
5 applying to determine whether Merck's
6 conduct concerning Vioxx was reasonable?
7 A. Okay. There is no one test the
8 way you would do a Chi-square on a
9 clinical trial. "The test," in quotes, is
10 whether that behavior meets reasonable
11 standards of experts in the field.
12 And there's also a common sense
13 test of, I think, whether any individual
14 layperson or a juror would expect that a
15 reasonable company would do X, Y, Z given
16 a given piece of data.
17 Q. Do you believe that jurors are
18 capable of evaluating Merck's conduct in
19 coming to a conclusion about whether
20 Merck's conduct was reasonable or
21 unreasonable?
22 A. In some ways yes and in some ways
23 no, and let me explain. They would not
24 be able to understand what acceptable

Page 193

1 standards of behavior in the medical
2 community are because they're not doctors,
3 or about interpreting the meaning of
4 certain findings because they're not
5 pharmacoepidemiologists. So there are some
6 important technical things which a juror,
7 on his or her own, could not be able to
8 interpret.
9 And then there are other things
10 which any person with common sense can
11 interpret, as in if you saw a particular
12 signal of a problem what would a
13 reasonable company do. So there's --
14 There's the two kinds.
15 And the latter I think a juror
16 could handle on their own. The former, I
17 think, requires some expert interpretation.
18 Q. So as I understand it, you believe
19 that expertise is required to be able to
20 explain the standards that you believe are
21 acceptable for a pharmaceutical company's
22 conduct, but whether or not Merck violated
23 those standards a juror could determine on
24 its own?

49 (Pages 190 to 193)

Jerry Avorn, M.D.

Page 194

1  A. That's a total distortion of what I
2  said.
3      MR. TISI: I would also
4  add, Counsel, you know, that is clearly a
5  ruling that a judge has to make.
6      Asking an expert witness to sit in
7  the -- to put judicial robes on and decide
8  where his appropriate expert testimony was
9  not appropriate expert testimony is
10 absolutely inappropriate.
11     And I will abide by Judge Fallon's
12 ruling about not, you know, stating
13 speaking objections; however, those kinds
14 of things are so ridiculous that if you
15 really feel like you're compelled to ask
16 this witness to sit as a judge, I will
17 feel that perhaps maybe we should call
18 Judge Fallon on that.
19     MR. GOLDMAN: Fine.
20     MR. TISI: So let's --
21 let's -- let's -- let's stick to medical
22 opinions, and not judicial opinions.
23     BY MR. GOLDMAN:
24 Q. Are you an expert, Dr. Avorn, in

Page 195

1  FDA regulations?
2  A. To the extent that my expertise
3  about drug risks and benefits relate very
4  closely to FDA decisions, yes. Am I a
5  regulatory attorney? No.
6  Q. But you believe you are an expert
7  in FDA guidelines concerning drug labeling?
8  A. We -- We have written on that
9  topic, and I, again, to the extent a great
10 deal of that is about pharmacoepidemiology
11 and data on risks and benefits, yes.
12 Q. We'll talk more about the FDA in a
13 minute.
14     When did you form your opinion that
15 Vioxx increased cardiovascular risk?
16 A. I think it began to form when the
17 VIGOR study was published in November of
18 2000.
19 Q. When did you form your opinion that
20 Merck's conduct in responding to the
21 potential cardiovascular risks of Vioxx was
22 unreasonable?
23 A. It took form over time. I think
24 it began, actually, in early 2001, in a

Page 196

1  conversation with Dr. Lou Sherwood of
2  Merck, whom I had invited to give grand
3  rounds at our hospital. And I asked him
4  about the VIGOR findings, and he said --
5  he dismissed it out of hand and said, "Oh,
6  that's nothing to think about. It's all
7  because Naproxen prevent MIs."
8      And that was the first time that I
9  began to feel, or believe, that Merck's
10 response to the cardiovascular risk of
11 Vioxx was not a reasonable response,
12 because that seemed to me to be a -- a
13 rather quick dismissal of a potentially
14 very worrisome problem.
15 Q. What did you say to Lou Sherwood
16 when he told you that?
17 A. I don't recall what I said to him
18 at the time. I remember thinking to
19 myself, "Gee, that seems like a pretty
20 glib answer." But since he was the vice
21 president of the company that made the
22 drug and knew the data more intimately
23 than I, I don't know that I -- I think I
24 may have indicated that that would make

Page 197

1  Naproxen the most cardioprotective drug
2  ever discovered. I know that that's what
3  many of us were saying at the time. I
4  would expect that I would have said that
5  to Lou.
6  Q. But you don't remember?
7  A. It was six years ago -- or five
8  years ago.
9  Q. Where was the discussion with -- I
10 can't remember. He's a doctor.
11 A. Sherwood is a doctor.
12 Q. Dr. Sherwood.
13     MR. TISI: He actually
14 is --
15     THE WITNESS: He's the head
16 of endocrine at Beth Israel.
17     MR. GOLDMAN: This is off.
18     (Off the record at 12:09 p.m.)
19     (Discussion off the record).
20     (On the record at 12:09 p.m.)
21     BY MR. GOLDMAN:
22 Q. When was your discussion --
23 A. It would have been about --
24 Q. Let me finish. When was your

50 (Pages 194 to 197)

Jerry Avorn, M.D.

Page 198

1  discussion with Dr. Sherwood?
2  A. It would have been about January of
3  '01, at the Brigham and Women's Hospital,
4  when I had had him come up to give grand
5  rounds.
6  Q. Was anyone else present during your
7  discussion?
8  A. That particular discussion, as I
9  recall, was in the hallway walking
10 somewhere, I think. Although I remember
11 Dr. -- We had a lunch with him after
12 grand rounds, and I remember Dr. Solomon
13 was at -- It was a small lunch, mostly
14 for my division with Dr. Sherwood, and I
15 know Dr. Solomon was there. But I don't
16 remember all the people that were there.
17 Q. Have you had dealings with Dr.
18 Sherwood in the past?
19 A. Over time, as I was just saying, he
20 was, I think, the head of endocrinology
21 around the time that I was at the Beth
22 Israel Hospital in the '70s or early '80s.
23 And I think he had invited -- he and I
24 were both on a panel or two over time of

Page 199

1  -- I remember there was a meeting at the
2  University of Pennsylvania we were both
3  at. So I've seen him on and off like
4  every few years. Rarely.
5  Q. And has Dr. Sherwood ever done
6  anything to you that you viewed was
7  inappropriate?
8  A. Not to my knowledge.
9  Q. Was he ever combative or
10 threatening toward you in any way?
11 A. Not to me. To others.
12     MR. GOLDMAN: Move to strike
13 as nonresponsive.
14     BY MR. GOLDMAN:
15 Q. I'm asking about you. Did you find
16 that Dr. Sherwood -- Let me back up for a
17 second.
18     Have you read a letter about Dr.
19 Sherwood that was written by Dr. Fries?
20 A. I'm aware of a concern that Dr.
21 Fries had about Dr. Sherwood's behavior.
22 Q. Is that based on a conversation you
23 had with Dr. Fries?
24 A. No. It was reading about it.

Page 200

1  Q. In a letter?
2  A. I don't remember if it was a letter
3  or an account of their interchange.
4  Q. What type of account did you
5  read --
6  A. Well, basically --
7  Q. -- about the interchange between
8  Dr. Fries and Dr. Sherwood?
9  A. Well, basically -- And this has
10 been, I think, widely reported in the
11 media -- that allegedly Dr. Sherwood
12 phoned or wrote -- I think phoned Dr.
13 Fries at Stanford to complain about the
14 statements made by Dr. Gupta -- no, I'm
15 sorry. Dr. Singh. His first name is
16 Gurkirpal Singh, S-I-N-G-H. Who was a
17 junior faculty at Stanford who had been
18 making statements, based on his reading of
19 the literature and his own research, about
20 Vioxx and its cardiovascular risk, and Dr.
21 Sherwood allegedly called Dr. Fries to
22 warn him to -- as the account goes, to
23 have Dr. Singh stop saying bad things
24 about Vioxx.

Page 201

1  Q. Do you know how Merck responded to
2  the complaint that Dr. Singh registered
3  with Merck?
4      MR. TISI: Dr. Fries.
5      BY MR. GOLDMAN:
6  Q. I'm sorry. Dr. Fries.
7  A. I know that there was a statement
8  within Merck that this looked very bad and
9  there was concern. I don't know that I
10 remember what they did about it.
11 Q. Do you have an opinion about
12 whether Merck acted responsibly in response
13 to Dr. Fries's letter about Dr. Sherwood?
14     MR. TISI: A separate report
15 from Dr. Sherwood's conduct? You're
16 talking about as an institution? Is that
17 what you're asking?
18     BY MR. GOLDMAN:
19 Q. Do you understand the question?
20     MR. TISI: I don't, and I'm
21 going to object.
22 A. No. I -- I -- I don't.
23 Q. Your knowledge about the
24 interaction between Dr. Sherwood and others

51 (Pages 198 to 201)

Jerry Avorn, M.D.

Page 202

1  and what Dr. Fries had to say about that
2  comes from your reading the newspaper,
3  right?
4  A. Correct. But I can tell you it
5  created quite a stir in the academic
6  community, that a company would sort of
7  threaten a faculty member for saying bad
8  things about their drug.
9      MR. GOLDMAN: Move to strike
10 as nonresponsive.
11     BY MR. GOLDMAN:
12 Q. And you've said, allegedly, in
13 several of your --
14 A. Right.
15 Q. -- answers, right?
16 A. Correct.
17 Q. You don't know whether the
18 statements by Dr. Fries are accurate about
19 Dr. Sherwood, correct?
20 A. I cannot rule out the possibility
21 that he was lying.
22 Q. You just don't have any personal
23 knowledge at all about Dr. Sherwood or his
24 interactions with any other doctor, right?

Page 203

1  A. It's from what I've read.
2  Q. Okay. You identify the sources of
3  information that you're relying on for
4  your opinion, sir, and you said that you
5  reach your opinions based on peer-reviewed
6  medical literature, right?
7  A. Right.
8  Q. Did you reach your opinions based
9  on publicly available material from the
10 FDA?
11 A. Right.
12 Q. And did you reach your opinion
13 about what Merck knew about the
14 cardiovascular risks and how it managed
15 those risks from the internal documents
16 that plaintiffs' lawyers sent you?
17 A. Yes. There -- There are other
18 sources, too. That was not an exhaustive
19 list.
20 Q. What are the other sources?
21 A. Well, there was not publicly
22 available information. I believe that it
23 was within FDA. I think that I saw FDA
24 documents that I would not have been able

Page 204

1  to get outside of the discovery process.
2  I'm not sure.
3      And other communication to Merck by
4  its -- I guess I got that via Merck
5  internal documents such as correspondence
6  that was sent to Merck by its scientific
7  advisors. And then, again, the media
8  reports, which were a smaller piece of it,
9  but they were part of that as well.
10 Q. You're relying on media reports in
11 forming your opinion, in part?
12 A. In small part.
13 Q. Were there good public health
14 reasons for Merck to develop Vioxx?
15 A. Yes.
16 Q. What were they?
17 A. The fact that gastrointestinal
18 toxicity, particularly GI bleeds, from
19 traditional nonsteroidals was and is a
20 clinical problem.
21 Q. Would you agree that
22 gastrointestinal toxicity from traditional
23 NSAIDs is a substantial problem?
24     MR. TISI: Objection.

Page 205

1  A. Yeah. Substantial is a subjective
2  word, but it's -- it's -- it's a problem.
3  I -- I -- I just don't know what
4  substantial means in this context. But
5  yes, it's -- it's an important problem.
6  Q. Are you aware of epidemiological
7  studies that have suggested there are
8  approximately 107,000 hospitalizations each
9  year because of GI complications from
10 traditional NSAIDs?
11 A. Yes.
12 Q. You have no reason to dispute the
13 integrity or accuracy of those studies,
14 right?
15 A. Right.
16 Q. Would you agree, sir, that Vioxx
17 worked to reduce pain and inflammation for
18 the vast majority of patients who used it
19 without causing them side effects?
20 A. Yes.
21 Q. And you would never say, sir, that
22 Vioxx is unsafe for any patient with any
23 dose for any duration, would you?
24 A. Sure, I would. In fact, that's

52 (Pages 202 to 205)

Jerry Avorn, M.D.

Page 206

1 what the FDA has said. That's what Merck
2 has said. Yes. Of course I would.
3    Q. Did you ever say, while Vioxx was
4 on the market, that it was unsafe for any
5 patient at any dose for any duration?
6    A. I recommended to our P and T
7 committee we not have it on our formulary.
8 That's about as clear I could have been
9 about it.
10   Q. Did you recommend to the medical
11 community, in terms of writing an article,
12 that you believed while Vioxx was on the
13 market that it was unsafe for any patient
14 at any dose for any duration?
15   A. I wrote in my book, while the drug
16 was on the market, that it was no more
17 effective than older nonsteroidals and that
18 it raised the risk of heart attack.
19   Q. Before Vioxx was withdrawn from the
20 market, sir, did you ever write any
21 peer-reviewed article that said that Vioxx
22 was unsafe for any patient at any dose for
23 any duration?
24   A. I wrote peer-reviewed articles,

Page 207

1 while the drug was on the market,
2 indicating that there was a worrisome risk
3 of cardiovascular side effects from the
4 drug.
5       I did not go on to call for its
6 being banned, because that's not what the
7 articles are about. But we had papers in
8 the literature well before the drug was
9 withdrawn saying this drug carries
10 important cardiovascular risk.
11      I think the papers also indicated
12 that it had no analgesic advantage.
13   Q. I wasn't asking about other
14 articles. I was asking about yours, okay?
15   A. No. I'm saying, that's -- I'm
16 talking about mine. Articles that I have
17 written.
18   Q. Did you ever write in any article
19 that was peer-reviewed while Vioxx was on
20 the market, that Vioxx was unsafe for any
21 patient at any dose for any duration?
22   A. If you can strain the question by
23 using those particular words, no. But to
24 complete my answer, I did say that

Page 208

1 Vioxx --
2    Q. Why do you have to complete your
3 answer?
4    A. Because you're asking --
5    Q. It's complete.
6    A. It's really a pretty absurd
7 question.
8    Q. It's a yes or no question.
9       MR. TISI: No, it isn't.
10   A. You're asking if I used a specific
11 set of words that you chose that are
12 extraordinarily extreme. And what I'm
13 saying is, while I did not use those
14 extreme words, that essentially no one
15 ever uses in an article, what I did say
16 very clearly for many years well before
17 the drug was withdrawn is that it had no
18 analgesic advantage and that it had an
19 increased cardiovascular risk.
20      That is tantamount to saying why in
21 the world would you use this drug? So
22 technically I did not use the words that
23 were in your question, but I certainly
24 made a statement very much like that in

Page 209

1 writing in peer-reviewed articles over the
2 years.
3    Q. Did you ever say, while Vioxx was
4 on the market in any peer-reviewed
5 article, that you believed it should be
6 withdrawn from the market?
7    A. No.
8    Q. Did you ever say in any
9 peer-reviewed article that you wrote while
10 Vioxx was on the market that it should
11 have a black box warning about potential
12 cardiovascular risks?
13   A. No.
14   Q. Did you ever write in any article
15 while Vioxx was on the market that you
16 believed that Merck's warning about
17 potential cardiovascular risks was
18 inadequate?
19   A. I never wrote any papers in which
20 that would have come up.
21   Q. Is the answer no?
22   A. Right.
23   Q. You, I think won a --
24       MR. TISI: Could you just

Jerry Avorn, M.D.

Page 210

1  read back that last question, if you don't
2  mind? I'm sorry. Let me ask you, was
3  that while he was on the market, while the
4  drug was on the market?
5       MR. GOLDMAN: Yes.
6       MR. TISI: That's fine.
7       BY MR. GOLDMAN:
8    Q. Were you the recipient of a
9  clinical investigator award concerning the
10 issue of drug induced illness in the
11 elderly? Do you remember that?
12   A. I don't know that it was a clinical
13 investigator award. That --
14   Q. Okay.
15   A. Tell me what you -- From whom?
16   Q. Did you receive a grant --
17   A. From whom?
18   Q. -- from the NIH in the early '90s
19 to assess drug induced illness in the
20 elderly, and did you use NSAIDs as a
21 model?
22   A. Yes.
23   Q. Briefly, can you tell us what your
24 study was about and what were the

Page 211

1  conclusions about NSAIDs?
2    A. Okay. It was, as I recall -- And
3  this would have been many years ago --
4  looking at patterns of use of NSAIDs and
5  complications, and it -- it led into the
6  work that I did with Dr. Solomon.
7       I think -- If we're talking about
8  the same grant, that was a small grant
9  pilot award from the National Institute on
10 Aging to develop data sets for studying a
11 variety of problems.
12      MR. TISI: To the extent
13 you refer to stuff like that, because I
14 think it's helpful, if you want to -- he
15 has his CV, so I know --
16      MR. GOLDMAN: I --
17      MR. TISI: Okay. So I
18 mean, it would help me to follow what
19 you're doing. If you can't do that,
20 that's fine. I understand.
21      BY MR. GOLDMAN:
22   Q. Did you discuss, when you were
23 doing this research for the NIH, the
24 gastrointestinal complications from NSAIDs?

Page 212

1  Do you remember?
2    A. Well, yeah. I remember that that
3  research led to a number of papers that
4  Dr. Solomon and I wrote that dealt with
5  that, yeah.
6    Q. Have you ever prescribed Vioxx?
7    A. I have recommended that -- I'm
8  trying to remember whether I've -- Given
9  that it came out after I was no longer
10 doing a lot of direct primary care, I'm
11 trying to recall whether I've recommended
12 that interns or residents prescribe it.
13      I would expect that when it was new
14 to the market, I would have probably had
15 supervised interns who prescribed it.
16   Q. At what point in time do you
17 believe you told the residents and interns
18 at your hospital that Vioxx carried an
19 increased cardiovascular risk that they
20 should consider when they prescribe Vioxx?
21      MR. TISI: Objection. Asked
22 and answered.
23   A. I think it would have been shortly
24 after the publication of VIGOR in November

Page 213

1  of 2000.
2    Q. Have you ever prescribed Celebrex?
3    A. Yes. As above, that is, supervise
4  interns and residents who prescribed it.
5    Q. Do you know that the FDA has
6  concluded that all NSAIDs carry
7  cardiovascular risk?
8       MR. TISI: Objection.
9    A. I know they --
10      MR. TISI: It misstates the
11 record.
12   A. I know that they have concluded
13 that. I think that they have concluded
14 that sloppily.
15   Q. Why?
16   A. Because, as I've discussed with Dr.
17 Temple of FDA, they really did not have
18 clinical trial or data or compelling
19 observational data about drugs other than
20 the COX-2s, but that for reasons that are
21 beyond me, they chose to put the same --
22 to recommend the same warning for all
23 nonsteroidals, really on the basis of not
24 having enough data, but just assuming a

54 (Pages 210 to 213)

Jerry Avorn, M.D.

Page 214

1 class vein.
2         And I think that they got it wrong,
3 as I've told Dr. Temple, and I've stated
4 it in print.
5    Q. What did Dr. Temple say to you when
6 you said that to him?
7    A. He said that they were working with
8 the best data they had, and they felt that
9 they wanted to be safe about it.
10   Q. Did you take issue with the FDA's
11 conclusion that all COX-2 inhibitors should
12 have a black box warning about potential
13 cardiovascular effects?
14   A. I did not take issue with that.
15   Q. Do you disagree with the FDA's
16 desire to have a black box warning on
17 Celebrex for potential cardiovascular risk?
18   A. No.
19   Q. Do you think that there is no
20 cardiovascular risk associated with
21 traditional NSAIDs, other than by
22 increasing hypertension?
23   A. I do not think that. I don't
24 know. I think we don't have enough data

Page 215

1 to know.
2         MR. GOLDMAN: Now is
3 probably an okay time to break for lunch,
4 because I'm about to switch topics.
5         MR. TISI: Okay.
6         (Off the record at 12:25 p.m.)
7         (Lunch recess).
8         (On the record at 1:38 p.m.)
9         BY MR. GOLDMAN:
10   Q. I want to switch topics, Dr. Avorn,
11 and talk about statistical significance.
12 Okay?
13   A. Mm-hmm.
14   Q. When you analyze and publish data,
15 do you follow generally accepted
16 statistical principles?
17   A. Usually.
18   Q. Is it important to follow generally
19 accepted statistical principles?
20   A. Usually.
21   Q. Why?
22   A. To convey a sense of the likelihood
23 that a given finding is the result of
24 chance or of causality.

Page 216

1    Q. Why do you say usually?
2    A. Because there are some times in
3 which a -- an excessively rigid use of
4 statistical, quote, rules, unquote, such as
5 saying that any finding with a P value of
6 less than .05 is real and meaningful, and
7 any finding with a P value of greater than
8 .05 is unimportant. Being too rigid about
9 that can lead to erroneous conclusions.
10   Q. Can taking results that are not
11 statistically significant -- Withdrawn.
12        Do statistical rules and the
13 concept of statistical significance help
14 prevent people from drawing invalid
15 conclusions from the data?
16   A. When used intelligently, yes.
17   Q. And is the concept of statistical
18 significance a principle that's been around
19 for many years?
20   A. Well, yeah. But so has astrology.
21 I don't know that that's a helpful
22 question.
23   Q. It's helpful to me to ask, so --
24   A. Okay. It's been around for many

Page 217

1 years.
2    Q. Merck didn't invent the concept of
3 statistical significance, right?
4    A. Correct.
5    Q. And when a result is statistically
6 significant, doesn't that help you
7 distinguish between adverse events that are
8 caused by a drug versus adverse events
9 that are caused by chance?
10   A. That can be one helpful tool.
11   Q. And is it true, sir, that it is
12 generally inappropriate to make causal
13 inferences if a difference is not
14 statistically significant?
15        MR. TISI: Clarification.
16 Because this is important, and I don't
17 want to get in the way, but are you
18 talking about in the confines of one
19 study, or are you talking about looking at
20 overall evidence of a cross- study?
21        BY MR. GOLDMAN:
22   Q. I'm just talking about the concept
23 of statistical significance --
24        MR. TISI: But causation --

Jerry Avorn, M.D.

Page 218

1  Causation involves more than just looking
2  at one -- one set of numbers, and I want
3  to make sure that we're not creating an
4  inappropriate record.
5      MR. GOLDMAN: Just object to
6  form, if you would. I don't -- I'm not
7  sure what your objection is, but --
8      MR. TISI: All right.
9  Well --
10     MR. GOLDMAN: Let me ask it
11 a different way. Okay?
12     MR. TISI: Sure.
13 BY MR. GOLDMAN:
14 Q. When you are analyzing adverse
15 events for a particular study, am I right
16 that it is generally inappropriate to make
17 a causal inference if the result is not
18 statistically significant?
19 A. I think that's an
20 oversimplification of the principle. And
21 I can explain why, if you like.
22 Q. Sure.
23 A. If a study does not have the power,
24 in the statistical sense of the term, to

Page 219

1  be able to identify a, quote, significant,
2  close quote, difference, then assuming that
3  an association with a P value of greater
4  than .05 is unimportant or irrelevant can
5  be an erroneous conclusion.
6  Q. Assuming that a study does have
7  power to detect a difference between a
8  drug and an event and a placebo and an
9  event, do you agree, sir, that it is
10 inappropriate to make causal inferences if
11 the difference is not statistically
12 significant?
13 A. If the study had power to detect a
14 difference in that outcome, then that
15 lends credence to adhering to the P 1.05
16 standard.
17 Q. And if -- Let me see what you
18 said.
19 (Record read).
20 Q. In your -- The answer before the
21 last one, Dr. Avorn, you said if the study
22 does not have sufficient power to identify
23 a statistically significant difference, it
24 would be wrong to interpret a P value that

Page 220

1  is greater than .05 as unimportant or
2  irrelevant?
3  A. Correct.
4  Q. Do you remember that?
5  A. Correct.
6  Q. Wouldn't it also be wrong, Dr.
7  Avorn, even if a study didn't have the
8  power to detect a statistically significant
9  difference, to conclude from a P value
10 that is greater than .05, that there is an
11 increased risk or there really is an
12 elevated risk?
13     MR. TISI: Clarification
14 based on that study alone.
15 A. I think what you meant was a P
16 value of less than .05 in your question.
17 Q. No.
18 A. A P value of less than .05, meaning
19 that it looks significant.
20 Q. Yeah. I meant greater than. So
21 let me ask again.
22 A. All right.
23 Q. As I understand your previous
24 statement, sir, if a study does not have

Page 221

1  the power to detect a statistically
2  significant difference, it would be wrong
3  to consider the result where a P value was
4  greater than .05 as being irrelevant or
5  unimportant, right?
6  A. Correct.
7      MR. TISI: Objection
8  BY MR. GOLDMAN:
9  Q. And my question is: It would also
10 be wrong to consider that P value of
11 greater than .05 as inferring causation?
12     MR. TISI: Objection.
13 Clarification on the study alone.
14 A. I'm not understanding -- I'm not
15 understanding the question.
16 Q. If you have a P value that is
17 greater than .05, is that statistically
18 significant or not?
19 A. In the conventional sense, no.
20 Q. And your point was that if a study
21 that is not powered enough to detect a
22 statistically significant difference
23 reveals a P value of greater than .05,
24 it's wrong to consider that result to be

Jerry Avorn, M.D.

**Page 222**

1  irrelevant or unimportant, right?
2  A. Right. It can be wrong. It --
3  Yeah. I mean, you could be misled by
4  writing off something with a P value
5  greater than .05 if there was no power to
6  detect a significant difference.
7  Q. You could also be misled by
8  concluding that a P value greater than
9  .05, even in a study that's not powered to
10  detect a difference --
11  A. Yeah.
12  Q. -- is evidence of actual causation?
13      MR. TISI: Objection for the
14  reason stated.
15  A. Okay. Let me see if I understand
16  what you're saying.
17  Q. Mm-hmm.
18  A. I said that dismissing a P value of
19  greater than .05 in a -- for an outcome
20  for which the study was not powered can be
21  an erroneous conclusion, and you're saying
22  -- I think what you're saying is, wouldn't
23  it -- couldn't it also be erroneous to
24  assume that it is meaningful?

**Page 223**

1  Q. Correct.
2  A. I said it can be erroneous to
3  assume it means nothing, and you're saying
4  couldn't it also be erroneous to assume
5  that it means something?
6  Q. Yes.
7  A. Correct. I agree with you.
8  Q. So let me just state it again, just
9  so the record is clear. I think we're on
10  the same page, okay?
11  A. Yes.
12  Q. It could be erroneous and
13  misleading for somebody to draw the
14  conclusion that there is a meaningful
15  difference seen in a study where a P value
16  is greater than .05 when that study is not
17  powered to detect a difference.
18      MR. TISI: Objection.
19  Assuming you're limiting it to one study.
20  Go ahead.
21  A. Right. In any given study it --
22  and I think what may be the simplest way
23  and clearest way to say this is, it is
24  inappropriate to read too much into the

**Page 224**

1  presence or absence of significance of a
2  finding for which there was no power to
3  detect a significant finding in either
4  direction.
5  Q. Do most researchers report results
6  at 95 percent confidence intervals?
7  A. Yes.
8  Q. And a 95 percent confidence
9  interval is traditionally used when
10  analyzing data, right?
11  A. Yes.
12  Q. And if you use a 95 percent
13  confidence interval, that means that you
14  are 95 percent confident that the true
15  risk lies within the lower and upper
16  bounds of the confidence interval, true?
17  A. Correct.
18  Q. And if the number one appears in
19  the confidence interval, then you cannot
20  reject the no hypothesis, right?
21  A. If one is using the P .05 standard.
22  Q. Yes.
23  A. I think -- I think cannot -- I'm
24  trying to avoid black and white, yes, no.

**Page 225**

1  But yes, it means that there is a 95 --
2  There is not a 95 percent confidence that
3  the finding is difference from one.
4  Q. It's generally true, sir, that if
5  the number one appears in a confidence
6  interval, that means the result is not
7  statistically significant, right?
8  A. In the conventional sense, yes.
9  Q. You said in your report that Merck
10  knew of the risk of heart attack or stroke
11  before approval in May of 1999, yet failed
12  to take reasonable action to address it.
13  Do you remember using words to that
14  effect?
15  A. Well, I'd like to see the exact
16  words I used, so if you want to tell me
17  where --
18  Q. Well, if you turn to the section
19  Available Evidence Prior to Approval --
20  A. Mm-hmm.
21  Q. -- of Vioxx.
22  A. (Witness viewing document). Yes.
23  Q. Is it your position, sir, that
24  based on your analysis in this report,

Jerry Avorn, M.D.

Page 226

1 Merck knew about the risk of heart attack
2 or stroke from Vioxx prior to approval?
3     MR. TISI: Objection.
4 Mischaracterizes his prior testimony on
5 that.
6     A. Well, that's -- that's why I wanted
7 to see the exact words of mine that you
8 were referring to, because a term like
9 "knew of" is both oversimplified and I
10 think misleading.
11    Q. Okay.
12    A. I think a fairer statement of this
13 is that Merck was aware of the potential
14 for that to be a problem.
15    Q. And you think that there was clear
16 evidence that Merck was aware of the
17 potential cardiovascular problem with Vioxx
18 before approval, right?
19    A. Yes.
20    Q. And I want to make a distinction
21 between being aware of the possibility of
22 an increased risk for cardiovascular events
23 and being aware that Vioxx actually causes
24 heart attacks, okay?

Page 227

1    A. All right.
2    Q. Is it your testimony, sir, that
3 Merck knew, prior to approval of Vioxx,
4 that Vioxx causes heart attacks?
5    A. No. I think prior to approval,
6 what -- Merck had evidence that this was
7 an important potential problem, but I
8 would not go so far as to say that --
9 Well, let me just think carefully about
10 this.
11       I'm having a problem with the
12 concept of quote, Merck knew that, because
13 Merck is a company, and companies don't
14 know or not know things.
15       I think the -- There was evidence
16 available to Merck, some of which Merck
17 generated, that raised a very worrisome
18 signal about the likelihood that Vioxx
19 could cause heart attack. I think that
20 that's a fair and accurate depiction of
21 what I think was available to the company.
22    Q. Do you agree, sir, that there is no
23 evidence that Merck officials, prior to
24 approval, believed that Vioxx causes heart

Page 228

1 attacks?
2    A. I guess that's asking me to state
3 what I believe individuals' beliefs were.
4    Q. Well, you say in your report, sir,
5 on Page 2, that the internal documents and
6 the documents in the public domain provide
7 clear evidence --
8    A. Can you tell me where you're
9 reading from?
10    Q. Sure. The second to last paragraph
11 on Page 2.
12    A. Okay.
13    Q. "Inspection of information available
14 in the public domain and internal company
15 documents --"
16    A. Right.
17    Q. -- "provides clear evidence that
18 Merck officials have been aware of this
19 risk for years." And then it continues,
20 okay?
21    A. Yeah.
22       MR. TISI: Just for
23 completeness sake, I know it comes under
24 the heading of pre -- prior approval, but

Page 229

1 if you read the sentence before, it says,
2 "Leading up to 2004." So let's -- For
3 completeness, maybe we should read the
4 whole paragraph.
5       MR. GOLDMAN: No. I don't
6 need to have him read the whole paragraph.
7       MR. TISI: Oh, okay. Then
8 we won't be doing that at trial now, will
9 we?
10       BY MR. GOLDMAN:
11    Q. Dr. Avorn, do you see how you talk
12 about that there was clear evidence about
13 what Merck officials were aware of, right?
14    A. Correct.
15    Q. Those are your words, right?
16       MR. TISI: Prior to what
17 date, Counsel?
18       BY MR. GOLDMAN:
19    Q. Are those your words, "prior to
20 approval," sir?
21    A. Yes.
22    Q. Is it your testimony that Merck
23 officials, prior to approval, were aware
24 that Vioxx causes heart attacks?

58 (Pages 226 to 229)