Jerry Avorn, M.D.

Page 230

1    A.  Okay.  The problem we have here,
2  Counsel, is that you're distorting my
3  quote, and that really is kind of --
4    Q.  I'm separating -- I'm moving from
5  the quote.
6    A.  You just read my statement.  Okay?
7  My statement is accurate and my statement
8  is what I believe.
9        So I don't understand the purpose
10  of your then recharacterizing it in words
11  that are not my own, and asking if I
12  agree with it.
13        What I agree with is what I wrote,
14  and you can read it again into the record
15  if you'd like.
16    Q.  Dr. Avorn, is it your opinion that
17  Merck officials were aware that Vioxx
18  carried an increased risk of causing heart
19  attacks?
20        MR. TISI:  When?
21        BY MR. GOLDMAN:
22    Q.  Prior to approval.
23    A.  Yes.
24    Q.  Based on what?

Page 231

1    A.  Based on the observation that there
2  was an increased incidence of
3  cardiovascular events in the preapproval
4  studies that they submitted to the FDA.
5    Q.  You believe the preapproval studies
6  submitted to the FDA show an increased
7  cardiovascular risk for Vioxx?
8    A.  Okay.  What we need to do is go
9  back to my words, which was "an increased
10  risk."  Okay.  That's different from
11  saying they knew that it caused heart
12  attacks.
13        What they knew was that their drug
14  was associated with an increased risk of
15  those events in the preapproval studies.
16        Now, the reason I'm being careful
17  about that is that it's an increased risk,
18  which is the potential for a problem.  I'm
19  not saying that there was prima facie
20  evidence that they had all these heart
21  attacks that they were hiding or something
22  like that.
23    Q.  Dr. Avorn, there is a difference
24  between saying that Merck officials were

Page 232

1  aware of the potential that Vioxx could
2  cause cardiovascular events --
3    A.  Right.
4    Q.  -- and taking the position that
5  Merck believed and knew and was aware that
6  Vioxx causes heart attacks yet put the
7  drug on the market anyway.
8        MR. TISI:  Objection.
9        BY MR. GOLDMAN:
10    Q.  Do you understand the difference?
11    A.  Yes.
12    Q.  Is it your testimony that Merck
13  officials were aware that there was an
14  increased risk and that Vioxx caused heart
15  attacks prior to approval of Vioxx?
16        MR. TISI:  Objection.
17  Compound.
18    A.  It's -- As Mr. Tisi said, what I
19  agree with is what I said, which was they
20  were aware of the increased risk, and that
21  is different from the second piece of the
22  question which is, they knew that Vioxx
23  caused heart attacks
24    Q.  Is it fair to say, then, Dr. Avorn,

Page 233

1  that you don't know of any evidence where
2  Merck officials knew that Vioxx caused
3  heart attacks before approval?
4    A.  I am aware that Merck officials
5  stated, in documents that I could cite for
6  you, that their drug had the potential to
7  increase the risk of heart attack.
8        And the problem is when you keep
9  coming back to the word new, because new
10  implies certainty, and I'm not testifying
11  that as of the time of approval, there was
12  certainty of the cause of heart attacks.
13  But there was very compelling evidence of
14  an increased risk of heart attacks, and
15  that's an important distinction.
16    Q.  And the compelling evidence of an
17  increased risk of heart attacks from Vioxx
18  before approval was what?
19    A.  Both the -- Well, primarily --
20  Well, it was of -- of several kinds.  One
21  was the evidence from the preapproval
22  studies as reflected in the NDA in which
23  there was a succession of what I would
24  characterize as worrisome signals of

59 (Pages 230 to 233)

Jerry Avorn, M.D.

Page 234

1   increase in a variety of different
2   clinical trials that Merck had conducted,
3   increased rates of cardiovascular outcomes,
4   which also was accompanied by evidence
5   from the company's own Scientific Advisory
6   Board and the pharmacological literature,
7   suggesting a precise reason why selected
8   inhibition of the COX-2 receptor might
9   predispose to cardiovascular outcomes.
10      And combining the evidence from
11  pharmacology, the statements of their own
12  advisors, and the signals from their
13  premarketing studies, I would -- and their
14  own statements, as per Dr. Scolnick and
15  others, of this could be a problem, it may
16  be a class effect, this drug could raise
17  the risk of thrombotic events, et cetera,
18  et cetera -- of which there are many such
19  internal documents -- that there was an
20  awareness of the possibility that their
21  drug could increase cardiovascular risk.
22      Q.  Did you read a study by Dr. Reicin
23  that was published in 2002?
24      A.  The one in which she -- American

Page 235

1   Heart Journal or American Journal of
2   Cardiology in which she looked at all
3   their -- she claimed to have looked,
4   although I think erroneously claimed, to
5   have looked at all their osteoarthritis
6   studies.
7       Q.  Are you claiming that Dr. Reicin
8   published an article and did not include
9   an osteoarthritis study in her analysis?
10      A.  I was unable to figure out whether
11  all the studies were there. I don't know
12  whether ADVANTAGE was in that collection
13  of studies or not, because they were
14  listed by numbers of people rather than
15  specific protocol numbers. And so my -- I
16  -- I simply can't tell whether ADVANTAGE
17  was listed in there or not.
18      Q.  Am I right, sir, that the
19  conclusion of the study that Dr. Reicin
20  did and published was that if you look at
21  the osteoarthritis studies, there is no
22  increased risk associated with Vioxx
23  concerning heart attacks?
24      A.  That was what she concluded.

Page 236

1       Q.  And that's, in fact, what the
2   analysis of the osteoarthritis studies
3   showed?
4           MR. TISI:  Objection.
5       A.  That was not what FDA's reading of
6   the osteoarthritis study showed.
7       Q.  Have -- You're saying that the FDA
8   concluded that Vioxx's preapproval
9   osteoarthritis studies showed that there
10  was an increased risk of heart attack with
11  Vioxx?
12          MR. TISI:  Objection.
13      A.  No. I'm concluding that FDA's
14  review of the osteoarthritis studies
15  submitted within the NDA indicated to the
16  FDA medical reviewers that there were --
17  there was evidence of the possibility of
18  increased thrombotic risk, and that there
19  was not enough information to dismiss that
20  risk, in their own words.
21      Q.  Do you agree, Dr. Avorn, that there
22  was no reasonable association of a risk of
23  stroke from Vioxx when Vioxx was on the
24  market?

Page 237

1           MR. TISI:  Objection to
2   form.
3       A.  There was no -- I want to go back
4   and look at the specific stroke outcomes
5   that were in the NDA as well as in other
6   prewithdrawal studies like ADVANTAGE and
7   VIGOR, and I -- I could do that now or
8   prior to tomorrow.
9       Q.  As you sit here today, Dr. Avorn,
10  can you identify any study, while Vioxx
11  was off the market, showing that Vioxx
12  carried an increased risk of stroke?
13      A.  Stroke was included among the
14  cardiovascular outcomes in several of those
15  studies, and so what I would need to do
16  is to see, among the studies that found
17  increased cardiovascular risk, how much of
18  that risk was explained by MI and how much
19  by stroke.
20      Q.  So will you do that by tomorrow?
21  Will you look to see whether you can
22  identify any study before Vioxx was
23  withdrawn from the market showing an
24  increased risk of strokes for Vioxx?

60 (Pages 234 to 237)

Jerry Avorn, M.D.

Page 238

1    A.  Yes.
2    Q.  Do you remember whether the VIGOR
3    study showed any signal that Vioxx causes
4    strokes?
5    A.  I don't recall that it did.
6    Q.  Do you know what the stroke results
7    were in the ADVANTAGE study?
8    A.  Not off the top of my head.
9    Q.  If the results of the ADVANTAGE
10   study showed that there were six strokes
11   on Naproxen and zero on Vioxx, would you
12   say that Vioxx prevents strokes?
13            MR. TISI:  Objection.
14   Mischaracterizes the evidence.
15   A.  Were they comparably sized groups,
16   the same number of people in both arms of
17   the study?
18   Q.  I believe so.  You can check that
19   tonight.  But I believe so.  Let's assume
20   that they were.
21   A.  Okay.  If the only information I
22   had from a study was that one drug caused
23   six strokes in a comparably sized ...
24   Q.  Okay.  In the ADVANTAGE study,

Page 239

1    2,785 patients received Vioxx, and 2,772
2    patients received Naproxen.
3    A.  Okay.  So it's about the same size.
4    Q.  Given that there were a similar
5    number of people who took Vioxx and
6    Naproxen in the ADVANTAGE study, would you
7    conclude, based on the fact there were six
8    strokes in the Naproxen arm and zero in
9    the Vioxx arm, that Vioxx prevents
10   strokes?
11            MR. TISI:  Objection.
12   Assumes facts that are incorrect.
13   A.  Okay.  The problem is the word
14   "conclude."  I think based on any single
15   study, it is -- especially if the findings
16   are of marginal significance, as I don't
17   know if those were or weren't -- I
18   wouldn't conclude anything.  What I would
19   say is that's a worrisome signal.
20   And if it was just Drug A and Drug
21   B, regardless of which drugs they were, I
22   would say this is interesting, this is of
23   concern, let's gather more information to
24   find out whether Naproxen causes strokes

Page 240

1    or whether Vioxx prevents strokes.
2            But I don't think a conclusion
3    based on one study with six events out of
4    thousands of people is likely to be a
5    conclusive conclusion.
6    Q.  Would you agree, sir, that before
7    you can draw firm conclusions about risks,
8    it's important to assess the totality of
9    the data --
10   A.  Yes.
11   Q.  -- and not just one study, right?
12   A.  Correct.  Unless there is one study
13   which has compelling evidence in and of
14   itself, as for example, VIGOR did.  But
15   usually that's not the case.
16   Q.  You think that the VIGOR study on
17   its own demonstrated that Vioxx caused
18   heart attacks?
19   A.  Yes.
20   Q.  And was that your view when you
21   read the VIGOR study in 2000-2001?
22   A.  Yes.
23   Q.  Do you know, while Vioxx was on the
24   market, sir, whether there was any

Page 241

1    reasonable association of risk between
2    Vioxx and arrhythmia?
3    A.  I do not know that there was,
4    whether there was.
5    Q.  Have you seen any evidence in your
6    review of the literature, sir, that there
7    is a reasonable association of risk
8    between Vioxx and heart attacks where
9    patients use Vioxx intermittently?
10           MR. TISI:  Objection.
11   A.  I'm sorry.  Can you repeat the
12   beginning of that question?
13   Q.  Have you seen any evidence in your
14   review of the literature, sir, that there
15   is a reasonable association of risk
16   between Vioxx and heart attacks where
17   patients use Vioxx intermittently?
18           MR. TISI:  Objection.
19   A.  Yes.
20   Q.  What's your basis for saying that
21   there's an increased risk?
22   A.  The observational studies conducted
23   by our group and by Dr. Ray, and most of
24   the other observational studies, if you

61 (Pages 238 to 241)

Jerry Avorn, M.D.

Page 242

1    look at drug use within those cohorts, the
2    use is frequently intermittent, as use of
3    nonsteroidals often is.
4        Q.   And we'll talk about the
5    observational studies later.  I should
6    have limited my question, okay?
7        A.   Okay.
8        Q.   Are you aware, sir, of any
9    randomized clinical trials showing that
10   there is an increased cardiovascular risk
11   associated with Vioxx where patients use
12   the medicine intermittently?
13           MR. TISI:  Objection.
14       A.   That's a faulty question because in
15   clinical trials, drugs are generally not
16   given intermittently, and so there aren't,
17   to my knowledge, no clinical trials in
18   which Vioxx is administered intermittently
19   And so it's an impossible question to --
20   to respond to.
21       Q.   Based on the clinical trials that
22   were done for Vioxx, sir, you can't
23   conclude that Vioxx increases
24   cardiovascular risk if patients use it

Page 243

1    intermittently, right?
2            MR. TISI:  Objection.
3        A.   The clinical trials didn't speak to
4    that, because they didn't administer the
5    drug intermittently.
6        Q.   So the answer to my question is
7    yes?
8            MR. TISI:  Objection.
9        A.   I think the answer to your question
10   is no, but I know what you mean.
11       Q.   Based on the clinical trials that
12   were done for Vioxx, you cannot conclude
13   that Vioxx increases cardiovascular risk
14   for patients who use the medicine
15   intermittently, correct?
16           MR. TISI:  Objection.
17       A.   Because there was no intermittent
18   use in the clinical trials, that -- that
19   is not a conclusion one can make or refute
20   based on the clinical trials.
21       Q.   You said in your report that the
22   doubling of a cardiovascular risk that was
23   seen in the APPROVe study in September of
24   2004 was known prior to approval.  Do you

Page 244

1    remember that?
2        A.   Can you show me where I say that?
3        Q.   Okay.  Let me rephrase the
4    question.  I don't have quotes around it,
5    so maybe I misspoke.
6        A.   Can you tell me which page you're
7    reading from?
8        Q.   Yes.  Page 2, under Available
9    Evidence Prior to FDA Approval of Vioxx.
10           You see, sir, in the first sentence
11   where you are talking about how you think
12   Merck officials were saying they were
13   astonished by an unanticipated finding --
14       A.   (Witness viewing document).  Yes.
15       Q.   -- that Vioxx could double the risk
16   of heart attack?
17       A.   Yes.
18       Q.   Are you aware of any evidence, sir,
19   that a doubling of a CV, cardiovascular
20   risk with Vioxx was known prior to the
21   approval of Vioxx?
22       A.   Okay.  The problem is you've,
23   again, mischaracterized what I've said.
24       Q.   I'm deviating from this to ask a

Page 245

1    question that is related to this.  Okay?
2    Are you with me?
3        A.   Let's try again.  Why don't you
4    phrase the question in a way that does not
5    misquote me.
6        Q.   Do you know, sir, of any evidence
7    showing that Vioxx doubled the
8    cardiovascular risk prior to approval?
9        A.   Prior to approval.  I'm aware of
10   evidence prior to approval that Vioxx
11   increased cardiovascular risk that --
12   What's problematic is the term "doubling,"
13   because I need to go back and look at the
14   extent to which it increased it.
15           But I -- I'm aware of the
16   preapproval studies demonstrating an
17   increase in risk.  I don't recall whether
18   it was a doubling or a 50 percent greater
19   or a tripling or whatever.
20       Q.   Will you show me any preapproval
21   study of Vioxx that shows a doubling of
22   cardiovascular risk between Vioxx and
23   placebo?  Or between Vioxx and an active
24   comparator?

62 (Pages 242 to 245)

Jerry Avorn, M.D.

Page 246

1    A.  Okay.  There was a binder that was
2  sitting over here --
3           MR. TISI:  I moved it
4  because we were doing that.  I'm sorry.
5           THE WITNESS:  All right.
6  So where is the binder that has 174 in
7  it?
8           (Discussion off the record).
9    A.  Okay.  Looking at Table 52, in the
10. primary review of the -- of Merck's NDA.
11    Q.  Which is tab what in your binder?
12    A.  Tab 175.  There are the following
13  numbers on -- in Table 52.  And again,
14  I'll just give some examples.
15        For placebo, there are rates of .2
16  percent, .8 percent.  But for Rofecoxib --
17  and the title of this is Thromboembolic
18  Adverse Events all OA, for osteoarthritis
19  trials.
20        So placebo .2 percent, 0.8 percent,
21  whereas for Rofecoxib the numbers -- Okay.
22  Let me just back up.
23        Six week studies which -- we do
24  these by duration.  Six week studies,

Page 247

1  placebo 0.2 percent, Rofecoxib 12.5
2  milligrams, 0.7 percent, Rofecoxib 25
3  milligrams, the rate is 0.18 percent.
4  Rofecoxib 50 milligrams, the rate is 1.1
5  percent.  Rofecoxib 125 milligrams, the
6  rate is 1.4 percent.
7        So for the six week studies we have
8  a dose- dependent increase in the risk of
9  thromboembolic adverse events as per the
10  FDA's review of the data submitted by
11  Merck from its osteoarthritis trials, as
12  compared with placebo, not Naproxen --
13    Q.  Is --
14    A.  I'm sorry.  I'm answering your
15  question now.
16    Q.  Mm-hmm.  Before you go to the next
17  table --
18    A.  As I recall, I was in the middle,
19  actually, of a sentence.
20    Q.  Okay.
21    A.  So we have a rate of .2 for
22  placebo, and then rates that are
23  threefold, fourfold, up to sevenfold
24  greater for Rofecoxib in various doses

Page 248

1  with the increase going higher with the
2  higher doses, as compared with placebo for
3  short studies.  And if you want, we can
4  repeat the data, which are similar, for
5  the longer studies.
6    Q.  Is it your testimony that there is
7  a statistically significant increased risk
8  of thromboembolic events between Vioxx at
9  25 milligrams and placebo in the
10  osteoarthritis studies?
11    A.  The numbers were too small to
12  attain the level of statistical
13  significance, but they are still worrisome
14  and still indicate, as the FDA concluded,
15  evidence of potential increased risk.
16    Q.  It would be wrong to conclude from
17  the table that you just referred to that
18  Vioxx caused the doubling of a
19  cardiovascular risk compared to placebo
20  based on the OA studies, true?
21           MR. TISI:  Objection.
22    A.  I do not agree with that.
23    Q.  Does the -- Sorry.
24    A.  What I -- What I would say is that

Page 249

1  there is clear evidence of an increased
2  risk in a dose-dependent fashion with
3  Vioxx that owing to the small numbers,
4  does not meet the test of statistical
5  significance, but is a clear pattern of
6  increased risk.
7    Q.  Can you conclude from the study
8  that your -- the analysis that the FDA did
9  of the OA studies that Vioxx causes a
10  doubling of cardiovascular risk, sir?
11    A.  The problem is "conclude," and
12  conclude would require larger numbers to
13  say with certainty that there is a
14  doubling, or in the case of the higher
15  dose, a sevenfold increase.  I don't think
16  one could, quote, conclude, close quote,
17  from these data that that is an obvious
18  and significant increase in risk.  But it
19  is a very worrisome pattern.
20    Q.  Did the FDA say that there was a
21  doubling of a cardiovascular risk seen
22  with Vioxx in the OA studies?
23    A.  (Witness viewing documents).  I was
24  looking for -- This is Dr. Pelayo's

63 (Pages 246 to 249)

Jerry Avorn, M.D.

Page 250

1  statement. I was looking for the overview
2  statement.
3      Okay. Let me read from Dr.
4  Pelayo's statement on -- It is the
5  paragraphs that appear right before page
6  -- Table 52.
7  Q.  Doctor, I'm not asking for what he
8  said.
9  A.  Right.
10 Q.  I'm asking you a very simple
11 question.
12 A.  Okay. What's the question?
13 Q.  Did the FDA conclude, before
14 approval, that Vioxx caused a doubling of
15 a cardiovascular risk?
16     MR. TISI: Objection. What
17 the FDA concluded.
18 A.  The FDA concluded there was a
19 higher incidence of ischemic and
20 thromboembolic events in patients taking
21 Rofecoxib compared to placebo, but it did
22 not conclude that -- it did not conclude
23 there was doublings, because the number of
24 events were underpowered to make such a

Page 251

1  conclusion rigorously.
2  Q.  So the answer to my question is no,
3  the FDA did not conclude that there was a
4  doubling of cardiovascular risk based on
5  the OA studies submitted preapproval --
6      MR. TISI: Objection.
7      BY MR. GOLDMAN:
8  Q.  -- right?
9      MR. TISI: Asked and
10 answered.
11 A.  Except I need to point out for
12 accuracy the FDA said the data seems to
13 suggest that in six week studies
14 thromboembolic events are more frequent in
15 patients receiving Rofecoxib than placebo.
16 So they said that there is this increased
17 rate, but they did not conclude that there
18 was a doubling of risk.
19 Q.  I'm going to ask it one more time,
20 and I'm hoping that you won't talk about
21 other things.
22     MR. TISI: No. Well, I'm
23 hoping you will accept his answer. You
24 can't keep asking the question to get an

Page 252

1  answer that you like. He's answered your
2  question fully.
3      BY MR. GOLDMAN:
4  Q.  Do you see anywhere in the FDA's
5  analysis, Dr. Avorn, a conclusion by them
6  that Vioxx causes a doubling of
7  cardiovascular risk based on the OA
8  studies?
9      MR. TISI: Objection. Asked
10 and answered.
11 A.  I would agree that I've answered
12 that question already.
13 Q.  Will you answer that question yes
14 or no?
15     MR. TISI: Objection. Asked
16 and answered.
17 A.  The FDA notes increase in risk.
18 They do not call it a doubling.
19 Q.  Is it true, sir, that based on the
20 studies that were submitted before Vioxx
21 was approved the incidence of thrombotic
22 or thromboembolic events were similar
23 between Vioxx and comparator NSAIDs?
24 A.  In the preapproval trials?

Page 253

1  Q.  Yes.
2  A.  No. That's not true.
3  Q.  You say, and you do, that early
4  papers made it clear that a selective
5  COX-2 inhibitor, the end of your quote,
6  could cause an imbalance.
7  A.  Right.
8  Q.  What papers are you referring to
9  when you say that early papers made it
10 clear that selective COX-2 inhibition could
11 disrupt the thromboxane/prostacyclin
12 balance and lead to heart attacks?
13 A.  Okay. There were several out of
14 Dr. FitzGerald's lab. He was the senior
15 author on most of them. The Dr.
16 Catella-Lawson was the first author.
17 There were others. I think I cited one
18 or more of those in -- from preapproval
19 time frame in the editorial. I just sent
20 it in Circulation a month ago, and I can
21 get you the citations if you want. I
22 don't have them all in my head.
23 Q.  Other than the Catella-Lawson,
24 FitzGerald urine study, are you aware off

Jerry Avorn, M.D.

Page 254

1  the top of your head of any other --
2  A.  Yes, I am.  They were -- And
3  again, I can't give you the citations from
4  memory -- but I remember that in his post
5  approval papers, Dr. Topol cited
6  preapproval papers that had come out
7  before the marketing of the drug also
8  consistent with this notion of an
9  increased risk.
10     So in other words, there are a
11  number of papers that we could get that
12  appeared before the drug was on the
13  market.
14  Q.  Is it your testimony, Dr. Avorn,
15  that in Dr. Topol's August 2001 JAMA
16  article, he cited multiple studies to
17  support the proposition that COX-2
18  inhibition can disrupt the
19  thromboxane/prostacyclin balance and cause
20  heart attacks?
21  A.  That's my recollection.
22  Q.  Before the FitzGerald urine study,
23  am I right, sir, that there was no
24  published article ever that suggested that

Page 255

1  COX-2 inhibition could cause heart
2  problems?
3     MR. TISI:  Objection.
4  A.  I don't think I can testify to
5  there was no published study ever.
6  Q.  Can you testify, Dr. Avorn, that
7  you are not aware of any published
8  article, prior to the Catella- Lawson,
9  FitzGerald urine study, suggesting that
10  COX-2 inhibition could cause heart
11  attacks --
12     MR. TISI:  Objection.
13     BY MR. GOLDMAN:
14  Q.  -- or heart problems?
15  A.  No.  There -- The paper you're
16  referring to is around '97, as I recall.
17  I'd need to --
18  Q.  Published in '99, conducted --
19     MR. GRAND:  Which FitzGerald
20  study?
21  A.  I think there was FitzGerald papers
22  that came out before '99 on this, and I
23  -- I don't think they would -- My sense
24  is they were not the very first papers to

Page 256

1  suggest that.
2  Q.  Do you know, as you sit here today,
3  Dr. Avorn, whether there were any
4  scientific articles before the
5  Catella-Lawson paper which demonstrated
6  this theory that COX-2 inhibition can
7  reduce prostacyclin and potentially cause
8  heart attacks?
9     MR. TISI:  Objection.
10  Objection to your characterization.
11  A.  There -- There are a couple of
12  problems with the question.  One is,
13  you're adding "and potentially cause heart
14  attacks," because I don't know whether
15  such studies will typically go on to say
16  "and this can cause a heart attack."  So
17  -- But if you take that out and just talk
18  about the imbalance between prostacyclin
19  and thromboxane, my impression was that
20  yes, there were papers before the
21  Catella-Lawson paper.
22     MR. GRAND:  Could you
23  clarify which Catella- Lawson paper you're
24  discussing?

Page 257

1     MR. GOLDMAN:  The one that
2  we all refer to as demonstrating the
3  FitzGerald hypothesis.
4     MR. GRAND:  There's one
5  prior to that, so that's why I'm asking.
6     MR. GOLDMAN:  All right.
7  BY MR. GOLDMAN:
8  Q.  Do you agree, sir, that the
9  Catella-Lawson FitzGerald urine study
10  showing a 60 to 70 percent reduction in
11  the urinary prostacyclin metabolite offered
12  an hypothesis?
13  A.  Why don't I just pull the paper,
14  because I think we have it here, and that
15  way we won't have to go on my memory.
16  Q.  Sure.
17  A.  (Witness viewing document).  Okay.
18  This is the Catella-Lawson paper that was
19  in the Journal of Pharmacology and
20  Experimental Therapeutics in May of 1999.
21  Q.  Mm-hmm.
22  A.  Okay.  What is the question?
23  Q.  The question is:  Based on the
24  study that was done by Catella-Lawson and

65 (Pages 254 to 257)

Jerry Avorn, M.D.

Page 258

1 FitzGerald that you're looking at, do you
2 agree that the authors were offering a
3 potential hypothesis concerning COX-2
4 inhibition and the imbalance theory?
5 A.  Tell me what you mean, were
6 offering a hypothesis.
7 Q.  Yes.  Did -- Well, let's do it
8 this way. Withdrawn.
9 Did the authors in the FitzGerald
10 Catella-Lawson study that you're looking at
11 in the Journal of Pharmacology and
12 Experimental Therapeutics conclude that
13 COX-2 inhibition causes heart attacks?
14 A.  No.  As I said, basic
15 pharmacologists working at this level don't
16 talk about heart attacks.
17 Q.  Did the authors of the
18 Catella-Lawson FitzGerald study conclude
19 that COX-2 inhibition puts patients in a
20 prothrombotic state?
21 A.  Okay.  What they conclude in their
22 conclusion is that COX-2 plays a role in
23 the biosynthesis of prostacyclin.  And it
24 is widely known that prostacyclin -- and

Page 259

1 this is not my quoting them, the quoting
2 of them ends with the word prostacyclin,
3 and now this is me saying that it has
4 been known and was known at the time and
5 was known before that prostacyclin is --
6 and I quote from their paper on Page .740,
7 "an effective antithrombotic strategy that
8 --" I'm sorry.  Let me read that more
9 fully.
10 "Pharmacologic enhancement of
11 endogenous prostacyclin is also an
12 effective antithrombotic strategy in vivo."
13 And other things in their paper refer to
14 the fact that prostacyclin is known to be
15 an antithrombotic agent, as well as having
16 other important effects of a good kind on
17 the vasculature, that act in opposition to
18 the thromboxane, which is known and was
19 known at the time to be prothrombotic.
20 So in their conclusion, they refer
21 to the fact that reducing prostacyclin
22 biosynthesis could relate to reducing
23 antithrombotic activity.
24 Q.  And that's a theory, right?

Page 260

1 A.  Sure.
2 Q.  Isn't it true that the authors of
3 the Catella- Lawson FitzGerald study
4 concluded that the implications of
5 prostacyclin suppression in vivo in living
6 beings was unclear?
7 A.  If you want to show me where they
8 say that, I'd be happy to take a look.
9 Q.  Second to the last paragraph, first
10 sentence.
11 A.  In their paper?
12 Q.  Mm-hmm.
13 A.  (Witness viewing document).
14 Correct.  However, in that same paragraph,
15 for completeness, I've got to point out
16 just a few lines below that they say --
17 we can't be selective in the quotation
18 here -- quote, "Prostacyclin formation by
19 the vasculature is of functional importance
20 in limiting the response to a thrombotic
21 insult."  And so they go on to say that
22 we do know that limiting prostacyclin
23 formation is a problem.
24 Q.  What does the next sentence say,

Page 261

1 for completeness?
2 A.  "We have shown previously that
3 urinary excretion --"
4 Q.  No.  "It remains."
5 A.  Oh, "It remains to be established
6 whether treatment with specific COX-2
7 inhibitors will suppress this response."
8 So there are two kinds of
9 statements here.  One is, there's worrying
10 about this because of the evidence from
11 previous studies, and we don't know what
12 this is going to do in humans.
13 Q.  How much of a reduction in
14 prostacyclin in the vasculature, sir, needs
15 to occur to put a patient in a
16 prothrombotic state?
17 A.  I have no idea.
18 Q.  Do you know how much reduction in
19 the urinary metabolite in the FitzGerald
20 study was seen?
21 A.  I have no idea.  I could look it
22 up.
23 Q.  Is prostacyclin present throughout
24 the body?

Jerry Avorn, M.D.

Page 262

1    A.  Yes.
2    Q.  Does the reduction in the urinary
3    metabolite of prostacyclin in the
4    Catella-Lawson FitzGerald study tell you
5    where in the body the prostacyclin is
6    being reduced?
7    A.  No.
8    Q.  For purposes of determining whether
9    Vioxx or any COX-2 inhibitor creates an
10   imbalance and puts patients in a
11   prothrombotic state, you would agree, sir,
12   that the reduction of the prostacyclin
13   needs to occur in the endothelium or the
14   vasculature?
15   A.  I don't know that that's the case.
16   Q.  Well, how could a reduction in
17   prostacyclin outside of the vasculature put
18   patients in a prothrombotic state?
19   A.  In theory, the prostacyclin could
20   be synthesized elsewhere and have an
21   activity on the vasculature. It needn't
22   be its synthesis in the vasculature. But
23   again, this is not my field.
24   Q.  Are you aware of literature, sir,

Page 263

1    that shows that COX-1 enzyme actually
2    produces prostacyclin in the vasculature
3    and not COX-2?
4    A.  They both, to my understanding,
5    produce it, and it's a matter of relative
6    balance of which produces it more in one
7    setting versus another.
8    Q.  Do you know whether more
9    prostacyclin is produced in the vasculature
10   by COX-1 compared to COX-2?
11   A.  I don't know.
12   Q.  Are you aware of studies measuring
13   the effect of Vioxx on prostacyclin in
14   coronary arteries?
15   A.  I know that animal studies were
16   done in -- in artery preparations.
17   Q.  Do you know the results of those?
18   A.  That's beyond my area of expertise.
19       But I should also point out that
20   prostacyclin has effects other than
21   prothrombotic, antithrombotic balance.
22   There may be effects on endothelium, there
23   may be effects on vascular resistance.
24   And so it's not only one effect of

Page 264

1    prostacyclin that one would be concerned
2    about.
3    Q.  Do you agree, Dr. Avorn, that the
4    theory that Catella-Lawson and FitzGerald
5    were advancing in this study was that
6    COX-2 inhibition could reduce prostacyclin
7    in the vasculature enough to put a patient
8    in a prothrombotic state?
9    A.  They raise that as a possibility.
10   Q.  And it was a big debate in the
11   medical community about whether or not
12   COX-2 produces prostacyclin in the
13   endothelium and the vasculature or whether
14   COX-1 does, right?
15   A.  That's not a debate that I was part
16   of, so I can't speak to it.
17   Q.  You talk, in your expert report,
18   about Protocol 017 and you mentioned that
19   earlier. Do you remember that?
20   A.  Yeah.
21   Q.  Did you review the CSR for Protocol
22   017?
23   A.  I think what I had on 017 was a
24   summary of its findings rather than the

Page 265

1    protocol itself.
2    Q.  Who prepared the summary?
3    A.  It was a photocopy of material from
4    Merck. It was a Xerox, much of which was
5    redacted out.
6         MR. TISI:  Just so you
7    know, it is right here. I mean, he was
8    provided it. I don't know whether that's
9    important to you. But I know --
10   A.  Okay. But what I remember most was
11   the heavily redacted summary produced by
12   Merck about it, because most of the pages
13   were black.
14   Q.  You didn't review the CSR for
15   Protocol 017, did you, sir?
16   A.  I don't recall reviewing it. I may
17   have seen it.
18   Q.  What was the purpose of Study 017?
19   A.  Let me pull out the materials
20   relating to 017.
21       (Witness viewing documents). Okay.
22   Q.  Okay. So what was the purpose of
23   Protocol 017?
24   A.  All right. The protocol itself,

67 (Pages 262 to 265)

Jerry Avorn, M.D.

Page 266

1   which is Bates number MRKAFL0010627, refers
2   to it as a double blind placebo controlled
3   study to assess safety and tolerability
4   and preliminarily evaluate efficacy in
5   patients with rheumatoid arthritis.
6     Q. Do you know long the study was?
7     A. It was brief, as I recall, six
8   weeks.
9     Q. Do you know what doses were used of
10   Vioxx?
11     A. 125 milligrams initially -- later,
12   but it also started at a much higher dose
13   of 175 milligrams.
14     Q. How many cardiovascular adverse
15   events occurred in the Study 017?
16     MR. GRAND: Would you
17   clarify which version? There's -- Can you
18   clarify what you're talking about, the
19   study or just the extension of the study?
20     BY MR. GOLDMAN:
21     Q. The study that you reviewed.
22     A. (Witness viewing documents). I'm
23   just going through the safety end of the
24   report.

Page 267

1     Okay. Looking at just the first
2   table, I find here is -- No. That's not
3   a good one.
4     Okay. Okay. Table 46 in the
5   Merck report of this Protocol 017,
6   indicated that 38 percent of patients on
7   what was then called MK0966, which is
8   Vioxx, 38 percent had a drug related
9   adverse experience, versus 16 percent of
10   placebo. And turning to cardiovascular
11   system --
12     Q. Which is what I asked about.
13     A. Okay. 10.1 percent of patients on
14   Vioxx compared to 2.9 percent of patients
15   on placebo. So that would be a threefold
16   difference.
17     Q. Can I see what you're looking at?
18     A. Sure. Do you want to come over
19   here, or do you want me to hand it over?
20     Q. How many heart attacks occurred in
21   Protocol 017?
22     A. Let me look that up. Since it was
23   a six week study, I would expect that of
24   all the cardiovascular outcomes, very very

Page 268

1   few, if any, would be heart attacks per se
2   because --
3     Q. Why would you expect that?
4     A. Because six weeks is a very, very
5   short period of time to -- to expect a
6   heart attack to occur in.
7     MR. TISI: I'm sorry. In
8   what?
9     THE WITNESS: I'm sorry?
10     MR. TISI: You said in
11   something.
12     A. Yeah. Six weeks is a short period
13   of time in which a drug is likely to
14   cause a heart attack. The shorter the
15   study, the less likely you are to see an
16   event like an MI as compared to
17   hypertension.
18     Q. How many heart attacks occurred in
19   Study 017?
20     A. Okay. I see acute myocardial
21   infarction in a white 73 year old male,
22   and -- Oh, I'm sorry. Those were patients
23   who were discontinued due to clinical
24   adverse experiences as opposed to having

Page 269

1   had --
2     So there was -- There was one
3   patient who discontinued this because of a
4   heart attack, and now I'm looking for
5   total heart attacks, which ought to be
6   here.
7     (Witness viewing document). Okay.
8   Here it is. Listing of patients. This is
9   table 55 on page .135. Listing of patients
10   with cardiovascular adverse experiences.
11   Okay. And here I guess is that same 73
12   year old male, acute myocardial
13   infarctions, intensity severe. That's one.
14     And all the others were nonspecific
15   STT changes, hypertension, sinus
16   bradycardia, irregular heartbeat. So if
17   this is the complete listing, there was
18   one.
19     Q. There was one thrombotic
20   cardiovascular event in Study 017, right,
21   sir?
22     A. Right. But there were a number of
23   other cardiovascular events.
24     Q. Well, the theory that you are

68 (Pages 266 to 269)

Jerry Avorn, M.D.

Page 270

1  operating under and everybody else was
2  operating under concerning how Vioxx
3  increased the risk of heart attack, if it
4  did, was based on an imbalance between
5  prostacyclin and thromboxane, right?
6       MR. TISI: Objection.
7  That's just not true.
8    A.  No. I think -- I think --
9       MR. GOLDMAN: It's not
10  testifying.
11       MR. TISI: No, you're
12  testifying. You're not allowed to testify
13  at all.
14    A.  All right. Let me testify.
15       I think you're either
16  misunderstanding or mischaracterizing the
17  issue here. The -- And you kind of made
18  a leap from discussing prostacyclin and
19  prothrombotic, antithrombotic balance to
20  jumping to heart attack.
21       There are many reasons of -- for
22  concern about potential pathways to
23  cardiovascular morbidity with the COX-2
24  drugs. One of them is the prothrombotic

Page 271

1  effect, but another is the hypertension,
2  another is the congestive heart failure as
3  manifested also by peripheral edema.
4       And so it's not only about the
5  thrombosis. And as I said a minute ago,
6  six weeks is a very short period of time
7  to expect an event.
8    Q.  Do you know, sir, for the patient
9  who had a heart attack, what his risk
10  factors were?
11    A.  No.
12    Q.  Do you take the position that Vioxx
13  caused that man's heart attack?
14    A.  I'm not taking that position.
15    Q.  Do you know if the investigator in
16  Study 017 believed that the man who had a
17  heart attack had it because of Vioxx?
18       MR. TISI: Objection.
19    A.  I don't think any investigator
20  looking at a specific clinical trial
21  patient can rule out or rule in a
22  situation of that kind.
23    Q.  Is the answer no, you don't know
24  what the investigator said?

Page 272

1    A.  I don't know.
2    Q.  Do you know what dose of Vioxx the
3  man who had a heart attack?
4    A.  These were very high doses. This
5  was 125 and 175 milligram doses.
6    Q.  Am I right, Dr. Avorn, that you
7  didn't look at the details of Protocol 017
8  before you wrote your report? What you
9  did, was you looked at an internal Merck
10  document that commented about Protocol 017.
11    A.  Correct.
12    Q.  So rather than actually look at the
13  Protocol 017 yourself and assess it, in
14  terms of whether it increases the risk --
15  demonstrates an increased risk of
16  cardiovascular events, you relied on an
17  internal document from Merck?
18    A.  It was submitted to their research
19  management committee, and I assumed that
20  they probably got it right.
21    Q.  Do you know if anybody died in
22  Study 017?
23    A.  I don't know.
24    Q.  You quote and discuss at length,

Page 273

1  sir, e-mails from Dr. Musliner, Dr.
2  Morrison and Dr. Reicin. Do you
3  remember --
4    A.  Yes, I do.
5    Q.  -- quoting from them?
6    A.  Yes.
7    Q.  Is it your opinion, sir, that Dr.
8  Morrison and Dr. Reicin believed that
9  Vioxx caused heart attacks back when they
10  wrote these e-mails in 1996, 1997?
11    A.  I believe that they -- I think
12  that they believed and wrote that they
13  thought that there was a quote,
14  Substantial chance," to quote Dr. Musliner,
15  "that there would be more cardiovascular
16  adverse events in patients given Vioxx
17  than in the comparison group."
18       And I further recognize that it was
19  not clear at that point whether that would
20  be because Vioxx did not have the
21  cardioprotective effect that other NSAIDs
22  or aspirin might have, or whether it was
23  because the drug itself could be
24  prothrombotic. And I'm aware that they

69 (Pages 270 to 273)

Jerry Avorn, M.D.

Page 274

1  considered both possibilities.
2      Q.   You believe that in the e-mails
3  between Dr. Reicin and Dr. Morrison that
4  there was a discussion about whether Vioxx
5  was prothrombotic?
6          MR. TISI:  Objection.
7  Mischaracterizes his testimony.
8      A.   No.  What I said was that they
9  stated that there was a, quote,
10 Substantial chance that significantly
11 higher rates of CV adverse events will be
12 observed in the selective COX-2 inhibitor
13 group, close quote.
14         And that I cannot tell from their
15 memos the extent to which they thought
16 that was because of the fact that Vioxx
17 did not have the cardioprotective effect
18 of other nonsteroidals, or because of
19 their awareness of other reasons for
20 worrying about COX-2 inhibitors being
21 prothrombotic.
22         I cannot tell what -- what was in
23 their minds.  I know that they considered
24 the possibility that it may just be the

Page 275

1  absence of cardioprotection.
2      Q.   Isn't it true, sir, that when they
3  were writing their e-mails back in 1996,
4  1997, that these Merck scientists believed
5  that Vioxx would be neutral in terms of
6  cardiovascular effects?
7          MR. TISI:  Objection as to
8  what they believed.
9      A.   I cannot know what they believed.
10     Q.   Have you read the deposition --
11 We've been through that.
12         Are you accusing at all, sir, the
13 Merck scientists of knowingly selling an
14 unsafe drug when they sold Vioxx?
15     A.   When you say the Merck scientists,
16 the people -- the scientists weren't
17 selling the drug.
18     Q.   Okay.  Are you accusing anybody at
19 Merck of knowingly selling an unsafe drug,
20 when it came to Vioxx?
21     A.   I think that Merck was aggressively
22 marketing a drug for which they had safety
23 concerns that they did not fully address,
24 and that as a minimum, they were aware

Page 276

1  that people would be switching to their
2  drug from a more cardioprotective drug,
3  which is what was in those e-mails you
4  were just referring; that in the marketing
5  consequence of the worries that you were
6  just describing, that Dr. Musliner et al.,
7  expressed, was that a patient might stop
8  taking -- Let me be -- You look confused.
9      Q.   No.  I just asked one question.
10     A.   Yes.  I believe, to be clear --
11     Q.   Let me ask the question again.
12     A.   All right.  All right.
13     Q.   Can you answer this yes or no, and
14 if you can't and you need to explain,
15 that's fine.
16         Are you accusing anybody at Merck
17 of knowingly selling an unsafe drug when
18 they sold Vioxx?
19         MR. TISI:  Are you -- Any
20 particular point in time or at all
21 during --
22         MR. GOLDMAN:  At any point.
23         MR. TISI:  Okay.
24     A.   Yes.  And let me explain.  I

Page 277

1  believe that Merck was promoting use of
2  its drug at the same time that it had
3  evidence that use of its drug created
4  greater cardiovascular risk than other
5  alternatives that a patient would have
6  been taking, and knew, from their own
7  data, that that would have placed these
8  patients at increased cardiovascular risk.
9      Q.   Before accusing Merck's employees
10 of knowingly selling an unsafe drug when
11 they sold Vioxx, do you think that you
12 should have at least reviewed the
13 depositions of the individuals at Merck
14 who were involved in the Vioxx program?
15     A.   Well, there were dozen, if not
16 hundreds, of Merck employees involved in
17 Vioxx, and I could not possibly review all
18 their depositions.  But if there's a
19 statement from one of them that I should
20 consider, I'd be happy to.
21     Q.   My question is:  Before you accuse
22 Merck scientists of knowingly selling an
23 unsafe drug --
24     A.   Can we go back and not

70 (Pages 274 to 277)

Jerry Avorn, M.D.

Page 278

1  mischaracterize my quotes again?  This is
2  becoming tiresome.
3      Q.  I asked you:  Are you accusing
4  anybody at Merck of knowingly selling an
5  unsafe drug when they --
6      A.  Right.
7      Q.  -- sold Vioxx, and your answer was
8  yes and let me explain.
9      A.  I am not accusing the scientists.
10  That's an important distinction.
11      Q.  So are you accusing the marketing
12  people at Merck of knowingly selling an
13  unsafe drug?
14      A.  I think the onus is more on the
15  marketing people than on the scientists,
16  and I would rather not be misquoted as
17  accusing scientists of selling unsafe
18  drugs.
19      Q.  So to be clear, you believe that
20  the scientists at Merck were not knowingly
21  selling an unsafe drug, but the marketing
22  people were knowingly selling an unsafe
23  drug when it came to Vioxx?
24      A.  Scientists don't sell drugs.

Page 279

1      Q.  When Vioxx was on the market in the
2  United States, is it your testimony, sir,
3  that the scientists at Merck believed that
4  Vioxx caused heart attacks?
5      A.  No.
6      Q.  Is it your testimony that when
7  Vioxx was on the market, the marketing
8  people believed that Vioxx causes heart
9  attacks?
10      A.  I can't indicate what people
11  believed or didn't believe.  What I can
12  indicate is that there was information
13  available to Merck, because Merck generated
14  most of it, indicating a higher risk of
15  heart attacks in people taking its drug.
16      Q.  You talked about Dr. Watson's
17  analysis from February of 1999.  That's on
18  Page 4 of your report, sir.
19      A.  Yes.
20      Q.  I have a copy if you want to see
21  it.  Okay?
22      A.  I've seen it.
23      Q.  Do you claim, sir, that the
24  analysis that Dr. Watson did in February

Page 280

1  of 1998 showed a signal of a potential
2  cardiovascular risk with Vioxx?
3      A.  Yes.
4      Q.  You wrote that in your report, in
5  fact, right?
6      A.  Then it's a good thing I believe
7  it.
8      Q.  Is it true that Dr. Watson's
9  analysis compared blinded data from all
10  patients in Vioxx's clinical trials,
11  regardless of what drug they were on,
12  against the placebo rates for
13  cardiovascular events in the Proscar and
14  Fosamax studies?
15      A.  Correct.
16      Q.  Is that a crude study?
17      A.  Yes.
18      Q.  Why is that a crude study?
19      A.  Because ideally one would like to
20  compare rates within the same study.
21      Q.  But why wouldn't you want to
22  compare the rates of Vioxx -- Sorry.
23          Why wouldn't you want to compare
24  the rates the way that Dr. Watson compared

Page 281

1  them?
2      A.  Because one cannot be certain that
3  the rates of events in the placebo group
4  of Study A are a good comparator --
5          (Interruption).
6      A.  One cannot conclude that the event
7  rates in the placebo group of study are
8  the best comparison for the event rates in
9  the active drug group of Study B.
10      Q.  Did the blinded study results in
11  the Watson analysis show any increased
12  risk in cardiovascular events between the
13  Vioxx studies and the men in the Proscar
14  database?
15      A.  Looking together at the men in the
16  Proscar database and the women in the
17  Fosamax database pooled there was an
18  increase in risk, and I don't recall -- I
19  need to go back and look at the men alone
20  versus the women alone.  I don't remember
21  that.
22      Q.  Would it surprise you to learn that
23  there was no difference in cardiovascular
24  events between the events in the Vioxx

71 (Pages 278 to 281)

Jerry Avorn, M.D.

Page 282

1    clinical trials and the Proscar placebo
2    arm?
3            MR. GRAND: Objection.
4    Misstates the evidence.
5      A.  I would want to look at the data
6    and tell you.
7      Q.  Did you ever look at any of the
8    blinded events in Dr. Watson's analysis to
9    determine how many of the cardiovascular
10   events occurred in patients who were
11   taking Ibuprofen?
12           MR. TISI: Objection.
13     A.  I read Dr. Watson's report. I
14   don't remember asking myself that question.
15           MR. TISI: Can I ask you a
16   question, because your question said in
17   the blinded results how many people were
18   taking Ibuprofen.
19           BY MR. GOLDMAN:
20     Q.  Did you ever make any effort to
21   determine, in the analysis that Dr. Watson
22   did, how many of the cardiovascular events
23   occurred in patients who were taking
24   Ibuprofen or Vioxx or Diclofenac or

Page 283

1    placebo?
2            MR. TISI: Objection.
3      A.  Well, in his original analysis,
4    there were no such data available.
5      Q.  Subsequently there was data
6    available, right?
7      A.  Correct.
8      Q.  Did you ever go back and try to
9    determine how many of the cardiovascular
10   events that Dr. Watson included in his
11   analysis in the Vioxx clinical trials
12   occur in patients who were taking Vioxx,
13   Ibuprofen, Diclofenac and placebo?
14     A.  I'm aware that once the data could
15   be unblinded, the evidence was less
16   compelling that there was an increased
17   risk with Vioxx.
18     Q.  In fact, when the data from
19   Watson's analysis was unblinded, it showed
20   that there was no increased cardiovascular
21   risk between Vioxx and placebo, correct?
22           MR. GRAND: Objection.
23     A.  I understand that.
24     Q.  You also understand when the Watson

Page 284

1    analysis was unblinded, that there was no
2    difference in cardiovascular events between
3    Vioxx and placebo, true?
4            MR. GRAND: Objection.
5            BY MR. GOLDMAN:
6      Q.  Do you understand, Dr. Avorn, that
7    when the final results were unblinded and
8    you looked at the events that Dr. Watson
9    was talking about, that there was no
10   increase in cardiovascular events between
11   Vioxx and any of the comparators?
12           MR. TISI: Objection.
13     A.  I understand that. But the reason
14   that the Watson initial report is in my
15   report is not because I believed that it
16   was a methodologically impeccable study,
17   because everybody recognized that it
18   wasn't, but what's important is that it
19   was an important enough study that Merck
20   had him do it, the design was acceptable
21   enough to Merck; that even with all the
22   caveats, they had him do that analysis,
23   and that when the results came in, they
24   were not acted on.

Page 285

1            And what is important to me is what
2    was known to the company at that stage
3    through the best available information it
4    had, and what they did with it, which was
5    not much, if anything, rather than the
6    ultimate finding, which did not bear out
7    those initial suppositions, but that was
8    much later.
9      Q.  Was it a responsible thing for
10   Merck to have Dr. Watson conduct his
11   analysis?
12     A.  To have him conduct it, yes. To
13   then ignore the findings, no.
14     Q.  You know, I'm trying to -- I don't
15   want you to --
16     A.  I'm sorry.
17     Q.  -- talk about things I'm not asking
18   about, if that's okay.
19           MR. TISI: No. He's
20   allowed to answer the question. Come on,
21   Counsel, we've been through many of these
22   depositions, where the shoe is on the
23   other foot.
24     A.  I just don't want to leave it this

72 (Pages 282 to 285)

Jerry Avorn, M.D.

Page 286

1  was -- this was a high point in Merck's
2  responsibility, because they found a
3  worrisome finding which they then didn't,
4  in my view, act upon.
5  Q.  Dr. Avorn, would you agree that it
6  was a responsible thing for Merck to have
7  Dr. Watson conduct his analysis?
8        MR. TISI:  Objection.  Asked
9  and answered.
10  A.  The conduct of it was a responsible
11  idea.
12  Q.  And is it your position, sir, that
13  Merck did not act on the results of the
14  Watson analysis?
15  A.  Well, it -- it did not act in a
16  way that was adequate.  And what I mean
17  by that is, if, in the early days of a
18  drug's development, one finds that there
19  seems to be a higher rate of an adverse
20  event, by whatever best study you can do
21  at the time method, you find this
22  increased risk and then you don't initiate
23  new studies to test that out while they
24  still believe the data from the Watson

Page 287

1  study as being worrisome, I don't think
2  that's an adequate response.
3  Q.  Do you believe that Merck did
4  anything in response to the results of the
5  Watson analysis?
6  A.  Oh, sure they did things.
7  Q.  What did they do?
8  A.  Well, there was this plan to look
9  at cardiovascular outcomes across all of
10  their studies, which I think was
11  problematic in ways we can talk about
12  later, if you want.  And there were some
13  animal studies, but nothing that -- Let me
14  be clear.
15        The appropriate response to the
16  Watson study and other things we've been
17  talking about, would have been to just cut
18  to the chase, a clinical trial designed to
19  get to the bottom of the cardiovascular
20  risk study; not a re-analysis of data from
21  other studies, or piggybacking new
22  analyses, but it would have been a study
23  targeting that question as aggressively and
24  effectively as they targeted the

Page 288

1  gastroprotection indication when they
2  wanted to sell product.  They never
3  commissioned that study.
4  Q.  Is that your personal opinion, sir,
5  or is that an expert opinion?
6  A.  That is an expert opinion.
7  Absolutely.
8  Q.  How could I test that assertion
9  that you just made?  How could I go and
10  test whether or not the appropriate
11  response to the Watson analysis would have
12  been to conduct a --
13  A.  And to the other data we've been
14  talking about.
15  Q.  How could I go test the assertion
16  that you just made concerning the
17  appropriate thing that you think should
18  have been done in response to the Watson
19  analysis was to conduct a clinical trial?
20  A.  Very simply.  You could ask a
21  hundred clinical trialists or
22  pharmacoepidemiologists or other experts in
23  the evaluation of drugs, and say the
24  following -- ask them the following

Page 289

1  question:  If there are numerous lines of
2  evidence indicating the possibility of an
3  increased cardiovascular risk in a given
4  drug, however flawed any single one of
5  those studies might be, is it appropriate
6  to conduct a new clinical trial designed
7  to understand that problem, or to simply
8  add analytic layers onto other already
9  ongoing studies that were designed for
10  very different purposes, and to do some
11  animal studies that may or may not deal
12  with the issue.
13        And I think that the answer, based
14  on my expertise, as somebody who knows
15  something about adverse events and about
16  the evaluation of drugs, that an
17  overwhelming majority of those hundred
18  people with expertise in drug evaluation
19  would say the responsible thing to do is
20  to do a focused randomized clinical trial
21  in humans to under -- that is designed to
22  understand this particular potential risk.
23  Q.  What numerous lines of evidence
24  were there in February of 1998 indicating

73 (Pages 286 to 289)

Jerry Avorn, M.D.

Page 290

1 the possibility of an increased
2 cardiovascular risk with Vioxx?
3   A.  Okay.  I did not preface my
4 statement with a particular point in time.
5     I think that the appropriate
6 reaction was abundantly clear by the time
7 the VIGOR data were in, which would have
8 been the spring of 2000.  I think it kind
9 of builds to a crescendo at that point.
10 In '98 it was worrisome.  In '99 it was
11 suggestive.  And by the time they had the
12 original VIGOR data in 2000, in early
13 2000, demonstrating a significant increase
14 in the risk of -- in the rate of heart
15 attacks in people given their drug, by
16 that time it was abundantly clear.
17   Q.  What was abundantly clear?
18   A.  That there was a very worrisome
19 risk of cardiovascular complications
20 associated with their drug.
21   Q.  You talked about the Board of
22 Scientific Advisors's --
23   A.  Yes.
24   Q.  -- memo on Page 5 of your report.

Page 291

1 Do you remember that?
2   A.  Yes.
3   Q.  Do you think it was a responsible
4 thing for Merck to meet with its advisors
5 to discuss the FitzGerald hypothesis?
6   A.  It would have been if they had
7 followed their advice.
8   Q.  That's hindsight, right, that
9 you're applying?
10     MR. TISI:  Objection.
11   A.  No.  These were recommendations
12 made at the time in May of 1998.
13   Q.  I'm not talking about the
14 recommendations.  We'll talk about that in
15 a minute, okay?
16   A.  Was it responsible for them to have
17 a meeting?
18   Q.  Was it responsible for Merck to
19 consult with its scientific advisors,
20 independent scientific advisors to discuss
21 the FitzGerald hypothesis?
22   A.  Yes.
23   Q.  And of the studies that the Board
24 of Scientific Advisors had mentioned in

Page 292

1 that meeting, do you have any idea which
2 ones Merck did and which ones Merck didn't
3 do?
4   A.  I know what they didn't do.  And I
5 know that they also did some animal
6 studies to try to follow up on -- on
7 these worries.
8   Q.  Do you know whether the Board of
9 Scientific Advisors ever said to Merck,
10 you're not doing the studies that we
11 suggested, and you really ought to do
12 them, or was the Board of Scientific
13 Advisors satisfied that Merck was acting
14 responsibly in response to their comments?
15     MR. GRAND:  Objection.
16     MR. TISI:  Objection.
17   A.  I have no way of knowing the level
18 of satisfaction.  I do know that the
19 meeting was in May of '98, and in
20 September of '98, there had -- they had --
21 Merck had already been contacted by Dr.
22 Oates, Dr. Patrono, and perhaps others,
23 asking them to please move forward on the
24 prostaglandin -- on the prostacyclin issue,

Page 293

1 and Dr. Nies indicated that they were not
2 going to.
3   Q.  Did I ask about Dr. Patrono or Dr.
4 Oates?
5     MR. TISI:  Well, yes.  You
6 actually did.
7     MR. GOLDMAN:  Indirectly.
8     BY MR. GOLDMAN:
9   Q.  Are they on Merck's Board of
10 Scientific Advisors?
11   A.  I -- You were talking about whether
12 Merck responsibly followed up on the
13 studies that the Scientific Advisory Board
14 performed.
15   Q.  Let me be clear.  Do you know
16 whether the Board of Scientific Advisors
17 ever took the position that Merck did not
18 act responsibly in response to their
19 suggestions?
20   A.  I do not know of such a document.
21     MR. TISI:  Asked and
22 answered.
23     BY MR. GOLDMAN:
24   Q.  Do you think the Board of

74 (Pages 290 to 293)

Jerry Avorn, M.D.

Page 294

1 Scientific Advisors, in May of '98,
2 conducted an unbiased and objective review
3 of the state of the science concerning
4 Vioxx and any potential cardiovascular
5 effects?
6 A. That's my impression.
7 Q. It's also your impression, as you
8 said before, that the Board of Scientific
9 Advisors raised theoretical benefits that
10 Vioxx could have on the heart and
11 theoretical adverse effects that Vioxx
12 could have on the heart, right?
13 A. Right.
14 Q. Did the Board of Scientific
15 Advisors, sir, think that more information
16 was needed before any conclusions could be
17 made about the potential for cardiovascular
18 adverse effects from Vioxx?
19 A. I would expect that they said that.
20 I don't think that they're exact words,
21 but it was -- that would have been a
22 plausible statement.
23 Q. Do you criticize the Board of
24 Scientific Advisors's suggestion that Merck

Page 295

1 move forward and attempt to put Vioxx on
2 the market?
3 A. I don't --
4 MR. TISI: I'm sorry.
5 Could you reread the question? I just
6 stepped away to get a drink. I'm sorry.
7 MR. GOLDMAN: You can read
8 it back.
9 (Record read).
10 MR. TISI: Objection.
11 A. I guess I don't -- I don't -- If
12 you can refer me to where they said that,
13 that would be helpful.
14 I don't recall seeing an
15 exhortation to Merck to market the drug in
16 their report.
17 MR. GOLDMAN: I'll mark this
18 as Exhibit 8.
19 (Exhibit-8, May 1998 Board of
20 Scientific Advisors Meeting, marked for
21 identification).
22 BY MR. GOLDMAN:
23 Q. This is the Board of Scientific
24 Advisors's meeting from --

Page 296

1 A. Right.
2 Q. -- May of 1998. If you turn to
3 the page that ends with the Bates stamp
4 2742.
5 A. (Witness complied).
6 Q. Do you see in the last sentence
7 there's a statement by the board, "Thus,
8 there is a strong mandate for introduction
9 of Vioxx into medical practice as soon as
10 it's feasible." Do you see that?
11 A. (Witness viewing document). Yes.
12 Q. Do you disagree with that?
13 A. Let me read what comes before the
14 thus.
15 Q. Mm-hmm.
16 A. (Witness viewing document). Yes.
17 I see that.
18 Q. Do you disagree with that advice?
19 A. No. I think in May of '98 that
20 was a -- that was a plausible conclusion.
21 Q. Did the Board of Scientific
22 Advisors advise Merck to set up a
23 procedure to monitor potential
24 cardiovascular events in their clinical

Page 297

1 trials?
2 A. As I recall they did.
3 Q. Were you also aware, sir, when you
4 read the document that the board wanted
5 Merck to set up this procedure so that
6 Merck could conduct a meta-analysis of all
7 of the cardiovascular adverse events that
8 were seen in the trials?
9 A. Yes.
10 Q. And Merck complied with the Board
11 of Scientific Advisors's request, right?
12 A. Wrong.
13 Q. Merck did not set up a
14 cardiovascular standard operating
15 procedure?
16 A. They set one up on paper, but they
17 implemented it in such a flawed manner as
18 to not be considered a compliance with
19 that recommendation.
20 Q. How did Merck, as you say,
21 implement the cardiovascular operating
22 procedure in a flawed manner?
23 A. Well, as -- as I describe in my
24 report, when it came to implementing it to

Jerry Avorn, M.D.

Page 298

1  the -- before approving the single most
2  important study about cardiovascular
3  outcomes, their implementation of the
4  cardiac standard operating procedure was
5  really -- it would be a comedy of errors
6  except there was nothing funny about it.
7      The disarray and incoherence of
8  their evaluation of the cardiac outcomes.
9  And the VIGOR study was appalling, and
10  reflects either ineptitude or willful
11  neglect, and I can't tell which, but the
12  quotations from within Merck, from Dr.
13  Guess and Dr. Capizzi and Dr. Watson,
14  about what are we doing, what are we
15  counting, how can we do this, there's no
16  time, what are we supposed to measure,
17  reflects the most inept tracking of a
18  potentially lethal outcome that I've ever
19  experienced in my career. So no, I can't
20  say they complied with that recommendation.
21      Q.  Is the way you just described
22  Merck's implementation of the CV SOP and
23  VIGOR the basis for your statement that
24  Merck implemented the CV SOP in a flawed

Page 299

1  manner?
2      A.  Yes.
3      Q.  What about with respect to other
4  studies other than VIGOR?
5      A.  There are problems there, too. Any
6  standard operating procedure for the
7  ascertainment of cardiovascular outcomes
8  needs to have some systematic means of
9  identifying which cases are going to be
10  brought forward for analysis, and there
11  needs to be a fair and rigorous
12  adjudication process. And it appears
13  that, at least in some instances, the
14  adjudication step was skipped because some
15  cases didn't even get put into the file of
16  cases that would be adjudicated.
17      There was one memorable case in
18  which -- I think it was Dr. Barr
19  identified a woman who died of what
20  appeared clinically to be a cardiovascular
21  death that Dr. Reicin urged him to
22  describe as an unknown cause.
23      And that kind of process -- I can't
24  tell how widespread it was, but it

Page 300

1  shouldn't have happened even once, that a
2  cardiac death gets not adjudicated because
3  -- or gets urged to be ignored by a Merck
4  official and recharacterized incorrectly as
5  an unknown cause, that is not exactly an
6  effective standard operating procedure.
7      There were other problems with, as
8  we know, the reporting of data to the New
9  England Journal about cardiovascular
10  outcomes in the VIGOR study, which again,
11  does not seem to reflect a standard
12  operating procedure.
13      The variation in the date of cutoff
14  for cardiac adverse events being earlier
15  than the date of cutoff for favorable
16  gastrointestinal effects in VIGOR was
17  contrary to all standard medical practice
18  in evaluating clinical trial design, and
19  there are other examples as well.
20      If there was a standard operating
21  procedure, it was a major embarrassment.
22      Q.  Are you done?
23      A.  For now.
24      Q.  Did you learn about this incident

Page 301

1  with Dr. Reicin and Dr. Barr when you read
2  it in the newspaper?
3      A.  No. It was in the materials that
4  was -- that were provided to me by
5  counsel.
6      Q.  Is that the first time you learned
7  about it, or did you learn about it in
8  the newspaper?
9      A.  Well, I think it was also in the
10  newspaper but a much more abbreviated -- I
11  think just a snippet. I was able to look
12  at the whole interchange before and after
13  that snippet.
14      Q.  Before you accused Dr. Reicin of
15  doing anything improper concerning that one
16  event, do you think that it would be fair
17  to review her deposition to see what she
18  says about that?
19      A.  I'd be interested in seeing it, but
20  I think that the -- her e-mails speak for
21  themselves as they occurred at the time
22  rather than her post hoc justifications.
23  But if there's something that she's said
24  since then that you wanted me to look at,

Jerry Avorn, M.D.

Page 302

1    I could review that.
2       Q.   Well, you reached that conclusion
3    about that incident without bothering to
4    go look at what Dr. Reicin said, right?
5       A.   It's not a matter of bothering.
6    It's a matter of the trail of e-mail
7    correspondence at the time is more
8    reliable than a subsequent, perhaps
9    coached, redescription of what she was
10   really thinking.
11      Q.   Are you suggesting that Dr.
12   Reicin's deposition testimony was coached?
13      A.   Well, I think that whenever there's
14   something as embarrassing as that appears
15   in the media and there's litigation, I'm
16   sure there were conversations about putting
17   the best face on it.  That's
18   understandable.
19      Q.   Do you know whether Dr. Reicin knew
20   whether that particular event that you
21   described occurred in a patient taking
22   Vioxx, or in a patient taking a
23   comparator?
24      A.   I have no way of knowing what she

Page 303

1    knew.  But I do know that the data was
2    already published in the New England
3    Journal, or data were — not published,
4    but data were already -- There was already
5    a pre-existing worry that -- and knowledge
6    that a cardiovascular event in a Vioxx
7    trial was more likely to be in a Vioxx
8    patient than in a controlled patient, just
9    because that was the way the data were --
10   had -- had sorted out from other studies.
11      Q.   Do you take the position, sir, that
12   Dr. Reicin knowingly changed the nature of
13   that particular event so that it would not
14   be characterized as a sudden cardiac death
15   that would be countered against Vioxx?
16      A.   No, I do not.
17      Q.   Do you know the circumstances, sir,
18   surrounding the data analysis plan that
19   the DSMB suggested be followed for the
20   VIGOR trial?
21           MR. TISI:  Objection.
22   Vague.
23      A.   I know some things, but not all
24   things, about it.

Page 304

1       Q.   Do you understand that all the
2    documents you refer to in your expert
3    report about the -- what you called an
4    embarrassing implementation of the CV SOP
5    actually related to a data analysis plan
6    for VIGOR as opposed to the CV SOP?
7       A.   You mean a specific analysis?
8       Q.   (Counsel nodded).
9       A.   But my understanding was that the
10   CV SOP was supposed to cover all Merck
11   trials.
12      Q.   Did you also understand or did the
13   plaintiffs' lawyers provide you with
14   documentation explaining that for the VIGOR
15   trial, the DSMB wanted a particular
16   procedure followed?
17      A.   I understand that.  But that that
18   would not preclude other analyses from
19   going forward as well.
20      Q.   Back in 1998 and 1999, sir, was it
21   a responsible thing for Merck to plan to
22   adjudicate all different types of
23   thrombotic events that were reported in
24   clinical trials?

Page 305

1       A.   I would need to review the
2    statement in which they put forward that
3    methodology before I could comment on how
4    responsible it was.
5       Q.   Do you know that the CV SOP was a
6    plan to have adjudicated by independent
7    people whether events were considered
8    thrombotic events or not?
9       A.   Right.
10      Q.   Okay.  And that was a responsible
11   thing to do, to have these independent
12   people evaluate these particular events and
13   make a determination about whether or not
14   they were a confirmed cardiovascular event
15   or not, true?
16      A.   You're responsible only if there
17   was a piece of the plan that included how
18   those cases would be identified in the
19   first place --
20      Q.   You don't --
21      A.   -- to be put forward.
22      Q.   You don't know whether the CV SOP
23   had a prespecified --
24           MR. TISI:  Ascertain.

77 (Pages 302 to 305)

Jerry Avorn, M.D.

Page 306

1  Trying to help you.
2          MR. GOLDMAN:  Yeah.  I'm
3  trying to think of my word.
4      A.  A prespecified list of diagnoses
5  which would warrant bringing forward for
6  adjudication.
7      Q.  Yes.
8      A.  There was such a prespecified list
9  which contained some very egregious
10  omissions that were put in place in late
11  '99.  I cannot understand why that
12  actually removed from adjudication some
13  very important events.  So I guess I would
14  not characterize that as responsible.
15      Q.  What was removed?
16      A.  There were -- There were diagnoses
17  such as some arrhythmias, which could well
18  have been a manifestation of an acute MI.
19  Congestive heart failure, which could have
20  been a manifestation of an acute MI, and
21  others, which I could pull out the
22  document and look at with you, that having
23  been struck out in the document that Merck
24  provided with a date in late '99, made me

Page 307

1  wonder why they would want to start
2  excluding cardiac events if the whole
3  point was to get to the bottom of whether
4  their drug was causing cardiac risk.
5      Q.  Wasn't the theory, sir, that the
6  Board of Scientific Advisors was
7  considering as a mechanism for Vioxx being
8  prothrombotic the fact that Vioxx might
9  lower prostacyclin and disrupt its balance
10  and put patients in a prothrombotic state?
11          MR. TISI:  Objection.
12  Misstates the record.
13      A.  That is only one very narrow
14  depiction of the potential cardiovascular
15  risks of the drug.  The others include the
16  retention of sodium, the precipitation of
17  congestive heart failure, the increase in
18  hypertension, all of which were known,
19  even for older nonsteroidals, so it was
20  not a particularly exotic idea.  And
21  elimination of all but a very, very narrow
22  kind of cardiovascular complication from
23  ascertainment was not only not responsible,
24  it was irresponsible.

Page 308

1          And just to be clear about this, it
2  is also well known that the first
3  presentation of myocardial infarction in a
4  patient can easily be acute congestive
5  heart failure, pulmonary edema, arrhythmia,
6  all of which were struck out in the list
7  of ascertainment in the cardiovascular SOP.
8  So I would not characterize that as
9  responsible.
10      Q.  Are the events you've just
11  mentioned thrombotic in nature?
12      A.  Let me explain it a little bit
13  clearer.  An acute MI may often present as
14  its first presentation --
15      Q.  Okay.
16      A.  -- as pulmonary edema, congestive
17  heart failure, arrhythmia, and as such,
18  it's a reflection of an acute MI, which is
19  a thrombotic event.
20      Q.  Is it your opinion, sir, that
21  Merck --
22          MR. TISI:  I don't know if
23  he was finished, was he?
24          THE WITNESS:  Yeah.  That's

Page 309

1  fine.
2          BY MR. GOLDMAN:
3      Q.  Is it your opinion, sir, that Merck
4  intentionally changed the criteria for
5  those cases that would be adjudicated in
6  order to cover up the potential of a
7  cardiovascular risk?
8          MR. TISI:  Objection.
9      A.  All I can report is that Merck
10  intentionally changed the criteria after
11  they had been established, and I cannot
12  speak to who did it or what they were
13  thinking.
14      Q.  Do you know that the CV SOP
15  contemplated that events would be analyzed
16  during the course of the trial and up to
17  14 days after a patient stopped treatment?
18      A.  Right.
19          MR. GRAND:  Objection.
20  Misstates the testimony.
21          BY MR. GOLDMAN:
22      Q.  And the plan, sir, to --
23      A.  If you stipulate that that's the
24  case, that sounds familiar.  But I -- I