Jerry Avorn, M.D.

Page 390

1  Vioxx was on the market which said that
2  Vioxx's anti-inflammatory properties might
3  actually slow down the progression of
4  arthrosclerosis and help stabilize plaque?
5     A.  Yes.
6     Q.  And that was a theory that actually
7  scientists were suggesting during the
8  entire time Vioxx was on the market, true?
9     A.  Right.
10    Q.  Did you subscribe to that theory?
11    A.  No.
12    Q.  Is it true, sir, that through the
13 third quarter of 2004, scientists were
14 saying that the COX-2 inhibitors might
15 prevent heart attacks?
16    A.  I don't recall seeing such papers.
17    Q.  Have you ever read a study about
18 Flurbiprofen, F-L-U-R-B-I-P-R-O-F-E-N?
19    A.  Yes.  I have seen studies of
20 flurbiprofen.
21          MR. TISI:  Can we go off
22 the record?
23          (Off the record at 5:07 p.m.)
24          (Discussion off the record).

Page 391

1          (On the record at 5:07 p.m.)
2          BY MR. GOLDMAN:
3     Q.  Do you know, sir, that in the
4  clinical study for Flurbiprofen there was
5  a cardioprotective effect that was similar
6  to the difference seen in the VIGOR trial
7  for heart attacks?
8     A.  I know there has been data on the
9  cardioprotective effect of Flurbiprofen,
10 and I don't recall the magnitude of that
11 effect.
12    Q.  During the time that Vioxx was on
13 the market, sir, were you aware of any
14 article or study suggesting that Vioxx
15 could cause plaque formation?
16    A.  Could cause plaque formation.
17 Cause plaque formation, no.
18    Q.  Are you aware of any article or
19 study during the time Vioxx was on the
20 market that suggested that Vioxx could
21 accelerate arthrosclerosis?
22    A.  There was the concern about
23 destabilizing plaque, which is a
24 manifestation of arthrosclerosis.

Page 392

1     Q.  I want to talk about destabilizing
2  plaque in a minute.
3     A.  Okay.
4          MR. GRAND:  Clarify what
5  type of study you mean.
6          BY MR. GOLDMAN:
7     Q.  Were there any articles or studies
8  published during the time that Vioxx was
9  on the market suggesting that Vioxx
10 accelerates the progression of
11 arthrosclerosis?
12         MR. TISI:  Objection.
13    A.  I'm not aware of any.
14    Q.  You mentioned plaque stability.  We
15 talked a minute ago about how there were
16 articles written by scientists while Vioxx
17 was on the market saying that Vioxx's
18 anti-inflammatory properties could actually
19 help stabilize plaque, right?
20    A.  Right.
21    Q.  And you're not aware of any article
22 or study that was written at the time
23 Vioxx was on the market suggesting that
24 Vioxx could cause plaque rupture, true?

Page 393

1     A.  I should say that my expertise is
2  not about clinical pharmacology papers --
3     Q.  Mm-hmm.
4     A.  -- and so whether I know or don't
5  know about a study isn't -- a clinical
6  pharmacology study isn't terribly
7  important.
8     Q.  Well --
9     A.  But I don't -- I focus more on
10 clinical events in humans.
11    Q.  Well, were there any studies in
12 humans, that you were aware of, sir, while
13 Vioxx was on the market suggesting that
14 Vioxx causes plaque rupture?
15    A.  I just don't know.
16    Q.  You've certainly never written, in
17 any of your articles, that you think Vioxx
18 causes arthrosclerosis or accelerates it,
19 right?  True?
20    A.  Right.
21    Q.  You may have answered this before,
22 and I apologize if you did.  At what
23 point, when Vioxx was on the market, do
24 you believe it was clear that Vioxx causes

99 (Pages 390 to 393)

Jerry Avorn, M.D.

**Page 394**

1  heart attacks?
2      MR. TISI: Objection. Asked
3  and answered, several times, actually.
4      A. But to say it again, because it's
5  important, in -- I believe it was March of
6  2000 when the -- when the first data for
7  VIGOR became available. For me, that was
8  a point at which it became clear that it
9  -- the drug increased the risk of heart
10 attack.
11     Q. Were there still questions about
12 whether Vioxx causes heart attacks as late
13 as December of 2003, in the medical
14 literature?
15     A. I'm sure there were people up until
16 the day the drug was withdrawn that were
17 writing articles questioning the risks of
18 Vioxx. I would not be surprised if -- In
19 fact, I know that scientists at Merck to
20 this day claim that Vioxx is safe in the
21 first 18 months. So we've been hearing
22 this, and we'll continue to hear it,
23 probably until 2008.
24     Q. Hopefully we won't be talking about

**Page 395**

1  it then.
2      Were there still questions about
3  whether Vioxx causes heart attacks as late
4  as December of 2003, sir?
5      A. When you say were there questions,
6  there were -- there may have been people
7  expressing doubt in the literature, but
8  there are people who are expressing doubt
9  about whether the theory of evolution is
10 correct. I don't think there was doubt in
11 my mind.
12     Q. On Page 12 of your report, sir,
13 you talk about a draft -- Withdrawn.
14     On Page 12 you mention that a
15 co-author of the VIGOR study suggested in
16 a draft that the study should report that
17 GI benefits should be balanced against the
18 risk of heart attack.
19     A. Can you show me where -- where on
20 the page?
21     Q. Okay. The first paragraph, the
22 last sentence.
23     MR. TISI: Page -- I'm
24 sorry, what page?

**Page 396**

1      MR. GOLDMAN: Page 12.
2      A. (Witness viewing document). Right.
3      Q. Is it your testimony, sir, that
4  there was a co-author of the VIGOR study
5  who thought that the study should say that
6  the GI benefits of Vioxx should be
7  balanced against the risks of heart
8  attacks?
9      A. That was my understanding from
10 reviewing that draft, yes
11     Q. Why did you reference the draft and
12 the fact that the VIGOR study ultimately
13 did not include that statement?
14     A. Because there has been a lot of
15 concern about whether the VIGOR paper had
16 been massaged over its development to
17 depict the risks of Vioxx in a way that
18 was more favorable to the drug than would
19 be fair, and that this, along with all the
20 other instances that we can talk about,
21 such as attributing it to -- the heart
22 attack rate to the Naproxen,
23 cardioprotection, this was another example
24 of that kind of spin.

**Page 397**

1      And because, it turns out, that it
2  is vitally important that the drug's GI
3  benefits should have been balanced against
4  the risk of MIs, because the drug would
5  not have come out looking as well in that
6  balance.
7      Q. But in your analysis here, sir,
8  about this issue about a draft of the
9  VIGOR article, what you're doing is
10 comparing a draft to what ultimately was
11 printed by the New England Journal of
12 Medicine, right?
13     A. Correct.
14     Q. That doesn't take any expertise,
15 does it, sir?
16     MR. TISI: Objection.
17     A. Oh, it sure does. To be able to
18 speak about what was removed from the
19 article, from its original version, to
20 what was finally submitted, and when that
21 deals with the central issue of risk about
22 the drug, and whether this is a very
23 important omission, as it is, does require
24 expertise.

Jerry Avorn, M.D.

Page 398

1  Q. Does it require expertise to look
2  at a draft of the VIGOR study and compare
3  it to the final study to see if a
4  sentence was deleted?
5  A. Absolutely. When that sentence
6  deals with the balancing of risks and
7  benefits, and that sentence is deleted in
8  a way so as to minimize the risk of the
9  drug, that is an important piece of the
10 story.
11 Q. My question was: Does it require
12 expertise to look at a draft of the VIGOR
13 study, compare it to the final study that
14 was published to see if a sentence was
15 deleted?
16 A. Well, to understand the importance
17 of that deletion it does, yes.
18 Q. You don't think a juror on their
19 own could understand the importance of
20 that deletion without your assistance?
21     MR. GRAND: Objection.
22     MR. TISI: Objection. You
23 don't have to get in the mind of the
24 juror or the judge in making that

Page 399

1  decision, Dr. Avorn.
2  A. I think that looking how a paper is
3  selectively spun from draft to draft so as
4  to maximize the depiction of benefit and
5  minimize the depiction of risk is vitally
6  important and does need to be interpreted
7  and put into context.
8  Q. Why do you discuss the expression
9  of concern that the New England --
10 A. Can you tell me where you're
11 referring to?
12 Q. The third paragraph.
13 A. Yes.
14 Q. Why do you discuss the expression
15 of concern that was issued by the New
16 England Journal of Medicine?
17 A. Because it dealt specifically with
18 my area of expertise, which is the
19 analysis of risk and of adverse events
20 caused by a drug, and because it was a
21 relatively extraordinary step taken by the
22 Journal which, in my memory is hardly ever
23 done, for them to indicate that the
24 depiction of risk of a drug in one of

Page 400

1  their papers was misleading.
2  Q. Do you think that the expression of
3  concern and the response by the authors of
4  the VIGOR study and then the New England
5  Journal of Medicine's reply speak for
6  themselves?
7  A. No. Because a juror would not
8  understand that this is an extraordinary
9  statement unless they read the New England
10 Journal every week, which most jurors
11 don't.
12     For a journal to publicly criticize
13 authors of a paper of distorting risk
14 data, a typical juror would not understand
15 how unusual that is and how important it
16 is.
17 Q. You don't think a juror would
18 understand the importance of allegedly
19 distorting data to the New England Journal
20 of Medicine?
21     MR. GRAND: Objection.
22     MR. TISI: Objection. Asked
23 and answered. He's given you an answer.
24 He's given you an answer. You don't like

Page 401

1  it, but it's the answer.
2  A. I think a typical juror would have
3  no way of knowing whether -- just like the
4  New York Times publishes corrections every
5  day, whether perhaps the New England
6  Journal publishes expressions of concern
7  every day, every week.
8  Q. Do you know that Dr. Curfman has
9  given a deposition twice in this case?
10 A. Yes.
11     MR. TISI: Objection. Asked
12 and answered.
13     BY MR. GOLDMAN:
14 Q. Dr. Curfman knows a lot more about
15 the circumstances, as he sees them,
16 concerning the expression of concern than
17 you do, right?
18 A. Yes.
19 Q. And Dr. Curfman is capable of
20 explaining why the New England Journal
21 issued the expression of concern and how
22 rare or not that is, right?
23     MR. TISI: Objection.
24 A. Yes.

101 (Pages 398 to 401)

Jerry Avorn, M.D.

Page 402

1  Q. Are you critical of Merck and the
2  non-Merck authors' decision not to inform
3  the New England Journal of Medicine of the
4  additional three heart attacks that
5  occurred after the prespecified cutoff?
6      MR. TISI: Objection.
7  Assumes facts not in evidence.
8  A. Yes, I am.
9  Q. Did Merck inform the FDA in October
10 of 2000 about the additional three heart
11 attacks?
12 A. Yes, they did.
13 Q. Were the additional three heart
14 attacks, sir, included in the analysis
15 that the Food and Drug Administration did
16 in anticipation of the February 2001 Ad
17 Com?
18 A. Yes, they were.
19 Q. Were the Ad Com members who
20 participated in the 2001 Ad Com privy to
21 the fact that there were 20 heart attacks
22 in the Vioxx arm and four heart attacks in
23 the Naproxen arm of the VIGOR study?
24     MR. TISI: Just for the

Page 403

1  record, Ad Com is advisory committee. New
2  lingo for me. Go ahead.
3  A. They were aware of the data. I
4  don't have the data in my memory. But
5  that sounds right.
6  Q. And it wasn't a secret that there
7  were 20 heart attacks in the Vioxx arm and
8  four heart attacks in the Naproxen arm,
9  because that was information that Dr.
10 Topol talked about in his article in
11 August of 2001, right?
12     MR. TISI: Objection.
13 A. It was a secret from the readers of
14 the New England Journal of Medicine, which
15 is the most influential medical journal in
16 the world. So in that sense, it was a,
17 quote, secret.
18 Q. Do you think that the authors of
19 the VIGOR study intentionally withheld
20 these three heart attacks so as to
21 downplay any potential cardiovascular risks
22 of Vioxx?
23 A. I can't speak to the intention of
24 the authors.

Page 404

1  Q. Do you agree, sir, that the
2  difference in heart attacks in the VIGOR
3  study was statistically significant based
4  on the 17 number that was reported to the
5  New England Journal?
6  A. Yes.
7  Q. And it remains statistically
8  significant when the true number was 20,
9  if you count the additional three heart
10 attacks, right?
11     MR. GRAND: Objection;
12 misstates.
13 A. But it was more -- It was -- It
14 was a greater difference than it was a
15 more significant difference.
16 Q. Was the -- Is it your testimony,
17 sir, that the additional three heart
18 attacks in the VIGOR study is -- makes the
19 statistical significance of the difference
20 between Vioxx and Naproxen even greater?
21 A. We would need to go back and look
22 at the P values for the different versions
23 of it, but the magnitude of the difference
24 was certainly greater.

Page 405

1  Q. Well, in terms of evaluating the
2  statistical significance of 20 heart
3  attacks in Vioxx and four heart attacks in
4  Naproxen versus 17 heart attacks in Vioxx
5  and four in Naproxen, there really isn't
6  any real difference in terms of the P
7  value, right?
8      MR. GRAND: Objection.
9      MR. TISI: Objection.
10 A. There are three people who had
11 heart attacks, and if you've ever known
12 anyone who had a heart attack, that's an
13 important clinical event, and the magnitude
14 of the difference was --
15 Q. Did the relative risk change much,
16 if you look at the additional three heart
17 attacks?
18 A. My impression was that it went up a
19 bit, yes.
20 Q. You talk about a table that was not
21 included in the final manuscript for the
22 VIGOR article. Do you remember that?
23 A. Right.
24 Q. Have you ever seen that table?

Jerry Avorn, M.D.

### Page 406

```
 1    A.  I believe I saw it in one of the
 2  earlier -- I saw the headings for it, at
 3  least, in the -- in the earlier draft.
 4    Q.  Have you ever evaluated what was in
 5  that table?
 6    A.  I'm aware that the information from
 7  it was for the most part representative of
 8  the text in the later versions, but
 9  there's an important difference, I think,
10  in whether something is a number in a text
11  versus numbers in a table.  I think tables
12  are much more salient.
13    Q.  Was there any substantive
14  information, sir, that was in the table in
15  -- that was not included in the VIGOR
16  publication --
17    A.  As I --
18    Q.  -- that was not in the text?
19    A.  As I understand it, nearly all of
20  the table data were in the text.  But as
21  I recall, there was maybe one or two
22  numbers -- but sitting here I can't
23  remember what they were -- that didn't
24  make it in the text.
```

### Page 407

```
 1    Q.  Do you know that the New England
 2  Journal of Medicine limits the number of
 3  tables you can include in an article?
 4    A.  Yes.
 5    Q.  Did you know that the peer
 6  reviewers for the VIGOR publication told
 7  the authors of the VIGOR publication that
 8  they could only include five tables?
 9         MR. TISI:  Objection.
10         MR. GRAND:  Objection.
11  Misstates the evidence.
12    A.  Usually that's not what a peer
13  reviewer would say.
14    Q.  Do you know whether a peer -- Well,
15  withdrawn.
16      Have you reviewed the comments by
17  all the peer reviewers of the VIGOR trial?
18    A.  I believe I've seen peer reviewers'
19  comments.  I can't say whether I've seen
20  every one of them.
21    Q.  Do you remember reading any
22  comments by a peer reviewer who asked
23  Merck to have only five tables in the
24  study?
```

### Page 408

```
 1         MR. TISI:  Objection.
 2    A.  It's interesting that you describe
 3  it as "asked Merck," because ostensibly
 4  this was a paper written by Dr.
 5  Bombardier, but we all know that it was
 6  really about asking Merck, and I don't
 7  recall that specific request by a peer
 8  reviewer.
 9         MR. GOLDMAN:  Move to strike
10  as nonresponsive.  I'm going to ask the
11  question again.
12         BY MR. GOLDMAN:
13    Q.  Do you remember whether the New
14  England Journal of Medicine asked the
15  authors of the VIGOR study to include five
16  tables for the VIGOR publication?
17    A.  I know that they will occasionally
18  say there are too many tables.  They will
19  often say limit it to X number, but leave
20  it up to the authors as to what is
21  included in the table and what isn't.
22    Q.  But you don't know the
23  circumstances about what the peer reviewer
24  said or didn't say about the number of
```

### Page 409

```
 1  tables that Dr. Bombardier should include
 2  in his article?
 3    A.  Her article.
 4    Q.  Her article.
 5    A.  Correct.
 6    Q.  Are you aware, sir, that the New
 7  England Journal of Medicine hired a public
 8  relations firm to advise it on how to deal
 9  with the VIGOR study?
10         MR. TISI:  Objection.  Time
11  frame.
12    A.  Do you mean recently in relation to
13  the current controversies --
14    Q.  Before --
15    A.  -- or back in 2000?
16    Q.  Before the New England Journal of
17  Medicine issued its expression of concern,
18  were you aware that they had hired a PR
19  company to advise it on how to deal with
20  the VIGOR study?
21    A.  I was aware that they have a PR
22  firm.
23    Q.  Did you know that the PR firm
24  advised the New England Journal of
```

Jerry Avorn, M.D.

| | Page 410 | | Page 412 |
|---|---|---|---|
| 1 | Medicine on when they should release the | 1 | that an author is aware of, that there is |
| 2 | expression of concern? | 2 | a responsibility to make sure that that is |
| 3 | A. I'm aware of that. | 3 | included as fully as possible in the |
| 4 | Q. Do you know that the New England | 4 | paper, especially if the paper has still |
| 5 | Journal of Medicine released the expression | 5 | not gone to press. |
| 6 | of concern the night before the jury in | 6 | Q. Did you know, prior to withdrawal, |
| 7 | the federal -- the first federal case | 7 | that the VIGOR publication reported 17 |
| 8 | started deliberating? | 8 | heart attacks in the Vioxx arm, but that |
| 9 | A. I'm aware of that. | 9 | there were really 20 in the VIGOR trial? |
| 10 | Q. Do you think that was appropriate, | 10 | MR. TISI: Objection. |
| 11 | sir? | 11 | A. Did I know that prior to |
| 12 | A. My understanding was that there was | 12 | withdrawal? |
| 13 | concern that other information was going | 13 | Q. Yes. |
| 14 | to be released -- and again, I have not | 14 | A. I don't see how I could have. You |
| 15 | followed this closely -- about this issue, | 15 | mean by virtue of going back to the FDA |
| 16 | and they wanted to make sure that if other | 16 | Web site? |
| 17 | information was released, their position | 17 | Q. (Counsel nodded). |
| 18 | was out there at the same time. | 18 | A. No. Most doctors are not -- or |
| 19 | Q. Do you think it was appropriate for | 19 | even experts -- are not going to go back |
| 20 | the New England Journal of Medicine to | 20 | and double-check numbers on the FDA Web |
| 21 | issue an expression of concern the night | 21 | site that they've read in a Journal |
| 22 | before a jury started deliberating in the | 22 | article. |
| 23 | first federal Vioxx trial? | 23 | Q. My question was whether you were |
| 24 | MR. TISI: Objection. | 24 | aware, prior to withdrawal, that there |

| | Page 411 | | Page 413 |
|---|---|---|---|
| 1 | Irrelevant. But you may answer. | 1 | were actually 20 heart attacks in the |
| 2 | A. It depends whether they were | 2 | Vioxx arm and not 17. |
| 3 | issuing it in relation to the jury's | 3 | A. No. |
| 4 | deliberation timing, or in relation to | 4 | Q. Were you aware, prior to |
| 5 | other evidence coming out that they wanted | 5 | withdrawal, that there was a five times |
| 6 | to get their position out about. And I | 6 | difference in heart attacks between the |
| 7 | can't know whether it was about the former | 7 | Vioxx arm and the Naproxen arm? |
| 8 | or the latter for the timing. | 8 | A. I think in the publication itself, |
| 9 | Q. Do you know whether the ten | 9 | the relative risk of .2 would be a |
| 10 | non-Merck authors on the VIGOR study | 10 | fivefold difference. |
| 11 | agreed with the New England Journal of | 11 | Q. You reference Dr. Scolnick's March |
| 12 | Medicine's criticisms of the VIGOR study? | 12 | 9th, 2000, e-mail -- |
| 13 | A. I know that in their response to | 13 | A. Yes. |
| 14 | the expression of concern, they defended | 14 | Q. -- on Page .12. Why do you |
| 15 | what they had done. | 15 | reference that, sir? |
| 16 | Q. Did you disagree with their | 16 | A. Because the company has taken the |
| 17 | position? | 17 | position that it was unaware that the drug |
| 18 | A. Yes. | 18 | imposed cardiovascular risk, and that the |
| 19 | Q. In its entirety? | 19 | findings from VIGOR, and later from |
| 20 | A. There may have been things that | 20 | APPROVe, were surprising to them in that |
| 21 | they said that they -- that I would not | 21 | they did not believe that their drug was |
| 22 | disagree with. | 22 | dangerous to the heart. |
| 23 | What I specifically disagreed with | 23 | And it seemed relevant that Dr. |
| 24 | is that if adverse events come to light | 24 | Scolnick, as early as March of 2000, wrote |

104 (Pages 410 to 413)

Jerry Avorn, M.D.

Page 414

1  the cardiovascular events are clearly
2  there, this is real, and it is
3  mechanism-based as we worried it was,
4  which conveys a concern that the company
5  had had about the cardiovascular risk of
6  the drug even before the VIGOR study was
7  completed.
8       And then going on about Oates and
9  Allen and Barry who write about the
10 metabolite meanings, that is, indicating
11 that the prostaglandin findings were
12 important to the riskiness of the drug.
13  Q. Is it your position, sir, that it's
14 obvious from the March 9, 2000, e-mail
15 from Dr. Scolnick, that he believed that
16 Vioxx caused heart attacks, and that he
17 and others at Merck were worried that that
18 would happen?
19  A. Okay.
20       MR. TISI: At that point in
21 time? Are you asking what his state of
22 mind is now, or what his state of mind
23 was then?
24       MR. GOLDMAN: Then.

Page 415

1  A. Okay. This is an important point
2  that has come up a number of times, and
3  I'll try to explain it again.
4       Whether or not Dr. Scolnick and the
5  others at Merck believed that more
6  patients given Vioxx in VIGOR would have
7  heart attacks than patients in VIGOR given
8  other drugs, does not require that they
9  have believed that their drug caused heart
10 attacks or whether they believed that the
11 reason was that other drugs prevented
12 heart attacks.
13      The important point is, that if the
14 company was going to go on and spend a
15 hundred million dollars a year to convince
16 patients to take Vioxx, and many millions
17 of dollars more to convince doctors to
18 prescribe Vioxx, instead of Naproxen or
19 other drugs, that the clear result of that
20 would be that patients who were switched
21 to Vioxx, even if they just believed that
22 Naproxen was preventing heart attacks, that
23 they knew that use of Vioxx would result
24 in a net increase in the number of heart

Page 416

1  attacks in patients taking Vioxx instead
2  of taking another drug.
3       And it does not matter as much
4  whether they attributed that to a
5  prothrombotic effect of Vioxx or even if
6  they believed there was an antithrombotic
7  effect of Naproxen. The net result would
8  obviously be that people who were taking
9  Naproxen and were then persuaded by Merck
10 to take Vioxx or their doctors were
11 persuaded to prescribe Vioxx, would have
12 more heart attacks as a result of that
13 switch.
14  Q. Did you just say that -- to try to
15 summarize -- that you believe Merck
16 expected there to be more heart attacks if
17 they switched or attempted to switch
18 patients from Naproxen to Vioxx?
19  A. In clinical practice, yes.
20  Q. Do you know that the patients who
21 are at risk of heart attacks were
22 encouraged to be on aspirin?
23  A. By whom?
24  Q. By their doctors.

Page 417

1       MR. TISI: In what? Where.
2  A. What patients?
3  Q. Well --
4       MR. TISI: VIGOR clinical
5  practice?
6       BY MR. GOLDMAN:
7  Q. Do you know that Merck never took
8  the position that Vioxx was a substitute
9  for aspirin in terms of protecting the
10 heart?
11 A. I've -- I've seen them say that
12 after VIGOR came out. I don't recall
13 seeing that before.
14 Q. When you say the important point is
15 not whether Merck believed that Vioxx
16 caused heart attacks or whether Naproxen
17 prevented heart attacks, the important
18 point is that the net results would mean
19 that there would be more heart attacks in
20 people taking Naproxen --
21 A. In people taking Vioxx.
22 Q. Sorry. Let me start over.
23 A. Okay.
24 Q. When you say that the important

Jerry Avorn, M.D.

Page 418

1  thing is not whether Merck believed that
2  Vioxx caused heart attacks or Naproxen
3  prevented them but rather there would be
4  more heart attacks when people take Vioxx,
5  who is that important to?
6  A. The public health. In that, as I
7  read all of the documents, even if one
8  assumes, in the most generous possible
9  way, that there was not a hint of belief
10 on the part of anyone at Merck that their
11 drug could cause heart attacks -- and I'm
12 not indicating that I think that's the
13 whole story, but even if one assumes that
14 that's all that was going on -- they would
15 still need to have embraced the fact that
16 if they're then going to go out and try
17 and market this drug, in a way that was
18 more active than most any other drug has
19 ever been marketed, that that would
20 clearly result in people stopping what
21 they perceived to be cardioprotective drugs
22 and starting their drug, which they appear
23 to have acknowledged was less
24 cardioprotective. And as a result -- and

Page 419

1  this is not rocket science -- they would
2  need to assume that, as was seen in VIGOR,
3  more patients would have heart attacks as
4  a result of that switch.
5  Q. So now you're testifying about what
6  Merck's employees would have had to
7  assume?
8        MR. TISI: Objection.
9  A. No.
10       MR. TISI: Objection.
11 That's not what he testified to, Counsel.
12 Come on. That's unfair and ridiculous,
13 and you know that.
14 A. I think -- What I'm trying to say
15 is that -- And this is -- this is not
16 engaging in really extended speculation.
17 If Drug A causes more heart attacks than
18 Drug B, and there's tons of people out
19 there taking Drug B, and the company makes
20 a concerted effort to get people to take
21 Drug A instead, and the evidence is that B
22 causes more heart attacks -- I'm sorry,
23 I've lost track of the letters, but you
24 know what I mean -- that the company's new

Page 420

1  drug will result in more patients having
2  heart attacks than the old drug they were
3  on, I have a problem with that.
4        Even if they believe that it was
5  taking away a cardioprotective drug and
6  replacing it with their drug, whatever the
7  mechanism, VIGOR clearly indicated that
8  patients taking Vioxx would have more
9  heart attacks than patients taking
10 Naproxen.
11 Q. Do you believe that the mechanism,
12 sir, that was being advanced for how Vioxx
13 might cause heart attacks was common to
14 Celebrex and Bextra?
15 A. I believe that that was a real
16 concern and still is.
17 Q. Do you have a problem with the way
18 Pfizer marketed Celebrex and Bextra in
19 terms of attempting to persuade doctors to
20 prescribe Celebrex and Bextra over drugs
21 like Naproxen?
22 A. For me, clinical outcomes in a
23 randomized trial are the most important
24 kind of evidence. And I do not believe

Page 421

1  that Pfizer had, certainly in 2000, the
2  level of compelling clinical evidence about
3  Celebrex causing heart attacks comparable
4  to the data that Merck had and was
5  published in 2000 about Vioxx and heart
6  attacks. So mechanism is less important
7  to me than actual results from a
8  randomized clinical trial.
9        And I feel that the burden of the
10 VIGOR data that Merck had was dramatically
11 different from whatever mechanistic worries
12 one might have had about Celebrex or
13 Bextra.
14 Q. So your personal opinion is that
15 Merck's effort to market Vioxx was more
16 problematic than Pfizer's efforts to market
17 Celebrex?
18       MR. TISI: Objection to the
19 personal opinion part.
20 A. I would say my expert opinion,
21 given the risk data available to both
22 companies, indicates that Merck was
23 marketing a drug with a strong burden of
24 risk evidence from clinical trials that

106 (Pages 418 to 421)

Jerry Avorn, M.D.

Page 422

1  was not the case with Celebrex, and still
2  is not, and the data on Bextra did not
3  emerge for years later.
4       Q.  You refer in your report, sir, to
5  another e-mail from Dr. Scolnick where he
6  calls the FDA --
7       A.  Bastards.
8       Q.  Yes. Do you remember that?
9       A.  Yes.
10      Q.  Why did you refer to that in your
11  report?
12      A.  Okay. Why don't we go to where it
13  is. Remind me what page it's on. It was
14  in the Negotiations about the Label
15  section.
16      Q.  Twenty-three. It's at 23, top
17  paragraph, the last sentence.
18      A.  (Witness viewing document). Right.
19  Yes. Because -- I think this is very
20  relevant to an assessment of the company's
21  willingness or unwillingness to depict the
22  cardiovascular risk of its drug in a fair
23  and accurate manner in the labeling.
24           And my reading of what FDA was

Page 423

1  proposing that Dr. Scolnick was responding
2  to, was that it was a fair and accurate
3  and helpful depiction of the true
4  cardiovascular risk of Vioxx, and Dr.
5  Scolnick's statement, and not just him
6  calling them bastards, but I think --
7  which is just bad manners -- but I think
8  more relevant, depicting that proposed
9  label as ugly cubed, and descriptions by
10 him and Mr. Anstice about fighting back
11 and the other materials that I cite, are
12 relevant because they depict a clear
13 pattern of resistance on the part of Merck
14 to the accurate depiction of the
15 cardiovascular risk of their drug in its
16 official FDA labeling.
17      Q.  You think that Dr. Scolnick's
18 reference to the FDA as bastards suggests
19 that he didn't want to accurately convey
20 the cardiovascular risks of Vioxx?
21      A.  As I said a minute ago, what is
22 more telling is not his bad language, but
23 the other quotations which I cite, in
24 which he and his colleagues depict the

Page 424

1  FDA's labeling, which in my view, fairly
2  describes the cardiovascular risk as ugly
3  and we will not accept this.
4           I think that's more relevant than
5  the bastards piece, which just indicates
6  the magnitude of his vehemence about this.
7       Q.  Do you know why Dr. Scolnick was
8  frustrated with the FDA over the label
9  negotiations?
10      A.  Part of it was that the company
11 wanted to win a label change that would
12 depict gastroprotection, and as I
13 understand it, FDA would not agree to that
14 until they were satisfied that there was a
15 more accurate depiction of the
16 cardiovascular risk.
17           And my understanding is that Merck
18 preferred to get the label changed to
19 reflect the favorable gastrointestinal
20 effects of the drug, but was not willing
21 to accept FDA's concurrent change of the
22 label to depict the cardiovascular risk
23 component.
24      Q.  What is your basis for saying that,

Page 425

1  sir?
2       A.  Various e-mails within Merck that
3  counsel has presented to me, in which the
4  company wanted to move along its changing
5  of the label, which was the whole reason
6  they did the VIGOR study, to get evidence
7  of Vioxx's lower gastrointestinal toxicity,
8  and the discussions about FDA's
9  unwillingness to change that label piece
10 until the risk piece was changed also.
11      Q.  Was your testimony a minute ago
12 based on anything else?
13      A.  Well, it was Dr. Scolnick's
14 deposition, which I read and it -- And
15 there were -- there were other statements
16 by other people within the company that
17 also wrote e-mails about -- there was
18 several chains of e-mails -- about the
19 labeling that I was able to see.
20           MR. GOLDMAN: Why don't we
21 call it a day, and resume -- How early
22 can you start so we can end by 2:00?
23           MR. TISI: Remember you've
24 asked him to do some things tonight, too.

107 (Pages 422 to 425)

Page 426

1  MR. GOLDMAN: Yes.
2  (Deposition of JERRY AVORN, M.D.
3  suspended at 5:44 p.m.)

Page 427

DESCRIPTION OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Curriculum Vitae of Jerry Avorn |
| 2 | Expert Report prepared by Jerry Avorn |
| 3 | Notice of Deposition in the New Jersey Cases |
| 4 | Amended Notice of Deposition in the Federal Cases |
| 5 | Letter of Additional Materials Numbered 178 through 188 |
| 6 | Excerpt of Testimony from the Humeston Trial |
| 7 | Excerpts of David Anstice's Testimony |
| 8 | May 1998 Board of Scientific Advisors Meeting |
| 9 | Original Vioxx label |
| 10 | Table included in a Medical Study |

Page 428

CERTIFICATE
COMMONWEALTH OF MASSACHUSETTS
SUFFOLK SS.

I, SUSAN A. ROMANO, Certified Shorthand Reporter No. 119393, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 19TH day of June 2006.

Susan A. Romano, Notary Public

Page 429

My commission expires April 21, 2006

CAPTION

The Deposition of Jerry Avorn, M.D., taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

Jerry Avorn, M.D.

Page 430

1
2  DEPOSITION ERRATA SHEET
3
4  RE:        Jack Daniel Court Reporting
5  File No.   2349
6  Case Caption:   Gerald Barnett, et al. Vs.
7                  Merck & Co., Inc.
8
9  Deponent:   Jerry Avorn, M.D.
10 Deposition Date: June 15, 2006
11 To the Reporter:
12 I have read the entire transcript of my
13 Deposition taken in the captioned matter or
14 the same has been read to me. I request
15 that the following changes be entered upon
16 the record for the reasons indicated. I
17 have signed my name to the Errata Sheet and
18 authorize you to attach to the original
19 transcript.
20
21 Page No.   Line No.   Change to:
22
23 Reason for change:
24 Page No.   Line No.   Change to:

Page 431

1
2  Reason for change:
3  Page No.   Line No.   Change to:
4
5  Reason for change:
6  Page No.   Line No.   Change to:
7
8  Reason for change:
9  Page No.   Line No.   Change to:
10
11 Reason for change:
12 Deposition of Jerry Avorn, M.D.
13 Page No.   Line No.   Change to:
14
15 Reason for change:
16 Page No.   Line No.   Change to:
17
18 Reason for change:
19 Page No.   Line No.   Change to:
20
21 Reason for change:
22 Page No.   Line No.   Change to:
23
24 Reason for change:

Page 432

1  Page No.   Line No.   Change to:
2
3  Reason for change:
4       No changes made to the Errata Sheet
5       I am returning this signed Errata
6  Sheet with changes noted.
7  Under penalties of perjury, I declare that I
8  have read the foregoing transcript and that
9  the facts stated in it are true.
10 SIGNATURE:            DATE:
11      Jerry Avorn, M.D.

109 (Pages 430 to 432)

Jerry Avorn, M.D.

Page 433

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2                MDL DOCKET NUMBER:  1657
                         SECTION L
 3
     In re:  VIOXX PRODUCTS LIABILITY LITIGATION
 4   GERALD BARNETT AND CORRINE BARNETT,

 5           Plaintiffs,

 6     VS                          CIVIL ACTION NUMBER:
                                   2:06cv485
 7   MERCK & CO., INC.,

 8           Defendant.

 9
                    CONTINUING DEPOSITION OF
10
                       JERRY AVORN, M.D.
11
                          VOLUME II
12
                         June 16, 2006
13                        8:38 a.m.

14                     Sheraton Boston Hotel
                         39 Dalton Street
15                     Boston, Massachusetts

16    Laurie J. Driggers, Notary Public, Certified Shorthand Reporter, Realtime
      Professional Reporter
17        and Certified Realtime Reporter within and for the Commonwealth of
      Massachusetts
```

Jerry Avorn, M.D.

Page 434

1   APPEARANCES:
2
3   ON BEHALF OF PLAINTIFFS:
4   CHRISTOPHER V. TISI, ESQUIRE
5   JENNIFER L. ORENDI, ESQUIRE
6   Ashcraft & Gerel
7   2000 L Street, N.W., Suite 400
8   Washington, District of Columbia 20036
9   202.783.6400
10  cvtisi@aol.com
11  jorendi@dc.ashcraftlaw.com
12
13  ON BEHALF OF DEFENDANT:
14  ANDREW L. GOLDMAN, ESQUIRE
15  Bartlit Beck Herman Palenchar & Scott LLP
16  54 West Hubbard Street, Suite 300
17  Chicago, Illinois 60610
18  312.494.4400
19  andrew.goldman@bartlit-beck.com
20
21
22
23
24

Page 435

1   CONTINUING DEPOSITION OF JERRY AVORN, M.D.
2   VOLUME II
3   JUNE 16, 2006
4   PROCEEDINGS:
5   JERRY AVORN, M.D., the deponent,
6   having been satisfactorily identified and
7   duly sworn by the Notary Public, was
8   examined and testified as follows:
9   EXAMINATION
10  BY MR. GOLDMAN:
11  Q.  Good morning, Dr. Avorn.
12  A.  Good morning.
13  Q.  Yesterday I asked you to try to get
14  me some answers on a few questions. Did
15  you attempt to do that last night?
16  A   Yes, I did. Whoops.
17  Q.  Can you tell me the list of animal
18  studies that you think show a potential
19  cardiovascular problem with Vioxx that were
20  published before Vioxx was approved?
21  A.  Yes. I have them written down
22  here. I can give you the citation and
23  then pull out the document.
24      One is Murata, M-U-R-A-T-A, et al.,

Page 436

1   from Nature 1997. Another is Adderly,
2   A-D-D-E-R-L-Y, et al., from the Journal of
3   Biological Chemistry in 1999. And the
4   third is Shinmura, S-H-I-N-M-U-R-A, et al.,
5   and that was in the proceedings of the
6   National Academy of Sciences.
7       The paper came out in 2000, but I
8   believe there was an abstract presented in
9   1999.
10  Q.  Is that the universe of animal
11  studies you're aware of, sir, that you
12  believe show an increase or a potential
13  cardiovascular risk with Vioxx preapproval?
14  A.  That's the universe that I was able
15  to identify between last night and this
16  morning.
17  Q.  Can you tell me all of the studies
18  that you believe show an increased risk of
19  stroke from Vioxx that existed while Vioxx
20  was on the market?
21  A.  I'm sorry. I thought the question
22  was preapproval. Maybe I got the question
23  wrong.
24  Q.  I -- Withdrawn.

Page 437

1       My question yesterday, actually,
2   Dr. Avorn, was whether you were aware of
3   any clinical trials showing an increased
4   risk of stroke with Vioxx at any point
5   while Vioxx was on the market?
6   A.  Okay. I erroneously looked for
7   preapproval evidence of stroke, and found
8   that in all -- in the data that was
9   reviewed by FDA, stroke -- in Pelayo's
10  report, stroke had been folded into
11  cardiovascular outcomes, and -- and was
12  not separated out uniquely.
13      I'm sorry if I misunderstood the
14  question about prior to withdrawal as
15  opposed to prior to approval. I can go
16  back and try to get that information for
17  you.
18  Q.  As you sit here today, Dr. Avorn,
19  are you aware of any clinical trials that
20  show an increased risk of stroke with
21  Vioxx at any point while Vioxx was on the
22  market?
23  A.  I would want to go back and look
24  at the ADVANTAGE trial and the Alzheimer's

2 (Pages 434 to 437)

Golkow Litigation Technologies - 877.DEPS.USA

Jerry Avorn, M.D.

Page 438

1  studies and others of the osteoarthritis
2  and RA studies. And I apologize for not
3  having done so, because I misunderstood
4  the question.
5      Q. What I'm going to do is mark as
6  the next exhibit, then, 11, a blank
7  document.
8      A. Mm-hmm.
9      Q. And if you could, after this
10 deposition, find any studies that you
11 think show an increased risk of stroke --
12     A. Okay.
13     Q. -- while Vioxx was on the market,
14 and then if you could just please let Mr.
15 Tisi know --
16     A. Right.
17     Q. -- and then we will make sure that
18 your list --
19          MR. TISI: I've never seen
20 this quite done this way, but I will --
21 Let's -- That's fine.
22          MR. GOLDMAN: -- put it on
23 Exhibit 11.
24          THE WITNESS: That's fine.

Page 439

1           MR. TISI: I'll take Exhibit
2  11 and we'll --
3           And were we successful in getting
4  all those materials that were photocopied
5  back?
6           MR. GOLDMAN: Yes.
7           MR. TISI: Okay. Good. So
8  I'll be able to take those back or get
9  them back to you.
10          (Exhibit-11, Studies That
11 Show An Increased Risk of Stroke,
12 Published During The Time Vioxx Was On The
13 Market, marked for identification).
14          MR. GOLDMAN: I'm going to
15 label Exhibit 11 Studies That Show An
16 Increased Cardio -- sorry -- An Increased
17 Risk of Stroke Published During the Time
18 Vioxx Was on the Market.
19          MR. TISI: And just to be
20 clear, I'm not -- I am not agreeing to
21 produce an exhibit this way. I will think
22 about it, because I've never seen it done
23 this way, whether I would just provide it
24 as a supplement or have an exhibit made

Page 440

1  like this. But I -- I accept that you
2  can mark any exhibit you want.
3          BY MR. GOLDMAN:
4      Q. And to be clear, Dr. Avorn, I don't
5  want the plaintiffs' lawyers to go search
6  the planet to try to find --
7      A. Of course.
8      Q. -- a study. I want it based on
9  the work you've done in formulating your
10 opinions and testifying that you believe
11 there's an increased risk of stroke. I
12 would appreciate if you could do that,
13 okay?
14         MR. TISI: And I will agree
15 that that's the way it's to be done.
16         BY MR. GOLDMAN:
17     Q. Do you know of any clinical trial
18 that showed a doubling of the risk of
19 cardiovascular events from Vioxx before the
20 APPROVe study?
21     A. Yes. And that is derived also from
22 Dr. Pelayo's, P-E-L-A-Y-O, 1999 review of
23 the new drug application for Vioxx. There
24 is a table in it which I can pull right

Page 441

1  now.
2          (Witness viewing documents).
3          MR. TISI: And would that
4  have been the preapproval or post? I
5  don't remember what your question was.
6  I'm sorry.
7          MR. GOLDMAN: At any point
8  Vioxx was on the market.
9          MR. TISI: Any point Vioxx
10 was on the market.
11     A. Okay. Then was I, because it was
12 a long day, just mishearing that as at any
13 time prior to approval as well, and I
14 misheard it? Because you apparently
15 didn't say that yesterday. Is that --
16     Q. Okay. Let me ask it both ways.
17     A. Maybe we can just go back and look
18 at what the wording was.
19         MR. TISI: I think you
20 testified, Jerry. I mean, I don't want --
21         BY MR. GOLDMAN:
22     Q. Let's start with preapproval
23 then --
24     A. Right.

3 (Pages 438 to 441)

Jerry Avorn, M.D.

**Page 442**

1  Q. -- and we can go to the next
2  question.
3  A. And we can review what the question
4  was, if we've got the transcript from
5  yesterday, just to see if I misheard that.
6  Q. Before Vioxx was approved for use
7  in the United States, sir, can you point
8  to any study that showed an increased
9  cardiovascular risk with Vioxx? And I
10 believe you said a doubling of the risk.
11      MR. TISI: I'm just going
12 to object, because I think we covered this
13 yesterday. But go ahead.
14 A. Okay. To be accurate about my
15 recollection of it, the doubling --
16 Q. Mm-hmm.
17 A. -- was a description of the finding
18 from APPROVe. And I believe that it was
19 you who put the doubling concept into the
20 question, rather than me. But that's
21 fine. Because there was a substantial
22 increase and in some cases a doubling.
23      And I think we talked about this
24 yesterday when we were going over table --

**Page 443**

1  I believe it was 52, in -- yes, in Dr. --
2  No. This is Dr. Villalba's -- I'm sorry,
3  it's Dr. Villalba's report,
4  V-I-L-L-A-L-B-A, review of the new drug
5  application.
6       MR. TISI: And since there
7  were numerous Villalba reports, can you
8  give the date of that?
9       THE WITNESS: Yes.
10      MR. TISI: Because there
11 were numerous ones.
12      THE WITNESS: Let me just
13 go to the beginning of it.
14      MR. TISI: I'm sorry.
15      THE WITNESS: It's all
16 right.
17      MR. TISI: Actually, just
18 for the record, it's Tab 175 in your
19 binder.
20      THE WITNESS: Right. And I
21 can -- It was 1999. I can get the
22 exact --
23      MR. TISI: That's okay.
24 A. Okay. It is -- The review date

**Page 444**

1  says December '98 through May of '99.
2  Q. Okay.
3  A. Okay. And it is Table 52. And as
4  I believe we covered yesterday, it
5  describes thromboembolic adverse events.
6  Q. Yes. You did describe it
7  yesterday.
8       Do you have anything to add other
9  than what you talked about yesterday
10 concerning the preapproval studies and
11 whether they show an increased
12 cardiovascular risk with Vioxx?
13 A. No. Concerning preapproval, that's
14 what I have.
15 Q. Okay. Now, let's go to the broader
16 question, and if there was a
17 misunderstanding, then I apologize.
18 A. Okay.
19 Q. So let me just ask you: Based on
20 your review of the materials before you
21 issued your expert report, okay?
22 A. Yes.
23 Q. What clinical trials do you believe
24 show an increased cardiovascular risk with

**Page 445**

1  Vioxx before the APPROVe study?
2  A. Okay. And that would include
3  VIGOR, ADVANTAGE, and there were others
4  whose protocol numbers I don't have in
5  mind. I think 090 sticks in my mind as a
6  protocol number. But since I haven't
7  memorized all the protocol numbers, that's
8  something that I would go back and provide
9  specific protocol numbers for you.
10     I was looking and thinking that the
11 question was about pre -- I think the
12 confusion was, you may have said pre
13 APPROVe, and I may have heard that as
14 preapproval.
15     So I can give you other protocol
16 numbers besides VIGOR, ADVANTAGE and O90,
17 if you want, subsequent to today.
18 Q. Sure. In fact, what we'll do, on
19 Exhibit 11, is just have another part that
20 says Clinical Trials Before APPROVe --
21 A. Why don't you say "The APPROVe
22 study," just to keep us from getting
23 confused again.
24 Q. Okay. So on Exhibit 11, I added,

Jerry Avorn, M.D.

Page 446

1  "These are your opinions now of clinical
2  trials before the APPROVe study that show
3  an increased cardiovascular risk from
4  Vioxx," okay?
5      A.  Good.
6      Q.  And you said VIGOR, ADVANTAGE, 090
7  and whatever else you want to add after
8  the deposition, okay?
9      A.  Correct.
10         MR. TISI:  And again, the
11 same qualified objection.  Go ahead.
12         BY MR. GOLDMAN:
13     Q.  The ADVANTAGE study, sir, did that
14 show an increased risk with Vioxx for
15 strokes?
16     A.  Let me pull the ADVANTAGE study and
17 take a look.  I -- If you have it there
18 and want to present it to me --
19     Q.  Sure.
20     A.  -- that would speed things up.
21 Thank you.
22         MR. TISI:  You're handing
23 him the published study, right?
24 ///

Page 447

1         BY MR. GOLDMAN:
2      Q.  I'm handing you the published study
3  of ADVANTAGE.
4          MR. TISI:  I want to make
5  sure what you're handing him.
6          MR. GOLDMAN:  Okay.
7          MR. TISI:  I mean, we're
8  not handing him the CSR, we're not handing
9  him the medical records to review or
10 anything -- nothing.
11         BY MR. GOLDMAN:
12     Q.  I'm handing you the peer-reviewed
13 published article on the ADVANTAGE study.
14     A.  (Witness viewing document).  Okay.
15 And the question was, is there evidence of
16 an increased risk of stroke in the
17 ADVANTAGE study?
18     Q.  Yes.
19     A.  I cannot see any --
20         MR. TISI:  No.  I think it
21 was -- I think he asked stroke.  You had
22 asked cardiovascular.
23         MR. GOLDMAN:  No.  We're on
24 the same page.

Page 448

1         MR. TISI:  Okay.  Objection.
2         BY MR. GOLDMAN:
3      Q.  Dr. Avorn, when you look at the
4  risk of thrombotic events in the ADVANTAGE
5  study, do you agree, sir, that there is no
6  statistically significant increased risk
7  associated with Vioxx?
8      A.  One problem I have with working
9  from the published version that I know was
10 that there were issues about adjudication
11 of endpoints in a number of the trials
12 that FDA received --
13     Q.  Mm-hmm.
14     A.  -- from -- from Merck.  And I
15 recall clearly that when -- that FDA felt
16 that it had to readjudicate outcomes in a
17 number of the trials.
18     Q.  Mm-hmm.
19     A.  And as I recall, in nearly all of
20 those instances FDA staff readjudicated
21 outcomes and found outcomes that were
22 cardiovascular adverse events in the Vioxx
23 group that Merck scientists had not found
24 to be cardiovascular events.  And I

Page 449

1  believe I recall that the differences also
2  went in the other direction.
3          And so I would like to first look
4  at my report where I discuss that, and
5  secondly, I would want to go back to
6  another version, because there has been
7  this persistent issue of FDA finding, when
8  its scientists looked at outcomes, more
9  events in Vioxx than Merck reported there
10 to be.
11     Q.  Dr. Avorn, in your study -- I'm
12 sorry -- in your report on Page 14, you
13 talk about the ADVANTAGE study --
14     A.  Yes.
15     Q.  -- at the bottom --
16     A.  Yes.
17     Q.  -- right?
18     A.  Right.
19     Q.  And then you continue on Page 15
20 to talk about it, right?
21     A.  Right.
22     Q.  Do you indicate, sir, anywhere in
23 your report that the ADVANTAGE study
24 reflects an increased risk of thrombotic

**Page 450**

1  events from Vioxx?
2  A. That's what I want to review.
3  (Witness viewing document). Yes.
4  This is exactly the point that I was going
5  to make.
6  Q. Mm-hmm.
7  A. In my report I indicate that there
8  was the question that we discussed
9  yesterday of at least one instance of
10 reassignment by Merck of one probable
11 cardiac death to unknown cause, and to
12 read from my report: When FDA used a
13 more comprehensive outcome definition of
14 serious coronary heart disease and
15 readjudicated these outcomes, it found a
16 relative risk of 3.2 for Vioxx use.
17 Q. My question, Dr. Avorn, was about
18 thrombotic events, not about a new
19 category of serious coronary heart disease,
20 okay? You understand the difference?
21 A. Well, thrombotic event would be a
22 subset of serious thrombotic -- serious
23 cardiac heart disease.
24 Q. Do you say in your report, sir,

**Page 451**

1  that there is an increased risk seen for
2  thrombotic events in the ADVANTAGE study?
3  A. I would need to look at the report
4  that FDA produced and to look at its
5  definition of serious coronary artery
6  disease which would of course include
7  thrombotic cardiovascular events.
8  Q. Did you -- I'll ask one more time
9  -- indicate in your report that there was
10 an increased risk in thrombotic events
11 seen in the ADVANTAGE study?
12 A. All right. We only -- I will need
13 to repeat that one can play games in a
14 counterproductive manner by using terms
15 such as thrombotic events versus serious
16 coronary heart disease versus myocardial
17 infarction, all of which are intersecting
18 circles which describe similar but related
19 events.
20 If you want, we can stop and I can
21 go back to the FDA's adjudication and see
22 what they considered a serious coronary
23 heart disease event. But I can assure you
24 that clinically, a thrombotic

**Page 452**

1  cardiovascular event is going to have
2  heavy overlap with a serious coronary
3  heart disease event.
4  Q. Are there other events that would
5  be considered part of coronary heart
6  disease events that are not thrombotic in
7  nature?
8  A. I would need to look at what FDA
9  meant when it used its term "serious
10 coronary heart disease," because many of
11 these are terms that can vary with exactly
12 what one includes.
13 But frankly, in any kind of
14 realistic terms, heart attack, serious
15 coronary heart disease, major thrombotic
16 coronary event all describe pretty much
17 the same thing, although there may be some
18 small differences in the definitions.
19 Q. At a break maybe we can look at
20 the FDA analysis, because I have to move
21 forward.
22 MR. TISI: Actually, I have
23 it if you want to --
24 MR. GOLDMAN: Okay.

**Page 453**

1  MR. TISI: I have it right
2  here if you want to --
3  MR. GOLDMAN: Let's do it
4  at a break.
5  MR. TISI: Sure.
6  THE WITNESS: You mean off
7  the record?
8  MR. TISI: No. We can do
9  it on break. I had it. I was trying to
10 speed things along.
11 A. All right.
12 Q. Dr. Avorn, you remember yesterday
13 we were talking about a number of
14 documents written by Dr. Scolnick or Dr.
15 Musliner or Dr. Reicin, internal Merck
16 documents that you're relying on for your
17 opinions, right?
18 A. Yes.
19 Q. Am I right, sir, that you don't
20 have any personal knowledge of the facts
21 described in those documents, you're just
22 relying on those documents, true?
23 A. Correct.
24 Q. Okay. In the Materials Considered,

6 (Pages 450 to 453)

Jerry Avorn, M.D.

### Page 454

```
 1   which is Exhibit 5, sir --
 2    A.  Mm-hmm.
 3    Q.  -- if you wouldn't mind looking at
 4   that.
 5    A.  Got it.
 6        (Witness viewing document).
 7    Q.  Am I right that you don't indicate
 8   anywhere in there that you're relying on
 9   Dr. Ray's expert report?
10    A.  I have, indeed, read Dr. Ray's
11   report --
12    Q.  Mm-hmm.
13    A.  -- and been impressed by it. And
14   I believe that my awareness of Dr.
15   Kronmal's analysis of the Alzheimer's data
16   was as it was reported in Dr. Ray's
17   report, as well as -- I think that was my
18   primary awareness of Dr. Kronmal's data.
19        So, yes, I did read it. I did
20   take it seriously, and it did inform me
21   about the Kronmal evaluation of the
22   Alzheimer data.
23    Q.  As I understand your testimony, Dr.
24   Avorn, you are relying on a portion of Dr.
```

### Page 455

```
 1   Ray's expert report where he describes an
 2   analysis that was conducted by another
 3   plaintiff's expert witness, Dr. Kronmal?
 4    A.  That's correct.
 5    Q.  I'm right, though, sir, that you
 6   don't identify and the plaintiffs' lawyers
 7   in this case didn't identify either Dr.
 8   Ray's report or Dr. Kronmal's report on
 9   the list of materials you considered in
10   forming your opinions?
11    A.  Okay. The list was prepared by
12   plaintiffs' counsel, and --
13    Q.  I can represent to you I've looked
14   at it, and there's no reference to Dr. Ray
15   or Dr. Kronmal.
16    A.  No, I understand that. But I'm
17   saying having not prepared this list, I'm
18   telling you that I did read and believe
19   Dr. Ray's expert testimony. And if it was
20   not listed as a report transmitted to me,
21   I think that was an omission by counsel.
22    Q.  Because there's no reference in Dr.
23   Avorn's report to Dr. Ray's analysis or
24   Dr. Kronmal's analysis of the Alzheimer's
```

### Page 456

```
 1   data, and that was not disclosed in any of
 2   the materials considered, we're going to
 3   object to any testimony in your trial
 4   deposition about either of those subjects,
 5   okay?
 6    A.  That's a legal issue.
 7        MR. TISI:  That's between
 8   you and me. You can't ask him.
 9        MR. GOLDMAN:  Okay. And
10   let me also note for the record that I've
11   spoken with Chris -- I'm sorry -- Charlie
12   Cohen, and he doesn't have any record of
13   receiving a letter dated June 8th from the
14   Seeger Weiss firm indicating some
15   additional materials that were sent to Dr.
16   Avorn. I understand, Chris, that you
17   all --
18        MR. TISI:  We have a
19   signed --
20        MR. GOLDMAN:  -- have a
21   signed copy, and you believe it was sent.
22   I'm just telling you that for the record,
23   I wasn't provided with it, and Charlie
24   doesn't have a record of receiving it. So
```

### Page 457

```
 1   I think that's going to be sorted out
 2   afterwards.
 3        MR. TISI:  Yeah. We'll
 4   probably have to just sort it out. I
 5   mean, I just -- It is what it is. There
 6   are a handful of documents, they're not
 7   complicated, so I think you'll have an
 8   adequate opportunity to take -- to take a
 9   look at them. They're not documents
10   you've not seen before. Go ahead.
11        THE WITNESS:  I'm listening.
12   I'm just getting a cup of coffee.
13        BY MR. GOLDMAN:
14    Q.  Okay. You didn't review any of the
15   expert reports that have been submitted by
16   Merck expert witnesses, did you, sir?
17    A.  I don't believe I have.
18    Q.  If you look on the first page of
19   Exhibit 5, you see that there's a number
20   of items there that were not included on
21   your original Materials Considered?
22    A.  (Witness viewing document). Yes.
23    Q.  I just want to establish that those
24   are materials that you didn't review
```

Jerry Avorn, M.D.

Page 458

1  before that you wrote your report but that
2  you are relying on because you've reviewed
3  them since? Is that the situation?
4      A. I have no way of knowing whether
5  these were added by counsel because they
6  were omitted in error from what was sent
7  originally, or whether this implies that
8  they were sent subsequently.
9      Q. Can I look at the list for one
10 second?
11     A. (Witness complied). Sure.
12         MR. TISI: I can make a
13 representation, if you wish.
14         MR. GOLDMAN: Well, let me
15 just ask Dr. Avorn first.
16         MR. TISI: Go ahead.
17 BY MR. GOLDMAN:
18     Q. Prior to issuing your report, Dr.
19 Avorn, did you read the FDA's medical
20 officer review --
21     A. Yes.
22     Q. -- of Vioxx?
23     A. Yes.
24     Q. Prior to issuing your report, did

Page 459

1  you read the New England Journal of
2  Medicine's "Expression of Concern" and
3  reaffirmance?
4      A. Yes.
5      Q. Prior to issuing your report, did
6  you read the section from the Federal Code
7  of Regulations, 21 CFR Section 201.57(e)?
8      A. Is that the one about duty to warn?
9      Q. Do you know?
10     A. Well, I know that I've read the
11 duty to warn section.
12         MR. TISI: I have that
13 right in front of me if you want me to
14 show you the --
15         MR. GOLDMAN: Well, he may
16 not know the number.
17     A. Yeah. I've read the duty to warn
18 section of 21 CFR many times over the
19 years, and if that's that particular
20 number, then, yes, I have read it before
21 my report.
22     Q. Did you read the transcript of the
23 Arthritis Advisory Committee meeting from
24 February 8th of 2001, before you issued

Page 460

1  your report?
2      A. Yes.
3      Q. Okay.
4      A. So it looks as if this was not
5  materials sent to me after my report but
6  material they had failed to list earlier.
7          MR. TISI: And I can
8  represent, just so that there's clarity of
9  the record, all of these were provided to
10 him before. It was our initial omission,
11 which we caught when we were preparing.
12         The only documents that were not
13 were obviously the supplemental APPROVe
14 data, which wasn't available at the time
15 of his report.
16         MR. GOLDMAN: I'm just going
17 to mark for the record the expert report
18 of Dr. Ray that you had in your file,
19 sir. It's dated January 11th of 2006, and
20 was submitted in the Plunkett case.
21         (Exhibit-12, Expert Report
22 of Dr. Ray dated January 11, 2006, marked
23 for identification).
24 ///

Page 461

1  BY MR. GOLDMAN:
2      Q. My only question about this, sir,
3  has to do with a reference on one of Dr.
4  Ray's references. It really has nothing
5  to do with his report, okay?
6      A. Okay.
7      Q. You wrote the word zodiac?
8      A. I wrote? Oh, okay. You mean my
9  notes -- My notes, right.
10     Q. There's an indication on the last
11 page of the report where you're just
12 listing references, and you wrote the
13 reference to zodiac next to Reference 83,
14 which is an article in JAMA from 1991
15 called Analysis and Interpretation of
16 Treatment Effects in Subgroups of Patients
17 in Randomized Clinical Trials.
18     A. Yes.
19     Q. Can you tell me, number one, what
20 that issue is about, and number two, why
21 you wrote zodiac?
22     A. Sure. Let me take a look.
23         (Witness viewing document). Sure.
24 That's a very interesting paper that I

Jerry Avorn, M.D.

Page 462

1   think I flagged just because it's one of
2   my favorite papers and I wanted to make a
3   note of its relevance to this case.
4       As I recall that paper, it looked
5   at the use of subgroup analysis, and
6   pointed out that in one very big clinical
7   trial, if one were to do a post hoc
8   subgroup analysis -- if this is the
9   correct paper I'm thinking of -- if one
10  were to do a subgroup post hoc analysis,
11  you could demonstrate that the given
12  treatment was very much more effective in
13  some patient groups and very much less
14  effective in other patient groups, and
15  that that group -- that grouping turned
16  out to be their zodiac sign, like Aquarius
17  or Capricorn.
18      And again, if this is the paper I'm
19  thinking of, the authors pointed out that
20  that was a limitation of post hoc subgroup
21  analyses, because clearly a patient's
22  zodiac sign was not going to be
23  meaningfully predictive of outcome.
24  Q.  Is it your opinion, then, that post

Page 463

1   hoc analyses are limited in what they can
2   establish, or is it your view that post
3   hoc analyses are compelling?
4   A.  Given that this is a topic that
5   people have written long papers about, let
6   me try to give a very brief answer.
7       Post hoc subgroup analyses can be
8   -- Well, subgroup analyses can be
9   meaningful if they have been predetermined
10  as subgroups and are not come up with --
11  are not designated after the fact. And we
12  do that all the time. We -- The research
13  community.
14      They can also be informative if
15  after a study is completed it turns out
16  that there may be a patient group that is
17  particularly either susceptible to a side
18  effect or likely to benefit or unlikely to
19  benefit.
20  Q.  Mm-hmm.
21  A.  And often that kind of analysis can
22  be very informative if it has -- Well, if
23  it has the following properties: A, it is
24  not data dredging, either by an academic

Page 464

1   trying to get a paper or by somebody with
2   an axe to grind otherwise, and if there's
3   a likely biologically meaningful
4   explanation for it, such as diabetics do
5   worse or elderly people do worse.
6   Q.  Mm-hmm.
7   A.  And so in that sense it can be
8   very useful and informative and real. But
9   it can be noninformative and even
10  counterproductive if it fits into that
11  data dredging or attempting to justify a
12  particular position by looking at --
13  looking for groups in which one can make a
14  case.
15      I'm sorry it's a complicated
16  answer, but it's not a good or bad thing
17  in itself.
18  Q.  Is it fair to say that there are
19  serious limitations when you do a post hoc
20  analyses of data?
21      MR. TISI: Objection to
22  limitations.
23  A.  I don't think -- I don't think
24  that's what I said. I think it depends

Page 465

1   on the instance. Sometimes they can be
2   helpful, sometimes they can be
3   counterproductive.
4   Q.  There's a letter that was in your
5   materials that I reviewed last night. Let
6   me represent to you it's dated March 13th
7   of 2003 -- sorry -- 2006. Okay?
8   A.  (Witness nods head).
9   Q.  And it was from the plaintiffs'
10  lawyers to you enclosing some material.
11  A.  Okay.
12  Q.  And the letter is dated March 13th,
13  2006, and it referred to the following
14  information: CSRs for Study 010, 017, 085
15  and 090. Okay?
16  A.  (Witness nods head).
17  Q.  Early versions of the Ingenix
18  study?
19  A.  Ingenix.
20  Q.  Ingenix study. And a May 22nd,
21  2001, New York Times article. Okay?
22  A.  Okay.
23  Q.  That was sent to you a week before
24  your report was signed, right?

9 (Pages 462 to 465)