Page 466

1   A. Right.
2   Q. Did you review those materials,
3   sir, and factor them in to your analysis
4   when you wrote your report?
5   A. I'm pausing, because I'm having a
6   hard time remembering which materials were
7   received when and what impact they did or
8   didn't have on my report.
9       I recall having seen them, and I
10  just can't tell you how any one of those
11  did or didn't relate to the report.
12  Q. Okay. In your expert report, sir,
13  you refer to a draft standby statement
14  dated March of 2000.
15  A. Please help me to know where you're
16  referring to.
17  Q. Yes. It's on Page 13. You quote
18  from it in the indented paragraph that
19  starts "The implications."
20  A. (Witness viewing document). Yes.
21  Q. Here you're quoting from a standby
22  statement that was a draft and was
23  prepared internally at Merck, right?
24  A. Correct.

Page 467

1   Q. You don't have any personal
2   knowledge of the facts here, right?
3       MR. TISI: Objection, other
4   than it was written and that's the
5   document that it says.
6       MR. GOLDMAN: Okay.
7   A. I -- I have knowledge that it was
8   a document Merck prepared.
9   Q. The underlying facts and what Merck
10  did with this draft standby statement you
11  don't have any personal knowledge of,
12  true?
13  A. My understanding is that they
14  didn't actually implement the -- this --
15  this draft standby statement in that form.
16  Q. And what's your understanding based
17  on?
18  A. I believe I asked counsel whether
19  this was ever -- you know, could I see a
20  document that was the final version, and
21  they said they didn't have one. So that
22  leaves me not knowing its ultimate fate.
23      But I refer to it as evidence of
24  what officials at the company were saying

Page 468

1   and doing at the time, whatever the
2   subsequent use of that was.
3   Q. Which you don't know?
4   A. Right. The absence of seeing a
5   final makes me suspect that there may not
6   have been a final. In other words, if
7   there had been a final, I would have
8   expected that counsel would have gotten it
9   in the discovery process. And the fact
10  that when I asked for the final they said
11  they did not have one to produce makes me
12  suspect that perhaps there was not a
13  final. But I can't know that for sure.
14  Q. Do you think that simple common
15  sense, sir, would lead to the conclusion
16  that if, as you say, the risk benefit
17  relationship of Vioxx were accurately
18  presented to doctors, that Merck would not
19  have sold as much Vioxx?
20      MR. TISI: Objection.
21  A. I don't know what simple common
22  sense would -- would indicate in that
23  because how much a company can sell of a
24  given product is a pretty complicated

Page 469

1   issue, and I -- I just can't tell you
2   what -- I don't have simple common sense.
3   I think of these things as someone who
4   spent his life studying the issue. So I
5   can't answer that.
6   Q. Let's talk about Study 090. Do you
7   remember what that study was about?
8   A. It was an osteoarthritis study.
9   And we can look to where I refer to it in
10  my report. It would have been in a
11  section of pre -- I think pre -- If you
12  have a specific page of my report you want
13  to refer me to, that would save me some
14  time.
15  Q. Fourteen.
16  A. (Witness viewing document). Okay.
17  Got it.
18  Q. So is your understanding about
19  Study 090 described here in Page 14 of
20  your report, sir?
21  A. Yes. That it was Vioxx twelve and
22  a half milligrams compared to Nabumetone
23  or placebo in patients with osteoarthritis.
24  Q. How many thrombotic cardiovascular

Jerry Avorn, M.D.

Page 470

1 events occurred in the 090 study?
2 A. I'd need to go back to the -- the
3 actual report. I can't keep all those
4 numbers in my head. But if you have --
5 If you want to show me, I would be happy
6 to look at it.
7 Q. Well, you refer, in the second full
8 paragraph, when you're describing protocol
9 090 in the second to the last sentence,
10 you say, "This included a heart attack and
11 two strokes in the Vioxx --"
12 A. I'm sorry. The second to the last
13 sentence where?
14 Q. In the second paragraph when you're
15 describing protocol 090 --
16 A. Okay.
17 Q. -- the second to the last
18 paragraph --
19 A. Right.
20 Q. -- second to the last sentence you
21 say, "This included a heart attack and two
22 strokes in the Vioxx group within the
23 six-week study period in none or either of
24 the comparison groups." Is that your

Page 471

1 understanding, sir?
2 A. (Witness viewing document). Yes
3 Q. While Vioxx was on the market, did
4 you ever write any articles about Study
5 090?
6 A. No, I did not. I don't believe
7 that I was aware of Study 090 while Vioxx
8 was on the market.
9 Q. Did you ever write anything about
10 ADVANTAGE while Vioxx was on the market?
11 A. No.
12 Q. It's not your testimony, is it,
13 sir, that Merck hid the results of the
14 Study 090, is it?
15          MR. TISI: From -- From
16 whom?
17          BY MR. GOLDMAN:
18 Q. From anybody.
19 A. First, to answer your question
20 about ADVANTAGE, I just want to see when
21 -- and I think you just handed me the
22 ADVANTAGE paper -- when it was -- There,
23 is that -- no. I just want to see when
24 it -- It's over here. Thank you. Okay.

Page 472

1          MR. TISI: Can we mark it
2 since you've --
3          THE WITNESS: Yeah, it is.
4          MR. TISI: It's not marked.
5          MR. GOLDMAN: I'll mark it
6 as Exhibit 13.
7          (Exhibit-13, Article Entitled
8 "Gastrointestinal Tolerability and
9 Effectiveness of Rofecoxib Versus Naproxen
10 in the Treatment of Osteoarthritis," marked
11 for identification).
12          MR. TISI: Okay.
13          BY MR. GOLDMAN:
14 Q. Exhibit 13 is the peer reviewed
15 publication of the ADVANTAGE study.
16          MR. TISI: Don't -- Don't
17 bait me.
18 A. (Witness viewing document). This
19 is the one with the outcomes as
20 readjudicated by FDA or with Merck's
21 adjudication, or don't we know?
22 Q. Are you --
23 A. I know that FDA readjudicated the
24 ADVANTAGE findings. I just don't know

Page 473

1 which --
2 Q. Dr. Avorn, you asked to see that
3 article, not to talk about whether the FDA
4 adjudicated events. You asked to see that
5 article to see whether it was completed to
6 decide whether or not you ever talked
7 about it in any of your articles.
8 A. Right.
9 Q. So can we stick to that topic?
10 A. Right. Okay. So it was published
11 in October of '03, and I -- I did not
12 write about it.
13 Q. Okay. Is it your position, sir,
14 that Merck hid the results of the Study
15 090?
16          MR. TISI: Objection.
17 A. Can you define what you mean by
18 hid?
19 Q. How would you define hid?
20 A. Well, if -- if results -- and maybe
21 to define it, I could use ADVANTAGE as an
22 example. If results are presented in a
23 paper or to FDA with outcomes that are
24 judged by the FDA to be incorrect and

Jerry Avorn, M.D.

Page 474

1  misleading, the provision of those outcome
2  data to the FDA does not in my view
3  constitute a full disclosure of the
4  results of that study.
5      So, for example, would I say that
6  the true results of ADVANTAGE were hidden?
7  I would say, as originally presented to
8  FDA, given that FDA felt that the results
9  were incorrect and favored Vioxx by
10 adjudicating outcomes in a way that ended
11 up favoring the drug, I would say that's a
12 kind of hiding.
13     Q. Is your testimony that the
14 individuals who were involved in the
15 adjudication process in the ADVANTAGE study
16 intentionally adjudicated certain events
17 so that they would favor Vioxx?
18     A. I can't speak to the intentions of
19 individuals or their motivations.
20     Q. Well --
21     A. I can only look at the outcome of
22 those adjudicate -- of those decisions.
23     Q. Do you think Merck, as a company,
24 or the individuals at Merck played any

Page 475

1  role in how the adjudicators decided what
2  they would call certain events in the
3  ADVANTAGE study?
4      A. Yes, in that the company did have a
5  procedure for bringing cases forward to
6  adjudication, and that is often one of the
7  most important components of adjudication,
8  which is -- which cases even get
9  adjudicated.
10     And so if there are company
11 policies or procedures that cause cases to
12 not even get adjudicated, that's a very
13 meaningful way of distorting adjudication.
14     Q. Tell me every case, sir, that you
15 say Merck caused not to get adjudicated --
16         MR. TISI: Objection.
17         BY MR. GOLDMAN:
18     Q. -- in the ADVANTAGE study or any
19 other study that has ever been done on
20 Vioxx.
21         MR. TISI: Objection;
22 improper question.
23     A. Okay. Given that I obviously
24 cannot know of every case of the tens of

Page 476

1  thousands of people in the various
2  studies, what I can tell you is the
3  cardiovascular SOP, as we discussed
4  yesterday, specifically -- no.
5      Don't shake your head in the middle
6  of my answer. I'm responding to your
7  question, Counsel.
8      Q. No. You're actually not.
9      A. You asked me to identify Merck
10 activities that caused adjudications to go
11 wrong.
12     Q. Un-un. Then there was a
13 miscommunication.
14     My question is: Tell me every case
15 where Merck caused a particular event not
16 to be adjudicated in any Vioxx clinical
17 trial.
18     A. Okay. All cases after the cardiac
19 SOP was modified in which patients
20 experienced pulmonary edema, congestive
21 heart failure, certain arrhythmias -- and
22 if you want, we can go through the cardiac
23 SOP and look at what diagnoses were
24 systematically struck through by Merck so

Page 477

1  as to prevent those cases from being
2  adjudicated.
3      Now, I can't tell you the case
4  numbers or the gender or the age of those
5  people. But I can tell you that if you
6  throw out anybody who had pulmonary edema
7  or congestive heart failure from
8  adjudication, you are going to definitely
9  underestimate cardiac events.
10     Q. And is it your view, sir, that by
11 not including the category of pulmonary
12 edema events in the adjudication process
13 that that ended up creating a misleading
14 or incorrect result in the Vioxx clinical
15 trials?
16     A. I can say that doing so will
17 clearly and systematically reduce
18 ascertainment of myocardial infarctions and
19 other important cardiac events.
20     Q. Did you ever look to see which
21 particular cases in the Vioxx clinical
22 trials involved pulmonary edema in the
23 Vioxx arm to see whether or not there were
24 more cases of pulmonary edema in the Vioxx

12 (Pages 474 to 477)

Jerry Avorn, M.D.

Page 478

1 arm than in comparator arms in the Vioxx
2 clinical trials?
3    A.  No.  It's too big.  I would have
4 had to have looked at the case histories
5 of thousands of patients, and I did not do
6 that.  But I think it does speak to a way
7 of analyzing data that caused me concern.
8    Q.  Did the FDA, in any of the
9 documents you reviewed, say that Merck
10 misled them about the ADVANTAGE study?
11    A.  The FDA did indicate that it
12 readjudicated cases and -- excuse me.
13        Counsel, it will help us a great
14 deal if you don't shake your head while
15 I'm trying to -- I'm trying to be
16 responsive to your answer.
17    Q.  That's not what I'm asking.
18    A.  I think it is.
19        (Reporter interruption).
20    A.  The FDA does not -- as you well
21 know -- does not use terms like "The
22 company tried to mislead us."
23    Q.  Did any -- I'm sorry.  Go ahead.
24    A.  That is not what a government

Page 479

1 bureaucrat writes down in a report.
2        What the FDA does state is that it
3 readjudicated outcomes in a given case,
4 and it will describe the original
5 presentation of the outcome, and then its
6 readjudication of that outcome.
7        And my observation, from the FDA
8 report that we're talking about, was that
9 as it turned out, it just so happened that
10 in nearly all cases, the FDA's
11 readjudication found more cardiac events
12 than Merck did in those very same cases.
13    Q.  I've heard you on that answer,
14 okay?
15    A.  Okay.  Okay.
16    Q.  Did you see any reference in any of
17 the FDA materials you reviewed where the
18 FDA said that they believed Merck was
19 misleading them with the results of the
20 ADVANTAGE study?
21    A.  (Witness viewing document).  As I
22 said, the FDA does not use terms that --
23 such as "You have misled us."
24    Q.  Is the answer no?

Page 480

1    A.  Right.
2    Q.  In fact, you haven't seen a single
3 instance in any of the FDA materials for
4 any of the clinical trials where the FDA
5 said they felt Merck mislead them in how
6 Merck presented the data to the FDA, true?
7    A.  (Witness viewing document).
8 Quoting the FDA in a letter to Merck,
9 "Your misrepresentation of the safety
10 profile for Vioxx is particularly
11 troublesome because we have previously, in
12 an untitled letter, objected to promotional
13 materials for Vioxx."
14        And so, yes, FDA has notified Merck
15 that it felt, in as many words, that Merck
16 was misrepresenting the safety profile of
17 Vioxx.
18        Now, in that case they were
19 referring to Merck's promotion.  But, yes,
20 FDA has accused Merck in writing of
21 misrepresenting the safety of its drug.
22    Q.  So the FDA does use words like
23 misleading if they believe an act is
24 misleading, right?

Page 481

1    A.  Yes.
2    Q.  Did you see, in any of the FDA
3 materials that you reviewed, any statement
4 by the FDA that they felt the way Merck
5 presented the data from the Vioxx clinical
6 trials was misleading?
7        MR. TISI:  Data from --
8        MR. GOLDMAN:  To them.  To
9 the FDA.
10        MR. TISI:  Okay.
11    A.  Can you just read back -- Did I
12 see any evidence?
13    Q.  Did you see any reference in any of
14 the FDA materials, sir, where the FDA said
15 that they felt Merck was misleading them,
16 the FDA, in the way that Merck presented
17 data from clinical trials?
18    A.  Okay.  If you want, we can pull
19 out the FDA report of the ADVANTAGE
20 outcomes.
21        What that report says, as you know,
22 was that the outcomes presented by Merck
23 were considered erroneous by the FDA's
24 medical officer as having underestimated

13 (Pages 478 to 481)

Jerry Avorn, M.D.

Page 482

1  the number of cases. That is there in
2  the FDA's report.
3  Q. Okay.
4  A. Did they use the word misleading in
5  their report? No. But frankly, it seems
6  pretty obvious to me that if they say,
7  here are the number of cardiac events that
8  Merck reported with patients on Vioxx, we
9  found that many more people had cardiac
10 events on Vioxx, and we corrected the
11 numbers upward because we think Merck got
12 it wrong. And to me, that -- that sure
13 looks like the FDA's perception or the
14 FDA's judgment that Merck had
15 underestimated the cardiovascular outcomes
16 of its drug.
17 Q. I want to go back to my original
18 question.
19 A. Did they send a letter saying that?
20 Not to my knowledge.
21 Q. Did Merck hide the results of Study
22 090?
23 A. Now we're not talking about
24 ADVANTAGE; we're talking about 090?

Page 483

1  Q. Well, because you decided to talk
2  about ADVANTAGE --
3  A. Okay. 090 then.
4  Q. -- in response to my question about
5  090. So let's start over.
6  A. Okay. Okay.
7  Q. Did Merck hide the results of Study
8  090?
9  A. All right.
10       MR. TISI: Objection.
11 A. In that -- as I -- and I just want
12 to refer to my report about the
13 cardiovascular card, because I think that's
14 -- that's exactly the response to your
15 question that I need to give.
16 Q. The CV Card you're now talking
17 about?
18 A. Yes. I'd like a minute to read
19 this, please.
20 Q. Sure.
21 A. (Witness viewing document). Okay.
22 I can answer your question in the
23 affirmative. I do believe that Merck hid
24 the results of Study 090 in the following

Page 484

1  way, and this is a problem that has come
2  up a number of times.
3       If the main means of communicating
4  results is via, quote, educational
5  materials, unquote, that are actively
6  disseminated to physicians, or a paper, as
7  in the case of VIGOR, that was published
8  in the most widely read medical journal in
9  the country, and if those materials fail
10 to include, or hide, to use your term,
11 important information about risk, it does
12 not relieve the company of responsibility
13 for them to say, as they did with Study
14 090, and as they did with the additional
15 heart attacks in the case of the VIGOR
16 study, "Oh, well, we told FDA about it."
17 Because most doctors do not go to the FDA
18 Web site to understand the risks of drugs.
19 They read journals. They talk to sales
20 reps. They look at advertisements. And
21 that is where their opinion comes from.
22       In my view, failing to include
23 important risk information in papers or in
24 teaching materials, including the

Page 485

1  cardiovascular card, in the case of Study
2  090, is a very important way of hiding
3  data and saying, "Well, it was put in some
4  FDA report," does not in any way undo that
5  hiding.
6  Q. Do doctors obtain information from
7  medical journals?
8  A. Yes.
9  Q. Did Merck hide the results of Study
10 090 from the FDA?
11 A. Probably not.
12 Q. Why do you say probably?
13 A. Well, I -- I would need to go back
14 and see if there was a problem of their
15 misadjudicating outcomes, as they did with
16 ADVANTAGE, which is, as I said a few
17 minutes ago, a form of hiding.
18 Q. Is it true, sir, that the numbers
19 of events in the Study 090 were too small
20 for meaningful comparison?
21       MR. TISI: Objection to the
22 word "meaningful."
23 A. This deals with an issue that came
24 up yesterday and will come up again today,

14 (Pages 482 to 485)

Jerry Avorn, M.D.

Page 486

1  and we can perhaps dispense with it with a
2  quick response.
3      It is always possible to look at
4  one specific result from one study and say
5  it did not meet the significance test of
6  people in '05, and therefore it was
7  somehow not real or not meaningful or not
8  important.
9      What matters is the totality of all
10 of those results, several of which taken
11 in isolation may not meet the test of
12 significance, but when looked in the
13 totality -- which often can be done only
14 by the company if the results are not all
15 in the public domain -- that it becomes an
16 important finding.
17     And so if you look at any one
18 study with one particular outcome and you
19 say, well, the numbers were small, yes, if
20 that's all there was, that would be not a
21 big deal. But it's the totality where it
22 does become a big deal.
23     Q. Is it your view that when you look
24 at Study 090 and also consider the VIGOR

Page 487

1  study, that the number of events in Study
2  090 are then large enough to be meaningful
3  for comparison?
4      MR. TISI: Objection.
5      A. For comparison of what?
6      Q. Well, when you're evaluating the --
7  the potential cardiovascular risk
8  associated with Vioxx, have you written
9  that you believe Study 090 shows an
10 increased cardiovascular risk associated
11 with Vioxx, right?
12     A. Right.
13     Q. And you believe that Study 090
14 replicates the VIGOR study, and that both
15 demonstrate an increased cardiovascular
16 risk associated with Vioxx, right?
17     A. I think that's a bit of a
18 distortion in that, if all that existed in
19 the world were Study 090, I would not
20 conclude from that that this is
21 incontrovertible evidence of the
22 cardiovascular risk of Vioxx.
23     Q. And my question -- I just want to
24 focus on Study 090 and VIGOR. That's all

Page 488

1  I want to talk about. Okay?
2      A. Okay.
3      Q. Is it your view that Study 090
4  replicates the results found in VIGOR?
5      A. I think replicates is not the
6  correct word. But are completely
7  compatible with and -- and further, I
8  guess, demonstrate the results.
9      Q. Do you remember Study 085?
10     A. Yes.
11     Q. I think you mentioned that in your
12 report, right?
13     A. Yes.
14     Q. Did Study 085 demonstrate any
15 increased cardiovascular risk from Vioxx?
16     A. Not to my knowledge.
17     Q. Do you agree, when you look at
18 Study 085 and 090 together you would not
19 conclude that there was an increased
20 cardiovascular risk from Vioxx?
21     A. If one were to pool those two
22 findings, the -- there would not be an
23 impressive signal.
24     Q. Is it true that doctors are

Page 489

1  interested in the tolerability of
2  medications they provide?
3      A. Yes.
4      Q. I said provide.
5          Is it true that doctors are
6  interested in the tolerability of
7  medications that they prescribe?
8      A. Yes.
9      Q. Is it important that patients be
10 able to tolerate medications?
11     A. Yes.
12     Q. If patients can't tolerate
13 medications, then some of them won't be
14 able to treat their disease state, right?
15     A. Correct.
16     Q. You said in your report, and I
17 believe you indicated yesterday, that you
18 think Merck did not provide the results of
19 ADVANTAGE in a timely fashion to the FDA.
20 Is that a fair description?
21     A. If you're quoting my report, please
22 show me where in my report I said it.
23     Q. I'm not quoting. I'm interpreting
24 your report, and tell me if this is fair,

15 (Pages 486 to 489)

Jerry Avorn, M.D.

Page 490

1  okay?
2  A. Well, I'd like to read my own words
3  before I confirm what I said.
4  Q. Well, let me ask you: Do you
5  believe, sir, that Merck did not submit
6  the results of the ADVANTAGE study to the
7  FDA in a timely fashion?
8  A. Yes.
9  Q. Do you know when Merck obtained the
10  final results of the ADVANTAGE study?
11  A. Well, when a company obtains the
12  final results, it's a function of when the
13  company makes it its business to obtain
14  the final results, in that the company was
15  conducting the study, which was in a time
16  frame similar to that of VIGOR, which
17  somehow had its results finalized much
18  quicker than ADVANTAGE.
19  Q. Is it your position, sir, that
20  Merck stalled on attempting to get the
21  results of the ADVANTAGE study?
22  A. I -- I can't know that, but I
23  think it's very important to point out
24  that if a company is conducting a study,

Page 491

1  when it is -- when, quote, the final
2  results come in, closed quote, has a great
3  deal to do with how expeditiously the
4  company does its work.
5  Q. Did the FDA, in any of the
6  materials you reviewed, indicate that they
7  believed Merck did not submit the
8  ADVANTAGE study in a timely fashion?
9  A. I know that FDA wanted the results
10  of the ADVANTAGE study before finalizing
11  its label, and I know that FDA was
12  concerned that it was not getting the
13  results of the ADVANTAGE study when it
14  wanted them. So I guess I believe that
15  that's the case.
16  Q. Do you know, sir, that the FDA had
17  the results of the ADVANTAGE study before
18  approving the language of the April 2002
19  Vioxx label?
20  A. I believe that they eventually got
21  it before April of 2002. But it was
22  completed well, well before that.
23  (Off the record at 9:36
24  a.m.)

Page 492

1  (Recess taken).
2  (Back on the record at 9:38
3  a.m.)
4  BY MR. GOLDMAN:
5  Q. My question, Dr. Avorn, was whether
6  the FDA had the results of the ADVANTAGE
7  study before they approved the language of
8  the April 2002 Vioxx label.
9  A. I believe they did.
10  Q. What is the test for heterogeneity?
11  A. That is a statistical test in which
12  different studies or different groups
13  within a study or the results in different
14  groups are compared with one another to
15  determine if they are significantly
16  different from one another.
17  Q. Is it important that a study
18  satisfy the test for heterogeneity to be
19  able to make meaningful conclusions from
20  it?
21  A. That's also not a quick yes-no. It
22  helps and it's reassuring if there is
23  hetero -- if there is not heterogeneity.
24  Q. Mm-hmm.

Page 493

1  A. But it does not blow away any
2  conclusions if there is.
3  Q. Is the concept of heterogeneity
4  sort of like making sure that you're
5  comparing apples to apples and not apples
6  to bananas?
7  A. Yes.
8  Q. You, I believe, indicate in your
9  report that Merck never told the FDA or
10  the medical community about how Vioxx
11  compared to placebo or other comparators
12  on the endpoint of heart attack or MI.
13  Is that your view?
14  A. Never told who?
15  Q. The FDA or the medical community.
16  A. Well, in the sense that the company
17  eventually gave all of its clinical trial
18  data to FDA and that the FDA eventually
19  readjudicated it as needed and got the
20  data, eventually the FDA received that
21  information.
22  But in terms of its communication
23  to physicians, I think there was selective
24  communication of -- of findings by Merck.

16 (Pages 490 to 493)

Jerry Avorn, M.D.

Page 494

1  Q. Did Merck tell the medical
2  community in any way how Vioxx compared to
3  placebo or other active comparators on the
4  endpoint of MI or heart attack?
5  A. Inaccurately, in my view. And I
6  can explain why.
7      In terms of active comparators,
8  we've discussed the fact that in the main
9  publication, which is probably the single
10 most commonly read paper about Vioxx, the
11 VIGOR study, the company failed to reveal
12 cases of MI that were known to it before
13 the paper was published.
14     In terms of the main tool that the
15 company used to educate, in quotes,
16 physicians about the cardiovascular effects
17 of Vioxx, it selectively presented some
18 studies but not all studies concerning
19 cardiovascular outcomes in its teaching
20 materials.
21     And in its training materials for
22 its sales reps, the famous dodge ball
23 training materials, it presented what seems
24 clearly to be a recipe for minimizing and

Page 495

1  distorting the cardiovascular outcomes of
2  Vioxx.
3      And in relation to its memos to its
4  sales staff about how to discuss various
5  articles that appeared in the literature,
6  whether it was the one from our group or
7  papers that others had produced, those
8  materials also struck me as essentially
9  providing guidance for how to minimize the
10 problem rather than for how to communicate
11 it.
12     So, yes, I would say that Merck
13 failed to provide the medical community
14 with a -- an adequate description of MIs
15 and other cardiovascular outcomes of their
16 drug.
17 Q. Do you remember my question?
18 A. I thought I was responsive, but you
19 can read it back
20 Q. My question was: Is it your
21 position that Merck never told the medical
22 community about how Vioxx compared to
23 placebo or other comparators on the
24 endpoint of MI? You can answer that yes

Page 496

1  or no.
2  A. I think my answer was responsive
3  exactly to that question. And when you
4  say never told, that's kind of an odd
5  phrase. I think their telling was
6  inaccurate and distorted.
7  Q. Why is the dodge ball training
8  materials considered famous to you?
9  A. Because it has received a great
10 deal of attention in the circles that I
11 move in in medical school and in
12 pharmacopeia. It also has received a
13 certain amount of notoriety I think
14 publicly.
15 Q. Do you know, sir, how the dodge
16 ball training game actually worked?
17 A. I know that sales reps were to be
18 awarded points for certain answers, and
19 that the answers -- and if I can just
20 refer to my report -- the answers often
21 were written in a way that seemed designed
22 to obscure the relationship with --
23 between Vioxx and cardiovascular outcomes.
24 Q. Mm-hmm. Am I right, sir, that when

Page 497

1  you are giving that answer, you're
2  providing your personal opinion about what
3  the dodge ball training materials
4  describe --
5      MR. TISI: Objection.
6      BY MR. GOLDMAN:
7  Q. -- right?
8      MR. TISI: Objection.
9  A. No. I'm quoting from Merck's own
10 materials.
11 Q. Have you ever spoken with any sales
12 representative or any individuals at Merck
13 about how the dodge ball training exercise
14 worked?
15 A. No.
16 Q. Did you read any depositions at
17 all, sir, on that topic?
18 A. No. But frankly, the fact that
19 anyone could even have prepared a
20 so-called training program of this kind I
21 found appalling.
22 Q. Is it your position, sir, you're
23 going to tell the jury that the dodge ball
24 materials are being discussed in medical

17 (Pages 494 to 497)

Golkow Litigation Technologies - 877.DEPS.USA

Jerry Avorn, M.D.

Page 498

1  schools and they're being discussed in the
2  medical community?
3     A.  No. The -- Yes. The fact that
4  Merck prepared a training game for its
5  sales reps called dodge ball, which
6  contained material of the kind that I
7  quoted in my report, in conversations with
8  colleagues with an interest in clinical
9  decision making and physician education,
10 many of us were absolutely struck with the
11 -- from reading from the accounts that had
12 made it into the media, that this was a
13 very strange way to educate physicians.
14    Q.  Did the meta-analysis that was
15 prepared by Dr. Shapiro pass the test for
16 heterogeneity?
17    A.  Now, by that do you mean the slide
18 sets that she showed to colleagues at
19 Merck?
20    Q.  What I mean is the materials that
21 you reviewed on the meta-analysis. And I
22 can show it to you if you want.
23         MR. TISI:  I think that
24 would be helpful. Thank you.

Page 499

1         BY MR. GOLDMAN:
2     Q.  While we're looking for it, did you
3  review the --
4     A.  I reviewed Dr. Shapiro's analyses,
5  and we can maybe make things go quicker to
6  say that I would not be surprised if there
7  was heterogeneity across the studies that
8  she looked at.
9         MR. GOLDMAN:  I didn't bring
10 it.
11        MR. TISI:  I have it.  I
12 have it here. Do you want me to pull it?
13    A.  But if we want to agree that there
14 was probably heterogeneity, we can agree
15 on that.
16        MR. TISI:  I mean, do you
17 want me to pull it?
18        BY MR. GOLDMAN:
19    Q.  I just wanted to know whether or
20 not your view is that the study passed the
21 test for heterogeneity.
22    A.  And my understanding was that there
23 was heterogeneity.
24    Q.  Okay.  Let's talk about the

Page 500

1  Alzheimer's trials, okay?
2     A.  Okay.
3     Q.  Do you agree that there was no
4  statistically significant difference in
5  heart attacks in the Alzheimer's trials
6  between Vioxx and placebo?
7     A.  (Witness viewing document).  No.
8     Q.  What's your basis for that?
9     A.  That the ascertainment, as I
10 indicated in my report, of heart attack in
11 elderly people, particularly elderly people
12 with dementia, is very difficult.
13        Even in elderly people without
14 dementia, we know that about a quarter of
15 heart attacks are not symptomatic. So any
16 conclusions about the rate of heart
17 attacks that is not based on a fairly
18 active surveillance mechanism, but rely on
19 kind of spontaneous report of heart
20 attacks but do not have a component of the
21 study designed to determine who had a
22 heart attack and who didn't proactively,
23 is of minimal reliability.
24    Q.  Have you described your bases for

Page 501

1  saying that there is a statistically
2  significant difference in heart attacks in
3  the Alzheimer's trials between Vioxx and
4  placebo?
5     A.  I didn't say that there was.
6     Q.  Yes, you did.
7     A.  Can you read back the question?
8     Q.  My question was:  Do you agree that
9  there was no statistically significant
10 difference in heart attacks in the
11 Alzheimer's trials been Vioxx and placebo?
12    A.  Right. And the reason that I said
13 I didn't agree is that I don't know from
14 the data available whether there was or
15 wasn't a difference in heart attack rates.
16    Q.  Do you know that the peer reviewed
17 published article on the Alzheimer's trial
18 -- let's start with 078 -- demonstrated no
19 statistically significant difference in
20 heart attacks?
21    A.  As I was recall, there was some
22 very major methodological problems with
23 that article. And the fact that something
24 makes it into a peer review journal is not

18 (Pages 498 to 501)

Jerry Avorn, M.D.

Page 502

1  in and of itself a guarantee that they got
2  it right.
3       There was problems, as I recall,
4  with the analysis in terms of whether it
5  was intentioned to treat or not in the
6  follow-up of patients. And we could go
7  over that paper in particular.
8       So they did not -- and as I also
9  recalled, there was a paper that was
10 written either mostly or predominantly by
11 Merck scientists, and it did not seem to
12 me to be a compelling representation of
13 the findings in that study.
14 Q.  Do you think because there were
15 Merck scientists on a paper about
16 Alzheimer's that that calls into question,
17 in your mind, the reliability of the study
18 and the way it's presented?
19 A.  Not in and of itself.
20 Q.  Okay. Did you see, sir, in the
21 materials that the FDA believed that there
22 was no statistically significant difference
23 in heart attacks in the Alzheimer's
24 trials?

Page 503

1  A.  Yes.
2  Q.  And you take issue with the FDA's
3  judgment on that?
4  A.  Well, I think FDA -- saying that a
5  study failed to find a difference does not
6  mean to -- does not mean the same thing
7  as there was no -- there was no
8  difference.
9  Q.  Do you dispute the FDA's conclusion
10 that there was no difference in -- in
11 heart attacks in the Alzheimer's trials
12 between Vioxx and placebo?
13 A.  Yes, I do, for the following
14 reason.
15 Q.  Actually, just say yes, you do.
16 Okay?
17 A.  Yes, I do.
18 Q.  Do you believe that there was a
19 statistically significant difference for
20 heart attacks and strokes combined in the
21 Alzheimer's trials between Vioxx and
22 placebo?
23 A.  What I believe is that there was a
24 doubling of mortality and that that raises

Page 504

1  the likelihood that there was an important
2  risk in one group and not in the other.
3       I can't speak to what that risk
4  was, whether it was stroke or heart attack
5  or both.
6  Q.  Before you were retained as an
7  expert witness, sir, did you ever say
8  anywhere that you thought that the
9  mortality question in Alzheimer's raised a
10 question about whether Vioxx caused
11 cardiovascular events in the Alzheimer's
12 trials?
13 A.  I'd never seen data on mortality.
14 Q.  And the data that you're relying on
15 is data from Dr. Ray, who is quoting Dr.
16 Kronmal?
17 A.  No. I believe that there also are
18 other sources of data on the eventually
19 reported mortality difference in that --
20 in those studies.
21 Q.  What are you relying on for your
22 opinion that there was an increase in
23 mortality between Vioxx and placebo in the
24 Alzheimer's trials, sir?

Page 505

1  A.  I honestly can't remember what the
2  source was, but I believe that they were
3  sources apart from Dr. Ray and Dr. Kronmal
4  in the reporting of the mortality data
5  from the Alzheimer's studies. And I
6  simply can't remember where I got that
7  from.
8  Q.  And you don't refer to that in your
9  report anywhere, do you, sir?
10      MR. TISI: Objection.
11 A.  I thought I did. Let me take a
12 look.
13      MR. TISI: Yeah.
14 A.  (Witness viewing document).
15      MR. TISI: What page do we
16 have that discussion on? I'm sorry. Oh,
17 here it is.
18      MR. GOLDMAN: Fifteen.
19      MR. TISI: Sixteen,
20 actually.
21      MR. GOLDMAN: Yeah, top.
22      MR. TISI: I think it's
23 Page .16. Can I help -- I can find where
24 he's -- It goes 15 to 16.

19 (Pages 502 to 505)

Jerry Avorn, M.D.

Page 506

1  A. (Witness viewing document). Okay.
2  Sure. Thank you. Yes. Here it is.
3  Yeah. It definitely is here. On the top
4  of Page 16.
5  Q. Mm-hmm.
6  A. "Of greatest concern, the mortality
7  rate of subjects given Vioxx in Merck's
8  Alzheimer's studies was double that seen
9  in subjects randomized to placebo. Having
10 practiced and taught geriatrics for many
11 years, I'm aware that ascertainment of and
12 causes of death in an elderly
13 patient's --"
14       (Reporter interruption).
15       MR. TISI: Actually, I think
16 he's got a different question. He just
17 wants to know what you rely on.
18 A. I got it. Right. Okay.
19 Q. My question -- My question --
20 A. Yeah.
21 Q. -- Dr. Avorn, is whether in your
22 report you cite the actual source of the
23 data that you're relying on for the
24 proposition that there was an increase in

Page 507

1  mortality in the Alzheimer's trials between
2  Vioxx and placebo?
3  A. Okay. Let me refer to the tabs
4  that I have indicated here to see, because
5  I'm fairly certain that it was not
6  exclusively via Dr. Ray's report.
7  Q. Okay.
8  A. And I'll just take a moment to do
9  that.
10       MR. TISI: I have a portion
11 of the binders here, if you need.
12       THE WITNESS: Okay.
13       MR. TISI: Which ones do
14 you need?
15       THE WITNESS: Okay. Now,
16 this -- This one doesn't have -- okay.
17 That's old 110 and 109. Okay.
18       MR. TISI: That's --
19       MR. GOLDMAN: Just let him
20 find it.
21       MR. TISI: I'm sorry?
22       MR. GOLDMAN: I said just
23 let him find it.
24       (Off the record at 9:55

Page 508

1  a.m.)
2       (Recess taken).
3       (Back on the record at 9:56
4  a.m.)
5       BY MR. GOLDMAN:
6  Q. In your report, sir, you have
7  handwritten some tab numbers that you say
8  you're now looking for.
9       What are the tab numbers in your
10 binders that you are looking at to find
11 the support for the mortality information?
12 A. Okay. The first one is Tab 35 --
13 Q. Okay.
14 A. -- which is a memo to Dr. Scolnick
15 from Dr. Block.
16 Q. Okay.
17 A. And the second one is Tab 68, which
18 is a Merck document called Deaths in
19 Studies 078, 091 and 126.
20      The third is a -- is Tab 69, a
21 memo from Joshua Chen to Dr. Bain called
22 Mortality Analysis for Protocol 091 and
23 078.
24 Q. You can just tell me the tab

Page 509

1  numbers.
2  A. Well, before I tell you them, I
3  want to make sure that they are what I'm
4  thinking of. And to do that I've got to
5  -- It's not that one.
6       THE WITNESS: Do we have
7  more binders?
8       MR. TISI: I have one right
9  here. That's why I was --
10      THE WITNESS: Okay.
11      MR. TISI: It's right here,
12 Doctor.
13      THE WITNESS: Okay.
14 A. Okay. Another is Tab 133.
15 Q. Mm-hmm.
16 A. A memo to Ray Bain from Josh Chen.
17 Q. Mm-hmm.
18 A. That is called Summary of the
19 Mortality Analysis. Another is Tab 147
20 from Dr. Chen to Dr. Bain, similar title.
21 And the last is Tab 146, which is the
22 12/18/04 Interim Review on Cardiovascular
23 Thrombotic Events in Alzheimer's Studies.
24 This looks like an FDA document.

20 (Pages 506 to 509)

Jerry Avorn, M.D.

Page 510

1  Q.  Is that the list of numbers that
2  you've indicated on your --
3  A.  Yes.
4  Q.  -- report?
5       I also want to mark as the next
6  exhibit, Doctor, the expert report you're
7  looking at with the tabs written next to
8  it.  Okay?
9  A.  Sure.  Sure.
10      MR. GOLDMAN:  Let me mark
11 that as 14.
12      MR. TISI:  The only thing
13 is I would like to make a copy, so he can
14 leave with it.
15      MR. GOLDMAN:  That's fine.
16      MR. TISI:  Then you can
17 mark the original report if you'd like.
18      MR. GOLDMAN:  Okay.
19      MR. TISI:  Doctor, can I
20 have your report --
21      THE WITNESS:  Sure.
22      MR. TISI:  -- so I can put
23 a sticker on it, please?
24      (Exhibit-14, Expert Report

Page 511

1  of Jerry Avorn, M.D., dated March 20,
2  2006, marked for identification).
3       BY MR. GOLDMAN:
4  Q.  Dr. Avorn, is it your testimony
5  that you reviewed all of the information
6  that was behind the tabs that you just
7  referred to?
8  A.  Absolutely.
9  Q.  The -- We're going to talk about
10 all-cause mortality in a minute --
11      MR. TISI:  Could we go off
12 the record for one second?
13      MR. GOLDMAN:  Sure.
14      (Off the record at 9:59
15 a.m.)
16      (Recess taken).
17      (Back on the record at 10:00
18 a.m.)
19      BY MR. GOLDMAN:
20 Q.  What's your definition of an ITT
21 analysis, sir?
22 A.  Intention-to-treat, which means that
23 all patients in a study are followed up on
24 regardless of whether they drop out of a

Page 512

1  given treatment group.
2  Q.  Is data better and more reliable
3  the longer you follow people in a
4  particular study?
5  A.  It depends.
6  Q.  Sometimes the data is more
7  reliable, sometimes it's less reliable,
8  depending on how long you study the
9  patients, right?
10 A.  Correct.
11      MR. TISI:  Objection.
12      MR. GOLDMAN:  Mm-hmm.
13      MR. TISI:  Go ahead.
14      BY MR. GOLDMAN:
15 Q.  Do you agree, sir, that on-therapy
16 experience may be more appropriate when
17 analyzing data on the side effects of
18 therapy?
19 A.  Not necessarily.
20 Q.  Well, when is on-therapy experience
21 more appropriate when analyzing side
22 effects of drug therapy?
23 A.  Well, if the side effect is
24 instantaneous, like anaphylaxis, then an

Page 513

1  on-therapy design would be plausible.
2       If the side effect is one that may
3  occur with some delay, even after a drug
4  is stopped, particularly if it might occur
5  more than 14 days after the drug is
6  stopped, then one could definitely miss
7  important adverse events if you stopped
8  considering patients within 14 days of
9  stopping.
10      And there's another important
11 point, and that is that an on-therapy
12 analysis drops out patients who stop
13 therapy, and if they stop therapy because
14 of a side effect, which perhaps may not be
15 documented or detected within 14 days, you
16 lose ascertainment of that side effect if
17 you stop considering that patient once
18 they're off therapy.
19 Q.  Is it your opinion, sir, in Merck's
20 analysis of the Alzheimer's data that
21 Merck did not count patients who stopped
22 the study because of a side effect?
23      MR. TISI:  What analysis,
24 Counsel?

Jerry Avorn, M.D.

Page 514

1  A. In --
2  Q. Do you know what I'm talking about?
3  A. I do. And I know that Merck did
4  it several different ways, so they were
5  intention-to-treat analyses, and there were
6  on-therapy analyses, both.
7  Q. Is it your testimony that Merck did
8  not include, in the analyses that were
9  done on the Alzheimer's trials, adverse
10 events that occurred when people stopped
11 using Vioxx in the clinical trials?
12 A. All right.
13     MR. TISI: Objection.
14 A. Let me answer that again. Merck
15 performed analyses on an intention-to-treat
16 basis as well as on an on-therapy basis.
17 Q. Fine.
18 A. If your question is about did they
19 miss side effects in their on-therapy or
20 on-treatment analysis, the important point
21 here, which is a subtle one, but very,
22 very important, is that if a patient has
23 an adverse event, let's say, on March 1st,
24 and perhaps is not identified as a heart

Page 515

1  attack or -- or anything, but simply feels
2  sick, doesn't show up anymore for the
3  study, doesn't take the drug, and then you
4  stop counting any events in that patient
5  two weeks later after they've dropped out
6  of the study, if the adverse event is not
7  ascertained accurately in those two weeks,
8  that adverse event will not be counted.
9  Q. Is it important when you are
10 determining, not after the fact, but when
11 you're planning a study, is it important
12 to think about what are the possible
13 biologic mechanisms that could lead to
14 side effects down the road with a
15 particular medicine?
16 A. That is one important step.
17 Q. It's important -- Before you just
18 say that everybody should be looking at
19 all the data through the year after a
20 particular study, that there be some
21 mechanism that somebody -- not after the
22 fact -- but at the time -- anticipates
23 might cause heart attacks or strokes after
24 people stop using Vioxx, true?

Page 516

1  A. And the -- the first part of the
2  question is, is it important?
3  Q. You would agree, sir, that before
4  concluding that Merck should have analyzed
5  all of the data and planned to do that in
6  advance of the trials through 210 weeks,
7  let's say, after a particular study ended,
8  it would be important to think about
9  whether there was a biologic mechanism
10 that might cause patients to suffer side
11 effects after they're done taking Vioxx,
12 right?
13 A. Would it be important -- I'm trying
14 to get back to the beginning of the
15 sentence.
16 Q. To you. To you.
17 A. Would it be important to consider
18 whether there is a mechanism in place?
19 Q. Yes.
20 A. That would be an important thing to
21 take into account.
22 Q. And the mechanism that everybody is
23 talking about, about how Vioxx could
24 potentially cause heart attacks, involved

Page 517

1  this imbalance between prostacyclin and
2  thromboxane, true?
3     MR. TISI: Objection.
4  A. I think that your continuously
5  referring back to that is a kind of
6  reductionist approach that oversimplifies
7  the issues.
8  Q. Have you ever, in any of your
9  articles, sir, said that Vioxx can cause
10 heart attacks by a mechanism other than by
11 reducing prostacyclin and create an
12 imbalance?
13 A. I've not -- I don't write about
14 mechanisms.
15 Q. So the answer is no?
16 A. Right.
17 Q. Okay. If Merck didn't have a
18 reason to think that these patients in
19 their studies would suffer a side effect
20 more than 14 days after stopping the
21 medicine, would you agree that it would be
22 appropriate to stop analyzing the data at
23 14 days after the study? Just -- Let's
24 assume that my premise is correct.

22 (Pages 514 to 517)

Jerry Avorn, M.D.

Page 518

1  A. Mm-hmm.
2  Q. Is my conclusion accurate?
3  A. In a population of elderly people,
4  I believe that the issues are different,
5  because we know that problems may be
6  underascertained, and their consequences
7  may become clearer or evident more than
8  two weeks after a drug is stopped.
9      So I would say that both an
10 on-treatment and an intention-to-treatment
11 analysis would be appropriate in that
12 setting, particularly in demented elderly
13 patients in whom ascertainment of side
14 effects may not be evident within two
15 weeks.
16     So I'm not saying it's
17 inappropriate to have considered an
18 on-treatment analysis, but I would also
19 have said that if one does that, one
20 should also consider an intention-to-treat
21 analysis.
22 Q. Did the FDA know what the plan was
23 before the Alzheimer's trials in terms of
24 analyzing the side effects?

Page 519

1  A. I believe they did.
2  Q. The FDA was aware that the plan
3  going into the Alzheimer's trials was to
4  look at adverse events that occurred on
5  therapy through 14 days after the study
6  ended, right?
7  A. Right.
8      MR. TISI: Objection as to
9  incomplete.
10     BY MR. GOLDMAN:
11 Q. Do you know, Dr. Avorn, whether in
12 any of the other NSAIDs that are on the
13 market, there have been clinical trials
14 where adverse events have been studied for
15 a year after a particular study ends?
16 A. I believe that in the Celebrex
17 colon polyps studies, there are ongoing
18 studies, as there was with APPROVe.
19 Q. Anything else?
20 A. Not to my knowledge.
21 Q. Do you know in the Alzheimer's
22 trials whether Vioxx patients were followed
23 for a longer period of time after they
24 stopped using the medicine than the

Page 520

1  patients in the placebo arm were followed?
2  A. I don't know.
3  Q. Do you know whether there was a
4  difference in the number of Vioxx patients
5  who were followed after the Alzheimer's
6  trials ended compared to the placebo
7  patients?
8  A. There should not have been, because
9  they were supposed to be double-blind
10 studies.
11 Q. Do you agree, sir, that during the
12 off-drug period in the Alzheimer's trial
13 there was no statistically significant
14 difference in heart attacks or thrombotic
15 cardiovascular events between Vioxx and
16 placebo?
17     MR. TISI: Objection,
18 misstates.
19 A. I believe that's the case, but for
20 -- my concern is what I stated earlier,
21 which is ascertainment of a heart attack
22 in a demented elderly patient is very
23 problematic.
24 Q. Well, you would agree, sir, there's

Page 521

1  no reason to think that demented elderly
2  patients would be more likely to miss a
3  heart attack in the Vioxx arm than they
4  would be in the placebo arm, true?
5  A. That's an incorrect question,
6  because --
7  Q. I'm not asking you to correct my
8  question. Can you just say whether or not
9  that's true, or not?
10 A. Only if I get to explain why that's
11 an incorrect question. It is -- There
12 would be no reason to think that, except
13 that under-ascertainment of outcomes will
14 always drive the results toward the known.
15 Q. Is it true that during the off-drug
16 period in the Alzheimer's trials there was
17 no statistically significant difference in
18 heart attacks or thrombotic cardiovascular
19 events?
20 A. I think we just answered that.
21 Q. Yes; that's true?
22 A. I've lost track of who's asking and
23 who's answering. I believe that that's
24 the case.

23 (Pages 518 to 521)

Jerry Avorn, M.D.

Page 522

1  Q. You made a statement in the last
2  sentence on Page 15 that Merck did not
3  provide a complete and accurate account of
4  study outcomes to the FDA --
5       MR. TISI: I'm sorry. What
6  page?
7       BY MR. GOLDMAN:
8  Q. -- concerning the Alzheimer's
9  trials --
10      THE WITNESS: Fifteen.
11      BY MR. GOLDMAN:
12 Q. -- until Vioxx was off the market.
13 Do you see the last sentence?
14 A. (Witness viewing document). Yes.
15 Q. "To my knowledge, Merck did not
16 provide a complete and accurate account of
17 these study outcomes to the FDA until
18 after the drug had been taken off the
19 market." Is that your testimony?
20 A. That is my understanding. And if
21 there is such an account, I would be
22 pleased to review it.
23 Q. What is the primary analysis that
24 was prespecified in the Alzheimer's trials

Page 523

1  concerning the time period when -- when
2  patients would be studied?
3  A. On-treatment, up to 14 days after
4  they stopped treatment.
5  Q. Did Merck provide that analysis to
6  the FDA before the drug was withdrawn?
7  A. I believe they did.
8  Q. Did Merck give the FDA all of the
9  information that would allow the FDA to
10 perform any intention-to-treat analysis
11 they wanted for the Alzheimer's trials?
12 A. I don't know whether FDA provided
13 them with the raw data needed for that.
14      MR. TISI: You meant Merck,
15 I assume? Merck provided FDA?
16 A. Right. That's what I meant.
17 Q. You say that, "Mortality is of
18 greatest concern when analyzing the
19 Alzheimer's trials." Is that your view?
20 A. Yes.
21 Q. Now, the mortality that you are
22 referring to includes deaths that occurred
23 off drug, right?
24 A. Any mortality, on or off.

Page 524

1  Q. And did you make any effort at all
2  to determine the cause of the deaths that
3  occurred in patients who had stopped using
4  Vioxx?
5  A. This is an important -- Yeah. Yes.
6  Q. Okay. That's all I want to know.
7  A. Yes.
8  Q. Of the deaths, sir, that occurred
9  in the -- let's say the 078 study, how
10 many occurred more than 48 weeks or 300 --
11 after 300 days after patients stopped
12 using Vioxx?
13 A. I don't recall that number.
14 Q. Do you know what the number is for
15 placebo?
16 A. No.
17 Q. Do you think it would be important
18 before you blame Vioxx for all of the
19 deaths that occurred in its Vioxx arm
20 after the end of the Alzheimer's trial to
21 take a look to see what the nature of
22 those deaths were?
23      MR. TISI: Objection to
24 after the end of the study. Intention to

Page 525

1  treat is while the study is ongoing. But
2  go ahead.
3  A. The correct answer is yes, I know.
4  And I need to explain why.
5  Q. Okay.
6  A. And this -- this relates to my work
7  in geriatric pharmacology and geriatrics.
8  Q. Mm-hmm.
9  A. The cause of death in an older
10 patient, as I indicate in my report, is
11 often very tough to determine. If an
12 older person has a stroke, perhaps, in
13 their sleep, they may aspirate their
14 stomach contents as a result of the
15 stroke. It goes into the lungs, and the
16 next day they are discovered to have
17 pneumonia. That will then be diagnosed as
18 pneumonia, and there may or may not be --
19 or if they have a heart attack and have a
20 transient period of unconsciousness or low
21 blood pressure, they may aspirate and
22 develop a pneumonia.
23      We've reported on -- on this kind
24 of issue in a paper in the New England

24 (Pages 522 to 525)

Jerry Avorn, M.D.

Page 526

1  Journal in December of last year in which
2  we looked at deaths related to a different
3  class of drugs. The important point, if I
4  may finish --
5      Q. Mm-hmm.
6      A. -- is that because heart attacks
7  and strokes may occur unobserved in an
8  elderly patient and do -- we know they do
9  not present typically as they do in middle
10 aged patients, the so-called terminal event
11 may be recorded as a pneumonia or sudden
12 death or any number of things.
13     Q. Mm-hmm.
14     A. So that death is a very, very
15 important outcome, even if the supposed
16 cause of death is gotten wrong. Because
17 one thing you tend to not get wrong in
18 these patients is whether they're dead or
19 not.
20     Q. Is there a statistically
21 significant difference in all-cause
22 mortality in the Alzheimer's trials if you
23 look at just the on-drug period when
24 patients were taking the medicine?

Page 527

1      A. I believe there is not.
2      Q. Are you aware of any other Vioxx
3  clinical trial, sir, other than the 078
4  Alzheimer's trial, that showed a
5  statistically significant difference in
6  all-cause mortality?
7      A. Okay.
8         (Witness viewing documents).
9  There's protocol 091 --
10     Q. Mm-hmm.
11     A. -- as per Tab 35, in which Drs.
12 Block and Reines, R-E-I-N-E-S, report a
13 statistically significant, almost fivefold
14 increase in the death rate in patients in
15 that Alzheimer's study using an
16 intention-to-treat analysis. And that's
17 from a Merck internal document dated March
18 21st, 2001.
19     Q. Other than Study 078 and 091 in the
20 Alzheimer's trials, do you know, sir,
21 whether or not there was an increased
22 statistically significant difference --
23 Withdrawn.
24        Other than Study 078 and 091 in the

Page 528

1  Alzheimer's trials that was analyzed under
2  this ITT analysis, are you aware of any
3  other Vioxx clinical trial where there was
4  an increase in all-cause mortality in the
5  Vioxx arm?
6      A. Okay. Let me just continue to look
7  through these, because I obviously don't
8  keep all these in my head.
9         (Witness viewing document).
10     Q. Why don't I do this, Dr. Avorn --
11     A. Yes.
12     Q. Because it's going to take too long
13 for you to look through all of them.
14     A. Okay.
15     Q. Do you, in your expert report,
16 indicate, sir, the names or descriptions
17 of any other Vioxx clinical trial that
18 showed an increase in all-cause mortality
19 in the Vioxx arm?
20     A. I think that's quite different from
21 what you just asked me.
22     Q. It is different. Can you answer
23 the question I just asked?
24     A. Okay. Do I indicate study numbers

Page 529

1  in my report?
2      Q. Do you indicate anywhere in your
3  expert report any studies, other than the
4  Alzheimer's studies, where you claim there
5  was an increase in mortality between Vioxx
6  and a comparator?
7      A. Where do I make that claim? I'm
8  asking for information about what your
9  question relates to.
10     Q. Sir --
11     A. You said I claim all-cause
12 mortality --
13        MR. TISI: I think you're
14 just not --
15        BY MR. GOLDMAN:
16     Q. Do you indicate anywhere in your
17 report --
18     A. Right.
19     Q. -- whether or not a study other
20 than Alzheimer's --
21     A. Right.
22     Q. -- for the Vioxx drug reflects an
23 increased risk of mortality between Vioxx
24 and a comparator?

25 (Pages 526 to 529)

Jerry Avorn, M.D.

Page 530

1  A. No.
2  Q. Was there a statistically
3  significant increase in all-cause mortality
4  across all the Vioxx studies when you look
5  at them together?
6  A. I've never done so. I've never
7  looked at all Vioxx studies together.
8  Again --
9       MR. TISI: Can I just ask a
10 clarification? Are you talking about on
11 drug or ITT or both? Because I just get
12 the impression that perhaps you and he may
13 be thinking of something different, but...
14 A. I've never had occasion to
15 amalgamate all Vioxx studies and look at
16 all-cause mortality in all studies.
17      MR. TISI: Okay.
18      BY MR. GOLDMAN:
19 Q. Do you know what the relative risk
20 of all-cause mortality was in the APPROVe
21 study when you look through 14 days after
22 the study ended?
23 A. Not off the top of my head. But I
24 do recall it as having been elevated.

Page 531

1  Q. In fact, you're aware, sir, that
2  there was no increase in mortality in the
3  APPROVe study between Vioxx and placebo,
4  true?
5  A. That's my understanding.
6  Q. Are you aware of any peer-reviewed
7  literature that analyzes the Alzheimer's
8  trials by looking at all-cause mortality?
9  A. I'm aware of the reports of the
10 Alzheimer's studies as they appeared in
11 the literature, but I'm not aware that the
12 people who wrote them up presented
13 all-cause mortality in any papers.
14 Q. So it's true that you're not aware
15 of any peer review article that analyzes
16 the Vioxx Alzheimer's trials by looking at
17 all-cause mortality?
18 A. Right.
19 Q. Before the withdrawal of Vioxx,
20 sir, wasn't the FDA aware of the deaths
21 that occurred in the Alzheimer's trials?
22      MR. TISI: Objection;
23 misleading.
24 A. I cannot speak to what FDA was or

Page 532

1  wasn't aware of.
2  Q. Did you ever read the FDA's
3  analysis of the Alzheimer's data in
4  December of 2004?
5  A. I was -- I had just in front of me
6  a minute ago what appeared to be an FDA
7  analysis of that.
8  Q. I just want to know if you read
9  it.
10 A. I just want to make sure we're
11 talking about the same thing.
12 Q. Okay.
13 A. There's a December of '04, Dr.
14 Villalba, December 18th interim review.
15 Is that what you're referring to?
16 Q. Yes. Did you review that?
17 A. Yes.
18 Q. Okay. You were sent the APPROVe
19 extension data, were you not?
20 A. Yes.
21 Q. When did you review that, sir?
22 A. Oh, very recently. It only became
23 available, I think, in May, just last
24 month, and I reviewed it when it was sent

Page 533

1  in just the last few weeks.
2  Q. How much time have you spent
3  reviewing the extension data in the
4  APPROVe study?
5  A. Not very much, because I think it
6  arrived while I was in Australia. And I
7  looked at it when I was on vacation, but
8  not for hours and hours.
9  Q. Did you spend more than an hour
10 looking at the extension data from the
11 APPROVe study?
12 A. I believe I did, because I had been
13 previously sent it by a reporter who
14 wanted my -- my impressions of it as well.
15 So I looked at it before I left town as
16 well as from abroad.
17 Q. What did the reporter send you?
18 A. It was information that I think
19 Merck had issued about -- about the
20 APPROVe extension study and its press
21 release, and then there was a concern
22 about whether the press release was
23 accurate.
24      And I think there -- And I can't

26 (Pages 530 to 533)

Jerry Avorn, M.D.

Page 534

1  remember which source I saw this from, but
2  there was also some backup data, which I
3  -- Yeah, I think Merck issued, actually.
4  Merck had a press release, but also issued
5  -- also made available some data as well.
6      Q. Did you review the data that Merck
7  made available about the extension for the
8  APPROVe study before the plaintiffs'
9  lawyers sent you the extension data?
10     A. I think I did, at the request of
11 the reporter, yes.
12     Q. You don't know what you reviewed
13 that the reporter sent you, true?
14     A. Well, no. I recall pretty clearly
15 that it was what Merck had put out on its
16 Web site.
17     Q. Okay. Where is that? Do you
18 still have the information that the
19 reporter sent you?
20     A. I actually looked at it on line.
21 But I can tell you that it was that which
22 was on the Merck Web site.
23     Q. Okay.
24     A. Which, actually I would have

Page 535

1  probably looked at anyway, because it was
2  of interest.
3      Q. Did you analyze the data in the
4  APPROVe study past 210 weeks?
5      A. Was there such -- I'm trying -- I
6  don't recall whether there was any data
7  past 210 weeks.
8      Q. If there was, you didn't review it
9  and analyze it, right?
10     A. I can't --
11        MR. TISI: Can we put the
12 document in front of him? That's the best
13 thing to do.
14     A. Yeah. I -- I can't say yes or no
15 to which week's worth of data I reviewed.
16 I remember there were several cut points.
17 I remember 210 was one of them. If there
18 was data beyond 210, we can look at it
19 and I can tell you --
20        MR. TISI: I mean, if
21 you're going to ask him a question, I'm
22 going to insist that you put it in front
23 of him.
24     ///

Page 536

1        BY MR. GOLDMAN:
2      Q. Do you agree, sir, that there's no
3  evidence of an elevated cardiovascular risk
4  after patients stop taking Vioxx in the
5  APPROVe study?
6        MR. TISI: I'm going to
7  insist that you give him the document,
8  Counsel. I really am.
9        BY MR. GOLDMAN:
10     Q. If you need to look at the
11 document, go ahead.
12     A. I can tell you --
13        MR. TISI: No, no, no.
14 He's not going to. I've allowed you to
15 do this a lot, and I know we're --
16        (Whereupon, all parties
17 speaking at the same time).
18        BY MR. GOLDMAN:
19     Q. Dr. Avorn, if you need to look at
20 the document, fine.
21     A. I will look at it, but without
22 looking at it, having reviewed it
23 previously, I can tell you that there was
24 a statistically significant P.01 or P.02

Page 537

1  increase in stroke post-cessation of Vioxx,
2  and that that is a kind of cardiovascular
3  morbidity.
4      Q. If you look at strokes and heart
5  attacks together, sir, you remember that
6  there was no evidence of an elevated
7  cardiovascular risk in patients who had
8  stopped taking Vioxx in the APPROVe study,
9  right?
10     A. I recall that it was not
11 statistically significant, but I'd want to
12 look at the numbers before going beyond
13 that.
14     Q. Do you know, sir, whether there was
15 any increased risk of Vioxx for heart
16 attacks and sudden cardiac death in the
17 APPROVe study when you look at patients
18 off drug?
19        MR. TISI: Again, I object
20 without the document in front of him.
21        BY MR. GOLDMAN:
22     Q. Do you know?
23     A. I recall that the significant
24 findings dealt with stroke, and I don't

27 (Pages 534 to 537)

Jerry Avorn, M.D.

Page 538

1  recall other significant findings off drug.
2  Q. Do you remember, sir, that when you
3  look at the off-drug data for the APPROVe
4  study in connection with the on-drug data
5  in the APPROVe study, that the relative
6  risk for heart attacks actually goes down?
7  A. As I recall, that was one of the
8  more deceptive ways that the Merck press
9  release presented -- that if you combine
10 the not taking the drug with the taking
11 the drug, there is less of a risk, if you
12 add the off-drug experience. But that's
13 not surprising or important.
14 Q. You can just tell me, sir, whether,
15 based on your analysis, you're aware that
16 the relative risk for heart attacks goes
17 down when you combine the on-drug data in
18 the APPROVe with the off-drug data?
19 A. That's my recollection.
20 Q. You've seen the KM curve in the
21 APPROVe study, haven't you?
22 A. Yes.
23 Q. What does the KM curve in the
24 APPROVe study reflect about when the

Page 539

1  difference in cardiovascular events -- I
2  should say confirmed APTC events --
3  becomes statistically significant?
4  A. That's been very controversial.
5  Q. I'm only talking right now about
6  the KM curve.
7  A. Right. Merck contended, I think
8  erroneously, that there's no risk until 18
9  months. And I think that's an incorrect
10 assessment, as do most other people whose
11 opinions I respect.
12      There's been some controversy
13 recently as to whether Merck performed the
14 statistics correctly in terms of the log
15 of time versus the actual time as a
16 variable.
17      But I do not believe that the
18 contention that there is no risk prior to
19 18 months is substantiated by that data.
20 Q. If you just look at the APPROVe KM
21 curve, do you agree that looking at just
22 the curve --
23      MR. TISI: The -- Which
24 curve --

Page 540

1      BY MR. GOLDMAN:
2  Q. -- the difference in --
3      MR. TISI: Which curve are
4  you talking about?
5      BY MR. GOLDMAN:
6  Q. -- confirmed APTC events?
7      MR. TISI: Okay. No other
8  curves.
9      BY MR. GOLDMAN:
10 Q. You agree that the difference in
11 those events does not become statistically
12 significant until 36 months?
13 A. That's an impossible question
14 because you can't determine statistical
15 significance by looking at a curve.
16 Q. Okay. You haven't done any
17 research to determine whether or not using
18 a statistical method involving log of time
19 versus the actual time as a variable was
20 appropriate, right?
21 A. Right.
22 Q. And you don't know because you're
23 not a statistician -- Well, withdrawn.
24      I need to be more specific, because

Page 541

1  I wasn't referring to studies. Okay?
2  A. Okay.
3  Q. You haven't done any research, Dr.
4  Avorn, to determine whether or not the
5  statistical method that was used in the
6  APPROVe study concerning log of time
7  versus actual time as a variable was
8  appropriate, right?
9  A. That's correct.
10 Q. And when you said before that
11 there's a controversy about whether or not
12 Merck used the appropriate variable, you're
13 basing that on what you've read in the
14 newspaper and heard in the media --
15      MR. TISI: Objection.
16      BY MR. GOLDMAN:
17 Q. -- true?
18 A. No. In conversation with
19 colleagues, including biostatisticians and
20 epidemiologists.
21 Q. Okay. The -- Let me just briefly
22 ask you, sir, about Study 136, which you
23 refer to in your report.
24 A. Can you show me where I refer to

Jerry Avorn, M.D.

Page 542

1  it?
2  Q. Yes. Page 17 at the top.
3  A. (Witness viewing document). Yes.
4  Q. Was there a statistically
5  significant difference in thrombotic events
6  between Vioxx and placebo in Study 136?
7  A. Let me just pull it out here.
8      (Witness viewing documents).
9      MR. TISI: Would you repeat
10 the question?
11     MR. GOLDMAN: Yes.
12     BY MR. GOLDMAN:
13 Q. Do you know, sir, that there was no
14 statistically significant difference in
15 thrombotic events between Vioxx and placebo
16 in Study 136?
17 A. (Witness viewing document).
18     MR. TISI: While he's
19 looking at that, I hate to do this, I've
20 got to make a quick phone call about my
21 flight.
22     (Off the record at 10:30
23 a.m.)
24     (Discussion off the record).

Page 543

1      (Back on the record at 10:35
2  a.m.)
3  A. That was a twelve-week study that
4  was designed to ask a totally different
5  question about the rate of ulcer
6  development, and so I would not even have
7  looked for that outcome.
8  Q. Do you know, sir, one way or the
9  other, whether there was a statistically
10 significant difference in thrombotic events
11 between Vioxx and placebo in Study 136?
12 A. I didn't even know that they looked
13 at that outcome. And if they had, I
14 would not have been interested, because it
15 was a different question being asked.
16 Q. So the answer is you don't know?
17 A. Right. I -- I would not expect
18 that there would be. I don't know.
19 Q. Do you take the position that Merck
20 delayed submitting the results of Study
21 136 to the FDA?
22 A. (Witness viewing document). My
23 understanding -- and I'm pleased to be
24 corrected if I got this wrong -- that the

Page 544

1  results of that study were not submitted
2  to the FDA until after the label was
3  revised.
4  Q. What's the basis for that
5  understanding?
6  A. I'm trying to recall whether it was
7  a date on the document in which it was
8  submitted or some other source. But I
9  can't recall the origin of that knowledge.
10 Q. Do you know whether the plaintiffs'
11 lawyers told you that fact and you relied
12 on it?
13 A. Well, I know the plaintiffs'
14 lawyers concurred with that, and I
15 honestly can't recall whether I saw it on
16 a document or heard it from them.
17 Q. Did you discover on your own the
18 fact that you say Merck did not disclose
19 Study 136 to the FDA in a timely fashion?
20 A. Well, when I saw that it wasn't
21 published until 2003, I believe I asked
22 when it was submitted to FDA, and either
23 -- and in response to that question, I
24 either was shown a document or was told

Page 545

1  that it was not submitted until after the
2  label was revised.
3  Q. Do you know when the final results
4  of Study 136 came to Merck's attention?
5  A. There are two very big problems
6  with your question. One is --
7  Q. It calls for a yes or no --
8  A. No, it does not, Counsel. I have
9  to answer in a -- in an honest way.
10     Phrasing it as "came to Merck's
11 attention," Merck conducted the study.
12 And as I said a minute ago, final results
13 are a function of how quickly one moves
14 the process along. But this is a study
15 conducted by Merck. So the results did
16 not come to their attention until they
17 completed them.
18 Q. Did --
19 A. So if it was a late point in time,
20 what I see here on this memo on -- at Tab
21 73 was that the preliminary results of
22 that study were internally circulated
23 within Merck in November of 2001,
24 revealing that there was no advantage in

29 (Pages 542 to 545)