Jerry Avorn, M.D.

Page 622

1  statins are in that model.
2       We did not -- The study was not
3  about looking at the effects of statins.
4  And I just explained why the statin effect
5  is not something one can consider, except
6  as an adjustment for compounding.
7       Q. Isn't it true, sir, that one
8  observation, however unimportant you think
9  it is, of your study with Dr. Solomon was
10 that the statins that were used by the
11 patients in your study did not reduce the
12 risk of heart attack?
13      A. That is not true.
14      Q. Putting aside all the caveats that
15 you did before about that you weren't
16 intending to study statins and studying
17 statins would not be a good idea in an
18 observational study, can you describe
19 succinctly for me what the finding was
20 concerning statin use in your study with
21 Dr. Solomon?
22      A. No significant difference.
23      Q. So one observation that you made
24 with Dr. Solomon in your study in 2004 was

Page 623

1  that there was no statistically significant
2  decrease in the risk of heart attack for
3  those patients who used statins compared
4  to those patients who didn't use statins?
5       A. That is not correct. And I'm not
6  trying to be difficult, but I think you
7  need to understand that if you
8  characterize it as an observation that we
9  made --
10      Q. Okay.
11      A. -- that's incorrect.
12      Q. Can I call it a finding?
13      A. No.
14      Q. Can I call it a --
15      A. You can call it a co-variant.
16      Q. Can you come up with a word that a
17 jury might understand other than
18 co-variant?
19         MR. TISI: Well, we need
20 expert testimony.
21      A. I don't think I can, because it's
22 -- it's deceptive to depict it as a
23 finding.
24      Q. Can you help me out here and show

Page 624

1  me where the statin discussion is? What
2  page is it on?
3       A. There is no discussion, because it
4  was not a finding. There's a line in a
5  table.
6       Q. Okay. Where is that?
7       A. And the only people who made
8  anything of that were the people at Merck.
9  Everyone else knew that. It's in Table 2.
10      Q. Oh, got it.
11         Am I right, Dr. Avorn, that in
12 Table 2, in your study with Dr. Solomon,
13 there is an indication that the use of
14 statins did not lead to a statistically
15 significant decrease in heart attack risk
16 compared to those who didn't use statins?
17      A. To be accurate, our Table 2
18 indicates that statin use did not have an
19 association with acute MI.
20      Q. Did your study also indicate that
21 hormone replacement therapy decreased the
22 risk of heart attack?
23      A. That hormone replacement therapy
24 was associated in a lower rate of heart

Page 625

1  attack, yes.
2       Q. And is it true that in clinical
3  trials there's actually been evidence that
4  hormone replacement therapy can increase
5  the risk for cardiovascular events?
6       A. Some have indicated an increase,
7  some have indicated no effect.
8       Q. It was your opinion, sir, after you
9  conducted your study with Dr. Solomon,
10 that more research should be done and more
11 trials should be conducted concerning
12 cardiovascular effects that might exist
13 with Vioxx?
14      A. Yes.
15      Q. I noticed in your expert report
16 that you mention that you want to talk
17 about the interactions you had with Merck
18 concerning your 2004 study with Dr.
19 Solomon?
20      A. Correct.
21      Q. Can you please tell me everything
22 that you think is important about your
23 interactions with Merck concerning your
24 study with Dr. Solomon in 2004?

Jerry Avorn, M.D.

Page 626

1  MR. TISI: Just to be
2  clear, Counsel, I think his report reads
3  he's prepared to testify to it.
4       As to him wanting to testify to it,
5  that's a decision that I make, number one.
6       Number two is, it's an improper
7  question to say tell me everything that
8  you know from -- in a period that covered
9  many years.
10      With that caveat, I mean, I assume
11 you want him -- I mean, you have a
12 responsibility to ask specific questions.
13 With that caveat, you can try to answer
14 that question.
15      BY MR. GOLDMAN:
16 Q.  On Page 24 of your report, sir,
17 you say, "I will also present evidence
18 concerning the experience of my research
19 team in its work on our Merck-funded
20 epidemiologic study of the relationship
21 between Vioxx and heart attack that was
22 ultimately published in the cardiology
23 journal Circulation in 2004," right?
24 A.  Right.

Page 627

1  Q.  What evidence do you intend to
2  present, sir, on that issue?
3       MR. TISI: Objection for the
4  reasons stated.
5  A.  In overview --
6  Q.  Actually, I would like you to be as
7  specific as you can --
8  A.  Okay.
9  Q.  -- so I know everything about the
10 interactions you had with Merck concerning
11 the 2004 study.
12 A.  Okay. I want to begin by stating
13 that we have had and have ongoing very
14 productive relationships with a number of
15 pharmaceutical manufacturers in conducting
16 pharmacoepidemiologic studies, which they
17 have funded in our research group.
18      Two examples that come to mind are
19 Glaxo and Pfizer. And although counsel
20 yesterday depicted me as a foe of the
21 pharmaceutical industry, we actually have
22 very close ties to companies for whom we
23 have done studies without any interference
24 with the conduct of that work or the

Page 628

1  presentation of those outcomes. And there
2  have been other companies that I could
3  list with whom that has been the case.
4       We sometimes accept funding from
5  drug companies because there is very
6  little external funding otherwise available
7  for the conduct of pharmacoepidemiologic
8  research. And the companies are often
9  quite eager to support groups that are
10 nationally known for their work in
11 studying adverse events.
12      Our experience with Merck was
13 unlike our experience with any other drug
14 company, whose -- which have funded any
15 other studies that we've done with the
16 industry.
17      It began with the longest and most
18 protracted period of contract negotiation
19 that I have ever experienced in my
20 academic life. In fact, I've -- I put
21 together a timeline -- which I'd be happy
22 to share with counsel -- after I just
23 refer to some dates on it.
24      Because during the time of our

Page 629

1  work, Dr. Solomon and I would frequently
2  ask one another, "Is this taking so long
3  in being allowed to proceed on this study
4  because this is just a big company, or is
5  something else going on?" And we, for a
6  period of several years, were not sure
7  what the answer to that was.
8       The chronology begins in February
9  of 2001, when Dr. Solomon first proposed
10 doing a study of Vioxx to Carolyn
11 Cannuscio. C-A-N --
12      MR. GOLDMAN: I'll get it
13 to you.
14 A.  Okay. Cannuscio. Who, at that
15 point, had just finished her doctorate in
16 epidemiology at Harvard, and had then gone
17 to work at Merck as an epidemiologist.
18      Those discussions, having begun in
19 February of '01, continued through the
20 spring and summer of '01. By the time it
21 got to August of 2001, there was a meeting
22 of the International Society for
23 Pharmacoepidemiology that Dr. Solomon and I
24 attended, in which I approached Dr. Harry

Jerry Avorn, M.D.

Page 630

1  Guess, who was the head of epidemiology at
2  the time at Merck, and I indicated that I
3  thought that there was a real need for
4  there to be an observational study of
5  cardiovascular complications from Vioxx, in
6  light of the VIGOR study, which had been
7  published, and that we were eager to get
8  the study done. And it seemed to me that
9  Merck should be eager to do such research
10 as well. And Harry agreed that this was
11 an important study to do, and that we had
12 the capacity to do that study, and that we
13 should go forward in making those plans.
14     Those conversations continued
15 through the fall of '01, through the
16 winter of '02, and into the spring of '02,
17 in trying -- in our trying to get Merck
18 to actually commit to doing the study.
19     And as I said, I have never
20 experienced a period of exceeding one year
21 between the time that a study is proposed
22 and a company expresses interest in doing
23 it, to the point where the contract
24 actually was signed.

Page 631

1      The contract was eventually signed
2  in April of 2002. And there then began a
3  period of about -- let's see -- April to
4  December would be about seven months --
5  eight months of protracted discussion with
6  Merck about the study design. Protracted
7  on Merck's part, not on our part, because
8  this also was the longest and most
9  protracted period of discussion about study
10 design that I had ever experienced to this
11 day, with any sponsor, corporate or other,
12 of a study design.
13     It seemed to us that it was a
14 fairly straightforward, case-controlled
15 design, and yet we could not get Merck,
16 even after they had signed the contract,
17 and even though we had been discussing the
18 concept of the study for about a year or
19 more, to sign off on the actual study
20 design.
21     And I remember Dan Solomon and I
22 would ask Carolyn Cannuscio, primarily Dan,
23 who was the contact with Carolyn, what's
24 going on, why is this taking so long, and

Page 632

1  she said, "Well, it's a very big company,
2  and they have a lot of committees."
3      It was not until December of 2002
4  that -- so about -- nearly two years after
5  Dan first proposed the study to Dr.
6  Cannuscio - that Merck finally accepted
7  the protocol that we had proposed. And
8  there were then additional steps, which
9  were plausible, such as Merck insisting
10 that we go back to the patient's primary
11 medical records in Pennsylvania to confirm
12 that each person -- that the people we
13 thought had had heart attacks had had
14 them. Our position was that this
15 validation had been done in other settings
16 with a very high degree of validity
17 demonstrated. But Merck asked us to do it
18 again in Pennsylvania, which we did.
19     Merck then asked that a -- an
20 outside reviewer be brought in to review
21 the programming associated with our study.
22 And this is before any data had been
23 generated. And, again, this is the first
24 and only time I've ever had any funder,

Page 633

1  corporate or governmental, ask to have an
2  external person come in to review our
3  code. But we complied. And each of
4  these steps continued to really slow down
5  our capacity to get the work done, because
6  Merck refused to release funding for the
7  next step of the work until the -- the
8  steps had been done, as -- you know, as
9  to their requirements.
10     It was not until March of 2003,
11 because of all of these delays, that we
12 were able to get the -- the work done to
13 the point where we were able to deliver
14 some preliminary data tables to Merck,
15 which we did.
16     And in the course of March and
17 April, Dan had ongoing conversations with
18 Dr. Cannuscio about her being a co-author
19 of the paper. And our position had been
20 that, since she was participating
21 meaningfully in the conduct of the work
22 and was making important contributions as
23 a collaborator that -- from our
24 perspective, that would warrant authorship,

51 (Pages 630 to 633)

Jerry Avorn, M.D.

Page 634

and she actually was a co-author of the original abstract that Dr. Solomon presented at the meeting. Well, he submitted it in May of 2003 to the American College of Rheumatology annual meeting. And at that point we also sent the full paper to Merck as per the terms of our contract, which allowed them to see and comment on the paper, but did not give them any rights of censorship over the content.

We then submitted the paper initially to two journals. One was the New England Journal and one was JAMA. And both of them said no, thank you. And our third choice was Circulation, which is the preeminent journal in cardiology. And at around the same time, which is October of 2003, Dr. Solomon presented the paper at the American College of Rheumatology meetings.

The paper was accepted at Circulation in February of 2004. And we kept sending notice of where things stood

Page 635

to the sponsor, Merck, as all this was evolving.

And then, as the paper was actually in galley at Circulation, we began to get calls from Merck, from Nancy Santanello, in particular, who had numerous conversations with Dan demanding that he make changes to the findings so as -- which would have had the effect of softening the -- the blow, so to speak, about the risk that we had detected of Vioxx in -- in association with -- or in causing heart attack.

Dan and Nancy had prolonged discussions about the changes that they proposed. Some we accepted. Some we did not. The ones we did not were changes which we felt would have watered down the conclusion in a way that we felt would have been misleading.

And as the paper was in galley at Circulation, Dr. Solomon received a call from Dr. Santanello demanding that Dr. Cannuscio's name be removed from the

Page 636

paper. And he indicated to Dr. Santanello that we would not do so because she demanded it, because Dr. Cannuscio was a colleague of ours, as well as whatever role she has as a Merck employee, and that we could not accept a colleague's employer telling us to take her name off the paper.

And the understanding that I have is that Merck was concerned about having a Merck employee as a co-author of a paper which documented a -- an increase in risk of heart attack caused by its drug, and then indicated to Dr. Santanello that that would not be something that we could do, and that any request would have to be something that Carolyn Cannuscio wanted, rather than what Merck wanted.

As it turns out, Carolyn was, I believe, on maternity leave at that point, and was a little difficult to reach. But at one point in -- in April of 2004, Dr. Solomon got a call from Dr. Cannuscio saying that she felt it was necessary for her to request that her name not be on

Page 637

the paper.

Bizarrely, it took so long for that request to eventually get made, that even though Merck had seen many, many versions of the paper, it was already in galley at that point. And we did not get Dr. Cannuscio's request in time for Circulation to remove her from the gal -- the Web version of the paper, because it had already been posted on their Web site in advance of the publication. But we were able to get them to remove it from the print version.

And we acknowledged Dr. Cannuscio's participation anonymously, as we were required to do, at the end of the paper by noting the -- by thanking an epidemiologist who participated actively in the study design, statistical analysis and interpretation of the data and preparation of the manuscript, all of which would normally have constituted grounds for authorship in common, academic behavior.

That difference was -- was noted by

52 (Pages 634 to 637)

Jerry Avorn, M.D.

**Page 638**

1  -- I believe a reporter for the Wall
2  Street Journal, who had originally covered
3  Dr. Solomon's presentation at the -- at
4  the rheumatology meetings. And he
5  investigated why Dr. Cannuscio had been on
6  the abstract but had not been on the final
7  paper. I believe that as a journalist he
8  got access to the Web version of the paper
9  and noticed that she was there on the Web
10 version and not on the printed version,
11 and asked about what had happened, and
12 ended up writing an article in the Wall
13 Street Journal about Merck, with a
14 headline that ran something like that
15 Merck pulls author off of study and
16 something about raising ethical questions
17 about their -- their doing so.
18     I know that Dr. Cannuscio wanted to
19 be a co-author of the paper because she
20 was a young person just starting out in
21 the field, and a paper in Circulation is a
22 very big deal at any point in one's
23 career. And I know that she's been
24 deposed. I've not read her deposition.

**Page 639**

1  But my understanding is that this was not
2  something that she saw as a -- a good
3  development in her career.
4      I have no way of being certain as
5  to why it took more than a year and a
6  half or about a year and a half to get
7  the contract signed and why it took an
8  additional eight months for Merck to
9  approve the protocol.
10     But, as I said, that's
11 unprecedented in my experience and that of
12 anybody else that I'm aware of in the
13 field. That was one of the matters that
14 interested me with the pace of the Ingenix
15 study, which we talked about, which also
16 was funded, I believe, at the same time,
17 and also took much longer than one would
18 have expected to see the light of print.
19     So I guess, in summary, those are
20 the high points of our experience with the
21 company in relation to the performance of
22 this research.
23 Q. When you say that those are the
24 high points, Dr. Avorn, am I right that

**Page 640**

1  those are the -- the details that you
2  remember as you're sitting here today
3  about your interactions with Merck
4  concerning your study with Dr. Solomon in
5  2004?
6      MR. TISI: Objection,
7  Counsel. As you know, I think it's
8  difficult to -- unless you have specific
9  questions, you're entitled to do that. He
10 summarized the experience over several
11 years.
12     MR. GOLDMAN: Just object.
13     MR. TISI: No. I mean --
14     BY MR. GOLDMAN:
15 Q. Dr. Avorn --
16     MR. TISI: It's a totally
17 inappropriate question. Go ahead.
18 A. I'm having trouble understanding
19 what the meaning of the question is.
20 Q. I asked you to be as specific as
21 you could about your interactions with
22 Merck, and I didn't interrupt you and gave
23 you all the opportunity to talk about the
24 details you remember about your

**Page 641**

1  interactions with Merck concerning your
2  study. And I just want to be clear that
3  there's no details that you remember right
4  now that you haven't shared with me,
5  right?
6  A. Well, I could spend another hour
7  talking about conference calls and getting
8  Harry Guess involved. But you know, they
9  were --
10 Q. Have you told me the most important
11 details in your mind about your
12 interactions --
13 A. I certainly have.
14 Q. -- with Merck?
15     Can I mark just your --
16 A. Yes.
17 Q. -- chronology as Exhibit 20?
18 A. Yes.
19     (Exhibit-20, Chronology of
20 Dr. Avorn's Interactions with Merck, marked
21 for identification).
22     BY MR. GOLDMAN:
23 Q. When did you prepare this
24 chronology?

53 (Pages 638 to 641)

Golkow Litigation Technologies - 877.DEPS.USA

**Page 642**

1  A. Months ago, actually unrelated to
2  this case, our group received a -- I think
3  it was a subpoena from the New York State
4  Attorney General in relation to a criminal
5  investigation, I think -- I hope I'm using
6  the right legal terms -- that the New York
7  State Attorney General was conducting
8  vis-a-vis Merck. And they asked us to
9  retain all information we have in relation
10 to our contact with Merck. And so it
11 seemed at that point that it would be
12 helpful for Dan and me to reconstruct the
13 chronology while it was fresh in our
14 memories.
15     MR. GOLDMAN: Okay. I
16 assume that, Mr. Tisi, you have no
17 intention of eliciting that testimony about
18 the investigation by the Attorney General?
19     MR. TISI: If it becomes
20 relevant -- If it's relevant in your
21 cross-examination, if you ask a question
22 that opens the door, that's up to you.
23     BY MR. GOLDMAN:
24 Q. I just have a couple follow-up

**Page 643**

1  questions to what you said, okay, Doctor?
2     The first is: You said that Nancy
3  Santanello demanded that you and Dr.
4  Solomon make certain changes to your
5  findings so as to soften the blow
6  concerning the cardiovascular risk that you
7  detected. Do you remember that testimony?
8  A. I think I meant to say or did say
9  that the effect of those changes would
10 have softened the blow.
11 Q. All right.
12 A. I don't remember that I imputed
13 that intent to her.
14 Q. Can you tell me the specific
15 changes that Dr. Santanello asked you to
16 make to your study --
17 A. Okay.
18 Q. -- article?
19 A. To give you -- okay. To give you
20 a complete answer, I -- I'd want to be
21 able to go back and pull out specific
22 memos.
23     But for example, one of the things
24 that struck me was her saying that we

**Page 644**

1  should remove the finding that we talked
2  about a few minutes ago of -- Let me just
3  find it in the abstract here.
4     (Witness viewing document). Our
5  finding that there is an increased risk of
6  Vioxx compared with no NSAID use, she said
7  that that should not be in the abstract
8  and should be taken out of the abstract.
9  Q. Did she say why?
10 A. Her view was that because it was a
11 P of .054 and not .050, it should not be
12 reported in the abstract.
13     And our view was that it was so
14 close to being a meaningful and, quote,
15 significant -- that it was so meaningful
16 and so close to quote, significant, that
17 as long as we presented the actual
18 P-value, it was appropriate to put it in
19 the abstract.
20 Q. Let me stop you there, and I'm
21 going to ask you about more changes.
22     When you say that Dr. Santanello
23 demanded that you make that change, do you
24 mean that you felt that Dr. Santanello was

**Page 645**

1  not acting professionally or was aggressive
2  toward you all about making the change, or
3  was she instead asking that -- that you
4  make a change that she felt better
5  reflected the results of the study?
6  A. She was forceful in her suggestion.
7  But -- but not bizarrely so.
8  Q. Can you be more specific --
9  A. Sure.
10 Q. -- what you mean by that?
11 A. Well, she -- she -- I mean, I
12 don't want to claim that she behaved
13 strangely or erratically. She just made
14 it clear that it was her very strong
15 belief that this should not be in the
16 abstract, and that it was not acceptable
17 or appropriate for us to put it there.
18 Q. And what is the second change that
19 you remember Dr. Santanello asking you to
20 make?
21 A. (Witness viewing document). I
22 think -- and I would want to go back,
23 because I truly don't recall off the top
24 of my head -- there were a number of

Jerry Avorn, M.D.

Page 646

1 wording changes. Some of them had to do
2 with the previous studies about -- I
3 believe it was other cardiovascular effects
4 of Vioxx, which I believe we had either in
5 the introduction or in the discussion,
6 which she felt were non contributory and
7 did not need to be included.
8     And there was one other about a
9 specific comparison of Vioxx with one of
10 the other nonsteroidals which she had an
11 issue about. And I -- I'm sorry that I
12 don't recall the specific issue.
13   Q. I'm going to ask you to find, at a
14 break, the document that you think
15 reflects the changes that Dr. Santanello
16 was requesting that you make. Okay?
17     MR. TISI: Well -- Let's go
18 off the record.
19   A. Okay. There is not a document I
20 have with me.
21   Q. Keep this.
22   A. Yeah. Well, no, there is not a
23 document I have with me that I can go to,
24 because if there was, I would do so.

Page 647

1   Q. When you were -- I thought you
2 referred a minute ago to having to go look
3 to find something that would help you
4 answer the question about exactly what
5 changes Dr. Santanello was suggesting --
6     MR. TISI: Yeah. Yeah.
7     BY MR. GOLDMAN:
8   Q. -- and I'm asking what that
9 document is or where would you find that.
10   A. Okay. I would need to go back to
11 the office and talk with Dr. Solomon and
12 ask him to go through his files.
13   Q. Okay. I thought -- I was talking
14 about what you have here --
15   A. No. No. If I had it, I would
16 have produced --
17   Q. What you've produced --
18   A. I would --
19     MR. TISI: Let me just make
20 clear, because I know that this is -- I
21 brought this to your attention yesterday,
22 that your notice of deposition did not ask
23 him to bring documents related to his --
24     MR. GOLDMAN: Yeah.

Page 648

1     MR. TISI: -- related to
2 his conduct and his communications and
3 actions with the company prior to -- prior
4 -- you know, absent being involved in an
5 -- his expert report; it all revolved
6 around his expert report.
7     I've made it clear from day one
8 that we're going to -- you know, that
9 issues of his factual involvement are
10 issues in this case. You didn't ask for
11 it, so he didn't bring it with him. So
12 if you ask him to pull out a document
13 here, obviously he didn't have it with him
14 because he wasn't asked by you to bring it
15 with him.
16     MR. GOLDMAN: Do you intend,
17 Chris, to use documents that Dr. Solomon
18 or Dr. Avorn have --
19     MR. TISI: I would --
20     MR. GOLDMAN: -- that have
21 not been produced in this litigation?
22     MR. TISI: I have not --
23 Honestly, Counsel, I have not looked at
24 documents that they may have in their

Page 649

1 possession. I may do that.
2     MR. GOLDMAN: Okay.
3     MR. TISI: I -- I can tell
4 you I have looked at the documents that
5 are in the Merck database --
6     MR. GOLDMAN: Mm-hmm.
7     MR. TISI: -- related to
8 his communications with the company, and I
9 certainly intend to use some of those.
10     MR. GOLDMAN: Okay. I need
11 to know, if you're planning on asking --
12     MR. TISI: I don't have to
13 tell you that.
14     MR. GOLDMAN: Okay. Then
15 I'm going to need to have the documents.
16     MR. TISI: Okay. You have
17 to -- You make the request, but obviously
18 -- we can deal with this. You make the
19 request, and we can -- we can certainly
20 deal with the request, and if it's an
21 appropriate request, we'll get it done.
22 But you have had notice of Dr. Avorn's
23 involvement for months and months and
24 months now, and you never made an effort

55 (Pages 646 to 649)

Jerry Avorn, M.D.

Page 650

1  to get it.
2      MR. GOLDMAN: You know,
3  Chris, you've served an expert report
4  here, and I asked for all the documents
5  that support his opinions in this case,
6  and among the opinions in this case --
7      MR. TISI: No. That's not
8  exactly true.
9      MR. GOLDMAN: -- is what --
10 Let me finish.
11     MR. TISI: You didn't do
12 that, Counsel.
13     MR. GOLDMAN: Let me finish.
14 Let me finish.
15     I asked for all the documents
16 that --
17     MR. TISI: Okay.
18     MR. GOLDMAN: -- that Dr.
19 Avorn is relying on in support of his
20 opinion. And in the expert report there's
21 a specific statement that refers to Dr.
22 Avorn wanting to discuss his
23 relationship --
24     MR. TISI: No.

Page 651

1      MR. GOLDMAN: -- with Merck
2  over the study, and I don't want to --
3      MR. TISI: Of course you
4  want to cut -- of course you want to put
5  what you want to put on the record, and
6  you don't want me to put it on the
7  record.
8      MR. GOLDMAN: Okay. Go
9  ahead. Say whatever you want.
10     MR. TISI: Okay. Thank
11 you.
12     First of all, the reason why that
13 statement is in there is because I asked
14 Dr. Avorn to make it abundantly clear in
15 his expert report that he's prepared to
16 give factual testimony in addition to his
17 expert testimony so that there would be no
18 surprise at the time of trial.
19     That was my -- That was my intent,
20 and I will represent to you that I
21 intentionally asked Dr. Avorn to make it
22 clear that he is prepared to give factual
23 testimony.
24     MR. GOLDMAN: Mm-hmm.

Page 652

1      MR. TISI: I will also note
2  that back many months ago, he was
3  scheduled to appear in the New Jersey
4  trial to give solely factual testimony.
5      So you guys have known about it,
6  not only from his expert report, but Merck
7  has known about it for -- in fact, there
8  was a motion before Judge Higbee on this
9  issue back in September.
10     I will also note that in your
11 notice of deposition you asked -- because
12 I specifically -- I specifically looked
13 for it -- you specifically asked for his
14 expert opinion developed in this case, and
15 specifically limited it to that. Because
16 I would have asked Dr. Avorn to produce
17 documents consistent with your report.
18     So let's -- Let's just be clear,
19 you didn't ask him to produce all
20 documents related to Vioxx.
21     MR. GOLDMAN: I asked Dr.
22 Avorn to bring all materials on which Dr.
23 Avorn relies as support for his opinions
24 in the litigation, and all --

Page 653

1      MR. TISI: Well, let's read
2  exactly what you stated, Counsel --
3      MR. GOLDMAN: I just read
4  it.
5      (Reporter interruption).
6      MR. TISI: I just have to
7  see it. I'm over your shoulder here.
8  His -- for his opinions in the Vioxx
9  litigation.
10     MR. GOLDMAN: Yeah.
11     MR. TISI: That's excluding
12 his factual testimony. The next page --
13     MR. GOLDMAN: Does it say
14 that?
15     MR. TISI: Yeah. You read
16 this whole thing.
17     MR. GOLDMAN: Hold on.
18 Time out.
19     MR. TISI: We're going to
20 go -- We're going to go --
21     MR. GOLDMAN: Chris --
22     MR. TISI: I think it will
23 stand on its own. I wanted to make my
24 objection on the record to your

56 (Pages 650 to 653)

Jerry Avorn, M.D.

Page 654

1 characterization of what was asked for.
2 If you want to ask for it, we'll
3 talk getting you documents.
4 MR. GOLDMAN: You know,
5 Chris, I don't want any surprises, and I'm
6 sure Dr. Avorn, in all fairness, you want
7 to tell your story, and you don't want to
8 surprise us with documents that I haven't
9 seen, right?
10 THE WITNESS: (Witness nods
11 head).
12 MR. GOLDMAN: That would be
13 unfair?
14 THE WITNESS: I'll do
15 whatever both of you agree I should do.
16 MR. GOLDMAN: Sure.
17 MR. TISI: And nor do I,
18 Counsel.
19 MR. GOLDMAN: Okay. All
20 I'm saying is, Chris, if you intend to use
21 documents that he has in his file, and
22 you're going to do that, and you're going
23 to have Dr. Avorn testify about what they
24 say or the documents themselves, then I

Page 655

1 need to see those.
2 MR. TISI: But I will --
3 and I said, you make a request and I will
4 attempt to do that.
5 MR. GOLDMAN: Okay.
6 MR. TISI: But I don't know
7 the volume of documents. As I told you,
8 I've never seen them.
9 MR. GOLDMAN: Okay.
10 MR. TISI: So I don't know
11 the volume of documents. I don't know how
12 easy they're going to be to get. I don't
13 -- You know, I don't -- I don't know a
14 lot of variables that may -- that may take
15 these things into consideration.
16 MR. GOLDMAN: All right.
17 We will decide whether to make a request
18 after the deposition, okay, sir?
19 THE WITNESS: I will do as
20 told.
21 MR. GOLDMAN: Thank you.
22 BY MR. GOLDMAN:
23 Q. You mentioned before the three
24 things that you remember Dr. Santanello

Page 656

1 asking you to change in your paper, and as
2 you sit here today, do you remember any
3 other changes that she wanted you to make?
4 A. No.
5 Q. You also said, sir, that -- okay.
6 You testified that it was your
7 understanding that the reason Dr.
8 Cannuscio's name was taken off of your
9 paper was because Merck was concerned
10 about having a Merck employee as a
11 co-author of a paper which documented an
12 increase in risk of heart attack caused by
13 its drug. Do you remember testifying to
14 that?
15 A. That is my belief.
16 Q. Can you tell me the basis for your
17 belief, sir?
18 A. Well, it was never the case that
19 Dr. Cannuscio -- Dr. Cannuscio's
20 involvement with the project failed to
21 meet the standard requirements for
22 authorship. And it was never the plan
23 that she would be stricken from the list
24 of authors as we were working on the

Page 657

1 study.
2 Q. Mm-hmm.
3 A. It was only when we had come up
4 with findings that were unfavorable to the
5 drug that that demand was made. And it
6 was not made initially by Dr. Cannuscio;
7 it was made by the company. And that is
8 my -- the basis for my expect -- or my
9 belief that the company had a problem with
10 Dr. Cannuscio being a co-author.
11 And ironically, she was -- she
12 remained a co-author of the versions that
13 would -- that had been submitted
14 previously. And it was only at the moment
15 of publication, it was indeed almost after
16 the moment of publication that the company
17 became insistent about this change.
18 Q. Did Merck demand that Dr.
19 Cannuscio's name be removed as an author
20 on your paper when you first informed
21 Merck of the findings of your study?
22 A. No. When it was submitted as an
23 abstract, no.
24 Q. I just want to make clear, Dr.

57 (Pages 654 to 657)

Jerry Avorn, M.D.

Page 658

1 Avorn, that you are presuming that the
2 reason Merck did not want Dr. Cannuscio's
3 name on your paper was because Merck
4 didn't want a Merck employee to be on a
5 paper that documented an increased risk of
6 heart attack from Vioxx?
7     MR. TISI: Objection;
8 mischaracterizes.
9     A. I can only speak to my belief about
10 what was behind their decision. I know
11 that as the paper came closer to actually
12 being published, they became more critical
13 of the findings, even though the findings
14 were pretty much the same findings they
15 had always been.
16     Q. Okay.
17     A. But as far as what they were
18 thinking, I can't know that.
19     Q. If a Merck employee were to testify
20 that -- such as Dr. -- Withdrawn.
21     If Dr. Santanello were to say, sir,
22 that the reason that Merck didn't want Dr.
23 Cannuscio's name to appear on your paper
24 was because Merck didn't agree with the

Page 659

1 conclusions that you were drawing from the
2 data, you would agree, sir, that that
3 would not be an unreasonable position to
4 take, true?
5     A. I don't agree with that. I think
6 that it would be unreasonable.
7     Q. Okay.
8     A. I believe that if a person is a
9 professional and a doctorally-prepared
10 epidemiologist, they should be respected as
11 a scientist, and the decision about
12 whether they are a co-author of a
13 scientific research paper ought to be up
14 to that person and not her boss.
15     Q. Is it true, sir, that when authors
16 appear on articles that are published,
17 that indicates that the author and his or
18 her affiliation agree with the content of
19 the article?
20     A. No. It means that the author
21 agrees --
22     Q. Okay.
23     A. -- with -- substantially with the
24 content, and it does not mean -- when I

Page 660

1 write an article it does not mean that
2 Harvard Medical School agrees with the
3 findings of my paper.
4     Q. If Dr. Cannuscio's name remained on
5 your paper, would you have indicated that
6 she was a Merck employee?
7     A. We would have had to.
8     Q. And if Merck doesn't agree with the
9 findings of a particular study, you agree,
10 sir, that Merck isn't obligated to have
11 its employees' names on those study?
12     A. I do not agree with that at all.
13 I believe that -- as I said, an
14 organization can have its -- a scientist
15 that is in its employ be a co-author of a
16 research paper without it implying that
17 the company subscribes to the finding.
18 And that happens all the time.
19     Q. Did Merck take away any grant money
20 from you because of the results of your
21 study?
22     A. No.
23     Q. Did Merck ever try to intimidate
24 you because of the results your study?

Page 661

1     A. No.
2     Q. Did Merck ever try to persuade you
3 not to publish your study?
4     A. No.
5     Q. Did Merck ever take any
6 inappropriate action after you published
7 your study?
8     A. No.
9     Q. Did Merck have a right to disagree
10 with some of the conclusions in your
11 study?
12     A. I think any person or entity has a
13 right to the disagree with anything.
14     Q. So the answer is yes?
15     A. Yes.
16     Q. It's true, sir, that you don't have
17 any personal knowledge of the real reasons
18 why Merck didn't want Dr. Cannuscio's name
19 to appear on your study, true?
20     MR. TISI: Objection; asked
21 and answered.
22     A. All I know is what we were told by
23 -- by Dr. Santanello and Dr. Merck -- and
24 Dr. Cannuscio.

Jerry Avorn, M.D.

Page 662

1  Q. And neither Dr. Cannuscio nor Dr.
2  Santanello told you that the reason that
3  they didn't want Dr. Cannuscio's name to
4  appear on your paper was because they
5  didn't want a Merck employee on an article
6  that reflected unfavorably about Vioxx?
7  A. I would need to ask Dr. Solomon
8  specifically what language was used in his
9  conversations.
10 Q. Well, based on your knowledge, sir,
11 as you sit here today, you don't know that
12 -- you have no reason to think that Dr.
13 Santanello or Dr. Cannuscio told you or
14 Dr. Solomon that the reason Dr.
15 Cannuscio's name was not going to be on
16 the paper was because Merck didn't want
17 its employees to be affiliated with an
18 article that reflected poorly on Vioxx?
19 A. That's not correct.
20 Q. Okay. Let me ask it differently,
21 then.
22       MR. TISI: Well, no
23       BY MR. GOLDMAN:
24 Q. Well, no, it's not correct. It's

Page 663

1  not correct.
2        MR. TISI: Okay. That's
3  fine.
4        BY MR. GOLDMAN:
5  Q. Doctor, as you sit here today, Dr.
6  Avorn, I understand that you believe, in
7  your heart of hearts, that Merck's reason
8  for not wanting Dr. Cannuscio on your
9  paper was because you think that Merck
10 didn't want an employee of theirs to be on
11 a paper that reflected poorly on Vioxx,
12 right?
13 A. Yes.
14 Q. In all fairness, though, Dr. Avorn,
15 you don't know the true reason why the
16 people at Merck didn't want Dr.
17 Cannuscio's name on your paper, right?
18 A. Can I answer that question?
19 Q. Yes.
20 A. When I asked Dr. Solomon -- who, as
21 I said, was the person who had the
22 conversations with Dr. Cannuscio and Dr.
23 Santanello -- what was going on -- because
24 this is pretty unprecedented.

Page 664

1  Q. Mm-hmm.
2  A. He said that he had the strong
3  impression, from his conversations with Dr.
4  Cannuscio and Dr. Santanello, that Merck
5  wanted to distance itself from our paper.
6  I can ask him --
7  Q. Distancing yourself from a paper
8  may be because you don't agree with its
9  conclusions as opposed to not wanting an
10 employee on the paper because it reflects
11 poorly on Vioxx, agree?
12 A. Well, the conclusions did not
13 change from the original submission.
14 Q. Let's put any discussions that Dr.
15 Solomon had with Dr. --
16 A. Cannuscio
17 Q. -- Cannuscio and Santanello aside.
18 All right?
19 A. Right.
20 Q. Based on your personal knowledge,
21 Dr. Avorn, it's true that you don't know
22 the reason why Merck didn't want Dr.
23 Cannuscio's name on your paper?
24       MR. TISI: Objection.

Page 665

1  A. It depends whether my personal
2  knowledge includes my conversations with
3  Dr. Solomon or not.
4        My conversations with him, when I
5  asked him what was going on, he said it
6  was clear to him that Merck wanted to
7  distance itself from the paper. So it
8  depends on how you define my personal
9  knowledge.
10 Q. Based on your personal interactions
11 with Merck, you don't know why Merck
12 decided that they didn't want Dr.
13 Cannuscio's name to appear on your paper?
14 A. That's right. I did not discuss
15 these matters with these people.
16 Q. Let's switch to the -- okay. Let's
17 switch to Dr. Graham's observational study
18 2005.
19 A. Observational study 2005, the one
20 he did with Pfizer?
21 Q. Yes.
22 A. Right. I'd like to have it in
23 front of me, if I could.
24 Q. Mm-hmm. Let me just hand it to

Jerry Avorn, M.D.

Page 666

1  you. I'm not going to mark it, okay?
2  This is the Graham study.
3  A. (Witness viewing document).
4      MR. TISI: I'm sorry. Just
5  for -- This may be used. Can we just
6  mark it?
7      MR. GOLDMAN: Okay. Twenty-
8  one.
9      MR. TISI: Thanks. I just
10 -- For the record we need to do that.
11     (Exhibit-21, Study entitled
12 "Risk of Acute Myocardial Infarction and
13 Sudden Cardiac Death in Patients Treated
14 with Cyclo-Oxygenase 2 Selective and
15 Non-Selective Non-Steroidal
16 Anti-Inflammatory Drugs: Nested
17 Case-Control Study," marked for
18 identification).
19     BY MR. GOLDMAN:
20 Q. This was a study that was published
21 after Vioxx was withdrawn, right?
22 A. (Witness viewing document). Right.
23 Q. And are you relying on the results
24 of this study, sir, for your opinions?

Page 667

1  A. Yes. Among other papers.
2  Q. Okay. Is one result of this study
3  that there was no statistically significant
4  increased risk of heart attack and sudden
5  cardiac death at the 25 milligram dose of
6  Vioxx?
7  A. (Witness viewing document). I see
8  a nearly 60 percent increase in risk at 25
9  milligrams per day or less.
10 Q. Where is that?
11 A. In the abstract. It's in the --
12 under Findings. It's right there. "1.59
13 for an adjusted odds ratio --" if I'm
14 reading this -- "for Rofecoxib, 25
15 milligrams per day or less."
16 Q. Have you read this study carefully,
17 sir?
18 A. Yes.
19 Q. And it's your opinion that Graham's
20 study shows an increased -- statistically
21 significant increased risk of heart attack
22 with Vioxx. Is that your testimony?
23 A. Okay. I think what -- what we're
24 talking about here is the P.054 issue

Page 668

1  again. And if you're -- okay. The
2  1.59 --
3  Q. Mm-hmm.
4  A. -- is for all doses, and I need to
5  explain again that the best estimate of a
6  subgroup -- in this case a dose subgroup
7  -- is generally accepted to be the
8  estimate for the whole group, and that
9  when one looks at numerically smaller
10 subgroups, it is inevitable that the power
11 of any one analysis is going to go down
12 because the number of people studied goes
13 down.
14 Q. Okay.
15 A. And as a result, it is quite
16 possible that the P-value may cross that
17 threshold of significance.
18     But I think that the nearly
19 universal view of most epidemiologists and
20 pharmacoepidemiologists would be that if
21 there is an increased risk in the
22 so-called parent group of all subjects,
23 and the point estimate is about the same
24 in a subgroup, that it is -- I don't want

Page 669

1  to use the word deceptive -- but it is an
2  inappropriate conclusion if, when you look
3  at smaller and smaller subgroups, and
4  therefore the power to achieve statistical
5  significance becomes less because you're
6  dividing the population up into small
7  groups, you cross the threshold, and a
8  given subgroup is P.054 instead of P.05,
9  to conclude that that failed to find a
10 significant difference is absolutely
11 incorrect.
12 Q. If you could -- Because I have more
13 to cover.
14 A. Okay.
15 Q. I heard your explanation.
16 A. Okay.
17 Q. Can you just answer this question
18 yes or no? If you can't, then you can't.
19 Okay?
20 A. Ask the question again, please.
21 Q. Looking at the relative risk of
22 1.47 for Vioxx 25 milligrams a day or
23 less, does the confidence interval cross
24 1?

60 (Pages 666 to 669)

Jerry Avorn, M.D.

**Page 670**

1  A.  Yes.
2  Q.  And when a confidence interval
3  crosses 1, as you said before, that means
4  it's not statistically significant, true?
5  A.  That is one conventional
6  explanation of that, yes.
7  Q.  And one other conventional
8  explanation is when a P-value is .054,
9  reasonable people can interpret that to
10 mean that's not statistically significant,
11 right?
12 A.  Yes.  But I'm not in that group
13 that would conclude that.
14 Q.  Do you know, sir, whether the
15 abstract for Dr. Graham's study found
16 there was no statistically significant
17 increase for risk at the 50 milligram
18 dose?
19 A.  The abstract?
20      Q.  That was published previously.
21      MR. TISI:  Are you talking
22 what was presented at the --
23      MR. GOLDMAN:  Yes.
24      MR. TISI:  I mean, unless

**Page 671**

1  you have it in front of him --
2  A.  I -- I don't recall what an
3  abstract that I don't have here said.
4  Q.  Do you know whether Dr. Graham
5  reclassified any cases from the 25
6  milligram dose of Vioxx to the 50
7  milligram dose?
8  A.  I do not know.
9  Q.  If he did that, that would be
10 inappropriate, right?
11      MR. TISI:  Objection.
12 A.  Well, if it was correct the second
13 way and wrong the first time, then it
14 would be appropriate.  That all depends.
15 I don't know what he did.  But, you know,
16 sometimes things get reclassified to make
17 them more accurate.  I just don't know.
18 Q.  If Dr. Graham reclassified cases in
19 his study from 25 milligrams to 50
20 milligrams in order to make the 50
21 milligram dose appear to have a
22 statistically significant increased risk,
23 you agree would that be inappropriate?
24      MR. TISI:  Objection.

**Page 672**

1  A.  That's a hypothetical that imputes
2  unethical behavior to a colleague, and I'm
3  not going to answer it.
4  Q.  So you're unwilling to -- even if I
5  ask you to assume that that's what Dr.
6  Graham did, you're unwilling to say
7  whether that's appropriate or not?
8      MR. TISI:  Objection.  You
9  know that's not accurate --
10 A.  Well, you're also imputing the "in
11 order to," which I just can't --
12 Q.  Okay.
13 A.  That's too many hypotheticals.
14 Q.  Was the incidence rate for heart
15 attack in Dr. Graham's study higher on
16 Celebrex than it was for Vioxx?
17 A.  I don't know.  We could look at
18 it.  You could direct me, in the interest
19 of time, to what you're referring to.
20 Q.  If you don't know, we can look
21 later --
22 A.  Okay.
23 Q.  -- when we're in another
24 deposition.

**Page 673**

1      Do you agree, sir, that a fairly
2  small number of patients in this study use
3  the 50 milligram dose of Vioxx?
4  A.  That is generally the case, and I
5  assumed it was the case here.  We could
6  look at the real numbers if you wanted.
7  But that's almost always true.
8  Q.  Have you looked at all studies that
9  have compared cardiovascular risks of Vioxx
10 to Celebrex?
11 A.  All studies?  I've looked at many
12 of them.  If you have one that you think
13 I haven't seen, I could take a look at
14 it.
15 Q.  I don't know what you've seen.
16 A.  Okay.
17 Q.  But do you know of studies that
18 have shown that the cardiovascular risks
19 that might exist with Vioxx and Celebrex
20 -- Withdrawn.
21     Have you seen any studies, Dr.
22 Avorn, that have shown that there is no
23 more increased risk of cardiovascular
24 events with Vioxx than there is with

Jerry Avorn, M.D.

Page 674

1  Celebrex?
2  A. I've seen studies that showed the
3  opposite, certainly. And I don't recall
4  right now sitting here studies that showed
5  the same result. But I would be happy to
6  look at one if you have it.
7  Q. What FDA regulatory experience,
8  sir, have you had in the last two years?
9  A. Can you define what you mean by FDA
10 regulatory experience?
11 Q. Your experience interpreting FDA
12 regulations for the FDA.
13       MR. TISI: Objection.
14 A. I think one can have regulatory
15 experience without working for the FDA.
16       I've written an article in the New
17 England Journal about the FDA's approval
18 standards. I've written an article, a
19 separate article in the New England
20 Journal about FDA's depiction of risks in
21 its labels.
22       I've been invited to sit on an FDA
23 advisory committee to evaluate adverse
24 effects associated with a drug it was

Page 675

1  considering. I've written extensively in
2  my book and elsewhere about the relation
3  between FDA's legal obligation and
4  mandating legislation and what is or isn't
5  done by the agency and by companies in
6  relation to the duty to warn.
7        I teach about that in -- at Harvard
8  Medical School and the Harvard School of
9  Public Health. I'm writing a chapter that
10 will be in the standard Harvard
11 pharmacology textbook on regulatory policy
12 and the affect on ascertainment of drug
13 side effects.
14       I have another paper that I'm
15 completing with a colleague in my division
16 who's a lawyer and a physician on the
17 relationship between 21 CFR and the
18 obligations that it imposes on FDA and on
19 companies about duty to warn.
20       Should I go on?
21 Q. You can stop.
22 A. Okay.
23 Q. Are you holding yourself out as an
24 expert in FDA regulations for labeling,

Page 676

1  sir?
2  A. I'm holding myself out as an expert
3  in the ascertainment of drug risks and in
4  the responsibilities of companies and,
5  frankly, of the federal government to take
6  those risks and that epidemiology and
7  translate that into communications.
8  Q. As to labeling, sir, you're not
9  holding yourself out as an expert in the
10 FDA regulations for drug labeling, true?
11 A. To the extent that those labels
12 require content, and that content is about
13 pharmacoepidemiology, I have expertise
14 about that content and what needs to be
15 communicated in that -- in those labels.
16 Q. In terms of what needs to be
17 communicated outside of pharmacology
18 within --
19       MR. TISI:
20 Pharmacoepidemiology.
21       MR. GOLDMAN: I'm sorry.
22 Withdrawn.
23       BY MR. GOLDMAN:
24 Q. Do you agree, sir, that you don't

Page 677

1  hold yourself out as an expert on FDA's
2  regulations concerning the labeling of drug
3  -- prescription drug products?
4        MR. TISI: Objection.
5  A. I don't think I can agree to that.
6  I think that while we all know that I'm
7  not an attorney, I think I have
8  considerable expertise in the ascertainment
9  of drug risk and in the quantification of
10 that risk, and in the communication of
11 that risk, which happens to be done
12 primarily through a drug label.
13 Q. In terms of what the FDA requires
14 of drug companies for labeling drug
15 products, you don't consider yourself an
16 expert in that; is that fair to say?
17 A. I didn't say that. I have a
18 fairly good understanding and expertise
19 related to what the legislation of the
20 Code of Federal Regulation requires of
21 companies and requires of FDA in relation
22 to depiction of drug risks.
23 Q. And you think your fairly good
24 understanding of the FDA regulations makes

62 (Pages 674 to 677)

Jerry Avorn, M.D.

Page 678

1  you an expert in FDA labeling?
2          MR. TISI: Objection.
3   A.  I think that's something the judge
4  will probably decide.
5   Q.  Have you ever approved a label as
6  an FDA employee, sir?
7   A.  No.
8   Q.  Have you ever prepared a label as
9  an employee of a pharmaceutical company?
10  A.  No. Thank goodness.
11  Q.  Do you agree, sir, that the FDA
12 advisory committee, before Vioxx was ever
13 brought to the market, approved of the
14 content of the Vioxx label before Vioxx
15 was brought to market?
16         MR. TISI: Objection.
17  A.  The FDA advisory committee?
18  Q.  Mm-hmm.
19         MR. TISI: Objection
20         BY MR. GOLDMAN:
21  Q.  Or don't you know?
22         MR. TISI: Objection.
23  A.  I'm not aware that the detailed
24 wording of labels is brought to the

Page 679

1  advisory committee.
2   Q.  You understand that the advisory
3  committee recommended that the FDA approve
4  Vioxx for use in the U.S., right?
5   A.  Yes.
6   Q.  And based on the information that
7  was available at the time, sir, you don't
8  disagree with that recommendation, true?
9   A.  Correct.
10  Q.  Nor do you disagree with the
11 decision by the FDA to approve Vioxx in
12 May of 1999, right?
13  A.  Correct.
14  Q.  The advisory committee for the FDA
15 indicated that there is --
16         MR. TISI: Which one?
17 There's been several, Counsel. Which
18 advisory committees are we talking about?
19         BY MR. GOLDMAN:
20  Q.  Before Vioxx was approved --
21         MR. TISI: Okay.
22         BY MR. GOLDMAN:
23  Q.  -- for use in the United States,
24 there was a consensus, according to the

Page 680

1  advisory committee, that information
2  regarding adverse events that are known
3  and learned in trials should be included
4  in the labeling. Do you agree with that?
5   A.  That information --
6   Q.  In other words, do you agree, sir,
7  that adverse events that are known to a
8  pharmaceutical company and to the FDA
9  should be included in package inserts?
10  A.  Yeah. That's required by the law.
11  Q.  Okay. Is that your understanding
12 of the regulations?
13  A.  Yes.
14  Q.  Do you claim, sir, that Merck could
15 have changed the label for Vioxx without
16 getting FDA's approval?
17  A.  Yes.
18  Q.  And what's your understanding based
19 on?
20  A.  That there is a procedure known as
21 notice of changes impending, or something
22 to that effect, in which a company is able
23 to communicate risk to a -- to anybody
24 that it likes, just send out a dear doctor

Page 681

1  letter, to take out an ad, to tell its
2  sales reps -- at the same time that it
3  has requested a change in labeling of the
4  government, without waiting for FDA to
5  approve a label change if it is in order
6  to provide warning about an important
7  risk.
8   Q.  Is that your general understanding,
9  sir, of the way it works, or are you
10 thinking about a particular regulation when
11 you say what you just said?
12  A.  I'm think -- I'm -- Well, I'm sure
13 that there is regulatory language that
14 would allow for that, because that is
15 something which is accepted as behavior of
16 -- of a pharmaceutical company.
17  Q.  Are you familiar with the
18 regulatory language that governs when a
19 package insert can be changed without FDA
20 approval?
21  A.  That there is a -- I'm familiar
22 with the duty to warn section of 21 CFR
23 -- and there are other numbers which I do
24 not recall -- which dates that when a

Jerry Avorn, M.D.

Page 682

1  company is aware of an important or a
2  serious adverse event associated with its
3  drug, that it is responsible for providing
4  a warning about that -- that adverse
5  event.
6  Q. Are you familiar, sir, and can you
7  tell me about the specific regulations
8  that the FDA has that describe when a drug
9  company can change their label without FDA
10 approval?
11 A. My understanding is that when --
12 the regulations state that when a company
13 becomes aware of an adverse event that
14 requires warning prescribers about it, that
15 the company is free to do so pending --
16 in other words, and can simultaneously
17 request a label change from FDA. But my
18 understanding is that the company is not
19 required to get FDA approval in order to
20 heighten its warning about its product.
21 Q. Do you believe, sir, that there's
22 limitations on a drug company's ability to
23 make a label change without FDA approval?
24 A. Oh, of course. It cannot assume a

Page 683

1  new indication. It cannot weaken a
2  warning and so forth. But my
3  understanding is that it can provide
4  additional warning without FDA's permission
5  at the time.
6  Q. Is it your understanding, sir, that
7  Merck could have made a change to the
8  label on its own without FDA approval if
9  the change involved a material or major
10 change to the label?
11         MR. TISI: Objection. A
12 warning? Indications? What are we
13 talking about now, Counsel?
14 A. It is my understanding that -- that
15 Merck was absolutely free to issue a
16 statement to physicians -- or patients for
17 that matter -- indicating an increased
18 risk beyond what was depicted in an
19 earlier version of a label.
20 Q. My question was different. Is it
21 your understanding based on the regulations
22 that Merck could have made a change to the
23 Vioxx label without FDA approval if the
24 change involved a major change?

Page 684

1         MR. TISI: Objection.
2  A. My understanding is that the
3  company could have indicated that it was
4  proposing a change to the label -- could
5  have indicated to physicians that it was
6  proposing a change to the label that would
7  heighten a given warning, and that it was
8  free to make that communication without
9  getting FDA's permission.
10 Q. Can you tell me, sir, what FDA
11 regulation calls for that or permits that?
12 A. I think it's more a matter of it
13 is not prohibited rather than -- there are
14 two pieces. And one is, to my knowledge,
15 there is no prohibition in any FDA
16 regulation from a company communicating
17 with physicians or patients about a risk.
18 And secondarily, there is the duty to warn
19 provision in which the company is, in
20 fact, obliged to communicate such a risk.
21     The company managed to send out a
22 dear doctor letter to doctors throughout
23 the country denying the validity of our
24 study, so they conceivably could have sent

Page 685

1  out a dear doctor letter indicating that
2  there was concern about cardiovascular
3  risk.
4  Q. Is it your testimony that Merck
5  sent a letter to doctors throughout the
6  country that --
7  A. Oh, they pub -- they dissem -- I'm
8  sorry. Maybe I should correct that.
9      They disseminated -- I don't have a
10 copy of the dear doctor letter. They
11 disseminated widely their position about
12 the invalidity of our study.
13 Q. Is it your testimony that Merck
14 disseminated widely a letter to doctors
15 that challenged the validity of your
16 study?
17 A. Yes.
18         MR. GOLDMAN: Do you have a
19 copy?
20         MR. TISI: I do.
21 A. I have seen it.
22         MR. TISI: Do you want --
23 A. I don't have one with me, but I've
24 seen it.

64 (Pages 682 to 685)

Jerry Avorn, M.D.

Page 686

1    MR. GOLDMAN: We'll mark
2 that as the next exhibit if you've got it,
3 Chris.
4    MR. TISI: I do.
5    THE WITNESS: Thank you.
6    MR. GOLDMAN: I'll mark this
7 as Exhibit 22?
8    (Exhibit-22, Merck
9 Correspondence to Doctors, marked for
10 identification).
11    MR. GOLDMAN: Okay. I'm
12 going to mark it. I'm not going to
13 discuss it right now. We don't have much
14 time.
15    BY MR. GOLDMAN:
16 Q. Dr. Avorn?
17 A. Yes.
18 Q. Have you read any of the expert
19 reports or trial testimony of FDA experts
20 who have discussed the issue of whether
21 Merck could have changed the label without
22 FDA's prior approval?
23 A. I know that there are individuals
24 who are ex-FDA employees who characterize

Page 687

1 themselves as quote FDA experts. Are
2 those the people you're referring to?
3 Q. Are you taking the position that
4 the witnesses who have testified for Merck
5 about FDA regulations are not experts?
6 A. No. I'm just trying to distinguish
7 between people who are FDA employees who I
8 believe, apart from Dr. Graham, have not
9 testified in this trial, as opposed to FDA
10 former employees who often consult for
11 drug companies on such matters and
12 testify. And I just want to be clear
13 what you're talking about.
14 Q. Have you read any of the testimony
15 of any of the expert witnesses hired by
16 Merck or hired by the plaintiffs' lawyers
17 that address the question of whether Merck
18 could have changed the label without FDA's
19 prior approval?
20 A. No.
21 Q. Did you ever say in any of your
22 articles, sir, that you wrote back when
23 Vioxx was on the market that -- that Merck
24 ought to immediately change its package

Page 688

1 insert to reflect any potential
2 cardiovascular risks?
3 A. No.
4 Q. You make the statement in your
5 report on Page .21 that, "The FDA attempted
6 to get Merck to change the company's
7 official labeling of the drug to more
8 accurately reflect the growing body of
9 data about its cardiovascular risk." Do
10 you see that?
11 A. (Witness viewing document). Yes.
12 Q. When did the FDA attempt to get
13 Merck to change the label, sir?
14 A. I know that even in early advisory
15 committee meetings, after the VIGOR study
16 was published, there was discussion by
17 members of the advisory committee that the
18 public needed to be -- or physicians
19 needed to be alerted through the labeling
20 of the increased risk of cardiovascular
21 toxicity that was evident in VIGOR.
22    And that would have been at the --
23 the first advisory committee post-VIGOR,
24 which I believe, was early '01. Perhaps

Page 689

1 February of '01.
2 Q. Is it your testimony that the
3 advisory committee in February of 2001
4 concluded that Merck needed to change the
5 labeling to tell doctors about the
6 increased risk of Vioxx concerning cardio
7 toxicity?
8 A. Members of the advisory committee
9 stated that. Whether there was a formal
10 vote on that or not, I don't know. But
11 it was clearly a strong theme in the
12 advisory committee.
13 Q. Were you aware, sir, that the
14 advisory committee was unable to reach any
15 consensus at all on whether Vioxx caused
16 the heart attack difference in the VIGOR
17 study or whether Naproxen prevented heart
18 attacks in the VIGOR study?
19    MR. TISI: Objection;
20 mischaracterizes.
21 A. I believe that members of the
22 advisory committee, some of them were
23 quite strong in saying this is an
24 important risk of this drug and this needs

65 (Pages 686 to 689)

Jerry Avorn, M.D.

Page 690

1  to be depicted more fully in a warning.
2  Q. That's your understanding of what
3  the transcript reflects?
4  A. Yes.
5  Q. Do you know what Dr. Nissen's
6  position was on this issue?
7  A. I believe he was one of the people
8  who said that.
9  Q. You believe Dr. Nissen was one of
10 the people who said what at that meeting?
11 A. That the -- That the drug -- That
12 there was -- I believe it was Dr. Nissen
13 who said that there was a concern about --
14 In fact, maybe we could just pull the
15 advisory committee minutes out.
16     But my recollection was that there
17 were members of the advisory committee --
18 and I believe that Dr. Nissen was one of
19 them, although I'm not positive -- who
20 stated that there was a worrisome signal
21 of cardiovascular risk in VIGOR that
22 needed to be communicated to the
23 profession.
24 Q. Did Dr. Nissen, as far as you can

Page 691

1  recall, Dr. Avorn, say that he believed
2  that the difference in VIGOR concerning
3  heart attack risk was due to Vioxx?
4  A. I'd want to go back to his words
5  before characterizing what he said.
6  Q. Do you know when Merck informed the
7  FDA about the results of the VIGOR trial?
8  A. I believe that it was in the spring
9  of 2000. Perhaps March.
10 Q. Do you know whether Merck tried to
11 get the label changed to include the VIGOR
12 results before the FDA suggested that
13 Merck try to make the change?
14     MR. TISI: Objection.
15 A. I know that there was ongoing
16 discussion of the Vioxx label going on
17 over many, many months, and that it
18 included both the issue of the depiction
19 of the gastrointestinal protection as well
20 as depiction of the cardiovascular risk.
21 Q. Have you read all the
22 correspondence between the FDA and Merck
23 concerning the change to the VIGOR label
24 between the time the VIGOR results came

Page 692

1  out and the time the label was changed in
2  April of 2002?
3  A. I'm sure that, since there was so
4  much of it, I've not read absolutely all
5  of it.
6  Q. Is it your position that the FDA
7  initiated the label change to get the
8  VIGOR information in the label, or did
9  Merck initiate the label change?
10     MR. TISI: Which VIGOR
11 information are we talking about, Counsel?
12 A. Did both, the VIGOR cardiac and the
13 VIGOR gastrointestinal.
14 Q. Both.
15 A. But my understanding is that there
16 was ongoing back and forth, and I don't
17 know who started what when.
18 Q. Is it your testimony that after the
19 advisory committee in 2001 that the FDA
20 initiated the label change, or did Merck
21 initiate that on its own?
22 A. Well, I know that Merck was very
23 keen to have the gastroprotective component
24 of the label changed, for understandable

Page 693

1  reasons. And so I would have expected
2  that Merck would have initiated the
3  conversations.
4  Q. But you don't know?
5  A. No. I'm -- I'm -- I don't know.
6  I cannot cite a document indicating who
7  said what first.
8  Q. Do you know Dr. -- Is it Delap or
9  Delab?
10 A. No.
11 Q. Do you know what he -- withdrawn.
12     You've cited Dr. Targum in your
13 report, sir, in comments that she's made
14 about Vioxx. You didn't talk about any
15 comments that Dr. Villalba made, did you?
16 A. I believe I did. I may not have
17 used Dr. Villalba's name, but I know that
18 I cited -- I think it's a she -- her
19 reports.
20 Q. Is it true, sir, that in practice,
21 manufacturers typically consult with the
22 FDA before implementing a label change?
23 A. Yes.
24 Q. Do you know what Merck's prior

Jerry Avorn, M.D.

**Page 694**

1  experience was with the FDA concerning any
2  label changes that Merck tried to make
3  without FDA approval?
4      A. No.
5      Q. You've never been on the company's
6  side of the fence or the FDA's side of
7  the fence when it comes to whether a drug
8  company should make a label change without
9  clearing it with the FDA, true?
10     A. Right. I've worked at Harvard my
11 whole life. I've never worked on either
12 of those sides.
13     Q. Do you know that the FDA recently
14 amended their labeling regulations?
15     A. Yes. I had a paper in the New
16 England Journal of Medicine about that
17 last week.
18     Q. You're critical of that, right?
19     A. That's what the paper said.
20     Q. Do you know that the FDA removed
21 the distinction between warnings and
22 precautions?
23     A. Yes. Well, they -- they put them
24 closer together. I'm trying to recall

**Page 695**

1  whether they obliterated the distinction or
2  just put them more in proximity with one
3  another.
4      Q. Would the VIGOR results, including
5  the cardiovascular results, be considered a
6  highlight under the FDA's new amended
7  labeling regulations?
8      A. Do you mean the cardiovascular
9  results of VIGOR?
10     Q. Mm-hmm.
11     A. It's a hypothetical because those
12 labels have not yet gone into effect. But
13 my hope is that they would be.
14     Q. If the cardiovascular results of
15 the VIGOR trial were considered a
16 highlight under the FDA's proposed labeling
17 regulations, that would require prior FDA
18 approval, true?
19     A. That is so hypothetical because the
20 system you're describing will not go into
21 place until June 30th of this year.
22     Q. Okay. You've indicated in your
23 report -- you refer to documents that talk
24 about -- Withdrawn.

**Page 696**

1      You've referenced documents that
2  refer to calculations that might reflect
3  how much money Merck would lose if the
4  cardiovascular data from VIGOR were in the
5  warning section versus the precaution
6  section. Do you remember that?
7      A. Yes.
8      Q. And you don't know the
9  circumstances about why Merck decided that
10 the cardiovascular information is more
11 properly in the precaution section, right?
12     A. Do I know why Merck made a given
13 decision?
14     Q. Mm-hmm.
15     A. I have my opinion about that, but I
16 do not have personal experience from
17 having been in the company when the
18 decision was made.
19     Q. And you make a statement about, if
20 the company was driven by profits in
21 deciding that the cardiovascular
22 information about VIGOR should be in the
23 precaution section as opposed to the
24 warning section, that that would be

**Page 697**

1  inappropriate?
2      A. Right.
3      Q. And there you're just expressing
4  your opinion about how it would be wrong
5  if Merck, in fact, suggested that the
6  cardiovascular information be in the
7  precaution section, that that would be
8  inappropriate?
9      A. Correct.
10     Q. That's your personal view, right?
11         MR. TISI: Objection.
12     A. Well, no, it is absolutely not. It
13 is a view based on the --
14     Q. I'm sorry. I wasn't clear. I'm
15 not asking that.
16         That's very much a hypothetical
17 statement that you made in your report,
18 isn't it, Dr. Avorn, because you don't
19 know why Merck made the decision that the
20 cardiovascular information should be in the
21 precaution section; you're just commenting
22 on if that reason had to do with profits,
23 that would be inappropriate?
24     A. I need to answer that in more than

Jerry Avorn, M.D.

Page 698

1 a yes or no.
2  Q. Mm-hmm.
3  A. Clinically, I don't know that
4 anybody would look at the causation of
5 heart attack by a drug as a precaution,
6 because normally what belongs in the label
7 as a precaution is things like check the
8 potassium or don't use this drug with --
9 in a particular context.
10      Causing heart attacks is
11 conventionally something that one would
12 expect to see as a warning rather than as
13 a precaution.
14      There's also ample literature, with
15 which I'm very familiar, that describes
16 the reduction in utilization of drugs if
17 physicians perceive excessive risk. And
18 we've published papers on that topic.
19  Q. Mm-hmm.
20  A. There is also the evidence, which
21 you've described, in which Merck employees
22 calculated the effect on sales of -- of
23 vivid depiction of warning versus a more
24 diminished depiction of warning and what

Page 699

1 that would do to Vioxx sales.
2      Putting all that together, it seems
3 important to me that the depiction of the
4 risk of cardiovascular toxicity with Vioxx
5 was placed in a location on the label that
6 most observers would think unusual, and
7 that that seems to relate importantly to
8 what -- how the drug was used by
9 physicians.
10  Q. Did the FDA approve that the VIGOR
11 data be included in the precautions
12 section?
13  A. By definition, the way the label
14 ended up would have been approved by FDA.
15  Q. What is the standard for what
16 should be included in the precautions
17 section of a package insert?
18  A. Tell me what you mean by what is
19 the standard.
20  Q. What do the FDA regulations say
21 about what information should be in the
22 precautions section as opposed to the
23 warning section?
24  A. Things which a physician would need

Page 700

1 to bear in mind in order to use the drug
2 safely and appropriately.
3  Q. That's your understanding of the
4 standard that the FDA applies as to
5 whether or not a side effect should be in
6 the precautions section versus the warning
7 section?
8  A. That's my understanding.
9      MR. GOLDMAN: Okay. I
10 believe I don't have anymore questions
11 right now, Dr. Avorn. But I think Mr.
12 Tisi does, and I might have some questions
13 after that.
14      (Off the record at 1:24
15 p.m.)
16      (Recess taken).
17      (Back on the record at 1:29
18 p.m.)
19      EXAMINATION
20 BY-MR.TISI:
21  Q. Dr. Avorn, I'm going to go through
22 some of the things we talked about today,
23 because it's most recent in time, and then
24 I'm going to go back to some of the

Page 701

1 things we talked about yesterday. Okay?
2  A. Okay.
3  Q. And I may jump around a little bit,
4 so I'm going to ask you to grind gears
5 for a little bit for me just so we can
6 get finished here.
7      You were asked by counsel for Merck
8 whether people who perform observational
9 studies do so for a hypothesis generation.
10  A. Right.
11  Q. Do you remember that line of
12 questioning?
13  A. Right.
14  Q. How many observational studies have
15 you personally done over the years?
16  A. Dozens.
17  Q. Okay. And you are one of the more
18 prolific researchers in doing observational
19 studies in the country?
20  A. I believe so.
21  Q. Okay. And do you perform
22 observational studies solely for hypothesis
23 generation?
24  A. No.

68 (Pages 698 to 701)

Golkow Litigation Technologies - 877.DEPS.USA