Jerry Avorn, M.D.

Page 702

1  Q. When you performed your Naproxen
2  study -- and when we talk about the
3  Naproxen study -- I shouldn't say Naproxen
4  study -- your non-COX-2 study --
5      (Reporter interruption).
6  Q. -- was that for hypothesis
7  generation?
8  A. No. It is for hypothesis testing.
9  Q. And in fact, you understand that
10 Merck used that study to demonstrate the
11 fact that Naproxen was cardioprotective?
12     MR. GOLDMAN: Object to the
13 form.
14 A. Yes.
15 Q. Okay.
16 A. Incorrectly, in my view.
17 Q. Okay. And did you do the Vioxx
18 study, the COX-2 study, for the purposes
19 of quote hypothesis generation?
20 A. No. That also was testing a
21 hypothesis.
22 Q. Okay. And, in fact, would it be
23 fair to say that you did those studies
24 because of the safety issues that were

Page 703

1  raised as a result of VIGOR?
2  A. Correct.
3  Q. All right. Let me go skip to the
4  ITT issue --
5  A. Yes.
6  Q. -- if we could. You talked about
7  adverse events which are acute, like
8  anaphylactic shock, and then those which
9  may be longer term or appear over a course
10 of time.
11 A. Correct.
12 Q. Are you aware that cardiovascular
13 risks are particularly appropriate to look
14 at on an ITT basis?
15     MR. GOLDMAN: Object to the
16 form.
17 A. Yes. I think that in this case it
18 would be appropriate to look at them both
19 ways.
20 Q. Okay.
21 A. Both in terms of the acute effect
22 of on-drug use but also the longer term
23 effect, particularly given the possibility
24 that there may be more longer term

Page 704

1  effects.
2  Q. Okay. Now, counsel asked you
3  questions about the preliminary analysis
4  plan for the Alzheimer's studies. Do you
5  remember that?
6  A. Yes.
7  Q. Are you aware that the protocols
8  for the Alzheimer's studies actually call
9  for an ITT analysis as a secondary
10 analysis?
11 A. That's interesting. I was not
12 aware that that was a prespecified
13 analysis.
14 Q. All right. If it was prespecified,
15 it was appropriate to do it, right?
16 A. Yes.
17     MR. GOLDMAN: Objection.
18     BY MR. TISI:
19 Q. And, in fact, we looked at some of
20 the Chen memos that you referred to
21 earlier --
22     MR. GOLDMAN: Object to the
23 form.
24 ///

Page 705

1     BY MR. TISI:
2  Q. -- you were aware that, in fact,
3  they did do an ITT analysis in mortality
4  looking at 091, Study 078, Study 126
5  individually, combined and in various
6  different combinations, correct?
7  A. I've seen all those analyses from
8  the internal company documents.
9      MR. GOLDMAN: Object to
10 the form.
11     BY MR. TISI:
12 Q. And if the company had actually
13 done the ITT analysis but did not share
14 that in a timely manner with the FDA,
15 would that in your view have been
16 inappropriate?
17     MR. GOLDMAN: Object to the
18 form.
19 A. Yes, particularly if the finding
20 revealed an increase in death rate.
21 Q. Okay. Let's talk about the VALOR
22 study for a minute, if you don't mind.
23 A. Okay.
24 Q. Counsel asked you about the

69 (Pages 702 to 705)

Jerry Avorn, M.D.

Page 706

1  hypothesis, would it be ethical to test a
2  hypothesis that Vioxx was causing heart
3  attacks. Do you remember that?
4  A. Yes.
5  Q. Okay. Do you remember yesterday
6  when counsel asked you questions that
7  dealt with the issue that there was also a
8  hypothesis that Vioxx was beneficial by
9  reducing inflammation and thereby being a
10 cardioprotective drug?
11 A. Right.
12 Q. That that was a hypothesis. And
13 then there was also hypothesis that it
14 might also be a neutral --
15 A. Neutral.
16 Q. -- a cardiovascular basis?
17 A. Yes.
18 Q. Okay. If there was a hypothesis, a
19 valid hypothesis that Vioxx was
20 cardioprotective, could that have been
21 tested --
22 A. Yes.
23 Q. -- ethically?
24 A. Prior to -- The ethics require more

Page 707

1  than just a hypothesis. The ethicalness
2  of a study depends on the hypothesis in
3  combination with the available knowledge at
4  the time.
5  Q. Okay. Now, the counselor referred
6  to the Konstam meta-analysis. Are you
7  aware that the FDA discounted the Konstam
8  meta-analysis as being strong evidence of
9  the lack of risk, cardiovascular risk?
10         MR. GOLDMAN: Object to the
11 form.
12 A. Discounted it as being strong.
13 Q. Strong.
14 A. I'm aware that there were concerns
15 about the Konstam analysis in terms of its
16 reassuringness.
17 Q. Okay. You agree that -- Do you
18 have any opinion, that you hold to a
19 reasonable degree of medical and scientific
20 certainty, that -- as to whether or not
21 the Konstam meta-analysis, which involved
22 different doses, different durations,
23 different populations, et cetera, was, in
24 fact, a strong evidence -- a strong

Page 708

1  reassuring evidence of cardiovascular
2  safety?
3  A. I think once the VIGOR findings
4  were out, one could not get reassurance by
5  that kind of a variegated meta-analysis.
6  Q. Let me also talk to you about the
7  -- the factual testimony that you gave
8  about your study, going -- jumping to that
9  topic for a moment.
10     In your time line that you had
11 here, you had -- you said you had a
12 conversation with -- in your time line
13 here -- Actually, let me rephrase the
14 question.
15     Yesterday you mentioned a
16 conversation you had with Dr. Sherwood
17 when he came, and he -- I'm not going to
18 characterize it -- that he was --
19 A. Dismissed.
20 Q. Okay. About -- on the -- on the
21 meaning of the VIGOR study. When did that
22 occur in relationship to the time line
23 that you prepared for your study?
24 A. I believe that his visit would have

Page 709

1  been around January of 2001. So it was
2  fairly soon after VIGOR came out. And
3  that would have been around the time -- a
4  little before the time that Dr. Solomon
5  spoke to Dr. Cannuscio about doing an
6  outcome study.
7  Q. When you and Dr. Solomon decided to
8  do the non COX-2 NSAID study, the first
9  study, why did you and Dr. Solomon decide
10 to do that study?
11 A. A couple of reasons. One big
12 prompt for that reason was the conclusion
13 from VIGOR that Naproxen prevented MIs.
14 Because we felt that if that was true,
15 that would have been one of the biggest
16 stories in cardiology ever, because nothing
17 has ever been shown to reduce the
18 incidence of MIs by 80 percent.
19     And we then spoke to a number of
20 colleagues at the Brigham and asked them
21 if they believed that NSAIDs in general
22 had the same cardioprotective effect as
23 aspirin. And the answer we most commonly
24 got was, that's never been demonstrated,

70 (Pages 706 to 709)

Jerry Avorn, M.D.

Page 710

1  but that's something you guys could look
2  at in your database.
3     Q.  And you did that independent of any
4  funding from any source?
5     A.  Correct.
6     Q.  Okay.
7     A.  We had some NIH support at the
8  time, which helped to keep the electricity
9  going, but it was not funded by any
10 company.
11    Q.  During the course of your
12 negotiations with -- And you were
13 involved, in a meaningful way, in both the
14 negotiations leading up to the conduct of
15 the study involving COX-2s, as well as the
16 implementation of the study, the findings
17 and publication of that study?
18    A.  Absolutely.
19    Q.  Okay.  Would you say that you were
20 involved every step of the way?
21    A.  Yes.
22    Q.  Okay.
23    A.  And it all happened within my
24 division for which I'm overall responsible.

Page 711

1     Q.  In fact, not to pull rank or
2  anything like that, what is your
3  relationship to Dr. Solomon in terms of --
4  in terms of being the primary researchers
5  on the study?
6     A.  He is a very, very smart faculty
7  member within my division.  I guess you
8  could say I'm his boss.
9     Q.  Okay.
10    A.  We work closely together on a
11 number of projects.
12    Q.  Sure.  I understand.
13       The design that -- You testified
14 earlier that the -- You're aware that
15 Merck had actually used your -- I'll call
16 it the Naproxen study?
17    A.  Yes.
18    Q.  I know that's an
19 oversimplification, but your Naproxen study
20 in support of its theory about the results
21 of VIGOR.
22       Was the study designed for your
23 Naproxen study for which they used -- for
24 which they bore -- or as a proponents of

Page 712

1  that study -- similar in any way to the
2  design of the study that looked at COX-2
3  relationship to cardiovascular disease?
4       MR. GOLDMAN:  Object to the
5  form.
6     A.  They were very similar.
7     Q.  Okay.
8     A.  They were both case-controlled
9  studies of MI.
10    Q.  And in fact, let me ask you this,
11 so this is clear:  Was Merck involved
12 every step of the way with the design and
13 implementation of the COX-2 study that you
14 and Dr. Solomon did?
15    A.  They were in the sense that -- you
16 mean the -- yes, the follow-up study.
17 They were in the sense that the contract
18 provided that we keep them abreast on a
19 very frequent basis of the study design.
20 They had a great deal to say about the
21 protocol and made a number of suggestions,
22 most of which we accepted.  And according
23 to the terms of the contract, we provided
24 them with milestones and progress reports

Page 713

1  and preliminary data tables and so forth.
2     Q.  Now, during these protracted
3  negotiations that we've talked about, and
4  I think you characterized them as
5  unprecedented, did there ever come a time
6  during the course of that negotiation
7  where you and Dr. Solomon had actually had
8  to tell Merck that, look, if you don't --
9  in effect, that if you don't commit, we're
10 going to have to go elsewhere to start
11 looking to get this study done?
12       MR. GOLDMAN:  Object to the
13 form.
14    A.  Yes.  That's true.
15    Q.  Okay.  Would you describe that for
16 us, please?
17    A.  Sure.  It began to seem to us, at
18 numerous points during that year plus of
19 discussion with them, that this was going
20 to -- this could well be a protracted
21 negotiation, which would then end up with
22 them simply saying forget it, we don't
23 want to do it.  Because we just were
24 never clear that they actually were going

71 (Pages 710 to 713)

Jerry Avorn, M.D.

Page 714

1 to commit to supporting this study.
2     And Dr. Solomon and I felt this was
3 a very important piece of research that
4 needed to be done, that it was an
5 important scientific question, and equally
6 important, that there were millions of
7 patients taking these drugs and that there
8 was a -- an important safety issue that
9 needed further study. And we felt that
10 the work needed to go on, and if they
11 weren't going to do it, we would have to
12 figure out some other way to get the work
13 done.
14 Q. Okay. You were asked about the
15 changes that were suggested back and forth
16 to the manuscript by counsel, do you
17 remember that? Were you involved in all
18 of the decisions about whether to accept
19 or reject certain changes to the paper?
20 A. Dr. Solomon and I would discuss
21 each of his conversations with -- I don't
22 want to say each -- but the substance of
23 his conversations with Merck.
24 Q. Now, the ultimate conclusions that

Page 715

1 went in to your paper, how did they relate
2 to what was presented at the ACR meeting,
3 in terms of the actual statistics that
4 were presented?
5 A. They were very similar.
6 Q. Okay. And at that time Dr.
7 Cannuscio actually was on the poster
8 presentation at the ACR, correct?
9 A. That's right. It may have even
10 been a podium presentation, but yes.
11 Q. Okay. And the actual statistics,
12 the .54 P-value that I think you discussed
13 with Mr. Goldman, that was in the poster,
14 correct?
15 A. I would need to go back and look
16 to see.
17 Q. Okay.
18     MR. GOLDMAN: Do you still
19 have the poster?
20     THE WITNESS: The relevant
21 document would be the actual abstract
22 itself as opposed to -- Because as I said,
23 I'm not sure. I thought it was
24 actually --

Page 716

1     BY MR. TISI:
2 Q. I actually have it here.
3 A. Okay. I thought it was actually an
4 oral presentation.
5     MR. GOLDMAN: Okay.
6 A. But it's -- it's around. It was
7 published in I think Arthritis and
8 Rheumatism, as all the abstracts were.
9 Q. But the point is, in any meaningful
10 way --
11 A. Correct.
12 Q. -- the statistics changed between
13 the time that Dr. Cannuscio was on the
14 paper -- on the abstract for the
15 presentation at the ACR, and the abstract
16 that actually appeared at the front of the
17 -- at the front of the article when it
18 was ultimately published?
19 A. The findings were basically the
20 same.
21 Q. Let me go back to some of the
22 things that we talked about yesterday.
23     You were asked some questions, and
24 we were objecting to them, but let me

Page 717

1 follow through with it.
2     You were asked about your opinions
3 about product liability lawsuits and your
4 feelings about that. Do you remember
5 those questions?
6 A. (Witness nods head).
7 Q. Do you believe that from a public
8 health perspective of legal liability,
9 failure to disclose drug risks serves any
10 important public health goal?
11 A. Yes. As a matter of fact, we're
12 writing a paper about that now, that
13 sometimes important drug risks are
14 discovered or clarified primarily through
15 information that becomes available in the
16 process of litigation.
17     And secondly, it often is an
18 important quality control mechanism to --
19 in the absence of what I consider to be
20 an inadequately vigilant FDA -- to make
21 sure that adverse events are worked up and
22 taken seriously by manufacturers.
23 Q. Referring to the questions about
24 the New England Journal of Medicine

72 (Pages 714 to 717)

Jerry Avorn, M.D.

**Page 718**

1 expression of concern and that whole
2 issue, let me ask you generally -- Back
3 up.
4   You're a peer reviewer for medical
5 journals?
6   A. Yes.
7   Q. Can you name some of the medical
8 journals that you have been a peer
9 reviewer for?
10   A. The New England Journal of Medicine
11 and the Journal of the American Medical
12 Association.
13   Q. In general, do peer reviewers, such
14 as yourself, rely on the honesty and
15 integrity of an author in reporting and
16 analyzing data?
17   A. You have to.
18   Q. Okay. Why is that?
19   A. Because there's no way that either
20 a peer reviewer, or a journal editor, can
21 go back and re-check the raw data that go
22 into the results section of a paper. That
23 would just not be feasible.
24   Q. Okay. Are they -- In terms of

**Page 719**

1 knowledge, typically, are peer reviewers on
2 the -- in terms of knowledge of data, are
3 peer reviewers on the same level -- is it
4 the same playing field as the people who
5 actually write the article and look at the
6 data in terms of knowledge about that
7 particular topic?
8   A. Well, they are certainly experts in
9 the content area, but there's no way that
10 an outsider can ever know as much about
11 the primary data in a given study as the
12 people who actually did the study.
13   Q. Okay. Going to the role of
14 clinical trials and observational data as
15 opposed to mechanistic studies, et cetera,
16 are there any instances you can think of
17 where it's generally accepted that a drug
18 causes a beneficial -- either a beneficial
19 effect or a side effect where the
20 mechanisms-of-actions-are-not-generally
21 accepted as being understood?
22   MR. GOLDMAN: Objection to
23 form.
24   A. Oh, that happens all the time.

**Page 720**

1   Q. Can you give us examples?
2   A. For many years -- and in some ways
3 perhaps even up to the present the -- how
4 aspirin worked was not well known, but it
5 clearly worked, and it was used very
6 widely.
7   A more recent example would be the
8 statin drugs to lower cholesterol. For
9 many years we believed that their main
10 mechanism of action was by lowering
11 cholesterol, but more recently there's some
12 very interesting and important reason to
13 believe that they also have an important
14 effect on the actual wall of the artery in
15 terms of reducing heart attacks that is
16 totally separate from their effect on
17 lowering cholesterol.
18   Q. Okay. Is it -- Do you have an
19 opinion, again to a reasonable degree of
20 medical certainty, that -- as to whether
21 it is generally accepted that Vioxx causes
22 cardiovascular injury, including heart
23 attack, congestive heart failure and
24 hypertension?

**Page 721**

1   A. I think that's universally accepted
2 at this point.
3   Q. Is that --
4   MR. GOLDMAN: Move to strike
5 as nonresponsive.
6   BY MR. TISI:
7   Q. Is that --
8   A. And it is also my opinion.
9   Q. And is that generally understood to
10 include all doses and in all durations?
11   MR. GOLDMAN: Object to the
12 form.
13   A. I think as a general principle, if
14 a drug causes a problem at a particular
15 dose, it is quite likely that it will
16 cause a problem at other doses as well,
17 and the same can be said about duration.
18   Q. Okay. Let me ask you -- I'm going
19 to go to some documents here. I'm going
20 to come-around here if you don't mind.
21 We've discussed with Mr. Goldman
22 today the Code of Federal Regulations and
23 where they over -- I'm just going to
24 attach it -- I pulled it from the

Jerry Avorn, M.D.

Page 722

1    materials that we had provided to Mr.
2    Goldman today, so I don't have a -- but I
3    don't know the tab number.
4         MR. TISI: Can we mark this
5    as the next exhibit? What number do we
6    have here? Is it 23?
7         MR. GOLDMAN: I think.
8    Yes.
9         (Exhibit-23, Food and Drug
10   Administration, HHS, Section 201.57, marked
11   for identification).
12        BY MR. TISI:
13   Q.   Okay. Doctor, I'm going to hand
14   this to you.
15   A.   (Witness viewing document).
16   Q.   First of all, there's a highlighted
17   section there. Could you just read that
18   into the record, please?
19   A.   Sure. This is the Food and --
20   It's labeled Food and Drug Administration,
21   HHS, Section 201.57.
22   Q.   Okay.
23   A.   And --
24   Q.   The section is highlighted?

Page 723

1    A.   Yes. And under heading (e)
2    Warnings, "The labeling shall be revised
3    to include a warning as soon as there is
4    reasonable evidence of an association of a
5    serious hazard with a drug;" semicolon, "a
6    causal relationship need not have been
7    proved." Period.
8    Q.   Okay. Just taking that language
9    alone, okay, if that language appeared in
10   any other context other than in a
11   regulation, just taking that language, if
12   it appeared in an article, if it appeared
13   in a textbook, if it appeared in a
14   presentation, would that language be
15   language that you are familiar with?
16   A.   Yes. I've seen it in many of
17   those contexts.
18   Q.   Okay. Is this language that is a
19   pharmacoepidemiologic concept, a reasonable
20   evidence of association and causation?
21   A.   Yes. I think pharmacoepidemiology
22   is all about reasonable evidence,
23   determining associations, serious hazards
24   and causal relationships. That's the

Page 724

1    substance of pharmacopeia.
2    Q.   Are you -- Do you consider yourself
3    an expert in interpreting the scientific
4    and medical concepts embodied in that
5    language?
6    A.   Yes. In fact, that language cannot
7    be operationalized without having mastery
8    of concepts such as reasonable evidence,
9    serious hazard, and causal relationship.
10   Q.   And is that something that, in your
11   experience, the average lay person
12   understands those concepts without guidance
13   from people such as yourself?
14   A.   They cannot.
15   Q.   Yesterday you were asked -- Stay
16   with that for a moment. You were asked
17   about written standards that deal with
18   managing risks, and I think you referred
19   to a pharmacoepidemiologic paper or
20   whatever. Would this be another example
21   of the kind of standards that -- talk
22   about managing risk, this regulation you
23   just referred to?
24        MR. GOLDMAN: Object to the

Page 725

1    form.
2    A.   Yes. It is a standard for managing
3    risk.
4    Q.   Okay. So this would be another
5    kind of source that you might look at?
6    A.   Right.
7         MR. GOLDMAN: Object to the
8    form.
9         BY MR. TISI:
10   Q.   Oh. Yeah. Let me go to this.
11        If you go to Page :12 of your
12   report, sir.
13   A.   (Witness complied). Yes.
14   Q.   If you look at -- It quotes -- and
15   we can go back to the original document --
16   But it quotes Dr. Scolnick's e-mail about
17   his March 2000 e-mail. Do you see that?
18   A.   (Witness viewing document). Yes.
19   Q.   We've referred to that before. And
20   you were asked, you know, do you know Dr.
21   Scolnick's intent, you can get into his
22   mind and figure out what he was really
23   thinking what he wrote that. Do you
24   remember that line of questioning?

Jerry Avorn, M.D.

Page 726

1  A. Right.
2  Q. I'm going to put that aside for a
3  moment and ask you this: In March of
4  2000, when the VIGOR results came out,
5  would a -- What, if anything, would a
6  reasonable and prudent scientist and
7  pharmaceutical company have interpreted
8  about the relationship between Vioxx and
9  heart attacks?
10       MR. GOLDMAN: Object to the
11 form.
12  A. I think any reasonable person
13 reading those data would see that there is
14 -- depending upon how they counted the
15 numbers -- a fivefold or a fourfold
16 increase in the risk of heart -- or in
17 the rate of heart attacks in people taking
18 Vioxx. For those who believe in
19 statistical significance, it even had that.
20 It was even a, quote, significant finding
21 in terms of the P-value. And it raised a
22 great concern, or it should have, on the
23 part of any responsible person looking at
24 those data, that this was a drug that

Page 727

1  could cause heart attacks, as we now, in
2  fact, years later, have ample evidence
3  that it does.
4  Q. And, in fact, is that the
5  conclusion that you, personally, came to
6  when you saw this data?
7  A. Yes. And I remember at the time,
8  as we discussed, with Dr. Sherwood's
9  visit, when I invited him to give grand
10 rounds at the Brigham, that he, as a
11 senior member of Merck management,
12 dismissed the rate of heart attack seen in
13 VIGOR, in my view, rather glibly as
14 saying, "Oh, yeah, Naproxen prevents heart
15 attacks."
16      And I remember thinking at the
17 time, in early 2001, what a smug and
18 superficial dismissal that was, because, if
19 he was wrong about that, there was a major
20 hazard out there; and I was distressed
21 that he seemed to write it off as --
22 (indicating), "That's just Naproxen
23 preventing heart attacks."
24      MR. GOLDMAN: I move to

Page 728

1  strike as not responsive.
2       BY MR. TISI:
3  Q. Is there any -- Doctor, did you
4  think that a reasonable and prudent
5  company would have relied on heavily on
6  the Naproxen hypothesis to explain the
7  result of VIGOR, especially when -- let's
8  not talk about in isolation -- when we
9  look at the ADVANTAGE study and we look at
10 090 study that we've talked about, and we
11 look at all the evidence together, do you
12 think that it was reasonable that a
13 reasonably prudent company -- it was
14 reasonable and prudent to rely upon the
15 Naproxen hypothesis to explain the VIGOR
16 results?
17      MR. GOLDMAN: Objection as
18 to form.
19 A. I would have -- I would have
20 characterized it as to explain away the
21 findings. And, no, I think that given all
22 that had come before, all the biology that
23 was known, all of the preapproval studies
24 that had raised flags -- frankly, even in

Page 729

1  isolation, this would have been a rather
2  striking signal that would have warranted
3  follow-up.
4       But coming as it did after all of
5  the clinical trial and biological evidence
6  that there was there, it strikes me as
7  unconscionable for there not to have to
8  have been better follow-up of that risk.
9       MR. GOLDMAN: I can't tell
10 -- I'm just going to move to strike as
11 nonresponsive.
12      BY MR. TISI:
13 Q. In your article on -- the Naproxen
14 article --
15 A. Yes.
16 Q. -- if I could ask you to turn to
17 that, if you could pull this out of the
18 pile -- Actually, you may know the
19 answer --
20 A. Okay.
21 Q. -- to this without looking at the
22 article.
23 A. Ask and I'll --
24 Q. You can if you want to.

75 (Pages 726 to 729)

Jerry Avorn, M.D.

Page 730

1    A.  All right.
2    Q.  Do you know whether you relied upon
3    the statement in -- that was in the VIGOR
4    study about the point -- the four to one
5    relative risk as opposed to what we know
6    as the five to one relative risk in the
7    VIGOR study?
8    A.  Let me pull it to -- Was it an
9    exhibit or --
10   Q.  Yeah.  I don't think we attached it
11   as an exhibit.
12   A.  I know that it's in one of these
13   piles, but if you can put your hands on
14   it quicker.
15   Q.  I can actually -- Actually, I can
16   probably give you my copy.  Here.
17   A.  Okay.
18       (Witness viewing document).
19   Q.  I think it's -- If you go to the
20   last page, that is the -- See at the top
21   of the page, Doctor?
22   A.  Yes.
23   Q.  Okay.
24   A.  Right.  We cited the -- the rate

Page 731

1    of MI as being fourfold higher, citing the
2    paper, the VIGOR paper in the New England
3    Journal.
4    Q.  Now, later on, down at the end of
5    the article, you talk about the magnitude
6    of the risk, it could not be explained by
7    a Naproxen effect alone.
8    A.  Correct.
9    Q.  Would that statement have been even
10   more -- even stronger if you had known
11   that there was a five to one relative risk
12   as opposed to a four to one relative risk?
13       MR. GOLDMAN:  Object to the
14   form.
15   A.  Yes.  Because a four to one risk
16   would have required a 75 percent reduction
17   in risk of heart attack with Naproxen.  A
18   five to one would have required an 80
19   percent reduction in risk.  So it would
20   have been even more implausible.
21   Q.  Just -- In observational studies
22   like yours, have they sometimes been
23   referred to as real-world studies?
24   A.  Yes.

Page 732

1    Q.  Have you heard that term before?
2    A.  Yes.  Yes.
3    Q.  Why is it important to look at,
4    quote, real-world studies as opposed to
5    clinical trial studies?
6    A.  Right.  Right.  Each kind of study
7    has its own very important strengths and
8    very important weaknesses.
9        The strengths of an observational
10   study or a real-world study, as you
11   describe it, are that it depicts patients
12   who are much more typical of real-world
13   users of the drug than clinical trial
14   subjects, who tend to be healthier,
15   younger, and more heavily selected to get
16   into a clinical trial, whereas an
17   observational study just looks at all
18   comers who happen to be taking a given
19   drug as prescribed by their doctor.  And
20   so it's generalizability is often much
21   better than data from a clinical trial.
22   Q.  And in fact, would your study, for
23   example, include people who had had
24   intermittent use?

Page 733

1    A.  Yes.
2    Q.  And, in fact, if you go to the
3    VIGOR study or the APPROVe study, even in
4    those studies, do the protocols tolerate a
5    certain degree of noncompliance?
6    A.  Yes.  And even when they don't --
7    they don't tolerate it, patients do tend
8    to do it.
9    Q.  Okay.  And just for the record,
10   what is noncompliance?
11   A.  Noncompliance is when a patient
12   does not take a drug exactly as directed.
13   Q.  Okay.  And when you say 80 percent
14   noncompliance, which I believe -- the
15   VIGOR, I'll represent to you, I don't know
16   whether you -- is up to 80 percent
17   noncompliance would be, they would still
18   be able to be in the study if --
19   A.  I think you mean 80 percent
20   compliance.
21   Q.  Compliance.  I meant to say that.
22   A.  Right.
23   Q.  Up to 80 percent compliance, which
24   means one in five times they would still

Jerry Avorn, M.D.

Page 734

1 remain in the study if they didn't take
2 the drug one every five days?
3 A. Correct.
4 Q. You were asked about whether or not
5 the company ever informed the FDA of the
6 concerns, the cardiac concerns of COX-2
7 inhibition in the preapproval phase. And
8 I think, just referring to your testimony,
9 you referred to the FDA's review of that
10 -- of that data --
11 A. Right.
12 Q. -- of that. I'm going to show you
13 a portion of the new drug application for
14 the Vioxx application, if I can find it.
15      MR. TISI: And I only have
16 one copy, and I apologize, Counsel. I'll
17 show it to you if you wish. Oh, you have
18 another copy?
19      And we'll mark this as Exhibit
20 No. --
21      THE WITNESS: I think that
22 last one was 23.
23      MR. TISI: We'll make this
24 24. Can I have a pen?

Page 735

1      (Exhibit-24, Vioxx, Clinical
2 Efficacy, Clinical Safety Document;
3 Exhibit-24A, Correspondence, marked for
4 identification).
5      BY MR. TISI:
6 Q. Doctor, I'm placing before you
7 Exhibit No. 24, which is a portion of a
8 binder called Vioxx NDA -- I'll represent
9 is part of the new drug application for
10 Vioxx that says, Clinical Efficacy,
11 Clinical Safety. And it is a Section 1.7,
12 Potential Risks Based Upon Specific
13 Cyclooxygenase-2 Inhibition. Do you see
14 that?
15 A. (Witness viewing document). Yes.
16 Q. And that section would refer to the
17 scope of -- that would refer to the kinds
18 of things that were addressed by the Board
19 of Scientific Advisors.
20      And if you need to take a look at
21 that, it's an exhibit that's in front of
22 you.
23      MR. GOLDMAN: Object to the
24 form.

Page 736

1 A. (Witness viewing document).
2 Q. Take your time and look through it.
3 I can reach over you. I don't want to be
4 rude, but ...
5      MR. GOLDMAN: Mm-hmm.
6 A. What's that?
7 Q. That's the --
8 A. Right. Okay.
9      (Witness viewing document). Yeah.
10 I've seen this before, and what was
11 striking to me the first time I saw it,
12 and continues to be so, is that in the
13 section about --
14 Q. Well, actually, let me ask the
15 question again.
16 A. Okay. That's fine. That's fine.
17 Q. Now, having in front of you the
18 Board of Scientific Advisors, which deals
19 with the issue of COX-2 inhibition, and
20 looking at that side by side with the new
21 drug application which deals with potential
22 concerns of COX-2 inhibition, do you see
23 any place in that document where the
24 company raises even the possibility -- the

Page 737

1 possibilities that are raised by the Board
2 of Scientific Advisors that this could
3 result in thrombosis, sheering off of
4 plaque or arthrogenesis?
5      MR. GOLDMAN: Object to the
6 form.
7 A. No. The discussions of the risk
8 are -- deal with renal function and
9 reproduction and bone health.
10      But it's striking how much of the
11 concerns expressed in the May 1998 Board
12 of Scientific Advisors's report does not
13 seem to have made it into the discussion
14 of the potential safety problems --
15      MR. GOLDMAN: Objection.
16 A. -- that was presented to FDA.
17
18      MR. GOLDMAN: Move to strike
19 as not responsive.
20      BY MR. TISI:
21 Q. Okay. Let me just go -- I think
22 this will probably be my last area.
23      You were asked yesterday about your
24 general views in your publications about

77 (Pages 734 to 737)

Jerry Avorn, M.D.

Page 738

1  the effect of warnings on labels. Do you
2  remember that testimony?
3  A. Yes. Yes.
4  Q. Did you mean to imply by your
5  testimony that you do not think that
6  companies have an obligation to provide a
7  fair and accurate warning about potential
8  risks or -- as we saw in the regulation,
9  reasonable evidence -- where there's
10 reasonable evidence of association between
11 a drug and a serious adverse event?
12         MR. GOLDMAN: Object to the
13 form.
14 A. I would never imply that companies
15 do not have such a responsibility.
16 Q. And would you ever -- Did you mean
17 to suggest that the company never should
18 have put a black box on the label or put
19 something in the warning section about the
20 cardiovascular risk, risk of mortality, et
21 cetera, that we've talked about over the
22 past two days?
23         MR. GOLDMAN: Object to the
24 form.

Page 739

1  A  Do not. I certainly do not feel
2  that.
3  Q. Now, if you -- And you had also
4  given some testimony about the
5  effectiveness of warnings.
6  A. Yes.
7  Q. Okay. Let me broaden it, because
8  you -- you've had -- in your research,
9  there are many ways in which companies
10 communicate with physicians, correct?
11 A. Correct.
12 Q. Could you name some of them?
13 A. Certainly what is in the label is a
14 start. But in addition, what is said in
15 advertisements and by sales reps and by
16 articles which a company might support a
17 piece of research, and then help an
18 investigator to complete and have
19 published; continuing medical education
20 programs, which are often sponsored by
21 companies, direct to consumer advertising.
22 Q. Have you -- All of those things, is
23 it your -- Do you have an opinion as to
24 whether all those things go into the mix

Page 740

1  of how doctors perceive risks and
2  benefits?
3         MR. GOLDMAN: Object to the
4  form.
5  A. Yes. The ultimate decision that a
6  doctor makes is based on all of the above.
7  Q. Now, going to the issue -- and I
8  think Counsel referred to it at the very
9  end of his questioning -- that the company
10 did a study about the -- or an analysis
11 of the effect of a warning, a
12 cardiovascular warning as a precaution as
13 opposed to a black box. Do you remember
14 that?
15 A. Yes.
16 Q. The putting aside the dollar
17 amounts there, what, if anything, does
18 that document demonstrate to you -- and in
19 the specific context of Vioxx -- as to how
20 a black box warning or precaution could
21 affect actual behavior of doctors?
22         MR. GOLDMAN: Object to the
23 form; calls for speculation. Go ahead.
24 A. There are some things that we know

Page 741

1  about black boxes and other kinds of
2  warnings. One is that competitive
3  companies will typically point out a
4  warning or a black box that the other
5  company's drug has if they don't have such
6  a drug -- such a warning, and use that as
7  an aspect -- as a means of winning market
8  share.
9      It is usually the case that if a
10 black box warning appears, a company will
11 refrain from direct to consumer advertising
12 of that drug. And we -- There is very
13 good evidence that direct to consumer
14 advertising sharply increases the
15 utilization of a given drug.
16     We also know that doctors are going
17 to be more reluctant to use a drug with a
18 black box warning if there is another drug
19 that doesn't have a black box warning that
20 does about the same thing.
21 Q. Okay.
22 A. And finally, the more prominent
23 warning is, even if it's not a black box,
24 the more that's going to shape what a

78 (Pages 738 to 741)

Jerry Avorn, M.D.

Page 742

1  doctor knows, although it may not
2  completely drive prescribing a hundred
3  percent.
4  Q. You mentioned different ways in
5  which companies in general can communicate
6  information about its drugs. Going
7  through all of those things, whether it's
8  a dear doctor letter, medical education,
9  labels, direct to consumer advertising, all
10 of those things, have you considered all
11 of those things in how you looked at the
12 communication and warnings or information
13 about risks for Vioxx?
14      MR. GOLDMAN: Object to the
15 form.
16 A. Yes, I have.
17 Q. In any of those methods of
18 communication, did -- do you -- Well, do
19 you have an opinion, that you hold to a
20 reasonable degree of medical certainty, as
21 to whether or not any of those methods of
22 communication adequately communicated the
23 seriousness, the magnitude, the frequency
24 of the risks associated with Vioxx?

Page 743

1       MR. GOLDMAN: Object to the
2  form, and also to the extent it's outside
3  the scope of his report.
4  A. I believe that certainly once the
5  VIGOR findings were in hand by March of
6  2000, there was strong evidence in place
7  of an important cardiovascular risk caused
8  by Vioxx, which was not promptly or fully
9  or accurately depicted by the manufacturer
10 in its communications with doctors or in
11 its direct to consumer advertising.
12      And, in fact, there is even
13 evidence that the company attempted,
14 through a variety of means, to undercut
15 the communication of such risk by
16 dismissing it, in a variety of ways,
17 whether it was attributing the findings in
18 VIGOR to Naproxen or preparing training
19 materials for its sales reps as to how to
20 avoid discussion of the risk with
21 physicians, preparing materials which were
22 incomplete, and in my view, misleading
23 about the cardiovascular risk of Vioxx,
24 depicting its risks and benefits in a

Page 744

1  distorted manner, particularly in the
2  direct to consumer ads, in which the
3  benefits of the drug were stated very
4  prominently, and the harms that could be
5  associated with its use were relegated to
6  a very small and, in my view, inadequate
7  presentation.
8  Q. And in your particular case
9  involving -- You have personal experience
10 with that, don't you, with how your study
11 was treated, in the dear doctor letter
12 that we had marked earlier, correct?
13 A. Right. My sense of an appropriate
14 response would have been for the company
15 to initiate at many, many points in time
16 clinical studies to clarify the risk and
17 identify its magnitude and perhaps which
18 patients were at greatest risk. And
19 instead, in response to our study, at
20 least, as well as at a number of other
21 points, the main communication in the dear
22 doctor letter that we've discussed was to
23 dismiss the findings of, quote,
24 observational studies, including our own.

Page 745

1  Q. Did they even report the results of
2  the study?
3  A. No. They simply said that these
4  studies have limitations, including biases
5  and other factors, that cannot be
6  adequately controlled, and then go on to
7  talk about the advantages of the drug and
8  the -- and directed doctors to the
9  labeling, which, at that point, still did
10 not convey the full magnitude of the risk.
11 Q. Let me ask you a couple questions.
12 Did they tell the medical community about
13 the results of your study showing an
14 increased relative risk associated with
15 Vioxx?
16 A. No. Their response to our study
17 was to not describe the findings, but to
18 send out a letter saying the methodology
19 was flawed, and then making other
20 statements basically defending the product.
21 Q. Did they tell doctors that it was a
22 Merck-funded study?
23 A. No.
24 Q. Did they tell them that they had a

79 (Pages 742 to 745)

Jerry Avorn, M.D.

Page 746

1  role in developing the protocol and
2  running -- and supporting the study in any
3  fashion?
4  A. No.
5  Q. You were asked -- Going back to the
6  New England Journal article and .2 --
7  remember that -- the relative risk of .2?
8  A. Yes.
9  Q. And Mr. Goldman asked you the
10 question, is that obvious that that's a
11 fivefold increase?
12 A. (Witness nods head).
13 Q. As a pharmacoepidemiologist, that
14 is obvious to you; is that fair to say?
15 A. Right.
16 Q. In your experience, do non
17 pharmacoepidemiologists typically recognize
18 the importance of that statistical
19 difference as a five to one as opposed to
20 a .2?
21       MR. GOLDMAN: Object to the
22 form; calls for speculation. How could he
23 possibly know that?
24 A. Well --

Page 747

1  Q. Actually, let me back up. Are you
2  an expert in the presentation of
3  statistics and the presentation of risk?
4  A. Yes.
5  Q. All right. And is it also
6  important in your view on how you
7  communicate risks and you can communicate
8  in a variety of different ways?
9  A. Yes. And as important as the
10 magnitude is the presentation, which I
11 think virtually everyone now recognizes as
12 problematic of the data as this is the
13 reduction in heart attacks caused by
14 Naproxen, which was clearly Merck's
15 language in that paper, as opposed to this
16 is the increase in risk caused by Vioxx.
17 Q. Okay.
18 A. That was a very unconventional way
19 to --
20 Q. This is really the last question
21 I'm going to ask here.
22     Doctor, you were referred to the
23 advisory committee -- the advisory
24 committee of 2001. And I'm going to ask

Page 748

1  you, and I only have my copy of it, so I
2  apologize.
3  A. But I've seen that document.
4  Q. Okay. I'm going to refer to a
5  Page .195 of -- Actually, let's refer --
6  go back up -- 192, which are the comments
7  of Dr. Pena, and I'll read them.
8  Actually, let me -- I know counsel wants
9  to go home.
10     Do you think that, having reviewed
11 the totality of the transcript, that the
12 company followed the direction of the
13 advisory committee members who suggested
14 that a fair representation of the
15 cardiovascular risk be communicated in the
16 label?
17     MR. GOLDMAN: Objection.
18 A. I think it's important to
19 distinguish between whatever the advisory
20 committee may or may not have voted on
21 versus the content of what was said by its
22 members.
23     And I read very clearly that a
24 number of its members expressed great

Page 749

1  concern about the cardiovascular risk of
2  Vioxx and concern that that needed to be
3  communicated more fully to physicians.
4      And I do not see evidence that the
5  company followed up on that fully or
6  promptly.
7      MR. TISI: Okay. That's
8  all.
9      MR. GOLDMAN: Just a couple
10 areas to followup. And if you could
11 possibly keep it short, that would be
12 great. Okay?
13     THE WITNESS: Yes.
14     FURTHER EXAMINATION
15     BY-MR. GOLDMAN:
16 Q. Did you ever have any direct
17 discussions with Dr. Santanello?
18 A. Yes.
19 Q. Did you have direct discussions
20 with Dr. Santanello about the issue of
21 whether Dr. Cannuscio would remain an
22 author on your paper?
23 A. No.
24 Q. Did you have any discussions with

Page 750

1   Dr. Cannuscio about whether or not her
2   name would remain on your paper?
3   A.  No.
4   Q.  And your understanding of what Dr.
5   Santanello and Dr. Cannuscio said about
6   this issue is based on your conversations
7   with Dr. Solomon?
8   A.  Yes.
9   Q.  You talked about statins, and I
10  think I heard you correctly to say that
11  there are times when you aren't certain
12  about whether there's going to be a
13  particular outcome because an outcome study
14  hasn't been done, but that you later learn
15  that -- that --
16       MR. TISI: Mechanism
17  studies. I think mechanism studies.
18       BY MR. GOLDMAN:
19  Q.  Just quickly clarify what you meant
20  by the statin example.
21  A.  In response to Mr. Tisi's question?
22  Q.  Yes. Or maybe it was aspirin you
23  talked about.
24  A.  I talked about both. And it was

Page 751

1   about how very often we know that a drug
2   that either works or has a given side
3   effect even though we may not know about
4   the mechanism of that effect or side
5   effect.
6   Q.  Are you familiar with the drug
7   Baycol?
8   A.  Yes.
9   Q.  And did Baycol reduce the incidence
10  of heart attacks?
11  A.  I don't know whether it ultimately
12  had clinical outcome data about MIs,
13  because it was on the market for such a
14  short period of time.
15  Q.  Did Baycol share the same mechanism
16  as Lipitor and other statins on the
17  market?
18  A.  Well, that's the point of what we
19  were discussing. It also lowers
20  cholesterol. We do not know its effect in
21  relation to these other less well
22  understood anti-inflammatory effects on the
23  arterial wall.
24  Q.  Based on the fact that there have

Page 752

1   been outcome studies on other statins,
2   would you say that Baycol, because it also
3   reduces LDL cholesterol, reduces heart
4   attacks?
5   A.  That's a very contentious area, and
6   I think it's a plausible hypothesis, but
7   until the clinical trials are done, one
8   cannot be sure.
9   Q.  You think it's a plausible
10  hypothesis that Baycol reduces the risk of
11  heart attacks, true?
12  A.  It's plausible, but not proven.
13  Q.  You talk about the fact that it's
14  quite likely that if a drug at one dose
15  causes an adverse effect, that the adverse
16  effect would be seen at all doses and for
17  all durations. Is that your testimony?
18  A.  I did not say that. I said it
19  could also occur at other doses and other
20  durations.
21  Q.  You understood, from your own
22  studies, that you might see an adverse
23  effect at one dose, a low dose, let's say,
24  and not at a high dose, right?

Page 753

1   A.  That's a possibility.
2   Q.  Or you could also see studies, as
3   was the case with Vioxx and observational
4   studies, that there might be an increased
5   risk seen with 50 milligrams but not 20
6   milligrams -- 25?
7   A.  Right.
8   Q.  And you might also see with --
9   Withdrawn.
10       Isn't it also true, sir, that with
11  drugs you might see a risk in the long
12  term but not in the short term when it
13  comes to a particular adverse event?
14  A.  That's possible.
15  Q.  You also could see a side effect
16  that occurs in the short term but not the
17  long term, right?
18  A.  Right.
19  Q.  You've never said that Vioxx at all
20  doses and for all duration causes heart
21  attacks, have you, sir, before you became
22  an expert witness in this case?
23  A.  At all doses and at all durations?
24  What I've said, before any involvement

Jerry Avorn, M.D.

Page 754

1  with this case, was that Vioxx causes
2  heart attacks, and I said that in my book
3  before the drug was withdrawn.
4  Q. Have you ever said that all doses
5  of Vioxx for all duration causes heart
6  attacks?
7  A. I've never been asked that question
8  before.
9  Q. So the answer is no, you've never
10 said that?
11 A. Well, I've said Vioxx causes heart
12 attacks, and you can read into that
13 whatever you want about what it means.
14 Q. Have you ever said in any article,
15 sir, during the time Vioxx was on the
16 market that all doses of Vioxx for all
17 duration cause heart attacks?
18 A. I have said that Vioxx causes heart
19 attacks, and whether you believe that
20 means all doses and all durations or --
21 I've -- I've said it in a nonlimited
22 manner.
23 Q. I heard that explanation --
24 A. Okay.

Page 755

1  Q. -- now let's see if you can just
2  answer this quick.
3  A. Have I used the phrase all doses
4  and all durations?
5  Q. Let me just ask it again, okay?
6     Have you ever, prior to withdrawal
7  of Vioxx, sir, ever written that Vioxx at
8  all doses for all durations causes heart
9  attacks?
10 A. If in your question you insist that
11 I have included the phrases in all doses
12 and all durations, I've not used those
13 words, but people don't usually write like
14 that.
15 Q. You talked about the effects of
16 warnings or black box statements in
17 package inserts, right?
18 A. Right.
19 Q. Did I hear you to say, either in
20 response to Mr. Tisi's questions or in
21 response to mine, that you've written an
22 article that reports that a black box
23 warning reduces the number of prescriptions
24 that are written for a particular drug?

Page 756

1  A. No. I have not written such an
2  article.
3  Q. Have you written an article that
4  says if a side effect is reported in the
5  warning section, there's going to be fewer
6  prescriptions written than if the warning
7  -- than if the statement appears in the
8  precaution section?
9  A. Have I written an article about
10 that?
11 Q. Yes.
12 A. I've written it in my book, but I
13 have not written it as an article.
14 Q. Have you ever written in any
15 peer-reviewed paper, sir, that if a side
16 effect is reported in the warning section
17 of a label that will lead to fewer
18 prescriptions being written than if a side
19 effect is reported in the precaution
20 section?
21 A. I don't believe I have.
22 Q. You said that all of these things
23 go into the mix when doctors prescribe
24 medicine, and you said the label is a

Page 757

1  start, what is said by sales
2  representatives, what's in advertisements,
3  articles, continued medical education
4  programs, direct to consumer advertising.
5  Do you remember that?
6  A. Yes.
7  Q. Isn't it true, Doctor, that
8  different doctors are influenced by
9  different information when it comes to
10 prescribing drugs?
11 A. Correct.
12 Q. So while you might be influenced by
13 a direct to consumer advertisement as a
14 patient or by a sales representative as a
15 doctor, other doctors are not?
16 A. Right.
17 Q. You can't say whether any
18 particular doctor in any of the cases in
19 which your deposition might be played that
20 those doctors were influenced by statements
21 made by sales representatives,
22 advertisements, articles or direct to
23 consumer advertising, right?
24 A. All one can do is look at what is

82 (Pages 754 to 757)

Jerry Avorn, M.D.

| Page 758 | Page 760 |
|---|---|
| 1  known about doctors in general as a | 1  A. No. My study with Dr. Solomon. |
| 2  predictor of what any given doctor might | 2  MR. TISI: Oh. I'm sorry. |
| 3  do. | 3  MR. GOLDMAN: Is this |
| 4  Q. Have you conducted any surveys of | 4  marked? |
| 5  doctors who prescribe Vioxx to see what | 5  (Off the record at 2:27 |
| 6  lead them to prescribe Vioxx? | 6  p.m.) |
| 7  A. We've conducted studies of heavy | 7  (Discussion off the record). |
| 8  users of COX-2s compared to light users of | 8  (Back on the record at 2:28 |
| 9  COX-2s, and have looked at their | 9  p.m.) |
| 10  characteristics, I think, in terms of | 10  BY MR. GOLDMAN: |
| 11  their age and board certification and so | 11  Q. The letter that, I believe, Mr. |
| 12  forth. | 12  Tisi marked as maybe Exhibit 23, I believe |
| 13  Q. Have you done any research studying | 13  but I'm not certain, is this the evidence |
| 14  the reasons why doctors who prescribe | 14  that you have that Merck criticized your |
| 15  Vioxx made a decision to prescribe it? | 15  study with Dr. Solomon? |
| 16  A. No. | 16  A. (Witness viewing document). That |
| 17  Q. And you can't say, sir, for any | 17  plus statements that were made by Dr. Kim. |
| 18  given doctor in any of the Vioxx cases in | 18  I believe there was a statement that Merck |
| 19  which your deposition might be played | 19  made that was published that was I believe |
| 20  whether the doctors who prescribed the | 20  a letter to the editor with a similar kind |
| 21  plaintiffs Vioxx did so because of | 21  of content. So it was not just that |
| 22  interactions they had with sales | 22  letter. There were several pronouncements |
| 23  representatives or advertisements that | 23  by Merck about our research. |
| 24  Merck prepared, true? | 24  Q. What pronouncements are you aware |

| Page 759 | Page 761 |
|---|---|
| 1  A. I have done research and published | 1  of that Merck circulated that was critical |
| 2  a paper on doctors' influences in terms of | 2  of your study? |
| 3  scientific versus commercial influences, | 3  A. Well, there's the dear doctor |
| 4  and demonstrated that commercial influences | 4  letter that you're holding. |
| 5  are important drivers of what doctors | 5  Q. Mm-hmm. |
| 6  prescribe. It did not involve Vioxx as a | 6  A. And there was also the statement |
| 7  drug. | 7  signed by Dr. Kim, and perhaps somebody |
| 8  Q. For the particular doctors who are | 8  else at Merck, disparaging the methodology |
| 9  -- who made decisions to prescribe Vioxx | 9  of our study as well. |
| 10  to the plaintiffs in the Vioxx cases, you | 10  Q. Was that a letter to the editor? |
| 11  cannot say, for any one of those doctors, | 11  A. I think it was a letter to the |
| 12  exactly what influenced them to prescribe | 12  editor. I think they also say it on |
| 13  Vioxx; is that fair, sir? | 13  their Web site. |
| 14  A. I completely disagree with that | 14  Q. Any other instances you know of, |
| 15  statement. | 15  sir, where Merck criticized your study? |
| 16  Q. Is it your testimony that Merck | 16  A. Yes. There were materials which |
| 17  circulated a dear healthcare professional | 17  they prepared for training their sales |
| 18  letter or some other communication that | 18  reps as to how to either evade or discount |
| 19  was critical of your study in 2004 with | 19  our findings. |
| 20  Dr. Solomon? | 20  Q. And that's based on your review of |
| 21  A. Yes. | 21  the documents that plaintiffs' lawyers gave |
| 22  MR. TISI: I think you | 22  you? |
| 23  called him Dr. Solomon. You meant to say | 23  A. That's right. |
| 24  Dr. Avorn? | 24  Q. Other than what you've mentioned, |

83 (Pages 758 to 761)

Jerry Avorn, M.D.

Page 762

1 the dear doctor letter, Dr. Kim's letter,
2 and training materials, are you aware of
3 any other instance where Merck criticized
4 your study?
5 A. Not off the top of my head.
6 Q. Did plaintiffs' lawyers ever show
7 you any documents showing that Merck
8 accurately described the results of your
9 study?
10 A. In what context?
11 Q. In any context.
12 A. Well, I know that internally within
13 the company there was a very accurate
14 summary of our study that was presented to
15 company officials.
16 Q. Are you aware of any communication
17 by Merck to physicians where Merck was
18 accurately describing results of your
19 study?
20 A. No.
21     MR. GOLDMAN: That's all I
22 have.
23     MR. TISI: Doctor, I'm going
24 to hand you what I'd like to have marked

Page 763

1 as an exhibit, the next exhibit, which we
2 will mark as Exhibit -- I don't know --
3 26?
4     MR. GOLDMAN: This one is
5 24, actually.
6     MR. TISI: This always
7 happens at the end of a deposition.
8     MS. ORENDI: It's 25.
9     (Exhibit-25, E-mail Chain
10 and Article, marked for identification).
11     FURTHER EXAMINATION
12 BY-MR.TISI:
13 Q. This is a -- Let me represent to
14 you, this is an e-mail from Dr. Santanello
15 attaching an article that appeared in the
16 -- I want to say in the AP.
17 A. The Associated Press?
18 Q. The Associated Press.
19 A. Okay.
20 Q. And it quotes Merck's spokeswoman,
21 Anita Larsen, about your study, confirming
22 the company's action taking Dr. Cannuscio
23 off the paper saying "Merck --
24     (Reporter interruption).

Page 764

1 BY MR. TISI:
2 Q. Yeah. I'm going to show you. It
3 says, "Merck spokeswoman, Anita Larsen,
4 confirmed the company's action, saying
5 Merck believe it's --"
6     (Reporter interruption).
7 BY MR. TISI:
8 Q. Actually, let me ask you this. Let
9 me just -- Let me -- I'll attach this as
10 a record, but let me ask you generally,
11 are you aware of statements to the press
12 that were made disparaging your study and
13 the results of the study?
14 A. Yes.
15 Q. Okay. So would that be in addition
16 to the dear doctor letter and those kinds
17 of things?
18 A. Yes.
19 Q. And one other thing I would like to
20 ask you is this.
21     MR. TISI: I'd like to
22 attach this as an exhibit. This is
23 Exhibit No. 26.
24     (Exhibit-26, Chart entitled

Page 765

1 "U.S. Long Range Operating Plan; Franchise:
2 Analgesic & Anti-Inflammatory; Products:
3 VIOXX, Etoricoxib, July 2001," marked for
4 identification).
5     BY MR. TISI:
6 Q. And this is the chart that we
7 talked about before, which is the --
8 Merck's own internal study about the
9 effect of the various different levels of
10 warning on prescribing practices. Do you
11 see that?
12 A. (Witness viewing document). Yes.
13 Yes. I've seen this.
14 Q. Do you have an opinion as to
15 whether or not the inclusion of a clear
16 warning, based upon Merck's own review,
17 would affect doctors' prescribing practices
18 based upon this document?
19     MR. GOLDMAN: Object to the
20 form; calls for speculation.
21 A. Yes. I've referred to this in my
22 report, and it actually was Merck's own
23 conclusion in this document that a clear
24 warning would result in several millions

84 (Pages 762 to 765)

Jerry Avorn, M.D.

Page 766

1  of dollars of reduced sales, compared to a
2  mild warning or no warning, as they
3  calculated it in their own sales
4  projections.
5  Q. Okay. And that would -- Sales
6  projections is a function of how willing
7  doctors are to actually prescribe the
8  drug?
9  A. Utilization. Right.
10  Q. Fair enough.
11       MR. TISI: Thank you very
12  much, Doctor. I appreciate your time.
13       MR. GOLDMAN: I think I had
14  one question, sir.
15       FURTHER EXAMINATION
16       BY MR. GOLDMAN:
17  Q. What instances, and tell me all of
18  them, are you aware of where Merck
19  disparaged your study with Dr. Solomon in
20  the press?
21  A. Well, there -- there was that
22  Associated Press report that Mr. Tisi just
23  referred to, and that was picked up by
24  papers all over the country.

Page 767

1       I know that they issued statements
2  to the press, and I can't know how all of
3  those did or didn't result in articles in
4  the media. But we could do a Google
5  search to find them all.
6  Q. Dr. Avorn, as you sit here today,
7  sir, you're aware of this one example that
8  Mr. Tisi showed you where you say that
9  Merck is disparaging you in the press over
10  your study, right?
11  A. Well, it's not one example if it
12  was Associated Press, because they go into
13  thousands of newspapers all over the
14  country.
15  Q. Did you ever write to Merck and
16  say, "I think you're disparaging me in the
17  press, please stop it"?
18  A. No.
19       MR. GOLDMAN: Okay. I
20  think we'll call it a day.
21       (Exhibits retained with the
22  transcript).
23       (Deposition of JERRY AVORN,
24  M.D. concluded at 2:34 p.m.)

Page 768

1       DESCRIPTION OF EXHIBITS
2  Exhibit  Description
3   11    Studies That Show An Increased
4       Risk of Stroke, Published During
5       The Time Vioxx Was On The Market
6   12    Expert Report of Dr. Ray dated
7       January 11, 2006
8   13    Article entitled "Gastrointestinal
9       Tolerability and Effectiveness of
10      Rofecoxib Versus Naproxen in the
11      Treatment of Osteoarthritis"
12  14    Expert Report of Jerry Avorn,
13      M.D., dated March 20, 2006
14  15    Ingenix Epidemiology,
15      Cardiovascular Risk of COX-2
16      Inhibitors and Other NANSAIDs,
17      Draft Manuscript dated February
18      27, 2004
19  16    Draft Manuscript
20  17    Ingenix Epidemiology,
21      Cardiovascular Risk of COX-2
22      Inhibitors and Other NANSAIDs,
23      Draft Manuscript dated September
24      27, 2004

Page 769

1       DESCRIPTION OF EXHIBITS
2  Exhibit  Description
3   18    Pamphlet entitled "COX-2
4       Inhibitors: Who Really Needs
5       Them?"
6   19    Drs. Avorn and Solomon Study
7       entitled "Relationship Between
8       Selective Cyclooxygenase-2
9       Inhibitors and Acute Myocardial
10      Infarction in Older Adults"
11  20    Chronology of Dr. Avorn's
12      Interactions with Merck
13  21    Study entitled "Risk of Acute
14      Myocardial Infarction and Sudden
15      Cardiac Death in Patients Treated
16      with Cyclo-Oxygenase 2 Selective
17      and Non-Selective Non-Steroidal
18      Anti-Inflammatory Drugs: Nested
19      Case-Control Study"
20  22    Merck Correspondence to Doctors
21  23    Food and Drug Administration, HHS,
22      Section 201.57
23  24    Vioxx, Clinical Efficacy, Clinical
24      Safety Document

85 (Pages 766 to 769)

Jerry Avorn, M.D.

Page 770

| | DESCRIPTION OF EXHIBITS |
|---|---|
| 1 | |
| 2 | Exhibit  Description |
| 3 | 24A    Correspondence |
| 4 | 25       E-mail Chain and Article |
| 5 | 26       Chart entitled "U.S. Long Range |
| 6 | Operating Plan; Franchise: |
| 7 | Analgesic & Anti-Inflammatory; |
| 8 | Products: VIOXX, Etoricoxib, July |
| 9 | 2001" |

Page 771

COMMONWEALTH OF MASSACHUSETTS

I, LAURIE J. DRIGGERS, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this    day of 2006.

Laurie J. Driggers, CSR, RPR, CRR
Notary Public
My commission expires October 16, 2009

Page 772

CAPTION

The Deposition of Jerry Avorn, M.D., taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

Page 773

DEPOSITION ERRATA SHEET

RE:       Jack Daniel Court Reporting
File No.     2349
Case Caption:   Gerald Barnett, et al. Vs. Merck & Co., Inc.

Deponent:    Jerry Avorn, M.D.
Deposition Date: June 16, 2006
To the Reporter:
I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and authorize you to attach to the original transcript.

Page No.    Line No.    Change to:

Reason for change:
Page No.    Line No.    Change to:

Jerry Avorn, M.D.

Page 774

| | |
|---|---|
| 1 | Reason for change: |
| 2 | Page No.   Line No.   Change to: |
| 3 | |
| 4 | Reason for change: |
| 5 | Page No.   Line No.   Change to: |
| 6 | |
| 7 | Reason for change: |
| 8 | Page No.   Line No.   Change to: |
| 9 | |
| 10 | Reason for change: |
| 11 | Deposition of Jerry Avorn, M.D. |
| 12 | Page No.   Line No.   Change to: |
| 13 | |
| 14 | Reason for change: |
| 15 | Page No.   Line No.   Change to: |
| 16 | |
| 17 | Reason for change: |
| 18 | Page No.   Line No.   Change to: |
| 19 | |
| 20 | Reason for change: |
| 21 | Page No.   Line No.   Change to: |
| 22 | |
| 23 | Reason for change: |
| 24 | Page No.   Line No.   Change to: |

Page 775

| | |
|---|---|
| 1 | |
| 2 | Reason for change: |
| 3 |      No changes made to the Errata Sheet |
| 4 |      I am returning this signed Errata |
| 5 | Sheet with changes noted. |
| 6 | Under penalties of perjury, I declare that I |
| 7 | have read the foregoing transcript and that |
| 8 | the facts stated in it are true. |
| 9 | SIGNATURE:           DATE: |
| 10 |      Jerry Avorn, M.D. |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |