determination of causality (see Monson, "Occupational Epidemiology," (2d ed. 1990) at 101. These "causality assists" were first suggested by the eminent British epidemiologist, Sir Austin Bradford Hill (see Hill, AB "Principles of Medical Statistics," 1966, at Ch XXIV) and have appeared since in slightly modified form in many authoritative epidemiology texts. All of these factors strongly support the causal inference and the extent of damage due to rofecoxib.

       62.   *Experimental evidence.* Experimental evidence on the harmful effects of rofecoxib to the cardiovascular system is derived primarily from Merck-supported RCTs, and additional RCTs sponsored by others that demonstrated more severe edema and hypertensive effects of rofecoxib than celecoxib or naproxen (§ V and VI, below). These are:

       a.   Comparison of rofecoxib with placebo in patients with a history of colonic polyps (a study identified as APPROVe). See Bresalier, et al., Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial," NEJM, 2005, Vol. 352:1092-1102 (§ V.A, below).

       b.   Comparison of rofecoxib with a particular NSAID (naproxen) in patients with rheumatoid arthritis (a study identified as VIGOR). See Bombardier et al," Comparison Of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," New England Journal of Medicine (NEJM), 2000, Vol. 343: 1520-8 (§ V.B and C, below).

       c.   Comparison of rofecoxib with naproxen and placebo in the supplemental Rheumatoid Arthritis (RA) studies (§ V.C, below).

       d.   Outcomes of the short-term ADVANTAGE trial comparing rofecoxib to naproxen in patients with osteoarthritis (OA) (§ V.D, below).

       e.   Outcomes in a second trial on colonic polyps known as VICTOR carried out in the UK, comparing rofecoxib to placebo (§ V.E, below).

f.    The ViP study done to test the ability of rofecoxib to reduce occurrence of prostate cancer (§ V.F, below).

g.    Outcomes of trials of rofecoxib in patients with Alzheimer's disease (§ V.G, below).

63.    In APPROVe, for the main outcome of "serious heart disease" (defined as fatal and non-fatal heart attacks, sudden death due to cardiac causes and "unstable angina", a frequent antecedent to heart attack), those exposed to rofecoxib (25 mg/day) experienced an incidence rate of 1.01/100-patient years contrasting with an incidence rate of 0.36/100 patient years in patients on placebo. The ratio of 1.01/0.36 resulted in a statistically significant relative risk (also termed a "hazard ratio) of 2.8. (See Bresalier at 1096.) Elevated relative risks were also present for serious heart disease in the VIGOR trial and supplemental RA studies, the VICTOR trial, the ADVANTAGE osteoarthritis trial, in the Alzheimer's studies and in the ViP trial. The findings from these 7 experiments (APPROVe, VIGOR, SUPPLEMENTAL RA, VICTOR, ADVANTAGE, Alzheimer's AND ViP) are consistent, and the APPROVe results alone establish beyond reasonable doubt that rofecoxib causes serious heart disease. On this issue of "proof", this quote is very telling—"The randomized clinical trial (RCT) is the closest approximation in epidemiology to an experiment, and a well-run trial may confirm a causal relationship between and exposure and an outcome (See Lilienfeld and Stolley at 266)." The conclusion of a cause-effect relationship is reinforced by replication in multiple studies.

64.    *Strength of Association.* The strength of association between a risk factor and a disease outcome is measured by the relative risk (RR) or odds ratio. An association between exposure and outcome supports the causal inference and quantifies the magnitude of the difference in incidence between the exposed and unexposed

population. See Monson, "Occupational Epidemiology," (2d ed. 1990) at 88,100.[2] 1998. For example, a RR of 2.0 means that an exposed individual is twice as likely to have the event or events in question; a RR of 4, four times as likely, etc. An additional measure of risk is that of the percent of the risk attributable to the exposure, given that the background rate for serious cardiac disease needs to be, in effect, subtracted from the rate in those exposed to rofecoxib. See, Jekel, Katz and Elmore, at 93-95, and Green, Freedman and Gordis, "Reference Guide on Epidemiology", at 351-352. This is obtained from the equation: % attributable risk = Relative Risk – 1/ Relative Risk. Given the RR of 2.80 for serious heart disease found for rofecoxib exposed/ placebo condition in the APPROVe study (Bresalier at 1096) this gives 2.80- 1/ 2.80 = 64.3 % of the risk of serious heart disease was attributable to rofecoxib use.

65.    *Consistency of the Observed Association.* Confirmation by repeated findings of an association in different population groups and different settings strengthens the inference of a causal connection. See, Monson, Occupational Epidemiology, at 98. The similarity in findings of an increased incidence of serious heart disease in APPROVe, VIGOR, the Supplemental RA Studies, VICTOR, ADVANTAGE, the Alzheimer's studies and ViP provides convincing evidence for consistency. Finding such consistency is logically equivalent to the replication of results in laboratory experiments under a variety of environmental or biological conditions. Additional research from observational epidemiological studies (see § VIII, below) has similarly demonstrated a strong association between exposure to rofecoxib and serious heart disease in other settings, reinforcing the consistency of the observed association and the strength of the causal inference.

_____

    [2] Richard Monson, M.D., the author of the cited text, is Professor of Epidemiology and former Director of the Occupational Health Program, Harvard School of Public Health. His epidemiology textbook is widely used and considered authoritative.

66.   *Temporality.*  In order for an exposure to cause a disease, it is obvious that the exposure must precede the disease. This factor is readily demonstrated from the findings of the published RCTs, and from the controlled observational epidemiology studies (those comparing exposed and non-exposed study groups), in which increased occurrence of serious heart disease was found in populations following exposure to rofecoxib.

67.   *Coherence.*  Epidemiologists consider the plausibility of the causal relationship based on current scientific understanding. See Monson, Occupational Epidemiology, at 100. Rofecoxib is a COX-2 inhibitor. Fitzgerald, a key investigator of COX-2 compounds, stated---"Thus, a single mechanism, depression of prostaglandin I-2 formation, might be expected to elevate blood pressure, accelerate atherogenesis [the process that narrows arteries with cholesterol and fibrous tissue], and predispose patients receiving coxibs to an exaggerated thrombotic response to the rupture of an atherosclerotic plaque." See Fitzgerald, "Coxibs and cardiovascular disease", NEJM, 2004, 351: 1709-1711. The excess risk associated with Vioxx is coherent with the scientific literature, supporting a cause-effect relationship between Vioxx exposure and cardiovascular disease.

68.   *Biologic Gradient.*  Where an exposure is causally associated with a disease outcome, a spectrum of host responses should follow exposure to the hypothesized agent along a logical biologic gradient from mild to severe. See Lilienfeld and Stolley, "Foundations of Epidemiology" (3d. ed. 1994) at 262. The biologic gradient is clearly evidenced by the data in the studies described in this Report. That is, the data show an increased incidence of CVD in the exposed groups, and more cases in the milder (non-fatal heart attacks) categories than the more severe categories (fatal heart attacks). See, Bresalier at 1096.

69. *Specificity.* Specificity of a relationship between exposure and outcome strengthens confidence in a causal inference, but lack of specificity does not rule out causality. See Monson, Occupational Epidemiology, at 99. There are specific biological effects of rofecoxib which are the cause of the differential increase in CVD due to rofecoxib exposure. These differential clinical outcomes provide evidence of specificity, which supports the causal inference.

70. *Statistical Significance.* Statistically significant results indicate that an association was probably not due to chance alone. See Monson, Occupational Epidemiology, at 16. The traditional measure of statistical significance is a "p-value" < 0.05, which means that there is a one-in-twenty likelihood that the observed results were due to chance. More recently, the "confidence interval" has been used to define statistical significance, where the lower bound of the interval is 1.0 or greater. The APPROVe study and others reported highly statistically significant associations between rofecoxib use and CVD. See, e.g., Bresalier, confidence interval 1.44-5.45 for "cardiac events" (serious cardiac disease), at 1096. Statistical significance in this setting thus confirms that the association of rofecoxib with increased incidence of CVD is not due to chance.

## V.   DATA FROM THE MERCK-SPONSORED RANDOMIZED CLINICAL TRIALS SHOW EXCESS CV RISK FROM VIOXX USE.

### A.   The APPROVe Study Demonstrates Excessive CV Disease Due To Vioxx, When Used At Normal Therapeutic Doses, Among Both Low-Risk And High-Risk Patients, For Both Short- And Long-Term Use.

71. *Project Description.* APPROVe was a well-run RCT of 25 mg rofecoxib vs placebo given for 3059 and 3327 patient-years, respectively, to male and female adults of mean age 59 who had a prior history of a resected colorectal adenoma, to test whether future colon cancers could be prevented by use of rofecoxib. The study was terminated prematurely. See Bresalier at 1095-1096. The selection and randomization

procedures followed commonly used methods. Although the population studied included some patients who had risk factors for heart disease, those with serious heart disease or with uncontrolled hypertension were excluded. See Bresalier at 1093. Therefore, the large majority of the population studied was selected as "low risk patients without known cardiovascular disease," and therefore at lower risk as compared to the general U.S. population in their age distribution. See, Topol, "Failing the Public Health – Rofecoxib, Merck, and the FDA", NEJM, 2004; Vol. 351: 1707-1709, at 1708. Since rofecoxib produces a heightened adverse clinical effect in those with risk factors for CVD, this creates a setting for the APPROVe trial underestimating the degree of toxicity experienced by the general population. See ¶¶ 72, 73, below.

72.     *Major Trial Outcome.* The outcome "serious heart disease" is the most relevant and the most generally available from both the RCTs and the observational epidemiology outcomes to be described in this report. The term "cardiac events" as used in this report and in APPROVe, includes fatal and non-fatal heart attack, sudden death due to cardiac causes and unstable angina. See Bresalier at 1096. The RR in APPROVe for cardiac events was **2.8** for rofecoxib/placebo, with a **95% CI of 1.44-5.45**—a statistically significant result showing a cause and effect relationship of a moderately strong magnitude. See Bresalier at 1096 and paras 11 and 12 above. In addition, a **very high** RR for thrombotic events was found for those with a prior history of cardiovascular disease **(RR 9.59)** or for those with known diabetes **(RR 6.10)**. See Bresalier at 1097. Furthermore, 26 rofecoxib participants vs 3 placebo participants experienced additional serious adverse cardiovascular clinical events, resulting in an RR of 9.42 for these individuals. Serious events were defined as those that were "life-threatening", that either "required prolonged hospitalization" or which "resulted in permanent disability". See Bresalier at 1100.

73. *The Major Trial Outcome of APPROVe was probably Underestimated.* Removal of individuals who develop underlying causes of the major endpoint early in the trial, shortening exposure to rofecoxib, will create an underestimate of the true expected rate of the major endpoint. In APPROVe, 38 individuals discontinued rofecoxib treatment during the study because of increased blood pressure or peripheral edema, compared to 9 in the placebo group, a 4.2/1 ratio. See Bresalier at 1096. Since increased blood pressure, when left untreated, may later result in a fatal or nonfatal heart attack, premature removal of these individuals biases the study toward an underestimate of the serious heart disease outcomes due to rofecoxib that would have occurred had these patients remained in the study. Those with peripheral edema represent a state that is the usual precursor and/or evidence of a serious weakening of the heart muscle and the clinical state of congestive heart failure (CHF). CHF, in turn, may be due to one or more known or silent heart attacks, or from hypertension—thus, peripheral edema is itself a common precursor of a later heart attack since second heart attacks are common and since hypertension is a strong and well-known precursor of heart attack. The participants in APPROVe were monitored more frequently than would be the case for the public at large (see Bresalier at 1093 and 1094), and this bias in APPROVe would produce an underestimate as compared to what would occur in its use for the general public. Therefore, the RR of 2.80 underestimates the magnitude of the excess number of cases of serious heart disease secondary to rofecoxib due to premature removal of those with either hypertension or peripheral edema.

74. *Incidence of cerebrovascular events in APPROVe is elevated.* Cerebrovascular events (fatal ischemic stroke, ischemic stroke, transient ischemic attack) were about half as frequent as cardiac events. The RR for rofecoxib vs placebo for these events was **2.32, CI 0.89-6.74**. The CI was at a non-significant level, a predictable result given the smaller sample size of events. However, the RR of 2.32 is evidence of a

comparable degree of damaging effect of rofecoxib as the RR of 2.8 found for cardiac events. Excess cerebrovascular events were also found in other Merck-sponsored randomized clinical trials described in this section below and in certain of the studies described below in the section on observational epidemiology

      75.    *The Occurrence of Increased Blood Pressure in APPROVe.*
Increased blood pressure was known to be an important effect of rofecoxib since the pre-marketing clinical trials. See Integrated Safety Summary, October, 1998, page MRK-0S420085537. Similarly, increases in blood pressure occurred in the APPROVe study as well as investigator-reported peripheral edema and congestive heart failure (CHF). CHF is associated with peripheral edema and often follows increased blood pressure. See Bresalier, at 1096. Although Bresalier, et al reported no statistical association between blood pressure increases and occurrence of heart attack, (see Bresalier at 1097-8), this statistical comparison becomes invalid due to the removal during the trial of those with hypertension, which was done more commonly in the rofecoxib group (31 individuals) than in the naproxen group (8 individuals). See Bresalier at 1096. Rofecoxib's blood pressure effect is highly relevant for two reasons: first, it occurs twice as often in those exposed, compared to those on placebo (see Bresalier at 1099, Table 4), and when it occurs, this rofecoxib-induced  hypertensive has almost four times the rate of thrombotic cardiovascular adverse events than occurs in those who develop hypertension while on placebo. This "extra burden" is seen clearly in a comparison of those in each group (rofecoxib-hypertensives vs placebo-hypertensives) who had comparable "spikes" of systolic blood pressure above 160 or diastolic pressures above 100. For those two groups the **RR was 3.82, 95% CI 1.42, 12.85,** for rofecoxib/placebo (see APPROVe cardiovascular safety report, Table 23 B. See MRK-AHD 0075805).

      76.    *Incidence of Additional Hypertension-Related Outcomes (Congestive Heart Failure, Pulmonary Edema and Cardiac Failure) in APPROVe.* The

RR for these hypertension-related complications was **4.61, CI 1.50-18.83**, comparing rofecoxib to placebo. See Bresalier, Table 4 at 1100. These are related adverse events for the following reasons: Hypertension increases the burden on the heart because the "pump" must now work harder since it beats against increased peripheral resistance, the hallmark of hypertension. Second, hypertension increases the occurrence rate of heart attacks, further weakening the heart muscles. Third, with both types of weakening, the heart begins to fail—and when this happens, water is retained, causing ankle swelling (peripheral edema) and lung congestion (pulmonary edema), with both becoming more evident as the heart failure progresses. It is likely that blood pressure increases will be greater in those with higher baseline pressures. It is also likely that the tendency of rofecoxib to increase arterial blood clotting, (see ¶¶ 57 and 67, above) will create more clots in arteries damaged by increased blood pressure than in undamaged arteries. In this manner, the combination of rofecoxib's tendencies to increase both blood pressure and arterial clotting will increase the likelihood of both heart attacks and strokes. Therefore, patients who suffered CHF due to Vioxx are at very high risk of further events, including MI, stroke and premature mortality.

### APPROVe Data Shows Excess Risk Throughout Exposure to Vioxx.

77.     Merck has claimed since September 2004 that the APPROVe study showed no excess risk of thrombotic events until after 18 months' use. This position is contrary to generally accepted principles of science, and is also contradicted by unpublished data and analyses from Merck's own files.

78.     On January 31, 2005, two weeks before the APPROVe article was published, Merck's consultant and APPROVe co-author Dr. Konstam stated that the authors were "going out on a limb" by emphasizing the assertion of a rate difference between the 0-18 month and 19-36 month time periods. (MRK-AHD0075697.) This is a candid admission that there is no scientific support for the assertion. Yet I have seen

Merck's former CEO, Raymond Gilmartin, testify that there was no effect on people who took Vioxx for less than 18 months. Mr. Gilmartin was going out on the same limb.

79.    The APPROVe study was not designed or "powered" to evaluate CV event rates, and instead the monitoring of CV events was incidental to the study's purpose, i.e., to detect a difference in the rate of recurrent neoplastic polyps of the large bowel for Vioxx versus placebo. "Power" refers to the ability to detect a statistically significant difference in outcomes between the treatment arms when such a difference exists. Scientific studies are designed in advance to include sufficient numbers of subjects to detect such differences, at pre-specified levels of significance, *as to the outcome for which the study was designed.* Thus, the APPROVe Data Analysis Plan (DAP) shows that the study was designed to detect recurrent polyps, not CV events (MRK-I8940080876); the study was certainly not powered to detect a difference in CV event rates for one segment versus another, and this is particularly true for the earliest time period, when there are relatively few events to be analyzed. It is a fundamental principle of science and epidemiology that, unless the study is adequately powered to detect differences in event rates over an early time period as part of the pre-study design, the same relative risk determined when the study is over is presumed to apply throughout. Merck's post-hoc "subgroup analysis" of 0-18 vs 19-36 month time periods violates this principle and lacks any scientific basis. It is axiomatic that the early phase of any RCT is subject to statistical uncertainties, and the entire field of statistics was developed to create rules of judgment on when enough evidence is present to draw sound conclusions.

80.    Despite the design limitations of the APPROVe study, it is important to note that even small studies can yield statistically significant results when the exposure causes a large difference in disease outcomes. This is true because the power of a study to detect a statistically significant effect of exposure is directly proportional to (a) the magnitude of effect, as well (b) the size of the study population.

Thus, the larger the magnitude of the effect, the smaller the population size necessary to detect the effect at a statistically significant level. Conversely, even a small increased risk can be detected at a significant level with very large population sizes. These principles are directly relevant to the analysis of data from the APPROVe study, as discussed below.

81. The largest magnitude of effect in APPROVe was seen in the patients with pre-existing conditions that placed them at exceptionally high risk for adverse cardiovascular events, including MI and stroke. Thus, the relative risk for the category of "symptomatic atherosclerotic cardiovascular disease" was **9.59**, and the relative risk for diabetics was **6.10**, and both results were statistically significant. Importantly, the Kaplan-Meier cumulative incidence curve presented in the published version of the APPROVe study displayed only the data for the population as a whole, without a separate display of the data for the high-risk subgroups. In fact, one of the reviewers for the *New England Journal of Medicine* specifically asked the authors to present the curve for high-risk patients (MRK-AHD0000075):

> "It is said that the thrombotic events do not separate out for 18 months it [sic] would be important to know if that is true for all risk groups and for the non-aspirin group. For example did the ACSD [Atherosclerotic Disease] symptomatic group not on ASA [aspirin] separate out earlier . . . did the patients with a CAD [coronary artery disease] history separate out earlier? <u>I am trying to understand whether patients with already existing ACSD develop problem early while other patients at lower risk (the majority in the study build up risk over time</u>." (2005 NEJM 000280) (emphasis added).

82. Rather than provide the requested analysis showing the separation of the curves for high-risk patients, the authors responded that the small numbers of subjects would result in a "lack of statistical power." (<u>Id.</u>) This reply to the NEJM reviewers was incorrect. In fact, the magnitude of the effect in the high risk groups is so

large that early separation and statistically significant increased risk can be observed in both the early and late portions of the study, despite the small size of the sub-population of patients in these categories. Analysis of the SAS files for the APPROVe study, provided by Merck in this case, allowed identification of the patients with pre-existing heart disease and/or pre-existing diabetes and their event rates. For such patients, there were **18 confirmed thrombotic events in the Vioxx arm, versus 3 in the placebo arm, and the curve for Vioxx is above placebo throughout the entire period of the study.** Furthermore, 15 of the 18 events in the Vioxx arm were cardiac in nature, including 11 MIs (2 of which were fatal), 4 unstable angina, and 1 sudden cardiac death, whereas 2 of the events in the placebo group were peripheral venous thromboses which are of questionable relevance to the endpoint of interest. The Kaplan-Meier curve for the high risk patients appears below:



**APPROVe Study**
**Adjudicated events, high risk subgroup**

83.     Contrary to Merck's oft-repeated claim of "no effect" in the first
18 months, the data show a statistically significant increased risk for these high-risk
patients in the Vioxx arm for the 0-18 month period.  **RR=3.49, P=0.0406,** by the log-
rank test, which is standard in this context.[3]  At 36 months, the Relative Risk was even
higher, **RR=5.69 (95% CI 1.68, 19.3)**.  These statistically significant findings mean that
it is highly likely the results were due to the toxic effects of Vioxx, rather than chance.

_____

    [3] The 95% CI at 18 months is 0.974, 12.5.  The CI is based on the estimated
standard error of the cox coefficient, and it is not as accurate nor efficient as the log rank
test.  The p-value of 0.0406 is the most reliable indicator of statistical significance.

The finding of a significant effect in the 0-18 month period in high-risk patients directly refutes the false claims made by Merck that no such difference exists.

84.     As noted previously, the clearest signal for the toxicity of Vioxx appears with respect to cardiac events, that is, MI, sudden cardiac death and unstable angina, with a highly statistically significant RR of **2.80** in APPROVe, Bresalier at 1096, Table 2. The SAS files provided by Merck from the APPROVe study did not precisely match the data presented in the published article, in that the SAS files showed 29 "cardiac events" in the Vioxx arm, rather than 31 as stated in Table 2 of the article. Therefore, the RR in my calculations is slightly lower (2.62) than the RR of 2.80 from Bresalier. Nevertheless, the RR of **2.62** was significant, **p < .04, 95% CI 1.33, 5.13.** For the 0 to 18 month period, **RR = 1.81, P = 0.129, 95% CI 0.83, 3.96.** Although the result at 18 months does not reach statistical significance due to the smaller number of events, there is nevertheless only a 1 in 8 possibility that the result is due to chance. Particularly where the data at 36 months show a highly significant increased risk, it is far more likely than

not that the different at 18 months is due to the toxic effect of Vioxx. The Kaplan-Meier

cumulative incidence curve, below, shows visual separation with Vioxx above placebo

well before 18 months:

### APPROVe Study
### 2.a.1 MI/SuddenDeath/Unstable Angina, all



85.    Equally important is the fact that the investigator-reported (IR)

cardiovascular events from the APPROVe study were analyzed by Merck pursuant to its

pre-study plan, and the results of that analysis, which were not disclosed to the NEJM

peer reviewers or the public, contradict Merck's public position on the supposed lack of

early risk of Vioxx. A Cardiovascular Safety Report (CSR) prepared by Merck in

January 2005 (MRK-AHD0075757, et seq.) includes a narrative description, relative risk

calculation and Kaplan-Meier incidence graph for IR events, and drafts of the APPROVe

manuscript (MS) included data that were <u>deleted</u> from the MS submitted to NEJM, as described below.[4]

86.     The CSR states that IR events constituted a "secondary endpoint" (<u>id.</u> at MRK-AHD0075767) of equivalent status as the endpoint based on the publications of the Antiplatelet Trialists Collaboration (APTC). The status of IR data as a "secondary endpoint" is confirmed by Protocol 203, which set forth Merck's plan to combine and statistically analyze data from the APPROVe, VICTOR and ViP trials (MRK-I8940077737). However, Merck published APTC statistical analyses while deleting the data for the IR events. The IR data show that Vioxx conferred clear early visual separation and therefore supports other evidence, including statistically significant differences that demonstrate increased CV risk throughout the study, contrary to Merck's claim that there was no difference until after 18 months' exposure.

87.     There were 77 patients with IR cardiovascular events in the rofecoxib treatment group and 44 patients with the events in the placebo treatment group. The patient-year adjusted event rates were 2.54 and 1.33 events per 100-patient years for the rofecoxib and placebo treatment groups, respectively. The relative risk of IR events for Vioxx versus placebo was **1.90 with a 95% confidence interval of (1.31, 2.76)**. The relative risk was significantly greater than 1 (p=0.001). (CSR at p. 33, MRK-AHD0075789).

---

[4] The data were ultimately submitted to the FDA in an appendix to the APPROVe CSR in June 2005. To my knowledge, they have not been discussed in the media or peer-reviewed literature. It is clear from the NEJM reviewers' comments that these data are highly relevant and of great interest to the scientific and medical community.

88.     Figure 6 of the CSR (MRK-AHD0075792; MRK-AFV0426392) displayed the Kaplan-Meier cumulative rate curves over time for both treatment groups for investigator-reported cardiovascular events.  Text accompanying the figure states, **"The curve of the rofecoxib treatment group was above the curve of the placebo treatment group during the entire study."** (Id., emphasis added.)[5]   This curve is reproduced below:

**Figure 6**
**Kaplan-Meier Plot for Investigator-Reported Cardiovascular Events**
**(Events on Treatment through 14 Days After the Last Dose of Study Therapy)**



| Patients at Risk | | | | | | | |
|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1127 | 1053 | 982 | 828 | 883 | 712 |
| Placebo | 1299 | 1194 | 1154 | 1076 | 1035 | 893 | 827 |

Data Source: [4.4.1; 4.21]

89.     Tables 12a and 12b of the CSR display the relative risk of Vioxx versus placebo over six-month time intervals and 18-month time intervals, respectively, based on IR events.  Table 12a shows that the relative risk of Vioxx versus placebo was elevated in every six month period, from "0 to 6 months" through "greater than 30

---

[5] A similar result was obtained by a Merck statistician in September 2004, before Vioxx was withdrawn.  (See MRK-AAD0357815.)

months". Table 12b shows that **the relative risk of IR cardiovascular events for Vioxx versus placebo was statistically significantly elevated during the 0-18 month interval, RR=1.67 (95% CI 1.01, 2.76) and in the 19-36 month interval, RR=2.22 (95% CI, 1.28, 3.85)** (MRK-AHD0075794). This statistically significant excess risk is not due to chance and should have been published rather than deleted. The statistical analysis is further evidence that the "18 month" hypothesis is untenable.

90.     Figure 7 of the CSR displayed the hazard functions over time for both treatment groups for investigator-reported cardiovascular events. "A test of the proportional hazard assumption for the COX proportional hazards model did not show the violation of the assumption (p=0.205)." (Id. at MRK-AHD0075793.) That is, **there was no significant difference between the relative risk of Vioxx versus placebo according to duration of exposure, and, instead, Vioxx conferred greater risk than placebo at all periods analyzed.**

91.     The data described above refute Merck's position that there was no difference in CV events until after 18 months of exposure to Vioxx in the APPROVe study. Merck failed to disclose these data in the published APPROVe study in the NEJM. It is important that a draft manuscript submitted to NEJM included a reference to the deletion of the IR event analysis from the table of CV adverse events, and that the suggestion to delete the IR data was made by Christopher Lines, an author of the article whose financial disclosure to NEJM a Merck employee and owner of more than $10,000 equity or stock options in Merck. (MRK-AHD0075698; 2005 NEJM 000008). Mr. Lines asserted that the deletion of these data "improves clarity" (MRK-AHD0075698). However, the deletion of data obscured, rather than clarified.

92.     The NEJM reviewers were very concerned about the deletion of investigator-reported event data. One reviewer stated: "The authors clearly considered including this category in the Table 2, but deleted this category. There is a note at the

top of Table 2 'suggestion is to delete investigator-reported events.' Recommendation: Restore this category in Table 2." Another reviewer stated: "There is a worrying note to delete some reports from Table 2 that the authors ought to explain – we were obviously not supposed to see that!" (MRK-AHD0000076-77.) On February 9, 2005, the NEJM (2005 NEJM 000281-282) rejected the APPROVe manuscript, with the directive, "Restore the investigator-reported events category to Table 2." 2005 NEJM 000013.

93.     Instead of simply providing the requested investigator-reported data, Merck prepared a misleading response that "the relative risk [for investigator-reported events] is similar to that for confirmed events," while failing to disclose that the IR data contradicted Merck's claim that there was no difference in event rates until after 18 months of exposure. (MRK-AHD0000077) The importance of this data is reinforced by the consistent evidence of statistically significant increased risk for the high risk patients, even when only "confirmed" events are considered. See ¶ 82, above.

94.     Merck also claimed in its responses to the NEJM reviewers that it was only appropriate to rely on the "confirmed" events rather than those reported by the investigators. However, this position is contrary to Merck's practice in the past. There is no legitimate reason to conceal investigator-reported event analysis, and, indeed, numerous Merck studies of Vioxx include statistical analysis of both confirmed and investigator-reported events. In APPROVe itself, the endpoint of CHF, pulmonary edema and cardiac failure was not adjudicated at all, yet the NEJM reviewers insisted upon including the statistical analysis showing increased relative risk of 4.6 versus placebo, and Merck complied. (MRK-AHD0000061; Bresalier, 352 NEJM at 1097.) Similarly, Merck provided statistical analysis of both confirmed and investigator-reported gastrointestinal adverse events in the VIGOR publication (Bombardier, NEJM 2000) and such data analyses were considered fit for publication by both the authors and

the journal. Furthermore, Merck authors published a study of thrombotic events based
entirely on investigator-reported data, Reicin, "Comparison of Cardiovascular Events,"
etc., Am J Cardiol 2002; 89:204-209, and it is improper for Merck to rely on IR data in
some studies but delete such data from the APPROVe manuscript, particularly where
the NEJM reviewers specifically asked to have it restored.

   95. Merck contends that the difference between Vioxx and placebo
after 18 months was attributable to the "flattening" of the curve for the placebo arm of
the trial, suggesting that the incidence of CV events declined drastically in the placebo
group after 18 months. (Howard Report at 8). Instead, the IR data show a fairly constant
event rate throughout the study, and the "flattening" resulted from disparate results of
the adjudication process. In the Vioxx arm, the percentage of cases confirmed by
adjudication was roughly the same in both the 0-18 and 19-36 month arms, and totaled
46 out of 77 (approximately 60%). The confirmation rate was drastically different
between the 0-18 month and 19-36 month segments of the placebo arm (80% versus
32%), resulting in an artifactual difference in the relative risks for the first and second
halves of the APPROVe study. There is no biologically plausible explanation for this
discrepancy, which instead appears to be either a statistical anomaly or the result of
excessively restrictive criteria for adjudication of events, or both.

   96. Merck has also claimed that the APPROVe data failed the test of
proportional hazards, to support its position that there is a true difference between the
relative risk of Vioxx versus placebo in the 19-36 month segment versus the 0-18 month
segment. However, this flawed statistical analysis is based upon the difference in the
rate of adjudicated confirmation, rather than the rate of reported events. Importantly,
the APPROVe CSR states that, when investigator-reported events were analyzed, such
events did not fail the proportional hazards test, indicating that **there was no significant**

**difference in the relative risk between the earlier and later portions of the study.** (MRK-AHD0075793.)

97.    Extending this flawed analysis, Merck attempts to cast doubt on the APPROVe results by arguing that the difference between the relative risks for the later versus earlier periods are inconsistent with the proposed thrombotic mechanism of Vioxx cardiovascular damage, which would be expected to appear more rapidly. Again, this argument fails because it is based upon the anomaly in adjudication confirmation rates, rather than reported event rates. Also, it fails because the high-risk patients showed statistically significant increased risk for the 0-18 month period, with immediate visual separation of the incidence curves, which demonstrates consistency with mechanisms of damage acting rapidly upon the most susceptible. Therefore, the occurrence of early and late effects in the investigator-reported data is coherent with the prothrombotic and hypertensive mechanisms, providing additional reasons why such data should not only have been disclosed, but are actually more credible than the implausible comparison of early to late event rates advanced by Merck.

98.    It should also be noted that Merck's reference to the "apparent absence of difference in the first 18 months," Bresalier, 352 NEJM at 1099, is factually incorrect. At 18 months the Vioxx group adjudicated thrombotic events were <u>18% greater</u> than those of the placebo group (RR =1.18). An 18% difference can certainly be certainly medically important, and it is misleading to say there is "an apparent absence of a difference" when, in fact, such a difference exists.

### The risk of cardiac events was more than doubled with standard therapeutic doses of Vioxx.

99.    The subjects in APPROVe received standard therapeutic doses of 25 mg Vioxx per day. Thus, the excess cardiac injuries cannot be attributed to higher-than-normal doses. This fact not only distinguishes APPROVe from the 50 mg dose administered in VIGOR, but also distinguishes the risk of Vioxx from that of Celebrex,