148.    The 24-hour test of blood pressure, taken by an automatic machine worn by the patient, is generally considered to be a very reliable method of judging the presence and severity of hypertension. A published study of rofecoxib's (25 mg/d) effects on 24-hr blood pressures (BPs), based on this method, appeared in 2005 and contrasted the results with that of celecoxib (200 mg/d) and naproxen (500 mg/twice daily). See Sowers, et al., Arch Intern Med, 165: 161-168, 2005. The patients were between about 62 to 64 yrs of age, all with osteoarthritis and all with hypertension that was reasonably well-controlled on antihypertensive medications. Although the baseline 24-hr BPs were closely similar, 6 weeks later the 24 hr BPs showed that only the rofecoxib group's BPs rose, and to a significant degree (p = 0.005 for rofecoxib vs celecoxib and p = 0.005 for rofecoxib vs naproxen. See Sowers at 163. Figure 3 of Sowers demonstrates graphically that rofecoxib was the only medication of the three that increased SBP both night and day throughout the 24 hrs. See Sowers at 166. This figure is reproduced below:



Figure 3. Hourly means of ambulatory systolic blood pressures (SBPs) over 24 hours at baseline and week 6 for celecoxib, rofecoxib, and naproxen. M/N indicates midnight. Ambulatory BP monitoring was initiated at approximately 9 AM ± 2 hours. The morning dose of study medication was administered within 5 minutes of initiating the ambulatory BP monitoring session. A consistent increase from baseline in ambulatory systolic pressure was observed only in the rofecoxib treatment group.

149.    It is generally accepted, and Sowers, et al., state, "Small increases in both clinic and ambulatory SBP in patients with hypertension and type 2 diabetes are associated with substantial increases in the risk of cardiovascular morbidity." Sowers at 166. The Sowers study showed significant mean elevations of about 5 mmHg in the Vioxx group. It is medically probable that the demonstrated hypertensive effects of

Vioxx contribute to the excess risks of MI, stroke and CHF found in the Vioxx RCTs, and among patients who used the drug.

        150.    Whelton, one of the co-authors of the Sowers article referenced above, had previously published data showing similar excess hypertension in Vioxx versus Celebrex. See, e.g., Whelton, Am. J. of Ther., 8:85-95, 2001, in which hypertensive-medicated OA patients 65 years or older had a statistically significantly greater risk of increased systolic blood pressure on Vioxx compared to Celebrex (17% v. 11%, p = 0.032), and also had almost double the rate of edema (9.5% v. 4.9%, p = 0.014). In 2001, Merck itself had conducted a head-to-head trial of Vioxx versus Celebrex and placebo, known as Protocol 112, which supported Whelton's conclusion that Vioxx was associated with a greater degree of hypertension. Protocol 112 was a 6-week controlled study of 1,521 patients in four treatment groups, Vioxx 12.5 mg, Vioxx 25 mg, Celebrex 200 mg., and placebo. (MRK-AIN0001240). The Merck Statistical Report showing analyses as of January 9, 2001, indicates that approximately 10% of the subjects in each of the Vioxx 12.5 mg. and 25 mg. arms of the study had increased systolic blood pressure greater than 20 mm and absolute value of over 140 mm, exceeding the pre-defined limits of change, compared to 5.3% in the Celebrex arm and 4.8% in placebo. The increased hypertension on Vioxx 25 mg. versus Celebrex 200 mg. was highly statistically significant, p = 0.004, and also statistically significant versus placebo (p = 0.046). (MRK-AIN0001608-609). Id. However, Merck did not publish the data from Protocol 112.

## VII.    SUMMARY OF ROFECOXIB'S EFFECTS IN ALL RANDOMIZED CLINICAL TRIALS (RCTs)

### A.    Summary of Randomized Clinical Trial Results.

        151.    Since the pre-marketing studies, Vioxx has demonstrated a clear danger to the cardiovascular system, which has been confirmed by repeated clinical trials. Before marketing, Vioxx displayed statistically significant increases in hypertension,

edema and chest pain compared to placebo. Vioxx also demonstrated worse hypertensive effects than diclofenac and ibuprofen, to which it was compared during the pre-market phase. Hypertension appeared even in studies of two weeks' duration or less, and the cumulative incidence of hypertension exceeded 20% of the population in the extensions of short-term, pre-market studies. The evidence of prothrombotic imbalance between thromboxane and prostacycline was also demonstrated in a pre-marketing, randomized trial, Protocol 023, which involved two-week exposures.

152. The results of the VIGOR study in March 2000 showed that Vioxx was responsible for a five times greater risk of MI, and a statistically significant increased relative risk of 2.37 for the combination of endpoints identified by Merck as "thrombotic." VIGOR was more than a "signal"; it was a confirmation of serious cardiotoxicity. Consistent increased cardiovascular risk was found in the supplemental RA studies. When data from those studies were combined with the VIGOR results, as Merck intended, the statistically significant increased risk of MI was confirmed **(RR = 4.39)**, and a statistically significant increased risk of CHF was also demonstrated. **(RR = 2.27)**. The risk of stroke and TIA was more than doubled **(RR = 2.10)**, and the result achieved borderline statistical significance ($p < 0.057$).

153. The ADVANTAGE study further confirmed the excess risk of serious cardiac events, the category for which the evidence has been strongest, and the MI + sudden cardiac death for Vioxx outnumbered naproxen by 8 to 1. These results were obtained despite the brief, 12-week duration of the study, using the standard therapeutic dose of 25 mg. of Vioxx.

154. The APPROVe study, commenced in 2001 and terminated prematurely on September 30, 2004, provides clear and convincing evidence of the damage of Vioxx to the cardiovascular system, including increased risk of cardiac events **(RR = 2.80)** and cerebrovascular events **(RR = 2.32)**. Relative risks for the patients at

highest background risk were particularly high, **9.59** for patients with pre-existing symptomatic atherosclerotic cardiovascular disease, and **6.10** for diabetics. APPROVe confirmed that the risk of Vioxx begins when the patient starts taking the drug, and this is particularly clear for the high-risk patients, where the confirmed event rate was statistically significant in both the 0-18 months and 19-36 months periods of the study, and visual separation of the incidence curves began immediately. Strong increased risk of CHF-related events also appeared early and was significant **(RR = 4.61; 95% CI, 1.50, 18.83)**. Patients on Vioxx were significantly more likely to experience hypertension, and those with spikes in hypertension were almost four times more likely to suffer thrombotic events. Relative risks would have been even higher than those reported if not for the disproportionate early drop-out of Vioxx patients who suffered precursor events such as hypertension and edema.

155.    The VICTOR study showed a statistically significant increased risk of confirmed events, and **RR = 4.0** for the subcategory of cardiac events. The ViP study showed a slight increase in cardiovascular events **(RR = 1.25)**, and when combined with APPROVe and VICTOR as Merck intended in Protocol 203, there was a highly statistically significant increased risk of cardiac events **(RR = 2.34)**.

156.    Finally, the Alzheimer's trials showed statistically significant increased risk for the endpoint of MI + sudden cardiac death **(RR = 2.04)**, and for mortality arising from such events **(RR = 4.33)**. The Alzheimer's trials also showed a continually rising incidence of hypertension in the Vioxx arm, with cumulative incidence exceeding 30% by the time the studies were terminated.

157.    These consistent results strongly demonstrate that Vioxx is cardiotoxic and has caused an excess of heart attack, stroke, CHF, and hypertension.

## VIII.   EVIDENCE FOR ROFECOXIB'S HARM DERIVED FROM OBSERVATIONAL EPIDEMIOLOGY

### A.      Introduction.

158.    Observational (also called "non-experimental") epidemiology studies contribute a large amount of the total literature on rofecoxib's harm. This group includes many case-control studies (which are done by a process of matching rofecoxib-exposed patients with controls matched for age and gender, and, when possible, matched also for risk factors such as hypertension). There are also adverse event reports (AERs) emanating from the FDA, from the World Health Organization's data, largely from Europe and one from the UK. AERs report occurrence rate comparisons, without matching, by referral to events reported and relating them to either (1) prescription data as a surrogate for patient-years of exposure, or (2) expected proportions of events. Both types of study will be categorized by their impact on the disease outcomes of interest: serious heart disease; cerebrovascular disease, that is, fatal and non-fatal stroke and transient ischemic attacks (TIA's); hypertension; congestive heart failure, pulmonary edema and peripheral edema. All these reports amplify, complement and verify the conclusions reached from the experimental epidemiology studies described above, and contribute to the consistency principle of epidemiology described under paras 9 and 12, above.

### B.      Serious Heart Disease.

159.    *Adverse Event Reporting System of the United States Food and Drug Administration (US-FDA)* The FDA's quarterly Data Extract provided the number of adverse events (AEs) from 1/1999 through 9/2004 for the two major competitors and major sellers in the COX-2 pharmaceutical field, Celebrex (celecoxib) and Vioxx (rofecoxib).  Relative Reporting Rates (RRRs) were derived from the AE data, as the numerator, and from the "IMS Health NPA Plus Monthly Rx Audit" for the number of prescriptions as the denominator. RRR data were derived for four time periods, 1/1999--

3/2000, 4/2000--12/2000; 1/2001--12/2001; and 1/2002—9/2004. From close to 9 through almost 80 million prescriptions for each of these drugs were filled during each of these 4 periods, with the largest sales occurring in the third period: over 76 million for Celebrex and over 67 million for Vioxx. Serious heart disease in this calculation was restricted to those terms defined as "myocardial infarction (MI)", which included fatal and non-fatal myocardial infarction, and sudden cardiac death. RRRs for MI for Vioxx versus Celebrex were high in each period

|      |                   |                                    |
|------|-------------------|------------------------------------|
| I.   | 1/1999 – 3/2000:  | RRR = 8.84                         |
| II.  | 4/2000 – 12/2000: | RRR = 4.72                         |
| III. | 1/2001 – 12/2001: | RRR = 12.11                        |
| IV.  | 1/2002 – 9/2004:  | RRR = 20.46                        |
|      | Overall:          | RRR = 11.29 (p <0.001 for all periods)[9] |

The RRR for all periods combined was 11.29, indicating over than an eleven-fold greater relative reporting rate of MI for Vioxx than for Celebrex. A high degree of statistical significance for Vioxx being more dangerous than Celebrex was present in each period (p <0.0001), and for the 4 periods combined (p <0.0001). The consistently elevated relative reporting rate therefore acts to supplement the information obtained from the randomized clinical trials described above: RR of 2.80 for serious heart disease for rofecoxib vs naproxen in APPROVe: RR of 5.00 for MI comparing Vioxx to placebo in VIGOR; an RR of 4.00 for serious heart disease (MI, Sudden Death and/or Unstable Angina) for Vioxx vs placebo in the VICTOR trial; an RR of 3.33 for serious heart disease for Vioxx compared to naproxen in the ADVANTAGE trial; and an RR of 2.04 for MI and sudden

---

[9] The most reliable RRR is for the first reporting period, before any adverse publicity about Vioxx could have affected the result. This RRR of 8.84 is consistent with and supportive of excess risk of Vioxx.

cardiac death for Vioxx compared to placebo in the Alzheimer trials. Therefore, the principle of consistency valued as evidence for causality by epidemiologists is amply demonstrated by the adverse event data, which clearly supplements the RCT data.

160.    *Case-Control Studies.* The case-control study with the largest database is that described by Graham and co-authors (Graham et al Lancet, 2005; 365:475-481). These publications reported on the occurrence of acute myocardial infarction (AMI), both fatal and non-fatal, and sudden death (SD). The latter represented deaths assumed to be the consequence of heart attacks, both outside the hospital and during hospitalizations. The data were obtained from a retrospective analysis of about 12 months of data derived from approximately 6 million Californians enrolled in the Kaiser Permanente Health Plan. This produced the extraordinary number of 2,302,029 person-years of exposure to NSAIDs, including rofecoxib, celebrex and others. See Graham at 477). The analysis revealed a significantly greater degree of harm from all doses of rofecoxib versus celecoxib (odds ratio = 1.59, p < 0.015). For rofecoxib doses > 25 mg/d, the odds ratio versus celecoxib was 3.58 (p < 0.0.16). For rofecoxib doses of 25 mg or less the odds ratio versus celebrex was 1.47 and of borderline significance (p = 0.054). See Graham at 475. The Merck claim (from the VIGOR trial) that the five fold greater risk for MI for rofecoxib vs naproxen was due to a protective effect of naproxen was contradicted by Graham and co-authors since they found a slight <u>increase</u> of heart disease risk with naproxen vs the group with previous exposure to NSAIDS (odds ratio = 1.14, p = 0.05). See Graham at 475.

161.    A second case-control study was done on a large database derived from a cohort of an elderly population (mean age of about 80) who were enrolled in a pharmacy benefit program. See Solomon et al. Circulation 109: 2068-2073. The records were examined for hospitalizations for acute myocardial infarction (AMI) for patients taking rofecoxib, celecoxib, non-selective NSAIDS or non-users of NSAIDS. They

found a significantly higher AMI rate for two dosage levels of rofecoxib (25 mg/d or less, and > 25 mg/d) vs celicoxib at two doses (200 mg/d or less, and > 200mg). Adjusted relative risks (expressed as odds ratios) were as follows: rofecoxib 25 mg/d or less, vs celecoxib 200 mg or less (odds ratio = 1.21, p < 0.036): rofecoxib at the higher dose vs celecoxib at its higher dose of > 200 mg/d, odds ratio = 1.70, p < 0.026. Rofecoxib at all doses vs no NSAIDS was also higher, but of borderline significance—odds ratio = 1.14, p < 0.054. Celecoxib was not associated with higher risk as compared to the two groups of non-selective NSAID use and non-users of NSAIDS. See Solomon at 2068. A further finding of relevance to the duration of use needed to cause harm was that the rofecoxib vs celecoxib comparison showed significance for both the 1 to 30 day period (odds ratio 1.40, p = 0.05) and the 31 to 90 day period (odds ratio 1.38, p < 0.003). The authors state, "The findings of our study suggest that the first 30 days of use may include a period of elevated risk." Id., at 2072. The period later than 90 days was not significantly different for rofecoxib vs celecoxib.

162.    Ray and co-workers did a case-control study of users of selective and non-selective NSAIDs in those enrolled in Tennessee's Medicaid program. See Ray et al. Lancet, 360: 1071-1073, 2002. Rofecoxib at doses > 25 mg/d was found to increase the reported number of cases of hospital admission for acute myocardial infarction or death from coronary heart disease when compared to non-users of NSAIDs. This increase was present for this dose either in comparing comparatively long-term rofecoxib users (risk ratio 1.7, p = 0.058) or those newly started on rofecoxib (risk ratio 1.93, p = 0.024). No other comparisons were significant, including the use of naproxen vs non-NSAID use or other NSAID use. A related study found no protective effect of naproxen. See Ray, et al., Lancet 2002; 359:118-23.

163.    A recent case-control study on the topic of serious heart disease and use of rofecoxib, celecoxib and certain non-selective NSAIDS was done using health

insurance records of elderly residents of the province of Quebec. See Levesque, et al.
Annals of Int Med, 142:481-489 (2005). They reported a significant increase in
myocardial infarction (MI) for current users of rofecoxib vs non-users of NSAIDs. They
analyzed the data by use of regression techniques to yield a "rate ratio" which they
termed an RR. The values were: rofecoxib vs non-users of NSAIDs, RR = 1.24 (95% CI
1.05-1.46). Celecoxib, meloxicam (a non-selective NSAID), naproxen and "other
NSAIDs" did not differ significantly from the non-NSAID users. This finding
contradicts a claim of cardioprotection by naproxen, while at the same time supporting
the view that Vioxx caused more damage than other NSAIDs. See Levesque at 481 . The
relatively high prevalence of use of celecoxib and rofexcoxib allowed low and high doses
of each of these NSAIDs to be compared to non-users of NSAIDs, and rofecoxib caused
significantly more MI's for each dose. The values were: low-dose rofecoxib (25 mg/d or
less), RR = 1.21 (CI 1.02-1.43); high dose rofecoxib (> 25 mg/d), RR 1.73 (CI 1.09-
2.76). Neither the low dose (200 mg/d or less) nor the high dose (> 200mg/d) of
celecoxib were significantly different from the non-NSAID users See Levesque
at 484-85.

       164.    Mamdani and co-workers reported a case-control study of patients
over the age of 66 who were enrolled in the province of Ontario's health care system. In
brief, they found no difference in the "adjusted rate ratios" for celecoxib, rofecoxib and
naproxen of myocardial infarction hospitalizations compared to a control of non-NSAID
users. See Mamdani, et al. Arch Int Med 163:481-486, 2003. Of interest is that the
unadjusted rate ratio for rofecoxib (1.5) was significantly greater than that of the control
group (CI 1.1-1.9). The unadjusted rate for the non-selective NSAIDs was also 1.5 and it
too was significantly greater than that of the control group. The ability to generalize
these results is limited, not only due to the known weaknesses of cohort studies, which
require many adjustments to attempt to bring the groups into closer alignment without

biasing the results, but also due to exclusions of data inherent in the study design. For example, the Mamdani study excluded all patients who died, which was not done in the other studies, and could have biased the results. Also, Mamdani excluded all patients who used the drugs for less than 30 days, and this exclusion has been criticized because of the potential for missing excess risk. See Solomon, et al., Circulation 109:2068-2073 at 2072 (2004).

C.  **Hypertension, Peripheral Edema and Congestive Heart Failure—Three Interrelated Complications**

165.    In a retrospective analysis of patient records, Cho and co-workers studied blood pressure changes in a group of older patients newly started on either rofecoxib (57 patients, mean dose 25.2 mg/d) and celecoxib (52 patients, mean dose 219.2 mg/d). See Cho, et al. Am J of Therapeutics, 10 (5): 311-317, 2003. Despite the rather small size of the groups, Cho and co-workers found a significant rise in blood pressure in the rofecoxib group, as compared to the celecoxib group. An even larger increase was noted in those patients over the age of 65, which change was also significant. See Cho at 311. Of note is that slightly over half of all the patients were already hypertensive, and on blood pressure-lowering medications at the start of the study. See Cho at 313.

166.    Nietert and colleagues reported a comparison of effects of newly prescribed rofecoxib vs celecoxib in stable hypertensives over the age of 55, using a retrospective, case-control design. (See Nietert, et al. Pharmacotherapy 23 (11): 1416-1423, 2003). Data were obtained from electronic medical records of 31 ambulatory care practices. The records were examined for patients newly prescribed either of these COX-2 inhibitor drugs. The usual doses were: rofecoxib 25 mg/day, and celecoxib 200 mg/day, and the results were unchanged if the few patients taking different doses were excluded from the analyses. Blood pressures taken after the new drugs began were not different, but the rofecoxib group had significantly more patients who required increases

in the doses of their blood pressure control medications (odds ratio = 1.68, 95% CI 1.09-2.60). Additionally those started on rofecoxib required the increased doses of blood pressure control medications to begin sooner than those requiring such changes in the celecoxib group (p < 0.05). (See Nietert at 1416).

167. In contrast to the two previously described studies, Solomon and co-workers wished to find if hypertension was induced in normotensive individuals (mean age, about 80 for each group) when started on either the two most commonly used COX-2 drugs (celecoxib and rofecoxib), when compared to non-selective NSAIDS or non-NSAID users during the years of 1998-2000. See Solomon, et al. Hypertension, 44:140-145, 2004. In this retrospective case-control study, they found that rofecoxib did create significantly more new cases when compared to either celecoxib, non-specific NSAIDS or to non-NSAID users. See Solomon at 140.

168. A fourth study was done using questionnaire responses of patients with either rheumatoid or osteoarthritis. See Wolfe et al. Jr Rheumatology, 31: 1143-1151, 2004. The goal was to determine prevalence of new hypertension, increased difficulty in blood pressure control or appearance of or worsening of edema, based on information provided to patients by their physicians as well as self-observation. Comparisons were made of those using rofecoxib, celecoxib or non-specific NSAIDS—with data restricted to self-report over the prior 6 months. All comparisons showed significant increases in all of the outcomes studied for rofecoxib over the other two treatment conditions, including greater than doubling of the risk of increased blood pressure and edema. Patients reporting increased edema also had a 4 times greater risk of developing CHF. See Wolfe at 1148.

169. A fifth study used FDA files of spontaneous reports of hypertension leading to hospitalization in association with rofecoxib, celecoxib, and two non-selective NSAIDS. See Brinker et al., Drugs Aging, 21 (7): 479-484, 2004. The

study covered the period from 1/2/92 through 4/02 that encompassed the first 3 years of marketing of these four drugs. Again only rofecoxib was responsible for an appreciable number of hospitalized cases. There were no cases from the two non-selective NSAIDS, and 3.8 times as many for rofecoxib as for celecoxib. See Brinker at 481. Of relevance to the dose required for produce adverse events, 13 of 17 rofecoxib cases were derived from those taking the 25 mg dose and only 4 at the 50 mg dose. The authors stated that the 50 mg dose "did not seem to be over-represented among the cases". See Brinker at 482. Of great relevance to the duration of rofecoxib use required for adverse events to occur is this observation—"the time to hospitalization was 4 weeks on average, but there were reports of acute illness and hospitalization following a single dose." See Brinker at 482. (Emphasis added). The rapid onset of extreme hypertension is a contributing factor to the early appearance of increased risk of MI, stroke and/or CHF due to Vioxx. Of antecedent diseases and risk factors, only pre-existing hypertension was listed as being common (80% of celecoxib cases and 60% of rofecoxib cases). See Brinker at 482. The methodology used by Brinker is identical to the methodology that I used to prepare the adverse event analyses of serious heart disease, stroke/TIA and CHF, that is, Medwatch adverse event reports in the numerator and IMS prescription data as a surrogate for patient years of exposure in the denominator.

170.    The World Health Organization/Uppsala Monitoring Centre (WHO/UMC) of Uppsala Sweden collects adverse drug reactions (ADRs) from 57 countries that belong to the WHO program for international drug monitoring. This center collects about 35,000 new reports quarterly. See Zhao, et al. Clinical Therapeutics, 23:1478-1491, 2001. Zhao and colleagues reported on comparisons of ADRs from celecoxib vs rofecoxib through the second quarter of 2000. The topics they explored in the database were as follows: water retention (which is comprised largely of peripheral edema); abnormal renal function; acute renal failure, nephritis, cardiac failure and

hypertension. They defined the group of ADRs as all being related to renal safety, including in their definition the three topics encompassed in this section: hypertension, peripheral edema and congestive heart failure (CHF), the latter a synonym for cardiac failure. They were stimulated to investigate these particular adverse events because of prior studies that had shown rofecoxib to cause more deleterious effects in these categories. (See Zhao at 1480, and this article's references #s 16-20). Their analytic method seeks evidence for disproportionality (referred to as "IC") in reporting of ADRs among different drugs. These IC comparisons were converted into "actual/expected ratios" of rofecoxib/celecoxib. These ratios were: 1.75 for water retention (p< 0.0001); 3.94 for cardiac failure (p <0.001); and 1.84 for hypertension (p <0.001). See Zhao at 1484. Comparisons also showed rofecoxib's IC values to be greater than those of two "traditional NSAIDS"--(diclofenac and ibuprofen) (p <0.05), whereas celecoxib was similar to these two other NSAIDs. See Zhao at 1483.

171. Hospitalizations for congestive heart failure (CHF) during the years 2000 and 2001 were studied in residents of the Canadian province of Ontario and comparisons were made among the following groups (all over 65 years in age): new users of rofecoxib, celecoxib, non-selective NSAIDS, and non-users of NSAIDs. See Mamdani, et al. Lancet 363:1751-1756, 2004. The findings showed the lowest rate of admissions were for celecoxib and non-users. Non-selective NSAID users had an intermediate rate and rofecoxib the highest rate. Additionally, rofecoxib users with no prior history of admissions for CHF had a higher readmission rate after their first admission than did either of the other two groups. See Mamdani at 1755. The CHF study by Mamdani had almost three times as many events than his study of MI. Also, the former study did not exclude subjects who took the drug for less than 30 days. These factors tend to make the CHF study more reliable.

172. The third article on CHF was that of a single case report of a 42

- 78 -

year-old woman who was diagnosed with this problem after two weeks of use of 25 mg/d of rofecoxib followed by one week at 50 mg/day. See Campbell and Sneed, JABFP 17(2): 131-135, 2004. This case was reported to the FDA. See Campbell at 132. Although single case reports taken in isolation are of limited value in assigning causality, this case report is consistent with other data, including the rapid onset of CHF in the Vioxx arm of the APPROVe RCT. Therefore, this case provides supportive evidence of the brief duration of Vioxx exposure needed to produce a serious adverse event.

**D.    Cerebrovascular Disease (Stroke and TIA)**

173.    *Adverse Event Reporting System of the United States Food and Drug Administration (US-FDA).* The FDA's quarterly Data Extract provided the number of adverse events (AEs) from 1/1999 through 9/2004 for the two major competitors and major sellers in the COX-2 pharmaceutical field, celebrex and vioxx. The methods used for the calculation of serious heart disease (see Discussion at ¶ X.B, above) were also used for stroke and TIA. RRR data were derived for four time periods, 1/1999 – 3/2000, 4/2000 – 12/2000; 1/2001–12/2001; and 1/2002 – 9/2004. In para __, I reported on the large and consistent increases in myocardial infarction rates for Vioxx/Celebrex from this data set, with the overall RRR being 11.29 (p < 0.001). Similarly, for stroke and TIA separately and combined, the RRRs for Vioxx/Celebrex were also large and statistically significant for each period and for all periods combined. The RRR and significance data for stroke and TIA combined are:

| | |
|---|---|
| I. | 17.72, (p < 0.001); |
| II. | 6.45, (p <0.001); |
| III. | 11.27, (p < 0.001); |
| IV. | 24.16, (p <0.001); |
| Overall: | 13.44, (p < 0.001) (all 4 periods combined) |

Thus, it is quite remarkable to note the very large excess and comparability of the toxic burden of Vioxx over Celebrex both for MI and stroke plus TIA (11.29 and 13.44, respectively). (Similar findings were present for strokes alone and TIAs alone).

174.    Many comparisons of Vioxx vs Celebrex have been reported, due to their similar dates of initial marketing as well as their classification as COX 2 inhibitors. A <u>different</u> NSAID also classified as having COX 2 properties, (meloxicam) was compared to rofecoxib by means of a prescription-monitoring program and questionnaires sent to general practitioners in England. <u>See</u> Layton et al. Rheumatology, 42: 1342-1353, 2003. Prescription data were obtained from a confidential registry and the prescribing practitioners were sent questionnaires requesting information on adverse events that occurred within 9 months after the time of the prescription. Four months of prescriptions were assessed: (12/96 to 3/97 for meloxicam and 7/99 to 11//99 for rofecoxib). <u>See</u> Layton at 1342. Cerebrovascular disease events were derived from a long list of 23 terms that fit the diagnostic categories used by the practitioners, of which 6 were termed as "non-specific and of the "lowest level" of "relevance". <u>See</u> Layton at 1344. These cerebrovascular disease events, which contained at least the terminology for "stroke" and "TIA" more commonly used in the US, revealed an excess of these events for rofecoxib/meloxicam, with an RR of 1.68 (95% CI 1.15-2.46). <u>See</u> Layton at 1342. Cardiovascular disease events were derived from a short list of accepted terms (cardiac arrest, myocardial infarction and the vague term "CVS not specified", with CVS likely meaning "cardiovascular system"). <u>See</u> Layton at 1344. Despite the uncertainty of the diagnostic criteria, there was an excess of cardiovascular events for rofecoxib/meloxicam, with an RR of 1.38. This difference was not statistically significant (95% CI 0.71-2.67). <u>See</u> Layton at 1342.

E.    **Summary of the Observational Epidemiology Studies**

175.    These studies provide ancillary support for the findings of increased risk report randomized clinical trials, including: serious heart disease, stroke and TIA, congestive heart failure, increased blood pressure and peripheral edema. No evidence was found for an increase in peripheral venous thromboses or for their

complications, such as pulmonary embolism, tending to support the view that such peripheral venous events are of doubtful relevance to the endpoints of damage caused by Vioxx. They also support the concept that increased risk starts when exposure begins, and significant increases in serious heart disease were found in less than 30 days (Solomon; Ingenix). Consistency in outcome is therefore present. Consistency was demonstrated as well for disease outcomes discerned through different types of studies, including retrospective case-control studies, adverse event reports collected by the FDA or WHO, and self-report obtained through mailed questionnaires. The case-control studies were carried out in groups that varied considerably in age, including one in which the mean age was about 80. The onset of hypertension occurred very early after beginning Vioxx, and this hypertensive change persisted throughout the duration of use of Vioxx. One study done on 24-hour measurements revealed that the increase in blood pressure occurred throughout the 24 hours, including measures taken while patients were sleeping. This tends to support a continuous and chronic increased risk due to hypertension.

## IX.   THE CARDIOVASCULAR RISK OF VIOXX BEGINS WHEN THE PATIENT STARTS TO TAKE THE DRUG AND PERSISTS THROUGHOUT EXPOSURE.

176.   David Graham, M.D., is an FDA official who has studied the effects of Vioxx and published peer-reviewed literature on this subject. Dr. Graham was invited to testify at the Advisory Committee hearings held by the FDA earlier this year. During his testimony, Dr. Graham stated to the Panel that "the risk of myocardial infarction with rofecoxib begins when rofecoxib use begins." (Transcript, FDA Advisory Committee Hearings, 2/17/05 at 64). I consider Dr. Graham's opinion to be reliable, and I agree with his statement.

A.  **APPROVe, ADVANTAGE, VICTOR and VIGOR Data Show Excess Risk Throughout Exposure to Vioxx, or Promptly after Exposure Begins.**

177.    As described previously, the APPROVe study investigator-reported data showed a statistically significant increased risk of CV events, including MI and stroke, in both the 0-18 month and 19-36 month periods of the study. The Kaplan-Meier cumulative incidence curve showed that the rate for Vioxx was above placebo throughout the entire period of the study (See Figure at ¶ 88, above.) The Cox proportional hazards test showed no significant difference in the rate during the first and second halves of the study. These results show early and continued excess of risk. They cannot be dismissed by suppressing them, as Merck did by failing to disclose them to the New England Journal of Medicine. Nor can they be explained away by referring to different endpoints that exclude some of the damage attributable to the drug.[10] Instead, this randomized clinical trial provides reliable evidence of increased risk throughout the period of exposure. The Kaplan-Meier curve for the APPROVe high-risk patient subgroup provides consistent findings: statistically significant increased risk in the 0-18 month period, and immediately, visually apparent separation of the incidence curves. (See Figure at ¶ 82, above.) As discussed above, similar findings of early visual apparent separation of the incidence curves were made in ADVANTAGE, VICTOR and VIGOR.

B.  **Early Excess Risk Is Biologically Plausible.**

178.    The rapid appearance of increased risk is biologically plausible and consistent with other evidence. There is general agreement in the scientific

---

[10] See NEJM reviewer comment: "'Thrombotic cardiovascular serious events' contains a long list of heterogeneous events, including venous thrombosis and pulmonary embolism. . . . The use of a composite endpoint that includes 'noise' will reduce power. Based on known biologic mechanisms of COX2 inhibitors, heart failure might have been a better choice as an element of the primary composite outcome than venous thrombosis." (2005 NEJM 000272.)

literature that at least part of the explanation for the excess risk of Vioxx is the reduction of prostacycline without a corresponding reduction of thromboxane, which promotes platelet aggregation, thrombosis and plaque rupture. Protocol 023, the clinical trial that first informed Merck of this effect in 1997, involved Vioxx exposures of only two weeks, and showed that the prothrombotic imbalance of prostacycline and thromboxane occurred within that brief period after exposure began. This evidence supports early onset of increased risk.

179. As is the case with all cardiovascular risk factors, the chief determinants of both the extent and rapidity of onset of adverse events are the individual "host factors" of the exposed patients. These include, primarily, the underlying state of cardiovascular risk. Thus, as noted above, there was immediate visual separation of the incidence curves for high-risk patients, with Vioxx above placebo throughout the APPROVe study, and a statistically significant excess risk in both the 0-18 month and 19-36 month periods.

180. Early increased risk of CV events due to COX-2 inhibition is strongly supported by a study of Bextra (valdecoxib) and Dynastat (parecoxib), two other COX-2 inhibitors among patients who had recently undergone coronary artery bypass grafting (CABG). In that RCT the authors found that "short-term COX-2 inhibition is associated with a significant risk of thromboembolic events in patients at high risk for such events." Nussmeier, et al., "Complications of the COX-2 Inhibitors Parecoxib and Valdecoxib After Cardiac Surgery," New England Journal of Medicine, 2005; 352:1081-91 at 1086. The patients were exposed to such drugs for only 10 days, with a 30-day follow-up period, yet despite this relatively brief exposure, a statistically significant increased risk was demonstrated for the occurrence of "cardiovascular events" including MI, sudden cardiac death, stroke, and TIA. Nussmeier at 1087, Table 3 (RR = 3.7, p = 0.03, 95% CI 1.0, 13.5). These results strongly support the

conclusion that the risk of COX-2 inhibitors, including Vioxx, can and does appear within the first days after exposure among high-risk populations. Just as important, the presence of underlying high risk is not known until MI or stroke occurs, leading to post-event diagnostic tests that show atherosclerotic narrowing of the artery where the thrombosis is found.

### C.     Hypertension Effects Begin Early and Increase Risk of Cardiovascular Events.

181.    As discussed previously, increased rates of hypertension adverse events have been reported in almost all studies of Vioxx of which I am aware. These events begin very early. For example, in APPROVe, the authors reported that the Vioxx group's increase in blood pressure had occurred within 4 weeks after the start of the study. (Bresalier, 352 NEJM at 1098.) As also noted above, adverse hypertensive events are significantly correlated with thrombotic events in APPROVe **(RR = 3.82)**, and a similar trend was reported in VIGOR **(RR= 3.96)**. Also, as cited in ¶ 75 above, not only does Vioxx cause hypertension occur more often, but when it does occur, the CV disease risks are magnified. Rapid onset of hypertension probably accelerates the risk of an adverse thrombotic event by multiplying the shear stress, which can disrupt plaque and result in emboli and/or clots. The formation of the clot would be facilitated by the effects of Vioxx in reducing the amount of prostacycline available to combat the clotting effects of thromboxane. Chronic hypertension causes ongoing damage to the arteries, increasing the risk of CV events ever further over time.

### D.     Observational Studies Show Early Onset of Excess Risk

182.    A published study by Solomon, et al. (See Hypertension, 44: 140-145, 2004) reported that there was an increased risk of MI during the first 30 days of exposure to Vioxx, and in the 31-90 day period. The difference between Vioxx and comparator drugs after 91 days was not significant. (See § X.B, above.)

183.    Similarly, in the Merck-sponsored Ingenix study, the authors reported in a 2003 draft that there was a statistically significant increased incidence of MI among Vioxx users compared to diclofenac or ibuprofen users in the United Health Group database of prescriptions and adverse event records, for the 0-30 day exposure period **(Adjusted Rate Ratio = 1.86, 95% CI 1.14, 3.04)**. (MRK-ADC0032557.) This study has not been published.

## X.    THE SIGNAL OF VIOXX CARDIOVASCULAR TOXICITY APPEARED BEFORE VIOXX WAS MARKETED

### A.    Vioxx Caused a Significant Increase in "Chest Pain," Hypertension and Edema in Pre-Market Clinical Trials

184.    Protocol 045 was a randomized controlled, pre-marketing study of Vioxx in an osteoarthritic population, consisting of 775 patients  between the approximate ages of 50 and 80 years, given Vioxx 25 mg, Vioxx 50 mg, placebo or ibuprofen 2400 per day. (MRK-OS420085325-326). The study was conducted in 1997-1998, prior to marketing of Vioxx , and data were presented in the New Drug Application submitted in November 1998. Patients participated in an initial 12-week period and a 12-week continuation. For Vioxx 50 mg patients compared to placebo, there was a significantly higher incidence of both "chest pain" **(3.6% v. 0% by week 18, p = 0.012)**. (MRK-OS420085536); MRK-OS420085469, Table 44). Merck did not include "chest pain" as a term that triggered adjudication for confirmed thrombotic events. (MRK-ACV0020385). Chest pain is the signature symptom for MI, angina, myocardial ischemia, and other illnesses attributable to narrowing and/or blockage of coronary arteries. This significant difference from placebo was not the result of chance, but rather was likely due to the cardiotoxic effects of Vioxx, including hypertension (also significantly elevated in Protocol 045 for both the 25 mg and 50 mg doses, *see* MRK-OS420085537, 557, Table 59). The significant excess of chest pain and hypertension in Protocol 045 was a strong signal of the danger of Vioxx to the heart and

CV system. Edema was also elevated by 2 to 3 times versus placebo, although not statistically significant due to the relatively small number of patients. See MRK-OS420085604.

**B.      Merck Knew of an Excess of CV Events in the Vioxx Pre-Marketing Clinical Trials, Compared to the Placebo Group It Chose for Such a Comparison**

185.    In December 1997, a year and a half before Vioxx was marketed, Merck appointed a Task Force to investigate the incidence of cardiovascular serious adverse events (SAEs) in the ongoing Vioxx clinical trials (Minutes, 12/3/97; MRK-ABY0199809). The included trials were 029, 029-10/20/30, 033, 034, 035, 040, 044 and 045, which comprised 5236 patients and 1488 patient-years of exposure to Vioxx, comparator drugs and placebo as of December 15, 1997(MRK-NJ0066815, 819). The stated reason for this investigation was the unexpected result of Protocol 023, which showed a decline in the levels of PGI-2, the "most potent of all inhibitors of platelet aggregation," but no inhibition of systemic thromboxane, in the urinalysis of patients on Vioxx. (Final Plan, 12/30/97, at MRK-ABS0037039). This imbalance triggered a concern over the potential for thrombotic events. (Id.) The Task Force held its first meeting on December 3, 1997. ("Updates: PTM (December, 1997), MRK-ABS0329466 – MRK-ABS0329473, at 9473).

186.    To investigate the concern over thrombotic events, Merck decided to analyze SAEs from the ongoing osteoarthritis (OA) trials listed in the preceding paragraph. Because the trials were still blinded as to treatment groups, it could not be determined whether SAEs in the database had occurred in the Vioxx, placebo, or comparator drug arms. Therefore, the Task Force designed a study in which CV SAEs from all arms of the OA trials would be added together, and the combined groups' SAEs incidence rate would be compared to incidence rates of placebo patients from trials of other Merck drugs. In particular, the incidence among females in the

Vioxx trials would be compared to the placebo groups from trials of Fosamax (an osteoporosis drug), and males from the Vioxx trials would be compared to the placebo groups from trials of Proscar (a treatment for benign prostate hyperplasia). The Task Force agreed to interpret the results according to "specific rules which set numerical cutoffs for when the incidence of a CV condition is greater than expected" for the Vioxx OA trial population. ("Minutes for December's Vioxx (MK-0966) Project Team Meeting," 1/9/98, at MRK-GUE0051409).

187.    An expedited timeframe was established for completion of the analysis. Douglas Watson, Ph.D., a Merck epidemiologist with training in cardiovascular studies, authored a Final Plan dated December 30, 1997. (MRK-ABS0037036-046). Results were to be presented at the January 7, 1998 meeting of the Merck Clinical Development Oversight Committee (CDOC). (Minutes, 12/4/97, MRK-ABY0199805).

188.    On average, women in the Fosamax placebo group were about 3 years older than their counterparts in the Vioxx trials (65.4 v. 62.3 years), which would confer greater risk on the Fosamax group. Women in the Vioxx group had higher prevalence of hypertension, overweight and high cholesterol, while the Fosamax group had a higher prevalence of prior stroke and TIA. Considering the constellation of risk factors, it was reasonable for Merck to conclude, as it did, that it would be useful to compare cardiovascular event rates between the females in the Vioxx trials and females in the Fosamax trials. (See MRK-ABT0014783, 785).

189.    Results calculated by Merck demonstrated a statistically significant increased relative risk (RR) of 2.16 (95% CI 1.14, 3.94) for the Vioxx females compared to the Fosamax placebo group, and a non-significant elevated RR of 1.28 for Vioxx males compared to the Proscar placebo group. The results report did not mention the "specific rules which set numerical cutoffs" for excessive CV SAEs, nor

whether such cutoffs were violated by a statistically significant doubling of the rate for the Vioxx trials compared to the Fosamax group. (Report, 2/2/98 MRK-NJ0066804-827) These results provided another signal of the cardiovascular toxicity of Vioxx.

C.   **Merck inappropriately dismissed the importance of the signal.**

190.    At the January 7, 1998 CDOC meeting, Watson gave a presentation that dismissed any concern over the results of the CV SAE analysis on the grounds that (1) the Fosamax placebo group "may" have had an atypically low incidence rate of CV events, so that the doubling of SAEs in the Vioxx group was not unexpectedly high, and (2) the Vioxx groups' incidence rates were not as high as the incidence rates in a so-called "background population." (1/7/98 Watson presentation; MRK-ABP0002685-686). Merck adopted Watson's view and declared that the results showing a doubling of risk were not felt to be of concern. On February 9, 1998, the Project Team Minutes Executive Summary stated that the "results show no evidence of unexpected rates compared to the general population or to the Fosamax and PROSCAR databases," despite the statistically significant doubling compared to Fosamax. (Memo from Pemrick, 2/9/98, at MRK-ABC0009947).

191.    With regard to Merck's dismissing the appropriateness of the Fosamax placebo subjects as a substitute for a control group, Merck's explanation fails for two reasons. First, Merck's own in-house cardiovascular and epidemiology experts selected the Fosamax subjects as appropriate for comparison to the Vioxx group. The documents that I have reviewed which claim an "atypically low" incidence of CV events in the Fosamax placebo group were written after Merck learned the adverse results of the comparison (e.g., Watson 1/7/98 presentation, Watson 2/2/98 Report.) The scientific method requires adherence to the pre-specified plan for analysis of the data, and does not allow that plan to be disregarded in favor of a different plan after the results are known. Furthermore, the 12/3/97 Agenda shows that the Task Force

explicitly addressed the question: "Are FOSAMAX and PROSCAR placebo patients appropriate as controls?" An annotated version of the Agenda bearing placed a handwritten checkmark next to that agenda item, without further comment, supporting the conclusion that Merck's Task Force did not find any reason to consider the Fosamax placebo comparison to be inappropriate until after adverse results were calculated. (MRK-ABY0199809).

192.    Merck's second rationale for dismissing the results of the SAE analysis was an indefensible comparison of the incidence of cardiovascular events in the Vioxx trials to a purported "background" rate from an elderly community population. It is important that the "Final Plan" of December 30, 1997, did not state an intent to compare the Vioxx group's CV SAE rate to any "background" general population groups, but instead indicated that the analysis of risk would be based on the study design to compare Vioxx trial CV SAE rates to the Merck-chosen placebo group rates. Nevertheless, after learning that the Vioxx trial rate was more than double the rate for the Fosamax placebo group, Merck altered the study design by deciding to compare the Vioxx group SAE incidence rates to event rates from a general population group, that is, the Cardiovascular Health Study (CHS; Ives, 1995).

193.    On general scientific principles, it was inappropriate to reach outside the study design comparing rates to a clinical trial placebo group, because the Vioxx clinical trial protocols involved selection of subjects who were at lower risk of CV events than the general population. The CHS was a particularly inappropriate comparison group, because the CHS population was, on average, 11 years older than the Vioxx clinical trial population (73 versus 62 years) and the CHS population also included a far greater number of high risk patients with previous MIs, strokes, angina, hypertension, and other preexisting conditions. In addition, the CHS incidence rates included endpoints that Watson had excluded from the search terms for the Vioxx

groups, particularly congestive heart failure, which contributed 30% of the events used to calculate the CHS overall incidence rates.

194.    Watson was aware that the background rate of CV events varied "greatly" based upon the age, gender and risk factors of the population selected, as he had written in a memorandum in 1996. That memorandum referenced 15 published articles as the data sources for such highly variable rates. Some of those sources would have provided background rates that were lower than those calculated by Merck for the Vioxx OA trials in 1997, while others, like the CHS, provided higher rates. This variability highlights the impropriety of selecting a "background rate" that would support a claim that Vioxx was not toxic, when other "background" data sources would readily have supported the opposite conclusion. It was wrong to change the study design, wrong to dismiss the results of the statistical analysis v. Fosamax placebo, and wrong to ignore the signal of Vioxx's toxic effects on the heart.

195.    In October 1998, after the OA trials had been unblinded, Merck submitted the New Drug Application (NDA), which included data relating to adverse events. In that document, Merck stated that there was no statistically significant difference between Vioxx and placebo, or between Vioxx and other NSAIDs, with respect to thrombotic event rates. However, the data did not establish the cardiovascular safety of Vioxx, because the comparison to placebo was based on a very small data set, and because the comparisons to other active drugs are inherently capable of establishing only relative, rather than absolute safety.

196.    The Vioxx OA trials involved only 363 patient years of exposure to Vioxx and 127 patient years for placebo. There were only three events classified as "thrombotic" under Merck's classifications, including a single MI, in the placebo group. (MRK-ABS0027726- 728). This is such a small sample size as to be meaningless from a statistical standpoint. By comparison, there were 3327 years of patient exposure to

placebo in the APPROVe study, about 26 times more than in the OA trials. Dr. Watson,

Merck's cardiovascular epidemiologist, wrote in a published article concerning

gastrointestinal effects of Vioxx versus other NSAIDs that he did not analyze data for a

study in which there were only 194 patient years of exposure and 3 adverse events,

because "the total person-time on the drug (194 person-years) and number of events (3

total) were *too low to provide meaningful analysis.*" (Watson, et al., *The upper*

*gastrointestinal safety of rofecoxib vs. NSAIDs: an updated combined analysis,"* Curr

Med Res and Opin 2004; 20:1539-1548; emphasis added). I agree with that assessment,

which applied with even greater force to the even smaller person-time placebo data in

the Merck NDA for Vioxx. Nevertheless, Merck's NDA asserted that the primary

safety analysis should be based on a comparison of Vioxx to placebo, and Merck further

stated that such a comparison did not demonstrate a statistically significant difference in

the rate of thrombotic events. (MRK-ABS0067017-019). This analysis was

scientifically unjustifiable in light of the small amount of data available for the

comparison.

197.    It was equally inappropriate for the Merck NDA to rely upon the

comparisons to other NSAIDs in the OA trials to prove the safety of Vioxx. The sample

size was not large — only 1657 patient-years on Vioxx, and 706 years on NSAIDs.

Further, as acknowledged by Thomas Bold, M.D., the Merck physician assigned to

evaluate post-marketing adverse event data, such comparisons only establish the profile

of Vioxx in relation to the drugs to which it was compared. (Deposition of Bold,

7/29/05, at 454:24-455:10). Merck had no basis to conclude that the comparator

NSAIDs were safe, and, in fact, recent data tends to support an elevated risk of

myocardial infarction associated with diclofenac, which accounted for 69% of the

exposure to which Vioxx was compared in the OA trials. (See, e.g., Graham, *Risk of*

*acute myocardial infarction and sudden cardiac death in patients treated with cyclo-*

*oxygenase 2 selective and non-selective non-steroidal anti-inflammatory drugs: nested case-control study,* Lancet 2005; online edition, 1/25/05, at 5; OR for diclofenac 1.60 versus no NSAID use, 95% CI 0.92-2.79, p=0.09; Merck submission to FDA Advisory Committee, 2/8/01, at 83). Thus, the similarity in adverse event rates between Vioxx and diclofenac would only establish that both impose risk.

       198.    For the reasons stated above, the NDA data had relatively little to offer concerning CV safety of Vioxx , and instead the best available comparison groups for the Vioxx OA trials were the large data sets of placebo event rates that Merck compiled among similar populations (Fosamax and Proscar placebo groups), and which were chosen for the Watson 1997 analysis. The Fosamax placebo group was particularly large, since it included 4,471 patients followed for over 14,500 patient-years (MRK-NJ0066815, 819, Tables 4 and 7), thus providing sufficient data to allow for stable comparisons.

       199.    Merck's failure to acknowledge the signal is attributable to its inappropriate rejection of the data analysis set forth in the Final Plan of 12/30/97, and the indefensible after-the-fact comparison to an inappropriate "background" population of older, sicker subjects. This early error is consistent with other events in the history of this case. At each juncture where evidence of cardiotoxicity of Vioxx appeared, Merck chose to disregard it, and instead to adopt a highly dubious hypothesis that incorrectly absolved Vioxx of blame for the excess cardiovascular illnesses that it caused.

## XI.    SUMMARY AND CONCLUSIONS

       200.    Based on my review of the documents and scientific literature, and my experience in the fields of cardiology and epidemiology, it is clear that patients who used Vioxx were exposed to an unacceptably high excess risk of cardiovascular disease. Multiple lines of evidence support this conclusion. Most important are the randomized clinical trials described in this Report, which consistently identified statistically

significant increased risk of Vioxx compared to both placebo and naproxen. These findings are supported by the weight of the evidence from observational epidemiology studies, which found significant increased risk of MI, stroke and TIA, CHF and hypertension among patients who used Vioxx in comparison to other NSAIDs or non-use. Consistent and supportive evidence appears in the literature concerning plausible mechanisms of disease, including Vioxx' effect in causing an imbalance of thromboxane versus prostacycline which favors plaque rupture and thrombus formation, as well as the effects of Vioxx in causing severe hypertension, which contributed to increased risk of MI, stroke and CHF. All Vioxx users were exposed to excess risk, and the magnitude of risk of cardiovascular events was particularly high for patients who were especially susceptible to adverse effects of a prothrombotic, hypertensive drug. The data support the conclusion that the risk of Vioxx begins when the patient begins taking the drug.

201.    Evidence of the toxicity of Vioxx appeared early and repeatedly. The prothrombotic imbalance of thromboxane was known as a result of Protocol 023, conducted between April and August, 1997. The Watson analysis in December 1997 showed a statistically significant increased risk of 2.16 for cardiovascular events (including MI, unstable angina and stroke, and TIA) in the blinded osteoarthritis (OA) trials, for the combined "Vioxx + other NSAIDs + placebo" population versus the Fosamax placebo group that Merck selected as an appropriate comparison group. Merck dismissed the importance of the signal on the basis of an inappropriate comparison of the adverse event rate in the Vioxx OA trials to the rate in an older, sicker community population. Protocol 045, completed before the New Drug Application (NDA) was submitted in November 1998, showed a statistically significant increased risk of "chest pain" for Vioxx versus placebo, and multiple clinical trials during the same pre-market time frame showed significant increased hypertension for Vioxx versus placebo and/or

other NSAIDs. The combination of excess hypertension accompanied by excess chest pain, the hallmark of serious heart disease, was a strong signal of cardiovascular toxicity.

202.    The NDA itself gave no assurance of cardiovascular safety, because the rates of thrombotic events and the patient-years of exposure were too small to provide for meaningful analysis of Vioxx versus the placebo group, and because the comparison to active NSAIDs, primarily diclofenac, was only capable of providing information about the relative danger of Vioxx in relation to such other drugs. Instead, the excess risk compared to the large statistical sample of the Fosamax group provided a strong signal of toxicity that was reinforced by the excess of hypertension and chest pain in the Vioxx arms of the pre-marketing clinical trials.

203.    The VIGOR randomized clinical trial showed clear evidence of Vioxx cardiotoxicity in March 2000, including a statistically significant, five times greater risk of MI, and more than doubling of risk of combined thrombotic events, as well as CHF, edema and hypertension. There was no scientific support for Merck's rationalization that the excess was due to a protective effect of naproxen. The ADVANTAGE study and the Supplemental RA studies showed consistent increased risk of MI, CHF , hypertension and edema, in 2001.

204.    In 2004, the APPROVe study demonstrated a statistically significant increased risk of 2.80 as to cardiac events, including MI, sudden cardiac death and unstable angina, for Vioxx versus placebo. As in VIGOR, the relative risk was elevated for those who were at higher background risk. The results of the APPROVe study are consistent with the earlier indicators of excess toxicity described above. At the same time, by making the unfounded claim that there is "no effect" for Vioxx exposures less than 18 months, Merck's position is consistent with its earlier efforts to absolve Vioxx from blame in causing the excess occurrence of serious and fatal cardiovascular disease.

September 26, 2005

John W. Farquhar, M.D.