# EXHIBIT 12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: VIOXX
PRODUCTS LIABILITY
LITIGATION

GERALD BARNETT and CORRINE BARNETT, Plaintiffs,

vs.

MERCK & CO., INC., Defendant.

MDL Docket No. 1657

VIDEOTAPED DEPOSITION OF JOHN W. FARQUHAR, M.D.
San Francisco, California
June 8, 2006

Reported by:
DARCY J. BROKAW
RPR, CRR, CSR No. 12584
Job No. 69492

you know, other trials.

And that's what I've tried to do in my supplementary report is pick a high-risk subgroup that is more generally represented, representative of the high-risk state in cardiovascular trials.

BY MR. MORTARA:

Q You picked a high-risk subgroup in your supplemental report that was not pre-specified in the data analysis plan, correct?

A That's not correct. And I think at this point, you know, I alluded to the increased cardiovascular risk in Table 19, right. I alluded to that.

The subgroup analysis as we -- as I -- described it -- and "we" means Professor Jewell and I -- says that diabetics were included -- but what I'm saying to you now, and I have a document that will clarify this, is that what is in the supplemental report is, in fact, only the group identified as increased cardiovascular risk.

Q In the APPROVe study?

A Right.

Q When you did your analysis in your supplemental report, you used the prespecified high cardiovascular risk subgroup of the APPROVe study --

A Correct.

Q -- as defined by Merck?

A Correct.

Q **Dr. Farquhar, when assessing the statistical reliability of a subgroup, how does one use a P for interaction?**

A Well, there are two -- a P for interaction is looking to see if there is a synergistic relationship between the attribute in question and the end point that has been studied.

So Professor Jewell is the individual who performed that analysis for me, or for us, to the extent that he's part of the report. And his -- would you want to know more about the level of p-value that -- is that what you're looking for?

Q **I'll ask another question. We'll get there. Thank you, Dr. Farquhar.**

**When you assess the statistical reliability of a subgroup, you look at the P for interaction to see if it's above a certain number or not, correct?**

A That's only one thing I look for. The first thing I look for is whether or not there is a significant difference in the value of -- well, two things. The value of the Vioxx group at high risk

the inferences that I drew from my notes -- incidentally, it wasn't the notes themselves that was guiding my writing the report. I had documents to review. And my modus operandi is to sit at the computer and try and create the, if you will, the initial concepts that come from my review of the materials.

The presence or absence of notes is not as germane as my method of taking materials that I'm looking at and deriving conclusions that end up in the report.

BY MR. MORTARA:

Q Dr. Farquhar, I'm going to mark as Exhibit 4 your Supplemental Expert Report.

(Exhibit No. 4 marked for identification.)

BY MR. MORTARA:

Q Dr. Farquhar, Exhibit 4 is your Supplemental Expert Report. Could you turn to the final page, page 25. Exhibit 4 is dated May 22nd, 2006, and is that your signature there, sir?

A Yes.

Q Dr. Farquhar, on the front page of your report, there is a bullet that says, "Protocol 203: Merck's prespecified analysis of data from three

pooled studies (APPROVe, VICTOR and ViP), known as 'Protocol 203.'"

Do you see that?

A Yes, I do.

Q What is Protocol 203?

A It's an analysis of data from those three studies.

Q And you say that Dr. Jewell has analyzed the Protocol 203 data?

A Yes, he has.

Q Did Dr. Jewell follow the data analysis plan for Protocol 203?

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, he did, but you know, he was using his own brain. And in order to answer whether or not he did analyses beyond what was in 203, I would have to look at the data analysis plan for that particular point.

BY MR. MORTARA:

Q Have you ever read the data analysis plan for Protocol 203?

A Yes. Not in detail, but --

Q Did Dr. Jewell, in his analysis, follow the data analysis plan for Protocol 203?

A Well, I'm going to stop and think a little

bit about what has been analyzed that is likely to be -- all right. Let me take -- I'm going to try and answer this piecemeal.

If we are considering Figures 2 and Figure 3 where we're dealing with the high-risk versus low-risk status, that follows the data analysis plan, because the data analysis plan had increased cardiovascular risk as one of the categories, among many, of baseline attributes.

So in Figures 2 and 3, the data analysis plan was followed in the sense that that category of increased cardiovascular risk was listed as one of the attributes.

Now, Figure 1, which is the total analysis of the 203 data, in respect to cardiac events, was in the data analysis plan because cardiac events, all thrombotic events and cardio -- cardiac events, cardiac and cerebrovascular events and all thrombotic events were all listed as part of the data analysis plan.

And Dr. Jewell, Professor Jewell, made analyses of the total population of 203, comparing the Vioxx to the placebo groups, using the Kaplan-Meier and other analyses, yes.

So I think what I'm leading up to is he

did follow the data analysis plan entirely.

Q What was the primary end point of Protocol 203?

A Well, the primary of 203 would have been all thrombotic events.

Q What was the secondary end point of Protocol 203?

A It included cardiac and cardiac plus cerebrovascular. Secondary end points were cardiac only, cardiac plus cerebrovascular, and I've analyzed all three.

Q Cardiac was, in fact, an exploratory end point of Protocol 203, wasn't it, Dr. Farquhar?

A Well, I don't agree with that.

Q Cardiac events was defined as an exploratory end point in Protocol 203 data analysis plan, correct?

A I consider it as secondary end point.

Q I'm not asking you what you consider it to be. I'm asking what "cardiac events" is defined as in the data analysis plan for Protocol 203?

Do you know, sir?

A Well, I -- what I know is what -- my assumption was, and you have some other information that it was identified as a secondary end point.

Q You assumed that cardiac events were identified as a secondary end point of Protocol 203, correct?

A I'm going to -- I'm going to say yes but one of the reasons that this supplement shows as Figure 1, cardiac events, is that Mr. Barnett, the case in whom I am, for whom, with whom, by whatever, that I'm involved in his case, he represents an individual with cardiac events. And so this is relevant to his case.

Q The end point most relevant to Mr. Barnett is cardiac events, in your opinion?

A Yes.

Q Dr. Farquhar, could you turn to page 5 of your 2006 supplemental report. And paragraph 8, first sentence reads: "Since all of the Protocol 203 studies were terminated on the same date, (9/30/04), there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of CV risk for all three trials, as prespecified."

Do you see that?

A Yes.

Q Is the VICTOR study part of the Protocol 203?

A Yes.

Q Who ran the VICTOR study?

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, the investigators, supported by Merck.

BY MR. MORTARA:

Q Do you know if Merck was in control of the data collection for the VICTOR study?

MR. ARBITBLIT: Object to form.

THE WITNESS: I'm assuming that the data collected in all three studies was done appropriately.

BY MR. MORTARA:

Q That's not what I'm asking. I'm asking: Do you know if data collection for the VICTOR study was done by Merck or by the University of Oxford?

A Well, the data collection would be by the investigators, as I said.

Q Who controlled the VICTOR data, do you know?

MR. ARBITBLIT: Object to form.

THE WITNESS: Controlled -- I don't understand the word "controlled."

BY MR. MORTARA:

Q Do you know when the VICTOR data became

final, sir?

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, in order -- do I know when it became final?

Thank you very much.

What this sentence says is the data, at the time of termination, there was no impediment to simultaneously collecting that data and reporting it, and that's my statement.

BY MR. MORTARA:

**Q No impediment to whom, sir? To Merck?**

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, no impediment to the investigators and to Merck as well, because the investigators are part of a Merck-sponsored study. And if they don't have a relationship that -- where one party knows when the study is terminated, then that's a very strange situation.

BY MR. MORTARA:

**Q When did the VICTOR trial investigators finalize the VICTOR trial data?**

MR. ARBITBLIT: Object to form.

THE WITNESS: What this sentence is talking about --

BY MR. MORTARA:

Q I'm not asking about this sentence, sir.

I'm asking you: When did the VICTOR trial data become final? Do you know?

A 9/30/04.

Q Have you asked plaintiffs' lawyers when the VICTOR trial data became final?

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, this sentence was something that plaintiffs' lawyers have agreed to.

BY MR. MORTARA:

Q Plaintiffs' lawyers told you that the VICTOR trial data was final September 30th of '04; is that correct?

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, I think there's a misunderstanding. All of the trials needed -- okay. They were all -- they were terminated in the sense of what Protocol 203 -- getting Protocol 203 analyzed in a timely manner would require that all three studies end at that time.

Now, if the investigators continued to collect data as they have in APPROVe, then that's supplementary data.

BY MR. MORTARA:

Q And if a patient comes in six months after September 30th, 2004 and says, "I had an event with my primary physician in March of '04," that could still get counted in the data analysis plan, couldn't it?

MR. ARBITBLIT: Object to the form.

THE WITNESS: The analysis that we performed, Professor Jewell and I, on 203 was the data of APPROVe; it didn't include the extension data of APPROVe because it wasn't available. It included the VICTOR and the ViP data, as it was -- as -- it included the data that was available by 9/30/04.

BY MR. MORTARA:

Q Dr. Farquhar, investigators do not perform their data analysis until they've frozen their statistical file, correct?

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, the ViP data that we used was available.

BY MR. MORTARA:

Q Dr. Farquhar, my question is: When investigators are reporting results of a clinical study, they do not do the statistical analysis until

the file is frozen, correct?

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, it's frozen and then there's -- "frozen" has a volitional element to it. And if 203 is being assembled and analyzed and reported in a timely manner, then data from all three elements need to be included.

BY MR. MORTARA:

Q The data from all three components of 203, APPROVe, VICTOR and ViP, needs to be frozen before Protocol 203 can be reported, correct?

MR. ARBITBLIT: Object to form.

THE WITNESS: "Frozen" is your word. It needs to be obtained.

BY MR. MORTARA:

Q Do you understand what it means for data to be frozen in a clinical trial?

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, I just don't like the word "frozen." I think yes, I do know what that means.

BY MR. MORTARA:

Q It's a term used in randomized clinical trials, correct?

A Some people use that. I don't.

Q It's a term statisticians use, isn't it?

A Some of them do, yes.

Q And the way statisticians use the term "frozen" is to mean the data has been collected and the database is locked for analysis, correct?

A Frozen and locked. I mean, APPROVe is doing an extension trial that required unfreezing and unlocking and continuing to accumulate, and then freezing and locking, and will it continue? In other words, it's a sequential manner.

Q With that understanding, Dr. Farquhar, Protocol 203 could not be completed until the on-treatment results were obtained for APPROVe, VICTOR and ViP, and that those three trials had had their databases locked, correct?

A What I'm saying is the investigators in VICTOR and ViP had an obligation to freeze and unlock and analyze their data in order to allow a timely analysis of 203.

Now, what is missing in all of this is the source of the ViP data that I was provided represents data that had been analyzed and therefore unlocked. I've heard indirectly, and I don't know much about it, that the investigators in Oxford had some lag in data analysis.

But all I'm saying is the data that I was provided on ViP was available to the plaintiffs' lawyers. And in order to find out the source of that, we would need to get the MRK number and look at it.

Q Dr. Farquhar, you state in your supplemental report that there was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of CV risk for all three trials as prespecified --

(Reporter interruption.)

BY MR. MORTARA:

Q There was no apparent impediment to simultaneously collecting the data and presenting the pooled analysis of CV risk for all three trials.

You said that in your report, didn't you?

A Yes, I did.

Q Now, if the VICTOR trial data wasn't complete, that's an impediment, isn't it?

MR. ARBITBLIT: Object to form.

THE WITNESS: I'm sorry. The APPROVe data wasn't complete either.

BY MR. MORTARA:

Q When did the VICTOR trial data become final, sir?

MR. ARBITBLIT: Object to form.

THE WITNESS: The data that I've used on VICTOR was available to the plaintiffs' attorneys and we would need to look at the MRK to see the date that that represented.

BY MR. MORTARA:

**Q Have any of the plaintiffs' attorneys told you that the VICTOR data did not become final until early May 2006?**

MR. ARBITBLIT: Object to the form. Mischaracterizes the record.

BY MR. MORTARA:

**Q Have you ever heard that the VICTOR data became final in May 2006?**

MR. ARBITBLIT: Object to form.

THE WITNESS: What I said earlier is that I've been told that there were delays in obtaining the VICTOR data, but what I said before and will say again is the VICTOR data that appears in here as part of 203 was obtained by the plaintiffs' attorneys, and I am not aware of impediments to their obtaining it, I'm not aware of the specific details of what that Merck document has revealed, and that would have to be explored with the plaintiffs' attorneys.

I cannot furnish any more information other than saying, as I have already, that when APPROVe was terminated, then VICTOR and ViP needed to have data available up to that time analyzed and included.

**Q Dr. Farquhar, if the VICTOR trial data only became final last month, it's possible that now a Protocol 203 analysis could be performed with all the final trial data, correct?**

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, I've gone through this about four times, that the obligation of the investigators is to assemble the data available at that time.

Now, we're stuck on VICTOR. I mean, you can't terminate VICTOR after the date of this report and say that's the only data of value. The VICTOR data that was available to the plaintiffs' attorneys is what appears in Protocol 203 analysis.

BY MR. MORTARA:

**Q Who's responsible for reporting the VICTOR trial data?**

MR. ARBITBLIT: Object to form.

THE WITNESS: Well, fundamentally, the investigators are responsible to do the appropriate