John W. Farquhar, M.D.

1    thing.  And if this whole 203 plan was distorted and

2    violated from its original purpose, then whoever did

3    that has made a mistake.

4    BY MR. MORTARA:

5        Q    If the VICTOR trial investigators

6    collected data for the VICTOR trial from the period

7    that the trial ended, September 30th, 2004, up until

8    early May 2006, do you blame the VICTOR trial

9    investigators for delaying in their data analysis?

10            MR. ARBITBLIT:  Object to form.

11            THE WITNESS:  Okay.  This is May 22nd,

12   2006.  Are you saying that I should have had some

13   additional data on VICTOR?

14   BY MR. MORTARA:

15       Q    Dr. Farquhar, I'm only asking you whether

16   or not you know that the VICTOR trial data was made

17   final in 2006.

18            MR. ARBITBLIT:  Object to form.

19            THE WITNESS:  Well, what I said earlier is

20   I knew there were delays, but I don't know the exact

21   date when the investigators decided it was final.

22   But I'll repeat that the VICTOR data that appears in

23   this analysis was available to the plaintiffs'

24   attorneys, and I cannot tell you the cutoff date for

25   the events that are present in the data they

John W. Farquhar, M.D.

1    obtained.

2            In order to explore that, I would have to

3    read the Merck document that is responsible for that

4    data.

5    BY MR. MORTARA:

6        Q    Dr. Farquhar, do you think Merck delayed

7    analyzing Protocol 203 data?

8        A    Well, let me answer that by saying that

9    this is the first analysis of 203 data that has

10   appeared in a form like this, to the best of my

11   knowledge, and yes, I believe that it should have

12   been analyzed and reported much earlier.

13       Q    If the VICTOR trial investigators had

14   delays, as you described them, associated with their

15   data collection, is that Merck's fault?

16           MR. ARBITBLIT:  Object to form.

17           THE WITNESS:  Well, you know, you're

18   asking me what kind of relationship existed between

19   the investigators and Merck, and that I cannot

20   answer.  But I want to return to saying that what is

21   analyzed as VICTOR here was available to the

22   plaintiffs' attorneys prior to May 22nd of '06.

23   BY MR. MORTARA:

24       Q    You understand that --

25           MR. ARBITBLIT:  Don't interrupt him,

John W. Farquhar, M.D.

1  Counsel.  Let him finish.

2  BY MR. MORTARA:

3      Q    Are you finished?

4      A    Not quite.  I'm saying that it had to be

5  available before May 22nd, 2006 in order for it to

6  be analyzed by Professor Jewell and, you know,

7  created jointly in the form that it appears in the

8  supplemental report.

9          So the missing ingredient here is -- first

10 of all, you're asking me to know the relationship

11 between Merck and the investigators of VICTOR.

12 That, I can't say with any important knowledge at

13 all, other than having heard there was -- there were

14 some delays.

15         So I do not know when the data cut point

16 for VICTOR was that gave the data that appears in

17 this analysis.  In order to do so, we would have to

18 have plaintiffs' attorneys provide the documents

19 that they obtained with the VICTOR data.

20     Q    Do you know whether or not Dr. Jewell used

21 the final VICTOR data in his analysis?

22     A    If it didn't become available until

23 May 26th, he obviously used what was available prior

24 to that time.

25     Q    If it became available to plaintiffs'

John W. Farquhar, M.D.

1    attorneys on May 5th, 2006, do you know if

2    Dr. Jewell used the final VICTOR data?

3           MR. ARBITBLIT:  Object to form.

4           THE WITNESS:  Well, again, you're asking

5    me a question that I have answered, I think, four or

6    five times.

7           The plaintiffs' attorneys would have to be

8    the one to tell you the cut point at the -- used in

9    the VICTOR data supplied to Jewell and to me.  And I

10   cannot give you that date.  I just can't.

11   BY MR. MORTARA:

12      Q    If it's correct that the VICTOR final data

13   was produced to plaintiffs on May 5th, 2006, you

14   don't know whether or not Dr. Jewell used that data?

15   Only Dr. Jewell knows that; is that correct?

16          MR. ARBITBLIT:  Object to form.

17          THE WITNESS:  Well --

18   BY MR. MORTARA:

19      Q    I'll ask it a different way.  Do you know

20   when Dr. Jewell performed his statistical analysis

21   of Protocol 203 for you?

22      A    Let's see what date is on his two things

23   that he's given us.

24          Here is --

25      Q    That's okay.  Dr. Farquhar, I'll just mark

John W. Farquhar, M.D.

1   them as exhibits, if you don't mind.

2       A    Okay.

3            MR. MORTARA:   I'll mark Jewell's Protocol

4   203 analysis as Exhibit 5 and you can use that one.

5                      (Exhibit No. 5 was marked for

6                       identification.)

7   BY MR. MORTARA:

8       Q    And this is -- Exhibit 5 is Dr. Jewell's

9   Protocol 203 analysis, correct?

10      A    Mm-hmm.

11      Q    Dr. Jewell didn't put his name anywhere on

12  the Protocol 203 analysis, did he?

13      A    No.

14      Q    Dr. Jewell didn't sign his Protocol 203

15  analysis, did he?

16      A    No.

17      Q    Dr. Jewell didn't date his Protocol 203

18  analysis, did he?

19      A    No.   And I'm trying to answer your

20  question when did it -- when did the analyses occur,

21  and I can't give you the exact date.   I'll put it

22  another way.   There was certainly a lot of desire to

23  finish the supplemental report, and getting it done

24  by May 22nd took a lot of hustling, and there was

25  some date prior to that when these analyses were

John W. Farquhar, M.D.

1    done.

2           Now, if the plaintiffs' attorneys had data

3    on VICTOR that they did not supply Professor Jewell

4    and me, then we need to ask them that question.  We

5    can't ask me that question because I don't have the

6    answer.

7       Q    The only person that knows what data

8    Dr. Jewell used in his Protocol 203 analysis is

9    Dr. Jewell, correct?

10      A    Yes, that's ultimately correct.

11      Q    And sitting here today, you don't know if

12   Dr. Jewell got an updated data package in May 2006

13   or not?

14      A    May 22nd.

15      Q    May 2006.

16      A    You know, I understand that.  I'm just

17   thinking of May 22nd and I'm trying to guess the

18   dates that these were produced.  I would think they

19   would likely have been in April but I can't be sure.

20      Q    I would have to ask Dr. Jewell what data

21   he used for his Protocol 203?

22      A    Correct.  And where he got it, and when he

23   received it.

24      Q    Thank you, Dr. Farquhar.

25      A    You're welcome.

John W. Farquhar, M.D.

1    reclassification of these two patients, correct?

2              MR. ARBITBLIT:  Object to form.

3              THE WITNESS:  Well, you know, the meaning

4    of words, I have looked over the data and explored

5    its origins.  And so in that sense, I have added a

6    verification step.

7    BY MR. MORTARA:

8        Q    You didn't check Ms. Gross, the

9    plaintiff's lawyer's, work with respect to these two

10   patients on page 2 of Exhibit 7, did you?

11             MR. ARBITBLIT:  Object to form.

12             THE WITNESS:  I answered that.

13   BY MR. MORTARA:

14       Q    You didn't look at the adverse event

15   reports, did you?

16       A    I've answered the question.

17             MR. ARBITBLIT:  Object to form --

18             THE WITNESS:  -- about these data.

19   BY MR. MORTARA:

20       Q    Dr. Farquhar, turning back to your report,

21   Supplemental Report, page 7, the first full sentence

22   on page 7 reads:  "Because interaction tests divide

23   the population into subgroups for comparison, the

24   power to detect important differences is reduced."

25             Do you see that?

John W. Farquhar, M.D.

1    A   Yes.

2    Q   The next sentence reads:  "Therefore,

3  tests of significant interaction may be

4  appropriately set at levels greater than the P

5  equals 0.05 level commonly established for

6  significance testing primary effects."

7      Do you see that?

8    A   Yes.

9    Q   You cite Dr. Jewell's book for that

10  proposition, correct?

11    A   I cite his book and I cite his stated

12  reasons for having put that in the book since we

13  have discussed these issues.

14    Q   It's your opinion that when doing a

15  subgroup analysis, you can set a p for interaction

16  above 0.05 and still have it be significant,

17  correct?

18    A   You need to distinguish between tests of

19  interaction versus tests of significant differences

20  and Dr. Professor Jewell is only talking about the

21  test for interaction.

22    Q   I'm only talking about the test for

23  interaction too so I'll ask the question again.

24  It's your opinion that in a significant interaction

25  can be found with a p for interaction greater than

John W. Farquhar, M.D.

1    0.05 when doing a subgroup analysis, correct?

2        A     Professor Jewell's actual words are that

3    one should see p-values as high as .2 as indicative

4    of a possible relationship and that one should

5    not -- and now I'm paraphrasing -- have a slavish

6    devotion to a single p-value of .05 in judging

7    interaction terms.  This is -- now particularly

8    heightened if you're dealing with the possibility of

9    harmful effect.

10            Now, I think my conclusion is that I agree

11   with Professor Jewell and would also point out that

12   the p-values that we list are not as high as .2.

13   And later when we get to hypertension, I will draw

14   your attention to even lower p-values for

15   interaction.

16       Q     Dr. Farquhar, you rely on Dr. Jewell to

17   set the level of significant interaction to a p of

18   less than or equal to .2, approximately?

19            MR. ARBITBLIT:  Object to form.

20            THE WITNESS:  No.  I'm going to repeat and

21   then leave it at that.  I'm going to repeat that the

22   language he uses is that a p-value as high as .2

23   should be considered to point to the possibility of

24   a meaningful interaction.

25            And he doesn't say that he's going to like

John W. Farquhar, M.D.

1    .2 better than he'll like .1.  He just wants to draw

2    the line higher to indicate the importance of

3    scientists considering a p-value of greater than .05

4    when one is looking at the possibility of an

5    interaction.

6    BY MR. MORTARA:

7        Q    Scientists should consider p-values for

8    interaction above .05 still as meaningful and

9    significant, correct?

10           MR. ARBITBLIT:  Object to form.

11           THE WITNESS:  I have answered that.

12   BY MR. MORTARA:

13       Q    Dr. Farquhar, have you ever heard of Steve

14   Lagakos?

15       A    No.

16       Q    Do you read the New England Journal of

17   Medicine?

18       A    Sometimes.

19           MR. MORTARA:  Handing you what's marked as

20   Exhibit 8.

21                        (Exhibit No. 8 marked for

22                        identification.)

23   BY MR. MORTARA:

24       Q    Exhibit 8 is an essay from the New England

25   Journal of Medicine by Stephen Lagakos, published on

Page 136

John W. Farquhar, M.D.

1   April 20th, 2006; the title of which is: "The

2   Challenge of Subgroup Analyses -- Reporting Without

3   Distorting."

4           Dr. Farquhar, have you ever seen this

5   essay on Subgroup Analyses?

6       A   No, but, you know, I've scanned it briefly

7   and this is not talking about interaction. It's

8   talking about multiple testing. And that warning

9   has been around for a long time.

10      Q   We'll get to that.

11          Dr. Farquhar, you've seen this before?

12      A   No, I haven't.

13      Q   Dr. Farquhar, I'll represent to you,

14  Professor Lagakos is the chairman of biostatistics

15  at Harvard University. As you can see at the end of

16  the article, it says he's a professor, but he's also

17  the chairman. The first sentence of the essay

18  reads: "Subgroup analyses are an important part of

19  the analysis of a comparative clinical trial."

20          Do you see that?

21      A   Yes. I see the whole article.

22      Q   The next sentence says: "However, they

23  are commonly misinterpreted and can lead to further

24  research that is misguided or worse, to suboptimal

25  patient care."

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1        Do you see that?

2    A    I see that.  I said I've seen it all and I

3  will then match you with Professor Jewell, who for

4  six years was Provost of the University of

5  California in Berkeley.

6        And so for the fact that Dr. Lagakos is

7  professor of biostatistics at the Harvard School of

8  Public Health doesn't mean that his opinion trumps

9  that of Professor Jewell.

10    Q    Thank you for telling me that about

11  Dr. Jewell.  One difference between Dr. Jewell and

12  Professor Lagakos, as far as you know, is that

13  Dr. Jewell is being paid by plaintiffs' lawyers and

14  Professor Lagakos is not, correct?

15        MR. ARBITBLIT:  Object to form.

16  Argumentative.

17        THE WITNESS:  That's really wild, you

18  know.  He wrote the book on his own.  We're citing

19  his opinions.

20  BY MR. MORTARA:

21    Q    Yes or no, Dr. Jewell is being paid by

22  plaintiffs' lawyers?

23        MR. ARBITBLIT:  Object to form.

24        THE WITNESS:  For what purpose?

25

Page 138

John W. Farquhar, M.D.

1    BY MR. MORTARA:

2        Q    For his work in this case.

3            MR. ARBITBLIT:  Object to form.

4            THE WITNESS:  Is that -- but for his work

5    in this case, yes.

6    BY MR. MORTARA:

7        Q    Professor Lagakos goes on, could you turn

8    to the second page, and the last sentence, second to

9    the last sentence of the only full paragraph in the

10   first column on the second page reads:  "For

11   example, when treatments have identical efficacy,

12   the probability of finding at least one

13   statistically significant interaction test when ten

14   independent interaction tests are undertaken is

15   40 percent.  The more subgroup analyses conducted,

16   the higher the probability of one or more chance

17   findings that may be misinterpreted as clinically

18   directive."

19           Do you see that?

20           MR. ARBITBLIT:  Object to form.

21           THE WITNESS:  Well, as I say, I see the

22   whole article.

23   BY MR. MORTARA:

24       Q    Professor Lagakos is here talking about

25   the same test for interaction that you're talking

Page 139

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    about on page 7 of your report, isn't he?

2            MR. ARBITBLIT:  Object to form.

3            THE WITNESS:  Not so far.

4    BY MR. MORTARA:

5        Q    What do you think Professor Lagakos means

6    by statistically significant interaction tests?

7        A    Yes, on that one sentence he's talking

8    about interaction, but -- fine.

9        Q    The problem Professor Lagakos is

10   identifying is that the more subgroup analyses you

11   do, the more likely it is you are to find a false

12   positive, correct?

13           MR. ARBITBLIT:  Object to form.

14           THE WITNESS:  What Professor Lagakos is

15   talking about, the danger of multiple testing, is a

16   concern of statisticians for decades.  He is

17   restating what I think is generally known.

18   BY MR. MORTARA:

19       Q    And Professor Lagakos is talking about the

20   appropriate p-value to use for interaction tests

21   when you have multiple subgroup analyses, correct?

22           MR. ARBITBLIT:  Object to form.

23           THE WITNESS:  His last sentence is:

24   "Ultimately, medical research and patients are best

25   served when subgroup analyses are well planned and

Page 140

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    appropriately analyzed and the conclusions and

2    recommendations about clinical practice are guided

3    by the strength of the evidence."

4           So I'm assuming that you agree that -- I'm

5    not supposed to use that.  But I believe that the

6    APPROVe investigators designed the study

7    appropriately.

8    BY MR. MORTARA:

9        Q    Dr. Farquhar, I'm asking you about the

10   second page of Professor Lagakos' essay where he's

11   discussing the problem of multiple subgroup analyses

12   and the possibility of false positives.  The first

13   sentence of the last paragraph of the first column

14   of that page says:  "One way to correct for the

15   inflated false positive rate when multiple subgroup

16   analyses are conducted is to apply a stricter

17   criterion than the usual P equals 0.05 for judging

18   the significance of each interaction test."

19          Do you see that?

20       A    I see that.

21          MR. ARBITBLIT:  Objection to form.

22          THE WITNESS:  And this --

23   BY MR. MORTARA:

24       Q    Dr. Farquhar -- the question is do you see

25   that?

John W. Farquhar, M.D.

1          MR. ARBITBLIT:  Don't interrupt him.

2          THE WITNESS:  I see that.  As I said, I

3    see everything that's in here.  And this entire

4    paragraph, and all the implications of it, are grist

5    for the mill of a discussion with Professor Jewell.

6    Professor Jewell has his way of looking at life and

7    he may or may not agree with this paragraph.  I

8    can't say since I am not a biostatistician.  This is

9    statistician language.

10   BY MR. MORTARA:

11      Q    You rely on Professor Jewell for

12   information of this character, correct?

13         MR. ARBITBLIT:  Object to form.

14         THE WITNESS:  I rely on Professor Jewell

15   currently as my colleague in not only this

16   consultation on Vioxx but on other issues.

17         And I also -- well, I'll just add that the

18   previous colleague, who is now no longer with us,

19   was one of the individuals who trained Professor

20   Jewell.  And so there's a long legacy of my

21   connection to Jewell and a long legacy of my trust

22   in his skill, ability and wisdom.

23         And what I am saying to you now is this

24   long paragraph on the second page here, he would

25   need to be asked how he interprets that and whether

John W. Farquhar, M.D.

1   or not it's in contradiction to what he has put in

2   his text; and if so, how would he handle what's been

3   done in the APPROVe study and in our particular

4   analyses of the 203.

5          I shouldn't have said APPROVe; I should

6   have said 203, and APPROVe as well.

7   Q    Dr. Farquhar, the plaintiffs' attorneys

8   are not going to let me ask questions of Dr. Jewell,

9   unfortunately.  You have relied on Dr. Jewell and

10  written things about significant interaction in your

11  report, and I'm asking you what your understanding

12  of Professor Lagakos' essay is with respect to what

13  the appropriate p-value for interaction is to use

14  when multiple subgroup analyses are performed.

15         Do you understand what Professor Lagakos

16  is talking about?

17         MR. ARBITBLIT:  Object to form.

18         THE WITNESS:  Well, you know, about six

19  answers ago, I said the entire topic of subgroup

20  analyses has been around for a long time, and I

21  return to this answer, and then I think I'll want to

22  say I've answered the questions regarding this topic

23  by saying I rely fully on Professor Jewell's

24  attitudes and concepts and beliefs and opinion about

25  this paragraph and how it applies to our analyses on

John W. Farquhar, M.D.

1    203 and APPROVe and of VIGOR and of any of the other

2    studies that we've analyzed.

3    BY MR. MORTARA:

4        Q    Have you ever asked Professor Jewell what

5    he thinks of Professor Lagakos' views?

6             Did you say no?

7        A    Well --

8             MR. ARBITBLIT:   Object to form.

9             THE WITNESS:   I told you that I haven't

10   seen the Lagakos article, so I can't have discussed

11   this specific article with him.  I have had

12   discussions on topics related to interaction tests.

13   BY MR. MORTARA:

14       Q    Your report says on page 7 of your

15   supplemental report:   "Tests of significant

16   interaction may be appropriately set at levels

17   greater than P equals 0.05," correct?

18       A    Well, we discussed that some time ago and

19   I said this is Professor Jewell's view and I hold to

20   his views.

21       Q    Whereas Professor Lagakos says:   "One way

22   to correct for the inflated false positive rate when

23   multiple subgroup analyses are conducted is to apply

24   a stricter criterion than the usual P equals 0.05."

25            That means Professor Lagakos thinks you

Page 144

John W. Farquhar, M.D.

1    should go lower than 0.05 but Professor Jewell

2    thinks you can be higher than 0.05, correct?

3              MR. ARBITBLIT:  Object to form.  Assumes

4    facts not in evidence.

5              THE WITNESS:  Return to the fact that

6    Jewell has his beliefs and his way of analyzing data

7    and he may or may not have a fundamental difference

8    of opinion with Lagakos.  And I submit that a single

9    article taken out of context cannot answer that

10   question of whether there is a wide disparity

11   between those two gentlemen.

12   BY MR. MORTARA:

13       Q   Dr. Farquhar, the first full sentence in

14   the second column on that same page says:  "For

15   example, if 10 tests are conducted, each one should

16   use 0.005 as the threshold for significance."

17              Do you see that?

18              MR. ARBITBLIT:  Object to form.

19              THE WITNESS:  I see the whole article and

20   I return to -- I prefer to rely on Professor Jewell

21   and any subsequent dissection of this article, my

22   answer is that I trust Professor Jewell's views on

23   all items.

24   BY MR. MORTARA:

25       Q   Do you recall earlier telling me you

John W. Farquhar, M.D.

1    thought at least ten subgroup analyses had been

2    performed in the APPROVe study?

3              MR. ARBITBLIT:  Object to form.

4              THE WITNESS:  Ten subgroup analyses have

5    not been performed on the 203 study.  And --

6    BY MR. MORTARA:

7       Q    Dr. Farquhar, could you turn to page 6 of

8    your report.  And the Section C is entitled:

9    "Patients in APPROVe."

10             Do you see that?

11      A    Yes.

12      Q    Section C of your supplemental report is

13   not about Protocol 203, is it?

14      A    No.

15      Q    Dr. Farquhar, over ten subgroup analyses

16   have been performed on the APPROVe data and

17   Professor Lagakos thinks that you should use at

18   least 0.005 as the threshold for significance, if

19   not something lower; isn't that right?

20             MR. ARBITBLIT:  Object to form,

21   mischaracterizes the record.  Professor Lagakos has

22   never had anything to say about APPROVe.

23             THE WITNESS:  Boy, oh boy.  You know, my

24   answer is I'm trying to get away from Lagakos and on

25   to Jewell.  So any opinion that Lagakos has

Page 146

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    expressed, I'll say again is not -- is out of

2    context, and Professor Jewell has his reasons for

3    picking a certain method of analysis and its

4    interpretation, and I trust his views.  And I do

5    not, at this point, have any opinions to offer about

6    Lagakos.

7    BY MR. MORTARA:

8        Q    You trust Dr. Jewell and the jury's

9    supposed to trust you when you say you trust

10   Dr. Jewell, correct?

11            MR. ARBITBLIT:  Object to form.

12   Argumentative.

13            MR. MORTARA:  Withdrawn.

14            THE WITNESS:  I'm not concerning myself

15   with juries.  I'm concerning myself with trusting

16   Professor Jewell.

17   BY MR. MORTARA:

18       Q    Dr. Farquhar, do you know if plaintiffs'

19   attorneys are going to allow Dr. Jewell to explain

20   himself and his analysis?

21       A    My belief is that they would, yes.  But I

22   haven't asked the attorneys if they have such a

23   plan.

24       Q    Do you think the plaintiffs' attorneys

25   should allow Dr. Jewell to come to trial and explain

Page 147

Golkow Litigation Technologies - 1.877.DEPS.USA

John W. Farquhar, M.D.

1    to the jury his analysis and explain, if he can,

2    Professor Lagakos' views?

3              MR. ARBITBLIT:  Object to form.

4              THE WITNESS:  I have no informed opinion

5    on what should happen with juries.  I just don't

6    know anything about that field.  So --

7    BY MR. MORTARA:

8         Q    Dr. Farquhar, I'll withdraw the question

9    and ask you this:  You talk about tests for

10   significant interaction in your report, correct?

11        A    Yes.

12        Q    You rely on Dr. Jewell for that analysis,

13   correct?

14        A    Correct.

15             MR. ARBITBLIT:  Object to form.

16   BY MR. MORTARA:

17        Q    In explaining the tests for significant

18   interaction that you disclose in your report, do you

19   think that Dr. Jewell would do a better job

20   explaining what this means and explaining how

21   Professor Lagakos' essay affects his views?

22        A    Do I think Jewell --

23        Q    Withdrawn.

24             Dr. Farquhar, do you think it's

25   appropriate to have Dr. Jewell explain himself as to

John W. Farquhar, M.D.

1    what he meant by the appropriate P for significant

2    interaction that you're relying on?

3        A    Well, I would say if that is something

4    that you and other attorneys would like to do, then

5    fine.  He needs to speak for himself.

6        Q    Dr. Farquhar, you understand that --

7    withdrawn.

8            The last sentence of the first full

9    paragraph on the third column of the second page of

10   the Lagakos essay, says:  "Post hoc subgroup

11   analyses undertaken because of an intriguing trend

12   seen in the results or selective reporting of

13   certain subgroup analyses can be especially

14   misleading."

15           Do you see that?

16           MR. ARBITBLIT:  Object to form.

17           THE WITNESS:  I see that, but please honor

18   my previous statements that anything in the Lagakos

19   paper which is contrary to Professor Jewell's modus

20   operandi and planning for analyses needs to say that

21   Jewell trumps Lagakos.  And I really -- I'm trying

22   to avoid further discussion about Lagakos.

23   BY MR. MORTARA:

24       Q    You're trying to avoid further discussion

25   of Professor Lagakos' essay, correct?