## Arbitblit, Donald C.

**From:** Goldman, Andrew [andrew.goldman@bartlit-beck.com]
**Sent:** Tuesday, June 13, 2006 9:19 PM
**To:** Arbitblit, Donald C.
**Subject:** Jewell

Don, after reviewing Dr. Farquhar's deposition, I believe it is vital that we obtain document discovery from and a deposition of Dr. Jewell. Dr. Farquhar is clearly relying on Dr. Jewell and our inability to cross-examine Dr. Jewell directly prejudices our ability to cross-examine Farquhar at trial.

(1) Dr. Farquhar repeatedly deferred to Jewell when it came to certain statistical inquiries and even suggested that Merck ask questions of Jewell. For example:

```
Q   Dr. Farquhar, I'm asking you about the
10  second page of Professor Lagakos' essay where he's
11  discussing the problem of multiple subgroup analyses
12  and the possibility of false positives. The first
13  sentence of the last paragraph of the first column
14  of that page says: "One way to correct for the
15  inflated false positive rate when multiple subgroup
16  analyses are conducted is to apply a stricter
17  criterion than the usual P equals 0.05 for judging
18  the significance of each interaction test."
19        Do you see that?
20   A   I see that.
21        MR. ARBITBLIT: Objection to form.
22        THE WITNESS: And this --
23  BY MR. MORTARA:
24   Q   Dr. Farquhar -- the question is do you see
25  that?
0142
1         MR. ARBITBLIT: Don't interrupt him.
2         THE WITNESS: I see that. As I said, I
3   see everything that's in here. And this entire
4   paragraph, and all the implications of it, are grist
5   for the mill of a discussion with Professor Jewell.
6   Professor Jewell has his way of looking at life and
7   he may or may not agree with this paragraph. I
8   can't say since I am not a biostatistician. This is
9   statistician language.
10  BY MR. MORTARA:
11   Q   You rely on Professor Jewell for
```

6/26/2006

12  information of this character, correct?
13      MR. ARBITBLIT: Object to form.
14      THE WITNESS: I rely on Professor Jewell
15  currently as my colleague in not only this
16  consultation on Vioxx but on other issues.
17      And I also -- well, I'll just add that the
18  previous colleague, who is now no longer with us,
19  was one of the individuals who trained Professor
20  Jewell. And so there's a long legacy of my
21  connection to Jewell and a long legacy of my trust
22  in his skill, ability and wisdom.
23      And what I am saying to you now is this
24  long paragraph on the second page here, he would
25  need to be asked how he interprets that and whether
0143
1  or not it's in contradiction to what he has put in
2  his text; and if so, how would he handle what's been
3  done in the APPROVe study and in our particular
4  analyses of the 203.
5      I shouldn't have said APPROVe; I should
6  have said 203, and APPROVe as well.
7  Q  Dr. Farquhar, the plaintiffs' attorneys
8  are not going to let me ask questions of Dr. Jewell,
9  unfortunately. You have relied on Dr. Jewell and
10  written things about significant interaction in your
11  report, and I'm asking you what your understanding
12  of Professor Lagakos' essay is with respect to what
13  the appropriate p-value for interaction is to use
14  when multiple subgroup analyses are performed.
15      Do you understand what Professor Lagakos
16  is talking about?
17      MR. ARBITBLIT: Object to form.
18      THE WITNESS: Well, you know, about six
19  answers ago, I said the entire topic of subgroup
20  analyses has been around for a long time, and I
21  return to this answer, and then I think I'll want to
22  say I've answered the questions regarding this topic
23  by saying I rely fully on Professor Jewell's
24  attitudes and concepts and beliefs and opinion about
25  this paragraph and how it applies to our analyses on
0144
1  203 and APPROVe and of VIGOR and of any of the other
2  studies that we've analyzed.
3  BY MR. MORTARA:
4  Q  Have you ever asked Professor Jewell what

6/26/2006

5  he thinks of Professor Lagakos' views?
6      Did you say no?
7   A  Well --
8      MR. ARBITBLIT: Object to form.
9      THE WITNESS: I told you that I haven't
10 seen the Lagakos article, so I can't have discussed
11 this specific article with him. I have had
12 discussions on topics related to interaction tests.
13 BY MR. MORTARA:
14  Q  Your report says on page 7 of your
15 supplemental report: "Tests of significant
16 interaction may be appropriately set at levels
17 greater than P equals 0.05," correct?
18  A  Well, we discussed that some time ago and
19 I said this is Professor Jewell's view and I hold to
20 his views.
21  Q  Whereas Professor Lagakos says: "One way
22 to correct for the inflated false positive rate when
23 multiple subgroup analyses are conducted is to apply
24 a stricter criterion than the usual P equals 0.05."
25     That means Professor Lagakos thinks you
0145
1  should go lower than 0.05 but Professor Jewell
2  thinks you can be higher than 0.05, correct?
3      MR. ARBITBLIT: Object to form. Assumes
4  facts not in evidence.
5      THE WITNESS: Return to the fact that
6  Jewell has his beliefs and his way of analyzing data
7  and he may or may not have a fundamental difference
8  of opinion with Lagakos. And I submit that a single
9  article taken out of context cannot answer that
10 question of whether there is a wide disparity
11 between those two gentlemen.
12 BY MR. MORTARA:
13  Q  Dr. Farquhar, the first full sentence in
14 the second column on that same page says: "For
15 example, if 10 tests are conducted, each one should
16 use 0.005 as the threshold for significance."
17     Do you see that?
18     MR. ARBITBLIT: Object to form.
19     THE WITNESS: I see the whole article and
20 I return to -- I prefer to rely on Professor Jewell
21 and any subsequent dissection of this article, my
22 answer is that I trust Professor Jewell's views on
23 all items.


6/26/2006

24  BY MR. MORTARA:
25     Q  Do you recall earlier telling me you
0146
1  thought at least ten subgroup analyses had been
2  performed in the APPROVe study?
3         MR. ARBITBLIT: Object to form.
4         THE WITNESS: Ten subgroup analyses have
5  not been performed on the 203 study. And --
6  BY MR. MORTARA:
7     Q  Dr. Farquhar, could you turn to page 6 of
8  your report. And the Section C is entitled:
9  "Patients in APPROVe."
10        Do you see that?
11    A  Yes.
12    Q  Section C of your supplemental report is
13  not about Protocol 203, is it?
14    A  No.
15    Q  Dr. Farquhar, over ten subgroup analyses
16  have been performed on the APPROVe data and
17  Professor Lagakos thinks that you should use at
18  least 0.005 as the threshold for significance, if
19  not something lower; isn't that right?
20        MR. ARBITBLIT: Object to form,
21  mischaracterizes the record. Professor Lagakos has
22  never had anything to say about APPROVe.
23        THE WITNESS: Boy, oh boy. You know, my
24  answer is I'm trying to get away from Lagakos and on
25  to Jewell. So any opinion that Lagakos has
0147
1  expressed, I'll say again is not -- is out of
2  context, and Professor Jewell has his reasons for
3  picking a certain method of analysis and its
4  interpretation, and I trust his views. And I do
5  not, at this point, have any opinions to offer about
6  Lagakos.
7  BY MR. MORTARA:
8     Q  You trust Dr. Jewell and the jury's
9  supposed to trust you when you say you trust
10  Dr. Jewell, correct?
11        MR. ARBITBLIT: Object to form.
12  Argumentative.
13        MR. MORTARA: Withdrawn.
14        THE WITNESS: I'm not concerning myself
15  with juries. I'm concerning myself with trusting
16  Professor Jewell.


6/26/2006

17  BY MR. MORTARA:
18    Q   Dr. Farquhar, do you know if plaintiffs'
19  attorneys are going to allow Dr. Jewell to explain
20  himself and his analysis?
21    A   My belief is that they would, yes. But I
22  haven't asked the attorneys if they have such a
23  plan.
24    Q   Do you think the plaintiffs' attorneys
25  should allow Dr. Jewell to come to trial and explain
0148
1  to the jury his analysis and explain, if he can,
2  Professor Lagakos' views?
3         MR. ARBITBLIT: Object to form.
4         THE WITNESS: I have no informed opinion
5  on what should happen with juries. I just don't
6  know anything about that field. So --
7  BY MR. MORTARA:
8    Q   Dr. Farquhar, I'll withdraw the question
9  and ask you this: You talk about tests for
10  significant interaction in your report, correct?
11    A   Yes.
12    Q   You rely on Dr. Jewell for that analysis,
13  correct?
14    A   Correct.
15         MR. ARBITBLIT: Object to form.
16  BY MR. MORTARA:
17    Q   In explaining the tests for significant
18  interaction that you disclose in your report, do you
19  think that Dr. Jewell would do a better job
20  explaining what this means and explaining how
21  Professor Lagakos' essay affects his views?
22    A   Do I think Jewell --
23    Q   Withdrawn.
24        Dr. Farquhar, do you think it's
25  appropriate to have Dr. Jewell explain himself as to
0149
1  what he meant by the appropriate P for significant
2  interaction that you're relying on?
3    A   Well, I would say if that is something
4  that you and other attorneys would like to do, then
5  fine. He needs to speak for himself.
6    Q   Dr. Farquhar, you understand that --
7  withdrawn.
8        The last sentence of the first full
9  paragraph on the third column of the second page of

6/26/2006

10  the Lagakos essay, says: "Post hoc subgroup
11  analyses undertaken because of an intriguing trend
12  seen in the results or selective reporting of
13  certain subgroup analyses can be especially
14  misleading."
15       Do you see that?
16       MR. ARBITBLIT: Object to form.
17       THE WITNESS: I see that, but please honor
18  my previous statements that anything in the Lagakos
19  paper which is contrary to Professor Jewell's modus
20  operandi and planning for analyses needs to say that
21  Jewell trumps Lagakos. And I really – I'm trying
22  to avoid further discussion about Lagakos.
23  BY MR. MORTARA:
24    Q   You're trying to avoid further discussion
25  of Professor Lagakos' essay, correct?
0150
1        MR. ARBITBLIT: Object to form.
2        THE WITNESS: I'm trying to elevate the
3   respect for Professor Jewell.
4   BY MR. MORTARA:
5     Q   Dr. Farquhar, do you agree or disagree
6   that "Post hoc subgroup analyses undertaken because
7   of an intriguing trend seen in the results or
8   selective reporting of certain subgroup analyses can
9   be especially misleading"?
10       MR. ARBITBLIT: Object to form.
11       THE WITNESS: I propose that that question
12  be asked for Professor Jewell and put into the
13  context of the APPROVe study and the specific
14  analyses that he and I performed.


(2) Furthermore, Farquhar did not know what data Jewell used in the protocol 203
analysis Dr. Farquhar relies on. Farquhar also didn't know whether that data
included the VICTOR final data produced to plaintiffs at the beginning of May:

7    Q   The only person that knows what data
8   Dr. Jewell used in his Protocol 203 analysis is
9   Dr. Jewell, correct?
10   A   Yes, that's ultimately correct.

***

  Q   I would have to ask Dr. Jewell what data

6/26/2006

21  he used for his Protocol 203?
22      A   Correct. And where he got it, and when he
23  received it.

Please let me know if you will produce Dr. Jewell for deposition as well as the standard documents that both sides experts' are producing.

Thanks,

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

6/26/2006

## Arbitblit, Donald C.

**From:** Goldman, Andrew [andrew.goldman@bartlit-beck.com]
**Sent:** Tuesday, June 13, 2006 9:36 PM
**To:** Arbitblit, Donald C.
**Subject:** RE: Jewell

Thanks

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Tuesday, June 13, 2006 11:31 PM
To: andrew.goldman@bartlit-beck.com
Subject: Re: Jewell


Andy,
I will discuss with Mark Robinson and get back to you tomorrow.
Don

-----Original Message-----
From: Goldman, Andrew <andrew.goldman@bartlit-beck.com>
To: Arbitblit, Donald C. <DARBITBLIT@lchb.com>
Sent: Tue Jun 13 21:19:11 2006
Subject: Jewell

Don, after reviewing Dr. Farquhar's deposition, I believe it is vital that
we obtain document discovery from and a deposition of Dr. Jewell. Dr.
Farquhar is clearly relying on Dr. Jewell and our inability to cross-examine
Dr. Jewell directly prejudices our ability to cross-examine Farquhar at
trial.

(1) Dr. Farquhar repeatedly deferred to Jewell when it came to certain
statistical inquiries and even suggested that Merck ask questions of Jewell.
For example:

```
Q    Dr. Farquhar, I'm asking you about the
10   second page of Professor Lagakos' essay where he's
11   discussing the problem of multiple subgroup analyses
12   and the possibility of false positives. The first
13   sentence of the last paragraph of the first column
14   of that page says: "One way to correct for the
15   inflated false positive rate when multiple subgroup
16   analyses are conducted is to apply a stricter
17   criterion than the usual P equals 0.05 for judging
18   the significance of each interaction test."
19        Do you see that?
20   A    I see that.
21        MR. ARBITBLIT: Objection to form.
22        THE WITNESS: And this --
23   BY MR. MORTARA:
24   Q    Dr. Farquhar -- the question is do you see
25   that?
0142
1         MR. ARBITBLIT: Don't interrupt him.
2         THE WITNESS: I see that. As I said, I
3    see everything that's in here. And this entire
```

1

```
 4   paragraph, and all the implications of it, are grist
 5   for the mill of a discussion with Professor Jewell.
 6   Professor Jewell has his way of looking at life and
 7   he may or may not agree with this paragraph.  I
 8   can't say since I am not a biostatistician.  This is
 9   statistician language.
10   BY MR. MORTARA:
11       Q    You rely on Professor Jewell for
12   information of this character, correct?
13            MR. ARBITBLIT:  Object to form.
14            THE WITNESS:  I rely on Professor Jewell
15   currently as my colleague in not only this
16   consultation on Vioxx but on other issues.
17            And I also -- well, I'll just add that the
18   previous colleague, who is now no longer with us,
19   was one of the individuals who trained Professor
20   Jewell.  And so there's a long legacy of my
21   connection to Jewell and a long legacy of my trust
22   in his skill, ability and wisdom.
23            And what I am saying to you now is this
24   long paragraph on the second page here, he would
25   need to be asked how he interprets that and whether
0143
 1   or not it's in contradiction to what he has put in
 2   his text; and if so, how would he handle what's been
 3   done in the APPROVe study and in our particular
 4   analyses of the 203.
 5            I shouldn't have said APPROVe; I should
 6   have said 203, and APPROVe as well.
 7       Q    Dr. Farquhar, the plaintiffs' attorneys
 8   are not going to let me ask questions of Dr. Jewell,
 9   unfortunately.  You have relied on Dr. Jewell and
10   written things about significant interaction in your
11   report, and I'm asking you what your understanding
12   of Professor Lagakos' essay is with respect to what
13   the appropriate p-value for interaction is to use
14   when multiple subgroup analyses are performed.
15            Do you understand what Professor Lagakos
16   is talking about?
17            MR. ARBITBLIT:  Object to form.
18            THE WITNESS:  Well, you know, about six
19   answers ago, I said the entire topic of subgroup
20   analyses has been around for a long time, and I
21   return to this answer, and then I think I'll want to
22   say I've answered the questions regarding this topic
23   by saying I rely fully on Professor Jewell's
24   attitudes and concepts and beliefs and opinion about
25   this paragraph and how it applies to our analyses on
0144
 1   203 and APPROVe and of VIGOR and of any of the other
 2   studies that we've analyzed.
 3   BY MR. MORTARA:
 4       Q    Have you ever asked Professor Jewell what
 5   he thinks of Professor Lagakos' views?
 6            Did you say no?
 7       A    Well --
 8            MR. ARBITBLIT:  Object to form.
 9            THE WITNESS:  I told you that I haven't
10   seen the Lagakos article, so I can't have discussed
11   this specific article with him.  I have had
```

2

```
12    discussions on topics related to interaction tests.
13    BY MR. MORTARA:
14        Q    Your report says on page 7 of your
15    supplemental report:  "Tests of significant
16    interaction may be appropriately set at levels
17    greater than P equals 0.05," correct?
18        A    Well, we discussed that some time ago and
19    I said this is Professor Jewell's view and I hold to
20    his views.
21        Q    Whereas Professor Lagakos says:  "One way
22    to correct for the inflated false positive rate when
23    multiple subgroup analyses are conducted is to apply
24    a stricter criterion than the usual P equals 0.05."
25             That means Professor Lagakos thinks you
0145
 1    should go lower than 0.05 but Professor Jewell
 2    thinks you can be higher than 0.05, correct?
 3             MR. ARBITBLIT:  Object to form.  Assumes
 4    facts not in evidence.
 5             THE WITNESS:  Return to the fact that
 6    Jewell has his beliefs and his way of analyzing data
 7    and he may or may not have a fundamental difference
 8    of opinion with Lagakos.  And I submit that a single
 9    article taken out of context cannot answer that
10    question of whether there is a wide disparity
11    between those two gentlemen.
12    BY MR. MORTARA:
13        Q    Dr. Farquhar, the first full sentence in
14    the second column on that same page says:  "For
15    example, if 10 tests are conducted, each one should
16    use 0.005 as the threshold for significance."
17             Do you see that?
18             MR. ARBITBLIT:  Object to form.
19             THE WITNESS:  I see the whole article and
20    I return to -- I prefer to rely on Professor Jewell
21    and any subsequent dissection of this article, my
22    answer is that I trust Professor Jewell's views on
23    all items.
24    BY MR. MORTARA:
25        Q    Do you recall earlier telling me you
0146
 1    thought at least ten subgroup analyses had been
 2    performed in the APPROVe study?
 3             MR. ARBITBLIT:  Object to form.
 4             THE WITNESS:  Ten subgroup analyses have
 5    not been performed on the 203 study.  And --
 6    BY MR. MORTARA:
 7        Q    Dr. Farquhar, could you turn to page 6 of
 8    your report.  And the Section C is entitled:
 9    "Patients in APPROVe."
10             Do you see that?
11        A    Yes.
12        Q    Section C of your supplemental report is
13    not about Protocol 203, is it?
14        A    No.
15        Q    Dr. Farquhar, over ten subgroup analyses
16    have been performed on the APPROVe data and
17    Professor Lagakos thinks that you should use at
18    least 0.005 as the threshold for significance, if
19    not something lower; isn't that right?
```

3

```
20            MR. ARBITBLIT:  Object to form,
21   mischaracterizes the record.  Professor Lagakos has
22   never had anything to say about APPROVe.
23            THE WITNESS:  Boy, oh boy.  You know, my
24   answer is I'm trying to get away from Lagakos and on
25   to Jewell.  So any opinion that Lagakos has
0147
1    expressed, I'll say again is not -- is out of
2    context, and Professor Jewell has his reasons for
3    picking a certain method of analysis and its
4    interpretation, and I trust his views.  And I do
5    not, at this point, have any opinions to offer about
6    Lagakos.
7    BY MR. MORTARA:
8         Q    You trust Dr. Jewell and the jury's
9    supposed to trust you when you say you trust
10   Dr. Jewell, correct?
11            MR. ARBITBLIT:  Object to form.
12   Argumentative.
13            MR. MORTARA:  Withdrawn.
14            THE WITNESS:  I'm not concerning myself
15   with juries.  I'm concerning myself with trusting
16   Professor Jewell.
17   BY MR. MORTARA:
18        Q    Dr. Farquhar, do you know if plaintiffs'
19   attorneys are going to allow Dr. Jewell to explain
20   himself and his analysis?
21        A    My belief is that they would, yes.  But I
22   haven't asked the attorneys if they have such a
23   plan.
24        Q    Do you think the plaintiffs' attorneys
25   should allow Dr. Jewell to come to trial and explain
0148
1    to the jury his analysis and explain, if he can,
2    Professor Lagakos' views?
3             MR. ARBITBLIT:  Object to form.
4             THE WITNESS:  I have no informed opinion
5    on what should happen with juries.  I just don't
6    know anything about that field.  So --
7    BY MR. MORTARA:
8         Q    Dr. Farquhar, I'll withdraw the question
9    and ask you this:  You talk about tests for
10   significant interaction in your report, correct?
11        A    Yes.
12        Q    You rely on Dr. Jewell for that analysis,
13   correct?
14        A    Correct.
15            MR. ARBITBLIT:  Object to form.
16   BY MR. MORTARA:
17        Q    In explaining the tests for significant
18   interaction that you disclose in your report, do you
19   think that Dr. Jewell would do a better job
20   explaining what this means and explaining how
21   Professor Lagakos' essay affects his views?
22        A    Do I think Jewell --
23        Q    Withdrawn.
24            Dr. Farquhar, do you think it's
25   appropriate to have Dr. Jewell explain himself as to
0149
1    what he meant by the appropriate P for significant
```

4

```
2    interaction that you're relying on?
3         A    Well, I would say if that is something
4    that you and other attorneys would like to do, then
5    fine.  He needs to speak for himself.
6         Q    Dr. Farquhar, you understand that --
7    withdrawn.
8              The last sentence of the first full
9    paragraph on the third column of the second page of
10   the Lagakos essay, says: "Post hoc subgroup
11   analyses undertaken because of an intriguing trend
12   seen in the results or selective reporting of
13   certain subgroup analyses can be especially
14   misleading."
15             Do you see that?
16             MR. ARBITBLIT:  Object to form.
17             THE WITNESS:  I see that, but please honor
18   my previous statements that anything in the Lagakos
19   paper which is contrary to Professor Jewell's modus
20   operandi and planning for analyses needs to say that
21   Jewell trumps Lagakos.  And I really -- I'm trying
22   to avoid further discussion about Lagakos.
23   BY MR. MORTARA:
24        Q    You're trying to avoid further discussion
25   of Professor Lagakos' essay, correct?
0150
1              MR. ARBITBLIT:  Object to form.
2              THE WITNESS:  I'm trying to elevate the
3    respect for Professor Jewell.
4    BY MR. MORTARA:
5         Q    Dr. Farquhar, do you agree or disagree
6    that "Post hoc subgroup analyses undertaken because
7    of an intriguing trend seen in the results or
8    selective reporting of certain subgroup analyses can
9    be especially misleading"?
10             MR. ARBITBLIT:  Object to form.
11             THE WITNESS:  I propose that that question
12   be asked for Professor Jewell and put into the
13   context of the APPROVe study and the specific
14   analyses that he and I performed.
```

(2) Furthermore, Farquhar did not know what data Jewell used in the protocol 203 analysis Dr. Farquhar relies on. Farquhar also didn't know whether that data included the VICTOR final data produced to plaintiffs at the beginning of May:

```
7         Q    The only person that knows what data
8    Dr. Jewell used in his Protocol 203 analysis is
9    Dr. Jewell, correct?
10        A    Yes, that's ultimately correct.
```

\*\*\*

```
     Q    I would have to ask Dr. Jewell what data
21   he used for his Protocol 203?
22        A    Correct.  And where he got it, and when he
23   received it.
```

Please let me know if you will produce Dr. Jewell for deposition as well as the standard documents that both sides experts' are producing.

5

Thanks,

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to postmaster@lchb.com

## Arbitblit, Donald C.

| | |
|---|---|
| From: | Goldman, Andrew [andrew.goldman@bartlit-beck.com] |
| Sent: | Thursday, June 15, 2006 3:07 AM |
| To: | Arbitblit, Donald C. |
| Cc: | beachlawyer51@hotmail.com |
| Subject: | RE: Any word from Mark on Jewell? |

You are trying to take advantage of our request to depose Dr. Jewell. We will object to any effort to produce a rebuttal expert report as they it is prohibited by the scheduling order (which supersedes any federal rule).

It is far too late to be giving us expert reports.

Let's discuss this after Avorn's deposition, which I am about to take.

Andy

Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should be considered to be attorney work product and/or attorney-client privileged. This communication is the property of Bartlit Beck Herman Palenchar & Scott LLP and is intended only for the use of the addressee. If you are not the intended recipient, please notify the sender, delete the message, and note that any distribution or copying of this message is prohibited. Any discussion of tax matters contained herein is not intended or written to be used, and cannot be used, for the purpose of avoiding any penalties that may be imposed under Federal tax laws.

-----Original Message-----
From: Arbitblit, Donald C. [mailto:DARBITBLIT@lchb.com]
Sent: Thursday, June 15, 2006 12:09 AM
To: andrew.goldman@bartlit-beck.com
Cc: beachlawyer51@hotmail.com
Subject: Re: Any word from Mark on Jewell?

I spoke to Mark this afternoon about your email. Our intention is to serve a rebuttal expert report prepared by Dr. Jewell, and to provide him for deposition on the subjects as to which Dr. Farquhar referred to or relied upon Dr. Jewell, as well as any additional issues raised by the rebuttal report. By rule, we would have 30 days from June 1 to serve a rebuttal report, but we are willing to work with you on scheduling. We suggest getting a report to you by June 21, to give Dr. Jewell time to review the transcript of Dr. Kim (not yet received) and to otherwise prepare his report, followed by a deposition in SF on June 28. I will be available to

1

discuss this proposal tomorrow, if you like, or send me an email.

-----Original Message-----
From: Goldman, Andrew <andrew.goldman@bartlit-beck.com>
To: Arbitblit, Donald C. <DARBITBLIT@lchb.com>
Sent: Wed Jun 14 21:10:47 2006
Subject: Any word from Mark on Jewell?


Andrew L. Goldman
Bartlit Beck Herman Palenchar & Scott LLP Courthouse Place
54 W. Hubbard Street, Ste. 300
Chicago, Illinois 60610
andrew.goldman@bartlit-beck.com
Direct: (312) 494-4464
Fax: (312) 494-4440
Mobile: (773) 251-2064

The information contained in this communication is confidential and should be considered to be attorney work product and/or attorney-client privileged. This communication is the property of Bartlit Beck Herman Palenchar & Scott LLP and is intended only for the use of the addressee. If you are not the intended recipient, please notify the sender, delete the message, and note that any distribution or copying of this message is prohibited.  Any discussion of tax matters contained herein is not intended or written to be used, and cannot be used, for the purpose of avoiding any penalties that may be imposed under Federal tax laws.


This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information.
If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
To reply to our email administrator directly, send an email to postmaster@lchb.com

2

## Arbitblit, Donald C.

**From:** Arbitblit, Donald C.
**Sent:** Wednesday, June 21, 2006 9:55 PM
**To:** 'Andrew.Goldman@bartlit-beck.com'
**Cc:** 'beachlawyer51@hotmail.com'
**Subject:** FW: Jewell Rebuttal Report



Document1.pdf (5 MB)

Andy,

As mentioned in my previous email, attached is the rebuttal expert report of Dr. Jewell. We understand that you have stated objections to the submission of rebuttal reports, which were the subject of discussion with Judge Fallon on Monday. As noted at that time, we believe that we have the right to submit rebuttal reports under the Federal Rules. A rebuttal from Professor Jewell is particularly appropriate in light of the issues raised by defendant in the deposition of Dr. Farquhar, as well as the report and deposition of defense expert Dr. Kim.

Please let us know whether you intend to take Professor Jewell's deposition. We had previously offered to make him available on June 28, and this offer still holds. He is also available on June 29. It is our intention to permit deposition of Professor Jewell without either side waiving its position as to the submission of rebuttal reports.

Don

1