# EXHIBIT B

Service: **Get by LEXSEE®**
Citation: **401 F. Supp. 2d 565**

*401 F. Supp. 2d 565, \*; 2005 U.S. Dist. LEXIS 30345, \*\**

IN RE: VIOXX PRODUCTS LIABILITY LITIGATION; THIS DOCUMENT RELATES TO Plunkett v. Merck & Co., Inc., 05-4046

MDL NO. 1657 SECTION: L

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

401 F. Supp. 2d 565; 2005 U.S. Dist. LEXIS 30345

November 18, 2005, Decided
November 18, 2005, Filed

**SUBSEQUENT HISTORY:** Reconsideration denied by In re Vioxx Prods. Liab. Litig., 2005 U.S. Dist. LEXIS 36518 (E.D. La., Dec. 3, 2005)

**PRIOR HISTORY:** In re Vioxx Prods. Liab. Litig., 230 F.R.D. 473, 2005 U.S. Dist. LEXIS 17806 (E.D. La., 2005)

## CASE SUMMARY

**PROCEDURAL POSTURE:** In multidistrict litigation, plaintiff surviving spouse claimed defendant drug manufacturer's anti-inflammatory arthritis drug was defective, that the manufacturer knew it was defective, and the manufacturer failed to adequately warn of the drug's defective nature, resulting in the decedents death from a heart attack. Both parties filed Daubert and Daubert-like motions as to expert testimony and other scientific evidence under Fed. R. Evid. 702.

**OVERVIEW:** The manufacturer's expert pathologist, while having specialized mostly in prostrate pathology, had conducted numerous autopsies, many involving cardiovascular issues, and had reached the same conclusions as the spouse's experts; he could testify. A previous Food and Drug Administration (FDA) medical review officer could testify for the manufacturer as to its interactions with the FDA, as all of the regulations cited by the survivor were in effect during the time that doctor was with the FDA. A professor was adequately qualified to testify for the spouse as to whether short-term use of the drug increased cardiovascular risks; he had conducted several studies of the gastrointestinal and cardiovascular safety of the drug type. But, he could not testify on what doctors should prescribe to patients and on the specific cause of the decedent's death as he was not a medical doctor. Other scientific evidence over which the parties disagreed on the conclusions reached, such as whether heart problems were found after short-term use of the drug, and an FDA report, were not excluded; those matters were not proper Daubert motion subject and were more properly addressed through cross-examination.

**OUTCOME:** All motions were denied, with the exception of the manufacturer's motion to exclude the testimony of a professor, who could not testify on what doctors should prescribe to patients and on the specific cause of the decedent's death. The court reserved ruling on whether a doctor designated by the spouse could testify as to whether the manufacturer acted properly in developing and marketing the drug.

**CORE TERMS:** cardiovascular, reliable, cardiac, methodology, scientific, clinical, scientifically, inhibitor, opine, causation, unreliable, qualifications, pathology, qualified to testify, patient, pain, expertise, pharmaceutical, training, expert testimony, state of mind, gastrointestinal, short-term, hypothesis, naproxen, cardiologist, thrombotic, doctor, prostacyclin, medication

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Evidence > Testimony > Experts > Daubert Standard

**HN1** Fed. R. Evid. 702 governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in Daubert, where the Supreme Court held that trial courts should serve as the gatekeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." More Like This Headnote

Evidence > Testimony > Experts > Daubert Standard

**HN2** Scientific testimony is reliable only if the reasoning or methodology underlying the testimony is scientifically valid, meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. In Daubert, the United States Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. More Like This Headnote

Evidence > Testimony > Experts > Daubert Standard

**HN3** In addition to the five factors laid out in Daubert, a trial court may consider additional factors in assessing the scientific reliability of expert testimony. Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. More Like This Headnote

Evidence > Testimony > Experts > Daubert Standard

**HN4** Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. More Like This Headnote

Evidence > Procedural Considerations > Burdens of Proof > Allocation

Evidence > Procedural Considerations > Burdens of Proof > Preponderance of Evidence

Evidence > Testimony > Experts > Admissibility

Evidence > Testimony > Experts > Daubert Standard

**HN5** The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. The focus is not on the result or conclusion, but on the methodology. The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper. More Like This Headnote

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Evidence > Testimony > Experts > Daubert Standard

**HN6** The trial court is the gatekeeper of scientific evidence. It has a special obligation to ensure that any and all expert testimony meets these standards. Accordingly, it must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. In making this assessment, the trial court need not take the expert's word for it. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it. In satisfying its "gatekeeper" duty, the court looks at the qualifications of the experts and the methodology used in reaching their opinions and does not attempt to determine the accuracy of the conclusion reached by the expert. The validity or correctness of the conclusions is for the fact finder to determine. More Like This Headnote

Evidence > Testimony > Experts > Daubert Standard

**HN7** Expert witnesses are allowed to base their opinions on personal experiences provided that their opinions are confirmed by scientifically reliable data. More Like This Headnote

Evidence > Testimony > Experts > Admissibility

Torts > Products Liability > General Overview

**HN8** Evidence relating to a defendant's conduct or representations in the course of Food and Drug Administration proceedings is admissible in support of a plaintiff's state law product liability or tort causes of action. More Like This Headnote

Evidence > Testimony > Experts > Daubert Standard

**HN9** Differing conclusions are permissible under Fed. R. Evid. 702; improper methodology is not. More Like This Headnote

Evidence > Scientific Evidence

Evidence > Testimony > Experts > Daubert Standard

**HN10** As a gatekeeper of the admissibility of scientific evidence, the court must evaluate methodology, not conclusions. The proper forum for challenging conclusions is at cross-examination, not in a Daubert motion. More Like This Headnote |

*Shepardize:* Restrict By Headnote

**COUNSEL:** [**1] For Plaintiff: Russ M. Herman, Leonard A. Davis, Herman, Herman, Katz & Cotlar, LLP, New Orleans, LA.

For Defendant: Phillip A. Wittmann, Stone Pigman Walther Wittmann, LLC, New Orleans, LA.

**JUDGES:** Eldon E. Fallon, UNITED STATES DISTRICT JUDGE. MAG. JUDGE KNOWLES.

**OPINIONBY:** Eldon E. Fallon

**OPINION:** [*570] **ORDER & REASONS**

Before the Court are several *Daubert* and Daubert-like motions filed by both the Plaintiff and Defendant. For the following reasons, the Court rules as follows:

## I. Background

Vioxx (known generically as rofecoxib) belongs to a general class of pain relievers known as non-steroidal anti-inflammatory drugs ("NSAIDs"). This class of drugs contains well-known medications sold either over the counter--such as Advil (ibuprofen) and Aleve (naproxen)--or by prescription--such as Daypro (oxaprozin) and Voltaren (diclofenac). NSAIDs work by inhibiting cyclooxygenase (COX), an enzyme that stimulates synthesis of prostaglandins, which are chemicals produced in the body that promote certain effects.

[*571] Traditional NSAIDs have been a longstanding treatment option for patients needing relief from chronic or acute inflammation and pain associated with osteoarthritis, rheumatoid [**2] arthritis, and other musculoskeletal conditions. This relief, however, comes with significant adverse side effects. Specifically, traditional NSAIDs greatly increase the risk of gastrointestinal perforations, ulcers, and bleeds ("PUBs"). This risk is increased when high doses are ingested, which is often necessary to remedy chronic or acute inflammation and pain. Scientists estimated that traditional NSAID-induced PUBs caused a significant number of deaths and hospitalizations each year in the United States.

In the early 1990s, scientists discovered that the COX enzyme had two forms--COX-1 and COX-2--each of which appeared to have several distinct functions. Scientists believed that COX-1 affected the synthesis or production of prostaglandins responsible for protection of the stomach lining, whereas COX-2 mediated the synthesis or production of prostaglandins responsible for pain and inflammation. This belief led scientists to hypothesize that "selective" NSAIDs designed to inhibit COX-2, but not COX-1, could offer the same pain relief as traditional NSAIDs with the reduced risk of fatal or debilitating PUBs. In addition, scientists believed that such drugs might be able to prove [**3] beneficial for the prevention or treatment of other conditions, such as Alzheimer's disease and certain cancers, where evidence suggested that inflammation may play a causative role.

In light of these scientific developments, Merck & Co., Inc. ("Merck") and several other pharmaceutical companies began the development of such drugs, which became known as "COX-2 inhibitors" or "coxibs." Vioxx is a COX-2 inhibitor.

On May 20, 1999, the Food and Drug Administration ("FDA") approved Vioxx for sale in the United States. From its initial approval, Vioxx gained widespread acceptance among physicians treating patients with arthritis and other conditions causing chronic or acute pain.

Before and after its initial approval, Vioxx was subjected to a number of studies and tests, including, but not limited to, VIGOR, APPROVe, ViP, VICTOR, ADVANTAGE, the Alzheimer's

studies, Professor Kronmal's reanalysis of Merck's clinical data, the Solomon study, the Juni study, the Ray study, the Graham study, the Kimmel study, the Levesque study, the Mamdani study, the Ingenix study, the Johnsen study, the Nussmeier study, and the Fitzgerald hypothesis. In addition, a large amount of scientific literature **[**4]** was written on the effects of Vioxx and other COX-2 inhibitors.

On September 30, 2004, Merck withdrew Vioxx from the market when interim unblinded data from a long-term, blinded, randomized placebo-controlled clinical trial, known as APPROVe, seeking to assess whether Vioxx could help prevent the recurrence of precancerous colon polyps, indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarctions and ischemic stroke.

Thousands of lawsuits followed in both state and federal court. On February 16, 2005, as a result of the sheer mass of these lawsuits and the potential for many more, the Judicial Panel on Multidistrict Litigation ordered that the Vioxx litigation be centralized, designated as an MDL, and assigned to this Court.

One of this Court's first tasks was to set cases for early federal court trial. With the consent of both the Plaintiff and Merck, this case was set for trial in late **[*572]** November in New Orleans, Louisiana. Due to Hurricane Katrina, the location of the trial was moved with the consent of the parties to Houston, Texas, but the timing of the trial remained the same. This case involves the death of Richard Irvin, **[**5]** Jr.

Mr. Irvin was a 53-year-old man with severe lower back and hip pain. He weighed approximately 230 lbs. and stood 6' tall. On April 9, 2001, he asked his son-in-law, Dr. Christopher Schirmer, an emergency room physician, to give him something for pain. Dr. Schirmer gave Mr. Irvin a prescription for Vicoprofen 7.5/200 mg and Methocarbrnol 750 mg each to be taken once every six hours. Mr. Irvin was unable to tolerate this medication because it produced severe nausea and vomiting. In addition, it provided no significant pain relief.

Subsequently, Mr. Irvin received some samples of Vioxx 25 mg from a friend. He was able to tolerate the Vioxx, and it also reduced his pain. On April 15, 2001, he again contacted Dr. Schirmer and, this time, requested a prescription for Vioxx. Dr. Schirmer sent Mr. Irvin a prescription for 30 tablets of Vioxx 25 mg to be taken once daily. This prescription was filled on April 22, 2001.

On May 15, 2001, while at work, Mr. Irvin suffered a heart attack. Extensive resuscitative efforts were then carried out by the Fire Department Emergency Medical Technicians and later by emergency room personnel at Flagler Hospital in St. Augustine, Florida, where Mr. **[**6]** Irvin had been taken. These efforts were unsuccessful, and Mr. Irvin was pronounced dead at 9:02 a.m. on May 15, 2001. An autopsy revealed an unattached coronary thrombus, or clot, in the left anterior descending coronary artery.

Mr. Irvin's surviving spouse, Evelyn Irvin Plunkett, has brought this suit against Merck on behalf of herself, Mr. Irvin's two minor children, and the Estate of Richard Irvin, Jr. She alleges that Vioxx was a defective product, Merck knew Vioxx was defective, and Merck failed to adequately warn Mr. Irvin of Vioxx's defective nature. As such, she asserts that Merck is liable for Mr. Irvin's death.

In particular, the Plaintiff asserts that the scientific tests conducted on and the scientific literature written on Vioxx revealed that Vioxx increases the risk of cardiovascular thrombotic events. To put it simply, the Plaintiff contends that Vioxx creates an imbalance between thromboxane and prostacyclin. Thromboxane promotes platelet aggregation, vessel constriction, and proliferation of smooth muscle cells. Prostacyclin, however, opposes the action of thromboxane inhibiting platelet aggregation, facilitating vasodilation, and

Get a Document - by Citation - 401 F. Supp. 2d 565
Case 2:05-md-01657-EEF-DEK   Document 6387-3   Filed 08/21/06   Page 7 of 16
Page 6 of 31

preventing proliferation of smooth **[\*\*7]** muscle cells. COX-2 is the dominant source of prostacyclin; therefore, the Plaintiff claims that the inhibition of COX-2 favors thrombogenesis, hypertension, and the promotion of atherosclerosis. Specifically, the Plaintiff claims that this mechanism ultimately led to the formation of the thrombus in Mr. Irvin's left anterior descending coronary artery and caused his death.

Merck asserts that none of the tests specifically revealed that Vioxx 25 mg ingested for less than a month can increase the risk of adverse cardiovascular events or create a prothrombotic state.

The Plaintiff and Merck intend to call experts to support their respective positions and each has filed *Daubert* motions to exclude the other's witnesses.

## II. LAW AND ANALYSIS

*HN1* Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's **[\*573]** opinion in *Daubert v. Merrel Dow Pharmaceuticals,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In *Daubert,* the Supreme Court held that trial courts should serve as the gatekeeeper for expert testimony and should not admit such testimony without first determining that the testimony **[\*\*8]** is both "reliable" and "relevant." *Id.* at 589.

*HN2* Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Id.* at 592-93. In *Daubert,* the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* at 593-95. These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.* Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 138, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

*HN3* In addition to the five factors laid out in *Daubert,* a trial court may consider additional **[\*\*9]** factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.,* 171 F.3d 308, 312 (5th Cir. 1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.,* 243 F. Supp. 2d 672, 678 (W.D. Tex. 2002).

*HN4* Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate **[\*\*10]** fit between the scientific testimony and the specific facts of the case. *Daubert,* 509 U.S. at 593. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *GE v. Joiner,* 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

HN5 The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore,* 151 F.3d at 275-76. The focus is not on the result or conclusion, but on the methodology. *Id.* The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper. *Id.*

HN6 The trial court is the gatekeeper of scientific evidence. *Daubert,* 509 U.S. at 596. It has a special obligation to ensure that any and all expert testimony meets these standards. *Id.* Accordingly, it must make a preliminary assessment of whether the reasoning or methodology **[\*574]** underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. *Id.* at 592-93. **[\*\*11]** In making this assessment, the trial court need not take the expert's word for it. *Joiner,* 522 U.S. at 147. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it. *Moore,* 151 F.3d at 279.

In satisfying its "gatekeeper" duty, the Court will look at the qualifications of the experts and the methodology used in reaching their opinions and not attempt to determine the accuracy of the conclusion reached by the expert. The validity or correctness of the conclusions is for the fact finder to determine.

### III. Present Motions

The Plaintiff has filed the following eight motions: (1) A Motion to Exclude the Testimony of Dr. Thomas Wheeler (Rec. Doc. 1139); (2) A Motion to Exclude the Testimony of Dr. Janet Arrowsmith-Lowe (Rec. Doc. 1372); (3) A Motion to Exclude the Testimony of Doctors Frank Lanza and Merlin Wilson (Rec. Doc. 1142); (4) A Motion to Exclude the Testimony of Dr. David Silver (Rec. Doc. 1143); (5) A Motion to Exclude Testimony that Adverse Thrombotic Cardiac Events Occur Only if Vioxx is Ingested 18 Months or Longer (Rec. Doc. 1144); (6) A Motion **[\*\*12]** to Exclude Testimony that Vioxx is the Same as All NSAIDs Regarding Cardiotoxic Effects (Rec. Doc. 1138); (7) A Motion to Exclude Testimony that Naproxen is Sufficiently Cardioprotective to Explain the Excess Cardiac Risk in VIGOR (Rec. Doc. 1141); and (8) A Motion to Exclude Testimony that Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the FDA (Rec. Doc. 1140). n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The Court is classifying the Plaintiff's last four motions and Merck's last motion as Daubert-like motions, as opposed to *Daubert* motions. These five motions do not challenge a specific expert's qualifications and methodology, but challenge the reliability of certain scientific conclusions.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Merck has also filed the following eight motions: (1) A Motion to Exclude the Testimony of Winston Gandy, Jr., M.D. (Rec. Doc. 1118); (2) A Motion to Exclude the Testimony of Wayne A. Ray, Ph.D. (Rec. Doc. 1117); (3) A Motion to Exclude the Testimony of Benedict Lucchesi, M.D., Ph.D., M.S., F.A.H.A. (Rec. **[\*\*13]** Doc. 1172); (4) A Motion to Exclude the Testimony of Colin M. Bloor, M.D., and Joseph L. Burton, M.D. (Rec. Doc. 1120); (5) A Motion to Exclude the Testimony of Thomas Baldwin, M.D. (Rec. Doc. 1121); (6) A Motion to Exclude the Testimony of John W. Farquhar, M.D. (Rec. Doc. 1122); (7) A Motion to Exclude the Testimony of Richard M. Kapit, M.D. (Rec. Doc. 1119); and (8) A Motion to Exclude Evidence of the Plaintiff's Experts Regarding Causation (Rec Doc. 1515).

The Court has reviewed the reports from the experts at issue and studied the extensive briefs submitted by the parties. Counsel further presented their respective positions at a hearing specifically set for this purpose on November 14-15, 2005. It is now appropriate for the Court to rule on these motions.

Generally, in *Daubert* motions, the parties attack the methodology used by the proposed expert or question the expertise of the expert. Here, at least in most of these motions, the movant questions the interpretation or accuracy of the underlying source studies or literature relied on by the expert and suggests that the conclusions **[*575]** drawn or formulated by the expert are flawed. The Court will address each challenged expert **[**14]** in turn starting first with the Plaintiff's motions and then proceeding to Merck's motions. Once the Court has reviewed these *Daubert* motions, the Court will rule on the Daubert-like motions.

### A. Plaintiff's Motions

### I. Dr. Thomas Wheeler

Dr. Wheeler was retained by Merck to testify as an expert regarding: (1) the cause and manner of Irvin's death; (2) the role of Irvin's pre-existing artherosclerosis in his death, specifically as it relates to an ostensible rupture of Irvin's artherosclerotic plaque; (3) the role of hypertrophy of Irvin's heart in his death; and (4) the lack of evidence to link short-term use of Vioxx 25 mg with serious adverse cardiovascular events.

### a. Plaintiff's Position

First, the Plaintiff argues that Dr. Wheeler lacks the necessary expertise to express an opinion. It is thus appropriate to review his curriculum vitae. Dr. Wheeler completed a residency in general pathology in 1981. There was no specialization in cardiac pathology at that time. Following his residency, he did not do any formal postgraduate training in cardiac pathology or any other subspecialty of pathology. After that, he became an Assistant Professor of Pathology at **[**15]** the Baylor College of Medicine. Since that time, according to the Plaintiff, Dr. Wheeler has become an authority on prostate pathology, but has done little work in the area of cardiac pathology. He has never conducted an independent study of his own on sudden cardiac death; he does not recall ever offering pathological expertise in any formal study in sudden cardiac death; he has not authored or co-authored a publication in sudden cardiac death. He is not a medical examiner or forensic pathologist who specifically addresses causes of death as a matter of routine. In addition, he only considers himself an expert in cardiac arrhythmias in a general medical sense, not as a cardiologist. He has never diagnosed a case of drug-induced myocardial infarction or cardiac thrombosis formation.

The Plaintiff also challenges Dr. Wheeler's ability to offer an opinion concerning cardiac hypertrophy (enlargement of the heart) because he has not done any research, published an article, or lectured on cardiac hypertrophy. Moreover, the Plaintiff suggests that mean weight, the tool used by Dr. Wheeler in diagnosing hypertrophy, is not reliable for determining hypertrophy.

The Plaintiff also challenges **[**16]** Dr. Wheeler's expertise to testify as to the focal rupture of the fibrous cap because Dr. Wheeler could not visualize one, but rather concluded one was present based on other observable phenomena in autopsy slides.

### b. Merck's Position

According to Merck, Dr. Wheeler posses sufficient expertise to testify on the cause and manner of Mr. Irvin's death. He has been board certified in both anatomic and clinical pathology, which includes cardiac pathology, for nearly 25 years. For three years in the late 1990s, Dr. Wheeler served on the Anatomic Pathology Test Committee of the American Board

of Pathology and helped design the anatomic pathology certification examination. Over the course of his career, Dr. Wheeler has conducted numerous autopsies involving cardiovascular issues and performed/supervised several hundred autopsies, many involving atherosclerotic coronary vascular disease. Additionally, Merck points out that an expert need not be an internationally recognized cardiac **[*576]** pathologist to provide expert testimony on cardiac-related causes of death.

As to cardiac hypertrophy, Merck asserts that Dr. Wheeler's substantial experience and training as a pathologist and his voluminous **[**17]** experience with respect to cardiac-related autopsies more than qualifies him to provide expert testimony as to cardiac hypertrophy despite the fact that it was not his primary research focus. In addition, Dr. Wheeler testified that certain studies have classified hearts with weights greater than the mean as enlarged hearts. Since Mr. Irvin's heart weight was greater than the mean, he classified it as enlarged.

As to the focal rupture of the fibrous cap, Merck asserts that two of the Plaintiff's experts agree with Dr. Wheeler. Next, Merck asserts that the observations made by Dr. Wheeler which led him to conclude that there was a focal rupture are consistent with the standard method for arriving at that diagnosis. Also, Merck points out that the focal rupture appears on other slides produced by the Plaintiff after the submission of Dr. Wheeler's report. In summary, Merck contends that Dr. Wheeler arrived at his diagnosis through standard diagnosis procedure, it was agreed to by two of the Plaintiff's experts, and was subsequently confirmed by additional evidence. As such, his opinion cannot be classified as conjecture, according to Merck.

### c. Court's Ruling

Dr. Wheeler is a **[**18]** board certified physician in both anatomical pathology and clinical pathology with a subspecialty in cytopathology. He is currently licensed to practice medicine in the state of Texas. He has been a practicing physician for the past 24 years and is currently the Interim Chair of the Department of Pathology at Baylor College of Medicine in Houston, Texas. Over the course of his career, he has performed hundreds of autopsies and signed off on hundreds more.

In formulating his opinion, he reviewed the report and histological slides from Mr. Irvin's autopsy, as well as Mr. Irvin's personal medical records, including reports from a 1998 emergency room visit as well as a report on the day of his death. He also reviewed the expert reports of Doctors Burton and Bloor, who are the Plaintiff's expert pathologists, and the depositions of both Dr. Schirmer and the Plaintiff. He based his opinions on these materials and his education, training, and experience.

At oral argument, the Plaintiff's main attack on Dr. Wheeler's qualifications was that he is an expert in prostrate pathology, not cardiovascular pathology. While Dr. Wheeler may spend the majority of his research time and academic pursuits **[**19]** in prostrate pathology, he is still qualified to opine in this case. He has conducted a large number of autopsies, many involving cardiovascular issues. In the 1990s, he served on the American Board of Pathology Anatomic Pathology Test Committee and helped design the anatomic pathology certification examination. In addition, he has numerous credentials and experience in the field of pathology. The Plaintiff's attack is fodder for cross-examination, not grounds to exclude Dr. Wheeler from testifying at all.

Additionally, there is nothing speculative or unreliable about the methodology used by Dr. Wheeler. He reviewed Mr. Irvin's autopsy slides and medical records. He also reviewed the expert reports of Dr. Bloor and Dr. Burton and the depositions of Dr. Schirmer and the Plaintiff. Dr. Wheeler based his opinion on his review of these materials and his training and experience. In fact, Dr. Wheeler reached the same conclusions as both of the Plaintiff's

experts. Therefore, there is no reason to **[\*577]** exclude Dr. Wheeler's expert testimony. He is qualified, and he used proper methodology in reaching his opinions. Accordingly, the Plaintiff's motion to disqualify Dr. Wheeler is denied.

### ii. [\*\*20] Dr. Janet Arrowsmith-Lowe

Merck has designated Dr. Arrowsmith-Lowe to testify as an expert witness on Merck's interactions with the FDA and on the company's communications with the medical community.

**a. Plaintiff's Position**

The Plaintiff asserts several reasons for excluding Dr. Arrowsmith-Lowe's testimony. First, the Plaintiff asserts that she did not properly review the data or results from the studies which she cites. Instead, she simply relied upon the quality of Merck's scientists and the FDA's review of their work. The Plaintiff asserts that her vouching for the work of others and the quality of government regulations is inadequate under *Daubert*.

Second, the Plaintiff challenges her testimony based on her inability to correctly answer how many people would have to be in a study to detect a doubling of the incidence rate from one in a thousand to two in a thousand. The Plaintiff asserts that her inability to answer this question along with her tortured explanation proves she is not a qualified expert.

Third, the Plaintiff challenges Dr. Arrowsmith-Lowe's qualifications. According to the Plaintiff, Dr. Arrowsmith-Lowe has not been at the FDA since 1996 and was **[\*\*21]** never a medical officer in charge of reviewing a new drug application or a supplemental new drug application. She never designed a randomized clinical study. She never engaged in direct negotiation with a sponsor over drug labeling. In addition, her current contact with the FDA is limited.

Moreover, the Plaintiff asserts that the FDA has changed significantly since she left. In specific, in 1997, the Food and Drug Administration Modernization Act was enacted which reauthorized the Prescription Drug User Fee Act. These changes required the FDA to refund fees to drug companies for any aspect of their fee going towards drug approvals not matched by the FDA. As such, the Plaintiff claims that she is not an expert in post-1996 FDA standards.

In addition, the Plaintiff claims that Dr. Arrowsmith-Lowe is biased. In support, the Plaintiff points out that her deposition testimony was full of holes, her consulting company makes $ 500,000 annually by providing testimony on behalf of pharmaceutical companies in drug litigation, and she has testified in 36 trials or depositions in the last four years--one every six weeks.

**b. Merck's Position**

According to Merck, Dr. Arrowsmith-Lowe is **[\*\*22]** well-qualified to offer her opinions as to Merck's interactions with the FDA and the company's communications with the medical community. First, Merck argues that Dr. Arrowsmith-Lowe did review the data and did not rely solely upon the opinions of others in reaching her conclusions. Second, Merck is offering Dr. Arrowsmith-Lowe as a regulatory expert, not an expert in epidemiology or biostatistics. She is not required to crunch numbers from every Merck study ever conducted to reach reliable conclusions about the adequacy of those studies from a regulatory standpoint. Instead, as a regulatory expert, it was reasonable for her to rely on what Merck submitted to the FDA, as well as what the FDA did in response to those submissions.

Third, regarding Dr. Arrowsmith-Lowe's alleged inability to testify about the **[\*578]** doubling of the incidence rate, Merck contends that she is not being called to testify as a

statistician. She is being called to testify as a regulatory expert to explain the nature of the FDA's review of Merck's testing of Vioxx. Lastly, Merck asserts that the Plaintiff's arguments concerning Dr. Arrowsmith-Lowe's qualifications and alleged bias are unfounded and completely untrue. **[\*\*23]**

### c. Court's Ruling

Dr. Arrowsmith-Lowe is a board certified physician in Internal Medicine, a fellow of the American College of Physicians, and an elected member of the American College of Epidemiology. From 1984-1996, she served as a medical review officer at the FDA and was acting Director of the Office of Surveillance and Biometrics, Center for Devices and Radiologic Health at the FDA from 1993-1995. She is currently licensed in New Mexico and has also passed the federal licensing exam.

In formulating her opinion, Dr. Arrowsmith-Lowe relied on her training and experience as a medical doctor, epidemiologist, and FDA medical review officer and acting director of the Office of Surveillance and Biometrics. Additionally, her opinions are based on her knowledge of the requirements applicable to pharmaceutical manufacturers under the Federal Food, Drug, and Cosmetic Act and federal regulations pursuant to the Act; her knowledge of general FDA policies, procedures, and industry practices through her FDA and consultant experience; and her knowledge of practices in the pharmaceutical industry involving the development of innovative medicines. Furthermore, she reviewed the following: **[\*\*24]** Merck's communications with as well as their submissions to the FDA, including portions of the Investigational New Drug Application for Vioxx and Supplemental New Drug Applications for Vioxx; FDA commentary; protocols and data from Vioxx clinical studies and clinical study reports; the minutes and transcripts of several Advisory Committee Meetings; the FDA's April 6, 2005 Decision Memorandum; the reports of Dr. Richard M. Kapit and Dr. John L. Gueriguian, who are the Plaintiff's expert witness; and other literature and material.

Regarding Dr. Arrowsmith-Lowe's qualifications, the Plaintiff asserts that she is unqualified to render her opinions because she has not been employed by the FDA since 1996 and was never in charge of reviewing a new drug application or supplemental new drug application. Nonetheless, Dr. Arrowsmith-Lowe was employed by the FDA for 12 years, has maintained contact with the FDA, and has worked as a consultant for pharmaceutical companies in their dealing with the FDA since 1996. Moreover, although she was never in charge of reviewing a new drug application or supplemental new drug application, she has substantial experience reviewing them and is knowledgeable **[\*\*25]** of the applicable regulations.

Specifically, the Plaintiff asserts that the enactment of the Food and Drug Administration Modernization Act in 1997 renders Dr. Arrowsmith-Lowe unqualified; however, the Plaintiff does not assert any specific reasons why this renders her unqualified. Instead, at oral argument, all of the regulations that the Plaintiff cited in support of her position were enacted well before 1996. As such, the Court finds the Plaintiff's arguments unpersuasive.

The Court finds that Dr. Arrowsmith-Lowe is qualified and her testimony is based on reliable methodology. Once again, the Plaintiff's position is appropriate to attack credibility of the expert at cross-examination instead, not to preclude her from testifying under *Daubert*. Accordingly, **[\*579]** the Plaintiff's motion to exclude Dr. Arrowsmith-Lowe is denied.

### iii. Dr. Frank Lanza and Dr. Merlin Wilson

Dr. Lanza, a gastroenterologist, was retained by Merck to offer his opinions that Vioxx and other COX-2 inhibitors serve as an important treatment option for patients with a history of gastrointestinal complications.

Dr. Wilson, a rheumatologist, was retained by Merck to offer his opinions that Vioxx was

a [**26] safe and effective treatment for pain and inflammation associated with rheumatoid arthritis, osteoarthritis, and other musculoskeletal disorders; that Vioxx was an important medicine for physicians like him; that in his patient practice, patients experienced fewer gastrointestinal side effects on Vioxx than on traditional NSAIDs; and that the results of VIGOR were disseminated widely in the medical community starting in March 2000.

### a. Plaintiff's Position

The Plaintiff claims that Dr. Lanza and Dr. Wilson's testimony is irrelevant because Mr. Irvin was not being treated by either a gastroenterologist or a rheumatologist. In addition, the Plaintiff asserts that their testimony is not reliable under *Daubert* because their opinions are based solely on their practice.

### b. Merck's Position

Merck claims that their testimony is relevant because it rebuts the Plaintiff's allegations that the principal purpose of Vioxx was to generate profits for Merck and that Merck was negligent. By testifying as to the benefits of Vioxx and that Vioxx was fit for its ordinary purposes, Dr. Lanza and Wilson can rebut the Plaintiff's contentions.

Regarding the specific relevancy as to Mr. [**27] Irvin, Merck claims that their testimony is relevant because Mr. Irvin did suffer severe gastrointestinal side effects while he was on Vicoprofen and, as such, switched to Vioxx. Moreover, Mr. Irvin did not have any reported medical history and his son-in-law testified that he complained about arthritis type pain. Therefore, the opinion of an expert gastroenterologist and rheumatologist is relevant to explain the efficacy of Vioxx.

Regarding the basis of their testimony, Merck claims that Doctors Lanza and Wilson have reviewed and relied upon substantial published literature proving that Vioxx has a safer GI profile as compared to traditional NSAIDs. This was the reason for introducing COX-2 inhibitors. Merck also claims that they have substantial clinical experience in their fields. As such, Merck asserts that *Daubert* allows experts to testify regarding their clinical experience if it is consistent with otherwise reliable evidence.

### c. Court's Ruling

Dr. Lanza is a board certified physician in Internal Medicine and Gastroenterology. He has a B.S. in Bacteriology from the University of Maryland, a M.A. in Biochemistry from the University of Texas Medical Branch, and a M. [**28] D. from the University of Texas Medical Branch. He did his residency at Baylor University and did a fellowship at the University of Texas.

Over the past 40 years, Dr. Lanza has held numerous academic appointments and professional positions. He currently serves as a Clinical Professor of Medicine in the Department of Gastroenterology at Baylor College of Medicine and as the Chief Emeritus for the Endoscopic Training Program at Ben Taub Hospital in Bellaire, [*580] Texas, and for the Sharpstown General Hospital in Houston, Texas. He has served as the Chief of Gastroenterology at Memorial Hospital in Houston, Texas. In addition, he has served as the Director and Principal Investigator at the Houston Institute for Clinical Research. He was also the Consulting Editor in Gastroenterology for the Journal of Muculoskeletal Medicine and a past President of the American College of Gastroenterology. In addition to his professional and academic qualifications, Dr. Lanza also currently maintains his own active gastroenterology practice in Houston, Texas.

In formulating his opinion, Dr. Lanza reviewed the scientific information on Vioxx and other COX-2 inhibitors, Mr. Irvin's medical records from the [**29] day of his death and his

autopsy, two depositions of Dr. Schirmer, the deposition of the Plaintiff, and the Plaintiff's responses to Merck's first set of interrogatories. In addition, his opinion is based on his 35 years of clinical experience in the filed of gastroenterology.

Dr. Wilson is a board certified physician in Internal Medicine, a diplomat of the American Board of Internal Medicine with a subspecialty in Rheumatology, a fellow of the American College of Physicians and the American College of Rheumatology, and a Clinical Professor of Medicine at LSU Health Sciences Center and Tulane Medical School. In addition to his formal education, he has been a practicing rheumatologist for the past twenty-five years.

In formulating his opinion, Dr. Wilson reviewed the scientific literature regarding Vioxx. In addition, his opinion is based on his experience as a prescribing physician.

The Plaintiff raised no challenges to the qualifications or methodology of Dr. Lanza or Dr. Wilson. Much like the Plaintiff, the Court finds no reason to challenge the experts on these grounds either. Simply put, Dr. Lanza and Dr. Wilson are qualified to testify as an expert witness.

Although the Plaintiff [**30] does not challenge the qualifications of Dr. Lanza or Dr. Wilson, the Plaintiff does challenge the relevancy of their testimony. According to the Plaintiff, Mr. Irvin was never treated by a gastroenterologist or rheumatologist and never suffered from a gastrointestinal injury or any form of arthritis. As such, their testimony has no relevance to this case.

To the contrary, Mr. Irvin did suffer from gastrointestinal side effects while he was on Vicoprofen. This is why Dr. Schirmer prescribed him Vioxx. Moreover, Dr. Schirmer testified that Mr. Irvin did complain about having arthritis type pain. Furthermore, their testimony is relevant to refuting the Plaintiff's claims. Dr. Lanza and Dr. Wilson will testify that the benefits of Vioxx outweighed its risks. In addition, the Plaintiff asserts that Merck's primary motivation in manufacturing and distributing Vioxx was to generate the greatest amount of profits possible. This testimony describes the benefits of Vioxx and is relevant to refuting the Plaintiff's claims.

Moreover, the Plaintiff challenges the admissibility of Dr. Lanza's and Dr. Wilson's testimony because it is anecdotal as opposed to scientific. According to the Plaintiff, [**31] since their testimony simply recounts their clinical experiences, it cannot be admitted as expert testimony. This assertion is incorrect. HN7 Expert witnesses are allowed to base their opinions on personal experiences provided that their opinions are confirmed by scientifically reliable data. Cantrell v. GAF Corp., 999 F.2d 1007, 1014 (6th Cir. 1993). Here, both doctors' personal experiences are supported by reliable scientific data. As such, their testimony is reliable, relevant, and admissible. Accordingly, the Plaintiff's motion [*581] to exclude the testimony of Dr. Lanza and Dr. Wilson is denied. The testimony of these doctors, however, may well be redundant and Merck should reevaluate whether they are needed at trial.

### iv. Dr. David Silver

Dr. Silver, a rheumatologist, was retained by Merck to offer his opinions relating to a threshold for duration of 36 months, the naproxen hypothesis, alleged gastrointestinal safety relating to Vioxx, adequacy of labeling for Vioxx, and specific causation as to the death of Richard Irvin.

### a. Plaintiff's Position

The Plaintiff argues that Dr. Silver is not qualified to testify because he does not have the qualifications [**32] to render the opinions offered. First, Dr. Silver is not a cardiologist, pharmacologist, biostatistician, neurologist, regulatory expert, hematologist/clot expert, or

pharmacoepidemiologist. He has no expertise in cardiology or cardiac pathology. As such, the Plaintiff argues that any opinion in these areas falls outside his area of expertise.

Second, the Plaintiff that Dr. Silver, as a rheumatologist, is not qualified to opine on the past medical treatment of Mr. Irvin, including why he ingested Vioxx. Specifically, osteoarthritis and rheumatoid arthritis are not diagnosed conditions for Mr. Irvin. As such, there is no importance regarding Dr. Silver's knowledge of whether Mr. Irvin had arthritis.

Third, the Plaintiff alleges that there were no gastrointestinal issues relating to Mr. Irvin's use of Vioxx that warrant the opinion testimony of Dr. Silver. To the extent that Dr. Silver bases any opinions of the gastrointestinal tolerability of Vioxx in his own patient population, such testimony is merely anecdotal and cannot qualify as scientific and reliable data.

Finally, the Plaintiff alleges that, with no cardiac training, Dr. Silver's medical experience does not qualify him to [**33] testify as to the specific cause of Mr. Irvin's thrombotic cardiac event and death.

### b. Merck's Position

First, based on his experience, Merck contends that Dr. Silver is an expert in pain management and the use of COX-2 inhibitors to treat pain. Merck argues that Dr. Silver, in his testimony, will explain the challenges of treating chronic pain and the benefits of COX-2 inhibitors such as Vioxx.

Second, regarding the Plaintiff's assertion concerning the fact that Mr. Irvin was never diagnosed with osteoarthritis or arthritis and never experienced any gastrointestinal issues, Merck argues that this is factually incorrect. In addition, even if it were correct, Merck argues that Dr. Silver can still testify because the gastrointestinal benefits of Vioxx are relevant to understanding the overall benefits of the drug and comparing those benefits to the known risks of the drug.

As far as testifying as to the cause of Mr. Irvin's death, Merck asserts that Dr. Silver's clinical experience and review of the published literature allow him to testify that based on the undisputed facts surrounding Mr. Irvin's death Vioxx did not cause his death.

As far as testifying as to the adequacy [**34] of Vioxx labeling, Merck asserts that Dr. Silver is qualified to give his opinion because of his experience as a routine prescriber, researcher, and primary care physician.

Lastly, regarding Dr. Silver's ability to testify as to the clinical trials conducted on Vioxx, Merck asserts that Dr. Silver is qualified because he has participated in a substantial number of clinical trials and he has first-hand knowledge concerning the [*582] design, implementation, and interpretation of clinical trials involving Vioxx.

### c. Court's Ruling

Dr. Silver is a board certified physician in Internal Medicine and Rheumatology. He is a licensed physician in California and Illinois and is on the National Board of Medical Examiners. He has held numerous distinguished appointments.

Presently, he is Associate Clinical Professor of Medicine at the University of California at Los Angeles, Director of the Chronic Pain Rehabilitation Program at Cedars-Sinai Medical Center in Los Angeles, and Associate Director of the Osteoporosis Medical Center. He has consulted with numerous pharmaceutical interests and was a clinical investigator for Merck in the ADVANTAGE trial and on Arcoxia. In addition, he is a practicing [**35] physician.

Furthermore, he is also a distinguished researcher, who is currently the beneficiary of 15 research grants. He has been involved in over fifty clinical trials involving arthritis, including more than twenty pertaining to COX-2 inhibitors. He has authored a number of publications and given over 200 lectures on the subject of NSAIDs and COX-2 inhibitors over the course of his career.

In formulating his opinion, Dr. Silver reviewed the relevant published, peer-reviewed medical literature and had even actively followed it before being retained in this case. Moreover, his opinion is based on his years of clinical experience.

The Plaintiff makes a broad-brush challenge to Dr. Silver's qualifications. To the extent that Dr. Silver may testify regarding chronic pain and the risk/benefit calculations of COX-2 inhibitors, he is certainly qualified. His experience with and understanding of these subjects, as evidenced by his expert report, support his qualifications. In addition, he has based his opinions on scientifically reliable information.

To the extent that Dr. Silver may testify that Vioxx did not contribute Mr. Irvin's death, Dr. Silver is qualified to testify. Dr. Silver [**36] is a board certified internist with years of experience treating his patients' cardiac conditions. He has reviewed all the relevant literature and studies. If the Plaintiff wishes to attack Dr. Silver because he is not a cardiologist, pharmacologist, biostatistician, neurologist, regulatory expert, hematologist/clot expert, or pharmacoepidemiologist, she will be allowed to do so on cross-examination. Moreover, for the same reasons as Dr. Lanza's testimony, Dr. Silver's testimony as to the gastrointestinal effects of Vioxx is both relevant and admissible. But again, such testimony is at best overlapping and at worst redundant.

**B. Merck's Motions**

**I. Winston Gandy, Jr., M.D.**

The Plaintiff has designated Dr. Gandy to opine that (a) Vioxx 25 mg increases the risk of blood clots in short-term use, and (b) that Vioxx contributed to Mr. Irvin's sudden cardiac death.

**a. Merck's Position**

Merck contends that Dr. Gandy is not qualified to opine that Vioxx 25 mg increases the risk of blood clots or that Mr. Irvin died as a result of his ingestion of Vioxx. Specifically, Merck argues that Dr. Gandy's professional training and experience does not qualify him to opine on general [**37] causation because he is not a researcher, has never done any research on NSAIDs prior to this case, never done any research on COX-2 inhibitors prior to this case, has never authored a publication on sudden cardiac death, and does not have any extensive experience with Vioxx. In addition, based on Dr. Gandy's lack of [*583] experience, Merck argues that he failed to undertake the proper study to opine on causation. Merck argues that the 10 to 15 hours spent by Dr. Gandy reviewing materials was insufficient, the materials reviewed by Dr. Gandy were incomplete and provided by the Plaintiff's counsel, and he only reviewed two Vioxx clinical studies.

Next, Merck argues that Dr. Gandy's opinion that Vioxx causes a prothrombotic state is not based on reliable scientific evidence. Dr. Gandy testified that he believes Vioxx causes a prothrombotic state based on the VIGOR results and his opinion that COX-2 inhibitor drugs create an imbalance in the thromboxane and prostacyclin levels in the vasculature. Merck contends that VIGOR does not support Dr. Gandy's opinion and that Dr. Gandy has no scientific support for his assertion that Vioxx causes a prostacyclin/thromboxane imbalance.

Lastly, Merck [**38] argues that Dr. Gandy does not have a scientific basis to opine that