Vioxx caused Mr. Irvin's death. Moreover, Merck argues that Dr. Gandy has no evidence that Vioxx, at the dose and duration used by Mr. Irvin, causes increased cardiovascular risks.

**b. Plaintiff's Position**

The Plaintiff argues that Dr. Gandy is a board certified cardiologist with extensive clinical experience and is eminently qualified to testify regarding the specific cause of Mr. Irvin's death. The Plaintiff asserts that there are hundreds of articles describing the relationship between COX-2 and prostacyclin and that Dr. Gandy is familiar with these articles. Although Dr. Gandy is not an expert pharmacologist, epidemiologist, or biostatistician, the Plaintiff argues that he does not need to be because he is allowed to rely on the opinions of others in formulating his own. The Plaintiff argues that Dr. Gandy does not have to reevaluate the raw data of each study.

**c. Court's Ruling**

Dr. Gandy is a board certified cardiologist. He has a B.S. in Chemistry from the University of Maryland. He has an M.D. from Howard University College of Medicine. He interned and was a resident in Internal Medicine at Emory [**39] University. He held a fellowship at the University of Alabama Birmingham from 1989-1992.

Dr. Gandy is licensed in both Alabama and Georgia. He has held several medical special appointments and is a staff member of several hospitals. He is a fellow of the American College of Cardiology and a member of the American Medical Association, National Medical Association, American Heart Association, Atlanta Medical Association, American Society of Echocardiography, and the American College of Physicians. He has co-authored two publications.

In formulating his opinions, Dr. Gandy relied upon his training, knowledge, and experience as a cardiologist. In addition, Dr. Gandy relied on numerous studies, reports, documents, and emails. In fact, twelve of the nineteen pages of Dr. Gandy's expert report contain a listing of the studies, reports, documents, and emails reviewed by Dr. Gandy.

Regarding Dr. Gandy's qualifications, Merck asserts that Dr. Gandy is not qualified to testify as an expert because he is not a researcher, but rather a cardiologist who specializes in reading echocardiograms. Furthermore, Merck contends that Dr. Gandy did not undertake the necessary research to make himself knowledgeable [**40] enough to testify as an expert witness.

There are several problems with Dr. Gandy's testimony. First, his expert report [*584] is nineteen pages long. The first fifteen pages consist of an introduction, his qualifications, and the materials reviewed by him. The last page and a half consists of his conclusions. As such, there are only two and a half pages of analysis by Dr. Gandy in his expert report. Dr. Gandy's analysis in these pages is wholly conclusive, rather than explanatory. In addition, his deposition testimony is littered with circular reasoning and instances where he is unable to answer certain questions regarding the literature and studies he said he had read.

The Court acknowledges that Dr. Gandy is a cardiologist who is well qualified to testify as an expert regarding Mr. Irvin's cardiac condition at his time of death. The Court, however, is faced with a much tougher decision of whether Dr. Gandy is qualified to testify that Vioxx was a cause of Mr. Irvin's death. Dr. Gandy's deposition as well as his report reveals that Dr. Gandy does not possess a superior understanding of how Vioxx increases cardiovascular risks. Yet, the Court acknowledges that Dr. Gandy did utilize proper [**41] methodology. He reviewed all the proper studies and literature. Although his comprehension of these studies may have been somewhat lacking, he was entitled to and did rely upon experts in the field of pharmacology and epidemiology. As such, the Court finds that his methodology was

proper and that he is qualified to render an opinion on Mr. Irvin's cardiac state based upon his review of the relevant materials. To the extent that Merck asserts that Dr. Gandy does not understand Vioxx and its alleged effects, Merck will be able to attack Dr. Gandy at cross-examination much like it did at his deposition. Accordingly, the jury will be entitled to draw its own conclusions as to how much weight Dr. Gandy's opinion should be afforded. Accordingly, Merck's motion to exclude Dr. Gandy's testimony is denied.

### ii. Wayne A. Ray, Ph.D.

The Plaintiff has designated Professor Ray to opine whether: (1) Vioxx increases the risk of heart attacks and heart disease; (2) if so, the magnitude of that risk; and (3) if there was an increased risk, could it come from a use of Vioxx for less than 30 days.

### a. Merck's Position

First, Merck challenges the data upon which Professor Ray relied upon [**42] to reach his conclusion that short-term use of Vioxx increases cardiovascular risk. Professor Ray claims four lines of evidence support his position: (1) biological plausibility; (2) short-term studies of other COX-2 inhibitors; (3) data from clinical trials of Vioxx for shorter periods of use; and (4) data from epidemiologic studies for shorter periods of time. Merck claims that these four lines of evidence do not support Professor Ray's claims.

As to biological plausibility, Merck claims that Professor Ray relied solely upon the Fitzgerald hypothesis to reach his conclusion that Vioxx causes a greater incidence of cardiovascular events. Merck claims that the Fitzgerald hypothesis is pure speculation. As such, Professor Ray's conclusion is based on unreliable information.

As to short-term studies of other COX-2 inhibitors (celecoxib, lumiracoxib, and valdecoxib/parecoxib), Merck asserts that these studies are unreliable for three reasons. First, Merck claims that Professor Ray's conclusion is based on the unreliable Fitzgerald hypothesis. Second, Merck argues that studies of other COX-2 inhibitors cannot prove causation as to Vioxx because of the differences between the drugs. [**43]

 [*585] As to clinical trials for shorter periods of time, Professor Ray reached his opinion by relying upon Professor Kronmal's re-analysis of Merck's clinical trial data. Merck claims that this re-analysis is unreliable because it was conducted for purposes of this litigation, has not been published, and has not been subject to peer review, and it does not demonstrate that 25 mg of Vioxx can cause thrombotic cardiovascular events during the first month of use.

As to epidemiologic studies, Professor Ray reviewed five studies: Solomon, Johnsen, Kimmel, Graham, and Levesque. Merck claims that all five of these studies are insufficient to support the theory that short-term use of Vioxx can cause an increase in cardiovascular events.

Second, Merck contends that Professor Ray cannot properly opine that Vioxx accelerates atherosclerosis. In reaching this opinion, Merck claims that Professor Ray once again relied on the Fitzgerald hypothesis, which Merck claims is unreliable.

Third, Merck contends that Professor Ray cannot opine on what doctors should prescribe to patients because Professor Ray is unqualified to do so. Professor Ray is not a medical doctor. He cannot prescribe Vioxx. As such, [**44] Merck argues that he is not qualified to opine on the risk-benefit analysis medical doctors make when determining whether to prescribe any medication to a particular patient.

Fourth, Merck argues that Professor Ray may not testify or opine about Mr. Irvin or the specific causation of his death. In support, Merck points out that Professor Ray is not a medical doctor, his expert report is silent on Mr. Irvin, and he even testified that he would

Get a Document by Citation 401 F. Supp. 2d 565
Case 2:05-md-01657-EEF-DEK Document 6387-4 Filed 08/21/06 Page 3 of 16
Page 18 of 31

not offer an analysis of any clinical information as to an individual patient.

Fifth, Merck asserts that Professor Ray may not testify regarding his disapproval of the actions taken by the FDA. Merck contends that Professor Ray is not an expert in FDA regulatory matters and, under Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 350, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001), he is not entitled to supplant the judgment of the FDA in balancing the benefits and risks of drugs from the regulatory perspective.

Sixth, Merck argues that Professor Ray cannot testify as to Merck's alleged failure to meet subjective normative standards. Basically, Merck asserts that Professor Ray's opinion as to what Merck should have done based upon his own subjective standards [**45] of what standards should be followed by a pharmaceutical company is unreliable. In addition, Merck asserts that Professor Ray cannot offer inflammatory characterizations of Merck's failure to follow his subjective standards because, in addition to its inflammatory nature, it is irrelevant since Merck must be judged according to legal standards, not Professor Ray's.

Lastly, Merck contends that Professor Ray should not be allowed to testify as to Merck's state of mind, motive, or perceived bias because Professor Ray has no qualifications or specialized expertise in determining a company's knowledge or state of mind.

### b. Plaintiff's Position

The Plaintiff asserts that Professor Ray's opinions are based on scientifically reliable evidence. There have been numerous studies that have concluded that Vioxx does cause an increase in cardiovascular incidents. Professor Ray has relied on these reports including Merck's VIGOR report. The Plaintiff argues that the reports regarding other drugs are also reliable because they are substantially similar to Vioxx. All the drugs are COX-2 inhibitors; they all are supposed to reduce pain; [*586] they all indicate a greater than normal incidence of cardiovascular [**46] event.

### c. Court's Ruling

Professor Ray is currently a professor of preventive medicine at Vanderbilt University School of Medicine. He is the director of Pharmacoepidemiology and of the Master of Public Health Program. He received a B.S. from the University of Washington, a M.S. from Vanderbilt University, and a Ph.D. from Vanderbilt University.

Professor Ray has carried out pharmacoepidemiologic research for thirty years and is actively involved in the design, execution, and analysis of numerous pharmacoepidemiologic studies. He is a fellow of the International Society for Pharmacoepidemiology. He is the principal investigator for the Vanderbilt Center for Education and Research on Therapeutics and for a Cooperative Agreement with Food and Drug Administration. In these duties, he is continually required to evaluate and design studies that determine whether or not there is evidence that a medication causes an adverse reaction.

Professor Ray has published more than 150 manuscripts in the peer reviewed literature. He also reviews articles for numerous leading medical journals.

As principal investigator for the Cooperative Agreement with the Food and Drug Administration, Professor [**47] Ray regularly meets with officials from the FDA and his work involves rapid identification and confirmation of adverse medication reactions and assessment of appropriateness of medication use.

In particular, Professor Ray has conducted several studies of the gastrointestinal and cardiovascular safety of the NSAIDs and coxibs. These studies have been published in several peer reviewed scientific journals.

Professor Ray's opinions are derived from his education, training, research, experience, expertise, and review of the peer-reviewed medical literature and other publicly available documents concerning the treatment of musculoskeletal disorders, NSAIDs, COX-2 inhibitors, and cardiovascular illness.

First, the Court finds that Professor Ray is adequately qualified to testify as to whether short-term use of Vioxx increases the risk of adverse cardiovascular risks. His career has been based around pharmacoepidemiologic investigations that concern the adverse and beneficial effects of medications. In particular, he has conducted several studies of the gastrointestinal and cardiovascular safety of NSAIDs and COX-2 inhibitors. Moreover, Professor Ray has reviewed the scientifically relevant [**48] literature surrounding Vioxx. Although these studies do not specifically address whether short-term use of Vioxx can cause adverse cardiovascular effects, these studies were not designed to reach these conclusions. Instead, they were designed for alternate purposes; however, a general theme running throughout all these studies was that Vioxx can cause adverse cardiovascular effects. Moreover, Professor Ray points to the raw data of these studies as support for his conclusion. Professor Ray is qualified to make an analogy based upon all these tests that short-term Vioxx use can cause adverse cardiovascular effects. Accordingly, the Court finds that he is qualified to testify as an expert and that he used scientifically reliable methodology in reaching his opinions.

Besides challenging his general opinion that short-term use of Vioxx can increase cardiovascular risks, Merck also challenges several other of Professor Ray's opinions. For the same reasons stated above, Professor Ray is qualified to opine [*587] that Vioxx accelerates atherosclerosis. This opinion is based upon the Fitzgerald hypothesis, which has been supported by numerous articles as well as recognized medical journals. Although [**49] Merck may disagree with the conclusions reached in the Fitzgerald hypothesis and supporting literature, a disagreement does not amount to improper methodology or scientifically unreliable data.

Merck has also challenged whether Professor Ray's is qualified to testify on what doctors should prescribe to patients and on the specific cause of Mr. Irvin's death. The Court finds that Professor Ray may not opine on these issues. He is not a medical doctor. He is not qualified to testify as to the risk-benefit analysis performed by medical doctors. Moreover, he is not qualified to review the clinical information of Mr. Irvin. He is lacking in the necessary training to testify as to what doctors should have done and to what was the specific cause of Mr. Irvin's death.

Additionally, Merck argues that Professor Ray may not testify as to his disapproval of the actions taken by the FDA. Professor Ray is not an expert in FDA regulatory matters. He does not have experience in this field. As such, Rule 702 bars him from testifying as to matters beyond his range of knowledge. The Court points out, however, that *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001), would [**50] not bar a qualified expert from testifying as to their opinion on whether the FDA correctly balanced the benefits and risks of a drug from a regulatory standpoint. In *Buckman,* the Supreme Court found that state law fraud-on-the-FDA claims were preempted by federal law. This holding is completely inapplicable to the issue at hand.

Lastly, Merck challenges Professor Ray's qualifications to testify as to what Merck should have done or as to Merck's state of mind. The Court will reserve ruling on these issues until such time as they are presented at trial. At that time, the Court will have a clearer basis for making its ruling. Accordingly, Merck's motion to exclude Professor Ray's testimony is denied in part and granted in part.

**iii. Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A.**

The Plaintiff has designated Dr. Lucchesi as an expert qualified to testify on a host of topics ranging from medical causation to an array of non-scientific issues such as advertising and drug pricing.

**a. Merck's Position**

First, Merck seeks to exclude Dr. Lucchesi from purporting to address Merck's knowledge and state of mind, whether Merck's development and marketing of Vioxx conformed **[\*\*51]** with Dr. Lucchesi's personal standards, and whether Merck's Vioxx warning in physician prescribing information, patent information, and consumer advertising conformed with Dr. Lucchesi's personal standards.

According to Merck, Dr. Lucchesi is a professor of pharmacology. Merck argues that He is not qualified to address what Merck knew, and he is not qualified to opine on the propriety of Merck's actions with respect to Vioxx. See In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). In addition, Merck alleges that Dr. Lucchesi's knowledge comes from documents provided by Plaintiff's counsel. From these documents, he draws his inferences and conclusions. In effect, Merck asserts that he is usurping the role of the jury.

As far as Merck's failure to meet Dr. Lucchesi's standards goes, Merck asserts that Dr. Lucchesi is not an expert in the **[\*588]** field of drug development, testing, and marketing. Therefore, according to Merck, his personal, subjective views are irrelevant and unreliable. They are not based on objective, empirical, ascertainable, and verifiable bases.

Moreover, Merck contends that Dr. Lucchesi should not be allowed to testify as **[\*\*52]** to the warnings that Vioxx carries or should carry. Merck argues that Dr. Lucchesi is not an expert in the labeling of FDA-regulated drugs. Merck alleges that he is not an expert in the advertising or marketing of prescription medications. Therefore, Merck contends that he should not be allowed to testify as to the adequacy of the warning Vioxx carried. Additionally, according to Merck, this testimony cannot meet the requirement of reliability because Dr. Lucchesi identifies no methodology or standard against which the Court can measure the reliability of his opinion.

Second, Merck claims that Dr. Lucchesi has no scientifically reliable basis to opine on general causation. According to Merck, since Dr. Lucchesi lacked reliable trial and epidemiologic data, he analogized data from animal studies he conducted and a case report written by Dr. Leslie Crofford to conclude that Vioxx causes a higher risk of cardiovascular events. Merck asserts that the animal studies are unreliable and, even if they are reliable, much of Dr. Lucchesi's animal work involved the use of a drug other than Vioxx, making it even more unreliable. Also, Merck asserts that case reports are unreliable because they **[\*\*53]** describe a single individual or a series of individuals who have coincident exposures and diseases. Merck argues that although they can be useful in generating testable hypotheses, case reports cannot establish a cause and effect relationship because case reports cannot for the role chance, bias, or confounding.

Next, Merck argues that Dr. Lucchesi cannot identify the pharmacological mechanism by which Vioxx supposedly has a thrombotic cardiovascular effect. Dr. Lucchesi relies upon the Fitzgerald hypothesis in reaching his conclusions. Merck, once again, claims that the Fitzgerald hypothesis is not proven and is unreliable.

Lastly, Merck argues that Dr. Lucchesi does not have a scientifically reliable basis to opine on specific causation. Merck alleges that Although he received a medical degree in 1964, Dr. Lucchesi is not a licensed physician, has never been a licensed physician, has never treated a patient, and has never been licensed to prescribe medications. Moreover, Merck contends that he has no basis to opine on whether Mr. Irvin died due to any of the alleged mechanisms by which he believes Vioxx can cause or contribute to sudden cardiac death. Merck asserts

that even if [**54] the Fitzgerald hypothesis were correct, Dr. Lucchesi has no basis to testify that Mr. Irvin actually suffered an imbalance of prostacyclin and thromboxane from Vioxx use, or even the degree of prostacyclin inhibition necessary to cause a clinically significant result.

In addition, according to Merck, Dr. Lucchesi cannot testify as to whether Mr. Irvin suffered a plaque rupture because he never looked at the pathology slides and he stipulated that he would not opine about whether Mr. Irvin suffered a plaque rupture. Plus, Merck claims that Dr. Lucchesi cannot testify as to whether Vioxx contributed to the formation of plaque in Mr. Irvin's coronary arteries. At his deposition, Merck contends that Dr. Lucchesi could only highly suspect that Vioxx contributed to plaque formation in Mr. Irvin. Plus, Dr. Lucchesi admitted that he could not rule out other potential causes of Mr. Irvin's death.

### [*589] b. Plaintiff's Position

The Plaintiff first points out and stresses Dr. Lucchesi's outstanding qualifications, including the fact that he has researched and published in the very areas of pharmacology that are at issue in this case. Regarding Dr. Lucchesi's ability to opine on what Merck knew [**55] or should have known, the Plaintiff asserts that few, if any, jurors will be able to understand the meaning and significance of scientific articles or documents like patents and emails between scientists. The Plaintiff contends that Dr. Lucchesi can provide the explanation that the jury will need to understand. In essence, Dr. Lucchesi will act as a translator.

In assessing what Merck knew or should have known, Dr. Lucchesi reviewed a series of emails between Merck employees. He also reviewed patents filed by Merck employees, all of which "describe a method for preventing platelet dependent arterial thrombosis in patients being treated with a COX-2 inhibitor. A reading of the patent indicates that Merck was attempting to develop one or more adjunctive agents to be used in combination with a COX-2 inhibitor to prevent arterial thrombus formation." It is necessary for an expert like Dr. Lucchesi to interpret these complex documents to the jury, according to the Plaintiff.

The Plaintiff further argues that in the same way that it is necessary for Dr. Lucchesi to address what Merck knew or should have known based on the relevant documentation, it is necessary for Dr. Lucchesi to explain [**56] the actions Merck should have taken based on the information evidenced in the documentation. The Plaintiff contends that his testimony is not personal opinion, but valid and reliable testimony about the logical consequences of scientific facts.

Next, the Plaintiff points out that many of the comments which Merck is concerned about are not Dr. Lucchesi's opinions, but comments taken out of context elicited by Merck's counsel.

Regarding Dr. Lucchesi's opinions on causation and his reliance on animal studies and case reports, the Plaintiff asserts that this is reliable, accepted science. First, the Plaintiff asserts that expert testimony does not have to be based on epidemiologic or case studies to prove causation. Second, the Plaintiff points out that the Federal Judicial Center's reference Manual on Scientific Evidence even recognizes that toxicology models based on animal studies may be used to determine adverse effects in humans. Third, the Plaintiff argues that Dr. Lucchesi has based his findings on numerous studies and many of his own studies. Lastly, according to the Plaintiff, all these studies are mutually corroborative.

Regarding mechanism, the Plaintiff asserts that Merck [**57] continues to confuse mechanism with plausibility. Biological plausibility is defined as the consideration of existing knowledge about human biology and disease pathology in order to provide a judgment about the plausibility that an agent causes a disease. The Plaintiff contends Biological plausibility lends further credence to an inference of causation established through epidemiology, animal studies, and other evidence. According to the Plaintiff, there is no need to prove the precise

mechanism by which Vioxx causes cardiovascular events, only that it is plausible. See *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). According to the Plaintiff, it would be unreasonable to conclude that the subject of scientific testimony must be known to a certainty because, in science, there are no certainties.

[*590] Regarding Dr. Lucchesi's lack of experience in practicing medicine, the Plaintiff argues that Dr. Lucchesi is well qualified to testify as to specific causation. The Plaintiff alleges that Dr. Lucchesi will not testify as to what Mr. Irvin actually suffered, but he intends to testify as to what might have happened based on his review of the facts of this case [**58] and his own expertise.

**c. Court's Ruling**

Dr. Lucchesi received a B.S. and a Masters in Pharmacy from St. John's University in New York City. He then received a Ph.D. in Pharmacology and a M.D. from the University of Michigan. He is presently a professor in the University of Michigan's Department of Pharmacology. He has received numerous awards and honors, is a member of many medical organizations, sits on several advisory boards and committees, and has authored and co-authored 390 publications. In reaching his opinions, Dr. Lucchesi reviewed a significant amount of materials. These materials along with his experience, training, and education form the basis for his testimony.

Merck challenges Dr. Lucchesi's testimony for several reasons. First, Merck contends that Dr. Lucchesi cannot testify as to what Merck knew or whether Merck acted properly in developing and marketing Vioxx. The Court reserves ruling on this issue until such time as it is presented at trial. At that time, the Court will have a clearer basis for making its ruling.

Second, Merck asserts that Dr. Lucchesi does not have a scientifically reliable basis to opine on general causation. Merck's assertion is incorrect. [**59] Just like Professor Ray, Dr. Lucchesi based his opinion on a thorough review of the scientific literature. In addition, he drew proper and supported inferences from the studies he reviewed. His opinion is based on reliable, scientific data.

Lastly, Merck asserts that Dr. Lucchesi cannot testify as to the specific cause of Mr. Irvin's death. Merck is correct. Dr. Lucchesi is neither a cardiologist or pathologist. As such, he cannot testify as to what was the specific cause of Mr. Irvin's death. Dr. Lucchesi, however, is not opining as to what specifically caused Mr. Irvin's death. Instead, based on the facts of this case, he is testifying as to what role Vioxx might have played in Mr. Irvin's death. This opinion is based upon his knowledge of Vioxx and his belief that it causes increased risks of cardiovascular events combined with his education as a medical doctor and professional experience. He is qualified to state this opinion, and it is based upon proper methodology.

**iv. Colin M. Bloor, M.D. and Joseph L. Burton, M.D.**

The Plaintiff designated both Dr. Bloor and Burton to testify as experts regarding the alleged role of Vioxx in Mr. Irvin's death.

**a. Merck's Position** [**60]

Merck asserts several reasons why Dr. Burton's opinion should not be admitted. First, Merck contends that Dr. Burton does not have the necessary training and experience to opine on general causation. Merck points out that Dr. Burton is a pathologist who has never done any research on any NSAIDs in general or COX-2 inhibitors in particular. In addition, he has never published anything on sudden cardiac death. He is not a pharmacologist and is relying on plaintiff's other experts to address Vioxx pharmacological mechanisms. He admits he is not an expert in clinical design or statistics and that he is not qualified to analyze and

[*591] interpret clinical and epidemiological data concerning Vioxx.

Next, Merck contends that Dr. Burton's general causation theories are not supported by the scientific literature on which he relied. He admitted that his opinions on Vioxx's causation of cardiovascular events based upon a prostacyclin and thromboxane imbalance are derived only from other experts. In addition, he cannot determine whether this information is correct or not.

Third, Merck asserts that Dr. Burton has no reliable scientific evidence supporting the hypothesized mechanisms by which he believes [**61] Vioxx could cause sudden cardiac death. This assertion is based on the fact that Dr. Burton cannot cite any studies supporting him and he is aware that there are competing views regarding whether Vioxx can cause vasoconstriction.

Fourth, Merck asserts that Dr. Burton does not have reliable scientific evidence to opine on specific causation. As a pathologist, Merck concedes that Dr. Burton may be able to opine that a thrombus formed in Mr. Irvin's artery and that a thrombus led to a sequence of events which resulted in Mr. Irvin's death. This, however, is completely different from Dr. Burton's ability to testify that the thrombus was caused by Mr. Irvin's Vioxx use. Essentially, Dr. Burton's testimony that Vioxx caused Mr. Irvin's death is based completely on the assumption that Vioxx causes an prothrombotic state. He does not have any basis for that conclusion other than the testimony of the Plaintiff's other experts.

Merck makes the same arguments regarding Dr. Bloor.

### b. Plaintiff's Position

The Plaintiff's opposition is similar to that concerning Dr. Gandy. Dr. Burton and Bloor are pathologists. As such, they are not familiar with pharmacology. In reaching their opinions, [**62] however, the doctors do not need to be familiar with every step in the Vioxx process. Instead, they may rely on the expertise of experts in other areas. Here, the doctors have relied on the expertise of the Plaintiff's other experts and formed an opinion based on that review as to what was the cause of Mr. Irvin's death.

### c. Court's Ruling

Both Dr. Bloor and Burton are pathologists. Dr. Bloor received a B.S. from Denison University and a M.D. from Yale University School of Medicine. He has served as professor of pathology at the University of California San Diego for the last thirty-one years. Prior to that, he held various research positions. He is a member of numerous medical organizations, editorial boards, and committees. He has received several honors and awards for his work. He has authored and co-authored 473 publications.

Dr. Burton received a B.A. and a M.D. from Emory University. He is a licensed physician in Georgia. He has served as a medical examiner for over twenty-five years. Currently, he is Chief Medical Examiner, Emeritus for DeKalb County, Georgia, and Senior Consulting Pathologist for Cobb, Gwinnett, and Paulding County, Georgia. He has served in other medical [**63] capacities, has received several special appointments, and is a member of numerous professional associations. In addition, he has presented a vast number of articles at medical conferences. In reaching their opinions, Dr. Bloor and Dr. Burton both reviewed the relevant literature on Vioxx, fourteen expert reports from other designated experts, and Mr. Irvin's medical and autopsy reports.

The crux of Merck's argument to exclude Dr. Bloor's and Dr. Burton's testimony [*592] is that they are not qualified to testify that Vioxx was the cause of Mr. Irvin's death and that their testimony is based on scientifically unreliable evidence. Merck acknowledges that they

are both expert pathologists, but Merck asserts that this, by itself, does not qualify them to testify as to how Vioxx caused Mr. Irvin's death. Merck is somewhat correct. Neither Dr. Bloor nor Dr. Burton have done any research on NSAIDs, published anything on NSAID, or have any pharmacological experience. They have, however, read the relevant materials and have a basic understanding of Vioxx and its hypothesized prothrombotic effects. They are entitled to rely on these materials, which are relevant and reliable, in reaching their own [**64] conclusions just as an orthopaedic surgeon, who is not an expert X-Ray technician and has no knowledge of the mechanics of an X-Ray machine, can rely on an X-Ray to diagnose a broken arm. Essentially, Merck is not attacking their methodology. Instead, Merck is attacking the level of their understanding. This is fodder for cross-examination, not exclusion under *Daubert*. Accordingly, Merck's motion to exclude the testimony of Dr. Bloor and Dr. Burton is denied. The anticipated testimony from these witnesses seems to be repetitive and may be excluded by the Court for this reason.

**v. Thomas Baldwin, M.D.**

The Plaintiff has designated Dr. Baldwin to opine that Mr. Irvin's use of Vioxx for less than 60 days created an increased risk of a sudden cardiac death and that Vioxx caused or substantially contributed to the development of an acute thrombosis which resulted in coronary occlusion, subsequent cardiac ischemia, a clinically evolving acute myocardial infarction, and the sudden death of Mr. Irvin.

**a. Merck's Position**

First, Merck asserts that Dr. Baldwin is not qualified to render opinions on general causation because of his lack of training and experience and his lack [**65] of the requisite study. In regards to experience and training, Dr. Baldwin has little experience with Vioxx. He has never done any research on NSAIDs or COX-2 inhibitors. He has never treated a patient who had taken Vioxx and suffered a thrombotic event. In short, Merck alleges that Dr. Baldwin, in his practice, has never seen a patient like Mr. Irvin--one who took Vioxx and suffered a fatal thrombotic event.

In regards to research, Dr. Baldwin cannot point to any specific piece of literature or data that supports his view that short-term ingestion of Vioxx increases the risk of cardiovascular events. In addition, Merck asserts that the literature which Dr. Baldwin read does not support his position.

Merck also contends that the studies relied on by Dr. Baldwin do not support the hypothesized mechanism by which Vioxx could cause sudden cardiac death. This assertion is based on Merck's challenges concerning the Fitzgerald hypothesis.

Lastly, Merck asserts that Dr. Baldwin has been unable to specifically show that Vioxx, as opposed to atherosclerosis, obesity, or a sedentary lifestyle, caused Mr. Irvin's death. Moreover, Dr. Baldwin does not know specifically how Mr. Irvin's clot [**66] formed and acknowledges that clots can form in the absence of Vioxx. Therefore, Merck claims Dr. Baldwin cannot show that Vioxx caused Mr. Irvin's death to a reasonable degree of medical certainty.

**b. Plaintiff's Position**

Basically, the Plaintiff's position is similar to its defense regarding Dr. Gandy. [*593] The Plaintiff contends that there are countless numbers of articles supporting the position that Vioxx causes an imbalance in the homeostasis between thromboxane and prostacyclin. In addition, the Plaintiff defines Dr. Baldwin's interpretation of this data and ultimate conclusion as biological plausibility. Dr. Baldwin does not have to explain precisely how an agent causes a disease, but instead must only provide a judgment about the plausibility that an agent

causes a disease.

### c. Court's Ruling

Dr. Baldwin received a B.S. from Kansas State University and a M.D. from the University of Kansas School of Medicine. Following his graduation from medical school, Dr. Baldwin interned at and did his residency at the University of Kansas School of Medicine, Internal Medicine. After that, he was a fellow at the University of Kansas School of Medicine, Cardiovascular Medicine. [**67] Since that time, he has been a practicing cardiologist. He is licensed in both Kansas and Missouri, is a diplomat in the American Board of Internal Medicine and the American College of Cardiology, is a member of the American College of Physicians, and is a fellow in the American College of Cardiology. In addition, he has written three publications.

Merck's challenge to Dr. Baldwin is quite similar to its challenge of Dr. Gandy. Like Dr. Gandy, Dr. Baldwin's expert report is quite short and conclusory. It is only twelve pages long. The first seven pages concern his qualifications, background, and materials reviewed. The last five pages consist of a recitation of the facts and seven paragraphs of conclusions. Furthermore, Dr. Baldwin's deposition testimony also reveals his lack of understanding. During repeated points in his deposition testimony, Dr. Baldwin made assertions that certain studies supported his position, but was unable to name or describe the studies he was relying on. At other points in his deposition, Dr. Baldwin admitted that he did not understand how to interpret certain studies.

Similar to Dr. Gandy, however, the Court acknowledges that Dr. Baldwin is a cardiologist [**68] who is qualified to testify as an expert regarding Mr. Irvin's cardiac condition at his time of death. Moreover, Dr. Baldwin did review all the relevant materials and is entitled to rely on pharmacological and epidemiological experts. As such, his methodology was proper. Merck will be allowed to attack Dr. Baldwin's understanding during cross-examination, but will not be able to entirely exclude him based on it.

### vi. Richard M. Kapit, M.D.

Plaintiff has designated Dr. Kapit as an expert to testify that: (1) Merck was not forthcoming with the FDA with respect to the risks of Vioxx; (2) Merck should have changed the label without the FDA's approval; (3) Merck had an ethical or moral obligation to ensure the safety of the medication; (4) Merck was motivated by competition to withhold information regarding the danger of Vioxx; and (5) Merck violated FDA requirements.

### a. Merck's Position

First, Merck contends that Dr. Kapit's testimony regarding the inadequacy of Merck's interactions is preempted by <u>Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 350, 353, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001)</u>.

Second, Merck asserts that Dr. Kapit's testimony is neither scientific nor technical evidence [**69] and, thus, is not admissible under <u>Rule 702</u>. As far as his testimony as to what should have been done, Merck argues that this testimony is unreliable because it is purely speculative, irrelevant to legal [*594] liability, and likely to prejudice the jury. In addition, Merck asserts that this testimony is unreliable because it is based solely on Dr. Kapit's subjective determination of what is ethical or proper or what Merck's state of mind was. This is not proper scientific methodology. In fact, according to Merck, it is not scientific at all.

Third, Merck asserts that Dr. Kapit is not an expert as to Merck's state of mind. Dr. Kapit reached his opinions as to Merck's state of mind by viewing internal Merck documentation.

Merck argues that he is in no better position to evaluate Merck's state of mind based on these documents than a jury would be because this issue requires no special skill.

**b. Plaintiff's Position**

As to the *Buckman* argument, the Plaintiff asserts that *Buckman* is inapplicable because it concerned claims of fraud on the FDA. In this case, the Plaintiff argues that there is no claim of fraud on the FDA, and courts which have addressed *Buckman* have concluded **[\*\*70]** that HN8 evidence relating to a defendant's conduct or representations in the course of FDA proceedings is admissible in support of the plaintiff's state law product liability or tort causes of action. *See, e.g., Globetti v. Sandoz Pharm. Corp.*, 2001 U.S. Dist. LEXIS 2391, 2001 WL 419160 (N.D. Ala. 2001); *Eve v. Sandoz Pharm. Corp.*, 2002 U.S. Dist. LEXIS 23965, 2002 WL 181972 (S.D. Ind. 2002).

Additionally, the Plaintiff asserts that Merck mischaracterizes Dr. Kapit's testimony. The Plaintiff contends that Dr. Kapit's testimony is based upon his experience and knowledge as a FDA regulatory official with the responsibility for interacting with pharmaceutical companies on issues of drug safety. Based upon his experience and federal regulations, Dr. Kapit opined that once the VIGOR results were made known, Merck had an obligation to inform the medical profession of a serious medical question regarding the safety of Vioxx. In addition, based on his experience, Dr. Kapit opined on several other Merck-FDA issues. The Plaintiff argues that these opinions were not based on his purely subjective views, but upon his background, expertise, and knowledge of the regulations governing drug safety.

As far as Merck's state **[\*\*71]** of mind, the Plaintiff contends that Dr. Kapit is not attempting to read the mind of Merck and its employees, but translate to the jury the significance of certain documents and how these documents fit into the complex regulatory scheme which governs the conduct of pharmaceutical companies. The Plaintiff asserts that Mr. Kapit is qualified to testify as to these matters based on his knowledge and expertise of FDA procedures, regulations, and regulatory guidelines as well as his first hand knowledge of a pharmaceutical company's obligations and required disclosures regarding their drugs.

**c. Court's Ruling**

Dr. Kapit received a B.A. from Columbia University and a M.D. from N.Y.U. School of Medicine. He did his residency in Psychiatry at the National Institute of Mental Health, Overholser Division of Training and Research, St. Elizabeth's Hospital, Washington, DC. After that, he worked as a Medical Officer at the Bureau of Forensic Psychiatry, Department of Human Services for five years while also running his own private practice. Following this employment, he spent the next 18 years as a Medical Officer: first within the Division of Neuropharmacological Drug Products, next within **[\*\*72]** the Clinical Trials Bureau, and finally within the Division of Epidemiology, all of which were within the FDA. For the past three years, Dr. Kapit has been the President of MD-Writer, LLC, which does research, **[\*595]** preparation, and composition of medical articles and scientific articles for newspapers, magazines, and other publications as well as consulting on matters related to pharmaceuticals and their adverse effects.

While employed by the FDA, he made recommendations about unapproved and approved pharmaceuticals, about the adequacy of Investigational New Drug Applications and New Drug Applications supporting the approval of pharmaceuticals, about labeling, and about postmarketing surveillance reports related to pharmaceuticals. His recommendations often focused on whether pharmaceuticals were safe for human beings.

The Court finds that Dr. Kapit is qualified to testify as an expert witness in this case. First, as stated in the Court's ruling on Professor Ray, *Buckman* is not applicable to this case or issue at all. Second, just like Dr. Arrowsmith-Lowe's testimony, Dr. Kapit's testimony will help the

jury understand the applicable FDA regulations and Merck's responses. He is more [**73] than qualified to testify on this. Lastly, regarding Merck's state of mind, Dr. Kapit may not testify as to what Merck was thinking. Instead, his testimony should focus on the significance of certain documents and how these documents fit into the FDA's regulatory scheme. If Dr. Kapit attempts to testify at trial as to Merck's state of mind, Merck should raise this objection at that time. Until then, the Court reserves ruling on this issue.

**vii. John W. Farquhar, M.D.**

The Plaintiff has retained Dr. Farquhar, a cardiologist, to offer his opinion that Vioxx causes cardiovascular disease, hypertension, and that the risk of heart attack associated with taking Vioxx begins when the patient first takes Vioxx and continues throughout the period of usage. The Defendants asserts that Dr. Farquhar's opinions on general causation lack a reliable scientific basis and that his opinion regarding the Defendant's state of mind is inadmissable because he is not an expert on this subject and his opinions are irrelevant.

**a. Merck's Position**

First, Merck contends that Dr. Farquhar does not have a reliable scientific basis on which to render an opinion as to whether Vioxx generally causes [**74] an increased risk of thrombotic cardiovascular risk. Specifically, Merck contends that Dr. Farquhar misinterpreted the APPROve trial and the other clinical trials upon which his opinion rests, that the observational studies he reviewed do not supply a reliable scientific basis for his opinions, and that his opinion is inadmissable because he did not offer a scientifically valid explanation for the mechanism by which he contends that the short-term use of Vioxx causes cardiovascular diseases.

Second, Merck contends that Dr. Farquhar cannot testify as to Merck's knowledge or whether Merck acted appropriately. Specifically, Dr. Farquhar is not an expert as to Merck's state of mind. Also, Dr. Farquhar's opinion is based on a review of internal Merck documents and selected deposition testimony. Merck contends that these documents and testimony are not the type of evidence that require expert testimony, and that a jury will be able to understand this evidence without Dr. Farquhar's assistance. Moreover, Merck asserts that Dr. Farquhar's personal opinions as to whether Merck acted appropriately are irrelevant and unreliable.

**b. Plaintiff's Position**

In response, the Plaintiff asserts [**75] that Dr. Farquhar's testimony as to causation is supported by the APPROve study as well as the VIGOR, ADVANTAGE, and the Rheumatoid Arthritis studies. In addition, [*596] the Plaintiff contends that Dr. Farquhar is well qualified to testify as to biologically plausible mechanisms and the results of statistical analyses that he directed. Regarding testimony as to appropriateness, the Plaintiff stipulates that Dr. Farquhar will not testify about the ethics of Merck's conduct. Instead, the Plaintiff argues that he will testify that Merck made unreasonable and unsupported interpretations of its scientific data. The Plaintiff contends that he will not be attacking Merck's business ethics, but will be testifying that Merck departed from the scientific method.

**c. Court's Ruling**

Dr. Farquhar is a Professor Emeritus of Medicine at the Stanford University School of Medicine. He has been a Professor of Medicine since 1973. He was an Assistant Professor from 1962-1966 and an Associate Professor from 1966-1973. He is also a Professor of Health Research and Policy at Stanford. He has held this position since 1978.

Dr. Farquhar received an A.B. in Medicine from the University of California School [**76] of Medicine, Berkeley and an M.D. from the University of California School of Medicine, San

Francisco. He was an intern and resident at U.C. San Francisco, a resident at the University of Minnesota School of Medicine, Minneapolis, and a postdoctoral fellow with the United States Health Service at U.C. San Francisco.

In his career, Dr. Farquhar has received a litany of awards and is a member of numerous medical organizations. His principal areas of research include epidemiology and cardiovascular risk factors. He was the Director of the Preventative Cardiology Clinic, Stanford Medical Center from 1978 to 1996 and has been Co-Director since that time. From 1973 to 1984, he served as the Director, Stanford Heart Disease Prevention Program. He also maintained an active clinical cardiology practice from 1962 to 2001.

Dr. Farquhar has authored or co-authored approximately 200 peer-reviewed articles, predominantly in the fields of epidemiology and cardiovascular risk factors such as cholesterol, hypertension, smoking, and atherosclerosis. He has also co-authored one book and authored another book. Dr. Farquhar based his opinion on his review of the literature pertaining to COX-2 inhibitors **[**77]** and his own training and experience in the fields of epidemiology and cardiology.

Merck challenges Dr. Farquhar on two grounds. First, Merck asserts that Dr. Farquhar's opinion is based on scientifically unreliable information. This assertion is unpersuasive. Dr. Farquhar has reviewed all the relevant literature on Vioxx. The materials he reviewed are the same materials reviewed by Merck's experts. Dr. Farquhar, however, has reached a different conclusion than Merck's experts. **HN9** Differing conclusions are permissible under Rule 702; improper methodology is not. If Dr. Farquhar's reliance on these studies is improper, than the same reliance by Merck's experts is improper. As evidenced by his thorough and explanatory ninety-five page expert report, Dr. Farquhar is qualified and relied on proper methodology.

Second, to the extent that Dr. Farquhar may testify as to Merck's state of mind, the Court reserves ruling on this issue until it is presented at trial. At that time, the Court will have a clearer basis for making its ruling.

**C. Daubert-Like Motions**

**i. Testimony that Adverse Thrombotic Cardiac Events Occur Only if Vioxx is Ingested 18 Months or Longer**

The Plaintiff asserts **[**78]** that the Defendant's position that Vioxx only causes prothrombotic **[*597]** effects if ingested for 18 months or longer is scientifically unreliable because this opinion is based upon a speculative post hoc sub group analysis by Merck from the APPROVe study, flies in the face of the results from Merck's own clinical trials and other epidemiologic studies, and is wholly without any biological plausibility. In opposition, Merck claims that the APPROVe study was reliable, its opinion is supported by its own clinical trials, and its opinion is supported by substantial literature and testing.

This motion concerns the results of the APPROVe study. The Plaintiff has interpreted the data collected by the APPROVe to mean that Vioxx can cause adverse thrombotic cardiovascular events after short-term use. Her position is based on adjudicated data from the study. Merck, however, takes the position that the APPROVe study shows that Vioxx only causes adverse thrombotic cardiovascular events after long-term use. Its position is based on confirmed data.

In essence, both parties are relying on the same test. Both parties agree that the test was conducted properly. The parties are disagreeing as to the conclusions **[**79]** reached by the other parties. **HN10** As a gatekeeper, the Court must evaluate methodology, not conclusions. The proper forum for challenging conclusions is at cross-examination, not in a

*Daubert* motion. Accordingly, the Plaintiff's motion to exclude this testimony is denied.

### ii. Testimony that Vioxx is the Same as All NSAIDs Regarding Cardiotoxic Effects

The Plaintiff asserts that Merck's position that Vioxx is the same as all NSAIDs regarding cardiotoxic effects is scientifically unreliable because it is based on an untested hypothesis; it has not been subjected to peer review or publication; it is impossible to know the rate of error or potential rate of error given its broad-sweeping application to all NSAIDs; there is no indication that it is generally accepted in the relevant scientific community; and there is a huge analytical gap between existing scientific certainty and a hypothetical opinion that Vioxx is like all other NSAIDs, with the exception of naproxen. Merck contends that each of the Plaintiff's arguments is incorrect and that its opinion is scientifically reliable.

Merck's position that Vioxx, based on all the present information, is the same as all NSAIDs regarding **[\*\*80]** cardiotoxic effects is predominantly based on an April 6, 2005 FDA Decision Memorandum reaching this conclusion. In addition, this position is also supported by an analysis presented at Health Canada. The Plaintiff contends that these two materials are scientifically unreliable because they are based on limited, unpublished, and non-peer-reviewed data.

In reaching the conclusions set forth in its April 6, 2005 Decision Memorandum, the FDA' advisory panel reviewed a large body of data. It reviewed an internal review by the FDA's Center for Drug Evaluation and Research of available data regarding the cardiovascular safety issues for COX-2 inhibitors and NSAIDs. In addition, it reviewed the regulatory histories, New Drug Applications, and postmarketing databases of the various NSAIDs. It reviewed FDA and sponsor background documents prepared for the advisory committee meeting. It reviewed all the materials and data submitted by and presentations made by interested parties. Lastly, the FDA Memorandum itself analyzes the results of the numerous clinical trials and epidemiological studies concerning NSAIDs that the advisory committee reviewed in reaching its conclusions. The Court finds **[\*\*81]** that the FDA's conclusions **[\*598]** were reached after a review of scientifically reliable data.

The Plaintiff is primarily challenging the conclusions reached by the FDA. Once again, it is not the Court's task to scrutinize conclusions. The Court is charged with the duty of ensuring proper methodology. Here, the FDA's Decision Memorandum is based on proper methodology. Accordingly, the Plaintiff's motion is denied.

### iii. Testimony that Naproxen is Sufficiently Cardioprotective to Explain Excess Cardiac Risk in VIGOR

The Plaintiff asserts that the Defendant's position that naproxen is sufficiently cardioprotective to explain the excess cardiac risks in the VIGOR study is scientifically unreliable because it has never been tested in a controlled clinical trial, it has never been accepted as scientifically true in a peer reviewed publication; it has an unknown rate of error and/or a high rate of error since it has been proven to the contrary in large epidemiological studies; it has not been generally accepted within the relevant scientific community; and there is an overwhelming analytical gap between the underlying data and the opinion proffered. Merck, however, asserts that its opinion **[\*\*82]** is scientifically reliable.

The Court finds that there is significant, scientifically reliable information supporting Merck's contention that naproxen is sufficiently cardioprotective to explain the VIGOR test results. In reaching this position, Merck relies on a wide array of materials. First, two peer-reviewed studies supported Merck's position. One of the studies was published in 2000 by Merck and the other was published in 2004 by an independent author. Second, several other clinical and basic research studies suggest that naproxen has cardioprotective effects. Moreover, naproxen's own warning label states that it may reduce platelet aggregation and prolong

bleeding. Third, numerous observational epidemiologic studies have detected a statistically significant lower rate of cardiovascular events for patients taking naproxen. Lastly, the results of the TARGET study lend support to Merck's position. TARGET consisted of two sub-trials comparing lumiracoxib, a COX-2 inhibitor, with ibuprofen and naproxen. The results of TARGET revealed significantly less myocardial infarctions and adverse cardiovascular events in the naproxen sub-trial than in the ibuprofen sub-trial. The cumulative **[\*\*83]** effect of all these materials tends to support Merck's position and corroborate the evidence it is relying on. As such, the Court finds that Merck's position is based on scientifically reliable evidence. Accordingly, the Plaintiff's motion is denied.

### iv. Testimony that Merck Could Not Provide Risk Information through Labeling or Marketing Without Prior Approval of the FDA

The Plaintiff asserts that the Defendant's position that it could not provide risk information through labeling or marketing without prior approval of the FDA is factually untrue and legally unsupported. As such, the Plaintiff contends that it is not helpful to the trier of fact and is contrary to what is considered to constitute generally accepted and reliable scientific testimony. Merck argues that FDA regulations and its past interactions with the FDA support its position that it could not change its label without prior FDA approval.

The Plaintiff argues that under the applicable FDA regulations and guidelines Merck had authority to strengthen its **[\*599]** warning label at any time. Merck contends that it did not have this authority. This disagreement stems from the classification of the label change. If the Vioxx **[\*\*84]** label change is classified as "moderate" under the applicable guidelines, then the Plaintiff is correct. If the Vioxx label change is classified as "major" under the applicable guidelines, then Merck is correct. Merck is seeking to introduce evidence that the Vioxx label change was major and, as such, it could not make the label change without prior FDA approval. The Court finds that there is nothing false or legally unsupportable concerning Merck's position. Accordingly, the Plaintiff's motion is denied.

### v. Testimony of Plaintiff's Experts Regarding Causation

Merck has moved to exclude the testimony of the Plaintiff's experts to as whether Vioxx 25 mg causes an increased risk of thrombotic cardiovascular events because this testimony is based on scientifically unreliable evidence. In addition, the Defendant has moved to exclude any expert testimony as to whether Mr. Irvin's ingestion of Vioxx caused his death because it is based on scientifically unreliable evidence.

The Plaintiff contends that there is more than enough scientific literature and data to support the position that Vioxx taken at 25 mg doses increases the risk of thrombotic cardiovascular events.

There have **[\*\*85]** been at least several clinical trials and observational studies which reveal that Vioxx can increase the risk of cardiac incidents. The issue, at least in this case, is temporal. Merck points out that no randomized, blind trials with a placebo counterpoint have specifically concluded that Vioxx can cause cardiac incidents within the first month of consumption. The Plaintiff argues that that was not the objective or goal set for these studies. So, it is not surprising.

The Plaintiff, however, points out that the raw data from these studies shows that the cardiac incidents, including sudden death, occurred within the first month. She also points to a significant number of peer reviewed articles and observational studies which appear in credible and well recognized medical publications and support her conclusion.

In essence, both the Plaintiff and Merck rely on the same material. They simply interpret it differently and reach contrary conclusions. The Court's role as gate-keeper is to scrutinize the

methodology, not the conclusions. Accordingly, Merck's motion is denied.

## IV. CONCLUSION

For the foregoing reasons, the Court rules that: (1) the Plaintiff's Motion to Exclude [**86] the Testimony of Dr. Thomas Wheeler is Denied; (2) the Plaintiff's Motion to Exclude the Testimony of Dr. Janet Arrowsmith-Lowe is Denied; (3) the Plaintiff's Motion to Exclude the Testimony of Doctors Frank Lanza and Merlin Wilson is Denied; (4) the Plaintiff's Motion to Exclude the Testimony of Dr. David Silver is Denied; (5) the Plaintiff's Motion to Exclude Testimony that Adverse Thrombotic Cardiac Events Occur Only if Vioxx is Ingested 18 Months or Longer is Denied; (6) the Plaintiff's Motion to Exclude Testimony that Vioxx is the Same as All NSAIDs Regarding Cardiotoxic Effects is Denied; (7) the Plaintiff's Motion to Exclude Testimony that Naproxen is Sufficiently Cardioprotective to Explain the Excess Cardiac Risk in VIGOR is Denied; (8) the Plaintiff's Motion to Exclude Testimony that Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the FDA is Denied; (9) Merck's Motion to [*600] Exclude the Testimony of Winston Gandy, Jr., M.D. is Denied; (10) Merck's Motion to Exclude the Testimony of Wayne A. Ray, Ph.D. is Granted in Part and Denied in Part; (11) Merck's Motion to Exclude the Testimony of Benedict Lucchesi, M.D., Ph.D., M.S., F. [**87] A.H.A. is Denied; (12) Merck's Motion to Exclude the Testimony of Colin M. Bloor, M.D., and Joseph L. Burton, M.D. is Denied; (13) Merck's Motion to Exclude the Testimony of Thomas Baldwin, M.D. is Denied; (14) Merck's Motion to Exclude the Testimony of John W. Farquhar, M.D. is Denied; (15) Merck's Motion to Exclude the Testimony of Richard M. Kapit, M.D. is Denied; and (16) Merck's Motion to Exclude Evidence of the Plaintiff's Experts Regarding Causation is Denied.

New Orleans, Louisiana, this 18th day of November, 2005.

Eldon E. Fallon

UNITED STATES DISTRICT JUDGE

Service: **Get by LEXSEE®**
Citation: **401 F. Supp. 2d 565**
View: Full
Date/Time: Sunday, August 20, 2006 - 2:30 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs With Analysis Available
- Citation information available
* Click on any Shepard's signal to Shepardize® that case



About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.