**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re: VIOXX PRODUCTS LIABILITY LITIGATION** | **MDL No. 1657**<br><br>**Section L**<br><br>**Judge Eldon E. Fallon**<br><br>**Magistrate Judge Daniel E. Knowles, III** |

**THIS DOCUMENT RELATES TO:**
*Robert G. Smith v. Merck & Co., Inc.*, **Case No. 2:05-CV-04379**

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF RICHARD A. KRONMAL, PH.D.**

---

*(Defendant's Expert Challenge No.3)*

**TO THE HONORABLE JUDGE OF SAID COURT:**

In an attempt to summarily exclude the opinion offered by clinical trials expert Richard A. Kronmal, Ph.D., Defendant Merck & Co., Inc. ("Merck") resorts to gross mischaracterizations of the statements, opinions, and conclusions offered in his expert report, deposition testimony, and prior trial testimony. In so doing, Merck fails to acknowledge the comprehensive analysis of the Vioxx clinical trial program performed by Dr. Kronmal, a biostatistician with 40 years experience designing, conducting, overseeing, and analyzing randomized controlled clinical trials and epidemiological studies.

Merck likewise fails to note that Dr. Kronmal employed precisely the same methodology and statistical analysis in his analysis of Merck's clinical trials that he has used in his day-to-day evaluation of drugs and disease for the NIH, FDA, and the pharmaceutical industry, including as member or Chairman of numerous Data Safety Monitoring Boards for trials sponsored by such

groups. It is therefore of little surprise that the methodology underlying the statistical analyses conducted by Dr. Kronmal is widely recognized by courts and the scientific community as sound, reliable, and capable of providing strong evidence of causation. Dr. Kronmal's analysis of the Vioxx clinical trial program has done just that here.

Foregoing any challenge to the comprehensive statistical analyses of the safety of Vioxx set forth in Dr. Kronmal's April 2006 report or his May 2006 addendum, Merck resorts to cherry picking select snippets of testimony in an effort to characterize his opinions and conclusions as impermissible testimony concerning ethics, intent, and moral judgements on Merck's conduct. The witness has proffered nothing of the sort. Rather, the isolated excerpts highlighted by Merck are those where, in the context of his own training and experience, Dr. Kronmal had concluded that certain of Merck's actions with respect to their clinical trials have been inconsistent with widely recognized industry guidelines and practice. Such opinions are properly the provenance of an expert with 40 years experience in the field of clinical trials.

In light of the foregoing and as described more fully below, Defendant's motion should be denied in its entirety.

## I.   PERTINENT BACKGROUND

### A. Qualifications

Richard A. Kronmal, Ph.D. currently serving as Professor of Biostatistics and Statistics at the University of Washington. He received his Ph.D. in boistatistics in 1964 and has received multiple awards. During the course of this 40 years career, he has focused largely on cardiovascular disease. Dr. Kronmal has designed, conducted, and analyzed numerous clinical trials. He has also served on numerous Data Safety Monitoring Boards ("DSMB"), which ensure the safety of patients

in clinical trials. He currently chairs the DSMB's for two different clinical trials. He consults, and has consulted, on numerous industry studies conducted by various corporations and governmental organizations, such as NIH and NHBLI. He has authored or co-authored over 200 peer-reviewed articles, and has reviewed medical research articles for many journals. Additionally, he has been an Associate Editor and member of the Editorial Advisory Board for several medical and scientific journals. He has previously been a member of the Epidemiology and Disease Control Study Section of the NIH and was a member of the FDA Advisory Committee on Cardiovascular and Renal Diseases. *See* Exhibit A at 1-2 and Curriculum Vitae (2006 Report of Richard A. Kronmal, Ph.D.).

While Dr. Kronmal is a recognized expert in clinical trials, he has been qualified previously as an expert concerning Vioxx clinical trial and safety issues, in particular in the New Jersey Vioxx Litigation and has testified at the trial of *Humeston v. Merck & Co., Inc.,* presided over by Honorable Carol E. Higbee.

### B. Opinions Proffered by Dr. Kronmal

Plaintiff requested Dr. Kronmal to review Merck's clinical trial data and, using generally accepted statistical methods, determine whether there was statistical evidence of cardiovascular risk associated with Vioxx. *See* Exhibit A at 2. Additionally, Dr. Kronmal was asked to consider, from a statistical perspective, whether the Vioxx label accurately reflected the cardiovascular risks reflected in the clinical trial data for the drug. *Id.* at 3. Dr. Kronmal reached his opinions based upon his analysis and review of clinical trial data for Vioxx, Merck's own analyses and internal documents, scientific and medical literature, and his own experience and expertise. *Id.* at 3.

### 1. Cardiovascular Risk in Merck Clinical Trials

Dr. Konmal's analysis of Merck's clinical trials for Vioxx revealed, *inter alia*:

- Merck's Vioxx Gastrointestinal Outcomes Research Study (VIGOR) demonstrated a statistically significant five-fold increase for myocardial infarction in patients taking Vioxx as compared to naproxen. *Id.* at 5-6.

- In the VIGOR study, patients taking Vioxx were twice as likely to develop congestive heart failure than patients taking naproxen (the p-value for this finding was just shy of statistical significance). There was, however, a statistically significant [three] times increased risk of serious congestive heart failure for Vioxx as compared to naproxen. *Id.* at 7.

- Patients in the VIOGOR study experienced a statistically significant increase in incidence of hypertension for those patients taking Vioxx as compared to naproxen. *Id.* at 10.

- A pooled-analysis of Merck's osteoarthritis (OA), rheumatoid arthritis (RA), Alzheimer's, and Low Back Pain trials—using the data filed generated for Merck's 2001 pooled analysis—reveal a statistically significant, more than doubling of the risk of myocardial infarction for arthritis patients taking Vioxx as compared to placebo or other NSAID. *Id.* at 15-17.

- Merck's own analyses of its Alzheimer's trials, protocols 078 and 091, demonstrated a statistically significant, nearly three-fold risk of death for patients taking Vioxx as compared to placebo. Typically, such data would result in the data-safety monitoring board ("DSMB") terminating the trial; however, Merck had no DSMB in place for these trials. Although study 091 had already been completed at the time of these analyses, Merck allowed study 078 to continue for approximately 2 years after learning these results. *Id. at* 19-22; Exhibit C at 1-3 (May 23, 2006 Supplemental Report of Richard A. Kronmal, Ph.D.)

- An analysis of the incidence of myocardial infarction and sudden cardiac death in the Alzheimer's trials, protocol 078 and 091, demonstrated a statistically significant, near doubling (1.89) of risk for patients taking Vioxx as compared to placebo. *See* Exhibit A at 25.

- Merck's APPROVe study demonstrated a statistically significant, doubling of risk for myocardial infarction and hard CHD (Myocardial infarction and sudden cardiac death). There was no statistically significant evidence that the hazard was any different for patients in this trial during the first 18 months as compared to the last 18 months. *Id.* at 33-36.

4

- Merck had planned, but never conducted, a pooled analyses of data from the APPROVe, VICTOR, and VIP clinical trials. Analysis of the data files produced by Merck from these three studies revealed a statistically significant more than doubling of the risk for myocardial infarction and hard CHD for those patients taking Vioxx as compared to placebo. *Id.* at 36-39.

- A pooled analysis of all of the studies described above reveal a statistically significant two-fold risk of myocardial infarction for users of Vioxx as compared to placebo and other NSAIDs. *Id.* at 40.

   **2. Merck's Disclosure of Safety Data to Regulatory Authorities, the Medical Community, and Patients**

Dr. Kronmal similarly reviewed Merck's closure to the medical community and regulatory authorities of the statistical results from the Vioxx trials and opined as to whether the reporting of the safety risk of Vioxx was consistent with the underlying data itself. That review revealed, *inter alia*:

- The manner in which cardiovascular safety was reported in the published article discussing the VIGOR results was atypical of the manner in which clinical trial results are reported. *Id.* at 10-11.

- The Vioxx label in place from after VIGOR until April 2002 did not contain any reference to the statistical evidence of the marked increase risk of myocardial infarction for Vioxx users. *Id.* at 41.

- The Vioxx label in place from April 2002 from the time of withdrawal contained only select clinical trial data that understated the consistent and statistically significant findings demonstrating an increased risk of myocardial infarction for Vioxx users. *Id.* at 42.

- Merck's continuance of the 078 trial without reporting these findings to the patients participating in the trial or the independent review board charged with insuring patient safety sharply deviated from accepted clinical practice. *Id.* at 22; Exhibit C at 2.

- Merck disclosure of mortality incidence to the FDA was incomplete, atypical, and internally inconsistent. *See* Exhibit A at 23-24.

Dr. Kronmal consistently found a statistically significant, doubling or near-doubling of risk for Vioxx users of severe cardiovascular events or death. His analysis relied on Merck data files produced by Defendant. Further, Dr. Kronmal concludes that the cardiovascular risks reflected in Merck's clinical trials of Vioxx were not accurately and/or fully disclosed in the product labeling.

### 3. Opinions Concerning the Follow-Up APPROVe Data

On May 23, 2006, Dr. Kronmal provided a supplemental report regarding additional information concerning the Alzheimer's studies and his preliminary analysis of APPROVe follow-up data that had been produced by Merck. *See* Exhibit C.

Previous analyses of the APPROVe data have been an important component of Merck's defense in this litigation, as it contends that the APPROVe study did not show an association with an increased risk for cardiovascular events prior to 18 months of continuous use. *See* Exhibit E at 2878-79 (03/24/2006 Tr., *Cona/McDarby v. Merck & Co., Inc.*) (testimony of Alise Reicin). Although the respecified analysis plan for the APPROVe data did not call for a separate analysis of cardiovascular events occurring in the 0-18 month and 19-36 month time periods, Merck asserted that this *post-hoc* analysis is valid because a statistical test to measure whether the risk in the two time periods was non-proportional was statistically significant (meaning, the risk of suffering a serious cardiovascular event on Vioxx over the entire study period was great in the second 18 month period than in the first. *See* Robert S. Bresalier, et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial,* N. Engl. Med. 2005: 352 at 5 (Exhibit F).

After reviewing Merck's regulatory submissions to the FDA on the APPROVe follow-up data and conducting an analysis of the underlying SAS files initially produced by Merck earlier in

May, 2006, Dr. Kronmal concluded that:

- When the same nonproportionality analysis conducted by Merck was revised to include the APPROVe follow-up data, the results were no longer statistically significant. In short, there was no evidence that the relative risk of cardiovascular events with Vioxx increased or decreased over time. Therefore, Merck's 18-month hypothesis was not supportable under generally accepted statistical analysis. *See* Exhibit C at 3-5.

Additionally, based on the data provided to him by Merck, Dr. Kronmal also concluded that the APPROVe study demonstrated an increased risk of cardiovascular events after the patient stopped taking the drug. This implied that the drug might result in damage to the body that persisted over time. *Id.* at 5.[1]

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993). In *Daubert,* the Supreme Court held that trial courts should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id.* at 589.

Scientific testimony is reliable where "the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93.

---

[1] Dr. Kronmal's findings in this regard are dependent on the accuracy and completeness of the SAS datasets and program/analysis file that Merck produced to Plaintiff prior to the preparation of his May 23, 2006 supplement. Regrettably, Merck produced none of the program files for the APPROVe extension trial until Dr. Kronmal's supplement was submitted. In fact, these materials were first provided after his deposition. Exhibit H (June 19, 2006 Letter enclosing SAS programs). Moreover, even the complete datasets that were used by Merck to generate its regulatory submission to FDA on May 10, 2006 were produced after Dr. Kronmal prepared his supplement. *Id.* Exhibit D (May 24, 2006 letter providing SAS files and regulatory filings related to the APPROVe follow-up data). Despite the fact that Dr. Kronmal had not had the opportunity to review the updated data prior to his June 7, 2006 deposition, defense counsel repeatedly accused Dr. Kronmal of making mistakes and of being "sloppy" in his analysis. *Id.,* Exhibit G at 54-72. Dr. Kronmal is presently analyzing the underlying SAS files for the May 26, 2006 APPROVe follow-up report to determine the impact, if any, the complete and updated data files have on his analysis. While Dr. Kronmal did acknowledge that he had made a transcription error in copying a value from one of the tables, that error had no impact on his conclusions. *Id.* at 53-54.

The Fifth Circuit rules on *Daubert*, as a starting point in its analysis of expert testimony:

> The landmark case *Daubert v. Merrell Dow Pharmaceuticals, Inc.* provided the analytic framework regarding the admissibility of expert and scientific testimony. The district court's chief role when determining the admissibility of expert testimony under *Daubert* is that of a "gate-keeper." As such, the district court makes a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts at issue." Many factors may bear on this inquiry, for example, whether it has received general acceptance. This so-called "gatekeeping" obligation applies to all types of expert testimony, not just "scientific" testimony. But whether *Daubert's* suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony. It is a fact-specific inquiry. The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Seatrax, Inc. v. Sonbeck Int'l. Inc.,* 200 F.3d.358, 371-72 (5th Cir. 2000) (finding the proffered expert testimony inadmissible because the expert did not have any formal or professional accounting training and was going to testify in a complex case involving trademark infringement) (citation omitted); *See also Allen v. Penn. Engineering Corp.,* 102 F.3d 194, 196 (5th Cir. 1996) ("[A] trial court has a duty to screen expert testimony for both its relevance and reliability. An expert's opinion must have a 'reliable basis in the knowledge and experience of his discipline.' Specifically, the court must determine that the reasoning and methodology underlying the testimony is scientifically valid and that the reasoning and methodology can properly be applied to the facts in issue.") (citation omitted).

Courts in the Fifth Circuit typically begin their analysis of an expert's testimony by analyzing the factors set forth in *Daubert*, which include "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has known

8

or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Burleson v. Texas Dept. of Criminal Justice,* 393 F.3d 577, 584 (5th Cir. 2004) (citation omitted). Although the *Daubert* factors may be the starting point, "as the Supreme Court noted in *Kumho Tire,* 'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' It is a fact-specific inquiry." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 245 (5th Cir. 2002).

When determining the admissibility of expert testimony, "the district court should approach its task 'with proper deference to the jury's role as the arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land,* 80 F. 3d 1074, 1077 (5th Cir. 1996) (citation omitted).

The court must also "determine whether the expert opinion is relevant, in that it sufficiently relates to the facts in issue so that it will assist the trier of fact in resolving the factual disputes. In this regard, Rule 702 requires a valid scientific connection to the relevant inquiry as a precondition to admissibility." *Chambers v. Exxon Corp.,* 81 F. Supp. 2d 661, 633 (M.D. La. 2000) (internal citation omitted). Louisiana District Court cases have also noted that "rather than preventing less than 'generally accepted' evidence to be adduced, [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *McClain,* 1995 WL 2272, at *2. In satisfying its "gatekeeper" duty, the Court will look at the qualifications of the experts and the methodology

used in reaching their opinions and not attempt to determine the accuracy of the conclusion reached by the expert. The validity or correctness of the conclusions is for the fact finder to determine.

## II.     DR. KRONMAL MAY TESTIFY AS TO GENERAL CAUSATION

Dr. Kronmal is a clinical trial expert and biostastician who has worked on FDA Advisory Committees and with the NIH, as well as numerous pharmaceutical corporations to evaluate drug safety data particularly with respect to cardiovascular safety. *See supra* at 2-3. Dr. Kronmal has also been a member of approximately 25 DSMBs, groups of independent consultants who monitor patient safety and assess the risks of drugs during clinical trials. *See* Exhibit B (09/22/205 Tr. at 30-34). As Dr. Kronmal has testified,

> I'm involved in the management, design and analysis of medical studies. I dedicate myself to trying to evaluate the results of medical research. And I help design the studies, and I help carry them out, and then I help—and do a lot of analysis of the studies... [M]y primary emphasis in my career has been in cardiovascular disease. For most of the 40 years that I've been involved in medical research, it's been in heart disease and stroke.

*Id.* at 5-8. Similarly, as noted by Dr. Kronmal in his report, his career has focused on the use of statistics in evaluating data in clinical trials and epidemiological studies. (Exhibit A at 1.)

As a biostatistician, Dr. Kronmal employs statistical analyses to determine whether the observed effects of a drug in a clinical trial are "real effects" or "due to chance." (Exhibit B (09/22/2005 Tr. at 6).) The causal relationship drawn from clinical trial data are distinct from the use of epidemiological tools, where typically, only inferences are drawn from observational data concerning large populations of people. Rather, as a biostatistician, he reviews and performs statistical analyses of the results of controlled clinical trials designed to assess the safety and efficacy of the agent at issue. *Id.* at 20-30. Data from controlled, randomized clinical trials provides the strongest form of evidence of causation. *Id.*

Indeed, in serving on approximately 25 data safety monitoring boards and as a consultant to the FDA, NIH and the pharmaceutical industry, Dr. Kronmal has routinely employed such methods to assess drug safety. *See* Exhibit D at 30-34. Moreover, as evidenced by his numerous publications in peer-reviewed journals, analyses such as those performed by Dr. Kronmal to evaluate safety and efficacy of pharmaceutical agents are widely-recognized as reliable, scientific data of an agent's effects.

Analysis and interpretation of the effects of an agent in a clinical trial is the business of biostatistics. As the court has seen in the Vioxx trials over which it has presided, the assessment of the increased cardiac risk of Vioxx has centered on the statistical analysis of Merck's clinical trials for the drug and whether those results are "real" or due to chance. The terms deployed by Merck witnesses and Plaintiff's experts confirm that reality, *e.g.,* p-values, statistical significance, relative risks, Kaplan-Meier curves, non-proportional hazards, log-time and linear-time non-proportional hazard tests, meta-analyses, homogeneity, hetergeneity, etc. Merck is hard pressed to identify an expert better qualified to interpret the findings from Merck's clinical trials than a clinical trials and biostatistical expert.

As described more fully *supra* and in his report, Dr. Kronmal has performed statistical analyses on several of Merck's clinical trials—and on all trials combined—and found a statistically significant, greater than doubling of the relative risks for certain cardiac events and, in certain trials, mortality. In the context of even epidemiological studies, such an increased risk is sufficient to prove general causation. *See Pick v. American Med. Systems, Inc.* 958 F. Supp. 1151 (E.D. La. 1997) (citing *Brock v. Merrell Dow Pharmaceutical, Inc.* 874 F.2d 307 (5th Cir. 1989)). As the *Pick* Court noted, "[e]pidemiological studies assess general causation via statistical probability,

11

comparing the incidence of a particular disease in people exposed to a particular substance as opposed to people not so exposed." *Pick,* 958 F. Supp. at 1158. "A relative risk *greater* than 2.0 means that the disease more likely than not was caused by the event." *Id.* at 1160.[2] In the context of biostatistics and the analysis of data from randomized controlled clinical trials, which Merck itself concedes are the gold standard for evaluating an agent's effect, this result is even more compelling evidence of causation.

Merck now argues that Dr. Kronmal should not be permitted to testify as to general causation because statistical analyses alone are insufficient. It premises this argument on additional considerations typically applied in the field of epidemiology when attempting to draw conclusion from *epidemiologic studies.* Def. Brief at 5 (discussing application of Bradford Hill factors). While it may be appropriate to rely on additional considerations when looking at data from uncontrolled, observational studies in large populations, such considerations are not required to draw conclusions from data from randomized, controlled clinical trials.

For instance, Merck argues that Dr. Kronmal should not be permitted to testify that Vioxx causes a greater incidence of hypertension because he has not identified biologically plausible mechanism by which Vioxx could cause high blood pressure. Ironically, there is no dispute that Vioxx, as well as other NSAIDs, cause increases in blood pressure—it has been a warning in Merck's label for Vioxx since the drug was first marketed. *See* Exhibit I at *Warnings* (1999 VIOXX Labels). Implicit in Merck's argument is the suggestion that Dr. Kronmal is somehow not familiar with the biologic mechanisms by which Vioxx might cause cardiovascular events. This suggestion

---

[2]Notably, the *Pick* Court stated that where the increased risk was less than 2.0, that study alone might be insufficient to establish causation but would be admissible. *Id.*

is disingenuous.  This scientific literature considered by Dr. Kronmal in forming this opinions contains full discussions of the drug's mechanism of action.  *See, e.g.,* Exhibit A at Reliance Materials (citing Antman, *et al.*, *Cyclooxygenase Inhibition and Cardiovascular Risk,* Circulation 2005; 112:759-770) (discussing what is widely referred to as the "Fitzgerald hypothesis," as well as other potential mechanisms of harm) (copy of the article is annexed to Exhibit J).  Indeed, as this Court has observed, the Fitzgerald hypothesis "has been supported by numerous articles as well as recognized medical journals." (Exhibit K at 32 (Order & Reasons, *Plunkett v. Merck & Co., Inc.,* 05-4046 (Nov. 18, 2005)) (denying Merck's motion to exclude opinions by Dr. Ray).

Regardless of the mechanism, Dr. Kronmal's analyses revealed a statistically significant, more that doubling of the risk of myocardial infarction and other serious adverse cardiovascular events for patients taking Vioxx.  As demonstrated above, such data is sufficient evidence of causation and may be presented to the jury.  *See Pick,* 958 F. Supp. at 1160.[3]  Accordingly, Merck's

---

[3]Following Dr. Kronmal's testimony in the *Humeston* trial, Merck sought to have his testimony stricken as unreliable.  Judge Higbee found that
> [Dr. Kronmal] is clearly well-qualified to testify as a biostatistician.  He clearly devoted his life to being trained and experienced in doing clinical studies and doing statistical analysis of such studies...He approached it from a statistical point of view of what the studies that had been done and what Merck said the statistics showed was not what the statistics actually showed, and that, in fact, their studies were not properly reported, and that, in fact, their own data showed that there was effects that they disputed.  His testimony certainly can be challenged by the defense as far as whether the jury should believe or not his final opinions, but the Court finds that his approach was certainly scientifically valid.

Exhibit L at 2587-88 (*Humeston* Tr. 09/29/2005).

motion to exclude Dr. Kronmal's causation opinions should be denied.[4]

## III. DR. KRONMAL IS NOT OFFERING OPINIONS CONCERNING ETHICS, INTENT OF LEGAL OBLIGATIONS

Dr. Kronmal also proffers that Merck's design and maintenance of several clinical trials deviated from accepted clinical practice and/or guidelines to which Merck purports to abide. As noted above, Dr. Kronmal has vast experience in the design, analyses, and safety monitoring practices for clinical trials. Certainly, it is within the realm of his expertise to opine as to instances where Merck's conduct deviated from typical and reasonable scientific practice. While Merck seeks to characterize these opinions as subjective commentary on its ethics and legal obligations, a review of Dr. Kronmal's report and testimony demonstrate that this is simply not the case. Furthermore, even were it the case that Dr. Kronmal's opinion overlapped with a legal conclusion, such testimony is permissible. *See Northrop Architectural Sys. v. Lupton Mfg. Co.,* 437 F.2d 889, 891 (9th Cir. 1971) ("The rule of evidence that an expert may express an opinion on a subject even though the opinion embraces an ultimate issue to be decided by the trier of the facts, has long be recognized.").

For example, as Dr. Kronmal has observed internal statistical analysis conducted by Merck in April 2001 on its Alzheimer's studies, revealed a statistically significant, near tripling of death

---

[4]Merck also argues that Dr. Kronmal should not be permitted to base causation opinions on statistically insignificant data. He doesn't and has explicitly stated in the testimony cited by Merck, Dr. Kronmal believes it is inappropriate to do so. However, where several studies demonstrate a statistically significant doubling of cardiac risk, Dr. Kronmal should also be permitted to discuss increased occurrence of events in specific studies. While statistically insignificant data alone cannot form the basis of a causation opinion, it is not inadmissible testimony. *See, e.g., Pick,* 958 F. Supp. at 1160 ("Evidence is admissible, however, if it has any tendency" to prove or disprove a fact of consequence in the case. FED. R. EVID. 401."). Indeed, Defendant has repeatedly highlighted at trial non-significant data from clinical trials that were not designed nor powered to detect increased cardiovascular risk of Vioxx. From the absence of effect seen in these underpowered studies, Merck has proffered the scientifically unfounded conclusion to the *Irvin I* and *II* juries that there is no risk of cardiovascular events on Vioxx. It seems plain that if Merck's witnesses are permitted to discuss the importance of non-significant findings, Plaintiff's witnesses should be accorded the same opportunity.

14

for patients taking Vioxx, as compared to placebo. *See supra* at 4. Dr. Kronmal has served on approximately 25 DSMBs charged with assessing and monitoring patient safety in clinical trials. His opinion that such data would typically result in the termination of the study by the DSMB is well within his expertise and is not a conclusion regarding Merck's ethics.[5] Merck also complains that Dr. Kronmal's opinion that Merck violated widely-recognized standards of patient safety is a "legal conclusion." Those guidelines, with which Merck claims compliance, provide that clinical trial participants must be made aware of any *significant* new information that may affect their willingness to continue to participate in the trial. *See* Exhibit N (Merck webpage discussing its clinical trial practices and its conformity with the Declaration of Helsinki); Exhibit C at 2. Dr. Kronmal's opinion that Merck's failure to tell participating patients and the Institutional Review Boards ("IRBs") responsible for them about the increase risk of mortality was inconsistent with, or violated, these guidelines, and that this failure permitted the trial to continue and the risk to remain undisclosed.[6] This opinion is formed within the context of his vast experience in designing and monitoring clinical trials for government agencies and the pharmaceutical industry. While Merck may disagree with Dr. Kronmal, this disagreement is not a proper basis for excluding testimony well within his expertise.

---

[5]Merck raised similar objections to his testimony in the *Humeston* trial. As noted by the Court, "[T]hat testimony doesn't really cross the line into ethics. He is a biostatistician. He was testifying to what people should do in relation to clinical trials and statistical evidence." Exhibit M at 2993-94 (*Humeston* Tr. 10/03/2005).

[6]The timing of this non-disclosure in April 2001 is critical. During this period, Merck was in negotiations with FDA over a revised label for Vioxx. The termination of the remaining Alzheimer's trial (078) for safety concerns either by Merck or its IRBs, or following patient withdrawals—would have confirmed the safety risk of Vioxx seen in the VIGOR trial and effectively ended the marketed life of the drug.

15

Similarly, Dr. Kronmal opines that Merck's presentation and disclosure of clinical trial results in published articles was incomplete and/or atypical of how such data is generally presented. It is unclear to Plaintiff why Merck maintains that this is commentary on Merck's ethics. Rather it is an opinion offered in the context of Dr. Kronmal's conclusions from his review of Vioxx clinical trial data and his experience as an author of more than 200 medical and scientific articles. Additionally, Dr. Kronmal has been a reviewer for numerous articles and has served on the editorial board of several prestigious journals.

Merck also complains that Dr. Kronmal may not testify as to Merck's state of mind. Dr. Kronmal has not offered opinion concerning Merck's intent. He can and does, however, offer opinions based upon his review of Merck's internal documents, about what information was available to Merck at certain time periods, what specific analysis conducted by Merck revealed, and whether such information should have been disclosed to the medical community and to the public.

While Defendant seeks to characterize this as testimony that Merck "attempted to conceal scientific data," it is nothing of the sort. Rather, it is his expert review of the scientific accuracy of Merck's disclosures to the medical and scientific communities of the critical safety data for Vioxx at various points in time. Having reviewed the internal study data for Vioxx, Dr. Kronmal is competent to address that important issue. That is a proper subject of expert testimony. *See* Exibit L at 2587-88 (*Humeston* Tr. 09/29/2005) ("Dr. Kronmal approached it from a statistical point of view of what the studies that had been done and what the studies that had been done by Merck actually showed. His position was that what Merck said the statistics showed was not what the statistics actually showed, and that, in fact, their studies were not properly reported, and that, in their own data showed that there was effects that they disputed.")

## IV.     DR. KRONMAL MAY TESTIFY THAT MERCK'S LABEL FOR VIOXX WAS INCONSISTENT WITH KNOWN RISKS

Under federal law, pharmaceutical labels "shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug: a causal relationship need not have been proved." 21 C.F.R. § 201.57(e). As Dr. Kronmal indicates in his report, the phrase "reasonable evidence of an association" is a statistical concept that is well within his area of expertise. Exhibit A at 41. Dr. Kronmal has opined that the statistical evidence of the marked increase of myocardial infarction for Vioxx users was not in the product label prior to April 2002, and that the cardiovascular and mortality data contained in the April 2002 label revision was inaccurate and incomplete. This conclusion is drawn from clinical trial data available at the time, Dr. Kronmal's own analyses, as well as his experience and expertise.

Contrary to Merck's argument, Dr. Kronmal is qualified to testify about the statistical association between Vioxx and adverse events including myocardial infarction and death, and whether that statistical association is accurately reflected in the text and table contained in the product label.

Merck argues that Dr. Kronmal has failed to demonstrate that his label analysis is reliable and suggests that he is required to demonstrate how an alternative label would have been more effective. The statistical analyses assessing relative risk and probability employed by Dr. Kronmal have long been recognized as scientifically valid. While questions concerning alternative labels might be appropriate where a witness is opining about the effectiveness of a label, such considerations have no place here. Dr. Kronmal proffers an opinion that as early as 2000, there was reasonable evidence of an association between Vioxx and cardiac events, but no reference to such an association appeared in the product label until April 2002. Further, the strength of the association

17

between Vioxx and cardiac events and death is not reflected in the label revisions made by Merck in April 2002.

In its motion papers, Merck mischaracterizes Dr. Kronmal's opinions about the Vioxx label, pulling a single quote out of context from several hundred pages of his *Humeston* trial testimony. Def. Brief at 12. While Defendant complains that Dr. Kronmal testified that Merck crafted the label to have a more favorable safety profile, it fails to acknowledge that Plaintiff there did not elicit such testimony from Dr. Kronmal. Rather, Merck sought opinions concerning the April 2002 label revisions during cross-examination—a label that was not even at issue in that case. *See* Exhibit B at 1722. Plaintiff's proffered testimony on the April 2002 label is that which is contained in Dr. Kronmal's April 2006 report, namely the accuracy and completeness of the statistical data included in the product label. The reliability of that analysis remains unchallenged.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendant's motion be denied in its entirety.

Dated:  August 21, 2006

                                                                                      Respectfully submitted,

| | |
|---|---|
| Drew Ranier | /s/ Grant Kaiser |
| Louisiana Bar No. 8320 | Grant Kaiser |
| **RANIER, GAYLE & ELLIOT LLC** | Texas Bar No. 11078900 |
| 1419 Ryan Street | **THE KAISER FIRM LLP** |
| Lake Charles, Louisiana 70601 | 8441 Gulf Freeway, Suite 600 |
| (337) 494-7171; fax (337) 494-7218 | Houston, Texas 77017 |
| | (713) 223-0000; fax (713) 223-0440 |

Walter Umphrey
Texas Bar No. 20380000
**PROVOST UMPHREY LAW FIRM LLP**
490 Park Street
Beaumont, Texas 77701
(409) 835-6000; fax (409) 838-8888

James L. "Larry" Wright
Texas Bar No. 22038500
**THE WATTS LAW FIRM LLP**
111 Congress Avenue, Suite 1010
Austin, Texas 78701
(512) 479-0500; fax (512) 473-0328

Mikal Watts
Texas Bar No. 20981820
**THE WATTS LAW FIRM LLP**
Tower II Building, 14th Floor
555 North Carancahua Street
Corpus Christi, Texas 78478
(361) 887-0500; fax (361) 887-0055

John Eddie Williams, Jr.
Texas Bar No. 21600300
Jim Doyle
Texas Bar No.6094450
**WILLIAMS BAILEY LAW FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-2200; fax (713) 643-6226

ATTORNEYS FOR PLAINTIFF ROBERT G. SMITH

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 21st day of August, 2006.

/s/ Grant Kaiser
Grant Kaiser
**THE KAISER FIRM LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
(713) 230-0000; fax (713) 230-0440
gkaiser@thekaiserfirm.com


cc   By email only:

   Robert Van Kirk          rvankirk@wc.com
   **Williams & Connolly LLP**
   725 Twelfth Street Northwest
   Washington, D.C.  20005
   (202) 434-5000; fax (202) 434-5029

   Carrie A. Jablonski      carrie.jablonski@bartlit-beck.com
   **Bartlit, Beck, Herman, Palenchar & Scott LLP**
   54 West Hubbard Street, Suite 300
   Chicago, Illinois 60610
   (312) 494-4400; fax (312) 494-4440