In another meta-analysis authored by Juni, et al. (investigators who were not connected to Merck) and published in *Lancet*, the authors reached similar results to those reported here based on summary data available from the FDA and peer-reviewed literature for the Merck rofecoxib studies in patients with chronic musculoskeletal disorders (arthritis). They describe their results and conclusions as follows: "By the end of 2000 (52 myocardial infarctions, 20 742 patients) the relative risk from randomized controlled trials was 2·30 (95% CI 1·22–4·33, p=0·010), and 1 year later (64 events, 21 432 patients) it was 2·24 (1·24–4·02, p=0·007). There was little evidence that the relative risk differed depending on the control group (placebo, non-naproxen NSAID, or naproxen; p=0·41) or trial duration (p=0·82)." As seen in table 1, my analyses verify Juni's results for the arthritis studies included in Juni's report.

In conclusion, the meta-analyses reported by Merck are extremely limited in their ability to either support or refute the finding from VIGOR. However, when the analyses use myocardial infarction as the endpoint—the logical choice for a primary endpoint in light of the VIGOR results—rofecoxib demonstrates a statistically significant and clinically important increased risk for myocardial infarction across all trials. As will be shown later in this report, the trials that were completed after the Merck meta-analyses show almost identical excess MI risks associated with rofecoxib use.

### Alzheimer's Studies (Protocols 078 and 091)

Merck conducted three clinical trials to assess the effects of rofecoxib on Alzheimer's disease. (Protocols 126 and 78 were terminated prior to completion.)

Protocol 078 enrolled 1457 patients over age 65 with mild cognitive impairment and randomized them to blinded treatment with rofecoxib 25 mg or placebo. The planned duration of the study was 48 months, but only 13.6% of the subjects completed the study while taking the agent to which they were randomized. The primary endpoint was conversion to Alzheimer's disease. Merck reported that significantly more patients taking rofecoxib were diagnosed with new onset Alzheimer's disease than those taking a placebo.

Protocol 091 involved 692 patients over age 50 diagnosed with possible or probable Alzheimer's and randomized them to blinded treatment with rofecoxib 25 mg or placebo. The planned duration of the study was 12 months. The primary endpoint was

reduction in cognitive decline measured by the Alzheimer's Disease Assessment Scale. The company reported no difference between treatment groups upon completion. In both trials the company collected investigator-reported adverse events and adjudicated certain cardiovascular events and all deaths. Merck also conducted in early 2001 an interim analysis of cardiovascular endpoints for inclusion in the meta-analysis prepared by the company.

My analysis relied on the raw data files the company produced that included data files with the pertinent patient demographic, concomitant medication, adverse event, vital signs, efficacy measurements, and laboratory test results. As with previously examined trials, the data were in the form of SAS data files, tables, program code, value, and variable labels. The data differed from that available from the earlier Merck trials in that adverse event information was available not only for the on-drug period but for off-drug follow-up on some patients. With the exception of the APPROVe trial, only the Alzheimers trials followed patients off drug in the study.

The focus of my analyses will be on CHD events and mortality. For study 078, I will also briefly describe the results for the primary endpoint of progression to Alzheimer's Dementia (AD).

Before showing the results of my analyses, I will present the results from an analysis reported in April of 2001 by a Merck statistician, Joshua Chen PhD in a memo (MRK-ACR004) to Raymond Bain, PhD, also a Merck employee. At the time of the Chen memo, study 091 had finished. The title of the Chen memo was MRK-0966 Combined Mortality Analyses Protocol 091 + Protocol 078.

Chen's analyses were directed to the question of whether there was evidence of an effect of rofecoxib on mortality. The tables below (tables 1.2a and 1.2b), extracted from the Chen memo, shows the mortality data from both studies. The data shown are for an intent-to-treat (ITT) analysis that includes all deaths within the study period of 12 months +14 days in study 091 (median follow-up of 1 year) and in study 078 up to last follow-up + 14 days (median follow-up 1.7 years). As shown in the tables, in study 091 there were 13 deaths in the rofecoxib and 3 in the placebo subjects; for study 078 there were 21 deaths in the rofecoxib and 9 in the placebo subjects.

-20-

Table 1.2a 0-12 Month ITT Analysis For Protocol 091

|  | MK-0966 (N=346) | Placebo (N=346) |
|---|---|---|
| Number of Deaths (%) | 13 (3.8) | 3 (0.9) |
| Number of Discon* (%) | 77 (22.3) | 70 (20.2) |
| Number still in Study (%) | 256 (74.0) | 273 (78.9) |
| * Discontinuation of study before 12-month AND alive 14 days after discontinuation | | |

Table 1.2b ITT Analysis For Protocol 078

|  | MK-0966 (N=723) | Placebo (N=732) |
|---|---|---|
| Number of Deaths (%) | 21 (2.9) | 9 (1.2) |
| Number of Discon* (%) | 290 (40.1) | 259 (35.4) |
| Number still in Study (%) | 412 (57.0) | 464 (63.4) |
| * Discontinuation of study AND alive 14 days after discontinuation | | |

Chen then carried out analyses that accounted for the exposure time of the subjects in the two treatment arms and estimated the hazard ratio (referred to hereafter as the relative risk, RR) using the Cox proportional hazards model. He did a separate analysis for each study as well as an analysis for the two studies combined.

Chen reported in study 091 that after adjustment for age and gender, the RR of death for a rofecoxib subject compared to a placebo subject was 4.43 (95% confidence interval of 1.26-15.53), which is statistically significant at the $p<0.01$. In study 078 he reported that after adjustment for age and gender, the RR of death for a rofecoxib subject compared to a placebo subject was 2.55 (95% confidence interval 1.17-5.56, p-value $<0.02$). He also reported on analyses that supported combining the two groups for a pooled analysis.

The table below (reproduced from the Chen memo) shows mortality from the pooled analysis. There are 34 deaths in the rofecoxib group and 12 in the placebo group.

Table 1.2.2 Mortality Frequency (Combined ITT Analysis)

| Number of Deaths (%) | MK-0966 (N=1069) | Placebo (N=1078) |
|---|---|---|
| Total * | 34 (3.2) | 12 (1.1) |
| Protocol 091 (AD) ** | 13 (38.2%) | 3 (25%) |
| Protocol 078 ** | 21 (61.8%) | 9 (75%) |
| * total number of deaths in each treatment arm (% number of patients in the treatment arm) ** number of deaths from individual protocol (% total deaths in the treatment arm) | | |

-21-

After adjustment for age, gender and protocol, the Cox model gives, a RR for death comparing rofecoxib to placebo of 2.99 (95% confidence interval of 1.55 to 5.77). This RR is significant at the $p<0.001$ level. Thus the data from the two Alzheimer's studies provide strong evidence of a major mortality excess associated with taking rofecoxib – a startling three-fold increase in the risk of death.

When I first saw the Chen memo, I assumed that Merck must have immediately notified the study Data Safety Monitoring Board (DSMB) and the FDA of this finding. However, neither of these actions was taken. The original protocol for Protocol 078 indicated that the study was to be monitored by a DSMB. However, soon after the study was started Merck filed a protocol amendment with the FDA (and I presume the Institution Review Boards of the study centers) that removed the DSMB. Thus, there was no one external to Merck who was monitoring the trial to protect the welfare of the trial participants.

The FDA has a role in the protection of the welfare of the participants, but this role is dependent on the company providing the necessary data for them to evaluate. The submission of individual adverse event reports by the company over time is insufficient to enable active trial monitoring.  FDA depends on the company and/or the DSMB (if there is one) to alert them if there is evidence of a possible harmful effect of the drug under study. Merck did not notify the FDA of the results of Chen's analyses. Further, the IRBs of the participating study sites should have been alerted to the possible detrimental effect of rofecoxib on mortality, as the IRBs are entrusted with protection of the welfare of people from their center who are in the trial. Merck did not notify the IRBs about the findings in the Chen memo. Study 078 continued for about 2 years; during that time there were approximately 8 additional excess deaths in the rofecoxib treated patients compared to placebo (20 rofecoxib versus 12 placebo, based on the difference in the numbers in the Chen report compared to the final totals from study 078).

In my opinion, Merck's failure to notify the appropriate organizations of the possible excess risk of death from taking rofecoxib sharply deviates from accepted clinical practice and constitutes gross scientific misconduct.

In July 2001, Merck filed with the FDA, a SUR (MRK-01420145856) for rofecoxib. At that time they reported data on the mortality findings from study 091 and 078. Their report of the mortality results lacked clarity and effectively hid the magnitude of the mortality difference seen so clearly in the Chen memo. In the FDA review of the data presented in the SUR the following table is shown that summarizes the mortality data from the Alzheimer's studies.

FDA Table 22.  Deaths in Alzheimer's studies

| Study # | Rofecoxib 25 mg N= 1448 | | | Placebo N= 1451 | | |
|---|---|---|---|---|---|---|
| | n/Pt Years of exposure | | | n/Pt Years of exposure | | |
| 091 | 15/301 | | | 8/366 | | |
| 078 | 14/996 | | | 8/1098 | | |
| 126 | 4/165 | | | 3/169 | | |
| | n | (%) | | n | (%) | |
| Total* | | 33 | (2.3) | | 20 | (1.4) |
| CVT[1] | | 8 | (0.6) | | 4 | (0.3) |
| Other[2] | | 24 | (1.7) | | 16 | (1.1) |

Both the results in the SUR and in Chen's memo were based on a data files prepared in March of 2001.  Thus, the results from both analyses should be very similar. A comparison of this table 22 with table 1.2.2 from the Chen memo shows considerable disagreement. However, in checking the data files from the two Alzheimer's studies I have been able to largely resolve these discrepancies.  For both study 091 and 078, Chen produced tables based on the ITT population. Thus, all deaths were included, even those that occurred when the subject wasn't taking the drug, as long as the study was ongoing. For study 091, Chen limited his analyses to the 12 months (+ 14 days) of the study when it was still a parallel design study, e.g. patients were randomly allocated to rofecoxib and placebo.

After the 12 month period, 90% of the rofecoxib group was switched to placebo, with the remainder staying on rofecoxib with three months of additional follow-up. In table 22 above, Merck included deaths that occurred during or after the extra 3-month period.  Thus, for study 091, Merck effectively reported an ITT analysis by including all deaths. However, for study 078, Merck did not include all of the deaths; rather they only included deaths that occurred within 14 days from the last dose of drug taken by the

-23-

patient. Had this rule been applied for study 091, the reported deaths would have been distributed as 9 rofecoxib versus 2 placebo.

However one looks at it, the presentation of the data as summarized in Table 22 is a serious misrepresentation of the mortality data from the two studies. An unbiased, clear presentation of the results would have shown the ITT findings along the lines done by Chen. Clearly, had the results been presented as was done by Chen, the level of concern in the FDA and the broader medical community would have been far greater. In my view, the serious mortality concerns identified in these trials was cause to stop trial 078.

Merck scientists claimed in the medical literature and in reports to the FDA that the Alzheimer's studies were reassuring with respect to cardiovascular safety of rofecoxib. Even as late as January 2005, Kim and Reicin (Merck employees) in a letter to the editor of Lancet criticized the report by Juni on the excess risk of MI associated with rofecoxib. They state in reference to the Alzheimer's studies that, "The results of these trials show no difference between rofecoxib (Vioxx) and placebo" [The Lancet, Vol 365, Jan 1, 2005].

My analyses (below) of the data show that Merck again failed to accurately report the significant adverse data from these studies to the medical community and the FDA. Table 2 shows the results of my analyses. The relative risk of myocardial infarction on rofecoxib was 1.52 compared to placebo (p = 0.21). However, this analysis underestimates the true risk for MI because many of the events recorded as sudden deaths were likely concurrent with or preceded by an MI, but classified as a sudden death. This is because most sudden deaths occur unobserved, so there is inadequate documentation available to determine if an MI or arrhythmia or both was the cause of the death. As a result, those MIs were not counted in Merck's analyses as MIs. Thus a better indication of the risk of a heart disease event is the broader category of "hard" CHD defined as MI plus sudden death. This endpoint is widely used in cardiovascular studies. It was used in the Merck-sponsored trial of Zocor (Scandinavian Simvastatin Survival Study Group: Randomized trial of cholesterol lowering in 4444 patients with coronary heart disease: the Scandinavian Simvastatin Survival Study (4S). *Lancet* 344:1383–1389, 1994).

In my analyses, I have also included as a hard CHD and heart disease death endpoint, three subjects who were recorded as having unknown (or 'insufficient data') as the cause of death and had an adverse event of MI noted for the hospitalization at which the death occurred. Merck did not count these events in any of their analyses as cardiac events. The relative risk of hard CHD was 1.89 (p < 0.05). The relative risk for fatal heart disease was 4.61 (p < 0.002). These findings cannot be interpreted as being "reassuring" with respect to the CHD risk associated with rofecoxib.

| **Table 2.** Relative Risks for Alzheimer's Studies | | | | |
|---|---|---|---|---|
| Endpoint | Relative Risk | Confidence Interval | | p-value |
| MI | 1.52 | 0.78 | 2.94 | 0.21 |
| Hard CHD (MI + Sudden Cardiac Death) | 1.89 | 1.08 | 3.33 | <0.05 |
| Heart Disease Mortality | 4.61 | 1.73 | 12.23 | <0.002 |
| All Cause Mortality | 2.13 | 1.36 | 3.33 | <0.001 |

In addition, treatment with rofecoxib was associated with statistically significant excess total mortality in the rofecoxib group, indicating that treatment shortened life in this patient population. For deaths from all causes, the relative risk of death for rofecoxib treatment was 2.13 (p < 0.001). In January 2001, in an email addressed to other Merck scientists, Shapiro (a Merck statistician) discusses the possibility of doing an ITT analysis of mortality for all of the rofecoxib studies. In the memo she states about the Alzheimer's deaths that, "But the count not excluding late deaths was 30 rofe to 10 placebo."

The time-to-event curves, Figures 6, 7 and 8, show the cumulative event rates for hard CHD, heart disease deaths, and total mortality, respectively. The over four-fold excess risk for CHD death and two-fold excess risk of total mortality in those taking rofecoxib compared to those on placebo was striking and the finding robust.

Figure 6.



Figure 7.



Figure 8



Death Rate by Treatment in Alzheimers Studies
Intent to Treat

In a search of the files provided by Merck I was able to locate a file that included mortality data from all of the studies included in the published meta-analyses. This file was among the files in a folder entitled "meta-analysis." I did an analysis of all-cause mortality (information on the cause of death was not included in the file). There were 56 deaths in subjects taking rofecoxib and 26 in subjects taking the comparator agents, giving a RR = 1.73 (p<0.025). The Alzheimer's studies deaths agreed with what was presented in the Shapiro email.

In addition, in March 1, 2001 a report was written that presented a cataloging of the causes of the deaths in the Alzheimer's studies by three Merck physicians, Dr. Chodakewitz, Dr. Beck and Dr. Barr (MRK-AAX000696- MRK-AAX000705). The table 2 below is reproduced from this report. Note that there are 8 rofecoxib and 2 placebo cardiovascular deaths, a four fold difference. In addition, among the deaths classified in the table as other/unknown, 7 rofecoxib and 3 placebo deaths were listed with cardiovascular causes in appendix 2 of the document.

**Table 2: Deaths on drug (including 14 days after discontinuation of drug) in MK-0966 studies 078, 091 and 126 based on secondary categorization**

| Category of Death[1] | Study | MK-0966 | Placebo |
|---|---|---|---|
| Cardiovascular[1] | 078 | 3 | 0 |
| | 091 | 3 | 1 |
| | 126 | 2 | 1 |
| | *Total* | *8* | *2* |
| | | | |
| Respiratory[1,2] | 078 | 1 | 0 |
| | 091 | 4 | 0 |
| | 126 | 0 | 0 |
| | *Total* | *5* | *0* |
| | | | |
| Cancer | 078 | 1 | 4 |
| | 091 | 0 | 0 |
| | 126 | 0 | 1 |
| | *Total* | *1* | *5* |
| | | | |
| Other/Unknown | 078 | 8 | 3 |
| | 091 | 2 | 1 |
| | 126 | 1 | 1 |
| | *Total* | *11* | *5* |
| | **Overall Total** | **25** | **12** |

Deaths listed for study 091 occurred during month 0-12,
study 078 is ongoing, study 126 is currently being discontinued, deaths listed for both
studies are as of 3/01
[1] based on blinded assessment by Eliav Barr, MD
[2] based on blinded assessment of deaths due to pneumonia Jeff Chodakewitz, MD

    Thus, as early as January of 2001, Merck scientists were aware of the excess
mortality associated with rofecoxib across all of their studies and that much of this excess
was due to cardiovascular causes.  These results were not presented in any of the
published meta-analyses nor were they presented to the FDA. On the contrary, in the July
2001 SUR (page 101), it is stated that, "Therefore, review of the deaths does not identify
a specific increased risk with rofecoxib."  This statement is false.

    Merck submitted a Clinical Safety Report (CSR) to the FDA in November 2003
on the results from study 078 (MRK-12690007833).  In addition, Merck summarizes the
mortality and cardiovascular risk results from the Alzheimer's studies in their
background document for the FDA Advisory Committee in February 2005.  Finally,
Merck and the investigators for studies 078 and 091 present the Alzheimer's results in

-28-

journal articles (Reines et al., Neurology 2004 and Thal et al., Neuropsychopharmacology 2005). The publication of the results of this trial, however, was incomplete and inaccurate.

In Merck's summary document for the 2003 CSR (MRK-AHP0085928) the following statement is made concerning the results of study 078: "There were no unexpected safety results in this study compared to what is in the current label ..." This statement is selective and misleading. This pattern of basing statements about the safety of rofecoxib on the on-drug data and not mentioning the full ITT results is repeated in all of Merck's presentations and publications. In the CSR (page 212), Merck states that "All deaths were adjudicated, whether they occurred on or off of study medication, ... . Statistical analyses of all-cause mortality and thrombotic cardiovascular mortality were performed only for patients on-drug ... ." Even when Merck does statistical analyses for the on-drug period they fail to present the survival curves or the Cox model RR's and associated statistical tests. Instead they present incidence rates and confidence intervals but not the statistical tests for differences in the rates (page 187). The one time that they do a statistical test for the on-drug death rates, they state it is not statistically significant (page 127). They come to this conclusion by computing the test based on the proportion of patients in each group who died rather than on the incidence rates (which accounts for exposure time). This is not the correct test to use for data of this type. .

On page 130 of the SUR, Merck presents the proportion of patients who died for the ITT population; however they don't present the incidence rates, survival curves, or RRs. They do a test of the proportions and do indicate that it is statistically significant but otherwise ignore this finding. In the final section of the CSR, Merck states that "Rofecoxib 25mg was generally well tolerated in patients with MCI."

The Company's submissions and presentations in connection with the 2005 Advisory Committee concerning the data from these trials did not reflect the substantial CHD and all-cause mortality risk associated with rofecoxib as determined by the trials. Once again Merck failed to present an ITT analysis. In Table 25 of Merck's Advisory Committee Briefing Document (page 117, MRK-AFK 02235712), the cardiovascular and mortality risk of rofecoxib is understated by omitting the events that occurred off-treatment. Table 3 shows the results for the ITT data compared to the results in Table 25

-29-

of the 2005 FDA report.  In spite of the results from the ITT mortality and CHD events analyses, Merck continued to assert that the Alzheimer's studies demonstrate the cardiovascular safety of rofecoxib.

**Table 3.**  Comparison of Results from Alzheimer's Data File to Results in FDA Presentation

| Adjudicated Event Category | ITT Results from Data File | | Results Presented to FDA | |
|---|---|---|---|---|
| | Placebo | rofecoxib | Placebo | rofecoxib |
| Acute myocardial infarction | 14 | 15* | 14 | 14 |
| Fatal acute myocardial infarction | 1 | 6 | 1 | 2 |
| Sudden cardiac death | 4** | 12* | 4 | 8 |
| Total Hard CHD Events | 19 | 32 | 19 | 24 |

*One acute myocardial infarction occurred on the same day as a sudden cardiac death and is included in both rows (but only once in the total hard CHD row).
**Two of the sudden cardiac deaths included here are deaths that the adjudication committee listed as 'respiratory arrest'. In my analyses in table 2, I did not include them as CHD events.

The results of study 091 were published in Neurology in 2004.  Seven of the eight authors of the paper were Merck employees (the non-employee was a Merck paid consultant).  The only mortality data presented were the number of deaths while on-drug, 9 on rofecoxib and 2 on placebo.  No statistical tests were done.  In the Chen memo based on the same on-drug data reported in Neurology, Chen reports that the RR for rofecoxib was 4.68, p<0.05.  Further, the ITT analyses produced by Chen showed a RR for rofecoxib of 4.43 (p<0.01).  The failure of the authors to include these analyses in the paper is consistent with Merck's failure to include essential information in the publication of its earlier VIGOR trial.

The paper describing the results of study 078, published in Neuropsychopharmacology in 2005, for which 8 of the 11 authors were employees of Merck, is very troubling in its presentation.  The authors interpreted the results for the primary endpoint of the study, which is the progression from mild cognitive impairment (MCI) to Alzheimer's, in a very troubling manner. The RR for the progression to Alzheimer's for rofecoxib compared to placebo was 1.46, p=0.011. The study was planned so that a RR of 0.7 in favor of rofecoxib would be detectable (i.e., in planning the trial, the investigators believed that a 30% or greater reduction in the risk of Alzheimer's due to the use of rofecoxib would be an important medical difference).  Had Merck observed a RR of 0.7 for the primary endpoint, it would have strongly supported

-30-

Merck's hypothesis that rofecoxib delayed the onset of Alzheimer's disease. One would think that having observed a RR of 1.46 (a forty-six percent *increase* in conversion to Alzheimers), Merck would have concluded that it was likely (although not certain) that the use of rofecoxib increased the progression from MCI to Alzheimer's. Instead, Merck concluded that, "The results from this MCI study did not support the hypothesis that rofecoxib would delay a diagnosis of Alzheimer's Disease. . ."

In the discussion section of the paper they state that, "The possibility that rofecoxib might be inferior to placebo was also not supported by data from two large previous AD treatment studies... and found that rofecoxib had no significant effect on progression of cognitive or functional decline (Aisen et al, 2003; Raines et al, 2004)." This statement is not correct. The Aisen paper (JAMA; 289, 21, 2003) shows a statistically significant difference between rofecoxib and placebo (p=0.044), favoring placebo. That is, in this study, the decline in intellectual functioning in the rofecoxib patients was statistically significantly greater than in the placebo group. The authors of the paper interpreted this difference as non-significant because they made an adjustment for the fact that they were also testing the hypothesis that naproxen was equal to placebo. However, for the purposes of whether or not the results of this study supported a possible harmful effect on progression of cognitive decline, the more appropriate p-value to use is the unadjusted one.

It is also important to note that the higher proportion of patients progressing to Alzheimer's on Vioxx verses placebo appeared after only four months in the study (Thal et al, page 1209, table 2). This difference persisted over the entire course of the study. Unfortunately, this study did not have a DSMB and, as a result, the patients on Vioxx unknowingly remained at increased risk of progressing to Alzheimer's Disease throughout the entire course of the study.

The inaccurate and misleading reporting of trial results in the medical literature is again present in the reporting and discussion of the mortality findings. The 091 publication first reports the proportion of patients who died on-treatment in the two arms of the study. It does not report the incidence rates, RR's, or any tests of significance. In this respect, the approach taken is identical to that in the FDA CSR report. While Merck does list the deaths that occur in the off-drug period, they provide no analyses concerning

-31-

the difference in the RR for total mortality or for heart disease mortality. Instead they state:

> "The total number of deaths and causes of death on–drug were consistent with expectation for an elderly population, and there was no specific pattern as to cause of death in either treatment group. The off-drug mortality data are difficult to assess since follow-up information was available for less than half of the patients, there was an imbalance in the extent of follow-up between the two groups, and the majority of the deaths occurred more than 48 weeks after the treatment had been discontinued."

This statement is both inaccurate and invites a misunderstanding of the importance of the mortality findings. Below are the critical facts:

- There was a statistically significant excess of mortality during the on-drug period, which continued into the off-drug period.
- An ITT analysis that includes all of the deaths is likely to be biased towards a reduced difference between the treatments. This is due to the fact that with longer follow-up deaths will occur due to "natural causes" - that is, deaths that are not related to the treatments used in the trials. Thus, the observation of a statistically significant difference for the ITT population should have been of great concern.
- The difference in the extent of follow-up was due to the higher rate of Alzheimers and of discontinuation due to side effects in rofecoxib patients than in placebo patients. Both of these would likely bias the results towards a smaller RR rather than a larger one, because Alzheimer's disease and side effects are themselves risk factors for subsequent mortality.
- Rather than there being "… no specific pattern as to cause of death in either treatment group," the majority of the difference in the risk of death was due to heart disease deaths. The number of cancer deaths, for example, was identical in the rofecoxib patients and placebo patients. There were also 5 deaths in the rofecoxib patients that were classified as accidental deaths (there were none in placebo patients). For several of these the adjudications could not rule out

-32-

that the accidents that resulted in the death of the patient might have been due to a heart attack or stroke. If some of these 'accidents' were heart attacks, then the observed RR for rofecoxib underestimated the true risk.

- Study 091 also observed an excess of mortality both on-drug and ITT.

An accurate and complete discussion of the findings of this study would have made the points I've outlined above and reported that there was a highly statistically significant excess of mortality associated with the use of rofecoxib.

In conclusion, as early as January of 2001, when Shapiro reported that there were 30 deaths in the rofecoxib patients and 10 in placebo patients in the Alzheimer's studies, Merck was aware that there might be a serious mortality risk in the elderly associated with taking rofecoxib. That information should have been presented to FDA and its Advisory Committee at that point in time. The report in March 2001 and the April 2001 analyses by Chen further supported this mortality concern. At that point in time, study 078 should have been halted and the data should have been disclosed to the medical community. This was not done. The findings after the completion of study 078 provided further compelling evidence that rofecoxib was unsafe for use in the elderly. It also showed that rofecoxib might increase the deterioration of mental functioning in the elderly. Much of this information remains unknown to the scientific and medical communities to this day.

### Protocol 122 Colon Polyps Study (APPROVe)

Protocol 122 enrolled 2586 patients with recently-removed colorectal adenomas to receive 25 mg of rofecoxib or placebo. They completed approximately 3 years of treatment before the trial was halted for safety reasons by the external data safety monitoring board. The study's intended endpoint was the recurrence of colorectal adenomas, but in addition it was among a group of clinical trials included in a plan established in 2003 to monitor and adjudicate certain cardiovascular endpoints. As in the Alzheimer's studies, follow up was continued in some patients after completion or discontinuation of drug treatment.

The SAS data files, tables, program code, variable and value labels provided by the company and used in this analysis were similar to those described in previous

sections. The relative risks of an MI and CHD were calculated with a Cox proportional hazard model using the same event definitions as in the Alzheimer's protocols.

The relative risk of rofecoxib for an MI was 2.07 (p=0.05, 95% CI=(1.00, 4.29)). The relative risk of hard CHD was 2.17 (p<0.025, 95% CI=(1.12, 4.23)).   The excess risk of MI or CHD with rofecoxib was statistically significant and consistent with those observed in the previous three analyses.  A test of the hypothesis of a constant hazard ratio (no differences in relative risk over time) found no statistically significant evidence of either increased or decreased risk over time. The time-to-event curves for MI and CHD are shown below in Figures 8 and 9.

Figure 8.



Figure 9.



The withdrawal of rofecoxib in September 2004 was publicly attributed to the results of the APPROVe trial. With respect to the APPROVe data, Merck has stated that the data demonstrated "an increased cardiovascular risk in patients using rofecoxib beginning after 18 months of continuous use . . ." The statement above is misleading because—as Merck did in its presentation of its meta-analysis and Alzheimer's data—it has failed to provide a separate analysis of the previously signaled cardiovascular events; particularly MI events and hard CHD. Further, the CSR for the APPROVe trial reveals that the investigator reported cardiovascular events, which were a secondary endpoint in the trial, separated early and remained separate over the duration of the trial: "The curve of the rofecoxib treatment group was above the curve of the placebo treatment group during the entire study." The publication of the APPROVe trial failed to reveal this information, which was contrary to the Company's public position. This was not proper.

As noted above, the relative risk for MI from a Cox model is 2.07 (p=0.05, 95% CI=(1.00, 4.29)). For CHD (MI & sudden cardiac death), the relative risk is 2.17 (p<0.025, 95% CI=(1.12, 4.23)). Both of these are consistent with the risks observed in my previous analyses for VIGOR, Alzheimer's, and the meta-analysis. It is also worth noting that, as is shown in Figures 8 & 9, the cumulative event rate curves appear to separate early and thus do not show the same degree of early similar risk and later increasing risk of rofecoxib compared to placebo shown for the APTC endpoint. Such findings are contrary to Merck's public assertions that in the APPROVe trial, an increased risk of cardiovascular events was not evident until after 18 months of continuous use.

An additional year of off therapy follow-up is nearing completion for the APPROVe study. I have examined an incomplete dataset of the data from this follow-up, but understand that a final data set will be promptly forthcoming. I intend to analyze this follow-up data upon receipt.

### Protocol 203 Pooled Analyses

In January of 2004, Merck produced a document entitled "Statistical Data Analysis Plan – A Combined Analysis of Thrombotic Cardiovascular Events in 3 Placebo-Controlled Studies of Rofecoxib (Study 203)." The report was authored by Jennifer Ng and Jim Bolognese, both members of the Merck Clinical Biostatistics unit.

The report lays out the analysis plan for an analysis of CV events based on the data from pooling the data from three studies of rofecoxib, APPROVe, VIP, and VICTOR. The planned analyses would be presented on a periodic basis to an unblinded independent DSMB referred to by Merck as the External Safety Monitoring Board (ESMB). The thrombotic endpoint is defined as a confirmed acute MI, unstable angina pectoris, sudden and/or unexplained death, resuscitated cardiac arrest, cardiac thrombus, pulmonary embolism, ischemic cerebrovascular stroke, cerebrovascular venous thrombosis and transient ischemic attack. The report lays out a detailed sequential analysis plan that was never implemented because of the slow accrual to the VIP and VIGOR trials. Thus ESMB review focused on the APPROVe trial which was recommended for termination by them in September of 2004 based on the excess CV events in the rofecoxib group compared to the placebo group.

I have received data files from all three studies which I have combined for the pooled analyses reported here. I provide results for the analysis of three endpoints, thrombotic events, MI and hard CHD. I am only including the thrombotic endpoint because it was pre-specified in the protocol 203. My view on the use of this composite endpoint is the same as for the APTC endpoint; namely that it mixes disparate events that have differing etiologies and is thus likely to mask the evidence of the increased MI risk associated with rofecoxib that was seen in VIGOR.

The results for the three endpoints are shown in Table 3. Note that there is a highly statistically and medically significant excess risk associated with rofecoxib use compared to placebo for each endpoint. For MI the RR is 2.45, for hard CHD it is 2.31 and for the thrombotic endpoint it is 1.75 (p-value<0.005 for all of the endpoints).

**Table 4.** Relative risks for Protocol 203 pooled analyses

| Endpoint | Relative Risk | 95% Confidence Interval | | p-value |
|---|---|---|---|---|
| MI | 2.43 | 1.30 | 4.56 | <0.005 |
| Hard CHD (MI + Sudden Cardiac Death) | 2.32 | 1.30 | 4.12 | <0.004 |
| Thrombotic Events | 1.76 | 1.22 | 2.53 | <0.003 |

Figures 10, 11 and 12 show the cumulative event curves for MI, hard CHD and thrombotic events, respectively. It is apparent from the curves for MI and hard CHD that the excess risk from Rofecoxib starts soon after beginning therapy and continues throughout the follow-up. For the thrombotic endpoint, the curves similarly separate early, with the rofecoxib curve remaining above the placebo curve during the entire period.

**Figure 10**



-38-