# Exhibit C

# IN RE VIOXX LITIGATION

# ADDENDUM TO REPORT OF RICHARD A. KRONMAL

**May 23, 2006**

# Addendum to the Report of Richard A. Kronmal

### Introduction

This addendum supplements my Report, submitted on April 7, 2006 (the "Report"), in the following areas:

- Updates to the Alzheimer's section of the Report; and

- Updated analyses of the APPROVe study, including analyses of the data from the study extension.

I have not yet updated the section of my Report concerning Protocol 203 to incorporate the recently produced APPROVe extension data and Oxford VICTOR data, but specifically reserve the right to do so.

### Updates to Alzheimer's Analysis

The following material should be inserted after the second paragraph on page 22 of the Report:

Merck did consider instituting a DSMB for study 078. An urgent meeting was called to discuss this issue (MRK-AFW0019561). This was followed by a meeting at which it was decided by Merck that a DSMB was unnecessary (MRK-NJ0333568). However, had a DSMB been formed, a reasonable DSMB would have been compelled to take immediate steps, including terminating the trial, to protect the patients in the study who never consented to the extreme risks seen in that trial. Evidence for this is the actions taken by the ESMB of the Merck APPROVe study. The APPROVe ESMB recommended termination of the APPROVe trial based on results that were less extreme than was the situation for the Alzheimer's trials. A member of the APPROVe ESMB and a Merck consultant when asked about the decision to terminate the APPROVe trial said:

> "*The reason we recommended termination was that we felt the patients in the APPROVe study were not aware of this and had not been consented to this adverse effect. So, in our judgment, you know, from an ethical viewpoint if you were going to continue you would have to go back and re-consent them and that certainly wasn't practical at that point in time. So, that is the specific reason we*

*recommended termination."*
*(http://www.fda.gov/ohrms/dockets/ac/05/transcripts/2005-4090T1.htm)*

Applying this same logic to the Alzheimer's 078 study would have resulted in a DSMB stopping the trial. In my years of experience with many clinical trials (and the DSMBs associated with such trials), study 078 could not be reasonably continued in the face of such information. One could not reasonably ask patients to consent to a trial of a drug that had a statistically significant 3 fold increased risk of death associated with it for a speculative benefit. Nor would a reasonable DSMB or IRB charged with protecting patients exposed to the therapy permit the continuation of such a study.

In my opinion, Merck's failure to notify the appropriate organizations of the possible excess risk of death from taking rofecoxib and their decision to not terminate the study sharply deviates from accepted clinical trial practice. The decision by Merck to continue study 078 is in direct violation of the principles of the *DECLARATION OF HELSINKI* that provides the standards for the conduct of medical research involving human subjects. To emphasize the widespread acceptance of this standard, I have provided three website references to this document, one from the FDA, one from the Office of Human Subjects Research of the U.S. National Institutes of Health, and one from the World Medical Association (WORLD MEDICAL ASSOCIATION DECLARATION OF HELSINKI Ethical Principles for Medical Research Involving Human Subjects, http://www.fda.gov/oc/health/helsinki89.html, http://ohsr.od.nih.gov/guidelines/helsinki.html , or  http://www.wma.net/e/policy/b3.htm ). Merck indicates on its website that they follow the tenets of the Declaration of Helsinki (http://www.merck.com/cr/science_innovation_and_quality/drug_development_process/c linical_trials/). Continuing the trial when there was strong evidence of excess mortality associated with the use of rofecoxib violated section I.4, which states: "*Biomedical research involving human subjects cannot legitimately be carried out unless the importance of the objective is in proportion to the inherent risk to the subject.*" This principle holds at all times during the trial and is a primary reason why DSMBs are widely utilized to monitor clinical trials. In April of 2001, there was a three times excess risk of mortality associated with the use of rofecoxib, a risk that far exceeded any likely benefits of the therapy for the subjects in the trial. Thus, by allowing the study to continue and thereby exposing the study subjects to the risk of premature death, Merck failed in its duty to the study subjects as specified in I.4.

Permitting study 078 to continue also violated the informed consent provisions of the Declaration of Helsinki by not informing the Alzheimer's study participants of the VIGOR MI results and the Alzheimer's mortality results. Section I.9 of the declaration states:

"In any research on human beings, each potential subject must be adequately informed of the aims, methods, anticipated benefits and potential hazards of the study and the discomfort it may entail."

2

The Alzheimer's 078 study informed consent (MRK-AFK0205452) contains the following provision:

> **"NEW FINDINGS**
> *You will be told of any significant new findings developed during the course of this study which may relate to your willingness to continue your participation."*

Nowhere in the informed consent was there any mention of the adverse events seen in VIGOR, nor was there any mention of the excess mortality seen in the 091 and 078 trials. These 'significant new findings' were not conveyed to the participants in the Alzheimer's study 078 at any time. Further, all patients still in the trial were reconsented in 2002 and at that time they were not informed about the findings in VIGOR or the early mortality findings in the two Alzheimer's trials.

On Dec. 5, 2001, the FDA sent a letter to Merck asking for the answer to a question they had about the ethics of continuing study 078 based on the excess mortality seen in study 091. The question posed to Merck was:

> *"Please clarify whether the safety monitoring board and the IRB overseeing these studies are aware of the excess in total cause mortality in the Vioxx 25 mg group as compared to placebo (p=0.026) and the trend against Vioxx 25 mg on CV mortality compared to placebo.*
>
> *Have these oversight groups commented on the ethics of continuing study 078 in light of the mortality data ..."*

The letter is important from two standpoints. First, it shows that the FDA was concerned about the ethics of continuing study 078 and that they were unaware of the lack of a DSMB for the study. It further indicates that the FDA was not aware of the statistically significant excess of mortality seen in 078 and shown in the Chen report.

Merck was far from forthcoming in their response to the FDA (MRK-AAF0005014). It did not provide the ITT results shown in the Chen report. Instead the Company reiterated the on-drug mortality experience. Merck indicated that it hadn't informed the IRB's of the findings because the study investigators remain blinded to the study results. This response demonstrates that Merck withheld the crucial information concerning the ITT mortality analyses from the IRB's and the FDA.

## APPROVe Extension Analyses

I have now analyzed the extended follow-up from the APPROVe study. The analysis below duplicates what I did in my Report with the addition of data from the follow-up that is now available. It is important to note that the extension did more than add additional follow-up time and events; it also made an intent-to-treat (ITT) analysis for

3

CV events possible for APPROVe. The extended follow-up included all trial participants who the investigators were able to contact and who agreed to the follow-up. This comprised 84% of the originally randomized participants.

For the analyses presented below I have included all available events and follow-up through 210 weeks from each study participant's entry date. This corresponds to the primary analysis specified in the Merck statistical analysis plan for the extension. As was done in my original Report, I present below the results for MI and hard CHD (MI + sudden cardiac death). I used the same statistical methods described in my Report.

For MI, the RR comparing rofecoxib to placebo is 2.11 (p=0.018, CI=1.13-3.90). This is a small increase in relative risk compared to the result for the "on-drug" analysis (RR= 2.07). The MI event rate curves are shown in Figure 1 of this addendum. Note that there is no evidence from the curves that the excess risk of MI starts after 18 months. Rather, it is clear that the curves separate within the first 6 months of follow-up. Merck's contention, founded on its post hoc analysis, that there is no excess risk for CV events until after 18 months of continuous use is not supported by these data. A statistical test for equality of RR across time is *not* rejected (proportional hazards p=0.43) and thus there is no statistical support for the Merck 18 month argument.

The results for hard CHD are quite similar. The RR is 2.45 (p=0.004, CI=1.34-4.47) compared to the on-drug RR of 2.17. The test for equality of RR across time is *not* rejected (proportional hazards p=0.47). Again, there is no evidence in support of Merck's contention that the risk associated with rofecoxib use is only manifest after 18 months of continuous use.

As I have discussed in my Report, Merck has based many of its arguments about the safety of rofecoxib on results using the APTC and thrombotic endpoints. Specifically, the Company's contention that the increased risk is only for patients who use rofecoxib for 18 months is based on an analysis of these endpoints. In the APPROVe report in the New England Journal of Medicine (NEJM), Merck supports this claim by presenting the event rate curves for the thrombotic endpoint and by doing a test for proportional hazards for the thrombotic endpoint. They report that this test was significant at the p=0.01 level. However, as I also discussed in my Report, this was based on a test done after examining the data and wasn't a prespecified hypothesis in the APPROVe protocol or statistical analysis plan. Such tests are not considered by the scientific community as being proof of an effect, rather at best they are considered only worthy of consideration as hypotheses for which confirmation would be needed in other studies before they would be accepted. The result for MI and for hard CHD didn't support this hypothesis and the results from the MI meta-analysis clearly contradicted it since it showed increased risk in studies of less than 1 year of duration.

The follow-up data from the APPROVe extension provides overwhelmingly convincing evidence that the 18 month hypothesis is not supportable even based on the APPROVe data. The additional follow-up not only tallied events that occurred during the one year extension, it also ascertained events that occurred during the first three years of the study

in participants who Merck did not follow for the entire period because they dropped out due to side effects or for other reasons. Thus, for the first three years of the study, the data now reflects more closely the ITT analyses that are the scientific standard for clinical trial results. Merck provided these analyses to the FDA in May of 2006 (MRK-S04020112023).

One of the striking findings shown in this report is that even for the thrombotic and APTC endpoint, the appearance of no increased RR for the first 18 months is no longer present and the test for proportional hazards is no longer near significant. This is shown in the two figures (B1, page 15 and B5, page 24 of the FDA submission) below for the thrombotic and APTC endpoint. Merck reports that the p-values of the test of proportional hazards are 0.75 for both the thrombotic and APTC endpoints. These p-values show that there is no statistical support for any deviation from a constant RR over the follow-up time, *e.g.,* the Merck 18 month hypothesis is no longer supported by the APPROVe data.

Finally, the extension also supports the possibility, first suggested by the Alzheimer's 078 trial results, that the elevated risk associated with rofecoxib might extend beyond the time when the patient stopped taking rofecoxib. In the Alzheimer's trial, this was seen in the continuation of an increased risk of both CHD and all cause mortality in the patients off drug. In the APPROVe trial, this argument is supported by the fact that the RR observed including the extension is virtually identical to that seen for the on drug analyses. For example, for thrombotic events, the on-drug RR reported in the NEJM paper is 1.86 (p=0.008). The ITT RR now is 1.74 (p=0.004), slightly reduced but with a smaller more significant p-value. For the APTC endpoint, the on-drug relative risk was increased from 2.06 in the NEJM paper to the ITT RR of 2.36 now. This indicates that the off-drug contribution to the ITT RR was actually greater than seen during the on-drug RR or the APTC endpoint. The overall implication of this is that it is likely that rofecoxib does some damage to the body that persists for some time after the drug is discontinued.

Richard A. Kronmal, PhD

5

Figure 1.  Cumulative MI rates by treatment in APPROVe for 210 weeks of follow-up.



Figure 2.  Cumulative CHD rates by treatment in APPROVe for 210 weeks of follow-up.



Figure B1   All Patients – Confirmed Thrombotic Cardiovascular Events – Week 210 Censoring - Kaplan Meier Plot



| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1221 | 1187 | 1152 | 1131 | 1117 | 1092 | 1032 | 989 |
| Placebo | 1300 | 1247 | 1224 | 1189 | 1173 | 1157 | 1133 | 1071 | 1027 |

Figure B5 All Patients – Confirmed APTC Events – Week 210 Censoring - Kaplan-Meier



| Patients at Risk | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rofecoxib 25 mg | 1287 | 1220 | 1188 | 1158 | 1140 | 1125 | 1102 | 1042 | 1002 |
| Placebo | 1300 | 1249 | 1228 | 1196 | 1181 | 1165 | 1140 | 1079 | 1036 |