# Exhibit E

```
              SUPERIOR COURT OF NEW JERSEY
              ATLANTIC COUNTY/CIVIL DIVISION
---------------------------------x
THOMAS CONA AND JOYCE CONA,    DOCKET NO. ATL-L-3553-05MT
         PLAINTIFFS,
      VS.
MERCK & CO., INC.,
         DEFENDANT.
---------------------------------x
JOHN MCDARBY,                  DOCKET NO. ATL-L-1296-05MT
         PLAINTIFF,
      VS.
MERCK & CO., INC.,                  - TRIAL -
         DEFENDANT.
---------------------------------x
         PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                 1201 BACHARACH BOULEVARD
                 ATLANTIC CITY, NJ 08401

         DATE:   March 24, 2006

B E F O R E:
     THE HONORABLE CAROL E. HIGBEE, P.J.Cv.

TRANSCRIPT ORDERED BY:
     W. MARK LANIER, ESQUIRE
     CHRISTY D. JONES, ESQUIRE
A P P E A R A N C E S:

     W. MARK LANIER, ESQUIRE
     THE LANIER FIRM
     JERRY KRISTAL, ESQUIRE
     ROBERT GORDON, ESQUIRE
     WEITZ & LUXENBERG
        ATTORNEYS FOR PLAINTIFFS CONA & McDARBY

     CHRISTY D. JONES, ESQUIRE
     BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
     KEVIN J. DUNNE, ESQUIRE
      SEDGWICK, DETERT, MORAN & ARNOLD, LLP
     MICHAEL BROCK, ESQUIRE
     HOPE FRIEWALD, ESQUIRE
     DECHERT, LLP
        ATTORNEYS FOR THE DEFENDANT

              *     *     *     *     *     *
                 REGINA A. TELL, CSR-CRR-RPR
                 OFFICIAL COURT REPORTER
                 1201 BACHARACH BOULEVARD
                 ATLANTIC CITY, NJ  08401
```

# INDEX

| WITNESS(S) | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

Page 2738

1) ALISE S. REICIN

| | By Mr. Brock | 2745 |
| | By Mr. Lanier | 2880 |

| EXHIBITS | ID. | EVID. |
|---|---|---|
| C-17 | | 2742 |
| C-265.1 | | 2742 |
| C-36.1 | | 2742 |
| C-8.1 | | 2742 |
| C-8 | | 2742 |
| C-32 | | 2742 |
| D-701 | | 2788 |
| A-660 | | 2791 |
| D-186 | | 2800 |
| D-351.1 | | 2809 |
| D-478 | | 2818 |
| A-550 | | 2825 |
| A-155 | | 2831 |
| D-145 | | 2837 |
| A-150 | | 2838 |
| P-2080 | | 2882 |
| P-2000 | | 2856 |
| P-66 | | 2899 |
| P-37 | | 2960 |
| P-352 | | 2965 |

Page 2739

```
 1              PROCEEDINGS
 2         THE COURT: You can be seated.
 3         You can bring in the jury.
 4         (Whereupon, the following occurred at
 5  side-bar:)
 6         MS. JONES: At this time, we offer the
 7  following medical records of Dr. Cona -- of Mr. Cona
 8  that were offered during Dr. Wasserman's testimony:
 9  What's been marked as Defendant's Exhibit C-17,
10  Defendant's Exhibit C-265.1, Defendant's Exhibit
11  C-36.1, Defendant's Exhibit C-8.1, and following it is
12  actually C-8 -- I'm sorry -- and Defendant's Exhibit
13  C-32.
14         They're all medical records of Mr. Cona that
15  were referred to, or at least portions of the records
16  were referred to during the examination of Dr.
17  Wasserman, and we would offer them at this time.
18         MR. LANIER: Judge, what I expressed to Miss
19  Jones when she mentioned she was going to do this, I
20  have no objection to the medical records coming in,
21  because I specifically said before I close that I was
22  closing with the understanding that I would still be
23  entitled to put the medical records in.
24         I want them all in. They probably need to be
25  redacted in places. At least they need to be looked at
```

Page 2740

```
 1  carefully to see if they need to be redacted, and I
 2  think they need to come in with a Plaintiff's Exhibit
 3  Number so there's not the appearance that the
 4  plaintiffs wouldn't put in their own medical records,
 5  the defendant had to.
 6         So that's the specific reason when I rested I
 7  said that I would rest pursuant to the housekeeping of
 8  putting in those medical records and other exhibits.
 9         Now, Miss Jones has pointed out to me that
10  because she called them by the defendant's number that
11  she wants them in with that, so what my recommendation
12  to the Court is that we give them a double number, we
13  give them a Plaintiff's exhibit number and a
14  Defendant's exhibit number so that they've got both of
15  those for purposes of reference, as far as the record's
16  concerned.
17         But I clearly have reserved the right to make
18  sure I have those admitted as a plaintiff's exhibit,
19  and I do want them redacted before they go back to the
20  jury, or at least looked at for possible redactions.
21         MS. JONES: Your Honor, I would simply say
22  that they have not yet been offered. We had no choice
23  but to offer them at this time under these
24  circumstances. If Mr. Lanier has redactions that he
25  wishes to make, we'll take it up at that point in time.
```

Page 2741

1  We have not been furnished with any evidence
2  of any request for redactions at this point in time. I
3  certainly understand these are being admitted subject
4  to their right to raise some issue with respect to
5  redaction.
6      THE COURT: All right. The records will be
7  admitted subject to the issue of redaction. The
8  defendants may not argue in closing that these were
9  admitted by the defense or that they're defense
10 exhibits, as opposed to plaintiff's exhibits.
11     As far as the actual number on them, I'm
12 keeping them the defense number, because it is already
13 in the record, and I have absolute 100 percent -- at
14 least 99.99.99 confidence that the jury could care less
15 whether they're a P or D exhibit, and they're not going
16 to infer anything from that.
17     MR. LANIER: Okay. Thank you, Judge.
18     THE COURT: We have all kinds of numbers on
19 the exhibits. We'll be fortunate if they look at them
20 for what you want them to look at them for, let alone
21 try to figure who put them in. I don't think that's an
22 issue.
23     So they're marked into evidence as of this
24 point, subject to redaction.
25     Give them to the clerk and let her know

Page 2742

1  they're in right here.
2      (Whereupon, Exhibit C-17, Exhibit C-265.1,
3  Exhibit C-36.1, Exhibit C-8.1, Exhibit C-8, and Exhibit
4  C-32 were marked into evidence.)
5      MR. KRISTAL: I wanted to share an observation
6  that when there were lengthy side-bars, there seems to
7  be some -- I don't want to say mugging it up, but
8  smiling and discussion with the jurors, at least
9  communication, nonverbal with the jurors from certain
10 witnesses.
11     So I would ask the Court, perhaps, if there
12 are going to be lengthy side-bars that the witness
13 should step down, or perhaps there should be an
14 instruction not to do that. I know it is hard for the
15 Court to see and when the attorneys' backs are here,
16 but I was sitting at counsel table watching exactly
17 that, so --
18     MS. JONES: Your Honor --
19     MR. KRISTAL: -- I wanted to raise it as an
20 issue.
21     MS. JONES: I'm not sure what the issue is
22 or how many witnesses or anything else, but every
23 witness thus far that has testified has sat in that
24 chair during the course of any side-bars.
25     I don't know -- and I'm not sure what you were

Page 2743

1  referring to. I haven't seen it. But to make any
2  exception based upon the defense witnesses at this
3  point is, I think, totally improper.
4      MR. KRISTAL: I'm just sharing an observation.
5  Perhaps, if you could --
6      THE COURT: I'll give an instruction to the
7  witness. I'm not going to make them get out of the
8  chair.
9      MR. LANIER: Instruction would be preferable.
10     MR. GORDON: I also noticed that during the
11 side-bars that at least Dr. Morrison and Dr. Wasserman
12 while we're having side-bars are reading off this
13 screen. I'm watching as they're looking, and I was
14 wondering, I thought it was in code, that's why I just
15 came over to see if is it actually in English, which it
16 is. It usually comes up as stenographer language,
17 which I don't understand.
18     So I'm just concerned about that, as well,
19 because if it is something the witness isn't supposed
20 to be hearing and they're reading our side-bar, there's
21 a concern.
22     THE COURT: Well, Regina will take care of
23 that.
24     Mr. Brock, caution your witness, caution your
25 witness that when she is at side-bar, when there's

Page 2744

1  side-bars or the breaks, she shouldn't engage in any --
2  you know, she might say to the jury, It is cold in
3  here, or something like that. No conversations, no
4  exchanges. She should look forward, basically, not do
5  any kind of -- I mean, I know it wouldn't be anything.
6  She is not going to be whispering facts, but she may
7  just say to them, It is cold. It is human nature if
8  they're sitting over there. But just make sure she
9  doesn't do that.
10     And although I'm very liberal on leading, make
11 sure you try to let this witness answer her own
12 questions. She is more than capable with doing it.
13 She is a scientist, and, you know, she is an important
14 witness for both sides, and I want to make sure that
15 she provides her own answers. That doesn't mean you
16 can't lead and set things up.
17     (The jury enters the courtroom.)
18     THE COURT: You can be seated.
19     Your next witness.
20     MR. BROCK: Your Honor, Merck calls Dr. Alise
21 Reicin.
22     THE COURT: Dr. Reicin to the stand.
23     (Whereupon, ALISE S. REICIN, Defense witness,
24 sworn.)
25 DIRECT EXAMINATION BY MR. BROCK:

Page 2745

1  Q. Are you comfortable?
2     Good morning. Would you introduce yourself to
3  the jury, please.
4  A. I'm Dr. Alise Reicin.
5     Q. And Dr. Reicin, would you tell the members of
6  the jury where you live and work.
7  A. I live in Englewood, New Jersey, and I work at
8  Merck Research Labs.
9     Q. What is your current position with Merck?
10 A. I'm a vice-president of clinical research at Merck.
11    Q. Okay. How long have you been employed with
12 Merck?
13 A. I have been employed with Merck about 10 years,
14 since February of 1996.
15    Q. Would you describe for the members of the jury
16 your educational background in terms of your college
17 and your medical education.
18 A. I graduated with a bachelor's in biochemistry from
19 Barnard College of Columbia University, which is the
20 women's college at Columbia. And then I got my M.D.
21 from Harvard. I was in a joint program there between
22 Harvard and MIT.
23    Q. And would you describe the joint program that
24 you were in when you were obtaining your combined
25 program.

Page 2746

1  A. Basically, I got -- it is a joint program for
2  people who had a strong interest in research. The
3  first two years were a combination of classes at
4  Harvard and MIT with a very strong focus on basic
5  science and pathophysiology; you know, how disease
6  works at a very, you know, molecular level.
7     And then the last two years, you're in the
8  hospital, and that's with the rest of the Harvard
9  Medical School class.
10    You also have to do a research project in
11 order to graduate, and, therefore, I took off a year
12 during medical school and did research at Sloan
13 Kettering Cancer Institute.
14    Q. And very briefly, what was your area of
15 interest at Sloan Kettering?
16 A. I worked on a mass tumor virus, so it was a virus
17 in mice that could cause cancer.
18    Q. You did that during your joint program at
19 Harvard and MIT?
20 A. I took off a year between my second and third
21 years.
22    Q. Upon completion of that work, did you enter
23 into an internship and residency for a medical
24 specialty?
25 A. I did my internship in internal medicine at

Page 2747

1  Columbia Presbyterian Hospital in New York City, which
2  is a part of Columbia University, and then I did a
3  two-year residency in internal medicine at Columbia, as
4  well.
5     Q. Would you describe Columbia Presbyterian
6  Hospital in New York City. That is the place where you
7  did your training for your internship and residency in
8  internal medicine?
9  A. It is a large tertiary care -- actually, it does
10 both primary care and tertiary care, which means many
11 patients are coming in from other hospitals. It is
12 located in Harlem, and it is a part of Columbia Medical
13 School.
14    Q. Did you obtain formal education in terms of
15 medical education and training after you completed your
16 internship and residency at Columbia Presbyterian
17 Hospital?
18 A. I did both a clinical and research fellowship in
19 infectious diseases at Columbia Presbyterian Hospital,
20 as well.
21    Q. Would you describe for the members of the jury
22 what the practice of infectious disease is.
23 A. Basically, very often in the hospital, we see
24 referrals for patients who might have fevers or other
25 infections caused either by bacteria or by viruses, or

Page 2748

1  other infectious agents, and so I spent a year --
2  basically, you would see surgical patients, internal
3  medicine patients, either to help treat an infection or
4  to help diagnose an infection.
5     Q. Okay. When you were in your fellowship at
6  Columbia Presbyterian Hospital, were you a practicing
7  physician during that time?
8  A. Yes, absolutely. I also had an outpatient clinic.
9     Q. Would you describe your outpatient clinic work
10 for the members of the jury, please.
11 A. I had -- during my internship and residency, I had
12 a general internal medicine outpatient clinic. During
13 my fellowship, I had an infectious disease outpatient
14 clinic.
15    About 90 percent of my patients had AIDS or
16 were infected with the virus that causes AIDS, and then
17 the other 10 percent had a variety of unusual
18 infectious diseases.
19    Q. Was the practice of infectious disease that
20 you were engaged in -- was the treatment of HIV and
21 AIDS, is that within that area of specialty?
22 A. Yes, it is within infectious diseases.
23    Q. Did you have a special interest in that?
24 A. Yes. When I then did my research, I did basic
25 science, AIDS research.

Page 2749

1  Q. How many years of private practice did you
2  have before joining Merck?
3  A. I was never in private practice. I always saw
4  patients within the medical center.
5  Q. All right. So I have asked the wrong
6  question. Let me rephrase it.
7      How many years of practice did you have taking
8  care of patients before you joined Merck?
9  A. Approximately 10 years before I joined Merck. I
10 started my internship in 1987, and I joined Merck in
11 1996.
12 Q. Prior to joining Merck, did you ever serve as
13 a teacher in a medical school setting?
14 A. In 1993, I joined the faculty at Columbia
15 Presbyterian Hospital as an assistant professor, and I
16 would teach as a part of that, and I actually continued
17 to volunteer my time at Columbia teaching and seeing
18 patients one month a year up until about three years
19 ago.
20 Q. All right. And I believe you have mentioned
21 that you joined Merck in about 1996, or in 1996.
22 A. That's correct.
23 Q. Can you tell the members of the jury why you
24 decided to leave your teaching position and come to
25 Merck.

Page 2750

1  A. Um, I was being successful in the research that I
2  was doing. I was publishing papers, I was getting
3  grants, and I enjoyed it. But what I realized was that
4  if I was lucky enough to find something that could
5  actually help in the treatment of patients with AIDS,
6  it was unlikely that I was ever going to be able to
7  develop that drug and test it myself. It would need to
8  be done at a pharmaceutical company.
9      MR. LANIER: Judge, can I object for a second?
10 I'm sorry, Dr. Reicin. Forgive me.
11 I think this was one of the matters that you
12 told us to discuss privately, and I hate to take a
13 side-bar, but...
14     THE COURT: Okay.
15 (Whereupon, the following occurred at
16 side-bar:)
17     MR. LANIER: Okay. It is one thing to pander
18 on cancer. It is another thing all together when it is
19 most likely we have at least one gay person on the jury
20 to be pandering with all of this AIDS stuff. This is
21 the exact same thing.
22     Excuse me.
23     She has now said six times -- she is talking
24 about how this is her study, it was her private
25 practice, what she wanted to do, and she is just going

Page 2751

1  on and on, and he specifically said -- this was
2  earlier, and I just let it go because I thought, surely
3  he won't revisit it, and he said, Is that a special
4  interest of yours, trying to help the AIDS patients?
5     Oh, yes.
6     That's just so outrageous to me that I can't
7  believe it is being done.
8     MR. BROCK: I have not done anything other
9  than give her background in terms of what she did, and
10 she has now said why she came to Merck, and that is
11 well within what --
12    THE COURT: Did she go right to work at an
13 AIDS program at Merck?
14    MR. BROCK: I don't think...
15 I'm not sure.
16    THE COURT: I don't think she ever did any
17 work in that area.
18    MR. LANIER: She didn't. This is pandering.
19 This is flat out pandering.
20    THE COURT: What is the request? I order him
21 to move on?
22    MR. LANIER: That we just stop it. I don't
23 know how you fix it without underscoring it, but this
24 needs to stop, and this is Mr. Brock.
25    THE COURT: Let's move on.

Page 2752

1     (End of side-bar.)
2  BY MR. BROCK:
3  Q. You joined Merck in 1996, and you were
4  involved in the VIOXX development program, correct?
5  A. Not initially.
6  Q. Right. But during your period of time at
7  Merck, you were involved in the VIOXX development
8  program?
9  A. That's correct.
10 Q. And can you tell the members of the jury in
11 what year you began working on the development of the
12 medicine VIOXX.
13 A. Um, I started working on the VIOXX program in 1997.
14 Q. So you had been there a year or so prior to
15 beginning your work on VIOXX?
16 A. Correct. In that year, I was working on another
17 drug.
18 Q. Now, can you describe for the members of the
19 jury briefly, just so they'll have the background for
20 this as we discuss your role with the medicine further
21 today, just give them an overview of your involvement
22 with the development of the drug and then things that
23 you did after the medicine was approved for use in the
24 United States.
25 A. Um, in 1997, I was asked to start designing a

Page 2753

1  large, what we call GI outcomes study. It was a study
2  to try and test whether VIOXX would be associated with
3  fewer serious gastrointestinal problems compared with
4  traditional NSAIDs, such as Motrin or Advil.
5      And what we meant by kind of serious
6  gastrointestinal problems are ulcers of the stomach or
7  bleeding from the stomach.
8      I worked on that study design for several
9  months.
10     A decision was made not to do that study, and
11 I started to -- I then helped design a study looking at
12 whether VIOXX could be used to treat pain in patients
13 who had just had hip or knee replacement.
14     And that would be beneficial, because VIOXX
15 doesn't make people bleed more, and some of the NSAIDs
16 can cause that because they interfere with platelet
17 clumping.
18     I then did, again, develop the design for a GI
19 outcomes study that's called the VIGOR study. We
20 conducted that study. So I was involved with that.
21     And then I took on increasing levels of
22 responsibility for the development program in, you
23 know, about 2001, 2002 -- this was after VIOXX was
24 already on the market -- and then took on
25 responsibility for other medications, novel therapies

Page 2754

1  that Merck was developing, as well.
2      Q. Okay. So the first project that you had was
3  to look at designing a study that would show VIOXX did
4  not cause as many perforations and ulcers and bleeds?
5      A. That's correct.
6      Q. And was that an expected benefit of VIOXX for
7  patients who would take the medicine if it was approved
8  for use in the United States?
9      A. Yes, it was. That was one of the key reasons we
10 were developing the drug is that we thought it would be
11 a benefit of the drug.
12     Q. The jury has heard about COX-1 and COX-2 and
13 that the COX-2 selective medicine is to protect the
14 stomach. If you have that general understanding, why
15 is it that Merck needed a GI megatrial to study this
16 issue?
17     A. I'm sorry, can you repeat the question for me
18 again?
19     Q. Sure.
20     The jury has heard about COX-1 and COX-2 and
21 that the COX-2 selective medicine is designed -- it's
22 intent is so that patients can take the medicine, get
23 pain relief, and still not have as many problems with
24 the stomach.
25     So that's the conceptual basis of the

Page 2755

1  development of the medicine.
2      A. That is correct.
3      Q. So if you have that general understanding, why
4  do you need a trial to prove that?
5      A. Well, there are all sorts of hypotheses that don't
6  pan out, so to speak, things that people think are
7  going to work and they don't work.
8      Now, we were doing endoscopy studies, meaning
9  that we were putting tubes down people's stomachs who
10 were taking our drug or an NSAID, looking for ulcers,
11 and I would say in 1997, there was controversy as to
12 whether that was enough. The theory from those who
13 said endoscopy is enough, saying if you have an ulcer
14 -- if you don't have ulcers on endoscopy, you're not
15 going to get them out in clinical practice.
16     Other people said, you know, sometimes you see
17 ulcers on endoscopy patients who never know they have
18 them, they come and they go, you really need to do
19 something that's more real world and prove not only in
20 the endoscopy studies but in real GI outcomes study you
21 have a benefit over the traditional NSAIDs.
22     Q. The test that you were doing prior to doing
23 the megatrial where you would stick the tube down in
24 the stomach to see if there was damage, was that
25 showing that VIOXX was safer that the traditional

Page 2756

1  NSAIDs just in what you saw in those tests?
2      A. Those tests did demonstrate that VIOXX was
3  significantly safer than the NSAIDs in that patients
4  had fewer holes -- I don't want to use the word
5  "hole" -- fewer ulcers in their stomachs.
6      Q. And the megatrial, the big trial with lots of
7  patients, was with the idea that you would look at it
8  to see if in clinical practice you saw clinically
9  significant differences?
10     A. Um, that's correct. It was still within the
11 confines of a clinical trial, but these were patients,
12 they didn't have to have endoscopies, they would have
13 an endoscopy if their physician felt based on their
14 symptoms or complaints that they needed an endoscopy.
15 So more like it would happen in the real world.
16     Q. Did you work with Dr. Briggs Morrison in the
17 design of the megatrial?
18     A. Um, well, Briggs and I and other physicians in my
19 group often collaborated. In 1997, when I put together
20 the initial kind of draft of the protocol which
21 outlines how we'll study the patients, how we'll
22 conduct the study, I did send a copy of it to Briggs
23 and other colleagues with some questions that I had for
24 them. I wanted their input on the study design.
25     Q. Was there an issue when you were looking at

Page 2757

1  the design of the trial to see if you got clinically
2  significant differences in outcomes when you looked at
3  VIOXX versus a traditional NSAID? Was there discussion
4  about whether or not to put aspirin in the trial?
5  A. It was something that was discussed a lot.
6  Q. I want to ask you just a couple of questions
7  about aspirin.
8      By 1997, was it pretty well understood that
9  aspirin was cardioprotective; that is, that if you were
10 taking aspirin on a regular basis, you had a better
11 chance of not having a heart attack.
12 A. Yes, especially in patients who had had previous
13 heart attacks or strokes, taking aspirin was
14 beneficial. We had found that to be in many, many
15 studies.
16 Q. So could we say aspirin, then, was known by
17 then to protect the heart?
18 A. That's correct.
19 Q. If you did a trial of aspirin versus placebo
20 based on what you knew in 1997, would you expect that
21 you would see more events, assuming that you set it up
22 right and you randomized it right and you had the right
23 number of patients, you would see more events on the
24 placebo side than you would on the aspirin side of the
25 trial?

Page 2758

1  A. Yes. You would have more, for instance, heart
2  attacks in the placebo patients than --
3  Q. Is that because placebo would be considered
4  neutral for that trial?
5  A. That's correct. So higher on placebo, lower on
6  aspirin, because aspirin is providing cardioprotection.
7  Q. The fact that you saw in a hypothetical trial
8  like this more events on placebo, would that mean that
9  placebo was causing the events?
10 A. No. I mean, your assumption would be that aspirin
11 was protecting patients and therefore was decreasing
12 the events.
13 Q. Okay. If we fast forward to the point of time
14 where we're talking about the trial of VIOXX versus
15 traditional NSAIDs to see if it is better on the
16 stomach, did one of the physicians and scientists at
17 Merck prepare a memo that looked at the consequences of
18 NSAID antiplatelet effects on the cardiovascular events
19 if you did a trial of VIOXX versus a traditional NSAID?
20 A. Yes. Dr. Tom Musliner had looked at that. It is a
21 commonly held belief that aspirin protects the heart
22 because it prevents platelets from clumping, so it has
23 antiplatelet activities. And NSAIDs can have some of
24 the same effects on platelets. It can inhibit platelet
25 clumping.

Page 2759

1      And so what Dr. Musliner was talking about was
2  the question of whether NSAIDs could act like aspirin
3  in terms of protecting the heart from having a heart
4  attack.
5  Q. All right. So let's look at Exhibit Number
6  A-13. This is the Musliner memo that is already in
7  evidence. I'll put your binder right here.
8      And if you'll turn to 13.4, all right, the
9  jury has seen this document, so we're not going to go
10 back through the whole thing and replow ground that we
11 have already been over, but do you see the highlighted
12 part that says "Figures for Different Assumed CV Event
13 Rates. Assumptions underlying these numbers include
14 the following," and then you see A there?
15 A. Yes, I do.
16 Q. And does it say "Patients treated with
17 standard NSAIDs will experience antiplatelet effects
18 and resultant CV protection similar to that produced by
19 aspirin"?
20     THE COURT: Mr. Brock, the jury can't see the
21 screen.
22     MR. BROCK: Thank you, Mary. And I apologize.
23 BY MR. BROCK:
24 Q. So "Figures are provided for different assumed
25 CV event rates. Assumptions underlying these numbers

Page 2760

1  include the following: Patients treated with standard
2  NSAIDs will experience antiplatelet effects and
3  resultant CV protection similar to that produced by
4  aspirin."
5      Right?
6  A. That's correct.
7  Q. Is that saying that if you do a trial where
8  you're looking to test VIOXX versus a standard NSAID
9  that Dr. Musliner, based on what he said here, is that
10 we may see protection in the NSAID group like what you
11 would see with aspirin?
12 A. That was the assumption that he was making.
13 Q. And I believe he says here, "There are good
14 theoretical arguments, as well as limited clinical data
15 to support this assumption."
16     Do you see that, the parens?
17 A. Yes, I do.
18 Q. Standard NSAIDs are things like Naproxen?
19 A. Like Naproxen, which when it is sold over the
20 counter in lower dosage is known as Aleve.
21 Q. Now, what does Dr. Musliner say in 1996 about
22 VIOXX in terms of its effect on the heart if you do a
23 big trial testing for protection on the stomach?
24 A. That it would have a neutral effect. It wouldn't
25 increase the rate of events and it wouldn't decrease

Page 2761

1   the rate of events.
2   Q. And was that the understanding about Merck --
3   by Merck at this point in time?
4   MR. LANIER: I'm going to object to her
5   speaking about "by Merck." She is not a corporate
6   representative. She can only speak for herself.
7   MR. BROCK: I'll rephrase the question.
8   BY MR. BROCK:
9   Q. Was the understanding of Merck as reflected in
10  the document that VIOXX was neutral?
11  MR. LANIER: Again, Judge, I have to object to
12  her speaking about the understanding of Merck. She can
13  say what the document means to her. That's it.
14  THE COURT: Well, the document is written by a
15  Merck employee, correct?
16  MR. BROCK: Yes, ma'am.
17  THE COURT: The issue is whether one doctor at
18  Merck or two doctors at Merck, what their opinion is,
19  whether that was the corporate -- whether that was the
20  opinion of everyone at Merck. If you want to lay that
21  foundation, you can; otherwise, you should ask her
22  whether this physician from Merck felt this way.
23  BY MR. BROCK:
24  Q. All right. Let's do it this way.
25      The document in 1996 reflects that VIOXX will

Page 2762

1   be neutral on the heart.
2   A. Yes.
3   Q. Okay. Was that your personal understanding
4   from the memo?
5   A. That was my understanding.
6   Q. From your many conversations and dealings with
7   people in the VIOXX program, was that the understanding
8   of the physicians and scientists of Merck during that
9   period of time?
10  A. Yes, it was.
11  Q. So what Dr. Musliner is saying here is that...
12      Well, let me ask the question this way: If
13  you did this trial like this and you did NSAIDs versus
14  VIOXX and you saw that you had more cardiovascular
15  events in the VIOXX arm, could you conclude from that
16  that VIOXX was causing events?
17  A. No. The assumption here that he was making is that
18  if you did that trial, in fact, you could find that the
19  event rate would be higher on the VIOXX arm than on the
20  NSAID arm, but not because VIOXX was increasing the
21  rate; rather, because the NSAIDs were acting like
22  aspirin and decreasing the rate.
23  Q. Because VIOXX would be like placebo, and the
24  standard NSAID like Naproxen or other NSAIDs would be
25  like aspirin?

Page 2763

1   A. Yes, that's exactly what he was saying.
2   Q. Now, if you'll turn, please, to Exhibit 29,
3   which is the second one in your notebook, please. It
4   is P-29. And this was admitted into evidence through
5   Dr. Morrison.
6       Do you see the e-mail on 29.2 that references
7   a note from you to Dr. Simon, Eric, and Dr. Briggs
8   Morrison?
9   A. Yes, I do.
10  Q. And do you see that it refers to at the
11  bottom, "Attached is a preliminary draft of the GIOT,"
12  that's the GI outcomes protocol, correct?
13  A. The T was for trial.
14  Q. "You can see throughout I have written
15  comments and questions." And can you tell the members
16  of the jury what this refers to?
17  A. I had attached to this e-mail the protocol, which
18  is a document that sets out the design of the study,
19  what the question you're trying to answer in the study
20  is, the hypothesis, what type of patients can be
21  enrolled in the study, how those patients will be
22  treated, how often they'll be seen by their physicians,
23  how you'll analyze the data that's in the protocol.
24  And I had attached this along with questions that I
25  inserted into the protocol on wanting to get their

Page 2764

1   advice.
2   Q. All right. Turn to the next exhibit, which is
3   Exhibit Number 512. A-512.1.
4       And is this the draft of the protocol that you
5   have just referenced?
6   A. Um, this is a draft of the protocol.
7   Q. And it refers to MK 0966 GI clinical outcomes
8   study, just as was referenced in the memo?
9   A. That's correct.
10  Q. And if you turn to 512.22, do you see the part
11  I have highlighted under F?
12  A. Yes, I do.
13  Q. Is this a comment that you are making to the
14  recipients of the e-mail that we just looked at?
15  A. That is correct.
16  Q. And tell the members of the jury what you were
17  communicating to the recipients of the e-mail here.
18  A. Um, I was concerned that if we did a study with an
19  NSAID and VIOXX that we, in fact, -- and there was
20  going to be no placebo in this group, so no sugar pill,
21  because this was a long-term study in arthritis
22  patients, and those patients need to take either an
23  NSAID or a COX-2 inhibitor to treat their pain. So
24  there was no placebo group.
25      And I was concerned if Tom Musliner was right

Page 2765

1  then we might, in fact, see a higher rate of events on
2  the VIOXX group compared to the NSAID group, because
3  the NSAID group would be providing cardioprotection and
4  the VIOXX group was not.
5       And so we were discussing whether we should
6  allow aspirin into the study or not, and if you allowed
7  patients on aspirin, you would also -- you would be
8  allowing patients who were at high risk for having
9  cardiovascular disease.
10      So the issue was around whether you allow
11 patients on aspirin into the study.
12 Q.  You say, "I sent you and Alan an article on
13 flurbiprofen given after PTCA. It decreased the
14 reocclusion rate compared to placebo. No comparison to
15 aspirin."
16      Does this reflect that you looked at some
17 literature in connection with this analysis?
18 A.  That's correct. I had gone back and tried to find
19 literature to whether there were any clinical studies
20 to test whether NSAIDs could, in fact, be
21 cardioprotective, and there was one I found on
22 flurbiprofen, which is an NSAID that is sold here in
23 the United States, and, in fact, they had found, I
24 think, a 70 percent -- in this study, patients had come
25 in and had either a heart attack or about to have had a

Page 2766

1  heart attack and they had opened up the artery. And
2  then they took those patients and they didn't give them
3  aspirin.
4       You couldn't do this study nowadays. It would
5  not be considered an ethical study to do, because all
6  of those patients are now given aspirin. But back
7  then, they didn't give them aspirin, they gave them
8  placebo or flurbiprofen, and what they found were that
9  the patients on flurbiprofen, which is an NSAID, had a
10 70 percent reduction in reclotting of the artery.
11 Q.  Now, going back to the Exhibit 29, I want to
12 direct your attention to 29.1, paragraph five. And
13 there's a -- this relates to an e-mail from you to Dr.
14 Simon, Daniels, Eric, and Morrison again, is that
15 correct?
16 A.  That's correct.
17 Q.  There's a note in paragraph five, "Low-dose
18 aspirin. I hear you. This is a no-win situation."
19      When you are communicating to them that
20 there's a no-win situation, what do you refer to there?
21 A.  So, again, this was around the question of do you
22 allow patients in the study on aspirin. We were trying
23 to answer a very specific question in this study, and
24 that is, would patients who took a drug that only
25 inhibited cyclooxygenase-2 have less serious GI events

Page 2767

1  compared with patients who took a nonselective NSAID
2  that inhibit both COX-1 and COX-2.
3       Aspirin inhibits COX-1, so if you allowed
4  patients into the study who were taking aspirin, in
5  those patients you wouldn't be testing the COX-2
6  hypothesis, because the VIOXX patients who are on
7  aspirin would not only have inhibition of COX-2, they
8  would have inhibition of COX-1, as well.
9       And while testing the GI safety in that
10 population is an important question, it is a different
11 question than the one we were trying to answer in this
12 particular study.
13 Q.  Okay. It says, "The relative risk of even
14 low-dose aspirin may be as high as two to fourfold."
15      What relative risk is that referring to?
16 A.  Potentially of GI bleeding.
17 Q.  So if you're taking aspirin, you're at higher
18 risk for problems with the stomach?
19 A.  That's correct.
20 Q.  "Yet the possibility of increased CV events is
21 of great concern. I just can't wait to be the one to
22 present those results to senior management."
23      What does that refer to?
24 A.  Well, I was concerned that if we allowed VIOXX and
25 we studied VIOXX and the NSAID and we didn't have

Page 2768

1  patients in the study with aspirin, you might see what
2  they saw in the flurbiprofen study, lower rate of
3  events on the NSAID group, higher rate of events on the
4  VIOXX group. There would be no placebo.
5       And so you would have this new drug, and the
6  question is, without a placebo, how could you tell
7  whether it was the NSAIDs decreased the rate or that
8  VIOXX was increasing the rate?
9  Q.  So what you're referring to now, I think
10 you're telling us is that if you do this trial and you
11 have fewer events on the NSAID group than you do on the
12 VIOXX group...
13      Well, let me ask the question this way: If
14 you do this trial and you see fewer events on the NSAID
15 group than you do on the VIOXX group, does that mean
16 that VIOXX is causing the heart attacks?
17 A.  Well, according to the data we had at that time, we
18 thought, in fact, it would mean that the NSAIDs were
19 decreasing the rate. But, of course, without a placebo
20 in the trial, you couldn't be sure.
21 Q.  Okay. Thank you.
22      Now, during this period of time when you were
23 working on the GI megatrial in the '98 time frame, were
24 you aware of the study that had been done, Study 023,
25 which has been described to the jury as the FitzGerald

Page 2769

1  study?
2  A. Well, this was in 1997, early 1997, and it was
3  before we had results from the Garrett FitzGerald
4  study. At that point in time, there was no animal data
5  or other data that suggested that VIOXX would increase
6  the risk of cardiovascular events.
7     Q. Thank you.
8        In a later point in time, did you learn about
9  the 023 study?
10 A. Yes, I did.
11    Q. And the 023 study, just to summarize very
12 quickly, so that we can put a couple questions in
13 context for the jury, 023, the FitzGerald study, saw a
14 reduction of the waste products of prostacyclin but not
15 thromboxane in the urine?
16 A. In patients treated with VIOXX, they saw a
17 reduction in a breakdown product of prostacyclin in the
18 urine and no change in thromboxane.
19    Q. From that study did you know if the reduction
20 in prostacyclin that you saw in the waste products of
21 the urine, whether that was from the blood vessels, the
22 vasculature?
23 A. No, you could not tell that from the study.
24 Prostacyclin is made in many organs in the body.
25    Q. Could you tell from that study whether

Page 2770

1  prostacyclin was being made in the vasculature by COX-1
2  or COX-2?
3  A. No, you could not tell from that study. In fact,
4  the majority of studies suggested that prostacyclin in
5  the vasculature was made by COX-1, which is why the
6  results of the study were so surprising to everybody.
7     Q. If prostacyclin is made by COX-1 and VIOXX is
8  a COX-2 inhibitor, just if you go with that statement,
9  then is VIOXX going to reduce anywhere in the
10 vasculature prostacyclin?
11 A. Not if COX-1 is making prostacyclin in the
12 vasculature.
13    Q. Now, we have talked extensively with the jury
14 about what Merck did in response to the FitzGerald
15 hypothesis, and we won't go back through all of those
16 steps, but I do need to ask you this question:
17       There's been statements made that Merck in its
18 development program of the medicine VIOXX did not test
19 the medicine in patients that were older or who had
20 health problems. I want to ask you if that statement
21 is true.
22    MR. LANIER: Obviously, Your Honor, I object
23 to him saying that statement is made. That's not the
24 statement we have made. We made the statement about
25 high risk patients.

Page 2771

1     THE COURT: The jury should disregard the
2  question, and you can reframe the question in terms of
3  were older populations included.
4  BY MR. BROCK:
5     Q. Did Merck test the medicine VIOXX before it
6  asked the FDA for permission to sell it in the United
7  States in patients who were older or in patients who
8  had risk factors for heart disease?
9  A. Yes, it did.
10    Q. Tell the jury about that.
11 A. Um, in our osteoarthritis studies, the average age
12 of the patients was 65, I think. About -- or 63. I
13 think about 40 percent were over the age of 65.
14       Forty percent of them had hypertension, high
15 blood pressure. I think 20 percent of them had high
16 cholesterol. Eight or 9 percent had diabetes. I think
17 about 8 percent had actually had a previous heart
18 attack or a stroke. And if you looked at what many
19 define as, quote, high risk -- so patients who had two
20 or more risk factors or had had a previous heart attack
21 or stroke -- it was about 20 percent of patients in the
22 osteoarthritis studies.
23    Q. Now, the next question I have for you is
24 whether or not Merck in the period of time leading up
25 to asking for permission to sell the medicine in the

Page 2772

1  United States, did Merck track the cardiovascular
2  events that were occurring in the trials?
3  A. Um, we had a very large clinical development
4  program, and we collect all safety data on patients,
5  blood pressures taken during the studies. We collect
6  blood from patients, and any adverse experiences,
7  whether or not they're related to the drug, are
8  reported in and put in the database. And so, of
9  course, all cardiovascular events would have been
10 included in that.
11    Q. Prior to the time that the FDA approved VIOXX
12 for sale in the United States, did Merck do a specific
13 safety trial where the only outcome of the trial was to
14 look at cardiovascular safety?
15 A. No, we did not. That would not have been standard
16 um, and I think probably at that period of time would
17 not have been necessary.
18    Q. Could you tell the members of the jury why.
19 A. The FitzGerald hypothesis certainly did -- he
20 raised the question, could this decrease in
21 prostacyclin put patients who take VIOXX at increased
22 risk of cardiovascular events? But there was really no
23 data at that time to suggest that prostacyclin was, in
24 fact, reduced in the vessels.
25       There were alternate theories also in the

Page 2773

1 literature at that time. There was a theory that
2 VIOXX, because it was an anti-inflammatory agent, could
3 actually help the heart and be cardioprotective.
4     So you had many -- you had differing theories
5 at that point in time.
6     Nothing in our animal data suggested that
7 there was an issue, and in addition, we looked very
8 carefully after we saw Dr. FitzGerald's data at our
9 entire Phase IIb/III database. So our OA database had
10 over 5,000 patients, who some of the studies were
11 six weeks, but some of them went a year or longer. And
12 we did a specific analysis looking at cardiovascular
13 events.
14     And, in fact, the rate of serious
15 cardiovascular events, including heart attacks, was the
16 same on VIOXX and placebo, although the placebo data
17 set was small.
18     And, also, importantly, it was the same
19 between VIOXX and the NSAID. And in this case, the
20 NSAIDs were Ibuprofen and diclofenac.
21     We discussed that data with the FDA. We
22 submitted that data to the FDA. That data was
23 discussed at the public FDA advisory committee meeting
24 and at no point in time did anybody say they thought it
25 was necessary for a cardiovascular outcomes study to be

Page 2774

1 done prior to the drug being put on the market.
2     However, we tend to be very careful at Merck,
3 and so we said, we haven't seen anything, but we have a
4 lot more studies that are about to start, let's be
5 proactive and put together a process to proactively
6 collect and have outside experts look at and adjudicate
7 to see whether something that is reported as a heart
8 attack really is a heart attack or something that's
9 reported as angina maybe is a heart attack, and let's
10 do that prospectively in our studies of four weeks or
11 more duration that we're about to start with any of our
12 COX-2 inhibitors.
13 Q. Okay. So just to summarize briefly, you
14 looked at in the database the major application when
15 you made your application to sell the drug VIOXX versus
16 placebo. And what did you do?
17 A. We saw that the rates of cardiovascular events was
18 similar. And when I'm talking about cardiovascular
19 events, because I think people use the terminology in
20 all different ways, I'm talking now about potential
21 thrombotic events. I'm not talking about hypertension,
22 which is higher on VIOXX than placebo, as it is on
23 NSAIDs versus placebo.
24 Q. And you looked at VIOXX versus the NSAIDs in
25 the trials that you had conducted, IIb and III, and

Page 2775

1 what did you see?
2 A. Again, the rate of potential thrombotic events,
3 serious cardiovascular events was similar on VIOXX and
4 the comparator NSAIDs.
5 Q. And you put in place this CVSOP that you have
6 just described --
7 A. Correct.
8 Q. -- so that you can get a better look at what
9 you do?
10 A. That was...
11     We started that in about, I think, December of
12 1998, early 1999.
13 Q. The jury has seen the documents. VIOXX was
14 approved for sale in the United States in May of 1999,
15 correct?
16 A. That's correct.
17 Q. Now, I want to go back to one point before I
18 get to the next step along the way.
19     Did Merck do the GI outcomes megatrial that we
20 were talking about in terms of the memos that went back
21 and forth between you and Dr. Morrison and others? Was
22 that actual trial conducted?
23 A. We did not do that actual trial. As I said, in
24 that period of time, there was controversy of whether
25 endoscopy studies would actually be enough. We did not

Page 2776

1 do that trial then, but in the 1998/1999 time frame, I
2 was asked to start working on the design of another GI
3 outcomes study.
4 Q. And that's the one the jury has heard about.
5 That's the VIGOR trial?
6 A. Yes, it is.
7 Q. And you were very involved in that trial?
8 A. Yes, I was.
9 Q. In fact, you were one of the primary drafters
10 of the protocols?
11 A. Yes.
12 Q. And I need you to just take a minute and tell
13 the jury what a trial protocol is and why it is
14 important to understanding the results of a trial.
15 A. Um, the protocol I think I said before kind of
16 outlines the specific questions that you're going to
17 ask, and you like to prespecify those questions, to
18 state in advance, these are the questions that we're
19 going to try to address during this study.
20     It tells you the types of patients that you're
21 going to enroll in the study. It tells you how you're
22 going to give the drug, the test drugs, and what dose
23 of the test drugs you're going to give. It tells the
24 physicians how often they should see the patients in
25 what type of safety tests they should do on the

Page 2777

1 patients during the studies.
2     It also -- in this particular case, we told
3 them if they told them about reporting gastrointestinal
4 events and specific reporting for cardiovascular
5 events, and all of that was outlined in the protocol.
6  Q. You served in the role as the clinical monitor
7 of the trial, correct?
8  A. Correct.
9  Q. This was a study that's referred to as a
10 blinding trial, correct?
11  A. That is correct.
12  Q. I know everybody understands that. They're
13 not sitting there with a blindfold over their eyes, but
14 what does that mean, to be blinded?
15  A. It means the patients don't know what therapy
16 they're on. The physicians who are taking care of them
17 don't know what therapy they're on. And it also means
18 that we at Merck don't know what therapy they're on.
19  Q. So what is the role of the clinical monitor in
20 a blinded trial like VIGOR?
21  A. You're saying during the conduct of the study?
22  Q. During the conduct of the study, yes, ma'am.
23  A. During the conduct of the study, I reviewed
24 laboratory results on all the patients. They also went
25 to the investigators, but I would kind of also review

Page 2778

1 them, and if I saw labs that were of concern to me, we
2 would call the investigators, make sure they were aware
3 of them, making sure they were following up on
4 patients.
5     I would review any adverse experiences that
6 were being reported in. I would look at all serious
7 adverse experiences, and if I didn't think...
8     They would have to give us a narrative, a
9 little story about what happened. If I didn't think
10 they were clear, I had questions, we would go back to
11 the investigator.
12     I would answer questions from any
13 investigators ongoing during the study and worked with
14 the Steering Committee, that was an outside group of
15 experts that was overseeing the conduct of the study to
16 ensure the study was conducted appropriately.
17  Q. When you have records come in someone had had
18 an adverse experience or there was a report, would you
19 know if that patient was taking VIOXX or the comparator
20 drug?
21  A. No, I was blinded.
22  Q. So you would be following up with questions,
23 but not knowing which treatment the patient was
24 receiving?
25  A. That's correct.

Page 2779

1  Q. How many patients were in the VIGOR trial,
2 approximately?
3  A. Approximately 8,000 patients.
4  Q. And can you tell the members of the jury what
5 was the purpose of the VIGOR trial?
6  A. Similar to the purpose we were talking about for
7 the study I was working on in 1997. The purpose was to
8 test whether VIOXX was associated with fewer clinical
9 GI outcomes, such as ulcers in the stomach, bleeding
10 from the stomach, or actually holes in the stomach,
11 compared with the comparator NSAID, which inhibits both
12 COX-1 and COX-2. And in this case, that comparator
13 NSAID was Naproxen, otherwise known as Aleve.
14  Q. Did Merck have interaction with the FDA in
15 terms of the design of the VIGOR trial?
16  A. Yes, we did. We sent them a copy of the protocol,
17 and then we, along with the Steering Committee chairs,
18 went down to discuss that with them.
19  Q. Let me get you to look at 50, Exhibit 50 and
20 turn to page 50.
21  A. Is that A-50?
22  Q. A-50. And do you have the cover sheet there?
23  A. Yes, I do.
24  Q. And is this the cover sheet for a letter that
25 is written to Robert Delap at FDA from Bob Silverman.

Page 2780

1  A. Yes. You can see that on the second page. I can't
2 tell that --
3  Q. On the second page. I apologize. Page 50.2,
4 please.
5     And the date of that is December 18th, 1998.
6  A. That's correct.
7  Q. And it says, "Reference is made to the above
8 Investigational New Drug Application (IND), a
9 background briefing document submitted on September
10 2nd, 1998, draft comments received from the agency on
11 October 30th, 1998, and a meeting between
12 representatives of MRL and the agency on November 5th
13 1998. By this letter and attachment, MRL is providing
14 minutes prepared by MRL of this proceeding."
15     Did I read that right?
16  A. You did.
17  Q. What does that refer to?
18  A. We sent the protocol down to the FDA, it looks like
19 in September of 1998. They sent us some comments back
20 on it, and then we met with them to discuss their
21 comments and how we would address them.
22  Q. And if you look at 50.7, paragraph number 1,
23 does it say that the agency and MRL generally concurred
24 on the design of the proposed GI outcomes trial?
25  A. That's correct.

Page 2781

1  Q. And that is the VIGOR trial?
2  A. That is the VIGOR trial.
3  Q. Now, in the VIGOR trial, was there a placebo
4  arm?
5  A. No. We did the VIGOR trial in patients with
6  rheumatoid arthritis, which is a severe form of
7  arthritis that can be crippling in some patients. And
8  those patients usually -- or often need to take high
9  doses of nonsteroidal anti-inflammatories or other pain
10 medications to treat their pain, and you can't ask them
11 to go on placebo for a prolonged period of time, and,
12 therefore, there was no placebo in this study.
13 Q. Okay. You mentioned that --
14 A. That means they wouldn't be getting treatment for
15 their pain if you asked them to take a placebo.
16 Q. So if you had a trial of patients that were --
17 that had rheumatoid arthritis that had a lot of pain,
18 you couldn't ask them to stay in the trial nine to
19 13 months without pain relief.
20 A. That's correct.
21 Q. Why was Naproxen selected as the comparator
22 drug?
23 A. There was several reasons for that.
24     First of all, Naproxen is given twice a day.
25 Some of the other nonsteroidal anti-inflammatories we

Page 2782

1  were considering were given three times a day, and our
2  consultants were telling us that rheumatoid arthritis
3  patients often have complicated medical regimens, and
4  if we wanted them to be able to take the drug during
5  the whole course that twice a day was about the most
6  that you could expect them to take a drug.
7      So that was one reason.
8      Naproxen also is the most commonly used
9  nonsteroidal for the treatment of rheumatoid arthritis.
10     And, thirdly, we had gotten a lot of data on
11 Ibuprofen and diclofenac, other NSAIDs, in our OA
12 studies, as well as I think nabumetone, and this would
13 provide us the opportunity to get more data on VIOXX
14 versus yet another nonsteroidal anti-inflammatory.
15 Q. All right. What dosage of VIOXX was selected
16 for the VIGOR trial, and why?
17 A. For Naproxen, it was the most commonly used dose,
18 which is 500 milligrams twice a day. For VIOXX,
19 actually, we chose 50 milligrams, which is two times
20 the maximum dose that's recommended.
21     And the reason for that is, actually, the
22 agency had requested that we look to see if the GI
23 safety for VIOXX would be maintained even if patients
24 went to a dose that was higher than recommended for
25 use.

Page 2783

1  Q. So the trial that you ended up with was one in
2  which you had Naproxen as a comparator at
3  500 milligrams times two?
4  A. 500 milligrams twice a day.
5  Q. And 50 milligrams of VIOXX, which was twice
6  the recommended dose?
7  A. That's correct, for chronic use. For acute pain,
8  you could take 50 milligrams for up to five days.
9  Q. Now, was there a board of physicians in place
10 to monitor developments in the trial as relates to
11 patient safety?
12 A. For this study, we convened, we put together a data
13 safety monitoring board, which are a group of experts
14 who do not work at Merck, experts in the field of
15 rheumatology, clinical trial design,
16 gastroenterologist, statistics, and there's a Merck
17 statistician who works with them, in this case, Deborah
18 Shapiro. She didn't vote, but she would provide them
19 the analyses.
20     And at several points during the study, they
21 would actually analyze the data in an unblinded manner
22 in that they would see safety events on patients on
23 treatment A versus treatment B. Some data safety
24 monitoring boards say they know what the treatments
25 are, but this particular board said we want to see it

Page 2784

1  by A versus B.
2  Q. Okay. So as events were being reported during
3  the VIGOR trial, would the data safety monitoring board
4  periodically receive summaries of those events or
5  information about the events?
6  A. When they meet in the beginning, they decide how
7  often they want to meet and how they want to see the
8  data, and so at set times, Dr. Shapiro would do
9  analyses that included the safety data, and she would
10 show those to the board. And once she was unblinded,
11 she was kind of -- she wasn't allowed to speak to
12 anybody else at Merck about either the study conduct or
13 the study design or results, obviously.
14 Q. At any point in time did the data safety
15 monitoring board relative to the VIGOR trial, recommend
16 that the trial be halted?
17 A. No, they did not.
18 Q. Now, when you have a trial of 8,000 patients
19 and you're testing to see if one drug or another is
20 safer on the stomach, you have to have a way for the
21 trial to end, don't you? How do you get to the end
22 point after trial?
23 A. That's correct. Trials are designed in many ways.
24 Some would say, okay, everybody has to be on study drug
25 for a year, and when the last patient has completed a

Page 2785

1  year of therapy, the study is over.
2       This particular study had a prespecified
3  number of end points that needed to occur. In this
4  case, we needed at least 120 what we call PUBS, that's
5  perforations, ulcers, or bleeds, and 40 confirmed
6  complicated events. These were the more serious ones.
7  It wouldn't include asymptomatical ulcers. It would be
8  major GI bleed or perforations, or maybe even
9  obstructions.
10      And when we reached that number of end points,
11 we would then terminate the study. So we couldn't
12 predict in advance the exact date the study would end.
13 Q.  Okay. What was the start date for the VIGOR
14 trial?
15 A.  I believe it was in January, 1999.
16 Q.  And is this what you would refer to as an
17 event-driven trial in terms of the termination date?
18 A.  That's correct. We would call it an event-driven
19 trial.
20 Q.  As GI events were being reported during the
21 trial, would independent folks look at them to see
22 whether or not they were actually GI events?
23 A.  So if a GI event was reported, we would then go
24 back to the site and say, could you provide us with the
25 patient's medical records as they relate to this event.

Page 2786

1  So if they had an endoscopy, we would ask for
2  that data. They would put a tube down to find an
3  ulcer. If there was laboratory data, anything that --
4  you know, we had certain documents we would ask for.
5       And these would come into us blinded. We
6  didn't know who the patient was or what treatment they
7  were on, other than what we call an allocation number,
8  kind of a number by which we can identify a patient in
9  a study.
10      And then that was sent to an outside group of
11 experts, who would review the data in a blinded manner,
12 and say, yes, this was really a perforation, an ulcer,
13 or a bleed, or it was a complicated bleed or, no, this
14 was not.
15 Q.  Okay. Now, I want to go back in time --
16 A.  And if they said it was, it was considered a
17 confirmed event. And that was what the primary
18 analysis was based on.
19 Q.  All right. So one of the things that you're
20 looking at in the VIGOR trial is clinically significant
21 problems on the stomach. That's one of the issues that
22 you're looking at, and you've got an adjudication
23 process in place to see if they're a real event or not.
24 A.  That's correct.
25 Q.  Did you also have in place for the VIGOR trial

Page 2787

1  the cardiovascular standard operating procedure that
2  the jury has heard about?
3  A.  Yes. As I said, when we had completed our Phase
4  III studies, even though we saw no evidence of a signal
5  in terms of an increase in thrombotic events on VIOXX,
6  we proactively started this, what we say,
7  cardiovascular SOP with the intent that we would
8  collect serious cardiovascular events in ongoing -- or,
9  you know, studies in the future, and then we would
10 analyze them in a pooled analysis.
11      We had done a GI pooled analysis as a part of
12 the original NDA, and we would do something similar in
13 terms of a cardiovascular pooled analysis.
14 Q.  So the CVSOP contemplated that in trials from
15 a certain point forward, VIGOR included, you would look
16 at the thrombotic events, you would send them out to
17 independent adjudicators, and then you would pool
18 results to see what you saw?
19 A.  Right. From VIGOR, as well as other studies.
20 Q.  Okay. And that CVSOP was in place for the
21 VIGOR trial?
22 A.  Yes, that is correct. It was one of the first
23 studies to use the CVSOP.
24 Q.  Now, did you, as the trial was coming to its
25 close in December of 1999, receive correspondence from

Page 2788

1  the data safety monitoring board about what they felt
2  would be appropriate in terms of adjudication of
3  events?
4  A.  It wasn't necessarily my recollection, at least
5  about adjudication. Rather, they were recommending
6  that we do a specific cardiovascular -- analysis of the
7  potential thrombotic events, the adjudicated events
8  from VIGOR alone.
9  Q.  Okay. And let me direct your attention to
10 Exhibit A-701.
11      Do you have it there?
12 A.  I do.
13 Q.  And is that a letter that you received from
14 Dr. Michael Weinblatt concerning the issue that we have
15 just discussed?
16 A.  That is correct.
17      MR. BROCK: Your Honor, at this point, we
18 would offer 701.
19      THE COURT: Any objection?
20      MR. LANIER: I don't have an objection, Judge.
21      THE COURT: 701 will be marked into evidence.
22      (Whereupon, Defense Exhibit 701 was marked
23 into evidence.)
24 BY MR. BROCK:
25 Q.  Do you see the date of this is December 20th

Page 2789

1  of 1999?
2  A. Mr. Brock, I think you have to move the...
3    Q. Thank you. I don't know where I would be
4  without my witnesses.
5      MR. LANIER: Home.
6      MR. BROCK: Don't tempt me.
7  BY MR. BROCK:
8    Q. All right. December 20th of 1999?
9  A. That's correct.
10   Q. And it is to you from Dr. Weinblatt, and you
11 see I've got a piece highlighted here that says "We
12 recommend that an analysis plan be developed to analyze
13 adjudicated serious vascular events in the VIGOR trial
14 separately from any other planned analyses of these
15 data"?
16 A. Correct.
17   Q. What does that mean?
18 A. He was suggesting that we analyze cardiovascular
19 events from VIGOR alone and that we prespecify how we
20 were going to do that.
21   Q. All right. So this suggestion doesn't change
22 the fact that you were going to send the
23 investigator-reported events to adjudicators.
24 A. Oh, no. That was already ongoing since the
25 beginning of the study.

Page 2790

1    Q. It is simply saying, instead of sending it out
2  and pooling it with everything else, look at it on its
3  own.
4  A. It is not so much the sending it out. It is more
5  once you get the data, the plan was to pool it with
6  other data sets, because we didn't think we would have
7  that much information from one study alone. And they
8  were suggesting that we do the analysis on this study
9  alone.
10   Q. Okay. Then if we could see Exhibit A-660.1,
11 please.
12     Tell the jury what this is, please. Do you
13 have it?
14 A. 661.1.
15   Q. A-660, correct.
16 A. Okay. This is another letter that I received from
17 Dr. Weinblatt in January.
18     We had gone back to him. We thought maybe he
19 didn't realize that we were going to be analyzing the
20 data pooled with other trials, and we went back to him
21 and said, no, we think this study is under-powered, we
22 plan to do this for all trials.
23     And so what he came back to was saying, no, we
24 understand, we want you to prespecify a specific
25 analysis just for the VIGOR study.

Page 2791

1    Q. And that's what he said there to you, "An
2  analysis of these cardiovascular data must be provided
3  separately for VIGOR as part of the study report"?
4  A. That's correct.
5    Q. And does he also say that "The plan for the
6  analysis of adjudicated serious cardiovascular data
7  must be written and approved prior to unblinding"?
8  A. That is correct.
9    Q. What does that mean?
10 A. He wanted us to prespecify what our plan was for
11 doing the analysis before we saw any of the data from
12 the study.
13   Q. Okay. Did you agree to the suggestion that
14 was being made by Dr. Weinblatt of the data safety
15 monitoring board to look at the data in the way he is
16 suggesting?
17 A. Yes, we did.
18   Q. Could we see A...
19     MR. BROCK: Let me at this point offer A-660.
20     THE COURT: Any objection?
21     MR. LANIER: No, Judge.
22     THE COURT: A-660 will be marked into
23 evidence.
24     (Whereupon, Defense Exhibit A-660 was marked
25 into evidence.)

Page 2792

1      MR. BROCK: A-661, please.
2  BY MR. BROCK:
3    Q. Can you tell the members of the jury what this
4  letter is.
5  A. This was my letter back to Dr. Weinblatt outlining
6  the specifics of how we planned to get the data
7  together to do the analysis.
8    Q. It says here in the first sentence, "I want to
9  share with you Merck's plan for analyzing serious"
10 thromboem -- "thrombolic and embolic adverse
11 experiences from the VIGOR study."
12     Did I get that right?
13 A. Yes.
14   Q. Go down to "Timing and logistics."
15     Does it say a cutoff date and reporting these
16 events to Merck will be February the 10th?
17 A. That is correct.
18   Q. In the last sentence of that document, does it
19 say "Any events which are reported after February 10th
20 will be adjudicated; however, they will not be included
21 in the initial analyses"?
22 A. That is correct.
23   Q. What does it mean when you say that you are
24 establishing a cutoff date for reporting events?
25 A. Um, it is not intuitive. I know before I came to

Page 2793

1  Merck, I thought, well, you do a clinical trial, you
2  get the data, you analyze it, and that's it.
3      It turns out that data can come in long after
4  you have already done your analyses. I mean, I have
5  had serious adverse experiences reported a year after a
6  study is already completed.
7      And so the question is, do you keep redoing
8  your analyses every time you get a new piece of
9  information? And what you have to do is you prespecify
10 what your cutoff date is, when you close the database.
11 If you don't do that, you can...
12     There's two things.
13     First of all, you would be continually
14 updating your analyses. And, number two, maybe the
15 analyses will change and then people could choose the
16 analysis they like the best. And so, you don't want
17 that to happen, and so the rigorous thing to do, and
18 what Merck always does, is we prespecify what the
19 cutoff date will be.
20     And so for cardiovascular events, it was going
21 to be February 10th, which was the day that we were
22 terminating the study.
23 Q. Now, you had a different cutoff date for the
24 GI events?
25 A. That is correct. We did. The GI event cutoff date

Page 2794

1  was about, I think, a month later.
2      And the reason that the dates were not the
3  same is that we were finding it was taking us much
4  longer to get the medical records for the serious
5  thrombotic events than it was for the GI events.
6      The actual adjudication, meaning the
7  committees looking at the data and deciding whether it
8  is a confirmed event or not, that doesn't take --
9  that's the same amount of time, whether it is a CV
10 event or GI event. But almost all of the patients who
11 had serious cardiovascular events were hospitalized.
12 Some of them in countries all around the world.
13     And we were finding it was just taking the
14 sites a lot of time to get the hospital records into
15 us. And we thought it was important, even though Dr
16 Weinblatt in one of his letters said it is okay, even
17 if you freeze the file, which is you say, okay, we're
18 going to unblind the data here, he said we could
19 adjudicate the events after we were unblinded to the
20 data, but we had done that -- he said as long as the
21 adjudicators don't know what the patient is on.
22     We had done that in our initial VIOXX program
23 for our GI events, meaning that the studies were over
24 and the cases went to the adjudication committee after
25 we had already seen data from the study.

Page 2795

1      The adjudicators were blinded, and the FDA had
2  concerns about that. They thought that maybe somewhere
3  along the way we had gotten unblinded, and it wasn't
4  true, but it had raised concerns, and therefore, we
5  didn't want to repeat that, and we wanted to make sure
6  that all of the adjudication was done before the final
7  unblinding of the database.
8  Q. So in terms of having one cutoff date for CV
9  and another cutoff date for GI, I think what you have
10 expressed to the jury is that there was a practical
11 issue in terms of getting medical records in for the
12 patients who had had thrombotic events.
13 A. That is correct.
14     MR. LANIER: Objection, leading. Judge, he
15 does it at the end of every one.
16     THE COURT: The objection is sustained.
17 BY MR. BROCK:
18 Q. Did it take longer to get the medical records
19 in for the folks that had had thrombotic events?
20 A. Yes. It was taking longer. In some cases, you
21 know, it was going up to six months, and so therefore,
22 we thought we needed the extra time to get the medical
23 records in so we can get them to the adjudicators
24 before the complete unblinding of the database in
25 April.

Page 2796

1  Q. Now, the jury has heard testimony about heart
2  attacks that were reported to Merck after the February
3  10th cutoff date that were not included in the paper
4  that was submitted to the New England Journal of
5  Medicine.
6  A. That is correct. There were heart attacks, there
7  were some strokes, and we had some GI events that came
8  in after the GI cutoff date, as well. And we had
9  prespecified that they would not be included in the
10 primary analysis, but that we would provide those to
11 regulatory agencies in a safety update report.
12 Q. So where you say in this letter to Dr.
13 Weinblatt, "Any events which are reported after
14 February 10th will be adjudicated; however, they will
15 not be included in the initial analyses," how does that
16 relate to what you have just said?
17 A. That is prespecifying and outlining before I saw
18 any of the data how the analysis would be done and what
19 data would be included in the analysis.
20 Q. All right. Now, can you tell the members of
21 the jury what the results of the VIGOR trial were?
22 A. We met our primary hypothesis and secondary
23 hypothesis, which meant that there was significantly
24 fewer perforations, ulcers, and bleeds and complicated
25 perforations, ulcers, and bleeds in patients who were

Reicin - Direct

Page 2797

1  taking VIOXX compared to patients taking the
2  traditional NSAID Naproxen.
3       In addition, there were more serious
4  cardiovascular events, and when -- I'm talking about
5  thrombotic events, significantly more thrombotic events
6  on VIOXX compared with Naproxen. And that result was
7  mainly driven by a difference in heart attacks.
8     Q. Did you have reduced ulcers, bleeds, and
9  perforations on the VIOXX arm of the trial?
10    A. Yes, we did.
11    Q. By what percentage?
12    A. It was about a twofold reduction. It was cut in
13 half.
14    Q. Did you also have fewer heart attacks on
15 Naproxen than you had on VIOXX?
16    A. Yes, there were. There were fewer heart attacks on
17 VIOXX -- on Naproxen than there were on VIOXX.
18    Q. To be clear, were the results statistically
19 significant; that is, you had enough events to say
20 there is statistical significance?
21    A. It was statistically significant.
22    Q. Now, there was no placebo arm in the trial,
23 correct?
24    A. That is correct. There was no placebo arm.
25    Q. So could you look at the trial results alone

Page 2798

1  and tell whether or not Naproxen was decreasing the
2  rate of events or VIOXX was increasing the rate of
3  events?
4     A. No. This was kind of what I had predicted or Dr.
5  Musliner had predicted in 1997. We saw a difference,
6  the rate being higher on VIOXX than the NSAID. We
7  didn't have a placebo group, and therefore, you
8  couldn't tell from looking at VIGOR alone, was this
9  because Naproxen had decreased the heart attack rate
10 because it was acting as a cardioprotective agent, or
11 because VIOXX was increasing the heart attack rate?
12    Q. When did you learn of the results of the VIGOR
13 trial?
14    A. Well, as I said, the official unblinding where the
15 whole team working on the study was going to be
16 unblinded was in April. We had prespecified a plan
17 where a very small group of us could get unblinded to
18 the data earlier before we had final data so that we
19 could start working on regulatory documentation and a
20 paper.
21      Once any of us -- myself in particular -- once
22 I was unblinded, I now had nothing to do with the
23 study. Briggs Morrison took over for me as the
24 monitor. Since I had seen the study results, I
25 couldn't take part in any discussions about data or

Page 2799

1  questions of that manner.
2     Q. All right. And what was your reaction to the
3  results of the VIGOR trial?
4     A. Um, obviously, I was very happy that we had met the
5  primary end point. As I said, you're never quite sure
6  until you do a study what the outcome is going to be.
7  And I was concerned about the cardiovascular data.
8     Q. While...
9       Why were you surprised or concerned about the
10 cardiovascular data?
11    A. Well, my first reaction was actually not that
12 Naproxen was cardioprotective, but is VIOXX being
13 prothrombotic, and I wondered whether there was
14 something unusual about rheumatoid arthritis patients
15 where VIOXX might act in that way.
16    Q. Okay. We've seen the e-mail, the jury has
17 seen the e-mail of Dr. Scolnick where he refers to the
18 fact that he is also concerned about the results. You
19 have seen that?
20    A. I have seen that e-mail.
21    Q. And have you had discussions and been involved
22 in meetings with Dr. Scolnick after the VIGOR results
23 were received?
24    A. Yes. We met often during the weeks after we first
25 saw the preliminary results.

Page 2800

1     Q. I want to show you Exhibit A-186, please.
2       This e-mail fast forwards for a period of time
3  to February of 2001, does it not?
4     A. Yes, it does.
5     Q. And it is from Dr. Scolnick to Alan Nies,
6  yourself, and Harry Guess, right?
7     A. Yes.
8     Q. And you are a recipient of this e-mail?
9     A. Yes, I was.
10       MR. BROCK: Your Honor, we would offer A-186.
11       THE COURT: Any objection?
12       MR. LANIER: I think it may be in evidence,
13 but I've got no objection either way.
14       THE COURT: All right. 186 will be marked
15 into evidence if it hasn't already been.
16       (Whereupon, Defense Exhibit 186 was marked
17 into evidence.)
18 BY MR. BROCK:
19    Q. And just to put things in context, Dr. Reicin,
20 what is going on at Merck in February of 2001?
21    A. Um, we were just getting ready to go to a public
22 FDA advisory committee meeting.
23    Q. Did this relate to the VIGOR results?
24    A. Yes, to talk about the VIGOR study results.
25    Q. Okay. And Dr. Scolnick makes the comment in

7bf775cc-3bf5-422a-aae9-31c7ab106654

Page 2801

1  the first sentence, "I want one more time to thank you
2  for the fantastic effort you have all made preparing
3  for the meeting this week. I have never seen better
4  preparation for an advisory meeting."
5      Does that refer to the meeting you just told
6  the jury about?
7  A. Yes, that's correct.
8  Q. And he says, "As I said the other day and as I
9  have told Ray and MC, no matter what the ultimate
10 outcome, you have distinguished yourselves. We all
11 worried to death about the CV events last spring."
12     Does that reference to the March time frame
13 when the results were received?
14 A. Yes, it does.
15 Q. "Merck is, of course, always an issue. But I
16 was sick at the thought that we might be doing harm to
17 patients. I know each of you well enough to know you
18 felt the same way. With all the data now available, I
19 am no longer worried."
20     Is that what he said?
21 A. That is what he said.
22 Q. By the time you went to the advisory committee
23 to present the results of VIGOR, and even well before
24 that, does this reflect your feelings about the VIGOR
25 result, also?

Page 2802

1  A. Yes, it does. As I said, I was initially very
2  concerned, and I think he said it right. I was sick
3  about the fact that -- the thought that we might have
4  done harm to patients inadvertently. But once I had a
5  chance to review all of the data -- and not just VIGOR,
6  it was an extensive other database -- I thought that
7  the only way, the best way to put all of the evidence
8  that we had together was that Naproxen was actually
9  acting as a cardioprotective agent.
10 Q. Now, I want to talk to you now about that
11 period of time immediately following the receipt of the
12 VIGOR results, and let me direct you to some things
13 that I think you looked at during that period of time.
14     First of all, did Merck go back and look at
15 the data that it had through March of 2000 in order to
16 see if there was any signal for cardiovascular risk as
17 one of the responses to the receipt of the VIGOR data?
18 A. Right. So when we got the VIGOR data, part of the
19 reason that it was a surprise, even though we had
20 talked about stuff in the Tom Musliner memo and Garrett
21 FitzGerald had raised a hypothesis, was, as I said, we
22 saw no signal in our osteoarthritis database.
23     And so we said, did we miss something? And we
24 went back and we reanalyzed the data in a manner more
25 consistent with how the VIGOR data was analyzed, and,

Page 2803

1  again, we saw no signal, no evidence of a difference in
2  serious thrombotic events between placebo, VIOXX, or
3  the NSAID comparators, Ibuprofen, diclofenac,
4  nabumetone. That was from our Phase IIb/III OA
5  database.
6      We also -- we happened to have ongoing at the
7  time two studies in elderly patients with either
8  Alzheimer's, early Alzheimer's disease or
9  preAlzheimer's disease. Those were the studies I think
10 that were being done in about 2,000 patients, long-term
11 therapy, and we were studying VIOXX, 25 milligrams
12 compared with placebo.
13     And so even though VIGOR didn't have placebo,
14 we were fortunate to have a database where there was a
15 lot of placebo-controlled information.
16     Now, these studies were ongoing. They were
17 partially unblinded, I believe over a weekend, so that
18 we could just look at the serious thrombotic events.
19 And what we found was that there was no evidence of an
20 increased risk on VIOXX compared with placebo of
21 serious thrombotic events, including heart attacks. If
22 anything, numerically, the rate was actually lower on
23 VIOXX than it was on placebo.
24     And that was extremely comforting data,
25 because if VIOXX had been increasing the rate of heart

Page 2804

1  attacks compared with Naproxen in the VIGOR study, I
2  think we should have seen a difference versus placebo,
3  in these large databases an increase, or we should have
4  seen an increase versus the other NSAIDs in the OA
5  database or versus placebo in the OA database.
6  Q. So you looked again at the OA database, and
7  you saw no increased risk?
8      MR. LANIER: Objection. Leading.
9      MR. BROCK: I'll ask it another way.
10     THE COURT: Counsel, don't summarize her
11 testimony.
12 BY MR. BROCK:
13 Q. Did you look at the OA database and the AZ
14 database?
15 A. So we looked at the OA database, and once again, we
16 found no evidence of an increased risk compared with
17 the comparator NSAIDs or the placebo, although, as I
18 said, the placebo database is pretty small from the OA
19 database.
20     And in addition, we saw no evidence of an
21 increase in the Alzheimer's studies versus placebo.
22 Q. All right. Because I'm not a good speller and
23 I have run out of room, I put AZ for that, but can you
24 tell the members of the jury what the AZ trial was, the
25 Alzheimer's trial.

Page 2805

1   A.  Well, there were actually two.  One of them was a
2   trial in patients...
3       Oh, you're correct.  There were three.  I'm
4   not sure three were ongoing at this time, however.  You
5   would have to check.
6   Q.  Go ahead.
7   A.  I think only two were ongoing at this time.
8       So of the two that I know were ongoing at this
9   time, um, one was Protocol 078, which was testing VIOXX
10  compared with placebo in patients who didn't quite have
11  Alzheimer's disease yet.  They had what we call early
12  cognitive impairment, so some evidence that they
13  weren't thinking clearly, but they did not yet have
14  Alzheimer's.
15      And then the other one was 091, which was
16  looking at patients with early Alzheimer's to see if
17  VIOXX could actually improve their Alzheimer's disease.
18      There was another one, Protocol 126, but I
19  don't recall that that was actually -- had been started
20  yet.  I think we started it right after that.  I could
21  be wrong, or maybe -- and it was also a treatment
22  study.
23  Q.  Now, in terms of clinical studies, where does
24  a placebo-controlled study like these AZ trials rank?
25  A.  Well, to me, that's the gold standard.  As I have

Page 2806

1   said when I described the VIGOR study, when you have
2   two active comparators and you see a difference in the
3   rate of any adverse event, if you look at that study
4   alone, you don't know if one drug is increasing the
5   rate or the other drug is decreasing the rate.
6       Placebo should be neutral, and so if you see
7   an increase compared with placebo, that's evidence that
8   you have an increase in the rate.  If you're the same
9   or a decrease, it is the same, you would say it is the
10  same as placebo, it is neutral.  If you have a
11  decrease, you would actually say it has a beneficial
12  effect.
13  Q.  Did you consider in any way the properties of
14  Naproxen as you looked at the meaning of the VIGOR
15  trial?
16  A.  Well, so, we now had three databases.  We had the
17  OA database where we saw no signal between VIOXX and
18  the NSAID comparators, which were Ibuprofen,
19  diclofenac, and a little bit of nabumetone data.  We
20  had no evidence of an increased risk of VIOXX compared
21  with placebo in the Alzheimer's studies.  But we did
22  have a difference -- there was an increased risk of
23  heart attacks in patients in the VIGOR study compared
24  with Naproxen.
25      So it didn't make sense to us.  So if Naproxen

Page 2807

1   was then acting as a cardioprotective agent, why hadn't
2   we seen that in the OA database?  Why didn't Ibuprofen
3   and diclofenac act as a cardioprotective agent?
4       And I was actually with Dr. Barry Gertz, who
5   was then the head of clinical pharmacology, discussing
6   the issues and how we could interpret this data, and he
7   said, Alise --
8       MR. LANIER:  Objection, hearsay.
9       THE COURT:  Sustained.
10      THE WITNESS:  He took out a clinical study
11  report --
12  BY MR. BROCK:
13  Q.  Let me stop you right there.
14      Would you turn to Exhibit A-351.  I may have
15  jumped ahead of you, but is this the document you were
16  referring to?
17  A.  I'm not sure it was this exact document, no.  He
18  took out a document where he showed me that the
19  antiplatelet effects of Naproxen were actually
20  different than Ibuprofen or diclofenac.  It is felt
21  that you need...
22      Remember, aspirin inhibits platelet clumping
23  by inhibiting COX-1.  And you need to have 90 to
24  95 percent inhibition of COX-1 and thromboxane in order
25  for aspirin to act as a cardioprotective agent.

Page 2808

1   Sixty percent inhibition is not felt to be enough.  And
2   you need that 90 to 95 percent inhibition to be
3   sustained over the entire dosing interval, meaning
4   between when you take one dose and you take your next
5   dose.
6       And if you looked at that study, Naproxen was
7   the only one that inhibited thromboxane by 90 to
8   95 percent over the entire dosing interval.  Ibuprofen
9   got up to 90 to 95 percent, but only for about
10  four hours.  So by the time you were redosing, it was
11  already back down, and diclofenac never got up to 90 to
12  95 percent.
13  Q.  Let me get you to look at Defendant's Exhibit
14  A-351.  And...
15      You got it?
16      MR. LANIER:  Yes, from the other day.  Thanks.
17      MR. BROCK:  Is this in evidence, do you know?
18      MR. LANIER:  I don't think it is in evidence,
19  but you gave it to me the other day.
20      MR. BROCK:  We offer A-351.1, Your Honor.
21      This is minutes for a June PT meeting,
22  7-10-98.
23      THE COURT:  Any objection, counsel?
24      MR. LANIER:  I don't care, Judge.
25      THE COURT:  Okay.  351.1 will be admitted into