Page 2809

1  evidence.
2          (Whereupon, Defense Exhibit 351.1 was marked
3  into evidence.)
4  BY MR. BROCK:
5      Q.  If you would turn to 351.4 --
6      A.  I'm there.
7      Q.  Does this illustrate what you were referring
8  to just a minute ago?
9      A.  Yes, it does.
10         So what you see here is actually inhibition of
11 platelet clumping.  That's where it goes from minus 20
12 to 100 percent.  100 percent would be 100 percent
13 inhibition of platelet clumping.  And then going
14 horizontally, this is looking over time.
15         You see baseline, so this is where patients
16 are coming in, they're not on any drug.  And then time
17 zero is they have already been dosed with their last
18 dose of study medication, and now here they are right
19 before they're about to take another dose.  So they're
20 at what we call trough, t-r-o-u-g-h.
21         For Ibuprofen and diclofenac, that's about
22 eight hours after they have taken their last dose of
23 study drug, because you take that medicine three times
24 a day.
25         For Naproxen, that's about 12 hours after they

Page 2810

1  took their last dose of study drug, because you take
2  Naproxen twice a day.
3          And what you can see is the yellow, the one
4  you have highlighted in yellow is Naproxen.  And even
5  at trough, that's Day 60 hours, you're at over
6  90 percent inhibition of platelet clumping.  And that's
7  sustained...
8          Well, here it only goes out to eight hours,
9  but the 12-hour time point was also at Day zero -- at
10 Day 60 hours.
11         If you see the next one underneath that, the
12 diamonds, that's Ibuprofen, and you can see that it
13 gets up to 90 to 95 percent, but by the time you have
14 to take your next dose eight hours later, it is down to
15 50 percent.
16         And diclofenac is in the squares.  It only
17 gets up to about 30 percent inhibition of platelet
18 clumping.
19         And so what that means is Naproxen, in terms
20 of its ability to inhibit platelet clumping, looks like
21 aspirin, other than the fact that for Naproxen, you
22 would have to take it at this dose, 500 milligrams,
23 twice a day in order to get that inhibition of platelet
24 clumping.  With aspirin, you actually can take a dose
25 today, you can wait two or three days.  You don't have

Page 2811

1  that type of -- you don't have to take it quite as
2  often, whereas Ibuprofen and diclofenac don't give you
3  maximal inhibition of platelet clumping.
4      Q.  There have been questions during the trial
5  about whether or not there is a randomized controlled
6  trial showing that Naproxen is cardioprotective; that
7  is, where you take one group or another and you
8  randomize it and you test it to see if you get a
9  positive result.  And I would like to ask you, is there
10 such a trial, and if not, why?
11     A.  There is no randomized clinical trial looking at
12 Naproxen to see if it is cardioprotective, and I think
13 there are a couple of reasons.
14         Number one, aspirin is the gold standard.  It
15 has been studied in, I don't know, over 100,000
16 patients.  It is now considered standard of care for
17 treating patients who are at high risk of having
18 cardiovascular disease.
19         And you remember the study I told you about
20 with flurbiprofen, where I said they took patients and
21 they put them on flurbiprofen versus placebo.  You
22 could no longer do that study, because all of those
23 patients would be on aspirin.
24         In addition, Naproxen, as we demonstrated in
25 the VIGOR study, is associated with a significant

Page 2812

1  amount of GI complications, and while aspirin is, as
2  well, low-dose aspirin, which is used for
3  cardioprotection, not to the degree that Naproxen is.
4          And in addition, you would have to take
5  Naproxen twice a day, and you couldn't really -- you
6  would have to do that every day, whereas, aspirin you
7  can take it today, if you forget to take at this time
8  the next day, you can take it the day after that.
9          So that's why no study has been done.
10         THE COURT:  We'll take a break here, Mr.
11 Brock.
12         (Break taken.)

Page 2813

1  AFTERNOON SESSION
2  THE COURT: You can be seated.
3  You can bring the jury in.
4  (The jury enters the courtroom.)
5  THE COURT: You can be seated.
6  You can proceed.
7  MR. BROCK: Thank you, Your Honor.
8  BY MR. BROCK:
9  Q. Early this morning you were talking to the
10 jury about a flurbiprofen article that you had found
11 back in the '97/'98 time frame. I don't remember
12 precisely the year.
13     Let me get you to turn to B-32.1.
14     MR. LANIER: Which number?
15     MR. BROCK: B-32.1.
16 BY MR. BROCK:
17 Q. And is this the article that you were
18 referring to the jury earlier today?
19 A. Yes, it is.
20 Q. And is this an article that relates to
21 reocclusion rates in patients that are taking
22 flurbiprofen?
23 A. That is correct, compared with placebo.
24 Q. This is the study you said could not be done
25 today?

Page 2814

1     MR. LANIER: I'm going to object to
2  continually leading. Three in a row.
3     THE COURT: Try to rephrase your question.
4  BY MR. BROCK:
5  Q. Is this the study that you were referring to
6  the jury earlier today?
7  A. Yes, it is.
8  Q. And if you'll look at the...
9     If you would pull that up, please.
10    At the top, is it "Evaluation of Flurbiprofen
11 for Prevention of Reinfarction and Reocclusion After
12 Successful Thrombolysis or Angioplasty in Acute
13 Myocardial Infarction"?
14    MR. LANIER: Your Honor, I don't object to him
15 using this as a learned treatise and putting it up on
16 the board, but I would ask for a copy of it if he is
17 going to do that.
18    And I have no objection, Judge.
19    THE COURT: It is not marked into evidence.
20 It is an exhibit that can be used with the jury.
21 BY MR. BROCK:
22 Q. And flurbiprofen is an NSAID like Naproxen?
23 A. Yes, they both inhibit cyclooxygenase-1 and
24 cyclooxygenase-2.
25 Q. If we can see 32.4, please.

Page 2815

1     And the paragraph that begins on the right
2  hand column, "In this study"?
3  A. Yes. I do see that.
4  Q. "In this study, flurbiprofen, 50 milligrams
5  twice daily, significantly decreased the rate of
6  reinfarction compared with placebo, reducing the
7  overall risk during the six-month follow-up period by
8  71 percent. Most of the reinfarctions occurred within
9  the first three weeks."
10    Correct?
11 A. That is correct.
12 Q. How does that relate to Naproxen?
13 A. Well, obviously, the VIGOR study was different than
14 this study, but this provided some clinical evidence
15 that an NSAID could act as a cardioprotective agent.
16    There were also several studies done with
17 another agent called indobufen, which inhibits also
18 cyclooxygenase-1 and cyclooxygenase-2. It is not sold
19 in the United States, but it is in the market in
20 several European countries, not to treat pain, but
21 actually to prevent heart attacks.
22    It is sold, maybe it is not just to prevent
23 heart attacks, but it is sold as a cardioprotective
24 agent, and there have been several studies where they
25 have compared indobufen to aspirin in its ability to

Page 2816

1  prevent clotting.
2  Q. Let me now direct your attention to
3  Exhibit 114, which is the next one.
4     And is this an e-mail from David Bjorkman to
5  Deborah Shapiro?
6  A. Yes, it is.
7  Q. And can you tell me who Deborah Shapiro is or
8  tell the jury who she is? I think you mentioned her
9  earlier today.
10 A. Deborah Shapiro was the statistician at Merck who
11 did the analyses for the Data Safety Monitoring Board.
12 So these were the unblinded analyses that were done
13 during the course of the study.
14    MR. BROCK: Your Honor, at this time we offer
15 114.
16    THE COURT: Any objection?
17    MR. LANIER: I haven't seen it yet.
18    Yes, Judge, right now there's an objection
19 based upon what I am seeing. We have hearsay in an
20 e-mail from David Bjorkman, who is not with Merck, to
21 Deborah Shapiro and I haven't been able to
22 cross-examine Mr. Bjorkman. I believe he is a dean at
23 the University of Utah School of Medicine.
24    So this would be hearsay absent my ability to
25 cross-examine him.

Page 2817

1    THE COURT: Do you want to approach,
2  Mr. Brock?
3    (Whereupon, the following occurred at
4  side-bar:)
5    THE COURT: The objection is sustained. It is
6  hearsay. The objection is sustained.
7    (End of side-bar.)
8  BY MR. BROCK:
9    Q. Did the folks that participated in the VIGOR
10 trial and others seek the publication of the results of
11 the VIGOR trial?
12 A. Yes, we did.
13   Q. And let me ask you to turn to Exhibit 478, if
14 you would, please.
15   Do you have it?
16 A. I do. Thank you.
17   Q. And is this a letter directed to the New
18 England Journal of Medicine by you and other proposed
19 authors of the paper?
20 A. Yes, it is. It is a letter to one of the deputy
21 editors at the New England Journal.
22   Q. Is it dated May 18th of 2000?
23 A. Yes, it is.
24   MR. BROCK: Your Honor, we would offer
25 Exhibit 478.

Page 2818

1    THE COURT: Any objection?
2    MR. LANIER: I haven't seen it yet, Judge.
3    THE COURT: Okay.
4    MR. LANIER: No objection, Your Honor.
5    THE COURT: Okay. The document will be marked
6  into evidence.
7    (Whereupon, Defendant's Exhibit 478 marked
8  into evidence.)
9  BY MR. BROCK:
10   Q. Would you pull up the first page of that, and
11 that's May 18th of 2000, correct?
12 A. That's correct.
13   Q. And Merck, small group of folks at Merck were
14 unblinded to the results on March the 9th of 2000; is
15 that correct?
16 A. That is correct.
17   Q. And there was a later unblinding after that?
18 A. That is correct, for the primary analysis, yes.
19   Q. And this is enclosing a draft manuscript of
20 the results of the VIGOR trial, correct?
21 A. This was a manuscript that we had written based on
22 the primary analysis of the results. This is based on
23 the April closing of the database, it is based on the
24 February 10th cutoff for cardiovascular events, and the
25 March cutoff date for gastrointestinal events.

Page 2819

1    Q. And does this tell the New England Journal
2  that you are sending along a manuscript on the
3  incidence of clinically important upper GI events
4  relating to the VIGOR trial, there in the first
5  paragraph?
6  A. Yes, it does.
7    Q. Okay. And do you say in the third paragraph,
8  "As we discussed during our recent telephone
9  conversation, a preliminary analysis of the data showed
10 a reduction in the number of myocardial infarctions in
11 the Naproxen patients, compared to those taking
12 rofecoxib or VIOXX"?
13 A. Yes, it does.
14   Q. Turn to 478.2, please.
15   Does your name appear on the submission?
16 A. Yes, it does, over on the right-hand side.
17   Q. Okay. You see on the left-hand side is Claire
18 Bombardier?
19 A. That's correct.
20   Q. Who is that?
21 A. She was the chair of the Steering Committee, which
22 was kind of the oversight committee for the conduct of
23 the study. And Claire is a very well-respected
24 rheumatologist at University of Toronto.
25   Q. Is she a Merck employee?

Page 2820

1  A. She is not.
2    Q. Who is Loren Laine?
3  A. Loren Laine was the cochair of the Steering
4  Committee. He is a gastroenterologist from California.
5  And he had signed on a separate sheet of paper.
6    Q. Look back at the first page, 478.1.
7    Did you say to the New England Journal of
8  Medicine, in the second paragraph, "We ask that you
9  please consider this manuscript for an expedited
10 review"?
11 A. Yes, we did.
12   Q. And why was that request made?
13 A. We thought that the results of the study were very
14 important, and we were requesting that they publish
15 this quickly.
16   Q. Look at 478.3, please.
17   Is this the title page for the draft of the
18 paper that you sent to the New England Journal of
19 Medicine?
20 A. Yes, it is.
21   Q. Look over to page A-478.27.
22   And if you could call out the first full
23 paragraph there.
24   Just going through the chronology of how the
25 paper came to its final form, this is the draft that

Page 2821

1 you initially sent to the New England Journal of
2 Medicine?
3 A. That is correct.
4 Q. And in the first draft, did you have a
5 paragraph "COX-2 selective inhibitors and nonselective
6 NSAIDs both may decrease production of prostacyclin, a
7 vasodilator and an inhibitor of platelet aggregation:
8 "It has been theorized that the inhibition of
9 prostacyclin without the concomitant inhibition of
10 thromboxane could potentially be prothrombotic.
11 However, this theoretical risk was not demonstrated
12 with rofecoxib in placebo-controlled studies."
13 Does that refer to the FitzGerald theory, the
14 FitzGerald hypothesis that we have talked about?
15 A. That is correct. And I think if you look at the
16 references, it is to studies done by Dr. FitzGerald
17 with COX-2 selective inhibitors.
18 Q. The next sentence in the draft says, "Combined
19 analyses of randomized, double-blind trials, including
20 7,535 patients with osteoarthritis or Alzheimer's
21 disease, show similar rates of cardiovascular adverse
22 events and myocardial infarctions with rofecoxib,
23 placebo, or the nonselective NSAIDs."
24 Did I read that part of it right?
25 A. Yes, you did.

Page 2822

1 Q. "Which, unlike Naproxen, do not maintain
2 maximal inhibition of platelet aggregation over their
3 dosing interval."
4 Did I read that right?
5 A. That's correct.
6 Q. Does that relate to the chart we looked at
7 where Naproxen goes up and it sustains for the dosing
8 interval and then comes down?
9 A. No, Naproxen goes up and it stays up. The other
10 NSAIDs, Ibuprofen goes up temporarily and comes down
11 before you would redose. And diclofenac didn't get up
12 to the top.
13 Q. All right. So we're saying the same thing.
14 It goes up, it stays up.
15 A. Naproxen does.
16 Q. At some point it would fall?
17 A. That's correct.
18 Q. But it stays up during the dosing interval.
19 Okay.
20 Now, turn, if you would, please, to A-550.1
21 and tell the members of the jury what this is, please.
22 A. We sent in our draft manuscript in May, and the New
23 England Journal then takes that draft manuscript and
24 sends it to external experts to review and to comment
25 on the manuscript.

Page 2823

1 We then received from Marshall Kaplan, one of
2 the editors at the New England Journal, their comments
3 on the manuscript, as well as the comments of the
4 reviewers asking us -- telling us, basically, the way
5 we sent in the paper initially could not be published,
6 but that they would reconsider the paper if we
7 addressed the comments that were raised by the
8 reviewers.
9 Q. Okay. So, just in terms of -- so that the
10 jury can understand it, when you submit a paper for
11 peer review to a journal like the New England Journal
12 of Medicine, do they just publish the first draft you
13 send in?
14 A. Highly unusual.
15 Q. So when you talk about the peer review
16 process, what are you describing?
17 A. The fact that when you send it into a journal that
18 has a peer review process, they take your paper, they
19 send it out to experts to review. They gather that
20 information, they send you back the comments, and then
21 you're asked to address the comments.
22 Q. All right. And is this Exhibit A-550, the
23 letter that was sent by Claire on behalf of the authors
24 to the New England Journal, incorporating proposed
25 changes?

Page 2824

1 A. I may have misspoken before.
2 So this was our response to the New England
3 Journal where we were basically -- the way you write
4 these letters you say, here was the reviewer comment,
5 here is how we're addressing it or we're not addressing
6 it, and we also attached an updated draft of the paper.
7 Q. All right.
8 MR. BROCK: Your Honor, at this time we would
9 offer A-550.
10 MR. LANIER: Judge, I'm not sure how you would
11 handle this. This is from Claire Bombardier. It seems
12 to me a hearsay letter. I have not been able to
13 cross-examine her either.
14 THE COURT: Can I see it?
15 I think you can use it. Ask her a few
16 additional questions about whether the entire committee
17 responded or just as you did. Why don't you lay a
18 little more foundation. Okay.
19 BY MR. BROCK:
20 Q. Dr. Reicin, does this document incorporate the
21 changes...
22 Is this document responding to suggested
23 changes by the New England Journal of Medicine peer
24 reviewers?
25 A. Yes, it was.

Page 2825

1    Q. Were you knowledgeable about the changes that
2    were being made to the paper in response to peer
3    reviewer comments?
4    A. Yes, I was.
5    Q. And were you staying up to date on the
6    requested changes and the changes to the draft?
7    A. Oh, yes, with the other authors. We all -- and
8    then we had to send in a revised manuscript that we
9    would all have to read and sign off on, as well.
10   Q. And does this document here represent the
11   changes that the authors were making in response to the
12   peer review comments?
13   A. Yes, it does.
14       MR. BROCK: We offer again A-550.
15       THE COURT: So the letter is not just from
16   Miss Bombardier?
17       THE WITNESS: It is a letter from all the
18   authors.
19       THE COURT: From all the authors?
20       THE WITNESS: That is correct.
21       MR. LANIER: In that event, I have no
22   objection.
23       THE COURT: It will be marked into evidence.
24       (Whereupon, Defendant's Exhibit A-550 marked
25   into evidence.)

Page 2826

1    BY MR. BROCK:
2    Q. If you would, turn to the first page of that
3    document, please, which is dated July 17th, 2000.
4        Does it say, "Thank you for your letter of
5    June 30th. We have done extensive revisions to our
6    manuscript in accordance with your letter and comments
7    from the reviewers"?
8        Is that the first sentence?
9    A. Yes.
10   Q. And does that reflect the peer review process
11   that you have just described to the jury, the back and
12   forth about you think you need to make a change here or
13   reform it there?
14   A. Yes, it does.
15   Q. Now, if you would turn over to page 11 of that
16   document, A-50.11, and if you would, pull out number
17   seven at the bottom, please, the conclusions.
18       The jury will see the document when they
19   deliberate, but do you see that on this page, the one
20   you're looking at, there's a four, the five, the six,
21   and the seven, and out to the right of the number is an
22   italicized portion of the document?
23       If you look at your page, I'm just trying to
24   set this up so the jury will understand.
25   A. Oh, yes, yes.

Page 2827

1    Q. So that's the reviewer's comment in italics?
2    A. In italics, and also in quotes.
3    Q. And so this one, number seven, is, "The
4    conclusion section is somewhat awkward. I understand
5    that the emphasis on the apparent increased comparative
6    risk of cardiovascular events in the rofecoxib group is
7    relevant. However, this needs to be tightened up."
8        Did I read that right?
9    A. You did.
10   Q. "The emphasis on the apparent increased
11   comparative risk in the rofecoxib group is relevant.
12   However, it needs to be tightened up."
13       What does that mean?
14   A. We interpreted it to mean that --
15       THE COURT: How did you interpret it?
16   BY MR. BROCK:
17   Q. How did you interpret it?
18   A. I interpreted it to mean that they understood why
19   we were emphasizing the difference in the paper. We
20   had put it in the abstract, in the abstract, in the
21   data section, as well as in the conclusions. But he
22   felt that the discussion was awkward and it was too
23   long and it needed to be shortened.
24   Q. So if we can go to 5550.12, please...
25       And this refers to "Overall mortality, as well

Page 2828

1    as deaths, due to GI events and cardiovascular causes
2    were comparable in the two treatment groups.
3        "A significantly lower rate of myocardial
4    infarction was noted with Naproxen as compared to
5    rofecoxib, .1 versus .4 percent."
6        Did I get that right?
7    A. You did.
8    Q. And I'll ask you, ma'am, if the paper was
9    ultimately published in the New England Journal of
10   Medicine on November 23rd of 2000.
11   A. Yes, it was.
12   Q. There's been discussion about three heart
13   attacks that Merck learned about before the publication
14   of the article that are not included in the actual
15   manuscript.
16       Are you aware of that?
17   A. That is correct -- not aware that they have been
18   discussed here, but...
19   Q. Well, there has been discussion about that.
20   A. That is correct.
21   Q. Tell the members of the jury why the events
22   that you learned about before the publication of the
23   article, the journal article, were not included in the
24   journal article.
25   A. Um, those three heart attacks, which occurred on

Page 2829

1  VIOXX, as well as one stroke, which occurred on
2  Naproxen, came in after the February 10th cutoff date.
3  And there may have been an unstable angina or something
4  like that that came in, as well.
5     Q. Okay. And I'll ask you if the results of the
6  VIGOR trial in terms of the difference in event rates
7  in VIOXX versus Naproxen, if those differences were
8  statistically significant.
9     A. Based on the February 10th cutoff date and the
10 primary analysis, which was included in this paper,
11 that was statistically significant. And that was
12 included in the paper. We put in what we call
13 95 percent confidence intervals, and based on what they
14 were, you could tell that it was statistically
15 significant.
16    Q. Let's look at B-69.4, please.
17       First of all, is this one of the pages from
18 the New England Journal of Medicine article?
19    A. Yes, it is.
20    Q. And it is dated November the 23rd of 2000?
21    A. I don't see that on this paper.
22    Q. Look at the first page.
23    A. Yes. November 23rd, 2000.
24    Q. And you appear as an author on this paper.
25    A. I am one of the authors.

Page 2830

1     Q. As does Dr. Bombardier and Dr. Loren Laine --
2     A. Correct.
3     Q. -- and others.
4        Now, under "General Safety," B-69.4, do you
5  write "The mortality rate was .5 percent in the
6  rofecoxib group and .4 percent in the Naproxen group"?
7     A. Yes, we do.
8     Q. Do you write "The rate of death from
9  cardiovascular causes was .2 percent in both groups"?
10    A. That is correct.
11    Q. "Ischemic cardiovascular events occurred in
12 .2 percent of the patients in each group. Myocardial
13 infarctions were less common in the Naproxen group than
14 in the rofecoxib group .1 versus .4 percent"?
15    A. That is correct.
16    Q. And I think we have heard this. Can you
17 confirm for the jury that the New England Journal of
18 Medicine is a widely-read journal?
19    A. Yes, it is.
20    Q. Let me see A-155, please.
21       Before the publication of the New England
22 Journal of Medicine article in November of 2000, did
23 Merck communicate the three myocardial infarctions that
24 had come in after the prespecified cutoff date to the
25 FDA?

Page 2831

1     A. Yes, we had.
2     Q. And if you look at A-155, is that a document
3  that's dated, Safety Update Report?
4     A. Yes, it is. I think I mentioned previously when
5  you have a cutoff date for a study and you prespecify
6  it, your primary analysis is based on that, and that is
7  what you send in as a part of your initial regulatory
8  filing.
9        The FDA does, then, have you provide a Safety
10 Update Report a couple of months later, which should
11 include other relevant data that's come in since that
12 time. And we updated the analyses with any of the new
13 events that had come in after the February 10th cutoff
14 date.
15       MR. BROCK: So, Your Honor, at this time, if
16 it is not in evidence, I would offer A-155, which is
17 the October 13th, 2000 Safety Update Report filed by
18 Merck.
19       THE COURT: Any objection?
20       MR. LANIER: None, Your Honor. None.
21       THE COURT: Okay. The document will be marked
22 into evidence. It is A-155.
23       (Whereupon, Exhibit A-155 was marked into
24 evidence.)
25 BY MR. BROCK:

Page 2832

1     Q. Do I have it right, October 13th, 2000, Merck
2  filed its Safety Update Report with regard to the VIGOR
3  study?
4     A. That is correct.
5     Q. If you will turn to page 155.25, and it says
6  there, "results of the adjudication of thrombotic
7  cardiovascular serious adverse experiences in the VIGOR
8  study."
9        Do I have that right?
10    A. Yes, you do.
11    Q. "Adjudication" means events that have been
12 reported. They have been sent out to an independent
13 group of folks, who have looked at them and determined
14 that they are, in fact, thrombotic events, and now they
15 are listed as events in the study report?
16    A. That's correct. They have been confirmed as
17 potential thrombotic events by the outside group of
18 experts.
19    Q. All right. And if you come down to the
20 section "Cardiac Events," on October 13th of 2000, do
21 you disclose to the FDA that there were 20 acute
22 myocardial infarctions in the VIOXX arm and four events
23 in the Naproxen arm?
24    A. Yes.
25    Q. Now, when you received the VIGOR results, you

Case 2:05-md-01657-EEF-DEK   Document 6389-12   Filed 08/21/06   Page 7 of 20

Reicin - Direct

Page 2833

1  saw that there was a benefit to the stomach in terms of
2  a reduction in clinically significant events, right?
3  A. That is correct.
4     Q. And you also saw that there was a difference
5  in the cardiovascular events?
6  A. That is also correct.
7     Q. Did Merck immediately send what it knew about
8  VIGOR to the FDA?
9  A. Yes. These were interim analyses. As I said,
10 there was a small group of us that got unblinded to
11 very preliminary data, and we saw the difference in GI
12 events, we saw the difference in cardiovascular events
13 and very quickly put that together in a study -- in a
14 report to send to the FDA. And I think that was done
15 within two weeks.
16    Q. And did Merck ask the FDA to consider the data
17 and allow for a label change incorporating the data?
18 A. We didn't specifically ask for that in March. In
19 June, when we had the primary analysis that I talked
20 about, we submitted what's called an SNDA, a
21 Supplemental New Drug Application, and we asked for a
22 label change which would include both the
23 cardiovascular and the GI data.
24    Q. Let's see Exhibit A-145.2, please.
25       And is this the June 29th, 2000 Supplemental

Page 2834

1  New Drug Application?
2  A. I'm sorry, can you give me the name of that again?
3     Q. 145.2. Just 145. Look at Exhibit 145.
4  A. It is back.
5     Q. It is about four documents from the very --
6  A. Okay. I have it.
7     Q. Do you have it?
8  A. I do.
9        MR. BROCK: Your Honor, at this time we would
10 offer Exhibit 145.
11       THE COURT: Any objection?
12       MR. LANIER: I don't have a clue. They
13 haven't given me a copy of it, Judge.
14       Judge, I have an objection to two pages of
15 this document, Page 1 and Page 8 being offered and
16 entered into evidence. I would like to see the whole
17 document, and I would like to have the whole document
18 entered into evidence.
19       THE COURT: Is there any objection to the
20 whole document going in?
21       MR. LANIER: I don't know. I need to see what
22 the whole document is.
23       THE COURT: Are you saying you withdraw your
24 the objection?
25       MR. LANIER: I don't know what it is --

Page 2835

1        MR. BROCK: I don't have any problem with the
2  whole document. I'm really just trying to show --
3        THE COURT: Let me see.
4        Let's break for lunch at this time, and I'll
5  ask the jury to come back at 1:10.
6        (The jury leaves the courtroom.)
7        MR. BROCK: I think this is one of those
8  documents, it is a pretty substantial filing, but I'll
9  find out about it at lunch. There's only one point to
10 it, which is the date, so she pretty much said it.
11       THE COURT: Give it to him to look at it.
12       Over the break, if defendants have any other
13 documents they're going to use with this witness on
14 direct, there's only an hour left, that aren't already
15 in evidence, that haven't been referred to, I would
16 appreciate it if you could show them to counsel so we
17 don't have to stop and review them. Okay?
18       (Break taken.)
19       THE COURT: You can be seated. Is there an
20 issue?
21       MR. BROCK: This is exhibit 145.2. It is the
22 transmittal letter of the NDA. This is the complete
23 letter. It is not the complete -- it is not the
24 complete supplemental NDA with the VIGOR information.
25 The entire submission I'm told was 10,000 pages or so.

Page 2836

1        MR. LANIER: Actually 1,100.
2        MR. BROCK: 1,100? Okay.
3        THE COURT: Is there an objection to 145.2?
4        MR. LANIER: Not as long as he clarifies to
5  the jury that this is the cover letter, and it has all
6  the pages of the cover letter.
7        THE COURT: You can bring the jury in.
8        (The jury enters the courtroom.)
9        THE COURT: You can be seated. Are you ready
10 to proceed? You can continue, counselor.
11       MR. BROCK: Thank you, Your Honor.
12 BY MR. BROCK:
13    Q. Good afternoon. Before the break we were
14 talking about Merck's request to have a label change
15 that took place -- that request took place on June 29th
16 of 2000, and do you have in front of you now Exhibit
17 A-145?
18 A. Yes, I do.
19    Q. And is that the document that you were
20 referring to that reflects Merck's request in June to
21 have the FDA approve a supplemental New Drug
22 Application?
23 A. Yes, it is. This is the cover letter that would go
24 along with the supplemental application asking to
25 change the label.

26 (Pages 2833 to 2836)

7bf775cc-3bf5-422a-aae9-31c7ab106654

Page 2837

1 Q. And this is just the cover letter, right,
2 there's a supplemental presentation of information that
3 would go with the letter?
4 A. Correct.
5 Q. And we have here just the letter?
6 A. That's correct.
7 MR. BROCK: So at this time, Your Honor, we
8 would offer 145.
9 MR. LANIER: No objection, Judge.
10 THE COURT: 145 will be marked into evidence.
11 (Whereupon, Exhibit 145 was marked into
12 evidence.)
13 BY MR. BROCK:
14 Q. I'll ask you, also, if you would look at
15 Exhibit 150 that is right there. Yes, ma'am.
16 And is this a letter of August 7th of 2000
17 from Karen Midthurn -- excuse me, to Karen Midthurn
18 from Dennis Erb of regulatory affairs?
19 A. Yes, it is.
20 Q. And Dennis Erb is with Merck?
21 A. That's correct.
22 Q. He is actually Dr. Erb?
23 A. That is also correct. He is a Ph.D.
24 Q. Ph.D. Dr. Erb. And does this letter
25 reflect -- at this point we would offer exhibit A-150?

Page 2838

1 THE COURT: Any objection?
2 MR. LANIER: I have not seen it yet, Your
3 Honor. I did ask for them over the lunch break.
4 BY MR. BROCK:
5 Q. Does this document reflect that Merck was in
6 discussions with FDA about an expedited review?
7 THE COURT: Any objection, counselor?
8 MR. LANIER: No objection, Your Honor. Is
9 this the whole document? I can't tell. I don't think
10 I have an objection.
11 I'll say no objection, Judge.
12 THE COURT: A-150 will be marked into
13 evidence.
14 (Whereupon, Exhibit A-150 is marked into
15 evidence.)
16 BY MR. BROCK:
17 Q. It says, "by this letter MRL requests
18 reconsideration of the therapeutic classification of
19 these supplements during the conversation between Dr.
20 Erb and Ms. Cook. It was agreed that a teleconference
21 would be conducted between representatives of FDA and
22 MRL on August 8th at 10:00 a.m. to discuss the agency's
23 rationale for a standard classification and Merck's
24 request for a reclassification as a priority review."
25 Did I read that right?

Page 2839

1 A. You did.
2 Q. Now, what is a priority review?
3 A. A priority review is when the FDA will review an
4 application, I think it is with a 6-month time clock
5 instead of the standard, which is approximately
6 10 months.
7 Q. This refers to a conference call that took
8 place on August the 8th of 2000.
9 Do you see that?
10 A. Yes, I do.
11 Q. Would you have participated in that conference
12 call?
13 A. Yes, I was on that conference call.
14 Q. And without getting into what FDA said, what
15 was the decision about whether there would be a
16 priority review or not?
17 A. The decision was that they could not grant a
18 priority review, that it would be a standard review.
19 They not only had our application, they had an
20 application for a similar request from Pfizer for their
21 COX-2 inhibitor Celebrex, and they told us there would
22 be a standard review and there would be an FDA public
23 advisory committee where they would have external
24 experts in February. I can't remember if they gave us
25 the date during that meeting.

Page 2840

1 Q. But they advised you that it would not be a
2 priority review, but that an advisory committee would
3 be convened to review the information?
4 MR. LANIER: Objection. Leading and
5 summarizing.
6 THE COURT: The objection is sustained.
7 BY MR. BROCK:
8 Q. Was it your understanding or not that there
9 would be an advisory committee that would take place
10 early the next year to consider the data from VIGOR and
11 from another trial?
12 A. Um, again, I can't remember if we had -- if we knew
13 it would be the end of 2001 -- the end of 2000 or early
14 2001, but we understood from this meeting that it would
15 be a standard review, not a priority review, and there
16 would be an FDA advisory committee.
17 Q. Did the FDA convene an advisory committee in
18 February of 2001?
19 A. Yes, they did.
20 Q. And why was the -- what was your understanding
21 as to why the FDA convened an advisory committee?
22 A. They wanted an external group of experts to review
23 the data from the VIGOR study, as well as to review the
24 data from a similar but different study done with
25 Celebrex.

Page 2841

1   Q. And the Celebrex trial that was like the VIGOR
2   trial was that a trial known as CLASS?
3   A. That's correct.
4   Q. And were you a presenter at the FDA advisory
5   committee?
6   A. I was one of the presenters, yes.
7   Q. Who else presented for Merck?
8   A. Dr. Bonnie Goldmann from regulatory affairs gave, I
9   think, a brief introduction. And then Dr. Alan Nies,
10  who was a vice-president at Merck Research Labs and a
11  clinical pharmacologist gave part of the presentation.
12  And then I also gave a presentation.
13  Q. What was the subject of your presentation?
14  A. I did a general overview of the VIGOR study, the
15  study design, the overall study results. So the GI
16  results, efficacy results and general safety results,
17  including the cardiovascular results, and then I also
18  reviewed some of the cardiovascular data from our Phase
19  IIb/III OA studies and our Alzheimer's studies.
20  Q. Did the FDA medical officers or did an FDA
21  medical officer also make a presentation?
22  A. Um, I think there were a few FDA medical officers
23  who made presentations.
24  Q. The folks that are sitting on the advisory
25  committee, what do they do during the -- during the day

Page 2842

1   of presentation?
2   A. They listen. They ask questions of the presenters
3   and then they discuss the data, and usually the agency,
4   the FDA gives them specific questions that they ask
5   them to answer.
6   Q. Was the presentation schedule such that
7   Celebrex folks presented on one day and Merck presented
8   on another day?
9   A. That's correct. The first day people from Pfizer
10  presented -- it was either Pfizer or another company at
11  the time -- presented the CLASS results, and then on
12  the second day we presented the results from the VIGOR
13  study.
14  Q. At the end of the advisory committee meeting
15  what was your understanding of the advisory committee's
16  view of what should occur next?
17  A. They suggested that --
18       MR. LANIER: Objection, Your Honor. Hearsay.
19       MR. BROCK: Your Honor, it is not being
20  offered for the truth. It is being offered for her
21  understanding of what the direction was, and it relates
22  to what Merck does next.
23       THE COURT: Well, I think the question as to
24  what their view was is -- the objection is sustained.
25  However, you can ask her what, if any, directions they

Page 2843

1   gave.
2        THE WITNESS: The directions they gave to the
3   agency were they thought that the VIGOR data should be
4   included in the label. They thought both the GI data
5   should be included in the label, as well as the
6   cardiovascular data should be included. They thought
7   we should highlight the fact that VIOXX is not an
8   inhibitor of platelet clumping, and they were unclear
9   of the significance of the findings, and I think they
10  also suggested that further research be done.
11  BY MR. BROCK:
12  Q. Okay. Now, following the advisory committee
13  did Merck send to the FDA a proposed label change in
14  March?
15  A. Yes. We had sent them a proposed label in June,
16  but based on what -- June of 2000 -- based on what we
17  heard from the external experts in February of 2001 we
18  revised the label, we updated it and then sent it to
19  the FDA in the hopes that we could expedite discussions
20  about changing the label.
21  Q. Did you participate in the preparation of the
22  draft label change that was sent to FDA?
23  A. Yes, I did.
24  Q. And that was sent, I believe, in March?
25  A. Um, the timing sounds about right.

Page 2844

1   Q. And then FDA responded with the proposed label
2   change of its own. I believe we heard testimony in
3   October.
4   A. That's correct. They asked us to provide more
5   information to them in April.
6   Q. And did Merck do that?
7   A. Yes, we did.
8   Q. Was a label reflecting the VIGOR data approved
9   by the FDA on April the 9th of 2002?
10  A. I'm sorry, can you ask me the question again?
11  Q. Was a label reflecting the VIGOR data approved
12  by the FDA in April of 2002?
13  A. Yes, it was.
14  Q. Let me get you to turn, if I could, to A-272.
15  Do you have it there?
16  A. I do.
17  Q. This has been admitted into evidence, and, so,
18  let me ask you, if you would, please, to focus on this
19  document and tell the jury if this label reflects
20  changes made on April 11th, 2002, including the VIGOR
21  data.
22  A. Yes, it does. I see the VIGOR data is included
23  here.
24  Q. Did the label show the difference in
25  myocardial infarction rates that were seen in VIGOR?

Page 2845

1  A. Um, yes, it did. It is in Table 3 -- or at least
2  that's one place, Table 3 on the second page.
3  Q. Let's look at Table 3, if we could. At
4  A-272.2. Can you pull that out? Does it show in Table
5  3 any CV thrombotic event, 45 on VIOXX, and 19 on
6  Naproxen?
7  A. That is correct.
8  Q. Does it show cardiac events 28 and 10?
9  A. Correct.
10 Q. Does it show fatal MI, sudden death, 5 for
11 VIOXX and 4 for Naproxen?
12 A. That's correct. It included two fatal myocardial
13 infarctions.
14 Q. And nonfatal MI, 18?
15       MR. LANIER: Your Honor in the interest of
16 moving on, this has been covered with other witnesses
17 and read word-for-word the way it is being read now.
18       MR. BROCK: I have a point to this.
19       THE COURT: That's true, counselor, it is
20 repetitive. Move through it quickly.
21       MR. BROCK: I'm to the point I want to make.
22 BY MR. BROCK:
23 Q. You see it says nonfatal MI 18 on VIOXX, and
24 on Naproxen it shows 4?
25 A. That is correct.

Page 2846

1  Q. And we saw earlier in the submission that we
2  made to the FDA that there were 20 heart attacks on
3  VIOXX and 4 on Naproxen.
4       Do you remember that?
5  A. That's correct.
6  Q. Where are the other two in this chart?
7  A. They're in the fatal MI sudden death category.
8  This is the way the FDA asked us to kind of tabulate
9  the events in the table.
10 Q. So all the data is there?
11 A. Yes, it is.
12 Q. And is it correct, also, that there's a Table
13 2 that shows the comparison to Naproxen, which shows
14 the number of events that occur over time?
15 A. Yes, that is correct.
16 Q. On 272.1?
17 A. That is correct.
18 Q. Let me turn your attention, if I could,
19 quickly to the precautions section under
20 "cardiovascular effects." This is the precautions
21 section of the label, correct?
22 A. That is correct.
23 Q. And is this where Merck believed the VIGOR
24 data should appear?
25 A. When we sent in our label to the FDA in March of

Page 2847

1  2001 we suggested that it appear in the precautions
2  section, that is correct. We thought it was most
3  appropriate here.
4  Q. Did the FDA agree that the CV events or risks
5  should go in the precautions section?
6  A. Yes, they did, or that wouldn't be what the
7  ultimate label showed --
8       MR. LANIER: Objection. This calls for
9  speculation. She is not able to say what the FDA
10 thought was appropriate.
11      THE COURT: The objection is sustained. You
12 can ask her if they approved the label with it in the
13 precautions section.
14 BY MR. BROCK:
15 Q. Did the FDA approve the label with the CV risk
16 in the precautions section?
17 A. Yes, they did.
18 Q. Did the FDA also agree to show the results in
19 the label of the two Alzheimer's trials that we spoke
20 about earlier today?
21 A. Um, they agreed to have us put interim data in the
22 label in the precautions section.
23 Q. If you would look in the part that I have
24 blown up it says, "In a placebo-controlled database
25 derived from two studies with a total of 2,142 elderly

Page 2848

1  patient with a mean duration of exposure of
2  approximately 14 months the number of patients with
3  serious cardiovascular thrombotic events was 21 versus
4  35 for patients treated with VIOXX once daily versus
5  placebo respectively." Right?
6  A. That is correct.
7  Q. And that trial database at that time there
8  were more events on placebo than there were on VIOXX?
9  A. That is correct.
10 Q. That trial had not completed at that point,
11 though, right?
12 A. No, it had not.
13 Q. And it also goes on to -- and the FDA approved
14 the language for the label, correct?
15 A. Actually, one of the studies might have completed,
16 and the other one was still ongoing.
17 Q. And these two placebo-controlled studies
18 mortality due to cardiovascular thrombotic events was 8
19 versus 3 for VIOXX versus placebo respectively?
20 A. That's correct.
21 Q. That refers to the total number of deaths that
22 occurred due to cardiovascular thrombotic events in
23 those two placebo-controlled trials?
24 A. That is correct --
25 Q. And FDA approved --

Page 2849

1   A. -- at that point in time.
2   Q. Correct. And the FDA approved that language?
3   A. That is correct.
4   Q. And then the FDA approved the language which
5   says, "the significance of the cardiovascular findings
6   from these three studies is unknown."
7   A. That is correct.
8   Q. Now, is there a term in science and medicine
9   that is called "all-cause mortality?
10  A. Yes, there is.
11  Q. Is the mortality number that's given in the
12  label in terms of the language approved by FDA is that
13  all cause mortality?
14  A. No. That's just mortality for cardiovascular
15  thrombotic events.
16  Q. Okay. What is all-cause mortality?
17  A. Basically that's death due to any cause.
18  Q. And what all could be included in that? Just
19  give some examples.
20  A. Death for any reason. It could be death due to an
21  MI. It could be death due to an infection. It could
22  be death due to a motor vehicle accident. We had a
23  death due to an electrocution during the study, so any
24  cancer deaths. And what we say death is an outcome it
25  is not a cause.

Page 2850

1   Q. And did Merck present the all-cause mortality
2   data to the FDA?
3   A. Yes, we did. When we sent them in additional data
4   in the summer of 2001, which was prior to them sending
5   their first label back to us we included the all-cause
6   mortality data from the Alzheimer's studies, as well as
7   serious adverse experience data from those studies.
8   Q. Now, we talked earlier today about whether
9   Merck had done a CV outcomes study before asking that
10  the FDA approve the medicine for sale in the United
11  States. I want to now focus on the period of time
12  after the VIGOR results.
13      Did Merck conduct an outcomes trial to look at
14  cardiovascular risks after VIGOR?
15  A. Um, yes we did. We implemented a protocol, a
16  study, protocol 203, which I consider to be a CV
17  outcomes study where we prespecified a hypothesis that
18  we would look at the incidence of cardiovascular events
19  on VIOXX compared with placebo from three large studies
20  in cancer chemoprevention.
21  Q. And is one of those studies called the APPROVe
22  trial that the jury has heard about?
23  A. One of those three studies was the APPROVe -- the
24  APPROVe trial.
25  Q. The jury has seen, I think, some e-mails

Page 2851

1   relating to trial design in terms of putting together a
2   CV outcomes trial.
3       Can you tell the jury why that's a difficult
4   trial to design and implement?
5   A. Well, we talked about the fact that it was
6   difficult to interpret the VIGOR results when you
7   looked at VIGOR alone because you had two active
8   comparators. And the best way to determine the
9   absolute safety of a drug, not the comparative safety,
10  which is also important, but the absolute safety to
11  know if VIOXX actually increased was neutral or
12  decreased the cardiovascular event rate would be to do
13  a placebo-controlled study.
14      But you can't just enroll patients and say
15  here we're going to give you this drug and see if it
16  has a negative effect. There has to be a benefit that
17  you're providing to patients, and, so, therefore, there
18  was an extensive literature, animal studies, there was
19  an epidemiologic literature, as well as some clinical
20  trial literature that suggested that NSAIDs, inhibition
21  of COX-2 which you get with both NSAIDs and COX-2
22  inhibitors might actually be beneficial in preventing
23  cancer. And, therefore, we felt these were studies
24  that could ethically be done where the patient would be
25  potentially getting a significant benefit, but would

Page 2852

1   also provide us long-term placebo-controlled data where
2   we could proactively collect and adjudicate and then
3   analyze in a prespecified manner cardiovascular events.
4       Now, it would have been nice if we could have
5   done this in arthritis patients, but as I discussed
6   before, you can't keep patients who need NSAIDs on
7   placebo for greater than a couple of months. And, so,
8   it actually took us a long time to figure how we were
9   going to do this study, the best type of study to do,
10  met with a lot of experts over, you know, probably a
11  year or even longer period of time.
12      MR. BROCK: Okay. I'm handing to Mr. Lanier
13  FDA advisory committee VIGOR outcomes slide deck, and
14  would ask you to look, if you would, at Page 120 there
15  that I have handed you. I'm focusing on 120 and 124?
16      MR. LANIER: Again, this is another one I
17  didn't get over lunch, and I'm being asked to look at a
18  130-page document to make a decision. I'm not going to
19  file an objection right now, but I would ask you to
20  repeat your request that you made before lunch so we
21  can do this.
22      THE COURT: Counselor, any documents you're
23  going to use with the witness please give to the
24  plaintiff's counsel so he can look at them.
25      MR. BROCK: Right. And I have been doing

30 (Pages 2849 to 2852)

Page 2853

1  that.
2  THE COURT: No, I asked you to give them to
3  him at lunchtime, didn't I?
4  MR. BROCK: I misunderstood you. I thought
5  you said if you've got any others like pages taken out.
6  So I may have misunderstood, but, yes, we'll get them
7  to him.
8  THE COURT: All right. At this point you're
9  going to show these on the screen?
10  MR. BROCK: Yes, ma'am.
11  THE COURT: All of them or one page?
12  MR. BROCK: Two pages.
13  THE COURT: Let counsel know which two pages.
14  MR. BROCK: Page 120 and 124.
15  THE COURT: You can make an offer in evidence
16  later.
17  You have no objection to the last two pages?
18  MR. LANIER: I have no objection to him
19  putting it into evidence. I'll just read it fast.
20  THE COURT: We'll mark the document into
21  evidence.
22  BY MR. BROCK:
23  Q. You see Page 120 from the slide set that --
24  was this what you were using at the FDA advisory
25  committee?

Page 2854

1  A. Yes, it is.
2  Q. And can you tell the members of the jury as of
3  February of 2001 what does this document reflect?
4  A. This is looking at the incidence of investigator
5  reported thrombotic cardiovascular events. That means
6  these had not gone to adjudication. So investigator
7  reported events that occurred in the Phase IIb/III OA
8  database. That was the database that we had before we
9  implemented the cardiovascular SOP, so none of those
10  were adjudicated. And, also, the VIGOR database.
11  So you have the incidence on the vertical axis
12  and how long patients have been on therapy is on that
13  horizontal axis. And even if you had placebo there you
14  would expect the rates to go up over time because more
15  patients would have events even if you were on placebo.
16  But what you can see here is that in VIGOR -- let's
17  start with the OA database. In the OA database the
18  cumulative incidence of investigator reported
19  thrombotic events was similar on the NSAID group and
20  the rofecoxib group. Those are the two lines in the
21  middle.
22  And if you look in the VIGOR database you have
23  rofecoxib and then Naproxen, which is showing you that
24  it is a lower event rate. So this kind of summarizes
25  in a figure some of the data that I had discussed

Page 2855

1  earlier.
2  Q. Okay. And then tell the members of the jury
3  what 124 represents.
4  A. These were investigator reported thrombotic events
5  from the Alzheimer's studies, and, again, very similar
6  to what I showed you on the other one this shows you
7  the event rates over time, and you can see that the
8  rofecoxib event rate is just a little bit lower than
9  the placebo event rate. That wasn't statistically
10  significant, so I would say that they were similar
11  because there was only a small numeric difference, but
12  certainly no difference that the rate on VIOXX was
13  higher than placebo.
14  Q. And this shows these trials through it looks
15  like around 16 months or so, does it not?
16  A. That is correct.
17  Q. And this trial continued on for a period of
18  time?
19  A. Um, one of the studies, 078, went on past 3 years.
20  091 was approximately a 1-year study.
21  Q. At the end of that process what did the
22  relative risk look like?
23  A. When all the studies were completed, and we had
24  actually confirmed thrombotic events. All of the
25  events had been adjudicated. The relative risk of

Page 2856

1  having a thrombotic event on VIOXX compared with
2  placebo was one, meaning they were the same or may have
3  been -- it was approximately one.
4  Q. And a relative risk of approximately one means
5  no increased risk?
6  A. That is correct or decreased risk.
7  Q. Right. Now, up until the time that Merck knew
8  of the APPROVe results can you tell the members of the
9  jury what you thought about VIOXX in terms of the risk
10  that it did or did not pose from a cardiovascular
11  perspective based on everything you knew?
12  MR. LANIER: Your Honor, I'm going to object
13  if he said you all. She can speak for her but not for
14  all of Merck.
15  MR. BROCK: I said you; if it had been you all
16  it would have been y'all.
17  MR. LANIER: I just wanted to make sure.
18  THE WITNESS: I thought that VIOXX's effects
19  on the heart were neutral. I didn't think that it
20  increased the risk of heart attacks, and I didn't think
21  it decreased the risk of heart attacks or serious
22  thrombotic events, and I thought that what we saw in
23  VIGOR was that Naproxen was acting as a
24  cardioprotective agent.
25  BY MR. BROCK:

Page 2857

1  Q. Now, let me direct your attention to Exhibit
2  B-139.
3  A. Can you tell me how far --
4  Q. Sure. It is about halfway through the book.
5  A. Oh, I got it.
6     MR. LANIER: She just handed it to me.
7  BY MR. BROCK:
8  Q. And can you tell the members of the jury what
9  I have handed to you?
10 A. This is a review article that I and other authors
11 wrote on -- basically it was a review of the
12 cardiovascular safety of rofecoxib.
13 Q. And what journal does this article appear in?
14 A. Oh, gosh, I can't even remember. American Heart
15 Journal.
16 Q. And the date of publication, do you recall
17 that?
18 A. Um, this was in 2003.
19 Q. And I'll ask you what you and the other
20 authors were attempting to do by this article?
21 A. Um, we were trying to review the data that was
22 available on the cardiovascular effects of VIOXX. I
23 think we went through some of the clinical pharmacology
24 data. Garrett FitzGerald's data. We went through some
25 of the effects on platelet aggregation of different

Page 2858

1  NSAIDs that I showed you before. We reviewed -- we
2  reviewed some of the clinical trial data. So we -- the
3  OA Phase IIb/III studies upon which the FDA actually
4  approved the drug some of them had long-term extensions
5  that went out several years, and we continued to
6  collect cardiovascular data, and when all of those
7  studies were over we updated the Phase IIb/III pooled
8  analysis. We also had the updated VIGOR data, and we
9  also had done a pooled analysis where we had pooled all
10 of the data from our clinical trials that had VIOXX and
11 a placebo, VIOXX and an -- or VIOXX and an NSAID that
12 were 4 weeks or more in duration from our IIb and
13 beyond.
14 Q. You had some figures and some data in this
15 article, also, did you not?
16 A. Yes, we did.
17 Q. And if we could look at 139.8, Figure 5,
18 please. Do you see how this is set up? It has
19 decreased risk on rofecoxib on the left side and
20 increased risk of rofecoxib on the right side, correct?
21 A. That is correct.
22 Q. All right. Tell the members of the jury, if
23 you would, please, what this table is set up to show,
24 and what it, in fact, does show?
25 A. This is showing the relative risk of what's called

Page 2859

1  an APTC endpoint. That includes -- the most commonly
2  endpoint used in cardiovascular studies looking at
3  thrombosis, and it includes heart attack, stroke and
4  cardiac death and/or unknown cause of death. So the
5  triangles point to the relative risk of having an APTC
6  thrombotic endpoint on rofecoxib versus the comparator.
7  The first line shows rofecoxib versus Naproxen. And
8  you can see that the relative risk is 1.69. It is
9  elevated on VIOXX compared with Naproxen. And you can
10 see that it is elevated because it is to the right of
11 the one, the line right in the middle. And then that
12 bold line through it shows the 95 percent confidence
13 intervals, which means that you've got a 95 percent
14 chance that the relative risk is somewhere in between
15 those lines. And the fact that it all is on the right
16 side of one that bold line tells you that, you know, it
17 is a significant -- there's a significant difference
18 between VIOXX and Naproxen.
19     If you look at the next line that's VIOXX and
20 NSAIDs other than Naproxen, Ibuprofen, diclofenac,
21 nabumetone, and what you can see here is that the
22 relative risk is a little bit less than one, which
23 would favor rofecoxib, but the black line goes through
24 the line, which means there's no significant difference
25 between a rofecoxib and nonNaproxen NSAIDs and then the

Page 2860

1  third line is between rofecoxib and placebo.
2  Q. What does that table say to you in terms of
3  whether or not VIOXX increases risk of thrombotic
4  events?
5  A. Certainly, this data did not suggest that VIOXX
6  increased the risk compared with nonNaproxen NSAIDs or
7  placebo, but there was an increased risk compared with
8  Naproxen.
9  Q. Okay. And Naproxen was the comparator in the
10 VIGOR trial?
11 A. That is correct.
12 Q. Now, up until September of 2004 was this the
13 picture of safety as you understood it with regard to
14 cardiovascular risk?
15 A. Yes, it was, but we were continuing to do more
16 studies to get an even better idea because you can't
17 get, you know, exact estimates with these data. The
18 confidence intervals going wide means it is based on
19 the amount of data that you have.
20 Q. Now, I want you to tell the jury again,
21 please, what was the APPROVe trial, what patient
22 population was in that trial and what you were doing in
23 terms of the test of VIOXX in that trial?
24     THE COURT: Was this chart preAPPROVe?
25     THE WITNESS: Yes, it is.

Page 2861

1  MR. BROCK: Yes, ma'am.
2  THE WITNESS: We submitted this paper in 2002.
3  Basically, the APPROVe study was looking at whether
4  VIOXX compared with placebo could reduce the incidence
5  of colon polyps or colon growths in patients who were
6  at risk of getting these colon growths.
7  So the way that you can screen for
8  precancerous colon lesions is people do colonoscopies
9  where they actually put a tube into someone's
10  intestines, and if you find these polyps, which are
11  precancerous lesions, you remove them. Sometimes if
12  you don't find them those polyps will then go on to
13  cause cancer.
14  So in patients who had had polyps found on
15  colonoscopy they were then randomized to VIOXX or
16  placebo, and they were followed for a period of 3 or
17  4 years, I think 3 years, and we would look, and they
18  had periodic colonoscopies, and we were looking to see
19  whether VIOXX would actually reduce the rate of colon
20  polyps in patients.
21  BY MR. BROCK:
22  Q. And why was the colon polyp trial a good model
23  for looking at CV safety?
24  A. Again, it was a placebo-controlled study, several
25  years in duration. And there was a known benefit. We

Page 2862

1  could give -- not a known benefit but a theoretical
2  benefit that we could provide to patients, and
3  therefore, provided an excellent opportunity to collect
4  cardiovascular data.
5  Q. What, Dr. Reicin, were the results of the
6  APPROVe trial from a cardiovascular standpoint?
7  A. Um, there were significantly more cardiovascular
8  events on VIOXX compared with placebo beginning after
9  18 months of therapy.
10  Q. And how did Merck learn of the increased
11  number of events in the APPROVe trial?
12  A. The Data Safety Monitoring Board -- the study also
13  had an external Data Safety Monitoring Board. They
14  contacted I think it was called the administrative
15  committee. It was similar to the Steering Committee
16  that we had. They told them about the increased rates
17  that they had seen in the study and suggested an early
18  termination to the study. The head of the
19  administration committee then called Merck and told us
20  of the results and the recommendation.
21  Q. Did you believe that there was an increased
22  risk of cardiovascular events with VIOXX use prior to
23  this time?
24  A. Absolutely not.
25  Q. Was there any evidence that -- well, let me

Page 2863

1  put it this way, did you believe that VIOXX increased
2  risk for persons who used the medication on a
3  short-term basis prior to seeing the APPROVe data?
4  A. The data was not consistent with this if you looked
5  at the totality of data. All of the studies.
6  Q. Now, how did you learn -- how did you
7  personally learn of the APPROVe results?
8  A. Um, we have a system at Merck called the MVX system
9  where people can leave messages on your office phone,
10  and early Friday morning as I was driving into Merck I
11  checked my messages. I heard a message from my boss
12  saying that there was an increased rate of
13  cardiovascular events, and I thought, no, no, no. I
14  have to relisten to that, I didn't hear that right, and
15  subsequent to that I got a phone call that there would
16  be a meeting they wanted me to be at.
17  Q. And we'll talk about the details of the
18  results in a minute, but as a result of the reporting
19  to Merck of the increased number of events in this
20  patient population did Merck take action based on that?
21  A. We voluntarily removed VIOXX from the market.
22  Q. Did you participate in the meetings and
23  discussions that took place about whether or not to
24  take the drug off the market?
25  A. Yes, I did.

Page 2864

1  Q. And what was Merck's decision to take the drug
2  off the market based on?
3  A. Well, we had a single -- we had this study that
4  showed that there was an increased risk of
5  cardiovascular events beginning after 18 months. At
6  that point in time there was no other NSAID, no other
7  COX-2 inhibitor that had a study that was this large or
8  this long in duration versus placebo, and so we didn't
9  know if this was something that was unique to VIOXX
10  something that affected the COX-2 inhibitors or the
11  NSAID class in general.
12  In addition, we felt that although we didn't
13  know if this was something that was unique to this
14  patient population that you had to be conservative and
15  assume that it wasn't unique to this patient
16  population, and, therefore, since we couldn't tell if
17  this was something unique to VIOXX we thought that
18  there were alternative therapies, including COX-2
19  inhibitors on the market --
20  MR. LANIER: I'm sorry, Judge. I have to
21  object at this point. She is clearly speaking for
22  Merck. She is not the corporate representative in this
23  case. She has an ability to speak on her own, but she
24  didn't make this decision, and I don't think she is the
25  person to give the company explanation.

Page 2865

1  MR. BROCK: She said she participated in the
2  discussions that led to it and was knowledgeable of it.
3  MR. LANIER: There's a difference between
4  participating in the discussions that led to it and the
5  actual withdrawal of the drug and who made that
6  decision. It was not her.
7  THE COURT: All right. Well ask who made the
8  decision and how much she participated in the decision.
9  BY MR. BROCK:
10  Q. The final decision maker in the -- in
11  taking -- in the decision to voluntarily withdraw the
12  drug from the market, the final decision maker was who?
13  A. Well, I don't know if I can tell you who the final
14  decision maker was. I know it was Peter Kim, who is
15  the head of Merck Research Labs, made a recommendation
16  to the Chief Executive Officer and management
17  committee. That recommendation was accepted, and they
18  also went to the Merck's board and informed them of the
19  decision, as well.
20  Q. Did you participate in the discussions and the
21  meetings that led to the recommendation that was made
22  to withdraw the drug from the market?
23  A. Yes, I did.
24  Q. And is that what you have been telling the
25  jury about?

Page 2866

1  A. Yes.
2  Q. All right. Please continue.
3  MR. LANIER: Your Honor, he has to frame it
4  within that because she was giving a specific answer of
5  here's why we withdrew the drug, and she wasn't in on
6  those meetings, and she doesn't know that reason. She
7  can talk about her discussion points leading up to it.
8  MR. BROCK: Let's approach.
9  MR. LANIER: It is an easy objection.
10  MS. JONES: No, not when you stand there and
11  make a speech it is not.
12  (Whereupon, the following occurred at
13  side-bar:)
14  THE COURT: Well, I still don't know to what
15  degree she participated. It is one thing to say I
16  participated in the conversations. Those conversations
17  may have been oh, there's a study, what are we going to
18  do, does anybody have any thoughts, and then all the
19  final decisions were made in meetings of executives
20  much higher than her.
21  MR. LANIER: And that's what happened. She
22  has given deposition testimony on it. She was in phone
23  calls and other meetings, but Peter Kim made the
24  decision.
25  THE COURT: It will be brought out one way or

Page 2867

1  the other.
2  MS. RELKIN: I also got the drift that she may
3  be going to the class effect defense in the answer of
4  the follow-up question.
5  THE COURT: There's no question on that. She
6  is not going to say anything further about the class
7  effect defense, is she?
8  MR. BROCK: I'm not going to --
9  THE COURT: There is no defense on that for
10  failure to warn. That would only be a defense in a
11  risk analysis, so it has no place here. Secondly,
12  there's absolutely no expert on behalf of Merck or on
13  behalf of the plaintiffs who is willing to say that
14  that is a valid theory. I have gone through this now
15  for months saying that I would be happy or willing to
16  allow testimony about the class effect of all NSAIDs
17  if there was any expert being offered by Merck that
18  said it was a valid scientific theory, that I would
19  hold a hearing outside the presence of the jury. We
20  went through the entire last trial with Merck saying
21  they wanted to get that evidence in with me saying,
22  Bring me one expert who says it is true and I'll do it,
23  that it is scientifically valid or I'll make a decision
24  based on that, but without that I can't do it.
25  And now we have her skirting that issue and --

Page 2868

1  not even skirting it. Pretty much saying it without --
2  when I have barred it. You know, if you were going to
3  have her say that you have to have an expert who is
4  going to say it outside the presence of the jury so we
5  can have a little hearing on it. And that's what I
6  said from the beginning. So don't go there with her.
7  (End of side-bar.)
8  THE COURT: All right. We need to know, Miss
9  Reicin, the exact level of your responsibility as far
10  as the decision to pull the drug. Were you in the
11  ultimate decision making group? I assume the decision
12  wasn't made by one person or you don't know?
13  THE WITNESS: Again, I was in the
14  decision-making group within Merck Research Labs, and
15  Peter Kim told the CEO what our decision was, and he
16  accepted that recommendation, and I was in the room
17  when that recommendation was given to the Chief
18  Executive Officer.
19  THE COURT: Before the recommendation was made
20  were you with a group of -- you sat with Peter Kim and
21  another group and actually went over whether should we
22  or shouldn't we pull the drug from the market?
23  THE WITNESS: Yes, I did.
24  THE COURT: And you were one of the group that
25  made the decision to pull the drug -- to recommend to

Page 2869

1  the CEO to pull the drug off the market?
2      THE WITNESS: I was part of that group.
3  Ultimately it was Peter Kim's decision.
4      THE COURT: No, I'm asking you whether you
5  were present when the decision was made.
6      THE WITNESS: I was present.
7      THE COURT: And you participated in it?
8      THE WITNESS: I did.
9      THE COURT: I'll allow it then.
10     MR. BROCK: So I don't know where we left off,
11 but, Your Honor, I would like to approach just for one
12 second.
13     (Whereupon, the following occurred at
14 side-bar:)
15     MR. BROCK: It might be wise if we took a
16 2-minute break and let me mention to her not to mention
17 this class effect thing again.
18     THE COURT: Okay. That's a good idea.
19     (End of side-bar.)
20     THE COURT: Okay. We're going to take a short
21 break.
22     (The jury leaves the courtroom.)
23     THE COURT: Just to make sure the record is
24 clear, we're not talking about a COX-2 class effect,
25 we're talking about the hypothesis that all NSAIDs

Page 2870

1  increase the risk of heart attacks.
2      MR. BROCK: Right. I think what her testimony
3  was -- we're not going to go back there, but I think
4  what she was saying was that at that time Merck saw
5  that it had -- that VIOXX increased the risk in that
6  trial and there was nothing known about the other
7  NSAIDs that would indicate that they did. There were
8  alternative therapies available, and, so, that was part
9  of the decision.
10     THE COURT: And I am not striking what she
11 said. I don't want her to go past that.
12     MR. BROCK: I'm with you. I'm with you.
13     THE COURT: I'm not striking what she said. I
14 don't want her to go past what she said.
15     MS. RELKIN: Or repeat it.
16     THE COURT: Well --
17     MR. LANIER: Okay. We're pulling the
18 testimony. What she just answered your questions about
19 being in on the decisions is absolutely contradicted by
20 multiple pieces of testimony in this case. I can do it
21 in cross, but I do want you to see the transcript.
22     MR. BROCK: You can bring it up if you think
23 you've got it.
24     MR. LANIER: By Ray Gilmartin and others.
25     MR. BROCK: That's fine.

Page 2871

1      THE COURT: Well, talk to her. That's what we
2  broke for. Mr. Brock, move away from the issue all
3  together.
4      MR. BROCK: She can finish the explanation or
5  the reason for the withdrawal, that's what we were --
6      THE COURT: She already gave the reason for
7  the withdrawal, actually. I don't want her to talk
8  about that other NSAIDs might have the same effect.
9  She could talk about the reason for withdrawal for
10 safety, for concern, for that there were other
11 alternatives we thought were available.
12     MR. BROCK: Okay.
13     (Break taken.)
14     THE COURT: You can be seated. You can bring
15 the jury in.
16     (The following side-bar discussion was had:)
17     MR. LANIER: The silent lawyer brought up a
18 good point.
19     MR. GORDON: Here's what concerns me. The
20 testimony is we weren't concerned about the dangers
21 about VIOXX, then we were concerned about the dangers
22 of VIOXX, then after VIGOR we weren't concerned about
23 the dangers of VIOXX, then came APPROVe and we were
24 concerned about the dangers of the VIOXX, then came the
25 Alzheimer's data and we weren't concerned about the

Page 2872

1  dangers of VIOXX, and then we can't ask what about the
2  APPROVe follow-up data now.
3      MR. LANIER: We pulled it just because we were
4  better safe than sorry. We just pulled it, and now it
5  turns out it wasn't bad after all.
6      MR. GORDON: And we're all done. All the
7  research is over.
8      MR. LANIER: And that's how they get out of
9  the we pulled the drug trap. It makes them look nice.
10 The second we had general concern we pulled the drug
11 and then history has shown we didn't need to pull it
12 after all.
13     MR. GORDON: Why can't we at least ask without
14 going through the results that did you know there was
15 follow-up data from the APPROVe people to see whether
16 or not there's dangers and that the results aren't in
17 yet. That we should at least be able to say.
18     MR. BROCK: We'll need to have a hearing on
19 this.
20     THE COURT: Well, the Alzheimer's data --
21     MR. BROCK: That came before.
22     MR. LANIER: It is not Alzheimer's.
23     THE COURT: She hasn't said anything after
24 APPROVe.
25     MR. GORDON: Believe me, she is going there.

Page 2873

1  THE COURT: What is she going to say after
2  APPROVe?
3  MR. BROCK: Nothing.
4  MR. LANIER: She's not going to say it turns
5  out it was not dangerous after all?
6  MR. BROCK: She will say if you ask her --
7  MR. LANIER: You're not going to ask her that,
8  and she won't volunteer it.
9  MR. GORDON: Then I'll withdraw the question.
10  MR. BROCK: Do I get to speak?
11  MR. LANIER: I haven't said anything.
12  MR. BROCK: I was starting to talk, and you
13  cut me off.
14  MR. LANIER: I haven't cut you off.
15  MR. BROCK: She will say that this is what we
16  saw up until APPROVe. She has said that. She has said
17  what APPROVe shows is an increased risk in that trial,
18  and unless she has asked questions about -- from them
19  about what do you think about it now, um, I don't
20  anticipate that that will be asked. If she is asked
21  questions about what did you think in, you know, on the
22  basis of the withdrawal what did the data show at that
23  point in time if he asks her that she will say the data
24  is inconsistent because if you look back at other
25  placebo data that you see something that's different,

Page 2874

1  which that's just a true fact. This other stuff is not
2  final. I don't even know if she knows that data.
3  MR. GORDON: So you're going to go do that
4  with Dr. Rayburn the post APPROVe stuff?
5  MR. BROCK: I don't think I'm going to stand
6  here and answer that.
7  MR. LANIER: Then we don't have a problem.
8  MR. BROCK: No, I said I'm not answering that
9  question.
10  MR. GORDON: I took his deposition. I know
11  where he is going to go.
12  THE COURT: Well, he is not doing that with
13  this witness. Let's move on.
14  (End of side-bar.
15  (The jury enters the courtroom.)
16  THE COURT: Be seated. You can proceed.
17  BY MR. BROCK:
18  Q. Before the break we were asking you some
19  questions about whether or not you were knowledgeable
20  about Merck's -- the reasons for Merck's decision to
21  withdraw voluntarily VIOXX from the market.
22  Do you remember those questions?
23  A. I do.
24  Q. And did you participate in discussions with
25  Dr. Kim and Mr. Gilmartin and other folks at MRL about

Page 2875

1  the options that were available during that period of
2  time?
3  A. There were conversations between Merck Research Lab
4  personnel including Dr. Kim, and I was there, and then
5  I was at a separate meeting in Whitehouse Station where
6  Dr. Kim presented his recommendation to Ray Gilmartin
7  and other members of management committee.
8  Q. And did you have an understanding of the
9  reasons that Merck decided to voluntarily withdraw the
10  drug from the market?
11  A. Yes, I did.
12  Q. And I think you have said that to the jury,
13  but could you just give the short version of that
14  again, please?
15  A. Um, basically --
16  MR. LANIER: Judge, maybe I'm out of line, and
17  so I apologize, but I think this is hearsay, unless
18  this is what she was saying at the meeting. They've
19  got the witnesses; let them bring them in for
20  cross-examination.
21  THE COURT: I think she has expressed what the
22  company's position was. Are you asking her what was
23  said at the management conference meeting?
24  MR. BROCK: I guess that was my question.
25  MR. LANIER: Then my objection is hearsay.

Page 2876

1  MR. BROCK: That's fine. I think she answered
2  the question.
3  THE COURT: You can ask her if there were
4  other items that were discussed, other than what she
5  told the jury about.
6  BY MR. BROCK:
7  Q. Let's do it this way. Have you told the jury
8  your understanding as to why the drug was withdrawn
9  from the market on a volunteer basis?
10  A. Basically other than we thought it was the best
11  thing to do for patients.
12  Q. Now, turn, if you would, to Exhibit B-169. It
13  is in your notebook there, Dr. Reicin. And it is
14  toward the back.
15  Is this the published paper regarding the
16  APPROVe trial?
17  A. Yes, it is.
18  Q. And the lead author is identified as Robert
19  Bresalier?
20  A. That is correct.
21  Q. If you would look over at exhibit -- I mean,
22  page 169.6 to that exhibit, please.
23  A. Yes.
24  Q. And if we could see that on the screen,
25  please. Pull that out, if you don't mind.

Page 2877

1   All right. And is that what we have been
2   calling a Kaplan-Meier curve?
3   A. That is correct, showing the incidence of confirmed
4   cardiovascular events over time.
5   Q. And do you see that for the first 18 months or
6   so the VIOXX curve and the rofecoxib curve or line they
7   lay right on top of each other?
8   A. That is correct.
9   Q. And then beginning at about 18 months there is
10  some separation in the curves?
11  A. That is correct.
12  Q. Now, what I want to ask you is this, is the
13  separation that occurs at 18 months, is that
14  statistically significant at that point in time?
15  A. No, not at 18 months.
16  Q. There's a numerical difference at that time?
17  A. That's correct.
18  Q. When does the difference in the risk that's
19  seen in this plot become statistically significant?
20  A. I believe it was at 30 months.
21  Q. Now, if you can come back to the full page
22  169.6.
23       THE COURT: Which study is this one?
24       MR. BROCK: This is the APPROVe trial, Your
25  Honor.

Page 2878

1       THE WITNESS: APPROVe.
2   BY MR. BROCK:
3   Q. Actually, go back to 169.1. And if you would
4   pull out the paragraph under results. And does that
5   show that in this trial there were 46 patients that had
6   confirmed thrombotic events during the 3,000 patient
7   years of follow-up --
8   A. Um --
9   Q. I'm sorry.
10      -- as compared with 26 patients in the placebo
11  group?
12  A. That's correct.
13  Q. Is that showing in the placebo group there
14  were 26 patients that had cardiovascular thrombotic
15  events?
16  A. That is correct.
17  Q. And it says, "the increased relative risk
18  became apparent after 18 months of treatment. During
19  the first 18 months the event rates were similar in the
20  two groups"?
21  A. That's correct.
22  Q. And so in the first 18 months that would
23  reflect those curves that we saw where the lines laid
24  right on top of each other?
25  A. Correct.

Page 2879

1   Q. And then they began to separate.
2       Let me see 169.6 again, please. There's a
3   paragraph, the second paragraph in the left hand
4   column. There were no significant interactions?
5   A. Yes, I see that.
6   Q. All right. Where it says, "there were no
7   significant interactions between treatment group and
8   subgroups for confirmed serious thrombotic events in
9   subgroup analyses based on country, age, sex, use or
10  nonuse of hypertension drugs at baseline, low-dose
11  aspirin," and it goes on to list a bunch of other
12  things. What does that mean, "no significant
13  interactions between subgroups"?
14  A. What that means is while you might see numeric
15  differences in the relative risk between -- in
16  subgroups the fact that there's not a significant
17  interaction means that you're supposed to assume that
18  the relative risk in any one subgroup is the same as
19  the overall cohort. So you might see that, you know,
20  in patients who smoked -- I'm making these numbers up.
21  Maybe the relative risk was 1.5, but in patients who
22  didn't smoke the relative risk was 3, but if the
23  treatment by subgroup interaction is not significant
24  you're supposed to assume that the relative risk is
25  similar whether you smoke or you don't smoke.

Page 2880

1   Q. Okay. And I just want to ask you this last
2   question, if I could. Before Merck saw the results in
3   APPROVe and voluntarily removed the drug from the
4   market did Merck believe that there was not an
5   increased risk of cardiovascular events from VIOXX use?
6       MR. LANIER: Objection. She can't testify
7   about what Merck believed. She can only testify about
8   what she believed.
9       THE COURT: The objection is sustained.
10  BY MR. BROCK:
11  Q. Answer it for Dr. Reicin.
12  A. I did not believe that there was an increased risk
13  of cardiovascular events prior to seeing the APPROVe
14  data.
15      MR. BROCK: Thank you.
16      THE COURT: Okay. Cross.
17      MR. LANIER: Thank you, Judge.
18  CROSS-EXAMINATION BY MR. LANIER:
19  Q. May it please the Court.
20      Good afternoon, y'all.
21      Good afternoon, Dr. Reicin. And he calls you
22  Dr. Reicin, but it is Dr. Reicin, isn't it?
23  A. You're correct.
24  Q. Because this is not the first time you and I
25  have had a chance to visit, is it?

Page 2881

1  A. That's correct.
2  Q. In fact, I guess this is my fourth time to
3  cross-examine you, isn't it?
4  A. Um, I haven't kept track, but that's possible.
5  Q. Let's see. I cross-examined you, I took your
6  deposition about a year or so before you pulled the
7  drug, remember that?
8  A. Yes.
9  Q. In a case where I was trying to get y'all to
10 pull the drug, remember?
11     MR. BROCK: Object to that. That is not an
12 appropriate question.
13     THE COURT: The objection is sustained as to
14 what the purpose of prior testimony was.
15     MR. LANIER: The jury should disregard it.
16 You can ask her if, in fact, she has testified
17 previously but not the purpose of those times.
18 BY MR. LANIER:
19 Q. Then I took your deposition again after the
20 drug -- after the drug was pulled?
21 A. That's right.
22 Q. And I have cross-examined you on another case
23 involving this drug, right?
24 A. That's correct.
25 Q. All right. Then let's go through -- you

Page 2882

1  probably know everything I'm going to ask you, but we
2  have to do it again, okay?
3  A. Okay.
4  Q. First subject. You -- is it fair for the jury
5  to assume that one of your job responsibilities has
6  been "defending the VIOXX franchise," and I'll put that
7  in quotes because it belongs in quotes. True?
8  A. My supervisor has in some of my evaluations
9  referred to me as "defending the VIOXX franchise." I
10 have never considered that one of my specific
11 responsibilities, but I think he has -- he has said
12 that in reference to me making public presentations,
13 presenting data, discussing data in scientific forums
14 and in other situations.
15 Q. Well, in fact, if we look at Plaintiff's
16 Exhibit 2080, which we move into evidence, Your Honor.
17 It is the personnel file, and we'll move it subsequent
18 to any necessary revisions or excisions or whatever or
19 redactions.
20     THE COURT: Any objection?
21     MR. BROCK: No.
22     THE COURT: P-2080 will be moved into
23 evidence.
24     (Whereupon, Exhibit P-2080 was marked into
25 evidence.)

Page 2883

1  BY MR. LANIER:
2  Q. If we look at your performance review form for
3  the year 2001 this is where Alise Reicin -- that's you,
4  right?
5  A. That's correct.
6  Q. And in this performance review -- by the way,
7  you have progressed a lot in job titles since then,
8  haven't you?
9  A. Um, I am now a vice-president.
10 Q. They have moved you up from a senior director
11 to a vice-president, haven't they?
12 A. I was an executive director first and then a
13 vice-president.
14 Q. So you have actually had two jumps since
15 senior director?
16 A. That's correct.
17 Q. Okay. Well, back two jumps ago --
18 A. I don't know if I would refer to them as "jumps,"
19 but...
20 Q. Okay. Two promotions ago?
21 A. That's correct.
22 Q. Excuse me. This is on 32. It says first
23 sentence right out of the box on your performance
24 review, "Your major efforts this past year were focused
25 on defending the VIOXX franchise. And building a

Page 2884

1  scientific base." Is that what it says, doesn't it?
2  A. Yes, it does, and I think you can say it was as I
3  described it presently at FDA advisory committee
4  meetings.
5  Q. And you and I have done this three other
6  times, and one thing I'm going to ask you because I
7  know your time is precious this afternoon, and I'm on a
8  clock. I'll ask short questions with yes or no answers
9  usually; if you'll try to restrict yourself to it, it
10 will go by a lot quicker and we'll get it done.
11 A. I'll do my best.
12     MR. BROCK: I would object to him instructing
13 the witness.
14     MR. LANIER: I'm asking as a favor.
15     THE COURT: The Court will instruct you to
16 answer yes or no when you can. If you can't indicate
17 for the record that you can't.
18     MR. LANIER: Thank you, Judge.
19 BY MR. LANIER:
20 Q. So let's go back to that and try it again.
21 This says that "your major efforts this past year were
22 focused on defending the VIOXX franchise." That's
23 right so far, true?
24 A. That's correct.
25 Q. "And building the scientific base for a COX-2

Page 2885

1  business"?
2  A. That's correct.
3    Q. So in a sense you had a twofold job that year,
4  defending the VIOXX franchise and building a scientific
5  base for it, right?
6  A. I think they were intertwined and one in the same.
7    Q. I would agree with you. But wouldn't you
8  think realistically y'all should have built the base
9  for the business first before you started selling the
10 drug, built the scientific base?
11 A. And I think we did. I think he was referring to
12 adding to that.
13   Q. Building the scientific base. You think he
14 was referring to adding to it, but, really, all you've
15 got is what he said here, right?
16 A. I know that we had a scientific basis for the drug
17 or it would not have been approved.
18   Q. And not only did -- 2001 was a pretty critical
19 year for y'all with this drug, wasn't it?
20 A. Um, certainly there were many critical years for
21 us.
22   Q. But 2001 was a year where y'all were focused
23 really hard on trying to make sure that the label came
24 out just right because there was a concern about the
25 label, wasn't there?

Page 2886

1  A. I think some people had a concern about the label.
2     MR. LANIER: Your Honor, I offer into evidence
3  Plaintiff's Exhibit 2000. This dealt with David
4  Anstice's testimony.
5     THE COURT: Any objection?
6     MR. BROCK: Is it in evidence?
7     MR. LANIER: I don't believe we ever formally
8  offered it at this point, so I offer it now.
9     MR. BROCK: No objection.
10    THE COURT: All right. 2000 will be marked
11 into evidence.
12    (Whereupon, Exhibit 2000 was marked into
13 evidence.)
14 BY MR. LANIER:
15   Q. In fact, there was a question of what might
16 happen financially to your company depending upon what
17 happened with the label during the year 2001 and
18 following, right?
19 A. I think that's a mischaracterization.
20   Q. Well, do you have the document in front of
21 you?
22 A. I do.
23   Q. Do you know who David Anstice is?
24 A. I do.
25   Q. This is a document that gave a forecast of how

Page 2887

1  your drug would sell, true?
2  A. That is correct. Responsible companies always do
3  that.
4    Q. Okay. Ma'am, you can just answer my question
5  please. It has a forecast, true?
6  A. That is correct.
7    Q. Okay. And by the same token it's got how that
8  forecast might change depending upon how the label
9  turns out, right?
10 A. Can you tell me what page you're on?
11   Q. Page 17. This is the graph entitled "key
12 sensitivities."
13      Do you see that?
14 A. Yes, I do.
15   Q. It has the upside and it has the downside in
16 the sales forecast in millions of dollars. Is that
17 right?
18 A. That is correct.
19   Q. And if we look at it so that like 2,500
20 million, that's 2.5 billion with a B, right?
21 A. Yes.
22   Q. And the upside, and this charts out from the
23 year 2001 all the way to 2006. It is a five-year
24 projection, right?
25 A. That is correct.

Page 2888

1    Q. The upside is if your CV label is mild you
2  don't have any language that says it causes clots and
3  heart attacks then you got the upside and you get to go
4  up to over 3 billion and kind of come back down just
5  under 3 billion, right?
6  A. That's correct.
7    Q. But --
8     MR. BROCK: Your Honor, one brief objection.
9  This is the document that was gone over in detail with
10 Mr. Anstice, and as I recall Your Honor limited the
11 examination on this document.
12    MR. LANIER: No, Your Honor. This was a
13 document that was not initially on the exhibit list,
14 and so I didn't admit it at that point in time so they
15 would have a chance to look at it.
16    THE COURT: It is already admitted into
17 evidence.
18    MR. BROCK: This is the one.
19    (Whereupon, the following occurred at
20 side-bar:)
21    MR. BROCK: It is -- this is the one -- it was
22 this one or one like it he was examining Anstice about
23 it. He was going on and on and on and 2.5 billion, say
24 it one time and that's enough. It is also beyond --
25 way beyond the scope of the direct exam, so I would ask