Reicin - Cross

1   that he move off this money stuff in accordance with
2   what Your Honor instructed when he was examining David
3   Anstice.
4          MR. LANIER:  A, I never showed it with David
5   Anstice.  B, it is dead on because she brought up the
6   label and the label negotiations she was in, and this
7   is in the height of it, and this is --
8          THE COURT:  I think that it is relevant
9   because she specifically is involved in label
10  negotiations.  I'm going to allow it.
11         (End of side-bar.)
12         MR. LANIER:  May I continue, Your Honor?
13         THE COURT:  You may.
14         MR. LANIER:  Thank you.
15  BY MR. LANIER:
16     Q.  And then there was just the base case, which
17  said if there is just a class CV label in the
18  precaution you would have that middle line where you
19  might not hit 3 billion and you would probably come
20  back down to looks around $2 billion.  Do you see that?
21     A.  That's correct.
22     Q.  The upside would be a 25 percent increase over
23  the base, right?
24     A.  That's correct.
25     Q.  Now, the downside would be if that CV label

1   actually had a warning, wasn't in the precautions
2   section but had to go in the warnings section, you know
3   the difference, don't you?
4     A.  I do, but I think it is saying more than that.  I
5   think it is saying that the first one could have a
6   class CV label.  In other words, the class of drugs
7   would have something versus a nonclass label in the
8   warnings section.
9     Q.  I'm not fussing that with you, ma'am.  I'm
10  just saying on this fourth one or third one there is a
11  section of the label, a section of the insert that's a
12  warnings section, right?
13    A.  That's correct.
14    Q.  That's the section where the FDA said
15  initially they thought that the language should go
16  about possible heart attacks, right?
17    A.  That's correct.  Initially, but that wasn't their
18  ultimate decision.
19    Q.  Okay.  I'll get to that.  Just keep to my
20  questions, please.
21         And then Merck suggested no, no, no, can we
22  put it in the precautions section and the FDA
23  ultimately agreed with that, fair?
24    A.  Well, I don't think the way you characterized it is
25  accurate.  We sent back a label with it in the

1   precautions section, and they accepted it.
2     Q.  Eventually?
3     A.  No, not eventually.  Their next label back to us
4   before we even met with them had moved it to the
5   precautions section.
6     Q.  Well, but -- all right.  We'll get to labeling
7   in a bit because I think you left out a couple steps
8   the jury ought to hear.  But for these purposes --
9          MR. BROCK:  I'm objecting to the commentary.
10         THE COURT:  The jury should disregard the last
11  statement of counsel.
12  BY MR. LANIER:
13    Q.  If the CV label, the cardiovascular label is
14  in the warning instead of in the precautions section
15  sales could plummet by half?
16    A.  That is what that says.
17    Q.  So -- and so we're clear this was prepared in
18  the middle of that year, July, 2001, right?
19    A.  That is correct.
20    Q.  The year where you -- at the end of the year
21  got a promotion and were applauded for the way you were
22  defending the VIOXX franchise and building the science
23  base, right?
24    A.  But I think you're adding things that have no
25  correlation.  What we did with the label was based on

1   what we thought was scientifically accurate, not
2   business reasons.
3     Q.  That wasn't my question.  I just asked you if
4   it was the same year.  Was it?
5     A.  I can't remember if I was promoted that year, but
6   it was the same year, I believe, that you read my
7   performance evaluation.
8     Q.  In fact, you did your own year end employee
9   form where you filled out what you did for the year,
10  didn't you?
11    A.  That's correct.
12    Q.  And we can find that, also, in your personnel
13  file on Page 29.
14         MR. BROCK:  Thank you.
15  BY MR. LANIER:
16    Q.  You had an area called "planned objectives."
17  Do you see that?
18    A.  That's correct.
19    Q.  Get it on the screen.  The number one
20  planned -- and this is a form you typed and prepared?
21    A.  That's correct.
22    Q.  The number one planned objective you had for
23  that year was "VIGOR/VIOXX CV safety," right?
24    A.  It is number one on the list.  That doesn't mean it
25  was the most important.  But it was certainly something

Reicin - Cross

Page 2893

1   important that we were working on.
2       Q.  When you typed it up you typed it up as the
3   first thing you put, the first thing for those people
4   reviewing you to read.
5   A.  That is correct.
6       Q.  Some of the objectives you met.  Some of them
7   you even exceeded, right?
8   A.  Correct.  We exceeded that because we got the label
9   changing earlier than we expected.
10      Q.  I'm not asking you why, I'm asking you to
11  follow with me in the interest of time?
12  A.  I'm sorry.
13      Q.  That's okay.  Objectives exceeded.  You
14  obtained favorable changes describing the VIGOR results
15  to the EU label?
16  A.  Correct.
17      Q.  And you published results -- that was where
18  you exceed the objective?
19  A.  We exceeded it because we didn't anticipate we
20  would get the label change that quickly.
21      Q.  And you also exceeded the objective publishing
22  the results of the CV meta-analysis, right?
23  A.  Correct, because I hadn't had that as an initial
24  objective.
25      Q.  I'm just asking you if that's correct.

Page 2894

1       MR. BROCK:  Judge, there are some answers that
2   are just natural to give, and every answer does not
3   have to be a yes or no.  He has cut her off five or six
4   times now, and I object to it.
5       MR. LANIER:  Your Honor, when he lead on
6   direct he got 19 "that's correct" in a row that I
7   counted.  I think I ought to get two.
8       THE COURT:  He can lead on cross, however, it
9   is allowed, and he is allowed to ask yes or no
10  questions.  I have instructed the witness she should
11  when she can if it is a yes-or-no question answer yes
12  or no.  If she can't answer that way she can advise
13  him.
14  BY MR. LANIER:
15      Q.  Now, your concerns about defending the VIOXX
16  franchise were not just in 2001.  You had an active eye
17  on VIOXX in 2000, also, didn't you?
18  A.  I'm not sure what you're referring to, but I was
19  certainly working on VIOXX and VIGOR in 2000.
20      Q.  Well, not just working on it.  You were also
21  involved in monitoring the stock market and what the
22  analysts were reporting about VIOXX and your company,
23  weren't you?
24  A.  No.  That's completely not true.
25      MR. LANIER:  I would like to offer into

Page 2895

1   evidence, Your Honor, Plaintiff's Exhibit 1463.
2       THE COURT:  Any objection?
3       MR. BROCK:  Your Honor, I do object to this on
4   the basis that it has a lot of hearsay information in
5   it.
6       MR. LANIER:  It doesn't go to the truth of the
7   matter asserted, but it is certainly an e-mail to her,
8   Judge.
9       (Whereupon, the following occurred at
10  side-bar:)
11      MR. BROCK:  Judge, Christy advices me in the
12  last case that you had everything below this redacted.
13  But I'll let her speak to that, if necessary.
14      MR. LANIER:  I'm not going to go into detail,
15  just the top part.
16      THE COURT:  Everything should be redacted
17  below the regards.
18      MR. LANIER:  No problem.
19      (End of side-bar.)
20  BY MR. LANIER:
21      Q.  Look specifically at an e-mail you got on May
22  25th of 2000.  Do you see that?
23  A.  Yes, I do.
24      Q.  And that's you, Alise Reicin, correct?
25  A.  That's correct.

Page 2896

1       Q.  Copied to Edward Scolnick.  He is the
2   president at the time of the whole Merck Research Labs,
3   right?
4   A.  That's correct.
5       Q.  Top, top scientist?
6   A.  That's correct.
7       Q.  It is from Margie McGlynn?
8   A.  That's also correct.
9       Q.  And the subject is "VIGOR analyst reports" and
10  it is talking about stock analysts, correct?
11  A.  I believe it is, yes.
12      Q.  And this e-mail to you says, Alise -- actually
13  it says "Alice," but your name is Alise?
14  A.  That is correct, as well.
15      Q.  "Alice, attached are two analyst reports which
16  most clearly demonstrate the success of our efforts to
17  defuse the cardiovascular risk issue for VIOXX..."
18      "Alice, attached are two analyst reports which
19  most clearly demonstrate the success of our efforts to
20  defuse the cardiovascular risk issue for VIOXX."
21      Did I read that right?
22  A.  You did.
23      Q.  You, and it is talking about you "Alise"
24  there?
25  A.  I believe so.

Reicin - Cross

Page 2897

1    Q.  "You played a major role in making this happen
2  along with Brian and I know many others supporting you
3  in Merck Research Labs.  I wanted to personally thank
4  you for all your efforts and the tremendous support you
5  provide for the marketing organization.  Regards,
6  Margie."
7        Did I read that correctly?
8  A.  Yes, you did.
9    Q.  You didn't just get stock analyst reports
10 e-mailed to you with appreciation notes with what you
11 were doing.  You actually got sent to talk to Wall
12 Street analysts, didn't you?
13 A.  That was not a part of my job.  I think there was
14 one occasion after we had the label change that I did
15 speak to analysts.
16   Q.  Well, you say on one occasion.  Now, in your
17 deposition you said "on rare occasions," plural, "I
18 have been asked to speak with analysts," plural.
19 A.  Again, I do remember the one time after at the
20 VIGOR label occasionally I will be approached by an
21 analyst at a scientific meeting who has questions, but
22 we have professional people in the organization who
23 deal with the analysts, and that is not one of my
24 primary activities.
25   Q.  Actually, in your deposition, ma'am, you said

Page 2898

1  that you've been asked to speak with analysts, that
2  Merck has asked you to speak with analysts on occasion.
3  I thought your brother was in the stock market?
4        MR. BROCK:  Your Honor, I object to that.
5  That's not an appropriate question.
6        THE COURT:  The objection is sustained.
7  BY MR. LANIER:
8    Q.  Um, you were actually asked by Merck to speak
9  to stock analysts, true?
10 A.  As I said, I recall one occasion where I was asked
11 after we had the VIGOR label change to speak to the
12 analysts and explain what exactly was changed in the
13 label.
14   Q.  Not only that, but during this same time
15 period, and at this point I'm back in 2001, and you
16 were off for a little bit in 2001, weren't you?
17 A.  That is correct.  I took a personal leave.
18   Q.  And when you came back, ma'am, from your
19 personal leave there was kind of a relief by your boss,
20 wasn't there?
21 A.  Um, my boss and I get along well.  He thinks I do a
22 good job.
23   Q.  I don't deny it.  Barry Gertz, right, he is
24 the one who found you defending the VIOXX franchise,
25 isn't he?

Page 2899

1  A.  That's correct.
2    Q.  Not only defending it but that same year -- is
3  this in evidence yet?  I apologize.  It is Plaintiff's
4  Exhibit 66.  I move it into evidence, please.
5        THE COURT:  Any objection.
6        MR. BROCK:  One second, please, Your Honor.
7  No objection.
8        THE COURT:  All right.  No objection.  66 will
9  be marked into evidence.
10       (Whereupon, Exhibit 66 was marked into
11 evidence.)
12 BY MR. LANIER:
13   Q.  And we can maybe put it into some context with
14 the last page, and the last page it says it is an
15 e-mail October 3rd of 2001.
16       Do you see that?
17 A.  Yes, I do.  Can I have the whole document so I can
18 look at it?
19   Q.  Sure.  That's one you and I have discussed on
20 multiple occasions.  I don't think there's much
21 difference.
22       MR. BROCK:  Your Honor, I'll object to that.
23 There is not any reason to keep having commentary about
24 things.
25       THE COURT:  Try to restrain yourself from

Page 2900

1  making comments.
2        MR. LANIER:  Okay, Your Honor.  I'm sorry.  I
3  was trying to be polite.  I apologize.
4  BY MR. LANIER:
5    Q.  Do you have it in front of you now, ma'am?
6  A.  Yes, I do.
7    Q.  It says, "at the end" -- this is we're
8  starting out with an e-mail with a fellow named
9  Waldemar something, right?"
10 A.  Radziszewski, I believe.
11   Q.  Can you say that again for me?
12 A.  Probably not.
13   Q.  It is October 3rd, 2001.  Do you see that?
14 A.  Yes.
15   Q.  And he is talking about a lecture that he went
16 to that went very well.  Do you see the reference at
17 the top?
18 A.  Yes, I do.
19   Q.  He says, "very fortunately as a backup I had
20 some slides supporting VIOXX's safety, including our
21 results of meta-analysis studies."  That's probably
22 Konstam, don't you think?
23 A.  It may have been.
24   Q.  We'll talk about him later.  "At the end of
25 the afternoon session, however, a Dr. Singh appeared, a

Reicin - Cross

Page 2901

1  statistician from U.S." You know Dr. Singh, don't you?
2  A.  Yes, I do.
3      Q.  "Who probably came only to question our
4  'Naproxen theory.'" This fellow even put it in
5  quotation marks, didn't he?
6  A.  He did put it in quotation marks.
7      Q.  The Naproxen theory. "He showed up only for
8  discussion on heart safety. Last session of the second
9  day. And together with Isakson..." is that some other
10 person?
11 A.  Peter Isakson works for Pharmacia. They made a
12 competitor drug called Celebrex.
13     Q.  "So together with Isakson they both strongly
14 and aggressively implied that one could not explain
15 differences in MI in VIGOR by aspirin-like effect of
16 Naproxen."
17     Did I read that right?
18 A.  You did.
19     Q.  Now, Dr. Singh, is that the Dr. Singh at the
20 Stanford Medical School in California?
21 A.  That is correct.
22     Q.  "I was firmly staying behind our data.
23 Afterwards Sir John..." I'll bet you that's John Vane,
24 don't you think?
25 A.  I believe.

Page 2902

1      Q.  Won the Nobel Prize for understanding COX
2  issues, didn't he?
3  A.  For prostaglandin research, you are correct.
4      Q.  "Sir John concluded that at this point we
5  can't draw any firm conclusion on the Naproxen effect."
6  Did I read that, correct?
7  A.  Yes, you did.
8      Q.  Within the context of that e-mail chain if we
9  fast forward a little bit your boss comes into the
10 picture on October 14th, 2001, right?
11 A.  That's correct.
12     Q.  And he talks about what y'all need to do now
13 that you're back in the picture to stop this type of
14 questioning at conferences?
15 A.  No, I don't think that fairly characterizes it. I
16 think what he was saying is that I would be able to go
17 to such scientific conferences and speak about the data
18 since I was one of the ones who knew the data best.
19     Q.  Well, let's look at it and see how it wrote
20 out. "With Alise back we should be in a better
21 position to cover such 'events.' Note we're focused on
22 getting our data into the best peer-reviewed journals
23 like Circulation."
24     An aside here he indicates that there are some
25 journals that are better than others like Circulation

Page 2903

1  might be one of the best.
2      Do you see that?
3  A.  He may be implying that.
4      Q.  Dr. Krumholz said that. You wouldn't fuss
5  that with that point, would you?
6  A.  That Circulation is a good journal?
7      Q.  One of the best.
8  A.  I don't know. I'm not a cardiologist, but I think
9  in the cardiology field it is considered one of the
10 best.
11     Q.  All right. He goes down at the bottom here.
12 "I will review this with..." now he is calling you
13 "Alsie" but he probably typed the S before the I.
14 That's Alise, right?
15 A.  That's correct.
16     Q.  "I will review with Alise and Wendy how to
17 better be prepared to meet the barbarians at the gate."
18     Did I read that right?
19 A.  Yes, you did.
20     Q.  And then I think the ultimate end of this was
21 an e-mail back to him from Doug Greene, who also works
22 at Merck, right?
23 A.  He worked at Merck at that period of time.
24     Q.  Who said, "we may need to seek them out..." I
25 guess those are the barbarians "...and destroy them

Page 2904

1  where they live." Right?
2  A.  I think he was being cute or thought he was being
3  cute.
4      Q.  Fair enough. This is the same Barry Gertz,
5  though, who took you that year and the year before to a
6  number of different events to talk to people, didn't
7  he?
8  A.  I don't know that you can say that Barry took me to
9  events.
10     Q.  Well, for example, didn't you go to the VIGOR
11 cardiology consultants meeting in October of 2000?
12 A.  Yes, I did.
13     MR. LANIER: Your Honor I move into evidence
14 Plaintiff's Exhibit 76.
15     THE WITNESS: I, actually, helped set up that
16 meeting.
17     THE COURT: Any objection to 76?
18     MR. LANIER: I think -- didn't you give it to
19 him a few minutes ago?
20     MS. HEGAR: Yes.
21     (Whereupon, the following occurred at
22 side-bar:)
23     MR. BROCK: Your Honor, in a long line of
24 hearsay this document is filled with hearsay statements
25 of other physicians, other people that are at the

Reicin - Cross

Page 2905

1    meeting.
2         MR. LANIER: Judge, this is the sentence I'm
3    going to read. It is that bracketed part.
4         THE COURT: What?
5         MR. LANIER: The bracketed parts Barry Gertz,
6    her boss, wrote it. It is an affidavit from him
7    certifying that he wrote it because he wanted to keep
8    it confidential.
9         THE COURT: Page 3?
10        MR. LANIER: Yes, Your Honor. It is just that
11   bracketed part. And she has testified about this
12   before.
13        MR. BROCK: Barry Gertz is not here. That
14   affidavit is not admissible in this case. I'm not even
15   sure what that is.
16        MR. LANIER: It is an affidavit in this case.
17        MR. BROCK: But it is still hearsay, same
18   objection you've been making all day.
19        MR. LANIER: It is an admission of a party
20   opponent. He works for Merck. It is not hearsay when
21   you say it.
22        MR. BROCK: It is right there. It is hearsay.
23   It is a statement out of court.
24        MR. LANIER: No.
25        THE COURT: Not if it is by Merck. Ask her

Page 2906

1    who made the statement --
2         MR. LANIER: Okay.
3         THE COURT: -- and if she received a copy of
4    it.
5         MR. LANIER: Yes.
6         THE COURT: We're not going to go through the
7    whole thing. We're only going to go to one section.
8         MR. LANIER: That's it on Page 3.
9         THE COURT: Show that --
10        MR. BROCK: This is Rory Collins, RC, this
11   isn't Barry Gertz's statement.
12        MR. LANIER: I don't think that is Rory.
13        MR. BROCK: Rory Collins, that's his statement
14   there.
15        MR. LANIER: This is --
16        MR. KRISTAL: I took his deposition. That's
17   exactly what he said. That's his handwriting. These
18   are his notes.
19        THE COURT: Well, you're just putting in this.
20        MR. LANIER: I'm putting in that bracketed
21   part, "Alise, reduce the emphasis on MI."
22        THE COURT: Ask her who said that to her.
23        (End of side-bar.)
24   BY MR. LANIER:
25        Q. Do you have it in front of you, ma'am?

Page 2907

1    A.  Yes, I do.
2         Q.  Do you understand these are Barry Gertz's
3    notes, your boss?
4    A.  Yes, I do.
5         Q.  And there's a reference on them for you to
6    reduce the emphasis on MI. Is that information or
7    something you were, in fact, told to do?
8    A.  He was jotting down one -- what one of the
9    consultants there had said at the meeting.
10        Q.  So you were told in some way, shape, form or
11   fashion to reduce the emphasis on MI, meaning heart
12   attack?
13   A.  No, I think you have to read the rest of it. Just
14   subdivision of subdivision. In other words --
15        Q.  Subdivision and subdivision?
16   A.  I'm sorry. Subdivision and subdivision. I don't
17   remember whether Barry told me this or not. He was
18   saying that some of the consultants felt that we should
19   be talking about confirmed thrombotic events rather
20   than just MI because it was a subdivision of the
21   cardiac events and then of the confirmed thrombotic
22   events.
23        Q.  So 2001, 2001 you were in the thick of matters
24   as far as building a scientific base and defending the
25   VIOXX franchise, agreed?

Page 2908

1    A.  Again, I wouldn't use the term "defending the VIOXX
2    franchise," but...
3         Q.  Your boss did.
4    A.  My boss did. I was very active working on VIOXX,
5    the VIGOR study, preparing regulatory documents and
6    going to regulatory meetings, as well and scientific
7    meetings.
8         Q.  Okay. Next subject. I want to talk to you
9    for a while about this FitzGerald hypothesis that you
10   have been testifying about, okay? You know what I mean
11   by that, don't you.
12   A.  I believe I do.
13        Q.  And Mr. Brock had a little chart with you.
14   And in that chart he asked you basically, if I can
15   understand it, whether or not VIOXX was neutral as it
16   was compared to an NSAID or whether or not VIOXX might
17   cause some type of prothrombotic or proclot type
18   response, remember?
19   A.  I think he was asking me what we thought in 1997.
20        Q.  Okay. And in that regard I want to see first
21   if I understand what you're telling the jury today.
22   You prepared to study VIOXX against Naproxen in a GI
23   trial, right?
24   A.  That's correct.
25        Q.  And so it was going to be VIOXX versus

Reicin - Cross

Page 2909

1  Naproxen, right?
2  A.  That's correct.
3     Q.  And --
4  A.  That wasn't the study we were looking at in 1997,
5  but that is ultimately we did for the VIGOR study a
6  little bit later.
7     Q.  Well, in 1997 you were looking at a GI study
8  that ultimately -- VIGOR was the GI study you
9  ultimately did?
10  A.  Ultimately did, but in 1997 it was going to be
11  VIOXX versus Ibuprofen and diclofenac.
12     Q.  Okay.  So let's do it this way.  It was VIOXX
13  versus an NSAID, fair?
14  A.  That's correct.
15     Q.  And if -- there are some e-mails that you have
16  been discussing, Plaintiff's Exhibit 29.  Do you
17  remember the e-mails?
18  A.  If you can show me which ones you're referring to.
19     Q.  These are the ones we also talked about them
20  with Mr. Morrison.
21  A.  Yes, I am familiar with those.
22     Q.  You're familiar with one where Mr. Morrison
23  said, "I would allow low-dose aspirin I know this has
24  been discussed to death, but real world is everyone is
25  on it so why exclude it?  Without COX-1 inhibition you

Page 2910

1  will get more thrombotic events and kill the drug"?
2  A.  That's correct.  That's what he said.
3     Q.  And this was one where you responded, "I hear
4  you.  This is a no-win situation"?
5  A.  That's correct.
6     Q.  If you put them on aspirin they're going to
7  have more stomach problems, and you can't win.  It is
8  not good for your VIOXX drug in the study, right?
9  A.  Well, not exactly.  I said you -- you're not going
10  to be able to answer the question you're trying to
11  answer.
12     Q.  Well, you said, "the relative risk of even
13  low-dose aspirin may be as high as two to fourfold"?
14  A.  That's correct.
15     Q.  That's what you said?
16  A.  That's correct.
17     Q.  You didn't say you won't be able to measure.
18  You said if we put them on aspirin you're not going to
19  get that great label change that says we reduced GI
20  problems because the aspirin is going to cause them.
21  A.  We didn't know what we would see.
22     Q.  And so putting them on aspirin is not going to
23  help.  And then you said, "yet, if we don't, the
24  possibility of increased heart attacks is a great
25  concern."  That's what you said, didn't you?

Page 2911

1  A.  That is correct.
2     Q.  Because you're not going to have inhibition of
3  COX-1, right?
4  A.  Because we won't have inhibition of COX-1, and it
5  wouldn't act as a cardioprotective agent in the way the
6  NSAID would.  It would be neutral.
7     Q.  Yes.  Well, you didn't say it will be
8  neutral.
9  A.  That is what I said in the attached document that
10  went with it.
11     Q.  All right.  We'll go to that in just a minute.
12  "I just can't wait to be the one to present those
13  results to senior management."
14        See that?
15  A.  I do.
16     Q.  "What about the idea of excluding high risk CV
17  patients, those that have already had an MI a CABG or a
18  PTCA" y'all did that in VIGOR, you eliminated those,
19  didn't you?
20  A.  That's not completely true.  If they had an event
21  within 1 year of randomization they were excluded or if
22  they were taking aspirin.  There were, in fact, some
23  patients who were in the study who had had prior MIs.
24     Q.  But as a practical matter, Dr. Reicin, even
25  though you're not a cardiologist you know that almost

Page 2912

1  anybody who has ever had a heart attack is going to be
2  taking aspirin for the rest of their lives?
3  A.  They should be, and that's why we couldn't allow
4  them in the study if we weren't going to allow patients
5  on aspirin in the study.
6     Q.  My point is, ma'am, y'all did exclude high
7  risk CV patients, didn't you?
8  A.  Um, we excluded patients who were on aspirin, that
9  is correct.  Some high risk CV patients were in the
10  study, however.
11     Q.  You said this may decrease the CV event rate,
12  so a difference between the two groups would not be
13  evident, didn't you?
14  A.  That's correct.
15     Q.  Now, ma'am, if I'm understanding your
16  testimony today to the jury, you're saying that my only
17  concern was that NSAIDs will be cardioprotective.
18  A.  That's correct.
19     Q.  I wasn't concerned that VIOXX may hurt the
20  heart?
21  A.  That's 100 percent correct.
22     Q.  Are you sure?
23  A.  I am 100 percent positive, Mr. Lanier.
24     Q.  Because ma'am, when y'all run these trials it
25  is extremely important, it involves human health,

Reicin - Cross

Page 2913

1  doesn't it?
2  A.  That's correct, and I take that responsibility
3  extremely seriously.
4      Q.  Because you were running this trial on people,
5  not on guinea pigs, right?
6  A.  That's correct.
7      Q.  And you have obligation as a scientist, you
8  have obligations as a doctor, you have obligations as a
9  person who is running a clinical trial, don't you?
10 A.  I take those obligations extremely seriously.  I
11 went into medicine to help patients.  To imply that I
12 wouldn't take those obligations seriously is
13 outrageous.
14     Q.  Let me tell you why I'm implying it.  Because
15 one of the things you have to do under law, you have to
16 inform anybody coming in for one of your tests of any
17 possible risks, don't you?
18     MR. BROCK:  Object to the statement about the
19 law and the argument of counsel and the relevance.
20     THE COURT:  Well, is there any dispute there's
21 a dispute that there's a law that they have to advise
22 people of the risks?
23 BY MR. LANIER:
24     Q.  Ma'am, you're --
25     MR. BROCK:  Just a minute.

Page 2914

1      (Whereupon, the following occurred at
2  side-bar:)
3      MR. BROCK:  The basis for my objection is
4  that, first of all, he is standing there saying what
5  the law is, and I don't know if that's the law or not.
6  You can't examine a witness on a statute.
7      MR. LANIER:  Yes, I can.
8      MR. BROCK:  No you can't.
9      MR. LANIER:  I'll show you why if you'll just
10 sit back and let me do it.  I'll do it right by the
11 rules.
12     MR. BROCK:  No.  That's not on the exhibit
13 list.
14     MR. LANIER:  It doesn't have to be.  It is the
15 law.
16     MR. BROCK:  You can't examine a witness on a
17 legal matter.  Legal matters are for the Court.
18     MR. LANIER:  Watch.
19     MR. BROCK:  And, Your Honor, informed consent
20 in a clinical trial is not relevant to the issues of
21 this case.  That's a whole different issue.  Entirely
22 different issue.
23     MR. LANIER:  Judge, I think this is important.
24     MR. KRISTAL:  This is the third time that I
25 saw Dr. Reicin look directly at a juror and smile at

Page 2915

1  them while there's been a side-bar.  I have been doing
2  nothing but watching that, and I have waited, and when
3  I saw her do it for the third time --
4      And Mr. Collins looked away, and what brought
5  it to my attention was when she was smiling at him.
6  This is the very thing --
7      MR. BROCK:  If you saw that -- and I have not
8  seen it.
9      MR. KRISTAL:  A, I'm not blind; and, B, I'm
10 not a liar.  This is the third time.
11     MR. BROCK:  If you saw it you should have
12 brought it up.
13     MR. KRISTAL:  That's --
14     MR. BROCK:  It wouldn't be three if you saw it
15 and said something.  I have not seen that.
16     MR. GORDON:  The he smiled the first time she
17 said AIDS and cancer, too.
18     THE COURT:  Mr. Lanier?
19     MR. LANIER:  I think you --
20     THE COURT:  I think you should rephrase your
21 question that people in studies have to be given
22 informed consent of not every single possible risk
23 because I think that's a misstatement.
24     MR. GORDON:  Could you instruct the witness to
25 stop smiling at the jury during the breaks?  It is just

Page 2916

1  really a problem.
2      MR. BROCK:  What do you want her to do?  She
3  can't look at the screen.
4      MR. KRISTAL:  The reason this was raised is
5  because it has been a problem at other trials, and
6  we're watching it happen.
7      (End of side-bar.)
8      MR. LANIER:  May I continue?
9      THE COURT:  Yes.
10     MR. LANIER:  Thank you.
11 BY MR. LANIER:
12     Q.  Your Honor, I've got Plaintiff's Exhibit 1958,
13 which I would like to move into evidence, although I
14 believe honestly it was admitted under a defense
15 number.
16     MR. BROCK:  1958 isn't in.  It was a
17 Defendant's Exhibit, I think.
18 BY MR. LANIER:
19     Q.  Ma'am, when you were being asked questions by
20 Mr. Brock earlier he put up on the board an outcome
21 trial that you actually wrote.  Clinical outcome study.
22 GI clinical outcomes study.  Do you remember this?
23 A.  Is this the same one that he put up?
24     Q.  Yes, ma'am?
25 A.  Yes, I see that.

7bf775cc-3bf5-422a-aae9-31c7ab106654

Page 2917

1    Q.  This is you writing a potential trial?
2  A.  That's correct.
3    Q.  And if you'll look on page 37, on page 37 you
4  actually put a copy of the FDA regulations regarding
5  informed consent and a consent form are attached to
6  this protocol.  Do you see that?
7  A.  Um, that is correct.  That's standard language.
8  There probably was no consent form attached to this
9  protocol because we didn't end up doing it.
10    Q.  I understand that, but I'm just showing you
11  that to make sure that you are familiar with what the
12  FDA regulations are regarding informed consent.  You
13  certainly have to know those in your job, don't you?
14  A.  That's correct.
15    Q.  And so you are well aware of the fact that you
16  have an obligation --
17    MR. BROCK:  Your Honor, whoa, whoa, whoa, take
18  that off the screen.  She has not given you permission
19  to use that.
20    MR. LANIER:  Judge, these are the regulations
21  that she is referencing.
22    THE COURT:  These are the regs that she
23  attached to her study.  I'll allow it.
24    MR. BROCK:  The regs were not attached to the
25  study.

Page 2918

1  BY MR. LANIER:
2    Q.  I have the regulations right here.  Those are
3  them, aren't they?
4    THE COURT:  Are they the ones you attached to
5  your study?
6    THE WITNESS:  We wouldn't have attached this
7  to the protocol.
8  BY MR. LANIER:
9    Q.  Would not have attached that form.  You had
10  them on a different sheet of paper.  It is the same
11  regulations, isn't it?
12  A.  We didn't attach the regulations; we attached the
13  informed consent, I believe.
14    Q.  So where it says on page 37 "a copy of the FDA
15  regulations regarding informed consent and a consent
16  form are attached to this protocol" you're saying you
17  weren't really doing that?
18  A.  I don't recall.  Maybe because I see it in a
19  different form.
20    Q.  Regardless, those are the regulations you're
21  obligated to follow, and you're familiar with them,
22  aren't you?
23  A.  That's correct.
24    MR. LANIER:  With that, Your Honor, may I
25  proceed?

Page 2919

1    THE COURT:  You can.
2    MR. LANIER:  Thank you.
3  BY MR. LANIER:
4    Q.  So what you're obligated to do, ma'am --
5    THE COURT:  The Court will instruct the jury
6  on the law.
7    MR. BROCK:  I'm going to object to putting
8  that up on the screen, Your Honor.  I'm sorry.
9    THE COURT:  Okay.  The objection is overruled.
10  You should not consider this evidence of what the regs
11  are or a statement of what the law is.  I will tell you
12  what the law is at the end of the case.  However, you
13  can use it for the purpose of what her understanding of
14  what the regs are.
15  BY MR. LANIER:
16    Q.  Ma'am, you understand that "the following
17  information shall," that means required, right?  "Shall
18  be provided to each subject," true?
19  A.  That's correct.
20    Q.  "And that includes a description of any
21  reasonably foreseeable risks," true?
22  A.  Correct.
23    Q.  "And a disclosure of appropriate alternative
24  procedures or courses of treatment, if any, that might
25  be advantageous to the subject."

Page 2920

1    True?
2  A.  That's correct.
3    Q.  Now, ma'am, if you truly were concerned before
4  VIGOR that folks who were taking VIOXX were going to
5  have more heart attacks than folks who were on Naproxen
6  because you thought Naproxen was cardioprotective you
7  had an obligation to tell that to those people who were
8  in your study, didn't you?
9  A.  Well, first of all, it was a theoretical concern,
10  and, secondly, that was in 1997 that that e-mail was
11  written before we had our Phase III data.  The VIGOR
12  study was done after we had our Phase III data, and we
13  saw no evidence of a difference in cardiovascular risk
14  between VIOXX and the NSAIDs we had studied.
15    Q.  Ma'am, we'll go through all the Phase III data
16  in a little bit, but Phase III were a lot of different
17  studies not just one study, true?
18  A.  Oh, yes, that is true.
19    Q.  And, in fact, Phase III data is the very data
20  that the FDA told you could not be used to say that
21  there's no concern about heart problems, true?
22  A.  Um, I think you're mischaracterizing it.
23    Q.  Do you not remember Villalba's comments?
24  A.  I'm not sure what you're referring to, but it was
25  the Phase III data upon which the drug was approved,

Reicin - Cross

Page 2921

1   and there was nothing based on that Phase III data that
2   the FDA asked us to put in the label to suggest that
3   VIOXX was associated with a cardiovascular risk or that
4   NSAIDs could be cardioprotective.
5       Q.   But, ma'am, y'all were putting people in the
6   VIGOR trial before you got the drug approved?
7   A.   Before we got the drug approved, but after we had
8   the Phase III data and had already submitted it to the
9   FDA.
10      Q.   But before the FDA signed off on it you
11  already had -- ma'am, let me do it this way, your whole
12  concern was that VIOXX was going to have more heart
13  attacks than Naproxen, that was your concern, wasn't
14  it?
15  A.   As I said, it was back in 1997.  It was not
16  Naproxen, it was versus Ibuprofen and diclofenac, and
17  we didn't see that in our Phase III data.
18      Q.   Ma'am, what you went into this test -- the
19  whole reason is we were thinking about giving aspirin
20  and worried about it killing the drug is because you
21  were concerned that Naproxen was going to cause less
22  heart attacks than VIOXX, that was what you foresaw,
23  that's what you told this jury this morning and this
24  afternoon?
25  A.   Except I think you're mixing chronology a little

Page 2922

1   bit, Mr. Lanier.  That protocol was written in 1997.
2   We weren't even talking about Naproxen at that point in
3   time.  We were talking about Ibuprofen and diclofenac.
4   By the time we started this protocol we had our Phase
5   III data, and there was no difference in cardiovascular
6   events between VIOXX and the NSAID comparators.
7       Q.   How about between VIOXX and Naproxen?
8   A.   In our Phase IIb/III OA studies we did not see a
9   difference.  We hadn't done studies versus Naproxen at
10  the time that we submitted.
11      Q.   All right.  Let me see if I have this right.
12  So here's the story now.  In 1997 y'all are concerned
13  because you think NSAIDs are cardioprotective and VIOXX
14  is not?
15  A.   There was the theoretical concern.  We couldn't be
16  sure, theoretical concern.
17      Q.   And then by the time 1998 rolls along and you
18  actually write the protocol for VIGOR y'all decide at
19  that point that NSAIDs are not cardioprotective and
20  neither is VIOXX, right?
21  A.   Well, all I could tell you at that point in time is
22  we didn't see a difference between VIOXX and the
23  comparator NSAIDs, so it wasn't consistent with the
24  NSAIDs being cardioprotective.  I couldn't have ruled
25  it out, but it was not consistent with it.

Page 2923

1       Q.   So you changed your mind between '97 and '98.
2   The NSAIDs went from being cardioprotective to not
3   cardioprotective, and then as soon as the tests came
4   out and VIGOR caused more heart attacks then it went
5   back to being cardioprotective again?
6   A.   Again, I think you're mischaracterizing what
7   happened.
8       Q.   Well, in 1998 and when these people are
9   enrolling in 1999 was it cardioprotective or not?
10  A.   Again, there was the theoretical issue that was
11  still there, but we had --
12      Q.   Was it a reasonably foreseeable risk that you
13  were going to have more heart attacks in one group than
14  the other?
15  A.   No, I don't believe it was a reasonably foreseeable
16  risk.
17      Q.   So when your guys -- when you get this e-mail
18  that you put out where you said "the possibility of
19  increased CV events is of great concern"?
20  A.   That's correct, that was in 1997.
21      Q.   In 1998 the next year it was no longer a great
22  concern, and that's why you never warned anybody about
23  it in the informed consent?
24  A.   That is correct.  It wouldn't -- we did not feel
25  that it was necessary to put in the informed consent

Page 2924

1   and, in fact, to put something like that in
2   informed consent for another drug when it wasn't in
3   their label would have been quite unusual.  IRBs
4   reviewed -- that's an institutional review board
5   reviewed our informed consent, reviewed the protocol,
6   and they also did not ask us to put anything in.
7       Q.   Well, ma'am, "possibility of increased CV
8   events is of great concern.  Without COX-1 inhibition
9   you'll get more thrombotic events and kill the drug."
10  All of the sudden did you decide that y'all were going
11  to get COX-1 inhibition in 1998?
12  A.   No, Mr. Lanier, but in 1998 we had safety data on
13  over 5,000 patients.  That's very different than the
14  situation in early 1997.
15      Q.   Ma'am, that safety data, how many of those
16  people had taken the drug for 7 months?
17  A.   I can't -- I think --
18      Q.   800.  800.
19  A.   No.  No.  No.  I think -- I think it was 800 for a
20  year or more.  I believe it was over 1,600.  I should
21  check my notes for over 6 months.
22      Q.   And you know enough about studies to know
23  that's not enough clinical power to decide if something
24  is safe for the heart or not you have to have at least
25  4,000 according to Braunwald and according to everybody

Reicin - Cross

Page 2925

1  that has written on this?
2  A.  The issue is not the number of patients, it is the
3  number of events you see.
4    Q.  That's like you ever play roulette in the
5  casinos?
6  A.  No, I haven't.
7    Q.  Do you know what it is, the wheel that goes
8  around?
9  A.  Yes.
10    Q.  Do you think you can study three times it goes
11  around, watch it three times and decide which numbers
12  it is always going to land on by those three?
13  A.  No, I don't.
14    Q.  But you've got to watch enough to know
15  statistically what the chances are, you have to have
16  enough power, you have to have enough people, you have
17  to have enough turns of the wheel, don't you?
18  A.  You do, that's true.
19    Q.  All right.  "Without COX-1 inhibition you will
20  get more thrombotic events."  That's what you were told
21  by Dr. Morrison, isn't it?
22  A.  That's what he wrote.
23    Q.  And that's what you agreed with as "the
24  possibility is of great concern," true?
25  A.  That is what I wrote in 1997.

Page 2926

1    Q.  And then to get to the bottom line of this.
2  Dara, have I given them 834 yet?
3    MS. HEGAR:  Yes.
4    MR. LANIER:  I move that into evidence.  It is
5  one of the patient consent forms.
6    THE COURT:  Any objection?  What is your
7  objection?
8    MR. BROCK:  I object.  It is not relevant to
9  the issues of the case.  What kind of --
10    THE COURT:  Your objection is relevancy.  Your
11  objection is overruled.
12    MR. LANIER:  Thanks, Judge.  Ma'am, here's a
13  copy --
14    THE COURT:  Wait.  He has a second objection.
15    (The following side-bar discussion was had:)
16    MR. BROCK:  It also has personal information
17  about the name of an investigator in here.  It has --
18    MR. LANIER:  We can redact that, Judge.
19    MR. BROCK:  -- patient information in there.
20    MR. LANIER:  We can redact that, as well.
21    THE COURT:  Is this the form that was used
22  with VIGOR?
23    MR. LANIER:  It is a form signed by someone.
24  We'll redact the names.
25    THE COURT:  All identification information

Page 2927

1  should be redacted and shouldn't be shown to the jury.
2    (End of side-bar.)
3  BY MR. LANIER:
4    Q.  Here you go.
5  A.  Thank you.
6    Q.  If you'll turn, please, to the page first that
7  has exclusions.  "You may not enter this study if
8  you..." do you see that?
9  A.  Yes, I do.
10    Q.  And if you'll follow down you can't enter the
11  study if you use low-dose aspirin?
12  A.  That's correct.
13    Q.  You kept those people out, didn't you?
14  A.  Um, we did not include them in the study, that is
15  true.
16    Q.  And then if you'll flip the page you're
17  telling everybody all of the risks associated with the
18  drug, do you see that or with the study, not just with
19  the drug, right?
20  A.  We do have risks that may be associated with the
21  drug.
22    Q.  You go through and look at all of the risks of
23  being in this study, risks of VIOXX, risks of Naproxen,
24  you go through all of the risks, and not one time do
25  you tell people that y'all are concerned that one group

Page 2928

1  in that study is going to have more heart attacks than
2  the other group, do you?
3  A.  Again, we didn't -- even in 1997 we didn't think
4  that was a risk of VIOXX.  We thought that it would be
5  cardioprotection of Naproxen.  By the time we got to
6  1998 you can see the drug has been tested in over 5,500
7  individuals.  We were basing our analysis of the safety
8  profile on that.  We -- and we wrote here, there may be
9  other side effects that are not yet known.  What we had
10  submitted to the FDA and the label that the FDA
11  approved did not have a warning or precaution for
12  cardiovascular effects.  This informed consent was
13  consistent with that label and was appropriate.
14    Q.  Ma'am, you never sent the FDA your e-mails
15  where y'all are talking about you're going to have more
16  events because you don't have COX-1 suppression it is
17  going to kill the drug, it is going to look bad, it is
18  a no-win situation.  The possibilities of increased CV
19  events is real?
20  A.  Again, that was a discussion of cardioprotection of
21  the NSAIDs not that VIOXX would be prothrombotic.
22    Q.  Ma'am, don't you remember the e-mail Ed
23  Scolnick sent out when you got the results from the
24  VIGOR study when he said the CV events were real, were
25  mechanism based and it was, quote, "as we worried,"

Reicin - Cross

Page 2929

1  past tense, "it would be"?
2  A. I think that's what he was saying when we got the
3  FitzGerald results. We were worried, and they got --
4     Q. This was after VIGOR?
5  A. I understand that.
6     MR. BROCK: Your Honor, he cut the witness
7  off. If she could finish, please.
8  BY MR. LANIER:
9     Q. The e-mail is right after VIGOR, isn't it?
10  A. I understand that, but to the best of my knowledge
11  nobody after the Phase III results came out were
12  worried about the cardiovascular safety profile of
13  VIOXX.
14     Q. Ma'am, you don't even have all your Phase III
15  results in at this point. Did you think you do?
16  A. We had everything in upon which the FDA I
17  believe -- well, maybe not the safety update report had
18  not gone in yet and we had extensions that were still
19  ongoing.
20     Q. Yes. That's my point, and the jury has been
21  shown this exhaustively. Phase III you're enrolling
22  these people in 1998 in this trial. You don't have
23  your Phase III studies done. You don't have your Phase
24  III results in?
25  A. Those were long-term extensions. The FDA approved

Page 2930

1  the drug while those extensions were going on. That's
2  a careful thing for us to do, and when we got the data
3  from those extensions they showed the same thing,
4  cardiovascular safety of VIOXX was similar to the NSAID
5  comparators.
6     Q. Ma'am, y'all started getting in some results.
7  You have had a chance to look at the VIGOR results,
8  haven't you?
9  A. I have, of course, seen them.
10     MR. LANIER: Your Honor, I move into evidence
11  1993.
12     THE COURT: Any objection.
13     MR. BROCK: I don't know what this document
14  is.
15     MR. LANIER: It is a Merck document. He knows
16  that from the lower right-hand corner. It is in our
17  exhibit list as 1993. It comes out of their VIGOR
18  analysis.
19     MR. BROCK: I would say some predicate should
20  be laid. If he is referring -- I don't believe it
21  is --
22     THE COURT: I'll let you use it with the
23  witness and see if he can lay a foundation.
24  BY MR. LANIER:
25     Q. Ma'am, you're familiar with this document,

Page 2931

1  aren't you?
2  A. I don't recall. I certainly may have seen it
3  before. I just don't recall.
4     MR. LANIER: Your Honor, I'll represent this
5  was produced to us in a self-authenticating manner by
6  Merck out of the Merck offices. It has a Merck Bates
7  stamp number out of their New Jersey litigation
8  specifically in your court.
9     MR. BROCK: There's no such thing as a
10  self-authenticating document, and I object to him
11  standing there making a speech about it. He can
12  establish a predicate to the witness if he can.
13     THE COURT: Is it from the VIGOR study?
14     MR. LANIER: Yes, Your Honor, it is.
15     THE COURT: And how do you know that?
16     MR. LANIER: This is a writeup from Merck
17  where they analyzed these are the ones each --
18     MR. BROCK: Where is the rest of the document?
19  Before we can put it in context --
20     MR. LANIER: You'll have to look at your Bates
21  number.
22     MR. BROCK: You're supposed to come up with a
23  complete copy.
24     MR. LANIER: That is -- those are all of the
25  charts. You can --

Page 2932

1     MR. BROCK: This is not the whole document.
2     MR. LANIER: That's the way we were given it.
3     MR. BROCK: Are you sure about that?
4     MR. LANIER: I'm sure we were given it that
5  way.
6     MR. BROCK: I don't know what it is.
7     MR. LANIER: He gave to it me, Judge.
8     MR. BROCK: I did not give you this.
9     THE COURT: You can question her on it.
10     MR. LANIER: Thank you.
11  BY MR. LANIER:
12     Q. Ma'am, if you look, please, with the jury and
13  help us understand what we have here, these are the
14  actual heart attacks that happened in the VIGOR study,
15  aren't they?
16     MR. BROCK: I'm going to object to him
17  testifying about it unless he lays a predicate for it.
18  She didn't say that.
19  BY MR. LANIER:
20     Q. That's why I'm asking her. Aren't they?
21  A. Looking at it what I'm going to guess is that each
22  of the boxes represents somebody having a heart attack
23  during the VIGOR study. And I would assume that the
24  numbers in those boxes are the day that they had that
25  heart attack.

Reicin - Cross

Page 2933

1    Q.  You can see that up at the top.  It is not a
2  hard assumption.  "Individual Events Labeled By Study
3  Day."
4       Do you see that?
5  A.  That's correct.
6    Q.  And heavy outline means it is a patient that
7  probably should have been on low-dose aspirin, doesn't
8  it?
9  A.  That's correct.
10   Q.  By the way, y'all wouldn't allow them to take
11  low-dose aspirin, would you?
12  A.  That's correct, and we specifically told
13  physicians --
14   Q.  Ma'am, please limit it to my questions or we
15  won't get through this.
16      Y'all did not limit them to be on low-dose
17  aspirin, true?
18      MR. BROCK:  I object.
19      THE WITNESS:  That is correct, but we also
20  told physicians not to stop aspirin in order for
21  patients to be enrolled in the study.
22  BY MR. LANIER:
23   Q.  And that's on the informed consent they signed
24  where?
25  A.  We instructed the investigators --

Page 2934

1    Q.  Ma'am, where is it on the informed consent
2  form?
3  A.  We told them they weren't allowed to take aspirin.
4    Q.  I see this.  You may not enter this if you use
5  low-dose aspirin, and you got them to sign -- you got
6  each person being tested to sign that.  Where did you
7  tell the people in this same form that they could go
8  ahead and take aspirin?
9  A.  We didn't say they could take aspirin.
10   Q.  All right.  But, yet, you had people that you
11  call aspirin indicated.  By that it means they had the
12  risk factors they should have been on aspirin?
13  A.  That's correct.  And they were not.
14   Q.  And you never warned any of those people that
15  they were at an increased risk of a heart attack, did
16  you?
17  A.  These were patients that were being --
18   Q.  Did you warn those people they were at an
19  increased risk of a heart attack, yes or no?
20      MR. BROCK:  That's a misleading question that
21  she should be allowed to explain.  I object to that.  I
22  ask she be allowed to explain her answer.
23  BY MR. LANIER:
24   Q.  Did you warn those patients that they were at
25  risk for a heart attack?

Page 2935

1       THE COURT:  She can answer yes or no, and you
2  can bring it out on redirect.
3       THE WITNESS:  I'm going to answer no, and I
4  would like to explain so there's not a misimpression.
5  BY MR. LANIER:
6    Q.  You'll get to explain on their clock instead
7  of mine, okay?
8       Now, above the time line those are people who
9  were taking VIOXX, right, this group is VIOXX?
10  A.  That's correct.
11   Q.  And below the line those folks are taking
12  Naproxen, right?
13  A.  That is correct.
14   Q.  And then we also have here how many days
15  before they had their heart attack, right?
16  A.  That's correct.  How many days they had been on
17  therapy before they had it.
18   Q.  So first heart attack happens on day seven.
19  We'll cover up day 100.  Look at the first hundred
20  days, okay?
21  A.  That's correct.
22   Q.  First heart attack is a Naproxen heart attack
23  1 week into the study, right?
24  A.  That's correct.
25   Q.  And then after that you have a VIOXX heart

Page 2936

1  attack on day 17, don't you?
2  A.  That's correct.
3    Q.  And then another VIOXX heart attack on day 30,
4  don't you?
5  A.  That's correct.
6    Q.  Then another VIOXX heart attack on day 41,
7  correct?
8  A.  That's correct.
9    Q.  Then you pick up your second Naproxen heart
10  attack?
11  A.  Correct.
12   Q.  And then you got VIOXX, VIOXX, Naproxen and
13  VIOXX, right?
14  A.  That's correct.
15   Q.  So you have six heart attacks on VIOXX in just
16  the first three months, hundred days, a little over
17  3 months, right?
18  A.  Out of 4,000 patients, that's correct.
19   Q.  And you only have three on Naproxen?
20  A.  That's correct.
21   Q.  And then if we keep going look at the next
22  hundred days.  You've got one, two, three, four, five,
23  six more heart attacks the next hundred days on VIOXX,
24  don't you?
25  A.  That's correct.

7bf775cc-3bf5-422a-aae9-31c7ab106654

Reicin - Cross

Page 2937

1    Q.  And you have one on Naproxen, don't you?
2    A.  Correct.
3    Q.  And the study keeps going, doesn't it?
4    A.  That's correct.
5    Q.  And the next hundred days.  You don't have any
6    on Naproxen, do you?
7    A.  That's correct.  It was quite unusual.  You would
8    have expected you would have gotten some.
9    Q.  Ma'am, please limit your answers to my
10   questions so we can keep this going.  You've got one,
11   two, three, four, five, six more.  Y'all seem to have
12   six every hundred days on VIOXX, don't you?
13   A.  According to those calculations, yes.
14   Q.  And the study is almost over at this point,
15   isn't it?
16   A.  That's correct.
17   Q.  You do pick up one more heart attack there on
18   VIOXX.  Actually two.  There's one at 305, isn't there?
19   A.  That's correct.
20   Q.  Now, you tell this jury that based upon your
21   earlier studies you didn't think there was any risk of
22   heart attacks, right?
23   A.  That is correct, based on the Phase IIb/III safety
24   database we did not believe there was an increased
25   risk.

Page 2938

1    Q.  Yet Eric Topol wrote about study 090, which
2    was a random placebo-controlled parallel group
3    double-blind trial of VIOXX versus nabumetone placebo
4    just 12 and-a-half milligrams, right?
5    A.  That's correct.  This was not part of our Phase
6    IIb/III OA database.
7    Q.  Yeah, this is one that shows a lot more heart
8    attacks, doesn't it?
9    A.  I don't think you can show -- say it shows a lot
10   more heart attacks.  Numerically in this study there
11   were more heart attacks on VIOXX than placebo.
12   Q.  Six to one?
13   A.  No.  That's not heart attacks.
14   Q.  Well, those are serious cardiovascular events.
15   A.  But they include things that aren't heart attacks
16   or thrombotic events.
17   Q.  Well, I understand that, and we're going to
18   cover that, too, because I think that's an important
19   point, but just for our purposes, ma'am, serious
20   cardiovascular events y'all group together in that
21   study, didn't you?
22   A.  No, that's the body system, that's the way the
23   dictionary is made up.
24   Q.  It is like 010, 010 was one of your risk
25   trials, wasn't it?

Page 2939

1    A.  That was one of the early studies that studied
2    VIOXX 25, 125, which is about five times the
3    recommended dose, and there were --
4    Q.  Ma'am, I ask if that was one of your early
5    studies?
6    A.  Yes.
7    Q.  Yes, it was, wasn't it.
8    And in that one you compared VIOXX 25 and 125
9    against placebo, didn't you?
10   A.  That's correct.
11   Q.  And in that study you had three times as many
12   cardiovascular events on 25 milligrams of VIOXX as you
13   did placebo, true?
14   A.  Well, --
15   Q.  Is that true?
16   A.  I would not use the word three times when you're
17   dealing with three and one.  It just sounds different
18   than it is.  There were three on VIOXX, one on placebo,
19   two of those were hypertensive adverse experiences.
20   Q.  What is one times three?
21   A.  I understand that you are factually correct, Mr.
22   Lanier.
23   Q.  Then that's all I need you to do is say, "yes,
24   that's correct."
25   A.  That's correct then, Mr. Lanier.

Page 2940

1    Q.  I mean, this is -- I'm just asking you.
2    You had three times as many heart attacks --
3    not heart attacks, cardiovascular problems on
4    25 milligrams of VIOXX as you did on placebo, true?
5    A.  There were no heart attacks in that study.
6    Q.  Is that true?
7    A.  You mentioned heart attacks.  There were no heart
8    attacks.
9    Q.  And I'm sorry cardiovascular --
10   MR. BROCK:  I object to him cutting her off.
11   If he asked her a question then she starts to answer,
12   and he jumps right in before she can finish.
13   THE COURT:  He changed it to cardiovascular
14   and she clarified what she was -- the exchange was
15   okay.  I'm sure the jury can follow it.  It was
16   appropriate.
17   MR. LANIER:  Thank you, Judge.
18   BY MR. LANIER:
19   Q.  By the way, the jury heard about the
20   difference between Phase II and Phase III studies, and
21   you were telling us oh, based on our Phase III data
22   earlier, do you remember that?
23   A.  That's correct.
24   Q.  Ma'am, the truth is regardless of what may
25   have been written by other witnesses Phase II is where

Reicin - Cross

Page 2941

1  you're supposed to evaluate whether a drug has
2  biological activity, and you're supposed to estimate
3  the rate of adverse events, isn't that true?
4  A.  You estimate the rate of adverse events in all
5  phases of your clinical studies.
6      Q.  But it is supposed to be done in Phase II
7  before you go to Phase III trials, true?
8  A.  And it was.
9      Q.  Well, actually --
10  A.  In fact, you showed them the data estimating the
11  adverse experience rates that were seen in that study.
12      Q.  Ma'am, y'all had not finished estimating the
13  rate of adverse events when you started Phase III
14  because you were doing them simultaneously at that
15  point, did you not know that?
16  A.  We did start Phase III when Phase II was still
17  ongoing.  That is perfectly acceptable.
18      Q.  Actually, that's not the way you're supposed
19  to do it generally.  Didn't you know that's not the
20  general rule?
21  A.  I think if you would look at updated textbooks you
22  would not see that's the case.
23      Q.  Which textbook do you think I ought to look
24  at?
25  A.  I can't tell you exactly, but there are a lot of

Page 2942

1  discussions now about being able to take Phase II
2  trials and potentially use them as Phase III trials.
3      Q.  This one is 1996, isn't that kind of the time
4  period y'all should have been under?
5  A.  As I said, the risk was to us not to patients.  The
6  final safety data you get is from Phase III.  Phase II
7  studies are often too small to have a big enough
8  database to know --
9          MR. LANIER:  I asked her if 1996 is the year
10  we should be concerned about on the textbook.
11          THE COURT:  That was the question.
12  BY MR. LANIER:
13      Q.  1996 is the year, isn't it, ma'am?
14  A.  That was the year we started our -- I can't see
15  from here.  It looks like we started our Phase III
16  trials.
17      Q.  Now, I want to clarify another subject you
18  talked about this morning.  You said at no point --
19  that Merck was, in essence, being Mr. Cautious.  The
20  way you said it is, you know, there may be a question
21  let's be proactive and let's do an SOP, a protocol to
22  see if there are going to be any CV events because we
23  just want to be extra careful even though we're not
24  worried, even though it is 1998 and we have decided
25  that NSAIDs aren't cardioprotective, just in case let's

Page 2943

1  do an SOP.  Remember that?
2  A.  Well, I think you slightly have mischaracterized
3  what I said, but I did say we were trying to be
4  proactive.  We had discussions with our scientific
5  board of advisors.  They recommended we started this,
6  and we agreed with them and we did.
7      Q.  That's the point I wanted to get at.  Y'all
8  didn't do it on your own.  You got told to do it by
9  your board of scientific advisors in 1998, didn't you?
10  A.  I don't think you can characterize it like that.
11  Merck as a part of --
12      Q.  Then just say no.
13  A.  I think you mischaracterized it, Mr. Lanier.
14      Q.  If you think I mischaracterized it then I
15  would like to look at some specific portions of this
16  with you.
17          By the way, while in 1998 you have just told
18  the jury the reason we didn't put a warning in the --
19  can y'all see this okay with the board or have I ruined
20  it?  Okay.  I'm sorry.
21          In 1998 you told the jury, oh, we didn't put a
22  warning in the informed consent where people say, okay,
23  this is a risk I'm running.  We didn't do that because
24  we weren't worried about heart problems in 1998,
25  remember you said that?

Page 2944

1  A.  That's correct, we were not.
2      Q.  It was in the middle of 1998 when the
3  scientific advisors had a meeting with y'all, wasn't
4  it?
5  A.  I was not at that meeting, but they did have a
6  meeting.
7      Q.  Did you know at that meeting that there were
8  some concerns about what might happen whether or not
9  there might be a development of coronary plaques,
10  whether or not those plaques might destabilize making
11  them rupture prone and whether or not there might be a
12  blood clot occluding the vessel at the cite of the
13  plaque rupture?
14  A.  No, you just mischaracterized that.  The first two,
15  if you read down they were actually suggesting that
16  VIOXX might prevent coronary plaques and that VIOXX
17  might prevent plaques from being rupture prone, and
18  then the third one was the FitzGerald hypothesis, so,
19  actually, there was several hypotheses they were
20  raising.
21      Q.  So when you just told the jury I didn't know
22  that when I testified here, it looks to me like maybe
23  you do know this memo after all?
24  A.  I'm sorry, I didn't hear what you just said.
25      Q.  When I was about to challenge you on this memo

7bf775cc-3bf5-422a-aae9-31c7ab106654

Reicin - Cross

Page 2945

1  you said "I wasn't at that meeting, Senator," but you
2  know this memo, don't you?
3  A.  I was not at that meeting.
4      Q.  But you do know that memo.
5  A.  I have seen it.  I have been asking about it at
6  that time.
7      Q.  So you know in this memo that in 1998 even
8  though you have just sworn to the jury that in 1998
9  y'all didn't think it was possible, you didn't think it
10 was a risk that there could be heart problems, you're
11 to go going to admit in 1998 your scientific advisors
12 were telling you that that might happen, right?
13 A.  They were telling us that there was a potential
14 benefit.  In fact, two potential benefits --
15     Q.  Ma'am, that wasn't my question.
16 A.  -- and one potential risk.
17     MR. BROCK:  That was the question.
18     MR. LANIER:  No.  Judge.
19     THE COURT:  Rephrase the question that that
20 might happen.
21 BY MR. LANIER:
22     Q.  You were told specifically, and I'm not going
23 to take time to fuss over the first two points with
24 you.  We'll fuss about those when we get to the APPROVe
25 article, but you were specifically told, you being

Page 2946

1  Merck, "the thrombotic occlusion of the vessel at the
2  site of plaque rupture with ensuing consequences of
3  ischemia," in other words heart attacks, "are of
4  concern of the advisors," right?
5  A.  I don't know if I could use the word "concern."
6  This is the FitzGerald hypothesis, and they were saying
7  this is one of the potentials, as well as the other
8  two, which would have been benefits.
9      Q.  Well, then I'm going back to this.  How can
10 you sit here and tell the jury, gee, the reason I
11 didn't warn anybody in the informed consent that we're
12 expecting more heart attacks in one group than the
13 other, I didn't warn anybody because I didn't think we
14 were really worried about it or even thought about it?
15 A.  Because at the same time I would have had to tell
16 them that there were two potential benefits, and there
17 wasn't enough science for any of these to do it, that
18 would not have been allowed by IRBs in an informed
19 consent.
20     Q.  Well, ma'am, if you're going to put me on a
21 drug I would like to know if you've got scientific
22 advisors so concerned about it that they're saying you
23 better put in a protocol, you better test for this, and
24 you better start looking for it, wouldn't you?
25     MR. BROCK:  Objection.

Page 2947

1      THE WITNESS:  I think that mischaracterizes
2  what they said.
3      THE COURT:  The objection is overruled.
4  BY MR. LANIER:
5      Q.  All right, ma'am.  Y'all didn't want to look
6  at those VIGOR test results by themselves.  You wanted
7  to blend them in with all the other tests you had done,
8  right?
9  A.  Again, I think you mischaracterized it.  As I said
10 earlier, we didn't think we would have enough events
11 from VIGOR alone, and, therefore, the plan was to pool
12 it so we would have enough events.
13     Q.  Well, you had plenty of events on VIGOR,
14 ma'am, didn't you?
15 A.  I can't -- we ended up having about 60 confirmed
16 thrombotic events.
17     Q.  That's plenty.  Let me put it to you this way,
18 you're telling me the whole reason y'all weren't
19 warning people is because of your pooled events from
20 other studies, and you didn't have that many heart
21 attacks in those studies you pooled, did you?
22 A.  You're correct.
23     Q.  All right.  So it is not enough when it serves
24 your purposes, but when it doesn't serve your purposes
25 then all of a sudden, whoa, that's plenty?

Page 2948

1  A.  I think that's a mischaracterization, Mr. Lanier.
2      Q.  Okay.  Let's go into some detail on VIGOR.
3      Your first reaction to VIGOR was that your
4  drug was killing people, right?
5  A.  Again, I think that's a mischaracterization.
6      Q.  Well, look at what it says.  How many -- those
7  people, some of those people with the heart attacks
8  died, didn't they?
9  A.  Yes, they did, but the cardiovascular mortality was
10 similar between VIOXX and Naproxen in the study.  The
11 difference was --
12     Q.  I just asked you simply did some of those
13 people with heart attacks die?
14 A.  Yes.
15     Q.  And that's on both groups; some died with
16 VIOXX, some died with Naproxen?
17 A.  Correct.  Similar numbers.
18     Q.  And this is the e-mail Ed Scolnick, the head
19 president of Merck Research Labs, put out that the jury
20 has heard enough times to mumble it in their sleep so
21 I'm not going to spend time on it, but "CV events are
22 clearly there.  It is real.  Let's find out about what
23 Oates told us."
24     You know who Oates is?
25 A.  John Oates.

Reicin - Cross

Page 2949

1    Q.  He's a big doctor who had written y'all a
2    letter in 1998 saying you better be careful, right?
3    A.  I'm not familiar with the letter.  If you showed it
4    to me it might remind me of it.
5    Q.  "It is a shame."  He really says that, doesn't
6    he?  "It is a shame."
7    A.  That is what it says.
8    Q.  "But it is a low incidence."  Not that many
9    people had the heart attacks.  "And it is
10   mechanism-based," that means it is our pill causing it,
11   doesn't it?
12   A.  That's what he was assuming.
13   Q.  "As we worried it was."  See that?  Worried?
14   A.  Correct.
15   Q.  Now, is your testimony to the jury that he
16   wasn't worried about it in '98 or '99, he is flipping
17   back to his worries in '97?
18   A.  I don't think I could speak for Dr. Scolnick.
19   Q.  Ma'am, if y'all were worried about it in '98
20   and '99 it sure should have -- should have been in the
21   informed consented that you get these people to sign
22   before they test their drug out for you?
23   A.  You didn't let me finish.  I was not aware when I
24   was putting the VIGOR study together that anybody was
25   worried about cardiovascular safety of VIOXX at Merck.

Page 2950

1    Q.  Well, ma'am, you're the one who said it is
2    no-win, we're going to have more events, and I can't
3    wait to be the one to have to present that to senior
4    management, that was your e-mail, wasn't it?
5    A.  I did in 1997, but I wasn't saying that VIOXX would
6    increase the rate.  I was saying that the NSAIDs would
7    decrease the rate.
8    Q.  And then if I understand what Mr. Brock put up
9    here earlier he put up exhibit -- what we marked or he
10   marked as Defendant's Exhibit 186.  It is a year later
11   that Dr. Scolnick finally says "we worried to death
12   about the CV events last spring."  Merck is an issue.
13   But he was also sick that they might be doing harm to
14   patients?
15   A.  Correct.
16   Q.  Well, if y'all are Mr. Safety, instead of
17   pulling the drug immediately once there's any concern
18   you should have pulled the drug after the VIGOR study
19   or you should have at least started warning people,
20   right?
21   A.  I disagree with that.  The data that we had at the
22   time was not consistent with VIOXX having an increased
23   risk.
24   Q.  Ma'am the only data you're comparing it to is
25   data you have told us doesn't have enough numbers.

Page 2951

1    A.  No.  We had data from several different sources.
2    We had the OA database.
3    Q.  Which didn't have enough numbers, right?
4    A.  We had the Alzheimer's database.
5    Q.  Answer my question.  OA didn't have enough
6    numbers?
7    A.  I don't know what that means, "not enough."
8    Q.  Yes, you do.  Your clinical trials, you know
9    what power is to a study.  It did not have enough power
10   for heart attack events, and you know that to be true,
11   don't you?
12   A.  Power -- excuse me, Mr. Lanier, power is something
13   you determine before you see the results.  We did it --
14   no, you have to let me finish.
15   Q.  And there weren't enough numbers for it?
16   A.  But that's before you see the results.  We did an
17   analysis when we got the VIGOR results and said if
18   VIGOR is true, and if VIOXX was really increasing the
19   risk of thrombotic events by twofold what's the chance
20   that we would have seen the results we saw in the Phase
21   IIb study and the results that we saw in the
22   Alzheimer's study.  And the answer was highly, highly
23   unlikely.
24   Q.  Ma'am, have you seen Dr. Krumholz's chart,
25   Exhibit 2003, where he goes through your studies?

Page 2952

1    A.  You'll have to show that to me.
2        THE COURT:  It is not in evidence, so don't
3    show it to the jury, but he can show it to her.
4    BY MR. LANIER:
5    Q.  Where he goes through study by study and shows
6    how many heart attacks were on VIOXX versus how many
7    were on the placebo and comparators?
8    A.  I do see that.
9    Q.  According to him you had a heart attack on
10   VIOXX in 029, and you didn't have any on placebo; is
11   that correct?
12   A.  I don't know.  I see other mistakes in this, so I
13   can't, sitting here right now, verify that.
14   Q.  Which mistakes do you see?
15   A.  Well, he doesn't have anything in the bone study.
16   Q.  Well, that's not a mistake; he hadn't filled
17   it in, he didn't have the data?
18   A.  In 078 there were not 18 on VIOXX and 15 on
19   placebo.
20   Q.  Are you sure?
21   A.  Um, that is correct.
22   Q.  How many were there?
23   A.  I think it was 13 and 10.  We would have to look,
24   but it was not 18 and 15.
25   Q.  Make a note, please.  And make sure we're

Reicin - Cross

Page 2953

1  clear on the record because you'll be gone, but I'll
2  get some other witness on this, you're talking 078?
3  A.  That's correct.
4      Q.  Did you see any other errors when you said "I
5  see errors"?
6  A.  I would have to go study by study.
7      Q.  I'm not asking you to do that.  When you said
8  you saw errors I wanted to know what you had seen that
9  triggered that.
10  A.  Well, that's what I'm seeing right here.
11      Q.  Well, let's look at what he's got here.  You
12  had a heart attack on 029.  He didn't have any on
13  placebo?
14  A.  Yes.  Although you have to point out that we had
15  more patients on VIOXX than on placebo.
16      Q.  I'm looking at the 25-milligram dose.  You had
17  one heart attack on 25 milligrams and --
18  A.  But none on 50.
19      Q.  What?
20  A.  But none on 50.
21      Q.  Ma'am, I understand that.  I'm looking at the
22  25-milligram dose.  There's 137 people on versus 145,
23  that's the dose Tom Cona was on?
24  A.  Okay.
25      Q.  He had a heart attack on it?

Page 2954

1  A.  That's correct.
2      Q.  Didn't have one on placebo?
3  A.  That's correct.
4      Q.  Look at the other study.  017 he had a heart
5  attack on VIOXX.  Didn't have one on placebo, did you?
6  A.  Okay.  But you can go to 045.  You had two on
7  placebo, none on VIOXX, and we had twice as many
8  patients on VIOXX so you can't cherry-pick.
9      Q.  I'll go to that too, but please answer my
10  question.
11  A.  Which question?
12      Q.  I just pointed out a study.  I pointed out
13  another one.  017 you had a heart attack on VIOXX not
14  placebo?
15  A.  That's correct.
16      Q.  Now, the only place you're going to find
17  anything more on placebo are in two studies out of all,
18  what you figure, 30, 40 studies, 044 the one you point
19  to, and you can come down here and find another one
20  091, see?
21  A.  The problem is the time on therapy and placebo is
22  also less than the time on therapy and VIOXX.  And you
23  have to take that into account.  And when we looked at
24  the data, as I said, if you look at our
25  placebo-controlled data the rate of cardiovascular

Page 2955

1  events was similar on VIOXX and placebo prior to
2  APPROVe.
3      Q.  That's the Konstam analysis, and we're going
4  to get to that in just a minute.  You went out
5  immediately after the --
6  A.  I think, by the way, that in the bone study there
7  were events on the comparator and not on VIOXX, the one
8  that he hadn't filled out.  I'm sorry, I just
9  remembered that.
10      Q.  We'll try and get that data from y'all and
11  look at it.
12      MR. BROCK:  I got it.
13      MR. LANIER:  All right.  Yeah.
14      The VIGOR study comes out.  Your Honor, if
15  we're taking an afternoon break now is a good time.  If
16  we're not taking one I'm going to suck it up and go.
17  But I'm about to move subjects is what I'm saying.
18      MR. BROCK:  Can I approach on this?
19      MR. LANIER:  What are we doing about that?
20  Can we keep going?
21      (Whereupon, the following occurred at
22  side-bar:)
23      MR. BROCK:  Can you move over just a little
24  bit?
25      MR. LANIER:  Sorry.

Page 2956

1      THE COURT:  Is the witness available?
2      MR. BROCK:  She needs to leave about 4:15 to
3  get home in time to be at home when she needs to be
4  there.
5      THE COURT:  So we either break now or we break
6  at 4:15.
7      MR. LANIER:  I would ask you to ask the jury
8  if they're comfortable today.  I have been pounding for
9  a while.  If they're comfortable continuing for 15,
10  20 minutes if it shortens the trial let's keep going.
11      (End of side-bar.)
12      THE COURT:  Ladies and gentlemen, we can
13  either break now or we can break at 4:15.  Are any of
14  you uncomfortable and need a break now?  We're not
15  going to stay past 4:15.  When we break you're leaving.
16  Is that okay?  Is there anyone who needs a break now?
17  If you do just let us know.
18      Okay.  Let's proceed.
19  BY MR. LANIER:
20      Q.  So after the VIGOR study comes out if I'm
21  understanding your testimony today y'all made a shift
22  back and decided that y'all were right in '97 but wrong
23  in '98, and it turns out Naproxen is cardioprotective
24  after all?
25  A.  Again, I don't think I would characterize it like

Page 2957

1  that.
2      Q.  So you went to work to try and find any study
3  that could say that maybe they're cardiovascular, maybe
4  Naproxen is cardioprotective, do you remember that
5  assignment?
6  A.  Well, actually, I found the study in 1997, but I
7  did go back to relook for them.
8      Q.  That's my point, ma'am.  If you just sort of
9  focus in on my question.  You got an assignment to go
10  look for any study you can find.  Any study you could
11  find that indicated that maybe an NSAID is
12  cardioprotective, do you remember that assignment?
13  A.  No, I don't recall getting that as an assignment.
14  I think it is something that I proactively started to
15  do.
16      Q.  Well, you did it, do you remember what day of
17  the week this was, the 13th of March, the year 2000?
18  A.  It certainly may have been over a weekend.
19      Q.  Over a weekend at 8:00 -- that's at 1:20 in
20  the morning, isn't it?
21  A.  That's correct.  I have young kids, and so I work
22  after they go to bed.
23      Q.  I've got them all ages, and I can't work at
24  any time.  By the time they're teenagers they're up
25  then they're asleep, and it doesn't work.

Page 2958

1          You sent out an e-mail at 1:20 in the morning,
2  and it says "additional article request," that's why I
3  thought you might have had it as a task given to you.
4  It looked like an assignment.  Request -- see that word
5  "request"?
6  A.  That's me requesting it from our library.
7      Q.  Oh, and then what it says is "below is
8  attached the abstract for the only study I could find
9  which assessed the potential cardioprotective effects
10  of an NSAID."  This is that flurbiprofen French trial
11  true?
12  A.  That's correct.
13      Q.  So we're clear on that trial this wasn't a
14  trial to give this to healthy people and see how fewer
15  heart attacks they have.  That trial was one of you got
16  a bunch of people that were having heart attacks, let's
17  use flurbiprofen in the heart attacks to see if we can
18  keep a recurrence from happening, right?
19  A.  No, you slightly mischaracterized that.
20      Q.  Well, then let's look at it for a second.
21  A.  Can you give me a copy, again?
22      Q.  I think he gave you one in the notebook.
23  A.  Is it in the notebook?
24      MR. BROCK:  We can probably find it.
25      MR. LANIER:  I'll tell you what, instead of

Page 2959

1  taking time for that...
2  BY MR. LANIER:
3      Q.  Ma'am, I'll put it up here so we can see it
4  together with the jury.  This is the flurbiprofen
5  article, isn't it?
6  A.  That's correct.
7      Q.  And this is after successful thrombolysis or
8  angioplasty in acute heart attack, right?
9  A.  Correct.  So they weren't in the middle of having a
10  heart attack.  They had aborted the heart attack by
11  reopening their vessel.
12      Q.  Ma'am, that was my statement to you.  In other
13  words, this was not a study of does flurbiprofen reduce
14  heart attacks in healthy people.  This is a study that
15  says you got people who have already had heart attacks?
16  A.  That's correct.
17      Q.  And does flurbiprofen keep it from happening
18  to them again?
19  A.  That's correct.
20      Q.  And that's the only study you could find?
21  A.  Well, as I said, there were other studies.  That's
22  the only study I could find that might.  Indobufen has
23  studies, as well.
24      Q.  And what you did, ma'am -- and that study was
25  what, 1993, write up, anyway.  Is 37 in evidence, Dara?

Page 2960

1      MS. HEGAR:  No.
2      MR. LANIER:  I move into evidence Plaintiff's
3  Exhibit P-37, the e-mail chain from Merck.
4      THE COURT:  Any objection?
5      MR. BROCK:  I'm looking at it now.  No, Your
6  Honor.
7      THE COURT:  37 will be marked into evidence.
8      (Whereupon, Exhibit P-37 marked into
9  evidence.)
10  BY MR. LANIER:
11      Q.  It says it is another e-mail to you from Ed
12  Scolnick with a high priority?
13  A.  That's correct.
14      Q.  It is a month later, isn't it?
15  A.  That is correct.
16      Q.  It says, "I'll tell you, my worry quotient is
17  high.  I'm actually in minor agony"?
18  A.  That's correct.
19      Q.  So now you had a whole month, and, by the way,
20  how many millions of people worldwide are taking your
21  drug that month while y'all are worried sick about it?
22  A.  I can't tell you how many patients were taking the
23  drug then.
24      Q.  Minor agony for a month.  Were you in minor
25  agony and were you worried, was your worry quotient

Page 2961

1  high that month while those millions of people were
2  taking your drug?
3  A.  No.  After we had seen the totality of data,
4  including the Alzheimer's data, I actually was quite
5  comforted and felt very comfortable with the data.
6     Q.  That's different between you and the head
7  scientist Edward Scolnick, would you agree with me?
8  A.  Ed takes his responsibilities as the head scientist
9  very, very seriously, and he often worried.
10    Q.  That wasn't my question.  My question was
11  would you agree with me, yes or no?
12  A.  I would agree with you that's what it says here.
13    Q.  He says "I'll tell you my worry quotient is
14  high."  Not was high, it is high, right?  "I actually
15  am in minor agony.  What I really want to do is a
16  10,000 versus 10,000 patient study in mild to moderate
17  OA Tylenol versus VIOXX with an as-needed low-dose
18  aspirin for those judged to need it.  Safety first
19  primary endpoint efficacy secondary to co-primary" and
20  then he put in all caps -- are you with me so far?
21  A.  I am.
22    Q.  "WE WILL NOT KNOW FOR SURE WHAT IS GOING ON
23  UNTIL WE DO THIS STUDY."
24       Did I read that correctly?
25  A.  You did.

Page 2962

1     Q.  Y'all never did that study, true or false?
2  A.  That is true, we did not do the study because we
3  didn't think we could do the study.
4     Q.  Because you were spending hundreds of millions
5  of dollars advertising for Peggy Flemming, and you
6  didn't have the money?
7  A.  No.  That's completely inaccurate.
8     Q.  Ma'am, it was a budget concern that Ed
9  Scolnick --
10       MR. BROCK:  She was answering that question.
11  He threw out an argumentative question.  She was
12  starting to answer it, and he cut her off again.
13       THE COURT:  She answered, no, that's
14  completely inaccurate.
15  BY MR. LANIER:
16    Q.  Ma'am, have you even -- the budget issues that
17  Ed Scolnick had if there's only money to do a study the
18  one essential study that we need to do is a CV study,
19  did you see that budget e-mail?
20  A.  And we did that CV study.  This was not the study.
21  We didn't think you could keep patients in the study
22  because those patients who need an NSAID wouldn't --
23       MR. LANIER:  Objection.  I asked if she had
24  seen the e-mail, and she is going on with a speech.
25  BY MR. LANIER:

Page 2963

1     Q.  Did you see the e-mail?
2       THE COURT:  Did you see the budget e-mail is
3  the question.
4       THE WITNESS:  I have in the past seen that
5  budget e-mail.  It was not in reference to this study.
6  BY MR. LANIER:
7     Q.  Ma'am -- actually, ma'am, it has been marked
8  as Plaintiff's Exhibit 16, and now we fast forward it
9  we're now in September of '01.  September of '01.  "MRL
10  has just completed its annual planning meeting.  We
11  reviewed strategy for each franchise and new projects.
12  I want to give you a list of the only studies that I
13  regard as ESSENTIAL."  Essential means just that.
14  Essential.  Not preferred, not useful, not helpful,
15  essential.  "We will, it is clear, only be able to
16  carry out the ESSENTIAL studies for the franchises and
17  be able to carry out the new Phase IIb and III
18  programs."  Y'all are still doing Phase II programs?
19  A.  This is probably talking about with other drugs.
20    Q.  Look at this.  "For VIOXX, only the CV
21  outcomes study" all capitals, "ONLY ESSENTIAL STUDY."
22       Do you see that?
23  A.  That's correct.
24    Q.  Now, the truth of the matter is y'all hit a
25  point where you talked about doing a study called

Page 2964

1  VALOR.  Do you remember the VALOR study?
2  A.  I do remember the VALOR study.
3     Q.  And I believe the testimony has already been
4  offered by Dr. Scolnick in his deposition that VALOR
5  was the CV outcomes study.
6       MR. BROCK:  I'm going to object to him saying
7  what Dr. Scolnick in this case testified.
8       MR. LANIER:  I'll be glad to put it on
9  overhead.
10       MR. BROCK:  No.  It is not in evidence.  It is
11  not appropriate to put it up there.
12       MR. LANIER:  It is an admission by a party
13  opponent.  Ed Scolnick said it under oath.
14       MR. BROCK:  It is a deposition.
15       THE COURT:  Is it a deposition of Dr.
16  Scolnick?
17       MR. LANIER:  Yes.
18       THE COURT:  Do you intend to offer it into
19  evidence?
20       MR. LANIER:  I would love to at this point in
21  time, page 107 line 8 through line 10.
22       MR. BROCK:  He has rested his case, Your
23  Honor, and he did not offer the deposition of Dr.
24  Scolnick, although he talked about doing it.
25       MR. LANIER:  I'll reask it a different way in

Reicin - Cross

Page 2965

1   the interest of time.
2   BY MR. LANIER:
3      Q.  Ma'am, would you fuss with Ed Scolnick in this
4   case if he said that Merck has already testified to --
5   if he said that the VALOR study was the CV outcomes
6   study, would you fuss with him over that?
7   A.  I'm not sure what he is referring to because we did
8   do what we considered a CV outcomes study, which I
9   talked about before.  We did not do the VALOR study,
10  and I can go through with you the reasons why.
11     Q.  Ma'am, you did not do one where the primary
12  endpoint, the one primary endpoint was CV safety, true
13  or false?
14  A.  False.  Protocol 203 had a primary CV safety
15  endpoint.
16     MR. LANIER:  Objection, Your Honor.  This is
17  speeching.
18     MR. BROCK:  I object to that.
19     THE COURT:  She said, false, 203 had a primary
20  CV safety endpoint.
21     MR. LANIER:  352 into evidence, please, Your
22  Honor.
23     THE WITNESS:  Can I get a copy of that?
24     MR. BROCK:  No objection.
25     (Whereupon, Exhibit P-352 marked into

Page 2966

1   evidence.)
2   BY MR. LANIER:
3      Q.  Ma'am, are you familiar with plaintiff's
4   Exhibit 352?
5   A.  No, I am not.
6      Q.  This is a letter from Alan Nies.
7      MR. BROCK:  Your Honor, she is not familiar
8   with it.  She shouldn't be questioned about it, so I
9   object to it.
10     MR. LANIER:  Well, it is in evidence now,
11  Judge.  I can question her about it.
12     MR. BROCK:  Just because it is in evidence
13  doesn't mean you can question the witness about it.
14     MR. LANIER:  Yes, it does.
15     MR. BROCK:  You objected to me doing that
16  already.
17     THE COURT:  All right.  It is in evidence.
18  Let's hear what the question is.
19  BY MR. LANIER:
20     Q.  Ma'am, do you know who Alan Nies is?
21  A.  Yes, I do.
22     Q.  He was head of the VIOXX development team,
23  wasn't he?
24  A.  At one point he was, yes, that's correct.
25     Q.  And do you see the date on this letter is

Page 2967

1   February 13th, 2002?
2   A.  Yes, I do.
3      Q.  And do you see that this letter is about doing
4   the VALOR study, "which was a randomized double-blind
5   parallel placebo-controlled trial to evaluate the
6   cardiovascular safety and efficacy of VIOXX on
7   cardiovascular events in patients with recent acute
8   coronary syndromes."
9      VALOR?
10     Do you see that?
11  A.  Yes, I do.
12     Q.  And it was going to cost $213,600.  Do you see
13  that?
14  A.  No, I don't think the study would have cost
15  $213,600.
16     Q.  It actually would have cost more.  That was
17  for the necessary preparations, true?
18  A.  I would have to read the whole budget to see what
19  exactly it was for.
20     Q.  "Merck hereby authorized Brigham to begin the
21  necessary preparations for the study at a cost not to
22  exceed $213,600."
23     Do you see that?
24  A.  Yes, I do.
25     MR. BROCK:  I would like to approach for one

Page 2968

1   second.
2      (Whereupon, the following occurred at
3   side-bar:)
4      MR. BROCK:  This is the only point I want to
5   make is that when I try to examine my witness about
6   documents she had not seen he stood up and objected and
7   Your Honor sustained the objection.  Now he stands up
8   with a document she has not seen and examination
9   continues, and I just don't think there's a fairness in
10  that.
11     THE COURT:  It is not an area that she doesn't
12  know about.  She said she knows about the VALOR study.
13     MR. BROCK:  But she knew about the other
14  documents I was showing her that she had not seen.
15  There were Merck documents --
16     MR. LANIER:  There's a difference.
17     MR. BROCK:  Where is the fairness allowing the
18  examination on documents she has not seen when he does
19  it and I can't do it?
20     MR. LANIER:  It is the difference between
21  cross-examination and direct.
22     MR. BROCK:  No, it is not.
23     MR. LANIER:  You're trying to get a direct
24  examination witness to put in your case.
25     THE COURT:  I believe there's a distinction,

Reicin - Cross

Page 2969

1  and I'm going to allow it.
2       (End of side-bar.)
3  BY MR. LANIER:
4       Q.  And this contract was actually even signed by
5  Alan Nies, senior vice-president for Merck, as well as
6  by the Brigham and Women's Hospital.
7       Do you see that?
8  A.  I do.
9       Q.  Did you know that that study was never done?
10  A.  That is correct.
11       Q.  Did you know that that study was cancelled?
12  Right after y'all finished the label negotiations with
13  FDA you announced you weren't going to do the study
14  after all, did you know that?
15  A.  I can't tell you the timing.  It had nothing,
16  nothing whatsoever to do with the label negotiations.
17  That I can tell you for sure.
18       MR. LANIER:  I got 10 minutes?
19       THE COURT:  You have 10 minutes.  Do you want
20  to break now?
21       MR. LANIER:  No.
22       THE COURT:  All right.  Take your 10 minutes.
23  BY MR. LANIER:
24       Q.  Let's start with the New England Journal of
25  Medicine before the weekend.  We'll out on something

Page 2970

1  fun, okay?
2       Would you agree with me that y'all kind of
3  fudged that article any way you could to your
4  advantage?
5  A.  No, I do not agree with that.
6       Q.  For example, in that article, and this is an
7  article that -- this is it, isn't it, this is the
8  article New England Journal of Medicine, right?
9  A.  This is the VIGOR article.  We had other ones
10  subsequent to this, but this is the first one.
11       Q.  And this is it.  This is the one y'all wanted
12  an expedited review, you didn't get it, but you wanted
13  it?
14  A.  That's correct.
15       Q.  Did y'all want an expedited review because you
16  didn't want anybody to look too close in detail at some
17  of these things?
18  A.  No, that's completely ridiculous.  They do the same
19  exact type of review with an expedited review as they
20  do with a regular review.
21       Q.  The reason I'm asking that is because I'm
22  looking here at Loren Laine, he is one of the fellows
23  on this, isn't he?
24  A.  Yes, he is.
25       Q.  He is a stomach doctor out at USC, right?

Page 2971

1  A.  That's correct.
2       Q.  Y'all put this article out; you're right next
3  to him, aren't you?
4  A.  Yes, I am.
5       Q.  Y'all put this article out saying "it has been
6  estimated that more than 100,000 patients are
7  hospitalized and 16,500 die each year in the U.S. as a
8  result of NSAID stomach problems."
9       Do you remember saying that?
10  A.  I do.
11       Q.  And the truth is that's a bogus number, and
12  you knew it was a bogus number, didn't you?
13  A.  No, I don't agree with that.
14       MR. LANIER:  Your Honor, we offer into
15  evidence a video release.  No, we already have it in
16  evidence.  I want that clip of the video news release
17  of Loren Laine that went with this article.
18       MR. BROCK:  I'm going to object to playing it
19  again.  It has been played it it doesn't need to be
20  played again.
21       MR. LANIER:  I'm going to quit after this.
22       THE COURT:  I'm going to allow it to be used
23  with this witness so she can testify about it.
24       (Video clip played for jury.)
25  BY MR. LANIER:

Page 2972

1       Q.  That is him, isn't it?
2  A.  That is Dr. Laine
3       MR. BROCK:  This is not in evidence.
4       MR. LANIER:  Wrong clip.  Time out.  Time out.
5  Stop the audio, please.  I want to play the video news
6  release.  I want to play the one we played for them
7  that has the Star Wars thing.  Cue it up, please.
8       All right.  Your Honor, we don't have it cued
9  up.  That's okay, Phillip.  Stop it and prepare the
10  other one.
11  BY MR. LANIER:
12       Q.  Ma'am, did you ever see that video, this video
13  release news release where y'all use those same
14  numbers, and you actually had Loren Laine, this fellow
15  saying that there's 16,500 that die each year as a
16  result of stomach problems?
17  A.  I think I may have showed it in Texas.  Other
18  than that or whatever you showed there I have not seen
19  it.
20       Q.  Well, we have shown it here to this jury, as
21  well.  You think maybe you saw it when we tried the
22  case down there, right?
23  A.  I think the video release is possible.
24       Q.  Okay.  Ma'am, what I would like to ask you is
25  did you know that your Merck people actually talked to

Reicin - Cross

Page 2973

1  Loren Laine and took -- please stop any audio.
2        That your Merck people talked to Loren Laine
3  and took video of him practicing for what y'all put
4  together.  In other words, you know how like when they
5  shoot a movie they don't shoot it, they take a whole
6  bunch of film and then they go into the editing room
7  and somebody wins a Grammy because they can put
8  everything together to look good?
9  A.  The editor.
10    Q.  Y'all actually took a whole bunch of film of
11  him.  Have you seen the outtakes?
12  A.  No, I have not.
13    Q.  Did you know that he specifically told y'all
14  that these figures are bogus, and he can tell you tons
15  of reasons they're bogus and inflated, but y'all used
16  them anyway?
17        MR. BROCK:  I object.  That terminology is not
18  used.
19        MR. LANIER:  Yes, it is, Judge.  I have the
20  exact terminology where he says it is bogus.  Your
21  Honor, I offer into evidence the outtakes of Loren
22  Laine.  We have marked them previously as exhibits.
23  166, we believe.  And we have it ready to play.
24        MR. BROCK:  I would like to see it before it
25  is played.

Page 2974

1        THE COURT:  I don't remember it being played
2  the first time.
3        MR. LANIER:  We played --
4        MR. KRISTAL:  Your Honor, we played the video
5  news release that was entered into evidence.  These are
6  the outtakes.
7        THE COURT:  Okay.  I don't remember any bogus
8  words.
9        MR. LANIER:  Can I call them the outtakes, and
10  we'll come up with the exhibit number in a minute and
11  play it, please.
12        MR. BROCK:  I want to see it before he plays
13  it.  He already cued it up, and I don't know --
14        MR. LANIER:  I'm playing this outtake from
15  Exhibit 166 where people are there.  He is a Merck guy.
16        And with that I'll be done for the day, Judge.
17        (Whereupon, the following occurred at
18  side-bar:)
19        MR. BROCK:  Your Honor, this is clearly
20  hearsay.  It is at out of court admissions.
21        THE COURT:  It is an admission.
22        MR. BROCK:  Loren Laine doesn't work for us.
23        MR. LANIER:  He is on contract with you at
24  this point in time.
25        MR. BROCK:  Whoa, whoa, whoa.  That doesn't --

Page 2975

1  the fact that he is under a contract doesn't make him
2  an agent.  It is not an admission.
3        THE COURT:  He is working for you at this
4  point in time.  Actually filming a news release for
5  you, isn't he?
6        MR. LANIER:  Yes, and they put it out.  It
7  doesn't make him an agent.
8        THE COURT:  When he is working for you, and he
9  is making a news release --
10        MR. BROCK:  I don't think he becomes our agent
11  because he is giving a talk, no.  An independent
12  physician.
13        THE COURT:  It is not a talk, is it a press
14  release that he was being used for.
15        MR. LANIER:  Yes, that's exactly right.
16        THE COURT:  I'm going to allow it.
17        (End of side-bar.)
18        MR. LANIER:  Ma'am I would like you to watch
19  one of the outtake clips, please.  Is there a way to
20  turn the -- can y'all see that okay?  That's okay.
21        (Video clip played for the jury.)
22  BY MR. LANIER:
23    Q.  Now, ma'am, those numbers that y'all put in
24  here, the guy who is the author with you, Loren Laine,
25  we'll go back to this, he can tell you five reasons,

Page 2976

1  and he was talking to the Merck people there getting
2  ready for that video press release why those numbers
3  are totally bogus?
4  A.  Well, he had never said that to me.  That's the
5  first time I have seen that.  This paper was written
6  before that.  I know he had made comments about them
7  being controversial, but that everyone accepted that
8  there was an increased risk, and these were really the
9  only numbers that were available.  If he hadn't agreed
10  with them we wouldn't have put them in the paper.
11    Q.  Ma'am, the truth is -- unless you wanted to
12  kind of -- I think the reason he put them in the paper
13  that way is he said the only way he would do it is if
14  you said it has been estimated because he says it is
15  true it has been estimated, it is just wrong, so he can
16  truthfully say it has been estimated.  It is just that
17  it is bogus.
18  A.  Well, Loren never said that to me, and he was
19  actually the person that drafted the first part of the
20  introduction, so it is possible he put those -- that
21  wording in.  I don't recall.  And he never told me he
22  had a problem with having it in the paper.
23    Q.  All right.  I will try to finish you, Your
24  Honor, in 30 minutes on Monday morning and, ma'am, what
25  I would like to urge you to do is I'm going to look

Page 2977

1   with you, please, in some more detail at the New
2   England Journal of Medicine when we start up, okay?
3   A.   Thank you.
4        MR. LANIER:  With that I'll rest right now for
5   this evening.
6        THE COURT:  All right.  The jury is excused
7   for the weekend.  Please don't discuss the case, and
8   we'll see you 9:00 Monday morning.
9        (The jury leaves the courtroom.)
10
11
12
13
14
15
16
17
18

C E R T I F I C A T I O N
I, REGINA A. TELL, C.S.R., R.P.R., C.R.R., License

7bf775cc-3bf5-422a-aae9-31c7ab106654