# Exhibit G

6/7/2006 Kronmal, Richard

1  ROBERT MCFARLAND,                          )
2                      Plaintiff,             ) SUPERIOR COURT OF
                                              ) NEW JERSEY LAW
3               vs.                           ) DIVISION: ATLANTIC
                                              ) COUNTY
4  MERCK & CO., INC.,                         )
                                              ) No. ATL-L-0199-04-MT
5                      Defendant.             )
                                              )
6  _____          )
                                              )
7  PATRICIA HATCH, Administrator of           )
   the Estate of STEPHEN HATCH,               )
8  Deceased and PATRICIA HATCH, In            )
   Her Own Right,                             ) SUPERIOR COURT OF
9                                             ) NEW JERSEY LAW
                                              ) DIVISION: ATLANTIC
10                     Plaintiff,             ) COUNTY
                                              )
11                                            ) No. ATL-L0403-05-MT
                                              )
12              vs.                           )
                                              )
13                                            )
                                              )
14 MERCK & CO., INC.,                         )
                                              )
15                                            )
                                              )
16                     Defendant.             )
                                              )
17 _____          )
18
19
20         DEPOSITION OF RICHARD A. KRONMAL, PH.D.
21                      June 7, 2006
22                  Seattle, Washington
23
24
25

---

6/7/2006 Kronmal, Richard

1                        EXAMINATION INDEX

2  EXAMINATION BY:                                  PAGE NO.
3  MR. RABER                                          12
4  MR. BUCHANAN                                       287
5  MR. RABER                                          329
6  MR. BUCHANAN                                       354
7  MR  RABER                                          355
8
9
10
11                       EXHIBIT INDEX
12    EXHIBIT NO.       DESCRIPTION                 PAGE NO.
13
14 Exhibit No. 1       In Re Vioxx Litigation Report    12
                       of Richard A. Kronmal
15
   Exhibit No. 2       In re Vioxx Litigation,          12
16                     Addendum to Report of
                       Richard A. Kronmal, May 23,
17                     2006.
18 Exhibit No. 3       Notice of Videotaped Oral        15
                       Deposition
19
   Exhibit No. 4       Supplement to Exhibit 1,         21
20                     Pages 38 and 39, last page
                       unnumbered.
21
   Exhibit No. 5       Document entitled               119
22                     "Hypotheses."
23 Exhibit No. 6       "Intention-to-Treat Analysis    143
                       in Randomized Trials: Who
24                     Gets Counted?" By Milo
                       Gibaldi, Ph.D., and Sean
25                     Sullivan, Ph.D.

3

---

6/7/2006 Kronmal, Richard

1                     APPEARANCES
2
3  For Plaintiff McFarland:
4
          David R. Buchanan
5         Seeger Weiss LLP
          One William Street
6         New York, NY 10004
          212.584.0700
7
8
   For Plaintiffs:
9
10        Christopher Tisi
          Ashcraft & Gerel
11        2000 L Street, NW
          Suite 400
12        Washington, D.C. 20036
          202.783.6400
13
14
   For the Defendant Merck:
15
16        Stephen D. Raber
          Paul Bochm
17        Williams & Connolly, LLP
          725 Twelfth Street, N.W.
18        Washington, D.C  20005
          202.434.5538
19        202.434.5029 Fax
20
21
22
23
24
25

2

---

6/7/2006 Kronmal, Richard

1
2                      EXHIBIT INDEX
3     EXHIBIT NO.      DESCRIPTION                  PAGE NO
4  Exhibit No. 7       "Prospective evaluation of a     169
                       prostacyclin-sparing aspirin
5                      formulation and
                       heparin/warfarin in aspirin
6                      users with unstable angina or
                       non-Q wave myocardial
7                      infarction at rest," by
                       Cohen, et al.
8
   Exhibit No. 8       Figure 3. Comparison of MI      182
9                      Rates Among Subjects
                       Receiving Placebo vs
10                     Rofecoxib or Celecoxib.
11 Exhibit No. 9       Table 5  Incidence of Serious   209
                       Adverse Events after
12                     Randomization.
13 Exhibit No. 10      "Risk of cardiovascular         216
                       events and rofecoxib:
14                     Cumulative meta-analysis," by
                       Jüni, et al.
15
16
17
18          (Request marked testimony on Page 193.)
19
20
21
22
23
24
25

4

6/7/2006 Kronmal, Richard

```
 1              BE IT REMEMBERED that on Wednesday,
 2   June 7, 2006, at 4507 Brooklyn Avenue NE, Seattle,
 3   Washington, at 9:43 a.m., before KARMEN M. FOX, CCR,
 4   RPR, CRR, Notary Public in and for the State of
 5   Washington, appeared RICHARD A. KRONMAL, PH.D., the
 6   witness herein;
 7              WHEREUPON, the following proceedings
 8   were had, to wit:
 9
10              <<<<<< >>>>>>
11
12   (Conference call with Judge Higbee via speakerphone.)
13
14              MR. BUCHANAN:  Good morning, Judge.
15   Dave Buchanan here with Mr. Raber at the deposition of
16   Dr. Kronmal.
17              JUDGE HIGBEE:  Okay.
18              MR. BUCHANAN:  This is the discovery
19   deposition of Dr. Kronmal.  And when I brought
20   Dr. Kronmal into the room today, I noticed that there
21   was actually a video camera and extensive video
22   equipment set up for the deposition.
23      It is a discovery deposition.  I'm advised by
24   Mr. Raber that the notice that was served, but
25   apparently served after I left on Monday to come here
```

5

6/7/2006 Kronmal, Richard

```
 1   for this deposition, reflects it's a videotape
 2   deposition.  We objected that the witness, frankly, is
 3   not dressed like he would be dressed in court.  And he
 4   was not prepared for it, and frankly, I think the
 5   notice is insufficient.
 6              JUDGE HIGBEE:  Does the notice
 7   say -- does the notice say anything about videotape?
 8              MR. RABER:  Yes.
 9              MR. BUCHANAN:  There was no notice
10   served prior to yesterday.  All other depositions that
11   were done, in my experience at least in the case that
12   I've been involved with of experts, have not been
13   video'd by the plaintiffs or the defense.  That's an
14   agreement that I was content to proceed with, with
15   respect to McFarland.
16      At no point in my discussions, in extensive
17   conversations with defense counsel about scheduling
18   depositions, has any deposition been noticed -- has it
19   been discussed that they would be noticed for
20   videotape.
21      There is a de bene esse deposition that has been
22   set for Dr. Kronmal at the end of this month that will
23   be videotaped, that was noticed by the plaintiffs, and
24   that, of course, his testimony will be recorded for
25   trial.
```

6

6/7/2006 Kronmal, Richard

```
 1      In prior instances -- and my experience is only
 2   Humeston at this point -- where there was going to be
 3   a discovery dep followed by a trial dep, at least of
 4   treaters, Your Honor had directed that the tape be
 5   turned off during the discovery portion of the
 6   treater, and then it could be turned on in the trial
 7   portion.
 8      So we object to going forward on this basis.
 9   And --
10              JUDGE HIGBEE:  All right.  Defense
11   counsel, anything you want to say?
12              MR. RABER:  Yes.  The notice was
13   served on Monday, June 5th, at 4:59, on the file and
14   serve, Your Honor.  We're not trying to pull a fast
15   one or anything here.  This is a deposition of a
16   witness that it's a little bigger than New Jersey,
17   because the lawyers in the California case have said
18   that they're going to use Dr. Kronmal's testimony as
19   an unretained expert.  There's been talk of using him
20   in the MDL.  So this deposition has been cross-noticed
21   for California and the MDL, in addition to New Jersey.
22      And we think that, in this day and age, video
23   depositions are nothing unusual.  The notices that
24   have been served in these cases have not -- none of
25   them have, you know, adhered to the ten days or the
```

7

6/7/2006 Kronmal, Richard

```
 1   twenty days, whatever the limitations are for this.
 2      Dr. Kronmal looks fine to me.  I said to
 3   Mr. Buchanan, if all my witnesses were this
 4   good-looking, I'd like to have them on camera.  And
 5   there's nobody here from California objecting to this.
 6      I think at a minimum, we have to have this
 7   videotape, Your Honor.  And a decision can be made
 8   later as to whether or not it's allowed to be used in
 9   any capacity.
10              MR. BUCHANAN:  Your Honor --
11              JUDGE HIGBEE:  All right.  I'm not
12   going to allow you to videotape the discovery
13   deposition.  I don't think it's appropriate.  You can,
14   of course, cross-notice and video notice the de bene
15   esse deposition, which is going to be in about a
16   month.  And if Counsel want to use that in their
17   cases, they can, but a discovery dep should not or
18   need not be videotaped.
19              MR. RABER:  Your Honor, but I have
20   the problem here that this has been cross-noticed in
21   California, and so I need to videotape it for that
22   particular matter.
23              MR. BUCHANAN:  I --
24              JUDGE HIGBEE:  I'm not going to let
25   you videotape it.  Is there somebody there from
```

8

1   California?

2         MR. RABER:  No, there's not.

3         JUDGE HIGBEE:  Well, then --

4         MR. RABER:  But the notice was

5   served, and --

6         JUDGE HIGBEE:  Well, then just

7   change your cross-notice and do it for the videotape.

8   I'm not going to accommodate the California litigation

9   by having our discovery deps videotaped.  When it's a

10  de bene esse dep, we can videotape it.

11        MR. RABER:  Do I understand Your

12  Honor's ruling, then, that no videotape is allowed for

13  California MDL or New Jersey?

14        MR. BUCHANAN:  Well, I think in

15  fairness, as I understood it, Your Honor, you're

16  ruling with respect to this in New Jersey.  And if the

17  defense wants to make an application to California

18        MR. RABER:  It's been noticed in

19  California and the MDL as a video.  And so my point

20  is, I think we need to videotape it  And --

21        JUDGE HIGBEE:  I have nothing to do

22  with that  I'm not going to -- and I don't know --

23  how would it be ever played in a California court as a

24  plaintiff's expert, when the plaintiff's attorney from

25  California is not even there?

1         MR. RABER:  It certainly could be

2  used for -- well, it's just a notice, Your Honor.

3  They don't have to show up.

4        JUDGE HIGBEE:  I know, because it's

5  not their deposition.  So your idea that they're going

6  to be using this deposition, they're going to use it

7  as a discovery dep, which is what everybody is going

8  to use it for.  And you don't need to videotape a

9  discovery dep; not in the MDL, not in California, not

10  here.  You do not need to videotape a discovery dep.

11  And it's not going to be used in California for a

12  trial deposition, when there's no plaintiff's lawyer

13  there.  I don't believe you're going to call

14  Dr. Kronmal as your witness.

15        MR. RABER:  No.  But Your Honor --

16        JUDGE HIGBEE:  And they're certainly

17  not to call them, unless they set up a videotape

18  deposition of him.

19        MR. RABER:  But certainly for

20  cross-examination purposes, should he appear live, we

21  have the right to have a video for impeachment, Your

22  Honor.

23        JUDGE HIGBEE:  No, you don't.

24  You'll have a transcript which you can use, which is

25  used in every case.  The de bene esse deposition will

1   be videotaped.  You'll have a transcript of the

2  discovery deposition.  If he says anything

3  inconsistent, you can use that transcript.

4        MR. RABER:  So do I understand --

5        JUDGE HIGBEE:  That's my ruling.

6        MR. BUCHANAN:  Thank you, Your

7  Honor.

8        MR. RABER:  So the ruling is, the

9  camera is off for all three cases, Your Honor?  Is

10  that what your ruling is?

11        JUDGE HIGBEE:  The ruling is, this

12  New Jersey deposition will not be videotaped.

13        MR. RABER:  Right.  But it is also a

14  deposition --

15        JUDGE HIGBEE:  It will not be

16  videotaped for any proceeding.

17    If you want to question Dr. Kronmal for the

18  New Jersey and then do something else for somebody

19  else, I guess -- there's nobody there for California.

20  There's nobody there for the MDL.  It's a discovery

21  deposition  You may not videotape it.

22        MR. RABER:  All right.  We'll follow

23  that order, but note our objection.

24        (Recess 9:50-10:01 a.m.)

25  ////

1         (Exhibit Nos. 1-2 marked

2         for identification.)

3

4   RICHARD A. KRONMAL, PH.D., having been first duly sworn

5         by the Notary, deposed and

6         testified as follows:

7

8

9             EXAMINATION

10  BY MR. RABER:

11  Q  Good morning, Dr. Kronmal.  My name is Steve Raber,

12    and I represent Merck in the Vioxx litigation --

13  A  Good morning.

14  Q  -- and we're here today for your deposition.

15    Before we get started, are you taking any

16    medications that would interfere with your ability to

17    give truthful and accurate answers today?

18  A  No.

19  Q  Do you have any physical condition that would

20    interfere with your ability to give truthful and

21    accurate answers today?

22  A  No

23  Q  I'd like to show you a document that has been marked

24    as Kronmal Exhibit 1.  Can you tell us what that is,

25    please?

6/7/2006 Kronmal, Richard

```
 1   A   That's my report for this proceeding.
 2                   MR. BUCHANAN:  You should probably
 3       try and date them in time, because you have multiple
 4       reports in the action.
 5                   THE WITNESS:  This is basically end
 6       of May?  What's the date on -- I don't remember the
 7       date.
 8           Well, I can look
 9                   MR. BUCHANAN:  For purposes of his
10       question, you can just identify, is this a report
11       regarding 2006 or 2005?
12                   THE WITNESS:  Yes, it's the report
13       from 3/20/2006.
14   Q   (By Mr. Raber)  I understand that for the Humeston
15       case in New Jersey, you filed a report in August of
16       2005, or thereabouts.
17                   MR. BUCHANAN:  It was April 2005.
18                   MR. RABER:  I'm sorry.
19   Q   (By Mr. Raber)  In 2005  And this report, Exhibit 1
20       here, was served in approximately April of 2006.
21   A   That's correct.
22   Q   Is that right?  Okay.
23   A   March.
24   Q   And did you serve an identical report for the MDL
25       proceeding in federal court in New Orleans?
```

13

6/7/2006 Kronmal, Richard

```
 1   Q   (By Mr. Raber)  Dr. Kronmal, can you just briefly tell
 2       us, what was your purpose in preparing the addendum to
 3       the report?
 4   A   Well, new information became available from Merck; a
 5       number of aspects.
 6           And in addition, I had been continuing my work on
 7       the Alzheimer's issues, and had new information on
 8       that, that I wasn't aware of before this time.
 9                   MR. RABER:  Let's mark this as
10       Exhibit 3, if we could.
11                   (Exhibit No  3 marked
12                   for identification.)
13
14   Q   (By Mr. Raber)  Dr. Kronmal, we've put in front of you
15       a document that's been marked as Exhibit 3.  I'll
16       represent to you that that's a Notice of Deposition
17       for today's deposition.  And if you look at Exhibit 3,
18       you'll see that it requests you bring some documents
19       with you today.
20           Do you see that?
21   A   Yes, I do.
22   Q   Have you brought any documents with you today?
23                   MR. BUCHANAN:  I'll just object
24       initially and state that due to travel and timing of
25       the deposition, as I indicated to you previously, I
```

15

6/7/2006 Kronmal, Richard

```
 1   A   I have not submitted --
 2                   MR. BUCHANAN:  Objection.  Form.
 3   A   On my own, I have not submitted this to anyone.
 4                   MR. RABER:  David, can we just
 5       stipulate that the report you served in the MDL is
 6       identical to this one?
 7                   MR. BUCHANAN:  They're identical --
 8                   MR. RABER:  Okay.
 9                   MR. BUCHANAN:  -- as it was served
10       in California, the same report there
11                   MR. RABER:  Okay.
12   Q   (By Mr. Raber)  Dr. Kronmal, can you please tell us
13       what Exhibit 2 is?
14   A   It's an addendum to my report.  It's dated May 23rd,
15       2006
16                   MR. BUCHANAN:  Before you
17       continue -- and, I'm sorry  I should have stated this
18       at the outset.  I don't know what the caption reads,
19       but the deposition today is noticed in the New Jersey
20       proceedings, MDL proceedings, and the California
21       proceedings, although I have not seen cross-notices
22       for California in the MDL.  It is proceeding by
23       agreement per my conversations with Mr. Cohen, Andy
24       Goldman, and myself.
25           Thank you, Counsel.
```

14

6/7/2006 Kronmal, Richard

```
 1       didn't see the deposition and the schedule until this
 2       morning  I shared it with Dr  Kronmal this morning
 3       And I do understand he's had an opportunity to review
 4       it.  And I believe that the hard drive that you'll see
 5       here --
 6   A   Well, the answer to the question is, I have most of
 7       the things that you requested here.  However, there
 8       are -- there's a very broad request, and there are
 9       some things that I have that are not included here.
10   Q   (By Mr. Raber)  Can you tell us what you have not
11       brought with you?
12   A   What I have not brought with me, I am precluded from
13       discussing with you because of a confidentiality
14       agreement I signed.
15   Q   With whom?
16   A   I'm not even sure I'm allowed to tell you that.
17   Q   Are they analyses of data and information?
18   A   Well, they're basically --  Let me put it this way:
19       There's nothing in them that is new or that would be
20       particularly relevant to this case.  I'm not allowed
21       to discuss it, as I understand it
22   Q   Do they relate to this case?
23   A   No.
24                   MR. BUCHANAN:  Well, let's be
25       clear --
```

16

```
 1              THE WITNESS:  Well, not in a direct
 2     sense, they don't relate to --
 3              MR. BUCHANAN:  Steve, can we go off
 4     the record here so I can provide some information?
 5              MR. RABER:  Yes.
 6              (Discussion off the record.)
 7
 8   Q   (By Mr. Raber)  Dr. Kronmal, do you have any documents
 9       that pertain to the analyses that you did in
10       connection with your opinions in Exhibits 1 and 2,
11       that you did not bring today?
12   A   Not -- again, it's complicated.
13          There are certainly data -- there are certainly
14       files that I constructed from Merck's files, that I
15       have not put on the hard drive.  I can even give them
16       to you, if you want.  They're basically copies of the
17       files that Merck provided, that you guys provided.
18       And if you want those, you can have them.  They're
19       just in a different format.  I have no problem with
20       giving them to you.
21          But beyond that, and the matter we talked about
22       before, I have not brought time sheets, bills,
23       invoices.
24              MR. BUCHANAN:  I think there's only
25       one bill, Steve, that's been provided to us.
```

```
 1              MR. RABER:  Off the record.
 2              (Discussion off the record.)
 3              (Answer on Page 17,
 4              Lines 12 through 23,
 5              read by the reporter.)
 6
 7              MR. BUCHANAN:  There's only one
 8     invoice, Steve, that --
 9              MR. RABER:  How about if I have him
10     testify, Dave?
11              MR. BUCHANAN:  Okay.  Well, I'm
12     trying to help you.
13              MR. RABER:  I know that you're
14     trying to help.
15   Q   (By Mr. Raber)  Can you estimate for us, Dr. Kronmal,
16       the total amount that you have billed for your time in
17       the Vioxx litigation?
18   A   In all Vioxx litigation?
19   Q   Yes.
20   A   Probably about $120,000, approximately.
21   Q   Do you know the approximate amount of the most recent
22       bill or invoice, that you said you didn't bring today?
23   A   I think it was twelve or fourteen thousand.  I'm not
24       absolutely sure.  It was for the MDL, not for this.
25   Q   Did you bring anything with you that's requested in
```

```
 1     that notice of deposition?
 2   A   Yes.  I brought basically everything that I had,
 3       except -- again, I didn't bring e-mails.  You're
 4       welcome to have those, too.
 5   Q   Okay.
 6   A   They're just, would you please meet me at this time or
 7       place; or, you know, when can we call each other.  You
 8       know, things like that.  But you're welcome to have
 9       them.
10   Q   I'll deal with Counsel on that.
11              MR. BUCHANAN:  And I'll reserve on
12       that, just so the record is clear.
13   A   Let me go over the rest of your list here, if you
14       don't mind.  I haven't had a chance to review this.
15          My publications or writings related to NSAIDS, I
16       don't actually know if I have -- if any of the
17       publications that I've written, there are reference to
18       say NSAIDS or not.  I just don't know.  I mean, I have
19       over 200 papers, and it's conceivable that in some
20       paper, you know, we said we adjusted for use of NSAIDS
21       and I wouldn't remember that.  So I didn't bring
22       anything.  There was no paper specifically on NSAIDS
23       that I have written.
24          I have some papers on aspirin, but you didn't ask
25       for those.  They're in my CV.
```

```
 1          I can't provide you with correspondence on
 2       relating to conduct of any pharmaceutical
 3       manufacturer, because the only correspondence I have
 4       with pharmaceutical manufacturers has to do with
 5       service on DSMBs.  And those are confidential, and I
 6       cannot provide them.
 7   Q   (By Mr. Raber)  Okay.
 8   A   You have my current syllabus.
 9          I'm sorry, I haven't taught any courses in the
10       last five years, so that's not relevant.
11          The rest of them aren't relevant.
12   Q   When you say not relevant, you mean you don't have
13       them?
14   A   I have not corresponded with the FDA and I have not
15       corresponded to the Congress.  I don't have any papers
16       under preparation at the moment on this matter.
17   Q   Okay.  And what numbered paragraphs were you referring
18       to when you said the rest of them are not relevant?
19       Can you just look and tell us what they are?
20   A   I don't know if you've been provided with the Rezulin
21       deposition that I gave within the last five years.
22       That's the only other one that there is.  I mean, you
23       had it at the previous deposition --
24   Q   Sure.
25   A   -- so I assume you have it now.
```

6/7/2006 Kronmal, Richard

```
 1   Q   Okay.  I just wanted -- the question is, which
 2       numbered paragraphs were you referring to when you
 3       said that the rest of these are irrelevant?  If you
 4       can just tell me the numbers.
 5   A   Sure
 6           11, 12, 15, 16.  And I already referenced 17 that
 7       I can't do.  18, 19, 20.
 8   Q   Okay.
 9               MR. RABER:  I want to mark the next
10       document as Exhibit 4.
11               (Exhibit No. 4 marked
12                 for identification.)
13
14   Q   (By Mr. Raber)  Dr. Kronmal, there's three pages that
15       are not fastened together yet, but they've been marked
16       as Exhibit 4.
17           Can you tell us what those three pages are?
18   A   Yeah.  The first two are corrections to Figure 10, 11,
19       and 12 of my report, Pages 38 and 39, where previously
20       I had erroneously marked a line that should have been
21       placebo as Vioxx.  And now they've been changed back
22       to placebo correctly.
23           And the third page of this document are a list of
24       references that I've looked at recently that relate to
25       a number of issues that conceivably could come up,
```

21

6/7/2006 Kronmal, Richard

```
 1       although I have no specific plans to bring any of them
 2       up.
 3   Q   Dr. Kronmal, I take it, then, that you carefully
 4       reviewed your report before today's deposition?
 5   A   I've reviewed it, yes.
 6   Q   And you made corrections because you wanted to ensure
 7       that your report was accurate?
 8               MR. BUCHANAN:  Objection.  Form.
 9   A   Well, I mean, for example, the change of the labeling.
10       Yeah, if I found anything inaccurate, I corrected it.
11   Q   (By Mr. Raber)  You knew that this report was
12       important as it relates to your opinions in the Vioxx
13       cases; true?
14   A   Absolutely.
15               MR. BUCHANAN:  Objection.  Form.
16   Q   (By Mr. Raber)  And you want to be careful to make
17       sure that your report is accurate?
18   A   Absolutely.
19   Q   And in reviewing your report, you found a couple of
20       errors that you are correcting by giving us Exhibit 4?
21   A   Yeah, absolutely.  Yes.
22   Q   And it's your belief that both Exhibits 1 and 2, your
23       report and the addendum to your report, are accurate?
24   A   To the best of my knowledge, they are, yes.
25   Q   And you stand by them?
```

22

6/7/2006 Kronmal, Richard

```
 1   A   Yes.
 2   Q   Did you meet with Counsel to prepare for your
 3       deposition today?
 4   A   Briefly, yes.
 5   Q   When?
 6   A   8:30 this morning.
 7   Q   With whom did you meet?
 8   A   What?
 9   Q   With whom did you meet?
10   A   With Dave Buchanan, Chris Tisi.
11   Q   What did you discuss?
12               MR. BUCHANAN:  Objection.  Just a
13       moment.  I thought we had an understanding that we're
14       not getting into dialogue back and forth between
15       witnesses and experts.  Is that a stipulation you're
16       not going to accept?
17               MR. RABER:  Well, I don't know
18       whether it is in the MDL in California.
19               MR. BUCHANAN:  I think it has held
20       true there, as well.  I mean, I thought that was the
21       working agreement in the MDL.
22               MR. RABER:  Okay.
23               MR. BUCHANAN:  If you're going to
24       violate it, we'll be violating it for everything   I
25       just want you to understand that.
```

23

6/7/2006 Kronmal, Richard

```
 1               MR. RABER:  All right.  We'll move
 2       on, then.  I seem to remember that, at least with
 3       Dr. Ray.
 4               MR. TISI:  Steve, while we're doing
 5       this, I want to make sure -- I'm here with my MDL hat
 6       on, as well as New Jersey.  Do you want me to object
 7       in accordance with the MDL pretrial order, or is
 8       Dave's objections, in your mind, preserving the MDL
 9       objections, as well?
10               MR. RABER:  I'll have to tell you, I
11       confess, I'm not familiar with what the MDL order is
12       on this issue
13               MR. TISI:  No, I'm talking about in
14       general.  Do you want to hear "objection" and
15       "objection" from both of us on every -- on questions
16       on form, et cetera?
17               MR. RABER:  If the substance of it
18       is covered by Mr. Buchanan's objection, I don't need
19       it in stereo.
20               MR. TISI:  That's fine.  I
21       appreciate that.
22               MR. BUCHANAN:  And again, I don't
23       know what the current state of that stipulation is.  I
24       caution you that it's a one-for-all rule.
25               MR. RABER:  We'll move on, then.
```

24

6/7/2006 Kronmal, Richard

```
 1    Q   (By Mr. Raber)  How long did you meet with
 2        Mr. Buchanan and Mr. Tisi?
 3    A   Well, I met yesterday for about seven hours and this
 4        morning for about an hour.
 5    Q   You met with both of them yesterday, as well?
 6    A   Yes.
 7    Q   I thought you just said you just met with them this
 8        morning.
 9    A   You asked me today.  That was your question.
10    Q   So you spent seven hours yesterday?
11    A   That's correct.
12    Q   Anytime before that?
13    A   We've talked on the phone occasionally.
14    Q   Your report has attached to it what I presume is the
15        most recent version of your CV?
16    A   It's the most recent that I've produced.  I mean,
17        there's certainly papers coming out, you know, every
18        other week or so.  So there may be some additional
19        paper.
20    Q   Aside from some additional papers, is it accurate?
21    A   Yes.
22    Q   Dr. Kronmal, do you plan to come testify live in
23        New Jersey for the trial that's set for September 11th
24        of this year?
25    A   I believe
```

25

6/7/2006 Kronmal, Richard

```
 1    A   I was asked, but I have refused
 2    Q   So I take it, as we sit here today, you have no plans
 3        to appear and testify live at that trial.  Is that
 4        correct?
 5    A   At this moment, that is correct.  It could change.
 6    Q   What could change that in your mind?
 7    A   If Dave were to request that I do so, I might
 8    Q   Okay.
 9    A   Again, it would depend on the timing.
10    Q   And why does it matter whether it's Dave requesting
11        you or someone else?
12    A   Primarily because most of the work I've done has been
13        for Dave, and I -- I value his advice as to when and
14        where I should appear.
15    Q   And by "Dave," you're referring to Mr. Buchanan?
16    A   That's correct.
17    Q   Dr. Kronmal, you're a biostatistician?
18    A   That's correct.
19    Q   What does a biostatistician do?
20    A   Well, it varies, obviously, with individuals.  But in
21        my case, I - well, there's a number of things I do.
22            I run a large center that has, as the primary
23        responsibility, the running of medical research
24        projects, primarily for the federal government  They
25        run the gamut of long-term, longitudinal studies,
```

27

6/7/2006 Kronmal, Richard

```
 1            MR. BUCHANAN:  Objection.
 2    A   I believe so.  I have no -- no formal arrangements
 3        have been made to this point.
 4    Q   (By Mr. Raber)  Do you understand that there is a
 5        trial that is going to begin in federal court in
 6        New Orleans in July of this year?
 7    A   Not specifically, no.
 8    Q   Have you been asked to come testify live at that
 9        trial?
10    A   No.
11    Q   Do you have plans to do that?
12    A   Not at the moment.
13    Q   Will do you it if asked?
14            MR. BUCHANAN:  Objection.
15        Do you even know when it is?
16            THE WITNESS:  No.
17            MR. TISI:  And I object.  We reserve
18        the right, as-the MDL, to ask Dr. Kronmal to testify
19        He may not know that.
20        Go ahead.
21    A   I don't know.  It would depend on the timing
22    Q   (By Mr. Raber)  Similar question  There's a trial set
23        to begin in California in Los Angeles later this
24        month.  Have you been asked to testify live at that
25        trial?
```

26

6/7/2006 Kronmal, Richard

```
 1        primarily in the area of cardiovascular disease.
 2            I also  I'm responsible for the running of
 3        several clinical trials  And I am a codirector of a
 4        large center that does clinical trial research in
 5        cystic fibrosis.
 6    Q   And a biostatistician, I take it you're not a medical
 7        doctor.  Correct?
 8    A   That's correct.
 9    Q   And a biostatistician, as I understand it, takes the
10        data from the clinical trials and analyzes the data
11        and helps report the data.  Is that a fair summary?
12    A   That's some of the things we do.  It's not entirely
13        what we do  I mean, I also am involved in designing
14        of clinical trials.  I have initiated -- helped
15        initiate clinical trials, where my expertise in the
16        medical areas was an important component of that.
17    Q   Would you agree with me that in analyzing and
18        reporting data, it's important to follow generally
19        accepted statistical rules and principles?
20    A   Absolutely.
21    Q   By doing that, you ensure that people are making valid
22        conclusions about data?
23            MR. BUCHANAN:  Objection.  Form.
24    A   In general, that's true, yes.
25    Q   (By Mr. Raber)  And these statistical rules help guard
```

28

```
1    against people making either misleading or erroneous
2    conclusions based on data; true?
3  A They help prevent that, yes
4  Q And they help with uniformity in terms of analyzing
5    and interpreting data; correct?
6  A Well, they provide some level of uniformity, but, you
7    know, like most fields, there's lots of ways of
8    analyzing data. There's no -- we're not asked to
9    conform to, you know, a whole set of specific rules.
10 Q But, for example, statistical significance would be a
11   generally accepted principle of statistics that's
12   followed?
13 A Yes, that's correct.
14 Q And the concept of statistical significance is one
15   that statisticians rely on so that conclusions --
16   strike that.
17   Statistical significance helps us identify
18   outcomes that occur by chance versus outcomes that are
19   actually caused by something or associated with
20   something.
21   Is that a fair statement, generally?
22        MR. BUCHANAN: Objection. Form.
23 A Generally it's correct, yes.
24 Q (By Mr. Raber) Because we recognize -- for example,
25   if I take five or six coins and flip them in the air
```

```
1    If you're looking at calories of drinks and you
2    were comparing sodas against, let's say, fruit juices,
3    would you agree with me that lumping diet sodas
4    together with sodas that have sugar in them, for
5    caloric content, that those would be heterogeneous?
6    In other words, you probably shouldn't lump them
7    together as sodas in one category when you're looking
8    at calories?
9         MR. BUCHANAN: Objection.
10   Incomplete hypothetical.
11 A It depends on what your purpose was in lumping them
12   together. If you wanted to be able to say, for
13   example, that country X, what is the total calorie
14   consumption from taking soda, then lumping together
15   would be perfectly reasonable.
16 Q (By Mr. Raber) Right. If you wanted to conclude, for
17   example, that sodas had fewer calories than fruit
18   juices, it would probably be misleading to combine
19   diet sodas with the sodas with sugar in them; correct?
20 A Again, it would depend how much you wanted to prove.
21   If you wanted to say that the amount of calories
22   from soda consumption was the same or different from
23   the amount of calories in, say, some community or
24   countries or whatever, was different from the amount
25   of calories consumed from fruit juices, it would be
```

```
1    at the same time and it comes up five to one, that
2    kind of thing happens by chance?
3  A With certainly probability, yes, that's correct.
4         MR. BUCHANAN: Objection to form.
5  Q (By Mr. Raber) Is there a concept in statistics
6    called heterogeneity?
7  A Yes
8  Q What is that?
9  A It just means that within the set of results, there is
10   differences between various components of the -- that
11   make up the whole, if you want to look at it that way.
12 Q So is it fair to say that the test for heterogeneity,
13   one of its purposes is to make sure that you're
14   comparing apples with apples instead of apples and
15   oranges?
16 A In a very broad sense, that's true.
17 Q Okay
18 A It's not -- that's not entirely the case, but it's
19   close.
20 Q Is heterogeneity an important statistical principle to
21   follow in analyzing and reporting data?
22        MR. BUCHANAN: Objection to form.
23 A It depends on the context
24 Q (By Mr. Raber) Let me give you an example, and you
25   tell me whether this is an example of heterogeneity
```

```
1    perfectly reasonable to combine them.
2    If you were, on the other hand, interested in
3    whether the specific source for the calories was the
4    same, then of course not.
5    And then again, fruit juices, you would have to
6    say what kind of fruit juice. I mean, it's --
7  Q But if you're interested in the specific source on the
8    sodas, did I hear you to say that it would not be
9    proper to combine diet soda with regular soda?
10 A Again, it depends on what your purpose is. If your
11   purpose was to summarize the overall amount of
12   calories that people were taking in sodas, it
13   would be perfectly reasonable to combine them.
14 Q I'm asking about if you're comparing, say, that sodas
15   have fewer calories than juices.
16        MR. BUCHANAN: Objection
17   Incomplete hypothetical.
18 A That question doesn't make sense, because you would
19   have to say, does sodas of kind X have fewer calories
20   than fruit juices of kind Y
21 Q (By Mr. Raber) Give me an example in my hypothetical
22   of sodas versus fruit juices of where it would be
23   improper to combine diet soda with regular soda.
24        MR. BUCHANAN: Objection. Form.
25   Incomplete hypothetical.
```

1    You can answer if you can.
2           MR. RABER:  By the way, while we're
3    at it here, I don't want to have any coaching of the
4    witness, David.  You can object to form and that's
5    sufficient.  You don't need to say other things.
6           MR. BUCHANAN:  I have been at
7    numerous depositions where that has been done by your
8    side --
9           MR. RABER:  We're not going to do
10   it.
11          MR. BUCHANAN:  You don't think
12   that's necessary to protect the record?
13          MR. RABER:  No.
14          MR. BUCHANAN:  Oh, okay.
15   Can you read back the question, please?
16          MR. RABER:  Particularly in federal
17   court.
18          MR. BUCHANAN:  This is a
19   cross-noticed deposition, and we're going to have to
20   deal with those issues all day.
21   Q  (By Mr. Raber)  Go ahead, Doctor.
22          MR. BUCHANAN:  Could you read back
23   the question, please?
24   ////
25   ////

1    are.
2           MR. BUCHANAN:  My objection is
3    proper under New Jersey practice --
4           MR. RABER:  David, I don't need to
5    commit to something that's going to apply once and for
6    all from now until the end of time.  I'm saying for
7    today's deposition, this is how we're going to do it.
8           MR. TISI:  In fairness, we have
9    other depositions coming up that are cross-noticed
10   similarly.
11          MR. RABER:  That's fine.
12          MR. TISI:  I'm willing to abide by
13   whatever rules you're willing to abide by, Steve.  So
14   you should probably --
15          MR. RABER:  I'm saying, I'm
16   following the rules that say no speaking objections.
17   So let's do that.
18          MR. TISI:  If that's the rule, I
19   expect it to be the rules across the board.
20          MR. RABER:  I'm not going to agree
21   to anything with anybody, because other lawyers may
22   not agree to stuff.
23      Stop interfering with the nonsense.  Let's go by
24   the rules and do this deposition.
25          MR. BUCHANAN:  I'm not going to deal

1           (Question on Page 32,
2            Lines 21 through 23,
3            read by the reporter.)
4
5    A  Well, it -- yeah, for example, if your question was,
6       does regular soda have more or less calories than
7       fruit juices, you wouldn't want to include diet soda.
8          If your question was, does diet soda have more or
9       fewer calories than fruit juices, you wouldn't want to
10      combine regular soda.
11   Q  (By Mr. Raber)  And that's because regular soda and
12      diet soda are different with regard to calorie
13      content?
14   A  Absolutely.
15          MR. BUCHANAN:  And just before you
16   go on, Counsel, because I'm taking some cross-noticed
17   deps next week, same deal?  Whatever you do here today
18   applies against your witnesses next week?
19          MR. RABER:  My practice is, if you
20   object to the form, you object to the form.  You don't
21   need to have a talking objection.
22          MR. BUCHANAN:  It's not your
23   practice.  It's going to be the arrangement.  I want
24   to know whether we have an agreement --
25          MR. RABER:  That's what the rules

1    with your lectures, Steve.  I think it was a proper
2    objection under New Jersey practice, but if you say
3    that because it's cross-noticed, there's an umbrella
4    that makes it improper, I'll object according to your
5    rules.  And I'll --
6           MR. RABER:  You don't need to do
7    speaking objections, as far as I'm concerned.  I will
8    not take the position that you've waived it.
9           MR. BUCHANAN:  You took the position
10   that they were improper, and you took the position
11   that objection was improper.
12          MR. RABER:  Right.  It's a speaking
13   objection.
14          MR. BUCHANAN:  I just want to
15   know --
16          MR. RABER:  Well --
17          MR. BUCHANAN:  -- that I'm dealing
18   with these depositions prospectively.
19   Go ahead.  I'm guided.
20          MR. RABER:  You can talk to whomever
21   you need to talk to at that deposition.
22   Q  (By Mr. Raber)  Dr. Kronmal, can you tell me -- I've
23      noticed in your report in a number of places, you
24      referred to something called an ITT analysis.
25   A  That's correct.

1 Q   Can you tell us what your definition is of an ITT
2     analysis?
3 A   An ITT analysis is where you basically include
4     everyone that you possibly can who was randomized in
5     the trial analyses of the data, for the full course of
6     the trial
7 Q   Is there some source or publication that you're
8     relying on for that definition?
9 A   I mean, I've taught courses in clinical trials for
10    several decades, and it is absolutely a standard
11    concept that is used by everyone in the field.
12        So I'm not relying on a specific source. If you
13    want some, the two books that I gave you in that
14    supplemental list define ITT analyses exactly that
15    way.
16 Q  Is there any time limit about how long you follow
17    people, in your definition of an ITT analysis?
18 A  You follow people to the end of the -- of the designed
19    study.
20 Q  Is the data better the longer you follow people?
21 A  It's better if you follow them to the end of the
22    study, whatever it is.
23 Q  What if you have data that goes a few months beyond
24    the end of the study? Is it better to include that in
25    your analysis?

37

1 Q   Is there anything wrong or inappropriate in analyzing
2     the data that goes beyond week 210?
3         MR. BUCHANAN:  Objection.  Form.
4 A   Again, it would depend on how they ascertained that
5     data.  And beyond that, the -- what you make your
6     judgments on in clinical trials is your pre-specified
7     analyses, unless there's some very, very strong reason
8     not to use those.  And Merck pre-specified that 210
9     was going to be their analyses, and that's what I
10    used.
11 Q  (By Mr. Raber)  Did you do any analyses of the data
12    that went beyond week 210?
13 A  No.
14 Q  Were you curious about that?
15 A  Merck had done it -- I had their results.  I knew what
16    it showed.
17 Q  Well, Merck had done the analysis for the week 210
18    also, hadn't they?
19 A  Yes.
20 Q  Then why did you do your own analysis?
21 A  Because that's what I was mandated to do.
22        And further, Merck did not present MI and hard CHI
23    analyses in their report.
24 Q  They provided the raw numbers and you did the
25    analysis; correct?

38

1 A   It would depend on how those events are ascertained.
2         MR. BUCHANAN:  Belated objection to
3     form.
4         MR. TISI:  I was just going to
5     object too.
6 A   If they're ascertained in a unbiased fashion, then
7     they can be included.  However, it's extremely
8     unusual, if not -- in my experience, I don't know of a
9     single study where people included events that
10    occurred beyond the end of the study.
11 Q  (By Mr. Raber)  Well, for example, we've seen the
12    extension data for the APPROVe study.
13 A  Right.
14 Q  Correct?
15        And there was data that ran to week 210; correct?
16 A  That's correct.
17 Q  And then there was data that ran beyond that for
18    certain periods of time; true?
19 A  That's correct.
20 Q  And I noticed in your report that you did an analysis
21    of the data that ended at week 210.
22 A  That's correct.
23 Q  Why did you do it that way rather than looking at the
24    data that went beyond that?
25 A  Because that was Merck's pre-specified endpoint.

38

1         MR. BUCHANAN:  Objection.  Form.
2 A   They provided the specific data files, and I did the
3     analysis, that's correct.
4 Q   (By Mr. Raber)  Dr. Kronmal, what is your definition
5     of a subgroup?
6         MR. BUCHANAN:  Objection.  Form.
7 A   Well, that's a hard one, in the sense that people use
8     the term loosely.
9         Generally a subgroup is some subset of the overall
10    population, but people also use it to specify subsets
11    on events; for example, different time periods, things
12    like that.  But generally speaking, it's some subset
13    of the population.
14 Q  (By Mr. Raber)  How do you use the term?
15 A  When I use it, I generally use it as a subset of the
16    population.
17 Q  Is there any source that you are relying on for that
18    definition?
19 A  Again, it's so standard, that I don't think there's
20    anybody who specifically writes down the subgroup.
21    It's completely standard.
22 Q  I want to talk to you, if I can, about this concept of
23    something called a nonproportional hazard.
24        Are you familiar with that concept?
25 A  Absolutely.

40

6/7/2006 Kronmal, Richard

```
 1   Q   Can you tell us generally what that is?
 2   A   Yeah.  Again, it's hard to put this into lay terms,
 3       but when you have events occurring across time, you're
 4       interested in -- at times, you may be interested in
 5       whether or not the risk difference, the risk ratio,
 6       really, the ratio of the two risks stays constant as
 7       you go across time.  That would be considered to be
 8       proportional hazards.
 9           Nonproportional hazards would mean the risk is
10       changing with time in some way.
11   Q   I noticed in looking at the KM curves that you
12       prepared in this case, that you used something called
13       linear time on the X axis for your KM files.  Is that
14       correct?
15   A   Well, I plotted them -- that's -- to plot it that way
16       is completely standard.  You wouldn't want to plot on
17       some other scale because it would not allow you to
18       easily read off what the actual rates were at a given
19       time point.
20   Q   Are there different ways to analyze this question
21       about whether or not a ratio is constant over time or
22       changes over time?
23   A   Yeah, there's lots of different ways.
24   Q   Okay.
25   A   Probably a dozen different methods that could be used.
```

6/7/2006 Kronmal, Richard

```
 1   Q   Can you tell us what some of the more commonly used
 2       methods are?
 3   A   There's certainly the Schoenfeld residuals.  A lot of
 4       times, people look at interactions with log time.
 5       Sometimes people use linear time.  Sometimes people
 6       use graphical methods.
 7           There are others.  I just don't remember the
 8       specific names of them.
 9   Q   Okay.  The four that you've mentioned -- Schoenfeld,
10       interaction with log, linear time, and graphicals --
11       are those all appropriate statistical methods to
12       analyze whether or not a ratio is constant over time
13       or changing over time?
14           MR. BUCHANAN:  Objection.  Form.
15   A   And again, in the context that you decided on which
16       one to use, the one you decided to use is the one you
17       should use.  That should be the one you do and one you
18       would report.
19           The general standard in the field is to use log or
20       Schoenfeld residuals.  That's by far the most commonly
21       used, but it's not the only ones.
22   Q   (By Mr. Raber)  Is it a fair statement that certain of
23       these tests or methods fit different data better than
24       others?
25           MR. BUCHANAN:  Objection.  Form.
```

6/7/2006 Kronmal, Richard

```
 1   A   You shouldn't pick the method without -- unless -- you
 2       should pick the method before you've seen the data.
 3       So that question can't be answered
 4   Q   (By Mr. Raber)  Is it common that when analyzing
 5       whether or not a ratio was constant over time, you use
 6       more than one method to try to answer that question?
 7           MR. BUCHANAN:  Objection.  Form
 8   A   No, it's not common that -- that doesn't mean people
 9       don't do it, but it's not common.  And you shouldn't
10       pick the one that gives you the highest p-value -- the
11       smallest p value, for example.  You should pick the
12       one you pre-specify.
13   Q   (By Mr. Raber)  What if you specify multiple tests and
14       methods?  Is there anything inappropriate about doing
15       more than one, applying more than one method to this
16       question, in your view?
17           MR. BUCHANAN:  Objection.  Form.
18   A   It would be inappropriate to do multiple methods and
19       then -- and then report the one that you like the
20       best, after the fact.  That would be inappropriate.
21   Q   (By Mr. Raber)  Well, isn't this a way of -- isn't it
22       true, Doctor, that when looking at this question,
23       there's something called a null hypothesis?
24   A   That's correct.
25   Q   And the null hypothesis would be that the rates are
```

6/7/2006 Kronmal, Richard

```
 1       constant over time?
 2           MR. BUCHANAN:  Objection.
 3   A   The rate ratio is constant over time, yes.
 4   Q   (By Mr. Raber)  And if you were to do a test that
 5       found an insignificant p-value, that would simply fail
 6       to reject the null hypothesis.
 7           Are you following me?
 8   A   That's correct.  That's correct.
 9   Q   You haven't proven that the rates are the same.
10       You've just failed to prove that they're different.
11       Correct?
12   A   That's correct.
13   Q   Okay
14   A   That's right.
15   Q   If you do another test on that same data which gives
16       you a statistically significant number for the
17       nonproportionality test, that would allow one to
18       conclude that the null hypothesis has been rejected
19       using that method; correct?
20   A   No, it's not correct
21   Q   What's wrong with that?
22   A   Because if you do multiple tests of different kinds,
23       you can't pick the one that's significant and say, on
24       the basis of that, I reject the null hypothesis.  That
25       is improper, completely.
```

6/7/2006 Kronmal, Richard

```
 1   Q   Are you familiar with the concept of a data fitting
 2       problem when it comes to nonproportional hazard
 3       testing?
 4   A   Sure.
 5   Q   And what does that describe?
 6   A   I assume you mean that whatever model you fit wasn't
 7       proper, wasn't the correct model.  But that's --
 8       again, those are after-the-fact determinations and
 9       those are not of any real validity.
10           You can't look at data after you've seen it
11       then say, oh, I've looked at it and I see that it now
12       looks like this or looks like this, whatever, and then
13       say, oh, I'm going to make a test that is going to be
14       significant for what I actually saw.
15           That's improper.  That's a standard principle that
16       you don't do tests after you've looked at -- you don't
17       make up your test that you're going to use after
18       you've examined the data for the pattern that you see.
19   Q   But if you say, before you look at the data, that
20       you're going to do certain tests, that's appropriate;
21       correct?
22   A   Sure.
23   Q   What approach have you used in your opinions in this
24       case to analyze the nonproportional hazard?
25   A   I used Schoenfeld residuals.
```

6/7/2006 Kronmal, Richard

```
 1   Q   Why did you use that particular test?
 2   A   It's pretty much what's considered to be the standard
 3       in the field.
 4   Q   How does that differ from the interaction with log
 5       tests?
 6   A   It's very similar.  They're approximately the same.
 7   Q   How does it differ from the linear test?
 8   A   It's quite different.
 9   Q   In what way?
10   A   The linear test weights all of the times about the
11       same.  The log test brings in the extreme - the ones
12       at the extreme end -- the events that occurred in the
13       extreme end.  And there's a good reason for doing
14       that, is that you don't want the -- at the end of
15       trials, you tend to have lower exposure rates because
16       people have been dropped out, people have had events,
17       and so on.  So you don't want to tend to over-weight
18       the data in the tail end of the time distribution.
19       And for that reason, you generally don't use linear.
20   Q   Have you used the linear model or method in any of
21       your studies?
22           MR. BUCHANAN:  I'm sorry.  Just --
23       for this case, or generally?
24           MR. RABER:  No.  Generally.
25   A   I don't really know.  I don't remember.  I mean, I
```

6/7/2006 Kronmal, Richard

```
 1       might have.  You need to test proportional hazards a
 2       lot.
 3           I don't put a whole lot of weight on the testing
 4       of proportional hazards, frankly, because in the end,
 5       what you're interested in is the average hazard ratio.
 6       You don't really care whether there's some
 7       fluctuations in it over time.  That's really usually
 8       relatively irrelevant.
 9           So, you know, perfunctorily, I have done tests for
10       proportional hazards on papers.  I don't remember
11       whether I used Schoenfeld residuals -- I might have in
12       some cases.  I might have even used linear in some
13       cases.  But I would have pre specified it, in any
14       event.  And I wouldn't have done five different tests.
15       I would have done the one test and then been done with
16       it.
17   Q   (By Mr. Raber)  I take it, though, that there's no
18       generally set rule for which model or method to use in
19       analyzing nonproportional hazard.  True?
20           MR. BUCHANAN:  Objection to form.
21   A   Well, there's nobody that writes rules for how you do
22       things.  You do what is thought to be the best method
23       that's available, you know, in terms of the context of
24       your particular problem.
25   Q   (By Mr. Raber)  Let's see, Dr. Kronmal.  I'd like to
```

6/7/2006 Kronmal, Richard

```
 1       ask you some questions about Exhibit 2, which is
 2       your --
 3           MR. BUCHANAN:  The skinny one?
 4   Q   (By Mr. Raber)  addendum to your report.
 5   A   Yes.
 6   Q   Now, this addendum to your report generally includes
 7       two matters.  It includes a supplement relating to
 8       your Alzheimer's analysis, and it includes something
 9       called the APPROVe extension analyses; correct?
10   A   That's correct.
11   Q   I want to focus, if we can, on the APPROVe extension
12       analyses.
13   A   Sure.
14   Q   You believe that your analysis of this extension data
15       is important to your opinions in this case; true?
16   A   It's one of the aspects of my opinions.  I don't think
17       it's crucial to it, but it's important.
18   Q   And you have concluded in your analysis that the data
19       from the APPROVe extension analysis is consistent with
20       other findings you made in your original report; true?
21   A   That's correct.
22   Q   Specifically, you state in your addendum that this new
23       data shows that the risk of Vioxx actually increases
24       when a person is off-drug.
25   A   No, I didn't say that.  I said it was similar.
```

```
1    Q   Similar?
2    A   Yeah.
3    Q   Similar in what way?
4    A   That the overall risk ratio basically did not change
5        when you added on the off drug extension data.
6    Q   And in fact, in your report, you concluded that in
7        several measurements, the relative risk actually
8        increased when you added the off drug data.
9    A   That's correct.  That was actually based on Merck's
10       own reporting of the data.
11   Q   And your analysis of the data?
12   A   And mine.  Both.
13   Q   And you felt that your analysis of this extension data
14       confirms the opinions that you've given in your
15       original report?
16           MR. BUCHANAN:  Objection to form.
17   A   Confirms?  I mean, what I said in the original report
18       doesn't need confirmation.  It just adds additional
19       data.
20   Q   (By Mr. Raber)  Well, look at Page 5, if you would, of
21       your Exhibit 2.  The very last paragraph of your
22       addendum says, "Finally, the extension also supports
23       the possibility, first suggested by the Alzheimer's
24       078 trial results, that the elevated risk associated
25       with rofecoxib might extend beyond the time when the
```

```
1        is that it is likely that rofecoxib does some damage
2        to the body that persists for some time after the drug
3        is discontinued."
4            That's your opinion?
5    A   That's my opinion.
6    Q   There's one problem with that opinion, isn't there,
7        Dr. Kronmal?
8    A   What is that?
9    Q   That your analysis is wrong in this addendum to the
10       report.
11           MR. BUCHANAN:  Objection to form.
12   A   Well, are you saying that Merck's analysis is
13       incorrect?
14   Q   (By Mr. Raber)  No.  I'm saying that your analysis and
15       what you wrote in this extension [sic] is wrong.
16   A   On what basis?
17           MR. BUCHANAN:  Objection to form.
18   Q   (By Mr. Raber)  Well, let's look at it.
19           Do you have -- you have that in front of you.  I
20       think you may need to have also the Merck data that
21       was submitted to the FDA.
22           Do you have that on your computer?
23   A   I do.
24           Okay.
25   Q   First of all, on Page 4 of your report -- I'm sorry.
```

```
1        patient stopped taking rofecoxib."
2            True?
3    A   That's correct.
4    Q   And that's what this data and your analysis told you?
5    A   That's correct.
6    Q   And the last sentence -- last two sentences, you say,
7        "This indicates that the off-drug contribution to the
8        ITT RR was actually greater than seen during the
9        on-drug RR or the APTC endpoint."
10   A   Actually, there's a typo.  That should have said "for
11       the ATPC endpoint."  It refers back to the previous
12       sentence.
13           Yeah.
14   Q   And what you mean by that is, when you analyzed these
15       relative risks, you found that when you added in the
16       data for people who were off the drug, your analysis
17       told you that the relative risk actually increased.
18   A   For that particular endpoint.  It wasn't my analysis.
19       It was Merck's.
20   Q   Well, it's your analysis, isn't it?
21   A   No.  It's Merck's -- I just took that right off Merck's
22       report.
23   Q   Okay.
24   A   I don't --
25   Q   And you state here, "The overall implication of this
```

```
1        Let's go to Page 5, Dr. Kronmal.
2            MR. TISI:  Of the addendum?
3            MR. RABER:  Of the addendum.
4    Q   (By Mr. Raber)  Halfway through the last paragraph,
5        you state, "For example, for thrombotic events, the
6        on-drug RR reported in the NEJM paper is 1.86."
7            Do you see that?
8    A   That's correct.
9    Q   That's wrong, isn't it?
10   A   Not as far as I know.
11   Q   In fact, the number is 1.92, isn't it?
12   A   If it is, I misread it from the table.  But if you can
13       show it to me that it's wrong, I'll be happy with
14       1.92.
15   Q   I'll represent to you that it's 1.92.
16   A   Let me look at that paper, then.
17   Q   Okay.  You can do that?
18   A   Sure.
19           MR. BUCHANAN:  There's a printed
20       copy.
21           THE WITNESS:  Thanks.
22   A   Oh, I see.
23           Wait a minute.  Are you referring to the
24       thrombotic or APTC?
25   Q   (By Mr. Raber)  I'm referring to the thrombotic.
```

6/7/2006 Kronmal, Richard

1    A    Yeah, you're right.  It's 1.92.
2    Q    So your addendum report is incorrect?
3    A    Well, I mis-- I miscopied -- mistyped that number.
4    Q    Sir, your report is incorrect?
5    A    Oh, come on.
6              MR. BUCHANAN:  Objection.  Asked and
7         answered.
8    A    I mean, if I mistyped one number in there, it's not
9         incorrect.  1.86 is not different from 1.92 in any
10        substantive way.
11   Q    (By Mr. Raber)  Sir, in the sentence before, you made
12        the point, "In the APPROVe trial, this argument is
13        supported by the fact that the RR observed including
14        the extension is virtually identical to that seen for
15        the on drug analyses."  And then you compare the
16        numbers 1.86 to 1.74; correct?
17   A    Well, it's even -- yeah.  But 1.92 and 1.74, you're
18        talking about minuscule differences.
19   Q    Sir, the difference between 1.92 and 1.74 is greater
20        than what you've written in your report?
21   A    It is, but it is not substantially different --
22   Q    And you made a mistake in your report, didn't you?
23             MR. BUCHANAN:  Excuse me.  You're
24        talking over each other.  I'm going to interpose an
25        objection.  I'm going to object to form.

                            53

6/7/2006 Kronmal, Richard

1         You can answer.
2    A    The answer is, those are not important differences.
3    Q    (By Mr. Raber)  Sir, you made a mistake in your
4         report.
5    A    I did.  I miscopied that number, yes.
6    Q    And you not only miscopied it.  You made a statement
7         about the fact that the numbers were virtually
8         identical.
9    A    They're still virtually identical.  That statement is
10        still true.  So whether it's 1.92 or 1.86, it's the
11        same thing.  It's all within --
12   Q    But you got the numbers wrong.
13   A    I miscopied that number, as I said that
14   Q    All right.  Looking at Page 5 of your report, you
15        say -- I'm sorry.  Page 5 of your report, you say
16        that "For the APTC endpoint, the on-drug" --
17             MR. TISI:  I'm sorry.  Where are
18        you, Steve?
19             MR. RABER:  last paragraph on
20        Page 5
21   Q    (By Mr. Raber)  "For the APTC endpoint, the on-drug
22        relative risk was increased from from 2.06 in the NEJM
23        paper to the ITT RR of 2.36 now "
24             MR. BUCHANAN:  Okay.  Your question?
25   Q    (By Mr. Raber)  Are you with me, what you said in your

                            54

6/7/2006 Kronmal, Richard

1         report?
2    A    Yeah.
3    Q    And the APTC number from APPROVe is 2.06; correct?
4    A    That's correct.
5    Q    And you said that it increases to 2.36 on the ITT;
6         correct?
7    A    That's correct.
8    Q    And you've commented on that by saying that "This
9         indicates that the off-drug contribution to the ITT RR
10        was actually greater than seen during the on-drug RR
11        for the APTC endpoint"; correct?
12   A    Yes.
13   Q    You were making the argument that this shows that when
14        you add the off-drug deaths, the relative risk gets
15        higher; right?
16             MR. BUCHANAN:  Objection.  Form.
17        You said "deaths," by the way.
18   A    I was basically commenting that it was larger.  That's
19        a fact.
20   Q    (By Mr. Raber)  In fact, you're wrong, aren't you,
21        Doctor?
22   A    I don't know I'm wrong.  Why am I wrong now?
23   Q    Because the ITT relative risk for the APTC endpoint
24        actually decreased when you add the off-drug data,
25        didn't it?

                            55

6/7/2006 Kronmal, Richard

1    A    What are you referring to specifically?
2    Q    Look at Table B9, sir, of the Merck data to the FDA.
3             MR. BUCHANAN:  Objection.  Form.
4    Q    (By Mr. Raber)  Do you see that?  Can you tell us what
5         that table shows for the relative risk for the APTC
6         endpoint for ITT population at week 210?
7    A    Shows 1.86.
8    Q    Right.  That APTC number decreased; correct?
9    A    You're right.  I don't know  I can't figure out what
10        I did.
11   Q    Your addendum is wrong, isn't it?
12   A    It's certainly wrong on that number.
13   Q    And the conclusions you draw from those numbers are
14        wrong, aren't they?
15             MR. BUCHANAN:  Objection.  Form
16   A    I'd really need to look at the documents I had at the
17        time, because I just can't believe I would miscopy
18        that number.  So I want to look back and see what
19        actual documents I was looking at.
20   Q    (By Mr. Raber)  It's a pretty big mistake, isn't it?
21             MR. BUCHANAN:  Objection.  Asked and
22        answered
23   A    I made a mistake, obviously.  If the -- you know, I...
24   Q    (By Mr. Raber)  You're shaking your head
25             MR. BUCHANAN:  Objection to the

                            56

6/7/2006 Kronmal, Richard

```
1    characterization.
2  Q (By Mr. Raber)  You were shaking your head.
3  A I was, because I don't understand where I got that
4    number from.  And I know that I copied it from a Merck
5    report, from this -- from this thing.
6      So the question is, did I have another preliminary
7    version and this is the later version and they
8    changed?  I don't know.  At this point in time, I
9    can't.
10 Q Could it just be possible that Dr. Kronmal made a
11   mistake rather than Merck changing numbers?  Is it
12   possible?
13 A I'm capable of making mistakes.  It's possible.  I
14   obviously made a mistake in copying the number 1.92,
15   that you previously pointed out.
16 Q And not only did you make a mistake, but you made a
17   conclusion that is incorrect.
18        MR. BUCHANAN:  Objection.
19 A If I made a mistake, that conclusion was incorrect.
20   That's correct.
21 Q (By Mr. Raber)  And based on your mistake, that
22   finding is incorrect -- or I'm sorry -- is
23   inconsistent with the Alzheimer's data that you were
24   talking about in this report?
25 A It's not inconsistent.  It's just that the numbers are
```

57

6/7/2006 Kronmal, Richard

```
1    I did.  I'm fallible, although I can't imagine where I
2    got that number from.  But I'm fallible.  And if I
3    made that mistake, then that statement was too strong,
4    yes.
5  Q (By Mr. Raber)  It's not only too strong.  It's
6    incorrect.
7  A It's not incorrect.  There's not enough data to tell.
8      The point is, it's not inconsistent with it
9    going -- it staying up, but it doesn't prove it.  And
10   it's too strong, I admit it.  If those numbers that I
11   quoted were miscopied from someplace, then that
12   statement is too strong.
13 Q Dr. Kronmal, let's look at Page 4 of your extension --
14   of your addendum, please.
15     On Page 4 of your addendum, the third paragraph,
16   you say, "For MI, the RR comparing rofecoxib to
17   placebo is 2.11.  This is a small increase in relative
18   risk compared to the result for the 'on-drug' analysis
19   (RR = 2.07)."
20 A Mm-hm.
21 Q Correct?
22 A That's correct.
23 Q So you're making a point there again that the relative
24   risk is increasing when you look at the people who had
25   off-drug events?
```

59

6/7/2006 Kronmal, Richard

```
1    small and there's a lot of variability.  So -- but it
2    certainly wouldn't justify the strength of what I
3    said, yes.
4  Q But in fact, the number goes down instead of going up.
5  A Yeah, but I wasn't making a big point of it going up.
6    I was only trying to say that basically that the
7    off-drug experience didn't change the relative risk
8    much.
9  Q When you said -- the last sentence of your addendum
10   report says, "The overall implication of this is that
11   it is likely that rofecoxib does some damage to the
12   body that persists for some time after the drug is
13   discontinued."
14     You said that, didn't you?
15        MR. BUCHANAN:  Excuse me.  Just
16   objection to form.
17     You can answer.
18 A It's too strong a statement based on -- if those
19   numbers are correct -- and I have to check to see if
20   the earlier version -- see, the thing is, there were
21   two reports that came out on this subject.  And it's
22   conceivable the earlier one had different numbers in
23   it, because I can't believe I would have made that
24   mistake.
25     But assuming that I did -- and it's possible that
```

58

6/7/2006 Kronmal, Richard

```
1  A No.  I'm making the point that they're similar.
2  Q Well, you say "a small increase."
3  A That doesn't mean anything.
4  Q You didn't say "similar."  You said "a small
5    increase."  Right?
6        MR. BUCHANAN:  Objection to form.
7      You can answer.
8  A That's a -- I mean, when I say "a small increase," I
9    mean similar.  Even if it would have been a small
10   decrease, I would have said it's similar.  It doesn't
11   matter.
12 Q (By Mr. Raber)  In fact, isn't it true that the
13   relative risk actually decreases for MIs when you add
14   the off-drug data?
15 A They didn't in the data file I had.
16 Q Well, let's look and see.  I had a question for you.
17   If you can pull up Table B5 of the extension data.
18 A Yeah, that -- yeah, I've seen that data.
19 Q And B5 indicates that the number of heart attacks for
20   the people off-drug was ten in the Vioxx group and six
21   on placebo; correct?
22 A That's correct.
23 Q Now, my question is, if you have a relative risk
24   that's greater than two, how is it that adding ten and
25   six will cause that relative risk to go up?
```

60

6/7/2006 Kronmal, Richard

```
 1   A   It depends when the events occurred.
 2   Q   That's just impossible, isn't it?
 3   A   No, it's not impossible.  It depends when the events
 4       occurred.
 5   Q   Your analysis here is wrong, isn't it?
 6   A   I don't believe it is.  It's based on their data.
 7   Q   You don't want to admit it?  You're going to make us
 8       prove it?
 9           MR. BUCHANAN:  Objection, Counsel.
10       That's ridiculous.
11   A   You give me another data file that shows it's wrong,
12       and I'll be willing to admit it's wrong.
13   Q   (By Mr. Raber)  So you stand by your position on
14       Paragraph 3 of Page 4 of your addendum, you stand by
15       your statement here that there was a small increase in
16       relative risk compared to the result in the on-drug
17       analysis?
18   A   I stand by the fact that the file I used that was
19       given to me, that was Merck's file --
20   Q   Sir, please answer the question.
21           MR. BUCHANAN:  Objection.  Don't
22       interrupt him.
23   A   I am.
24           MR. BUCHANAN:  Can you read back the
25       prior question he was trying to answer before he was
```

6/7/2006 Kronmal, Richard

```
 1       rudely interrupted?
 2   Q   (By Mr. Raber)  Sir, my question --
 3           MR. BUCHANAN:  No.  He gets to
 4       finish his answer.
 5           MR. RABER:  David, stop it.
 6           MR. BUCHANAN:  You asked a question.
 7       He answers it.  You don't get to stop his answer
 8       Can you read the question back?
 9   Q   (By Mr. Raber)  Let's hear your answer  I have the
10       feeling I'm going to have to ask the question again.
11       Go ahead, Doctor.
12   A   The answer is, based on the file that I received, I
13       stand by what the analysis showed from that data
14       analysis.
15   Q   Do you stand by the statement in the addendum to your
16       report that this is a small increase in relative risk
17       compared to the result for the on drug analysis?
18   A   Absolutely.  That is a small increase.  A 11, whatever
19       the number was, is bigger than the other number.  But
20       that is based on that file
21       Now, if there's another file that has different
22       data, then it's a different issue.
23   Q   Well, we've seen that based on the file, you've made
24       two mistakes before this one.
25   A   No, that is incorrect.
```

6/7/2006 Kronmal, Richard

```
 1           MR. BUCHANAN:  Objection.  Form.
 2   Q   (By Mr. Raber)  Well, you made a mistake on the 1.92
 3       versus 1.86; right?
 4   A   You're not letting me answer the question.
 5   Q   You made a mistake.
 6           MR. BUCHANAN:  Objection.  Are you
 7       just going to hadger him, Steve, or are you going to
 8       let him answer the questions?  Okay?  There's four on
 9       top of each other.
10       Can you read back the last full question, please.
11               (Question on Page 63,
12                Lines 2 through 3,
13                read by the reporter.)
14
15   A   You asked me based on the file.  The mistake I made in
16       the previous instance was not based on any data files.
17       It was based on some misrecording on my part of, one,
18       the rate in the New England Journal of Medicine paper,
19       and potentially a misrecording of the rate in their
20       report, but had nothing to do with the data file.
21   Q   (By Mr. Raber)  Okay.
22   A   The result I reported there was based on the data file
23       that I had.
24       Now, if it turns out to be incorrect, then it
25       means that the data file was incorrect.
```

6/7/2006 Kronmal, Richard

```
 1   Q   So it's always somebody else rather than you?
 2           MR. BUCHANAN:  Objection.  Form.
 3   A   Always?
 4   Q   (By Mr. Raber)  You're saying somebody else must have
 5       made a mistake.
 6           MR. BUCHANAN:  Objection  Form.
 7       Hadgering.
 8           MR. TISI:  And I'm also going to
 9       object on behalf of the MDL.  I think the judge has
10       been very specific about being courteous to witnesses.
11           MR. RABER:  I'm being courteous.
12           MR. TISI:  You're being particularly
13       unprofessional and discourteous, and I'm going to make
14       an objection based upon that.
15           MR. RABER:  I wish we had the video
16       here, sir.
17           MR. BUCHANAN:  So do I.
18           MR. TISI:  Actually, I wish I could
19       pull that back.
20           MR. BUCHANAN:  I think you'd like to
21       listen to yourself, Counsel.
22   A   The answer is, I've admitted that if I miscopied those
23       numbers, that's a mistake, no doubt.  And I apologize
24       to David and them that I made that mistake.  I don't
25       understand how I did it.
```

6/7/2006 Kronmal, Richard

```
 1   Q   (By Mr. Raber)  Sir, how did you calculate a relative
 2       risk of 2 or --
 3   A   I used the data file.
 4   Q   Excuse me.  How did you calculate a relative risk for
 5       2.07 for MIs in the APPROVe base study?
 6   A   I took the data file that I had from the APPROVe study
 7       and I calculated it.
 8   Q   How many events were there in the Vioxx arm and the
 9       placebo arm?
10   A   I don't remember.  I don't remember.
11   Q   Is it possible that you made a mistake?
12           MR. BUCHANAN:  Objection.
13   A   It's always possible to make mistakes.  Obviously I've
14       already made some, apparently.  At least one for sure.
15       And the other one, probable.
16   Q   (By Mr. Raber)  Would you agree with me that just in
17       looking at this data, that if the MIs off drug are ten
18       to six, that it would be unusual for that to increase
19       a relative risk that's greater than two?
20   A   It would be.
21   Q   Does that suggest to you that maybe you made a
22       mistake?
23   A   It's unlikely, for the following reason:  That I just
24       took the data that was in that file and ran the
25       analyses.  And that is a standard process.  That
```

65

6/7/2006 Kronmal, Richard

```
 1   Q   Now, if you would look, please, at Table B5.
 2   A   Yeah.  Yeah.
 3   Q   Do you see that the number of events for sudden
 4       cardiac death plus myocardial infarction, it's
 5       fourteen for Vioxx and eleven for placebo?
 6   A   That is also correct.
 7   Q   Now, in looking at those numbers, does that suggest to
 8       you that when you add fourteen versus eleven events,
 9       that a relative risk that starts out above two is not
10       going to get bigger?
11   A   That's --
12           MR. BUCHANAN:  Objection.  Form.
13   A   That's correct also.
14   Q   (By Mr. Raber)  Does it appear to you that you've made
15       a mistake in your statements and calculations relating
16       to the results for hard CHD in your addendum?
17   A   What it suggests to me is that the file I had was not
18       correct or not up to date.
19   Q   So you're going to blame the file?
20           MR. BUCHANAN:  Objection to form.
21   A   I'm not blaming anything.  I'm just saying that's the
22       only explanation for it.  It's the only logical
23       explanation.
24   Q   (By Mr. Raber)  It appears to me that your statement
25       in the fourth paragraph on Page 4 of your addendum is
```

67

6/7/2006 Kronmal, Richard

```
 1       doesn't mean it's inconceivable, but it's fairly
 2       unlikely.
 3   Q   Could you have written down the wrong data or the
 4       wrong numbers?
 5   A   That's conceivable, but unlikely, for the following
 6       reason:  I don't tend to write down the numbers.  I
 7       tend to paste them in.  And   from the analysis
 8       files.  So again -- but, you know, given that I've
 9       made some of these mistakes, yeah, it's possible.
10   Q   Is it possible that you double counted some heart
11       attacks?
12           MR. BUCHANAN:  Objection.  Asked and
13       answered.
14   A   No, not unless they were in the file twice.
15   Q   (By Mr. Raber)  All right.  Let's look further down on
16       Page 4 of your addendum.  You say, "The results for
17       hard CHD are quite similar."
18   A   That's correct.
19   Q   "The RR is 2.45 compared to the on drug RR of 2.17."
20   A   Yes.
21   Q   And what you've concluded from that is that the
22       relative risk increased from 2.17 up to 2.45 when you
23       added the off-drug data for MI and sudden cardiac
24       death; correct?
25   A   That's correct.
```

66

6/7/2006 Kronmal, Richard

```
 1       incorrect.
 2           Would you agree with that?
 3           MR. BUCHANAN:  Objection.
 4   A   I don't know.  I haven't looked at the -- I mean, all
 5       I can say is that the file I had gave those results.
 6           Now, if there was a more recent file   and there
 7       are more recent files   that give a different result,
 8       then I'll say that whatever that different result is,
 9       is the result.
10           I'm not trying to make up data here.  This is what
11       I had.  And --
12   Q   (By Mr. Raber)  But you're drawing -- go ahead
13   A   And if they're wrong, then of course everything
14       follows from that.
15   Q   And your conclusions would be wrong, as well?
16   A   They would be different.
17   Q   Well, looking at Table B8, if you would, please.
18   A   Yes.
19   Q   Okay.  Table B8 lists the confirmed APTC endpoint by
20       class of terms for the ITT population; is that
21       correct?
22   A   That's correct.
23   Q   Ending at week 210?
24   A   Mm-hm.
25   Q   And that's the same analysis that you did; correct?
```

68

6/7/2006 Kronmal, Richard

```
 1   A   To the best of my knowledge, yes.
 2   Q   And if we look at the - what you defined as CHD, that
 3       would include the fatal and non fatal acute myocardial
 4       infarction and the sudden cardiac death?
 5   A   That's correct.
 6   Q   And those numbers, looking at Table R8, are 38 to 21?
 7   A   That's correct.
 8   Q   Can you conceive of any circumstance where with those
 9       numbers, 38 to 21, you have a relative risk of 2.45?
10   A   I think it's highly unlikely.
11   Q   Looks like you made a mistake.
12   A   Looks like the file I had was not comparable to this
13       file
14   Q   You made a mistake, didn't you?
15   A   I --
16                   MR. BUCHANAN:  Objection.  Asked and
17       answered.
18   A   I've answered that question four times to you.  The
19       data I had gave that result.
20   Q   (By Mr. Raber)  Sir
21   A   If the data in here is different, then that's the
22       fact.  But I can't   I can't verify that now
23   Q   Is the statement in your report, in the addendum, that
24       the relative risk is 2.45 for hard CHD for the ITT
25       analysis, is that statement correct or incorrect?
```

69

6/7/2006 Kronmal, Richard

```
 1   A   It -- it depends on whether this data is correct in
 2       the report.  I don't have any way of validating right
 3       now whether the data that's in Merck's report is
 4       accurate.
 5   Q   Sir --
 6   A   Until I can do that, I can't tell you the answer to
 7       that question.
 8   Q   Six, true or false:  The relative risk for hard CHD
 9       for the ITT population censored at week 210 is 2.45?
10       True or false?
11   A   I don't know now.  And I don't know because there's
12       data reported here in this report that doesn't
13       correspond to the data I had in my data file.  If
14       those two don't correspond, we need to resolve why
15       they don't correspond.
16       Now, it may be that they supplemented the data.
17       They may have updated it, for all I know   I don't
18       know.
19       And it's even possible I made a mistake.  That's
20       possible.
21   Q   We've referred --
22   A   I don't know.
23   Q   We've referred to at least four matters now where you
24       at least admit it's a possible mistake.
25                   MR BUCHANAN:  Objection.
```

70

6/7/2006 Kronmal, Richard

```
 1   A   I didn't count them.  There's one --
 2   Q   (By Mr. Raber)  The 1 86 --
 3   A   There's one place where I definitely made a mistake,
 4       where I copied the number wrong on the other report.
 5       The others could have been based on different
 6       reports that were available.  I don't know.
 7   Q   And in each situation, that possible mistake made your
 8       opinions stronger; correct?
 9                   MR. BUCHANAN:  Objection.
10   A   I don't know that, to this point.  But probably
11   Q   (By Mr. Raber)  They supported your opinions?
12   A   They probably did, yes.
13   Q   More so than had they gone the other way?
14   A   That's correct.
15                   MR. BUCHANAN:  Steve, when you get a
16       chance, can we take a break?
17                   MR. RABER:  We'll take a break
18                   (Recess 11:18-11:36 p.m.)
19
20
21                   EXAMINATION (Continuing)
22   BY MR  RABER:
23   Q   Dr. Kronmal, I want to ask you a general question now
24       that relates to the APPROVe extension analysis that's
25       in your addendum to your report.
```

71

6/7/2006 Kronmal, Richard

```
 1       My general question is, can you tell us what
 2       opinions you have that relate to that data?
 3   A   Well --
 4                   MR. TISI:  Let me just place an
 5       objection.  I think it's an ambiguous question.
 6       Go ahead.
 7                   MR BUCHANAN:  Objection.  Form.
 8   A   Well, until I get a chance to redo the analyses for
 9       the MI, it's kind of hard for me to state what my
10       opinions would be based on analyses I have not done
11       currently
12       Clearly if the data in these tables that were in
13       the final FDA report are correct, then all I probably
14       could say at that point in time was that the follow-up
15       data was neither confirmatory or not confirmatory of
16       an increased risk.
17   Q   (By Mr. Raber)  Has no impact?
18   A   Very little on that specific issue.  It has a big
19       impact on the 18-month issue.  But for that specific
20       issue, there's almost no -
21   Q   All right.  Well, let me hear your opinion about that.
22                   MR. TISI:  Objection
23   Q   (By Mr. Raber)  The 18-month issue.
24   A   Well, I express it in the report.  But basically, tha
25       the new data quite clearly shows   and this is based
```

72

6/7/2006 Kronmal, Richard

1    on Merck's analysis, not on mine.  On Merck's analyses
2    presented in the FDA report and illustrated in Figures
3    B1 and B2, and if you wanted to, B2 and B6, which I
4    didn't put in the report, it clearly showed that
5    there's no longer any substantive evidence for an
6    18 month increase in risk.
7  Q What's your basis for saying that?
8  A The overall test for significance as reported in -- by
9    Merck in     on the bottom of Figure B2 and B6 were
10   nowhere's near significant.  They were like .7,
11   something like that.
12 Q Are you talking about the nonproportionality numbers?
13 A That's correct.
14 Q What does the nonproportionality test show for
15   confirmed thrombotic events?
16         MR. BUCHANAN:  Do you want that?
17         THE WITNESS:  Do you have that
18   report?  Yeah, it would be easier than looking on the
19   computer.
20 A It's Figure B2, and the footnote, it says
21   proportionality p-value, .748.
22 Q (By Mr. Raber)  And it's on that basis that you
23   conclude that there's no evidence that --
24 A There's no statistical evidence, that's correct.
25 Q No statistical evidence.

73

6/7/2006 Kronmal, Richard

1         Did you consider whether the declining rate for
2    people off-drug would have any impact on that
3    analysis?
4         MR. BUCHANAN:  Objection.  Form.
5  A Well, it almost had to have.  And likewise -- in the
6    late period.
7         On the other hand, it had to have also been
8    higher in the early period in order to get the
9    proportionality back in track.  And that's what, in
10   effect, happened if you look at the tables.
11 Q (By Mr. Raber)  Did you do an analysis to look at the
12   data for the first 18 months as one set, the second 18
13   months for a second, and then the off-drug as a third?
14 A No.  It would have been inappropriate to do that.
15 Q Why?
16 A Because the way you treat this kind of a secondary
17   post hoc analysis is, you do the overall test, and if
18   it's clearly nonsignificant, as this is, with a p
19   of .7, you stop there.  That's the appropriate thing
20   to do.
21        You don't go and say, oh, well, what if I look at
22   the period from six to 18 months, maybe there was an
23   increased risk there, and maybe if I look at the
24   period 12 to 14 months, there's a decrease there,
25   because once you've looked at the data, you can see

74

6/7/2006 Kronmal, Richard

1    all kinds of patterns   There's always patterns in
2    data, always, even when it's totally random.
3         And so you don't do that.  You base it on the
4    entire -- on the specific test.  And then if that test
5    is significant, then you might want to look to
6    describe how it actually occurred.
7         In other words, if you get a significant
8    difference, you wouldn't say, oh, gee, look, it
9    appears to be in the first 18 months or the last 18
10   months or the first six months, or whatever it was.
11 Q What's wrong with looking at a Kaplan-Meier curve to
12   answer that question?
13 A Well, you can't look at the curve -- the curves
14   themselves are not easy to look at from that point of
15   view, because they magnify differences at the end,
16   because they're cumulative, so they add up.  So they
17   will always get wider apart if the same rate of events
18   are occurring across time.  So you always look closer
19   at the beginning, because there aren't very many
20   events at the beginning.
21        So say there's twice as many events in the first
22   month.  Say it's two/one, and there happens to be two
23   events and one in the other.  You wouldn't be able to
24   see that on the graph at all; yet, it's two times.
25   But when you get out to the end, when there are, say,

75

6/7/2006 Kronmal, Richard

1    200 versus 100, you get this big gap
2  Q Okay.
3  A So you can't look at those graphs and come to
4    conclusions that way.  You have to base it on the
5    test.  The test is straightforward.  It gives a
6    p-value of .7.
7  Q At what point in time does the difference between
8    Vioxx and placebo become statistically significant for
9    confirmed thrombotic events?
10 A That's, again, an irrelevant question.  The question
11   is   you're asking a question -- the question that's
12   being addressed is --
13 Q I'd like an answer.
14 A I don't know.  It's not relevant to anything.
15 Q Well, the Court decides what's relevant.
16        MR. BUCHANAN:  Objection.  I'm
17   sorry; he should be entitled to answer, and you can
18   move to strike if the answer is not responsive to your
19   question.
20        MR. RABER:  Move to strike
21   Nonresponsive.
22        MR. BUCHANAN:  Can he finish his
23   answer, please?
24        MR. RABER:  No, because it's
25   nonresponsive.

76