6/7/2006 Kronmal, Richard

1  MR. BUCHANAN:  You're not the judge.
2  MR. RABER:  The answer is either --
3  MR. BUCHANAN:  Why don't you restate
4  your question.
5  MR. RABER:  -- "I don't know" or --
6  MR. BUCHANAN:  When you're the
7  judge, Steve, you can make those calls.  Don't
8  interrupt the witness when he's trying to answer.
9  MR. RABER:  Please don't talk to me
10  that way.
11  MR. BUCHANAN:  You know the rules.
12  Q  (By Mr. Raber)  At what point in time, Dr. Kronmal,
13  does the difference between Vioxx and placebo become
14  statistically significant for confirmed thrombotic
15  events in the APPROVe study on the ITT analysis?
16  MR. BUCHANAN:  Objection  Form.
17  A  As I said, it's irrelevant.  And I don't know, to make
18  it simple on you.
19  Q  (By Mr. Raber)  Did you attempt to determine the
20  answer to that?
21  A  No.  I would never do that.  It's -- why would I do
22  something that's totally irrelevant?
23  Q  What's something called an error bar?
24  A  I assume you're talking about the confidence interval
25  bars.

77

6/7/2006 Kronmal, Richard

1  Q  Have you ever used error bars or confidence interval
2  bars on the Kaplan-Meier curve?
3  A  Probably.
4  Q  Okay.  Why would you do that if it's irrelevant?
5  A  Why would I do that if it's irrelevant?  I wouldn't
6  test at any given point on the curve, if that's what
7  you mean.  That's what I said was irrelevant.
8  Putting a confidence bar is reasonable to do.
9  It's not for purpose of testing it, though.
10  Q  I noticed that in Figure 1 and Figure 2 on Page 6 of
11  your addendum, you did not include any confidence
12  intervals.  Is that correct?
13  A  That's correct.  It's not typical that they're
14  included, but you can.
15  Q  How many confirmed thrombotic events were there in
16  Vioxx versus placebo at 18 months in your MI category?
17  A  I don't remember.
18  Q  Was the difference statistically significant?
19  A  As I told you before, I would never test that.  It
20  wasn't relevant.
21  Q  Was it, do you know?
22  A  I don't know  I wouldn't have tested it.
23  Q  How many CHD events were there at 18 months in the
24  APPROVe ITT data set?
25  A  I didn't count them up.  I don't know.

78

6/7/2006 Kronmal, Richard

1  Q  Was the difference at 18 months statistically
2  significant?
3  A  As I said, it's irrelevant.  I don't know.
4  MR. TISI:  Belated objection on --
5  just on form.
6  Q  (By Mr. Raber)  Looking at Page 4 of your addendum --
7  actually, let's go to the last page.  I'm sorry.  Page
8  7.
9  Those are Figures B1 and B5 from Merck's
10  submission to the FDA; is that correct?
11  A  That's correct.
12  Q  These Kaplan Meier plots have confidence intervals
13  shown on them, don't they?
14  A  That's correct.
15  Q  And in looking at -- let's look at Figure B1, which is
16  for confirmed thrombotic events.
17  At what point in time do the differences between
18  Vioxx and placebo become statistically significant,
19  according to this figure?
20  MR. BUCHANAN:  Objection to the
21  form
22  A  I can't really tell.  It's probably towards the
23  36-month point.
24  But you have to remember, it can't be significant
25  at the early phase, because the number of events

79

6/7/2006 Kronmal, Richard

1  aren't very high.  There's no chance whatsoever that
2  if you go -- say you took one month as a example, and
3  say the rate was twice as high.  You can't get
4  statistical significance at one month because you
5  don't have enough exposure.  And you don't have,
6  therefore, enough events.
7  The statistical significance can only be at the
8  end.  I mean, that's just plain logic, number one, but
9  it's also a statistical fact.  So testing these at
10  these early points is a complete irrelevance.  It's
11  wrong  It's statistically wrong.  It would be
12  incorrect.  And it shouldn't be done
13  So you can question me all you want on it, but
14  it's a total waste of time.  It's wrong to do it,
15  period
16  Q  According to Figure B1, is the difference between
17  Vioxx and placebo statistically significant at 18
18  months?
19  A  Probably not.
20  Q  Looking at Figure B5 on Page 7, can you tell us when
21  it appears the difference between Vioxx and placebo
22  becomes statistically significant for confirmed APTC
23  events?
24  MR. BUCHANAN:  Objection.
25  A  Probably about 36 months.

80

6/7/2006 Kronmal, Richard

1   But by the way, if you want to make that argument,
2   then it's even more significant at 48 months, when
3   they've been off the drug for a long time. So what
4   does that prove?
5                   MR. RABER: Sir, I'll move to strike
6   that last question [sic] as nonresponsive.
7   Q   (By Mr. Raber) Sir, at 18 months, is the difference
8   between Vioxx and placebo statistically significant
9   for confirmed APTC events?
10  A   I'm sure it's not.
11  Q   Going back to Page 4 of your addendum report. In the
12  third and fourth paragraphs, you refer to a
13  statistical test for equality of RR across time, and
14  report values of 0.43 and 0.47.
15  Do you see where I'm reading there?
16  A   Yes.
17  Q   What is the test that you used in order to come up
18  with that figure?
19  A   The Schoenfeld residuals.
20  Q   Did you use any other tests in analyzing that
21  question?
22  A   No. I used the Schoenfeld residuals.
23  Q   How did you decide to use that particular test?
24  A   It's pretty standard. It's the one I would normally
25  use.

81

6/7/2006 Kronmal, Richard

1   Q   And is that the test that you use for all of your
2   tests for equality of relative risk across time?
3   A   I can't say that, because first place, there was a
4   time when Schoenfeld residuals weren't even known, so
5   I couldn't --
6   Q   I mean in connection with this case.
7   A   Oh Yes, I used Schoenfeld residuals all the way
8   through.
9   Q   Now, to be fair, in its publication of the APPROVe
10  data, the authors of that paper indicated that this
11  particular analysis of the 18-month issue was a post
12  hoc analysis.
13  A   That's correct.
14  Q   They were up-front about that.
15                  MR. BUCHANAN: Objection
16                  MR. TISI: Yeah, objection.
17  A   They said it was post hoc. I mean, up-front? They
18  didn't hide it.
19                  MR. BUCHANAN: Objection.
20                  MR. TISI: Objection
21  Q   (By Mr Raber) And your opinions in this case are
22  post hoc?
23  A   Post hoc means after the fact.
24  Q   Right.
25  A   Well, every opinion -- anytime you do anything on data

82

6/7/2006 Kronmal, Richard

1   is after the fact. I don't know what you mean.
2   Q   Well, you knew what the data was before you formed
3   your opinions
4   A   Oh, no, I didn't. Actually, most cases, that's not
5   true. In the vast majority of cases, I had no idea
6   what the data was. I knew what Merck reported. I had
7   no idea what the truth was.
8   Q   But you knew what they reported?
9   A   I knew what they reported, with the exception of the
10  Alzheimer's.
11  Q   And you know what the FDA --
12  A   With the exception of Alzheimer's. With the
13  Alzheimer's, I didn't know, at the time I did the
14  analysis, what they reported.
15  Q   But the data that you knew about, you already knew the
16  data that -- the results that had been reported when
17  you formed your opinions?
18                  MR. BUCHANAN: Objection.
19  A   Well, in many cases, I did. And other cases, I
20  didn't.
21  I mean, it depends what specifically we're talking
22  about I mean, I didn't, for example, know the
23  results of doing the proportional hazards test,
24  because I hadn't done it yet, so how could I have
25  known it in advance?

83

6/7/2006 Kronmal, Richard

1   Q   But you new, for example, that the VIGOR study showed
2   a higher rate of heart attacks on Vioxx as compared to
3   naproxen?
4   A   Absolutely No question about that.
5   Q   And you knew that at the time the study came out,
6   didn't you?
7   A   Well, I may have. I just don't remember. I mean, I
8   read New England Journal of Medicine regularly, but
9   how much attention I paid to that specific article, I
10  don't remember.
11  Q   But you spend a lot of time in the cardiovascular
12  field; right?
13  A   Right. But that paper was about -- as you well know,
14  was not about cardiovascular disease. It was about,
15  you know, osteoarthritis and bleeds in the stomach.
16  That's not an article that I would have normally paid
17  a lot of attention to, because it's not a
18  cardiovascular article.
19  Q   There was discussion that you recall in the medical
20  community and the press about whether Vioxx increased
21  the risk for heart attack?
22  A   I actually wasn't very much aware of that. I mean,
23  that was not something I paid any attention to. I
24  might have heard it, but I certainly didn't remember
25  it

84

6/7/2006  Kronmal, Richard

1    When I was first contacted in this case, I didn't
2    remember what the details were about what was in the
3    press, or anywheres else, for that matter.
4    Q    And to be fair, you don't treat patients, so that's
5    not something that you would necessarily take account
6    of; correct?
7                    MR. BUCHANAN:  Objection.  Form.
8    A    Well, I wouldn't take account of it for the purposes
9    of treating patients, no.
10   Q    (By Mr. Raber)  I want to look earlier in your
11   addendum, where you were talking about the Alzheimer's
12   analysis.
13       On Page 2, you refer to something called the
14   Declaration of Helsinki.  Do you see that?
15   A    That's right.
16   Q    And I take it that your basic opinion here is that
17   Merck should have stopped the Alzheimer's trials
18   earlier?
19   A    That's correct.
20   Q    And that it's your view here that Merck violated
21   something called the Declaration of Helsinki in
22   allowing these trials -- in not stopping those trials
23   earlier?
24   A    That's correct.
25   Q    And you cite here   well, let me back up.

85

6/7/2006  Kronmal, Richard

1    This opinion about stopping the Alzheimer's
2    trials, does that have anything to do with either the
3    two plaintiffs in the New Jersey case, the plaintiff
4    in the MDL case, or the individual plaintiff in the
5    California cases?
6                    MR. TISI:  Actually, let me just
7    interpose an objection.  This is a generic opinion
8    that potentially applies to cases beyond that.
9    Q    (By Mr. Raber)  Sir, let me rephrase it.
10       Does this opinion have any relationship to any
11   specific plaintiffs who are suing Merck?
12   A    I have no idea.  I mean, I don't know anything about
13   the plaintiffs suing Merck, so I can't really tell
14   you.
15   Q    This opinion relates to people who are in the
16   Alzheimer's trials?
17   A    It relates to what was known -- what should have been
18   done, and, therefore, what should have been known to
19   the medical community in April of 2001.  To the extent
20   that that would have affected those plaintiffs, it
21   might well have, because had Merck stopped the trial
22   in 2001, that would have been public knowledge.  They
23   would have had to report that to the FDA.  It would
24   have been in the public domain.  It would have been
25   known to the medical community.  And that   and that

86

6/7/2006  Kronmal, Richard

1    might have affected whether those particular
2    plaintiffs took the drug.
3    Q    Well, we know two of the three Alzheimer's studies
4    were stopped early; true?  Protocol 091 and protocol
5    126.
6                    MR. BUCHANAN:  Objection
7    A    That's not accurate, actually.  126 was stopped early.
8    091 completed.  078 was actually stopped a bit early.
9    Q    (By Mr. Raber)  I'm sorry.  I got my numbers -- you're
10   correct.  I made a mistake.
11   A    See?  We're all human.
12   Q    Some of us admit our mistakes.
13   A    I admit mine too.
14                   MR. BUCHANAN:  Objection.
15   A    I admitted my mistake when you ---
16   Q    (By Mr. Raber)  So let me just make sure the record is
17   clear.
18       You would agree that two of the three Alzheimer's
19   studies, 078 and 126, were stopped early?
20   A    078 was not actually stopped early, in the sense that
21   the original planning for 078 would have had completed
22   a lot sooner.  It was stopped before they had reached
23   the goal of the number of Alzheimer's events that had
24   actually -- was planned for.
25   Q    It was stopped ---

87

6/7/2006  Kronmal, Richard

1    A    But it was not stopped based on the mortality data.
2    Q    It was stopped before it was completed; true?
3    A    It was stopped before it was completed.
4    Q    Now, in your addendum here, you quote language that's
5    in italics from the Declaration of Helsinki.  It says,
6    "Biomedical research involving human subjects cannot
7    legitimately be carried out unless the importance of
8    the objective is in proportion to the inherent risk to
9    the subject."
10       Do you see that?
11   A    That's correct.
12   Q    And that's the principle that you contend Merck
13   violated in not stopping the Alzheimer's trials
14   earlier?
15                   MR. BUCHANAN:  Objection.  Form
16   A    That's the principle that they violated in not
17   stopping 078 earlier.
18   126 was stopped because 091 didn't reach a
19   statistically significant result in 091.
20   Q    (By Mr. Raber)  I'm just trying to understand.  The
21   basis for your -- the standard that you're applying in
22   saying Merck didn't stop 078 early enough is this
23   language that you've quoted in italics here; correct?
24   A    It's one of them; not the only one.
25   Q    Well, there's nothing else quoted here; correct?

88

6/7/2006 Kronmal, Richard

1  A  Yeah, I do -- I quote the next paragraph --
2  Q  Well, that has to do with informed consent  I'm
3     talking about stopping the trial.
4  A  Yes, that's the primary reason. Yes.
5  Q  And in looking at that, that appears to me that that
6     requires some type of a risk/benefit analysis.
7     Correct?
8  A  That's correct, it should be.
9  Q  Did you conduct a risk/benefit analysis in forming
10    this opinion?
11 A  Yes.
12 Q  Where is it?
13 A  I record in my original report that there was a
14    significant increased risk of Alzheimer's in the -- in
15    the -- in 078 associated with the drug. That's -- so
16    there was no benefit, clearly.
17 Q  Well, it says the importance of the objective, which
18    would be preventing Alzheimer's.
19 A  I know. But at the time
20 Q  Is that an important objective?
21 A  Oh, absolutely
22 Q  Okay. But --
23 A  Let me finish.
24    At the time that they had this data on 078 on the
25    mortality excess, they also, if they had looked, would

89

6/7/2006 Kronmal, Richard

1     have seen that there was already an excess risk of
2     Alzheimer's disease in those taking Vioxx.
3     Therefore, there was no benefit -- in fact, there
4     was an excess risk  of the primary endpoint at that
5     point in time. And even if they had seen a benefit,
6     even if they had seen it, it wouldn't have justified
7     continuing it when they were seeing a two- to
8     threefold increased risk of death.
9  Q  Now, that's your subjective risk/benefit analysis;
10    correct?
11 A  I don't believe it's fully subjective
12 Q  It's your opinion.
13 A  It is based on my experience in clinical trials, that
14    I have never heard of a clinical trial, in all of my
15    experience in --
16 Q  Sir --
17    MR. BUCHANAN:  Objection
18 A  You're not letting me finish the question
19 Q  (By Mr Raber)  Sir, it's your objective opinion?
20    MR. BUCHANAN:  No, Steve, that
21    question can't be answered until he answered the last
22    question.
23    MR. RABER:  I'm not going to have
24    him give speeches.
25    MR. BUCHANAN:  No  You're going to

90

6/7/2006 Kronmal, Richard

1     have to accept his answer.
2     MR. RABER:  No, I'm not
3     MR. BUCHANAN:  Can you read back the
4     question, please?
5     MR. TISI:  You can move to strike
6     it, Counsel.
7     MR. BUCHANAN:  Can you read back the
8     question and answer before the interruption?
9     MR. RABER:  I don't have to sit here
10    and listen to an evasive witness.
11    MR. BUCHANAN:  He's not evasive.
12    He's answering your question.
13    THE WITNESS:  I was directly
14    answering your question.
15 Q  (By Mr. Raber)  Is it your subjective opinion --
16    MR. BUCHANAN:  No. Stop.
17    Please read back the question and answer.  Thank
18    you.
19    (Questions/Answers on
20    Page 90, Lines 9 through 15
21    read by the reporter.)
22
23    MR. BUCHANAN:  Continue.
24 A  Where a trial that had an excess of mortality, that
25    wasn't for a life-threatening condition  well, even

91

6/7/2006 Kronmal, Richard

1     then it wouldn't matter.
2     Where a trial that showed a statistically
3     significant excess in mortality was allowed to
4     continue, I know of not a single instance of that.
5  Q  (By Mr. Raber)  Okay  But your opinion here about
6     stopping the trial is your personal opinion?
7  A  Well, everything is somebody's personal opinion, but
8     it's based on my experience as a clinical trial expert
9     over -- over four decades, and extensive reading of
10    the literature over that period, and being involved in
11    multiple data safety monitoring boards where some of
12    these issues have come up.
13 Q  Further down on Page 2, you make a reference that
14    permitting 078 to continue also violated the informed
15    consent provisions of the Declaration of Helsinki
16    Do you see that?
17 A  Yes, I do
18 Q  And again, that standard relates to risks and
19    benefits; correct?
20 A  Well, it --
21    MR. BUCHANAN:  Objection. Form.
22 A  it certainly -- it says potential hazards  And, I
23    mean, it doesn't have to --
24 Q  (By Mr Raber)  It also said anticipated deaths.
25 A  Yeah, both. They should know about both.

92

6/7/2006 Kronmal, Richard

1  Q  So it's a risk/benefit determination that needs to be
2     made; correct?
3  A  Not necessarily.  They have to be informed about
4     potential benefits and the potential risks.
5            MR. BUCHANAN:  Belated objection to
6     the form.
7  Q  (By Mr. Raber)  Right.  And your opinion here that
8     Merck violated the informed consent provisions is a
9     subjective one --
10           MR. BUCHANAN:  Objection.
11           MR. TISI:  Objection.
12 Q  (By Mr. Raber)  -- based on your own analysis of risk
13    and benefit?
14 A  No.  It is based on the statement of the Helsinki that
15    they should have been informed of the risks and the
16    benefits both.  They were not informed.  It's not a
17    ratio issue.
18 Q  That's your opinion.
19 A  No.  It's what the says.
20 Q  Your conclusion from that, that Merck violated it, is
21    your opinion?
22           MR. BUCHANAN:  Objection.
23 A  Well, everything is somebody's -- is my opinion.
24    Obviously I can't write down something that isn't my
25    opinion.

6/7/2006 Kronmal, Richard

1  Q  (By Mr. Raber)  Did the FDA ever conclude that Merck
2     should have stopped study No. 078 earlier?
3  A  They were very concerned about it.
4  Q  Did the FDA ever conclude that Merck should have
5     stopped study No. 078 earlier?
6  A  I don't know what the FDA concluded or didn't
7     conclude.  They clearly let it go on.  But why they
8     reached that decision was largely, in my view, was
9     Merck's not fully disclosing the results that they had
10    from 078 at that time
11 Q  Well, that's your view.
12 A  Well, it's a fact.
13           MR. BUCHANAN:  Objection.  Come on.
14 A  It's not my view  It's a fact.  They didn't report
15    the ITT analysis, so how is that my view?
16 Q  (By Mr. Raber)  Sir
17 A  It's a fact.
18 Q  Sir
19 A  Can you show me where they reported the ITT analysis?
20 Q  Sir, do you know the rule of holes?
21 A  Yeah
22 Q  Did the FDA ever conclude that Merck violated the
23    informed consent standards of the Declaration of
24    Helsinki in connection with study No. 078?
25 A  As far as I know, they didn't.

6/7/2006 Kronmal, Richard

1  Q  Now, in the middle of Page 3 of your addendum, you
2     refer to a December 5th, 2001 letter from the FDA to
3     Merck; correct?
4  A  That's correct.
5  Q  And a couple paragraphs down, you're referring to the
6     letter, and you say the letter is important from two
7     standpoints.
8         Do you see that?
9  A  Yes.
10 Q  And you conclude in your report, "It further
11    indicates" -- that's referring to the letter; correct?
12 A  That's correct
13 Q  "It further indicates that the FDA was not aware of
14    the statistically significant excess of mortality seen
15    in 078 and shown in the Chen report."
16 A  That's my view.
17 Q  Well, look at the language in italics immediately
18    above that.
19 A  Yes.
20 Q  The FDA says, "Please clarify whether the safety
21    monitoring board and the IRB overseeing these studies
22    are aware of the excess in total cause mortality in
23    the Vioxx 25 milligram group as compared to placebo
24    (p = 0.206)."
25        Do you see that?

6/7/2006 Kronmal, Richard

1  A  I do.
2  Q  Doesn't that indicate to you that the FDA was aware
3     that there was a statistically significant difference
4     in mortality between Vioxx and placebo?
5  A  They were aware of it for study 091.  They were not
6     aware of that -- that's the study 091 result.  They
7     were not aware of it for study 078, because if they
8     were aware of it for study 078, the overall
9     significance would have been .001 for the combined
10 Q  The next sentence says, "Have these oversight groups
11    commented on the ethics of continuing study 078 in
12    light of the mortality data..."
13 A  Yeah.  They're referring to the 091 mortality data.
14 Q  The FDA wasn't in the dark here.  They knew there was
15    an excess in total cause mortality, didn't they?
16 A  In 091, not in 078.  I didn't say they didn't know
17    about 091  I said 078.  I specifically stated that
18 Q  Did you do any analysis of the tables that Merck
19    submitted to the FDA with the APPROVe extension data?
20 A  Of the tables themselves?
21 Q  Yes.
22 A  No.
23 Q  And is it fair to say you only looked at the data that
24    related to the ITT group censored at week 210?
25 A  Oh, I looked at it all.  That's the only one that

6/7/2006  Kronmal, Richard

1  based my opinion on.
2  Q  Did you do any other analyses other than the ones for
3     the period ending at week 210?
4  A  No, I didn't.
5  Q  Dr. Kronmal, is it appropriate for drug companies to
6     get advice from outside consultants?
7  A  Of course.
8  Q  Is there anything wrong with a drug company paying a
9     consultant for their time or for their work?
10 A  No, of course not.
11 Q  And in fact, when you do work for drug companies, you
12    get paid?
13 A  That's correct.
14 Q  And you're able to maintain your objectivity?
15 A  I try to.
16 Q  Have you served on DSMBs before?
17 A  Yes.
18 Q  Were you paid for that work?
19 A  That's correct.
20 Q  Is there anything wrong with that, in your opinion?
21 A  No.
22 Q  And I take it, then, if someone were to question the
23    integrity of members of a DSMB because they're being
24    paid, you would disagree with that?
25 A  On that basis alone, yes, absolutely.

6/7/2006  Kronmal, Richard

1  Q  So in your view, then, a trend towards excess
2     mortality is a basis for stopping a study?
3  A  Could be.  Could be.  But it would depend on other
4     things.
5        We would not have stopped it if, for example --
6     this was a really serious thing, because it was a
7     stroke.
8  Q  Sure.
9  A  A drug to prevent damage in stroke, even if it
10    actually had a little higher mortality, you might very
11    well let go on if you were showing a big benefit in
12    preventing the damage from stroke, because stroke may
13    be as bad as death.  You know, you're balancing two
14    really bad outcomes.
15       But that just didn't turn out to be the case.
16    all of the other endpoints, including the primary
17    endpoint, were in the wrong direction  And so we
18    stopped it.
19 Q  So in your opinion, if there's no efficacy being shown
20    and a trend in death in the experimental drug, that
21    would be a basis for stopping the study?
22 A  It could be.  Could be.  It would depend how strong it
23    was, but yes.
24       Now, you wanted the other one too?
25 Q  Yes.

6/7/2006  Kronmal, Richard

1  Q  It would be somewhat of an insult to the doctors on a
2     DSMB?
3            MR. BUCHANAN:  Objection to form.
4  A  Well, I just think it would be inappropriate.
5  Q  (By Mr. Raber)  Inappropriate to make that accusation?
6  A  That's correct, based on their pay.  You could
7     disagree with what they did, but that's a different
8     issue
9  Q  Have you ever served on a DSMB where you stopped a
10    study for safety reasons?
11 A  Yes.
12 Q  How many times?
13 A  Twice.
14 Q  What studies were those?
15 A  The first one I don't --
16           MR. BUCHANAN:  Objection.  This is
17    asked and answered in the last deposition
18 A  I don't remember the first one.  It was  I just
19    don't remember it.  It was a drug to prevent the
20    damage from stroke.  And it ended up having a bit
21    higher mortality, big increases in blood pressure, and
22    no evidence of efficacy.  And we stopped it.
23 Q  (By Mr Raber)  Was the difference in mortality
24    statistically significant?
25 A  No.  It was trending that direction.

6/7/2006  Kronmal, Richard

1  A  The other one was very recent.  And they are -- it was
2     a drug to prevent the kind of pneumonia in people who
3     were on ventilators.  And the primary endpoint was
4     prevention of pneumonia, plus mortality  So it was a
5     combined endpoint.
6        We saw a significant difference at the -- barely
7     at the .05 level from mortality.  We looked at the
8     primary endpoint, and it was not   it was negative.
9     It was in the wrong direction, but it wasn't
10    statistically significant.  And we stopped the trial
11 Q  What was the safety concern?
12 A  Death.
13 Q  Death?
14 A  And again, no clear benefit that was being shown
15 Q  Do you have any estimate about what the numbers were?
16           MR  BUCHANAN:  Objection  Form
17 A  It was substantially less than what was in the
18    Alzheimer's, but I don't remember them
19 Q  (By Mr. Raber)  Could a difference of, let's say, five
20    to nothing in deaths --
21 A  Oh, that would not have stopped the trial, or seven to
22    nothing wouldn't have stopped trial.  Thirty versus
23    ten would have.
24 Q  Are you familiar with the concept of biological
25    plausibility

6/7/2006 Kronmal, Richard

1  A  Of course.
2  Q  -- in determining causation?
3     What is that?
4  A  Well, I'm not sure what you're exactly referring to.
5  Q  Didn't you say "of course"?
6  A  I said I know what biological plausibility means, but
7     I don't know what it means in the context you're
8     referring to
9  Q  Well, in the context of determining association
10    between a drug and an adverse event.
11 A  That's not actually a requirement for determining
12    association. It doesn't have to be biologically
13    plausible, because we don't know the answer.
14    It's mostly what drugs do  So it's not -- you
15    don't need biological plausibility to decide that
16    there's an association between a drug and a side
17    effect. It just has to occur.
18 Q  What about causation?
19        MR. BUCHANAN:  Objection  Form.
20 A  Well, we base our determination of causation on the
21    very thing you discussed: On whether the difference
22    reaches statistical significance or not, or comes
23    close to it in the case of side effect. And once it
24    reaches statistical significance, that's enough.
25 Q  (By Mr. Raber)  That's enough for a placebo-controlled

101

6/7/2006 Kronmal, Richard

1     trial?
2  A  Yeah, to stop it. Sure.
3  Q  Is it ever important to look at the data and say, Does
4     this make sense?
5        MR. BUCHANAN:  Objection to the
6     form.
7  A  Well, I mean, you would look for -- obviously you
8     would look to see if there was some other explanation
9     for it.
10    Suppose, as an example, that you saw an excess of
11    mortality, and what you found out was that all of the
12    people on the drug for some reason were on a plane
13    together and the plane crashed. You know, you
14    wouldn't blame that on the drug. But, you know, other
15    than some really oddball kind of circumstances that
16    it's hard to believe would ever really occur in real
17    life in a randomized trial, in a blind randomized
18    trial at that, no, it's not a relevant issue when
19    deciding whether to stop a trial or not.
20 Q  (By Mr. Raber)  Well, I'm not limiting my question no
21    whether to stop a trial. My question is in terms of
22    attributing causation between a drug and an adverse
23    event.
24 A  Well, once you observe a statistically significant
25    difference, you have to assume it's causal. I mean,

102

6/7/2006 Kronmal, Richard

1     that's the rules we set up for doing this sort of
2     thing.
3     Now, you know, if you had other evidence from --
4     you know, from another  exactly the same trial, and
5     it didn't there, then you would take that into
6     account, clearly
7  Q  Does dosage of a drug make a difference in determining
8     association and causation?
9  A  Oh, certainly.
10        MR. TISI:  Objection. Compound.
11 Q  (By Mr. Raber)  Does the patient population make a
12    difference in determining association and causation?
13        MR. TISI:  Objection. Compound.
14        MR. BUCHANAN:  Compound.
15 A  I don't know what you mean by association/causation
16    If you're trying to say --
17 Q  (By Mr. Raber)  Association and  --
18 A  -- could a drug have a much more damaging effect on
19    one population than another, yes. it could.
20    I mean, you take a healthy young person that's got
21    nothing wrong with them and you give them a drug, they
22    might tolerate it. You give an old, sick person a
23    drug, it might kill them.
24 Q  Dr. Kronmal, do you have any data showing that
25    osteoarthritis patients have a statistically

103

6/7/2006 Kronmal, Richard

1     significant, increased risk of heart attack with Vioxx:
2        MR. BUCHANAN:  Can you read that
3     back?
4        (Question on Pages 103-104
5        Lines 24 through 1,
6        read by the reporter.)
7
8  A  No.
9  Q  (By Mr. Raber)  And in fact, in forming your opinions
10    and writing your report, you didn't analyze the data
11    that Merck had for its studies in osteoarthritis
12    patients; right?
13 A  I looked at them. I mean, i certainly looked at them,
14    particularly for the last -- in the last  earlier
15    report, yeah
16 Q  But you didn't lay it out in your report; right?
17 A  No  I didn't think it was particularly relevant
18 Q  Did you understand that that was the data that was the
19    basis for Vioxx being approved by the FDA?
20 A  For osteoarthritis, yeah  Sure
21 Q  Now, I want to look at your report, if we can go back
22    to your report for a moment.
23        MR. TISI:  Is this the supplement or
24    the original?
25        MR RABER:  The original. Sorry.

104

6/7/2006 Kronmal, Richard

1    Exhibit 1.
2  Q  (By Mr. Raber)  And if you would, turn to Page 41.
3  A  Mm-hm.
4  Q  In the second paragraph on Page 41, you say, "As
5    expressed in this report, by early 2000, there was
6    reasonable evidence of an association between
7    rofecoxib and the development of a spectrum of
8    cardiovascular disease, including MI, hard CHD, CHF,
9    and hypertension."
10    Do you see that?
11 A  Mm-hm.
12 Q  While Vioxx was on the market, was there reasonable
13    evidence of an association between rofecoxib and
14    stroke?
15    MR. BUCHANAN:  Objection.
16 A  Well, I didn't really specifically look at stroke.
17    That was not -- the signal for a serious side effect
18    for rofecoxib was primarily MI and hypertension.
19    That's what I focused on.
20 Q  (By Mr. Raber)  Okay.  Let me repeat the question.
21    While Vioxx was on the market, was there
22    reasonable evidence of an association between Vioxx
23    and stroke?
24    MR. TISI:  Objection.  Asked and
25    answered.

105

6/7/2006 Kronmal, Richard

1    MR. BUCHANAN:  Objection.  Asked and
2    answered.
3  A  I don't know.  I didn't really look at the stroke
4    issue.
5  Q  (By Mr. Raber)  Well, the studies you looked at had
6    stroke data, didn't they?
7  A  They did.  They did.
8  Q  And --
9  A  I didn't do any analysis of stroke by itself, so I
10    don't know the answer to that question.
11 Q  Well, when you were doing your analysis, you were
12    looking for cardiovascular events that were increased
13    with Vioxx; correct?
14 A  No.  I was looking at the signal that came out of
15    VIGOR.  The signal that came out of VIGOR was MI,
16    hypertension, congestive heart failure  That's what I
17    was looking at.
18 Q  And you looked at other trials, as well, didn't you?
19 A  I did some analyses of other trials, yes.
20 Q  And in none of these analyses did you see a reasonable
21    evidence of an association between Vioxx and stroke;
22    correct?
23 A  I didn't look at that.  I didn't -- I never did any
24    analyses of stroke, so I can't answer your question.
25 Q  Why not?

106

6/7/2006 Kronmal, Richard

1  A  Because the signal from VIGOR was MI, and that's what
2    I focused on
3  Q  So the other side of that coin, there was no signal
4    from VIGOR of a problem with stroke, was there?
5  A  That's correct, there was none.
6  Q  And while Vioxx was on the market, there was no signal
7    for a problem with Vioxx and stroke?
8    MR. BUCHANAN:  Objection.  Asked and
9    answered.
10 A  I don't know -- I didn't analyze the stroke data.  You
11    could well be right.  I did not analyze it.
12    My impression is that there may not have been,
13    because VIGOR didn't show it, and therefore, there was
14    no reason to look at any further than that, as far as
15    I was concerned.
16 Q  (By Mr. Raber)  And you're familiar with a study
17    called the ADVANTAGE study?
18 A  Yes, I am.
19 Q  And you know that the numbers there were that there
20    were zero strokes in the Vioxx group and six in the
21    naproxen group?
22    MR. BUCHANAN:  Objection to form.
23 A  I think that's roughly correct.  I --
24 Q  (By Mr. Raber)  And that would be a signal to you that
25    naproxen actually may increase the risk of stroke as

107

6/7/2006 Kronmal, Richard

1    compared to Vioxx; correct?
2    MR. BUCHANAN:  Objection to the
3    form
4  A  It would be in that direction, yeah.  I wouldn't jump
5    to any conclusions on zero versus six.  I wouldn't
6    jump to any conclusions on the basis of that, but,
7    yeah, it would raise that possibility, certainly
8  Q  (By Mr. Raber)  It's certainly not a signal that Vioxx
9    increases the risk of stroke, is it?
10 A  No, it's not.
11    MR. BUCHANAN:  Objection.  Asked and
12    answered
13 Q  (By Mr. Raber)  While Vioxx was on the market, was
14    there any reasonable evidence of an association
15    between Vioxx and arrhythmia?
16 A  That I really can't answer, because I didn't look at
17    that at all
18    There was -- no, I mean, I just didn't look at
19    that  I have no idea  I don't have a clue.
20 Q  When Vioxx was on the market, was there reasonable
21    evidence of an association between intermittent use of
22    Vioxx and serious hazard?
23 A  I don't know.
24    MR. BUCHANAN:  Objection to form.
25 A  I have no idea  I mean, Merck never did any analyses

108

1   of intermittent use.  It would have been very
2   difficult to do, because you can't really -- it's very
3   hard to know how much -- unless you did extremely
4   accurate diaries of people taking the medication over
5   time, you wouldn't be able to tell.
6       And Merck did no studies of intermittent use, that
7   I know of.
8   Q   The studies that were done involved continuous use;
9       correct?
10  A   Well, they involved asking the people to take it
11      continuously.  But, in fact, people don't do that.
12      And, you know, as you know, there were large numbers
13      of people who dropped out of the trials, who stopped
14      taking it.  There were certainly -- there were --
15      there were -- certainly adherence to the drug was not
16      perfect in these trials.  So I don't know whether
17      people were taking it intermittently or continuously
18      or some combination thereof.
19  Q   Well, certainly the protocols for the studies called
20      for regular usage; correct?
21  A   That's it.  That's correct.
22  Q   And there were measures in place to try to ensure
23      compliance with that; correct?
24  A   I don't know what measures they took to ensure
25      compliance.

1   Q   Now, is it your opinion that hypertension is the
2       primary mechanism for the increased risk of CHD?
3   A   I have no idea.  It's a possibility.
4   Q   In your experience in the cardiovascular field, is it
5       well-known that hypertension causes an increased risk
6       of heart attack and stroke?
7   A   Yes.
8   Q   Based on your experience and your knowledge, how much
9       hypertension is necessary to promote atherosclerosis?
10  A   I haven't got a clue.  Nobody knows that.  In fact,
11      there's no one that really understands the mechanism
12      by which hypertension causes MIs and strokes.  It's
13      not understood.
14      So I mean, you expect me to understand it?  It's
15      not understood by anyone.  There are theories, but
16      that's all.
17  Q   Based on your analysis of the data in the Vioxx
18      studies, do the patients taking Vioxx have
19      intermittent or constant rises in their blood
20      pressure?
21  A   I have no idea.  They didn't collect data in a way
22      that would have allowed me to determine that.
23  Q   Does that matter?
24  A   It might.
25  Q   How might it matter?

1   Q   You don't know?
2   A   No.
3   Q   And so you don't know whether people who failed to
4       comply were not allowed to continue in the study, or
5       something like that?
6   A   Well, I mean, if they knew that they weren't
7       complying, I would imagine they wouldn't have kept
8       them in.  But I don't know specifically.  I haven't
9       looked at every one of those trials to see exactly
10      what they did.
11  Q   Have you ever done protocols that had provisions in
12      them to try to ensure that the patients regularly took
13      the drug being studied?
14  A   We always do  We always make that attempt
15  Q   And that's the best any of us can do; correct?
16                  MR. BUCHANAN:  Objection.
17  A   Well, it's certainly the best that I can do.  I don't
18      know about anybody.  But yeah.
19  Q   (By Mr. Raber)  Now, you mentioned here, on Page 41 --
20                  MR. BUCHANAN:  Is that in the big
21      one?
22  Q   (By Mr. Raber)  You mentioned "reasonable evidence of
23      an association" between rofecoxib and hypertension.
24      Do you see that?
25  A   That's correct.

1   A   Well, if they had spikes in the blood pressure,
2       extremely high spikes, that could be very damaging to
3       the vascular system.  So I just don't know the answer.
4       Wildly fluctuating blood pressures is probably
5       worse than a constant increase.  But whether that's
6       what Vioxx does or not, I don't know.
7       As far as I know, Merck never did studies to try
8       to find that out, as far as I know.
9                   MR. RABER:  I'm going to move to
10      strike that.
11  Q   (By Mr. Raber)  Did I ask that question?
12                  MR. BUCHANAN:  Objection.
13  A   You were asking me about the hypertension, and you
14      were asking me whether the variation in
15      hypertension --
16                  MR. BUCHANAN:  Ask a question
17  Q   (By Mr. Raber)  I asked you whether --
18                  MR. BUCHANAN:  That is an insult.
19      That's not a question.
20  Q   (By Mr. Raber)  And I was asking --
21  A   And I tried to explain why it might matter  And I
22      was --
23  Q   How does the fact whether or not a company did a study
24      or didn't do a study bear on the question of why it
25      might matter?

6/7/2006 Kronmal, Richard

1   MR. BUCHANAN: Objection.
2   Argumentative.
3   MR. RABER: I'm going to ask Counsel
4   to instruct the witness not to make gratuitous
5   statements about Merck.
6   MR. TISI: I'm going to ask --
7   MR. BUCHANAN: Counsel, your tone is
8   entirely inappropriate. I wish we had a video record
9   here today. You're insulting the witness
10   MR. RABER: My tone is proper. You
11   didn't want the video.
12   MR. BUCHANAN: I didn't realize that
13   was an invitation for you to be rude to the witness.
14   And that's exactly what's going on.
15   MR. RABER: I'm not being rude.
16   Q   (By Mr. Raber) Sir, on Page 13 of your report, near
17   the top, you say, "In short, it was unreasonable for
18   Merck to presume that the VIGOR trial brought a
19   previously unseen cardioprotective effect of naproxen,
20   rather than the more obvious and rational conclusion
21   that rofecoxib significantly increased the risk of
22   myocardial infarctions."
23   Do you see that?
24   A   That's correct.
25   Q   So in your view -- strike that.

113

6/7/2006 Kronmal, Richard

1   What made it so obvious -- strike that
2   What made the conclusion that Vioxx was increasing
3   the risk of heart attacks so obvious?
4   MR. BUCHANAN: Objection to form
5   A   No drug for cardiovascular disease, none, would have
6   reduced the risk in the amount that was seen -- that
7   was hypothesized for naproxen based on the results of
8   VIGOR. No drug known to man. So they had to assume
9   that a previously unseen incredibly protective -- that
10   naproxen was a miracle drug, literally.
11   Further, naproxen has been on the market for 20
12   years. There was no clinical evidence whatsoever,
13   nothing, that naproxen prevented heart attacks
14   Further, when you have a new drug, you have to
15   make the -- versus a drug that's been on the market
16   for 20 years, and you see a substantial increase in
17   risk associated with that new drug, it is incumbent on
18   the company to begin with the assumption that it's
19   likely that the new drug causes it.
20   Q   (By Mr. Raber) Do you know whether Merck did that?
21   A   They clearly did not.
22   Q   What do you base that on?
23   A   Their statements in the VIGOR paper.
24   Q   Did you see --
25   A   They said naproxen was the explanation.

114

6/7/2006 Kronmal, Richard

1   Q   Are you familiar with what Merck did to try and
2   understand the results of the VIGOR study?
3   A   No.
4   Q   Have you read the testimony of Alise Reicin to
5   describe what she and what Merck did to understand the
6   results of the VIGOR trial?
7   A   No.
8   Q   Have you read the deposition or the testimony of
9   Dr. Ed Scolnick to see what Merck did to understand
10   the results of the VIGOR study?
11   A   I've seen a little bit of Scolnick's deposition, but I
12   don't -- I don't   I didn't see that part of it.
13   Q   As we sit here today, can you tell me anything that
14   Merck did to try and understand why there was a
15   difference between the rate of heart attacks in Vioxx
16   versus naproxen?
17   A   I can only tell you what they did in terms of clinical
18   trials. And that was nothing.
19   Q   But other than that, you can't tell me anything?
20   A   No, I don't know what they did.
21   Q   And so is it your opinion then that the data, the
22   number of heart attacks between naproxen and Vioxx,
23   that one conclusion from that, that was obvious to
24   anybody that looked at it, was that Vioxx might be
25   increasing the risk of heart attack?

115

6/7/2006 Kronmal, Richard

1   MR. BUCHANAN: Objection to form
2   MR. TISI: Objection.
3   A   Yeah, I think that might be -- yes, sure. Absolutely.
4   Q   (By Mr. Raber) It's not like some secret out there --
5   strike that.
6   That wouldn't be something that would be hard for
7   somebody to do, looking at a difference between the
8   heart attacks; correct?
9   MR. BUCHANAN: Objection to form.
10   MR. TISI: Objection.
11   A   That's certainly correct.
12   Q   (By Mr. Raber) And that's true whether the ratio of
13   heart attacks is four to one or five to one, isn't it?
14   MR. BUCHANAN: Objection.
15   A   Well, obviously the more it is, the worse it looks
16   Q   (By Mr. Raber) But it's obvious either way, isn't it?
17   MR. BUCHANAN: Objection.
18   A   It would depend on the statistical significance, but
19   it certainly would be pointing in the same direction
20   of -- the force of that would be different depending
21   on the magnitude
22   Q   (By Mr. Raber) It would be an obvious conclusion that
23   at least one possibility is that Vioxx is increasing
24   the risk of heart attacks?
25   A   Absolutely

116

6/7/2006  Kronmal, Richard

```
 1                 MR. TISI:  Of what, Counsel?  Let's
 2   be clear.
 3                 MR. BUCHANAN:  Objection to form.
 4                 MR. TISI:  Objection.
 5   Q   (By Mr. Raber)  And you would expect any doctor --
 6                 MR. TISI:  You don't want to clarify
 7   that, Counsel?
 8                 MR. RABER:  I don't know what I'm
 9   being asked to clarify.
10                 MR. TISI:  Well, I think that
11   question is totally misleading.
12                 MR. RABER:  Okay.
13                 MR. TISI:  Go ahead.
14                 MR. RABER:  That's fine.  We'll move
15   on.
16   Q   (By Mr. Raber)  Are you familiar with a drug called
17   Flurbiprofen, F-L-U-R-B-I-P-R-O-F-E-N?
18   A   I've heard of it.
19   Q   Have you ever seen any studies about the ability of
20   Flurbiprofen to reduce of risk of heart attack?
21   A   Yeah, I've seen those studies.  Yes
22   Q   By what percentage has Flurbiprofen been shown to
23   reduce heart attack?
24   A   I don't remember.
25       And those were not, by the way, studies in primary
```

117

6/7/2006  Kronmal, Richard

```
 1   prevention.  They were studies in people who already
 2   had heart disease.  And they were very narrow, small
 3   studies, not particularly -- and never been verified.
 4       That drug is not approved for prevention of heart
 5   disease.
 6   Q   Was the reduction seen in Flurbiprofen studies in the
 7   ballpark of the reduction or the difference in the
 8   VIGOR study?
 9   A   I doubt it, but I don't know.
10   Q   You don't know one way or the other?
11   A   I don't remember.  But I don't know what relevance it
12   has, anyway.
13   Q   Would you agree   your endpoint of CHD, which is
14   heart attack plus sudden cardiac death, did you do an
15   analysis to determine whether the people who were
16   off drug in the APPROVe study were at an increased
17   risk for CHD?
18   A   No.
19   Q   Do you know what the answer is to that?
20   A   Well, from the table, it didn't appear to be.
21                 MR. BUCHANAN:  Steve, I'll just note
22   the clock.
23                 MR. RABER:  Yeah.  Let me just do
24   one more thing.
25       Let's mark this as -- what are we up to?  No  5?
```

118

6/7/2006  Kronmal, Richard

```
 1                 THE REPORTER:  Yes
 2                    (Exhibit No  5 marked
 3                     for identification.)
 4
 5   Q   (By Mr. Raber)  Dr. Kronmal, I've put in front of you
 6   a document that's been marked as Kronmal Exhibit 5
 7   It has the word "Hypotheses" at the top, and then two
 8   paragraphs labeled "Primary" and "Secondary "
 9       Do you see that?
10   A   Yes.
11   Q   I'd like you to look at this and tell me -- and answer
12   this question:  Does what's described on Exhibit 5
13   describe a CV outcomes trial?
14                 MR. BUCHANAN:  Objection.  Form.
15   A   It doesn't describe any trial at all.  It just
16   describes the strategy for testing.
17   Q   (By Mr. Raber)  Would it describe strategy for testing
18   for a CV outcomes trial?  Is that what it looks like
19   to you?
20                 MR. BUCHANAN:  Objection to the
21   form, again.
22   A   It is -- it is -- it's kind of a funny hypothesis
23   statement, because it's talking about noninferiority.
24   And typically, that's not the way you do
25   cardiovascular trials.  You look to see whether one
```

119

6/7/2006  Kronmal, Richard

```
 1   treatment is better than the other.
 2       So if you were doing a noninferiority trial, yeah,
 3   it describes how you might test for a noninferiority
 4   trial.
 5   Q   (By Mr. Raber)  In a CV outcomes trial?
 6   A   In a CV outcomes.  That's what I was talking about,
 7   yeah.
 8   Q   So it is one type of CV outcomes trial?
 9                 MR. BUCHANAN:  Objection.
10   A   It's not describing a trial at all.  It's describing a
11   method of analyses.  It's not the same as describing a
12   trial
13   Q   (By Mr. Raber)  But the method of analyses, it looks
14   to you like a CV outcomes trial; true?
15   A   No.
16                 MR. BUCHANAN:  Objection.
17   A   It doesn't describe a trial at all.  It just says
18   they're going to do a test of thrombotic endpoints.
19   That's all
20   Q   (By Mr. Raber)  In a clinical trial?
21   A   I assume so.  It doesn't say so.
22   Q   Well, I will tell you that this is --
23   A   I know what this is from, so you don't have to tell
24   me.
25   Q   What is it?
```

120

6/7/2006  Kronmal, Richard

1  A   It's what they wrote in their statistical plan for the
2      protocol 203.
3  Q   Would you describe protocol 203 as a CV outcomes
4      study?
5  A   No.
6  Q   Why not?
7  A   It was simply taking three studies that were ongoing
8      and looking at it for cardiovascular side effects.  It
9      was not designed to -- those three trials were not
10     designed to determine whether Vioxx was causing
11     cardiovascular events.
12 Q   Have you read the protocol for --
13 A   Yes, I have.
14 Q   -- 203?
15 A   Yes, I have.
16 Q   And it's your opinion that it's not a CV outcomes
17     trial?
18 A   It's not.  It's clearly not.  Has nothing to do with
19     CV outcomes.
20     I mean, one was a polyp prevention trial.  I can't
21     remember; one was
22 Q   Is a pre specified --
23         MR. BUCHANAN:   I'm sorry.  He's not
24     done answering.
25 A   The answer is:  They were not CV outcome trials   None

121

6/7/2006  Kronmal, Richard

1      of them were.
2  Q   (By Mr. Raber)   Were CV outcomes pre-specified
3      endpoints in protocol 203?
4  A   They were pre-specified endpoints for adjudication for
5      CV events
6  Q   And doesn't that make them CV outcomes trial?
7  A   No.
8  Q   How would you design a CV outcomes trial?
9  A   I would have done what they're doing now for the
10     comparison of Celebrex to naproxen to placebo.  That's
11     what I would have done.
12 Q   And who is doing that?
13 A   Pfizer, is my understanding.
14 Q   And it's your opinion that there's a placebo arm of
15     that study?
16 A   That's my recollection, but
17 Q   Are you sure about that?
18 A   No, I'm not.  I think there should have been.  If there
19     wasn't, but I don't know.
20 Q   Well, in order to do that, wouldn't you have to offer
21     some benefit to patients?
22 A   No; because the drugs might be harmful.
23 Q   I'm sorry?
24 A   The drugs might be harmful.
25 Q   So how would you --

122

6/7/2006  Kronmal, Richard

1  A   It's a case of -- it's a case of equipoise, where you
2      don't know whether the drugs will be beneficial or
3      harmful; and therefore, a placebo is perfectly
4      ethical.
5  Q   So you're saying you would have two groups of people,
6      and give one group placebo and one group pain
7      reliever, to see which group had more heart attacks?
8      That's an ethical study, in your opinion?
9  A   Well, it wouldn't --
10         MR. TISI:   Let me just ask, what
11     population?
12         MR. BUCHANAN:   Objection to form
13 A   Yes, what population, exactly?
14 Q   (By Mr. Raber)   Any population.
15 A   Oh, yeah.  If it were a population of people who were
16     high risk of inflammatory CV events, that is -- say
17     you took people, for example, who had unstable angina,
18     which is thought to be an inflammatory process in
19     part, and you randomize them to -- I don't care --
20     naproxen, Vioxx, Celebrex, and placebo, yes, it would
21     be a perfectly reasonable trial to do.
22 Q   That's because you have a theory or a hypothesis that
23     the anti-inflammatory effects of the drug might
24     provide some benefit to the patients?
25 A   That's correct.

123

6/7/2006  Kronmal, Richard

1  Q   Correct?
2  A   That's correct.  And you also have the hypothesis it
3      might do harm   So you don't know whether it's going
4      to be harmful or beneficial   That's the reason to do
5      the trial.
6      And placebo control would be almost mandatory in
7      that circumstance, in my opinion
8  Q   And so you would agree that if you just compared one
9      NSAID to another, that that wouldn't really be a CV
10     outcomes study; correct?
11 A   Oh, it would still be a CV outcomes study, if CV
12     outcomes were the primary endpoint.  But it wouldn't
13     be as good as
14 Q   It would be difficult to interpret the results;
15     correct?
16         MR. BUCHANAN:   Objection to form
17 A   It depends what they came out to be.  If one of them
18     was much worse than the other, you could interpret
19     that.  If they came out the same, you wouldn't know
20     whether they were both bad.
21 Q   (By Mr. Raber)   But without a placebo to give you a
22     background or a baseline, it would be hard to
23     interpret the results of a study of one comparator
24     versus another; true?
25         MR. BUCHANAN:   Objection

124

6/7/2006 Kronmal, Richard

1 A No, that's not true. I just explained to you, if one
2 was much worse than the other, you would conclude that
3 one was much worse than the other. That's clear, and
4 you would have an answer to that question.
5 If somebody wants to know is Celebrex worse than
6 naproxen, they could test that.
7 Q (By Mr. Raber) What if --
8 A If they both came out the same in the trial, if they
9 had exactly the same result in the trial, you would
10 not know whether they were both bad, both good, or
11 both neutral.
12 Q But in the case, even where there's a big difference,
13 you wouldn't know if the higher one was better than
14 taking nothing at all or worse than taking nothing at
15 all; true?
16 MR. BUCHANAN: Objection to form.
17 A You would not know compared to nothing at all, because
18 you haven't tested nothing at all. You would know
19 compared to the other treatment.
20 Q (By Mr. Raber) That's all I'm saying.
21 A I don't disagree with that.
22 Q Now, you would agree with me that right up until the
23 time -- strike that.
24 Until the third quarter of 2004, there were people
25 who believed that Vioxx or other COX-2 inhibitors

125

6/7/2006 Kronmal, Richard

1 might prevent heart attacks because of their
2 anti-inflammatory properties; true?
3 MR. BUCHANAN: Objection.
4 A Well, I don't think anybody believed Vioxx did,
5 because of the VIGOR result. But I think there
6 certainly were people who thought that other
7 anti-inflammatories might have that effect, yes.
8 Q (By Mr. Raber) I'm talking about COX 2 inhibitors,
9 including Vioxx.
10 A I don't know what people thought about COX 2
11 inhibitors.
12 Q Well, you were involved in studies looking, for
13 example, at whether infection could increase the risk
14 of heart attack and stroke; correct?
15 A That's correct, I was.
16 Q And there were others who looked at things like
17 C-reactive protein; correct?
18 A There are studies ongoing now to see whether
19 C-reactive protein -- whether giving
20 anti-inflammatories with a placebo with -- yeah, there
21 are studies now.
22 Q There were scientists into 2004 who believed that a
23 COX-2 inhibitor could reduce the risk of heart attack
24 and stroke by reducing inflammation; true?
25 A There may be --

126

6/7/2006 Kronmal, Richard

1 MR. BUCHANAN: Objection
2 A There might well have been. I don't know. I didn't
3 interview any particular scientist who said to me, you
4 know, COX-2 inhibitors will have that effect. But I
5 wouldn't doubt that there was some who believed that.
6 I mean, I'm not trying to be argumentative about
7 it. That it's certainly likely.
8 MR. BUCHANAN: Steve --
9 MR. RABER: Do you want to take a
10 lunch break?
11 MR. BUCHANAN: Please.
12 (Recess 12:39-1:47 p.m.)
13
14
15 EXAMINATION (Continuing)
16 BY MR. RABER:
17 Q Dr. Kronmal, I want to just ask you a couple questions
18 about this testing for nonproportional hazards. We
19 talked about it a bit this morning.
20 A Mm-hm
21 Q Do scientists ever explore data to find out which of
22 the nonproportional hazards tests fits the data the
23 best?
24 A They shouldn't.
25 MR. BUCHANAN: Objection. Asked and

127

6/7/2006 Kronmal, Richard

1 answered.
2 Q (By Mr. Raber) They shouldn't?
3 A No.
4 MR. BUCHANAN: Asked and answered.
5 A Because it's biased.
6 Q (By Mr. Raber) Is there any source that you can point
7 to as the basis for your opinion on that?
8 A Again, you have to put it into context, of course
9 I mean, if you were doing a completely exploratory
10 analysis, you just wanted to describe your data, then
11 it would be perfectly all right to look at what model
12 would fit it the best. There's nothing wrong with
13 that.
14 If you wanted to test a hypothesis about
15 proportional hazards, you would not do that kind of
16 exploration. You would pick your test in the
17 clinical trial setting, you would pick your test in
18 advance. You would do that test. If it wasn't
19 significant, you would go on to the next step, which
20 was to do nothing, basically.
21 Or if you wanted to do more descriptive things,
22 you could do it, but you would basically treat that as
23 highly exploratory and not worth of, you know, much in
24 the way of comment
25 Q (By Mr. Raber) If protocol called for additional

128

6/7/2006  Kronmal, Richard

1   analyses beyond the primary one, would it be
2   appropriate to do that?
3                    MR. BUCHANAN:  Objection.  Form.
4   A   Well, I mean, I've read that protocol.  And as I read
5   it -- and again, I don't have it in front of me, so I
6   can't quote it exactly.  But as I read it, they
7   basically sort of -- they specifically said that they
8   would do the overall test using log or Schoenfeld
9   residual, and if they didn't see anything, they would
10  basically not continue on.
11      They only said they would explore it if they saw a
12  significant result, as I remember it.
13      And since they didn't, you know...
14  Q   (By Mr. Raber)  Okay.  Since they didn't -- what?
15  What was the conclusion?
16  A   Well, if they didn't, there was no point in really
17  doing much more.
18  Q   Dr. Kronmal, are you aware of any data that shows an
19  increased risk of using Vioxx if it's used
20  intermittently?
21                   MR. BUCHANAN:  Objection.
22  A   I've already addressed that; that, no, there was never
23  any study that addressed that issue.
24  Q   (By Mr. Raber)  Are you aware of any mechanism that
25  would explain an increased risk of Vioxx for

129

6/7/2006  Kronmal, Richard

1   intermittent use?
2   A   I could speculate on some, if you want.  I can't prove
3   any, if that's what you mean.
4   Q   Okay.
5   A   Do you want me to speculate on mechanisms?
6   Q   Sure.
7   A   You could have a spike in blood pressure when you were
8   on it that would damage the arteries, and that damage
9   wouldn't go away.  So it wouldn't matter whether you
10  were taking it intermittently or continuously.  It
11  wouldn't make any difference.
12  Q   That's speculation?
13  A   Of course.
14  Q   Are you aware of any evidence that Vioxx increases the
15  risk of arrhythmic events?
16  A   No.
17                   MR. TISI:  Objection.  Asked and
18                   answered.
19                   MR. BUCHANAN:  Objection.  Asked and
20  answered.
21  A   I don't know.  I haven't looked at it specifically
22  from that point of view.
23  Q   (By Mr. Raber)  And you can't point to any evidence
24  that Vioxx increases the risk of arrhythmic events;
25  correct?

130

6/7/2006  Kronmal, Richard

1                    MR. BUCHANAN:  Objection.  Asked and
2   answered.
3   Q   (By Mr. Raber)  True?
4                    MR. BUCHANAN:  Objection.
5   A   Again, I haven't looked at it in any detail.
6       In the Alzheimer's study, at least in the original
7   classification, there was more sudden deaths in the --
8   in the Vioxx group than the placebo.  But then they
9   reclassified them to -- a lot of those arrhythmic
10  deaths to MIs, for reasons I don't understand, but
11  they did.  And that wouldn't have been there any
12  longer.
13      So the answer is, I don't know.
14  Q   (By Mr. Raber)  Who reclassified events?
15  A   It was done between the time that Merck reported to
16  the FDA the results and Thal published the paper in
17  2005.  That's all I know.  Because those two don't
18  correspond on that issue.
19  Q   Is it your understanding that one reports investigator
20  reported events, and the other adjudicated events?
21  A   Not in this case.  They were both adjudicated.
22  Q   They were?
23  A   Yeah.
24  Q   Okay.  Should a DSMB be formed for every clinical
25  study of a drug?

131

6/7/2006  Kronmal, Richard

1                    MR. BUCHANAN:  Objection.  You said
2   "the drug"?
3                    MR. RABER:  "Of a drug."
4   A   It would depend on the study.  If you're doing a
5   study, a long-term study where there is potential for
6   safety issues, you know, then you should always have a
7   DSMB, yes.  Absolutely.
8   Q   (By Mr. Raber)  If you don't believe that there's a
9   potential for a safety issue --
10  A   It doesn't matter whether you believe it or not.
11  That's irrelevant.  If the potential exists.
12  Q   Well, doesn't that exist in every case?
13  A   No.  Suppose you were doing a two-week study of
14  aspirin.  You have lots of information, you know that
15  it's not going to do anything in two-weeks' time.  You
16  don't have to have a DSMB.  There wouldn't be any
17  point, because the study would be over before a DSMB
18  could do anything.
19      So there are certainly studies that are innocuous
20  enough, that you don't have to do a DSMB.  But if
21  you're talking about a study where you have elderly
22  people with mild cognitive impairment and it's going
23  to last for three years or more, then, you know, it's
24  absolutely clear there should have been a DSMB.
25  Q   Can you point to any source, authoritative source, to

132

6/7/2006 Kronmal, Richard

1    support that opinion?

2 A   I can find you papers that basically say that all

3    studies should have DSMBs, if you want.

4 Q   Are those authoritative?

5 A   Yeah; in the literature.

6 Q   Can you identify any, as we sit here today?

7 A   There's a paper by Tom Fleming. There's several books

8    on the subject that say that -- I mean, I could find

9    you some.

10 Q   Have you ever heard of a standard or a practice of

11    having a DSMB when the study has a safety endpoint?

12 A   Sure.

13 Q   Okay. But not necessarily for other studies?

14           MR. BUCHANAN: Objection to form.

15 A   I don't know what you mean by that. I'm sorry.

16 Q   (By Mr. Raber) Well, have you ever understood that

17    the existence of a safety endpoint is a determinative

18    factor in deciding whether or not to have a DSMB?

19 A   All studies should be monitored for safety. I don't

20    know what you mean by that question. I don't know how

21    to answer.

22    By the way, a good example, if you want, of

23    authoritative source for -- that there should be DSMBs

24    is the NIH. The NIH requires DSMBs for all clinical

25    trials. There's an authoritative -- and I can point

133

6/7/2006 Kronmal, Richard

1    you to the website where it describes it, if you want.

2 Q   Okay. The NIH website?

3 A   It would be on there, yeah.

4 Q   Is it your experience that a relative risk is rarely

5    calculated in a safety analysis?

6           MR. BUCHANAN: Objection to form.

7 A   That's a good question. I don't know the answer. I

8    mean, I have not --

9 Q   (By Mr. Raber) Have you ever tested --

10 A   -- studied, you know, whether people do well -- you

11    know, most -- a lot of times, they do risk differences

12    rather than relative risk in the safety analyses. And

13    that's typically because the frequency of the risk is

14    so low, that it's hard to compute a relative risk.

15    Say, for example, there was zero events in one

16    group and seven in the other, and the relative risk

17    would be infinite. You know, seven divided by zero is

18    infinity. And so it would not be very descriptive to

19    do that. So it varies.

20 Q   Have you ever testified that a relative risk is rarely

21    calculated in a safety analysis?

22 A   Not that I remember. I mean, I don't -- I could have.

23    I don't remember doing it.

24 Q   Dr. Kronmal, is it your opinion that all drugs are

25    dangerous?

134

6/7/2006 Kronmal, Richard

1           MR. BUCHANAN: Objection.

2 A   All drugs have side effects, that I have ever heard.

3 Q   (By Mr. Raber) Have you ever testified that, in your

4    opinion, all drugs are dangerous?

5 A   I might have said that. They all have dangers

6    associated with them.

7 Q   And you would include aspirin and ibuprofen in that

8    category?

9 A   Absolutely. That's well-known, actually.

10 Q   You've got -- that they're dangerous?

11 A   Yeah. But they have dangers associated with them.

12 Q   How about that they're dangerous?

13 A   That's -- if by that you mean that they're not worth

14    taking, then of course that's incorrect. I mean,

15    that's not what I meant.

16    What I meant was, they have dangers associated

17    with their use, and there are there are no drugs,

18    that I know of, that don't.

19 Q   You've had experience as a member of an FDA advisory

20    committee; correct?

21 A   Yes.

22 Q   Based on your experience with the FDA, is it your

23    understanding that the FDA has complete authority over

24    whether a new drug application can be approved?

25 A   They do.

135

6/7/2006 Kronmal, Richard

1 Q   Has it been your experience with the FDA that the FDA

2    is overcautious about safety?

3           MR. BUCHANAN: Objection to form.

4 A   Up to -- up to my experience with VIGOR, I would have

5    said yes. After that, I don't know what's happened in

6    the FDA. I really don't understand what's going on.

7 Q   (By Mr. Raber) Has it been your experience that the

8    FDA is very concerned about side effects?

9           MR. BUCHANAN: Objection.

10           MR. TISI: Objection. Vague.

11 A   I assume they are. I can't speak for everybody in the

12    FDA, but --

13 Q   (By Mr. Raber) Have you ever testified to that?

14 A   I probably did. I mean, if you say I did, I - I have

15    no problem with saying that, because I'm sure they're

16    concerned about side effects. Of course.

17           MR. BUCHANAN: He's not saying you

18           did. He's asking you a question.

19           THE WITNESS: I don't remember. But

20    if I did, I wouldn't disagree with that now.

21 Q   (By Mr. Raber) Okay. Now, you testified in the

22    Humeston case. Do you remember that?

23 A   That's correct.

24 Q   And it was argued by the plaintiff in that case that

25    the FDA advisory committee in February of 2001 was

136

6/7/2006 Kronmal, Richard

1     essentially bought by Merck.
2            MR. BUCHANAN:  Objection to the
3     characterization.
4  Q  (By Mr. Raber)  Do you agree with that?
5  A  I have no idea.  I had nothing -- I didn't testify
6     about that, and I wouldn't have.
7  Q  Based on your experience on advisory committees, is it
8     often the case that members of the advisory committee
9     have either real or perceived conflicts of interest?
10           MR. BUCHANAN:  Objection to form.
11  A  They're not supposed to.
12  Q  (By Mr. Raber)  Do they have them?
13  A  I don't know.  Probably
14  Q  Are there procedures for people to disclose potential
15     conflicts --
16  A  There are
17  Q  -- on an advisory committee?
18  A  There are, yeah.
19  Q  And do you agree that the -- do you have an opinion as
20     to whether or not the advisory committee in February
21     of 2001 that looked at Vioxx was biased in favor of
22     Merck because of conflicts of interest?
23  A  I have no idea.  I don't even know who was on it, who
24     the specific members were.
25     Plus, even if I knew that, I wouldn't know whether

137

6/7/2006 Kronmal, Richard

1     they had a conflict of interest.  So I don't know the
2     answer to that.
3  Q  Do you think that the fact that a scientist has done
4     work or received payments for work from a company
5     makes them unqualified to sit on an advisory
6     committee?
7           MR. BUCHANAN:  Objection to form.
8  A  No, I don't think it makes them unqualified.
9  Q  (By Mr. Raber)  Now, you have been a professor at the
10     University of Washington for how many years?
11  A  Since 1964.
12  Q  The opinions that you're expressing in this case are
13     your personal opinions; correct?
14           MR. BUCHANAN:  Objection.
15           MR. TISI:  Objection.
16  A  Well, you've asked that before.  Every opinion that
17     one gives is based on experience and training.  And,
18     therefore -- I mean, if you want to call that
19     personal, you can   I'm not going to object to that.
20  Q  (By Mr. Raber)  Your opinions that you're expressing
21     are not the opinions of the University of Washington?
22  A  Oh, absolutely not   I'm not representing the
23     University of Washington
24  Q  And in fact, respected scientists disagree with your
25     opinions in this case?

138

6/7/2006 Kronmal, Richard

1           MR. BUCHANAN:  Objection.
2  A  I mean, I don't -- I don't know whether respected
3     scientists disagree with my opinions, because I don't
4     know if they've reviewed my report.
5  Q  (By Mr. Raber)  Well, one of your opinions is that
6     after VIGOR, Vioxx should have been taken from the
7     market; true?
8           MR. BUCHANAN:  Objection
9  A  No, I didn't -- I didn't characterize it quite that
10     strong.  It should have been considered for taking off
11     the market, yes, but I don't -- my view was that the
12     decision to take it off the market should have come
13     when the Alzheimer's mortality data was known.
14  Q  (By Mr. Raber)  Well, but back to VIGOR, it was your
15     opinion that VIGOR should have -- that the label
16     should have had a stronger warning?
17  A  That's true.
18  Q  And so in that respect, the FDA disagreed with you;
19     true?
20           MR. TISI:  Objection.
21     Mischaracterizes the evidence.
22           MR. BUCHANAN:  Objection.
23  A  I don't know what the FDA thought.  How should I know;
24  Q  (By Mr. Raber)  Well, the FDA approved the label.
25           MR. BUCHANAN:  Objection.

139

6/7/2006 Kronmal, Richard

1  A  I don't know on what basis the FDA decided what they
2     decided
3  Q  (By Mr. Raber)  They approved the label, didn't they?
4  A  They did approve it.  Yes, that's a fact.
5  Q  And so they disagreed with you, your interpretation of
6     VIGOR, didn't they?
7           MR. TISI:  Objection.
8           MR. BUCHANAN:  Objection.
9  A  I don't know whether they did or did not.  I mean, if
10     I -- as I read the reviews of Targum and of Villalba
11     and the statistician that worked on it, I don't think
12     they disagreed in a marked way with what I have
13     thought about VIGOR.
14     On the other hand, they didn't know everything I
15     knew about VIGOR.  They didn't know how different the
16     hypertension results were between Vioxx and naproxen.
17  Q  (By Mr. Raber)  You're just making that up, aren't
18     you?
19           MR. BUCHANAN:  Objection.
20  A  No.  It's in my report.
21           MR. BUCHANAN:  You're doing it
22     again.  Stop.
23     You have the right to answer the question.  He
24     can't cut you off.  Was your answer before complete?
25           THE WITNESS:  Yes

140

6/7/2006 Kronmal, Richard

```
1    Q   (By Mr. Raber)  The fact of the matter is, you don't
2        know what the FDA know
3                    MR. BUCHANAN:  Objection to form and
4        tone.
5    Q   (By Mr. Raber)  True?
6    A   I know what they said in their reports.
7    Q   You don't know what people at the FDA know or what
8        data they reviewed, do you?
9                    MR. BUCHANAN:  Objection to form.
10       Once again --
11   A   I know what data Merck provided to the FDA.  I know
12       what reports they provided to the FDA.  And the
13       reports that they provided to the FDA did not show the
14       hypertension adverse event data in a way in which it
15       was clear how strong the difference was.
16                   MR. RABER:  David, I would note,
17       too, that your posturing about tone and all of that is
18       nonsense.
19                   MR. BUCHANAN:  It's not posture at
20       all.
21                   MR. TISI:  Actually, to be honest
22       with you, Steve, I think what would be a good idea is,
23       the next time it happens, I will try to call Judge
24       Fallon, because I think enough is enough.
25                   MR. RABER:  You can do that.
```

141

6/7/2006 Kronmal, Richard

```
1                    MR. TISI:  Just let me tell you, it
2        is four o'clock now.  If it happens in the next 15
3        minutes, we're going to --
4                    MR. RABER:  It's two o'clock.
5                    MR. TISI:  No.  It's two o'clock now
6        in Seattle.  It's four o'clock where Judge Fallon is.
7        And we'll call him.
8                    MR. RABER:  I would be happy to do
9        any of these depositions in a courtroom, with a judge
10       present, with the video, and you guys didn't want it.
11                   MR. TISI:  And I would be very happy
12       that Judge Fallon hear the comments that you've made
13       during the course of the deposition.  I've seen him
14       take lawyers to task for that.
15                   MR. RABER:  Sir --
16                   MR. TISI:  Go ahead.  Proceed,
17       Counsel.
18   Q   (By Mr. Raber)  Dr. Kronmal, some of your
19       colleagues -- well, strike that
20           It's your opinion that the ITT analysis should be
21       applied to all clinical trials?
22   A   Absolutely.
23                   MR. BUCHANAN:  Objection to the
24       form.
25   Q   (By Mr. Raber)  And you're aware, aren't you, that
```

142

6/7/2006 Kronmal, Richard

```
1        some of your colleagues at the University of
2        Washington disagree with you on that point?
3    A   I don't know anyone that would disagree with me.  You
4        can point to one that does?
5    Q   Sure.
6                    MR. RABER:  Let's mark this as
7        No. 6.
8                        (Exhibit No. 6 marked
9                        for identification.)
10
11   Q   (By Mr. Raber)  Dr. Kronmal, I've put in front of you
12       Kronmal Exhibit 6, which I'll represent to you is an
13       article called "Intention-to-Treat Analysis in
14       Randomized Trials: Who Gets Counted?"  And the authors
15       are Milo Gibaldi, Ph.D., and Sean Sullivan, Ph.D.
16           Do you see that?
17   A   I do.
18   Q   And are Drs. Gibaldi and Sullivan affiliated with the
19       University of Washington?
20   A   Apparently they are, yes.
21   Q   And I'd like you to turn, if you would, to Page 671.
22           You're chuckling, sir.  Is there something funny
23       about the article?
24   A   Yes.
25   Q   What?
```

143

6/7/2006 Kronmal, Richard

```
1    A   It's ridiculous.
2    Q   Have you read it?
3    A   No.  I can tell you right now --
4    Q   You know it's ridiculous without reading it?
5    A   Well, I know from just reading the first few
6        paragraphs.
7    Q   On Page 671, the first full paragraph on the
8        right-hand column, it says, "Elliott has suggested
9        that for drug trials, especially of antihypertensive
10       or nonsteroidal antiinflammatory agents, in which
11       patients are likely to switch therapies over time, the
12       actually on-therapy experience analysis may more
13       closely reflect the situation in clinical practice "
14           Do you see that?
15   A   Yeah, I do.
16   Q   Do you agree or disagree with that statement?
17                   MR. BUCHANAN:  Objection.
18           You have the ability to read the article if you
19       would like it.
20   Q   (By Mr. Raber)  Do you agree or disagree with that
21       statement?
22   A   Let me read the sentence again.
23           Well, you're talking about the sentence that --
24   Q   On the far right column, "Elliott has suggested "
25   A   Oh, I see it.  Oh, I don't object to that statement at
```

144

6/7/2006  Kronmal, Richard

```
1     all
2  Q  And that's the sentence that begins, "Elliott has
3     suggested"?
4  A  Right.  Yeah.
5  Q  The next sentence says, "He also" --
6        MR. BUCHANAN:  I'm sorry.  Were you
7     done?
8        THE WITNESS:  I was going to go on.
9     That's all right.
10 Q  (By Mr. Raber)  The next sentence says, "He also
11    suggested that actually on-therapy experience may be
12    more appropriate when analyzing data on the side
13    effects of therapy."
14       Do you see that?
15 A  I don't agree with that statement.  I don't  because
16    the part I don't agree with, let me point out, is that
17    it's always appropriate to do an intent-to-treat.
18       It may be appropriate, as well, to look at
19    on-drug  I have no problem with that.
20 Q  It says, "If the discontinuation during the course of
21    a trial of a drug causing a side effect results in the
22    elimination of a side effect, analyzing data from
23    patients who have stopped taking the drug minimizes
24    the differences between treatment groups and makes
25    them less likely to achieve statistical significance."
```

145

6/7/2006  Kronmal, Richard

```
1     MR. BUCHANAN:  You can read whatever
2  you like.
3        MR. RABER:  I'm sorry, David?  He
4  can read whatever he likes?
5        MR. BUCHANAN:  Yes.
6        MR. RABER:  I'm just directing him
7  to refresh his recollection.
8        MR. BUCHANAN:  I understand.  He's
9  allowed to read the surrounding sentences for context.
10 He's perfectly entitled to do that.
11       MR. RABER:  What you're doing is
12 improper.
13       MR. BUCHANAN:  It's not improper at
14 all.
15 A  That's not the question that was asked, nor my
16    response.  It has nothing to do with -- it doesn't say
17    anything about Alzheimer's.  It doesn't say anything
18    about APPROVe
19       Oh, I see.  You're saying the answer to the next
20    question.  I'm sorry.
21 Q  (By Mr. Raber)  No.  Page 245 --
22 A  I didn't use the word "ethical."  He did.  But anyway,
23    I couldn't have done the Alzheimer's study, I couldn't
24    have done the APPROVe study --
25 Q  (By Mr. Raber)  Based on your interpretation.  And you
```

147

6/7/2006  Kronmal, Richard

```
1        Do you agree with that?
2  A  That's correct.
3  Q  And it says, "If this were to occur, an important side
4     effect may be discounted unintentionally."
5        Do you see that?
6  A  Absolutely.  I agree totally.  Not a problem.
7  Q  So
8  A  I have no objection to doing on drug analyses.  I
9     never said I did.
10 Q  Your opinion is that, based on the VIGOR data, it
11    would have been unethical to do the Alzheimer's study
12    and the APPROVe study; correct?
13       MR. BUCHANAN:  Objection.  Are you
14    referring to his report or just --
15       MR. RABER:  Testimony.
16       MR. BUCHANAN:  Oh.  I'll object.
17 A  Well, number one, I don't know that I've said that.  I
18    don't believe I would have.  But if you can point to
19    where I said it, I'll be glad to look at it.
20       I think that --
21       MR. BUCHANAN:  He's going to show
22    you.
23       THE WITNESS:  Okay
24 Q  (By Mr. Raber)  Okay.  Look at Page 245, Line 15, and
25    read 245, Line 15, read that question and answer
```

146

6/7/2006  Kronmal, Richard

```
1     did use the word "ethical," didn't you?
2  A  Yes.
3        MR. BUCHANAN:  You can read keeping.
4  Q  (By Mr. Raber)  So what you said under oath is that
5     based on the VIGOR results, you could not have done
6     either the Alzheimer's studies or the APPROVe studies;
7     correct?
8  A  That's correct.
9  Q  All right.  The FDA disagrees with you on that, don't
10    they?
11 A  Yeah, apparently.
12 Q  And the investigators who were involved in those
13    trials disagree with you about that?
14 A  Apparently they did, yes.  Obviously, or they wouldn't
15    have let it go on.
16 Q  Have you ever done any studies of Vioxx or COX-2
17    inhibitor drugs?
18 A  No, I haven't.
19 Q  You grouped your data after you knew what the results
20    were, didn't you?
21 A  No.
22       MR. BUCHANAN:  Excuse me.
23    Objection.  Form.
24 Q  (By Mr. Raber)  Well, you started out doing your
25    analysis looking at MI; correct?
```

148

6/7/2006  Kronmal, Richard

1   A   Yes.
2   Q   And after you started looking at the data, you changed
3       your group and added sudden cardiac death to it; true?
4   A   I did both MI and cardiac and total CHD.
5   Q   In fact, after looking at the data, you decided to
6       include sudden death; true?
7   A   Well, it was -- yeah, that's true.  Sure.
8   Q   Okay.
9   A   But it was based on the fact that in the Alzheimer's
10      studies, there were a number of deaths that have been
11      classified as sudden death that were clearly MIs, as
12      well.  And so I thought it was appropriate to look at
13      the hard CHD.
14          And probably in retrospect, that's what I should
15      have done for all of them.
16  Q   So you had the benefit of hindsight when you did that?
17  A   Yeah, of course.
18          MR. BUCHANAN:  Objection.
19  Q   (By Mr. Raber)  When Merck set up its groups, it did
20      it before it knew the results; true?
21          MR. BUCHANAN:  Objection to form.
22  A   No, that's not true.
23  Q   (By Mr. Raber)  It set up its confirmed thrombotic
24      events before it knew all the results, didn't it?
25  A   No.

149

6/7/2006  Kronmal, Richard

1           MR. BUCHANAN:  Objection.
2   A   They knew all the results from all of their trials
3       well before they set up those -- they added those
4       results for, in some of the cases, years.  They have
5       seen the VIGOR results.
6   Q   (By Mr. Raber)  When did Merck set up its standard
7       operating procedure for thrombotic events?
8   A   Which one?  They set up --
9   Q   The SOP.
10  A   They did several of those.
11  Q   They did?  How many?
12  A   Well, they did the two or three.  Right?
13  Q   I'm talking about the standard operating procedure to
14      adjudicate --
15  A   Oh, to adjudicate?  Yes, I didn't understand your
16      question.
17          The adjudication, I think it was done sometime in
18      2000.
19  Q   They did that before they knew the VIGOR results?
20  A   Yeah, the adjudication.
21  Q   And they identified categories before they knew the
22      VIGOR results?
23  A   They didn't specify --
24          MR. RABER:  Please don't shake your
25      head "no."

150

6/7/2006  Kronmal, Richard

1           MR. BUCHANAN:  I'm going to
2   object -- not at all   I can't believe -- I can't
3   believe you're asking this question.  It is unfounded
4   and misleading.  Objection.  Form.  Misleading.
5           MR. RABER:  Mr. Boehm, was
6   Mr. Buchanan shaking his head when I asked that
7   question?
8           MR. BOEHM:  He's been doing it from
9   the very first question about this.
10          MR. BUCHANAN:  That is absolutely
11  false.  And you should have noted that before.
12      I'm objecting because that question is unfounded,
13  and you know it.  You know that document well.  You
14  don't have a basis to ask that question.
15          MR. RABER:  Sir, don't coach the
16  witness.
17          MR. BUCHANAN:  That's not a coach.
18  That's an improper question.
19          MR. RABER:  Don't point your finger
20  at me.
21          MR. BUCHANAN:  Objection.  Form.
22  Improper question.
23  Q   (By Mr. Raber)  Sir, Merck didn't know the results of
24      the VIGOR study when it set up the categories of
25      events to be adjudicated, did it?

151

6/7/2006  Kronmal, Richard

1   A   That's correct.
2   Q   You gave us, in your report, your final analysis of
3       the data; true?
4   A   It's final -
5           MR. BUCHANAN:  Objection to form.
6   A   It's final as of now.  Obviously I will redo the
7       analyses for the -- for the APPROVe extension, because
8       you pointed out some errors.  I want to make sure I
9       get it correct.
10  Q   (By Mr. Raber)  You did some preliminary analyses that
11      you didn't give to us, true, in the context of forming
12      your report?
13  A   I did lots of preliminary analysis, of course.
14  Q   Ones that you didn't give to us?
15          MR. BUCHANAN:  Objection.
16  A   I didn't keep them.  I mean, because they were
17      preliminary.
18  Q   (By Mr. Raber)  And in fact, in doing analyses, if
19      your analysis didn't have the right number of events,
20      you would go on to the next one; true?
21  A   If I knew that, yes.
22  Q   Now, one problem with looking at data after the fact
23      is that you can cut and dice the groups in hundreds of
24      different ways; true?
25  A   You could.

152

6/7/2006 Kronmal, Richard

1  Q  And depending on how you cut and dice them, you can
2     get different conclusions; true?
3  A  You might.
4  Q  In fact, you could, for example, find that somebody
5     with one astrological sign has a higher risk of
6     something happening to them?
7  A  Oh, absolutely.
8  Q  Have you read any depositions of the Merck scientists
9     in this case?
10  A  Yes.
11  Q  Whose depositions?
12  A  I don't remember.
13  Q  When did you read them?
14  A  Long time ago.
15  Q  Do you remember testifying in August of last year,
16     that you had not read any depositions?
17  A  At that point, I hadn't.
18  Q  Okay. Whose did you read?
19  A  I think I've read Shapiro's now.
20  Q  Anybody else come to mind?
21  A  Depositions? I've heard snippets of Scolnick's, but I
22     didn't -- haven't read his deposition.
23  Q  Did you read Alise Reicin's deposition?
24  A  I don't believe I have.
25  Q  Have you read her testimony?

153

6/7/2006 Kronmal, Richard

1  A  No, I haven't.
2  Q  Why not?
3       MR. BUCHANAN: Objection.
4  A  Just, I'm busy, and, you know, it's not relevant to my
5     report.
6     I've read Howard's deposition, by the way. That
7     one I definitely read.
8  Q  (By Mr. Raber) Have you looked at the medical records
9     of any particular plaintiff?
10  A  No.
11  Q  And I take it you have no case-specific opinions about
12     whether or not Vioxx caused or contributed to
13     somebody's heart attack or stroke; correct?
14  A  I don't know -- I can't answer that question, because
15     what do you mean by case-specific?
16  Q  Well, in other words, you don't intend to offer an
17     opinion that Vioxx was a substantial factor in causing
18     the heart attack of Mr. McFarland or causing the death
19     of Mr. Hatch in the New Jersey cases, as an example?
20       MR. BUCHANAN: Objection to form.
21  A  I really don't know how to answer that question,
22     primarily because all of what I've done in my report,
23     my testimony, bears on the issue of whether Vioxx is a
24     cause of MIs and cardiac and death, basically.
25     So in that sense, it relates to the individual.

154

6/7/2006 Kronmal, Richard

1     So I don't know what you mean by the question.
2  Q  (By Mr. Raber) Well, let me ask you this question.
3     In APPROVe, how many people took Vioxx?
4  A  It's in the thousands.
5  Q  About 1200?
6  A  Yeah.
7  Q  And there were how many heart attacks in APPROVe?
8  A  I don't know the exact number. 40, 50, 60.
9  Q  Less than 50, probably; right?
10  A  I don't know. I'd have to look at the numbers.
11  Q  So that means 1100 people didn't have a heart attack;
12     right?
13  A  Of course.
14  Q  So are you going to give an opinion as to whether
15     Mr. McFarland or Mr. Hatch or any individual plaintiff
16     was one of the 1100 who didn't have a heart attack or
17     stroke or was one of the ones who did?
18       MR. BUCHANAN: Objection to form.
19  Q  (By Mr. Raber) That's what I'm getting at.
20  A  Well, I still don't understand, because they had a
21     heart attack or stroke. Otherwise, there wouldn't be
22     a trial.
23     So I don't know -- I mean, you're talking about a
24     hypothetical here. I don't know how to answer that
25     question.

155

6/7/2006 Kronmal, Richard

1  Q  Do you intend to offer an opinion at trial that Vioxx
2     played a role in causing a particular plaintiff's
3     heart attack, stroke, or other event?
4       MR. BUCHANAN: Objection to form.
5  A  Only to the extent that in testifying that increased
6     the risk of having those events -- I mean, to the
7     extent that that is directed towards that individual,
8     the answer would be yes.
9     If you're talking about am I going to specifically
10     say I know for certain that it causes it in that case,
11     no, of course I wouldn't say that.
12  Q  (By Mr. Raber) Your opinion would apply equally to
13     anyone?
14  A  Yes.
15  Q  Right?
16  A  That's exactly the point I'm trying to make, in so
17     many words.
18       MR. BUCHANAN: Show said it better.
19  Q  (By Mr. Raber) Now, your category of CHD includes
20     heart attack and sudden death; correct?
21  A  That's correct.
22  Q  You have used CHD as a category in other trials,
23     haven't you?
24  A  Yes.
25  Q  And in those other trials, your definition of CHD has

156