also included something called angina; true?
A The only other trial that I -- that I was involved in that used that as an endpoint included unstable angina, hospitalization for unstable angina.
Q How about angina pectoris?
A No, I can't think of a trial I was involved in where that was part of the primary endpoint.
You're talking about the primary endpoint or secondary endpoints?
Q I'm talking about a definition.
A Oh, if you mean did -- in clinical trials, you're talking about?
Q Yes.
A Where it was part of the primary endpoint?
MR. BUCHANAN: He's going to show you something.
THE WITNESS: Okay. I don't know the answer.
Q (By Mr. Raber) Are you familiar with a study called the association of fasting glucose levels with congestive heart failure in diabetic adults greater than 65 years?
A Yes, I am.
Q That was a study that you were coauthor of with Cardiovascular Health Study; right?

A That's correct.
Q And in this study, you said baseline and incident CHD was defined as a history of myocardial infarction for a non-MI event, such as angina pectoris or a revascularization procedure; true?
A Sure.
Q So you have done studies where you define CHD to include angina?
A Of course. But --
Q You didn't do that --
A But I made the distinction in my report that this was hard CHD. And the definition of hard CHD is generally given as MI plus sudden cardiac death.
If I would have said CHD in general, then I would have -- I could have encompassed a broader definition.
And by the way, for different purposes -- that was an epidemiologic study, by the way, not a clinical trial. I should make that distinction. But for different purposes, you may well have included CHD all the way through mild angina. And in that particular case, it included revascularizations.
Q But you decided not to do it here?
A I never thought about doing it here.
Q Why not?
A It wasn't a decision.

Q Why not?
A Well, the main reason was, there was not good data on angina from the studies. Merck didn't give me data that would have allowed me to have looked at angina as an endpoint. Otherwise, I might have.
I thought about it, actually, a little bit.
Q Does the 2002 label report angina in a table from the VIGOR study?
A I don't remember. They might have. I mean, they treat it as an AE. And so it's recorded, but there wasn't -- you know, for all -- the signal for VIGOR was MI, and so I focused on MI.
And when I saw the Alzheimer's results and recognized that it was easily possible that some MIs were being classified as sudden cardiac deaths, then I thought it was worth looking at the combined, as well. And that was the entire motivation.
Q Do you know whether or not if you add -- or if you include angina in your definition of CHD, whether the ITT results for APPROVe are statistically significant for an increased risk of Vioxx?
A I have no idea. But the problem is that angina was not adjudicated, as far as I know. And so I wouldn't have been able to do that. I mean, it's --
Q Have you seen the list of adjudicated terms in Merck's

CV SOP?
A Yes.
Q It includes angina, doesn't it?
A Yeah. But what they did was, they tried to use that information to decide whether or not someone had an MI or a thrombotic event. But I don't believe that they...
Q Don't believe that they what?
A Well, I'm not sure what they did. I don't know. I shouldn't comment. I haven't really thought about it.
Q I'm showing what you I'll represent to be the 2002 label, and Table 3, which is a table of cardiovascular events from the VIGOR study.
Do you see that?
A Yes.
Q And do you see where it's broken out, unstable angina --
A Yes. Unstable angina, yes. You're talking about angina pectoris. Unstable angina is a different thing.
Q How is it different?
A Because it's unstable. And typically, it requires hospitalization as part of that definition. That's totally different.
Q You didn't include unstable angina in your definition

of CHD, did you?

A No, I did not.

Q Okay. You didn't include stroke in your definition of CHD?

A It's not CHD. Stroke is CHD. It's not CHD.

Q You didn't include stroke in your analysis of the data, did you?

A No, I did not.

MR. BUCHANAN: Asked and answered.

Q (By Mr. Raber) Sir, do you remember that in your report that you filed in 2005, you accused Merck of misrepresenting the MI data in the label that came out after VIGOR?

MR. BUCHANAN: Objection. Asked and answered.

A I don't remember exactly what I said, no.

Did I use the word "misrepresented"? I might have. I don't know.

Q (By Mr. Raber) Do you remember that you later admitted in your deposition that your accusation was untrue?

A No, I don't remember.

MR. BUCHANAN: I have it. If you can just tell me what page you're on.

MR. RABER: 223.

(Discussion off the record between the witness and his counsel.)

MR. BUCHANAN: You said 223? Do you have a line, by the way?

MR. RABER: Line 23.

Q (By Mr. Raber) It says, "So then, Doctor, if that were in fact true, then the statement in your report on Page 23 is not true?" And you say, "That's correct." Right?

A Yeah, that's correct. That, I do not remember

Q (By Mr. Raber) Does that refresh your recollection?

A It does. And that was an issue that I missed, that there was a line in a table in the label that did show the MIs.

Q So you accused -- in your report, you accused Merck of misrepresenting the MI data in the label -- --

A Well, I think they still misrepresented it, but they did have it there. He was asking me a question, was it there. And I said, then, yes, it was.

Q So you admitted that you made an accusation that was not true?

MR. BUCHANAN: Objection.

A It's not an accusation. It was -- it was -- I didn't

notice that one line of that table. So the statement was untrue. I don't consider it an accusation or anything.

Q (By Mr. Raber) But you repeated that -- well, never mind.

In your 2005 report, you recall that you said that the trend was unfavorable in the Vioxx group regarding death in the VIGOR study?

A Yes.

MR. BUCHANAN: Objection. Asked and answered.

Q (By Mr. Raber) And you admitted that using the word "trend" was sloppy and you shouldn't have used it?

A Well, I didn't use the word "sloppy," but I agree that it shouldn't have been used, yes. It was not very precise.

Q Look at Page --

MR. BUCHANAN: I'm going to interpose an objection, in any event, to going over tired ground.

MR. RABER: This is called cross-examination. It's -- 

MR. BUCHANAN: It's actually called retreading tired ground. It's supposed to be --

MR. RABER: Stop it, David.

MR. BUCHANAN: No. Let me get my objection out for the record.

MR. RABER: I've heard it.

MR. BUCHANAN: No. The reporter needs it.

MR. RABER: Your witness just denied using the word "sloppy" under oath.

MR. BUCHANAN: No. Actually, let me get my objection out.

We are retreading tired ground. I object to this. This deposition is supposed to be conducted for discovery concerning the witness's opinions in his new reports. We have now spent the last 15 to 20 minutes going over statements --

MR. RABER: Stop talking.

MR. BUCHANAN: -- in his last deposition. I strongly object to that and your discourteousness.

Let's go forward. What page would you like the witness to go to?

MR. RABER: 76 and 77.

Q (By Mr. Raber) Page 77, Line 5. 77, Line 5, question: "I'm just trying to understand your use of the word trend."

Answer: "Well, I was sloppy -- it was sloppy

there."

A Okay. That's fine.

Q Then you go on to say in Line 11 through 13 that "I shouldn't have used it there."

A Yes. I mean, I never disagreed with that. I just didn't remember using the word "sloppy."

Q But you used it again in your 2006 report, didn't you?

A What?

Q The word "trend" to describe Vioxx and deaths in the VIGOR study.

A If I did, it was inadvertent. I meant to take it out.

Q Please look at Exhibit 1.

A No, I believe you when you said if I did. I have no reason to disbelieve you on that. I just -- my point is that I wouldn't have -- if I'd have noticed it, I would have taken it out.

Q Would you look at Page 3 of your 2006 report? Towards the bottom, you say, "Moreover, there was an unfavorable trend against the safety of rofecoxib for congestive heart failure and death."

Another mistake?

A Well --

MR. BUCHANAN: Objection to form.

A I would rather have not used the word "trend" there. However, for congestive failure, there was more than a

trend for -- there was actually a statistically significant difference for CHF hospitalizations and for withdrawal from the trial due to CHF events.

So for CHF, I could have said a stronger statement there. For death, I shouldn't have used the word "trend." I admit, I should have taken it out. I missed it.

Q (By Mr. Raber) Well, sir, turn to Page 7 of your report, please.

In fact, in your report, you said that CHF was not statistically significant; true?

MR. BUCHANAN: Objection to form.

A I had already mentioned to you that, overall, CHF was not significant, but hospitalizations for CHF was significant, as was people dropping out of the trial due to CHF was also statistically significant. And that's all I said, is that I could have made a stronger statement there for CHF and a weaker one for death.

I apologize for using the word "trend." It shouldn't have been used. I don't like using that word anyway. Just crept in.

Q (By Mr. Raber) It would be inaccurate to describe the data?

MR. BUCHANAN: Objection

A Well, people use it that way. I don't like to use it that way.

Q (By Mr. Raber) But you did.

A I know. It was a mistake. You know, choice of words when you're writing thousands of pages, hundreds of pages, it's easy to use a word that you would rather not have used if you thought of the single word in that context.

MR. BUCHANAN: Belated objection.

Q (By Mr. Raber) Let's talk about VIGOR. One of your criticisms of Merck's reporting of the VIGOR study is that they rounded the incidence of death from .54 to .5 and then from .37 up to .4. Correct?

A That's correct.

Q And your problem with that is that by rounding the numbers that way, they reduced the apparent difference between the two groups?

A That's correct. And -- well, there's more than that. It's also that they didn't accurately report the results of enough digits that you could actually tell what the rates were.

Q Have you ever done that before, reported a percentage at one digit?

A I may well have in some -- some case. But, you know, I would always report the numbers someplace, in a

table or someplace else. I wouldn't just give the percents.

Q Well, here you said that your criticism here was that they rounded the numbers to make the difference appear to be less, on Page 11 of your report.

A Yeah, they did. That's a fact. It doesn't change -- I mean, it's just the fact.

MR. BUCHANAN: I'm just going to put it on the record, while he's looking for this, this was again information that was in his original report, about which he's previously been examined.

I understand this examination was for the specific purpose of cross-examining -- discovering from Dr. Kronmal the basis for his opinions in the addendum --

MR. RABER: You submitted a different report, didn't you?

MR. BUCHANAN: It's the same information.

MR. RABER: It's not the same report.

MR. BUCHANAN: This is absolutely the same information about which you had a full and fair opportunity to examine him last year.

MR. RABER: I deny that he changed

it. I deny that it's the same report

MR. BUCHANAN: You deny that this information is in the original report?

MR. RABER: He added stuff.

MR. BUCHANAN: Was this in the original report?

MR. RABER: Let's mark this as No. 7.

(Exhibit No. 7 marked for identification.)

MR. RABER: His name was in the original report. You didn't stop me from asking that.

MR. BUCHANAN: Counsel, you're grossing violating the process, and this is going to expose your witnesses to the same thing.

Q (By Mr. Raber) Dr. Kronmal, do you recognize Exhibit 7 as an article called "Prospective evaluation of a prostacyclin-sparing aspirin formulation and heparin/warfarin in aspirin users with unstable angina or non Q wave myocardial infarction at rest"?

A Yeah, I do.

Q Published in the European Heart Journal in 1994?

A Yes.

Q And your name is on there as a coauthor; is that

correct?

A It is. It is.

Q Is this in a peer reviewed journal?

A Yes, it is.

Q This was a clinical trial?

A Mm-hm

Q "Yes"?

A Yes.

Q And what you wanted to do was, you had a theory that prostacyclin in the blood vessels could help prevent heart attacks; correct?

A I didn't have a theory.

Q The people on this study did?

A They -- the main author did. I was just a co-investigator with him.

Q Okay. That was the hypothesis of the article, was that if you increased the amount of prostacyclin in the endothelium, that you could reduce the risk of heart attack; correct?

A Well, I'd have to read the paper again It's been a long time since this paper was written, and I don't remember details of it very much at all. I was only a minor player in this. So let me read it.

Well, I have to say, I don't understand the details of this. I mean, I'm not an expert of the

biology of aspirin. You know, they talk about the pre-systematic acetylation, A-C-E-T-Y-L A-T-I-O-N, of platelets without endothelial cell, cyclooxygenase inhibition. I don't actually know what that exactly means

Q It's pretty easy to understand on the front page, though, the last sentence in italics of the front page, where it says, "Prostacyclin-sparing aspirin offers no clinical benefit over conventional aspirin."

You can understand that, can't you?

A Yeah, exactly.

Q And that means that an aspirin that preserves the amount of prostacyclin in your endothelium doesn't protect any better against a heart attack than regular aspirin.

MR. BUCHANAN: Objection. Form.

Q (By Mr. Raber) True?

MR. BUCHANAN: Objection. Foundation. Form.

A That's what this study was meant to study, yeah. Among other things.

Q (By Mr Raber) And when you put your name on this paper, that meant that you agreed with the content of it; true?

MR. BUCHANAN: Objection to form.

A I agree with the content, sure. I mean, not necessarily the theories about the biology of it. I don't know enough about that to comment. That's what these other experts are for. I can't tell you

Q (By Mr. Raber) You agreed with the statistical analysis?

A Yes.

Q You agreed with the presentation of the data?

A Yeah, sure.

Q Let's look at Page 1200 of this paper Do you see Table 2?

A Yes.

Q Where it says "Primary end-points"?

A Yes, I do

Q And there's a table there where it says "Myocardial infarction"; correct?

A That's correct.

Q That is a heart attack?

A That's correct.

Q And you report that two people in the controlled-release aspirin group had heart attacks, and that three in the other group had heart attacks; right?

A That's correct.

Q And you report the percentages as 3 percent versus 4 percent; correct?

A That's what's in the table, yes

Q And actually, that 3 percent is a number that's been rounded up, hasn't it?

A I don't know. I'd have to compute it, but I think --

Q Let me give you a calculator.

A I think that's probably true.

Yes, it's been rounded up. I can tell from this 2.078, it's been founded up.

Q It's been rounded up from 2.078?

A Yes, something like that.

Q And that's in the experimental group; right?

A Yeah.

Q And in the other group, it's reported as 4 percent; right?

A I see that

Q And that's rounded down, isn't it?

A Yes

Q Rounded down from about 4 17 percent?

A That's correct.

Q And the effect of the rounding there was to make the difference appear to be less; true?

A But -- but we reported the numbers. Merck did not

Q True?

A Merck didn't report the numbers. If Merck had reported the numbers, I would not have said a word

about their percentages.

Q If Merck had reported the numbers of what?

A Of deaths. They didn't report them, and that's the key factor.

Q Sir, did you round up and round down the percentages?

A Yes, of course.

Q And does that have the effect of making the numbers look like less than a difference?

A Not when you see the 3 versus 2. You know the exact numbers. There's no need for the percentages. That's just sort of a convention to put them in when you put the numbers in.

Q Sir, looking at this experiment that you were involved in, it looks like five people died when they were given more prostacyclin.

A No. They were given warfarin.

Q Controlled release aspirin, plus heparin/warfarin, did you understand that the controlled release aspirin was to increase the amount of prostacyclin versus regular aspirin?

A Right.

Q As to the people who had more prostacyclin in their endothelium, five of those people died in this study; right?

A That's correct.

Q And nobody died in the study that got just the conventional aspirin?

A That's correct.

Q You don't report any kind of a p-value there, do you?

A It's nonsignificant. It says nonsignificant.

Q Right. What was the p-value for that?

A I don't know. It's -- well, I can tell you right -- I can tell you approximately what it is. I can't tell you exactly, because I don't have the raw numbers. I can tell you approximately. It's about .06 something, .07.

Q Pretty close to significant.

A That's not the point

Q It's pretty close to statistically significant, isn't it?

A It is. It is.

Q Did you consider stopping this study?

A With five versus zero? No.

Q There was no efficacy, was there?

A And this this study was a short-term -- what was the time? This is so many years ago, you have to remember. I have to read back as to how long the study was.

Q Five out of 72 patients

A This is a twelve-week treatment period study. We

didn't know the results until the study was over. So there was no -- there was no point you could have stopped it And five versus zero wouldn't have been enough anyway.

Q Five out of 72 people died in twelve weeks in your experimental group; true?

A Yes.

MR. BUCHANAN: Objection.

A Yes. As pointed out to you earlier, I wouldn't have stopped on five out of zero.

Q (By Mr. Raber) You didn't report relative risks for any of these safety endpoints, did you?

A No.

Q And in fact, in the text of this study on Page 1200, you state, "There was no difference in outcome between controlled release versus conventional aspirin in combination with anticoagulation."

Do you see that?

A Yes.

Q And it refers to Table 2.

A That's right.

Q Yet, there were five deaths in one group and none in the other.

A Right. It was nonsignificant.

MR. BUCHANAN: Objection. Asked and

answered.

A It's one -- primary endpoint of the study based on intent-to-treat had identical results in the two groups. And that's what that statement was based on.

Q (By Mr. Raber) Okay.

A And that's what it should have been based on.

Q There was a difference in deaths, wasn't there, of five to nothing?

A Nonsignificant, yes. But there were five - - there were one, two, three, four five endpoints here. If you made any kind of adjustment for the multiple testing, that wouldn't be anywheres near significant. You expect to see random of things like that in any trial.

That isn't to say, by the way, that I know for a fact that this other regiment might not be dangerous. It might be. I have no way of knowing that.

Q So I think we might -- you know, what you're saying, then, is if you see a study where the events are five against one drug and zero for the other, you can't reach the conclusion that that drug that had the five events is dangerous or that it's a signal, can you?

A No. I have already said that. I said that before you ever brought this study up.

Q You see, because the lawyers for the plaintiffs have

stood up and said that you can.

MR. BUCHANAN: Objection. That's an absolutely improper way to phrase a question.

A I have no idea what the lawyers said.

MR. BUCHANAN: Objection.

Q (By Mr. Raber) If somebody were to stand up in front of a jury and say a five to nothing difference was a basis for concluding that a drug was unreasonably dangerous, you would say, "I, Dr. Kronmal, would disagree with that"; correct?

A Correct.

MR. BUCHANAN: Objection to form.

A By itself. If that was the only thing that they said and that was the only piece of information they presented, I would disagree with it, yeah, absolutely. No question about it.

Q (By Mr. Raber) And have you heard of this thing ~~called the Fitzgerald theory?~~

A Yes, I've heard of it.

Q And what's your understanding of that?

A Well, apparently he had a paper or a presentation of some sort where he indicated that he thought that it was possible that the COX-2 inhibitors would have the effect of being pro-thrombotic.

Q By reducing prostacyclin?

A I believe that's the mechanism he assumed.

Q And the study that you're a coauthor of is inconsistent with that, isn't it?

MR. BUCHANAN: Objection to form.

A I don't know enough about the balance, either, to comment on that.

Q (By Mr. Raber) Because you found that by maximizing prostacyclin, you had no effect?

MR. BUCHANAN: Objection to form.

A I don't know if that proves anything about COX-2 inhibitors. I just don't know enough about the biology of the way thromboxin works and the way anti-platelet agents work, to comment on that.

This isn't aspirin, remember, and it's a totally different set of circumstances.

Q (By Mr. Raber) Are you knowledgeable about whether or not the prostacyclin that exists in the endothelium is made by the COX-1 enzyme or the COX-2 enzyme?

A I don't know much about the -- what human prostacyclin is produced in the artery wall

Q Do you know the answer?

A No.

Q Do you have an opinion about that?

A No I'm not an expert in that.

Q Have you ever done any work for Merck?

A Not as far as I know. I mean, the reason I say that that way is that companies merge all the time, and there could have been somebody who merged with Merck at some point in time that I had worked for and I didn't know they merged with them. So anything's possible.

As far as I know, I haven't.

Q On Page 2 of your report, you say that you were requested to review Merck's clinical trial data, "much in the same way that I would have done had I been asked to do so by Merck."

A That's correct.

Q How do you know what Merck would have asked you to do?

MR. BUCHANAN: Objection.

A No. What I was saying is, I would have done this review the same way as if Merck had asked me to review their clinical trial data.

~~Q (By Mr. Raber) Do you think Merck would have asked~~ you not to look at the studies that formed the basis for the approval for the drug?

MR BUCHANAN: Objection.

A I have no idea what they would have asked me. I wasn't specifying it that way I'm just saying, if Merck had said to me, "Dr. Kronmal, please review the data from our clinical trials with the aim of

determining whether there was a safety issue," I would have done the analysis identically the same.

Q (By Mr. Raber) Have you reviewed any studies that address the question of whether naproxen can mimic aspirin in its cardioprotective -- by protecting the heart against heart attack?

A I did look at the study of cats that Merck refers to. I didn't

Q C-A-T-S, cats, the animals?

A Yeah, the animals I did look at that study briefly. And I think there were eight cats that were sacrificed or something And they gave them a whole bunch of naproxen, some of them, and not the others And they saw some effect on the cats.

Q Have you looked at any studies by Carlo Patrono on this question?

A I have not looked at his studies. I have seen his -- I have seen a series of e mails from Merck, describing how Patrono did not believe that naproxen was cardioprotective.

Q Have you seen his study afterwards where he says that a combination of the protective effect of naproxen and the play of chance is a plausible explanation for the VIGOR results?

MR. BUCHANAN: Objection to form.

A No, I haven't seen that particular paper.

Q (By Mr Raber) Have you looked at any of the scientific literature, other than this study involving cats, have you looked at any of the other literature on the question of whether naproxen can be cardioprotective?

A No. I haven't. I looked for whether there was any clinical trial data, and I haven't found any.

Q Are you familiar with Eric Topol?

A Yes.

Q Have you read the paper that Dr. Topol wrote with Dr Nissen and another doctor?

A Yes, I did read that paper.

Q And the method Dr. Topol used would show a protective effect of naproxen of greater than 70 percent, wouldn't it?

A I don't know what you're talking about.

~~MR. RABER: Mark this as Exhibit 8.~~

(Exhibit No. 8 marked for identification.)

MR. BUCHANAN: Do you have the whole article? I don't know what you're going to refer to. I have one. I don't know if he's going to need it, but as a courtesy.

MR. RABER: I don't think he will.

Q (By Mr. Raber) Exhibit 8, I'll represent to you, Dr. Kronmal, is a portion of Dr. Topol's article. Specifically, it's Figure 3 that's been blown up and highlighted.

A I see that.

Q And the second page of this exhibit is a document from the FDA review of Vioxx.

A Yeah, I see that.

Q Okay. And do you understand that in Dr. Topol's study, what he did was, he took the annualized rate for myocardial infarction in some placebo studies and compared that against myocardial infarction rate for Vioxx from the VIGOR trial and Celebrex from the CLASS trial, and that's what Figure 3 represents?

A Yes.

Q And what he concluded was that, based on this type of analysis, that there was an excess risk of Vioxx compared to placebo.

A That's what he concluded

MR. BUCHANAN: Objection to the form.

Q (By Mr. Raber) Now, do you see on the second page, that he took that annualized rate for Vioxx from the FDA review memo here, where it's highlighted with .74?

A I see that.

Q And that the naproxen rate was .15?

A Mm-hm.

Q "Yes"?

A Yeah, I see it.

Q Now, if we were to plot the naproxen rate on Figure 3 on placebo -- you see where there's a yellow bar that goes across there?

A Mm-hm.

Q And if we were to put 0.15 there, using Dr. Topol's method, that's a cardioprotective effect of naproxen of greater than 70 percent, isn't it?

MR. BUCHANAN: Objection to form.

Q (By Mr. Raber) You're smiling.

A Yes. It's based on four events. That's not enough to estimate the rate. It's clearly not enough. No one would estimate a rate based on four events

~~Q Sir, using Dr. Topol's method --~~

A But he didn't base this result on four events. He based it on a much larger placebo experience. If he would have based it on four events, I would have said this paper was full of it, was just totally crap.

Q But you're basing your conclusions of Vioxx versus naproxen on the same four events.

A I'm not -- I'm not doing it on the rate. I'm doing it

on the comparison of within a randomized clinical trial of naproxen versus Vioxx, where there was 20 versus four.

Q Well, we're doing the same thing here.

A No, you're not.

MR. BUCHANAN: Objection to form

A You're absolutely not.

Q (By Mr Raber) What if you plot the annualized myocardial infarction rate for naproxen from the VIGOR trial, the same trial that's portrayed here for Vioxx, is the cardioprotective effect of naproxen greater than 70 percent?

A It's not -- you can't do that. It's four events

Q Is it greater than 70 percent?

A You can't estimate a rate based on four events.

Q Sir, is it greater than 70 percent?

A I don't care what it is. It's irrelevant. It's totally irrelevant You want me to make a statement that is scientifically unjustified based on four events.

Q Sir, mathematically, is it more than 70 percent?

A Mathematically, it well may be. That's a totally useless number.

Q So what do you think of -- do you have any opinions about the methodology used by Dr Topol here,

comparing the placebo rate from other trials to the rates from the VIGOR study?

A I'm not

MR. BUCHANAN: Objection. Form.

A I'm not impressed with it as a very strong way of doing things, no. It's weak. You know, it may have been the best he could do under the circumstances, but it's weak. I think he would agree to that, actually, if he was asked.

Q (By Mr. Raber) I guess you haven't met Dr. Topol.

A No, I have not.

MR. BUCHANAN: Objection to form.

A I have not.

MR BUCHANAN: Steve, are you moving into a new area?

MR RABER: You want to take a break?

MR. BUCHANAN: I do.

MR. RABER: Yeah.

MR. BUCHANAN: Thanks

(Recess 2:53-3:12 p.m )

////

////

////

////

EXAMINATION (Continuing)

BY MR. RABER:

Q Sir, on Page 13 of your report, you talk about an Expression of Concern that was published by the New England Journal of Medicine

A That's correct.

Q What have you read or reviewed in connection with forming that opinion?

A I read the Expression of Concern.

Q Did you read anything else?

A I read the responses to the Expression of Concern.

Q Have you read any of the testimony of the people involved?

A Actually, I think I've seen the deposition of somebody from the New England Journal.

Q Curfman?

A Might have been. I don't remember.

Q Do you know which one you saw?

A No I didn't -- I didn't really care for that. Just sort of skimmed it

Q Do you feel like you know enough facts about that episode to form judgments and conclusions about it?

A About what episode?

MR. BUCHANAN: Objection to form.

Q (By Mr. Raber) About the Expression of Concern.

A I mean, I have written my conclusions in here, obviously.

Q Were you aware that the New England Journal of Medicine hired a PR firm to help it with its timing of filing this thing?

A No, I don't know that.

MR. BUCHANAN: Objection to form.

Q (By Mr. Raber) Would it be appropriate, in your view as a scientist, to time the release of an Expression of Concern in connection with a trial that was going on involving Vioxx?

MR. TISI: Objection. Incomplete statement of facts

MR. BUCHANAN: Objection.

A I don't have any idea why they did what they did in connection with that. I don't know what they did, I don't know why they did it, and I don't know when they did it.

Q (By Mr. Raber) Do you know whether or not anyone ever sent a letter to the New England Journal of Medicine, alerting them to -- let me back up.

You've said that the additional events changed the results in a meaningful way because there's a difference in the relative risk. True?

A Yes.

Q Okay. What did Merck report as the relative risk in the original VIGOR manuscript? 0 2; correct?
A That's correct.
Q And what was the relative risk after the change?
A I think the same.
Q So the relative risk remained the same, didn't it?
A Yeah, that's true enough. But the number of events they reported did not stay the same and statistical significance did not stay the same.
Q But it was still significant under both scenarios; true?
A Not as much in the first case
Q Do you believe that the original numbers reported in the New England Journal of Medicine were strong signal of a heart attack risk in Vioxx?
A Yes But, you know, there's an obligation to present the data accurately and completely.
Q Have you ever used pre-specified cut-off points for data in a study?
A To the best of my knowledge -- and I can't tell you for certain that there wasn't some study where it wasn't true -- we tried in all studies I've been involved with to report the most up to date data we had available to us, and as complete as we possibly could make it

Q Do you understand that somebody could accuse a company of cherry-picking if they decided in some circumstances to honor a pre specified cut-off date and didn't in others?
A I don't think that's true.
MR. BUCHANAN: Objection to form.
A Not -- not in this case. Because in this case, you want to get all the events reported. And for somebody to say that they're dishonest because they're being accurate, to me, is ridiculous. That would be ridiculous for someone to do.
Q (By Mr. Raber) Did you know that there was an additional GI event in the naproxen group that would have made Vioxx look better had they reported that?
A They should have reported it then.
Q Did you know that Merck provided all of the information to the FDA in October of 2000?
A Yes, I do.
Q And did you know that that information was publicly available on the FDA website in February of 2001?
MR. BUCHANAN: Objection. Form.
A I believe you And I don't remember the exact dates
MR. BOEHM: Mr. Buchanan, you probably don't notice that you're doing it, but you continue to -- just let me finish -- you continue to

shake your head yes and no. It could be construed as coaching the witness.
MR. BUCHANAN: And I appreciate that. I'm asking a question foundationally, I guess. And I could have objected to foundation, if I was making those objections, but I think we're reserving those, because I don't believe that factually to be true. So that's my concern.
MR. BOEHM: I understand. I'm talking strictly about your nonverbal cues.
MR. BUCHANAN: I appreciate that, and I'll accept that comment, but I was questioning the accuracy of the question or the premise of the question.
MR TISI: Are you both on the same side here? I mean, you represent a different party here, or we have one questioner and one --
MR. RABER: You know what? You know what? Do you represent a party?
MR TISI: Yes, I do. I represent the MDL in this litigation, and he represents New Jersey.
MR. RABER: Just let him talk. It's between Mr. Buchanan and him.
MR. BOEHM: That's all I had to say,

Chris. That's fine. It's going to be fine.
MR. TISI: I think that's inappropriate.
THE WITNESS: By the way, I never noticed what he was doing.
MR. BUCHANAN: I was actually admiring that you got the answer to the question, frankly. I didn't know that was the case, and I'll validate that.
Q (By Mr. Raber) Are you aware that a doctor sent a letter to the New England Journal of Medicine in June of 2001, alerting them to the FDA's posting the website of these additional data, and that the New England Journal refused to publish the letter because they said they didn't have enough space?
Are you aware of those facts?
MR. BUCHANAN: Objection.
Can I get a read back?
(Question on Page 192, Lines 10 through 16, read by the reporter.)
A Not that detail, no.
Q (By Mr. Raber) Did you consider that in forming your opinions about the validity of this Expression of

Concern?

MR. TISI: Let me just pose an objection. Assumes facts not in evidence.

A No, I don't even know why it's relevant to that. I didn't consider it.

Q (By Mr. Raber) Don't you think it would be unusual for someone to know about something in 2001 and then make a big deal of it in December of 2005, something they had known about more than four years?

A Well, I don't know who knew about it within the New England Journal, so I have no idea. The person that made that decision could have been totally different than who made the decision about the Expression of Concern.

Q (By Mr. Raber) Do you know the term CYA?

MR. BUCHANAN: Objection

A No.

Q (By Mr. Raber) Cover your back side?

A Yeah, yeah, I've heard it before.

Q Does that sound like a CYA move to the New England Journal, to you?

MR. TISI: Objection. Improper question.

A I can't say what New England Journal thought or didn't think. I mean, I don't know what's going on with

them.

Q (By Mr. Raber) Do you understand that --

MR. TISI: Please mark that question and answer in case we have to go to the judge, please. Thank you

MR. RABER: On what?

MR. TISI: Inappropriate and unprofessional behavior.

Go ahead

MR RABER: What's inappropriate about it?

MR. TISI: The questions and the manner in which you're asking a lot these questions is inappropriate.

MR. RABER: What was wrong with the question about a CYA response?

MR. TISI: You think that's an appropriate question to ask an expert witness?

MR. RABER: Yeah.

MR. TISI: Okay. We'll see what the judge says. Go ahead.

MR. RABER: I mean, I'm no Mark Lanier.

MR TISI: Nor am I, and nor is anybody in this room.

MR. BUCHANAN: Now you're making faces.

Q (By Mr. Raber) Have you reviewed the materials that Merck submitted to the FDA advisory committee for the advisory committee that occurred in February of 2001, relating to the VIGOR study?

A Yes

Q And do you have any opinions about whether Merck appropriately disclosed the data about heart attacks?

A Unless it says specifically in my report, I don't have any other comments about that. I just don't -- I don't remember if it's -- if I said something in my report, then I'll be glad to look at that.

Q They reported the actual final number of heart attacks to them?

A Oh, yes, they did. If that's what you're asking me, yes, they did. They reported 20 versus four.

Q So the advisory committee had the benefit of that full information in deciding how to label Vioxx?

A That's correct

MR. TISI: Objection.

A Well, I don't know about that, but they had the full information, yes.

Q (By Mr. Raber) And in its submissions to the FDA, Merck laid out that there were at least two possible

explanations for the difference that was seen in VIGOR for heart attacks: One that Vioxx could be pro-thrombotic, and one that Vioxx could be protective?

MR. TISI: Objection to form. Objection.

A Well, I mean, they may have mentioned that there were two, but they -- the emphasis entirely was on the naproxen protective aspect. But that's --

Q (By Mr. Raber) Because that's what they believed.

MR. BUCHANAN: Objection.

A Yeah, they believed that, that's correct They believed it, no doubt

Q (By Mr Raber) But everybody knew there was that other possibility?

A I sure hope so, yes.

Q Well, they did; right?

MR. BUCHANAN: Objection.

A I believe they did, yes

Q (By Mr. Raber) Can you cite any source that supports your opinion that Merck should have included data beyond the specified cut off point in its New England Journal of Medicine publication?

MR. TISI: Objection. Assumes facts not in evidence.

A Again, you're asking me a question about whether or not data should be reported accurately or not, and I don't think that's something that somebody has to write down on a piece of paper and say there's some code that you have to report data accurately.

Q (By Mr. Raber) The data was accurate given the cut-off points, wasn't it?

MR. TISI: Incorrect statement of fact.

MR. RABER: What? Don't -- you're answering that question, sir. Say "objection to form." Don't answer the question.

MR. TISI: Okay. Objection. Misstates the fact.

MR. RABER: And my tone is loud right now because that is an improper --

MR. TISI: It's a misstatement of fact, and you know it is.

MR. RABER: No. He can correct me.

MR. BUCHANAN: No --

MR. TISI: There was no pre-specified cut-off. You know that.

MR. RABER: You know there was too.

MR. TISI: You know there was not.

A Well, two aspects of that I'll try to answer

One is, there's nothing in the New England Journal article that says there was a pre-specified cut-off point. There's not a word. Not one word, by the way.

Q (By Mr. Raber) That was peer-reviewed, wasn't it?

A Yes

Q Assuming that there was a pre-specified cut-off date --

A I don't know about the pre-specified cut-off date.

Q I'm asking you to assume that.

A All right.

Q If you're reporting data as of that date, it's accurate; right?

A It's accurate of that date. It's not an accurate representation of what you know. And it's what you know that is much more important than the date. The date is an arbitrary thing.

As an example, suppose they had found 18 more ~~events in naproxen. Suppose they had~~

Q Yes.

A And now there was absolutely no difference between the two groups Do you think they should have reported that that was five times increased risk?

Q I think that the Merck people would say that they did find a GI event that was different

A You're talking about one event that didn't materially

change anything at all. We're talking about -- I'm giving you an example.

Q Thank you for that answer.

A You're wanting to do hypotheticals, so I will give you one back.

Q Okay.

A There are 18 additional --

Q I'm not here to answer questions, sir.

A I know you aren't, but I'm giving this answer. Suppose there were 18 additional --

Q Well --

A I'm trying to explain why.

Q I get your point. You said a small number of events is not material.

MR. BUCHANAN: He's entitled to explain his answer.

A I didn't say that at all. You misunderstood what I said, then

Q (By Mr. Raber) The record is clear.

MR. BUCHANAN: He can finish his answer. This is ridiculous. He's entitled to explain his answer.

MR. RABER: You're raising your voice, Mr. Buchanan.

MR. BUCHANAN: You know what? The

conduct in this deposition has been so unprofessional, in my opinion You don't have factual foundation for questions. Your premises are loaded, and they're --

MR. RABER: Save it for the jury.

MR. BUCHANAN: -- and they're not properly founded.

MR. RABER: Save it for the jury.

MR. BUCHANAN: No, you're not entitled to do that.

Please feel free to answer the question.

MR. RABER: No, I don't want him to --

MR. BUCHANAN: That's rude to the witness.

MR. RABER: I don't want a filibuster.

MR. BUCHANAN: It's not a ~~filibuster.~~

MR. RABER: It is a filibuster.

MR. BUCHANAN: You know what a filibuster is? It's spending two hours today retreading his old report

MR. RABER: Don't point your finger at me.

MR. BUCHANAN: It's spending two

hours retreading his old report.

MR. RABER: Don't point your finger at me.

MR. BUCHANAN: That's not pointing.

Can you please read back his last answer before he was rudely interrupted?

MR RABER: No, let's go. Let's question and answer. Come on.

MR BUCHANAN: No, he's entitled to answer the question.

MR. RABER: There was no question pending.

MR. BUCHANAN: Please explain yourself, Dr. Kronmal.

Can you read back where he was -- at the point where he was interrupted?

THE REPORTER: Give me one second to find it.

(Question/Answer on Page 199, Lines 13 through 14 and 17 through 18, read by the reporter.)

A That's what I was trying to elaborate. And my point is, that's not the issue. The issue is, if you have

other data that's available - let me finish.

MR. RABER: This is nonresponsive.

MR. BUCHANAN: You're interrupting him again.

A I'm trying to answer the question. You may not think it's what -- it's relevant. I do.

If you have important information that would change the interpretation of the results, and you know that before the publication, you should always change the paper.

And my illustration was -- you gave me a hypothetical, too. My illustration was, if you had seen 18 more events in naproxen and no new events in Vioxx, it would be absolutely inappropriate to report that the relative risk was five when it was one.

And the point is, you don't report in the medical literature data that you know to be inaccurate And ~~that's what was done here.~~

Q (By Mr. Raber) Well, you had a key qualifier in your last answer. You said, if you believe it to change the analysis or change the --

A No. No

Q You said that. And so if someone doesn't believe that, do you give a different answer?

A No. I said you need to --

Q What's the basis for that?

A I said, you need to report the data accurately. Doesn't matter whether I believe it changes it or not.

Q If you reported it as of a cut-off date, it's accurate, regardless of if there's data later; true?

MR. BUCHANAN: Just, make sure you get your answers in before you accept the next question.

A No, it is not accurate if you don't supply all of the data you know. It is simply inaccurate.

Q (By Mr. Raber) What's the source, the basis, for your opinion on that, that you always report everything you know?

A Well, New England Journal of Medicine published an Expression of Concern based on that.

Q Right.

A That's a very serious thing for them to do. They agree with me. I don't know. What other source do you want?

Q But you don't know all the facts and circumstances surrounding that, do you?

A I don't need to know any other facts. They didn't report the data accurately to the New England Journal of Medicine. They should have.

Q Well, there are, what, ten non-Merck authors who

disagree with you on that; true?

MR. BUCHANAN: Objection.

A They, first of all, said they didn't know about those three other events.

Q Sir, please answer the question.

MR. BUCHANAN: He's trying -- objection. He is trying to answer the question The record should not reflect that he was not answering the question You're cutting him off over and over.

Q (By Mr. Raber) Sir, there are ten non-Merck authors on the VIGOR study who disagree with you, aren't there?

MR BUCHANAN: Objection to form

A Disagree that they should have provided that data?

Q (By Mr Raber) Yes.

A I don't know if they disagree with me, all ten of ~~them.~~

Q Did you read their response?

A Yes. It was exactly the same as Merck's.

Q And they disagree with you.

A They disagree, sure.

Q Sir, would you agree with me that extreme caution should be used in extrapolating results to portions of a population that were not represented by a sample

included in a study?

A Yes, I do.

Q You published -- or you were an author in drafting some guidelines for the management of transient ischemic attacks.

Do you remember that?

A Yes

Q Through the American Heart Association?

A Yes, I do.

Q And among the recommendations that you gave in 1994, you stated that aspirin is the standard medical therapy used for prevention in patients at risk of stroke.

A That's correct.

Q And you cited studies that said that aspirin reduces the risk of stroke or death

A That's correct.

Q In 1998, you did a study called "Aspirin use and incident stroke in the Cardiovascular Health Study," where you were the lead author.

Do you remember that?

A I do.

Q And in that particular study, in 1998, you told the scientific community that aspirin use was associated with increased risks of stroke; true?

A In that very old population, yes, I did.

Q That's different from what was being said in 1994; true?

A That's correct

Q And then in 2003, you published something called "Lessens from the stroke prevention in atrial fibrillation trials"; true?

A Yes.

Q And in that, you went back and said that aspirin reduces the risk of stroke.

A In patients with atrial fibrillation, yes.

Q Okay.

A But the people in the previous paper you referenced weren't in atrial fibrillation

Q So is that an example of how a drug can have different effects on different patient populations?

A Absolutely. No question about it.

~~Q And that we should use caution in taking results from~~ one patient population and generalizing them to a different patient population?

A True. Truly.

Q And also, this aspirin use and incident stroke study that you did, that was what's called an epidemiological study?

A That's correct.

Q And I take it you would agree with me that one generally cannot infer or determine causation from an epidemiological study?

A Absolutely. And we say that. As a matter of fact, we point out all the reasons why that may or may not be a real finding that we have.

Q Even if you have a doubling of a risk; true?

A In an epidemiologic study?

Q Yes.

A Absolutely. No question.

Q So if someone were to, in this case, point to an epidemiological study that had a relative risk of, let's say, anywhere from 1.2 to 2, and argued that that shows that Vioxx causes heart attacks and strokes, you would disagree with that; true?

MR. BUCHANAN: I didn't get your numbers.

MR. RABER: 1.2 to 2.

MR. TISI: Let me object.

MR. BUCHANAN: Objection.

A I would say that you would not want to make causal inferences from epidemiologic studies.

Q (By Mr. Raber) And if someone were to argue that to a jury in this case, that an epidemiological study with a relative risk of, let's say, 1.2 to 2 against Vioxx,

you would disagree with that; right?

MR. TISI: Objection.

MR. BUCHANAN: Objection to form.

A Well, not necessarily. It depends on what context it was placed in.

If they were to say that, for example, that given the clinical trial data, this other epidemiologic study seems to support this hypothesis, I wouldn't disagree with them.

If they were to make the statement that on the basis of that epidemiologic study alone, that that was enough information to say that Vioxx causes it, I would disagree with that.

Q (By Mr. Raber) And you would especially disagree with using epidemiological studies to infer causation when the results of epidemiological studies are a mixed bag; in other words, some show an increased risk, some ~~show no increased risk?~~

MR. BUCHANAN: Objection to form.

MR. TISI: Objection.

A It's not whether some show an increase or some don't, because you expect that. There's this random variation; there's different comparison groups, there's different compilations. There's all those differences

If you're wanting to know whether or not I believe that the inferences from epidemiologic studies are much weaker than from clinical trials, I absolutely agree, they are.

Q (By Mr. Raber) And it would be wrong to infer causation just from the epidemiological studies?

A Just from the epidemiological? Yes, that would be wrong.

Q Okay.

A No question about it.

Q I want to show you something that we'll mark as Exhibit --

MR. RABER: What are we up to?

THE REPORTER: 9.

(Exhibit No. 9 marked for identification.)

A You're probably the only person in the world that's read all my papers, literally.

MR. BUCHANAN: You may be praising him too much.

THE WITNESS: I'm impressed. That's good.

MR. BUCHANAN: What are we looking at?

Q (By Mr. Raber) Exhibit 9, I'll represent to you, is a Table 5 from a study. And I'll represent to you that I have written in "Dose 1 NSAID" and "Dose 2 NSAID," but that this is actual data from a study.

MR. TISI: Which study?

Q (By Mr. Raber) Doctor, in looking at those numbers

MR. TISI: Can I ask what study?

MR. RABER: You can ask.

MR. TISI: And you're not going to say?

MR. RABER: That's right.

MR. TISI: Okay.

Q (By Mr. Raber) In looking at this data, I will tell you that this was a study to see whether or not a drug could prevent colorectal adenomas. Okay?

A Mm-hm.

Q Now, you see there that for myocardial infarction, the placebo group had one heart attack, and that the NSAID had two heart attacks in one group and five in the other group?

A Mm-hm.

Q Correct?

A Yes, I see it.

Q Is that a signal that the NSAID that's there might cause heart attacks?

MR. BUCHANAN: Objection to the form. Incomplete hypothetical.

A Well, I mean, "might" is a hard-to-quantify word. I don't think it's particularly strong one way or the other.

Q (By Mr. Raber) It's a placebo-controlled trial?

A I know. The numbers are too small.

Q Well, if you combine myocardial infarction and stroke -- which you have done before as an endpoint; true?

A No, I haven't.

Q You've never done that?

A Well, no, not in this context.

You mean in my Vioxx report?

Q Any study. Have you ever combined myocardial infarction and stroke?

A Oh, surely, but for a totally different purpose

Q But they're both thrombotic events; true?

A Yes.

Q Both serious?

A Yeah.

Q All right If you combine myocardial infarction and stroke, you have a ten-to-one difference

A Yeah.

Q -- between the NSAID and placebo. Do you see that?

A Yes, I do.

Q Is that a strong signal that there might be a problem with that drug?

A It's certainly a signal.

Q A strong one?

A The numbers are still small, but I would be concerned about it if I was involved in it.

Q And I think -- would that be statistically significant, ten to one?

MR. BUCHANAN: Objection to form.

A Again, you would have to -- yes, it would be.

Q (By Mr. Raber) And you told us this morning that if you had a statistically significant result in a placebo controlled trial, that that means there's causation; true?

MR. BUCHANAN: Objection to form.

A It's evidence of causation It doesn't mean there were, because it could be chance.

Q (By Mr. Raber) But it's statistically significant

A I know. It still could be chance. Statistically significant results occur by chance

Q Okay. But unlikely to be chance?

MR. BUCHANAN: Objection to form.

A Well, if this were pre -- I mean, the -- but the combining of it obviously makes it a little bit harder

to assess, because -- because you could have included cardiovascular revascularizations in there if you wanted, too, and then it would have not been significant. So -- and you could have included death in there and it wouldn't have been significant.

So it's certainly enough to be of concern. Let's put it that way.

Q Isn't that what you did here? You decided to combine heart attack and sudden cardiac death; true?

MR. BUCHANAN: Objection to the form.

Q (By Mr. Raber) True?

A I included sudden cardiac death for the reason I specified, which is that oftentimes it is actually a myocardial infarction. In old people, particularly it's hard to tell. For that reason, I thought it was appropriate to combine it.

To say in retrospect, I probably should have used hard CHD all the way through, but that's in retrospect.

Q But certainly the five to one on heart attacks is a signal of potential for thrombosis; true?

A It would be a concern, yes. Absolutely.

Q And that might lead you then to see other thrombotic events, such as stroke, and want to combine them

together; true?

A No, you wouldn't want to combine together. It would be confirmatory that there might be a problem, yes.

I mean, if I saw this, I would think there probably was a problem with this drug and that something should be looked at more carefully.

Q And would you advocate allowing people to take this drug?

MR. BUCHANAN: Objection to form. Incomplete hypothetical.

A It would depend on what other information there was. I wouldn't know enough about this to know. There may have been another trial just like this that showed something totally different.

Q (By Mr. Raber) Could this reflect that people with colorectal adenomas are a different type of patient population that is susceptible to heart attack or stroke with NSAIDS?

A Could. It could. I mean, it could be if you took people who were children and you gave them the same drug, nothing would happen to them. I don't know.

The problem is, we don't know what would happen in other groups, unless there's been a study that looks at those other groups. And if you don't know, then you have to be cautious and say, We don't know; and,

therefore, we shouldn't be using it in anybody.

Q Okay. Would you -- based on this data, would you advocate doing another study like this, with this drug?

MR. BUCHANAN: Objection to form.

A Depends what other information there were out there. The answer is, I might. It depends on what other information that was available.

Q (By Mr. Raber) Even with a ten to one statistically significant difference of heart attacks?

A I personally would not want to use this dose in another study, you know, this second dose. But the intermediate dose, I wouldn't have enough information to know.

But you're right, I would be very worried about this if I saw this.

Q You would be worried about this drug?

A Yes, I would be.

Q And its propensity to cause heart attack or stroke?

A I would be worried about that possibility that it was dangerous. If this was the only information I had, if there were no other studies, this was it, I would be worried about it, yes, absolutely. No question about it.

Are you going to leave us in the dark about what

this is? I can guess, but...

MR. BUCHANAN: I'll just object to the prior inquiry. I think it's improper. But go ahead.

Q (By Mr. Raber) You refer to the Juni article in your report.

Do you remember that?

A That's correct.

Q And what Juni purported to do was look at the relative risk for heart attack for Vioxx across all Vioxx studies; true?

A That's correct.

Q But Juni did not --

A All arthritis studies.

Q Well, more than that, right, because he included studies involving low back pain and some things like that; true?

A I don't think so. I think he just included arthritis studies. My recollection is, entirely arthritis studies.

Q I'm looking at -- here, I'll give you a copy.

MR. RABER: Let's mark this.

(Exhibit No. 10 marked for identification.)

////

A Yeah, he specifically says musculoskeletal disorders. I mean, that could have included back pain. I don't know.

Q (By Mr. Raber) Sir, look at Table 1. It's on Page 3. Do you see there, about the third study from the bottom, he includes the chronic low back pain studies?

A Yeah, he did I just didn't remember that.

Q One thing Jnni did not include, though, was the Alzheimer's data. True?

A That's correct.

Q Can you think of any reason why he would exclude that?

A Yeah. He said the reason. The data wasn't available to him at the time. That was one reason.

And the other reason commented on was that -- oh, by then, it might have been available, actually, come to think of it.

Q Are you saying in November of 2004, it wasn't available?

A Yeah, it probably was available to him.

I mean, I'm not Jnni, so I can't totally speak for him, but he said -- when he was questioned about that by Merck, he said basically that the osteoarthritis was the approved indication for the drug, and therefore, he restricted his analyses to the approved indication.

Q Right. Now, you know that when the VIGOR study was done, that 50 milligrams wasn't approved for chronic use, don't you?

A I understand it wasn't, yes.

Q But he included that in this, didn't he?

A Yeah, but because it was approved at this time.

Q It wasn't approved when it was used with patients, was it?

A No. But what is approved at the time he did the --

MR. BUCHANAN: Objection to form.

A It was approved at the time he did his analyses.

Q (By Mr. Raber) Do you think that's a valid basis for excluding data from over -- from that number of patients?

A I think, actually, if he had really known what the results were from the Alzheimer's, he wouldn't have probably included it, but it wasn't favorable.

Q For heart attacks?

A Yeah It wasn't favorable.

Q It was not statistically significant, was it?

A It was if you included --

Q Sir, heart attacks --

A It was if you included -- I consider a sudden cardiac death a heart attack.

Q You do?

A Yeah. It is. You can ask any cardiologist in the world, they will tell you it's a heart attack.

Q A sudden cardiac death is a heart attack, according to any cardiologist?

A That's true

Q But you did more than that, because you took sudden deaths that you just inferred that they were heart attacks; true?

A No, I didn't. I mean, I -- because if you looked at the actual Thal paper, which I mentioned before, they reclassified a large number of them as MIs So I had indirect evidence that they even thought they were MIs; even Merck thought they were MIs

Q Who reclassified them?

A Merck. That's the only one that could have.

Q Are you sure about that?

A Who else would have done it?

Q Are you sure that they reclassified them?

MR BUCHANAN: Objection to form. Asked and answered.

A Well, how could they change the numbers?

Q (By Mr. Raber) Is it possible that the Thal article reported investigator reported events and the CSR to the FDA reported adjudicated events?

A No. I checked that, and he reported the same events.

He changed the classification.

Q Sir --

A He could have changed it on the basis of the investigator. I don't know why he said that. He said they were adjudicated I don't know.

Q Thal said that they were adjudicated?

A I believe so.

Q We'll look at that.

MR. RABER: Can we get the Thal articles out, Paul?

MR. BOEHM: Sure.

A I believe he did. But the point is, it's immaterial because --

Q (By Mr. Raber) No, don't change the subject.

MR. BUCHANAN: No.

MR. RABER: There's no question pending

MR. BUCHANAN: He's finishing his last point

MR RABER: He's arguing.

MR. BUCHANAN: You're arguing

You can answer.

A The point I was trying to make was that Thal thought -- or if he did it itself and it wasn't adjudicated, he thought those were MIs, and reported

it that way.

And the point is, if he's making the same point I am, you can't tell an MI from a sudden death in someone who is on the floor and there's no one that observed them and there was no autopsy done.

So --

Q (By Mr. Raber) Have you ever talked with Thal?

A No, I haven't.

Q How do you know what Thal thought?

A It's what's in his paper. I'm not basing it on what he thought.

Q You just told me what Thal taught.

MR. BUCHANAN: Objection. Argumentative

A If he put --

MR BUCHANAN: We are winding down if that's the direction this is going to go in. You know, it's been all day. I've about had it. I think the witness has, and I think everybody has. You've been talking on him, you've been stepping on him, you've been insulting, and that's enough.

MR. RABER: I disagree with that characterization.

MR. BUCHANAN: Well, you know what? The record is what it is, and I think everyone in the

room knows what it is.

A If he had put in this paper that those were MIs, he must have thought they were. If you disagree with that, that's your business, but I don't understand how you can make that statement.

Q (By Mr. Raber) Sir, let's look at Defense Exhibit 688.

A No, we haven't finished looking at Thal's paper. I want to see if it --

Q Juni?

A No. I'm talking about Thal.

Q You don't have Thal there.

MR. TISI: I just gave it to him.

MR. BUCHANAN: Do you want to mark it?

MR. RABER: No, this is mine

MR BUCHANAN: Oh, I thought you wanted to mark it.

Q (By Mr. Raber) We can look at Thal. Let me just show you something here.

If you look at Thal on Page 7 -- are you on Page 7?

A No. I'm just looking at the oh, they were all adjudicated, says here.

Q What page?

A Says on Page 3, on the bottom of the left-hand paragraph, if you look at the very bottom of that, it says, "All serious vascular events, including (inaudible)" --

THE REPORTER: You're talking to fast. I can't understand.

Q (By Mr. Raber) It doesn't say deaths

A No, it doesn't say deaths. You're right. But deaths were adjudicated by Merck in the same way as these events, so I can't believe he would have taken a non-adjudicated.

Q Well, let's look at Page 7.

So you were incorrect in suggesting that deaths were adjudicated in this paper; right?

A No, I don't know that.

MR. BUCHANAN: Objection. The record was MIs.

Go ahead.

A I don't know that.

Q (By Mr. Raber) I'm sorry, sir?

A I don't know whether I was wrong or not. He doesn't say.

Q On Page 7 --

A I'm looking there. Give me time, please.

Q Do you see about three-quarters of the way down the

page, he says -- refers to the term "cardiac arrest"?

A Yes.

Q Do you know that cardiac arrest was not an adjudicated term under Merck's protocol and adjudication program?

MR. BUCHANAN: Objection.

A Merck adjudicated all deaths.

Q (By Mr. Raber) Sir --

A In their protocol, they adjudicated all deaths.

Q Do you know that the term "cardiac arrest" was not an adjudicated label for a death?

A Well, they called it sudden cardiac death. That's the same term.

Q Sir, doesn't that indicate to you that cardiac arrest was investigator reported rather than adjudicated?

A No, it doesn't indicate that. It might have been. It might have been. I don't know.

Q Well, wouldn't that have an impact on your opinion --

A No.

Q -- that people were changing things?

MR BUCHANAN: Objection to form.

A They changed he changed -- one way or another, this has Merck authors on it. Every other author, except for Thal, I think, is a Merck employee. Okay? They saw this data. They had the adjudicated mortality data available to them.

If they thought that this wasn't the right thing to report, they could have changed it.

Q (By Mr. Raber) Do you know whether --

A The statistical analyses in this paper was done by Merck's statistician, not by Thal.

Q Do you know whether the adjudication had been completed when this was submitted for publication?

A Yes, they were 2005.

Q When it was submitted for publication?

A That was in late 2003. It was already reported to the FDA, the studies, with adjudicated events.

Q But you don't know whether or not the events reported here are adjudicated or investigator reported, do you?

MR. BUCHANAN: Objection to the form.

Q (By Mr. Raber) Just admit, you don't know.

A I don't know --

MR. BUCHANAN: Objection.

A -- but it's irrelevant. But it makes the same point.

Q (By Mr. Raber) But you're accusing people of changing things, when --

MR. BUCHANAN: Objection to the characterization.

Q (By Mr. Raber) Are you accusing Merck of changing things?

A I have said that the results that were reported here are not the same results as they reported to the FDA.

Q (By Mr. Raber) And my simple question --

A That's true. That's a true statement.

Q Yes. And my question is, can that difference be explained by one set being adjudicated and another being investigator reporting?

A It could be.

Q Okay. And you just don't know one way or the other?

A No, I don't.

Q But you made the accusation that people changed things without knowing the answer to that question; true?

MR. BUCHANAN: Objection to form.

A I didn't say they changed things. I said they were different. That's a change. I mean, isn't it?

If Merck thought this wasn't accurate, they had the ample opportunity to change it to the accurate representation. Merck's authors are on here. They did the analyses.

Q (By Mr. Raber) You said they reclassified them. True?

A Somebody reclassified them.

Q Well, how are they reclassified if they go from investigator reported to adjudicated --

A Does he say there -- you show me where he says --

Q Sir, please don't interrupt.

A -- investigator reported. You show me where he says that.

Q I'm telling you that in that article -- well, I don't need to do that.

My question for you is --

A Do you have the testimony of Thal?

Q Sir, my question for you --

MR. RABER: Sir, would you please tell your witness not to be so combative and to ask me questions?

MR. BUCHANAN: With due respect, Counsel, I think you've been nothing but combative for most of the day.

MR. RABER: Sir --

MR. TISI: If you would like to take a break, we can take a break, because I think you're both -- I think this is going the wrong direction.

Q (By Mr. Raber) Let me ask you this question. If an event is investigator reported and then it's adjudicated and there is a different description for the event as a result of the adjudication are you with me so far?

A Yes.

Q -- is it fair to call that a reclassification?

A You could.

Q Okay.

A It is.

Q Is there anything improper about doing an adjudication and having a result or a description that's different from an investigator reported event?

A No. But in 2005, to report events that have now been changed in their classification as something different is improper.

Q Now, see, there you've said it again. You said "change." And you've been denying it, and you just said it again.

A No. No. The evidence --

MR. BUCHANAN: Objection again.

Q (By Mr. Raber) You said --

MR. BUCHANAN: I'd like to take a break. I think we need a break from this, Counsel. This is wrong. Your tone, your tenor, is wrong.

MR. RABER: My tone is fine.

MR. BUCHANAN: There you go again. You're being insulting.

MR. RABER: He keeps using the word "change" and then he denies it. It's in the transcript.

MR. BUCHANAN: Counsel, this is not

professional, the conduct of this deposition. It's wrong. Let's take a break.

MR. RABER: There's a question pending. You can't take a break when there's a question pending.

MR. BUCHANAN: You know what? I'll take a break.

Let's go. We'll be back in a minute.

I won't discuss the question with him. I think this room is the wrong atmosphere for this conduct right now. I think that the tone, the tenor, what you're trying to do with this witness is wrong. I'm not going to allow the witness to be exposed to it. If there was still a judge on the East Coast or Central time who could hear this right now, I'd be comfortable taking it to him.

MR. RABER: Well, you didn't want the camera.

MR. BUCHANAN: That's it, huh, Steve? If there's not a referee in the room, that's the way you behave?

MR. RABER: I'm just telling you --

MR. BUCHANAN: I'm out of the room, off the record.

MR. TISI: You know what? I'm going

to call and see if Judge Fallon is around.

(Recess 2:52-2:59 p.m.)

EXAMINATION (Continuing)

BY MR. RABER:

Q Let me see if I can just understand your opinion.

Your opinion is that Merck reported the death data in a certain way to the FDA in a CSR --

A That's correct.

Q -- and that between the time of that reporting and the publication of the Thal article, the classification of certain deaths changed?

A Were different.

Q Were different?

A Yes.

Q Okay.

A That is a fact.

Q And is it your opinion that that was improper?

A I don't think it's improper, particularly, no. I never said that. I just -- my only point about that was largely that there's a difficulty in telling whether someone who dies suddenly, unobserved, died of an MI or a cardiac arrhythmia or both.

And in that -- that was -- and that means that you

really need, in old people particularly, to combine those two into a single endpoint. That's my only point.

Q But the change that you saw from what was reported to the FDA in the CSR and what was reported in the Thal article, you don't know whether that was the result of adjudicated, do you?

A No, I don't for sure. I don't. I hypothesize that because the adjudication was done well before this paper was published, that the Merck authors would have insisted that the adjudicated events be put in there. But maybe they didn't. I don't know.

Q And you just don't know one way or the other?

A No. I don't think it's important one way or the other, either.

Q All right. Let's go back to Dr. Juni, if we can.

A Okay.

Q Spanning the globe.

MR. BUCHANAN: How did we get to Thal from Juni?

THE WITNESS: Let's not worry about it.

MR. RABER: It had to do with excluding Alzheimer's.

MR. BUCHANAN: Thank you.

THE WITNESS: That's correct.

Q (By Mr. Raber) Sir, isn't it true that if the data from Alzheimer's had been included in the Juni study, his relative risk for heart attack would have been lower?

A Yes.

Q And if we look at the Juni article, isn't it true that the only statistically significant difference he saw was for a type of control was when you compared Vioxx to naproxen?

A That's not true.

Q Look at --

A He combined all the studies.

Q Look at Table 2, sir. Table 2 on Page 4.

Do you see that?

A I see the studies, yes.

Q Are you looking at this table right here, Table 2?

A Yeah.

Q Now, do you see where he --

A Oh, yeah, sure.

Q He reports relative risk for all comparators, but then he breaks it down for type of control.

Do you see that?

A I do.

Q And when you compare Vioxx against placebo, you get a

relative risk of 1.04 that's not statistically significant; true?
A That's correct.
Q And that was Jnni doing that; true?
A Yeah, that's correct.
Q And when Jnni compared Vioxx to non-naproxen NSAIDS, he got a relative risk of 1.55, which again was not statistically significant; true?
A That's correct.
Q So the only control that produced a statistically significant difference was Vioxx against naproxen; true?
A That's correct.
Q And when you looked at dose, isn't it true that the only dose at which Dr. Jnni found a statistically significant difference was the 50 milligram dose? True?
A That's true, although the 12 and a half was very close. Yeah, that's true.
Q And the only statistically significant difference he found for trial duration was greater than six months; true?
A That's correct.
Q Now, doesn't that reflect the fact that VIGOR is dominating these results?

A VIGOR has a major influence on these results, absolutely.
Q Because VIGOR was against naproxen; true?
A Yeah.
Q VIGOR was at 50 milligrams; correct?
A That's correct.
Q And VIGOR had an average exposure of about nine months?
A That's correct.
Q All right. And so this table from Jnni isn't really telling us anything that VIGOR didn't tell us; true?
A Well, it's telling us something. It adds a little bit more information to say that the other studies that looked at MI, that didn't show a markedly different results, in the sense -- by markedly, I mean that they didn't show a flat-out one relative risk throughout.
And, you know, if you want me to say that I don't think a whole lot of these meta-analyses, I don't never have. I say so in my report. I don't think the meta-analysis was worth much of anything.
Q And you're referring to the Jnni meta-analysis?
A No. I'm referring to all the meta-analyses.
Q But you include Jnni?
A That's correct. The only thing that makes Jnni's better than what Merck did was, he looked at the right

endpoint. He looked at MI.
Q You're concerned with placebo-controlled clinical studies? That's what you like to look at; true?
MR. BUCHANAN: Objection.
A Well, that's certainly the best thing to look at. However, I'm interested in where the signals were.
The signals were in VIGOR. VIGOR showed dramatically poor side effect profile. And it wasn't just MI. It was hypertension, big time. It was congestive heart failure for hospitalization and for going off therapy. So you had a really what I thought, from just VIGOR, was a nasty side effect profile; one that, for a drug for pain relief, was unacceptable in my view.
Q (By Mr. Raber) Better for naproxen for reducing serious perforations, ulcers, and bleeds; true?
A It was, but I don't think that was worth it.
Q Significantly better.
A Yeah, I know. I don't think that was worth it compared to the hypertension and the CHF and MI.
But you could have argued that. If Merck would have said -- frankly, if Merck would have said in the literature and in the label, gee, we have a bad side effect for cardiovascular associated events, but our benefit in terms of GI bleeds is sufficient to

overwhelm that, I wouldn't have had any quarrel with them. Not a bit. That would have been a fair assessment.
They could have made the assessment the risk/benefit ratio was positive, and I would have had a hard time arguing it because I wouldn't know. But they didn't.
Q Well, after VIGOR, the FDA changed the label and concluded that Vioxx was safe and effective as labeled; true?
MR. BUCHANAN: Objection to form.
MR. TISI: Objection.
A I don't know that the FDA changed it. I mean, you said changed it. I don't know that they changed it. They agreed with -- they ended up with an agreement with Merck about what the label should read. That's true.
Q (By Mr. Raber) The FDA has final authority over that? That's true?
MR. TISI: Objection.
A Yes.
Q (By Mr. Raber) And based on your experience with the FDA, they would have done a risk/benefit analysis in making that determination?
A I don't know if they did or not