**Page 237**

1  Q  Sir, I believe you testified that in the ADVANTAGE
2     trial, that the number of heart attacks was eight to
3     one against Vioxx.
4        Do you remember that?
5  A  Yeah, vaguely.  Yes.
6  Q  I'd like to show you
7        MR. RABER:  Paul, can you find the
8     copy of this, please?
9        MR. BOEHM:  Yeah.
10 Q  (By Mr. Raber)  Let me show you a document that's
11    already been marked as Defendants' Exhibit 657.  I'll
12    represent to you that this was the peer-reviewed
13    publication of the ADVANTAGE study.
14       Have you ever seen that before?
15 A  Yes.
16 Q  And I'll ask you, if you would, to turn to Page 543.
17       Are you there, sir?
18 A  I'm trying to find the page number.
19 Q  It's there in the bottom right corner.
20 A  Yeah, I see.
21 Q  543.
22 A  Mm-hm.
23 Q  The left-hand column, maybe two-thirds of the way
24    down, it says, "Five myocardial infarctions occurred
25    in the rofecoxib group and one occurred in the

**Page 238**

1     naproxen group."
2        Do you see that?
3  A  Yes.
4  Q  Do you understand that those events were adjudicated
5     by blinded independent experts?
6  A  I don't know for sure.  I think they are.  I mean,
7     because I didn't know the date when this was done, as
8     you say, relative to the adjudication, but it's
9     certainly reasonable that they were.  I wouldn't --
10 Q  Do you place much -- do those numbers concern you?
11 A  Not particularly, because there was one additional MI
12    that Merck had not classified, that was admitted --
13    that they admitted to in a later letter to the editor.
14    So that made it six versus one.  And I believe there
15    were two sudden deaths that weren't counted here.  So
16    that would have made it nine versus one.
17 Q  But that's assuming a sudden death is a myocardial
18    infarction.
19 A  No.  It's assuming we're looking at hard CHD.
20 Q  Right.  But we're looking at heart attacks.
21 A  I consider a sudden cardiac death a heart attack.
22       Are you talking about MIs?
23 Q  I don't want to quibble here, but you said "sudden
24    death," and then you just said "sudden cardiac death."
25       Is there a difference in your mind between sudden

**Page 239**

1     death and sudden cardiac death?
2  A  Well, there is other -- there can be other sudden
3     deaths that aren't cardiac, but the vast majority of
4     them are cardiac.  And if you don't know, you have to
5     classify them that way.
6  Q  Let's say -- you're not saying that sudden death and
7     myocardial infarction are the same thing, are you?
8  A  No, but they frequently come together.
9  Q  Okay.  But from the data as adjudicated by the
10    independent doctors, they classified five myocardial
11    infarctions for Vioxx and one for naproxen?
12 A  And the additional one that they weren't asked to
13    adjudicate, that Merck later admitted was a myocardial
14    infarction.
15 Q  Where does it say that?
16 A  There's a letter to the editor by one of the Merck
17    scientists.
18 Q  And you're sure that they said it was a myocardial
19    infarction?
20 A  Yes.  They said it should have been classified as a
21    myocardial infarction.
22 Q  A letter to the editor?
23 A  Yes.
24 Q  Which paper?
25 A  Relative to this paper.  (Indicating.)

**Page 240**

1  Q  Is that in your reliance materials?
2  A  I don't know.
3  Q  Can you identify it any more than that?
4  A  It was the letter to the editor of this journal,
5     several years later, and it was based on the fact --
6     my understanding is, it was reported in the New York
7     Times that there was an additional event.  And then
8     there was a letter to the editor from one of the Merck
9     scientists, saying, yes, there was a -- what they had
10    classified as a hypertensive death, that was in fact
11    an MI, and should have been classified that way.  And
12    they said that there was a flaw in the adjudication
13    protocol, that they didn't send hypertensive deaths to
14    the adjudication committee.
15 Q  Merck said that?
16 A  Yeah, mm-hm.  I can find it with time.  I can't --
17 Q  Okay.  I'm going to ask you to -- since you've
18    testified about it, to find it and have your counsel
19    provide it to me.
20 A  Sure.
21       MR. BUCHANAN:  And we'll take it
22    under advisement.
23       THE WITNESS:  Sure
24 Q  (By Mr. Raber)  And I think we mentioned earlier that
25    this reports zero strokes for Vioxx and six for

6/7/2006 Kronmal, Richard

```
1        naproxen.
2    A   Yeah, you said that.
3    Q   Would that be a concern for naproxen?
4    A   Yeah, might be.  I can't say it wouldn't be.  I would
5        be a little worried about it.  I'm not convinced that
6        naproxen isn't dangerous.
7    Q   Have you seen the recent publication from Dr. Baigent,
8        B-A-I-G-E-N-T?
9    A   No.  I've never heard of him.
10   Q   Have you reviewed the memorandum from the FDA dated
11       April of 2005?
12   A   About what?
13   Q   Concerning the risk of heart attacks and strokes for
14       not only the COX-2 inhibitors, but for all NSAIDS.
15   A   I know about it.  I've seen press releases, you know,
16       press reports about it.
17   Q   Are you aware that the issue being debated as to
18       whether or not all NSAIDS increase the risk of heart
19       attack, CHD --
20   A   I'm quite aware of that, yes.
21   Q   And how are you aware of that?
22   A   I've seen it in the literature.
23   Q   And what have you concluded from looking at the
24       literature, if anything?
25   A   I think it's a concern
```

241

6/7/2006 Kronmal, Richard

```
1    Q   A concern about what?
2    A   That they may all be.
3    Q   That they may all be what?
4    A   They may all increase the risk of cardiovascular
5        events
6    Q   And that would be -- when you say "they," you mean
7        both COX-2 inhibiters and traditional NSAIDS?
8    A   I think it's certainly true of some COX-2 -- of the
9        COX 2 class.  And I think it may be true of some of
10       the NSAIDS; not necessarily all of them
11           I don't think we just have enough data.  And we
12       don't have enough data yet on whether there's a dose-
13       related effect.  I mean, even within the COX-2
14       inhibitors, there could be a dose-related effect
15           I'm not even sure, for example, for rofecoxib that
16       there isn't a dose effect
17   Q   So in other words --
18   A   12-and-a-half might be safe, for all I know.
19   Q   25 might be safe?
20   A   Not from the Alzheimer's, no.  No way.
21   Q   In certain patient populations?
22   A   Well, that's certainly true.
23                 MR BUCHANAN:  Objection to the
24       form.
25   A   If you give it to a young child, it may well be safe;
```

242

6/7/2006 Kronmal, Richard

```
1        or a healthy adult, it may be safe.
2    Q   (By Mr  Raber)  Or an osteoarthritis patient?
3    A   They're old, mostly.  I would be worried about them.
4    Q   Someone in their 50s?
5    A   Maybe.
6    Q   Might be safe?
7    A   Maybe.  Maybe.  I don't know.  We don't have the data.
8        That's a problem.  There's no data.
9    Q   Well, you haven't analyzed the data that looked at
10       osteoarthritis patients in their 50s and 60s?
11   A   There's not enough exposure in those studies.  They're
12       too short.
13   Q   How long were those studies?
14   A   Oh, they varied, but most of them were only under --
15       the average exposure in the osteoarthritis studies, in
16       my recollection, is about four months.
17   Q   And how long did they range?
18   A   Oh, there may have been a few of them that went on a
19       year or so.
20   Q   Anything more than that?
21   A   There might have been, but they were very small.  I
22       don't remember  Very inadequate individually to tell
23       whether there was an increased risk or not.
24   Q   In your report, on Page 22 -- I want to compare
25       something in your report, because I'm a little
```

243

6/7/2006 Kronmal, Richard

```
1        confused  On Page 22, near the top, you say, "Thus
2        the data from the two Alzheimer's studies provide
3        strong evidence of a major mortality excess associated
4        with taking rofecoxib  a startling three-fold
5        increase in the risk of death."
6            Do you see that?
7    A   Yes.
8    Q   Then I look at Page 25, and below the table there, you
9        say, "For deaths from all causes, the relative risk of
10       death for rofecoxib treatment was 2 13."
11   A   That's correct.
12   Q   Which one is it?
13   A   The first one I was reporting was Chen's analysis, and
14       that was -- that was in April of 2001  This analyses
15       is through 2003.
16   Q   And so the Chen numbers that you were referring to
17       were not final; true?
18   A   They were.
19                 MR. BUCHANAN:  Objection.
20   A   They were the data that was available at that time
21   Q   (By Mr  Raber)  But the 078 study was not completed;
22       true?
23   A   That's correct, it wasn't
24   Q   Dr. Kronmal, as I understand it, your main
25       criticism -- one of your criticisms of Merck relating
```

244

```
 1        to Alzheimer's studies is that they had information
 2        about the ITT population, but they only reported the
 3        on-drug information to the FDA.
 4     A  Well, that's a little mischaracterization.  They --
 5        they listed all the deaths.  I mean, they were there,
 6        you know, listed in a big long list.  So they reported
 7        them.
 8           What my objection is, they didn't report the
 9        analyses of the ITT.
10     Q  I see.  Do you know what the primary analysis was for
11        the safety endpoint in the protocols for --
12     A  It was 14 days.
13     Q  For 078 and 091?
14     A  Yes.  It was on-drug, plus 14 days.
15     Q  And Merck did that analysis and reported that analysis
16        to the FDA; true?
17     A  That's correct, they did.
18     Q  And that was the primary pre-specified analysis?
19     A  That was the pre-specified, yes.
20     Q  And what you're saying is that Merck should have also
21        reported the secondary analysis?
22     A  Well, I consider the ITT what should have been the
23        primary.  I think that was -- that was really -- they
24        should have had both of them in there.
25           You could call them primary -- for safety, you
```

```
 1        fluid accumulations in the lungs, you then went to the
 2        hospital, you then acquired a hospital-acquired
 3        pneumonia and you died.
 4           Well, that's the point.  That death was due to the
 5        drug.  You should have counted it.  And that's why the
 6        ITT is appropriate.
 7     Q  Do you know whether Merck counted, as on-drug deaths,
 8        a death where the event happened within 14 days of
 9        stopping the drug, but the death occurred beyond 14
10        days?
11     A  They selectively did that.  But the problem with that
12        is, they had no firm rule as to how to do that.  And
13        the example I gave you, they would never have counted
14        it.  Not in a million years, because they wouldn't
15        have connected the two events.
16           Certainly, yeah, they did.  They took --
17     Q  How do you know that?
18     A  Because there weren't any.  There were not one.
19     Q  Not one what?
20     A  Not a single person who died later of a cardiovascular
21        event who -- where they were off-drug, who they count
22        as an on-drug death.  Not one.
23     Q  Who they counted as an on-drug death?
24     A  That's correct.  There wasn't a one.  And there had to
25        be people like that.
```

```
 1        don't normally have a primary and a secondary
 2        endpoint.  You just have safety.  And both are
 3        relevant to safety, both the ITT and the on-drug are
 4        relevant to safety for two different reasons.  The
 5        on-drug is relevant if the effect is entirely acute;
 6        that is, if it's only when they're on the drug that --
 7        say it was a rash, as an example.  You're not going to
 8        get the rash if you're not on the drug.  It just
 9        doesn't happen.  So the on-drug would be absolutely
10        appropriate for looking at rashes
11           But on the other hand, for CHD, totally different
12        issue.  There, if you damage the vascular system in
13        some way or the heart in some way or the brain or the
14        kidney, or any organs, really, you could see the
15        effect months later, even though the person had been
16        off the drug.  And, therefore, you must do ITT
17        analyses of such endpoints
18           And Merck had the ITT analysis for death.  They
19        had it.  Death takes a long time to happen.  You don't
20        die instantaneously most times, nowadays.  What
21        happens is  congestive heart failure is a good
22        example  You get ill with congestive heart failure,
23        maybe due to the drug, and then you linger.  And six
24        months later, you die because you got a pneumonia that
25        was due to the fact you went into failure.  You got
```

```
 1     Q  Okay.
 2     A  The other thing is, but the only few that they
 3        counted -- there aren't very many they counted, by the
 4        way, that were cancers.  Somebody was having -- had
 5        pancreatic cancer and they had pancreatic cancer and
 6        they died six months later, they counted it.  I mean,
 7        arguably, you wouldn't want to count that one, but I'm
 8        going to let them -- give them the leeway to do that
 9        But...
10     Q  Do you know what the final numbers were for all caused
11        deaths for the ITT?
12     A  Yeah, I don't remember the exact numbers, but I
13        could --
14           MR. TISI:  Can I ask you what study
15        you're talking about?  Or are you talking about all of
16        them together?
17           MR. RABER:  All of them together
18     A  I don't remember the exact numbers.
19     Q  (By Mr. Raber)  Does the number 61 to 34 ring a bell?
20     A  Yes
21     Q  And is the 61 to 34 how you calculated a relative risk
22        of 2.13?
23     A  Yep  There was much less exposure in the rofecoxib
24        group, because they had many more people drop out for
25        side effects and for new onset Alzheimer's.
```

6/7/2006 Kronmal, Richard

```
1   Q   Is it true that more people in the Vioxx group were
2       followed?
3   A   No.  More dropped out   Just the opposite.
4   Q   In the ITT, they still count, don't they?
5   A   If Merck had continued to follow them, yeah.  They
6       didn't.
7   Q   And isn't it true that
8   A   They didn't follow them.  They didn't follow them.
9   Q   Isn't it true that --
10  A   They should have.
11  Q   Is true that, on average, Merck followed the Vioxx
12      patients for a longer period of time?
13  A   No.  Less.  Just the opposite.  There were many more
14      people who dropped out of the study on Vioxx, and they
15      were not followed.  They should have.
16  Q   Now, one thing you criticized is -- there's a
17      publication of the 091 study, and in your report, you
18      criticize that, because you said that they only
19      reported the on-drug deaths of nine to two
20          Do you remember that?
21  A   Yeah.  I said they should have reported the ITT.
22  Q   Do you know what the final ITT numbers were for study
23      091?
24  A   Yeah  It was -- I think it was 13/4.
25  Q   15/9, wasn't it?
```

249

6/7/2006 Kronmal, Richard

```
1   A   Well, I could look it up, but I don't have it handy.
2       They were -- study 091, as I described in my
3       report, was a 12-month study, parallel design study.
4       The paper reporting the results of study 091 only
5       reported the results for the 12 months.
6           For the 12 months, I believe -- oh, I have it
7       here.  The results for 091 on ITT was 13 versus three
8       as reported by Chen.
9   Q   Right.  As reported by Chen back in
10  A   The study was over then.
11  Q   Okay.  But do you know what the ITT showed for zero to
12      15 months?
13  A   Yes.  It showed a different result.  It showed more --
14      but that wasn't what the paper was about.  The paper
15      was specifically about the zero to 12-month time
16      point.
17  Q   Do you know, if Merck had reported the ITT results for
18      the zero to 15 months rather than the on-drug reports,
19      would Vioxx have looked better or worse?
20  A   It would look a little better.  But that's not what
21      the paper was about.  They would have a very hard time
22      reporting it that way, when the study was a 12-month
23      study.
24  Q   Do you know what the results would have shown at 12
25      months for ITT?
```

250

6/7/2006 Kronmal, Richard

```
1   A   Yeah.  I told you, it's 13 to 3.
2   Q   Actually, it's 14 to 4, isn't it?
3   A   Well, there were two other events.  I don't know where
4       they came from.  But they're 13 to 3 that Chen
5       reports.
6   Q   Doesn't the CSR say 14 to 4?
7   A   It might.  I don't remember.
8   Q   Have you read the CSRs?
9   A   I don't remember.  It's been a lot of reading and a
10      long time over a period of two years.  I don't
11      remember every number.  I don't have that kind of
12      mind.
13          It wouldn't matter.  14/4, 13/3, they're still
14      significant.
15  Q   9/2?
16  A   Yes.
17  Q   They're all significant.  So what's your criticism?
18  A   My criticism, they should have reported the ITT,
19      because the ITT is the right thing to report --
20  Q   But --
21  A   -- for cardiovascular events.  You should report them
22      both   You should report 9/2 or 13/3, 14/4.
23  Q   Would it have reflected a difference in risk?
24  A   It would have reflected more data on the mortality.
25      Should have been reported.
```

251

6/7/2006 Kronmal, Richard

```
1   Q   So under that rationale -- well, let me ask you this.
2       If they know the zero to 15-month data --
3   A   They should have said something about it.  Yeah, they
4       could have said it in the paper, if they wanted to.  I
5       wouldn't have any objection to that.
6   Q   And had they done that, that would have made Vioxx
7       look better; true?
8   A   Yeah.
9   Q   It would have made Vioxx look better?
10          MR. BUCHANAN:  Objection.  Asked and
11      answered.
12  Q   (By Mr  Raber)  And they didn't do it?
13  A   That's correct, because it was a 12-month study.
14  Q   Well, but you told me in connection with the VIGOR
15      article with the New England Journal of Medicine, that
16      you tell everything you know; right?
17  A   Yeah   See, I have no objection to that.
18  Q   So Merck had data on the zero to 15 months, didn't
19      they?
20  A   Yeah.
21  Q   And data that made Vioxx look better; true?
22  A   Yes.
23  Q   But they didn't report it, did they?
24  A   No, they didn't.  The author of that paper decided
25      that this was a 12-month study, and that's what he was
```

252

1    going to report.
2  Q  How do you know that?  Did you talk to the author?
3  A  Well, that's what he reported.  It's a fact.
4  Q  You just testified that the author of the paper
5    decided something.  Did you talk to the author?
6  A  Well --
7          MR. BUCHANAN:  Objection.
8  A  -- if the paper is zero to 12 months, he made that
9    decision.  Who else made it?
10  Q  (By Mr. Raber)  Peer reviewers, perhaps?
11  A  Not likely.  The peer reviewers don't tell people what
12    study to report.  And it was designed to be a zero to
13    12-month study.  He even says so.  He even mentions
14    the other three months.  He doesn't report anything
15    about it, because it's irregular.
16      What they did in those three months is so
17    irregular, that most studies wouldn't report it.  I
18    mean, you take 90 percent of the people on the drug
19    and you put them on a placebo.  What kind of study is
20    that?
21      I mean, clearly he didn't report it.  It wasn't
22    much of a study.
23  Q  Was the ITT zero to 15 months relevant safety
24    information?
25  A  Yeah, I have no problem with him reporting it.  I

253

1  Q  I'm asking about Vioxx.
2  A  Well, I don't know.  I don't.  Do you have any
3    explanation for the eleven/one?
4  Q  Sir, sounds a lot like -- you know, we had a ten to
5    one on that other thing, didn't we, the heart attack
6    and stroke?
7          MR. BUCHANAN:  Objection.
8  A  And I said it was of concern.
9  Q  (By Mr. Raber)  But you have to look and see what's
10    going on in order to make that judgment, don't you?
11  A  No.  It's death.
12  Q  But you need --
13  A  It's a simple matter
14  Q  Sir, are you qualified -- have you ever done an
15    autopsy?
16          MR. BUCHANAN:  Objection.
17          MR. TISI:  Objection.
18  A  No, of course not.
19  Q  (By Mr. Raber)  Have you ever determined a cause of
20    death?
21  A  No.
22  Q  Are you trained to do that?
23  A  No.
24  Q  Okay.  You would need to look and see what's causing
25    those deaths, wouldn't you?

255

1    mean, some of the deaths, I think, were arguably
2    not -- shouldn't have been counted.  Like the cancers
3    that occurred way after the study was over, that's
4    very irregular.
5      But, you know, again, I have no problem with them
6    doing it, as long as they were clear that those
7    cancers occurred well after the study had ended
8  Q  Well, do you know -- of the deaths in the 078 study,
9    do you know how many of them occurred more than 48
10    weeks or 300 days after the drug was stopped?
11  A  Yeah, right.
12  Q  Do you recall that it was eleven from the Vioxx group
13    and only one from the placebo group?
14  A  That's correct.
15  Q  Can you think of any mechanism that would cause an
16    eleven-to-one difference more than 300 days after
17    discontinuation of the drug?
18  A  Oh, lots of different mechanisms.
19  Q  Okay.  What are they?
20  A  Kidney damage, damage to the vascular system, damage
21    to the heart, damage to the brain, damage to the
22    liver, damage to almost any organ system in the body.
23  Q  Do you have any medical support for those possible
24    theories that you've just thrown out?
25  A  There's lots of drugs that -- I mean, yeah, sure

254

1  A  No.  No, you would not.  Death is -- if you're dead,
2    you're dead.  It doesn't matter what caused it.
3  Q  If you're trying to say that a drug caused a death in
4    someone when the death occurred more than 300 days
5    after they stopped taking the drug, don't you think it
6    would be prudent to look at each of those cases and
7    see what caused the death?
8  A  It's prudent to look at it.  It has no relevance to
9    the issue of whether the drug caused it or not.
10  Q  So if someone ate a bromide tablet and died, you would
11    say that the drug caused that?
12  A  No.  I would say that if over the -- over the full
13    study, if you had an excess death in one group versus
14    the other on the basis of randomization, the frequency
15    of these bromide deaths or any other non-caused death
16    by the drug should be even in both groups.
17  Q  Should be even?
18  A  Well, they will be on average
19  Q  On average?
20  A  Yeah.  That's what statistics is about.  What
21    explanation do you have -- well, I won't ask you that.
22    I shouldn't ask you questions.
23          THE WITNESS:  Sorry about that
24          MR. BUCHANAN:  That's okay.
25  Q  (By Mr. Raber)  Have you reviewed the FDA review memo

256

```
1       from December of 2004 that looked at the Alzheimer's
2       death data?
3    A  I reviewed Merck -- well, I don't know the answer to
4       that.  I don't remember.
5              MR. BUCHANAN:  Did you say February?
6              MR. RABER:  I said December of 2004.
7       I meant to.
8    A  I don't remember.  I probably have, but I don't
9       remember.
10   Q  (By Mr. Raber)  Would that have any relevance in your
11      mind as to what the FDA knew or didn't know?
12   A  Surely it would have some relevance  Although I do
13      know what they said they knew -- I did review very
14      carefully the transcripts of the 2005 meeting, So I
15      have a pretty good idea what they knew.  If you want
16      to ask me about what they knew, I could certainly tell
17      you.
18   Q  Did they know about the ITT data?
19   A  They said they didn't.  They said it was pending.
20      That's what Brooke Villalba said when asked about the
21      ITT analysis, whether it was --
22   Q  I didn't ask analysis.  I said the ITT data.
23   A  Oh, sorry.
24             MR. BUCHANAN:  Objection to form.
25   A  They always had all of the deaths from the very start.
```

257

```
1       Merck reported every death in a table, big long table,
2       all the deaths listed.  Yes.  Always had that.
3    Q  (By Mr. Raber)  And if somebody wanted to do an
4       analysis by ITT or by on-drug, or anything they
5       wanted, they could have done that; true?
6    A  They could have done it.  They were taken to task by
7       the reviewers for not doing it, in that committee
8       meeting
9    Q  Who took them to task?
10   A  The members of the committee  Three of them, at
11      least.
12   Q  Who?
13   A  Tom Fleming, D'Agostino, Allister somebody.  Wood,
14      maybe.  And maybe Nissen.  And Nissen.  There were
15      four that took them to task
16   Q  Is it fair to say, though, that even when you studied
17      MI in the Alzheimer's studies, the difference you
18      found was not statistically significant?  Is that
19      true?
20   A  By MI itself, that's true.
21             MR. RABER:  Let's take a five-minute
22      break.  I just want to sort through and make sure I'm
23      not missing anything.
24             (Recess 4:32-5:04 p.m.)
25      ////
```

258

```
1              EXAMINATION (Continuing)
2    BY MR. RABER:
3    Q  Dr. Kronmal, during our break, did you meet with
4       Mr. Buchanan and Mr. Tisi?
5    A  I was there.  I didn't -- I don't know what you mean
6       by meet.  I was there.
7    Q  Did you discuss your testimony in any way with them?
8    A  No, I didn't.
9    Q  Would you agree with me, Dr. Kronmal, that if you
10      observe a signal of abnormal events in a trial, that
11      it would be wrong to make an inference that this
12      signal was causal?
13             MR. BUCHANAN:  Objection.  Form.
14   A  Wrong --
15             MR. TISI:  Could you repeat the
16      question?  I'm sorry.  I apologize, Steve.
17                  (Question on Page 259,
18                  Lines 9 through 12,
19                  read by the reporter.)
20
21             MR. TISI:  Objection  Vague.
22   A  I'm not sure what you mean.  How big a signal is it?
23      What kind of results are you talking about?  20 versus
24      four?
25   Q  (By Mr. Raber)  I'm looking at your testimony from the
```

259

```
1       Rezulin deposition.  And you were asked, "Does that
2       mean that you can't really draw any inference about a
3       potential causal relationship between Rezulin and
4       liver enzyme elevations from the clinical trials?"
5              And your answer was:  "I don't think it's
6       appropriate to do causal inference in this kind of
7       context anyway."
8    A  I have no idea what that refers to.
9    Q  You said, "Trials were not designed to evaluate
10      whether or not Rezulin caused liver function
11      abnormalities or not.  They were to look for efficacy.
12      Therefore, when you observe a single, you know, group
13      of abnormal events, you have to think of them as a
14      signal.  That's why they call it signal, not proof
15      And, no, it would be wrong to make an inference that
16      it was causal under those circumstances, absolutely."
17   A  Yeah  I was talking about --
18             MR. BUCHANAN:  Objection
19   A  What I was talking about there was a situation where
20      there was very small numbers, and there was
21      non-statistically significant  And what I was
22      basically trying to say is, when you don't have
23      statistical significance, you can look at, you know,
24      side effect data, but that you can't make strong
25      inferences based on them.
```

260

6/7/2006 Kronmal, Richard

```
1    Q    (By Mr. Raber)  And you can't make inferences of
2         causality?
3    A    When you have inadequate numbers, you can't make
4         inferences about causality.  But not in general terms,
5         I certainly didn't mean it.
6    Q    And when you have differences that are not
7         statistically significant, it's inappropriate to make
8         causal inferences?
9    A    That's correct.  If it was not statistically
10        significant, it would be inappropriate.  That's what I
11        said there, and I still say it.
12   Q    Dr. Kronmal, in your -- let me ask you this.  Was
13        there any placebo-controlled study involving Vioxx
14        that showed an increased risk of myocardial infarction
15        before the APPROVe study?
16   A    Individually?
17   Q    Yes.
18   A    No.
19   Q    Was there any combination of placebo-controlled
20        studies prior to APPROVe that showed a statistically
21        significant increased risk of myocardial infarction?
22   A    No, there were not.
23   Q    In your report, you mention that when Merck filed its
24        SUR, Safety Update Report, for the Alzheimer's studies
25        in July of 2001, they only reported the on-drug
```

261

6/7/2006 Kronmal, Richard

```
1         information.
2              Do you remember that?
3    A    From 078, yes.
4    Q    However, Merck told the FDA in that Safety Update
5         Report that it would be providing the
6         intention-to-treat data with the CSR; true?
7    A    I'm not sure whether they said with it the CSR or when
8         the study was completed.  I don't remember.
9    Q    They told the FDA in the July 2001 SUR that that
10        particular submission did not include the ITT data;
11        true?
12   A    They did tell them that, yes.
13   Q    So the FDA knew that the ITT data was not in that
14        submission?
15   A    That's true.
16   Q    And they told them that it would be coming at a later
17        date; true?
18   A    That's correct.
19   Q    And the FDA could have requested the ITT data or an
20        ITT analysis at any time; true?
21             MR. BUCHANAN:  Objection to form.
22   A    They could have, of course.
23   Q    (By Mr. Raber)  And ultimately, when Merck provided
24        the CSR for protocol 078 to the FDA, it provided all
25        of the ITT data; true?
```

262

6/7/2006 Kronmal, Richard

```
1    A    They --
2              MR. BUCHANAN:  Objection to form.
3    A    No.  They did not do an ITT analysis, even in the --
4         even in that study.
5    Q    (By Mr. Raber)  Sir, they provided all the ITT data;
6         true?
7    A    They -- they provided all cause -- all deaths that
8         occurred during the study, whether they were on or
9         off-drug.
10   Q    They accounted for every death in the Alzheimer's
11        studies?
12   A    Yeah, but ITT --
13   Q    Yes.
14   A    -- means you do an ITT analysis.  It doesn't mean you
15        just list them all.
16   Q    Well, they provided the data for the ITT population;
17        true?
18   A    They provided the data for the ITT population, yes.
19        Stated that way, I agree.
20   Q    Sir, I want to just show you something and ask you --
21        I'm not going to mark it --  I'm just going to show it
22        to you, and you tell me whether it's what I think it
23        is.
24             Do you remember at the Humeston trial, when you
25        were asked some questions by the jury, that you
```

263

6/7/2006 Kronmal, Richard

```
1         referenced a book called "How to Lie with Statistics";
2    A    Yeah, I did.
3    Q    You described that as a wonderful book?
4    A    It's a nice book, yeah.
5    Q    I've got a book here.  It's blue.  It's called "How to
6         Lie with Statistics," and the author is Darrell Huff.
7    A    Yeah.
8    Q    That's the one you were referring to?
9    A    Yeah.  Must have been reprinted.  Mine was in a brown
10        cover.
11   Q    You've read it?
12   A    Yeah, a long time ago.  Must be 50 years old or 40
13        years old.
14   Q    Is it your experience with the FDA that the FDA helps
15        drug companies ensure that the trials they do are
16        appropriate, clinical trials?
17             MR. BUCHANAN:  Objection.
18   A    They try to do that, yes.  They don't always succeed,
19        but they certainly try.
20   Q    (By Mr. Raber)  And the FDA, as you understand it,
21        approves the protocols for clinical trials?
22   A    That's true, they do.  They do.  If it's under an IND,
23        they do.
24   Q    Did they approve the protocols for the Alzheimer's
```

264

1    studies?

2  A  They must have, yes.

3  Q  Has the FDA ever concluded that Vioxx causes heart

4     attacks?

5  A  I don't know what they've specifically concluded.  I

6     don't have any clue about that.

7  Q  Doctor, if you were to go out on the street and

8     randomly select a hundred people between the ages of

9     40 and 96 and followed them for a year, how many of

10    them would you predict would have an MI during that

11    year?

12 A  It depends on what proportion of the people were 40

13    and what proportion were 96.  And it would also depend

14    on how many men -- whether they were men or women or

15    whether they were black or white.  Where am I doing

16    this?

17 Q  Say a random sample --

18 A  On the street of Seattle?

19 Q  -- in the United States   Sure

20 A  In a year?

21            MR. BUCHANAN:  Objection to form.

22            MR. TISI:  Let me just object too.

23 A  I have no idea.  Maybe a half a percent.  But it would

24    depend on the age mixture, the racial mixture, how

25    many were females.  It would depend on so many things,

1    it's hard to estimate.

2  Q  (By Mr. Raber)  But you would ballpark a half a

3     percentage?

4            MR. TISI:  Objection

5  A  It's really a guess.  It's impossible to make that

6     judgment.

7  Q  (By Mr. Raber)  Well, don't people make judgments

8     about how prevalent the heart attacks are?

9  A  Yeah.  If you told me the United States, I could give

10    you a rough idea.

11 Q  Okay.  Can you tell me, in the United States, for

12    every, let's say, what the rate is per hundred people

13    in an age range between 40 and 96?

14            MR. BUCHANAN:  Objection to form.

15 A  I'd have to look it up   And it would depends on the

16    mix -- I don't know the mixture -- I don't know how

17    many 96-year-olds in the United States versus

18    that's really hard to do.

19 Q  (By Mr. Raber)  Let's say the median age is about 60.

20 A  That's not enough.  I would have to know the actual

21    distribution of people within those age groups.  How

22    many blacks or whites --

23 Q  Let's say the VIGOR -- are you familiar with the

24    demographics of the VIGOR population?

25 A  Not in detail.  I know the average age, roughly.

1  Q  So let's assume the average age, then, of a random

2     hundred people in VIGOR.

3  A  I don't know   I mean, VIGOR was -- you have to

4     remember that VIGOR was a study that selected people

5     based on two criteria - a number of criteria.

6  Q  I asked you simply a question about the age of VIGOR

7     or random population.

8            MR. BUCHANAN:  Objection.

9  Q  (By Mr. Raber)  Can you answer that?

10           MR. BUCHANAN:  Objection

11 A  Just a random population?

12 Q  (By Mr. Raber)  Just a random population of adults in

13    the United States in that age range.

14 A  I can't answer that question.  There's no way.

15 Q  Okay.  Now, you understand that there was a DSMB for

16    the VIGOR study?

17 A  Yes, I do.

18 Q  And the DSMB saw the difference in the treatment

19    groups for cardiovascular events before the study was

20    over?

21 A  They saw, I think, A versus B.  They didn't know which

22    was which.

23 Q  But they saw that there was a difference?

24 A  Yes, they did.

25 Q  And they decided not stop the study?

1  A  Yeah, they did.

2            MR. BUCHANAN:  Objection.  Asked and

3     answered.

4  Q  (By Mr. Raber)  And is it your understanding that that

5     committee believed that the difference they were

6     seeing could be because of the cardiovascular

7     protective effect of one of the treatments?

8  A  I don't know what they believed.

9  Q  Have you seen documents that say that?

10 A  I've seen something that said something along those

11    lines, but I have no quotes directly from them that I

12    saw.  And I don't know if all the members believed

13    that or just some of the members or -- you know?

14 Q  Would you agree that the number of -- the overall

15    number of heart attacks in the VIGOR study was small?

16 A  Small compared to what?

17           MR. BUCHANAN:  Objection to form.

18 Q  (By Mr. Raber)  Compared to what you might expect in a

19    normal population?

20 A  No

21 Q  .5 and .1 percent?

22 A  No

23 Q  You think those are big numbers?

24 A  I don't have any opinion as to where they are, because

25    the selection criteria that puts people into clinical

1    trials selects a very unusual group of people.

2      First of all, the physician makes a selection on

3    the basis of what they think of the health of the

4    person.  There are selection criteria that are imposed

5    by the protocol.  And then there are volunteers.  And

6    that makes it a very, very select group.  And you

7    can't extrapolate from the general population to that

8    very select group about what the rates should or

9    shouldn't be.  It's really impossible to tell

10 Q   I'm going to read you just a list of names from the

11    people, and I'll represent to you, these were members

12    of the advisory committee in February of 2001.  And I

13    just want to ask you whether you're familiar with any

14    of these folks.  Okay?

15      Nigel Harris from the Ohio School of Medicine?

16 A   Never heard of him.

17 Q   Leigh Callahan from the University of North Carolina?

18 A   I don't know him.

19 Q   James Williams from the University of Utah?

20 A   No.

21 Q   Janet Elashoff, Ph.D., adjunct professor of

22    biomathematics from UCLA?

23 A   I know Janet.

24 Q   What's her reputation as a scientist?

25 A   I don't have any idea.  I know her.  I don't know

1    due to beneficial cardioprotective effects of naproxen

2    or pro-thrombotic effects of the agent, and leave it

3    at that, but basically we don't know the reason?

4      Do you recall reading that?

5 A   That sounds familiar to me.

6 Q   And that would be different from what your reaction

7    was to the VIGOR data; true?

8 A   Absolutely

9 Q   And Dr. Nissen is a respected cardiologist?

10 A   He is.  But he didn't know the data I knew about in

11    terms of hypertension.

12 Q   Well, we're talking about the cardioprotective effect

13    of naproxen, not hypertension.

14 A   But hypertension is a major cause of cardiovascular

15    disease.  He may not have recognized that there was

16    this huge difference in hypertension, because Merck

17    didn't report it to them.

18 Q   You're saying Merck didn't report the hypertension

19    data to the advisory committee?

20 A   They did not.  They reported no analyses of the

21    hypertension data.

22 Q   But I think you told us this morning, you didn't

23    review any of the data of the pharmacological

24    information addressing whether or not naproxen is

25    cardioprotective.  True?

1 Q   Do you consider her to be a good scientist?

2 A   I don't know one way or the other.  I just haven't

3    reviewed her work.  She doesn't publish much in

4    statistics or biostatistics.  That much I know.

5      I wouldn't say she has a reputation as being a

6    leader in the field, by any stretch of the

7    imagination

8 Q   David Wofsy, W-O-F-S-Y, M.D., from UC San Francisco?

9 A   Never heard of him.

10 Q   Stephen Nissen?

11 A   I know of Steve Nissen.

12 Q   Do you know of his reputation as a cardiologist?

13 A   No, I don't really.  I've seen papers by him, and he's

14    certainly written a lot.

15 Q   Have you read the transcript of the advisory committee

16    in February of 2001?

17 A   Yeah.  Several -- almost two years ago.

18 Q   And you're familiar with what Dr. Nissen said about

19    the data involving --

20 A   I don't remember what he said.

21 Q   Do you recall that he said that when proposing what

22    the label should say, he said, briefly, I think that

23    what I would say on the label is that there was an

24    excess of cardiovascular events in comparison to

25    naproxen, that it remains uncertain whether this is

1 A   That's correct, yes.

2 Q   Ileana Pina, P-I N A?

3 A   Never heard of her.

4 Q   Michael Wolfe from the Boston University School of

5    Medicine?

6 A   I don't think I know him.

7 Q   Allan Sampson, S-A-M-P-S-O-N, from the University of

8    Pittsburgh Department of Statistics, do you know him?

9 A   No.

10 Q   Frank Harrell, H A R R E-L-L, Ph D.?

11 A   Yeah, I know Frank.

12 Q   Is he a good biostatistician?

13 A   Yeah, he is.

14 Q   Competent?

15 A   Yes.

16 Q   Knows how to analyze data?

17 A   Yes, he does.

18 Q   Byron, B-Y-R-O-N, Cryer, C-R-Y-O-R, M.D.?

19 A   No, don't know him.

20 Q   Sir, what's your opinion as to whether -- are you

21    familiar with something called the Bradford-Hill

22    criteria?

23 A   For epidemiologic studies?

24 Q   I don't know.

25 A   That's what they're for

6/7/2006 Kronmal, Richard

```
1    Q    Do you have an opinion as to whether the Bradford-Hill
2         criteria have any application to clinical trials?
3    A    They don't.
4    Q    Are there people who disagree with you on that?
5    A    I don't know.  I don't see why anybody would, but
6         there may be somebody out there who does.
7              I think maybe George Howard seems to    I -- but I
8         don't know of anyone else who would.
9    Q    Do you know somebody named Poulter, P-O-U-L-T-E-R?
10   A    No.
11   Q    Do you know somebody named Hayes -- actually, do you
12        know a Dr. Furberg?
13   A    Yes.
14   Q    You respect him?
15   A    Yes, I do.
16   Q    You've worked with him?
17   A    Yes.
18   Q    Have you ever seen anything that he's written on this
19        question about interpreting the results of clinical
20        trials?
21   A    Yes.  He has a book on clinical trials, where he's the
22        coauthor of a book on clinical trials.
23   Q    Now, in looking to determine whether drugs are safe or
24        unsafe, one needs to do a risk/benefit analysis; true?
25   A    Yes, you should.
```

273

6/7/2006 Kronmal, Richard

```
1    Q    And have you ever looked at the GI data regarding
2         Vioxx?
3    A    I've read the paper, yes.
4    Q    Have you ever analyzed the data to do a risk/benefit
5         analysis to compare GI benefits to --
6    A    No, I'm not really qualified to do that, because I
7         don't know how one -- how to assess whether the excess
8         MIs, hypertension, congestive failure, weigh out
9         versus the benefit in terms of bleeds.
10             I do know what the FDA reviewers said.  And they
11        said if you had to make a risk/benefit decision, you
12        would make it in favor of naproxen.  It was said by, I
13        think, Targum in her report.  But I'm not qualified to
14        make that ..
15   Q    Okay.  I noticed in your reliance materials, that you
16        cited an article called "Cardiovascular Complications
17        of Cocaine Use," by Richard Lange.
18   A    That was just one of the articles I had -- I didn't
19        cite it.  I mean, I gathered a lot of articles, and I
20        was trying to find articles on     to see if I could
21        find any drug that had a profile that was similar to
22        Vioxx.  And the only one I was able to find in the
23        literature was cocaine
24   Q    What do you think of a cocaine user blaming Vioxx for
25        a heart attack?
```

274

6/7/2006 Kronmal, Richard

```
1    A    I think it would be a rather strange thing.
2    Q    What do you think about someone who was never
3         prescribed Vioxx claiming that Vioxx caused a death?
4              MR. BUCHANAN:  Objection to form.
5              MR. TISI:  Yeah, objection to form.
6    A    I think that person would be dishonest.
7    Q    (By Mr. Raber)  What do you think about a claim by
8         someone who told a different court that something else
9         caused his heart attack, and then telling another
10        court that Vioxx caused his heart attack?
11             MR. BUCHANAN:  Objection to form.
12   A    I think that would be a -- someone who wasn't all
13        there.
14             MR. TISI:  Objection.
15   Q    (By Mr. Raber)  You've said in your report that you
16        felt that prior to 2002, the Vioxx label was
17        inaccurate and incomplete.
18   A    Yes.
19   Q    Have you seen any quotes or statements from the FDA
20        that disagree with your opinion on that?
21   A    I don't remember any in particular.
22             MR. BUCHANAN:  I thought you were
23        going home with all those folders.
24   Q    (By Mr. Raber)  I want to show you a document that has
25        already been marked as Defendants' Exhibit 133.  It's
```

275

6/7/2006 Kronmal, Richard

```
1         called FDA WebView.
2              MR. BUCHANAN:  Counsel, is this an
3         FDA document?
4              MR. RABER:  I'm not sure what it is.
5              MR. TISI:  You're not sure what it
6         is?  I'm sorry; is that what you said?
7              MR. BUCHANAN:  Do you have an answer
8         for me?  I was just asking for a copy.
9              MR. RABER:  Yeah, I'll give it to
10        you in just a second here.
11   Q    (By Mr. Raber)  Have you ever seen Defendants' Exhibit
12        133?
13             MR. RABER:  It's already marked as
14        Defense Exhibit 133 for identification.
15   A    I have no idea what this is about.
16   Q    (By Mr. Raber)  In forming your opinions, did you
17        consider statements from people within the FDA on the
18        questions about which you have opinions?
19   A    I considered them.
20   Q    Do you see in Exhibit 133, it says, "DeLap told FDA
21        WebView 5/1 that the cardiac events data from the
22        VIGOR study that the agency has seen are preliminary,
23        and he is expecting more to be submitted shortly.  For
24        now, DeLap is convinced the product is labeled
25        appropriately."
```

276

6/7/2006 Kronmal, Richard

```
1         Do you see that?
2    A    Yeah, I see that
3    Q    Does that appear to you that Robert DeLap from the FDA
4         disagreed with your opinion?
5    A    Apparently.
6                   (Discussion off the record.)
7
8    Q    (By Mr. Raber)  On Page 41 of your -- I'm sorry.
9         Never mind.
10        You said you're not a big fan of pooled analyses?
11   A    Yeah, I'm not.
12   Q    Can you use a pooled analyses to provide strong
13        evidence of causation?
14   A    Can you?
15                  MR. BUCHANAN:  Objection to form.
16   Q    (By Mr. Raber)  Yeah.  Is it appropriate to do that?
17   A    It really depends on the nature of the
18        studies.  If there are a lot of studies of very
19        similar designs, you know, they're well conducted,
20        then -- and, you know, that are fairly comparable,
21        then, yes, it helps you to combine them to get an
22        overall better estimate.
23   Q    If the studies involved different doses, different
24        patient populations, and different durations, is it
25        appropriate to infer causation based on a pooled
```

277

6/7/2006 Kronmal, Richard

```
1         significance level of the  00002 level, and now the
2         data is just completely overwhelming.
3            If you mean --
4                   MR. BUCHANAN:  I'll object, Counsel.
5         If we're going to comment on my face, I'm going to
6         comment on yours.
7    A    If you were to try to say to me do I think that the
8         meta-analysis of MI that I did in the earlier part of
9         this report was weak in terms of the ability to make
10        inference, I'll agree with that, because the studies
11        involved are mostly these little, tiny studies of --
12        that were not long term, they didn't have a large
13        number of people in them, and they varied all over the
14        place.
15        By this point in time, you have APPROVe, which is
16        a very large study; you have VIGOR, a very large
17        study; you have the Alzheimer's, which is a large
18        study; and then you have modest size studies in Vip
19        and VICTOR.  And the result is so dramatically large
20        in terms of the p-value, that there's overwhelming
21        evidence that it's causally related.
22        But you have to remember, there's -- one other
23        thing.  You have to remember that there are now, at
24        the time this is done, you have two major studies done
25        by Merck, both showing highly statistically
```

279

6/7/2006 Kronmal, Richard

```
1         analysis?
2                   MR. BUCHANAN:  Objection to form.
3    A    I think it's a weak kind of inference to make under
4         those circumstances, based on pooled analysis.
5    Q    (By Mr. Raber)  Could you turn to Page 40 of your
6         report, please?
7    A    Sure.
8    Q    Do you see where you referred to a pooled MI analysis of all
9         Merck trials?
10   A    Yeah, I do.
11   Q    And that pooled analysis involved studies of --
12        involving different patient populations?
13   A    Absolutely.
14   Q    Different dosages?
15   A    Absolutely
16   Q    And in your report, you said that your pooled analysis
17        provides overwhelming evidence that rofecoxib causes
18        MI.
19        Do you see that?
20   A    Yeah
21   Q    That's a mistake, isn't it?
22   A    No, no, no.  Here, it is not.  Mainly because at this
23        point, the data is so -- you have all of the data now
24        from all of the studies, including APPROVe, including
25        VICTOR, including the Vip.  And now we're at the
```

278

6/7/2006 Kronmal, Richard

```
1         significant excess risk of MI.  You have VIGOR and you
2         have APPROVe.  That's enough by itself.  You don't
3         need anything else.  This just is sort of icing on the
4         cake, if you like.  It just shows that, gee, if you
5         include them all, every one, no matter how small, how
6         inadequate they were, you get this incredibly
7         significant result.
8         Yes, I think that's sufficient to say causality.
9    Q    (By Mr. Raber)  And the only one that anybody knew
10        about while the drug was on the market was VIGOR, of
11        all the studies you just mentioned; true?
12                  MR. BUCHANAN:  Objection.  Form.
13   A    Well, eventually they knew about Alzheimer's, but --
14   Q    (By Mr. Raber)  But Alzheimer's does not show a
15        statistically significant increased risk for
16        myocardial infarction, does it?
17   A    No, but it shows a much worse outcome -- shows
18        statistically significant excess of death, which is
19        much worse.  I'd much rather have an MI than be dead.
20   Q    Now, when do you decide whether or not to use an
21        adjusted p-value versus an unadjusted p-value?  What
22        are the rules on that?
23   A    You mean in terms of adjusting for what?  What are you
24        talking about?
25   Q    Well, in your report, you talk about the Aisen,
```

280

1    A-I-S-E-N, paper dealing with Alzheimer's, and you
2    mention that the more appropriate p-value to use is
3    the unadjusted one
4    A  Right.  Oh, in that context?
5    Q  Right.
6    A  I'm sorry.  I didn't know what the context was.
7       In the context of -- this was in the context of
8    Thal's discussion of the other results from other
9    studies.  And what he was trying to do was to say,
10   were there other studies that compared Vioxx to
11   placebo in Alzheimer's disease, that also showed an
12   excess risk of cognitive impairment.
13      And there was one.  And it specifically had data
14   on Vioxx and placebo, and it was an NIH-sponsored
15   study.  And it actually shows a statistically
16   significant difference in the comparison, the pairwise
17   comparison of Vioxx to placebo.
18      From that -- in that context, the relevant p value
19   was the unadjusted, because there's only one contrast
20   that was of concern to Thal, and that was that
21   specific one.  He wasn't concerned with whether
22   naproxen caused a decline in functioning.  He was only
23   concerned with the one question.
24      Now, if you were concerned with the two questions,
25   then you might want to adjust.  Even that's arguable.

1    Many statisticians would not adjust for the
2    multiple comparisons in that case either.  I don't
3    have a strong position on that.
4    Q  Now, on Page 18 of your report, in the last paragraph,
5    you talk about the fact that you used MI as an
6    endpoint.
7    A  That's correct.
8    Q  And you say, "By using MI as the endpoint, my analysis
9    is not subject to the dilution effect due to including
10   in the composite endpoint, events that were not
11   associated with rofecoxib use."
12      Do you see that?
13   A  That's correct.
14   Q  And is it your opinion that by using the composite
15   endpoint, that that had the effect of diluting the
16   effect associated with Vioxx use?
17   A  Yes.
18   Q  What events within the composite endpoint had that
19   diluting effect --
20   A  I don't --
21   Q  -- specifically?
22   A  Probably stroke.  But I didn't specifically, you know,
23   look at the individual components of the APTC, since I
24   didn't think it was the right thing to use anyway.
25      Hemorrhage probably did, too, but I don't think

1    that Vioxx causes hemorrhages; more than naproxen
2    does, at least.
3                MR. BUCHANAN:  Are you getting
4    close, Steve?
5                MR. RABER:  Yeah.
6    Q  (By Mr. Raber)  And when you say would have a diluting
7    effect, it means the risk would be either not
8    significant or not high enough, and it would drag down
9    the higher risk of myocardial infarction --
10   A  That's correct.
11   Q  -- when you combine the two?
12   A  That's correct.
13   Q  Now, you criticize Merck for not including the -- a
14   discussion of hypertension or the congestive heart
15   failure results in the New England Journal publication
16   on VIGOR; true?
17   A  Yes, I did.
18   Q  Did you review any of the peer reviewed comments back
19   and forth about the content of that article?
20   A  No, I didn't.
21   Q  Do you understand that there are page limits and word
22   limits that are imposed in various studies?
23   A  Yeah, but there's no reason not to report -- I mean,
24   in every clinical trial that I'm aware of, you always
25   report the AEs that were important, like hypertension

1    would have been, in a table.  And one of the few
2    papers I've ever seen that didn't do that was
3    Merck's --
4    Q  Are you aware of --
5    A  -- in their paper.
6    Q  -- of any guidelines or limitations with the New
7    England Journal of Medicine or other publications that
8    limit the number of tables that they'll allow in a
9    publication?
10   A  I know there are some, but that's not a hard-and-fast
11   thing.  They - particularly for clinical trials, they
12   tend to be more liberal if there's important data that
13   needs to be presented.
14   Q  Do you know whether or not the New England Journal of
15   Medicine ever advised Merck in the peer-review process
16   that they needed to limit their number of tables to
17   five in the VIGOR paper?
18   A  I don't know what they told them.
19      I mean, I just had a paper published in the New
20   England Journal of Medicine on a clinical trial.  We
21   reported all the side effect data.  They didn't object
22   to that.  They would have objected if we hadn't.
23   Q  Well, wouldn't you agree, though, that studies have
24   different purposes and different hypotheses --
25   A  There's never a reason not to report the important

6/7/2006 Kronmal, Richard

```
1        side effect data.  Never.
2    Q   Would you agree with me that when you have a small
3        number of patients that are still under observation
4        late in a study, that that can cause a large and
5        potentially misleading increase in event rates when
6        just a few events occur?
7    A   Oh, absolutely.  That's one of the reasons you use log
8        time in doing proportional hazards analysis.
9    Q   Or linear?
10   A   No.  That's the reason you use the log.  You don't --
11       that's reason you don't use the linear.
12   Q   Okay.  You have no way of knowing whether any
13       physician was actually misled by anything that Merck
14       said about Vioxx; true?
15   A   Well, I know that Mr. Humeston's physician said he
16       was
17   Q   Do you know
18   A   But that's the only one I know specifically.
19   Q   You know what the jury thought of that; right?
20   A   No, I don't.  Not that particular thing, no.
21   Q   You know that the jury found for Merck in that trial?
22   A   I know they did, but I don't know what they thought of
23       that specific issue.
24   Q   My question to you is:  You have no way of knowing if
25       any physician was actually misled by Merck with regard
```

285

6/7/2006 Kronmal, Richard

```
1        to Vioxx?
2                  MR. BUCHANAN:  Objection.  Asked and
3        answered.
4    A   I don't know.  I already said what I knew.  I already
5        told you the answer to that.  The only one I know who
6        said he was misled was that particular physician.  I
7        don't know about any other physician.  I haven't
8        talked -- I haven't gone out and surveyed the
9        physicians in the United States to see if they were
10       misled or not.
11       Has Merck done that?
12       I'm sorry.  I shouldn't ask you questions
13   Q   (By Mr. Raber)  Why would you ask me a question like
14       that?
15   A   I don't know
16   Q   Late in the day?
17   A   I'm tired.
18                 MR. BUCHANAN:  If truly is, counsel
19       That was a five-minute warning an hour ago.
20                 MR. RABER:  Well, listen,
21       "Mr. Thirty-minute break, let's take ten minutes."
22                 MR. BUCHANAN:  I think we've been
23       very accommodating.  The breaks have been few and far
24       between, and we're now at quarter of 6:00.  And we've
25       been very accommodating.
```

286

6/7/2006 Kronmal, Richard

```
1                 MR. RABER:  I'm going to be done
2        pretty soon here.
3                 MR. BUCHANAN:  That's what I thought
4        an hour ago.  That's my point.
5                 MR. RABER:  Dr. Kronmal, thank you
6        for your time.  I think that's all I have right now.
7                 THE WITNESS:  You're welcome
8
9
10                EXAMINATION
11   BY MR. BUCHANAN:
12   Q   Doctor, I just want to pick up with the last area of
13       inquiry by counsel concerning whether or not you're
14       aware of individual physicians having been misled
15       concerning data with Vioxx by Merck.
16       Apart from the doctor in the case that you heard
17       testimony on, the Humeston case, have you reviewed the
18       New England Journal of Medicine's Expression of
19       Concern?
20   A   Yes, I have.
21   Q   And who authored that?
22   A   The New England Journal of Medicine editors.
23   Q   What is your understanding of the concern they
24       expressed in the Expression of Concern?
25                 MR. RABER:  Objection to form.
```

287

6/7/2006 Kronmal, Richard

```
1    A   They basically said that they thought that Merck's
2        reporting was misleading and incomplete.
3    Q   (By Mr. Buchanan)  Okay.  Dr. Kronmal, I just want to
4        read to you from the New England Journal of Medicine
5        Expression of Concern.  I believe it's dated December
6        29, 2005.
7        The article states that, "lack of inclusion of the
8        three events resulted in an understatement of the
9        difference in risk of myocardial infarction between
10       the rofecoxib and naproxen groups, presented in the
11       article as a reduction in the risk with naproxen but
12       shown here as an increase in the risk with rofecoxib.
13       It also resulted in the misleading conclusion that
14       there was a difference in the risk of myocardial
15       infarction between the aspirin-indicated and aspirin-
16       non indicated groups."
17       Do you recall reading that language?
18   A   Yes, I do.
19   Q   Do you agree that the presentation of the data in the
20       original Bombardier article concerning the VIGOR trial
21       was misleading in its presentation of certain of the
22       risk data from the VIGOR trial?
23   A   Yes.
24                 MR. RABER:  Objection to form.
25       Leading.
```

288

6/7/2006 Kronmal, Richard

```
1  A   Not only do I agree with it.  I said the same thing in
2      my report prior to the New England Journal publication
3      of the Expression of Concern.
4  Q   (By Mr. Buchanan)  Okay.  You noted, I believe, that
5      you had read not only the Expression of Concern, but
6      also Merck's response, as well as the reaffirmation of
7      the Expression of Concern.
8          Do you recall that?
9  A   Yes.
10 Q   Do you recall reading the Expression of Concern?
11 A   Yes.
12 Q   The reaffirmed --
13 A   Yes, I did read that
14 Q   In the reaffirmance, Drs. Curfman, Morrisey and
15     Dr. Drazen -- do you know who they are, by the way?
16 A   I do.  The editors of the journal.
17 Q   In the reaffirmance, the New England Journal commented
18     as follows:  "The authors state that these events did
19     occur during the trial, but did not qualify for
20     inclusion in the article because they were reported
21     after a pre-specified cut-off date for the reporting
22     of cardiovascular events.  This data, which the
23     sponsor selected shortly before the trial ended, was
24     one month earlier than the cut-off date for the
25     reporting of adverse gastrointestinal events.  This
```

289

6/7/2006 Kronmal, Richard

```
1      untenable feature of the trial design, which
2      inevitably skewed the results, was not disclosed to
3      the editors or the academic authors of the study."
4          Do you recall reading that?
5  A   Yes, I do.
6  Q   Do you agree that that type of information should be
7      disclosed -- withdrawn.
8          Should that type of information be disclosed in
9      journals in connection with the peer-review process?
10         MR. RABER:  Objection to form.
11 A   Yes, it should be.
12 Q   (By Mr. Buchanan)  Should it be disclosed to the
13     non-company authors of company-sponsored clinical
14     trials?
15 A   Absolutely.
16         MR. RABER:  Objection to form.
17 A   In fact, they're -- they have to sign something that
18     says that they've actually looked at all the data from
19     the study and know all of the statistical analyses and
20     how it was performed
21 Q   (By Mr. Buchanan)  All right.  Just to get back to the
22     beginning of where we started today, you were asked
23     some questions about the notice and some materials
24     that you brought today.
25         I know we talked about it off the record.  I'm
```

290

6/7/2006 Kronmal, Richard

```
1      just going to ask you, for purposes of the record, did
2      you bring with you today a hard drive that contained
3      what you consider to be your complete file in
4      connection with the reports generated for this
5      litigation?
6  A   Yes, I did.
7  Q   And --
8          MR. RABER:  Let me jump in.  How do
9      we arrange to get that?
10         MR. BUCHANAN:  I'll make a copy for
11     you.  Happy to.  Last time, defense trusted me to do
12     it accurately.  I mean, I can do it for you, if that's
13     fine with you.
14         MR. RABER:  Okay.
15 Q   (By Mr. Buchanan)  Turning back to some of the recent
16     questions by Mr. Raber.
17         Have you examined the details of any specific case
18     regarding whether a patient was on Vioxx or not on
19     Vioxx?
20 A   No.
21 Q   Have you examined the detail of   the detail of any
22     particular case as to whether a patient got Vioxx by a
23     prescription or by samples?
24 A   No, I didn't.
25 Q   You are aware that drug companies provide samples to
```

291

6/7/2006 Kronmal, Richard

```
1      doctors to provide to patients?
2  A   Yes.
3          Actually, I should modify that.  I saw at one
4      point in time, one of the cases that was in the South
5      somewheres, where there was an issue about whether or
6      not they got it by samples or by prescription or
7      things like that.  But I don't remember any of the
8      details.  And I wasn't involved in that case.  I just
9      happened to be asked about it
10 Q   I understand   And is it fair to say, sir, that you
11     don't know the particulars in any particular case
12     about whether a person may have gotten Vioxx by
13     samples or whether they got them from a prescription?
14 A   No, I don't know that.
15 Q   And anybody reading this transcript down the road
16     shouldn't interpret your testimony today to be a
17     commentary on whether somebody was likely to have
18     gotten samples or likely to have gotten the drug by
19     prescription or not at all?
20         MR. RABER:  Objection to form.
21     Leading.
22 Q   (By Mr. Buchanan)  Can you answer, sir?
23 A   No, I don't know anything about that issue at all.
24 Q   I understand.  I just wanted to make sure the record
25     is clear.
```

292

6/7/2006 Kronmal, Richard

```
 1          There was also some commentary by you     or,
 2     actually, a question by Mr. Raber concerning, what do
 3     you think of somebody who says in one court they had a
 4     heart attack for one reason, and in another court,
 5     they had it because of Vioxx.
 6          Do you recall that question and answer?
 7   A  Yes, I do
 8   Q  And I think you said something along the lines of,
 9     "Well, I'd be concerned about whether they were all
10     there," or something.
11   A  Something like that.
12   Q  Fair to say that you haven't examined the
13     circumstances of any particular case as to why
14     somebody would make a claim concerning cause of their
15     heart attack in a particular case?
16          MR. RABER:  Object to form.
17   A  I have not examined any case in that regard.
18   Q  (By Mr. Buchanan)  Sitting here today, do you feel
19     comfortable providing an opinion as to why somebody
20     would say one thing in one court and a different thing
21     in a different court, depending on the circumstances?
22          MR. RABER:  Objection.  Leading.
23   A  I don't -- I have no idea what the circumstances were,
24     so how can I comment as to why they didn't or didn't
25     do it?  I don't know.
```

293

6/7/2006 Kronmal, Richard

```
 1   Q  (By Mr. Buchanan)  I'd like to turn back to the FDA
 2     WebView document.
 3          First of all, do you have a copy of that?
 4   A  No, I don't.  I can look at that one.
 5   Q  Looking at the document, does it appear to be a
 6     document like the FDA documents that you've looked at?
 7   A  Well, it's not from the FDA.
 8   Q  How do you know that, sir?
 9   A  Because it has -- would have FDA.gov on it.  It would
10     say it's an FDA official document.  It doesn't say
11     that.
12   Q  In fairness, there's not a URL, so to speak, a Web
13     address?
14   A  No.  But it says Dickinson's FDA WebView, which is not
15     exactly how you would identify the FDA.
16   Q  This document is dated 5/1/2000.  Did you see that
17     date?
18   A  No, I didn't notice it.
19   Q  I'll direct your attention to that.
20   A  Yeah, I see that now
21   Q  When did the VIOXX results, the preliminary VIGOR
22     results, come into the company?
23   A  I don't know.
24   Q  Do you recall, sitting here today    and I realize
25     you've looked at a lot of things, but sitting here
```

294

6/7/2006 Kronmal, Richard

```
 1     today, do you recall when Merck provided its initial
 2     analysis of the VIGOR results to the FDA?  Was it
 3     before or after 5/1/2000?
 4   A  I don't remember, David, the exact date.  I just don't
 5     know.  It was somewhere in that period.  I don't know
 6     exactly when.
 7   Q  Well, sitting here today, and looking at this
 8     statement talking about whether it's premature to draw
 9     conclusions from recent clinical trial and data on
10     Merck's arthritis drug, Vioxx, are you aware of
11     whether the FDA had even gotten Merck's preliminary
12     submission of Vioxx data as of this point in time?
13   A  I don't know when they got it.  I don't know.  It was
14     in that general period, but I don't know --
15          MR. RABER:  Objection.  You're going
16     to accuse me about asking a question without
17     foundation, and you ask that one?
18          MR. BUCHANAN:  Absolutely.  You
19     provided it in June, late June.
20          MR. RABER:  March 2000, pal.
21          MR. BUCHANAN:  False    June 28,
22     2000, is when you filed your supplemental new drug
23     application --
24          MR. RABER:  Preliminary information
25     faxed on March 23rd and sent on --
```

295

6/7/2006 Kronmal, Richard

```
 1          MR. BUCHANAN:  I'll accept my
 2     question.
 3   Q  (By Mr. Raber)  Dr. Targum, you mentioned her earlier
 4     today.
 5   A  Yes.
 6   Q  Who is she?
 7   A  She's an FDA medical reviewer that was called in to
 8     review the cardiovascular event rates in VIGOR.
 9   Q  To your memory, was she a cardiologist?
10   A  I believe she was.  I don't know for certain.
11   Q  And did she prepare a memorandum concerning her review
12     of the VIGOR data?
13   A  Yes, she did.
14   Q  Did she suggest a warning for the drug?
15   A  I believe she did
16   Q  That was after May of 2000?
17   A  I believe it was.
18   Q  And after Merck had submitted its supplemental -- I'll
19     represent, Merck submitted their supplemental new drug
20     application to the FDA concerning VIGOR in June --
21   A  I think it was close to December, I believe.  Wasn't
22     it?
23   Q  You were reminded, I think today, of some of your
24     earlier testimony -- it may have been in your
25     deposition -- concerning whether you, knowing what you
```

296

6/7/2006 Kronmal, Richard

```
1    know about VIGOR, could have allowed the Alzheimer's
2    and APPROVe trials to go forward.
3        Do you recall that?
4  A  That's correct.
5  Q  Is that because you had different analyses in your
6    report than what were reflected in the New England
7    Journal of Medicine?
8        MR. RABER:  Objection.  Leading.
9  A  That's correct.  I --
10 Q  (By Mr. Buchanan)  Well, did you have different
11   information -- does your report contain different
12   information than the New England Journal of Medical
13   [sic] article concerning the VIGOR trial?
14 A  That's right, it does.
15       MR. RABER:  Objection.  Leading.
16 Q  (By Mr. Buchanan)  Have you seen any evidence that
17   Merck presented the VIGOR data in the way you've
18   analyzed it in your reports, to the FDA, concerning CV
19   events?
20 A  No, they never presented it that way.
21 Q  Did you see them ever analyze the hypertension and
22   congestive heart failure data and present it to the
23   FDA or their advisory committee?
24       MR. RABER:  Objection to form.
25 A  Not the hypertension.  There was certainly in the
```

297

6/7/2006 Kronmal, Richard

```
1  Q  And again, the APPROVe data was not in the -- included
2    in the Jnni article?
3  A  No, they were not.
4  Q  While we're talking about APPROVe, I want to talk
5    about the APPROVe extension.  We talked about that a
6    little bit this morning.
7  A  Right.
8  Q  And Mr. Raber highlighted the -- had you look at the
9    printed report and some printed tables concerning MIs,
10   and I think maybe even sudden death.
11       Do you recall that?
12 A  Yes, I do.
13 Q  Your testimony earlier today was, you calculated the
14   relative risk, I believe, from a data file.  Is that
15   right?
16 A  That's correct.
17 Q  The data file from data Merck gave you?
18 A  Yes.  Well, through you, obviously.
19 Q  They gave it to me; I gave it to you?
20 A  Right.
21 Q  Have you since -- and prior to preparing your report
22   on the APPROVe extension data, had you received a
23   supplemental production of APPROVe data?
24 A  Prior or after?
25 Q  I'm asking whether -- before you prepared your report,
```

299

6/7/2006 Kronmal, Richard

```
1    report, the congestive failure data.
2  Q  (By Mr. Buchanan)  I want to turn now to Dr. Jnni's
3    article.  There was some testimony about whether
4    Dr. Jnni had included the Alzheimer's trials in his
5    meta-analysis.
6        Do you recall that?
7  A  Yes, I do.
8  Q  I believe you testified that if you included the
9    Alzheimer's results, it would have pulled down the
10   relative risk, the global endpoint?
11 A  Yeah, slightly.
12 Q  Did you do any calculation to figure out how much it
13   would pull it down?
14 A  No.
15 Q  Do you have an opinion as to whether it would have
16   been a significant amount?
17 A  It wouldn't have been much.
18 Q  Now, did the Jnni analysis include data from the
19   chemo prevention trials?
20 A  No.  They weren't done yet.
21 Q  Do you know what the chemo prevention trials are?
22 A  Yes.  APPROVe, VICTOR, and VIP.
23 Q  Was the relative risk for MIs greater in the APPROVe
24   trial than in the Alzheimer's trial?
25 A  Yes, it was greater.
```

298

6/7/2006 Kronmal, Richard

```
1    the addendum to your report, had you received more
2    recent APPROVe data?
3  A  Not at that time, no.
4  Q  Did you, at some point in time, receive more recent
5    APPROVe data?
6  A  Yeah.  Within about the last week or so.
7  Q  And your extension [sic] is not based on that?
8  A  No, it's not.
9  Q  Excuse me.  Your addendum is not based on that?
10 A  No, it's not.  I didn't have time.
11 Q  Do you intend to review that data?
12 A  Now I certainly do, yes.
13 Q  Do you intend to determine whether or not the results
14   from the new data set are different from the results
15   generated from the old data set?
16 A  Yeah, absolutely.
17 Q  A couple quick questions.  And I'm sorry to hop
18   around.
19 A  That's okay.
20 Q  My notes are not the best organized.
21      I'd like to turn back to VIGOR, and specifically
22   the death issue.
23      Did the prior report, the report you disclosed in
24   connection with the New Jersey proceedings back in
25   April of 2005, contain a discussion of the 15 versus
```

300

6/7/2006 Kronmal, Richard

```
 1      22?
 2   A  Yes.
 3   Q  And the death information that was contained in the
 4      old report, was that the same as what you reflected in
 5      the new report for the VIGOR trials?
 6   A  Exactly the same.
 7   Q  Let's turn now briefly to Alzheimer's   Okay?
 8         There was some discussion this morning about the
 9      078 trial and whether -- what information was given to
10      the FDA in particular with regard to the 078 trial.
11         You referenced an analysis that was conducted in
12      April 2001   And I just want to be clear for the
13      record, what were you referring to about an analysis
14      conducted for ITT information from 078 in April 2001?
15   A  I was referring to the Chen memos.
16   Q  And who is Chen?
17   A  Chen is a statistician who works for Merck who was
18      asked by Merck physicians to do analyses of the
19      survival data, the mortality data, from 091, 078   And
20      he did both an ITT and an on-drug plus 14 day
21      analyses.
22   Q  And when you testified earlier that Merck didn't give
23      certain of the mortality analyses to the FDA for 078,
24      what were you referring to?
25   A  I was basically referring to what Chen did; or if it
```

301

6/7/2006 Kronmal, Richard

```
 1      And as your sample size in terms of events gets
 2      larger, then the statistical significance gets larger.
 3      And that's basically the reason you don't do analyses
 4      looking at a specific time points.
 5         If you have a constant excess risk associated with
 6      one treatment or another, the longer you wait, the
 7      more significant it will become.  And the shorter time
 8      period you look at, the less significant it will
 9      become.
10         That's just algebra.  It doesn't even require any
11      statistics.  The number of events is proportionate to
12      the amount of time that people are at risk and the
13      number of people at risk.  The longer the risk period
14      is, the more events.  The more events, the greater
15      statistical significance given that there's a
16      difference.
17   Q  So based on your review of the APPROVe data, for
18      somebody that had -- if you wanted to know, for
19      example, at a particular point in time, what the
20      relative risk was, what's the best estimate of the
21      relative risk, say at a year?
22   A  It's the overall global relative risk.  That is the
23      only reliable estimate of the relative risk that you
24      have, is the relative risk over the whole time period.
25   Q  I want to turn now to some testimony you gave on
```

303

6/7/2006 Kronmal, Richard

```
 1      was later on, an update to that information.
 2   Q  I want to turn now to some testimony you gave with
 3      regard to the APPROVe graphs over time, talking about
 4      this 18 month hypothesis   Okay?
 5         I believe you testified that you wouldn't expect
 6      to see statistical significance in terms of the
 7      difference between cardiovascular events in one
 8      treatment arm for APPROVe versus the other treatment
 9      arm in a short period of time in a study.
10         Do you recall that?
11   A  Yes.
12   Q  Now, why is that?
13   A  Well, if you - if you limit yourself to, say -- say
14      as an example, suppose you only went one day into the
15      study, and suppose the risks were five times as large
16      in one treatment arm versus the other.  That doesn't
17      mean you're going to get an event in one day in either
18      group.  So you might get zero versus zero.  And if you
19      go to two days, it may still be zero versus zero;
20      nonsignificant
21         Maybe you go to a month and it's three versus one.
22      Still not significant.
23         Maybe you go two months, and it's now nine versus
24      two.  Marginally significant   And you go out.  And
25      the further you go out, the events cumulate.
```

302

6/7/2006 Kronmal, Richard

```
 1      DSMBs
 2         To be clear, you know, when there's a DSMB, whose
 3      responsibility is it to look out for patient safety
 4      with a study drug?
 5            MR. RABER:  Objection to form.
 6   A  It's the DSMB's responsibility.
 7   Q  (By Mr. Buchanan)  In those instances where you've
 8      been involved with DSMBs that have recommended
 9      stopping the trials, who makes the recommendations to
10      stop the trial:  the FDA or the DSMB?
11   A  The DSMB makes the recommendation.
12   Q  Okay.  That's fine
13         There was some testimony earlier today about the
14      inclusion of your CHD endpoint.  Do you recall that?
15   A  Yes.
16   Q  I should be more specific.  You used an endpoint
17      called hard CHD?
18   A  That's correct.
19   Q  And that is what?
20   A  It's sudden death and myocardial infarction.
21   Q  And I think you testified you treated sudden cardiac
22      deaths the same way you treated MIs for purposes of
23      that analysis.  Correct?
24   A  I included them in the analyses, yes
25   Q  Is a sudden cardiac death the same thing as a heart
```

304

6/7/2006 Kronmal, Richard

1     attack?

2  A  Heart attack in its global, you know, everyday use,

3     you would include a sudden death as called a heart

4     attack.

5  Q  Let me ask you this:  Is a sudden death the same thing

6     as a myocardial infarction?

7  A  It is not the same thing, no.  It is an arrhythmia.

8     And arrhythmic death may or may not be accompanied by

9     an MI.  It may be preceded by an MI.  May even be

10    followed by an MI.  Typically, though, MIs are the

11    triggering event for a sudden cardiac death.  But that

12    is not always the case  There is sometimes

13    arrhythmias that occur through some sort of fault in

14    the electrical system of the heart, that is

15    unconnected to an MI.

16  Q  So if we're doing, you know, more likely than not, if

17    we're just asking more likely than not --

18         MR. RABER:  Excuse me.  David.  If

19    you're going to go into this and turn him into a

20    cardiology expert, we're going to go a long time and

21    this is not going to be at the end of your deposition.

22    This is well beyond the scope

23         MR. BUCHANAN:  It's well

24         MR. RABER:  If you're going to ask

25    him on a more likely than not about cardiology and

305

6/7/2006 Kronmal, Richard

1     cause of death

2         MR. BUCHANAN:  No.  I'm going the

3    opposite way.  It's a very direct question.

4  Q  (By Mr. Buchanan)  In terms of more likely than not,

5    in your experience in cardiac literature, et cetera,

6    when you see a sudden death, is that presentation more

7    likely or less likely to be secondary to a heart

8    attack  excuse me -- an MI?

9  A  The majority of sudden cardiac deaths are preceded by

10    MIs.  That's just a statistic.  It's not a medical

11    decision.

12         MR. RABER:  The majority of what?

13         THE REPORTER:  "Sudden cardiac

14    deaths."

15         THE WITNESS:  Are preceded by an

16    MI.

17  Q  (By Mr. Buchanan)  Do you know what that statistic is?

18  A  No, not exactly.

19  Q  I'd like to turn briefly now to the Thal article

20    There is a lot of testimony on this issue, and I won't

21    characterize it, but I'm not exactly clear if the

22    answer is clear.

23     Is there anywhere in the Thal article that says

24    that the deaths, in reporting the deaths, they were

25    using investigator reported deaths?

306

6/7/2006 Kronmal, Richard

1  A  There is no such notation.

2         (Discussion off the record.)

3         (Recess 6:08-6:12 p.m.)

4

5

6         EXAMINATION (Continuing)

7    BY MR. BUCHANAN:

8  Q  Doctor, there was some testimony earlier regarding

9    statistical significance and how you interpret

10    nonsignificant effects.

11     Do you recall that?

12  A  Yes.

13  Q  Can nonsignificant findings from clinical trials be

14    important to assessing safety issues?

15  A  Yes

16         MR. RABER:  Objection to form.

17  Q  (By Mr. Buchanan)  In your role on DSMBs, do you

18    require statistically significant findings on safety

19    issues before taking action?

20  A  No.

21  Q  And have you taken action in your role as a DSMB

22    member in the face of nonsignificant findings?

23  A  Well, one of the trials, as I say, was very marginal.

24    It was right on the boundary of .05.

25    The other one, I don't remember whether it crossed

307

6/7/2006 Kronmal, Richard

1     it  It was close.  It might have crossed it.  It

2    might not have.

3  Q  And with that, you're referring to mortality issues?

4  A  Yes, primarily.

5  Q  There was some talk earlier today about five-oh and

6    six-oh, and what that tells you about whether

7    something is statistically significant or not.

8     Do you recall testifying about that?

9  A  You mean five versus zero and six --

10  Q  Five versus zero and six versus zero.  Do you recall

11    that?

12  A  Yes.

13  Q  When you were discussing the five versus zero, I think

14    you stated that that wouldn't be particularly

15    concerning.  And I want to know why that is.

16  A  Well, I didn't say it wouldn't be particularly

17    concerning.  I just think it wouldn't reach the level

18    that you would  that you would necessarily take any

19    significant action based object it.  Because -- it

20    wouldn't reach statistical significance, because when

21    it was one of many endpoints, and, you know, you

22    expect to see some imbalances when you look at a lot

23    of endpoints.

24     An example is, there was one trial I was on the

25    monitoring board, and we had seven cases of breast

308

6/7/2006 Kronmal, Richard

```
 1        cancers versus none in the two treatment arms.  And we
 2        wondered about it.  We asked the company to look at
 3        all the other trials they had to see if they had seen
 4        any breast cancer excess, but we didn't stop the trial
 5        on the basis of that, because it was one of many
 6        endpoints.  It could have been, you know, out of
 7        balance.  And by chance, you expect some to be.
 8    Q   Okay.  Doctor, I want to follow up with you on some
 9        questions you were asked about the relative risk or
10        the excess risk for heart attacks that was seen in the
11        VIGOR trial.  Okay?
12    A   Mm-hm.
13    Q   Do you recall discussing the five-to-one difference
14        between heart attacks on Vioxx versus naproxen in the
15        VIGOR today?
16    A   Yes, sir.
17    Q   I know we talked about it, and you discussed it with
18        Mr. Raber in a lot of different ways.
19            I think you were asked whether a five to one risk
20        difference between Vioxx and naproxen would be obvious
21        that there's an issue between the two from a relative
22        risk perspective.
23            Do you recall that?
24    A   Yes.
25    Q   What is the data in the Bombardier paper presented to
```

309

6/7/2006 Kronmal, Richard

```
 1        show an increased risk on Vioxx or a decreased risk on
 2        naproxen?
 3    A   It was given as a decreased risk associated with
 4        naproxen.  They showed a .2 relative risk, where
 5        naproxen was basically a numerator and Vioxx was a
 6        denominator.
 7    Q   In your opinion, is a relative risk of .2 an obvious
 8        presentation of an increased risk of heart attack on
 9        Vioxx as compared to naproxen?
10            MR. RABER:  Objection to form.
11    A   As I said in my report, it was extremely unusual to
12        report a relative risk for an experimental agent
13        against an agent that has been in use for 20 years,
14        with the experimental agent in the denominator and the
15        widely-used 20-year-old drug in the numerator.
16            And, you know, most unsophisticated people, as a
17        lot of physicians are about reading these papers,
18        would not readily pick up that a .2 relative risk is a
19        fivefold increased risk.  But the other direction,
20        that doesn't mean they couldn't.  And certainly the
21        more sophisticated reader would certainly pick up on
22        that.  But it's unusual.  It's a very unusual
23        presentation.  I can't remember ever seeing that done.
24    Q   Thank you.
25            I'd like to direct your attention to the article
```

310

6/7/2006 Kronmal, Richard

```
 1        itself, sir.  I'll read this sentence, the portion I
 2        want to focus on.  The article stated, "The difference
 3        in the rates of myocardial infarction between the
 4        rofecoxib and the naproxen groups was not significant
 5        among the patients without indications for aspirin
 6        therapy, a secondary prophylaxis."
 7            Do you know what that's referring to?
 8    A   Yes.  It was that they divided up people into those
 9        that potentially should have been on aspirin versus
10        those who had no indication for aspirin
11    Q   And when the company included -- excuse me -- when the
12        additional three MIs that were identified after the
13        publication of the Bombardier article -- excuse me.
14        Withdrawn.
15            With the inclusion of the additional three MIs,
16        does the relative risk change in the aspirin-indicated
17        population?
18    A   Yes.  It's larger.
19    Q   Were those -- excuse me.  I believe it's the aspirin-
20        not-indicated population.  Let me rephrase the
21        question, Doctor.
22            With the inclusion of the additional three events
23        in the non-aspirin-indicated population, does the
24        relative risk increase between Vioxx and naproxen?
25    A   Yes, it does.
```

311

6/7/2006 Kronmal, Richard

```
 1    Q   That, of course, was not in the paper?
 2    A   That's correct.
 3    Q   There was some testimony earlier, I think it was a
 4        hypothetical that Mr. Raber presented to you, talking
 5        about -- or asking you what conclusions you can draw
 6        in studies where you're not comparing -- where you're
 7        comparing two active agents rather than an active
 8        agent versus a placebo.
 9            Do you recall talking about that?
10    A   Yes, I do.
11    Q   In the VIGOR trial, there was no placebo; correct?
12    A   That's correct.
13    Q   There were two active agents?
14    A   That's correct
15    Q   And you were asked about what conclusions you can draw
16        from a difference in the frequency of events in one
17        arm of an active agent versus those in another arm;
18        correct?
19    A   That's correct.
20    Q   Now, if the difference is quite large, a large
21        relative risk difference, does that provide
22        information to you in assessing risk about the target
23        drug in an active versus inactive comparative trial?
24            MR. RABER:  Objection.  Leading.
25    A   It provides some information, yes
```

312

Q (By Mr. Buchanan) What if one of the comparators was well-known and well understood? Does that add to the understanding in the difference in relative risks?
A Yes, it does. In fact, the issue, of course, that was framed by Merck was that naproxen was equivalent to aspirin and would have the same effect on reducing the risk that aspirin would.
There was substantial data at that point in time on what the benefits of aspirin are in cardiovascular prevention of MI and in other cardiovascular events. And roughly, that reduction is about .33. About a 33 percent reduction at maximum.
Q Okay.
A And the data from the VIGOR study for the excess risk seen with Vioxx was not consistent with that on a statistical basis. The data was sufficient to rule out that naproxen was an equivalent to aspirin. It would have to have been much better than aspirin.
MR. RABER: Objection. Nonresponsive.
Q (By Mr. Buchanan) I'm going to turn back to the actual -- did you conduct a statistical analysis of the data from the VIGOR trial to determine whether or not there was statistical support for the naproxen hypothesis that Merck would hold?

A I did.
Q And what did you conclude when you did that?
A I concluded that there was not.
Q I want to read you a statement, sir. It's from Dr. Villalba. I believe it's from the 2001 advisory committee, concerning naproxen explanation.
The statement is, "Therefore, it is not very convincing to us that this is the whole explanation, and there are no controlled studies of naproxen versus placebo for cardiovascular prophylaxis."
Did you read the transcript, by the way?
A Yes, I did.
Q Do you agree with that statement --
A Yes
Q -- as of that point in time?
A Yes.
Q And how about as of today?
A It's -- well, today, there's the ADAPT study. And the ADAPT study was stopped. It was a study of naproxen versus placebo. There is the first -- actually, the first large placebo-controlled trial of naproxen, and it was stopped early because they had seen an excess risk of CV events in the naproxen group.
I think that data basically is now the only -- really the only clinical trial they did, that I know

of. And it goes the wrong direction. It really contradicts the naproxen hypothesis. It makes it very untenable, really.
Q Now, does that data mean that Vioxx and naproxen have the same risk of cardiac events?
A No, no, because we already know from VIGOR that they don't; that Vioxx has a much greater increased risk. And actually, the ADVANTAGE shows the same thing, which is also a naproxen-controlled clinical trial.
MR. RABER: I'm sorry, can I hear that answer back again?
(Answer on Page 315, Lines 6 through 9, read by the reporter.)

Q (By Mr. Buchanan) I want to turn now to some questions you were asked by Mr. Merck -- not Mr. Merck.
MR. BUCHANAN: There you go, Steve. Getting late for all of us.
Q (By Mr. Buchanan) I want to turn back to some some questions you were asked by Mr. Raber about what Merck believed and the FDA believed.
Do you remember being asked questions along those lines?

A Yes.
Q At any point in time, do you know what Merck believed about anything with the drug?
A No, I don't really know what they believed. I know what they said and what they did. I don't know what they believed.
Q And how about the FDA? At any point in time, do you know what the FDA believed versus --
A No. The FDA is not one person, of course. And there were many people in the FDA who were very worried about Vioxx. So I don't know what anybody believed, per se.
Q My question is: The conclusions that you've drawn, though, about the safety or the risks with Vioxx, do you draw that from data that you've looked at or things people have said?
A It's from the data I've looked at.
Q You were shown an article. I don't know if I actually looked at the article, but it was one that was done, I believe, by you, perhaps some point in the '90s, an aspirin plus prostacyclin plus an aspirin study?
A Yeah. It's a prostacyclin-sparing aspirin formulation combined with with heparin/warfarin versus aspirin alone with warfarin.
Q First of all, what was your role in the study?