6/7/2006 Kronmal, Richard

| | | |
|---|---|---|
| 1 | A | I was sort of a consultant to the study. I wasn't |
| 2 | | directly involved in it. I was more a consultant. |
| 3 | Q | Okay. And what was your focus? |
| 4 | A | Mostly on getting the data in good shape. We had a |
| 5 | | little consulting activity going on with various |
| 6 | | investigators. And this particular investigator knew |
| 7 | | us from another study, and asked us if we would handle |
| 8 | | the data management for his study. And we did so. |
| 9 | | And I provided a little statistical input to him |
| 10 | | too. |
| 11 | Q | Just so the record is clear on this, you don't |
| 12 | | consider yourself to be an expert in prostaglandins, |
| 13 | | do you? |
| 14 | A | No, I don't. |
| 15 | Q | You were asked a question earlier today with regard to |
| 16 | | a statement you made on Page 13 of your report. It |
| 17 | | was about whether or not the additional events, the |
| 18 | | additional heart attacks that were discussed in the |
| 19 | | Expression of Concern, affected the relative risk. |
| 20 | | Do you recall that? |
| 21 | A | Yes, I do. |
| 22 | Q | Did the additional events -- and you state in this |
| 23 | | paragraph here, first, as pointed out by the NEJM, the |
| 24 | | additional events do in fact change the results in a |
| 25 | | meaningful way because there is a difference in the |

317

6/7/2006 Kronmal, Richard

| | | |
|---|---|---|
| 1 | | magnitude of the relative risk. |
| 2 | | And the magnitude in relative risk is, what, .4 to |
| 3 | | .5? |
| 4 | A | Mm-hm. |
| 5 | Q | A statistical significance, what do you mean by that? |
| 6 | A | I mean that p-value become more significant. |
| 7 | Q | Okay. And the interpretation of the subgroup in which |
| 8 | | the events occurred, what are you referring to? |
| 9 | A | That was the aspirin indicated or not. |
| 10 | Q | And again, the relative risk changed? |
| 11 | A | Yes. |
| 12 | Q | You were reminded, I think, earlier today about an |
| 13 | | error I think you identified or an oversight in your |
| 14 | | first report in April 2005, about something relating |
| 15 | | to MIs in the April -- in the April 2002 label. |
| 16 | | Do you recall that? |
| 17 | A | Yes, I remember that. |
| 18 | Q | In connection with preparation of your new report, did |
| 19 | | you review your section on labeling? |
| 20 | A | Yes, I did. |
| 21 | Q | And did you correct that error? |
| 22 | A | I believe so. I'd have to look. |
| 23 | Q | Take a look. |
| 24 | A | I thought I had corrected the statements about trend |
| 25 | | too. I missed one. So I can't -- what page is it? |

318

6/7/2006 Kronmal, Richard

| | | |
|---|---|---|
| 1 | Q | I think it's towards the end. |
| 2 | A | I'm not sure. I say, in particular, prior to -- oh, |
| 3 | | prior to 2002, the rofecoxib -- well, you say -- I |
| 4 | | don't know what -- oh, prior to 2002, I said. Okay. |
| 5 | | Oh, no, it is corrected. Yes. |
| 6 | Q | Okay. |
| 7 | A | Yes, it's corrected. |
| 8 | Q | All right. I want to turn now to what was identified |
| 9 | | as Kronmal Exhibit 9. This was the mystery table, |
| 10 | | Table 5, Incidence of Serious Adverse Events After |
| 11 | | Randomization. |
| 12 | A | Right. |
| 13 | Q | Could you look at that, please? |
| 14 | A | Yes. |
| 15 | Q | Just so the record is clear, based on the chart -- |
| 16 | | okay? -- if someone was just reading the transcript, |
| 17 | | based on the chart, do you know what the therapies are |
| 18 | | that were tested against placebo? |
| 19 | A | No, I don't. |
| 20 | Q | Based on what's reflected on control Exhibit 9, can |
| 21 | | you tell us anything about -- do you know what the |
| 22 | | primary endpoint of the trial was? |
| 23 | A | No, I don't. |
| 24 | Q | Do you know anything about the patient population? |
| 25 | A | No, I don't. |

319

6/7/2006 Kronmal, Richard

| | | |
|---|---|---|
| 1 | Q | Do you know anything about the duration of the trial? |
| 2 | A | No, I don't. |
| 3 | Q | Do you feel comfortable making conclusions about the |
| 4 | | safety of two different doses of a drug from a trial |
| 5 | | you don't know anything about? |
| 6 | | MR. RABER: Objection. Leading. |
| 7 | A | Well, I said the same thing earlier. I don't think |
| 8 | | you can come to much in the way of any conclusions on |
| 9 | | this, except to be a little concerned. I think there |
| 10 | | should -- you know, seeing this data cold, without |
| 11 | | knowing anything about the details, you know, five |
| 12 | | versus one of myocardial infarction, five versus zero |
| 13 | | in stroke, would be reason for concern. |
| 14 | Q | (By Mr. Buchanan) And when you looked at the Vioxx |
| 15 | | when you did your Vioxx analysis, did you examine the |
| 16 | | patient populations that were being looked at? |
| 17 | A | Yes. |
| 18 | Q | Did you look at the length of the studies? |
| 19 | A | Yes. |
| 20 | Q | Did you consider the size? |
| 21 | A | Yes. |
| 22 | Q | Did you consider the study designs? |
| 23 | A | Yes. |
| 24 | | MR. RABER: We are past ten minutes, |
| 25 | | just FYI. |

320

6/7/2006 Kronmal, Richard

1  MR. BUCHANAN: I wish I reminded you
2  throughout the day as we were passing marks.
3  MR. RABER: I never made any time
4  promises.
5  MR. BUCHANAN: I should have.
6  That's my fault. You did go long.
7  Q (By Mr. Buchanan) Quick question. Mr. Raber put the
8  book away, but I think he pulled out a book that you
9  referenced in connection with your testimony at trial
10 in an earlier Vioxx proceeding.
11    Do you recall that?
12 A Yes.
13 Q Something entitled "How to Lie with Statistics."
14 A Right.
15 Q Sir, you did an extensive analysis that included a lot
16 of statistical analyses; correct?
17 A Yes.
18 Q Did you lie with statistics when doing that analyses?
19 A No.
20 Q Let me be more particular there. In doing your
21 analysis, did you use standard statistical methods?
22 A Yes, I did.
23 Q And standard statistical tests?
24 A Yes, I did.
25 Q Did you consider the type of data that you would

321

6/7/2006 Kronmal, Richard

1  consider if you were examining the safety of this
2  particular drug, Vioxx, say on a DSMB?
3  A Yes.
4  Q Same type of data that you would consider in your
5  day-to-day practice, if exposed to it?
6  A Yes.
7  Q Did you apply these methods to this data in the way
8  you would ordinarily do so?
9  A Yes.
10    MR. RABER: Objection to form.
11 Leading.
12 A Yes, I did.
13 Q (By Mr. Buchanan) Doctor, I just want to ask you
14 quickly. Merck recently issued a press release about
15 the method through which it did its post hoc 18-month
16 analysis, whether there was a different risk in the
17 first 18 months versus the later 18 months.
18 A Yes, they did.
19 Q You saw that press release?
20 A Yes, I did.
21 Q When they had done -- when they presented the data
22 previously, do you recall whether the manner in which
23 they presented it reflected a linear time risk or a
24 log time?
25 A They said it was log time.

322

6/7/2006 Kronmal, Richard

1  Q And do you know what was called for by the protocol?
2  A It was log time.
3  Q And in fact, Merck has since advised the public that
4  they didn't use log time; correct?
5  A They reported the p-value -- the statistical
6  significance, "P" as in Paul, p-value statistical
7  significance based on a linear test, though the paper
8  says it was based on log time
9  Q Accepting that it was a post hoc analysis to begin
10 with, is there even any statistical -- any statistical
11 evidence using Merck's pre-specified endpoint that
12 there's a difference in the risk in the first 18
13 months and the later 18 months?
14    MR. RABER: Objection to form.
15 A The test that was pre-specified, it was a test for
16 proportional hazards. And that test was not rejected
17 based on the log time test, indicating that it did
18 not -- there was not statistically significant
19 evidence that there was in fact a difference in the
20 risks across time.
21 Q (By Mr. Buchanan) Okay.
22 A The relative risks across time.
23 Q Doctor, I want to turn quickly -- you were presented
24 with an article about intention-to-treat analysis.
25    Do you recall that?

323

6/7/2006 Kronmal, Richard

1  A Yes.
2  Q And I think it was written by some folks at the
3  University of Washington.
4  A Mm-hm.
5  Q I think your initial reaction was something that the
6  article was absurd. Or I can't remember your exact
7  word.
8  A I didn't really read it.
9  Q Did you understand -- what was your understanding,
10 when you were presented with the article, as to what
11 you were
12 A Well, when I first was presented, I thought this was
13 an article that said you shouldn't do intent-to-treat
14 analyses. And that was not the case, actually. It
15 was just simply trying to make the case that there are
16 occasions where you need to be very cognizant of the
17 on-drug experience. And that's something that I agree
18 with.
19    Now, I -- my own view is that you could never do
20 on-drug without also doing ITT, intent to-treat
21 analyses, and that you have to look at them both in
22 context. And one without the other is not going to
23 tell you a reasonable answer.
24    And the final thing, before you stop that -- I
25 don't mean to lecture -- but is that the ITT is the

324

6/7/2006 Kronmal, Richard

1 only unbiased assessment of risk in a clinical trial.
2 The on-drug analyses is always subject to the strong
3 potential for bias.
4 Q (By Mr. Buchanan) What do you mean by that?
5 A Well, I mean, the best way to explain it is an
6 illustration, really. And that is, suppose you're
7 looking at a drug that has a side effect -- oh, let's
8 say bleeding ulcers. That's a side effect you're
9 concerned with. And that drug also causes people to
10 become nauseous early on in the study. And so the
11 people who are most likely to get bleeding ulcers are
12 also much more likely to get nauseous. And the nausea
13 causes those people to drop out of the study.
14   So now all the people that were susceptible to a
15 bleeding ulcer are gone from the study. They've all
16 dropped out. So all you have left are people who
17 would never, under any circumstances, get a bleeding
18 ulcer in the one treatment arm.
19   The other treatment arm doesn't cause nausea, so
20 you're going to get people in there who are high risk
21 for getting bleeding ulcers, and they do. So now you
22 compare the two groups and you find, lo and behold,
23 that the drug that caused people to drop out has less
24 risk than the drug that didn't cause people to drop
25 out. And it's only because the drop-outs are

325

6/7/2006 Kronmal, Richard

1 different from the people who stayed in the study.
2   And that's not uncommon. It's -- and it's one of
3 the reasons you have to do intent-to-treat, is because
4 as soon as you deviate from intent-to-treat, there's
5 some kind of selection going on based on patient
6 characteristics, and people can stay in the trial in
7 one treatment arm may be very different than people
8 who stay in, in the other. And the two groups are no
9 longer comparable.
10 Q Doctor, quickly, just another statement from the
11 article, or at least one that I'd like to read to you.
12   The article states in the first column, second
13 paragraph, "Most statisticians, notably those at the
14 United States Food and Drug Administration, believe
15 the primary analysis of a randomized clinical trial
16 should compare patients groups according to random
17 assignment. Statisticians call this intention-to-
18 treat analysis or analysis-as-randomized."
19   Do you agree with those statements?
20 A Yes, I do.
21 Q You were asked some questions earlier today about
22 what's been referred to as a CV SOP. Do you recall
23 that?
24 A Yes.
25 Q To your understanding, sir, was there a data analysis

326

6/7/2006 Kronmal, Richard

1 plan for analyzing events that had been adjudicated
2 pursuant to the CV SOP as of the time the VIGOR trial
3 concluded?
4 A As far as I know, there was no such plan.
5 Q Was there a data analysis plan as of the time the
6 VIGOR trial concluded, that specified grouping
7 individual event endpoints into an APTC endpoint at
8 the time of VIGOR?
9 A No, there was not, to the best of my knowledge.
10 Q Have you seen anything to support the contention that
11 Merck had pre-specified an analysis across all trials
12 using the APTC endpoint prior to the conclusion of
13 VIGOR?
14 A No, I have seen no such document.
15 Q How about prior to combining the Alzheimer's trials in
16 March of 2000?
17 A No, there was nothing I've seen.
18 Q Now, sir, I think you testified that you had reviewed
19 the February 2005 advisory committee vote.
20 A Yes, I did.
21 Q You reviewed the advisory committee transcripts. Do
22 you recall that?
23 A Yes, I did.
24 Q Do you recall looking at the actual vote of the
25 advisory committee members on specific questions?

327

6/7/2006 Kronmal, Richard

1 A I've seen what it was.
2   MR. RABER: Are you talking April of
3 '05 or February of '01?
4   MR. BUCHANAN: Did I say April of
5 '05? That's my fault. I meant February '05.
6   MR. RABER: I didn't ask him about
7 '05.
8   MR. BUCHANAN: Well, I'll ask him.
9   MR. RABER: So he's remembering
10 something we didn't talk about?
11   MR. BUCHANAN: I thought you did ask
12 about the '05 advisory committee.
13 Q (By Mr. Buchanan) Do you recall the FDA taking a vote
14 of the advisory committee members of February of 2005?
15 A Yes, I do.
16 Q And did they vote 32 to nothing that Vioxx increased
17 cardiac hazard?
18 A I believe they did, yes.
19 Q Do you agree with the vote of that advisory committee?
20 A I do.
21 Q To your understanding, was the advisory committee in
22 2005 presented with evidence of the ITT mortality
23 information from the Alzheimer's trials?
24 A They were --
25   MR. RABER: Objection.

328

6/7/2006 Kronmal, Richard

1  A  They were not presented with that data
2  Q  (By Mr. Buchanan) Doctor, I just want to be clear.
3     Apart from the questions that you were asked and a
4     couple clarifications you made with respect to your
5     report, do you continue to hold the opinions that you
6     expressed in your report?
7  A  I do.
8  Q  And do you hold those opinions to a reasonable degree
9     of scientific probability?
10 A  I do.
11        MR. BUCHANAN: Thank you. I have no
12     further questions.
13
14
15             FURTHER EXAMINATION
16 BY MR. RABER:
17 Q  Sir, how did the advisory committee vote on the
18    question of whether Vioxx should be allowed to come
19    back on the market in February of 2005?
20 A  I think it was something like 16/15, something like
21    that.
22 Q  In favor of Vioxx coming back?
23 A  I don't remember which direction it was.
24 Q  You don't remember that?
25 A  No, I don't. I assume by your tone, it was in favor,

329

6/7/2006 Kronmal, Richard

1     but --
2  Q  Do you think that the advisory committee in February
3     of 2005 was biased in favor of Merck?
4  A  I don't know. I know some of the members were
5     definitely non-biased in favor of Merck, because
6     they're colleagues of mine and I know them well.
7  Q  And they were not biased?
8  A  Those individuals were not.
9  Q  Would you agree with me that tolerability of a drug is
10    an important medical question to answer in a clinical
11    study?
12        MR. BUCHANAN: Objection to form.
13 Q  (By Mr. Raber) I asked that because you mentioned
14    people becoming nauseous and dropping out of studies.
15    So in that context, would you agree with me that
16    tolerability of a drug is a important medical question
17    for doctors to know?
18 A  Sure, of course.
19 Q  Now, you talked about the Merck press release recently
20    about this log test.
21 A  Yes.
22 Q  That didn't change any of the data from the APPROVe
23    study, did it?
24 A  You mean -- by the data, you mean the raw data?
25 Q  The raw data.

330

6/7/2006 Kronmal, Richard

1  A  No, it doesn't change anything.
2  Q  Number of events, time of events?
3  A  No, doesn't change anything
4  Q  It only changed one method used to analyze the data;
5     true?
6  A  It changed the interpretation of the result that has
7     been a centerpiece for some of the legal cases; at
8     least the one I was involved in.
9  Q  It changes a method used to analyze the data?
10 A  It changes the interpretation of the result.
11 Q  Well, it --
12 A  You change the method, you change the interpretation.
13 Q  The press release reported that Merck had said in the
14    method section that they did a log test, when in fact
15    they did a linear test; true?
16 A  That's correct.
17 Q  And a linear test is a means for testing the
18    nonproportional hazard assumption; true?
19        MR. BUCHANAN: Objection to form.
20 A  It is one method of testing. It is not the method
21    they specified, however.
22 Q  (By Mr. Raber) And the fact that the log test was not
23    statistically significant, that did not prove that the
24    relative risk was constant over time, did it?
25 A  No. It just -- it says that there's no statistical

331

6/7/2006 Kronmal, Richard

1     evidence to support it. It doesn't prove it one way
2     or the other. You can't prove a null hypothesis.
3  Q  And the linear analysis that Merck did rejected the
4     null hypothesis; true?
5  A  That's correct.
6  Q  Now, we talked about your prostacyclin-sparing aspirin
7     paper. You mentioned that you were just a consultant
8     on that study?
9  A  Yes, largely  Yes.
10 Q  You were listed as an author, weren't you?
11 A  Yes, I know, because I contributed to discussions with
12    them. I helped them at times with questions.
13 Q  Does the paper say anywhere that you were just a
14    consultant?
15 A  No. It doesn't have to, though. There's no --
16    there's no requirement to say you were a consultant or
17    what your relationship is, as long as you contributed
18    to the paper. Which I did.
19 Q  Well, you appear to be minimizing your role in that
20    paper. Is there a reason for that?
21        MR. BUCHANAN: I'll object to the
22    characterization.
23 A  No, no reason. I didn't have a large role. I mean,
24    I'm not minimizing it. It was what it was.
25        MR. BUCHANAN: Objection.

332

6/7/2006 Kronmal, Richard

```
1   A   Yes. And I think it's a good paper. I have no
2       problem with that. That was a good study.
3   Q   (By Mr. Raber) Now, you mentioned that you had
4       corrected your mistake about Merck misleading people
5       with its 2002 label.
6           Do you remember that testimony?
7               MR. BUCHANAN: Objection to the
8       form.
9   A   Yeah, I mentioned that the -- no, not about the
10      misleading issue. No, I didn't mean that. I
11      corrected that the 2006 label did not include the MI
12      information.
13  Q   (By Mr. Raber) The 2002 label?
14  A   Yes. Right.
15              MR. BUCHANAN: Late in the day.
16  Q   (By Mr. Raber) And, yet, knowing that, you repeated
17      that mistake under oath to the jury in the Humeston
18      case, didn't you?
19              MR. BUCHANAN: Objection. Show him
20      the testimony.
21  Q   (By Mr. Raber) Look at Pages 1721 through 1723.
22              MR. BUCHANAN: Okay, I'll look at
23      it.
24          I don't have it. Can you share it?
25              MR. TISI: Which lines?
```
333

6/7/2006 Kronmal, Richard

```
1   Q   Yes.
2               MR. BUCHANAN: Objection. You're
3       mischaracterizing the testimony.
4               MR. RABER: I am not
5       mischaracterizing anything.
6               MR. BUCHANAN: You absolutely are.
7   A   I'd have to look at the label again. I just don't
8       know what specifically I was referring to there. This
9       is a long time ago.
10  Q   (By Mr. Raber) You know that the 2002 label lists the
11      number of heart attacks, doesn't it?
12  A   Yes, it does.
13  Q   And so when you say that the label didn't show the
14      number of heart attacks, that's incorrect; true?
15              MR. BUCHANAN: Objection.
16      Mischaracterizes the testimony.
17  Q   (By Mr. Raber) Lines 14 through 16, you say, "They
18      don't show in here, as you know, the 20 versus 4, the
19      fivefold increased risk."
20          That's what you said; right?
21              MR. BUCHANAN: I'm going object to
22      selectively doing this.
23  Q   (By Mr. Raber) Did you say that?
24  A   That's what it says.
25  Q   And you were talking about the label, weren't you?
```
335

6/7/2006 Kronmal, Richard

```
1               MR. RABER: Look at Page 1722.
2               MR. BUCHANAN: Got it.
3   Q   (By Mr. Raber) Lines 14 through 23. Did you testify,
4       "And secondly, if you look at the cardiovascular
5       events for VIGOR, they don't show in here, as you
6       know, the 20 versus 4, the fivefold increased risk.
7       All they say is it was significant. That could mean
8       it was 15 to 5, 18 to 6. A lot of results would have
9       been significant, but fivefold is a lot bigger. This
10      label was carefully crafted by Merck to make sure that
11      people did not know what the safety profile of this
12      drug was. The FDA may have approved it, but that
13      wasn't the point."
14          Did you testify to that under oath?
15  A   Yeah, I said that.
16  Q   And you knew that that testimony was incorrect, didn't
17      you?
18              MR. BUCHANAN: Objection.
19  A   Not at that time, I didn't. I wouldn't have said it
20      if I knew it was incorrect.
21  Q   (By Mr. Raber) Well, in August of 2005, you had your
22      deposition taken, and you conceded that it was a
23      mistake to say that the label didn't identify the
24      number of heart attacks in the VIGOR study; true?
25  A   In the deposition?
```
334

6/7/2006 Kronmal, Richard

```
1               MR. BUCHANAN: Objection.
2       Objection. You're mischaracterizing it. I'm telling
3       you, read the surrounding pages.
4               MR. RABER: I'm asking him.
5   Q   (By Mr. Raber) You were talking about the label,
6       weren't you?
7               MR. BUCHANAN: Objection. Then show
8       him the surrounding testimony.
9               MR. RABER: Don't coach the witness.
10              MR. BUCHANAN: No. I want to see
11      the surrounding pages. I'm not going to allow to you
12      ask the witness about trial testimony if you're only
13      going to show him one page.
14              MR. RABER: He can look at 1721,
15      1722, 1723.
16  Q   (By Mr. Raber) On Page 1721, lines 2 to 3, you said,
17      "I don't know what they concluded, but I can tell you
18      this label is grossly inaccurate."
19          Did you see that?
20  A   I mean, it's written here. I must have said it. It's
21      the transcript.
22  Q   So on Pages 1721 through 1723, you were talking about
23      the 2002 label, weren't you?
24  A   I don't know.
25  Q   Well, look at Page 1721, Line 12. Question: "And
```
336

6/7/2006 Kronmal, Richard

1  they tell the public that the cardiovascular findings
2  is unknown; right? That's what the FDA concluded in
3  2002."
4      Answer: "That's what they approved."
5      That question and answer relates to the 2002
6  label, doesn't it?
7              MR. BUCHANAN: Objection.
8  A  I don't see that. Where are you reading now?
9  Q  (By Mr. Raber) Page 1721, Lines 12 through 15.
10 A  I don't have that.
11             MR. RABER: Paul, do you have the
12 minuscript?
13             MR. BOEHM: Yeah, I do.
14 Q  (By Mr. Raber) You can have all the pages on one page
15 here, sir.
16 A  That's fine.
17 Q  1721, 1722, and 1723.
18    Sir, it's clear on Pages 1721, 1722, and 1723,
19 that you were testifying about the 2002 label that
20 included the VIGOR results, yes or no?
21             MR. BUCHANAN: Objection. I object
22 to that statement.
23 A  It's not absolutely clear to me what was being
24 discussed there.
25 Q  (By Mr. Raber) Okay. Hang on. Look at Page 1721,

337

6/7/2006 Kronmal, Richard

1  Line 23. What was your answer there? Would you
2  please read that?
3  A  Yes. It says, "You were talking about this label." I
4  don't know what label.
5  Q  Then what does it say after that?
6     No, in the same answer.
7  A  I'm trying to discuss it.
8  Q  You were talking about the 2002 label, weren't you?
9              MR. BUCHANAN: Objection, Counsel.
10 A  No. It says I am talking about the cardiovascular
11 findings. That's what the -- of the FDA discussion in
12 2002. I didn't --
13 Q  (By Mr. Raber) Right. And that refers to the fact
14 that it says that it referred to Alzheimer's, VIGOR,
15 the two placebo-controlled studies, and that the
16 cardiovascular findings is unknown, you know that that
17 language is in the 2002 label, don't you?
18             MR. BUCHANAN: Objection. Asked and
19 answered over and over and over again.
20 A  I say, "They misled the FDA in this respect," and
21 that's as far as I can tell. I don't say that -- when
22 you go to this line here --
23             MR. BUCHANAN: You have to note
24 where you're indicating.
25             THE WITNESS: I'm looking at 1722,

338

6/7/2006 Kronmal, Richard

1  14, 15, 16, 17, 18, 19.
2  Q  (By Mr. Raber) You're talking about the label in
3  Lines 14 through 23.
4  A  Yeah.
5  Q  You're talking about the VIGOR label, aren't you, the
6  2002 label?
7              MR. BUCHANAN: Objection.
8  A  Maybe. I may well have been. I don't remember. It
9  was a long time ago.
10 Q  (By Mr. Raber) But you know that it was a mistake to
11 say that the 2002 label didn't include the numbers of
12 heart attacks, didn't you?
13             MR. BUCHANAN: Objection. His
14 answer, as he already said, he doesn't know what he
15 was --
16             MR. RABER: Don't coach the witness.
17             MR. BUCHANAN: No. You know the
18 premise is flawed. He just gave you an answer, and
19 you're ignoring it.
20 A  I don't know what I was thinking at that point in
21 time. And certainly had I known that -- had I
22 remembered, if that was what it was saying here -- and
23 it's been a long time, and it was at the end of a very
24 long day, as you know. This is the very last page of
25 this very arduous cross-examination. And I may have

339

6/7/2006 Kronmal, Richard

1  been confused at that point in time and may have
2  forgotten about it. I don't know.
3     I certainly didn't intentionally say something
4  about the label that was untrue. If I did, it was a
5  mistake. But I certainly didn't intentionally do it.
6  Q  (By Mr. Raber) Well --
7  A  And I'm not even sure what I was talking about here,
8  to be honest with you. It's so garbled, that I'm not
9  certain. But it certainly wasn't intentional, in any
10 event.
11    By the way, if I had misrepresented it, why didn't
12 she say, "Look, here's the label, and you've
13 misrepresented it."? There's no sentence there that
14 she says that I've done this wrong.
15    Do you see anything in here that says I've done
16 this incorrectly?
17             MR. BUCHANAN: You don't need to ask
18 him questions.
19 A  There's nothing in here where she calls me on this and
20 says, "You misrepresented the label." If she'd have
21 said that and pointed me to the label and shown me
22 where I was wrong, I would have said, "Jeez, I'm
23 sorry. I made a mistake."
24 Q  (By Mr. Raber) Well, somebody did that to you in the
25 deposition, didn't they?

340

6/7/2006 Kronmal, Richard

**Page 341**

1  A  They did.
2  Q  And you admitted the mistake, didn't you?
3  A  Yes, I did.
4  Q  But you repeated it in your trial testimony?
5         MR. BUCHANAN: Objection. Again, no
6  foundation. Asked and answered repeatedly.
7  A  I've already answered that question. I don't know
8  what I was trying to say here. I was -- at that point
9  in time, I was tired and confused. And I -- if she'd
10 have specifically said, "Is this the right data,
11 Dr. Kronmal," then you'll show me the label and it
12 shows it's there, I would have said, "Gee, I'm really
13 sorry. Obviously I misrepresented that."
14 Q  (By Mr. Raber) You said that the ADVANTAGE study
15 shows the same thing as VIGOR.
16        MR. BUCHANAN: Objection.
17 Q  (By Mr. Raber) I had that answer read back.
18 A  I said something to that effect.
19 Q  That's an incorrect statement?
20        MR. BUCHANAN: Objection. From a
21 cardiac perspective.
22 A  I was trying to say that it also showed an excess
23 risk.
24 Q  (By Mr. Raber) Well, I think you told me, in response
25 to my questions, that it was not statistically

**Page 342**

1  significant.
2  A  Well, if you added in -- well, the MI was not, but it
3  was in the same direction. The FDA said the same
4  thing, that it was supportive of what was seen in
5  VIGOR. And that's all I was trying to say. And if I
6  overstated it, I apologize.
7  Q  Well, do you realize you're making very serious
8  allegations in this case?
9         MR. BUCHANAN: Objection.
10 Objection.
11 Q  (By Mr. Raber) Do you understand that?
12        MR. BUCHANAN: Objection. That's
13 not a question. It's a lecture. Objection.
14 Argumentative.
15 A  The answer to that question is: I think that Merck
16 did some very serious things with respect to the
17 Alzheimer's. I think they --
18 Q  Sir, I didn't ask you about Merck. I asked about you.
19 I said, Do you understand that you are making serious
20 allegations in this case?
21 A  Yes. Yes.
22 Q  Now, you mentioned an analysis you did about naproxen.
23 Do you remember that?
24 A  Yes.
25 Q  Did you review all of the literature on naproxen --

**Page 343**

1         MR. BUCHANAN: Objection.
2  Q  (By Mr. Raber) -- in your analysis?
3  A  No, of course not.
4  Q  In your analysis of naproxen, did you look at any of
5  the pharmacological data relating to naproxen?
6  A  I already answered that question. I did not.
7  Q  In your analysis of naproxen, did you look at data for
8  similar NSAIDS?
9         MR. BUCHANAN: Objection. Asked and
10 answered.
11 A  No, I did not. I wasn't -- it wasn't relevant to the
12 question. The question was whether it had the same
13 effect as aspirin. I specified what I did. I was
14 very clear.
15 Q  (By Mr. Raber) Sir, you mentioned that it was unusual
16 to report a relative risk of .2 when referring to the
17 heart attacks between Vioxx and naproxen.
18    Do you understand that the reporting of it that
19 way went through the peer-review process at the New
20 England Journal of Medicine?
21 A  Yes, it did.
22 Q  And regardless of whether it's reported as a .2
23 relative risk or a five relative risk, the magnitude
24 of that difference, the conclusion that Vioxx may be
25 causing that excess risk is an obvious possibility,

**Page 344**

1  isn't it?
2         MR. BUCHANAN: Objection.
3  A  It's an obvious possibility. But if someone reading
4  it quickly might have interpreted it as naproxen being
5  protective rather than -- obviously the impact -- you
6  know, like anything you do, the way you present data
7  changes the way people perceive it, if they don't read
8  it carefully and think about it carefully.
9  Q  (By Mr. Raber) Sir, you testified that a majority of
10 sudden cardiac deaths are preceded by MI.
11    Do you remember that?
12 A  That's correct.
13 Q  Can you identify any peer-reviewed journal that
14 supports that opinion?
15 A  I'd have to look that up, frankly. It's well-known
16 that most of the people who die in hospitals after an
17 MI die of cardiac arrhythmias, the vast majority
18 Q  But you can't point me to any peer-reviewed journals?
19 A  No, not off the top of my head.
20 Q  Can you identify anything in the materials you cited
21 in your report that you relied on for your opinions,
22 that supports that statement?
23 A  No.
24 Q  And you're not a cardiologist, are you?
25 A  No, but I know cardiology very well

6/7/2006 Kronmal, Richard

1  Q  You've never been trained in cardiology?
2         MR. BUCHANAN: Objection. Asked and
3     answered.
4  A  Formally?
5  Q  (By Mr. Raber)  Yes.
6  A  No.
7  Q  You've never treated a patient?
8  A  No.
9  Q  You've never done an autopsy?
10 A  No.
11 Q  Never determined a cause of death?
12        MR. BUCHANAN: Objection. These are
13    asked and answered several times.
14        THE WITNESS:  Yes.
15 Q  (By Mr. Raber)  You said that typically, MIs are the
16    trigger for arrhythmia.
17        Do you remember that?
18 A  They typically are, yes.
19 Q  Is it true that severe atherosclerosis and physical
20    exertion are a very common trigger for arrhythmia?
21        MR. BUCHANAN: Objection to the
22    form.
23 A  They can be.
24 Q  (By Mr. Raber)  You mentioned that studies that don't
25    last very long, it's going to be difficult, if not

345

6/7/2006 Kronmal, Richard

1     impossible, to show a statistically significant risk.
2        Do you remember that?
3  A  Yes.
4  Q  But if a drug has a high risk for short term use,
5     can't you see a difference early?
6  A  It would have to be extraordinarily high. Then it
7     would be obvious. I mean, it would be -- if people
8     suddenly started dropping like flies, of course you'd
9     know.
10 Q  Now, you testified about the Chen data involving
11    Alzheimer's that you relied on in your report?
12 A  Yes, that's correct.
13 Q  Is that data final data or preliminary data?
14 A  It was the data that was available at that time.
15 Q  Is it final or preliminary?
16 A  I don't know what you mean by that. It's the data
17    that was available at that time.
18 Q  Does it represent --
19 A  That tells you exactly what the data was.
20 Q  Were all of the Alzheimer's studies completed when
21    Chen did that --
22 A  No. 078 was not completed.
23 Q  So it was preliminary data?
24 A  It wasn't preliminary. It was the data that was
25    available at that point in time. It's not preliminary

346

6/7/2006 Kronmal, Richard

1     to anything.
2  Q  Preliminary to the conclusion of the study?
3  A  It's before the conclusion of the study.
4  Q  Didn't have all the data from the study?
5  A  It didn't have data that didn't occur yet, yes.
6         MR. BUCHANAN: Objection. Form.
7  A  How could it? That's the whole point.
8  Q  (By Mr. Raber)  Now, I think I heard you say to
9     Mr. Buchanan that you didn't have enough time to
10    review certain data relating to the APPROVe study
11    before you submitted your addendum?
12 A  That's correct.
13 Q  You signed your name to that report, didn't you?
14 A  Yes.
15 Q  You didn't say in there --
16        MR. BUCHANAN: Objection.
17 Q  (By Mr. Raber) -- that you didn't have enough time,
18    did you?
19        MR. BUCHANAN: Objection. Misstates
20    his whole testimony.
21 Q  (By Mr. Raber) You signed your original report and
22    your addendum; true?
23 A  Yes.
24        MR. BUCHANAN: I'm going to object
25    to this line. It misrepresents his testimony.

347

6/7/2006 Kronmal, Richard

1         MR. RABER: David, do you want to
2     keep coaching?
3         MR. BUCHANAN: No, Counsel, the
4     premise for your question is flawed, and you heard his
5     answer.
6         MR. RABER: Just stop it. I gave
7     you a lot courtesy when you were questioning, and
8     you're acting like a jerk right now.
9         MR. TISI: What was that?
10        MR. RABER: I said he's acting like
11    a jerk right now.
12        MR. BUCHANAN: Oh, really? We've
13    been here for a long day, and now you're
14    misrepresenting his answer.
15        MR. RABER: David, you're a good
16    guy, and just please stop. We're almost done. We're
17    almost done.
18        MR. BUCHANAN: Please don't
19    patronize me. Just represent his testimony
20    accurately.
21 Q  (By Mr. Raber) You testified that you didn't have
22    enough time to review certain data relating to the
23    APPROVe study; true?
24 A  I didn't have time to review data that didn't come to
25    me until after my statement was already done and

348

6/7/2006 Kronmal, Richard

1 submitted.
2 Q And when you submitted your statement, you signed it?
3 A Yes.
4 Q And you didn't say in the statement, "I need more data
5     to look at," did you?
6 A No.
7 Q You didn't say, "I don't have enough time," did you?
8         MR BUCHANAN: Objection.
9 A I think I probably stated somewheres in there that if
10     more data were to accrue, I would reserve the right to
11     look at it.
12 Q (By Mr. Raber) And you mentioned that the information
13     in your -- let me back up.
14         You said that Dr. Targum at the FDA suggested a
15     warning for Vioxx after the VIGOR study; correct?
16 A I said she was concerned about the safety profile in
17     terms of cardiovascular events.
18 Q And that she thought maybe a warning would be
19     appropriate?
20 A I don't really remember.
21 Q At the end of the day, when the FDA approved the April
22     2002 label, it presented the heart attack data for
23     VIGOR; true?
24 A Not as a warning.
25 Q It presented the data; true?

349

6/7/2006 Kronmal, Richard

1 A It didn't present it as a warning, though.
2 Q It presented the data; true?
3 A Yes, it presented the data.
4 Q On the first page of the label?
5 A I don't know what page it was on.
6         MR. BUCHANAN: Objection. Which
7     label?
8 Q (By Mr. Raber) It didn't say that naproxen was the
9     explanation, did it?
10 A I don't remember what it said about that.
11 Q It said the significance is unknown; true?
12 A It may have said that, yes.
13 Q And it also had a discussion of the VIGOR study in the
14     precaution section; true?
15 A That's true.
16 Q Now, you mentioned that Merck should have disclosed
17     any pre-specified cut-off for the VIGOR study both to
18     the New England Journal of Medicine and to other
19     authors of the paper?
20 A Yes.
21 Q What is the source for that opinion?
22 A It's just my opinion.
23 Q Your personal opinion?
24 A Yes, it is.
25 Q Are you an expert in the standards that govern

350

6/7/2006 Kronmal, Richard

1     publication of peer-reviewed articles?
2 A I'm an expert at what governs clinical trials.
3 Q Are you an expert in the standards that govern the
4     publication of peer reviewed articles?
5 A I've written over 200 articles. I've had over 200
6     articles reviewed by journals. And I think I have a
7     pretty good idea what goes into the -- and I've been a
8     reviewer for journals for 40 years.
9 Q Sir --
10 A So I have a pretty good idea what goes into the
11     process.
12 Q Sir, are you an expert in the standards that govern
13     publication of peer-reviewed articles?
14 A I don't know what that means. Who is an expert? What
15     is the criteria to be --
16 Q Are there standards that govern disclosure rules and
17     protocols for publishing articles in peer-reviewed
18     journals?
19 A There are some things that are written down, but most
20     are not.
21 Q Are you familiar with those?
22 A Some of them, yes.
23 Q Can you identify any standards or codes that govern
24     publication of peer-reviewed articles?
25         MR. TISI: Objection

351

6/7/2006 Kronmal, Richard

1 A I can tell you about some things associated with it.
2         I mean, for example, you can't publish a paper
3     that -- with results that have already been published
4     somewheres else.
5 Q (By Mr. Raber) I didn't ask you that. I asked you --
6         MR. BUCHANAN: Objection. Cutting
7     him off.
8 Q (By Mr. Raber)  can you identify any codes,
9     standards, publications, that address the -- let's
10     call them rules or standards that govern publication
11     of articles in peer-reviewed journals?
12 A The answer is, I don't know of any such document.
13 Q Would you agree with me that if you were an author of
14     a peer-reviewed article, that you would expect that
15     before, let's say, the New England Journal of Medicine
16     published an Expression of Concern about your article,
17     that you would be given an opportunity to respond to
18     what they had to say before they published it?
19         MR. BUCHANAN: Objection. Form,
20     foundation.
21 A I don't know  I've never been in that position. I
22     wouldn't
23 Q (By Mr. Raber) Wouldn't that seem to be the fair
24     thing to do?
25         MR. BUCHANAN: Objection.

352

6/7/2006 Kronmal, Richard

```
1   A   I don't know. I mean, Expression of Concern is a very
2       serious matter, and I think that journals don't take
3       it lightly. In fact, it's mostly reserved for people
4       where they have evidence of falsification of data.
5       And I don't think they inform those people in advance,
6       but I don't know what the laws of -- what courtesy
7       would require --
8   Q   (By Mr. Raber) I'm just asking, as a matter of
9       general fairness, wouldn't you think it would be fair
10      to give somebody an opportunity to respond before an
11      Expression of Concern is published?
12              MR. BUCHANAN: I'm going to object.
13  A   I don't know. I don't have an opinion on that.
14  Q   (By Mr. Raber) You're not saying that Merck falsified
15      data in the VIGOR article, are you?
16  A   No.
17  Q   Now, do you know whether Merck or the non-Merck
18      authors were given an opportunity to respond to the
19      New England Journal of Medicine before the Expression
20      of Concern was published?
21  A   No, I don't know one way or the other what was done.
22              MR. RABER: Thank you. That's it.
23              MR. BUCHANAN: Just one second.
24              (Discussion off the record.)
25      ////
```
353

6/7/2006 Kronmal, Richard

```
1               FURTHER EXAMINATION
2   BY MR. BUCHANAN:
3   Q   Doctor, I'm going to suggest it will be two questions,
4       but maybe it will be five.
5       There were some questions about your expertise and
6       training in cardiovascular medicine. Do you recall
7       that?
8   A   Yes.
9   Q   Are you an expert in trials concerning cardiovascular
10      issues?
11  A   Yes, I am.
12  Q   Are you an expert in assessing the risk of agents in
13      clinical trial populations
14  A   Yes, I am.
15  Q   -- for cardiovascular disease?
16  A   Yes, frankly, I am.
17  Q   On a population basis -- withdrawn.
18      Are biostatisticians with expertise in clinical
19      trial analysis experts in the analysis of the effect
20      of drugs on a risk?
21  A   Yes.
22  Q   Is that the domain of statistics?
23  A   Yes.
24  Q   To your knowledge, can you get a drug approved by the
25      FDA based on anecdotal evidence of efficacy?
```
354

6/7/2006 Kronmal, Richard

```
1   A   No. You require clinical trials with statistical --
2       in fact, you require generally two clinical trials
3       with statistically significant evidence for efficacy,
4       and sufficient safety data to indicate that the safety
5       profile is sufficient to justify approval.
6   Q   Okay. Quick question for you on the 2002 label.
7       There was some presentation of some Alzheimer's
8       data in the 2002 label; correct?
9   A   I believe there was.
10  Q   Was that data final Alzheimer's data?
11  A   No.
12  Q   So that data was presented before all the data had
13      accumulated in the Alzheimer's trials?
14  A   That's correct.
15              MR. BUCHANAN: No further questions.
16
17
18              FURTHER EXAMINATION
19  BY MR. RABER:
20  Q   Two quick ones.
21      You mentioned you're an expert in clinical trials
22      involving cardiovascular matters; true?
23  A   That's correct.
24  Q   And in interpreting those?
25  A   Yes
```
355

6/7/2006 Kronmal, Richard

```
1   Q   What were the clinical implications of your clinical
2       trial of prostacyclin-sparing aspirin to protect
3       against thrombus?
4   A   It didn't work.
5   Q   And what were the clinical implications of the role of
6       localized prostacyclin in protecting against
7       thrombotic events?
8               MR. BUCHANAN: Objection to form
9   A   I don't know. I have no idea.
10  Q   (By Mr. Raber) Did your paper address that?
11  A   No, it didn't. It specifically -- it was very
12      specific to people who were taking warfarin at the
13      same time. And that's a different -- that's a totally
14      different question. It's in combination with
15      warfarin. And what happens when you don't have
16      warfarin available, I don't know.
17  Q   Sir, on Page 1202 of Exhibit -- of the
18      prostacyclin-sparing aspirin article, about halfway
19      down in the left-hand column, it says, "Unlike other
20      cardiac conditions where interference with
21      prostaglandin and prostacyclin synthesis appears to be
22      detrimental, such as heart failure and infarct
23      reperfusion injury, preservation of local prostacyclin
24      may not be as influential in unstable angina."
25      Do you see that?
```
356

6/7/2006 Kronmal, Richard

```
1   A    Yes.
2   Q    What does that mean?
3   A    That means what it says. I'm not an expert in
4        prostaglandin and prostacyclin synthesis, so I
5        didn't -- I mean, I didn't write that sentence. This
6        was written by the cardiologist.
7   Q    But you're an expert in clinical studies that assess
8        cardiovascular issues, aren't you?
9                MR. BUCHANAN: Objection.
10  A    Not the details about how prostaglandin works. I
11       never said that. In fact, I said specifically I
12       wasn't an expert in that aspect of it
13  Q    (By Mr. Raber) And this talks about the impact of
14       prostaglandins on unstable angina, doesn't it?
15  A    It does.
16  Q    Can you tell me what that means?
17               MR. BUCHANAN: Objection. Asked and
18       answered.
19  A    I've already said, I don't -- I'm not an expert on
20       prostaglandin, prostacyclin.
21  Q    (By Mr. Raber) Well, your expertise in the area of
22       the effect of drugs on heart attacks is limited
23       Would you agree with that?
24               MR. BUCHANAN: Objection.
25  A    It's not infinite.
```

357

6/7/2006 Kronmal, Richard

```
1   Q    (By Mr. Raber) It's limited, isn't it?
2   A    It's not infinite.
3   Q    It's limited, isn't it?
4   A    I've answered the question  It's not infinite.
5        That's answering your question directly
6   Q    In fact, your article states, "In fact, administration
7        of exogenous prostacyclin in experimental arterial
8        injury did not result in less platelet thrombus."
9        Do you see that?
10  A    Yes.
11  Q    What's that referring to?
12  A    It's referring to some study that's referenced in
13       reference 20.
14  Q    Well, what does it mean?
15  A    I don't know. I'm not -- I told you, I'm not an
16       expert in prostacyclin.
17  Q    Well, this is talking about thrombus, isn't it, and
18       arterial injury?
19  A    No. It's talking about --
20               MR. BUCHANAN: Objection. Asked and
21       answered multiple times. He's already told you he's
22       not an expert in that area.
23  Q    (By Mr. Raber) How does this study relate to
24       Fitzgerald's hypothesis about the mechanism for Vioxx
25       increasing the risk of heart attacks or stroke?
```

358

6/7/2006 Kronmal, Richard

```
1                MR. BUCHANAN: Objection. Beyond my
2        redirect.
3   A    I haven't got a clue.
4                MR. RABER: No further questions.
5                (Signature reserved.)
6                (Deposition concluded at
7                 7:15 p.m.)
8
9
10       _____
11       RICHARD A. KRONMAL, PH.D.
12
13  Subscribed and sworn to before me
14  this _____ day of _____, 2006.
15
16  _____   _____
    (Notary Public)      My Commission Expires:
```

359

6/7/2006 Kronmal, Richard

STATE OF WASHINGTON  )      I, Karmen M. Fox, CCR, RPR, (
                     ) ss  CCR # 1935, a duly authorized
County of Pierce     )      Notary Public in and for the
                            of Washington, residing at
                            Milton, do hereby certify;

That the foregoing deposition of RICHARD A. KRONMAL, PH.D., was taken before me and completed on _ 2006, and thereafter was transcribed under my directic that the deposition is a full, true and complete trans of the testimony of said witness, including all questi answers, objections, motions and exceptions;

That the witness, before examination, was b duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved : right of signature;

That I am not a relative, employee, attorney counsel of any party to this action or relative or emp of any such attorney or counsel and that I am not financially interested in the said action or the outc thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to Attorney Stephen D. Raber.

IN WITNESS WHEREOF, I have hereunto set my h and affixed my official seal this 8th day of June, 2006.


                            Karmen M. Fox, CCR, RPR, CRR
                            Notary Public in and for the State
                            of Washington, residing at
                            Milton.