grounds either. Simply put, Dr. Lanza and Dr. Wilson are qualified to testify as an expert witness.

Although the Plaintiff does not challenge the qualifications of Dr. Lanza or Dr. Wilson, the Plaintiff does challenge the relevancy of their testimony. According to the Plaintiff, Mr. Irvin was never treated by a gastroenterologist or rheumatologist and never suffered from a gastrointestinal injury or any form of arthritis. As such, their testimony has no relevance to this case.

To the contrary, Mr. Irvin did suffer from gastrointestinal side effects while he was on Vicoprofen. This is why Dr. Schirmer prescribed him Vioxx. Moreover, Dr. Schirmer testified that Mr. Irvin did complain about having arthritis type pain. Furthermore, their testimony is relevant to refuting the Plaintiff's claims. Dr. Lanza and Dr. Wilson will testify that the benefits of Vioxx outweighed its risks. In addition, the Plaintiff asserts that Merck's primary motivation in manufacturing and distributing Vioxx was to generate the greatest amount of profits possible. This testimony describes the benefits of Vioxx and is relevant to refuting the Plaintiff's claims.

Moreover, the Plaintiff challenges the admissibility of Dr. Lanza's and Dr. Wilson's testimony because it is anecdotal as opposed to scientific. According to the Plaintiff, since their testimony simply recounts their clinical experiences, it cannot be admitted as expert testimony. This assertion is incorrect. Expert witnesses are allowed to base their opinions on personal experiences provided that their opinions are confirmed by scientifically reliable data. *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1014 (6th Cir. 1993). Here, both doctors' personal experiences are supported by reliable scientific data. As such, their testimony is reliable, relevant, and admissible. Accordingly, the Plaintiff's motion to exclude the testimony of Dr. Lanza and Dr.

Wilson is denied. The testimony of these doctors, however, may well be redundant and Merck should reevaluate whether they are needed at trial.

### iv. Dr. David Silver

Dr. Silver, a rheumatologist, was retained by Merck to offer his opinions relating to a threshold for duration of 36 months, the naproxen hypothesis, alleged gastrointestinal safety relating to Vioxx, adequacy of labeling for Vioxx, and specific causation as to the death of Richard Irvin.

#### a. Plaintiff's Position

The Plaintiff argues that Dr. Silver is not qualified to testify because he does not have the qualifications to render the opinions offered. First, Dr. Silver is not a cardiologist, pharmacologist, biostatistician, neurologist, regulatory expert, hematologist/clot expert, or pharmacoepidemiologist. He has no expertise in cardiology or cardiac pathology. As such, the Plaintiff argues that any opinion in these areas falls outside his area of expertise.

Second, the Plaintiff that Dr. Silver, as a rheumatologist, is not qualified to opine on the past medical treatment of Mr. Irvin, including why he ingested Vioxx. Specifically, osteoarthritis and rheumatoid arthritis are not diagnosed conditions for Mr. Irvin. As such, there is no importance regarding Dr. Silver's knowledge of whether Mr. Irvin had arthritis.

Third, the Plaintiff alleges that there were no gastrointestinal issues relating to Mr. Irvin's use of Vioxx that warrant the opinion testimony of Dr. Silver. To the extent that Dr. Silver bases any opinions of the gastrointestinal tolerability of Vioxx in his own patient population, such testimony is merely anecdotal and cannot qualify as scientific and reliable data.

Finally, the Plaintiff alleges that, with no cardiac training, Dr. Silver's medical experience

does not qualify him to testify as to the specific cause of Mr. Irvin's thrombotic cardiac event and death.

### b. Merck's Position

First, based on his experience, Merck contends that Dr. Silver is an expert in pain management and the use of COX-2 inhibitors to treat pain. Merck argues that Dr. Silver, in his testimony, will explain the challenges of treating chronic pain and the benefits of COX-2 inhibitors such as Vioxx.

Second, regarding the Plaintiff's assertion concerning the fact that Mr. Irvin was never diagnosed with osteoarthritis or arthritis and never experienced any gastrointestinal issues, Merck argues that this is factually incorrect. In addition, even if it were correct, Merck argues that Dr. Silver can still testify because the gastrointestinal benefits of Vioxx are relevant to understanding the overall benefits of the drug and comparing those benefits to the known risks of the drug.

As far as testifying as to the cause of Mr. Irvin's death, Merck asserts that Dr. Silver's clinical experience and review of the published literature allow him to testify that based on the undisputed facts surrounding Mr. Irvin's death Vioxx did not cause his death.

As far as testifying as to the adequacy of Vioxx labeling, Merck asserts that Dr. Silver is qualified to give his opinion because of his experience as a routine prescriber, researcher, and primary care physician.

Lastly, regarding Dr. Silver's ability to testify as to the clinical trials conducted on Vioxx, Merck asserts that Dr. Silver is qualified because he has participated in a substantial number of clinical trials and he has first-hand knowledge concerning the design, implementation, and interpretation of clinical trials involving Vioxx.

### c. Court's Ruling

Dr. Silver is a board certified physician in Internal Medicine and Rheumatology. He is a licensed physician in California and Illinois and is on the National Board of Medical Examiners. He has held numerous distinguished appointments.

Presently, he is Associate Clinical Professor of Medicine at the University of California at Los Angeles, Director of the Chronic Pain Rehabilitation Program at Cedars-Sinai Medical Center in Los Angeles, and Associate Director of the Osteoporosis Medical Center. He has consulted with numerous pharmaceutical interests and was a clinical investigator for Merck in the ADVANTAGE trial and on Arcoxia. In addition, he is a practicing physician.

Furthermore, he is also a distinguished researcher, who is currently the beneficiary of 15 research grants. He has been involved in over fifty clinical trials involving arthritis, including more than twenty pertaining to COX-2 inhibitors. He has authored a number of publications and given over 200 lectures on the subject of NSAIDs and COX-2 inhibitors over the course of his career.

In formulating his opinion, Dr. Silver reviewed the relevant published, peer-reviewed medical literature and had even actively followed it before being retained in this case. Moreover, his opinion is based on his years of clinical experience.

The Plaintiff makes a broad-brush challenge to Dr. Silver's qualifications. To the extent that Dr. Silver may testify regarding chronic pain and the risk/benefit calculations of COX-2 inhibitors, he is certainly qualified. His experience with and understanding of these subjects, as evidenced by his expert report, support his qualifications. In addition, he has based his opinions on scientifically reliable information.

To the extent that Dr. Silver may testify that Vioxx did not contribute Mr. Irvin's death, Dr. Silver is qualified to testify. Dr. Silver is a board certified internist with years of experience treating his patients' cardiac conditions. He has reviewed all the relevant literature and studies. If the Plaintiff wishes to attack Dr. Silver because he is not a cardiologist, pharmacologist, biostatistician, neurologist, regulatory expert, hematologist/clot expert, or pharmacoepidemiologist, she will be allowed to do so on cross-examination. Moreover, for the same reasons as Dr. Lanza's testimony, Dr. Silver's testimony as to the gastrointestinal effects of Vioxx is both relevant and admissible. But again, such testimony is at best overlapping and at worst redundant.

### B. Merck's Motions

### I. Winston Gandy, Jr., M.D.

The Plaintiff has designated Dr. Gandy to opine that (a) Vioxx 25 mg increases the risk of blood clots in short-term use, and (b) that Vioxx contributed to Mr. Irvin's sudden cardiac death.

#### a. Merck's Position

Merck contends that Dr. Gandy is not qualified to opine that Vioxx 25 mg increases the risk of blood clots or that Mr. Irvin died as a result of his ingestion of Vioxx. Specifically, Merck argues that Dr. Gandy's professional training and experience does not qualify him to opine on general causation because he is not a researcher, has never done any research on NSAIDs prior to this case, never done any research on COX-2 inhibitors prior to this case, has never authored a publication on sudden cardiac death, and does not have any extensive experience with Vioxx. In addition, based on Dr. Gandy's lack of experience, Merck argues that he failed to undertake the proper study to opine on causation. Merck argues that the 10 to 15

hours spent by Dr. Gandy reviewing materials was insufficient, the materials reviewed by Dr. Gandy were incomplete and provided by the Plaintiff's counsel, and he only reviewed two Vioxx clinical studies.

Next, Merck argues that Dr. Gandy's opinion that Vioxx causes a prothrombotic state is not based on reliable scientific evidence. Dr. Gandy testified that he believes Vioxx causes a prothrombotic state based on the VIGOR results and his opinion that COX-2 inhibitor drugs create an imbalance in the thromboxane and prostacyclin levels in the vasculature. Merck contends that VIGOR does not support Dr. Gandy's opinion and that Dr. Gandy has no scientific support for his assertion that Vioxx causes a prostacyclin/thromboxane imbalance.

Lastly, Merck argues that Dr. Gandy does not have a scientific basis to opine that Vioxx caused Mr. Irvin's death. Moreover, Merck argues that Dr. Gandy has no evidence that Vioxx, at the dose and duration used by Mr. Irvin, causes increased cardiovascular risks.

### b.     Plaintiff's Position

The Plaintiff argues that Dr. Gandy is a board certified cardiologist with extensive clinical experience and is eminently qualified to testify regarding the specific cause of Mr. Irvin's death. The Plaintiff asserts that there are hundreds of articles describing the relationship between COX-2 and prostacyclin and that Dr. Gandy is familiar with these articles. Although Dr. Gandy is not an expert pharmacologist, epidemiologist, or biostatistician, the Plaintiff argues that he does not need to be because he is allowed to rely on the opinions of others in formulating his own. The Plaintiff argues that Dr. Gandy does not have to reevaluate the raw data of each study.

### c.     Court's Ruling

Dr. Gandy is a board certified cardiologist. He has a B.S. in Chemistry from the

University of Maryland. He has an M.D. from Howard University College of Medicine. He interned and was a resident in Internal Medicine at Emory University. He held a fellowship at the University of Alabama Birmingham from 1989-1992.

Dr. Gandy is licensed in both Alabama and Georgia. He has held several medical special appointments and is a staff member of several hospitals. He is a fellow of the American College of Cardiology and a member of the American Medical Association, National Medical Association, American Heart Association, Atlanta Medical Association, American Society of Echocardiography, and the American College of Physicians. He has co-authored two publications.

In formulating his opinions, Dr. Gandy relied upon his training, knowledge, and experience as a cardiologist. In addition, Dr. Gandy relied on numerous studies, reports, documents, and emails. In fact, twelve of the nineteen pages of Dr. Gandy's expert report contain a listing of the studies, reports, documents, and emails reviewed by Dr. Gandy.

Regarding Dr. Gandy's qualifications, Merck asserts that Dr. Gandy is not qualified to testify as an expert because he is not a researcher, but rather a cardiologist who specializes in reading echocardiograms. Furthermore, Merck contends that Dr. Gandy did not undertake the necessary research to make himself knowledgeable enough to testify as an expert witness.

There are several problems with Dr. Gandy's testimony. First, his expert report is nineteen pages long. The first fifteen pages consist of an introduction, his qualifications, and the materials reviewed by him. The last page and a half consists of his conclusions. As such, there are only two and a half pages of analysis by Dr. Gandy in his expert report. Dr. Gandy's analysis in these pages is wholly conclusive, rather than explanatory. In addition, his deposition

testimony is littered with circular reasoning and instances where he is unable to answer certain questions regarding the literature and studies he said he had read.

The Court acknowledges that Dr. Gandy is a cardiologist who is well qualified to testify as an expert regarding Mr. Irvin's cardiac condition at his time of death. The Court, however, is faced with a much tougher decision of whether Dr. Gandy is qualified to testify that Vioxx was a cause of Mr. Irvin's death. Dr. Gandy's deposition as well as his report reveals that Dr. Gandy does not possess a superior understanding of how Vioxx increases cardiovascular risks. Yet, the Court acknowledges that Dr. Gandy did utilize proper methodology. He reviewed all the proper studies and literature. Although his comprehension of these studies may have been somewhat lacking, he was entitled to and did rely upon experts in the field of pharmacology and epidemiology. As such, the Court finds that his methodology was proper and that he is qualified to render an opinion on Mr. Irvin's cardiac state based upon his review of the relevant materials. To the extent that Merck asserts that Dr. Gandy does not understand Vioxx and its alleged effects, Merck will be able to attack Dr. Gandy at cross-examination much like it did at his deposition. Accordingly, the jury will be entitled to draw its own conclusions as to how much weight Dr. Gandy's opinion should be afforded. Accordingly, Merck's motion to exclude Dr. Gandy's testimony is denied.

### ii. Wayne A. Ray, Ph.D.

The Plaintiff has designated Professor Ray to opine whether: (1) Vioxx increases the risk of heart attacks and heart disease; (2) if so, the magnitude of that risk; and (3) if there was an increased risk, could it come from a use of Vioxx for less than 30 days.

### a. Merck's Position

First, Merck challenges the data upon which Professor Ray relied upon to reach his conclusion that short-term use of Vioxx increases cardiovascular risk. Professor Ray claims four lines of evidence support his position: (1) biological plausibility; (2) short-term studies of other COX-2 inhibitors; (3) data from clinical trials of Vioxx for shorter periods of use; and (4) data from epidemiologic studies for shorter periods of time. Merck claims that these four lines of evidence do not support Professor Ray's claims.

As to biological plausibility, Merck claims that Professor Ray relied solely upon the Fitzgerald hypothesis to reach his conclusion that Vioxx causes a greater incidence of cardiovascular events. Merck claims that the Fitzgerald hypothesis is pure speculation. As such, Professor Ray's conclusion is based on unreliable information.

As to short-term studies of other COX-2 inhibitors (celecoxib, lumiracoxib, and valdecoxib/parecoxib), Merck asserts that these studies are unreliable for three reasons. First, Merck claims that Professor Ray's conclusion is based on the unreliable Fitzgerald hypothesis. Second, Merck argues that studies of other COX-2 inhibitors cannot prove causation as to Vioxx because of the differences between the drugs.

As to clinical trials for shorter periods of time, Professor Ray reached his opinion by relying upon Professor Kronmal's re-analysis of Merck's clinical trial data. Merck claims that this re-analysis is unreliable because it was conducted for purposes of this litigation, has not been published, and has not been subject to peer review, and it does not demonstrate that 25 mg of Vioxx can cause thrombotic cardiovascular events during the first month of use.

As to epidemiologic studies, Professor Ray reviewed five studies: Solomon, Johnsen,

Kimmel, Graham, and Levesque. Merck claims that all five of these studies are insufficient to support the theory that short-term use of Vioxx can cause an increase in cardiovascular events.

Second, Merck contends that Professor Ray cannot properly opine that Vioxx accelerates atherosclerosis. In reaching this opinion, Merck claims that Professor Ray once again relied on the Fitzgerald hypothesis, which Merck claims is unreliable.

Third, Merck contends that Professor Ray cannot opine on what doctors should prescribe to patients because Professor Ray is unqualified to do so. Professor Ray is not a medical doctor. He cannot prescribe Vioxx. As such, Merck argues that he is not qualified to opine on the risk-benefit analysis medical doctors make when determining whether to prescribe any medication to a particular patient.

Fourth, Merck argues that Professor Ray may not testify or opine about Mr. Irvin or the specific causation of his death. In support, Merck points out that Professor Ray is not a medical doctor, his expert report is silent on Mr. Irvin, and he even testified that he would not offer an analysis of any clinical information as to an individual patient.

Fifth, Merck asserts that Professor Ray may not testify regarding his disapproval of the actions taken by the FDA. Merck contends that Professor Ray is not an expert in FDA regulatory matters and, under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001), he is not entitled to supplant the judgment of the FDA in balancing the benefits and risks of drugs from the regulatory perspective.

Sixth, Merck argues that Professor Ray cannot testify as to Merck's alleged failure to meet subjective normative standards. Basically, Merck asserts that Professor Ray's opinion as to what Merck should have done based upon his own subjective standards of what standards should

be followed by a pharmaceutical company is unreliable. In addition, Merck asserts that Professor Ray cannot offer inflammatory characterizations of Merck's failure to follow his subjective standards because, in addition to its inflammatory nature, it is irrelevant since Merck must be judged according to legal standards, not Professor Ray's.

Lastly, Merck contends that Professor Ray should not be allowed to testify as to Merck's state of mind, motive, or perceived bias because Professor Ray has no qualifications or specialized expertise in determining a company's knowledge or state of mind.

### b. Plaintiff's Position

The Plaintiff asserts that Professor Ray's opinions are based on scientifically reliable evidence. There have been numerous studies that have concluded that Vioxx does cause an increase in cardiovascular incidents. Professor Ray has relied on these reports including Merck's VIGOR report. The Plaintiff argues that the reports regarding other drugs are also reliable because they are substantially similar to Vioxx. All the drugs are COX-2 inhibitors; they all are supposed to reduce pain; they all indicate a greater than normal incidence of cardiovascular event.

### c. Court's Ruling

Professor Ray is currently a professor of preventive medicine at Vanderbilt University School of Medicine. He is the director of Pharmacoepidemiology and of the Master of Public Health Program. He received a B.S. from the University of Washington, a M.S. from Vanderbilt University, and a Ph.D. from Vanderbilt University.

Professor Ray has carried out pharmacoepidemiologic research for thirty years and is actively involved in the design, execution, and analysis of numerous pharmacoepidemiologic

studies. He is a fellow of the International Society for Pharmacoepidemiology. He is the principal investigator for the Vanderbilt Center for Education and Research on Therapeutics and for a Cooperative Agreement with Food and Drug Administration. In these duties, he is continually required to evaluate and design studies that determine whether or not there is evidence that a medication causes an adverse reaction.

Professor Ray has published more than 150 manuscripts in the peer reviewed literature. He also reviews articles for numerous leading medical journals.

As principal investigator for the Cooperative Agreement with the Food and Drug Administration, Professor Ray regularly meets with officials from the FDA and his work involves rapid identification and confirmation of adverse medication reactions and assessment of appropriateness of medication use.

In particular, Professor Ray has conducted several studies of the gastrointestinal and cardiovascular safety of the NSAIDs and coxibs. These studies have been published in several peer reviewed scientific journals.

Professor Ray's opinions are derived from his education, training, research, experience, expertise, and review of the peer-reviewed medical literature and other publicly available documents concerning the treatment of musculoskeletal disorders, NSAIDs, COX-2 inhibitors, and cardiovascular illness.

First, the Court finds that Professor Ray is adequately qualified to testify as to whether short-term use of Vioxx increases the risk of adverse cardiovascular risks. His career has been based around pharmacoepidemiologic investigations that concern the adverse and beneficial effects of medications. In particular, he has conducted several studies of the gastrointestinal and

-31-

cardiovascular safety of NSAIDs and COX-2 inhibitors. Moreover, Professor Ray has reviewed the scientifically relevant literature surrounding Vioxx. Although these studies do not specifically address whether short-term use of Vioxx can cause adverse cardiovascular effects, these studies were not designed to reach these conclusions. Instead, they were designed for alternate purposes; however, a general theme running throughout all these studies was that Vioxx can cause adverse cardiovascular effects. Moreover, Professor Ray points to the raw data of these studies as support for his conclusion. Professor Ray is qualified to make an analogy based upon all these tests that short-term Vioxx use can cause adverse cardiovascular effects. Accordingly, the Court finds that he is qualified to testify as an expert and that he used scientifically reliable methodology in reaching his opinions.

Besides challenging his general opinion that short-term use of Vioxx can increase cardiovascular risks, Merck also challenges several other of Professor Ray's opinions. For the same reasons stated above, Professor Ray is qualified to opine that Vioxx accelerates atherosclerosis. This opinion is based upon the Fitzgerald hypothesis, which has been supported by numerous articles as well as recognized medical journals. Although Merck may disagree with the conclusions reached in the Fitzgerald hypothesis and supporting literature, a disagreement does not amount to improper methodology or scientifically unreliable data.

Merck has also challenged whether Professor Ray's is qualified to testify on what doctors should prescribe to patients and on the specific cause of Mr. Irvin's death. The Court finds that Professor Ray may not opine on these issues. He is not a medical doctor. He is not qualified to testify as to the risk-benefit analysis performed by medical doctors. Moreover, he is not qualified to review the clinical information of Mr. Irvin. He is lacking in the necessary training to testify

as to what doctors should have done and to what was the specific cause of Mr. Irvin's death.

Additionally, Merck argues that Professor Ray may not testify as to his disapproval of the actions taken by the FDA. Professor Ray is not an expert in FDA regulatory matters. He does not have experience in this field. As such, Rule 702 bars him from testifying as to matters beyond his range of knowledge. The Court points out, however, that *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), would not bar a qualified expert from testifying as to their opinion on whether the FDA correctly balanced the benefits and risks of a drug from a regulatory standpoint. In *Buckman*, the Supreme Court found that state law fraud-on-the-FDA claims were preempted by federal law. This holding is completely inapplicable to the issue at hand.

Lastly, Merck challenges Professor Ray's qualifications to testify as to what Merck should have done or as to Merck's state of mind. The Court will reserve ruling on these issues until such time as they are presented at trial. At that time, the Court will have a clearer basis for making its ruling. Accordingly, Merck's motion to exclude Professor Ray's testimony is denied in part and granted in part.

### iii. Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A.

The Plaintiff has designated Dr. Lucchesi as an expert qualified to testify on a host of topics ranging from medical causation to an array of non-scientific issues such as advertising and drug pricing.

#### a. Merck's Position

First, Merck seeks to exclude Dr. Lucchesi from purporting to address Merck's knowledge and state of mind, whether Merck's development and marketing of Vioxx conformed

with Dr. Lucchesi's personal standards, and whether Merck's Vioxx warning in physician prescribing information, patent information, and consumer advertising conformed with Dr. Lucchesi's personal standards.

According to Merck, Dr. Lucchesi is a professor of pharmacology. Merck argues that He is not qualified to address what Merck knew, and he is not qualified to opine on the propriety of Merck's actions with respect to Vioxx. *See* In re *Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). In addition, Merck alleges that Dr. Lucchesi's knowledge comes from documents provided by Plaintiff's counsel. From these documents, he draws his inferences and conclusions. In effect, Merck asserts that he is usurping the role of the jury.

As far as Merck's failure to meet Dr. Lucchesi's standards goes, Merck asserts that Dr. Lucchesi is not an expert in the field of drug development, testing, and marketing. Therefore, according to Merck, his personal, subjective views are irrelevant and unreliable. They are not based on objective, empirical, ascertainable, and verifiable bases.

Moreover, Merck contends that Dr. Lucchesi should not be allowed to testify as to the warnings that Vioxx carries or should carry. Merck argues that Dr. Lucchesi is not an expert in the labeling of FDA-regulated drugs. Merck alleges that he is not an expert in the advertising or marketing of prescription medications. Therefore, Merck contends that he should not be allowed to testify as to the adequacy of the warning Vioxx carried. Additionally, according to Merck, this testimony cannot meet the requirement of reliability because Dr. Lucchesi identifies no methodology or standard against which the Court can measure the reliability of his opinion.

Second, Merck claims that Dr. Lucchesi has no scientifically reliable basis to opine on general causation. According to Merck, since Dr. Lucchesi lacked reliable trial and

epidemiologic data, he analogized data from animal studies he conducted and a case report written by Dr. Leslie Crofford to conclude that Vioxx causes a higher risk of cardiovascular events. Merck asserts that the animal studies are unreliable and, even if they are reliable, much of Dr. Lucchesi's animal work involved the use of a drug other than Vioxx, making it even more unreliable. Also, Merck asserts that case reports are unreliable because they describe a single individual or a series of individuals who have coincident exposures and diseases. Merck argues that although they can be useful in generating testable hypotheses, case reports cannot establish a cause and effect relationship because case reports cannot for the role chance, bias, or confounding.

Next, Merck argues that Dr. Lucchesi cannot identify the pharmacological mechanism by which Vioxx supposedly has a thrombotic cardiovascular effect. Dr. Lucchesi relies upon the Fitzgerald hypothesis in reaching his conclusions. Merck, once again, claims that the Fitzgerald hypothesis is not proven and is unreliable.

Lastly, Merck argues that Dr. Lucchesi does not have a scientifically reliable basis to opine on specific causation. Merck alleges that Although he received a medical degree in 1964, Dr. Lucchesi is not a licensed physician, has never been a licensed physician, has never treated a patient, and has never been licensed to prescribe medications. Moreover, Merck contends that he has no basis to opine on whether Mr. Irvin died due to any of the alleged mechanisms by which he believes Vioxx can cause or contribute to sudden cardiac death. Merck asserts that even if the Fitzgerald hypothesis were correct, Dr. Lucchesi has no basis to testify that Mr. Irvin actually suffered an imbalance of prostacyclin and thromboxane from Vioxx use, or even the degree of prostacyclin inhibition necessary to cause a clinically significant result.

In addition, according to Merck, Dr. Lucchesi cannot testify as to whether Mr. Irvin suffered a plaque rupture because he never looked at the pathology slides and he stipulated that he would not opine about whether Mr. Irvin suffered a plaque rupture. Plus, Merck claims that Dr. Lucchesi cannot testify as to whether Vioxx contributed to the formation of plaque in Mr. Irvin's coronary arteries. At his deposition, Merck contends that Dr. Lucchesi could only highly suspect that Vioxx contributed to plaque formation in Mr. Irvin. Plus, Dr. Lucchesi admitted that he could not rule out other potential causes of Mr. Irvin's death.

### b. Plaintiff's Position

The Plaintiff first points out and stresses Dr. Lucchesi's outstanding qualifications, including the fact that he has researched and published in the very areas of pharmacology that are at issue in this case. Regarding Dr. Lucchesi's ability to opine on what Merck knew or should have known, the Plaintiff asserts that few, if any, jurors will be able to understand the meaning and significance of scientific articles or documents like patents and emails between scientists. The Plaintiff contends that Dr. Lucchesi can provide the explanation that the jury will need to understand. In essence, Dr. Lucchesi will act as a translator.

In assessing what Merck knew or should have known, Dr. Lucchesi reviewed a series of emails between Merck employees. He also reviewed patents filed by Merck employees, all of which "describe a method for preventing platelet dependent arterial thrombosis in patients being treated with a COX-2 inhibitor. A reading of the patent indicates that Merck was attempting to develop one or more adjunctive agents to be used in combination with a COX-2 inhibitor to prevent arterial thrombus formation." It is necessary for an expert like Dr. Lucchesi to interpret these complex documents to the jury, according to the Plaintiff.

The Plaintiff further argues that in the same way that it is necessary for Dr. Lucchesi to address what Merck knew or should have known based on the relevant documentation, it is necessary for Dr. Lucchesi to explain the actions Merck should have taken based on the information evidenced in the documentation. The Plaintiff contends that his testimony is not personal opinion, but valid and reliable testimony about the logical consequences of scientific facts.

Next, the Plaintiff points out that many of the comments which Merck is concerned about are not Dr. Lucchesi's opinions, but comments taken out of context elicited by Merck's counsel.

Regarding Dr. Lucchesi's opinions on causation and his reliance on animal studies and case reports, the Plaintiff asserts that this is reliable, accepted science. First, the Plaintiff asserts that expert testimony does not have to be based on epidemiologic or case studies to prove causation. Second, the Plaintiff points out that the Federal Judicial Center's reference Manual on Scientific Evidence even recognizes that toxicology models based on animal studies may be used to determine adverse effects in humans. Third, the Plaintiff argues that Dr. Lucchesi has based his findings on numerous studies and many of his own studies. Lastly, according to the Plaintiff, all these studies are mutually corroborative.

Regarding mechanism, the Plaintiff asserts that Merck continues to confuse mechanism with plausibility. Biological plausibility is defined as the consideration of existing knowledge about human biology and disease pathology in order to provide a judgment about the plausibility that an agent causes a disease. The Plaintiff contends Biological plausibility lends further credence to an inference of causation established through epidemiology, animal studies, and other evidence. According to the Plaintiff, there is no need to prove the precise mechanism by

which Vioxx causes cardiovascular events, only that it is plausible. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). According to the Plaintiff, it would be unreasonable to conclude that the subject of scientific testimony must be known to a certainty because, in science, there are no certainties.

Regarding Dr. Lucchesi's lack of experience in practicing medicine, the Plaintiff argues that Dr. Lucchesi is well qualified to testify as to specific causation. The Plaintiff alleges that Dr. Lucchesi will not testify as to what Mr. Irvin actually suffered, but he intends to testify as to what might have happened based on his review of the facts of this case and his own expertise.

### c. Court's Ruling

Dr. Lucchesi received a B.S. and a Masters in Pharmacy from St. John's University in New York City. He then received a Ph.D. in Pharmacology and a M.D. from the University of Michigan. He is presently a professor in the University of Michigan's Department of Pharmacology. He has received numerous awards and honors, is a member of many medical organizations, sits on several advisory boards and committees, and has authored and co-authored 390 publications. In reaching his opinions, Dr. Lucchesi reviewed a significant amount of materials. These materials along with his experience, training, and education form the basis for his testimony.

Merck challenges Dr. Lucchesi's testimony for several reasons. First, Merck contends that Dr. Lucchesi cannot testify as to what Merck knew or whether Merck acted properly in developing and marketing Vioxx. The Court reserves ruling on this issue until such time as it is presented at trial. At that time, the Court will have a clearer basis for making its ruling.

Second, Merck asserts that Dr. Lucchesi does not have a scientifically reliable basis to

opine on general causation. Merck's assertion is incorrect. Just like Professor Ray, Dr. Lucchesi based his opinion on a thorough review of the scientific literature. In addition, he drew proper and supported inferences from the studies he reviewed. His opinion is based on reliable, scientific data.

Lastly, Merck asserts that Dr. Lucchesi cannot testify as to the specific cause of Mr. Irvin's death. Merck is correct. Dr. Lucchesi is neither a cardiologist or pathologist. As such, he cannot testify as to what was the specific cause of Mr. Irvin's death. Dr. Lucchesi, however, is not opining as to what specifically caused Mr. Irvin's death. Instead, based on the facts of this case, he is testifying as to what role Vioxx might have played in Mr. Irvin's death. This opinion is based upon his knowledge of Vioxx and his belief that it causes increased risks of cardiovascular events combined with his education as a medical doctor and professional experience. He is qualified to state this opinion, and it is based upon proper methodology.

### iv. Colin M. Bloor, M.D. and Joseph L. Burton, M.D.

The Plaintiff designated both Dr. Bloor and Burton to testify as experts regarding the alleged role of Vioxx in Mr. Irvin's death.

#### a. Merck's Position

Merck asserts several reasons why Dr. Burton's opinion should not be admitted. First, Merck contends that Dr. Burton does not have the necessary training and experience to opine on general causation. Merck points out that Dr. Burton is a pathologist who has never done any research on any NSAIDs in general or COX-2 inhibitors in particular. In addition, he has never published anything on sudden cardiac death. He is not a pharmacologist and is relying on plaintiff's other experts to address Vioxx pharmacological mechanisms. He admits he is not an