expert in clinical design or statistics and that he is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx.

Next, Merck contends that Dr. Burton's general causation theories are not supported by the scientific literature on which he relied. He admitted that his opinions on Vioxx's causation of cardiovascular events based upon a prostacyclin and thromboxane imbalance are derived only from other experts. In addition, he cannot determine whether this information is correct or not.

Third, Merck asserts that Dr. Burton has no reliable scientific evidence supporting the hypothesized mechanisms by which he believes Vioxx could cause sudden cardiac death. This assertion is based on the fact that Dr. Burton cannot cite any studies supporting him and he is aware that there are competing views regarding whether Vioxx can cause vasoconstriction.

Fourth, Merck asserts that Dr. Burton does not have reliable scientific evidence to opine on specific causation. As a pathologist, Merck concedes that Dr. Burton may be able to opine that a thrombus formed in Mr. Irvin's artery and that a thrombus led to a sequence of events which resulted in Mr. Irvin's death. This, however, is completely different from Dr. Burton's ability to testify that the thrombus was caused by Mr. Irvin's Vioxx use. Essentially, Dr. Burton's testimony that Vioxx caused Mr. Irvin's death is based completely on the assumption that Vioxx causes an prothrombotic state. He does not have any basis for that conclusion other than the testimony of the Plaintiff's other experts.

Merck makes the same arguments regarding Dr. Bloor.

### b. Plaintiff's Position

The Plaintiff's opposition is similar to that concerning Dr. Gandy. Dr. Burton and Bloor are pathologists. As such, they are not familiar with pharmacology. In reaching their opinions,

however, the doctors do not need to be familiar with every step in the Vioxx process. Instead, they may rely on the expertise of experts in other areas. Here, the doctors have relied on the expertise of the Plaintiff's other experts and formed an opinion based on that review as to what was the cause of Mr. Irvin's death.

### c. Court's Ruling

Both Dr. Bloor and Burton are pathologists. Dr. Bloor received a B.S. from Denison University and a M.D. from Yale University School of Medicine. He has served as professor of pathology at the University of California San Diego for the last thirty-one years. Prior to that, he held various research positions. He is a member of numerous medical organizations, editorial boards, and committees. He has received several honors and awards for his work. He has authored and co-authored 473 publications.

Dr. Burton received a B.A. and a M.D. from Emory University. He is a licensed physician in Georgia. He has served as a medical examiner for over twenty-five years. Currently, he is Chief Medical Examiner, Emeritus for DeKalb County, Georgia, and Senior Consulting Pathologist for Cobb, Gwinnett, and Paulding County, Georgia. He has served in other medical capacities, has received several special appointments, and is a member of numerous professional associations. In addition, he has presented a vast number of articles at medical conferences. In reaching their opinions, Dr. Bloor and Dr. Burton both reviewed the relevant literature on Vioxx, fourteen expert reports from other designated experts, and Mr. Irvin's medical and autopsy reports.

The crux of Merck's argument to exclude Dr. Bloor's and Dr. Burton's testimony is that they are not qualified to testify that Vioxx was the cause of Mr. Irvin's death and that their

testimony is based on scientifically unreliable evidence. Merck acknowledges that they are both expert pathologists, but Merck asserts that this, by itself, does not qualify them to testify as to how Vioxx caused Mr. Irvin's death. Merck is somewhat correct. Neither Dr. Bloor nor Dr. Burton have done any research on NSAIDs, published anything on NSAID, or have any pharmacological experience. They have, however, read the relevant materials and have a basic understanding of Vioxx and its hypothesized prothrombotic effects. They are entitled to rely on these materials, which are relevant and reliable, in reaching their own conclusions just as an orthopaedic surgeon, who is not an expert X-Ray technician and has no knowledge of the mechanics of an X-Ray machine, can rely on an X-Ray to diagnose a broken arm. Essentially, Merck is not attacking their methodology. Instead, Merck is attacking the level of their understanding. This is fodder for cross-examination, not exclusion under *Daubert*. Accordingly, Merck's motion to exclude the testimony of Dr. Bloor and Dr. Burton is denied. The anticipated testimony from these witnesses seems to be repetitive and may be excluded by the Court for this reason.

### v. Thomas Baldwin, M.D.

The Plaintiff has designated Dr. Baldwin to opine that Mr. Irvin's use of Vioxx for less than 60 days created an increased risk of a sudden cardiac death and that Vioxx caused or substantially contributed to the development of an acute thrombosis which resulted in coronary occlusion, subsequent cardiac ischemia, a clinically evolving acute myocardial infarction, and the sudden death of Mr. Irvin.

#### a. Merck's Position

First, Merck asserts that Dr. Baldwin is not qualified to render opinions on general

-42-

causation because of his lack of training and experience and his lack of the requisite study. In regards to experience and training, Dr. Baldwin has little experience with Vioxx. He has never done any research on NSAIDs or COX-2 inhibitors. He has never treated a patient who had taken Vioxx and suffered a thrombotic event. In short, Merck alleges that Dr. Baldwin, in his practice, has never seen a patient like Mr. Irvin—one who took Vioxx and suffered a fatal thrombotic event.

In regards to research, Dr. Baldwin cannot point to any specific piece of literature or data that supports his view that short-term ingestion of Vioxx increases the risk of cardiovascular events. In addition, Merck asserts that the literature which Dr. Baldwin read does not support his position.

Merck also contends that the studies relied on by Dr. Baldwin do not support the hypothesized mechanism by which Vioxx could cause sudden cardiac death. This assertion is based on Merck's challenges concerning the Fitzgerald hypothesis.

Lastly, Merck asserts that Dr. Baldwin has been unable to specifically show that Vioxx, as opposed to atherosclerosis, obesity, or a sedentary lifestyle, caused Mr. Irvin's death. Moreover, Dr. Baldwin does not know specifically how Mr. Irvin's clot formed and acknowledges that clots can form in the absence of Vioxx. Therefore, Merck claims Dr. Baldwin cannot show that Vioxx caused Mr. Irvin's death to a reasonable degree of medical certainty.

### b. Plaintiff's Position

Basically, the Plaintiff's position is similar to its defense regarding Dr. Gandy. The Plaintiff contends that there are countless numbers of articles supporting the position that Vioxx causes an imbalance in the homeostasis between thromboxane and prostacyclin. In addition, the

-43-

Plaintiff defines Dr. Baldwin's interpretation of this data and ultimate conclusion as biological plausibility. Dr. Baldwin does not have to explain precisely how an agent causes a disease, but instead must only provide a judgment about the plausibility that an agent causes a disease.

### c. Court's Ruling

Dr. Baldwin received a B.S. from Kansas State University and a M.D. from the University of Kansas School of Medicine. Following his graduation from medical school, Dr. Baldwin interned at and did his residency at the University of Kansas School of Medicine, Internal Medicine. After that, he was a fellow at the University of Kansas School of Medicine, Cardiovascular Medicine. Since that time, he has been a practicing cardiologist. He is licensed in both Kansas and Missouri, is a diplomat in the American Board of Internal Medicine and the American College of Cardiology, is a member of the American College of Physicians, and is a fellow in the American College of Cardiology. In addition, he has written three publications.

Merck's challenge to Dr. Baldwin is quite similar to its challenge of Dr. Gandy. Like Dr. Gandy, Dr. Baldwin's expert report is quite short and conclusory. It is only twelve pages long. The first seven pages concern his qualifications, background, and materials reviewed. The last five pages consist of a recitation of the facts and seven paragraphs of conclusions. Furthermore, Dr. Baldwin's deposition testimony also reveals his lack of understanding. During repeated points in his deposition testimony, Dr. Baldwin made assertions that certain studies supported his position, but was unable to name or describe the studies he was relying on. At other points in his deposition, Dr. Baldwin admitted that he did not understand how to interpret certain studies.

Similar to Dr. Gandy, however, the Court acknowledges that Dr. Baldwin is a cardiologist who is qualified to testify as an expert regarding Mr. Irvin's cardiac condition at his time of

-44-

death. Moreover, Dr. Baldwin did review all the relevant materials and is entitled to rely on pharmacological and epidemiological experts. As such, his methodology was proper. Merck will be allowed to attack Dr. Baldwin's understanding during cross-examination, but will not be able to entirely exclude him based on it.

### vi. Richard M. Kapit, M.D.

Plaintiff has designated Dr. Kapit as an expert to testify that: (1) Merck was not forthcoming with the FDA with respect to the risks of Vioxx; (2) Merck should have changed the label without the FDA's approval; (3) Merck had an ethical or moral obligation to ensure the safety of the medication; (4) Merck was motivated by competition to withhold information regarding the danger of Vioxx; and (5) Merck violated FDA requirements.

#### a. Merck's Position

First, Merck contends that Dr. Kapit's testimony regarding the inadequacy of Merck's interactions is preempted by *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350, 353 (2001).

Second, Merck asserts that Dr. Kapit's testimony is neither scientific nor technical evidence and, thus, is not admissible under Rule 702. As far as his testimony as to what should have been done, Merck argues that this testimony is unreliable because it is purely speculative, irrelevant to legal liability, and likely to prejudice the jury. In addition, Merck asserts that this testimony is unreliable because it is based solely on Dr. Kapit's subjective determination of what is ethical or proper or what Merck's state of mind was. This is not proper scientific methodology. In fact, according to Merck, it is not scientific at all.

Third, Merck asserts that Dr. Kapit is not an expert as to Merck's state of mind. Dr.

Kapit reached his opinions as to Merck's state of mind by viewing internal Merck documentation. Merck argues that he is in no better position to evaluate Merck's state of mind based on these documents than a jury would be because this issue requires no special skill.

### b. Plaintiff's Position

As to the *Buckman* argument, the Plaintiff asserts that *Buckman* is inapplicable because it concerned claims of fraud on the FDA. In this case, the Plaintiff argues that there is no claim of fraud on the FDA, and courts which have addressed *Buckman* have concluded that evidence relating to a defendant's conduct or representations in the course of FDA proceedings is admissible in support of the plaintiff's state law product liability or tort causes of action. *See, e.g., Globetti v. Sandoz Pharm. Corp.*, 2001 WL 419160 (N.D. Ala. 2001); *Eve v. Sandoz Pharm. Corp.*, 2002 WL 181972 (S.D. Ind. 2002).

Additionally, the Plaintiff asserts that Merck mischaracterizes Dr. Kapit's testimony. The Plaintiff contends that Dr. Kapit's testimony is based upon his experience and knowledge as a FDA regulatory official with the responsibility for interacting with pharmaceutical companies on issues of drug safety. Based upon his experience and federal regulations, Dr. Kapit opined that once the VIGOR results were made known, Merck had an obligation to inform the medical profession of a serious medical question regarding the safety of Vioxx. In addition, based on his experience, Dr. Kapit opined on several other Merck-FDA issues. The Plaintiff argues that these opinions were not based on his purely subjective views, but upon his background, expertise, and knowledge of the regulations governing drug safety.

As far as Merck's state of mind, the Plaintiff contends that Dr. Kapit is not attempting to read the mind of Merck and its employees, but translate to the jury the significance of certain

-46-

documents and how these documents fit into the complex regulatory scheme which governs the conduct of pharmaceutical companies. The Plaintiff asserts that Mr. Kapit is qualified to testify as to these matters based on his knowledge and expertise of FDA procedures, regulations, and regulatory guidelines as well as his first hand knowledge of a pharmaceutical company's obligations and required disclosures regarding their drugs.

### c.    Court's Ruling

Dr. Kapit received a B.A. from Columbia University and a M.D. from N.Y.U. School of Medicine. He did his residency in Psychiatry at the National Institute of Mental Health, Overholser Division of Training and Research, St. Elizabeth's Hospital, Washington, DC. After that, he worked as a Medical Officer at the Bureau of Forensic Psychiatry, Department of Human Services for five years while also running his own private practice. Following this employment, he spent the next 18 years as a Medical Officer: first within the Division of Neuropharmacological Drug Products, next within the Clinical Trials Bureau, and finally within the Division of Epidemiology, all of which were within the FDA. For the past three years, Dr. Kapit has been the President of MD-Writer, LLC, which does research, preparation, and composition of medical articles and scientific articles for newspapers, magazines, and other publications as well as consulting on matters related to pharmaceuticals and their adverse effects.

While employed by the FDA, he made recommendations about unapproved and approved pharmaceuticals, about the adequacy of Investigational New Drug Applications and New Drug Applications supporting the approval of pharmaceuticals, about labeling, and about postmarketing surveillance reports related to pharmaceuticals. His recommendations often focused on whether pharmaceuticals were safe for human beings.

-47-

The Court finds that Dr. Kapit is qualified to testify as an expert witness in this case. First, as stated in the Court's ruling on Professor Ray, *Buckman* is not applicable to this case or issue at all. Second, just like Dr. Arrowsmith-Lowe's testimony, Dr. Kapit's testimony will help the jury understand the applicable FDA regulations and Merck's responses. He is more than qualified to testify on this. Lastly, regarding Merck's state of mind, Dr. Kapit may not testify as to what Merck was thinking. Instead, his testimony should focus on the significance of certain documents and how these documents fit into the FDA's regulatory scheme. If Dr. Kapit attempts to testify at trial as to Merck's state of mind, Merck should raise this objection at that time. Until then, the Court reserves ruling on this issue.

### vii. John W. Farquhar, M.D.

The Plaintiff has retained Dr. Farquhar, a cardiologist, to offer his opinion that Vioxx causes cardiovascular disease, hypertension, and that the risk of heart attack associated with taking Vioxx begins when the patient first takes Vioxx and continues throughout the period of usage. The Defendants asserts that Dr. Farquhar's opinions on general causation lack a reliable scientific basis and that his opinion regarding the Defendant's state of mind is inadmissable because he is not an expert on this subject and his opinions are irrelevant.

#### a. Merck's Position

First, Merck contends that Dr. Farquhar does not have a reliable scientific basis on which to render an opinion as to whether Vioxx generally causes an increased risk of thrombotic cardiovascular risk. Specifically, Merck contends that Dr. Farquhar misinterpreted the APPROve trial and the other clinical trials upon which his opinion rests, that the observational studies he reviewed do not supply a reliable scientific basis for his opinions, and that his opinion is

-48-

inadmissable because he did not offer a scientifically valid explanation for the mechanism by which he contends that the short-term use of Vioxx causes cardiovascular diseases.

Second, Merck contends that Dr. Farquhar cannot testify as to Merck's knowledge or whether Merck acted appropriately. Specifically, Dr. Farquhar is not an expert as to Merck's state of mind. Also, Dr. Farquhar's opinion is based on a review of internal Merck documents and selected deposition testimony. Merck contends that these documents and testimony are not the type of evidence that require expert testimony, and that a jury will be able to understand this evidence without Dr. Farquhar's assistance. Moreover, Merck asserts that Dr. Farquhar's personal opinions as to whether Merck acted appropriately are irrelevant and unreliable.

### b. Plaintiff's Position

In response, the Plaintiff asserts that Dr. Farquhar's testimony as to causation is supported by the APPROVe study as well as the VIGOR, ADVANTAGE, and the Rheumatoid Arthritis studies. In addition, the Plaintiff contends that Dr. Farquhar is well qualified to testify as to biologically plausible mechanisms and the results of statistical analyses that he directed. Regarding testimony as to appropriateness, the Plaintiff stipulates that Dr. Farquhar will not testify about the ethics of Merck's conduct. Instead, the Plaintiff argues that he will testify that Merck made unreasonable and unsupported interpretations of its scientific data. The Plaintiff contends that he will not be attacking Merck's business ethics, but will be testifying that Merck departed from the scientific method.

### c. Court's Ruling

Dr. Farquhar is a Professor Emeritus of Medicine at the Stanford University School of Medicine. He has been a Professor of Medicine since 1973. He was an Assistant Professor from

1962-1966 and an Associate Professor from 1966-1973. He is also a Professor of Health Research and Policy at Stanford. He has held this position since 1978.

Dr. Farquhar received an A.B. in Medicine from the University of California School of Medicine, Berkeley and an M.D. from the University of California School of Medicine, San Francisco. He was an intern and resident at U.C. San Francisco, a resident at the University of Minnesota School of Medicine, Minneapolis, and a postdoctoral fellow with the United States Health Service at U.C. San Francisco.

In his career, Dr. Farquhar has received a litany of awards and is a member of numerous medical organizations. His principal areas of research include epidemiology and cardiovascular risk factors. He was the Director of the Preventative Cardiology Clinic, Stanford Medical Center from 1978 to 1996 and has been Co-Director since that time. From 1973 to 1984, he served as the Director, Stanford Heart Disease Prevention Program. He also maintained an active clinical cardiology practice from 1962 to 2001.

Dr. Farquhar has authored or co-authored approximately 200 peer-reviewed articles, predominantly in the fields of epidemiology and cardiovascular risk factors such as cholesterol, hypertension, smoking, and atherosclerosis. He has also co-authored one book and authored another book. Dr. Farquhar based his opinion on his review of the literature pertaining to COX-2 inhibitors and his own training and experience in the fields of epidemiology and cardiology.

Merck challenges Dr. Farquhar on two grounds. First, Merck asserts that Dr. Farquhar's opinion is based on scientifically unreliable information. This assertion is unpersuasive. Dr. Farquhar has reviewed all the relevant literature on Vioxx. The materials he reviewed are the same materials reviewed by Merck's experts. Dr. Farquhar, however, has reached a different

-50-

conclusion than Merck's experts. Differing conclusions are permissible under Rule 702; improper methodology is not. If Dr. Farquhar's reliance on these studies is improper, than the same reliance by Merck's experts is improper. As evidenced by his thorough and explanatory ninety-five page expert report, Dr. Farquhar is qualified and relied on proper methodology.

Second, to the extent that Dr. Farquhar may testify as to Merck's state of mind, the Court reserves ruling on this issue until it is presented at trial. At that time, the Court will have a clearer basis for making its ruling.

### C. *Daubert*-Like Motions

#### i. Testimony that Adverse Thrombotic Cardiac Events Occur Only if Vioxx is Ingested 18 Months or Longer

The Plaintiff asserts that the Defendant's position that Vioxx only causes prothrombotic effects if ingested for 18 months or longer is scientifically unreliable because this opinion is based upon a speculative post hoc sub group analysis by Merck from the APPROVe study, flies in the face of the results from Merck's own clinical trials and other epidemiologic studies, and is wholly without any biological plausibility. In opposition, Merck claims that the APPROVe study was reliable, its opinion is supported by its own clinical trials, and its opinion is supported by substantial literature and testing.

This motion concerns the results of the APPROVe study. The Plaintiff has interpreted the data collected by the APPROVe to mean that Vioxx can cause adverse thrombotic cardiovascular events after short-term use. Her position is based on adjudicated data from the study. Merck, however, takes the position that the APPROVe study shows that Vioxx only causes adverse thrombotic cardiovascular events after long-term use. Its position is based on confirmed data.

In essence, both parties are relying on the same test. Both parties agree that the test was conducted properly. The parties are disagreeing as to the conclusions reached by the other parties. As a gatekeeper, the Court must evaluate methodology, not conclusions. The proper forum for challenging conclusions is at cross-examination, not in a *Daubert* motion. Accordingly, the Plaintiff's motion to exclude this testimony is denied.

### ii. Testimony that Vioxx is the Same as All NSAIDs Regarding Cardiotoxic Effects

The Plaintiff asserts that Merck's position that Vioxx is the same as all NSAIDs regarding cardiotoxic effects is scientifically unreliable because it is based on an untested hypothesis; it has not been subjected to peer review or publication; it is impossible to know the rate of error or potential rate of error given its broad-sweeping application to all NSAIDs; there is no indication that it is generally accepted in the relevant scientific community; and there is a huge analytical gap between existing scientific certainty and a hypothetical opinion that Vioxx is like all other NSAIDs, with the exception of naproxen. Merck contends that each of the Plaintiff's arguments is incorrect and that its opinion is scientifically reliable.

Merck's position that Vioxx, based on all the present information, is the same as all NSAIDs regarding cardiotoxic effects is predominantly based on an April 6, 2005 FDA Decision Memorandum reaching this conclusion. In addition, this position is also supported by an analysis presented at Health Canada. The Plaintiff contends that these two materials are scientifically unreliable because they are based on limited, unpublished, and non-peer-reviewed data.

In reaching the conclusions set forth in its April 6, 2005 Decision Memorandum, the FDA' advisory panel reviewed a large body of data. It reviewed an internal review by the FDA's Center for Drug Evaluation and Research of available data regarding the cardiovascular safety

-52-

Case 2:05-md-01657-EEF-DEK Document 6509-22 Filed 08/21/06 Page 53 of 187

issues for COX-2 inhibitors and NSAIDs. In addition, it reviewed the regulatory histories, New Drug Applications, and postmarketing databases of the various NSAIDs. It reviewed FDA and sponsor background documents prepared for the advisory committee meeting. It reviewed all the materials and data submitted by and presentations made by interested parties. Lastly, the FDA Memorandum itself analyzes the results of the numerous clinical trials and epidemiological studies concerning NSAIDs that the advisory committee reviewed in reaching its conclusions. The Court finds that the FDA's conclusions were reached after a review of scientifically reliable data.

The Plaintiff is primarily challenging the conclusions reached by the FDA. Once again, it is not the Court's task to scrutinize conclusions. The Court is charged with the duty of ensuring proper methodology. Here, the FDA's Decision Memorandum is based on proper methodology. Accordingly, the Plaintiff's motion is denied.

### iii. Testimony that Naproxen is Sufficiently Cardioprotective to Explain Excess Cardiac Risk in VIGOR

The Plaintiff asserts that the Defendant's position that naproxen is sufficiently cardioprotective to explain the excess cardiac risks in the VIGOR study is scientifically unreliable because it has never been tested in a controlled clinical trial, it has never been accepted as scientifically true in a peer reviewed publication; it has an unknown rate of error and/or a high rate of error since it has been proven to the contrary in large epidemiological studies; it has not been generally accepted within the relevant scientific community; and there is an overwhelming analytical gap between the underlying data and the opinion proffered. Merck, however, asserts that its opinion is scientifically reliable.

The Court finds that there is significant, scientifically reliable information supporting

-53-

Merck's contention that naproxen is sufficiently cardioprotective to explain the VIGOR test results. In reaching this position, Merck relies on a wide array of materials. First, two peer-reviewed studies supported Merck's position. One of the studies was published in 2000 by Merck and the other was published in 2004 by an independent author. Second, several other clinical and basic research studies suggest that naproxen has cardioprotective effects. Moreover, naproxen's own warning label states that it may reduce platelet aggregation and prolong bleeding. Third, numerous observational epidemiologic studies have detected a statistically significant lower rate of cardiovascular events for patients taking naproxen. Lastly, the results of the TARGET study lend support to Merck's position. TARGET consisted of two sub-trials comparing lumiracoxib, a COX-2 inhibitor, with ibuprofen and naproxen. The results of TARGET revealed significantly less myocardial infarctions and adverse cardiovascular events in the naproxen sub-trial than in the ibuprofen sub-trial. The cumulative effect of all these materials tends to support Merck's position and corroborate the evidence it is relying on. As such, the Court finds that Merck's position is based on scientifically reliable evidence. Accordingly, the Plaintiff's motion is denied.

### iv. Testimony that Merck Could Not Provide Risk Information through Labeling or Marketing Without Prior Approval of the FDA

The Plaintiff asserts that the Defendant's position that it could not provide risk information through labeling or marketing without prior approval of the FDA is factually untrue and legally unsupported. As such, the Plaintiff contends that it is not helpful to the trier of fact and is contrary to what is considered to constitute generally accepted and reliable scientific testimony. Merck argues that FDA regulations and its past interactions with the FDA support its position that it could not change its label without prior FDA approval.

The Plaintiff argues that under the applicable FDA regulations and guidelines Merck had authority to strengthen its warning label at any time. Merck contends that it did not have this authority. This disagreement stems from the classification of the label change. If the Vioxx label change is classified as "moderate" under the applicable guidelines, then the Plaintiff is correct. If the Vioxx label change is classified as "major" under the applicable guidelines, then Merck is correct. Merck is seeking to introduce evidence that the Vioxx label change was major and, as such, it could not make the label change without prior FDA approval. The Court finds that there is nothing false or legally unsupportable concerning Merck's position. Accordingly, the Plaintiff's motion is denied.

### v. Testimony of Plaintiff's Experts Regarding Causation

Merck has moved to exclude the testimony of the Plaintiff's experts to as whether Vioxx 25 mg causes an increased risk of thrombotic cardiovascular events because this testimony is based on scientifically unreliable evidence. In addition, the Defendant has moved to exclude any expert testimony as to whether Mr. Irvin's ingestion of Vioxx caused his death because it is based on scientifically unreliable evidence.

The Plaintiff contends that there is more than enough scientific literature and data to support the position that Vioxx taken at 25 mg doses increases the risk of thrombotic cardiovascular events.

There have been at least several clinical trials and observational studies which reveal that Vioxx can increase the risk of cardiac incidents. The issue, at least in this case, is temporal. Merck points out that no randomized, blind trials with a placebo counterpoint have specifically concluded that Vioxx can cause cardiac incidents within the first month of consumption. The

Plaintiff argues that that was not the objective or goal set for these studies. So, it is not surprising.

The Plaintiff, however, points out that the raw data from these studies shows that the cardiac incidents, including sudden death, occurred within the first month. She also points to a significant number of peer reviewed articles and observational studies which appear in credible and well recognized medical publications and support her conclusion.

In essence, both the Plaintiff and Merck rely on the same material. They simply interpret it differently and reach contrary conclusions. The Court's role as gate-keeper is to scrutinize the methodology, not the conclusions. Accordingly, Merck's motion is denied.

## IV.  CONCLUSION

For the foregoing reasons, the Court rules that: (1) the Plaintiff's Motion to Exclude the Testimony of Dr. Thomas Wheeler is Denied; (2) the Plaintiff's Motion to Exclude the Testimony of Dr. Janet Arrowsmith-Lowe is Denied; (3) the Plaintiff's Motion to Exclude the Testimony of Doctors Frank Lanza and Merlin Wilson is Denied; (4) the Plaintiff's Motion to Exclude the Testimony of Dr. David Silver is Denied; (5) the Plaintiff's Motion to Exclude Testimony that Adverse Thrombotic Cardiac Events Occur Only if Vioxx is Ingested 18 Months or Longer is Denied; (6) the Plaintiff's Motion to Exclude Testimony that Vioxx is the Same as All NSAIDs Regarding Cardiotoxic Effects is Denied; (7) the Plaintiff's Motion to Exclude Testimony that Naproxen is Sufficiently Cardioprotective to Explain the Excess Cardiac Risk in VIGOR is Denied;(8) the Plaintiff's Motion to Exclude Testimony that Merck Could Not Provide Risk Information Through Labeling or Marketing Without Prior Approval of the FDA is Denied; (9) Merck's Motion to Exclude the Testimony of Winston Gandy, Jr., M.D. is Denied;

(10) Merck's Motion to Exclude the Testimony of Wayne A. Ray, Ph.D. is Granted in Part and Denied in Part; (11) Merck's Motion to Exclude the Testimony of Benedict Lucchesi, M.D., Ph.D., M.S., F.A.H.A. is Denied; (12) Merck's Motion to Exclude the Testimony of Colin M. Bloor, M.D., and Joseph L. Burton, M.D. is Denied; (13) Merck's Motion to Exclude the Testimony of Thomas Baldwin, M.D. is Denied; (14) Merck's Motion to Exclude the Testimony of John W. Farquhar, M.D. is Denied; (15) Merck's Motion to Exclude the Testimony of Richard M. Kapit, M.D. is Denied; and (16) Merck's Motion to Exclude Evidence of the Plaintiff's Experts Regarding Causation is Denied.

New Orleans, Louisiana, this __18th__ day of __November__, 2005.

UNITED STATES DISTRICT JUDGE