# Exhibit L

09 - 092905 - DePace.txt

2505

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY/CIVIL DIVISION
DOCKET NO. ATL-L-2272-03MT
--------------------------------X
FREDERICK HUMESTON, et al.,

  PLAINTIFFS,

      VS.                        STENOGRAPHIC TRANSCRIPT
                                         OF:
MERCK & CO., INC.,
                                      - TRIAL -
      DEFENDANT.
--------------------------------X
  PLACE: ATLANTIC COUNTY CIVIL COURTHOUSE
         1201 BACHARACH BOULEVARD
         ATLANTIC CITY, NJ 08401

  DATE:  SEPTEMBER 29, 2005

B E F O R E:

  THE HONORABLE CAROL E. HIGBEE, P.J.Cv.

TRANSCRIPT ORDERED BY:

  DIANE P. SULLIVAN, ESQUIRE
  DAVID R. BUCHANAN, ESQUIRE

A P P E A R A N C E S:

  DAVID BUCHANAN, ESQUIRE
  CHRISTOPHER SEEGER, ESQUIRE
  MOSHE HORN, ESQUIRE
  SEEGER, WEISS, LLC
     ATTORNEYS FOR THE PLAINTIFFS

  DIANE SULLIVAN, ESQUIRE
  HOPE FREIWALD, ESQUIRE
  DECHERT, LLP
  STEPHEN D. RABER, ESQUIRE
  WILLIAMS AND CONNOLLY, LLP
  CHRISTY D. JONES, ESQUIRE
  BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
     ATTORNEYS FOR THE DEFENDANT
        *       *       *       *       *
              CAROL A. FARRELL, CSR-CRR-RMR
                        Page 1

---

09 - 092905 - DePace.txt
                        OFFICIAL COURT REPORTER
                        1201 BACHARACH BOULEVARD
                        ATLANTIC CITY, NJ  08401

                                                         2506

                       I N D E X

                        Direct    Cross   Redirect   Recross
WITNESSES FOR
THE PLAINTIFFS

DAVID N. SIM, M.D. (videotaped testimony)     Page 2546

SETH HUMESTON           2548

NICHOLAS L. DePACE      2589


EXHIBITS                             Ident.     Evid.
None

                        Page 2

---

09 - 092905 - DePace.txt

                     Colloquy                  2507

 1              P R O C E E D I N G S
 2       (The following conference transpired in
 3  chambers at 8:50 a.m.)
 4           THE COURT:  The issue that's, I think, before
 5  the Court and on the record is the Sim deposition, Page
 6  126, starting at Line 6, going through Page 127, 128,
 7  129, 130 and 131.  There is testimony concerning when
 8  he began to consider that VIOXX might be a causative
 9  factor in the heart attack or relevant to the heart
10  attack.  Counsel for the defense is objecting to that
11  portion being read in.
12           Counsel, you want to put on the record what
13  your argument is?
14           MS. FREIWALD:  Yes, Your Honor, and just to
15  expand upon your references a little bit, there is
16  also -- if I can find my notation here -- there is also
17  reference later in the deposition, at Page 212 and 216,
18  217, to Dr. Topol's publications and what he knows or
                        Page 3

---

09 - 092905 - DePace.txt
19  doesn't know of the various studies that have been done
20  related to VIOXX, and if Your Honor's initial
21  inclinations regarding causation opinions hold, we
22  would submit that that testimony is part and parcel of
23  the same concept; that testimony, we object similarly
24  to that testimony because it's fundamentally linked to
25  the issue of whether he can offer an opinion on the


                     Colloquy                  2508

 1  ultimate causative issue.
 2           THE COURT:  Okay.  Well, let's look at 126
 3  first and then we will come to that.
 4           MS. FREIWALD:  Fair enough, Your Honor.
 5           Our position, as you know, Your Honor, is
 6  that Dr. Sim is the treating cardiologist who has never
 7  offered an opinion in the course and scope of his
 8  treatment with regard to VIOXX.
 9           His testimony at this deposition was that at
10  the time that he assumed the care of Mr. Humeston, in
11  the hospital, he did not look at the patient health
12  information with regard to what medicines the patient
13  had used.  He similarly testified that he did not,
14  himself, take Mr. Humeston off of VIOXX.
15           He speculated that Dr. Lewer did so.  As we
                        Page 4

09 - 092905 - DePace.txt

16   know, that's an inaccurate speculation because
17   Dr. Lewer testified to the contrary, and I think it's
18   pretty much undisputed that Mr. Humeston made his own
19   decision about what to do.
20          After the heart attack, he's never put in his
21   medical record anywhere that he thinks that VIOXX is
22   causative. In fact, he has treated him like a person
23   who has had a standard heart attack.
24          Beyond that, his opinions are so speculative,
25   and so all over, as I believe Your Honor noted

Colloquy                                      2509

1    yesterday, that they clearly don't meet any kind of a
2    test for an expert/fact opinion. He talks about what
3    might be causative, what might potentially VIOXX's role
4    would be. VIOXX is the drug that's potentially
5    relative, he says. VIOXX might have been implicated.
6    All of that is clearly speculation.
7           He's not an expert in coxibs. He has not
8    done, even by his own account, a thorough review of the
9    literature. Whether or not he can testify as to the
10   state of the coronary arteries or whether he thinks
11   that the heart attack happened, as heart attacks
12   typically do, he does not have the kind of reliable
                     Page 5

09 - 092905 - DePace.txt

13   opinions stated to anything close to a reasonable
14   degree of expert probability, that one would want under
15   the Stigliano test.
16          And, of course, in that case, it was quite
17   the contrary. The treating physicians were engaged in
18   their treatment for the purposes of deciding the cause
19   of the child's injury. Why was she having seizures?
20   And they specifically reached that question in their
21   care. They documented those opinions in their medical
22   records. And they held those opinions with a very high
23   degree of certainty.
24          This is not at all that case. This is just a
25   case where there is going to be prejudice in the

Colloquy                                      2510

1    suggestion that a treating physician has an opinion,
2    when, in fact, what he has, at very best, is a -- an
3    uninformed guess or speculation.
4           So we would submit that, for two reasons, the
5    lack of connection to the care and treatment, and,
6    frankly, just the lack of any kind of reliability,
7    Dr. Lewer should not be allowed to testify as to VIOXX
8    being potentially or maybe the cause of Mr. Humeston's
9    heart attack.
                     Page 6

09 - 092905 - DePace.txt

10          THE COURT: Counsel?
11          MR. BUCHANAN: Your Honor, I think this does
12   go back to the Stigliano case, at least as -- to give
13   us the framework on it, and the Stigliano case, I
14   think, makes it quite clear that treating physicians
15   are entitled to provide testimony concerning their
16   factual impressions and even opinions, the Court noting
17   that opinions and facts are often a blurry line as it
18   relates to issues like we're talking about. But he can
19   provide those opinions and testimony under a lay
20   opinion standard, under a 701 standard rather than a
21   702 standard.
22          The testimony at issue here, while counsel's
23   highlighted certain words that suggest a lack of
24   certainty, this is not a 702 standard that we're
25   looking at. This is a lay opinion standard, and the

Colloquy                                      2511

1    standard is going to be whether if that were to go to
2    the jury and submit the testimony that is submitted
3    here, if we exclude the portion where he talks about
4    VIOXX being potentially implicated, would leave the
5    jury with an impression that -- he says was something
6    else going on in this case that caused him to have an
                     Page 7

09 - 092905 - DePace.txt

7    event? Or that's his -- the full sentence is, And even
8    though I was unable to formulate what that cause might
9    have been at that point in time, it was apparent that
10   there very likely was something else going on in his
11   case that had caused him to have his event.
12          We had heard from the defense yesterday that,
13   apparently, stress is going to be a centerpiece of the
14   trigger for Mr. Humeston's heart attack. There is
15   certainly a lingering inference by cutting off the next
16   series of questions and answers that maybe that
17   something else was stress that he's referring to, when,
18   in reality, as we can see from the transcript, he's
19   considering VIOXX as being that potential other thing
20   that caused him to have his event.
21          So, you know, I think it would be very
22   misleading to stop where we had previously discussed
23   stopping, and that was at 127-4 of his deposition, and
24   exclude portions that relate to his findings or
25   potential conclusions with respect to VIOXX.

Colloquy                                      2512

1           The one thing that's quite significant, I
2    think, is that the treating physician did put VIOXX in
3    the differential diagnosis. He may not have reached
                     Page 8

```
                09 - 092905 - DePace.txt
 4    the firm conclusion, yes, VIOXX was the cause, but he
 5    does say that it was potentially relevant to his
 6    particular heart attack, and, from a 701 standard, Your
 7    Honor, that's fine. The jury can certainly consider
 8    other -- other facts elucidated on cross-examination as
 9    to the strength of which that particular opinion can be
10    considered, but it should not be excluded.
11              MS. FREIWALD: Your Honor, if I may, just two
12    points in response to Mr. Buchanan.
13              Dr. Lewer absolutely does not put VIOXX in
14    the differential. I think --
15              MR. BUCHANAN: You mean Dr. Sim.
16              MS. FREIWALD: Dr. Sim. I'm sorry.
17              I think we have to be absolutely clear about
18    this. A differential diagnosis is what is happening to
19    this patient now. At the time of the heart attack,
20    Dr. Sim didn't diagnose him as having a heart attack,
21    and he most surely didn't diagnose him as having a
22    heart attack caused by VIOXX. I mean, that's
23    absolutely clear in the record.
24              The only thing that Dr. Sim has done is look
25    at how do I manage this patient now that he has had a

                        Colloquy                    2513
                         Page 9
```

```
                09 - 092905 - DePace.txt
 1    heart attack? And in his management of this patient,
 2    he did not even stop the patient from taking VIOXX. He
 3    doesn't even know exactly when the patient stopped
 4    taking VIOXX or why the patient stopped taking VIOXX.
 5    In fact, his best guess, we all know to be wrong, so
 6    VIOXX was in no way part of his differential.
 7              The second thing is that the Stigliano
 8    reference to lay opinion testimony comes at a part of
 9    the case where the Court is merely making the point
10    that you don't need to designate a treating physician
11    as an expert with a formal expert report because their
12    opinions are a mixture of fact and expert testimony.
13    However, clearly, the Court says that they --
14    doubtlessly, the treating physician doubtlessly has to
15    have the right expertise, and you're relying on their
16    expertise, and the presumption is that if they form the
17    opinion with sufficient certainty in the course and
18    scope of their care of the patient, you can take them
19    as having the appropriate level of expertise.
20              Dr. Sim -- excuse me -- did not do that. He
21    did not document anywhere that he thought that VIOXX
22    was causative, and he admittedly doesn't really know
23    very much about what the data on VIOXX do and don't
24    show.
25              You know that our view is that all of his

                         Page 10
```

```
                09 - 092905 - DePace.txt

                        Colloquy                    2514
 1    views about whether plaque rupture was involved or not
 2    should come out because they leak into this issue of
 3    VIOXX. But even if you cut off where you were
 4    yesterday, it's not confusing. They will have
 5    Dr. DePace to testify as to causation.
 6              They -- I believe Dr. Lewer has given his
 7    opinion on the theory that that was in his medical
 8    record. They surely don't need Dr. Sim to speculate on
 9    the issue. He is the absolutely most confused and
10    uncertain and I think your words were yesterday all
11    over the board or all over the map on what may have
12    been or might have been or possibly could have been the
13    role of VIOXX.
14              MR. BUCHANAN: I don't agree with that
15    characterization.
16              Just to tell you one thing, Your Honor, he
17    did testify above at 124, that it is his practice as a
18    cardiologist when he begins the care and treatment for
19    somebody who has already had a heart attack to do an
20    assessment of the risk factors and the potential causes
21    of the heart attack. And then it goes -- it follows
22    logically in the next section as to what was done in
23    the case of Mr. Humeston.
                         Page 11
```

```
                09 - 092905 - DePace.txt
24              I understand there is not a documented
25    medical record but that's not a requirement.

                        Colloquy                    2515
 1              MS. FREIWALD: Not only is there not a
 2    documented record, there is affirmative testimony that
 3    he didn't look at the product use, never thought about
 4    the product use, never made a decision about the
 5    product use.
 6              MR. BUCHANAN: It's absolutely in the medical
 7    records in his admit note. He knew he was on VIOXX.
 8              MS. FREIWALD: He testified, if you read the
 9    deposition, he looked at the note about the patient
10    taking VIOXX, and he says, I didn't look at this, I
11    didn't discuss it with Mr. Humeston.
12              THE COURT: All right. Well, the Court's
13    looking at the testimony of Dr. Sim as a treating
14    doctor. And he's not only a treating doctor, I mean,
15    he was a treating doctor immediately after the heart
16    attack or very shortly after the heart attack. In
17    addition, he had been a treating doctor before the
18    heart attack. And, in fact, he is still a treating
19    doctor and still treating the patient.
20              So there is no question that we have to look
                         Page 12
```

09 - 092905 - DePace.txt
21  at him in a light -- in a light differently, according
22  to the caselaw, and according to the New Jersey
23  decisions, and the Supreme Court's decision,
24  particularly, on how treating doctors should be
25  considered.

                    Colloquy                         2516

 1       And I looked last night in more detail at
 2  some of the caselaw. And I've read Stigliano many
 3  times but, until yesterday, I really had not taken note
 4  of the fact, as Mr. Buchanan pointed out, that the
 5  evidence record -- that the reference in the evidence
 6  book is to -- by the Supreme Court is to New Jersey
 7  Evidence Rule 701, permitting a fact witness to testify
 8  and to form an opinion, as opposed to a reference to
 9  702 or 703, the expert evidence opinions.
10       Stigliano, in fact, has always -- was an
11  important decision by the Supreme Court. There is no
12  question about that. And it has somewhat changed
13  trials since it was made in 1994.
14       What the Court says at that point is that
15  determinative causation partakes of both fact and
16  opinion. The critical point is that treating doctors,
17  to treat their patients, must determine the cause of a
                         Page 13

09 - 092905 - DePace.txt
18  disease, whether that determination is characterized as
19  fact or opinion. As fact witnesses, treating doctors
20  may testify about their diagnosis and treatment,
21  including their determination of the disorder's cause.
22  Their testimony about likely and unlikely causes is
23  factual information, albeit in the form of opinion.
24       So they talk specifically in the opinion
25  about likely and unlikely causes. And referring to the

                    Colloquy                         2517

 1  fact witness evidence rule N.J.R.E. 701, they indicate
 2  that a fact witness can testify in the form of opinion
 3  to assist a -- the jury in their fact finding.
 4       They further note at the end of the opinion
 5  that, without impugning expert witnesses who may
 6  testify for either plaintiffs or defendants, the
 7  treating doctors may be the only medical witnesses who
 8  have not been retained in a anticipation of trial. A
 9  jury could find treating doctors' testimony to be more
10  impartial and credible than retained experts, and
11  excluding treating doctors' testimony undermines the
12  ultimate objective of trial, the determination of
13  truth. We find the probative value of a treating
14  doctor's testimony outweighs any prejudice to the
                         Page 14

09 - 092905 - DePace.txt
15  plaintiffs.
16       Now, I note that there is -- as I said,
17  Stigliano is a major decision by the Supreme Court. I
18  guess they would think that all their decisions are,
19  and I guess they all are, certainly, since they
20  determine the law of the State, but this particular one
21  actually had a strong influence on how trials have been
22  operated since then.
23       And in 1996, which was only actually a year
24  later, the Appellate Division is saying it's well
25  settled that treating physicians may testify as to any

                    Colloquy                         2518

 1  subject relevant to the evaluation and treatment of
 2  their patients. And that's in Ginsberg versus Saint
 3  Michael's Hospital, 292 N.J. Super 21. So by 1996, it
 4  was considered well settled law that treating doctors
 5  were to have a great deal of flexibility.
 6       I looked through the other states and the
 7  majority of states seem to agree that treating doctors
 8  should be allowed to testify as to causation.
 9       I found some interesting language in a case
10  in Texas which I think sums up somehow how I feel about
11  this particular issue, and that is the case of Green
                         Page 15

09 - 092905 - DePace.txt
12  versus Texas Worker's Comp, 993 S.W. 2nd 839.
13       Interestingly, in this particular case, they
14  actually -- the trial judge in this case barred
15  causation testimony by the treating doctor and barred
16  any testimony really by the treating doctor. The Court
17  looked at it as abuse of discretion and decided that
18  they wouldn't -- actually did not overturn the trial
19  judge's decision on causation, but what they said was
20  we'll allow it to go and we'll -- they sort of said
21  what we're going to do is rule that we're going to
22  reverse because he should have allowed it in on the
23  other -- as to everything else. They don't actually
24  reverse on the causation decision but they -- they
25  certainly don't seem to approve of what the trial judge

                    Colloquy                         2519

 1  did. And it seems to me that they basically were
 2  saying that, in their discretion, they would have done
 3  something else.
 4       They specifically said, as mentioned, we test
 5  the decision on an abuse of discretion standard, which
 6  is a heavy burden for Green to meet. We begin with the
 7  observation that medicine is as much an art as a
 8  science, and clinical medicine necessarily evolves from
                         Page 16

09 - 092905 - DePace.txt

9  a process of trial and error. As such, clinical
10 medicine has traditionally been granted leeway in a
11 determination of admissibility. A physician may not
12 always be able to isolate to mathematical certainty why
13 human beings react in a certain way or why certain
14 ailments respond to particular cures, but this does not
15 render such diagnoses or treatments ineffective or
16 unreliable. We have -- unfortunately, we have yet to
17 reduce all of life's mysteries to a discrete set of
18 scientific principles.
19        The bottom line is that in this case, we have
20 two treating doctors, Dr. Lewer and Dr. Sim. They are
21 very different.
22        One being an internist, who treated the
23 patient and prescribed VIOXX. He testified that in
24 medical probability, he believes that VIOXX caused the
25 heart attack. He gave that testimony saying that at

Colloquy                    2520

1  the time he prescribed it, he didn't understand that,
2  but subsequent to it -- and he basically testified that
3  shortly thereafter, within a few months of this, he
4  began to realize that there was literature out there
5  about cardiovascular risks. He reviewed it, and he

Page 17

09 - 092905 - DePace.txt

6  based his opinion, basically, on the fact that he
7  hadn't had prior cardiac risk, that he didn't see his
8  patient as being someone who had cardiac risk, that the
9  angiogram didn't show that this was a patient who had
10 cardiovascular disease and he, therefore, felt that, in
11 his opinion, it was, in fact, caused by VIOXX. I
12 allowed that opinion to go to the jury.
13        Sim is a cardiologist and, therefore, much
14 more knowledgeable about cardiology probably than
15 Lewer, although they're both doctors and I think both
16 qualified to give opinions in the area.
17        Dr. Sim treated -- is a treating doctor. He
18 treated Humeston before the heart attack. He treated
19 him after the heart attack. He treated him basically
20 for the heart attack. He has subsequently continued to
21 treat him. And since he's a cardiologist, he is
22 obviously treating him for his heart.
23        He says -- his testimony really -- he doesn't
24 actually -- his testimony, basically, is very similar
25 to Dr. Lewer's, although he says he did not discuss it

Colloquy                    2521

1  with Dr. Lewer. He is not a friend of Dr. Lewer's. He
2  didn't really have contact with Dr. Lewer, except very

Page 18

09 - 092905 - DePace.txt

3  limited about the patient.
4         But his position is, and I think it's
5  important, very probative for the jury to know, that
6  here is a second doctor who was not aware of the risks
7  of VIOXX, or that there was any controversy about the
8  risks of VIOXX, prior to seeing Mr. Humeston. I think
9  that's certainly probative information for the jury to
10 know, particularly in light of the fact that counsel
11 has opened by saying that you'd have to be under a rock
12 not to know what was happening about VIOXX, that there
13 was a controversy. Counsel the other day for defense
14 put in the fact in evidence that there were numerous
15 newspaper articles about VIOXX and of the VIGOR trial.
16 And Dr. Lewer said, well, I wasn't aware of that. The
17 literature that I got and the statements from the reps
18 and the other, didn't lead me to believe that VIOXX was
19 a problem before. But, shortly thereafter, I did
20 become aware of it.
21        And, actually, Sim's testimony is the same.
22 Sim says at the time when I first saw him, I didn't
23 know about it. I didn't realize there was a
24 controversy. And he is a cardiologist. I hadn't heard
25 about it. But within a month or two, couple months, I

Page 19

09 - 092905 - DePace.txt
Colloquy                    2522

1  started to hear about it. I mean, isn't that what he
2  says?
3         MS. FREIWALD: He --
4         MR. BUCHANAN: Yes.
5         MS. FREIWALD: He does claim that.
6         Your Honor, I would suggest that what Dr. Sim
7  knew or didn't know prior to the heart attack is not
8  even remotely probative. He, one, was not
9  Mr. Humeston's prescriber, and, two, he said he really
10 didn't prescribe. He was a cardiologist. This wasn't
11 his area.
12        So I can't imagine that Merck is going to be
13 held to the standard of proving that anybody and
14 everybody had the same level of knowledge as somebody
15 who was prescribing and making prescribing decisions.
16 It's not relevant in this case.
17        THE COURT: Well, it's more relevant what the
18 cardiology people -- what the cardiologist knew than it
19 is was what --
20        MS. FREIWALD: Actually, cardiologists were
21 less frequent -- less frequent prescribers because of
22 the nature of their practice.
23        MR. BUCHANAN: More sensitive to the risks.
24        THE COURT: All right. Regardless, you know,
25 I feel that that is a probative issue, and I think that

Page 20

09 - 092905 - DePace.txt

Colloquy                                    2523

1   it is something that should go to the jury.
2           But, more important, he is allowed to testify
3   to causation and what he thought caused this heart
4   attack.
5           And the important thing, when you read
6   Dr. Sim's testimony and when the jury hears it, is not
7   that he is saying VIOXX caused it, but that he is
8   saying there is no other logical reason for this, that
9   there isn't -- that some people -- he admits that some
10  people just have heart attacks and we don't know why
11  and he acknowledges that. He also says that that's
12  infrequent and doesn't happen very often. He says that
13  this man had no risks, or no problem with his arteries
14  and no problem with his cardiovascular system, and that
15  he examined the angiogram and didn't see that he had
16  had any risk for heart attack, significant risks, and
17  he felt -- at first he had no -- nothing about VIOXX,
18  then he hears about it, just about the same time Lewer
19  hears about it. He considers that, and in the end --
20  and he says, he's considering it's relevant, he's
21  thinking about it, but he is describing how he was
22  thinking in October of 2001, I guess. He's talking
                          Page 21

09 - 092905 - DePace.txt
23  about how he felt. But in the end, he says, if we're
24  talking about scientific -- you don't have to use the
25  magic word "probability." In the end, he says, I'm

Colloquy                                    2524

1   left -- and this is now all the way at Page 227. He
2   says, I'm left, in retrospect, with a patient who had
3   no or minimal coronary risk factors; who, by angiogram,
4   did not have coronary disease; who had a myocardial
5   infarction who was on VIOXX. If somebody asked me, did
6   VIOXX play a contributing role or did he have a plaque
7   rupture, my tendency -- no, not tendency -- my strong
8   feeling is that in view of the fact that he did not
9   have discernible coronary disease, it's unlikely he had
10  a plaque rupture. More likely, he had something else,
11  a thrombosis or spasm of a normal vessel.
12          MS. FREIWALD: He then goes on to say that
13  there is no evidence of spasm and you can't distinguish
14  between the plaque and the thrombosis.
15          Your Honor, I understand your ruling, but I
16  just have to put on the record, if it were the case
17  that you read Stigliano to mean that any opinion can
18  come in, if it's uttered at any level by a treating
19  doctor because it's a quote, unquote, lay opinion, you
                          Page 22

09 - 092905 - DePace.txt
20  would be so far down the slippery slope of speculation
21  and lack of reliability.
22          And Your Honor hit the nail on the head.
23  There is a great likelihood that the jury will put more
24  weight on these opinions because they are coming from a
25  treating doctor, and yet they are made without any

Colloquy                                    2525

1   level of confidence, without any level of real
2   expertise in the COX-2s, and, as this commentary at 701
3   says, somebody can -- the man on the street can testify
4   that somebody looked intoxicated, but if the issue of
5   the defendant's intoxication is part of the defense,
6   you need more than just a -- you know, I was drunk kind
7   of opinion.
8           And that's really what we have here. They
9   have Dr. DePace. They have other experts. They have
10  gotten Dr. Lewer's opinion in. Dr. Sim is way more
11  prejudicial than it is probative, given how all over
12  the board he is, and that he didn't make any --
13          THE COURT: Well, he is not all over the
14  board. He says the same thing consistently. What he
15  says is -- when you're saying all over the board, he
16  uses terms, different spots, just like -- doctors who
                          Page 23

09 - 092905 - DePace.txt
17  aren't expert witnesses don't talk in legal terms. And
18  what he talks about is I had a tendency, and then he
19  goes, no, look, I had a strong feeling. That, I think,
20  comes to more probative -- more probable than not.
21          He then talks about how -- and he doesn't
22  specifically say -- what he is saying is there is no
23  other cause. That's what he says, that he believes
24  there is no legitimate cause. And that is an opinion
25  that the cardiologist who treated him, who has looked

Colloquy                                    2526

1   at his angiogram, who treats him today, should
2   certainly be allowed to give.
3           I agree with you, Stigliano doesn't go as far
4   to say that any doctor who says anything can be
5   admitted.
6           There is a treating cardiologist, treating
7   the patient, and this isn't a decision that he made in
8   2006 or 2005. I guess he couldn't make it in 2006.
9   It's not a decision made in 2004 or 2005. He says that
10  he made these -- this was part of his thought process.
11  He started to hear about the literature and look at the
12  literature while he is treating him, and he
13  specifically says in October of 2001, I started to look
                          Page 24

09 - 092905 - DePace.txt

14  at the VIOXX things and this -- this is his position on
15  causation as of 2001, two years before the litigation,
16  two years before anything's happened, and he gives his
17  reasons in detail for it. It's not just speculation --
18  well, I don't know what caused his heart attack,
19  therefore, I think it was VIOXX. And he never says
20  that. What he says is there is no other good
21  explanation for this from a cardiovascular point of
22  view. And that's what his opinion is.
23  MR. BUCHANAN: I mean, the other important
24  point, Your Honor, is now we have -- we have a
25  prescribing physician and a cardiologist living under

Colloquy                                    2527

1   the same rock who apparently missed all the news
2   relating to VIOXX.
3   THE COURT: Which I also think is a second
4   reason why I think it's probative myself, and I really
5   don't have any doubt but that that's a probative fact.
6   I'm going to allow in the testimony on Page
7   126, 127, 128. We will take out from the bottom of
8   128, Line 16, where he speculates about when he went
9   off of VIOXX, 128 -- it's Page 26 of the transcript --
10  or 28 of the transcript. Page 28 of the transcript.

Page 25

09 - 092905 - DePace.txt

11  128.
12  MR. BUCHANAN: Taking that out, okay?
13  THE COURT: Take out Question 16 and 17
14  through to 125.
15  MR. BUCHANAN: Excuse me, Your Honor.
16  THE COURT: 129-5.
17  MR. BUCHANAN: 129-5, okay.
18  THE COURT: The next page, 129-5. That's
19  where he speculates about when he -- or who took him
20  off of VIOXX or -- I had not prescribed it when he was
21  seen. I believe it was discontinued by his primary
22  care physician. Counsel for defense has indicated that
23  that's supposedly speculation because he didn't
24  specifically see that or know. And I'll exclude that.
25  But, starting at Line 6, do you recall,

Colloquy                                    2528

1   though, in terms of opinion you have about VIOXX being
2   implicated, whether you held that before or after
3   November, 2001, and he says it was in the October
4   visit. I'm going to allow that in.
5   So the rest of that will all be in now. And
6   all through 130 is in. 131 is in.
7   MR. BUCHANAN: Okay.

Page 26

09 - 092905 - DePace.txt

8   THE COURT: And all that section is in.
9   Now, there was an objection, too, to his
10  future prognosis, I think that's on Page 32 of the --
11  of the document, Page 146 of the transcript. Where he
12  says -- where he says, it's basically an unknown what's
13  going to happen in the future. He doesn't give a
14  specific opinion that he is going to have heart failure
15  or that this is going to happen or that's going to
16  happen. He basically says the prognosis is uncertain,
17  and I'm going to allow that.
18  Anything else?
19  MS. FREIWALD: Your Honor, just to make --
20  THE COURT: What do you want to put in?
21  MS. FREIWALD: I want to make my record on
22  the prognosis issue is that what he is saying is I
23  don't have data and, under the standard, if there is a
24  lack of data, the Court shouldn't hear it. He's saying
25  I don't have data, I don't know if there's data, and

Colloquy                                    2529

1   the implication is that something bad might happen and
2   he doesn't know. I mean, the fact is something bad
3   might happen to all of us and none of us know. And if
4   that's all he's going to say, it's essentially an

Page 27

09 - 092905 - DePace.txt

5   opinion that Mr. Humeston may be like the entire rest
6   of the world, but the implication is clearly much more
7   aggrieved than that.
8   MR. BUCHANAN: Well, certainly, a patient
9   who's in a very unsettled position medically, whether
10  their condition could dramatically worsen at any moment
11  and beta blockers fail or not, it goes right to
12  Mr. Humeston as well and his views. He is aware of
13  this. He is aware of what this therapy could do to him
14  or not do to him over time and the uncertain success of
15  it perspectively and I think that's part of his
16  damages, Your Honor.
17  MS. FREIWALD: Again, it's an opinion based
18  on the absence of data.
19  MR. BUCHANAN: Mr. Humeston is in an
20  uncertain place. That's an unsettling thing and that
21  goes to damages.
22  THE COURT: Okay. I'm going to leave it in.
23  MR. BUCHANAN: Okay.
24  THE COURT: I think, basically, he's saying
25  that we don't really know what the future will bring is

Colloquy                                    2530

1   fair testimony.

Page 28

```
09 - 092905 - DePace.txt
```

2    On Page 147, are there side effects with beta
3  blockers, I'm going to allow in the section, Lines 5
4  through 11, which talks about sleepiness and fatigue.
5  I'm going to remove Lines 12 through 19 where he talks
6  about the loss of sexual function. Plaintiff didn't
7  testify that he has a loss of sexual function. He
8  testifies that he has a specter of death or some
9  such language.
10   MR. BUCHANAN: I'm not sure that his wife
11 won't be addressing that but --
12   MS. FREIWALD: There is --
13   THE COURT: We can only hope not but --
14   MS. FREIWALD: There is --
15   MR. BUCHANAN: Okay.
16   MS. FREIWALD: Yeah, there was actually no
17 testimony -- I believe yesterday he said, Your Honor,
18 that if Mr. Humeston links it up to his beta blockers,
19 it would be in. He testified to some fatigue, but he
20 didn't testify to any relationship between the beta
21 blockers. Nobody has at this point --
22   THE COURT: No, but Dr. Sim does. Dr. Sim
23 says beta blockers can cause fatigue. Some patients
24 have sedate effects, they become sleepy and more
25 fatigued. Some beta blockers are more prone to have

Page 29

```
09 - 092905 - DePace.txt
```
                           Colloquy                    2531
1  that happen than others. I'm going to allow that in.
2  That's --
3    MR. BUCHANAN: Is this another section? I
4  mean, are these your questions at this point, or are
5  they still ours?
6    MS. FREIWALD: These are my questions.
7    MR. BUCHANAN: So you will have to make that
8  change in your --
9    MS. FREIWALD: I think -- actually, I'm
10 not -- it's actually Chris's question.
11   MR. BUCHANAN: Okay.
12   THE COURT: Line 12 to 18 is out.
13   MR. BUCHANAN: Fair enough.
14   THE COURT: All right. Okay.
15   MS. FREIWALD: The next issue, unless Your
16 Honor has a particular order that you want to go in,
17 really, is the reference to the materials provided by
18 counsel and discussions with counsel, and, to a lesser
19 but related extent, knowledge of the video recording.
20   The testimony is that Dr. Sim was faxed
21 several articles that went directly to the issues in
22 the case, and the issues about which he was going to
23 offer opinions at his deposition. He was provided an
24 article on the role of borderline blood pressure. He

Page 30

```
09 - 092905 - DePace.txt
```
25 was provided an article on thromboxane/prostacyclin

                           Colloquy                    2532
1  imbalance, and he was provided a third article and --
2  it's escaping me right now exactly what it was on -- it
3  will come to me in a minute.
4    And, surely, if the plaintiffs are going to
5  be allowed to suggest to the jury that this doctor
6  reached an opinion in the course and scope of his
7  treatment, the jury needs to hear that he had numerous
8  conversations with plaintiffs' counsel prior to the
9  deposition, that he was provided information by them
10 going directly to his opinions prior to the deposition,
11 and that some of that information was stuff that he had
12 never seen before. It goes to bias, it goes to
13 knowledge, and it would be entirely one-sided to allow
14 the suggestion out there that this is an unbiased, as
15 you say, more credible than the paid expert doctor,
16 without having the jury hear what the extent of his
17 relationship is in this litigation.
18   Of course, the defense counsel don't have the
19 right, under Your Honor's order, to have prior
20 communications with a treating doctor. So we went out
21 to this deposition and saw that there had been numerous

Page 31

```
09 - 092905 - DePace.txt
```
22 communications, and that much of what was going to be
23 discussed at the deposition had previously been readied
24 with this doctor.
25   MR. BUCHANAN: Your Honor --

                           Colloquy                    2533
1    THE COURT: Well, that's true, I did put it
2  out, partly because there wasn't going to be an opinion
3  on causation.
4    MR. BUCHANAN: Your Honor, I mean, as a
5  factual matter, the record is that he asked for
6  articles and we sent them. He asked for two or three
7  articles and we sent them, and the communications with
8  counsel are not the hours and hours and hours you
9  portray. I think in the record, there were a few
10 scheduling calls, which you're aware of, and there was
11 a meeting 15 minutes before the deposition.
12   MS. FREIWALD: The jury can decide how
13 probative that is, just like they can decide how
14 probative his opinions are, but to let them hear
15 one-half of the story, with the implication being that
16 he is entirely neutral, and that he is coming to each
17 side fresh, as -- not in hire or not coached in any
18 way, and not let the jury hear what his contacts had

Page 32

09 - 092905 - DePace.txt

19  been is just an inaccurate portrayal of events.
20      MR. BUCHANAN: Your Honor, the one thing
21  that's clear, though, from the testimony that's been
22  elicited here, is that he formed this opinion back in
23  2001, long before this litigation was even conceived or
24  filed. To put that in, with the suggestion that he
25  didn't actually form them, when there is no testimony

Colloquy                                              2534

1   otherwise, I submit is improper, Your Honor. And we
2   have operated under this rule throughout the
3   litigation. If that is not going to be probative and
4   it is not going to come in -- I'd love to know how many
5   days and days and days they spent with each witness
6   before they offer them up.
7       MS. FREIWALD: And that's even for both
8   sides, because plaintiffs have hired experts and we
9   have hired experts, and that's absolutely even.
10      What's not even here is access to fact
11  witnesses such as treating doctors. That's not even.
12  The defense doesn't have the ability to reach out to
13  them on an ex parte basis and the plaintiffs do, and
14  this isn't a swipe at lawyers or lawyering. It just
15  goes to bias, it goes to knowledge.
                        Page 33

09 - 092905 - DePace.txt

16      THE COURT: I'm going to allow on the -- I'm
17  going to allow back in on Page 11, 12.
18      MS. FREIWALD: Actually, it starts on Page 10
19  at the very bottom, Your Honor, I believe, at 25. It's
20  just one line.
21      THE COURT: To save -- that's not even asked.
22  That's not part of your lined testimony.
23      MS. FREIWALD: Yeah, it is. It is. Page
24  10-25, 11-5.
25      THE COURT: Page 10 -- oh, 11. Oh, 24, you

Colloquy                                              2535

1   mean?
2       MS. FREIWALD: Line 25. Page 10, Line 25.
3       THE COURT: Did you have any communication --
4   I knew that some of the basics, I did have some
5   questions and I asked for some assistance as far as
6   some background information. I will allow that.
7       And I will allow 11, 12, 13, 14, 15 and 16
8   in, through the -- through the end of the Line at 17-2.
9       MR. BUCHANAN: Excuse me? Where, Your Honor?
10      MS. FREIWALD: It's to the bottom of 17-2.
11      THE COURT: Those sections that are marked
12  with a bold line.
                        Page 34

09 - 092905 - DePace.txt

13      MS. FREIWALD: And then by my notes, Your
14  Honor, it jumps to 21. And there were objections at
15  21 --
16      THE COURT: Did you meet with Mr. Whitehead
17  or Mr. Seeger in person before this deposition?
18  Briefly, I met with Mr. Seeger when he came to town.
19  He came by my office and said hello, and that was two
20  days ago when he came to town.
21      MS. FREIWALD: It's all part of the entire
22  thing.
23      THE COURT: I'll allow it.
24      MR. BUCHANAN: I, frankly, would rather have
25  it in.

Colloquy                                              2536

1       THE COURT: I will allow it.
2       MR. BUCHANAN: If we are going to put the
3   other stuff in, to say it's only 15 minutes, that's
4   fine with me.
5       MS. FREIWALD: And then at 25-17, this
6   just -- this just goes to the exhibits that we
7   discussed, so this wouldn't --
8       THE COURT: That should be out.
9       MS. FREIWALD: It needs to come in because
                        Page 35

09 - 092905 - DePace.txt

10  the exhibits -- the documents that were sent --
11      THE COURT: No documents are going to come
12  in. The fact that he sent him some articles will come
13  in. The documents themselves aren't going to come in.
14  The articles, learned treatises wouldn't come in.
15      MS. FREIWALD: Are we allowed to show the
16  jury just the fax cover sheets?
17      THE COURT: No.
18      MR. BUCHANAN: No.
19      THE COURT: That's not necessary.
20      So Line 25, through 17 to 25 and 26 --
21      MS. FREIWALD: We actually --
22      THE COURT: Stopped at 25.
23      MS. FREIWALD: Just so the record is clear,
24  Sim-3 is a medical record, so that actually does have
25  to come in. That has nothing to do with this issue.

Colloquy                                              2537

1       MR. BUCHANAN: If it's a medical record,
2   that's fine.
3       MS. FREIWALD: Yeah. It's separate from this
4   issue.
5       And then it goes to, I believe, Page 46.
6       THE COURT: 17 through 25 can come out but
                        Page 36

09 - 092905 - DePace.txt

7  Sim-3 can be marked.
8       MR. BUCHANAN: That's fine.
9       MS. FREIWALD: We cut and pasted it so it
10 only says, let's mark Sim-3.
11      THE COURT: Okay. That's fine.
12      All right. And then the next -- you get back
13 into it again at the end then, and I don't think I'm
14 going to let you do that because you start asking him
15 about this fatty omega acid thing, which has nothing to
16 do with the case.
17      MS. FREIWALD: Well, no, the point is --
18      MR. BUCHANAN: Mr. Whitehead is a doctor. He
19 is a doctor and they actually had conversations about
20 this other issue.
21      MS. FREIWALD: No, this is actually, Your
22 Honor, the most significant thing because Dr. Sim
23 fought me on it. What happened was that Mr. Whitehead
24 sent Dr. Sim an index to abridged medical journal
25 article and behind that, an article on

Colloquy                                              2538

1  prostacyclin/thromboxane imbalance. And Dr. Sim tried
2  to say to me that the only reason this document was
3  sent to him was because of the shared interest with

Page 37

---

09 - 092905 - DePace.txt

4  Mr. Whitehead about the fatty acids, and, in fact, the
5  point I was making to him was, well, that's
6  interesting, because he didn't send you that article.
7  The article he sent you was the one on
8  prostacyclin/thromboxane imbalance.
9       MR. BUCHANAN: Your Honor, it does start to
10 get --
11      MS. FREIWALD: The whole thrust of the
12 discussion is that -- and the fax cover sheet shows --
13 says prostacyclin, et cetera. So it goes to the
14 doctor's credibility. Maybe it won't come off on the
15 videotape, but it goes to the doctor's credibility.
16 And that's -- that's why it's an issue.
17      MR. BUCHANAN: What page are you on?
18      MS. FREIWALD: 40 -- well, I don't know
19 exactly where it comes in. I next pick up with this
20 whole subject on 46-24.
21      THE COURT: What page are we at?
22      MS. FREIWALD: Well, 46-24 --
23      THE COURT: Page what?
24      MS. FREIWALD: I'm looking at Page 11 of the
25 printout, Page 46, Line 24 of the transcript.

Colloquy                                              2539

Page 38

---

09 - 092905 - DePace.txt

1       THE COURT: Page 11 of the printout.
2       MS. FREIWALD: Mr. Seeger asks him about his
3  re-review of -- I'm sorry. I ask him about his
4  re-review of the angiogram, and then I ask him and when
5  you did that, you had talked to Mr. Whitehead about the
6  20 percent narrowing in the vessel.
7       MR. BUCHANAN: Oh --
8       MS. FREIWALD: And then --
9       MR. BUCHANAN: He says I don't know.
10      THE COURT: He says, I already answered that
11 question, so that's out. It's a question and answer
12 that's only -- the question tries to prejudice the
13 jury. The answer doesn't add anything.
14      As to Line 150 -- so that's out. 156 is
15 what --
16      MS. FREIWALD: I think I pick up next at 151
17 actually, Your Honor.
18      THE COURT: 151.
19      MR. BUCHANAN: I don't see that one, Hope.
20      MS. FREIWALD: It's at the top of Page 34.
21 Actually, I don't -- I don't particularly care about
22 that one. What I do care about is -- it's really --
23      THE COURT: So you are going to withdraw your
24 request at 150?
25      MS. FREIWALD: Well, it's really only in

Page 39

---

09 - 092905 - DePace.txt

Colloquy                                              2540

1  there for context, which is when we get to 153.
2       MR. BUCHANAN: That's the same issue again.
3       THE COURT: You know, you can't do it twice.
4  This is the problem with a discovery dep and a cross.
5  You covered it in the discovery dep. Then you covered
6  it in the cross. And which one do you want in?
7       MS. FREIWALD: Well, I'm certainly willing to
8  cut it down. The problem was, is that it was -- we
9  were very limited in our time, and because Mr. Seeger
10 agreed to the using of both, it was easier not to
11 duplicate the effort with the doctor at the time.
12      Why don't we start with it in the cross
13 and --
14      MR. BUCHANAN: So eliminate it up front?
15      MS. FREIWALD: I will try -- it's a little
16 bit hard for me to do this on the fly, but I think it's
17 probably cleaner if we do it in the cross, and I will
18 try to do it that way.
19      MR. BUCHANAN: I just want to make sure
20 that --
21      MS. FREIWALD: Okay. Well, let's look
22 through this and I think we can do this.
23      153 -- I'd prefer to do it in the cross, Your

Page 40

09 - 092905 - DePace.txt

24  Honor, if you are only going to allow me to do it in
25  one place.

                    Colloquy                    2541

1        THE COURT: All right. So you are going to
2   eliminate the beginning sections?
3        MS. FREIWALD: Okay.
4        MR. BUCHANAN: So we don't have to worry
5   about putting the beginning back in, anything from
6   discovery on this?
7        MS. FREIWALD: That's right, if we can get
8   through it on cross.
9        THE COURT: You just want to start it here on
10  the cross?
11       MS. FREIWALD: I think it's my obligation to
12  put it in, anyway.
13       MR. BUCHANAN: I think if you are going to do
14  the cross, then you've got to include the beginning
15  that I had scheduling conversations with him. That was
16  the nature of it.
17       MS. FREIWALD: So Mr. Buchanan is requesting
18  that I put in 151 --
19       MR. BUCHANAN: Well, I don't know how it
20  makes sense otherwise.
                    Page 41

09 - 092905 - DePace.txt

21       MS. FREIWALD: That was my point.
22       THE COURT: So 151, Line 13 to 25, you are
23  going to put in?
24       MS. FREIWALD: Yes.
25       THE COURT: 153 --

                    Colloquy                    2542

1        MS. FREIWALD: Um-hum.
2        THE COURT: They sent you certain literature.
3        MS. FREIWALD: Right.
4        THE COURT: That's going to come in.
5        MS. FREIWALD: Yes.
6   153 through 154-3.
7        THE COURT: Well, it should be --
8        MS. FREIWALD: It's 153-10 through 154-3,
9   then 155-6 to 155-10. 155-24 and 25.
10       THE COURT: Okay.
11       MS. FREIWALD: 156-3 to 18. 158-14 through
12  159-13. 160-11 through 161-20. And 162-1 through 14.
13       THE COURT: All right. I'll allow it in.
14       MS. FREIWALD: Okay. And then --
15       MR. BUCHANAN: The one thing I just ask,
16  Hope, I have to review the interspersed questions and
17  answers to see if there is anything on completeness so
                    Page 42

09 - 092905 - DePace.txt

18  I'll look at them. I have to get my guy started on the
19  changes.
20       MS. FREIWALD: It's actually going to take
21  awhile to do this, and we can talk about logistically.
22       Your Honor, the other issue --
23       THE COURT: You've got to get it done so we
24  can get Sim on right after -- all right. Let's go.
25  You're going to put the son on?

                    Colloquy                    2543

1        MR. BUCHANAN: Actually, this was --
2        THE COURT: Sim was going to go first?
3        MR. BUCHANAN: He was. Let me see if the son
4   is here because we were icing him back at the hotel,
5   thinking Sim was going on first.
6        MS. FREIWALD: Your Honor, one last point
7   related to the video recording.
8        Again, if Dr. Sim is going to testify as to
9   causation, it seems to me, in fairness, we should be
10  allowed to elicit that he doesn't know anything about
11  the video recording which we say was a stressor for
12  Mr. Humeston. It just goes to the completeness of his
13  picture. I think it's one question and answer on
14  158-18 -- I'm sorry -- 58-18 to 59-11.
                    Page 43

09 - 092905 - DePace.txt

15       THE COURT: Page what?
16       MS. FREIWALD: 58-18, going by the
17  transcript, not the printout pages, to 59-11.
18  Actually, it's the couple questions and answers.
19       THE COURT: 58-18.
20       MS. FREIWALD: To 59-11.
21       MR. BUCHANAN: This gets into -- my question
22  was whether the lawyers talked to you about the fact
23  that you might be getting questions about whether you
24  knew anything related to the video?
25       MS. FREIWALD: Yeah.

                    Colloquy                    2544

1        MR. BUCHANAN: You don't have that
2   designated.
3        MS. FREIWALD: It ends on 11.
4        THE COURT: I will allow it. You can put it
5   back in. May go to his credibility. Okay?
6        MR. BUCHANAN: That's in your discovery
7   section.
8        MS. FREIWALD: It's in my section. I just
9   wanted to talk to you about something logistically.
10       MR. BUCHANAN: Let me just go check to see if
11  we've got the son there because that will give us 20
                    Page 44

```
                 09 - 092905 - DePace.txt
12   minutes.
13             MS. FREIWALD:  Thank you, Your Honor.
14             (Conference concluded at 9:50 a.m.)
15             THE COURT:  We're ready to go?
16             MR. BUCHANAN:  We are, your Honor.
17             THE COURT:  We are going to start with
18   Dr. Sim?
19             MR. BUCHANAN:  We are going to start with
20   Dr. Sim.  The plaintiffs have about an hour and 20
21   minutes.
22             How long are your cuts?
23             MS. FREIWALD:  Last night it was a little bit
24   shorter than it is now.
25             MR. BUCHANAN:  Okay.


                         Colloquy                          2545

1              MS. FREIWALD:  It's under an hour, I believe.
2              MR. BUCHANAN:  Okay.  We may need to stop at
3    the plaintiffs' cuts, Your Honor, just to provide
4    them -- if you guys need any more time to make sure all
5    your changes are in, before we switch over to them.
6              THE COURT:  That may be a good time to stop,
7    anyway.
8              MR. BUCHANAN:  Okay.  That's fine.
                             Page 45
```

```
                 09 - 092905 - DePace.txt
9              MS. FREIWALD:  It's an hour, 20, because we
10   are also playing your designations from within the
11   sections where I was --
12             MR. BUCHANAN:  Fair enough.
13             THE COURT:  You can bring the jury in.
14             Are those seats okay that you guys are
15   sitting in?  Do they feel all right?  I don't want to
16   have an accident where the entire press falls over.
17             THE JURY ATTENDANT:  All rise.
18             (The jury entered the courtroom at
19   10:15 a.m.)
20             THE COURT:  You can be seated.
21             Counsel, your next witness.
22             MR. BUCHANAN:  Yes, Your Honor.
23             We are going to play the videotaped
24   deposition, trial preparation deposition, of
25   Mr. Humeston's treating cardiologist, Dr. Sim.


                         Colloquy                          2546

1    Plaintiffs' portions will go first, includes about an
2    hour and 20 minutes worth of them, to be followed by
3    the defense portion, which includes both defendant's
4    and plaintiffs' designations.
5              THE COURT:  We will proceed.
                             Page 46
```

```
                 09 - 092905 - DePace.txt
6              (The videotaped deposition of Dr. Sim played
7    from 10:16 a.m.)
8              MR. BUCHANAN:  Your Honor, I think that
9    concludes the portion from plaintiffs' direct
10   examination.  There is some designations from
11   plaintiffs and defendants from defense examination.
12             THE COURT:  Do any of the jurors need a
13   break?  All right, if you want it?  Okay.  Well, let's
14   proceed then.  Are you ready or do you need a break?
15             MS. FREIWALD:  Your Honor, we need about two
16   minutes so we can print out a report of this, so we can
17   follow along and plaintiffs' counsel can follow along.
18             THE COURT:  Why don't you take a short break
19   then.  You can go out.
20             THE JURY ATTENDANT:  All rise.
21             THE COURT:  We will just take a few minutes.
22             (The jury left the courtroom at 11:04 a.m.)
23             (A recess was taken at 11:04 a.m.)
24             MR. BUCHANAN:  Your Honor, the estimate for
25   the next piece of tape has dropped from, I think, an


                         Colloquy                          2547

1    hour and 20 minutes to three minutes.  So --
2              THE COURT:  Okay.  And then we have another
                             Page 47
```

```
                 09 - 092905 - DePace.txt
3    witness.
4              MR. BUCHANAN:  Then we have a live witness.
5              THE COURT:  Bring the jury in.
6              MR. RABER:  Also, part of that, there is an
7    agreement between counsel, there will be no foundation
8    objection to Dr. Sim's medical records for the part of
9    cutting the amount of time from our side.
10             THE COURT:  Okay.
11             (The jury entered the courtroom at
12   11:47 a.m.)
13             THE COURT:  You can be seated.
14             MR. RABER:  Your Honor, the defense now
15   intends to play its portion of the videotape.  In the
16   interim time, we have cut it from an hour and 20
17   minutes to three minutes.
18             THE COURT:  Okay.
19             (The videotaped testimony of Dr. Sim
20   continued playing from 11:48 a.m. to 11:52 a.m.)
21             THE COURT:  Okay.  Your next witness,
22   counselor?
23             MR. SEEGER:  Your Honor, we are going to call
24   Seth Humeston to the stand at this point.  He will be
25   examined by Moshe Horn.
                             Page 48
```

```
                 09 - 092905 - DePace.txt
            Seth Humeston - Direct           2548
 1         THE COURT:  Okay.
 2   SETH HUMESTON, PLAINTIFFS' WITNESS, SWORN.
 3         THE WITNESS:  Yes.
 4         THE COURT CLERK:  State your full name and
 5   spell your last name for the record.
 6         THE WITNESS:  Seth Humeston.
 7         THE COURT CLERK:  Spell your last name.
 8         THE WITNESS:  H-U-M-E-S-T-O-N.
 9         MR. HORN:  Proceed, Your Honor?
10         THE COURT:  You may.
11                DIRECT EXAMINATION
12   BY MR. HORN:
13      Q    Good morning, Mr. Humeston.  How are you
14   doing?
15      A    Good.
16      Q    Did you ever testify before?
17      A    No.
18      Q    Ever been in a courtroom before?
19      A    No.
20      Q    Just relax.  Answer my questions.  You don't
21   understand anything, you let me know.  Okay?
22      A    Okay.
23      Q    How old are you?
24      A    21.
25      Q    And tell us a little about your schooling.
                          Page 49
```

```
                 09 - 092905 - DePace.txt
            Seth Humeston - Direct           2549
 1   Are you in school now?
 2      A    Yes.
 3      Q    Where are you in school?
 4      A    Boise State University.
 5      Q    And what are you studying?
 6      A    My major is business management.
 7      Q    And what year are you in now?
 8      A    I believe my sophomore.
 9      Q    Do you work, as well?
10      A    Yes.
11      Q    Where do you work?
12      A    The Home Depot.
13      Q    How long have you worked there?
14      A    Almost a year.
15      Q    Where do you live?
16      A    Boise, Idaho.
17      Q    And who do you live with?
18      A    My parents.
19      Q    And do you know what?  We all know.  Are your
20   parents sitting here in the courtroom?
21      A    Yes.
22      Q    Are you married?
                          Page 50
```

```
                 09 - 092905 - DePace.txt
23      A    No, not yet.  I'm engaged.
24      Q    Oh, you are engaged.
25           Now, Seth, I'm going to ask you to come back

            Seth Humeston - Direct           2550
 1   with me now to September 18th, 2001, okay?
 2      A    Okay.
 3      Q    Do you remember that date?
 4      A    Yes.
 5      Q    Okay.  How do you remember that date?
 6      A    Well, that's the day that my dad had his heart
 7   attack.
 8      Q    I'm going to ask you if you can walk through
 9   it for us, tell us where you were when you found out
10   about your dad's heart attack.
11      A    I had just gone over to my buddy's house, and we
12   were kind of just playing some video games, and my
13   phone rang and I looked at it, and it's my mom, and I
14   was kind of disappointed that it was her because she is
15   always calling me, bothering me.  And so I answer the
16   phone, and at the time, we were sharing a car, my
17   parents and I.  I didn't have my own car.  And so she
18   calls me up and she said, hey, you need to come home,
19   and I -- you know, I'm like, oh, why.  And she said,
                          Page 51
```

```
                 09 - 092905 - DePace.txt
20   you know, I think your dad's having a heart attack, you
21   need to come home.  And so I said, okay, and I hung up
22   the phone.  My buddies are like, oh, you got to go home
23   again, and I'm like, I think my dad's having a heart
24   attack.  And so I ran out the door and drove home, and
25   I got home, and my parents were outside waiting for me,

            Seth Humeston - Direct           2551
 1   and I just jumped out of the car and they got in and
 2   they left.
 3      Q    And did you stay home?
 4      A    Yes.
 5      Q    At some point did you go to the hospital?
 6      A    Yes.  Shortly after, my sister came and picked me
 7   up.
 8      Q    Which sister was that?
 9      A    I believe it was Olivia.
10      Q    And how many siblings do you have?
11      A    Three.
12      Q    And did Olivia drive you to the hospital?
13      A    Yes.
14      Q    When you got to the hospital, what was going
15   on?
16      A    We got in the elevator, went up, and we went to
                          Page 52
```

09 - 092905 - DePace.txt

17 the waiting room, and my mom and some friends were
18 there, and everyone was just kind of waiting in the
19 waiting room, waiting for the doctors to come out.
20 They had my dad in the operating room.
21    Q   Okay. And then what happened?
22    A   Everyone kind of waited there, the area that we
23 were in, one-half of it -- it's like a big loop.
24 One-half is like where the patients stay after their
25 operations, and then the other side is the operating

Seth Humeston - Direct                    2552

1 room, so I went into the hallway and I waited outside
2 the operating room.
3    Q   Okay. Let me stop you right there. You said
4 a minute ago, everyone was waiting there. Who was
5 everyone? Who was at the hospital at that time?
6    A   My sisters that were in town, and friends and
7 family.
8    Q   Okay. Do you have a sister who is not in
9 town?
10   A   Yes.
11   Q   Who is that?
12   A   That was Rachel.
13   Q   And did she at some point come to Boise?
Page 53

09 - 092905 - DePace.txt

14   A   I don't think so.
15   Q   Okay.
16   A   I don't remember.
17   Q   And your friends came, as well?
18   A   My parents' friends and things like that, and then
19 my friends came later.
20   Q   Okay. Do you remember how long you were
21 waiting?
22   A   I don't really remember how long. I was just --
23 my parents -- or my mom and friends were in the
24 waiting room, and then I was just in the hallway. And
25 I'm not sure how long.

Seth Humeston - Direct                    2553

1    Q   Okay. What happened after you were in the
2 hallway?
3    A   Then they opened the door and they were pulling my
4 dad out on the -- on the gurney, right after they had
5 just gotten done, and they were wheeling him to his
6 room.
7    Q   Was he awake at the time?
8    A   Not really. He was -- I mean, it was just like
9 right -- as soon as they came out of the operating
10 room, so he was really kind of groggy, but his eyes
Page 54

09 - 092905 - DePace.txt

11 were kind of open. And I just kind of grabbed his hand
12 as he was going by and then they took him to his room.
13   Q   When was the next time you saw him?
14   A   Well, I went back to the -- to the waiting room,
15 to let everyone know that he was out of the operating
16 room, and so I'm not sure of the -- 15 minutes or a
17 half hour later, they didn't let us go in right away,
18 and then, like, 15 minutes or a half hour later, we
19 went in, into his room.
20   Q   And, again, you said "we." Who was that?
21   A   My two sisters, my mom, and our friends.
22   Q   Okay. And did you see your dad then when you
23 went in?
24   A   Yes.
25   Q   And how was he doing then?

Seth Humeston - Direct                    2554

1    A   He was still a little out of it, just really, I
2 mean, you know, just kind of laying there a little bit.
3 Not really talking a whole lot, just, you know, he was
4 just really groggy.
5    Q   Now, did you come back and visit him at the
6 hospital again at some other point?
7    A   Yes. I stayed there until like late, really late,
Page 55

09 - 092905 - DePace.txt

8 and I went to school the next day, skipped football
9 practice, and went to the hospital, and stayed with him
10 for -- for quite awhile. I forget exactly how long.
11 And he was just able to talk -- talk then and just
12 visit.
13   Q   So the next day when you came back, when you
14 missed the practice, was he awake when you came back to
15 the hospital?
16   A   Yes.
17   Q   And how was he doing?
18   A   He was still a little groggy and kind of -- I mean
19 my dad's ornery as it is, just kind of -- so he wasn't
20 too happy to be in the hospital.
21   Q   Okay. How did you handle that? Did you try
22 to calm him down?
23   A   Yeah. I just tried to talk to him about, like, my
24 day and, you know, just -- you know, about upcoming
25 football events and stuff like that.

Seth Humeston - Direct                    2555

1    Q   Had you ever sen your dad sick like that
2 before?
3    A   Not like that.
4    Q   Do you remember when he came home?
Page 56

09 - 092905 - DePace.txt

5   A    I think it was the next day or the day after.  I
6   was -- I was at school and I came home, and he was
7   home.  They had brought him home.  So --
8        Q    Tell us how he was doing when you saw him,
9   when you came home and found him there.
10  A    He was just pretty lackadaisical.  You know, he
11  was happy to be out of the hospital, but he definitely
12  wasn't himself.  Just kind of, you know, resting up
13  and, you know, just kind of staying put and --
14       Q    Okay.  How was your mom doing this whole
15  time, when he was in the hospital?
16  A    While he was in the hospital, especially the night
17  of, she was -- I mean, she was crying, she was just a
18  wreck.  And, you know, she was extremely worried and,
19  you know, her friends were there to kind of help and
20  support her.
21            And then, once he got out of the operating
22  room, you know, she was still just really worried about
23  him and, you know, each day she was just a little bit
24  happier that he, you know, was doing well, and, you
25  know, that he was gonna be okay.  So -- you know, she

                Seth Humeston - Direct              2556

1   was just -- she was just really worried about him.
                        Page 57

---

09 - 092905 - DePace.txt

2        Q    Okay.  Now, Seth, I'm going to ask you to
3   help us out now.  Tell us a little bit about the
4   differences that -- let me ask you this:  Did you see
5   any differences in your father before and after this
6   heart attack?
7   A    Yes.
8        Q    Okay.  I'm going to ask you to help us out
9   now and tell us about that.  Tell us, how was he
10  different to you now or after the heart attack than he
11  was before September of 2001?
12  A    He isn't nearly as active as he was.
13       Q    Let me stop you there.  What kind of
14  activities -- well, what activities are you referring
15  to when you say that?
16  A    Just kind of like everyday things, you know, the
17  kind of things that not everybody can do, you know,
18  moving heavy things, things around the house, mowing
19  the yard, trimming trees, you know, gardening, stuff
20  like that.
21       Q    Was your father that kind of guy before the
22  heart attack, he took care of the house?
23  A    Yeah.  I mean, his -- his house is his castle and
24  he likes it to look a certain way, and he was always
25  out pruning and, you know, always, you know, taking
                        Page 58

---

09 - 092905 - DePace.txt

                Seth Humeston - Direct              2557

1   care of the stuff, like that.
2        Q    Okay.  And since the heart attack, things
3   like pruning, taking care of the stuff, what you're
4   referring to, who does all that?
5   A    I do.
6        Q    Okay.  You're still living there?
7   A    Yes.
8        Q    So have you taken over those jobs since the
9   heart attack?
10  A    Yes.
11       Q    Has he ever talked to you about that?  Has he
12  asked you to take over?
13  A    Not -- not really officially.  My mom, more so,
14  talked to me about it a little bit more.
15       Q    Does he ever come out and help you when
16  you're doing it?
17  A    Not really.
18       Q    Before the heart attack, would he have helped
19  you do that kind of stuff?
20  A    Yes.
21       Q    Okay.  Tell us some more about that.  What
22  other kinds of differences do you see in him?
23  A    What do you mean, like physically or just --
24       Q    Physically, emotionally, anything that you've
                        Page 59

---

09 - 092905 - DePace.txt
25  seen personally that you can tell us about.

                Seth Humeston - Direct              2558

1   A    Sometimes he's a little bit -- I guess depressed,
2   you know.  Every once in awhile I'll come home from
3   work and he is usually home by then, and, you know,
4   more often than not during the week, you know, I ask
5   him how his day is going, you know, and he is like,
6   Oh, you know, it was all right.  And, you know, when
7   normally, you know, it's like, yeah, you know, it was
8   great, you know, how was your day, and we would have an
9   upbeat conversation.
10       Q    When you say normally, do you mean before the
11  heart attack?
12  A    Yeah, before the heart attack.
13       Q    We have heard a lot about your father's
14  hiking in this case.  Tell us about that.  Do you
15  remember him hiking before the heart attack?
16  A    Yes.
17       Q    Okay.  What kind of hikes did he go on, how
18  often?
19  A    Just -- I mean, he always -- he loved the Owyhee
20  desert.  He would always go out and, you know, go on
21  these hikes, you know, through canyons and across the
                        Page 60

09 - 092905 - DePace.txt

22  desert and things like that, with his buddies and even
23  with my mom.
24  Q  Did you ever go on those hikes with him?
25  A  I went on a few of them, not the really long,

Seth Humeston - Direct                           2559

1   strenuous ones. I'm -- you know, I was never really
2   thin, so --
3   Q  Now, we've heard a lot about his knee
4   problems. Was he able to do these kind of hikes when
5   his knee was bad?
6   A  Yeah. I mean, he had his brace on, and he could,
7   you know, just kind of take care of that. And, I mean,
8   he's a tough guy and, I mean, he will always just -- I
9   mean, he loved doing it, so he would do whatever he
10  could so he could do it.
11  Q  Since the heart attack, have you seen him
12  doing those kind of things?
13  A  Not -- not like he was. He -- you know, pretty
14  much stays more towards the car.
15     We recently took a trip out to Jordan
16  craters, and we went out and --
17  Q  Let me stop you there. When you say "we,"
18  who is "we"?

Page 61

09 - 092905 - DePace.txt

19  A  My fiance' and my sister and her husband, my mom
20  and our friends. We just kind of walked around the --
21  it's not really a hike, just because it's short and
22  it's not very strenuous, but we walked around and he
23  had to stick around the car.
24  Q  Did anybody stay back with him?
25  A  Not that I recall.

Seth Humeston - Direct                           2560

1   Q  How far was that, was this walk or hike
2   you're referring to?
3   A  Roughly a mile. It wasn't too long, and it was,
4   you know, just kind of around the crater.
5   Q  Okay. And before the heart attack, would he
6   have been to do that with you?
7   A  Definitely.
8   Q  We heard about -- something about you
9   building a fence for him yesterday. Could you tell us
10  about that?
11  A  On the side of the house, there's a strip of our
12  property that's adjacent to the house and the driveway,
13  and we had wanted to pave it over, move the fence back,
14  and, you know, pave it all over so it would be like an
15  extra spot for cars, for some storage and things like

Page 62

09 - 092905 - DePace.txt

16  that. And, quite a few years ago, we had started that,
17  put in some gravel and we -- he had me dig out some
18  dirt and things like that, and then we were going to
19  build this fence and tear down the old one and, you
20  know, a basic home project, things like that.
21     And, you know, things just kind of happened
22  and it just didn't get done. I got busy with school
23  and work, and, you know, it's been sitting for quite a
24  few years now. And on one of the recent trips when
25  they were gone, over Father's Day, I -- while I was

Seth Humeston - Direct                           2561

1   mowing the yard, I just looked at it, and I was like, I
2   should probably build that. That would really make him
3   happy, and do it as a Father's Day gift. So I built
4   the whole fence across there, and when he got home, he
5   was really, really pleased and happy.
6   Q  Now, before the heart attack, is that the
7   kind of thing he could have done?
8   A  Yes.
9   Q  Those are the kind of projects you did
10  together?
11  A  Yes.
12  Q  Have you seen any effect on your mother since

Page 63

09 - 092905 - DePace.txt

13  the heart attack in terms of her role at the home?
14  A  Yes.
15  Q  Can you tell us about that?
16  A  I usually do most of, you know, like the heavy
17  lifting or the everyday things around the house. But
18  if I'm not available, and things have to get done, you
19  know, she'll pick up, you know, usually where I left
20  off, you know, and I mean, obviously, she's really
21  worried about, you know, her husband, my dad, his
22  health, and, I mean, she's -- and, I mean, with -- in
23  addition to, you know, um, having to just kind of take
24  care of him a little bit more.
25  Q  We've heard about something called the Thing

Seth Humeston - Direct                           2562

1   rally. What's a Thing rally?
2   A  A Thing rally is -- a Thing is a Volkswagen car,
3   and it's kind of like a tightly knit group of friends
4   that they all kind of get together and go on these
5   trips, you know, for a few days. It's usually to,
6   like, a -- like a national monument or something like
7   that, certain parks, where they just kind of all group
8   together and they have a big convoy of Things, and they
9   go out and just kind of go see the sites and stuff like

Page 64

```
              09 - 092905 - DePace.txt
10   that.
11   Q    Do you worry about your dad going on these
12   Thing rallies?
13   A    No.
14   Q    Why is that?
15   A    Well, I mean, they're always out -- I mean, I have
16   a full itinerary of where they're staying, the bed and
17   breakfasts, hotels and things and stuff, stuff like
18   that, where they're staying. There is usually, like,
19   15 cars, you know, usually like at least two per car,
20   you know, just a, you know, big group of older folks
21   out having a good time.
22   Q    Have you ever gone on these?
23   A    When I was younger, I did go on quite a few of
24   them.
25   Q    Were they fun?


              Seth Humeston - Direct            2563

1    A    Yeah. Yeah.
2    Q    Now, you mentioned you play football.
3    A    Yes.
4    Q    Do -- did your parents come to your games?
5    A    Yes.
6    Q    Do they come to all your games?
                       Page 65
```

```
              09 - 092905 - DePace.txt
7    A    Yeah, -- well, for the most part.
8    Q    What do you mean by "for the most part"?
9    A    Well, I played football ever since I was a little
10   kid, I played Optimist, which is like peewee football,
11   and I went through -- all the way up through high
12   school, and my senior year, you know, my parents would
13   always make it to my games, whether they be home or
14   away, with the exception to certain really long
15   distance trips, where, you know, sometimes we played
16   teams that were all the way up in North Idaho and they
17   couldn't make the trip. But, for the most part, they
18   made pretty much all my games.
19        And, after my dad's heart attack, he wasn't
20   able to make all the games. He would usually make
21   my -- he would almost always make my home games because
22   it's only like a mile away from our house, my school
23   is, but, you know, usually, my away games, you know, he
24   wasn't going to be there.
25   Q    Before the heart attack, would he make those


              Seth Humeston - Direct            2564

1    long trips to your games?
2    A    Yes.
3    Q    Did he ever talk to you about not being able
                       Page 66
```

```
              09 - 092905 - DePace.txt
4    to go?
5    A    No.
6    Q    So I think before you said it bothered him.
7    How would you know it bothered him that he couldn't go
8    to your games if he never talked to you about it?
9    A    Well, I mean, he was always there before, and, you
10   know, he always loved going, and he'd -- you know, come
11   over after, you know, like during half time or after
12   the game, when we come off the field, and be taking
13   pictures and, you know, just totally into it, and I
14   mean, we have pictures of me and my buddies, you know,
15   in our football uniforms and things like that. My dad
16   was just always -- he just loved it. And, you know, it
17   just -- I could always kind of tell that it bugged him
18   that he couldn't make those -- make all those games.
19   Q    Okay. Just the bottom line, Seth, just to
20   wrap it up, you told us a lot about things you have
21   seen in your father and your mother. How has it
22   changed for you, since the heart attack?
23   A    Well, I mean, like I had talked about was, you
24   know, just picking up a lot more slack in the house,
25   you know, I -- sometimes, you know, I have certain


              Seth Humeston - Direct            2565
                       Page 67
```

```
              09 - 092905 - DePace.txt
1    obligations like work and school that doesn't allow me
2    to, you know, be there the whole time for them. And,
3    in addition to -- I mean, I'm getting married in the
4    spring, so, you know, I'm going to be leaving them,
5    makes me worry, you know, about -- you know, if they're
6    going to be okay, my dad and my mom, when I'm not there
7    for them.
8    Q    And has your father ever talked to you about
9    you doing the yardwork, you doing the painting, things
10   like that?
11   A    No. He just says that he appreciates it a lot and
12   it means a lot to him, that, you know, that I'm there
13   for him to help with, you know, with the things that he
14   could have done before.
15        MR. HORN: Just a second, Your Honor, please.
16        Thanks a lot, Seth.
17        MS. JONES: We have no questions of this
18   witness, Your Honor. Thank you.
19        THE COURT: Okay. Thank you. You can step
20   down.
21        Take THE jury out to see if there are any
22   questions. Take them out to see.
23        THE JURY ATTENDANT: All rise.
24        (The jury left the courtroom at 12:09 p.m.)
25        THE COURT: You can be seated.
                       Page 68
```

```
                  09 - 092905 - DePace.txt
                    Colloquy                    2566
 1              Counsel, who do we have next?
 2              MR. SEEGER:  We have Dr. DePace.
 3              MS. SULLIVAN:  Your Honor, we have a motion
 4    on Dr. DePace concerning his supplemental report and
 5    IME that were served approximately three weeks before
 6    the trial, in fact, during the last day of his
 7    deposition.
 8              MR. BUCHANAN:  It was served prior to his
 9    deposition, and I thought this was already resolved.
10              MS. SULLIVAN:  We haven't gotten a ruling,
11    Your Honor, on that issue.
12              MR. BUCHANAN:  Your Honor, the history on the
13    IME.
14              THE JURY ATTENDANT:  No questions.
15              THE COURT:  No questions?  All right.  Tell
16    the jury to go to lunch, come back at 1:30.  There is
17    no questions.
18              MR. BUCHANAN:  Your Honor --
19              THE COURT:  We are going to break until 1:30.
20    I will hear this motion first.
21              MR. BUCHANAN:  Your Honor, the history on the
22    IME, and there was a request, as you may recall, that
23    was served where plaintiffs initially believed late, as
                              Page 69
```

```
                  09 - 092905 - DePace.txt
24    it related to their request for an IME of Mr. Humeston
25    by their expert, I spoke to Ms. Sullivan in either late

                    Colloquy                    2567
 1    May or early June and discussed certain scheduling
 2    issues we had had with getting Mr. Humeston back east
 3    to see Dr. DePace, and we were going to try and
 4    coordinate both -- no, there is absolute e-mails on
 5    this Diane, and I will dig them out.  If I need to
 6    produce the records, I will, Your Honor.
 7              I had conversations with Ms. Sullivan
 8    concerning bringing Mr. Humeston back east and we would
 9    bring him back east to see both Dr. DePace and whatever
10    of their experts wanted to see him.
11              It was later learned it was Dr. Tyberg who
12    wanted to do an IME, and there were conversations over
13    the next two, four, six weeks about precisely when that
14    would be.  As Your Honor is aware, this even crept into
15    your monthly status conferences as to whether or not
16    their physician would be entitled to draw blood and do
17    other certain forms of mildly invasive examinations.
18              I thought the issue was resolved with respect
19    to Dr. DePace.  But I can certainly produce e-mail
20    records that reflect the back and forth between
                              Page 70
```

```
                  09 - 092905 - DePace.txt
21    Ms. Sullivan on the IME issue, but it was very clear
22    from the beginning that we were going to bring him back
23    both for them, for their expert, and for Dr. DePace at
24    the same time and, hopefully, in advance of
25    Dr. DePace's deposition, so that he wouldn't have to be

                    Colloquy                    2568
 1    redeposed on his IME.
 2              The IME was produced prior to the completion
 3    of his deposition, several days or two days before.
 4    They had it, they examined him on it, and I don't know
 5    what basis there would be for excluding it at this
 6    point.
 7              THE COURT:  I'm going -- is there anything
 8    else you want to say?
 9              MS. SULLIVAN:  Only, Your Honor, there was --
10    and I challenge Mr. Buchanan to show any correspondence
11    regarding an IME by Dr. DePace.  We did have
12    discussions about IME from defense experts which was
13    requested before the end of expert discovery and before
14    the time that our expert reports are due.  Dr. DePace's
15    IME and report were served three months -- I'm sorry --
16    three weeks before this trial started, Your Honor, and
17    it was way out of time.
                              Page 71
```

```
                  09 - 092905 - DePace.txt
18              They had access to the medical records, it's
19    their client, they can talk to the treaters.  Under our
20    best practices rule, there was no reasonable
21    explanation for not discovering this information or
22    doing the IME prior to three weeks before trial and,
23    because of the untimeliness, we ask the Court to
24    exclude any testimony regarding the new -- not only the
25    IME, Your Honor.  There is a set of new opinions about

                    Colloquy                    2569
 1    VIOXX causation in the late report, and there is simply
 2    no excuse for an eve-of-trial supplemental expert
 3    report from this witness.
 4              MR. BUCHANAN:  I don't know what could be
 5    more eve of trial than raising this motion minutes
 6    before Dr. DePace get on the stand.
 7              MS. SULLIVAN:  We filed it.  We filed it in
 8    limine --
 9              MR. BUCHANAN:  I thought this was resolved in
10    connection --
11              THE COURT:  All right, counsel.  I have read
12    the brief.  There was some -- you know, we didn't
13    really follow best practices as far as exchange of
14    expert reports in this case.  Not -- because that was
                              Page 72
```

09 - 092905 - DePace.txt

15  part of what we were doing. We were having monthly
16  management meetings. We had agreed on trying this case
17  first. There had been intensive discovery, obviously,
18  relating to general VIOXX issues, experts relating to
19  VIOXX issues. And, basically, for the years before
20  this, there have been exchange of expert reports. It
21  happened in the spring, it was a culmination of
22  reviewing multiple records, and I think we had first
23  put in a May deadline for expert reports. But it was
24  understood throughout the meetings that we had through
25  the summer that discovery was ongoing, that, in fact,

Colloquy                                          2570

1   discovery would continue to be exchanged, there were
2   updated reports, there was -- you know, there was an
3   IME done for the defense. There was a lot of work that
4   was done in the last month before the trial. There is
5   no question about that. And I think it was done
6   completely with the Court's knowledge and the Court's
7   understanding that both sides were trying to prepare
8   for the case, and both -- everybody wanted to move a
9   test case forward -- not a test case necessarily, but a
10  representative case, and it was -- and it's under that
11  scenario that I look at this motion. The motion was
                          Page 73

09 - 092905 - DePace.txt

12  filed pretrial to bar Dr. DePace for that. It also
13  wanted to bar him because he supposedly didn't have
14  scientific basis for his opinion.
15          When we had oral argument, there was no
16  request for a hearing. When we had oral argument,
17  there was no request to argue Dr. DePace's, and now a
18  motion. But I understand you still preserve that
19  motion and that's fine.
20          The fact is, however, I don't find that there
21  has been any prejudice here. You have had the
22  opportunity to depose him prior to trial. You have had
23  the report. And the motion of the defense to bar
24  Dr. DePace, to limit him from testifying to what was in
25  his supplemental report is denied.

Colloquy                                          2571

1           Anything else?
2           MS. SULLIVAN: Actually, Your Honor, there is
3   an issue, as I understand it, Mr. Buchanan has with an
4   exhibit that was introduced with Dr. Lewer. There was
5   no objection at the time it was put on the screen. We
6   asked if there was an objection, there was none.
7   Dr. Lewer testified about it. We would like to move it
8   in to use with other witnesses and experts.
                          Page 74

09 - 092905 - DePace.txt

9           THE COURT: Let me see it.
10          MR. SEEGER: We raised this with Your Honor
11  immediately --
12          MS. SULLIVAN: This was Exhibit 547, Defense
13  Exhibit 547. It is Page 186 of Dr. -- OF the Genesis
14  medical records.
15          THE COURT: Where are the Genesis medical
16  records?
17          MS. SULLIVAN: They're in Dr. Lewer's file,
18  Your Honor.
19          And Dr. Lewer testified specifically
20  regarding that, and the testimony was that either
21  Dr. Lewer or Dr. Sim recommended that the plaintiff go
22  through a complete metabolic panel, a series of blood
23  testing, and Dr. Lewer testified that Mr. Humeston
24  objected to that because of the VIOXX trial.
25          MR. BUCHANAN: Your Honor, as Your Honor is

Colloquy                                          2572

1   aware, this was raised either at the conclusion of
2   Dr. Lewer's testimony or at the end of that day, I
3   can't remember which it was.
4           The concern expressed by plaintiffs, again,
5   was that the -- the record itself reflects what was
                          Page 75

09 - 092905 - DePace.txt

6   going on at that point in time with whether or not
7   there would be blood drawn pursuant to an IME the
8   defendants have requested. The issue had not yet been
9   resolved, it was still open. In fact, a panel was
10  ultimately done in the subsequent weeks and the
11  inference suggested by that particular record is, I
12  think, factually unfounded but inevitably prejudicial,
13  and we certainly object to it coming into evidence.
14  And I wasn't prepared to address this right now. I
15  would be happy to look back at the -- at the transcript
16  on it, but I don't recall --
17          MS. SULLIVAN: I'm happy to have --
18          MR. BUCHANAN: I don't recall you consulting
19  with us before you popped it on the screen, and I
20  didn't want to raise further attention to it while it
21  was on the screen.
22          MR. SEEGER: I raised that with Your Honor.
23  I didn't want to object at the time.
24          MS. SULLIVAN: There was no objection. Two
25  things, Your Honor.

Colloquy                                          2573

1           MR. BUCHANAN: You didn't show it to us on
2   our screen --
                          Page 76