# Exhibit M

11 - 100305VX.txt

Header 1                                                    2987

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY/CIVIL DIVISION
DOCKET NO. ATL-L-2272-03MT
------------------------------X
FREDERICK HUMESTON, et al.,

        PLAINTIFFS,

VS.                        STENOGRAPHIC TRANSCRIPT
                           OF:
MERCK & CO.,INC.,
                           - TRIAL -
        DEFENDANT.
------------------------------X
    PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
            1201 BACHARACH BOULEVARD
            ATLANTIC CITY, NJ 08401

    DATE:  OCTOBER 3, 2005

B E F O R E :

    THE HONORABLE CAROL E. HIGBEE, P.J.Cv.

TRANSCRIPT ORDERED BY:
    DIANE P. SULLIVAN, ESQUIRE
    DAVID R. BUCHANAN, ESQUIRE

A P P E A R A N C E S :

    DAVID R. BUCHANAN, ESQUIRE
    CHRISTOPHER SEEGER, ESQUIRE
    MOSHE HORN, ESQUIRE
    SEEGER, WEISS, LLC
        ATTORNEYS FOR THE PLAINTIFFS

    DIANE P. SULLIVAN, ESQUIRE
    DECHERT, LLP
    STEPHEN D. RABER, ESQUIRE
    WILLIAMS AND CONNOLLY, LLP
    CHRISTY D. JONES, ESQUIRE
    BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
        ATTORNEYS FOR THE DEFENDANT
    *    *    *    *    *    *    *    *    *
            REGINA A. TELL, CSR-CRR-RPR
            OFFICIAL COURT REPORTER
            Page 1

11 - 100305VX.txt
                    1201 BACHARACH BOULEVARD
                    ATLANTIC CITY, NJ  08401

Header 1                                                    2988

                         I N D E X
WITNESS(S)        DIRECT  CROSS  REDIRECT  RECROSS

FOR THE PLAINTIFF
1). MARY HUMESTON
By Mr. Horn        3000              3075
By Ms. Jones              3067               3078
Jury Questions, 3097

EXHIBITS  DESCRIPTION                    ID.      EVID.
          (No exhibits marked.)

Page 2

11 - 100305VX.txt

                                                           2989
                        Colloquy

1            P R O C E E D I N G S
2        THE COURT:  You can be seated.  All right.
3   You can bring the jury in.
4        (The jury enters the courtroom.)
5        THE COURT:  You can be seated.  We're ready
6   to proceed, counselor, your next witness.
7        MR. SEEGER:  Your Honor, we have by
8   videotape -- I'm sorry to say -- Dr. Wetherly, who was
9   the cardiologist who treated Mr. Humeston the night of
10  his heart attack.
11       THE COURT:  Okay.
12       (Whereupon, the videotape was played for the
13  jury.)
14       MR. SEEGER:  Your Honor, that concludes our
15  portion of Dr. Wetherly's testimony.
16       MR. RABER:  Your Honor, we designated some
17  that will follow now.
18       THE COURT:  Okay.
                        Page 3

11 - 100305VX.txt
19       (Whereupon, the videotape was played for the
20  jury.)
21       MR. SEEGER:  Your Honor, there's just three
22  or four follow-up questions.
23       (Whereupon, the videotape was played for the
24  jury.)
25       MR. SEEGER:  That's it for Dr. Wetherly.

                                                           2990
                        Colloquy

1        THE COURT:  Okay.
2        MR. SEEGER:  We have a witness ready if you
3   want to take a break.
4        THE COURT:  We'll take a short break.
5        (The jury leaves the courtroom.)
6        THE COURT:  You can be seated.  You're going
7   to go with another tape?
8        MR. SEEGER:  No, we're going to go with
9   Mrs. Humeston.
10       THE COURT:  Let's deal with the motion for a
11  mistrial.  I got the brief.  Do you want to just rely
12  on the papers?
13       MR. RABER:  I rely on the papers, and we
14  noted there were clear violations of motions in limine,
15  which we believe couldn't be cured by any instruction
                        Page 4

11 - 100305VX.txt

16 and then, therefore, move for a mistrial on the basis
17 as stated in our papers, Your Honor.
18        THE COURT:  Okay.
19        MR. BUCHANAN:  Your Honor, we're content to
20 rely on the papers, Your Honor.  I think that the
21 evidence highlighted by the defense is selective in
22 terms of total presentation of the evident by
23 witnesses, and I think to the extent there were any
24 statement that may have crossed the line Your Honor's
25 curative was sufficient.


                          Colloquy                    2991

1         THE COURT:  There were two statements that
2 were objected to -- not objected to initially but are
3 objected to now.  There was the first statement that
4 they after all stopped their trial and withdrew the
5 drug from the market on the basis of a thrombotic risk.
6 That was objected to and I did give an instruction to
7 the jury that they should disregard it.
8         There was a second statement in which he
9 mentioned that Dr. Kronmal mentioned in response to a
10 question that he had a concern that VIOXX might be
11 placed back on the market or that Merck might want to
12 put it back on the market.  There was no objection to
                          Page 5

11 - 100305VX.txt

13 that at the time, so I did not give an instruction.  He
14 also -- based on those two remarks the Court finds
15 there's no reason for a mistrial based on either of
16 those remarks an instruction has been given to the
17 jury.  There is absolutely no chance, I think that all
18 counsel have agreed, and, in fact, I think defense
19 counsel stated it in the beginning of the trial that
20 these jurors don't know that VIOXX was taken off the
21 market.  First of all, they knew it before they came
22 here and counsel acknowledged that when they argued the
23 case -- argued some of the motions.  Everyone pretty
24 much has to be aware of that.
25        Since you opened on it, also, obviously, if


                          Colloquy                    2992

1 they didn't know about it they knew about it at that
2 point.  I instructed them, however, to disregard that
3 particular point that it is not something that should
4 be part of their decision-making process, and I think
5 they fully understand that, and I don't have any
6 question they'll follow my instruction on that.  And I
7 don't really think it is that difficult of a thing to
8 set aside, actually.
9         The Court, therefore, finds while
                          Page 6

11 - 100305VX.txt

10 Dr. Kronmal's two statements about that were not
11 appropriate that, in fact, they're certainly not the
12 basis of a mistrial, and I refer to the quote that
13 plaintiffs put in their brief in which they stated, and
14 they're quoting from prior case law that states that
15 the plain fact of the matter is that inadmissible
16 evidence frequently often unavoidably comes to the
17 attention of a jury, and the record cannot be purged of
18 all extraneous influence.  It is axiomatic that not
19 every admission of inadmissible hearsay can be
20 considered to be reversible error.  Instances occur in
21 almost every trial where inadmissible evidence creeps
22 in, usually inadvertently.
23        The fact is in this site and in this case on
24 both sides things have come before the jury that I
25 instructed not to come in or that I hoped wouldn't come


                          Colloquy                    2993

1 in, and, in fact, we discussed ahead of time and the
2 presentation of both sides testimony things creep in at
3 times.  People say things that they shouldn't say.  The
4 Court, however, finds that this is not -- at least
5 nothing that's been said up to this point is a basis
6 for a mistrial.  I note that this is the fifth
                          Page 7

11 - 100305VX.txt

7 application for a mistrial by defense counsel since the
8 trial started.  There was a motion for postponement
9 before the trial, a motion for mistrial during the
10 opening, two motions for a mistrial on the 15th another
11 motion before this one and then this one, so this is
12 your fifth motion for a mistrial, and they're all
13 denied.
14        There is also at this point an argument
15 second argument by defense counsel that the -- or
16 three, actually, the first was were the two statements.
17 The second is Dr. Kronmal stepped over the line.  I
18 had, in fact, barred plaintiffs from calling one of
19 their experts, who was an expert in business ethics.  I
20 ruled pretrial that they could not call that expert
21 because the issue in this case is whether or not they
22 failed to warn or whether or not they had breached the
23 Consumer Fraud Act and is not whether they acted quote
24 "ethically" as opposed to legally; therefore, I did not
25 allow the ethics expert to testify and granted the


                          Colloquy                    2994

1 defense motion on that issue.
2         Defendant argues that Dr. Kronmal stepped
3 over that line when he indicated that they should have
                          Page 8

11 - 100305VX.txt

4  stopped the clinical trial, that their conduct was
5  wrongful and it was scientific misconduct and wrong not
6  to stop the clinical trial when the results were
7  showing that there was an increase in overall death
8  rate.  The Court finds that that testimony doesn't
9  really cross the line into ethics.  He is a
10 biostatistician.  He was testifying about what people
11 should do in relation to clinical trials and
12 statistical evidence.  What you do when you look at
13 certain statistical evidence and how you react to it I
14 think it goes to the -- I realize the cause of action
15 here is not stopping any clinical trials.  The cause of
16 action is failure to warn, but in order to know about
17 failure to warn you have to know about the whole
18 picture of what Merck was doing and what they weren't
19 doing, and, again, I'm looking at in motion at
20 everything in the light most favorable to the plaintiff
21 with all inferences as favorable to them, and I think
22 that at this point that was appropriate testimony.  But
23 the jury can consider that.
24        There is also an application for a mistrial
25 based on the fact that the marketing data is

2995

Colloquy
Page 9

---

11 - 100305VX.txt

1  inadmissible.  This was already decided pretrial, and I
2  had already ruled on it.  I'll rule on it once again
3  that, in fact, marketing data is appropriate.  It is
4  basically the defendant's contention that nothing
5  concerning marketing, and they made a motion pretrial
6  and they made a motion pretrial that was very broad
7  that said no marketing documents should come in.  I
8  have ruled against you at that point, and, again, there
9  seems to be basically just a general objection to the
10 fact that I have allowed marketing documents to come
11 in.
12        The fact is, and I said it at the time, that
13 doctors don't learn about drugs from medical school
14 they learn about drugs -- or they might learn
15 preliminarily about drugs, but in the end in our
16 society today doctors learn about drugs when they come
17 on the market and they learn about them primarily based
18 on what the pharmaceutical companies tell them.  They
19 learn about them from the drug sales representatives
20 who are supposed to be trained to inform the physicians
21 and who the physicians rely on.  They rely on the
22 labeling, which certainly does go through FDA approval
23 processes, and they rely on speakers and speeches and
24 the opinions of other doctors and medical literature.
25 So all those things go into what a doctor decides and

Page 10

---

11 - 100305VX.txt

2996

Colloquy

1  what a doctor knows about a drug and what the doctor's
2  decision is in whether to prescribe or not prescribe a
3  drug.  I don't think that that is any secret.  I think
4  everybody -- I don't think it is a matter of
5  contention.  I think everybody on both sides would
6  agree to that.
7        The issue is in this case because Dr. Lewer
8  said I didn't know about the cardiovascular risks, I
9  don't remember the salespeople ever telling me that.  I
10 don't remember reading any literature about that,
11 therefore, it is not relevant what was in the
12 literature or, for example, what was in the CV risk
13 card.  Obviously, when we're talking about failure to
14 warn we're talking about not just what he was told but
15 what he wasn't.  Obviously, if he is seeing
16 salesmen over and over it is plaintiff's contention
17 that the jury can derive from the fact that he didn't
18 know about the risk that it wasn't properly presented
19 by Merck in the literature in the insert, in the
20 training that they gave to their sales reps and then to
21 the sales reps themselves.
22        Obviously, the jury has to make a decision.
23 They may very well find that there was no risks, that
Page 11

---

11 - 100305VX.txt

24 Merck knew about or it wasn't a substantial enough risk
25 that they could have advised about it or should have

2997

Colloquy

1  advised about it.  They may find, in fact, that there
2  was no clear evidence of a risk and that Merck didn't
3  really know there was a risk, in which case they'll not
4  find Merck responsible.  They may find that there was a
5  risk that should have been told about, and they may
6  find, in fact, that the dodge ball document and the CV
7  document and the other documents that are marketing
8  promotional things are evidence that they can consider
9  to decide whether Merck, in fact, knew of a risk and
10 then decided not to let doctors know about it.  Lots of
11 issues for the jury to decide.  I'm glad I'm not a
12 juror and I'm just the judge and just ruling on the
13 evidence, and the jury eventually will make their
14 decision.  But I think that my decision on the
15 marketing documents coming in was appropriate before.
16 I think it is still appropriate.  Your objection is
17 certainly noted and preserved for the record, but the
18 motion for a mistrial is denied.
19        MR. RABER:  Your Honor, may I ask a
20 clarification on one point in Your Honor's ruling?  And
Page 12

11 - 100305VX.txt

21  that is you noted as part of your ruling that since the
22  plaintiffs opened on withdrawal that that somehow
23  colors the motion for a mistrial.  It was our
24  understanding from Your Honor's pretrial ruling, in
25  fact, that withdrawal was in the case, and Your Honor

                                                    2998
                    Colloquy

1   would give the jury an instruction about what to do
2   about withdrawal, and when the plaintiffs opened first
3   they put up a slide which had the press release
4   announcing the withdrawal with a headline that says,
5   Merck Now Agrees or Admits That VIOXX Causes Heart
6   Attacks and Strokes.  Your Honor, we had no choice but
7   to open on withdrawal under those circumstances.
8          THE COURT:  And I don't criticize you at all
9   for opening on withdrawal.  I'm not suggesting there
10  was anything improper on that.  There is no question
11  that initially withdrawal was going to be in the case.
12  At the conclusion of the openings I made a decision
13  that it shouldn't be in the case.  I told the jury it
14  should be in the case.  Whether you opened on it or not
15  my only point was whether you opened on it or didn't
16  open on it they still knew it.  It is not just like
17  because you opened on it they knew about it.  They knew
                    Page 13

11 - 100305VX.txt

18  about it before they got here.  There's no question in
19  my mind that these jurors knew that it was taken off
20  the market.
21          The question then is, and you're right, I
22  allowed you both to open on it and then I decided it
23  should not be part of the case.  I'm certainly not
24  faulting defense counsel for opening on it or saying
25  that that in any way they waive their right to dispute

                                                    2999
                    Colloquy

1   that it shouldn't have been in the case in the
2   beginning or whatever.  I am not criticizing counsel or
3   suggesting that you waived any claim as a result of
4   that.  It is just a fact that it was opened on and then
5   I told the jury not to consider it and Mr. --
6   Dr. Kronmal certainly shouldn't have mentioned it.  I
7   hope all the witnesses -- nobody in the future is going
8   to mention it.  It is wrong.  I'm instructing you to do
9   to do it, and, hopefully, people will abide by that.
10  And that's it.  All right.  Motion is denied.
11          MR. BUCHANAN:  Thank you, Your Honor.
12          (Break taken.)
13          THE COURT:  You can be seated.  You can bring
14  the jury in.
                    Page 14

11 - 100305VX.txt

15          MR. BUCHANAN:  Your Honor, what is our cut
16  off time today, 3:00, 3:30.
17          THE COURT:  3:30.  Is that good enough?
18          MR. SEEGER:  Yes.
19          THE COURT:  Is that a problem?
20          MR. SEEGER:  We only lose a half-hour so
21  that's good.
22          (The jury enters the courtroom.)
23          THE COURT:  You can be seated.  Your next
24  witness, counselor?
25          MR. SEEGER:  Your Honor, we're calling Mary

                                                    3000
                Mary Humeston - Direct

1   Humeston.  And the examination will be done by
2   Mr. Horn. WHEREUPON, MARY HUMESTON, PLAINTIFF'S
3   WITNESS, SWORN.
4   DIRECT EXAMINATION BY MR. HORN:
5       Q.  Good morning, Mrs. Humeston.
6   A.  Good morning.
7       Q.  Have you ever been in a courtroom before?
8   A.  Um, yeah.
9       Q.  Where was that?
10  A.  Um, a friend of ours is a judge, and when we
11  worked for -- worked when we volunteered for the
                    Page 15

11 - 100305VX.txt

12  historical society he would let us use his courtroom
13  for presentations for fund-raisers and stuff.
14      Q.  Was that the only time?
15  A.  No.  I had another experience when I was going to
16  college in one of my courses I had to go and observe
17  traffic court.
18      Q.  Have you ever been in a courtroom as a
19  witness?
20  A.  No.
21      Q.  Okay.  If you're a little nervous it is okay.
22  Take your time.  If you don't understand the questions
23  I ask let me know, and I'll rephrase it, okay?
24  A.  Okay.
25      Q.  I want to start by telling the jury a little

                                                    3001
                Mary Humeston - Direct

1   bit about yourself, where are you from originally?
2   A.  I'm from northern Florida, Lake City, Florida.  I
3   grew up there.
4       Q.  What kind of town is Lake City, Florida?
5   A.  It is a small -- when I was growing up it was very
6   small down on the edge of the Okefenokee swamp.  I
7   lived out in the swamp.
8       Q.  Did you have any siblings?
                    Page 16

11 - 100305VX.txt

```
 9  A.   Yes.
10       Q.   How many siblings?
11  A.   I have two brothers and a sister.
12       Q.   Where were you in the order?
13  A.   Second older.  My brother, me, my younger brother
14  and then my younger sister.
15       Q.   And did your parents work?
16  A.   Yes.  Yes.
17       Q.   And what did your mother do for a living?
18  A.   My mother would take -- when I was younger she
19  would take in sewing to get some extra money.
20       Q.   And was your father employed?
21  A.   off and on.
22       Q.   Tell us about your educational background.
23  How far did you go in school?
24  A.   When I was -- I went through -- I loved school.
25  When I went through high school I had to switch over to
```

                                                    3002
                    Mary Humeston - Direct

```
 1  night school in my senior year.  I had an opportunity
 2  for a job to help out, and so I switched over to night
 3  school and graduated on time with the rest of the
 4  people I went to school with.
 5       Q.   When did you switch from day school to night
```
                        Page 17

11 - 100305VX.txt

```
 6  school?
 7  A.   It was like April in my senior year.
 8       Q.   Why did you switch to night school?
 9  A.   Because I had an opportunity with a local
10  newspaper to get a job, and we needed the money.
11       Q.   After you graduated high school what did you
12  do next?
13  A.   Um, I -- I married a guy that was -- that I grew
14  up with, I thought I knew and turned out I didn't know
15  him very well.
16       Q.   How long did that marriage last?
17  A.   I -- seven, eight months.
18       Q.   What did you do after you were divorced?
19  A.   I decided to leave North Florida, and I moved down
20  to Miami.
21       Q.   Why did you leave that area of Florida?
22  A.   I didn't have any opportunities.  We were poor,
23  and I didn't want to have my life be there in the
24  swamp.
25       Q.   What did you do when you moved to Miami?
```

                                                    3003
                    Mary Humeston - Direct

```
 1  A.   I -- when you're young you do just ridiculous
 2  things and think that you can just go and do things, so
```
                        Page 18

11 - 100305VX.txt

```
 3  I did.  I just had an old beater car, and I had enough
 4  gas to get down there, and I had a friend that said I
 5  could room with her, and so I figured, well, I'll just
 6  get a job, and I did.  I got a job within just a couple
 7  of weeks as a secretary/receptionist at an electronics
 8  import company, and so I got a job as a secretary and
 9  off and going.
10       Q.   How long did you live -- well, withdrawn.
11            When did you meet Mike Humeston?
12  A.   I met him just shortly after I moved down to
13  Miami.
14       Q.   And how did you meet him?
15  A.   Through my roommate's friend.
16       Q.   By the way, do you see Mike in the courtroom
17  now?
18  A.   No.
19       Q.   Can you tell us do you know why he is not
20  here now?
21  A.   I don't want to hurt him.
22       Q.   Was that your idea that he step out?
23  A.   Yes.
24       Q.   When did you and Mike get married?
25  A.   1973, November 17th.
```

                                                    3004
                        Page 19

11 - 100305VX.txt
                    Mary Humeston - Direct

```
 1       Q.   Were you still in Miami?
 2  A.   Yes.
 3       Q.   At some point did you and Mike move out of
 4  Miami?
 5  A.   Yes.
 6       Q.   Actually out of Florida completely?
 7  A.   Yes.
 8       Q.   And at some point did you move to Boise?
 9  A.   Yes.
10       Q.   Why did you pick Boise to move to?
11  A.   We had a couple of reasons.  We had come to Boise
12  on vacation to visit some friends, and they had -- he,
13  the friend, had said that he was moving back -- he had
14  moved from Bismarck, and he was here, and we went to
15  visit them, and they said -- he said that he could get
16  a job here in Boise, and North Dakota was awfully cold
17  and a lot of tornadoes for this Florida girl.  That was
18  not so much fun.
19       Q.   You mentioned North Dakota.  Is that where
20  you moved after Florida?
21  A.   Yes.
22       Q.   Because that was between Florida and Boise?
23  A.   Right.
24       Q.   When you moved to Boise was Mike able to find
25  a job?
```
                        Page 20

11 - 100305VX.txt

3005

Mary Humeston - Direct

1  A.   Not right away.
2       Q.   Where did he eventually get employed?
3  A.   At the post office.
4       Q.   In the same post office job he has had for
5  over 20 years?
6  A.   Yes.
7       Q.   Now, did you get a job once you got to Boise?
8  A.   Not right -- no, I didn't.
9       Q.   Are you employed now?
10 A.   Yes, I am.
11      Q.   What did you do?
12 A.   I am director of marketing for a small software
13 company.  We deal with the produce industry.
14      Q.   How long have you worked there?
15 A.   I have worked there, let's see, since 2000 or the
16 beginning of the year 2000.
17      Q.   Now, when you first went to Boise had you
18 already had any children?
19 A.   Yes.
20      Q.   How many?
21 A.   We had -- I had had three children, two were still
22 living.
                    Page 21

11 - 100305VX.txt
23      Q.   Okay.  How many do you have total, you and
24 Mike together?
25 A.   We had five children.

3006

Mary Humeston - Direct

1       Q.   Now, I'm going to ask you now if you can tell
2  us a little bit about your life in Boise before Mike
3  had his heart attack.
4  A.   Okay.
5       Q.   How far did your kids go in school?
6  A.   They -- how far did my kids go in school?
7       Q.   They all graduated high school?
8  A.   Yes.  They weren't allowed not to.
9       Q.   And have any gone to college?
10 A.   Yes.
11      Q.   What were -- and how long have you and Mike
12 lived in the same house?
13 A.   We have been in our house since 1980.
14      Q.   Was it the first house you purchased when you
15 moved to Boise?
16 A.   Yes.
17      Q.   Now, tell us about some of the things you and
18 Mike like to do together and your whole family like to
19 do together before Mike had his heart attack; for
                    Page 22

11 - 100305VX.txt
20 example, we heard a lot about outdoors stuff and
21 hiking, traveling, why don't you tell us a little bit
22 about that.
23 A.   We live in Boise in Idaho.  It is renowned for the
24 outdoors, and that was one of the beautiful things
25 about living there is we could -- we didn't have a lot

3007

Mary Humeston - Direct

1  of money and we could take vacations.  We took our kids
2  and went camping in the mountains.  That's where I grew
3  to love the mornings and the beautiful -- getting up in
4  the mornings, I don't know if any of you guys have ever
5  gone out camping or hiking and that kind of stuff, it
6  is -- it is almost spiritual.  It is very beautiful.
7  And beautiful sounds so shallow, but it is
8  extraordinary, and we were able to go with our kids and
9  to do that kind of stuff.
10      Mike was very active.  He is a very -- he is
11 a very stoic, strong man, and so with me and four
12 children it wasn't as challenging for him to just go
13 camping.  He would like to go and do more extreme
14 trekking with his friends.  It is not something that I
15 am interested in doing or I do or would allow him to
16 take my children to do, but, um, he would like to do
                    Page 23

11 - 100305VX.txt
17 that.  And so when we moved to Boise early on we would
18 do that, and he would take his time to just go and
19 stare in a fire and get exhausted and does these type of
20 things.
21      Q.   You mentioned to us some of these 50-mile
22 hikes, those are some of the ones you would not do with
23 him?
24 A.   No.  Absolutely.
25      Q.   Would you pick him up when he was done?

3008

Mary Humeston - Direct

1  A.   Sure, sure.
2       Q.   What kind of terrain -- give us a frame of
3  reference, these hikes he mentioned about when did he
4  used to do these adventurous, 50-mile four- or five-day
5  hikes?
6  A.   What do you mean?
7       Q.   In the eighties, nineties?
8  A.   It was in the eighties, a lot in the late
9  eighties, maybe the first part of the nineties, yes.
10      Q.   We heard Mike talk about his interest in
11 history.  Is that something you share with him, as
12 well?
13 A.   Yes, absolutely.
                    Page 24

11 - 100305VX.txt

14      Q.   What kind of history do you and Mike study
15  together or what are you interested in?
16      A.   My heritage is Native American, and I have
17  always -- I have a conflict.  I'm Native American and
18  white and so I have always had that internal conflict
19  between the history of the conflict of Native Americans
20  and white and so I have been always really interested
21  in the native civilization, and out west there's so
22  much that's still there.  There's not buildings and
23  cities.  There's the trails that are still there that
24  you can see and the stories of the people that settled
25  out there.  It is remarkable.  It kind of edifies your

                                                    3009
                    Mary Humeston - Direct

1   own life when you can look at the courage that these
2   people who pioneered that they -- when they did and it
3   really makes you grateful for whatever you have in life
4   that -- it makes you feel good to go and to see what
5   was there before you, and so we do like to go, and I
6   will do that, I will always want that.
7       Q.   You mentioned the historical society?
8       A.   Yes.
9       Q.   How did you get involved in that and what do
10  you do for it?
            Page 25

11 - 100305VX.txt

11      A.   We served on the board of directors for the Owyhee
12  County Historical Society, and we co-chaired their main
13  fund raising event called Out Post Base.  It was the
14  fund raising for -- it is a small -- very, very large
15  county with a small population, and I am a mom, and I
16  see things through mom's filter, and a mom filter is if
17  you can educate children that's what you need to do,
18  and so the historical society, the reason for the fund
19  raiser was to do educational programs.  They would
20  provide tours and guides through historical sices for
21  the school children.  We thought -- I think, and we
22  think that's very worthwhile, and so we would do that,
23  and it was really important to try to get enough money
24  for operating costs for that kind of stuff, and so we
25  did that for several years.

                                                    3010
                    Mary Humeston - Direct

1       Q.   Are you involved in any charitable
2   organizations?
3       A.   Charitable organizations like United Way, that
4   kind of stuff, no, but we -- again, in Idaho there is a
5   lot of people that are disadvantaged, and in small
6   communities, to give you a short history lesson Idaho
7   was really the boom time for Idaho was mining and
            Page 26

11 - 100305VX.txt

8   logging.  Logging has pretty much disappeared, but
9   there's a lot of elderly people now who are old that
10  their life was logging, and when that has disappeared
11  they are very, very poor, and elderly poor will break
12  your heart.  And so we are involved in getting clothes,
13  and this is my own personal -- I like to be able to get
14  coffee and chocolate and things that old people can't
15  afford for Christmas time, you know, when we do that
16  kind of stuff.  So we're involved in doing that kind of
17  stuff.  It is directly helping people, that's just what
18  I do.
19      Q.   You heard Mike tell us something about a
20  hiking business?
21      A.   Yes.
22      Q.   At some point did you and Mike begin to get
23  involved in an outdoors outfitting business?
24      A.   Yes.
25      Q.   How did that come about?

                                                    3011
                    Mary Humeston - Direct

1       A.   We always liked to go and explore.  We have always
2   done that.  And friends would say, you know, Uncle
3   Charlie is coming in can you show him this area, that
4   area, and it's really wonderful to do that because you
            Page 27

11 - 100305VX.txt

5   get to see your own environment with new eyes.  And so
6   after doing that a while we thought maybe there --
7   maybe we should start a business, so I we decided, and
8   I became the outfitter and because I could do the
9   business side of it and the administration and also as
10  an outfitter you do have to be qualified to Red Cross
11  certification, and know where you're taking things --
12  taking people and know what you're doing.  And then
13  Mike became licensed as a guide, my chief guide.  And
14  so we did that.  It was a seasonal business.
15      Q.   Okay.  Can you -- tell us about when did you
16  start this business?
17      A.   I believe it was around 1992.
18      Q.   And how long did it last?
19      A.   We ceased operations in 1998.
20      Q.   Do you remember why you stopped it?
21      A.   Mike couldn't -- by then we had had to make
22  adjustments on -- he had to make adjustments on what he
23  could do where he could hike, and it was to the point
24  where he couldn't take people to the very remote areas
25  or the arduous areas to get to, and so we -- it was to

                                                    3012
                    Mary Humeston - Direct

1   the point that we had to make changes, so we ceased.
            Page 28

11 - 100305VX.txt

2    Q.   What are you referring to when you say he
3  couldn't take it any more specifically?
4  A.   His knee.  His knee.  He couldn't do the length of
5  the days.  When people pay you money it is your
6  obligation -- I mean, especially if it is their
7  vacation, their entertainment, it is your obligation to
8  fulfill what they're expecting.
9    Q.   So during those six years was the business
10 successful?
11 A.   Yes, I think it was.  I mean, it was, like I said,
12 seasonal, but I think it was.
13   Q.   Okay.  Now, you just mentioned Mike's knee.
14 Let's talk about Mike's knee a little bit.  Going
15 with -- let's begin with the eighties when you moved to
16 Boise what was the condition of Mike's knee at that
17 time?
18 A.   It had scars, but he just -- it was fine.
19   Q.   Was he taking pain medication?
20 A.   Well, I don't think so.  I mean, you know, it
21 would be like he would take an aspirin, I take an
22 aspirin, so, you know, he wouldn't say, Oh, my knee is
23 hurting I have to take anything.
24   Q.   In the eighties do you remember him ever
25 having trouble completing any of these adventure treks,

Page 29

11 - 100305VX.txt
                                                    3013
Mary Humeston - Direct

1  as you referred to them, because of his knee?
2  A.   No.
3    Q.   When do you first remember his knee beginning
4  to show signs of worsening?
5  A.   It was in the mid nineties.
6    Q.   What is the first recollection you have of
7  his knee beginning to be a problem?
8  A.   Um, he -- this kind of is kind of a continuum.  It
9  is hard to say this I remember this day.  He just
10 started to when he was tired start to favor it more,
11 just from fatigue, and I would just see it kind of grew
12 from that when he would be -- Christmas time because he
13 worked on the dock Christmas time started to be where I
14 knew he was going to be hurting.
15   Q.   Why was Christmas time a problem?
16 A.   There's so much volume of mail on the dock at
17 Christmas time, and he was physically unloading mail
18 and walking the distance with these 70-pound sacks, and
19 the volume of mail at Christmas is terrible.  I think
20 the postal service and retail share a common dislike of
21 Christmas.
22   Q.   When is the first time you remember Mike
23 having to see a doctor or any kind of medical issues
24 coming up because of his knee?  And don't worry about a
                          Page 30

11 - 100305VX.txt
25 date, just give us whatever you can estimate.

                                                    3014
Mary Humeston - Direct

1  A.   I really don't know the date.  Some time in the
2  late nineties, I think he finally just was, like I
3  said, we had adjusted enough in our own personal life
4  with his knee and our hikes and that kind of stuff that
5  I guess it finally wasn't doing it.  He was hurting.
6    Q.   We have heard a lot about Mike's restrictions
7  at work.  When was the first time you remember these
8  restrictions coming up in your home life?
9  A.   That would have been in the late nineties
10 like '99, '98, something like that.
11   Q.   What is the first thing you remember hearing
12 about these restrictions?
13 A.   Actually, when he had to fly down to Salt Lake to
14 see a doctor down there.
15   Q.   Okay.  Tell us about that, why did you have
16 to go to Salt Lake to go see a doctor?
17 A.   Because -- and like I said, I wasn't aware of all
18 of this, he took care of his medical stuff then, but
19 the post office wanted to evaluate his knee, because I
20 guess, Dr. Lewer had started implementing some
21 preservation methods or plan.
                          Page 31

11 - 100305VX.txt
22   Q.   Let me stop you right there.  What does that
23 mean, preservation plan or preservation method?
24 A.   Mike had told me that Dr. Lewer wanted him to
25 start not doing any overtime and to limit some of the

                                                    3015
Mary Humeston - Direct

1  work he was doing on the dock so that his knee --
2  because he is not a candidate for knee replacement his
3  thought was, okay, let's preserve what you have left so
4  that you'll have a leg.
5    Q.   Okay.  To the best of your recollection what
6  were the restrictions Dr. Lewer recommended to the post
7  office that, you know, Mike begin to adapt?
8  A.   They wanted to limit the amount of walking
9  that he did when he was -- and the weight of the sacks
10 and the weights of the things he was carrying and to
11 limit the amount of walking that he was doing and doing
12 that, and climbing up and down off a forklift, I
13 guess.  I'm not real familiar with forklifts, but I
14 guess there's a distance or step that you have to step
15 up with, so he wanted to limit that just those
16 type of things he wanted him to just stop wearing down
17 his knee.
18   Q.   Did Mike ever see the VA doctors for this, as
                          Page 32

11 - 100305VX.txt

19  well?
20  A.   I think he did go to the VA, yes.
21       Q.   And then he saw Dr. Lewer, as well?
22  A.   Right.
23       Q.   Okay.  And do you know if Dr. Lewer made
24  these recommendation to the post office?
25  A.   Right.

                                                    3016
                    Mary Humeston - Direct

1        Q.   Whose idea was it for Mike to go to Salt
2   Lake?  Was it Mike's idea or from the post office?
3   A.   It was from the post office.
4        Q.   And do you know who this doctor was in Salt
5   Lake City?
6   A.   I never saw him.  It started with a G, and I don't
7   know.
8        Q.   Was that a doctor the post office selected?
9   A.   Oh, yes.
10       Q.   And what was the purpose to go there?
11  A.   So that they could have another doctor evaluate
12  the condition of his knee.
13       Q.   Do you remember when Mike flew there for the
14  evaluation?
15  A.   Right.
                    Page 33

11 - 100305VX.txt

16       Q.   And do know what the results were of his
17  visit to this doctor in Salt Lake City?
18  A.   The results were the doctor said so you have a
19  really bad knee, and you need to not be grating it any
20  further, and so why are you here.
21       Q.   And now after that visit to Salt Lake City
22  were these restrictions then implemented at the post
23  office?
24  A.   I think they -- the process of getting those
25  implemented started, and I think there was some

                                                    3017
                    Mary Humeston - Direct

1   negotiations back and forth with doing that, and it did
2   eventually happen.
3        Q.   Okay.  Now, you have been sitting here during
4   the course of this trial; is that right?
5   A.   Right.
6        Q.   Do you see some of the letters that have been
7   shown to the jury about negotiations back and forth
8   between mike and the post office?
9   A.   Yes.
10       Q.   Were those related to these restrictions?
11  A.   I think those letters were related to the work
12  time, the half-hour.
                    Page 34

11 - 100305VX.txt

13       Q.   We'll get to that in a minute.  In terms of
14  restrictions was there negotiations about overtime and
15  everything else?
16  A.   There was some.  He needed to because at the post
17  office they have this hierarchy of supervisors, and he
18  is called a mail handler, and so they would have
19  different -- they rotate supervisors in, and one
20  supervisor would come in and not know what he was
21  supposed to be doing or --
22           MS. JONES:  Your Honor, I hate to object, but
23  I believe we're getting into hearsay beyond Miss
24  Humeston's personal knowledge.
25           MR. HORN:  I can move on.

                                                    3018
                    Mary Humeston - Direct

1            THE COURT:  All right.  The objection is
2   sustained.
3   BY MR. HORN:
4        Q.   At some point were these restrictions
5   implemented?
6   A.   Yes.
7        Q.   Okay.  Now, did you ever begin to see any
8   improvement in mike's knee?
9   A.   Yes.  I wouldn't say improvement.  I don't think
                    Page 35

11 - 100305VX.txt

10  that his knee will ever improve.  I think the
11  improvement is in his life, his pain, and his ability
12  to cope with it, so, yes, there was improvement, but
13  I'm not a doctor, but from what I have heard the
14  doctors say they say his knee is not going to get
15  better.
16       Q.   From what you saw at home in terms of your
17  day-to-day interaction with Mike at some point did the
18  restrictions begin to improve, what you could see him
19  do?
20  A.   Yes.
21       Q.   Now, we heard a lot about this half-hour
22  issue, so I'm going ask you some had questions about
23  that now.  What was the issue with Mike and this
24  half-hour?
25  A.   Okay.  When you work it is very common where we

                                                    3019
                    Mary Humeston - Direct

1   are -- when you work as a laborer in a labor setting
2   you work, you're on the time clock in that time you're
3   getting paid for, and then you have a half-hour --
4        Q.   When you say in a labor setting you mean at
5   the post office?
6   A.   Yes.
                    Page 36

11 - 100305VX.txt

7    Q.   Tell us about that specifically, the post
8  office.
9    A.   Okay.  Specifically, the post office, he is paid
10  when he goes in at 7:00 and he is paid and he is to put
11  in -- at lunch he clocks out and he is not paid for
12  that time that he has his lunch and then he clocks back
13  in, and then he is paid for the rest of the time for
14  the day.
15        Now, during the day, though, in that first
16  four hours and that last four hours they pay him for a
17  15-minute break each time morning and afternoon.  But
18  that half-hour in the middle of the day he is not paid
19  for, it is his time.
20    Q.   Now, what was the recommendation about --
21  well, take a step back for a second.  You heard the
22  phrase "straight eight"?
23  A.   Yes.
24    Q.   What is a "straight eight"?
25  A.   That means to not clock out in the middle of the

                                             3020
                Mary Humeston - Direct

1  day but to work the whole time so that you're not
2  taking a half-hour of your time spending that time in
3  the middle of the day not getting paid but there.
                 Page 37

---

11 - 100305VX.txt

4    Q.   What was the point of a straight eight, how
5  was that supposed to help Mike?
6  A.   Well, because he sits like this in his
7  restrictions, and he has pain it's just a fact of life.
8  Sometimes the weather can make it worse, sometimes
9  there's just I don't know the rhyme or reason, but if
10  he was able to work the straight eight then he could
11  leave at three, he -- if he was in pain he could come
12  home and take medicine for pain earlier and be home,
13  maybe take a nap, maybe put his leg up or try to cope
14  better, and so I believe that was what they wanted to
15  do, the doctor thought it would be better to put his
16  work time in and then go home.
17    Q.   Now, he said the doctor, which doctor are you
18  referring to?
19  A.   Dr. Lewer.
20    Q.   Was the straight eight, was this something
21  Mike wanted, as well?
22  A.   No, Dr. Lewer thought, well, if you're not getting
23  paid for that half-hour then just work your time and
24  then go home.
25    Q.   So the difference was between 7:00 and 3:00

                                             3021
                Mary Humeston - Direct
                 Page 38

---

11 - 100305VX.txt

1  and 7:00 to 3:30?
2  A.   Correct.
3    Q.   Was Mike trying to get any extra vacation
4  time or disability time?
5  A.   No.
6    Q.   Was that the whole issue about the half an
7  hour issue, half-hour and the straight eight what you
8  described to us?
9  A.   Yes.
10    Q.   At some point did the post office agree to
11  give Mike the half-hour straight eight accommodation?
12  A.   Yes, they did.
13    Q.   Did it help his condition?
14  A.   Yes, it does.
15    Q.   Does he still have that?
16  A.   Yes.
17    Q.   Has he had this straight eight, again, the
18  7:00 to 3:00 shift continuously, in other words, since
19  he first received it?
20  A.   Yes.
21    Q.   Now, let's take a step back for a minute.
22  You told us about the knee.  And you told us before
23  about all the adventure treks Mike used to do and your
24  family vacations, how did you -- or did those trips or
25  your nature trips change as Mike's knee got worse in
                 Page 39

---

11 - 100305VX.txt

                                             3022
                Mary Humeston - Direct

1  the nineties?
2  A.   Yes, they did.
3    Q.   How did you make those changes and
4  accommodate that?
5  A.   Where we live Boise is on what we call a
6  transition zone.  You can go like half-hour, 45 minutes
7  to the north and you can get -- you're in alpine
8  mountains.  You can go about the same amount of time to
9  the south and you're in high desert in canyon lands
10  with the Owyhee Mountains, which is a very rugged,
11  harsh, dry mountain area.  In Boise it is called the
12  Treasure Valley, and it is a huge big valley that goes
13  east to west, and so there's still a lot of history in
14  the valley.
15        Of course, when that area was first settled
16  the valley was prime land, and so we would go --
17  instead of going up into the mountains or going into
18  the canyons we would go into areas that were not so
19  challenging but still interesting.
20    Q.   Okay.  So you weren't doing the rugged hikes
21  in the late nineties that you were doing in the
22  eighties?
23  A.   Correct.
                 Page 40

11 - 100305VX.txt

24      Q.   Was there still traveling you could do by
25   car?


                                                        3023
                    Mary Humeston - Direct

1   A.   Yes.
2        Q.   Was Mike still able to take walks on the
3   level path or things along those lines?
4   A.   Yes.
5        Q.   Okay.  Now, we have heard a lot about this
6   video that took place in July of 2001?
7   A.   Uh-huh (witness nodding head in the affirmative).
8        Q.   Tell us what you -- you know, what you recall
9   about that day when the video was taken of Mike?
10  A.   When I came home from work Mike was like, Well,
11  they were here today, they were taping me.  And I said
12  Oh, you know, what's up?  And he said, Well, because of
13  the lunch thing they were here taping me.
14           Later on that evening my neighbor, who she is
15  my neighbor, she likes to see everything that's going
16  on in the neighborhood, she came over and said, Oh, did
17  you hear about what happened, they caught -- and she
18  was talking about she thought that the guy with the
19  video camera in her words was a "pervert" because
20  there's a school right down there, and she said, I
                         Page 41

---

11 - 100305VX.txt

21  thought he was a pervert, and it turned out to be not
22  that, and so, boy, do I feel really stupid, so, yes, I
23  knew about it.
24       Q.   You weren't home when this all happened?
25  A.   No.


                                                        3024
                    Mary Humeston - Direct

1        Q.   You got home and Mike was already home?
2   A.   Right.
3        Q.   And this is in July of 2001?
4   A.   Uh-huh (witness nodding head in the affirmative).
5        Q.   So when you first got home was your neighbor
6   already there or did Mike tell you about this first?
7   A.   Mike told me about it.
8        Q.   Okay.  To the best of your recollection do
9   you remember how he seemed when he was telling you
10  about --
11  A.   He just was more like kind of resigned like he
12  knew that because there were changes going on with what
13  his requirements were that he knew that it was going to
14  happen, and it was more like, well, yes, he didn't
15  seem -- he wasn't upset.  He was like more matter of a
16  fact that they were here filming.
17       Q.   Let me stop you there.  What do you mean he
                         Page 42

---

11 - 100305VX.txt

18  knew it was going to happen because of the changes,
19  what did you mean by that?
20  A.   Because when Dr. Lewer first suggested to do the
21  straight eight that's a change in the structure of the
22  way they do their hours, and in the postal service --
23  and any change, of course, they would have to verify.
24  I would think anybody would verify.
25       Q.   So was that what they were there for?


                                                        3025
                    Mary Humeston - Direct

1   A.   Yes.
2        Q.   And did Mike seem angry, did he seem overly
3   upset or how would you describe his emotional state
4   from what you could see?
5   A.   From what I could see it was more like resigned,
6   kind of annoyed, resigned, but that's just the fact.
7   They did, and you just -- what do you do?  I mean...
8        Q.   Did he seem alarmed?
9   A.   No.
10       Q.   And you said your neighbor came over and was
11  very excited?
12  A.   Well, she is kind of funny, and, yes.
13       Q.   What do you mean by "funny"?
14  A.   She likes to see what is going on in the
                         Page 43

---

11 - 100305VX.txt

15  neighborhood, and she is -- if the police go through
16  she has a what is that radio that police where they
17  monitor the --
18       Q.   A scanner?
19  A.   Yes, whatever.  Yes.  She has one of those, and so
20  she is one of those people that are just interesting.
21       Q.   Was she the one that called the police?
22  A.   Yes.
23       Q.   Now, after this video happened and when you
24  heard about it did Mike go back to work after that?
25  A.   Yes, yes, he went back the work.


                                                        3026
                    Mary Humeston - Direct

1        Q.   In late July of 2001, August 2001 do you
2   remember any problems emerging from the video or
3   anything like that?
4   A.   No.
5        Q.   Did Mike ever come home and seem alarmed or
6   upset by anything that had happened with that video at
7   work?
8   A.   No.
9        Q.   Did anything problematic happen with him at
10  work during that next two-month time period?
11  A.   No.  He told me people heard about it, and it was
                         Page 44

11 - 100305VX.txt

12  funny.
13      Q.   Why was it funny?
14  A.   Because the investigators, you know, you always
15  think investigators would be kind of reclusive or
16  hiding trying to look at something, and they thought it
17  was funny that the investigators got caught by the
18  cops, and so they thought it was, you know, it was kind
19  of ironic.
20      Q.   The issue that the investigators were there
21  for that was this half-hour straight eight situation?
22  A.   Yes.
23      Q.   Again, what was the conclusion of that?
24  A.   The conclusion was that would be the best for
25  Mike, and that's what they said to do, and that's what

                                              3027
              Mary Humeston - Direct

1  he has been doing.
2      Q.   And to this day has there ever been a problem
3  with the restrictions, has Mike even been fined,
4  disciplined or demoted from this whole incident?
5  A.   No.  No.
6           MR. HORN:  Okay.  Your Honor, I don't know
7  when you want to take our break.  This is a natural
8  break for me if you want to take the lunch break now.
                   Page 45

11 - 100305VX.txt

9           THE COURT:  Okay.  Let's take a break for
10  lunch, and I ask the jury to come back at 1:30.
11           (The jury leaves the courtroom.)
12           (Break taken.)
13
14
15
16
17
18
19
20
21
22
23
24
25

                                              3028
              Mary Humeston - Direct

1       A F T E R N O O N   S E S S I O N
2           THE COURT:  You can be seated.  Bring the
3  jury in.  Am I correct we're going to have motions?
4           MS. SULLIVAN:  You guys are resting on
5  witnesses?
                   Page 46

11 - 100305VX.txt

6           MR. BUCHANAN:  I think based on the timing
7  we'll have to carry over until Wednesday morning.
8           THE COURT:  I wonder if we can argue that
9  motion before we bring the jury in.
10           MS. SULLIVAN:  Wednesday morning before they
11  rest, Your Honor.
12           THE COURT:  The testimony they're going to
13  put in I can read, in which case I'll know.
14           MR. RABER:  I think we have something we're
15  filing we would like to have it filed before we argue.
16           THE COURT:  You would rather put your witness
17  on and then do your motion?
18           MR. RABER:  The plan was to file something
19  tomorrow and then be prepared to argue it when they
20  rested -- oh, Wednesday morning?  I thought you meant
21  now.
22           THE COURT:  Not now.
23           MR. RABER:  There was confusion before the
24  jury was coming in.
25           THE COURT:  I just didn't want the jury to

                                              3029
              Mary Humeston - Direct

1  come here on Wednesday and then listen to a tape for an
2  hour and then sit for three hours while we did a
                   Page 47

11 - 100305VX.txt

3  motion.
4           MR. RABER:  I think that makes sense.
5           MS. SULLIVAN:  That's fine.
6           THE COURT:  I either wanted to bring the jury
7  in later or have you start your case and then start
8  your motion, one of the two.
9           MS. JONES:  Can we have an agreement that we
10  know exactly what tape is going in before they rest?
11           THE COURT:  Yes.
12           MS. JONES:  So we don't --
13           THE COURT:  Okay.  Yes, we'll discuss it at
14  the end of the day.
15           MS. JONES:  That's fine.
16           THE COURT:  You can bring the jury in.
17           (The jury enters the courtroom.)
18           THE COURT:  You can be seated.  You can
19  proceed, counselor.
20           MR. HORN:  Thank you, Your Honor.
21  BY MR. HORN:
22      Q.   Miss Humeston, when is the first time you
23  ever remember your husband being on VIOXX?
24  A.   Um, it was when he -- after he had hurt his right
25  leg at work.

                   Page 48                    3030

**11 - 100305VX.txt**
Mary Humeston - Direct

1    Q.   Was that in July, 2001?  And what do you
2    remember about that?
3    A.   He had said a few days afterwards that he was
4    taking this medicine, this VIOXX, and the really neat
5    thing about it was it was helping his other leg, the
6    pain, it was helping the pain on that other leg.
7        Q.   At that time he had pain in both legs from
8    the injury and from the chronic condition?
9    A.   Uh-huh (witness nodding head in the affirmative).
10       Q.   And over the years has your husband been on
11   different kinds of pain medications for his knee?
12   A.   Yes, yes.
13       Q.   Okay.  Miss Humeston, I want to take you now
14   to September 18th, 2001 --
15   A.   Okay.
16       Q.   -- the day your husband had his heart attack?
17   A.   Okay.
18       Q.   When was the first time you remember -- what
19   is first thing that comes to your mind that day about
20   hearing about the heart attack or seeing anything that
21   related to it?
22   A.   When he -- I was sweeping the floor after doing
23   the kitchen, and he had gone in the shower, and he
24   called me in and said, um, I have got a pain in my
25   chest.
                    Page 49

**11 - 100305VX.txt**

Mary Humeston - Direct                    3031

1        Q.   Was this after dinner?
2    A.   Yes.
3        Q.   Did you have even a rough estimate about what
4    time it is?  If you don't, that's fine; if you do --
5    A.   I would say it was 7:00, sevenish.
6        Q.   What happened after he told you he had a pain
7    in his chest?
8    A.   I was -- said, well, could it be heartburn, and he
9    said, I never felt this before, and I don't think it is
10   heartburn, and so I said, Well, then we need to go to
11   the hospital.
12       Q.   Okay.  So what did you do?
13   A.   I called my son.  He had our car.
14       Q.   That was Seth, who was here before?
15   A.   Yes, yes.
16       Q.   Did he come with the car?
17   A.   Excuse me?
18       Q.   Did he come to the house with the car?
19   A.   Yes.
20       Q.   And then what did you and Mike do next?
21   A.   Jumped in the car, and on the way to the hospital
22   Mike said, you know, I want to stop at Dr. Lewer's
                    Page 50

**11 - 100305VX.txt**
23   house, and I was, like, I don't think you should.  And
24   he was hoping that Dr. Lewer would say, oh, it's okay,
25   it is heartburn, take some Gaviscon, and it will be

Mary Humeston - Direct                    3032

1    okay.  I was hoping that, too.
2        Q.   How far does Dr. Lewer live from you?
3    A.   A little less than a mile.
4        Q.   Now, when you say you went to his house, I
5    forgot to ask you this, are your family and Dr. Lewer's
6    family friends or --
7    A.   Well, yes, we are friends as a family, yes.  Our
8    sons grew up together, and Mike and Dr. Lewer have
9    this -- they do these hobbies they like to go to
10   breakfast and look for odd parts.  Dr. Lewer likes to
11   build telescopes, and they have developed a friendship
12   over the years, and I really -- the Lewer family is a
13   good family.  I make barbeque sauce, homemade barbecue
14   sauce, and I make sure they get a bottle of barbeque
15   sauce every Christmas, so --
16       Q.   Did you go to his house that day on the way
17   to the hospital?
18   A.   Yes.
19       Q.   What happened when you got there?
                    Page 51

Mary Humeston - Direct                    3033

20   A.   We walked around back because he was in the back
21   working on his telescope, and he was on the telephone.
22   And I walked in first, and he looked up and he said
23   What's up?  And Mike walked in, walked around the
24   backyard behind me, and he immediately put both hands
25   on his thighs and kind of leaned over, and Dr. Lewer

1    said, What's wrong?  And Mike said, I have a pain in my
2    chest.  And Dr. Lewer said, Do you have tightness in
3    your throat?  And he said, No.  And he says, Do you
4    have pain going down your arm?  And Mike said, No.  He
5    said, Are you sick to your stomach?  And Mike said, No.
6    He says, Are you sweating?  And Mike said, No.  And he
7    reached out and touched Mike and, of course, he was
8    sweating, but he was -- I think he was just so wanting
9    not to believe it that he -- and he said -- after
10   Dr. Lewer touched Mike he said, You have got to go to
11   the hospital.  And so I immediately put him in the car
12   and went to the hospital.
13       Q.   Okay.  How far away is the hospital from you?
14   A.   About 20 minutes.
15       Q.   Okay.  What happened when you got to the
16   hospital?
                    Page 52

11 - 100305VX.txt

17   A.   I pulled up to the emergency entrance and had him
18   get out.  And I started to think, well, what do I do
19   with this because I was worried an ambulance would
20   come.  I didn't know what to do with the car, so I left
21   the keys in it and then followed, and when I got there
22   they had him into the triage area, they had put him in
23   a wheelchair and taken him back.  And he was just going
24   through the doors, I could see him going through the
25   doors and so she, the clerk, wanted me to sit down and

                                                    3034
                 Mary Humeston - Direct

1   talk, and I lasted about 10, 15 seconds, and I said, I
2   have got to go back with him.  And so she said, That's
3   fine, I'll come back and get the information later.
4        Q.   Just to get a picture here, you stopped at
5   the desk and Mike was admitted in?
6   A.   Yes.
7        Q.   So that's when you were separated from him?
8   A.   Yes.
9        Q.   And do you remember this woman asking you
10   questions?
11   A.   Yes.  She had a clipboard, and she was asking
12   questions.
13        Q.   Did you finish the interview or that's what
                         Page 53

11 - 100305VX.txt

14   you meant when you said you wanted to go be with Mike?
15   A.   No, I didn't finish the interview.
16        Q.   Did you find him?
17   A.   Yes.
18        Q.   Where was Mike at the time?
19   A.   He was in the emergency room, the treating area,
20   and they were stripping him down and getting him ready
21   for I.V. and taking the stuff off of his chest and
22   doing those pads that they put on.
23        Q.   What was Mike's condition that you could see
24   at that time?
25   A.   He was pale and shaking and sweating.  He was

                                                    3035
                 Mary Humeston - Direct

1   panicked by then, and he was babbling.
2        Q.   What do you mean by "babbling"?
3   A.   He was just trying to just talk himself out of not
4   having a heart attack, just talking nonsense.
5        Q.   Okay.  And then what happened?
6   A.   They put the EKG on him and put the I.V. in and
7   had him lay down.  And they were giving him stuff in
8   the I.V. for pain, and asking him on his pain level,
9   and I don't remember, you know, the mechanics of that,
10   just asking him on that, and I was trying to be there
                         Page 54

11 - 100305VX.txt

11   with him because we're close, and I wanted to be with
12   him.
13             And, so, this -- I don't remember the
14   doctor's name that came in there just right away he was
15   giving instructions.  He read the EKG, the readout
16   thing and he said, okay, give him another nitro and
17   Mike says, I have never had a nitro, what, am I having
18   a heart attack?  And the doctor said, yeah, and his
19   exact -- it was odd the way he said it, Yeah, man, and
20   he put his hand on his harm there, yeah, man, you are,
21   you're taking a heavy hit to the bottom half of your
22   heart, and Mike kind of sat back, and so they gave him
23   nitro and they started working on him, and then I
24   started getting pulled away, and --
25        Q.   What do you mean you got "pulled away"?

                                                    3036
                 Mary Humeston - Direct

1   A.   One of the nurses just wanted me to get out of the
2   way, and I said, I need to be with him.  And she said,
3   If you want him to live you need us to be there, and so
4   I said, Okay.  So I went over to the head of the gurney
5   and just reached over and put my hands on his cheeks so
6   that he could feel that I was there.
7        Q.   Okay.  What happened next?
                         Page 55

11 - 100305VX.txt

8   A.   I'm sorry.  They did call -- made calls to the
9   cath lab and said that they needed to take him to find
10   out what was going on.  And so they started getting him
11   stabilized and getting him ready to go.  At that time
12   some time around there I called Dr. Lewer's house and
13   asked him to tell my son what had happened because I --
14   excuse me.  I didn't want to call my son and tell him
15   that his dad had a heart attack because I didn't want
16   to scare my son to death, and so I asked Dr. Lewer to
17   go over and to be with him and to tell him.  And then I
18   called my second daughter and told her -- I had called
19   some friends and called my second daughter and told her
20   and asked her to call her other sister, and then I
21   called my daughter in Miami -- in Boca Raton.
22        Q.   Did you stay with Mike until he was taken to
23   the lab?
24   A.   Yes.  They let me -- they let me walk with him
25   from the E.R. to -- it is quite a distance from the

                                                    3037
                 Mary Humeston - Direct

1   E.R. to the cath lab, and they let me walk with him and
2   hold his hand while we went there, and then they -- at
3   the waiting room where he had to go through they just
4   said, okay, they stopped and said, Okay, kiss him
                         Page 56

11 - 100305VX.txt

5   good-bye.  And they took him.

6        Q.   Where did you go when they put him into the

7   lab?

8   A.   In the waiting room.

9        Q.   Did anybody come to the hospital to be with

10  you?

11  A.   Yes.

12       Q.   Who was that?

13  A.   Some close family friends and then the kids got

14  there.

15       Q.   You mentioned a daughter in Florida.  Which

16  of your daughters lives in Florida?  At the time which

17  of your daughters lived in Florida?

18  A.   Rachel, my oldest daughter.

19       Q.   Did she come at some point to Idaho?

20  A.   Yes, a few weeks later.

21       Q.   Was she able to get there right away?

22  A.   No.

23       Q.   Why is that?

24  A.   It was the week after 9/11, and the flights --

25  available flights, although the flights were flying

                                                    3038
                    Mary Humeston - Direct

1   available flights were hard to get, and so it took her
                         Page 57

---

11 - 100305VX.txt

2   a while to be able to get there.

3        Q.   How long -- rephrase that.  When was the next

4   time you saw Mike?

5   A.   It was when he was coming into his room at the

6   CCU.

7        Q.   Do you have any idea how much later that was,

8   can you estimate for us?  If you can't, that's fine.

9   A.   It felt like forever.  Hours to me.  I don't know.

10  It was a long time.

11       Q.   Did anybody say anything to you when you came

12  out, tell you that he was out of the lab or how did you

13  know where to go?

14  A.   A nurse -- my son -- my son when we were waiting

15  he took it as I feared he would, and he was very upset,

16  and he would just -- he walked away, and I didn't know

17  where he went.  And he wandered back and I wanted to

18  know where he was, and he said I'm waiting for dad.

19  Then he left again.  And then, um, a little while later

20  he came out and said, I just saw him.  They're bringing

21  him to his room, and then a nurse came out and said, He

22  is coming out.  If you guys want to come with me I'll

23  show you where to go.

24       Q.   Was he awake when you found him?

25  A.   His eyes were open and he was speaking, but he was

                         Page 58

---

11 - 100305VX.txt
                                                    3039
                    Mary Humeston - Direct

1   just out of it.

2        Q.   Did you -- how long did you stay at the

3   hospital?

4   A.   I stayed all night.

5        Q.   And how did his condition change at all over

6   the next day or so?

7   A.   It became apparent he was going to live, and so he

8   was stabilized and Dr. Wetherly said that --

9        Q.   Let me stop you right there.  You saw

10  Dr. Wetherly at the hospital?

11  A.   Yes.

12       Q.   Did you have a conversation with him

13  concerning VIOXX at some point?

14  A.   Yes.

15       Q.   How long did your husband stay in the

16  hospital?

17  A.   He came -- I brought him home on Thursday.  It was

18  Tuesday evening, and I brought him home on Thursday.

19       Q.   Okay.  How long did you stay at the hospital

20  over that -- I guess that 48-hour period?

21  A.   I stayed most of the time.  I think the second

22  night I went home about 11:00 or 12:00 that night and

23  went back early the next morning.

24       Q.   When you took Mike home -- first of all, when
                         Page 59

---

11 - 100305VX.txt

25  you took him out of the hospital what did he seem to

                                                    3040
                    Mary Humeston - Direct

1   you, what was his condition like?

2   A.   That's hard to answer because I was feeling so

3   much relief that he didn't die, and so to me I was like

4   whatever, he is alive, and so, but he was -- he was

5   very subdued, and I think that's -- I would expect

6   that.

7        Q.   More subdued than he had been prior to the

8   heart attack?

9   A.   Oh, definitely.

10       Q.   And when he got home what were the next

11  couple days like?

12  A.   Just I was hovering over him and making him crazy,

13  and I was worried, and just had him laying down just

14  not doing much, just recuperating.

15       Q.   Did you take some time off from work?

16  A.   Yes, I took the rest of that week off.

17       Q.   How much time did Mike take off from work?

18  A.   He took off that week and then the following week.

19       Q.   Okay.  And what was he like the next two

20  weeks?  Was he awake and alert, was he walking around

21  at all?
                         Page 60

11 - 100305VX.txt

22  A.  Yes.  He was up and awake.  Like I said, I went
23  back to work and so he was awake and by himself.
24      Q.  What was his mood like when you were around
25  him the next few weeks?

3041
Mary Humeston - Direct

1  A.  He was very, very distant, very -- when you live
2  with somebody for a lifetime, 20 I don't remember how
3  many years, 28 years, you just are in sync.  You know,
4  you feel it how things are going, and it was not there,
5  it was like part -- he was trying to be positive, but
6  part of him was just flat, just not there.
7      Q.  How did he -- how did you feel when he went
8  back to work?
9  A.  I was very concerned.
10      Q.  What were you concerned about?
11  A.  That he went back to work too soon.
12      Q.  Did you tell him that?
13  A.  Oh, yes.
14      Q.  And what was his response?
15  A.  My husband is very stoic and a very tough guy, and
16  he said, I'm not going to sit here in this house by
17  myself and think about my heart attack.
18      Q.  So did he go to work?
Page 61

11 - 100305VX.txt

19  A.  Yes.
20      Q.  At some point do you remember your husband
21  calling you about getting some prescription refilled
22  when he went back to work?
23  A.  Yes, a few weeks later.
24      Q.  Was that about October 3rd?
25  A.  Yes.

3042
Mary Humeston - Direct

1      Q.  Was that about the same time he went back to
2  work?
3  A.  Yes.
4      Q.  So what happened when he gave you that call?
5  A.  Oh, he just called me at work and asked me if I
6  would pick up a prescription on the way home.  I
7  typically do that.
8      Q.  Did you know what it was -- when you received
9  the phone call did you know what you were picking up?
10  A.  No.
11      Q.  And did you go pick it up?
12  A.  Yes.
13      Q.  And what was it?
14  A.  It was VIOXX.
15      Q.  When you got home did you say anything to him
Page 62

11 - 100305VX.txt

16  about the VIOXX?
17  A.  Yes, I did.
18      Q.  And did you tell him -- what did you tell him
19  very briefly?
20  A.  I threw a fit.
21          MS. JONES:  Objection, Your Honor, hearsay.
22          MR. HORN:  I thought this was okay.  I'm
23  limiting it, Your Honor.
24          THE COURT:  Just don't say anything the
25  doctor said to you.

3043
Mary Humeston - Direct

1          MR. HORN:  What did you tell him about
2  whether or not he should take the VIOXX?
3          THE COURT:  Wait a second.  What's your
4  objection?
5          MS. JONES:  Okay.  It is still hearsay.
6          THE COURT:  I instructed her not to say
7  anything the doctor said to her.
8          MS. JONES:  I think we're still dealing with
9  hearsay.
10          MR. HORN:  I thought I was following Your
11  Honor's instruction.
12          THE COURT:  I'll allow her to answer
Page 63

11 - 100305VX.txt

13  BY MR. HORN:
14      Q.  Tell us what you said to him about whether he
15  should take VIOXX in the beginning of October?
16  A.  I threw a fit, and I was angry that it was VIOXX
17  because of the conversation.
18      Q.  Just tell us what you told your husband.  Did
19  you tell him not to take the VIOXX?
20  A.  Yes.
21      Q.  And now have you seen that bottle you picked
22  up in October?
23  A.  Yes.
24      Q.  Are all the pills still in that bottle?
25  A.  Yes.

3044
Mary Humeston - Direct

1      Q.  Did Mike ever take any of them?
2  A.  No.
3      Q.  Did you go to see Dr. Sim after Mike's heart
4  attack?
5  A.  Yes.
6      Q.  Did he become Mike's treating cardiologist?
7  A.  Yes.
8      Q.  Did you go see Dr. Lewer again, as well?
9  A.  Not as much.
Page 64

11 - 100305VX.txt

10      Q.  Okay.  He is still Mike's internist?
11  A.  Yes.
12      Q.  Just one question, ma'am.  When you picked up
13  the VIOXX as a general rule did you have to pay a part
14  of the prescriptions?
15  A.  Yes.
16      Q.  Approximately how much did you have to pay
17  for in general and how much for the VIOXX?
18  A.  It was 20 percent co-pay.  It was possibly about
19  30 bucks.
20      Q.  Now, I want to go back to the hospital for a
21  minute.  You remember you were telling us before about
22  filling out -- being asked questions with the woman
23  with the clipboard?
24  A.  Yes.
25      Q.  Okay. At some point did this woman come back

                                                    3045
            Mary Humeston - Direct

1  and finish the conversation with you?
2  A.  Yes.
3      Q.  First of all, I'm going ask you try to give
4  us a little context.  We're sitting in the courtroom,
5  and it is a little hard.  What was going on at the time
6  you were being asked these questions?
            Page 65

11 - 100305VX.txt

7  A.  It was chaos.  It was just there was this team
8  like, and I don't know how many, I would say four or
9  five medical people all around and trying to shove me
10  out of the way and attend to him, and it was -- and he
11  was scared to death.
12      Q.  And were you scared, as well?
13  A.  Um, yes, I was.
14      Q.  At the time were you trying to be -- were you
15  trying to be helpful to them and telling them what they
16  wanted to know?
17  A.  Yes.
18      Q.  Okay.  Ben, could you put up, counsel, I'm
19  going to refer now to 107.  It is already in evidence.
20  Could you put up 00107.  Okay.  Could you blow that up
21  right there?
22          Mary, do you recognize this what we're
23  looking at right now?
24  A.  I have seen that, yes.
25      Q.  If you need a break let me know?

                                                    3046
            Mary Humeston - Direct

1  A.  Okay.
2      Q.  You have seen this before?
3  A.  Yes.
            Page 66

11 - 100305VX.txt

4      Q.  Is Saint Alphonsus your hospital?
5  A.  Yes.
6      Q.  Is that where you took Mike that night?
7  A.  It is.
8      Q.  Do you remember filling out this form or
9  helping anybody fill out this form?
10  A.  I don't remember.  The lady was standing there
11  with the clipboard.  I don't --
12      Q.  Do you remember being asked what medications
13  Mike was on?
14  A.  Yes.
15      Q.  Do you remember right there did you tell them
16  he was on VIOXX?
17  A.  Yes.
18      Q.  Now I'm going to move over there.  Do you see
19  where there's a question mark right there for last
20  dose?
21  A.  Yes.
22      Q.  Do you have any memory of what was going on
23  when you told them that?
24  A.  Well, it was all of this stuff people telling
25  orders and one of the words I do know in medical stuff

                                                    3047
            Mary Humeston - Direct
            Page 67

11 - 100305VX.txt

1  when somebody says "stat" it means right now there's a
2  problem, and, of course, everything was that, and that
3  I assume that she wanted to know what time, what time
4  he took it.
5      Q.  Let's stop for a minute there.  Sitting here
6  today do you have any doubt whether or not he took
7  VIOXX the day of his heart attack?
8  A.  Oh, no, I don't have any doubt.
9      Q.  Take us back then to that date for a minute.
10  How do you remember that he took VIOXX on that date?
11  A.  Because he -- when he took the last two he asked
12  me to call in his prescription, and I was fixing
13  supper, and I had come home from work.  And I was
14  fixing supper, and he said, I need you to call it in,
15  can you call it in now?  And I said, No, I can't, I'm
16  fixing supper.  And so I was a little annoyed with him
17  for asking me to stop what I was doing and call in a
18  prescription for him.
19      Q.  But at the moment when all this, as you said
20  the word, chaos was going on you told them that he was
21  taking VIOXX?
22  A.  Yes, I did.
23      Q.  And at the time did you know what Mike's
24  condition was going to be?
25  A.  No.  I was scared.
            Page 68

11 - 100305VX.txt

3048
Mary Humeston - Direct

1    Q.   Okay.  You can take that down.
2         Now, Miss Humeston, if you can, to the best
3  of your ability, tell us some of the differences you
4  see in Mike now that are different from things you saw
5  before the heart attack.  If you want to start, for
6  example, around your house, what are some of the
7  differences you see in him?
8  A.  Mike loves to have the house look nice.  He takes
9  pride, I do, too.  We would do yard work.  I like to
10 garden.  And we had decided our front yard had a slope
11 in it, and the water would run off, not an
12 exaggerated -- not an exaggerated slope but a slope
13 where the water wouldn't absorb very well and there it
14 is very dry.  And so we had decided to build -- to
15 build up that and put a retaining wall in so it would
16 level it out.
17    Q.   Is Mike a handy guy?  Is he the kind of guy
18 that can do landscaping and build things?
19 A.  Oh, yes.  Yes.  And so we had planned on doing
20 that together, and so he had his heart attack and I did
21 it.  He would come out and sit with me or he would be
22 there when he could, but it is not something that he
23 was able to do.
Page 69

11 - 100305VX.txt

24    Q.   Now, was that a strange thing for you?  In
25 the past had you ever before the heart attack ever been

3049
Mary Humeston - Direct

1  the one to do that kind of maintenance work around the
2  house?
3  A.  No, no.  We would do things together, and it would
4  be a team.
5     Q.   Has Seth picked up some responsibilities
6  around the house since the heart attack?
7  A.  Yes, he has.
8     Q.   What are some of the things Seth has done?
9  A.  Seth will -- he does all the yard work.  He does
10 the repairs.  For example, we had a flood in our
11 kitchen and didn't know about it, and the only way I
12 found out about it was I came in the kitchen one
13 morning and the tiles were cracked across.  And so we
14 were looking to find out what happened, and I
15 discovered that underneath the sink there was a leak,
16 and it had been leaking, and it went underneath the
17 tiles and it swelled up.
18      So that had to be fixed.  Mike, he wants to,
19 and he tries, but Seth and I fixed the leak, and, of
20 course, I had to deal with the homeowner's insurance
Page 70

11 - 100305VX.txt

21 and getting the contractor in and all of that kind of
22 stuff.  That's something I never did before.  I just
23 didn't do that before.
24    Q.   When you say that, you mean things like
25 insurance and contractors and things like that?

3050
Mary Humeston - Direct

1  A.  Right, right.
2     Q.   How about things like paying the bills, you
3  know, doing the paperwork at home, how about things
4  like that?
5  A.  Mike typically does all the bills.  Before he
6  would pay the bills and that was just something I
7  didn't have to worry about.  Now he does the bills and
8  he reviews with me to make sure that he hasn't
9  forgotten anything and to make sure that I know what's
10 been done.
11    Q.   Now, so far you have been talking about
12 things like energy levels and things like that.  Why
13 would he need to go over the bills to make sure he
14 hasn't forgotten anything?
15 A.  A couple of things.  He doesn't trust his memory
16 anymore, and he wants me to know where all of the
17 information on money, things that I would need to know
Page 71

11 - 100305VX.txt

18 if I was by myself.
19    Q.   Okay.  Mike mentioned that he feels some
20 depression.  Have you ever seen that around the house?
21 A.  Yes.
22    Q.   Okay.  Can you tell us some examples of
23 things you have seen?
24 A.  That focus on his mortality is  -- that's the
25 really hard thing because we expected to grow old

3051
Mary Humeston - Direct

1  together, and we expected to die one day.  This is a
2  little bit early, and when he talks about making sure
3  that I know everything that I need to know when he is
4  not there, and it is not just once, that's the thing.
5  It is not.
6     Q.   How does it happen?  Give us some examples or
7  things that happen, things you have seen.
8  A.  He will -- right after the heart attack he went
9  through all of this, here's where the life insurance
10 is, this is another policy here.  This is everything,
11 just everything that he has done on the house.  This is
12 where you keep the furnace, this is the furnace
13 information, this is how you change the filters on the
14 furnace and all of that kind of stuff.  And I
Page 72

11 - 100305VX.txt

15   expected -- I guess I expected that because we just had
16   gotten a really big scare, but he does it all the time
17   now.  It is like it is something that he has to make
18   sure that I know and --
19        Q.   How about on a daily basis when he comes home
20   from work?
21   A.   When he comes home from work he is  -- he is
22   not -- he is not enthusiastic.  He is not -- a lot of
23   times in the summertime we have long days.  It doesn't
24   get dark until like 10:00, so when I get home I used
25   to love to just after work grab a picnic and just head

Mary Humeston - Direct                          3052

1   out to go up on the river and sit down and have a
2   picnic up there.  It is not a big deal.  It is not --
3   it is just nice, and he doesn't want to do that.
4   There's not a reason why.  It is just he doesn't have
5   the joy, he doesn't have the -- he doesn't have it.
6        Q.   Now, before we were talking about, you know,
7   some of the trips you used to take, the more rugged
8   ones in the eighties, the less rugged ones in the
9   nineties.  Are you still able to take trips and
10   vacations?
11   A.   Yes.
                        Page 73

11 - 100305VX.txt

12        Q.   Are they different at all?
13   A.   Yes.
14        Q.   How are they different?
15   A.   We used to go and camp and take trips and just
16   really go for the pushing, the adventure, the finding
17   something new.  Nowadays the rallies, for example, this
18   past rally we went to the Four Corners Region in the
19   southwest, and for years, probably 20 years, I have
20   dreamed of going to Mesa Verde.
21        Q.   Real quick, where is Mesa Verde?
22   A.   Mesa Verde is in southwestern Colorado.  You guys
23   have probably seen pictures of cliff dwellings, and
24   that's where they are is in Mesa Verde, and it is a
25   national park.  And so we wanted to go to see it.  I

Mary Humeston - Direct                          3053

1   have wanted to go for a long time, so we did that.  Our
2   rally was down into that area.  It was a very historic
3   and beautiful area, a lot of national parks in that
4   region, and so we went, and, for example, he instead of
5   going to cliff dwellings, which is down the path to go
6   there, it was kind of warm that day and so he was in
7   the air-conditioned visitor's center watching me with
8   some of our friends go down to the cliff dwellings.
                        Page 74

11 - 100305VX.txt

9        Q.   Now, before the heart attack would he have
10   been able to make that walk down to the cliff
11   dwellings?
12   A.   Yes.
13        Q.   Would he have ever missed that kind of thing?
14   A.   Oh, no.
15        Q.   And I don't want too many of these, but the
16   example you gave is that the kind of thing that happens
17   now?
18   A.   That is.
19        Q.   We heard about those Thing rallies.  Give us
20   a real quick explanation, what are these Thing rallies
21   we saw a website, what is that?
22   A.   This is a group of -- this car is called the
23   Volkswagen Thing.  And it is a unique car, and it is --
24   I guess you could call it a collector car because it is
25   very unique.  This is a group of people that we have

Mary Humeston - Direct                          3054

1   known for 15 years or more.  We all own these cars, and
2   like many people who have unique cars they rally, and
3   we like to go on rallies every year, and that's our
4   chance to get together with our friends.
5        Q.   So a rally is really like a convoy-type of
                        Page 75

11 - 100305VX.txt

6   thing where you drive together?
7   A.   Yes.  Yes.  Yes.  It is a chance -- we -- I do the
8   planning.  I have -- try to get a certain number of
9   miles, whatever, you know, the day in and do the
10   lodging at night, and we always stay in bed and
11   breakfasts now or hotels.
12        Q.   Now, are these strenuous -- physically
13   strenuous?
14   A.   They used to be more, but now they're not, no.
15        Q.   And are there other people, older people,
16   people of different kind of physical levels on these
17   trips?
18   A.   Yes.
19        Q.   Is most of it driving?
20   A.   Most of it is driving.  We will stop in -- those
21   who want to go exploring do, and those who don't want
22   to or can't will go -- because they said it is mostly
23   we can stop at a lot of national parks and national
24   monuments there's a lot of facilities now for people
25   who can't go out and see the rest of the park, so we do

Mary Humeston - Direct                          3055

1   that.  One of the ladies is on a drug that thins her
2   blood, and so she has to get her blood checked every so
                        Page 76

11 - 10030SVX.txt

3  often, so...
4      Q.   Are you ever by yourselves or out of radio
5  contact with anybody around you?
6  A.   No.  We have CB radios and we have cell phones.
7      Q.   And you stay in hotels and things like that?
8  A.   Yes.
9      Q.   Before Mike's heart attack did you used to go
10 to doctors' appointments with him?
11 A.   No.
12     Q.   Do you go now?
13 A.   Yes.
14     Q.   Why is that?
15 A.   He is a big guy.  He is a big boy, he can take
16 care of himself.  Now if goes to Dr. Sim I need to go
17 with him.  I need to for a couple of reasons.  I need
18 to -- I need to know how he is doing.  I need to
19 understand because I have assumed the role of
20 caretaker, and as far as his heart and what he needs to
21 do just to live.  I want him to live and so I go.  He
22 wants me there because he doesn't understand half the
23 time when there is a lot of technical stuff or when
24 there's a medication that needs to be adjusted or
25 something like that he gets confused on now when am I

                                            30S6
                    Page 77

11 - 10030SVX.txt
                Mary Humeston - Direct

1  supposed to take it and how often, and what is the
2  consequences if I mess up.  So I need to be there as
3  his safety to make sure that he does as he is supposed
4  to do prescribed or he does his medicines and stuff.
5      Q.   Why does he get confused now, what did you
6  mean by you said he gets confused?
7  A.   Well, for example, the Coreg that he is on has to
8  be taken 12 hours apart with food, and when he was
9  first put on it it was like a switching from one drug
10 to the other and so there was take so much of this at
11 this time and back off on one and increase the other
12 four for two weeks and then two and a half and that
13 type of thing, that was confusing.  And then, of
14 course, he gave the precaution that he wanted us to --
15 Mike, I say us because -- he wanted us to do it in that
16 way so that he wouldn't have any adverse effects, and
17 here I don't know what that is but adverse effects of
18 that switching of the medicine.
19     Q.   So do you monitor Mike's medication now?
20 A.   100 percent.
21     Q.   Miss Humeston, I don't want to delve into
22 this too much.  I want to ask you a few quick questions
23 about it.  Has your personal companionship with Mike
24 been affected after the heart attack?
25 A.   Yes.
                    Page 78

11 - 10030SVX.txt

                                            3057
                Mary Humeston - Direct

1      Q.   Extremely -- has it been affected adversely?
2  A.   Yes, it has.
3      Q.   Okay.  Was there a period of time, we heard
4  about this briefly, when you and Mike were eventually
5  planning a retirement in a more remote area of Idaho?
6  A.   Yes.
7      Q.   And where was that?
8  A.   Kamiah.
9      Q.   And in two sentences or less what is Kamiah
10 like?
11 A.   It is a small, beautiful, little town on Clear
12 Water River.  I say it is beautiful because it is in a
13 valley and the Clear Water River is absolutely clear,
14 and it is remote.  It is quiet, and it is a small
15 community.
16     Q.   Had you actually been up there looking for
17 places to eventually move to?
18 A.   Yes.
19     Q.   Had you picked out an area?
20 A.   Yes.
21     Q.   At some point did you begin to think you
22 might not be able to move there?
                    Page 79

11 - 10030SVX.txt
23 A.   Yes.
24     Q.   When was that?
25 A.   Since his heart attack and since he's had to

                                            3058
                Mary Humeston - Direct

1  manage the changes.
2      Q.   Was it suggested by Dr. Lewer for medical
3  reasons it would not be a good idea to move there?
4  A.   Yes.
5      Q.   Is that something you otherwise you would
6  have liked to have done?
7  A.   Absolutely.
8      Q.   Now, it was suggested that you still do go to
9  these remote areas in the Thing rallies away from
10 medical centers, so how is it you still would be able
11 to think about moving to a remote area?
12 A.   We're trying to live our life, and living in a
13 remote area is different than taking a week's vacation
14 or a two- or three-day drive.  We don't want to -- I
15 think it would kill Mike to just sit at home and buy a
16 house next to a medical center.  We're trying to live
17 our life and trying to say, okay, how are you doing and
18 we want to live.
19     Q.   But would you be able to still move to a
                    Page 80

11 - 100305VX.txt
20    place like Kamiah?
21    A.    Well, they don't have the facilities there.
22        Q.    And what is the most you're ever away from
23    Boise at these Thing rallies?
24    A.    On the yearly rally the most we're ever away is
25    nine to 12 days at the most.

3059
Mary Humeston - Direct

1        Q.    And are you ever far away from a place where
2    there are rangers and things like that?
3    A.    Oh, no, no.
4        Q.    Just two more quick areas. Miss Humeston, do
5    you remember there was some suggestion about, I think
6    you were in the courtroom, about Mike running out of
7    pills in August?
8    A.    Yes.
9        Q.    Do you remember how he was taking VIOXX?
10    A.    Yes.
11        Q.    What do you remember about that?
12    A.    He would take them when he needed them. Sometimes
13    he was in more pain than others. Sometimes -- it is
14    like I said before, his pain is affected by weather,
15    sleep, just many different things, and he has never
16    been one to take medicine if he didn't need it, so he
Page 81

11 - 100305VX.txt
17    would take it as he needed it.
18        Q.    Okay. You just actually answered my last
19    question. Is your husband the kind of guy that would
20    take medication if he didn't need it?
21    A.    Oh, no.
22        Q.    If he was taking it daily -- withdrawn.
23            Would you ever see Mike take a medication
24    daily if it wasn't working?
25    A.    Oh, never, no.

3060
Mary Humeston - Direct

1        Q.    And, again, I think you saw those slides
2    about him running out of medication mid August. In the
3    past whenever Mike ran out of pain medication and he
4    needed it what would he do?
5    A.    Refill it.
6        Q.    And did he ever ask you to refill it at any
7    point in August?
8    A.    No. No. We had it, so we didn't need to refill
9    it.
10        Q.    When you say you had it you mean you had
11    VIOXX at home?
12    A.    Yes.
13        Q.    Were there refills available if you needed
Page 82

11 - 100305VX.txt
14    it?
15    A.    Oh, yes, a years' worth.
16        Q.    But you never went and refilled anything
17    until the 18th?
18    A.    Yes, until he was out. Well, I mean, I was
19    supposed to on the 18th.
20        Q.    You didn't actually call it in?
21    A.    Right.
22        Q.    That's when had you the discussion about it?
23    A.    Right.
24        Q.    Okay. You have heard a lot of -- I am sure
25    you have heard a lot about this as far as stress?

3061
Mary Humeston - Direct

1    A.    Yes.
2        Q.    Over the years tell us your husband stress
3    level what have you seen?
4    A.    We raised four children. We both worked. I don't
5    know anybody that could do that and not have some
6    stress. It is life. It was not something that I
7    observed that there was any huge issues. We had three
8    teenage girls at one time.
9        Q.    We heard about Mike and a union job?
10    A.    Yes.
Page 83

11 - 100305VX.txt
11        Q.    Do you remember in the late eighties Mike had
12    that job?
13    A.    Yes.
14        Q.    Was that a stressful time?
15    A.    It was tough. It was tough because Mike is a very
16    caring and passionate man. He viewed his
17    responsibility to help people very seriously, and, yes,
18    it was tough because sometimes there was just inane
19    things that people would do, and he still -- that was
20    his job.
21        Q.    And during that stressful period did he ever
22    have any major heart problems?
23    A.    No.
24        Q.    Do you remember any major stressful issues in
25    the nineties?

3062
Mary Humeston - Direct

1    A.    Other than raising three teenage girls.
2        Q.    Okay. Now, there's been some discussion
3    about stress during the changes at work and issues with
4    his supervisors. Are those the kind of things that you
5    would see at home majorly stressful or alarming or
6    anything like that?
7    A.    No. He would discuss with me what's going on, but
Page 84

11 - 100305vx.txt

8  I never got a sense that there was a big problem.  I
9  just never was -- I never got a sense that there was
10  any kind of a huge problem that it was just issues that
11  needed to be worked out and you deal with it.
12     Q.   Okay.  Could you put up 0075.
13          Okay.  Miss Humeston, have you seen this
14  document during the course of the trial?
15  A.  Yes.
16     Q.   Is this from the hospital when Mike was
17  admitted for the heart attack?
18  A.  Yes.
19     Q.   Could you just blow it up a little bit,
20  please?  There we go.
21          Okay.  Miss Humeston, do you see here where
22  it talks about stress at home?
23  A.  I see that.
24     Q.   Okay.  Do you know who filled this out?  Do
25  you know if it was you or Mike or a hospital

                                                        3063
              Mary Humeston - Direct

1  professional?
2  A.  I don't know who filled that out, no.
3     Q.   Do you know what they're talking about there?
4  Was there anything that you remember seeing at home?
                    Page 85

---

11 - 100305vx.txt
5  A.  No, there wasn't.  At that time it was football
6  season.  It was my son's senior year.  The girls had by
7  then moved out and football season is a great time when
8  you have a son in high school that plays football.  It
9  is fun, and so I don't know what it is about.
10     Q.   Do you see it says, anxious, upset about
11  possibility of MI?
12  A.  Yes.
13     Q.   Do you remember who told them that or who
14  noted that down, do you have any idea?
15  A.  I don't know.
16     Q.   Okay.  And right there is that referring to
17  anxiety about the actual heart attack itself?
18  A.  Where are you pointing?
19     Q.   Right here where it is highlighted.
20  A.  Yes, it looks like that's what it is says.
21     Q.   Anxious and upset about possibility of MI?
22  A.  Yes.  He was.  We both were.
23     Q.   When you saw him there was he clearly in a
24  state of anxiety?
25  A.  Big time.

                                                        3064
              Mary Humeston - Direct

1     Q.   At the hospital?
                    Page 86

---

11 - 100305vx.txt
2  A.  Oh, yes, oh, yes.
3     Q.   Now, you can take that down.
4          You have heard a lot about this video and a
5  phone call from Dr. Lewer.  Do you remember when this
6  phone call happened?
7  A.  I don't remember when it happened, I'm sorry.
8     Q.   Do you remember the phone call?
9  A.  I remember the phone call.  I just don't remember
10  when.
11     Q.   It could have been before or after the heart
12  attack?
13  A.  I don't know yes.
14     Q.   What do you remember about the phone call?
15  A.  I remember him laughing and talking about Bisja.
16     Q.   Who is Bisja?
17  A.  Bisja is my dog.
18     Q.   Why were they laughing about Bisja?
19  A.  Because she was in the video, in the surveillance
20  video.  And she is my dog and she is a pretty social
21  dog, and so she was hanging out with Mike in the video.
22     Q.   Now, you don't remember if the call came on
23  the night of the 17th?
24  A.  I don't.
25     Q.   Do you remember anything abnormal about the

                    Page 87

---

11 - 100305vx.txt
                                                        3065
              Mary Humeston - Direct

1  night of the 17th, putting aside that phone call, do
2  you remember fights or stress or anything else
3  abnormal?
4  A.  You know, I tried -- I have spent a lot of time
5  reflecting on that, and I just don't -- I don't know
6  what that's about.  I don't remember any fights or --
7     Q.   On the morning of the 18th did Mike go to
8  work?
9  A.  Yes.
10     Q.   Did it seem like any abnormal or a different
11  kind of workday?
12  A.  No.
13     Q.   Even if that phone call happened did he go to
14  work with anxiety -- did you have any conversations
15  about him having anxiety going to work, problems,
16  fearful of anything?
17  A.  No.  We both just got up and went to work like
18  normal.
19     Q.   When you saw him after that day at work did
20  you have a normal dinner?
21  A.  Yes.
22     Q.   Do you remember him before that heart attack
23  that night being alarmed about anything at work,
24  bothered, overly concerned?
                    Page 88

11 - 100305VX.txt

25  A.  No.  It was a pretty normal evening.  I fixed

3066

Mary Humeston - Direct

1  supper, we ate supper, cleaning up, he was eating milk
2  and cookies and watching the news.  I mean, we felt a
3  lot of the news was, of course, about 9/11 still then
4  and it was sad.  It was very sad.  We're a country
5  away, but it is our country, so we were feeling sad,
6  but I mean...
7       Q.  And Seth had gone to be at his friend's
8  house?
9  A.  Right.
10      Q.  So there's nothing you remember about the
11  period of time between the possible phone call the
12  night of the 17th and the heart attack on the 18th that
13  you can think about that was different than any of your
14  normal life?
15  A.   There is nothing that -- I don't remember
16  anything.
17           MR. HORN:  One moment please, Your Honor.
18  Thank you very much, Miss Humeston.  No further
19  questions at this time.
20           THE COURT:  Counsel?  Cross.
21           THE COURT:  Okay.  We have to take a short

Page 89

11 - 100305VX.txt

22  break.  A juror wants a short break first.
23           (The jury leaves the courtroom.)
24           (Break taken.)
25           THE COURT:  You can be seated.  You can bring

3067

Mary Humeston - Cross

1  the jury in.
2           (The jury enters the courtroom.)
3           THE COURT:  You can be seated.  Proceed with
4  cross, counselor.
5  CROSS-EXAMINATION BY MS. JONES:
6       Q.  Good afternoon, Miss Humeston.
7  A.  Hello.
8       Q.  Miss Humeston, you love your husband very
9  much, don't you?
10  A.  I love him with all my heart.
11      Q.  You have got a very good marriage, don't you?
12  A.  I do.
13      Q.  You are very close to him, are you not?
14  A.  Excuse me?
15      Q.  You're very close?
16  A.  Yes.
17      Q.  You have not had to have any counselling as a
18  result of his heart attack?

Page 90

11 - 100305VX.txt

19  A.  Not had to have any counselling?  I don't
20  understand what you mean.
21      Q.  You haven't had any counselling, have you,
22  since his heart attack?
23  A.  No.
24      Q.  And, indeed, you have told us about
25  Mr. Humeston's depression and his concern, and he has

3068

Mary Humeston - Cross

1  not had any type of counselling since his heart attack,
2  has he?
3  A.  No.
4       Q.  And, in fact, I believe you told us at the
5  time of your deposition that his doctors haven't placed
6  any restrictions on what he can do and not do?
7  A.  They said he can do what he felt like doing.
8       Q.  He should do whatever he felt like doing?
9  A.  Uh-huh (witness nodding head in the affirmative).
10      Q.  Let me turn quickly, Ms. Humeston, to the day
11  of the taping that you talked about just briefly.  That
12  taping took place, that surveillance took place on July
13  the 19th, did it not?
14  A.  I don't remember the date, I'm sorry.
15      Q.  You do know that it was while he was at home

Page 91

11 - 100305VX.txt

16  off work after he had injured his right knee, don't
17  you?
18  A.  Yes.
19      Q.  And if I represented to you that his knee was
20  injured and he went to see Nurse Holstine on July the
21  16th it would be three or four days after that that the
22  taping took place, correct?
23  A.  I believe so.
24      Q.  And Nurse Holstine had suggested that after
25  he injured his right knee that he go home, take a few

3069

Mary Humeston - Cross

1  days off, keep his knee immobilized and then to come
2  back to see Dr. Lewer or Nurse Holstine on July the
3  20th, didn't she?
4  A.  I assume that's it.  I didn't -- I wasn't
5  intimately involved.
6       Q.  That's fair enough.  You didn't go see
7  Dr. Lewer with your husband, did you?
8  A.  No.
9       Q.  And as I recall you testified, I think this
10  morning, that generally he took care of his own medical
11  things at the time, did he not?
12  A.  That's correct.

Page 92

11 - 100305VX.txt

13    Q.    And so you weren't with him when Dr. Lewer
14 prescribed the VIOXX on May the 1st, were you?
15    A.    No.
16    Q.    And you weren't with him when Nurse Holstine
17 prescribed the VIOXX on July the 16th, were you?
18    A.    I wasn't.
19    Q.    And I take it by the same token you didn't go
20 back with Mr. Humeston to see Dr. Lewer on July the
21 20th, later in that week?
22    A.    No.
23    Q.    In fact, Miss Humeston, as I recall, at the
24 time of your deposition you didn't even realize that
25 Dr. Lewer had prescribed VIOXX initially for

                Mary Humeston - Cross              3070

1 Mr. Humeston's left knee, did you?
2    A.    That's correct.
3    Q.    You thought he had only prescribed it for the
4 right knee in July, correct?
5    A.    Yes, I think so.
6    Q.    And I think it is also fair to say when we
7 talked with you at your deposition you didn't remember
8 whether Mr. Humeston had taken one pill or two
9 times (sic) during the course of that summer, did you?
                    Page 93

11 - 100305VX.txt

10    A.    We didn't talk about it.
11    Q.    So as you sit here today you can't tell us --
12    A.    Wait a minute.  You said during the course of the
13 summer.  Are you talking about --
14    Q.    While he was taking VIOXX.  I mean
15 Mr. Humeston testified that he only took two pills of
16 the May prescription.  I understand that.  After he got
17 another prescription in July do you remember whether he
18 would take one or two pills at a time?
19    A.    I remember he took it, and I know that he took one
20 or two pills.  I don't know exactly the dates that he
21 took it.  But you had confused me you said over the
22 course of the summer because July is in the summer, and
23 I knew that he took it after July, but we didn't talk
24 about it, you know.
25    Q.    So as you sit here today you don't have any

                Mary Humeston - Cross              3071

1 recollection of him taking it before July?
2    A.    I don't.
3    Q.    And you know that he took it at some point in
4 time after he got it prescribed to him in July, and
5 you're not able to tell us whether he took two pills
6 more than he took one pill or he took one pill most of
                    Page 94

11 - 100305VX.txt

7 the time --
8         MR. HORN:  Objection, asked and answered.
9         MS. JONES:  -- is that clear?
10         THE WITNESS:  I just know that he took as he
11 needed it.  I don't know -- I don't know.
12 BY MS. JONES:
13    Q.    And then other than on the day of September
14 the 18th you can't tell us any day specifically by date
15 that he took it or didn't take it, can you?
16    A.    By date?
17    Q.    Yes, ma'am.
18    A.    I didn't know I was supposed to be remembering.
19    Q.    But you were the one that would generally go
20 and pick up the prescription?
21    A.    Yes.
22    Q.    Would those prescriptions be called in by
23 your husband or were they called in by the doctor or
24 did you call them in?
25    A.    It could be any of the above.  It depended on if

                Mary Humeston - Cross              3072

1 the doctor -- it was an initial thing or it was a
2 refill or he said oh, I need to call it in or can you
3 call it in for me.  It could be --
                    Page 95

11 - 100305VX.txt

4    Q.    And we looked at the pharmacy records the
5 other day, Miss Humeston, and I can pull them out if we
6 need to but, do you remember that there were
7 prescriptions that were filled on August the 17th for
8 Vicodin and Ultram?
9    A.    If that's in there that's fine.  I don't remember
10 it, but that's sounds logical.
11    Q.    Do you remember, Miss Humeston, that your
12 husband took both Vicodin and Ultram?
13    A.    I remember that he had prescriptions for those,
14 and that he would -- you know, you have to realize that
15 he was taking care of himself, so I didn't -- I mean, I
16 can't give you any, I'm sorry, I can't.
17    Q.    I understand.  That's fair.  If the
18 prescription records which we have already admitted
19 into evidence show that he got a prescription filled
20 for Vicodin and Ultram in August you would have been
21 the one to pick up those prescriptions?
22    A.    I could have, yes.
23    Q.    Were you generally the one that picked them
24 up at Albertson's?
25    A.    A lot of times, unless I couldn't, and then

                Mary Humeston - Cross              3073
                    Page 96

11 - 100305VX.txt

1   somebody else did.
2       Q.   And do you remember that when you picked up
3   the prescription in October after the heart attack that
4   there was not only a prescription for VIOXX but there
5   was a prescription for Vicodin at the same time?
6   A.   It could be.  You know, I don't remember.
7       Q.   That would be something we would need to look
8   at the pharmacy records?
9   A.   If it is in the records.  If it is there I would
10  have, yes, I would have brought it home.
11      Q.   Just one more question, Miss Humeston.  Do I
12  recollect that you told us that Mr. Humeston generally
13  took his medicine his VIOXX or his pain medicines in
14  the morning?
15  A.   I don't remember.  I don't know.  I don't even
16  remember if I said that or if I -- I don't know.
17      Q.   Do you remember, in fact, that he generally
18  took his medicines in the morning with breakfast?
19  A.   No, I don't remember that.
20      Q.   You do remember when you gave your deposition
21  in this case in March of this year?
22  A.   Uh-huh (witness nodding head in the affirmative).
23      Q.   Obviously, at that time just as you're doing
24  here today, you were doing your best to tell the truth?
25  A.   Absolutely.

                    Page 97

11 - 100305VX.txt

                                                3074
                Mary Humeston - Cross

1       Q.   And do you remember being asked when during
2   the day he typically would take his VIOXX?
3   A.   I don't remember the question.  It probably was
4   asked, but I don't remember.
5       Q.   I'm going to show you Page 22 of your
6   deposition.  Let me just show you Page 22 of your
7   deposition, Miss Humeston, Line 20.
8   A.   Okay.
9       Q.   Does that refresh your recollection in terms
10  of the question and the answer that you gave at the
11  time?
12  A.   Honestly it doesn't.  I see that's what my
13  response was.  I said typically in the morning if he
14  forgot he would take it in the evening, so, I'm sorry,
15  I just don't remember specifically.  I remember sitting
16  there for the deposition, but I don't remember all the
17  questions.  I just answered.
18      Q.   I understand you don't remember all the
19  questions and the answers, but you do remember that
20  generally he would take his medicine at breakfast, do
21  you not?
22  A.   You know, he would take his medicine when he
23  needed it, so I answer my best, and if it was in the
                    Page 98

11 - 100305VX.txt

24  morning it would be in the morning, if it was later it
25  was later.

                                                3075
                Mary Humeston - Redirect

1       Q.   The fact of the matter is, Miss Humeston,
2   that at that point in time Mr. Humeston was taking care
3   of himself with all the medications, right?
4   A.   Yes.  He would ask me can you get me something,
5   but, generally, yes.
6       Q.   You might go to the pharmacy for him and pick
7   them up or whatever, but he decided when he needed them
8   and he would decide how much he needed to take of them,
9   right?
10  A.   Yes.
11          MS. JONES:  And I thank you.  I think that's
12  all I have, Miss Humeston.
13          MR. HORN:  Just a moment, Your Honor.  Very
14  briefly, Your Honor.
15  REDIRECT EXAMINATION BY MR. HORN:
16      Q.   Miss Humeston, you were asked some questions
17  about your husband taking Vicodin and Ultram?
18  A.   Yes.
19      Q.   Do you remember that?
20  A.   Yes.
                    Page 99

11 - 100305VX.txt

21      Q.   When you went to the hospital on September
22  18th you weren't thinking about a lawsuit or litigation
23  or anything; is that right?
24  A.   I was scared to death he was going to die.
25      Q.   Were you trying to give the hospital all the

                                                3076
                Mary Humeston - Redirect

1   relevant information you had at the time?
2   A.   Yes.
3       Q.   Would you have any reason to not tell them
4   about certain medications or tell them about incorrect
5   information medications?
6   A.   No.  I wanted the doctors to help him.  I wanted
7   him to live.
8       Q.   We saw that record before where you told them
9   VIOXX.  Why did you tell them VIOXX?
10  A.   Because I knew he took it.
11      Q.   You were asked some questions about whether
12  or not your husband had received any counselling or
13  taken any medications for depression?
14  A.   Right.
15      Q.   Is your husband the kind of guy that is going
16  to go to counselling?
17  A.   My husband is a very strong, stoic man.  We have a
                    Page 100

11 - 100305VX.txt

18  relationship that we talk to each other.  We help each
19  other.  If we hurt we talk to each other.
20      Q.   Does he seem like the kind of guy -- is he
21  the type of person that would want to go for
22  counselling?
23  A.   No.  No.  Just no.
24      Q.   Is he the type of person that would want to
25  take more medication for depression?

                                                    3077
                    Mary Humeston - Redirect

1   A.   Oh, my gosh, after this both of us are scared to
2   death of medicine.
3       Q.   Has he ever wanted to take any more
4   daily -- any more daily pills?
5   A.   No.
6       Q.   What is he on now for his knee?
7   A.   When he needs help for the pain he takes
8   Ibuprofen, and for a while he did use Vicodin
9   occasionally.  He doesn't like to take that because the
10  side effects -- I think it is a narcotic.  It is
11  different, and so he would have it on hand in case it
12  was necessary, but mostly it is prescription Ibuprofen.
13      Q.   Okay.  Do you remember you were shown a
14  deposition a minute ago, but you don't remember the
                    Page 101

11 - 100305VX.txt

15  question?
16  A.   Yes.
17      Q.   I want to put it back up there for a minute.
18  You were asked a question when during the day did he
19  typically take his VIOXX, and the answer is, Typically
20  in the morning, if he forgot he would take it in the
21  evening?
22  A.   Right.
23      Q.   Did it happen sometimes he would take it in
24  the evening?
25  A.   Oh, yes.

                                                    3078
                    Mary Humeston - Recross

1       MR. HORN:  Okay.  No further questions.
2   Thank you.
3   RECROSS-EXAMINATION BY MS. JONES:
4       Q.   Briefly, Your Honor.
5           Miss Humeston, at the time you took
6   Mr. Humeston to the hospital we have talked about the
7   fact that you actually did sign what we previously
8   marked as Exhibit 56 -- let me see.  Oh, I'm sorry.
9   564.107 did you not, that's your signature at the
10  bottom?
11  A.   That's my signature.
                    Page 102

11 - 100305VX.txt

12      Q.   And we have looked at this line here that
13  says, VIOXX 25 milligrams, do you see that?
14  A.   Yes.
15      Q.   And there you say one per day?
16  A.   Yes, that's what the instructions are on, you
17  know, what it says.
18      Q.   But that's not necessarily the way Mr.
19  Humeston took it, was it?
20          MR. HORN:  Objection.  Your Honor, this is
21  beyond the scope of redirect.  Dosage, I didn't enter
22  the dosage at all.
23          THE COURT:  The objection is overruled.
24  BY MS. JONES:
25      Q.   Do you know whether or not -- she is

                                                    3079
                    Mary Humeston - Recross

1   basically telling you, Miss Humeston, you can answer
2   the question.  Do you know whether or not he took the
3   VIOXX that way?
4   A.   What way?
5       Q.   One per day as opposed to two per day.
6   A.   He took it sometimes one per day and sometimes two
7   per day.
8       Q.   But as you sit here and am I right that at
                    Page 103

11 - 100305VX.txt

9   the same time he was taking Ultram?
10  A.   You know, I don't know.  That was prior heart
11  attack, and so he could have, but I don't know.  I
12  can't tell you that Mary Humeston knows.
13      Q.   The fair thing is as we sit here today that
14  you, Miss Humeston, don't know what he took and what he
15  didn't take at what different period of time prior to
16  his heart attack, is that right?
17  A.   I did know that he was taking the VIOXX because it
18  worked.
19      Q.   But you didn't know whether he was taking one
20  a day or two a day or which days he took it, right?
21  A.   I think I already said that he was taking it as he
22  needed it for the pain, and sometimes he would take
23  one.  Sometimes he would not take it at all in the day
24  and sometimes he would take two.  It just depends on
25  the pain, but I know that he was taking it because it

                                                    3080
                    Mary Humeston - Recross

1   worked for the pain, and I know that that day he took
2   it because he said he took the last two, please call in
3   my prescription.
4       Q.   And you also know that he was taking Vicodin
5   at the time?
                    Page 104

11 - 100305VX.txt

6    A.   He had a prescription for it, yes.

7         Q.   Can you tell us when he took Vicodin?

8    A.   When he needed it.

9         Q.   And you also know he was taking Ultram at the

10   time?

11   A.   I understand there's a prescription for it.

12        Q.   And can you tell us when he was taking that?

13   A.   When he needed it.

14        Q.   But in terms of going back and looking at any

15   individual day whether he took one pill or two days or

16   whatever you can't tell us that?

17   A.   Ma'am, I didn't know we were supposed to be

18   remembering that.  We were just living our lives and

19   didn't know that there was going to be this horrible

20   stressful thing happening now.

21        MS. JONES:  Thank you.

22        MR. BUCHANAN:  Just a minute, Your Honor.

23        THE COURT:  You can take the jury out.

24        (The jury leaves the courtroom.)

25        MR. BUCHANAN:  Your Honor, could we approach

                                                    3081
                 Mary Humeston - Recross

1    on something?

2         THE COURT:  Sure.
                 Page 105

---

11 - 100305VX.txt

3         MR. BUCHANAN:  Your Honor, I think we

4    correctly predicted that the suggestion would be raised

5    that the only thing Miss Humeston remembers is the

6    VIOXX, and she doesn't remember any other drug and the

7    fact of the matter is the reason she remembers that one

8    drug is because of the conversation with Dr. Wetherly.

9    I think it is really an issue, and it could be offered

10   for a nonhearsay --

11        MR. HORN:  This was unfair.  There were 15

12   questions in a row on her not remembering one

13   medication, and we all know why she remembers that, and

14   that is a classic shield and sword issue.  I stayed

15   away from it, but that was patently unfair.

16        MS. JONES:  Your Honor, it is hearsay.  You

17   allowed him to ask or to go into the fact that she was

18   allowed to take VIOXX simply because she had a

19   conversation with Dr. Wetherly.  That's fair.  Anything

20   beyond that is inappropriate and is hearsay as Your

21   Honor is aware.

22        MR. HORN:  I wasn't allowed to ask those

23   questions.  I wasn't allowed to ask do you remember

24   because of the conversation with Dr. Wetherly, I

25   specifically was not allowed to ask that.  All I was

                                                    3082
                 Page 106

---

11 - 100305VX.txt
                 Mary Humeston - Recross

1    allowed to ask was did you have a conversation with a

2    doctor.  If you let me ask that question now I'll live

3    with that.

4         THE COURT:  What's the question going to be?

5         MR. HORN:  Why do you remember VIOXX and not

6    Ultram and Vicodin and say I have a conversation with

7    Dr. Wetherly about it.  The questions were you don't

8    know what he took and when, and there's a reason for

9    that.  Now they're hiding behind a shield, and they're

10   using it as a means of attack.

11        THE COURT:  Well, hearsay is hearsay.

12        MR. HORN:  All I want to say is why and why

13   is it you remember that.  It is not she didn't know if

14   there was a study.  She doesn't know if there was a

15   study.  She doesn't care if there was a study.  She

16   doesn't care if Wetherly was right, all she knows --

17        THE COURT:  I think sitting here today she

18   cares whether there was a study and why.

19        MR. HORN:  But she remembers it because

20   somebody said something to her.

21        MR. RABER:  She remembered because it worked,

22   and he said he ran out of the two pills.

23        MR. HORN:  That's because I instructed her

24   not to answer the other way based on the Judge's

25   instructions, so that's patently unfair to phrase it
                 Page 107

---

11 - 100305VX.txt

                                                    3083
                 Mary Humeston - Recross

1    that way, Mr. Raber.

2         MS. JONES:  It is hearsay.

3         MR. HORN:  It is a black letter exception.

4         MS. JONES:  It has nothing to do with the

5    effect on the listener.

6         MR. HORN:  It is a challenge to credibility

7    and the fact he took it is the exact reason why she

8    believes it, because she was told --

9         THE COURT:  But that you already got in.

10        MS. JONES:  Yes.

11        THE COURT:  She was told about VIOXX, and she

12   said she had a conversation with VIOXX with the doctor.

13        MR. HORN:  I wasn't allowed to ask her why do

14   you remember the VIOXX and not others, all I could ask

15   was did you have a conversation with a doctor about

16   VIOXX, and I stopped.  The next question which I would

17   have said, if you allowed me to, then why do you

18   remember VIOXX and not Ultram and Vicodin because of

19   that conversation with the doctor, and I can live with

20   that ruling, but it is literally unfair for them to say

21   to her you don't remember this, you don't remember that

22   when she does remember, and there's a reason she
                 Page 108

11 - 100305VX.txt

23  remembers, and they're hiding behind it now.
24          MS. JONES:  Everything she was asked about
25  dealt with what he had done up until the time of his

3084

Mary Humeston - Recross

1  heart attack.
2          MR. HORN:  Why does she not remember Ultram
3  and Vicodin?  Because no doctor said it caused the
4  heart attack.  She remembers what Dr. Wetherly said.
5  It is a really unfair attack.  The jury is left with an
6  impression that she has no idea when how could she
7  possibly remember VIOXX as an answer.
8          THE COURT:  First of all, when she gave her
9  history to the personnel that was before she had spoken
10  to Wetherly.  So at that point she either mentioned
11  VIOXX or she didn't.  She apparently did.  She also put
12  a question mark, but she remembers it.  Now to say you
13  remember you have to put in this conversation with
14  Wetherly to say that's why she remembers the VIOXX in
15  the record.  If there was no where it says VIOXX then I
16  would see you might need it to prove she mentioned
17  VIOXX.  She mentioned VIOXX that day, and now she has
18  already testified that there were two additional
19  reasons why she remembers it.  One because it relieved
Page 109

---

11 - 100305VX.txt

20  his pain when -- which the other things didn't seem to
21  do, and, second, that he asked her about the
22  prescription that day, and, third, you can argue to the
23  jury she also testified she had a discussion about
24  VIOXX that day with the doctor, which would have also
25  helped her to remember VIOXX.

3085

Mary Humeston - Recross

1          MR. HORN:  If we can argue that.
2          THE COURT:  You can argue it because it is in
3  evidence, but that's it.  Any other question to her
4  just opens the door to an inadvertent disclosure of
5  what Dr. Wetherly said, which I don't want.
6          MR. SEEGER:  We have jury questions already.
7          MR. RABER:  I don't think so.
8          MR. SEEGER:  Now they want to know.
9          THE COURT:  These are killer.  The jury is
10  tough.
11          MS. JONES:  Your Honor, do you realize --
12          MR. SEEGER:  See, if he took the prescription
13  in the morning why did he have it to leave in the
14  afternoon?
15          THE COURT:  Do you like that one, Diane?
16          MS. SULLIVAN:  No.
Page 110

---

11 - 100305VX.txt

17          THE COURT:  Why did he have to leave work
18  early to go home and take his medicine if he took it in
19  the morning?  If she knows.
20          MR. SEEGER:  Okay.  Those are all okay.
21          MR. HORN:  See, there you go.  That's the
22  problem.
23          MR. SEEGER:  Christy, you opened it.
24          MS. JONES:  I did not.
25          THE COURT:  She didn't open it.  It was out

3086

Mary Humeston - Recross

1  there before then as soon as he said did she speak to
2  Dr. Wetherly.  Yes, well, I think she should be allowed
3  to answer that at least there was a conversation and
4  she's been instructed not to reveal the contents of the
5  conversation but that she was upset based on that
6  conversation.
7          MR. HORN:  If they're going to challenge her
8  credibility on this that's not fair.  Not if you tell
9  the jury if she doesn't remember because they have used
10  it to attack her credibility.
11          THE COURT:  Whether she doesn't remember, it
12  wasn't that she just didn't remember it, it is not like
13  he said I don't remember saying that, it is more like I
Page 111

---

11 - 100305VX.txt

14  don't remember I have a million patients, and I saw
15  this guy in the E.R. and I don't know.
16          MR. HORN:  Can she refer to the conversation
17  of the doctor on that evening and say based on the
18  conversation --
19          MR. SEEGER:  She can name the -
20          THE COURT:  The jury questions can't be used
21  to put in improper evidence, but the question is
22  obviously the jury has a concern.
23          MR. SEEGER:  It has to be answered.
24          MR. RABER:  This goes to the same issue.
25          THE COURT:  There are three questions that go

3087

Mary Humeston - Recross

1  to the issue.
2          MS. SULLIVAN:  So if the jury asks about
3  personal Merck employees they're allowed to answer?
4          MR. BUCHANAN:  No she is not going to testify
5  to the details of the conversation.  She should be
6  allowed to tell them she told Mike she didn't want him
7  to take it.
8          MS. JONES:  I don't think it is probative at
9  this stage because --
10          MR. SEEGER:  It is probative if the jury is
Page 112

11 - 100305VX.txt

11  asking about it.

12        THE COURT:  Let me think about it.  How many

13  did he take, that's okay.  If he took it in the morning

14  and why did he leave early these are clearly okay

15  questions.  How could he forget to take a pill if he

16  were in pain.

17        MR. SEEGER:  That should be answered.

18  There's a reason for that.  There is testimony in the

19  record on it, but that should be answered. ·

20        THE COURT:  This actually says what did you

21  tell Dr. Wetherly, not what did Dr. Wetherly tell you

22  now that I look at it.

23        MR. HORN:  She would answer she told him what

24  medications he was on.

25        THE COURT:  What would be your reaction?


                                        3088
            Mary Humeston - Recross

1        MR. SEEGER:  Well, again, it goes to why he

2  stopped taking it.

3        MR. BUCHANAN:  You can't --

4        THE COURT:  Well, one reason, you know, she

5  could say, well, he can't prescribe it because it is

6  off the market.  She could also say I wouldn't take it

7  because the FDA won't approve it.
            Page 113

11 - 100305VX.txt

8        MS. JONES:  Your Honor, you think that would

9  get the 2005 advisory memo in?

10        THE COURT:  I think that is personal

11  subjective would you do it, it doesn't help anything.

12  But these questions concern me.  Because it somewhat

13  does go to her credibility, and I do agree with counsel

14  that the fact that she had a conversation with a doctor

15  and if, in fact, based on that she told her husband not

16  to fill the prescription and not to take the pills that

17  that's conduct that doesn't go to the truth of what was

18  said.  However, there's a real prejudice 403 problem

19  letting in that Dr. Wetherly told her that he saw some

20  study, and it might have been VIOXX that caused the

21  heart attack.

22        MR. SEEGER:  I'll instruct her not to go into

23  details, just the existence of a conversation.

24        MR. BUCHANAN:  You'll be directing her now,

25  Your Honor.


                                        3089
            Mary Humeston - Recross

1        MR. SEEGER:  Judge, that's true.  You can

2  lead her through that part.

3        MS. JONES:   I think she has already answered

4  the question.
            Page 114

11 - 100305VX.txt

5        MR. SEEGER:  Apparently not.

6        MR. HORN:  Based on your ruling we didn't ask

7  that question.

8        MS. JONES:  You did.  You asked her.

9        MR. HORN:  Did you have a conversation, I

10  didn't say is that why you told him not to refill the

11  pills.  I didn't go anywhere near there based on the

12  Judge's instruction, but you crossed on it extensively.

13        MS. JONES:  No, I crossed on what she did

14  before the heart attack.

15        MR. HORN:  Your whole cross was why do you

16  remember one and not the other.

17        MS. JONES:  It was not.

18        MR. HORN:  You don't have questions about the

19  Ultram on Vicodin.

20        THE COURT:  I'm going to ask her, but I'm

21  telling her she has to restrict her answer.

22        MR. SEEGER:  Do you want to us tell her

23  because I want to make sure --

24        THE COURT:  Ask why were you so upset that

25  Mr. Humeston filled the VIOXX after the heart attack.


                                        3090
            Mary Humeston - Recross

1  She can answer she was afraid that VIOXX was related to
            Page 115

11 - 100305VX.txt

2  the heart attack.

3        MS. JONES:  Whoa.

4        THE COURT:  She can't say that?

5        MS. JONES:  If you're letting her say that in

6  the context of saying Dr. Wetherly said that at the

7  same time I think you're letting in the hearsay.

8        THE COURT:  I mean, Mrs. Humeston, when

9  you're asked why were you so upset when Mr. Humeston

10  got a prescription for VIOXX refilled after his heart

11  attack do not mention Dr. Wetherly.  You can simply say

12  you had concerns at that point that VIOXX was

13  responsible or whatever it was but your thoughts were

14  not based on the fact that one of the doctors said that

15  to you.

16        THE WITNESS:  Okay.  I didn't have any idea.

17  I wouldn't have known if Dr. Wetherly hadn't told me.

18        MR. SEEGER:  She wants to testify -- can she

19  say based on the discussion --

20        THE WITNESS:  I wouldn't have known at all if

21  Dr. Wetherly hadn't told me.

22        MS. JONES:  And that, Your Honor, is hearsay.

23        MR. HORN:  Its affects on the listener it

24  shows why she talked to her husband.  Literally it is

25  classic.  Why did you talk to your husband that way


            Page 116

11 - 100305VX.txt

Mary Humeston - Recross                    3091

1  because I heard something, not that it is true.
2        THE COURT:   You have a whole research
3  machine there. Mrs. Humeston, you can step down and
4  walk around if you want.  Hearsay exception.  It is
5  conduct basically.  You may want to bring me something,
6  too.
7        MS. JONES:  I'm telling you that it is not
8  effect on the listener.  I am sitting here looking at
9  it.
10       THE COURT:  I'm not sure that's not written
11 in the rules.
12       MS. JONES:  It is number one and number two.
13 Certainly you can't bootstrap it over 403.
14       MR. BUCHANAN:  There is a nonhearsay.
15       MS. JONES:  There is not a nonhearsay
16 purpose.
17       MR. BUCHANAN:  It is offered to why she told
18 her husband not to take the drug.
19       MS. JONES:  It is clear she told him not to
20 take the drug.
21       MR. BUCHANAN:  It is offered to show why she
22 told him not to take the drug.  It is a nonhearsay
23 purpose.
24       (Discussion off the record.)
                    Page 117

11 - 100305VX.txt

25       MS. JONES:  I think it is an improper

Mary Humeston - Recross                    3092

1  question.  I think she has already testified that she
2  spoke to a doctor, and I don't think that anything
3  beyond, you know, based upon my conversations at the
4  hospital or whatever it is -- I was concerned about him
5  taking VIOXX is appropriate there's not going to be a
6  follow-up question about why.
7        MR. SEEGER:  According to his comment that's
8  not even hearsay because it is not offered for the
9  truth.
10       MS. JONES:  But the thing about it is it
11 clearly makes the comment makes it clear that it would
12 be excludable under 403 even if you found --
13       MR. SEEGER:  No, that's not it.
14       MS. JONES:  We're in a classic situation
15 where that's exactly what our situation is.
16       MR. SEEGER:  It says it is admitted with a
17 limiting instruction.
18       THE COURT:  Well, it does violate 403.  It is
19 too prejudicial.
20       MR. BUCHANAN:  Substantively or the process.
21 It is prejudicial because you're concerned it is
                    Page 118

11 - 100305VX.txt

22 offered for a hearsay purpose.
23       THE COURT:  It is prejudicial because when it
24 comes in it comes in for both purposes.
25       MR. BUCHANAN:  I know.

Mary Humeston - Recross                    3093

1        (Discussion off the record.)
2        THE COURT:  All right.  Counsel have referred
3  me to page 943 of the evidence book where it says, when
4  a statement is offered not for the truthfulness of its
5  contents only to show the statement was made and the
6  listener took certain action as a result of it such as
7  to demonstrate to the listen that information relating
8  to the reasonableness or good faith of the conduct the
9  statement is not inadmissible hearsay, and it cites
10 Brag versus Short Care, 293 NJ Super 33.  However, it
11 goes on to say, however, such an out of court statement
12 frequently has an impermissible hearsay aspect as well
13 as a permissible nonhearsay aspect.  Therefore such
14 evidence is generally admitted with a limiting
15 instruction, unless the evidence must be excluded under
16 403 because the probative purpose of the statement is
17 substantially outweighed by the dangers of its improper
18 use.
                    Page 119

11 - 100305VX.txt

19       In this case we're dealing with a statement
20 by a treating physician to the wife that on the night
21 of the heart attack that there had been a study and
22 that he is not really specific as to what he told her
23 but something about there might be a relationship
24 between the two.  I don't know that he gave any opinion
25 to a degree of certainty, but he made a suggestion to

Mary Humeston - Recross                    3094

1  her or said something like he wouldn't take VIOXX in
2  the future.
3        That doctor has been deposed.  He doesn't
4  even remember the plaintiff.  He only remembers what is
5  in the record, and this is not in the record, so
6  whether it was said or not there is no corroboration
7  for it other than this witness' statement.  Defense
8  moves to have it stricken or not allowed to preclude
9  her from testifying about it pre the witness
10 testifying.  I did, in fact, state that I thought it
11 would be improper for this witness to state the doctor
12 told her these facts about VIOXX that it would be too
13 prejudicial and it was really hearsay.
14       However, I did allow her to testify that she
15 had a conversation with the doctor at the time.  The
                    Page 120

11 - 100305VX.txt

16  question that the jury wants to ask her is why were you

17  so upset when Mr. Humeston got the prescription for

18  VIOXX refilled after his heart attack, and, obviously,

19  her answer would be that she thought that it might be

20  related to his heart attack, which I think she can say,

21  which still leaves the jury as to how did she come to

22  that opinion since they both testified they didn't know

23  anything about VIOXX. Well, he has testified to that

24  and she certainly hasn't testified to the contrary.

25  I'm going to allow her to testify that, in fact, based

Mary Humeston - Recross                         3095

1  on things she had heard that she was afraid there was a

2  link in there, so, therefore, she told him not the take

3  it. I'm not going to specify that it was, quote, "the

4  doctor" or "after talking to the doctor." That gets us

5  right to a reliable source having said this. I'm just

6  going to allow her to say based on what she heard she

7  decided there might be a link. All right? And I

8  understand defense still objects to that.

9       MS. JONES: That's right. I want to make

10  sure our objections are noted on the record for the

11  hearsay.

12       THE COURT: And I will then give them an
                        Page 121

11 - 100305VX.txt

13  instruction that it is admitted not for the purpose of

14  proving what she was thinking but simply for the

15  purpose of showing what she had in her mind.

16       (End of side-bar.)

17       THE COURT: Miss Humeston, are you

18  comfortable? Do you understand what you can say and

19  can't say?

20       MR. SEEGER: Actually, I'm a little concerned

21  now.

22       THE WITNESS: I'm sorry.

23       MR. SEEGER: I'm sorry it may create in the

24  jury's mind that where did she get this from, and is

25  she just sort of answering their question in a way.

Mary Humeston - Recross                         3096

1  I'm wondering if we should stay away from it all

2  together.

3       MS. JONES: If you want to withdrawal the

4  question all together.

5       MR. SEEGER: I would like her to answer

6  because, apparently, her answer to it wasn't

7  understood, but if she answers it this way we're all

8  discussing doing it.

9       THE COURT: She can simply say she was afraid
                        Page 122

11 - 100305VX.txt

10  that VIOXX had caused the heart attack. That's what

11  she was afraid of. She was afraid VIOXX might be

12  linked to the heart attack without referring to

13  anybody's conversation. I was going let her go one step

14  further saying based on things she heard, but I won't

15  let her specifically say based on what X, Y, Z doctor

16  told me. That gives it too much credibility as a as a

17  hearsay statement.

18       MR. SEEGER: I understand. So it would have

19  to be based on what she heard but not specifying

20  whether it occurred at a hospital or in connection with

21  anything else, that's how you want to do it?

22       THE COURT: Yes. Well, she can just say in

23  my mind.

24       MR. SEEGER: Could she at least say as I

25  testified earlier I had concerns?

Jury Questions                                  3097

1       THE COURT: Yes, she can say, I had concerns.

2       MR. SEEGER: As I testified earlier I had

3  concerns because then we link it up with her prior

4  testimony if, you know.

5       THE COURT: I have no problem with her

6  saying, As I testified earlier I had concerns about the
                        Page 123

11 - 100305VX.txt

7  relationship between VIOXX and the heart attack.

8       MR. SEEGER: All right. Just say that.

9  That's as far as you can go.

10       THE COURT: All right. Do not mention

11  Dr. Wetherly or that a doctor told you. You can bring

12  the jury in.

13       (The jury enters the courtroom.)

14       THE COURT: After these questions we'll wrap

15  up for the day. You can be seated.

16       On the night of September 18, 2001 at the

17  hospital what did you tell Dr. Wetherly about

18  Mr. Humeston's taking VIOXX? Don't tell us what Dr.

19  Wetherly said to you but what you said to him, if you

20  remember.

21       THE WITNESS: I told Dr. Wetherly -- he asked

22  me what drugs he was on, and I thought he was asking if

23  he was on some kind of illicit drugs, and so I shrugged

24  and I said, Well, nothing but VIOXX, a prescription.

25       THE COURT: If he was taking medicine only

Jury Questions                                  3098

1  when needed how would the change in his work style

2  accommodate him if they had offered his schedule for

3  just for the chance time so he would have time would
                        Page 124

11 - 100305VX.txt

4  they have been altering it.
5         THE WITNESS:  I'm not sure I understand.
6         THE COURT:  I think they're saying -- let me
7  read it again.  If taking medicine only when needed how
8  can his work schedule have to be changed to accommodate
9  the time he took his medicine?  They altered the
10  schedule just for chance times he would have pain,
11  question mark.
12        THE WITNESS:  I think that's what they did
13  because rather than -- I'm supposing.  I don't work for
14  the post office.  Rather than try to do a variance one
15  day on one day off it would make more sense to just
16  make the adjustment as a rule and just leave it at
17  that.
18        THE COURT:  In your opinion did he take
19  medicine more days than not?
20        THE WITNESS:  Would he take medicine more
21  days?
22        THE COURT:  Now we're asking about any kind
23  of painkillers as opposed to not just VIOXX but on most
24  days would he take some kind of medication or not?
25        THE WITNESS:  You know, he took medicine

                                              3099
                   Jury Questions
                     Page 125

---

11 - 100305VX.txt

1  whenever he needed it, and I would say 50 percent of
2  the time.  That's just a wild guess because I just
3  can't tell you.  He took it whenever he needed it, and
4  I truthfully -- I didn't babysit that.  He took it when
5  he needed it.  I'm sorry.
6         THE COURT:  This is another question, two
7  questions, but they're asked if you know.  Do you know
8  how many 50 milligrams of VIOXX pills Mr. Humeston took
9  on September 18th 2001?
10        THE WITNESS:  He didn't take any 50 milligram
11  pills, he took 225 milligram pills.
12        THE COURT:  Do you know how many he took on
13  the previous day, the 17th?
14        THE WITNESS:  I don't know how many he took
15  on the previous day, and the only reason I knew that he
16  took the two was he told me, I just took the last two
17  can you refill my prescription for me.
18        THE COURT:  Why were you so upset when
19  Mr. Humeston got his prescription for VIOXX refilled
20  after his heart attack?
21        THE WITNESS:  As I testified earlier
22  information that I had found out made me very fearful
23  that he could have another heart attack because of it.
24        THE COURT:  Why were you so upset when
25  Mr. Humeston got his prescription for VIOXX refilled --

                     Page 126

---

11 - 100305VX.txt

                                              3100
                   Jury Questions

1  I already asked that.  How could he forget to take his
2  pill if he was in pain?
3         THE WITNESS:  I don't know if he forgot to
4  take -- I don't know.  I don't know that question.
5         THE COURT:  Please clarify if he took his
6  prescriptions in the morning would why he had to leave
7  work early to take prescriptions.
8         THE WITNESS:  Because one of the
9  prescriptions was a narcotic, it was Vicodin, and if he
10  needed to take that that's not a good drug to take if
11  you have to drive or to be around equipment, and so I'm
12  sure it was a broad brush accommodation for that.
13        THE COURT:  If you spoke to your husband and
14  recommended in October that you didn't want him to take
15  VIOXX why did you pay the co-pay and bring it home?
16        THE WITNESS:  I didn't realize -- when you go
17  to the pharmacy they have everything stapled together
18  and they hand it to you and say this is how much it is
19  and you go on your way.  And I didn't realize that it
20  was VIOXX in my hand until I got home and opened up the
21  bag and there was a bottle of VIOXX.  And that's when I
22  got so upset.
23        THE COURT:  Was the $30 co-pay for per
                     Page 127

---

11 - 100305VX.txt

24  prescription?
25        THE WITNESS:  I don't think so.  I think it

                                              3101
                   Jury Questions

1  was 20 percent of like each amount of the pills in
2  there.  I think the total was about $30.
3         THE COURT:  Okay.  Any other questions?
4         MR. HORN:  No, Your Honor.
5         MS. JONES:  No, Your Honor.
6         THE COURT:  You can step down, Miss Humeston.
7         THE WITNESS:  Thank you.
8         THE COURT:  Because of the Jewish holiday we
9  are going to break early today so we'll break now,
10  Mary, and we're not going to be here tomorrow, but
11  we'll ask you to be back on Wednesday.  Can you just
12  have the jurors wait for a few minutes so I can talk to
13  the attorneys about what time?
14        (The jury leaves the courtroom.)
15        THE COURT:  You can be seated.  I guess my
16  dilemma is, again, this issue of not having the jurors
17  just sit while we argue the motion at the end of
18  plaintiff's case.  One way to do it is simply have them
19  come in and listen to the rest of the tapes and then
20  let them go home and do the motion.  But I'm afraid
                     Page 128

11 - 100305VX.txt

21 we'll, you know, we won't get to start a defense
22 witness that way. You can start the defense witnesses
23 Thursday.
24          MR. SEEGER: It looks like we will have two
25 and a half hours. We could do the motions in the

                    Jury Questions                        3102

1 afternoon and then Mr. Raber or Diane --
2          THE COURT: Unless you're going to make a
3 very short motion.
4          MS. JONES: I can almost assure you it is a
5 very long one, Your Honor.
6          MR. SEEGER: They always win the weight test
7 on their motions.
8          THE COURT: That's what I was afraid of. All
9 right. Then let's tell the jury to be here at 9:30 on
10 Wednesday. We'll go through the end of the plaintiff's
11 case, and then, hopefully, I'll see the papers tomorrow
12 and see if I think it is going the take substantial
13 time if it is we'll have to send them out and start
14 Thursday.
15          MR. RABER: Should we then plan on having our
16 first witness Thursday morning? That kind of certainty
17 would be helpful.
                    Page 129

11 - 100305VX.txt

18          THE COURT: Yes. I think you can plan on
19 that. You need to tell us who your first two witnesses
20 are on Wednesday. We got one we have to know number
21 two.
22          MR. RABER: I think Thursday's witness will
23 be all day.
24          MR. BUCHANAN: I'm sorry, Steve.
25          MR. RABER: I think Dr. Morrison will be all

                    Jury Questions                        3103

1 day.
2          THE COURT: Okay. All right. I'll see you.
3 You're going to get any papers to me are you going to
4 drop them in my mailbox again?
5          MR. RABER: For depositions?
6          THE COURT: For this.
7          MR. RABER: For directed verdict. Yes, what
8 we need to go back and look at final draft and we'll
9 get it to you.
10          MS. JONES: And I assume, Your Honor, that
11 since they are going to have videotapes that we can
12 certainly supplement anything that needs to be
13 supplemented based on the videotapes that they --
14          THE COURT: Well, somebody on the defense
                    Page 130

11 - 100305VX.txt

15 team already knows everything that's being read in.
16          MR. BUCHANAN: They should have copies of
17 plaintiffs' trial cuts of the deposition transcripts,
18 Your Honor.
19          MS. JONES: I'm just concerned -- I'm not
20 concerned about that I'm concerned we're going to give
21 you papers in the morning, we'll give you papers
22 tomorrow that relate to the motion for directed verdict
23 and, yet, you'll get the papers before whatever comes
24 in Wednesday morning, and I just want to make sure.
25          THE COURT: But you can address whatever is

                    Jury Questions                        3104

1 going to come in Wednesday morning.
2          MS. JONES: I want to make sure --
3          THE COURT: Address it as if it is already in
4 and then you know what is coming in.
5          MS. JONES: Is it Nies and --
6          MR. BUCHANAN: Nies MacInnis and Weiner.
7          THE COURT: And you have the sections.
8          MR. RABER: Would you like papers delivered
9 here or your other location?
10          THE COURT: My other location would be good.
11 All right. See you tomorrow.
                    Page 131

11 - 100305VX.txt

12 (End of proceedings.)
13
14
15
16
17
18
19
20
21
22
23
24
25

                                                          3105

              C E R T I F I C A T I O N

     I, REGINA A. TELL, C.S.R., C.R.R., License Number
30X100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
                    Page 132

11 - 100305VX.txt

true and accurate compressed transcript to the best of
my knowledge and ability.


_____ 10-03-05
Regina A. Tell, CSR-CRR
Official Court Reporter
Atlantic County Courthouse
Mays Landing, New Jersey

Page 133