# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| | Section L |
| | Judge Eldon E. Fallon |
| | Magistrate Judge Daniel E. Knowles, III |

THIS DOCUMENT RELATES TO:
   *Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379

## DECLARATION OF JOHN DAVID ABRAMSON, M.D.

I, John David Abramson, MD, hereby state as follows:

"I have been provided with a copy of Merck's MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING TESTIMONY OF JOHN D. ABRAMSON, M.D. and would respond as follows:

I opined in my affidavit and in my deposition that Merck failed to provide adequate information to prescribing physicians concerning the safety of Vioxx, that the risks of using Vioxx outweighed the benefits and that these failures were a substantial contributing factor in the damages suffered by this Plaintiff. It is my understanding Merck seeks to preclude me from testifying about these opinions at trial because Merck asserts they are outside my area of expertise or because they assert I formed them without a reliable scientific method. As stated in my affidavit, I am qualified to render these opinions because of my education, training, over two decades of experience as a physician and a prescriber of medications, my academic experience, my research about these specific issues over the past five years, and my review of the relevant documents and medical and scientific literature.

Though I believe the basis for my qualifications to testify regarding these areas is clear and has been previously stated, I will further elucidate for The Court.

## GENERAL QUALIFICATIONS

As a physician for over twenty years, I have vast experience in reviewing medical records, drug labels, marketing information disseminated by drug companies and clinical studies and forming conclusions based on my review and analysis of these types of information to make informed and appropriate decisions with my patients regarding their medical care and treatment. I have extensive expertise in all of these areas and for Merck to say I should be precluded from testifying because of lack of expertise in any of these areas is without basis.

Merck appears to be making the false assumption that because a physician does not have board certification in a certain area, he or she lacks expertise in that area of medicine. I am Board Certified in Family Medicine, a field of medicine in which practitioners are trained to treat the whole patient—meaning all body systems and not just one specific system treated by physicians who subspecialize in one area. Thus the family physician is like an internist or pediatrician who takes care of patients of all ages. In terms of clinical expertise, hospitals grant clinical privileges for family physicians to provide the same range of patient care services as they do general internists.

Since receiving my medical for degree, I have thirty years of professional training and experience in treating virtually all of the patients treated by specialists in internal medicine, and many if not most patients with illnesses that are also treated by specialists in gastroenterology,

cardiology, and rheumatology. I certainly have decades of experience and expertise in caring the types of patients for whom Vioxx was prescribed.

As an experienced physician who has been on the front lines of primary care for more than 20 years, I certainly possess the requisite level of expertise to testify on these matters. In addition, my training, experience and research go far beyond clinical experience alone. I completed a two year Robert Wood Johnson fellowship that included study of exactly the skills required to critically assess Merck's research on Vioxx and the information that was communicated to health practitioners through articles in medical journals, clinical practice guidelines, advertising, marketing, and continuing education. In addition to this, I have studied the specific areas of my testimony regarding Vioxx for the past five years, more than three of which were prior to and independent of litigation.

## QUALIFICATIONS REGARDING ADEQUACY OF INFORMATION IN MERCK'S MARKETING AND VIOXX LABEL

I am qualified to testify that the scientific evidence on Vioxx from Merck's own studies was not adequately communicated to physicians and consumers because I was one of those physicians and experienced first hand the impact of Merck's marketing on my patients and in my practice. For the same reason, I am qualified to testify about Merck's failure to communicate to physicians the dangers of Vioxx identified in Merck's own studies because they failed to adequately and accurately communicate them to me, a prescriber, and to the patients in my clinical practice.

As a prescribing physician who also prescribed Vioxx, having reviewed Merck internal documents and comparing it to what was reported to physicians like me in the labeling and in

marketing material and publications, I am acutely aware of the misleading information and misrepresentations contained in those materials and how that impacted physicians and patients and am qualified to render my opinions in this area.

In addition, my opinions are based on and supported by the fact that the FDA came to the same conclusions I have stated in my report and deposition  as evidenced in their  September 17, 2001 Warning Letter to Merck about Vioxx promotional materials (attached). In this document, the FDA stated they found Merck's promotional materials misleading regarding the safety profile and the VIGOR study results as well, and stated they found Merck's claim that Vioxx has " a favorable cardiovascular safety profile" "simply incomprehensible" in the 5-22-01 Press Release. This same statement was made in the 4-28-00 Press Release.

Further, prior to becoming involved in the litigation, I have published and lectured on the subject of the impact of marketing by pharmaceutical companies on physician prescribing behavior. I authored a book, Overdosed America, published in September 2004, one of the major themes of which is how the drug companies influence doctors' prescribing habits.  Pages 117 to 126 specifically address the issue of drug company marketing to doctors through drug reps and sponsorship of continuing education activities.  An extensive body of scientific literature exists on the effect of drug company marketing to doctors, twenty references of which are cited in my book to support my opinions and findings as noted in this chapter.

As stated in my deposition, I also have expertise in drug labeling (1).  There are two sides of expertise in drug labeling – the author and the recipient. I have been on the recipient side for over

20 years as a prescribing physician, and have extensive expertise in reviewing drug labeling and applying it to clinical practice and, more importantly, to individual patient care. My opinions regarding the inadequacy of the Merck labels and communication of safety information on Vioxx are based in part on my training, expertise, and experience as a reader, not a writer, of drug labeling and clinical trials. As a physician who reviewed hundreds of drug labels over the course on my clinical practice, I have knowledge and expertise regarding the different sections of the labeling such as Warnings and Precautions and how both the information and placement of the information impact physician prescribing. I am familiar with the regulations regarding the type of information required to be in the various sections of the labels and in conjunction with my experience as a prescribing physician and my training in statistics and epidemiology, I have expertise to opine on the type of information prescribing physicians such as myself need and want to see in a drug label in order to make informed decisions about patient care. As stated in my deposition the *Warnings* section is intended to describe serious adverse events. In the case of post-VIGOR labeling of Vioxx the significantly increased rate of serious adverse events and the significantly increased rate of myocardial infarction as well as thrombotic cardiovascular events *in toto* were not included in the April 2002 label. Merck documents I have reviewed confirm my opinion that the FDA in fact wanted this information in the Warning section.

My opinion that the label and the information conveyed by Merck's marketing efforts about the cardiovascular and overall risks of Vioxx —particularly in patients without a medical history of ischemic heart disease—is based upon my years of experience as a practicing physician and in academic medicine as well as my training and experience in medical research and epidemiology. As a physician who has prescribed Vioxx, has reviewed the medical records of this Plaintiff, and has

specialized training in statistics, I am also qualified to testify about Merck's misrepresentation of the VIGOR data in the Vioxx labeling and the impact of that information on prescribing of this drug to a patient like Mr. Smith. The testimony of the prescribing physician in this case, Dr. Grefer, supports my opinion that the misleading nature of the marketing material presented by Merck representatives and the understatement of Merck's own scientific evidence in the April 2002 label regarding the increased risk of serious adverse events associated with Vioxx were substantial contributing factors to Mr. Smith ever getting this drug. The testimony of Dr. Michael Grefer, attached, states that had he received the information I have testified Merck should have communicated, he would not have prescribed Vioxx to Mr. Smith in October 2002 (2).

For more than 20 years, I have been on the receiving end of medical journal articles, clinical practice guidelines, marketing material and drug company labeling as a primary care doctor and have an important, firsthand perspective on how the marketing of Vioxx misrepresented to health practitioners the overall picture of Vioxx safety and benefit and how the labeling was misleading.

## QUALIFICATIONS TO OPINE ON THE RELATIVE RISKS OF VIOXX AND THE ADEQUACY OF MERCK'S CLINICAL STUDIES

I have special training in epidemiologic principles which include study design, conduct, interpretation of data (including clinical trials); critical analysis of research articles published in medical journals; and over two decades experience as a physician applying research data and these analytic skills to the clinical practice of medicine and individualized patient care. As stated in my report, I completed a Robert Wood Johnson Fellowship in Family Medicine at Case Western University from 1980-1982, earning a Master of Science in Family Practice degree. This two year

fellowship included study of epidemiology, statistics, research design, critical analysis of medical literature, and health policy, as well as specific training in the interpretation of scientific data including relative risk and statistical analysis. Additionally, I was a Senior Research Associate on the Faculty of the Institute for Health Policy, Heller School, Brandeis University from 1992-1993 during which I received additional experience in health policy. During my Robert Wood Johnson Fellowship, I designed, conducted, analyzed, and performed the interpretation of data for an observational study, which is one type of epidemiologic study, the results of which I presented to a meeting of the National Governors' Association held in New Orleans (3).

I am an expert at the translation of clinical studies, including studies of like design as VIGOR and APPROVe, into clinical practice. I did this for more than 20 years both in my clinical practice as a primary care physician and as a clinical instructor at Harvard. In addition, I have been invited to lecture to Universities and Institutions, including Harvard Medical School, specifically about the clinical studies of Vioxx and the presentation of the VIGOR Trial in the New England Journal of Medicine. I am certainly qualified based on my education, training, experience and physician's review of the documents and studies to testify on the discrepancies between the findings of Merck's studies and the information that was presented in medical journals and marketing material. That I have not been an employee of a drug company is not relevant to my expertise in applying scientific evidence to individual patients. That is something physicians do daily in their clinical practice. In addition, I have received specialized training to do this and over the past five years (both before and after becoming involved in litigation) have spent hundreds of hours analyzing the discrepancies between the scientific evidence and the information that was communicated by Merck to health practitioners about the safety and efficacy of Vioxx.

My opinions regarding the Vioxx clinical data are not, as Merck suggested, "speculative and lacking scientific validity" nor are they "based entirely on the results of the VIGOR study" as stated in Merck's motion.  They are based on my training and experience in epidemiology, statistics, research, and decades of clinical experience reviewing and interpreting clinical data and applying it to the practice of medicine. Further, my opinions that Merck misrepresented the Vioxx clinical data are based on and have been supported and echoed in Merck's own documents, depositions of their employees, the clinical studies relating to Vioxx, and statements made by the FDA to Merck in FDA communications to Merck.

## QUALIFICATIONS REGARDING WHAT A VIOXX PRESCRIBER NEEDS TO KNOW

I have extensive expertise in the issues of the type of information prescribers need to know and how the manner of delivery or communication of this information impacts prescribing habits. The issue of public health and health policy and how doctors process information from various sources has been of importance and interest to me throughout my career as a physician. Because of the changes that I was observing in American medicine and experiencing in my own practice, I left clinical practice in 2002 long before this litigation began to devote full time to research this topic, specifically in regard to the pharmaceutical industry and its impact on public health, public safety, and the quality of American health care.  Since the beginning of 2002 I have been researching, writing, lecturing, and teaching about how the information and misinformation about drugs and other medical products available to practicing physicians impacts their medical decisions and the overall quality, effectiveness, and cost of American health care. I have authored several articles and published a book on this subject.

In addition, I have first hand experience regarding the type and content of information a physician and a patient want and need to know to make informed decisions about a drug and when performing a risk/benefit analysis to determine if a drug like Vioxx is a reasonable treatment for that individual. I prescribed Vioxx as well as other NSAIDS to my patients prior to becoming aware of the true risks of this drug and had to do so based on the information available to me through the traditional resources available to physicians.

As stated in my deposition (4) I have been an invited lecturer over the past several years, prior to involvement in this litigation, on the issue of physicians' knowledge regarding Vioxx and its impact on prescribing of Vioxx. I have lectured to Harvard medical students and faculty, the Harvard School of Public Health, the Sharp Rees Medical Group in San Diego, California, The Regents Group (a group that covers almost three million lives in Blue Cross plans in the northwest), the Heller School for Social Policy at Brandeis University, and The Southern Vermont Area Educational Council For Physicians to name a few. I have also presented this issue to the Congressional Task Force on Prescription Drugs in Washington, D.C.

## APPLICABILITY OF OPINIONS TO THIS PLAINTIFF

As stated in my report and deposition, my opinions concerning VIGOR and the April 2002 label are applicable to Mr. Smith based on my experience as a clinician and prescriber and on evidence and testimony produced in this case, not the least of which is that Merck in their marketing materials and Press Release was not forthright with the results of the VIGOR study, which clearly showed an increased risk of serious cardiovascular complications for all patients in the study. Notably, though they assert in their Motion that the VIGOR study was not applicable to Mr. Smith,

there is nothing in the Press Releases or the labeling for the drug stating VIGOR only applied to elderly patients with rheumatoid arthritis taking 50 mg doses. In the 4-28-00 Press Release titled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx" Merck failed to even mention the age of the patients in the VIGOR study, notably omitted any reference to a 50 mg dosage, and gave no instruction that physicians should not apply the results of this study to patients such as Mr. Smith. Merck states in their Motion that the VIGOR study involved "an elderly population" and that Mr. Smith was not elderly. However, according to the NEJM article that presented the VIGOR results patients as young as 40 were allowed to participate in the study. And both the NEJM article and the April 2002 labeling, the first to include the VIGOR findings and which I also rely upon for my opinions, stated that the median age of patients in the VIGOR study was 58. Mr. Smith was 52 at the time he ingested Vioxx and as such, the VIGOR study certainly involved patients of Mr. Smith's age. Furthermore, Merck's statements that the VIGOR study results cannot be relied on in regard to Mr. Smith because "VIGOR did not compare Vioxx against placebo and, in fact, was not designed to assess cardiovascular risk" are directly contradicted by its own Press Releases and information conveyed to physicians and consumers about the VIGOR results, purporting to "confirm" the cardiovascular safety of the drug (without stated exclusion of patients of a certain age or disease state). Merck's lawyers in fact proactively use the VIGOR study in depositions of the treating physicians in this very case to assert that Merck disclosed the CV risk to Mr. Smith to his own physicians, though without their new caveat that the VIGOR results did not apply to Mr. Smith. The fact that the VIGOR study was not designed to assess cardiovascular risk makes the findings of a substantially increased risk even more worrisome, which is a factor that should have been included in the risk/benefit assessment for all patients, including Mr. Smith, for whom treatment with Vioxx was being considered.

Furthermore, the claim that the results of VIGOR are not applicable to Mr. Smith because "VIGOR did not compare Vioxx against placebo" are contradicted by the November 18, 2004 testimony of Merck's then CEO, Raymond Gilmartin, before the Senate Finance Committee that testing Vioxx against a placebo in the VIGOR study would have been unethical in patients requiring anti-inflammatory medication. This forms the basis of my opinion that the results of VIGOR are applicable to Garry Smith and to Dr. Grefer's decision to treat Garry Smith with Vioxx: Because Mr. Smith required treatment for knee pain the question is not how would the safety and efficacy of Vioxx have compared to placebo therapy—because no doctor would consider treating such a patient with a placebo. The information that I and physicians like Dr. Grefer required to make the best decision about therapy for patients with pain such as Mr. Smith is how the safety and efficacy of Vioxx compares to other potential therapies. The VIGOR study provided the answer to exactly this question: While Vioxx provided no better symptom relief, it was significantly more dangerous overall and caused significantly more serious thrombotic cardiovascular complications and significantly more heart attacks in comparison to treatment with naproxen.

### RELIABLE EVIDENCE

Merck argues that "Dr. Abramson's opinion on the relative risks and benefits of Vioxx was derived for, and generated by, this litigation." The facts show otherwise. The manuscript for my book on this subject was completed in March of 2004 and published September 21, 2004, nine days before the withdrawal of Vioxx and long before I was ever consulted by attorneys in this matter.

Prior to being consulted for the litigation, I have been invited to lecture to medical students and faculty at major universities and Institutions, including Harvard, on the trustworthiness of scientific evidence based medicine. I have published research and opinions in peer reviewed medical and health policy journals. My training, experience, and research into these matters (long before

ever becoming involved in litigation) to testify on the issues raised in my expert report
and deposition.

My opinion that drug prescriptions require individualized risk assessment demonstrates
that my positions are based on applying the best available scientific evidence to the
particular circumstances of each individual patient. This is the challenge that clinicians
face every day and is an area in particular where I have extensive firsthand and research
expertise. There should be no debate that my testimony is "based on the scientific
method, and, therefore, reliable" as much of my testimony is based upon the scientific
evidence that Merck presents about its own product. The opinions I have formed and
stated in my report and deposition were formed and based on a scientific review process
that I learned in medical school and residency training; that were expanded upon in my
fellowship training on research techniques, statistics and epidemiology; that I applied in
clinical practice for over 20 years; and that I have researched extensively for the past five
years.

Further, Affiant sayeth not."

8|21|06

Date

On this 21 day of August, 20 06, before
me, the undersigned notary public, personally appeared
JOHN DAVID ABRAMSON,
proved to me through satisfactory evidence of identification,
which were MASS D.L., to be the person whose
name is signed on the preceding or attached document who swore
or affirmed to me that the contents of the document are truthful and
accurate to the best of his/her knowledge and belief.
STEVEN ROBERT McCLENAGHAN, Notary Public
My Commission Expires December 6, 2011

John David Abramson, M.D.

STEVEN ROBERT McCLENAGHAN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 8, 2011

**ATTACHMENT 1 TO DECLARATION OF JOHN ABRAMSON, M.D.**
**(Footnotes)**

## FOOTNOTES

**(1)  RE: DRUG LABELING          116**

18        Do you consider FDA labeling
19   requirements for pharmaceutical products to be
20   outside your area of expertise?
21        THE WITNESS:
22            Should I answer it?
23        MR. WRIGHT:
24            Yes.  If you can.
25        THE WITNESS:

### 117

1            Yes.  I can.  I consider myself
2   an expert on the role of the label in the
3   practice of medicine.


**(2)  RE: DEPOSITION OF DR. MICHAEL GREFER, 6-29-06:**

### 66

15        Q.  But generally what would you have told
16   him about cardiovascular risk, if anything?
17            A.   Generally I probably would have said
18   that there was no significant evidence that there was
19   any particular difference in the medicine that he was
20   taking, the diclofenac, and the Vioxx that I was
21   aware of that would make me -- make any reasons not
22   to prescribe it for him.
23            Q.  Would you have mentioned anything
24   about cardiovascular?
25            A.  Again, probably not, because the

### 67

1   information, as it says in the package insert, was
2   unclear, and it was uncertain what the significance
3   was.

### 85

5   Q.  Is it or is it not fair to say that the
6   entire Merck campaign for Vioxx over the years, your
7   contacts with the Merck representatives, the
8   advertisements both to doctors and to the public that
9   you saw, is it or is it not fair to say that all of

10  that had an influence on your prescribing of Vioxx
11  during the time that you prescribed it to Garry Smith?
12        MR. SKIDMORE: Objection. Leading.
13        A.   Well, I think that -- that all of the
14  information that I knew as well as the response I was
15  getting affected my prescribing it for Mr. Smith.
16        Q.   Okay. I want to ask you some specific
17  things about the Merck representatives.  We talked
18  about the Merck representatives coming and providing
19  you information from time to time.  Do you recall that?
20        A.   Yes.
21        Q.   Okay.  Do you recall the Merck sales
22  representatives telling you about a study numbered 090
23  that showed an increase in heart attacks in patients
24  taking Vioxx as compared to another drug?
25        A.   No.

86

1        Q.   Did the Merck representatives ever tell
2   you that there were other Merck studies that showed
3   that Vioxx increased the risk of heart attack or
4   cardiovascular events over other place-- over other
5   NSAIDs or placebos?
6        A.   No.
7        Q.   Did the Merck sales representatives ever
8   tell you that a Merck statistician had done a
9   meta-analysis of many Merck studies comparing Vioxx to
10  other NSAIDs and found that the Vioxx group had more
11  than twice as many heart attacks as the group comprised
12  of other NSAID users?
13        MR. SKIDMORE: Objection. Foundation
14        and leading.
15        A.   No.
16        Q.   Did the Merck sales representatives ever
17  tell you that Merck's own scientists and consultants
18  had told Merck, even before Vioxx was placed on the
19  market, that there was a scientific basis for the
20  prothrombotic potential of Vioxx?
21        MR. SKIDMORE: Objection. Foundation
22        and leading.
23        A.   No.
24        Q.   Did the Merck sales representatives
25  disclose to you that the results of the VIGOR trial

87

1   showed that for every 100 patients treated for a year

2   with Vioxx, instead of being treated with naproxen,
3   that there were two and a half additional serious
4   adverse events in the Vioxx group?
5          MR. SKIDMORE:  Objection.  Foundation
6       and leading.
7       A.  No.
8       Q.  Okay.  Let me -- let me rephrase that
9   because of the objection and just ask you a couple
10  of -- of beginning questions.
11         Do you remember the Merck
12  representatives talking to you about patient years in
13  the studies, like if you give one patient the drug for
14  one year, that's one patient year?
15      A.  Truly, no, I don't remember them
16  bringing up the term "patient years" at all.
17      Q.  All right.  Well, let me just ask you.
18  If -- if -- let me ask it this way first:  Do you
19  remember, in general -- actually, let me phrase it even
20  differently, because I can see John sitting over there
21  like a cat about to pounce.  And we'll object to the --
22  I'll object to the preamble myself.
23         What was your general impression, from
24  the Merck sales representative contacts, about the
25  safety of Vioxx as it relates to naproxen?

                          88
1       A.  The -- the -- the general pitch
2   throughout all those years that -- that the -- that the
3   Vioxx representatives made was that their drug was
4   better because it -- it worked better to begin with,
5   and it was safer on the gastrointestinal tract, and
6   that there did not seem to be any significant other
7   factors when compared to naproxen that would make it a
8   poor choice -- or a poor choice of the drug.
9       Q.  Okay.  If the Merck sales
10  representatives had disclosed to you that the results
11  of the VIGOR trial showed that for every 100 patients
12  treated for a year with Vioxx as -- as opposed to the
13  same number of patients treated for a year with
14  naproxen, that there were two and a half additional
15  serious adverse events in the Vioxx group, if they had
16  disclosed that to you prior to the time that you gave
17  the drug to Garry Smith, would you or would you not
18  have probably given the drug to patients like Garry
19  Smith?
20         MR. SKIDMORE:  Objection.  Foundation

21       and leading.
22       A.  Well, I -- I would have had to have
23  known the particulars of the situation and I would have
24  had to have known the definite concrete evidence that
25  was there, but it certainly would have made me less

89

1  likely to prescribe the medication to Mr. Smith.
2       Q.  Is that information that you would have
3  liked to have had given to you by the Merck
4  representatives if it existed?
5       A.  Yes.
6          MR. SKIDMORE:  Objection.  Leading.
7       Q.  Let me ask it a different way because of
8  the objection.
9          Would you or would you not like to have
10  that kind of information so that you can make educated
11  decisions to care for your patients?
12       A.  I would like to have as much education
13  and information as possible when I make a decision.
14       Q.   Would you or would you not specifically
15  like to have information about hazards that may relate
16  to the use of the drug that the sales representative is
17  talking to you about?
18       A.  I would.
19       Q.  Doctor, did the Merck representatives
20  ever show you a chart like what we're going to mark as
21  Exhibit Number --
22          MR. WRIGHT:  What's our next exhibit?
23          THE REPORTER:  9, I believe.
24          MR. WRIGHT:  Okay.  I think it's from
25       the Shapiro memo.

90

1          MS. JABLONSKI:  I think our next exhibit
2       is 7.
3               (Deposition Exhibit 7 was
                 marked for identi-
4                 fication.)
5  BY MR. WRIGHT:
6       Q.  Okay.  Doctor, I'm going to hand you
7  what we've marked as Exhibit Number 7, and I'll
8  represent to you that that's a chart prepared by a
9  Merck biostatistician and included in a -- in a memo
10  that she presented in the days -- or in the -- in the
11  time prior to when you prescribed the Vioxx to Garry

12  Smith.
13         A.  I -- I don't particularly remember
14  seeing this particular one, but I was very frequently
15  presented with a lot of information like that.  I don't
16  know if that one specifically was presented to me.
17         Q.  All right.  Well, let me ask you a
18  specific question about it, and it may help you
19  remember whether you were or were not presented with
20  this information.
21            If you look up here, it says MI
22  Endpoint, and I'll represent to you that that means
23  myocardial infarction endpoint, comparing Rofecoxib,
24  which is the generic name for the -- I guess the
25  molecule name for Vioxx, versus other NSAIDs.  Do you

                            91

1  see that?
2         A.  Yes.
3            MR. SKIDMORE:  Larry, let me -- I'm
4         going to go ahead and object on the basis of
5         foundation, since the doctor has said he
6         doesn't know if he's ---
7            He's seen a lot of information --
8            MR. WRIGHT:  Yes.  I agree.
9            MR. SKIDMORE:  -- doesn't know if he's
10        seen this or not.  So can I have a running
11        foundation objection --
12           MR. WRIGHT:  Yes.
13           MR. SKIDMORE:  -- to all your questions
14        concerning this document?
15           MR. WRIGHT:  Yes, sir.
16           MR. SKIDMORE:  So I won't have to
17        interject?
18           MR. WRIGHT:  Yes, sir.
19           MR. SKIDMORE:  Okay.
20  BY MR. WRIGHT:
21        Q.  If the Merck representatives had shown
22  you this document and explained to you that the first
23  line is all patients, a comparison of all patients for
24  various different studies, and that it showed a
25  relative risk of more than two for myocardial

                            92

1  infarctions in the Vioxx group over the other NSAIDs
2  group, first of all, do you think that would have stuck
3  in your mind if they had ever told you that there was a

4  doubling of the risk for Vioxx users over other NSAIDs?
5          MR. SKIDMORE:  Objection.  Leading.
6      A.  Yes.
7      Q.  Would or would not that information, a
8  doubling of the risk for Vioxx users over other NSAID
9  users, have stuck in your mind if the Merck
10  representatives had ever brought it to your attention?
11          MR. SKIDMORE:  Objection.  Leading.
12      A.  Yes, probably.
13      Q.  Did the Merck representatives ever tell
14  you or show you information that indicated that their
15  biostatistician had determined in a summary of these
16  studies a relative risk of more than two for the Vioxx
17  group over the NSAIDs group for myocardial infarctions?
18      A.  What was that?
19      Q.  Did they ever --
20      A.  Did they --
21      Q.  -- tell you that or show you that,
22  either one?
23          MR. SKIDMORE:  Objection.  Foundation.
24      A.  Not -- not that I recall, no, sir.
25      Q.  Doctor, if information had been brought

93

1  to your attention before October of 2002 that Vioxx
2  increased the risk of myocardial infarction or other
3  cardiovascular events in patients like Garry Smith,
4  would you or would you not have prescribed Vioxx to him
5  in October of 2002?
6          MR. SKIDMORE:  Objection.  Leading.
7      Foundation.
8      A.  Probably not.


(3) RE: EPIDEMIOLOGY

91

24  Q.    And during the time you were a
25  Robert Wood Johnson fellow, you were involved

92

1  in an epidemiological study of some sort?
2      A.  Yes.
3      Q.    Did you actually conduct the
4  epidemiological study?
5      A.  Yes.

6     Q.    What was the study on?
7     A.    The study was designed to
8   determine the effect of enrollment of AFD
9   recipients in what was previously a private
10  nonprofit HMO in the City of Cleveland.


(4) RE: ADEQUACY OF MERCK CLINICAL STUDIES AND SAFETY
INFORMATION

334

19    Q.    I want to fast forward again.
20  Since of September of 2004, we talked -- we
21  have already talked about your contacts with
22  lawyers.  I want to talk about contacts not
23  with lawyers.
24            What research and teaching -- and
25  by "teaching," I want to use the broad term,

335

1   in all public dissemination of knowledge.
2            So what research and teaching
3   have you done that doesn't have anything to do
4   with lawyers or litigation about Vioxx and the
5   way Vioxx information was disseminated to
6   physicians so that they could make prescribing
7   decisions?
8     MR. PIORKOWSKI:
9            Objection to form.
10    THE WITNESS:
11            I have presented in many
12  different forums the sequence of events that
13  occurred with Vioxx.  In particular, comparing
14  the information that was available to
15  physicians compared to the data that Merck
16  turned over to the FDA.  I have done that in
17  lectures, in some grand rounds.
18  BY MR. WRIGHT:
19    Q.    Let's talk about the different
20  forums.  What lectures can you recall off the
21  top of your head -- well, let me just ask you
22  this way.
23            Are there any institutions or
24  groups that we or the judge might have heard
25  of that you have been asked to come lecture on

336

1  this very subject to?
2      A.    Harvard medical students, the
3  Sharp Rees Medical Group in San Diego,
4  California.  The Regents Group which was a
5  group that covers almost three million lives
6  in Blue Cross plans in the northwest.  The
7  Southern Vermont Area Educational Council For
8  Physicians.  I am sure there are more.
9      Q.    It is late in the day.  Grand
10  rounds, what are grand rounds?
11      A.    Grand rounds are weekly meetings
12  at hospitals, weekly educational meetings for
13  physicians in hospitals.
14      Q.    What are some of the grand rounds
15  that you recall talking specifically about
16  Vioxx and the information that physicians had
17  that related to their prescribing decisions?
18      A.    I haven't included the title of
19  my talks.
20      Q.    You are looking at your CV.
21      A.    I am looking at my CV.
22      Q.    To be honest, if it is listed in
23  your CV, there is no point in us going into it
24  right now.
25          Is it fair to say that you have

337

1  given grand rounds on the issue of physicians'
2  knowledge regarding Vioxx and its impact on
3  prescribing of Vioxx?
4      A.    Yes.  And also presented this
5  issue to the Congressional Task Force on
6  Prescription Drugs in Washington, D.C.
7      Q.    Doctor, the second issue --
8      A.    I also presented this issue of
9  the Harvard -- lectured on this issue at the
10  Harvard School of Public Health.