UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| | Section L |
| | Judge Eldon E. Fallon |
| | Magistrate Judge Daniel E. Knowles, III |

**THIS DOCUMENT RELATES TO:**
*Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379

### DECLARATION OF JOHN DAVID ABRAMSON, M.D.

I, John David Abramson, MD, hereby state as follows:

"I have been provided with a copy of Merck's MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING TESTIMONY OF JOHN D. ABRAMSON, M.D. and would respond as follows:

I opined in my affidavit and in my deposition that Merck failed to provide adequate information to prescribing physicians concerning the safety of Vioxx, that the risks of using Vioxx outweighed the benefits and that these failures were a substantial contributing factor in the damages suffered by this Plaintiff.  It is my understanding Merck seeks to preclude me from testifying about these opinions at trial because Merck asserts they are outside my area of expertise or because they assert I formed them without a reliable scientific method. As stated in my affidavit, I am qualified to render these opinions because of my education, training, over two decades of experience as a physician and a prescriber of medications, my academic experience, my research about these specific issues over the past five years, and my review of the relevant documents and medical and scientific literature.

Though I believe the basis for my qualifications to testify regarding these areas is clear and has been previously stated, I will further elucidate for The Court.

## **GENERAL QUALIFICATIONS**

As a physician for over twenty years, I have vast experience in reviewing medical records, drug labels, marketing information disseminated by drug companies and clinical studies and forming conclusions based on my review and analysis of these types of information to make informed and appropriate decisions with my patients regarding their medical care and treatment. I have extensive expertise in all of these areas and for Merck to say I should be precluded from testifying because of lack of expertise in any of these areas is without basis.

Merck appears to be making the false assumption that because a physician does not have board certification in a certain area, he or she lacks expertise in that area of medicine. I am Board Certified in Family Medicine, a field of medicine in which practitioners are trained to treat the whole patient—meaning all body systems and not just one specific system treated by physicians who subspecialize in one area. Thus the family physician is like an internist or pediatrician who takes care of patients of all ages. In terms of clinical expertise, hospitals grant clinical privileges for family physicians to provide the same range of patient care services as they do general internists.

Since receiving my medical for degree, I have thirty years of professional training and experience in treating virtually all of the patients treated by specialists in internal medicine, and many if not most patients with illnesses that are also treated by specialists in gastroenterology,

cardiology, and rheumatology. I certainly have decades of experience and expertise in caring the types of patients for whom Vioxx was prescribed.

As an experienced physician who has been on the front lines of primary care for more than 20 years, I certainly possess the requisite level of expertise to testify on these matters. In addition, my training, experience and research go far beyond clinical experience alone. I completed a two year Robert Wood Johnson fellowship that included study of exactly the skills required to critically assess Merck's research on Vioxx and the information that was communicated to health practitioners through articles in medical journals, clinical practice guidelines, advertising, marketing, and continuing education. In addition to this, I have studied the specific areas of my testimony regarding Vioxx for the past five years, more than three of which were prior to and independent of litigation.

### QUALIFICATIONS REGARDING ADEQUACY OF INFORMATION IN MERCK'S MARKETING AND VIOXX LABEL

I am qualified to testify that the scientific evidence on Vioxx from Merck's own studies was not adequately communicated to physicians and consumers because I was one of those physicians and experienced first hand the impact of Merck's marketing on my patients and in my practice. For the same reason, I am qualified to testify about Merck's failure to communicate to physicians the dangers of Vioxx identified in Merck's own studies because they failed to adequately and accurately communicate them to me, a prescriber, and to the patients in my clinical practice.

As a prescribing physician who also prescribed Vioxx, having reviewed Merck internal documents and comparing it to what was reported to physicians like me in the labeling and in marketing material and publications, I am acutely aware of the misleading information and

misrepresentations contained in those materials and how that impacted physicians and patients and am qualified to render my opinions in this area.

In addition, my opinions are based on and supported by the fact that the FDA came to the same conclusions I have stated in my report and deposition as evidenced in their September 17, 2001 Warning Letter to Merck about Vioxx promotional materials (attached). In this document, the FDA stated they found Merck's promotional materials misleading regarding the safety profile and the VIGOR study results as well, and stated they found Merck's claim that Vioxx has " a favorable cardiovascular safety profile" "simply incomprehensible" in the 5-22-01 Press Release. This same statement was made in the 4-28-00 Press Release.

Further, prior to becoming involved in the litigation, I have published and lectured on the subject of the impact of marketing by pharmaceutical companies on physician prescribing behavior. I authored a book, Overdosed America, published in September 2004, one of the major themes of which is how the drug companies influence doctors' prescribing habits. Pages 117 to 126 specifically address the issue of drug company marketing to doctors through drug reps and sponsorship of continuing education activities. An extensive body of scientific literature exists on the effect of drug company marketing to doctors, twenty references of which are cited in my book to support my opinions and findings as noted in this chapter.

As stated in my deposition, I also have expertise in drug labeling (1). There are two sides of expertise in drug labeling – the author and the recipient. I have been on the recipient side for over 20 years as a prescribing physician, and have extensive expertise in reviewing drug labeling and

applying it to clinical practice and, more importantly, to individual patient care. My opinions regarding the inadequacy of the Merck labels and communication of safety information on Vioxx are based in part on my training, expertise, and experience as a reader, not a writer, of drug labeling and clinical trials. As a physician who reviewed hundreds of drug labels over the course on my clinical practice, I have knowledge and expertise regarding the different sections of the labeling such as Warnings and Precautions and how both the information and placement of the information impact physician prescribing. I am familiar with the regulations regarding the type of information required to be in the various sections of the labels and in conjunction with my experience as a prescribing physician and my training in statistics and epidemiology, I have expertise to opine on the type of information prescribing physicians such as myself need and want to see in a drug label in order to make informed decisions about patient care. As stated in my deposition the *Warnings* section is intended to describe serious adverse events. In the case of post-VIGOR labeling of Vioxx the significantly increased rate of serious adverse events and the significantly increased rate of myocardial infarction as well as thrombotic cardiovascular events *in toto* were not included in the April 2002 label. Merck documents I have reviewed confirm my opinion that the FDA in fact wanted this information in the Warning section.

My opinion that the label and the information conveyed by Merck's marketing efforts about the cardiovascular and overall risks of Vioxx —particularly in patients without a medical history of ischemic heart disease—is based upon my years of experience as a practicing physician and in academic medicine as well as my training and experience in medical research and epidemiology. As a physician who has prescribed Vioxx, has reviewed the medical records of this Plaintiff, and has specialized training in statistics, I am also qualified to testify about Merck's misrepresentation of the

VIGOR data in the Vioxx labeling and the impact of that information on prescribing of this drug to a patient like Mr. Smith. The testimony of the prescribing physician in this case, Dr. Grefer, supports my opinion that the misleading nature of the marketing material presented by Merck representatives and the understatement of Merck's own scientific evidence in the April 2002 label regarding the increased risk of serious adverse events associated with Vioxx were substantial contributing factors to Mr. Smith ever getting this drug. The testimony of Dr. Michael Grefer, attached, states that had he received the information I have testified Merck should have communicated, he would not have prescribed Vioxx to Mr. Smith in October 2002 (2).

For more than 20 years, I have been on the receiving end of medical journal articles, clinical practice guidelines, marketing material and drug company labeling as a primary care doctor and have an important, firsthand perspective on how the marketing of Vioxx misrepresented to health practitioners the overall picture of Vioxx safety and benefit and how the labeling was misleading.

**QUALIFICATIONS TO OPINE ON THE RELATIVE RISKS OF VIOXX AND THE ADEQUACY OF MERCK'S CLINICAL STUDIES**

I have special training in epidemiologic principles which include study design, conduct, interpretation of data (including clinical trials); critical analysis of research articles published in medical journals; and over two decades experience as a physician applying research data and these analytic skills to the clinical practice of medicine and individualized patient care. As stated in my report, I completed a Robert Wood Johnson Fellowship in Family Medicine at Case Western University from 1980-1982, earning a Master of Science in Family Practice degree. This two year fellowship included study of epidemiology, statistics, research design, critical analysis of medical literature, and health policy, as well as specific training in the interpretation of scientific data

including relative risk and statistical analysis. Additionally, I was a Senior Research Associate on the Faculty of the Institute for Health Policy, Heller School, Brandeis University from 1992-1993 during which I received additional experience in health policy. During my Robert Wood Johnson Fellowship, I designed, conducted, analyzed, and performed the interpretation of data for an observational study, which is one type of epidemiologic study, the results of which I presented to a meeting of the National Governors' Association held in New Orleans (3).

I am an expert at the translation of clinical studies, including studies of like design as VIGOR and APPROVe, into clinical practice. I did this for more than 20 years both in my clinical practice as a primary care physician and as a clinical instructor at Harvard. In addition, I have been invited to lecture to Universities and Institutions, including Harvard Medical School, specifically about the clinical studies of Vioxx and the presentation of the VIGOR Trial in the New England Journal of Medicine. I am certainly qualified based on my education, training, experience and physician's review of the documents and studies to testify on the discrepancies between the findings of Merck's studies and the information that was presented in medical journals and marketing material. That I have not been an employee of a drug company is not relevant to my expertise in applying scientific evidence to individual patients. That is something physicians do daily in their clinical practice. In addition, I have received specialized training to do this and over the past five years (both before and after becoming involved in litigation) have spent hundreds of hours analyzing the discrepancies between the scientific evidence and the information that was communicated by Merck to health practitioners about the safety and efficacy of Vioxx.

My opinions regarding the Vioxx clinical data are not, as Merck suggested, "speculative and lacking scientific validity" nor are they "based entirely on the results of the VIGOR study" as stated

in Merck's motion. They are based on my training and experience in epidemiology, statistics, research, and decades of clinical experience reviewing and interpreting clinical data and applying it to the practice of medicine. Further, my opinions that Merck misrepresented the Vioxx clinical data are based on and have been supported and echoed in Merck's own documents, depositions of their employees, the clinical studies relating to Vioxx, and statements made by the FDA to Merck in FDA communications to Merck.

**QUALIFICATIONS REGARDING WHAT A VIOXX PRESCRIBER NEEDS TO KNOW**

I have extensive expertise in the issues of the type of information prescribers need to know and how the manner of delivery or communication of this information impacts prescribing habits. The issue of public health and health policy and how doctors process information from various sources has been of importance and interest to me throughout my career as a physician. Because of the changes that I was observing in American medicine and experiencing in my own practice, I left clinical practice in 2002 long before this litigation began to devote full time to research this topic, specifically in regard to the pharmaceutical industry and its impact on public health, public safety, and the quality of American health care. Since the beginning of 2002 I have been researching, writing, lecturing, and teaching about how the information and misinformation about drugs and other medical products available to practicing physicians impacts their medical decisions and the overall quality, effectiveness, and cost of American health care. I have authored several articles and published a book on this subject.

In addition, I have first hand experience regarding the type and content of information a physician and a patient want and need to know to make informed decisions about a drug and when performing a risk/benefit analysis to determine if a drug like Vioxx is a reasonable treatment for that

individual. I prescribed Vioxx as well as other NSAIDS to my patients prior to becoming aware of the true risks of this drug and had to do so based on the information available to me through the traditional resources available to physicians.

As stated in my deposition (4) I have been an invited lecturer over the past several years, prior to involvement in this litigation, on the issue of physicians' knowledge regarding Vioxx and its impact on prescribing of Vioxx. I have lectured to Harvard medical students and faculty, the Harvard School of Public Health, the Sharp Rees Medical Group in San Diego, California, The Regents Group (a group that covers almost three million lives in Blue Cross plans in the northwest), the Heller School for Social Policy at Brandeis University, and The Southern Vermont Area Educational Council For Physicians to name a few. I have also presented this issue to the Congressional Task Force on Prescription Drugs in Washington, D.C.

## **APPLICABILITY OF OPINIONS TO THIS PLAINTIFF**

As stated in my report and deposition, my opinions concerning VIGOR and the April 2002 label are applicable to Mr. Smith based on my experience as a clinician and prescriber and on evidence and testimony produced in this case, not the least of which is that Merck in their marketing materials and Press Release was not forthright with the results of the VIGOR study, which clearly showed an increased risk of serious cardiovascular complications for all patients in the study. Notably, though they assert in their Motion that the VIGOR study was not applicable to Mr. Smith, there is nothing in the Press Releases or the labeling for the drug stating VIGOR <u>only</u> applied to elderly patients with rheumatoid arthritis taking 50 mg doses. In the 4-28-00 Press Release titled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx" Merck failed to even mention

the age of the patients in the VIGOR study, notably omitted any reference to a 50 mg dosage, and gave no instruction that physicians should not apply the results of this study to patients such as Mr. Smith. Merck states in their Motion that the VIGOR study involved "an elderly population" and that Mr. Smith was not elderly.  However, according to the NEJM article that presented the VIGOR results patients as young as 40 were allowed to participate in the study.  And both the NEJM article and the April 2002 labeling, the first to include the VIGOR findings and which I also rely upon for my opinions, stated that the median age of patients in the VIGOR study was 58.  Mr. Smith was 52 at the time he ingested Vioxx and as such, the VIGOR study certainly involved patients of Mr. Smith's age. Furthermore, Merck's statements that the VIGOR study results cannot be relied on in regard to Mr. Smith because "VIGOR did not compare Vioxx against placebo and, in fact, was not designed to assess cardiovascular risk" are directly contradicted by its own Press Releases and information conveyed to physicians and consumers about the VIGOR results, purporting to "confirm" the cardiovascular safety of the drug (without stated exclusion of patients of a certain age or disease state).  Merck's lawyers in fact proactively use the VIGOR study in depositions of the treating physicians in this very case to assert that Merck disclosed the CV risk to Mr. Smith to his own physicians, though without their new caveat that the VIGOR results did not apply to Mr. Smith. The fact that the VIGOR study was not designed to assess cardiovascular risk makes the findings of a substantially increased risk even more worrisome, which is a factor that should have been included in the risk/benefit assessment for all patients, including Mr. Smith, for whom treatment with Vioxx was being considered.

Furthermore, the claim that the results of VIGOR are not applicable to Mr. Smith because "VIGOR did not compare Vioxx against placebo" are contradicted by the November 18, 2004 testimony of Merck's then CEO, Raymond Gilmartin, before the Senate Finance Committee that

testing Vioxx against a placebo in the VIGOR study would have been unethical in patients requiring anti-inflammatory medication. This forms the basis of my opinion that the results of VIGOR are applicable to Garry Smith and to Dr. Grefer's decision to treat Garry Smith with Vioxx: Because Mr. Smith required treatment for knee pain the question is not how would the safety and efficacy of Vioxx have compared to placebo therapy—because no doctor would consider treating such a patient with a placebo. The information that I and physicians like Dr. Grefer required to make the best decision about therapy for patients with pain such as Mr. Smith is how the safety and efficacy of Vioxx compares to other potential therapies. The VIGOR study provided the answer to exactly this question: While Vioxx provided no better symptom relief, it was significantly more dangerous overall and caused significantly more serious thrombotic cardiovascular complications and significantly more heart attacks in comparison to treatment with naproxen.

### **RELIABLE EVIDENCE**

Merck argues that "Dr. Abramson's opinion on the relative risks and benefits of Vioxx was derived for, and generated by, this litigation." The facts show otherwise. The manuscript for my book on this subject was completed in March of 2004 and published September 21, 2004, nine days before the withdrawal of Vioxx and long before I was ever consulted by attorneys in this matter.

Prior to being consulted for the litigation, I have been invited to lecture to medical students and faculty at major universities and Institutions, including Harvard, on the trustworthiness of scientific evidence based medicine. I have published research and opinions in peer reviewed medical and health policy journals. My training, experience, and research into these matters (long before
ever becoming involved in litigation) to testify on the issues raised in my expert report and deposition.

My opinion that drug prescriptions require individualized risk assessment demonstrates that my positions are based on applying the best available scientific evidence to the particular circumstances of each individual patient.  This is the challenge that clinicians face every day and is an area in particular where I have extensive firsthand and research expertise. There should be no debate that my testimony is "based on the scientific method, and, therefore…reliable" as much of my testimony is based upon the scientific evidence that Merck presents about its own product.  The opinions I have formed and stated in my report and deposition were formed and based on a scientific review process that I learned in medical school and residency training; that were expanded upon in my fellowship training on research techniques, statistics and epidemiology; that I applied in clinical practice for over 20 years; and that I have researched extensively for the past five years.


Further, Affiant sayeth not."


_____                    _____

Date                                                              John David Abramson, M.D.