UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| | Section L |
| | Judge Eldon E. Fallon |
| | Magistrate Judge Daniel E. Knowles, III |

**THIS DOCUMENT RELATES TO:**
*Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379
_____

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF CORNELIA PECHMANN, PH.D.**
_____

*(Defendant's Expert Challenge No. 3)*

**TO THE HONORABLE JUDGE OF SAID COURT:**

## INTRODUCTION

Dr. Cornelia Pechmann is a professor of marketing at the Paul Merage School of Business at the University of California, Irvine. Her specialty is in integrated marketing communications campaigns, which are comprehensive and sophisticated marketing programs intended to convey a seamless integration of discrete marketing messages. She has worked in this area for over 20 years, published over 50 articles on this subject, and has been retained by government agencies and businesses as a consultant and advisor on large integrated marketing communications campaigns.

Dr. Pechmann was retained by Plaintiff primarily to review and provide opinions on a comprehensive integrated marketing communications campaign by Merck to neutralize concerns among doctors and consumers regarding the potential cardiovascular risk associated with Vioxx.

-1-

Her expertise was and remains necessary to describe and explain the strategy and objectives of the campaign, the nature of the marketing and research studies performed by Merck to achieve those objectives, the methodology used in those studies, the consultants used by Merck to perform those studies, the results of those studies, Merck's evaluation of those studies, how Merck adjusted its campaign to better achieve its objectives and the success of the campaign as measured the data collected. Dr. Pechmann's testimony is at the core of Plaintiff's case for fraud and failure to warn of the cardiovascular risk associated with the drug.

Marketing is a behavioral science and, like other behavioral sciences such as psychology and economics, is the proper subject of expert testimony. Marketing campaigns at the level employed by Merck involve the same expertise as the natural and other behavioral sciences, in that they require identification of hypotheses, testing the hypotheses using valid methods and controlled studies, and analysis and preparation of reports. Numerous courts have upheld and allowed presentation of testimony of experts on marketing techniques.

Merck submits that Plaintiff can simply present at trial some of the detail pieces and ads and that jurors will be able to discern on their own the complex integrated marketing communications campaign employed by Merck to shape marketplace perceptions regarding cardiovascular risk. If it is that simple, then Merck should not have had to hire the many consultants and spend hundreds of millions of dollars on research and on its campaign to neutralize doctor and consumer concerns about the cardiovascular risk associated with Vioxx. Merck will have available to it at trial its marketing expertise in the form of its witness employees who designed and handled the campaign. Plaintiff similarly should be allowed to have its own expert with specialization in this scientific, technical and complex area to explain the manner in which Merck used a sophisticated marketing

campaign to neutralize any concern in the marketplace regarding Vioxx's cardiovascular risk.

## I.   BACKGROUND

### A. Dr. Pechmann's Is Qualified As An Expert In Marketing And Integrated Marketing Communications Campaigns

Dr. Pechmann is a full tenured professor of marketing at the University of California, Irvine School of Business. (Expert Report, p. 1; Depo., Vol. 1, 288:14-17.) Dr. Pechmann has approximately 50 refereed publications in academic journals, books and conference proceedings on topis relating to integrated marketing communications campaigns. (Report, p. 4; Depo., Vol. 1, 288:18-20.) Her 2002 article in the *Journal of Consumer Research* about cigarette advertising and adolescents won that journal's "best paper in 2002" award. (Report, p. 4)  A recent scientific study to determine the top 50 marketing scholars based on a citation index (i.e. impact of work on academia) included Dr. Pechmann. (Depo., Vol. 1, 290:5-16.)  Dr. Pechmann has been a member of the editorial boards of three of the top marketing journals, including the *Journal of Consumer Research*. (Depo., Vol. 1, 289:6 to 290:1.)[1]

Additionally, Dr. Pechmann has substantial practical experience in designing, implementing and advising on integrated marketing communications campaigns. For example, Dr. Pechmann was retained by the United States Office of National Drug Control Policy to develop an anti-drug integrated marketing communications campaign over a five year period from 1998 to 2004. (Report, p. 1.)  This was the largest integrated social marketing communications campaign in U.S. history.

---

[1] Plaintiff attaches hereto the following exhibits: Exhibit 1, Dr. Pechmann's May 26, 2006 deposition transcript (herein "Depo., Vol.1"); Exhibit 2, Dr. Pechmann's June 15, 2006 rough draft deposition transcript (herein "Depo., Vol. 2"); Exhibit 3, Dr. Pechmann's "Abstract" concerning Exhibit 5 of her initial deposition, and attached as Exhibit 8 of her subsequent deposition (herein "Abstract re Exhibit 5"); and Exhibit 4, Dr. Pechmann's curriculum vitae.  Dr. Pechmann's main report is attached to Merck's motion as Exhibit A.

*Id.* She was one of six members of the behavioral change expert panel and was chosen to oversee research conducted for the campaign. This involved copy testing and tracking of reactions to the campaign. (Depo., Vol. 1, 8:10 to 11:11.) Dr. Pechmann developed strategy (core messages); reviewed focus group work before filming; tested storyboards and preliminary ads; reviewed tracking research after ads run (designed research and analyzed data); reviewed findings and statistical analyses of the data; and adjusted the campaign based on the results. (Report, pp. 1-2; Depo. Vol. 1, 293:21 to 294:7.) Dr. Pechmann worked with an affiliate of the same marketing communications campaign, and during the same time period at issue here.

Based on Dr. Pechmann's qualifications, she is an expert in integrated marketing campaigns (Report, p. 1; Depo., Vol. 1, 288:21-23); misleading advertising (Report, p. 3; Depo., Vol. 1, 157:2-7); the role of the U.S. federal and state governments in identifying and preventing misleading advertising, particularly the FTC (she published peer-reviewed articles regarding the FTC's role in identifying and preventing misleading advertising) and the FDA (she assisted in the American Psychological Association's response to the FDA's proposed regulations restricting tobacco products to children) (Report, p. 3.); and experimental and quasi-experimental research and designs and statistics in marketing. *Id*.

Dr. Pechmann's numerous other qualifications in the marketing field and especially in the sub-field of integrated marketing communications are set forth in her expert report and attached curriculum vitae. (Report, pp. 1 to 5 and Exhibit 2 to Report.) Indeed, Merck cannot and does not challenge Dr. Pechmann's expertise in these areas.

## B. Dr. Pechmann Spent Substantial Time Reviewing Materials And Preparing Her Expert Reports

Dr. Pechmann spent approximately 250 hours reviewing Merck's documents, meeting with counsel and preparing her expert report prior to her initial deposition by Merck on May 26, 2006. (Depo. Vol. 1, Exhibit 3.) She spent substantial additional time reviewing documents and preparing for a further deposition by Merck on June 15, 2006 and preparing further documentation memorializing those matters to which she testified in her initial deposition. (*See* Depo., Vol. 2, 44:22 to 48:20 and Exhibit 8 thereto (abstract of Exhibit 5 from initial deposition with additional details on Merck's six marketing research studies)).

Dr. Pechmann spent approximately half of her time reviewing Merck's marketing studies. (Depo., Vol. 1, 327:2-7.) In preparation for her initial deposition she reviewed several boxes documents regarding Merck's integrated marketing communications campaign, and focused in particular on the various research studies employed by Merck, the methods used, the findings and the validity of that research. *Id.* at 8:8-21. In preparation for her second deposition she reviewed, among other things, the literature which discusses, describes or critiques the integrated marketing campaign of pharmaceutical companies. (Depo., Vol. 2, 40:18 to 41.) She also reviewed key textbooks on consumer behavior and marketing management regarding marketing analysis and confirming the scientific bases for integrated marketing communications plans. *Id.* at 42:20 to 43:11.

## C. Dr. Pechmann's Expert Analysis and Opinions

Dr. Pechmann's expert review and testimony primarily concerns Merck's integrated marketing communications campaign that was implemented to neutralize doctor and patient concerns about cardiovascular risks associated with Vioxx. The textbook definition of an integrated

marketing communications campaign is as follows:

> "A concept of marketing communications planning that recognizes the added value of a comprehensive plan that evaluates the strategic roles of a variety of communication disciplines - for example, general advertising, direct response, sales promotion and public relations - and combines these disciplines to provide clarity, consistency, and maximum communications impact through the seamless integration of discrete messages." (Report, p. 1 and Report, Exhibit 1, p. 1.)

An integrated marketing communications campaign utilizes extremely sophisticated marketing concepts and tools which, as indicated above, are the subject of numerous articles and academic discussions as well as practical applications. The concepts and tools used in integrated marketing communications campaigns apply across industries. (Depo., Vol. 1, 291:2-10.) For example, as mentioned above Dr. Pechmann has been retained by government agencies and private business in many different areas to work and advise them on their integrated marketing communications campaigns, and she has published articles on the same techniques used for those campaigns as were used by Merck in its Vioxx campaign. (Report, pp. 1 to 2; Depo., Vol. 1, 8:10 to 11:11; 293:21 to 294:7; and Vol. 2, 52:10 to 53:5.) Additionally, Dr. Pechmann has prepared with a former Ph.D. student a paper for publication entitled "Information Formats for Presenting Unfavorable Efficacy Information, Managerial and Regulatory Perspectives." The paper concerns controlled experiments and research they conducting involving products from three industries, namely, the automobile, topical sun screen and pharmaceutical industries. (Depo., Vol. 2 37:14 to 40:15.)

As set forth, the integrated marketing communications campaign conducted by Merck with regard to Vioxx and its cardiovascular risk requires application of the same marketing techniques and methodologies employed in other natural and behavioral sciences. Merck used these techniques

to identify issues that were affecting sales of the drug, design and develop marketing tools to address those issues, conduct research studies of those tools prior to their release in the marketplace to gauge their effectiveness, track the results of their campaign through research studies, analyze the results of the campaign and make any adjustments to the campaign to continue to achieve the campaign goals.  *See* Depo., Vol. 1, 9:3 to 10:8; 290:21 to 292:1.

Based upon her review and analysis of Merck's integrated marketing communications campaign, Dr. Pechmann will testify as to Merck's marketing goals and objectives concerning Merck's campaign, namely, to neutralize doctor and consumer concerns about Vioxx's cardiovascular risks and to convince doctors to prescribe Vioxx regardless of their patients' cardiovascular risk profile.  *See* Depo., Vol. 1, 305:11-22 and 340:11-22.

In addition to testifying as to Merck's overall campaign, Dr. Pechmann will focus on six specific areas of the campaign, namely: (1) copy testing by Merck of detail pieces with doctors; (2) doctor tracking and doctor promotional message recall; (3) doctor behavioral and prescription tracking; (4) doctor attribute tracking; (5) Merck's awareness and action or chronic pain consumer tracking study; and (6) consumer ad copy testing.  *See* Report; Abstract re Exhibit 5; and Depo., Vol. 1, 295:12 to 326:1, Vol. 2 pp. 84 to 157.  For each area, Dr. Pechmann explains the objectives of the studies, the methodology of the studies, the consultants used to conduct the studies, the results of the studies and how the studies fit into Merck's overall integrated marketing communications campaign both in guiding Merck's marketing efforts and cross-checking the results of those efforts to determine whether they accomplished Merck's marketing goals.  *See* Abstract re Exhibit 5 and references to main Report therein.  Dr. Pechmann will testify as to the quality of the studies and that they were done in a manner that accomplished Merck's marketing goals and objectives.  (Depo.,

Vol. 1, 327:8-15.)

As a result of Merck's integrated marketing communications campaign, Dr. Pechmann concludes that doctors had a misunderstanding about the cardiovascular risks associated with Vioxx based on Merck's integrated marketing communications campaign, and that the detail pieces and other information provided to doctors in the campaign about Vioxx and its safety continued to mislead them regarding the potential risk. (Depo., Vol. 2 64:19 to 65:6.) In addition, consumers were reassured by Merck's safety messages about Vioxx and those perceptions remained stable throughout the campaign. In other words, consumers did not get the message that their use of Vioxx exposed them to a cardiovascular risk. (143:1 to 144:23.)

## II.     DISCUSSION

### A.  Legal Background

Federal Rule of Evidence 702 allows a witness with sufficient expertise in a field to testify as to matters in which "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . .: The qualifications of the expert witness are judged under Rule 702 by his or her knowledge, skill, experience, training, or education." Finally, Rule 702 requires that "(1) the testimony be based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The principles behind Rule 702 as set forth in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993) and its progeny are well known by the Court and discussed extensively in its decision in *In re: Vioxx Products Liability Litigation,* 401 F.Supp. 2d 569 (E.D. La. 2005), and in Plaintiff's other briefs filed in conjunction with this litigation (which

are adopted herein). In sum, as the gatekeeper of scientific evidence, the Court must make a preliminary assessment to ensure the proffered expert testimony meets the requirements of Rule 702 and the factors set forth in Daubert. *Id*. at 573-74. "In satisfying its 'gatekeeper' duty, the Court will look at the qualifications of the experts and the methodology used in reaching their opinions and not attempt to determine the accuracy of the conclusion reached by the expert. The validity or correctness of the conclusion is for the fact finder to determine." *Id.* at 574.

Rule 702 and the factors set forth in *Daubert* have been applied by courts to admit and uphold testimony of marketing experts in complex litigation matters. For example, in *Schwab v. Philip Morris USA, Inc.,* 2005 WL 2401647 (E.D.N.Y. 2005), the plaintiffs proffered a marketing expert to testify that defendant cigarette manufacturers intentionally marketed and advertised low tar and light cigarettes in a manner that conveyed they had a health benefit over regular, full flavor cigarettes and "that defendants 'knew' that smokers switched to low tar brands for 'health' reasons, and that 'successful advertising had to allay consumers' fears about company documents and thereby identifying seven 'lights are safer' cues that defendants allegedly employed in low tar advertising." *Id.* The district court noted that the plaintiffs' expert was a "Professor Emeritus of Marketing with adequate credentials in his field." *Id.* The district court denied the defendants' motion to exclude testimony, stating:

> "The charge of fraud makes relevant both what defendants knew and intended and how their activities were designed to influence the beliefs and activities of consumers. It can be assumed that the tobacco companies' advertising budgets and programs affected consumer reactions. Dr. Pollay's experience, analytical techniques and reports meet all the elements of *Daubert* and Rule 702's requirements. His report could be reliable and helpful to the jury. It is not excludable under Rule 403 of the Federal Rules of Evidence. Advertising methodologies are esoteric; the average juror could be helped by an explanation of how they work and were used by defendants." *Id.*

Other courts similarly have upheld the admission of testimony by marketing experts or reversed trial courts for failing to allow such testimony under Rule 702 and *Daubert* or similar evidentiary rules. *See, e.g., Novartis Corp. v. Fed. Trade Commission,* 223 F.3d 783, 787-88 (holding that expert testimony admissible as to whether "advertising played a 'substantial role' in creating or reinforcing a false belief" in a drug product's efficacy); *Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.,* WL 1738338 (E.D.N.Y. 2000) (also upholding expert testimony with regard to marketing low tar and light cigarettes); *Edina Realty v. TheMLSonline.com,* WL 737064 (D.Minn.2006) (allowing marketing expert testimony in trademark infringement); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134 (9th Cir. 1997) (reversing district court's exclusion of testimony of plaintiff's marketing research expert in false advertising Lanham Act action concerning how defendants' advertisements mislead the consuming public); *Nestle Food Co., v. Abbott Laboratories,* WL 8578 (9th Cir. 1997) (allowing expert in consumer psychology to testify as to defendants' motivations concerning direct to consumer marketing to reduce breast feeding and promote use of infant formula); *Tyus v. Urban Search Management,* 102 F.3d 256, 264 (7th Cir 1996) (holding that district court abused discretion in refusing to allow psychologist to testify concerning how an advertising campaign sends message to its target market, and stating that materials on which expert relied and methodology used "were well within the range contemplated by *Daubert* for expert scientific testimony"); *Betterbox Communications v. BB Technologies,* 300F.3D 325 (E.D. Pa. 2002) (allowing expert testimony of marketing expert on trademark confusion based on 20 years marketing expertise).

### B. Dr. Pechmann's Testimony Meets The Standards of Admissibility Set Forth In The Federal Rules Of Evidence And *Daubert*

In the present case, Dr. Pechmann's expert testimony meets all legal and evidentiary standards for admission under Rule 702 and *Daubert*.

It cannot be seriously disputed that Dr. Pechmann has the knowledge, skill, experience, training and education to testify as to her opinions and these areas of marketing science and expertise. She has worked in these areas for 20 years, teaches courses in these subject areas, has published over 50 peer reviewed articles and is considered one of the top 50 scholars in these areas, has substantial practical experience working in these areas, has major degrees in these areas and has participated on editorial boards of major marketing journals. The Defendant cannot and does not even attempt to challenge her marketing expertise.

Moreover, Dr. Pechmann's opinions and testimony meet all the factors and standards required by Rule 702 and *Daubert* as enumerated by this Court in its earlier decision in this litigation. As set forth in detail above, Dr. Pechmann engaged in a considerable review of Merck's documents and marketing materials and research, she reviewed and analyzed the methodology utilized by Merck for its integrated marketing communications campaign, she reviewed and analyzed the results of Merck's campaign, and she made an assessment of the methods used by Merck and the success of the campaign. She has drawn from her own research and articles and has reviewed articles on campaigns utilized by the pharmaceutical industry to formulate her opinions and conclusions. In sum, Dr. Pechmann's testimony is based on sufficient facts and data (Merck's own data and her own body of knowledge in this area), her analysis is based on widely accepted and reliable principles and methods and she has applied those methods satisfactorily to the facts of this case.

Finally, Dr. Pechmann's testimony is essential for the trier of fact to have a complete understanding of Merck's integrated marketing communications campaign and how it worked to neutralize concerns in the marketplace amongst doctors and patients regarding the cardiovascular risks associated with Vioxx. Almost certainly the jurors will not have an understanding of what an integrated marketing communications campaign entails. Nor will jurors have an understanding of how market research studies of marketing messages and advertising and promotional pieces are used to subtly shape doctor and patient views concerning the safety of Vioxx and also to document that doctor and patient views and behaviors have been successfully affected. Indeed, the complexity of Merck's advertising campaign required an infusion by Merck of hundreds of millions of dollars and the retention of numerous consultants to implement. Courts have found that such expert testimony is essential in the marketing context. In *Tyus v. Urban Search Management, supra,* 102 F.3d at 264, the Court reversed the district court's decision to exclude the plaintiff's marketing expert, stating:

> "Dr. Tarini was prepared to testify about the way an advertising campaign sends a message to its target market and how an all-White campaign affects African Americans. This kind of social research, which would demonstrate the way one of the most important industries in our country actually operates, ***would have given the jury a view of the evidence well beyond their everyday experience.*** (Indeed, anyone who watches television knows that the major consumer product companies in the country ***spend billions crafting their advertising campaigns, to reach exactly the right audience, with exactly the right pitch.*** It is doubtful they are making these decisions by asking six or twelve random people on the street what might appeal to them." (Emphasis added.)

For these reasons, Merck's motion to exclude Dr. Pechmann's testimony must be denied and she should be allowed to testify as to Merck's integrated marketing communications campaign.

### C. Merck's Arguments Are Unavailing And Actually Underscore The Need For Dr. Pechmann's Testimony

Merck raises a number of arguments that not only lack merit, but underscore the tactics it intends to use at trial and the need for Dr. Pechmann's testimony to avoid having the jury misled.

Merck first leads the Court to believe that plaintiffs are offering Dr. Pechmann to testify as a medical expert on causation with regard to Vioxx's cardiovascular risk. Specifically, they complain that Dr. Pechmann is opining that Vioxx causes heart attacks and that the VIGOR data "establish[es] that Vioxx increases cardiovascular risk." (Merck brief, pp. 5 to 6.) Nothing could be further from the truth.

Dr. Pechmann specifically stated at her deposition that she is not offering an expert medical opinion as to relationship between Vioxx and cardiovascular events. (Depo., Vol. 1 294:12-15.) Rather, as a component of her opinion on marketing matters she determined from the documents that Merck was aware of a potential cardiovascular risk associated with Vioxx. (294:16-20.) Dr. Pechmann testified as to the importance of this awareness to her opinion:

> "[The] internal documents and statements [made] by the Merck executives... are part of the whole picture. You have to understand what was the objective of the campaign and then you test the hypothesis that that objective has met. And the answer to that hypothesis test based on all of the research is, yes, they obtained the objective that they sought, which was to neutralize the CV risks." (Depo., Vol. 1 329:4-18.)

So in other words, in order to understand what prompted the integrated marketing campaign and the goals and objectives of that campaign, the internal documents and the knowledge of the executives at Merck regarding the risks must be understood and incorporated into the opinion. But such knowledge is not the primary opinion. Rather it is the catalyst that explains the whole misleading campaign to neutralize the cardiovascular risks in the minds of the doctors and patients.

Also, since Merck specifically designed an entire campaign to neutralize doctor and patient perceptions of the cardiovascular risk, it must have been aware of the existence of the risk and that it threatened the product.

Merck then tries to distinguish between a "potential" risk and a "known" risk. (Merck Brief, p. 5.) But the fact of the matter is that a risk is a risk - Merck admits in its own papers (and made clear to it in the FDA warning letter) that it was very plausible that the VIGOR data showed that Vioxx increased the risk of heart attack. *Id.* at 4-5. If Merck was aware of the risk and crafted a highly sophisticated campaign to neutralize that risk so that doctors and patients did not think there was any risk, then that was misleading. Of course, if Merck manages to convince the jury that Vioxx does not cause heart attacks then Dr. Pechmann's testimony, as well as testimony of all Plaintiff's experts, will be moot. But if the jury finds that there is a risk, Dr. Pechmann's testimony is very relevant to plaintiff's fraud and failure to warn claims.

Merck next complains that Dr. Pechmann cannot testify as to Merck's "knowledge and state of mind." (Merck Brief, p. 6.) Merck does not cite to any specific examples in the record, but rather generally references Merck's knowledge of Vioxx's cardiovascular risks. This is not a state of mind concerning Merck's intent or motives as Merck asserts. It is a fact as to what Merck knew or did not know and it is undisputed from the documents that Merck knew of this potential risk. And such fact provides a context and a basis to Dr. Pechmann's opinion as to the objective of Merck's marketing campaign - to make sure that doctors and patients will not have the same knowledge that Merck had concerning Vioxx's risks.

Merck further argues that the jury will not be assisted by Dr. Pechmann's opinions. (Merck Brief, pp. 6 to 8.) Merck first argues that Dr. Pechmann relied on documents provided by Plaintiff's

lawyers and "omitted key documents." *Id*. at pp. 6 and 7. To the contrary, Dr. Pechmann also relied on her own research and studies. And with regard to confidential Merck documents provided in this litigation, where else would she have obtained those but from Plaintiff's counsel? Indeed, all Plaintiff's and Merck's experts get the confidential documents from the lawyers that retained them. Further, Dr. Pechmann testified that she requested documents to review and those documents were then given to her. (Vol. I at 7:8 to 8:9.) If Merck believes that Dr. Pechmann did not review certain key documents, it could have brought them to the deposition and shown them to her. It can also raise the issue before the jury. But that is no reason to exclude her testimony.

Merck next argues that the "documents" are understandable to the jury without the need of Dr. Pechmann's testimony. But as explained above, how the documents fit into Merck's overall integrated marketing campaign necessarily requires expert testimony since it is beyond the common knowledge of the jurors. The courts in many of the cases cited above stated the need for expert testimony when complex marketing concepts are involved.

Merck next argues that Dr. Pechmann cannot testify as to the misleading nature of its advertising campaign. (Merck Brief, p. 8.) Again, courts frequently allow marketing experts to testify in similar contexts. *See, e.g. Schwab v. Philip Morris, supra,* 2005 WL 2401647 (finding that "the charge of fraud makes relevant both what defendants knew and intended and how their activities were designed to influence the beliefs and activities of consumers;" *Novartis Corp. v. Fed. Trade Commission, supra,* 223 F.3d 783 (holding that expert testimony admissible as to whether advertising played a substantial role in creating or reinforcing a false belief about the efficacy of defendant's product).

Merck then, incredibly, asserts that Dr. Pechmann "not once in her report or deposition... discusses any theory or 'science' of marketing as it relates to Merck's marketing campaign." (Merck Brief, p. 9.) However, the report, her deposition and her notes at Exhibit 5 of her first deposition, and the Abstract submitted as Exhibit 8 at her second deposition, are replete with references to and discussion of the marketing science behind her opinions as specifically applied to Merck's campaign. This is discussed exhaustively above, but examples of where it is explicitly discussed can be found at pages 290:15 to 292:1 of her deposition:

> Q. Is marketing a science?
> A. Yes.
> Q. Is it a subspecialty of any particular science?
> A. It is a behavioral science.
> Q. What are other behavioral sciences?
> A. Psychology, economics.
> Q. Do you in marketing use the scientific method?
> A. Yes.
> Q. Can you describe that?
> A. Okay. Well you identify hypotheses. You test hypotheses using a controlled study and using valid methods and run statistical analysis; and write up reports.
> Q. Is there any difference in the scientific methods used in marketing versus the scientific methods, say, used in medical research, to your knowledge?
> A. No, they are very similar.
> Q. Are there scientific principles and methodologies applied to integrated marketing campaigns?
> A. Yes. I mean I wouldn't say all, but integrated marketing campaigns... may apply the scientific method to test the messages, understand their impact before they go out, and then to track the messages afterwards...
> Q. Did Merck researchers who did work on their integrated marketing campaigns use the scientific method to conduct their studies?
> A. Yes." (Depo., Vol. 1, 290:15 to 292:1.)

Dr. Pechmann then proceeded in the deposition to explain in detail how those methods and principles actually applied to Merck's integrated marketing campaign. (Depo., Vol. 1, 295:12 to 326:1.) The Abstract at Exhibit 8 of her second deposition (attached as Exhibit 3 to these papers) also entirely applies scientific methods and analysis to Merck's marketing campaign.

-16-

Merck further argues that Dr. Pechmann should not testify as to how much Merck spent on its marketing and its Vioxx revenue. (Merck Brief, p. 12.) These amounts, however, will assist in understanding the sheer scope of Merck's marketing efforts and are relevant to Plaintiff's opinion. Merck admits the information will come in anyway through their own witnesses, so there does not seem to be any harm. *Id.* Merck also complains that Dr. Pechmann relies on hearsay evidence. Experts however, most often rely on some hearsay evidence and this is allowed explicitly by Evidence Rule 703 (stating "If a type reasonably relied upon by experts in the particular field in forming opinions or interferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted").

Finally, Merck seeks to exclude any opinion by Dr. Pechmann regarding regulatory matters. These include regulations Dr. Pechmann reviewed concerning impermissible marketing and advertising regarding pharmaceutical drugs. Such regulations provide Dr. Pechmann with the framework and guidelines within which Merck was to operate in its marketing efforts, and Dr. Pechmann found that they were in line with overall marketing guidelines that preclude misleading advertising. Dr. Pechmann is qualified to review these regulations and incorporate them into her testimony, since she not only has expertise in marketing matters but specifically with regard to the application of FTC and FDA regulations to marketing campaigns. (Report, p. 3.) Indeed, much marketing is governed by regulations and it is not surprising that experts like Dr. Pechmann have sufficient expertise to be able to apply those regulations to marketing efforts.

In sum, the arguments raised by Merck either lack any basis or are more suited to arguments before the jury concerning credibility issues. None of the arguments raise any legitimate basis to preclude Dr. Pechmann from testifying.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Merck's motion to exclude the expert testimony of Dr. Pechmann be denied.

Dated:  August 21, 2006

Respectfully submitted,

| | |
|---|---|
| Drew Ranier<br>Louisiana Bar No. 8320<br>**RANIER, GAYLE & ELLIOT LLC**<br>1419 Ryan Street<br>Lake Charles, Louisiana 70601<br>(337) 494-7171; fax (337) 494-7218 | /s/ Grant Kaiser<br>Grant Kaiser<br>Texas Bar No. 11078900<br>**THE KAISER FIRM LLP**<br>8441 Gulf Freeway, Suite 600<br>Houston, Texas 77017<br>(713) 223-0000; fax (713) 223-0440 |
| Walter Umphrey<br>Texas Bar No. 20380000<br>**PROVOST UMPHREY LAW FIRM LLP**<br>490 Park Street<br>Beaumont, Texas 77701<br>(409) 835-6000; fax (409) 838-8888 | Mikal Watts<br>Texas Bar No. 20981820<br>**THE WATTS LAW FIRM LLP**<br>Tower II Building, 14th Floor<br>555 North Carancahua Street<br>Corpus Christi, Texas 78478<br>(361) 887-0500; fax (361) 887-0055 |
| James L. "Larry" Wright<br>Texas Bar No. 22038500<br>**THE WATTS LAW FIRM LLP**<br>111 Congress Avenue, Suite 1010<br>Austin, Texas 78701<br>(512) 479-0500; fax (512) 473-0328 | John Eddie Williams, Jr.<br>Texas Bar No. 21600300<br>Jim Doyle<br>Texas Bar No.6094450**WILLIAMS BAILEY LAW FIRM LLP**<br>8441 Gulf Freeway, Suite 600<br>Houston, Texas 77017<br>(713) 230-2200; fax (713) 643-6226 |

ATTORNEYS FOR PLAINTIFF ROBERT G. SMITH

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing document has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8(B), and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 21st day of August, 2006.

      /s/ Grant Kaiser
      Grant Kaiser
      **THE KAISER FIRM LLP**
      8441 Gulf Freeway, Suite 600
      Houston, Texas 77017
      (713) 230-0000; fax (713) 230-0440
      gkaiser@thekaiserfirm.com

cc    By email only:

    Robert Van Kirk    rvankirk@wc.com
    **Williams & Connolly LLP**
    725 Twelfth Street Northwest
    Washington, D.C.  20005
    (202) 434-5000; fax (202) 434-5029

    Carrie A. Jablonski    carrie.jablonski@bartlit-beck.com
    **Bartlit, Beck, Herman, Palenchar & Scott LLP**
    54 West Hubbard Street, Suite 300
    Chicago, Illinois 60610
    (312) 494-4400; fax (312) 494-4440