# Exhibit 1

Ex 1 - 5-26-06 depo transcript

```
0001
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4   In re:  VIOXX                    )
     PRODUCTS LIABILITY LITIGATION    ) MDL Docket No. 1657
 5                                    )
     This document relates to         ) Section L
 6                                    )
     GERALD BARNETT,                  ) Judge Fallon
 7                                    )
                    Plaintiff,        ) Civil Action No.
 8                                    ) 2:06cv485
              vs                      )
 9                                    )
     MERCK & CO., INC.,               )
10                                    )
                    Defendant.        )
11   _____)
12
13
14
15         DEPOSITION OF CORNELIA PECHMANN, Ph.D.
16               Newport Beach, California
17                Friday, May 26, 2006
18
19
20
21
22   Reported by:
23   DIANA JANNIERE
     CSR NO. 10034
24   LA JOB No. 918215
     PHIL JOB No. 2153
25
```

```
0002
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4   In re:  VIOXX                    )
     PRODUCTS LIABILITY LITIGATION    ) MDL Docket No. 1657
 5                                    )
     This document relates to         ) Section L
 6                                    )
     GERALD BARNETT,                  ) Judge Fallon
 7                                    )
                    Plaintiff,        ) Civil Action No.
 8                                    ) 2:06cv485
              vs                      )
 9                                    )
     MERCK & CO., INC.,               )
10                                    )
                    Defendant.        )
11   _____)
12
13
14
15         DEPOSITION OF CORNELIA PECHMANN, Ph.D., taken
16   on behalf of Defendant at 660 Newport Center, Suite 330,
17   Newport Beach, California, beginning at 8:30 A.M., and
18   ending at 7:30 P.M., Friday, May 26, 2006, before Diana
19   Janniere, Certified Shorthand Reporter No. 10034.
20
```

Ex 1 – 5-26-06 depo transcript

```
21
22
23
24
25
0003
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4           ROBINSON, CALCAGNIE & ROBINSON
             BY:  MARK ROBINSON, ESQ.
 5           620 Newport Center Drive, 7th Floor
             Newport Beach, California  92660
 6           (949) 720-1288
 7           LOPEZ, HODES, RESTAINO, MILAN & SKIKOS
             BY:  STEVEN J. SKIKOS, ESQ.
 8           625 Market Street, 11th Floor
             San Francisco, California  94105
 9           (415) 956-5257
             sskikos@lopez-hodes.com
10
11   For Defendant:
12           BARTLIT, BECK, HERMAN, PALENCHAR & SCOTT, LLP
             BY:  ANDREW L. GOLDMAN, ESQ.
13           54 West Hubbard Street, Suite 300
             Chicago, Illinois  60610
14           (312) 494-4400
             andrew.goldman@bartlit-beck.com
15
16   For Stewart Grossberg/California Case:
17           GIRARDI AND KEESE
             BY:  JAMES G. O'CALLAHAN, ESQ.
18           1126 Wilshire Boulevard,
             Los Angeles, California  90017-1904
19           (213) 977-0211
20
21
22
23
24
25
0004
 1                        INDEX
 2   WITNESS                        EXAMINATION
 3   CORNELIA PECHMANN, Ph.D.
 4
 5               MR. GOLDMAN           6, 336
 6               MR. SKIKOS              288
 7               MR. O'CALLAHAN          330
 8
 9                   EXHIBITS
10   DEFENDANT'S       DESCRIPTION           PAGE
11      1     Deposition Notice               12
12      2     Dr. Pechmann's Expert Report    35
13      3     Dr. Pechmann's Invoice          35
14      4     Merck Vioxx Case: Involved Parties
             and Technical Terms 4-06         55
15
        5     Handwritten Notes/Scientific Testing   68
16
        6     Blank Sheet with Exhibit Stamp on it   91
17
        7     The National Yough Anti-drug Media
```

Page 2

                              Ex 1 - 5-26-06 depo transcript
18                Campaign Copy Test System              155
19        8       Do Consumers Over generalize one-sided
                  Comparative Price Claims and Are.
20                More Stringent Regulations Needed?     286
21        9       An Assessment of U.S. and Canadian
                  Smoking Objectives for the year 2000   286
22
          10      Quasi-Experimentation Design and
23                Analysis Issues                        286
24        11      Outline of Pechmann Expert Report      287
25        12      Expert Report Exhibit Binder, 1 of 3   287
0005
 1                     INDEX (Continued):
 2
 3                        EXHIBITS
 4    DEFENDANT'S         DESCRIPTION               PAGE
 5        13      Expert Report Exhibit Binder, 1 of 2   287
 6        14      Expert Report Exhibit Binder, 1 of 3   287
 7        15      Various E-mail Correspondence          287
 8
 9
10                INSTRUCTED NOT TO ANSWER
11                    PAGE     LINE
12                    121       6
13
14
15
16
17
18
19
20
21
22
23
24
25
0006
 1        Newport Beach, California, Friday, May 26, 2006
 2                8:30 A.M. - 7:30 P.M.
 3
 4                  CORNELIA PECHMANN, Ph.D.,
 5        having been duly sworn, testified as follows:
 6
 7                        EXAMINATION
 8    BY MR. GOLDMAN:
 9        Q    Good morning, Dr. Pechmann.
10        A    Yes.
11        Q    Can you please state your name for the record?
12        A    Cornelia Pechmann.
13             MR. ROBINSON:  Better known as Connie.
14             THE WITNESS:  Better known as Connie.
15    BY MR. GOLDMAN:
16        Q    Do you understand that you have been designated
17    as an expert witness in the Barnett case in the federal
18    litigation?
19        A    Yes.
20        Q    I am going to remind you of some of the ground
21    rules for deposition.  I know we have been through this
22    drill before.  And I am going to ask you some questions.
23             If you don't understand what I am asking,
24    please ask me to rephrase.  Okay?
25        A    Okay.

Ex 1 - 5-26-06 depo transcript

```
0007
 1        Q    Try not to interrupt each other.  Please let me
 2   finish my question and I will try to let you finish your
 3   answer.
 4        A    Okay.
 5        Q    And if you need to take a break for any reason,
 6   Dr. Pechmann, let me know, and we will take a break.
 7        A    Okay.
 8        Q    Can you tell me what you did to prepare for
 9   your deposition today?
10        A    I reviewed several boxes of documents regarding
11   Merck's integrated marketing integrations campaign for
12   vioxx, and I focused particular attention of the science
13   of the campaign.
14             There were six major types of research that
15   they conducted to evaluate the campaign and fine-tuned
16   it.  So I spent about 200 hours total at least on these
17   documents.
18             And about half of that, I spent on the
19   different research studies trying to understand the
20   methods, the findings, the validity of the research;
21   what it all meant.
22        Q    Was -- were the boxes that you reviewed boxes
23   of documents that you prepared or that you were given by
24   plaintiff's lawyers?
25        A    I met every couple of weeks with one of the
0008
 1   attorneys at Robinson, Calcagnie and Robinson and worked
 2   with that attorney to get the documents I needed.
 3             I worked on a similar integrated marketing
 4   campaign.  So I knew what key words to use, to search
 5   for the documents.  So working with him, primarily Chris
 6   Spiro, we identified the documents that I needed.
 7             I mean, we did not find everything, but we
 8   found a reasonable amount.  The rest he said that he
 9   could not find anywhere.
10        Q    What similar integrated marketing
11   communications campaign had you worked on before?
12        A    I worked on the anti-drug ad campaign for about
13   five years.  That was run by the office of National
14   Control Drug Policy, the U.S. Office of National Control
15   Drug Policy.  It is under the White House.
16             And I was one of the six members of the
17   behavioral change expert panel and I was specifically
18   chosen for that panel to oversee all the research, the
19   science.
20        Q    Oversee the research and science in what?
21        A    In that integrated marketing campaign and it
22   was very similar to the science that you see here in
23   this campaign.
24             So I worked with the different marketing
25   research firms.  I evaluated their methods.  I evaluated
0009
 1   their findings for that campaign, and I, basically, did
 2   the same thing with this campaign.
 3        Q    Tell me what you mean by "science," when you
 4   say you reviewed and evaluated the science involved in
 5   the anti-drug-ad-campaign?
 6        A    Okay.  Well, marketing -- I think a lot of
 7   people think marketing is just some creative-type
 8   sitting down and figuring out some creative ads; but
 9   marketing has become a very, very sophisticated science.
10             And we do two basic types of research.  One is
```

Ex 1 - 5-26-06 depo transcript
```
11  a controlled experiment where you expose people to
12  different campaign materials before you are using it and
13  test the effectiveness of it.
14          So a pretest, and do statistical analyses and
15  compare one approach to another and compare different
16  groups, how different people react in statistically.
17          One of the things in the anti-drug campaign
18  that we tried to make sure that none of the ads were --
19  had unintended effects or misleading or confusing to the
20  audience members, which is a challenge.
21          But anyway, we tested all of these ads and all
22  of these ads we tested before they were aired and they
23  did the same thing here in this campaign.
24      Q   I'm sorry.  Who did that?
25      A   The Merck research people.  They had several
0010
1   different research people, research firms.  The primary
2   firm they used was Millward Brown, which we actually
3   used, too, because I worked with Ogilvy and they worked
4   with Ogilvy.  There is two different groups of Ogilvy.
5           Anyway, they were using major vendors and we
6   were using major vendors.  And so there was overlap in
7   the venders that we used and even considerable overlap
8   of the research.
9           (Discussion held off the record.)
10  BY MR. GOLDMAN:
11      Q   What was your role on the anti-drug ad
12  campaign, your role specifically?
13      A   Well, I was a member of this behavioral change
14  expert panel and I was responsible for these two types
15  of research:  Copy testing, and the other type is
16  tracking.
17          So tracking is what you do once the ads have
18  aired.  You continually are surveying members of your
19  target audience every month and asking them their
20  perception of the brand and their behaviors.
21          In this campaign, they actually had sales data.
22  In the case of marijuana, we did not have sales data.
23  It is illegal.  So we cannot track, but they had
24  pharmacy data.  So they could actually look at sales.
25          So what you are doing with tracking is that you
0011
1   are looking for the effect of your campaign out in the
2   field, and that is important because other factors could
3   occur.
4           For in the case of marijuana, you could have a
5   movie that is pro marijuana.  It can really screw up
6   your campaign, temporarily at least.
7           And in this campaign, you had events like the
8   "New York Times" article or a JAMA article; and so they
9   would track what was the effect of those external events
10  on people's perception relative to what was the effect
11  of their campaign; and these were statistical analyses.
12      Q   I am going to come back to the anti-drug
13  campaign in a minute and talk about the similarities
14  that you see in this case.
15      A   Okay.
16      Q   I want to focus first on what you did to
17  prepare for your deposition and you said that you
18  reviewed several boxes of documents on Merck's
19  integrated marketing communications campaign?
20      A   Correct.
21      Q   What else did you do?
```
Page 5

Ex 1 - 5-26-06 depo transcript
```
22        A      I met on occasion with the attorneys to request
23   more documents.
24        Q      Um-hmm.
25        A      And yesterday I met with Steve and started to
0012
 1   explain to him my findings and what was the science and
 2   what was the science telling me; what was the different
 3   types of studies.
 4              But up until yesterday, we did not have a
 5   chance to talk about what I found is pretty much what is
 6   in my report.  I had -- I would have spoken to Mark,
 7   too, but except he was sick.
 8        Q      Let me hand you Exhibit 1.
 9              MR. GOLDMAN:  And I should have said this at
10   the beginning of the deposition to be clear, but it is
11   my understanding that this deposition is being taken for
12   purposes of the Barnett case and the MDL.
13              (Discussion held off the record.)
14              (Defendant's Exhibit 1 was marked
15              for identification by the court
16              reporter.)
17              MR. O'CALLAHAN:  Let me interject that this was
18   also noticed in California JCP 4247 Vioxx case and your
19   firm, of course, is involved in that case as well.
20              I spoke yesterday with Ralph Camateo, who
21   indicated that to the extent that Dr. Pechmann's
22   opinions were opinions that would extend to what
23   happened in California, that he would -- he would have
24   no objection to the deposition going forward in
25   California as well.
0013
 1              MR. GOLDMAN:  Okay.  I'm not sure about that
 2   conversation, but you can sort that out with
 3   Mr. Camateo.  All I know is, I am here to take the
 4   deposition for purposes of the Barnett case in the MDL.
 5              THE WITNESS:  Okay.  I want to just point out
 6   that my name is misspelled here.  It is two C's and mine
 7   has one C -- P-E-C-H-M-A-N-N -- in the real world.
 8   BY MR. GOLDMAN:
 9        Q      Okay.
10        A      It's okay.
11        Q      If you turn to the third page of Exhibit 1 or
12   fourth page, Dr. Pechmann, do you see that there are six
13   items asking for documents for you to produce?
14        A      That is on the third page of my document.
15        Q      Okay.  Do you see that?
16        A      Yes.
17        Q      Have you seen this list before?
18        A      No, but I was verbally told what to produce.
19        Q      Looking at the first request, "All
20              Materials that Dr. Pechmann has
21              reviewed prior to and since the time
22              she was retained as an expert in this
23              litigation that relate to Vioxx."
24              Have you produced those materials here today?
25        A      Yes.
0014
 1        Q      No. 2 says, "All materials that
 2              Dr. Pechmann relies and support for
 3              her opinions in the Vioxx
 4              litigation."
 5              Have you produced all of those materials today?
 6        A      Yes.
```

Page 6

                        Ex 1 - 5-26-06 depo transcript
 7      Q     No. 3 says, "All work product other
 8            Than draft reports that Dr. Pechmann
 9            has prepared in the Vioxx
10            litigation."
11            Have you brought those here today?
12      A     I brought them here.  Some of them I have with
13   me here.  Like, you know, a note that I created.  And I
14   had given this, but I'm not sure you got a copy.  This
15   is just another sheet.
16      Q     I don't think I have.
17      A     Okay.  Well, I can make you copies.
18            MR. GOLDMAN:  Let's go off the record for a
19   second.
20            (Brief recess.)
21   BY MR. GOLDMAN:
22      Q     No. 4 says, "All statements
23            Reflecting time, Dr. Pechmann has
24            spent on Vioxx and bills she
25            submitted for payment."
0015
 1            Have you brought those here today?
 2      A     Yes.
 3      Q     Have you billed the plaintiffs' lawyers for all
 4   of the time that you spent on Vioxx work, and is that
 5   reflected in those bills?
 6      A     Yes, I -- yes.
 7      Q     No. 5, "All notes and other
 8            Memorandum Dr. Pechmann prepared in
 9            the Vioxx litigation."
10            Have you brought those here today?
11      A     Yes.
12      Q     No. 6 says, "All communications
13            Dr. Pechmann has had with any
14            plaintiffs' counsel in the Vioxx
15            litigation."
16            Have you brought those?  That would include the
17   E-mails.
18      A     It might -- yeah, there might -- I did not keep
19   copies of the E-mail correspondence.
20            For example, I would say, I am coming to UCI
21   Irvine tomorrow.  I am going to pick up boxes.  I am
22   going to be there at 3:00 P.M.  Have the boxes ready.
23   That kind of thing.
24            So there were on occasion that type of -- a few
25   of those, and I did not print those out because I didn't
0016
 1   know I was supposed to.  And there might be a few -- a
 2   couple in my E-mail, which we can pull out at some
 3   point.
 4      Q     Would you please produce all the E-mails that
 5   you have on your hard drive whether in your sent mail or
 6   in your in-box or anywhere on your computer that relate
 7   to communications with plaintiffs' counsel in the Vioxx
 8   litigation?
 9      A     Sure.  I don't -- will I have time to do it at
10   lunch?
11      Q     That would be great if you can work any
12   Internet connection and print them out.
13            MR. ROBINSON:  And you can get it after the
14   depo, whatever you prefer.
15   BY MR. GOLDMAN:
16      Q     I would prefer at lunch.
17      A     Yes, whatever is easy.  There aren't many, but

                              Ex 1 - 5-26-06 depo transcript
18  they are there.
19       Q    Have you kept notes of conversations that you
20  have had with plaintiffs' counsel in the Vioxx
21  litigation?
22       A    No.
23       Q    Did you have notes at one point and then
24  discarded them, or did you not take notes at all?
25       A    I didn't take notes.
0017
 1       Q    When were you first contacted, Dr. Pechmann, to
 2  be an expert in this case?
 3       A    December of 2005 -- end of December.
 4       Q    who contacted you?
 5       A    Mark Robinson.
 6       Q    What did Mr. Robinson ask you to do?
 7       A    He first explained the case said that he had a
 8  case on Vioxx and asked if I would be interested in
 9  working as an expert, reviewing the integrated marketing
10  campaign, or the marketing campaign he probably said.
11  I'm not sure if he used the words integrated marketing.
12            And then we discussed the case a little bit
13  more and realized that Ogilvy was involved, which was
14  the same firm that I worked on the anti-drug campaign.
15            And so at that point, I knew that this was a
16  highly-sophisticated integrated marketing campaign with
17  extensive research because that is the way Ogilvy is.
18            And so I became interested in serving as an
19  expert because I knew there would be a lot of studies to
20  review and a lot of research.  And it wouldn't just be
21  my opinion.  There would be a lot of data and
22  statistics.
23            That is my area of expertise.  I really am a
24  scientist.  That is what I am comfortable doing and I
25  knew that I would know this research because we did
0018
 1  similar research in the anti-drug -- let me just say,
 2  too, that I also helped oversee the census ad campaign.
 3            They did an big integrated campaign to get
 4  people to fill out the census, and I have been involved
 5  in other integrated campaigns; but the anti-drug one was
 6  the most comparable; similar research techniques, and
 7  vendors; and I was most involved in this one.
 8       Q    So in late December 2005, Mr. Robinson, who is
 9  one of the plaintiffs' lawyers in these cases, called
10  you up and explained the case to you; right?
11       A    Well, I think -- not really explained the case.
12  He just said there was a Vioxx case and he thought he
13  might want a marketing expert.
14            Then I tried to explain -- and then I explained
15  to him that -- we spoke and then he said Ogilvy.  And I
16  said, oh, I worked at Ogilvy.
17            And I tried to explain to him that it was
18  probably a very sophisticated marketing campaign with
19  lots of research.  And that I think I would be able to
20  help out.  That is my area of expertise.
21            And so then that is when he decided to retain
22  me.  And then as I looked at the documents, I realized I
23  was correct.
24       Q    Why did Mr. Robinson say he was considering
25  using you as a marketing expert?
0019
 1       A    Because we -- I was involved in a tobacco
 2  litigation called Daniels.  And he -- that was a class

<pre>
                         Ex 1 - 5-26-06 depo transcript
 3   action case, and he had another related class action
 4   case.
 5          So the lawyer in Daniels asked me if I would
 6   work with Mark, too.  So I think we met once -- maybe
 7   not with Mark, but with someone else at his firm.  So
 8   they knew who I was.
 9          You will have to ask Mark exactly why he
10   thought of me.  The reason he knew me was that I was --
11   I had worked with him for -- for a few hours on that
12   other case.
13          Their other case ended up not going anywhere.
14   So I don't think that I ever submitted a bill or
15   anything, but I do recall that at one point we met with
16   somebody at his firm.  I don't remember -- really
17   remember if it was Mark or someone else.  He probably
18   remembers.
19      Q    What specifically did Mr. Robinson ask you to
20   do after you expressed an interest in the case?
21      A    To -- he asked me to come get the documents and
22   start looking at them.
23      Q    When did he formally retain you as an expert
24   witness?
25      A    I -- I think maybe even the first day we spoke,
0020
 1   he made it clear that he wanted me to start working on
 2   it.
 3      Q    So you were retained the end of 2005?
 4      A    Right.
 5      Q    When did you start your work on the case?
 6      A    I would have to refer to my invoices.
 7           MR. ROBINSON:  They are coming.
 8           THE WITNESS:  I think it was December or
 9   probably early January.  I recall it being right around
10   New Year's.  So I believe I started after and in January
11   after New Year's, but maybe I started it at the end of
12   December.
13   BY MR. GOLDMAN:
14      Q    When did you form the opinions, Dr. Pechmann,
15   that you express in your report?
16      A    I finalized my opinions when I finalized the
17   report at the -- I prepared a semifinal report at the
18   end of last month, end of April.
19      Q    Had you reached your opinions about Merck's
20   marketing campaign before you finalized your report at
21   the end of April, 2005?
22      A    No.
23      Q    So you were actually forming your opinions as
24   you were writing them?
25      A    As I was looking at the research -- looking at
0021
 1   the research and what the research said, and it took a
 2   while to get the documents.  So they kind of trickled
 3   in.
 4           It wasn't really until then when I had the
 5   complete set of documents and all -- by "documents," I
 6   mean these extensive research reports and data and
 7   interpretations of the data; and the statistical
 8   analyses.
 9           And I looked at each set of findings, assessed
10   the validity of the research, the validity of their
11   conclusions.  Stepped back:  What does this really mean
12   in terms of what the campaign was doing?
13           And then by the end of last month, I had
</pre>

```
                       Ex 1 - 5-26-06 depo transcript
14    reached the conclusions that are in my report.
15         Q    When did you begin to receive documents to
16    review that were sent by Mr. Robinson's firm?
17         A    Early January or maybe end of December.  I
18    can't remember the first date that we met.
19              After we spoke on the phone, I came to his
20    offices and picked up some documents then.
21         Q    When did you begin to review the extensive
22    research reports that you say that you reviewed?
23         A    In January.
24         Q    Well, you said it took a while for you to get
25    all of the documents --
0022
1          A    Well, some of them were --
2          Q    -- and so I am trying to get a sense from when
3     you received the materials that you really wanted to
4     review.
5          A    I started to receive them in January, yeah.  So
6     we received -- I received some of the materials right
7     away.  And some I received in February.
8               I received a huge slue towards the end of
9     February.  And then I received some in March.  And then
10    I think we uncovered a few more in early April.
11              After that, I don't think there were any new
12    ones.  It was just a matter of me going through them
13    all.
14         Q    So the big shipment of documents that you
15    received from the plaintiffs' lawyers came in February
16    of 2005?
17         A    Right.
18         Q    At the end of February?
19         A    Towards the end.  I can also --
20              MR. ROBINSON:  We are going to get them.  Why
21    don't we defer those questions until we get her bills
22    back?
23              THE WITNESS:  Yeah.  Mid to end of February.
24    BY MR. GOLDMAN:
25         Q    If we need to see your invoices for this, we
0023
1     can wait for this, too, but do you know how much time
2     you have actually spent reviewing documents prior to the
3     time you formed your opinions in this case?
4          A    I would have to look to give you the exact
5     number.  I would have to look at the invoices.
6          Q    Okay.
7          A    But, roughly, 200 hours.
8          Q    Do you know how many pages of documents you've
9     reviewed in those 200 hours?
10         A    I reviewed the documents that are in those
11    boxes.  So I have no idea how many pages that is.
12         Q    We will mark the boxes later, but you have
13    produced to me here --
14         A    Five boxes.
15         Q    -- one, two, three, four, five.  Five boxes of
16    documents; right?
17         A    Right.
18         Q    And we will inventory those five boxes of
19    documents shortly.  Okay.
20              How much are you charging the plaintiffs'
21    lawyers to testify in this litigation, ma'am?
22         A    $350 an hour.
23         Q    Do you keep that money or does it go somewhere?
24    Like charity?
```

Ex 1 - 5-26-06 depo transcript

```
25        A    I am putting it in my child's college fund.
0024
 1        Q    Good idea.
 2        A    She is four.  So I have some time, but college
 3   costs a lot.
 4        Q    How many different meetings or conversations
 5   have you had with plaintiffs' counsel in the Vioxx
 6   litigation?
 7             And if you could try to give it to me in
 8   chronological order, great.  If you need your invoices
 9   to be able to do that, then we can wait.
10        A    I think I could do it.
11             So we spoke at the end of December on the
12   phone.  We met in January.
13        Q    How long did you speak on the phone in
14   December?
15        A    An hour.  And then we met for -- well, you
16   know, it might help to look at the invoices, to tell you
17   the truth.
18        Q    You mentioned that you had served as an expert
19   witness for Mr. Robinson's firm.  Was that against
20   tobacco companies?
21             MR. ROBINSON:  I think I am going to object.
22             THE WITNESS:  I didn't actually say I worked
23   for his firm.  They approached me about being an expert
24   in the case, but the case never went anywhere, so I
25   never --
0025
 1             MR. ROBINSON:  Were you actually deposed in
 2   Daniels?
 3             THE WITNESS:  Yes.
 4             MR. ROBINSON:  I wasn't a lawyer on Daniels.
 5   So I --
 6   BY MR. GOLDMAN:
 7        Q    Have you done any consulting work for the
 8   Robinson, Calcagnie, and Robinson firm relating to
 9   tobacco?
10        A    No.
11             MR. ROBINSON:  I want to say I did meet --
12             (Telephonic interruption.)
13             THE WITNESS:  "Work" meaning paid work or --
14   BY MR. GOLDMAN:
15        Q    Paid or pro bono work?
16        A    I would say it was a preliminary meeting.
17             MR. ROBINSON:  We had a consultation meeting.
18             THE WITNESS:  Well, yeah --
19             MR. GOLDMAN:  Mark, I am trying to get the
20   witness to answer, not you.
21             MR. ROBINSON:  Okay.
22             THE WITNESS:  In my mind, I would not
23   characterize it as working for them because I was not
24   billing.  It was just a meet -- an initial meeting where
25   we met as a group and talked about some issues regarding
0026
 1   the case.
 2             And I believe I mostly just sat in and listened
 3   to what another expert was saying and that is my
 4   recollection.  I was really there for the Daniels' case;
 5   but in the back of my mind, I knew that the Robinson,
 6   Calcagnie, Robinson firm had another case that I might
 7   get involved in; but it never went anywhere, so --
 8   BY MR. GOLDMAN:
 9        Q    Would it be incorrect then to say that you were
```

Ex 1 - 5-26-06 depo transcript

```
10  a consultant, or did consulting for Mr. Robinson's firm
11  in the tobacco litigation in 2004?
12       A    I don't know how you want to characterize it.
13  I met with some of the attorneys for an afternoon.  I
14  was never retained as an expert or paid, so --
15       Q    Dr. Pechmann, let me ask you whether you agree
16  with this or not:  Were you a consultant, whether you
17  were paid or not, for Mr. Robinson's firm in the tobacco
18  litigation in 2004?
19       A    To be conservative, I would will say yes
20  because I did meet with him that afternoon.
21       Q    Your C.V. indicates that you have been a
22  consultant to that firm from 2004 to the present in
23  tobacco litigation; is that not accurate?
24       A    It is not accurate.  My C.V. says that?
25       Q    Page 11.
0027
 1       A    Wow, that is wrong.  I know at the time that I
 2  wrote that -- I am thinking about this.  I knew that the
 3  case could warm up or could reappear.
 4            So at the time I wrote that, I knew I was on
 5  hold, but when I spoke to Mark on this case, he said
 6  that other case had pretty much died.
 7            I should fix that now.
 8       Q    Have you served as an expert witness in cases
 9  involving tobacco?
10       A    Yes.
11       Q    Have you served as an expert witness in any
12  other type of case?
13       A    Yes.
14       Q    What other cases have you been an expert in?
15       A    One of my first -- I participated in a case
16  involving comparative advertising and --
17       Q    What is comparative advertising?
18       A    Comparative advertising is advertising where
19  the sponsoring brand names the competitor brand and
20  shows their trademark and uses their trademark.
21            And this case involved a Canadian trademark law
22  and whether the comparative ad complied or did not
23  comply with Canadian trademark law.
24       Q    Other than tobacco cases and this Canadian
25  trademark case, what other cases have you testified as
0028
 1  an expert witness in?
 2       A    I testified in an arbitration for Rogers and
 3  Sheffield involving sales force negotiations.
 4       Q    Are you looking somewhere on your C.V.?
 5       A    Yes.  Right here, on Page 12.
 6       Q    Which entry is that?
 7       A    Rogers and Sheffield about halfway down the
 8  list on Page 12.
 9       Q    Did you testify as an expert in this case?
10       A    In an arbitration, yes.
11       Q    And what was that case about?
12       A    It was a long time ago, but it had to do with
13  sales representatives discussion of a product.
14       Q    What product?
15       A    I believe it was a high-tech product.
16       Q    Where did the sales representatives work?  What
17  company?
18       A    I have no idea.  I cannot remember.
19       Q    Do you have any transcripts or reports that you
20  generated in that case?
```

Page 12

Ex 1 - 5-26-06 depo transcript

```
21      A     No.
22      Q     What was the name of the lawyer who you worked
23   with at Rogers and Sheffield on the arbitration?
24      A     I can't remember.  It was a long time ago.
25      Q     When was it?
0029
 1      A     Late '80's.
 2      Q     Can you be anymore specific about your expert
 3   testimony in the case that you worked on for Rogers and
 4   Sheffield in the late 1980's?
 5      A     I believe it had to do with whether the sales
 6   representatives were complying with a contract.  They
 7   had a contract to maybe sell this product and not a
 8   competitive product; and what they were doing was
 9   selling the competitor product in violation of the
10   contract.
11      Q     So what was your role?
12      A     I think it was just to discuss what would
13   typically happen in these types of conversations and
14   how -- what typically would happen compared to what did
15   happen.  And I really can't remember the details.
16      Q     When you say it was part of your role to
17   testify about what typically happens in these types of
18   conversations, what are you talking about?
19      A     A face-to-face sales meeting.
20      Q     With whom?
21      A     So it was with a sales rep and a company, a
22   buyer at a company versus a sales rep.
23      Q     And what expertise do you have in knowing what
24   types of conversations typically occur between buyers at
25   companies and sales reps?
0030
 1            MR. ROBINSON:  I'm sorry.  Are we back on the
 2   1988 thing?
 3            MR. GOLDMAN:  Yes.
 4            THE WITNESS:  I teach a course that covers that
 5   topic.  Sales -- that covers as part of the material.
 6   BY MR. GOLDMAN:
 7      Q     What is the course that you teach on sales
 8   representative's interactions with buyers at companies?
 9      A     Marketing Management -- actually, it was called
10   Principles of Marketing.
11      Q     What types of --
12      A     Or manage -- or Marketing Management, one of
13   those two titles.
14      Q     What types of sales reps do you discuss in that
15   course?
16      A     We discuss a variety of sales rep encounters.
17   I stress that what happens between a sales rep and a
18   buyer is very consistent across industries.
19      Q     What does that mean?
20      A     Meaning, that the same techniques apply.
21      Q     What are the techniques?
22            MR. ROBINSON:  I am going to object.  This
23   calls for a narrative.
24   BY MR. GOLDMAN:
25      Q     You can answer.
0031
 1      A     Okay.  Well, you get to know the buyer.  You
 2   know your product.  You figure out the match between
 3   your product and what the buyer wants.  You interview
 4   the buyer.  You --
 5      Q     So these --
```

Page 13

Ex 1 - 5-26-06 depo transcript

```
 6                MR. SKIKOS:  Let her finish.
 7   BY MR. GOLDMAN:
 8        Q    I now get the point.
 9        A    Okay.
10        Q    The types of interactions that you are
11   describing between the sales representatives and buyers
12   of companies are different between the noninteractions
13   between sales reps that sell drugs and doctors; true?
14        A    No, they are similar.  I mean, that is an
15   extensive encounter with a sales representative; but
16   then there could be brief encounters, too, where you
17   just drop off a sample or drop off information; pop in
18   and ask if they have any questions or concerns.
19             So there is a variety of different sales
20   encounters and I taught that in the course.
21        Q    Are you holding yourself as an expert,
22   Dr. Pechmann, in the interactions between sales
23   representatives and physicians?
24        A    I am holding myself out as an expert in
25   integrated marketing communications, and one major
0032
 1   communication is between a sales rep and the doctor.
 2        Q    Have you ever surveyed doctors about their
 3   interactions with pharmaceutical sales representatives?
 4        A    No.  I have not personally done the surveys.
 5        Q    Have you ever --
 6             MR. SKIKOS:  She is not finished.
 7             MR. ROBINSON:  Were you finished with your
 8   answer?
 9             THE WITNESS:  Yes.
10   BY MR. GOLDMAN:
11        Q    Had you ever conducted any surveys or research
12   of pharmaceutical representatives?
13        A    I have not done research on pharmaceutical
14   representatives.
15        Q    Have you ever -- go ahead.
16        A    I have done extensive reading on -- in ad
17   journals about those types of encounters.  So I am
18   familiar with the research, quite familiar with the
19   research, but myself have not done that research.
20        Q    What publications are you thinking about that
21   discuss interactions between pharmaceutical sales
22   representatives and doctors?
23        A    Well, in my -- one of my folders, I have
24   several articles.  A whole pile of articles, actually.
25        Q    Would you find those for me on a break?
0033
 1        A    Sure.
 2        Q    Okay.  Other than the comparative advertising
 3   case where you testified about Canadian trademark law
 4   and the case in the late 1980's when you were talking
 5   about sales representatives and their interactions with
 6   buyers of products, what other cases have you worked as
 7   an expert witness in other than tobacco?
 8        A    I was involved in the case against Orange
 9   County.  Munger, Tolls and Olson was the law firm and I
10   conducted research for them regarding changing the venue
11   from Orange County to some other neutral county.
12             And I did an analysis of the media coverage of
13   the Orange County bankruptcy to argue that -- to reach
14   the conclusion that, that citizens of Orange County had
15   seen extensive negative coverage of -- you know, of --
16   actually, it is the -- it was one of the financial firms
```

Page 14

Ex 1 - 5-26-06 depo transcript

```
17    that worked with Orange County.
18             One of the accounting firms that worked at
19    Orange County that worked through Munger, Tolls and
20    Olson -- I can't remember.  Maybe it was Merrill Lynch.
21    I'm not sure what firm it was in.
22             Orange County was in bankrupty.  There was an
23    accounting firm that worked with Orange County.  They
24    were faced with litigation and I assessed the media
25    coverage in Orange County with regard to moving the
0034
 1    venue outside of Orange County.
 2        Q    Remind me, and jurors, who might hear this --
 3        A    Oh, here it is.  It is Merrill Lynch.  Yes.  It
 4    was on my vitae.  Sorry.
 5        Q    What was the -- why were you -- withdrawn.
 6             Tell me about the issue about moving the venue
 7    of Orange County, briefly.
 8             What does that have to do --
 9        A    Well, they wanted to find out what the
10    newspapers were saying about Merrill Lynch.
11        Q    Oh, you are talking about a litigant, who was
12    interested in knowing whether they should move a case
13    away from Orange County based on publicity that was
14    made?
15        A    Correct.
16        Q    Okay.  Can you name any other cases that you
17    have testified or consulted as an expert?
18        A    No.
19        Q    Have you ever consulted or testified as an
20    expert in a case involving prescription drugs?
21        A    No.
22        Q    Let me hand you a corrected copy of your
23    report.
24        A    Okay.
25             MR. GOLDMAN:  I will mark this as Exhibit 2.
0035
 1             (Defendant's Exhibit 2 was marked
 2             for identification by the court
 3             reporter.)
 4    BY MR. GOLDMAN:
 5        Q    Just for the record, the corrected copy
 6    contains a few corrected citations; right?
 7        A    Correct.
 8        Q    The opinions that you expressed and the
 9    substantive changes that you made in your original
10    report have not changed?
11        A    Correct.
12        Q    When did you start writing your report,
13    Dr. Pechmann?
14        A    I think towards the end of January, mid to --
15    middle of January, yes.  So as you see here on the
16    invoice there was a week in January where I started to
17    work on the report.
18        Q    Can I get a copy now of the time entries?
19             MR. ROBINSON:  We gave you one.  I handed you a
20    stack of stuff.
21             MR. GOLDMAN:  I will mark as Exhibit 3, your
22    time records for the time you have spent in the Vioxx
23    litigation.
24             (Defendant's Exhibit 3 was marked
25             for identification by the court
0036
 1             reporter.)
```

Page 15

Ex 1 - 5-26-06 depo transcript

```
 2   BY MR. GOLDMAN:
 3        Q    Is that right, Dr. Pechmann?
 4        A    Yes.  I have to state now that it was actually
 5   March that things were -- is it was not February.  It
 6   was March when --
 7             MR. ROBINSON:  When what?
 8             THE WITNESS:  -- when I started to get a lot of
 9   documents.  I was one month off.
10   BY MR. GOLDMAN:
11        Q    So you --
12        A    I didn't do any work in February.
13        Q    You started to prepare your report in January
14   of 2006 and then you received the bulk of your materials
15   to review in March of 2006; right?
16        A    I received a lot of materials in January.  So I
17   said I spent about half of the time on research and half
18   of the time understanding other aspects of the case like
19   the depositions of the marketing experts and what the
20   FDA said about the product.
21             Right from the beginning, I could see all of
22   the ads that they used.  So there was quite a bit that I
23   had received in January.  And then I found many --
24   working with the attorneys, I found many additional
25   documents that I was receiving in February and reviewing
0037
 1   in February and March.
 2             MR. ROBINSON:  I'm sorry.  February?
 3             THE WITNESS:  I'm sorry.  I keep saying it
 4   wrong.
 5             MR. ROBINSON:  Right.
 6             THE WITNESS:  March and April.
 7   BY MR. GOLDMAN:
 8        Q    Can you tell me looking at the first page of
 9   Exhibit 1 -- Exhibit 3, what these handwritten notes
10   mean?  Are they your handwritten notes?
11        A    I'm sorry.  Page 1?
12        Q    Yes.
13        A    Yes.  So these are hours that I spent just over
14   the past week on refreshing, getting back up to speed on
15   my report and on all of the studies that I had reviewed.
16        Q    So today is May 26th; right?
17        A    Is it?
18        Q    And you worked two hours on May 20th,
19   four-and-a-half hours on May 22nd, five-and-a-half hours
20   on May 23rd; right?
21        A    Well, I am a little confused because you said
22   today is the 26th.  So something must be wrong with the
23   dates.
24             MR. ROBINSON:  Thursday was not May 24th.
25             THE WITNESS:  Okay.  Thursday was the 25th.
0038
 1             Got it.  That's right.  Okay.  I'm sorry.
 2             Can you ask me the question again?
 3   BY MR. GOLDMAN:
 4        Q    Did you work two hours on May 20,
 5   four-and-a-half hours on May 22nd, five-and-a-half hours
 6   on May 23rd?
 7        A    Correct.
 8        Q    Did you work at all yesterday May 24th
 9   preparing for your deposition?
10        A    Yesterday was May 25th.  That is where I made
11   the typo.
12        Q    Got it.
```

Page 16

                         Ex 1 - 5-26-06 depo transcript
13        A     Yes.  I did work yesterday.  I spent most of
14    the day with Steve.  I think we started at 10:00 in the
15    morning and finished -- I should have written it down --
16    maybe 7:00 at night.
17        Q     Can I write that down on this exhibit?
18        A     Sure.
19        Q     So on May 25th, you worked with Steve and
20    Steve's last name is Skikos?
21        A     Skikos.
22        Q     And he is one of the plaintiffs' lawyers in the
23    case?
24        A     Yes.
25        Q     So you worked with Steve Skikos from 10:00 A.M.
0039
 1    to 7:00 P.M.?
 2        A     Yes.
 3        Q     What did you guys work on?
 4        A     I went through each of the studies that I
 5    reviewed and described what the study was, what was the
 6    method; what I called -- what I called the method; what
 7    my background was in that type of research; what was the
 8    findings; and how did I reach my conclusions; and my
 9    opinions based on those findings.
10        Q     Can you identify each of the studies that you
11    just referred to?
12        A     Yes.  In fact, I took -- I should have asked
13    for copies to be made.  I'm sorry.
14              I took notes as I was going through the
15    documents and so these are all of the different studies
16    and the findings.
17        Q     If you can make a copy on that and I can ask
18    you some questions about that.
19        A     I'm sorry.  I was not thinking.
20        Q     Looking at the second page, Dr. Pechmann, on
21    Exhibit 3, it indicates that between December 28, 2005
22    and January 19th, 2006, you worked for 123 1/2 hours for
23    a total of $43,225; right?
24        A     Yes.
25        Q     And do you know based on the entries on this
0040
 1    page, which of the entries relate to discussions with
 2    plaintiffs' counsel, and which related to your own
 3    independent work?
 4        A     Well, I know that the -- though, I am not 100
 5    percent certain.  I know that one of these -- I would
 6    assume -- my guess would be that the 28th -- the time on
 7    the 20th is when we met.  And then --
 8        Q     That was for two-and-a-half hours with
 9    Mr. Robinson?
10        A     I am not 100 percent certain, but that is what
11    I believe it represents, yes.  And I am not -- I don't
12    remember meeting with him again at all at that time.
13        Q     What about meetings --
14        A     With anyone.  Let me explain that.
15              There is another attorney in the office, Lexi
16    Myer --
17        Q     Um-hmm.
18        A     -- who lives right by my house.  So she would
19    drop off boxes of documents at my house.  I wasn't
20    teaching in January.  So I was not down there that much.
21        Q     Which of the entries on Exhibit 3 in the first
22    page where you list your hours relate to meetings with
23    plaintiffs' counsel other than Mr. Robinson?

                              Page 17

```
                        Ex 1 - 5-26-06 depo transcript
24              MR. SKIKOS:  I think you mean the second page;
25      don't you?
0041
 1              MR. GOLDMAN:  The first page with the detail.
 2      Let me ask the question again.
 3         Q    On Exhibit 3, second page, can you tell me
 4      which of the entries there relate to meetings or
 5      telephone conversations you had with plaintiffs' counsel
 6      other than Mr. Robinson?
 7         A    I don't recall there being any other meetings,
 8      but there could have possibly been a brief phone
 9      conversation saying more documents were coming or
10      describing the documents, or me requesting documents of
11      Lexi when she dropped them off.
12         Q    Okay.  Second page indicates that from March 10
13      to March --
14              MR. ROBINSON:  Actually, this is the third
15      page.  I'm sorry.
16              THE WITNESS:  Yeah.
17      BY MR. GOLDMAN:
18         Q    The third page of Exhibit 3 indicates that you
19      worked 34 hours from March 10th, 2006, through
20      March 17th, 2006; right?
21         A    Yes.
22         Q    So you did not work on the Vioxx litigation or
23      your report at any point between January 19th and
24      February 10, 2006; correct?
25         A    March 10th.  You are doing the same thing as
0042
 1      me.
 2         Q    Sorry.
 3         A    March 10, correct.
 4         Q    Am I right, Dr. Pechmann, that you didn't work
 5      on the Vioxx litigation or your report or reading
 6      documents at any point between January 19, 2006 and
 7      March 10, 2006?
 8         A    Correct.
 9         Q    Are any of the entries on the third page of
10      Exhibit 3 meetings you had with plaintiffs' counsel?
11         A    Yes.
12         Q    Which ones?
13         A    I believe it is 3/15/06 and I can check with my
14      organizer, but I think the 4:00 P.M. to 11:00 P.M. was
15      the trip I took to San Jose to meet with Steve Skikos.
16         Q    And during your meeting with Steve Skikos on
17      March 15 of 2006, did you review your draft report with
18      him?
19         A    I actually should clarify that Mark was also
20      there.  So Mark was up there.  Steve was there, and I
21      was there.
22              No, we didn't spend much time.  Maybe we spent
23      a little time on the draft report, but I spent a lot of
24      time describing the type of research that I know goes
25      into this campaign and describing the types of documents
0043
 1      I still wanted to see to help me understand what was
 2      going on with this campaign.
 3         Q    Did you meet with Mr. Robinson and Mr. Skikos
 4      to obtain feedback on the report that you had drafted in
 5      January of 2006?
 6         A    They didn't tell me why we were meeting.
 7         Q    That wasn't my question.
 8              When you met with plaintiffs' counsel on March
```

```
                          Ex 1 - 5-26-06 depo transcript
 9   15th of 2006, did you obtain feedback on the report that
10   you had drafted in January?
11        A    Yes, I received something back.
12        Q    Did you discuss strategy with Mr. Robinson and
13   Mr. Skikos on March 15th, 2006?
14        A    What do you mean by "strategy"?
15        Q    Well, you wrote it down on the third page and
16   you say, "Tasks:  Discuss strategy."
17             So tell me what strategy you discussed with
18   Mr. Robinson and Mr. Skikos on March 15 of 2006.
19        A    I can't be certain what I was thinking when I
20   wrote that, but my recollection is that we extensively
21   discussed the general orientation of the report.
22             And I said that I wanted it to be focused on
23   marketing and the marketing research and not just -- not
24   on the medical issues.  So not on, you know, what the
25   FDA said or what any of their other medical experts
0044
 1   said; or what the articles were that I wanted to focus
 2   and research -- I wanted to focus the report on what my
 3   area of expertise was, which was marketing research.
 4             And they agreed that it was a good thing to do.
 5        Q    Did you then revise your report after you
 6   obtained feedback from plaintiffs' counsel on March 15,
 7   2006?
 8        A    I would say I extended the report and I put the
 9   medical part of it in the Appendix.  So I reorganized
10   it.
11        Q    When you say the medical part of your report,
12   you are referring to your opinion about what Merck knew
13   or should have known about the cardiovascular risks
14   associated with Vioxx?
15        A    Yes, and I am also referring to the FDA
16   regulations.
17        Q    Would you agree with me, Dr. Pechmann, you are
18   not an expert of what Merck knew or should have known
19   about the cardiovascular risks associated with Vioxx?
20        A    I formed an opinion about what they knew or
21   should have known.  I think that I have enough expertise
22   as a scientist to understand what the FDA was telling
23   them and what some of the basic studies were about.
24             And, yes, I do think I have expertise to answer
25   that question.
0045
 1        Q    Dr. Pechmann, are you holding yourself out as
 2   an expert in what Merck knew or should have known about
 3   the cardiovascular risks associated with Vioxx?
 4        A    Yes.
 5        Q    What experience do you have, ma'am, in the
 6   cardiovascular risks associated with COX-2 inhibitors?
 7        A    I read what the FDA reports were on Vioxx.
 8        Q    What reports?
 9        A    Of the Advisory Committee Report.
10        Q    And you read that after you were retained as an
11   expert in this case; correct?
12        A    Yes.
13        Q    Okay.
14        A    I read the -- the reports of the staff at FDA
15   that -- that preceded the Advisory Committee Report, so
16   the medical officers reviews.
17             I read the Vigor Study that was published in
18   the Journal of American -- I mean, New England Journal
19   of Medicine.
```

Page 19