```
                    Ex 1 - 5-26-06 depo transcript
15    Q    You are reading from the warning letter?
16    A    Yes, "Vioxx minimizes the
17         potentially serious cardiovascular
18         findings that were observed in the
19         Vioxx gastrointestinal outcomes
20         research Vigor Study, and thus,
21         misrepresents the safety profile of
22         Vioxx.
23              "Specifically your promotional
24         campaign discounts the fact that in
25         the Vigor Study patients on Vioxx
0131
 1         were observed to have a four- to
 2         fivefold increase in myocardial
 3         infarctions, MI, compared to patients
 4         on the comparator nonsteroidal
 5         anti-inflammatory drug NSAID,
 6         Naprosyn, and then Naproxen.
 7         It is not easy to read because there is
 8  parentheses.
 9         MR. ROBINSON:  Keep reading. Let her keep
10  reading.
11         THE WITNESS:  Well, that is what they did.  I
12  mean, if you look at the marketing materials, they did
13  not reveal the fact -- in fact, they left out in the
14  materials -- the fact that there was a four- or fivefold
15  increase of myocardial, the Dear Doctor letters.
16         The detail materials that they gave to
17  physicians.  The ads to consumers, the ads to physicians
18  did not -- the PR, the press releases, did not -- did
19  not disclose that information.
20         There were possibly a few pieces of the
21  promotional that -- a few pieces of the promotional
22  materials that might have said that; but then they would
23  have qualifications which as it gets to the next
24  paragraph -- the next paragraph it says you can't
25  qualify or try to blow it off because -- "although
0132
 1         The exact reason for the increase
 2         rate of MI's observed in the Vioxx
 3         treatment is unknown, your
 4         promotional campaign selectively
 5         presents the following hypothetical
 6         explanation for the observed increase
 7         in MI" --
 8         MR. ROBINSON:  Let her go.
 9         MR. GOLDMAN:  I don't need for --
10         MR. ROBINSON:  Connie, just finish that
11  sentence.
12  BY MR. GOLDMAN:
13    Q    Ma'am, I am not interested in hearing the
14  entire warning letter.  I read it.  I know exactly what
15  it says.
16         My question was very simple: What practices do
17  you claim Merck engaged in after receiving the warning
18  letter from the Food and Drug Administration that you
19  think the Food and Drug Administration had told Merck
20  not to do?
21         MR. SKIKOS:  Well, she was going to tell you.
22         MR. ROBINSON:  You cut her off and she was
23  reading it.
24         Go ahead and finish your reading.
25

                              Page 55
```

```
                    Ex 1 - 5-26-06 depo transcript
0133
 1  BY MR. GOLDMAN:
 2    Q    No, No, I don't want you to finish your
 3  reading.  Okay.
 4         It is not about Mr. Robinson conducting the
 5  deposition, Dr. Pechmann.  Can you answer my question?
 6    A    Well, first I think we have to say -- it says
 7  here, do you assert that Vioxx doesn't increase the risk
 8  of MI's, and that the Vigor Study finds consistent with
 9  Naproxen's ability to block platelet aggregation like
10  aspirin, that is a possible explanation, but you failed
11  to disclose that your explanation is a hypothetical and
12  it has not been demonstrated by evidence that --
13    Q    Ma'am --
14    A    -- reasonable explanation --
15    Q    -- Ma'am, I --
16    A    I need to explain this to them, so that we can
17  just expose it to what they actually said in their press
18  releases.
19         MR. SKIKOS:  You are asking her.
20  BY MR. GOLDMAN:
21    Q    Can you put that down, please?
22    A    Let me just say, it wasn't just this, but it is
23  the exact same thing that the FDA had told them in
24  February of 2001 about the study, the implications of
25  the study, the fact they could not assert that it was
0134
 1  Naproxen.
 2         So they were given substantial information from
 3  the FDA as to what -- what the FDA expected of them,
 4  what the FDA believed to be true and not true with
 5  regard to the risks.
 6         And I am relying on the FDA's information to
 7  say that they knew or should have known because the FDA
 8  told them.  How can they have not have known?
 9         The FDA is the body that they have to listen
10  to.
11    Q    Are you done?
12    A    Yes.
13    Q    Is it your position, Dr. Pechmann, that after
14  Merck received the warning letter that it, in its
15  advertisements and in its marketing campaign, was saying
16  that the reason for the difference in heart attacks in
17  Vigor was because of Naproxen; is that your sworn
18  testimony?
19    A    I would need to look at the exact dates of when
20  they stopped saying Naproxen.  Let's see.
21         But certainly, after the February warning about
22  Naproxen -- the February, 2001 warning about Naproxen
23  not being the only possible explanation.
24    Q    That was not my question.
25    A    Then they did continue to state that after this
0135
 1  warning label.
 2    Q    Let me ask the question again then.
 3    A    I have to double-check the date.  What happened
 4  subsequent to this date.
 5    Q    Is it your testimony that Merck continued to
 6  tell people that in advertising that they thought
 7  Naproxen explained the difference between the heart
 8  attacks and the Vigor Study between -- is it your
 9  testimony, Dr. Pechmann, sworn testimony, that after
10  Merck received that letter from the Food and Drug

                              Page 56
```

```
                    Ex 1 - 5-26-06 depo transcript
11  Administration, it continued in a marketing campaign to
12  advance the Naproxen hypothesis?  Is that your sworn
13  testimony?
14         MR. SKIKOS:  Argumentative.
15         Go ahead.
16         THE WITNESS:  It is my sworn testimony that
17  they violated the mandate of this warning letter.  That
18  they misrepresented the safety profile.
19  BY MR. GOLDMAN:
20    Q    Did the Food and Drug Administration ever send
21  Merck another warning letter after September of 2001
22  saying that they felt Merck violated the rules that they
23  were setting forth in that September, 2001 letter?
24    A    Not that I have seen, but that doesn't mean it
25  didn't happen.
0136
 1    Q    It doesn't mean that it did either?
 2    A    Of course not.  That is why I looked at all of
 3  the research.
 4         MR. O'CALLAHAN:  Mr. Goldman, let's put in here
 5  for the California plaintiffs, I think there is an
 6  unfortunate tendency to interrupt her answers.
 7         For purposes of the record, I would just ask
 8  that you let her finish her answers before you
 9  interject.
10         MR. ROBINSON:  We have been going three hours.
11  Can we break for lunch, please?
12         MR. GOLDMAN:  It is just three hours.  We will
13  stop shortly.
14    Q    Am I right, Dr. Pechmann, that the only
15  knowledge that you have about Vioxx and Merck's
16  integrated marketing communications campaign is based on
17  work that you have done as an expert witness in this
18  case?
19    A    The only expertise I have on Merck's integrated
20  marketing campaign is from the work that I have done in
21  this case.  Yes, that's correct.
22    Q    And your only knowledge about Vioxx and any
23  cardiovascular risk associated with Vioxx came from your
24  review of documents that the plaintiffs' lawyers gave
25  you in this case; correct?
0137
 1    A    A few documents I obtained on the web, but
 2  largely, yes.
 3         (Discussion held off the record.)
 4         (Lunch recess.)
 5  BY MR. GOLDMAN:
 6    Q    Dr. Pechmann, have you ever done any research
 7  or published any articles about prescription drugs?
 8    A    I did research for this case.
 9    Q    Other than your involvement in the Vioxx
10  litigation, have you ever done any research or published
11  any articles about prescription drugs?
12    A    No, I have not.
13    Q    Have you done any research or published any
14  articles on pharmaceutical marketing other than --
15  withdrawn.
16         Other than in your involvement in this case,
17  have you done any research or published any articles on
18  pharmaceutical marketing?
19    A    Not on pharmaceutical marketing per se.  Just
20  on integrated marketing communications.
21    Q    Have you ever prior to this case done any

                              Page 57
```

```
                    Ex 1 - 5-26-06 depo transcript
22  research or published any articles on direct-to-consumer
23  advertising in a pharmaceutical industry?
24    A    No.
25    Q    Have you ever done any research or published
0138
 1  any articles on the effects of pharmaceutical
 2  advertising on patients or doctors?
 3    A    You mean prior to this case?
 4    Q    Yes.
 5    A    I believe that the 50 articles that I have
 6  written about integrated marketing communications relate
 7  to this -- relate to pharmaceutical marketing -- not --
 8  yeah.
 9    Q    Have you ever done any research or published
10  any articles on the effects of pharmaceutical
11  advertising on patients or doctors?
12    A    As I said, I believe the research I have done
13  relates to that topic.
14    Q    Has any --
15    A    All of the research that I have done.
16    Q    Have you published any articles at all
17  specifically mentioning pharmaceutical advertising and
18  their effects on patients or doctors?
19    A    No, I have not.
20    Q    Have you done any survey or interviews of any
21  doctors or patients about their reactions to
22  advertisements about pharmaceutical products?
23    A    No, I have not.
24    Q    Have you ever observed any patients or doctors
25  as they watch advertisements on television?
0139
 1    A    Not in any of my research as to how my research
 2  is done.
 3    Q    Have you ever interviewed anybody that ever
 4  used Vioxx?
 5    A    Yes, I have.
 6    Q    Who?
 7         MR. SKIKOS:  Objection.  Was it as part of your
 8  research or is this something some person who --
 9         THE WITNESS:  Just some person.
10         MR. SKIKOS:  He doesn't want to know.  It's
11  irrelevant.
12  BY MR. GOLDMAN:
13    Q    In formulating your opinions in this case,
14  Dr. Pechmann, have you ever spoken to a single person
15  who had used Vioxx?
16    A    No, I have not.
17    Q    Have you ever spoken with a single doctor who
18  has prescribed Vioxx as part of your analysis here in
19  this litigation?
20    A    I read the depositions only.
21    Q    Of Dr. --
22    A    Micola and McCaffrey.
23    Q    Other than reading the depositions of
24  Drs. Micola and McCaffrey, have you ever spoken to any
25  doctors that ever prescribed Vioxx?
0140
 1    A    I read hundreds of pages on research on
 2  doctors.
 3    Q    Have you ever interviewed or spoken with any
 4  doctors who have prescribed Vioxx to their patients?
 5    A    I have read the interviews but I personally did
 6  not conduct any of the interviews, but I never do in my

                              Page 58
```

Ex 1 - 5-26-06 depo transcript

```
 7  research.
 8       Q  You said in your article -- in your --
 9  withdrawn.
10          In your report, you are saying that you are an
11  expert in integrated marketing communications campaigns;
12  right?
13       A  Yes.
14       Q  Can you just briefly describe what that is?
15       A  Sure. It is an approach to marketing where you
16  have a comprehensive plan that involves several
17  different communication disciplines: Advertising, sales
18  promotion, public relations, packaging; and combines all
19  of these forms of communication to disseminate a
20  consistent, clear message so that it maximizes the
21  impact.
22          And as part of it, you conduct research on
23  different segments to figure out what this clear message
24  is going to be. And you study the affects on consumers
25  of this message --
0141
 1       Q  Are you reading your report as you are giving
 2  the answer?
 3       A  No. No.
 4       Q  All right.
 5       A  And make adjustments to the plan. So that it
 6  is effective, but always trying to have a consistent
 7  message across all of the different types of
 8  communications.
 9       Q  Is it fair to say that integrated marketing
10  communications plan is a term that can describe
11  marketing efforts through a number of avenues that
12  companies can use to market their products?
13       A  That is one aspect. That you are using
14  multiple avenues, yes, but it is not all of it by any
15  means.
16          (Discussion held off the record.)
17  BY MR. GOLDMAN:
18       Q  Have you ever consulted for any conditions that
19  had used an integrated marketing communications plan?
20       A  Yes, several.
21       Q  Which ones?
22       A  Well, I worked for Ogilvy and Mather, who had
23  the contract from the Office of National Drug Control
24  Policy to run the anti-drug advertising campaign. I was
25  hired by an ad agency in Massachusetts, who was
0142
 1  responsible for the anti-smoking campaign.
 2          Let's see. What was the name of that --
 3  anyway, Houston Efler, Dafott (phonetic), which is now
 4  Arnold. That is the name of them. They are a very
 5  well-known ad agency. And we -- and I, on behalf of the
 6  American Marketing Association, assisted the Census
 7  Bureau and their ad agency with the census advertising
 8  campaign for the 2000 census. I believe it was Y & R.
 9       Q  Any other companies that you have consulted for
10  with respect to their integrated marketing
11  communications plan?
12       A  Yes. I worked with the University of Vermont
13  to help with an anti-smoking ad campaign in Vermont.
14       Q  Anything else?
15       A  A long time ago when I worked for the National
16  consulting Group, I helped with several integrated
```

Page 59

```
18  marketing campaigns.
19       Q  In what areas?
20       A  -- when I was an MBA student.
21       Q  Since you graduated --
22       A  Well, I had a master's degree in psychology,
23  so --
24       Q  Since you graduated from business school, have
25  you consulted in any capacity for the integrated
0143
 1  marketing communications campaigns for any companies
 2  other than what you just described?
 3       A  Oh, other than what I just described, yes, I
 4  worked on the campaign for Commerce Bank and American
 5  Savings Bank, as I supervised teams of students who
 6  worked on those projects.
 7       Q  Did that involve integrated marketing
 8  communications?
 9       A  I believe they both did, yes. And I
10  continually supervise students on projects where they
11  work on integrated marketing communications campaigns.
12          We have projects that students engage in as
13  teams, and I find on a routine basis, I supervise those
14  teams on integrated marketing campaigns. And I stopped
15  listing them because it would have gotten, too, big on
16  my resume.
17       Q  Any other integrated marketing communications
18  campaigns that you have described that you have been
19  involved with?
20          MR. SKIKOS: You said companies. You are not
21  talking about any universities?
22          MR. GOLDMAN: No, companies.
23          MR. SKIKOS: Companies.
24          THE WITNESS: I am helping out the business
25  school.
0144
 1  BY MR. GOLDMAN:
 2       Q  That is a university?
 3       A  Yes.
 4       Q  I am interested in companies.
 5       A  Companies, okay.
 6       Q  How many for profit companies have you worked
 7  for or consulted with on their integrated marketing
 8  communications --
 9       A  Yes, I worked with Ogilvy directly on the
10  anti-drug campaign. So yes.
11       Q  Other than that?
12       A  I helped them with the campaign for the Tobacco
13  Free Kids, but it is minimal.
14          Yes, it is the major ones that I helped with
15  that I can recall.
16       Q  Have you ever consulted with any pharmaceutical
17  company with its integrated marketing communication --
18       A  Not that I recall.
19       Q  Did you ever work with any ad agency who had
20  developed an integrated marketing communications
21  campaign for a pharmaceutical company?
22       A  No, I have not.
23       Q  Am I right that your work with respect to the
24  anti-drug media campaign that you have been describing
25  involved consulting with an ad agency once a week?
0145
 1       A  Approximately once a week, yes, for about four
 2  years -- over four years.
```

Page 60

Ex 1 - 5-26-06 depo transcript

```
 3       Q  And this was a campaign that was supposed to
 4  help the government combat illegal use of drugs?
 5       A  Yes.
 6       Q  So that integrated marketing communications
 7  campaign was for a government, not a company; correct?
 8       A  I was hired by Ogilvy and Mather, yes, but --
 9       Q  But the campaign that was being implemented was
10  being implemented for the benefit of a government agency
11  not a corporation; correct?
12       A  Well, the government paid the bills, yes. I
13  was working for Ogilvy and Mather as if I was an
14  employee of Ogilvy and Mather.
15          I never worked with a government official. I
16  was working with all of the vendors -- all of the for
17  profit companies that worked with Ogilvy and Mather and
18  they treated it like any other campaign.
19       Q  Were you ever employed by Ogilvy and Mather?
20       A  Yes, that is who I was employed by.
21       Q  Page 2 of your report, Dr. Pechmann, you say in
22  the middle of the second paragraph, "I worked
23          As a consultant to the Anti-Drug
24          campaign during approximately the
25          same time frame as the Vioxx
0146
 1          campaign."
 2          You didn't work on the Vioxx campaign; correct?
 3       A  No, I did not.
 4       Q  You are not trying to suggest that your
 5  involvement in the anti-drug campaign had anything to do
 6  with the Vioxx campaign; right?
 7          You are just pointing out that those occurred
 8  at the same time?
 9       A  Well, I am saying that there were tremendous
10  parallels between the two campaigns. And in terms of
11  the vendors that we used, the amount of money that we
12  used on the campaign were very similar. So I think
13  there were parallels.
14       Q  What other parallels were there?
15       A  Significant parallels? Well, the whole
16  approach to integrated marketing communication was the
17  same.
18       Q  To deliver a consistent message?
19       A  Not just to deliver a consistent message, but
20  to engage in extensive upfront research and tracking
21  research, to make sure that that message was being
22  conveyed, and in our case -- and in their case, too, to
23  make sure that no other messages were being conveyed
24  that you didn't want to convey.
25       Q  Did you at the time you were working on this
0147
 1  anti-drug campaign do any work whatsoever on the Vioxx
 2  campaign?
 3       A  I did not.
 4       Q  You also point out that "Ogilvy
 5          Public Relations which was
 6          responsible for Vioxx's public
 7          relations campaign is a sister
 8          company to the company I worked for."
 9       A  That is correct, yes.
10       Q  But the fact that a sister company was
11  responsible for Vioxx's public relations campaign does
12  not mean that you had any role with Vioxx's campaign;
13  correct?
```

Page 61

```
14       A  Well, we use the same vendor, possibly
15  because -- you know, because Ogilvy tends to use
16  Millward Brown. Whether this is Ogilvy Public Relations
17  or Ogilvy and Mather, but basically, we used Millward
18  Brown as a major research vehicle.
19       Q  Is Ogilvy a reputable advertising firm?
20       A  I'm sorry. I didn't finish my other question.
21          Also, we had a public relations firm -- we did
22  not use Ogilvy Public Relations, but I routinely saw
23  information from our public relations firm.
24          So, you know, so many, many ways, it was very
25  similar. We had the same structure of -- in the
0148
 1  campaign. The same types of entities were involved,
 2  both research wise and just servicewise as they did. It
 3  was moneywise very comparable.
 4       Q  Did you, when you were at Ogilvy and Mather, do
 5  any work on Vioxx's public relations campaign?
 6       A  I did not.
 7       Q  You agree that Ogilvy and Mather, which
 8  consulted with Merck on Vioxx, is a reputable agency?
 9       A  Yes, they are.
10       Q  You would not have worked there if they were
11  not?
12       A  Correct.
13       Q  Ogilvy and Mather does their best to make sure
14  that advertisements that they sponsor are accurate;
15  true?
16       A  I worked with Ogilvy and Mather. They did not
17  use Ogilvy and Mather, but that is correct.
18       Q  They used -- they used Ogilvy Public Relations;
19  right?
20       A  Right. The public relations arm does not have
21  advertising. They are doing press releases and that
22  sort of thing.
23       Q  Having worked with Ogilvy, they do their best
24  to convey accurate information in the materials they
25  sponsor?
0149
 1       A  Yes. I was not surprised when Ogilvy
 2  Publications asked Merck, where the evidence for the
 3  Naproxen theory -- where is the evidence? We want to
 4  know what the evidence is. Can we help you obtain the
 5  evidence you need to substantiate these claims?
 6          That is what Ogilvy would do. They did not
 7  collect the evidence themselves, but they are concerned
 8  and they asked if someone should collect the data, which
 9  indicates they themselves thought the data was tenuous.
10       Q  You don't comment at all about that in your
11  report; right?
12       A  You know, I had so much to put in the report, I
13  didn't put that in. That document is in those boxes.
14       Q  You don't intend to offer any opinions about
15  the interactions between Ogilvy and Merck about the
16  Naproxen hypothesis; do you, ma'am?
17          MR. ROBINSON: Objection. She has already been
18  talking on half the depo on that.
19          THE WITNESS: We may decide to use that because
20  it is part of the overall opinion I am giving that they
21  mislead the public.
22  BY MR. GOLDMAN:
23       Q  Nowhere in your report do you mention anything
24  about Ogilvy's discussions with Merck about the Naproxen
```

Page 62

```
                    Ex 1 - 5-26-06 depo transcript
25    hypothesis; correct?
0150
 1         A    That is correct.
 2         Q    And in your report, you included everything you
 3    felt was important to your opinion; true?
 4         A    To my opinion, yes, and my overall --
 5         MR. ROBINSON:  You have enough time.  You have
 6    two months.  You heard that new opinion.
 7         MR. GOLDMAN:  What are you doing?
 8         MR. ROBINSON:  You have a right now to
 9    cross-examine her on this because I may want to ask her
10    about that.  Since you asked her about it in depo, I am
11    going to ask her about it at trial, I am going to put
12    you on notice.  I am going to ask her the same line of
13    questioning at trial.
14    BY MR. GOLDMAN:
15         Q    You know, I am sticking with what is in your
16    report, ma'am.
17         A    I did not leave it out of my report assuming
18    that I didn't want to testify to it.  I said I only had
19    a certain number of pages, and it was consistent with my
20    opinion.  I was told to put my opinion in, not every
21    single fact.
22              There are numerous documents that substantiate
23    these opinions.  I did the best I could to put the main
24    ones in the report, but I mostly was certain that these
25    were my opinions and that is what I felt I needed to put
0151
 1    is my opinion.
 2         Q    Dr. Pechmann, is your knowledge about any
 3    communications between Ogilvy and Merck about the
 4    Naproxen hypothesis based on your review of Merck's
 5    internal documents?
 6         A    It was in the documents that we -- we were
 7    given by one of the entities who was subpoenaed.  I
 8    mean --
 9         Q    Did you understand my question?
10         A    I guess not.
11         Q    Is your understanding about the interactions
12    between Ogilvy and Mather and Merck about Vioxx limited
13    to what you have seen in the documents that the
14    plaintiffs' lawyers have given to you?
15         A    Yes.
16         Q    Okay.  You've never spoken with anyone from
17    Merck about their discussions with Ogilvy about the
18    Naproxen hypothesis; have you, ma'am?
19         A    No, I have not.
20         Q    Nor have you spoken with anybody from Ogilvy;
21    correct?
22         A    That's correct.  It just sounded -- it was a
23    very Ogilvy-like memo from having worked with them.
24         MR. GOLDMAN:  Move to strike the last part of
25    the answer as nonresponsive.
0152
 1         Q    You claim to be an expert in misleading
 2    advertising; right?
 3         A    Yes.  I published articles in that area.
 4         Q    Incidentally, have you ever published articles
 5    that specifically address integrated marketing
 6    communications campaigns?
 7         A    I've published articles and in every one of my
 8    articles, it addresses an aspect of the integrated
 9    marketing communications campaign.

                              Page 63
```

```
                    Ex 1 - 5-26-06 depo transcript
10         Q    You can't, in academia, publish a descriptive
11    article of an integrated marketing communications
12    campaign because that is not considered novel enough to
13    be publishable.
14              So, in other words, someone who did -- if you
15    are involved in a campaign where people are using
16    generally accepted practices to deliver an outstanding
17    integrated marketing campaign, I would love to write an
18    article like that, but it is not publishable because in
19    the type of journals that the --
20         Q    Ma'am, I didn't ask you whether it is
21    publishable.
22         A    No, I have not.
23         Q    My question is did you -- withdrawn.
24              Have you ever published a single article that
25    talks about integrated marketing communications
0153
 1    campaigns?
 2         A    Yes, all of mine.
 3         Q    All of them talk about a segment of it;
 4    correct?  Right?
 5         A    You just told me that the articles address
 6    different segments of integrated marketing
 7    communications campaigns?
 8         A    Yes.  Therefore, they address integrated
 9    marketing communications.
10         Q    Have you ever written a single article that
11    addressed a single integrated marketing communications
12    campaign along the lines of what you are trying to do in
13    this case?
14         MR. SKIKOS:  Objection.
15         THE WITNESS:  Well, that is what I was trying
16    to answer.
17    BY MR. GOLDMAN:
18         Q    Yes or no?
19         MR. ROBINSON:  Steve, let her go.
20         THE WITNESS:  I have not published that type of
21    article because -- because it is not possible to publish
22    it and get credit for it at UCI Irvine.  And I can't
23    afford to work on things that I don't get credit for.
24    BY MR. GOLDMAN:
25         Q    Well, you feel that your work here in this case
0154
 1    is important to talk about Merck's integrated marketing
 2    communications campaign; right?  Right?
 3         A    What do you mean you think it is important?
 4         Q    You feel it is important to participate in this
 5    case and evaluate Merck's integrated marketing
 6    communications campaign; is that right?
 7         A    Yes.
 8         Q    And have you written a report in this case
 9    where you attempted to describe your view of Merck's
10    integrated marketing communications campaign?
11         A    Yes.
12         Q    You've never attempted to write an article and
13    try to have it published talking about anybody -- any
14    company, any government agency, anybody who has used an
15    integrated marketing communications campaign?
16         A    Yes.  I have published articles about companies
17    that have integrated marketing communications campaigns
18    and describing major parts of those campaigns in
19    articles, yes.
20         Q    Which ones?

                              Page 64
```

```
                    Ex 1 - 5-26-06 depo transcript
21         A    Well, I brought one with me.  Where did I put
22    it?  I believe we made a copy for you.  It is the --
23    this one.  We made a copy for you.
24         Q    So the one article that you have cited that
25    talks about integrated marketing communications
0155
 1    campaigns is one just titled the National Youth
 2    Anti-drug Media Campaign Copy Test Program; right?
 3         A    I don't agree that that is the only one that I
 4    wrote on integrated marketing communications.  I have
 5    written several articles about integrated marketing
 6    communications campaigns.
 7         Q    Have you published any articles of an
 8    integrated marketing communications campaign used by a
 9    company?
10         A    And Ogilvy is a company.
11         Q    I am not talking about ad agencies.
12         A    That is a company.
13              (Discussion held off the record.)
14         MR. GOLDMAN:  I am marking as Exhibit 7 the
15    article that you showed me, the National Youth Anti-drug
16    Media Copy Test System.
17              (Defendant's Exhibit 7 was marked
18              for identification by the court
19              reporter.)
20    BY MR. GOLDMAN:
21         Q    Other than the work that you did for Ogilvy
22    concerning the anti-drug campaign, have you ever
23    published an article talking about a complete integrated
24    marketing communications campaign for any company?
25         A    As I said, I did not because I cannot.
0156
 1         Q    Okay.  Let's talk about your expertise in
 2    misleading advertising.  What does it mean to be an
 3    expert in misleading advertising?
 4         A    I have to go back to your question because
 5    although I didn't publish it, I co-wrote a case on
 6    integrated marketing communications for a cell phone
 7    company that I used in class for a number of years.
 8              And we were thinking of publishing that, but
 9    then the case got out of date because cell phones get
10    out of date real fast.
11         Q    You were thinking about publishing, but you did
12    not publish it?
13         MR. ROBINSON:  This is our version.
14    BY MR. GOLDMAN:
15         Q    Can you answer my question?  I am getting tired
16    of the long-winded explanations.  Just like he gets
17    tired of our witnesses.
18         MR. ROBINSON:  It's a good witness.
19    BY MR. GOLDMAN:
20         Q    Dr. Pechmann, other than your work for Ogilvy,
21    you have never published a single article about a
22    complete integrated marketing campaign for any company;
23    true?
24         A    Not that I can think of.
25         Q    Now, let's talk about your expertise that you
0157
 1    say that you have in misleading advertising.  Okay?
 2         Q    What does it mean to be an expert in misleading
 3    advertising?
 4         A    It means that I understand the criteria for
 5    distinguishing between regular advertising and

                              Page 65
```

```
                    Ex 1 - 5-26-06 depo transcript
 6    misleading advertising.  And I know how to conduct
 7    research to find out if an ad is misleading.
 8         Q    What research have you conducted to determine
 9    whether any of Merck's advertisements are misleading
10    about Vioxx?
11         A    I didn't have to conduct any of my own research
12    because they conducted their own research -- extensive
13    research.
14         Q    What research did you do to determine that
15    Merck's advertisements for Vioxx were misleading?
16         A    Let me explain it this way.  I conducted -- I
17    view what I did as research because I looked at their
18    research.
19         Q    You looked at documents that were created by
20    other companies that performed certain surveys and that
21    kind of thing?
22         A    Exactly.  And I did my research on their
23    research, but I didn't collect any data myself.
24         Q    You never analyzed the underlying data that
25    these other companies did when they conducted their
0158
 1    surveys for Merck on Vioxx?
 2         A    I did double-check one survey.  I recalculated
 3    the numbers -- well, I didn't actually have their
 4    summary.  So I only had the data and then it coincided
 5    with what they concluded when I got that data.  So in
 6    one case, yes, I did.
 7         Q    Have you ever published any articles that
 8    addressed misleading advertising other than in the
 9    tobacco industry?
10         A    Yes.
11         Q    Have you ever --
12         A    You don't want it?
13         Q    No, that's okay.  I don't need to see it.
14              When you say that you are an expert in
15    misleading advertising, whose definition of misleading
16    are you using?
17         A    I have one in my report.  And it is the common
18    definition of misleading advertising that is used in
19    marketing.  It is a term of art in marketing.
20         Q    You said that your definition of misleading is
21    consistent with the FDA's definition of misleading; is
22    that what you said in your report?
23         A    Yes.
24         Q    What is the definition of the FDA's of
25    misleading?
0159
 1         A    Well, they have several documents that discuss
 2    what is misleading.  So they don't have a single one
 3    sentence definition.
 4         Q    How would you describe the FDA's definition of
 5    misleading, ma'am, when it comes to advertising for
 6    prescription drugs?
 7         A    By choice of words or omission, you could not
 8    have a meaning that's contrary to the facts or contrary
 9    to truth.
10         Q    And that is what -- that is how you think FDA
11    defines misleading?
12         A    Yes, roughly.
13         Q    You are not an FDA expert; true?
14         A    I am an expert in the FDA rules governing
15    advertising.
16         Q    Ma'am, before you signed up to be a plaintiffs'

                              Page 66
```

Ex 1 - 5-26-06 depo transcript

```
17   expert in this case, you never analyzed a single FDA
18   regulation on pharmaceutical advertising?
19        You told me that earlier.
20     A   I analyzed the regulation for tobacco.
21     Q   Dr. Pechmann, that is not my question.
22         Dr. Pechmann, my question was prior to you
23   signing up to be an expert witness in this litigation,
24   you never reviewed a single regulation by the FDA
25   concerning advertising pharmaceutical products; true?
0160
 1     A   Of course, I did. You mean was I not familiar
 2   with these regulations?
 3     Q   Yes.
 4     A   I have seen them before.
 5     Q   When have you seen them? In what context?
 6     A   I review articles about the FDA in journals. I
 7   am on the review board of the General Public Policy in
 8   Marketing. There are articles submitted all of the time
 9   by FDA and FDC and I get those articles.
10     Q   What section of the CFR code addresses the
11   advertising for pharmaceutical products?
12         MR. ROBINSON: Can she look at her --
13         THE WITNESS: I need to look. I don't have
14   that memorized.
15   BY MR. GOLDMAN:
16     Q   You don't know off the top of your head and you
17   say that you are an expert in FDA advertising?
18     A   21 CFR, 2.2 F1.
19     Q   When was the first time you read that?
20     A   I don't remember but years ago.
21     Q   Dr. Pechmann, have you ever written a single
22   article about the FDA regulations that apply to
23   pharmaceutical advertising?
24     A   No.
25     Q   Have you ever given a single speech, a single
0161
 1   lecture about the FDA regulations on pharmaceutical
 2   advertising?
 3     A   I may have discussed it in class. I discussed
 4   FTC and I may have discussed the FDA, too.
 5     Q   Have you ever presented anywhere to any
 6   audience, other than maybe in your classroom, your
 7   interpretation of the FDA regulations on pharmaceutical
 8   advertising?
 9     A   No.
10     Q   Have you ever written anything about your
11   understanding of what is misleading under the FDA
12   regulations?
13     A   My report.
14     Q   Other than the report that you generated as a
15   plaintiffs' expert in the Vioxx litigation, have you
16   ever written anything about your interpretation of the
17   FDA regulations when it comes to pharmaceutical
18   advertising?
19     A   No, just for tobacco.
20     Q   Do you think that you are in a better position,
21   Dr. Pechmann, to look at a Vioxx advertisement and
22   determine whether it is misleading compared to a juror?
23     A   Yes.
24     Q   Why?
25     A   Because I have extensive research that shows
0162
 1   what -- what they found when they did research on
```

Page 67

Ex 1 - 5-26-06 depo transcript

```
 2   various types of promotional materials and what the
 3   research shows from tracking; so what happened when the
 4   ads were out in the real world.
 5         And that is the kind of thing that a juror
 6   could not understand and the reason I can understand it
 7   is because of my extensive expertise.
 8     Q   You claim to be an expert in misleading
 9   advertising of any kind?
10     A   Yeah. Well, there is a general definition of
11   what is misleading. We don't distinguish between
12   industry.
13     Q   Are you an expert in misleading advertising in
14   every industry for every product?
15     A   Yes. That is how we are in academia. We are
16   not industry specific.
17     Q   You said you are -- have expertise in reading
18   medical journals; is that right?
19     A   Yes.
20     Q   What is your expertise in that area?
21     A   I review for the journal of American Medical
22   Association and other related journals. Those are --
23     Q   You are a peer reviewer?
24     A   Yes.
25     Q   For what publications?
0163
 1     A   Well, one that I can think of is the Journal of
 2   the American Medical Association, American Journal of
 3   Public Health. I am wondering if any of the others are
 4   medical -- I reviewed for the National Cancer Institute,
 5   for preventative medicine, tobacco control -- just
 6   several articles that publish medical articles.
 7     Q   Have you ever consulted or been retained as an
 8   expert in medical journals and how to interpret them?
 9     A   How to interpret articles in --
10     Q   Yes.
11     A   I mean, I review articles for medical journals.
12   So in that review, you evaluate the validity of the
13   research and the conclusions.
14     Q   Okay.
15     A   And I also review research. I was elected to
16   the committee on research. At UC Irvine, we are
17   continually reviewing medical research to determine what
18   would get funding. And I also review medical protocols
19   for the institution's review board where I was an
20   advisory chair.
21     Q   You are not going to come into court and
22   attempt to interpret the medical journal articles
23   written by Vioxx; are you, ma'am?
24     A   Well, I have the Vigor in my -- in the New
25   England Journal materials in my Appendix. So if it came
0164
 1   up, I would speak about them.
 2     Q   When was the first time you read the Vigor
 3   article?
 4     A   December of '05 or January of '06.
 5     Q   And you have read the editorial of concerns
 6   written by the New England Journal of Medicine about
 7   that article?
 8     A   Yes, that's right. There is a series of them.
 9   I think there were two.
10     Q   Did you read the author's responses to that?
11     A   Absolutely.
12     Q   Do you know who Dr. Kurfm is?
```

Page 68

Ex 1 - 5-26-06 depo transcript

```
13     A   Yes.
14     Q   Have you read his deposition?
15     A   I looked it over.
16     Q   Did you read Dr. Kurfm's entire deposition?
17     A   I skimmed through it and read relevant parts.
18     Q   Dr. Kurfm and our cross-examination of him
19   would be a better way to describe the Vigor article
20   then for you to describe it at trial; do you agree with
21   that?
22         MR. ROBINSON: I object to tone.
23         MR. GOLDMAN: Let me ask it a different way.
24         THE WITNESS: I have an opinion about --
25
0165
 1   BY MR. GOLDMAN:
 2     Q   I'm sure you have an opinion about that. You
 3   are not the best person to interpret the Vigor Study for
 4   the jury?
 5     A   I disagree because I am a marketing person and
 6   we are talking about integrated marketing communications
 7   campaign --
 8     Q   Ma'am --
 9     A   -- and I worked on the integrated marketing
10   communication campaigns where we had to compare the
11   science to actually what we were doing. And that is
12   what I am trying to do here.
13     Q   Ma'am --
14     A   So from a marketing perspective, I am much
15   better able to state what that article said to a
16   marketer.
17     Q   What dose of Naproxen was used in the Vigor
18   study?
19     A   50 milligrams.
20     Q   What dose of Vioxx was used in the --
21     A   Oh, I'm sorry. Vioxx was 50 milligrams and --
22     Q   What does was Naproxen?
23     A   -- Naproxen was, I think, 200-something.
24     Q   What was the difference in serious
25   gastrointestinal problems in the Vioxx arm versus the
0166
 1   Naproxen arm?
 2     A   Gastrointestinal, I know there was a
 3   significant difference in the favored Vioxx.
 4     Q   How much of a difference?
 5     A   I can't remember -- significant.
 6     Q   How many cardiovascular events were seen in the
 7   vigor trial for Vioxx and Naproxen?
 8     A   What I remember is that the incidents of heart
 9   attacks was .5 for Vioxx and .1 for Naproxen, which
10   means, you know, out of 1,000, so five versus one.
11     Q   How many patients were involved in the Vigor
12   Study?
13     A   Over 8,000.
14     Q   You mentioned that Merck sold, you say, $9 1/2
15   billion of Vioxx between March of 2000 and
16   September 2004; is that right?
17     A   I believe that is a little bit of an under
18   estimate, but it is close.
19     Q   Do you consider yourself an expert of knowing
20   how much Merck sold of Vioxx?
21     A   Yes. I reviewed the documents.
22     Q   Other than reviewing the documents that have
23   the number 9.5 billion on it, you agree that you don't
```

Page 69

Ex 1 - 5-26-06 depo transcript

```
24   have any independent knowledge of what Merck made when
25   it sold Vioxx; true?
0167
 1     A   What do you mean; dollar sales or profits?
 2     Q   Either.
 3     A   Yes, I do. I have several documents that
 4   provide information. Some which were from Merck and
 5   some were independent. And some were in publications
 6   that are in my folders.
 7     Q   Have you ever reviewed any of Merck's financial
 8   statements?
 9     A   Yes, I have. The ones that are in the
10   documents.
11     Q   Do you consider yourself an expert in
12   interpreting financial statements?
13     A   Those related to marketing, yes.
14     Q   What about those related to the sales of drugs?
15     A   Yes.
16     Q   Do you think you are in a better position,
17   ma'am, than a juror to understand that Merck made a lot
18   of money selling Vioxx?
19         MR. ROBINSON: Objection.
20   BY MR. GOLDMAN:
21     Q   You think the jurors might get that in the case
22   without your help?
23         MR. ROBINSON: Objection. Compound.
24         MR. O'CALLAHAN: Join.
25         THE WITNESS: I think it would have to have an
0168
 1   marketing expert in the study. I find that with MBA
 2   students, they don't really understand those numbers.
 3   BY MR. GOLDMAN:
 4     Q   Do you think that if a witness for Merck were
 5   asked a question of how much money Merck made on Vioxx,
 6   that the jurors would understand that testimony; how
 7   much money Merck made on Vioxx?
 8     A   No.
 9     Q   You think you need to be there to tell the jury
10   the exact amount?
11     A   I thought you said understand how much you
12   made?
13     Q   Yeah.
14     A   Understand is different from hearing a word.
15   Hearing a word is just knowing the number, but
16   understanding means you have a context to understand
17   what does that mean. And I don't believe the -- juries
18   don't understand. I'm pretty sure they don't. MBA's
19   don't understand that.
20     Q   MBA's don't understand what it means when a
21   company sells $9 1/2 billion of a drug?
22     A   No, they don't understand what that number
23   means. You have to have a context.
24     Q   You said that -- you asked the question, how
25   did Merck sell so much given Vioxx's significant CV
0169
 1   potential; right? Do you remember being asked that?
 2     A   Yes, I do. Something like that.
 3     Q   You don't know how significant the
 4   cardiovascular risk was of Vioxx; do you, ma'am?
 5     A   I know that it was -- that there was a
 6   significant potential. It was a statistically
 7   significant effect. It was a significant potential.
 8     Q   Were there clinical trials that showed there
```

Page 70

```
                    Ex 1 - 5-26-06 depo transcript
 9    was no difference in cardiovascular events between Vioxx
10    and placebo?
11         A    On what?
12         Q    Vioxx.
13         A    You mean what outcome?
14         Q    Any outcome.  Are you aware of clinical trials,
15    ma'am, when you say that there was a significant
16    cardiovascular risk that showed that the difference
17    between Vioxx and placebo in terms of cardiovascular
18    risk was at zero?
19         A    I am aware of studies that they put in their CV
20    card that the FDA told them that they could not put on
21    the label that were against --
22         Q    Is that an answer to my question?  Is that in
23    any way an answer to my question?
24         A    Tell me your question again.
25              MR. O'CALLAHAN:  That is argumentative.
0170
 1    BY MR. GOLDMAN:
 2         Q    Look, Dr. Pechmann, my question was very
 3    simple:  Did you review studies, not CV cards -- did you
 4    review any studies showing the difference between Vioxx
 5    and placebo in terms of cardiovascular risks was at
 6    zero?
 7         A    I reviewed descriptions of the studies.
 8         Q    But not the studies themselves?
 9         A    No, I don't believe -- I may have, but I don't
10    recall doing that.
11         Q    You said that Merck devised and implemented an
12    unprecedented integrated management communications
13    campaign for Vioxx?
14         A    No.  It is a marketing communications campaign.
15              (Discussion held off the record.)
16    BY MR. GOLDMAN:
17         Q    Dr. Pechmann, you said that Merck devised and
18    implemented an unprecedented integrated marketing
19    campaign for Vioxx; correct?  Right?
20         A    Yes.
21         Q    When you say "unprecedented," what are you
22    talking about?
23         A    What I am talking about is that it was the
24    number one prescription drug advertised in the United
25    States.  I believe it was 2000, and it was unprecedented
0171
 1    in its scope and its sophistication.
 2         Q    Have you ever analyzed any integrated
 3    management -- marketing communications plan for Pfizer?
 4         A    I have read articles on multiple different --
 5    on different pharmaceutical campaigns.  I don't have the
 6    details about any other campaign like I do about this
 7    one.
 8         Q    Have you ever analyzed the integrated marketing
 9    communications campaign for Pfizer and its sale of
10    Celebrex?
11         A    Well, many of those documents were in here.
12    They describe Celebrex -- I mean, aspects of the
13    Celebrex campaign in here.  For example, they tested the
14    Celebrex ads.
15         Q    Do you consider your review of the documents in
16    this case to put you in the position to say, yes, I have
17    reviewed and analyzed Pfizer's integrated marketing
18    communications campaign for Celebrex?
19         A    Not the entire campaign, no.

                              Page 71
```

```
                    Ex 1 - 5-26-06 depo transcript
20         Q    You have never analyzed an integrated
21    communications marketing campaign -- withdrawn.
22              You've never analyzed an integrated marketing
23    communications campaign for any pharmaceutical company?
24              MR. ROBINSON:  Objection.  Asked and answered.
25
0172
 1    BY MR. GOLDMAN:
 2         Q    Other than your involvement in this case?
 3         A    Yes, I have read pharmaceutical campaigns.
 4              MR. ROBINSON:  We are retreading.
 5    BY MR. GOLDMAN:
 6         Q    Which ones?
 7         A    I read hundreds of articles a month -- a year,
 8    so --
 9         Q    What integrated marketing communications
10    campaigns have you read about pharmaceutical companies?
11              MR. O'CALLAHAN:  I am going to object.  You cut
12    off her answer.  I just think that it's -- it's a lack
13    of courtesy, which I don't think it is characteristic of
14    you?
15              MR. GOLDMAN:  Thank you.  I appreciate that.  I
16    am not trying to be discourteous.  I am trying to move
17    forward.
18         Q    New question:  Did you ever --
19         A    Let me just say some of the articles are there
20    about other campaigns.
21         Q    Other than your work in this case,
22    Dr. Pechmann, am I right that you've never analyzed an
23    integrated marketing communications campaign for any
24    drug company?
25         A    What do you mean by "analyze"?  Some of those
0173
 1    articles in my folder I read before I was involved in
 2    the case and those described -- I have not done any
 3    research on any other integrated marketing communication
 4    campaign that involved pharmaceuticals.
 5         Q    You have never done any research or published
 6    any articles on integrated marketing campaigns for any
 7    drug company; right?
 8         A    Yes, I agree with that statement.
 9         Q    You said Merck's integrated marketing
10    communications campaign for Vioxx was perfect except on
11    the most important dimension of all; everything was
12    misleading.
13              Do you remember making that statement?
14         A    Yes, I do.
15         Q    Who was the campaign misleading to?
16         A    Physicians, consumers, and the general public.
17         Q    What objective criteria do you use to decide
18    that Merck's marketing campaign was misleading?
19         A    I used the data from the studies.
20         Q    What studies?
21         A    Well, for example, there is a physician
22    tracking study, very extensive, and it shows what the
23    sales representatives -- well, what the physicians
24    recalled that the sales representatives said to them
25    about Vioxx.
0174
 1         Q    Okay.
 2         A    And they said that the sales representatives
 3    affirmatively asserted that --
 4         Q    What page are you on?  If you can point me to

                              Page 72
```

```
                    Ex 1 - 5-26-06 depo transcript
 5    the page, you don't need to read the whole thing.
 6         A    Exhibit 56, Page 17.
 7         Q    Okay.  Now, here you were relying on a document
 8    that purports to report what doctors sometimes after
 9    they meet with sales representatives remember sales
10    representatives telling them about Vioxx?
11         A    Yes, and that is the standard -- generally
12    accepted research method in this industry and in any
13    evaluation of an integrated marketing communications
14    campaign.
15         Q    So you were relying on a study report of what
16    166 doctors seem to remember about their interactions
17    with certain sales representatives and you are
18    concluding that Merck --
19         A    No.  No.  I'm sorry.  First of all, it was 300
20    a month for years.  It was not 166.  You are talking
21    about a different document.  That is Exhibit 55.
22         Q    Um-hmm.
23         A    That is where I independently counted up the
24    comments to see whether in that sample it coincided with
25    the numbers that they said and it did.  That is where I
0175
 1    validated their numbers.
 2         Q    You think that you are in a better position
 3    than a juror, ma'am, to look at a comment by a doctor
 4    and see whether or not what he remembers a sales
 5    representative telling him is misleading?
 6         A    What I am saying is that the jury --
 7         Q    Can you answer my question yes or no?
 8         A    Yes.  I do believe I am better qualified than
 9    the jury, yes.
10         Q    Do you believe that the jury is not capable of
11    determining whether Vioxx's marketing efforts was
12    misleading if you are not there to help them?
13         A    I think that I could add a huge amount to their
14    knowledge.  That -- I think that they will not be able
15    to understand the vast majority of the documents in this
16    case that are relevant to that issue unless they have an
17    expert like me to explain it to them.
18         Q    You don't think that the jury can understand a
19    report about what doctors remembered sales
20    representatives telling them?
21         A    No, I think that jurors would need to be --
22    need to be explained -- needs someone to explain to them
23    what the research method is, what the validity of that
24    method is, what the different data points indicate; what
25    the statistical, statistical analyses were done.
0176
 1         A    I don't think a jury -- and it is not just this
 2    one study.  There is six different types of studies.
 3    And I do not think that a jury could handle this on
 4    their own.
 5              Many of the documents, you can't even
 6    understand them.  If you were to put the document up,
 7    they would have no idea how to read it.  So you need an
 8    expert to explain what the X axis is, what the Y axis
 9    is, what are the acronyms; what are the statistical
10    tests; is it valid -- you know, is this a valid
11    technique?  How do we know it's valid?  I mean for every
12    study.
13              I just think they would have a difficult time
14    and they would not understand the majority of the
15    evidence.

                              Page 73
```

Ex 1 - 5-26-06 depo transcript

16  Q    Let's look at an example -- well, actually, we
17  will get there in a minute.
18       You claim that Merck's marketing campaign was
19  expressly designed to neutralize the concerns of Vioxx's
20  cardiovascular potential; is that your testimony?
21  A    Yes, I found that in the documents in several
22  places.
23  Q    And that is your personal interpretation of the
24  documents; right?
25  A    No, it is verbatim from the documents.
0177
1   Q    So the jury can understand that; right?
2   A    That statement, yes.
3   Q    There are actually lots of examples in your
4   report where all you are doing is quoting from documents
5   and then going to your next example of what you think is
6   misleading; right?
7   A    Because -- yes, because what I was trying to do
8   was describe the campaign before getting into all of the
9   research.
10  Q    Can you --
11  A    But, really, what I spent most of my time is on
12  the research. Much of my time was on the research.
13  Q    Would you do me a favor and point me to
14  paragraphs in your report where you are talking about
15  the six studies and the research that you think that you
16  need to explain to the jury?
17  A    Okay. Well, first of all, the materials that
18  you would need to know is on Page 6 and 7 and top of 8.
19  You can't understand many of the documents unless you
20  know the definitions for those terms.
21  Q    I don't think 90 percent of those terms are
22  even in those documents, but --
23  A    But that is where I got every single term.  I
24  didn't pick a term right out of my head.  They were all
25  from a document.
0178
1   Q    Okay. Let me ask you: On the actual studies
2   themselves, Dr. Pechmann, tell me where in your report
3   and just mention the paragraphs, do you offer opinions
4   about the six studies that you want to tell the jury
5   about?
6   A    It is really throughout the report.  So I will
7   go page by page and find --
8   Q    Okay.
9   A    -- and find them.
10       Okay. There is material on Page 32 and 33.
11  Q    Let me get there.
12       Okay. You are referring here to an Awareness
13  and Action Study?
14  A    Yes, or the Chronic Pain Study.  That is what
15  they more commonly called it.
16  Q    That is one study?
17  A    Yeah.
18  Q    Okay.
19  A    It was conducted monthly from May 2000 through
20  December, 2003.
21  Q    So that is paragraph 27(b) of your report?
22  A    Yes.
23  Q    Where is the next time you talk about the
24  second study?
25  A    Okay. 47, the Attribute Tracker Study.
0179

Ex 1 - 5-26-06 depo transcript

```
 1      Q    That's Paragraph 35(a)?
 2      A    Yes, and (b). And then there is some
 3 additional research on Page 50.
 4      Q    Where is that?
 5      A    It is at the top of the page. It is part of
 6 (c) from Page 49.
 7      Q    I want you to identify the study.
 8      A    Additional 10 to 15 prescriptions, so it is
 9 Exhibit 41. Do you see it on the top of Page 50?
10      Q    Yes. So Exhibit 41, that is cited in
11 subparagraph (d) that is on Page 50.
12           Okay. What is the next study that you want to
13 talk about?
14      A    Page 51, 52, 53.
15      Q    What study is that?
16      A    Well, you know, let me explain. I am
17 describing several studies sometimes. I don't say -- I
18 was -- I addressed several studies that all reached the
19 same conclusion.
20      Q    Yes.
21      A    And so on Page 50 and 51, that is the -- I
22 believe that is the Attribute Tracking Study.
23      Q    Okay. That is the one that we already covered?
24      A    Yeah, more data from it. Let me make sure.
25           And on Page 53, that is a different research
0180
 1 project.
 2      Q    Which one?
 3      A    The middle of the paragraph, so that is
 4 Exhibit 54.
 5      Q    Okay. Paragraph H on 53.
 6           What is the next study that you wanted to talk
 7 about?
 8      A    Okay. That is the Message Tracking Study. The
 9 sales rep message tracking study that looked at what the
10 physicians recalled from the sales reps and how it
11 affected their prescribing behavior.
12           MR. ROBINSON:  Are you on Page 53?
13           THE WITNESS:  Yes. 53, 54, 55, 56.
14 BY MR. GOLDMAN:
15      Q    Let me just ask you about this study as an
16 example.
17           Do you see on Page 54, where you are reporting
18 on the findings of that study, and you have a bullet
19 that says, "Safe and effective and not associated with
20 cardiac deaths"?
21           Do you see that?
22      A    Yes. That is a quote from a doctor.
23      Q    That is a quote from a doctor. Do you think
24 that the jury can understand that without your
25 particular help?
0181
 1      A    That particular quote?
 2      Q    Yes.
 3      A    Yes, but not the research, not the validity of
 4 the research, not the approach to the research, not the
 5 statistics involved. I mean, there is --
 6      Q    What statistics do you report on here? What
 7 statistics are you reporting on here?
 8      A    This particular one, is very, very, very clever
 9 statistics.
10      Q    Where do you report on the statistics in your
11 study -- in your report, ma'am?
```

```
                           Ex 1 - 5-26-06 depo transcript
12       A     I don't.  I just talk about my opinion, but in
13   the -- in the -- and said I was going to talk about
14   these studies.
15           So I did not get into all of the details, the
16   methods, and all of the statistics in this report.  I
17   focused on my conclusions and the studies that I used to
18   reach those conclusions.
19           So this study had very significant -- had --
20       Q     Let's go to the next study.
21           MR. SKIKOS:  So you don't want her --
22           THE WITNESS:  You didn't want me to answer the
23   question about the statistics?
24           MR. GOLDMAN:  No.
25           MR. ROBINSON:  Let her keep going.
0182
 1   BY MR. GOLDMAN:
 2       Q     What is the next study?  Tell me the next study
 3   that you would want to talk to the jury about.
 4           MR. ROBINSON:  Here, Page 54, DTW Marketing and
 5   Research Group; is that what you are --
 6           MR. GOLDMAN:  That is the one that she just
 7   covered.  Mark, let me handle the dep, please.
 8       Q     Dr. Pechmann, what is the next study that you
 9   would like to talk to the jury about?
10       A     On 57(c), that is prescribing data.  So that is
11   behavioral tracking.  There is extensive charts and
12   figures and statistics associated with that because they
13   tracked that continuously.
14       Q     So you want to talk about C on 57?
15       A     Uh-huh.
16       Q     Okay.  And what is the next study that you want
17   to talk about?
18       A     And (d).
19       Q     Okay.  And these are Merck reports.
20           What are Vioxx Monthly EAR's?
21       A     Early Assessments and Response.
22       Q     Okay.
23       A     It was research designed to help them adjust
24   the campaign if something went wrong, which they did do.
25   They used their research to adjust the campaign.
0183
 1       Q     Okay.  Keep going.
 2       A     Page 58 at the top.
 3       Q     Yeah.  Which?
 4       A     And (e) and (f).
 5       Q     Exhibit 57, you want to talk about?
 6       A     Um-hmm.
 7           MR. ROBINSON:  You mean page?  Oh, --
 8           THE WITNESS:  Page 58.  There are other
 9   exhibits that have comparable -- there is a pattern
10   across multiple different studies, multiple different
11   exhibits.  I just put in representative ones.
12   BY MR. GOLDMAN:
13       Q     Tell me what other studies in your report that
14   you want to talk about.
15       A     So everything on Page 58.
16       Q     Okay.
17       A     Page 59 is another.  It says, Copy Test of
18   Physicians is on Page 59.
19       Q     Okay.
20       A     And Page 60 at the top.  And then, I believe,
21   the research picks up again on 63.  That is the Consumer
22   Copy Test Research.  64, that is the Consumer Copy Test.
```

```
                            Ex 1 - 5-26-06 depo transcript
23   65, Consumer Copy Test.
24              These reports are 100-pages long and I know for
25   a fact a jury cannot understand them because we had to
0184
 1   present this type of thing to the government officials
 2   and they didn't understand.
 3        Q    I did not ask you about whether the jury can
 4   understand.  I want to know which studies you would like
 5   to talk about that are in this report.
 6        A    And Page 66.
 7        Q    Which one on 66?
 8        A    Well, there are different copy tests.  So it is
 9   on the top of Page 66.
10        Q    Which is Exhibit 67?
11        A    Yes.  And then on Page 66 at the bottom, that
12   is the same study, again, but more details on it.  So it
13   picks up again.  66, 67, 68.
14        Q    Through -- before 39; right?
15        A    Yeah.
16        Q    Paragraph 39; right?
17        A    Yes.
18        Q    What about after Paragraph 39, what research
19   studies?
20        A    39(a).
21        Q    Where is the research study there?
22        A    Well, that was a progression -- I mean, a trend
23   analysis.
24        Q    Is that a research study?
25        A    Oh, yeah.  There is a whole class that is
0185
 1   taught on that.
 2        Q    This is a Profit Plan?
 3        A    No, no.  There is a forecast in there.  It is a
 4   research based --
 5        Q    Is it a Profit Plan, ma'am, that you are
 6   quoting from?
 7        A    The document is called Profit Plan, but it
 8   reports research, yes.
 9        Q    What else do you want to talk to the jury about
10   concerning research?
11        A    56, at the top, it is another forecast.  I
12   mean, 69.
13        Q    This is another financial forecast you want to
14   talk about?
15        A    Right.  Well, it is a progression.  It is a
16   sales -- it is a progression.  It is not a financial --
17   well, it is a -- it forecast sales.  So if you think
18   sales is financial, that is okay.  We consider that
19   marketing -- a marketing forecast.
20        Q    What other research studies in your report?
21        A    So (c), that is another --
22        Q    Profit Plan?
23        A    It is a --
24        Q    It is a Merck document --
25        A    It is a forecasting model.
0186
 1        Q    -- called a Profit Plan?
 2        A    I don't think that is -- Oh, yes, it is.  It
 3   says, Profit Plan -- "Profit Plan 2002."  It is.
 4             It has forecasts in them.  That is research.
 5        Q    You want to talk about Profit Plans as
 6   research.
 7             What is the next type of research that you
```

```
                                   Ex 1 - 5-26-06 depo transcript
 8  would like to talk about to the jury?
 9         MR. SKIKOS:  No, that misstates what she said.
10         THE WITNESS:  It is.  No.  There is research
11  that is reported in the plan.
12         MR. O'CALLAHAN:  She did not name the document.
13  It says what it says and the information in there is
14  what it is, and it is exactly as she described it.
15  BY MR. GOLDMAN:
16      Q    I would like to know what other research
17  reports that you would like to talk to the jury about.
18      A    Well, like I said, I would like to talk to them
19  about the research showing their sales, which is 69 and
20  70.  Giving them a context to understand that.
21      Q    Okay.
22      A    And that's it.
23      Q    Okay.
24      A    It is about half of the boxes of documents,
25  that are about research.
0187
 1      Q    Are you familiar with the procedure that Merck
 2  followed before approving an advertisement for use on
 3  Vioxx?
 4      A    Yes.
 5      Q    What procedure did Merck follow?
 6      A    Well, I read the document that described it and
 7  I read the FDA documents.  And so they had to submit it
 8  to the FDA.  The FDA did not approve the ad, but they
 9  had to, basically, file it with the FDA, with DDMAC.
10      Q    What did Merck do internally to approve
11  advertisements or other promotional material that were
12  used for Vioxx?
13      A    They had an office that looked it over.  I
14  can't remember the name of the office, but there was an
15  internal office that looked it over before it went to
16  FDA.
17      Q    Do you know what the procedure that Merck
18  followed internally to make sure that its promotional
19  pieces were fairly balanced and accurate?
20      A    Yes, I read a document that described it.
21      Q    Tell me what the process was.
22      A    The people -- there was a key -- a list of
23  different types of materials.  And there were -- they
24  all had to be submitted to this office for review.
25         And then that office would forward some of it
0188
 1  onto the FDA.  And that nothing could be used until it
 2  was approved by that office.
 3      Q    Do you know if Merck sent direct-to-consumer
 4  advertising to the FDA in advance of using their ads?
 5      A    Yes, they did and I know they did.
 6      Q    You mentioned that you met with and/or
 7  interviewed a former sales representative.
 8         Who was that?
 9      A    I don't remember her name.  She was a friend of
10  Shannon's and I just wanted to speak to someone to get,
11  you know, a human -- a human's validation of everything
12  I was seeing.
13      Q    What did this person, whose name you don't
14  remember, tell you?
15      A    Well, she described her typical day as a sales
16  rep and -- and then I -- let's see, I asked her some
17  specific questions about Vioxx.  Did she know that it
18  posed a cardiovascular risk?  Did she tell the doctors?
```

Ex 1 - 5-26-06 depo transcript

```
19             And she said, no, that they believed -- she
20  believed the Naproxen hypothesis. And then I showed her
21  some of the materials that I had reviewed and confirmed
22  that she would use those materials.
23             I asked her about the confidence -- Efficacy
24  Confidence Program because it was a huge success. And
25  that is when she left the company and so she didn't know
0189
1   about that one.
2        Q    When did she leave the company?
3        A    Right before the Efficacy Confidence. I
4   believe it was August of '02 -- August '02.
5        Q    What else did you discuss with this former
6   sales representative?
7        A    What she knew about the FDA regulations or
8   Merck's own regulations regarding advertising.
9        Q    Anything else?
10       A    What were the challenges to her in selling
11  Vioxx.
12       Q    What did she say about that?
13       A    She said they were concerned about the bad
14  press. The salespeople were concerned about the bad
15  press.
16            And that is, of course, apparent in the Be The
17  Power videotape that they created and the Efficacy
18  Confidence Program. And so the salespeople were getting
19  a little discouraged because they felt they were getting
20  unfair bad press.
21       Q    You are talking about the one sales rep?
22       A    That's correct, but the documents state that in
23  general, the sales reps were -- needed boosting up.
24  They were a little discouraged.
25       Q    What else did you discuss with this sales
0190
1   representative whose name you can't remember?
2        A    Those are the main things that I remember
3   discussing.
4        Q    When did you meet with her or him?
5        A    It is a her. And it was a Friday morning.
6        Q    For how long?
7        A    For maybe four hours.
8        Q    Who else was there?
9        A    Maybe my daughter was in the back room for part
10  of the time with the nanny.
11            MR. ROBINSON:   Your four-year-old daughter?
12            THE WITNESS:    Um-hmm.
13  BY MR. GOLDMAN:
14       Q    This was at your house?
15       A    Yes, she came to my house. She lives by me.
16       Q    Did this former salesperson ever call on
17  Dr. Micola or Dr. McCaffrey?
18       A    No, she called around here.
19       Q    Which is in California?
20       A    Los Angeles is her territory. Yeah, South Bay.
21  Los Angeles County, not L.A. city.
22       Q    You don't know what doctors this person called
23  on; do you, ma'am?
24       A    No.
25       Q    How is the interview with the one sales
0191
1   representative relevant to your opinions here today?
2        A    They just helped me to validate what I was
3   seeing. There was nothing that she said that surprised
```

Page 79

```
                        Ex 1 - 5-26-06 depo transcript
 4    me.
 5              That is what we learn in doing research. You
 6    want to triangulate, use multiple sources of
 7    information. So you can feel that you are confident
 8    that you've got the story right.
 9         Q    So this sales rep validated what you have seen.
10    What does that mean?
11         A    Well, in terms of what the message was -- I
12    mean, we have several other documents that say what the
13    messages was. We have several of the documents that say
14    how ads were approved, both within Merck and going to
15    the FDA.
16              We have several other documents that say how
17    they used the promotional materials, how they
18    approached, how often they approached doctors; how they
19    worked in teams; and all of that.
20              And you know, so she just confirmed what I was
21    seeing.
22         Q    Did you think it might be a good idea to talk
23    to more than one sales representative?
24         A    If there had been discrepancies between what
25    she said and what I saw, then I would have had to do
0192
 1    something.
 2         Q    So you think meeting with one sales
 3    representative is sufficient validation of your
 4    findings?
 5         A    No, she didn't validate any of the research
 6    findings.
 7         Q    You said she validated what you saw?
 8         A    She validated certain parts of the story -- a
 9    very, very, small part. I mean, I didn't discuss any of
10    the research with her.
11              I'm sure the sales reps didn't see the research
12    and would not understand the research. So mostly I --
13    she validated what -- how these promotion materials were
14    used, the CV card and so forth.
15              And she validated what Kaghe said, who is in
16    Southern California, that they did not tell the doctors
17    about the heart attack risk because they didn't think
18    there was one; and they told them the Naproxen
19    hypothesis.
20         Q    Did you think that you might want to speak to
21    more than one sales representative to validate what you
22    had seen in the documents that the plaintiffs' lawyers
23    gave you?
24         A    No, because I had the documents months for
25    years and it did not validate itself. I was not
0193
 1    actually talking to her to validate the research. It
 2    was just to validate what the experience was of the
 3    sales rep.
 4         Q    On Page 6, Paragraph 14, you refer to having
 5    expertise in pharmaceutical marketing matrix.
 6              What does that mean?
 7         A    Well, okay, I list them: Patient volume, total
 8    patients, new-to-market patients, reinitiated patients,
 9    which volume. These are all terms of art that are very
10    related to any other type of marketing.
11              It says, "patient" instead of "consumer," you
12    know. So I was familiar with the general terms and the
13    general constructs; but I learned how they are worded,
14    what the correct term is in pharmaceutical marketing.
```

```
                             Ex 1 - 5-26-06 depo transcript
15      Q    You learned that as part of your role as an
16 expert in this case?
17      A    Yes. Some of the words, I knew, and some of
18 them, I learned. But you become --
19      Q    So you became an expert in pharmaceutical
20 marketing matrix during your work in this case?
21      A    Well, no. I knew the matrix before. All I
22 learned was how the acronyms for what they are called in
23 the pharmaceutical marketing, so -- you know --
24      Q    What --
25      A    -- TRX, ANRX, those things.
0194
 1      Q    What experience do you have that makes you an
 2 expert in pharmaceutical marketing matrix?
 3      A    I am an expert in marketing matrix.
 4 Pharmaceutical marketing is the same matrix as any other
 5 marketing, so --
 6      Q    So you are not an expert in pharmaceutical
 7 marketing matrix, you are an expert in marketing matrix?
 8           MR. SKIKOS: Objection.
 9           THE WITNESS: Including pharmaceutical
10 marketing matrix. I don't agree with your assessment of
11 my expertise.
12           I am an expert in pharmaceutical marketing
13 matrix and the marketing matrix used in other
14 industries. It is the same matrix.
15 BY MR. GOLDMAN:
16      Q    Have you written any articles, done any
17 research involving pharmaceutical marketing matrix?
18      A    I have not published any research that
19 discusses pharmaceutical marketing matrix to date.
20      Q    Have you written any articles anywhere on
21 pharmaceutical marketing matrix, Dr. Pechmann?
22      A    Have I written any articles? No.
23      Q    Is there a particular place in your report
24 where you apply these pharmaceutical marketing matrix?
25      A    Yes. Those matrixes were primarily used to
0195
 1 understand the behavioral tracking data. Although --
 2 and also, the data that is the tracking of the sales rep
 3 messages. So in both -- those two types of studies.
 4           Oh, and also, the Attribute Tracking Study had
 5 to do with efficacy and safety perceptions and gaps and
 6 all of that. So three of the studies use those matrix.
 7           Like I said, I am familiar with the matrix
 8 before. They just have a -- they have a spin on them
 9 for -- I mean, a certain label in pharmaceutical is
10 slightly different than what you would use in another
11 industry, but the matrixes are the same.
12      Q    You say that you want to help the jury
13 understand testimony in the case; is that right?
14      A    Well, to understand the research and --
15      Q    What testimony do you want the jurors to --
16 withdrawn.
17           Is there a particular testimony that you are
18 saying that is going to come into evidence in the trial
19 that you need to explain to the jury?
20           MR. SKIKOS: Huh? Objection.
21           MR. O'CALLAHAN: Objection.
22           THE WITNESS: Am I supposed to answer the
23 question?
24 BY MR. GOLDMAN:
25      Q    Do you understand?
```

```
                           Ex 1 - 5-26-06 depo transcript
0196
 1      A      I don't understand that question.
 2      Q      I didn't understand the statement that you made
 3   in here about testimony. Maybe I can find it.
 4             Okay. Let's talk about Dr. McCaffrey. You
 5   said that he was mislead by Merck's marketing campaign;
 6   right?
 7      A      Yes.
 8      Q      And your basis for that is based on your
 9   skimming of his deposition; correct?
10      A      No.
11             MR. SKIKOS:  Objection.
12   BY MR. GOLDMAN:
13      Q      Did you ever talk with Dr. McCaffrey?
14      A      No, I did not.
15      Q      Did you ever read his deposition carefully?
16      A      Parts of it, I read very carefully and I read
17   all of it.
18      Q      You didn't skim the deposition?
19      A      No.  Actually, not with these guys.  I read
20   through --
21      Q      Did you take notes on Dr. McCaffrey's
22   deposition?
23      A      No, I don't believe I did.
24      Q      Did you highlight anything in Dr. McCaffrey's
25   deposition?
0197
 1      A      No, I watched -- saw it on a computer screen.
 2      Q      What do you mean, you saw it on a computer
 3   screen?
 4      A      I pulled it up on a computer screen.
 5      Q      What did Dr. McCaffrey know about the potential
 6   cardiovascular risks of Vioxx?
 7      A      He testified that he didn't know.
 8      Q      Is that --
 9      A      I'm sorry.  I will tell you exactly what he
10   testified to.  It's very interesting.
11             So in Exhibit 5, he was asked, "During
12             The two years you prescribed Vioxx
13             for Dr. Barnett, were you ever given
14             a warning by Merck that Vioxx caused
15             heart attacks?"
16             And he said, "No, sir."
17             And he went into quite a bit of detail -- at
18   least two points in his depo about how -- as to when the
19   label was changed and Vigor was put on the label, he and
20   the rep sat down.
21             And the rep said, I don't know how to make
22   heads or tails out of this.
23             And he said, I didn't see any evidence that
24   Vioxx was causing heart attacks.
25      Q      Do you think that the jury is capable of
0198
 1   understanding that testimony without your help?
 2             MR. SKIKOS:  Objection.
 3             THE WITNESS:  What I want to talk about is the
 4   research that puts this in the context.  I don't think
 5   they understand.
 6   BY MR. GOLDMAN:
 7      Q      My question is do you think that the jury can
 8   understand the testimony by Dr. McCaffrey without your
 9   help?
10             MR. ROBINSON:  You mean just the testimony
```

Ex 1 - 5-26-06 depo transcript

```
11  itself?
12           MR. GOLDMAN:  Yes.
13           THE WITNESS:  No, I don't think they can really
14  understand it unless they have a context of
15  understanding the whole integrated marketing
16  communications campaign and what the research was
17  showing and what --
18  BY MR. GOLDMAN:
19      Q    Okay.  Sorry?
20      A    Yeah.  And so I think other -- I think this is
21  the crux of why it is misleading is because this was
22  happening across the country.
23           And it was because that was the goal of their
24  campaign to neutralize the heart attack risks, and they
25  did extensive research to make sure that this was
0199
 1  happening.  And they adjusted things when it looked like
 2  things weren't going right.
 3           So I don't think they would understand this
 4  testimony unless they understood the research --
 5      Q    Do you think --
 6      A    -- as it relates to the testimony.
 7      Q    You think that you need to come to trial to
 8  help the jury understand as to what Dr. McCaffrey had
 9  testified about as to his knowledge of the
10  cardiovascular risks of Vioxx?
11      A    No.  I think that they can understand his words
12  and what he is saying, yes, I think they will understand
13  that.
14      Q    Okay.  Do you have any idea what the sales
15  representative who called on Dr. McCaffrey said to him
16  about Vioxx and any cardiovascular risks?
17      A    Yes, there is research on that.
18      Q    There is research on what the sales
19  representative told Dr. McCaffrey?
20      A    Yes, we have the call notes.
21      Q    The call notes?
22      A    Right.
23      Q    Okay.  Let's look at the call notes.
24           MR. ROBINSON:  Can she get a copy of it or do
25  we have a copy?
0200
 1           THE WITNESS:  It should be Exhibit 7.
 2  BY MR. GOLDMAN:
 3      Q    In your binder?
 4      A    Yes.
 5      Q    Let's look in your binder, Exhibit 7.
 6      A    And they were also notes indicating how many
 7  meetings they had had, which I don't think I have in
 8  here, but there was every single meeting he had.
 9      Q    Let's talk about one that you mention in your
10  report.
11           MR. ROBINSON:  She said 7.  Let's go to 7.
12           THE WITNESS:  Yeah, Exhibit 7.
13  BY MR. GOLDMAN:
14      Q    And Exhibit 7 in your binder --
15      A    Yes.
16      Q    -- you point out that on September 14 of 1999,
17  there is an indication that Sherry Elder, who is a
18  representative, wrote a note that said, three S's of
19  Vioxx; is that what you are talking about?
20      A    Yes.
21      Q    What did Sherry Elder tell Dr. McCaffrey on
```

```
                          Ex 1 - 5-26-06 depo transcript
22   that date about the three S's, ma'am?
23            MR. SKIKOS:  Objection.
24            MR. ROBINSON:  Go ahead.
25            THE WITNESS:  Well, I am saying that she said
0201
 1   she discussed the three S's.  So that means strength,
 2   safety and QD simplicity.  So she discussed safety at
 3   that meeting.
 4   BY MR. GOLDMAN:
 5       Q    What about safety did Ms. Elder say to
 6   Dr. McCaffrey?
 7       A    I don't know for certain, but I know what the
 8   research says that in general was happening.
 9       Q    You don't know what any particular sales
10   representative said to Dr. McCaffrey; do you, ma'am?
11       A    I know what they are instructed to tell
12   McCaffrey.
13       Q    What were they instructed to tell
14   Dr. McCaffrey?
15       A    They were given detailed instructions on what
16   to stay.  That was part of the integrated marketing
17   campaign.  So they had detailing pieces.
18       Q    What did -- withdrawn.
19            You don't know, Dr. Pechmann, what the sales
20   representatives of South Carolina said to Dr. McCaffrey
21   or to Dr. Micola; do you, ma'am, about Vioxx or its
22   cardio -- withdrawn.
23       A    I have research that it --
24       Q    You don't know what the sales representatives
25   of South Carolina said to Drs. Micola or McCaffrey about
0202
 1   the cardiovascular risks associated with Vioxx; do you,
 2   ma'am?
 3       A    Yes, he testified.
 4       Q    Other than the testimony you read, you don't
 5   have any other knowledge about what the sales
 6   representatives said to Dr. Micola and Dr. McCaffrey
 7   about the cardiovascular risk associated with Vioxx?
 8       A    Yes, I do.
 9       Q    What sales representatives have you spoken with
10   from South Carolina?
11       A    I am saying in order to understand what the
12   sales reps were saying to the physicians, Merck spent
13   hundreds of millions of dollars.
14            And based on that research, we have a
15   statistical understanding or prediction of what they
16   were hearing.
17       Q    What --
18       A    So I do have a statistical basis for predicting
19   what they were told.
20       Q    What did Ms. Elder tell Dr. McCaffrey on
21   September 4th of 2002?
22            MR. SKIKOS:  He is asking if you were in the
23   room.
24            THE WITNESS:  No.  I know the general topics
25   they discussed and I know what they were told
0203
 1   specifically to say on each topic.
 2            But as to how the exact statistic applies in
 3   this case, I cannot state what happened in that one
 4   instance, but I can give you statistics about it.
 5   BY MR. GOLDMAN:
 6       Q    Try to answer my question yes or no.  Without
```

Case 2:05-md-01657-EEF-DEK   Document 6392-3   Filed 08/21/06   Page 17 of 20

```
                           Ex 1 - 5-26-06 depo transcript
 7    talking about statistics.
 8            MR. ROBINSON:  Objection.
 9            You don't have to answer yes or no.  You just
10    answer his question.
11    BY MR. GOLDMAN:
12       Q    Dr. Pechmann, do you know what the sales
13    representatives of South Carolina told Dr. McCaffrey and
14    Dr. Micola about the cardiovascular risk associated with
15    Vioxx?
16       A    Yes, I have a statistical prediction of what
17    they were told.
18       Q    Did you speak to any sales representative in
19    South Carolina?
20       A    I don't believe so.
21       Q    Did you ever read any depositions of any sales
22    representatives in South Carolina?
23       A    I didn't read the depositions.  No.
24       Q    Did you ever speak to Dr. Micola and
25    Dr. McCaffrey about what the sales representatives
0204
 1    telling them about cardiovascular risks associated with
 2    Vioxx?
 3       A    No, I read it in their depositions.
 4            THE WITNESS:  I have to take a break.
 5            (Brief recess.)
 6    BY MR. GOLDMAN:
 7       Q    Do you know, Dr. Pechmann, what promotional
 8    pieces or advertisements Dr. Micola and Dr. McCaffrey
 9    actually saw?
10       A    I know what promotional pieces the sales reps
11    were instructed to show them and I know when there was
12    enough -- because they actually had a meeting and they
13    recorded it.  And so I have a pretty good idea of what
14    they say, but I would not know with certainty.
15       Q    You don't know, Dr. Pechmann, what the sales
16    representatives actually showed Dr. Micola and
17    Dr. McCaffrey; do you, ma'am?
18       A    Yes, I do.
19       Q    How do you know what promotional pieces sales
20    representatives actually showed those doctors?
21       A    Because there was one that they were required
22    to show.
23       Q    How do you know they showed it?
24       A    I mean, he might not have seen it, but they
25    showed it to him because that is what they were required
0205
 1    to do.  And they used for several months.  So there is
 2    no way they would not have shown it to them.
 3       Q    Are you talking about the CV card?
 4       A    No.  The core promotional pieces.
 5       Q    Were you ever with the sales representatives
 6    and the doctors when they had their discussions?
 7       A    No, I was not.
 8       Q    You don't know, ma'am, what sales promotional
 9    pieces or advertisements Dr. Micola and Dr. McCaffrey
10    actually saw; true?
11       A    I know what they were shown by the sales reps.
12       Q    Did you talk to the sales reps to see what they
13    actually showed Dr. Micola and Dr. McCaffrey?
14       A    They were given one piece.  They had to show
15    that to the doctor.  That was their job.
16       Q    Did you talk to any sales representatives to
17    see what they showed Dr. Micola and Dr. McCaffrey?
```

```
                          Ex 1 - 5-26-06 depo transcript
18      A    No.
19      Q    You don't know what the sales representatives
20 actually showed Dr. Micola and Dr. McCaffrey; true?
21      A    False.  They have -- the sales reps were
22 scripted and they were required to show a certain
23 brochure.  It is the core piece.  I don't know what else
24 they showed, but I do know they showed that core piece.
25      Q    Do you know that sales representatives were
0206
 1 instructed to discuss the label change in April of 2002
 2 with doctors?
 3      A    Yes, I saw the bulletin.
 4      Q    Did the sales representatives in South Carolina
 5 talk to Dr. Micola and Dr. McCaffrey about the changes
 6 to the April, 2002 label?
 7      A    We just saw that Micola -- I'm sorry.
 8           McCaffrey did discuss the change with the sales
 9 rep.
10      Q    Ma'am, I understand that --
11      A    So that -- so that was testimony.  So, yes, I
12 know that they discussed it.
13      Q    I understand that you have read training
14 materials and you have interpreted Merck's documents,
15 and you believe you know what the sales representatives
16 were instructed to do.  Okay.  I know that.
17      A    Okay.
18           MR. ROBINSON:  But she did say she read the
19 deposes of Micola and McCaffrey.
20 BY MR. GOLDMAN:
21      Q    You do not know what materials the sales reps
22 actually showed Dr. Micola and Dr. McCaffrey; true?
23      A    With virtual certainty -- I don't know a
24 hundred percent, but with a very, very high probability,
25 I know.
0207
 1           I don't know what ads they saw, but I know what
 2 brochure that they showed.  They were required to show
 3 that.  It -- they can't get away with not showing that.
 4           That is their job.  That is their one thing
 5 they had to do, and they had that one brochure for
 6 several months.
 7      Q    Dr. Pechmann, you do not know what the sales
 8 representatives actually showed Dr. Micola and
 9 Dr. McCaffrey concerning the cardiovascular risks
10 associated with Vioxx; do you, ma'am?
11      A    Oh, concerning the cardiovascular risks?
12      Q    Yes.
13      A    Oh, you reworded the question.
14           Not with certainty.  I just have a statistical
15 probability.  A statistical estimate based on the
16 research that they conducted for the very reason to
17 answer that question.  That is why they did the research
18 to answer that question.
19      Q    Ma'am, you are really not answering my
20 question.  My question really calls for a yes or no.
21      A    I am a scientist.  No, that is not how
22 scientists --
23      Q    Can you answer it yes or no?
24      A    No.  I said I know the statistical estimate
25 whether they saw -- what they said to them.  I have a
0208
 1 statistical estimate.
 2      Q    See, if you can answer this question yes or no
```

```
                         Ex 1 - 5-26-06 depo transcript
 3    and then we can talk about your statistical estimate.
 4    Okay?
 5              Do you know what materials the sales
 6    representatives showed Dr. Micola and Dr. McCaffrey?
 7        A    With virtual certainty, yes.
 8        Q    How do you know with virtual certainty what the
 9    sales representatives showed those doctors when you
10    never talked to the sales representatives?
11        A    Because they only had one core marketing
12    brochure. That is their job. They have to. There are
13    other reps coming into the office. If they didn't show
14    that material, they would be fired. I mean --
15        Q    How do you know?
16        A    How do I know?
17        Q    How many sales representatives got fired from
18    Merck because they didn't show certain materials?
19        A    In there -- you see, the three S's. There is a
20    brochure that goes with that. So the person recorded --
21    I showed them that -- the core thing, the three S's
22    because I have the call notes --
23        Q    Dr. Pechmann --
24        A    -- and I know what brochure was being used, and
25    the person is saying, I did the three S's -- I guess,
0209
 1    the person could be lying.
 2              So there is a slight chance.
 3        Q    Dr. Pechmann --
 4        A    That is why I am saying, I am not 100 percent
 5    sure, but I am virtually sure.
 6        Q    I am going to ask you one more time and see if
 7    you can answer this one yes or no.
 8              Do you know what materials the sales
 9    representatives in South Carolina showed Dr. Micola and
10    Dr. McCaffrey?
11              MR. ROBINSON: Objection. Asked and answered
12    about three times.
13              THE WITNESS: I know.
14    BY MR. GOLDMAN:
15        Q    Can you answer it yes or no?
16        A    I don't have a different answer than what I
17    said.
18        Q    So you think you know?
19        A    Yes, with virtually --
20        Q    Without speaking to Dr. Micola and
21    Dr. McCaffrey; right?
22              MR. ROBINSON: Same objections. Repeated.
23    Repeated.
24              THE WITNESS: Merck monitored these people.
25
0210
 1    BY MR. GOLDMAN:
 2        Q    What is your statistical estimate of the
 3    chances that the Merck representatives used this
 4    brochure with Dr. Micola and Dr. McCaffrey?
 5        A    Oh, the statistical -- they used the brochure?
 6        Q    Yes.
 7        A    It is virtually 100 percent.
 8        Q    Where is your support for that?
 9        A    Because the sale reps had one promotional
10    brochure. The main core -- I cannot tell you what else
11    they showed, but the whole point of their job was to
12    show the core brochure.
13        Q    So your statistical estimate --
```

Page 87

```
                         Ex 1 - 5-26-06 depo transcript
14        A    And their call notes indicate that they did
15   three times.
16        Q    Your statistical estimate is based on
17   instructions that were given to sales representatives?
18        A    No. No. My statistical estimate was whether
19   they talked to them about -- told them there was no M.I.
20   risk. That is what I have a --
21        Q    I didn't ask you about that. You are talking
22   about statistical estimates.
23        A    Yeah. Well, you did, I believe, ask that
24   question because that is what I was answering in
25   response to -- in response to: Did they see a
0211
 1   particular brochure? The core brochure, I said virtual
 2   certainty.
 3        Q    Do you plan to come to trial and tell the jury
 4   what you think that Dr. Micola and Dr. McCaffrey were
 5   shown by sales representatives?
 6        A    No, I am going to use the call notes and the
 7   instructions and say the call notes indicated they
 8   showed this brochure, which they are required to do, and
 9   this is the brochure they saw.
10        Q    You point out a few different times that
11   Dr. Micola was called on 374 times and there were a
12   number of samples left?
13             MR. ROBINSON:  That was McCaffrey.
14   BY MR. GOLDMAN:
15        Q    You point out a few times in your report the
16   number of times that sales representatives visited the
17   doctors in the Barnett case.
18             Do you know that, ma'am?
19        A    Yes, I counted those numbers.
20        Q    Do you think the jury can count those numbers,
21   too?
22        A    Well, I don't think they could -- well, they
23   would count, but they could, I guess, if you want to
24   spend the time.
25        Q    The jury does not need you to add up the number
0212
 1   of call visits that the sales representatives made on
 2   Dr. Micola and Dr. McCaffrey; do they, ma'am?
 3        A    I'm sorry. What was the question?
 4        Q    The jury does not need you to add up the number
 5   of call visits that the sales representatives made on
 6   Dr. Micola and Dr. McCaffrey; do they?
 7             MR. SKIKOS:  Objection.
 8             THE WITNESS:  They need someone to count it up.
 9   BY MR. GOLDMAN:
10        Q    Do they need you to do that?
11        A    No. Someone else could do it I can explain the
12   context, what it means.
13        Q    What do the 374 call visits mean?
14        A    That they saw him a lot.
15        Q    What number of times out of the 374 visits did
16   Dr. McCaffrey did they actually speak with
17   Dr. McCaffrey?
18        A    Those are what the call notes tell us. So,
19   roughly, once a -- what did I say? once every week.
20             MR. SKIKOS:  No. That was --
21             THE WITNESS:  No. That is what McCaffrey said.
22             Most reps have to see me every week, but in
23   terms of the call notes, it was about once a month, I
24   believe. I had this in here somewhere. Yeah, I believe
```

Page 88