```
                      Ex 1 - 5-26-06 depo transcript
25  it was once a month.
0213
 1  BY MR. GOLDMAN:
 2      Q    You believe that the sales representatives
 3  actually spoke with Dr. McCaffrey once a month?
 4          MR. ROBINSON:  No, I am going to object.  She
 5  said there were contacts once a week.
 6          MR. GOLDMAN:  Just object.  Don't insert the
 7  testimony, Mr. Robinson.
 8          THE WITNESS:  I'm sorry.  What was the
 9  question?
10  BY MR. GOLDMAN:
11      Q    The question was how many visits out of the 374
12  with Dr. McCaffrey, do you believe the sales
13  representatives actually spoke with Dr. McCaffrey?
14      A    Well, according to the call notes, when they
15  had lengthy discussions, it was about once a month; but
16  when they were brief discussions, it was much more
17  frequently than that.
18      Q    Do you know what the sales representatives told
19  Dr. McCaffrey in their brief discussions?
20      A    No.  No, not specifically.
21      Q    Do you know --
22      A    I have a statistical estimate as to what they
23  likely said based on the research that Merck did.
24      Q    Do you know what, if any, significance
25  Dr. McCaffrey -- strike that.
0214
 1          Do you know whether Dr. McCaffrey considered
 2  what he was told about the sales representatives in his
 3  decision to prescribe Vioxx?
 4          MR. SKIKOS:  Asked and answered.
 5          THE WITNESS:  I'm sorry.  State the question
 6  again.
 7  BY MR. GOLDMAN:
 8      Q    Do you know whether Dr. McCaffrey took into
 9  account what sales representatives told him when he
10  decided to prescribe Vioxx?
11      A    Yes.
12      Q    What is that based on?
13      A    Well, he, Dr. McCaffrey, states that he talked
14  to the sales representative about the label.  So it is
15  clear that he is getting advice from the sales rep and
16  he is listening to the sales rep.
17      Q    Is it your opinion about what Dr. McCaffrey
18  considered based on his discussions with the sales reps
19  when he prescribed Vioxx based on your interpretation of
20  Dr. McCaffrey's deposition testimony?
21      A    I don't know what the question was.  I'm sorry.
22      Q    As I understand your testimony, Dr. Pechmann,
23  you believe that Dr. McCaffrey relied on information
24  that he received from sales representatives when he
25  decided to prescribe Vioxx to Mr. Barnett; is that your
0215
 1  testimony?
 2      A    When he decided to -- well, he wouldn't even
 3  know that Vioxx existed if the sales rep didn't tell him
 4  about it.
 5      Q    Why not?  Don't doctors hear about medicine
 6  from other people other than sales reps?
 7      A    Not exactly at the time that it's available.
 8      Q    I don't understand.
 9      A    I mean, he clearly had talked to sales reps
```

Ex 1 - 5-26-06 depo transcript

```
10    about Vioxx and has relied on information from the sales
11    reps because he said he was trying to get the sales reps
12    to explain the label to him.
13         Q    Is your opinion that what Dr. McCaffrey and
14    what Dr. Micola considered -- withdrawn.
15         Let me ask you this way:  You believe that Drs.
16    Micola and McCaffrey used information that they obtained
17    from sales representatives in their decision to
18    prescribe Vioxx; is that your testimony?
19         A    Yes. Yes.
20         Q    And your opinion is based on your review of
21    Dr. Micola and Dr. McCaffrey's testimony; true?
22         A    And the research that I have seen.
23         Q    The question about whether Dr. Micola and
24    Dr. McCaffrey specifically relied on information about
25    the risks of Vioxx that they learned from sales
0216
1     representatives, my question to you is --
2          A    They said they didn't know. They were never
3     told of the heart attack risks, and they said they
4     wouldn't have prescribed it had they known it was a
5     relevant fact.
6          Q    Actually, that is not what they say.
7          A    I'm sorry. They would have appreciated
8     knowing. So if they had appreciated knowing, they
9     indicated that they thought it was relevant.
10         So the ultimate decision is unclear, but they
11    said it would have influenced their decision making
12    about it because McCaffrey said he wanted to know about
13    it.
14         Q    I am going to ask this one more time.
15         Is your opinion about what Dr. Micola and Dr.
16    McCaffrey relied on in terms of their conversations with
17    sales representatives and their decision to prescribe
18    Vioxx based on your review of the deposition testimony
19    of those witnesses?
20         MR. ROBINSON:  Asked and answered. She said
21    that and the research.
22         THE WITNESS:  The research and the call notes
23    and the instructions to the sales reps. The whole
24    picture not just the depositions, no.
25    BY MR. GOLDMAN:
0217
1          Q    If Dr. Micola testified that he makes his
2     prescribing decisions based on medical articles and not
3     based on what sales representatives tell him, you agree,
4     that you have no reason to dispute that?
5          A    They are one and the same thing. The sales
6     representatives gave out the articles.
7          Q    Do you understand my question?
8          A    No, I didn't understand your question because
9     you said there was a difference between what the sales
10    reps gave them and the article.
11         Q    Dr. Pechmann, do you have any reason to dispute
12    Dr. Micola's testimony that he said that he does not
13    rely on information that a sales rep tells him about
14    safety and instead he relies on medical journals
15    published in the medical community?
16         MR. SKIKOS:  Objection.
17         THE WITNESS:  They gave him the article.
18    BY MR. GOLDMAN:
19         Q    Can you answer my question? Do you dispute his
20    testimony; yes or no?
```

Page 90

Ex 1 - 5-26-06 depo transcript

21   A   Yes.  And there is extensive research that
22  shows that people don't have a thorough understanding of
23  how they make decisions and how they underestimate the
24  influence of marketing on that.
25   Q   So you are going to come tell the jury that
0218
1  Dr. Micola doesn't know why he made decisions about
2  prescribing Vioxx?
3
4       MR. SKIKOS:  Objection.
5       THE WITNESS:  No.  I am going to tell them the
6  research.
7  BY MR. GOLDMAN:
8   Q   You added on to my question before.  So I am
9  going to ask again and see if you can answer this yes or
10  no.
11       Do you dispute Dr. Micola's testimony about
12  what he relies on in deciding to prescribe medicine like
13  Vioxx; yes or no?
14   A   His testimony is conflicting about whether he
15  does or does not rely on the sales reps.
16   Q   Do you believe --
17   A   And he said at least at one point, that he
18  relies on the sales reps and I believe that testimony
19  where he said he relies on the sales rep.
20   Q   You don't believe the testimony where he says
21  he didn't rely on the sales rep?
22   A   Correct.
23   Q   And do you think that you are in a better
24  position to assess credibility of Dr. Micola on whether
25  or not he relied on sales representatives in making
0219
1  treatment decisions than a jury?
2   A   It's the whole reason that this research was
3  done was to understand what the doctors are doing
4  without asking them directly because they don't know.
5   Q   Do you believe that?
6   A   They don't necessarily know.  So, yes, I think
7  I am an expert on his behavior.  And I know things about
8  his behavior that he may not know about because I looked
9  at the research very carefully.
10   Q   Do you believe that you are in a better
11  position to assess Dr. Micola's credibility concerning
12  whether he relied on sales representatives or not than
13  the jury is?
14       MR. ROBINSON:  Objection.  Credibility?
15       THE WITNESS:  I am not addressing his
16  credibility.
17  BY MR. GOLDMAN:
18   Q   How about the accuracy of his testimony?
19   A   He has conflicting testimony.  Obviously,
20  something is wrong.  He has conflicting testimony.
21   Q   Was Dr. Micola aware of the April, 2002 label
22  change containing the Vigor data?
23   A   Yes.  I mean, at some point, he was familiar
24  with the Vigor Study.
25   Q   Do you know what advertisements Dr. Micola and
0220
1  Dr. McCaffrey saw concerning Vioxx or what role they
2  played in their decision to prescribe Vioxx to Mr.
3  Barnett?
4
5       MR. ROBINSON:  Do you want to go to your

Page 91

                                Ex 1 - 5-26-06 depo transcript
     6    reporter?
     7    BY MR. GOLDMAN:
     8        Q    No.  Answer the question.
     9             MR. ROBINSON:  She can see her report if she
    10    wants to.
    11    BY MR. GOLDMAN:
    12        Q    Do you know what advertisements Dr. Micola and
    13    Dr. McCaffrey saw concerning Vioxx, ma'am?
    14             MR. ROBINSON:  Objection.  Compound.  You threw
    15    in Micola and McCaffrey.
    16             THE WITNESS:  Right.  Shouldn't we talk about
    17    Dr. Micola?
    18    BY MR. GOLDMAN:
    19        Q    Do you know what advertisements Dr. Micola saw
    20    concerning Vioxx?
    21        A    Well, I can tell by the call notes what people
    22    were talking about.  They were showing the main
    23    promotional brochure because that is the three S's.
    24        Q    I am talking about the television advertising.
    25        A    Oh, television advertising.
0221
     1        Q    Do you know what television advertising
     2    Dr. Micola or Dr. McCaffrey saw about Vioxx?
     3        A    No, I know what ads were running at different
     4    times.  Not what they say saw, no.
     5        Q    Do you know what ads Mr. Barnett saw concerning
     6    Vioxx?
     7        A    Yes, he testified.
     8        Q    What ads?
     9        A    That he saw the Dorothy Hamill.  All of which
    10    were very similar.  Remember, it is a very integrated
    11    marketing campaign, they all basically said the same
    12    thing.
    13        Q    Did Dr. -- sorry.  Withdrawn.
    14             Is it your opinion that Mr. Barnett relied on
    15    the Dorothy Hamill ad when he decided to use Vioxx?
    16        A    He said it factored into his decision both to
    17    take it and to continuing to take it.
    18        Q    And that is based on deposition testimony you
    19    read?
    20        A    Yes.  Plus the research that shows 85 percent
    21    of people in the target audience did see these ads and
    22    were well-aware of the brand.
    23             MR. GOLDMAN:  Move to strike the last part of
    24    that answer.
    25             THE WITNESS:  Well, you asked me, what I was
0222
     1    relying on.
     2    BY MR. GOLDMAN:
     3        Q    No, I didn't.
     4        A    Oh, I thought you did.
     5        Q    Dr. -- withdrawn.
     6             Your testimony is that you believe Mr. Barnett
     7    relied on Dorothy Hamill's advertisement about Vioxx when
     8    he decided to use Vioxx; right?
     9             MR. ROBINSON:  Object.  Not when he decided to.
    10             MR. GOLDMAN:  Yes, she did.  Stop coaching.
    11        Q    Ma'am, I don't know what you are looking at.
    12        A    I am looking at the deposition.
    13        Q    What page of the deposition are you looking at?
    14        A    Page 25.
    15        Q    Are you looking at your report?
    16        A    Exhibit 13.  Right.  I'm sorry.  The verbatim

                                Page 92

```
                            Ex 1 - 5-26-06 depo transcript
17    quote from the deposition.  So this is with regard to
18    Micola, not when he initially -- let's see, is this
19    Dr. Micola?
20            MR. ROBINSON:  He is asking about Mr. Barnett
21    now.
22            THE WITNESS:  I know.  I'm sorry.  I am
23    confused.
24            So let's see -- so, yeah.
25    BY MR. GOLDMAN:
0223
 1       Q    Okay.  Now, I am going to move to a different
 2    question.
 3            MR. ROBINSON:  Let's slow down.
 4            THE WITNESS:  So, yes, I misunderstood your
 5    question.
 6    BY MR. GOLDMAN:
 7       Q    Do you know if Mr. Barnett saw advertisements
 8    other than Dorothy Hamill?
 9       A    Based on the research, we have a statistical
10    probability of which of the ads that he saw.  We know
11    ads were running and we know what percentage of the
12    audience saw those ads and --
13       Q    Do you know what advertisements Mr. Barnett saw
14    for Vioxx other than Dorothy Hamill?
15       A    Not with certainty, no.
16       Q    Mr. Barnett relied on his doctors to decide
17    what medicine he should take; right?
18       A    In part, yes.
19       Q    And did you read Mr. Barnett's wife's testimony
20    about whether she thinks he was influenced by
21    advertising?
22       A    His wife's testimony?
23       Q    Yes.
24       A    No.
25       Q    Did you read any of Dr. Micola's and
0224
 1    Dr. McCaffrey's testimony about whether they thought
 2    Mr. Barnett is a type of person who relied on
 3    commercials to decide what medicine to use?
 4       A    I believe I recall seeing that, but I mean,
 5    it's not valid.
 6       Q    "It's not valid," what do you mean?
 7       A    Well, he is not an expert.  Neither of those
 8    doctors are an expert on what ads people did or did not
 9    see or if that is the type of person -- I mean, that
10    requires expertise.  They don't have expertise.
11       Q    Who spent more time --
12       A    Unless they had direct -- they had a
13    conversation about it and they did not say they did.
14       Q    Who is more familiar with Mr. Barnett and his
15    medical care and the type of patient he is; you or
16    Dr. Micola?
17       A    The type of patient he is in general?
18       Q    Um-hmm.
19       A    His doctor.
20       Q    Who is more familiar with Mr. Barnett's
21    knowledge about risks of medicine that he uses; you or
22    his doctors?
23       A    I would hope his doctors.
24       Q    Do you know whether Mr. Barnett takes any
25    medication today because of advertisements he saw on TV?
0225
 1       A    No, I don't.
```

Page 93

```
                        Ex 1 - 5-26-06 depo transcript
 2        Q     You said --
 3        A     Most customers don't know that either.
 4        Q     You said in your report --
 5              MR. GOLDMAN:  Move to strike the last answer.
 6        Q     You said in your report that Merck never
 7    disclosed the potential cardiovascular risk of Vioxx to
 8    the public?  Is that your testimony?
 9        A     Yes.
10        Q     Did Merck publish the Vigor Study?
11        A     Merck authors did, yes.
12        Q     Did Merck inform the FDA about the Vigor Study?
13        A     Yes.
14        Q     Did Merck send press releases about the Vigor
15    Study?
16        A     Yes.
17        Q     Did Merck talk about potential cardiovascular
18    risks at a Advisory Committee Meeting held by the FDA in
19    February of 2001?
20        A     Did Merck talk about the --
21        Q     Um-hmm.
22        A     At the Advisory Committee Meeting?  I don't
23    know.
24        Q     Have you ever read any of the materials that
25    were presented at the Advisory Committee Meeting in
0226
 1    February of 2001?
 2        A     Yes.
 3        Q     What materials did you review?
 4        A     Well, I read the -- the report and I read the
 5    medical officer reviews.
 6        Q     What report?  The Targum Memo?
 7        A     The Advisory Committee Report.
 8        Q     You think --
 9        A     Well, we can look at it in the Appendix.  It is
10    in the Appendix, Exhibit 24.
11        Q     Exhibit 24, FDA Advisory Committee Briefing
12    document, did you review that?  This is in your
13    notebook; right?
14        A     Yes.
15        Q     You reviewed it?
16        A     Yes.
17        Q     Did you make any markings on it when you
18    reviewed it?
19        A     Probably.
20        Q     Where are they?
21        A     Well, this is a clean copy from the exhibit.
22              MR. SKIKOS:  They would be in one of the boxes.
23              THE WITNESS:  You know, these are all clean
24    copies.
25              MR. SKIKOS:  The exhibits are clean.  The boxes
0227
 1    are dirty.
 2              THE WITNESS:  My originals are in there.
 3              MR. GOLDMAN:  Okay.  We will look at that in a
 4    minute.
 5        Q     You said in your report that promotional pieces
 6    emphasized Vioxx's safety profile in elderly patients
 7    even though Vioxx posed a significantly higher potential
 8    CV risks in elderly patients with preexisting
 9    cardiovascular problems?
10        A     Their own research shown that.
11        Q     You are not qualified to say that there were
12    significantly higher potential cardiovascular risks of
```

Page 94

Ex 1 - 5-26-06 depo transcript
```
13   Vioxx in elderly patients; are you, ma'am?
14        A    In patients with cardiovascular risks, yes,
15   that was in Vigor.
16        Q    What was in Vigor?
17        A    That cardiovascular risk was higher among
18   people with preexisting cardiovascular problems.
19        Q    Dr. Pechmann, is your basis for concluding that
20   there was a significantly higher potential
21   cardiovascular risk in elderly patients, who had
22   preexisting cardiovascular problems based on your review
23   of the Vigor Study?
24        A    Yes.
25        Q    Anything else?
0228
 1        A    Not that I can think of at the moment.
 2        Q    You say that Merck's research reports show that
 3   doctors were confused by cardiovascular information in
 4   promotional pieces shown by representatives.
 5             Do you remember that?
 6        A    Yes.
 7        Q    Did you ask Dr. Micola and/or Dr. McCaffrey if
 8   they were confused about promotional pieces they saw?
 9        A    No, but it is in their testimony.
10        Q    Are you relying on your interpretation of
11   their -- withdrawn.
12             Are you relying on the deposition testimony of
13   Dr. Micola and Dr. McCaffrey concerning whether they
14   were confused by promotional pieces?
15        A    In part.  And in part on the research where
16   they tested.
17        Q    They tested what?
18        A    The promotional pieces.
19        Q    What research reports are you relying on when
20   you say doctors were confused by cardiovascular
21   information in promotional pieces?
22        A    Well, one study is in here.  I am getting
23   tired.
24             MR. ROBINSON:  Why don't we take a break?
25             THE WITNESS:  That's okay.  I am just getting
0229
 1   tired.  It is taking me a little longer to find.
 2             Yes, it is Exhibit 59.
 3   BY MR. GOLDMAN:
 4        Q    Let's take a look at 59 in your books.
 5        A    It is one of the pieces of information that
 6   suggests that.
 7        Q    I want to know all.  Tell me your list of all
 8   of the sources that you are relying on that doctors were
 9   confused about cardiovascular information in promotional
10   pieces.
11        A    Okay.  I believe 59 is in there.  So in here --
12   this was a major detailing piece that they used and I
13   can show you the detail piece itself.
14        Q    I want you to show me how you know that the
15   doctors were confused.
16        A    They said they were.  Most pointed to being
17   confused about the CV risk.  That's the General Points.
18        Q    what page is that?
19        A    Page 6.
20        Q    What drug is that talking about?
21        A    It is talking about Vioxx.  As it is clear
22   later on, too.
23        Q    Wait a minute.  The page that you are talking
```

Page 95

Ex 1 - 5-26-06 depo transcript
```
24    about is Bates stamped MRK --
25       A    Yes, but that is General Points.  So it is not
0230
 1    specific.  You see, there is Celebrex, Bextra.  The next
 2    heading is General Points.
 3       Q    Okay.
 4       A    So it should have been put on a different page.
 5       Q    So you are interpreting Page 6 of this research
 6    finding to mean that doctors were confused about
 7    cardiovascular risk?
 8       A    That is one place that says that they were
 9    confused.
10       Q    How was that study done?
11       A    They did one-to-one interviews --
12       Q    How many --
13       A    -- with doctors.
14       Q    How many doctors were interviewed?
15       A    45 minute in-depth interviews with 31 doctors,
16    which is generally accepted practice.  Actually, that is
17    a high number of subjects and a long interview.
18       Q    So is it your position that because that
19    research report indicates that some of the doctors were
20    confused about cardiovascular risks that Dr. Micola and
21    Dr. McCaffrey were confused about it?
22       A    Well, they said that they were never told that
23    it had a cardiovascular risk by Merck.
24       Q    That is based on your review of their
25    testimony?
0231
 1       A    Yes.
 2       Q    Which the jury can understand as well as you;
 3    right?
 4       A    No, I don't think -- they can understand the
 5    words, but not the whole context in which the program is
 6    existing.
 7            They need to understand the whole integrated
 8    marketing communications campaign to understand the
 9    specific testimony.  They need to understand the
10    context.
11       Q    What other sources are you relying on showing
12    that doctors were confused about the cardiovascular
13    risks in promotional pieces?
14       A    There are several points in here that says --
15       Q    That is the same document; right?
16       A    Yes.
17       Q    What other documents are you relying on other
18    than Exhibit 59 in your book?
19       A    Well, shouldn't I go what they say here?
20       Q    No, that is just one study; right?
21       A    Yes.
22       Q    I want to know what other studies that you are
23    relying on that supports your opinions that doctors were
24    confused about cardiovascular risks in Merck's
25    promotional pieces?
0232
 1       A    There are several other studies that show
 2    attributes towards -- attribute ratings on Vioxx and
 3    sales of Vioxx, prescriptions of Vioxx.  That show that
 4    there was no discernible change in perceptions of Vioxx
 5    or prescribing for Vioxx --
 6       Q    That was not my question.
 7       A    -- except when there was like the JAMA article
 8    or when the label changed you saw --
```
Page 96

Ex 1 - 5-26-06 depo transcript
```
 9      Q     So, Dr. Pechmann, other than Exhibit 59 in your
10  binder, what other materials are you relying on to
11  support your opinion that doctors were confused by the
12  cardiovascular information in promotional pieces for
13  Vioxx?
14      A     I will show you the other.
15      Q     What are you looking at?
16      A     My notes about the different research products
17  which you have a copy of.
18      Q     Okay.  That is Exhibit 5 for the record.
19      A     Well, okay, this is a good one.  Exhibit 56.
20      Q     If you could just name them.  What did that one
21  say?  Tell me what you think it says.
22      A     18 to 47 percent of the physicians said that
23  the sales reps said that Vioxx does not increase the
24  risk of M.I. or stroke.
25      Q     Does that tell you that -- does Exhibit 56 say
0233
 1  that doctors are confused, ma'am, about the
 2  cardiovascular risks in promotion material?
 3      A     It says that they were mislead by the sales
 4  reps.
 5      Q     It is your testimony that Exhibit 56 in your
 6  binder, which is a document called Vioxx Monthly EAR
 7  review November, 2001, that, that says that doctors were
 8  confused about what the cardiovascular information was
 9  contained in Vioxx's promotional pieces?
10      A     It shows that they were mislead.
11      Q     That was not my question.
12      A     Yes, I think it means they were confused.
13      Q     Okay.  So you relied on that, Exhibit 56.
14          What else do you rely on to support your
15  opinion that?
16      A     20 to 33 percent said the reps said that Vioxx
17  was safe for the elderly.  So they were getting the
18  impression that Vioxx was safe.  The elderly could have
19  CV risks.
20          E58 shows the same thing.
21      Q     Does Exhibit 58 in your binder say that doctors
22  were confused about the cardiovascular risks as
23  described in promotional pieces?
24      A     They were concluding that the --
25      Q     Can you answer that yes or no?
0234
 1      A     Yes.
 2      Q     Okay.  Your testimony is that Exhibit, what?
 3      A     58.
 4      Q     58 in your binder, showed that doctors were
 5  confused about cardiovascular risks in promotional
 6  pieces.
 7          Anything else that supports your opinion that
 8  doctors were confused about cardiovascular information?
 9      A     Exhibit 48.
10      Q     What else?
11      A     Exhibit 55.
12      Q     What else?
13      A     Exhibit 56.
14      Q     We talked about that.
15      A     Exhibit 54, Exhibit 48, Exhibit 47 -- that's
16  it.
17      Q     Do you plan to --
18      A     You know, there are other -- there could be
19  other documents that would lead me to reach the same
```

Ex 1 - 5-26-06 depo transcript

```
20   opinion.
21        Q    Do you plan to use the documents that you just
22   mentioned to tell the jury that doctors were either
23   confused by cardiovascular information in Merck's
24   promotional pieces or mislead by them?
25        A    Yes.
0235
 1        Q    You talked about Obstacle Handlers in your
 2   report.  Do you remember that?
 3        A    Yes.
 4        Q    Did you ever hear of Merck's explanation as to
 5   what Obstacle Handlers are?
 6        A    Yes.
 7        Q    What is it?  What is Merck's explanation?
 8        A    Merck's explanation is that -- well, that when
 9   physicians felt hesitant about prescribing Vioxx, they
10   tried to reassure them or convince them to prescribe it
11   by telling them what the Obstacle Handlers -- you know,
12   by stating the Obstacle Handler.
13        Q    What is the basis for your testimony there?
14        A    With regard to the cardio --
15        Q    No, with regard to the --
16        A    Well, I think the Obstacle Handling materials
17   were misleading.
18        Q    And that is based on your interpretation of
19   Merck's documents; right?
20        A    It is based on the face of what the documents
21   state versus what Merck knew or should have know.
22        Q    Because you still hold yourself out as an
23   expert about what Merck knew or should have known about
24   the cardiovascular risks?
25        A    Yes.
0236
 1        Q    You talk about the CV card in your report.
 2             Do you know whether there are any false
 3   statements on the CV card?
 4        A    I -- I used the standard misleading, not out
 5   right false lies.  So I didn't evaluate it based on a
 6   higher standard of false statements.
 7        Q    If you could answer my question.
 8             Is there anything untrue or false about the
 9   statements on the CV card?
10        A    I don't recall there being any outright false
11   statements that were misleading.
12        Q    Can you answer my question?
13        A    I did.  I can't recall at the moment there
14   being any false statements.
15        Q    You don't have any reason to believe that
16   there were untrue or false statements on the CV card;
17   correct?
18        A    They were misleading.
19        Q    I did not ask you that, ma'am.
20        A    Okay.  I already said the answer to that other
21   question; didn't I?
22        Q    Dr. Pechmann, you have no reason to believe
23   that the statements in the CV card are untrue --
24        A    At this point, I don't recall any false
25   statements in the CV card.
0237
 1        Q    -- am I right?
 2             Do you know whether any of the sales
 3   representatives in South Carolina used the CV card with
 4   Dr. Micola or Dr. McCaffrey?
```

Page 98

```
                          Ex 1 - 5-26-06 depo transcript
 5      A    I didn't see it on the call notes.  So I have
 6  no -- I don't know one way or the other.
 7      Q    Do you -- did you watch the Be The Power video?
 8      A    Yes, I did.
 9      Q    Do you know if any of the sales representatives
10  who called on Dr. Micola and Dr. McCaffrey watched the
11  Be The Power video?
12      A    No.
13      Q    Do you know whether it is common that drug
14  companies do things sometimes that are meant to motivate
15  the sales force to sell?
16      A    Yes, it is very common.
17      Q    And having a Be The Power video or something
18  like that, that is meant to motivate the sales force is
19  not necessarily a campaign to deceive doctors; is it,
20  ma'am?
21           MR. O'CALLAHAN:  Assumes facts not in evidence.
22           THE WITNESS:  That video was providing
23  misleading information.
24  BY MR. GOLDMAN:
25      Q    Okay.  Did you understand my question?
0238
 1           When sales representatives are shown videos or
 2  go to launch parties, and there is motivational things
 3  that happen, that is not an effort or campaign to
 4  mislead doctors; is it?
 5           MR. SKIKOS:  Objection.
 6           THE WITNESS:  You mean as a general rule?
 7           MR. O'CALLAHAN:  Join.
 8  BY MR. GOLDMAN:
 9      Q    Yes.
10      A    I don't know.  I have not done research on
11  that.  I would hope not.
12      Q    By the way, it is common, isn't it, in the
13  pharmaceutical industry for sales representatives to
14  call on doctors?
15      A    Yes.
16      Q    It is common for pharmaceutical reps of all
17  different companies to drop off samples; right?
18      A    Yes.
19      Q    You don't have any reason to think that Merck's
20  sales representatives visited doctors more often than
21  sales representatives of other companies; do you, ma'am?
22           MR. SKIKOS:  Objection.
23           MR. O'CALLAHAN:  Join.
24           THE WITNESS:  Yes.  There is data on the
25  frequency, which the Merck representatives saw the
0239
 1  physicians versus Celebrex and others.  They kept
 2  detailed records on that.
 3  BY MR. GOLDMAN:
 4      Q    Is it your testimony, Dr. Pechmann, that Merck
 5  sales representatives visited doctors more often about
 6  Vioxx than Pfizer sales representatives visited doctors
 7  about Celebrex and Bextra?
 8      A    I would have to review that data, but I didn't
 9  review that prior to being here.  There is data on that
10  to answer that question.
11      Q    You don't know the answer?
12      A    At this point in time, no.
13      Q    You talked about an audio conference by Peter
14  Holt.  Do you remember that --
15      A    Yes.
```

                              Ex 1 - 5-26-06 depo transcript
16      Q    -- in your report?
17           Did you listen to that audio conference?
18      A    No.
19      Q    Did Dr. McCaffrey or Dr. Micola attend that
20   audio conference?
21      A    They didn't testify that they had.
22      Q    Did Merck respond --
23      A    I believe they said they did not.
24      Q    Did Merck respond appropriately when the FDA
25   sent its warning letter about Peter Holt?
0240
 1      A    I don't think they responded appropriately to
 2   that warning letter, no.
 3      Q    What did Merck do with respect to Pete Holt
 4   after Merck got the warning letter from the FDA?
 5      A    As I recall, they sent out a letter to correct
 6   the problem to the people that were at the seminar.
 7      Q    What did the FDA say after they received a
 8   letter from Merck advising them of what Merck was going
 9   to do in response to the FDA's letter -- strike that.
10           Do you know whether the FDA took any further
11   action after Merck sent out letters correcting
12   misstatements that were made by Dr. Holt?
13      A    I didn't see that they did anything else, no.
14      Q    Did you ever see Merck's response to the FDA
15   warning letter?
16      A    I saw the correction letters that -- but, no, I
17   did not.  I don't recall seeing a response to the
18   warning letter from Merck.
19      Q    The plaintiffs' lawyers never showed you that?
20      A    I don't recall seeing it.
21      Q    By the way, do you know whether you have
22   received and reviewed all of the research reports that
23   were done concerning Merck's marketing efforts for
24   Vioxx?
25      A    Well, I -- I asked for very specific reports
0241
 1   and I got what I asked for.
 2      Q    Do you know whether you have received and
 3   reviewed all of the research that Merck has done on
 4   Vioxx?
 5      A    Well, I am positive I haven't, no -- well, I am
 6   not positive, but I think there is research that we
 7   don't have, but -- that wasn't in the deposit --
 8   repository.  Is that what it is called?
 9           It seems like there is missing pieces of
10   research, but I think I got everything that we could get
11   my hands on.  There clearly seems to be missing research
12   because they said they were going to do this subsequent
13   research, and there is no record of it.
14      Q    Dr. Pechmann, throughout your report, you quote
15   from Merck's internal documents and then you express
16   your opinions about them; right?
17      A    No, I would not say it is throughout the
18   report.  Part of the report, I do that.
19      Q    Okay.  Let's look as an example at 29 and do
20   you see in Paragraph C, you are talking about a March,
21   2000, Vioxx promotional piece for physicians which
22   features an elderly woman Ms. Guzman.  It is Exhibit 26
23   in your binder.
24      A    Yes.
25      Q    And you quote from it and you say,
0242

                              Page 100

                         Ex 1 - 5-26-06 depo transcript
1              "The promotional piece went on to
2              state that in a specific six-week
3              study of patients 80-years-of-age or
4              older" and then it continues, and
5              then it says, "As with all NSAIDs,
6              Vioxx should be used with caution in
7              patients with fluid retention,
8              hypertension and heart failure."
9              Do you see that?
10      A      Yes.
11      Q      And then you add, "However, the
12             Overall message of the promotional
13             piece was that Vioxx was safe to use
14             in the elderly, more effective than
15             other nonsteroidal pain relievers and
16             simpler to use."
17             Do you see that?
18      A      Yes.
19      Q      You are just offering your interpretation of
20      that promotional piece; right?
21      A      No, we actually have research on that
22      promotional piece and that is why I put it in there.
23      Q      Do you cite any of the research here?
24      A      I believe I do.  Well, it must be in a
25      different part of the report, but I did cite the
0243
1       research on this because I chose -- is it this one?
2              Let's see.  Okay.  Okay.  I'm sorry.  It is not
3       that one.  It is the first quarter of 2003, that we have
4       research on.
5       Q      You are offering your subjective interpretation
6       of this March, 2000 promotional piece?
7       A      No.  We have tracking research that shows what
8       physicians believed about Vioxx, what they said the
9       sales reps were telling them when they were shown these
10      promotional brochures --
11      Q      Dr. Pechmann --
12      A      -- and it shows that they were getting the
13      impression that Vioxx was safe to use in the elderly.
14      The statistics are --
15      Q      Dr. Pechmann, I am not asking about statistics.
16      Please focus with me.
17             MR. SKIKOS:  I think you did.
18             THE WITNESS:  -- 18 to 40 percent, that is the
19      basis on which I am reaching the conclusion that it was
20      safe.
21      BY MR. GOLDMAN:
22      Q      Are you talking about the promotional ad?
23      A      Yes, I have data from when they were shown that
24      promotional piece.
25      Q      Show me the data that shows that the overall
0244
1       message of the March, 2000, Vioxx promotional piece was
2       that Vioxx was safe to use in the elderly, more
3       effective than nonsteroidal pain relievers, and simpler
4       to use.
5       A      I'm not sure if I have it from that exact
6       promotional piece, but I have it from a very similar
7       promotional piece.
8       Q      I want to talk about this one because that is
9       the one I am on now.
10      A      Okay.  Well, March, 2000, I believe that
11      particular data is missing.

                              Page 101

```
                      Ex 1 - 5-26-06 depo transcript
12        Q    You are expressing your subjective view,
13   Dr. Pechmann, about your interpretation of this March,
14   2000 promotional piece?
15        A    No, because there are other promotional pieces
16   that have the exact same wording and we have research on
17   those.  So there should be no difference in the
18   response.
19             You see, they kept using the exact same wording
20   over and over again.  You know, in the integrated
21   marketing communications campaign that is what you do.
22   You repeat the same thing over and over again.  You
23   change the cover.  You change -- you know, if it is not
24   Liz Guzman, it is someone else.
25        Q    Is it your testimony that every time you say in
0245
1    your report that the "overall message of a promotional
2    piece was that Vioxx was safe to use in the elderly"
3    that that is based on research and that is not your own
4    subjective opinion?
5         A    Yes, that is my testimony.
6         Q    Turn with me, please, to Page 61, Paragraph
7    C -- actually, Paragraph E.
8         A    E, okay.
9         Q    Do you see that you are talking about the FDA
10   recommending that a Vioxx product label be changed to
11   include a cardiovascular warning?
12             Do you see that?
13        A    Yes.
14        Q    And then you say, "If a cardiovascular
15             warning had been included in the new
16             Vioxx product label, Merck had to
17             prominently convey such a warning in
18             all Vioxx television and print
19             advertisements."
20             Do you see that?
21        A    Yes.
22        Q    And then you say, "However, Merck
23             Executives put intense pressure on
24             the FDA and persuaded the agency to
25             allow them to move Vioxx
0246
1              cardiovascular risk information from
2              the warning section to the precaution
3              section of the new Vioxx label."
4         A    Yes, I saw evidence on that.
5         Q    What is your basis that Merck executives put
6    intense pressure on the FDA?
7         A    Memos that I saw.
8         Q    It is your basis for concluding that Merck
9    executives put intense pressure on the FDA based on your
10   review of the selective documents that the plaintiffs'
11   lawyers gave you?
12        A    And also, what the outcome was, that the FDA
13   said very clearly, there should be a warning about CV
14   risks, and they proposed that warning.  And the outcome
15   was no warning.
16        Q    Did you review all of the correspondence
17   between Merck and the FDA and their discussions about
18   the Vigor label?
19        A    I reviewed a lot of it.  I am not sure --
20        Q    Did you review all of the correspondence
21   between the FDA and Merck concerning the addition of the
22   Vigor label?  I'm sorry.  Withdrawn.
```

                              Ex 1 - 5-26-06 depo transcript
23       A    I'm not sure because I know I reviewed a lot of
24    it, but I am not sure if it was 100 percent of what it
25    was.
0247
 1       Q    Do you know, Mr. Pechmann, whether you reviewed
 2    all of the correspondence between Merck and the FDA
 3    concerning the addition of the Vigor data into the Vioxx
 4    package insert?
 5       A    No, I don't know with certainty.
 6       Q    And you are expressing your opinion here --
 7    your subjective opinion about Merck putting pressure on
 8    the FDA; are you not?
 9       A    I looked at the documents, yes.
10       Q    And a juror could look at the same documents
11    and reach the same conclusions or disagree with you,
12    they don't need your help to reach a conclusion; right?
13       A    I think in this case, yes, they could probably
14    understand it.  Although it would help to provide the
15    marketing context of it in terms of what the research
16    showed had the warning been in the ad -- in the TV ad.
17            There is research -- they started to do
18    research on what would happen if they had to put the
19    warning label on TV.  And basically, that research
20    showed --
21       Q    Did you hear my question?
22            MR. O'CALLAHAN:  I'm sorry.  She is answering
23    your question.
24            MR. GOLDMAN:  No, She is not answering.
25            THE WITNESS:  I am not?  What was your
0248
 1    question?
 2            MR. SKIKOS:  I think she is on this one.
 3    BY MR. GOLDMAN:
 4       Q    What was my question?
 5            MR. SKIKOS:  No.  Finish your answer.  She gets
 6    to finish her answer.
 7    BY MR. GOLDMAN:
 8       Q    I don't mean to interrupt you, but
 9    Dr. Pechmann, my question was really straightforward.
10            MR. O'CALLAHAN:  You know, for the record, I
11    think she has got to be allowed to finish the answer.
12            MR. GOLDMAN:  Go ahead.
13            THE WITNESS:  Because I have had innumerable
14    times, I have been interrupted and I have never been
15    able to finish my answer, and I was trying very hard to
16    answer your question.
17    BY MR. GOLDMAN:
18       Q    Oh, if there is anything that you would like to
19    say that you haven't said in this deposition, say it
20    now.
21       A    Well, I can't remember back, but there were
22    several times that I wanted to say something and I --
23            MR. SKIKOS:  Just finish this answer.
24            THE WITNESS:  So what I was saying is that
25    there is research that shows what would -- that there
0249
 1    was concern about having -- significant concerns about
 2    having a heart-attack warning in their television ads,
 3    and they were doing research, and, basically, said, that
 4    if the warning -- heart attack warning was on the TV
 5    ads, then they might not even run product ads any longer
 6    because it would be devastating.  It would be
 7    de-marketing the product.

                              Page 103

Ex 1 - 5-26-06 depo transcript

```
 8   BY MR. GOLDMAN:
 9      Q    Are you finished?
10      A    Yes.
11      Q    You said that you feel like I haven't let you
12   finish your answers.  I don't want to hear at trial, if
13   your going to testify, Dr. Pechmann, that you wanted to
14   say something, but I didn't let you say it.
15           So I would like you to tell me whatever it is
16   that you would like to tell me that I have not let you
17   say.
18      A    Well, the one thing is I misunderstood your
19   question with regard to what ad Barnett saw and when he
20   saw the ad, so --
21      Q    Did you talk to the plaintiffs' lawyers about
22   that issue at a break?
23      A    No.  I've tried to correct my thing --
24      Q    Okay.
25      A    -- but you just jumped ahead.  And I couldn't
0250
 1   correct what I was trying to say.
 2      Q    Go ahead and correct it.
 3      A    That was the most recent example.  I have to
 4   look at the Barnett material, but the Hamill ads were
 5   played later.  So it was when he was continuing, not
 6   when he originally got the drug because the Hamill ads
 7   were not appearing in 1999 or 2000.
 8      Q    Is that all you wanted to say about that
 9   issue?
10      A    Yes, I just misunderstood your question.  So I
11   answered it improperly and then I did not get a chance
12   to correct.
13           So thank you for giving me the chance now.
14      Q    Did Mr. Barnett --
15      A    If I can think of other things, I will bring
16   them up.
17      Q    Did Mr. Barnett rely on the Dorothy Hamill ad
18   in deciding to use Vioxx?
19      A    To continue to use Vioxx, yes.
20      Q    Anything else that you feel I didn't give you
21   an opportunity to say because I don't want to hear at
22   trial that you felt like I was cutting you off.  So I
23   want to give you the chance to say whatever you would
24   like to say.
25           MR. O'CALLAHAN:  I have to interpose an
0251
 1   objection here.  When you throughout the course of the
 2   deposition, you cut her off repeatedly.  I think it is
 3   unfair to, at this point, ask her to recall every answer
 4   that you cut off, that she now needs to fill in the rest
 5   of the answer.  Notwithstanding that --
 6           THE WITNESS:  I feel the same way.  It is
 7   impossible, but if I think of anything that really
 8   sticks out, I will let you know; but I felt that way
 9   several times.
10           MR. SKIKOS:  Let's take a short break.
11           MR. GOLDMAN:  Okay.  Because I will take the
12   deposition again.
13           (Lunch recess.)
14           MR. SKIKOS:  We are going to agree to put the
15   boxes of documents that Dr. Pechmann reviewed and
16   replied upon in the possession of the court reporter and
17   then we are going to send something from Robinson,
18   Calcagnie to the court reporter's office to index all of
```

Page 104

                              Ex 1 - 5-26-06 depo transcript
19    the documents by Bates number; right?
20              MR. GOLDMAN:  (Nods head.)
21              MR. SKIKOS:  And to avoid having to attach the
22    five boxes of documents as exhibits to the deposition?
23              MR. GOLDMAN:  Yes.
24              Ready?
25              THE WITNESS:  So, the entire box -- all of the
0252
1     boxes?
2               MR. GOLDMAN:  Um-hmm.
3               MR. SKIKOS:  What about the exhibits?
4               MR. GOLDMAN:  We will attach the three binders
5     of exhibits that we have been referring to throughout
6     the deposition, which are the documents that have
7     actually been cited in Dr. Pechmann's report; right?
8               THE WITNESS:  Okay.
9     BY MR. GOLDMAN:
10        Q     Dr. Pechmann, I want to have an understanding
11    that at trial, you are not going to suggest to the jury
12    that you weren't given an opportunity to explain your
13    answers or that I cut you off in a way that didn't allow
14    you to give complete, full, honest answers.
15              That is not --
16        A     Good for you.
17        Q     It is not only not good for me.  It is not at
18    all what I think.  I certainly did not intend for that
19    to happen and I don't want you to leave here thinking
20    that that happened.
21        A     Okay.
22        Q     So if there are things that -- anything that
23    you want to say, that you feel I didn't let you say,
24    please say it.
25        A     Okay.  I would like to say one more thing.
0253
1         Q     Yes.
2         A     When you asked me about the Naproxen hypothesis
3     and did they continue to -- did Merck continue to
4     promulgate the Naproxen hypothesis after the warning
5     letter, I felt that I did not have a chance to
6     adequately respond.
7         Q     Okay.
8         A     The Naproxen hypothesis, of course, is in the
9     New England Journal of Medicine article on Vigor and
10    those reprints were still out there.  So I am not sure
11    if they were being given out, but they were out there.
12              As an expert in misleading ads, I know that if
13    there is something that you did to mislead the public,
14    in order to correct that misperception, you have to
15    overtly correct it.  It does not just correct itself.
16              So not surprisingly what the research shows is
17    that, that perception persisted.  It was never
18    corrected.
19              And one of the doctors in the case states
20    exactly that.  Page 19 in my report, Micola says that
21    his conclusions from the Vigor trial was that Naproxen
22    blocked platelet aggregation and that was never
23    corrected.
24              And also, later on, they just used slightly
25    different words in the brochures that talked about how
0254
1     Vioxx doesn't affect platelets.  So it used wording that
2     would be consistent with the Naproxen hypothesis.
3               So people knowing that Naproxen hypothesis and

Ex 1 - 5-26-06 depo transcript
4    reading that, would think it is consistent with the
5    Naproxen hypothesis.
6         Q    Have you now said everything that you wanted to
7    say that you felt that I prevented you from saying?
8         A    That is all I can recall at the moment.  Maybe
9    in the middle of the night, I think of something else,
10   but, no, I feel good that these were the two issues that
11   I felt that I didn't have a chance to adequately
12   address.
13           And you should know my opinion; right?  And it
14   is good that you know them.
15        Q    Can we have an understanding that,
16   Dr. Pechmann, at trial you are not going to say that I
17   cut you off and you did not explain your answer?
18        A    Yes, as long as it doesn't keep happening.
19             MR. GOLDMAN:  Off the record.
20             (Discussion held off the record.)
21   BY MR. GOLDMAN:
22        Q    Can you turn, Dr. Pechmann, please to Page 62
23   of your report and I just want to focus on Paragraph F
24   where you are describing Merck's label that added the
25   Vigor data to it.
0255
1         A    Yes.
2         Q    Do you see that you say, "Further,
3              Merck avoided having to prominently
4              feature cardiovascular risk
5              information in the Vioxx print
6              advertisements, instead Merck simply
7              put some vague and ambiguous
8              cardiovascular information in the
9              fine print of the Vioxx print
10             advertisements"?
11        A    Yes.
12        Q    Am I right that you are just expressing your
13   opinion and your personal view that the language in the
14   print advertisements was vague and ambiguous?
15        A    No, they had research on that.
16        Q    So you can point me to studies showing that the
17   cardiovascular information in the Vigor label was vague
18   and ambiguous?
19        A    I'm sorry.  The cardiovascular information in
20   the print advertisements that consumers saw once the
21   label changed was vague and ambiguous.  It was consumer
22   research.
23        Q    Okay.  So let me ask about, first, the label.
24             Okay.  Is it your opinion that the language
25   that the FDA approved and included in the April, 2002
0256
1    label about the Vigor study was vague and ambiguous?
2         A    Yes, I found it to be vague and ambiguous.
3         Q    And that is your personal view and not based on
4    any research?
5         A    No.  What the research shows --
6              MR. SKIKOS:  He is asking about the specific
7    FDA label, not about the print ads or the integrated
8    marketing campaign.  He is just asking about the label.
9              THE WITNESS:  Well, there is research that
10   shows the effects of the label on physicians and there
11   was a downward turn in sales.  So some -- some people
12   got it.
13   BY MR. GOLDMAN:
14        Q    What research can you point me to that says

Page 106

Ex 1 - 5-26-06 depo transcript
15    that the language about cardiovascular information in
16    the April, 2002 label was vague and ambiguous?
17        A    Well, the research that I am going to refer to
18    is the, the focus group data we talked about earlier
19    when they did the focus group, with similar
20    cardiovascular information and the people said that they
21    were confused.
22            The doctors in this case, who said they didn't
23    understand the risks and other research that shows
24    that -- that overall perceptions of Vioxx, the
25    cardiovascular risks remained remarkably positive over
0257
1    the entire period of the campaign.
2        Q    Do any of the research reports that you just
3    referred to state that doctors believed the language in
4    the April, 2002 label was vague and ambiguous?
5        A    I haven't seen any research where they showed
6    doctors that label exactly and they said that, no.
7        Q    Am I right, Dr. Pechmann, that you are not an
8    expert in the wording of labels for prescription drugs?
9        A    Yes, I would say you are correct.  I am not an
10    expert in that.
11        Q    Let's turn a -- let's turn to Appendix A, which
12    is on Page 72.
13        A    Okay.
14        Q    Who wrote this?
15        A    I did, except where I typed in verbatim and
16    then I didn't write the quotes because they were
17    verbatim quotes.
18        Q    Now, in the text of your report on Page 9, you
19    say in Paragraph 16 that Appendix A to your report,
20    discusses in greater detail your opinion regarding what
21    Merck's marketing executives knew or should have known
22    about Vioxx's potential cardiovascular risk and my basis
23    for that opinion?
24        A    Yes.
25        Q    Now, when you turn to Appendix A, do you see
0258
1    that you're talking -- at least the title of this
2    Appendix says, "Merck's knowledge of Vioxx's
3    Cardiovascular Risk Potential"?
4        A    No.  What was in here is actually what I meant,
5    they knew or should have known.
6        Q    Did you review any of the deposition testimony
7    of any of the scientists at Merck, rather than just the
8    marketing executives?
9        A    Yes.
10        Q    What depositions did you review of a Merck
11    scientist?
12        A    Dr. Demopoulos, on Page 23 of in my report, is
13    a scientist.  This individual was the senior director of
14    cardiovascular clinical research.
15        Q    Is that it?
16        A    Yes.
17        Q    Did any of the plaintiffs' lawyers have input
18    to what you wrote in Appendix A?
19        A    No.
20        Q    How long did you spend reviewing Merck's
21    documents and depositions before you prepared Exhibit A?
22        A    I -- I can't answer that question exactly
23    because I didn't keep a record of that particular task
24    but --
25        Q    I'm sorry.

Ex 1 - 5-26-06 depo transcript

0259
1       A    -- but, I mean, days of looking things over
2    would be a good start of what kind of time I spent on
3    this.
4       Q    So before you wrote Exhibit A to your report,
5    you spent several days reviewing documents and
6    depositions; is that right?
7       A    Mostly documents.
8       Q    About how many hours total would you say in
9    those days you spent reviewing materials that allowed
10   you to prepare Exhibit A?
11      A    I'm sorry.  How many hours in each day?
12      Q    Um-hmm.
13      A    Oh, I am assuming eight hour days.
14      Q    So you spent 16 hours reviewing documents or
15   deposition testimony before preparing Exhibit A?
16      A    I don't know that exact.  I mean --
17      Q    Is that about right?
18      A    I'm sure it is not exactly accurate, but it is
19   rough.
20      Q    When do you think Merck knew about the
21   cardiovascular risks that are potentially associated
22   with Vioxx?
23      A    Well, on Page 80, I have a report from 1998 and
24   on Page 79, I have a document from 1997.  So those
25   documents indicate they knew quite a while ago that
0260
1    there could be a potential risk.
2       Q    How can you say that, Dr. Pechmann, when you've
3    only been shown selected documents that the plaintiffs'
4    attorneys gave you and you haven't --
5            MR. SKIKOS:  Objection.
6    BY MR. GOLDMAN:
7       Q    -- and you haven't reviewed all of the
8    documents to be able to say what Merck knew or should
9    have known about cardiovascular risks?
10      A    Well, I am just saying it's potential risk, not
11   a certainty.  And then combining that with the fact that
12   they got the statistically significant results in Vigor,
13   and the FDA told them they couldn't with certainty
14   include or that it was Naproxen; and it could be that,
15   that Vioxx was causing the heart attacks.
16      Q    Do you think there was scientific evidence --
17      A    It is not my opinion that as to exactly when
18   they knew or should have known the risk exactly what
19   date because that is beyond my area of expertise; but
20   certainly, by the time of the Vigor findings, that is
21   when I feel confident in saying.  I mean, it has a
22   statistically significant effect.  So, I mean, I
23   understand that.  I am a scientist and --
24      Q    Do --
25      A    And then the FDA hits them own the head with
0261
1    it, but even when the Vigor study came out, its -- I
2    mean, it is a statistically significant effect.  They
3    knew -- they should have known.
4       Q    Dr. Pechmann, did you understand that there was
5    no placebo arm in the Vigor study?
6       A    Yes.
7       Q    Did you also understand that one interpretation
8    of the results in Vigor could be that Naproxen was
9    cardioprotective, not that Vioxx was harmful for the
10   heart?