# Exhibit 2

IN RE VIOXX CASES
DEPOSITION OF CONNIE PECHMANN, Ph.D.
THURSDAY, JUNE 15, 2006
VOLUME I

UNCERTIFIED REALTIME ROUGH DRAFT

This realtime draft is unedited and uncertified and may contain untranslated stenographic symbols, an occasional reporter's note, a misspelled proper name and/or nonsensical word combinations.

This is an unedited version of the deposition transcript and should not be used in place of a certified copy. This document should not be duplicated or sold to other persons or businesses. This document is not to be relied upon in whole or in part as the official transcript. This uncertified realtime rough draft version has not been reviewed or edited by the certified shorthand reporter for accuracy. This unedited transcript is computer generated and random translations by the computer may be erroneous or different than that

which will appear on the final certified transc[illegible]

Due to the need to correct entries pr[illegible] certification, the use of this realtime draft is only [illegible] the purpose of augmenting counsel's notes and cannot be used to cite in any court proceeding or be distributed to any other parties.

Acceptance of this realtime draft is an automatic final copy order.

JUN 26 20[illegible]

CONNIE PECHMANN, Ph.D.,

the witness, having been administered an oath in accordance with CCP Section 2094, testified as follows:

EXAMINATION

BY MR. CAMPILLO:

Q. Would you be kind enough to state your full name for the record, please.

A. Cornelia Pechmann, but I go by Connie.

Q. It is pronounced Pechmann?

A. Yes.

Q. If I misstate it, mispronounce it, I apologize in advance. I have been saying Pechmann for a few weeks and I will probably make a mistake a few times.

A. That's okay.

Q. Dr. Pechmann, what is your understanding as to

the name of the case or cases that this deposition that I'm starting right now is being taken in?

A. Yes. It's two L.A. cases, Arrigale and Gross -- let's see. Grossberg.

Q. And when did you first hear either the name of Mr. Arrigale or the name of Mr. Grossberg?

A. A month or two ago.

Q. And in what context did you hear either name?

A. Jim Cunningham sent me materials.

Q. Do you mean Jim O'Callahan?

A. O'Callahan. Sorry.

MR. O'CALLAHAN: It's an Irish name, so it's the same thing.

MR. CAMPILLO: Just to be sure we are talking about the same person.

Q. So Mr. O'Callahan sent you some materials about a month or so ago?

A. Uh-hmm.

Q. Yes?

A. Yes.

Q. And let me show you a series of e-mails that I believe you produced at your prior deposition which we will mark as Exhibit No. 1 for this deposition and ask you to look at the sixth page of Exhibit 1?

MR. SKIKOS: Do you have your own copy?

MR. CAMPILLO: I have one for the witness, one core counsel and one for the court reporter. I didn't know that you were going to have a group of four.

(Deposition Exhibit 1 was marked for identification and is annexed hereto.)

BY MR. CAMPILLO:

Q. Preliminarily, do you recognize what we have now marked as Exhibit No. 1?

(Witness reviews document.)

THE WITNESS: Yes.

BY MR. CAMPILLO:

Q. Could you tell us what that is, your understanding of what Exhibit 1 is.

A. It's a series of correspondence between me and various people primarily at the law firm of Robinson, Calcagne & Robinson with regard to my first depo, finalizing the exhibits, giving them the final report, letting me know when the depo was taking place and so on.

Q. These documents were produced either by you or by counsel for the plaintiff in that other action in connection with your deposition, correct?

A. Correct.

Q. Okay. Let me refer your attention to I think I said the fifth page of the exhibit.

MS. TUCKER: Sixth.

MR. CAMPILLO: Sixth? No, actually it's the third. I'm sorry.

MR. SKIKOS: Is it the e-mail from Jim O'Callahan?

MR. CAMPILLO: Yes. Maybe they are stapled together.

THE WITNESS: I've got it.

BY MR. CAMPILLO:

Q. There is an e-mail dated May 22, 2006 at 8:46 A.M. Do you see that?

A. Yes.

Q. Was that the first time that you heard from Mr. O'Callahan in connection with any aspect of the Vioxx litigation?

A. I'm not sure. There might have been a prior e-mail.

Q. You're not certain?

A. I'm not certain.

Q. Is this approximately the time that you first heard of the Arrigale or Grossberg cases?

A. Yes, approximately.

Q. Okay. For the record, this e-mail is dated May 22, 2006. Did you request this information that's referenced in the e-mail from Mr. O'Callahan or from anyone else?

A. No, I did not.

Q. So this came to you unsolicited, if you will?

A. Yes.

Q. And upon receipt of this information and the e-mail, what you did was to forward it to Alexis Myer and Mark Robinson and basically asked them what you ought to do with this?

A. Correct.

Q. Okay. Now, prior to this exchange on May 22, 2006, had you had any conversations with anyone about being or potentially being an expert in the cases that you have referred to, the Arrigale and Grossberg cases?

A. Not those cases. Mark Robinson was involved in a third L.A. case.

Q. That was the man so he case?

A. The man so he case, exactly. And we had discussed that case briefly, and he had said that had been postponed. And I knew that was tied to two other cases but at the time we did not discuss the other cases.

Q. So prior to receiving this e-mail from Mr. O'Callahan your work on Vioxx or your involvement in Vioxx, as you understood it, involved the Barnett case that's moving forward in the MDL, the case in Florida , I believe the name is Kozic.

A. Yes, correct.

Q. And the man so he case; is that correct?

A. I would say it was primarily Barnett.

Q. But those are the three cases that you understood you were potentially going to be a witness in, at least as of May 22, 2006; is that correct?

A. Well, I also knew that I could potentially be a witness in the two other L.A. cases but I didn't know the names of the plaintiffs or anything or the names of the attorneys or anything.

Q. Okay. Now, prior to May 22, 2006 had you given consent in writing or verbally in any fashion to any attorneys to list you as a witness or as a retained expert for the Arrigale and Grossberg plaintiffs specifically?

A. Well, when I discussed the cases with Mark he said he was going to list me as an expert on all three. So at that time I did give permission for me to be the expert for the other two, even though I didn't know anything about them.

Q. You didn't even know the names of them, correct?

A. Correct.

Q. As of May 22, 2006 had you received any materials of any sort specifically related to Arrigale or Grossberg cases?

A. I may have received something and not opened it.

I received some materials around this time in e-mail and FedEx, mail, but I was very busy finalizing the Barnett case so I didn't pay attention to anything else that came.

Q. Let me ask you this. To the present time have you received any information, any materials, I should say, that specifically pertains to the Arrigale and/or Grossberg plaintiffs?

A. By "plaintiffs" you mean material from the plaintiffs or with the plaintiffs' name on it?

Q. Any of the above.

A. Okay. Well, I have the call notes for both plaintiffs and the list of visits, Doctor visits. I have those here with me right now.

Q. What else have you received that relates directly to or makes reference to Mr. Arrigale or Mr. Grossberg?

A. Well, I read the deposition of Krahe, which is a Southern California regional sales representative and part of the cross-functional Vioxx team.

Q. And does that deposition mention either Grossberg or Arrigale in any way that you can remember?

A. I don't believe by name, although it might. I read through it for a general understanding as to what was going on in Southern California.

Q. But do you recall one way or the other as you sit here right now whether or not the names Arrigale or Grossberg appear anywhere in her deposition?
A. I wouldn't know, because at the time I read it I didn't know these were the plaintiffs, so I wouldn't have noticed one way or the other.
Q. Anything else you have received from anyone that you understood pertains specifically to the Arrigale or Grossberg plaintiffs?
A. I did receive deposition transcripts but I did not review them.
Q. Do you remember the names of the deponents whose transcripts you received but did not read?
A. No.
Q. And who did you receive those from?
A. I'm not sure. One of the firms. I don't even know -- are they in the same firm or different firms?
Q. I think they are three different firms.
A. Different firms. Okay. So I'm not sure.
Q. And when did you receive those depositions?
A. At some point after May 22nd.
Q. And can you be more precise in terms of was it yesterday, was it closer to May 22nd; any kind of time frame you can provide?
A. Let's see. Probably late May, early June.

Q. Any particular run haven't read those materials? The depositions I'm talking about.
A. The depositions, yes. Well, I discussed them with Steve Skikos, because he was at original deposition and was told not to read those materials.
Q. So to this point in time you have not read them and you have no intention of reading them; is that correct?
A. That is correct.
MR. SKIKOS: And she will not be offering opinions as to the content of those depositions at trial.
MR. CAMPILLO: I would hope not if she has not read them. But I appreciate that.
Q. Now, had you met any of the attorneys next to Mr. Skikos prior to today?
A. I met Jim O'Callahan at my last deposition. He was there the entire time and made a few objection, as I recall.
Q. I read them. That was the first time you met Mr. O'Callahan, at your deposition?
A. As I recall, yes.
Q. Had you ever met Mr. Sizemore before?
A. Yes.
Q. When did you meet him?
A. I met him for a couple of times for short

periods in mark Robinson's office, as discussed in my last depo.
Q. Had you ever met Mr. Brandi before?
A. No.
Q. You met him today?
A. Yes, I met him today.
Q. Now, when did you receive the call notes and the list of doctor visits that you mentioned a few minutes ago?
A. Around the same time as the other materials, end of May, early June.
Q. They all came together?
A. Not necessarily. Maybe two or three envelopes.
Q. But about the same time?
A. Roughly. Within a week or so of each other.
Q. And have you read the call notes and listing of doctor visits?
A. I counted the listing of doctor visits and I read the call notes, yes.
Q. And when did you do that, the counting and the reading?
A. I did it initially a week ago and I did it again just before this deposition, except the counting. I didn't redo the counting.
Q. Now, other than the call notes and the listing

of doctor visits and the deposition of Miss Krahe to the extent it addresses Arrigale or Grossberg, if any, have you received any other materials that you have read or looked at or considered for purposes of your expected testimony in the Grossberg and Arrigale cases?
A. Well, all of the material I looked at for Barnett I'm going to be using in this case. And then I met with a Los Angeles-based sales representative, as I discussed in my last deposition.
Q. Okay. Let me ask it this way. It's probably a good way of shortcutting it.
After your deposition and up until today what new materials have you looked at, considered or reviewed in connection with the Vioxx issues and Vioxx litigation?
A. Well, the call notes and the doctor visits. And I went through some additional materials to respond to your queries, Query 1 and Query 7 in particular.
Q. Okay. Other than that, and we will identify those more precisely later, other than those categories of materials, have you received and reviewed any other materials that pertain to the Vioxx issues in a summary way to shortcut this since your deposition?
A. Well, I also identified a paper that I worked on that relates to pharmaceutical marketing where I did experiments on pharmaceutical markets and advertising as

the fourth experiment in the series of studies, and I brought that paper along.

Q. Is that in the set that you have provided?

A. Yes.

Q. Anything else you have reviewed, relied on or considered since the conclusion of your deposition in the Barnett case and up through today that deals in any way with the Vioxx issues or any lawsuit involving Vioxx?

A. I spoke with Steve Skikos this Thursday and last Thursday.

Q. We will get to materials later but I'm just talking about materials now, just so we have a clear index.

A. Nothing comes to mind.

Q. And if something does you will let me know?

A. I will.

Q. Thank you. How much time did you spend reviewing the call notes and the listing of doctor visits that you made reference to?

A. I didn't record the exact amount of time but I would say two hours.

Q. That's including your review approximately a week ago and whatever time you spent relooking at those materials today?

A. Yes.

Q. Is it your understanding, Dr. Pechmann that those materials will form some basis of whatever opinions you will be expressing at the trial of the Arrigale or Grossberg cases?

A. Yes, I think it might come up.

Q. Okay. What is your understanding as to what you will be addressing that pertains to those documents?

A. Well, as you know, I reviewed the Merck integrated marketing campaign for the whole United States and in reviewing the call notes and the visits I was checking to see whether there was any difference in what happened in this situation versus what I had been seeing from all the research and documents nationwide.

Q. And what did you find?

A. And I found that there was no difference. They are virtually identical patterns in terms of the number of visits, what was talked about and so on. So the opinion I would express is that -- I have the same opinion as the opinion I stated in the Barnett case are the same as the ones I'm going to state in these cases with the exclusion of the specific opinions that had to do with Barnett.

Q. So is it fair to say, maybe to see if we can shortcut this a little bit, that when I'm referring to your general opinions that apply to any -- strike that.

Let me reword that.

Putting aside your specific opinions about Barnett, the rest of your testimony that you expressed either in your report that was produced in the Barnett case or was discussed in your deposition taken in the Barnett case is the extent of what you will be testifying about in the Arrigale and Grossberg cases?

MR. SKIKOS: And the answers to your questions. Everything else is correct but you she answered questions in your e-mails and you have those. Other than that, yes. Does that make sense?

MR. CAMPILLO: No. I thought I had it.

MR. SKIKOS: Her opinions are limited to what's in Barnett, her deposition -- that she expressed in her deposition. And you sent an e-mail asking certain questions and she prepared documents to speed the response to those answers to the questions. And those are the documents that we provided to you prior to the deposition (indicating).

THE WITNESS: And the call notes and call visits that are specific to this case would also be discussed in this case.

BY MR. CAMPILLO:

Q. Okay. How much time have you spent in total reviewing any of the materials that we have already

identified on the record since the conclusion of the deposition in the Barnett case?

A. I should have brought my bill with me. Let's see. Well, I know I spent all day yesterday. Well, let's see. All of this week, basically, working on it. Let me think. Did I work on it last Friday?

Well, several days. I would say five, six eight-hour days. But I could tell you exactly if I had my billing with me, which I didn't bring.

Q. I'll make a request on the record for your billing since the deposition to the present time to be provided to Mr. Skikos.

Is that agreeable?

MR. SKIKOS: Yes.

THE WITNESS: I should have brought it.

BY MR. CAMPILLO:

Q. Because I think there has been a pretty clear identification of your activities through the time of your deposition. I just want to update it from the conclusion to the present time.

MR. SKIKOS: No problem.

Q. Has all of the time that you have spent since the conclusion of your deposition been involved either preparing the responses to the list of questions that I intended to address today and/or reviewing the materials

that pertain to the call notes and listing of doctor visits in the Arrigale and Grossberg situations?

A. Yes.

Q. Anything else that you have done in that interim time that pertains to the Vioxx litigation?

A. Not that I recall.

Q. Is it fair to say, and I know I'm jumping to a conclusion here, but a lot of the time you spent this week was trying to find the materials that you produced that will be identified in a few minutes that are in response to the list of issues that I had identified?

A. I spent Monday doing that. Just Monday.

Q. So Monday you spent looking for the literature?

A. Yes. That would address your issue 7.

Q. So Monday was for Issue 7, literature. And you said you spent five to six hours that day, roughly?

A. Yeah. Up to eight.

Q. Okay.

A. Six to eight.

Q. Let's say four to eight.

A. Six to eight.

Q. Six to eight. All right. And then what activity did you engage in on Tuesday that had to do with the preparation of your deposition for these cases?

A. I prepared the response about Exhibit 5. And

yesterday I continued to work on the response to Exhibit 5 and also read my other deposition, my deposition transcript.

Q. And is it fair to say that both Tuesday and Wednesday you spent six to eight hours each of those two days?

A. Yes. And also this morning.

Q. Okay. What did you do this morning?

A. Reviewed all of the materials. Everything, basically.

Q. Just kind of refresh your memory on what you worked on so far?

A. Right, and answered some questions in my own mind. I took some notes, which are right here (indicating).

Q. Now, in terms of meetings with counsel or discussions with counsel, have you had any such events since the conclusion of your deposition in Barnett?

A. Yes.

Q. Okay. Could you identify those for me, please.

A. Yes. Last Thursday I met with Steve Skikos from 4:00 to 6:00 P.M. and he explained that this depo was going to take place. He showed me the list of the seven questions. We discussed briefly how I would approach each of these questions. I gave suggestion. He mostly

agreed with what I said. I think he did agree with everything I said.

And we took care of scheduling and that sort of thing.

Q. Okay. Now, let me ask you this. Since the conclusion of your deposition in the Barnett case and your meeting with Mr. Skikos last Thursday, had you had any discussions of substance other than scheduling or something like that with any of the lawyers involved in this litigation?

A. Not that I recall.

Q. You certain had certainly not had any discussions with Mr. O'Callahan since the conclusion of the Bar net deposition, correct?

A. Correct.

Q. So basically the first time you did anything since the Barnett deposition related to this litigation was last Thursday when you met with Mr. Skikos?

A. As I recall, yes.

Q. And this week you did some work to prepare for the deposition and your involvement at trial?

A. Right. And I can't remember what I did on Friday at the moment.

Q. Did you do something last Friday that related to this litigation?

A. Let's see. I could check my organizer.

Q. Sure.

A. -- if I did. No. Very little. I was at a conference.

Q. I'm sorry?

A. I was at a conference last Friday.

Q. So you didn't do anything related to this litigation last Friday?

A. Maybe just a few hours worth.

Q. Doing what?

A. Looking over some materials I brought to the conference in my hotel room.

Q. Do you remember what those materials were?

A. They were related to this (indicating), to my response to Exhibit 7 on integrated marketing communications. I stopped by my office to get materials after I met with Steve Skikos on Thursday night and brought them to the hotel and at a break went up -- skipped a session and went up and looked at some of the materials.

Q. Okay. Now, other than meeting with Mr. Skikos last Thursday had you met with any other attorneys relating to this litigation since the conclusion of the Bar net deposition?

A. Not that I recall.

Q. Today did you meet with any of the attorneys that are here today?

A. I met with Steve Skikos.

Q. When did you meet Mr. Skikos?

A. 1:30 P.M.

Q. Until approximately 3:00?

A. Quarter of 3:00.

Q. And was anyone else present during your meeting with Mr. Skikos?

A. Mark Robinson came in for a second.

Q. Anyone else?

A. Someone brought the boxes. That's it.

Q. The other Mr. Skikos?

MR. SKIKOS: Yes.

THE WITNESS: The other Mr. Skikos.

BY MR. CAMPILLO:

Q. So is it fair to say, Dr. Pechmann that other than speaking with Mr. O'Callahan at the Barnett deposition while he was there -- I'm sure you had some pleasantries before and at the conclusion -- that you have had no meetings directly to discuss your testimony in the Vioxx litigation with any of the lawyers that represent Mr. Grossberg and/or Mr. Arrigale in the lawsuits that we are here on?

MR. SKIKOS: That Mr. Sizemore represents?

MR. O'CALLAHAN: Yeah. He is pro hac vice in the California case, just like Mr. Ismail.

MR. CAMPILLO: You are counsel of record for Arrigale and Grossberg.

MR. SIZEMORE: Right.

MR. CAMPILLO: Or just in the coordinating proceeding?

MR. O'CALLAHAN: I don't think it makes any difference.

MR. CAMPILLO: I'm wondering whether he made an appearance for Grossberg or Arrigale specifically?

MR. O'CALLAHAN: He just got into town today.

BY MR. CAMPILLO:

Q. Have you had any discussions with Mr. Sizemore since the Barnett deposition about the Arrigale and Grossberg cases?

A. Yes.

Q. Okay. When?

A. I talked to him on the phone today.

Q. Okay. And when did you do that, the time?

A. About noon, 11:30 and then at about 2:30.

Q. Okay. And did you discuss the substance of your testimony in the Grossberg and Arrigale cases?

A. No. We discussed just some of the facts of the case.

Q. Okay. Why don't you tell me what you discussed with Mr. Sizemore about either the Arrigale or Grossberg cases today at 11:30.

A. He told me the dates on which they took Vioxx.

Q. What did he tell you about that?

A. Arrigale, November '01 to March '02. Grossberg, July '99 to September '01 and then again from '02 to August '04 intermittently.

Q. Did he give you any other details beyond what you just stated on the record?

A. No.

Q. Any other information on any other subject that Mr. Sizemore gave you today provided you during your telephone conversation at 11:30?

A. Yes. We discussed the medical issues.

Q. Okay. What do you mean by that?

A. I wanted to go over with him the indications of Vioxx and exactly when each was approved.

Q. And what did you learn in that regard?

A. That -- well, I knew a lot already from the labels that I had but I confirmed that it was originally approved in '99, May of '99 for osteoarthritis, rheumatoid arthritis in adults and acute pain and men central pain, acute men central pain, which is a very complicated title, label.

And then I knew that it was approved for rheumatoid arthritis in adults in April '02. And then I learned that in '04 it was approved sometime in the spring, like April, for migraine. And in the fall of '04, close to when it was withdrawn, for rheumatoid arthritis with youth.

Q. I don't want to confuse you but I believe you said rheumatoid arthritis as to adults both in May of '99 and April of '02. I expect you may have misspoken. I just want to clear that up.

A. What did I say?

Q. I thought you said that the May '99 approval was to osteoarthritis, acute point, rheumatoid arthritis in adults and menstrual pain.

A. Yes.

Q. Is that correct?

A. Yes.

Q. Because you said that in April of '02 it was approved for rheumatoid arthritis in adults.

A. Oh, you're right. I was wrong. Rheumatoid arthritis is adults was not until '02. I misspoke.

Q. That's what I'm trying to clarify.

A. Thank you. Oh, I did have it written down.

Q. You just said it wrong?

A. Yeah.

Q. Okay. Any other information that you gleaned or learned from Mr. Sizemore in your conversation today at approximately 11:30?
A. Not that I recall.
Q. Any other topics discussed?
A. Not that I recall.
Q. Okay. Then you say you had a second conversation with him at around 2:30, correct?
A. Correct.
Q. And what did you discuss during the second conversation?
A. I got the dates for Grossberg in the first conversation. I got the dates for Arrigale in the second conversation.
Q. The dates that they ingested Vioxx?
A. Correct.
Q. So the afternoon was Grossberg?
A. The afternoon was Arrigale.
Q. So that's when you learned that he had used Vioxx between November of 2001 and -- did you say March of 2002?
A. Correct.
Q. Did you learn anything else about Arrigale's use of Vioxx during either phone conversation than what you have already told us?

A. Not that I recall.
Q. Did you learn anything else about Mr. Grossberg's use of Vioxx during either telephone conversation?
A. Not that I recall.
Q. Did you learn anything else about any of the facts of either case other than what you have already told us during either telephone conversation?
A. Not that I recall.
Q. Other than your phone conversations with Mr. Sizemore today, your meeting with Mr. Skikos last Thursday, have you had any other meetings or discussions with any of the lawyers representing any of the plaintiffs in the Vioxx litigation since the conclusion of your Barnett deposition?
A. Just about scheduling this deposition.
Q. Nothing of substance?
A. Correct. Not that I recall.
Q. Now, you have some notes of your conversations with Mr. Sizemore?
A. Yes. That was what I should have referred to where it gave the dates of those approvals.
Q. You have a note pad with several pages with handwriting on it. What is that pad?
A. This pad I prepared, started last night and then

this morning. And what I did was just to go back through the research, each of the six studies that I had identified, to see what were the range of dates for which there are data available.

Because each document just talks about a slice of the data and there is not one document that has all six studies or all the data from all the studies, so I just went through each of the documents that was originally in my report and then was recited in Exhibit 5 and is now rediscussed in the new document. And I just went through to see what time period we are talking about where we had research and concluded that for three of the studies we have three years of data, summer/fall 2000 to fall/winter '03.

And it's roughly a thousand people per month for three years that were interviewed, 700 physician, 300 consumers.

And then there's just examples, two examples of copy testing with consumers, one example of copy testing with physicians where small groups or medium-size groups reacted to the materials. I don't have continual studies of that.

And then I have another study for which I have the tracking of the message recall from the sales reps. It goes from September to December '01 and then picks up

again in May '02 to May '03. We just don't have the -- I was never provided with the data for the other year. It just basically cites the years.
Q. We are going to get into that in a little more. I'm trying to understand what you have in front of you so I can decide whether I need to copy it or not.

So you have some notes of the materials you reviewed previously that went into, I guess, your update of what was referred to as Exhibit 5 in the Barnett deposition; is that correct?
A. Correct.
Q. How many pages of your handwritten notes relate to that?
A. Two.
Q. All right. And then what's the third page?
A. So three, four, five and six are the chronology of events from 2000 to 2003. So basically just going through what were different marketing materials that I looked at in chronological order and different events that occurred, like the *JAMA* article or the FDA warning letter in chronological order just so I could see it, if I needed to.
Q. Okay. When did you prepare those pages?
A. This morning.
Q. So a refresher for yourself from documents you

had already seen before?

A. Yes.

Q. And how many pages after that?

A. Then there is a page where I took the notes from Paul Sizemore about the approved uses for Vioxx.

Q. That's your conversations from today?

A. Correct.

Q. Okay.

A. And then a couple of notes to myself to check exhibits, which I then did when I got here.

Q. Okay. What's the next page?

A. Find out years involved in L.A. cases.

Q. That was a note that you had written to yourself before you spoke to Mr. Sizemore or after?

A. This was a note after.

Q. What is the question you are asking?

A. I had written a note to myself with no answer. I had written this part, "Find out years involved in L.A. cases" maybe yesterday. And then when he gave me the answer I put the answer on the same page.

Q. Okay. Anything else?

A. And then this is an overview of my opinion as I was practicing with Steve before we came.

Q. Okay. That's fine. I didn't mean to cut you off. I'm sorry.

A. That's it.

Q. All right. Do me a favor. Without commenting or editorializing just read verbatim your summary of your opinions that you wrote with Mr. Skikos today when you were practicing. Just read it verbatim slowly for the reporter to take it down.

A. Okay. "In integrated marketing communication based on science. Science isn't industry specific. Merck's integrated marketing communications campaign was intense, sophisticated and science based.

"Research studied CV risk awareness and awareness low. They did nothing to increase awareness and actively tried to reduce awareness.

"California equals the U.S. Sales rep, call notes, Krahe, senior business director Southern California, cross-functional team for Vioxx. Details in Barnett report."

Q. Now, Dr. Pechmann, is it accurate to say that those pages on the pad that you have already described is the totality of the materials that you have created for the Arrigale and -- in connection with the Arrigale and Grossberg cases except for the other materials that you have handed to me that I have yet to identify on the record?

A. Yes, I believe so.

MR. CAMPILLO: We can at some point in time make a copy of those sheets and we will mark those as Exhibit 2 collectively.

THE WITNESS: I'm sorry my handwriting is so messy.

BY MR. CAMPILLO:

Q. That's why I asked you that one part that's more significant to me.

(Deposition Exhibit 2 was marked for identification and is annexed hereto.)

BY MR. CAMPILLO:

Q. All right. Now, is my understanding, Mr. O'Callahan, just to see if we can shortcut this deposition a little bit, that she is not going to express any specific opinions about Arrigale and Grossberg as she did in the Barnett case other than to say that whatever was happening in California was similar or consistent with what was being done everywhere else, but she is going to testify about what the prescribing doctors in Mr. Grossberg's or Arrigale's case knew and things of that nature? Do I have I it correct?

MR. O'CALLAHAN: I think that's generally a fair statement. She does have specific -- she has reviewed the call notes and records regarding the physicians who were prescribing Vioxx to the trial plaintiffs in this

case.

And as I understand her testimony, she believes that those notes and so on are consistent with what she observed with respect to the Barnett case. That, I think, further confirms that this was a national integrated marketing plan that was put into effect.

I don't want to put words in the witness' mouth but I think that's a summary of what she has done.

MR. SKIKOS: We are going to go off the record for a second.

(Recess taken.)

BY MR. CAMPILLO:

Q. Dr. Pechmann would you tell me your own understanding of what opinions, and just the opinions. Don't worry about the bases of the opinions for now -- oh, she needs her notes?

MR. O'CALLAHAN: I'm going to object to the extent it's cumulative. She prepared a 87-page report that contains her opinions. Do you want her to read her report into the record?

MR. CAMPILLO: Just make your objection, Mr. O'Callahan. I'm really trying to shorten this, not belabor the point.

MR. O'CALLAHAN: Ralph, we all know what you are trying to do here. So just go ahead.

MR. BRANDI: Can we also reflect that there was an off-the-record discussion. I told you that the doctor was not going to testify to as to what any prescribing physician had actual knowledge of but, rather, based on her knowledge, skill, training and experience and review of the materials what information they had and what they likely were told and what effect it was designed to produce.

MR. CAMPILLO: Okay. I will just for now say that that is way beyond what was stated to Judge Cheney that she was being proffered for when we agreed that the deposition could be limited to three hours. I will continue but I want to make sure I'm not waiving my right to seek additional time to the extent she is going to say anything about the specific physicians that are involved in the care and treatment of Mr. Arrigale, because those would be case-specific opinions. Whether it's what they were told or what they knew or what was available for them to be told, it's still case-specific and I just want the record to be clear what our position is.

MR. BRANDI: Okay. Let's go.

MR. SKIKOS: Now she is confused.

THE WITNESS: No, it's okay. You will ask questions and I will answer.

MR. CAMPILLO: We will clarify it. Let me mark

these other documents just so that we have a clean record.

Let's start with the call notes and the listing of Dr. Visits that you made reference to, Dr. Pechmann if you could. Let me look at them really quickly and I will give them back to you.

(Documents handed to counsel.)

MR. CAMPILLO: Exhibit No. 3 will be a document entitled "Call Notes" which has nine pages and it lists the call notes relating to Dr. Shaw and Mr. Grossberg.

(Deposition Exhibit 3 was marked for identification and is annexed hereto.)

MR. CAMPILLO: Exhibit No. 4 is a similar document. This one identifies Mr. Arrigale, Dr. Caceres, Dr. Chung, Dr. Nguyen.

(Deposition Exhibit 4 was marked for identification and is annexed hereto.)

And Exhibit No. 5 is another document. This one does not have a title.

(Deposition Exhibit 5 was marked for identification and is annexed hereto.)

THE WITNESS: Contact said --

BY MR. CAMPILLO:

Q. Dr. Pechmann is that your handwriting?

A. Yes.

Q. And it says ID case --

A. Those are the headings for the columns but this says contacts and-what does this say? Samples.

Q. Okay.

A. I would call it a contacts and sample documents.

Q. Are these documents, Exhibits 3, 4 and 5, the totality of information that you have received other than what Mr. Sizemore told you on the phone today that pertain specifically to either Mr. Grossberg or Mr. Arrigale or the prescribing physicians?

A. Unless Krahe's depo said something about it.

Q. So what I said is correct with that caveat?

A. Yes.

Q. Okay. Have you looked at any of the medical records that pertain to Mr. Arrigale or Mr. Grossberg?

A. No.

Q. Have you looked at any pharmacy records that pertain to either Mr. Arrigale or Mr. Grossberg or the pharmacies through which they acquired any medical products?

A. No.

Q. Have you looked at -- do you know anything about the background of Dr. Caceres, Dr. Shaw or any of the other doctors that are listed or mentioned in Exhibits 3, 4 and 5?

A. No.

Q. Other than the information that was related to you by Mr. Sizemore on the telephone today, do you have any other knowledge or information relating to when Mr. Arrigale or Mr. Grossberg used Vioxx, the doses that they used, the time during which they used Vioxx, the duration of use or anything else relating to those topics?

A. No.

MR. SKIKOS: Ralph, I don't want to speak out of school, but this might be them.

MR. CAMPILLO: Sure.

MR. SKIKOS: Prior to the deposition Dr. Pechmann and I prepared what she read to you, those seven points. And we did that in an effort to limit her opinions and create a cut off so that certain case-specific opinions that you are concerned about would not be discussed, for example, what was specifically told to the treating physicians is a perfect example am.

Unfortunately, my brother took the document, but the seven general topics are the topics that she intends to testify to at trial. Of course, they are supplemented by whatever data is in her Barnett report and whatever she is providing to you here and in response to your e-mails.

That is our best effort to narrow the opinions so that you have a clear understanding before going to trial about what she is going to talk about.

MR. CAMPILLO: That's very helpful. I just want to make sure that counsel of record, who will be the ones, I assume, at trial agree with what your characterization of what her involvement in this case will be.

Can you do that?

MR. BRANDI: Yeah.

MR. CAMPILLO: Good enough for me. Then when we get the document back I will clarify what those are and we are probably fine. Thank you.

Q. Now, do you have some other materials, Dr. Pechmann in front of you that I just want to make sure I know what they are so I can decide whether I need to mark them. You can just walk me through them in whatever order you want.

A. This document entitled "Information Formats for Presenting Unfavorable Efficacy Information, Managerial and Regulatory Perspectives" .

Q. What is that?

A. It is a document I am working on with a former Ph.D. student, Dipayan Biswas.

I brought this because the fourth study is a

controlled experiment of a real Merck label for Maxalt tablets, which is for migraine headache. It's a prescription drug for migraine headache.

So this study shows that I have done controlled experiments, independent research on pharmaceutical marketing. The reason I didn't bring it up at the last deposition was because I didn't conceive of the paper as a paper on pharmaceutical marketing.

When I do research I talk about general topics, like the topic here, how do you present unfavorable efficacy information. And the first study is about sun screen, I believe, first and second studies are about sun screen and it's an over-the-counter sun screen. One of the study is about cars and car crash results and the final study is about prescription drugs.

And that epitomizes what we do. We try to do research that transcends industries, because we couldn't do a study about every single industry or we would never get anywhere.

So when I was originally asked at my last deposition had I done independent research and so on I had said no because I hadn't thought of this paper. But once I understood their definition of what pharmaceutical research is, I realized that clearly this would qualify.

Q. Okay.

A. So I wanted to make sure that you knew I have this paper.

Q. Now, basically, this is significant to your experience and expertise in marketing and particularly how it relates to pharmaceutical products?

A. Absolutely, yes.

Q. When was this research conducted, just a general time frame?

A. Well, he started it for his dissertation, so it was started three years ago. He graduated two years ago already. It takes a long time.

And I think that study was done in May full. The last study was done last fall.

Q. Fall of 2005?

A. Yes.

Q. And that part of the work that the student is doing is complete?

A. Yes.

Q. But his dissertation is not complete?

A. No, his dissertation is complete. His dissertation was the first three studies.

Q. So what is the status of this document? Is this a draft in process or has it been published? Where does this stand?

A. This is a draft paper that we are still working

on. And within a month we hope to submit it to a journal.

Q. Any particular journals you have in mind at this point?

A. Yes. Journal of marketing research.

MR. CAMPILLO: All right. Can we mark this as Exhibit No. 6.

(Deposition Exhibit 6 was marked for identification and is annexed hereto.)

MR. CAMPILLO: Mr. Skikos and I have discussed the fact that since this paper is in process, if you will, and not published, that it will not be used for any purpose whatsoever other than possibly to cross-examine Dr. Pechmann and will not be made available to anyone for any other purpose.

MR. SKIKOS: Yes. Thank you.

BY MR. CAMPILLO:

Q. Another document that you have in front of you, Dr. Pechmann I believe, is a set of reprints with a summary in front of it.

A. Yes.

Q. And those are articles that you have personally located and copied for us that address literature which discusses, describes or critiques integrated marketing communication campaigns of pharmaceutical companies?

A. Yes. Most of them discuss that.

Q. And these are the ones that you searched for and located earlier this week?

A. Yes.

Q. And did you do that solely because that was an area that I had identified personally as an or that I wanted to ask you questions about before you took the stand in the Grossberg and Arrigale cases?

A. Yes. And also because it was a blank exhibit in my last depo.

Q. Because you were asked some questions about studies but no studies were identified during the Barnett deposition?

A. Correct.

Q. So these are the studies that at least you believe were responsive to those questions and you have now had the opportunity to look for, identify and provide?

A. Correct.

MR. CAMPILLO: So we will have this entire set and the summary sheet which is two-sided marked as Exhibit No. 7.

(Deposition Exhibit 7 was marked for identification and is annexed hereto.)

BY MR. CAMPILLO:





Q. A couple of more questions about Exhibit 7, Dr. Pechmann. The summary, the two-sided or two-page summary, is that something you prepared yourself?

A. Yes.

Q. Did anyone help you with the searching and identification of these articles or is this something you did personally?

A. I did it personally.

Q. Okay. And just in very general terms how did you go about conducting the research that identified these articles?

A. I went to the Harvard cases, Stanford cases and Ivy cases that are available on line to proceed professors and I identified ones that dealt with pharmaceutical marketing and integrated market communications. The only thing I did get help with was my account had expired, so my Ph.D. student, Dip, actually bought them for me. And then I --

MR. SKIKOS: He dipped into his own account.

THE WITNESS: I also looked at two textbooks, one in consumer behavior and one in marketing management, because they talk about marketing being a science and the different types of science that are involved specifically.

I did that because it reinforces my point that





integrated marketing communications are based on science. That are well known techniques, validated tech next for studying these campaigns and their effects.

And the next case from Harvard shows that Merck employed this science, that they changed their approach from a non-science-based to a very marketing science-based approach to integrated marketing communications.

And then after that I just show examples of how these types of research are used in other pharmaceutical contexts.

Q. Okay. Dr. Pechmann had you read any of the materials or articles that are included within Exhibit 7 prior to your locating them this week?

A. Some of them, yes.

Q. Which ones had you read before locating them this week?

A. 1, 2, 4, 8, 10, 11.

Q. And any others?

A. Not that I recall, no.

Q. I assume you had read those particular items other than in connection with your work in the Barnett case or the cases we are here on today?

A. Yes. I would like to point out that the last one is about the link between pharmaceutical marketing





and tobacco marketing, which was specifically asked for at my last deposition.

Q. Do any of these materials, which obviously I don't have the time to read at the moment, mention Vioxx or marketing of Vioxx specifically?

A. Yes.

Q. Which one or ones?

A. 10.

Q. That's one of the ones you had read before?

A. Yes.

Q. And just in very brief fashion what does that item tell you about Vioxx and the marketing of Vioxx?

A. It gives statistics about Vioxx's advertising expenditures relative to other consumer goods like Pepsi and indicates that the expenditures are very high, say double that compared to what was spent on Campbell's Soup and 50 percent higher than Pepsi. That sort of thing.

Q. Any other references to Vioxx in any of the materials contained within Exhibit 7 that you can think of?

A. Not that I recall.

Q. And you also provided me with a document entitled "information about Pechmann Deposition Exhibit No. 5." To be honest with you, I'm not sure I understand what this is. Can you try to explain that for me.

A. Sure. When I was preparing for the first deposition the issue arose as to whether I would meet the standards of an expert, of which I know nothing about because I'm not a lawyer. But Steve Skikos talked to me the day before and said that -- something to the effect that there has to be a scientific basis for the opinions.

And I said that half of what I looked at were these studies, that there was extensive research, which is why initially I said I was interested in the case because I knew that there would be a lot of research and that was my background and I felt comfortable with that.

And he said there is probably going to be a direct exam on those studies and they are not clearly laid out in your report because they are kind of interspersed with other things, which is how in many documents they are. You talk about that topic and all the research about that topic as opposed to a research-by-research layout.

I started to go through the studies with him and he said, "Why don't you write that down because it's so much work -- so much material that it might be difficult for you; you won't remember."

So I prepared this document?

Q. The handwritten Exhibit 5?

A. Exactly. And then we read that you wanted more

information about this Exhibit 5. And I said to myself you would be better off with something that was typed than something that was handwritten and something that clearly showed that mostly what I did with Exhibit 5 is just pull the researchers out of Exhibit 5 and put them in my own handwriting.

The only other thing I did was do it study by study so that the format was different and talked about the method at the beginning, which makes sense when you start talking study by study.

So what I did was, since you wanted more information about No. 5, was to make a document that I thought would be helpful would you where I typed it up so the method is now typed up very clearly stating where everything was in the original exhibits from my expert report. And then everything in bold is cut and paced from my original expert report to show that virtually everything in therein terms of results was in my original report.

The only thing I did was reorganize it and add the method. So that's what this is. It's just a way to clarify what I was doing with Exhibit 5.

Q. So another way of putting it is that you have taken the handwritten Exhibit 5 from the Barnett deposition and you have now typed it up, organized it,

added details to make it more complete and more thorough? Is that a fair summary?

A. Well, I organized it the same way but I added details, because last time for results I would just write very brief results. And this time I just cut and paced all the results, the detailed results I had in my original expert report. So I gave a more complete set of results.

Q. Now, if you will recall, Dr. Pechmann during the Barnett deposition Mr. Skikos towards the end asked you a series of questions and you identified six types of studies that you had comments about. Do you remember that?

A. Yes.

Q. How does that series of questions and your discussion about those six types of studies relate to Exhibit 5, if it does at all?

A. It directly relates to Exhibit 5, because as he was asking me those questions I was using these notes to respond.

Q. I see. All right. So this exhibit, when I have a chance to read it, should track, if you will, your testimony in response to Mr. Skikos' questions in the Barnett deposition, possibly with more detail of course, but in a sense discusses those opinions and the bases for

those opinions?

A. Yes.

Q. So it's not something different from the opinions you express on the record during the questions by Mr. Skikos, it's just a written version of that with added detail?

A. Correct. The added detail is a little bit more about the method and a little bit more about the findings. But what I would like to point out is everything in bold was from my original report, so if you read my expert report you will just be repeating the same thing here.

MR. CAMPILLO: Let's mark -- what do we want to call this?

MR. SKIKOS: The answer to Ralph's question.

MR. CAMPILLO: We will just call it information about Pechmann's Deposition on Exhibit 5. That will be Exhibit No. 8 to this deposition.

(Deposition Exhibit 8 was marked for identification and is annexed hereto.)

BY MR. CAMPILLO:

Q. Okay. Any other materials, Dr. Pechmann that you brought with you today that we have not already discussed or identified on the record? And I do understand, by the way, that you have the boxes of

materials that you relied on, read or considered and I assume those are the same five, quote, unquote, boxes that were at the Barnett deposition?

A. Yes.

Q. So there is nothing new in the boxes that were not present at the time of your Barnett deposition, correct?

A. Correct.

Q. Okay. Because I'm not going to copy those as long as they are the same thing that we already have. Is that correct?

A. Correct.

Q. Anything else that you have here today that we have not already identified on the record?

A. Yes.

Q. Okay. What is that?

A. To help you go through this --

Q. I should ask for more things. She is so helpful. I could have thought about ten more questions if I knew she was going to be so responsive.

MR. SKIKOS: You should have.

MR. CAMPILLO: I will next time.

Q. Thank you, Dr. Pechmann. I appreciate it.

A. To assist you with this document that's called information about Pechmann Deposition Exhibit 5 we

created a binder that provides the exhibits in the order in which they appear.

Q. Could we see the binder?

A. Yes.

MR. SKIKOS: While you are looking, my wife just called.

MR. CAMPILLO: We will go off the record.

(Recess taken.)

MR. CAMPILLO: Just to complete the housekeeping, Exhibit 9 to this deposition is going to be a binder, very beautifully organized, tabbed binder prepared by Dr. Pechmann or someone at your request --

THE WITNESS: Someone at my request.

MR. CAMPILLO: And the first one, as I understand it, is a list -- well, it contains all of the exhibits from your original Barnett report. So when it says Exhibit 59, that's referring to Exhibit 59 to the Barnett expert report.

A. Correct.

Q. And these are the exhibits that correspond to your comments and opinions that relate to the six types of studies that you discussed on the record during the Barnett deposition?

A. Right, that were identified as Exhibit 5 from the deposition.

Q. Okay.

(Deposition Exhibit 5 was marked for identification and is annexed hereto.)

BY MR. CAMPILLO:

Q. And the next binder which we will mark as No. 10 is somewhat similar to No. 9 but it differences that for some of the documents in Exhibit 10 you only have the specific pages that are referenced in Exhibit 5 and not the entire document, correct?

A. Correct.

Q. And there's also some documents under tabs 25, 26, 27 and 28 which are some other Merck documents that are also referenced in Exhibit 5?

A. Yes, as Merck documents.

Q. As opposed to an exhibit to your expert report?

A. Correct. Those were mostly the nod papers that I original didn't put in the report because I didn't put the method of the research in the report.

Q. But the number that you use in your column is just the first Bates number for each document but each document is actually multi-paged?

A. Correct.

Q. All right. Okay.

BY MR. CAMPILLO:

Q. And I think with the identification of Exhibits

9 and 10, Dr. Pechmann we have now covered everything that you have brought with you to this deposition and also I think with the materials contained in the five boxes that we are not going to mark it's the totality of the materials you have read, relied on or considered for your opinions in this case? I see there is an exception to that.

A. Just one more item.

Q. Okay.

A. This was the special issue of a journal that described the integrated marketing campaign that we did for the antidrug program.

Q. May I see that, please?

A. It's my only copy (handing).

MR. CAMPILLO: This is -- what do we call this? A periodical?

THE WITNESS: Yes. Called social marketing quarterly.

MR. CAMPILLO: Social marketing quarterly. This particular one is Volume 10, No. 2 from the summer of 2004.

Q. And the significance of this particular publication, Dr. Pechmann is what?

A. That we used the same scientific studies for that campaign as was used in the Merck campaign.

Q. Meaning the types of studies, the methodology?

A. Exactly. Merck did more studies but we did many of the same studies that they did. I had already provided my own article from that issue but this gives you the totality of the articles that are written.

Q. All right. Is it all right if we take this, the court reporter takes it, makes a copy, marks the copy and returns the original to you?

A. Okay.

Q. Is that okay with you?

A. Yes.

MR. SKIKOS: Would you be happier if Mr. Skikos over there copied it and gave it to Mr. Campillo?

THE WITNESS: Yes.

MR. CAMPILLO: That's okay with me. I'm not going to ask you any questions about it, so he can take it.

MR. SKIKOS: Good luck, Mr. Skikos.

THE WITNESS: All right. That's it.

BY MR. CAMPILLO:

Q. One more exhibit. This is not the one that you brought.

No. 11 will be the marketing journal that we just identified. And Exhibit 12 will be the plaintiff's expert witness list and declaration served in connection

with the Arrigale and Grossberg cases dated April 21, 2006.

(Deposition Exhibit 12 was marked for identification and is annexed hereto.)

BY MR. CAMPILLO:

Q. From Pechmann you pointed to something on the first page of Exhibit 12 and kind of chuckled. Can you tell us what that was about.

A. I said that I got a raise because I'm charging $350 an hour. But they are going to pay me $400 an hour.

Q. All right.

A. According to this statement.

Q. Well, what is your normal and customary hourly rate for consultation that you are involved in here?

A. $350 an hour.

Q. So this is a mistake, you believe?

A. I don't know.

Q. Well, have you discussed with counsel of record for Mr. Grossberg and Mr. Arrigale what rate you will be charging them for the work you do in this case?

A. No.

Q. Will it be $350 an hour?

A. Yes. Also my name has two N's at the end of it.

Q. Okay. As of April 21, 2006 -- well, let me ask you: Had you seen this document before this afternoon?

A. No, I had not.

MR. O'CALLAHAN: Mr. Campillo, let me just put on the record that we are an hour and a half into the deposition. It's a three-hour time limit imposed by the court. And I don't think you have gotten to the seven areas of questioning you wanted to get so. I hope that you are able to do that in the next hour and a half.

MR. CAMPILLO: What was my last question?

(The last question was read.)

BY MR. CAMPILLO:

Q. And had you given your consent to anyone at the law firm of Girardi and Keese to list you as a retained expert in connection with either the Grossberg or Arrigale cases?

MR. SKIKOS: That's asked and answered. She has already answered that one.

MR. CAMPILLO: I said to Girardi and Keese.

Q. Have you specifically given your consent to anyone at the Girardi and Keese law firm to use you as an expert?

A. I told mark Robinson that it would be okay.

Q. And that was before April 21, 2006?

A. Yes.

Q. Thank you. Dr. Pechmann do you have any knowledge as you sit here today about the credentials or

the professional training and experience of any of the prescribing physicians or physicians who prescribed Vioxx to either Mr. Grossberg or Mr. Arrigale?

A. No.

Q. Do you have any knowledge as to what any of those individuals knew about the risks and benefits of Vioxx at any point in time in between 1999 and 2004?

A. Yes.

Q. Other than the information that you have gleaned from the review of the documents that have already been identified, do you have any specific information about what any of those prescribing physicians knew about the risk and benefits of Vioxx during the time frame 1999 through 2004?

A. Beyond what we have already -- beyond my other depo and the report and everything, not that I recall.

Q. Now, you mentioned earlier that you had talked to -- let's see the way you described it -- a sales representative I think you said from the Southern California area.

A. Correct.

Q. Who did you talk to?

A. I don't know. I don't remember her name.

MR. SKIKOS: She went over this in the last depo.

MR. CAMPILLO: I was going to clarify.

Q. You were referring to the same person you had mentioned in the Barnett deposition?

A. Yes.

Q. Have you talked to that person again?

A. No.

Q. Just the one time described in the Barnett deposition?

A. Correct.

Q. All right. Have you talked to anyone else involved in any way with the marketing or promotion of Vioxx in the State of California other than that person?

A. Have I spoken with anyone else?

Q. Yes.

A. No.

Q. Do you have any knowledge or information, Dr. Pechmann as to whether or not Mr. Arrigale and/or Mr. Grossberg saw any direct to consumer advertising related to Vioxx at any time?

A. No, I don't know.

Q. Do you have any knowledge as to whether or not any of the physicians that prescribed Vioxx to Mr. Grossberg or Mr. Arrigale attended any events sponsored by Merck at any time pertaining to Vioxx?

A. I believe the call notes make reference to some

events.

Q. Would that be the extent of your knowledge, whatever is reflected in the call notes?

A. Correct.

Q. As you sit here today do you have in mind any particular demonstrative exhibits or audio visual aids that you would use at the trial of the Arrigale and Grossberg cases?

A. Yes.

Q. Okay. What have you considered? What do you have in mind as you sit here today?

A. The exhibits that are referred to in this report we call information about Pechmann Deposition Exhibit 5 that talks about the science.

Q. If we can call it Deposition Exhibit No. 8.

A. Exhibit 8. Okay. And there are several documents throughout my expert report that I would think would be good to show to the jury.

Q. By that you mean that the actual document may be put up on a screen or shown to the jury in some way?

A. I guess. We haven't really discussed it but that's one way.

MR. SKIKOS: That's a good idea. I'll do that.

BY MR. CAMPILLO:

Q. Okay. Other than displaying documents that are

referenced in Deposition Exhibit 8 or your Barnett report, have you given any thought to what demonstrative exhibits or any audio visual aids that would be used at the trial of these two plaintiffs' cases?

A. Yes. And we talked about using the "Be the Power" video.

Q. Okay. When you say "we talked about using" who are you referring to?

A. I believe Steve and I talked about it.

Q. Mr. Skikos?

A. Yes. Or perhaps mark -- actually, it was mark Robinson when he was originally going to do the L.A. trial.

Q. Anything else you have considered to this point in time in terms of audio visual aids or other demonstrative exhibits that you would use to complement along with your testimony?

A. We might show some of the TV ads, the Dorothy Hamill ads.

Q. Anything else?

A. I haven't thought about it yet.

Q. So you have told us at least what you have thought about or considered to this point in time?

A. Yes. I haven't gone into the specifics. It would take quite a while to go through every page of my

report and say which documents.

Q. I'm not asking you to tell me which of your exhibits you would display but I'm saying conceptually any other ideas that you have come up within terms of what you would want to do to demonstrate your testimony in front of the jury.

A. We might put some summary opinions up in a PowerPoint or something.

Q. Have you discussed that with any of the attorneys representing either Mr. Arrigale or Mr. Grossberg?

A. No.

Q. Have you began work on any such aids?

A. No.

Q. Dr. Pechmann have you located any published articles authored by anyone in which the Merck integrated marketing campaign for Vioxx is critiqued?

A. I believe there is a case in Europe, and I tried to get a copy of it but I haven't managed to get it yet.

Q. And what is it that you have been trying to get? Can you refer to it by authority or what you have heard about it.

A. It's a case on Vioxx that's disseminated from the European clearing house.

Q. When you say "a case" you mean a lawsuit?

Q. That's the first part or is that both?

A. No. The first part was that they were misinformed from earlier aspects of the integrated marketing campaign. And when they saw this new piece of the campaign they remained misinformed because the campaign was misleading.

Q. Now, specifically, if we can look at Exhibit 28 -- would it help you to have the binder?

A. I have them. I have my copies, so I'll look. I'm trying to think the best way to do it.

Q. I'm going to be asking you about Exhibit 28 first.

A. So you are going to be referring to these based on my original exhibit numbers?

Q. Yes, from your Barnett report. Does that work for you?

A. Yeah, I think that will work. And this should do it. And if not I will get the other box with my original exhibits.

MR. SKIKOS: Since there is so much science it's so heavy.

BY MR. CAMPILLO:

Q. All right. You are on 28?

A. Yes.

Q. That's the brochure, strength, safety, CV

simplicity?

A. With the woman with her hands up, yes.

Q. What about this exhibit specifically tells you that the physicians were confused? I'm sorry, misinformed about the CV risks of Vioxx?

A. Okay. So you are talking about my opinion No. 2?

Q. Let me see if I have it right. You said with regard to this type of study your opinion was that the physician who participated in the study had some misunderstandings about the potential cardiovascular risks of Vioxx and that the detailed pieces that they saw allowed them to continue to be misinformed?

A. Correct.

Q. Did I mistake that in any significant way?

A. Not that it appears to me.

Q. Okay.

A. So you're asking me about the second part?

Q. Yes.

A. Okay.

Q. And if you can refer me to the portion of the brochure or the detailed piece which you believe caused them to remain miss informed.

A. Well, what they said in response to this is that they want the company to address the CV safety issue. So

what they were misled about was the omission about anything about CV risks that would be helpful to these physicians.

Q. Okay. What was it that was omitted from Exhibit 28 that in your judgment should have been included?

A. Vioxx could cause heart attacks and strokes.

Q. In those words?

A. Something to that effect to let people know that there is research indicating that this drug could cause heart attacks.

Q. Okay.

A. Particularly among high-risk elderly consumers with cardiovascular risk factors.

Q. So if I understand you correctly, your criticism of Exhibit 28 as it relates to your first pair of opinions is that the brochure or this detailed piece should have had language to the effect in substance that Vioxx could cause heart attacks and strokes?

A. Right.

Q. And it's your judgment that it didn't?

A. Correct.

Q. Anything else that in your judgment was omitted from Exhibit 28 that pertains to this first group of studies?

A. On Page 2 where it talks about the safety

profile in elderly patients it says "No substantial difference in safety and effectiveness were observed between older and younger patients." And it shows the percentages of people who took the drug who were over 65, over 75 and over 80 and applies a very significant number of the patients saying Vioxx are elderly and it clearly indicates it's safe to use in the elderly.

Q. Are you aware of any data anywhere that would show the safety risk or events, adverse events in elderly are higher than in younger patients?

A. It's not age. It's that the CV risks are higher in the elderly.

Q. And what do you base that opinion on, that the CV risks are higher in the elderly population?

A. Well, the doctors were saying it themselves in this research.

Q. Okay. Are you aware of any data that elderly patients that use Vioxx have a higher rate of CV events than younger patients who use Vioxx?

A. What I'm saying is that elderly patients in general have an increase in cardiovascular risk with age.

Q. Okay.

A. Independent of Vioxx use.

Q. Okay. Do you know whether that's a well-known fact or knowledge that's well known among the medical

profession across the United States?

A. Well, I heard the physicians stating it throughout the research that I reviewed.

Q. Okay. So, then, given that -- I'm not sure I understand what your criticism is of Exhibit 28.

A. My criticism is to the extent that CV risks are increased in the elderly and the risk of Vioxx is higher in people with a CV risk, then putting those two together there is an increased potential for CV adverse effects in elderly patients with CV risk factors.

Q. Okay. And where -- I'm sorry, I didn't mean to interrupt you.

A. And this implies that there is no difference, no problem.

Q. Can you refer me, Dr. Pechmann to any publication, any document that says that older patients on Vioxx have a higher incident of CV events than younger patients?

A. As I said, I's not -- the publication I'm referring to is the bigger study that shows that people with higher CV risk have more of a problem on Vioxx.

Q. That's your interpretation of the VIGOR data?

A. Yes.

Q. Okay. And what else?

A. And there is a correlation between age and CV

risk, so it's a two-part argument that I'm making.

Q. Okay. Anything else in Exhibit 28 that you believe is inappropriate or help keep the physicians who sold these detailed pieces misinformed?

A. Well, the next page is similar, again implying that a lot of people who are elderly use Vioxx, and so it's just a follow-up on what was on the last page.

Q. Are you aware of any data anywhere that would say that -- indicate that any of the data that's reported or any of the numbers that are reported in Exhibit 28 are inaccurate?

A. No.

Q. So it's not lack of accuracy. What is it that you think is misleading about this document?

A. Omissions.

Q. Okay. You told us about the omission that it didn't say in substance that Vioxx could cause heart attacks and strokes. Anything else?

A. And it's even more likely to cause heart attacks and strokes in people with CV risk.

Q. And you believe that there was data available at the time this brochure was used that indicated that?

A. This particular brochure was used -- let's see. Which one is this. This is my original Exhibit 28?

Q. Yes.

A. Yes. This was used in the first quarter of 2003.

Q. Is that when it was tested or is that when it was end used in the public?

A. End used. It was tested in November of '02.

Q. Anything else about Exhibit 28 specifically?

A. No.

Q. Can I assume that for Exhibit 29 it's basically the same opinions? Let me ask you: Is there anything different about Exhibit 29 -- this is a very similar do you mean -- than what you just told us about Exhibit 28?

A. It is different.

Q. Okay.

A. 29 includes the efficacy competency program. I guess on the fourth page, fifth page it describes that program and there is extensive research to show that people interpreted the program to mean that Vioxx was safer than they had originally thought.

So it improved -- there is quite extensive research to know that this program had a halo effect on safety perceptions. It created the perception that there was less cardiovascular risks and increased people's confidence in Vioxx, which was the objective.

Q. The brochure itself, Exhibit 29, your criticism is it referred to the confidence program?

A. It shows the confidence program has been extended through 2003.

Q. Okay. Go ahead. I'm sorry.

A. So it's stating that Merck stands behind Vioxx, is going to provide this money-back guarantee for another year. It was started in, I think, August of 2002. And Merck had data to show that this created the misleading perception.

Well, they didn't say it was misleading. I'm saying it's misleading. But in any event, created the perception that Vioxx was safer than people had thought and stemmed to decline in prescribing behavior, and so they decided to extend it.

This is an example where they had research showing that instead of increasing awareness of the CV risks they were purposefully trying to decrease awareness in extending a program that was proven to decrease awareness of the risk.

MR. SKIKOS: Are those research studies in Exhibit 8?

THE WITNESS: In this exhibit?

MR. SKIKOS: Yes.

THE WITNESS: Yes. See, it's a different type of study. That's the efficacy study.

BY MR. CAMPILLO:

Q. Let me ask you this, Dr. Pechmann. You just stated there was data or you have seen indications that perk purposely tried to decrease the CV awareness. Is that what you said?

A. What I'm saying is --

Q. Did you say that or mean to say that?

A. I said they continued to the program when they knew it was decreasing concerns about CV safety. They purposefully decided to continue the program. They indicated they were pleased with the results and with the sales by stating it was successful and they wanted to continue the program.

Q. Are you aware of any indication from any documents that you can point us to today that would say to you that Merck purposefully was trying to decrease awareness of CV risks with Vioxx?

A. I did not find a document in which they stated that exactly.

Q. Are there documents in which you are inferring that?

A. Yes.

Q. Okay. Which documents are you using to infer from that Merck purposefully was trying to decrease the awareness of CV risks with Vioxx?

A. It's later on this report, so it will take a

minute to find it.

Q. Sure.

(Witness reviews document.)

MR. SKIKOS: While she is doing that, my wife is calling. Let's take three or four minutes.

MR. CAMPILLO: Whatever you need.

(Recess taken.)

BY MR. CAMPILLO:

Q. Dr. Pechmann while we were on the break you were able to look through Exhibit 8 to try to answer my last question?

A. Yes.

Q. Can we have the reporter read the last question back.

(The last question was read.)

THE WITNESS: I'm going to be using Exhibits 47 and 48 that are referred to in this Deposition Exhibit 8.

BY MR. CAMPILLO:

Q. All right. I have Exhibit 47. Let's go to Exhibit 47 first. What about 47 allows you to infer that Merck was trying to decrease CV risk awareness?

A. Well, I would rather start with 48, if I could.

Q. Sure.

A. Because that's where it begins.

Q. It's your opinion. Just give me one second.

Okay.

A. Well, Exhibit 47 describes research that Merck did to figure out why they were starting to have some problems with Vioxx versus Celebrex.

Q. We are on 47? I just want to make sure we are not misspeaking here.

A. 47, yes.

Q. Okay. Go ahead.

A. Oh, golly. 48. We are on 48.

Q. Okay, 48.

A. It's very confusing. Okay. Hold on.

The original research is described in Exhibit 48, yes. So they found out what physicians said was the most important was efficacy but what actually was the most important was does not cause edema, does not cause significance increases in blood pressure, does not increase the risk of MI or stroke and it's safe to use in the elderly.

And they said, quote, possible implication was to prevent movement off center on non-GI safety. So, in other words --

Q. Where in the document does it say that?

A. Exhibit 48, Pages 8 through 12. I hope we have the right exhibit here. That does not look like the right exhibit.

MR. SKIKOS: I was just flipping through.

THE WITNESS: I'm counting on you.

BY MR. CAMPILLO:

Q. I have all these exhibits.

A. No, we've got it.

Q. I brought extra copies which I was going to ask you about, which are the same ones in your binder.

Dr. Pechmann I have here a copy of Exhibit 48 to your original report. Will this help you?

A. Okay. Same thing?

Q. Yes. We don't have to remark it. I will represent to you that's Exhibit 48 to your Barnett report.

A. Okay. Yeah, that looks like it. So I say it's 8 to 12.

Well, on Page 11 it says "The most important attributes that must be defended are non-GI safety attributes. More work needs to be done to understand what comprises what's safe for the elderly. It's likely driven largely by GI, CV and renal risk."

Q. Okay.

A. So Page 12, "Possible implication should prevent movement 'off center' on non-GI safety."

So the implication on this is they were starting to see some concerns about safety with this drug among

the physicians. So right after, very close after this was done, this report, they launched this new efficacy guarantee program which they later called efficacy confidence. And the whole point of it was to, as they say bolster physicians' and consumers' confidence in Vioxx.

I have the specific goals somewhere here. That's in my main report.

So they launched the program to bolster the confidence and what they found, as shown in Exhibit 47, is a series of very positive results indicating that they had succeeded in preventing movement, any further movement off center on non-GI safety and otherwise neutralizing safety concerns, neutralizing physicians' safety concerns, which of course was an objective of their campaign, the stated objective of their campaign.

Q. Let me see if I understand correctly. Are you saying that on Page 12 of Exhibit 48, because there is a reference to possible implications, bullet point under that that says "prevent movement 'off center' on non-GI safety," that you read into that or your interpretation of that or your opinion about that is that Merck was intentionally, purposefully trying to decrease awareness in the field, in the real world of CV risks?

A. Well, that's part of the evidence. The evidence

continues when you actually look at fact that they launched this efficacy guarantee program which stated to consumers and physicians it's a satisfaction back guarantee. And then they bothered to write up a huge power point in which they focus on all these changes in safety showing that they were preventing movement off center with this program.

Q. Okay. What support do you have for your statement that the efficacy guarantee or efficacy confidence program was implemented specifically to affect the perceptions and minimize or decrease the awareness of physicians about CV risks of Vioxx?

A. They never state that explicitly. What they state is when they describe the goals of the program they state that it's to increase confidence.

Q. And you are reading that to mean that Merck was purposefully trying to decrease CV awareness of the doctors?

A. When I look at everything together, particularly their focus on the results once it was launched, that's when I think the other shoe falls and it's clear that the program did decrease awareness of or concern or neutralized physicians' concerns about safety risks. And then they continued the program even though the research showed they were doing this. So it's a series of these

events that when you put them together it looks like the point of the program -- well, in any event, they knew that the program was reducing perceptions about CV risk and they continued it.

Q. Where do you have the support for your statement that they knew that the program was decreasing awareness of CV risks?

A. In Exhibit 47.

Q. Okay. Let's go to Exhibit 47 now.

A. Okay. Had I known you were going to be so organized I wouldn't have made all these beautiful binders.

This is not a very good copy of this one.

MR. SKIKOS: This one is a better copy.

THE WITNESS: So this is August. This is October of 2002. The program was launched in August and they are saying on Page 7 that efficacy perceptions of Vioxx and Celebrex remain fairly consistent. But on Page 8 it says in August, which is when this program launched, and you would expect to see the biggest effects more physicians rated Vioxx and Celebrex equally on the MI stroke which could have contributed to the narrowing of the new prescription shared gap between Vioxx and Celebrex.

So basically that was good, because people had

been rating Vioxx worse than Celebrex. In fact, they rated them equally showed them in the direction they wanted.

In August significant changes were seen in the percentage of physicians that rated Vioxx and Bextra the same in the elderly and MI stroke attributes.

In August the mean rating for Vioxx and the safe for the elderly attributes stabilized and the gap between Vioxx and Celebrex/Bextra narrowed. So it just goes on and on. If you want me to keep going, there's blood pressure, edema, CV risk.

The original slide showed improvement in prescribing, more new prescriptions.

Q. Let me see -- maybe my questions are not very precisely drafted or articulated. I'm trying to identify the basis for your statement earlier that Merck was purposefully attempting to decrease the awareness of physicians concerning CV risks, they were purposefully doing that.

A. Right.

Q. And have you now told me your entire basis for making that assertion?

MR. SKIKOS: Well, objection. You mean as to 47 and 48?

MR. CAMPILLO: Well, if there is anything else,