UNCERTIFIED REALTIME ROUGH DRAFT

1   I want to look at it.

2           MR. SKIKOS:  Her entire Barnett report has all

3   that in there.

4           THE WITNESS:  Right.  And there's a lot of

5   evidence.  Like I said, there were six studies, which we

6   have three years of data on, a thousand people a month.

7   There's a lot of data showing for multiple different

8   studies that Merck was neutralizing the safety risks

9   perceptions.

10  BY MR. CAMPILLO:

11      Q.   Can you point to any document anywhere that

12  states that that was a goal of any of the programs,

13  projects, studies or marketing campaigns conducted by

14  Merck at any time?

15      A.   Yes.

16      Q.   Okay.  Which one?

17      A.   In my expert report.  Let me see if I can find

18  it.  Okay.  Page 24 and 25 of my report, which is Exhibit

19  19 in a document entitled "2001 Profit Plan for Vioxx"

20  Merck stated that "A key objective of the 2001 Vioxx

21  campaign was to 'neutralize' safety concerns about

22  hypertension, edema and MI."

23           And then in describing the objectives for each

24  physician group repeatedly stated that a key goal was to

25  convey Vioxx's, quote, comparable safety versus Celebrex

81

UNCERTIFIED REALTIME ROUGH DRAFT

1   and NSAIDS.  This safety -- then it said high COX

2   inhibitors, physician tended to view Vioxx as slightly

3   better on efficacy see but having some concern relative

4   to hypertension, edema, MI.

5           And since they repeat the same thing in 2002 and

6   they repeat -- something similar, not exactly the same

7   thing but related thing about safety in their plan for

8   consumers.

9       Q.   Is it your testimony, Dr. Pechmann, where any

10  document someone writes that one objective of the Vioxx

11  campaign is to neutralize safety concerns around

12  hypertension, edema and MI, that that means to you that

13  they are purposely trying to decrease the awareness in

14  the physicians' minds about the CV risks of Vioxx?

15      A.   Yes.

16      Q.   That's your interpretation of that language?

17           MR. SKIKOS:  Asked and answered.

18  BY MR. CAMPILLO:

19      Q.   Any other basis for you to make that statement?

20      A.   The statement that you just quoted?

21      Q.   Yes, that Merck was purposefully trying to

22  decrease the awareness in the doctors' minds about the CV

23  risks of Vioxx.

24      A.   Yes.  I have lots of other things to say about

25  that.

82

UNCERTIFIED REALTIME ROUGH DRAFT

1       Q.   My question is:  Is there any document that in

2   your opinion state that as an objective of Merck's

3   campaign.

4       A.   Oh, state that as an objective.  As I said,

5   there is a comparable statement in 2001 in Exhibit 20.

6   It says "The campaign was designed to ensure that

7   physicians prescribed Vioxx for all patients needing pain

8   relief independent of CV risk factors because Vioxx does

9   not increase the risk of MI, heart attack or stroke."

10      Q.   Okay.  Any other documents that you can point us

11  to where you believe Merck identified as a stated

12  objective of their campaign to minimize the awareness of

13  physicians of the CV risks of Vioxx?

14      A.   Yes.

15      Q.   Okay.  What else?

16      A.   On Page 61 of my report, referring again to

17  Exhibit 19, "In 2001 profit plan for Vioxx the

18  communication objective for consumers was to get them to

19  believe that Vioxx offers a safety of tolerability

20  advantage over traditional medicines."

21      Q.   Okay.

22      A.   It's not as explicit because their ads to

23  consumers were not a medically oriented but it has the

24  same thrust to it and it was an integrated campaign.

25      Q.   Any other documents that in your opinion

83

UNCERTIFIED REALTIME ROUGH DRAFT

1   indicate to you that there was a stated objective by

2   Merck to decrease physicians' awareness of the CV risks

3   of Vioxx?

4       A.   Not that I can recall.

5       Q.   Going back to the first group of studies that we

6   have been talking about, the copy testing of detailed

7   pieces with medical doctors.

8       A.   Yes.

9       Q.   Do you have any other opinions about those

10  studies other than what you have already stated on the

11  record today?

12           MR. SKIKOS:  Objection.  Or that was done in a

13  previous deposition.  Because, remember, I asked her a

14  bunch of questions in the last deposition.

15           MR. CAMPILLO:  I'm asking specifically about

16  study type 1, the copy testing of detailed pieces with

17  M.D.'s.

18      Q.   Have we now heard all your opinions that you

19  have about that group of studies or that type of study?

20      A.   So if I stated something in my report I have to

21  restate it here?  Is that what you're saying.

22      Q.   I mean, if there is a part of your report that

23  addresses copy testing of detailed pieces with doctors

24  and that is something other than what you have told us --

25  and I'll represent to you what I understood you to say is

84

UNCERTIFIED REALTIME ROUGH DRAFT

1   the physicians who participated in these studies
2   indicated that they were misinformed about the potential
3   CV risks of Vioxx and that when they saw these detailed
4   pieces they remained misinformed and you are critical
5   about that for some reason.
6       A.   Right.
7       Q.   Are there any other opinions about the copy
8   testing of detailed pieces with medical physicians other
9   than that?
10      A.   Well, then I would like to just point out that
11  in Exhibit 41, from the copy testing they had done, they
12  found out that this efficacy confidence program would
13  increase new prescriptions, because physicians did find
14  it impressive that Merck was giving a money-back
15  guarantee.  I believe it was very unusual to do that.
16      Q.   And how does that translate into Merck -- how
17  does that translate into these detail pieces leading the
18  physicians to be misinformed?  That's what I'm trying to
19  have you connect.
20      A.   Yes.  Well, it was clear that when the results
21  came out that this campaign isn't affecting efficacy
22  perception.  It was affecting safety perception.  That's
23  why prescriptions were going up.  Physicians were feeling
24  confident that this product was safer than they were
25  worried about.

85

UNCERTIFIED REALTIME ROUGH DRAFT

1        As they indicated, they had some concerns.  And
2   knowing that, Merck continued the program basically until
3   they pulled the product from the market.
4       Q.   Okay.  Anything else?
5       A.   They focused much of their research on CV
6   awareness of various types, because they wanted to know
7   the effect.  They sent a lot of time on the power points,
8   on the slides.  It was a very relevant issue to them.  It
9   wasn't that they didn't notice the results.
10      Q.   Which parts of Exhibit 41 were you referring to
11  for your last comments?
12      A.   Page 71.
13      Q.   71, is that a Bates number?
14      A.   Exhibit 41, Page 71.
15      Q.   The document is not numbered.
16      A.   It's tab 4 here.  Oh, I know.  That's one of
17  those that wasn't numbered, right.  That's why I made the
18  binder that only had the one page in it so you could find
19  it.
20      Q.   But if you can find it in your binder, tell me
21  the Bates number and I can find it.
22      A.   Okay.  I've got it right here.  Tab 4.  That's
23  the one with just the page numbers.  MRK ADG 0057471.
24      Q.   It is 71 of the Bates number.  Okay.  Will you
25  point me to the portion of that page that you believe

86

UNCERTIFIED REALTIME ROUGH DRAFT

1   supports your opinion.
2       A.   The second bullet point.  They did a qualitative
3   study, which is focus group copy test.
4       Q.   Okay.  Give me one second.  If I read the bullet
5   point correctly, it's saying 20 out of 30 physicians felt
6   the efficacy guarantee program might increase by 10 to 15
7   percent of the prescriptions, correct?
8       A.   Correct.  And they actually did increase, which
9   the other data showed.  They did increase prescriptions.
10      Q.   I guess I'm at a little bit of a -- I'm trying
11  to figure out where is there a connection between what
12  they say in this exhibit and their concerns for safety.
13      A.   Well, these people were concerned about safety.
14      Q.   They were or were not?  I didn't hear you.
15      A.   They were.  And yet they said now they were
16  going to have increased in prescribing 10 to 15 percent.
17      Q.   And what concerns did they have, Dr. Pechmann?
18      A.   The safety concerns of the physicians were
19  described in this report.
20      Q.   You are talking about Exhibit 47 or somewhere
21  else?
22      A.   59.  Back to 59.  It's quite confusing because
23  they are different pieces.
24      Q.   I will agree with you.
25      A.   Right.  Having done the antidrug campaign I'm

87

UNCERTIFIED REALTIME ROUGH DRAFT

1   used to this.  It's the same way.
2        MR. SKIKOS:  Which is why you need an expert to
3   testify in this area.
4        THE WITNESS:  Because it's little pieces pulled
5   by different people.
6   BY MR. CAMPILLO:
7       Q.   If I understood you correctly, Exhibit 41 is a
8   document prepared in 2001 sometime; is that right?
9       A.   We can check the date.
10      Q.   Let's start over to make sure we are on the same
11  page.  You made a comment about the physicians who are
12  referenced in the second bullet point of Page 71 of
13  Exhibit 41, that they had safety concerns.
14      A.   Yes.
15      Q.   These 20 to 30 physicians had safety concerns;
16  is that what you're saying?
17      A.   I'm saying that based on the physicians that
18  they interviewed that is discussed in Exhibit 59.
19      Q.   All right.  Here is my question.  Let's start
20  over.
21        There is a reference in Exhibit 41, Page 71 to
22  the effect that certain physicians who were queried
23  believed that the efficacy guarantee program might result
24  in increased writing of prescriptions.  Are we together
25  so far?

88

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.  Yes.

2    Q.  All right.  And I believe you stated that those

3  physicians had safety concerns.  So my first question is:

4  Is that what you meant, that the physicians that were

5  being interviewed who gave their opinions about the

6  effect of the efficacy guarantee program, they themselves

7  had safety concerns?

8    A.  I'm inferring that based on the fact that the

9  other study which had 31 physicians and also said they

10  liked the efficacy program had safety concerns at the

11  same time.  So I would assume that these guys, which are

12  pulled from the same population, would be like the

13  population for which we know that they had safety

14  concerns.

15    Q.  So first of all, do you have any documentation

16  or support for the proposition that the 30 physicians

17  interviewed and discussed in Exhibit 41, Page 71 had any

18  safety concerns themselves?

19    A.  Not directly.

20    Q.  Do you have any information or any data, any

21  support for the proposition that the 30 physicians

22  described in Exhibit 41, Page 71 are the same 31

23  physicians that are reported in Exhibit 59?

24    A.  Not directly.  That's why I answered not

25  directly to your first question.

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.  I'm just trying to get the record to be clear.

2    A.  Very good.

3    Q.  Thank you.  So you have no information that you

4  could point us to that would indicate that the physicians

5  being discussed in Exhibit 41 -- physicians being

6  discussed in Exhibit 41 are the same as the ones

7  discussed in 59 or that they have the same impressions

8  and attitudes about Vioxx?

9    A.  Well, I do have based on my experience.  When we

10  did these focus groups you about the same issue you don't

11  go to radically different groups of people.

12    Q.  But you have no knowledge, Dr. Pechmann as to

13  what these particular groups were for the Vioxx studies,

14  do you?

15    A.  I know just based on standard practice that it

16  would be a similar group, but I cannot state with

17  certainty, no.

18    Q.  So you don't know if, for whatever reason, the

19  physicians discussed in Exhibit 41 had a certain level of

20  awareness about CV risk and whether that level of

21  awareness of CV risk was any different than the group as

22  discussed in Exhibit 59; is that fair?

23    A.  I can't state with certainty.

24    Q.  One way or the other?

25    A.  Correct.

---

UNCERTIFIED REALTIME ROUGH DRAFT

1    Q.  They could be similar or they could be

2  dissimilar?

3    A.  Correct.

4    Q.  Any other way that Exhibit 41 supports your

5  opinion that the physicians who saw the detailed pieces,

6  Exhibits 28 and 29, remained misinformed about CV risks

7  of Vioxx?  Or have we now covered all the bases of that

8  opinion?

9    A.  I believe we have covered everything.

10    Q.  The second group of studies I think you

11  described as testing of promotion message recall.  Did I

12  get that right?

13    A.  Yes.

14    Q.  Very briefly, what does that mean?

15    A.  Actually, I want to call it M.D. promotion

16  message recall because what it means is it's a study of

17  physicians to determine what they remembered the

18  salespeople telling them about Vioxx and Celebrex and

19  Bextra.

20    Q.  Doctors as opposed to users or patients?

21    A.  Correct.

22    Q.  And I believe the documents that you would refer

23  us to in this particular type of study would be Exhibits

24  55, 56, 58 and 48; is that correct?

25    A.  Well, also the MRK AJT 006750 document through

---

UNCERTIFIED REALTIME ROUGH DRAFT

1  Page 62.

2    Q.  Okay.  I might have to resort to one of your

3  binders for that one.

4    A.  Yeah.  That describes the method.  It's at the

5  very end of the binder that has that.

6    Q.  Let's take it one at a time.  We will get to

7  that one.

8    A.  So which exhibits did you say?

9    Q.  I identified Exhibits 55, 56, 58 and 48.  Is

10  that a complete-

11    A.  It looks like it.

12    Q.  -- inventory with the exception of the other

13  document?

14    A.  Looks good, yes.

15    Q.  Give me the number of the document again, the

16  one that's not in the exhibit to your report.

17    A.  MRK AJT 0060750 to 62.

18    Q.  Which is the final tab in your new binder.

19    A.  That's the one that got lost when copies were

20  made.

21    Q.  First I want to understand what your opinion is

22  about this type of testing.  Okay?

23    A.  Okay.

24    Q.  Give me one minute.

25    As I understand it, Dr. Pechmann these are

UNCERTIFIED REALTIME ROUGH DRAFT

1    studies where physicians are being asked what they recall
2    about visits from sales representatives?
3        A.   Correct.
4        Q.   And what is your opinion about these studies?
5        A.   That a very significant number of physicians
6    state or recall that the sales rep told them that Vioxx
7    does not cause heart attacks.  Does not increase the risk
8    of heart attack or stroke and a very substantial number
9    also recalled the reps telling them Vioxx is safe to use
10   in the elderly.
11        And we have data for two years.  There is a year
12   in the middle where we weren't able to get the data.
13        Q.   All right.  Now, what is your criticism of that?
14   They found out this information, according to you.  What
15   is wrong with finding out that information?
16        A.   The sales reps were aggressively telling
17   physicians that Vioxx doesn't cause heart attacks when
18   they knew -- this was already September '01 -- that there
19   was research to suggest that that was not true; that
20   Vioxx did cause heart attacks or had a significant
21   potential to cause heart attacks.
22        MR. CAMPILLO:  Could you read the response back,
23   please.
24        (The last question was read.)
25        THE WITNESS:  I would like to clarify.  When I

                                                          93

UNCERTIFIED REALTIME ROUGH DRAFT

1    said, "They" I meant Merck.  I don't know whether the
2    sales reps knew but Merck knew.
3    BY MR. CAMPILLO:
4        Q.   Okay.  So I gather your opinion is that they
5    shouldn't have been making those statements to the
6    physicians because it wasn't true?  Is it that simple or
7    is there something more to it that I'm missing?
8        A.   Right, that's it.
9        Q.   So your opinion assumes that it is true that
10   Vioxx does increase the risk of MI's and strokes?
11        A.   No.
12        Q.   No?  Okay.  If it wasn't known and it wasn't
13   believed that Vioxx increased the risk of MI's and
14   strokes, then what would be wrong with the sales reps
15   making those representations to physicians?
16        A.   That representation wasn't true.  They didn't
17   know that it didn't cause heart attacks.  There was at
18   least as much a likelihood if not a greatly likelihood
19   that it did cause heart attacks.
20        Q.   I'm just trying to understand your opinion.  So
21   your opinion is that it was unknown whether or not Vioxx
22   increased the risk of heart attacks in this time frame
23   and therefore, in your view, it would have been wrong for
24   the sales reps to make representations to the effect that
25   Vioxx decreased or did not increase the risk of heart

                                                          94

UNCERTIFIED REALTIME ROUGH DRAFT

1    attacks, because that wasn't known one way or the other?
2        MR. SKIKOS:  Vague.  I interpose an objection
3    that it's a vague question.
4        MR. CAMPILLO:
5        Q.   Did you follow me?  I can restate it.  Let me
6    restate it because I want the record to be clear.
7        The research that you are referring to indicated
8    that the doctors recalled or some doctors recalled that
9    sales reps had said in substance that Vioxx did not
10   increase the risk of MI's and strokes, correct?
11        A.   Correct.
12        Q.   And that Vioxx was safe in the elderly?
13        A.   Correct.
14        Q.   Okay.  I want to talk about just the first one
15   first, the Vioxx increasing or not increasing the risk of
16   MI's and strokes, because they may be different.  Okay?
17   Are you with me?
18        A.   Yes.
19        Q.   And as to that first recall, if you will, that
20   physicians reported, your opinion is that that was
21   inappropriate for the representative to be making those
22   statements because at that time it was unknown whether or
23   not Vioxx did or did not increase the risk of MI's and
24   strokes; is that correct?
25        A.   Yes.

                                                          95

UNCERTIFIED REALTIME ROUGH DRAFT

1        Q.   Okay.  So anything else about this research that
2    you are critical about?
3        A.   You mean about the findings?
4        Q.   Yes, any other opinions that you have about the
5    results of this research and why you feel that this shows
6    some misconduct on the part of Merck.
7        A.   Yes.  The company's code is what people recall.
8    You see almost no one stating that the rep told them that
9    Vioxx could cause heart attacks.
10        Q.   Just the converse of what we just said?
11        A.   Exactly, yes.  Well, they could have told them
12   both.  They could have caused heart attacks, might not
13   have caused heart attacks.  People would have recalled
14   both but instead they just recalled the one.
15        Q.   If I understand this testing, it's asking the
16   doctors what they recalled.  That doesn't necessarily
17   mean, Dr. Pechmann that something was not said; it's
18   simply what the doctor recalled, correct?
19        MR. BRANDI:  Argumentative.
20        MR. O'CALLAHAN:  Compound.
21        THE WITNESS:  That is true.
22        MR. CAMPILLO:  Before we go on, one of you can
23   make objections but not both.  Take your pick.
24        MR. O'CALLAHAN:  I was making the objection on
25   behalf of Mr. Grossberg.

                                                          96

UNCERTIFIED REALTIME ROUGH DRAFT

1    MR. BRANDI:  I was making the objection on
2    behalf of Mr. Arrigale.  I actually thought
3    Mr. O'Callahan was working on something else.
4         MR. CAMPILLO:  I would one is going to be making
5    the objections?
6         MR. SKIKOS:  Go ahead.
7         MR. BRANDI:  Go ahead.
8         MR. CAMPILLO:  No.  I want to know who is going
9    to be making the objections.
10        MR. BRANDI:  Or what?
11        MR. SKIKOS:  Let's not have a fight.  I'm make
12   the objections.  Go ahead.  Argumentative and compound.
13        MR. CAMPILLO:  Could you read me the last
14   question back, please.
15        (The last question was read.)
16        THE WITNESS:  That is correct, but it's the
17   standard method of doing the research and Merck knew the
18   results.  So if they were concerned that people were
19   getting the wrong impression they could have told their
20   sales reps "Correct this problem."
21   BY MR. CAMPILLO:
22        Q.   Okay.  Thank you.  Now, anything else about that
23   part of the recall before we go to the elderly issue that
24   you are critical about?
25        A.   Well, I went through one month of data where we

97

UNCERTIFIED REALTIME ROUGH DRAFT

1    had all the verbatim comments.  We have a whole binder
2    from one of the companies.  And to see exactly what they
3    were saying about what the reps said.
4         So it wasn't just a coding.  It was their
5    actually comments, what they said.  And those are
6    summarized here.
7         I found a comparable number to what they were
8    reporting, 20 percent or one in five physicians recalled
9    that the reps saying that Vioxx didn't cause heart
10   attacks.
11        If you read the comments it's clear that's what
12   they were recalling; there's no cardiovascular risk from
13   using Vioxx, safe from a cardiovascular standpoint, safe
14   and effective and not associated with cardiac deaths,
15   does not cause heart disease.
16        So there is no problem with how the data are
17   treated.  It accurately reflects what people are saying
18   that they recall.
19        Q.   Okay.
20        A.   And also there were some things that weren't
21   coded by the coders that I found striking.  A lot of them
22   said that the Merck representatives criticized the
23   studies concerning Vioxx's having a potential
24   cardiovascular risk, saying the studies were weak or the
25   that pros six hypothesis held that Naproxen was cardiac

98

UNCERTIFIED REALTIME ROUGH DRAFT

1    protective, which the FDA stated they could not state.
2         So it looks like the reps were bad-mouthing any
3    study that indicated that there was a risk.
4         Q.   Okay.
5         A.   And you also had reps complaining about media
6    hype and saying oh, you know, it's just media hype.
7         "Merck felt that recent press about Vioxx was
8    inaccurate.  Vioxx is not cardiac protective but it
9    doesn't cause heart attacks.  No cardiac detriment.  Bad
10   reporting in the press.  Stroke issue not new.  Being
11   blown out of proportion."
12        So, in other words, there is even more evidence
13   that the reps were trying very hard to convey that there
14   was no risk, the one side of the story.  And they were
15   bad-mouthing the press and bad-mouthing other studies and
16   using the Naproxen hypothesis and so on to persuade these
17   physicians to believe there was no problem.
18        Q.   Did you see any data in the materials that you
19   looked at that asked the sales reps what kind of messages
20   they were conveying to physician as opposed to what
21   messages were being remember or what attributes were
22   being recalled by the physicians?
23        A.   Yes.  The call notes say that.  The call notes
24   are the notes from the reps.
25        Q.   Okay.

99

UNCERTIFIED REALTIME ROUGH DRAFT

1         A.   And they say in this case and other cases, they
2    frequently say vague things about safety.  But some of
3    them are quite explicit.  I think in some of the call
4    notes, as I recall, they state much of the same thing.
5    They said Vioxx doesn't cause heart attacks.
6         Q.   We will come to the call notes later.
7         A.   Okay.
8         Q.   Anything else about this group of studies or
9    this type of study that you have not already told us
10   about?
11        A.   Well, only one physician out of 166 said that
12   the rep told them that Vioxx might cause a heart attacks.
13        Q.   You are saying one physician recalled?
14        A.   Yes.
15        Q.   The second part of your original answer was that
16   physicians recalled being told that Vioxx was safe in the
17   elderly.
18        A.   Yes.
19        Q.   Okay.  And you believed that that should not
20   have been stated, if it was stated, because it wasn't
21   true?
22        A.   Correct.
23        Q.   Okay.  What basis do you have for saying that
24   Vioxx was not safe in the elderly?
25        MR. SKIKOS:  I'm going to interpose an

100

UNCERTIFIED REALTIME ROUGH DRAFT

1   objection.  What Merck knew or should have known
2   questions were gone over very detailed by Andy Goldman in
3   the last deposition.  And her opinions relating to
4   medical causation versus what was done from a marketing
5   standpoint I thought were clarified at that last
6   deposition.
7        So to the extent that you're asking again for
8   what Merck knew or should have known, we have done that
9   in the last deposition.  I'm fine with you going through
10  the studies.  I'm willing to let you go even a little
11  longer to get this work done, but to rehash what Merck
12  knew or should have known from a medical standpoint or a
13  marketing standpoint, that's what Mr. Goldman did.
14  BY MR. CAMPILLO:
15       Q.  Let me ask it this way, Dr. Pechmann.  Your
16  opinion that the sales reps should not have made comments
17  to the effect that Vioxx was safe for the elderly, if
18  they made those statements, is based on because of your
19  belief that it wasn't safe for the elderly; is that true?
20       A.  It's based on the logic that I told you earlier
21  about the VIGOR study showing increased risk among people
22  with CV risk and there is a correlation between the
23  elderly and the CV risk, which many physicians point out
24  at various points in time.
25       Q.  Are there any documents that you have seen in

101

UNCERTIFIED REALTIME ROUGH DRAFT

1   connection with your work for this case and the other
2   cases that indicated that Merck had any information other
3   than what you just told us about your interpretation of
4   the VIGOR study that showed that Vioxx was not safe for
5   the elderly?
6        A.  No, not that I can think of.
7        Q.  Have we now covered all of the opinions that you
8   have that relate to the second type of study, the M.D.
9   promotion message recall studies?
10       A.  I believe I have covered everything.
11       Q.  Okay.  The third type of study that you
12  addressed I think you referred to as tracking behavior of
13  prescribers by looking at pharmacy records of new and
14  refills of prescriptions.
15       A.  Correct.
16       Q.  Is that a good way to summarize it?
17       A.  Yes.  I just called it behavioral prescription
18  tracking for short.
19       Q.  Okay.  And I understood from your direct
20  examination or by your response to Mr. Skikos' questions
21  in the Barnett deposition that these studies are
22  referenced or described in Exhibits 54 and 56.  Is that
23  true?  Or is that a complete listing?
24       A.  I have 56, I have 47, 58, 54.  Did I read the
25  same ones that you had?

102

UNCERTIFIED REALTIME ROUGH DRAFT

1        Q.  I have 54 and 56.  And you had in addition to
2   that 47 and 58?
3        A.  58, yes.  And what was the other one?
4        Q.  I think you said 47.
5        A.  47, yes, because that's about the efficacy of
6   the guarantee program.  This is the behavioral tracking
7   of that program.
8        Q.  First of all I want to make sure I understand
9   what your opinion is.  First of all, I assume that
10  tracking sales of your product is not a bad thing in your
11  judgment.
12       A.  Correct.
13       Q.  So what is it about tracking the sales via
14  pharmacy records of prescriptions that you are critical
15  about?
16       A.  I'm not critical of the research at all, as you
17  point out.
18       Q.  Okay.
19       A.  What I am critical about is what the research
20  shows.  We have three years of data, very accurate data
21  because these are the actual records.  It's not
22  self-report.
23       And you see that the only time you get drops in
24  sales for the most part is when there is an external
25  factor, external party that discloses the cardiovascular

103

UNCERTIFIED REALTIME ROUGH DRAFT

1   risk such as the August 2001 Journal of the American
2   Medical Association article by Topol and The New York
3   Times article.
4        And so what you see is the market reacted when
5   they were told about the risks.  But Merck actually
6   states in the documents that they launched programs to
7   improve the situation to bolster sales and it shows
8   arrows for the various programs and show the line inching
9   back up, because people forget.
10       So what it indicates is people were being
11  informed mostly by external factors, not by Merck, and
12  that Merck then launched programs to improve sales, one
13  of these being the efficacy confidence program.
14       Q.  In your opinion, I gather, to launch programs to
15  increase sales is a bad thing?
16       A.  If by doing that you are neutralizing risk
17  perceptions and therefore misleading the public, I do
18  think that's wrong.
19       Q.  So assumed in your opinion or subsumed in your
20  opinion is that the perceptions -- well, strike that.
21       Let me hear her answer back, please.
22       (The last answer was read.)
23  BY MR. CAMPILLO:
24       Q.  So in general terms -- let's not talk about
25  Merck or Vioxx right now so I understand the comment or

104

UNCERTIFIED REALTIME ROUGH DRAFT

1  the point that you are making -- a company sees that the
2  market is going in the wrong direction for their product
3  and they launch a campaign to try to reverse that trend
4  and get the sales to go back to where they were or even
5  higher, that's what you do professionally, you advise
6  companies on people to do that, right?
7      A.   Absolutely.
8      Q.   And you teach students how to accomplish that so
9  they can work with clients on how to accomplish that?
10     A.   Exactly.
11     Q.   So that's not the part that's troublesome for
12  you, right?
13     A.   Correct.
14     Q.   What you are saying is that in your opinion
15  Merck was trying to change perceptions that were accurate
16  but that Merck wanted to change to something else?
17     A.   Correct.
18     Q.   All right.  So in other words, people felt X and
19  X was true and Merck wanted them to think something other
20  than X?
21     A.   Correct.
22     Q.   All right.  And that's why you are critical of
23  this?
24     A.   Yes.
25     Q.   Okay.  So in that opinion you are assuming that

105

UNCERTIFIED REALTIME ROUGH DRAFT

1  X was true?
2      A.   No.  I'm assuming -- well, X meaning what was
3  true is Vioxx could have had a cardiovascular risk.
4  These articles that came out in the press did not say it
5  a hundred percent did.  It just disclosed the possibility
6  that there was a significant concern that it could pose a
7  cardiovascular risk.
8          And so what people weren't told that it
9  definitely did cause cardiovascular risks, which you
10 would get plummeting sales like you see now with
11 Celebrex.  It isn't what the sales were before.
12         So what it did is it informed people that there
13 was a cardiovascular risk potential.  And what Merck then
14 did was launch programs to minimize awareness of that or
15 neutralize concerns about that.
16     Q.   Now, let me ask you this.  In the work that you
17 do for companies and clients of yours or in your
18 teachings to students who might be doing that in the
19 nature, if there is a misperception or bad press that's
20 not fair or accurate about your product it would be
21 appropriate for the company who makes that product to
22 launch a campaign to respond to misguided or misinformed
23 criticisms, correct?
24     A.   Yes.
25     Q.   So you are assuming here whatever was said in

106

UNCERTIFIED REALTIME ROUGH DRAFT

1  the JAMA article that you made reference to or The New
2  York Times article that it was accurate and fair and it
3  would be inappropriate to try to affect whatever
4  perceptions those publications yielded?
5      A.   No.  What I'm saying is what was true was that
6  there was a significant cardiovascular risk and that
7  this -- risk potential and that these publications
8  managed to convey that information.
9      Q.   You are not assuming that whatever potential
10 risk is true and accurate for purposes of your opinion?
11         MR. SKIKOS:  I'm not sure I understand that
12 question.
13         THE WITNESS:  What I'm not saying is that I
14 could say for a fact that every single word in the
15 article was true.  What I'm saying is what the reserve
16 shows is that it conveyed to people that there was a
17 concern.
18         If you look at other research the rating on a
19 ten-point scale never dropped below six but it had been
20 up like eight and was dropping lower.  It should have
21 been at five, I guess, at 50/50 but lower than what it
22 was and it was way up much.
23         And what these publications managed to do was
24 convey that there was a concern.
25 BY MR. CAMPILLO:

107

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.   Let me ask, first of all, are there any other
2  events or external -- what did you call them?  I think
3  external publications, that yielded or caused sales to
4  drop other than the two that you have identified?
5      A.   Sometimes they put Wall Street Journal on there
6  but it didn't seem to have much of an impact.
7      Q.   Any others that you can think of?
8      A.   The label change.
9      Q.   The April 2 label change?
10     A.   Yes.
11     Q.   Okay.  Anything else that you have been able to
12 find in your work?
13     A.   In terms of reducing perceived risk and
14 increasing sales?
15     Q.   Yes.
16     A.   Not that I can think of.
17     Q.   Let's take them each at one time.  With regard
18 to The New York Times article, what was the program or
19 the strategy that Merck launched to address whatever
20 negative impact The New York Times article had?
21     A.   The launch confidence guarantee.  I mean,
22 efficacy confidence.
23     Q.   Is there a document that indicates that they
24 specifically implemented or launched the efficacy
25 confidence program or the efficacy guarantee program in

108

UNCERTIFIED REALTIME ROUGH DRAFT

1  response to The New York Times article or is that an
2  assumption you are making based on timing?
3       MR. O'CALLAHAN:  Objection; compound.
4       THE WITNESS:  In describing the efficacy
5  confidence they state that they are trying to increase
6  the physicians' and the sales reps' confidence in the
7  drug.
8  BY MR. CAMPILLO:
9    Q.   I understand that.
10   A.   That's basically how they word it.
11   Q.   Can you point us to any document, any exhibit
12  that would indicates or you interpret as saying -- well,
13  first of all, that says in substance that the efficacy
14  confidence program was implemented to respond to The New
15  York Times article or the effect of the New York Times
16  article?
17   A.   What I can state is that in this one exhibit,
18  which is Exhibit 54, it states "The 2002 promotional
19  campaigns for Vioxx lead to new prescription volume
20  rebounds" and then the campaigns are listed as efficacy
21  confidence, Divide and Conquer and Project Jump Start.
22   Q.   Is there any reference in Exhibit 54 that this
23  is in response to The New York Times article?
24   A.   No.  That's from the other exhibit where they
25  did research over the summer and they found that there

109

UNCERTIFIED REALTIME ROUGH DRAFT

1  was this mounting concern.  And that was right before
2  they launched it.  And they said we need to prevent
3  movement off center or whatever it was.  And then we got
4  the efficacy confidence.
5       So in this document it says that the campaigns
6  have led to the volume rebounds and it implies very
7  strongly that that was the goal of the campaign.
8    Q.   I'm trying to try to ask very specifically
9  whether you can point us to any document that would
10  indicate that the efficacy confidence program was
11  implemented specifically or at least in part to deal with
12  The New York Times article publication that you made
13  reference to.
14   A.   The research did not specifically cite New York
15  Times.  It just said that there was a concern.
16   Q.   Now, the same question as to the August '01 JAMA
17  article.  Can you point us to any document, any exhibit
18  before us among all the boxes that we have here that
19  would indicate that the efficacy confidence program was
20  implemented in part or as a whole to respond to the
21  publication of the JAMA Topol article?
22   A.   No.  It just said it was in response -- I mean,
23  that there was concern.
24   Q.   Isn't it true that any time a company has
25  concern about sales dropping, that they will consider

110

UNCERTIFIED REALTIME ROUGH DRAFT

1  implementing programs, because they care about their
2  product, to get the sales back up?
3    A.   Yes, as long as they are not misleading or
4  deceptive programs.
5    Q.   I want to know if you can point us to anything
6  that would suggest to you that the -- well, not suggest
7  to you.  That states in substance that the program was
8  implemented either because of the New York Times article
9  or the JAMA article.
10   A.   Well, I think that this figure clearly, at least
11  very strongly, I am price that that was the point.
12   Q.   Okay.  Which one implies that?
13   A.   Exhibit 54.
14   Q.   Do you have a page reference there?
15   A.   It says Page 31 and 45.  So it's one of those
16  two pages.
17   Q.   Okay.  Page 31 --
18   A.   It says the promotional campaigns lead to volume
19  rebounds.  I mean, it states that.
20   Q.   Can you go to Page 31.  Here is 54 (handing).
21   A.   So I'm looking at Exhibit 54, Page 31?
22   Q.   You said 31 and 45.
23   A.   Yeah.  That's the label change and that's the
24  increased resources.
25   Q.   We will come to the label change in a minute.

111

UNCERTIFIED REALTIME ROUGH DRAFT

1  Right now we are on the toe pop JAMA article and The New
2  York Times article.
3    A.   Yes.  So I'm talking about 30 and 31, Pages 30
4  and 31.
5    Q.   Okay.  Can you describe what you see on Page 30
6  that to you is a strong indication that the confidence,
7  its efficacy confidence program was implemented in
8  response to the effect of the JAMA Topol article or the
9  New York Times article?
10   A.   Well, actually I think the best one is Page 45.
11   Q.   First of all, is there anything on Page 30?
12   A.   I think 30.  Total share for Vioxx has
13  stabilized following label change and increased
14  promotional resources.  So what it is indicating is they
15  put in new resources to stabilize the decline.
16   Q.   Okay.  I'm just trying to keep faux us caned.
17  And I know you are trying to be helpful, so I'm not being
18  critical at all.
19   A.   Okay.
20   Q.   I think you said something about Exhibit 54,
21  Pages 30, 31 and 45 that was a strong indication to you
22  that the confidence, efficacy confidence program was
23  implemented in response to the JAMA article and The New
24  York Times article, correct?
25   A.   Yes.  And what I'm saying is, the answer to that

112

UNCERTIFIED REALTIME ROUGH DRAFT

1   question here is the heading and the little arrow
2   pointing to increased resources. So it is stating
3   that -- and the arrow showing the JAMA, the drop from
4   JAMA.
5         So you see a drop from JAMA and then you see
6   this heading saying -- but it managed to stabilize it by
7   putting in resources. Well, I think that pretty clearly
8   implies that they put in the resources because of the
9   problems.
10       Q.   Okay. The reference to resources, if I'm
11  reading this chart appropriately, seems to be in the
12  September '02 or August '02 time frame; am I correct?
13       A.   August. It's the efficacy confidence program.
14       Q.   August of '02?
15       A.   Yes.
16       Q.   When was The New York Times article published
17  that you referenced before?
18       A.   I think New York Times was May.
19       Q.   Of what year?
20       A.   Of '02, I believe.
21       Q.   Do you have anything that would identify that?
22       A.   Wait a minute. New York Times. I have Exhibit
23  4, May 2002.
24       Q.   Okay. Let's assume that to be the case. When
25  was the Topol article published in JAMA?

113

UNCERTIFIED REALTIME ROUGH DRAFT

1        A.   8/02. Wait. Wow. There is something wrong
2   with this.
3        Q.   I will represent to you that it was published in
4   the fall of 2001.
5        A.   Yes. This is wrong.
6             MR. SKIKOS: That's what it says on the graph.
7             THE WITNESS: They have it wrong. Geez.
8   BY MR. CAMPILLO:
9        Q.   On what do you base your opinion that the
10  efficacy confidence program that was implemented in
11  August of '02 was in response to the publishing of the
12  August '01 JAMA article by Topol?
13       A.   Well, I told you. I don't know what else I
14  could say other than the fact that they said they put in
15  increased resources and now things have stabilized. And
16  so the implication is they put in the resources to
17  stabilize the problem which began with JAMA.
18            And I think there are some other power points
19  that make that explicit, too. And for why it took a
20  whole year, having worked on these campaigns, it takes a
21  while. I mean, you can't just come up with a program.
22  It had to be approved, it had to be tested. You can't
23  just launch something within three months. I mean, a
24  year is good.
25       Q.   If I'm reading this graph correctly, still on

114

UNCERTIFIED REALTIME ROUGH DRAFT

1   Page 30, the market share of Vioxx actually continued to
2   decline and flattened out at around 38.6 percent but
3   didn't go anywhere close to where it had been at the time
4   before, which was above 48 percent, correct?
5        A.   Correct. It went up slightly. It's not the
6   total share. The new share showed increases. Not back
7   up to the original.
8             I think you can see that on Page 31, yes.
9        Q.   Can anything else in your judgment, in your
10  opinion that Merck implemented other than the efficacy
11  confidence program that you believe was done directly in
12  response to the three events that you have discussed;
13  that is the JAMA article in August '01, the label change
14  in April '02 and The New York Times article in May of
15  '02?
16       A.   Yes, I do think there were other events that
17  occurred. If you look on Page 45 you'll see them.
18       Q.   My question is what other programs did you
19  implement.
20       A.   Yeah. That's on Page 45. Project offensive is
21  one thing they launched right after the JAMA that is
22  shown here.
23       Q.   Okay. What was that?
24       A.   That's something I reviewed a couple of months
25  ago so I can't remember it. I don't have a lot of

115

UNCERTIFIED REALTIME ROUGH DRAFT

1   information on it but it was promotional campaign to get
2   people excited.
3        Q.   As you sit here now do you recall what the
4   program was?
5        A.   I can't at the moment.
6        Q.   Okay.
7        A.   But I do remember reading quite a bit about it.
8        Q.   Okay. What else did Merck do other than the
9   efficacy confidence program?
10       A.   Well, they also did this divide and concur and
11  project jump start. I couldn't find anything on Divide
12  and Conquer but I did read some information about Jump
13  Start.
14       Q.   Did you have any knowledge whether or not Divide
15  and Conquer was anything that was ever implemented as
16  opposed to perceived?
17       A.   Oh, no, these were implemented programs. Divide
18  and Concur, I don't know. Project Jump Start I heard
19  described and it was clearly implemented as a project.
20            MR. SKIKOS: It looks like it says Divide and
21  Conquer if you look at the top. It's obvious.
22            THE WITNESS: It certainly looks like it was
23  implemented.
24  BY MR. CAMPILLO:
25       Q.   Let me ask you with respect to any of these

116

1  programs that you believe were implemented to respond to
2  the publication in JAMA, the VIGOR label change or The
3  New York Times article where you can specifically point
4  us to something that says that they were implemented for
5  that reason?
6      A.  Just figures like this.
7      Q.  Where you are surmising the intent from
8  something else?
9      A.  Like I said, I think it's very strongly
10  suggested, yes.
11     Q.  Is there anything you can show us, you can point
12  us to where it actually said that Merck implemented any
13  of these programs in part or in full as a result of the
14  events that you have identified, the JAMA article, The
15  New York Times article and the label change?
16     A.  I didn't -- can't point you to any right now but
17  there may be some.
18     Q.  And you would agree, Dr. Pechmann that there
19  were events in this time frame such as the entry of
20  Bextra into the market and other events unrelated to the
21  three that you have identified that affected Merck's
22  Vioxx market share?
23     A.  I agree with that.
24     Q.  Do you have any criticism of Merck attempting to
25  minimize the loss of market share by the entry of other

117

1  products into the market or other events that may occur
2  that may affect their sales?
3      A.  No, but I have -- I am very troubled by the fact
4  that they could see improvement on the safety attributes.
5      Q.  Okay.  What do you mean by that?
6      A.  That when they launched the efficacy confidence
7  program, that there were these improvements on safety
8  attributes.
9          MR. SKIKOS:  You mean perceptions?
10         THE WITNESS:  Exactly.  Safety attribute
11  perceptions.
12  BY MR. CAMPILLO:
13     Q.  What document, in your judgment, indicates that
14  there were changes in the attribute perceptions of
15  physician after these programs?
16     A.  The document we were looking at earlier.
17     Q.  Which one is that?  Is that 48?
18     A.  47.
19     Q.  Are we still --
20     A.  That was a prior study.  You know, that was a
21  prior type of study.
22     Q.  What do you mean by "prior"?
23     A.  This is tracking the behavior.  The prior study
24  we talked about was tracking the attribute perceptions.
25  So we talked about this in the context of the other

118

1  study.
2      Q.  You said 47 as opposed to 48?
3      A.  47 is what I have here.
4      Q.  Okay.  I'm sorry.  What is it?
5      A.  We went through all of these -- well, maybe it
6  wasn't clear at the time.  There are a series of power
7  points that indicate that perceptions of Vioxx relative
8  to Celebrex improved.  Remember, I said one was rated the
9  same whereas before people had rated Vioxx inferior,
10  unsafe for the elderly and MI stroke.
11         So basically what I'm saying is this program
12  affected safety perceptions and that was what they had
13  identified the summer before as being the problem.
14     Q.  I'm sorry, I don't mean to interrupt you but
15  when you say "this program affected perceptions" --
16     A.  Efficacy confidence.
17     Q.  Affected perceptions about safety?
18     A.  The physicians' perceptions, yes.
19     Q.  Okay.  Is there something after the
20  implementation of the efficacy confidence program that
21  looks at any changes over time in the perceptions of the
22  physicians?
23     A.  Yes.
24     Q.  Okay.
25     A.  I think the most important one is the month in

119

1  which it was launched, because having had experience in
2  this, that's the time when you're going to see the big
3  improvement, if there is going to be one.
4      Q.  And what month was this launched?
5      A.  August.
6      Q.  All right.  And you're saying that Exhibit 47
7  shows a change in the perceptions of physicians in
8  September of 2002?
9      A.  No.  In August.
10     Q.  The same month that it was launched?
11     A.  That's what it should be, yes.
12     Q.  Show me where in Exhibit 47 it shows this
13  increase in August of 2002 and the perception of the
14  physicians.
15     A.  Okay.  How would I best show you this.  I still
16  have your copy.
17     Q.  That's an extra one.  Page 8?
18     A.  Yes.  The interesting thing is there is no
19  change in efficacy perceptions.  Even though it is
20  called efficacy confidence program it was affected
21  efficacy of safety.
22         So Page 8 on the top and the bottom, Page 9 the
23  top and the bottom.  These are really bad copies.  Page
24  10, the top and the bottom.
25     Q.  What is the change that you are referring to in

120

UNCERTIFIED REALTIME ROUGH DRAFT

1 the safety perceptions of physicians in August.
2      A.   Okay.  So it says on Page 8 "In August more
3 physicians rated Vioxx and Celebrex equally on the MI
4 attribute which could have contributed to the narrowing
5 of the new shared gap between Vioxx and Celebrex," which
6 meant that Celebrex was way ahead and now Vioxx is
7 catching up.
8      Q.   You are assuming, are you not, Dr. Pechmann,
9 that whatever change there was in August of 2002 in that
10 particular measurement was somehow relate to the
11 implementation of the efficacy confidence program?
12      A.   Yes.  And plus they said that, too.
13      Q.   Okay.  Where did they say this was due to the
14 efficacy confidence program's implementation?
15      A.   I'm not sure I could put my finger on it right
16 now.
17      Q.   Are you confident that is one document or more
18 than one document that said in August of 2002 in the
19 perception of physicians that the safety of Vioxx was due
20 to the implementation of the efficacy confidence program?
21      A.   That's what I recall reading, yes.
22      Q.   In one of the documents you have identified in
23 this deposition?
24      A.   Yes.
25      Q.   Okay.  If it's not in the exhibits that -- in

121

UNCERTIFIED REALTIME ROUGH DRAFT

1 the binders, then --
2      A.   They are in the boxes.  It might be in the
3 report.
4      Q.   Take a minute to see if you can find it.
5      A.   This is important.
6           (Witness reviews document.)
7           MR. O'CALLAHAN:  Let me just put on the record
8 that we are past the three-hour mark now, well past it.
9 How much longer do you expect to go?  Ralph, how much
10 longer do you expect to go?
11           MR. CAMPILLO:  I'm looking at my notes to see if
12 I can try to give you an estimate.  I would say probably
13 another hour.
14           MR. O'CALLAHAN:  Let's go off the record for a
15 second.
16           MR. CAMPILLO:  Sure.
17           (Recess taken.)
18 BY MR. CAMPILLO:
19      Q.   Dr. Pechmann when we took the break I think you
20 were trying to find a document that may indicate that the
21 change in perceptions concerning the safety of Vioxx had
22 improved in August of 2002 as a result of the
23 implementation of the efficacy confidence program.
24      A.   Yes.  And I haven't been able to -- I wasn't
25 able to identify that document.  I think it exists,

122

UNCERTIFIED REALTIME ROUGH DRAFT

1 although it's also possible that I just put two and two
2 together and inferred that.
3           It could be in my expert report and it could be
4 in quotes.  But rather than spending another five minutes
5 looking for it, maybe we could move on.  It may be in my
6 expert report and it would be in quotes.
7      Q.   I will look at the expert report later.  That's
8 fine.
9           Let me ask you this.  Do you know what date the
10 efficacy confidence program actually started?
11           MR. O'CALLAHAN:  Ralph, I'm going to interrupt
12 you to say we are going to go until 7:00.  I'll give you
13 another half an hour.
14           MR. CAMPILLO:  I'll do my best.  Thank you.
15           THE WITNESS:  I cannot recall the date right
16 off, but I would believe it's in the materials.
17 BY MR. CAMPILLO:
18      Q.   Do you know when the survey that's reflected in
19 Exhibit 47, when the actual questions for the August time
20 frame are posed to the physicians?
21      A.   That's a good question.  Let's see.  The
22 behavior is tracked on a continual basis, so some of the
23 graphs were behavior.  The attribute tracking is
24 described -- it doesn't say here.  It just says
25 interviews occurring every month.

123

UNCERTIFIED REALTIME ROUGH DRAFT

1      Q.   So you have no specific knowledge as you sit
2 here today when the interviews were conducted, correct?
3      A.   Correct.
4      Q.   Switching on study type No. 4, which I think we
5 have discussed indirectly, as described in your
6 deposition testimony as attribute tracking studies of
7 physicians or ANA attribute tracker.
8      A.   Yes, uh-hmm.
9      Q.   This is where physicians are selected from a
10 panel at random and then questioned about certain things?
11      A.   Yes.
12      Q.   And what opinion do you have about these if I
13 can types of studies conducted by Merck or for Merck?
14      A.   Let me just clarify that it's a random sample,
15 so it's not panelists technically.
16      Q.   Okay.
17      A.   A panelist is someone who is agreed is a
18 priority.
19      Q.   So randomly selected by the vendor who is doing
20 this work?
21      A.   Yes.  So basically they identified the groups
22 they were interested in and the company would contact
23 physicians at random from those.
24      Q.   If I understood your testimony before, it was
25 that somehow the attributes of actual importance were

124

UNCERTIFIED REALTIME ROUGH DRAFT

1   different than the attributes of stated importance.

2      A.   Correct.

3      Q.   Can you in lay terms explain to me what that

4   means.

5      A.   Yes.  The doctors were asked to rate the

6   importance on a ten-point scale, I believe.  They rated

7   each brand on each attribute and then they indicated the

8   prescribing, so you could run a regression analysis, a

9   simple regression, to see what actually affected

10  prescribing as opposed to what they said was affected

11  prescribing.

12     Q.   What are you referring to what led the physician

13  to actually prescribe it?

14     A.   Statistical analysis.  So if they said that safe

15  for the elderly was the least important attribute but

16  every brand -- when a brand was rated high on safe for

17  the elderly they prescribed it and if a brand was rated

18  low on safe for the elderly they never prescribed it.

19  And the best predictor of their prescribing was how that

20  brand was rated on that attribute.

21          It's not the least important.  It's in fact the

22  most important.  So that's how it's done.  Does that make

23  sense?

24     Q.   Honestly?

25     A.   It's a statistical comparison where they -- I

125

UNCERTIFIED REALTIME ROUGH DRAFT

1   don't know how to describe it.  Where they see the actual

2   behavior and see how they rated the brands.

3      Q.   Maybe you can't answer this, but how does a

4   study identify why the doctor wrote the prescription

5   without asking the doctor for a given prescription?  What

6   led you to write this prescription?

7      A.   As I said, if they have the doctors' opinions

8   about all the brands and then they know what the doctor

9   actually prescribed, then they link the opinion to actual

10  behavior.

11     Q.   But knowing the intent of the physician at the

12  time they write the prescription?

13     A.   Because they collect the data at the same time.

14     Q.   You mean they ask the physician why are you

15  writing the prescription?

16     A.   No.  They say give us your records on

17  prescribing for this past time period and rate these

18  brands.  See, because if they ask them, then you run into

19  the problem of finding them.  People say one thing is

20  important but another thing ends up being important.

21     Q.   I think your opinion is that somehow Merck used

22  the efficacy confidence program again, the program we

23  have been talking about to some extent, to direct the

24  attention of the physicians to the attributes of actual

25  importance versus the attributes of stated importance; is

126

UNCERTIFIED REALTIME ROUGH DRAFT

1   that correct?

2      A.   No.

3      Q.   That's not your opinion?

4      A.   Unh-uh.

5      Q.   Okay.  Then you state it, please.

6      A.   Okay.  So my opinion is that they started doing

7   the sophisticated type of research, which is difficult to

8   explain, to be able to infer why people were prescribing

9   at the same time they were giving their prescribing

10  records they asked them to rate their opinion of each

11  brand and then through statistical techniques were able

12  to tell which opinions really mattered.

13          So the opinion about edema, the opinion about

14  safe for the elderly and effectiveness, they found -- and

15  they did this for a couple of years, actually, and they

16  found grad actually the attributes that were

17  differentiating between -- that was causing people to

18  choose between Vioxx versus Celebrex was not efficacy but

19  safety, despite the fact that they said efficacy was the

20  most important thing, in fact safety was.

21          So from that they concluded we've got to do

22  something about the slippage.  And also they were seeing

23  a slippage in the safety of Vioxx and a reduction in sale

24  of Vioxx, especially new prescriptions of Vioxx.

25          So they said geez, we need to fix that.  And

127

UNCERTIFIED REALTIME ROUGH DRAFT

1   right after that is when they launched the program.

2      Q.   Is it your opinion, if I'm reading between the

3   lines, that by focusing on the efficacy by using the

4   efficacy confidence program, that in a sense it

5   distracted the attention of the physician from safety

6   issues to efficacy issues?

7      A.   No.

8      Q.   That's not your opinion?

9      A.   No.  What actually happened is it created the

10  perception that it was safe because you were giving a

11  money-back guarantee.  So that's like pretty much any

12  guarantee creates perceptions of higher quality.  And

13  here the quality perceptions that were weak were the ones

14  with regard to safety, so those were the ones you would

15  most expect to improve.

16     Q.   So you are saying they conceived that by saying

17  we're going to give your money back if the product didn't

18  help your pain, that that led the physicians to believe

19  that the product was safer?

20     A.   Well, they didn't say if it didn't relief your

21  pain.  What they said is satisfaction guaranteed or your

22  money back.  That's what they told the consumers and

23  that's what most of the ads said for physicians.  In the

24  fine principle for physicians it said pain.  But with the

25  consumers it was just any problem satisfaction to get

128

1  your money back.

2      Q.   For any reason you are not satisfied, let us

3  know and we will give you your money back?

4      A.   Right.

5      Q.   What is your criticism of that program?

6      A.   I mean, in general I'm not critical of that type

7  of program but what I'm saying is that here what they

8  were doing was trying to neutralize safety concerns and

9  create the perception that we stand by this product, that

10  we stand firmly behind the product in its entirety.

11          And the part of the product that was weak was

12  the cardiovascular perception.  So that was the part that

13  improved.  And, likewise, you saw improvements in sales

14  because what were driving sales were the safety

15  perceptions.

16      Q.   And how are you able to measure that --

17          Can you read the answer back.

18          (The last answer was read.)

19  BY MR. CAMPILLO:

20      Q.   Did you see any indication anywhere that Merck

21  was not standing behind Vioxx from the moment it put it

22  on the market until the time it was drawn?

23          MR. SKIKOS:  Vague.  Objection.

24          You can still answer.

25          THE WITNESS:  I didn't see indications of that.

                                                    129

1  I saw every indication that they did stand behind hair

2  product.

3  BY MR. CAMPILLO:

4      Q.   All right.  So --

5      A.   Having an efficacy confidence program is

6  aggressive.  It's a very strong signal to the market.

7      Q.   That, I understand, too.  I'm trying to

8  understand how the implementation of the efficacy

9  confidence program was an effort, as you said, to

10  neutralize safety concerns.

11      A.   Because what we know is when you offer a

12  guarantee it reassures people about the parts, the

13  attributes of the product that they are worried about,

14  whatever those happen to be.  That's what a guarantee is

15  designed to do, to give a signal that you don't have to

16  worry because you can buy the product with confidence, no

17  problem.

18          So if you -- people know that the company would

19  not offer a guarantee if the product was crappy because

20  they would go out of business and everyone would return

21  it.

22      Q.   Okay.

23      A.   So the whole idea is to reassure people,

24  especially about things for which they can't directly

25  observe problems.  It might be not identifiable.  It

                                                    130

1  might not happen for a long period of time or whatever

2  ever.

3          So they use that technique which is well

4  established and well known in a very unique context

5  because it's not very common at all to may have money O

6  back guarantees for prescription drugs, and it sent a

7  very strong signal to the physicians and you could see it

8  in the data.

9      Q.   Can you point us to any exhibit to your report

10  or any documents here that we have here that indicate

11  that Merck's purpose for I am me, Ing the efficacy

12  confidence program was to neutralize safety concerns?

13      A.   I think we went through that.  I said that -- I

14  kind of went through the documents that we talked about

15  before.

16      Q.   We are talking about a different type of study,

17  I believe.  Is it the same document?  Is that what you're

18  saying?

19      A.   Yeah.  We jumped into this study and back to the

20  other study.  I was talking about a variety of studies

21  when I answered that question before.

22      Q.   Let me ask it this way.  Can you identify any

23  documents that we can point to right now that indicate

24  that the efficacy confidence program was implemented to

25  neutralize the safety concerns which had been identified

                                                    131

1  via the sophisticated studies that sought were to infer

2  the real reasons why the people prescribed the

3  medication?

4      A.   The graphs that I showed you that showed

5  increased resources.

6      Q.   That's it?

7      A.   Those are the ones I can identify right now.

8      Q.   Are there any documents that have words in

9  substance that indicate this is being done to neutralize

10  safety concerns, either in that phrase or any other

11  phrase?

12          MR. SKIKOS:  You mean the efficacy safety

13  programs as opposed to the whole integrated marketing?

14          MR. CAMPILLO:  Correct.

15          MR. SKIKOS:  Because you already answered about

16  integrated marketing.

17          MR. CAMPILLO:  Correct.

18          THE WITNESS:  The documents that prescribed that

19  had the objectives did not state that explicitly

20  BY MR. CAMPILLO:

21      Q.   Have we covered all the opinions that you

22  anticipate expressing concerning the sophisticated

23  studies done to infer the real attributes for physicians

24  prescribing Vioxx and your criticisms thereof, of how

25  that was used?

                                                    132

UNCERTIFIED REALTIME ROUGH DRAFT

**Page 133**

1    A.   With regard to that sophisticated study, I have
2  stated everything I can think of that I want to state.
3  This type of study yielded other data as well, and so I
4  have opinions about the other results of this type of
5  study.  He didn't just do sophisticated analysis.  They
6  did some basic analysis, too.
7    Q.   What other opinion do you have that relates to
8  these studies?
9    A.   They tracked over time the ratings of Vioxx on
10  no increased risk heart attack, stroke and safety of the
11  attribute and compared year to year and month to month
12  for three years and showed that overall ratings on both
13  of those attributes remained very high through -- let's
14  see.  I think mid-2003 is where I stopped.  We couldn't
15  find any data after that.  Actually as late as December
16  of 2003.
17    Q.   What exhibit, if any, are you referring to?
18    A.   Okay.  So let's see.  One exhibit is MRK AD
19  00194820.
20    Q.   Which is contained in tab 26 of Exhibit 10?
21    A.   Page 48, 49.
22    Q.   An orthopedic program for Vioxx?
23    A.   Is that the right page?
24    Q.   Give me the Bates number again.  I'm sorry.
25    A.   MRK AD 019 -- I'm sorry.  MRK AD 00194820, Page

**Page 134**

1  48.  Is it a big exhibit?
2    Q.   Uh-hmm.
3    A.   Okay.
4    Q.   I'm looking at Page 48.  Why don't you take a
5  look and see if maybe Page 48 is the wrong reference.
6    A.   Where are you finding the page numbers?  There
7  are no page numbers on this.
8    Q.   There is a small number at the bottom.
9    A.   I think I hand counted these numbers.  That's
10  why.  Let me see if I can find it.
11       Yeah, here it is.  That's this page.
12    Q.   Why don't you tell us what the number is on the
13  bottom, just the last five digits.
14    A.   4869.
15    Q.   May I see that?
16       (Document handed to counsel.)
17  BY MR. CAMPILLO:
18    Q.   Can you tell us what the significance of this
19  is?
20    A.   Even as late of September '03 you still have
21  reasonably high ratings and there is no indication that
22  there is a consistent trend down.  So, in other words, we
23  have three years of this data we can put all together and
24  it declined maybe one point in the entire time.
25       So there is no clear trend.  If Merck was

**Page 135**

1  disclosing this as a concern you would see a big, you
2  know, decline from the minute they start doing it.  You
3  would see a big decline.  And you don't see that.  You
4  see it kind of bouncing around.
5    Q.   If Merck had done what?
6    A.   Had stated, had conveyed there was a possible
7  risk of heart attack or a stroke.  You would see a very
8  different pattern.
9    Q.   That's an assumption you are making or
10  conclusion you are reaching?
11       MR. SKIKOS:  That was answered in the last
12  deposition.
13       MR. CAMPILLO:  I don't recall any discussion of
14  this particular document at all.
15       MR. SKIKOS:  Whether it was known or should have
16  been known.
17       MR. CAMPILLO:  That's not what I'm trying to do.
18    Q.   You are saying the fact that this exhibit, which
19  is in tab 26 of Exhibit 10, that shows that the ratings
20  of Vioxx did not decrease significantly over time somehow
21  shows that Merck did something wrong?
22    A.   It shows they did not have a campaign to
23  disclose the risk.
24    Q.   So is it your opinion they should have had a
25  campaign that disclosed the risk?

**Page 136**

1    A.   Yes.
2    Q.   What risk, in your opinion, should Merck have
3  been advising physicians of?
4    A.   The risk of heart attack from the VIGOR study.
5    Q.   Is it your position that nowhere did Merck
6  advise physicians of the results of the VIGOR study
7  before December of 2003?
8    A.   They did advise them of the results of the VIGOR
9  study but in such a way to reassure physicians that it
10  wasn't a problem.  For example, they focused on the four
11  percent of patients that were very high risk and should
12  have had aspirin and said if you look at everyone else it
13  was a nonsignificant change in risk.  And the FDA adviser
14  panel said that that type of analysis was not valid.
15    Q.   Have you read the findings of the advisory
16  committee that looked at Vioxx and the VIGOR data in 2001
17  and which ultimately led to the change of the label?
18    A.   Yes.
19    Q.   Okay.  And it's your testimony that you believe
20  that Merck did not put out the information to physicians
21  consistent with what was recommended by that advisory
22  committee?
23    A.   Yes?
24    Q.   Okay.  And is that based on anything other than
25  your comparison of reviewing the advisory committee

UNCERTIFIED REALTIME ROUGH DRAFT

1  materials and looking at the label from April '02?
2  　　A.　Well, it wasn't just the label.  Looking at the
3  detailing pieces that they gave physicians, the CV card,
4  the letters that they sent out, the dear doctor letters,
5  solicited and unsolicited.
6  　　　　Those materials contained information that an
7  advisory report was described as invalid.  And also the
8  FDA warning letter had more information about that.
9  　　Q.　Let's start in April of '02.  Are there any
10  materials that were promulgated, distributed, used by
11  Merck, to your knowledge, after April of '02 that in your
12  opinion is contrary or inconsistent with the advisory
13  committee's recommendations?
14  　　A.　Yes.
15  　　Q.　Okay.  Which pieces?
16  　　A.　That's why I prepared this chronological list.
17  　　Q.　I just want you to identify the pieces without
18  necessarily any discussions so we can try to get this
19  moved along as much as we can.
20  　　A.　Which date do you want to talk about?
21  　　Q.　After April 9th of 2002.
22  　　A.　Okay.  You can see the ones.  So there was a
23  bulletin on how to present the label change, which is
24  also related to the Cannell PowerPoint.
25  　　Q.　Which page are we looking at?  Because we don't

137

UNCERTIFIED REALTIME ROUGH DRAFT

1  need to go into it in detail.
2  　　A.　Anything after the April '02 label change.
3  　　Q.　So there are four items on your list, correct?
4  　　A.　Well, let's see.  For this year there's three
5  and this year there's four.  And that's it.
6  　　Q.　Okay.  Just so we can inventory what you're
7  talking about, there are three items, the April 11
8  bulletin to the sales reps.
9  　　A.　Yes.
10  　　Q.　There is the power point by Mr. Cannell in 2002?
11  　　A.　Yes.
12  　　Q.　And there is an August of 2002 -- well,
13  implementation of the efficacy confidence program?
14  　　A.　Yes.
15  　　Q.　And you are saying there are representations in
16  each of those which are inconsistent with the
17  recommendations of the advisory committee from 2001?
18  　　A.　Yes.
19  　　Q.　That's also true for the three items on the next
20  page, which are the first quarter 2003 --
21  　　A.　Well, four items.
22  　　Q.　I'm sorry.  I misread it.  But the first one is
23  two detailed pieces.  Are those the same ones we have
24  talked about, 28 and 29?
25  　　A.　I believe those were the numbers.

138

UNCERTIFIED REALTIME ROUGH DRAFT

1  　　Q.　Okay.  And the next one is --
2  　　A.　The obstacle response guide, which basically
3  refers back to that same April 11, 2002 bulletin.
4  　　Q.　Okay.  Is there a dear doctor letter -- the one
5  you are referring to specifically, the one to Dr. Mikola?
6  　　A.　Yes.
7  　　Q.　And you believe that that letter, whatever it
8  was, since I don't know what it is, was inconsistent in
9  some way with the advisory committee recommendation from
10  2001?
11  　　A.　Yes.
12  　　Q.　And then the fourth one is -- you are really
13  talking about the bulletin and the --
14  　　A.　Related to the bulletin is the -- attached to
15  the bulletin is the obstacle handlers.
16  　　Q.　I just want to make sure we have the inventory.
17  In terms of material that would have disseminated to
18  physician, we are talking about the bulletin and the
19  attached materials?  Go ahead.
20  　　A.　Those were sent to the sales reps who then used
21  it with physicians.
22  　　Q.　That's what I'm trying to identify, the material
23  that went to the physicians.
24  　　A.　Oh, the physicians directly.
25  　　Q.　You are referring to whatever was attached to

139

UNCERTIFIED REALTIME ROUGH DRAFT

1  the bulletin that the sales reps were supposed to or
2  could use.
3  　　A.　Yes.
4  　　Q.　That's one item.  Secondly, you are talking
5  about the two detailed pieces, Exhibits 28 and 29.
6  　　A.　Yes.
7  　　Q.　And any dear doctor letters such as the one that
8  went to Dr. Mikola?
9  　　A.　Yes.
10  　　Q.　Is there anything else that would have gone to
11  the physicians?
12  　　A.　The efficacy confidence ads.
13  　　Q.　And the efficacy confidence ads as a class?
14  　　A.　Yes.
15  　　Q.　Okay.  So those four items are the ones that you
16  are based your opinion on that Merck was making
17  statements after April of 2002 which were inconsistent
18  with what the advisory committed had recommended in 2001?
19  　　A.　There could be others but those are the main
20  ones.
21  　　Q.　Well, are there any others that you are basing
22  your opinions on in this case?
23  　　A.　There could be something in the report that
24  would be clearly labeled with a date, but when I went
25  through my notes this morning, these are the ones I wrote

140

1  down.

2     Q.   And then are, then, the items in your opinion

3  that were used by Merck to reinforce, improperly

4  reinforce decisions on the safety attributes of Vioxx?

5     A.   Yes.

6     Q.   Any other basis upon which you base that opinion

7  besides these four documents or categories of documents?

8     A.   Well, the research.  I mean, the research we

9  have been talking about also has led me to the

10  conclusion.

11         So I looked at the materials and then I looked

12  at all the research.

13     Q.   In terms of documents or materials that would

14  have been used out in the field, shown and given to a

15  physician, can you identify anything else?

16     A.   Well, the detailed pieces that we saw, I think

17  Exhibits 28 and 29, there were other versions of that.

18  That was just for first quarter.

19     Q.   Others that are similarly deficient, in your

20  opinion?

21     A.   Correct.

22     Q.   Is your opinion that these pieces were deficient

23  based on anything other than your comparison of your

24  understanding and your reading of the April or the 2001

25  advisory committee recommendations and then comparing

141

1  that to your looking at the pieces?

2         MR. SKIKOS:  Asked and answered.

3         THE WITNESS:  It's also based on all the

4  research that was done.

5  BY MR. CAMPILLO:

6     Q.   The last group of studies are the direct to

7  consumer advertisements testing, copy testing, correct?

8     A.   Well, there's two more.  There is the consumer

9  tracking and then the consumer copy testing.

10     Q.   You have thrown me for a loop.

11         MR. SKIKOS:  It's all Wendy's fault.

12         MS. TUCKER:  No, we have it.

13         THE WITNESS:  It's a very sophisticated,

14  thoroughly researched campaign.

15  BY MR. CAMPILLO:

16     Q.   By the way, Dr. Pechmann in the materials that

17  you reviewed, the entirety of any materials that were

18  disseminated to the public or the physicians, did you see

19  anything where Merck described Vioxx as a miracle drug or

20  used the word "miracle" anywhere in the actual piece?

21     A.   I didn't see that, no.

22     Q.   There is a telephone survey of chronic pain

23  consumers.  Is that the fifth category of studies that

24  you have opinions about?

25     A.   Yes.

142

1     Q.   Okay.  Can you just briefly summarize what the

2  opinion is about those studies or that you have come up

3  within the context of those studies.

4     A.   Yes.  It's not something directly relevant but I

5  think important to know is that awareness of Vioxx was

6  about 85 percent.  You can't get much higher than that.

7         The other thing we learned is a lot of these

8  people were at high risk in that they had hypertension or

9  heart disease.  So that was apparent from the survey.

10  They had age criteria for these people and a lot of them

11  were high risk.

12         The average age of those interviewed was 55.

13     Q.   First if you can just summarize your opinions.

14  Because I want to ask you about 5 and 6 and we may not

15  have time to get into any details.

16     A.   So basically consumer perceptions of the brand

17  remained stable.  What shot up was awareness of the brand

18  but what remained stable throughout was the perception of

19  the safety of the brand much.

20         They didn't ask about heart attack because I

21  think people would have been shocked to even be asked a

22  question about heart attack.  But they asked them about

23  safe as a sugar pill and a brand that you could trust by

24  way of safety perceptions.

25     Q.   What is it that in your opinion Merck did or

143

1  didn't do that they should have in connection with these

2  studies?

3     A.   What this research shows is that the message to

4  the consumer -- that they didn't get a message to the

5  consumer that Vioxx posed a potential cardiovascular

6  risk.

7     Q.   So your criticism in a nutshell is Merck should

8  have but didn't convey messages to the patients that

9  Vioxx could cause increased CV events; is that it?  I

10  mean, in a nutshell.  I'm trying to summarize it.  If you

11  can't, please tell me.

12     A.   No, that's exactly it.

13     Q.   So it's your opinion that they should have sent

14  out information telling the patients that Vioxx use could

15  increase their risks of CV events?

16     A.   They could have put it in the advertisements, in

17  the print advertisements.  Because this included data

18  post -- when the label changed.  And they did have a

19  vague statement in the advertisements about

20  cardiovascular risk but it did not seem to have any

21  effect on people's perceptions of the brand.

22     Q.   So your opinion is they should have done more

23  than that?

24     A.   Yes.  They should have had a much clearer label.

25     Q.   They should have done something other than the

144

1  patient insert that was prepared and distributed after
2  April of '02?  Have you seen that?
3     A.  I think so, yeah.  The patient label?
4     Q.  Yes.
5     A.  It's exactly the same thing that was in the
6  print ads.
7     Q.  Your opinion is that was not sufficient and
8  Merck should have provided additional information beyond
9  that contained in the ads and in the patient insert?
10     A.  Yes.
11     Q.  What exactly is your opinion that should have
12  been stated by Merck, let's say in the year June of 2002,
13  that was not said about the risks, CV risks of Vioxx in
14  those source of materials?
15     A.  That some research suggested that it could cause
16  heart attacks.
17     Q.  As long as they said that in substance you would
18  be satisfied?
19     A.  Well, no, because I'm a research-based person,
20  so I would do research just like there did.  But what
21  they did in their research -- that's the next category of
22  studies, so maybe it's good that we are moving ahead.
23     In their research they chose a label that had no
24  affect on peel's likely behavior to talk to their
25  physicians.  They saw no significant difference with

145

1  people that said they were very concerned about the risks
2  that were reported and people that were not.  That's what
3  they wanted.  They didn't want the warning label to
4  distract people from our message or they had euphemisms.
5  Basically they didn't want the risk information to have
6  any effect on people's behavior.
7     What I would do is choose a risk message where
8  you actually see a decline in behavior because people are
9  paying attention to the message and getting the message
10  that it's a problem.
11     Q.  Let me move to the sixth type of study which
12  are, I think, described as copy testing of direct to
13  consumer ads.
14     A.  Yes.
15     Q.  If you can summarize what your opinion is about
16  those tests or the testing.
17     A.  Well, the data indicate that people thought the
18  ads were good and increased their interest in talking to
19  the doctor and finding out about the product.  That's
20  fine.
21     What worries me is that they did these tests of
22  the warnings that I was talking about where they
23  specifically looked at -- compared a motivation to talk
24  to the doctor based on people who indicated that they
25  were very concerned about the warning or not.  And they

146

1  found no difference.
2     In the warning that they were using they found
3  that even though some people said they were concerned it
4  didn't affect their likelihood to talk to the doctor or
5  do anything proactively to get the drug.
6     So it's kind of like the same thing we were
7  talking about with the physician attributes; it's one
8  thing what people say and another thing what they
9  actually do.  They actually state in the research
10  documents that if they found that the ad did adversely
11  affect willingness to talk to the doctor, they would not
12  have run the ads.
13     Q.  Do you agree, Dr. Pechmann that the primary
14  purpose of direct to consumer advertising is to encourage
15  the patient to go and talk to the physician about the
16  product or about their problem?
17     A.  Well, that was the goal of this research.  I
18  mean, of this direct to consumer ads.
19     Q.  Isn't that the primary goal of the direct to
20  consumer advertising, to get the patient to go and talk
21  to the physician as an intermediary?
22     A.  Yes.
23     Q.  So to the extent an ad would not motivate the
24  patient to go and talk to the physician, then it wouldn't
25  be very effective, would it?

147

1     A.  The whole point of the warning is to warn
2  people.  So if you do research and tinker with the
3  warning, you get a warning that's worded so vaguely that
4  it has absolutely no effect on their purpose to purchase
5  it.  So it defeats the purpose of the warning.
6     So what I'm saying is the direct to consumer ads
7  are supposed to have warnings and the warnings are
8  supposed to actually warn.
9     Q.  What's basically your opinion that direct to
10  consumer ads have to have warnings?
11     A.  Well, they have to have disclosed risks.  That's
12  what the FDA says.
13     Q.  First of all, do you have any information, any
14  indication that any of the direct to consumer ads that
15  were used by Merck with Vioxx were not in compliance with
16  the FDA guidelines?
17     MR. SKIKOS:  We did that one last time, whether
18  she is going to give opinions about what the FDA should
19  or should not put into an ad.  She is not giving opinions
20  on the FDA.
21     MR. O'CALLAHAN:  I would point out it's after
22  7:00.
23     MR. SKIKOS:  That's okay.  I want you to get the
24  full information.
25     MR. CAMPILLO:  Well, if I can go another five,

148

UNCERTIFIED REALTIME ROUGH DRAFT

1  ten minutes we can stop.  If I haven't gotten full
2  information I'll have to figure out what I can do about
3  that at some other point in time.
4          MR. BRANDI:  I just want you to know that there
5  is a timer underneath that that's going to eject you in
6  seven minutes.
7          MR. CAMPILLO:  I'm looking forward to that.
8          MR. BRANDI:  The record should reflect people
9  smiled and laughed but that there is no tension in the
10  room.
11          MR. CAMPILLO:  Absolutely.
12     Q.  I could have misheard you, Dr. Pechmann, but I
13  thought you said that one of your criticisms was that the
14  DTC ads that were tested by Merck were -- some of them
15  indicated to Merck that those ads would not cause the
16  patient to go and talk to the physician.
17     A.  No, that's not what I was saying.  What I was
18  saying is they tested different types of warnings in the
19  same ad.
20     Q.  By the way, which exhibit addresses these
21  particular ads?
22     A.  Exhibit 64.
23     Q.  Where the warnings are being tested.
24     A.  And 65.
25     Q.  All right.

149

UNCERTIFIED REALTIME ROUGH DRAFT

1     A.  And maybe 67.
2     Q.  I think you identified in your deposition 64,
3  65, 66, 67 and 68 as documents referencing this
4  specifically.
5     A.  Yes.
6     Q.  With regard to the warnings on DTC ads that were
7  being tested, do all of these address that or is it only
8  some of these?
9     A.  Well, let's see.  Sometimes it states it.  Okay.
10  So 67 and 64 and 65, according to this report, have
11  something about warnings in them.
12     Q.  All right.
13     A.  And side effects.
14     Q.  Your opinion is that the DTC ads should have
15  included more information, more warnings about potential
16  CV risks, so you are critical Merck for not including
17  those additional warnings or additional information on
18  the DTC ads?  That's No. 1?
19     A.  Yes.
20     Q.  In addition to that you are critical of what
21  else?
22     A.  Of the fact that they compared -- they tested
23  different warnings looking for the wording that would not
24  affect people's behavior.
25     Q.  Okay.

150

UNCERTIFIED REALTIME ROUGH DRAFT

1     A.  Which seems to under cut the whole point of a
2  warning.
3     Q.  Which document indicates to you that Merck was
4  looking for warnings that would not affect people?
5     A.  Well, in document 64 --
6     Q.  Just pick one and let's see if we can find one
7  example of it, understanding there may be others.  I just
8  want to understand your point.  64?  Okay.  Do you want
9  to see 64?
10         (Document handed to the witness.)
11         THE WITNESS:  I'm not sure which document has
12  exactly what in it.  But 64 has information that I found
13  problematic, troubling.  On Page 14.
14     Q.  VIGOR assessment?
15     A.  Yes.  The last bullet point.  CV and other
16  aspirin fair balance.
17         So the one they tested is people who need to
18  take aspirin with Vioxx are at greater risk of developing
19  stomach ulcer.  Vioxx is not a substitute for the
20  prevention of heart attack.  Rarely heart attacks have
21  been reported.
22     Q.  Okay.  They tested that?
23     A.  Yes.
24     Q.  And what was the result of the test of that
25  particular message?

151

UNCERTIFIED REALTIME ROUGH DRAFT

1     A.  It didn't keep them from the product claim.  If
2  you look at the other research you understand what that
3  means.  That it means on the willingness to talk to the
4  doctor that was the criteria for that.
5     Q.  So this language that they tested did not drive
6  the patient to go and talk to the physician?
7     A.  That did not affect their willingness to go talk
8  to the physician about the drug, to basically ask about
9  whether they should take the drug.
10     Q.  And did they use this language in the DTC?
11     A.  No, they did not.  They used what might even be
12  considered weaker language.  Although we looked carefully
13  for it and they said they were going to do the research,
14  we were not able to get documents on the final label.
15     Q.  Do you know how they came up with the language
16  that was actually used in the final version of the DTC
17  ads?
18     A.  Based on this information, they did comparable
19  research.
20     Q.  But you have even seen that research or what led
21  them to select the particular language that was
22  ultimately used?
23     A.  Well, they state the criteria here for
24  selecting.
25     Q.  Okay.  What's the criteria?

152

UNCERTIFIED REALTIME ROUGH DRAFT

1    A.   They say here do not keep from product claim.
2  But from a statistical standpoint what that meant is that
3  there was no change in your motivation to talk to the
4  doctor about getting the drug.  Because other graphs show
5  that.
6       And they said that if in fact adding the warning
7  reduced their likelihood to talk to the doctor, then they
8  would not continue to use product advertising.
9    Q.   Where do you see that?  Where is it saying that?
10   A.   "It's incorrect to reassess media options
11 reminder and help seeking advertising."  So what that
12 means is there is product advertising for which you have
13 to have a statement of the risks.
14      And then there is reminder in help seeking
15 advertising, both of which do not require that statement.
16 It's what's called the brief summary.
17   Q.   Okay.  What is the statement that you believe
18 should have been given?
19   A.   Well, that's what I was trying to get amount I
20 would do research to see what statement accurately
21 conveyed the risk.
22   Q.   What is it --
23   A.   It would be something more explicit than what
24 they ended up using, which is -- oh, boy, I can't
25 remember exactly.  Something like heart attacks have been

153

UNCERTIFIED REALTIME ROUGH DRAFT

1  observed in some people taking Vioxx.  I mean, it doesn't
2  even -- just looking at the face value of that statement,
3  it doesn't state that there could be a cause
4  relationship.  It could mean old people take Vioxx and
5  also have heart attacks.
6       MR. CAMPILLO:  I think we better stop.  I mean,
7  I have more.  I probably can spend another two hours
8  going through this but I think under the circumstances
9  this is as good as we can do.  I will, you know, work
10 with counsel and see if we can do something.  If not, we
11 will take things up with the judge.
12      MR. SKIKOS:  The only speech I'm going to make
13 is that --
14      MR. CAMPILLO:  I didn't mean to suggest by that
15 that in anybody is acting inappropriately in any way.  I
16 think the witness has been cooperative.  Mr. Skikos, I
17 think you have been very cooperative as well to move this
18 along.  I didn't mean to suggest anything by my comment
19 other than I'm not true.  To prepare for trial I think I
20 need at least another two, three hours of deposition.
21      MR. SKIKOS:  All right.  My only speech is that
22 we did do a lot of work to try and make sure this was
23 efficient and that we've gone now, I don't know, four
24 hours and 15 minutes, which is pretty good.  And that we
25 tried to make sure that the opinions are contained in the

154

UNCERTIFIED REALTIME ROUGH DRAFT

1  report or in the documents we provided you and we put
2  together a binder.  So hopefully this will be done.
3       MR. CAMPILLO:  First of all, for once I agree a
4  hundred percent with what you have said on the record.  I
5  have absolutely no qualifications or reservations about
6  that.  And I will look at everything that has been
7  produced, which is a lot of material, which obviously I
8  have not been able to read it.  And I will do that before
9  I make any further inquiry or effort to continue or take
10 a further deposition of the witness.  I'm not blaming you
11 or her for the predicament that I find myself in.
12      MR. BRANDI:  So we are absolutely clear, we
13 would oppose any further deposition.  Merck has deposed
14 her now for going on 13 hours.
15      MR. CAMPILLO:  I understand a hundred percent,
16 Mr. Brandi.  I didn't expect anything to the contrary.
17      MR. BRANDI:  And I think you inadvertently left
18 out my name and Mr. O'Callahan's name when you talked
19 about being cooperative.
20      MR. CAMPILLO:  No.  I meant what I said.
21      MR. BRANDI:  And Miss Pechmann's name as well.
22 She has been very cooperative.
23      MR. SKIKOS:  I have one more request.  If there
24 is something brought on Dr. Pechmann, please include me
25 on the notice.

155

UNCERTIFIED REALTIME ROUGH DRAFT

1       MR. CAMPILLO:  For deposition purposes.  I think
2  there is a motion being filed to prevent her for
3  testifying on Kelly Frye grounds but nothing to do with
4  her deposition time or commitment.
5       MR. O'CALLAHAN:  Speaking of time, do you have a
6  check for her?
7       MR. CAMPILLO:  I sure do.  And it was done at
8  $400 an hour.  Since we went over, I probably owe you
9  something.  If you can figure it out, let me know.  We
10 actually thought three hours at $400 an hour based on --
11      THE REPORTER:  Do either Mr. Sizemore or Mr.
12 O'Callahan need a copy of the transcript?
13      MR. O'CALLAHAN:  Send me a copy.
14      MR. CAMPILLO:  Let me propose the stipulation
15 that the original transcript be sent directly to
16 Mr. Skikos and he will procure the witness' review of the
17 transcript as well as corrections and signature; that
18 Mr. Skikos thereafter will provide the original to my
19 office and will give notice to all counsel of any changes
20 and the fact that the deposition has been signed and
21 corrected; that the reporter be relieved of her statutory
22 obligations concerning the original once she has sent the
23 original off to Mr. Skikos; that the deposition can be
24 signed under penalty of perjury without the necessity of
25 a notary and that if the original is lost after it has

156

UNCERTIFIED REALTIME ROUGH DRAFT

1    been sign, that any certified copy can be us used.

2              MR. SKIKOS:  I agree.  The one question I have

3    is the trial starts in a week, so you are probably going

4    to want any corrections/revisions before that, I would

5    guess.  But I need to know when we are going to get the

6    transcript.

7              MR. CAMPILLO:  We are requesting it to be

8    expedited.  I'm not sure what that means exactly, but we

9    will get it to you as soon as possible.  I think given

10   the circumstances you just do your best to get it signed

11   and returned at least before the witness takes the

12   witness stand.

13             MR. SKIKOS:  Yes, I will agree to that.

14

15                (TIME NOTED:  7:22 P.M.)

16

17

18

19

20

21

22

23

24

25

                                    157