UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to<br>Case No. 2:05-CV-04379 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| ROBERT G. SMITH, | * | |
| Plaintiff, | * | |
| v. | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * * *

MOTION AND INCORPORATED MEMORANDUM IN
SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
OR ORDER EXCLUDING TESTIMONY OF GARY SANDER, M.D.[1]

(EXPERT CHALLENGE NO. 2)

Merck moves to exclude the testimony of Gary Sander, M.D., a cardiologist and "blood pressure physician" retained by plaintiff to give general and specific causation opinions. Dr. Sander's primary opinions are that Vioxx® increases the risk of cardiovascular events by

---

[1] As explained in Merck's Motion For Order Excluding Testimony of Gary Sander, M.D., Merck was unable to secure a deposition date for Dr. Sander until August 15, 2006 due to scheduling constraints of the witness and/or plaintiff's counsel. Merck now files this memorandum of law supporting its motion to exclude Dr. Sander's testimony, as agreed upon by the parties.

increasing blood pressure, and that Mr. Smith's heart attack was caused by a Vioxx-induced increase in his blood pressure, and a resulting plaque rupture. Dr. Sander's blood pressure opinions not only are scientifically unreliable, they also are irrelevant to plaintiff's claims against Merck, and they contradict Mr. Smith's undisputed medical history. Mr. Smith was hypertensive before he ever took Vioxx. Moreover, *Merck explicitly warned that Vioxx could increase blood pressure*, an effect which, as Dr. Sander admitted has been a well-known risk of all NSAIDs for nearly two decades. Thus, even assuming Vioxx caused Mr. Smith's blood pressure to increase and that increase had any clinical significance (there is no evidence supporting either contention), those facts would be irrelevant to plaintiff's claims, all of which are premised on Merck's alleged failure to warn.

In addition to his blood pressure opinions, Dr. Sander offers other scientifically unreliable opinions, including:

- That Vioxx may accelerate atherosclerosis and that it may have had such an effect on Mr. Smith. He acknowledges, as he must, however, that this hypothesis has not been scientifically proven and that he has no evidence to support an opinion that Vioxx accelerated Mr. Smith's atherosclerosis. Significantly, Dr. Sander has testified that he will not offer opinions as to whether Vioxx accelerated Mr. Smith's atherosclerosis. (Deposition of Dr. Gary E. Sander ("Sander Dep.") at 239:17-240:18, attached hereto as Ex. A.) This Court's order would simply hold him to his promise.

- That Vioxx increases cardiovascular risk by reducing prostacyclin production *in the coronary vasculature*. He acknowledges that there is no scientific study establishing this proposition, however, and that he relies on it simply because he has "no better mechanism."

Finally, Dr. Sander purports to offer his views on Merck's ethics and corporate conduct based on his very limited personal experiences with Merck. Dr. Sander's personal opinions and experiences on these subjects are inadmissible because plaintiff did not designate Dr. Sander to offer such opinions, and Dr. Sander admittedly is unqualified to assess the propriety of Merck's

2

conduct. Lastly, Dr. Sander's personal views and experiences, which are too vague to be in any way meaningful, are also irrelevant to any issue in this case.

Because all of Dr. Sander's opinions are scientifically unreliable, irrelevant and/or he is not qualified to give them, he should be precluded from testifying.[2]

## I. LEGAL STANDARD.

The legal standard for the admission of expert testimony in federal court is set forth at pages 3-5 of the Motion of Defendant Merck & Co., Inc. ("Merck") for Order Excluding Opinion Testimony by Plaintiff's Experts that Vioxx Accelerates Atherosclerosis or Causes Plaque Rupture (the "Atherosclerosis and Plaque Rupture Motion"), filed August 14, 2006 and incorporated herein by reference.

In addition to the qualifications and reliability requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), expert testimony, like all evidence, must satisfy the relevancy requirements of Federal Rule of Evidence 401.

## II. THE COURT SHOULD EXCLUDE DR. SANDER'S SCIENTIFICALLY UNRELIABLE, IRRELEVANT AND FACTUALLY UNSUPPORTED BLOOD PRESSURE OPINIONS.

Dr. Sander testifies that "Vioxx can increase blood pressure" and, by increasing blood pressure, Vioxx increases the risk of plaque rupture and resulting cardiovascular events. (Expert Report of Gary E. Sander, M.D. ("Sander Rpt.") at 5, attached hereto as Ex. B.) He also testifies that Vioxx increased Mr. Smith's blood pressure, that this increase caused Mr. Smith to experience a plaque rupture, and ultimately led to his heart attack.. (Sander Rpt. at 10-11.) Dr. Sander's opinions are scientifically unreliable. There is no scientific evidence that Vioxx causes

---

[2] Dr. Sander was not designated as in expert witness in any previously-tried Vioxx case and thus,

plaque rupture and, thus, Dr. Sander has no reliable basis for opining that Vioxx causes plaque rupture by increasing blood pressure or any other mechanism.  Moreover, Dr. Sander's opinions regarding Vioxx's allege impact on Mr. Smith's blood pressure are wholly irrelevant to any issue in this case.

> **A.   There Is No Reliable Scientific Support For An Opinion That Vioxx Causes Plaque Rupture.**

Dr. Sander's testimony that Vioxx can cause plaque rupture through its effects on blood pressure is scientifically unsupportable.  As explained in Merck's Atherosclerosis and Plaque Rupture Motion, incorporated herein by reference, *no* study establishes that Vioxx can cause plaque rupture.[3]  Plaintiff and his experts cannot make up for that lack of evidence by asserting that Vioxx may have such an effect by increasing blood pressure.  The uncontroverted fact remains: *no* study shows that Vioxx can cause plaque rupture – not through its effects on blood pressure nor through any other mechanism.

> **B.   Mr. Smith Had Hypertension Long Before He Started Taking Vioxx And There Is No Reliable Evidence That It Increased With His Vioxx Use.**

Mr. Smith had high blood pressure before he ever took Vioxx.  High blood pressure is defined to include diastolic blood pressure of 90 or more on at least two occasions.  (Deposition of Daniel J. Courtade, M.D. ("Courtade Dep.") at 101:15-23, attached hereto as Ex. C.)  On June 15, 2000, Mr. Smith's diastolic blood pressure was 100.  (SmithR-PatientsFirst-00002-3; Courtade Dep. at 103:19-104:1.)[4]  The following month, he had two diastolic blood pressure

---

the Court has not considered Dr. Sander's qualifications or the admissibility of his opinions.

[3] Indeed, Dr. Benedict Lucchesi, plaintiffs' expert in animal research in other Vioxx cases, *admits* that the plaintiffs' plaque rupture theory is speculative and that he is unaware of any studies showing that Vioxx increases the risk of plaque rupture.  (Oct. 18, 2005 Deposition of Benedict Lucchesi ("Lucchesi 10/18/05 Dep.") at 331:21-332:6, attached hereto as Ex. D.)

[4] Although Dr. Courtade acknowledges that the diastolic reading of 100 is "alarming", he points out that the reading is less reliable because Mr. Smith was lying down (rather than seated) when

4

readings of 90 – on August 3, 2000, his blood pressure was 136/90 and it was 130/90 on August 24, 2000. (SmithR-PatientsFirst-00005; SmithR-PlProfileForm-00006-00007; Courtade Dep. at 105:2-106:4)  As Mr. Smith's cardiologist, Dr. Courtade, acknowledged, these two readings demonstrate that Mr. Smith had high blood pressure, and was at increased CV risk, before he took Vioxx. (Courtade Dep. at 106:1-8.)  Mr. Smith's hypertensive diastolic blood pressure was confirmed in December of 2001, when he had a blood pressure reading of 130/92, and again on August 26, 2002, when his diastolic blood pressure remained hypertensive at 92.  (SmithR-PatientsFirst-000010; Courtade Dep. at 106:9-107:3.)  In light of all of these readings, Dr. Courtade again testified that Mr. Smith was hypertensive and at increased CV risk:

> Q: Prior to Garry's heart attack, was hypertension a risk factor for Garry?
>
> A: Now looking at these records that you provided me, I'd have to say Garry was hypertensive, mild hypertension.  And that is a risk factor for cardiovascular events, including heart attack, yes.
>
> Q: And is hypertension one of the major risk factors?
>
> A: Hypertension is a major risk factor.  Probably the major risk factor.

(Courtade Dep. at 108:7-16.)

Although Dr. Sander originally quibbled about whether Mr. Smith was hypertensive before he took Vioxx, he acknowledged that, before Mr. Smith began using Vioxx, it is conceivable that he was hypertensive, that he probably was prehypertensive and, at minimum, "[h]is blood pressures were higher than optimal", putting him at increased risk of CV disease. (Sander Dep. at 282:25-283:20.)  Later in his deposition, Dr. Sander acknowledged that Mr. Smith was hypertensive:

> Q: My question is, did you consider Mr. Smith hypertensive?

---

the reading was taken. (Courtade Dep. at 103:19-105:1.)  Subsequent readings confirmed Mr. Smith's high blood pressure, however.

5

> A:    We agreed he was hypertensive.
>
> Q:    So you would say you looked at the hypertensive category of data from which study?
>
> . . .
>
> A:    Well, we argued as to whether hypertension was a risk factor. I agree with you that is was. So he has hypertension. . . .

(Sander Dep. at 316:10-25.)

Despite not being treated with an anti-hypertensive drug prior to his event, Mr. Smith's diastolic blood pressure was actually *lower* while allegedly taking Vioxx in October 2002 than his previous readings. (SmithR-StElizabethMC-00091-94 at 00091.) Thus, Dr. Sander has no evidence of a relationship between, and therefore cannot attribute, Mr. Smith's hypertension to his Vioxx use.

### C.    Increased Blood Pressure Has Long Been A Well-Known Risk Of All NSAIDs And Merck Warned Of The Risk In Its Vioxx Label.

Even if there were evidence that Mr. Smith's Vioxx use caused his hypertension (and there is not), such evidence would be irrelevant to plaintiff's failure to warn claims because Merck explicitly warned of the risk of increased blood pressure in its label. When Merck began marketing Vioxx in 1999, it specifically warned prescribing physicians about the potential link between Vioxx (and NSAIDs generally) and hypertension – *i.e.*, high blood pressure. The initial Vioxx label was explicit and unequivocal:

> PRECAUTIONS
>
> …
>
> Renal Effects
>
> …
>
> Clinical trials with Vioxx at daily doses of 12.5 and 25 mg have shown renal effects (e.g., hypertension, edema) similar to those observed with comparator NSAIDs; these occur with an increased ferquency with chronic use of Vioxx at doses above the 12.5 to 25 mg range. (see

> ADVERSE REACTIONS).
>
> …
>
> Fluid Retention and Edema
>
> Fluid Retention and edema have been observed in some patients taking Vioxx (see ADVERSE REACTIONS). Vioxx should be used with caution, and should be introduced at the lowest recommended dose in patients with fluid retention, hypertension, or heart failure.

(*See* Vioxx Label # 9183800 dated May 1999, attached hereto as Ex. E.)

As demonstrated by the label, it was well known when Merck first began marketing Vioxx that all NSAIDs affect salt and water retention, which can potentially lead to hypertension, edema, and fluid retention. Indeed, Dr. Sander admits that hypertension is a well-known risk associated with all NSAIDs, and it has been known for 15 to 20 years. (Sander Dep. at 73: 6-15.) As Dr. Sander also admits, any drug that may cause hypertension increases cardiovascular risk. (*Id.* at 122:23-123:23.) He testified:

> Q: How long have you known about NSAIDs and their relationship with hypertension?
>
> A: Whether there could be a problem, probably 20 years. Maybe make it 15. Somewhere in there.
>
> Q: Has that been well known in the scientific community?
>
> A: To those of us who are interested in it.
>
> \*   \*   \*
>
> Q: Does any drug that raises blood pressure carry with it an increased cardiovascular risk?
>
> A: Any drugs which raise blood pressure increases [sic] cardiovascular risk. . . .

(Sander Dep. at 73:6-15; 123:3-15.) Dr. Sander also admits that Merck warned about the risk of

7

increased blood pressure in the initial Vioxx label. (Sander Dep. at 271:13-272:7.)[5]

Given that Merck specifically warned prescribing physicians about the potential for Vioxx and other NSAIDs to increase blood pressure – and this potential was well-known to the medical community anyway – it was not, as a matter of law, Merck's duty to warn about all of the known body mechanisms and systems[6] conceivably impacted by blood pressure or the risks possibly related thereto, including plaque-related ones. *See Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 867 (6th Cir. 2006) (affirming grant of summary judgment and district court's finding that drug label adequately warned of risk of increased blood pressure). In *Meridia Prods. Liab. Litig.*, which involved an alleged failure to warn that the prescription diet-drug Meridia could increase blood pressure, the Sixth Circuit held:

> We agree with the district court that '[p]hysicians are well aware of the scope of the risks associated with increased blood pressure and do not need specifics regarding the possible consequences of blood pressure increases'.

*Id.* In other words, a pharmaceutical company that warns that its product may increase blood pressure is not obligated to also warn of all of the associated risks posed by increased blood pressure; it is squarely the role of the prescribing physician, as the learned intermediary, to assess and balance such factors in the context of individual patients. *See id.; see also Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 763 (Ky. 2004) ("The rationale supporting this 'learned intermediary' rule

---

[5] The Vioxx label in effect when Mr. Smith was prescribed Vioxx warned:
> Fluid retention, edema, and hypertension have been reported in some patients taking VIOXX. In clinical trials of VIOXX at daily doses of 25 mg in patients with rheumatoid arthritis the incidence of hypertension was twice as high in patients treated with VIOXX as compared to patients treated with naproxen 1000 mg daily.

(*See* April 2002 Vioxx label, attached hereto as Ex. F.)

[6] In a general sense, it is well-known that atherosclerosis is associated with hypertension. Indeed, hypertension is a traditional risk factor for atherosclerotic disease. (*See, e.g.*, Anderson KM et al., *Cardiovascular Disease Risk Profiles*, Am. Heart J. 1991; 121:293-298; *see also* Sander Dep. at 123:3-15.)

is that only health-care professionals are in a position to understand the significance of the risks involved and to assess the relative advantages and disadvantages of a given form of prescription-based therapy."); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1231-32 (4th Cir. 1984) ("It is the physician's duty to remain abreast of product characteristics and, exercising an informed professional judgment, decide which facts should be told to the patient. Once adequate warnings are given to the physician, the choice of treatment and the duty to disclose properly fall on the doctor."); *Odom v. G. D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) (upholding trial court's granting of summary judgment because plaintiff failed to prove that her doctor would have prescribed a different course of treatment if more drastic warnings had been given).

Because plaintiff's claims stem from an alleged failure to warn, and given that Merck warned about the potential for Vioxx to increase blood pressure (and that this potential side effect was well-known for all NSAIDs for many years), Dr. Sander's testimony that Vioxx increases blood pressure, and that it had such an effect in Mr. Smith, cannot support plaintiff's failure to warn claims.[7]

### III. THE COURT SHOULD EXCLUDE DR. SANDER'S SCIENTIFICALLY UNRELIABLE OPINIONS.

#### A. Dr. Sander's Opinions On Whether Vioxx Causes Or Accelerates Atherosclerosis Are Scientifically Unreliable.

In his expert report, Dr. Sander opines that Vioxx may accelerate atherosclerosis and that it may have contributed to the progression of Mr. Smith's atherosclerosis. (Sander Rpt. at 4, 11; *see also* Sander Dep. at 55:12-19 ("there is at least some evidence that there can be progressive

---

7 Dr. Sander also attempts to opine about other alleged risks of Vioxx – including edema (swelling caused by fluid retention) and heart failure – that he admits Mr. Smith did not experience. (*See* Sander Rpt. at 5; Sander Dep. at 240:19-241:21.) Moreover, Merck warned of the risk of edema, and recommended cautious use by patients with edema or heart failure, in the Vioxx label. (*See* Vioxx Label # 9183800 dated May 1999.) As these alleged risks, too, are irrelevant, Dr. Sander should be precluded from testifying about them.

atherosclerosis [with Vioxx use]").)  This theory of causation lacks a foundation in reliable science, as explained in Merck's Atherosclerosis and Plaque Rupture Motion, filed August 14, 2006.  Merck incorporates that motion herein by reference, and for the reasons stated in the motion moves to exclude Dr. Sander's testimony about Vioxx's alleged ability to cause or accelerate atherosclerosis.

Moreover, in deposition, Dr. Sander admitted the theory is unproven and that he has no evidence to support an opinion that Vioxx accelerated Mr. Smith's atherosclerosis; he even said he will not offer opinions on the subject:

> Q: We talked earlier [about Sander's statement in his report that "at least in certain animal models, interruption of PGI-2 accelerates the development of progression of atherosclerosis"] and you agreed that this is not scientifically proven, but is a hypothesis at this time.
>
> . . .
>
> A: I think the actual interactions in the formation of atherosclerosis is still experimental as opposed to COX-2 in humans.  I think there is some evidence that supports it.
>
> I think there are some people who still argue that they are not convinced and I don't intend to go there.
>
> Q: And you don't intend in this case to say that Mr. Smith had a progression of his atherosclerosis or an acceleration of his atherosclerosis due to Vioxx?
>
> A: No.
>
> Q: That is correct?
>
> A: That is correct.  I do not plan to testify that he would have had accelerated atherosclerosis from Vioxx.
>
> . . .
>
> Q: But you are not going to say his atherosclerotic process --
>
> A: In general, I have no evidence to support that.

(Sander Dep. at 238:18-240:18.)[8]  In light of this, Dr. Sander should be precluded from opining that Vioxx may accelerate atherosclerosis, or that it did so in Mr. Smith.

### B. Dr. Sander's Opinion That Vioxx Reduces Prostacyclin Production In The Coronary Endothelium Is Scientifically Unreliable.

Dr. Sander relies on the "FitzGerald hypothesis" as the foundation for his opinion that Vioxx increases CV risk through its purported impact on blood pressure. As explained in the Motion of Defendant Merck & Co., Inc. ("Merck") to Exclude Testimony of Wayne A. Ray, Ph.D., filed August 14, 2006 and incorporated herein by reference, the FitzGerald hypothesis remains speculative and cannot form the basis for plaintiff's experts' causation opinions.

Dr. Sander takes the FitzGerald hypothesis one step further, however, purporting to opine that Vioxx causes a protacyclin/thromboxane imbalance, and causes CV events, by reducing prostacyclin production *in the coronary vasculature*. (*See* Sander Dep. at 216:22-217:20; *see also* Sander Rpt. at 3-4.) Although Dr. Sander admits that there is no scientific evidence supporting his theory, he, nonetheless, uses it as the foundation for his opinions:

> Q: Would it be fair to say that there is no scientific study out there, either in humans or animals, that shows that Vioxx decreases protacyclin in the coronary vasculature?
>
> . . .
>
> A: I'm not aware of any.
>
> . . .
>
> Q: So would you agree that the theory that Vioxx reduces prostacyclin in the coronary vasculature is a hypothesis at this time?
>
> . . .

---

[8] Indeed, Dr. Sander's lack of scientific certainty on this point is demonstrated by the fact that he acknowledged that the converse may well be true--that it is a sound scientific hypothesis that Vioxx might actually slow the progression of atherosclerosis and help stabilize plaque in animal models. (Sander Dep. at 268:22-269:14.)

11

> A: Since I do not know specifically of any literature that has measured it. Although, we do know COX-2 is expressed. And there is no reason to believe this mechanism is not operative. I do not know of anything that specifically demonstrates it.
>
> Q: Therefore, it is a hypothesis right now?
>
> . . .
>
> A: I would not use the word hypothesis. I think that is the presumptive reason why thrombotic events occur in coronary arteries.
>
> Q: But with no science right now proving that, would you agree that is a hypothesis until proven? Would you agree it is --
>
> A: Well, clots occur in patients taking Vioxx in the coronary arteries. I have no better mechanism, so I think it is a working hypothesis. And I would go so far as to say it is an assumption by those of us who treat people with these problems.
>
> . . .
>
> Q: Are you aware of any scientific proof that Vioxx reduces prostacyclin in the coronary vasculature?
>
> A: I have never seen that measurement published.

(Sander Dep. at 216:2-218:18.) Dr. Sander's theory, which admittedly is derived from the fact that he "has no better mechanism" to explain how Vioxx might cause heart attacks, is speculative and unproven. He, therefore, should not be permitted to testify about it.

## IV. THE COURT SHOULD EXCLUDE DR. SANDER'S TESTIMONY ABOUT MERCK'S CORPORATE CONDUCT AND ETHICS.

Dr. Sander purports to offer his views on Merck's ethics and corporate conduct, based upon one meeting he had with an unidentified Merck representative sometime in 2001 or 2002. He alleges, in hindsight, that this unidentified representative misrepresented the "true data" on Vioxx, and that this interaction causes him to question Merck's integrity. (*See* Sander Dep. at 71:2-4, 74:19-76:4, 77:9-18, 78:15-79:21, 119:21-120:19, 140:12-141:9.) In testifying about this alleged meeting, Dr. Sander also purports to talk about the unidentified Merck representative's

12

state of mind, speculating that the purpose of the visit to him was to "convince [him] that there was no issue with Vioxx" and "to assure [him] that the VIGOR trial in fact did not implicate Vioxx as a thrombotic agent." (Sander Dep. at 71:2-4, 74:19-75:4.) Dr. Sander's personal opinions and experiences in this regard are inadmissible because plaintiff did not designate Dr. Sander to offer opinions of this sort, Dr. Sander admittedly is unqualified to assess the propriety of Merck's conduct and Dr. Sander's personal views are irrelevant to any issue in this case.

Dr. Sander says nothing in his report about Merck's conduct or ethics, nor does he mention the meeting he allegedly had with a Merck representative in 2000 or 2001. (*See generally* Sander Rpt.) He should be precluded from offering opinions on these topics, and from testifying about the alleged Merck meeting, because plaintiff did not designate him to offer any such opinions. Rule 26 requires a party to file a report for each expert witness it intends to use at trial and to provide "a complete statement of all opinions to be expressed and the basis and reasons therefor." *See* FED. R. CIV. P. 26(a)(2)(B). If a party does not comply, the Court should exclude the expert from testifying at trial on the matters the party was required to disclose. *See* FED. R. CIV. P. 37(c)(1); *see also Sheridan v. Merck & Co., Inc.* No. Civ. A-02-2581, 2003 WL 22902622, at *2 (E.D. La. Dec. 8, 2003) (refusing to allow plaintiff's experts to offer opinions and testimony not included in reports; stating "[t]o allow Plaintiff to now garner from his experts testimony addressing for the first time, an alleged drug defect would unfairly prejudice Merck and its defense" and "to allow an expert to state an opinion for the first time in his deposition, *after his expert report has been produced,* would render meaningless the expert report deadline").[9]

Dr. Sander should be precluded from offering his opinions for the additional reason that

---

[9] Dr. Sander also should be precluded from offering any other opinions not contained in his July

13

he has no expertise that qualifies him to testify about Merck's corporate conduct or ethics. He acknowledges that he has no expertise in these areas:

> Q: And those meetings and any feelings you have about Merck are not a basis, a factual basis, for any of the opinions you are giving in this case?
>
> A: Of course not.
>
> Q: I assume you don't have any plans to discuss those meetings with the jury in the case?
>
> . . .
>
> A: I have not been asked to deal with issues of Merck's behavior relative to drug analysis and release. And I don't feel that I have expertise to do it.
>
> Q: And you don't have the expertise to do what?
>
> A: To discuss what Merck knew, when they knew it, what the issues with publication were, the data tables. The entire discussion that I had read, but I am not going to talk about.

(Sander Dep. at 78:10-79:7.) Moreover, any such testimony would be unduly prejudicial and would not assist the jury. Expert witnesses are routinely prohibited from providing testimony regarding the "intent, motives or states of mind of corporations, regulatory agencies and others," because they "have no basis in any relevant body of knowledge or expertise." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).

Dr. Sander's personal views of Merck's conduct, or his speculation as to its state of mind, are also irrelevant and therefore inadmissible. Examining and drawing factual inferences from the evidence are roles left properly to the trier of fact. The jury does not need Dr. Sander's assistance in carrying out that responsibility.

Finally, Dr. Sander's testimony about his alleged meeting with a Merck representative is

---

10, 2006 report.

14

too vague to be in any way useful to the jury. He does not even recall when the meeting occurred or the name of the person with whom he purportedly met. (Sander Dep. at 74:19-75:12.) Courts routinely exclude expert testimony based on such vague testimony or evidence. *See, e.g., In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 543 (stating that expert testimony "must comport with the reliability and helpfulness requirements of Rule 702" and excluding testimony that was "so vague as to be unhelpful to a fact-finder").

## V. CONCLUSION.

For the reasons stated above, Merck respectfully requests that this Court grant Merck's Motion for Order Excluding Testimony of Gary Sander, M.D.

Dated: August 24, 2006

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
Carrie A. Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone: 312-494-4400
Fax:    312-494-4440

Brian Currey
Catalina J. Vergara
Ashley A. Harrington

O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

And

Douglas R. Marvin
Robert A. Van Kirk
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Motion and Incorporated Memorandum in Support of Motion of Merck for Order Excluding Testimony of Gary Sander, M.D. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 24th day of August, 2006.

                                              */s/ Dorothy H. Wimberly*
                                              Dorothy H. Wimberly, 18509
                                              STONE PIGMAN WALTHER
                                              WITTMANN L.L.C.
                                              546 Carondelet Street
                                              New Orleans, Louisiana  70130
                                              Phone:  504-581-3200
                                              Fax:     504-581-3361
                                              dwimberly@stonepigman.com

                                              Defendants' Liaison Counsel