the F.D.A. The F.D.A. considers both the content of the advisory committee's delibera-

tions and committee's answers to the F.D.A. posed questions very seriously. However, the

advisory committee can only render its most informed and effective judgments when it is

also the beneficiary of open, honest, accurate and timely reporting from both the F.D.A.

and the sponsor. To this end, the sponsor spends months preparing briefing packets for the

advisory committee, and weeks in intense practice sessions preparing for the meeting.

176. *Decision Processes:* The decision process of the F.D.A. and its external advisory com-

mittees is built on a foundation of the open, accurate and timely dissemination of scien-

tific evidence concerning the mechanism of drug action, the drug's effectiveness, and the

drug's safety profile. When this foundation is solid, the process will swiftly identify and

rapidly approve drugs that are safe, effective, and meet a medical need. During this proc-

ess, the public is protected from compounds that either have no efficacy or are unsafe,

these inferior products being removed from further consideration. The maintenance and

promotion of the public health depend on the integrity of this system. If either the sponsor

or the F.D.A. engage in dishonest or deceptive practices, the process begins to erode, and

the public suffers. This occurs either through the delay in the approval of safe and effec-

tive compounds that meet a medical need, or through the publics direct exposure to inef-

fective and dangerous compounds. The F.D.A. cannot make timely, informed decisions

when the sponsor denies them information.

177. *Material Information*: Embedded in this body of procedures are the channels through

which accurate, relevant, and material information describing the drugs actions is

promptly communicated to practicing physicians and through the physicians to their pa-

tients. After the F.D.A. approves the drug and the sponsor to the medical community ad-

M006E3925M

vertises the drug, it is the sponsor's obligation to closely monitor the use of the drug for the appearance of unanticipated adverse events.

178. *Adverse Events*: An adverse event is an undesirable effect produced by the drug. Many adverse events are identified during the early testing phase of the drug. These adverse effects are included in the drug label. The drug label is the official description of the drug, which appears, with all the labels of all approved drugs in the Physicians' Desk Reference (PDR). This label describes the effect of the drug, the population in which the drug is effective, the adverse effects of the drug, and the general precautions reasonable and prudent physicians should take in prescribing the drugs. Physicians and pharmacists rely on these labels in making decisions involving the use of these drugs in their patients, and they require that the information in these drug labels be accurate and up to date. The sponsor owns the drug label. It has the responsibility for ensuring that the information in the label is accurate and up to date. Although there are specific regulations in the C.F.R., which govern the content of the label, responsibility for guaranteeing that the information in the drug label is accurate resides with the sponsor.

179. *Labeling*. Both physicians and patients have the right to draw independent conclusions concerning the risks and benefits of a therapy. Their best and clearest recommendations come from these considerations. Review of the Rofecoxib labels reveals several understatements about the label. The federal regulations require that the labeling shall contain a summary of the essential scientific information needed for the safe and effective use of the drug. The essential information was lacking in the warning labels for the fenfluramines.

180. Drug labels are to be designed for the safe and effective use of the drug. There is no way to write an adequate label about a drug that has minimal efficacy and causes serious, life

M00GE38291

threatening side effects because such a compound cannot be used safely and effectively. By definition an adequate label cannot be written for Rofecoxib since the drug cannot be used safely and effectively. The particular defects in the Vioxx label are as follows.

181. An adequate label must contain complete statements about the effectiveness of the compound. The data for the analgesic effect of Vioxx did not state that was of the same effectiveness as standard NSAIDS.

182. 21 CFR Parts 201 and 202 states, "The Commissioner also advises that these labeling requirements do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The additional labeling and advertising of additional warnings, as well as contraindication, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., 'Dear Doctor' letters containing such information) is not prohibited by these regulations.

183. However, Merck did not provide adequate warnings. On February 25, 1996 in an email from Brian F. Daniels to Thomas Simon, et. Al, regarding GI Outcomes Trial Protocol, he states, "Would allow low dose ASA real world everyone is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill drug". With this comment, not only does Merck recognize that without COX-1inhibition, rofecoxib will increase cardiovascular thrombotic events, but also that patients should take low dose ASA while on rofecoxib. Yet, this warning never appeared in the rofecoxib label.

184. The attitude toward the FDA, whose only mission is ensure that only safe and effective compounds are used by the public was antagonistic. On May 14, 1999, in an email form Scolnick to Blois, Goldmann regarding the Vioxx US label, he states "I think the ONLY

M00GE38292

way to handle is to GO THERE AND INVOLVE LUMPKIN and word by word agree to the final circular by next Mon/Tue. I DID THIS WITH TEMPLE ON VASOTEC IN 1985.

185. On March 9, 2000, email for Scolnick to Shapiro, Reicin, Nies, regarding VIGOR stated, "The CV events are clearly there. Since no obvious correlate…this is real…it is a shame, but it is a low incidence and it is mechanism based as we worried it would be." The early preapproval data demonstrated a signal of CV hazard that Merck ignored. Leadership in Merck acknowledged the hazardous effect of rofecoxib. There was no mention of a possible, scientifically unsupportable beneficial effect of naproxen as a possible explanation.

186. On March 27, 2000, Merck announced through a press release the preliminary results of GI outcome study with Vioxx (VIGOR). One day later, in an email from Alan Nies to Barry Gertz regarding Dr. Patrono on VIGOR, they state that Dr. Patrono "does not think that the CV effect that we observed can be attributed to naproxen for a couple of good reasons. Merck's consultant who correctly warned before the drug was approved that rofecoxib could produce serious cardiovascular adverse effects, also warned them that the results in VIGOR, while confirmed his own concerns, could not be explained away.

187. However, on April 28, 2000, in a press release, Merck misinforms the public by "confirming a favorable CV profile.

188. On June 20, 2000, email from Laurenzie to Daniels regarding Dr. Patrono warned, "the presentation of VIGOR data must not mislead the audience into thinking that the difference in CV events could be explained by an anti-thrombotic effect of naproxen, which is not demonstrated.

M006E38293

189. On June 29, 2000, the Vioxx sNDA (supplemental new drug application) with Dennis
Erb's letter to Central Document Room of the FDA for submission of labeling supplement
to NHDA 21-042 based on VIGOR GI results. In this document, Merck argues that
VIGOIR reinforces the need for concomitant aspirin use is some patients. Merck submitted
protocols 085 and 090. However did not change the label adding the warning about re-
quired aspirin use.

190. On July 5, 2000, a memo from the statistician Deborah Shapiro Alise Reicin revealed that
Merck knew it was not publishing all of the myocardial infarctions that occurred in
VIGOR in the *New England Journal of Medicine* that would not be published until No-
vember 2000. They had the opportunity to update the data but refused to take it.

191. On November 8, 2000, in an email from Reicin to Barr involving a hypertensive patient,
Dr. Barr believes a hypertension-related death in ADVANTAGE should have been classi-
fied as an MI, stating in an email timed at 11:43AM "Common things being common, the
clinical scenario is likely to be an MI." He then explained the definition of sudden death
and unexplained death in an email timed at 12:58 PM. However, Dr. Reicin challenged
him, saying, "I still strongly feel that this should not be an MI-..." However, she went fur-
ther than that, saying the death should be classified as "unknown". Specifically, she stated,
"...I would prefer unknown cause of death so that we don't raise concerns." This state-
ment's egregious insensitivity to the importance of identifying appropriate safety monito-
ries speaks for itself.

192. On October 18, 2000, Deborah Shapiro, Merck statistician carried out a preliminary meta-
analysis that demonstrated an increased CV risk. Specifically, this report showed that Vi-
oxx more than doubled the risk of MI related to all NSAIDS, and that this increase was sta-

M006E38294

tistically significant. This included a MI-only analysis of the Vioxx program. This report
was omitted in Merck's FDA submission and in the published meta-analysis of Konstam.

193. On January 31, 2001, a national thought leader summary of the VIGOR study recom-
mended that Merck not emphasize the "protective effect" of Naprosyn as an explanation."
In that same paragraph, they state that there is no supporting data to substantiate a protec-
tive effect for Naproxen.

194. On this same date, January 31, 2001, Dr. Scolnick of Merck sent an email to Mr. Anstice
and Gilmartin, it which he stated, "...there is no way to prove that in patients with rheu-
matoid arthritis that ALL of the difference between Vioxx and naproxen is due to the
benefit of naproxen. It is impossible to prove this; it is impossible to know this with cer-
tainty."

195. On February 1, 2001, Targum of the FDA wrote a memo to Cook and Villalba regarding
NDA 21-042, S-007 review of cardiovascular safety database. He stated that "Despite
lower dose, smaller sample size and aspirin use, the trend is against rofecoxib." He also
stated "The sponsor claims that the difference in MI between the two groups is primarily
due to the anti-platelet effects of naproxen. This hypothesis is not supported by any pro-
spective placebo-controlled trials with naproxen."

196. On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the
safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory
Committee in public session that there was no evidence from an examination of their Phase
IIb/III database of excess cardiovascular events. A similar statement was also made on
page 56. This was false. The Watson report on which that was based clearly demonstrated
excess cardiovascular events in women, and in most of the age ranges examined in men.

M006E38295

This information was withheld from both the 1999 Advisory Committee and the 2001 Advisory Committee, as well.

197. On September 17, 2001, the FDA sent a Warning letter from Abrams to Gilmartin regarding Vioxx. That letter stated that Merck's promotional activities were "false, lacking in fair balance or otherwise misleading." It also stated," your claim in the press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible."

198. Nevertheless, on November 6, 2001, in a draft letter to Jonca Bull regarding the Amendment to the Supplemental New Drug Application, Merck expressed strong disagreement with FDA's initial October 15, 2001 labeling proposal, which it argues is unprecedented. Merck argues for labeling information tempering any commentary on CV/T data from VIGOR.

## Misleading the FDA

199. Regulation Sec. 14.171: Utilization of an advisory committee on the initiative of FDA. (f) Presentation of all relevant information about the matter will be made in open session unless it relates to an IND the existence of which has not previously been disclosed to the public as defined in Sec. 20.81 or is otherwise prohibited from public disclosure under part 20 and the regulations referenced therein. Sections 314.430 and 601.51 determine whether, and the extent to which, relevant information may be made available for public disclosure, summarized and discussed in open session but not otherwise made available for public disclosure, or not in any way discussed or disclosed in open session or otherwise disclosed to the public.

200. Merck mislead the FDA at the FDA Advisory Committee Meeting. On April 20, 1999, the FDA Arthritis Advisory Committee met to discuss the consideration of whether Vioxx

M00GE38296

should be approved for use for pain relief. During that discussion, both efficacy and safety of Vioxx were discussed. There was a section of the presentation of the thromboembolic cardiovascular adverse experience. Beginning on page 105 of the transcript, the individual presenting on behalf of Merck states "I will now review the thromboembolic cardiovascular adverse experiences. We looked at an extensive list of adverse experiences representing peripheral, myocardial, and central nervous system thromboembolic events. The data presented on this slide is a combined analysis from all of our osteoarthritis studies. This is reported in events per 100 patient years. The event rate was low and was similar between placebo, rofecoxib, and the NSAID comparators. All deaths across all osteoarthritis studies are summarized on this slide: The events are reported again, per 100 patient years. The rates for rofecoxib, as you can see, are if anything, lower than with the NSAID group.

201. However, one year before, on February 2, 1998, Watson's Final results of an analysis of the incidence of Cardiovascular SAE's in the Phase IIb/III Vioxx Osteoarthritis Clinical Trials demonstrated a CV signal. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The overall relative risk for cardiovascular SAE for men was 1.28 and for women was 2.16, demonstrating a clear signal of increased cardiovascular risk associated with rofecoxib therapy (Table 7). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's than the placebo group in protocol 010(page 1 following executive summary). This finding was not reported to the FDA advisory committee at this meeting. These relevant tables were omitted from the Merck FDA Advisory Committee Background Information Packet for this meeting. The FDA Advisory Commit-

M00SE39297

tee was never told about the increased cardiovascular risk associated with rofecoxib at this
critical juncture in the FDA's deliberations for the approval of rofecoxib.

202. On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the
safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory
Committee in public session that there was no evidence from an examination of their Phase
IIb/III database of excess cardiovascular events. A similar statement was also made on
page 56. This was false. The Watson report on which that was based clearly demonstrated
excess cardiovascular events in women, and in most of the age ranges examined in men.
This information was withheld from both the 1999 Advisory Committee as well. The
Merck FDA Advisory Committee Background Information Packet dated February 8, 2001
was incomplete. On page 9 of that document (Section 2.2.1.1. Rationale for the Choice of
Patient Population in VIGOR), no description of the rationale for only including patients
who were not at high risk for cardiovascular disease. The critical information intimated in
an email on November 11, 1996 by Dr. Reicin stating the plan of "excluding high risk car-
diovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may
decrease the CV event rate so that a difference between the two groups would not be evi-
dent" was not included in the Advisory Committee Packet. This critical information that
altered the VIGOR study, blocking its ability to fairly assess the risk associated with rofe-
coxib was not shared with the FDA at this critical decision point in the FDA review proc-
ess. In addition, Tables 6 and 7 of the Watson report, which demonstrated a clear signal of
the cardiovascular danger of rofecoxib was omitted from this critical document on which
the FDA reviewers relied.

M00GE38298

203. In addition the emails dated April 6 and 7, 2001 between Dr. Greene and Dr. Scolnick re-
vealed the internal attitude of Merck to the FDA, whose only desire was to ensure that safe
and effective medications be available to the US public.

204. On April 6, 2005, John Jenkins, Director of the Office of New Drugs and Paul J. Selig-
man, Director Office of Pharmacoepidemiology and Statistical Science wrote a memoran-
dum bearing the FDA's imprimatur whose subject was Analysis and recommendations for
Agency action regarding nonsteroidal anti-inflammatory drugs and cardiovascular risk.
The specific sources of the information on which the statements within this memo are
based are not revealed in the document (e.g., the findings from the Alzheimer's trials for
Vioxx, page 5). It is therefore unclear what the scientific basis for the statements and ac-
tions recommended in the document are. Without knowing the source of the information, it
is difficult to assess the worthiness of the recommendations provided in this document.
However the basis of my conclusion that Vioxx is a dangerous compound with unaccept-
able cardiovascular risks, regardless of dose or duration of exposure, are clearly delineated
in this affidavit.

205. This affidavit draft does not discuss the results of analyses yet to be produced by Merck,
nor does it discuss an evaluation of the actual APPROVe datasets that I plan to undertake.
This affidavit will be amended as additional relevant information becomes available, and,
if appropriate, upon completion of my evaluation of the SAS APPROVe datasets.

M006E38299

## Appendix A: Statistical Reasoning in Medicine

206. Statistical Reasoning in Medicine: Statistical reasoning in { XE "statistical reason-
ing:definition" }medicine is, at its heart, the process by which we determine if health care
research results identified in one sample apply to a much larger population. The urgent
question for a reviewer of the COX literature is whether results from all of the studies (or
any of the studies) can be generalized from the peer reviewed manuscript to the population
at large, and therefore be extended to a particular plaintiff. Is there a subset of studies that
contribute more to our understanding, and can therefore be extended to the population?
The type of generalization is not automatic; in fact, commonly in science this generaliza-
tion is inappropriate. Thus, the reviewer must precisely identify the circumstances in which
extension to the population is appropriate, and, alternatively, when the research results
must be firmly circumscribed by the sample from which they are obtained.

207. A negative answer to this critical question does not imply that the veracity of the investi-
gator's work is in question. { XE "statistical reasoning:critical question" }The authors of a
published article did in fact find what they claimed to find in the sample; their probity is
not in question. The relevant, question is whether the sample findings translate to the popu-
lation from which the sample was obtained? Specifically, does the examination of the rela-
tionship between exposure and disease in the sample concisely and efficiently capture what
they would find if they examined the entire population, or, alternatively, are the sample re-
sults merely due to the freak of chance, the vicissitudes of their inadvertent selection of the
wrong, unrepresentative sample from the population. If the former is the case, then a
whirlwind of scientific discussion is necessary and valid. However, if the relationship is
one that is seen only in the sample, and does not adequately depict a population finding,

M00GE39300

then any ensuring discussion is based on a fantasy. These questions are of direct relevance
to the COX inhibitor literature, which is replete with studies of different designs, different
sensitivities, and widely disparate results.

208. *Sampling Error and Significance Testing* Sample-based research is the study of a sam-
ple obtained from a population. Different samples, obtained from the same population,
contain different individuals with different experiences an{ XE "p value:and sampling er-
ror" }d therefore contain different results. Sampling error is simply this sample-to-sample
variability. The symbol $\alpha$, representing the type I error is the specific sample error that al-
lows a population to generate a sample which contains a spurious relationship that is not
seen in the population.

209. Clinical trial investigators recognize that there are many reasons why the positive find-
ings of clinical experiment may be misleading. For example, they may have selected a
population of patients in whom the therapy works but the inclusion and exclusion criteria
of the study were too restrictive. The dose of the medication chosen may be effective, but it
produces too many side effects. The blinding of the procedure may have been ineffective,
leading to a more diligent search for endpoints among the subjects randomized to placebo
therapy. These are all problems with the execution of the trial. They can be anticipated and
the trial designed to remove them as obstacles to the trial's success. However, there is one
problem that, no matter how well the clinical trial is designed, cannot be removed as the
generator of false positive results — chance alone. This is a $\alpha$ error.

210. Statistical significance addresses the possibility that sampling error has produced the
positive findings in the sample. If an $\alpha$ (or type I) error occurs, then there is no effect of the
therapy in the population, but the population produced a sample in which, just through

M006E38301

chance alone, the therapy produced an effect. There is no question that the therapy worked
in the sample; however, the sample results are not a reflection of the population effect, but
instead were generated by the random aggregation of subjects selected for the sample.

211. The occurrence of a type I error is solely a property of the sampling process. Since sam-
pling is necessary for the research effort, the investigators understand that they cannot re-
move this possible explanation of these results. They instead decide to measure the possi-
ble influence of sampling error. Investigators set the $\alpha$ error level at the beginning of the
study, and compute a sample size based on the maximum acceptable type I error rate, as
well as on other parameters. At the conclusion of the experiment, the investigators com-
pute the $p$-value for the result of the study. The $p$-value is the measure of the type I error
rate at the end of the study and is based on the actual research results. If the $p$-value is less
than the $\alpha$ error rate that was prospectively identified (commonly set at the 0.05 level, a
decision that has its sole basis in tradition), then researchers conclude that it is very
unlikely that chance alone produced the findings of the study, and that the results of the
study (be they clinically significant or clinically negligible) are truly reflective of what
would occur in the larger population from which the sample was obtained.

212. Therefore, if (1) the systematic explanations for a spurious research finding are removed
from the experiment by exceptional planning and good clinical trial execution, (2) the
probability of a false finding just by chance alone is reduced to a small level (i.e., the $p$-
value is less than the prospectively set $\alpha$ error rate), and (3) the magnitude of the findings
are clinically important, then the medical and regulatory communities are assured that, to a

M006E38302

reasonable degree of certainty, the positive results of the trial represent a true population finding.[*]

213. *Statistical Power*: Statistical power, like *p*-values, is a phenomenon of sampling error. The circumstance in which statistical power is relevant in the interpretation of a research program involving the investigation of COX inhibition is when the trial results are not positive, but null; no treatment effect is seen. { XE "power (statistical):definition" } Of course, there are many systematic explanations for a null finding (the wrong exposure level to the active intervention is but one of many possible circumstance). However, another possible explanation is sampling error. In this circumstance, the therapy is effective in the population. However, the population produced a sample by chance alone in which the therapy was ineffective. This is a type II or beta error. Power is defined as one minus the type II error. High statistical power translates into a low type II error rate.

214. Consideration of statistical power has important implications for the COX literature, since the occurrence of a type II error makes it impossible to assess the implications of a null finding. Specifically, if a study does not find a relationship between exposure to a COX inhibitor and cardiovascular disease, low statistical power means that it is quite likely that, even if there were a relationship between COX inhibition and cardiovascular disease, the study would not have found it. Therefore the null finding must not be treated as implying a null relationship in the population, but as a non-informative finding. This is the justification for the creed "Absence of evidence is not evidence of absence." Specifically, this means that absence of evidence (of a relationship between COX inhibition and cardiovascular disease) need not be evidence of absence (of this relationship existing in the popula-

---

[*] We will have much more to say about the interpretation of *p*-values.

MO06E39303

tion). Thus null findings from underpowered evaluations of the relationship between COX inhibition and cardiovascular disease are uninformative.

215. Since the researcher does not know during the design phase of the study whether the results will be positive or null, she must plan for each possibility. Thus, she should design the study so that the type I error rate will be low (customarily no higher than 0.05) and that the power of the experiment will be high (typically, at least 80%). Each of these considerations is part of the sample size computation.

216. *Sample Size Computations*: Good clinical trials, regardless of their size, are characterized by careful planning, controlled execution, and disciplined analysis. An important component of the design of a clinical research effort is the sample size calculation. The sample size computation is the mathematical calculation that determines how many patients the trial should recruit. It is based on clinical concerns, epidemiologic determinations of event rates, and biostatistical considerations about the role sampling error may play in producing the trial's results. It can be said that the sample size computati{ XE "sample size computation:general concerns" \b }on is the forge upon which the clinical trial design is hammered.

217. Exploratory Analysis and Random Research: Exploratory analysis is the process by which the investigator allows the data to answer specific questions that the investigator did not plan to use the data to address. There are two problems with *exploratory research* or *hypothe {* XE "exploratory analyses:definition" *} {* XE "hypothesis generating analyses:definition" \t *"See* exploratory analyses" *}sis generating research*. The first is that commonly the sample is not an optimal one, since the investigator can only design a sample to answer questions that they knew to ask.

M00SE38304

## Appendix B: Determining Causality in Medicine

218. Clinical investigation has been a human endeavor for over two thousand years. The most common building block in the edifice of health study is the { XE "case reports" }{ XE "case series" }case report. A case report is a summary of a single patient's findings and the communication of those findings to the medical community. A case series is a collection of case reports, linked together by a common thread (e.g., all of the patients were seen by the same doctor, or each of the patients was exposed to the same agent, e.g., quinine).

219. It is easy to understand how the growth of general medical knowledge has been propelled by the use of case reports. The delivery of healthcare has been governed by the interaction between a single, concerned, responsible provider and his patient. This relationship is private and privileged. However, it has historically been conducted in isolation, by physicians and nurses widely separated from each other. The idea of a community was well established. However, the concept of a medical community (i.e., a collection of practitioners who worked together to jointly expand their knowledge base) was one that took many generations to develop.

220. Therefore, medical care was delivered for hundreds of years by practitioners, who, working alone with incomplete knowledge, made decisions that directly affected the lives of their patients, and indirectly, their patients' families and communities. The one, natural learning tool these physicians could use was the active sharing of their experiences among themselves. This served to expand their expertise, suggest alternative approaches to healthcare, and extend their knowledge. This shared experience is at the heart of the case report.

221. The core thesis of this approach was best captured by{ XE "Celsus" } Celsus (circa A.D. 25) [32], who stated that "Careful men noted what generally answered the better, and then

MO05E383305

began the same for their patients." For the next 1900 years, advances in clinical medicine
occurred through the combined use of careful observations, clear recorded descriptions,
and deductive reasoning. The discovery that gunshot wounds could be healed without the
application of burning hot oil [33] demonstrated that a case report-style observation could
uncover new information and overturn prior, erroneous principles in medicine. When
medical journals began to appear, the primary medical information that they dispersed was
that of the case report. Those physicians who had more exposure and experience with a
medical issue compiled their case reports together into a case series that they would pub-
lish. This continues to this day. Examples are diet drugs and heart valve disease [34] and
radiation poisoning [35].

222. However, case reports have well-established difficulties. Although they reflect very clear
and honest observations, the degree to which a single case report represents a general phe-
nomenon in the population can be subject to debate. Even though they are useful, the vari-
ability of observations across patients makes it difficult to assess whether one patient's
findings summarized in a case report can be easily translated to others.

223. However, what the case report and essentially all investigative mechanisms in medicine
hope to illuminate, by examining both the environment (e.g., exposure to a toxin or a po-
tential cure) and the patient's response, is the true nature of the exposure–outcome rela-
tionship. This true nature could be simply an association, or it could be causal.

224. An { XE "association:vs causation" \t "*See* causation" }association is the coincidental oc-
currence of an exposure and an outcome. Its recognition (e.g., the relationship between
coffee drinking and pancreatic cancer) typically does not require direct action by the medi-

M00GE38306

cal community. A { XE "causation" }causal relationship, on the other hand, signifies that

the exposure excites the production of the outcome. This more powerful, directed relation-

ship incites the medical and regulatory communities to action. For example, the conclusion

that exposure to citrus fruits reversed the symptoms of scurvy incited action by the British

navy to mandate the storage of fresh fruit in the provisions of its crews for long sea voy-

ages [36]. On the other hand, links between the use of cutting and bleedings and the remis-

sion of yellow fever were merely associative. Thus, when we as physicians examine a case

report's details, we sift through the provided clinical descriptions in order to discern if the

relationship between the exposure and the outcome is either causative or associative.

225. Epidemiologists are specialists who identify the determinants or causes of disease. They

have developed criteria that would be useful in ascertaining whether an exposure causes

(i.e., excites the production of) the disease. Elaborated by Sir Austin Bradfor{ XE "Hill,

Bradford:and causality tenets" }d Hill [37], these tenets are based on a common sense ap-

proach to determining causality and are remarkably free from complicated mathematical

arguments. These criteria acknowledge that more disease cases in the presence of the risk

factor than in its absence raise a causal suspicion. In addition, determining that greater ex-

posure (either by dose or duration) to the risk factor produces a greater extent of disease

amplifies our sense that the exposure is controlling the disease's occurrence and/or sever-

ity. These two features are important characteristics of a cause–effect relationship.

226. Other questions posed by Hill permit us to explore the "believability" of the relationship.

Is there a discernible mechanism by which the risk factor produces the disease? Have other

researchers also shown this relationship? Are there other examples that help us to under-

stand the current exposure–disease relationship? The nine precise Bradford Hill criteria

M006E53307

are: (1) strength of association, (2) temporality, (3) dose-response relationship, (4) biologic plausibility, (5) consistency, (6) coherency, (7) specificity, (8) experimentation, (9) analogy. These are well elaborated in the literature [38].

227. Diligent attempts to determine whether specific case reports and case series can satisfy these causality criteria continue to provide invaluable service to patients and communities. The link between methyl mercury exposure and birth defects in communities surrounding Minamata Bay, Japan, [39], and the establishment that thalidomide was the cause of the birth defects phecomelia and achondroplasia [40] are just two 20th century examples of the ability of case reports and case series to establish causal relationships that produced public health action. The identification of (1) the relationship between tick bites and Lyme disease, and (2) the link between new illnesses among postal workers and anthrax exposure in 2001 are recent examples of their continued value.

228. ***Limitations of Case Reports***: Although medical knowledge has progressed through the sensitive and intelligent use of case reports and case series, there is no doubt that the illumination provided by these investigational tools are also profoundly limited. There are four major criticisms of the value of case reports and case series in determining the causal nature of an exposure–disease relationship. They are th{ XE "case reports:and limitations" }at (1) case reports and case series do not provide quantitative measures of the relationship between an exposure and a disease, (2) case reports do not always rule out other competing causes of disease, (3) case reports are subject to biases of selection (i.e., the manner in which the case report was selected may make it unreasonable to believe that its occurrence reflects an important finding in the population), and (4) measurements made in the case re-

M006E38308

port may be nonstandard. These limitations reduce the contribution of case reports to our
understanding of the exposure–disease relationship.

229. One of the most remarkable deductive failures of case reports was their false identifica-
tion of the effects of cardiac arrhythmia suppression [41]. In the 1970s, considerable atten-
tion was provided to the potential of new therapies (specifically, the drugs encainide, fle-
cainide, or mirtazapine) for the treatment of dangerous ventricular arrhythmias. It was be-
lieved that these new drugs would be more effective and produce fewer side effects than
the traditional, poorly tolerated medications. The effectiveness and safety of these newer
drugs were examined in a collection of case series. At first, only the sickest patients were
given the new therapy. When these patients survived, the investigational drug was credited
with saving the patient's life. However, if the patient died, then the patient was commonly
deemed "too sick to be saved" and the drug was not debited for the death.

230. Based on these observations, despite some opposition, a consensus developed in the car-
diology community that patients with arrhythmias would benefit from the use of these new
drugs. After a period of intense deliberation, the Federal Food and Drug Administration
(FDA) approved the new antiarrhythmic agents. As a consequence of this approval, physi-
cians began to prescribe the drugs not just to patients with severe rhythm disturbances, but
also to patients with milder arrhythmias. This new use was consistent with the growing
consensus that these drugs would be beneficial in blocking the progression of dysrhythmia
from mild heart arrhythmias to more serious rhythm disturbances.

231. Only after the drugs were approved and on the market was a study carried out that incor-
porated a control group and the use of randomization. This trial, called CAST{ XE "The
CAST Trial" } (Cardiac Arrhythmia Suppression Trial) demonstrated that, not only did the

MD06E39309

new therapies not save lives, but also their use caused excess mortality [42]. The findings

from CAST, demonstrated the lethality of medications whose safety had been "demon-

strated" by case series.

M006E38310

## Appendix C: Detecting Adverse Events

232. *Detecting Adverse Events: Complication in Safety Monitoring*: The ethical concern for
safety introduces a new complexity into the interpretation of interim monitoring results.
Essentially, the primacy of the admonition, "First, do no harm," complicates the interpreta-
tion of exploratory analyzes. Recall that confirmatory analyzes, they the product of pro-
spectively declared plans, are most easily generalizable. They produce reliable estimates of
effect sizes, effect size variability, and type I error rates. In addition, prospective consid-
eration of the type and number of statistical hypotheses to be tested leads to tight control of
the family wise error rate. On the other hand, exploratory analyzes hold none of these fea-
tures. These latter analyzes that are suggested by the data rather than by prospective plan-
ning produce inaccurate estimators and must be repeate{ XE "safety:and confirmatory
monitoring" }d (or confirmed) before they can be generalized.[*]

233. With this dis{ XE "estimators:efficacy versus safety" }tinction in place, the evaluation of
efficacy examinations in clinical research is clear and straightforward at both the conclu-
sion of the study and during an interim examination. Consider a hypothetical clinical trial
designed to determine the effect of an intervention on patients who have suffered a stroke.
The primary analysis for this clinical trial is the effect of therapy on the total mortality rate.
If the study's design and execution has been (1) carefully considered with a precise, pro-
spectively declared protocol, (2) executed in accordance with that protocol,[†] and (3) pro-
duces a type I error rate below the a priori declared threshold for a clinically significant

---

[*] The reasons for the different interpretations of exploratory versus confirmatory analyzes are discussed eariler in this report
Two.

[†] This is defined as concordant execution.

M006E39311

level of efficacy, its results on the primary endpoint would be heralded as positive. How-
ever, assume in that same study, that the therapy was observed to produce a reduction in
the myocardial infarction rate. Because the therapy's effect on the myocardial infarction
rate was not prospectively declared, and its results would be seen as exploratory*, requiring
confirmation before they can be generalized.

234. However, in the reverse setting, where both the findings for mortality and the myocardial
infarction rate indicate harm and not benefit, the ability to interpret the situation is compli-
cated. Again, the prospective nature of the research design that is focused on mortality
permits the investigators to conclude that the study produces a confirmatory evidence of
harm. However, the identification of an early harmful effect of the intervention on the cu-
mulative myocardial infarction rate is problematic. Clearly, the finding of an increased risk
of myocardial infarction associated with the therapy is crippled by the exploratory nature
of the analysis. However, the occurrence of this finding for harm in all likelihood would
not, and could not, be reproduced. The ethics of protecting subjects from known and sus-
pected dangers precludes the initiation of a new confirmatory research effort in order to
demonstrate that the intervention excites the production of myocardial infarctions.[†]

235. Thus, although confirmatory findings of harm carry the same weight as those of efficacy,
exploratory findings of harm commonly carry more weight than exploratory findings of ef-
ficacy. This places a greater burden on investigators, who must balance the ethical re-

---

* Because both the effect of therapy on the total mortality rate and the effect of therapy on the myocardial infarction rate appear
to be equally reliable to the observer, both being produced from the same database, concluding that only the myocardial infarc-
tion finding be discounted may appear capricious. However, because the trial was not designed to examine the myocardial infarc-
tion issue, the ability of the study to ensure that (1) it had an appropriate sample size for the evaluation of the effect of therapy on
heart attacks, and (2) the investigators collected all of the cases of heart attacks (including silent myocardial infarctions) even
though they never said that they would must be questioned. Secondly, the "positive" finding of therapy on the myocardial infarc-
tion rate was based on an unplanned interrogation of the database. This inquiry rose to prominence solely because of its unantici-
pated and surprising finding. Allowing the data to suggest answers in this fashion introduces a new sampling error component
into the analysis that undermines the traditional estimates of effect size, precision, p-values and power.

† Other information may become available that would allow the evaluation of the possibility of harm produced by the interven-
tion. Additional concurrent studies, case control, and historical cohort studies may provide some illumination of this issue.

MO06E38312

quirement to adequately warn about adverse events with the scientific need to avoid misdi-

rection about the risks of an intervention. This is a challenge to healthcare research in gen-

eral and interim monitoring in particular. Because, confirmatory analyzes for harm will be

the most persuasive, investigators make their strongest possible case when they execute as

many confirmatory analyzes as possible.

236. Although two strategies to address this issue of multiple safety measures are reviewed,

the best strategy begins with good a priori knowledge. During the design phase, investiga-

tors can strengthen the interim analyzes that they have in mind for the safety monitoring by

carrying out an in-depth review of the evidence of adverse effects produced by the inter-

vention that they plan to study. This will allow them to put prospective monitoring rules in

place that provide rigor in detecting the early occurrence of several different adverse

events.

237. With foreknowledge of the adverse event profile of the intervention, and some apprecia-

tion of the frequency at which these adve{ XE "safety:exploratory monitoring" }rse events

appeared, the researcher is able to place prospectively declared rules in place.

238. However, many times adverse events occur that were completely unsuspected during the

course of a clinical research effort, which catch the researcher by surprise. The occurrence

of de novo breast cancer in women exposed to lipid lowering agents during the course of a

cardiovascular clinical experiment, the occurrence of dangerous new arrhythmias gener-

ated by an intervention that suppresses other rhythm disturbances, and the production of

liver failure in medications designed to reduce insulin sensitivity are but a few examples of

unanticipated adverse effects that can be produced by a new intervention.

M00E38313

239. This illustration suggests that although monitoring procedures can provide clear warning that a treatment signal has been detected; the presence of this signal does not provide prima facie evidence for drawing a conclusion and terminating the research effort. That decision is more complex, requiring thoughtful consideration of both the efficacy and the safety of the compound. Ultimately, the decision to discontinue a study is not a mathematical one, but a clinical and ethical decision.

240. Statistical monitoring rules do not provide much guidance in this scenario. The absence of prospective identification, in concert with the large probability of a type I error generated by multiple interrogations of the adverse event data confound any attempt to apply statistical rigor to the evaluations executed on behalf of the patients. This is the conundrum of safety-based monitoring. The predomination of ethical considerations requires the researcher to sometimes set aside statistical precepts in order to be assured that patients are not being harmed in the research effort or in the population. This is unacceptable when one is building an argument for efficacy, but is required in the examination of safety. The asymmetry of this circumstance finds its genesis more in an oath than in science. The following are other useful tools in assessing the validity of an unanticipated adverse event finding.

241. *Strategy 1: Monitor Widely*: Researchers m{ XE "adverse events:need to monitor widely" }ust lead diligent adverse event report evaluations. Just as physicians cannot diagnose diseases of which they have never heard, researchers cannot ethically weigh the implications of serious adverse events that they are not measuring. Thus, the researchers must cast a wide net in order to capture the occurrence of all adverse events. The investigators in post marketing clinical trials were able to successfully carry out this strategy.

MOD6E38314

242. ***Strategy 2: Assessing Unanticipated Adverse Events***: Clinical trials have been executed
for only sixty years. This is a relatively short period of time in the history of clinical inves-
tigation. However, the assessment of whether the occurrence of the event is related to a
treatment has been a cerebral process that has evolved for hundreds of years. Useful skills
have been amassed by scientists in the implementation of no statistical evaluations of the
relationship between an event (be it either adverse or salubrious) and an exposure. In the
setting of exploratory endpoint analyzes, where statistical assessments are not quite so reli-
able, these other no statistical assessments rise to new prominence.

243. The occurrence of an exposure and an adverse event occurring in the same patient (or
group of patients) begs the question of whether the relationship between the two is associa-
tive or causal. An associative relationship is merely that the exposure and the disease oc-
curred coincidentally in the same patients, for example, the occurrence of breast cancer in
women taking HMG-Coal reductase inhibitor (i.e., statin) therapy for elevated lipid levels.
It is a passive relationship. On the other hand, a causal relationship, as discussed earlier, is
active. An exposure causes a event if the exposure excites the production of the event. It is
an active relationship, a relationship with directionality. An example is the causal relation-
ship between liver hepatotoxicity and thiazolidinedione therapy for diabetes mellitus.

244. When statistical tools are less useful, other tools of observation become more valuable. In
1965, Hill [43] described the nine criteria for causality arguments in healthcare. These nine
rules or tenets are remarkably and refreshingly devoid of complex mathematical argu-
ments, relying instead on natural honest intuition and common sense for the inquiry into
the true nature of a risk factor–disease relationship. The questions Dr. Hill suggested

M00GE38315

should be posed by the investigators in their assessment of the true nature of the exposure–
disease relationship.

245. The evaluation begins with a simple assessment of numbers. Are there many more ad-
verse event cases when the intervention is present, and fewer disease cases when the inter-
vention is absent? If this question has been affirmatively answered, other questions follow.
Does a greater exposure to the risk factor produce a greater extent of disease? Other ques-
tions asked by Hill explore the "believability" of the relationship. Some of these are: is
there a discernible mechanism by which the risk factor produces the disease? Have other
researchers also shown this relationship? Are there other such relationships whose demon-
stration helps us to understand the current risk factor– disease relationship?

246. Consistency requires that the findings of one study be replicated in other studies. The
persuasive argument for causality is much more clearly built on a collection of studies in-
volving different patients and different protocols, each of which identifies the same rela-
tionship between exposure to the risk factor and its consequent effect. There are numerous
examples of collections of studies with different designs and patient populations, but that
nevertheless successfully identify the same hazardous relationship between an exposure
and disease. Identification of case series involving different series of patients in different
countries and different cultures—yet each series producing the disease after the exposure
would satisfy these criteria. Because research findings become more convincing when they
are replicated in different populations, different studies that examine the same exposure–
disease relationship and find similar results add to the weight of causal inference.

247. The specificity of a disease is directly related to the number of known causes of the dis-
ease. The greater the number of causes of a disease, the more nonspecific the disease is,

M006E38316

and the more difficult it is to demonstrate a new causal agent is involved in the production of the disease. The presence of specificity is considered supportive but not necessary, and researchers no longer require that the effect of exposure to an agent such as a drug be specific for a single disease.

248. Exposure must occur before the disease develops for it to cause that disease. A temporal relationship must exist in order to convincingly demonstrate causation.[*] This criterion can be clearly satisfied by a case report that accurately documents that the exposure occurred before the disease.

249. An evaluation of a relationship between occurrences of the adverse events and either the dose or duration of the intervention is also useful. The observation that a more intense exposure produces a greater frequency or severity of adverse events adds new strength to the notion that the relationship between the intervention and the adverse event is a causal one. In addition there should be some b{ XE "Hill, Bradford:causality and safety" }asis in the scientific theory that supports the relationship between the supposed "cause" and the effect. However, observations have been made in epidemiological studies that were not considered biologically plausible at the time but subsequently were shown to be correct.

250. It is important to note in the application of these tenets that satisfaction of all nine is not required to establish to the satisfaction of the medical community that a causative relationship exists between the exposure and the disease. Hill himself stated [43]:

251. None of my nine viewpoints can bring indisputable evidence for or against the cause–and–effect hypothesis, and none can be required as a *sine qua non*.

---

[*] Protopathic bias, or the result of drawing a conclusion about causation when the disease process precedes the risk factor in occurrence can result without appropriate attention to the condition.

M009E38317

252. However, these tenets are invaluable in the assessment of intervention-adverse event rela-

tionships.

M006E38318

# Appendix D. Subgroup Analyses

253. A subgroup analyses in a clinical research effort is the evaluation of the effect of the ran-
domly allocated intervention within a fraction of the recruited subjects. The analysis of
subgroups is a popular, necessary, and controversial component of the complete evaluation
of a controlled clinical trial. Indeed, it is difficult to find a manuscript that reports the re-
sults of a clinical trial that does not report findings within selected subgroups.

254. Subgroup analyses as currently utilized in clinical trials are tantalizing and controversial.
There may be no better maxim for guiding the interpretation of subgroup analyses in this
setting than "Look, but don't touch," The results from subgroup assessments have tradi-
tionally been used to augment the persuasive power of a clinical trial's overall results by
demonstrating the uniform effect of the therapy in patients with different demographic and
risk factor profiles. This uniformity leads to the development of easily understood and im-
plemented rules to guide the use of therapy*. Some clinical trials report these results both
in the manuscript announcing the trial's overall results  [44, 45, 46,47] and separately [48,
49, 50]. Such subgroup analyses potentially provide new information about an unantici-
pated benefit (or hazard) of the clinical trial's randomly allocated intervention.

255. However useful and provocative these results can be, it is well established that subgroup
analyses are often misleading [51, 52, 53, 54]. Assmann et al. [55] has demonstrated how
commonly subgroup analyses are misused, while others point out the dangers of accepting
subgroup analyses as confirmatory [56]. For example, the Amlodipine controversy in the
PRAISE trials discussed earlier in this report were based on a subgroup analysis. Neverthe-

---

* The finding that a particular lipid lowering drug works better in women than in men can complicate the already complex deci-
sions that practitioners must make as the number of available compounds increase.

M006E38319

less, the medical community continues to be tantalized by spectacular subgroup findings from clinical trials. A recent example is the subgroup analysis-based suggestion that medication efficacy is a function of race; this has appeared in both peer-reviewed journals [57, 58] and the lay press [59]. In this section, we will review the definitions, concepts, and limitations of subgroup utilization in clinical trials.

256. *Subgroups: Definitions and Basic Concepts* While the concept of subgroup analyses is straightforward, the terminology can sometimes be confusing. This report will therefore devote some attention to defining nine and classifying subgroup analyses.

257. *Subgroups Versus Subgroup Strata*: A subgroup is the description of{ XE "subgrooups:definition" } patient based characteristic, e.g., gender that can be subdivided into categories. These different categories are described as strata, one stratum level for each category. For example, if an investigator is interested in creating a gender subgroup, patients are classified according to their sexual characteristics; the resultant gender subgroup consists of two strata—male and female.

258. The classic subgroup analysis itself is an evaluation of the effect of therapy within each of the subgroup strata. In this example of a gender-based subgroup, the subgroup analysis consists of an evaluation of the effect of therapy for males and an evaluation of the effect of therapy for females. Thus each stratum analysis produces an effect size with its standard error, a confidence interval, and a *p*-value.

259. The investigators choose the characteristics that form the basis of these subsets. However, over time, a commonly evaluated set of subgroup evaluations has emerged. Although there are differences from one medical subspecialty to another, the most common of these subgroups are based on demographic criteria e.g., gender, ethnicity, and age. Frequently used

M006E38320

sociologic determinants are marital status, education, and acculturation.[*] In addition, there are subgroups that are based on lifestyle choices. Some examples of these are alcohol use, tobacco use, dietary intake, and exercise. Of course findings from medical histories (e.g., history of cancer, history of CHF, history of endocrine disorders) and physical examination (e.g., body mass index or DBP) are among commonly appearing subgroups in clinical trials as well.

260. The definition of a subgroup can be more complicated than a first glance would suggest. Consider the marriage status subgroup. One might think that this is easy to define. Is the patient married or not? Phrased this way, this suggests that the marriage subgroup should have two strata. However, the choices can be much more complex than this. The patient could be married now, or have been married in the past and is single now. The patient could be separated, divorced, or remarried. These alternative classifications can either be useful, or merely distractions depending on the purpose for which the evaluation will take place. For example, in some research, which is not primarily sociologic, these additional classifications may be unnecessary. However, in other research efforts, the intricate differentiation of marriage history details is very important. Thus, one must know how the subgroup analysis will be used so that the most useful strata membership criteria can be developed. Once each of the subgroup strata have been identified, the clinical trial workers will know what data to collect that will be the most useful.[†]

261. *Subgroups: Interpretation Difficulties*: The illustrations of the previous sections have demonstrated that there are many possible ways to subgroup patients. However, we must keep in mind that, in a collection of subgroup analyses, it is the same patien{ XE "sub-

---

[*] Acculturation is the degree to which a community composed primarily of immigrants accepts with approval and is involved in the activities of the surrounding society.

[†] Another subgroup that has grown in complexity is that for race/ethnicity.

M006E38321

groups:interpretation difficulties" }ts that are being stratified in different ways. This observation can complicate the interpretation of a subgroup evaluation.

262. For example, consider a randomized, controlled clinical trial, which is in its analysis phase. At this time, all of its patients are classified by gender, grouping patients into male and female sub-cohorts. Once the stratum membership assignment is finished, the effect of the randomly allocated intervention is assessed in each of the two gender strata. It is seen that the effect of therapy appears to depend on gender, with males experiencing a different effect than females.

263. When completed, these same patients are then re-aggregated based not on gender, but on age. Subjects are placed into one of the following three age strata: (1) less than 40 years of age, (2) between 40 and 60 years of age, and (3) greater than 60 years of age. When the subgroup analysis is carried out for the age strata, it appears that the effect of therapy is the same in each of the age groups.

264. The results from these two subgroup analyses essentially demonstrate that the same patients when characterized one way (by gender) provide a different result than when characterized another way (by age). Was it really gender that modified the effect of therapy or was it the chance collection of patients that made it appear that gender was an influence? Since we can expect that the effect of treatment within a subgroup stratum depends on the patients within that stratum, then the value of the subgroup analysis must be tightly linked to the ability to demonstrate that it is the stratum characteristic that is producing the interesting effect and not just the random aggregation and re-aggregation of patients.

265. ***Random Subgroups***. Investigators work to identify subgroup classifications that are meaningful. When examination of the therapy effect within a subgroup appears, it is only

M006E39322

natural for the investigator to believe the rationale for the choice of the subgroup was justi-
fied. Furthermore, the scientist may think that the stratum specific therapy effect is due to
some effect-mediation ability produced by the subgroup trait. However, the very fact that
patients are classified and divided can induce a subgroup effect.

266. Consider the following simple experiment. A courtroom chosen at random has a capacity
of seating 60 observers. A central aisle divides these 60 seats, with 30 seats on each of the
left-hand and right-hand side of the courtroom. Sixty people seat themselves as they
choose, distributing themselves in an unrestricted manner among the seats on each side of
the courtroom. When all are seated, we measure the height of each person, finding that the
average height is exactly 67 inches. Does that mean that the average height of those seated
on the left-hand side of the courtroom will be 67 inches? No. The average height of those
seated on the left-hand side of the courtroom will be either less than 67 inches or greater
than 67 inches, but it will not be exactly 67 inches (because the average is based on only
thirty of the sixty people). If the average height on the left-hand side of the courtroom is
less than 67 inches, than those seated on the right-hand side will have an average height
greater than 67 inches[*]. Is it fair to conclude that those who sit on the right- hand side of
the courtroom are in general taller than those who sit on the left-hand side?

267. The simple, random aggregation and sub-aggregation of the observations has induced a
subgroup effect that is based only on the play of chance. This random subgroup effect ap-
pears in all subgroup analyses, and we will have to integrate it into our interpretation of
any subgroup effect that we see. Some interesting findings of random subgroup analyses

---

[*] If the average height of all in the courtroom is 67 inches, and the average height on the left side is less than 67 inches, then the
average height on the right hand side must be greater than 67 inches

M006E38823

are available [60]. These occurrences help to justify the admonition that the best descriptor of the effect in a subgroup is the finding that is observed in the overall cohort.

268. *Proper Versus Improper Subgroups*: A critical preliminary task that clearly must be completed before a subgroup analysis proceeds is the classification of each patient into a subgroup stratum. This is the process by which the subgroup membership f{ XE "subgroups:proper vs improper" }or each patient in the study is determined. Although membership determination may appear to be a trivial task, there are circumstances in which this classification is problematic. These concerns revolve around the timing of the subgroup membership determination.

269. There are two important possibilities for determination of the timing of subgroup membership. The first is the classification of patients into the correct subgroup stratum when the patients are randomized. The second choice is to classify patients into subgroup strata at some time during the execution of the trial. While each has advantages, the determination of subgroup membership at the beginning of the study is preferred.

270. Determining subgroup membership at the beginning of the trial requires that, not only must the subgroup be defined at the beginning of the study, but also subgroup strata membership should be defined prospectively as well. This is a straightforward procedure to apply to the gender subgroup with its two strata. However, for other subgroups of clinical interest, the process can be complex.

271. *Intention-to-Treat" Versus "As Treated" Subgroup Analyses*: Consider a clinical trial in which patients are randomized to receive an intervention to reduce the total mortality rate from chronic cirrhosis of the liver. At the inception of the study, patients are randomized to receive either control group therapy or the intervention. At the conclusion of the

M006E38324

study, the investigators will compare the cumulative mortality rates of patients in each of the two { XE "intention to treat:vs. \"as treated\"" }treatment groups. However, at the end of the study, how will the investigators decide what patients should be considered active group patients and which patients should be counted as in the control group? The commonly used approach is to assign treatment group membership simply as the group to which the patient was randomized. This is the "intention to treat" principle.

272. The "intention-to-treat" principle of analysis is the standard analysis procedure for the evaluation of clinical trial results. Undoubtedly, this analysis tends to be a conservative one, since not every patient is treated as they were "intended." For example, some patients randomized to the active group may not take their medication. These patients, although randomized to the active group, will have the control group experience and produce end-points at rates similar to that of the control group. However, they would be included in the active group since they were randomized to and "intended to be treated" like active group patients. The inclusion of these patients in the active group for analysis purposes tends to make the active group experience look more like the control group experience, increasing the overall active group event rate.*

273. Similarly, patients who are randomized to the control group may nevertheless be exposed to active group medication (e.g., from their personal physician who is not an investigator in the study). These patients will experience event rates similar to the rates of the active group, but since they are considered as part of the control group, the inclusion of these patients will produce an event rate for the control group that is closer to that of the active

---

* There are occasional complications in an "intention-to-treat" analysis. In some cases, a patient is tested and randomized, but then, subsequent to the randomization the test result reveals that the patient is not eligible for the trial for a prospectively stated reason. In this case, there was no "intent" to randomize this patient when the test result was known, and the patient is removed from the study.

M006E38325

group. Thus the control group rate will approach that of the active group, while the cumu-lative event rate in the active group will be closer to that of the control group (described in the previous paragraph). This effect of these combined rate alterations reduces the magni-tude of the treatment effect, thereby diminishing the power of the clinical trial.[*]

274. An alternative analysis to the "intent to treat" principle is one that analyzes the endpoint results using an "as-treated" analysis. In this case, although patients are still randomized to receive either placebo or active therapy, they are classified for analysis purposes based on whether they actually took their medication or not. Since this is determined after the pa-tient was randomized to the medication, and the effect (both perceived beneficial effects, and adverse effects) of the medication may determine whether the patient takes the medi-cation, the "as-treated" evaluation is a confounded analysis. A clearly detailed examination of this issue is available [61].

275. *Effect Domination Principle*: I have stated previously that, in the absence of confirma-tory subgroup evaluations, the best estimate of the effect of randomly allocated therapy within subgroup strata is the effect of that therapy on the overall cohort. We will call this the principle of *effect domination*— the effect of therapy averaged over all randomized pa-tients dominates the effect seen in the individual subgroup strata.

276. The effect domination principle was the basis { XE "subgroups:effect domination prinicple" } of our decision to overturn the results of several of the subgroup evaluations that were provided previously. Although there are many clinical trials designed to provide confirmatory evaluations of their primary analyses, there are far fewer confirmatory evaluations that occur in the assessments of subgroups. Therefore, the effect domination

---

[*] The effect of the magnitude of the treatment effect on the power of a study for fixed sample size is discussed in Appendix D.

M008E38326

principle is much more frequently required in the interpretation of the results of clinical trials.

277. Since subgroup analyses have and will, in all likelihood, continue to engender the interest of the medical community, it is logical to ask why there aren't more confirmatory analyses involving subgroup evaluations. This is an especially interesting question since there are clear circumstances in which subgroup evaluations can produce confirmatory results of the therapy effect within (or across) subgroup strata. When executed, these confirmatory results stand on their own, separate and apart from the result of the effect of therapy in the overall cohort. The criteria for these evaluations were clearly characterized by Yusuf et al. [62] and are coincident with our development of confirmatory analyses in this text.

278. The first of these criteria for the development of confirmatory analyses in clinical trials is that the subgroup analysis must be prospectively designed and proper. This structure is required so that (1) the therapy effect size estimators that the subgroup analysis produces are trustworthy; and (2) that the effect of therapy to be evaluated in a subgroup is not confounded by (i.e., bound up with) post-randomization events as discussed previously. In general, there has been no difficulty with meeting this requirement of confirmatory subgroup analyses. Many clinical trials make statements in their protocols describing the plans of investigators to evaluate the effect of therapy within their subgroups of interest. These subgroups are, by and large, proper subgroups, e.g., demographic traits, or the presence of risk characteristics at baseline.

279. However, the final requirement for a confirmatory subgroup analysis is the prospective allocation of type I and type II error rates. This last criterion has proved to be especially vexing because of the severe sample size constraints this places on subgroup analyses. As

M006E38327

we have pointed out earlier, the allocation of type I error rates for confirmatory testing must be such that the FWER, $\xi$, is conserved. This requires that statistical testing at the level of subgroup analyses will be governed by test-specific $\alpha$ error rates that are generally less than 0.05.

280. The difficulty of executing subgroup analyses in the presence of type I error rate control and adequate statistical power is not difficult to understand. In fact, resources are generally strained to the breaking point for the analysis of the effect of therapy in the overall cohort. This overall analysis is typically carried out with the minimum acceptable power (80%) because of either financial constraints or patient recruitment difficulties. By definition, subgroup analyses (and certainly within-stratum subgroup analyses) will involve a smaller number of patients; it is a daunting task to prospectively allocate type I and type II error rates at acceptable levels in a smaller number of patients, although the methodology for the accurate computation of sample size is available [63]. Thus, the growth of the use of sub-groups as confirmatory tools has, to some extent, been stunted by the difficulty of con-structing a prospective clinical trial with an embedded, prospectively defined proper sub-group for which tight statistical control is provided for type I and type II statistical errors.

281. *Manuscript Interpretation* The purpose of a published manuscript is to identify the con-tribution the research effort has made. Specifically, this general evaluation reduces to three questions that should be answered. (1) What was the purpose of the research? (2) Do the methods used allow the researcher to answer the question? and, (3) If so, then what is the answer?

282. The motivation for the research is determined from a careful study of the introductory section of the manuscript. Commonly replete with citations, this section should clearly de-

M006E38528

lineates the research question that was raised by the investigators. Whether the investigators are able to answer the research question they asked is determined in the methods section. Your review of this section of the manuscript should be careful and thorough. Was the instrumentation sufficient to provide the measures with the precision that the authors require? If laboratory samples are involved were they preserved using the appropriate environmental conditions?

283. If the research involves subjects, other questions must be adequately addressed in this critical section of the manuscript that describes the methodology used by the authors. Was there an adequate number of subjects? Is the analysis carried our prospectively delineated, leading to trustworthy estimates of effect sizes, standard errors, confidence intervals, and p-values, or were the analyses exploratory, requiring an additional, confirmatory study to sustain the findings.

284. If the methodology empowers the investigators to answer their prospectively asked question, then proceed to read the results section, fully planning to integrate the main findings of the research into your fund of knowledge. However, if the methods reveal that the findings from the study are exploratory and not generalizable, then the results are not generalizable, and cannot really be accepted as reflective of the population. However, considerable care must be given if the manuscript has identified a harmful effect,

285. The reviewer must avoid the temptation to "study count". "Study counting" is the process of simply counting the number of studies that address an issue and deciding if there "are enough" studies to support the result of interest. Some who are involved in study counting argue that there must be more than one study. Others say that the number of "positive" studies must outnumber the number of "negative" studies. Instead, the scientific reasoning

M00SE38329

process assesses in detail each of the available studies, carefully dissecting the methodol-ogy, sifting through the methodology, and carefully considering the conclusions. Study counting represents the wholesale abandonment of the intellectual principles of careful re-view.

286. The specific problem with "study counting" is the implicit ceteris paribus (all other things being equal) assumption, i.e. that all of the studies that are being included in the count are equal in methodology, equal in the thoroughness of their design, equal in the rigor of their execution, and equal in the discipline of their analyses and interpretation. This fallacious assumption is far from the truth of scientific discovery. Studies have different strengths and different weaknesses. Different investigators with their own non-uniform standards of discipline execute the research efforts. Some studies give precise results, while others are rife with imprecision. The panoply of studies is known not for its homogeneity, but for the heterogeneity of designs and interpretations.

M006E38330

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                      5/22/2006

I certify that the foregoing statements made by me are true and correct. Executed this

22nd day of _May_ _____ 2006 at Houston, Texas

_____

Lemuel Moyé, M.D., Ph.D.

STATE OF TEXAS    )

                                          Subscribed and sworn to me

                     ) ss.                 Before this 22nd day of _May_ _____ 2006

COUNTY OF HARRIS                           _____
                                           Signature of Notary Public

                                           My Commission Expires _9/30/09_

APRIL K THOMSON
My Commission Expires
September 30, 2009

M00603331

# References

1 . Hippisley-Cox JC, et al.  Risk of myocardial infarction in patients taking cyclo-oxygenase-2 inhibitors or conventional non-steroidal anti-inflammatory drugs: population based nested case-control analysis.  BMJ VOLUME 330 11 JUNE 2005

2 . Cole P, MacMahon B. Attributable risk percent in case-control studies. Br J Prev Soc Med. 1971 Nov;25(4):242-4.

3 . Miettinen OS.  Proportion of disease caused or prevented by a given exposure, trait or intervention. Am J Epidemiol. 1974 May;99(5):325-32.

4 . Wilson PW.  Prediction of coronary heart disease using risk factor categories. Circulation. 1998 May 12;97(18):1837-47.

5 American Heart Association Stroke Statistics. In: 2001 *Heart and Stroke Statistical Update*. Dallas: American Heart Association, 2000.

6 American Heart Association *2001 Heart and Stroke Facts*, Dallas: American Heart Association, 2000.

7 Hennan JK. Effects of selective cyclooxygenase-2 inhibition on vascular responses and thrombosis in canine coronary arteries. Circulation. 2001 Aug 14;104(7):820-5.

8. Linder JD. Cyclooxygenase-2 inhibitor celecoxib: a possible cause of gastropathy and hypoprothrombinemia. South Med J. 2000 Sep;93(9):930-2.

9 Crofford LJ. Thrombosis in patients with connective tissue diseases treated with specific cyclooxygenase 2 inhibitors. A report of four cases. Arthritis Rheum. 2000 Aug;43(8):1891-6.

10 Bombadier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343:1520-1528.

11 Food and Drug Administration Advisory Committee. Cardiovascular safety review of rofecoxib. Available from URL: http://www.fda.gove/ohrms/dockets/ac/01/briefing/3677b2_06-cardio.pdf.

12 . Curfman GD, Morissey S, Drazen JM (2005). Expression of concern; Bombardier et al., "Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis *N Engl J Med* 2000;353:1520-8. *New England Journal of Medicine* 353:2813-2814.

13. Juni P, Rutjes AW, Dieppe PA. Are selective COX-2 inhibitors superior to traditional non-steroidal anti-inflammatory drugs? BMJ 2002.324:1287-8.

14. Konstam MA, Weir MR, Reicin A, et al. Cardiovascular thrombotic events in controlled clinical trials of rofecoxib. Circulation 2001. 104:2280-8.

15 Garcia Rodriguez LA. The effect of nonsteroidal anti-inflammatory drugs (NSAIDS) on the risk of coronary heart disease: fusion of clinical pharmacology and pharmacoepidemiologic data. Clin Exp Rheumatol 2001:19 (6 Suppl. 25):S41-4.

M006E38332

16  Ray WA, Stein CM, Hall K, et al. Non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease; an observational cohort study. Lancet 2002:359 118-23.

17  Breaslier RS. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med 2005: 352:

18. FitzGerald GA. Coxibs and Cardiovascular Disease. New England Journal of Medicine.351: 1709-1711.

19. Solomon DH. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. *Circulation* 2004:109:2068-2073.

20  Bannwarth B, et al. Adverse events associated with rofecoxib therapy. Drug Safety 2003;26(1): 49-54.

21 Reicin A, et al. Comparison of cardiovascular thrombotic events in patients with osteoarthritis treated with rofecoxib versus nonselective nonsteroidal anti-inflammatory drugs (Ibuprofen, diclofenac, and nabumetone). Am J Cardiol 2002;89: 204-9.

22 Weir MR. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J. 2003 Oct;146(4):591-604. Review.

23  Ray W, et al. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. The Lancet 2002;360: 1071-3.

24 Mamdani M, et al. Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of acute myocardial infarction in the elderly. Arch Intern Med 2003;163: 481-6.

25  Layton D, et al. Comparison of the incidence rates of thromboembolic events reported for patients prescribed rofecoxib and meloxicam in general practice in England using prescription-events monitoring (PEM) data. Rheumatology 2003;42:1342-53.

26  Layton D, et al. Comparison of the incidence rates of thromboembolic events reported for patients prescribed rofecoxib and meloxicam in general practice in England using prescription-events monitoring (PEM) data. Rheumatology 2003;42:1354-65.

27 Zhao SZ, Reynold NW, Lejkowth J, et al. A comparison of renal-related adverse drug reactions between rofecoxib and celecoxib based on the World Health Organization/Uppsala Monitoring Centre safety database. Clin Ther 2001; 23:1478-91.

28 Vu D, Murty M, McMorran M, Selective COX-2 inhibitors: suspected cardiovascular/cerebrovascular adverse reactions. Can Adv Reaction News 2002:12:1-3.

29 Mukherjee D, et al. Risk of cardiovascular events associated with selective COX-2 inhibitors. JAMA 2001;286: 954-9.

30. Fisher LD, Moyé LA.  Carvedilol and the Food and Drug Administration approval process: an introduction..  Controlled Clin Trials 1999,20:1-15.

31. Moyé LA.  P-Value Interpretation in Clinical Trials. The Case for Discipline. Controlled Clin Trials 1999;20:40-49.

M006E39333

32. Bull JP. (1959) Historical development of clinical therapeutic trials. *Journal of Chronic Disease* **10**:218–248.

33. Malgaigne LF. (1947) *Weuvres Completes d'Ambrosise Paré*, vol. 2. Paris, p. 127.

34. Connolly HM, Crary JL, McGoon MD, et al. (1997) Valvular heart disease associated with fenflura-mine-phentermine. *New England Journal of Medicine* **337**:581–588.

35. Clark C. (1997) *Radium Girls: Women and Industrial Health Reform, 1910–1935* Chapel Hill, University of North Carolina Press.

36. Gehan EA, Lemak NA. (1994) *Statistics in Medical Research: Developments in Clinical Trials*. New York, Plenum Medical Book Company.

37. Hill B. (1953) Observation and experiment. *New England Journal of Medicine* **248**:995–1001.

38. Kleinbaum DG, Kupper LL, Morgenstern H. (1982) *Epidemiologic Research: Principles and Quantitative Methods*. New York, Van Nostrand Reinhold Company.

39. Pepall J. (1997) *Methyl Mercury Poisoning: The Minamata Bay Disaster*. Copyright © International Development Research Centre, Ottawa, Canada.

40. Lenz W. (1962) Thalidomide and congenital abnormalities. *Lancet* **1**:45.

41. Moore T{ XE "*Thomas Moore*" }{ XE "Moore, Thomas" }. (1995) *Deadly Medicine*. New York, Simon and Schuster.

42. Preliminary report: effect of encainide and flecainide on mortality in a randomized trial of arrhythmia suppression after myocardial infarction. The Cardiac Arrhythmia Suppression Trial (CAST) Investigators. N Engl J Med. 1989 Aug 10;321(6):406-12.

43. Hill B. (1953) Observation and experiment. *New England Journal of Medicine* **248**:995–1001.

44. Pfeffer, M.A., Braunwald, E., Moyé, L.A. et al. (1992). Effect of captopril on mortality and morbidity in patients with left ventricular dysfunction after myocardial infarction–results of the Survival and Ventricular Enlargement Trial. *New England Journal of Medicine* **327**:669–677.

45. Sacks F.M. Pfeffer M.A., Moyé, L.A. (1996). The effect of pravastatin on coronary events after myocardial infarction in patients with average cholesterol levels. *New England Journal of Medicine* **335**:1001–1009.

46 The SHEP Cooperative Research Group (1991) Prevention of stroke by antihypertensive drug therapy in older persons with isolated systolic hypertension: final results of the systolic hypertension in the elderly program (SHEP). *Journal of the American Medical Association* **265**:3255–3264

47. The Long-Term Intervention with Pravastatin in Ischemic Disease (LIPID) Study Group. (1998). Prevention of cardiovascular events and death with pravastatin in patients with CAD and a broad range of initial cholesterol levels. *New England Journal of Medicine* **339**:1349–1357.

M006E38334

48. Moyé, L.A., Pfeffer, M.A., Wun, C.C., et. al (1994). Uniformity of captopril benefit in the post in-
farction population: Subgroup analysis in SAVE. *European Heart Journal.*15: Supplement B:2–8.

49. Lewis, S.J., Moyé, L.A., Sacks, F.M., et. al (1998). Effect of pravastatin on cardiovascular events in
older patients with myocardial infarction and cholesterol levels in the average range. Results of the
Cholesterol and Recurrent Events (CARE) trial. *Annals of Internal Medicine* 129:681–689.

50. Lewis, S.J., Sacks, F.M., Mitchell, J.S., et. al (1998). Effect of pravastatin on cardiovascular events in
women after myocardial infarction: the cholesterol and recurrent events (CARE) trial. *Journal of the
American College of Cardiology* 32:140–146.

51. Peto, R., Collins, R., Gray, R. (1995). Large-scale randomized evidence: Large, simple trials and
overviews of trials. *Journal of Clinical Epidemiology* 48:23–40.

52. MRFIT Investigators. (1982). Multiple risk factor intervention trial. *Journal of the American Medical
Association* 248:1465–77.

53. ISIS-1 Collaborative Group (1986) Randomized trial of intravenous atenolol among 16027 cases of
suspected acute myocardial infarction–ISIS–1. *Lancet* ii;57–66.

54. Lee, K.L., McNeer, F., Starmer, C.F., Harris, P.J., Rosari, R.A. (1980). Clinical judgment and statis-
tics. Lessons from a simulated randomized trial in coronary artery disease. Circulation 61:508–515.

55. Assmann SF, Pocock SJ, Enos LE, Kasten LE. (2000), Subgroup analysis and other (mis)uses of
baseline data in clinical trials. Lancet. 2000 Mar 25;355(9209):1064-9.

56. Bulpitt, C. (1988). Subgroup Analysis. *Lancet*: 31–34 .

57. Exner, D.V., Dreis, D.L., Domanski, M.J., Cohn, J.N. (2001), Lesser response to angiotensin–
converting enzyme inhibitor therapy in black as compared to white patients with left ventricular dys-
function. *New England Journal of Medicine* 334:1351–7

58. Yancy, C.W., Fowler, M.B., Colucci, W.S., Gilber, E.M., Brsitow, M.R., Cohn, J.N., Luka, M.A.,
Young, S.T., Packer, M. for the US Carvedilol Heart Failure Study Group. 2001.Race and response to
adrenergic blockade with carvedilol in patients with chronic heart failure. *New England Journal of
Medicine* 334:1358–65.

59. Stolberg S.G. Should a pill be colorblind? *New York Times*. Week in Review. May 13, 2001.p 1.

60. Moyé, L. (2000) *Statistical Reasoning in Medicine: The Intuitive P-Value Primer*. New York.
Springer.

61. Peduzzi, P.,Wittes, J., Deter, K., Holford, T. Analysis as-randomized and the problem of non-
adherence; an example from the veterans affairs randomized trial of coronary artery bypass surgery.
(1993). *Statistics in Medicine* 12:1185–1195.

62. Yusuf, S, Wittes J., Probstfield, J., Tyroler, H.A. (1991). Analysis and interpretation of treatment ef-
fects in subgroups of patients in randomized clinical trials. *Journal of the American Medical Associa-
tion* 266:93–8.

63. Peterson, B., George, S.L. (1993). Sample size requirements and length of study for testing interaction in a 1 x $k$ factorial design when time-to-failure is the outcome. *Controlled Clinical Trials* **14**:511–522.

M006E38336