**Catherine Kessedjian**
*Professeur Agrégé des Facultés de droit*
19 B Villa Seurat
75014 Paris
France
Tel +33 1 43 20 07 75
Fax +33 1 43 20 09 13
E-mail: kessedjian@justice.com

## Response to Prof. Raynouard's Declaration

In re: VIOXX case – Product liability
Claimants, Mr. Raphaël de Toledo (representative of the class), Mrs. Sandra Johnson,
Mr. Bruno Marly and Mr. Robert Salle

### 1) Introduction

1. I, the undersigned, Catherine Kessedjian, Professor Agrégé of the Faculties of Law, was solicited by the office of Kenneth B. Moll & Associates Ltd, attorney for the claimants cited above, regarding the case between the latter and Merck, Inc, to respond to the statement given by Professor Arnaud Raynouard on June 21, 2006, of which a copy in the original French was submitted to us.

2. We will not respond to each and every claim made by Professor Raynouard, the majority of which are no more than expansions or summaries of the statements he had previously given, on December 13, 2005. Instead, we will clarify some issues addressed in the legal opinion we signed on May 9, 2006.

### 2) Concerning the general environment of the French judicial system

3. The true question is whether France, in a trial such as the present case, affords similar procedural conditions to those granted in the American system. There can be no doubt that, despite all the developments in France and the various reforms, which have honed our judicial arena over the past 200 years, the French judicial system remains extremely different from those prevalent in the United States (whether in the federal or state systems). We will not attempt to judge these different systems. What is important is simply to understand their general philosophies, in which culture, history and politics all play an undeniable role. Legal and judicial techniques are one thing, but we must bear in mind that justice is borne by men and women, each of whom has their own history and culture, the importance of which cannot be underestimated when it comes to their decision-making process.

### 3) Concerning success fees and legal aid

4. It is entirely possible that, in practice, some attorneys may take advantage of the system, which authorizes them to calculate a portion of their fees, based on the result they believe they can obtain in the matter at hand. In doing so, however, they are violating the spirit of the rule. It is clear that the prohibition of success fees is the

principle and that setting success fees in such a way that the latter come to represent the vast majority of their remuneration, to the point where the fixed fees become "quasi-symbolic," is completely contrary to the intentions of the legislators. As a result, attorneys who operate in such a manner run the additional risk of the judge deciding to reduce their fees.

5. As concerns legal aid, all the technical details which allow the slight modification of attorneys' payment schedules or the number of beneficiaries, particularly in the case of partial legal aid, in no way alter the French system's general philosophy, as described in our legal opinion of May 9, 2006. Legal aid, as organized in France, is unfit to truly allow easy access to justice for the greatest number. This is especially true in complex matters such as the issues raised in the present dispute.

## 4) Concerning class actions in Europe and in France

6. In our legal opinion dated May 9, 2006, we did not refer to the European Commission's 2005 green paper on damages actions for breach of the EC antitrust rules, simply because this green paper has strictly nothing to do with the type of matter which is the subject of the present case. Indeed, it only pertains to competition law. This green paper is a part of the profound changes in competition law which began, in particular, with Regulation 1/2003, which considerably altered the monitoring and sanctioning approach of this unique branch of the law. We have exchanged a system of individual exemptions for one of legal exception, rendering indispensable the monitoring of firms by their market contacts, in addition to that performed by antitrust authorities. Additionally, we have moved away from a system in which the European Commission was at the center of monitoring activities and sanctions, toward a highly decentralized one, based around national antitrust authorities and the judges of the various Member States. It is in this unusual context that the Commission considered the possibility of introducing class action into European law. However, it is uncertain that, at the end of the day, this will be adopted in the text that will eventually be produced out of the slow and complicated EU legislative process. From the time when a green paper is published and the adoption of a legislative text, a complex process must take place, which involves not only the European Parliament and the Council (i.e. the Member States), but also a series of consultations, which may lead to often-widespread lobbying activities.[1]

7. As concerns bills on group legal recourse presented in the French legislature,[2] it is of interest to note that these texts are highly different from the American concept of class actions, retaining the restrictive aspects currently present in French law, the major points of which we reviewed in our legal opinion of May 9, 2006. Even were a law quickly passed by the French legislature, it would not allow for the type of action that can be pursued in the United States, due, in particular, to the complete absence of

---

[1] For examples of this, see the green paper responses that have already been received by the European Commission, which are available on its website, located at: www.europa.eu.int.

[2] These propositions, put forward by members of the legislative branch, are quite different from the bills proposed by the government on the same subject.

arrangements concerning evidence, a matter which remains as stipulated in existing legislation, given the radical opposition to establishing a system similar to American discovery procedures in France.

8. To that effect, the example of the case of contaminated blood, which has occupied French courts for a number of years, is irrelevant. In that case, the public authorities themselves were put on trial for an issue in a highly regulated field. All judicial activities surrounding this case (which became a veritable scandal) were dictated by the political will to appease public opinion. For example, the fact that the Treasury Department paid for the expert testimony necessary to the claimants' case is in no way an absolute rule, but rather a simple question of political decisions faced with a given situation. Furthermore, the payment made by the Treasury was simply an advance, reimbursement of which may be required of the party or parties declared liable at the end of the trial. At any rate, it is impossible to extract principles or rules from this matter that would be immediately applicable to the Vioxx case.

## 5) Concerning the length of proceedings in France

9. It is obvious that any prognostication of the length of proceedings in France can only be made in function of one's own litigation experience. The evaluation formulated in our legal opinion of May 9, 2006, is based on some twenty years of professional experience, primarily involving relatively complex litigation proceedings.

10. The statistics published by the Ministry of Justice are in no way probative, as they are averages integrating all types of trials, from the simplest to the most complex. Detailed statistics would be necessary in order to draw any meaning from them, and we are unaware as to the availability to the public of such statistics.

11. At any rate, we must bear in mind that it is in the interest of the Ministry of Justice to publish favorable statistics. At the time when we were a practicing attorney, we came to know of the existence of instructions given to all jurisdictional heads by the Ministry of Justice, to "improve their results." One of the solutions for this improvement consisted in the creation of what was then called a "waiting list," which was not accounted for in the statistics, and on which were placed those cases which required an excessive amount of time, so as not to "burden" the statistics. So long as the case was not ready to be "fixed,"[3] it would remain on this waiting list. We do not know whether this practice still exists today; in the short period of time granted for the preparation of this response, verification was not possible.

## 6) Concerning evidence

12. We are only able to confirm here that, in French law, there is no means of requiring the parties to provide information or produce a piece of evidence, if the other party is

---

[3] "Fixing" a case consists in determining a firm schedule for proceedings and a date of audience which, with only the rare exception, must be respected.

unaware of its existence, contrary to American law.[4] To illustrate our position, let us consider an example. Imagine a similar case to the present matter, in which the defendant had had doubts concerning adverse side effects associated with the medication in question, during the research undertaken prior to marketing the product. Imagine that this doubt could be proved, either through internal memos or through the testimony of members of the company's personnel. Then imagine that the claimant party is not privy to this information. There is no rule, under French law, requiring the defendant to inform the judge of this evidence and no rule allows the claimant to force the defendant to reveal this information.

13. Legal expertise can certainly help to expand the knowledge concerning evidentiary information presented to a judge, but it is rare that an expert named by the court be able to visit the site in question at his/her leisure and to conduct his/her own investigation to draw out the truth. Most often, the court will provide the expert with a strictly defined mandate, and he/she will have to be satisfied with those pieces of evidence, as presented to him/her by the parties to the case.

14. As concerns the Hague Convention of 1970, it is important to recall that blocking statutes may not be implemented in the context of this convention, as these statutes are applicable "subject to treaties." In other words, if the American judge follows the procedural avenues set out in the 1970 Convention, blocking statutes may not beapplied. Of course, the French Central Authority could still be prevented from furnishing certain pieces of evidence -- and therefore from responding in full to the request made under the Hague Convention – for reasons of French national security or sovereignty. Nevertheless, an examination of information released by the French Central Authority indicates that this body has only opposed a single request from an American jurisdiction over the past few years. To our knowledge, there have been no cases in which the French authorities refused to produce documents or other pieces of evidence that would be useful in the administration of evidence before an American court, for purely civil matters similar to the present case.

## 7) The effects of American judgments in France

15. There is no controversy regarding the effects in France of an American judgment, with respect to French claimants who voluntarily agreed to a trial in the United States and were designated by name in those proceedings. All agree that these claimants have renounced their right of jurisdiction, as granted by Article 14 of the French Civil Code, and may therefore not plead the incompetence of the American court, should they lose their case in the United States.

16. The most sensitive point is undoubtedly that of determining what the effects of an American class action case will be in France, with regards to French claimants

---

[4] The working group responsible for a feasibility study on French-style class actions raised once again the issue of the incompatibility of French law with the American style of *discovery* procedures, in its recommendations of December 16, 2005.

represented *in absentia* in the American trial, without having clearly participated in the proceedings, due to the fact that they did not take the positive step of being excluded from the case (through the opt-out system). In other words, if a French claimant remains silent, and if the "class" has been validated by an American court, American law considers this French claimant to be bound by the eventual outcome of the case, which will most likely take the form of a financial arrangement.

17. This question must be considered from two different angles: 1) Would Article 14 of the Civil Code prevent the French courts from recognizing an American judgment made in the circumstances cited in point 18? 2) Can the American judgment be considered as contrary to French international public policy? To our knowledge, neither of these questions has yet been directly ruled upon by French courts, in the context of a class action lawsuit in the United States.

18. The first question deals indirectly with whether the right of jurisdiction stipulated by Article 14 of the French Civil Code is an imperative or an optional rule. This has not yet been directly decided by the Court of Cassation. Nevertheless, it is already known that claimants may renounce this right, which would therefore lead to the belief that it is an optional rule. In addition, through analogy with Article 15 of the Civil Code, it would appear likely that the Court would declare Article 14 to be an optional rule. In fact, in a recent decision[5], for the first time rendered so clearly, the Court ruled that "Article 15 of French Civil Code grants optional jurisdiction to the French courts and is therefore unfit to exclude the indirect jurisdiction of the foreign court, so long as the litigation is validly attached to the State whose jurisdiction is involved, and the choice of jurisdiction is not fraudulent."

19. As the natures of Articles 14 and 15 of the Civil Code are the same, it is highly probable that the Court of Cassation's decision concerning Article 15 could be extended to include Article 14. Were the Court of Cassation called upon regarding the indirect jurisdiction of an American court for a case in which the claimants were French, it would, in all likelihood, rule that Article 14 is, indeed, an optional rule. Would it go so far as to declare that a French claimant, duly represented under American law, but who did not explicitly give his/her consent to the trial, may not call upon Article 14 of the Civil Code to protest against an unsatisfactory American verdict? Given the current state of French law, it would be impossible to give a firm response in one direction or another.

20. The answer will depend, in part, on how the French claimants potentially affected by the American class action proceedings were informed. If the information was widely known and the French claimants were informed in detail of their rights and obligations regarding the proceedings, it seems likely that the Court would concede that they had been duly represented in the foreign country.

21. As for the second question, concerning French international public policy, as previously explained in our legal opinion dated May 9, 2006, this public policy is highly restricted. In order to evaluate its application in the present context, the balance of interests of the French claimants must be taken into account. For example, the judge

---

[5] Civ. 1, May 23, 2006, Appeal #04-12777, Prieur vs. Montenach.

will consider the fact that the French claimants represented *in absentia* would certainly never have gone to trial in France, either because they were unaware of their claim against Merck, or because the costs of a trial in France would have outweighed the possible compensation to be granted in trial.

22. A mathematical evaluation of French international public policy is not possible, as numerous factors contribute to the judge's ruling. In any case, the fact that the rights of French claimants were respected without fraud, in a foreign country, against a foreign company, can only argue in favor of the recognition of the foreign ruling in France.

On the strength of which, I have drafted this response, as a complement to my legal opinion of May 9, 2006, prepared by myself and which represents, to the best of my knowledge, an accurate interpretation of current French law, based on the facts presented to me.

Paris, August 16th, 2006

Catherine Kessedjian
Professeur Agrégé
University of Paris II (Panthéon-Assas)



**TRANSPERFECT**
T R A N S L A T I O N S

City of New York, State of New York, County of New York

I, Allison Hahn, hereby certify that the following is, to the best of my knowledge and

ATLANTA
BOSTON
BRUSSELS
CHICAGO
DALLAS
DENVER
FRANKFURT
GENEVA
HONG KONG
HOUSTON
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
STOCKHOLM
TOKYO
WASHINGTON, DC

belief, a true and accurate translation of the document titled "Response to Prof.

Raynouard's Declaration", from French into English.

*Allison Hahn*

Allison Hahn

Sworn to before me this
17th of August, 2006.

*[signature]*

Signature, Notary Public

PAUL D. RALSTON
.otary Public, State of New York
No. 01RA6023867
Qualified in Queens County
mmission Expires May 3, 200

Stamp, Notary Public

**Catherine Kessedjian**
*Professeur agrégé des Facultés de droit*
19 B Villa Seurat
75014 PARIS - FRANCE
Tel +33 1 43 20 07 75
Fax +33 1 43 20 09 13
Courriel : kessedjian@justice.com

## Réponse à la déclaration du Professeur Raynouard

Dans l'affaire VIOXX – Responsabilité du fait des produits
Demandeurs, M. Raphaël de Toledo (représentant de la classe), Mme Sandra Johnson,
M.Bruno Marly et M.Robert Salle

### 1) Introduction

1. Je soussignée, Catherine Kessedjian, Professeur agrégé des Facultés de droit, ai été sollicitée par le Cabinet Kenneth B. Moll & Associates Ltd, avocat des demandeurs dont les noms sont indiqués en tête des présentes, dans l'affaire qui les oppose à la société Merck, Inc, pour répondre à la déclaration établie par le Professeur Arnaud Raynouard le 21 juin 2006, dont copie en langue originale française nous a été remise.

2. Précisions, dès l'abord, que nous ne répondrons pas systématiquement à toutes les affirmations du Professeur Raynouard, dont la plupart ne font que répéter en les explicitant ou les synthétisant les déclarations qu'il avait faites précédemment en date du 13 décembre 2005. Nous nous contenterons d'apporter quelques précisions par rapport à l'avis juridique que nous avons signé le 9 mai 2006.

### 2) Sur l'environnement général du système judiciaire français

3. La question est de savoir si la France, dans un procès tel que celui en cause, offre des conditions procédurales similaires à celles offertes par le système américain. Or, il ne fait guère de doute que, malgré toutes les évolutions constatées en France et les différentes réformes qui depuis 200 ans ont émaillé notre vie judiciaire, que le système de justice français est encore profondément différent de ceux (tant le système fédéral, que les systèmes des Etats fédérés) qui prévalent aux Etats-Unis. Il n'est pas question de passer un jugement de valeur sur ces différents systèmes. Il est simplement important d'en comprendre la philosophie générale dans laquelle la culture, l'histoire et la politique jouent un rôle indéniable. La technique juridique et judiciaire est une chose, mais la justice est rendue par des hommes et des femmes qui ont tous leur histoire et leur culture dont on ne peut sous-estimer l'importance au moment de rendre une décision.

### 3) Sur les honoraires de résultat et l'aide juridictionnelle

4. Il est fort possible que, en pratique, certains avocats abusent du système les autorisant à calculer une partie de leurs honoraires en fonction du résultat qu'ils pensent obtenir dans l'affaire en cause. Mais ce faisant, ils violent l'esprit de la règle. Il demeure clair que l'interdiction des honoraires de résultat est le principe et que fixer des honoraires de résultat

de telle manière que ceux-ci représentent l'essentiel de leur rémunération, au point que la partie fixe soit « quasi-symbolique », ne correspond pas du tout à ce qu'a voulu le législateur. Les avocats qui procèdent de cette manière prennent d'autant plus de risque de voir leurs honoraires réduits par le juge.

5. En ce qui concerne l'aide juridictionnelle, tous les détails techniques qui permettent   de modifier légèrement l'assiette du paiement des avocats ou le nombre de bénéficiaires, notamment par l'aide juridictionnelle partielle, ne modifient en rien la philosophie générale du système français, telle que nous l'avons exposée dans notre avis juridique du 9 mai 2006. L'aide juridictionnelle, telle qu'elle est organisée en France, est impropre à permettre réellement un accès aisé à la justice pour le plus grand nombre, notamment dans des affaires complexes telle que celle en cause dans la présente espèce.

## 4) Sur les actions de groupe en Europe et en France

6. Si, dans notre avis juridique du 9 mai 2006, nous n'avons pas mentionné le livre vert de la Commission européenne de 2005 sur les actions en dommages et intérêts pour infractions aux règles communautaires sur les ententes et les abus de position dominante, c'est que ce livre vert n'a <u>absolument rien à voir</u> avec le type d'affaires qui est en cause dans le procès qui nous occupe. Il s'agit en effet de droit de la concurrence. Or, ce livre vert s'inscrit dans une évolution profonde du droit de la concurrence commencée, notamment, avec le Règlement 1/2003 qui a modifié de manière considérable l'approche du contrôle et des sanctions de ce droit très particulier qu'est le droit de la concurrence. Nous sommes passés en effet d'un système d'exemptions individuelles à un système d'exception légale, rendant absolument nécessaire une surveillance des entreprises par leurs interlocuteurs sur le marché, en plus des autorités de la concurrence. Nous sommes passés d'un système où la Commission européenne était au centre du contrôle et des sanctions, à un système très décentralisé, au profit des autorités nationales de la concurrence et des juges nationaux des différents Etats membres. C'est donc dans ce contexte très particulier que la Commission a réfléchi sur la possibilité d'introduire une action de groupe en droit européen. Mais, il n'est pas du tout certain que cela soit accepté *in fine* dans le texte qui sortira un jour du processus lent et compliqué d'adoption du droit communautaire. Entre le moment où un livre vert est publié et l'adoption d'un texte de nature législative, se déroule un processus complexe qui met en scène non seulement le Parlement européen et le Conseil (i.e. les Etats membres) mais également des consultations diverses et, parfois, des consultations, qui permettent une action souvent prolifique des groupes de pression[1].

7. En ce qui concerne les propositions de lois sur les recours collectifs déposées par des parlementaires français[2], il est intéressant de noter que ces textes sont très différents de la conception américaine des *class actions* et reprennent les caractéristiques restrictives déjà existantes en droit français et dont nous avons exposé l'essentiel dans notre avis juridique du 9 mai 2006. Même si une loi était votée rapidement par le Parlement français, elle ne permettrait pas d'entreprendre le type d'actions que l'on peut entreprendre aux Etats-Unis.

---

[1] A cet égard, il suffit de regarder les réponses au livre vert d'ores et déjà reçues par la Commission européenne et disponibles sur le site www.europa.eu.int.

[2] Il s'agit de propositions de parlementaires qui sont très différents des projets de lois déposés par le gouvernement.

Notamment, on doit noter l'absence de toute disposition sur les questions de preuve qui demeurent celles prévues par les textes actuels, compte tenu d'une opposition radicale en France d'instaurer un système proche de la *discovery* à l'américaine.

8. A cet égard, il est inutile d'utiliser l'exemple de l'affaire du sang contaminé qui a occupé les tribunaux français depuis de nombreuses années. En effet, dans cette affaire les pouvoirs publics eux-mêmes ont été mis en cause, dans un domaine fortement réglementé. Toute l'activité judiciaire autour de cette affaire (qui a pris la nature d'un véritable scandale) a été dictée par une volonté politique de calmer les esprits. Le fait, par exemple, que le Trésor public ait payé les expertises nécessaires aux demandeurs pour établir leur cause, ne relève absolument pas d'une règle absolue mais uniquement de la volonté politique dont il est question ci-dessus. De plus, on doit noter que le paiement effectué par le Trésor public n'est qu'une avance qui pourrait être remboursée par la ou les entités qui sont déclarées responsables. En tout état de cause, il n'est pas possible de tirer de cette affaire des principes ou des règles immédiatement applicables à un cas comme celui du médicament Vioxx.

### 5)  Sur la durée des procédures en France

9. Il est clair que tout pronostique sur la durée des procédures en France est fait en fonction de l'expérience contentieuse que chacun d'entre nous peut avoir. L'évaluation que nous avons faite dans notre avis juridique du 9 mai 2006 est basée sur quelques vingt années d'expérience professionnelle consacrée, pour une grande part, à des procédures contentieuses relativement complexes.

10. En aucun cas les statistiques publiées par le Ministère de la Justice ne sont probantes car il s'agit de moyennes qui mélangent toute sorte de procès, du plus simple au plus complexe. Il faudrait avoir accès aux statistiques détaillées, et nous ignorons si de telles statistiques détaillées sont à la disposition du public.

11. En tout état de cause, le Ministère de la Justice a tout intérêt à publier des statistiques favorables. A l'époque où nous étions avocat, nous avions été informée d'une consigne adressée par le Ministère de la Justice à tous les chefs de juridiction, destinée à leur demander « d'améliorer leur rendement ». Une des manières par lesquelles cette amélioration avait été faite, consistait à créer, ce que l'on appelait à l'époque « un rôle d'attente », rôle n'entrant pas dans les statistiques, sur lequel les affaires prenant trop de temps étaient temporairement placées afin de ne pas « obérer » les statistiques. Tant que l'affaire n'était pas prête à être « fixée »[3], elle ne quittait pas ce rôle d'attente. Nous ignorons si cette pratique est toujours en vigueur. Dans le faible laps de temps qui nous a été imparti pour préparer cette réponse, nous n'avons pas la possibilité de vérifier.

### 6)  Sur la preuve

12. Nous ne pouvons que confirmer ici qu'il n'existe, en droit français, aucun moyen d'obliger les parties à soulever un fait ou produire un élément de preuve si cet élément de

---

[3] La « fixation » d'une affaire consiste à indiquer un calendrier de procédure ferme et une date d'audience qui, sauf très rares exceptions, devra être respectée.

preuve est ignoré par l'autre partie et ce, contrairement à ce qui se passe en droit américain[4]. Prenons un exemple pour illustrer la position que nous prenons. Imaginons dans un cas similaire à celui qui nous préoccupe, que le défendeur ait eu un doute, durant les recherches effectuées avant la mise sur le marché de son médicament, doute portant sur les effets secondaires indésirables de ce médicament. Imaginons que ce fait puisse être prouvé, soit par des mémos internes de l'entreprise, soit par le témoignage de certains membres du personnel de l'entreprise. Imaginons que ce fait soit ignoré de la partie demanderesse. Aucune règle, en droit français, ne permet de dire que le défendeur est obligé de porter ce fait à la connaissance du juge. Aucune règle, en droit français, ne permet au demandeur de forcer le défendeur à dévoiler ce fait.

13. Certes, l'expertise judiciaire peut aider à étendre la connaissance des données factuelles mises à la disposition du juge. Mais il est rare que l'expert désigné par le tribunal puisse opérer par descente sur les lieux, avec tout loisir de procéder à des investigations propres à la manifestation de la vérité. Très souvent, l'expert aura une mission strictement définie par le tribunal et devra se contenter des éléments de fait qui seront mis à sa disposition par les parties.

14. En ce qui concerne le fonctionnement de la Convention de La Haye de 1970, on doit rappeler que les lois de blocage ne peuvent pas être utilisées dans le cadre de cette convention puisque ces lois sont applicables « sous réserve des traités ». En d'autres termes, si le juge américain utilise les voies procédurales offertes par la Convention de 1970, les lois de blocage ne pourront pas intervenir. Bien entendu, l'autorité centrale française, pourrait néanmoins être empêchée de divulguer certains éléments de preuve, et donc de donner suite à la requête faite en vertu de la Convention de La Haye, si des questions liées à la sécurité ou à la souveraineté française étaient en cause. Toutefois, on doit noter, en étudiant les documents émanant de l'autorité centrale française, que cette dernière ne s'est opposée qu'une seule fois, dans les années récentes, à une demande émanant d'une juridiction américaine. A notre connaissance, il n'existe pas d'affaires dans lesquelles les autorités françaises se soient opposées à la production de documents ou d'éléments de preuve dans des affaires, purement civiles, similaires à celle de l'espèce et qui seraient utiles à l'administration de la preuve devant un tribunal situé aux Etats-Unis.

## 7) Sur les effets des jugements américains en France

15. Il n'existe aucune controverse sur l'effet en France du jugement américain à l'égard des demandeurs français qui auront procédé volontairement aux Etats-Unis et auront été nommément désignés dans cette procédure. Tout le monde est d'accord pour dire que ces demandeurs ayant renoncé à se prévaloir du privilège de juridiction qui leur est conféré par l'article 14 du Code civil, ils ne pourront pas exciper de l'incompétence du tribunal américain si jamais ils perdaient leur procès aux Etats-Unis.

16. Le point le plus délicat est certainement de savoir quels seront les effets en France d'une décision américaine de *class action*, à l'égard des demandeurs français qui auront été représentés *in abstentia* dans le procès américain, sans avoir concrètement participé à la

---

[4] L'incompatibilité du droit français avec une procédure de *discovery* à l'américaine a encore été rappelée par le groupe de travail chargé d'étudier la faisabilité d'une action de groupe à la française rendu le 16 décembre 2005.

procédure, du seul fait qu'ils n'auront pas procédé à un acte positif pour se faire exclure (système dit du *opt out*). En d'autres termes, si un demandeur français est resté silencieux, et si la « *class* » a été homologuée par la juridiction américaine, ce demandeur français sera considéré en droit américain comme tenu par la décision sur le fond qui sera prise, qui prendra vraisemblablement la forme d'une transaction.

17. Cette question doit être étudiée sous deux angles : 1) l'article 14 du Code civil empêcherait-il les tribunaux français de reconnaître un jugement américain pris dans les conditions rappelées au point 18 ci-dessus ? 2) Le jugement américain peut-il être considéré comme contraire à l'ordre public international du juge français ? A notre connaissance, aucune de ces deux questions n'a encore été jugée par les tribunaux français de manière directe dans le contexte d'une *class action* aux Etats-Unis.

18. La première question consiste indirectement à se demander si le privilège de juridiction prévu par le code civil français en son article 14 est une règle impérative ou simplement facultative. Cette dernière question n'a pas encore été jugée directement par la Cour de cassation. Toutefois, on sait déjà que les demandeurs peuvent y renoncer, ce qui incline à penser qu'il s'agit d'une règle facultative. Par ailleurs, par analogie avec l'article 15 du Code civil, on peut penser que la Cour serait amenée à dire que l'article 14 est une simple règle facultative. En effet, dans un arrêt récent[5], et pour la première fois aussi nettement, la Cour a décidé que « l'article 15 du code civil ne consacre qu'une compétence facultative de la juridiction française, impropre à exclure la compétence indirecte du tribunal étranger, dès lors que le litige se rattache de manière caractérisée à l'Etat dont la juridiction est saisie et que le choix de la juridiction n'est pas frauduleux ».

19. Comme les dispositions des articles 14 et 15 du Code civil sont de même nature, il est fort probable que la décision de la Cour de cassation pour l'article 15 puisse être étendue à l'article 14. Si la Cour décide de cassation venait à être interrogée sur la compétence indirecte de la juridiction américaine alors que les demandeurs étaient français, elle sera vraisemblablement amenée à dire que l'article 14 est effectivement une règle facultative. Ira-t-elle plus loin en disant qu'un demandeur français, dûment représenté en vertu du droit américain mais qui n'a pas donné explicitement son consentement, ne pourra pas utiliser l'article 14 du code civil pour se défendre contre un jugement américain qui ne le satisferait pas ? Il nous paraît impossible, en l'état actuel d'évolution du droit français, de répondre fermement à cette question dans un sens ou dans un autre.

20. La réponse dépendra en partie de la manière dont les demandeurs français potentiellement affectés par la procédure américaine de *class action* ont été informés. Si l'information a été largement connue et que les demandeurs français ont été informés en détail de leurs droits et obligations dans le cadre de la procédure, on peut penser que la Cour admettrait qu'ils ont été valablement représentés à l'étranger.

21. Quant à la seconde question concernant l'ordre public international français, comme nous l'avons précédemment expliqué dans notre avis juridique du 9 mai 2006, cet ordre public est extrêmement restreint. Pour apprécier son application dans le contexte qui nous occupe ici, il faut tenir compte de la balance des intérêts des demandeurs français. Par exemple, le juge sera sensible au fait que les demandeurs français représentés *in abstentia* n'auraient de toute

---

[5] Civ. 1, 23 mai 2006, pourvoi n°04-12777, affaire Prieur c. Montenach.

manière jamais procédé en France parce qu'ils ignoraient posséder une telle action à l'encontre de Merck ou parce que les frais du procès en France auraient dépassé les chances de gain que ce procès leur aurait offert.

22. Il est impossible de faire une appréciation mathématique de l'ordre public international français car de très nombreux facteurs interviennent dans la décision du juge. En tout état de cause, le fait que le droit des demandeurs français aura été acquis sans fraude à l'étranger, à l'encontre d'une société étrangère, ne peut que militer en faveur d'une reconnaissance des effets de cette décision en France.

En foi de quoi, j'ai établi la présente réponse, en complément de mon avis juridique du 9 mai 2006, préparée par mes propres soins, et qui représente, au mieux de mes connaissances, une interprétation correcte du droit français actuel, en fonction des faits qui m'ont été présentés.

Fait à Paris,
le 16 août 2006

Catherine Kessedjian
Professeur agrégé
Université Panthéon-Assas Paris II

## Supplementary *Affidavit*

### in response to the *reply declaration* of Professor Gambaro dated June 12, 2006

### I. Introduction

This opinion is drawn up on the request of Kenneth B. Moll & Associates LTD in response to the observations made by Professor Gambaro in the *reply declaration* dated June 12, and supplementing the previous *affidavit* dated May 15, 2006, attached to the "*Plaintiffs' Memorandum in Support of Their Opposition to Defendant Merck & Co. Inc's Motion to Dismiss the Foreign Class Action*", in which various arguments were illustrated to the Court to demonstrate the inadequacy of the Italian procedural system to protect citizens harmed by taking the medicinal product Vioxx (in response to Prof. Gambaro's first declaration dated December 13, 2005), owing to the numerous limitations preventing the Italian justice from dealing efficiently with the complexity of the procedural situations determined by large-scale offences.

It is a shame to have to don the clothes of Voltaire's *Candide* once again, who was basically slightly envious of the ability of his friend Pangloss – an excellent scholar – to see everything in a positive light; in truth, the writer too, for the love of his country and as a professor of procedural law for twenty years, would like to be able to affirm with certainty that the Italian legal system has witnessed such considerable progress as described by Professor Gambaro with regard to the length of processes and the adequacy and efficiency of the tools of procedural protection, but unfortunately, in this particular case, we have to balance a description that risks being somewhat "golden" with a dose of realism.

Although it is generally true that *adducere inconvenientem non est solvere argumentum [persuading someone of the exception is not resolving the issue]*, in this particular case the opposite seems true, because only a clear, albeit dull, description of the most serious (and ever deteriorating) limits of the Italian procedural system, not just in relation to the efficient English and American processes but also in relation to the European standards, can contribute to an appropriate and efficient solution to the case in question, on the most convenient way of handling the actions of Vioxx patients *fairly*.

**II. Alleged existence of alternative protection tools: proof of the facts**

Prof. Gambaro recognizes what had been defined, in our previous *affidavit*, as the fundamental limit of the Italian system in dealing with the *mass torts* or the non-existence of any procedural institutions seriously similar to the American *class action*, which allows the group of plaintiffs to organize themselves into an "active unit", thanks to the contribution of professional firms set up for business purposes, in order to obtain more efficient results with regard to the costs of the proceedings, the suitability of the defense and the collective assumption of the burden of proof, resulting in being able to oppose normal defendants, such as the multinational manufacturers, with greater force.

He objects, however, that the non-existence of an exact equivalent to the American *class action* does not necessarily give rise to a lack of production, as the Italian procedural system contains alternative tools able to guarantee the same or similar results in terms of protection, in particular:

-       the institution of joint litigation on the plaintiff's side (Art. 103 of the Code of Civil Procedure) that allows a plurality of persons to act in the same proceedings when the decision depends even partially on the solution of identical questions or when there is a connection between the disputes owing to the object or title on which they depend;

-       the increasingly more widespread practice of contacting a single specialist professional firm that produces acts in series, strictly the same apart from the name of the plaintiff, directed against the same defendant.

These observations are just as correct on a theoretical level, but do not support the proof of the facts, as can be seen by analyzing carefully the various legal cases mentioned by Professor Gambaro to illustrate to the Court the alleged (and apparent) efficiency of the aforesaid institutions.

In particular, proof of the efficiency of the institution of <u>active joint litigation</u> to coordinate group actions, despite the <u>risk</u> in the fact that many clients rely on the same law firm from the outset and throughout the proceedings, is given, according to our contact, by the case filed in 1993 before the Court of Rome by persons affected by illnesses contracted through transfusions and through taking infected hemoderivatives. We will therefore start from here.

**II.a) Case of hemophiliacs**

Professor Gambaro quotes the case to show how, on that occasion, a good 388 citizens from all over Italy were able to organize themselves and take joint action against the Ministry of Health to obtain compensation for the losses caused, managing to obtain justice relatively quickly, as the judgment in the first instance was pronounced in 1998, around five years after the case was first filed[1], despite the lack of an institution such as the American *class action.*

The pure numerical figures hide a far more complex reality, however, that takes a great deal of value from the example provided by the aforesaid case.

We will start from the time of the proceedings: the proceedings had a long "gestation" *ante causam*: back in 1989, lawyers close to the Italian Hemophilia Foundation and the Forensic Union for the Protection of Human Rights of Rome advised all Italian hemophiliacs (affected by the immunity disease as a result of taking infected hemoderivatives) to submit an act for the establishment of a delay with the Ministry of Health to file a general request for compensation intended to interrupt the course of the time limit.

The summons was only notified 4 years later, in 1993, at the end of a complex procedure involving the coordination and preparation of acts, which originally related to 195 plaintiffs, all hemophiliacs, infected by HIV and/or hepatitis, as a result of transfusions or taking hemoderivatives. The action was then extended by the intervention of a group of thalassemic subjects, infected following repeated transfusions.

The proceedings then continued slowly and painstakingly: following the issue of an order whereby the court ordered the separation of the proceedings into uniform groups of plaintiffs (considering it advisable to distinguish between the vague procedural and probatory positions of the plaintiffs in view of the compensation sentence, which initially had not been limited to

---

[1] The case referred to was filed before the Court of Rome in 1993, resolved in the first instance by a judgment pronounced on November 27, 1998 (printed in *Foro It.*, 1999, I, 314, with a note by U. IZZO) and then on appeal in a judgment pronounced on October 23, 2000 (in *Danno e Responsabilità*, 2001, 1067, with comments by IZZO) and before the Court of Cassation with judgment no. 11609 of May 31, 2005 (in *Danno e Responsabilità*, 2005, 909).

the *an*), the proceedings were interrupted owing to the transfer of an investigating Judge assigned to the case.

In this context, a group of plaintiffs, exasperated by the uncertain timing and with no assurance of the procedural path undertaken, <u>applied to the European Court of Human Rights in May 1997, pursuant to Article 6 CEDU, complaining of the already unreasonable duration of the proceedings which, at that time, still appeared to be far off settling the investigation.</u>

In November 1998, the Italian government was promptly convicted owing to the infringement of Article 6 of the CEDU. Only then did the proceedings pending before the Court of Rome suddenly speed up, *"whether notification of the opening of proceedings in Strasbourg against the Italian Ministry of Grace and Justice had played a part in this can only be assumed with a good measure of probability"*[2].

Four years had already passed and the counsel for the plaintiff *"fearful of losing the common procedural front laboriously built up"* initially tried, unsuccessfully, to obtain the revocation of the order for separation of the proceedings, then changed its strategy by asking for the case to be decided with a partial judgment limited to the *an*, i.e. limited to the establishment of the Ministry's liability, with settlement of the losses sustained individually to be effected in separate proceedings.

Only the resulting, considerable lightening of the decision-making load led the Judge to rejoin the proceedings that were then considered ready for a decision.

In particular, the Court considered that a simple allegation of the records of the assessments made by the Hospital Medical Commissions pursuant to Article 4 of Law 210/92 was insufficient to satisfy the burden of proof on the part of the plaintiff to prove the causal connection between the transfusions or administrations of infected hemoderivatives and the onset of the infections.

As noted by the commentators, *"this stratagem, in such a numerically complex dispute, may be considered to be a particularly effective way of lightening the task of using the wide margins for maneuver granted to the Judge in the possibility of proving simple assumptions, in the knowledge that the question, in any event, could be the object of a further investigation if the*

---

[2] IZZO, Comment made to the Court of Rome, November 27, 1998, in *Danno e Resp.*, 1999, 221

*individual plaintiff decided to apply to a court for settlement of the amount"[3].*

Nor did the Court of Rome accept the request for an estimated 400 million *per capita*, quantified by the plaintiffs based on the compensation paid for that same reason in other EU States, pointing out "*the absence of any reference and assessment in relation to the specific amount of compensation payable individually*".

In short, the proceedings, quite differently from the intentions of the party filing them, for example, simply further confirmed the considerable difficulties in filing a joint action in Italy that managed to reach efficient judgments in terms of protection in tolerable times.

The judgment in the first instance was pronounced in a relatively short time, but only after the intervention of the European Court of Human Rights, and only thanks to the limitation of the judgment to a general conviction, making it possible to avoid the investigation, which is notorious for extending the periods of proceedings.

In short, the proceedings in question certainly did not allow the plaintiffs to obtain similar protection to that provided by the American *class action*, but the far more limited result of a mere establishment of the Ministry's liability for omissions, with the correct settlement of the loss being referred to separate proceedings, in which each individual plaintiff will have to prove the amount of the loss actually sustained and the resulting compensation.

The procedural mechanism applied to the case in question, far from achieving the levels of efficiency of the *class action*, recalls the more modest procedural path identified in bill 3839, presented recently to try and introduce forms of joint action in Italy as well.

This bill authorizes consumers' associations to file, not just actions for prohibition, but also actions seeking compensation for losses sustained by persons belonging to a certain category, limiting the authorization of the association to an action for mere establishment.

---

[3] IZZO, comment made to the Rome Court of Appeal, October 23, 2000, *Corr. Giur.* 1086.

This means that, only following the collective proceedings, and therefore only after the judgment establishing liability has become final (i.e. after a five-year period), can the initiative be taken by the individual consumers belonging to the class, who, to benefit from the effects of a favorable conviction, should act <u>individually</u> to establish the requirements of the individual plaintiff, as already identified in the abstract in the collective proceedings, and to establish the *quantum debeatur* in relation to the actual loss[4].

The inefficiency of such a mechanism, which in substance leaves the individual plaintiff the difficult and more onerous part of the proceedings, has already been illustrated in the previous *affidavit*. What should be pointed out here is that the case of the hemophiliacs does not appear to give any proof of the alleged adequacy of the Italian procedural system to provide adequate protection for offences of that type.

Joint proceedings too, in the case in question, are not an argument from which it can be deduced that the plaintiffs' difficulty in organizing themselves and acting jointly in a single case has been overcome, but represents an exception that can be explained based on the particular coherence linking the hemophiliacs.

As the initial commentators are keenly aware, *"normally our procedural rules (and also the codes of ethics of the Italian forensic profession; think of the prohibition from advertising and the prohibition from clients making gains for themselves, asking a group of potential plaintiffs to be represented jointly in law ...) do not offer any compensation for the members of a uniform class of plaintiffs seeking to join their common substantial claims in proceedings. <u>The case under review is, from this profile too, a special case: disregarding the disaster concerning them, it is difficult to imagine a more originally cohesive social group than the community of hemophiliacs,</u> united by a daily association with their illness and with a liquid that is vital to them more than to anyone else[5]"*

**II. b) The case of cigarette smokers:**

---

[4] For further details, see CONSOLO, *Fra nuovi riti civili e riscoperta delle class action, alla ricerca di una "giusta" efficienza*, Corr. Giur., 2004, 5, 567.

[5] IZZO, Comment made to the Court of Rome, November 27, 1998, *cit.*, 221, note 7, containing references to texts on political activism and on the internal divisions of the various national hemophiliac communities.

The other tool which, according to Professor Gambaro, would allow efficient levels of protection consists of the increasingly more widespread practice of notifying a single defendant of a series of acts in series, strictly identical apart from the name of the plaintiff, in which several persons ask for compensation for loss or damage deriving from the same unlawful event "with the result, which is typical of mass industrial actions, of highly reducing the costs of *producing the case*" (*reply declaration*, p. 4).

A similar strategy would have been used in the disputes with the cigarette manufacturers or for compensation for losses deriving from having believed that smoking *light* cigarettes is less harmful than smoking normal cigarettes.

In this connection too, it is the same case law used as an example that shows the limits of the argument: the fact that many subjects have filed individual actions against the tobacco manufacturers, based on almost identical legal arguments, does not, however, mean that they were not individual actions, i.e. actions in which the object of allegation and proof was not a loss involving an entire class, in which recourse to statistics is helpful to lighten the burden of proof, but rather the individual loss sustained by each plaintiff.

In fact, many judgments have denied smokers compensation, specifically owing to the insufficient details provided to demonstrate the causal connection between exposure to smoke and the manifestation of tumors.

The loss complained of by smokers, owing to its specific nature (i.e. since it is attributable to many very different causal factors), is very similar to the cardiac pathologies appearing in patients taking Vioxx.

It therefore seems interesting to note that, with regard to the profile of establishing the causal connection, in recent judgments pronounced in the cases filed by smokers, the Italian Judges have denied compensation for smokers on the grounds that "*cancer is the result of a series of concomitant, personal and environmental factors, which means that the pathologies suffered by the plaintiff may also arise in subjects who have never smoked: this means that smoking alone, while constituting a high risk factor of similar pathologies, does not satisfy the concept*

*of "necessary condition" required for the establishment of the etiological connection referred to in Article 2043 of the Civil Code."[6]*

In short, it has been considered that the scientific criterion of probability alone is not enough to establish the attributability of the disease to tobacco consumption, but that a double judgment is necessary: the first aiming to establish the causal connection between a harmful event and harm, according to a criterion of probability, and the second aiming to exclude possible external factors that break that relationship of probability.

This two-stage method of assessment was established by the Rome Court of Appeal which, after assessing the high level of scientific probability of a certain subject's tumor depending on smoking, sought to investigate the family, employment and residential history of the man, and the molecular characteristics of the tumor, and only after that detailed analysis, conducted on the individual subject, ruled out the existence of pre-existing causes affecting the causal connection between the use of tobacco and the disease[7].

That same Court, however, has already changed its opinion on the same facts[8], so that convictions and acquittals, specifically owing to the lack of collective actions, are inconsistent and "spotted".

In short, with regard to compensation for loss caused by smoking, case law also confirms the absolute necessity, in the Italian system, of a specific and individual demonstration of the causal connection, all the more detailed as the loss complained of is specific and not definitely attributable to a single cause.

## III.    Topicality and significance of the Seveso case

The previous *affidavit* quoted the Seveso case as an example to demonstrate how, on that occasion, the citizens involved in the environmental disaster caused by the escape of dioxin

---

[6] Court of Naples, Sec. IX, December 15, 2004, no. 12729, in *Danno e Resp.* 2005, 645.

[7] Rome Court of Appeal, Sec. I, March 7, 2005, no. 1015, in *Danno e Resp.* 2005, 641, with comment by V. D'ANTONIO.

[8] Cf. judgment no. 2183 pronounced by the Rome Court of Appeal, Sec. I, filed on May 15, 2006, in which, in an identical case to that resolved a year beforehand by the same section of the Rome Court of Appeal with the aforesaid judgment 1015/2005 (even with regard to the expert witness who had also affirmed the existence of the causal connection), the Court nonetheless rejected the appeal filed by the heirs of the victim of smoking and by the Codacons against the Ente Tabacchi Italiani, based on a question of legitimization.

only managed to obtain a form of relief after waiting over twenty years, and with almost symbolic convictions (2 million lire per person) considered adequate in the absence of specific proof of the losses individually sustained by each one.

The case had been mentioned to demonstrate the difficulty experienced by the Italian system in recognizing and providing adequate compensation for collective losses.

The significance of the Seveso case to understand the limitations of Italian law in dealing with *mass tort* has also been accepted by other authors dealing with the question who have observed that *"the case recognizes a kind of <u>collective moral loss, which frankly does not exist in our system,</u> and two million lire per capita has been paid stating "...<u>failing any proof of more serious sufferings, this does not appear to be a ludicrous sum</u>".*

The Court of Cassation, dealing with the question, has changed the grounds, but always in the sense of limiting and containing the indemnification of collective losses, introducing *"a non-existent rule whereby "in the event of environmental harm, the moral loss is established as a loss resulting from a loss event which must consist of biological harm".*

According to legal literature, *"In short, we are in the presence of innovations in case law, but <u>fanciful innovations, which help deal with mass tort in the sense that they arbitrarily reduce indemnifiable losses"</u>*[9].

It is true that, in recent judgments, the Court of Cassation has shown itself to be more open to recognizing ways of protecting victims from a moral and/or existential loss, which is now indemnified in itself, even disregarding the existence of biological harm and/or loss of wealth, but always provided the loss is proven in its constituent parts.

There are also cases in which case law considered that, to provide compensation for existential loss, individual proof of suffering is not necessary, considering that the proof is *in re ipsa*, but the example quoted by Professor Gambaro appears to be very different from that one: he quotes the case of a baby born with an irreversible lesion due to the incorrect extraction of the

---

[9] The quotations on the Seveso case are taken from MONATERI, *I mass torts, dalla R.C. al contratto "politico"*, in *Resp. Civ e Prev.* 2003, 18-19.

fetus at birth, in which the Court had considered that *"the loss of seeing their child every day different from the others owing to the disability affecting him is in re ipsa and does not require specific elements of proof"*.

It seems necessary, however, to keep cases in which the Judge is called upon to pronounce judgment on compensation for a loss sustained individually separate from cases of *mass tort*.

It is precisely in mass torts that it has been possible to note the trend of Italian Judges to reduce the compensation payable, or to lay down more stringent requirements for its recognition, probably owing to economic requirements, in view of the effects that might arise in the event of an "avalanche" filing of cases for compensation.

In short, it is as if there were a basic political concern according to which the Judge, to avoid frustrating any expectations of compensation, prefers to guarantee minimum compensation for everyone, or compensation solely to persons truly able to prove the loss sustained beyond any reasonable doubt.

This is also the trend noted in cases filed against the tobacco manufacturers referred to above, in which the laws of statistics have not been considered sufficient to establish the causal connection between conduct and loss, but the Judges have considered it necessary to investigate the life and habits of each individual victim, and to seek costly and elaborate technical advice, then changing the legal guidelines of the proceedings, even at the same court (as in the case of the Rome court).

It has been no different in the Seveso case, in which a symbolic, collective, moral loss has been settled, giving the idea that more adequate compensation for the existential moral loss would only have been possible following individual proof of the moral and existential losses sustained by each one, which is even more difficult given the clearly more evasive nature of the loss.

In short, Prof. Gambaro, while noting that case law is tending increasingly to recognize compensation for existential losses, does not go into the specific scope of *mass torts*, and the doubtless implications that mass tort may have on the effectiveness of protection that can be obtained in the Italian system.

Proof of this lies in the fact that not a single case of mass tort is quoted in which the individual subjects have been able to obtain adequate and not merely a symbolic form of protection with a joint action, not even for harm to the health.

In this sense, the Seveso case maintains all its topicality, because it demonstrates the difficulty of the Italian system in dealing with mass tort.

Nor does such significance appear to be reduced by the observation that, when the 90 inhabitants of Seveso began their civil case, around 7,000 files had already been closed with settlements and the civil case then only related to those who had not managed or sought to reach a settlement with the damaging party.

The problem we are concerned with is not one of assessing whether there are any alternative tools for protecting the victims, such as settlements or State aid (which presuppose the willingness of both parties) but rather one of assessing the adequacy of the Italian procedural system (and more generally Italian justice) in dealing with the *mass torts*. There is also the consideration that the lack of an institution such as the *class action* makes a settlement far more difficult and uncertain, owing to the lesser contractual force of the group of injured parties.

Another argument often used in the *reply declaration* is that, after the Seveso case, extensive reforms were made in the Italian civil procedure, "*in which the object sought is to speed up the proceedings*".

We note that Professor Gambaro himself, with extreme prudence, states that it was the object sought, and does not even venture to affirm that the object has actually been achieved.

The statistics given on page 4 of the *reply affidavit* appear to be excessively optimistic, particularly with regard to the length of the proceedings in the first instance, which have clearly been obtained considering the proceedings heard by the Justice of Peace (which are considerably shorter as the Justice of Peace is only competent to hear cases of a lower value, i.e. up to € 2,582.00).

The figures supplied by the Ministry of Justice, Directorate General for Statistics, show a far more depressing picture: only proceedings in the first instance heard by the Justice of Peace would last around 1 year, while those filed before the Court lasted for an average of 860 days

over the period 7.1.02-06.30.03 and 888 days over the period 7.1.03-6.30.04, i.e. at least double the figures provided in the reply declaration.

Professor Gambaro also hastened to state that "*naturally, the length of complex proceedings that require technical advice is normally longer than the average*".

We agree fully with this statement, pointing out that the case in question is actually one in which recourse to technical advice is essential and probably several pieces of advice would be given, in view of the varied nature of the rights deduced by the various sub-classes, with the resulting unforeseeable lengthening of the times of the proceedings.

## IV.    More recent case law confirms the difficulty of group actions in Italy: action for compensation against insurance companies

To confirm the belief in the court that the Seveso case currently indicates the limits of the Italian system, it seems useful to mention more recent case law.

In July 2000, the Authority Guaranteeing Competition and the Market established that, in the motor insurance sector, 39 insurance companies had set up a cartel restricting competition, and imposed a fine against them. Following that, numerous insured persons, assuming a cause-effect relationship between an agreement not to compete, on the one hand, and alleged increases in policy costs, on the other hand, as a percentage of the premiums paid generally quantified at 20%, filed claims before the Justices of Peace demanding that insurance companies pay them the aforesaid amounts by way of reimbursement, returns or compensation for losses.

The first judgments totally refused to grant the insured persons authorization to file action for compensation for the loss, on the grounds that "*consumers fall outside the scope of protection of the antitrust rules, which seek to establish a competitive market price in the general interest*

*of the community, and not in the interest of the individual in an individual settlement[10]*".

The Court then started to recognize the consumers' legitimization, at least in abstract form, on the grounds that "*the problem of selecting legitimate persons should be established on specific terms, applying the general rules on tort and causal connection in each individual case and considering that the anti-competitive behavior is suitable for widespread use in the abstract according to the outline of the chain reaction[11]*".

As noted by legal literature, having resolved the problem of legitimization in the abstract, we need to assess the requirements for the specific acceptance of the petition: since the person filing an action to hear another person pronounced liable has to prove the existence of the loss and the causal connection between the conduct attributable to the party liable and the alleged loss.

That fact proves that the individual consumer would have encountered serious obstacles in obtaining a form of compensation: he could not have limited himself to alleging the existence of the cartel among the insurance companies, or prove the increase in tariff based on the assessment of the infringement of the antitrust law contained in administrative orders, as the assessment of the amount of the increase in the insurance tariff is a circumstance that is not proven by the guarantee authority, nor could it replace the lack of proof of the causal connection between the infringement of Article 2 of Law 287/1990 and the increase in tariffs, invoking the well-known fact, in the absence of the requirements of incontestability and certainty.

In short, "*the specific and operational analysis of the Aquileian rule shows a redimensioning, if not the elimination, thereof, if the declamations of liability lead to the specific quantification of the loss*"[12].

These difficulties would also arise in any "mass Italian action", i.e. even if several consumers filed a joint action through the institution of active joint litigation.

---

[10] Court of Cass. March 4, 1999, no. 1811 in *Mass. Foro It.* 1999, 273.

[11] As in the order for the removal of the question to the Combined Sections of the Court of Cassation dated 17 October 2003, no. 15538, *Resp. Civ. e prev.* 2004, 493.

[12] GUARNIERI,. 2004, 499.

As legal literature is keenly aware, "*if the phenomenon of a mass dispute is evoked...we also need to consider that [Italian] civil procedural rules only manage very imperfectly to deal with the complexity of the procedural situations determined by large-scale offences*"[13].

\*\*\*

The above considerations demonstrate that the institution of the *class action* cannot be simply made equivalent to a mode of joint action, almost replaceable by joinder of plaintiffs, but it is a true and proper institution of procedural law that has no equivalent in the Italian system because, on the one hand, it allows a whole class to act as a single party – and not as the sum of various individualities – and on the other hand, it allows pursuing not only collective rights (as could be, in the case at hand, the right to a market that complies with competition rules), but rights held by each of the *class members.*

The structure of the *class action* as the action of the "class-party," which transforms the "quality" (and not only the quantity) of the plaintiffs and of the object of the lawsuit, allows obtaining significant advantages, especially in the proof of the causal link, because it makes it possible to have a collective bearing of the burden of proof, allowing to demonstrate the causality between the damaging conduct and the event, including when it would not be possible to establish with certainty the existence of the causal nexus in reference to each individual.

The higher potential of the *class action* versus individual actions, including enjoinders, have been described in doctrine precisely in reference to cases of multifactorial indemnities for damage to health, in other words, that may arise depending on several causal factors.

In these cases, it is often indispensable to resort to statistical laws in order to establish the causal nexus: this is normally admitted by Cassation as well, at least in the field of civil law (while in the criminal field, the need to acquire a certainty beyond any reasonable doubt prevails, in order to protect the presumption of innocence in favor of the defendant).

---

[13] See *Cartello degli assicuratori e tutele degli assicurati, aspettando le Sezioni Unite, cit.,* 501, which in turn quotes MONATERI, I *mass torts: dalla R.C.. al contratto politico, cit.,* 2003, 19.

However – and now comes into play the different protection that can be obtained by the *class action* – it is not always possible to transfer information concerning statistical laws to the individual case: Frosini[14] (citing Vineis) writes that "*one of the most obvious implications of the causal inference in epidemiology is the conflict between the individual level and the level of the population. If necessary, all epidemiological inferences are derived from the population studies and apply exclusively to the populations. It can be affirmed, therefore, that in a group of persons exposed to asbestos, the risk of contracting lung cancer is higher than in a group of people not exposed, but this affirmation does not necessarily have value for the individual persons.*"

This means that if a statistical law can be valid when the court Judges the rights of a very large sample of individuals, such law may lose all its inductive meaning when the cases brought to court are less numerous, or even in connection with the petitions filed by individual persons.

The risk of an action in Italy would also be in the more serious difficulty of giving access to statistical laws in the proof of the causal nexus, given that a possible joinder of cases – and this would be the best case scenario – would not allow claiming in court the petitions of an entire class of individuals, but once again the petitions of a group of persons without any capacity to represent the entire class of persons damaged for various reasons by the effect of Vioxx.

This fundamental structural difference is accompanied by the introduction of the institution of *class action* in a legal system that is very different from our own, characterized by "*a pro plaintiff approach, tending to favor the plaintiff, quite typical for the American system, and much less for continental systems, where the process is structured not so much pro plaintiff but especially pro defendant*"[15].

In this context, we must also remember once again the particular role of the American law firms in the capacity to organize and sustain, including economically, thanks to their corporate structure, the group of the plaintiffs who act in the form of *class action*.

In this regard, Prof. Gambaro indicates that in Italy as well, nothing prohibits a law firm to get fitted to coordinate complex lawsuits, and in which in addition associated law firms would

---

[14] B.V. FROSINI, *Le prove statistiche nel processo civile e nel processo penale [Statistical proof in the civil lawsuit and in the criminal lawsuit]*, Milan, 2002, 148.
[15] MONATERI, I *mass torts: dalla R.C.. al contratto politico, cit.*, 2003, 16

already participate, *"even though their preferred sector of activity is the commercial one"* (*reply declaration*, p. 7): indeed, there is a shortage of large law firms dedicated to consumer protection, also because the Italian tariff system would not allow them to prosper or to survive.

In this regard as well, it seems sufficient to remember that the great difference between the American firms and the Italian firms does not stem only from their organization, but precisely from the corporate structure of the American firm, with its indubitable implication in terms of incentives for access to justice through the "leverage" of the *contingency fee,* both on winning and on settlements.

As an example, in Italy it is normal for a lawyer to request an expense fund even before starting a case, while in America it is often the law firm that is willing to sustain economically the plaintiff, provided they consent to start a case which seems profitable, due to the sheer economic advantage that can be obtained by the law firm as well, thanks to the *contingent fees[16]* agreements.

In addition, there is now consolidated experience of the American law firms in managing such large disputes, both in the fields of damage to health, commonly less studied by the major Italian firms which, as recognized by Professor Gambaro, specialize especially in commercial matters, and due to the higher profit margins that this field produces.

Other European law systems have already tried to overcome the limits arising from the prohibition of the quota late agreement: in England, it has been admitted now for a certain period of time to have a *contingent fee* agreement, in Germany, the question is being debated, only in Italy there is still a lot of resistance to conceive the corporate character of the legal profession, so that there is still the legislative obligation to request the minimum tariff.

## V. The knowledge in Italy of the absence of specialized procedural instruments to manage mass torts

The fact that the Italian procedural system is not appropriate to manage mass torts is not the isolated opinion of the undersigned, but results *ipso facto* from the recent attempts to introduce in Italy procedural institutions copied on the model of the American *class action*, motivated precisely

---

[16] On this point, we naturally refer to the considerations already made in the previous affidavit: in par. b.4: The roles of the lawyer in the class action.

by the insufficiency – unanimously recognized – of institutions currently available to guarantee a convenient and appropriate protection of the so-called serial claims.

An efficient synthesis of the still existing and severe limitations of the Italian system is found in the Presentation Speech of Draft Law No. 679 by the initiative of Senator Benvenuto, communicated to the Presidency just a few days ago (on June 26, 2006), in which it is concluded – with hopes for the future, but with resignation concerning the present) – that "*the institutions of the class action and mass conciliation represent two different but concurring aspects of the phenomenon of the access to justice, because they pursue the same objective of creating new spaces for collective rights and interests otherwise destined to remain without protection.*" *Furthermore,* it is observed from a comparative viewpoint, that "*in recent years, other countries of the European Union introduced the rules on the class action to facilitate collective cases. In order: Netherlands (1994); Portugal (1995); England and Wales (2000); Spain (2001); Sweden (2002)*", while still noting that "*for now, these rules have remained inefficient because they require from each consumer to send a written mandate to the associations and prohibited more efficient forms of publicity of the petition.*"

In other words, even the European countries which, while having an advantage versus Italy, introduced for several years functional procedural institutions to manage mass torts, have not obtained results comparable to the level of efficiency that became possible in the American *class action.*

The situation seems even more severe in Italy, where the possibility to introduce a class procedural instrument in the specific field of consumer protection is still in discussion in Parliament, which engages in the evaluation of a draft law that seems quite far from being able to achieve the speed and cost containment it intended.

In the Italian style *class action* referred to in the draft law No. 679, it is indicated, indeed, that there is standing to sue on behalf of consumer associations (or other entities contained in the respective lists), in order to file petitions for

indemnity for damage and for the refund of amounts owed directly to individual consumers or users as a consequence of illegal acts containing several offenses.

However, the protection that can be obtained would normally be a form of generic sentencing.

Indeed, the draft law indicates that the Judge is limited to determining the criteria based on which it is necessary to establish the amount payable to the individual consumers and users and the modes and terms of payment of the amount (and only if the outcome of the lawsuit allows, otherwise the determination must be made in a conciliation proceeding which the parties have the charge of introducing within 60 days from the sentence).

After establishing criteria for the determination of the indemnity by the Judge, it would be necessary to open a new phase, by the initiative of the individual consumers of users that may benefit from the sentence in their favor only as written proof in order to obtain a payment injunction.

The individual consumer, in order to obtain concrete indemnity, would therefore have to go to court again.

The only advantage arising from the "class action" would consist, as is easy to understand, of the possibility of using a simplified proceeding (the injunction proceeding, from which in Italy it is possible, in the presence of certain requisites, to obtain a sentence based on summary proceedings) which is still always liable to becoming a full proceeding, if the party enjoined to pay files an objection.

The decision of the Judge or the possible settlement agreement of the lawsuit, in addition would not be efficient in connection with consumers or users who did not participate in the lawsuit or the settlement. Consequently, in the Italian experiment as well, there would be a repetition of the inconveniencies arising from the need for a document of active adhesion of the individual parties (concerning which, see *infra*, paragraph. VII).

Beyond the limits that still exist in the draft law, there is the fact that the institution of class action has not yet been experimented with in Italy and the need, noticed by the legislator, to introduce it, demonstrates the limits intrinsic to the procedure institutions currently available.

Not only the Italian legislator but also the Italian Judge is quite aware of the inefficiency of the national institutions in managing serial petitions (on this point, it seems really difficult to argue otherwise: here it is necessary to mention the difficulty of the study entrusted to Professor Gambaro, to find arguments to affirm that our procedural system is not so inadequate in the management of *mass tort*).

The United Cassation Sections, in the sentence of July 15, 2005, no. 14698[17] concerning a serial question (related specifically to the calculation of the indemnity payable by the administration for the thirteenth salary) denounced the costly handling of the dispute on the traditional "carbon copy" model, and wished that in the future there would be an increase in the competitiveness of the system through the introduction of representative actions. The Court pointed out that in Italy, even after the decision on a serial controversial matter, as in this case, the interpretation of the rules of the national collective bargaining agreement in matters of administration indemnities and thirteenth salary, it is still necessary to handle the elements of the serial litigation because, beyond the lawsuit that ended with a jurisprudential solution on the de facto or de jure questions common to all the members of the class, the system still contains built in all the other lawsuits (usually extremely numerous) which must continue, and which may give rise to contradictory decisions.

The concern of the Court in the case at hand was especially to denounce the expenditure of cost and energy in the proceedings found in the serial litigation carried out with submission of numerous identical documents.

These denunciations demonstrate, however, that in Italy, the difficulty of organizing the groups of plaintiffs and coordinating them in a united action have not been overcome. This is a limit still present in the system, and to overcome it, it will be necessary to have many changes from the legislative viewpoint and not only – which, even though they can be expected *de jure condendo*, they are still too far away and uncertain to assure efficient protection to the victims in the case at hand.

**VI. The possibility of recognition in Italy of a possible American sentence in the *class action***

---

[17] *Published in Corr. Giur.*, 4/2006, 533, with a note by FAVA, *Class action between procedural efficiency, increased competitiveness, and lower expenses, the examination of a concrete serial proceeding.*

Merck's defense, in the *Corrected Reply Memorandum*, supporting the exception of *forum non conveniences*, maintained that in Italy there would be no recognition of the force of res judicata of possible sentence issued by the American Court in favor of the pharmaceutical company (see page 3). This would imply that the Italian plaintiffs, had they lost in the American *class action*, could have filed a new action before an Italian Court, in order to bring the same claim of compensation for damage already rejected by the United States Judge.

In reality, this scenario must be considered completely unrealistic, as demonstrated by the lack of jurisprudence precedent concerning cases in which Italian citizens filed individually the same claim already heard by an American Court in the form of *class action*.

First of all, it is not impossible that the American sentence will obtain force of res judicata in Italy as well, because the limits to the recognition of the foreign sentence delineated in article 64 L. 218/95 are designed to guarantee the full right of defense, or to assure that the parties have a possibility to fully explain their own defenses.

Given that, in the case at hand, the *class action* in the procedural institution that would allow for the best possibilities of protection to the persons injured by Vioxx (given the difficulties that still remain in Italy in the management of mass tort) the Italian Judges could recognize the sentence rendered in a *class action*, on grounds that it would be a sentence issued after the proceeding that was most appropriate to guarantee proper defense, i.e. precisely in the name of the same principles set forth in article 64 L. 218/95.

In other words, in the case at hand, the recognition of such a sentence in Italy would not be in contradiction with article 24 of the Constitution (according to which all citizens can act in court to protect their rights) but it would be in line with an evolving interpretation of article 111 of the Constitution (which indicates the cannons of due process) since an inefficient lawsuit would not be a fair lawsuit, a principle which the Italian legislator demonstrated to know with the recent draft laws designed to introduce in Italy forms of proceedings similar to the *class action*.

It is true that the lack of precedence does not allow affirming with certainty that in Italy, the ruling in the *class action*, will be recognized as res judicata, but there are arguments in favor of

such possibility and, according to the American Courts, this circumstance would be sufficient to hold back the claims made in a class action including foreign citizens (Cromer Finance Ltd. V. Berger, 205 F.R.D. 113 (SDNY 2001:) in which the Judge stresses that it is necessary to distinguish between the cases in which it is clear or at least practically ruled out, that the foreign court will not recognize the decision, from the cases in which this scenario exists as a mere possibility, and specifies that in Bersch v. Drexel Firestone Inc. 519 F.2d 974 (2d Cir. 1975) – cited by Merck to support its thesis – the Judge could not adopt another decision but that of excluding the foreigners, because he could base himself only on the *affidavits* produced by the defendant.)

In the same sentence, it is sustained that, even though it is true that the negative sentence for the class could not be recognized in Europe, the *class action* could meet the requisite of *superiority*: before the defendant suffered from this possible lack of recognition, indeed, it would be necessary to recognize a series of uncertain events, namely 1) the case must reach sentencing, when it is rather probable that it will be settled; 2) the defendant must win on the merits; 3) a *class member* must file an addition action in the alternative forum, in spite of the absence of quota lite agreements and *class actions* and therefore, encountering a thousand difficulties; 4) it would be necessary to convince the Court to ignore the U.S. sentence; 5) it would be necessary to obtain a positive sentence on the merits.

These observations seem particularly pertinent in connection with the case at hand.

Even ignoring the matter of recognition of the foreign sentence, indeed, for the Italian citizen, it would not be convenient to resort as an individual to the national court following an unfavorable sentence of the United States Judge, at least for two types of reasons.

First of all, due to the *de facto* authority of the precedent formed in America, which would make rather difficult to obtain in Italy a reversal of the decision already rendered by the American Court.

Secondly because, even in the quite improbable hypothesis that the Italian Judge sentences the pharmaceutical company in contradiction with the American sentence, it would be rather difficult for the Italian citizen to obtain the execution of this sentence (and therefore the correct

protection of the rights). This is so because given that the assets of the company are most likely located in the State of its headquarters, i.e., United States, the execution of the sentence should take place before a U.S. Judge, who would hardly be willing to execute the foreign sentence that would go in the opposite sense with a previous U.S. pronouncement in the same matter (In re U.S. Financial Securities Litigation, 69 FRD 24 (SD Cal 1975: the Judge points out that in alternative forums, the possible favorable sentence cannot be executed for absence of assets – since the defendant's headquarters are in America – and therefore the plaintiffs who win abroad should execute the sentence in the United States. Now, a United States Judge who finds himself in the presence of a foreign sentence to be executed, and which is contrary to one previously rendered by an American Judge, would certainly give prevalence to the latter: unless such possible second sentence obtained by a *class member* unsatisfied with the sentence in the *class action* would remain unexecuted and substantially unenforceable).

### VII. *Opt in* and *opt out* is not the same as *class action* and joinder of actions

Another argument adopted in the defense of Merck is the affirmation that simple absence in Italy of a procedural institution similar to the *class action* would not be sufficient to consider the Italian court inadequate to assure real protection.

In this regard, it seems useful to point out that the results that can be achieved with the *class action* are quite different from those that could be obtained with the procedural institutions available in Italy.

In particular, the institution of joinder of plaintiffs, by which commonly in Italy serial claims are filed is the most similar (albeit with significant differences) to the structure of the *class action* based on *opt in,* which, and not randomly, has been abandoned in 1966 in favor of the more efficient *opt out class actions.*

As observed by Kaplan, "*if, now, we consider the class...we see that requiring the individuals affirmatively to request inclusion in the lawsuit would result in freezing out the claims of people - especially small claims held by small people - who for one reason or another, ignorance, timidity, unfamiliarity with business or legal matter, will simply not take the affirmative step. The moral justification for treating such people as null quantities is*

*questionable. For them the class action serves something like the function of an administrative proceeding where scattered individual interests are represented by the Government. In the circumstances delineated in subdivision b.3, it seems fair for the silent to be considered as part of the class. Otherwise the b.3 type would become a class action which was not that at all...[18]".*

These shortcomings would be found especially in the event of joinder of plaintiffs where, in which, not unlike what happens in the *opt in class actions,* the initiative to participate in the case depends on a positive act of will of the person who, in fact, in this determination to participate in the action would be left alone, because he would not be able to even benefit from the incentives that characterize the American system, such as the possibility for the lawyers to publicize the class action filed, and to promote, including from an economic viewpoint, the participation of the largest possible number of persons, thanks to the corporate structure of the American law firms.

In addition, in the joinder of plaintiffs, every client is separable and autonomous, may want to change lawyers, may claim to be represented in particular and impose on the lawyer under penalty of revoking his mandate, his own idea and strategic and defense thesis: potentially, the joinder of plaintiffs is none other than an accidental and temporary sum of actions, and not a true united and coherent coaction.

As an additional confirmation of the unsuitability of the joinder of actions there is the circumstance that many European countries – which were not familiar with the institution of the class action – have introduced in recent years procedural instruments to deal with the claims of many individuals in a much more efficient way.

This effort has been recorded especially in England, with the introduction of the *group litigation*, in Germany with the Musterverfahren, as well as in Italy with the recent draft laws mentioned *above,* (under the circumstances still far away from the levels of efficiency that can be obtained with the American *class action*).

The presence of procedural institutions specialized in the management of *mass torts* has been considered so fundamental to obtain a real form of protection it took a particular meaning in

---

[18] KAPLAN, *Continuing work of the civil committee: 1966 amendments of the Federal Rules of Civil Procedure*, 81 *Harv. L. Rev.* 356, 397 ss. (1967).

the decision on the good grounds of the exception of *forum non conveniens*.

We are referring in particular to the decision of the British *House of Lords* of July 20, 2000, Lubbe v/ Cape Plc, [2000] 1 WLR 1545[19], issued in a case where approximately 3000 plaintiffs, South African citizens, had filed a lawsuit claiming retribution for the damage suffered by exposure to asbestos, bringing into the case a British company operating in South Africa. The exception of forum *non conveniens* raised by the defendants in favor of the South African forum was rejected by the *House of Lords* based on two reasons that appear particularly interesting, given the certain analogy of the case submitted to the British Court with the case at hand:

-        since South African law did not have any valid procedural instruments to manage *mass torts*, in contract with the potential of protection under the British system, where the action was already pending in the form of *group action*;

-        the unavailability in the South African system of free legal assistance and quota lite agreements, all of which were considered factors that would not have allowed the plaintiffs to file the suit with a South African court, and therefore the suspension of the suit filed before the English Judge would have lead to an inadmissible denial of justice.

## VIII. Il *Discovery* procedure

The impossibility of assimilating the institution of the *class action* to a simple instrument of joint action such as the Italian joinder of actions, comes also from the more general characteristics of the American suit in which the institution is viewed from the perspective of the much broader powers recognized to the parties in the research of evidence.

We refer in particular to the *discovery* procedure which allows the parties to collect documents sometimes fundamental for the decision of the case, which they could hardly obtain in Italy.

By saying this, we are not sustaining that any legal system which does not include the *discovery* procedure is a *forum non conveniens* as compared to the American one, but we wish

---

[19]Found on the site: www.publications.parliament.uk/pa/ld/ldjudgmt.htm and annotated by MARENGO, *South African Asbestos and English jurisdiction: forum non conveniens, gratuito patrocinio, group actions*, in *Int'l Lis*, 2002, 73

to stress the particular relevance as similar investigative instrument may have in this case.

As pointed out by the plaintiffs, the pharmaceutical company had conducted a series of tests from which it is possible to draw elements on the damaging effect of the product, the disclosure of which would certainly be relevant in the demonstration of the facts underlying the petition for indemnity.

In Italy, the only procedural instrument to be able to produce in court such documentation, if the adversary refuses to make it available spontaneously, would be the order to exhibit indicated in article 210 of the Code of Civil Procedure, which however, can be issued only in the presence of certain requisites, and is not subject to coactive execution.

In particular, Italian jurisprudence considered that the order to exhibit documents is possible only in the presence of the following requisites: i) absence of severe damage for the party; ii) absence of danger for the party of violation of professional secrecy; iii) offer of evidence of possession of the document by the adversary (Civil Cassation November 11, 1999, 12507, in *Foro It.* 2000, I, 451); iv) specific indications of the fact that is intended to be proven with the document whose exhibition is requested (Civil Cassation September 8, 1999, 9514); v) indispensable character of the document, and therefore absence of any other means to reach the same purpose.

Even admitting that these requisites are met, a possible order to exhibit would not give any certainty of obtaining the documentation requested, because the party may also refuse to comply with the order, in which case the Judge does not have the power to order coactive execution (Civil Cassation August 2, 2002 No. 11617, confirmed by almost unanimous doctrine.

The only negative consequence would be the negative possibility for the Judge to evaluate the lack of compliance with the order to exhibit as "an argument of proof" to the detriment of the defendant, pursuant to article 116, paragraph II of the Code of Civil Procedure but such arguments of proof do not allow the Judge without true evidence to admit a petition, because in the Italian process, they have only an accessory and secondary role[20]

---

[20] The thesis that is still majority in doctrine looks at the arguments of proof as mere instruments of evaluation of the understood *strictu sensu*, in other works, verification of their intrinsic reliability, and therefore, they remain purely subsidiary and additional elements of conviction, unsuitable to motivate by themselves the decision of the Judge in the point of fact. Jurisprudence admits that the argument of proof may in certain cases be a source of conviction, but secondarily to the condition which is actually ambiguous, that it must be part of an ampler evaluation context (see Cassation March 26, 1997, No. 2700). It is however excluded that the procedural behavior of the parties may take on any

On the contrary, the *discovery* procedure allows the party to obtain from the other party material related to any relevant issue to the object of the dispute, (*Rule* 26(b)(1), even if the material so obtained cannot be used as evidence.

In particular *Rule* 34 dictates a particularly favorable principle for the acquisition of documents in the possession of the adversary.

In addition, if the party does not comply spontaneously with the request to produce, there is a possibility to obtain from the Judge an *order*, whose violation entails sanctions that may be varied by the court depending on circumstances, including the possibility for the Judge to consider the fact about which the documentation was requested as proven.

*** 

It seems that we can conclude with a mild provocation *"Well, my dear Pangloss, said Candide to him... did you continue to think that everything in this world happens for the best?"* (Voltaire, *Candide*, chap. XXVIII), once again complaining of the ingrate task of denouncing the shortcomings of our procedural system, which the recent reforms – only procedural[21] – seem too many to have it made worse rather than better.

I declare, knowing about the penalty for false declaration under the laws of the United States of America, that the above is true and correct <u>according to my best knowledge and belief.</u>

Verona, July 14, 2006

(Prof. Atty. Claudio Consolo)

---

importance in the hierarchic sequence as compared to the evidence proper, so as to allow the Judge to use such arguments of proof as a parameter to control the admissibility of the other investigative measures (Cassation March 17, 1997, No. 2329).
[21] Vedi CONSOLO, *Dieci anni e sei riforme processuali visti dal Corriere*, Milan, 2004.



**TRANSPERFECT**
T R A N S L A T I O N S

City of New York, State of New York, County of New York

I, Allison Hahn, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the document titled "Supplementary Affadvit in response to the reply declaration of Professor Gambaro", from Italian into English.

*Allison Hahn*

Allison Hahn

Sworn to before me this
3rd of August, 2006.

*D. Ru...*

Signature, Notary Public

PAUL D. RALSTON
Notary Public, State of New York
No. 01RA6023867
Qualified in Queens County
Commission Expires May 3, 20...

Stamp, Notary Public

ATLANTA
BOSTON
BRUSSELS
CHICAGO
DALLAS
DENVER
FRANKFURT
GENEVA
HONG KONG
HOUSTON
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
STOCKHOLM
TOKYO
WASHINGTON, DC

*Affidavit* integrativo

in replica al *reply declatation* del professor Gambaro in data 12 giugno 2006

## I. Introduzione

Il presente parere viene redatto su richiesta dello studio Kenneth B. Moll & Associates LTD in risposta alle osservazioni formulate dal professor Gambaro nel *reply declaration* in data 12 giugno, nonché ad integrazione del precedente *affidavit* in data 15 maggio 2006, allegato al *"Plaintiffs' Memorandum in Support of Their Opposition to Defendant Merck & Co. Inc's Motion to Dismiss the Foreign Class Action"*, con cui erano stati illustrati alla Corte vari argomenti diretti a dimostrare l'inadeguatezza del sistema processuale italiano a tutelare i cittadini danneggiati dall'assunzione del farmaco Vioxx (in replica alla prima dichiarazione del Prof. Gambaro in data 13 dicembre 2005), per i numerosi limiti che ancora impediscono alla giustizia italiana di far fronte con efficienza alla complessità delle situazioni processuali determinate dagli illeciti a grande scala.

Spiace dover anche in questa sede vestire i panni del Candido di Voltaire che, in fondo, un po'invidiava la capacità del suo amico Pangloss – studioso eccellente - di vedere tutto in positivo; in sincerità, piacerebbe anche allo scrivente, anche per amor di patria come professore proprio di diritto processuale da vent'anni- poter affermare con tanta sicurezza che nel sistema giuridico italiano si siano raggiunti quei numerosi progressi che descrive il professor Gambaro sul fronte della durata dei processi e dell'adeguatezza ed efficienza degli strumenti di tutela processuale, ma purtroppo, nel caso di specie, è doveroso bilanciare, con una dose di realismo, una descrizione che rischia di essere davvero alquanto "dorata".

Se in generale è vero che *adducere inconvenientem non est solvere argumentum*, nel caso di specie pare vero il contrario, perché solo una chiara, anche se grigia, descrizione dei gravissimi (e per più versi in sempre maggiore deterioramento) limiti del sistema processuale italiano - non solo nei confronti degli efficienti processi anglo-americani, ma anche rispetto agli standards europei - può dare un contributo ad una conveniente ed efficiente soluzione al caso che qui ci occupa, sul forum più *"conveniens"* per trattare *fairly* le azioni dei pazienti Vioxx.

## II. Sull'asserita esistenza di strumenti alternativi di tutela: la prova dei fatti

Il professor Gambaro riconosce quello che era stato definito, nel nostro precedente *affidavit*, il primo fondamentale limite del sistema italiano nell'affrontare i *mass torts* ossia l'inesistenza di qualunque istituto processuale paragonabile seriamente alla *class action* americana, che consente – anche grazie al contributo di studi professionali strutturati in modo imprenditoriale - di organizzare il gruppo degli attori, come una "unità attiva", in modo da conseguire risultati di maggior efficienza sul fronte dei costi di lite, dell'adeguatezza dell'attività difensiva e dell'assunzione collettiva dell'onere della prova, col risultato di poter contrastare con maggior forza i convenuti-litiganti abituali, quali i produttori multinazionali.

Si eccepisce, tuttavia, che l'inesistenza di un esatto equivalente alla *class action* americana non determina necessariamente una mancanza di protezione, in quanto vi sarebbero, nel sistema processuale italiano, strumenti alternativi in grado di garantire comunque i medesimi, o analoghi, risultati in termini di tutela, in particolare:

-        l'istituto del litisconsorzio dal lato attivo (art. 103 c.p.c.) che consente ad una pluralità di persone di agire nello stesso processo quando la decisione dipende anche parzialmente dalla soluzione di identiche questioni o quando tra le vertenze sussista una connessione per l'oggetto o per il titolo da cui dipendono;

-        la prassi, sempre più diffusa, di rivolgersi ad un unico studio professionale specializzato che produce degli atti in serie, rigorosamente uguali salvo il nome dell'attore, diretti contro il medesimo convenuto.

Tali osservazioni sono senz'altro corrette sul piano teorico, ma non reggono la prova dei fatti, come si potrà constatare proprio analizzando con attenzione gli stessi casi giurisprudenziali citati dal professor Gambaro per illustrare alla Corte l'asserita (ed apparente) efficienza degli istituti citati.

In particolare la prova dell'efficienza dell'istituto del litisconsorzio attivo per coordinare delle azioni di gruppo, nonostante la precarietà del fatto che molti clienti si affidano fin dall'inizio e a lungo allo stesso studio legale - sarebbe testimoniata, secondo il nostro interlocutore, dalla causa intentata nel 1993 avanti al Tribunale di Roma da persone

affette da malattie contratte per trasfusioni e assunzione di emoderivati infetti. Iniziamo così da esso.

## II.a) Il caso degli emofiliaci

Il professor Gambaro cita il caso per dimostrare come, in quell'occasione, ben 388 cittadini, provenienti da ogni parte d'Italia, siano stati in grado di organizzarsi e di agire congiuntamente contro il Ministero della Sanità per ottenere il risarcimento dei danni sofferti, riuscendo ad ottenere giustizia in tempi relativamente rapidi, visto che la sentenza di primo grado fu emessa già nel 1998, a distanza di circa cinque anni dall'inizio della causa[1], e nonostante la mancanza di un istituto come la *class action* americana.

I puri dati numerici nascondono tuttavia una realtà ben più complessa, che toglie molto valore alla portata esemplificativa del caso citato.

Iniziamo dai tempi processuali: il giudizio ha avuto una lunga "gestazione" *ante causam*: già nel 1989 dei legali vicini alla Fondazione Italiana dell'emofilia e all'Unione Forense per la tutela dei diritti dell'uomo di Roma consigliò a tutti gli emofiliaci italiani (colpiti dal male immunitario in esito all'assunzione di emoderivati infetti) di indirizzare un atto di messa in mora al Ministero della Sanità per formulare una generica richiesta di danni atta ad interrompere il corso della prescrizione.

L'atto di citazione veniva notificato solo 4 anni dopo, nel 1993, alla fine di una complessa opera di coordinamento e preparazione degli atti di causa, che originariamente riguardava 195 attori, tutti emofiliaci contagiati dall'HIV e/o da epatiti, in conseguenza di trasfusioni o assunzione di emoderivati. L'azione si era poi arricchita per l'intervento di un gruppo di soggetti talassemici, contagiati a seguito delle ripetute trasfusioni.

Il giudizio proseguiva quindi con un *iter* processuale lento e travagliato: dopo l'emissione di un'ordinanza con cui il tribunale aveva disposto la separazione del

---

[1] La causa cui si fa riferimento venne instaurata avanti al Tribunale di Roma nel 1993, decisa in primo grado con sentenza del 27 novembre 1998 (edita in *Foro It.*, 1999, I, 314, con nota di U. IZZO) quindi in appello con sentenza del 23 ottobre 2000 (in *Danno e Responsabilità*, 2001, 1067, con commento di IZZO) e in Cassazione con sentenza n. 11609 del 31 maggio 2005 (in *Danno e Responsabilità*, 2005, 909).

giudizio per gruppi omogenei di attori, (ritenendo opportuno distinguere le indistinte posizioni processuali e probatorie degli attori in vista della condanna risarcitoria, che inizialmente non era stata limitata all'*an*) il processo subiva un arresto per il trasferimento di un giudice istruttore assegnatario.

In questo contesto un gruppo di attori, esasperati dai tempi incerti e per nulla rassicuranti del cammino processuale intrapreso, <u>adivano nel maggio 1997 la Corte Europea dei Diritti dell'Uomo, lamentando ex art. 6 CEDU la durata già irragionevole raggiunta da una procedura, che in quel momento appariva ancora lontana dal definire la fase istruttoria.</u>

Nel novembre del 1998 il governo italiano veniva puntualmente condannato per violazione dell'art. 6 della CEDU. Solo in seguito, il giudizio pendente a Roma subiva una repentina accelerazione, "*se in ciò la comunicazione dell'apertura di un procedimento a Strasburgo nei confronti del Ministero di Grazia e Giustizia Italiano abbia giocato un ruolo, lo si può qui solo ipotizzare con buoni margini di verosimiglianza*"[2].

Erano comunque passati già quattro anni, e la difesa attorea, "*timorosa di perdere il fronte comune processuale faticosamente edificato*" dapprima tentò, senza successo, di ottenere la revoca dell'ordinanza di separazione della causa, in seguito mutò la strategia chiedendo che la causa fosse decisa con una sentenza parziale limitata all'*an*, ossia limitata all'accertamento della responsabilità del Ministero, con liquidazione dei danni individualmente subiti da operarsi in separati giudizi.

Solo il conseguente e notevole alleggerimento del carico decisionale ha spinto il Giudice a riunificare la causa che veniva subito ritenuta matura per la decisione.

In particolare, il Tribunale riteneva che la semplice allegazione dei verbali degli accertamenti condotti dalle Commissioni Mediche Ospedaliere ex art. 4 L. 210/92 fosse sufficiente per soddisfare l'onere probatorio attoreo del nesso di causalità tra le trasfusioni o le somministrazioni di emoderivati infetti e il sorgere delle infezioni.

Come notato dai commentatori, "*lo stratagemma, in una controversia così numericamente complessa, può essere considerato un modo particolarmente efficace*

---

[2] IZZO, Commento a Trib. Roma, 27 novembre 1998, in *Danno e Resp.*, 1999, 221

*per alleggerire il compito di utilizzare gli ampi margini di manovre concessi al giudicante nella possibilità di accreditare presunzioni semplici, nella consapevolezza che la questione, in ogni caso, potrebbe essere oggetto di un vaglio più approfondito ove il singolo attore decidesse di rivolgersi ad una corte per la liquidazione del quantum"[3]*.

Il Tribunale di Roma non accoglieva neppure la richiesta di provvisionale di 400 milioni *pro capite*, quantificata dagli attori in base ai risarcimenti riconosciuti per il medesimo titolo in altri Stati dell'UE, rilevando *"l'assenza di ogni e qualunque riferimento ed accertamento rispetto alla concreta entità del risarcimento singolarmente dovuto"*.

In sostanza la vicenda processuale, ben diversamente dagli intenti di chi l'ha citata ad esempio, non fa che confermare ulteriormente le notevoli difficoltà di esperire in Italia, un'azione congiunta che riesca a pervenire, in tempi sostenibili, a delle pronunce efficienti in termini di tutela.

La sentenza di primo grado è stata emessa in tempi relativamente contenuti, ma solo dopo l'intervento della Corte Europea per i Diritti dell'Uomo, e solo grazie alla limitazione della pronuncia ad una condanna generica, che ha consentito di evitare la fase istruttoria, cui è notoriamente riconducibile il dilungarsi dei tempi processuali.

In sostanza, la vicenda processuale in esame non ha certo consentito agli attori di ottenere una tutela paragonabile a quella conseguibile mediante la *class action* americana, ma il ben più limitato risultato di un mero accertamento della responsabilità del Ministero per condotte omissive, con rinvio della fase della concreta liquidazione del danno ad un separato giudizio, in cui incomberà sul singolo attore provare l'entità del pregiudizio concretamente subito e del conseguente risarcimento.

Il meccanismo processuale che si è realizzato nella vicenda in esame, ben lungi dal raggiungere i livelli di efficienza delle *class action*, richiama semmai il più modesto iter processuale individuato nella proposta di legge 3839 che, in tempi recenti, è stato presentato per cercare di introdurre anche in Italia delle forme di azione collettiva.

In tale progetto, si conferisce alle associazioni dei consumatori la legittimazione a proporre non più solo azioni inibitorie, ma anche azioni dirette ad ottenere un

---

[3] IZZO, commento a Corte d'Appello di Roma, 23 ottobre 2000, *Corr. Giur.* 1086.

risarcimento dei danni subiti dagli appartenenti ad una certa categoria, limitando tuttavia la legittimazione dell'associazione ad un'azione di mero accertamento.

Ciò significa che solo all'esito del giudizio collettivo, e quindi solo dopo il passaggio in giudicato della sentenza che accerta la responsabilità (cioè dopo lustri), l'iniziativa può passare ai singoli consumatori appartenenti alla classe, che, per beneficiare degli effetti di una condanna favorevole, dovrebbero agire ad uno ad uno per l'accertamento dei requisiti, in capo al singolo attore, quali in astratto già individuati nel provvedimento collettivo, nonché per la determinazione del *quantum debeatur* in relazione al proprio pregiudizio[4].

L'inefficienza di un simile meccanismo, che in sostanza lascia al singolo attore la parte difficile, nonché quella più onerosa, del giudizio, è già stata illustrata nel precedente *affidavit*. Quel che preme qui sottolineare è che dal caso giurisprudenziale degli emofiliaci non pare desumibile alcuna dimostrazione dell'asserita adeguatezza del sistema processuale italiano a predisporre adeguata tutela per gli illeciti di classe.

Anche l'iniziativa processuale congiunta nel caso di specie non è affatto argomento da cui desumere l'ormai superata difficoltà per gli attori di organizzarsi e di agire congiuntamente in un unico processo, ma rappresentò un'eccezione spiegabile sulla base della particolare coesione che lega i soggetti emofiliaci.

Come acutamente notato dai primi commentatori, "*normalmente le nostre regole processuali (e diciamolo, anche le regole deontologiche della professione forense italiana; si pensi al divieto di pubblicità e al divieto di accapararsi la clientela sollecitando un gruppo di attori potenziali ad essere unitariamente rappresentati in giudizio...) non offrono nessuna ricompensa ai componenti di una classe omogenea di attori che intendano unire processualmente le proprie comuni pretese sostanziali. Il caso in rassegna è, anche sotto questo profilo, un caso speciale: a prescindere dal disastro che li ha interessati, è difficile immaginare un gruppo sociale più*

---

[4] Per approfondimenti si veda CONSOLO, *Fra nuovi riti civili e riscoperta delle class action, alla ricerca di una "giusta" efficienza*, Corr. Giur., 2004, 5, 567.

*originariamente coeso della comunità degli emofiliaci, uniti da un rapporto quotidiano con la loro malattia e con un liquido che per essi è vitale più che per chiunque altro[5]"*

## II. b) Il caso dei consumatori di sigarette:

L'altro strumento che, secondo il Professor Gambaro consentirebbe di addivenire a livelli efficienti di tutela consiste nella prassi, sempre più diffusa, di notificare ad un unico convenuto una serie di atti in serie, rigorosamente uguali salvo il nome dell'attore, in cui più persone chiedono un risarcimento per danni derivanti dal medesimo fatto illecito "con l'esito, tipico delle azioni industriali di massa, di ridurre fortemente i costi di *produzione della lite*" (*reply declaration*, p. 4).

Simile strategia sarebbe stata usata nelle vertenze contro i produttori di sigarette o per il risarcimento del danno derivante dall'aver creduto che il consumo di sigarette *light* fosse meno nocivo del fumo di sigarette normali.

Anche a questo proposito, è lo stesso caso giurisprudenziale portato ad esempio che mostra i limiti dell'argomento: il fatto che molti soggetti abbiano proposto azioni individuali contro le case produttrici di tabacco, sulla base di argomenti giuridici pressoché identici, non toglie che si trattava, comunque, di azioni individuali, ossia di azioni in cui oggetto di allegazione e di prova non era un danno coinvolgente un'intera classe - in cui soccorre, ad alleggerire l'onere probatorio, il ricorso a leggi statistiche – bensì il danno individuale subito da ciascun attore.

Ed infatti, sono molte le pronunce in cui è stato negato il risarcimento ai fumatori, proprio per la ritenuta insufficienza degli elementi offerti a dimostrazione del nesso causale tra esposizione al fumo e manifestazione di patologie tumorali.

Il danno lamentato dai fumatori, per la sua aspecificità (ossia per la sua riconduciblità a molteplici fattori causali diversissimi tra loro) assomiglia molto alle patologie cardiache manifestate dagli assuntori del Vioxx.

Pare dunque interessante notare che, circa il profilo dell'accertamento del nesso causale, in recenti sentenze emesse nelle cause instaurate dai fumatori, i giudici italiani hanno negato il risarcimento ai fumatori sul rilievo che "*la malattia cancerosa è il frutto di*

---

[5] IZZO, Commento a Trib. Roma, 27 novembre 1998, *cit.*, 221, nota 7, ove riferimenti a testi sull'attivismo politico e sulle divisioni interne delle varie comunità emofiliache nazionali.

*una serie di fattori concomitanti, personali ed ambientali, che fanno sì che patologie come quella subita dall'attore possano insorgere anche in soggetti che non hanno mai fumato: ciò comporta che il fumo, da solo, pur costituendo un elevato fattore di rischio di patologie similari, non soddisfa il concetto di "condizione necessaria" richiesto per la configurazione del nesso eziologico di cui all'art. 2043 c.c. "[6]*

In sostanza, si è ritenuto che il solo criterio probabilistico scientifico non sia sufficiente per accertare la riconducibilità della malattia al consumo di tabacco, ma che sia necessario un doppio giudizio: il primo teso a stabilire, secondo un criterio probabilistico, il nesso causale tra fatto dannoso e danno, il secondo, invece, finalizzato ad escludere possibili fattori esterni che rompano tale relazione probabilistica.

Tale metodo bifasico di accertamento è stato delineato dalla Corte d'Appello di Roma che, dopo avere accertato l'elevato grado di probabilità scientifica di dipendenza del tumore di un certo soggetto dal fumo, si è soffermata ad indagare la storia famigliare, lavorativa e residenziale dell'uomo, nonché le caratteristiche molecolari della patologia tumorale, e solo dopo tale particolareggiata analisi, condotta sul singolo soggetto, è arrivata ad escludere la sussistenza di concause incidenti sul vincolo causale tra consumo di tabacco e malattia[7].

Ma la stessa Corte, sugli stessi fatti, oggi ha già cambiato opinione[8], sì che le condanne e le assoluzioni – proprio per la mancanza di azioni collettive – sono incoerenti e "a macchia di leopardo".

In sostanza, anche la giurisprudenza in tema di risarcibilità del danno da fumo conferma l'imprescindibilità, nel sistema italiano, di una puntuale ed individuale dimostrazione del nesso causale, tanto più dettagliata quanto più il danno lamentato sia aspecifico e non riconducibile con sicurezza ad un unico fattore causale.

---

[6] Tribunale di Napoli, Sez. IX, 15 dicembre 2004, n. 12729, in *Danno e Resp.* 2005, 645.

[7] Corte d'Appello di Roma, sez. I, 7 marzo 2005, n. 1015, in *Danno e Resp.* 2005, 641, con commento di V. D'ANTONIO.

[8] Cfr. sentenza Corte d'Appello di Roma, sez. I, n. 2183 depositata in data 15 maggio 2006, in cui - in una causa esattamente identica a quella decisa un anno prima dalla medesima sezione della Corte d'Appello romana con la sopra menzionata sentenza 1015/2005 (anche per quanto riguarda la C.T.U. che del pari aveva affermato l'esistenza del nesso di causalità) - la Corte ha

### III.   Sull'attualità e sulla significatività del caso Seveso

Nel precedente *affidavit* era stato citato a titolo esemplificativo il caso Seveso, per dimostrare come in quell'occasione, i cittadini coinvolti dal disastro ambientale provocato dalla fuoriuscita di diossina fossero riusciti ad ottenere una forma di ristoro solo dopo un attesa di più di vent'anni, e con delle condanne pressoché simboliche (2 milioni di lire a persona) ritenute adeguate in mancanza di una prova specifica dei danni singolarmente subiti da ciascuno.

Il caso era stato indicato proprio per dimostrare la difficoltà dell'ordinamento italiano di riconoscere e risarcire in modo adeguato dei danni collettivi.

La significatività del caso Seveso per comprendere i limiti del diritto italiano nell'affrontare i *mass tort* è stata colta anche da altri autori che si sono occuparti della questione i quali hanno osservato "*nel caso si è riconosciuto una specie di <u>danno morale collettivo, che francamente non esiste nel nostro ordinamento, e sono stati liquidati due milioni pro capite dicendo "…in difetto di qualsiasi prova in ordine a più gravi sofferenze, questa non appare una somma irrisoria</u>*".

La Cassazione, tornando ad occuparsi della questione, ha modificato la motivazione, ma sempre nel senso di limitare e contenere la risarcibilità del danno collettivo, introducendo "*una regola inesistente secondo cui " a fronte di una lesione ambientale, il danno morale si pone come danno-conseguenza di un danno-evento che deve consistere in un danno biologico*".

"*Insomma* – nota la dottrina – *ci troviamo qui in presenza di innovazioni giurisprudenziali, ma di <u>innovazioni fantasiose, le quali aiutano a gestire i mass tort nel senso che arbitrariamente abbattono i danni risarcibili</u>*"[9].

Vero è che in recenti sentenze, la Cassazione si è dimostrata più aperta a riconoscere forme di tutela alle vittime di un danno morale e/o esistenziale, che oramai viene risarcito in sé, anche a prescindere dall'esistenza di un danno biologico e/o patrimoniale, ma sempre purchè il danno venga provato nei suoi elementi costitutivi.

---

nondimeno rigettato l'appello promosso dagli eredi della vittima del fumo e dal Codacons nei confronti dell'Ente Tabacchi Italiani, sulla base di una questione di legittimazione.

[9] Le citazioni sul caso Seveso sono di MONATERI, *I mass torts, dalla R.C. al contratto "politico"*, in *Resp. Civ e Prev.* 2003, 18-19.

Vi sono pure dei casi in cui la giurisprudenza ha ritenuto che, per il risarcimento del danno esistenziale, non fosse necessaria una prova individuale della sofferenza, ritenendo che la prova fosse *in re ipsa*, ma, il caso esemplificativo citato dal professor Gambaro pare molto diverso da quello di specie: si cita, infatti il caso di un bambino nato con una lesione irreversibile dovuta ad una errata manovra di estrazione del feto alla nascita, in cui la Corte aveva ritenuto che *"il danno di vedere quotidianamente il proprio figlio diverso dagli altri per la menomazione che lo affigge è in re ipsa e non necessita di specifici elementi probatori"*.

Pare invece necessario tenere ben distinti i casi in cui il Giudice sia chiamato a pronunciarsi su un risarcimento di un danno individualmente subito, dai casi di *mass tort*.

E' proprio negli illeciti di massa che si è potuta constatare la tendenza dei giudici italiani a ridurre il risarcimento dovuto, o ad esigere dei più stringenti presupposti per il suo riconoscimento, probabilmente per esigenze di carattere economico, visti gli effetti che potrebbero verificarsi in caso di una proposizione "a valanga" di cause risarcitorie.

In sostanza è come se vi fosse una preoccupazione politica di fondo secondo cui il Giudice, per evitare di frustrare ogni aspettativa risarcitoria, preferisce garantire un risarcimento minimo per tutti, o un risarcimento solo a chi sia veramente in grado di provare, ogni ragionevole dubbio, il danno subito.

Tale è anche la tendenza che si è notata nelle cause intentate contro i produttori di tabacco di cui sopra, in cui non si sono ritenute sufficienti delle leggi statistiche per l'accertamento del nesso di causalità tra condotta e danno, ma i Giudici hanno ritenuto necessario indagare la vita e le abitudini di ogni singola vittima, nonché procedere a costose ed elaborate consulenze tecniche, cambiando, poi, anche presso la stessa Corte (come quella di Roma) gli stesi canoni-giuda giuridici del giudizio.

Non diversamente è accaduto nel caso Seveso, in cui venne liquidato un danno morale collettivo simbolico, lasciando trasparire l'idea che un più adeguato risarcimento del danno morale- esistenziale, sarebbe stato possibile solo a seguito di una prova individuale dei danni morali ed esistenziali da ciascuno subiti, ancora più difficile data la natura all'evidenza più sfuggente del danno.

In sostanza il prof. Gambaro, pur dando atto di un'evoluzione giurisprudenziale sempre più tesa a riconoscere il risarcimento del danno esistenziale, non cala il problema nello specifico ambito dei *mass torts*, e delle indubbie implicazioni che l'illecito di massa può comportare sull'effettività di tutela conseguibile nell'ordinamento italiano.

Prova ne è che non viene citato un solo caso di illecito di massa in cui i singoli soggetti siano stati in grado di conseguire una adeguata e non meramente simbolica forma di tutela con un'azione congiunta, neppure per danni alla salute.

In questo senso il caso Seveso conserva tutta la sua attualità, perché dimostra la difficoltà dell'ordinamento italiano nel gestire gli illeciti di massa.

Né tale significatività pare sminuita dall'osservazione che, quando i 90 abitanti di Seveso iniziarono la causa civile, circa 7.000 pratiche si erano già chiuse con transazioni e la causa civile riguardava quindi solo coloro che non erano riusciti o non avevano inteso pervenire ad una transazione con il danneggiante.

Il problema che qui ci occupa, infatti, non è valutare se vi siano strumenti alternativi per tutelare le vittime, quali transazioni o aiuti dallo Stato (che peraltro presuppongono la disponibilità di entrambe le parti) bensì valutare l'adeguatezza del sistema processuale italiano (e più in generale della giustizia italiana) ad affrontare i *mass torts*. A ciò si aggiunga la considerazione che la mancanza di un istituto come la *class action* rende ben più difficile ed incerto anche il percorso transattivo, per la minor forza contrattuale del gruppo dei danneggiati.

Altro argomento speso nel *reply declaration* è che dopo il caso Seveso, sono entrate in vigore estese riforme della procedura civile italiana, *"in cui lo scopo perseguito è quello della accelerazione dei processi"*.

Notiamo che lo stesso professor Gambaro, con estrema prudenza, precisa che si trattava di scopo perseguito, e non si avventura neppure nell'affermazione che lo scopo sarebbe stato effettivamente raggiunto.

I dati statistici forniti a pag. 4 del *reply affidavit* paiono infatti eccessivamente ottimistici, soprattutto per quanto concerne la durata dei processi di primo grado, che evidentemente è stata ricavata considerando anche i procedimenti instaurati avanti al

Giudice di Pace (di durata notevolmente inferiore essendo la competenza del Giudice di Pace limitata alle cause di valore inferiore, ossia fino a 2.582,00 euro).

I dati forniti dal Ministero della Giustizia, Direzione Generale di Statistica, mostrano un quadro ben più sconsolante: solo i procedimenti in primo grado avanti al Giudice di Pace avrebbero una durata di circa 1 anno, mentre per quelli instaurati avanti al Tribunale si è registrata una durata media di 860 giorni nel periodo 1.7.02-30.06.03 e di 888 giorni nel periodo 1.7.03-30.6.04, ossia almeno il doppio dei dati indicati nella dichiarazione cui si risponde.

Lo stesso professor Gambaro, del resto, si è affrettato a precisare che "*naturalmente la durata di processi complessi che richiedono consulenze tecniche è normalmente più lunga della media*".

Ci associamo in pieno a tale affermazione, con la precisazione che la causa di specie è appunto una di quelle in cui il ricorso alla consulenza tecnica sarebbe indispensabile, anzi verrebbero probabilmente disposte più consulenze, attesa la natura eterogenea dei diritti dedotti dalle varie sottoclassi, con conseguente allungamento, davvero imprevedibile, dei tempi processuali.


**IV.   Un caso giurisprudenziale, più recente, che conferma la difficoltà delle azioni di gruppo in Italia: l'azione risarcitoria contro le assicurazioni**

Per confermare nella Corte il convincimento che il caso Seveso rappresenti con attualità i limiti dell'ordinamento italiano, pare utile nondimeno citare un caso giurisprudenziale più recente.

Nel luglio del 2000 l'Autorità Garante della Concorrenza e del Mercato accertò che nel settore dell'assicurazione automobilistica 39 compagnie di assicurazione avevano posto in essere tra loro un cartello restrittivo della concorrenza, ed irrogò loro una sanzione pecuniaria. A seguito di ciò, numerosi assicurati, avendo ipotizzato una relazione di causa-effetto tra intesa anticoncorrenziale, da un lato, e pretesi aumenti del costo della polizza, dall'altro, in una misura percentuale dei premi versati in genere quantificata del 20%, esperirono avanti ai Giudici di Pace domande di condanna delle compagnie di

assicurazione alla corresponsione a loro favore dei suddetti importi a titolo di rimborso, o restituzione o risarcimento del danno.

Le prime sentenze negarono del tutto la legittimazione ad agire degli assicurati per il risarcimento del danno, sul rilievo che "*i consumatori sono fuori dall'ambito proprio di protezione della norma antitrust, che mira alla formazione di un prezzo concorrenziale di mercato quale interesse generale della comunità, e non come interesse del singolo nella singola transazione[10]*"

Successivamente la Corte iniziò a riconoscere, almeno astrattamente, legittimazione ai consumatori, sul rilevo che "*il problema della selezione dei soggetti legittimati deve essere impostato in termini concreti, facendo applicazione caso per caso delle norme generali in materia di illecito e nesso di causalità e considerando che il comportamento anticoncorrenziale è astrattamente idoneo a propagarsi secondo lo schema della reazione a catena[11]*"

Come ha notato la dottrina, risolto, così, in astratto il problema della legittimazione, occorre vagliare i presupposti per l'accoglimento in concreto della domanda: visto che chi agisce in giudizio per sentir proclamare una responsabilità altrui deve dimostrare l'esistenza del danno ed il nesso di causalità tra la condotta ascrivibile al responsabile e l'asserito pregiudizio.

E tale verifica dimostra come il singolo consumatore incontrerebbe seri ostacoli per ottenere una forma di risarcimento: non potrebbe infatti limitarsi ad allegare l'esistenza del cartello tra le imprese assicuratrici, né provare il rincaro della tariffa sulla base dell'accertamento della violazione della legge antitrust contenuta in provvedimenti amministrativi, in quanto l'accertamento dell'entità del rincaro della tariffa assicurativa è circostanza non provata dall'autorità garante, né potrebbe supplire alla carenza di prova del nesso causale tra violazione dell'art. 2 L. 287/1990 e rincaro delle tariffe, invocando fatto notorio, difettandone i requisiti dell'incontestabilità e dell'indubitabilità.

---

[10] Cass. 4 marzo 1999, n. 1811 in *Mass. Foro It.* 1999, 273.
[11] Così nell'ordinanza di rimessione della questione alle Sezioni Unite della Cassazione in data 17 ottobre 2003, n. 15538, *Resp. Civ. e prev.* 2004, 493.

In sostanza, *"l'analisi concreta e operazionale della regola aquiliana mostra un ridimensionamento, se non addirittura un azzeramento della stessa, se dalle declamazioni di responsabilità si passa alla quantificazione concreta del danno"*[12].

Tali difficoltà si riverbererebbero anche in un'eventuale "azione di massa all'italiana", ossia anche nel caso in cui più consumatori proponessero un'azione congiunta attraverso l'istituto del litisconsorzio attivo.

Come acutamente notato dalla dottrina, infatti, *"se si evoca il fenomeno del contenzioso di massa...occorre anche considerare che le regole processuali civili [italiane] non riescono a far fronte se non molto imperfettamente alla complessità delle situazioni processuali determinate dagli illeciti a grande scala"*[13].

***

Le considerazioni sovra esposte dimostrano come l'istituto della *class action* non possa essere equiparato semplicemente ad una modalità di azione congiunta, quasi fungibile con il litisconsorzio attivo, ma sia un vero e proprio istituto di diritto processuale che non trova equivalenti nell'ordinamento italiano, in quanto, da un lato, consente ad un'intera classe di agire come una sola parte - e non come sommatoria di distinte individualità - dall'altro lato consente di perseguire non semplicemente diritti collettivi (come potrebbe essere, nel caso di specie, il diritto ad un mercato rispettoso delle regole concorrenziali) bensì diritti facenti capo a ciascuno dei *class members*.

La struttura della *class action* come azione della "classe-parte", che trasforma la "qualità" (e non solo la quantità) degli attori e dello stesso oggetto del processo, consente di ottenere notevoli vantaggi in particolare sul fronte della prova del nesso causale, in quanto rende possibile un'assunzione collettiva dell'onere probatorio, consentendo di dimostrare la causalità tra condotta dannosa ed evento anche in quei casi in cui non sarebbe possibile stabilire con certezza la sussistenza del nesso causale con riferimento al singolo individuo.

---

[12] GUARNIERI, *Cartello degli assicuratori e tutele degli assicurati: aspettando le Sezioni Unite, in Resp. Civ. e Prev.* 2004, 499.

[13] Così GUARNIERI, *Cartello degli assicuratori, cit.*, 501, il quale a sua volta cita le parole di MONATERI, I *mass torts: dalla R.C.. al contratto politico, cit.*, 2003, 19.

La maggiori potenzialità della *class action* rispetto alle azioni individuali, anche litisconsortili sono state colte dalla dottrina proprio con riferimento ai casi di risarcimento per danni alla salute multifattoriali, ossia che possono sorgere in dipendenza da diversi fattori causali.

In questi casi è spesso indispensabile ricorrere a leggi statistiche per accertare il nesso causale: ciò viene normalmente ammesso anche dalla Cassazione, almeno nel campo del diritto civile (mentre nel campo penale prevale la necessità di acquisire la certezza oltre ogni ragionevole dubbio, per tutelare la presunzione di innocenza a favore dell'indagato).

Tuttavia – e qui viene in gioco la diversa tutela con seguibile con la *class action* – non sempre è possibile trasferire informazioni concernenti leggi statistiche al caso individuale: Scrive Frosini[14] (citando Vineis) che "*una delle implicazioni più ovvie dell'inferenza causale in epidemiologia è il conflitto tra il livello individuale e il livello di popolazione. A rigore tutte le inferenza epidemiologiche sono derivate da studi di popolazione e sono applicabili esclusivamente alle popolazioni. Si può affermare, cioè, che in un gruppo di esposti all'amianto il rischio di contrarre il cancro al polmone è superiore rispetto a un gruppo di non esposti, senza che quest'affermazione abbia necessariamente valore per i singoli individui*".

Ciò significa che se una legge statistica può essere valida quando vengano dedotti in giudizio i diritti di un campione molto grande di individui, tale legge può perdere tutto il suo significato induttivo quando i casi sottoposti a giudizio sono meno numerosi, o addirittura, con riferimento alle domande svolte dai singoli individui.

Il rischio di un'azione in Italia consisterebbe dunque anche nella maggiore difficoltà di dare accesso a leggi statistiche nella prova del nesso casuale, visto che un eventuale litisconsorzio - e sarebbe già la migliore delle ipotesi – non consentirebbe di dedurre in giudizio le pretese di un'intera classe di individui, ma ancora una volta le domande di un gruppo di persone senza alcuna capacità rappresentativa nei confronti dell'intera classe dei soggetti lesi a vario titolo per effetto del Vioxx.

---

[14] B.V. FROSINI, *Le prove statistiche nel processo civile e nel processo penale*, Milano, 2002, 148.

A questa fondamentale differenza strutturale si accompagna l'inserimento dell'istituto della *class action* in un ordinamento giuridico molto diverso dal nostro, caratterizzato da "*un atteggiamento pro plaintiff, cioè a favore dell'attore, molto tipico del sistema americano, e molto meno dei sistemi continentali, dove il processo è strutturato non tanto pro plaintiff, ma soprattutto pro convenuto*"[15].

In questo contesto merita ricordare ancora un volta anche il particolare ruolo degli studi legali americani nella capacità di organizzare e sostenere anche economicamente, grazie alla loro struttura imprenditoriale, il gruppo degli attori che agiscono in forma di *class action*.

Il Prof. Gambaro rileva in proposito che, anche in Italia, nulla vieta ad uno studio legale di attrezzarsi per coordinare litigi complessi e che anzi si starebbero già diffondendo studi associati, "*anche se il loro settore preferito di attività è quello commerciale*" (*reply declaration*, p. 7): mancano infatti grandi studi dediti alla tutela dei consumatori, anche perché il sistema tariffario italiano non consentirebbe loro né di prosperare, né di sopravvivere.

Anche a tale proposito pare sufficiente ricordare che la grande differenza tra gli studi americani e quelli italiani non dipende solo dall'organizzazione, ma appunto dalla struttura imprenditoriale dello studio americano, con le sue indubbie implicazioni in termini di incentivo all'accesso alla giustizia, attraverso la "leva" del *contingency fee* sia sulle vittorie sia sulle transazioni.

A titolo esemplificativo, in Italia è normale che un avvocato chieda un fondo spese ancora prima di iniziare una causa, in America spesso è lo studio legale che è disposto a sostenere economicamente gli attori purchè acconsentano ad iniziare una causa che si profila profittevole, e ciò per l'indubbio vantaggio economico ricavabile anche dallo studio legale grazie agli accordi di *contingent fees*[16].

A ciò si unisca l'esperienza ormai consolidata degli studi americani a gestire contenziosi di così grandi dimensioni, anche in ambiti come quello dei danni alla salute, comunemente meno approfonditi dagli studi italiani maggiori, che, come riconosciuto

---

[15] MONATERI, I *mass torts: dalla R.C.. al contratto politico*, cit., 2003, 16

[16] Sul punto si richiamano naturalmente le considerazioni già svolte nel precedente *affidavit :* in particolare par. b.4: il ruolo dell'avvocato nelle *class action*.

dal professor Gambaro, sono specializzati soprattutto in materia commerciale, anche per i maggiori margini di profitto che tale ambito consente.

Altri ordinamenti europei hanno già cercato di superare i limiti derivanti dal divieto del patto di quota lite: in Inghilterra è ammesso ormai da qualche tempo il patto di *contingent fees*, in Germania si sta dibattendo sulla questione, solo in Italia vi sono ancora molte resistenze a concepire il carattere imprenditoriale della professione legale, tanto che permane ancora l'obbligo legislativo di chiedere il minimo tariffario.

## V. La consapevolezza, in Italia, della mancanza di una strumentazione processualistica specialistica per la gestione degli illeciti di massa

Che il sistema processuale italiano non sia adeguato alla gestione degli illeciti di massa non è opinione isolata di chi scrive, ma risulta *ipso facto* dai recenti tentativi di introdurre in Italia degli istituti processuali sul modello della *class action* americana, motivati proprio dall'insufficienza – unanimemente riconosciuta – degli istituti attualmente disponibili a garantire una tutela conveniente ed adeguata delle cd. pretese seriali.

Un'efficace sintesi dei tuttora non superati e gravi limiti del sistema italiano si ricavano nel discorso di presentazione del Disegno di Legge n. 679 d'iniziativa del senatore Benvenuto, comunicato alla Presidenza solo pochi giorni fa: (in data 26 giugno 2006), in cui si conclude - speranzosamente per il futuro, ma rassegnatamente circa il presente) - che "*gli istituti della class action e della conciliazione di massa rappresentano due aspetti diversi ma concorrenti del fenomeno di accesso alla giustizia, in quanto perseguono il medesimo obiettivo di creare nuovi spazi per diritti ed interessi collettivi diversamente destinati a restare privi di tutela*". Ancora si osserva, sul piano comparativistico che "*negli ultimi anni, altri paesi dell'Unione Europea hanno introdotto norme sulla class action per facilitare le cause collettive. In ordine: Paesi Bassi (1994); Portogallo (1995); Inghilterra e Galles (2000); Spagna (2001); Svezia (2002)*", dando tuttavia atto che "*per il momento queste norme sono rimaste poco efficaci, in quanto richiedevano a ciascun consumatore l'invio di un mandato scritto alle associazioni e vietavano forme più efficaci di pubblicizzazione del ricorso*".

In altri termini, anche i paesi Europei che, avvantaggiandosi rispetto all'Italia, hanno introdotto già da alcuni anni istituti processuali funzionali alla gestione degli illeciti di

massa, non hanno ottenuto risultati comparabili con il livello di efficienza resa possibile dalla *class action* americana.

La situazione sembra ancora più grave in Italia, in cui la possibilità di introdurre una strumentazione processuale di classe nello specifico ambito della tutela dei consumatori è ancora al vaglio del Parlamento, impegnato nella valutazione di una proposta di legge che appare peraltro ben lontana dal poter realizzare quelle istanze di rapidità e di contenimento dei costi che l'hanno accompagnata negli intenti.

Nella *class action* all'italiana di cui al disegno di legge n. 679, si prevede, è vero, una legittimazione ad agire in capo alle associazioni dei consumatori (o comunque ad altri organismi inseriti in appositi elenchi) al fine di proporre domande di risarcimento dei danni e di restituzione di somme dovute direttamente ai singoli consumatori o utenti in conseguenza di atti illeciti plurioffensivi.

La tutela conseguibile, tuttavia, sarebbe normalmente una forma di condanna generica.

Il disegno di legge, infatti, prevede che il Giudice si limiti a determinare i criteri in base ai quali deve essere fissata la misura dell'importo da liquidare in favore dei singoli consumatori e utenti e i modi e termini di erogazione dell'importo (e solo se le risultanze del processo lo consentano, altrimenti tale determinazione dovrà essere effettuata nell'ambito di un procedimento di conciliazione che parti avrebbero l'onere di instaurare entro 60 giorni dalla sentenza di condanna).

Dopo la fissazione dei criteri per la determinazione del risarcimento ad opera del Giudice, dovrebbe aprirsi una nuova fase, ad iniziativa dei singoli consumatori o utenti, che potrebbero giovarsi della sentenza di condanna solo come prova scritta al fine di ottenere la pronuncia di un'ingiunzione di pagamento.

Il singolo consumatore, al fine di ottenere un concreto risarcimento, dovrebbe quindi adire nuovamente la giustizia.

L'unico vantaggio derivante dall' "azione di classe" consisterebbe, par di capire, nella possibilità di avvalersi di un procedimento semplificato (il procedimento d'ingiunzione, con cui in Italia è possibile, in presenza di determinati requisiti, ottenere un provvedimento di condanna sulla base di una cognizione sommaria) che nondimeno è

sempre suscettibile di convertirsi in un procedimento a cognizione piena, nel caso in cui il soggetto cui viene ingiunto il pagamento notifichi un'opposizione.

La pronuncia del Giudice o l'eventuale accordo di conciliazione della lite, inoltre, non avrebbe efficacia nei confronti dei consumatori o utenti che non fossero intervenuti nel giudizio o nell'eventuale conciliazione. Si riproporrebbero anche nell'esperimento italiano, quindi, gli inconvenienti derivanti dalla necessità di un atto di adesione attiva del singolo soggetto (su cui vedi *infra*, par. VII).

Al di là di limiti ancora presenti nel progetto di legge, sta di fatto che l'istituto di un'azione di classe, in Italia, non è ancora stato sperimentato, e la necessità, avvertita dal legislatore, di una sua introduzione, dimostra i limiti immanenti negli istituti processuali attualmente disponibili.

Non solo il legislatore, ma anche il Giudice italiano è ben consapevole dell'inefficienza degli istituti nazionali nella gestione delle domande seriali (sul punto pare davvero difficile argomentare in contrario: in questo si deve dar atto della difficoltà dello studio affidato al Professor Gambaro, di trovare argomenti per affermare che il nostro sistema processuale non è così inadeguato nella gestione dei *mass tort*).

Le Sezioni Unite della Cassazione, nella sentenza 15 luglio 2005, n. 14698[17] relativa ad una questione seriale (afferente, nello specifico, alla conteggiabilità dell'indennità di amministrazione ai fini della tredicesima mensilità) ha denunciato la costosa gestione del contenzioso sul tradizionale sul modello "a carta copiativa" ed ha auspicato che in futuro si possa aumentare la competitività del sistema attraverso l'introduzione di azioni rappresentative. La Corte ha rilevato come in Italia, anche dopo l'emissione di una pronuncia su una questione controversa seriale (come, nell'ipotesi, sull'interpretazione delle norme del Contratto Collettivo Nazionale dei Lavoratori in materia di indennità di amministrazione e tredicesima) rimangono da gestire le appendici del contenzioso seriale, perché, al di là del giudizio che si è chiuso con una soluzione giurisprudenziale sulla questione di fatto o di diritto comune a tutti i membri della classe, restano incardinati nel sistema tutti gli altri giudizi (solitamente numerosissimi) che devono proseguire e che talvolta possono dare luogo a pronunce contrastanti.

---

[17] Pubblicata in *Corr. Giur.*, 4/2006, 533, con nota di FAVA, *Class action tra efficientismo processuale, aumento di competitività e risparmio di spesa: l'esame di un contenzioso seriale concreto.*

La preoccupazione della Corte, nel caso di specie, era rivolta in particolare a denunciare il dispendio di costi e di energie processuali che di verifica nel contenzioso seriale realizzato mediante la proposizione di numerosi atti identici.

Tali denunce dimostrano, tuttavia, come non siano affatto superate, in Italia, le difficoltà di organizzare i gruppi di attori e di coordinarli in un'azione unitaria. Si tratta di un limite ancora presente nel sistema, per il cui superamento saranno necessari numerosi cambiamenti - sul fronte legislativo e non solo – che, pur auspicabili *de iure condendo*, sono ancora troppo lontani ed incerti per poter assicurare una efficace tutela alle vittime del caso di specie.

## VI. Sulla possibilità di riconoscimento, in Italia, dell'eventuale sentenza americana sulla *class action*

La difesa di Merck, nel *Corrected Reply Memorandum*, a sostegno della eccezione di *forum non conveniens* ha sostenuto che in Italia non verrebbe riconosciuta efficacia di giudicato all'eventuale sentenza che fosse emessa dalla Corte americana a favore della casa farmaceutica (cfr. pag. 3). Ciò implicherebbe che gli attori italiani, ove fossero soccombenti nella *class action* americana, potrebbero iniziare una nuova azione innanzi ad un Tribunale italiano, per dedurre la medesima pretesa di risarcimento dei danni già rigettata dal giudice statunitense.

In realtà tale ipotesi deve ritenersi del tutto irrealistica, come dimostra la mancanza di precedenti giurisprudenziali relativi a casi in cui dei cittadini italiani abbiano dedotto individualmente in causa le stesse pretese già azionate avanti ad una Corte americana in forma di *class action*.

Innanzitutto non è affatto scontato che la sentenza americana non possa ottenere anche in Italia efficacia di giudicato, e ciò in quanto i limiti al riconoscimento della sentenza straniera delineati dall'art. 64 della L. 218/95 sono diretti a garantire il pieno diritto di difesa, ossia ad assicurare che le parti abbiano la possibilità di esplicare appieno le proprie istanze difensive.

Posto che, nel caso di specie, la *class action* è l'istituto processuale che consentirebbe le maggiori possibilità di tutela ai soggetti lesi dal Vioxx (stanti le difficoltà che ancora permangono in Italia nella gestione degli illeciti di massa), i Giudici italiani potrebbero

riconoscere la sentenza resa su una *class action*, sul rilevo che si tratterebbe di sentenza emessa all'esito del procedimento più idoneo a garantire una adeguata difesa, ossia proprio in nome di quegli stessi principi di cui all'art. 64 L. 218/95.

In altri termini, nel caso di specie il riconoscimento di tali sentenze in Italia non si scontrerebbe affatto con l'art. 24 Cost (secondo tutti i cittadini possono agire in giudizio per la tutela dei loro diritti) ma semmai sarebbe conforme ad un'interpretazione evolutiva dell'art. 111 Cost. (che prevede i canoni del giusto processo) visto che un processo inefficiente non sarebbe un giusto processo, principio di cui lo stesso legislatore italiano ha dimostrato di aver preso consapevolezza con i recenti progetti di legge tesi ad introdurre anche in Italia forme di processo analoghe alla *class action*.

Vero è che la mancanza di precedenti non consente di affermare con sicurezza la riconoscibilità, in Italia, del giudicato di *class action*, tuttavia vi sono argomenti che depongono a favore di tale possibilità, e tale circostanza sarebbe, secondo le Corti americane, sufficiente a trattenere avanti a sé le pretese dedotte in un'azione di classe conglobante cittadini stranieri (Cromer Finance Ltd. V. Berger, 205 F.R.D. 113 (SDNY 2001) in cui il giudice sottolinea che è necessario distinguere tra i casi in cui è chiaro, o comunque è praticamente scontato, che la corte straniera non riconoscerà il giudicato, dai casi in cui questa ipotesi esiste a livello di mera possibilità, e precisa che nel caso Bersch v. Drexel Firestone Inc. 519 F.2d 974 (2d Cir.1975) - citato da Merck a sostegno della sua tesi - il giudice non poteva adottare altra decisione che quella di escludere gli stranieri, in quanto si era potuto basare soltanto sugli *affidavits* prodotti da parte convenuta).

Nella medesima sentenza si sostiene che, anche qualora fosse certo che la sentenza negativa per la classe non potrebbe trovare riconoscimento in Europa, la *class action* potrebbe comunque rispondere al requisito della *superiorità*: prima che i convenuti soffrano di questo eventuale mancato riconoscimento, infatti, dovrebbero verificarsi una serie di eventi incerti, ossia  1) la causa dovrebbe giungere a sentenza, quando è assai probabile che venga transatta; 2) il convenuto dovrebbe vincere nel merito; 3) un *class member* dovrebbe intentare una ulteriore azione nel foro alternativo, nonostante la mancanza di patti di quota lite e di *class actions* e quindi tra mille difficoltà; 4)

dovrebbe riuscire a convincere la Corte a ignorare la sentenza statunitense; 5) dovrebbe ottenere una sentenza positiva sul merito.

Tali rilievi paiono particolarmente pertinenti in relazione al caso di specie.

Anche a prescindere dalla questione del riconoscimento della sentenza straniera, infatti, il cittadino italiano non avrebbe alcuna convenienza ad adire come singolo il tribunale nazionale a seguito di una sentenza sfavorevole del giudice statunitense e ciò almeno per due ordini di ragioni.

Innanzitutto per l'autorità *de facto* de precedente formatosi in America, che renderebbe assai difficile ottenere in Italia un capovolgimento della decisione già resa dalla Corte americana.

In secondo luogo perché, anche nella del tutto improbabile ipotesi in cui il giudice italiano emettesse una sentenza di condanna della casa farmaceutica contrastante con la sentenza americana, sarebbe assai difficile per il cittadino italiano ottenere l'esecuzione di tale sentenza (e quindi la concreta tutela dei propri diritti). E questo perché, posto che il patrimonio della società è verosimilmente situato nello Stato in cui si trova la sua sede legale, ossia negli Stati Uniti, l'esecuzione della sentenza dovrebbe avvenire avanti ad un Giudice statunitense, che molto difficilmente sarebbe disposto a dare esecuzione alla sentenza straniera di segno contrario rispetto ad una precedente pronuncia statunitense resa sulla medesima questione (In re U.S. Financial Securities Litigation, 69 FRD 24 (SD Cal 1975: il giudice rileva che nei fori alternativi la eventuale sentenza favorevole non potrebbe essere eseguita per mancanza di beni- avendo la convenuta sede in America - dunque gli attori vincitori all'estero dovrebbero comunque eseguire la sentenza negli Stati Uniti . Ora, un giudice statunitense che si trovasse di fronte ad una sentenza straniera da eseguire, contraria ad una precedentemente resa da un giudice statunitense, darebbe certamente prevalenza a quest'ultima: sicché tale eventuale seconda sentenza ottenuta da un *class member* insoddisfatto con la sentenza di *class action* resterebbe ineseguita e sostanzialmente ineseguibile).

## VII. *Opt in* e *opt out* e non equiparabilità tra *class action* e litisconsorzio

Altro argomento addotto alla difesa di Merck consiste nell'affermazione che la semplice mancanza in Italia di un istituto processuale omologo alla *class action* non sarebbe sufficiente per ritenere il foro italiano inadeguato ad assicurare una reale tutela.

A tale proposito pare utile evidenziare che i risultati conseguibili con la *class action* sono ben diversi da quelli che potrebbero ottenersi con gli istituti processuali disponibili in Italia.

In particolare l'istituto del litisconsorzio attivo, con cui comunemente in Italia vengono dedotte le pretese seriali è più simile (anche se permangono importanti differenze) alla struttura della *class action* basata sull'*opt in* che, non a caso, è stata abbandonata nel 1966 a favore delle ben più efficienti *opt out class actions*.

Come osserva Kaplan, "*if, now, we consider the class…we see that requiring the individuals affirmatively to request inclusion in the lawsuit would result in freezing out the claims of people - especially small claims held by small people - who for one reason or another, ignorance, timidity, unfamiliarity with business or legal matter, will simply not take the affirmative step. The moral justification for treating such people as null quantities is questionable. For them the class action serves something like the function of an administrative proceeding where scattered individual interests are represented by the Government. In the circumstances delineated in subdivision b.3, it seems fair for the silent to be considered as part of the class. Otherwise the b.3 type would become a class action which was not that at all…[18]*".

Tali inconvenienti si registrerebbero a maggior ragione nell'ipotesi del litisconsorzio attivo, in cui, non diversamente che nelle *opt in class actions*, l'iniziativa di partecipare alla causa dipende da un atto di volontà positivo del soggetto, il quale, peraltro, in tale determinazione all'azione, sarebbe lasciato più solo, in quanto non potrebbe neppure beneficiare di quegli incentivi che caratterizzano il sistema americano, quali la possibilità per gli avvocati di pubblicizzare l'azione di gruppo intentata, e di promuovere, anche dal punto di vista economico, la partecipazione del maggior numero possibile di soggetti, grazie alla struttura imprenditoriale degli studi americani.

---

[18] KAPLAN, *Continuing work of the civil committee: 1966 amendments of the Federal Rules of Civil Procedure*, 81 *Harv. L. Rev.* 356, 397 ss. (1967).

Nel litisconsorzio attivo, inoltre, ogni cliente è scindibile ed autonomo, può volere cambiare avvocato, può pretendere di essere rappresentato in modo particolaristico ed imporre all'avvocato, a pena di revoca del mandato, le proprie idee e tesi strategiche e difensive: in potenza il litisconsorzio attivo non è altro che un'accidentale e momentanea sommatoria di azioni, non un vero coacervo unitario e coerente.

A ulteriore conferma dell'inadeguatezza del litisconsorzio è la circostanza che molti paesi europei – che pur non conoscevano l'istituto dell'azione di classe – hanno introdotto in anni recenti strumenti processuali per la trattazione di pretese multi individuali ben più efficienti.

Tale sforzo si è registrato in particolare in Inghilterra, con l'introduzione della *group litigation,* in Germania con il Musterverfahren, nonché in Italia con i recenti disegni di legge su cui vedi *supra,* (allo stato tuttavia ancora lontani dai livelli di efficienza conseguibili con la *class action* americana).

La presenza di istituti processuali specialistici per la gestione dei *mass torts* è stata ritenuta così fondamentale ai fini del conseguimento di una reale forma di tutela da assumere un rilievo determinante nella decisione sulla fondatezza dell'eccezione di *forum non conveniens.*

Ci si riferisce in particolare alla decisione della *House of Lords* inglese 20 luglio 2000, Lubbe v/ Cape Plc, [2000] 1 WLR 1545[19], emessa in una causa in cui circa 3000 attori di cittadinanza sudafricana avevano dedotto in giudizio pretese al risarcimento del danno subito a causa dell'esposizione all'amianto, citando in causa una società inglese operante in Sudafrica. L'eccezione di foro *non conveniens* sollevata dai convenuti a favore del foro sudafricano, venne rigettata dalla *House of Lords* sulla base di due motivi che appaiono particolarmente interessanti, viste le indubbie analogie del caso sottoposto alla Corte inglese con la fattispecie che qui ci occupa:

- la mancanza nell'ordinamento sudafricano di validi strumenti processuali per la gestione dei *mass torts,* in contrasto con le potenzialità di tutela dell'ordinamento inglese, in cui l'azione già pendeva in forma di *group action;*

---

[19]Consultabile nel sito: www.publications.parliament.uk/pa/ld/ldjudgmt.htm ed annotato da MARENGO, *Asbesto sudafricano e giurisdizione inglese: forum non conveniens, gratuito patrocinio, group actions,* in *Int'l Lis,* 2002, 73

- l'indisponibilità, nell'ordinamento sudafricano, di assistenza legale gratuita e dei patti di quota lite, ritenuti fattori che non avrebbero permesso agli attori di instaurare il giudizio innanzi al giudice sudafricano, per cui la sospensione del processo instaurato innanzi al giudice inglese si sarebbe risolta in un inammissibile diniego di giustizia.

## VIII. Il procedimento di *dicovery*

L'impossibilità di assimilare l'istituto della *class action* ad un semplice strumento di azione congiunta, quale il litisconsorzio italiano, discende anche dalle più generali caratteristiche del processo americano in cui l'istituto si colloca sul fronte dei ben maggiori poteri riconosciuti alle parti nella ricerca delle prove.

Si fa riferimento in particolare al procedimento di *discovery*, che consente alle parti di raccogliere documenti, a volte fondamentali per la decisione della causa, di cui ben difficilmente potrebbe venire in possesso in Italia.

Con questo non si vuole affatto sostenere che qualsiasi ordinamento che non conosca il procedimento di *discovery* sia un *forum non conveniens* rispetto a quello americano, ma sottolineare la particolare rilevanza che un simile strumento istruttorio potrebbe avere nel caso di specie.

Come rilevato dagli attori, la società farmaceutica aveva condotto una serie di tests da cui potrebbero trarsi elementi sulla dannosità del prodotto, la cui esibizione avrebbe un'indubbia rilevanza nella dimostrazione dei fatti posti a fondamento della domanda di risarcimento.

In Italia l'unico strumento processuale per poter acquisire al processo tale documentazione, nel caso in cui controparte si rifiutasse di renderla disponibile spontaneamente, sarebbe l'ordine di esibizione di cui all'art. 210 c.p.c, che tuttavia può essere emesso solo in presenza di determinati requisiti, e non è suscettibile di esecuzione coattiva.

In particolare la giurisprudenza italiana ha ritenuto che l'ordine di esibizione di documenti sia possibile solo in presenza dei seguenti requisiti: i) assenza di grave danno per la parte; ii) assenza del pericolo per la parte di violare il segreto professionale; iii) offerta della prova del possesso del documento da parte dell'avversario (Cass. civ. 11

novembre 1999, 12507, in *Foro It.* 2000, I, 451); iv) specifica indicazione del fatto di cui si vuole dare la prova con il documento di cui si chiede l'esibizione (Cass. civ. 8 settembre 1999, 9514); v) indispensabilità del documento, e cioè mancanza di altri mezzi che permettano di raggiungere lo stesso scopo.

Anche ammesso che tali requisiti fossero soddisfatti, l'eventuale ordine di esibizione non darebbe inoltre alcuna certezza di acquisire agli atti di causa la documentazione richiesta, in quanto la parte potrebbe anche rifiutarsi di osservare l'ordine, senza che il Giudice abbia il potere di disporne l'esecuzione coattiva (Cass. civ. 2 agosto 2002 n. 11617, confermata da dottrina pressochè unanime).

L'unica conseguenza negativa sarebbe la possibilità che il giudice valuti il mancato rispetto dell'ordine di esibizione come "argomento di prova" a sfavore del convenuto, ai sensi dell'art. 116, II comma c.p.c.; ma tali argomenti di prova non consentono al giudice – senza vere prove – di accogliere una domanda, poiché hanno, nel processo italiano, un ruolo solo accessorio e secondario[20]

Al contrario il procedimento di *discovery* permette alla parte di ottenere da controparte materiale relativo ad ogni questione rilevante rispetto all'oggetto della controversia (*Rule* 26(b)(1)), anche ove il materiale così ottenuto non possa essere utilizzato come prova. In particolare la *Rule* 34 detta una disciplina particolarmente favorevole per l'acquisizione di documenti in possesso della controparte.

Inoltre, nel caso in cui la parte non adempia spontaneamente alla richiesta di produzione, è prevista la possibilità di ottenere dal Giudice un *order*, il cui inadempimento comporta delle sanzioni che possono essere variamente modulate dalla corte a seconda delle circostanze, tra cui la possibilità che il Giudice consideri provato il fatto in ordine al quale era stata richiesta la documentazione.

---

[20] La tesi a tutt'oggi maggioritaria in dottrina vede egli argomenti di prova dei meri strumenti di valutazione delle prove *strictu sensu* intese, ossia di verifica della loro intrinseca attendibilità, in definitiva quindi, elementi puramente sussidiari ed integrativi di convincimento, inidonei fondare, da soli, la decisione del giudice in punto di fatto. La giurisprudenza ammette che l'argomento di prova possa in certo casi essere fonte di convincimento, ma subordinatamente alla condizione, per vero piuttosto ambigua, del suo inserimento in un più ampio contesto valutativo (cfr. Cass. 26 marzo 1997, n. 2700). Resta invece escluso che il contegno processuale della parti possa assumere un rilievo addirittura di sovraordinazione gerarchica rispetto alle vere e proprie prove, tale cioè da consentire al giudice di avvalersi di tale argomenti di prova come parametro di controllo dell'ammissibilità di altri mezzi istruttori (Cass. 17 marzo 1997, n. 2329).

***

Pare il caso di concludere con una benevola provocazione:*"Ebbene, mio caro Pangloss, gli disse Candido...siete rimasto del parere che tutto va per il meglio nel mondo?"(*Voltaire, *Candido,* cap. XXVIII), ancora una volta dolendoci dell'ingrato compito di aver dovuto denunciare le carenze del nostro sistema processuale, che le riforme recenti - solo proceduristiche[21] - paiono a molti avere più accentuato che alleviato.

Dichiaro, edotto della pena per falsa attestazione secondo le leggi degli Stati Uniti d'America, che quanto sopra esteso corrisponde a verità ed è corretto, secondo la mia informata opinione.

Verona, 26 luglio 2006

(Prof. Avv. Claudio Consolo)

---

[21] Vedi CONSOLO, *Dieci anni e sei riforme processuali visti dal Corriere*, Milano, 2004.