*GARY E SANDER, M.D., PH.D., F.A.C.C., F.A.H.A.*
*CARDIOVASCULAR DISEASES*

1237 BEVERLY GARDEN DRIVE
METAIRIE, LA 70002
504-835-7019(F), 504-458-5717 (C)
gsande3@cox.net

July 10, 2006

Mr. James L. Wright
Attorney at Law
Watts Law Firm
One Congress Plaza
111 Congress, Suite 1010
Austin, TX 78701

RE: *Robert Garry Smith*

Dear Mr. Wright:

I am board certified by the American Board of Internal Medicine in Internal Medicine and Cardiovascular Diseases as well. I hold fellowship status with the American College of Physicians, American College of Cardiology, the American College of Chest Physicians, and the American Heart Association, and membership in such related organizations as the American Society of Hypertension, the Heart Failure Society of America, the Southern Society of Clinical Investigation, and the American Society of Pharmacology and Experimental Therapeutics. I am also designated as a Specialist in Clinical Hypertension by the American Society of Hypertension. I serve as a Physician Advisor for the Louisiana Health Care Review, Inc, which is the peer review organization for CMS in Louisiana. In my present positions as Professor of Medicine in the Sections of Cardiology at Louisiana State University Health Sciences Center and Adjunct Professor at Tulane University Health Sciences Center in New Orleans, I supervise medicine house staff and cardiology fellows in the practice of cardiology. I also maintain

Medical Report Robert Garry Smith
July 10, 2006

a private cardiology practice with Canal Street Cardiology Associates in New Orleans. I have authored over 100 publications dealing with various aspects of Cardiovascular Medicine, and have taught and lectured extensively in these areas as well. My qualifications and experience are more specifically listed in the attached curriculum vitae. My knowledge, training, and experience have made me extremely familiar with the issues concerning use and toxicity of NSAID and COX-2 drugs; I estimate that I have spent over 100 hours, not specifically related to VIOXX litigation cases, reviewing, writing, and presenting topics related to these issues. A comprehensive list of articles and materials that I have reviewed is attached. I am also very familiar with medicolegal proceedings; a list of my depositions and court appearances is also attached.

It is well established that heart disease represents a very major epidemiological problem in the United States, such that the NIH as well as the pharmaceutical industry have expended billions of dollars in an attempt to better understand the pathophysiological mechanisms driving these cardiovascular events and trying to develop more effective treatments and prevention measures. While much of the causation of cardiovascular events can be related to the presence of risk factors including dsylipidemias, cigarette smoking, hypertension, and diabetes, it is clear that additional factors, including increases in blood pressure and increases in the activation and aggregation of blood platelets, together with impairment of the cardiovascular system's ability for autoregulation and defense, can play substantial roles in the development of cardiovascular events. One of the major breakthroughs in clinical pharmacology has been the demonstration of the effectiveness of aspirin in both preventing as well as reducing

Medical Report Robert Garry Smith
July 10, 2006

the severity of ongoing cardiovascular events, especially myocardial infarction. Aspirin produces its effects by interfering with the activation and aggregation of blood platelets, an event that occurs in response to vascular tissue injury and in turn results in activation of blood clotting factors and then clot formation, often leading to vascular obstruction and tissue injury, such as myocardial infarction. This has highlighted the importance of blood platelets in modulating the extent of tissue injury and repair, and led to the development of additional drugs, such as Plavix and GpIIb-IIIa inhibitors, as even better platelet inhibitors and therapeutic agents. Thus it is not surprising that drugs that increase platelet aggregation, such as the potent COX-2 inhibitor VIOXX, have been demonstrated to increase the number of cardiovascular events; nor should it be surprising that this increase in events would be more apparent in patients with pre-existing atherosclerosis, who already have vascular obstructive disease and are at greater risk for subsequent events augmented by platelet aggregation.

The cyclooxygenase (COX) system functions to produce a family of prostanoids, including $PGD_2$, $PGE_2$, $PGF_{2\alpha}$ (prostacyclin), and $TxA_2$ (thromboxane), which modulate a variety of biological functions. In this system arachidonic acid is generated from membrane-bound phospholipids by the enzyme phospholipase $A_2$. Cyclooxygenase–1 (COX-1) is a constitutive (present normally) enzyme that produces prostaglandins that mediate gastrointestinal mucosal integrity, platelet aggregation, and renal function. Cyclooxygenase-2 (COX-2) is an inducible enzyme that contributes to inflammatory responses and carcinogenesis. However, COX-2 is constitutive in kidney and brain, and both COX-1 and COX-2 are expressed at sites inflammation. COX-2 is unregulated in

3

Medical Report Robert Garry Smith
July 10, 2006

high renin states, such as salt depletion, ACE inhibition and angiotensin receptor blockade, and renovascular hypertension. Importantly, COX-1 catalyzes the conversion of arachidonic acid to $TxA_2$ and $PGI_2$, prostaglandins that play a critical role in platelet–vessel wall interactions. $TxA_2$, the major product of blood platelet COX-1, is a vasoconstrictor and plays an important role in platelet aggregation. $PGI_2$, mainly produced by the endothelium, is a potent vasodilator and antiplatelet factor; an increase in the concentration of $TxA_2$ relative to that of $PGI_2$ results in a prothrombotic of hypercoaguable state.

Aspirin acetylates and irreversibly inhibits COX-1; nonsteroidal anti-inflammatory drugs (NSAIDs) variably and reversibly inhibit both COX-1 and COX-2 activity. COXIBS are relatively selective COX-2 inhibitors, with rofecoxib more selective than celecoxib. Although it was previously thought that COX-1 was responsible for $PGI_2$ production in normal endothelial cells it is now apparent that COX-2 also contributes significantly to $PGI_2$ biosynthesis in humans. COX-2 inhibitors, by selectively reducing endothelial $PGI_2$ production, appear to cause unopposed $TxA_2$ activity and thus lead to a prothrombotic state. Furthermore, at least in certain animal models, interruption of $PGI_2$ accelerates the development and progression of atherosclerosis. This suggests that selective inhibition of COX-2 can disrupt the physiological balance between $TxA_2$ and $PGI_2$ and thus increase the risk of atherosclerosis, thrombogenesis, and the risk of cardiovascular complications. This critically important interaction between platelet activation and aggregation, represented by $TxA_2$, and the integrity of vascular defense mechanisms, represented by $PGI_2$, is

Medical Report Robert Garry Smith
July 10, 2006

illustrated in the attached figure from Dr. Antman's peer-reviewed and published article. (*Antman EM, DeMets D, Loscalzo J. Cyclooxygenase inhibition and cardiovascular risk. Circulation2005;112(5):759 - 70.*)

Mechanisms within the kidney are also vitally important. Prostaglandins modulate microvascular hemodynamics, tubular salt and water reabsorption, and renin release. $PGE_2$ decreases tubular $Na^+$ reabsorption. $PGI_2$ stimulates renin release, in turn stimulating aldosterone secretion and an increased $K^+$ secretion at the distal nephron. $PGI_2$ is also a potent vasodilator that preserves renal perfusion in conditions associated with decreased actual or effective circulating volume. Reduction in $PGI_2$ may lead to hyperkalemia and even acute renal failure. Under physiologic conditions COX-2 appears to be the dominant contributor to $Na^+$, $Cl^-$, and water homeostasis. Thus a reduction in renal production of $PGE_2$ may result in $Na^+$ and water retention with resultant edema, increase in blood pressure, and potentially congestive heart failure.

Thus potent COX-2 inhibitors such as VIOXX can increase blood pressure and blood coagulability; the increased blood pressure will increase shear stress forces in such blood vessels as the coronary arteries, thus increasing the risk of vulnerable plaque rupture, then increasing the likelihood of platelet activation and aggregation (clumping), leading to activation of blood protein coagulation factors, blood clot formation, arterial obstruction, and finally acute coronary syndromes including stroke and myocardial infarction.

Clinical data now clearly indicate that these mechanisms are operative in increasing the rate of cardiovascular events in humans; recognition of these data has led

Medical Report Robert Garry Smith
July 10, 2006

Merck to withdraw VIOXX from the market. Examination of clinical trials such as Merck 090, VIGOR, and ADVANTAGE have demonstrated that cardiovascular event rates can increase at least as early as 4 to 6 weeks after initiating VIOXX treatment. The APPROVe Trial was a long-term, multi-center, randomized, placebo-controlled, double blind trial designed to determine the effect of three years of treatment with rofecoxib (25 mg daily) on the risk of recurrent neoplastic polyps of the large bowel in patients with a history of colonic adenomas but no cardiac history. A total of 46 rofecoxib patients had a confirmed thrombotic event (1.50 events per 100 patient-years), compared to 0.78 events per 100 patient-years on placebo, representing a relative risk for thrombotic events of 1.92 (95% CI 1.19 to 3.11, $p=0.008$). Although it was this trial that led to the withdrawal of VIOXX, several other trials and combined or meta-analyses have indicated an even higher relative risk. Although Merck's position from APPROVe was that the relative risk of VIOXX-induced events only became apparent after 18 months of therapy, further data analysis now indicates that the risk appears to have occurred throughout the trial. Interestingly, the cumulative incidence of thrombotic events and the cumulative incidence of congestive heart failure, pulmonary edema, or cardiac failure began to separate as early as 6 months into the trial (rofecoxib vs placebo $p = 0.004$). Thus time on drug no longer seems to be an issue in the causation of cardiovascular events.

I have reviewed the following medical records detailing Mr. Smith's claims that VIOXX contributed substantially to his myocardial infarction:

1. Robert G. Smith's deposition, dated June 15, 2006;
2. Dr. Daniel J. Courtade's deposition, dated June 22, 2006;

6

Medical Report Robert Garry Smith
July 10, 2006

   3. Amended Plaintiff Profile Form;

   4. Medical chronology;

   5. Dr. Daniel J. Courtade's records ;

   6. St. Luke's Hospital records for MI treatment;

   7. St. Elizabeth's Medical Center MI treatment records;

   8. St. Elizabeth's Medical Center comprehensive treatment records;

   9. Patient First Physicians Group records;

   10. Hand Surgery Specialists Northern Kentucky records;

   11. CVS Pharmacy records;

   12. Wal-Mart records;

   13. Greater Cincinnati Orthopedic records;

   14. Dr. Michael A. Grefer/Commonwealth Orthopedic Center records;

   15. Dr. Courtade's angiograms including ventriculogram and stenting (CD-ROM).

      By way of brief review of Mr. Smith's medical history, he was free of clinical evidence of cardiovascular disease until the time of his myocardial infarction on February 17, 2003. Treatment with VIOXX had been initiated on October 2, 2002. Although it is unclear as to the exact number of tablets that he had received, it is documented on the St. Elizabeth Interdisciplinary Data Base Form that was completed by nursing staff on February 17, 2003, that he had taken VIOXX on the day of his presentation with acute myocardial infarction. It is important to note that Mr. Smith was not aware of the possible adverse effects of VIOXX at this time. Mr. Smith suffered an acute inferoposterolateral and probable right ventricular myocardial infarction, documented

Medical Report Robert Garry Smith
July 10, 2006

both by electrocardiogram and elevation of cardiac enzyme levels in his blood. Fortunately, he received early thrombolytic treatment at St. Luke's Hospital, followed by emergency angioplasty at St. Elizabeth's Hospital, thus limiting the extent of myocardial damage. Dr. Courtade did document a wall motion abnormality by ventriculography. Although he classified this myocardial infarction as non-transmural, in fact an electrocardiogram recorded on March 11, 2004, at Patient First over one year after his myocardial infarction, showed marked left axis deviation together with tall R and T waves in lead $V_1$, indicative of an inferoposterior transmural scar. I find no documentation of any cardiac imaging performed since February 2003 that would suggest that this electrocardiographic finding does not represent transmural myocardial scarring. Thus, Mr. Smith has suffered a myocardial infarction, the residual of which is **at least** an increased risk of future cardiovascular events and the psychological burden of having suffered a heart attack.

There is clinical evidence to suggest that Mr. Smith may have had pre-existing cardiovascular disease, thus putting him at even greater risk for VIOXX-related cardiovascular complications. Dr. Sommerkamp, a hand surgeon, evaluated Mr. Smith on September 6, 2000, for hand osteoarthritis. In his medical record, he states that X-rays of Mr. Smith's hands revealed vascular wall calcifications in his left radial and right radial and ulnar arteries. Dr. Sommerkamp proceeded to recommend that Mr. Smith be screened for cardiovascular risks factors. The subsequent screening yielded evidence of increased body mass index and a mild dyslipidemia, with HDL of 39 mg/dL, LDL of 140 mg/dL, and triglycerides of 218 mg/dL. The target HDL should have been greater than 40

Medical Report Robert Garry Smith
July 10, 2006

mg/dL, the triglycerides less than 150 mg/dL, and the LDL probably less than 130 mg/dL. Blood pressures were quite variable, which I believe indicates lack of precision in the way that these pressures were recorded. As an example, the two recorded pressures immediately prior to initiation of VIOXX were 120/82 mm Hg on May 1, 2002, and 120/92 mm Hg on August 26, 2002, with no reason for a 12 mm Hg difference in diastolic blood pressure other than lack of appropriate precision in recordings. In fact, sitting blood pressure recordings for the previous two years had been 136/84 mm Hg, 130/90 mm Hg, 136/90 mm Hg, 120/70 mm Hg, and 130/92 mm Hg. Mr. Smith also took medication for erectile dysfunction; erectile dysfunction is often indicative of cardiovascular disease. He did have a family of history of ischemic heart disease in a paternal uncle and a younger brother, but it is difficult to fully understand the significance of this particular risk factor without further information about these individuals (cigarette smoking, etc). Very importantly, Mr. Smith had no evidence of diabetes or even glucose intolerance and no cigarette smoking history, and had maintained a very active lifestyle, including aerobic workouts. Such activity was ultimately limited by his knee pain, but he was at least walking and playing golf until the time of knee surgery on October 30, 2002.

Mr. Smith's myocardial infarction occurred in the context of unusually intense physical exertion – shoveling snow in freezing temperatures, followed by a shower. In my opinion, Mr. Smith's clinical situation was one in which VIOXX would be expected to substantially contribute to the final myocardial event. The issues at play here are not only the stress of physical exertion, but also the confounding effects of vasoconstriction due to cold, followed by vasodilatation during the shower. This combination would result

Medical Report Robert Garry Smith
July 10, 2006

in increased blood pressure (superimposed upon his baseline at least borderline hypertensive state) and coronary blood flow, **markedly** increasing shear stress in his coronary arteries and leading to rupture of a previously non-hemodynamically significant atherosclerotic plaque with resultant platelet aggregation and clot formation. This interaction then produced coronary artery occlusion and acute myocardial infarction; in fact, a clot was visible in the right coronary artery during angiography. In such circumstances the **normally protective** effect of $PGI_2$ in antagonizing platelet aggregation would be reduced or absent due to VIOXX effect, and the both the likelihood of plaque rupture and the extent of clot formation leading to coronary occlusion would be greatly enhanced.

In further support of this pathophysiological mechanism, the medical records do suggest that Mr. Smith's blood pressures, particularly his systolic blood pressure, did increase after starting VIOXX, as evidenced by systolic blood pressure recordings of 154 mm Hg on October 30, 2002, 148-160 mm Hg in the PACU after knee arthroplasty on the same date, and 167 mm Hg at presentation on February 17, 2002. Importantly, further data analysis from APPROVe has suggested that any systolic blood pressure excursion above 160 mm Hg is associated with an even greater increase in myocardial infarction rate relative to placebo control. It is critical to understand that it is the systolic blood pressure that is more closely related to cardiovascular events than is the diastolic blood pressure. At the time of his discharge from the hospital, Mr. Smith was specifically instructed as to "No VIOXX;" his lipid status was assessed during hospitalization and not felt to require specific pharmacologic treatment.

Medical Report Robert Garry Smith
July 10, 2006

It is my opinion, that, more likely than not, VIOXX contributed substantially to the development of Mr. Smith's coronary occlusion and myocardial infarction on February 17, 2002, principally by inhibiting the potential protective effects of $PGI_2$ generation in antagonizing the platelet aggregating effect of unopposed $TxA_2$ in a clinical situation of increased risk of a myocardial event; again I would refer to Dr. Antman's diagram in explaining this interaction. VIOXX induced increases in blood pressure, superimposed upon already borderline hypertension, contributed to increased coronary artery sheer stress and plaque rupture. Furthermore, VIOXX may well have also contributed to the progression of atherosclerosis at the right coronary site.

Please feel free to contact me if you will need further information from me concerning this report. Thank you.

Sincerely,

Gary E. Sander, M.D., Ph.D., F.A.C.C., F.A.H.A.
Adjunct Professor of Medicine, Section of Cardiology
Tulane University Health Sciences Center

Medical Report Robert Garry Smith
July 10, 2006



Illustration 1. The consequences of COX-2 inhibition upon the levels of the thrombotic thromboxane $TXA_2$ and the protective prostacyclin $PGI_2$. From Antman EM, DeMets D, Loscalzo J. *Cyclooxygenase inhibition and cardiovascular risk.* Circulation 2005; 112(5):759-70.