UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 2:05-CV-04379 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| ROBERT G. SMITH, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | | |

**REPLY IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") FOR ORDER EXCLUDING EXPERT TESTIMONY THAT SHORT-TERM VIOXX® USE <u>INCREASES CARDIOVASCULAR RISK</u>**

**(EXPERT CHALLENGE NO. 11)**

Plaintiff acknowledges that the general causation issue in this case is whether short-term use of 25 mg Vioxx causes increased cardiovascular ("CV") risk.  (Pl.'s Opp. at 4.)  Plaintiff's opposition, however, like plaintiff's experts, relies on temporal coincidence and statistically insignificant data, exactly the type of "science evidence" that federal courts consistently find inadequate as the basis for expert testimony.  Seeking to salvage his unfounded theory of general causation, plaintiff mischaracterizes the results of clinical studies and other legal proceedings, but fails to resolve the central problem with his claim:  the complete lack of reliable scientific evidence that short-term use of Vioxx increases CV risk.

826072v.1

I.  **PLAINTIFF MISCHARACTERIZES THE AVAILABLE CLINICAL DATA ON SHORT-TERM USE OF VIOXX.**

No reliable, statistically significant data from *any* clinical trials shows that using 25 mg Vioxx for fewer than five months can increase the risk of a thrombotic CV event. Yet, plaintiff's experts seek to offer just such an opinion, based essentially on the fact that some clinical trial patients had heart attacks within the first few months of Vioxx use. The Court must exclude this testimony. *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (rejecting expert testimony that nicotine patch caused a heart attack because the attack occurred just three days later as "lack[ing] scientific rigor").

Before a court may admit expert testimony, the proponent of the testimony must demonstrate that it is based on reliable evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc) (to offer expert opinion, a party must "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable"). Moreover, just because an expert can identify a scientific study does not render his opinion admissible – the opinion must flow from the evidence offered and conclusions must be excluded when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997); *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 587 (5th Cir. 2004) ("A court may rightfully exclude expert testimony where a court finds that an expert has extrapolated data, and there is too great an analytical gap between the data and the opinion proffered.") (internal quotation marks and citations omitted). There is just such an analytical gap between plaintiff's expert's testimony about the risks of short-term Vioxx use and the available scientific data.

A.  **The VIGOR Study.**

As explained in Merck's moving papers, there are at least three critical flaws with

plaintiff's experts' reliance on the VIGOR[1] study as the basis for their causation opinions. Plaintiff fails to address these flaws in his Opposition. Instead, he claims that they can be addressed by cross-examination or careful instruction. (Pl.'s Opp. at 7.) Plaintiff is wrong – it is his burden to establish that his experts' opinions are supported by reliable scientific evidence, and each of these flaws alone is enough to render the VIGOR results unreliable as a basis for an opinion that short-term use of Vioxx increases CV risk.

VIGOR patients regularly took a 50 mg dose, twice the dose used by Mr. Smith. Clinical studies are *inadmissible* if they do not involve doses comparable with those of the plaintiff. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005); *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996) (plaintiff must prove he was "exposed to levels of that agent that are known to cause the kind of harm" that they he allegedly suffered); *McNeil-P.C.C., Inc. v. Britol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) (holding that clinical studies, to be admissible, must compare drug at issue in comparable doses). The dosage issue alone renders VIGOR an unreasonable basis for plaintiff's causation argument.

Plaintiff makes the novel assertion that the VIGOR trial meets "the 'gold standard' for determining a relationship between a drug and its health effect," because "one group was exposed to Vioxx and the other group wasn't." (Pl.'s Opp. at 7.) Not only does plaintiff ignore the dosage issue in making this argument, he also ignores that only blinded, randomized, *placebo-controlled* clinical trials meet the "gold standard for determining the relationship of an agent to a disease or health outcome."[2]

---

[1] Claire Bombardier et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, 343 NEW. ENG. J. MED. 1520 (Nov. 30, 2000).

[2] Michael J. Saks et al., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 484 (2d ed. 2005-2006). Plaintiff's own expert Lemuel Moye recognized this important aspect of epidemiological
(*footnote continued next page*)

Because VIGOR was not placebo controlled, it is impossible to know whether the results were due to the cardio-protective qualities of naproxen, a risk imposed by 50 mg Vioxx, chance, or some combination of these factors.[3]

Also fatal to plaintiff's reliance on VIGOR is the fact that its patients had a type of arthritis known to be associated with high rates of CV events – a type of arthritis plaintiff does not have.[4] VIGOR simply does not provide reliable evidence that someone in plaintiff's condition faces an increased CV risk with short-term Vioxx use. *See, e.g.*, *In re Silicone Gel Breasts Implants*, 318 F. Supp. 2d 879, 894 (C.D. Cal. 2004) (the use of epidemiological studies to show causation requires that "the plaintiff is comparable to the subjects of the epidemiological study and that there were no other causal agents present in the plaintiff's case not accounted for by the study").

Even if the VIGOR results were reliable, relevant evidence of the alleged risk faced by Mr. Smith when he used 25 mg Vioxx for fewer than five months, plaintiff's position is contradicted by the study's actual data. Plaintiff claims that VIGOR's Kaplan-Meier curve for thrombotic CV events provided Merck with "a conclusive evaluation highlighting of [sic] the

---

studies when testifying in the *Barnett* trial. (Aug. 3, 2006 *Barnett* Tr. at 802:3-21, attached hereto as Ex. A.)

[3] *See* Patrono, FitzGerald et al., *Platelet Active Drugs: The Relationships Among Dose, Effectiveness, and Side Effects*, CHEST 2004; 126:234S-264S ("While the cause of the apparent excess risk of MI in [VIGOR] cannot be conclusively established, a combination of some cardioprotective effect of naproxen and the play of chance does seem to offer a plausible explanation for these unexpected findings."); REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 484-5.

[4] Wolfe, et al., *The Mortality of Rheumatoid Arthritis, Arthritis & Rheumatism* (08/19/93); Myllykangas-Luosujarvi, et al*., Mortality in Rheumatoid Arthritis, Arthritis & Rheumatism* (12/95).

increased CV risks associated with short-term use of VIOXX."[5] (Pl.'s Opp. at 5.) Plaintiff makes much about his experts' claims that the Kaplan-Meier curve for patients on Vioxx "diverged" from patients on naproxen. (Pl.'s Opp. at 5-6.) Yet, the actual curve from the VIGOR study shows that any divergence was not statistically significant for short-term use – in fact, the confidence interval for events on Vioxx and naproxen overlapped for nearly *ten months*.[6]

Moreover, plaintiff's proposed interpretation of the VIGOR data is entirely inconsistent with that of the FDA, which saw a different hazard-rate pattern between the Vioxx and naproxen groups only after eight months.[7] Further, based on its detailed review of the VIGOR data, the FDA in 2002 approved a revised label that included a precaution advising physicians that the "significance of the [VIGOR and Alzheimer's CV data] is unknown."[8]

### B. The APPROVe Study.

Plaintiff's reliance on the APPROVe[9] study is entirely misplaced. If APPROVe reveals anything about the alleged CV risk associated with Vioxx, it is that there is *not* an increased risk

---

[5] Plaintiff seeks to allege the earliest possible date that Merck *could* have been aware of a purported CV risk. This type of liability argument is entirely distinct from what is at issue in this motion – namely, plaintiff's inability to establish causation. It is plaintiff's burden to establish that his alleged short-term exposure to Vioxx could have caused his heart attack. *McClain*, 401 F.3d at 1239. If plaintiff cannot identify reliable scientific evidence to this end, the Court must preclude his experts from offering this opinion. *See Moore v. Ashland Chem., Inc.*, 151 F.3d at 276. The appropriate inquiry here is whether plaintiff's purported scientific evidence supports his theory of causation, not the earliest date any purportedly related evidence became available.

[6] (See Rofecoxib FDA Advisory Committee Background Information VERSION 5.1 at 81 (21-Jan-2005), attached hereto as Ex. B.)

[7] (*Id.* at 81.)

[8] (*See* April 2002 Vioxx Label No. 9183810, attached hereto as Ex. C.)

[9] Bresalier RS et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, 352 NEW. ENG. J. MED. 1092 (Mar. 17, 2005).

5

during the first 18 months of use. In fact, during the first 18 months of the study, there were 22 confirmed on-drug thrombotic events on Vioxx versus 20 on placebo, nowhere near a statistically significant difference.[10] During the same 18 month period, there were nine myocardial infarctions (heart attacks) among patients on Vioxx and eight for patients on placebo, also not a statistically significant difference.[11]

Contrary to plaintiff's claims, the APPROVe Kaplan-Meier curve also shows that the actual rate of events in the APPROVe trial began to diverge only after 18 months, and diverge with statistical significance only after 30 months.[12] As was confirmed in the recently-published "correction" to the article publishing the APPROVe results, "[v]isual inspection of the Kaplan-Meier curves suggested that there was an increasing frequency of thrombotic events associated with rofecoxib therapy after 18 months."[13]

In his efforts to recast the APPROVe data, plaintiff relies almost entirely on the allegations of Dr. Zipes, *who has been withdrawn as a trial witness* and whose opinions are contradicted by the APPROVe data itself, as discussed above. This motion seeks to exclude the testimony of experts *at trial* that short-term use of Vioxx increases CV risk. As he will not testify at trial, Dr. Zipes' opinions are of no consequence here. The Court should ignore them. Plaintiff also argues that because Dr. Zipes' testimony in the *Barnett* case included a passing assertion that APPROVe shows that short-term Vioxx use increases CV risk, some sort of

---

[10] *See* Bresalier RS et al., *supra*. After 18 months of continuous use the number of events began to increase among Vioxx users, but the difference did not become statistically significant until after about 30 months of continuous use. *See* Bresalier RS et al., *supra*.

[11] (*See* APPROVe Trial Abbreviated Clinical Study Report at, excerpt attached hereto as Ex. D.)

[12] Bresalier RS et al., *supra*; (*see* APPROVe Extension Statistical Package, dated May 26, 2006, at 25, 52, attached hereto as Ex. E).

[13] (*Correction*, New. Eng. J. Med. 355(2):221. (July 13, 2006), attached hereto as Ex. F.)

826072v.1

precedent has been established that requires the Court to admit similar testimony here. (Pl.'s Opp. at 8.) *Barnett*, however, was not a case involving the short-term use of Vioxx, and thus there was no reason for the Court or the parties to focus on that snippet of Dr. Zipes' testimony. No such precedent was established.[14]

Finally, plaintiff accuses Merck of "unethical conduct" because the APPROVe analysis only considered events that took place up to 14 days after the use of either Vioxx or placebo was stopped. (Pl.'s Opp. at 9.) Not only was this method of analysis entirely appropriate because it only considered subjects who could, pharmacologically, be considered "on drug,"[15] but in May of 2006, "extension data" from APPROVe was published that *included* events taking place after 14 days.[16] Just like the original APPROVe data, the extension data did not reveal a statistically significant difference in the risk of confirmed thrombotic CV events in patients who had previously taken VIOXX compared to those who had previously taken placebo over the first 18 months.[17]

---

[14] Additionally, the Kaplan-Meier curve discussed by Dr. Zipes in the excerpted testimony did not reveal a *statistically significant* separation in events for patients on Vioxx as compared to those on placebo until after 30 months of use. (*See* Pl.'s Opp. Ex. G at 27.)

[15] The APPROVe authors have explained the reasonableness of this approach. ("Drs Bresalier and Baron Respond" attached to Pl.'s Opp. Ex. H at 204.)

[16] *See* APPROVe Extension Statistical Package. The extension data evaluated the rate of serious thrombotic cardiovascular events experienced by patients more than 14 days after they stopped taking Vioxx or placebo, while the original published data only considered events up to 14 days later.

[17] *Compare* APPROVe Extension Statistical Package, *supra*, at 51 *with* Bresalier RS et al., *supra*, at 1092-1102. Over the first 18 months of use, the extension data revealed a relative risk of 1.27, with a 95% confidence interval between 0.71 and 2.25, while the published base study produced a relative risk of 1.18, with a 95% confidence interval between 0.64 and 2.15. Thus, given that the confidence intervals fell below 1.0, neither revealed a statistically significant increased risk within the first 18 months. *See, e.g., LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 783 & n.3 (E.D. La. 1996) (an epidemiological study's results are not statistically significant if the confidence interval includes 1.0 or below).

## II. NO OBSERVATIONAL STUDY OFFERS RELEVANT, RELIABLE EVIDENCE THAT SHORT-TERM VIOXX USE INCREASES CV RISK.

Plaintiff now claims that Merck is wrong to seek exclusion of expert testimony based on epidemiological studies when those studies do not meet well-established reliability requirements. (Pl.'s Opp. at 10.)  This view, of course, contradicts what the Supreme Court has made clear when it required that expert opinions not only be based on reliable evidence, but that they actually be the reasonable analytical product of that evidence.  *Kumho Tire*, 526 U.S. at 152; *Moore,* 151 F.3d at 276; *Joiner*, 522 U.S. at 146 (1997).

The fact is that no observational study provides statistically significant data showing that the use of 25 mg Vioxx for fewer than five months can more than double the risk of thrombotic CV events.[18]  There is, simply, an "analytical gap" between the data and plaintiff's experts' conclusion that short-term use of Vioxx increases CV risk.  Accordingly, plaintiff's theory of causation remains unsupported by reliable evidence.  The Court must exclude it.  *Joiner*, 522 U.S. at 148.

### A.  The 2006 Levesque Study.

As explained in the moving papers, the only risk the Levesque authors found was in patients who had filled their first prescription for Vioxx within the previous nine days.[19]  Plaintiff's heart attack, however, occurred more than nine days after he started using Vioxx.  Plaintiff now asserts that the study revealed a statistically significant risk for patients who used Vioxx for 2-4 months and "5-8 prescriptions." (Pl.'s Opp. at 12.)  Yet, plaintiff's own cited figures revealed a confidence interval of 0.95-1.61 for this first group and 0.97-1.76 for the second.  These results are statistically *in*significant.  (*See supra* n.16.)  They also fail to

---

[18] (*See* cases cited in Merck's Mot. at 8-9.)

[19] (*Id.* at 1-2.)

demonstrate the more than doubling of risk required before an expert can rely on an observational study.

Additionally, plaintiff does not address the fact that the subjects in the Levesque study were not similar in age to Mr. Smith. Nor does plaintiff address the study's authors' own doubts about the reliability of their results, which Merck explained in its moving papers.

### B. The Ingenix Study.

As previously explained, the Ingenix[20] study did not distinguish between individuals who took Vioxx at the 25 mg or 50 mg doses when compared against use of ibuprofen/diclofenac. Further, this combined-dose comparison was statistically *in*significant for heart attacks and sudden cardiac death. It is true, as plaintiff asserts, that the study did not show an increasing risk with higher daily dosage. It is also true, however, as Merck has asserted, that the study actually confirmed that there is no excess risk of acute coronary syndrome and sudden cardiac death associated with Vioxx versus Ibuprofen/diclofenac during treatment of 61-90 days or treatments longer than 90 days,[21] the period of use for which plaintiff has a burden to establish causation. Plaintiff ignores this fact. The Court should not.

### C. The Solomon Study.

Plaintiff also identifies a retrospective, observational study conducted by Dr. D.H. Solomon in 2004, which was based on a review of patient records in a Medicare database.[22]

---

[20] (Ingenix Epidemiology Report, *Cardiovascular Risk of COX-2 Inhibitors and Other NSAIDs*, Feb. 16, 2004, attached hereto as Ex. G.)

[21] Velentgas P. et al., *Cardiovascular risk of selective cyclooxygenase-2 inhibitors and other non-aspirin non-steroidal anti-inflammatory medications*, PHARMACOEPIDEMIOL DRUG SAF. 2006 Jan 4; (Epub ahead of print) available at www.interscience.wiley.com (DOI: 10.1002/pds.1192) at 8, Table 4.

[22] Daniel Solomon et al., *Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults*, CIRCULATION 2004 May; 109:2068-2073.

826072v.1

(Pl.'s Opp. at 11.) This study, however, does not support plaintiff's claim that his alleged four and one-half months of Vioxx use increased his CV risk. The only short-term risk Solomon found involved a comparison between Vioxx and Celebrex, both active drugs, during the first 90 days of therapy. The risk for acute heart attacks for Vioxx versus Celebrex was nearly identical after 90 days of therapy, the only duration of therapy relevant here.[23] Further, contrary to plaintiff's claims, the study found *no* excess risk of acute heart attacks with Vioxx versus no-NSAID use, much less a doubling of the risk.[24]

### D. The Juni Study.

Plaintiff also relies on Peter Juni's 2004 meta-analysis. (Pl.'s Opp. at 10-11.) The data from this study is *directly contrary* to the conclusions of plaintiffs' experts. First, Juni found that, when compared against placebo and all NSAID comparators, Vioxx at the 25 mg dose neither doubled the risk for heart attacks nor resulted in a statistically significant increased risk (RR = 1.37, CI = 0.52-3.61).[25] Second, when Juni compared Vioxx at all doses against placebo, Juni again found that Vioxx neither doubled the risk of heart attacks nor resulted in a statistically significant increased risk (RR = 1.04, CI = 0.34-3.12).[26] Third, Juni found that use of Vioxx at all doses during the first six months was *not* associated with a statistically significant increased risk of heart attacks (CI = 0.90-6.03).[27] The Juni study cannot support an opinion that 25 mg Vioxx, taken for fewer than five months, increases the risk of thrombotic CV events.

---

[23] *Id.* at 2071.

[24] *Id.* at 2070-2071.

[25] Juni, P., *et al.*, *Risk of cardiovascular events and rofecoxib: cumulative meta-analysis*, THE LANCET Nov. 5, 2004 (online) at Table 2.

[26] *Id.*

[27] *Id.* at Table 2.

## II. CONCLUSION.

For the foregoing reasons and the reasons stated in Merck's moving papers and the prior briefing on this subject, Merck respectfully requests that the Court exclude any testimony from plaintiff's expert witnesses that the use of 25 mg Vioxx for fewer than five months is capable of causing thrombotic CV events such as heart attacks or that it caused plaintiff's heart attack.

Dated:  August 28, 2006

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
Carrie A. Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

826072v.1

Brian Currey
Catalina J. Vergara
Ashley A. Harrington
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

And

Douglas R. Marvin
Robert A. Van Kirk
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

Attorneys for Merck & Co., Inc.

826072v.1

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Reply in Support of Merck's Motion for Order Excluding Expert Testimony that Short-Term Vioxx Use Increases Cardiovascular Risk has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 28th day of August, 2006.

                                            */s/ Dorothy H. Wimberly*
                                            Dorothy H. Wimberly, 18509
                                            STONE PIGMAN WALTHER
                                            WITTMANN L.L.C.
                                            546 Carondelet Street
                                            New Orleans, Louisiana  70130
                                            Phone:  504-581-3200
                                            Fax:     504-581-3361
                                            dwimberly@stonepigman.com

                                            Defendants' Liaison Counsel

826072v.1