## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0485 | * | |
| | * | MAGISTRATE JUDGE |
| GERALD D. BARNETT, | * | KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * | * | |

## MEMORANDUM IN SUPPORT OF MOTION OF
## MERCK & CO., INC. ("MERCK") FOR A NEW TRIAL ON ALL ISSUES

## TABLE OF AUTHORITIES

**Page**

### CASES

*Alabama v. Blue Bird Body Co.,*
573 F.2d 309 (5th Cir. 1978) ........................................................................................... 4, 18

*Allen v. Pennsylvania Eng'g Corp.,*
102 F.3d 194 (5th Cir. 1996) ................................................................................................ 23

*Anderson v. Siemens Med. Sys., Inc.,*
335 F.3d 466 (5th Cir. 2003) ......................................................................... 3, 8, 15, 16, 17

*Bradley v. Gen. Motors Corp.,*
116 F.3d 1489 (10th Cir. 1997) ........................................................................................... 29

*Bragg v. Hi-Ranger, Inc.,*
462 S.E.2d 321 (S.C. Ct. App. 1995)................................................................................... 28

*Brock v. Merrell Dow Pharms., Inc.,*
874 F.2d 307 (5th Cir. 1989) ............................................................................................... 23

*Brunnemann v. Terra Int'l, Inc.,*
975 F.2d 175 (5th Cir. 1992) ............................................................................................... 17

*Carr v. Wal-Mart Stores, Inc.,*
312 F.3d 667 (5th Cir. 2002) ........................................................................................... 4, 19

*Castano v. Am. Tobacco Co.,*
84 F.3d 734 (5th Cir. 1996) ......................................................................................... 4, 5, 18

*Christopher v. Florida,*
449 F.3d 1360 (11th Cir. 2006) ........................................................................................... 20

*Colonial Leasing v. Logistics Control Int'l.,*
770 F.2d 479 (5th Cir. 1985) ................................................................................................. 9

*Davis v. Safeway Stores, Inc.,*
532 F.2d 489 (5th Cir. 1976) ................................................................................................. 9

*Duk v. MGM Grand Hotel, Inc.,*
320 F.3d 1052 (9th Cir. 2003) ............................................................................................. 26

*Dunn v. Lederele Labs.,*
328 N.W.2d 576 (Mich. App. 1982)..................................................................................... 36

*Edwards v. Sears, Roebuck and Co.,*
512 F.2d 276 (5th Cir. 1975) ....................................................................................... 5, 19, 20

*Evers v. Equifax, Inc.,*
650 F.2d 793 (5th Cir. 1981) ......................................................................................... 20, 22

*Eximco, Inc. v. Trane Co.,*
748 F.2d 287 (5th Cir. 1984) ................................................................................................. 9

*Fed. Deposit Ins. Corp. v. Munn,*
804 F.2d 860 (5th Cir. 1986) ................................................................................................. 6

## TABLE OF AUTHORITIES
### (continued)

Page

*Fennell v. Littlejohn*,
25 S.E.2d 408 (S.C. 1962) ............................................................................................... 5

*First Commonwealth Corp. v. Hibernia Nat'l Bank of New Orleans*,
891 F. Supp. 290 (E.D. La. 1995).................................................................................. 34

*Gallick v. Baltimore & Ohio R.R. Co.*,
372 U.S. 108 (1963)....................................................................................................... 29

*Garrett v. Hamilton Standard Controls, Inc.*,
850 F.2d 253 (5th Cir. 1988) ........................................................................................ 28

*Gasoline Prods. Co., Inc. v. Champlin Refining Co.*,
283 U.S. 494 (1931)................................................................................. 3, 4, 5, 8, 9, 10, 18

*Gasperini v. Center for Humanities, Inc.*,
518 U.S. 415 (1996)....................................................................................................... 13

*Griffin v. Matherne*,
471 F.2d 911 (5th Cir. 1973) ........................................................................................ 29

*Hetzel v. Prince William County*,
523 U.S. 208 (1998)....................................................................................................... 13

*In re Rhone-Poulenc Rorer, Inc.*,
51 F.3d 1293 (7th Cir. 1995) ................................................................................... 13, 18

*Johnson v. ABLT Trucking Co., Inc.*,
412 F.3d 1138 (10th Cir. 2005) .................................................................................... 29

*Kellassy v. Cirrus Design Corp.*,
No. 3:04-CV-0727-N, 2006 U.S. Dist. Lexis 34347, (N.D. Tex. May 30, 2006) .......................................................................................................................... 28

*Kirsch v. Picker Int'l, Inc.*,
753 F.2d 670 (8th Cir. 1985) ........................................................................................ 36

*Laxton v. Gap Inc.*,
333 F.3d 572 (5th Cir. 2003) .......................................................................................... 7

*Lehrman v. Gulf Oil Corp.*,
464 F.2d 26 (5th Cir. 1972) ............................................................................... 13, 26, 30

*Leibowitz v. Ortho Pharm. Corp.*,
307 A.2d 449 (Pa. Super. 1973)..................................................................................... 36

*Lind v. Schenley Indus., Inc.*,
278 F.2d 79 (3d Cir. 1960)............................................................................................. 34

*Lindsay v. Ortho Pharm. Corp.*,
637 F.2d 87 (2d Cir. 1980)............................................................................................. 36

*Mack Trucks, Inc. v. Arrow Aluminum Castings Co.*,
510 F.2d 1029 n.3 (5th Cir. 1995) .................................................................................. 8

## TABLE OF AUTHORITIES
### (continued)

Page

*Magistrini v. One Hour Martinizing Dry Cleaning,*
180 F. Supp. 2d 584 (D.N.J. 2002) ........................................................................................ 42

*Mampe v. Ayerst Labs.,*
548 A.2d 798 (D.C. App. 1988)............................................................................................ 36

*McClain v. Metabolife Int'l Inc.,*
401 F.3d 1233 (11th Cir. 2005) ............................................................................................ 41

*Medalen v. Tiger Drylac U.S.A., Inc.,*
269 F. Supp. 2d 1118 (D. Minn. 2003)................................................................................. 42

*Moore v. Ashland Chem. Ins.,*
151 F.3d 269 (5th Cir. 1998) ................................................................................................ 41

*Mueller v. Hubbard Milling Co.,*
573 F.2d 1029 (8th Cir. 1978) .............................................................................................. 20

*Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.,*
22 F. Supp. 2d 942 (E.D. Ark. 1998).................................................................................... 42

*Nissho-Iwai Co. v. Occidental Crude Sales, Inc.,*
729 F.2d 1530 n.13 (5th Cir. 1984) .............................................................................. 4, 9, 19

*O'Neal v. Bowles,*
431 S.E.2d 555 (S.C. 1993) .................................................................................................. 21

*Odom v. G.D. Searle & Co.,*
979 F.2d 1001 (4th Cir. 1992) ........................................................................................ 35, 37

*Ohio v. Dep't of the Interior,*
880 F.2d 432 (D.C. Cir. 1989)............................................................................................... 41

*Payton v. Abbott Labs,*
780 F.2d 147 (1st Cir. 1985)................................................................................................... 4

*Plummer v. Lederle Labs.,*
819 F.2d 349 (2d Cir. 1987).............................................................................................. 35, 36

*Porterfield v. Ethicon, Inc.,*
183 F.3d 464 (5th Cir. 1999) ................................................................................................ 35

*Richard v. Firestone Tire & Rubber Co.,*
853 F.2d 1258 (5th Cir. 1988) .............................................................................................. 26

*Smith v. Transworld Drilling Co.,*
773 F.2d 610 (5th Cir. 1985) ........................................................................................... 6, 35

*Sprankle v. Bower Ammonia & Chem. Co.,*
824 F.2d 409 (5th Cir. 1987) .......................................................................................... 28, 29

*Stanback v. Parke, Davis & Co.,*
657 F.2d 642 (4th Cir. 1981) ................................................................................................ 35

*Steinke v. Beach Bungee, Inc.,*
105 F.3d 192 (4th Cir. 1997) .................................................................................................. 5

## TABLE OF AUTHORITIES
### (continued)

Page

*Thomas v. Hoffman-LaRoche, Inc.*,
   949 F.2d 806 (5th Cir. 1992) ................................................................................................ 37

*Tipton v. Michelin Tire Co.*,
   101 F.3d 1145 (6th Cir. 1996) ............................................................................................. 29

*Turner v. Iowa Fire Equip. Co.*,
   229 F.3d 1202 (8th Cir. 2000) ............................................................................................. 42

*Valentine v. Baxter Healthcare Corp.*,
   68 Cal. App. 4th 1467 (1999) ................................................................................. 25, 27, 28

*Werner v. Upjohn Co., Inc.*,
   628 F.2d 848 (4th Cir. 1980) ....................................................................................... 25, 28

*Wheat v. Pfizer, Inc.*,
   31 F.3d 340 (5th Cir. 1994) ................................................................................................. 42

*Williams v. Slade*,
   431 F.2d 605 (5th Cir. 1970) ........................................................................................... 9, 19

*Witt v. Norfe, Inc.*,
   725 F.2d 1277 (11th Cir. 1984) ........................................................................................... 29

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. VII ................................................................................................. 13, 26, 30

## STATUTES

S.C. CODE ANN. § 15-33-125 ...................................................................................................... 5

S.C. CODE ANN. § 15-73-30 ....................................................................................................... 27

## OTHER AUTHORITIES

Richard L. Cupp, Jr. & Danielle Polage, *The Rhetoric of Strict Products Liability
   Versus Negligence: An Empirical Analysis*, 77 N.Y.U.L. REV. 874, 875-76
   (2002) ................................................................................................................................... 29

6A J. Moore, FEDERAL PRACTICE § 59.06 ................................................................................ 19

11 Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2815
   (2d ed. 1995) .................................................................................................................. 19, 20

11 Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2806
   (2d ed. 1995) ....................................................................................................................... 34

RESTATEMENT (SECOND) OF TORTS § 402A cmt. k ..................................................................... 27

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | MERCK IS ENTITLED TO A NEW TRIAL ON ALL ISSUES BECAUSE THE DAMAGES AND LIABILITY ISSUES ARE INEXTRICABLY INTERTWINED | 8 |
| II. | THE COURT MUST GRANT A NEW TRIAL ON ALL ISSUES BECAUSE THE ENTIRE VERDICT WAS INFECTED WITH PASSION AND PREJUDICE | 19 |
| III. | THE COURT MUST ORDER A NEW TRIAL ON ALL ISSUES BECAUSE THE VERDICT IS INCONSISTENT | 24 |
| | A. | The jury's findings on the strict liability and negligent failure to warn interrogatories are fatally inconsistent ................ 26 |
| | B. | The jury's findings on the deceit by concealment issue cannot be divorced from its findings on strict liability or negligence ................ 31 |
| | C. | The fact that the Court instructed the jury to separately consider each of plaintiff's three claims does not change this result ................ 32 |
| IV. | THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE | 34 |
| | A. | Mr. Barnett's treating physicians had independent knowledge of the alleged risks of Vioxx ................ 35 |
| | B. | Plaintiff has failed to show that a different warning would have changed his doctors' prescribing decisions ................ 37 |
| | C. | The weight of the evidence is that Vioxx neither caused Mr. Barnett's heart attack nor accelerated his atherosclerosis ................ 41 |
| V. | CONCLUSION | 44 |

As the Court correctly noted in its August 30, 2006 order ("New Trial Order"), the jury's $50 million "compensatory damages" verdict bears no relationship to any injury suffered by Mr. Barnett as a result of his Vioxx® use. The Court found that the "award is excessive under any conceivable substantive standard of excessiveness" and that "no reasonable jury could have found that the Plaintiff's losses totaled $50 million." (New Trial Order at 6.) As a result, the Court ordered a new trial on the issues of damages. A new trial limited to damages, however, is not permissible and would constitute reversible error. By this motion, Merck seeks a new trial on *all* issues, not just damages.[1]

The jury clearly attempted to punish Merck, despite the Court's explicit instructions forbidding that. (Jury Charge at 16.) The resulting award was divorced from any rational assessment of the impact of Merck's conduct on Mr. Barnett. Rather, as the Court found, the damages award was so excessive as to be the result of caprice, passion, or prejudice. In a very real sense, the verdict had nothing to do with the impact of Vioxx – or Merck's conduct – on Mr. Barnett. Yet the liability part of the verdict contained key questions concerning impacts on Mr. Barnett: causation and fact of damage, as well as knowledge and reliance by Mr. Barnett's prescribing physicians. There is no reason to believe that, in the few hours it deliberated, the jury acted with caprice, passion, and prejudice when deciding the amount of damages yet acted deliberately and dispassionately when deciding fact of damage and causation, and when resolving the case-specific questions under the learned intermediary doctrine. Indeed, the inconsistencies among the special verdicts compel the opposite conclusion. Instead, in all

---

[1] If the Court believes it is appropriate to do so, Merck requests that the Court consider this a motion for reconsideration under Rule 60(b), either of the Court's denial as moot of Merck's oral motion for a new trial, or of the Court's decision to grant a new trial on damages only. The basis for this motion is set forth in this memorandum.

probability the jury quickly decided that Merck did something wrong, did not rationally address the critical, case-specific questions that should have determined the liability issues, and arrived at an astronomical damages award intended to punish rather than compensate.

As discussed more fully below, a new trial on *all* issues is required because:

- *The Seventh Amendment prohibits a retrial on damages alone.* A retrial of damages alone is not permitted under the Seventh Amendment when, as here, the damages question is "so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial." *Gasoline Prods. Co., Inc. v. Champlin Refining Co.*, 283 U.S. 494, 498, 500-01 (1931); *Anderson v. Siemens Med. Sys., Inc.*, 335 F.3d 466, 475-76 (5th Cir. 2003) (ordering retrial on all issues, not just damages, in a products liability case involving a medical device, because "partial new trials should not be resorted to unless it appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice" (citations and internal quotations omitted)).

  - *Damages and liability are intertwined.* In responding to interrogatories numbers two and three, the first jury decided at most that Merck caused "an injury" to Mr. Barnett. But it never specified what that injury was. Thus, the second jury will have to resolve specific and general causation issues – among the most hotly contested liability issues – at every turn. For example, did Vioxx cause Mr. Barnett's mild heart attack by creating a prothrombotic state, without also causing an acceleration of his atherosclerotic plaque? If so, it may have saved his life by alerting doctors to his need for bypass surgery, and any damage award would be slight. (8/4/06 Tr. at 1074:6-15 (Test. of Dr. Karavan).) Did Vioxx contribute to Mr. Barnett's atherosclerotic plaque, and if so, by how much? Has Mr. Barnett's life expectancy been reduced as a result of his Vioxx use, and if so, by how much?

- 3 -

&ndash;   *Punitive damages also are intertwined with liability issues.* In addition to these liability and causation questions, a retrial of the entitlement to (or even the amount of) punitive damages necessary would involve a resubmission to the new jury of almost all the "conduct" evidence considered in the liability phase of the first trial, with the result being that virtually all of the evidence in the first trial would need to be resubmitted to the second jury. Because this would require the jury to reconsider causation, knowledge, conduct, and other liability issues, a retrial on damages alone is prohibited.

&ndash;   *A retrial on damages only would violate the Seventh Amendment. Gasoline Prods. Co., Inc.*, 283 U.S. at 498, 500-501; *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750-51 (5th Cir. 1996) ("The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues"); *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978) (same); *see also Payton v. Abbott Labs*, 780 F.2d 147, 154-55 (1st Cir. 1985) (retrial on *all* issues, rather than damages alone, required in a prescription drug case "because damages can only be found by assessing the same evidence as to nature, extent and results of the injuries that the jury must consider to determine liability"). Nothing is to be gained by a lengthy retrial on damages only, that necessarily will involve a retrial on almost all issues, and that ultimately will be set aside on appeal. *See Carr v. Wal-Mart Stores, Inc.*, 312 F.3d 667, 675 (5th Cir. 2002) ("any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care"). A retrial on all issues would be far preferable. *See Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1538-39 n.13 (5th Cir. 1984) (noting courts must order a retrial of all issues unless it clearly appears that the issue to be retried is so distinct and separable that it can be tried separately without injustice; also noting lack of precedent for reversing a trial judge's decision to order a complete new trial).

- 4 -

- *As a practical matter, a fair retrial of damages only would be impossible.* It would be impossible to craft a jury charge that allows a fair retrial on damages. For example, as noted above, it would be impossible to instruct the jury on which injuries, if any, Merck caused. But there are other significant problems. For example, it would be unfair to tell the second jury that Merck is liable for "an injury" to Mr. Barnett caused by knowingly misrepresenting or failing to disclose a material fact to his physicians, when the first jury did not specify what the misrepresentation or failure to disclose was. Merck would be entitled to an instruction, based on the first jury's response to the first interrogatory, that the misrepresentation was not a failure to warn of a known or reasonably scientifically or medically knowable risk associated with Vioxx. And if it was not that, what was it and how did it harm Mr. Barnett? The second jury would be left to guess. Any such trial would violate Merck's Seventh Amendment right to a fair trial. *Gasoline Prods. Co., Inc.*, 283 U.S. at 498, 500-01; *Castano*, 84 F.3d at 750.

- *The entire verdict was infected by passion and prejudice.* A new trial is required on all issues when there is evidence that the entire verdict was infected by passion and prejudice. *See, e.g., Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 282-83 (5th Cir. 1975). Here, instead of awarding damages based on its assessment of the harm it believed Merck caused Mr. Barnett, the jury wholly ignored the Court's instructions in order to attempt to punish Merck. The unreasonable magnitude of the award, its improper motive, the jury's willingness to ignore instructions, and the inconsistent verdicts are all evidence that the jury's entire decision making process was infected by caprice, passion, and prejudice. Where, as here, "the verdict appears so excessive as to indicate that it was the result of caprice, passion or prejudice," the trial judge must set it aside and order a new trial on all issues. *Steinke v. Beach Bungee, Inc.*, 105 F.3d 192, 197 (4th Cir. 1997) (applying South Carolina law and quoting *Fennell v. Littlejohn*, 25 S.E.2d 408, 414 (S.C. 1962)); *see also* S.C. CODE ANN. § 15-33-125 ("unless the plaintiff

is entitled to a directed verdict on the issue of liability, any new trial must include both issues of liability and damages").

- *The jury's inconsistent verdicts require a new trial on all issues.* In addition, the jury's inconsistent verdicts require a new trial. *Fed. Deposit Ins. Corp. v. Munn*, 804 F.2d 860, 866-67 (5th Cir. 1986). The jury's finding (in response to the first jury interrogatory) that Merck did not fail to warn Mr. Barnett's treating physicians adequately, and/or that any such failure did not cause Mr. Barnett's injuries, is wholly inconsistent with its findings (in response to jury interrogatories two and three) that Merck negligently or fraudulently failed to warn. The Court's New Trial Order considered only the inconsistency between the strict liability and negligence findings – and concluded that it was of no consequence. As discussed below, this finding is in error. Moreover, once the inconsistency between the strict liability and deceit by concealment findings is also considered, a new trial on all issues is required. As is also shown below, the fatal inconsistency between the verdicts is not cured by the Court's instruction to the jury to consider plaintiff's claims separately. The inconsistency, too, is evidence that, in reaching its verdicts on the liability questions, the jury ignored this Court's instructions, and acted with caprice, passion, or prejudice.

- *A new trial on all issues also is required because the jury's negligence and fraud verdicts are against the weight of the evidence.* The great weight of the evidence on both liability and damages issues strongly favored Merck. Although the Court correctly noted in the New Trial Order that on a motion for judgment notwithstanding the verdict the Court must consider all the evidence in the light most favorable to the non-moving party, a different standard applies to motions for a new trial. "The trial court's power to grant a new trial on the basis of the court's firm belief that the verdict is clearly contrary to the weight of the evidence has, as Professor Charles Wright observes, 'long been regarded as an integral part of trial by jury.' In making this determination, the district court weighs all the evidence, *but need not view it in the light most favorable to the moving party*." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (emphasis

added; citation omitted); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) (confirming that, in granting a new trial, the district court weighs all of the evidence and need not view it in the light most favorable to the nonmoving party). Viewed in the proper light, the jury's findings on the negligence and fraud claims are against the great weight of the evidence for at least three reasons:

—  *The treating physicians knew the risks.* The Court's statement in its New Trial Order that "[a]ll three of Plaintiff's claims revolve around the safety risks of Vioxx, what Merck knew about any such risks, when Merck knew this information, and what Merck should have done about it" ignores half the equation: what did Mr. Barnett's doctors know about these risks and how did it affect their decisions? Plaintiff's warning expert, Dr. Moye, agreed that "the information on VIGOR and the CV risks is accurately set forth" in the 2002 label. (8/3/06 Tr. at 863:17-864:4 (Test. of Dr. Moye).) The undisputed evidence is that Mr. Barnett's treating physicians already had independent knowledge of the VIGOR data and the alleged cardiovascular risks of Vioxx throughout the time Mr. Barnett used Vioxx and well before the 2002 label came out. This negates the causation and reliance elements of plaintiff's three claims.   The jury's findings on negligence and fraud were wholly unwarranted, reflect its intent to punish Merck, and demonstrate caprice, passion, and prejudice.

—  *A different warning would not have changed the treating physicians' prescribing decisions.* Dr. Moye's only criticism of the 2002 label was that the VIGOR and CV risk information was printed in the precautions section, rather than the warnings section. The undisputed evidence, however, is that Mr. Barnett's doctors understood the *entire* label and – as noted above – fully understood the risks.  Dr. Mikola continued to prescribe Vioxx after he was fully aware of the VIGOR data and after Mr. Barnett's heart attack.   Indeed, there can be no suggestion that Mr. Barnett's doctors would never have put him on a drug that contained cardiovascular warnings. He was prescribed other drugs that have "black

box" cardiovascular warnings.   (8/4/06 Tr. at 970:16-971:7,  972:2-23 (Test. of Dr. Mikola).)  This, too, negates causation, and requires a new trial.  The jury's decision to ignore this evidence is a further indication that it acted with caprice, passion, and prejudice.

–       *Vioxx did not cause Mr. Barnett's injuries.*   The great weight of the evidence is that the natural progression of Mr. Barnett's longstanding Coronary Artery Disease ("CAD") – not Vioxx – caused his medical problems.  That is what his own doctors said. The jury's effort to punish Merck, in the face of this evidence, is further evidence that passion and prejudice interfered not only with its calculation of damages but with its resolution of the negligent and fraudulent failure to warn issues as well.

## I.    MERCK IS ENTITLED TO A NEW TRIAL ON ALL ISSUES BECAUSE THE DAMAGES AND LIABILITY ISSUES ARE INEXTRICABLY INTERTWINED.

Retrial of damages only would violate Merck's right to a jury trial under the Seventh Amendment to the United States Constitution.  In the seminal case of *Gasoline Products Co., Inc.*, the United States Supreme Court held that "a partial new trial . . . may *not* properly be resorted to unless it clearly appears that the issue to be retried is so *distinct* and *separable* from the others that a trial of it alone may be had without injustice."  283 U.S. at 500 (emphasis added).  Where, as here, "the question of damages . . . is so interwoven with that of liability that the former cannot be submitted to the jury independently . . . without confusion and uncertainty, which would amount to a denial of a fair trial" then "a new trial of all the issues" is required.  *Id.* at 500-01.  *See also Anderson*, 335 F.3d at 475-76 (reiterating the *Gasoline Products* rule and ordering a new trial on all issues raised in a medical device products liability case, including damages); *Mack Trucks, Inc. v. Arrow Aluminum Castings Co.*, 510 F.2d 1029, 1034 n.3 (5th Cir. 1995) ("A new trial on only some of the issues in a case may be ordered *only* if the issues to be retried are so distinct and separable from the other issues that trial of them alone clearly may

be had without injustice or prejudice to either party." (emphasis added)); *Eximco, Inc. v. Trane Co.*, 748 F.2d 287, 290 (5th Cir. 1984) (affirming trial court's grant of new trial on both liability and damages "[b]ecause a second jury charged with determining damages, would be unaware of how the first jury found that [defendant] breached its contract with [plaintiff]"); *Nissho-Iwai Co.*, 729 F.2d at 1538-1539 ("Courts must order a complete retrial of issues unless it clearly appears that the issue to be tried is so distinct and separable from the others that a trial of it alone may be had without injustice" (internal quotations and citations omitted)); *Davis v. Safeway Stores, Inc.*, 532 F.2d 489, 491 n.3 (5th Cir. 1976) (Partial retrial is permitted, "but it must clearly appear that these issues are separate from the other issues in the case and . . . did not affect the determination of the other issues . . . . Sometimes the issues of liability and damages are so interwoven that an error in the latter may have affected the factfinder's determination of the former" (internal quotation marks omitted)); *Colonial Leasing v. Logistics Control Int'l*, 770 F.2d 479, 481-82 (5th Cir. 1985) (ordering retrial on all issues and restating *Gasoline Products* rule); *Williams v. Slade*, 431 F.2d 605, 608 (5th Cir. 1970) ("[P]artial new trials should not be resorted to unless no injustice would result.").

In *Gasoline Products*, the plaintiff brought suit for breach of contract, claiming that the defendant had failed to pay for its use of certain oil refining structures. The defendant counterclaimed on the grounds that plaintiff had breached both an oral and a written contract to construct one or more "treating towers" necessary for the refining process. 283 U.S. at 495. The jury returned a verdict for plaintiff and a verdict for defendant on the counterclaims. The Court of Appeals reversed the verdict, finding that the trial court had erred in giving the jury charge on the measure of damages, and ordered a new trial restricted to the issue of damages only. *Id.* at 496.

- 9 -

The United States Supreme Court granted certiorari "to review the single question whether the court below erred in thus limiting the new trial." *Id.* at 497. The Court held that the Seventh Amendment does not prohibit all partial retrials. *Id.* at 498. Relying on the Seventh Amendment's guarantee of the right to a jury trial, however, the Court held that a partial new trial is *not* proper unless "it *clearly* appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Id.* at 500 (emphasis added). Applying the standard to the case before it, the Court concluded that the question of damages was "so interwoven with that of liability" that a retrial on damages alone was prohibited. *Id.*

In support of its conclusion that the issues of damages and liability were too interwoven to permit a retrial on the issue of damages only without running afoul of the Seventh Amendment, the Court explained:

> [U]pon the new trial, the jury cannot fix the amount of damages unless also advised of the terms of the contract; and the dates of formation and breach may be material, since it will be open to [plaintiff] to insist upon the duty of [defendant] to minimize damages .... But it is impossible from an inspection of the present record to say precisely what were the dates of formation and breach of contract found by the jury, or its terms. Different dates are alleged in the counterclaim as that of the contract .... No date was set for performance, and what the jury, by its verdict, found to be the reasonable time for performance is not disclosed in the record.

*Id.* at 499-500. Moreover, the jury had not resolved whether the contract was to construct one, two or three treating towers, something that a second jury retrying damages would need to know to calculate damages. *Id.* at 500. Other information, such as whether the contract included a guaranty that the treating tower would function adequately, likewise had not been decided by the first jury. *Id.* In short, the undetermined liability issues were so intertwined with the damages issues that a retrial on damages alone would be unworkable and unfair. *Id.*

- 10 -

As in *Gasoline Products*, a new jury in this case would not be able to determine the amount of damages without first determining a number of critical liability issues. At the most fundamental level, it is impossible to say which injury or injuries the jury found to have been caused by Vioxx (assuming for the moment that the jury paid any attention to this issue, rather than just determining to punish Merck). The evidence of damages falls into three categories: (i) Mr. Barnett's medical bills; (ii) non-economic damages such as pain and suffering and/or quality of life diminishment; and (iii) Dr. Zipes's speculative testimony that Mr. Barnett's life expectancy was decreased by nine to ten years. But as to each of these injuries, there is conflicting evidence as to whether, and to what extent, it was caused by Vioxx. This is because each of the injuries is linked to Mr. Barnett's Coronary Artery Disease, and the undisputed evidence proves that Mr. Barnett had preexisting CAD. (*See, e.g.*, 8/8/06 Tr. at 1754:17-1755:14 (Test. of Dr. Zipes) ("Q: Do you agree, sir, that in January of 2000 that Mr. Barnett already had coronary artery disease? A: Yes, sir. Q: Do you agree that it is more likely than not that the coronary artery disease that Mr. Barnett already had in January 2000 was not due to Vioxx? A: Yes, sir.").) Indeed, plaintiff's counsel admitted in his opening statement that Mr. Barnett would likely have had a heart attack at some point, even if he had never taken Vioxx. (7/31/06 Tr. at 124:13-17.)

Because of Mr. Barnett's preexisting CAD and other risk factors, he was a likely candidate for a heart attack and/or bypass surgery – regardless of whether he had taken Vioxx or not – and would have incurred certain medical bills relating to his heart disease. Similarly, Mr. Barnett's alleged pain and suffering, loss of quality of life, and decreased life span are injuries that he may have sustained even if he had never taken Vioxx.

The "first" jury, of course, never decided which, if any, of Mr. Barnett's claimed injuries resulted from his Vioxx use.[2] Thus, the "second" jury would be required to examine all of the issues of general and specific causation – issues that form the core of the liability case – in order to determine which, if any, of Mr. Barnett's injuries were caused by his Vioxx use. Because the first jury did not make any findings on these issues, we do not know what it thought about them. For example, did the first jury think that Vioxx caused Mr. Barnett's mild heart attack via the Fitzgerald hypothesis, but not the progression of his atherosclerotic plaque? No one knows. Did the first jury conclude that Vioxx contributed to some of Mr. Barnett's atherosclerosis, but did not cause him to need bypass surgery? It's impossible to say. Did it believe that Vioxx reduced his life span? The jury made no finding on the issue. At most, in responding to interrogatories two and three, the jury concluded that Merck had caused "an injury," but it did not find *which* injury was caused by Vioxx, let alone the extent to which Vioxx contributed to that injury. As a result, this Court cannot instruct the second jury which elements of damages were caused by Vioxx – a necessary predicate for determining a new damages award. Thus, damages cannot be determined without retrying key liability issues.

In any event, because Mr. Barnett had preexisting CAD, it would be impossible for the second jury to determine the amount of damages without first answering the question for each claimed injury, was Vioxx a "but for" cause of the injury? If so, the jury would have to determine how much of each particular injury, if any, was caused by Vioxx – and how much was

---

[2] To say this is no criticism of the verdict form. Neither the Court nor the parties could have anticipated that the jury would return a verdict in which: (i) the damages component was the result of caprice, passion, or prejudice; and (ii) the liability portion contained inconsistent verdicts and likely was infused with the same caprice, passion, or prejudice.

caused by Mr. Barnett's preexisting cardiovascular disease. All of this requires specific causation evidence that is properly part of liability, not damages.

Furthermore, in the absence of any specific findings on these issues by the first jury, the Court may not substitute its own conclusions about what injury the first jury intended to compensate for or how much of that injury is attributable to Vioxx. First, this would violate the Seventh Amendment's reexamination clause. U.S. CONST. amend. VII; *see also Hetzel v. Prince William County*, 523 U.S. 208, 212 (1998) (per curiam) ("in accord with the Seventh Amendment's prohibition on the reexamination of facts determined by a jury," a court may not substitute its judgment for that of the jury on the amount of damages to be awarded); *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 432 (1996) (explaining that the Seventh Amendment bears on "the allocation of trial functions between judge and jury" and "controls the allocation of authority to review verdicts"); *Lehrman*, 464 F.2d at 47 ("[W]hen there was factual uncertainty over the amount and duration of plaintiff's harm, the court simply took a different view from the jury's and entered judgment accordingly. In so doing, if that is what the court was doing, the trial court violated the command of the Seventh Amendment, which prohibits reexamination of the facts found by a jury."); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995).

Second, the record provides little or no basis upon which the Court could make such a determination without simply guessing. For example, Dr. Zipes's testimony regarding loss of life expectancy is fundamentally flawed — so it cannot be said that Mr. Barnett indisputably suffered an injury of decreased life expectancy that the jury must compensate. The Court recognized that this was a speculative injury in its New Trial Order: "The evidence suggests that the Plaintiff *may* have lost nine or ten years of life expectancy as a result of his use of Vioxx."

(New Trial Order at 6 (emphasis in original).)  No more could possibly be said.  The entire

evidence on this subject comprises no more than a few lines of trial testimony:

> Q: Let's move on. Next slide.  What does this slide show?
>
> A: I was asked to estimate what impact the heart disease has had on Jerry Barnett, and this is a life table created by the CDC, the Center for Disease Control.  It shows that, at age 55, Jerry would have had 24 years of expected life according to being a white male.  But my feeling is that with the extent of damage that he has, that this has been reduced significantly by some nine or ten years.  If you go to the next slide, again, these are very important information [sic].
>
> Q: I think the next slide was left out, so we just have to talk about it.
>
> A: Okay.  What the next slide showed is that individuals who have bypass surgery, about 42 percent died by ten years.  So only 58 percent are alive at ten years.  So I put that together with this life table and came up with the fact that I think his life has been shortened by some nine or ten years.

(8/8/06 Tr. at 1733:24-1735:14.)

This is sophistry.  All that this testimony amounts to is that some portion of people who

have had bypass surgery (42%) die within ten years.  But Dr. Zipes failed to explain the causal

nexus between the bypass surgery and the hypothesized decrease in life expectancy.  In fact,

bypass surgery is intended to, and often does, *lengthen* life spans – not decrease them.  Thus, it is

more likely that the reason this 42% die within ten years is due not to the bypass surgery but

rather to the fact that people who need such surgery are usually in poorer health than the general

population.  The bypass surgery is merely an indicator of the seriousness of the underlying

disease.  Dr. Zipes's failure to account for this fact is fatal to his analysis.

Additionally, Dr. Zipes was comparing the life expectancy of patients who have had

bypass surgery with the general population.  The record shows, however, that Mr. Barnett had

pre-existing CAD, and that he had a higher risk of heart disease than the general population.  Dr.

Zipes never examined the expected life span of people with Mr. Barnett's characteristics.

- 14 -

Indeed, other than stating his "feeling" that Mr. Barnett's life expectancy was decreased by nine to ten years, Dr. Zipes offered no explanation of why Mr. Barnett would fall into this 42% category.   A number of factors, including age, weight, overall health, and general fitness, play a role in determining the life expectancy of an individual who had bypass surgery.   Here, Mr. Barnett dedicated much of his case to showing that he was generally in great health, that he watched his diet, exercised regularly, and intended to stay fit. (*See, e.g.*, 8/8/06 Tr. at 1581:11-1582:2 (Test. of Mr. Barnett).)   He is also taking anti-cholesterol drugs that, according to Dr. Popma, are capable of arresting or even reversing the build-up of atherosclerotic plaque.  (8/7/06 Tr. at 1410:18-1411:4.)  These factors all militate against the conclusion that Mr. Barnett would fall into the 42% of people who had a decreased life span after bypass surgery.   In the end, the only "evidence" left to support this conclusion is Dr. Zipes's unsubstantiated testimony about his "feelings" on the subject.

More importantly, even if Dr. Zipes had accounted for all of these factors, the second jury could still not award damages based on this testimony.  As explained above, the first jury never found that the use of Vioxx caused the underlying need for the bypass surgery.  Nor did it ever make findings on the *degree*, if any, to which Vioxx exacerbated Mr. Barnett's underlying CAD. Without such findings, there is no way for the second jury to make a determination on the amount of compensation, if any, Mr. Barnett is entitled to for his alleged decreased life expectancy.

The very cases the Court cited for the proposition that "a new trial may be limited to the issue of damages" (New Trial Order at 6) demonstrate that in *this* case a retrial on damages alone is impermissible.   In the first, *Anderson v. Siemens Corp.*, a widow sued the distributor of a medical device, claiming that it caused her late husband's stroke and his death two years later.

- 15 -

335 F.3d at 468-70.  The jury returned a verdict finding that the device had a design defect, and

that it caused both the stroke and the decedent's death.  It awarded $7 million in damages.  On

appeal, the Fifth Circuit held that the only evidence linking the device to the decedent's death

had been admitted in error.  *Id.* at 471-75.  The error affected not only the jury's determination

that the device caused the decedent's death, but also its calculation of damages:

> The jury's $7 million award of damages lumps damages incurred
> as a result of Decedent's 1996 stroke together with damages
> associated with Decedent's subsequent death two years later.
> From the jury's verdict form, there is no way of knowing the
> specific amount of the damages award that is attributable to the
> jury's finding that Decedent's 1996 stroke was a producing cause
> of his death.   The jury form failed to identify those damages
> stemming solely from the 1996 stroke separately from those
> damages stemming from his death.

*Id.* at 475.  If the district court's error were not corrected, an undetermined portion of the $7

million judgment would rest on inadmissible evidence.  *Id.*

In the portion of the opinion relied upon by this Court in its New Trial Order, the Fifth

Circuit said that it had the power to correct the error by ordering a new trial:  "Under the Federal

Rules of Civil Procedure, a court may grant a new trial to all or any of the parties and on all or

part of the issues . . . ."  *Id.* (internal quotation marks omitted).  But that portion was immediately

followed by an explanation of why a new trial on damages alone could *not* be granted in that

case, an explanation that applies with equal force to this case:

> However, partial new trials should not be resorted to unless it
> appears that the issue to be retried is so distinct and separable from
> the others that a trial of it alone may be had without injustice.
> Thus, in cases where the issues subject to retrial are so interwoven
> with other issues in the case that they cannot be submitted to the
> jury independently . . . without confusion and uncertainty, which
> would amount to a denial of a fair trial, then it is proper to grant a
> new trial on all of the issues raised.

*Id.* at 475-76 (citations and internal quotation marks omitted).  As the Fifth Circuit continued:

- 16 -

> Assuming, *arguendo*, that a reasonable jury could have found – as
> the jury did – that Siemens is liable . . . for damages associated
> with Decedent's stroke, it would, nonetheless, cause considerable
> confusion and uncertainty if we granted a retrial only on the issue
> of whether Siemens is liable for damages associated with
> Decedent's death. Given the interrelatedness of these issues, and
> given that the jury's award of damages fails to identify damages
> incurred as a result of Decedent's stroke separately and apart from
> those damages associated with Decedent's death, we conclude that
> there should be a retrial of all the issues raised, including damages.

*Id.* at 476.

Just as in *Anderson*, the jury's verdict form in this case did not specify which damages
resulted from Mr. Barnett's use of Vioxx. Nor, of course, did it accomplish the logically
impossible task of specifying which damages resulted from negligent failure to warn or deceit by
concealment, but *not* strict liability failure to warn. Given the "interrelatedness" of damages and
liability issues in this case, there should be a retrial on all issues.

*Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992), the other case cited
by this Court for the proposition that a new trial may be limited to the issue of damages, has no
application to this case. In *Brunnemann*, the Fifth Circuit held that, although the jury award was
excessive, unlike the award in this case "the defects in the award are readily identifiable and
measurable, and do not seem to be the product of passion or prejudice." *Id.* at 178. Also unlike
the award in this case, the *Brunnemann* damages award did not appear to be interwoven in any
way with other issues.

In addition to being unconstitutional, a retrial on damages alone would be a practical
impossibility. As explained above, the first jury was not called upon to decide which of Mr.
Barnett's claimed injuries was caused by Vioxx. This means that the Court would not be able to
instruct the new jury on this issue. The Court also could not give instructions on liability

because of the jury's inconsistent verdict. By answering "no" to interrogatory one (on strict liability), the jury necessarily decided that Merck did not fail to adequately warn and/or that any failure to warn did not cause an injury to Mr. Barnett. This leaves many outstanding questions which are simply not answerable by reference to the record. For example, if it wasn't a failure to warn of known or reasonably knowable risks, what duty did Merck fail to discharge on the negligence claim? Similarly, what misrepresentations did Merck make on the fraud claim – since they could not have been misrepresentations about the warning or label? The second jury will not know the answers to these questions – but, unless it does, it will be unable to award damages in any rational fashion.

A solution might be to re-present most or all of the evidence from the first trial to the second jury, so that it could make these liability determinations itself. But Merck has a constitutional right to have one jury decide these liability issues along with the issue of damages. *Gasoline Prods. Co., Inc.*, 283 U.S. at 498, 500-01; *Castano*, 84 F.3d at 750-51 ("The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues."); *Alabama*, 573 F.2d at 318 (same); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d at 1302-03 (Posner, J.) (explaining that bifurcating cases in a way that results in separate juries trying the same overlapping factual issues is prohibited because "[t]he right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them").

Similarly, any retrial of punitive damages necessarily would involve a resubmission to the new jury of almost all the conduct evidence considered in the first trial, including what Merck knew about any risks of Vioxx, when it knew it, and what it should have done about it. As the Court recognized, these issues are among those at the core of plaintiff's claims. (New

- 18 -

Trial Order at 4.)  Thus, just as the amount of compensatory damages is inextricably intertwined with liability issues and evidence, so too is the entitlement to (and even the amount) of punitive damages.  For this reason, a retrial on damages issues alone in this case is flatly prohibited by *Gasoline Products* and the controlling Fifth Circuit precedent referenced above.

Thus, what the Court envisions as a comparatively short retrial on damages alone would turn out to be as lengthy as the original trial.  Almost all the evidence would be presented again. And the Fifth Circuit likely would overturn the result on appeal.  *See Carr*, 312 F.3d at 675 ("any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care").  That would be an enormous waste of time, money, and judicial resources.  A retrial on all issues would be far preferable.  *Nissho-Iwai Co.*, 729 F.2d at 1538-39 n.13 (noting preference for a retrial of all issues where, as here, they are intertwined; also noting lack of precedent for reversing a trial judge's decision to order a new trial on *all* issues).

## II.     THE COURT MUST GRANT A NEW TRIAL ON ALL ISSUES BECAUSE THE ENTIRE VERDICT WAS INFECTED WITH PASSION AND PREJUDICE.

A court *must* order a new trial on all issues when – as here – there is a "reasonable probability" that passion, prejudice or caprice affected the jury's decisions on both liability and damages.  *Edwards*, 512 F.2d at 282-83 ("If it appears that the ["passion, prejudice, caprice, undue sympathy, arbitrariness or more"], in reasonable probability, affected both the liability and damages issues, then a new trial as to both issues *must* be ordered." (internal citations omitted) (emphasis added)); *see also Williams v. Slade*, 431 F.2d 605, 609 (5th Cir. 1970) ("[W]here the damages are excessive and the verdict is the product of passion or prejudice a new trial as to all the issues must be ordered." (*quoting* 6A J. Moore, FEDERAL PRACTICE § 59.06 at 3767)); 11 Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2815 at 165 (2d ed.

1995) (explaining that when passion or prejudice may have affected the decision of the jury on liability as well as damages, "*a complete new trial is required*" (emphasis added)).

A number of factors can indicate that a jury's verdict was so influenced by passion, prejudice or other improper motives that a new trial on all issues is required. In *Edwards*, for example, the Fifth Circuit pointed to the following facts as evidence of pervasive passion and prejudice in a products liability case: (i) the trial court itself determined the award of damages to have been grossly excessive; (ii) the jury had "failed to respond to the court's instructions"; and (iii) the issue of liability was "strongly disputed." 512 F.2d at 582-83. A grossly excessive award – especially one wholly divorced from any rational assessment of actual damages – may itself be evidence that the entire verdict was the result of improper jury action. *See Christopher v. Florida*, 449 F.3d 1360, 1368 (11th Cir. 2006) (stating that "[t]he gross excessiveness of these awards casts doubt on the validity of the entire verdict, including liability" and shows that it was "swayed by passion"); *Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1040 (8th Cir. 1978) ("The large excess in itself and the absence of any plausible explanation therefor clearly points to bias and prejudice on the part of the jury."). The Fifth Circuit has also found that where, as here, a jury improperly awards punitive damages as part of the compensatory award, a new trial on all issues is proper. *See Evers v. Equifax, Inc.*, 650 F.2d 793, 798 (5th Cir. 1981) (affirming district court's grant of a new trial on all issues because the fact that the jury awarded punitive damages as part of the compensatory award was evidence that the entire verdict was infected with passion and prejudice); *see also Mueller*, 573 F.2d at 1040 (finding that jury's apparent award of punitive damages as part of the compensatory award must have been the result of passion and prejudice and warranted a new trial on *all* issues).

- 20 -

This case has all these factors and more, demonstrating a "reasonable probability" that the *entire* verdict was tainted by the jury's passion and prejudice. The Court has already determined that the $50 million dollar compensatory damage verdict is grossly excessive and was the result of improper jury conduct. (New Trial Order at 5-6.) In setting aside the damages verdict in this case, the Court explained that "[i]n South Carolina, a damage award is grossly excessive if it appears 'to be the result of passion, caprice, prejudice, or some influence outside the evidence.'" (New Trial Order at 5 (citing *O'Neal v. Bowles*, 431 S.E.2d 555, 556 (S.C. 1993)).) The Court concluded that the jury's award not only was "grossly excessive" but "excessive under any substantive standard of excessiveness." (*Id.* at 6.) In addition, the Court found that the jury was *unreasonable,* stating that "no reasonable jury could have found that the Plaintiff's losses totaled $50 million." (*Id.*) Thus, as in *Edwards*, this Court concluded that the compensatory damage award was grossly excessive and was the result of passion, caprice or prejudice – and rightly so.

The jury in this case, as in *Edwards*, completely ignored the Court's instructions: instead of awarding damages to compensate Mr. Barnett, it clearly intended the compensatory damage award to punish Merck. The Court explicitly instructed the jury as follows:

> Compensatory damages are not allowed as a punishment against a party. Such damages cannot be based on speculation for it is only actual damages – what the law calls compensatory damages – that are recoverable.

(Jury Charge at 16.) Despite these clear instructions, the jury did the opposite of what the Court directed. It awarded damages that had no basis in the evidence and instead punished Merck. Although Mr. Barnett had a mild heart attack and heart surgery in 2002, he is now in remarkable shape, exercises regularly, and enjoys a full and active life. (*See, e.g.*, 8/8/06 Tr. at 1618:25-1619:18; 8/7/06 Tr. at 1532:18-20.) And although his expert witness, Dr. Zipes, contended that

- 21 -

Mr. Barnett faces a reduced lifespan, as explained above, that opinion was speculative and fallacious. In light of this scant evidence of damages, and the astronomical size of the damages award, it is clear that rather than compensate Mr. Barnett for his harms, the jury returned a verdict that was intended to punish Merck.

In fact, the jurors visually acknowledged as much in open court. During closing arguments in the punitive phase, Merck's counsel stated: "My guess is that you have already awarded punitive damages and that you did not know that this stage was even a possibility." (8/17/06 Tr. at 2696:19-22.) Upon hearing this statement, many of the jurors nodded their heads in agreement. This is exactly the type of evidence of passion and prejudice that caused the Fifth Circuit to conclude in *Evers v. Equifax, Inc.* that a new trial on all issues was necessary to cure the jury's misconduct. 650 F.2d at 798.

As in *Edwards*, the issue of liability was also strongly disputed in this case. The central focus of this trial was causation. The overarching question was: Did Vioxx cause Mr. Barnett's cardiovascular problems? There was significant evidence that Mr. Barnett's harm was the result of his preexisting CAD as opposed to Vioxx. Mr. Barnett's experts and treating physicians conceded he had CAD and ischemia before he ever took Vioxx (8/4/06 Tr. at 949:9-17 (Test. of Dr. Mikola), 1060:10-19 (Test. of Dr. Karavan)), and his treating physicians attributed his heart attack and increased plaque to pre-existing disease (8/4/06 Tr. at 949:5-17 (Test. of Dr. Mikola), 1064:20-1065:5 (Test. of Dr. Karavan)). In fact, his own lawyer conceded in opening statement that he would have had a heart attack someday even without Vioxx. (7/31/06 Tr. at 124:13-17.)

The only evidence connecting Mr. Barnett's injuries to Vioxx came from Dr. Zipes, whose testimony linking Vioxx to acceleration of atherosclerosis was scientifically unreliable. Dr. Zipes relied on studies conducted on genetically altered mice. But the authors of those

studies cautioned against extrapolating the results to humans.  (8/5/06 Tr. at 1224:9-1225:14, 1232:5-21) (Test. of Dr. Epstein).)  Courts have echoed that caution.  *See, e.g., Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) (rejecting animal studies given difficulty extrapolating results to humans); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 197-98 & n.5 (5th Cir. 1996) (rat studies were "inconclusive" and "unreliable" and could not establish that chemical would have same effect in humans).  Dr. Zipes also ignored all the studies that came out the other way, saying his 45-page report would be over a thousand pages long if he included references to all the studies that contradicted his hypothesis.  (8/10/06 Tr. at 1831-16, 1830:12-17.)  As far as linking Vioxx to Mr. Barnett's illness, the only evidence was Dr. Zipes's blood pressure spike chart.  But on cross examination he admitted that Mr. Barnett had just as many blood pressure spikes before taking Vioxx as after.  (8/8/06 Tr. at 1712:21-1713:2.)

Further, as argued in Section IV below, the liability verdict is against the weight of the evidence on another causation-related issue: the learned intermediary doctrine.  The evidence established that plaintiff's expert Dr. Moye admitted that the VIGOR label accurately set forth the CV risks of Vioxx, that Dr. Mikola continued to prescribe Vioxx after the VIGOR label, and that he prescribed another NSAID with a black box warning to Mr. Barnett after he stopped taking Vioxx.  In short, the weight of the evidence is that a different or earlier Vioxx warning would not have made any difference in this case.

To resolve the present motion, however, the Court need not conclude that the weight of the causation and learned intermediary liability evidence favored Merck – much less that it compelled a verdict in Merck's favor.  Rather, the question is whether – given (i) the fact that the damage award resulted from caprice, passion, or prejudice and (ii) the hotly contested evidence

on causation and the learned intermediary defense – there is a "reasonable probability" that the entire verdict resulted from caprice, passion, or prejudice.

Here, the probability is high, not merely reasonable. The verdict plainly did not have anything to do with Mr. Barnett or his injuries. In the guise of establishing Merck's state of mind, plaintiff introduced a great deal of evidence that related to Merck's conduct and that concerned Vioxx generally but that had very little if anything to do with any alleged failure to warn. Usually, jurors can separate such evidence from the failure to warn issues and can decide the case on the merits; sometimes, they cannot. In this case, for whatever reason, the jury made a choice to punish Merck in violation of the Court's instructions, and proceeded to do so without regard to any impact (not just the extent of the impact) that Merck's conduct may have had on Mr. Barnett. Where, as here, no doubt exists that the jury chose to ignore the Court's instructions on the amount of damages, there is a high likelihood it also ignored the Court's instructions on causation and the learned intermediary doctrine. It is no answer to say that a jury uninfluenced by caprice, passion, or prejudice *could* have found against Merck on these issues. Merck did not have such a jury, and it is entitled to one.

## III.   THE COURT MUST ORDER A NEW TRIAL ON ALL ISSUES BECAUSE THE VERDICT IS INCONSISTENT.

A new trial on all issues is warranted for the additional and independent reason that the jury's verdict is irreconcilably inconsistent. As the Court noted in its New Trial Order, the jury found that Merck "was negligent in failing to adequately warn the Plaintiff's treating physicians of a known or reasonably scientifically or medically knowable risk associated with Vioxx" and that Merck "knowingly misrepresented or failed to disclose a material fact to the Plaintiff's treating physicians in a circumstance where it was required to do so." (New Trial Order at 2.) At the same time, the jury found, on the strict liability issue, that "Merck *did not fail to*

- 24 -

*adequately warn* the Plaintiff's treating physicians of a known or reasonably medically knowable risk associated with Vioxx." (*Id.* (emphasis added).)   In other words, the jury found *both* that Merck negligently and fraudulently failed to warn *and* that it did not fail to warn.   Such obviously inconsistent findings cannot stand.

At the core of each of plaintiff's claims is the allegation that Merck failed to apprise Mr. Barnett's treating physicians adequately of the cardiovascular risks allegedly caused by Vioxx, and that this failure to warn caused Mr. Barnett's injuries.   By answering the special interrogatory on strict liability in the negative, the jury necessarily negated at least one of these essential elements in the other two claims.   It found either that there was no failure to warn on the part of Merck or that any failure to warn was not the legal cause of Mr. Barnett's injuries – or both.   Thus, the jury's finding in favor of Merck on the strict liability issue foreclosed a finding in favor of plaintiff on his remaining failure to warn claims and should have disposed of the entire case in Merck's favor. *See Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 860 (4th Cir. 1980); *Valentine v. Baxter Healthcare Corp.*, 68 Cal. App. 4th 1467, 1480-81 (1999).   The jury nonetheless went on to find in plaintiff's favor on the negligent failure to warn and fraud-based failure to warn issues – suggesting that its verdict was based on something other than the applicable law and relevant evidence.

The Court found it "unnecessary to address this issue" in its New Trial Order – a finding Merck respectfully submits is in error. (New Trial Order at 4.)   Were the Court to reexamine the question, it would find that:

- The jury's strict liability and negligence findings cannot be reconciled. Moreover, it is not a matter of simply picking one finding over the other, as the Court suggested it might be in its Order. (New Trial Order at 4-5.)   The Court cannot choose one over another of the jury's necessarily conflicting factual findings without running afoul of the reexamination clause of the

Seventh Amendment. U.S. CONST. amend. VII; *see also Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 47 (5th Cir. 1972).

- The jury's verdict on the deceit by concealment issue, which is predicated on an alleged failure to warn, necessarily falls given the verdict in Merck's favor on strict liability.[3]   The alleged misrepresentations could only have been material – and could only have caused plaintiff's injury – if they related to the warnings given to plaintiff's prescribing physicians.   And these warnings cannot be both "adequate" under plaintiff's strict liability claim and "misrepresentations" under his concealment claim.

- The fact that the jury was properly instructed to consider each of plaintiff's claims separately does not somehow excuse the jury's inconsistent verdict. Such an instruction is simply an admonition to evaluate each claim on its own merits – always taking the relevant law and the evidence in the record into account.  It is not an invitation to reach a verdict that is inconsistent with the law and the facts of the case.

In sum, the Court would find the jury's verdict not "reasonable," but irreconcilably inconsistent. (*See* New Trial Order at 4.)  When faced with such a verdict, a court must either resubmit it to the jury – which it did not do in this case – or order a new trial.  *Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1260 (5th Cir. 1988); *see also Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1057-59 (9th Cir. 2003) (collecting cases).  The correct result in this case is thus to order a new trial on all issues, as explained further below.

### A.    The jury's findings on the strict liability and negligent failure to warn interrogatories are fatally inconsistent.

In order to decide the strict liability failure to warn issue, the jury was required to decide "whether Vioxx was defective and unreasonably dangerous by reason of an inadequate warning" and, if so, "whether the use of Vioxx and the absence of an adequate warning was a legal cause

---

[3] Although, in its oral motions following the announcement of the verdicts, Merck focused on the inconsistency between the strict liability and negligence verdicts, its counsel noted that the "defense verdicts on strict liability failure to warn would exonerate the defendant on failure to warn *under any theory. . . .*" (*See* 8/17/06 Tr. at 2682:24-2683:10.)  The Court expressly agreed that Merck could supplement its motion at a later date. (*Id.*)

of the injuries sustained by Gerald Barnett." (Jury Charge at 8.)  The jury was further instructed that a product "is defective due to inadequate warning if the manufacturer fails to give a reasonably prudent physician adequate warning of a particular risk that was known or knowable to the manufacturer in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." (*Id.* at 8-9.)  This language mirrors the instruction on plaintiff's negligent failure to warn claim, which required the jury to determine whether "(1) Merck negligently failed to adequately warn the Plaintiff's treating physicians or the medical community of a known or reasonably scientifically or medically knowable risk associated with Vioxx, (2) [Mr. Barnett] suffered injuries as a result of Merck's alleged failure to warn, and (3) Merck's negligence was the proximate cause of his injuries." (*Id.* at 11.)

In order to prevail on either claim, plaintiff was thus required to prove that Merck failed to warn his treating physicians adequately of the cardiovascular risks allegedly associated with Vioxx, and that this failure to warn caused Mr. Barnett's injuries.  Having rejected one (or both) of these elements in answering the strict liability interrogatory, it is incomprehensible that the jury went on – as it apparently did – to find that both elements were met in answering the negligent failure to warn interrogatory.

Such contradictory findings are fatally flawed, as other courts have recognized in pharmaceutical cases that are factually and legally analogous to this one.[4]  In *Valentine v. Baxter*

---

[4] Products liability claims against manufacturers of prescription drugs are governed by the special rule of comment k to Section 402A of the Restatement (Second) of Torts.  Comment k provides that certain products, such as prescription drugs, are "unreasonably dangerous" but are not "defective" products if an adequate warning is provided.  South Carolina has adopted comment k by statute.  S.C. CODE ANN. § 15-73-30.  In products liability claims not governed by comment k, "it is possible under certain circumstances for a supplier of products to be held liable
(*footnote continued next page*)

*Healthcare Corporation*, a products liability case brought against a manufacturer of silicone breast implants, a California court held that a jury's "negative finding on strict liability failure to warn . . . subsumed the negligent failure to warn theory and thus exonerated [the defendant] of *any* liability for failure to warn." *Valentine*, 68 Cal. App. 4th at 1480-81 (emphasis in original). Similarly, in *Werner v. Upjohn Co., Inc.*, the Fourth Circuit Court of Appeals held that a new trial was warranted in a products liability case arising out of the use of the prescription drug Cleocin, in part because the jury's finding in favor of the defendant on strict liability failure to warn and its finding in favor of the plaintiff on negligent failure to warn could not be reconciled. *Werner*, 628 F.2d at 860. As the Court explained:

> The effect of the jury verdict on negligence was to find that Upjohn failed to use due care to give an adequate warning of the propensities of the drug marketed, and, in the same breath, the verdict on strict liability found that the drug marketed with such an inadequate warning was not unreasonably dangerous. The verdicts in the context of this failure to warn case involving prescription drugs are obviously inconsistent and cannot stand.

*Id.* So, too, are the jury's verdicts obviously inconsistent in this case.

Outside of the pharmaceutical context, the Fifth Circuit has also recognized that products liability claims can overlap to such an extent as to make a negative finding on one claim dispositive on all remaining claims. In *Garrett v. Hamilton Standard Controls, Inc.*, for example, the Fifth Circuit explained that "a manufacturer logically cannot be held liable for failing to exercise ordinary care when producing a product that is not defective." *Garrett*, 850 F.2d 253, 257 (5th Cir. 1988); *accord Kellassy v. Cirrus Design Corp.*, No. 3:04-CV-0727-N, 2006 U.S. Dist. Lexis 34347, at *13-14 (N.D. Tex. May 30, 2006); *see also Sprankle v. Bower*

---

under a negligence theory even though the supplier is not strictly liable." *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 327 (S.C. Ct. App. 1995). This case is governed by comment k, and no such peculiar circumstances exist, in any event.

*Ammonia & Chem. Co.*, 824 F.2d 409, 413-14 (5th Cir. 1987) (explaining that "the jury's rejection of [plaintiff's] strict liability theory necessarily also constitutes a rejection by the jury of at least one essential factual element of [plaintiff's] negligent failure to warn theory," since "both inadequate warning and proximate cause are factual elements on which a plaintiff must secure favorable jury findings in order to prevail in a warning claim").[5]

Under these authorities, the jury's findings on liability in this case are irreconcilable and cannot stand. They cannot "fairly be said to represent a logical and probable decision on the relevant issues as submitted." *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973). To the contrary, they are "logically incompatible, thereby indicating that the jury was confused or abused its power." *Johnson v. ABLT Trucking Co., Inc.*, 412 F.3d 1138, 1144 (10th Cir. 2005) (citation and internal quotation marks omitted). It is thus impossible to reconcile the inconsistencies in the jury's verdicts "under a fair reading of them." *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963).

---

[5]   *See also, e.g., Bradley v. Gen. Motors Corp.*, 116 F.3d 1489, 1997 WL 354721, at *3-4 (10th Cir. 1997) (unpublished table decision) (finding the jury's verdict for the defendant on strict liability "irreconcilably inconsistent" with it's verdict for the plaintiff on negligence, explaining that "if a plaintiff cannot prove a product is defective, he cannot prove a claim of negligence," and ordering a new trial); *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1150 (6th Cir. 1996) (finding a fatal inconsistency in the jury's verdict where it found for defendant on strict liability and found for plaintiff on negligence, because "[i]n answering 'no' to the interrogatory on strict liability, the jury necessarily found that [the defendant's] tire was not in a 'defective condition'" (emphasis in original)); *Witt v. Norfe, Inc.*, 725 F.2d 1277, 1279 (11th Cir. 1984) (per curiam) ("it must be deemed inconsistent for a jury to find that a product was not defective for purposes of strict liability, and yet that the product was negligently designed, i.e., was defective, for purposes of establishing liability under a theory of negligence"); *see also* Richard L. Cupp, Jr. & Danielle Polage, *The Rhetoric of Strict Products Liability Versus Negligence: An Empirical Analysis*, 77 N.Y.U.L. REV. 874, 875-76 (2002) (explaining that, in products liability cases grounded in a failure to warn, "courts allow plaintiffs to utilize two quite different rhetorical constructs – the language of negligence and the language of strict liability – to define what is increasingly a nearly identical standard of liability").

However, the Court made no effort in its New Trial Order to reconcile the jury's findings.

Instead, the Court reasoned:

> Assuming *arguendo* that these two findings are inconsistent, the inconsistency would, at most, require the Court to enter judgment for Merck on the negligent failure-to-warn claim. However, it is equally plausible that this inconsistency could require the Court to enter judgment for the Plaintiff on the strict liability failure to warn claim. Both results are logically defensible, depending on which finding is used to initiate the chain of reasoning.

(New Trial Order at 4-5.) Merck respectfully disagrees. Whether or not one could plausibly negate one or the other of the jury's inconsistent findings is not the issue. Such an analysis could be done any time there is an inconsistent verdict – and would vitiate the well-established rule that an irreconcilably inconsistent verdict requires either resubmission of the verdict to the jury or a new trial. Indeed, for the Court to choose one of the jury's findings over the other would violate the reexamination clause of the Seventh Amendment and would deprive the losing party of its right to trial by jury. U.S. CONST. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."); *Lehrman*, 464 F.2d at 47. The Court's suggestion in the New Trial Order about the possibility of entering judgment for one party or the other in order to reconcile the jury's verdict was thus wide of the mark. The Court could *not*, consistent with the Seventh Amendment, pick and choose among the special verdicts, entering judgment on one but ignoring another, in an effort to harmonize the results. Accordingly, the Court should grant Merck's request for a new trial on all issues.

**B.    The jury's findings on the deceit by concealment issue cannot be divorced from its findings on strict liability or negligence.**

The Court also suggested, in its New Trial Order, that the jury's finding on the deceit by concealment issue is "unaffected" by the findings on strict liability and negligent failure to warn. (New Trial Order at 5.) But, as the Court also acknowledged, "*[a]ll three* of Plaintiff's claims revolve around the safety risks of Vioxx, what Merck knew about any such risks, when Merck knew this information, and what Merck should have done about it." (*Id.* at 4 (emphasis added).) On the concealment issue, the jury was asked to determine the same core elements it was asked to evaluate in connection with the other two: whether Merck "knowingly misrepresented or failed to disclose a material fact to the Plaintiff's treating physicians in a circumstance where it was required to do so" and whether "the misrepresentation or nondisclosure was a legal cause of the Plaintiff's claimed injuries." (Jury Charge at 12.) Although framed in terms of a heightened intent element, these are the same essential components of the strict liability and negligent failure to warn interrogatories.    Therefore, the jury's findings on strict liability and deceit by concealment cannot coexist.

In fact, even assuming *arguendo* that the jury found some of Merck's conduct misleading and further found that it was intentional, there is still no way its verdict on deceit by concealment is tenable. For a misrepresentation to be actionable, it must be *material*. To use the language from the Court's instructions to the jury, Merck must have "knowingly misrepresented or failed to disclose a material fact to the Plaintiff's treating physicians in a circumstance where it was required to do so." (Jury Charge at 12.) Here, the only place in which Merck was required to disclose information to plaintiff's treating physicians was in the Vioxx labeling and other related disclosures of Vioxx-related risk/benefit information. Merck's alleged misrepresentations could only have been material and could only have caused plaintiff's injury if they related to the

- 31 -

warnings Merck provided Mr. Barnett's doctors about the cardiovascular risks associated with

Vioxx.[6]  Merck's duty to disclose material information under plaintiff's deceit by concealment

claim is thus exactly coextensive with its duty to warn under plaintiff's strict liability and

negligence failure to warn claims.  Having found there was no failure to warn that caused Mr.

Barnett's injuries in response to the strict liability interrogatory, the jury accordingly could not

rationally have found the polar opposite in response to the deceit by concealment interrogatory.

The jury's verdict on the concealment question cannot be considered in isolation, contrary to the

Court's suggestion in its New Trial Order.  It is irreconcilably inconsistent with the verdict on

strict liability and provides additional justification for Merck's request for a new trial on all

issues.

## C.     The fact that the Court instructed the jury to separately consider each of plaintiff's three claims does not change this result.

When, on the last day of trial, Merck moved orally for a new trial based on the jury's

inconsistent verdict, the Court requested that Merck address in its written briefing whether the

submission of three separate claims to the jury had any impact on whether a new trial is

warranted.  Specifically, the Court stated:

> I told the jury, because it's consistent with the law, that there are
> three separate theories that could have been tried to three different
> juries and that each were separate, and the jury had to focus on
> each one and return a verdict on each one of them separately.  I
> gave them the jury charge and also gave them a verdict form in
> which they were instructed to look at each one separately.  In fact,
> one of them they had to use clear and convincing as a standard as

---

[6] Even if one considers the VIGOR article as the predicate for this claim, it cannot support the jury's verdict.    Dr. Mikola testified at trial that whether there were 17 or 20 reported cardiovascular events in the Vioxx arm of the study – as discussed in the *New England Journal of Medicine*'s "Expression of Concern" – made no difference to him.  (8/4/06 Tr. at 958:24-959:23.)  Merck's "statements" in the VIGOR paper thus cannot have been the legal cause of Mr. Barnett's alleged injuries.

opposed to another one, which they used preponderance as the
standard. I will be interested in your written material on that.

(8/17/06 Tr. at 2683:9-20; *see also* New Trial Order at 5 n.2.)

As the Court noted, the jury was required to "separately consider each claim" asserted by

plaintiff. (Jury Charge at 7.) There was nothing erroneous in this instruction – indeed, because

plaintiff was seeking punitive damages, which are not available on a strict liability claim brought

under South Carolina law, the jury was required to consider plaintiff's negligence and fraud-

based claims in addition to his claim for strict liability failure to warn. In considering each

claim, in accordance with the Court's instructions, it would have been possible for the jury to

return any number of consistent answers to the Court's special interrogatories. Hypothetically,

the jury could have found that Merck failed to warn but that its conduct did not rise to the level

necessary to show either negligence or deceit by concealment, thus resulting in a verdict of "yes"

on strict liability but a "no" verdict on negligent failure to warn and deceit by concealment.

Alternately, on sufficient proof, the jury could have found a failure to warn and that Merck's

conduct breached its standard of care, but that it did not constitute "knowing" conduct sufficient

to show fraud. This result would have yielded a "yes" on strict liability and negligent failure to

warn but a "no" on deceit by concealment. Given the elements of these claims, as described

above, neither of these outcomes would have been internally inconsistent. The verdict actually

returned by the jury, however, was inconsistent on its face.

Simply because plaintiff pled three separate theories of recovery does not mean that the

jury's answers to interrogatories one through three can be reconciled. In fact, if the three claims

had been tried to three separate juries, an early verdict in Merck's favor in the strict liability trial

would have been *res judicata* as to the other two. In short, on the facts of this case and under

South Carolina law, the jury's verdict is irreconcilably inconsistent and warrants a new trial.

- 33 -

## IV.   THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE.

A district court should grant a new trial if "the verdict is against the clear weight of evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *First Commonwealth Corp. v. Hibernia Nat'l Bank of New Orleans*, 891 F. Supp. 290, 297 (E.D. La. 1995) (internal quotation marks and citation omitted). "Thus on a motion for a new trial – unlike a motion for a judgment as a matter of law – the judge may set aside the verdict even though there is substantial evidence to support it." 11 Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE: CIVIL §2806 at 65 (2d ed. 1995).

In this case, there are a number of reasons why the Court should scrutinize the jury's verdict more closely than usual, and be more open to granting a new trial on this basis. First, the Court has already determined that at least the damages portion of the jury's verdict was the result of "passion, caprice, prejudice, or some other influence outside the evidence.'" (New Trial Order at 5.) The jury also ignored the Court's instructions on damages. And it returned inconsistent verdicts. Moreover, a trial judge should scrutinize the verdict more closely if – as in this case – the trial deals with a complicated subject matter not lying within the ordinary ken of jurors. *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90-91 (3d Cir. 1960). Here, the jury rushed to decide the case in a few hours after hearing weeks of testimony on complicated medical issues.

All of these factors are reasons why the Court should be more vigilant in scrutinizing this verdict than in the ordinary case. Instead, however, the Court appears to have applied only the far more lenient standard for judgment notwithstanding the verdict – by considering all the evidence in the light most favorable to plaintiff. (New Trial Motion at 4.) In evaluating whether it should grant a new trial on the ground that the verdict is against the clear weight of the

evidence, the Court *need not* view the evidence in the light most favorable to the plaintiff. *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

In this case, the jury's findings on negligent failure to warn and deceit by concealment were against the clear weight of the evidence. In particular, the clear weight of the evidence established that: (i) the treating physicians knew the risks; (ii) a different warning would not have changed the treating physicians' prescribing decisions; and (iii) Vioxx did not cause Mr. Barnett's injuries. Importantly, none of these issues has to do with "what Merck knew and when Merck knew it," which was the basis for the Court's denial of Merck's JMOL and appears to have been the basis for the lawless $50 million verdict. And, just as the jury ignored the evidence and instructions on damages (and, as discussed above, causation), there is no reason to believe the jury paid any attention to the evidence and instructions on the learned intermediary doctrine.

## A.   Mr. Barnett's treating physicians had independent knowledge of the alleged risks of Vioxx.

It is well-settled that when a prescribing physician has independent knowledge of the risks associated with a drug from sources other than the manufacturer, an absent or allegedly inadequate warning is not the cause of the plaintiff's injury. *See Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) (applying South Carolina law; affirming summary judgment for manufacturer in failure to warn case in part because physician had independent knowledge of the risks); *see also Porterfield v. Ethicon, Inc.*, 183 F.3d 464, 468 (5th Cir. 1999) ("If the physician was aware of the possible risks involved in the use of the product but decided to use it anyway, the adequacy of the warning is not a producing cause of the injury"); *Stanback v. Parke, Davis & Co.*, 657 F.2d 642 (4th Cir. 1981) (holding that manufacturer is not liable for failure to warn when doctor knew of risk); *Plummer v. Lederle Labs.*, 819 F.2d 349 (2d Cir. 1987) (finding

no causation when doctor knew of risk of polio); *Kirsch v. Picker Int'l, Inc.*, 753 F.2d 670 (8th Cir. 1985) (affirming directed verdict because physician knew of cancer risk related to X-ray treatment); *Mampe v. Ayerst Labs.*, 548 A.2d 798 (D.C. App. 1988) (holding manufacturer was not liable where prescribing physician acquired knowledge of risks from a variety of other sources); *Dunn v. Lederele Labs.*, 328 N.W.2d 576 (Mich. App. 1982) (finding no proximate cause where physician had knowledge of the risks associated with a drug); *Leibowitz v. Ortho Pharm. Corp.*, 307 A.2d 449 (Pa. Super. 1973) (finding no causal nexus where physician had other sources of information). Stated simply, the common-sense rule is that "[n]o one needs notice of that which he already knows." *Lindsay v. Ortho Pharm. Corp.*, 637 F.2d 87, 92 (2d Cir. 1980) (internal quotation marks and citations omitted).

In keeping with this rule, the Court instructed the jury that, "if the user or his treating physician is aware of the danger and nevertheless proceeds to make use of the product and the user is injured by it, the user may not recover from the manufacturer any damages caused by its use." (Jury Charge at 10.) Similarly, in connection with the fraudulent failure to warn claim, the Court instructed the jury:

> To recover for deceit by concealment in a pharmaceutical case, the Plaintiff's prescribing physicians must have relied on the alleged misrepresentation or nondisclosure. If they knew the misrepresentation was false or knew the allegedly undisclosed facts, there is no cause of action for fraudulent concealment because there could not have been any reliance.

(*Id.* at 13.)

The weight of the evidence is that Mr. Barnett's doctors knew of the risks associated with Vioxx. Merck provided the results of the VIGOR study to the FDA and the medical community soon after it received the results. (8/14/06 Tr. at 2249:19-2250:1 (Test. of Dr. Reicin).) There is no evidence that the prescribing physicians were unaware of the VIGOR data. Dr. Mikola read

- 36 -

the VIGOR article when it was published and knew that there were four times as many heart attack events in the Vioxx arm of VIGOR study compared to the Naproxen arm. (8/4/06 Tr. at 958:17-959:2.)[7]   Because VIGOR compared Vioxx to Naproxen rather than placebo, he understood that "it was impossible to know for sure whether Vioxx was causing the heart attacks in the VIGOR study." (*Id.* at 960:13-961:15.)  Moreover, he was aware that the interpretation of the VIGOR results was the subject of "much debate" in the medical community and that some in the medical community questioned "whether Naproxen was the appropriate explanation for VIGOR results." (*Id.* at 960:8-962:4.)  Based on all he knew during the time he prescribed Vioxx to Mr. Barnett, he believed the benefits of Vioxx outweighed the risks. (*Id.* at 961:16-20.)

Similarly, Dr. Karavan testified that he had been aware since medical school of the possible relationship between NSAID's and cardiovascular risks. (8/4/06 Tr. at 1090:4-8.)  He also was familiar with the VIGOR study and the debate surrounding it during the time that Mr. Barnett took Vioxx. (8/4/06 Tr. at 1018:14-1023:18.)

## B.  Plaintiff has failed to show that a different warning would have changed his doctors' prescribing decisions.

In pharmaceutical cases, the plaintiff has the burden of proving both that a warning defect existed and that the inadequate warning was the proximate cause of the injury. *Odom*, 979 F.2d at 1003 (citing *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812-14 (5th Cir. 1992)). Applying this rule, the court in *Odom* affirmed a grant of summary judgment on a failure-to-warn claim in favor of the manufacturer of an IUD (birth control device) when plaintiff's physician stated that he would still prescribe the device despite his knowledge of the risks

---

[7] He also testified that it probably would not have made any difference to him if Merck had included three additional heart attacks that occurred after the cutoff date of the study. (*Id.* at 959:8-23.)

associated with it. *Id.* The court explained that "[e]ven viewing the facts most favorably to [plaintiff], we cannot escape the district court's conclusion that [physician] would have prescribed the . . . IUD no matter how carefully [defendant manufacturer] refined the phrasing of its warning." *Id.* In short, the plaintiff had failed to meet her burden because the "[prescribing physician's] testimony makes clear that such a warning would not have changed his decision to prescribe the IUD." *Id.* at 1003-04.

This case warrants the same conclusion. There is no evidence that a different warning would have changed Mr. Barnett's doctors' decisions to prescribe Vioxx to him. Plaintiff's warning expert, Dr. Moye, conceded that the VIGOR data and cardiovascular risk information contained in the 2002 label was all the risk information Merck needed to disclose about Vioxx. His only quibble was with the placement of the information in the precautions section rather than in the warnings section. (8/3/06 Tr. at 835:8-21.) Dr. Mikola testified at trial that he was aware of all that information, and that he continued to prescribe Vioxx to Mr. Barnett even *after* he read the 2002 label (which contained the VIGOR data regarding cardiovascular risks), *and* after Mr. Barnett had his quintuple bypass surgery:

> Q: I've handed you what I've marked as exhibit 44.
>
> A: Yes, sir.
>
> Q: A package insert that is dated April of 2002, approved by the Food & Drug Administration. Okay?
>
> A: Yes, sir.
>
> Q: When you were prescribing Vioxx to Mr. Barnett, in April 2002 time frame, were you familiar with the risks and benefits in the label that was in existence at the time?
>
> A: Yes, sir.
>
> Q: So you would have been familiar with the information contained in exhibit 44?
>
> A: Yes, sir.

Q: And then, further down, where it says "other safety findings, cardiovascular safety," do you see that it indicates the VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events in patients treated with Vioxx 50 milligrams once daily as compared to patients treated with naproxen 500 milligrams twice daily?

A: Yes, sir.

Q: You understood that information back in November of 2000 when you read the VIGOR study; right?

A: Yes, sir.

Q: And if you look on the right-hand column, the "precautions," under "cardiovascular effects," the "information below should be taken into consideration and caution should be exercised when Vioxx is used in patients with a medical history of ischemic heart disease." And it continues to describe the VIGOR study. Did you see that?

A: Not yet.

Q: Right-hand column under "precautions," "cardiovascular effects."

A: Oh, yes.

. . .

Q: That is information you knew in April of 2002; right?

A: Yes, sir.

Q: Are you weighing the risks and benefits of Vioxx based on how they're described in the package, in other words, when you're deciding whether to prescribe Vioxx for Mr. Barnett?

A: That's one part of the decision-making process.

. . .

Q: Based on that, you felt that the benefits of Vioxx outweighed the risks for Mr. Barnett?

A: I thought – I thought that the risk-to-benefit ratio was acceptable for Mr. Barnett.

(8/4/06 Tr. at 964:16-969:5; *see also id.* at 970:1-15 ("Q: And when you were prescribing Vioxx to Mr. Barnett – now, this is after his heart attack in March of 2003 – you understood this information and you believed that the benefits of Vioxx outweighed the risks? A: Yes, sir. At the doses prescribed, yes, sir.").) In addition, Dr. Mikola testified that he continues to prescribe other NSAIDs that contain black box CV warnings because he believes that the benefits of pain

- 39 -

relief outweigh the black box-disclosed CV risks. (8/4/06 Tr. at 971:5-18 ("Q.  Are you aware that Celebrex and Mobic and other NSAIDs have the same black-box warning today? A.  Yes, sir.  Q.  Even though there is a black-box warning for potential cardiovascular risks, however small, in Feldene and other NSAIDs, you still prescribe those NSAIDs if you think the benefits outweigh the risks; right?  A.  Yes, sir.  Q.  And even if there's the potential for some small increased cardiovascular risk for a particular patient, that pain that that patient is experiencing every day is a relevant factor in deciding whether or not the benefits outweigh the risks for that particular medicine; true?  A.  Yes, sir.").)

This Court's jury charge instructed the jury as follows:

> In order to prove his failure to warn claim, the Plaintiff must not only show that Merck's warnings regarding Vioxx were inadequate, but also that such inadequacy affected the decision of his prescribing physicians to prescribe or not to prescribe Vioxx. In other words, the Plaintiff must show that his doctors would not have prescribed Vioxx to him if Merck had provided an adequate warning.

(Jury Charge at 10.)   As noted above, the greater weight of the evidence – indeed the uncontradicted evidence – was that Mr. Barnett's doctors would have prescribed (and did prescribe) Vioxx to Mr. Barnett with a warning label that contained all the information that Dr. Moye said was necessary.  Thus, the alleged failure to warn (whether negligent or fraudulent) did not happen and did not cause Mr. Barnett's injuries.  The jury's failure to follow the Court's instructions with respect to this evidence is grounds for a new trial, and is a further indication that it acted out of caprice, passion, or prejudice.

- 40 -

### C. The weight of the evidence is that Vioxx neither caused Mr. Barnett's heart attack nor accelerated his atherosclerosis.

Finally, the weight of the evidence is that Mr. Barnett's use of Vioxx did not accelerate his atherosclerosis or cause his heart attack.[8]   The specific causation opinion of Dr. Zipes amounts to nothing more than a temporal proximity argument – *i.e.*, Mr. Barnett ingested Vioxx during the period in which there was atherogenesis, *ergo* Vioxx must be the cause. (*See e.g.*, 8/8/06 Tr. at 1734:15-1735:14.) Courts have rejected this primitive view of causation. *Moore v. Ashland Chem. Ins.*, 151 F.3d 269, 278 (5th Cir. 1998) ("In the absence of an established scientific connection between exposure and illness . . . the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation."); *McClain v. Metabolife Int'l Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) ("The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. It literally means after this, because of this. It is called a fallacy because  it makes an assumption based on the false inference that a temporal relationship proves a causal relationship." (internal citations omitted)). As the Court of Appeals for the District of Columbia explained in a similar context: in essence, the requirement of adequate documentation in scientific literature ensures that decision makers will not be misled by the *post hoc ergo proper hoc* fallacy – the fallacy of assuming that because a biological injury occurred after a spill, it must have been caused by the spill." *Ohio v. Dep't of the Interior*, 880 F.2d 432, 437 (D.C. Cir. 1989) (internal citations omitted).

Moreover, Mr. Barnett cannot prevail on his failure to warn claims because he has failed to eliminate other possible causes of his atherosclerosis and heart attack, most notably the natural

---

[8] Plaintiff's utter failure to prove general causation through competent scientific evidence was described in detail in Merck's previously filed motions for judgment as a matter of law, and will be included in Merck's renewed JMOL motion.  That discussion is incorporated by this reference.

progression of his pre-existing CAD. To establish specific causation, plaintiff must "rule out" the possibility that his heart attack was caused by something *other* than Vioxx. *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (upholding judgment as a matter of law because plaintiff failed to prove that decedent had not contracted hepatitis from a source other then defendant's pharmaceutical); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1139 (D. Minn. 2003) ("Having failed to 'rule out' other factors for the Plaintiff's skin cancer, the Plaintiff has not established a submissible showing of causation"); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*, 22 F. Supp. 2d 942, 963 (E.D. Ark. 1998) (recognizing that an expert must "rule in" the suspected cause as well as "rule out" other possible causes), *aff'd*, 191 F.3d 858 (8th Cir. 1999); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000) (affirming grant of summary judgment in favor of defendant manufacturer where plaintiff "failed to 'rule out' all other possible causes"); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (excluding expert testimony because "[t]he defendants pointed to some likely alternative cause and the expert offered no reasonable explanation as to why he or she still believed that defendant's actions were a substantial factor in bringing about plaintiff's illness").

Plaintiff failed to carry this burden. More specifically, it is undisputed that Mr. Barnett had pre-existing atherosclerosis and multiple risk factors that could have caused his heart attack. These factors include:

- *Age*: Mr. Barnett was 58 years old at the time of his heart attack;
- *Family History*: Mr. Barnett's father suffered a heart attack at age 55 or 62 and ultimately died of a second heart attack at age 68, Mr. Barnett's mother suffers from hypertension and had several transient ischemic attacks ("TIAs"), and his sister had multiple TIAs before the age of 50;
- *High Cholesterol*: Mr. Barnett suffered from hyperlipidemia for which he began taking Lipitor in 2000;

- 42 -

- *Stress*: Mr. Barnett suffered from stress and anxiety, due to his job as an FBI agent and his wife's experience with cancer;
- *Gender*: Mr. Barnett is male; and
- *Smoking*: Mr. Barnett was exposed to his wife's secondhand smoke.

(8/4/06 Tr. at 950:13-17 (Test. of Dr. Mikola), 992:6-23 (Test. of Dr. Karavan); 8/7/06 Tr. at 1356:17-21 (Test. of Dr. Popma), 1432:8-10 (Test. of Dr. Popma), 1533:5-9 (Test. of Mrs. Barnett).)

Doctors Karavan and Mikola testified that Mr. Barnett had CAD before he took Vioxx and his problems more likely than not result from the natural progression of his illness. (8/4/06 Tr. at 949:9-17 (Test. of Dr. Mikola), 949:5-17 (Test. of Dr. Mikola), 1060:10-19 (Test. of Dr. Karavan), 1064:20-1065:5 (Test. of Dr. Karavan).) Dr. Popma testified that the cause of Mr. Barnett's condition is "unexplained." (8/7/06 Tr. at 1495:19-22.) Dr. Zipes also conceded that Mr. Barnett had atherosclerotic disease before he started taking Vioxx. (8/10/06 Tr. at 1911:9-12.)

Although Dr. Zipes proclaimed that he reviewed Mr. Barnett's medical records and could not explain what happened so it must be Vioxx, it is not enough for an expert to proclaim that he has ruled out other possible causes – he must also give a "good explanation as to why his or her conclusion remain[] reliable" despite the existence of these alternative risk factors. *Magistrini*, 180 F. Supp. 2d at 609. Dr. Zipes offered no such "good explanation." Instead, he relied largely on a chart purporting to show that Mr. Barnett's blood pressure was at normal levels throughout the period prior to his Vioxx use and then exhibited a pattern of spikes that must have been due to Vioxx. (8/8/06 Tr. at 1712:21-1713:2.) On cross-examination, Dr. Zipes admitted that his chart omitted an equal number of pre-Vioxx spikes and that his explanations for these pre-Vioxx spikes would also apply to the spikes he attributed to Vioxx. (8/10/06 Tr. at 1884:15-1890:20.)

In any event, the greater weight of the evidence is that Vioxx did not cause Mr. Barnett's heart attack and plaque buildup. This alone is grounds for a new trial. That the jury's verdict is against the weight of this evidence is a further indication that it was based on caprice, passion, or prejudice.

## V.   CONCLUSION.

The Court should order a new trial on all issues because: (i) the damages and liability issues are inextricably intertwined; (ii) the entire verdict was the product of caprice, passion, or prejudice; (iii) the verdict was inconsistent; and (iv) the verdict was against the weight of the evidence. A new trial on damages and punitive damages only would not cure these problems and would deny Merck its Seventh Amendment right to a jury trial.

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Phone: 312-494-4400
Fax:    312-494-4440

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

Phone: 202-434-5000
Fax:      202-434-5029

And

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
Fax:      213-430-6407

Attorneys for Merck & Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Merck's Motion for New Trial on All Issues has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 5th day of September, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel