**Smith v. Merck & Co., Inc.**
**Deposition Designations for Michael Grefer**

| | | | | | Objections | Responses |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 7:8 | - | 8:18 | Grefer, Michael 2006-06-29 | 00:01:41 | |
| | | 7: 8 | | Q. Dr. Grefer. My name is Larry Wright, | | |
| | | 7: 9 | | and I represent Robert Garry Smith, and he -- he goes | | |
| | | 7: 10 | | by Garry. I'll just tell you that. | | |
| | | 7: 11 | | A. Okay. | | |
| | | 7: 12 | | (Plaintiff's Exhibit 1 | | |
| | | 7: 13 | | fication.) | | |
| | | 7: 14 | | Q. And usually I'll refer to him as Mr. | | |
| | | 7: 15 | | Smith, but occasionally I may slip and refer to him | | |
| | | 7: 16 | | as Garry. | | |
| | | 7: 17 | | Let me hand you Exhibit Number 1, and | | |
| | | 7: 18 | | can you tell the jury what Exhibit Number 1 is? | | |
| | | 7: 19 | | A. Yes. It's my curriculum vitae. It's | | |
| | | 7: 20 | | just a synopsis of my education, hospital affilia- | | |
| | | 7: 21 | | tions, licenses, and things like that. | | |
| | | 7: 22 | | Q. All right. Let me start and get you | | |
| | | 7: 23 | | to give the jury a -- a brief summary of your posi- | | |
| | | 7: 24 | | tion. You're a -- a physician practicing here in | | |
| | | 7: 25 | | northern Kentucky? | | |
| | | 8: 1 | | A. Correct. | | |
| | | 8: 2 | | Q. Tell the jury, if you would, about | | |
| | | 8: 3 | | your educational background, please, sir. | | |
| | | 8: 4 | | A. Yes. I graduated from Xavier Univer- | | |
| | | 8: 5 | | sity. From Xavier University I went to University of | | |
| | | 8: 6 | | Cincinnati College of Medicine, finished in 1973. So | | |
| | | 8: 7 | | I've been a doctor since 1973. | | |
| | | 8: 8 | | From 1973 to 1977 I trained with my | | |
| | | 8: 9 | | internship year, my residency years, that's a | | |
| | | 8: 10 | | Cincinnati General Hospital complex, finishing my | | |
| | | 8: 11 | | chief year in 1977, and have been a practicing | | |
| | | 8: 12 | | physician in greater Cincinnati and northern Kentucky | | |
| | | 8: 13 | | since that time. | | |
| | | 8: 14 | | Q. What is your specialty area of prac- | | |
| | | 8: 15 | | tice? | | |
| | | 8: 16 | | A. Orthopedic surgery. | | |
| | | 8: 17 | | Q. And have you seen Garry Smith before? | | |
| | | 8: 18 | | A. Yes. | | |
| 2 | 8:19 | - | 8:23 | Grefer, Michael 2006-06-29 | 00:00:17 | Re: 8:19-8:23 |
| | | 8: 19 | | Q. I think there were -- we have some | | **Pltf Obj:** |
| | | 8: 20 | | records that indicated that you actually did a | | Relevance |
| | | 8: 21 | | surgery on him several years ago. Do you have any | | |
| | | 8: 22 | | recollection of that? | | **Re: 8:19-8:23** |
| | | 8: 23 | | A. Not that I recall, no, sir. | | **Def Resp:** |
| 3 | 8:24 | - | 9:5 | Grefer, Michael 2006-06-29 | 00:00:20 | Appropriate background concerning doctor's treatment of plaintiff and lack of specific recollection concerning plaintiff |
| | | 8: 24 | | Q. Okay. And then you began seeing him | | |
| | | 8: 25 | | again in the early fall of 2002. Do your records | | |
| | | 9: 1 | | reflect that? | | |
| | | 9: 2 | | A. It does. September the 11th of 2002. | | |
| | | 9: 3 | | Q. Why were you seeing Mr. Smith? | | |
| | | 9: 4 | | A. Because of an injury that he sustained | | |
| | | 9: 5 | | to his right knee. | | |
| 4 | 9:9 | - | 9:20 | Grefer, Michael 2006-06-29 | 00:00:45 | Re: 9:9-9:20 |
| | | 9: 9 | | Q. Is it fair to say you've seen thou- | | **Pltf Obj:** |
| | | 9: 10 | | sands of patients like Mr. Smith over the years? | | Relevance |
| | | 9: 11 | | A. Yes, sir. | | |
| | | 9: 12 | | Q. What specific treatment do you | | **Re: 9:9-9:20** |
| | | 9: 13 | | normally give for patients with knee problems like | | **Def Resp:** |
| | | 9: 14 | | Mr. Smith? | | Appropriate background concerning doctor's recollection of specific patients and standard procedures when evaluating patients. |
| | | 9: 15 | | A. Well, when someone comes in with a | | |
| | | 9: 16 | | knee injury, usually I review the records and I | | |
| | | 9: 17 | | review the patient's history, do an examination, and | | |
| | | 9: 18 | | basically make a decision of what the appropriate | | |
| | | 9: 19 | | treatment is at that time and proceed with the | | |
| | | 9: 20 | | treatment. | | |
| 5 | 11:25 | - | 12:7 | Grefer, Michael 2006-06-29 | 00:00:31 | |

|  |  |  | Objections | Responses |
|---|---|---|---|---|

11: 25     When the patients fill out these forms
12: 1     that give the history, are you or are you not count-
12: 2     ing on the patient to diagnose themselves with any of
12: 3     these conditions?
12: 4   A.   No, I'm not asking the patient to --
12: 5     to diagnose themselves.  I'm asking the patient to
12: 6     tell me if they've ever had any problems with those
12: 7     particular situations.

6    12:14     -   16:1    Grefer, Michael 2006-06-29       00:04:44

12: 14     Based upon their many years of dealing
12: 15     with patients who are not physicians, where do the
12: 16     patient's knowledge about whether or not they have
12: 17     any of these conditions come from?
12: 18   A.   Well, whether they've been sick with
12: 19     any of those conditions or whether they've been
12: 20     treated for any of those conditions.
12: 21   Q.   Now, in this case you saw Mr. Smith,
12: 22     and what did you do?
12: 23   A.   Well, I saw Mr. Smith, and I'll review
12: 24     my -- my records here.  And basically I did examine
12: 25     him and found out my findings, and basically he --
13: 1     I -- I told him to modify his activities.  I gave him
13: 2     a brace, started him on some therapy, and told him
13: 3     that I would like to see how things like that went
13: 4     and that I would see him back in three or four weeks.
13: 5   Q.   Was he on any medications when you saw
13: 6     him?
13: 7   A.   He was.
13: 8   Q.   What were the medications?
13: 9   A.   He was on diclofenac, and I believe he
13: 10     was on gout medicine, too.
13: 11   Q.   What's diclofenac?
13: 12   A.   Diclofenac is -- is a nonsteroidal
13: 13     anti-inflammatory pain medicine.
13: 14   Q.   And were you aware that he'd been on
13: 15     other nonsteroidal anti-inflammatory pain medications
13: 16     over the years?
13: 17   A.   I was not aware of the particulars,
13: 18     but I do -- I -- I do know that he was on some, but I
13: 19     don't know what the particular ones were.
13: 20   Q.   All right.  Did he ever report any
13: 21     problems with any other nonsteroidal anti-
13: 22     inflammatories?
13: 23   A.   Not that I'm aware of, no, sir.
13: 24   Q.   Okay.  Specifically, did he report or
13: 25     were you aware of any stomach problems that he'd ever
14: 1     had on any other nonsteroidal anti-inflammatory, or
14: 2     aspirin for that matter?
14: 3   A.   No, sir.
14: 4   Q.   Okay.  When you saw him the first
14: 5     time, you've described what you did.  Did you see him
14: 6     again after that?
14: 7   A.   Yes, sir, I did.
14: 8   Q.   When did you see him the second time?
14: 9   A.   My second visit with him was on
14: 10     October the 2nd of 2002.
14: 11   Q.   And what did you do at that visit?
14: 12   A.   Well, I talked to him and just kind of
14: 13     examined things.  And he said he was doing fairly
14: 14     well until the Monday prior, and he was kind of bend-
14: 15     ing down and got under a piece of equipment, and he
14: 16     had more signs of some damage to the knee on his
14: 17     examination.  And the therapy did seem to help him.
14: 18     I did change his medication at that time, and I sent
14: 19     him to get an MRI test.
14: 20   Q.   All right.  Now, before that he had
14: 21     been on the diclofenac.  When you say you changed his
14: 22     medication, what did you change it to?
14: 23   A.   I changed it to Vioxx.
14: 24   Q.   And this is what date?
14: 25   A.   This is October the 2nd of 2002.
15: 1   Q.   And why did you change him from the
15: 2     diclofenac to the Vioxx?
15: 3   A.   I changed him to Vioxx because he was

| | | | | Objections | Responses |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| | 15: 4 | | not getting the relief that I would have liked him to | | |
| | 15: 5 | | have gotten from the diclofenac, and so I switched | | |
| | 15: 6 | | him to Vioxx. | | |
| | 15: 7 | Q. | All right.  Is that customary, when | | |
| | 15: 8 | | you're trying a conservative course of treatment with | | |
| | 15: 9 | | a patient, to try a patient on different medications | | |
| | 15: 10 | | to see if that particular medication might give some | | |
| | 15: 11 | | relief? | | |
| | 15: 12 | A. | Yes, sir. | | |
| | 15: 13 | Q. | What happened -- well, at that visit | | |
| | 15: 14 | | did you give Mr. Smith some samples? | | |
| | 15: 15 | A. | I did. | | |
| | 15: 16 | Q. | And is that recorded in your records | | |
| | 15: 17 | | that you gave him samples? | | |
| | 15: 18 | A. | Yes, it is. | **Re: 15:24-16:23** | **Re: 15:24-16:23** |
| | 15: 19 | Q. | Do you know at this time how many | **Def Obj:** | **Pltf Resp:** |
| | 15: 20 | | samples you gave Mr. Smith? | Re: Plaintiff's Exhibit 2; | This document was |
| | 15: 21 | A. | No. | Mischaracterizes the | produced in response to |
| | 15: 22 | | (Plaintiff's Exhibit 2 | document as a Merck | production of Merck's |
| | 15: 23 | | fication.) | document, which it is | call notes recording |
| | 15: 24 | Q. | Let me show you some records that were | not (Note: Plaintiff's | the sales |
| | 15: 25 | | provided to us by Merck, and I've marked as Exhibit | counsel agrees that it | representatives visits |
| | 16: 1 | | Number 2 a document -- | is  a Plaintiff | with Dr. Grefer |
| 7 | 16:18  -  16:23 | Grefer, Michael 2006-06-29 | 00:00:24 | compiled document, see | |
| | 16: 18 | Q. | Handing you a -- a document that is | 84:8-12); Plaintiff | |
| | 16: 19 | | entitled "Rep Contacts in Date Order," and I'll just | misrepresents what this | |
| | 16: 20 | | represent to you that it's information that was | document includes; | |
| | 16: 21 | | produced to us by Merck that documents contacts with | Hearsay (802); | |
| | 16: 22 | | you by Merck regarding Vioxx.  Okay? | Foundation | |
| | 16: 23 | A. | Uh-huh. | Exhibit 2) | |
| 8 | 18:1  -  19:17 | Grefer, Michael 2006-06-29 | 00:01:48 | **Re: 18:1-18:5** | **Re: 18:1-18:15** |
| | 18: 1 | Q. | Let's turn to -- well, page 10, for | **Def Obj:** | **Pltf Resp:** |
| | 18: 2 | | example.  It's in December of 2000.  There's a lady | Same | The document being |
| | 18: 3 | | named Amy Block who was calling on you at that time. | | shown to Dr. Grefer is |
| | 18: 4 | | Do you remember Amy, by any chance? | | not hearsay because |
| | 18: 5 | A. | I don't. | | it is an admission by |
| | 18: 6 | Q. | All right.  Do you remember generally | | party opponent |
| | 18: 7 | | the Vioxx representatives that -- that called on you? | | 801(d)(2); 803(1); |
| | 18: 8 | A. | Yes, in general. | | present sense |
| | 18: 9 | Q. | Can you describe what your impres- | | impression; and a |
| | 18: 10 | | sions -- the impressions that stick in your mind from | | business record 803(6) |
| | 18: 11 | | when the Vioxx reps called on you. | | |
| | 18: 12 | A. | Well, they were very courteous.  They | | |
| | 18: 13 | | were very informative, attractive individuals. | | |
| | 18: 14 | | Whether they be male or female, they were very | | |
| | 18: 15 | | presentable, and they were a pleasure to talk to. | | |
| | 18: 16 | Q. | Were the ones that called on you | | |
| | 18: 17 | | mostly female, in your recollection? | | |
| | 18: 18 | A. | Yes. | | |
| | 18: 19 | Q. | Okay.  And if you'll see here, for | **Re: 18:19-19:10** | **Re: 18:19-19:10** |
| | 18: 20 | | example, in December of 2000 there's a call summary | **Def Obj:** | **Pltf Resp:** |
| | 18: 21 | | by Amy Block, and there's a notation "Vioxx, 25 | Same | Admission by party |
| | 18: 22 | | milligrams, one by four," and then a number after | | opponent 801(d)(2); |
| | 18: 23 | | that. | | present sense |
| | 18: 24 | A. | Right. | | impression 803(1); and |
| | 18: 25 | Q. | Do you see that? | | a business record |
| | 19: 1 | A. | Right. | | 803(6) |
| | 19: 2 | Q. | Does that -- is that consistent with | | |
| | 19: 3 | | your recollection of the representative coming in and | | |
| | 19: 4 | | dropping off samples? | | |
| | 19: 5 | A. | Yes.  It -- it -- it says there that | | |
| | 19: 6 | | they "Got a few seconds to talk to Dr. Grefer - he is | | |
| | 19: 7 | | a big threat with Celebrex, got a quick Vioxx message | | |
| | 19: 8 | | out - first time I've met him." | | |
| | 19: 9 | Q. | All right. | | |
| | 19: 10 | A. | That's what it says. | | |
| | 19: 11 | Q. | So that was the first time that you | | |
| | 19: 12 | | met with -- | | |
| | 19: 13 | A. | Right. | | |
| 9 | 19:20  -  20:14 | Grefer, Michael 2006-06-29 | 00:00:42 | | |
| | 19: 20 | Q. | Did you get Vioxx 25-milligram one by | | |
| | 19: 21 | | four samples from time to time? | | |
| | 19: 22 | A. | Yes. | | |

| | | | | | Objections | Responses |
|---|---|---|---|---|---|---|
| | 19: 23 | | | Q. All right. Then the next entry, for | **Re: 19:23-20:14** | **Re: 19:23-20:14** |
| | 19: 24 | | | example, is about two weeks later: December the | **Def Obj:** | **Pltf Resp:** |
| | 19: 25 | | | 19th. | Same | Admission by party |
| | 20: 1 | | | A. Correct. | | opponent 801(d)(2); |
| | 20: 2 | | | Q. Again by Amy Block. | | present sense |
| | 20: 3 | | | A. Right. | | impression 803(1); and |
| | 20: 4 | | | Q. And does it appear that she again | | a business record |
| | 20: 5 | | | dropped off 25-milligram one by four samples? | | 803(6) |
| | 20: 6 | | | A. Yes. | | |
| | 20: 7 | | | Q. Did she make a note about that meeting | | |
| | 20: 8 | | | with you? | | |
| | 20: 9 | | | A. Yes, she did. | | |
| | 20: 10 | | | Q. Can you read that meeting? | | |
| | 20: 11 | | | A. It says, "Am still having trouble | | |
| | 20: 12 | | | convincing Grefer about Vioxx versus Celebrex - he is | | |
| | 20: 13 | | | not buying into anything I say and his numbers are | | |
| | 20: 14 | | | killing us." | | |
| 10 | 20:18 | - | 20:24 | Grefer, Michael 2006-06-29 | 00:00:14 | | |
| | 20: 18 | | | Q. Okay. Do you -- did you write a lot | | |
| | 20: 19 | | | of Celebrex prescriptions back in the 2000 time | | |
| | 20: 20 | | | period? | | |
| | 20: 21 | | | A. I did. | | |
| | 20: 22 | | | Q. Do you think you probably were writing | | |
| | 20: 23 | | | more Celebrex than Vioxx back in those days? | | |
| | 20: 24 | | | A. A lot more, yes, sir. | | |
| 11 | 21:2 | - | 21:5 | Grefer, Michael 2006-06-29 | 00:00:17 | **Re: 21:2-21:24** | **Re: 21:2-21:11** |
| | 21: 2 | | | Did the sales reps try -- and by sales | **Def Obj:** Same; also | **Pltf Resp:** |
| | 21: 3 | | | reps I mean the Vioxx sales reps -- try hard to | leading (Plaintiff not | The question is not |
| | 21: 4 | | | convince you to write more Vioxx in place of some of | permitted to lead non- | leading as the witness |
| | 21: 5 | | | the Celebrex that you were writing? | hostile witness); hearsay | could answer in the |
| 12 | 21:7 | - | 21:11 | Grefer, Michael 2006-06-29 | 00:00:10 | (discussing | affirmative or negative |
| | 21: 7 | | | A. They generally encouraged me to | what unidentified sales | and the question does |
| | 21: 8 | | | more -- to -- to write more Vioxx in general, yes. | representative said) | not suggest the correct |
| | 21: 9 | | | Q. All right. | | answer; untimely; |
| | 21: 10 | | | A. And -- and that was pretty emphatic, | | statements of the |
| | 21: 11 | | | yes, sir. | | reps are admissions |
| 13 | 21:18 | - | 22:25 | Grefer, Michael 2006-06-29 | 00:02:32 | | and not offered for the |
| | 21: 18 | | | Q. In your meetings with the Vioxx sales | | truth |
| | 21: 19 | | | representatives what did they generally try to do | | |
| | 21: 20 | | | with regard to your writing Celebrex as opposed to | | |
| | 21: 21 | | | Vioxx? | | |
| | 21: 22 | | | A. They encouraged me to -- the -- the -- | | |
| | 21: 23 | | | the -- the -- the Vioxx representatives encouraged me | | |
| | 21: 24 | | | to write more Vioxx prescriptions, period. | | |
| | 21: 25 | | | Q. All right. Now, with regard to the | **Re: 21:25-23:8** | **Re: 21:25-23:8** |
| | 22: 1 | | | samples again, because I'm going to come back in a | **Def Obj:** | **Pltf Resp:** |
| | 22: 2 | | | little bit and talk more about the representatives, | Same; | Admission by party |
| | 22: 3 | | | but let me just -- just kind of leaf through there | Mischaracterization & | opponent 801(d)(2); |
| | 22: 4 | | | and -- and you'll see every -- every couple weeks if | misuse of Plaintiff's | present sense |
| | 22: 5 | | | the reps were dropping off samples during the 2001- | Ex. 2 (hearsay; | impression 803(1); and a |
| | 22: 6 | | | 2002 time frame. | foundation) | business record 803(6); |
| | 22: 7 | | | A. In general. Sometimes quicker. Like | | question is not leading |
| | 22: 8 | | | one, for example, was 9/12, and the next one was | | untimely; statements |
| | 22: 9 | | | 9/17. Basically. So, you know, much of those things | | of the reps are |
| | 22: 10 | | | are there. | | admissions and not |
| | 22: 11 | | | Q. During that period of time are most of | | offered for the truth |
| | 22: 12 | | | the samples the one by four packets? | | |
| | 22: 13 | | | A. That's what it says, yes, sir. | | |
| | 22: 14 | | | Q. All right. And then in -- let me ask | | |
| | 22: 15 | | | you, I don't want to go through every one, every | | |
| | 22: 16 | | | single one of these sales notes, but let's start in | | |
| | 22: 17 | | | October of 2001. Did -- did Amy Block see you again? | | |
| | 22: 18 | | | A. She did. | | |
| | 22: 19 | | | Q. All right. And at that time what does | | |
| | 22: 20 | | | her note reflect occurred? | | |
| | 22: 21 | | | A. Basically on 10/15/2001 the note -- | | |
| | 22: 22 | | | did you say the note? | | |
| | 22: 23 | | | Q. Yes, sir. | | |
| | 22: 24 | | | A. It reflected she had "Lunch at Dr. | | |
| | 22: 25 | | | Grefer's office" -- | | |

| | | | | | Objections | Responses |
|---|---|---|---|---|---|---|

| 14 | 23:2 | - 23:8 | | Grefer, Michael 2006-06-29 | 00:00:20 | | |
| | | 23: 2 | A. | -- "with HM.  Had a great talk with | | | |
| | | 23: 3 | | doctor (Redacted)," whatever that means, "and he | | | |
| | | 23: 4 | | said" that "he's been using more Vioxx postopera- | | | |
| | | 23: 5 | | tively.  We discussed both the Reicen with him and | | | |
| | | 23: 6 | | Greenberg, and presented the Percocet data" to -- "to | | | |
| | | 23: 7 | | all.  They seemed impressed, but cautious at the same | | | |
| | | 23: 8 | | time." | | | |

| 15 | 23:11 | - 23:16 | | Grefer, Michael 2006-06-29 | 00:00:09 | **Re: 23:11-24:4** | **Re: 23:11-24:4** |
| | | 23: 11 | Q. | And then on the next was -- what's the | | **Def Obj:** | **Pltf Resp:** |
| | | 23: 12 | | next note? | | Mischaracterizes the | Admission by party |
| | | 23: 13 | A. | The next -- the next note is dated | | document as a Merck | opponent 801(d)(2); |
| | | 23: 14 | | 10/19 -- | | document, which it is | present sense |
| | | 23: 15 | Q. | So -- | | not; hearsay (802); | impression 803(1); and |
| | | 23: 16 | A. | -- four days later. | | foundation (Plaintiff's | a business record 803(6) |
| | | | | | | Exhibit 2) | |

| 16 | 23:25 | - 25:4 | | Grefer, Michael 2006-06-29 | 00:01:10 | | |
| | | 23: 25 | Q. | On October 19th, so four days later | | | |
| | | 24: 1 | | another rep? | | | |
| | | 24: 2 | A. | Yes. | | | |
| | | 24: 3 | Q. | Who was this rep? | | | |
| | | 24: 4 | A. | Holly Biss. | | | |
| | | 24: 5 | Q. | Do you remember her, by any chance? | | | |
| | | 24: 6 | A. | No. | | | |
| | | 24: 7 | Q. | All right.  And did she leave a note? | | | |
| | | 24: 8 | A. | Yes. | | | |
| | | 24: 9 | Q. | What did her note say? | | **Re: 24:9-24:23** | **Re: 24:9-24:23** |
| | | 24: 10 | A. | Grefer, colon, Hopefully we're on our | | **Def Obj:** | **Pltf Resp:** |
| | | 24: 11 | | way.  He agreed to meet with Dr. Kelly on November | | Same | Admission by party |
| | | 24: 12 | | the 9th.  He just doesn't want to go to dinner, just | | | opponent 801(d)(2); |
| | | 24: 13 | | a business meeting in his office.  I hope we can get | | | present sense |
| | | 24: 14 | | this one. | | | impression 803(1); and |
| | | 24: 15 | Q. | All right.  And then on October | | | a business record 803(6) |
| | | 24: 16 | | 22nd -- | | | |
| | | 24: 17 | A. | October 22nd. | | | |
| | | 24: 18 | Q. | -- a gentleman -- | | | |
| | | 24: 19 | A. | Tom Schatz-- Schatzman. | | | |
| | | 24: 20 | Q. | Yes.  What did he write? | | | |
| | | 24: 21 | A. | His notes are:  "Stressed the impor- | | | |
| | | 24: 22 | | tance of winning Dr. Grefer over with Kelly.  This | | | |
| | | 24: 23 | | will be" out -- "This will be one of his talks." | | | |
| | | 24: 24 | Q. | Do you remember a Dr. Kelly? | | | |
| | | 24: 25 | A. | I do. | | | |
| | | 25: 1 | Q. | Okay.  And who is Dr. Kelly? | | | |
| | | 25: 2 | A. | Dr. Kelly is a -- a neurologist, I | | | |
| | | 25: 3 | | believe, who works with a lot of rheumatologic | | | |
| | | 25: 4 | | problems in chronic pain people. | | | |

| 17 | 25:12 | - 25:13 | | Grefer, Michael 2006-06-29 | 00:04:45 | | |
| | | 25: 12 | Q. | All right.  Then are there more | | **Re: 25:12-27:3** | **Re: 25:12-25:15** |
| | | 25: 13 | | samples dropped off, on page 16? | | **Def Obj:** Same; also | **Pltf Resp:** |
| | | 25: 14 | | MR. SKIDMORE:  Objection.  Leading. | | leading | Question is not leading; |

| 18 | 25:15 | - 28:19 | | Grefer, Michael 2006-06-29 | 00:04:45 | | admission by party |
| | | 25: 15 | A. | Yes, there are. | | | opponent 801(d)(2); |
| | | 25: 16 | Q. | On page -- page 17 what date does the | | | present sense |
| | | 25: 17 | | first note relate to? | | | impression 803(1); |
| | | 25: 18 | A. | November the 19th of 2001. | | | and a business record |
| | | 25: 19 | Q. | And what does the note reflect | | | 803(6) |
| | | 25: 20 | | happened at that meeting? | | | |
| | | 25: 21 | A. | Basically it says that we were able to | | | |
| | | 25: 22 | | get to -- well, first of all, they said that there | | | |
| | | 25: 23 | | were some Vioxx samples given and that -- | | | |
| | | 25: 24 | Q. | What kind -- what kind were they? | | | |
| | | 25: 25 | A. | 25 milligrams, one by four. | | | |
| | | 26: 1 | Q. | All right. | | | |
| | | 26: 2 | A. | "We were able to get" to see -- "in to | | | |
| | | 26: 3 | | see Dr. Grefer... new VIP information as well as" | | | |
| | | 26: 4 | | reinterated (sic) the -- "reiterated the Percocet | | | |
| | | 26: 5 | | data.  I did not get much time, however, Bill was a | | | |
| | | 26: 6 | | good resource to help me think of ideas for next time | | | |
| | | 26: 7 | | to extend the call.  I have found that Mondays around | | | |
| | | 26: 8 | | 10:30 is a good time to get in to see him.  I will | | | |

| | Objections | Responses |
|---|---|---|

26: 9   communicate this with the rest of the cluster and
26: 10   hopefully we can build a stronger relationship with
26: 11   him."
26: 12   Q.   Doctor, is all of this consistent with
26: 13   your recollection of the way the Merck representa-
26: 14   tives were working with you during that time period?
26: 15   A.   It -- it -- it reflects meetings.  I
26: 16   do not spend a lot of my time having meetings with
26: 17   the representatives.  I do meet with them and I do
26: 18   discuss things, but basically I really don't remember
26: 19   what I discuss or what's -- what -- what -- what --
26: 20   what the meetings pan out to be.
26: 21   Q.   How would you describe the intensity
26: 22   of the representative's efforts to convince you to
26: 23   use Vioxx?
26: 24   A.   They're very intense.  They are
26: 25   extremely competitive, and they really do their job
27: 1   and -- and -- and try to get me to spend time with
27: 2   them and for them to convince me to use their med--
27: 3   their medicines.
27: 4   Q.   Did the Merck Vioxx representatives
27: 5   present you information from time to time in these
27: 6   meetings?
27: 7   A.   Yes.
27: 8   Q.   What forms did that information take?
27: 9   For example, was it verbal, was it written, was it a
27: 10   combination?
27: 11   A.   All kinds, yes, sir.
27: 12   Q.   What kinds do you recall?

**Re: 27:12-20**
**Def Obj:**
Hearsay; and
plaintiff cannot
establish a hearsay
exception where the
alleged speaker(s) are
unidentified

**Re: 27:12-20**
**Pltf Resp:**
Untimely;
statements of the
reps are admissions
and not offered for
the truth

27: 13   A.   I re-- I -- I recall all kinds.  Basi-
27: 14   cally you would meet them in the hall.  Most of the
27: 15   times it's an attractive woman.  And they sit there
27: 16   and they smile and ask how the medications are
27: 17   working.  I tell them about my complaints, about my
27: 18   problems, about whether I'm doing it or not.  They
27: 19   always suggest I do more, and they always give me
27: 20   some sort of response to my questions.
27: 21   Q.   Did they give you responses to ques-
27: 22   tions about the efficacy of the drug, the safety of
27: 23   the drug, and other things like that?
27: 24   A.   Yes.
27: 25   Q.   Did they do that on more than one
28: 1   occasion?
28: 2   A.   Almost every occasion.
28: 3   Q.   All right.  And is there any way for
28: 4   you to -- to estimate how many meetings you had with
28: 5   Merck Vioxx representatives over the four or five
28: 6   years that you were prescribing Vioxx?
28: 7   A.   No.  I -- I could guess, but I -- I
28: 8   can't estimate the number, no, sir.
28: 9   Q.   Do you believe it would be more than
28: 10   50?
28: 11   A.   Oh, yes.
28: 12   Q.   Do you believe it would probably be
28: 13   more than a hundred?
28: 14   A.   Well, I don't know how -- I don't
28: 15   remember the dates that you're talking about, but I
28: 16   can almost say back then when the competition,
28: 17   frankly, between Celebrex and Vioxx was so intense, I
28: 18   would see a representative at least, I would say,
28: 19   once a week.

---

19   35:15            -   37:20   Grefer, Michael 2006-06-29                              00:03:14

35: 15   Q.   All right.  Doctor, let me turn you
35: 16   now to February of 2002.  Did you meet with Merck
35: 17   reps in February of 2002?
35: 18   A.   February, yes, sir.
35: 19   Q.   Did you meet -- does it appear that
35: 20   you met with a Merck rep on February the 12th, 2002?
35: 21   A.   Yes.
35: 22   Q.   Who was that rep?
35: 23   A.   Amy Block.
35: 24   Q.   Did she drop samples off again?
35: 25   A.   She did.
36: 1   Q.   What kind of samples were they this

**Re: 35:15-37:20**
**Def Obj:**
Same re:
Plaintiff's Exhibit 2;
including hearsay;
foundation (applies to
all questions re:
Plaintiff's Exhibit 2);
also leading

**Re: 35:15-37:20**
**Pltf Resp:**
Admission by party
opponent 801(d)(2);
present sense
impression 803(1);
and a business record
803(6); questions are
not leading

| | | | Objections | Responses |
|---|---|---|---|---|

36: 2    time?
36: 3  A. Basically let -- let -- let me go
36: 4    back.  I -- I -- I may -- at least according to this,
36: 5    she was in the office and she dropped off Vioxx
36: 6    samples.  I don't know if I met with her.
36: 7  Q. All right.  And what kind of samples
36: 8    does it reflect that she dropped off?
36: 9  A. 25 milligrams, one by four.
36: 10  Q. All right.  Did she meet with you, or
36: 11    does the record reflect another call on February
36: 12    19th?
36: 13  A. Yes, by two representatives.
36: 14  Q. All right.  What's the next call
36: 15    that's referenced?
36: 16  A. On the 19th or the -- or the one after
36: 17    that?
36: 18  Q. The next one after that.
36: 19  A. The 27th, 2/27.
36: 20  Q. All right.  Is there a note referenc-
36: 21    ing a discussion in that --
36: 22  A. Yes.
36: 23  Q. -- meeting?  What does the note
36: 24    referencing a discussion on the 27th of February of
36: 25    2002 indicate?
37: 1  A. Said "I called on Dr. Grefer and we
37: 2    discussed Vioxx and (Redacted, dash, OP)."
37: 3  Q. All right.  Let me have you skip down
37: 4    to the note from April of 2002.
37: 5  A. Uh-huh.
37: 6  Q. And what does the record seem to
37: 7    reflect occurred in April of 2002?
37: 8  A. It says there that "Dr. Grefer does
37: 9    not see reps - per office in Southgate; will not
37: 10    attend lunches either.  Working with 'Annie' at" the
37: 11    "Crestview Hills office to see if we can get a lunch
37: 12    with Dr. Grefer/discussing samples with signature as
37: 13    well."
37: 14  Q. All right.  And is there a reference
37: 15    to samples being dropped off in that visit?
37: 16  A. Yes.
37: 17  Q. What kind of samples were dropped off
37: 18    in that visit, according to this record?
37: 19  A. That was Vioxx, 25 milligrams, one by
37: 20    30.

20 37:24  - 38:3  Grefer, Michael 2006-06-29

37: 24  Q. All right.  Do you recall from time
37: 25    to time getting bottles with 30 tablets in them as
38: 1    samples?
38: 2  A. I do.
38: 3    MR. SKIDMORE:  Objection.  Leading.

**Re: 37:24-38:3**
**Def Obj:** Same objections re: Plaintiff's Exhibit 2; also improper leading of a non-hostile witness

**Re: 37:24-38:3**
**Pltf Resp:** Question is not leading

21 38:7  - 38:22  Grefer, Michael 2006-06-29  00:01:20

38: 7    Do you or do you not recall getting
38: 8    Vioxx samples of 30 tablets in a bottle for 25 milli-
38: 9    gram from time to time?
38: 10  A. I remember getting bottles of Vioxx
38: 11    from time to time, whether they be 25 milligrams,
38: 12    12.5 milligrams, or 50 milligrams.  And the number in
38: 13    each bottle I don't absolutely recall, but I do
38: 14    remember getting Vioxx sample bottles.
38: 15  Q. All right.  Can you tell me anything
38: 16    about the quantity of samples that Merck was giving
38: 17    you back in the 2002 time frame?  What was your
38: 18    impression of the volume of samples that you were
38: 19    getting?
38: 20  A. A -- a lot.  We -- we -- we could get,
38: 21    certainly, whatever we needed, and the closet was
38: 22    always stocked with samples.

22 38:25  - 41:12  Grefer, Michael 2006-06-29  00:03:40

38: 25    We left off when we started talking
39: 1    about the meetings with the sales reps and the -- the
39: 2    samples.  We were talking about your October 2nd
39: 3    meeting with Garry Smith.

| | Objections | Responses |
|---|---|---|

| | | |
|---|---|---|
| 39: 4   A.  Yes, sir. | | |
| 39: 5   Q.  And your records do reflect that you | | |
| 39: 6        gave him two kinds of samples that day? | | |
| 39: 7   A.  Yes, it does. | | |
| 39: 8   Q.  And do you have -- let me just | **Re: 39:8-39:23** | **Re: 39:8-39:23** |
| 39: 9        describe to you what Mr. Smith said in his deposition | **Def Obj:** | **Pltf Resp:** |
| 39: 10       and ask you if you have any reason to disbelieve what | Mischaracterizes prior | Plaintiff will provide the |
| 39: 11       he said. | testimony; counsel | proper predicate to the |
| 39: 12       He said his recollection is that he | testifying | question through the |
| 39: 13       met with you, you suggested that he go on the Vioxx, | | testimony of Mr. Smith; |
| 39: 14       and that you gave him a bag with samples in it and he | | therefore. The question |
| 39: 15       does not remember how many samples or what kind of | | is proper and should be |
| 39: 16       samples he got. | | allowed |
| 39: 17       MR. SKIDMORE:  Objection.  Mischarac- | | |
| 39: 18       terizes the testimony. | | |
| 39: 19   Q.  If that was the substance of his | | |
| 39: 20       testimony, or words similar to that, do you have any | | |
| 39: 21       reason to disbelieve that that was what actually | | |
| 39: 22       happened? | | |
| 39: 23   A.  No, I don't. | | |
| 39: 24   Q.  Okay.  Would that be consistent with | | |
| 39: 25       your practice?  And by that I mean going to the | **Re: 39:24-40:14** | **Re: 39:24-40:14** |
| 40: 1        closet, getting some samples, putting them in a bag, | **Def Obj:** | **Pltf Resp:** |
| 40: 2        and giving them to a patient to take with them. | Leading (611); witness | Question is not leading; |
| 40: 3        MR. SKIDMORE:  Objection.  Leading. | speculating | witness is stating his |
| 40: 4   A.  That is not what usually happens.  I'm | | common practice and |
| 40: 5        not saying it's never happened.  And it -- and it has | | is, therefore, not |
| 40: 6        happened.  I don't know whether it's happened in this | | speculating |
| 40: 7        case.  I don't know if it was for Vioxx.  I don't | | |
| 40: 8        know whether it was for Celebrex.  I don't know what | | |
| 40: 9        drug it was.  But at some times, if there is a lot of | | |
| 40: 10       samples in there and if they're just kind of taking | | |
| 40: 11       up space and I think that the patient would benefit | | |
| 40: 12       from getting more, there have been times when I've | | |
| 40: 13       given bottles, and there have been times when I've | | |
| 40: 14       given bagfuls of them, yes, sir. | | |
| 40: 15   Q.  All right.  And do you remember one | | |
| 40: 16       way or the other whether this time with Garry Smith | | |
| 40: 17       was one of the times where you gave more than you | | |
| 40: 18       would ordinarily give of samples? | | |
| 40: 19   A.  No, I don't. | | |
| 40: 20   Q.  All right.  Now, with regard to what | | |
| 40: 21       happened next, after Mr. Smith left with the samples | | |
| 40: 22       and the prescription, what happened next? | | |
| 40: 23   A.  I sent him to get an MRI examination | | |
| 40: 24       to see in a little bit better fashion what was going | | |
| 40: 25       on inside the knee, and he came back to see me on | | |
| 41: 1        10/14 of 2002 with an MRI that did show significant | | |
| 41: 2        problems and problems that I thought needed an | | |
| 41: 3        operation, so I referred him to my partner Dr. Heis. | | |
| 41: 4   Q.  All right.  Had you tried to treat him | | |
| 41: 5        conservatively? | | |
| 41: 6   A.  I did, yes, sir. | | |
| 41: 7   Q.  Is that your ordinary practice? | | |
| 41: 8   A.  Yes, it is. | | |
| 41: 9   Q.  And after you referred him to Dr. | | |
| 41: 10       Heis, did you see Mr. Smith again? | | |
| 41: 11   A.  No, not that I recall.  At least I | | |
| 41: 12       didn't see him in the office at all. | | |

| 23   41:22        -   42:21 | Grefer, Michael 2006-06-29 | 00:01:46 | | |
|---|---|---|---|---|
| | 41: 22   Q.  All right.  Doctor, I'm handing you | | **Re: 41:22-42:21** | **Re: 41:22-42:21** |
| | 41: 23       what we've marked as Exhibit Number 3, and I'll rep- | | **Def Obj:** | **Pltf Resp:** |
| | 41: 24       resent to you that that is a -- a document that Merck | | Hearsay; foundation (Dr. | Admission by party |
| | 41: 25       produced to us documenting calls upon you.  And can | | Grefer has never seen | opponent 801(d)(2); |
| | 42: 1        you tell me the dates that this particular document | | this document before) | present sense |
| | 42: 2        reflects calls? | | | impression 803(1); and |
| | 42: 3   A.  This particular document reflects | | | a business record 803(6) |
| | 42: 4        calls that are made on 6/30 of '99, 8/29 of 2001 | | | |
| | 42: 5        twice, April the 1st of 2002, and July the 31st of | | | |
| | 42: 6        2002. | | | |
| | 42: 7   Q.  All right.  And let's turn to the July | | | |
| | 42: 8        2002 meeting.  And what is the date of that meeting? | | | |
| | 42: 9   A.  July 31st of 2002. | | | |
| | 42: 10   Q.  And who was the representative at the | | | |

| | | | | Objections | Responses |
|---|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|

**42: 11** meeting, according to that document?
**42: 12** A.  I -- I see Amy Block.
**42: 13** Q.  And what does the note say was
**42: 14** discussed at that meeting?
**42: 15** A.  That "Went over VIGOR with him.  He
**42: 16** agrees there is better pain relief with Vioxx" and
**42: 17** "was concerned about cardiovascular events."
**42: 18** Q.  All right.  Is that consistent with
**42: 19** your recollection that the sales representatives
**42: 20** would discuss the VIGOR article with you?
**42: 21** A.  Absolutely.

**24   42:22   -   43:10**   Grefer, Michael 2006-06-29   00:00:40
**42: 22** Q.  All right.
**42: 23** A.  Yes, sir.
**42: 24** Q.  Now, do you subscribe to the New
**42: 25** England Journal of Medicine?
**43: 1** A.  I -- I -- I believe we get it at
**43: 2** the office, yes, sir.
**43: 3** Q.  All right.  Do you usually read it --
**43: 4** A.  No.
**43: 5** Q.  -- regularly?
**43: 6** A.  No, sir.
**43: 7** Q.  Did -- before the VIGOR article was
**43: 8** brought to your attention by the Merck representa-
**43: 9** tives, had you studied that article?
**43: 10** A.  Before the VIGOR was -- no, I had not.

**25   43:15   -   44:7**   Grefer, Michael 2006-06-29   00:01:01
**43: 15** Q.  All right.  Did or did not most of the
**43: 16** information that you have about the VIGOR article
**43: 17** come during your meetings with the Merck sales repre-
**43: 18** sentatives?
**43: 19** A.  Either from the Merck sales represen-
**43: 20** tatives or from possibly correspondence from Merck,
**43: 21** which came usually via the sales representatives.  So
**43: 22** yes, sir.
**43: 23** Q.  Okay.  Did you or did you not have
**43: 24** discussions with the sales representatives of the
**43: 25** information contained in the VIGOR article in the New
**44: 1** England Journal of Medicine?
**44: 2** A.  I did.
**44: 3** Q.  Did that occur on more than one occa-
**44: 4** sion?
**44: 5** A.  It did.
**44: 6** Q.  Did it occur on many occasions?
**44: 7** A.  As I recall, yes.

**26   44:12   -   45:21**   Grefer, Michael 2006-06-29   00:02:17
**44: 12** What do you recall the Merck sales
**44: 13** representatives telling you about the excess cardio-
**44: 14** vascular events in the Vioxx group in the VIGOR
**44: 15** article?
**44: 16** A.  In general, they told me -- and --
**44: 17** and -- and it -- it -- it didn't come from one
**44: 18** particular representative.  In general, they -- they
**44: 19** told me that it wasn't fair or something that -- that
**44: 20** it -- it -- that -- that the study was flawed and --
**44: 21** and it was unfair to make decisions because there was
**44: 22** still controversy over the fact that -- that these
**44: 23** people were not in -- that the group did not include
**44: 24** people that maintained or were on their aspirin
**44: 25** dosage, that the naproxen may have had a protective
**45: 1** effect on it, and that, in essence, the study was
**45: 2** flawed and it wasn't conclusive.  And they kind of
**45: 3** told me that there were ongoing studies and that
**45: 4** hopefully they would be able to tell me something at
**45: 5** a later date but that -- that -- that it wasn't fair
**45: 6** to draw a conclusion because the study was flawed.
**45: 7** In general, that's what they said, and
**45: 8** that's kind of in a synopsis kind of a situation.
**45: 9** Q.  Did you go out on your own and try to
**45: 10** verify all of these things that the Merck sales
**45: 11** representatives told you?
**45: 12** A.  No.

**Objections:**
**Re: 44:12 - 45:8**
**Def Obj:**
Hearsay; and
plaintiff cannot
establish a hearsay
exception where the
alleged speaker(s) are
unidentified

**Responses:**
**Re: 44:12 - 45:8**
**Pltf Resp:**
Untimely;
statements of the
reps are admissions
and not offered for
the truth

| | Objections | Responses |
|---|---|---|

45: 13    Q.  Do you have time to independently and
45: 14       exhaustively research all of the drugs that you have
45: 15       to prescribe as a physician?
45: 16    A.  The fact of the matter is is that
45: 17       it's -- it's almost impossible to exhaustively
45: 18       evaluate one drug.  All you can do is get the best
45: 19       information you know, and when you put that informa-
45: 20       tion and times it times 40 to 50 drugs currently
45: 21       being discussed by these drug reps, it's impossible.

**27   45:24        -   46:20**   Grefer, Michael 2006-06-29   00:01:16

45: 24       Did you rely on the Merck drug repre-
45: 25       sentatives to give you accurate and complete informa-
46: 1       tion in these meetings when they're discussing Vioxx
46: 2       with you?
46: 3    A.  Like I say, I -- I -- I don't think
46: 4       there's any way they could have given me complete
46: 5       information, but I relied upon them to give me an
46: 6       accurate reflection of what their information about
46: 7       the drug was.
46: 8    Q.  All right.  And if there was signifi-
46: 9       cant information that Merck had that was not in the
46: 10       VIGOR article, for example, that affected the
46: 11       cardiovascular risk profile of the drug, would you
46: 12       have expected them to bring that to your attention
46: 13       sometime during the two years between when the
46: 14       article came out and when you prescribed it to Mr.
46: 15       Smith?
46: 16    A.  Yes.
46: 17    Q.  When you're trying to decide to
46: 18       prescribe a drug like Vioxx to a man like Mr. Smith,
46: 19       do you do a risk benefit analysis?
46: 20    A.  In my mind I do, yes, sir.

**28   47:9         -   47:12**   Grefer, Michael 2006-06-29   00:00:18

47: 9    Q.  With regard to the benefits of the
47: 10       drug, was or was not Merck very emphatic in their
47: 11       presentation of the benefits of the drug to you?
47: 12    A.  They were.

**29   49:24        -   50:17**   Grefer, Michael 2006-06-29   00:01:13

49: 24    Q.  Doctor, do you recall the Merck repre-
49: 25       sentatives in their discussion of the VIGOR article
50: 1       discussing the fact that in the VIGOR patient group
50: 2       there were patients that were aspirin indicated and
50: 3       patients that were not aspirin indicated?  And by
50: 4       aspirin indicated, it's defined as patients with a
50: 5       prior, let's see, presence of a history of myocardial
50: 6       infarction, angina, cerebrovascular accident, tran-
50: 7       sient ischemic attack, angioplasty or coronary
50: 8       bypass.
50: 9       Do you remember them discussing that
50: 10       there was a difference in the groups between those
50: 11       who were aspirin indicated, i.e., a prior myocardial
50: 12       history, or patients that were not aspirin indicated,
50: 13       i.e., not having that same kind of a history?
50: 14       MR. SKIDMORE:  Objection to the form.
50: 15       Multiple -- multiple questions.
50: 16    A.  I remember them referring to that,
50: 17       yes, sir.

*Objections:*
**Re: 49:24-50:17**
**Def Obj:**
Improper question;
multiple questions;
leading (e.g. see 50:14);
hearsay

*Responses:*
**Re: 49:24-50:17**
**Pltf Resp:**
Attorney is defining
terms in his question -
not asking multiple
questions; question is
not leading and the
leading objection is
waived under FRCP
32(d)(3)(B); untimely;
statements of the
reps are admissions
and not offered for
the truth

**30   51:6         -   51:22**   Grefer, Michael 2006-06-29   00:00:52

51: 6    Q.  Doctor, let me hand you the VIGOR
51: 7       article.  And turning to the general safety section,
51: 8       you'll see a sentence there where it says, after it
51: 9       discusses the aspirin indicated group --
51: 10    A.  Uh-huh.
51: 11    Q.  -- where it says:  These patients,
51: 12       referring to the aspirin indicated group, accounted
51: 13       for 38 percent of the patients in the study who had
51: 14       myocardial infarctions.
51: 15    A.  Yes.
51: 16    Q.  All right?  That they were only four
51: 17       percent of the patient group, but they accounted for
51: 18       38 percent of the myocardial infarctions.  Do you see

| | | | | Objections | Responses |
|---|---|---|---|---|---|

51: 19    that in the article?
51: 20    A.  I see that in the article.
51: 21    Q.  All right.
51: 22    A.  I believe I -- yes.

**31**   53:17    - 53:20    Grefer, Michael 2006-06-29    00:02:15
53: 17    After you raised a CV concern with
53: 18    them in July of 2002, what is your impression of what
53: 19    they said and what they did regarding your question
53: 20    of CV risks and how --

**Re: 53:17-53:18**
**Def Obj:**
Assumes facts not in evidence; hearsay

**Re: 53:17-53:18**
Dr. Grefer's CV concern is evidenced at 42:13-17; admission by party opponent 801(d)(2); present sense impression 803(1); and a business record 803(6)

**32**   53:23    - 54:14    Grefer, Michael 2006-06-29
53: 23    A.  I was always told that the study was
53: 24    not conclusive, that there was no definite evidence
53: 25    that showed there was increased cardiovascular events
54: 1    with this, given a study with people on aspirin, plus
54: 2    or minus naproxen, et cetera, so that basically the
54: 3    evidence was inconclusive.
54: 4    Q.  What -- if you had known that Vioxx
54: 5    increased the risk of heart attacks in patients like
54: 6    Garry Smith who had never had a problem with an
54: 7    NSAID, had never had a stomach problem with an NSAID,
54: 8    and did not have a myocardial history that put him in
54: 9    the aspirin indicated group, if you had known that in
54: 10    patients like that Vioxx increased the risk of heart
54: 11    attacks, would you have prescribed that drug to Garry
54: 12    back in October of 2002?
54: 13    MR. SKIDMORE:  Objection.  Leading,
54: 14    lack of foundation, and speculation.

**Re: 54:4-54:15**
**Def Obj:**
Leading (611); lack of foundation (602); speculation; assumes facts not in evidence; incomplete hypothetical

**Re: 54:4-54:15**
Question is not leading; witness is being asked about his own actions and reactions, and therefore, is not speculating; facts predicating the question will be presented by Plaintiff's expert witnesses

**33**   54:15    - 55:2    Grefer, Michael 2006-06-29    00:00:44
54: 15    A.  The answer's no.
54: 16    Q.  Okay.  Do you remember the Merck rep-
54: 17    resentatives talking to you about the theory that
54: 18    naproxen is somehow cardioprotective and that
54: 19    explained the results in the VIGOR article?
54: 20    A.  Well, the fact of the matter is is
54: 21    that -- the answer to your question is yes, they --
54: 22    that that was the thing that they keep -- kept bring-
54: 23    ing up, that these people were not on a protective
54: 24    heart medicine, and so that you couldn't draw any
54: 25    conclusions from the study --
55: 1    Q.  All right.
55: 2    A.  -- at that stage.

**34**   56:16    - 56:20    Grefer, Michael 2006-06-29    00:00:30
56: 16    Q.  Was it ever brought to your attention
56: 17    by the Merck representatives that the FDA had sent a
56: 18    warning letter to Merck in September of 2001 regard-
56: 19    ing its marketing of Vioxx?
56: 20    A.  No.

**Re: 56:16-58:11**
**Def Obj:**
The Warning Letter is irrelevant to any specific issue to be addressed by the witness; no personal knowledge of the document by the witness (602); lack of foundation (602); hearsay (802); 403

**Re: 56:16-58:11**
**Pltf Resp:**
Document is relevant to the plaintiff's case and the witness's testimony because Dr. Grefer previously testified that his understanding from Merck's sales representatives was Naproxen could explain the Vigor results (see page 44 and line 44:12-45:8); Dr. Grefer's lack of personal knowledge regarding the document is the relevant evidence; the document is not being used to prove the truth of the matter asserted, but instead, it is use to show Merck's understanding of the FDA's position at the time

**35**   56:23    - 57:1    Grefer, Michael 2006-06-29    00:00:18
56: 23    Q.  Let me hand you Exhibit Number 4, and
56: 24    I'll represent to you that Exhibit Number 4 is a copy
56: 25    of the warning letter that was sent to Merck in
57: 1    September of 2001.

**36**   57:17    - 58:11    Grefer, Michael 2006-06-29    00:01:07
57: 17    Q.  Did the Merck sales representatives
57: 18    advise you that in September of 2001 that the FDA
57: 19    stated that there are no -- quote, there are no
57: 20    adequate and well-controlled studies of naproxen that
57: 21    support your assertion that naproxen's --
57: 22    What is that next word, Doctor?  Why
57: 23    don't you just read the rest of the sentence.
57: 24    A.  It says -- it says, "In fact... there
57: 25    are no adequate and well-controlled studies of
58: 1    naproxen that support your assertion that naproxyn's
58: 2    transient inhibition of platelet aggregation is
58: 3    pharmocodynamically comparable to aspirin or
58: 4    clinically effective in decreasing the risk of MIs.
58: 5    Therefore, your" misrepresentation -- I'm sorry.
58: 6    "Therefore your representation that naproxen
58: 7    prolongs" beating time -- "bleeding time and inhibits

| | | | | | Objections | Responses |
|---|---|---|---|---|---|---|
| | | | 58: 8 | | | |
| | | | 58: 9 | | | |
| | | | 58: 10 | | | |
| | | | 58: 11 | | | |

58: 8    platelet" incidentally -- "identically to aspirin is
58: 9    misleading, and it minimizes the potential" serious--
58: 10    "seriousness of this finding."
58: 11    I was not told that, no.

---

**37**  **58:12**  **- 59:14**  Grefer, Michael 2006-06-29    00:01:40

58: 12    Q.  If you had been told that, would it
58: 13     have affected your decision to prescribe Vioxx to a
58: 14     patient like Garry Smith who had not had a problem
58: 15     with using other NSAIDs other than Vioxx?
58: 16    A.  I'm -- I'm not so sure that would have
58: 17     affected it.  The reason being, again, because there
58: 18     was -- there -- there's no definite evidence one way
58: 19     or another as far as that's concerned, you know.
58: 20     And, again, you know, and that still does not reflect
58: 21     the people that were -- that were aspirin indicated,
58: 22     also.
58: 23     So basically that type of thing --
58: 24     was not told that to begin with, and I'm not so sure,
58: 25     having been told that, because there's really nothing
59: 1     definitive there, it would have changed my prescrib-
59: 2     ing situation.
59: 3    Q.  If you had been told that and been
59: 4     told that Merck's own researchers were concerned
59: 5     about Merck making statements that Vioxx is cardio-
59: 6     protective -- I mean that naproxyn is cardioprotec-
59: 7     tive, if you'd been told several similar things like
59: 8     that, would that have affected your decision, pre-
59: 9     scribing decision, for patients like Garry who had
59: 10     not ever had a problem with other NSAIDs?
59: 11    A.  About whether naproxen is cardiopro-
59: 12     tective or not?
59: 13    Q.  Yes, sir.
59: 14    A.  I don't think so.

*Objections:* **Re: 58:12-59:14**
**Pltf Obj:**
Relevance

*Responses:* **Re: 58:12-59:14**
**Def Resp:**
Relevant to establish
that the information
plaintiff's counsel showed
witness would not have
affected decision to
prescribe Vioxx

---

**38**  **61:12**  **- 61:22**  Grefer, Michael 2006-06-29    00:01:07

61: 12    Q.  All right.  With regard to the issue
61: 13     of -- let me show you a graph.  You're aware that
61: 14     there was -- that the New England Journal of Medicine
61: 15     issued an expression of concern regarding the VIGOR
61: 16     article.  Correct?
61: 17    A.  I was.
61: 18    Q.  Was the fact that the VIGOR article
61: 19     was published in the New England Journal of Medicine
61: 20     a factor in your giving credibility to the Merck
61: 21     sales representatives' discussions of the VIGOR
61: 22     article with you?

---

**39**  **61:24**  **- 61:24**  Grefer, Michael 2006-06-29

61: 24    A.  No.

---

**40**  **62:16**  **- 62:24**  Grefer, Michael 2006-06-29    00:00:53

62: 16    Q.  Let me hand you the VIGOR article that
62: 17     we've now marked as Exhibit Number 5.  Just -- just
62: 18     keep that there in front of you for the moment.
62: 19     If you -- going back to this risk
62: 20     benefit analysis, if you look in the VIGOR article,
62: 21     they have a chart that shows the difference between
62: 22     Vioxx and naproxen in the events of gastrointestinal
62: 23     problems.  Correct?
62: 24    A.  Yes.

---

**41**  **63:3**  **- 63:11**  Grefer, Michael 2006-06-29    00:00:33

63: 3    Q.  And it shows a -- a big separation
63: 4     between naproxen on the top and Vioxx on the bottom.
63: 5     Correct?
63: 6    A.  Yes.
63: 7    Q.  Okay.  Was that somewhat impressive to
63: 8     you, as a physician, for patients who might have a
63: 9     problem with -- a stomach problem with naproxen or
63: 10     other NSAIDs and Vioxx's benefit over them?
63: 11    A.  Yes.

---

**42**  **63:19**  **- 64:21**  Grefer, Michael 2006-06-29    00:02:30

63: 19    Q.  Do you see a similar chart in there

*Responses:* **Re: 63:23-64:5**

| | | Objections | Responses |
|---|---|---|---|

| | | | **Pltf Resp:**
Predicate facts will be established by Plaintiff's expert witnesses; question is not leading and the leading objection is waived under FRCP 32(d)(3)(B) |
|---|---|---|---|
| 63: 20 | for showing the difference in the cardiovascular | | |
| 63: 21 | experience? | | |
| 63: 22 | A.  No. | | |
| 63: 23 | Q.  All right.  Do you think it might have | **Re: 63:23-64:5** | |
| 63: 24 | been helpful to use in comparing the risk benefit | **Def Obj:** | |
| 63: 25 | analysis of patients like Garry who have not had a | Assumes facts not in | |
| 64: 1 | problem, a prior problem with NSAIDs and stomach | evidence; leading | |
| 64: 2 | problems, to have seen a similar chart for the | | |
| 64: 3 | cardiovascular risk separation between the two | | **Re: 64:6-64:13** |
| 64: 4 | groups? | | **Pltf Resp:** |
| 64: 5 | A.  Yes. | | Objections to leading |
| 64: 6 | Q.  In the New England Journal reaffir- | **Re: 64:6-64:13** | and vague are waived |
| 64: 7 | mation they include such a chart that -- do you see | **Def Obj:** | under FRCP 32(d)(3)(B); |
| 64: 8 | that?  Can you hold it up for the -- for the jury. | Leading; vague (403); | Predicate facts will be |
| 64: 9 | A.  (Witness complies with request.) | assumes facts not in | established by |
| 64: 10 | Q.  Does it show a significant separation | evidence; incomplete | Plaintiff's expert |
| 64: 11 | between the Vioxx group on the top for cardiovascular | hypothetical; cherry- | witnesses; question is |
| 64: 12 | events and the naproxen group on the bottom? | picks conclusions | not a hypothetical |
| 64: 13 | A.  Yes. | | **Re: 64:14-64:21** |
| 64: 14 | Q.  If you had seen a chart like that | **Re: 64:14-64:21** | **Pltf Resp:** |
| 64: 15 | showing that kind of separation back in October of | **Def Obj:** | Witness is being asked |
| 64: 16 | 2002, if you had been shown that by the Merck | Lack of foundation (602); | about his own actions |
| 64: 17 | representatives, would it have affected or could it | speculation; leading | and reactions, and |
| 64: 18 | have affected your decision to prescribe Vioxx in a | | therefore, is not |
| 64: 19 | patient like Garry who did not have the risk of or | | speculating; question |
| 64: 20 | did not appear to have the risk of stomach bleeding? | | is not leading and |
| 64: 21 | A.  Yes. | | leading objection is |
| | | | waived under FRCP |
| | | | 32(d)(3)(B) |

**43**   **65:17   -   65:24**   Grefer, Michael 2006-06-29   00:00:37

| | | Objections | Responses |
|---|---|---|---|
| 65: 17 | Is it or is it not fair to say, | **Re: 65:17-66:1** | **Re: 65:17-66:1** |
| 65: 18 | Doctor, that you were influenced to some extent by | **Def Obj:** | **Pltf Resp:** |
| 65: 19 | the entire Vioxx sales campaign, in print, in tele- | Leading; assumes facts | Question is not leading; |
| 65: 20 | vision, in sales representatives' meetings, in other | not in evidence | predicate facts are |
| 65: 21 | physicians being asked by Merck to come talk to you? | | established in witness's |
| 65: 22 | Is it fair to say that that entire campaign | | later testimony (see pg |
| 65: 23 | influenced you to start prescribing more | | 84) |
| 65: 24 | Vioxx to patients like Garry Smith? | | |

**44**   **66:1   -   66:1**   Grefer, Michael 2006-06-29   00:00:16

| | |
|---|---|
| 66: 1 | A.  It did influence me, yes, sir. |

**45**   **83:24   -   84:5**   Grefer, Michael 2006-07-27   00:00:32

| | |
|---|---|
| 83: 24 | Doctor, I'm handing you Exhibit |
| 83: 25 | Number 2, which I'll represent to you is a compilation |
| 84: 1 | of several Merck documents that were produced to you and |
| 84: 2 | in response to a request for documents relating to you and |
| 84: 3 | this office.  And it goes for three or four years, |
| 84: 4 | starting in 1999.  Do you see that? |
| 84: 5 | A.  Yes. |

**46**   **84:8   -   84:12**   Grefer, Michael 2006-07-27   00:00:15

| | |
|---|---|
| 84: 8 | Q.  And I'll just represent to you that this |
| 84: 9 | compilation was -- was put together by somebody in my |
| 84: 10 | office from those various different Merck documents. |
| 84: 11 | Okay? |
| 84: 12 | A.  Okay. |

**47**   **84:13   -   84:17**   Grefer, Michael 2006-07-27   00:00:35

| | | Objections | Responses |
|---|---|---|---|
| | | | **Re: 84:13-84:15**       **Pltf Resp:** |
| 84: 13 | A.  All right.  Now, we left off -- we left | **Re: 84:13-84:15** | Untimely; |
| 84: 14 | off when we were talking about the -- the entire | **Def Obj:** | statements of the |
| 84: 15 | campaign for Vioxx.  Do you remember seeing television | Sidebar comment prior | reps are admissions |
| 84: 16 | ads for Vioxx, for example? | to question | and not offered for |
| 84: 17 | A.  Yes. | | the truth |

**48**   **84:25   -   85:4**   Grefer, Michael 2006-07-27   00:00:15

| | | Objections | Responses |
|---|---|---|---|
| 84: 25 | Did you see magazine advertisements in | **Re: 84:25-85:4** | **Re: 84:25-85:4** |
| 85: 1 | popular magazines, not just magazines that are sent to | **Def Obj:** | **Pltf Resp:** |
| 85: 2 | doctors? | Leading | Question is not leading |
| 85: 3 | MR. SKIDMORE:  Same objection. | | |
| 85: 4 | A.  I -- I believe I did. | | |

**49**   **85:5   -   86:12**   Grefer, Michael 2006-07-27   00:02:24

| | |
|---|---|
| 85: 5 | Q.  Is it or is it not fair to say that the |
| 85: 6 | entire Merck campaign for Vioxx over the years, your |
| 85: 7 | contacts with the Merck representatives, the |

| | | | | Objections | Responses |
|---|---|---|---|---|---|

| | | | |
|---|---|---|---|
| | 85: 8 | advertisements both to doctors and to the public that | |
| | 85: 9 | you saw, is it or is it not fair to say that all of | |
| | 85: 10 | that had an influence on your prescribing of Vioxx | |
| | 85: 11 | during the time that you prescribed it to Garry Smith? | |
| | 85: 12 | MR. SKIDMORE:  Objection.  Leading. | |
| | 85: 13 | A.  Well, I think that -- that all of the | |
| | 85: 14 | information that I knew as well as the response I was | |
| | 85: 15 | getting affected my prescribing it for Mr. Smith. | |
| | 85: 16 | Q.  Okay.  I want to ask you some specific | |
| | 85: 17 | things about the Merck representatives.  We talked | |
| | 85: 18 | about the Merck representatives coming and providing | |
| | 85: 19 | you information from time to time.  Do you recall that? | |
| | 85: 20 | A.  Yes. | |
| | 85: 21 | Q.  Okay.  Do you recall the Merck sales | **Re: 85:21-86:6** |
| | 85: 22 | representatives telling you about a study numbered 090 | **Def Obj:** |
| | 85: 23 | that showed an increase in heart attacks in patients | Leading; assumes facts |
| | 85: 24 | taking Vioxx as compared to another drug? | not in evidence; vague |
| | 85: 25 | A.  No. | and misleading (403); |
| | 86: 1 | Q.  Did the Merck representatives ever tell | cherry-picks |
| | 86: 2 | you that there were other Merck studies that showed | conclusions; hearsay |
| | 86: 3 | that Vioxx increased the risk of heart attack or | |
| | 86: 4 | cardiovascular events over other place-- over other | |
| | 86: 5 | NSAIDs or placebos? | |
| | 86: 6 | A.  No. | |
| | 86: 7 | Q.  Did the Merck sales representatives ever | **Re: 86:7-86:15** |
| | 86: 8 | tell you that a Merck statistician had done a | **Def Obj:** |
| | 86: 9 | meta-analysis of many Merck studies comparing Vioxx to | Leading; lack of |
| | 86: 10 | other NSAIDs and found that the Vioxx group had more | foundation (602; 403); |
| | 86: 11 | than twice as many heart attacks as the group comprised | misleading; cherry-picks |
| | 86: 12 | of other NSAID users? | conclusions; hearsay |
| | 86: 13 | MR. SKIDMORE:  Objection.  Foundation | |
| | 86: 14 | and leading. | |
| | 86: 15 | A.  No. | |
| | 86: 24 | Q.  Did the Merck sales representatives | **Re: 86:24-87:7** |
| | 86: 25 | disclose to you that the results of the VIGOR trial | **Def Obj:** |
| | 87: 1 | showed that for every 100 patients treated for a year | Same |
| | 87: 2 | with Vioxx, instead of being treated with naproxen, | |
| | 87: 3 | that there were two and a half additional serious | |
| | 87: 4 | adverse events in the Vioxx group? | |
| | 87: 5 | MR. SKIDMORE:  Objection.  Foundation | |
| | 87: 6 | and leading. | |
| | 87: 7 | A.  No. | |

**Re: 85:21-86:6**
**Pltf Resp:**
Objections to leading
and the form of
questions are waived
under FRCP 32(d)(3)(B);
predicate facts will be
established by Plaintiff's
experts; untimely;
statements of the
reps are admissions
and not offered for
the truth

**Re: 86:7-86:15**
**Pltf Resp:**
Untimely;
statements of the
reps are admissions
and not offered for
the truth

**Re: 86:24-87:7**
**Pltf Resp:**
Question is not leading;
untimely; statements
of the reps are
admissions and not
offered for the truth

| | | | | | |
|---|---|---|---|---|---|
| 50 | 87:23 | - 88:19 | Grefer, Michael 2006-07-27 | 00:01:47 | |
| | 87: 23 | What was your general impression, from | | **Re: 87:23-88:8** | **Re: 87:23-88:8** |
| | 87: 24 | the Merck sales representative contacts, about the | | **Def Obj:** | **Pltf Resp:** |
| | 87: 25 | safety of Vioxx as it relates to naproxen? | | Hearsay | Untimely; |
| | 88: 1 | A.  The -- the -- the general pitch | | | statements of the |
| | 88: 2 | throughout all those years that -- that the -- that the | | | reps are admissions |
| | 88: 3 | Vioxx representatives made was that their drug was | | | and not offered for |
| | 88: 4 | better because it -- it worked better to begin with, | | | the truth |
| | 88: 5 | and it was safer on the gastrointestinal tract, and | | | |
| | 88: 6 | that there did not seem to be any significant other | | | |
| | 88: 7 | factors when compared to naproxen that would make it a | | | |
| | 88: 8 | poor choice -- or a poor choice of the drug. | | | |
| | 88: 9 | Q.  Okay.  If the Merck sales | | **Re: 88:9-89:1** | **Re: 88:9-89:1** |
| | 88: 10 | representatives had disclosed to you that the results | | **Def Obj:** | **Pltf Resp:** |
| | 88: 11 | of the VIGOR trial showed that for every 100 patients | | Leading; lack of | Question is not leading; |
| | 88: 12 | treated for a year with Vioxx as -- as opposed to the | | foundation (602); calls | witness's own actions |
| | 88: 13 | same number of patients treated for a year with | | for speculation; | and  reactions to |
| | 88: 14 | naproxen, that there were two and a half additional | | incomplete hypothetical | information are not |
| | 88: 15 | serious adverse events in the Vioxx group, if they had | | | speculation |
| | 88: 16 | disclosed that to you prior to the time that you gave | | | |
| | 88: 17 | the drug to Garry Smith, would you or would you not | | | |
| | 88: 18 | have probably given the drug to patients like Garry | | | |
| | 88: 19 | Smith? | | | |
| 51 | 88:22 | - 89:5 | Grefer, Michael 2006-07-27 | 00:00:27 | |
| | 88: 22 | A.  Well, I -- I would have had to have | | | |
| | 88: 23 | known the particulars of the situation and I would have | | | |
| | 88: 24 | had to have known the definite concrete evidence that | | | |
| | 88: 25 | was there, but it certainly would have made me less | | | |
| | 89: 1 | likely to prescribe the medication to Mr. Smith. | | | |
| | 89: 2 | Q.  Is that information that you would have | | **Re: 89:2-89:5** | **Re: 89:2-89:5** |
| | 89: 3 | liked to have had given to you by the Merck | | **Def Obj:** | **Pltf Resp:** |

| | | | | Objections | Responses |
|---|---|---|---|---|---|
| | 89: 4<br>89: 5<br>89: 6 | representatives if it existed?<br>A.   Yes.<br>MR. SKIDMORE:  Objection.  Leading. | | Leading; incomplete<br>hypothetical | Question in not leading;<br>objections as to the form<br>of question are waived<br>under FRCP 32(d)(3)(B); |
| 52   89:9 | - 89:18<br>89: 9<br>89: 10<br>89: 11<br>89: 12<br>89: 13<br>89: 14<br>89: 15<br>89: 16<br>89: 17<br>89: 18 | Grefer, Michael 2006-07-27<br>Would you or would you not like to have<br>that kind of information so that you can make educated<br>decisions to care for your patients?<br>A.   I would like to have as much education<br>and information as possible when I make a decision.<br>Q.   Would you or would you not specifically<br>like to have information about hazards that may relate<br>to the use of the drug that the sales representative is<br>talking to you about?<br>A.   I would. | 00:01:08 | Re: 89:9-89:18<br>Def Obj:<br>Vague; leading and<br>based on an<br>incomplete hypothetical<br>(see previous Q&A) | Re: 89:9-89:18<br>Pltf Resp:<br>Objections as to the form<br>of questions are waived<br>under FRCP 32(d)(3)(B); |
| 53   90:6 | - 90:12<br>90: 6<br>90: 7<br>90: 8<br>90: 9<br>90: 10<br>90: 11<br>90: 12 | Grefer, Michael 2006-07-27<br>Q.   Okay.  Doctor, I'm going to hand you<br>what we've marked as Exhibit Number 7, and I'll<br>represent to you that that's a chart prepared by a<br>Merck biostatistician and included in a -- in a memo<br>that she presented in the studies -- or in the -- in the<br>time prior to when you prescribed the Vioxx to Garry<br>Smith. | 00:00:30 | Re: 90:6-90:12<br>Def Obj:<br>Lack of foundation<br>and no personal<br>knowledge of document | Re: 90:6-90:12 & 90:21-<br>91:2<br>Pltf Resp:<br>Beginning statement is<br>to explain what<br>document is referenced<br>in following questions;<br>the witness's lack of<br>personal knowledge of<br>the document is<br>relevant; question is not<br>leading and all other<br>objections to form are<br>waived under FRCP<br>32(d)(3)(B) |
| 54   90:13 | - 90:16<br>90: 13<br>90: 14<br>90: 15<br>90: 16 | Grefer, Michael 2006-07-27<br>A.   I -- I don't particularly remember<br>seeing this particular one, but I was very frequently<br>presented with a lot of information like that.  I don't<br>know if that one specifically was presented to me. | 00:00:13 | | |
| 55   90:21 | - 91:2<br>90: 21<br>90: 22<br>90: 23<br>90: 24<br>90: 25<br>91: 1<br>91: 2 | Grefer, Michael 2006-07-27<br>If you look up here, it says MI<br>Endpoint, and I'll represent to you that that means<br>myocardial infarction endpoint, comparing Rofecoxib,<br>which is the generic name for the -- I guess the<br>molecule name for Vioxx, versus other NSAIDs.  Do you<br>see that?<br>A.   Yes. | 00:00:18 | Re: 90:21-91:2<br>Def Obj:<br>Lack of foundation;<br>no personal knowledge | Pltf Resp:<br>Beginning statement is<br>to explain what<br>document is referenced<br>in following questions;<br>personal knowledge of<br>the document is<br>relevant; question is not<br>leading and all other<br>objections to form are<br>waived under FRCP |
| 56   91:21 | - 92:4<br>91: 21<br>91: 22<br>91: 23<br>91: 24<br>91: 25<br>92: 1<br>92: 2<br>92: 3<br>92: 4 | Grefer, Michael 2006-07-27<br>Q.   If the Merck representatives had shown<br>you this document and explained to you that the first<br>line is all patients, a comparison of all patients for<br>various different studies, and that it showed a<br>relative risk of more than two for myocardial<br>infarctions in the Vioxx group over the other NSAIDs<br>group, first of all, do you think that would have stuck<br>in your mind if they had ever told you that there was a<br>doubling of the risk for Vioxx users over other NSAIDs? | 00:00:50 | Re: 91:21-92:12<br>Def Obj:<br>Leading; assumes facts<br>not in evidence;<br>incomplete hypothetical;<br>calls for speculation | Re: 91:21-92:12<br>Pltf Resp:<br>Untimely;<br>statements of the<br>reps are admissions and<br>not offered for<br>the truth |
| 57   92:6 | - 92:10<br>92: 6<br>92: 7<br>92: 8<br>92: 9<br>92: 10 | Grefer, Michael 2006-07-27<br>A.   Yes.<br>Q.   Would or would not that information, a<br>doubling of the risk for Vioxx users over other NSAID<br>users, have stuck in your mind if the Merck<br>representatives had ever brought it to your attention? | 00:00:16 | | |
| 58   92:12 | - 92:17<br>92: 12<br>92: 13<br>92: 14<br>92: 15<br>92: 16<br>92: 17 | Grefer, Michael 2006-07-27<br>A.   Yes, probably.<br>Q.   Did the Merck representatives ever tell<br>you or show you information that indicated that their<br>biostatistician had determined in a summary of these<br>studies a relative risk of more than two for the Vioxx<br>group over the NSAIDs group for myocardial infarctions? | 00:00:34 | Re: 92:12-92:24<br>Def Obj:<br>Lack of foundation (602);<br>leading; hearsay | Re: 92:12-92:24<br>Pltf Resp:<br>Witness's lack of<br>personal knowledge<br>is relevant; question<br>is not leading; untimely;<br>statements of the<br>reps are admissions<br>and not offered for<br>the truth |
| 59   92:19 | - 92:19<br>92: 19 | Grefer, Michael 2006-07-27<br>Q.   Did they ever -- | 00:00:01 | | |
| 60   92:21 | - 92:22<br>92: 21<br>92: 22 | Grefer, Michael 2006-07-27<br>Q.   -- tell you that or show you that,<br>either one? | 00:00:03 | | |
| 61   92:24 | - 93:5<br>92: 24<br>92: 25 | Grefer, Michael 2006-07-27<br>A.   Not -- not that I recall, no, sir.<br>Q.   Doctor, if information had been brought | 00:00:34 | Re: 92:25-93:8<br>Def Obj:<br>Leading; lack of | Re: 92:25-93:8<br>Pltf Resp:<br>Question is not leading; |

| | | | | | | Objections | Responses |
|---|---|---|---|---|---|---|---|
| | | | 93: 1 | to your attention before October of 2002 that Vioxx | | foundation (602; 403); | witness has personal |
| | | | 93: 2 | increased the risk of myocardial infarction or other | | Question/Answer comes | knowledge of his own |
| | | | 93: 3 | cardiovascular events in patients like Garry Smith, | | after a series of | actions and reactions; |
| | | | 93: 4 | would you or would you not have prescribed Vioxx to him | | misleading and | question does not |
| | | | 93: 5 | in October of 2002? | | speculative questions; | previous testimony |
| | | | | | | and questions re: Merck | |
| 62 | 93:8 | - 93:8 | | Grefer, Michael 2006-07-27 | 00:00:06 | | |
| | | | 93: 8 | A.  Probably not. | | | |
| 63 | 4:9 | - 5:1 | | Grefer, Michael (Discovery) 2006-06-29 | 00:00:38 | | |
| | | | 4: 9 | Q.  Dr. Grefer, my name's Jon Skidmore, | | | |
| | | | 4: 10 | and I represent Merck in this lawsuit.  Good morning. | | | |
| | | | 4: 11 | A.  Good morning. | | | |
| | | | 4: 12 | Q.  We have never met before today, have | | | |
| | | | 4: 13 | we? | | | |
| | | | 4: 14 | A.  No, sir. | | | |
| | | | 4: 15 | Q.  You have given depositions before, | | Re: 4:15-5:1 | Re: 4:15-5:1 |
| | | | 4: 16 | have you not? | | Pltf Obj: | Def Resp: |
| | | | 4: 17 | A.  Yes, sir. | | Relevance | Proper background for |
| | | | 4: 18 | Q.  And you're familiar with the ground | | | witness |
| | | | 4: 19 | rules for them? | | | |
| | | | 4: 20 | A.  Yes, sir. | | | |
| | | | 4: 21 | Q.  Could you tell the jury where -- where | | | |
| | | | 4: 22 | we are today, your -- your office location. | | | |
| | | | 4: 23 | A.  Yes.  Today we're at 525 Alexandria | | | |
| | | | 4: 24 | Pike.  It's in Southgate, Kentucky.  That's my -- my | | | |
| | | | 4: 25 | main office, and it's one of the three offices that | | | |
| | | | 5: 1 | my group has. | | | |
| 64 | 6:11 | - 6:17 | | Grefer, Michael (Discovery) 2006-06-29 | 00:00:12 | | |
| | | | 6: 11 | Q.  Now, prior to today I know you've had | | | |
| | | | 6: 12 | an opportunity to meet with your own counsel, but | | | |
| | | | 6: 13 | have you also had an opportunity to meet with the | | | |
| | | | 6: 14 | attorneys for Garry Smith? | | | |
| | | | 6: 15 | A.  Yes, sir. | | | |
| | | | 6: 16 | Q.  And that's Larry Wright? | | | |
| | | | 6: 17 | A.  Yes, sir. | | | |
| 65 | 7:4 | - 7:25 | | Grefer, Michael (Discovery) 2006-06-29 | 00:00:57 | | |
| | | | 7: 4 | Q.  At that meeting did he show you any | | | |
| | | | 7: 5 | materials? | | | |
| | | | 7: 6 | A.  He showed me some, yes, sir. | | | |
| | | | 7: 7 | Q.  What did he show you? | | | |
| | | | 7: 8 | A.  He showed me some records from mainly | | | |
| | | | 7: 9 | representatives of -- of Merck that pertained to the | | | |
| | | | 7: 10 | vis-- visits -- | | | |
| | | | 7: 11 | And there are a lot of them.  I -- I | | | |
| | | | 7: 12 | just briefly glanced at them. | | | |
| | | | 7: 13 | -- of -- of the visits that the drug | | | |
| | | | 7: 14 | representatives made note of when they came to see | | | |
| | | | 7: 15 | me. | | | |
| | | | 7: 16 | Q.  Did you have an independent | | | |
| | | | 7: 17 | recollection of any of those? | | | |
| | | | 7: 18 | A.  No, sir.  As I say, there were a lot | | | |
| | | | 7: 19 | of them, and I -- I -- I didn't read them with -- | | | |
| | | | 7: 20 | with any depth.  I was -- I -- I was surprised they | | | |
| | | | 7: 21 | existed. | | | |
| | | | 7: 22 | Q.  Surprised they kept notes on meetings? | | | |
| | | | 7: 23 | A.  Yes, sir. | | | |
| | | | 7: 24 | Q.  Okay.  Did it offend you in any way? | | | |
| | | | 7: 25 | A.  No, sir; no. | | | |
| 66 | 8:1 | - 8:16 | | Grefer, Michael (Discovery) 2006-06-29 | 00:00:43 | | |
| | | | 8: 1 | Q.  It was just you didn't know that that | | | |
| | | | 8: 2 | information existed? | | | |
| | | | 8: 3 | A.  Well, when people come to see me, | | | |
| | | | 8: 4 | they -- they smile, they shake my hand.  They don't | | | |
| | | | 8: 5 | write down notes, and -- and I don't know where -- | | | |
| | | | 8: 6 | when they generate these interview type of situations | | | |
| | | | 8: 7 | that they have.  But it did surprise me, because | | | |
| | | | 8: 8 | nobody's ever taken notes when they've talked to me | | | |
| | | | 8: 9 | about certain things like that. | | | |
| | | | 8: 10 | Q.  Okay.  Do -- do you have any | | | |
| | | | 8: 11 | independent recollection of meetings with any Merck | | | |
| | | | 8: 12 | sales representatives? | | | |

|  |  |  |  |  | Objections | Responses |
|---|---|---|---|---|---|---|

| | 8: 13 | | A.  Oh, I've -- I must have met with Merck | | | |
| | 8: 14 | | sales representatives 50 to a hundred times, but I | | | |
| | 8: 15 | | don't remember any particular individual meeting. | | | |
| | 8: 16 | | Maybe more. | | | |
| 67 | 8:17 | - 9:3 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:23 | | |
| | 8: 17 | | Q.  And you -- all the major | | | |
| | 8: 18 | | pharmaceutical companies have professional sales | | | |
| | 8: 19 | | representatives that call on physicians? | | | |
| | 8: 20 | | A.  Sure do. | | | |
| | 8: 21 | | Q.  And I assume you've also at least met | | | |
| | 8: 22 | | briefly, as with the Merck representatives, | | | |
| | 8: 23 | | representatives of all the other major pharmaceutical | | | |
| | 8: 24 | | companies? | | | |
| | 8: 25 | | A.  Yes, sir. | | | |
| | 9: 1 | | Q.  That is a big part of their job to be | | | |
| | 9: 2 | | in the physicians' offices making their rounds? | | | |
| | 9: 3 | | A.  Correct. | | | |
| 68 | 10:7 | - 10:12 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:11 | Re: 10:7-10:12 | Re: 10:7-10:12 |
| | 10: 7 | | Q.  And you are not a cardiologist? | | Pltf Obj: | Def Resp: |
| | 10: 8 | | A.  Correct. | | Relevance; 403 | Relevant to |
| | 10: 9 | | Q.  And I assume, if you have patients | | | establish scope of |
| | 10: 10 | | with cardiology issues, you refer them to a | | | expertise. |
| | 10: 11 | | cardiologist? | | | |
| | 10: 12 | | A.  Yes, sir. | | | |
| 69 | 11:17 | - 11:22 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:08 | | |
| | 11: 17 | | Q.  Okay.  Can you -- can you tell the | | | |
| | 11: 18 | | jury what your medical specialty is? | | | |
| | 11: 19 | | A.  I'm an orthopedic surgeon. | | | |
| | 11: 20 | | Q.  And you're licensed to practice in | | | |
| | 11: 21 | | Kentucky? | | | |
| | 11: 22 | | A.  Yes, sir. | | | |
| 70 | 11:23 | - 12:11 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:44 | Re: 11:23-12:11 | Re: 11:23-12:11 |
| | 11: 23 | | Q.  Now, do people get cross-licensed here | | Pltf Obj: | Def Resp: |
| | 11: 24 | | since you're so close to the border with Ohio, or is | | Relevance; 403 | Relevant to |
| | 11: 25 | | it -- or do you just practice in Kentucky? | | | establish scope of |
| | 12: 1 | | A.  I -- I am licensed.  I -- I am | | | expertise and areas of |
| | 12: 2 | | licensed to practice in Ohio and have been up until | | | practice. |
| | 12: 3 | | very, very recently.  I -- I've had this problem with | | | |
| | 12: 4 | | my neck, and I stopped doing active surgical proce- | | | |
| | 12: 5 | | dures.  So I did not maintain or I have not main- | | | |
| | 12: 6 | | tained -- as a matter of fact, I still might have it, | | | |
| | 12: 7 | | but I think very recently I'm going to drop my licen- | | | |
| | 12: 8 | | sure in Ohio because I just don't need it anymore.  I | | | |
| | 12: 9 | | just don't do much over there.  But basically I will | | | |
| | 12: 10 | | maintain the one in Kentucky.  And I still might be | | | |
| | 12: 11 | | licensed in Ohio.  I don't know that. | | | |
| 71 | 13:4 | - 13:21 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:53 | Re: 13:4-13:21 | Re: 13:4-13:21 |
| | 13: 4 | | Q.  Can you give us a description of what | | Pltf Obj: | Def Resp: Relevant to |
| | 13: 5 | | your practice is today? | | Relevance; 403 | establish scope of |
| | 13: 6 | | A.  Today my practice is office practice. | | | expertise and areas of |
| | 13: 7 | | I set bones, I take care of people that come in. | | | practice |
| | 13: 8 | | Taken care of a lot of people over the last 25 years | | | |
| | 13: 9 | | and people come in with surgical and nonsurgical | | | |
| | 13: 10 | | problems, and I see them.  And if they do need a | | | |
| | 13: 11 | | surgical procedure, I send them to one of my | | | |
| | 13: 12 | | partners. | | | |
| | 13: 13 | | Most of the time these people that | | | |
| | 13: 14 | | come in to see me are my old patients, and I -- | | | |
| | 13: 15 | | and -- and they want me to follow up on their care. | | | |
| | 13: 16 | | So basically it's just a matter of taking care of the | | | |
| | 13: 17 | | nonsurgical things, which are significant, probably. | | | |
| | 13: 18 | | There -- there's not many things that need surgery. | | | |
| | 13: 19 | | but basically, when they do need surgery, my partners | | | |
| | 13: 20 | | do them, and then either I or my partners will follow | | | |
| | 13: 21 | | up with the patients. | | | |
| 72 | 14:15 | - 15:8 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:50 | | |
| | 14: 15 | | Q.  In your practice I assume it is -- it | | | |
| | 14: 16 | | is fairly routine with patients for you to use | | | |
| | 14: 17 | | samples. | | | |

| | | | | | Objections | Responses |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| | 14: 18 | | A. | Yes, sir. | | |
| | 14: 19 | | Q. | When you do use samples with a | | |
| | 14: 20 | | | patient, do you follow a standard practice of -- of | | |
| | 14: 21 | | | notation of how many -- of giving samples to a | | |
| | 14: 22 | | | patient? | | |
| | 14: 23 | | A. | We try to.  We try to make a notation | | |
| | 14: 24 | | | of the samples that were given.  Usually, when we | | |
| | 14: 25 | | | talk about samples, we usually don't make a notation | | |
| | 15: 1 | | | of the number. | | |
| | 15: 2 | | Q. | Okay.  But would it be fair to say | | |
| | 15: 3 | | | that in your normal practice, if you provide a | | |
| | 15: 4 | | | patient samples, you at least note that samples were | | |
| | 15: 5 | | | given? | | |
| | 15: 6 | | A. | Yes, sir. | | |
| | 15: 7 | | Q. | And that's important in the medical | | |
| | 15: 8 | | | record, isn't it? | | |
| 73 | 15:10 | - 16:16 | | Grefer, Michael (Discovery) 2006-06-29 | 00:01:25 | |
| | 15: 10 | | A. | Yes, sir. | | |
| | 15: 11 | | Q. | And why is that? | | |
| | 15: 12 | | A. | It -- it -- it's -- it's just continu- | | |
| | 15: 13 | | | ity of care of any particular individual.  You need | | |
| | 15: 14 | | | to know what you've given them and what they take | | |
| | 15: 15 | | | with them.  And then also you like to follow with a | | |
| | 15: 16 | | | notation of any follow-up prescriptions that have | | |
| | 15: 17 | | | been given. | | |
| | 15: 18 | | Q. | And that's helpful in terms of | | |
| | 15: 19 | | | continuity of care? | | |
| | 15: 20 | | A. | Yes. | | |
| | 15: 21 | | Q. | Now, if you were prescribing a patient | | |
| | 15: 22 | | | Vioxx, for example, and wrote them a prescription, | | |
| | 15: 23 | | | would there be a standard practice of how many | | |
| | 15: 24 | | | samples you might give them at that time, if any? | | |
| | 15: 25 | | A. | There -- there's -- there's nothing | | |
| | 16: 1 | | | that's written in stone in the office.  Basically | | |
| | 16: 2 | | | it's -- it's a -- it's a situation of, number one, | | |
| | 16: 3 | | | whether we have the samples available -- | | |
| | 16: 4 | | | Sometimes you don't; sometimes you're | | |
| | 16: 5 | | | out of them. | | |
| | 16: 6 | | | -- and the numbers that you think a | | |
| | 16: 7 | | | patient requires. | | |
| | 16: 8 | | | My personal situation is is that I | | |
| | 16: 9 | | | usually give the patients enough to give them a short | | |
| | 16: 10 | | | trial dose of it and also make it convenient so that | | |
| | 16: 11 | | | they don't have to leave here and just go right to | | |
| | 16: 12 | | | the pharmacist. | | |
| | 16: 13 | | Q. | And with something like Vioxx, what | | |
| | 16: 14 | | | would that number of samples be? | | |
| | 16: 15 | | A. | Basically it -- it -- it would vary. | | |
| | 16: 16 | | | Usually it's under a week's worth, usually. | | |
| 74 | 16:20 | - 16:22 | | Grefer, Michael (Discovery) 2006-06-29 | 00:00:07 | Re: 16:20-17:5 | Re: 16:20-17:5 |
| | 16: 20 | | Q. | And the reason for giving under a | | Pltf Obj: | Def Resp: |
| | 16: 21 | | | week's worth, is that to give them plenty of time to | | Misleading; speculative | Proper questions re: |
| | 16: 22 | | | go get their prescription filled? | | | doctor's typical practice |
| 75 | 16:24 | - 17:21 | | Grefer, Michael (Discovery) 2006-06-29 | 00:01:02 | | and reason therefore |
| | 16: 24 | | A. | Plenty of time to get their prescrip- | | | |
| | 16: 25 | | | tion to fill -- filled and make sure that the | | | |
| | 17: 1 | | | medicine agrees with them rather than going out and | | | |
| | 17: 2 | | | getting a prescription filled for 30 to 40 pills | | | |
| | 17: 3 | | | when, if they take one or two, it -- it doesn't -- it | | | |
| | 17: 4 | | | doesn't agree with them. | | | |
| | 17: 5 | | Q. | Okay.  Now, all -- all prescription | | | |
| | 17: 6 | | | drugs have side effects, don't they? | | | |
| | 17: 7 | | A. | Yes, sir. | | | |
| | 17: 8 | | Q. | Is it helpful in your practice to have | | | |
| | 17: 9 | | | more than one drug in a class of drugs that you are | | | |
| | 17: 10 | | | able to use with patients? | | | |
| | 17: 11 | | A. | Yes, sir. | | | |
| | 17: 12 | | Q. | And why is that? | | | |
| | 17: 13 | | A. | Patient tolerance.  People won't | | | |
| | 17: 14 | | | tolerate one drug as compared to another drug. | | | |
| | 17: 15 | | | Basically the typical types of side effects that you | | | |
| | 17: 16 | | | get with different particular people and -- and | | | |

| | | | | | Objections | Responses |
|---|---|---|---|---|---|---|
| | | | 17: 17 | what's happened to them in the past. That's -- | | |
| | | | 17: 18 | that's my rationale. | | |
| | | | 17: 19 | Q. And that's one of the reasons you may | Re: 17:18-17:23 | Re: 17:18-17:23 |
| | | | 17: 20 | give someone less than a week's supply of samples, so | **Pltf Obj:** | **Def Resp:** |
| | | | 17: 21 | that they can see if it agrees with them? | Misleading; speculative | Proper questions re: |
| 76 | 17:23 | - 17:23 | | Grefer, Michael (Discovery) 2006-06-29 | | Dr. Grefer's typical |
| | | | 17: 23 | A. Yes, sir. | | practices & justification |
| | | | | | | for those practices |
| 77 | 17:24 | - 18:7 | | Grefer, Michael (Discovery) 2006-06-29 | 00:00:19 | |
| | | | 17: 24 | Q. Now, do you regularly subscribe to any | Re: 17:24-18:7 | Re: 17:24-18:7 |
| | | | 17: 25 | medical journals or publications? | **Pltf Obj:** | **Def Resp:** |
| | | | 18: 1 | A. Yes. | Relevance; 403 | Relevant to establish |
| | | | 18: 2 | Q. Which ones? | | doctor's practices |
| | | | 18: 3 | A. The Journal of Orthopedic Surgery, and | | concerning information |
| | | | 18: 4 | basically that's usually the only one that I -- that | Re: 18:9 | disseminated in medical |
| | | | 18: 5 | I read with regularity. | **Pltf Obj:** | journals and periodicals |
| | | | 18: 6 | Q. Do you on occasion read the New | Relevance; 403; | Re: 18:9 |
| | | | 18: 7 | England Journal of Medicine? | cumulative | **Def Resp:** |
| 78 | 18:9 | - 18:9 | | Grefer, Michael (Discovery) 2006-06-29 | | Relevant to establish |
| | | | 18: 9 | A. Rarely. | | doctor's practices |
| | | | | | | concerning information |
| | | | | | | disseminated in medical |
| 79 | 18:13 | - 19:25 | | Grefer, Michael (Discovery) 2006-06-29 | 00:01:36 | journals and periodicals |
| | | | 18: 13 | Q. Now, I know we touched on this | | |
| | | | 18: 14 | briefly, but your practice is limited to orthopedics? | | |
| | | | 18: 15 | A. Correct. | | |
| | | | 18: 16 | Q. And can you describe orthopedics to | | |
| | | | 18: 17 | the jury. | | |
| | | | 18: 18 | A. It's musculoskeletal medicine and | | |
| | | | 18: 19 | surgery. It has to do with your muscular and | | |
| | | | 18: 20 | skeletal system. | | |
| | | | 18: 21 | Q. If -- if a patient has a cardiology | Re: 18:21-19:25 | Re: 18:21-19:25 |
| | | | 18: 22 | issue, which I assume has occurred from time to time | **Pltf Obj:** | **Def Resp:** |
| | | | 18: 23 | in your practice, what do you do for the patient | Relevance; 403; outside | Relevant to establish |
| | | | 18: 24 | typically? | the scope of direct | witness' practice, |
| | | | 18: 25 | A. Well, if a patient is in my office and | | background and areas |
| | | | 19: 1 | they have a cardiology problem, number one, I make | | of knowledge; no unfair |
| | | | 19: 2 | sure they're stable if they have a -- an event | | prejudice; witness is on |
| | | | 19: 3 | in -- in my office. And maybe once or twice I've had | | defendant's list as well |
| | | | 19: 4 | to call the emergency department and have them come | | so defendant is not |
| | | | 19: 5 | pick up people if they're undergoing an event. | | limited by scope of |
| | | | 19: 6 | But basically if he -- if -- if the | | direct |
| | | | 19: 7 | patient is in a stable condition and there's no | | |
| | | | 19: 8 | imminent danger, I recommend they see a heart doctor, | | |
| | | | 19: 9 | a cardiologist. | | |
| | | | 19: 10 | Q. Okay. You don't typically -- part of | | |
| | | | 19: 11 | your practice is not addressing cardiology health | | |
| | | | 19: 12 | issues with patients unless there was an emergent | | |
| | | | 19: 13 | situation? | | |
| | | | 19: 14 | A. Correct. | | |
| | | | 19: 15 | Q. Do you know Dr. Daniel Courtade? | | |
| | | | 19: 16 | A. Courtade (pronouncing), yes, sir. | | |
| | | | 19: 17 | Q. Is he respected in this area? | | |
| | | | 19: 18 | A. He is. | | |
| | | | 19: 19 | Q. And he's a specialist in cardiology? | | |
| | | | 19: 20 | A. He is. | | |
| | | | 19: 21 | Q. Are you aware that he treated Garry | | |
| | | | 19: 22 | Smith after his heart attack? | | |
| | | | 19: 23 | A. I became aware of that. And I -- I | | |
| | | | 19: 24 | don't know when I became aware of that, but I did | | |
| | | | 19: 25 | become aware of that. | | |
| 80 | 20:7 | - 22:7 | | Grefer, Michael (Discovery) 2006-06-29 | 00:01:58 | |
| | | | 20: 7 | Q. Now, you never treated Mr. Smith for | Re: 20:7-21:12 | Re: 20:7-21:12 |
| | | | 20: 8 | any cardiology or heart issues? | **Pltf Obj:** | **Def Resp:** |
| | | | 20: 9 | A. That's correct. | Relevance; 403; outside | Relevant to establish |
| | | | 20: 10 | Q. Would you defer to Dr. Courtade for | the scope of direct | witness' practice, |
| | | | 20: 11 | any opinions concerning Mr. Smith's cardiology | | background and areas |
| | | | 20: 12 | issues? | | of knowledge; no unfair |
| | | | 20: 13 | A. Yes, sir. | | prejudice; witness is on |
| | | | 20: 14 | Q. Would that include the cause of his | | defendant's list as well |
| | | | 20: 15 | heart attack? | | so defendant is not |
| | | | 20: 16 | A. Yes, sir. | | limited by scope of |
| | | | 20: 17 | Q. Would that include Mr. Smith's risk | | direct |
| | | | 20: 18 | factors for cardiovascular -- cardiovascular disease | | |

| | Objections | Responses |
|---|---|---|

| | | |
|---|---|---|
| 20: 19  both before and after the heart attack? | | |
| 20: 20  A. Yes, sir. | | |
| 20: 21  Q. Would that include the extent of | | |
| 20: 22  cardiovascular disease found by Dr. Courtade? | | |
| 20: 23  MR. WRIGHT:  Object to the form. | | |
| 20: 24  A. Yes, sir. | | |
| 20: 25  Q. Would you also defer to Dr. Courtade | | |
| 21: 1  for any treatment Mr. Smith received after his | | |
| 21: 2  cardiovascular disease was identified? | | |
| 21: 3  A. Yes, sir. | | |
| 21: 4  MR. WRIGHT:  Object to the form. | | |
| 21: 5  Q. And would you defer to Dr. Courtade | | |
| 21: 6  for any opinions concerning Mr. Smith's recovery from | | |
| 21: 7  his heart attack? | | |
| 21: 8  A. Yes, sir. | | |
| 21: 9  Q. And also would you defer to Cour-- Dr. | | |
| 21: 10  Courtade as to whether or not Vioxx or any risk | | |
| 21: 11  factors played any role in Mr. Smith's heart attack? | | |
| 21: 12  A. Yes, sir. | | |
| 21: 13  Q. I probably know the answer to these | **Re: 21:13-22:7** | **Re: 21:13-22:7** |
| 21: 14  questions, but it's something I need to ask very | **Pltf Obj:** | **Def Resp:** |
| 21: 15  briefly. | Relevance; 403; outside | Relevant to establish |
| 21: 16  A. Sure. | the scope of direct | witness' practice, |
| 21: 17  Q. Do you have any expertise in the FDA's | | background and areas |
| 21: 18  handling and regulation of new drug applications? | | of knowledge; no unfair |
| 21: 19  A. No, sir. | | prejudice; witness is on |
| 21: 20  Q. Or the design -- the design of | | defendant's list as well |
| 21: 21  clinical trials? | | so defendant is not |
| 21: 22  A. No, sir. | | limited by scope of |
| 21: 23  Q. The FDA labeling process? | | direct |
| 21: 24  A. No, sir. | | |
| 21: 25  Q. The FDA determination of whether a | | |
| 22: 1  prescription drug is safe and effective? | | |
| 22: 2  A. No, sir. | | |
| 22: 3  Q. Do you ever -- have you ever conducted | | |
| 22: 4  a clinical trial? | | |
| 22: 5  A. No, sir. | | |
| 22: 6  Q. Have you ever participated in one? | | |
| 22: 7  A. No, sir. | | |

81  **22:17**    -  **24:16**     Grefer, Michael (Discovery) 2006-06-29          00:01:36

| | | |
|---|---|---|
| 22: 17  Q. Do you -- do you specifically remember | | |
| 22: 18  Mr. Smith?  You saw him a long time ago and not for | | |
| 22: 19  long. | | |
| 22: 20  A. No, sir, I don't. | | |
| 22: 21  Q. You don't have a picture of him in | | |
| 22: 22  your mind? | | |
| 22: 23  A. I do not. | | |
| 22: 24  Q. Okay.  Now, you see a lot of patients, | | |
| 22: 25  don't you? | | |
| 23: 1  A. I do. | | |
| 23: 2  Q. And -- and I assume from the years of | | |
| 23: 3  practice here in -- in the -- the nice practice that | | |
| 23: 4  you have, you have some patients you've -- you've | | |
| 23: 5  followed for many, many years? | | |
| 23: 6  A. I have. | | |
| 23: 7  Q. And he's not one of them? | | |
| 23: 8  A. No, sir, he's not. | | |
| 23: 9  Q. So I assume that your best recollec- | | |
| 23: 10  tion of him is referring to your chart? | | |
| 23: 11  A. That's correct. | | |
| 23: 12  Q. Can you tell us when you treated Mr. | **Re: 23:12-24:16** | **Re: 23:12-24:16** |
| 23: 13  Smith, the time period? | **Pltf Obj:** | **Def Resp:** |
| 23: 14  A. Yes, sir.  I saw Mr. Smith for the | Cumulative | Background; Proper to |
| 23: 15  first time on September the 11th of 2002, and then I | | establish context for |
| 23: 16  referred him to my partner -- Dr. Forest Heis -- on | | questioning |
| 23: 17  10/14 of 2002.  So I saw him on 9/11, 10/02 and | | |
| 23: 18  10/14. | | |
| 23: 19  Q. On three -- three occasions? | | |
| 23: 20  A. Three occasions, yes, sir. | | |
| 23: 21  Q. And can you tell the jury what your | | |
| 23: 22  care and treatment of him had to do with at that | | |
| 23: 23  time? | | |
| 23: 24  A. It was his right knee. | | |
| 23: 25  Q. And that's an orthopedic issue? | | |

|  |  | Objections | Responses |
|---|---|---|---|

24: 1    A.  Yes, sir.
24: 2    Q.  And it was something that had been
24: 3        hurting him?
24: 4    A.  Correct.
24: 5    Q.  And you ultimately, based upon your
24: 6        diagnostic testing, made a decision that he needed
24: 7        surgery?
24: 8    A.  Correct.
24: 9    Q.  And that's when you referred him to
24: 10        your partner?
24: 11    A.  Yes, sir.
24: 12    Q.  And that's Dr. Heis?
24: 13    A.  Yes, sir.
24: 14    Q.  Because at that point in time you had
24: 15        ceased doing surgeries?
24: 16    A.  Correct.

**82  24:17        -  24:20**    Grefer, Michael (Discovery) 2006-06-29          00:00:10
24: 17    Q.  Do you have a -- I assume, based upon
24: 18        what you've already said, you don't have a memory of
24: 19        any conversation with Mr. Smith?
24: 20    A.  No, I don't.

**83  24:24        -  26:14**    Grefer, Michael (Discovery) 2006-06-29          00:01:42
24: 24        Doctor, I want to talk to you about
24: 25        prescriptions.  In general, I know in providing
25: 1        medical care to your -- for your patients, you
25: 2        familiarize yourself with the safety information
25: 3        about drugs before prescribing one for the first
25: 4        time.
25: 5    A.  Yes, sir.
25: 6    Q.  And I assume one of the ways you
25: 7        educate yourself is with the -- the package insert,
25: 8        the labeling that comes with the drug?
25: 9    A.  Yes, sir.
25: 10    Q.  And do you use the package insert and
25: 11        the PDR?
25: 12    A.  Basically, yes.
25: 13    Q.  Whatever's handy?
25: 14    A.  Whatever's handy, what-- what--
25: 15        whatever's been given to me, and basically what --
25: 16        what knowledge just comes by my desk.  All the time
25: 17        we're getting brochures and all the time we're
25: 18        getting information.
25: 19    Q.  Drug companies send out information?
25: 20    A.  They do.
25: 21    Q.  I assume in the field of orthopedics
25: 22        there are times where either the journal you review
25: 23        or the -- or other physicians circulate articles?
25: 24    A.  Correct.
25: 25    Q.  I assume you confer with medical
26: 1        colleagues about medications?
26: 2    A.  You talk to them, correct.
26: 3    Q.  And I assume you base your prescrip-
26: 4        tion decisions on your clinical experience, too?
26: 5    A.  That's most of where it comes from,
26: 6        yes, sir.
26: 7    Q.  Is there anything else you typically
26: 8        use other than the package insert, the labeling, some
26: 9        articles that come across your desk, and visiting
26: 10        with colleagues, along with your clinical experience,
26: 11        to make these prescribing decisions?
26: 12    A.  That and the material that's supplied,
26: 13        which is very, very frequently a lot, by the drug
26: 14        companies themselves.

**84  26:19        -  27:6**    Grefer, Michael (Discovery) 2006-06-29          00:00:32
26: 19    Q.  Okay.  Now, you are aware that -- that
26: 20        the labeling on drugs over -- with time and experi-
26: 21        ence, will sometimes change?
26: 22    A.  Yes, sir.
26: 23    Q.  And I assume, in accordance with your
26: 24        goal of, you know, making good prescription decisions
26: 25        for your patients, you keep up to date with changes
27: 1        to the labeling so that you know how that may or may

|  |  |  | | | Objections | Responses |
|---|---|---|---|---|---|---|

|  |  |  |  |
|---|---|---|---|
| | 27: 2 | not change your prescription decisions? | |
| | 27: 3 | A.   I try to. | |
| | 27: 4 | Q.   Now, the companies -- you mentioned | |
| | 27: 5 | that the companies sometimes send you information. | |
| | 27: 6 | A.   They do. | |
| 85 | 27:12       -   28:11 | Grefer, Michael (Discovery) 2006-06-29 | 00:01:07 |
| | 27: 12 | Q.   What are -- is -- is it just a letter | |
| | 27: 13 | addressed to you from the company enclosing some | |
| | 27: 14 | material? | |
| | 27: 15 | A.   Yes, yes. | |
| | 27: 16 | Q.   It's kind of unsolicited by you, but I | |
| | 27: 17 | assume information you are -- are pleased to receive? | |
| | 27: 18 | A.   Yes. | |
| | 27: 19 | Q.   Now, I assume when there are, | |
| | 27: 20 | particularly with labeling changes on drugs, that's | |
| | 27: 21 | the type of information you read -- read when you | |
| | 27: 22 | receive it? | |
| | 27: 23 | A.   Yes. | |
| | 27: 24 | Q.   What's your -- what's your procedure | |
| | 27: 25 | or your office's procedure for handling these letters | |
| | 28: 1 | from drug companies that contain prescribing informa- | |
| | 28: 2 | tion? | |
| | 28: 3 | A.   The letters are usually addressed to | |
| | 28: 4 | myself, so basically they're opened by my secretary | |
| | 28: 5 | or someone in the office.  They're placed back in the | |
| | 28: 6 | envelope, and then they're put on a pile on my -- on | |
| | 28: 7 | my desk. | |
| | 28: 8 | Q.   And do you generally go through those? | |
| | 28: 9 | A.   I generally go through those.  And I'm | |
| | 28: 10 | not saying I read them all, but I read as much as | |
| | 28: 11 | I -- I can when I review my mail. | |
| 86 | 28:21       -   30:14 | Grefer, Michael (Discovery) 2006-06-29 | 00:01:57 |
| | 28: 21 | Q.   Now, I guess since you started | |
| | 28: 22 | practicing medicine and prescribing drugs you've been | |
| | 28: 23 | aware that all prescription drugs have risks? | |
| | 28: 24 | A.   Yes. | |
| | 28: 25 | Q.   Some of those risks can be serious? | |
| | 29: 1 | A.   Yes. | |
| | 29: 2 | Q.   Even with drugs who have a side effect | |
| | 29: 3 | where the potential exists for death, there are | |
| | 29: 4 | reasons for the prescribing of those drugs? | |
| | 29: 5 | A.   Yes. | |
| | 29: 6 | Q.   For example, a polio vaccine? | |
| | 29: 7 | A.   Yes. | |
| | 29: 8 | Q.   Aspirin? | |
| | 29: 9 | A.   Yes. | |
| | 29: 10 | Q.   And many other drugs? | |
| | 29: 11 | A.   Yes. | |
| | 29: 12 | Q.   Now, the fact that -- that a death has | |
| | 29: 13 | occurred with a drug doesn't stop doctors from | |
| | 29: 14 | prescribing it, does it? | |
| | 29: 15 | A.   No, sir. | |
| | 29: 16 | Q.   As a physician, you've got to weigh | |
| | 29: 17 | the potential side effects and -- and -- and consider | |
| | 29: 18 | the benefits and -- and make a decision for a | |
| | 29: 19 | particular patient, sometimes in consultation with | |
| | 29: 20 | the patient? | |
| | 29: 21 | A.   Yes. | |
| | 29: 22 | Q.   Now, is it fair to say that even | |
| | 29: 23 | when -- when a drug is on the market, sometimes it | |
| | 29: 24 | takes a -- a -- an experience with a much larger | |
| | 29: 25 | population than the clinical trials to fully | |
| | 30: 1 | appreciate all the risks of that drug? | |
| | 30: 2 | A.   That's correct. | |
| | 30: 3 | Q.   And that's commonly known in the | |
| | 30: 4 | medical field? | |
| | 30: 5 | A.   It happens, yes, sir. | |
| | 30: 6 | Q.   It's also true that if a -- if a | |
| | 30: 7 | patient is on a drug and has some type of medical | |
| | 30: 8 | problem or condition, it may not be caused by the | |
| | 30: 9 | drug? | |
| | 30: 10 | A.   Correct. | |
| | 30: 11 | Q.   There may be other reasons or | |

**Objections** (Re: 28:25-29:15):

Re: 28:25-29:15
Pltf Obj:
Foundation; calls for
expert medical opinion
outside the scope of
witnesses' treatment of
Mr. Smith; cumulative

**Responses** (Re: 28:25-29:15):

Re: 28:25-29:15
Def Resp:
As a practicing physician,
witness has ample
basis for testimony on
prescription drugs;
proper background for
testimony concerning
treatment of plaintiff;
not cumulative

**Objections** (Re: 29:22-30:14):

Re: 29:22-30:14
Pltf Obj:
Foundation; calls for
expert medical opinion
outside the scope of
witness' treatment of
Mr. Smith; cumulative;
speculation

**Responses** (Re: 29:22-30:14):

Re: 29:22-30:14
Def Resp:
As a practicing physician,
witness has ample
basis for testimony on
prescription drugs;
proper background for
testimony concerning
treatment of plaintiff;
not cumulative

| | | | | Objections | Responses |
|---|---|---|---|---|---|
| | | 30: 12 | unrelated reasons for a medical condition other than | | |
| | | 30: 13 | taking a prescription drug? | | |
| | | 30: 14 | A.  Correct. | | |
| 87 | 31:4 | - 33:9 | Grefer, Michael (Discovery) 2006-06-29 | 00:02:19 | |
| | | 31: 4 | Q.  Now I want to talk with you a little | **Re: 31:4-31:24** | **Re: 31:4-31:24** |
| | | 31: 5 | bit about NSAIDs or nonsteroidal --steroidal anti- | **Pltf Obj:** | **Def Resp:** |
| | | 31: 6 | inflammatory drugs. | Cumulative | As a practicing physician, |
| | | 31: 7 | A.  Okay. | | witness has ample |
| | | 31: 8 | Q.  Now, these have potential side | | basis for testimony on |
| | | 31: 9 | effects, do they not? | | prescription drugs; |
| | | 31: 10 | A.  Yes. | | proper background for |
| | | 31: 11 | Q.  Some are nonspecific nonsteroidals and | | testimony concerning |
| | | 31: 12 | others are specific steroidals.  Correct? | | treatment of plaintiff; |
| | | 31: 13 | A.  Yes. | | not cumulative |
| | | 31: 14 | Q.  And there are some differences in the | | |
| | | 31: 15 | potential side effects of those two? | | |
| | | 31: 16 | A.  Yes, sir. | | |
| | | 31: 17 | Q.  Now, it's my understanding that | | |
| | | 31: 18 | NSAIDs, the nonspecific NSAIDs, have a common side | | |
| | | 31: 19 | effect, potential side specific side effect of GI | | |
| | | 31: 20 | bleeds. | | |
| | | 31: 21 | A.  Correct. | | |
| | | 31: 22 | Q.  The way I've heard it described is | | |
| | | 31: 23 | perforations, ulcers and bleeds. | | |
| | | 31: 24 | A.  Yes, sir. | | |
| | | 31: 25 | Q.  And that is a -- that is a serious | **Re: 31:25-32:12** | **Re: 31:25-32:12** |
| | | 32: 1 | side effect? | **Pltf Obj:** | Not cumulative; same as |
| | | 32: 2 | A.  Yes, sir. | Cumulative; foundation; | above on foundation/ |
| | | 32: 3 | Q.  It results in a lot of hospitaliza- | calls for expert medical | expert opinion |
| | | 32: 4 | tions a year? | opinion outside the | |
| | | 32: 5 | A.  Correct. | scope of witness' | |
| | | 32: 6 | Q.  And -- and some deaths? | treatment of Mr. Smith | |
| | | 32: 7 | A.  Yes. | | |
| | | 32: 8 | Q.  And it's a side effect that physicians | | |
| | | 32: 9 | would like to avoid? | | |
| | | 32: 10 | A.  Correct. | | |
| | | 32: 11 | Q.  As well as patients? | | |
| | | 32: 12 | A.  Yes, sir. | | |
| | | 32: 13 | Q.  Now, the COX-2 inhibitor drugs like | **Re: 32:13-33:12** | **Re: 32:13-33:12** |
| | | 32: 14 | Vioxx, when they came on the market one of the | **Pltf Obj:** | **Def Resp:** |
| | | 32: 15 | expected benefits was a decrease in the gastrointes- | Foundation; | Not cumulative; same as |
| | | 32: 16 | tinal risks? | calls for expert medical | above on foundation/ |
| | | 32: 17 | A.  Yes. | opinion outside the | expert opinion |
| | | 32: 18 | Q.  And -- and that is a good thing for -- | scope of witness' | |
| | | 32: 19 | for physicians to be able to prescribe something that | treatment of Mr. Smith | |
| | | 32: 20 | might avoid a side effect of another similar drug? | | |
| | | 32: 21 | A.  Yes. | | |
| | | 32: 22 | Q.  Did you find that with COX-2s that you | | |
| | | 32: 23 | saw less gastrointestinal side effects? | | |
| | | 32: 24 | A.  Yes. | | |
| | | 32: 25 | Q.  And did you feel that was a -- was a | | |
| | | 33: 1 | real benefit of COX-2s? | | |
| | | 33: 2 | A.  It was. | | |
| | | 33: 3 | Q.  With COX-2s, such as Vioxx, did you | | |
| | | 33: 4 | also see that patients were receiving good pain | | |
| | | 33: 5 | relief? | | |
| | | 33: 6 | A.  Yes, I did. | | |
| | | 33: 7 | Q.  And the fact that you could get that | | |
| | | 33: 8 | pain relief with less risk of the gastrointestinal | | |
| | | 33: 9 | adverse events was a good thing for -- for patients? | | |
| 88 | 33:12 | - 34:19 | Grefer, Michael (Discovery) 2006-06-29 | 00:01:34 | |
| | | 33: 12 | A.  Yes, sir. | | |
| | | 33: 13 | Q.  Now, at some point in time you started | | |
| | | 33: 14 | prescribing the -- the -- the COX-2 inhibitors like | | |
| | | 33: 15 | Celebrex and Vioxx? | | |
| | | 33: 16 | A.  Yeah, I did. | | |
| | | 33: 17 | Q.  I believe you also -- did you | | |
| | | 33: 18 | prescribe Bextra? | | |
| | | 33: 19 | A.  I did. | | |
| | | 33: 20 | Q.  Can you tell me, what would you | | |
| | | 33: 21 | generally tell your patients about Vioxx or any other | | |
| | | 33: 22 | COX-2 when you would prescribe it to them? | | |
| | | 33: 23 | A.  I would tell them what the drug was | | |

| | | | | Objections | Responses |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| | 33: 24 | for, and I would tell them that basically there are | | | |
| | 33: 25 | things you have to watch out for with the drugs.  And | | | |
| | 34: 1 | had -- had they been on other drugs before or concom- | | | |
| | 34: 2 | itant drugs, I'd tell them what to avoid and what to | | | |
| | 34: 3 | take with it, and I would discuss with them the | | | |
| | 34: 4 | various side effects that were common. | | | |
| | 34: 5 | Q.  And would one of those be cardio- | | **Re: 34:5-34:19** | **Re: 34:5-34:19** |
| | 34: 6 | vascular issues? | | **Pltf Obj:** | **Def Resp:** |
| | 34: 7 | A.  It -- it is today, yes, sir. | | 403; confusing; | No formal objection so |
| | 34: 8 | Q.  And back at the time the labeling was | | misleading | waived; neither |
| | 34: 9 | changed to reflect cardiovascular risks, would you | | | confusing nor |
| | 34: 10 | have talked with them about it then? | | | misleading |
| | 34: 11 | A.  I don't -- I don't know when the | | | |
| | 34: 12 | labeling was changed specifically, but when it became | | | |
| | 34: 13 | apparent that there were increased risks with cardio- | | | |
| | 34: 14 | vascular problems and complications, I -- I did | | | |
| | 34: 15 | change my discussion with the patients. | | | |
| | 34: 16 | Q.  Okay.  And would your discussion with | | | |
| | 34: 17 | the patient have been any different which COX-2 you | | | |
| | 34: 18 | prescribed? | | | |
| | 34: 19 | A.  No. | | | |

| 89 | 34:20 | - 35:7 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:29 | |
|---|---|---|---|---|---|
| | 34: 20 | Q.  And -- and that would be -- | | | |
| | 34: 21 | A.  Now, you're talking about then or now? | | | |
| | 34: 22 | Obviously, I can't prescribe but one now. | | | |
| | 34: 23 | Q.  Correct. | | | |
| | 34: 24 | A.  But then, before the withdrawal of the | | | |
| | 34: 25 | certain drugs occurred, I really was unaware that | | | |
| | 35: 1 | there was a major difference between the different | | | |
| | 35: 2 | COX-2s. | | | |
| | 35: 3 | Q.  And you would tell all the patients | | | |
| | 35: 4 | the same thing? | | | |
| | 35: 5 | A.  I would try to, yes, sir.  I would try | | | |
| | 35: 6 | to tell the patients the same time -- or the same | | | |
| | 35: 7 | things. | | | |

| 90 | 35:8 | - 36:2 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:51 | |
|---|---|---|---|---|---|
| | 35: 8 | Q.  And that would -- and -- and you | | **Re: 35:8-36:2** | **Re: 35:8-36:2** |
| | 35: 9 | yourself would assess whether there was any reason | | **Pltf Obj:** | **Def Resp:** |
| | 35: 10 | not to prescribe a particular drug to a patient due | | Relevance; 403 | Relevant to establish |
| | 35: 11 | to -- COX-2 to a patient due to cardiovascular risk? | | | doctor's practices |
| | 35: 12 | A.  Correct, back then. | | | concerning information |
| | 35: 13 | Q.  Now, do you still prescribe COX-2s | | | provided to patients |
| | 35: 14 | today? | | | when prescribing |
| | 35: 15 | A.  I do. | | | Cox-2s |
| | 35: 16 | Q.  And the only one on the market is | | | |
| | 35: 17 | Celebrex? | | | |
| | 35: 18 | A.  Correct. | | | |
| | 35: 19 | Q.  And have you found it to be a -- a -- | | | |
| | 35: 20 | a -- a good addition to your -- your arsenal of drugs | | | |
| | 35: 21 | you're able to use to treat pain -- | | | |
| | 35: 22 | A.  Yes. | | | |
| | 35: 23 | Q.  -- in patients? | | | |
| | 35: 24 | A.  Yes. | | | |
| | 35: 25 | Q.  And do you tell them today about, the | | | |
| | 36: 1 | patients, about cardiovascular risk? | | | |
| | 36: 2 | A.  Pretty many of them know, but I do. | | | |

| 91 | 36:3 | - 36:17 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:48 | |
|---|---|---|---|---|---|
| | 36: 3 | Q.  Is what you tell them much different | | | |
| | 36: 4 | than what you used to tell them? | | | |
| | 36: 5 | A.  Back when I was really unaware that | | **Re: 36:5-7** | **Re: 36:5-7** |
| | 36: 6 | there was this significant difference in cardiovascu- | | **Def Obj:** | **Pltf Resp:** |
| | 36: 7 | lar problems with all the NSAIDs, basically I did | | Non-responsive; 403 | Untimely; |
| | 36: 8 | tell them that the drugs were similar to the other | | | statements of the |
| | 36: 9 | NSAIDs but that hopefully this would not cause as | | | reps are admissions |
| | 36: 10 | much gastrointestinal problem. | | | and not offered for |
| | 36: 11 | Q.  And would you tell them that -- you | | | the truth |
| | 36: 12 | know, that one risk was cardiovascular effects? | | | |
| | 36: 13 | A.  Back then I would say that that prob- | | | |
| | 36: 14 | ably was not one of my major things.  I would tell | | | |
| | 36: 15 | them more about gastrointestinal.  And this is, | | | |
| | 36: 16 | again, before the knowledge came out that it was that | | | |
| | 36: 17 | significant a problem. | | | |

| | | | | | Objections | Responses |
|---|---|---|---|---|---|---|

**92**  36:18  -  36:22   Grefer, Michael (Discovery) 2006-06-29   00:00:08
36: 18   Q.  All right.  Were you familiar with
36: 19      the -- the VIGOR study that --
36: 20   A.  I was.
36: 21   Q.  -- that Merck did?
36: 22   A.  I was.

**93**  36:23  -  37:21   Grefer, Michael (Discovery) 2006-06-29   00:01:19
36: 23   Q.  And when the results of that came out,
36: 24      was that when you started learning more about the
36: 25      potential for cardiovascular risks?
37: 1   MR. WRIGHT:  Object to the form.
37: 2   A.  Yeah.  I -- I think that the VIGOR
37: 3      study -- at least the information that I was getting
37: 4      from the VIGOR study was directed primarily at the
37: 5      very, very beginning, and not even at the beginning,
37: 6      even the later stages of the -- of -- of the
37: 7      prescribing, was related to the GI side effects, and
37: 8      basically that's what I was commonly informed about.
37: 9   Q.  All right.  But the VIGOR study also
37: 10      reflected a -- a -- a -- a difference in the number
37: 11      of cardiovascular events between Vioxx and naproxen?
37: 12   A.  Yes, but it was -- in -- in -- in the
37: 13      portions that I read, it wasn't a major difference.
37: 14   Q.  But you were aware of that?
37: 15   A.  I were -- I was aware of that, but it
37: 16      did not seem to be a significant difference over
37: 17      naproxen until the study and the clinical trials were
37: 18      over, and then it became more apparent with the later
37: 19      studies.
37: 20   Q.  Okay.
37: 21   A.  That was my understanding.

**94**  38:23  -  39:1   Grefer, Michael (Discovery) 2006-06-29   00:00:15
38: 23   Q.  Are -- are you aware that the FDA has
38: 24      come to the conclusion at this point in time, and
38: 25      this is at least about a year ago, that -- that all
39: 1      COX-2s are in the same cardiovascular risk class?

Objections: **Re: 38:23-39:6**
**Pltf Obj:**
Assumes facts not in evidence; misleading; 403; relevance

**95**  39:3  -  39:6   Grefer, Michael (Discovery) 2006-06-29   00:00:15
39: 3   A.  I think you meant all NSAIDs rather
39: 4      than all COX-2s.  There's only one COX-2.  But, yes,
39: 5      I -- I am aware of that, that all NSAIDs produce and
39: 6      represent some form of -- of a cardiovascular risk.

**96**  39:20  -  40:3   Grefer, Michael (Discovery) 2006-06-29   00:00:35
39: 20   A.  Well, no.  You can't prescribe Vioxx.
39: 21      You can't prescribe Bextra.  And that might be for a
39: 22      different skin lesion type of situation.
39: 23      So, yes, there's obviously a problem
39: 24      with the different COX-2s, because Celebrex is back
39: 25      on the market and the other ones aren't, and so, you
40: 1      know, there -- I -- I don't even know why we need to
40: 2      talk about the other two COX-2 at today's date,
40: 3      because I can't prescribe them to begin with.

Objections: **Re: 39:20-40:3**
**Def Obj:**
Improper designation - answer without a question; witness speculating; 403

Responses: **Re: 39:20-40:3**
**Pltf Resp:**
Untimely; statements of the reps are admissions and not offered for the truth

**97**  41:1  -  42:11   Grefer, Michael (Discovery) 2006-06-29   00:01:40
41: 1   Q.  What type of pain did you prescribe
41: 2      Vioxx for?
41: 3   A.  General arthritic and musculoskeletal
41: 4      pain.
41: 5   Q.  Did it offer benefits to patients?
41: 6   A.  Yes, it did.
41: 7   Q.  Did you find it to be an effective
41: 8      medication?
41: 9   A.  Yes, I did.
41: 10   Q.  Now, it's my understanding from your
41: 11      records that you first prescribed Vioxx to Mr. Smith
41: 12      in, I believe it's, September of 2002.
41: 13   A.  I prescribed it on October the 2nd of
41: 14      2002.
41: 15   Q.  Excuse me.  October the 2nd?
41: 16   A.  Yes, sir.
41: 17   Q.  2002?

Objections: **Re: 41:1-41:6**
**Pltf Obj:**
Cumulative

Responses: **Re: 41:1-41:6**
**Def Resp:**
Appropriate background for questions that follow

|  |  |  |  | Objections | Responses |
|---|---|---|---|---|---|

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  | 41: 18 | A. Uh-huh. |  |  |
|  |  | 41: 19 | Q. And at that point in time what medi- |  |  |
|  |  | 41: 20 | cation was he on? |  |  |
|  |  | 41: 21 | A. He was on diclofenac. |  |  |
|  |  | 41: 22 | Q. Okay. And -- |  |  |
|  |  | 41: 23 | A. And allopurinol. |  |  |
|  |  | 41: 24 | Q. Okay. And at that point in time why |  |  |
|  |  | 41: 25 | make a change to Vioxx? |  |  |
|  |  | 42: 1 | A. Because he wasn't getting the response |  |  |
|  |  | 42: 2 | that I would have liked from that other medication, |  |  |
|  |  | 42: 3 | and so I told him to stop taking the diclofenac and |  |  |
|  |  | 42: 4 | let's try the Vioxx, because, frankly, I had had |  |  |
|  |  | 42: 5 | success with it. |  |  |
|  |  | 42: 6 | Q. And when you say you had had success |  |  |
|  |  | 42: 7 | with it, what do you mean? |  |  |
|  |  | 42: 8 | A. Again, you know, different drugs |  |  |
|  |  | 42: 9 | affect different people in a different manner, and I |  |  |
|  |  | 42: 10 | had changed it from time to time from patient to |  |  |
|  |  | 42: 11 | patient, and it seemed to work better. |  |  |

| 98 | 42:19 | - 43:23 | Grefer, Michael (Discovery) 2006-06-29 | 00:01:23 |  |
|---|---|---|---|---|---|
|  |  | 42: 19 | Q. I show you what's marked as Exhibit 2, |  |  |
|  |  | 42: 20 | and if you would just flip through that, I think that |  |  |
|  |  | 42: 21 | includes all the physician notes, essentially, in |  |  |
|  |  | 42: 22 | your medical file. |  |  |
|  |  | 42: 23 | A. Yes, sir. |  |  |
|  |  | 42: 24 | Q. And that includes visits to you as |  |  |
|  |  | 42: 25 | well as to Dr. Heis? |  |  |
|  |  | 43: 1 | A. It does. |  |  |
|  |  | 43: 2 | Q. And on the October 2 entry when you |  |  |
|  |  | 43: 3 | were seeing him for his right knee, that's when you |  |  |
|  |  | 43: 4 | switched him from diclofenac to Vioxx? |  |  |
|  |  | 43: 5 | A. That's -- yes, sir. |  |  |
|  |  | 43: 6 | Q. They -- now, it says in there you were |  |  |
|  |  | 43: 7 | going to give him 50 milligrams for four days. |  |  |
|  |  | 43: 8 | A. Yes, sir. |  |  |
|  |  | 43: 9 | Q. And what's the purpose of that? |  |  |
|  |  | 43: 10 | A. Basically to load him up, to give him |  |  |
|  |  | 43: 11 | an extra amount to kind of give his -- his treatment |  |  |
|  |  | 43: 12 | a jump start kind of a thing. |  |  |
|  |  | 43: 13 | Q. And then, after four days, you were |  |  |
|  |  | 43: 14 | switching him to 25 milligrams? |  |  |
|  |  | 43: 15 | A. Correct. |  |  |
|  |  | 43: 16 | Q. And why is that? |  |  |
|  |  | 43: 17 | A. Because that was my usual starting |  |  |
|  |  | 43: 18 | maintenance dose. |  |  |
|  |  | 43: 19 | Q. And that was within the prescribing |  |  |
|  |  | 43: 20 | instructions from the -- from the company? |  |  |
|  |  | 43: 21 | A. Yes, sir. |  |  |
|  |  | 43: 22 | Q. Let me also show you a copy of the |  |  |
|  |  | 43: 23 | prescription record from your chart. |  |  |

| 99 | 44:3 | - 44:3 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:01 |  |
|---|---|---|---|---|---|
|  |  | 44: 3 | A. Okay. |  |  |

| 100 | 44:7 | - 46:4 | Grefer, Michael (Discovery) 2006-06-29 | 00:01:37 |  |
|---|---|---|---|---|---|
|  |  | 44: 7 | Q. And can you identify that for us? |  |  |
|  |  | 44: 8 | A. Yes. It's the page in my chart that |  |  |
|  |  | 44: 9 | has the various communications to the patients, to |  |  |
|  |  | 44: 10 | the -- what -- what we've done. It's kind of a |  |  |
|  |  | 44: 11 | running office kind of history. |  |  |
|  |  | 44: 12 | Q. And is this where you put prescrip- |  |  |
|  |  | 44: 13 | tions? |  |  |
|  |  | 44: 14 | A. Yes, sir. |  |  |
|  |  | 44: 15 | Q. And on this Exhibit 3 you also -- you |  |  |
|  |  | 44: 16 | put down the prescriptions for Vioxx? |  |  |
|  |  | 44: 17 | A. Yes. |  |  |
|  |  | 44: 18 | Q. You also noted on 10/2 that samples |  |  |
|  |  | 44: 19 | were given. |  |  |
|  |  | 44: 20 | A. Yes. |  |  |
|  |  | 44: 21 | Q. Can you tell us what it says about |  |  |
|  |  | 44: 22 | samples? |  |  |
|  |  | 44: 23 | A. It says "Samples Vioxx 50 milligrams, |  |  |
|  |  | 44: 24 | Samples Vioxx 25 milligrams." |  |  |
|  |  | 44: 25 | Q. And then what does it say below that |  |  |

|  |  |  | Objections | Responses |
|---|---|---|---|---|

45: 1      about the prescriptions?
45: 2   A.  It says a prescription for Vioxx 25
45: 3      milligrams, 30 of them, one qd, with one refill.
45: 4   Q.  So --
45: 5   A.  One daily qd.  That's what that means.
45: 6   Q.  So -- so you would have given him --
45: 7      since you were giving him a four-day supply of 50
45: 8      milligram, I assume you would have given him four
45: 9      tablets?
45: 10   A.  Yes, sir.
45: 11   Q.  Do you recall what kind of packs they
45: 12      were in?
45: 13   A.  I think they were in those blister
45: 14      packs.  And as I recall, they were usually two per
45: 15      blister pack.
45: 16   Q.  So you would have given him -- if that
45: 17      was the case, you would have given him two blister
45: 18      packs at two pills each?
45: 19   A.  Usually, yes, sir.
45: 20   Q.  Okay.  And you wouldn't have given him
45: 21      any more than 50 milligram of that?
45: 22   A.  No, sir.
45: 23   Q.  Okay.  You also noted in the record
45: 24      that some samples of 25-milligram Vioxx were given.
45: 25   A.  Yes.
46: 1   Q.  And was that consistent with your
46: 2      practice of giving him time to test the drug a little
46: 3      bit and have time to go get a prescription filled?
46: 4   A.  Yes.

---

**101  46:6  -  46:8**  Grefer, Michael (Discovery) 2006-06-29    00:00:05

46: 6   Q.  Would you -- generally, would this
46: 7      generally have been, you know, less than a week's
46: 8      supply?

Objections: **Re: 46:6-46:17** / **Pltf Obj:** / Speculation; cumulative

Responses: **Re: 46:6-46:17** / **Def Resp:** / Proper testimony concerning general practice; not cumulative as it relates specifically to Plaintiff

---

**102  46:10  -  46:12**  Grefer, Michael (Discovery) 2006-06-29    00:00:06

46: 10   A.  Usually.  Usually, yes, sir.
46: 11   Q.  If you'd given more than that, would
46: 12      that have been unusual?

---

**103  46:14  -  47:12**  Grefer, Michael (Discovery) 2006-06-29    00:01:00

46: 14   A.  Well, actually, what I usually do is I
46: 15      go over and I -- and I grab them some, so -- but it's
46: 16      usually less than four or five packs.  But it would
46: 17      have been unusual had I given him a lot, yes, sir.
46: 18   Q.  And do you recall how these came,
46: 19      these samples, the 25 milligram?
46: 20   A.  I think they were in the two blister
46: 21      packs, also.
46: 22   Q.  Okay.  If you'd go ahead and just look
46: 23      down Exhibit Number 3, and can you tell us when else
46: 24      Vioxx was prescribed or samples given, at least from
46: 25      this record?
47: 1   A.  It looks like Vioxx was prescribed on
47: 2      December the 9th of 2002.  30 were given with one a
47: 3      day, no refills.
47: 4   Q.  Okay.
47: 5   A.  And that's about it, unless I'm miss-
47: 6      ing any others.
47: 7   Q.  Okay.  And are any other samples
47: 8      noted?
47: 9   A.  No, sir.
47: 10   Q.  And it would have been the normal
47: 11      practice here that, if samples were given, that it
47: 12      would be noted in this record?

---

**104  47:14  -  48:4**  Grefer, Michael (Discovery) 2006-06-29    00:00:39

47: 14   A.  Most of the time, yes, sir.
47: 15   Q.  Okay.  Now, based upon Exhibit 3, it
47: 16      appears that he received a -- essentially on October
47: 17      2nd, a 60-day supply plus a handful of samples?
47: 18   A.  Correct.
47: 19   Q.  And then again on December 9th he
47: 20      received another 30-day supply?
47: 21   A.  Correct.

Objections: **Re: 47:14-47:18** / **Pltf Obj:** / Mischaracterizes previous testimony

Responses: **Re: 47:14-47:18** / **Def Resp:** / No mischaracterization; witness agrees with characterization; no form objection to second question so waived

|  |  | Objections | Responses |
|---|---|---|---|

47: 22   Q.  With no refills?
47: 23   A.  Right.
47: 24   Q.  And that is, as far as you can -- that
47: 25      is your best evidence of how much he received?
48: 1   A.  Yes, sir.
48: 2   Q.  And you don't have any recollection
48: 3      outside of this?
48: 4   A.  No, sir.

**105   48:16         -   49:24**   Grefer, Michael (Discovery) 2006-06-29         00:01:54

48: 16   Q.  Okay.  And it was ultimately learned
48: 17      he had some pretty significant damage in his knee
48: 18      that needed repair?
48: 19   A.  It was.
48: 20   Q.  And is that probably something that
48: 21      could have been treated with medicine as opposed to
48: 22      surgery?  The problem with --
48: 23   A.  I was -- well, no.  He -- he had some
48: 24      major ligament disruption, some meger (sic) -- major
48: 25      ligament problems, and it winds up that, while the
49: 1      medicines could have helped and could have been
49: 2      beneficial with the pain, the underlying problem was
49: 3      probably the more urgent thing that needed to be
49: 4      fixed.
49: 5   Q.  Okay.  And that's what ultimately
49: 6      happened?
49: 7   A.  It did.
49: 8   Q.  Now, by switching Mr. Smith from
49: 9      diclofenac to Vioxx, you were just making a change to
49: 10      see if a different drug would have a better result?
49: 11   A.  Correct.
49: 12   Q.  And that's something you would
49: 13      typically do with your patients that are on a -- on
49: 14      an anti-inflammatory but still having pain?
49: 15   A.  One that if -- if it doesn't seem to
49: 16      be doing the job, I try a different one.
49: 17   Q.  Now, I assume at the time that you
49: 18      referred Mr. Smith to Dr. Heis you did not feel like
49: 19      there was any need to switch to some other anti-
49: 20      inflammatory medication to try and solve the problem?
49: 21   A.  That's correct.  I -- I like to give
49: 22      people a little bit of a time on a medication, and
49: 23      basically that's correct.  I didn't think I needed to
49: 24      switch it.

**106   50:7          -   55:17**   Grefer, Michael (Discovery) 2006-06-29         00:07:06

50: 7   Q.  Doctor, I'm handing you what is marked
50: 8      as Exhibit -- is that 4?
50: 9   A.  Yes, sir.
50: 10   Q.  And I'll represent to you that this is
50: 11      the -- the package insert, the label for Vioxx that
50: 12      was in effect from April 2002 on, and that was the
50: 13      label that was in effect at the time you prescribed
50: 14      Vioxx to Mr. Smith.
50: 15   A.  Okay.
50: 16   Q.  And this is the type of information
50: 17      that you would familiarize yourself with before you
50: 18      made prescription decisions?
50: 19   A.  I -- I -- I don't know if I read this
50: 20      particular one, but it's a type of information that I
50: 21      rely on, yes, sir.
50: 22   Q.  Okay.  Now, you became aware of the --
50: 23      the -- the VIGOR study back when -- back about the
50: 24      time it was published in the medical journals.  Would
50: 25      that be fair?
51: 1   A.  I guess I can tell you that I was made
51: 2      aware of the VIGOR study probably in -- I -- I don't
51: 3      know when it was published in the medical journals.
51: 4      As I say, I -- I didn't see it in the medical
51: 5      journals.  Again, I just saw the information.  And I
51: 6      probably became aware of that in probably early 2002,
51: 7      maybe 2003, something like that.  I think it was -- I
51: 8      think -- I think it was released, at least prelimi-
51: 9      nary data was.
51: 10      I -- I -- I don't know.  I don't know.

| | Objections | Responses |
|---|---|---|
| 51: 11  Q.  Yeah. | | |
| 51: 12  A.  But that's about the time that I | | |
| 51: 13      became aware of it, in 2002, something of that | | |
| 51: 14      nature. | | |
| 51: 15  Q.  All right.  Well, it was first pub- | Re: 51:15-51:20 | Re: 51:15-51:20 |
| 51: 16      lished in -- in the fall of 2002 -- 2000. | Pltf Obj: | Def Resp: |
| 51: 17  A.  Yeah.  I thought it was late '99.  Or | Misleading; 403; | Not misleading; no unfair |
| 51: 18      I guess late 2000. | speculation | prejudice; witness is |
| 51: 19  Q.  Yeah. | | providing best |
| 51: 20  A.  Okay. | | recollection of event |
| 51: 21  Q.  And so within a short period of time | | |
| 51: 22      after that did you become familiar with it? | | |
| 51: 23  A.  I can't tell you when I became | | |
| 51: 24      familiar with it, yes, sir. | | |
| 51: 25  Q.  But it's something you did learn | | |
| 52: 1      about? | | |
| 52: 2  A.  Something I did learn about, that's | | |
| 52: 3      correct. | | |
| 52: 4  Q.  And are you aware that -- that the | | |
| 52: 5      Vioxx label was modified in response to data they | | |
| 52: 6      learned in the VIGOR study? | | |
| 52: 7  A.  I was not aware of that. | | |
| 52: 8  Q.  Well, let me go through it.  At the | Re: 52:8-51:17 | Re: 52:8-52:17 |
| 52: 9      time you prescribed Vioxx or any COX-2 to -- to your | Pltf Obj: | Def Resp: |
| 52: 10      patients, one of the things you did pay attention to | Misleading; vague as to | Question is |
| 52: 11      was whether that patient had any cardiovascular risk | time; mischaracterizes | cabined in time by |
| 52: 12      factors? | previous testimony; 403 | Ex. 4 introduced at |
| 52: 13  A.  I did. | | 50:7, which is the |
| 52: 14  Q.  And that was because you were aware | | April 2002 Vioxx label; |
| 52: 15      that there was some increased risk of cardiovascular | | no mischaracterization |
| 52: 16      events on the COX-2s like Vioxx? | | of previous testimony |
| 52: 17  A.  Yes. | | as evidenced by |
| 52: 18  Q.  And let me show you the label that was | | witness' response. |
| 52: 19      being used at that time, and -- and refer to the -- | | |
| 52: 20      the procur-- the prescribing section.  I'm just | | |
| 52: 21      trying to make sure we kind of both on the same page | | |
| 52: 22      of what you knew at the time you prescribed this -- | | |
| 52: 23  A.  Okay. | | |
| 52: 24  Q.  -- to Mr. Smith.  On -- on the first | | |
| 52: 25      page in the third column you'll notice that it talks | | |
| 53: 1      about the -- the Vioxx GI outcomes research, the | | |
| 53: 2      VIGOR study. | | |
| 53: 3  A.  Uh-huh. | | |
| 53: 4  Q.  And it -- and it states that "The | | |
| 53: 5      VIGOR study was designed to evaluate the comparative | | |
| 53: 6      GI safety of Vioxx 50 milligrams once daily (twice | | |
| 53: 7      the highest dose recommended for chronic use in OA | | |
| 53: 8      and RA) versus naproxen 500 milligrams twice daily." | | |
| 53: 9  A.  Yes. | | |
| 53: 10  Q.  Correct? | | |
| 53: 11  A.  Yes. | | |
| 53: 12  Q.  And so at the beginning of it, it | | |
| 53: 13      talks about it, it references that study.  Correct? | | |
| 53: 14  A.  Yes. | | |
| 53: 15  Q.  Okay.  Then right down below that we | | |
| 53: 16      get to the -- it has a little section on the gastro- | | |
| 53: 17      intestinal safety of VIGOR. | | |
| 53: 18  A.  Yes. | | |
| 53: 19  Q.  And it discusses the fact that "The | | |
| 53: 20      VIGOR study showed a significant reduction in the | | |
| 53: 21      risk of development of PUBs," which is perforations, | | |
| 53: 22      ulcers and bleeds, "including complicated PUBs in | | |
| 53: 23      patients taking Vioxx compared to naproxen." | | |
| 53: 24  A.  Yes. | | |
| 53: 25  Q.  Then right below that, the gastro- | | |
| 54: 1      intestinal safety data, is a section on other safety | | |
| 54: 2      findings, cardiovascular safety. | | |
| 54: 3  A.  Yes. | | |
| 54: 4  Q.  Correct? | | |
| 54: 5  A.  Yes. | | |
| 54: 6  Q.  And in -- in the label, this -- the -- | | |
| 54: 7      this April 2002 label, it goes on to reference the | | |
| 54: 8      fact that the VIGOR study showed a higher incidence | | |
| 54: 9      of adjudicated serious cardiovascular thrombotic | | |
| 54: 10      events in patients treated with Vioxx, 50 milligrams | | |

| | Objections | Responses |
|---|---|---|

54: 11   daily, and it references Table 2.  Correct?
54: 12   A.  Yes.
54: 13   Q.  And this finding was largely due to a
54: 14   difference in the incident of myocardial infarctions
54: 15   between the groups, and it references Table 3.
54: 16   A.  Yes.
54: 17   Q.  And then it goes on to mention, it
54: 18   says, "Precautions:  Cardiovascular Effects," and it
54: 19   mentions the fact that some of the serious cardio-
54: 20   vascular events that occurred included a myocardial
54: 21   infarctions.
54: 22   A.  Yes.
54: 23   Q.  Okay.  And then you have a Table 2
54: 24   that summarizes data, and Table 3 on the -- Table 3
54: 25   that summarizes the serious cardiovascular thrombotic
55: 1   adverse events?
55: 2   A.  Yes.
55: 3   Q.  And -- and in that Table 3, one thing
55: 4   it does reference is that between Vioxx and naproxen,
55: 5   the 50 milligrams of Vioxx and naproxen, the -- the
55: 6   fatal MIs or sudden deaths from cardiovascular events
55: 7   were fairly even at five and four?
55: 8   A.  Yes.
55: 9   Q.  But the diff-- the difference was in
55: 10   the nonfatal heart attacks, whereas it references 18
55: 11   on Vioxx and four on naproxen?
55: 12   A.  Yes.
55: 13   Q.  So -- so back at the time that you
55: 14   were prescribing Vioxx to Mr. Smith, you were aware
55: 15   that, from the VIGOR study, that there was a
55: 16   difference in the rate of nonfatal MIs?
55: 17   A.  Yes.

| 107 | 56:4 | - | 56:9 | Grefer, Michael (Discovery) 2006-06-29 | 00:04:12 | | |
|---|---|---|---|---|---|---|---|

56: 4   Q.  And that based upon the labeling
56: 5   information that you knew at that time, if there had
56: 6   been cardiovascular risk factors, then you would have
56: 7   had -- possibly you would have evaluated that -- you
56: 8   would have taken that into account when making the
56: 9   decision on what to prescribe him?

Re: 56:4-56:12
Pltf Obj:
Speculation

Re: 56:4-56:12
Def Resp:
Witness is capable
of determining and
testifying about what
factors he does
considered in treating his
patient.

| 108 | 56:11 | - | 60:19 | Grefer, Michael (Discovery) 2006-06-29 | 00:04:12 | | |
|---|---|---|---|---|---|---|---|

56: 11   A.  Well, I take everything into account,
56: 12   but yes, sir, that's right.
56: 13   Q.  All right.  Now, back on page two of
56: 14   that label that was in effect back at that time
56: 15   you'll see on page two in the second column there's
56: 16   also a note that it's -- and it's bolded.  It says
56: 17   "Because of its lack of platelet effects, Vioxx is
56: 18   not a substitute for aspirin for cardiovascular
56: 19   prophylaxis."  Do you see that?
56: 20   A.  Yes.
56: 21   Q.  And was that something you understood
56: 22   and knew?
56: 23   A.  Yes.
56: 24   Q.  Okay.  Then this label also went on,
56: 25   in the third column there, to the precautions
57: 1   section.  Correct?
57: 2   A.  Yes.
57: 3   Q.  Okay.  And the -- right after the
57: 4   first paragraph under Precautions, it talks about
57: 5   cardiovascular effects?
57: 6   A.  Yes.
57: 7   Q.  And this is the type of information
57: 8   you would have familiarized yourself with before
57: 9   prescribing to Mr. Smith?
57: 10   A.  Yes.
57: 11   Q.  And in that section it says that this
57: 12   "information should be taken into consideration and
57: 13   caution" should -- "should be exercised when Vioxx is
57: 14   used in patients with a medical history of ischemic
57: 15   heart disease"?
57: 16   A.  That's what it says.
57: 17   Q.  And that is something you knew back at
57: 18   that time?

| | Objections | Responses |
|---|---|---|

57: 19  A.  Yes.
57: 20  Q.  And that is something you would have
57: 21      considered for Mr. Smith before prescribing it to
57: 22      him?
57: 23  A.  Yes.
57: 24  Q.  And based upon your history with him,
57: 25      there was no history of ischemic heart disease?
58: 1   A.  Correct.
58: 2   Q.  Then it goes on right after that and
58: 3       it talks about VIGOR again, the VIGOR study, does it
58: 4       not?
58: 5   A.  Now, where are you talking about?
58: 6   Q.  That third column:  Cardiovascular
58: 7       Effects.
58: 8   A.  VIGOR, yes.
58: 9   Q.  And it talks about the fact that the
58: 10      way that it was -- that it was done, the number of
58: 11      patients in the VIGOR study.  Correct?
58: 12  A.  It says -- it says "See Clinical
58: 13      Studies, Special Studies, VIGOR, Other Safety
58: 14      Findings:  Cardiovascular Safety."
58: 15  Q.  All right.  Yeah.  Let me -- right up
58: 16      there at the top right after it talks about this
58: 17      should be taken into consideration --
58: 18  A.  Yes.
58: 19  Q.  -- as a matter of fact it reads "In
58: 20      VIGOR" --
58: 21  A.  Yes.
58: 22  Q.  -- "a study" --
58: 23  A.  Yes.
58: 24  Q.  -- of "8,076 patients" --
58: 25  A.  Yes.
59: 1   Q.  -- "with a median duration of exposure
59: 2       of nine months" --
59: 3   A.  Yes.
59: 4   Q.  -- "the risk of developing a serious
59: 5       cardiovascular thrombotic event was significantly
59: 6       higher in patients treated with Vioxx 50 milligrams
59: 7       once daily" --
59: 8   A.  Correct.
59: 9   Q.  -- "as compared to patients treated
59: 10      with naproxen 500 milligrams twice daily"?
59: 11  A.  Yes.
59: 12  Q.  And then it goes on to say that "in
59: 13      VIGOR," mortality -- "mortality due to cardiovascular
59: 14      thrombotic events (seven versus six) was similar
59: 15      between the treatment groups."
59: 16  A.  Yes.
59: 17  Q.  Correct?
59: 18  A.  Uh-huh.
59: 19  Q.  Then if you'll go down after Cardio-
59: 20      vascular Safety, just keep going down in that same
59: 21      paragraph, the next to the last sentence says "The
59: 22      significance of the cardiovascular findings from
59: 23      these three studies," and it references VIGOR and two
59: 24      previous placebo-controlled studies, the significance
59: 25      from these is unknown.
60: 1   A.  Correct.
60: 2   Q.  And then it goes on to mention again
60: 3       about the fact that Vioxx is not a substitute for
60: 4       aspirin?
60: 5   A.  Right.
60: 6   Q.  And which is -- and all this informa-
60: 7       tion is information that you knew back at the time
60: 8       that you prescribed to Mr. Smith?
60: 9   A.  Yes.
60: 10  Q.  There is also -- and I won't go
60: 11      through it -- through it all.  There's -- there's
60: 12      other mention about cardiovascular risks including,
60: 13      under the adverse reaction section, mentioning that
60: 14      certain events had been reported, including
60: 15      myocardial infarctions of people taking Vioxx.
60: 16  A.  Yes.
60: 17  Q.  And that's something you were familiar
60: 18      with back at the time you prescribed it to Mr. Smith?

|  |  | Objections | Responses |
|---|---|---|---|
| 60: 19 | A.  Yes. | | |

| | | | |
|---|---|---|---|
| 109  66:4          -  67:10 | Grefer, Michael (Discovery) 2006-06-29 | 00:03:25 | |
| 66: 4 | Q.  Okay.  Now, based upon the label that | | |
| 66: 5 | we went over just a little bit ago, does that help -- | | |
| 66: 6 | help refresh your recollection back at that time | | |
| 66: 7 | period of what you might have told a patient like Mr. | | |
| 66: 8 | Smith about at the time you prescribed Vioxx? | | |
| 66: 9 | A.  I don't think it makes any changes of | | |
| 66: 10 | what I would have told him, no sir. | | |
| 66: 11 | Q.  Okay.  And you don't have a specific | | |
| 66: 12 | recollection of what you told him? | | |
| 66: 13 | A.  I don't have a specific recollection | | |
| 66: 14 | of what I told him, no, sir. | | |
| 66: 15 | Q.  But generally what would you have told | | |
| 66: 16 | him about cardiovascular risk, if anything? | | |
| 66: 17 | A.  Generally I probably would have said | | |
| 66: 18 | that there was no significant evidence that there was | | |
| 66: 19 | any particular difference in the medicine that he was | | |
| 66: 20 | taking, the diclofenac, and the Vioxx that I was | | |
| 66: 21 | aware of that would make me -- make any reasons not | | |
| 66: 22 | to prescribe it for him. | | |
| 66: 23 | Q.  Would you have mentioned anything | | |
| 66: 24 | about cardiovascular? | | |
| 66: 25 | A.  Again, probably not, because the | | |
| 67: 1 | information, as it says in the package insert, was | | |
| 67: 2 | unclear, and it was uncertain what the significance | | |
| 67: 3 | was. | | |
| 67: 4 | Q.  Okay.  Now, you -- you were well aware | | |
| 67: 5 | of the fact of the results from VIGOR? | | |
| 67: 6 | A.  I was well aware of the results from | | |
| 67: 7 | VIGOR. | | |
| 67: 8 | Q.  But the conclusion in there, in the -- | | |
| 67: 9 | in the label was that there was -- that the -- and | | |
| 67: 10 | let me pull the exact language up real quick. | | |

| | | | |
|---|---|---|---|
| 110  67:21          -  68:16 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:55 | |
| 67: 21 | Q.  It was on -- flip back to after it | | |
| 67: 22 | talks about VIGOR it goes on to say -- | | |
| 67: 23 | And we're talking about under Cardio- | | |
| 67: 24 | vascular Effects. | | |
| 67: 25 | A.  Uh-huh. | | |
| 68: 1 | Q.  -- it talks about the fact that VIGOR | | |
| 68: 2 | found a -- and I'm on column three on page two. | | |
| 68: 3 | A.  Yeah. | | |
| 68: 4 | Q.  It talks about VIGOR found a signif-- | | |
| 68: 5 | significantly higher number of serious cardio- | | |
| 68: 6 | vascular thrombotic events than naproxen.  Then it | | |
| 68: 7 | went on to mention the two placebo-controlled trials. | | |
| 68: 8 | Correct? | | |
| 68: 9 | A.  Right. | | |
| 68: 10 | Q.  And it said the -- it goes on to say | | |
| 68: 11 | "The significance of the cardiovascular findings from | | |
| 68: 12 | these three studies is unknown." | | |
| 68: 13 | A.  Correct. | | |
| 68: 14 | Q.  And that's what you were referring to? | | |
| 68: 15 | A.  That's correct, that's what I was | | |
| 68: 16 | referring to. | | |

| | | | |
|---|---|---|---|
| 111  69:3          -  69:6 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:09 | |
| 69: 3 | Q.  All right.  And -- and based upon that | | |
| 69: 4 | information, you -- you had to make a risk benefit | | |
| 69: 5 | analysis for your patient when you prescribed it? | | |
| 69: 6 | A.  Correct. | | |

| | | | |
|---|---|---|---|
| 112  69:15          -  69:19 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:26 | |
| 69: 15 | Q.  All right.  Based on the information | | |
| 69: 16 | that you had available to you in the label that we | | |
| 69: 17 | just read over, you felt comfortable with your risk | | |
| 69: 18 | benefit analysis of prescribing Vioxx to Mr. Smith? | | |
| 69: 19 | A.  Yes. | | |

| | | | |
|---|---|---|---|
| 113  69:22          -  70:13 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:36 | |
| 69: 22 | Q.  One -- one thing I wanted to mention, | | |
| 69: 23 | and -- and I don't know if it was important to you | | |

| | Objections | Responses |
|---|---|---|

69: 24     back at that time, that this VIGOR study was of 50
69: 25     milligrams of Vioxx.  Correct?
70: 1  A.  I -- I -- I knew that, yes, sir.
70: 2  Q.  And Mr. Smith was only on 50 milli-
70: 3     grams for four days?
70: 4  A.  Correct.
70: 5  Q.  The rest of the time he was on 25
70: 6     milligrams?
70: 7  A.  Correct.
70: 8  Q.  And also was a study involving
70: 9     rheumatoid arthritis patients?
70: 10  A.  That's correct.
70: 11  Q.  And Mr. Smith, as far as you knew, did
70: 12     not have rheumatoid arthritis?
70: 13  A.  Correct.

**114  70:14  -  71:15**   Grefer, Michael (Discovery) 2006-06-29   00:03:03

70: 14  Q.  I assume, since you referred Mr. Smith
70: 15     on for -- to Dr. Heis for surgery, you have not seen
70: 16     him again?
70: 17  A.  Not that I recall.
70: 18  Q.  Or, as far as you know, spoken with
70: 19     him again?
70: 20  A.  Correct.
70: 21  Q.  And I assume you're not here to give
70: 22     any opinion as to whether Mr. Smith's use of Vioxx
70: 23     caused or contributed in any way to his heart attack?
70: 24  A.  That's correct.
70: 25  Q.  I want to just briefly touch with you
71: 1     on Merck professional representatives, contact with
71: 2     them.
71: 3  A.  Okay.
71: 4  Q.  Do you have a specific recollection of
71: 5     any visit with a Merck professional representative
71: 6     about Vioxx?
71: 7  A.  Not a specific one.  There were
71: 8     numerous ones.
71: 9  Q.  Okay.
71: 10  A.  Numerous ones.
71: 11  Q.  Okay.  And can you tell me -- I -- I'm
71: 12     guessing, as busy as your practice is and as many
71: 13     pharmaceutical reps as you see, you're not going to
71: 14     remember dates or exact time periods?
71: 15  A.  That's correct.

**Objections (Re: 70:21-70:24):**
**Pltf Obj:**
Outside the scope of direct; 403; relevance

**Responses (Re: 70:21-70:24):**
**Def Resp:**
Dr. Grefer is on defendant's witness list so defendant is not limited to scope of direct; question is proper in any event; no unfair prejudice; relevant to establish witness is not offering an opinion on causation

**115  71:17  -  72:22**   Grefer, Michael (Discovery) 2006-06-29   00:00:54

71: 17     recall about your discussions with Merck sales reps.
71: 18     And, you know, let me know if you have specific
71: 19     recollections.
71: 20  A.  In -- in general, my recollections
71: 21     were that they would come up to me and they would say
71: 22     that they knew that I was a very heavy prescriber of
71: 23     Celebrex, that they wished I would consider prescrib-
71: 24     ing Vioxx, and we would go over these exact things
71: 25     that we had just talked about.  And they would offer
72: 1     information and some kinds of explanations of what
72: 2     their handle on the situation was.
72: 3     And they would usually ask me to sign,
72: 4     whether it would be a computerized signature type of
72: 5     thing that's on a data input type of thing or whether
72: 6     it's a piece of paper or whatever.  And my feeling
72: 7     was is that I thought the reason I signed that was
72: 8     that -- so that they would leave us samples that I
72: 9     could disburse to my patients.  And they would
72: 10     usually leave me a paper or two that I would read at
72: 11     my convenience later on in the day.
72: 12  Q.  Okay.  Do you recall any specific dis-
72: 13     cussions about either efficacy or safety of Vioxx?
72: 14  A.  I do.
72: 15  Q.  And what were those?
72: 16  A.  Well, always Vioxx, in their opinion,
72: 17     was safer for the gastrointestinal tract.  And we
72: 18     would discuss the fact about the cardiovascular
72: 19     problems, and several times -- and I can't tell you
72: 20     particular times, but several times they'd say, well,

| | | | | Objections | Responses |
|---|---|---|---|---|---|
| | 72: 21 | | yes, there were more incidences of myocardial | | |
| | 72: 22 | | infarctions. | | |
| 116 **72:23** | **- 73:18** | Grefer, Michael (Discovery) 2006-06-29 | 00:00:54 | | |
| | 72: 23 | Q. You're talking about VIGOR? | | | |
| | 72: 24 | A. VIG-- I'm -- well, I'm talking about | | | |
| | 72: 25 | in general. You know, I'm not talking about VIGOR. | | | |
| | 73: 1 | I think that that would -- as I say, I probably read | | | |
| | 73: 2 | that VIGOR label. | | | |
| | 73: 3 | Which you say is a label. It's four | | | |
| | 73: 4 | pages of stuff that I have to get way up here (demon- | | | |
| | 73: 5 | strating) to read, and it's almost impossible to | | | |
| | 73: 6 | digest all of that. | | | |
| | 73: 7 | But they would always say that the | | | |
| | 73: 8 | tests, the VIGOR tests, were complicated because of | **Re: 73:8-18** | **Re: 73:8-18** |
| | 73: 9 | the fact that Naprosyn might have produced its own | **Def Obj:** | **Pltf Resp:** |
| | 73: 10 | cardiovascular health effect and these people were | Hearsay; and | Untimely; |
| | 73: 11 | not allowed to take their aspirins, and so it really | plaintiff cannot | statements of the |
| | 73: 12 | wasn't a good reflection of what happened in the | establish a hearsay | reps are admissions |
| | 73: 13 | situation and they needed to do more studies, but | exception where the | and not offered for |
| | 73: 14 | that their opinion, and their opinion from their | alleged speaker(s) are | the truth |
| | 73: 15 | company, was that it was a safe drug and it really | unidentified | |
| | 73: 16 | shouldn't have any effect on my prescribing it as far | | |
| | 73: 17 | as cardiovascular status goes. That's what I recall, | | |
| | 73: 18 | and that was drummed into my head repeatedly. | | |
| 118 **73:25** | **- 74:3** | Grefer, Michael (Discovery) 2006-06-29 | 00:00:09 | | |
| | 73: 25 | Q. Okay. The -- the sales reps that | | | |
| | 74: 1 | would call upon you, would they provide you litera- | | | |
| | 74: 2 | ture, too? | | | |
| | 74: 3 | A. Yes, they would. | | | |
| 119 **74:4** | **- 74:13** | Grefer, Michael (Discovery) 2006-06-29 | 00:00:25 | | |
| | 74: 4 | Q. Now, did you usually have meetings | | | |
| | 74: 5 | with sales reps, or are these brief conversations in | | | |
| | 74: 6 | the hall? | | | |
| | 74: 7 | A. These were passing in the hall. | | | |
| | 74: 8 | Q. I -- I would assume, with your busy | | | |
| | 74: 9 | practice and the number of -- of professional sales | | | |
| | 74: 10 | representatives from various pharmaceutical companies | | | |
| | 74: 11 | that would call upon you, that you didn't have a lot | | | |
| | 74: 12 | of time to spend talking to them each day? | | | |
| | 74: 13 | A. That's correct. | | | |
| 120 **74:14** | **- 75:10** | Grefer, Michael (Discovery) 2006-06-29 | 00:01:12 | | |
| | 74: 14 | Q. So essentially you're saying, in your | **Re: 74:14-75:10** | **Re: 74:14-75:10** |
| | 74: 15 | brief conversations with some Merck sales reps over | **Def Obj:** | **Pltf Resp:** |
| | 74: 16 | time, you were aware of the cardiovascular events | Hearsay; and | Untimely; |
| | 74: 17 | that had been reported but, based upon VIGOR, you | plaintiff can not | statements of the |
| | 74: 18 | felt that there was -- there was still work to be | establish a hearsay | reps are admissions |
| | 74: 19 | done on figuring that out? | exception where the | and not offered for |
| | 74: 20 | MR. WRIGHT: Object to the form. | alleged speaker(s) are | the truth |
| | 74: 21 | A. I -- I was aware that were -- that | unidentified | |
| | 74: 22 | there were some cardiovascular issues with all the | | |
| | 74: 23 | COX-2s and basically that their feeling was is that | | |
| | 74: 24 | the studies that they had to rely upon were flawed | | |
| | 74: 25 | and that they did not believe that further | | |
| | 75: 1 | evaluations would prove that to be true if you added | | |
| | 75: 2 | in the aspirin and added in the secondary effects. | | |
| | 75: 3 | And basically those were just conver- | | |
| | 75: 4 | sations. They would ask for my signature. I would | | |
| | 75: 5 | give them my signature, and then they would go on | | |
| | 75: 6 | their way. And I would take the literature and put | | |
| | 75: 7 | it in this very room -- that was not here then but it | | |
| | 75: 8 | was in my other office -- and then come back at the | | |
| | 75: 9 | end of the day and complete my charts and then review | | |
| | 75: 10 | that records. | | |
| 121 **75:11** | **- 75:14** | Grefer, Michael (Discovery) 2006-06-29 | 00:00:12 | | |
| | 75: 11 | Q. Were you aware back at that time that | | | |
| | 75: 12 | there was scientific debate about whether Vioxx | | | |
| | 75: 13 | caused an increased risk of cardiovascular events or | | | |
| | 75: 14 | whether naproxen was cardioprotective? | | | |
| 122 **75:16** | **- 76:11** | Grefer, Michael (Discovery) 2006-06-29 | 00:00:55 | | |

| | Objections | Responses |
|---|---|---|

75: 16　A.　Absolutely.  That -- that -- that was
75: 17　　the whole -- that was their main point, is that these
75: 18　　people were not on a cardiovascular protective drug,
75: 19　　which was either the naproxen, if, indeed, that turned
75: 20　　out to be true, or their aspirin.  And I don't
75: 21　　believe that in the VIGOR case they included people
75: 22　　on aspirin, and they didn't include people that had
75: 23　　significant gastrointestinal problems, I don't
75: 24　　believe.
75: 25　　But yes.  And that was their mainstay
76: 1　　and that was their main thing to me.
76: 2　Q.　All right.  And you were familiar with
76: 3　　this scientific debate going on on this issue?
76: 4　A.　Certainly I was.  And I -- and I --
76: 5　　and I had not seen anything that was definitive, and
76: 6　　there was still questions in-- in-- involved in the
76: 7　　situation.
76: 8　Q.　So back at that time it was an open
76: 9　　question about whether Vioxx was actually causing
76: 10　　more heart attacks or whether naproxen was actually
76: 11　　protecting people from heart attacks?

**123  76:13          -  77:7**　Grefer, Michael (Discovery) 2006-06-29　00:00:52

76: 13　A.　Or if people took their aspirin with
76: 14　　the Vioxx, they would have the protection also,
76: 15　　that's correct.
76: 16　Q.　Anything else you remember about any
76: 17　　meetings or discussions with professional sales
76: 18　　representatives back at that time?
76: 19　A.　Nothing in particular, no, sir.
76: 20　Q.　Were they courteous?
76: 21　A.　They were courteous.
76: 22　Q.　When you asked for information, did
76: 23　　they get it to you?
76: 24　A.　Yes, they did.  When I asked for
76: 25　　samples, they gave them to me.
77: 1　Q.　Okay.  On the sampling issue, very
77: 2　　briefly, is sampling a good thing for a prac-- a
77: 3　　physician's practice?  Is that helpful?
77: 4　A.　It is.
77: 5　Q.　And do you consider that a good thing
77: 6　　that pharmaceutical companies do:  providing samples?
77: 7　A.　Yes.

**124  78:6          -  82:2**　Grefer, Michael (Discovery) 2006-06-29　00:03:43

78: 6　Q.　Doctor, I've handed you what's been
78: 7　　marked as Exhibit -- is that 7?
78: 8　A.　This is 7, yes, sir.
78: 9　Q.　And this a -- one of those informa-
78: 10　　tional letters from Merck --
78: 11　A.　Uh-huh.
78: 12　Q.　-- that was addressed to you, dated
78: 13　　June 5, 2002.
78: 14　A.　Yes, sir.
78: 15　Q.　Does this appear to be something you
78: 16　　would have received and read?
78: 17　A.　Probably.
78: 18　Q.　In this letter dated June 5, 2002, it
78: 19　　mentions that a -- a professional representative --
78: 20　　Holly Merrell -- referred a request for information
78: 21　　to them to get you a reprint of the VIGOR trial --
78: 22　A.　Uh-huh.
78: 23　Q.　-- study.
78: 24　A.　Uh-huh.
78: 25　Q.　Does that sound reasonable, something
79: 1　　you might have asked for?
79: 2　A.　Probably.
79: 3　Q.　Then it talks about, in the second
79: 4　　paragraph, about when it was published.
79: 5　A.　Uh-huh.
79: 6　Q.　And a little bit about it.  And then
79: 7　　about the fourth paragraph down it says, "The
79: 8　　enclosed reprint of the VIGOR study should be
79: 9　　reviewed."  So they obviously -- it seems to me they
79: 10　　enclosed a copy of it.

**Objections column (row 124):**

Re: 78:6-81:5
**Pltf Obj:**
Foundation; calls for an
improper expert medical
opinion outside
the scope of the
witness' treatment of Mr.
Smith; speculation;
hearsay

**Responses column (row 124):**

Re: 78:6-81:5
**Def Resp:**
Questions do not call
for expert opinion and
witness has personal
knowledge;
questions relate to letter
received by witness; not
hearsay, goes to notice

| | Objections | Responses |
|---|---|---|

79: 11    A.  I don't recall it, but it does -- but
79: 12        it does say that.
79: 13    Q.  Right.  And beneath that it talks
79: 14        about a post-publication update.
79: 15    A.  Okay.
79: 16    Q.  Do you see that?
79: 17    A.  Uh-huh.
79: 18    Q.  And it talks about in the original
79: 19        analysis of VIGOR they had a prespecified February
79: 20        2000 cutoff date for events.  Do you see that?
79: 21    A.  Uh-huh.
79: 22    Q.  And the rate of MIs, the myocardial
79: 23        infarctions, that were reported in the -- in the
79: 24        original study was .4 percent among the pa-- patients
79: 25        taking Vioxx?
80: 1     A.  Yes, sir.
80: 2     Q.  Do you see that?
80: 3     A.  Uh-huh.
80: 4     Q.  As you may recall, it was .1 percent
80: 5         with the -- with people taking -- the comparator
80: 6         drug.  Correct?
80: 7     A.  Uh-huh.  Yes.  I -- I -- I -- I think
80: 8         so.
80: 9     Q.  Because it was --
80: 10    A.  Naproxen.
80: 11    Q.  -- reported as four to one.
80: 12    A.  You're talking about the naproxen.
80: 13    Q.  Yes, sir, naproxen.  It was reported
80: 14        as four to one then?
80: 15    A.  Yes.
80: 16    Q.  It goes on to say "In the subsequent
80: 17        final analysis, which included all events reported
80: 18        after the February 2000 cutoff date, this rate was
80: 19        updated to .5 percent."
80: 20    A.  Yes.
80: 21    Q.  Do you see that?
80: 22    A.  Uh-huh.
80: 23    Q.  Is this information you -- you recall
80: 24        getting back at that time?
80: 25    A.  I -- I -- I don't recall it, no, sir.
81: 1     Q.  Do you know one way or the other
81: 2         whether you re-- you reviewed this back then?
81: 3     A.  No, I -- I don't recall reviewing it.
81: 4     Q.  Okay.
81: 5     A.  And I've been -- four years now.
81: 6     Q.  Is this information surprising to you
81: 7         at all?
81: 8     A.  No, not really.
81: 9     Q.  The fact that in VIGOR it originally
81: 10        reported a four to one or .4 percent MI rate of Vioxx
81: 11        compared to -- to .1 for naproxen and that, after all
81: 12        the events ran, it changed to .5 versus .1, would
81: 13        that have had any impact on your prescribing
81: 14        decisions back then?
81: 15    A.  I don't think so.
81: 16    Q.  And as a matter of fact, I think it
81: 17        has to do with three heart attacks, MIs, that came in
81: 18        after the cutoff date that were later reported?
81: 19    A.  I believe I've read that somewhere,
81: 20        yes, sir.
81: 21    Q.  And that there has been some contro-
81: 22        versy with the journal over that.  You've probably
81: 23        read about that.
81: 24    A.  I have.
81: 25    Q.  And would you agree that that likely
82: 1         would not have made any difference in your prescrib-
82: 2         ing decision back in October of 2002?

| | **Re: 81:24-82:4** | **Re: 81:25-82:4** |
| | **Pltf Obj:** | **Def Resp:** |
| | Speculation | Question |
| | | relates to Ex. 7 dated |
| | | June 5, 2002, which |

125  82:4        -   82:4    Grefer, Michael (Discovery) 2006-06-29    00:00:39    decision. Witness had
82: 4     A.  I really don't think it would have.

this information at time
prescribed in Oct. 2002
so does not call for
speculation

126  84:3        -   85:12   Grefer, Michael (Discovery) 2006-06-29    00:01:20
84: 3     Q.  Let me show you what's marked as
84: 4         Exhibit 8 and tell you that this is a -- a memorandum
84: 5         from the FDA that was made public in -- on April 6,

| | **Re: 84:3-85:12** | **Def Resp:** |
| | **Pltf Obj:** | Document is admissible; |
| | Hearsay; foundation; | |

| | | | Objections | Responses |
|---|---|---|---|---|
| | 84: 6 | 2005, and was their analysis of what to do regarding | calls for an improper expert medical opinion outside the scope of the witness' treatment of Mr. Smith; 403 relevance; *Plaintiff refers to his Motion in Limine filed on this issue* | familiarity or awareness of issues addressed does not call for expert opinion; relevant to witness' understanding of risks and alternatives; see responses to Plaintiff's MILs |
| | 84: 7 | NSAIDs after a lengthy FDA advisory committee | | |
| | 84: 8 | meeting. | | |
| | 84: 9 | Were you familiar with that advisory | | |
| | 84: 10 | committee meeting -- | | |
| | 84: 11 | A. No, sir. | | |
| | 84: 12 | Q. -- that occurred in February of '05? | | |
| | 84: 13 | A. No, sir. | | |
| | 84: 14 | Q. I just want to point out a couple of | | |
| | 84: 15 | things to you and see if you were aware of -- of | | |
| | 84: 16 | these. And I think you are, from -- from earlier | | |
| | 84: 17 | testimony. | | |
| | 84: 18 | On -- on page 1 they talk about the | | |
| | 84: 19 | thorough review they did of the data -- | | |
| | 84: 20 | A. Uh-huh. | | |
| | 84: 21 | Q. -- an FDA advisory committee meeting. | | |
| | 84: 22 | A. Uh-huh. | | |
| | 84: 23 | Q. I assume you have not done a thorough | | |
| | 84: 24 | review of all the data on -- | | |
| | 84: 25 | A. No, sir, I have -- | | |
| | 85: 1 | Q. -- COX-2s? | | |
| | 85: 2 | A. -- I have not. | | |
| | 85: 3 | Q. You looked at the FDA and the -- and | | |
| | 85: 4 | the company and the current research to provide you | | |
| | 85: 5 | the information you need? | | |
| | 85: 6 | A. That's correct. | | |
| | 85: 7 | Q. You don't look at internal company | | |
| | 85: 8 | documents ever, do you? | | |
| | 85: 9 | A. I never have, no, sir. | | |
| | 85: 10 | Q. And that's not the type of information | | |
| | 85: 11 | you base prescribing decisions on? | | |
| | 85: 12 | A. No, sir, not routinely. | | |
| 127  85:13    -  86:4 | | Grefer, Michael (Discovery) 2006-06-29        00:00:48 | | |
| | 85: 13 | Q. Okay. If you flip to page 3, the FDA | | |
| | 85: 14 | memo talked to -- talks about the voluntary with- | | |
| | 85: 15 | drawal of Vioxx from the market, under Background. | | |
| | 85: 16 | A. Okay. | | |
| | 85: 17 | Q. And then it says subsequent to that | | |
| | 85: 18 | reports of additional data from controlled clinical | | |
| | 85: 19 | trials became available. And going on, it says | | |
| | 85: 20 | this -- this new data prompted the agency to conduct | | |
| | 85: 21 | a comprehensive review of the available data and to | | |
| | 85: 22 | present the issue for review at a joint meeting of | | |
| | 85: 23 | FDA's Arthritis, Drug Safety and Risk Management | | |
| | 85: 24 | Advisory Committee on February 16th to 18th, 2005. | | |
| | 85: 25 | Do you see that? | | |
| | 86: 1 | A. Yes. | | |
| | 86: 2 | Q. And were you familiar with that | | |
| | 86: 3 | before? | | |
| | 86: 4 | A. No. | | |
| 128  87:6    -  88:21 | | Grefer, Michael (Discovery) 2006-06-29        00:01:45 | Re: 87:6-88:21 **Pltf Obj:** Hearsay; foundation; calls for an improper expert medical opinion outside the scope of the witness' treatment of Mr. Smith; 403 relevance; *Plaintiff refers to his Motion in Limine filed on this issue* | Re: 87:6-88:21 **Def Resp:** Familiarity or awareness of issues addressed does not call for expert opinion; relevant to witness' understanding of risks and alternatives; see responses to Plaintiff's MILs |
| | 87: 6 | Q. On the front it says, on page 1 this | | |
| | 87: 7 | FDA memo indicates that this group found that all the | | |
| | 87: 8 | COX-2 selected NSAIDs were associated with an | | |
| | 87: 9 | increased risk. Do you see that? | | |
| | 87: 10 | A. I do. | | |
| | 87: 11 | Q. And that's information you are | | |
| | 87: 12 | familiar with? | | |
| | 87: 13 | A. Yes. | | |
| | 87: 14 | Q. Then the second one is that the data | | |
| | 87: 15 | from the long-term controlled clinical trials that | | |
| | 87: 16 | have concluded -- included a comparison of COX-2 | | |
| | 87: 17 | selective and nonselective NSAIDs do not clearly | | |
| | 87: 18 | demonstrate that the COX-2 selectives confer a | | |
| | 87: 19 | greater risk of adverse CV events than nonselective | | |
| | 87: 20 | NSAIDs. | | |
| | 87: 21 | A. That's what it says. | | |
| | 87: 22 | Q. And is that information you were | | |
| | 87: 23 | familiar with? | | |
| | 87: 24 | A. Yes. | | |
| | 87: 25 | Q. If you'll go to page 2, the -- the | | |
| | 88: 1 | second bullet point up at the top, this FDA memo | | |
| | 88: 2 | mentions that "Pending the availability of additional | | |

| | | | Objections | Responses |
|---|---|---|---|---|

|  | | | | |
|---|---|---|---|---|
| | 88: 3 | long-term controlled clinical trial data," the" | | |
| | 88: 4 | availabab (sic) -- "available data are best inter- | | |
| | 88: 5 | preted as being consistent with a class effect of an | | |
| | 88: 6 | increased... of serious adverse CV events for COX-2 | | |
| | 88: 7 | selective and nonselective NSAIDs." | | |
| | 88: 8 | A.  Correct. | | |
| | 88: 9 | Q.  Do you see that? | | |
| | 88: 10 | A.  Yes. | | |
| | 88: 11 | Q.  And is that something you were | | |
| | 88: 12 | familiar with? | | |
| | 88: 13 | A.  Yes. | | |
| | 88: 14 | Q.  Then it goes on to say, "Short-term | | |
| | 88: 15 | use of NSAIDs to relieve acute pain, particularly at | | |
| | 88: 16 | low doses, does not appear to confer an increased | | |
| | 88: 17 | risk of adverse CV events." | | |
| | 88: 18 | A.  That's what it says. | | |
| | 88: 19 | Q.  With one exception that didn't apply | | |
| | 88: 20 | to Vioxx? | | |
| | 88: 21 | A.  Correct. | | |

**129   89:23        -   91:7        Grefer, Michael (Discovery) 2006-06-29                       00:01:50**

|  | | | | |
|---|---|---|---|---|
| | 89: 23 | Q.  I want you to turn to page 8, if you | **Re: 89:23-91:11** | **Re: 89:23-91:11** |
| | 89: 24 | could. | **Pltf Obj:** | **Def Resp:** Same |
| | 89: 25 | A.  Okay. | Hearsay; foundation; | response |
| | 90: 1 | Q.  Under their analysis and conclusions, | calls for an improper | |
| | 90: 2 | after all of the data they reviewed and all the work | expert medical opinion | |
| | 90: 3 | they did, they came to analysis and conclusions, and | outside the scope of | |
| | 90: 4 | one of those is, the very last sentence, "It, there- | the witness' treatment | |
| | 90: 5 | fore, remains unclear to what extent the COX-2 | of Mr. Smith; 403 | |
| | 90: 6 | selectivity of an individual drug predicts the drug's | relevance; *Plaintiff* | |
| | 90: 7 | potential for an increased... of adverse CV events | *refers to his Motion in* | |
| | 90: 8 | compared to" the "drugs that are less COX-2 selec- | *Limine filed on this* | |
| | 90: 9 | tive." | *issue* | |
| | 90: 10 | A.  The last sentence where? | | |
| | 90: 11 | Q.  On page 8. | | |
| | 90: 12 | A.  The last sentence on page -- yes, sir. | | |
| | 90: 13 | Okay.  I've got you. | | |
| | 90: 14 | Okay.  Go ahead. | | |
| | 90: 15 | Q.  Is that information you -- you -- you | | |
| | 90: 16 | know? | | |
| | 90: 17 | A.  I've -- I've -- I've been aware that | | |
| | 90: 18 | that is the case, yes, sir. | | |
| | 90: 19 | Q.  That there's just not a -- there's not | | |
| | 90: 20 | a scientific conclusion at this point in time? | | |
| | 90: 21 | A.  I don't think there ever has been a | | |
| | 90: 22 | scientific conclusion. | | |
| | 90: 23 | Q.  And this is still subject to scien- | | |
| | 90: 24 | tific debate? | | |
| | 90: 25 | A.  Yes, sir. | | |
| | 91: 1 | Q.  And as a matter of fact, they con- | | |
| | 91: 2 | cluded, and you -- I think you know this, is that all | | |
| | 91: 3 | NSAIDs, whether it's a COX-2 or those that are non- | | |
| | 91: 4 | selective, have been on the market for many years, | | |
| | 91: 5 | for purposes of -- of -- of prescribing and using | | |
| | 91: 6 | now, they've asked physicians to assume that all | | |
| | 91: 7 | carry the same risk? | | |

**130   91:9        -   92:9        Grefer, Michael (Discovery) 2006-06-29                       00:01:40**

|  | | | | |
|---|---|---|---|---|
| | 91: 9 | A.  Basically they said that there are | | |
| | 91: 10 | similar risks involved with all NSAIDs.  That's my | | |
| | 91: 11 | understanding. | | |
| | 91: 12 | Q.  Okay. | **Re: 91:12-92:9** | **Re: 91:12-92:9** |
| | 91: 13 | A.  That are available today. | **Pltf Obj:** | **Def Resp:** Same |
| | 91: 14 | Q.  On page 10, one last thing I wanted to | Hearsay; foundation; | response |
| | 91: 15 | mention to you, after all this research I wanted to | calls for an improper | |
| | 91: 16 | mention this point on naproxen and see if you were | expert medical opinion | |
| | 91: 17 | familiar with that. | outside the scope of | |
| | 91: 18 | You do understand that -- that since | the witness' treatment | |
| | 91: 19 | VIGOR there's been this scientific debate about | of Mr. Smith; 403 | |
| | 91: 20 | whether naproxen is cardioprotective versus Vioxx, | relevance; *Plaintiff* | |
| | 91: 21 | whether it causes heart attacks? | *refers to his Motion in* | |
| | 91: 22 | A.  Correct. | *Limine filed on this* | |
| | 91: 23 | Q.  This FDA panel concluded right -- if | *issue* | |
| | 91: 24 | you look at the middle of that bottom paragraph, "We | | |
| | 91: 25 | also believe," and I'm quoting from it, "that it is | | |

| | | Objections | Responses |
|---|---|---|---|

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| | 92: 1 | not possible to conclude at this point that the COX-2 | | | |
| | 92: 2 | selective drugs confer an increased risk over non- | | | |
| | 92: 3 | selective NSAIDs in chronic use."  And then it goes | | | |
| | 92: 4 | on to say "Naproxyn may be an exception." | | | |
| | 92: 5 | Do you see that? | | | |
| | 92: 6 | A.  Yes. | | | |
| | 92: 7 | Q.  And is that something that you under- | | | |
| | 92: 8 | stand that that scientific debate is still out there? | | | |
| | 92: 9 | A.  Yes. | | | |
| 131 | 93:12 | - 93:12 | Grefer, Michael 2006-07-27 | 00:00:02 | |
| | 93: 12 | BY MR. SKIDMORE: | | | |
| 132 | 93:21 | - 93:23 | Grefer, Michael 2006-07-27 | 00:00:11 | Re: 93:21-93:23 | Re: 93:21-93:23 |
| | 93: 21 | Q.  But I want to visit with you a little | | Def Obj: | Pltf Resp: |
| | 93: 22 | bit about the sales representative calls. | | Sidebar | Statement is a signal |
| | 93: 23 | A.  Uh-huh. | | | of new subject to help |
| | | | | | the jury |
| 133 | 93:25 | - 94:9 | Grefer, Michael 2006-07-27 | 00:00:26 | |
| | 93: 25 | Q.  Now, if you recall when we started your | | | |
| | 94: 1 | deposition earlier this month, now, he -- he talked | | | |
| | 94: 2 | with you about sales representatives' visits to your | | | |
| | 94: 3 | office and there was a little more of that today, | | | |
| | 94: 4 | correct? | | | |
| | 94: 5 | A.  Sure. | | | |
| | 94: 6 | Q.  And you have a general recollection of | | | |
| | 94: 7 | when Merck sales, professional sales representatives | | | |
| | 94: 8 | called upon you while Vioxx was on the market? | | | |
| | 94: 9 | A.  Yes. | | | |
| 134 | 94:11 | - 94:16 | Grefer, Michael 2006-07-27 | 00:00:10 | |
| | 94: 11 | Q.  You don't have a specific recollection | | | |
| | 94: 12 | of any specific conversations with any -- any | | | |
| | 94: 13 | professional representatives? | | | |
| | 94: 14 | A.  No, sir. | | | |
| | 94: 15 | Q.  Now, it's pretty general? | | | |
| | 94: 16 | A.  It is. | | | |
| 135 | 94:18 | - 95:3 | Grefer, Michael 2006-07-27 | 00:00:25 | |
| | 94: 18 | Q.  Now, at the time, as well as today, back | | | |
| | 94: 19 | at the time when Vioxx was on the market as well as | | | |
| | 94: 20 | today, there are a number of pharmaceutical company | | | |
| | 94: 21 | representatives that call upon your office every week? | | | |
| | 94: 22 | A.  Yes, sir. | | | |
| | 94: 23 | Q.  And probably all the major | | | |
| | 94: 24 | pharmaceutical companies, given the size of your | | | |
| | 94: 25 | practice, make stops by this office? | | | |
| | 95: 1 | A.  They do. | | | |
| | 95: 2 | Q.  That is their job? | | | |
| | 95: 3 | A.  Yes, sir. | | | |
| 136 | 95:5 | - 95:11 | Grefer, Michael 2006-07-27 | 00:00:15 | |
| | 95: 5 | Q.  And in doing their job, they provide | | | |
| | 95: 6 | your office with samples? | | | |
| | 95: 7 | A.  Yes. | | | |
| | 95: 8 | Q.  And they provide you with valuable | | | |
| | 95: 9 | information and important information concerning drugs | | | |
| | 95: 10 | that you may have an interest in? | | | |
| | 95: 11 | A.  Yes. | | | |
| 137 | 95:13 | - 95:14 | Grefer, Michael 2006-07-27 | 00:00:04 | |
| | 95: 13 | Q.  And you're not saying there's anything | | | |
| | 95: 14 | wrong with sales representatives coming by your office? | | | |
| 138 | 95:16 | - 95:23 | Grefer, Michael 2006-07-27 | 00:00:15 | |
| | 95: 16 | A.  No, sir. | | | |
| | 95: 17 | Q.  That is helpful to your practice and to | | | |
| | 95: 18 | your patients? | | | |
| | 95: 19 | A.  It is. | | | |
| | 95: 20 | Q.  And the literature they leave and | | | |
| | 95: 21 | provide you with can be very helpful to you for drugs | | | |
| | 95: 22 | that you have an interest in? | | | |
| | 95: 23 | A.  Yes, sir. | | | |
| 139 | 95:25 | - 96:4 | Grefer, Michael 2006-07-27 | 00:00:15 | |

|  |  |  | Objections | Responses |
|---|---|---|---|---|

| | | |
|---|---|---|
| | 95: 25 | Q.  Now, following VIGOR, we -- we've |
| | 96: 1 | discussed already at length your understanding of VIGOR |
| | 96: 2 | back at that time, but following VIGOR, you had some |
| | 96: 3 | brief conversations with some sales reps? |
| | 96: 4 | A.  Yes. |
| 140  96:6 | - 96:8 | Grefer, Michael 2006-07-27   00:00:05 |
| | 96: 6 | Q.  Typically, when you talk to sales reps |
| | 96: 7 | it's in passing in the hallway; is it not? |
| | 96: 8 | A.  Yes. |
| 141  98:3 | - 98:12 | Grefer, Michael 2006-07-27   00:00:22 |
| | 98: 3 | Q.  Doctor, you typically don't have |
| | 98: 4 | sit-down conferences with sales representatives from |
| | 98: 5 | the pharmaceutical companies? |
| | 98: 6 | A.  I do not. |
| | 98: 7 | Q.  You simply do not have time for that? |
| | 98: 8 | A.  Correct. |
| | 98: 9 | Q.  And there are so many, from various |
| | 98: 10 | companies, that call on your office, it would be a huge |
| | 98: 11 | distraction from your practice? |
| | 98: 12 | A.  It's exactly -- that's exactly correct. |
| 142  98:13 | - 99:15 | Grefer, Michael 2006-07-27   00:01:07 |
| | 98: 13 | Q.  Okay.  Now, Merck representatives |
| | 98: 14 | provided you written and some verbal information about |
| | 98: 15 | the VIGOR trial? |
| | 98: 16 | A.  They did. |
| | 98: 17 | Q.  And we went over before what you were |
| | 98: 18 | aware of from them and from the labeling, correct? |
| | 98: 19 | A.  Correct. |
| | 98: 20 | Q.  And you understood that following VIGOR |
| | 98: 21 | that the science wasn't clear about the reason for the |
| | 98: 22 | difference in myocardial -- nonfatal myocardial |
| | 98: 23 | infarctions between patients on Vioxx and those on |
| | 98: 24 | naproxen? |
| | 98: 25 | A.  That's correct. |
| | 99: 1 | Q.  Now, and it was well-known to you back |
| | 99: 2 | at that time that there was a significant difference in |
| | 99: 3 | the number of nonfatal MIs for people on Vioxx in VIGOR |
| | 99: 4 | versus those on placebo? |
| | 99: 5 | A.  Well, that was always the question. |
| | 99: 6 | There was a difference.  The question is is was it a |
| | 99: 7 | significant difference and was it because the studies |
| | 99: 8 | were not studying apples to oranges, and that was the |
| | 99: 9 | entire conflict that was going on there. |
| | 99: 10 | Q.  Right.  Right.  The scientific debate |
| | 99: 11 | was we had this difference in MIs in VIGOR, and what is |
| | 99: 12 | the cause of it? |
| | 99: 13 | A.  And what is the cause of it, and it |
| | 99: 14 | seemed slight.  That -- that would -- that's what I was |
| | 99: 15 | told. |
| 143  99:16 | - 99:20 | Grefer, Michael 2006-07-27   00:00:16 |
| | 99: 16 | Q.  Well, back at that time, you're well |
| | 99: 17 | aware from the labeling that there was a significant |
| | 99: 18 | number of MIs on Vioxx, significantly more than as |
| | 99: 19 | compared to naproxen? |
| | 99: 20 | A.  There were more, yes, sir. |
| 144  99:21 | - 100:3 | Grefer, Michael 2006-07-27   00:00:19 |
| | 99: 21 | Q.  I want to direct your attention just a |
| | 99: 22 | minute -- not for long -- to Exhibit Number 4 that |
| | 99: 23 | plaintiffs used that was an FDA warning letter.  Do you |
| | 99: 24 | remember briefly discussing that before -- |
| | 99: 25 | A.  Yes, I do. |
| | 100: 1 | Q.  -- with Mr. Wright?  Now, you had never |
| | 100: 2 | seen that before? |
| | 100: 3 | A.  No. |
| 145  100:7 | - 101:21 | Grefer, Michael 2006-07-27   00:02:02 |
| | 100: 7 | Q.  That's not something you would use to |
| | 100: 8 | make prescribing decisions? |
| | 100: 9 | A.  I would never have seen it. |
| | 100: 10 | Q.  As a matter of fact, you even testified |

| | | | | Objections | Responses |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| | 100: 11 | earlier that, you know, the information in that letter | | | |
| | 100: 12 | would not have impacted your prescribing decision for | | | |
| | 100: 13 | Mr. Smith; do you recall that? | | | |
| | 100: 14 | A. Because I didn't see it; that's right. | | | |
| | 100: 15 | Q. Right. Now, in fairness, I just wanted | | | |
| | 100: 16 | to mention a couple things in here. This -- this FDA | | | |
| | 100: 17 | warning letter that's marked as Exhibit Number 4 | | | |
| | 100: 18 | actually references some discreet events that the FDA | | | |
| | 100: 19 | was bringing to Merck's attention. One of them was a | | | |
| | 100: 20 | set of audio conferences conducted by a Dr. Peter Holt. | | | |
| | 100: 21 | You never participated in those, did you? | | | |
| | 100: 22 | A. No, sir. | | | |
| | 100: 23 | Q. Another of the discreet matters that | | | |
| | 100: 24 | were part of this warning letter were some pharmacist | | | |
| | 100: 25 | conferences at which FDA -- the FDA said that Merck | | | |
| | 101: 1 | professional representatives made certain statements | | | |
| | 101: 2 | about Vioxx. You would not have been at these | | | |
| | 101: 3 | pharmacist conferences? | | | |
| | 101: 4 | A. No, sir. | | | |
| | 101: 5 | Q. And to make it clear, this warning | | | |
| | 101: 6 | letter would have -- would have had no impact on your | | | |
| | 101: 7 | prescribing decision for Mr. Smith? | | | |
| | 101: 8 | A. No, sir. | | | |
| 146 111:6 - 111:18 | | Grefer, Michael 2006-07-27 | 00:00:41 | | |
| | 111: 6 | Q. The bottom line is, back at the time | | | |
| | 111: 7 | you -- you prescribed Vioxx to Mr. Smith, you | | | |
| | 111: 8 | understood that VIGOR had resulted in -- in an | | | |
| | 111: 9 | increased number of nonfatal heart attacks? | | | |
| | 111: 10 | A. Correct. | | | |
| | 111: 11 | Q. From the Vioxx users versus the naproxen | | | |
| | 111: 12 | users? | | | |
| | 111: 13 | A. Correct. | | | |
| | 111: 14 | Q. You also understood that there was | | Re: 111:14-111:23 | Re: 111:14-112:33 |
| | 111: 15 | scientific debate ongoing, whether it was due to Vioxx | | Pltf Obj: | Def Resp: |
| | 111: 16 | being the cause of more heart attacks or because it was | | Mischaracterizes | Does not characterize |
| | 111: 17 | being compared to naproxen, a drug that has a cardio- | | previous testimony; | anything, asks a |
| | 111: 18 | protective -- that may have a cardio-protective effect? | | misleading; 403 | question; does no |
| 147 111:20 - 112:3 | | Grefer, Michael 2006-07-27 | 00:00:34 | | mischaracterize or |
| | 111: 20 | A. Basically, I -- the -- the -- the | | | mislead as evidenced |
| | 111: 21 | situation was that with this particular test and | | | by witness's agreement |
| | 111: 22 | with VIGOR comparing with naproxen, it was unclear why | | | |
| | 111: 23 | there were those changes. | | | |
| | 111: 24 | Q. All right. And you were also aware that | | | |
| | 111: 25 | prior to the VIGOR study, in prior studies done in the | | | |
| | 112: 1 | clinical trials by Merck, there had not shown an | | | |
| | 112: 2 | increased risk of heart attack in patients on Vioxx as | | | |
| | 112: 3 | compared to placebo? | | | |
| 148 112:5 - 112:12 | | Grefer, Michael 2006-07-27 | 00:00:21 | | |
| | 112: 5 | A. I -- I was unaware of any significant | | | |
| | 112: 6 | increase in cardiovascular events prior to VIGOR, | | | |
| | 112: 7 | that's right. | | | |
| | 112: 8 | Q. Okay. And then at the time you | | | |
| | 112: 9 | prescribed to Mr. Smith, you're well aware of VIGOR, | | | |
| | 112: 10 | but felt that the science was still uncertain? | | | |
| | 112: 11 | A. That's -- was my understanding; that's | | | |
| | 112: 12 | correct. | | | |
| 149 114:8 - 114:10 | | Grefer, Michael 2006-07-27 | 00:00:05 | | |
| | 114: 8 | Q. Now, you still prescribe Celebrex today, | | Re: 114:8-114:10 | Re: 114:8-114:10 |
| | 114: 9 | do you not? | | Pltf Obj: | Def Resp: |
| | 114: 10 | A. I do. | | Misleading; 403; | No objection so waived; |
| 150 114:11 - 114:21 | | Grefer, Michael 2006-07-27 | 00:00:49 | speculation; foundation; | witness is capable of |
| | 114: 11 | Q. And what is the patient profile that you | | calls for an improper | answering whether he |
| | 114: 12 | typically look for in terms of prescribing Celebrex? | | expert medical opinion | prescribes Celebrex; not |
| | 114: 13 | A. Well, I look for a -- a patient who | | outside the scope of | misleading or |
| | 114: 14 | needs that type of medication, and usually I prescribe | | the witness' treatment | speculative and he has |
| | 114: 15 | a -- a -- a -- a -- an -- another NSAID of a more | | of Mr. Smith; relevance; | a personal knowledge |
| | 114: 16 | generalized nature, depending upon what the condition | | assumes facts not in | |
| | 114: 17 | is, unless someone tells me they have significant | | evidence | |
| | 114: 18 | gastrointestinal problems and things like that, and -- | | | |
| | 114: 19 | and/or if they do not tolerate a more generalized | | | |

| | | | Objections | Responses |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | 114: 20 | NSAID.  And then when that's the case, I do prescribe | | |
| | 114: 21 | Celebrex. | | |

| | | | | | |
|---|---|---|---|---|---|
| 151 | 114:22 | - 115:17 | Grefer, Michael 2006-07-27 | 00:00:47 | |
| | 114: 22 | Q.  And do you find Celebrex to be | | Re: 114:22-115:17 | Re: 114:22-115:17 |
| | 114: 23 | beneficial to your patients? | | Pltf Obj: | Def Resp: |
| | 114: 24 | A.  I do. | | Misleading; 403; | No objection so waived; |
| | 114: 25 | Q.  And -- and I assume that for those you | | speculation; foundation; | not misleading or |
| | 115: 1 | prescribe it, you believe the benefits of the drug | | calls for an improper | speculative; witness has |
| | 115: 2 | outweigh the risks? | | expert medical opinion | personal knowledge of |
| | 115: 3 | A.  I do. | | outside the scope of | drug and its warnings |
| | 115: 4 | Q.  And Celebrex carries some significant | | the witness' treatment | and manner in which he |
| | 115: 5 | cardiovascular warnings? | | of Mr. Smith; relevance; | prescribes it; warning is |
| | 115: 6 | A.  Basically almost all the NSAIDs do now. | | assumes facts not in | or will be in evidence |
| | 115: 7 | Q.  But you still prescribe it? | | evidence | |
| | 115: 8 | A.  I do. | | | |
| | 115: 9 | Q.  Because there's a -- there is -- that | | | |
| | 115: 10 | is -- one of the decisions you have to make as a | | | |
| | 115: 11 | physician is weighing the benefits and the risks? | | | |
| | 115: 12 | A.  The risk/reward, yes, sir. | | | |
| | 115: 13 | Q.  And a COX-2 like -- like Celebrex, you | | | |
| | 115: 14 | still find that, even understanding that there are | | | |
| | 115: 15 | cardiovascular risks associated with it, there is still | | | |
| | 115: 16 | the right patient and the right reason to prescribe it? | | | |
| | 115: 17 | A.  Yes, sir. | | | |

| | | | | | |
|---|---|---|---|---|---|
| 152 | 116:4 | - 118:8 | Grefer, Michael 2006-07-27 | 00:02:25 | |
| | 116: 4 | Q.  I am handing you Exhibit Number 9, which | | Re: 116:4-119:8 | Re: 116:4-119:8 |
| | 116: 5 | I'll represent to you is the prescribing labeling | | Pltf Obj: | Def Resp: |
| | 116: 6 | information for Celebrex. | | Misleading; 403; | See above re: waiver |
| | 116: 7 | A.  Okay. | | speculation; foundation; | re: misleading/ |
| | 116: 8 | Q.  And I assume at some point in time | | calls for an improper | speculation/ |
| | 116: 9 | you've reviewed the labeling information for Celebrex? | | expert medical opinion | foundation/expert |
| | 116: 10 | A.  Yes. | | outside the scope of | opinion/relevance/facts |
| | 116: 11 | Q.  And are familiar with it? | | the witness' treatment | in evidence; also as to |
| | 116: 12 | A.  Yes. | | of Mr. Smith; relevance; | relevance establishing |
| | 116: 13 | Q.  And used that in terms of assessing the | | assumes facts not in | risks and alternatives |
| | 116: 14 | risk/benefit of prescribing the drug to your patients? | | evidence | and developing state |
| | 116: 15 | A.  Correct. | | | of scientific knowledge |
| | 116: 16 | Q.  On page 1 they have a boxed warning. | | | |
| | 116: 17 | A.  Uh-huh. | | | |
| | 116: 18 | Q.  Is that true? | | | |
| | 116: 19 | A.  Yes. | | | |
| | 116: 20 | Q.  And in that boxed warning it talks about | | | |
| | 116: 21 | cardiovascular thrombotic events. | | | |
| | 116: 22 | A.  Right. | | | |
| | 116: 23 | Q.  Could you read that for the jury, that | | | |
| | 116: 24 | top paragraph. | | | |
| | 116: 25 | A.  "Cardiovascular Risks.  CELEBREX may | | | |
| | 117: 1 | cause an increased risk of serious cardiovascular | | | |
| | 117: 2 | thrombotic events, myocardial infarction, and stroke, | | | |
| | 117: 3 | which can be fatal.  All NSAIDs may have a similar | | | |
| | 117: 4 | risk.  This risk may increase with duration of use. | | | |
| | 117: 5 | Patients with cardiovascular disease or risk factors | | | |
| | 117: 6 | for cardiovascular disease may be at a greater risk. | | | |
| | 117: 7 | (See WARNINGS and CLINICAL TRIALS)." | | | |
| | 117: 8 | Q.  And behind that in the WARNINGS and the | | | |
| | 117: 9 | CLINICAL TRIALS section it has similar warnings, does | | | |
| | 117: 10 | it not? | | | |
| | 117: 11 | A.  I believe so.  I -- I don't have those | | | |
| | 117: 12 | handy right here. | | | |
| | 117: 13 | Q.  As a matter of fact, I can just flip you | | | |
| | 117: 14 | to -- if you'll flip to page 11. | | | |
| | 117: 15 | A.  Okay. | | | |
| | 117: 16 | Q.  Okay.  Under Cardiovascular Effects | | | |
| | 117: 17 | under WARNINGS. | | | |
| | 117: 18 | A.  Uh-huh.  Uh-huh. | | | |
| | 117: 19 | Q.  Can you just read that first paragraph | | | |
| | 117: 20 | there. | | | |
| | 117: 21 | A.  Cardiovascular Thrombotic Events. | | | |
| | 117: 22 | Chronic use of Celebrex may cause an increased risk of | | | |
| | 117: 23 | serious adverse cardiovascular thrombotic events, | | | |
| | 117: 24 | myocardial infarction, and stroke, which can be fatal. | | | |
| | 117: 25 | In the APC trial, the relative risks for the composite | | | |
| | 118: 1 | endpoint of cardiovascular death, MI, or stroke was 3.4 | | | |

| | Objections | Responses |
|---|---|---|

118: 2    (95% Clinical Index 1.4 - 8.5) for Celebrex
118: 3    400 milligrams twice daily and 2.5 (95%) for Celebrex
118: 4    200 milligrams twice daily compared to placebo.
118: 5    Q.  And when it references the 3.4, would
118: 6    that mean that it was three -- three -- almost three
118: 7    and a half times more likely to have a cardiovascular
118: 8    event on Celebrex than on placebo?

**153  118:11        -  119:8**    Grefer, Michael 2006-07-27    00:00:51
118: 11    A.  I assume that's what that says, yes,
118: 12    sir.
118: 13    Q.  All right.  And that was on the Celebrex
118: 14    400 milligrams?
118: 15    A.  400 milligrams.
118: 16    Q.  And on the Celebrex 200 milligrams it
118: 17    looks like there was a -- a two and a half times higher
118: 18    risk of a cardiovascular event?
118: 19    A.  Celebrex 400 milligrams a day on -- and
118: 20    the first incidents of 200 milligrams -- I'm sorry.
118: 21    200 milligrams.  400 milligrams twice a day versus
118: 22    200 milligrams twice a day, yeah.
118: 23    Q.  And on one there's a two and a half
118: 24    times greater risk of a cardiovascular event, and on
118: 25    the other it's a three and a half times?
119: 1    A.  Yes, it looks like that.
119: 2    Q.  But even based upon that information,
119: 3    you -- you are comfortable, with the right patients,
119: 4    prescribing Celebrex?
119: 5    A.  Yes.
119: 6    Q.  And that's part of what you have to do
119: 7    as a doctor, make those decisions?
119: 8    A.  That's right.

**154  119:11        -  119:17**    Grefer, Michael 2006-07-27    00:00:40
119: 11    Today when you're -- even with this
119: 12    label on Celebrex and this warning information, when
119: 13    you make your prescribing decision, you're looking --
119: 14    you're looking not only for a person that needs the
119: 15    drug, but also you're looking for a patient who's --
119: 16    the risk/benefit analysis weighs in their favor?
119: 17    A.  Correct.

**Re: 119:11-119:17**
**Pltf Obj:**
Misleading; 403;
speculation; foundation;
calls for an improper
expert medical opinion
outside the scope of
the witness' treatment of
Mr. Smith; relevance;
assumes facts not in
evidence

**Re: 119:11-119:17**
**Def Resp:**
See above re: waiver
re: misleading/
speculation/
foundation/expert
opinion/relevance/facts
in evidence; also as to
relevance establishing
risks and alternatives
and developing state
of scientific knowledge

**155  120:11        -  120:14**    Grefer, Michael 2006-07-27    00:00:10
120: 11    Q.  Doctor, did you -- have you ever
120: 12    personally taken Vioxx?
120: 13    A.  Yes.
120: 14    Q.  Did you consider it an effective drug?

**Re: 120:11-120:22**
**Pltf Obj:** Relevance;
misleading; 403

**Re: 120:11-120:22**
**Def Resp:** No objection
as to first questions re:
Vioxx use, so waived;
relevant to experience
prescribing drug and as
background for
questions that follow;
not misleading

**156  120:17        -  120:18**    Grefer, Michael 2006-07-27    00:00:05
120: 17    A.  Yes, I did.
120: 18    Q.  And did you consider it a drug --

**157  120:20        -  120:22**    Grefer, Michael 2006-07-27    00:00:21
120: 20    Q.  -- that was beneficial to you as the
120: 21    person taking it?
120: 22    A.  Yes.

**158  120:24        -  121:3**    Grefer, Michael 2006-07-27    00:00:10
120: 24    Q.  Back at the time you prescribed Vioxx to
120: 25    your patients, I assume you likewise found it to be
121: 1    a -- very effective for your patients in terms of pain
121: 2    relief?
121: 3    A.  Yes, I did.

**159  121:11        -  122:21**    Grefer, Michael 2006-07-27    00:02:02
121: 11    During Mr. Wright's questioning, he
121: 12    asked you -- he asked you whether, to some extent, you
121: 13    were influenced by the Vioxx sales campaign.
121: 14    A.  I was.
121: 15    Q.  Now, at that same time you started using
121: 16    the drug you found it to be a very effective drug for
121: 17    your patients?
121: 18    A.  Correct.
121: 19    Q.  And if it had not been an effective
121: 20    drug, then you would not have prescribed it?

|  | Objections | Responses |
|---|---|---|

121: 21    A.  Correct.
121: 22    Q.  It also had some -- some very important
121: 23       and valuable benefits for the gastrointestinal system
121: 24       of your patients?
121: 25    A.  Yes.
122: 1    Q.  And that was something you considered
122: 2       very important?
122: 3    A.  Yes.
122: 4    Q.  And an added benefit of a drug like
122: 5       Vioxx over traditional NSAIDs?
122: 6    A.  Correct.
122: 7    Q.  Okay.  And provided you something you
122: 8       could prescribe patients who -- particularly those that
122: 9       had gastrointestinal problems?
122: 10    A.  Correct.
122: 11    Q.  So during the time Vioxx was on the
122: 12       market, you prescribed it because you as a doctor felt
122: 13       it was a good drug?
122: 14    A.  I did.
122: 15    Q.  And you felt that it was beneficial to
122: 16       your patients?
122: 17    A.  I did.
122: 18    Q.  And you felt, at the time you prescribed
122: 19       it, the benefits of the drug outweighed any of the
122: 20       risks that you were aware of?
122: 21    A.  Correct.

160  **123:9**  -  **124:17**    Grefer, Michael 2006-07-27    00:01:17
123: 9    Q.  Doctor, during Mr. Wright's questions
123: 10       earlier today he -- he talked about some different
123: 11       substudies like -- remember the name 090?
123: 12    A.  Uh-huh.
123: 13    Q.  And other studies that you have never
123: 14       seen and are not familiar with.
123: 15    A.  That's correct.
123: 16    Q.  He also mentioned to you statements
123: 17       about Merck statisticians, did he not?
123: 18    A.  He mentioned some things about that,
123: 19       yes.
123: 20    Q.  And went on to talk about what Merck
123: 21       statisticians and consultants may have told Merck at
123: 22       some given time?
123: 23    A.  Okay.
123: 24    Q.  Do you recall that?
123: 25    A.  I don't remember the particulars, but I
124: 1       do remember that type of situation.
124: 2    Q.  He also showed -- showed you a chart
124: 3       that he said it was from the Shapiro memo.  Do you
124: 4       remember that?
124: 5    A.  I believe so.
124: 6    Q.  And you couldn't remember if you had
124: 7       ever seen that chart or not?
124: 8    A.  Correct.
124: 9    Q.  And it was marked as Plaintiff's
124: 10       Exhibit 7?
124: 11    A.  Correct.
124: 12    Q.  Now, this internal documents at -- at a
124: 13       pharmaceutical company and what their consultants may
124: 14       or may not be saying to them at any given point in
124: 15       time, is that the type of information you typically
124: 16       make prescribing decisions from?
124: 17    A.  I never have it.  The answer's no.

161  **124:22**  -  **124:25**    Grefer, Michael 2006-07-27    00:00:09
124: 22    Q.  You look to the FDA-approved labeling --
124: 23    A.  I do.
124: 24    Q.  -- and information you gather from your
124: 25       experience and from studies to make your decisions?

162  **125:2**  -  **125:5**    Grefer, Michael 2006-07-27    00:00:11
125: 2    A.  Correct.
125: 3    Q.  You typically do not look to internal
125: 4       company documents and dialogue between the FDA and
125: 5       companies, to make prescribing decisions?

| | | | | | Objections | Responses |
|---|---|---|---|---|---|---|

| 163 | 125:7 | - | 126:14 | Grefer, Michael 2006-07-27 | 00:01:27 | | |
|---|---|---|---|---|---|---|---|

125: 7    A.   Correct.
125: 8    Q.   Now, it would be important -- if you did
125: 9         look to a substudy or what a Merck statistician may
125: 10        have said or done at any given point in time, would it
125: 11        be important for you to understand the totality of
125: 12        those circumstances before you answered important
125: 13        questions based upon what that statis-- statistician
125: 14        may have said or done at some point in time?
125: 15   A.   Yes.
125: 16   Q.   You would want to know all information
125: 17        about the subject rather than just bits and pieces?
125: 18   A.   Correct.
125: 19   Q.   When Mr. Wright referenced a study
125: 20        called 090 and said that it had a certain result, he
125: 21        didn't tell you about all the studies that had a
125: 22        different result than that one, did he?
125: 23   A.   No.
125: 24   Q.   He didn't tell you the size of the
125: 25        study, did he?
126: 1    A.   No.
126: 2    Q.   Or that it was not statistically
126: 3         significant, did he?
126: 4    A.   No.
126: 5    Q.   And that is the type of information
126: 6         you'd like to have about that study and any other study
126: 7         if you're going to answer important questions about
126: 8         them?
126: 9    A.   Correct.
126: 10   Q.   If you're going to answer questions
126: 11        about what someone within Merck, whether it's a
126: 12        consultant or a statistician, knew or said to Merck at
126: 13        any given point in time, you'd want to know everything
126: 14        about those circumstances?

| 164 | 126:16 | - | 127:8 | Grefer, Michael 2006-07-27 | 00:00:38 | | |
|---|---|---|---|---|---|---|---|

126: 16   A.   Yes.
126: 17   Q.   Particularly before you answered
126: 18        important questions about whether that would impact
126: 19        your prescribing decision?
126: 20   A.   Well, it would be -- I would like to
126: 21        know as much information that's available before I made
126: 22        any decision about whether I would prescribe or not.
126: 23   Q.   And are you aware that all of these
126: 24        people that Mr. Wright has referenced have given
126: 25        depositions in this litigation?
127: 1    A.   No.
127: 2    Q.   And you haven't seen any of that, have
127: 3         you?
127: 4    A.   No.
127: 5    Q.   And you wouldn't want to comment on
127: 6         what -- how some-- what somebody said or did at Merck,
127: 7         how that would impact you, without seeing the full
127: 8         totality of their testimony, too?

| 165 | 127:10 | - | 127:11 | Grefer, Michael 2006-07-27 | 00:00:08 | | |
|---|---|---|---|---|---|---|---|

127: 10   Q.   Would that be fair?
127: 11   A.   Yes.

| 166 | 127:18 | - | 132:11 | Grefer, Michael 2006-07-27 | 00:09:14 | | |
|---|---|---|---|---|---|---|---|

127: 18   Q.   With regard to your prescribing
127: 19        decisions for Vioxx or other medications that you
127: 20        prescribe, do you or do you not rely upon the
127: 21        representatives from that company that come to sell you
127: 22        or convince you to buy their drugs or to prescribe
127: 23        their drugs, do you or do you not rely upon those
127: 24        representatives to tell you both the good information
127: 25        that they have about their drug and the potential
128: 1         hazards that their company knows about their drug?
128: 2    A.   The answer to your question is yes, I
128: 3         would expect them to give me all the relevant
128: 4         information that they have.
128: 5    Q.   All right.  And specifically with regard
128: 6         to the VIGOR study, I understood you to say that the

Objections:
**Re: 127:18-128:4**
**Def Obj:**
Leading a non-hostile
witness; counsel
testifying "[reps] that
come to you to sell or
convince you to buy
their drugs..."; 403

**Re: 128:5-129:9**
**Def Obj:**

Responses:
**Re: 127:18-128:4**
**Pltf Resp:**
Untimely;
statements of the
reps are admissions
and not offered for
the truth

**Re: 128:5-128:24**
**Pltf Resp:**

| | Objections | Responses |
|---|---|---|
| 128: 7   Merck representatives told you their position why the<br>128: 8   VIGOR studies did not show an important cardiovascular<br>128: 9   risk, and that reason that they gave you was because<br>128: 10   naproxen had a cardio-protective effect.<br>128: 11   Is that or is that not the general gist<br>128: 12   of what the Merck representatives told you in<br>128: 13   discussing the VIGOR studies?<br>128: 15   A.   The -- the Merck representatives told me<br>128: 16   that while it looked like there was cardiovascular<br>128: 17   problems with Vioxx, the situation was unclear and it<br>128: 18   was muddied by the fact that the study was flawed and<br>128: 19   that some people may have been taken off aspirin that<br>128: 20   were taking it, and there could have been a<br>128: 21   cardiovascular effect for the positive with naproxen.<br>128: 22   They said that they were just -- that -- that --<br>128: 23   that -- I -- I can truly tell you that nobody from<br>128: 24   Merck gave me any bad news about Vioxx.<br>128: 25   Q.   Is it fair to say or is it not fair to<br>129: 1   say -- well, let me rephrase the question.<br>129: 2   In that regard, did the Merck sales<br>129: 3   representatives ever tell you that there was a<br>129: 4   scientific theory that Vioxx may cause blood clots, be<br>129: 5   prothrombotic?  Did the Merck sales representatives<br>129: 6   ever tell you that they were aware, that Merck was<br>129: 7   aware that there was a potential for Vioxx to be<br>129: 8   prothrombotic, and that they were aware of that<br>129: 9   potential?<br>129: 10   MR. SKIDMORE:  I need to object to the<br>129: 11   multiple questions in one, the multifarious<br>129: 12   questions, as well as leading.<br>129: 13   MR. WRIGHT:  All right.  I'll rephrase<br>129: 14   it.<br>129: 15   BY MR. WRIGHT: | Leading<br>**128:5-129:14:** Counsel testifying; multiple questions; leading a non-hostile witness; assumes facts not in evidence; 403 Hearsay; and plaintiff cannot establish a hearsay exception where the alleged speaker(s) are unidentified | Question is not leading; untimely; statements of the reps are admissions and not offered for the truth |
| 129: 16   Q.   In that regard, Doctor, in any of the<br>129: 17   discussions that you had with the Merck sales<br>129: 18   representatives, do you remember them ever disclosing<br>129: 19   to you that there was a scientific theory that some<br>129: 20   Merck scientists had discussed with Merck that Vioxx,<br>129: 21   because of its nature, may be prothrombotic?  In other<br>129: 22   words, may be prone to causing blood clots?<br>129: 23   A.   No.<br>129: 24   MR. SKIDMORE:  Same objection as before. | **Re: 129:16-129:23**<br>**Def Obj:**<br>Leading; multifarious question (see, e.g., 129:10-12); hearsay | **Re: 129:16-129:9**<br>**Pltf Resp:**<br>Question is not leading or multifarious; untimely; statements of the reps are admissions and not offered for the truth |
| 129: 25   Q.   Now -- now, is it or is it not fair to<br>130: 1   say that when Merck discussed the VIGOR findings with<br>130: 2   you -- I'm turning to this -- I'm going to read you a<br>130: 3   statement from the FDA warning letter that we<br>130: 4   discussed, which is Exhibit Number 4.  This is a letter<br>130: 5   from the FDA to Merck, September 17th.<br>130: 6   Quote, You have engaged in a promotional<br>130: 7   campaign for Vioxx that minimizes the potentially<br>130: 8   serious cardiovascular findings that were observed in<br>130: 9   the Vioxx gastrointestinal outcomes research (VIGOR)<br>130: 10   study, and thus, misrepresents the safety profile for<br>130: 11   Vioxx. | **129:25-130:23:** Counsel testifying; lack of foundation (Warning Letter); leading | **Re: 129:25 - 130:23**<br>**Pltf Resp:**<br>Untimely; statements of the reps are admissions and not offered for the truth |
| 130: 12   Let me ask you, Doctor, from your<br>130: 13   experience with the Merck representatives, did you or<br>130: 14   did you not perceive them to be, in their presentation<br>130: 15   to you, minimizing the potentially serious<br>130: 16   cardiovascular findings in the VIGOR study?<br>130: 17   MR. SKIDMORE:  Objection.  Lack of<br>130: 18   foundation and to leading.  Foundation based<br>130: 19   upon the use of this letter in that question.<br>130: 20   A.   I guess the answer to your question is<br>130: 21   never did a Vioxx representative tell me that the<br>130: 22   cardiovascular risks over other NSAIDs was a big deal,<br>130: 23   because it was unclear. | **130:12 - 131:12**<br>Hearsay; and plaintiff cannot establish a hearsay exception where the alleged speaker(s) are unidentified | **Re: 130:12-131:12**<br>Untimely; statements of the reps are admissions and not offered for the truth |
| 130: 24   Q.   Final two questions.  With regard to the<br>130: 25   discussion of the VIGOR study, is it or is it not fair<br>131: 1   to say that that's essentially the only study that the<br>131: 2   Merck sales representatives ever discussed with you<br>131: 3   regarding Vioxx and cardiovascular safety, to the best<br>131: 4   of your recollection?<br>131: 5   A.   To the best of my recollection, there<br>131: 6   was a lot of literature, there was a lot of stuff put<br>131: 7   in front of me over the several years that we dealt | **130:24-131:12:**  Leading | **Re: 130:24-131:12**<br>Untimely; statements of the reps are admissions and not offered for the truth |

| | | Objections | Responses |
|---|---|---|---|

|  |  |
|---|---|
| 131: 8 | with this situation, but it seemed to me that always it |
| 131: 9 | came down to VIGOR as the named study and as the -- |
| 131: 10 | kind of the Bi-- the Bible of the whole deal.  But, |
| 131: 11 | again, I don't -- I don't recall ever seeing any of the |
| 131: 12 | other particular studies. |
| 131: 13 | Q.  If there had been other studies that |
| 131: 14 | Merck was aware of that also showed a cardiovascular or |
| 131: 15 | heart attack risk for Vioxx in addition to the VIGOR |
| 131: 16 | study and showed the same kind of risk that was shown |
| 131: 17 | in the VIGOR study for other NSAIDs or for placebo -- |
| 131: 18 | against placebo, would or would not that, in your mind, |
| 131: 19 | have caused you to have more cardiovascular concerns |
| 131: 20 | for Vioxx before October of 2002? |
| 131: 21 | MR. SKIDMORE:  Objection.  Foundation. |
| 131: 22 | Leading. |
| 131: 23 | A.  Well, sure.  Had -- had I seen other |
| 131: 24 | studies that showed me that there was more |
| 131: 25 | cardiovascular risk than was apparent then, for any of |
| 132: 1 | the medications, I would have had more concern about |
| 132: 2 | prescribing them. |
| 132: 3 | Q.  Is that the kind of information that, if |
| 132: 4 | the company has, that you would expect the company |
| 132: 5 | representatives and like for the company |
| 132: 6 | representatives to share with you so that you can make |
| 132: 7 | proper prescribing decisions for your patients? |
| 132: 8 | A.  I would expect that any company would |
| 132: 9 | give me whatever information they have about their |
| 132: 10 | drug, to help me to discern whether I would prescribe |
| 132: 11 | it or not. |

Objections:
**Re: 131:13-132:11**
**Def Obj:**
Leading; lack of
foundation (602); calls
for speculation

Responses:
**Re: 131:13-132:11**
**Pltf Resp:**
Question is not leading;
witness's own actions
and reactions to
information are not
speculation

---

**167  132:18       -  133:1**    Grefer, Michael 2006-07-27    00:00:20

| | |
|---|---|
| 132: 18 | Q.  Now, in your brief meetings with sales |
| 132: 19 | reps, they would quite often hand you materials? |
| 132: 20 | A.  Very frequent. |
| 132: 21 | Q.  And this is -- would be -- if it was |
| 132: 22 | a -- a drug you were interested in or had some |
| 132: 23 | questions about, it was material that you would |
| 132: 24 | generally read? |
| 132: 25 | A.  I -- I read almost all of the stuff that |
| 133: 1 | they give me. |

Objections:
**Re: 132:18-133:13**
**Def Obj:** Foundation;
assumes facts not in
evidence; 403

Responses:
Re: 132:18-133:13
Pltf Resp: Dr. Grefer
has personal knowledge
about what materials
the sales reps gave him

---

**168  133:7       -  133:13**    Grefer, Michael 2006-07-27    00:00:18

| | |
|---|---|
| 133: 7 | Are you aware that professional sales |
| 133: 8 | representatives at Merck and other pharmaceutical |
| 133: 9 | companies are limited to what is in the labeling as to |
| 133: 10 | what they can discuss with you about a drug? |
| 133: 11 | MR. WRIGHT:  Object to the form. |
| 133: 12 | A.  No, I was not aware of that in |
| 133: 13 | particular. |

---

**169  133:20       -  134:4**    Grefer, Michael 2006-07-27    00:00:22

| | |
|---|---|
| 133: 20 | Q.  Yeah.  Let me ask it better. |
| 133: 21 | We talked about the fact that, did we |
| 133: 22 | not, that after -- after VIGOR came out, you had a lot |
| 133: 23 | of discussions with sales reps and reviewed -- reviewed |
| 133: 24 | different material about VIGOR? |
| 133: 25 | A.  Yes. |
| 134: 1 | Q.  And then we went over the label, and the |
| 134: 2 | VIGOR information, there was a significant amount of |
| 134: 3 | VIGOR information contained in the label. |
| 134: 4 | A.  Yes. |

---

**170  134:6       -  134:9**    Grefer, Michael 2006-07-27    00:00:08

| | |
|---|---|
| 134: 6 | Q.  And that information in the label is the |
| 134: 7 | same type of information that the sales reps talked to |
| 134: 8 | you about? |
| 134: 9 | A.  Yes. |

---

**171  134:11       -  134:23**    Grefer, Michael 2006-07-27    00:00:37

| | |
|---|---|
| 134: 11 | Q.  Now, the sales reps are typically not |
| 134: 12 | physicians, are they? |
| 134: 13 | A.  I don't know of one that is. |
| 134: 14 | Q.  So -- and you -- you understand that? |
| 134: 15 | A.  Sure. |
| 134: 16 | Q.  And you expect the sales reps to provide |

Objections:
**Re: 134:11-134:15**
**Pltf Obj:**
Foundation; calls for an
improper expert medical
opinion outside the
scope of the witness'

Responses:
**Re: 134:11-134:15**
**Def Resp:**
Foundation is personal
knowledge; does not
call for expert opinion

<u>Objections</u>                    <u>Responses</u>

134: 17        you information, but you as the physician take the        treatment of Mr. Smith
134: 18        information you have, along with your experience and
134: 19        qualifications, and -- and with that you make decisions
134: 20        based upon the science as you understand it rather than
134: 21        what a sales rep might tell you anyway about a drug?
134: 22    A.  With -- with the information that I have
134: 23        available to me, yes.