these two end organs (the brain and the heart) with nutrient and oxygen rich blood. The atheromatous gruel grows over time, fed by lipid rich macrophages, aggravated by high vascular pressures, and the vasoactive affects of smoking. The creation of a fissure in the plaque can activate the intricate collection of clotting mechanisms that leads to the rapid development of a thrombus, further narrowing the lumen of the blood vessels, leading to death of the supplied tissue.

49.   The risk factors for stroke (older age, hypertension, unfavorable lipid panels, smoking) are closely related to those of heart attacks. In addition, treatment is the same. The first treatment, prevention, requires the modulation of risk factor levels. A second is the identification of major blood vessels that are at risk (carotid vessels for the brain, coronary arteries for the heart) including bypassing the lesions or end-arterectomy. Finally, acute treatment for each includes the use of clot lysis therapy including tissue plasminogen activator or tPA. In each case, the lysis therapy must begin as quickly as possible after the onset of the heart attack or stroke. Thus, stroke and heart attacks and sister symptomatic manifestations of the same underlying disease – atherosclerosis.

50.   Thus the introduction of new risk factor for the development of thromboembolic disease would naturally suggest the risk factor would affect not just the occurrence of heart attacks, but the occurrence of strokes as well. Because of the same underlying pathophysiology, the warnings received by Merck outlining the potential dangers of rofecoxib applied to the occurrence of stroke as well.

51.   The epidemiology of risk factor identification and stroke is complicated by the relatively small number of strokes. Therefore, when the a priori warning about cardiovascular adverse events associated with rofecoxib was sounded by Fitzgerald, Oakes, and Patrono,

the search for stroke adverse events must be especially sensitive and diligent since the occurrence of strokes are themselves not common.

52.   In the 1998 Watson report. Table 1 of that report reveals that cerebral infarction, and cerebral vascular accident, were included as cardiovascular serious adverse events. In the words of the report (Page 3; C: Cardiovascular Serious Adverse Events). The SAE's chosen were felt to have a high likelihood of representing acute thrombotic events. Table 6 and 7 of that report demonstrate a greater incidence of CV SAE cases in men (relative risk 1.28) and women (relative risk 2.16). Appendix C of that report reveals that there was at least one patient who had a CVA.

53.   Preliminary rofecoxib meta-analysis by Dr. Deborah Shapiro (October 18, 2000) noted there were 8 cerebral accidents in the rofecoxib group and 9 in the control group (including one hemorrhagic and one lacunar stroke).  However, in that same report, an evaluation of the effect of rofecoxib versus NSAIDS, there were 23 CVA's in the rofecoxib group (11 CVA, 2 hemorrhagic strokes, 9 cerebral vascular strokes, and 1 lacunar stroke) versus only 9 in the NSAIDS group. (7 CVA, 1 hemorrhagic stroke, and 8 ischemic cerebrovascular strokes). This is a remarkably strong signal of rofecoxib-stroke hazard, given the paucity of stroke events.

54.   IN VIP (Table 1.12 of the Clinical Study Synopsis), There were five strokes on treatment or within 14 days of study drug discontinuation. However, Table 1.6 which lists events believed to be related to the drug, there was only one infarction (lacunar) in the rofecoxib group and none in the placebo group. This is unquestionably a small number of events, but it is enhanced sensitivity to these rare events that the sponsor is obligated to pay when there has been adequate *a priori* warning.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    8/10/2006

55. The Advantage study produced more stroke events in the control group than the rofe-coxib group. However, this finding does not "cancel out" the findings of rofecoxib-stroke hazard in the other studies. The evidence for hazard includes the mechanism by which many strokes are produced, and the greater number of studies that demonstrate rofecoxib stroke-excess. These powerful findings are not nullified by the observation that not every single study doesn't demonstrate this harmless effect.

56. In the Alzheimer studies (protocol 091, 078, and 126), three fatal strokes occur, versus one in the placebo groups. (Table 2, FDA Cardiovascular data in Alzheimer's studies). This occurred in relatively short term studies, again manifesting a small but clear in-creased stroke hazard in patients taking rofecoxib.

57. In the Victor protocol, as stated in the Overview of Cardiovascular Events in the VICTOR Study (Table 1 Summary of Confirmed Thrombotic Cardiovascular Serious AE's by Class of Terms Rofecoxib 25 mg vs. Placebo). There were four ischemic cardio-vascular strokes observed, 3 in the rofecoxib, and 1 on placebo. The combined endpoint analysis including ATPC events revealed the same division (3 in the rofecoxib group and 1 in the placebo group) again, an excess number of strokes attributable to rofecoxib ther-apy.

58. The published APPROVe study, revealed 22 cerebrovascular events (Table 2, Incidence of Adjudicated Thrombotic Adverse Events). Of these 22 CVA's 15 were in the rofe-coxib group, and 7 in the placebo group (hazard ratio 2.32: 95% CI 0.89 – 6.74). The no-tion of statistical significance means little in this underpowered environment. The only fatal stroke occurred in the patients receiving rofecoxib.

59.   While the identification of excess risk can be complex when the number of events are small, a review of the available data reveals consistent excess risk from several Merck sponsored studies. Given the similarities between the pathophysiology of stroke and CVA, a review of the data, consistent with well established epidemiologic principles reveals that it is more reasonable than not that rofecoxib causes strokes.

### *Hypertension*

60.   The rofecoxib group had a greater proportion of patients with hypertension-related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In the ADVANTAGE study, there were more 15 patients versus 7 patients who discontinued therapy for ischemia hypertension-related adverse events, and 19 versus 12 patients discontinued therapy for edema related events. In addition, in the APPROVe clinical trial, the rofecoxib group had a greater proportion of patients with hypertension related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10).

# Background Biochemistry

61.   *Biochemistry of COX-2 inhibition*: COX stands for cyclooxygenase. It is an enzyme system that expedites, and accelerates a particular type of chemical reaction in the body. Many chemical actions and reactions in the body must be facilitated in order to proceed. Before we can discuss the role of COX inhibition, we must first understand what en-

zymes do, and specifically, the remarkable degree of control their presence gives the organism.

62. *The Role of Enzymes*: While people and governments conduct the affairs of business using money, the body conducts its affairs of living through chemistry. Chemical reactions permit it to feed itself, to grow, to move, to defend itself, and to reproduce. This chemistry is intense and complex.

63. Just as fiscal flow, critical in societal interaction, must be carefully balanced and regulated, so too the intricate chemistry of life must be controlled and monitored. The fact is that chemical reactions, left to their own, would quickly consume all reagents and generate products in unproductive amounts at unhelpful times. Frequently, chemical reactions necessary for life would not take place at all because the chemical environment in the cell or tissue where the reaction is to take place is wrong. (e.g., too little reagent, or not enough acid). In order to bring order to this chemical chaos, the body, over tens of thousands of years, has developed reaction-facilitators. These facilitators are called enzymes. Specifically, an enzyme is a complex molecule that expedites a chemical reaction. The enzyme is neither consumed nor produced by the reaction. The reaction is facilitated by the mere presence and interaction of the enzyme.

64. The human body has tens of thousands (and perhaps many more) of such enzyme complexes. Many of these systems have been studied for generations, e.g., the Kreb cycle, which is the process by which glucose (sugar) is converted in the presence of oxygen to chemical energy, with water and carbon dioxide as byproducts. There are over ten differ-

ent chemical reactions that must take place and each of them is facilitated by enzyme system.[*] Without it, organized energy production in living tissue would fail.

65.  *The Prostaglandin System*: A prostaglandin is a molecule. Specifically, it is a collection of fatty acids (approximately twenty of them) attached to a five-member ring. Their main function (as best understood at this time) is to function as messengers; their presence initiates a series of other chemical reactions. For example, one signal that prostaglandins send is the need for an inflammatory response. The injured body part notifies its constituency that a self-protective, inflammatory reaction is necessary by synthesizing prostaglandins. Inflammation is commonly and most productively a protective response of the organism, commonly producing increased blood flow to the site of inflammation, an immune response, and pain.

66.  A second function of prostaglandins is to mediate the propensity of blood to clot. The tendency of blood to clot must be carefully balanced. Blood that does not clot loses the ability to repair damaged blood vessels that are commonly injured or worn down in the process of daily living.[†] Blood that does not clot quickly enough leads to a painfully debilitating and short life, as revealed by the natural history of patients with untreated hemophilia. Alternatively, blood that is too likely to clot (i.e., it exists in a hypercoagulable state) leads to blood clots forming where they are neither required nor helpful. Such clots can break off, be carried though the blood stream, and lodge in small (and sometimes large) vessels. The blockage of blood flow leads to death of the tissue that relies on the blood flow, now impeded by the clot. The results of these clots are pulmonary embolisms

---

[*] Some of these enzymes are hexokinase, aldolase, dihydrolipoyl dehydrogenase, pyruvate kinase, and dihydrolipoyl transacetylase.

[†] The body has over 100,00 miles of blood vessels, most of them too small to see. There are frequently hourly tears in these blood vessels that must be immediately repaired.

(if the arteries to the lungs are blocked), and heart attacks (if a coronary artery, a vessel supplying the cardiac muscles own blood supply is blocked) or strokes (if the blood supply to the brain is blocked). Platelet aggregation is one of the precipitating mechanisms in producing a myocardial infarction by producing a blood clot in a vessel that directly supplies the heart with oxygen. This pro-clotting process can trigger the cascade of events that produces a heart attack.

67.   The mechanism by which blood clots is one of most studied and complex biochemical mechanisms known, and a detailed discussion of this complicated system, involving literally hundreds of reagents, enzymes, and coenzymes is beyond the scope of this report. The relevant component here is the compound thromboxane $A_2$. One effect of prostaglandins are that they stimulate hemostasis through up-regulation of thromboxane $A_2$, increasing platelet adhesion and aggregation. Thus the production of prostaglandin, according to this theory, increases the coagulability of the blood.

68.   In addition, prostaglandins control the protection of the sensitive stomach lining from an attack on it by the acids and caustic digestive juices produced by the stomach needed to digest food. Prostaglandins are involved in the regulation of these systems (and most likely, many, many more).

69.   Prostaglandin production is controlled in part by the cyclooxygenase, (COX) enzyme system. By stimulating COX, *ceteris paribus*[*] prostaglandin synthesis is increased. By repressing or inhibiting COX, prostaglandin synthesis is decreased.[†] We might then expect that a COX inhibitor, by down regulating COX and thereby reducing prostaglandin syn-

---

[*] This is a critical insertion. In a complicated biochemical system, any assertion about the response of a system when a component is changes assumes everything else in the system is constant.
[†] Aspirin controls pain and inflammation because it blocks prostaglandin synthesis. With a reduction in prostaglandin synthesis, the inflammation signal is not sent, and the production of pain is reduced.

thesis would 1) decrease pain and inflammation, 2) reduce blood coagulability (since prostaglandins up regulate thromboxane $A_2$), and 3) decrease the ability of the stomach to protect itself. This is precisely what the traditional non-steroidal inflammatory agents (NSAIDS) do.

70. These NSAIDS, (e.g. ibuprofen and naproxen) are general or nonselective COX inhibitors[*] and have been available for approximately thirty years. They have well known clinical characteristics. While widely accepted as having generally effective analgesia, or pain control. However, since the mechanism of pain control is based on inhibiting COX, and thereby reducing prostaglandin synthesis, they reduce gastric mucosal protection. This reduction is associated with the production of gastric ulcers, gastric obstruction, and gastrointestinal bleeding, all symptoms of erosion of the gastric mucosa. It has been estimated (MK-966 Cox-2 inhibitor product development plan stage 0 review MRK-NJ0220388 page 8, Introduction and Program hypothesis ) 76,000 patients are hospitalized each year, and that over 7,600 patients die each year in the United States alone as a result of NSAID associated gastrointestinal events.

71. However, there is a huge population of patients who have been exposed to the traditional NSAIDS for over thirty-five years. The number of patients with severe gastrointestinal illnesses and deaths is actually a relatively small proportion of patients taking traditional NSAIDS.

72. *COX-1 and COX-2*: Continued research on the COX system lead to the identification of a bifurcated system. It is now believed that there is not one but two COX systems regulating the production of prostaglandins, identified as COX-1 and COX-2.  Each metabolize

---

[*] We will see later that even these broad COX inhibitors have different abilities to repress different aspects of the COX system.

arachidonic acid to prostaglandin $PGH_2$, with is the intermediate step in the synthesis of prostaglandins and related compounds known as prostanoids.

73.   It is important to understand the role of these two COX systems to appreciate the advantage and difficulties produced by differential COX inhibition. The currently accepted view is that the COX-1 system is a constitutive system, i.e., it is always active, with the enzyme present in high concentrations within tissues including platelets, vascular endothelium (the special cells that make up the inner layer of blood vessels), gastric epithelial cells, and cells in the kidney (renal parenchyma). The prostanoids produced by the COX-1 system increase stomach-lining protection, and increase the coagulability of the blood.

74.   Alternatively, the COX-2 system is not always active, but is induced by inflammation. It produces the prostaglandin that sends the inflammatory signal, thereby inducing the cycle of increase blood flow, immune response and pain. It has also been learned that COX-2 also produces prostacyclin $PGI_2$ that is an anti-aggregator and a vasodilator.

75.   Thus, it was believed, that just as NSAIDS were developed to block all COX activity, that further refinement of medical therapy could produce a COX-2 inhibitor. Such a therapy, it was felt, would reduce the inflammatory response, while leaving vascular coagulability unchanged and the protective gastrointestinal lining in tact.

76.   Early Investigation of the COX-2 inhibitors: The true effects of a therapy emerge over time, where the speed at which knowledge is gained is related to the experience of the medical community with the therapy. Preapproval studies of the COX-2 inhibitors revealed definite efficacy, but minimal benefit above and beyond the medications that were already available. However, when evidence of harm emerges, however inconsistently, regardless of whether it appears in either the pre-marketing or post-marketing environment,

the burden of proof shifts. Specifically, the appearance of harm requires that the sponsor 1) look for definitive evidence of harm in an ethical way and 2) acknowledge that the risk-benefit balance is beginning to change as evidence of new risk emerges. This requires greater efficacy to offset the greater risk. The threshold of significance for harmful effects is much less extreme than that for determining efficacy.

77.   Undoubtedly, exploratory analyses demonstrating harm may not be generalizable. However, the ethical credo of "First, do no harm," requires a patient protective response to this potential new hazard. An appropriate response includes but is not limited to 1) additional analyses that can, in an ethical fashion, determine if the initial finding represents a result that can be generalized to the population at large, and 2) an immediate recalibration of the risk-benefit balance, tipping this balance in the direction of greater harm.

78.   The requirement of these ethical responses neutralize the assertion that exploratory analyses demonstrating harm can be ignored. The need to protect populations from harmful effects must not be blocked by concerns for statistical significance.

79.   What is most convincing is the consistency of findings across the breath of studies involving rofecoxib. The repeated findings of elevations of cardiovascular thrombotic events associated with rofecoxib use, regardless of dose or duration of use strengthen the argument that rofecoxib causes these serious adverse events.

80.   The identification of compounds that have an increased differential inhibition of COX-2 was heralded as a major step forward in pain control, allowing the patient to obtain effective analgesia while avoiding the difficulties long known to be associated with COX-1 inhibition. However, it was also recognized early in the development of COX-2 inhibitors that, by not inhibiting the COX-1 system, a pro-aggregatory effect might be produced.

Even though, early in vitro studies showed that the COX-2 inhibitor rofecoxib did not inhibit platelet aggregation or prolong bleeding time when administered to health volunteers, the 1998 Scientific Advisory Committee served notice to Merck that the effect of Cox-2 inhibitors on the cardiovascular system might be harmful. Findings supported the idea that the COX-2 inhibitors were not necessarily thrombogenic.

81. However, although 800 mg of celecoxib (a COX-2 inhibitor), did not alter levels of either serum $TXA_2$ or its urinary metabolites, a modest reduction in serum $TXB_2$ (a metabolite of $TXA_2$) was observed, suggesting that COX-2's might engender a coagulable state (i.e., make the blood more likely to clot). The balance between $TXA2$ (a platelet aggregator promoted by COX-1) and $PGI_2$ (which counteracts platelet aggregation, modulated by COX-2) requires attention at this point. The difference can be elucidated by the effect of aspirin. COX-1 is selectively inhibited by low-dose aspirin in activated platelets.[*] However, since COX-2 activity is preserved in the presence of aspirin, and the produced $PGI_2$ decreases blood coagulability, the effect of aspirin is to shift the haemostatic balance to an antithrombotic state.

82. Thus, inhibition of COX 2 suppresses $PGI_2$ formation, blocking the anti-aggregatory effect of $PGI_2$, making the blood more coagulable. This effect should attenuate the anti-aggregatory effect of aspirin. In mechanistic animal studies, the beneficial effect of aspirin was blocked by celecoxib. In addition, the vasodilator effect of $PGI_2$ derived from the endothelium of the coronary vessel and vasodilatory response to application of arachidonic acid was reduced significantly when compared to controls [7]. Because of these results, the authors expressed concern regarding the possibility of an increased risk of acute

---

[*] This occurs by acetylation of the hydroxyl group of a serine residue near the COX active site. Aspirin's COX-1 inhibitory action persists for the lifetime of the platelet. Recovery of the effect is strictly a function of platelet turnover.

vascular events in patients receiving COX-2 inhibitors, especially in individuals with underling inflammatory disorders, including coronary artery disease. This bolstered the theoretical argument that COX-2 inhibitors might increase the likelihood of serious thrombotic adverse events.

83.  The scientific motivation for this prescient concern is clear. COX-2 inhibition would reduce the anti-thrombotic effect of PGI2. By not suppressing COX-1, the thromboxane $A_2$ activity would proceed, tipping the hemostatic balance to a procoagulation state. However, the interaction between the COX enzyme system and hemostasis is complicated by the different potencies that the COX-2 inhibitory agents have on COX- inhibition, i.e., COX-2 inhibitors can also be COX-1 inhibitors. In one study, the COX inhibitors were directly evaluated for their differential COX-1/COX-2 inhibitory activity. The main aim of this investigation was to clarify the possible effect that various COX-2 inhibitors might have on the aggregatory propensity of blood. The researchers found that the COX-2 inhibitors had widely variable selectivity for COX-1 inhibition. Rofecoxib as well as the newer agent etoricoxib have the smallest effect against COX-1. Hence they are closer to "pure COX-2 inhibitors". Alternatively, celecoxib had more COX-1 inhibitory activity, and is a less pure COX-2 inhibitor.

84.  In addition an effect of platelet aggregation with possible clinical significance was suggested by observations of elevated prothrombin times and bleeding episodes with concomitant use of celecoxib and warfarin in a patient with pre-exiting cardiovascular disease [8]. In addition, there were reports of patients with connective tissue disorder who developed arterial thrombosis after initiation of celecoxib therapy [9]. An FDA assessment of the preapproval data led to their acknowledgement that there was a possibility

that COX-2 inhibitors could cause thromboembolic disease. The conclusions from these pharmacological studies and other experimental evidence lent credence to the view that selective COX-2 inhibition reduces synthesis of $PGI_2$ and may promote a pro-aggregatory state before rofecoxib was approved.

## Inadequate Testing

85.   The potential cardiovascular risks of Vioxx were apparent well before the drug was approved, and Merck was aware of these dangers. Their testing program was inadequate.

86.   On September 12, 1996, before rofecoxib was approved, a memo from Dr. Randall to the Cox-2 Team, on page 6 stated, "Another SAE (severe adverse event) of unstable angina was reported in extension to RA (rheumatoid arthritis) study. The vascular AE's are expected since COX-1 is not inhibited". This memo demonstrates that Merck appreciated not just that cardiovascular serious adverse events could be anticipated with rofecoxib, but that they understood the mechanism by which they would be produced. They accepted the causal link between rofecoxib and cardiothrombotic adverse events before the drug was approved.

87.   On Thursday, October 10, 1996, before rofecoxib was approved, a review of protocol 017 was described (MRK-ABC0048706). In this review the following statement appears "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure), documenting the potential for cardiovascular adverse effects caused by rofecoxib.

88.   On November 11, 1996, before rofecoxib was approved, Dr. Musliner anticipated that there would be 25% more adverse cardiovascular events with rofecoxib (Memo: Subject-

Anticipated consequences of NSAID anti-platelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial – Page 5.). Dr, Musliner also stated the rofecoxib-induced increased cardiovascular event rate might be expected "due to the absence of anti-platelet effect for the selective Cox-2 inhibitor," and "would create a negative aspect to the results and leave open the question (reasonable or unreasonable) whether the drug might in some other way be contributing to such events." The concern about an increased cardiovascular adverse event profile was well established years before the drug was approved, requiring adequate testing.

89.   However, rather than design a clinical trial that was designed to fully elaborate the risks and benefits of rofecoxib, Merck designed VIGOR to underestimate the true risk rofecoxib for increasing cardiovascular events. A concern about possibility of rofecoxib caused an increase in CV events and "you will get more thrombotic events and kill drug." a prescient concern that time demonstrated was the fact of the matter. Dr. Reicin in a later email that day provided an unethical solution, actively considering "the idea of excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" This was a deliberate attempt to confuse the medical community about the potential cardiovascular risk associated with rofecoxib. The only concern about this unethical thought process was not that the medical community would be mislead, but "would we be able to recruit any patients?" A following email from Brian Daniels (February 26, 1997) stated "It is clear to me that the program will be severely hurt if a megatrial shows a win in PUB's and a loss in MI/CVA." Thus VIGOR was designed not to demonstrate the true benefits and risks of the therapy, but to understate the risks while

magnifying the benefits. VIGOR's configuration was crippled, designed to deceive the medical community.

90. On October 24, 1997, before rofecoxib was approved, Dr. Fitzgerald emailed Dr. Nies, in which Dr. Fitzgerald made specific recommendations for further cardiovascular studies based on the concerns for the effects of Cox-2 inhibitor therapy.

91. On October 27, 1997, in a letter from Dr Oates to Dr. Nies, Dr. Oates warned of the mechanism by which Vioxx could produce adverse events and proposed additional testing. Specifically, Dr. Oats made suggestions on how to study the effects of rofecoxib on prostacyclin biosynthesis in order to determine whether an imbalance is created between prostacyclin and thromboxane-A2.

92. On February 2, 1998, before rofecoxib was approved, Dr. Watson's final results on the analysis of cardiovascular SAE's in the Phase IIb/III Vioxx osteoarthritis clinical trials was received. This was a detailed analysis demonstrating that rofecoxib produced more cardiovascular events in the VIOXX program This analysis demonstrated that the incidence ratio of cardiovascular serious adverse events was 19.4/1000 in men and 15.5/1000 in women. The overall incidence rate for women was elevated when compared to FOSAMAX controls with a relative risk of 2.16 and a 95% confidence interval of 1.14 – 3.94. On page 2, the description of the results of protocol 023 states, "These findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events) page 2. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's then the placebo group in protocol 010 (page 1 following executive sum-

mary). The next sentence which states there is no evidence of an increased incidence of such events ignores the findings from Table 6. This analysis revealed a signal to Merck that the thromboembolic events whose occurrence was anticipated by the understanding by which rofecoxib worked. Given the *a priori* concern about the relationship between rofecoxib and cardiovascular events, this was clear signal that Merck missed.

93.   The inappropriate interpretation of the Watson report reveals a substantial, persistent inconsistency in Merck's philosophy toward rofecoxib-induced cardiovascular events. From 1996-98, there were well documented points at which Merck received advice about the likelihood that rofecoxib produces cardiovascular events. Clearly Merck absorbed this message because it was repeated by key Merck personnel. Merck's understanding of this threat to rofecoxib was complete enough for them to distort the design of VIGOR, excluding patients who were at high risk of cardiovascular events. However, when the threat becomes reality, as in the Watson report, where almost all age-gender groups manifest excess cardiovascular serious adverse events in patients taking rofecoxib, revealing the relationship that Merck has been educated to fear, its scientists turn a blind eye to the results. It is this reaction that governs Merck's perspective on the rofecoxib-CV event relationship.

94.   From May 3 – May 6, 1998, the Science Advisory Committee to Merck reviewed the Vioxx program. They wrote that there were significant safety risks with Vioxx. On page 11, they stated that the possible harmful effects of Cox-2 inhibition could be produced by a combination of three mechanisms 1) development of lipid-rich plaques in the coronary arteries, 2) plaque cap destabilization, making them rupture prone, and 3) thrombotic occlusion of the vessel at the rupture site. They further warned Merck, before rofecoxib was

approved, that more information is needed to address these questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality.

95.   On May 20, 1998, before rofecoxib was approved, Dr. Watson convened a meeting of the Cox-2 cardiovascular SAE Surveillance Task Force. During the introduction to the meeting, he states, "these findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events).

96.   On September 9, 1998, before rofecoxib was approved, Dr. Patrono wrote a letter to Dr. Laurenzi at Merck, in which Dr. Patrono warned of potential CV issues with rofecoxib, suggesting that more tests are required. Specifically, he said (page 1), speaking about Cox-2 inhibitor effect, "I would like to emphasize that this is likely to be but one of several facets of the potential cardiovascular implications of Cox-2 expression and inhibition." In addition, he said (page 2), "Because companies making non-selective Cox-2 inhibitors are likely to emphasize the cardiovascular implications of specific Cox-2 inhibitors, I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

97.   On September 29, 1998, before rofecoxib was approved, Dr. Nies penned a handwritten note in which he tells Dr. Oates and Dr. Patrono that Merck will not do the kinds of studies that the two experts have proposed to explore the cardiovascular risks of rofecoxib. He anticipated that the drugs would become available without the need for the safety testing Drs. Oates and Patrono warned were so necessary.

98.   This body of information demonstrates that before rofecoxib was approved, the mechanism by which it produced harmful cardiovascular events had been elucidated, and sig-

nals of cardiovascular events had occurred. Merck's pre approval testing program was incomplete.

99. On May 20, 1999, the month Vioxx was approved, the FDA Medical Officer Review reflected concern about rofecoxib's cardiovascular risk. He noted that the cardiovascular trends and that a larger databases was needed to assess CV safety. He also commented on the relatively small number of patients that Merck exposed to Vioxx prior to approval.

100. The role of statistical errors. The Appendices to this report lay out the basis of statistical errors in clinical research. Essentially, since researchers in health care cannot study entire populations but only samples from those populations, they must acknowledge that the occurrence of misleading samples can skew their research results. For example, it is possible that a population in which there is no relationship between exposure and disease can produce a sample in which a relationship exists. In this case, the positive sample results mislead the medical community. Similarly, populations in which there is no relationship between the exposure and disease can, just through the play of chance, produce a sample in which there is a relationship. Thus, researchers must understand that sampling error, or the variability of results from the population to the sample can provide misleading results.

101. Well-designed, well-executed studies tailored to produce effects for desired endpoints must therefore have adequate protection against the first error (populations with negative results producing positive findings in samples, a type I error). This protection is statistical significance. In addition, there must be protection of samples from populations which have negative results producing positive results in samples (a type II error) – this projection is provided by the statistical power of the research. Research protocols typically are designed to produce low levels of type I error (traditionally p values less than 0.05, or

high levels of statistical significance) and high values of power (typically greater than 0.80).

102. For example Protocol 090 was designed to have adequate protection against these statistical errors, but only for the pain relief component. It was not designed to be adequately powered for the cardiovascular effects. Therefore, since the study was not designed to have this adequate statistical protection, we can take no assurance from the absence of statistical significance of its findings for myocardial infarction. The relative risk of 3.0 for cardiovascular events, demonstrating increased risk of Vioxx, does not required statistical significance since the study was not designed to demonstrate this effect with statistical significance (i.e., it lacked adequate power).

103. Typically, underpowered studies that produce non-statistically significant results are termed "non-informative." However, while this is a reasonable approach for findings that produce efficacy, it is not helpful for findings that identify harm. This is because the medical community typically cannot afford to wait for the ideal study to be done in a large number of patients with appropriate protection against type I and type II statistical errors, in the meantime exposing patients to risk needlessly. Thus, small signals of harm while not statistically significant, must be taken seriously by the investigator and the sponsor.

104. In addition, statistically insignificant signals of harm in small samples can have terrible consequences for the community of patients at large. The identification of four cases of myocardial infarction in the exposed group when compared to one case in the control group out of total of less than 100 patients may be statistically insignificant. However, this four fold increase in risk when transmitted to hundreds of thousands of patients tak-

ing the drug would be a public health catastrophe. Thus, statistically insignificant signals of harm in small studies must be taken seriously.

105. In the presence of statistically insignificant signals of harm, studies with reverse findings from each other do not commit fratricide – they do not cancel each other out. The presence of sample-to-sample variability blocks our natural tendency to insist that all studies show the same result. Thus the identification of a harmful effect of Vioxx on cardiovascular findings in Protocol 090 is not negated by the presence of the reverse effect in its sister study 085. The mechanism of action by which Vioxx produced heart attacks remains the same in the two studies, however, sample to sample variability produced the reverse findings in 085. This is also the explanation for the absence of a harmful effect of Vioxx on the occurrence of strokes in the Advantage study. The epidemiologic assertion of consistency does not require that all studies show the same result – only that a number of them, carried out in different patients using different methodologies produce similar results.

## Clinical Studies

106. Clinical Studies: When considering the evidence to support or disprove a hypothesis, one must consider the quality of evidence available on the subject matter. Randomized controlled trials are generally accepted as the gold standard for assessing efficacy of medicines, a justifiable conclusion assuming that the clinical trials were well conducted and executed according to their prospective plan However, not all hazards can be identified from these types of studies, or from studies conducted before the compound receives final regulatory approval.