the population). Thus null findings from underpowered evaluations of the relationship between COX inhibition and cardiovascular disease are uninformative.

200   Since the researcher does not know during the design phase of the study whether the results will be positive or null, she must plan for each possibility. Thus, she should design the study so that the type I error rate will be low (customarily no higher than 0.05) and that the power of the experiment will be high (typically, at least 80%). Each of these considerations are part of the sample size computation.

201   **Sample Size Computations**: Good clinical trials, regardless of their size, are characterized by careful planning, controlled execution, and disciplined analysis. An important component of the design of a clinical research effort is the sample size calculation. The sample size computation is the mathematical calculation that determines how many patients the trial should recruit. It is based on clinical concerns, epidemiologic determinations of event rates, and biostatistical considerations about the role sampling error may play in producing the trial's results. It can be said that the sample size computati{ XE "sample size computation:general concerns" \b }on is the forge upon which the clinical trial design is hammered.

202   Exploratory Analysis and Random Research: Exploratory analysis is the process by which the investigator allows the data to answer specific questions that the investigator did not plan to use the data to address. There are two problems with *exploratory research* or *hypothe{* XE "exploratory analyses:definition" *}{* XE "hypothesis generating analyses:definition" \t "*See* exploratory analyses" *}sis generating research*. The first is that commonly the sample is not an optimal one, since the investigator can only design a sample to answer questions that they knew to ask.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                         8/10/2006

## Appendix B: Determining Causality in Medicine

203   Clinical investigation has been a human endeavor for over two thousand years. The most common building block in the edifice of health study is the { XE "case reports" }{ XE "case series" }case report. A case report is a summary of a single patient's findings and the communication of those findings to the medical community. A case series is a collection of case reports, linked together by a common thread (e.g., all of the patients were seen by the same doctor, or each of the patients was exposed to the same agent, e.g., quinine).

204   It is easy to understand how the growth of general medical knowledge has been propelled by the use of case reports. The delivery of healthcare has been governed by the interaction between a single, concerned, responsible provider and his patient. This relationship is private and privileged. However, it has historically been conducted in isolation, by physicians and nurses widely separated from each other. The idea of a community was well established. However, the concept of a medical community (i.e., a collection of practitioners who worked together to jointly expand their knowledge base) was one that took many generations to develop.

205   Therefore, medical care was delivered for hundreds of years by practitioners, who, working alone with incomplete knowledge, made decisions that directly affected the lives of their patients, and indirectly, their patients' families and communities. The one, natural learning tool these physicians could use was the active sharing of their experiences among themselves. This served to expand their expertise, suggest alternative approaches to healthcare, and extend their knowledge. This shared experience is at the heart of the case report.

206  The core thesis of this approach was best captured by{ XE "Celsus" } Celsus (circa A.D. 25) [32], who stated that "Careful men noted what generally answered the better, and then began the same for their patients." For the next 1900 years, advances in clinical medicine occurred through the combined use of careful observations, clear recorded descriptions, and deductive reasoning. The discovery that gunshot wounds could be healed without the application of burning hot oil [33] demonstrated that a case report-style observation could uncover new information and overturn prior, erroneous principles in medicine. When medical journals began to appear, the primary medical information that they dispersed was that of the case report. Those physicians who had more exposure and experience with a medical issue compiled their case reports together into a case series that they would publish. This continues to this day. Examples are diet drugs and heart valve disease [34] and radiation poisoning [35].

207  However, case reports have well-established difficulties. Although they reflect very clear and honest observations, the degree to which a single case report represents a general phenomenon in the population can be subject to debate. Even though they are useful, the variability of observations across patients makes it difficult to assess whether one patient's findings summarized in a case report can be easily translated to others.

208  However, what the case report and essentially all investigative mechanisms in medicine hope to illuminate, by examining both the environment (e.g., exposure to a toxin or a potential cure) and the patient's response, is the true nature of the exposure–outcome relationship. This true nature could be simply an association, or it could be causal.

209   An { XE "association:vs causation" \t "*See* causation" }association is the coincidental oc-
currence of an exposure and an outcome. Its recognition (e.g., the relationship between
coffee drinking and pancreatic cancer) typically does not require direct action by the
medical community. A { XE "causation" }causal relationship, on the other hand, signifies
that the exposure excites the production of the outcome. This more powerful, directed re-
lationship incites the medical and regulatory communities to action. For example, the
conclusion that exposure to citrus fruits reversed the symptoms of scurvy incited action
by the British navy to mandate the storage of fresh fruit in the provisions of its crews for
long sea voyages [36]. On the other hand, links between the use of cutting and bleedings
and the remission of yellow fever were merely associative. Thus, when we as physicians
examine a case report's details, we sift through the provided clinical descriptions in order
to discern if the relationship between the exposure and the outcome is either causative or
associative.

210   Epidemiologists are specialists who identify the determinants or causes of disease. They
have developed criteria that would be useful in ascertaining whether an exposure causes
(i.e., excites the production of) the disease. Elaborated by Sir Austin Bradfor{ XE "Hill,
Bradford:and causality tenets" }d Hill [37], these tenets are based on a common sense ap-
proach to determining causality and are remarkably free from complicated mathematical
arguments. These criteria acknowledge that more disease cases in the presence of the risk
factor than in its absence raise a causal suspicion. In addition, determining that greater
exposure (either by dose or duration) to the risk factor produces a greater extent of dis-
ease amplifies our sense that the exposure is controlling the disease's occurrence and/or
severity. These two features are important characteristics of a cause–effect relationship.

211   Other questions posed by Hill permit us to explore the "believability" of the relationship. Is there a discernible mechanism by which the risk factor produces the disease? Have other researchers also shown this relationship? Are there other examples that help us to understand the current exposure–disease relationship? The nine precise Bradford Hill criteria are: (1) strength of association, (2) temporality, (3) dose-response relationship, (4) biologic plausibility, (5) consistency, (6) coherency, (7) specificity, (8) experimentation, (9) analogy. These are well elaborated in the literature [38].

212   Diligent attempts to determine whether specific case reports and case series can satisfy these causality criteria continue to provide invaluable service to patients and communities. The link between methylmercury exposure and birth defects in communities surrounding Minamata Bay, Japan, [39], and the establishment that thalidomide was the cause of the birth defects phecomelia and achondroplasia [40] are just two 20th century examples of the ability of case reports and case series to establish causal relationships that produced public health action. The identification of (1) the relationship between tick bites and Lyme disease, and (2) the link between new illnesses among postal workers and anthrax exposure in 2001 are recent examples of their continued value.

213   *Limitations of Case Reports*: Although medical knowledge has progressed through the sensitive and intelligent use of case reports and case series, there is no doubt that the illumination provided by these investigational tools is also profoundly limited. There are four major criticisms of the value of case reports and case series in determining the causal nature of an exposure–disease relationship. They are th{ XE "case reports:and limitations" }at (1) case reports and case series do not provide quantitative measures of the relationship between an exposure and a disease, (2) case reports do not always rule out other

competing causes of disease, (3) case reports are subject to biases of selection (i.e., the manner in which the case report was selected may make it unreasonable to believe that its occurrence reflects an important finding in the population), and (4) measurements made in the case report may be nonstandard. These limitations reduce the contribution of case reports to our understanding of the exposure–disease relationship.

214  One of the most remarkable deductive failures of case reports was their false identification of the effects of cardiac arrhythmia suppression [41]. In the 1970s, considerable attention was provided to the potential of new therapies (specifically, the drugs encainide, flecainide, and moritzacine) for the treatment of dangerous ventricular arrhythmias. It was believed that these new drugs would be more effective and produce fewer side effects than the traditional, poorly tolerated medications. The effectiveness and safety of these newer drugs were examined in a collection of case series. At first, only the sickest patients were given the new therapy. When these patients survived, the investigational drug was credited with saving the patient's life. However, if the patient died, then the patient was commonly deemed "too sick to be saved" and the drug was not debited for the death.

215  Based on these observations, despite some opposition, a consensus developed in the cardiology community that patients with arrhythmias would benefit from the use of these new drugs. After a period of intense deliberation, the Federal Food and Drug Administration (FDA) approved the new antiarrhythmic agents. As a consequence of this approval, physicians began to prescribe the drugs not just to patients with severe rhythm disturbances, but also to patients with milder arrhythmias. This new use was consistent with the

growing consensus that these drugs would be beneficial in blocking the progression of dysrhythmia from mild heart arrhythmias to more serious rhythm disturbances.

216  Only after the drugs were approved and on the market was a study carried out that incorporated a control group and the use of randomization. This trial, called CAST{ XE "The CAST Trial" } (Cardiac Arrhythmia Suppression Trial), demonstrated that, not only did the new therapies not save lives, but their use caused excess mortality [42]. The findings from CAST, demonstrated the lethality of medications whose safety had been "demonstrated" by case series.

### Appendix C : Detecting Adverse Events:

217 *Detecting Adverse Events: Complication in Safety Monitoring*: The ethical concern for safety introduces a new complexity into the interpretation of interim monitoring results. Essentially, the primacy of the admonition, "First, do no harm," complicates the interpretation of exploratory analyzes. Recall that confirmatory analyzes, themselves the product of prospectively declared plans, are most easily generalizable. They produce reliable estimates of effect sizes, effect size variability, and type I error rates. In addition, prospective consideration of the type and number of statistical hypotheses to be tested leads to tight control of the family wise error rate. Exploratory analyzes, on the other hand, hold none of these features. These latter analyzes that are suggested by the data rather than by prospective planning produce inaccurate estimators and must be repeate{ XE "safety:and confirmatory monitoring" }d (or confirmed) before they can be generalized.[*]

218 With this dis{ XE "estimators:efficacy versus safety" }tinction in place, the evaluation of efficacy examinations in clinical research is clear and straightforward at both the conclusion of the study and during an interim examination. Consider a hypothetical clinical trial designed to determine the effect of an intervention on patients who have suffered a stroke. The primary analysis for this clinical trial is the effect of therapy on the total mortality rate. If the study's design and execution has been (1) carefully considered with a precise, prospectively declared protocol, (2) executed in accordance with that protocol,[†] and (3) produces a type I error rate below the a priori declared threshold for a clinically significant level of efficacy, its results on the primary endpoint would be heralded as

---

[*] The reasons for the different interpretations of exploratory versus confirmatory analyzes are discussed eariler in this report Two.
[†] This is defined as concordant execution.

positive. However, assume in that same study, that the therapy was observed to produce a reduction in the myocardial infarction rate. Because the therapy's effect on the myocardial infarction rate was not prospectively declared, and its results would be seen as exploratory[*], requiring confirmation before they can be generalized.

219   However, in the reverse setting, where both the findings for mortality and the myocardial infarction rate indicate harm and not benefit, the ability to interpret the situation is complicated. Again, the prospective nature of the research design that is focused on mortality permits the investigators to conclude that the study produces a confirmatory evidence of harm. However, the identification of an early harmful effect of the intervention on the cumulative myocardial infarction rate is problematic. Clearly, the finding of an increased risk of myocardial infarction associated with the therapy is crippled by the exploratory nature of the analysis. However, the occurrence of this finding for harm in all likelihood would not, and could not, be reproduced. The ethics of protecting subjects from known and suspected dangers precludes the initiation of a new confirmatory research effort in order to demonstrate that the intervention excites the production of myocardial infarctions.[†]

220   Thus, although confirmatory findings of harm carry the same weight as those of efficacy, exploratory findings of harm commonly carry more weight than exploratory findings of efficacy. This places a greater burden on investigators, who must balance the ethical re-

---

[*] Because both the effect of therapy on the total mortality rate and the effect of therapy on the myocardial infarction rate appear to be equally reliable to the observer, both being produced from the same database, concluding that only the myocardial infarction finding be discounted may appear capricious. However, because the trial was not designed to examine the myocardial infarction issue, the ability of the study to ensure that (1) it had an appropriate sample size for the evaluation of the effect of therapy on heart attacks, and (2) the investigators collected all of the cases of heart attacks (including silent myocardial infarctions) even though they never said that they would must be questioned. Secondly, the "positive" finding of therapy on the myocardial infarction rate was based on an unplanned interrogation of the database. This inquiry rose to prominence solely because of its unanticipated and surprising finding. Allowing the data to suggest answers in this fashion introduces a new sampling error component into the analysis that undermines the traditional estimates of effect size, precision, $p$-values and power.

[†] Other information may become available that would allow the evaluation of the possibility of harm produced by the intervention. Additional concurrent studies, case control, and historical cohort studies may provide some illumination of this issue.

quirement to adequately warn about adverse events with the scientific need to avoid mis-direction about the risks of an intervention. This is a challenge to healthcare research in general and interim monitoring in particular. Because, confirmatory analyzes for harm will be the most persuasive, investigators make their strongest possible case when they execute as many confirmatory analyzes as possible.

221  Although two strategies to address this issue of multiple safety measures are reviewed, the best strategy begins with good a priori knowledge. During the design phase, investigators can strengthen the interim analyzes that they have in mind for the safety monitoring by carrying out an in-depth review of the evidence of adverse effects produced by the intervention that they plan to study. This will allow them to put prospective monitoring rules in place that provide rigor in detecting the early occurrence of several different adverse events.

222  With foreknowledge of the adverse event profile of the intervention, and some appreciation of the frequency at which these adve{ XE "safety:exploratory monitoring" }rse events appeared, the researcher is able to place prospectively declared rules in place.

223  However, many times adverse events occur that were completely unsuspected during the course of a clinical research effort, which catch the researcher by surprise. The occurrence of de novo breast cancer in women exposed to lipid lowering agents during the course of a cardiovascular clinical experiment, the occurrence of dangerous new arrhythmias generated by an intervention that suppresses other rhythm disturbances, and the production of liver failure in medications designed to reduce insulin sensitivity are but a few examples of unanticipated adverse effects that can be produced by a new intervention.

224   This illustration suggests that although monitoring procedures can provide clear warning that a treatment signal has been detected, the presence of this signal does not provide prima facie evidence for drawing a conclusion and terminating the research effort. That decision is more complex, requiring thoughtful consideration of both the efficacy and the safety of the compound. Ultimately, the decision to discontinue a study is not a mathematical one, but a clinical and ethical decision.

225   Statistical monitoring rules do not provide much guidance in this scenario. The absence of prospective identification, in concert with the large probability of a type I error generated by multiple interrogations of the adverse event data confound any attempt to apply statistical rigor to the evaluations executed on behalf of the patients. This is the conundrum of safety-based monitoring. The predomination of ethical considerations requires the researcher to sometimes set aside statistical precepts in order to be assured that patients are not being harmed in the research effort or in the population. This is unacceptable when one is building an argument for efficacy, but is required in the examination of safety. The asymmetry of this circumstance finds its genesis more in an oath than in science. The following are other useful tools in assessing the validity of an unanticipated adverse event finding.

226   *Strategy 1: Monitor Widely*: Researchers m{ XE "adverse events:need to monitor widely" }ust lead diligent adverse event report evaluations. Just as physicians cannot diagnose diseases of which they have never heard, researchers cannot ethically weigh the implications of serious adverse events that they are not measuring. Thus, the researchers must cast a wide net in order to capture the occurrence of all adverse events. The investigators in post marketing clinical trials were able to successfully carry out this strategy.

227 ***Strategy 2: Assessing Unanticipated Adverse Events***: Clinical trials have been executed

for only sixty years. This is a relatively short period of time in the history of clinical in-

vestigation. However, the assessment of whether the occurrence of the event is related to

a treatment has been a cerebral process that has evolved for hundreds of years. Useful

skills have been amassed by scientists in the implementation of no statistical evaluations

of the relationship between an event (be it either adverse or salubrious) and an exposure.

In the setting of exploratory endpoint analyzes, where statistical assessments are not quite

so reliable, these other no statistical assessments rise to new prominence.

228 The occurrence of an exposure and an adverse event occurring in the same patient (or

group of patients) begs the question of whether the relationship between the two is asso-

ciative or causal. An associative relationship is merely that the exposure and the disease

occurred coincidentally in the same patients, for example, the occurrence of breast cancer

in women taking HMG-Coal reductase inhibitor (i.e., statin) therapy for elevated lipid

levels. It is a passive relationship. On the other hand, a causal relationship, as discussed

earlier, is active. An exposure causes a event if the exposure excites the production of the

event. It is an active relationship, a relationship with directionality. An example is the

causal relationship between liver hepatotoxicity and thiazolidienedione therapy for diabe-

tes mellitus.

229 When statistical tools are less useful, other tools of observation become more valuable. In

1965, Hill [43] described the nine criteria for causality arguments in healthcare. These

nine rules or tenets are remarkably and refreshingly devoid of complex mathematical ar-

guments, relying instead on natural honest intuition and common sense for the inquiry

into the true nature of a risk factor–disease relationship. The questions Dr. Hill suggested

should be posed by the investigators in their assessment of the true nature of the expo-
sure–disease relationship.

230  The evaluation begins with a simple assessment of numbers. Are there many more ad-
verse event cases when the intervention is present, and fewer disease cases when the in-
tervention is absent? If this question has been affirmatively answered, other questions fol-
low. Does a greater exposure to the risk factor produce a greater extent of disease? Other
questions asked by Hill explore the "believability" of the relationship. Some of these are:
is there a discernible mechanism by which the risk factor produces the disease? Have
other researchers also shown this relationship? Are there other such relationships whose
demonstration helps us to understand the current risk factor– disease relationship?

231  Consistency requires that the findings of one study be replicated in other studies. The
persuasive argument for causality is much more clearly built on a collection of studies in-
volving different patients and different protocols, each of which identifies the same rela-
tionship between exposure to the risk factor and its consequent effect. There are numer-
ous examples of collections of studies with different designs and patient populations, but
that nevertheless successfully identify the same hazardous relationship between an expo-
sure and disease. Identification of case series involving different series of patients in dif-
ferent countries and different cultures—yet each series producing the disease after the
exposure would satisfy these criteria. Because research findings become more convincing
when they are replicated in different populations, different studies that examine the same
exposure–disease relationship and find similar results add to the weight of causal infer-
ence.

232   The specificity of a disease is directly related to the number of known causes of the disease. The greater the number of causes of a disease, the more nonspecific the disease is, and the more difficult it is to demonstrate a new causal agent is involved in the production of the disease. The presence of specificity is considered supportive but not necessary, and researchers no longer require that the effect of exposure to an agent such as a drug be specific for a single disease.

233   Exposure must occur before the disease develops for it to cause that disease. A temporal relationship must exist in order to convincingly demonstrate causation.[*] This criterion can be clearly satisfied by a case report that accurately documents that the exposure occurred before the disease.

234   An evaluation of a relationship between occurrences of the adverse events and either the dose or duration of the intervention is also useful. The observation that a more intense exposure produces a greater frequency or severity of adverse events adds new strength to the notion that the relationship between the intervention and the adverse event is a causal one. In addition there should be some b{ XE "Hill, Bradford:causality and safety" }asis in the scientific theory that supports the relationship between the supposed "cause" and the effect. However, observations have been made in epidemiological studies that were not considered biologically plausible at the time but subsequently were shown to be correct.

235   It is important to note in the application of these tenets that satisfaction of all nine is not required to establish to the satisfaction of the medical community that a causative relationship exists between the exposure and the disease. Hill himself stated [43]:

---

[*] Protopathic bias, or the result of drawing a conclusion about causation when the disease process precedes the risk factor in occurrence can result without appropriate attention to the condition.

236  None of my nine viewpoints can bring indisputable evidence for or against the cause–and–effect hypothesis, and none can be required as a *sine qua non*.

237  However, these tenets are invaluable in the assessment of intervention-adverse event relationships.

## Appendix D. Subgroup Analyses

238   A subgroup analyses in a clinical research effort is the evaluation of the effect of the ran-
domly allocated intervention within a fraction of the recruited subjects. The analysis of
subgroups is a popular, necessary, and controversial component of the complete evalua-
tion of a controlled clinical trial. Indeed, it is difficult to find a manuscript that reports the
results of a clinical trial that does not report findings within selected subgroups.

239   Subgroup analyses as currently utilized in clinical trials are tantalizing and controversial.
There may be no better maxim for guiding the interpretation of subgroup analyses in this
setting than "Look, but don't touch," The results from subgroup assessments have tradi-
tionally been used to augment the persuasive power of a clinical trial's overall results by
demonstrating the uniform effect of the therapy in patients with different demographic
and risk factor profiles. This uniformity leads to the development of easily understood
and implemented rules to guide the use of therapy[*]. Some clinical trials report these re-
sults both in the manuscript announcing the trial's overall results  [44, 45, 46,47] and
separately [48, 49, 50]. Such subgroup analyses potentially provide new information
about an unanticipated benefit (or hazard) of the clinical trial's randomly allocated inter-
vention.

240   However useful and provocative these results can be, it is well established that subgroup
analyses are often misleading [51, 52, 53, 54]. Assmann et al. [55] has demonstrated how
commonly subgroup analyses are misused, while others point out the dangers of accept-
ing subgroup analyses as confirmatory [56]. For example, the Amlodipine controversy in

---

[*] The finding that a particular lipid lowering drug works better in women than in men can complicate the already complex deci-
sions that practitioners must make as the number of available compounds increase.

the PRAISE trials discussed earlier in this report were based on a subgroup analysis. Nevertheless, the medical community continues to be tantalized by spectacular subgroup findings from clinical trials. A recent example is the subgroup analysis-based suggestion that medication efficacy is a function of race; this has appeared in both peer-reviewed journals [57, 58] and the lay press  [59]. In this section, we will review the definitions, concepts, and limitations of subgroup utilization in clinical trials.

241  ***Subgroups: Definitions and Basic Concepts*** While the concept of subgroup analyses is straightforward, the terminology can sometimes be confusing. This report will therefore devote some attention to defining nine and classifying subgroup analyses.

242  ***Subgroups Versus Subgroup Strata***: A subgroup is the description of{ XE "subgrooups:definition" } patient based characteristic, e.g., gender that can be subdivided into categories. These different categories are described as strata, one stratum level for each category. For example, if an investigator is interested in creating a gender subgroup, patients are classified according to their sexual characteristics; the resultant gender subgroup consists of two strata—male and female.

243  The classic subgroup analysis itself is an evaluation of the effect of therapy within each of the subgroup strata. In this example of a gender-based subgroup, the subgroup analysis consists of an evaluation of the effect of therapy for males and an evaluation of the effect of therapy for females. Thus each stratum analysis produces an effect size with its standard error, a confidence interval, and a *p*-value.

244  The characteristics that form the basis of these subsets are chosen by the investigators. However, over time, a commonly evaluated set of subgroup evaluations has emerged. Although there are differences from one medical subspecialty to another, the most common

of these subgroups are based on demographic criteria e.g., gender, ethnicity, and age. Frequently used sociologic determinants are marital status, education, and acculturation.[*] In addition, there are subgroups that are based on lifestyle choices. Some examples of these are alcohol use, tobacco use, dietary intake, and exercise. Of course findings from medical histories (e.g., history of cancer, history of CHF, history of endocrine disorders) and physical examination (e.g., body mass index or DBP) are among commonly appearing subgroups in clinical trials as well.

245    The definition of a subgroup can be more complicated than a first glance would suggest. Consider the marriage status subgroup. One might think that this is easy to define. Is the patient married or not? Phrased this way, this suggests that the marriage subgroup should have two strata. However, the choices can be much more complex than this. The patient could be married now, or have been married in the past and is single now. The patient could be separated, divorced, or remarried. These alternative classifications can either be useful, or merely distractions depending on the purpose for which the evaluation will take place. For example, in some research, which is not primarily sociologic, these additional classifications may be unnecessary. However, in other research efforts, the intricate differentiation of marriage history details is very important. Thus, one must know how the subgroup analysis will be used so that the most useful strata membership criteria can be developed. Once each of the subgroup strata have been identified, the clinical trial workers will know what data to collect that will be the most useful.[†]

246    ***Subgroups: Interpretation Difficulties***: The illustrations of the previous sections have demonstrated that there are many possible ways to subgroup patients. However, we must

---

[*] Acculturation is the degree to which a community composed primarily of immigrants accepts with approval and is involved in the activities of the surrounding society.
[†] Another subgroup that has grown in complexity is that for race/ethnicity.

keep in mind that, in a collection of subgroup analyses, it is the same patien{ XE "sub-groups:interpretation difficulties" }ts that are being stratified in different ways. This observation can complicate the interpretation of a subgroup evaluation.

247   For example, consider a randomized, controlled clinical trial, which is in its analysis phase. At this time, all of its patients are classified by gender, grouping patients into male and female sub-cohorts. Once the stratum membership assignment is finished, the effect of the randomly allocated intervention is assessed in each of the two gender strata. It is seen that the effect of therapy appears to depend on gender, with males experiencing a different effect than females.

248   When completed, these same patients are then re-aggregated based not on gender, but on age. Subjects are placed into one of the following three age strata: (1) less than 40 years of age, (2) between 40 and 60 years of age, and (3) greater than 60 years of age. When the subgroup analysis is carried out for the age strata, it appears that the effect of therapy is the same in each of the age groups.

249   The results from these two subgroup analyses essentially demonstrate that the same patients when characterized one way (by gender) provide a different result than when characterized another way (by age). Was it really gender that modified the effect of therapy or was it the chance collection of patients that made it appear that gender was an influence? Since we can expect that the effect of treatment within a subgroup stratum depends on the patients within that stratum, then the value of the subgroup analysis must be tightly linked to the ability to demonstrate that it is the stratum characteristic that is producing the interesting effect and not just the random aggregation and re-aggregation of patients.