```
 1           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
 2
    IN RE: VIOXX            :  MDL DOCKET NO.
 3  LITIGATION PRODUCTS     :  1657
    LIABILITY LITIGATION    :  SECTION L
 4                          :
    This document relates:     JUDGE FALLON
 5  To                      :
    GERALD BARNETT AND      :  MAGISTRATE JUDGE
 6  CORRINE BARNETT         :  KNOWLES
            V.              :
 7  MERCK & CO., INC.       :
                            :
 8  Civil Action No.        :
    2:06cv485               :
 9              - - -

10              June 2, 2006

11              - - -

12       Oral deposition of LEMUEL A. MOYE,

13  M.D., Ph.D., held in the offices of

14  Abraham, Watkins, Nichols, Sorrels,

15  Matthew & Friend, 800 Commerce, Houston,

16  Texas, commencing at 9:30 a.m., on the

17  above date, before Linda L. Golkow, a

18  Federally-Approved Registered Diplomate

19  Reporter and Certified Shorthand

20  Reporter.
                  - - -
21        GOLKOW LITIGATION TECHNOLOGIES
                Four Penn Center
22        1600 John F. Kennedy Boulevard
                  Suite 1210
23        Philadelphia, Pennsylvania 19103
                 877.DEPS.USA
24
```

Page 2

```
 1  APPEARANCES:
 2
 3      BEASLEY, ALLEN, CROW, METHVIN,
        PORTIS & MILES
 4      BY:  J. PAUL SIZEMORE, ESQUIRE
        218 Commerce Street
 5      Montgomery, Alabama 36103-4160
        (334) 269-2343
 6      Counsel for Plaintiffs
 7
 8      SNAPKA TURMAN & WATERHOUSE
        BY:  KATHRYN A. SNAPKA, ESQUIRE
 9           and
             RICK WATERHOUSE, JR., ESQUIRE
10      Suite 1511 - 606 North Carancahua
        Corpus Christi, Texas 78476
11      (361) 888-7676
        rwaterhouse@snapkaturman.com
12      Counsel for Plaintiffs
13
14      BLIZZARD MCCARTHY & NABERS
        BY:  EDWARD BLIZZARD, ESQUIRE
15      440 Louisiana - Suite 1710
        Houston, Texas 77024
16      (713) 844-3750
        Counsel for MDL Plaintiffs
17      Steering Committee
18
19
        FIBICH HAMPTON LEEBRON & GARTH,
20      LLP
        BY:  TOMMY FIBICH, ESQUIRE
21      Suite 1800, Five Houston Center
        1401 McKinney Street
22      Houston, Texas 77010-9998
        (713) 751-0025
23      Counsel for Plaintiffs
24          - - -
```

Page 3

```
 1  APPEARANCES: (CONTINUED)
 2
 3      WATTS LAW FIRM
        BY:  T. CHRISTOPHER PINEDO, ESQ.
 4      14th Floor, Tower II Building
        555 North Carancahua Street
 5      Corpus Christi, Texas 78478
        (361) 887-0500
 6      epinedo@wattslawfirm.com
        Counsel for Plaintiffs
 7
 8      O'QUINN LAW FIRM
        BY:  JENNIFER J.J. LEACH, ESQUIRE
 9      2300 Lyric Centre Building
        440 Louisiana
10      Houston, Texas 77002
        (713) 223-1000
11      Counsel for Plaintiffs
12
        WILLIAMS BAILEY
13      BY:  AMY M. CARTER, ESQUIRE
        Suite 600
14      8441 Gulf Freeway
        Houston, Texas 77017
15      Counsel for Plaintiffs
16
17      JOSEPH D. PIORKOWSKI, JR., ESQUIRE
        Suite 800
18      910 17th Street, N.W.
        Washington, DC 20006
19      (202) 223-5535
        jpiorkowski@lawdoc1.com
20      Counsel for Merck & Co., Inc.
21
22           - - -
23
24
```

Page 4

```
 1  APPEARANCES: (CONTINUED)
 2
 3      FULBRIGHT & JAWORSKI LLP
        BY:  DAVID WALLACE, ESQUIRE
 4      Suite 2800 - 2200 Ross Avenue
        Dallas, Texas 75201
 5      (214) 855-8184
        dawallace@fulbright.com
 6      Counsel for Merck & Company, Inc.
 7
 8      BAKER BOTTS LLP
        BY:  RICHARD L. JOSEPHSON, ESQUIRE
 9      One Shell Plaza
        910 Louisiana Street
10      Houston, Texas 77002
        (713) 229-1460
11      richard.josephson@bakerbotts.com
        Counsel for Merck & Co., Inc.
12
13
        BARTLIT BECK HERMAN
14      BY:  SHAYNA COOK, ESQUIRE
        Courthouse Place
15      54 West Hubbard Street
        Chicago, Illinois 60610
16      (312) 494-4451
        Counsel for Merck & Co., Inc.
17
18
        CRUSE, SCOTT, HENDERSON & ALLEN,
19      LLP
        BY:  PEGI S. BLOCK, ESQUIRE
20           and
             VICTORIA A. FILIPPOV, ESQUIRE
21      7th Floor - 2777 Allen Parkway
        Houston, Texas 77019-2133
22      (713) 650-6600
        Counsel for Texas physicians
23
24          - - -
```

Page 5

```
 1              - - -
 2              I N D E X
 3  WITNESS                           PAGE NO.
 4  LEMUEL A. MOYE, M.D., Ph.D.
 5
 6      By Mr. Piorkowski         10
 7      By Mr. Wacker            392
 8
 9              - - -
10          E X H I B I T S
11
    NO.         DESCRIPTION       PAGE NO.
12
13  Moye MDL 1   "COX-2 Inhibitor      38
                 Report of Lemuel A.
14               Moye, M.D., Ph.D."
                 5-22-06
15               (110 pages)
16
    Moye MDL 2   "Documents Reviewed   71
17               by Dr. Lemuel A.
                 Moye"
18               (88 pages)
19
    Moye MDL 3   Curriculum Vitae of  136
20               Lemuel A. Moye,
                 M.D., Ph.D.
21               (22 pages)
22
    Moye MDL 4   "Testimony of        224
23               Lemuel A. Moye, MD,
                 PhD"
24               (2 pages)
```

Page 6

| # | | |
|---|---|---|
| | Moye MDL 5 | Invoices    211 |
| | | (9 pages) |
| | Moye MDL 6 | "Scientific    228 |
| | | Advisors' Meeting |
| | | May 3-May 6, 1998 |
| | | Programmatic Review |
| | | Vioxx Program" |
| | | MRK-AEI0002734 - |
| | | MRK-AEI0002746 |
| | Moye MDL 7 | "Final Results of    267 |
| | | an Analysis of the |
| | | Incidence of |
| | | Cardiovascular SAEs |
| | | in the Phase |
| | | IIb/III Vioxx |
| | | Osteoarthritis |
| | | Clinical Trials" |
| | | 2-2-98 (Watson) |
| | | MRK-AAD0046029 - |
| | | MRK-AAD0046052 |
| | Moye MDL 8 | Vioxx  May 1999    317 |
| | | Label |
| | | MRK-LBL0000027 - |
| | | MRK-LBL0000030 |
| | Moye MDL 9 | Memo 4-6-05    360 |
| | | "Analysis and |
| | | recommendations for |
| | | Agency action |
| | | regarding |
| | | nonsteroidal and |
| | | anti-inflammatory |
| | | drugs and |
| | | cardiovascular |
| | | risk" (19 pages) |

Page 7

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page Line  Page Line
(None)

Request For Production of Documents
Page Line  Page Line
(None)

Stipulations
Page Line  Page Line
(None)

Questions Marked
Page Line  Page Line
(None)

Page 8

                - - -
 2    MR. PIORKOWSKI: Is anybody
 3  here who is in New Jersey?
 4    MR. SIZEMORE: I don't think
 5  so. Nobody in New Jersey is here.
 6    MR. PIORKOWSKI: Let me just
 7  state that we received a cross
 8  notice of this deposition for the
 9  New Jersey litigation. A letter
10  was filed on behalf of Merck with
11  Judge Higbee objecting to that.
12  Apparently there's no counsel from
13  New Jersey here present. It's my
14  understanding that Dr. Moye has
15  not been designated as an expert
16  at this time in any New Jersey
17  case.
18    Paul, any other preliminary
19  stuff we need to talk about as far
20  as --
21    MR. SIZEMORE: I can't think
22  of anything.
23    MR. JOSEPHSON: Let me just
24  say this on the record. Richard

Page 9

 1  Josephson for Merck in the State
 2  of Texas MDL.
 3    Because of a hearing we had
 4  a few days ago which Paul is
 5  familiar with, I did not
 6  originally intend to be here since
 7  it was a California case. That's
 8  the position I took. The judge
 9  has recognized some of the cross
10  notices from Texas that were filed
11  in this case, and, therefore, I'm
12  here representing Merck in this
13  case. So, to the extent that I
14  feel the need to use our objection
15  form or objection responsiveness,
16  and Mr. Piorkowski doesn't make
17  that connection, then you may hear
18  me make that objection. I don't
19  want to disrupt the proceedings
20  because I, frankly, didn't want to
21  be here.
22    MR. SIZEMORE: That's fair.
23  I won't pitch a fit like everyone
24  else has done.

Page 10

1     MR. PIORKOWSKI: Anything
2  else preliminary?
3     (No response.)
4        - - -
5     LEMUEL A. MOYE, M.D., Ph.D.,
6  after having been duly sworn, was
7  examined and testified as follows:
8        - - -
9         EXAMINATION
10       - - -
11 BY MR. PIORKOWSKI:
12    Q.   Would you state your full
13 name, Doctor.
14    A.   Sure. Lemuel, L-E-M-U-E-L,
15 Moye, M-O-Y-E.
16    Q.   How are you today, sir?
17    A.   I'm doing fine. How are
18 you?
19    Q.   Are you prepared to give
20 your deposition? This is the first Vioxx
21 case in which you've been deposed; is
22 that right?
23    A.   That's right, yes.
24    Q.   You've been deposed a number

Page 11

1  of times in other matters, true?
2     A.   Yes, I have.
3     Q.   Okay.
4        Let's just talk real briefly
5  about the ground rules. I'm going to ask
6  a series of questions. If you don't
7  understand my question, will you ask me
8  to rephrase it?
9     A.   Yes. I understand that.
10    Q.   If you go ahead and answer
11 the question, I'll assume you understood
12 it.
13       Is that fair?
14    A.   Yes.
15    Q.   If you need a break at any
16 time, just let us know, and we can
17 accommodate you.
18       All right?
19    A.   Okay.
20    Q.   As far as objections, there
21 may be objections by counsel at any point
22 in time to a question. In the event of
23 an objection, you understand you proceed
24 to answer the question?

Page 12

1     A.   Yes.
2     Q.   I may from time to time
3  object to your answer or part of your
4  answer as nonresponsive if I feel like
5  you're not answering my question.
6        Do you understand that?
7     A.   I do.
8     Q.   That's not intended to be a
9  show of disrespect to you. It's just
10 something we're doing to preserve the
11 record.
12    A.   I appreciate that.
13    Q.   Do you understand?
14    A.   Yes.
15    Q.   Can you tell us first how
16 did you get involved in the Vioxx
17 litigation?
18    A.   I have worked with -- well,
19 a couple things. Number one, I have been
20 following, as most physicians have, I
21 think, the whole development of concerns
22 involving Vioxx and had been asked to
23 consider being part of this litigation
24 process actually by both plaintiffs and

Page 13

1  defendants and gave it careful
2  consideration, began to review the
3  literature. Again, this was now, just to
4  put a time frame on this, this was in
5  maybe 2005, and have been reviewing
6  literature during this time. And had
7  finally been decided that my beliefs
8  served the plaintiffs and offered myself
9  as an expert witness, available expert
10 witness for plaintiffs.
11    Q.   Who was the first person to
12 contact you to ask you to be an expert
13 witness on behalf of the plaintiffs?
14    A.   I think it was through
15 Scientific Evidence. I'm a consultant
16 for that company.
17    Q.   Is that still run by Dr.
18 Jean Hoepfel?
19    A.   It is, yes.
20    Q.   Is Dr. Hoepfel the person
21 that called you?
22    A.   Yes.
23    Q.   Who is the first lawyer
24 representing a plaintiff that you talked

Lemuel A. Moye, M.D.

Page 14

1  to in connection with the litigation?
2     A.   I don't remember.
3     Q.   You said that you were asked
4  by defendants to become involved in the
5  litigation. Is that what I heard you
6  say?
7     A.   Yes.
8     Q.   What defense lawyer asked
9  you to become involved in the litigation?
10    A.   It's -- I don't know. I got
11 a phone call at the University from a
12 group of lawyers who represented the
13 defendants and asked me to consider
14 working on Vioxx. I told them that I
15 would, that I hadn't made my mind up and
16 let it go at that. They never called
17 back. Never any followup conversation.
18    Q.   Do you have the name of the
19 lawyer?
20    A.   I don't.
21    Q.   Did you ever meet with that
22 lawyer?
23    A.   No, sir.
24    Q.   Was there ever a phone call

Page 15

1  following up that conversation after that
2  phone call with that lawyer?
3     A.   No.
4     Q.   Do you know whether that
5  lawyer was based in Texas?
6     A.   I don't remember.
7     Q.   Was it a male or a female?
8     A.   Male, I believe.
9     Q.   Do you remember any other
10 identifying information about that
11 lawyer?
12    A.   No.
13    Q.   When was that phone call?
14    A.   Maybe late 2004, early 2005.
15    Q.   Is that the only contact you
16 had where an attorney asked you to become
17 involved on behalf of Merck?
18    A.   Yes.
19    Q.   Who's the first attorney you
20 met who represented the plaintiff in this
21 case?
22    A.   I don't know. That is to
23 say, let me answer this way. I don't
24 think I met with a single attorney. I

Page 16

1  think I met with a group of attorneys.
2     Q.   Let me back up a minute.
3  And I apologize. I'm working off of your
4  -- we've been provided for the record
5  with, what is it, 14 disks?
6        MS. COOK: 12. Yes, 14.
7  BY MR. PIORKOWSKI:
8     Q.   There's a total of 14 disks,
9  I believe, by Mr. Sizemore. One of them
10 is entitled Vioxx billing, I think, which
11 I'm assuming that contains your billing
12 records to date?
13    A.   Yes, sir.
14    Q.   Is that your understanding?
15    A.   Yes, it is.
16    Q.   Then there are 12 disks that
17 are marked as "Vioxx documents reviewed
18 by Dr. Moye" 1 through 12 of 12?
19    A.   Yes.
20    Q.   Right? And then there's
21 another independent disk that's entitled
22 "Vioxx documents reviewed by Dr. Moye
23 ,"right?
24    A.   Yes.

Page 17

1     Q.   We'll come back to what
2  those are in a moment. I apologize, I
3  don't have this in hard copy. I'm just
4  getting it off the disk.
5        Am I correct that your
6  records reflect that the first time you
7  billed any time on Vioxx was in February
8  of 2005?
9     A.   I believe that's right, yes.
10    Q.   If your records reflect it
11 was February 26, 2005, is that consistent
12 with your recollection?
13    A.   If that's in the record,
14 then I'm willing to stand by that, yes.
15    Q.   And there's a meeting with
16 the lawyers that appears to be on March
17 4th of 2005?
18    A.   Then I accept that, yes.
19    Q.   Now, to come back to what
20 you said, you said you first met with
21 lawyers, that was your first contact with
22 several lawyers?
23    A.   Yes.
24    Q.   Where was that meeting?

Lemuel A. Moye, M.D.

Page 18

1  A. I don't remember.
2  Q. Was it in Texas?
3  A. Yes, it was.
4  Q. Do you know if it was in
5  Houston?
6  A. I'm sorry. It was in
7  Houston, Texas. I don't know what
8  office.
9  Q. Some law office in Houston,
10 Texas?
11 A. Yes.
12 Q. Who attended the meeting?
13 A. I don't remember.
14 Q. Can you remember anybody who
15 attended the meeting?
16 A. No.
17 Q. Are any of the attorneys who
18 are present in the room today in
19 attendance at the meeting?
20 A. I've had subsequent meetings
21 in which they've been in attendance. I
22 don't remember who was at the -- in
23 attendance at the March 4 meeting.
24 Q. At the original meeting. Do

Page 19

1  you know whether that would be contained
2  in your documents anywhere?
3  A. I don't think so.
4  Q. Do you know what law firm
5  the lawyers were with who originally
6  represented you?
7  A. No. At this meeting, no, I
8  don't.
9  Q. How long was the meeting on
10 March 4?
11 A. That's going to be in the
12 record. I would imagine it was no more
13 than two hours, but that would be in the
14 billing record.
15 Q. And can you tell me what
16 happened at the meeting?
17 A. I don't have any particular
18 recollection of it. I believe it was
19 just about the developing litigation and
20 my willingness to participate in this.
21 Q. Had it been decided before
22 you attended the meeting that you would
23 serve as an expert on behalf of
24 plaintiffs, or was that the purpose of

Page 20

1  the meeting, to kind of get acquainted?
2  A. I think the purpose of the
3  meeting was to let me know that they were
4  interested in moving forward and would be
5  interested in my participation. At that
6  point I guess I wasn't sufficiently
7  informed about the facts of the case to
8  provide an assertion one way or the
9  other. But I believe I did say that I
10 would begin an investigation.
11 Q. Now, at the time that you
12 say you weren't sufficiently informed
13 about the facts of the case, what had you
14 looked at at that point in time? Prior
15 to the meeting I'm talking about.
16 A. I don't remember. Let me
17 answer this way. In the capacity as a
18 physician and a public health worker, I
19 was aware there were several manuscripts
20 out, several controversial manuscripts
21 out that were examining the relationship
22 between Vioxx and serious adverse events,
23 and I had looked at those.
24 Q. And by "manuscripts," are

Page 21

1  you referring to articles in the
2  published medical literature?
3  A. Yes.
4  Q. Had you looked at anything
5  else other than articles in the published
6  medical literature at that point?
7  A. I don't believe so, no.
8  Q. Had you attended the 2005
9  Advisory Committee meeting?
10 A. No.
11 Q. Had you read newspaper
12 accounts of what was going on in the
13 Vioxx litigation?
14 A. Well, I have to say yes, I
15 think I did. I mean, I read the
16 newspaper, and certainly Vioxx was in the
17 newspapers. I will say about the
18 Advisory Committee meeting, I was not in
19 attendance, but a good portion of it --
20 well, a portion of it was actually
21 televised on C-Span. And I did watch
22 that. Also there were, of course, other
23 hearings that were also televised that I
24 watched as well.

Page 22

1  Q.  What else did you watch?
2  A.  David Graham's testimony,
3  Dr. Gilmartin's testimony. I recall
4  those. They may have been before a
5  Congressional committee. I don't
6  remember the exact forum.
7  Q.  So, you watched David Graham
8  and Dr. Gilmartin's testimony on C-Span?
9  A.  Yes.
10    MR. SIZEMORE: Object to
11    form.
12    THE WITNESS: Yes, I did. I
13    didn't mean to cut you off. Yes,
14    I did.
15  BY MR. PIORKOWSKI:
16  Q.  Anything else you remember
17  having reviewed prior to the initial
18  meeting on March 4th?
19  A.  As I sit here now, no.
20  Q.  During this meeting, did the
21  lawyers who were in attendance present
22  what they thought the facts of the case
23  showed to you?
24  A.  I don't remember in detail.

Page 23

1  I think probably just the broad strokes
2  and nothing that anybody who was
3  conversant with the information that was
4  available in the public domain wouldn't
5  already know.
6  Q.  Were you shown specific
7  documents at that meeting?
8  A.  I don't think so. I don't
9  remember.
10  Q.  Was there anyone who was not
11  a lawyer in attendance at the meeting?
12  A.  I think there was probably a
13  representative from Scientific Evidence
14  at the meeting, but I don't remember.
15  Q.  Do you know who that was?
16  A.  No, I don't remember.
17  Q.  Do you know if it was Dr.
18  Hoepfel?
19  A.  I don't remember.
20  Q.  Who else works with you from
21  Scientific Evidence besides Dr. Hoepfel?
22  A.  Well, the only support
23  Scientific Evidence provides to me is
24  logistical support. So, they collect

Page 24

1  information for me. And they will
2  collect information on CDs, for example,
3  and prepare the CDs that we have today.
4  But to answer your question, April
5  Thompson has been my chief contact person
6  at Scientific Evidence, and her role for
7  me has been administrative.
8  Q.  Did you say before when we
9  were off the record that Dr. Hoepfel is
10  on some sort of a sabbatical?
11  A.  Well, I know she's traveling
12  a lot.
13  Q.  But in terms of this
14  litigation -- let me back up.
15    You've worked with Dr.
16  Hoepfel on other litigations, right?
17  A.  Yes.
18  Q.  In this litigation, have you
19  worked with her?
20  A.  No.
21  Q.  Is there anybody else at
22  Scientific Evidence besides April
23  Thompson with whom you've worked?
24  A.  No.

Page 25

1  Q.  So, if anyone attended the
2  meeting, it most likely would have been
3  April Thompson?
4  A.  I think so, yes.
5  Q.  How was it left at the end
6  of the meeting on March 4th?
7  A.  I think I left it open, that
8  I had no real opinions about Vioxx or
9  Merck's conduct one way or the other and
10  that I would begin to look into it.
11  Q.  What was the plan for you to
12  begin to look into it?
13  A.  As time would allow. I
14  mean, I really didn't put a time schedule
15  on it, but as time would allow, I would
16  begin to evaluate the information that
17  was available to me in the public domain.
18  Q.  Did you agree at that time
19  to serve as an expert, or did you just
20  agree at that time to review the
21  material?
22  A.  I think I agreed only to
23  review the material.
24  Q.  When did you agree to serve

Page 26

1  as an expert witness?
2  A. That was much later, but I
3  don't have a particular date in mind
4  where I say that I agreed to be an expert
5  witness for Vioxx.
6  Q. It would have certainly been
7  before the 22nd of May?
8  A. 22nd of May, 2006.
9  Q. Right.
10 A. Yes.
11 Q. That's when you signed your
12 report?
13 A. That's correct. Yes.
14 Q. Do you know whether it was
15 within a month or two of the meeting?
16 A. Maybe closer to earlier this
17 year.
18 Q. Early 2006?
19 A. Early 2006, yes.
20 Q. When you agreed to serve as
21 an expert, did you agree to serve as an
22 expert for certain attorneys, or did you
23 agree to serve as an expert for anybody
24 who wanted to hire you?

Page 27

1  A. Let me back up for one
2  second. Let me amend my answer.
3  I believe I signed an
4  agreement with Scientific Evidence in the
5  fall of '05 to serve as an expert. I
6  don't have the date specifically in mind,
7  but I think it was a few months earlier
8  than I earlier testified today.
9  Q. Would a copy of that signed
10 agreement be included on the disks that
11 are provided?
12 A. I don't know.
13 Q. Are you in possession of a
14 copy of the agreement?
15 A. I should say this. I should
16 be. I don't know if I have it or not.
17 MR. PIORKOWSKI: Paul, we
18 would like to receive it if it's
19 not on the CD if that's agreeable.
20 MR. SIZEMORE: Okay.
21 BY MR. PIORKOWSKI:
22 Q. Okay.
23 Can you tell me what's the
24 first lawyer who you can remember having

Page 28

1  had a contact with?
2  A. I think it would have
3  been -- again, I can't be specifically
4  sure whether this is the first attorney,
5  but I certainly met with Dave Matthews
6  several times this year.
7  Q. Who is here at this firm
8  where we're taking the deposition?
9  A. Yes.
10 Q. All right.
11 Any other lawyers who you
12 specifically remember meeting with
13 multiple times?
14 A. Oh, sure. Ted, Tom
15 Sizemore.
16 Q. Let's just use full names
17 just since we're on the record.
18 MR. SIZEMORE: Paul
19 Sizemore.
20 THE WITNESS: Thanks. Paul
21 Sizemore.
22 MR. SIZEMORE: I've been
23 called worse. Thanks.
24 MR. WACKER: Ted Wacker.

Page 29

1  BY MR. PIORKOWSKI:
2  Q. Anybody else?
3  A. Tommy Fibich. I had
4  conversations with Mark Robinson.
5  Conversation with Ed Blizzard. That's
6  all I remember now.
7  Q. Have you had any contact
8  with Chris Seeger or Dave Buchanan?
9  A. If I did, I don't remember.
10 Q. Have you had any contact
11 with Mark Lanier?
12 A. I don't remember.
13 Q. Do you know as you sit here
14 today whether you've had contact with
15 anybody who represents plaintiffs in New
16 Jersey?
17 A. Back up a minute. I know
18 who Mark Lanier is. I have had no
19 contact with him. I just realized that.
20 Q. All right. Thanks for the
21 clarification.
22 A. I'm sorry. Go ahead.
23 Q. Have you agreed to be
24 retained by any lawyers who you know to

Page 30

1  be representing plaintiffs who have cases
2  pending in New Jersey?
3      A.  To my knowledge, no.
4      Q.  Is the list that you just
5  gave me the list of all of the lawyers by
6  whom you've been retained to date to the
7  best of your knowledge?
8      A.  I would say I think so.  I
9  don't know, but I think so.
10     Q.  Any other lawyers that we
11 didn't mention by whom you believe you've
12 been retained?
13     A.  I don't remember any.  If I
14 do during the proceedings, I will
15 certainly mention them.
16     Q.  How about Tommy Pirtle?
17     A.  I don't think so.  No, not
18 for Vioxx, no.
19     Q.  Tommy Jackson?
20     A.  The name doesn't ring a
21 bell.
22     Q.  Okay.
23         Have you agreed to testify
24 in California as an expert witness?

Page 31

1      A.  I have.
2      Q.  Have you set aside a date to
3  go out there?
4      A.  What month is it?
5         MR. SIZEMORE:  Trial?
6         THE WITNESS:  Yes.
7         MR. SIZEMORE:  In June.
8         THE WITNESS:  Then I have.
9  BY MR. PIORKOWSKI:
10     Q.  Have you agreed to testify
11 in the MDL trial that's pending in New
12 Orleans in July?
13     A.  Yes.
14     Q.  Are there any other specific
15 trials that you've agreed to testify in?
16     A.  I guess I don't know how to
17 answer that.
18     Q.  Let me reword it.  That's a
19 bad question.
20         I understand that you've
21 been retained in a number of cases by the
22 lawyers we already reviewed.  Apart from
23 the California case and the MDL, which
24 are the cases we're primarily here taking

Page 32

1  this deposition in today, are there any
2  other cases where you have a date on your
3  calendar blocked off to go to trial and
4  testify?
5      A.  No.
6      Q.  How do you track your time
7  for purposes of expert witness work?
8      A.  I track it on -- each day I
9  track it, and I log the number of hours I
10 work and to whom it's billed and the
11 amount.
12     Q.  And do you do that on
13 computer, do you do it by hand, how do
14 you do it?
15     A.  I do it by computer.
16     Q.  Okay.
17         Is it on a computer software
18 program or how do you keep track?
19     A.  I can generate reports from
20 it using a software program.
21     Q.  To whom is your time billed?
22 Is there one primary lawyer that you bill
23 your time to for purposes of Vioxx, or is
24 it split between a number of different

Page 33

1  lawyers?
2      A.  I can answer the first part
3  of your question.  I think I bill it to
4  something called Vioxx group or group
5  Vioxx.
6      Q.  Group Vioxx?
7      A.  Yes.
8      Q.  Do you know who the bill is
9  actually sent to?
10     A.  I do not.
11     Q.  Your billing is not done
12 through Scientific Evidence?
13     A.  It is.  I send my bill to
14 Scientific Evidence.  I don't know what
15 they do after that.
16     Q.  Okay.
17         But all of your Vioxx
18 matters have been on general Vioxx
19 matters as opposed to individual
20 plaintiff-specific things?
21         MR. SIZEMORE:  Object to
22     form.
23         MR. PIORKOWSKI:  Let me
24     rephrase it.

Page 34

1  BY MR. PIORKOWSKI:
2      Q.   Apart from group Vioxx work,
3  have you billed any matters to matters
4  involving individual plaintiffs like the
5  Barnett plaintiff, for example?
6      A.   I have not billed to
7  plaintiffs, no. I think, though, that
8  when I started billing in 2005, I didn't
9  start with group Vioxx. It might have
10 been for particular attorneys.
11     Q.   Is it your understanding
12 that the invoices that we have which are
13 approximately $98,800 represents all of
14 your billing in Vioxx to date?
15     A.   That sounds -- the amount
16 sounds correct. Yes. I don't know how
17 inclusive the dates are.
18     Q.   Okay.
19          You don't know when that
20 would go up through?
21     A.   That's true.
22     Q.   In terms of the month of
23 May, what work have you done since the
24 completion of your MDL report, which was

Page 35

1  dated the 22nd?
2      A.   I've reviewed -- the
3  literature -- the material is voluminous,
4  and reading this material one time just
5  hasn't been sufficient for me. So, I've
6  spent some time reviewing material that I
7  have already read.
8      Q.   Okay.
9          Your rate for billing is how
10 much now?
11     A.   $400 an hour.
12     Q.   For reviewing materials?
13     A.   Yes.
14     Q.   Okay.
15          So, if we were going to
16 figure out how much time you spent, it
17 would be roughly 100,000 divided by 400?
18     A.   Right.
19     Q.   So, what's that, 250 hours?
20     A.   250 hours, right.
21     Q.   Your MDL report does not
22 have any specific opinions about the
23 plaintiff in that case, is that correct?
24     A.   Yes, sir.

Page 36

1      Q.   Do you know anything about
2  the plaintiff in the MDL case?
3      A.   No, sir.
4      Q.   You don't intend to offer
5  any opinions at trial about the plaintiff
6  specifically?
7      A.   I intend to offer no such
8  opinions.
9      Q.   Is the same true with
10 respect to the California cases?
11     A.   Yes, sir.
12     Q.   Is there any case in which
13 you've been designated or filed a
14 report -- let me back up.
15          Other than the MDL report,
16 have you filed any other reports in any
17 other Vioxx cases?
18     A.   No, sir. No, sir.
19     Q.   Are you aware that you were
20 designated in a couple Texas cases as an
21 expert witness?
22     A.   I believe that, yes. I
23 haven't seen the designation, I don't
24 think, but, yes.

Page 37

1      Q.   Are you familiar with what a
2  designation is as opposed to a report?
3      A.   I am.
4      Q.   It's a written description
5  prepared by the attorneys, right?
6          MR. SIZEMORE: Object to
7      form.
8          THE WITNESS: Yes.
9  BY MR. PIORKOWSKI:
10     Q.   That's your understanding?
11     A.   Yes.
12     Q.   Okay.
13          And there were actually two
14 of them prepared in Texas. Do you
15 understand that?
16     A.   Yes.
17     Q.   Did you review those before
18 they were filed?
19     A.   I reviewed several
20 designations in May. I don't remember to
21 which cases they applied.
22     Q.   Is there any case, as we sit
23 here today, as to which you intend to
24 offer an opinion about a specific