Lemuel A. Moye, M.D.

Page 38

1  plaintiff?
2      A.   There is no such case.
3           - - -
4           (Whereupon, Deposition
5      Exhibit Moye MDL 1, "COX-2
6      Inhibitor Report of Lemuel A.
7      Moye, M.D., Ph.D." 5-22-06 (110
8      pages) was marked for
9      identification.)
10          - - -
11 BY MR. PIORKOWSKI:
12     Q.   Doctor, can you identify
13 what I've marked as Exhibit 1?
14     A.   Yes.  This is my COX-2
15 inhibitor report.
16     Q.   Okay.
17          COX-2 inhibitors are a class
18 of drugs that include Vioxx and Celebrex,
19 right?
20     A.   Yes, sir.
21     Q.   Have you been retained to
22 offer any opinions regarding Celebrex?
23     A.   I have not.
24     Q.   How was this report

Page 39

1  prepared?
2      A.   I reviewed the material and
3  wrote the report.
4      Q.   Did you dictate it or did
5  you type it yourself?
6      A.   I typed it myself.
7      Q.   Did you have a template from
8  other cases that you were involved with
9  that you used?
10     A.   I had no template, but, of
11 course, I've written expert reports in
12 other litigation.  So, I used that
13 experience to write this, but I had no
14 formal template, no formal word
15 processing format to follow.
16     Q.   Okay.
17          Did you use any cut and
18 pastes from old reports in connection
19 with this report?
20     A.   No.
21     Q.   Did you review this report
22 carefully before signing it?
23     A.   I did.
24     Q.   Did you check it for

Page 40

1  accuracy?
2      A.   I did.
3      Q.   Did you check it for errors?
4      A.   As best I could.  There's
5  always the grammatical error that gets by
6  me, but yes.
7      Q.   When is the last time you
8  reviewed the report?
9      A.   Earlier this week.
10     Q.   As you sit here today, are
11 there any corrections that need to be
12 made to it?
13     A.   I don't think so, no.
14     Q.   Are there any changes that
15 need to be made to it?
16     A.   No.
17     Q.   Does the report set forth
18 the opinions that you intend to offer at
19 trial in the MDL?
20     A.   I would say this.  Based on
21 the review of the information I had done
22 at the time -- I had reviewed up to the
23 time of preparing the report, it does.  I
24 am aware that there's always new material

Page 41

1  that's available.  And I will read that
2  material as it becomes available.  I'm
3  also aware of my obligation to announce
4  that I'm looking at new material.
5      Q.   Fair enough.
6           As you sit here today, are
7  there other opinions -- today is June
8  2nd, is that right?
9      A.   Yes, sir.
10     Q.   And the report was on May
11 22nd?
12     A.   Yes.
13     Q.   Are there any opinions that
14 you've formed since May 22nd that need to
15 be added to your report or that are
16 beyond the scope of what's in your report
17 that you're aware of as you sit here
18 today?
19     A.   No, sir.
20     Q.   Are you waiting for any
21 additional information or documents at
22 this time?
23     A.   I am not waiting for any
24 particular document.  However, I am aware

Lemuel A. Moye, M.D.

Page 42

1   that, waiting or not, documents continue
2   to be produced.
3       Q.   But as we sit here today,
4   you've not asked to see certain documents
5   that you're still waiting for
6   specifically?
7       A.   That's true, yes.
8       Q.   You're referring to a
9   situation where something new may be
10  produced in the context of the litigation
11  and be forwarded to you?
12      A.   Yes, sir.
13      Q.   Okay.
14          Do the opinions that are set
15  forth in your report represent your final
16  opinions subject to additional
17  information that may become available?
18      A.   Yes, sir.
19      Q.   When you first became
20  involved in the litigation, how did you
21  approach your review?  What I'm trying to
22  understand is, were you sent certain
23  materials by the plaintiffs, did you ask
24  the plaintiffs to send you certain

Page 43

1   materials, did you start with a medical
2   literature search?  How did the process
3   start?
4       A.   Well, I began by not asking
5   anybody for information, but just
6   gathering information as best I could.
7   There's a voluminous amount of published
8   material that I have access to.  Of
9   course, the third FDA Advisory Committee
10  on Vioxx met in late winter/early spring
11  of 2005, and I reviewed that transcript
12  when it became available, as well as the
13  other transcripts which were already
14  actually available on the FDA site.  So,
15  much of my early review involved material
16  that I was able to get on my own.
17          Just to finish up here.
18  There were manuscripts that were sent to
19  me through Scientific Evidence that --
20  again, by "manuscripts," information that
21  was published in the peer-reviewed
22  literature that supplemented my review.
23      Q.   We'll talk about the details
24  of these Advisory Committee meetings

Page 44

1   later, but you're referring to there were
2   three Advisory Committee meetings that
3   dealt in part or in whole with Vioxx,
4   right?
5       A.   Yes, sir.
6       Q.   One was in 1999, one was in
7   2001, and one was in 2005?
8       A.   Yes, sir.
9       Q.   And you read the full
10  transcripts of each of those meetings?
11      A.   Yes, sir.
12      Q.   Okay.
13          The 2001 meeting was a
14  two-day meeting.  Do you recall that?
15      A.   Yes, sir.
16      Q.   First day was a day that
17  dealt with Celebrex?
18      A.   Yes.
19      Q.   Did you read the day that
20  dealt with Celebrex?
21      A.   I did not.
22      Q.   In terms of the published
23  medical literature, did you do your own
24  literature search, or did you ask

Page 45

1   Scientific Evidence to do a specific
2   literature search for you?
3       A.   No.  I'm sorry.  I did my
4   own literature searches first.
5       Q.   What was your literature
6   search that you did?
7       A.   By that you mean what
8   literature did I read based on that?
9       Q.   What search terms did you
10  use, or how did you go about your search
11  for relevant medical articles?
12      A.   Oh, I don't remember.  I
13  would tell you it was primarily
14  Internet-based search, but I don't
15  remember what search terms I used.
16      Q.   You have in your report at
17  the end on Pages 106 through 110, you
18  have a list of references.  Do you see
19  that?
20      A.   Yes, sir.
21      Q.   Are all of the published
22  medical articles that you've reviewed
23  listed in these references?
24      A.   I hesitate to say that all

Lemuel A. Moye, M.D.

Page 46

1  of them are listed here.  I mean, I think
2  all of them would be on the CDs that you
3  have, but I don't want to suggest that
4  every single medical reference, reference
5  in the medical literature that I based my
6  opinion on is listed in the references.
7  I mean, I wish that were the case, but
8  there may have been a couple that got
9  away.
10      Q.   Okay.
11           It's fair to say that while
12  you may have missed one or two, your
13  intent was to list all of the medical
14  articles that you reviewed or that you
15  thought were important in your
16  references?
17      A.   Yes, sir.
18      Q.   And if there's an article
19  that you looked at that's not in the
20  references, it would be on the CDs that
21  we referred to?
22      A.   I would say if there's an
23  article that I looked at and relied upon
24  and incorporated its ideas in any way,

Page 47

1  shape or form in my report, then it
2  should have been listed in the
3  references.
4      Q.   Okay.
5           Now, did you review the
6  investigational new drug application?
7      A.   Yes, sir, I did.
8      Q.   How did you get access to
9  that?
10      A.   Scientific Evidence sent
11  that to me.
12      Q.   Did you review it in its
13  entirety or did you look at certain parts
14  of it?
15      A.   Well, I only looked at
16  certain parts.  It is a voluminous
17  document, of course, so, I looked at what
18  I believe were the relevant sections.
19      Q.   What did you believe were
20  the relevant sections at the time you
21  looked at them?
22      A.   The integrated review of
23  efficacy, the integrated review of
24  safety, integrated summary of safety.

Page 48

1      Q.   Are you talking about the
2  IND or the NDA?
3      A.   I'm talking about the NDA.
4      Q.   The NDA?
5      A.   The NDA.  I'm sorry.  Did
6  you not ask me about that?
7      Q.   I think I said IND, but I
8  shouldn't -- let's back up and start
9  over.
10      A.   Okay.
11      Q.   Did you look at the
12  investigational new drug application?
13      A.   I did not.
14      Q.   You did look at certain
15  sections of the new drug application?
16      A.   I looked at the new drug
17  application.  That's right.
18      Q.   The original new drug
19  application?
20      A.   Yes, sir.
21      Q.   When you said you looked at
22  certain sections, the sections you looked
23  at were the integrated summary of
24  efficacy, the integrated summary of

Page 49

1  safety?
2      A.   Yes, sir.
3      Q.   And what else?
4      A.   If there was an overall
5  summary, I looked at that.  I also looked
6  at the statistical reviewer's comments.
7  The medical reviewer's comments really
8  were part of, I thought, the ISS and ISE.
9      Q.   So, you did look at the
10  medical officer reviewer's comments?
11      A.   Yes.
12      Q.   But am I understanding you
13  to say you thought her comments were
14  already included in what was presented in
15  the integrated summary of safety?
16      A.   By and large, yes.
17      Q.   Are you familiar with the
18  summary basis of approval?
19      A.   I am.
20      Q.   Was there any summary basis
21  of approval document related to Vioxx?
22      A.   I don't remember.
23      Q.   Did you look at any of the
24  supplemental new drug applications?

13 (Pages 46 to 49)

Golkow Litigation Technologies - 1.877.DEPS.USA

Lemuel A. Moye, M.D.

Page 50

1       A.    Not in their entirety, no.
2       Q.    Is there any section of the
3   supplemental new drug applications that
4   you can remember reviewing?
5       A.    I reviewed several reviews
6   of supplemental material -- reviews by
7   the FDA of supplemental materials
8   submitted by Merck.
9       Q.    Like, for example, the
10  medical officer's review of the
11  supplemental new drug application?
12      A.    Yes, sir.
13      Q.    That's what you're talking
14  about?
15      A.    Yes.
16      Q.    Did you review -- you're
17  aware that there was a cardiorenal
18  adviser who looked at information in
19  early 2001 named Shari Targum.  Do you
20  recall that?
21      A.    Yes.
22      Q.    Did you read her review?
23      A.    Yes, sir.
24      Q.    Anything else that you can

Page 51

1   remember in terms of FDA reviews of the
2   supplemental new drug applications?
3       A.    No, sir.
4       Q.    Did you look at the periodic
5   safety updates that were submitted by
6   Merck?
7       A.    I did not.
8       Q.    Did you review any kind of
9   post-marketing analyses that were
10  conducted by FDA?
11      A.    Nothing separate and apart
12  from what was provided to Advisory
13  Committees or provided in the --
14  discussed in the supplemental new drug
15  applications.
16      Q.    Okay.
17          So, you had available to you
18  essentially the same information that was
19  available to the members of the Advisory
20  Committees in 1999 and 2001 respectively?
21      A.    I'm not sure what time frame
22  we're talking about.  I actually believe
23  as I sit here now, I've looked at much
24  more information than they've had, but

Page 52

1   maybe I'm not addressing your question.
2       Q.    Okay.
3          In terms of FDA materials,
4   in terms of materials that Merck
5   submitted to the FDA or medical officer
6   reviews of the FDA, you looked at the
7   same materials that the Advisory
8   Committee members looked at.  Is that
9   your understanding?
10      A.    Again, I think I probably
11  looked at much more than the Advisory
12  Committees would have looked at.
13      Q.    All right.
14          What other things have you
15  looked at other than what the Advisory
16  Committee looked at?
17      A.    Wait.
18          MR. SIZEMORE:  Can you
19      specify which one, Joe?
20          MR. PIORKOWSKI:  Yes.
21  BY MR. PIORKOWSKI:
22      Q.    Let's back up a minute.
23          Let's start with the 1999
24  Advisory Committee.  What materials do

Page 53

1   you believe that you've looked at that
2   were available at the time that the
3   Advisory Committee members in 1999 did
4   not look at?
5       A.    Just so I can be clear, you
6   mean materials that were provided by the
7   FDA or materials in general?
8       Q.    Well, I'm assuming -- let's
9   just say materials in general.
10      A.    Okay.
11          Reports -- excuse me.
12  Reports within Merck that suggest the
13  appearance -- suggest the possibility,
14  I'll say, of a link between Vioxx use and
15  severe cardiac events and also data
16  within Merck that demonstrates a link
17  between Vioxx and severe cardiovascular
18  embolic events.
19      Q.    Are you referring to what
20  you call in your report the "Watson
21  analysis"?
22      A.    That's one thing, yes.
23      Q.    What other materials are you
24  aware of that was available in 1999 that

Lemuel A. Moye, M.D.

Page 54

1    was not available to the FDA or the
2    Advisory Committee?
3         A.    What I list in my report,
4    and that is -- let me just look at this
5    specifically.
6              The September -- I'm on item
7    84, Paragraph 84 on Page 32.
8         Q.    Page 32?
9         A.    Yes, sir.
10        Q.    Paragraph what?
11        A.    84, the very last one on
12   that page.
13             Beginning with that
14   Paragraph 84, the September 12, 1996
15   memo; Paragraph 85, the October 10th,
16   '96; Paragraph 86, November 11, 1996.
17        Q.    Right.
18        A.    And this litany of material
19   was available, but had not been presented
20   at the Advisory Committee.  So, that's
21   the basis of my answer to the question.
22        Q.    Okay.
23             The materials you're talking
24   about in Paragraph 84, you're talking

Page 55

1    about an internal memorandum, right?
2         A.    Yes, sir.
3         Q.    And the internal memorandum
4    deals with a case of unstable angina that
5    was reported in an RA study, correct?
6         A.    Yes, sir.
7         Q.    Do you know whether that
8    case was reported to the FDA in
9    accordance with the procedures by which
10   it's supposed to be reported the FDA?
11        A.    I don't know if it was
12   reported to the FDA or not.
13        Q.    Paragraph 85 deals with also
14   an internal memorandum.  Is that right?
15        A.    Yes, sir.
16        Q.    Do you know whether the data
17   that were the subject of that memorandum
18   were or were not reported to the FDA?
19        A.    I don't know.
20        Q.    In Paragraph 86, there's a
21   discussion about a memo authored by a Dr.
22   Musliner, right?
23        A.    Yes.
24        Q.    That talks about an

Page 56

1    anticipation of greater adverse
2    cardiovascular events in rofecoxib
3    compared with comparator NSAIDs, right?
4         A.    Yes.
5         Q.    That was not a study.  That
6    was a memo, right?
7         A.    Yes.
8         Q.    Actually, further on in your
9    report on Page 71, you discuss the Watson
10   analysis, correct?  70 and 71?
11        A.    Yes.
12        Q.    In this discussion you say
13   that Merck misled the FDA, right?
14        A.    Yes.  I also discussed it in
15   90 and 91 as well.
16        Q.    90 and 91?
17        A.    Paragraph 90 and 91, top of
18   Page 35.
19        Q.    Yes.  I understand.  I'm not
20   suggesting that's the only place you talk
21   about it.  I'm just saying in your
22   discussion about misleading the FDA on
23   Page 70 and 71, the first part of your
24   discussion starts with the proposition

Page 57

1    that Merck misled the FDA and the FDA
2    Advisory Committee because at the time of
3    the original Advisory Committee meeting,
4    they did not disclose the Watson
5    analysis.  Right?
6         A.    Yes, sir, and it's your understanding
7         Q.    And it's your understanding
8    that the Watson analysis showed a clear
9    signal of an increased cardiovascular
10   risk associated with rofecoxib therapy?
11        A.    Yes, sir.
12        Q.    To your understanding, were
13   the data upon which the Watson analysis
14   was based disclosed to the FDA?
15        A.    I don't know whether the
16   data in any way, shape or form was
17   disclosed to the FDA in the IND or any
18   supplemental information, but it was not
19   disclosed to the Advisory Committee.
20        Q.    You know that because you've
21   reviewed the Advisory Committee
22   transcript?
23        A.    The transcript and also the
24   background dossier provided by Merck for

Lemuel A. Moye, M.D.

Page 58

1  the Advisory Committee to review.
2      Q.   Prior to the original 1999
3  Advisory Committee meeting?
4      A.   Yes, sir.
5      Q.   Now, is there any other data
6  besides the data contained in the Watson
7  analysis that you believe that Merck did
8  not disclose to the FDA or to the FDA
9  Advisory Committee prior to the 1999
10 meeting?
11     A.   No.  That's the only data I
12 believe I point out in my affidavit for
13 the 1999 Advisory Committee.
14     Q.   Did you look at a file that
15 contained -- well, let me back up.
16         You just alluded to the
17 documents that Merck provided to the
18 Advisory Committee members.  There're
19 referred to as briefing documents?
20     A.   Yes, sir.
21     Q.   Right?
22         Did you look at those on
23 line?
24     A.   I don't think I looked at

Page 59

1  those on line, no.
2      Q.   Those are --
3      A.   I'm sorry.
4      Q.   Were they provided by
5  Scientific Evidence?
6      A.   Yes.
7      Q.   Did you look at all of
8  Merck's briefing documents before all of
9  the Advisory Committees?
10     A.   Yes.
11     Q.   Including the 2005?
12     A.   Yes.
13     Q.   Did you review as a part of
14 your review a correspondence file between
15 Merck and the FDA concerning Vioxx?
16     A.   I reviewed some
17 correspondence between the FDA and Merck.
18 I can't say I reviewed one large complete
19 correspondence file.
20     Q.   How was the correspondence
21 that you reviewed selected?
22         MR. SIZEMORE:  Object to
23     form.
24 BY MR. PIORKOWSKI:

Page 60

1      Q.   Let me withdraw the
2  question.
3         If you reviewed some letters
4  but not all the letters, there had to be
5  some selection process in deciding what
6  you saw?
7      A.   Yes.
8      Q.   Fair?
9         Were you involved in that
10 selection process, was that a decision
11 made by Scientific Evidence, or was that
12 a decision made by the lawyers with whom
13 you were working?
14     A.   No.  I would say it was a
15 joint decision.  At this point in my
16 review, you're talking now about April or
17 May of this year, and I would meet with
18 attorneys, some of whom I mentioned
19 earlier, and we would talk about what
20 information would be most useful, and I
21 would ask for material, as well as have
22 material supplied unvolunteered --
23 supplied, volunteered by others, not by
24 me.

Page 61

1      Q.   Did you give the lawyers
2  directions about what you wanted to see
3  in terms of correspondence?
4      A.   Well, yes.  Not just
5  correspondence, but other documents as
6  well, yes.
7      Q.   Let's talk first about
8  correspondence.  What directions or
9  guidance did you give them about what you
10 wanted to see?
11     A.   Well, it depended on the
12 topic we were talking about.  For
13 example, when we're talking about
14 preparations for Advisory Committee
15 meetings, then any material that
16 corresponded between FDA and the --
17 excuse me -- between FDA and Merck
18 involving the Advisory Committee, I
19 wanted to see.  And that included, but
20 wasn't limited to, background documents.
21     Q.   Okay.  Anything else?
22     A.   That's the clearest example
23 I can think of as I sit here now.
24     Q.   Have you reviewed all of the

Lemuel A. Moye, M.D.

Page 62

1 correspondence dealing with label changes
2 or proposed label changes between Merck
3 and the FDA?
4      A.   I have not, no.
5      Q.   Have you reviewed any of the
6 correspondence concerning label changes
7 or proposed label changes between Merck
8 and the FDA?
9      A.   I don't think so, no.
10      Q.   Have you reviewed
11 correspondence between Merck and the FDA
12 with respect to warning letters?
13      A.   Warning letters?  Yes, I
14 have.
15      Q.   Your report makes reference
16 to a warning letter in September of 2001,
17 correct?
18      A.   Yes, sir.
19      Q.   Is that the only letter
20 concerning any DDMAC-related issues that
21 you saw?
22      A.   No, it's not.
23      Q.   Were you provided with
24 Merck's response to that warning letter?

Page 63

1      A.   I believe so, yes.
2      Q.   Were you provided with the
3 FDA's response to Merck's response?
4      A.   That I don't remember.
5      Q.   You said you gave the
6 lawyers guidance not only with respect to
7 correspondence, but with respect to
8 documents generally that you wanted to
9 see?
10      A.   Yes.
11      Q.   What guidance did you give
12 them?
13      A.   Any correspondence relating
14 to communication -- any correspondence
15 involving or centered on the VIGOR
16 manuscript and the -- actually, any and
17 all published manuscripts.  So,
18 correspondence between editors and
19 authors involving reviewers.  I
20 correspondence involving reviewers.  I
21 wanted to see all of that material in
22 addition to whatever internal
23 documentation that they had -- I'm sorry,
24 documentation internal to Merck involving

Page 64

1 these studies, as well as the studies
2 themselves.
3      Q.   So, first of all, you wanted
4 to see any correspondence between Merck
5 employees and editors of journals?
6      A.   Let me rephrase.  No.
7      Q.   Okay.
8      A.   Between the authors of
9 Merck's -- Merck-funded manuscripts and
10 editors.
11      Q.   Okay.
12      A.   Including reviews,
13 summaries, cover letters and so on.
14      Q.   Do you believe you were
15 provided with that?
16      A.   Yes.
17      Q.   Is that included in the
18 materials in the disk?
19      A.   Yes.
20      Q.   Any other -- let me back up.
21      I'm sure you did review
22 internal company documents, right?
23      A.   Yes, sir.
24      Q.   How were the internal

Page 65

1 documents selected that you reviewed?
2      A.   They were -- during
3 conversations, face-to-face
4 conversations, there were discussions,
5 and they would say that there were -- the
6 statement would be made that there is an
7 e-mail that is responsive to this issue.
8 Let's just say -- I'll give you a
9 specific example.  The evaluation of the
10 design of VIGOR.  And then my response
11 was, I'd like to see that and all related
12 material involving the design of VIGOR
13 that was available that they had.
14      Q.   So your understanding is
15 that you received that, all materials
16 relating, let's say, to the design of
17 VIGOR?
18      A.   That they had, yes.
19      Q.   That the lawyers had?
20      A.   Yes.
21      Q.   Okay.
22      Anything else besides the
23 design of VIGOR specifically as it
24 applies to internal company documents?

Lemuel A. Moye, M.D.

Page 66

1    A.   Well, I actually -- the
2  tenor of the conversation was precisely
3  that.  So, it was about the design of
4  VIGOR, about concern, early concerns
5  about the possibility of a relationship
6  between Vioxx and cardiothrombolic
7  agents.  If there was any correspondence
8  about that, I wanted to see, not just the
9  correspondence that was in hand, but any
10 and all correspondence related to that.
11    Q.   Including the followup?
12    A.   Yes.
13    Q.   And to your understanding,
14 you've seen that?
15    A.   Yes, sir.
16    Q.   Okay.
17         Anything else that you asked
18 to see?
19    A.   Actually, that's quite a
20 bit.
21    Q.   And I want to focus on
22 internal company documents for this line
23 of discussion.  Any other internal
24 company documents that you specifically

Page 67

1  asked to see?
2    A.   Let me go through my
3  affidavit to see because I think there's
4  probably some others.
5    Q.   Sure.
6         MR. SIZEMORE:  Can we take a
7  break?
8         MR. PIORKOWSKI:  Sure.
9         (Witness reviewing
10 document.)
11         - - -
12         (Whereupon, a recess was
13 taken from 10:30 until 10:44 a.m.)
14         - - -
15         THE WITNESS:  Two other
16 areas.  One was the notion of the
17 naproxen protective effect, and
18 the second broad area was any
19 information that was available
20 about study protocols.  I'll give
21 you an example, the Alzheimer
22 studies.  Another example would be
23 VIP.  Another example would be
24 VICTOR.  I'm not trying to be

Page 68

1  exhaustive here, but that's
2  examples.  If there was a little
3  bit of material I was exposed to,
4  I wanted to see all of the
5  material that was available.
6  BY MR. PIORKOWSKI:
7    Q.   With respect to study
8  protocols?
9    A.   Yes.
10    Q.   For the clinical trials?
11    A.   Yes.
12    Q.   Well, let me ask you, when
13 you looked at the new drug application,
14 did you look at any of the study
15 protocols for the osteoarthritis trials
16 that were submitted as a part of the
17 Phase III studies?
18    A.   Yes.
19    Q.   You looked at that as part
20 of the new drug application?
21    A.   Yes.
22    Q.   But then the later studies
23 that came down the pike like VIP and
24 APPROVe and VICTOR, you asked to see

Page 69

1  those protocols?
2    A.   Yes.  Actually, any and all
3  internal documents related to, be it
4  protocols, internal analyses or
5  meta-analyses or interim reviews, I asked
6  to see.
7    Q.   Okay.
8    A.   And I need to add one other
9  thing.  Kathy Snapka is an attorney who
10 designated me.  I didn't mention that
11 before.  That was my fault.  I want to
12 correct that.
13    Q.   Fair enough.
14         We'll add her to the list.
15 Let me follow up on that.
16    A.   Sure.
17    Q.   Have you met with Kathy
18 separate from the other lawyers?
19    A.   No, I have not.
20    Q.   Has Kathy participated in
21 meetings you've had with other lawyers?
22    A.   Yes.
23    Q.   Are you specifically
24 designated in a case that Kathy has set

18 (Pages 66 to 69)

Lemuel A. Moye, M.D.

Page 70

1    for trial?
2         A.   I believe so.
3         Q.   Have you set aside a date on
4    your calendar for a case Kathy has set
5    for trial?
6         A.   I don't think so.
7         Q.   Any other corrections we
8    need to make from round one?
9         A.   As I sit here now, no.  If I
10   get some more, I'll let you know.
11        Q.   While we're cleaning up some
12   things, I asked you about whether the
13   opinions you intended to render in the
14   MDL trial in New Orleans were set forth
15   in your report.  My colleague reminded me
16   that I need to ask the same question with
17   respect to California.  Are the opinions
18   you intend to render at trial in
19   California also set forth in your report
20   subject to new information becoming
21   available?
22        A.   Yes, sir.
23        Q.   As a part of your review,
24   did you review the various labels that

Page 71

1    were in force with respect to Vioxx?
2         A.   Yes, sir.
3         Q.   Did you review all of them?
4         A.   Yes, I did.
5         Q.   Did you review all of the
6    draft labels?
7         A.   I don't think so, no.
8              - - -
9              (Whereupon, Deposition
10        Exhibit Moye MDL 2, "Documents
11        Reviewed by Dr. Lemuel A. Moye,"
12        (88 pages), was marked for
13        identification.)
14             - - -
15   BY MR. PIORKOWSKI:
16        Q.   We were provided with a
17   document which I've marked as Exhibit 2.
18             MR. PIORKOWSKI:  I think I
19        gave you a copy there, Paul.
20   BY MR. PIORKOWSKI:
21        Q.   I ask you to identify what
22   Exhibit 2 is.
23        A.   (Witness reviewing
24   document.)

Page 72

1              It is a compendium of the
2    material that I have been provided to
3    review related to the Vioxx litigation.
4         Q.   Is it your understanding
5    that all of the material that's contained
6    in Exhibit 2 is on the CDs that we've
7    been provided?
8         A.   Yes, sir.
9         Q.   Now, you haven't read all of
10   this stuff; is that right?
11        A.   I think in fairness I can
12   say, yes, I have, but I don't remember
13   all of it.
14        Q.   To the best of your
15   knowledge, you've read everything that's
16   listed on this document?
17        A.   Yes, sir.
18        Q.   For example, on Page 2 of
19   88, second -- third line from the bottom,
20   it has, "Carol Ernst...versus Merck -
21   hearing regarding Dr. Araneta's
22   testimony."  Do you see that?
23             MR. SIZEMORE:  Where is it?
24   BY MR. PIORKOWSKI:

Page 73

1         Q.   Page 2 of 8, third entry
2    from the bottom.
3         A.   Oh.  Third entry from the
4    bottom.  Yes.
5         Q.   Do you know why that was
6    provided to you?
7         A.   No, I don't.
8         Q.   Do you remember reading it?
9         A.   No, I don't remember the
10   details of it.
11        Q.   You remember anything about
12   it?
13        A.   No.
14        Q.   Or, for example, the one,
15   the entry right above it, "Hearing on
16   Exhibits"?
17        A.   Yes.
18        Q.   That's a transcript of a
19   court trial?
20        A.   That's right.  That's right.
21        Q.   Do you know what that would
22   have been of interest to you?
23        A.   No.  For that, what I did
24   was look at it to see first, cursorily,

Lemuel A. Moye, M.D.

Page 74

1  to see if it was going to be directly
2  relevant.  And if it wasn't going to be
3  relevant to my opinions, then I put it
4  down and moved on to something else.
5      Q.   How much of the roughly 250
6  hours that you've spent were spent
7  reviewing documents versus preparing your
8  report versus meetings with lawyers?
9      A.   I'll answer the easy part
10  first.  A small amount of time, I'd say
11  less than one percent, less than a half
12  of one percent, was spent meeting with
13  attorneys.  Maybe 70 percent of the time
14  was spent reviewing documents, and 30
15  percent of the time was preparing an
16  affidavit.  It's just a rough ballpark.
17      Q.   On Page 4, for example, of
18  this document, it appears the entire
19  trial transcript from the Ernst trial,
20  which was four weeks long, was sent to
21  you?
22      A.   Yes.
23      Q.   Did you read all of that?
24      A.   I went through it all, yes.

Page 75

1  I confess to you, I did not spend hours
2  on parts that I thought were irrelevant
3  for me --
4      Q.   Right.
5      A.   -- but I did go through it
6  all.
7      Q.   Do you remember reading the
8  deposition of Alan Nies?
9      A.   No.  I don't remember
10  anything particularly relevant from that.
11      Q.   Or do you remember reading
12  his trial testimony?
13      A.   I remember looking at it,
14  yes.
15      Q.   How about depositions or
16  trial testimony of Dr. Alise Reicin?
17      A.   Yes.
18      Q.   You read that?
19      A.   Yes.
20      Q.   How about Briggs Morrison?
21      A.   I don't remember.
22      Q.   Deposition testimony of Dr.
23  Ed Scolnick?
24      A.   Yes.

Page 76

1      Q.   David Anstice?
2      A.   I don't remember that one.
3      Q.   Deborah Shapiro?
4      A.   Yes.
5      Q.   Did you read the depositions
6  of any of the regulatory affairs
7  individuals at Merck?
8      A.   I don't remember who they
9  were.
10      Q.   Do you remember reading the
11  deposition of any sales and marketing
12  personnel other than Dr. Anstice?
13      A.   I've gone through them, but
14  I don't recall any of the details.
15          MR. BLIZZARD:  Object to
16      form.  Sorry, a little late.
17  BY MR. PIORKOWSKI:
18      Q.   Who prepared Exhibit 2?
19      A.   Scientific Evidence did.
20      Q.   Okay.
21          When was it prepared?
22      A.   I don't know.  I think
23  recently, but I don't when.
24      Q.   Was it prepared in

Page 77

1  anticipation of filing your report?
2      A.   Well, I think they knew they
3  had to have that when I filed my report,
4  but that's all I know.
5      Q.   Did you look at any Merck
6  standard operating procedures?
7      A.   No, sir.
8      Q.   You know from your own
9  clinical trial experience what a SAS file
10  is?
11      A.   Yes, sir.
12      Q.   Did you look at any of the
13  original SAS files on any of the data
14  from the Vioxx clinical trials?
15      A.   I answer your question as I
16  have begun to do that.  I am nowhere
17  near -- I'm only in the introductory
18  phase of it.
19      Q.   When did you begin to do
20  that?
21      A.   Last weekend.  Actually,
22  about a week ago.
23      Q.   Since you filed your report?
24      A.   Yes.

Golkow Litigation Technologies - 1.877.DEPS.USA