Lemuel A. Moye, M.D.

Page 78

1  Q. What was the purpose of
2  looking at the SAS files from your
3  perspective?
4  A. This file -- excuse me.
5  These files were files that were made
6  available, I believe, of the APPROVe
7  followup -- the followup component of the
8  APPROVe clinical trial.
9  Q. And you have no opinions on
10 that at this point?
11 A. I have no opinions on the
12 SAS data set content.
13 Q. How long do you anticipate
14 that's going to take you to complete that
15 review?
16 A. I don't know. I believe
17 it's going to be a long process to get it
18 right. So, at this point I can't even
19 reasonably estimate the number of hours.
20 Q. Let me ask you, in coming to
21 your opinions in this case, did you look
22 at the new drug application -- any part
23 of the new drug application for Celebrex
24 or Bextra?

Page 79

1  A. No, sir.
2  Q. Did you took at any part of
3  the new drug application for any other
4  nonsteroidal anti-inflammatory drug?
5  A. No, sir.
6  Q. Did you look at the medical
7  officer review or summary basis of
8  approval for Celebrex or Bextra?
9  A. No, sir.
10 Q. Did you look at the medical
11 officer review or summary basis of
12 approval for any other nonsteroidal
13 anti-inflammatory drug?
14 A. No.
15 Q. Did you review the labeling
16 for Celebrex or Bextra in connection with
17 your opinions?
18 A. No.
19 Q. Did you review the labeling
20 for naproxen?
21 A. No.
22 Q. Did you review the labeling
23 for any other nonsteroidal
24 anti-inflammatory drug?

Page 80

1  A. No, sir.
2  Q. Did you do any specific
3  medical literature review concerning
4  Celebrex as a part of your review of this
5  case?
6  A. No, sir.
7  Q. How about with respect to
8  Bextra?
9  A. No, sir.
10 Q. Did you do a medical
11 literature review on the issue of
12 naproxen?
13 A. I think I have to say yes
14 insofar as it was related to the
15 possibility of an anticardiothrombotic
16 effect associated with Naprosyn.
17 Q. Okay.
18 What specific literature
19 search did you do?
20 A. Well, it's the literature
21 that's in my affidavit.
22 Q. Just for keeping the record
23 straight, when you are referring to your
24 affidavit, you're referring to Exhibit 1,

Page 81

1  your report?
2  A. Yes, that's right.
3  Q. That's fine. Call it what
4  you want. I just want to make sure we're
5  clear.
6  So, to the extent that
7  you've reviewed literature on naproxen,
8  that would be listed in your references?
9  A. Yes, sir.
10 Q. Okay.
11 Did you do a medical
12 literature review on any other
13 non-selective NSAID other than naproxen?
14 A. I need to add one thing. In
15 the literature and also what's on this
16 index because I perhaps didn't include
17 everything in my references.
18 Q. That was with respect to
19 naproxen?
20 A. Yes.
21 Q. Okay.
22 Did you do a specific
23 medical literature review for any other
24 nonselective NSAID?

21 (Pages 78 to 81)

Lemuel A. Moye, M.D.

Page 82

1    A.    No, sir.
2    Q.    Did you review the
3  deposition testimony of Dr. Eric Topol?
4    A.    No, I did not review that.
5    Q.    Did you review the
6  deposition testimony of Dr. Curfman?
7    A.    Yes.
8    Q.    What was the purpose of
9  reviewing his testimony?
10   A.    The Dr. Curfman I'm thinking
11 of is the editor-in-chief of the New
12 England Journal.
13   Q.    Actually, he's not the
14 editor-in-chief, but he's an editor.
15   A.    Actually, you're right.
16   Q.    Same question.
17   A.    That's right, an editor of
18 the New England Journal. I reviewed that
19 because I thought it was related to the
20 reporting of the VIGOR results. So, I
21 thought it was relevant to VIGOR.
22   Q.    Okay.
23         Did you read both of his
24 depositions?

Page 83

1    A.    Yes, sir.
2    Q.    Did you look at the
3  exhibits?
4    A.    Yes.
5    Q.    Did you review the
6  deposition of Dr. David Graham?
7    A.    No, I did not.
8    Q.    In connection with your
9  opinions in California and the MDL, do
10 you intend to offer any opinions about
11 Merck's motives or intent with respect to
12 Vioxx?
13         MR. WACKER: Object to form.
14         MR. SIZEMORE: Object to
15    form.
16         THE WITNESS: I'm not sure I
17    know how to answer that. As I
18    read the internal documents and
19    tried to put together in my mind
20    what was going on here, I think it
21    became clear to me what they
22    weren't doing, so, I suppose I am
23    going to speak to some degree
24    about the motives.

Page 84

1  BY MR. PIORKOWSKI:
2    Q.    Let me rephrase it like
3  this: You understand that there are
4  things that one believes should be done
5  and they don't get done, that that can
6  either be the result of a deliberate
7  process or it can be the result of lack
8  of awareness or negligence or a variety
9  of other reasons. Fair enough?
10   A.    Yes, I understand that.
11         MR. WACKER: I'm sorry. Let
12    me just object to form.
13 BY MR. PIORKOWSKI:
14   Q.    My question is, you're
15 looking at the records, and in a variety
16 of respects you're saying, I think
17 certain things should have been done and
18 I don't think Merck did them. Fair
19 enough?
20   A.    Yes.
21   Q.    Okay.
22         Are you offering any
23 opinions that Merck intended to hurt
24 patients or intended to mislead the FDA?

Page 85

1         MR. SIZEMORE: Object to
2    form.
3         THE WITNESS: I think I am.
4  BY MR. PIORKOWSKI:
5    Q.    What expertise do you have
6  in determining corporate intent?
7    A.    My expertise with working
8  with the drug companies in the past and
9  my expertise in designing, executing and
10 analyzing clinical trials.
11   Q.    Okay.
12         What specific -- I'd like to
13 have you just tell me as far as specific
14 issues are concerned, what specific
15 issues are you intending to offer
16 opinions about with respect to either
17 Merck's intent or Merck's motives?
18   A.    I think I can probably speak
19 most clearly about Merck's intent. And I
20 believe Merck's intent was not to provide
21 a fair, clear assessment of the
22 relationship between Vioxx and
23 cardiovascular events -- cardiovascular
24 serious adverse events.

22 (Pages 82 to 85)

Page 86

1  Q. At a particular point in
2  time?
3  A. I have examples at
4  particular points in time, yes.
5  Q. Well, let's break it down
6  like this. Are you offering any opinions
7  along that line about an intent not to
8  provide a fair and clear assessment
9  between Vioxx and cardiovascular events
10 prior to the initial approval?
11     MR. SIZEMORE: Object to
12     form.
13     THE WITNESS: Yes.
14 BY MR. PIORKOWSKI:
15 Q. Are you offering opinions
16 between the time of the initial approval
17 and the April 2002 label change?
18 A. Yes.
19 Q. And are you offering
20 opinions about Merck's intent following
21 the April 2002 label change?
22 A. I think not so much.
23 Q. Not so much as in no?
24 A. I mean no, sorry. No.

Page 87

1  Q. All right.
2     Any other aspects of Merck's
3  motives or intent that you plan to offer
4  opinions about?
5     MR. SIZEMORE: Object to
6     form.
7     THE WITNESS: As I sit here
8     now, I think my answer is no.
9  BY MR. PIORKOWSKI:
10 Q. In terms of your background,
11 Dr. Moye, you've completed a medical
12 internship; is that right?
13 A. That's right.
14 Q. But you've never completed
15 residency training, right?
16 A. Never entered residency
17 training. That's right.
18 Q. You are not fellowship
19 trained in cardiology, correct?
20 A. That's true. I'm not
21 fellowship trained.
22 Q. You're not board certified
23 in cardiology?
24 A. I'm not board certified.

Page 88

1  Q. You don't hold yourself out
2  as a cardiologist, right?
3  A. That's right.
4  Q. You're not fellowship
5  trained in hematology; is that right?
6  A. That's right.
7  Q. You're not board certified
8  in hematology?
9  A. That's correct.
10 Q. You don't hold yourself out
11 as a hematologist?
12 A. That's right.
13 Q. You're not fellowship
14 trained in rheumatology, right?
15 A. Right.
16 Q. You are not board certified
17 in rheumatology?
18 A. Right.
19 Q. You don't hold yourself out
20 as an expert in rheumatology, correct?
21 A. That's correct.
22 Q. You don't hold yourself out
23 as an expert in pharmacology, either,
24 right?

Page 89

1  A. That's correct.
2  Q. Am I correct you've not seen
3  a patient since March of 1992?
4  A. That's not true. Certainly,
5  I have not been in practice since March
6  of 1992, but I've seen patients, and the
7  biggest -- I saw many patients during the
8  Katrina debacle, but I've certainly not
9  been in practice since March 1992.
10 Q. By "not in practice," that
11 means you didn't have regular office
12 hours?
13 A. That's true.
14 Q. Is that what that means?
15 A. That's right.
16 Q. All right.
17     In what capacity have you
18 seen patients since March of 1992?
19 A. Actually, more as courtesy
20 than anything else. And also the
21 emergency care that first responders
22 provided at the Astro Arena last
23 September.
24 Q. Do you currently keep a

Lemuel A. Moye, M.D.

Page 90

1 valid medical license?
2    A.   I do.
3    Q.   In Texas?
4    A.   Yes.
5    Q.   Anywhere else?
6    A.   No.
7    Q.   What was your involvement in
8 the medical arena in Katrina?
9    A.   Providing emergency care and
10 then family practice general medicine
11 responder to the myriad difficulties that
12 the Katrina survivors had.
13   Q.   Did you take off from work
14 to do that, or what were the
15 circumstances?
16   A.   Well, it was off of work,
17 off of weekends.  It was --
18   Q.   Is that something that the
19 University of Texas sort of allows you
20 time off to go do, or did you have to
21 take vacation time to do that?
22   A.   No.  Actually, they made an
23 allowance for us to do that.  They made
24 an administrative time allowance for us

Page 91

1 to do that.
2    Q.   To sort of contribute to the
3 effort?
4    A.   Yes, sir.
5    Q.   Have you ever prescribed
6 Vioxx?
7    A.   No.
8    Q.   Have you ever counseled a
9 patient about Vioxx?
10   A.   No.
11   Q.   Did you ever read the
12 product label for Vioxx while Vioxx was
13 on the market?
14   A.   No.
15   Q.   Have you ever prescribed any
16 COX-2 inhibitor drug?
17   A.   No.
18   Q.   Do you have any personal
19 experience with Vioxx?
20   A.   No.
21   Q.   Are there any physicians
22 that you know who prescribed Vioxx with
23 whom you've discussed their experience?
24   A.   No.

Page 92

1    Q.   Are there any patients you
2 know who've used Vioxx with whom you've
3 discussed their experience?
4    A.   No.
5    Q.   When you were practicing
6 medicine regularly, did you prescribe
7 nonselective nonsteroidal
8 anti-inflammatory drugs?
9    A.   Frequently, yes.
10   Q.   Frequently?
11   A.   Yes.
12   Q.   For what types of problems?
13   A.   Acute injuries, some chronic
14 problems, but primarily acute injuries.
15   Q.   Which nonsteroidal
16 anti-inflammatory drugs did you use?
17   A.   Primarily ibuprofen, also
18 naproxen.
19   Q.   Any others?
20   A.   Those are the only ones that
21 come to mind now.  I'm sorry.  Parafon
22 Forte.  But I'm not sure if that's an
23 NSAID.
24   Q.   I don't think that's an

Page 93

1 NSAID.
2    A.   Okay.
3    Q.   In any event, you prescribed
4 Parafon Forte --
5    A.   Yes.
6    Q.   -- for musculoskeletal pain?
7    A.   Yes.
8    Q.   Was it your practice when
9 you were involved in active regular
10 medical practice to inform patients of
11 the potential risks of medications you
12 prescribed?
13   A.   Yes.
14   Q.   Did you inform patients when
15 you prescribed nonsteroidal
16 anti-inflammatory medications to them
17 that there were potentially serious
18 gastrointestinal risks?
19   A.   Yes.
20   Q.   Did you consider at the time
21 nonsteroidal anti-inflammatory drugs to
22 be unsafe because they had
23 gastrointestinal risks?
24   A.   Not when used as directed.

24 (Pages 90 to 93)

Page 94

Q. How did you direct people to use them?
A. For a fairly short period of time, no more than five to seven days.
Q. Did you ever use nonsteroidal anti-inflammatory drugs for more than five to seven days?
A. No.
Q. Did you take care of any arthritis patients?
A. Osteoarthritic patients, yes. Very rarely did I care for a rheumatoid arthritic patient chronically, but several osteoarthritic patients.
Q. What medications did you use to control pain and inflammation in osteoarthritis patients?
A. Actually, I didn't use -- well, to answer your question directly, Tylenol. An acute bout -- an acute bolus I would say, five to seven days of a nonsteroidal anti-inflammatory, but primarily it was a combination of rest and exercise and warm water baths.

Page 95

Q. Did you conduct at any point in your career any original laboratory research on COX-2 inhibitors?
A. No, sir.
Q. Did you conduct any original laboratory research on the effects of nonsteroidal anti-inflammatory drugs?
A. No.
Q. Were you the author of any original epidemiological studies on Vioxx or any other COX-2 inhibitor?
A. No.
Q. Are you the author of any original epidemiological studies on the effects of NSAIDs?
MR. SIZEMORE: Did you get that question?
THE WITNESS: I did. Let me answer this way. I was not involved in an epidemiologic study that focused on the effect of NSAIDs. That's true.
BY MR. PIORKOWSKI:
Q. Were you involved in a study

Page 96

that focused on the efficacy of NSAIDs?
A. No.
Q. Were you involved in a study that focused on the safety of NSAIDs?
A. Yes. We used NSAIDs as a control. We used actually ibuprofen as a control in an epidemiologic study that we carried out in the 1980s.
Q. Is that a published manuscript?
A. Yes, it is.
Q. Can you direct me to -- actually, let me see what I've got here.
Do you have your CV with you?
A. I don't, no.
Q. I'll get it on a break.
Is it listed in your CV?
A. Yes, it is.
Q. Can you describe for me briefly what the study was?
A. Sure. It was a study that attempted to evaluate the cardiovascular effects of terfenadine. And we used

Page 97

ibuprofen as a control.
Q. Terfenadine is the drug Seldane?
A. Yes.
Q. And you were a consultant to Marion Merrill-Dow with respect to Seldane, is that right?
A. That's right.
Q. Were you a consultant at the time you were the author of the study?
A. Yes.
Q. And was the study intended to evaluate the potential cardiovascular adverse effects of Seldane?
A. Yes.
Q. And what you're saying is that ibuprofen was used as the control group for your study?
A. Yes.
Q. And is the assumption of your study that ibuprofen does not have any adverse cardiovascular effects?
A. At the time, that was the understanding, yes.

Page 98

1    Q.   And at the time, was that
2  the common understanding of the medical
3  community based on your best opinion?
4    A.   Yes.
5    Q.   Otherwise, you wouldn't have
6  chosen it as a control group, right?
7    A.   That's right.
8    Q.   Any other study that you've
9  been involved with that's involved the
10 use of NSAIDs in any way?
11   A.   No.
12   Q.   Have you published on the
13 subject of COX-2 biochemistry?
14   A.   I have not.
15   Q.   Have you published on the
16 subject of the benefits of nonsteroidal
17 anti-inflammatory drugs?
18   A.   No.
19   Q.   Have you published anything
20 about the risks of nonsteroidal
21 anti-inflammatory drugs?
22   A.   No.
23   Q.   Have you had discussions
24 with any person who was the author of an

Page 99

1  epidemiological study involving NSAIDs
2  about the subject of NSAIDs?
3    A.   No, I have not.
4    Q.   Do you know Dr. Wayne Ray?
5    A.   I do.
6    Q.   Are you aware that Dr. Wayne
7  Ray has published extensively on the
8  gastrointestinal risks of NSAIDs?
9    A.   Yes. Actually, I think I
10 referred to one of his manuscripts in my
11 affidavit, Exhibit 1.
12   Q.   Have you read Dr. Ray's
13 deposition testimony?
14   A.   No, sir.
15   Q.   Have you read Dr. Ray's
16 trial testimony?
17   A.   Yes.
18   Q.   Do you know he testified
19 twice?
20   A.   I only read one.
21   Q.   Do you know which one you
22 read?
23   A.   No, sir. I think the answer
24 might be in here. (Indicating).

Page 100

1    Q.   Okay.
2         It would be reflected in
3  Exhibit 2?
4    A.   Yes, sir.
5    Q.   So, you haven't had any
6  discussions with Wayne Ray about any
7  aspect of this case?
8    A.   That's true.
9    Q.   What about Jerry Avorn, have
10 you had any discussions with Jerry Avorn?
11   A.   No, sir.
12   Q.   Do you know David Graham?
13   A.   Not personally. We've never
14 met.
15   Q.   Have you had any discussions
16 with him on the phone or otherwise about
17 any aspect of this case?
18   A.   No, sir.
19   Q.   What about Eric Topol?
20   A.   Not about this case, no.
21   Q.   Have you had any discussions
22 with Eric Topol about any aspect of COX-2
23 inhibitors?
24   A.   No, sir.

Page 101

1    Q.   Do you know Dr. Curfman?
2    A.   Not personally, no.
3    Q.   Do you know any of the
4  editors? Do you know Dr. Drazen?
5    A.   No, I don't.
6    Q.   Do you know any of the
7  editors who were involved in a review of
8  the VIGOR manuscript?
9    A.   No, I don't.
10   Q.   Have you had any discussion
11 with any editors about the VIGOR
12 manuscript personally?
13   A.   No.
14   Q.   Is it fair to say that you
15 do not have any knowledge, experience,
16 training, skill or education in
17 pharmaceutical product marketing? Is
18 that correct?
19        MR. WACKER: Object to form.
20        MR. SIZEMORE: Objection.
21        THE WITNESS: I don't think
22   I could agree with that.
23 BY MR. PIORKOWSKI:
24   Q.   You don't think you could

Lemuel A. Moye, M.D.

Page 102

1  agree with that?
2      A.   No, sir.
3      Q.   Have you ever worked for
4  DDMAC?
5      A.   No, sir.
6      Q.   Have you ever worked, been a
7  consultant to DDMAC?
8      A.   No.
9      Q.   Do you remember giving
10 testimony in the Rocha case in Jim Wells
11 County Texas back in 1999?
12     A.   Yes.
13     Q.   In fact, I think I was the
14 person that was examining you?
15     A.   I think you were.
16         MR. PIORKOWSKI:  Paul, I've
17     got one copy of this, but I'll let
18     you take a look at the transcript.
19         MR. SIZEMORE:  I'd like him
20     to see it before he comments.
21 BY MR. PIORKOWSKI:
22     Q.   Do you recall being asked
23 this question and giving this answer?
24         "Question:  Okay.  Now, you

Page 103

1  have no knowledge, experience, training
2  or education in pharmaceutical product
3  marketing, do you?
4         "Answer:  I think that's
5  true.  Yes."
6         MR. PIORKOWSKI:  (Handing
7     over document.)
8         MR. SIZEMORE:  Is this from
9     the trial?
10        MR. PIORKOWSKI:  Yes
11        (Witness reviewing
12    document.)
13        THE WITNESS:  I understand.
14    Sure.  I recall that's what I
15    said.  I certainly meant then and
16    mean today that I'm not an expert
17    in marketing.  There's no question
18    of that.  I'm not an expert.  But
19    I think any physician who's had
20    marketers come in their office and
21    speak with them about products
22    understands good and bad marketing
23    techniques.
24 BY MR. PIORKOWSKI:

Page 104

1      Q.   All right.
2      A.   So, that was the basis for
3  my answer to your question.
4      Q.   Okay.
5           You've never worked for any
6  company or given advice to any
7  pharmaceutical company about any aspect
8  of pharmaceutical product marketing; is
9  that correct?
10     A.   That's right.
11     Q.   Your report discusses your
12 involvement on the Advisory Committee and
13 actually has some discussion generally
14 about Advisory Committees, is that right?
15     A.   Yes, it does.
16     Q.   Is it correct that an
17 Advisory Committee is an official body
18 under the Code of Federal Regulations?
19     A.   Yes.
20     Q.   And the purpose of an
21 Advisory Committee is to provide
22 independent advice to FDA?
23     A.   Yes.
24     Q.   And the rules of disclosure

Page 105

1  concerning Advisory Committee members are
2  designed to ensure that Advisory
3  Committee members are independent, right?
4      A.   Yes.
5      Q.   In other words, to make sure
6  that they don't have any personal stake
7  in the outcome of the Advisory
8  Committee's decision?
9      A.   I would disagree with you
10 about that.  I think the rules are not to
11 ensure that there is none, but to reveal
12 what there is so that people can view the
13 comments of the advisors in the
14 appropriate context.
15     Q.   Well, there's certainly a
16 threshold beyond which a potential
17 interest in the outcome of a decision is
18 too much as far as the FDA is concerned,
19 right?
20     A.   Right.  I couldn't tell you
21 what that threshold is, but --
22     Q.   But your interpretation of
23 the rules is that at a minimum, wherever
24 that point is, that the disclosure rules

27 (Pages 102 to 105)

Page 106

1  require that any potential interest be
2  out on the table?
3      A.  Yes.
4      Q.  So that people can evaluate
5  whether, in fact, these individual
6  Advisory Committee members are or are not
7  independent?
8      A.  Yes.
9      Q.  Okay.
10         Advisory Committees
11 generally are made up of scientists in
12 the field in which the drug is expected
13 to be effective, right?
14     A.  Generally.  They also
15 include patients sometimes, and
16 occasionally they will include a
17 representative from the pharmacy industry
18 itself.  But in general, it's composed of
19 scientists.
20     Q.  The lion's share of the
21 voting members on an Advisory Committee
22 are generally scientists who have a
23 medical specialty in the area in which
24 the drug is expected to be effective; is

Page 107

1  that right?
2      A.  Yes.
3      Q.  In your case, the Advisory
4  Committee that you served on was the
5  cardiorenal Advisory Committee?
6      A.  That was the first of two,
7  yes.
8      Q.  That's the one you were on
9  for a period of --
10     A.  Four years.
11     Q.  -- four years?
12     A.  Yes, sir.
13     Q.  Is the pharmaceutical
14 committee that you're on, is that also an
15 Advisory Committee?
16     A.  Pharmacy science is.  I'm
17 not on it now.  I rotated off.  That was
18 a committee that focused on issues
19 involving generic drugs.  It used to be
20 called the generic Advisory Committee,
21 but they changed that.
22     Q.  So, because that has a
23 cross-section of different disciplines,
24 that draws on a number of people from

Page 108

1  different specialties?
2      A.  Yes.
3      Q.  But there are different
4  Advisory Committees for different types
5  of drugs, right?
6      A.  Yes.
7      Q.  And where a drug is expected
8  to have a cardiac effect, that's the
9  cardiorenal Advisory Committee that would
10 do that drug?
11     A.  In general, yes.  Of course
12 drugs have multiple effects, and
13 sometimes Advisory Committees meet
14 together.  Sometimes one group will
15 borrow from another, but in general, what
16 you say is true.
17     Q.  Advisory Committees also
18 include biostatisticians, correct?
19     A.  Yes.
20     Q.  And even though you were on
21 the cardiorenal Advisory Committee,
22 you're not an expert in cardiology or
23 nephrology, right?
24     A.  I would disagree with you

Page 109

1  about that.  I certainly am not a
2  cardiologist, but I have extensive
3  training and experience carrying out
4  cardiovascular clinical trials.
5      Q.  Were you chosen for the
6  committee as a result of your cardiology
7  experience or as a result of your
8  biostatistics experience?
9      A.  I believe it was both.
10     Q.  The way an Advisory
11 Committee works is there's a meeting date
12 that's set, right?
13     A.  Yes, sir.
14     Q.  And prior to the meeting
15 date, the Advisory Committee members
16 receive information from the FDA, right?
17     A.  That's one source of
18 information.
19     Q.  I'm getting there.  That's
20 one source of information.
21         So, the FDA reviewers who
22 are looking at, let's say, whether to
23 approve a product, they have their own
24 ways of input into the Advisory

Lemuel A. Moye, M.D.

Page 110

1  Committee, right?
2      A.   Yes, sir.
3      Q.   Additionally, the sponsor
4  whose product is before the Advisory
5  Committee, they also have an opportunity
6  to provide the Advisory Committee members
7  with briefing documents, right?
8      A.   Yes.
9      Q.   Such as we already discussed
10 with Merck?
11     A.   Yes.
12     Q.   Now, from your report, you
13 mention that sponsors often spend months
14 preparing these briefing packets; is that
15 right?
16     A.   Yes, sir.
17     Q.   And you'd agree with me that
18 that makes sense because the sponsor
19 doesn't want to make a presentation and
20 then have something be found to be
21 inaccurate at the presentation?
22     A.   I would say this.  The
23 sponsors want things to go correctly for
24 them, and they work very hard to try to

Page 111

1  bring that event about.
2      Q.   And you make reference in
3  your report to saying that they conduct
4  intense preparation sessions, right?
5      A.   Yes, sir.
6      Q.   There's nothing wrong with
7  that, right?
8      A.   That's right.
9      Q.   And in fact, it's important
10 to be fully prepared for an Advisory
11 Committee meeting?
12     A.   Yes.
13     Q.   It's a serious proceeding?
14     A.   Yes.
15     Q.   Okay.
16          Now, the way this works is
17 that FDA asks the committee members
18 specific questions about a particular
19 drug, right?
20     A.   Yes.
21     Q.   And the role of the Advisory
22 Committee members is to answer the
23 questions that the FDA puts to them?
24     A.   Yes.

Page 112

1      Q.   And the Advisory Committee
2  has no actual legal authority to approve
3  or to disapprove a drug, right?
4      A.   That's true.
5      Q.   The committee provides its
6  input to the FDA, and the FDA considers
7  it and makes it own decision?
8      A.   Yes.  It provides critical
9  input.
10     Q.   The types of questions that
11 the Advisory Committee is asked are
12 things like, does the scientific evidence
13 support that a particular drug is safe
14 and effective when used as labeled?
15     A.   Actually not.  The questions
16 are nowhere near that refined.  The
17 questions are, what are the benefits of
18 this drug?  What are the adverse -- what
19 are the adverse experiences of this drug?
20 Do the benefits outweigh the risks?  What
21 should be in the label?  To whom should
22 the drug be marketed?  Should the drug be
23 approved?
24     Q.   Well, the question of should

Page 113

1  the drug be approved is essentially based
2  on the FDA's standards, right?
3          MR. SIZEMORE:  Object to
4      form.
5          MR. PIORKOWSKI:  Let me back
6      up.  I'll withdraw the question.
7  BY MR. PIORKOWSKI:
8      Q.   The Advisory Committee is
9  not at liberty to sort of make up its own
10 rules about what should or shouldn't
11 constitute approval.  It's applying the
12 set of standards that the FDA has given
13 them, right?
14     A.   No, sir.  Advisory
15 Committees are not so well behaved.
16 Advisory Committees will commonly
17 disagree with what the FDA's rules are.
18 I shouldn't say "commonly."  They will
19 occasionally disagree with what the FDA's
20 rules are.  They will suggest
21 alternatives.  They will even discard the
22 FDA's questions and come up with their
23 own questions.  And so Advisory
24 Committees can be prickly and

Lemuel A. Moye, M.D.

Page 114

1  independent.
2      Q.   All right.
3           If the Advisory Committee
4  disregards the questions that the FDA put
5  to it, that has no binding effect on
6  anybody, right?
7      A.   Binding effect, I don't
8  know. It certainly conveys to the FDA
9  what the Advisory Committee's concerns
10 are. And --
11     Q.   Okay. I'm sorry. Go ahead.
12 I didn't mean to cut you off.
13     A.   And that is one of the most
14 important functions that the Advisory
15 Committee carries out. It lets the FDA
16 know through the conversations during the
17 day, through the questions and through
18 the conversations around the questions
19 either posed by the FDA or posed by the
20 committee members what the Advisory
21 Committee's concerns are. So, it's not
22 just the answers to the questions that
23 the FDA responds to, it's the entire
24 gestalt, it's the entire flavor of the

Page 115

1  conversations that took place.
2      Q.   Is it correct that most of
3  the Advisory Committee meetings that you
4  have attended on cardiorenal drugs have
5  ended with a bottom line question about
6  whether a particular drug should be
7  approved as -- should be approved for
8  marketing in the United States?
9           That's the question.
10     A.   Certainly I would agree.
11 Certainly one of the questions is that.
12 Commonly the question is more complicated
13 than that because it has to be because we
14 on the Advisory Committee don't have a
15 label yet. And there's lots of
16 discussion about label. And depending on
17 whether the drug should be approved or
18 not, it really depends on what the label
19 is going to say many times. So, it's
20 really a little more complicated a
21 question that we have to deal with.
22     Q.   So, your testimony is that
23 the FDA Advisory Committee does not have
24 a draft label available to them at the

Page 116

1  time they make a decision as to whether a
2  drug should be approved for marketing?
3      A.   No. Many times we do have a
4  draft label, but the draft label's
5  tenability may be questioned at the
6  Advisory Committee meeting. Then when we
7  ask a question about approval, then it
8  has to be clear in what context the
9  approval is going to be gained.
10     Q.   That's an important
11 question. Let's talk about that for a
12 second.
13          When the FDA approves a
14 drug, it doesn't just approve it in a
15 vacuum, right?
16     A.   That's true.
17     Q.   The FDA approves a drug for
18 a specific indication or specific
19 indications, right?
20     A.   Yes, sir.
21     Q.   With specific dosages,
22 right?
23     A.   Yes, sir.
24     Q.   Sometimes with certain

Page 117

1  duration of use requirements, right?
2      A.   Yes.
3      Q.   And it's always approved --
4  every FDA approval is always approved as
5  used in the approved label, right?
6      A.   Not Advisory Committee,
7  every FDA approval, yes.
8      Q.   Every FDA approval
9  ultimately approves a drug for use as
10 labeled, right?
11     A.   Yes.
12     Q.   Okay.
13          Now, what the proposed
14 labeled indications are and what the
15 proposed doses are, that information is
16 available and is the subject of
17 discussion at Advisory Committee
18 meetings?
19     A.   Those and many other things,
20 yes.
21     Q.   But that's not a secret.
22 The Advisory Committee is not in the dark
23 about what the proposed dosage is going
24 to be?