Lemuel A. Moye, M.D.

Page 118

1   A.   That's right.
2   Q.   They know what's on the
3   table as far as -- I mean, as an Advisory
4   Committee member, you couldn't make a
5   determination about whether a drug should
6   or shouldn't be approved in the absence
7   of specific indications or specific dose
8   information?
9   A.   I agree.  My point is that
10  there is disagreement at the Advisory
11  Committee about what the indications are
12  or about what the adverse event complex
13  really is.  And so the question for
14  approval really hinges on what the
15  understanding is about those.
16  Q.   Okay.
17       And the truth of the matter
18  is that Advisory Committee members can
19  have different points of view about, for
20  example, whether the scientific evidence
21  on a drug shows that it's efficacious,
22  right?
23  A.   Yes.
24       MR. SIZEMORE:  Before you do

Page 119

1   that, there's a interruption --
2   distraction.
3          - - -
4       (Whereupon, a recess was
5       taken from 11:32 a.m. until 11:41
6       a.m.)
7          - - -
8   BY MR. PIORKOWSKI:
9   Q.   Before we took our break, we
10  were talking about Advisory Committees,
11  and I believe you were telling me that
12  the questions that are presented to the
13  Advisory Committee are often difficult
14  questions?
15  A.   Yes.  Difficult and
16  complicated questions which spawn
17  unpredictable answers, which lead to
18  changing the question.  So, it's a very
19  dynamic process.
20  Q.   The questions that they're
21  considering usually are some variant of
22  whether the drug is effective and whether
23  the drug is safe.  Those are really the
24  primary considerations?

Page 120

1   A.   That's a fair statement.
2   The conversations ultimately are about
3   whether the drug can be used safely and
4   effectively.
5   Q.   It may involve at what doses
6   or with what limitations, but those tend
7   to be the central issues.  Fair enough?
8   A.   Yes.
9   Q.   And fair to say that
10  Advisory Committee members often have
11  different points of view with respect to
12  these issues of safety and efficacy with
13  respect to a particular drug?
14  A.   Certainly.
15  Q.   And often one or more
16  Advisory Committee member dissents from
17  the majority view?
18  A.   Yes.
19  Q.   Because the decisions often
20  involve questions of medical judgment.
21  Fair to say?
22  A.   Yes.  Individual medical
23  judgment, yes.
24  Q.   And reasonable minds can

Page 121

1   often differ on these questions.  Would
2   you agree?
3   A.   Yes.  There are some tough
4   questions.
5   Q.   And in fact, if we were to
6   look at your own voting record on the
7   cardiorenal Advisory Committee, more
8   often than not you were in the minority,
9   right?
10  A.   That's true.
11  Q.   You voted against approving
12  the vast majority of drugs that came
13  before the Advisory Committee, true?
14       MR. SIZEMORE:  Object to the
15       form.
16       THE WITNESS:  Yes.  That's
17       true.
18  BY MR. PIORKOWSKI:
19  Q.   And one of the drugs you
20  voted against is a drug called Plavix,
21  right?
22  A.   Yes.
23  Q.   Which today is the second
24  most commonly prescribed drug in the

31 (Pages 118 to 121)

Lemuel A. Moye, M.D.

Page 122

1 world, right?
2  A. I accept your representation
3 of that.
4  Q. Okay.
5     Now, to bring us back to
6 Vioxx, at the point after the FDA
7 reviewed the new drug application for
8 Vioxx and before FDA issued its approval,
9 there was an Advisory Committee convened
10 to review Vioxx in 1999, right?
11  A. Yes.
12  Q. Just so everybody is clear,
13 you were not a member of that Advisory
14 Committee?
15  A. That's correct.
16  Q. That was the arthritis
17 Advisory Committee, not the cardiorenal
18 Advisory Committee that considered Vioxx?
19  A. That's true.
20  Q. And have you spoken with
21 anyone who was on that Advisory
22 Committee?
23  A. No. Certainly not about
24 Vioxx. I don't know who was on the

Page 123

1 committee, but I've not spoken to any
2 Advisory Committee member about Vioxx.
3  Q. Well, you do know who was on
4 the committee by virtue of having read
5 the transcripts?
6  A. I don't know today, but I
7 can look it up to see, sure.
8  Q. The same thing is true for
9 the 2001 Advisory Committee, you were not
10 a member of that committee, right?
11  A. That's true.
12  Q. And you've not spoken to
13 anyone who is on that committee?
14  A. That's true. Again, about
15 Vioxx.
16  Q. About Vioxx.
17  A. Right.
18  Q. You've never done any work
19 for Merck, is that right?
20  A. That's true. I've not done
21 any work for Merck.
22  Q. Have you spoken to any
23 employee of Merck about any aspect of
24 this case?

Page 124

1  A. No, I have not.
2  Q. Do you have any
3 recollections of having met with sales
4 representatives of Merck about Vioxx?
5  A. No, I haven't. It was
6 approved well after I was out of
7 practice, so, no.
8  Q. I assume that you would
9 really have no occasion to meet with
10 sales reps for any reason now that you're
11 not in active practice?
12  A. That's true. Again, just to
13 be clear, there were many people in the
14 pharmaceutical industry who were at the
15 Astrodome in Katrina who really helped us
16 quite a bit, and so I had lots of
17 conversations with them, but it wasn't
18 about any of the matter we're talking
19 today.
20  Q. Was there anyone at Merck
21 involved in that?
22  A. I presume there were, but I
23 don't recall who they were.
24  Q. On the Advisory Committees

Page 125

1 that you've served on, is it correct that
2 you have never been involved in any
3 aspect of reviewing any COX-2 drug?
4  A. That's certainly true for
5 cardiorenal. I can't recall -- well,
6 it's true for both of them because
7 pharmacy science, we didn't talk about
8 any drug in particular. So, it's true
9 for both.
10  Q. On the cardiorenal Advisory
11 Committee, you were never involved in the
12 consideration of any issue concerning
13 nonsteroidal anti-inflammatories, right?
14  A. The main focus of the
15 conversation was never about nonsteroidal
16 anti-inflammatories, that's right.
17  Q. Was there ever a
18 nonsteroidal anti-inflammatory issue
19 presented to the pharmacy sciences
20 Advisory Committee?
21  A. Right. That's the right
22 committee. No, there has not been.
23  Q. So, fair to say that none of
24 your Advisory Committee experience has

Lemuel A. Moye, M.D.

Page 126

1  involved reviewing any aspect of
2  nonsteroidal anti-inflammatory drugs?
3      A.   That's true.
4      Q.   Okay.
5           Have you ever spoken to any
6  FDA official or former FDA official who
7  was involved in Vioxx about their
8  experience?
9      A.   About their experience with?
10     Q.   With Vioxx.
11     A.   No.
12     Q.   Or about any aspect of
13 Vioxx?
14     A.   No.
15     Q.   Now, on Paragraph 10 of your
16 report, you make reference to having been
17 a consultant to various drug companies?
18     A.   Yes, sir.
19     Q.   Have you ever been a
20 consultant to any pharmaceutical company
21 with respect to any nonsteroidal
22 anti-inflammatory drug?
23     A.   I need a moment.
24          (Witness reviewing

Page 127

1  document.)
2      No.
3      Q.   Have you ever been a
4  consultant to any pharmaceutical company
5  with respect to any drug used for the
6  treatment of arthritis?
7      A.   No.
8      Q.   Have you ever been a
9  consultant to any pharmaceutical company
10 with respect to any drug that had as its
11 purpose pain relief or analgesia?
12     A.   No.
13     Q.   With respect to Paragraph
14 10, what was the earliest of these
15 consultations?  Are these in
16 chronological order on here, or are these
17 just kind of in a random order?
18     A.   They're not in chronological
19 order.  I don't know what order they're
20 in.  They might very well be random, but
21 what's your question?
22     Q.   What's the earliest of your
23 consultancies of these things that are
24 listed in 10?  Is it Marion Merrill-Dow?

Page 128

1      A.   Goodness.  Let's see.
2           Either Marion Merrill-Dow or
3  Key Pharmaceuticals.
4      Q.   Marion Merrill-Dow, you
5  consulted with them with respect to the
6  drug Seldane, correct?
7      A.   Right.
8      Q.   Which you referred to
9  earlier?
10     A.   Yes, sir.
11     Q.   Any other drugs you
12 consulted with them on?
13     A.   I don't think so.
14     Q.   What about Key
15 Pharmaceuticals, what did you consult
16 with them on?
17     A.   Nitro-Dur.
18     Q.   Is that a nitroglycerin
19 product?
20     A.   Yes.  Long acting.
21     Q.   I'm sorry.  Go ahead.
22     A.   Long acting nitroglycerin
23 paste.
24     Q.   Was that before or after you

Page 129

1  were on the Advisory Committee for
2  cardiorenal?
3      A.   I think it was before.
4      Q.   Did you design clinical
5  trials?
6      A.   Yes.
7      Q.   Is that what your role was?
8      A.   Yes, sir.
9      Q.   Phase III clinical trials?
10     A.   Yes.
11     Q.   All right.
12          What about Berlex, what was
13 your involvement with them?
14     A.   Berlex was -- involved
15 development of viral therapy for angina
16 pectoris.
17     Q.   Viral therapy?
18     A.   Yes.
19     Q.   You give a virus to stop
20 their ischemia?
21     A.   The idea is you alter the
22 virus' DNA and provide intercoronary
23 virus so that it perfuses to the
24 myocardium, changes the myocardium,

Page 130

1  develops stronger heart and muscle and
2  more blood vessels.
3      Q.   Is that under the "what
4  doesn't kill you makes you stronger"
5  heading?
6      A.   We had some interesting
7  meetings.
8      Q.   What did you do in their
9  case? Did you design clinical trials?
10     A.   No. I was on the data
11 monitoring committee for them.
12     Q.   Okay.
13          Are those still in clinical
14 trials today?
15     A.   No. Those have ended.
16     Q.   Did the data monitoring
17 committee end the clinical trials
18 prematurely?
19     A.   I think we may have ended it
20 barely prematurely, just a few months
21 before its scheduled end.
22     Q.   Because of unforeseen side
23 effects?
24     A.   No. Just no effects at all.

Page 131

1      Q.   No beneficial effects?
2      A.   No beneficial or adverse
3  effects.
4      Q.   Any other involvement with
5  Berlex?
6      A.   I think so. I had an
7  earlier involvement with them. It had to
8  do with designing a monitoring rule for
9  the early termination of studies. It was
10 a statistical consultation. That was in
11 1996.
12     Q.   "A monitoring rule," meaning
13 under what circumstances would you
14 terminate a study early?
15     A.   Yes. Under what statistical
16 criteria would you use that would trigger
17 the conversations that might lead to
18 early termination.
19     Q.   Was that in your capacity as
20 a member of the data safety monitoring
21 board?
22     A.   No. I was not on the DMC
23 there. I was just an advisor to Berlex
24 in helping them construct a rule.

Page 132

1      Q.   Was it the same product?
2      A.   No. It was a different
3  product.
4      Q.   What product was that?
5      A.   I don't remember.
6      Q.   What about Proctor & Gamble?
7      A.   Proctor & Gamble was a
8  consultation about an antipsychotic
9  medication.
10     Q.   Was it in your capacity as a
11 biostatistician?
12     A.   Yes, it was, and also my
13 expertise in cardiology because there was
14 concern about the occurrence of
15 arrhythmias.
16     Q.   Did you design a study?
17     A.   No, sir. I beg your pardon.
18 Yes. I didn't execute it or analyze it,
19 but I helped design it.
20     Q.   Was the study you helped
21 design carried out?
22     A.   I believe so, yes.
23     Q.   At what stage was the
24 product when you were involved? Was it

Page 133

1  already approved?
2      A.   Preapproval.
3      Q.   Was the study that you
4  designed completed prior to approval?
5      A.   Yes.
6      Q.   I'm sorry. What was the
7  name of the product?
8      A.   I'm trying to remember. I
9  don't remember what it was. It was one
10 of the newer generation anti-psychotics,
11 anti-schizophrenic, but I don't remember
12 the name.
13     Q.   All right.
14          Is it on the market today?
15     A.   I don't think so.
16     Q.   You don't think so?
17     A.   I don't think so.
18     Q.   Because it's still under
19 review or because it's been withdrawn?
20     A.   No. It's been a long time.
21 It may have been -- the company may have
22 decided to withdraw the NDA. I don't
23 know. If I'm right that it's not on the
24 market, and I may be wrong about that,

Page 134

1  but if I'm right, it's because it just
2  didn't finish going through the approval
3  process.
4      Q.   Roughly what time frame are
5  we talking about, year-wise?
6      A.   Early 190s, I think.
7      Q.   Anything else for Proctor &
8  Gamble?
9      A.   No.
10     Q.   Nothing else for Marion
11 Merrill-Dow besides Seldane?
12     A.   That's right.
13     Q.   How about Pfizer?
14     A.   Pfizer, any psychotic
15 medication for them I was involved in
16 analyzing the results of the clinical
17 study. Same type of newer generation
18 anti-schizophrenic medication that they
19 feared was associated with arrhythmias.
20     Q.   Is this by virtue of your
21 work in the Seldane litigation that these
22 came into you?
23     A.   I don't know. It certainly
24 makes sense, because the kind of

Page 135

1  arrhythmia we were concerned about in
2  Seldane was related to the arrhythmias
3  that were associated with these newer
4  anti-psychotics.
5      Q.   Okay.
6           Did you design a clinical
7  trial or was that just a one-time
8  consultation?
9      A.   I think it was just a short
10 consultation evaluation of their Phase
11 III clinical -- of their Phase III safety
12 program. So, it's preapproval.
13     Q.   While it was still going on?
14     A.   You mean while the trial was
15 still going on?
16     Q.   Yes.
17     A.   I think while the trial --
18 yes, yes, and afterwards, yes.
19     Q.   Okay.
20          Any other work for Pfizer?
21     A.   I've given some lectures at
22 Pfizer, but not consulted on a drug.
23     Q.   What lectures have you
24 given?

Page 136

1      A.   I gave three lectures to
2  Pfizer, November 2004. Do you want the
3  topics?
4      Q.   Sure.
5      A.   Okay.
6      Q.   Would they be on your CV?
7      A.   Yes, they would.
8      Q.   Let me give you that if that
9  helps.
10          - - -
11          (Whereupon, Deposition
12     Exhibit Moye MDL 3, Curriculum
13     Vitae of Lemuel A. Moye, M.D.,
14     Ph.D. (22 pages), was marked for
15     identification.)
16          - - -
17 BY MR. PIORKOWSKI:
18     Q.   I'm going to give you what I
19 marked as Exhibit 3, which is your CV.
20     A.   (Witness reviewing
21 document.)
22          Yes. Here they are. Items
23 56, 57 and 58. One was a discussion of
24 dependence in subgroup analyses. The

Page 137

1  other was hyperdependence in clinical
2  trial analyses.
3      Q.   I'm sorry, what page are you
4  on?
5      A.   I'm on Page 15.
6      Q.   56, 57 and 58?
7      A.   56, 57 and 58. So,
8  dependence in subgroup analyses,
9  hyperdependence in clinical trial
10 analyses, and professionalism in science.
11     Q.   Okay.
12          Anything else for Pfizer?
13     A.   No.
14     Q.   What about -- how do you say
15 that, Hoechst --
16     A.   Hoechst Roussel. Yeah, they
17 were interested -- again, this was a
18 consultation to oversee a clinical trial,
19 evaluating the possible arrhythmogenic
20 effects of an antibiotic. That was circa
21 1996.
22     Q.   Putting aside Seldane,
23 that's three companies that you consulted
24 with in terms of evaluating through

Page 138

1  clinical trials the antiarrhythmic
2  effects of different products?
3      A.   Yes.
4      Q.   What's the name of the
5  product with Hoechst Roussel?
6      A.   I don't remember. It was an
7  antibiotic. I don't remember the name of
8  it.
9      Q.   Do you remember what
10 category of antibiotic? Was it
11 cephalosporin?
12     A.   Cephalosporin.
13     Q.   Third generation?
14     A.   Yes.
15     Q.   Do you know if it's on the
16 market today?
17     A.   I don't know.
18     Q.   Okay.
19          How about Aventis?
20     A.   Aventis was interested in
21 developing an ARB receptor blocker for
22 the treatment of heart failure. And I
23 was engaged as a consultant to help
24 design a Phase III clinical study.

Page 139

1      Q.   So, the study was designed
2  to look at heart failure as the efficacy
3  endpoint?
4      A.   Actually not. The study was
5  primarily focused on the occurrence of
6  adverse events. The concern was for the
7  appearance of angioedema. So it's
8  primarily a safety study.
9      Q.   Was it a Phase III study?
10     A.   No. Actually, I call it a
11 Phase II/III study.
12     Q.   Was the study done?
13     A.   No, it was not. They
14 terminated it because -- well, they
15 terminated it.
16     Q.   They terminated it?
17     A.   They terminated it.
18     Q.   So, the product died on the
19 vine, as they say?
20     A.   Yes.
21     Q.   Do you know what the name of
22 the product was?
23     A.   No.
24     Q.   Any other things for

Page 140

1  Aventis?
2      A.   No.
3      Q.   What was the time frame on
4  that?
5      A.   2001 I think, early 2001.
6      Q.   How about Coromed?
7      A.   Coromed, I was asked to
8  serve as a member of a mock Advisory
9  Committee.
10     Q.   In your report you make
11 reference to the Board of Scientific
12 Advisors?
13     A.   Yes.
14     Q.   That was in place in Merck
15 that you make various references to. Do
16 you recall that?
17     A.   Yes, I do.
18     Q.   Is this consultancy similar
19 to that?
20     A.   No. It was as a member of a
21 mock Advisory Committee for rehearsal.
22 The Coromed's group were planning to
23 present before an FDA Advisory Committee.
24 As part of their rehearsals, they called

Page 141

1  together a group of scientists who could
2  pose as Advisory Committee members.
3      Q.   So, you weren't on the
4  Advisory Committee at the time?
5      A.   That's correct. I was not.
6      Q.   So, based on your experience
7  of having been on that, they thought
8  you'd be a useful person as far as
9  answering questions and so forth?
10     A.   Yes.
11     Q.   Was that a one-time
12 participation?
13     A.   Yes.
14     Q.   What was the product that
15 was at issue?
16     A.   I don't remember.
17     Q.   Do you remember what the
18 nature of the product was?
19     A.   No, I don't.
20     Q.   When was this roughly?
21     A.   This was September 2001.
22     Q.   How about DuPont?
23     A.   DuPont -- before they became
24 part of Bristol-Myers Squibb, I was head

Lemuel A. Moye, M.D.

Page 142

1    of a DSMB that reviewed the -- oversaw
2    the conduct of a study that compared
3    medical versus surgical intervention for
4    patients with a class of angina pectoris.
5        Q.   We've had a couple
6    references to DSMB. Is it my
7    understanding that what you described as,
8    I guess you call it a data monitoring
9    committee, DMC or DSMB, are they
10   interchangeable?
11       A.   Actually, DMC is what I
12   should be using. It's the accepted
13   contemporary term for it, right.
14       Q.   DMC is a body that is made
15   up of independent scientists who are not
16   employed by the company that's funding
17   the study?
18           MR. SIZEMORE: Object to
19   form.
20           THE WITNESS: Yes.
21           MR. SIZEMORE: I'm sorry.
22           THE WITNESS: Yes. A small
23   group of distinguished
24   professionals who are independent

Page 143

1        of the sponsor and of the
2        investigators and who oversee the
3        conduct of the study on a regular
4        basis.
5    BY MR. PIORKOWSKI:
6        Q.   So, they're paid by the
7    company?
8        A.   Yes, that's right.
9        Q.   But they're not employees of
10   the company, right?
11       A.   That's correct.
12       Q.   And they're not involved in
13   the clinical trial itself?
14       A.   That's right.
15       Q.   And their primary goal is to
16   ensure that patients in the clinical
17   trial are safe?
18       A.   Yes.
19       Q.   That's their only goal?
20       A.   Well, I think you said it
21   right at first, the primary goal. The
22   modern DMCs have broadened their
23   portfolio. So, they also look at the
24   underlying assumptions on which the trial

Page 144

1    was designed. They have taken on some
2    ancillary responsibilities, but the
3    primary goal is to ensure the safety of
4    the participants.
5        Q.   Okay.
6            Are the DMCs that you've
7    served on the same type of body as the
8    DSMB that was monitoring the VIGOR study?
9        A.   I don't know much about the
10   monitoring of the VIGOR study, but if it
11   was a classic DMC, that is, as we have
12   laid out in the parameters, independent
13   and providing -- after complete review of
14   all the data that neither the sponsor nor
15   the investigators have access to, make
16   recommendations to the sponsors and to
17   the steering committee, the group of
18   investigators, as to whether the trial
19   should continue or not.
20       Q.   Have you, as a part of the
21   documents you've reviewed, the internal
22   company documents, have you reviewed the
23   meeting minutes of the VIGOR DSMB?
24       A.   I have not.

Page 145

1        Q.   Have you reviewed the
2    meeting minutes of the APPROVe, I think
3    it was called an ESMB, but an external
4    safety monitoring board?
5        A.   I have not.
6        Q.   Have you reviewed any
7    correspondence or e-mail exchanges
8    between Merck employees and members of
9    those boards either before or after the
10   blind was broken?
11       A.   No.
12       Q.   What's the status of the
13   Bristol-Myers -- your service on the
14   Bristol-Myers matter right now?
15       A.   Oh, the DSMB?
16       Q.   Yes.
17       A.   I'm sorry. DMC. The study
18   ended about 18 months ago.
19       Q.   What was the name of the
20   product?
21       A.   Well, actually, it was
22   curious. The study was designed to
23   really assess the ability of a
24   radionuclide to differentiate between

37 (Pages 142 to 145)

Page 146

1  patients with different degrees of left
2  ventricular dysfunction. That was the
3  product. The clinical aspect of it was
4  to demonstrate that patients could be
5  safely -- could have their anginal status
6  safely classified so that appropriate
7  therapy could be targeted for. So, the
8  product really was a radionuclide
9  procedure.
10     Q.  But it still had to be FDA
11  approved, right?
12     A.  Yes.
13     Q.  Was it?
14     A.  Yes.
15     Q.  Do you know the name of the
16  product?
17     A.  I don't.
18     Q.  Is there a product marketed
19  by Bristol-Myers Squibb that is in the
20  form of the radionuclide?
21     A.  I think so.
22     Q.  Was that study terminated
23  early?
24     A.  No.

Page 147

1     Q.  Were there any unusual
2  problems that came up during the study?
3     A.  No. I assume unusual
4  adverse events for patients?
5     Q.  Yes.
6     A.  No, there were not.
7     Q.  Okay.
8         Now, is that the same
9  product that you started off talking
10  about, DuPont, or is that a different
11  DMC?
12     A.  DMC, same product.
13     Q.  Anything else that you've
14  been involved with for Bristol-Myers
15  Squibb?
16     A.  Well, I've done a lot of
17  work for Bristol-Myers Squibb in
18  designing and executing clinical trials.
19  And to answer your first question,
20  probably Bristol-Myers Squibb is the
21  first. We looked at these
22  chronologically.
23     Q.  When did you first consult
24  with them?

Page 148

1     A.  1987. Actually, it wasn't
2  so much as a consultation as it was a
3  grant, that I helped design, execute,
4  analyze a study looking at the effect of
5  Captopril in reducing mortality in
6  patients with LV -- left ventricular
7  dysfunction.
8     Q.  What kind of drug is
9  Captopril?
10     A.  Captopril was an ACE
11  inhibitor, one of the first ACE
12  inhibitors.
13     Q.  Was Captopril approved and
14  on the market at the time you were
15  consulted?
16     A.  Yes, but not for heart
17  failure treatment, for the control of
18  elevated blood pressure.
19     Q.  Any other consultations
20  you've done with Bristol-Myers Squibb?
21     A.  Yes. I helped design,
22  execute and analyze CARE, which was a
23  4100 patient study that evaluated the
24  effect of pravastatin in patients who had

Page 149

1  established positive cardiovascular
2  disease history for reducing the
3  incidence of fatal and nonfatal
4  myocardial infarction.
5     Q.  Pravastatin is a statin
6  drug?
7     A.  Yes, sir.
8     Q.  Lowers lipids?
9     A.  Yes.
10     Q.  Bristol-Myers Squibb was the
11  manufacturer of pravastatin?
12     A.  Yes.
13     Q.  Were you paid --
14     A.  I don't want a nuance here.
15  I don't think so. I think Sankyo was in
16  Japan, and the licensing agreement led to
17  BMS in the United States. I think that's
18  right.
19     Q.  Let me rephrase. The people
20  that were selling pravastatin in the
21  United States, to the best of your
22  understanding, was Bristol-Myers Squibb?
23     A.  Yes.
24     Q.  Now, were you involved in

Page 150

1  the design of the CARE study?
2      A.   I was.
3      Q.   Were you the primary
4  designer of the CARE study?
5      A.   No. I was not the principal
6  investigator of the CARE study, no. I
7  was one of the investigators who helped
8  design the study.
9      Q.   As I understand
10 investigators, investigators are the
11 people who are actually conducting the
12 clinical study generally?
13     A.   You have to change your
14 understanding. Certainly there are a
15 class of investigators who are
16 responsible for seeing patients. But
17 investigators is a broader -- I mean,
18 it's a broader -- those are, let's say --
19 clinical investigators are what those
20 are. Investigators of the study are
21 scientists who are involved in the
22 design, execution or analysis of the
23 study. So, for example, an
24 epidemiologist who is designing an aspect

Page 151

1  of the CARE study that looks at quality
2  of life would be considered an
3  investigator, even though the
4  epidemiologist doesn't see any of the
5  patients.
6      Q.   Okay.
7           Regardless of whether you
8  see patients, though, does your funding
9  come directly from the company?
10     A.   No. Funding went to the
11 university. Essentially BMS gave the
12 university a grant or a contract, I don't
13 know which, and I worked through the
14 university's grants.
15     Q.   But the money came from
16 Bristol-Myers Squibb is what I'm trying
17 to pin down?
18     A.   Yes. Correct.
19     Q.   Was the CARE study
20 published?
21     A.   Yes.
22     Q.   Were you listed as an
23 author?
24     A.   Yes.

Page 152

1      Q.   Did you agree with all the
2  findings?
3      A.   Yes.
4      Q.   Have any of the findings
5  been changed since the publication?
6      A.   No.
7      Q.   Who else was involved in the
8  design of that study?
9      A.   Eugene Braunwald, Frank
10 Sacks, Mark Pfeffer. I mean, if we had
11 the manuscript here, we could see the
12 masthead, and that would give us a more
13 complete list.
14          MR. SIZEMORE: Is it listed
15     in your CV? Would that help?
16          THE WITNESS: I don't know.
17     Perhaps all the authors are
18     listed.
19 BY MR. PIORKOWSKI:
20     Q.   I can check it.
21     A.   Okay.
22     Q.   Were you pressured at all by
23 Bristol-Myers Squibb concerning your
24 reporting of the results of the CARE

Page 153

1  study?
2          MR. SIZEMORE: Object to
3     form.
4          THE WITNESS: No. I would
5     say, no, I wasn't pressured.
6  BY MR. PIORKOWSKI:
7      Q.   Since we just marked it, is
8  Exhibit 3 a current copy of your
9  curriculum vitae?
10     A.   Yes, it is.
11     Q.   Is there anything that needs
12 to be added or changed to make it up to
13 date?
14     A.   No.
15     Q.   What was your involvement in
16 working -- I'm sorry. Back to
17 Bristol-Myers Squibb. Were there any
18 other consultancies besides those two or
19 three things we talked about?
20     A.   As I sit here now, I can't
21 remember any others.
22     Q.   Are you continuing to do any
23 work for Bristol-Myers Squibb today?
24     A.   No.

Page 154

1  Q. Has it been your experience
2  that they've always behaved as a
3  responsible company?
4      MR. WACKER: Objection.
5      MR. SIZEMORE: Same
6  objection.
7  BY MR. PIORKOWSKI:
8  Q. Let me narrow it down. On
9  matters with which you have been involved
10 with them, has it been your view that
11 they've always behaved as a responsible
12 company?
13 A. Yes.
14 Q. Novartis. What was your
15 involvement with them?
16 A. Oh, I don't remember.
17 Q. I don't mean to be grilling.
18 If you need to look at your CV or
19 anything else to refresh your memory,
20 please feel free to do that.
21 A. Let's come back to that.
22 Right now I don't remember.
23 Q. How about Medtronics?
24 A. Medtronics, I was involved

Page 155

1  in designing a study that would look at
2  the effectiveness of one of their cardiac
3  defibrillators.
4  Q. How do you do that?
5  A. Oh, you design a study. You
6  decide --
7  Q. No. I'm sorry. Let me
8  rephrase it.
9      I meant, given that cardiac
10 defibrillation under the best of
11 circumstances tends to be like a ten
12 percent success, how do you design a
13 study to evaluate whether a defibrillator
14 is effective?
15 A. Oh, because you look at it
16 in a population in which you expect to
17 have a high mortality rate. If you can
18 produce -- if you can demonstrate a
19 reduction from the untreated group's high
20 mortality rate, then you've demonstrated
21 the efficacy, let's say, of the device.
22 Q. Okay. What was the name of
23 the product you were designing?
24 A. Maybe it's a product number.

Page 156

1  I don't remember what it was.
2  Q. Was it an AED, automatic
3  external defibrillator?
4  A. No. It was implantable.
5  Q. An implantable
6  defibrillator?
7  A. Right. I'm sorry. Maybe I
8  wasn't clear about that. An implantable
9  defibrillator.
10 Q. So, you're talking about for
11 patients who had chronic arrhythmias that
12 could potentially deteriorate, you
13 designed a study using an implantable
14 defibrillator and compared that with
15 what, medical therapy?
16 A. Compared that with the
17 standard therapy, which was medical
18 therapy, right.
19 Q. Okay.
20     When was that study done?
21 A. That was done in the late
22 1990s perhaps.
23 Q. Do you know if the product
24 was approved?

Page 157

1  A. I think the product was
2  already on the market actually.
3  Q. Was your study that you were
4  designing to approve it for a new
5  indication?
6  A. Yes.
7  Q. What was the new indication?
8  A. I don't remember.
9  Q. Any other involvement for
10 Medtronic?
11 A. No.
12 Q. AstraZeneca?
13 A. AstraZeneca, I was asked to
14 help them respond to an FDA concern
15 involving one of the beta agonists for
16 the treatment of heart failure.
17 Metoprolol, M-E-T-O-P-R-O-L-O-L, I think.
18 Q. What was the issue with
19 metoprolol?
20 A. The issue with metropolol
21 was the interpretation of subgroup
22 analyses. And they were involved in
23 discussions and negotiations with the FDA
24 about that. And we drafted a response