Page 158

1 and actually wrote a label that we
2 thought would meet the FDA's concerns.
3    Q.  What was the subgroup
4 analysis issue that was at issue there?
5    A.  It was that -- I forget the
6 name of the study, but it was an
7 international study designed to compare
8 metoprolol versus control therapy in
9 patients who have heart failure, the idea
10 being that metoprolol would reduce the
11 incidence of mortality.  The overall
12 findings were positive.  That is to say,
13 the single omnibus analysis demonstrated
14 that metoprolol was associated with lives
15 saved.  But the FDA did a subgroup
16 analysis and found all the lives saved --
17 let me put it another way.  The positive
18 effect was only seen in non-US countries.
19 The effect in the U.S. was neutral or
20 perhaps slightly harmful.
21    Q.  Was there a rationale?  Did
22 the FDA offer a rationale why patients in
23 the United States would be different?
24    A.  Oh, I understand what you're

Page 159

1 saying.  There were many explanations
2 offered as to why this might be the case,
3 but the bottom line is nobody knew.  I
4 mean, there were concerns about perhaps
5 the concomitant care is different in
6 Europe, perhaps European patients have
7 different referral mechanism, but in the
8 end, nobody knew.
9    Q.  What was the effect on
10 metoprolol?
11    A.  You mean regulatory effect?
12    Q.  Let me back up.  Was this in
13 the context of a supplemental new drug
14 application to approve metoprolol for
15 treatment of heart failure?
16    A.  Either an sNDA or an NDA.  I
17 don't remember which.
18    Q.  Was metoprolol approved?
19    A.  Yes.
20    Q.  Was it approved across the
21 board or were there restrictions?
22    A.  As I sit here now, I'd say,
23 no, there were restrictions.  They did
24 not get -- excuse me.  I don't think they

Page 160

1 got the total mortality indication that
2 they were looking for, but they did get
3 an indication for a secondary finding.  I
4 don't remember what that is right now.
5 It might be -- I just don't remember what
6 it was.
7    Q.  What's the timing of this
8 consultancy with AstraZeneca?
9    A.  Maybe 2002.  Maybe earlier
10 than that.  I don't remember.
11    Q.  Was there -- I'm sorry.
12 2002 or maybe earlier?
13    A.  Maybe earlier.
14    Q.  Was there an Advisory
15 Committee meeting conducted on this
16 issue?
17    A.  Oh, there was no FDA
18 Advisory Committee meeting.
19    Q.  Was there any other Advisory
20 Committee meeting by any other regulatory
21 body that you're aware of?
22    A.  No.
23    Q.  Anything else for
24 AstraZeneca?

Page 161

1    A.  That's it.
2    Q.  CryoCor?
3    A.  CryoCor asked me to help
4 them design a study that would reduce the
5 incidence of -- reduce the prevalence of
6 chronic atrial fibrillation.  It was an
7 ablation procedure where they would
8 freeze part of the electrical conducting
9 system of the heart that they felt was
10 pathogenically -- or pathologically
11 producing these abnormal electrical
12 impulses.
13    Q.  Was this a
14 placebo-controlled study?
15    A.  I would say --
16    Q.  Let me withdraw that.
17       Was this a study that was
18 comparing ablation to conventional
19 medical therapy for chronic atrial
20 fibrillation?
21    A.  Yes, sir.
22    Q.  Was the product approved?
23    A.  I don't remember.
24    Q.  What time frame was this?

Lemuel A. Moye, M.D.

Page 162

1  A. I think approximately 1998
2  to 2000.
3  Q. How about Vasogen?
4  A. Vasogen I am working with
5  now.
6      MR. SIZEMORE: You might
7  want to be careful. Is this a
8  drug that's out on the market or
9  are you working with them on an
10 investigational drug?
11     THE WITNESS: An
12 investigational drug. I was going
13 to be very careful.
14     MR. SIZEMORE: Okay. You
15 need to be careful when you
16 answer.
17 BY MR. PIORKOWSKI:
18 Q. Does it have anything to do
19 with the issues in this case?
20 A. Only that it's a drug that
21 involves cardiology and the occurrence of
22 myocardial infarction, but it doesn't
23 involve this drug or any -- or this class
24 of drugs.

Page 163

1  Q. Keep this as general as you
2  need to, but does it involve an
3  investigation of myocardial infarction as
4  an endpoint with the use of a certain
5  drug?
6  A. With use of a certain
7  treatment, yes.
8  Q. Did you design the study?
9  A. I helped design it, yes.
10 Q. Is the study underway?
11 A. Yes, sir.
12 Q. Anything else for Vasogen?
13 A. No.
14 Q. Any recollection on
15 Novartis?
16 A. I'm still working on it.
17     MR. SIZEMORE: Joe, is this
18 a good time to take a lunch break?
19     MR. PIORKOWSKI: Sure.
20     MS. SNAPKA: I have not said
21 anything prior. I'm assuming you
22 don't want this muddled up by too
23 many -- that an objection by them
24 is good for mine as well?

Page 164

1      MR. PIORKOWSKI: Yes.
2      MS. SNAPKA: That's fine.
3      MR. SIZEMORE: We had talked
4  about that, too.
5      MS. SNAPKA: I didn't hear
6  it, I didn't know, and I just
7  wanted to make sure that that was
8  on the record that I didn't have
9  to object.
10     MR. SIZEMORE: Objection for
11 one is good for all.
12         - - -
13     (Whereupon, a recess was
14 taken from 12:26 p.m. until 1:16
15 p.m.)
16         - - -
17 BY MR. PIORKOWSKI:
18 Q. Doctor, have you ever
19 consulted for a company called Power
20 Three General?
21 A. Power Three Medical.
22 Q. I didn't see it on your
23 list.
24 A. Yeah. Actually, I should

Page 165

1  have put that there. That's a local
2  biopharm group.
3  Q. What have you done for them?
4  A. We're in the process of
5  studying different combinations of
6  proteins, serum proteins as predictors
7  for Alzheimer's disease, Parkinson's
8  disease.
9  Q. What's your role with that?
10 A. To develop the stat models,
11 to develop the statistical models for
12 this.
13 Q. For the clinical trials?
14 A. No, it is not a clinical
15 trial at all, actually. I would call
16 this kind of Phase II, just trying to get
17 sensitivity and specificity parameters
18 for the different tests we have.
19 Q. Is this a current
20 consultancy?
21 A. No.
22 Q. Let me go back for a minute
23 to, I think you mentioned two or three
24 trials that you designed to evaluate

Page 166

1 arrhythmic effects?
2    A.   Yes.
3    Q.   Was the purpose of those
4 trials to evaluate the potential for
5 arrhythmias specifically as a primary
6 endpoint?
7    A.   Yes.
8    Q.   Is it fair to say that
9 arrhythmia generally is a fairly rare
10 side effect?
11    A.   I guess I wouldn't say that.
12 Let me back up a second. There are
13 several -- I'm involved in several
14 arrhythmia studies, some of them looking
15 at chronic atrial fib. Unfortunately
16 that's not rare at all. That's common.
17 But there are some arrhythmias such as
18 torsades and ventricular tachycardia
19 which are very rare.
20    Q.   Okay.
21         And assuming that
22 arrhythmias -- well, is it correct that
23 the arrhythmias that you were looking at
24 specifically with respect to the

Page 167

1 antibiotic product and the antipsychotic
2 product, were those torsade and
3 ventricular fibrillation?
4    A.   Yes.
5    Q.   So, the side effects you
6 were evaluating were rare?
7    A.   Yes.
8    Q.   Okay.
9         And were you evaluating them
10 using prospectively designed clinical
11 trials?
12    A.   Yes.
13    Q.   How many patients did you
14 need to study those?
15    A.   We used, again, it's been a
16 long time, essentially less than 1,000
17 patients. However, the endpoints of
18 those studies were not the torsades or
19 the v tach, which are very rare. The
20 endpoints of those studies were
21 prolongation of the electrocardiogram.
22 And those we could measure fairly
23 precisely with a relatively small number
24 of subjects. And so we were using that

Page 168

1 as a surrogate for the propensity for
2 torsade de pointes and v tach.
3    Q.   So, you didn't actually
4 measure Torsades and v tach or v fib?
5    A.   That's correct. As I said,
6 anybody who had it, of course, we
7 accepted that, but it wasn't the endpoint
8 of the study.
9    Q.   Were there discussions about
10 the possibility of designing a study to
11 evaluate the actual endpoints of torsade
12 and v tach?
13    A.   Yes.
14    Q.   Was there a decision made
15 not to pursue those?
16    A.   Oh, yes. Because in order
17 to have enough patients to evaluate the
18 effect of a therapy on torsade, you would
19 have to recruit the entire Eurasian
20 continent. I mean, it is a fairly rare
21 disorder, and so you would need tens of
22 -- hundreds of millions patients in the
23 study to be able to detect that
24 particular endpoint.

Page 169

1    Q.   Okay.
2         Was that the same issue in
3 both of those products? I know we've
4 been talking about them together, but the
5 antibiotic product and the antipsychotic
6 product was the same issue?
7    A.   Yes.
8    Q.   All right.
9         You also mention in
10 Paragraph 12 of your report, you talk
11 about the data monitoring committees, and
12 I think we already talked about the
13 Bristol-Myers Squibb data monitoring
14 committee. When we were talking about
15 Key Pharmaceuticals, you mentioned
16 Nitro-Dur?
17    A.   Right.
18    Q.   I don't remember you
19 mentioning a monitoring board for Key
20 Pharmaceuticals.
21    A.   Right. I served as one of
22 three members on the monitoring board for
23 a Nitro-Dur study.
24    Q.   Okay.

Page 170

1  I thought you told me
2  originally you designed the clinical
3  trials for that?
4      A.   That's true.
5      Q.   Okay.
6           So, you designed the trials
7  and you were on the monitoring board?
8      A.   That's correct.
9      Q.   Were you participating in
10 the clinical trials as an investigator at
11 the time you were on the board?
12     A.   Not as a clinical
13 investigator, but as the investigator
14 whose primary responsibility is to
15 collect the data and produce the reports
16 that would be analyzed by others.
17     Q.   Okay.
18          Is that past tense, that
19 monitoring board is completed?
20     A.   Yes. It ended about --
21 well, maybe five, six years ago.
22     Q.   Was that clinical trial
23 terminated prematurely?
24     A.   No.

Page 171

1      Q.   Were there any unexpected
2  adverse events that arose in the course
3  of that clinical trial?
4      A.   I don't know how to answer
5  that actually. I mean, I don't know what
6  happened to every patient. There may
7  have been a small number of adverse
8  events that were serious, not
9  anticipated.
10     Q.   Were there any adverse event
11 report trends that were appreciated by
12 the data monitoring committee in that
13 clinical trial?
14     A.   No, there were not.
15     Q.   You also indicate that you
16 are currently on three DMCs. I think you
17 told us about one already; is that right?
18     A.   Right.
19     Q.   What are the other two?
20     A.   Actually, there may be more
21 than that. I'm on one that's looking at
22 the protocols to identify new useful
23 therapies for sickle cell disease. And
24 that comes out of NHLBI, National Heart,

Page 172

1  Lung & Blood Institute.
2           I'm also on one that is,
3  again, underwritten by NHLBI that is
4  looking at the effect of exercise in
5  heart failure.
6      Q.   Now, are these clinical
7  studies?
8      A.   Yes. These are both --
9  well, let me back up. The sickle cell
10 program is an early -- is a collection of
11 Phase II/small Phase III programs. And
12 so the DMC really is functioning as a
13 protocol review committee. As much as it
14 is the review of adverse events and what
15 occurs to patients, it really has an
16 expanded role there. So, that's a little
17 unusual in the traditional DMC paradigm.
18     Q.   Okay.
19     A.   HF action is the clinical
20 trial that the action DMC is overseeing.
21 It is one large multicenter,
22 multinational clinical program that's
23 assessing the effect of exercise in
24 patients with heart failure.

Page 173

1      Q.   In patients with?
2      A.   I'm sorry. In patients with
3  heart failure.
4      Q.   Okay.
5           Is there any medication
6  involved in that?
7      A.   The medication -- the
8  inter --
9      Q.   Let me withdraw the question
10 and rephrase it.
11          Apart from medications that
12 the patient may be taking as a part of
13 their regular medical therapy, is that
14 clinical trial attempting to evaluate the
15 efficacy or safety of any particular
16 medical therapy?
17     A.   No.
18     Q.   Okay.
19          So, does that cover all of
20 the DMCs that you are on right now?
21     A.   No. I'm on another one.
22 It's -- actually, I'm on two other ones.
23 One is looking at the effect of beta
24 blockade in helping patients who have

Page 174

1  pulmonary surgery to determine the
2  positive and negative effects of beta
3  blockers in this type of patient. This
4  is funded now by NIH.
5      Q.   Okay.
6      A.   And there's one I just
7  joined that is assessing the effect of a
8  new therapy, whose name I don't remember
9  right now, on patients with scleroderma.
10     Q.   For what kind of drug?
11     A.   Anti-inflammatory -- no, no.
12 It is a drug related to steroids that
13 they believe might be useful in treating
14 patients with scleroderma.
15     Q.   Steroid-based compound?
16     A.   I believe so, yes.
17     Q.   Have you ever been on a data
18 monitoring committee for any COX-2
19 inhibitor or any nonselective NSAID?
20     A.   No.
21     Q.   Any other data monitoring
22 committees?
23     A.   That I'm currently on?
24     Q.   That you currently are on or

Page 175

1  that you have been on in the past.
2      A.   Yes. There was one other
3  that I was on, and that was a trial that
4  was looking at the effect of blood
5  transfusions in patients with sickle cell
6  disease.
7      Q.   When was that?
8      A.   Oh, that was -- it ended in
9  2000.
10     Q.   Who was the sponsor of that?
11     A.   NHLBI.
12     Q.   All right.
13          Does that complete that
14 list?
15     A.   Yes.
16     Q.   You indicated in Paragraph
17 13 that you've appeared before the FDA on
18 behalf of sponsors on several occasions?
19     A.   Yes.
20     Q.   Which specific occasions or
21 which specific sponsors?
22     A.   Bristol-Myers Squibb.
23     Q.   What product?
24     A.   Captopril.

Page 176

1      Q.   Okay.
2      A.   Pfizer. The name of the
3  product I think was ziprasidone,
4  Z-I-P-R-A-S-I-D-O-N-E. Marion
5  Merrill-Dow and Seldane. That's it.
6      Q.   That's it?
7          What was your role for
8  Bristol-Myers Squibb before the FDA?
9      A.   As --
10     Q.   You were hired by
11 Bristol-Myers Squibb to appear before the
12 FDA on their behalf?
13     A.   In the context of our
14 previous discussion about my work in SAE,
15 we had produced a new type of statistical
16 analysis that the FDA was not familiar
17 with, and I gave, I think, one lecture to
18 the FDA officials about the development
19 of this measure.
20     Q.   Okay.
21          So, you were not serving as
22 an advocate for the product, you were
23 just explaining the statistical method?
24     A.   That's correct.

Page 177

1      Q.   All right.
2          And is that your only
3  involvement before the FDA with
4  Bristol-Myers Squibb?
5      A.   Yes.
6      Q.   Was that an advisory
7  committee or a private meeting of FDA
8  officials?
9      A.   Private meeting with FDA
10 officials.
11     Q.   What about with respect to
12 Pfizer?
13     A.   Pfizer, I appeared before
14 the FDA in discussions involving
15 ziprasidone and the design of the study
16 that would look at the arrhythmogenic
17 potential of this new antipsychotic.
18     Q.   And was your role explaining
19 why the study was designed the way it was
20 designed?
21     A.   Yes.
22     Q.   And that's the discussion we
23 just had about the surrogate marker?
24     A.   Yes, sir.

Page 178

1  Q. Okay.
2     Were you involved in
3  explaining the data from the clinical
4  trials to the FDA?
5  A. No.
6  Q. Just limited to the design
7  of the study?
8  A. Yes.
9  Q. With respect to Marion
10 Merrill-Dow -- actually, let me back up.
11    On the Pfizer front, was
12 that an Advisory Committee meeting or was
13 that a private meeting with FDA
14 officials?
15 A. Private meeting.
16 Q. With respect to Marion
17 Merrill-Dow, what was your involvement?
18 A. I explained the result of
19 the study that we had carried out that
20 used ibuprofen as a comparator, and
21 looking at the incidence of -- well,
22 actually, prevalence of ventricular
23 tachycardia in torsade for terfenadine
24 versus control.

Page 179

1  Q. That's the study we talked
2  about earlier?
3  A. Yes.
4  Q. Okay.
5     We didn't have your CV out
6  before. Can you identify which one that
7  is in it?
8  A. Sure, yes. There's a fourth
9  one I should tell you about I just
10 remembered.
11 Q. Sure. We can come back to
12 that.
13 A. What are we looking for now?
14 Q. The study.
15 A. The manuscript?
16 Q. Right.
17 A. 38 on Page 5.
18 Q. Okay.
19    Pratt is the first author?
20 A. Yes. And actually 37, too.
21 Both of them.
22 Q. I'm sorry, 35 and 37?
23 A. No, I'm sorry. 37 and 38.
24 Q. 37 and 38.

Page 180

1  A. Right.
2  Q. All right.
3     Craig Pratt is a colleague
4  of yours, right?
5  A. Sure is.
6  Q. And a personal friend?
7  A. And a good friend.
8  Q. Has he served on the FDA
9  cardiorenal advisory committee with you?
10 A. Not with me, before me.
11 Q. Before you, okay.
12 A. Right. I think he was chair
13 before I started.
14 Q. I saw on the list of
15 reliance materials that you had reviewed
16 his testimony; is that right?
17 A. Yes.
18 Q. Did you rely on his
19 testimony in any way in reaching your
20 conclusions?
21 A. No. I read it. I didn't
22 rely on it.
23    MR. SIZEMORE: Which
24 testimony was that, just for the

Page 181

1  record?
2     MR. PIORKOWSKI: Craig
3  Pratt's testimony in the Ernst
4  case.
5     THE WITNESS: Yeah.
6  BY MR. PIORKOWSKI:
7  Q. And that's the only one I
8  see on there.
9  A. Right.
10    Excuse me. I owe you a
11 fourth presentation before I forget.
12 Q. Yes.
13 A. It was actually just last
14 year. It was May of 2005, and I
15 presented before the FDA on the use of
16 orthogonal discriminate analysis in
17 developing mixtures of proteomic tests to
18 predict Alzheimer's disease and
19 Parkinson's disease.
20 Q. On whose behalf was that
21 presentation?
22 A. Power Three Medical.
23 Q. Was it in association with a
24 particular product?

Lemuel A. Moye, M.D.

Page 182

1   A.   Yes, it was.  The product
2   would be a test kit.
3   Q.   Did it have a product name
4   you were aware of?
5   A.   I would say not yet.  It
6   wasn't even that far.
7   Q.   All right.
8        Is it fair to say that that
9   presentation was also about the use of a
10  particular statistical technique?
11  A.   Yes, that's right.
12  Q.   And was that also to -- was
13  that a private meeting with FDA officials
14  as opposed to a public meeting?
15  A.   Private meeting.
16  Q.   Okay.
17       Have you ever spoken on
18  behalf of a pharmaceutical company
19  sponsor at a public meeting?
20  A.   No, sir.
21  Q.   Okay.
22       You've never made a
23  presentation, for example, at an Advisory
24  Committee meeting?

Page 183

1   A.   That's correct.
2   Q.   In Paragraph 14 of your
3   report, you talk about the fact that as a
4   part of your role as an Advisory
5   Committee member that you've reviewed
6   over 20 clinical trial programs of
7   private sponsors and commented in public
8   testimony that is part of the Federal
9   Registry.  Do you see that?
10  A.   Yes.
11  Q.   Are you referring there to
12  your service on the cardiorenal Advisory
13  Committee at cardiorenal Advisory
14  Committee meetings?
15  A.   Yes.  The only reason I
16  hesitated is that sometimes I was farmed
17  out to other Advisory Committee meetings,
18  like blood products, and so I think that
19  would have to be included in this.
20  Q.   Let me just ask it a little
21  differently.
22       You are aware that there are
23  transcripts on the FDA's website of
24  Advisory Committee meetings, right?

Page 184

1   A.   Well, from 1996 on.  At
2   least I can't find them earlier.
3   Q.   Okay.
4        But that's true regardless
5   of which Advisory Committee we're talking
6   about, whether it's the arthritis
7   Advisory Committee or the cardiorenal
8   Advisory Committee, from 1996 on, all of
9   those transcripts are on the FDA's
10  website, right?
11  A.   I believe so, yes.
12  Q.   Okay.
13       The commentary that you are
14  talking about in public testimony, to the
15  extent it's been since 1996, would all of
16  that be captured on a transcript on the
17  FDA's website?
18  A.   Yes, sir.
19  Q.   We don't have to look
20  anywhere else, in other words, to find
21  what you are referring to in Paragraph
22  14?
23  A.   That's correct.
24  Q.   Okay.

Page 185

1        Let's talk a little bit
2   about the development of Vioxx.
3        Is it correct that the
4   development started back in the
5   mid-1990s?
6   A.   That's my understanding.
7   Q.   That's your understanding?
8   A.   Yes.
9   Q.   And it followed the
10  discovery that the COX enzyme had two
11  different subcomponents?
12  A.   Yes.
13  Q.   The process started with
14  Merck filing an investigational new drug
15  application, right?
16  A.   Yes.
17  Q.   Doing preliminary tests in
18  animals?
19  A.   Yes.
20  Q.   And then seeking approval
21  for testing in humans, right?
22  A.   Yes.
23  Q.   The way human testing works
24  pursuant to FDA regulations is, it is

47 (Pages 182 to 185)

Page 186

1 done in three phases, right?
2     A.  Traditionally, yes.
3     Q.  Traditionally, and also I
4 mean that prior to the initial approval.
5 There's sometimes what's call it Phase IV
6 after an approval, right?
7     A.  Right. The only reason I
8 quibble with that, the distinction
9 between Phase I, Phase II and Phase III
10 has gotten very blurred recently. But I
11 think in the mid-1990s it was still the
12 traditional.
13    Q.  Phase I at least at that
14 time was generally testing in healthy
15 volunteers?
16    A.  Yes. Well, it is tested in
17 people that have the affliction that the
18 investigators believe the drug would be
19 most effective in
20    Q.  In your review of FDA
21 materials and Merck internal documents,
22 did you see Merck had meetings with the
23 FDA at the end of Phase II?
24    A.  Yes.

Page 187

1     Q.  There were multiple
2 meetings; is that right?
3     A.  Yes.
4     Q.  Do you understand what the
5 purpose of end of Phase II meetings is
6 between a sponsor and the FDA?
7     A.  Yes, I do.
8     Q.  What is the that?
9     A.  The purpose is to, number
10 one, make sure that the sponsor and the
11 FDA understand each others' positions
12 about what's been demonstrated about the
13 drug, particularly dose-specific efficacy
14 and dose-specific hazard.
15    Q.  And is it fair to say --
16    A.  One thing. I'm sorry.
17        And then to begin the
18 delicate stage of discussions about what
19 caliber of Phase III studies or what
20 collection of Phase III studies would be
21 most useful in gaining approval.
22    Q.  Part of the reasoning
23 underlying having an end of Phase II
24 meeting is it doesn't make a lot of sense

Page 188

1 for a sponsor to invest extensively in
2 conducting Phase III studies that the FDA
3 is going to find unacceptable on their
4 face?
5     A.  Right.
6     Q.  Is that fair to say?
7     A.  Sure.
8     Q.  Okay.
9         Now, at this end of Phase II
10 meeting, does the FDA have an opportunity
11 to comment on the study design of the
12 Phase III clinical trials?
13    A.  Certainly. That's one of
14 the --
15        MR. WACKER: I --
16        THE WITNESS: Sorry.
17        MR. WACKER: I was just
18     going to say objection.
19        THE WITNESS: That's one of
20     the reasons to have these end of
21     Phase II discussions.
22 BY MR. PIORKOWSKI:
23    Q.  Among the things the FDA has
24 an opportunity to comment on are the

Page 189

1 number of patients, right?
2     A.  Yes, sir.
3     Q.  The type of patients?
4     A.  Yes.
5     Q.  The subgroups that might be
6 considered being analyzed as a part of
7 the patient population?
8     A.  Sure.
9     Q.  The dosages of medication to
10 be tested?
11    A.  Yes.
12    Q.  The length of time for which
13 those dosages need to be tested?
14    A.  Yes.
15    Q.  Okay.
16        The endpoints that the
17 company should be attentive to during the
18 Phase III clinical studies?
19    A.  That's part of it as well.
20    Q.  Okay.
21        Any other aspects that I
22 didn't mention specifically?
23    A.  The performance of the data
24 monitoring committee. The creation of

Lemuel A. Moye, M.D.

Page 190

1 appropriate monitoring rules, document
2 rules, notion of multiplicity of testing,
3 triaging primary versus secondary
4 endpoint analyses, how exploratory
5 analyses would be considered, what trials
6 are being carried out by other sponsors
7 looking at related compounds. I think as
8 I sit here now, that's all I can think
9 of.
10    Q. But those would all be areas
11 that the FDA would have an opportunity to
12 comment on at these end of Phase II
13 meetings?
14    A. Yes.
15    Q. Okay.
16    And from your review of the
17 records in Vioxx, did the FDA actually
18 have an opportunity to comment on those
19 with respect to Merck, with respect to
20 Vioxx?
21    MR. WACKER: Object to form.
22    THE WITNESS: They had the
23    opportunity.
24 BY MR. PIORKOWSKI:

Page 191

1    Q. Is it your understanding
2 that the FDA gave Merck input on issues
3 like the number of patients that need to
4 be studied, the types of patients that
5 need to be studied, the dosages that need
6 to be studied, et cetera?
7    A. I don't recall the specific
8 details, but they did have input on
9 important matters in trial design.
10    Q. When Merck undertook its
11 Phase III studies, is it your
12 understanding that the biggest group of
13 patients were osteoarthritis patients?
14    A. Yes.
15    Q. Let me digress for a minute
16 and ask you some questions related to
17 aspirin and stroke, because you have a
18 discussion in your report about stroke,
19 right?
20    A. Yes, sir.
21    Q. Am I correct that there are
22 two different kinds of stroke that are
23 commonly recognized?
24    A. Yes, sir.

Page 192

1    Q. One type of stroke is what's
2 called a thrombotic or sometimes it is
3 called an ischemic stroke?
4    A. Yes, sir.
5    Q. That's related to a blood
6 clot basically?
7    A. Yes.
8    Q. Okay.
9    The other kind of stroke is
10 referred to as a hemorrhagic stroke?
11    A. Yes, sir.
12    Q. That is different in how it
13 occurs. That tends to be more related to
14 a bleeding episode?
15    MR. SIZEMORE: Object to
16    form.
17    THE WITNESS: It is not
18    quite as easy as that. A
19    hemorrhagic stroke is a stroke in
20    which an immediate product is the
21    rupture of a blood vessel. It
22    doesn't mean a thrombus didn't
23    cause it. But the result, the
24    rupture of the blood vessel is

Page 193

1    what characterized it as
2    hemorrhagic.
3 BY MR. PIORKOWSKI:
4    Q. But they are recognized as
5 different events. Fair to say?
6    A. Certainly different
7 pathology, yes.
8    Q. Different pathology,
9 different endpoints when they are
10 considered in clinical trials?
11    A. Potentially, yes.
12    Q. Okay.
13    And I want to bring this
14 back to the context of aspirin, but one
15 thing we know about drugs in general is
16 that there are almost no drugs that are
17 all good or all bad. They all have some
18 helpful effects and some not so helpful
19 effects. Is that a fair statement?
20    A. Well, I would say that every
21 drug has -- is associated with a
22 collection of adverse events.
23    Q. Sometimes, though, the
24 effect, the physiological effect that's

49 (Pages 190 to 193)

Page 194

1 causing the drug to be helpful may also
2 cause an adverse event, right?
3    A.   Yes.
4    Q.   That's exactly the case in
5 aspirin, right?
6    A.   Yes.
7    Q.   Aspirin is well known to
8 prevent the clotting type of strokes,
9 right?
10    A.   Yes.
11    Q.   And on the other hand,
12 aspirin is known to cause the bleeding
13 kind of strokes?
14    A.   Well, I would say this.
15       Aspirin has been strongly --
16 associated with the bleeding types of
17 strokes. I don't know that I can sit
18 here and say the literature says that
19 aspirin causes hemorrhagic stroke. I do
20 know it has been associated with it. But
21 the preponderance of the literature lines
22 up nicely with your first statement, and
23 that is, aspirin prevents ischemic
24 nonbleeding strokes.

Page 195

1    Q.   Well, it's fair to say that
2 there's been controversy for many years
3 about whether aspirin should just be
4 given to everybody or not, right?
5    A.   Yes.
6    Q.   The reason that we don't all
7 take aspirin every day is because there
8 is a risk of hemorrhagic stroke?
9    A.   That's one of the reasons,
10 yes.
11    Q.   Okay.
12       That's the reason that the
13 recommendation is only to give aspirin to
14 people who are at a higher risk, right?
15    A.   Right.
16    MR. SIZEMORE: Object to
17    form. I'm sorry.
18    THE WITNESS: There are
19    several reasons why it is
20    restricted to patients who are at
21    higher risk. One reason, perhaps
22    the most important, is that that's
23    been the group that has been
24    studied the most intensively and

Page 196

1    we have the most information on.
2       We have no information among
3    aspirin use, prophylactic aspirin
4    use for teenagers or people in
5    their 20s. We just don't have
6    information about that. So, the
7    main reason that we have the
8    limitation is because we studied a
9    large number in this cohort.
10 BY MR. PIORKOWSKI:
11    Q.   Also, aspirin has
12 gastrointestinal side effects as well as
13 potential cardiovascular side effects,
14 right?
15    A.   Well, it certainly has
16 gastrointestinal side effects, that's
17 right.
18    Q.   Now, the way aspirin works
19 in terms of -- let me back up.
20       Do I understand you to say
21 that there's pretty solid scientific
22 evidence that aspirin prevents the
23 clotting type of stroke?
24    A.   Yes.

Page 197

1    Q.   And the way aspirin does
2 that is it blocks an enzyme known as
3 thromboxane, right?
4    A.   Right.
5    Q.   Thromboxane, the word
6 "thrombo" means clot, right?
7    A.   Yes.
8    Q.   And thromboxane is an enzyme
9 that kind of causes the blood to tend to
10 clot, right?
11    A.   Excuse me. Everything else
12 being equal. I mean, we have to admit
13 that the entire clotting mechanism is a
14 delicate balance that includes a whole
15 panoply of enzymes, proenzymes that
16 govern it. So, everything else being
17 equal, the addition of aspirin tends
18 to -- well, excuse me, thromboxane tends
19 to produce clotting, as we're talking
20 about it.
21    Q.   So, comparing a patient who
22 is the same patient, a patient who is not
23 taking aspirin and a patient who is
24 taking aspirin, the patient who is taking