Lemuel A. Moye, M.D.

Page 238

1  yes.
2      Q.   Are you familiar, Dr.
3  Moye -- have you come across in your
4  studies discussion about matrix
5  metalloproteinase inhibitors?  Are you
6  familiar with those?
7      A.   Yes, yes.
8      Q.   MMP-2 and MMP-9?
9      A.   Well, I didn't know about
10 MMP-2 and P-9, but I know about MMP a
11 little bit.
12     Q.   Okay.
13          But MMPs are thought to
14 contribute to plaque destabilization,
15 right?
16     A.   Yes.
17     Q.   And MMPs are induced by
18 COX-2, right?
19     A.   Yes.
20     Q.   Does that make sense that
21 that is the same scientific understanding
22 to which they are referring?
23     A.   Well, they don't talk about
24 MMPs here.

Page 239

1      Q.   I understand.
2      A.   But it does fit with the
3  thought process that would go again to
4  the speculative statement.
5      Q.   Okay.
6           Now, the third section talks
7  about events following plaque rupture,
8  right?
9      A.   Yes.
10     Q.   This is where it talks about
11 prostacyclin being a potent endogenous
12 inhibitor of platelet aggregation, right?
13     A.   Yes.
14     Q.   Is that consistent with what
15 you know about prostacyclin?
16     A.   Yes.
17     Q.   Okay.
18          And then it says it also
19 potentially inhibits the development of
20 ischemic ventricular fibrillation in
21 dogs, right?
22     A.   Right.
23     Q.   Now, do you understand that
24 this discussion on Page 12 and 13 of

Page 240

1  Exhibit 6 is a discussion that arises
2  from the finding that was found in study
3  023?
4      A.   Yes.
5      Q.   Okay.
6           In other words, this is the
7  scientific advisors following up on the
8  results of study 023?
9      A.   Well, speculating on its
10 implications.
11     Q.   Speculating on its
12 implications.
13          And, in fact, it talks about
14 -- on Page 13, it says, "On this
15 background of information regarding the
16 anti-platelet and anti-fibrillatory
17 effects of prostacyclin and its vascular
18 localization, it has been found that
19 Vioxx reduces the urinary excretion of
20 the prostacyclin metabolite,
21 2,3-dinor-6-keto-PGF alpha."
22     A.   Right.
23     Q.   Right?
24          And then the next sentence

Page 241

1  is, "This is important data but it is not
2  a basis for any conclusion."
3      A.   Sure.
4      Q.   So, again, they are saying
5  that this is still somewhat speculative,
6  right?
7      A.   Right.  I mean, to me this
8  clearly says we don't know.
9      Q.   We don't know.
10          Then in the next paragraph
11 it offers a couple of alternative
12 explanations for this finding of
13 decreased prostacyclin in the urine,
14 right?
15     A.   Right.
16     Q.   The first hypothesis it
17 gives is that "the excretion of the
18 prostacyclin metabolite...does not
19 reflect systemic/vascular prostacyclin
20 biosynthesis."  Right?
21     A.   Right.
22     Q.   Just so we're clear, when we
23 talk about an imbalance between
24 thromboxane and prostacyclin, we're

Lemuel A. Moye, M.D.

Page 242

1  talking about that at the level of the
2  endothelium, right?
3      A.   Absolutely.
4      Q.   And endothelium is the
5  lining of the coronary artery?
6      A.   The inner lining.
7      Q.   The inner lining.
8           And what is going on in the
9  endothelium may or may not be reflective
10 of what's going on systemically with
11 prostacyclin?
12     A.   In fact, it probably isn't,
13 because it is just a micro environment.
14     Q.   Right.
15          And are there multiple
16 organs in the body that produce
17 prostacyclin?
18     A.   Yes, sir.
19     Q.   What are the organs?
20     A.   Prostacyclin -- kidney.
21     Q.   Kidney.
22     A.   That's the only one that
23 comes to mind right now.
24     Q.   Is it produced in the lung?

Page 243

1      A.   I don't know about that.
2      Q.   How about the ovary?
3      A.   I don't know about that.
4      Q.   You just don't know one way
5  or the other?
6      A.   Right.
7      Q.   And then you see the second
8  part of that second paragraph on Page 13,
9  it says, "An alternative hypothesis is
10 that prostacyclin biosynthesis in the
11 vasculature is inhibited by Vioxx
12 (without blocking the production of
13 thromboxane A1 by the platelet)."
14     A.   Right.
15     Q.   And it says, "By removing
16 this potent inhibitor of platelet
17 aggregation, the probability that a
18 coronary plaque rupture would lead to
19 myocardial infarction or ischemic
20 ventricular fibrillation is enhanced."
21     A.   Right.
22     Q.   Right?
23          So, it is giving two
24 possible explanations for what this

Page 244

1  finding could mean of decreased urinary
2  prostacyclin, right?
3      A.   I would say it's engaging in
4  speculation.
5      Q.   Okay.
6           But it's important to think
7  this issue through, given where they are
8  in the development of the product, right?
9      A.   Yes.
10     Q.   I mean, no question about
11 that?
12     A.   Right.
13     Q.   Do you know what studies or
14 what tests Merck did to evaluate whether
15 or not Vioxx affected prostacyclin at the
16 level of the endothelium?
17     A.   No, I don't.
18     Q.   Do you know whether they
19 made any effort to determine whether or
20 not the prostacyclin that was decreased
21 in the urine came from the kidney?
22     A.   Just one second, please.
23     Q.   Sure.
24     A.   (Witness reviewing

Page 245

1  document.)
2           I know that recommendations
3  were made to do that by Dr. Oates
4  specifically, and that Merck decided not
5  to go with those specific
6  recommendations.
7      Q.   Who is Dr. Oates?
8      A.   Well, Dr. Oates was an
9  external consultant for Merck.
10     Q.   Do you know what his role
11 was in the Board of Scientific Advisors?
12     A.   I don't, no.
13     Q.   Do you know what was the
14 basis for your saying that Dr. Oates made
15 recommendations?
16     A.   October 27, 1997 letter.
17     Q.   That's one of the internal
18 documents that you were provided?
19     A.   Yes, sir.
20     Q.   Let's go back to Exhibit 6
21 for a minute.
22     A.   Sure.
23     Q.   At the end of this
24 discussion about the two speculative

Page 246

1  benefits and the speculative harm that
2  could be related to Vioxx use, the
3  scientific advisors make some specific
4  recommendations, right?
5      A.   Yes.
6      Q.   The recommendations, the
7  first thing they point out is they say,
8  "It is unlikely that any of the
9  individual trials with Vioxx will have
10 sufficient power to determine whether
11 coronary events are increased or
12 decreased by COX-2 inhibition."  Right?
13     A.   Yes.
14     Q.   Now, as someone who has
15 designed clinical trials on rare events,
16 do you agree with that statement?
17     A.   Yes.
18     Q.   I mean, that's a fair
19 statement.  Do you agree with it?
20     A.   It's called a truism.
21     Q.   I'm sorry?
22     A.   A truism.
23     Q.   A truism.  All right.
24          So, they say, "It is

Page 247

1  therefore proposed that coronary events
2  be predetermined endpoints in all future
3  controlled trials with Vioxx and the
4  'back-up' COX-2 inhibitors."  Right?
5      A.   Yes.
6      Q.   Okay.
7           Now, do you think that
8  recommendation was an appropriate
9  recommendation?
10     A.   I think, yes, it was.
11 However, that's not to say that it
12 overshadows the responsibility of any
13 investigator to look at each trial to see
14 if, in fact, there isn't a signal being
15 produced by the trial, be the trial
16 underpowered or not.
17     Q.   Well, certainly nobody is --
18 the board certainly isn't suggesting that
19 they just blow off looking at the data
20 from the clinical trials individually?
21     A.   Right.  They just wanted to
22 make sure that it wasn't construed that
23 that was my suggestion either.
24     Q.   Okay.

Page 248

1           What they're saying is that
2  because these events are very rare, you
3  need to study a lot of people to really
4  get any meaningful data, right?
5      A.   That's their sense of it.
6      Q.   That's the layman's version?
7      A.   Right.
8      Q.   And so what they are saying
9  is that the best chance of getting a good
10 answer to this question is to take all of
11 our data at least on a going forward
12 basis and to try to analyze it in a
13 careful and systematic way?
14     A.   Right.  I would say maybe
15 not the best chance, but a good chance.
16     Q.   Okay.
17          And one of the things that
18 they advise is that there be endpoints
19 developed that are assessed by a uniform
20 set of criteria so that a meta-analysis
21 of coronary and cerebrovascular events
22 from all of those trials can be
23 performed, right?
24     A.   Yes.

Page 249

1      Q.   Now, as a biostatistician
2  and epidemiologist, was that a smart
3  thing to do?
4      A.   Not necessarily.  I would
5  say it was a popular thing to do and even
6  a defensible thing to do.  But -- and in
7  order for meta-analyses to be carried
8  out in a way that is most illuminatory,
9  you have to have endpoints that reflect
10 the effect of the therapy, which they
11 really didn't know just yet.  I mean, the
12 possible adverse events of therapy, they
13 really didn't know.  For example, should
14 they include strokes or not, hemorraghic
15 strokes?  They didn't know that yet.
16          And they have to be laid out
17 in a way that they are measured the same
18 way from trial to trial.  That's when a
19 meta-analysis is its most productive.
20     Q.   Let's stop and talk about
21 that for a second.
22          The first point you made
23 there in your answer was it is not clear,
24 when we talk about endpoints, it is not

Page 250

1  clear what endpoints we're talking about?
2      A.   Right.
3      Q.   So, if we're going to be
4  prudent about it, the prudent way to
5  proceed would be to cast a wide net and
6  look at a lot of different endpoints
7  which we can either analyze individually
8  or collectively?
9           Is that a fair statement?
10     A.   Well --
11     Q.   Let me withdraw the
12 question.
13     A.   Okay.
14     Q.   You just pointed out that
15 you didn't know, for example, if strokes
16 were included or not in this issue?
17     A.   Right.
18     Q.   So, to be prudent, you would
19 include strokes?
20     A.   You would certainly want to
21 include strokes in your evaluation
22 program.
23     Q.   You would want to include
24 strokes because arguably if there's a

Page 251

1  clotting problem, that could implicate a
2  stroke?
3      A.   Right.
4      Q.   Right?
5           And, in fact, the same
6  reasoning could apply for pulmonary
7  embolism, right?
8      A.   I don't know.  If you're
9  saying that we really don't know, and it
10 is possible that this could produce a
11 large thrombus like a PE, then, yes.
12          But just so we're clear,
13 we're not talking about a combined
14 endpoint at this point, we're just
15 talking about an endpoint collection
16 mechanism?
17     Q.   I understand.
18     A.   Okay.
19     Q.   Okay.
20          But what I'm saying is, if I
21 hire you and you're giving me advice and
22 I say I want to be prudent, I'm in this
23 position that the scientific advisors
24 were in in May of 1999, and I want to

Page 252

1  design something on a going forward basis
2  to give me as many answers as possible,
3  you're going to tell me to include
4  stroke, right?
5      A.   I want to measure stroke,
6  right.
7      Q.   You want to measure stroke.
8           You want to measure
9  pulmonary embolism?
10     A.   Right.
11     Q.   You want to measure
12 myocardial infarction?
13     A.   Right.
14     Q.   You want to measure sudden
15 cardiac death?
16     A.   Yes.
17     Q.   You want to measure angina
18 pectoris?
19     A.   Sure.
20     Q.   You want to measure --
21     A.   Venous.
22     Q.   Venous thrombotic events,
23 like deep vein thrombosis?
24     A.   Right.

Page 253

1      Q.   And that would be the
2  prudent way to go forward, is looking at
3  all of those events?
4      A.   Just so we're clear, that
5  would be one mechanism that might produce
6  an answer.  It is not the only mechanism,
7  but it is one mechanism.
8      Q.   But it is certainly more
9  responsible than going forward and not
10 looking at strokes?
11     A.   Sure, sure.
12     Q.   Right?  No question about
13 that?
14     A.   Right.
15     Q.   All right.
16          Now, the other issue that I
17 think you alluded to is it is important
18 if you are going to be looking at
19 different studies to make sure that you
20 are using the same definition for the
21 same endpoint from one study to the next
22 study?
23     A.   For this particular
24 analysis, that would be an important

Lemuel A. Moye, M.D.

Page 254

1  methodologic consideration that I would
2  insist on.
3     Q.  One of the reasons you'd
4  insist on it is because when you have a
5  situation where you have rare events, one
6  event one way or the other can greatly
7  affect the results, right?
8     A.  I guess I would say that we
9  want to be sure that events are being
10 captured the same way and we don't
11 inappropriately include or exclude events
12 from one trial because they weren't
13 captured the same way as others were.
14    Q.  And one of the expressions
15 that epidemiologists use for making sure
16 that the comparisons are valid is they
17 say you want to make sure you are
18 comparing apples to apples and oranges to
19 oranges, right?
20    A.  That's true.
21    Q.  And that's exactly what
22 we're talking about right here, right?
23    A.  That's what you and I are
24 talking about and also what I think the

Page 255

1  Board of Scientific Advisors had in mind.
2     Q.  Okay.
3         Now, if you were setting up
4  a program, one of the things that I think
5  I heard you say is that you'd want to
6  have definitions for each of these events
7  that could be applied from study to
8  study, right?
9     A.  Yes.
10    Q.  One of the mechanisms -- it
11 talks about applying the uniform set of
12 criteria.  One of the things that you
13 could do is you could actually have the
14 cases that were potential cases sent off
15 to an independent group of scientists who
16 were specialists in the area to
17 adjudicate those cases, right?
18    A.  That's one thing to do.
19    Q.  Okay.
20    A.  It may not be the best thing
21 to do, because at this point in time, in
22 fact, contemporaneously, there was
23 discussion, public discussion at the FDA
24 about the appropriateness of this

Page 256

1  procedure, the procedure of having
2  endpoints go out to be reviewed by an
3  endpoint review committee.  An endpoint
4  committee, they call it.  It gained a lot
5  of interest in the 1980s and 1990s and
6  was one common modality.
7         The difficulty was, is that
8  commonly endpoint determinations made by
9  the individual investigators on the spot,
10 if you will, might be overturned by the
11 endpoint committee.  Some would argue
12 that that would be a good thing.  Others
13 have argued that since in the end we're
14 concerned about what happens in the
15 community, then perhaps we need to go by
16 what the investigators in the community
17 say.
18        So, I don't know at this
19 point whether the notion of going to an
20 endpoints committee was the best thing to
21 do.
22    Q.  Well, if you are going to
23 be -- if you are not going to use an
24 endpoint committee, then it is important

Page 257

1  to put into place some measure that
2  ensures that the investigators themselves
3  are applying the uniform definitions from
4  one case to the next case, right?
5     A.  They would have a common set
6  of criteria, yes.  By that I mean, for
7  example, that require the same
8  documentation, for example.  But that
9  there would not be a discussion among
10 reviewers sitting at a table like we are
11 today where they reach a consensus about
12 an endpoint.  That's the part that
13 perhaps should be subtracted, the
14 downside of having the endpoint review
15 committee, the need to come to a
16 consensus.
17    Q.  Now, they go on to say that
18 they are aware here that there are trials
19 anticipated or ongoing for both
20 rheumatoid arthritis and Alzheimer's
21 disease patients, right?
22    A.  Yes.
23    Q.  And they recognize that
24 there's an increased probability of those

Page 258

1  events because of the patient
2  populations, right?
3      A.  Yes, right.
4      Q.  They are talking about
5  cardiovascular events?
6      A.  Yes. I assume they are
7  talking about CV events, yes.
8      Q.  All right.
9          And the reason there's an
10 increased risk of those events in the
11 Alzheimer's population is because the
12 Alzheimer's population by definition is
13 an older population, right?
14     A.  Right.
15     Q.  The rheumatoid arthritis
16 population has an increased probability
17 because rheumatoid arthritis patients
18 have an increased risk of cardiovascular
19 events. Correct?
20     A.  Right.
21     Q.  Now, do you see at the very
22 bottom it goes on to say, "Such data
23 would address whether the net effect of
24 these COX-2 inhibitors on coronary

Page 259

1  ischemic events and stroke are favorable
2  or adverse"?
3      A.  I'm sorry. I'm not with
4  you. What page are you on?
5      Q.  I'm on Page 14.
6      A.  Okay. Thank you.
7      Q.  Did I read that correctly?
8      A.  Yes. I'm sorry.
9      Q.  And so the Board of
10 Scientific Advisors is entertaining both
11 possibilities, that Vioxx may have a
12 favorable effect on cardiovascular
13 disease and the possibility that Vioxx
14 may have an adverse effect on
15 cardiovascular disease, true?
16     A.  That's right. But both
17 possibilities are posed here.
18     Q.  Okay.
19         They go on in the next
20 sentence to say, "Knowledge that this
21 plan is in place should be reassuring to
22 the FDA as they consider the prostacyclin
23 biosynthesis question." Right?
24     A.  They say that.

Page 260

1      Q.  Do you know if the FDA did
2  consider the prostacyclin biosynthesis
3  question?
4      A.  I don't know if they
5  considered it. I also don't know if they
6  were reassured.
7      Q.  All right.
8          Do you know whether Merck
9  actually did implement the procedure that
10 the scientific advisors recommended?
11     A.  I believe they did, yes.
12     Q.  Was that procedure known as
13 the cardiovascular standard operating
14 procedure?
15     A.  Yes.
16     Q.  Okay.
17         Do you have any criticisms
18 of their having implemented this
19 cardiovascular standard operating
20 procedure?
21     A.  The criticisms I have of
22 this -- how about we say CSOP?
23     Q.  CVSOP?
24     A.  CVSOP. Okay.

Page 261

1          The criticisms I have of the
2  CVSOP are twofold. One, because you are
3  trying to apply it to trials that are
4  already in place, it is going to be
5  difficult to produce the kind of
6  standardization that you and I have
7  discussed.
8          Secondly, the CVSOP cannot
9  suck all of the air out of the room, that
10 is to say, it can't be the only mechanism
11 by which Merck decides to assess the
12 tenability of this CV -- of the
13 rofecoxib/CV relationship, CV adverse
14 event relationship.
15         There are many ways to
16 detect a signal. This is one of them.
17 There's no guarantee it will work, and it
18 is unreasonable to rely on this and only
19 on this.
20     Q.  But you don't know if they
21 did rely on this and only this because
22 you're not sure what other studies they
23 did?
24     A.  Well, I know -- well, I do

Page 262

1  know, I would say I think do know the
2  answer to that, because when they -- this
3  is all, as you and I have discussed, this
4  is all theory.  I mean, what we're
5  talking about here in 1998, the Advisory
6  Committee is saying very nicely that we
7  don't know what the effect is.  It may be
8  beneficial, it may be harmful.
9       So, we have to pay -- so,
10  their recommendation to Merck, again, to
11  be brief, is to be vigilant.  But we do
12  know, at least I believe I know, that
13  Merck was not vigilant, because when they
14  had data that allowed them to put the
15  elegant theory aside and look at the cold
16  hard fact of the matter, in fact, they
17  did not pay attention to that, and
18  perhaps one of the reasons is they were
19  so invested in this CVSOP, maybe not, but
20  they didn't pay attention to the
21  information when it became available.
22     Q.   What data are you referring
23  to?
24     A.   What data?  The Watson

Page 263

1  report.
2     Q.   Okay.
3          Is there any other data that
4  you believe Merck had that showed CV risk
5  at that time?
6     A.   No.  I mean, primarily it is
7  the Watson data.
8     Q.   Okay.
9          You would agree with me that
10  if what you are trying to do -- strike
11  that.
12          You described two options
13  for trying to apply uniform criteria,
14  right?
15     A.   Yes.
16     Q.   One option is to have an
17  outside adjudication committee who
18  reviews each case, makes a determination
19  according to the standard uniform set of
20  criteria?
21     A.   Yes.
22     Q.   The other option is to equip
23  the investigators with these uniform set
24  of criteria and rely on them to adhere to

Page 264

1  those?
2     A.   Yes.
3     Q.   One of the problems that you
4  just identified is that they were trying
5  to apply this in part to studies that
6  were already ongoing, right?
7     A.   Right.
8     Q.   When you're trying to apply
9  those two options to studies that are
10  already ongoing, the option of an
11  independent adjudication committee is
12  really the only viable option, right?
13     A.   Except I think you
14  underestimate the diluting effect of the
15  consensus process.  If one considers that
16  the worst thing that happens with these
17  external committees is they adjudicate
18  out important signals to reach a
19  consensus, then I would disagree.
20          Certainly having
21  investigators make their own
22  determination when you have post hoc
23  criteria is problematic.  I am not going
24  to deny that.  That's kind of

Page 265

1  self-evident.  But it might be worth it
2  to do that and accept that degradation in
3  signal rather than rely on an expert
4  committee which may dilute the signal by
5  coming to a consensus.
6     Q.   Have you looked at any
7  documents that talked about how many
8  events there was a dispute about on any
9  of the adjudication committees?
10     A.   Not in this matter, no.  But
11  I have experience in my own experience,
12  but I don't know what the adjudication
13  rate is in any of the clinical trials
14  involving Vioxx.
15     Q.   But apart from the
16  adjudication rate, I'm talking about the
17  agreement among the members of the
18  adjudication committee.
19     A.   I'm sorry.  That's what I
20  meant to imply.  The agreement rate is a
21  better term.  Right.
22     Q.   All right.
23          Is it your understanding
24  that Merck had one adjudication committee

Lemuel A. Moye, M.D.

Page 266

1  or multiple adjudication committees?
2      A.   I don't know.
3          MR. PIORKOWSKI:  Why don't
4      we take five minutes.
5              - - -
6          (Whereupon, a recess was
7      taken from 3:01 p.m. until 3:15
8      p.m.)
9              - - -
10 BY MR. PIORKOWSKI:
11     Q.   Dr. Moye, the data that you
12 indicated that the FDA did not have and
13 that the Advisory Committee did not have
14 was set forth in the Watson memo, right?
15     A.   That the Advisory Committee
16 did not have is in the Watson memo,
17 that's right.
18     Q.   Do you know whether the FDA
19 did or didn't have that?
20     A.   The FDA gets a wealth of
21 material from Merck.  I can't tell you,
22 I've gone through the thousands of pages
23 to see if the Merck -- this data was in
24 it, but I do know that the Advisory

Page 267

1  Committee didn't get it.
2      Q.   You know that because it
3  wasn't in the background package and
4  because it wasn't in the FDA's package?
5      A.   And it wasn't discussed at
6  the meeting.
7      Q.   So, your assumption is if it
8  was provided, then it would have been
9  discussed at the meeting?
10         MR. WACKER:  Objection to
11     the form.
12         THE WITNESS:  Well, no.  My
13     assumption is, if it wasn't in the
14     FDA packet and it wasn't in the
15     background packet and it wasn't
16     discussed in the meeting, then the
17     Advisory Committee did not get it.
18              - - -
19         (Whereupon, Deposition
20     Exhibit Moye MDL 7, "Final Results
21     of an Analysis of the Incidence of
22     Cardiovascular SAEs in the Phase
23     IIb/III Vioxx Osteoarthritis
24     Clinical Trials" 2-2-98 (Watson)

Page 268

1      MRK-AAD0046029 - MRK-AAD0046052,
2      was marked for identification.)
3              - - -
4  BY MR. PIORKOWSKI:
5      Q.   Now, let me hand you what
6  I've marked as Exhibit 7 and ask you if
7  that is the Watson memo that you're
8  referring to, the Watson analysis,
9  rather.
10     A.   Yes, it is.
11     Q.   Okay.
12         Your understanding of this
13 is that it was done in early 1998, right?
14     A.   Yes, sir.
15     Q.   And that it showed, I think
16 the words you used in your report is a
17 clear signal of increased cardiovascular
18 risk associated with rofecoxib therapy,
19 right?
20     A.   Yes, sir.
21     Q.   That's Vioxx?
22     A.   Yes.
23     Q.   All right.
24         Now, do you understand the

Page 269

1  study design for the Watson analysis?
2      A.   Yes, I think so.  It is a
3  little complicated, but I believe I
4  understand it.
5      Q.   Okay.
6          What's your -- can you give
7  me your basic understanding of what the
8  design was?
9          MR. WACKER:  Object to form.
10         THE WITNESS:  Sure.  What
11     they wanted to do was to get some
12     sense of the adverse events
13     associated with Vioxx versus what
14     a reasonable background rate would
15     be.  They had several trials that
16     were placebo controlled that also
17     involved other drugs -- that
18     involved drugs in these other
19     trials, including Fosamax.
20         And so what they did was
21     combine groups to try to get a
22     sense for whether the adverse
23     event rate, I should say
24     cardiovascular adverse event rate

68 (Pages 266 to 269)

Lemuel A. Moye, M.D.

Page 270

1   here for patients who were on
2   Vioxx was different than the
3   adverse event rate, cardiovascular
4   adverse event rate seen by
5   patients in other studies.
6   BY MR. PIORKOWSKI:
7       Q.   So, your understanding is
8   the comparison was between patients
9   taking Vioxx and the placebo group from
10  the Fosamax study?
11      A.   And also I think Proscar.
12      Q.   And the placebo group from
13  the Proscar study?
14      A.   Right.
15      Q.   But that was the basic
16  comparison?
17      A.   Yes.
18      Q.   Okay.
19           And your understanding is
20  that that comparison showed an increased
21  risk of cardiovascular events?
22      A.   Yes.
23      Q.   Okay.
24           Now, do you see in the very

Page 271

1   first page of Dr. Watson's analysis, I
2   guess it's page letter i, small letter i?
3       A.   Yes.
4       Q.   The analysis that he
5   conducted was based on the incidence of
6   thrombotic cardiovascular serious adverse
7   events among patients in the Vioxx Phase
8   IIb and III osteoarthritis trials and
9   their extensions, right?
10      A.   Yes.
11      Q.   Okay.
12           Now, is it your
13  understanding that all of the data from
14  Phase IIb and III osteoarthritis studies
15  that were completed at the time of the
16  approval had been submitted to the FDA
17  for their consideration?
18      A.   I believe that that's true,
19  yes.  I think I would expect that to be
20  part of the NDA.
21      Q.   You would expect an
22  evaluation of all of the Phase II and III
23  OA trials to be part of the NDA?
24      A.   Yes.

Page 272

1       Q.   And you would expect that
2   any serious adverse events including
3   cardiovascular serious adverse events
4   would be included and analyzed as a part
5   of that, right?
6       A.   I would hope they would be
7   included and hope that they would be
8   analyzed and hope that it would appear
9   prominent.
10      Q.   You said you reviewed
11  something called the integrated summary
12  of safety, right?
13      A.   Yes.
14      Q.   The integrated summary of
15  safety is just that, it's a summary of
16  data on a variety of different safety
17  endpoints of the clinical trial data that
18  were done in Phase III, right?
19      A.   Yes.
20      Q.   When you reviewed the
21  integrated summary of safety, was there
22  any indication that in the Phase IIb and
23  III OA trials that there was an increased
24  risk of serious cardiovascular events?

Page 273

1       A.   When I reviewed the ISS?
2       Q.   Yes.
3       A.   I don't think I was.  And I
4   think I was struck by the relatively
5   small number of patients, but I don't
6   think there was any acknowledgment of an
7   increased cardiovascular risk in the IND.
8           MR. WACKER:  Let's not make
9       this a memory test if you need to
10      go to the document.
11  BY MR. PIORKOWSKI:
12      Q.   Actually, hang on a minute.
13  You said you were struck by the small
14  number of patients.  Is that what you
15  said?
16      A.   Yes.
17      Q.   You mean you were struck by
18  the small number of patients that were
19  studied as part of the Phase III studies?
20      A.   Yes.
21      Q.   What products have you sat
22  on the Advisory Committee for that have
23  had more patients studied in Phase III
24  that have been approved than Vioxx did?

69 (Pages 270 to 273)

Lemuel A. Moye, M.D.

Page 274

1  A. Sitting here, I can't
2  remember.
3  Q. Do you know, do you have a
4  sense of -- are you familiar with the ICH
5  guidelines --
6  A. Yes.
7  Q. -- for patients?
8  A. Yes.
9  Q. The ICH guidelines are
10 followed by the FDA, is that right?
11 A. Right.
12 Q. Do you know how many times
13 greater than the ICH guidelines the Vioxx
14 population of clinical trial patients
15 was?
16 A. No, I don't.
17 Q. When we started talking
18 about the Watson analysis, you said one
19 of the things that they were trying to do
20 is get a rough understanding of how what
21 was seen in Vioxx compared with the
22 general population?
23 A. With what they thought would
24 be an appreciable, a fair representation

Page 275

1  of the background rate.
2  Q. Okay.
3      In concept, is that a fair
4  thing to do, to try to get an
5  appreciation of whether to do a
6  comparison against what you think the
7  background rate would be?
8      MR. WACKER: Object to form.
9      THE WITNESS: It's
10     acceptable. Obviously the best
11     thing to do is to have a large
12     trial that within one study
13     compares patients in the active
14     group and the control group for CV
15     adverse event. And if you can't
16     do that, then what was attempted
17     here is a reasonable step. I
18     mean, it has epidemiologic
19     validity.
20 BY MR. PIORKOWSKI:
21 Q. Do you understand that when
22 the Watson analysis was undertaken that
23 there were some studies that were already
24 unblinded?

Page 276

1  A. Yes.
2  Q. And the studies that were
3  already unblinded did not show an
4  increased risk compared to NSAID
5  comparators?
6  A. I would have to look at
7  those to see myself.
8  Q. Do you know one way or the
9  other?
10 A. Excuse me?
11 Q. Do you know one way or the
12 other?
13 A. I would have to look to see.
14 No, I don't.
15 Q. Okay.
16     Where would you need to
17 look?
18 A. I need to look at the
19 results of those studies.
20 Q. Do you understand that the
21 Watson analysis was based on the patients
22 that were unblinded -- I'm sorry, the
23 patients that were still blinded?
24 A. Still blinded, yes.

Page 277

1  Q. Do you understand that?
2  A. Yes.
3  Q. And if they were still
4  blinded, that meant that you couldn't
5  tell whether they were taking Vioxx or
6  not, right?
7  A. Right.
8  Q. I mean, if patients in a
9  clinical study are blinded, you don't
10 know what treatment medication they're
11 taking, right?
12 A. That's right.
13 Q. That's what blinded means?
14 A. That's right.
15 Q. Now, do you see on Page 3
16 where it talks about study populations?
17 A. Yes, I do.
18 Q. The two study populations
19 that they talk about, they essentially
20 give the definitions. They talk about
21 Vioxx patients?
22 A. Right.
23 Q. And they talk about Proscar
24 and Fosamax placebo patients, right?

70 (Pages 274 to 277)