And that is where it belonged based on the findings in the clinical trial, right?

MR. WACKER: Object, calls for speculation.

THE WITNESS: I'm not certain. At this point, I guess I am just not certain about that.

BY MR. PIORKOWSKI:

Q. My question is, you've already established that you're not aware of any information about hypertension or about blood pressure effects that the FDA did not have at the time it approved the initial label, right?

A. Right, right.

Q. And one of the goals the FDA has when it approves the original label is to ensure that information from the clinical trials is fairly and accurately set forth in the label, right?

A. Yes.

Q. Do you have any reason to believe they didn't do that in this case?

A. Well, I believe what we have here is a clear statement of what happened within the clinical trials, to the prevalence of hypertension associated with Vioxx in the clinical trials. I believe we have that here.

Q. Okay.

So, the label fairly and accurately reflects the results of the clinical trials with respect to Vioxx and hypertension, fair?

A. Yes, that's true.

Q. All right.

In fact, in the adverse events section, it specifically lists the rates for both Vioxx 12.5 and 25 milligrams as well as the placebo comparator and two other nonsteroidal anti-inflammatory comparators, right?

A. It is a description of the rates of hypertension experienced within the clinical trials.

Q. Okay.

And in fact, further down

under the next paragraph, it also indicates that when 50 milligrams was studied, the rate of hypertension was even higher than for 25 and 12.5 milligrams, right?

A. Yes.

Q. Now, we started off talking about your having two mechanisms that you were discussing, and you told me in addition, you had this destabilization that was part of your opinion, right?

A. Right. Destabilization, I mentioned that. And also I need to mention the potential for atherosclerosis generation separate and apart from the effect of elevated blood pressures.

Q. Well, that's not in your report either.

A. I understand that. Neither was the fissure rupture, but I should have put those in.

Q. What scientific evidence do you have to show that Vioxx causes atherosclerosis promotion other than in

the context of hypertension?

A. Let me see my -- I'm sorry. What paragraph of my report are we talking about?

Q. 24.

A. 24.

MR. WACKER: That's where you discuss it, but don't just limit yourself to that.

THE WITNESS: Right, yes. The best information I have is the work done by Dr. FitzGerald.

BY MR. PIORKOWSKI:

Q. Dr. FitzGerald doesn't say anywhere that it causes atherosclerosis, does he?

A. Well, he talks about the possibility that atherosclerosis might be caused by Vioxx, and, in fact, suggested a test that might be carried out that would answer this question that he posed.

Q. What test is that?

A. The test was to follow the

APPROVe protocol patients beyond the conclusion of the study. And this test was carried out and an answer was provided most recently in an evaluation of the APPROVe followup, which showed increased risk of disease, that is to say, cardiovascular disease associated with Vioxx.

Q. Is this something that you discussed with counsel on one of the breaks?

A. No.

Q. No?

A. No. You mean today?

Q. Yes.

A. Absolutely not, no.

Q. When we started the deposition today, I asked you if, since you finished your report on May 22nd, you had come up with any other opinions.

A. Right.

Q. You said no, right?

A. Right. This is in my report.

Q. The APPROVe followup data?

A. I don't know where it is, but it is certainly in my report.

Q. And the fact that that's a separate mechanism?

A. Well, let me just find it and we'll see what it says.

Q. Okay.

So, really, though, on Page 11, Paragraph 24, where it says, "Rofecoxib excites the production of cardiovascular disease. It produces this disease through two mechanisms," really that should be changed to say four mechanisms, right?

A. Right. Yes. On Paragraph 134 and 135, Page 50. Actually, it goes even earlier than that. It starts on -- it really starts on 133, I think.

Q. When did you look at the APPROVe followup data?

A. Sometime in May.

Q. Your opinion is that the APPROVe followup data shows -- well, what is your opinion about the APPROVe followup data?

A. Well, I'm looking at Paragraph 135 here.

MR. WACKER: I think it is actually 132.

THE WITNESS: Well, 132 begins, I guess if we come down seven lines, the line that ends, "In 2004, Dr. FitzGerald wrote an article entitled 'Coxibs and CV Disease.' On Page 1711...he stated, 'Patients in the APPROVe study should continue to be followed" to provide "some estimate of how quickly the developed risk may dissipate. Give the relatively short half-lives of these compounds...dissipation may occur rapidly. On the other hand, if treatment has accelerated atherosclerosis,'" which is what we're talking about, "'the offset

of risk,'" that is, the decrease in risk "'may be more gradual.'"

BY MR. PIORKOWSKI:

Q. Let's back up to the middle of that paragraph. Okay?

A. Right.

Q. Do you see where it says, "In 1998, one of the fears voiced by the Merck Scientific Advisory Panel"?

A. Right. Sure do.

Q. It says, "was that COX-2 inhibitors could accelerate atherosclerosis."

A. Right.

Q. "This would occur by fostering the development of lipid rich plaque or the destabilization of the plaque's fibrous cap," right?

A. Yes.

Q. We already talked about that memo, right?

A. Yes.

Q. Actually, what the board was suggesting was that Vioxx would have a

beneficial effect on lipid rich plaque and on destabilization of the plaque's fibrous cap?

A. No. What that report said is that they didn't know what the effect was, first of all.

Secondly, they came up with a mechanism untested, unproven, that showed how it might be possible that COX inhibitors could reduce atherosclerotic disease. Those were the paragraphs that you and I worked through earlier. All those were ideas. That's all that was.

Q. And that's the memo you're talking about here?

A. Right. That's right. So, all we have are ideas, and I then go on -- okay. So, just to stay focused on what you were talking about, in that memo, the Scientific Advisory Panel, they're talking about ideas. And certainly that memo was consistent with the theme that these ideas might be wrong and that, in fact, COX-2 inhibitors may

make disease worse and, therefore, they advised Merck to keep an eye out.

Q. There's nothing in that memo that even suggests the possibility that Vioxx fosters the development of lipid rich plaque or the destabilization of --

A. Well, let's look at the memo again.

Q. Look at the memo.

A. "The board addressed the potential for either benefits or adverse consequences of selective COX-2 inhibitors...The possible effects of COX-2 inhibition on three separate components of the process leading to coronary ischemic events were considered. These are," and it lists these three reasons.

Now, it says up above it is either beneficial or adverse consequences.

Q. That's right.

A. It does not matter to me that this board chooses to provide a

couple of paragraphs that say how there might not be a risk. It does matter to me that they say that there are either benefits or adverse consequences.

Q. You said that the benefit was speculation?

A. The entire board's comment here is speculation.

Q. Well, there's not even a speculation about how Vioxx could foster the development of lipid rich plaque or destabilization of the plaque?

A. Well, I disagree.

Q. Show me where it says --

A. I just did.

Q. No. What you showed me is where there's a discussion that says pro or con. And the first two items are pro, and the third item is con. That's what you showed me.

MR. WACKER: That's --

THE WITNESS: Let me not argue with you.

MR. WACKER: That's your

interpretation.

THE WITNESS: To answer your question, I believe these -- that first section down to the beginning of the underlined paragraph there, that first section is a warning about the possible adverse effects of COX-2 inhibition on any of those three mechanisms.

BY MR. PIORKOWSKI:

Q. That's your interpretation.

A. Of course, it is.

Q. And to really understand, we'd have to talk to the people on the Board of Scientific Advisors to find out what they meant. Is that fair?

MR. WACKER: Objection.

THE WITNESS: Well, I would just say that's my interpretation of what they have written, and if they have other motivations for what they have written, then they are the best people to talk to

about it.
MR. WACKER: Object to form.
MR. PIORKOWSKI: Are you objecting to the answer?
MR. WACKER: I'm objecting to the form of the question.
BY MR. PIORKOWSKI:
Q. So, what basis, what study, what scientific article do you have to show that in the absence of blood pressure that Vioxx has an effect on atherosclerosis?
MR. WACKER: Objection, asked and answered.
THE WITNESS: What I told you, I think, was that the APPROVe followup data demonstrates that.
BY MR. PIORKOWSKI:
Q. The APPROVe followup data which shows no statistically significant increase?
A. The APPROVe followup data is what I rely on.
Q. Anything else?

A. No. That's it.
Q. Okay.
Page 26 of your report, Paragraph 64 and 65, you're talking about prostaglandins?
A. Yes.
Q. Is prostacyclin a prostaglandin?
A. (Witness reviewing document.)
I'm sorry. I don't see where I mention prostacyclin here.
Q. You don't.
A. Oh, okay. I'm sorry.
Q. I said you mentioned prostaglandins.
A. Yes.
Q. My question is, is prostacyclin a prostaglandin?
A. It's related to it. I don't know the chemical composition of it. So, I don't know if it meets the chemist's definition of being a prostaglandin or not.

Q. Is that outside your area of expertise?
A. Whether prostacyclin is a prostaglandin, yes.
Q. Do you know whether thromboxane is a prostaglandin?
A. It's regulated by prostaglandin. I don't know if itself it is a prostaglandin.
Q. You say that in Paragraph 68 that NSAIDs --
A. I'm sorry. 68?
Q. Yes.
A. Okay.
Q. You have a discussion about general NSAIDs?
A. Yes.
Q. You say that they have been available for approximately 30 years?
A. Yes.
Q. They have well-known clinical characteristics?
A. Yes.
Q. Okay.

Are you aware of any long-term placebo-controlled study of any nonsteroidal anti-inflammatory drug that has evaluated cardiovascular risks?
A. I don't know what you mean by that. If you are talking about a clinical trial, then, no, I'm not.
Q. For any NSAID?
A. For a clinical trial?
Q. Yes.
A. No.
Q. Okay.
You say that disturbing the balance, delicate clotting balance is one of the mechanisms by which you believe Vioxx can exert an effect, right?
A. Right.
Q. And is that effect one that is related to what you believe to be its effect on prostacyclin?
A. Yes.
Q. Okay.
And for how long does that effect continue to exert itself after

Vioxx is out of the system?

MR. WACKER: Object to form.

THE WITNESS: I think the best answer I can give you today is quite a long time.

BY MR. PIORKOWSKI:

Q. Well, let me stop and make sure we're on the same page here.

I'm not asking you about your views about risks in general. I'm asking you about your views about increasing the potential for clotting through the mechanism of affecting the balance. That's what I'm limiting my question to.

I'm saying with respect to that issue, how long does Vioxx continue to exert an effect on clotting after it is out of your system?

MR. WACKER: Objection.

THE WITNESS: Again, I would have to say I don't know. I am now uncertain. In the presence of the APPROVe followup data, I just

don't know.

BY MR. PIORKOWSKI:

Q. Do you have any reason to believe that any events in the APPROVe followup data were related to an increased -- a disturbance of the clotting balance?

A. I can only say that it's possible. I don't know.

Q. Do you know what the half-life of Vioxx is?

A. I did. Actually, I thought I put it in my report. It is a fairly short half-life.

Q. Is it your belief that Vioxx has no effect on thromboxane, but it has an effect of inhibiting prostacyclin?

A. That it is primarily a COX-2 inhibitor, so, it has no effect on thromboxane, yes. It works primarily through its effect on prostacyclin.

Q. Okay.

And by contrast, aspirin has an effect of inhibiting thromboxane,

correct?

A. Yes. For the duration of the life of the platelet, yes.

Q. Other nonselective NSAIDs inhibit both thromboxane and prostacyclin, correct?

A. Yes.

Q. Now, the idea about this imbalance is that the imbalance is caused by inhibiting prostacyclin without the thromboxane, right?

A. Of the clotting imbalance.

Q. Of the clotting imbalance?

A. Yes.

Q. Right.

So, to the extent that the clotting imbalance is caused by not having inhibition of thromboxane, if one were to take aspirin at the same time, that would straighten out the balance problem?

MR. WACKER: Object to form.

THE WITNESS: Well, if I understand the circumstance right,

by adding a pure COX-1 to a pure COX-2, you've got an NSAID, which means that you really haven't disturbed the balance. That's what I think I just heard. That's what I think we're talking about.

BY MR. PIORKOWSKI:

Q. Okay.

Well, you recognize that when you're talking about inhibiting thromboxane, for example, that you can inhibit it so much and any additional inhibition is sort of clinically insignificant, right?

A. That's true, yes.

Q. The same thing is true with prostacyclin?

A. You have to have, I think, a 90 percent inhibition.

Q. Right.

A. Right.

Q. So, if you add a higher dose that gives you 92, that doesn't really have any meaningful effect. Fair to say?

A. Yes.
Q. So, you would agree then that aspirin, at least with respect to the clotting issue, would counterbalance the effect of what you believe Vioxx causes?
MR. WACKER: Objection. Are you talking about in a hypothetical sense or in a clinical that's actually been tested?
MR. PIORKOWSKI: I'm asking him his understanding based on his knowledge of the biochemistry of these compounds as he's described in his report.
THE WITNESS: Well, based on the model that we used which reflects our belief at how this works, then, in fact, adding aspirin undoes the imbalance that has been produced by COX-2 -- by Vioxx.
BY MR. PIORKOWSKI:

Q. Okay.
You have opinions in your report about the risks, the balance of the risks and benefits, right, of Vioxx?
A. Yes.
Q. Is it your opinion that Vioxx is always unsafe for all people at any dose under any circumstances?
MR. WACKER: Objection. Overly broad.
BY MR. PIORKOWSKI:
Q. Well, let me just read you your statement then and make sure this is accurate.
"Rofecoxib," which is Vioxx?
MR. WACKER: What page are you on?
MR. PIORKOWSKI: I'm on Page 11.
BY MR. PIORKOWSKI:
Q. -- "is unsafe at any dose/duration combination in any patient regardless of their underlying risk for cardiovascular disease."

Is that your opinion?
A. Yes.
Q. So, there's no patient ever for whom the risks of Vioxx justify giving that product? Is that your view?
A. That's my view. That is my view, yes.
Q. Okay.
You recognize that there are patients -- let me back up.
You talk about the efficacy of Vioxx, and you say that there is no -- that Vioxx was not more effective than other NSAIDs, right?
A. Yes, sir.
Q. Okay.
Certainly you would agree that the evidence shows that it was as effective as other NSAIDs, right?
A. Yes.
Q. There's no suggestion that it was less effective than the other available NSAIDs?
A. That's correct.

Q. Do you know from your clinical experience that there are also people for whom one drug product works and cures their pain or alleviates their pain, and another drug product doesn't work?
A. Well, I know from my clinical experience that pain is subjective and that some modalities work better than others at some time.
Q. Let me back up and make sure I understand one thing.
Do you accept that arthritis is a serious disease?
A. Yes.
Q. Do you recognize that arthritis leaves many patients crippled and disabled?
A. Yes.
Q. That arthritis leaves some patients unable to work?
A. Yes.
Q. Unable to earn a living?
A. Yes. So far, I mean, the

answers I give apply to rheumatoid as well as osteo.
Q. As I meant them to.
A. Okay.
Q. You agree that arthritis patients are often unable to enjoy life with their families?
A. I don't think I agree with that.
Q. I mean, a dad can't go to the backyard and throw the ball with his kid because of his arthritis?
A. It doesn't mean you don't enjoy life with your family, though.
Q. Okay.
Do you agree that providing effective relief to arthritis patients is an important public health goal?
A. No.
Q. You don't?
A. No. Not the way you phrased it, no.
Q. What don't you agree with about that?

A. You didn't use the word "safe."
Q. I said -- well, okay.
What do you mean by the word "safe"? Do you mean having no risks?
A. No, no. I just mean that -- two things. I mean that the benefits of the drug exceed the risk, number one.
And number two, that the patient understands what the potential risks are, as well as the physician and pharmacist, but primarily the patient understands.
Q. Who decides if the benefits outweigh the risks, you?
MR. WACKER: Objection.
THE WITNESS: The patients do.
BY MR. PIORKOWSKI:
Q. Okay.
Well, you're expressing the view that there's no patient for whom the benefits outweigh the risks?
A. That's true.

Q. Okay.
You told me that you read through the 2005 Advisory Committee meeting transcripts, right?
A. I did.
Q. Did you read the testimonials of individual patients at the end of that meeting?
A. I did.
Q. Did you recognize that there were a number of patients who were pleading with the FDA to have Vioxx back on the market because it was the only drug that allowed them relief from their crippling condition?
MR. WACKER: I object to form.
THE WITNESS: I understand that anecdotes can be persuasive to some people. I also understand that when one doesn't have the opportunity to speak to the person providing the anecdote, they really don't -- they really -- the

person providing the anecdote may not understand that there are other modalities that would be safer and effective. But with no opportunity to speak with them about it, you don't get a chance to educate them.
BY MR. PIORKOWSKI:
Q. Well, first of all, they are patients, not anecdotes, right?
A. Excuse me. No. They are providing patient anecdotes. They are providing single, sole experiences which may or may not be reproducible, in fact, may or may not be accurate. We don't know.
Q. A lot of things may or may not be accurate.
A. But when you stand before an Advisory Committee, we certainly expect Merck to provide accurate information for the Advisory Committee, right? However, when it comes to anecdotes, we don't know if those are

accurate or not. I mean, we just don't know.

Q. So, you're assuming that they are not accurate?

A. I'm saying that we don't know.

Q. I'm asking you.

A. I'm just saying we don't know.

Q. Do you have a reason to believe that they are not true?

A. Insofar as that people don't always remember things appropriately, yes. Recollection is not perfect, yes. That they have a particular point of view they want to promulgate, yes.

Q. The clinical trials really can't measure whether Vioxx works in patients for whom no other drug works, can it?

A. I'm sorry. I didn't hear the last part.

Q. The clinical trials were really not able to measure whether Vioxx

works in patients for whom no other NSAID works, were they?

A. That's true. That has to do with the exclusion -- an exclusion criteria of the study.

Q. Because to be a participant in the study, you had to have had success on an NSAID by definition?

A. Right. Yes.

Q. All right.

So, if you had success on an NSAID by definition, then you couldn't be a patient for whom Vioxx was the only drug that worked, right?

A. Yes.

Q. The only way to determine if there are cases like that that exist is through patient anecdotes.

A. No. It's through a trial that looks at -- recruits patients who are failures. I mean, that's not an unethical trial to do. Patients who have failed on therapy are admissible to the study.

Q. Did you see the testimony at the end of the Advisory Committee from the military physician who talked about the importance of COX-2s in taking care of battlefield casualties?

A. Yes.

MR. WACKER: Objection to form.

BY MR. PIORKOWSKI:

Q. Vioxx was an important option because it was not associated with the same bleeding difficulties that other nonsteroidal anti-inflammatory drugs were associated with?

A. That's true.

MR. WACKER: Objection to form.

THE WITNESS: Yes, I did see that.

BY MR. PIORKOWSKI:

Q. And for a young healthy U.S. Marine for acute pain relief, you believe that Vioxx is not safe?

MR. WACKER: Object to form.

THE WITNESS: I think it would be a shame to give that young, healthy Marine a heart attack.

BY MR. PIORKOWSKI:

Q. I agree.

A. Or a stroke.

Q. I agree.

A. So, I don't think Vioxx is worth it.

Q. What's the likelihood of a stroke or a heart attack occurring in a young otherwise healthy patient with no previous cardiac disease and no risk factors for that disease in short-term use?

MR. WACKER: Objection, incomplete hypothetical.

THE WITNESS: I'm sorry. I lost the conditions. You are talking about someone who is young, healthy?

BY MR. PIORKOWSKI:

Q. Young, healthy, no

cardiovascular risk factors.

A. So, let's just go through them.

No diabetes, no hypertension, no elevated lipids, no stress, exercises.

Q. Right.

A. Okay.

MR. WACKER: This is somebody taking Vioxx or not taking Vioxx?

MR. PIORKOWSKI: Taking Vioxx. Short-term use.

THE WITNESS: And then we add Vioxx short-term use?

BY MR. PIORKOWSKI:

Q. Yeah.

MR. WACKER: Still incomplete hypothetical.

THE WITNESS: I guess all I can tell you, this is a risk for heart attack?

BY MR. PIORKOWSKI:

Q. I am asking you, you said it

would be unfortunate to give that person a heart attack.

A. Right.

Q. I mean, I think it would be unfortunate to give somebody an aspirin and have them have a bleeding stroke.

A. Or Tylenol?

Q. Or Tylenol.

A. Or medication, or an NSAID and a protease pump inhibitor. There are alternatives.

Q. There are alternatives that are less risky?

A. There are alternatives that don't cause heart attacks and strokes.

Q. What are those?

A. And there are alternatives for which we know what the risks are.

Q. So tell me what the alternative would be for a Marine in the field that doesn't cause heart attacks and stroke.

A. Tylenol.

Q. Have you ever been in the

military?

A. No, sir, I have not.

Q. Do you know if Tylenol is an as effective a pain reliever as nonsteroidal antiinflammatories?

A. I will say this, it is in many people.

Q. Does Tylenol have its own potentially fatal side effects?

A. Extremely rare and only on extreme overdoses.

Q. Is it limited to overdoses?

A. My understanding is yes.

Q. Does Tylenol occasionally cause liver failure?

A. Only on overdoses. Not on -- I don't know of any case of liver -- of hepatotoxicity occurring on normal doses of Tylenol.

Q. In alcohol?

A. Even in alcohol, it's elevated doses.

Q. Okay.

Nonsteroidal

anti-inflammatory drugs have a property not only of reducing pain, but of also reducing inflammation, correct?

A. Yes.

Q. Reducing inflammation is an important medical goal because that breaks the chain of what is causing the pain, true?

A. Yes.

Q. Okay.

Tylenol does not reduce inflammation?

A. That's correct.

Q. Okay.

Are there any other treatment options besides Tylenol that are not associated with any risk of cardiovascular disease?

MR. WACKER: Asked and answered.

MR. PIORKOWSKI: Any others, I said.

MR. WACKER: I think he said NSAIDs and protease pump

inhibitors.

THE WITNESS: NSAIDs and protease pump inhibitors, I mentioned.

BY MR. PIORKOWSKI:

Q. So, it is your testimony under oath that nonselective NSAIDs plus proton pump inhibitors are not associated with any risk of heart attack or stroke?

A. That they are not associated with an elevated risk of heart attack or stroke.

Q. Elevated compared to what?

A. To baseline. To what the risk would be in the absence of the medication. And certainly its risk is much less than that associated with COX-2.

Q. And what do you base that on?

A. Base it on VIGOR.

Q. VIGOR is one study that compared naproxen to Vioxx, right?

A. VIGOR is one large clinical

trial that compared naproxen to rofecoxib, right.

Q. Anything else you base it on besides VIGOR?

A. That's all I can think of now.

Q. You reviewed the FDA's April 2005 memo, right?

A. I did.

Q. And you saw --

A. Not the transcript. The brief memo that came out at the end.

Q. Right. By John Jenkins.

A. Yes.

Q. And you said at the end of your report that you weren't certain about the basis of the FDA's conclusions; is that right?

A. That was one thing I said. Yes.

Q. Okay.

You do understand that there's a lot of data, while there may not be data comparing nonsteroidal

anti-inflammatory drugs to placebo groups, there's a lot of clinical controlled data comparing nonsteroidal anti-inflammatory drugs to COX-2s, right?

A. Yes.

Q. And that includes a lot of clinical trials on Vioxx, right?

A. Right.

Q. It includes the CLASS study, right? Do you know what the CLASS study is?

A. Yes. But CLASS I didn't think was Vioxx.

Q. It's not.

A. Okay. Right.

Q. But it is a comparison between two nonsteroidal anti-inflammatory drugs and a COX-2 inhibitor.

A. Yes. That's true. Yes.

Q. Okay.

And it showed no significant difference between the COX-2 inhibitor and the nonsteroidal anti-inflammatory

drugs with respect to myocardial infarction rate?

A. Well, fair enough, but celecoxib is not Vioxx. I mean, they are different, and so I don't want to paint Vioxx with this brush.

Q. Well, many of your statements relate to COX-2s generally and the effects of COX-2s.

A. I thought -- actually, I thought I was pretty clear about the differential effect of rofecoxib versus the other drugs.

Q. So, is it your view that celecoxib is a safe drug?

A. I don't think --

MR. WACKER: Objection. Objection to form.

THE WITNESS: Actually, I have to say I haven't studied celecoxib sufficiently to be able to say one way or the other today about that.

BY MR. PIORKOWSKI: