Lemuel A. Moye, M.D.

Page 358

1    Q.   Is the same thing true for
2  ibuprofen?
3         MR. WACKER:  Object to form.
4    What's your definition of "same"?
5  BY MR. PIORKOWSKI:
6    Q.   I mean, he's not allowed to
7  testify.
8    A.   I understand.  Ask me the
9  question again, please.
10   Q.   What about ibuprofen, is
11 that a safe drug?
12   A.   It is a relatively safe
13 drug, yes.
14   Q.   Relative to what?
15   A.   Relative to nothing.
16 Relative to water.  I mean, relative to
17 placebo.
18   Q.   Well, in here you talk --
19 you know, you use the term "safe."
20   A.   Yes.
21   Q.   And you say that Vioxx is
22 unsafe?
23   A.   Yes.
24   Q.   So, my question is, is

Page 359

1  ibuprofen safe or is it unsafe?
2    A.   Ibuprofen is safe.
3    Q.   Okay.
4         What do you base that on?
5    A.   I base it on the
6  understanding of the serious adverse
7  events associated with it and the
8  understanding we have of the adverse
9  events associated with it and our
10 understanding of those events.
11        MR. WACKER:  Let me, just
12   for the record, so you are clear
13   about my objection, the reason
14   that I'm saying objection to the
15   word "safe" is because people have
16   different understandings and
17   meanings as I've seen in this
18   litigation.
19        One definition of "safe"
20   that I've seen, you know, defense
21   counsel use, means no risk.  And
22   another definition of "safe" could
23   mean that the benefits outweigh
24   the risks, and if you use it as

Page 360

1  directed as labeled, then that's
2  safe.  So, I'm not sure which
3  definition of "safe" you're
4  referring to.
5  BY MR. PIORKOWSKI:
6    Q.   Okay.
7         But your view is that there
8  are no circumstances in which the
9  benefits of Vioxx outweigh the risks,
10 right?
11   A.   Yes, sir.
12   Q.   Ever?
13   A.   Yes.
14        - - -
15        (Whereupon, Deposition
16 Exhibit Moye MDL 9, Memo 4-6-05
17 "Analysis and recommendations for
18 Agency action regarding
19 nonsteroidal and
20 anti-inflammatory drugs and
21 cardiovascular risk" (19 pages),
22 was marked for identification.)
23        - - -
24 BY MR. PIORKOWSKI:

Page 361

1    Q.   Okay.
2         Now, let me hand you what
3  I've marked as Exhibit 9.
4    A.   Yes.
5    Q.   And ask you, you've reviewed
6  this memo?
7         MR. WACKER:  Again, just for
8    the record, this is the subject of
9    a motion in limine.
10        MR. PIORKOWSKI:  Well, he
11   relied on it in his report.
12        MR. WACKER:  Only to the
13   extent that it is allowed into
14   evidence and you have to comment.
15   You could comment on it if -- this
16   is the subject of a motion in
17   limine to exclude it.  It was
18   excluded in New Jersey, as you
19   know, and so to the extent that
20   there is an adverse ruling,
21   obviously he has an ability to
22   comment on it.
23        But it is the subject of a
24   motion in limine, it was excluded

Lemuel A. Moye, M.D.

Page 362

1 in New Jersey.
2     MR. PIORKOWSKI:  It wasn't
3 excluded in New Jersey.
4     MR. WACKER:  I'm sorry.
5     MR. PIORKOWSKI:  That's not
6 an entirely accurate statement.
7 There were sections of it that
8 were admitted into evidence in New
9 Jersey.
10    MR. WACKER:  My
11 understanding from the
12 Kona/McDarby trial was that this
13 was not admitted into evidence,
14 and it is the current subject of a
15 motion in limine before Judge
16 Fallon that has not been ruled
17 upon.
18    So, out of caution, we
19 provided it to Dr. Moye to review
20 pending a ruling by Judge Fallon
21 on its admissibility.
22 BY MR. PIORKOWSKI:
23    Q.  Did you consider the FDA's
24 conclusion that "The three approved COX-2

Page 363

1 selective NSAIDs (celecoxib, rofecoxib
2 and valdecoxib) are associated with an
3 increased risk of serious adverse CV
4 events compared to placebo" and that "The
5 available data do not permit a rank
6 ordering of these drugs with regard to CV
7 risk"?
8    A.  Can you show me that in the
9 report?
10   Q.  First point under "Executive
11 Summary."
12   A.  Okay.  Yes.
13   Q.  Okay.
14       And when they say, "The
15 available data do not permit a rank
16 ordering," what that means is that you
17 cannot say that one of those drugs is any
18 better or any worse than any other one of
19 those drugs?
20   A.  No, it doesn't.  It means
21 that they cannot say.
22   Q.  So, you can say, but they
23 can't say?
24   A.  Right.

Page 364

1    Q.  What data do you have that
2 they don't have?
3        MR. WACKER:  Objection.  I
4 mean, that's not part of his --
5        THE WITNESS:  I don't know.
6 BY MR. PIORKOWSKI:
7    Q.  What?
8    A.  I said I don't know.  But
9 certainly I am permitted to have my own
10 conclusion based on the data that I've
11 reviewed, which has been provided to you
12 independent of what the FDA thinks.
13       MR. WACKER:  Just for the
14 record, that's part of the basis
15 of the motion in limine.  There's
16 no citations to what data in this
17 document.  There's no citations in
18 this document to any data.
19 They're just statements.
20 BY MR. PIORKOWSKI:
21   Q.  Well, do you want to turn to
22 the background section, Doctor.
23   A.  Sure.  What page is that?
24   Q.  It is on Page 3.

Page 365

1    A.  Page 3?
2    Q.  All right.
3        Is it fair to say that FDA
4 has clinical trial data available to it
5 on each and every one of the COX-2
6 inhibitors that has been marketed in the
7 United States?
8    A.  Yes.
9    Q.  And they have available to
10 it clinical trial data on each and every
11 nonsteroidal anti-inflammatory drug
12 that's been marketed in the United
13 States?
14   A.  Yes.
15   Q.  Including drugs that have
16 been marketed in the United States and
17 taken off the market, right?
18   A.  Sure.
19   Q.  They have animal studies
20 available to them, right?
21   A.  Yes.
22   Q.  They have post-marketing
23 adverse event information on COX-2
24 inhibitors and NSAIDs ranging back 30

92 (Pages 362 to 365)

Page 366

1  years on some drugs?
2  A.  They do, indeed.
3  Q.  Okay.
4      And the FDA additionally has
5  the ability when a drug is on the market
6  or when a drug is being sought for
7  approval to ask for additional studies
8  really at any time it wants, right?
9  A.  They can ask.
10  Q.  They can ask, and if their
11  request is not complied with, they cannot
12  approve the drug, right?
13  A.  But also they can ask, their
14  request not be complied with, and they do
15  approve the drug.
16  Q.  Can you name me a situation
17  where that has happened?
18  A.  Of course.
19  Q.  Where?
20  A.  Warner-Lambert, Rezulin.
21  Q.  Okay.
22      What specific information
23  did they ask for?
24  A.  Specifically the FDA asked

Page 367

1  for a long-term study that would assess
2  the effectiveness of any diabetic
3  medication on morbidity and mortality.
4  It was formally asked for in a pre-NDA
5  meeting.  Warner-Lambert didn't do the
6  study.  They still got it approved.
7  Q.  Did they embark to do the
8  study?
9  A.  I don't know.  They didn't
10  do it.  I don't know.  I don't know what
11  they did do.  I know what they didn't do.
12  They didn't do the study.
13  Q.  If the FDA felt it was
14  important enough, they could have
15  withheld its approval, right?
16  A.  We'd like to think so.  But
17  the fact of the matter is, you asked for
18  a counter example, I gave you one.
19  Q.  Okay.
20      The background section says,
21  "Following the joint meeting, CDER
22  conducted a thorough internal review of
23  the available data regarding" --
24  A.  Second paragraph?

Page 368

1  Q.  Under "Background."
2  A.  Okay.  Thank you.
3  Q.  "Following the joint
4  meeting, CDER conducted a thorough
5  internal review of the available data
6  regarding cardiovascular safety issues
7  for COX-2 selective and non-selective
8  nonsteroidal anti-inflammatory drugs,"
9  correct?
10  A.  Yes.
11  Q.  That includes all of the
12  clinical trial data available to them,
13  right?
14  A.  Well --
15      MR. WACKER:  Objection.
16  Calls for speculation.
17      THE WITNESS:  I don't know.
18  You know, I don't know what
19  "available" means.
20  BY MR. PIORKOWSKI:
21  Q.  Okay.
22      Do you disagree that the FDA
23  also found that data from long-term
24  controlled clinical trials that have

Page 369

1  included a comparison of COX-2 selective
2  and nonselective NSAIDs do not clearly
3  demonstrate that the COX-2 selective
4  agents confer a greater risk of serious
5  adverse CV events than nonselective
6  NSAIDs?
7  A.  If you ask me do I disagree
8  with the fact that they said that, of
9  course not.
10  Q.  Okay.
11      So, let me make sure I got
12  this --
13  A.  That's what they said and I
14  acknowledged that.
15  Q.  And you disagree with that?
16  A.  Well, I'm here to speak
17  today about rofecoxib.
18  Q.  I understand.
19  A.  I'm not here to speak about
20  Bextra or Celebrex.
21  Q.  I understand.
22  A.  And so based on my
23  understanding of the effects of
24  rofecoxib, I would disagree with that.

Lemuel A. Moye, M.D.

Page 370

1  Q. Okay.
2     But you haven't done a
3  scientific review of the literature on
4  the cardiovascular effects of other
5  NSAIDs, have you?
6  A. That's true.
7  Q. And the FDA says that they
8  did that?
9  A. Fair enough.
10 Q. Okay. All right.
11    Is it your position that you
12 know that Vioxx has a greater
13 cardiovascular risk than these other
14 drugs which you have not done a
15 scientific investigation of, or is it
16 your opinion you've not looked at the
17 question and don't have an opinion one
18 way or the other?
19 A. I have not looked at the
20 question, so, I can't rank order, I think
21 is the term used by the FDA. At this
22 point in time, I can't rank order.
23 Q. With respect to
24 cardiovascular risk?

Page 371

1  A. Right.
2  Q. Okay.
3     And that's true with respect
4  to Vioxx and Celebrex also, right?
5  A. Well, it means the same
6  thing. Rank order with respect to
7  COX-2s -- with respect to rofecoxib and
8  other COX-2s, because I haven't looked at
9  other COX-2s.
10 Q. I just want to make sure
11 we're clear on two things.
12 A. Maybe not.
13 Q. Rank order with respect to
14 Vioxx versus Celebrex, you haven't looked
15 at that question, right?
16 A. That's right. I have not
17 looked at that point.
18 Q. So, you can't have an
19 opinion not having looked at that
20 question?
21 A. Right.
22 Q. And you also have not looked
23 at the question of the CV risk of Vioxx
24 versus nonselective NSAIDs?

Page 372

1  A. I disagree with that. I
2  have.
3  Q. What literature search have
4  you done to look -- well, let's back up.
5     You said first that you
6  didn't look at any of the new drug
7  applications on any of the NSAIDs, right?
8  A. Right.
9  Q. You didn't look at any of
10 the medical officer reviews on any of the
11 NSAIDs?
12 A. Right.
13 Q. You didn't do a medical
14 literature review on any of the
15 nonselective NSAIDs?
16 A. Right.
17 Q. And are you prepared today
18 then to say that you've formed an opinion
19 about the cardiovascular risk of the
20 nonselective NSAIDs?
21 A. What I said about the NSAIDs
22 is that I did look at data involving
23 NSAIDs and their CV risk and I referred
24 to the epidemiological data in my

Page 373

1  affidavit. So, I am comfortable with the
2  solidity of the basis of my opinion about
3  Vioxx versus NSAIDs.
4  Q. What is your opinion about
5  Vioxx versus NSAIDs? What specific
6  studies are you relying on for your
7  opinion of Vioxx versus nonselective
8  NSAIDs?
9  A. Primarily VIGOR.
10 Q. Okay.
11    VIGOR is one nonselective
12 NSAID.
13 A. Okay.
14 Q. Is there any other study on
15 any other nonselective NSAID you're
16 relying on, or are you extrapolating that
17 because that's the way naproxen behaved,
18 that that's also the way indomethacin and
19 ibuprofen and diclofenac and nabumetone
20 behave?
21 A. Actually there was an
22 assessment of nabumetone and Vioxx. That
23 was protocol 90, I think. I don't
24 remember which number it was. So, that's

Lemuel A. Moye, M.D.

Page 374

1 another assessment of the two. But
2 nevertheless, I think I've done enough of
3 a review to understand the relative risk
4 of Vioxx for CV events versus NSAIDs.
5    Q.   Do other NSAIDs have an
6 increased CV risk versus placebo,
7 nonselective NSAIDs?
8    A.   Versus placebo?
9    Q.   Yes.
10   A.   It's unclear.
11   Q.   You acknowledged earlier
12 that every one of the other NSAIDs has
13 blood pressure elevation as a potential
14 side effect, right?
15   A.   Yes.
16   Q.   You also acknowledged that
17 any drug that can cause blood pressure
18 elevations potentially can potentiate
19 atherosclerosis, right?
20   A.   I said used chronically.
21   Q.   Used on a chronic basis?
22   A.   Right.
23   Q.   What's your definition of
24 chronic?

Page 375

1    A.   Longer than how I prescribed
2 it, which was for five -- I would say for
3 months.
4    Q.   Okay.
5    A.   For months.
6    Q.   All right.
7         Are you aware of any data to
8 suggest that the effects on blood
9 pressure do not increase the CV risks?
10   A.   Well, I would put it this
11 way. I think for these NSAIDs that have
12 been around for generations now, I think
13 if there was an appreciable increased
14 risk associated with them, we would know
15 it.
16   Q.   That's the basis of your
17 opinion?
18   A.   I think that we would know
19 it.
20   Q.   Okay.
21        And the fact of the matter
22 is that there just had never been studies
23 like APPROVe or CLASS done on any of the
24 nonselective NSAIDs, true?

Page 376

1    A.   That's true. There have
2 been no such studies done with those
3 drugs.
4    Q.   And if APPROVe and CLASS had
5 never been done, elevated risks in Vioxx
6 and Celebrex never would have been
7 appreciated?
8    A.   Well, I mean, that's all
9 speculative, you know.
10   Q.   It's true.
11   A.   No, it's speculative. I
12 don't know.
13        MR. PIORKOWSKI: Why don't
14   we take a brief break.
15            - - -
16        (Whereupon, a recess was
17   taken from 5:05 p.m. until
18   5:14 p.m.)
19            - - -
20 BY MR. PIORKOWSKI:
21   Q.   Dr. Moye, is there any
22 specific study that you're relying on for
23 your opinion that Vioxx causes an
24 imbalance between prostacyclin and

Page 377

1 thromboxane?
2    A.   No. It was my understanding
3 of the biochemistry of it, but I haven't
4 reviewed the basic biochemical studies,
5 no.
6    Q.   Do you know whether the
7 studies measure prostacyclin directly or
8 whether they measure a metabolite of
9 prostacyclin?
10   A.   I don't know that.
11   Q.   Do you know the difference
12 between PGI2 and PGF1a?
13   A.   No.
14   Q.   Are you aware of any studies
15 of a COX-2 inhibitor's impact on
16 prostacyclin in animal blood vessels?
17   A.   I don't think so.
18   Q.   How about in human blood
19 vessels?
20   A.   Human blood vessels? You
21 mean -- I'm not sure I know what you mean
22 by that.
23   Q.   Are you aware of any studies
24 that have been done evaluating it in

95 (Pages 374 to 377)

Page 378

1 human blood vessels?
2   A.  I still don't know what you
3 mean.
4   Q.  Evaluating whether
5 prostacyclin causes vasoconstriction.
6   A.  I see.
7   Q.  Whether it causes, you know,
8 an alteration in the endothelium,
9 anything like that?
10  A.  No, I'm not.
11  Q.  We talked about -- when I
12 was asking you originally about your
13 opinions about intent, I broke the time
14 frame down.  One of the things I asked
15 you is whether you were offering any
16 opinions about Merck's intent after April
17 of 2002.  Do you recall that?
18  A.  Yes.
19  Q.  Okay.
20      April 2002 was the point in
21 time in which the VIGOR data was
22 incorporated into the label, right?
23  A.  Right.
24      MR. WACKER:  Well, object to

Page 379

1   form.
2 BY MR. PIORKOWSKI:
3   Q.  Okay.
4       Well, first of all, are you
5 aware of any data pertaining to the VIGOR
6 study that was not provided to the FDA by
7 Merck?
8   A.  That depends on when.
9   Q.  Ever.  I mean, I'm trying to
10 figure out what you're going to say at
11 trial, and there's nothing in your report
12 that suggests that anything about VIGOR
13 was withheld, but I want to be sure that
14 that's your opinion, that there's no
15 information, you are not going to walk
16 into court and say Merck had such and
17 such data about the VIGOR study and never
18 told the FDA.  Understand?
19  A.  Well, I understand.
20      VIGOR is a complicated
21 issue, because there was information that
22 was available at the end of the study
23 that certainly didn't get into the
24 manuscript.  It became available during

Page 380

1 that summer, I guess May/August 2000, I
2 guess it was.
3       Was that information turned
4 over to the FDA before May of 2000?
5 Certainly not.  Was it available after
6 that?  Yes.  So...
7   Q.  Was it available at the time
8 of the Advisory Committee meeting in
9 2001?
10      MR. WACKER:  Objection,
11  vague and ambiguous.
12      THE WITNESS:  Yes, it was.
13 BY MR. PIORKOWSKI:
14  Q.  In fact, you know that
15 because it was specifically written up in
16 the memorandum by Shari Targum, right?
17  A.  Yes, right.
18  Q.  So, as of February 1st,
19 2001, the date of Shari Targum's memo,
20 all of those cases had been reported to
21 the FDA?
22  A.  Yes.
23  Q.  Plus the extra stroke case
24 in the naproxen group?

Page 381

1   A.  Right.
2   Q.  Okay.
3       Now, are you aware of any
4 information about VIGOR that had not been
5 reported to the FDA as of the date of the
6 Advisory Committee meeting in February of
7 2001?
8       MR. WACKER:  Object to form.
9       MR. PIORKOWSKI:  On what
10  basis?
11      MR. WACKER:  Well, the basis
12  is it is overbroad, vague and
13  ambiguous when you are using the
14  statement of, you know, all the
15  data about VIGOR.  And I
16  specifically have in mind
17  something --
18      MR. PIORKOWSKI:  That was
19  sufficient to inform me.
20      MR. WACKER:  I specifically
21  had in mind something about VIGOR
22  that --
23      MR. PIORKOWSKI:  Okay.
24  That's enough.

Lemuel A. Moye, M.D.

Page 382

1       MR. WACKER: That's about
2    VIGOR. Anyway, go ahead.
3  BY MR. PIORKOWSKI:
4    Q.  Well, are you aware of any
5  data from the VIGOR study that was not
6  submitted to the FDA as of the time of
7  the February of 2001 Advisory Committee
8  meeting?
9       MR. WACKER: Same objection.
10      THE WITNESS: As I sit here
11   now, I can't think of any data set
12   component that wasn't provided to
13   the FDA from VIGOR.
14 BY MR. PIORKOWSKI:
15   Q.  Did the April 2002 label
16 change that included information about
17 VIGOR fairly and accurately set forth the
18 results of the VIGOR study?
19      MR. WACKER: Objection to
20   form.
21      THE WITNESS: I would have
22   to look at that again. Without
23   looking at the label again, I
24   can't answer.

Page 383

1  BY MR. PIORKOWSKI:
2    Q.  Is there any information
3  that you believe after the April 2002
4  label change that Merck was aware of and
5  failed to disclose to physicians between
6  the time of the April 2002 label change
7  and the withdrawal of the medication from
8  the market?
9    A.  Maybe it is just late, but
10 I'm really lost in there.
11   Q.  Okay.
12      There was a label change in
13 April 2002, right?
14   A.  Right.
15   Q.  The drug came off the market
16 in 2004?
17   A.  Right.
18   Q.  Okay.
19      We can argue about the
20 period of time between the VIGOR
21 unblinding and the April 2002 label
22 change.
23   A.  Right.
24   Q.  Okay.

Page 384

1       My question is, between the
2  April 2002 label change and the
3  withdrawal of Vioxx from the market, is
4  there any information that you contend
5  that Merck knew about the safety risks of
6  Vioxx that they failed to disclose?
7       MR. WACKER: Now, okay.
8    Object to form.
9       MR. PIORKOWSKI: Okay.
10      THE WITNESS: Yes.
11 BY MR. PIORKOWSKI:
12   Q.  What?
13   A.  The Alzheimer mortality
14 results. Alzheimer study mortality
15 results is one thing that comes to mind.
16 This is not a question about VIGOR
17 anymore. This is a question about any
18 information, if I understand your
19 question correctly.
20   Q.  It is. That's my question.
21      The Alzheimer study
22 mortality results. Okay.
23      What else?
24   A.  I have to look in my report

Page 385

1  to see.
2       MR. WACKER: Your question
3    is limited up until September 30,
4    2004, or are you talking about up
5    until now? Because obviously if
6    you are talking about up until
7    now, you are talking about the
8    APPROVe and the APPROVe followup.
9       MR. PIORKOWSKI: The drug's
10   not on the market.
11      MR. WACKER: Yeah. That's
12   why I wanted to make sure that you
13   were talking about up to September
14   30th.
15      MR. PIORKOWSKI: That wasn't
16   my question.
17      (Witness reviewing
18   document.)
19      THE WITNESS: I guess the
20   fact that they believe, they
21   continue to argue that naproxen
22   might be -- the alleged protective
23   effect of naproxen. They continue
24   to advocate that.

97 (Pages 382 to 385)

Lemuel A. Moye, M.D.

Page 386

BY MR. PIORKOWSKI:
Q. Okay.
   Anything else?
A. Deborah Shapiro's October 18th, 2000 report that showed that Vioxx more than doubled the risk of MIs related to NSAIDs. But that may be -- I'm confusing the timelines now. That was 2000.
Q. My question is between the label change in April of 2002 and the withdrawal.
   MR. WACKER: I guess the point is that even if -- in other words, if something wasn't disclosed before April 2002 and it wasn't further disclosed even after April 2002, then that would encompass that time frame.
   MR. PIORKOWSKI: I understand.
   THE WITNESS: What I said just reflects what's in my report. So, the degree to which my report

Page 387

is responsive to the question is the degree to which I can be responsive. I don't have anything in here from 2002 to 2004.
BY MR. PIORKOWSKI:
Q. You testified, I believe, in February of 2005 that you had made about $1.35 million in your work in fen-phen; is that right?
A. Yes.
Q. How much have you made since February of 2005 additional?
A. In fen-phen?
Q. Yes.
A. I don't know. 2005. I don't know.
Q. In the last year?
A. I don't know.
Q. Have you testified in cases in the last year?
A. Yeah.
Q. Okay.
   What's your best estimate of how much you've made in the fen-phen

Page 388

litigation overall?
A. I don't know. A little more than $1 million.
Q. Well, if you made 1.35 --
A. To me, that's a little more.
Q. What?
A. To me, that's a little more.
Q. I'm saying if you had 1.35 in February of 2005 --
A. But see, even that was an estimate. My overall estimate is somewhere between 1 and $1.5 million. That would be probably the best I can do.
Q. Okay.
   What other litigation have you testified in as an expert over the last three years?
A. The last three years?
Q. Yes.
A. This is '06.
Q. Let me withdraw the question and see if I can expedite it.
A. Okay.
Q. You testified against

Page 389

Pfizer, right, in the Rezulin litigation?
A. Yes. I just wasn't sure that was in the last three years or not.
Q. Okay.
   Was Pfizer the defendant then or was somebody else the defendant?
A. No. I think Pfizer was the defendant then. My last Rezulin trial may have been in the spring of 2004 in California. I don't remember.
Q. Do you see it on there anywhere?
   (Handing over document.)
A. Thanks.
   (Witness reviewing document.)
   I don't think so, no.
Q. It's not on there?
A. I don't think so.
Q. But it should be on there?
A. Yes.
Q. Okay.
   Do you know how many cases you testified in against Pfizer?

Lemuel A. Moye, M.D.

Page 390

1  A. For Pfizer?
2  Q. Yes.
3  A. I believe there were four.
4  Q. Four?
5  A. Four trials against Pfizer.
6  Q. Okay.
7     And where were those?
8  A. One was in Houston, one was
9  in Corpus, a third was in McAllen, and a
10 fourth was in Los Angeles.
11 Q. And your testimony was on
12 behalf of plaintiffs for all of those
13 cases?
14 A. Yes, sir.
15 Q. All right.
16    Other than your testimony
17 against Pfizer and American Home Products
18 for Wyeth, have you been involved in any
19 other product cases?
20 A. Yes, but to very limited
21 degrees. I gave a deposition I think in
22 Lotronex. That's all I remember. I
23 investigated getting into some other
24 ones, but never did.

Page 391

1  Q. Are you still involved in
2  diet drug cases today?
3  A. I don't think so anymore,
4  but with fen-phen, one never knows. So,
5  I would say I think I'm done with that.
6  Q. You don't have any active
7  things on your calendar at this point?
8  A. That's right. That's right.
9  Q. Do you know how much money
10 you made, best estimate of how much money
11 you made in the Pfizer/Rezulin
12 litigation?
13 A. No. I don't have an
14 estimate today.
15    MR. PIORKOWSKI: Okay.
16    I think we're done for
17 today. Thanks.
18    THE WITNESS: Good to see
19 you again.
20    MR. PIORKOWSKI: Good to see
21 you, too.
22    MR. WACKER: I just want to
23 ask a few questions.
24       - - -

Page 392

1       EXAMINATION
2          - - -
3  BY MR. WACKER:
4  Q. Dr. Moye, there was earlier
5  testimony that you had received a SAS
6  database. I believe you indicated that
7  that was regarding the APPROVe followup
8  data. Do you recall that?
9  A. Yes.
10 Q. Did you also receive a SAS
11 database, it may be on your index,
12 regarding the study out of Oxford?
13    MR. JOSEPHSON: Objection,
14    form.
15    THE WITNESS: Yes, I did. I
16    guess I assumed it was part of the
17    APPROVe data set. I didn't know
18    it was part of a separate study.
19 BY MR. WACKER:
20 Q. So, that's another --
21 A. But I did receive that, yes.
22 Q. That's another database that
23 you are going to look at?
24 A. Yes.

Page 393

1  Q. Okay.
2     You also mentioned here
3  today that while you haven't reviewed
4  every NDA or every study concerning
5  Bextra or Celebrex, you've looked at
6  those generally with respect to their
7  relationship with Vioxx?
8     MR. PIORKOWSKI: Objection,
9     form.
10    THE WITNESS: Yes. And
11    having reviewed all the FDA, the
12    2005 Advisory Committee meeting, I
13    certainly read about -- I read
14    their discussion of the data.
15 BY MR. WACKER:
16 Q. And we know that Celebrex
17 remains on the market, right?
18 A. Yes.
19 Q. And Bextra has been removed
20 from the market?
21 A. That's correct.
22 Q. And Vioxx has been removed
23 from the market?
24 A. Yes.

Lemuel A. Moye, M.D.

Page 394

1  MR. PIORKOWSKI: Objection
2  to form.
3  BY MR. WACKER:
4  Q. Would it be fair to say that
5  based upon the studies that you have
6  reviewed, looking at those drugs, that
7  Vioxx was the worst of those COX-2
8  inhibitors?
9  MR. PIORKOWSKI: Objection
10  to form.
11  THE WITNESS: I would say
12  not just based on those studies,
13  but based on my understanding of
14  the role of the -- the
15  differential role of COX-1, COX-2,
16  that Vioxx is the worst. That's
17  my understanding as I sit here
18  today.
19  MR. WACKER: Thank you.
20  MR. JOSEPHSON: I have no
21  questions of the witness at this
22  point. I'll reserve my questions
23  until his next appearance.
24  MS. SNAPKA: We're reserving

Page 395

1  ours.
2  MR. JOSEPHSON: Which I
3  think is on the 20th?
4  MS. FILIPPOV: We're
5  reserving ours also.
6  MR. JOSEPHSON: 16th. I
7  stand corrected. It is the 16th.
8   - - -
9  (Whereupon, the deposition
10  adjourned at 5:31 p.m.)
11   - - -

Page 396

1  CERTIFICATE
2
3  I, LINDA L. GOLKOW, a Notary
   Public and Certified Shorthand Reporter
4  of the State of New Jersey, do hereby
   certify that prior to the commencement of
5  the examination, LEMUEL A. MOYE, M.D. was
   duly sworn by me to testify to the truth,
6  the whole truth and nothing but the
   truth.
7
8  I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
9  testimony as taken stenographically by
   and before me at the time, place and on
10 the date hereinbefore set forth, to the
   best of my ability.
11
12 I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor
13 attorney nor counsel of any of the
   parties to this action, and that I am
14 neither a relative nor employee of such
   attorney or counsel, and that I am not
15 financially interested in the action.
16
17
18
19 _____
   LINDA L. GOLKOW, CSR
20 Notary Number: 1060147
   Notary Expiration: 1-2-08
21 CSR Number: 30XI176200
   Dated: June 9, 2006
22
23
24

Page 397

1  ACKNOWLEDGMENT OF DEPONENT
2
3
4  I,_____, do
   hereby certify that I have read the
5  foregoing pages, 1 - 399, and that the
   same is a correct transcription of the
6  answers given by me to the questions
   therein propounded, except for the
7  corrections or changes in form or
   substance, if any, noted in the attached
8  Errata Sheet.
9
10
11
12 _____
   LEMUEL A. MOYE, M.D.      DATE
13
14
15
16
17 Subscribed and sworn
   to before me this
18    Day of         , 20  .
19 My commission expires:
20
21 Notary Public
22
23
24

Page 398

```
 1        - - - - - -
            E R R A T A
 2        - - - - - -
 3   PAGE  LINE  CHANGE
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Page 399

```
 1              LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```