**Smith v. Merck & Co., Inc.**
**Deposition Designations for Michael Grefer**

| | | | | Objections | Responses |
|---|---|---|---|---|---|

| 1 | 7:8 | - 8:18 | Grefer, Michael 2006-06-29 | 00:01:41 | | |

| | 7:8 | Q. | Dr. Grefer. My name is Larry Wright, |
| | 7:9 | | and I represent Robert Garry Smith, and he -- he goes |
| | 7:10 | | by Garry. I'll just tell you that. |
| | 7:11 | A. | Okay. |
| | 7:12 | | (Plaintiff's Exhibit 1 |
| | 7:13 | | fication.) |
| | 7:14 | Q. | And usually I'll refer to him as Mr. |
| | 7:15 | | Smith, but occasionally I may slip and refer to him |
| | 7:16 | | as Garry. |
| | 7:17 | | Let me hand you Exhibit Number 1, and |
| | 7:18 | | can you tell the jury what Exhibit Number 1 is? |
| | 7:19 | A. | Yes. It's my curriculum vitae. It's |
| | 7:20 | | just a synopsis of my education, hospital affilia- |
| | 7:21 | | tions, licenses, and things like that. |
| | 7:22 | Q. | All right. Let me start and get you |
| | 7:23 | | to give the jury a -- a brief summary of your posi- |
| | 7:24 | | tion. You're a -- a physician practicing here in |
| | 7:25 | | northern Kentucky? |
| | 8:1 | A. | Correct. |
| | 8:2 | Q. | Tell the jury, if you would, about |
| | 8:3 | | your educational background, please, sir. |
| | 8:4 | A. | Yes. I graduated from Xavier Univer- |
| | 8:5 | | sity. From Xavier University I went to University of |
| | 8:6 | | Cincinnati College of Medicine, finished in 1973. So |
| | 8:7 | | I've been a doctor since 1973. |
| | 8:8 | | From 1973 to 1977 I trained with my |
| | 8:9 | | internship year, my residency years, that's a |
| | 8:10 | | Cincinnati General Hospital complex, finishing my |
| | 8:11 | | chief year in 1977, and have been a practicing |
| | 8:12 | | physician in greater Cincinnati and northern Kentucky |
| | 8:13 | | since that time. |
| | 8:14 | Q. | What is your specialty area of prac- |
| | 8:15 | | tice? |
| | 8:16 | A. | Orthopedic surgery. |
| | 8:17 | Q. | And have you seen Garry Smith before? |
| | 8:18 | A. | Yes. |

*overruled*

| 2 | 8:19 | - 8:23 | Grefer, Michael 2006-06-29 | 00:00:17 | **Re: 8:19-8:23** | **Re: 8:19-8:23** |
| | 8:19 | Q. | I think there were -- we have some | | **Pltf Obj:** | **Def Resp:** |
| | 8:20 | | records that indicated that you actually did a | | Relevance | Appropriate background |
| | 8:21 | | surgery on him several years ago. Do you have any | | | concerning doctor's |
| | 8:22 | | recollection of that? | | | treatment of plaintiff |
| | 8:23 | A. | Not that I recall, no, sir. | | | and lack of specific |

| 3 | 8:24 | - 9:5 | Grefer, Michael 2006-06-29 | 00:00:20 | | recollection concerning |
| | 8:24 | Q. | Okay. And then you began seeing him | | | plaintiff |
| | 8:25 | | again in the early fall of 2002. Do your records |
| | 9:1 | | reflect that? |
| | 9:2 | A. | It does. September the 11th of 2002. |
| | 9:3 | Q. | Why were you seeing Mr. Smith? |
| | 9:4 | A. | Because of an injury that he sustained |
| | 9:5 | | to his right knee. |

*overruled*

| 4 | 9:9 | - 9:20 | Grefer, Michael 2006-06-29 | 00:00:45 | **Re: 9:9-9:20** | **Re: 9:9-9:20** |
| | 9:9 | Q. | Is it fair to say you've seen thou- | | **Pltf Obj:** | **Def Resp:** |
| | 9:10 | | sands of patients like Mr. Smith over the years? | | Relevance | Appropriate background |
| | 9:11 | A. | Yes, sir. | | | concerning doctor's |
| | 9:12 | Q. | What specific treatment do you | | | recollection of specific |
| | 9:13 | | normally give for patients with knee problems like | | | patients and standard |
| | 9:14 | | Mr. Smith? | | | procedures when |
| | 9:15 | A. | Well, when someone comes in with a | | | evaluating patients. |
| | 9:16 | | knee injury, usually I review the records and I |

|  |  |  |
|---|---|---|
| 9: 17 | review the patient's history, do an examination, and |  |
| 9: 18 | basically make a decision of what the appropriate |  |
| 9: 19 | treatment is at that time and proceed with the |  |
| 9: 20 | treatment. |  |

**5**  11:25  -  12:7   Grefer, Michael 2006-06-29                    00:00:31

| 11: 25 | When the patients fill out these forms |
| 12: 1 | that give the history, are you or are you not count- |
| 12: 2 | ing on the patient to diagnose themselves with any of |
| 12: 3 | these conditions? |
| 12: 4 | A. No, I'm not asking the patient to – |
| 12: 5 | to diagnose themselves.  I'm asking the patient to |
| 12: 6 | tell me if they've ever had any problems with those |
| 12: 7 | particular situations. |

**6**  12:14  -  16:1   Grefer, Michael 2006-06-29                    00:04:44

| 12: 14 | Based upon your many years of dealing |
| 12: 15 | with patients who are not physicians, where do the |
| 12: 16 | patient's knowledge about whether or not they have |
| 12: 17 | any of these conditions come from? |
| 12: 18 | A. Well, whether they've been sick with |
| 12: 19 | any of those conditions or whether they've been |
| 12: 20 | treated for any of those conditions. |
| 12: 21 | Q. Now, in this case you saw Mr. Smith, |
| 12: 22 | and what did you do? |
| 12: 23 | A. Well, I saw Mr. Smith, and I'll review |
| 12: 24 | my -- my records here.  And basically I did examine |
| 12: 25 | him and found out my findings, and basically he -- |
| 13: 1 | I -- I told him to modify his activities.  I gave him |
| 13: 2 | a brace, started him on some therapy, and told him |
| 13: 3 | that I would like to see how things like that went |
| 13: 4 | and that I would see him back in three or four weeks. |
| 13: 5 | Q. Was he on any medications when you saw |
| 13: 6 | him? |
| 13: 7 | A. He was. |
| 13: 8 | Q. What were the medications? |
| 13: 9 | A. He was on diclofenac, and I believe he |
| 13: 10 | was on gout medicine, too. |
| 13: 11 | Q. What's diclofenac? |
| 13: 12 | A. Diclofenac is -- is a nonsteroidal |
| 13: 13 | anti-inflammatory pain medicine. |
| 13: 14 | Q. And were you aware that he'd been on |
| 13: 15 | other nonsteroidal anti-inflammatory pain medications |
| 13: 16 | over the years? |
| 13: 17 | A. I was not aware of the particulars, |
| 13: 18 | but I do -- I -- I do know that he was on some, but I |
| 13: 19 | don't know what the particular ones were. |
| 13: 20 | Q. All right.  Did he ever report any |
| 13: 21 | problems with any other nonsteroidal anti- |
| 13: 22 | inflammatories? |
| 13: 23 | A. Not that I'm aware of, no, sir. |
| 13: 24 | Q. Okay.  Specifically, did he report or |
| 13: 25 | were you aware of any stomach problems that he'd ever |
| 14: 1 | had on any other nonsteroidal anti-inflammatory, or |
| 14: 2 | aspirin for that matter? |
| 14: 3 | A. No, sir. |
| 14: 4 | Q. Okay.  When you saw him the first |
| 14: 5 | time, you've described what you did.  Did you see him |
| 14: 6 | again after that? |
| 14: 7 | A. Yes, sir, I did. |
| 14: 8 | Q. When did you see him the second time? |
| 14: 9 | A. My second visit with him was on |
| 14: 10 | October the 2nd of 2002. |
| 14: 11 | Q. And what did you do at that visit? |
| 14: 12 | A. Well, I talked to him and just kind of |
| 14: 13 | examined things.  And he said he was doing fairly |
| 14: 14 | well until the Monday prior, and he was kind of bend- |
| 14: 15 | ing down and got under a piece of equipment, and he |
| 14: 16 | had more signs of some damage to the knee on his |

| | Objections | Responses |
|---|---|---|

14: 17    examination. And the therapy did seem to help him.
14: 18    I did change his medication at that time, and I sent
14: 19    him to get an MRI test.
14: 20  Q.  All right. Now, before that he had
14: 21    been on the diclofenac. When you say you changed his
14: 22    medication, what did you change it to?
14: 23  A.  I changed it to Vioxx.
14: 24  Q.  And this is what date?
14: 25  A.  This is October the 2nd of 2002.
15: 1  Q.  And why did you change him from the
15: 2    diclofenac to the Vioxx?
15: 3  A.  I changed him to Vioxx because he was
15: 4    not getting the relief that I would have liked him to
15: 5    have gotten from the diclofenac, and so I switched
15: 6    him to Vioxx.
15: 7  Q.  All right. Is that customary, when
15: 8    you're trying a conservative course of treatment with
15: 9    a patient, to try a patient on different medications
15: 10    to see if that particular medication might give some
15: 11    relief?
15: 12  A.  Yes, sir.
15: 13  Q.  What happened -- well, at that visit
15: 14    did you give Mr. Smith some samples?
15: 15  A.  I did.
15: 16  Q.  And is that recorded in your records
15: 17    that you gave him samples?
15: 18  A.  Yes, it is.
15: 19  Q.  Do you know at this time how many
15: 20    samples you gave Mr. Smith?
15: 21  A.  No.
15: 22    (Plaintiff's Exhibit 2
15: 23    fication.)
15: 24  Q.  Let me show you some records that were
15: 25    provided to us by Merck, and I've marked as Exhibit
16: 1    Number 2 a document --

**Re: 15:24-16:23**
**Def Obj:**
Re: Plaintiff's Exhibit 2;
Mischaracterizes the
document as a Merck
document, which it is
not (Note: Plaintiff's
counsel agrees that it
is a Plaintiff
compiled document, see
84:8-12); Plaintiff
misrepresents what this
document includes;
Hearsay (802);
Foundation
Exhibit 2)

**Re: 15:24-16:23**
**Pltf Resp:**
This document was
produced in response to
production of Merck's
call notes recording
representatives visits
with Dr. Grefer

7  16:18  -  16:23  Grefer, Michael 2006-06-29    00:00:24
16: 18  Q.  Handing you a -- a document that is
16: 19    entitled "Rep Contacts in Date Order," and I'll just
16: 20    represent to you that it's information that was
16: 21    produced to us by Merck that documents contacts with
16: 22    you by Merck regarding Vioxx. Okay?
16: 23  A.  Uh-huh.

8  18:1  -  19:17  Grefer, Michael 2006-06-29    00:01:48
18: 1  Q.  Let's turn to -- well, page 10, for
18: 2    example. It's in December of 2000. There's a lady
18: 3    named Amy Block who was calling on you at that time.
18: 4    Do you remember Amy, by any chance?
18: 5  A.  I don't.
18: 6  Q.  All right. Do you remember generally
18: 7    the Vioxx representatives that -- that called on you?
18: 8  A.  Yes, in general.
18: 9  Q.  Can you describe what your impres-
18: 10    sions -- the impressions that stick in your mind from
18: 11    when the Vioxx reps called on you.
18: 12  A.  Well, they were very courteous. They
18: 13    were very informative, attractive individuals.
18: 14    Whether they be male or female, they were very
18: 15    presentable, and they were a pleasure to talk to.
18: 16  Q.  Were the ones that called on you
18: 17    mostly female, in your recollection?
18: 18  A.  Yes.
18: 19  Q.  Okay. And if you'll see here, for
18: 20    example, in December of 2000 there's a call summary
18: 21    by Amy Block, and there's a notation "Vioxx, 25
18: 22    milligrams, one by four," and then a number after
18: 23    that.
18: 24  A.  Right.
18: 25  Q.  Do you see that?

**Re: 18:1-18:5**
**Def Obj:**
Same

**Re: 18:1-18:15**
**Pltf Resp:**
The document being
shown to Dr. Grefer is
not hearsay because
it is an admission by
party opponent
801(d)(2);
present sense
impression; and a
business record 803(6)

**Re: 18:19-19:10**
**Def Obj:** Same

**Re: 18:19-19:10**
**Pltf Resp:**
Admission by party
opponent 801(d)(2);
present sense
impression 803(1); and
a business record



| | | | Objections | Responses |
|---|---|---|---|---|

19: 1   A.   Right.
19: 2   Q.   Does that -- is that consistent with      803(6)
19: 3      your recollection of the representative coming in and
19: 4      dropping off samples?
19: 5   A.   Yes.  It -- it -- it says there that
19: 6      they "Got a few seconds to talk to Dr. Grefer - he is
19: 7      a big threat with Celebrex, got a quick Vioxx message
19: 8      out - first time I've met him."
19: 9   Q.   All right.
19: 10   A.   That's what it says.
19: 11   Q.   So that was the first time that you
19: 12      met with --
19: 13   A.   Right.

**9   19:20   -   20:14   Grefer, Michael 2006-06-29      00:00:42**

19: 20   Q.   Did you get Vioxx 25-milligram one by
19: 21      four samples from time to time?
19: 22   A.   Yes.
19: 23   Q.   All right.  Then the next entry, for      **Re: 19:23-20:14**    **Re: 19:23-20:14**
19: 24      example, is about two weeks later:  December the      **Def Obj**: Same    **Pltf Resp:**
19: 25      19th.      Admission by party
20: 1   A.   Correct.      opponent 801(d)(2);
20: 2   Q.   Again by Amy Block.      present sense
20: 3   A.   Right.      impression 803(1); and
20: 4   Q.   And does it appear that she again      a business record
20: 5      dropped off 25-milligram one by four samples?      803(6)
20: 6   A.   Yes.
20: 7   Q.   Did she make a note about that meeting
20: 8      with you?
20: 9   A.   Yes, she did.
20: 10   Q.   Can you read that meeting?
20: 11   A.   It says, "Am still having trouble
20: 12      convincing Grefer about Vioxx versus Celebrex - he is
20: 13      not buying into anything I say and his numbers are
20: 14      killing us."

**10   20:18   -   20:24   Grefer, Michael 2006-06-29      00:00:14**

20: 18   Q.   Okay.  Do you -- did you write a lot
20: 19      of Celebrex prescriptions back in the 2000 time
20: 20      period?
20: 21   A.   I did.
20: 22   Q.   Do you think you probably were writing
20: 23      more Celebrex than Vioxx back in those days?
20: 24   A.   A lot more, yes, sir.

**11   21:2   -   21:5   Grefer, Michael 2006-06-29      00:00:17**

21: 2      Did the sales reps try -- and by sales      **Re: 21:2-21:11**    **Re: 21:2-21:11**
21: 3      reps I mean the Vioxx sales reps -- try hard to      **Def Obj**: Same; also    **Pltf Resp:**
21: 4      convince you to write more Vioxx in place of some of      leading (Plaintiff not    The question is not
21: 5      the Celebrex that you were writing?      permitted to lead non-    leading as the witness
     hostile witness)    could answer in the

**12   21:7   -   21:11   Grefer, Michael 2006-06-29      00:00:10**      affirmative or negative

21: 7   A.   They generally encouraged me to      Sustained    and the question does
21: 8      more -- to -- to write more Vioxx in general, yes.      not suggest the correct
21: 9   Q.   All right.      answer
21: 10   A.   And -- and that was pretty emphatic,
21: 11      yes, sir.

**13   21:18   -   22:25   Grefer, Michael 2006-06-29      00:02:32**

21: 18   Q.   In your meetings with the Vioxx sales
21: 19      representatives what did they generally try to do
21: 20      with regard to your writing Celebrex as opposed to
21: 21      Vioxx?
21: 22   A.   They encouraged me to -- the -- the --
21: 23      the -- the -- the Vioxx representatives encouraged me
21: 24      to write more Vioxx prescriptions, period.
21: 25   Q.   All right.  Now, with regard to the
22: 1      samples again, because I'm going to come back in a      **Re: 21:25-23:8**    **Re: 21:25-23:8**
22: 2      little bit and talk more about the representatives,      **Def Obj**: Same    **Pltf Resp:**

*(handwritten) Overruled*

| | | | Objections | Responses |
|---|---|---|---|---|

| | 22: 3 | but let me just -- just kind of leaf through there | Mischaracterization & misuse of Plaintiff's Ex. 2 | Admission by party opponent 801(d)(2); present sense impression 803(1); and a business record 803(6); Question is not leading |
| | 22: 4 | and -- and you'll see every -- every couple weeks if | | |
| | 22: 5 | the reps were dropping off samples during the 2001- | | |
| | 22: 6 | 2002 time frame. | | |
| | 22: 7 | A.  In general.  Sometimes quicker.  Like | | |
| | 22: 8 | one, for example, was 9/12, and the next one was | | |
| | 22: 9 | 9/17.  Basically.  So, you know, much of those things | | |
| | 22: 10 | are there. | | |
| | 22: 11 | Q.  During that period of time are most of | | |
| | 22: 12 | the samples the one by four packets? | | |
| | 22: 13 | A.  That's what it says, yes, sir. | | |
| | 22: 14 | Q.  All right.  And then in -- let me ask | | |
| | 22: 15 | you, I don't want to go through every one, every | | |
| | 22: 16 | single one of these sales notes, but let's start in | | |
| | 22: 17 | October of 2001.  Did -- did Amy Block see you again? | | |
| | 22: 18 | A.  She did. | | |
| | 22: 19 | Q.  All right.  And at that time what does | | |
| | 22: 20 | her note reflect occurred? | | |
| | 22: 21 | A.  Basically on 10/15/2001 the note -- | | |
| | 22: 22 | did you say the note? | | |
| | 22: 23 | Q.  Yes, sir. | | |
| | 22: 24 | A.  It reflected she had "Lunch at Dr. | | |
| | 22: 25 | Grefer's office" -- | | |

| 14 | 23:2     -   23:8 | Grefer, Michael 2006-06-29 | 00:00:20 | | |
| | 23: 2 | A.  -- "with HM.  Had a great talk with | | |
| | 23: 3 | doctor (Redacted)," whatever that means, "and he | | |
| | 23: 4 | said" that "he's been using more Vioxx postopera- | | |
| | 23: 5 | tively.  We discussed both the Reicen with him and | | |
| | 23: 6 | Greenberg, and presented the Percocet data" to -- "to | | |
| | 23: 7 | all.  They seemed impressed, but cautious at the same | | |
| | 23: 8 | time." | | |

| | 23:11    -   23:16 | Grefer, Michael 2006-06-29 | 00:00:09 | **Re: 23:11-24:4** **Def Obj:** Mischaracterizes the document as a Merck document, which it is not; hearsay (802); foundation (Plaintiff's Exhibit 2) | **Re: 23:11-24:4** **Pltf Resp:** Admission by party opponent 801(d)(2); present sense impression 803(1); and a business record 803(6) |
| | 23: 11 | Q.  And then on the next was -- what's the | | |
| | 23: 12 | next note? | | |
| | 23: 13 | A.  The next -- the next note is dated | | |
| | 23: 14 | 10/19 -- | | |
| | 23: 15 | Q.  So -- | | |
| | 23: 16 | A.  -- four days later. | | |

| 16 | 23:25    -   25:4 | Grefer, Michael 2006-06-29 | 00:01:10 | | |
| | 23: 25 | Q.  On October 19th, so four days later | | |
| | 24: 1 | another rep? | | |
| | 24: 2 | A.  Yes. | | |
| | 24: 3 | Q.  Who was this rep? | | |
| | 24: 4 | A.  Holly Biss. | | |
| | 24: 5 | Q.  Do you remember her, by any chance? | | |
| | 24: 6 | A.  No. | | |
| | 24: 7 | Q.  All right.  And did she leave a note? | | |
| | 24: 8 | A.  Yes. | | |
| | 24: 9 | Q.  What did her note say? | | |
| | 24: 10 | A.  Grefer, colon, Hopefully we're on our | **Re: 24:9-24:23** **Def Obj:** Same | **Re: 24:9-24:23** **Pltf Resp:** Admission by party opponent 801(d)(2); present sense impression 803(1); and a business record 803(6) |
| | 24: 11 | way.  He agreed to meet with Dr. Kelly on November | | |
| | 24: 12 | the 9th.  He just doesn't want to go to dinner, just | | |
| | 24: 13 | a business meeting in his office.  I hope we can get | | |
| | 24: 14 | this one. | | |
| | 24: 15 | Q.  All right.  And then on October | | |
| | 24: 16 | 22nd -- | | |
| | 24: 17 | A.  October 22nd. | | |
| | 24: 18 | Q.  -- a gentleman -- | | |
| | 24: 19 | A.  Tom Schatz-- Schatzman. | | |
| | 24: 20 | Q.  Yes.  What did he write? | | |
| | 24: 21 | A.  His notes are:  "Stressed the impor- | | |
| | 24: 22 | tance of winning Dr. Grefer over with Kelly.  This | | |
| | 24: 23 | will be" out -- "This will be one of his talks." | | |
| | 24: 24 | Q.  Do you remember a Dr. Kelly? | | |
| | 24: 25 | A.  I do. | | |
| | 25: 1 | Q.  Okay.  And who is Dr. Kelly? | | |

|  | Objections | Responses |
|---|---|---|

```
        25: 2      A.  Dr. Kelly is a -- a neurologist, I
        25: 3          believe, who works with a lot of rheumatologic
        25: 4          problems in chronic pain people.

 25:12   -  25:13   Grefer, Michael 2006-06-29                     00:04:45
        25: 12     Q.  All right.  Then are there more
        25: 13         samples dropped off, on page 16?
        25: 14         MR. SKIDMORE:  Objection.  Leading.

17  25:15   -  28:19   Grefer, Michael 2006-06-29                  00:04:45
        25: 15     A.  Yes, there are.
        25: 16     Q.  On page -- page 17 what date does the
        25: 17         first note relate to?
        25: 18     A.  November the 19th of 2001.
        25: 19     Q.  And what does the note reflect
        25: 20         happened at that meeting?
        25: 21     A.  Basically it says that we were able to
        25: 22         get to -- well, first of all, they said that there
        25: 23         were some Vioxx samples given and that --
        25: 24     Q.  What kind -- what kind were they?
        25: 25     A.  25 milligrams, one by four.
        26: 1      Q.  All right.
        26: 2      A.  "We were able to get" to see -- "in to
        26: 3          see Dr. Grefer... new VIP information as well as"
        26: 4          reinterated (sic) the -- "reiterated the Percocet
        26: 5          data.  I did not get much time, however, Bill was a
        26: 6          good resource to help me think of ideas for next time
        26: 7          to extend the call.  I have found that Mondays around
        26: 8          10:30 is a good time to get in to see him.  I will
        26: 9          communicate this with the rest of the cluster and
        26: 10         hopefully we can build a stronger relationship with
        26: 11         him."
        26: 12     Q.  Doctor, is all of this consistent with
        26: 13         your recollection of the way the Merck representa-
        26: 14         tives were working with you during that time period?
        26: 15     A.  It -- it -- it reflects meetings.  I
        26: 16         do not spend a lot of my time having meetings with
        26: 17         the representatives.  I do meet with them and I do
        26: 18         discuss things, but basically I really don't remember
        26: 19         what I discuss or what's -- what -- what -- what --
        26: 20         what the meetings pan out to be.
        26: 21     Q.  How would you describe the intensity
        26: 22         of the representative's efforts to convince you to
        26: 23         use Vioxx?
        26: 24     A.  They're very intense.  They are
        26: 25         extremely competitive, and they really do their job
        27: 1          and -- and -- and try to get me to spend time with
        27: 2          them and for them to convince me to use their med--
        27: 3          their medicines.
        27: 4      Q.  Did the Merck Vioxx representatives
        27: 5          present you information from time to time in these
        27: 6          meetings?
        27: 7      A.  Yes.
        27: 8      Q.  What forms did that information take?
        27: 9          For example, was it verbal, was it written, was it a
        27: 10         combination?
        27: 11     A.  All kinds, yes, sir.
        27: 12     Q.  What kinds do you recall?
        27: 13     A.  I re-- I -- I recall all kinds.  Basi-
        27: 14         cally you would meet them in the hall.  Most of the
        27: 15         times it's an attractive woman.  And they sit there
        27: 16         and they smile and ask how the medications are
        27: 17         working.  I tell them about my complaints, about my
        27: 18         problems, about whether I'm doing it or not.  They
        27: 19         always suggest I do more, and they always give me
        27: 20         some sort of response to my questions.
        27: 21     Q.  Did they give you responses to ques-
        27: 22         tions about the efficacy of the drug, the safety of
        27: 23         the drug, and other things like that?
```

**Objections column:**

Re: 25:12-27:3
**Def Obj:** Same, also
leading

*Overruled* *referring* *to document*

**Responses column:**

Re: 25:12-25:15
**Pltf Resp:**
Question is not leading
Admission by party

opponent 801(d)(2);
present sense
impression 803(1);
and a business record
803(6)

|  | Objections | Responses |
|---|---|---|

27: 24   A. Yes.
27: 25   Q. Did they do that on more than one
28: 1     occasion?
28: 2   A. Almost every occasion.
28: 3   Q. All right.  And is there any way for
28: 4     you to -- to estimate how many meetings you had with
28: 5     Merck Vioxx representatives over the four or five
28: 6     years that you were prescribing Vioxx?
28: 7   A. No.  I -- I could guess, but I -- I
28: 8     can't estimate the number, no, sir.
28: 9   Q. Do you believe it would be more than
28: 10     50?
28: 11   A. Oh, yes.
28: 12   Q. Do you believe it would probably be
28: 13     more than a hundred?
28: 14   A. Well, I don't know how -- I don't
28: 15     remember the dates that you're talking about, but I
28: 16     can almost say back then when the competition,
28: 17     frankly, between Celebrex and Vioxx was so intense, I
28: 18     would see a representative at least, I would say,
28: 19     once a week.

18   35:15   -   37:20   Grefer, Michael 2006-06-29     00:03:14

| | | |
|---|---|---|
| | **Re: 35:15-37:20** | **Re: 35:15-37:20** |
| | **Def Obj:** Same re: | **Pltf Resp:** |
| | Plaintiff's Exhibit 2; | Admission by party |
| | including hearsay; | opponent 801(d)(2); |
| | foundation (applies to | present sense |
| | all questions re: | impression 803(1); |
| | Plaintiff's Exhibit 2); | and a business record |
| | also leading | 803(6); questions are |
| | | not leading |

35: 15   Q. All right.  Doctor, let me turn you
35: 16     now to February of 2002.  Did you meet with Merck
35: 17     reps in February of 2002?
35: 18   A. February, yes, sir.
35: 19   Q. Did you meet -- does it appear that
35: 20     you met with a Merck rep on February the 12th, 2002?
35: 21   A. Yes.
35: 22   Q. Who was that rep?
35: 23   A. Amy Block.
35: 24   Q. Did she drop samples off again?
35: 25   A. She did.
36: 1   Q. What kind of samples were they this
36: 2     time?
36: 3   A. Basically let -- let -- let me go
36: 4     back.  I -- I -- I may -- at least according to this,
36: 5     she was in the office and she dropped off Vioxx
36: 6     samples.  I don't know if I met with her.
36: 7   Q. All right.  And what kind of samples
36: 8     does it reflect that she dropped off?
36: 9   A. 25 milligrams, one by four.
36: 10   Q. All right.  Did she meet with you, or
36: 11     does the record reflect another call on February
36: 12     19th?
36: 13   A. Yes, by two representatives.
36: 14   Q. All right.  What's the next call
36: 15     that's referenced?
36: 16   A. On the 19th or the -- or the one after
36: 17     that?
36: 18   Q. The next one after that.
36: 19   A. The 27th, 2/27.
36: 20   Q. All right.  Is there a note referenc-
36: 21     ing a discussion in that --
36: 22   A. Yes.
36: 23   Q. -- meeting?  What does the note
36: 24     referencing a discussion on the 27th of February of
36: 25     2002 indicate?
37: 1   A. Said "I called on Dr. Grefer and we
37: 2     discussed Vioxx and (Redacted, dash, OP)."
37: 3   Q. All right.  Let me have you skip down
37: 4     to the note from April of 2002.
37: 5   A. Uh-huh.
37: 6   Q. And what does the record seem to
37: 7     reflect occurred in April of 2002?
37: 8   A. It says there that "Dr. Grefer does
37: 9     not see reps - per office in Southgate; will not
37: 10     attend lunches either.  Working with 'Annie' at the

| | Objections | Responses |
|---|---|---|

```
        37: 11        "Crestview Hills office to see if we can get a lunch
        37: 12        with Dr. Grefer/discussing samples with signature as
        37: 13        well."
        37: 14    Q.  All right.  And is there a reference
        37: 15        to samples being dropped off in that visit?
        37: 16    A.  Yes.
        37: 17    Q.  What kind of samples were dropped off
        37: 18        in that visit, according to this record?
        37: 19    A.  That was Vioxx, 25 milligrams, one by
        37: 20        30.
```

| | | |
|---|---|---|
| **19  37:24  -  38:3**  Grefer, Michael 2006-06-29 | | |

```
        37: 24    Q.  All right.  Do you recall from time
        37: 25        to time getting bottles with 30 tablets in them as
        38: 1         samples?
        38: 2     A.  I do.
        38: 3         MR. SKIDMORE:  Objection.  Leading.
```

| | Re: 37:24-38:3 | Re: 37:24-38:3 |
|---|---|---|
| | **Def Obj:** Same objections re: Plaintiff's Exhibit 2; also improper leading of a non-hostile witness | **Pltf Resp:** Question is not leading |

| | | |
|---|---|---|
| **20  38:7  -  38:22**  Grefer, Michael 2006-06-29 | 00:01:20 | |

```
        38: 7         Do you or do you not recall getting
        38: 8         Vioxx samples of 30 tablets in a bottle for 25 milli-
        38: 9         gram from time to time?
        38: 10    A.  I remember getting bottles of Vioxx
        38: 11        from time to time, whether they be 25 milligrams,
        38: 12        12.5 milligrams, or 50 milligrams.  And the number in
        38: 13        each bottle I don't absolutely recall, but I do
        38: 14        remember getting Vioxx sample bottles.
        38: 15    Q.  All right.  Can you tell me anything
        38: 16        about the quantity of samples that Merck was giving
        38: 17        you back in the 2002 time frame?  What was your
        38: 18        impression of the volume of samples that you were
        38: 19        getting?
        38: 20    A.  A -- a lot.  We -- we -- we could get,
        38: 21        certainly, whatever we needed, and the closet was
        38: 22        always stocked with samples.
```

| | | |
|---|---|---|
| **21  38:25  -  41:12**  Grefer, Michael 2006-06-29 | 00:03:40 | |

```
        38: 25        We left off when we started talking
        39: 1         about the meetings with the sales reps and the -- the
        39: 2         samples.  We were talking about your October 2nd
        39: 3         meeting with Garry Smith.
        39: 4     A.  Yes, sir.
        39: 5     Q.  And your records do reflect that you
        39: 6         gave him two kinds of samples that day?
        39: 7     A.  Yes, it does.
        39: 8     Q.  And do you have -- let me just
        39: 9         describe to you what Mr. Smith said in his deposition
        39: 10        and ask you if you have any reason to disbelieve what
        39: 11        he said.
        39: 12        He said his recollection is that he
        39: 13        met with you, you suggested that he go on the Vioxx,
        39: 14        and that you gave him a bag with samples in it and he
        39: 15        does not remember how many samples or what kind of
        39: 16        samples he got.
        39: 17        MR. SKIDMORE:  Objection.  Mischarac-
        39: 18        terizes the testimony.
        39: 19    Q.  If that was the substance of his
        39: 20        testimony, or words similar to that, do you have any
        39: 21        reason to disbelieve that that was what actually
        39: 22        happened?
        39: 23    A.  No, I don't.
        39: 24    Q.  Okay.  Would that be consistent with
        39: 25        your practice?  And by that I mean going to the
        40: 1         closet, getting some samples, putting them in a bag,
        40: 2         and giving them to a patient to take with them.
        40: 3         MR. SKIDMORE:  Objection.  Leading.
        40: 4     A.  That is not what usually happens.  I'm
        40: 5         not saying it's never happened.  And it -- and it has
        40: 6         happened.  I don't know whether it's happened in this
```

| | Re: 39:8-39:23 | Re: 39:8-39:23 |
|---|---|---|
| | **Def Obj:** Mischaracterizes prior testimony; counsel testifying | **Pltf Resp:** Plaintiff will provide the proper predicate to the question through the testimony of Mr. Smith; therefore. The question is proper and should be allowed |
| | Re: 39:24-40:14 | Re: 39:24-40:14 |
| | **Def Obj:** Leading (611); witness speculating | **Pltf Resp:** Question is not leading; witness is stating his common practice and is, therefore, not |

| | Objections | Responses |
|---|---|---|

speculating

| | |
|---|---|
| 40: 7 | case. I don't know if it was for Vioxx. I don't |
| 40: 8 | know whether it was for Celebrex. I don't know what |
| 40: 9 | drug it was. But at some times, if there is a lot of |
| 40: 10 | samples in there and if they're just kind of taking |
| 40: 11 | up space and I think that the patient would benefit |
| 40: 12 | from getting more, there have been times when I've |
| 40: 13 | given bottles, and there have been times when I've |
| 40: 14 | given bagfuls of them, yes, sir. |
| 40: 15 | Q. All right. And do you remember one |
| 40: 16 | way or the other whether this time with Garry Smith |
| 40: 17 | was one of the times where you gave more than you |
| 40: 18 | would ordinarily give of samples? |
| 40: 19 | A. No, I don't. |
| 40: 20 | Q. All right. Now, with regard to what |
| 40: 21 | happened next, after Mr. Smith left with the samples |
| 40: 22 | and the prescription, what happened next? |
| 40: 23 | A. I sent him to get an MRI examination |
| 40: 24 | to see in a little bit better fashion what was going |
| 40: 25 | on inside the knee, and he came back to see me on |
| 41: 1 | 10/14 of 2002 with an MRI that did show significant |
| 41: 2 | problems and problems that I thought needed an |
| 41: 3 | operation, so I referred him to my partner Dr. Heis. |
| 41: 4 | Q. All right. Had you tried to treat him |
| 41: 5 | conservatively? |
| 41: 6 | A. I did, yes, sir. |
| 41: 7 | Q. Is that your ordinary practice? |
| 41: 8 | A. Yes, it is. |
| 41: 9 | Q. And after you referred him to Dr. |
| 41: 10 | Heis, did you see Mr. Smith again? |
| 41: 11 | A. No, not that I recall. At least I |
| 41: 12 | didn't see him in the office at all. |

22  41:22  -  42:21   Grefer, Michael 2006-06-29    00:01:46

Re: 41:22-42:21
Def Obj:
Hearsay; foundation (Dr. Grefer has never seen this document before)

Re: 41:22-42:21
Pltf Resp:
Admission by party opponent 801(d)(2); present sense impression 803(1); and a business record 803(6)

Overruled

| | |
|---|---|
| 41: 22 | Q. All right. Doctor, I'm handing you |
| 41: 23 | what we've marked as Exhibit Number 3, and I'll rep- |
| 41: 24 | resent to you that that is a -- a document that Merck |
| 41: 25 | produced to us documenting calls upon you. And can |
| 42: 1 | you tell me the dates that this particular document |
| 42: 2 | reflects calls? |
| 42: 3 | A. This particular document reflects |
| 42: 4 | calls that are made on 6/30 of '99, 8/29 of 2001 |
| 42: 5 | twice, April the 1st of 2002, and July the 31st of |
| 42: 6 | 2002. |
| 42: 7 | Q. All right. And let's turn to the July |
| 42: 8 | 2002 meeting. And what is the date of that meeting? |
| 42: 9 | A. July 31st of 2002. |
| 42: 10 | Q. And who was the representative at the |
| 42: 11 | meeting, according to that document? |
| 42: 12 | A. I -- I see Amy Block. |
| 42: 13 | Q. And what does the note say was |
| 42: 14 | discussed at that meeting? |
| 42: 15 | A. That "Went over VIGOR with him. He |
| 42: 16 | agrees there is better pain relief with Vioxx" and |
| 42: 17 | "was concerned about cardiovascular events." |
| 42: 18 | Q. All right. Is that consistent with |
| 42: 19 | your recollection that the sales representatives |
| 42: 20 | would discuss the VIGOR article with you? |
| 42: 21 | A. Absolutely. |

23  42:22  -  43:10   Grefer, Michael 2006-06-29    00:00:40

| | |
|---|---|
| 42: 22 | Q. All right. |
| 42: 23 | A. Yes, sir. |
| 42: 24 | Q. Now, do you subscribe to the New |
| 42: 25 | England Journal of Medicine? |
| 43: 1 | A. I -- I -- I -- I believe we get it at |
| 43: 2 | the office, yes, sir. |
| 43: 3 | Q. All right. Do you usually read it -- |
| 43: 4 | A. No. |
| 43: 5 | Q. -- regularly? |

| | Objections | Responses |
|---|---|---|

43: 6   A.  No, sir.
43: 7   Q.  Did – before the VIGOR article was
43: 8       brought to your attention by the Merck representa-
43: 9       tives, had you studied that article?
43: 10  A.  Before the VIGOR was -- no, I had not.

**24   43:15    - 44:7**    Grefer, Michael 2006-06-29        00:01:01

43: 15  Q.  All right. Did or did not most of the
43: 16      information that you have about the VIGOR article
43: 17      come during your meetings with the Merck sales repre-
43: 18      sentatives?
43: 19  A.  Either from the Merck sales represen-
43: 20      tatives or from possibly correspondence from Merck,
43: 21      which came usually via the sales representatives. So
43: 22      yes, sir.
43: 23  Q.  Okay. Did you or did you not have
43: 24      discussions with the sales representatives of the
43: 25      information contained in the VIGOR article in the New
44: 1       England Journal of Medicine?
44: 2  A.  I did.
44: 3  Q.  Did that occur on more than one occa-
44: 4      sion?
44: 5  A.  It did.
44: 6  Q.  Did it occur on many occasions?
44: 7  A.  As I recall, yes.

**25   44:12    - 45:21**    Grefer, Michael 2006-06-29        00:02:17

44: 12      What do you recall the Merck sales
44: 13      representatives telling you about the excess cardio-
44: 14      vascular events in the Vioxx group in the VIGOR
44: 15      article?
44: 16  A.  In general, they told me -- and --
44: 17      and -- and it -- it -- it didn't come from one
44: 18      particular representative. In general, they -- they
44: 19      told me that it wasn't fair or something that -- that
44: 20      it -- it -- that -- that the study was flawed and --
44: 21      and it was unfair to make decisions because there was
44: 22      still controversy over the fact that -- that these
44: 23      people were not in -- that the group did not include
44: 24      people that maintained or were on their aspirin
44: 25      dosage, that the naproxen may have had a protective
45: 1       effect on it, and that, in essence, the study was
45: 2       flawed and it wasn't conclusive. And they kind of
45: 3       told me that there were ongoing studies and that
45: 4       hopefully they would be able to tell me something at
45: 5       a later date but that -- that -- that it wasn't fair
45: 6       to draw a conclusion because the study was flawed.
45: 7       In general, that's what they said, and
45: 8       that's kind of in a synopsis kind of a situation.
45: 9  Q.  Did you go out on your own and try to
45: 10      verify all of these things that the Merck sales
45: 11      representatives told you?
45: 12  A.  No.
45: 13  Q.  Do you have time to independently and
45: 14      exhaustively research all of the drugs that you have
45: 15      to prescribe as a physician?
45: 16  A.  The fact of the matter is is that
45: 17      it's -- it's almost impossible to exhaustively
45: 18      evaluate one drug. All you can do is get the best
45: 19      information you know, and when you put that informa-
45: 20      tion and times it times 40 to 50 drugs currently
45: 21      being discussed by these drug reps, it's impossible.

**45:24    - 46:20**    Grefer, Michael 2006-06-29        00:01:16

45: 24      Did you rely on the Merck drug repre-
45: 25      sentatives to give you accurate and complete informa-
46: 1       tion in these meetings when they're discussing Vioxx
46: 2       with you?
46: 3  A.  Like I say, I -- I -- I don't think

| | | Objections | Responses |
|---|---|---|---|

46: 4    there's any way they could have given me complete
46: 5    information, but I relied upon them to give me an
46: 6    accurate reflection of what their information about
46: 7    the drug was.
46: 8    Q. All right. And if there was signifi-
46: 9    cant information that Merck had that was not in the
46: 10    VIGOR article, for example, that affected the
46: 11    cardiovascular risk profile of the drug, would you
46: 12    have expected them to bring that to your attention
46: 13    sometime during the two years between when the
46: 14    article came out and when you prescribed it to Mr.
46: 15    Smith?
46: 16    A. Yes.
46: 17    Q. When you're trying to decide to
46: 18    prescribe a drug like Vioxx to a man like Mr. Smith,
46: 19    do you do a risk benefit analysis?
46: 20    A. In my mind I do, yes, sir.

27   47:9   -   47:12   Grefer, Michael 2006-06-29      00:00:18
47: 9    Q. With regard to the benefits of the
47: 10    drug, was or was not Merck very emphatic in their
47: 11    presentation of the benefits of the drug to you?
47: 12    A. They were.

28   49:24   -   50:17   Grefer, Michael 2006-06-29      00:01:13
49: 24    Q. Doctor, do you recall the Merck repre-
49: 25    sentatives in their discussion of the VIGOR article
50: 1    discussing the fact that in the VIGOR patient group
50: 2    there were patients that were aspirin indicated and
50: 3    patients that were not aspirin indicated? And by
50: 4    aspirin indicated, it's defined as patients with a
50: 5    prior, let's see, presence of a history of myocardial
50: 6    infarction, angina, cerebrovascular accident, tran-
50: 7    sient ischemic attack, angioplasty or coronary
50: 8    bypass.
50: 9    Do you remember them discussing that
50: 10    there was a difference in the groups between those
50: 11    who were aspirin indicated, i.e., a prior myocardial
50: 12    history, or patients that were not aspirin indicated,
50: 13    i.e., not having that same kind of a history?
50: 14    MR. SKIDMORE: Objection to the form.
50: 15    Multiple -- multiple questions.
50: 16    A. I remember them referring to that,
50: 17    yes, sir.

**Re: 49:24-50:17**
**Def Obj:**
Improper question;
multiple questions;
leading (e.g. see 50:14)

**Re: 49:24-50:17**
**Pltf Resp:**
Attorney is defining
terms in his question -
not asking multiple
questions; question is
not leading and the
leading objection is
waived under FRCP
32(d)(3)(B)

29   51:6   -   51:22   Grefer, Michael 2006-06-29      00:00:52
51: 6    Q. Doctor, let me hand you the VIGOR
51: 7    article. And turning to the general safety section,
51: 8    you'll see a sentence there where it says, after it
51: 9    discusses the aspirin indicated group --
51: 10    A. Uh-huh.
51: 11    Q. -- where it says: These patients,
51: 12    referring to the aspirin indicated group, accounted
51: 13    for 38 percent of the patients in the study who had
51: 14    myocardial infarctions.
51: 15    A. Yes.
51: 16    Q. All right? That they were only four
51: 17    percent of the patient group, but they accounted for
51: 18    38 percent of the myocardial infarctions. Do you see
51: 19    that in the article?
51: 20    A. I see that in the article.
51: 21    Q. All right.
51: 22    A. I believe I -- yes.

53:17   -   53:20   Grefer, Michael 2006-06-29      00:02:15
53: 17    After you raised a CV concern with
53: 18    them in July of 2002, what is your impression of what
53: 19    they said and what they did regarding your question
53: 20    of CV risks and how --

**Re: 53:17-53:18**
**Def Obj:**
Assumes facts not in
evidence; hearsay

**Re: 53:17-53:18**
**Pltf Resp:**
Dr. Grefer's CV concern
is evidenced at 42:13-17



| | Objections | Responses |
|---|---|---|

0

; admission by party opponent 801(d)(2); present sense impression 803(1); and a business record 803(6)

**31**  53:23  -  54:14   Grefer, Michael 2006-06-29
53: 23   A.  I was always told that the study was
53: 24      not conclusive, that there was no definite evidence
53: 25      that showed there was increased cardiovascular events
54: 1      with this, given a study with people on aspirin, plus
54: 2      or minus naproxen, et cetera, so that basically the
54: 3      evidence was inconclusive.
54: 4   Q.  What -- if you had known that Vioxx
54: 5      increased the risk of heart attacks in patients like
54: 6      Garry Smith who had never had a problem with an
54: 7      NSAID, had never had a stomach problem with an NSAID,
54: 8      and did not have a myocardial history that put him in
54: 9      the aspirin indicated group, if you had known that in
54: 10      patients like that Vioxx increased the risk of heart
54: 11      attacks, would you have prescribed that drug to Garry
54: 12      back in October of 2002?
54: 13      MR. SKIDMORE: Objection. Leading,
54: 14      lack of foundation, and speculation.

**Re: 54:4-54:15**
**Def Obj:**
Leading (611); lack of foundation (602); speculation; assumes facts not in evidence; incomplete hypothetical

**Re: 54:4-54:15**
**Pltf Resp:**
Question is not leading; witness is being asked about his own actions and reactions, and therefore, is not speculating; facts predicating the question will be presented by Plaintiff's expert witnesses

**32**  54:15  -  55:2   Grefer, Michael 2006-06-29
54: 15   A.  The answer's no.
54: 16   Q.  Okay.  Do you remember the Merck rep-
54: 17      resentatives talking to you about the theory that
54: 18      naproxen is somehow cardioprotective and that that
54: 19      explained the results in the VIGOR article?
54: 20   A.  Well, the fact of the matter is is
54: 21      that -- the answer to your question is yes, they --
54: 22      that that was the thing that they keep -- kept bring-
54: 23      ing up, that these people were not on a protective
54: 24      heart medicine, and so that you couldn't draw any
54: 25      conclusions from the study --
55: 1   Q.  All right.
55: 2   A.  -- at that stage.

00:00:44

**33**  56:16  -  56:20   Grefer, Michael 2006-06-29
56: 16   Q.  Was it ever brought to your attention
56: 17      by the Merck representatives that the FDA had sent a
56: 18      warning letter to Merck in September of 2001 regard-
56: 19      ing its marketing of Vioxx?
56: 20   A.  No.

00:00:30

**Re: 56:16-58:11**
**Def Obj:**
The Warning Letter is irrelevant to any specific issue to be addressed by the witness; no personal knowledge of the document by the witness (602); lack of foundation (602); hearsay (802); 403

**Re: 56:16-58:11**
**Pltf Resp:**
Document is relevant to the plaintiff's case and the witness's testimony because Dr. Grefer previously testified that his understanding from Merck's sales representatives was Naproxen could explain the Vigor results (see page and line 44:12-45:8); Dr. Grefer's lack of personal knowledge regarding the document is the relevant evidence; the document is not being used to prove the truth of the matter asserted, but instead, it is use to show Merck's understanding of the FDA's position at the time

**34**  56:23  -  57:1   Grefer, Michael 2006-06-29
56: 23   Q.  Let me hand you Exhibit Number 4, and
56: 24      I'll represent to you that Exhibit Number 4 is a copy
56: 25      of the warning letter that was sent to Merck in
57: 1      September of 2001.

00:00:18

**35**  57:17  -  58:11   Grefer, Michael 2006-06-29
57: 17   Q.  Did the Merck sales representatives
57: 18      advise you that in September of 2001 that the FDA
57: 19      stated that there are no -- quote, there are no
57: 20      adequate and well-controlled studies of naproxen that
57: 21      support your assertion that naproxen's --
57: 22      What is that next word, Doctor?  Why
57: 23      don't you just read the rest of the sentence.
57: 24   A.  It says -- it says, "In fact... there
57: 25      are no adequate and well-controlled studies of
58: 1      naproxen that support your assertion that naproxyn's
58: 2      transient inhibition of platelet aggregation is
58: 3      pharmocodynamically comparable to aspirin or
58: 4      clinically effective in decreasing the risk of MIs.
58: 5      Therefore, your' misrepresentation -- I'm sorry.
58: 6      "Therefore your representation that naproxen
58: 7      prolongs" beating time -- "bleeding time and inhibits
58: 8      platelet" incidentally -- "identically to aspirin is
58: 9      misleading, and it minimizes the potential" serious--
58: 10      "seriousness of this finding."
58: 11      I was not told that, no.

00:01:07

| | | | | Objections | Responses |
|---|---|---|---|---|---|

| 36 | 58:12 - 59:14 | Grefer, Michael 2006-06-29 | 00:01:40 | **Re: 58:12-59:14** | **Re: 58:12-59:14** |
| | 58:12 | Q. If you had been told that, would it | | **Pltf Obj:** | **Def Resp:** |
| | 58:13 | have affected your decision to prescribe Vioxx to a | | Relevance | Relevant to establish |
| | 58:14 | patient like Garry Smith who had not had a problem | | | that the information |
| | 58:15 | with using other NSAIDs other than Vioxx? | | | plaintiff's counsel showed |
| | 58:16 | A. I'm -- I'm not so sure that would have | | | witness would not have |
| | 58:17 | affected it. The reason being, again, because there | | *Overrule* | affected decision to |
| | 58:18 | was -- there -- there's no definite evidence one way | | | prescribe Vioxx |
| | 58:19 | or another as far as that's concerned, you know. | | | |
| | 58:20 | And, again, you know, and that still does not reflect | | | |
| | 58:21 | the people that were -- that were aspirin indicated, | | | |
| | 58:22 | also. | | | |
| | 58:23 | So basically that type of thing -- I | | | |
| | 58:24 | was not told that to begin with, and I'm not so sure, | | | |
| | 58:25 | having been told that, because there's really nothing | | | |
| | 59:1 | definitive there, it would have changed my prescrib- | | | |
| | 59:2 | ing situation. | | | |
| | 59:3 | Q. If you had been told that and been | | | |
| | 59:4 | told that Merck's own researchers were concerned | | | |
| | 59:5 | about Merck making statements that Vioxx is cardio- | | | |
| | 59:6 | protective -- I mean that naproxyn is cardioprotec- | | | |
| | 59:7 | tive, if you'd been told several similar things like | | | |
| | 59:8 | that, would that have affected your decision, pre- | | | |
| | 59:9 | scribing decision, for patients like Garry who had | | | |
| | 59:10 | not ever had a problem with other NSAIDs? | | | |
| | 59:11 | A. About whether naproxen is cardiopro- | | | |
| | 59:12 | tective or not? | | | |
| | 59:13 | Q. Yes, sir. | | | |
| | 59:14 | A. I don't think so. | | | |

| 37 | 61:6 - 61:22 | Grefer, Michael 2006-06-29 | 00:01:07 | | |
| | 61:6 | Q. If you had known what I just said? | | | |
| | 61:7 | A. If -- if -- if indeed what you just | | | |
| | 61:8 | said -- | | | |
| | 61:9 | Q. Had been disclosed. | | | |
| | 61:10 | A. -- had been disclosed to me, I prob- | | | |
| | 61:11 | ably would not have prescribed it. | | | |
| | 61:12 | Q. All right. With regard to the issue | | | |
| | 61:13 | of -- let me show you a graph. You're aware that | | | |
| | 61:14 | there was -- that the New England Journal of Medicine | | | |
| | 61:15 | issued an expression of concern regarding the VIGOR | | | |
| | 61:16 | article. Correct? | | | |
| | 61:17 | A. I was. | | | |
| | 61:18 | Q. Was the fact that the VIGOR article | | | |
| | 61:19 | was published in the New England Journal of Medicine | | | |
| | 61:20 | a factor in your giving credibility to the Merck | | | |
| | 61:21 | sales representatives' discussions of the VIGOR | | | |
| | 61:22 | article with you? | | | |

| 38 | 61:24 - 61:24 | Grefer, Michael 2006-06-29 | 0 | | |
| | 61:24 | A. No. | | | |

| 39 | 62:16 - 62:24 | Grefer, Michael 2006-06-29 | 00:00:53 | | |
| | 62:16 | Q. Let me hand you the VIGOR article that | | | |
| | 62:17 | we've now marked as Exhibit Number 5. Just -- just | | | |
| | 62:18 | keep that there in front of you for the moment. | | | |
| | 62:19 | If you -- going back to this risk | | | |
| | 62:20 | benefit analysis, if you look in the VIGOR article, | | | |
| | 62:21 | they have a chart that shows the difference between | | | |
| | 62:22 | Vioxx and naproxen in the events of gastrointestinal | | | |
| | 62:23 | problems. Correct? | | | |
| | 62:24 | A. Yes. | | | |

| | 63:3 - 63:11 | Grefer, Michael 2006-06-29 | 00:00:33 | | |
| | 63:3 | Q. And it shows a -- a big separation | | | |
| | 63:4 | between naproxen on the top and Vioxx on the bottom. | | | |
| | 63:5 | Correct? | | | |
| | 63:6 | A. Yes. | | | |

| | Objections | Responses |
|---|---|---|



63: 7   Q.  Okay.  Was that somewhat impressive to
63: 8        you, as a physician, for patients who might have a
63: 9        problem with -- a stomach problem with naproxen or
63: 10       other NSAIDs and Vioxx's benefit over them?
63: 11  A.  Yes.

41   63:19   -   64:21   Grefer, Michael 2006-06-29   00:02:30
63: 19  Q.  Do you see a similar chart in there
63: 20       for showing the difference in the cardiovascular
63: 21       experience?
63: 22  A.  No.
63: 23  Q.  All right.  Do you think it might have
63: 24       been helpful to you in comparing the risk benefit
63: 25       analysis of patients like Garry who have not had a
64: 1        problem, a prior problem with NSAIDs and stomach
64: 2        problems, to have seen a similar chart for the
64: 3        cardiovascular risk separation between the two
64: 4        groups?
64: 5   A.  Yes.
64: 6   Q.  In the New England Journal reaffir-
64: 7        mation they include such a chart that -- do you see
64: 8        that?  Can you hold it up for the -- for the jury.
64: 9   A.  (Witness complies with request.)
64: 10  Q.  Does it show a significant separation
64: 11       between the Vioxx group on the top for cardiovascular
64: 12       events and the naproxen group on the bottom?
64: 13  A.  Yes.
64: 14  Q.  If you had seen a chart like that
64: 15       showing that kind of separation back in October of
64: 16       2002, if you had been shown that by the Merck
64: 17       representatives, would it have affected or could it
64: 18       have affected your decision to prescribe Vioxx in a
64: 19       patient like Garry who did not have the risk of or
64: 20       did not appear to have the risk of stomach bleeding?
64: 21  A.  Yes.

**Re: 63:23-64:5**
**Def Obj:**
Assumes facts not in
evidence; leading

**Re: 64:6-64:13**
**Def Obj:**
Leading; vague (403);
assumes facts not in
evidence; incomplete
hypothetical; cherry-
picks conclusions

**Re: 64:14-64:21**
**Def Obj:**
Lack of foundation (602);
speculation; leading

**Re: 63:23-64:5**
**Pltf Resp:**
Predicate facts will be
established by
Plaintiff's expert
witnesses; question is
not leading and the
leading objection is
waived under FRCP
32(d)(3)(B)

**Re: 64:6-64:13**
**Pltf Resp:**
Objections to leading
and vague are waived
under FRCP 32(d)(3)(B);
Predicate facts will be
established by
Plaintiff's expert
witnesses; question is
not a hypothetical

**Re: 64:14-64:21**
**Pltf Resp:**
Witness is being asked
about his own actions
and reactions, and
therefore, is not
speculating; question
is not leading and
leading objection is
waived under FRCP
32(d)(3)(B)

42   65:17   -   65:24   Grefer, Michael 2006-06-29   00:00:37
65: 17       Is it or is it not fair to say,
65: 18       Doctor, that you were influenced to some extent by
65: 19       the entire Vioxx sales campaign, in print, in tele-
65: 20       vision, in sales representatives' meetings, in other
65: 21       physicians being asked by Merck to come talk to you?
65: 22       Is it fair to say that that entire campaign
65: 23       influenced your decision to start prescribing more
65: 24       Vioxx to patients like Garry Smith?

**Re: 65:17-66:1**
**Def Obj:**
Leading; assumes facts
not in evidence

**Re: 65:17-66:1**
**Pltf Resp:**
Question is not leading;
predicate facts are
established in witness's
later testimony (see pg
84)

43   66:1   -   66:1   Grefer, Michael 2006-06-29   00:00:16
66: 1   A.  It did influence me, yes, sir.

44   83:24   -   84:5   Grefer, Michael 2006-07-27   00:00:32
83: 24       Doctor, I'm handing you Exhibit
83: 25       Number 2, which I'll represent to you is a compilation
84: 1        of several Merck documents that were produced to us in
84: 2        response to a request for documents relating to you and
84: 3        this office.  And it goes for three or four years,
84: 4        starting in 1999.  Do you see that?
84: 5   A.  Yes.

45   84:8   -   84:12   Grefer, Michael 2006-07-27   00:00:15
84: 8   Q.  And I'll just represent to you that this
84: 9        compilation was -- was put together by somebody in my
84: 10       office from those various different Merck documents.
84: 11       Okay?
84: 12  A.  Okay.

46   84:13   -   84:17   Grefer, Michael 2006-07-27   00:00:35
84: 13  Q.  All right.  Now, we left off -- we left
84: 14       off when we were talking about the -- the entire
84: 15       campaign for Vioxx.  Do you remember seeing television

**Re: 84:13-84:15**
**Def Obj:**
Sidebar comment prior

|  |  | Objections | Responses |
|--|--|-----------|-----------|

| 84: 16 | ads for Vioxx, for example? | to question |  |
| 84: 17 | A. Yes. |  |  |

**84:25    -    85:4    Grefer, Michael 2006-07-27**    00:00:15

| 84: 25 | Did you see magazine advertisements in |
| 85: 1 | popular magazines, not just magazines that are sent to |
| 85: 2 | doctors? |
| 85: 3 | MR. SKIDMORE:  Same objection. |
| 85: 4 | A.  I -- I believe I did. |

Re: 84:25-85:4
**Def Obj:**
Leading

*Sustained*
6 11 (c)

Re: 84:25-85:4
**Pltf Resp:**
Question is not leading

**48   85:5    -    86:12    Grefer, Michael 2006-07-27**    00:02:24

| 85: 5 | Q.  Is it or is it not fair to say that the |
| 85: 6 | entire Merck campaign for Vioxx over the years, your |
| 85: 7 | contacts with the Merck representatives, the |
| 85: 8 | advertisements both to doctors and to the public that |
| 85: 9 | you saw, is it or is it not fair to say that all of |
| 85: 10 | that had an influence on your prescribing of Vioxx |
| 85: 11 | during the time that you prescribed it to Garry Smith? |
| 85: 12 | MR. SKIDMORE:  Objection.  Leading. |
| 85: 13 | A.  Well, I think that -- that all of the |
| 85: 14 | information that I knew as well as the response I was |
| 85: 15 | getting affected my prescribing it for Mr. Smith. |
| 85: 16 | Q.  Okay.  I want to ask you some specific |
| 85: 17 | things about the Merck representatives.  We talked |
| 85: 18 | about the Merck representatives coming and providing |
| 85: 19 | you information from time to time.  Do you recall that? |
| 85: 20 | A.  Yes. |
| 85: 21 | Q.  Okay.  Do you recall the Merck sales |
| 85: 22 | representatives telling you about a study numbered 090 |
| 85: 23 | that showed an increase in heart attacks in patients |
| 85: 24 | taking Vioxx as compared to another drug? |
| 85: 25 | A.  No. |
| 86: 1 | Q.  Did the Merck representatives ever tell |
| 86: 2 | you that there were other Merck studies that showed |
| 86: 3 | that Vioxx increased the risk of heart attack or |
| 86: 4 | cardiovascular events over other place-- over other |
| 86: 5 | NSAIDs or placebos? |
| 86: 6 | A.  No. |
| 86: 7 | Q.  Did the Merck sales representatives ever |
| 86: 8 | tell you that a Merck statistician had done a |
| 86: 9 | meta-analysis of many Merck studies comparing Vioxx to |
| 86: 10 | other NSAIDs and found that the Vioxx group had more |
| 86: 11 | than twice as many heart attacks as the group comprised |
| 86: 12 | of other NSAID users? |
| 86: 13 | MR. SKIDMORE:  Objection.  Foundation |
| 86: 14 | and leading. |
| 86: 15 | A.  No. |
| 86: 24 | Q.  Did the Merck sales representatives |
| 86: 25 | disclose to you that the results of the VIGOR trial |
| 87: 1 | showed that for every 100 patients treated for a year |
| 87: 2 | with Vioxx, instead of being treated with naproxen, |
| 87: 3 | that there were two and a half additional serious |
| 87: 4 | adverse events in the Vioxx group? |
| 87: 5 | MR. SKIDMORE:  Objection.  Foundation |
| 87: 6 | and leading. |
| 87: 7 | A.  No. |

*overrule*

Re: 85:21-86:6
**Def Obj:**
Leading; assumes facts
not in evidence; vague
and misleading (403);
cherry-picks
conclusions

Re: 85:21-86:6
**Pltf Resp:**
Objections to leading
and the form of
questions are waived
under FRCP 32(d)(3)(B);
predicate facts will be
established by Plaintiff's
experts

Re: 86:7-86:15
**Def Obj:**
Leading; lack of
foundation (602; 403);
misleading; cherry-picks
conclusions

Re: 86:24-87:7
**Def Obj:**
Leading; lack of
foundation (602; 403);
misleading; cherry-picks
conclusions

Re: 86:24-87:7
**Pltf Resp:**
Question is not leading

**49   87:23    -    88:19    Grefer, Michael 2006-07-27**    00:01:47

| 87: 23 | What was your general impression, from |
| 87: 24 | the Merck sales representative contacts, about the |
| 87: 25 | safety of Vioxx as it relates to naproxen? |
| 88: 1 | A.  The -- the -- the general pitch |
| 88: 2 | throughout all those years that -- that the -- that the |
| 88: 3 | Vioxx representatives made was that their drug was |
| 88: 4 | better because it -- it worked better to begin with, |
| 88: 5 | and it was safer on the gastrointestinal tract, and |
| 88: 6 | that there did not seem to be any significant other |
| 88: 7 | factors when compared to naproxen that would make it a |
| 88: 8 | poor choice -- or a poor choice of the drug. |

|  | Objections | Responses |
|---|---|---|

88: 9   Q.  Okay. If the Merck sales
88: 10       representatives had disclosed to you that the results
88: 11       of the VIGOR trial showed that for every 100 patients
88: 12       treated for a year with Vioxx as -- as opposed to the
88: 13       same number of patients treated for a year with
88: 14       naproxen, that there were two and a half additional
88: 15       serious adverse events in the Vioxx group, if they had
88: 16       disclosed that to you prior to the time that you gave
88: 17       the drug to Garry Smith, would you or would you not
88: 18       have probably given the drug to patients like Garry
88: 19       Smith?

**Re: 88:9-89:1**
**Def Obj:**
Leading; lack of
foundation (602); calls
for speculation;
incomplete hypothetical

**Re: 88:9-89:1**
**Pltf Resp:**
Question is not leading;
witness's own actions
and reactions to
information are not
speculation

---

**50**   **88:22**   **-**   **89:5**   Grefer, Michael 2006-07-27      00:00:27

88: 22   A.  Well, I -- I would have had to have
88: 23       known the particulars of the situation and I would have
88: 24       had to have known the definite concrete evidence that
88: 25       was there, but it certainly would have made me less
89: 1       likely to prescribe the medication to Mr. Smith.
89: 2   Q.  Is that information that you would have
89: 3       liked to have had given to you by the Merck
89: 4       representatives if it existed?
89: 5   A.  Yes.
89: 6       MR. SKIDMORE: Objection. Leading.

**Re: 89:2-89:5**
**Def Obj:**
Leading; incomplete
hypothetical

**Re: 89:2-89:5**
**Pltf Resp:**
Question in not leading;
objections as to the form
of question are waived
under FRCP 32(d)(3)(B);

---

**51**   **89:9**   **-**   **89:18**   Grefer, Michael 2006-07-27      00:01:08

89: 9       Would you or would you not like to have
89: 10       that kind of information so that you can make educated
89: 11       decisions to care for your patients?
89: 12   A.  I would like to have as much education
89: 13       and information as possible when I make a decision.
89: 14   Q.  Would you or would you not specifically
89: 15       like to have information about hazards that may relate
89: 16       to the use of the drug that the sales representative is
89: 17       talking to you about?
89: 18   A.  I would.

**Re: 89:9-89:18**
**Def Obj:**
Vague; leading and
based on an
incomplete hypothetical
(see previous Q&A)

**Re: 89:9-89:18**
**Pltf Resp:**
Objections as to the form
of questions are waived
under FRCP 32(d)(3)(B);

---

**52**   **90:6**   **-**   **90:12**   Grefer, Michael 2006-07-27      00:00:30

90: 6   Q.  Okay. Doctor, I'm going to hand you
90: 7       what we've marked as Exhibit Number 7, and I'll
90: 8       represent to you that that's a chart prepared by a
90: 9       Merck biostatistician and included in a -- in a memo
90: 10       that she presented in the days -- or in the -- in the
90: 11       time prior to when you prescribed the Vioxx to Garry
90: 12       Smith.

**Re: 90:6-90:12**
**Def Obj:** Lack of
foundation and no
personal knowledge by
witness of document

**Re: 90:6-90:12 & 90:21-91:2**
**Pltf Resp:**
Beginning statement is
to explain what
document is referenced
in following questions;
the witness's lack of
personal knowledge of
the document is
relevant; question is not
leading and all other
objections to form are
waived under FRCP
32(d)(3)(B)

---

**53**   **90:13**   **-**   **90:16**   Grefer, Michael 2006-07-27      00:00:13

90: 13   A.  I -- I don't particularly remember
90: 14       seeing this particular one, but I was very frequently
90: 15       presented with a lot of information like that. I don't
90: 16       know if that one specifically was presented to me.

---

**54**   **90:21**   **-**   **91:2**   Grefer, Michael 2006-07-27      00:00:18

90: 21       If you look up here, it says MI
90: 22       Endpoint, and I'll represent to you that that means
90: 23       myocardial infarction endpoint, comparing Rofecoxib,
90: 24       which is the generic name for the -- I guess the
90: 25       molecule name for Vioxx, versus other NSAIDs. Do you
91: 1       see that?
91: 2   A.  Yes.

**Re: 90:21-91:2**
**Def Obj:**
Lack of foundation;
no personal knowledge

**Pltf Resp:**
Beginning statement is
to explain what
document is referenced
in following questions;
personal knowledge of
the document is
relevant; question is not
leading and all other
objections to form are
waived under FRCP

---

**55**   **91:21**   **-**   **92:4**   Grefer, Michael 2006-07-27      00:00:50

91: 21   Q.  If the Merck representatives had shown
91: 22       you this document and explained to you that the first
91: 23       line is all patients, a comparison of all patients for
91: 24       various different studies, and that it showed a
91: 25       relative risk of more than two for myocardial
92: 1       infarctions in the Vioxx group over the other NSAIDs
92: 2       group, first of all, do you think that would have stuck
92: 3       in your mind if they had ever told you that there was a
92: 4       doubling of the risk for Vioxx users over other NSAIDs?

**Re: 91:21-92:12**
**Def Obj:**
Leading; assumes facts
not in evidence;
incomplete hypothetical;
calls for speculation

*Sustained* (handwritten)

| | | | Objections | Responses |
|---|---|---|---|---|

**56**   92:6   -   92:10   Grefer, Michael 2006-07-27                00:00:16
    92: 6   A.  Yes.
    92: 7   Q.  Would or would not that information, a
    92: 8       doubling of the risk for Vioxx users over other NSAID
    92: 9       users, have stuck in your mind if the Merck
    92: 10      representatives had ever brought it to your attention?

**57**   92:12   -   92:17   Grefer, Michael 2006-07-27                00:00:34
    92: 12  A.  Yes, probably.
    92: 13  Q.  Did the Merck representatives ever tell          **Re: 92:12-92:24** | **Re: 92:12-92:24**
    92: 14     you or show you information that indicated that their   **Def Obj:** | **Pltf Resp:**
    92: 15     biostatistician had determined in a summary of these   Lack of foundation (602); | Witness's lack of
    92: 16     studies a relative risk of more than two for the Vioxx   leading | personal knowledge
    92: 17     group over the NSAIDs group for myocardial infarctions?    | is relevant; question
    | | | | is not leading

**58**   92:19   -   92:19   Grefer, Michael 2006-07-27                00:00:01
    92: 19  Q.  Did they ever --

**59**   92:21   -   92:22   Grefer, Michael 2006-07-27                00:00:03
    92: 21  Q.  -- tell you that or show you that,
    92: 22     either one?

*Is this in evidence? Not, sustained* (handwritten)

**60**   92:24   -   93:5   Grefer, Michael 2006-07-27                00:00:34   **Re: 92:25-93:8**
    92: 24  A.  Not -- not that I recall, no, sir.                 **Def Obj:**
    92: 25  Q.  Doctor, if information had been brought           Leading; lack of          | **Re: 92:25-93:8**
    93: 1     to your attention before October of 2002 that Vioxx     foundation (602; 403); | **Pltf Resp:**
    93: 2     increased the risk of myocardial infarction or other   Question/Answer comes | Question is not leading;
    93: 3     cardiovascular events in patients like Garry Smith,     after a series of | witness has personal
    93: 4     would you or would you not have prescribed Vioxx to him  misleading and | knowledge of his own
    93: 5     in October of 2002?                                    speculative questions; | actions and reactions;
*overruled* (handwritten)                                                           and questions re: Merck | question does not
**61**   93:8   -   93:8   Grefer, Michael 2006-07-27                00:00:06                  | incorporate any of the
    93: 8   A.  Probably not.                                    | previous testimony

**62**   4:9   -   5:1   Grefer, Michael (Discovery) 2006-06-29                00:00:38
    4: 9   Q.  Dr. Grefer, my name's Jon Skidmore,
    4: 10     and I represent Merck in this lawsuit.  Good morning.
    4: 11  A.  Good morning.
    4: 12  Q.  We have never met before today, have
    4: 13     we?
    4: 14  A.  No, sir.
    4: 15  Q.  You have given depositions before,
    4: 16     have you not?
    4: 17  A.  Yes, sir.
    4: 18  Q.  And you're familiar with the ground          *overruled* (handwritten)
    4: 19     rules for them?
    4: 20  A.  Yes, sir.                                       **Re: 4:15-5:1** | **Re: 4:15-5:1**
    4: 21  Q.  Could you tell the jury where -- where         **Pltf Obj:** | **Def Resp:**
    4: 22     we are today, your -- your office location.          Relevance | Proper background for
    4: 23  A.  Yes.  Today we're at 525 Alexandria                 | witness
    4: 24     Pike.  It's in Southgate, Kentucky.  That's my -- my
    4: 25     main office, and it's one of the three offices that
    5: 1     my group has.

**63**   6:11   -   6:17   Grefer, Michael (Discovery) 2006-06-29                00:00:12
    6: 11  Q.  Now, prior to today I know you've had
    6: 12     an opportunity to meet with your own counsel, but
    6: 13     have you also had an opportunity to meet with the
    6: 14     attorneys for Garry Smith?
    6: 15  A.  Yes, sir.
    6: 16  Q.  And that's Larry Wright?
    6: 17  A.  Yes, sir.

    7:4   -   7:25   Grefer, Michael (Discovery) 2006-06-29                00:00:57
    7: 4   Q.  At that meeting did he show you any
    7: 5     materials?
    7: 6  A.  He showed me some, yes, sir.
    7: 7  Q.  What did he show you?

|  |  | Objections | Responses |
|---|---|---|---|

| | | |
|---|---|---|
| 7: 8 | A. He showed me some records from mainly | |
| 7: 9 | representatives of -- of Merck that pertained to the | |
| 7: 10 | vis-- visits -- | |
| 7: 11 | And there are a lot of them. I -- I | |
| 7: 12 | just briefly glanced at them. | |
| 7: 13 | -- of -- of the visits that the drug | |
| 7: 14 | representatives made note of when they came to see | |
| 7: 15 | me. | |
| 7: 16 | Q. Did you have an independent | |
| 7: 17 | recollection of any of those? | |
| 7: 18 | A. No, sir. As I say, there were a lot | |
| 7: 19 | of them, and I -- I -- I didn't read them with -- | |
| 7: 20 | with any depth. I was -- I -- I was surprised they | |
| 7: 21 | existed. | |
| 7: 22 | Q. Surprised they kept notes on meetings? | |
| 7: 23 | A. Yes, sir. | |
| 7: 24 | Q. Okay. Did it offend you in any way? | |
| 7: 25 | A. No, sir; no. | |

| 65 | 8:1 | - 8:16 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:43 |
|---|---|---|---|---|
| | 8: 1 | | Q. It was just you didn't know that that | |
| | 8: 2 | | information existed? | |
| | 8: 3 | | A. Well, when people come to see me, | |
| | 8: 4 | | they -- they smile, they shake my hand. They don't | |
| | 8: 5 | | write down notes, and -- and I don't know where -- | |
| | 8: 6 | | when they generate these interview type of situations | |
| | 8: 7 | | that they have. But it did surprise me, because | |
| | 8: 8 | | nobody's ever taken notes when they've talked to me | |
| | 8: 9 | | about certain things like that. | |
| | 8: 10 | | Q. Okay. Do -- do you have any | |
| | 8: 11 | | independent recollection of meetings with any Merck | |
| | 8: 12 | | sales representatives? | |
| | 8: 13 | | A. Oh, I've -- I must have met with Merck | |
| | 8: 14 | | sales representatives 50 to a hundred times, but I | |
| | 8: 15 | | don't remember any particular individual meeting. | |
| | 8: 16 | | Maybe more. | |

| 66 | 8:17 | - 9:3 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:23 |
|---|---|---|---|---|
| | 8: 17 | | Q. And you -- all the major | |
| | 8: 18 | | pharmaceutical companies have professional sales | |
| | 8: 19 | | representatives that call on physicians? | |
| | 8: 20 | | A. Sure do. | |
| | 8: 21 | | Q. And I assume you've also at least met | |
| | 8: 22 | | briefly, as with the Merck representatives, | |
| | 8: 23 | | representatives of all the other major pharmaceutical | |
| | 8: 24 | | companies? | |
| | 8: 25 | | A. Yes, sir. | |
| | 9: 1 | | Q. That is a big part of their job to be | |
| | 9: 2 | | in the physicians' offices making their rounds? | |
| | 9: 3 | | A. Correct. | |

| 67 | 10:7 | - 10:12 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:11 |
|---|---|---|---|---|
| | 10: 7 | | Q. And you are not a cardiologist? | |
| | 10: 8 | | A. Correct. | |
| | 10: 9 | | Q. And I assume, if you have patients | |
| | 10: 10 | | with cardiology issues, you refer them to a | |
| | 10: 11 | | cardiologist? | |
| | 10: 12 | | A. Yes, sir. | |

Re: 10:7-10:12
Pltf Obj:
Relevance; 403

Re: 10:7-10:12
Def Resp: Relevant to
establish scope of
expertise.

| 68 | 11:17 | - 11:22 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:08 |
|---|---|---|---|---|
| | 11: 17 | | Q. Okay. Can you -- can you tell the | |
| | 11: 18 | | jury what your medical specialty is? | |
| | 11: 19 | | A. I'm an orthopedic surgeon. | |
| | 11: 20 | | Q. And you're licensed to practice in | |
| | 11: 21 | | Kentucky? | |
| | 11: 22 | | A. Yes, sir. | |

| 69 | 11:23 | - 12:11 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:44 |
|---|---|---|---|---|
| | 11: 23 | | Q. Now, do people get cross-licensed here | |

Re: 11:23-12:11

Re: 11:23-12:11

| | | | | Objections | Responses |
|---|---|---|---|---|---|

| | | | | **Pltf Obj:** Relevance; 403 | **Def Resp:** Relevant to establish scope of expertise and areas of practice. |
|---|---|---|---|---|---|
| | 11: 24 | | since you're so close to the border with Ohio, or is | | |
| | 11: 25 | | it -- or do you just practice in Kentucky? | | |
| | 12: 1 | A. | I -- I am licensed.  I -- I am | | |
| | 12: 2 | | licensed to practice in Ohio and have been up until | | |
| | 12: 3 | | very, very recently.  I -- I've had this problem with | | |
| | 12: 4 | | my neck, and I stopped doing active surgical proce- | | |
| | 12: 5 | | dures.  So I did not maintain or I have not main- | | |
| | 12: 6 | | tained -- as a matter of fact, I still might have it, | | |
| | 12: 7 | | but I think very recently I'm going to drop my licen- | | |
| | 12: 8 | | sure in Ohio because I just don't need it anymore.  I | | |
| | 12: 9 | | just don't do much over there.  But basically I will | | |
| | 12: 10 | | maintain the one in Kentucky.  And I still might be | | |
| | 12: 11 | | licensed in Ohio.  I don't know that. | | |

| 70 | 13:4 | - 13:21 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:53 | **Re: 13:4-13:21** | **Re: 13:4-13:21** |
|---|---|---|---|---|---|---|
| | 13: 4 | Q. | Can you give us a description of what | | **Pltf Obj:** | **Def Resp:** Relevant to |
| | 13: 5 | | your practice is today? | | Relevance; 403 | establish scope of |
| | 13: 6 | A. | Today my practice is office practice. | | | expertise and areas of |
| | 13: 7 | | I set bones, I take care of people that come in. | | | practice. |
| | 13: 8 | | Taken care of a lot of people over the last 25 years | | | |
| | 13: 9 | | and people come in with surgical and nonsurgical | | | |
| | 13: 10 | | problems, and I see them.  And if they do need a | | | |
| | 13: 11 | | surgical procedure, I send them to one of my | | | |
| | 13: 12 | | partners. | | | |
| | 13: 13 | | Most of the time these people that | | | |
| | 13: 14 | | come in to see me are my old patients, and I -- | | | |
| | 13: 15 | | and -- and they want me to follow up on their care. | | | |
| | 13: 16 | | So basically it's just a matter of taking care of the | | | |
| | 13: 17 | | nonsurgical things, which are significant, probably. | | | |
| | 13: 18 | | There -- there's not many things that need surgery, | | | |
| | 13: 19 | | but basically, when they do need surgery, my partners | | | |
| | 13: 20 | | do them, and then either I or my partners will follow | | | |
| | 13: 21 | | up with the patients. | | | |

| | 14:15 | - 15:8 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:50 | | |
|---|---|---|---|---|---|---|
| | 14: 15 | Q. | In your practice I assume it is -- it | | | |
| | 14: 16 | | is fairly routine with patients for you to use | | | |
| | 14: 17 | | samples. | | | |
| | 14: 18 | A. | Yes, sir. | | | |
| | 14: 19 | Q. | When you do use samples with a | | | |
| | 14: 20 | | patient, do you follow a standard practice of -- of | | | |
| | 14: 21 | | notation of how many -- of giving samples to a | | | |
| | 14: 22 | | patient? | | | |
| | 14: 23 | A. | We try to.  We try to make a notation | | | |
| | 14: 24 | | of the samples that were given.  Usually, when we | | | |
| | 14: 25 | | talk about samples, we usually don't make a notation | | | |
| | 15: 1 | | of the number. | | | |
| | 15: 2 | Q. | Okay.  But would it be fair to say | | | |
| | 15: 3 | | that in your normal practice, if you provide a | | | |
| | 15: 4 | | patient samples, you at least note that samples were | | | |
| | 15: 5 | | given? | | | |
| | 15: 6 | A. | Yes, sir. | | | |
| | 15: 7 | Q. | And that's important in the medical | | | |
| | 15: 8 | | record, isn't it? | | | |

| 72 | 15:10 | - 16:16 | Grefer, Michael (Discovery) 2006-06-29 | 00:01:25 | | |
|---|---|---|---|---|---|---|
| | 15: 10 | A. | Yes, sir. | | | |
| | 15: 11 | Q. | And why is that? | | | |
| | 15: 12 | A. | It -- it -- it's -- it's just continu- | | | |
| | 15: 13 | | ity of care of any particular individual.  You need | | | |
| | 15: 14 | | to know what you've given them and what they take | | | |
| | 15: 15 | | with them.  And then also you like to follow with a | | | |
| | 15: 16 | | notation of any follow-up prescriptions that have | | | |
| | 15: 17 | | been given. | | | |
| | 15: 18 | Q. | And that's helpful in terms of | | | |
| | 15: 19 | | continuity of care? | | | |
| | 15: 20 | A. | Yes. | | | |
| | 15: 21 | Q. | Now, if you were prescribing a patient | | | |
| | 15: 22 | | Vioxx, for example, and wrote them a prescription, | | | |



| | | Objections | Responses |
|---|---|---|---|

```
15: 23              would there be a standard practice of how many
15: 24              samples you might give them at that time, if any?
15: 25      A. There -- there's -- there's nothing
16: 1           that's written in stone in the office.  Basically
16: 2           it's -- it's a -- it's a situation of, number one,
16: 3           whether we have the samples available --
16: 4           Sometimes you don't; sometimes you're
16: 5           out of them.
16: 6           -- and the numbers that you think a
16: 7           patient requires.
16: 8           My personal situation is is that I
16: 9           usually give the patients enough to give them a short
16: 10          trial dose of it and also make it convenient so that
16: 11          they don't have to leave here and just go right to
16: 12          the pharmacist.
16: 13      Q. And with something like Vioxx, what
16: 14          would that number of samples be?
16: 15      A. Basically it -- it -- it would vary.
16: 16          Usually it's under a week's worth, usually.
```

73   16:20   -   16:22   Grefer, Michael (Discovery) 2006-06-29        00:00:07
```
16: 20      Q. And the reason for giving under a
16: 21          week's worth, is that to give them plenty of time to
16: 22          go get their prescription filled?
```

Re: 16:20-17:5
**Pltf Obj:**
Misleading; speculative

Re: 16:20-17:5
**Def Resp:**
Proper questions re:
doctor's typical practice
and reason therefore

74   16:24   -   17:21   Grefer, Michael (Discovery) 2006-06-29        00:01:02
```
16: 24      A. Plenty of time to get their prescrip-
16: 25          tion to fill -- filled and make sure that the
17: 1           medicine agrees with them rather than going out and
17: 2           getting a prescription filled for 30 to 40 pills
17: 3           when, if they take one or two, it -- it doesn't -- it
17: 4           doesn't agree with them.
17: 5       Q. Okay.  Now, all -- all prescription
17: 6           drugs have side effects, don't they?
17: 7       A. Yes, sir.
17: 8       Q. Is it helpful in your practice to have
17: 9           more than one drug in a class of drugs that you are
17: 10          able to use with patients?
17: 11      A. Yes, sir.
17: 12      Q. And why is that?
17: 13      A. Patient tolerance.  People won't
17: 14          tolerate one drug as compared to another drug.
17: 15          Basically the typical types of side effects that you
17: 16          get with different particular people and -- and
17: 17          what's happened to them in the past.  That's --
17: 18          that's my rationale.
17: 19      Q. And that's one of the reasons you may
17: 20          give someone less than a week's supply of samples, so
17: 21          that they can see if it agrees with them?
```

Re: 17:18-17:23
**Pltf Obj:**
Misleading; speculative

Re: 17:18-17:23
**Def Resp:**
Proper questions re:
Dr. Grefer's typical
practices & justification
for those practices

75   17:23   -   17:23   Grefer, Michael (Discovery) 2006-06-29        0
```
17: 23      A. Yes, sir.
```

76   17:24   -   18:7   Grefer, Michael (Discovery) 2006-06-29        00:00:19
```
17: 24      Q. Now, do you regularly subscribe to any
17: 25          medical journals or publications?
18: 1       A. Yes.
18: 2       Q. Which ones?
18: 3       A. The Journal of Orthopedic Surgery, and
18: 4           basically that's usually the only one that I -- that
18: 5           I read with regularity.
18: 6       Q. Do you on occasion read the New
18: 7           England Journal of Medicine?
```

Re: 17:24-18:7
**Pltf Obj:**
Relevance; 403

Re: 17:24-18:7
**Def Resp:**
Relevant to establish
doctor's practices
concerning information
disseminated in medical
journals and periodicals

Re: 18:9
**Pltf Obj:**
Relevance; 403;
cumulative

Re: 18:9
**Def Resp:**
Relevant to establish
doctor's practices
concerning information
disseminated in medical
journals and periodicals

     18:9   -   18:9   Grefer, Michael (Discovery) 2006-06-29        0
```
18: 9       A. Rarely.
```

78   18:13   -   19:25   Grefer, Michael (Discovery) 2006-06-29        00:01:36
```
18: 13      Q. Now, I know we touched on this
18: 14          briefly, but your practice is limited to orthopedics?
```

| | | Objections | Responses |

18:15   A.  Correct.
18:16   Q.  And can you describe orthopedics to
18:17       the jury.
18:18   A.  It's musculoskeletal medicine and
18:19       surgery.  It has to do with your muscular and
18:20       skeletal system.
18:21   Q.  If -- if a patient has a cardiology
18:22       issue, which I assume has occurred from time to time
18:23       in your practice, what do you do for the patient
18:24       typically?
18:25   A.  Well, if a patient is in my office and
19:1        they have a cardiology problem, number one, I make
19:2        sure they're stable if they have a -- a -- an event
19:3        in -- in my office.  And maybe once or twice I've had
19:4        to call the emergency department and have them come
19:5        pick up people if they're undergoing an event.
19:6        But basically if the -- if -- if the
19:7        patient is in a stable condition and there's no
19:8        imminent danger, I recommend they see a heart doctor,
19:9        a cardiologist.
19:10  Q.  Okay.  You don't typically -- part of
19:11      your practice is not addressing cardiology health
19:12      issues with patients unless there was an emergent
19:13      situation?
19:14  A.  Correct.
19:15  Q.  Do you know Dr. Daniel Courtade?
19:16  A.  Courtade (pronouncing), yes, sir.
19:17  Q.  Is he respected in this area?
19:18  A.  He is.
19:19  Q.  And he's a specialist in cardiology?
19:20  A.  He is.
19:21  Q.  Are you aware that he treated Garry
19:22      Smith after his heart attack?
19:23  A.  I became aware of that.  And I -- I
19:24      don't know when I became aware of that, but I did
19:25      become aware of that.

79   20:7    -   22:7   Grefer, Michael (Discovery) 2006-06-29                        00:01:58
20:7   Q.  Now, you never treated Mr. Smith for
20:8       any cardiology or heart issues?
20:9   A.  That's correct.
20:10  Q.  Would you defer to Dr. Courtade for
20:11      any opinions concerning Mr. Smith's cardiology
20:12      issues?
20:13  A.  Yes, sir.
20:14  Q.  Would that include the cause of his
20:15      heart attack?
20:16  A.  Yes, sir.
20:17  Q.  Would that include Mr. Smith's risk
20:18      factors for cardiovascular -- cardiovascular disease
20:19      both before and after the heart attack?
20:20  A.  Yes, sir.
20:21  Q.  Would that include the extent of
20:22      cardiovascular disease found by Dr. Courtade?
20:23      MR. WRIGHT:  Object to the form.
20:24  A.  Yes, sir.
20:25  Q.  Would you also defer to Dr. Courtade
21:1       for any treatment Mr. Smith received after his
21:2       cardiovascular disease was identified?
21:3   A.  Yes, sir.
21:4       MR. WRIGHT:  Object to the form.
21:5   Q.  And would you defer to Dr. Courtade
21:6       for any opinions concerning Mr. Smith's recovery from
21:7       his heart attack?
21:8   A.  Yes, sir.
21:9   Q.  And also would you defer to Cour-- Dr.
21:10      Courtade as to whether or not Vioxx or any risk
21:11      factors played any role in Mr. Smith's heart attack?
21:12  A.  Yes, sir.

**Re: 18:21-19:25**
**Pltf Obj:**
Relevance; 403; outside
the scope of direct

**Re: 18:21-19:25**
**Def Resp:**
Relevant to establish
witness' practice,
background and areas
of knowledge; no unfair
prejudice; witness is on
defendant's list as well
so defendant is not
limited by scope of
direct

**Re: 20:7-21:12**
**Pltf Obj:**
Relevance; 403; outside
the scope of direct

**Re: 20:7-21:12**
**Def Resp:**
Relevant to establish
witness' practice,
background and areas
of knowledge; no unfair
prejudice; witness is on
defendant's list as well
so defendant is not
limited by scope of
direct

|  | Objections | Responses |
|---|---|---|

| 21: 13 | Q. I probably know the answer to these | **Re: 21:13-22:7** | **Re: 21:13-22:7** |
| 21: 14 | questions, but it's something I need to ask very | **Pltf Obj:** | **Def Resp:** |
| 21: 15 | briefly. | Relevance; 403; outside | Relevant to establish |
| 21: 16 | A. Sure. | the scope of direct | witness' practice, |
| 21: 17 | Q. Do you have any expertise in the FDA's | | background and areas |
| 21: 18 | handling and regulation of new drug applications? | | of knowledge; no unfair |
| 21: 19 | A. No, sir. | | prejudice; witness is on |
| 21: 20 | Q. Or the design -- the design of | | defendant's list as well |
| 21: 21 | clinical trials? | | so defendant is not |
| 21: 22 | A. No, sir. | | limited by scope of |
| 21: 23 | Q. The FDA labeling process? | | direct |
| 21: 24 | A. No, sir. | | |
| 21: 25 | Q. The FDA determination of whether a | | |
| 22: 1 | prescription drug is safe and effective? | | |
| 22: 2 | A. No, sir. | | |
| 22: 3 | Q. Do you ever -- have you ever conducted | | |
| 22: 4 | a clinical trial? | | |
| 22: 5 | A. No, sir. | | |
| 22: 6 | Q. Have you ever participated in one? | | |
| 22: 7 | A. No, sir. | | |

80   22:17   -   24:16   Grefer, Michael (Discovery) 2006-06-29            00:01:36

| 22: 17 | Q. Do you -- do you specifically remember |
| 22: 18 | Mr. Smith? You saw him a long time ago and not for |
| 22: 19 | long. |
| 22: 20 | A. No, sir, I don't. |
| 22: 21 | Q. You don't have a picture of him in |
| 22: 22 | your mind? |
| 22: 23 | A. I do not. |
| 22: 24 | Q. Okay. Now, you see a lot of patients, |
| 22: 25 | don't you? |
| 23: 1 | A. I do. |
| 23: 2 | Q. And -- and I assume from the years of |
| 23: 3 | practice here in -- in the -- the nice practice that |
| 23: 4 | you have, you have some patients you've -- you've |
| 23: 5 | followed for many, many years? |
| 23: 6 | A. I have. |
| 23: 7 | Q. And he's not one of them? |
| 23: 8 | A. No, sir, he's not. |
| 23: 9 | Q. So I assume that your best recollec- |
| 23: 10 | tion of him is referring to your chart? |
| 23: 11 | A. That's correct. |

| 23: 12 | Q. Can you tell us when you treated Mr. | **Re: 23:12-24:16** | **Re: 23:12-24:16** |
| 23: 13 | Smith, the time period? | **Pltf Obj:** | **Def Resp:** |
| 23: 14 | A. Yes, sir. I saw Mr. Smith for the | Cumulative | Background; Proper to |
| 23: 15 | first time on September the 11th of 2002, and then I | | establish context for |
| 23: 16 | referred him to my partner -- Dr. Forest Heis -- on | | questioning |
| 23: 17 | 10/14 of 2002. So I saw him on 9/11, 10/02 and | | |
| 23: 18 | 10/14. | | |
| 23: 19 | Q. On three -- three occasions? | | |
| 23: 20 | A. Three occasions, yes, sir. | | |
| 23: 21 | Q. And can you tell the jury what your | | |
| 23: 22 | care and treatment of him had to do with at that | | |
| 23: 23 | time? | | |
| 23: 24 | A. It was his right knee. | | |
| 23: 25 | Q. And that's an orthopedic issue? | | |
| 24: 1 | A. Yes, sir. | | |
| 24: 2 | Q. And it was something that had been | | |
| 24: 3 | hurting him? | | |
| 24: 4 | A. Correct. | | |
| 24: 5 | Q. And you ultimately, based upon your | | |
| 24: 6 | diagnostic testing, made a decision that he needed | | |
| 24: 7 | surgery? | | |
| 24: 8 | A. Correct. | | |
| 24: 9 | Q. And that's when you referred him to | | |
| 24: 10 | your partner? | | |
| 24: 11 | A. Yes, sir. | | |
| 24: 12 | Q. And that's Dr. Heis? | | |
| 24: 13 | A. Yes, sir. | | |

Overruled

<u>Objections</u>                    <u>Responses</u>

| | | |
|---|---|---|
| 24: 14 | Q. Because at that point in time you had | |
| 24: 15 | ceased doing surgeries? | |
| 24: 16 | A. Correct. | |

**81**  **24:17**  **- 24:20**   Grefer, Michael (Discovery) 2006-06-29          00:00:10

| | |
|---|---|
| 24: 17 | Q. Do you have a -- I assume, based upon |
| 24: 18 | what you've already said, you don't have a memory of |
| 24: 19 | any conversation with Mr. Smith? |
| 24: 20 | A. No, I don't. |

**82**  **24:24**  **- 26:14**   Grefer, Michael (Discovery) 2006-06-29          00:01:42

| | |
|---|---|
| 24: 24 | Doctor, I want to talk to you about |
| 24: 25 | prescriptions. In general, I know in providing |
| 25: 1 | medical care to your -- for your patients, you |
| 25: 2 | familiarize yourself with the safety information |
| 25: 3 | about drugs before prescribing one for the first |
| 25: 4 | time. |
| 25: 5 | A. Yes, sir. |
| 25: 6 | Q. And I assume one of the ways you |
| 25: 7 | educate yourself is with the -- the package insert, |
| 25: 8 | the labeling that comes with the drug? |
| 25: 9 | A. Yes, sir. |
| 25: 10 | Q. And do you use the package insert and |
| 25: 11 | the PDR? |
| 25: 12 | A. Basically, yes. |
| 25: 13 | Q. Whatever's handy? |
| 25: 14 | A. Whatever's handy, what-- what-- |
| 25: 15 | whatever's been given to me, and basically what -- |
| 25: 16 | what knowledge just comes by my desk. All the time |
| 25: 17 | we're getting brochures and all the time we're |
| 25: 18 | getting information. |
| 25: 19 | Q. Drug companies send out information? |
| 25: 20 | A. They do. |
| 25: 21 | Q. I assume in the field of orthopedics |
| 25: 22 | there are times where either the journal you review |
| 25: 23 | or the -- or other physicians circulate articles? |
| 25: 24 | A. Correct. |
| 25: 25 | Q. I assume you confer with medical |
| 26: 1 | colleagues about medications? |
| 26: 2 | A. You talk to them, correct. |
| 26: 3 | Q. And I assume you base your prescrip- |
| 26: 4 | tion decisions on your clinical experience, too? |
| 26: 5 | A. That's most of where it comes from, |
| 26: 6 | yes, sir. |
| 26: 7 | Q. Is there anything else you typically |
| 26: 8 | use other than the package insert, the labeling, some |
| 26: 9 | articles that come across your desk, and visiting |
| 26: 10 | with colleagues, along with your clinical experience, |
| 26: 11 | to make these prescribing decisions? |
| 26: 12 | A. That and the material that's supplied, |
| 26: 13 | which is very, very frequently a lot, by the drug |
| 26: 14 | companies themselves. |

**83**  **26:19**  **- 27:6**   Grefer, Michael (Discovery) 2006-06-29          00:00:32

| | |
|---|---|
| 26: 19 | Q. Okay. Now, you are aware that -- that |
| 26: 20 | the labeling on drugs over -- with time and experi- |
| 26: 21 | ence, will sometimes change? |
| 26: 22 | A. Yes, sir. |
| 26: 23 | Q. And I assume, in accordance with your |
| 26: 24 | goal of, you know, making good prescription decisions |
| 26: 25 | for your patients, you keep up to date with changes |
| 27: 1 | to the labeling so that you know how that may or may |
| 27: 2 | not change your prescription decisions? |
| 27: 3 | A. I try to. |
| 27: 4 | Q. Now, the companies -- you mentioned |
| 27: 5 | that the companies sometimes send you information. |
| 27: 6 | A. They do. |

**84**  **27:12**  **- 28:11**   Grefer, Michael (Discovery) 2006-06-29          00:01:07

| | Objections | Responses |
|---|---|---|

27: 12  Q. What are -- is -- is it just a letter
27: 13      addressed to you from the company enclosing some
27: 14      material?
27: 15  A. Yes, yes.
27: 16  Q. It's kind of unsolicited by you, but I
27: 17      assume information you are -- are pleased to receive?
27: 18  A. Yes.
27: 19  Q. Now, I assume when there are,
27: 20      particularly with labeling changes on drugs, that's
27: 21      the type of information you read -- read when you
27: 22      receive it?
27: 23  A. Yes.
27: 24  Q. What's your -- what's your procedure
27: 25      or your office's procedure for handling these letters
28: 1      from drug companies that contain prescribing informa-
28: 2      tion?
28: 3  A. The letters are usually addressed to
28: 4      myself, so basically they're opened by my secretary
28: 5      or someone in the office.  They're placed back in the
28: 6      envelope, and then they're put on a pile on my -- on
28: 7      my desk.
28: 8  Q. And do you generally go through those?
28: 9  A. I generally go through those.  And I'm
28: 10      not saying I read them all, but I read as much as
28: 11      I -- I can when I review my mail.

85   28:21   -  30:14   Grefer, Michael (Discovery) 2006-06-29                00:01:57

28: 21  Q. Now, I guess since you started
28: 22      practicing medicine and prescribing drugs you've been
28: 23      aware that all prescription drugs have risks?
28: 24  A. Yes.
28: 25  Q. Some of those risks can be serious?

**Re: 28:25-29:15**
**Pltf Obj:**
Foundation; calls for
expert medical opinion
outside the scope of
witnesses' treatment of
Mr. Smith; cumulative

**Re: 28:25-29:15**
**Def Resp:**
As a practicing physician,
witness has ample
basis for testimony on
prescription drugs;
proper background for
testimony concerning
treatment of plaintiff;
not cumulative

29: 1  A. Yes.
29: 2  Q. Even with drugs who have a side effect
29: 3      where the potential exists for death, there are
29: 4      reasons for the prescribing of those drugs?
29: 5  A. Yes.
29: 6  Q. For example, a polio vaccine?
29: 7  A. Yes.
29: 8  Q. Aspirin?
29: 9  A. Yes.
29: 10  Q. And many other drugs?
29: 11  A. Yes.
29: 12  Q. Now, the fact that -- that a death has
29: 13      occurred with a drug doesn't stop doctors from
29: 14      prescribing it, does it?
29: 15  A. No, sir.
29: 16  Q. As a physician, you've got to weigh
29: 17      the potential side effects and -- and -- and consider
29: 18      the benefits and -- and make a decision for a
29: 19      particular patient, sometimes in consultation with
29: 20      the patient?
29: 21  A. Yes.
29: 22  Q. Now, is it fair to say that even
29: 23      when -- when a drug is on the market, sometimes it
29: 24      takes a -- a -- an experience with a much larger
29: 25      population than the clinical trials to fully
30: 1      appreciate all the risks of that drug?

**Re: 29:22-30:14**
**Pltf Obj:**
Foundation; calls for
expert medical opinion
outside the scope of
witness' treatment of
Mr. Smith; cumulative;
speculation

**Re: 29:22-30:14**
**Def Resp:**
As a practicing physician,
witness has ample
basis for testimony on
prescription drugs;
proper background for
testimony concerning
treatment of plaintiff;
not cumulative

30: 2  A. That's correct.
30: 3  Q. And that's commonly known in the
30: 4      medical field?
30: 5  A. It happens, yes, sir.
30: 6  Q. It's also true that if a -- if a
30: 7      patient is on a drug and has some type of medical
30: 8      problem or condition, it may not be caused by the
30: 9      drug?
30: 10  A. Correct.
30: 11  Q. There may be other reasons or
30: 12      unrelated reasons for a medical condition other than

| | | | Objections | Responses |
|---|---|---|---|---|



```
30: 13          taking a prescription drug?
30: 14      A.  Correct.

31:4    -  33:9   Grefer, Michael (Discovery) 2006-06-29        00:02:19
31: 4       Q.  Now I want to talk with you a little
31: 5           bit about NSAIDs or nonsteroidal --steroidal anti-
31: 6           inflammatory drugs.
31: 7       A.  Okay.
31: 8       Q.  Now, these have potential side
31: 9           effects, do they not?
31: 10      A.  Yes.
31: 11      Q.  Some are nonspecific nonsteroidals and
31: 12          others are specific steroidals.  Correct?
31: 13      A.  Yes.
31: 14      Q.  And there are some differences in the
31: 15          potential side effects of those two?
31: 16      A.  Yes, sir.
31: 17      Q.  Now, it's my understanding that
31: 18          NSAIDs, the nonspecific NSAIDs, have a common side
31: 19          effect, potential side specific side effect of GI
31: 20          bleeds.
31: 21      A.  Correct.
31: 22      Q.  The way I've heard it described is
31: 23          perforations, ulcers and bleeds.
31: 24      A.  Yes, sir.
31: 25      Q.  And that is a -- that is a serious
32: 1           side effect?
32: 2       A.  Yes, sir.
32: 3       Q.  It results in a lot of hospitaliza-
32: 4           tions a year?
32: 5       A.  Correct.
32: 6       Q.  And -- and some deaths?
32: 7       A.  Yes.
32: 8       Q.  And it's a side effect that physicians
32: 9           would like to avoid?
32: 10      A.  Correct.
32: 11      Q.  As well as patients?
32: 12      A.  Yes, sir.
32: 13      Q.  Now, the COX-2 inhibitor drugs like
32: 14          Vioxx, when they came on the market one of the
32: 15          expected benefits was a decrease in the gastrointes-
32: 16          tinal risks?
32: 17      A.  Yes.
32: 18      Q.  And -- and that is a good thing for --
32: 19          for physicians to be able to prescribe something that
32: 20          might avoid a side effect of another similar drug?
32: 21      A.  Yes.
32: 22      Q.  Did you find that with COX-2s that you
32: 23          saw less gastrointestinal side effects?
32: 24      A.  Yes.
32: 25      Q.  And did you feel that was a -- was a
33: 1           real benefit of COX-2s?
33: 2       A.  It was.
33: 3       Q.  With COX-2s, such as Vioxx, did you
33: 4           also see that patients were receiving good pain
33: 5           relief?
33: 6       A.  Yes, I did.
33: 7       Q.  And the fact that you could get that
33: 8           pain relief with less risk of the gastrointestinal
33: 9           adverse events was a good thing for -- for patients?

87  33:12   -  34:19   Grefer, Michael (Discovery) 2006-06-29        00:01:34
33: 12      A.  Yes, sir.
33: 13      Q.  Now, at some point in time you started
33: 14          prescribing the -- the -- the COX-2 inhibitors like
33: 15          Celebrex and Vioxx?
33: 16      A.  Yeah, I did.
33: 17      Q.  I believe you also -- did you
33: 18          prescribe Bextra?
```

**Objections**

Overruled

Re: 31:4-31:24
Pltf Obj:
Cumulative

Re: 31:25-32:12
Pltf Obj:
Cumulative; foundation;
calls for expert medical
opinion outside the
scope of witness'
treatment of Mr. Smith

Re: 32:13-33:12
Pltf Obj:
Foundation;
calls for expert medical
opinion outside the
scope of witness'
treatment of Mr. Smith

**Responses**

Re: 31:4-31:24
Def Resp:
As a practicing physician,
witness has ample
basis for testimony on
prescription drugs;
proper background for
testimony concerning
treatment of plaintiff;
not cumulative

Re: 31:25-32:12
Def Resp:
Not cumulative; same as
above on foundation/
expert opinion

Re: 32:13-33:12
Def Resp:
Not cumulative; same as
above on foundation/
expert opinion

| | Objections | Responses |
|---|---|---|

33: 19   A.  I did.
33: 20   Q.  Can you tell me, what would you
33: 21        generally tell your patients about Vioxx or any other
33: 22        COX-2 when you would prescribe it to them?
33: 23   A.  I would tell them what the drug was
33: 24        for, and I would tell them that basically there are
33: 25        things you have to watch out for with the drugs.  And
34: 1        had -- had they been on other drugs before or concom-
34: 2        itant drugs, I'd tell them what to avoid and what to
34: 3        take with it, and I would discuss with them the
34: 4        various side effects that were common.
34: 5    Q.  And would one of those be cardio-
34: 6        vascular issues?
34: 7    A.  It -- it is today, yes, sir.
34: 8    Q.  And back at the time the labeling was
34: 9        changed to reflect cardiovascular risks, would you
34: 10       have talked with them about it then?
34: 11   A.  I don't -- I don't know when the
34: 12       labeling was changed specifically, but when it became
34: 13       apparent that there were increased risks with cardio-
34: 14       vascular problems and complications, I -- I did
34: 15       change my discussion with the patients.
34: 16   Q.  Okay.  And would your discussion with
34: 17       the patient have been any different which COX-2 you
34: 18       prescribed?
34: 19   A.  No.



**Re: 34:5-34:19**
**Pltf Obj:**
403; confusing;
misleading

**Re: 34:5-34:19**
**Def Resp:**
No formal objection so
waived; neither
confusing nor
misleading

---

88   34:20   -   35:7   Grefer, Michael (Discovery) 2006-06-29          00:00:29
34: 20   Q.  And -- and that would be --
34: 21   A.  Now, you're talking about then or now?
34: 22       Obviously, I can't prescribe but one now.
34: 23   Q.  Correct.
34: 24   A.  But then, before the withdrawal of the
34: 25       certain drugs occurred, I really was unaware that
35: 1        there was a major difference between the different
35: 2        COX-2s.
35: 3    Q.  And you would tell all the patients
35: 4        the same thing?
35: 5    A.  I would try to, yes, sir.  I would try
35: 6        to tell the patients the same time -- or the same
35: 7        things.

---

89   35:8   -   36:2   Grefer, Michael (Discovery) 2006-06-29          00:00:51
35: 8    Q.  And that would -- and -- and you
35: 9        yourself would assess whether there was any reason
35: 10       not to prescribe a particular drug to a patient due
35: 11       to -- COX-2 to a patient due to cardiovascular risk?
35: 12   A.  Correct, back then.
35: 13   Q.  Now, do you still prescribe COX-2s
35: 14       today?
35: 15   A.  I do.
35: 16   Q.  And the only one on the market is
35: 17       Celebrex?
35: 18   A.  Correct.
35: 19   Q.  And have you found it to be a -- a --
35: 20       a -- a good addition to your -- your arsenal of drugs
35: 21       you're able to use to treat pain --
35: 22   A.  Yes.
35: 23   Q.  -- in patients?
35: 24   A.  Yes.
35: 25   Q.  And do you tell them today about, the
36: 1        patients, about cardiovascular risk?
36: 2    A.  Pretty many of them know, but I do.

**Re: 35:8-36:2**
**Pltf Obj:**
Relevance; 403

**Re: 35:8-36:2**
**Def Resp:**
Relevant to establish
doctor's practices
concerning information
provided to patients
when prescribing
Cox-2s

---

36:3   -   36:17   Grefer, Michael (Discovery) 2006-06-29          00:00:48
36: 3    Q.  Is what you tell them much different
36: 4        than what you used to tell them?
36: 5    A.  Back when I was really unaware that
36: 6        there was this significant difference in cardiovascu-

**Re: 36:5-7**
**Def Obj:**

| | Objections | Responses |
|---|---|---|

Non-responsive; 403

*overrule*

|   |   |   |
|---|---|---|
| 36: 7 | lar problems with all the NSAIDs, basically I did | |
| 36: 8 | tell them that the drugs were similar to the other | |
| 36: 9 | NSAIDs but that hopefully this would not cause as | |
| 36: 10 | much gastrointestinal problem. | |
| 36: 11 | Q.  And would you tell them that -- you | |
| 36: 12 | know, that one risk was cardiovascular effects? | |
| 36: 13 | A.  Back then I would say that that prob- | |
| 36: 14 | ably was not one of my major things.  I would tell | |
| 36: 15 | them more about gastrointestinal.  And this is, | |
| 36: 16 | again, before the knowledge came out that it was that | |
| 36: 17 | significant a problem. | |

**91    36:18      -  36:22    Grefer, Michael (Discovery) 2006-06-29                     00:00:08**

| 36: 18 | Q.  All right.  Were you familiar with |
| 36: 19 | the -- the VIGOR study that -- |
| 36: 20 | A.  I was. |
| 36: 21 | Q.  -- that Merck did? |
| 36: 22 | A.  I was. |

**92    36:23      -  37:21    Grefer, Michael (Discovery) 2006-06-29                     00:01:19**

| 36: 23 | Q.  And when the results of that came out, |
| 36: 24 | was that when you started learning more about the |
| 36: 25 | potential for cardiovascular risks? |
| 37: 1 | MR. WRIGHT:  Object to the form. |
| 37: 2 | A.  Yeah.  I -- I think that the VIGOR |
| 37: 3 | study -- at least the information that I was getting |
| 37: 4 | from the VIGOR study was directed primarily at the |
| 37: 5 | very, very beginning, and not even at the beginning, |
| 37: 6 | even the later stages of the -- of -- of the |
| 37: 7 | prescribing, was related to the GI side effects, and |
| 37: 8 | basically that's what I was commonly informed about. |
| 37: 9 | Q.  All right.  But the VIGOR study also |
| 37: 10 | reflected a -- a -- a -- a difference in the number |
| 37: 11 | of cardiovascular events between Vioxx and naproxen? |
| 37: 12 | A.  Yes, but it was -- in -- in -- in the |
| 37: 13 | portions that I read, it wasn't a major difference. |
| 37: 14 | Q.  But you were aware of that? |
| 37: 15 | A.  I were -- I was aware of that, but it |
| 37: 16 | did not seem to be a significant difference over |
| 37: 17 | naproxen until the study and the clinical trials were |
| 37: 18 | over, and then it became more apparent with the later |
| 37: 19 | studies. |
| 37: 20 | Q.  Okay. |
| 37: 21 | A.  That was my understanding. |

*Sustained*

**93    38:23      -  39:1     Grefer, Michael (Discovery) 2006-06-29                     00:00:15**

| 38: 23 | Q.  Are -- are you aware that the FDA has |
| 38: 24 | come to the conclusion at this point in time, and |
| 38: 25 | this is at least about a year ago, that -- that all |
| 39: 1 | COX-2s are in the same cardiovascular risk class? |

Re: 38:23-39:6
**Pltf Obj:**
Assumes facts not in
evidence; misleading;
403; relevance

**94    39:3       -  39:6     Grefer, Michael (Discovery) 2006-06-29                     00:00:15**

| 39: 3 | A.  I think you meant all NSAIDs rather |
| 39: 4 | than all COX-2s.  There's only one COX-2.  But, yes, |
| 39: 5 | I -- I am aware of that, that all NSAIDs produce and |
| 39: 6 | represent some form of -- of a cardiovascular risk. |

**95    39:20      -  40:3     Grefer, Michael (Discovery) 2006-06-29                     00:00:35**

| 39: 20 | A.  Well, no.  You can't prescribe Vioxx. |
| 39: 21 | You can't prescribe Bextra.  And that might be for a |
| 39: 22 | different skin lesion type of situation. |
| 39: 23 | So, yes, there's obviously a problem |
| 39: 24 | with the different COX-2s, because Celebrex is back |
| 39: 25 | on the market and the other ones aren't, and so, you |
| 40: 1 | know, there -- I -- I don't even know why we need to |
| 40: 2 | talk about the other two COX-2s at today's date, |
| 40: 3 | because I can't prescribe them to begin with. |

Re: 39:20-40:3
**Def Obj:**
Improper designation -
answer without a
question; witness
speculating; 403

**96    41:1       -  42:11    Grefer, Michael (Discovery) 2006-06-29                     00:01:40**

| | Objections | Responses |
|---|---|---|

41: 1    Q.   What type of pain did you prescribe
41: 2       Vioxx for?
41: 3    A.   General arthritic and musculoskeletal
41: 4       pain.
41: 5    Q.   Did it offer benefits to patients?
41: 6    A.   Yes, it did.
41: 7    Q.   Did you find it to be an effective
41: 8       medication?
41: 9    A.   Yes, I did.
41: 10   Q.   Now, it's my understanding from your
41: 11       records that you first prescribed Vioxx to Mr. Smith
41: 12       in, I believe it's, September of 2002.
41: 13   A.   I prescribed it on October the 2nd of
41: 14       2002.
41: 15   Q.   Excuse me.  October the 2nd?
41: 16   A.   Yes, sir.
41: 17   Q.   2002?
41: 18   A.   Uh-huh.
41: 19   Q.   And at that point in time what medi-
41: 20       cation was he on?
41: 21   A.   He was on diclofenac.
41: 22   Q.   Okay.  And --
41: 23   A.   And allopurinol.
41: 24   Q.   Okay.  And at that point in time why
41: 25       make a change to Vioxx?
42: 1    A.   Because he wasn't getting the response
42: 2       that I would have liked from that other medication,
42: 3       and so I told him to stop taking the diclofenac and
42: 4       let's try the Vioxx, because, frankly, I had had
42: 5       success with it.
42: 6    Q.   And when you say you had had success
42: 7       with it, what do you mean?
42: 8    A.   Again, you know, different drugs
42: 9       affect different people in a different manner, and I
42: 10      had changed it from time to time from patient to
42: 11      patient, and it seemed to work better.

97   42:19    -   43:23   Grefer, Michael (Discovery) 2006-06-29       00:01:23

42: 19   Q.   I show you what's marked as Exhibit 2,
42: 20       and if you would just flip through that, I think that
42: 21       includes all the physician notes, essentially, in
42: 22       your medical file.
42: 23   A.   Yes, sir.
42: 24   Q.   And that includes visits to you as
42: 25       well as to Dr. Heis?
43: 1    A.   It does.
43: 2    Q.   And on the October 2 entry when you
43: 3       were seeing him for his right knee, that's when you
43: 4       switched him from diclofenac to Vioxx?
43: 5    A.   That's -- yes, sir.
43: 6    Q.   They -- now, it says in there you were
43: 7       going to give him 50 milligrams for four days.
43: 8    A.   Yes, sir.
43: 9    Q.   And what's the purpose of that?
43: 10   A.   Basically to load him up, to give him
43: 11       an extra amount to kind of give his -- his treatment
43: 12       a jump start kind of a thing.
43: 13   Q.   And then, after four days, you were
43: 14       switching him to 25 milligrams?
43: 15   A.   Correct.
43: 16   Q.   And why is that?
43: 17   A.   Because that was my usual starting
43: 18       maintenance dose.
43: 19   Q.   And that was within the prescribing
43: 20       instructions from the -- from the company?
43: 21   A.   Yes, sir.
43: 22   Q.   Let me also show you a copy of the
43: 23       prescription record from your chart.

**Objections:**
Re: 41:1-41:6
Pltf Obj:
Cumulative

**Responses:**
Re: 41:1-41:6
Def Resp:
Appropriate background
for questions that follow

Overruled

|  |  | Objections | Responses |

98   44:3      -   44:3    Grefer, Michael (Discovery) 2006-06-29                          00:00:01
        44: 3        A.  Okay.

99   44:7      -   46:4    Grefer, Michael (Discovery) 2006-06-29                          00:01:37
        44: 7        Q.  And can you identify that for us?
        44: 8        A.  Yes.  It's the page in my chart that
        44: 9            has the various communications to the patients, to
        44: 10           the -- what -- what we've done.  It's kind of a
        44: 11           running office kind of history.
        44: 12       Q.  And is this where you put prescrip-
        44: 13           tions?
        44: 14       A.  Yes, sir.
        44: 15       Q.  And on this Exhibit 3 you also -- you
        44: 16           put down the prescriptions for Vioxx?
        44: 17       A.  Yes.
        44: 18       Q.  You also noted on 10/2 that samples
        44: 19           were given.
        44: 20       A.  Yes.
        44: 21       Q.  Can you tell us what it says about
        44: 22           samples?
        44: 23       A.  It says "Samples Vioxx 50 milligrams,
        44: 24           Samples Vioxx 25 milligrams."
        44: 25       Q.  And then what does it say below that
        45: 1            about the prescriptions?
        45: 2        A.  It says a prescription for Vioxx 25
        45: 3            milligrams, 30 of them, one qd, with one refill.
        45: 4        Q.  So --
        45: 5        A.  One daily qd.  That's what that means.
        45: 6        Q.  So -- so you would have given him --
        45: 7            since you were giving him a four-day supply of 50
        45: 8            milligram, I assume you would have given him four
        45: 9            tablets?
        45: 10       A.  Yes, sir.
        45: 11       Q.  Do you recall what kind of packs they
        45: 12           were in?
        45: 13       A.  I think they were in those blister
        45: 14           packs.  And as I recall, they were usually two per
        45: 15           blister pack.
        45: 16       Q.  So you would have given him -- if that
        45: 17           was the case, you would have given him two blister
        45: 18           packs at two pills each?
        45: 19       A.  Usually, yes, sir.
        45: 20       Q.  Okay.  And you wouldn't have given him
        45: 21           any more than 50 milligram of that?
        45: 22       A.  No, sir.
        45: 23       Q.  Okay.  You also noted in the record
        45: 24           that some samples of 25-milligram Vioxx were given.
        45: 25       A.  Yes.
        46: 1        Q.  And was that consistent with your
        46: 2            practice of giving him time to test the drug a little
        46: 3            bit and have time to go get a prescription filled?
        46: 4        A.  Yes.

100  46:6      -   46:8    Grefer, Michael (Discovery) 2006-06-29                          00:00:05   Re: 46:6-46:17      Re: 46:6-46:17
        46: 6        Q.  Would you -- generally, would this                                            Pltf Obj:           Def Resp:
        46: 7            generally have been, you know, less than a week's                             Speculation; cumulative   Proper testimony
        46: 8            supply?                                                                                           concerning general
                                                                                                                          practice; not cumulative
101  46:10     -   46:12   Grefer, Michael (Discovery) 2006-06-29                          00:00:06                       as it relates specifically
        46: 10       A.  Usually.  Usually, yes, sir.                                                                      to Plaintiff
        46: 11       Q.  If you'd given more than that, would
        46: 12           that have been unusual?

     46:14     -   47:12   Grefer, Michael (Discovery) 2006-06-29                          00:01:00
        46: 14       A.  Well, actually, what I usually do is I
        46: 15           go over and I -- and I grab them some, so -- but it's
        46: 16           usually less than four or five packs.  But it would
        46: 17           have been unusual had I given him a lot, yes, sir.

| | Objections | Responses |
|---|---|---|

```
46: 18   Q.  And do you recall how these came,
46: 19       these samples, the 25 milligram?
46: 20   A.  I think they were in the two blister
46: 21       packs, also.
46: 22   Q.  Okay.  If you'd go ahead and just look
46: 23       down Exhibit Number 3, and can you tell us when else
46: 24       Vioxx was prescribed or samples given, at least from
46: 25       this record?
47: 1    A.  It looks like Vioxx was prescribed on
47: 2        December the 9th of 2002.  30 were given with one a
47: 3        day, no refills.
47: 4    Q.  Okay.
47: 5    A.  And that's about it, unless I'm miss-
47: 6        ing any others.
47: 7    Q.  Okay.  And are any other samples
47: 8        noted?
47: 9    A.  No, sir.
47: 10   Q.  And it would have been the normal
47: 11       practice here that, if samples were given, that it
47: 12       would be noted in this record?
```

**103  47:14     - 48:4   Grefer, Michael (Discovery) 2006-06-29     00:00:39**

```
47: 14   A.  Most of the time, yes, sir.
47: 15   Q.  Okay.  Now, based upon Exhibit 3, it
47: 16       appears that he received a -- essentially on October
47: 17       2nd, a 60-day supply plus a handful of samples?
47: 18   A.  Correct.
47: 19   Q.  And then again on December 9th he
47: 20       received another 30-day supply?
47: 21   A.  Correct.
47: 22   Q.  With no refills?
47: 23   A.  Right.
47: 24   Q.  And that is, as far as you can -- that
47: 25       is your best evidence of how much he received?
48: 1    A.  Yes, sir.
48: 2    Q.  And you don't have any recollection
48: 3        outside of this?
48: 4    A.  No, sir.
```

| | Re: 47:14-47:18 | Re: 47:14-47:18 |
|---|---|---|
| | **Pltf Obj:** | **Def Resp:** |
| | Mischaracterizes | No mischaracterization; |
| | previous testimony | witness agrees with |
| | | characterization; |
| | | no form objection |
| | | to second question |
| | | so waived |

**104  48:16     - 49:24   Grefer, Michael (Discovery) 2006-06-29     00:01:54**

```
48: 16   Q.  Okay.  And it was ultimately learned
48: 17       he had some pretty significant damage in his knee
48: 18       that needed repair?
48: 19   A.  It was.
48: 20   Q.  And is that probably something that
48: 21       could have been treated with medicine as opposed to
48: 22       surgery?  The problem with --
48: 23   A.  I was -- well, no.  He -- he had some
48: 24       major ligament disruption, some meger (sic) -- major
48: 25       ligament problems, and it winds up that, while the
49: 1        medicines could have helped and could have been
49: 2        beneficial with the pain, the underlying problem was
49: 3        probably the more urgent thing that needed to be
49: 4        fixed.
49: 5    Q.  Okay.  And that's what ultimately
49: 6        happened?
49: 7    A.  It did.
49: 8    Q.  Now, by switching Mr. Smith from
49: 9        diclofenac to Vioxx, you were just making a change to
49: 10       see if a different drug would have a better result?
49: 11   A.  Correct.
49: 12   Q.  And that's something you would
49: 13       typically do with your patients that are on a -- on
49: 14       an anti-inflammatory but still having pain?
49: 15   A.  One that if -- if it doesn't seem to
49: 16       be doing the job, I try a different one.
49: 17   Q.  Now, I assume at the time that you
49: 18       referred Mr. Smith to Dr. Heis you did not feel like
49: 19       there was any need to switch to some other anti-
```

| | Objections | Responses |
|---|---|---|

49: 20   inflammatory medication to try and solve the problem?
49: 21  A.  That's correct.  I -- I like to give
49: 22   people a little bit of a time on a medication, and
49: 23   basically that's correct.  I didn't think I needed to
49: 24   switch it.

105  50:7 -  56:9 Grefer, Michael (Discovery) 2006-06-29    00:07:06
50: 7  Q.  Doctor, I'm handing you what is marked
50: 8   as Exhibit -- is that 4?
50: 9  A.  Yes, sir.
50: 10  Q.  And I'll represent to you that this is
50: 11   the -- the package insert, the label for Vioxx that
50: 12   was in effect from April 2002 on, and that was the
50: 13   label that was in effect at the time you prescribed
50: 14   Vioxx to Mr. Smith.
50: 15  A.  Okay.
50: 16  Q.  And this is the type of information
50: 17   that you would familiarize yourself with before you
50: 18   made prescription decisions?
50: 19  A.  I -- I -- I don't know if I read this
50: 20   particular one, but it's a type of information that I
50: 21   rely on, yes, sir.
50: 22  Q.  Okay.  Now, you became aware of the --
50: 23   the -- the VIGOR study back when -- back about the
50: 24   time it was published in the medical journals.  Would
50: 25   that be fair?
51: 1  A.  I guess I can tell you that I was made
51: 2   aware of the VIGOR study probably in -- I -- I don't
51: 3   know when it was published in the medical journals.
51: 4   As I say, I -- I didn't see it in the medical
51: 5   journals.  Again, I just saw the information.  And I
51: 6   probably became aware of that in probably early 2002,
51: 7   maybe 2003, something like that.  I think it was -- I
51: 8   think -- I think it was released, at least prelimi-
51: 9   nary data was.
51: 10   I -- I -- I don't know.  I don't know.
51: 11  Q.  Yeah.
51: 12  A.  But that's about the time that I
51: 13   became aware of it, in 2002, something of that
51: 14   nature.
51: 15  Q.  All right.  Well, it was first pub-
51: 16   lished in -- in the fall of 2002 -- 2000.
51: 17  A.  Yeah.  I thought it was late '99.  Or
51: 18   I guess late 2000.
51: 19  Q.  Yeah.
51: 20  A.  Okay.
51: 21  Q.  And so within a short period of time
51: 22   after that did you become familiar with it?
51: 23  A.  I can't tell you when I became
51: 24   familiar with it, yes, sir.
51: 25  Q.  But it's something you did learn
52: 1   about?
52: 2  A.  Something I did learn about, that's
52: 3   correct.
52: 4  Q.  And are you aware that -- that the
52: 5   Vioxx label was modified in response to data they
52: 6   learned in the VIGOR study?
52: 7  A.  I was not aware of that.
52: 8  Q.  Well, let me go through it.  At the
52: 9   time you prescribed Vioxx or any COX-2 to -- to your
52: 10   patients, one of the things you did pay attention to
52: 11   was whether that patient had any cardiovascular risk
52: 12   factors?
52: 13  A.  I did.
52: 14  Q.  And that was because you were aware
52: 15   that there was some increased risk of cardiovascular
52: 16   events on the COX-2s like Vioxx?
52: 17  A.  Yes.
52: 18  Q.  And let me show you the label that was

**Re: 51:15-51:20**
**Pltf Obj:**
Misleading; 403;
speculation

**Re: 51:15-51:20**
**Def Resp:**
Not misleading; no unfair
prejudice; witness is
providing best
recollection of event

**Re: 52:8-51:17**
**Pltf Obj:**
Misleading; vague as to
time; mischaracterizes
previous testimony; 403

**Re: 52:8-52:17**
**Def Resp:**
Question is
cabined in time by
Ex. 4 introduced at
50:7, which is the
April 2002 Vioxx label;
no mischaracterization
of previous testimony
as evidenced by
witness' response.

52: 19    being used at that time, and -- and refer to the --
52: 20    the procur-- the prescribing section. I'm just
52: 21    trying to make sure we kind of both on the same page
52: 22    of what you knew at the time you prescribed this --
52: 23  A.  Okay.
52: 24  Q.  -- to Mr. Smith.  On -- on the first
52: 25    page in the third column you'll notice that it talks
53: 1    about the -- the Vioxx GI outcomes research, the
53: 2    VIGOR study.
53: 3  A.  Uh-huh.
53: 4  Q.  And it -- it states that "The
53: 5    VIGOR study was designed to evaluate the comparative
53: 6    GI safety of Vioxx 50 milligrams once daily (twice
53: 7    the highest dose recommended for chronic use in OA
53: 8    and RA) versus naproxen 500 milligrams twice daily."
53: 9  A.  Yes.
53: 10  Q.  Correct?
53: 11  A.  Yes.
53: 12  Q.  And so at the beginning of it, it
53: 13    talks about it, it references that study.  Correct?
53: 14  A.  Yes.
53: 15  Q.  Okay.  Then right down below that we
53: 16    get to the -- it has a little section on the gastro-
53: 17    intestinal safety of VIGOR.
53: 18  A.  Yes.
53: 19  Q.  And it discusses the fact that "The
53: 20    VIGOR study showed a significant reduction in the
53: 21    risk of development of PUBs," which is perforations,
53: 22    ulcers and bleeds, "including complicated PUBs in
53: 23    patients taking Vioxx compared to naproxen."
53: 24  A.  Yes.
53: 25  Q.  Then right below that, the gastro-
54: 1    intestinal safety data, is a section on other safety
54: 2    findings, cardiovascular safety.
54: 3  A.  Yes.
54: 4  Q.  Correct?
54: 5  A.  Yes.
54: 6  Q.  And in -- in the label, this -- the --
54: 7    this April 2002 label, it goes on to reference the
54: 8    fact that the VIGOR study showed a higher incidence
54: 9    of adjudicated serious cardiovascular thrombotic
54: 10    events in patients treated with Vioxx, 50 milligrams
54: 11    daily, and it references Table 2.  Correct?
54: 12  A.  Yes.
54: 13  Q.  And this finding was largely due to a
54: 14    difference in the incident of myocardial infarctions
54: 15    between the groups, and it references Table 3.
54: 16  A.  Yes.
54: 17  Q.  And then it goes on to mention, it
54: 18    says, "Precautions:  Cardiovascular Effects," and it
54: 19    mentions the fact that some of the serious cardio-
54: 20    vascular events that occurred included a myocardial
54: 21    infarctions.
54: 22  A.  Yes.
54: 23  Q.  Okay.  And then you have a Table 2
54: 24    that summarizes data, and Table 3 on the -- Table 3
54: 25    that summarizes the serious cardiovascular thrombotic
55: 1    adverse events?
55: 2  A.  Yes.
55: 3  Q.  And -- and in that Table 3, one thing
55: 4    it does reference is that between Vioxx and naproxen,
55: 5    the 50 milligrams of Vioxx and naproxen, the -- the
55: 6    fatal MIs or sudden deaths from cardiovascular events
55: 7    were fairly even at five and four?
55: 8  A.  Yes.
55: 9  Q.  But the diff-- the difference was in
55: 10    the nonfatal heart attacks, whereas it references 18
55: 11    on Vioxx and four on naproxen?
55: 12  A.  Yes.

|  | Objections | Responses |
|---|---|---|

55: 13   Q.  So -- so back at the time that you
55: 14      were prescribing Vioxx to Mr. Smith, you were aware
55: 15      that, from the VIGOR study, that there was a
55: 16      difference in the rate of nonfatal MIs?
55: 17   A.  Yes.
55: 18   Q.  And because of that, you would
55: 19      typically check with your patient on their history of
55: 20      whether they had any cardiovascular risk factors?
55: 21   A.  Yes.
55: 22   Q.  And with Mr. Smith this is something
55: 23      you would have done?
55: 24   A.  I did.
55: 25   Q.  And from his -- from the information
56: 1      he provided, it appears to me from your records that
56: 2      it did not indicate any cardiovascular risk factors?
56: 3   A.  That's correct.
56: 4   Q.  And that based upon the labeling
56: 5      information that you knew at that time, if there had
56: 6      been cardiovascular risk factors, then you would have
56: 7      had -- possibly you would have evaluated that -- you
56: 8      would have taken that into account when making the
56: 9      decision on what to prescribe him?

**Re: 56:4-56:12**
**Pltf Obj:**
Speculation

**Re: 56:4-56:12**
**Def Resp:**
Witness is capable
of determining and
testifying about what
factors he does
considered in treating his
patient.

106  56:11    -  60:19   Grefer, Michael (Discovery) 2006-06-29      00:04:12
56: 11   A.  Well, I take everything into account,
56: 12      but yes, sir, that's right.
56: 13   Q.  All right.  Now, back on page two of
56: 14      that label that was in effect back at that time
56: 15      you'll see on page two in the second column there's
56: 16      also a note that it's -- and it's bolded.  It says
56: 17      "Because of its lack of platelet effects, Vioxx is
56: 18      not a substitute for aspirin for cardiovascular
56: 19      prophylaxis."  Do you see that?
56: 20   A.  Yes.
56: 21   Q.  And was that something you understood
56: 22      and knew?
56: 23   A.  Yes.
56: 24   Q.  Okay.  Then this label also went on,
56: 25      in the third column there, to the precautions
57: 1      section.  Correct?
57: 2   A.  Yes.
57: 3   Q.  Okay.  And the -- right after the
57: 4      first paragraph under Precautions, it talks about
57: 5      cardiovascular effects?
57: 6   A.  Yes.
57: 7   Q.  And this is the type of information
57: 8      you would have familiarized yourself with before
57: 9      prescribing to Mr. Smith?
57: 10   A.  Yes.
57: 11   Q.  And in that section it says that this
57: 12      "information should be taken into consideration and
57: 13      caution" should -- "should be exercised when Vioxx is
57: 14      used in patients with a medical history of ischemic
57: 15      heart disease"?
57: 16   A.  That's what it says.
57: 17   Q.  And that is something you knew back at
57: 18      that time?
57: 19   A.  Yes.
57: 20   Q.  And that is something you would have
57: 21      considered for Mr. Smith before prescribing it to
57: 22      him?
57: 23   A.  Yes.
57: 24   Q.  And based upon your history with him,
57: 25      there was no history of ischemic heart disease?
58: 1   A.  Correct.
58: 2   Q.  Then it goes on right after that and
58: 3      it talks about VIGOR again, the VIGOR study, does it
58: 4      not?
58: 5   A.  Now, where are you talking about?

|  | Objections | Responses |
|--|--|--|

58: 6  Q.  That third column: Cardiovascular
58: 7      Effects.
58: 8  A.  VIGOR, yes.
58: 9  Q.  And it talks about the fact that the
58: 10     way that it was -- that it was done, the number of
58: 11     patients in the VIGOR study.  Correct?
58: 12 A.  It says -- it says "See Clinical
58: 13     Studies, Special Studies, VIGOR, Other Safety
58: 14     Findings:  Cardiovascular Safety."
58: 15 Q.  All right.  Yeah.  Let me -- right up
58: 16     there at the top right after it talks about this
58: 17     should be taken into consideration --
58: 18 A.  Yes.
58: 19 Q.  -- as a matter of fact it reads "In
58: 20     VIGOR" --
58: 21 A.  Yes.
58: 22 Q.  -- "a study" --
58: 23 A.  Yes.
58: 24 Q.  -- of "8,076 patients" --
58: 25 A.  Yes.
59: 1  Q.  -- "with a median duration of exposure
59: 2      of nine months" --
59: 3  A.  Yes.
59: 4  Q.  -- "the risk of developing a serious
59: 5      cardiovascular thrombotic event was significantly
59: 6      higher in patients treated with Vioxx 50 milligrams
59: 7      once daily" --
59: 8  A.  Correct.
59: 9  Q.  -- "as compared to patients treated
59: 10     with naproxen 500 milligrams twice daily"?
59: 11 A.  Yes.
59: 12 Q.  And then it goes on to say that "in
59: 13     VIGOR," mortality -- "mortality due to cardiovascular
59: 14     thrombotic events (seven versus six) was similar
59: 15     between the treatment groups."
59: 16 A.  Yes.
59: 17 Q.  Correct?
59: 18 A.  Uh-huh.
59: 19 Q.  Then if you'll go down after Cardio-
59: 20     vascular Safety, just keep going down in that same
59: 21     paragraph, the next to the last sentence says "The
59: 22     significance of the cardiovascular findings from
59: 23     these three studies," and it references VIGOR and two
59: 24     previous placebo-controlled studies, the significance
59: 25     from these is unknown.
60: 1  A.  Correct.
60: 2  Q.  And then it goes on to mention again
60: 3      about the fact that Vioxx is not a substitute for
60: 4      aspirin?
60: 5  A.  Right.
60: 6  Q.  And which is -- and all this informa-
60: 7      tion is information that you knew back at the time
60: 8      that you prescribed to Mr. Smith?
60: 9  A.  Yes.
60: 10 Q.  There is also -- and I won't go
60: 11     through it -- through it all.  There's -- there's
60: 12     other mention about cardiovascular risks including,
60: 13     under the adverse reaction section, mentioning that
60: 14     certain events had been reported, including
60: 15     myocardial infarctions of people taking Vioxx.
60: 16 A.  Yes.
60: 17 Q.  And that's something you were familiar
60: 18     with back at the time you prescribed it to Mr. Smith?
60: 19 A.  Yes.

107  64:4    -   64:9    Grefer, Michael (Discovery) 2006-06-29        00:00:22
64: 4  Q.  Now, at your first visit with Mr.
64: 5      Smith you would have taken a patient history.
64: 6      Correct?

Objections                Responses

```
64: 7      A.  I did.
64: 8          MR. SKIDMORE:  And let me find it.  I
64: 9          had it right here.

64:19   -   67:10   Grefer, Michael (Discovery) 2006-06-29          00:03:25
64: 19     Q.  And can you tell the jury what that
64: 20         is?
64: 21     A.  Yes.  It is a history form and a -- a
64: 22         past history and family history form that was --
64: 23         that -- that was filled out by Mr. Smith.
64: 24     Q.  Okay.  And from review of that form,
64: 25         does it have sections where you can determine if a --
65: 1          a person has, at least to some degree, has some
65: 2          cardiovascular risk factors?
65: 3      A.  Yes.
65: 4      Q.  And can you tell us what those are and
65: 5          what Mr. Smith's response was?
65: 6      A.  Well, we asked about had he ever had
65: 7          any particular injuries of significance, and the only
65: 8          thing that he said yes is that he had joint pain,
65: 9          joint swelling, and he was in good general health,
65: 10         and he did have gout.
65: 11         It did specifically ask was there any
65: 12         family history of any high blood pressure, diabetes,
65: 13         cancer, arthritis, heart disease, lung disease or
65: 14         infections, and he replied no.
65: 15     Q.  Okay.  And the medical history is
65: 16         important for you in caring for a patient, that the
65: 17         patient tell you, give you their best information so
65: 18         that you can factor that in to your diagnosis and
65: 19         treatment?
65: 20     A.  Yes, sir.
65: 21     Q.  And -- and the medical history can be
65: 22         important for your prescribing decisions?
65: 23     A.  Yes.
65: 24     Q.  And based upon that you -- in your
65: 25         examination of Mr. Smith I assume you came to the
66: 1          conclusion that he was not at risk or at any -- any
66: 2          increased risk for any cardiovascular event?
66: 3      A.  I was unaware of any.
66: 4      Q.  Okay.  Now, based upon the label that
66: 5          we went over just a little bit ago, does that help --
66: 6          help refresh your recollection back at that time
66: 7          period of what you might have told a patient like Mr.
66: 8          Smith about at the time you prescribed Vioxx?
66: 9      A.  I don't think it makes any changes of
66: 10         what I would have told him, no, sir.
66: 11     Q.  Okay.  And you don't have a specific
66: 12         recollection of what you told him?
66: 13     A.  I don't have a specific recollection
66: 14         of what I told him, no, sir.
66: 15     Q.  But generally what would you have told
66: 16         him about cardiovascular risk, if anything?
66: 17     A.  Generally I probably would have said
66: 18         that there was no significant evidence that there was
66: 19         any particular difference in the medicine that he was
66: 20         taking, the diclofenac, and the Vioxx that I was
66: 21         aware of that would make me -- make any reasons not
66: 22         to prescribe it for him.
66: 23     Q.  Would you have mentioned anything
66: 24         about cardiovascular?
66: 25     A.  Again, probably not, because the
67: 1          information, as it says in the package insert, was
67: 2          unclear, and it was uncertain what the significance
67: 3          was.
67: 4      Q.  Okay.  Now, you -- were well aware
67: 5          of the fact of the results from VIGOR?
67: 6      A.  I was well aware of the results from
67: 7          VIGOR.
```

|  |  | Objections | Responses |
|---|---|---|---|

67: 8   Q.  But the conclusion in there, in the --
67: 9       in the label was that there was -- that the -- and
67: 10      let me pull the exact language up real quick.

**67:21   - 68:16   Grefer, Michael (Discovery) 2006-06-29       00:00:55**
67: 21   Q.  It was on -- flip back to after it
67: 22       talks about VIGOR it goes on to say --
67: 23       And we're talking about under Cardio-
67: 24       vascular Effects.
67: 25   A.  Uh-huh.
68: 1   Q.  -- it talks about the fact that VIGOR
68: 2       found a -- a -- and I'm on column three on page two.
68: 3   A.  Yeah.
68: 4   Q.  It talks about VIGOR found a signif--
68: 5       significantly higher number of serious cardio-
68: 6       vascular thrombotic events than naproxen.  Then it
68: 7       went on to mention the two placebo-controlled trials.
68: 8       Correct?
68: 9   A.  Right.
68: 10   Q.  And it said the -- it goes on to say
68: 11       "The significance of the cardiovascular findings from
68: 12       these three studies is unknown."
68: 13   A.  Correct.
68: 14   Q.  And that's what you were referring to?
68: 15   A.  That's correct, that's what I was
68: 16       referring to.

**110  69:3   - 69:6   Grefer, Michael (Discovery) 2006-06-29       00:00:09**
69: 3   Q.  All right.  And -- and based upon that
69: 4       information, you -- you had to make a risk benefit
69: 5       analysis for your patient when you prescribed it?
69: 6   A.  Correct.

**69:15   - 69:19   Grefer, Michael (Discovery) 2006-06-29       00:00:26**
69: 15   Q.  All right.  Based on the information
69: 16       that you had available to you in the label that we
69: 17       just read over, you felt comfortable with your risk
69: 18       benefit analysis of prescribing Vioxx to Mr. Smith?
69: 19   A.  Yes.

**112  69:22   - 70:13   Grefer, Michael (Discovery) 2006-06-29       00:00:36**
69: 22   Q.  One -- one thing I wanted to mention,
69: 23       and -- and I don't know if it was important to you
69: 24       back at that time, that this VIGOR study was of 50
69: 25       milligrams of Vioxx.  Correct?
70: 1   A.  I -- I -- I knew that, yes, sir.
70: 2   Q.  And Mr. Smith was only on 50 milli-
70: 3       grams for four days?
70: 4   A.  Correct.
70: 5   Q.  The rest of the time he was on 25
70: 6       milligrams?
70: 7   A.  Correct.
70: 8   Q.  And also was a study involving
70: 9       rheumatoid arthritis patients?
70: 10   A.  That's correct.
70: 11   Q.  And Mr. Smith, as far as you knew, did
70: 12       not have rheumatoid arthritis?
70: 13   A.  Correct.

**113  70:14   - 72:22   Grefer, Michael (Discovery) 2006-06-29       00:03:03**
70: 14   Q.  I assume, since you referred Mr. Smith
70: 15       on for -- to Dr. Heis for surgery, you have not seen
70: 16       him again?
70: 17   A.  Not that I recall.
70: 18   Q.  Or, as far as you know, spoken with
70: 19       him again?
70: 20   A.  Correct.
70: 21   Q.  And I assume you're not here to give
70: 22       any opinion as to whether Mr. Smith's use of Vioxx

Re: 70:21-70:24       Re: 70:21-70:24
Pltf Obj:       Def Resp:

| | | Objections | Responses |
|---|---|---|---|
| 70: 23 | caused or contributed in any way to his heart attack? | Outside the scope of direct; 403; relevance | Dr. Grefer is on defendant's witness list so defendant is not limited to scope of direct; question is proper in any event; no unfair prejudice; relevant to establish witness is not offering an opinion on causation |
| 70: 24 | A.  That's correct. | | |
| 70: 25 | Q.  I want to just briefly touch with you | | |
| 71: 1 | on Merck professional representatives, contact with | | |
| 71: 2 | them. | | |
| 71: 3 | A.  Okay. | | |
| 71: 4 | Q.  Do you have a specific recollection of | | |
| 71: 5 | any visit with a Merck professional representative | | |
| 71: 6 | about Vioxx? | | |
| 71: 7 | A.  Not a specific one.  There were | | |
| 71: 8 | numerous ones. | | |
| 71: 9 | Q.  Okay. | | |
| 71: 10 | A.  Numerous ones. | | |
| 71: 11 | Q.  Okay.  And can you tell me – I -- I'm | | |
| 71: 12 | guessing, as busy as your practice is and as many | | |
| 71: 13 | pharmaceutical reps as you see, you're not going to | | |
| 71: 14 | remember dates or exact time periods? | | |
| 71: 15 | A.  That's correct. | | |
| 71: 16 | Q.  Can you tell me generally what you | | |
| 71: 17 | recall about your discussions with Merck sales reps. | | |
| 71: 18 | And, you know, let me know if you have specific | | |
| 71: 19 | recollections. | | |
| 71: 20 | A.  In -- in general, my recollections | | |
| 71: 21 | were that they would come up to me and they would say | | |
| 71: 22 | that they knew that I was a very heavy prescriber of | | |
| 71: 23 | Celebrex, that they wished I would consider prescrib- | | |
| 71: 24 | ing Vioxx, and we would go over these exact things | | |
| 71: 25 | that we had just talked about.  And they would offer | | |
| 72: 1 | information and some kinds of explanations of what | | |
| 72: 2 | their handle on the situation was. | | |
| 72: 3 | And they would usually ask me to sign, | | |
| 72: 4 | whether it would be a computerized signature type of | | |
| 72: 5 | thing that's on a data input type of thing or whether | | |
| 72: 6 | it's a piece of paper or whatever.  And my feeling | | |
| 72: 7 | was is that I thought the reason I signed that was | | |
| 72: 8 | that -- so that they would leave us samples that I | | |
| 72: 9 | could disburse to my patients.  And they would | | |
| 72: 10 | usually leave me a paper or two that I would read at | | |
| 72: 11 | my convenience later on in the day. | | |
| 72: 12 | Q.  Okay.  Do you recall any specific dis- | | |
| 72: 13 | cussions about either efficacy or safety of Vioxx? | | |
| 72: 14 | A.  I do. | | |
| 72: 15 | Q.  And what were those? | | |
| 72: 16 | A.  Well, always Vioxx, in their opinion, | | |
| 72: 17 | was safer for the gastrointestinal tract.  And we | | |
| 72: 18 | would discuss the fact about the cardiovascular | | |
| 72: 19 | problems, and several times -- and I can't tell you | | |
| 72: 20 | particular times, but several times they'd say, well, | | |
| 72: 21 | yes, there were more incidences of myocardial | | |
| 72: 22 | infarctions. | | |

| | | | |
|---|---|---|---|
| 114  72:23     - 73:18 | Grefer, Michael (Discovery) 2006-06-29 | 00:00:54 | |
| 72: 23 | Q.  You're talking about VIGOR? | | |
| 72: 24 | A.  VIG-- I'm -- well, I'm talking about | | |
| 72: 25 | in general.  You know, I'm not talking about VIGOR. | | |
| 73: 1 | I think that they would -- as I say, I probably read | | |
| 73: 2 | that VIGOR label. | | |
| 73: 3 | Which you say is a label.  It's four | | |
| 73: 4 | pages of stuff that I have to get way up here (demon- | | |
| 73: 5 | strating) to read, and it's almost impossible to | | |
| 73: 6 | digest all of that. | | |
| 73: 7 | But they would always say that the | | |
| 73: 8 | tests, the VIGOR tests, were complicated because of | | |
| 73: 9 | the fact that Naprosyn might have produced its own | | |
| 73: 10 | cardiovascular health effect and these people were | | |
| 73: 11 | not allowed to take their aspirins, and so it really | | |
| 73: 12 | wasn't a good reflection of what happened in the | | |
| 73: 13 | situation and they needed to do more studies, but | | |
| 73: 14 | that their opinion, and their opinion from their | | |

|  | Objections | Responses |
|---|---|---|

73: 15    company, was that it was a safe drug and it really
73: 16    shouldn't have any effect on my prescribing it as far
73: 17    as cardiovascular status goes.  That's what I recall,
73: 18    and that was drummed into my head repeatedly.

**115  73:25  -  74:3**  Grefer, Michael (Discovery) 2006-06-29      00:00:09
73: 25    Q.  Okay.  The -- the sales reps that
74: 1    would call upon you, would they provide you litera-
74: 2    ture, too?
74: 3    A.  Yes, they would.

**116  74:4  -  74:13**  Grefer, Michael (Discovery) 2006-06-29      00:00:25
74: 4    Q.  Now, did you usually have meetings
74: 5    with sales reps, or are these brief conversations in
74: 6    the hall?
74: 7    A.  These were passing in the hall.
74: 8    Q.  I -- I would assume, with your busy
74: 9    practice and the number of -- of professional sales
74: 10    representatives from various pharmaceutical companies
74: 11    that would call upon you, that you didn't have a lot
74: 12    of time to spend talking to them each day?
74: 13    A.  That's correct.

**117  74:14  -  75:10**  Grefer, Michael (Discovery) 2006-06-29      00:01:12
74: 14    Q.  So essentially you're saying, in your
74: 15    brief conversations with some Merck sales reps over
74: 16    time, you were aware of the cardiovascular events
74: 17    that had been reported but, based upon VIGOR, you
74: 18    felt that there was -- there was still work to be
74: 19    done on figuring that out?
74: 20    MR. WRIGHT:  Object to the form.
74: 21    A.  I -- I was aware that were -- that
74: 22    there were some cardiovascular issues with all the
74: 23    COX-2s and basically that their feeling was is that
74: 24    the studies that had to rely upon were flawed
74: 25    and that they did not believe that further
75: 1    evaluations would prove that to be true if you added
75: 2    in the aspirin and added in the secondary effects.
75: 3    And basically those were just conver-
75: 4    sations.  They would ask for my signature.  I would
75: 5    give them my signature, and then they would go on
75: 6    their way.  And I would take the literature and put
75: 7    it in this very room -- that was not here then but it
75: 8    was in my other office -- and then come back at the
75: 9    end of the day and complete my charts and then review
75: 10    that records.

**118  75:11  -  75:14**  Grefer, Michael (Discovery) 2006-06-29      00:00:12
75: 11    Q.  Were you aware back at that time that
75: 12    there was scientific debate about whether Vioxx
75: 13    caused an increased risk of cardiovascular events or
75: 14    whether naproxen was cardioprotective?

**119  75:16  -  76:11**  Grefer, Michael (Discovery) 2006-06-29      00:00:55
75: 16    A.  Absolutely.  That -- that -- that was
75: 17    the whole -- that was their main point, is that these
75: 18    people were not on a cardiovascular protective drug,
75: 19    which was either the naproxen, if indeed, that turned
75: 20    out to be true, or their aspirin.  And I don't
75: 21    believe that in the VIGOR case they included people
75: 22    on aspirin, and they didn't include people that had
75: 23    significant gastrointestinal problems, I don't
75: 24    believe.
75: 25    But yes.  And that was their mainstay
76: 1    and that was their main thing to me.
76: 2    Q.  All right.  And you were familiar with
76: 3    this scientific debate going on on this issue?
76: 4    A.  Certainly I was.  And I -- and I --
76: 5    and I had not seen anything that was definitive, and

|  | Objections | Responses |
|---|---|---|

76: 6    there was still questions in-- in-- involved in the
76: 7    situation.
76: 8    Q. So back at that time it was an open
76: 9    question about whether Vioxx was actually causing
76: 10    more heart attacks or whether naproxen was actually
76: 11    protecting people from heart attacks?

**120  76:13  -  77:7**  Grefer, Michael (Discovery) 2006-06-29     00:00:52

76: 13    A. Or if people took their aspirin with
76: 14    the Vioxx, they would have the protection also,
76: 15    that's correct.
76: 16    Q. Anything else you remember about any
76: 17    meetings or discussions with professional sales
76: 18    representatives back at that time?
76: 19    A. Nothing in particular, no, sir.
76: 20    Q. Were they courteous?
76: 21    A. They were courteous.
76: 22    Q. When you asked for information, did
76: 23    they get it to you?
76: 24    A. Yes, they did. When I asked for
76: 25    samples, they gave them to me.
77: 1    Q. Okay. On the sampling issue, very
77: 2    briefly, is sampling a good thing for a prac-- a
77: 3    physician's practice? Is that helpful?
77: 4    A. It is.
77: 5    Q. And do you consider that a good thing
77: 6    that pharmaceutical companies do: providing samples?
77: 7    A. Yes.

*overruled*

**121  78:6  -  82:2**  Grefer, Michael (Discovery) 2006-06-29     00:03:43

78: 6    Q. Doctor, I've handed you what's been
78: 7    marked as Exhibit -- is that 7?
78: 8    A. This is 7, yes, sir.
78: 9    Q. And this is a -- one of those informa-
78: 10    tional letters from Merck --
78: 11    A. Uh-huh.
78: 12    Q. -- that was addressed to you, dated
78: 13    June 5, 2002.
78: 14    A. Yes, sir.
78: 15    Q. Does this appear to be something you
78: 16    would have received and read?
78: 17    A. Probably.
78: 18    Q. In this letter dated June 5, 2002, it
78: 19    mentions that a -- a professional representative --
78: 20    Holly Merrell -- referred a request for information
78: 21    to them to get you a reprint of the VIGOR trial --
78: 22    A. Uh-huh.
78: 23    Q. -- study.
78: 24    A. Uh-huh.
78: 25    Q. Does that sound reasonable, something
79: 1    you might have asked for?
79: 2    A. Probably.
79: 3    Q. Then it talks about, in the second
79: 4    paragraph, about when it was published.
79: 5    A. Uh-huh.
79: 6    Q. And a little bit about it. And then
79: 7    about the fourth paragraph down it says, "The
79: 8    enclosed reprint of the VIGOR study should be
79: 9    reviewed." So they obviously -- it seems to me they
79: 10    enclosed a copy of it.
79: 11    A. I don't recall it, but it does -- but
79: 12    it does say that.
79: 13    Q. Right. And beneath that it talks
79: 14    about a post-publication update.
79: 15    A. Okay.
79: 16    Q. Do you see that?
79: 17    A. Uh-huh.
79: 18    Q. And it talks about in the original
79: 19    analysis of VIGOR they had a prespecified February

**Re: 78:6-81:5**
**Pltf Obj:**
Foundation; calls for an
improper expert medical
opinion outside
the scope of the
witness' treatment of Mr.
Smith; speculation;
hearsay

**Re: 78:6-81:5**
**Def Resp:**
Questions do not call
for expert opinion and
witness has personal
knowledge;
questions relate to letter
received by witness; not
hearsay, goes to notice

|  | Objections | Responses |
|---|---|---|

79: 20     2000 cutoff date for events.  Do you see that?

79: 21  A.  Uh-huh.

79: 22  Q.  And the rate of MIs, the myocardial

79: 23     infarctions, that were reported in the -- in the

79: 24     original study was .4 percent among the pa-- patients

79: 25     taking Vioxx?

80: 1  A.  Yes, sir.

80: 2  Q.  Do you see that?

80: 3  A.  Uh-huh.

80: 4  Q.  As you may recall, it was .1 percent

80: 5     with the -- with people taking -- the comparator

80: 6     drug.  Correct?

80: 7  A.  Uh-huh.  Yes.  I -- I -- I -- I think

80: 8     so.

80: 9  Q.  Because it was --

80: 10  A.  Naproxen.

80: 11  Q.  -- reported as four to one.

80: 12  A.  You're talking about the naproxen.

80: 13  Q.  Yes, sir, naproxen.  It was reported

80: 14     as four to one then?

80: 15  A.  Yes.

80: 16  Q.  It goes on to say "In the subsequent

80: 17     final analysis, which included all events reported

80: 18     after the February 2000 cutoff date, this rate was

80: 19     updated to .5 percent."

80: 20  A.  Yes.

80: 21  Q.  Do you see that?

80: 22  A.  Uh-huh.

80: 23  Q.  Is this information you -- you recall

80: 24     getting back at that time?

80: 25  A.  I -- I -- I don't recall it, no, sir.

81: 1  Q.  Do you know one way or the other

81: 2     whether you re-- you reviewed this back then?

81: 3  A.  No, I -- I don't recall reviewing it.

81: 4  Q.  Okay.

81: 5  A.  And I've been -- four years now.

81: 6  Q.  Is this information surprising to you

81: 7     at all?

81: 8  A.  No, not really.

81: 9  Q.  The fact that in VIGOR it originally

81: 10     reported a four to one or .4 percent MI rate of Vioxx

81: 11     compared to -- to .1 for naproxen and that, after all

81: 12     the events ran, it changed to .5 versus .1, would

81: 13     that have had any impact on your prescribing

81: 14     decisions back then?

81: 15  A.  I don't think so.

81: 16  Q.  And as a matter of fact, I think it

81: 17     has to do with three heart attacks, MIs, that came in

81: 18     after the cutoff date that were later reported?

81: 19  A.  I believe I've read that somewhere,

81: 20     yes, sir.

81: 21  Q.  And that there has been some contro-

81: 22     versy with the journal over that.  You've probably

81: 23     read about that.

81: 24  A.  I have.

81: 25  Q.  And would you agree that that likely

82: 1     would not have made any difference in your prescrib-

82: 2     ing decision back in October of 2002?

**122** 82:4    -   82:15     Grefer, Michael (Discovery) 2006-06-29     00:00:39

82: 4  A.  I really don't think it would have.

82: 5  Q.  There's a couple other things I wanted

82: 6     to cover.  One is, back at the time you prescribed to

82: 7     Mr. Smith if -- assume with me that -- that he was

82: 8     suffering from hypertension at that time.  Would that

82: 9     have impacted your prescribing decision?

82: 10     MR. WRIGHT:  Object to --

82: 11  A.  Probably not.

82: 12  Q.  If you had been told that he was --

**Re: 81:24-82:4**
Pltf Obj:
Speculation

**Re: 81:25-82:4**
Def Resp:
Question relates to Ex. 7 dated June 5, 2002, which predates prescribing decision. Witness had this information at time prescribed in Oct. 2002 so does not call for speculation

*Overruled* (handwritten)

**Re: 82:12-83:3**

**Re: 82:12-83:3**

| | | Objections | Responses |
|---|---|---|---|
| | | **Objections** | **Responses** |

82: 13     that he had a family history of cardiovascular
82: 14     disease, would that have impacted your prescribing
82: 15     decision --

**Pltf Obj:**
Assumes facts not in
evidence; incomplete
hypothetical; 403

**Def Resp:**
Plaintiff's
family history of
cardiovascular disease is
or will be in evidence;
not misleading or
prejudicial hypothetical

123  82:17  -  82:25  Grefer, Michael (Discovery) 2006-06-29    00:00:20
82: 17    Q.  -- of Vioxx?
82: 18    A.  I can't say with certainty, but it
82: 19     certainly would have made me less likely to prescribe
82: 20     it.
82: 21    Q.  And is that because, based upon the
82: 22     labeling information and what you knew about VIGOR,
82: 23     there was a little different risk benefit analysis
82: 24     for someone that did versus those that did not have a
82: 25     family history?

124  83:2  -  83:3  Grefer, Michael (Discovery) 2006-06-29    00:00:04
83: 2    A.  It -- it would have just raised some
83: 3     concerns for me, yes, sir.

125  83:11  -  83:14  Grefer, Michael (Discovery) 2006-06-29    00:00:11
83: 11    Q.  Okay.  If he reported to you back in
83: 12     October of 2002 that he suffered from dyslipidemia,
83: 13     would that have had any impact on your prescribing
83: 14     decision?

**Re: 83:11-83:23**
**Pltf Obj:**
Assumes facts not in
evidence; incomplete
hypothetical; 403

**Re: 83:11-83:23**
**Def Resp:**
Plaintiff's dyslipidemia
is or will be in evidence;
not misleading or
prejudicial hypothetical

126  83:16  -  83:21  Grefer, Michael (Discovery) 2006-06-29    00:00:14
83: 16    A.  I don't think so.  Again, you know, it
83: 17     would have had to have depended on the degree, what
83: 18     type of dyslipidemia, and basically I would have had
83: 19     to know a lot more information.
83: 20    Q.  But -- but you count on the patient to
83: 21     provide you that information?

127  83:23  -  83:23  Grefer, Michael (Discovery) 2006-06-29    00:00:05
83: 23    A.  I do.

128  84:3  -  85:12  Grefer, Michael (Discovery) 2006-06-29    00:01:20
84: 3    Q.  Let me show you what's marked as
84: 4     Exhibit 8 and tell you that this is a -- a memorandum
84: 5     from the FDA that was made public in -- on April 6,
84: 6     2005, and was their analysis of what to do regarding
84: 7     NSAIDs after a lengthy FDA advisory committee
84: 8     meeting.
84: 9     Were you familiar with that advisory
84: 10     committee meeting --
84: 11    A.  No, sir.
84: 12    Q.  -- that occurred in February of '05?
84: 13    A.  No, sir.
84: 14    Q.  I just want to point out a couple of
84: 15     things to you and see if you were aware of -- of
84: 16     these.  And I think you are, from -- from earlier
84: 17     testimony.
84: 18     On -- on page 1 they talk about the
84: 19     thorough review they did of the data --
84: 20    A.  Uh-huh.
84: 21    Q.  -- an FDA advisory committee meeting.
84: 22    A.  Uh-huh.
84: 23    Q.  I assume you have not done a thorough
84: 24     review of all the data on --
84: 25    A.  No, sir, I have --
85: 1    Q.  -- COX-2s?
85: 2    A.  -- I have not.
85: 3    Q.  You looked at the FDA and the -- and
85: 4     the company and the current research to provide you
85: 5     the information you need?
85: 6    A.  That's correct.
85: 7    Q.  You don't look at internal company
85: 8     documents ever, do you?
85: 9    A.  I never have, no, sir.

**Re: 84:3-85:12**
**Pltf Obj:**
Hearsay; foundation;
calls for an improper
expert medical opinion
outside the scope of
the witness' treatment
of Mr. Smith; 403
relevance; *Plaintiff
refers to his Motion in
Limine filed on this
issue*

**Re: 84:3-85:12**
**Def Resp:**
Document is admissible;
familiarity or awareness
of issues addressed
does not call for expert
opinion; relevant to
witness' understanding
of risks and alternatives;
see responses to
Plaintiff's MILs

*Sustained*

| | Objections | Responses |
|---|---|---|

85: 10   Q.   And that's not the type of information
85: 11        you base prescribing decisions on?
85: 12   A.   No, sir, not routinely.

129   85:13   -   86:4   Grefer, Michael (Discovery) 2006-06-29          00:00:48
85: 13   Q.   Okay. If you flip to page 3, the FDA
85: 14        memo talked to -- talks about the voluntary with-
85: 15        drawal of Vioxx from the market, under Background.
85: 16   A.   Okay.
85: 17   Q.   And then it says subsequent to that
85: 18        reports of additional data from controlled clinical
85: 19        trials became available.  And going on, it says
85: 20        this -- this new data prompted the agency to conduct
85: 21        a comprehensive review of the available data and to
85: 22        present the issue for review at a joint meeting of
85: 23        FDA's Arthritis, Drug Safety and Risk Management
85: 24        Advisory Committee on February 16th to 18th, 2005.
85: 25        Do you see that?
86: 1    A.   Yes.
86: 2    Q.   And were you familiar with that
86: 3         before?
86: 4    A.   No.

130   87:6   -   88:21   Grefer, Michael (Discovery) 2006-06-29          00:01:45
87: 6    Q.   On the front it says, on page 1 this
87: 7         FDA memo indicates that this group found that all the
87: 8         COX-2 selected NSAIDs were associated with an
87: 9         increased risk.  Do you see that?
87: 10   A.   I do.
87: 11   Q.   And that's information you are
87: 12        familiar with?
87: 13   A.   Yes.
87: 14   Q.   Then the second one is that the data
87: 15        from the long-term controlled clinical trials that
87: 16        have concluded -- included a comparison of COX-2
87: 17        selective and nonselective NSAIDs do not clearly
87: 18        demonstrate that the COX-2 selectives confer a
87: 19        greater risk of adverse CV events than nonselective
87: 20        NSAIDs.
87: 21   A.   That's what it says.
87: 22   Q.   And is that information you were
87: 23        familiar with?
87: 24   A.   Yes.
87: 25   Q.   If you'll go to page 2, the -- the
88: 1         second bullet point up at the top, this FDA memo
88: 2         mentions that "Pending the availability of additional
88: 3         long-term controlled clinical trial data, the"
88: 4         availabate (sic) -- "available data are best inter-
88: 5         preted as being consistent with a class effect of an
88: 6         increased... of serious adverse CV events for COX-2
88: 7         selective and nonselective NSAIDs."
88: 8    A.   Correct.
88: 9    Q.   Do you see that?
88: 10   A.   Yes.
88: 11   Q.   And is that something you were
88: 12        familiar with?
88: 13   A.   Yes.
88: 14   Q.   Then it goes on to say, "Short-term
88: 15        use of NSAIDs to relieve acute pain, particularly at
88: 16        low doses, does not appear to confer an increased
88: 17        risk of adverse CV events."
88: 18   A.   That's what it says.
88: 19   Q.   With one exception that didn't apply
88: 20        to Vioxx?
88: 21   A.   Correct.

131   89:23   -   91:7   Grefer, Michael (Discovery) 2006-06-29          00:01:50
89: 23   Q.   I want you to turn to page 8, if you
89: 24        could.

**Re: 87:6-88:21**
**Pltf Obj:**
Hearsay; foundation;
calls for an improper
expert medical opinion
outside the scope of
the witness' treatment
of Mr. Smith; 403
relevance; *Plaintiff
refers to his Motion in
Limine filed on this
issue*

**Re: 87:6-88:21**
**Def Resp:**
Familiarity or awareness
of issues addressed
does not call for expert
opinion; relevant to
witness' understanding
of risks and alternatives;
see responses to
Plaintiff's MILs

**Re: 89:23-91:11**
**Pltf Obj:**

**Re: 89:23-91:11**
**Def Resp:** Same

|  |  | Objections | Responses |
|---|---|---|---|

89: 25    A. Okay.

90: 1    Q. Under their analysis and conclusions,
90: 2      after all of the data they reviewed and all the work
90: 3      they did, they came to analysis and conclusions, and
90: 4      one of those is, the very last sentence, "It, there-
90: 5      fore, remains unclear to what extent the COX-2
90: 6      selectivity of an individual drug predicts the drug's
90: 7      potential for an increased... of adverse CV events
90: 8      compared to" the "drugs that are less COX-2 selec-
90: 9      tive."
90: 10    A. The last sentence where?
90: 11    Q. On page 8.
90: 12    A. The last sentence on page -- yes, sir.
90: 13      Okay. I've got you.
90: 14      Okay. Go ahead.
90: 15    Q. Is that information you -- you -- you
90: 16      know?
90: 17    A. I've -- I've -- I've been aware that
90: 18      that is the case, yes, sir.
90: 19    Q. That there's just not a -- there's not
90: 20      a scientific conclusion at this point in time?
90: 21    A. I don't think there ever has been a
90: 22      scientific conclusion.
90: 23    Q. And this is still subject to scien-
90: 24      tific debate?
90: 25    A. Yes, sir.
91: 1    Q. And as a matter of fact, they con-
91: 2      cluded, and you -- I think you know this, is that all
91: 3      NSAIDs, whether it's a COX-2 or those that are non-
91: 4      selective, have been on the market for many years,
91: 5      for purposes of -- of -- of prescribing and using
91: 6      now, they've asked physicians to assume that all
91: 7      carry the same risk?

*Objections column (89:25–91:7):* Hearsay; foundation; calls for an improper expert medical opinion outside the scope of the witness' treatment of Mr. Smith; 403 relevance; *Plaintiff refers to his Motion in Limine filed on this issue*

*Responses column:* response

*[handwritten: Overruled]*

**91:9  -  92:9**    Grefer, Michael (Discovery) 2006-06-29      00:01:40

91: 9    A. Basically they said that there are
91: 10      similar risks involved with all NSAIDs. That's my
91: 11      understanding.
91: 12    Q. Okay.
91: 13    A. That are available today.
91: 14    Q. On page 10, one last thing I wanted to
91: 15      mention to you, after all this research I wanted to
91: 16      mention this point on naproxen and see if you were
91: 17      familiar with that.
91: 18      You do understand that -- that since
91: 19      VIGOR there's been this scientific debate about
91: 20      whether naproxen is cardioprotective versus Vioxx,
91: 21      whether it causes heart attacks?
91: 22    A. Correct.
91: 23    Q. This FDA panel concluded right -- if
91: 24      you look at the middle of that bottom paragraph, "We
91: 25      also believe," and I'm quoting from it, "that it is
92: 1      not possible to conclude at this point that the COX-2
92: 2      selective drugs confer an increased risk over non-
92: 3      selective NSAIDs in chronic use." And then it goes
92: 4      on to say "Naproxyn may be an exception."
92: 5      Do you see that?
92: 6    A. Yes.
92: 7    Q. And is that something that you under-
92: 8      stand that that scientific debate is still out there?
92: 9    A. Yes.

*Objections column:* **Re: 91:12-92:9**
**Pltf Obj:**
Hearsay; foundation; calls for an improper expert medical opinion outside the scope of the witness' treatment of Mr. Smith; 403 relevance; *Plaintiff refers to his Motion in Limine filed on this issue*

*Responses column:* **Re: 91:12-92:9**
**Def Resp:** Same response

**133**   **93:12  -  93:12**    Grefer, Michael 2006-07-27      00:00:02
93: 12      BY MR. SKIDMORE:

*[handwritten: Overruled]*

**134**   **93:21  -  93:23**    Grefer, Michael 2006-07-27      00:00:11
93: 21    Q. But I want to visit with you a little
93: 22      bit about the sales representative calls.
93: 23    A. Uh-huh.

*Objections column:* **Re: 93:21-93:23**
**Def Obj:**
Sidebar

*Responses column:* **Re: 93:21-93:23**
**Pltf Resp:**
Statement is a signal

| | Objections | Responses |
|---|---|---|
| | | of new subject to help the jury |

**135  93:25  -  94:9**    Grefer, Michael 2006-07-27                                    00:00:26

93: 25
94: 1     Q.  Now, if you recall when we started your
94: 2         deposition earlier this month, now, he -- he talked
94: 3         with you about sales representatives' visits to your
94: 4         office and there was a little more of that today,
94: 5         correct?
          A.  Sure.
94: 6     Q.  And you have a general recollection of
94: 7         when Merck sales, professional sales representatives
94: 8         called upon you while Vioxx was on the market?
94: 9     A.  Yes.

**136  94:11  -  94:16**    Grefer, Michael 2006-07-27                                   00:00:10

94: 11    Q.  You don't have a specific recollection
94: 12        of any specific conversations with any -- any
94: 13        professional representatives?
94: 14    A.  No, sir.
94: 15    Q.  Now, it's pretty general?
94: 16    A.  It is.

**137  94:18  -  95:3**    Grefer, Michael 2006-07-27                                    00:00:25

94: 18    Q.  Now, at the time, as well as today, back
94: 19        at the time when Vioxx was on the market as well as
94: 20        today, there are a number of pharmaceutical company
94: 21        representatives that call upon your office every week?
94: 22    A.  Yes, sir.
94: 23    Q.  And probably all the major
94: 24        pharmaceutical companies, given the size of your
94: 25        practice, make stops by this office?
95: 1     A.  They do.
95: 2     Q.  That is their job?
95: 3     A.  Yes, sir.

**95:5  -  95:11**    Grefer, Michael 2006-07-27                                    00:00:15

95: 5     Q.  And in doing their job, they provide
95: 6         your office with samples?
95: 7     A.  Yes.
95: 8     Q.  And they provide you with valuable
95: 9         information and important information concerning drugs
95: 10        that you may have an interest in?
95: 11    A.  Yes.

**139  95:13  -  95:14**    Grefer, Michael 2006-07-27                                    00:00:04

95: 13    Q.  And you're not saying there's anything
95: 14        wrong with sales representatives coming by your office?

**140  95:16  -  95:23**    Grefer, Michael 2006-07-27                                    00:00:15

95: 16    A.  No, sir.
95: 17    Q.  That is helpful to your practice and to
95: 18        your patients?
95: 19    A.  It is.
95: 20    Q.  And the literature they leave and
95: 21        provide you with can be very helpful to you for drugs
95: 22        that you have an interest in?
95: 23    A.  Yes, sir.

**141  95:25  -  96:4**    Grefer, Michael 2006-07-27                                    00:00:15

95: 25    Q.  Now, following VIGOR, we -- we've
96: 1         discussed already at length your understanding of VIGOR
96: 2         back at that time, but following VIGOR, you had some
96: 3         brief conversations with some sales reps?
96: 4     A.  Yes.

**96:6  -  96:8**    Grefer, Michael 2006-07-27                                    00:00:05

96: 6     Q.  Typically, when you talk to sales reps
96: 7         it's in passing in the hallway; is it not?
96: 8     A.  Yes.

Objections          Responses

143  98:3    -  98:12   Grefer, Michael 2006-07-27                    00:00:22
         98: 3      Q.   Doctor, you typically don't have
         98: 4           sit-down conferences with sales representatives from
         98: 5           the pharmaceutical companies?
         98: 6      A.   I do not.
         98: 7      Q.   You simply do not have time for that?
         98: 8      A.   Correct.
         98: 9      Q.   And there are so many, from various
         98: 10          companies, that call on your office, it would be a huge
         98: 11          distraction from your practice?
         98: 12     A.   It's exactly -- that's exactly correct.

144  98:13   -  99:15   Grefer, Michael 2006-07-27                    00:01:07
         98: 13     Q.   Okay.  Now, Merck representatives
         98: 14          provided you written and some verbal information about
         98: 15          the VIGOR trial?
         98: 16     A.   They did.
         98: 17     Q.   And we went over before what you were
         98: 18          aware of from them and from the labeling, correct?
         98: 19     A.   Correct.
         98: 20     Q.   And you understood that following VIGOR
         98: 21          that the science wasn't clear about the reason for the
         98: 22          difference in myocardial -- nonfatal myocardial
         98: 23          infarctions between patients on Vioxx and those on
         98: 24          naproxen?
         98: 25     A.   That's correct.
         99: 1      Q.   Now, and it was well-known to you back
         99: 2           at that time that there was a significant difference in
         99: 3           the number of nonfatal MIs for people on Vioxx in VIGOR
         99: 4           versus those on placebo?
         99: 5      A.   Well, that was always the question.
         99: 6           There was a difference.  The question is is was it a
         99: 7           significant difference and was it because the studies
         99: 8           were not studying apples to oranges, and that was the
         99: 9           entire conflict that was going on there.
         99: 10     Q.   Right.  Right.  The scientific debate
         99: 11          was we had this difference in MIs in VIGOR, and what is
         99: 12          the cause of it?
         99: 13     A.   And what is the cause of it, and it
         99: 14          seemed slight.  That -- that would -- that's what I was
         99: 15          told.

145  99:16   -  99:20   Grefer, Michael 2006-07-27                    00:00:16
         99: 16     Q.   Well, back at that time, you're well
         99: 17          aware from the labeling that there was a significant
         99: 18          number of MIs on Vioxx, significantly more than as
         99: 19          compared to naproxen?
         99: 20     A.   There were more, yes, sir.

146  99:21   -  100:3   Grefer, Michael 2006-07-27                    00:00:19
         99: 21     Q.   I want to direct your attention just a
         99: 22          minute -- not for long -- to Exhibit Number 4 that
         99: 23          plaintiffs used that was an FDA warning letter.  Do you
         99: 24          remember briefly discussing that before --
         99: 25     A.   Yes, I do.
         100: 1     Q.   -- with Mr. Wright?  Now, you had never
         100: 2          seen that before?
         100: 3     A.   No.

147  100:7   -  101:21  Grefer, Michael 2006-07-27                    00:02:02
         100: 7     Q.   That's not something you would use to
         100: 8          make prescribing decisions?
         100: 9     A.   I would never have seen it.
         100: 10    Q.   As a matter of fact, you even testified
         100: 11         earlier that, you know, the information in that letter
         100: 12         would not have impacted your prescribing decision for
         100: 13         Mr. Smith; do you recall that?
         100: 14    A.   Because I didn't see it; that's right.

|  |  | Objections | Responses |
|---|---|---|---|

100: 15  Q.  Right.  Now, in fairness, I just wanted
100: 16    to mention a couple things in here.  This -- this FDA
100: 17    warning letter that's marked as Exhibit Number 4
100: 18    actually references some discreet events that the FDA
100: 19    was bringing to Merck's attention.  One of them was a
100: 20    set of audio conferences conducted by a Dr. Peter Holt.
100: 21    You never participated in those, did you?
100: 22  A.  No, sir.
100: 23  Q.  Another of the discreet matters that
100: 24    were part of this warning letter were some pharmacist
100: 25    conferences at which FDA -- the FDA said that Merck
101: 1    professional representatives made certain statements
101: 2    about Vioxx.  You would not have been at these
101: 3    pharmacist conferences?
101: 4  A.  No, sir.
101: 5  Q.  And to make it clear, this warning
101: 6    letter would have -- would have had no impact on your
101: 7    prescribing decision for Mr. Smith?
101: 8  A.  No, sir.

**164   111:6   -   111:18   Grefer, Michael 2006-07-27**    00:00:41

111: 6  Q.  The bottom line is, back at the time
111: 7    you -- you prescribed Vioxx to Mr. Smith, you
111: 8    understood that VIGOR had resulted in -- in an
111: 9    increased number of nonfatal heart attacks?
111: 10  A.  Correct.
111: 11  Q.  From the Vioxx users versus the naproxen
111: 12    users?
111: 13  A.  Correct.
111: 14  Q.  You also understood that there was
111: 15    scientific debate ongoing, whether it was due to Vioxx
111: 16    being the cause of more heart attacks or because it was
111: 17    being compared to naproxen, a drug that has a cardio-
111: 18    protective -- that may have a cardio-protective effect?

**Re: 111:14-111:23**
**Pltf Obj:**
Mischaracterizes
previous testimony;
misleading; 403

**Re: 111:14-112:33**
**Def Resp:**
Does not characterize
anything, asks a
question; does no
mischaracterize or
mislead as evidenced
by witness's agreement

**165   111:20   -   112:3   Grefer, Michael 2006-07-27**    00:00:34

111: 20  A.  Basically, I -- the -- the -- the
111: 21    situation was is that with this particular test and
111: 22    with VIGOR comparing with naproxen, it was unclear why
111: 23    there were those changes.
111: 24  Q.  All right.  And you were also aware that
111: 25    prior to the VIGOR study, in prior studies done in the
112: 1    clinical trials by Merck, there had not shown an
112: 2    increased risk of heart attack in patients on Vioxx as
112: 3    compared to placebo?

**166   112:5   -   112:12   Grefer, Michael 2006-07-27**    00:00:21

112: 5  A.  I -- I was unaware of any significant
112: 6    increase in cardiovascular events prior to VIGOR,
112: 7    that's right.
112: 8  Q.  Okay.  And then at the time you
112: 9    prescribed to Mr. Smith, you're well aware of VIGOR,
112: 10    but felt that the science was still uncertain?
112: 11  A.  That's -- was my understanding; that's
112: 12    correct.

**169   114:8   -   114:10   Grefer, Michael 2006-07-27**    00:00:05

114: 8  Q.  Now, you still prescribe Celebrex today,
114: 9    do you not?
114: 10  A.  I do.

**Re: 114:8-114:10**
**Pltf Obj:**
Misleading; 403;
speculation; foundation;
calls for an improper
expert medical opinion
outside the scope of
the witness' treatment
of Mr. Smith; relevance;
assumes facts not in
evidence

**Re: 114:8-114:10**
**Def Resp:**
No objection so waived;
witness is capable of
answering whether he
prescribes Celebrex; not
misleading or
speculative and he has
a personal knowledge

**170   114:11   -   114:21   Grefer, Michael 2006-07-27**    00:00:49

114: 11  Q.  And what is the patient profile that you
114: 12    typically look for in terms of prescribing Celebrex?
114: 13  A.  Well, I look for a -- a patient who
114: 14    needs that type of medication, and usually I prescribe
114: 15    a -- a -- a -- a -- an -- another NSAID of a more
114: 16    generalized nature, depending upon what the condition
114: 17    is, unless someone tells me they have significant

| | | | Objections | Responses |
|---|---|---|---|---|

114: 18    gastrointestinal problems and things like that, and --
114: 19    and/or if they do not tolerate a more generalized
114: 20    NSAID.  And then when that's the case, I do prescribe
114: 21    Celebrex.

**171  114:22    - 115:17**  Grefer, Michael 2006-07-27                    00:00:47

114: 22    Q.  And do you find Celebrex to be
114: 23       beneficial to your patients?
114: 24    A.  I do.
114: 25    Q.  And -- and I assume that for those you
115: 1       prescribe it, you believe the benefits of the drug
115: 2       outweigh the risks?
115: 3    A.  I do.
115: 4    Q.  And Celebrex carries some significant
115: 5       cardiovascular warnings?
115: 6    A.  Basically almost all the NSAIDs do now.
115: 7    Q.  But you still prescribe it?
115: 8    A.  I do.
115: 9    Q.  Because there's a -- there is -- that
115: 10      is -- one of the decisions you have to make as a
115: 11      physician is weighing the benefits and the risks?
115: 12   A.  The risk/reward, yes, sir.
115: 13   Q.  And a COX-2 like -- like Celebrex, you
115: 14      still find that, even understanding that there are
115: 15      cardiovascular risks associated with it, there is still
115: 16      the right patient and the right reason to prescribe it?
115: 17   A.  Yes, sir.

**Re: 114:22-115:17**
**Pltf Obj:**
Misleading; 403;
speculation; foundation;
calls for an improper
expert medical opinion
outside the scope of
the witness' treatment
of Mr. Smith; relevance;
assumes facts not in
evidence

**Re: 114:22-115:17**
**Def Resp:**
No objection so waived;
not misleading or
speculative; witness has
personal knowledge of
drug and its warnings
and manner in which he
prescribes it; warning is
or will be in evidence

**172  116:4    - 118:8**  Grefer, Michael 2006-07-27                    00:02:25

116: 4    Q.  I am handing you Exhibit Number 9, which
116: 5       I'll represent to you is the prescribing labeling
116: 6       information for Celebrex.
116: 7    A.  Okay.
116: 8    Q.  And I assume at some point in time
116: 9       you've reviewed the labeling information for Celebrex?
116: 10   A.  Yes.
116: 11   Q.  And are familiar with it?
116: 12   A.  Yes.
116: 13   Q.  And used that in terms of assessing the
116: 14      risk/benefit of prescribing the drug to your patients?
116: 15   A.  Correct.
116: 16   Q.  On page 1 they have a boxed warning.
116: 17   A.  Uh-huh.
116: 18   Q.  Is that true?
116: 19   A.  Yes.
116: 20   Q.  And in that boxed warning it talks about
116: 21      cardiovascular thrombotic events.
116: 22   A.  Right.
116: 23   Q.  Could you read that for the jury, that
116: 24      top paragraph.
116: 25   A.  "Cardiovascular Risks.  CELEBREX may
117: 1       cause an increased risk of serious cardiovascular
117: 2       thrombotic events, myocardial infarction, and stroke,
117: 3       which can be fatal.  All NSAIDs may have a similar
117: 4       risk.  This risk may increase with duration of use.
117: 5       Patients with cardiovascular disease or risk factors
117: 6       for cardiovascular disease may be at a greater risk.
117: 7       (See WARNINGS and CLINICAL TRIALS)."
117: 8    Q.  And behind that in the WARNINGS and the
117: 9       CLINICAL TRIALS section it has similar warnings, does
117: 10      it not?
117: 11   A.  I believe so.  I -- I don't have those
117: 12      handy right here.
117: 13   Q.  As a matter of fact, I can just flip you
117: 14      to -- if you'll flip to page 11.
117: 15   A.  Okay.
117: 16   Q.  Okay.  Under Cardiovascular Effects
117: 17      under WARNINGS.
117: 18   A.  Uh-huh.  Uh-huh.

**Re: 116:4-119:8**
**Pltf Obj:**
Misleading; 403;
speculation; foundation;
calls for an improper
expert medical opinion
outside the scope of
the witness' treatment
of Mr. Smith; relevance;
assumes facts not in
evidence

**Re: 116:4-119:8**
**Def Resp:**
See above re: waiver
re: misleading/
speculation/
foundation/expert
opinion/relevance/facts
in evidence; also as to
relevance establishing
risks and alternatives
and developing state
of scientific knowledge

403
Sustained drug
Different dosage
different label
different trials
P. didn't
it.

Objections                    Responses

| | |
|---|---|
| 117: 19 | Q.  Can you just read that first paragraph |
| 117: 20 | there. |
| 117: 21 | A.  Cardiovascular Thrombotic Events. |
| 117: 22 | Chronic use of Celebrex may cause an increased risk of |
| 117: 23 | serious adverse cardiovascular thrombotic events, |
| 117: 24 | myocardial infarction, and stroke, which can be fatal. |
| 117: 25 | In the APC trial, the relative risks for the composite |
| 118: 1 | endpoint of cardiovascular death, MI, or stroke was 3.4 |
| 118: 2 | (95% Clinical Index 1.4 - 8.5) for Celebrex |
| 118: 3 | 400 milligrams twice daily and 2.5 (95%) for Celebrex |
| 118: 4 | 200 milligrams twice daily compared to placebo. |
| 118: 5 | Q.  And when it references the 3.4, would |
| 118: 6 | that mean that it was three -- three -- almost three |
| 118: 7 | and a half times more likely to have a cardiovascular |
| 118: 8 | event on Celebrex than on placebo? |

**173  118:11   -  119:8**  Grefer, Michael 2006-07-27          00:00:51

| | |
|---|---|
| 118: 11 | A.  I assume that's what that says, yes, |
| 118: 12 | sir. |
| 118: 13 | Q.  All right.  And that was on the Celebrex |
| 118: 14 | 400 milligrams? |
| 118: 15 | A.  400 milligrams. |
| 118: 16 | Q.  And on the Celebrex 200 milligrams it |
| 118: 17 | looks like there was a -- a two and a half times higher |
| 118: 18 | risk of a cardiovascular event? |
| 118: 19 | A.  Celebrex 400 milligrams a day on -- and |
| 118: 20 | the first incidents of 200 milligrams -- I'm sorry. |
| 118: 21 | 200 milligrams.  400 milligrams twice a day versus |
| 118: 22 | 200 milligrams twice a day, yeah. |
| 118: 23 | Q.  And on one there's a two and a half |
| 118: 24 | times greater risk of a cardiovascular event, and on |
| 118: 25 | the other it's a three and a half times? |
| 119: 1 | A.  Yes, it looks like that. |
| 119: 2 | Q.  But even based upon that information, |
| 119: 3 | you -- you are comfortable, with the right patients, |
| 119: 4 | prescribing Celebrex? |
| 119: 5 | A.  Yes. |
| 119: 6 | Q.  And that's part of what you have to do |
| 119: 7 | as a doctor, make those decisions? |
| 119: 8 | A.  That's right. |

*Sustained*
*see supra*

**174  119:11   -  120:1**  Grefer, Michael 2006-07-27          00:00:40

| | |
|---|---|
| 119: 11 | Today when you're -- even with this |
| 119: 12 | label on Celebrex and this warning information, when |
| 119: 13 | you make your prescribing decision, you're looking -- |
| 119: 14 | you're looking not only for a person that needs the |
| 119: 15 | drug, but also you're looking for a patient who's -- |
| 119: 16 | the risk/benefit analysis weighs in their favor? |
| 119: 17 | A.  Correct. |
| 119: 18 | Q.  I assume you don't -- you're looking for |
| 119: 19 | a patient without a cardiovascular history? |
| 119: 20 | A.  Correct. |
| 119: 21 | Q.  Okay.  And so if a patient comes to you |
| 119: 22 | with no cardiovascular history, tells you they have no |
| 119: 23 | family history of cardiovascular events, they don't |
| 119: 24 | describe to you that they've had any high blood |
| 119: 25 | pressure problems, would you be comfortable prescribing |
| 120: 1 | to them? |

Re: 119:11-120:7
Pltf Obj:
Misleading; 403;
speculation; foundation;
calls for an improper
expert medical opinion
outside the scope of
the witness' treatment
of Mr. Smith; relevance;
assumes facts not in
evidence

Re: 119:11-120:1
Def Resp:
See above re: waiver
re: misleading/
speculation/
foundation/expert
opinion/relevance/facts
in evidence; also as to
relevance establishing
risks and alternatives
and developing state
of scientific knowledge

**175  120:3   -  120:7**  Grefer, Michael 2006-07-27          00:00:08

| | |
|---|---|
| 120: 3 | A.  Yes. |
| 120: 4 | Q.  And today, that same patient, if they |
| 120: 5 | came to you with those factors, you would feel |
| 120: 6 | comfortable, if they needed it, prescribing Celebrex to |
| 120: 7 | them? |

**176  120:10   -  120:14**  Grefer, Michael 2006-07-27          00:00:10

| | |
|---|---|
| 120: 10 | A.  Yes. |
| 120: 11 | Q.  Doctor, did you -- have you ever |

Re: 120:10-120:22
Pltf Obj:

Re: 120:10-120:22
Def Resp:

| | Objections | Responses |
|---|---|---|

| | | |
|---|---|---|
| 120: 12      personally taken Vioxx? | Relevance; misleading; 403 | No objection as to first questions re: Vioxx use, so waived; relevant to experience prescribing drug and as background for questions that follow; not misleading |
| 120: 13    A. Yes. | | |
| 120: 14    Q. Did you consider it an effective drug? | | |

**120:17   -   120:18**   Grefer, Michael 2006-07-27      00:00:05
120: 17    A. Yes, I did.
120: 18    Q. And did you consider it a drug --

178   **120:20   -   120:22**   Grefer, Michael 2006-07-27      00:00:21
120: 20    Q. -- that was beneficial to you as the
120: 21      person taking it?
120: 22    A. Yes.

179   **120:24   -   121:3**   Grefer, Michael 2006-07-27      00:00:10
120: 24    Q. Back at the time you prescribed Vioxx to
120: 25      your patients, I assume you likewise found it to be
121: 1      a -- very effective for your patients in terms of pain
121: 2      relief?
121: 3    A. Yes, I did.

180   **121:11   -   122:21**   Grefer, Michael 2006-07-27      00:02:02
121: 11      During Mr. Wright's questioning, he
121: 12      asked you -- he asked you whether, to some extent, you
121: 13      were influenced by the Vioxx sales campaign.
121: 14    A. I was.
121: 15    Q. Now, at that same time you started using
121: 16      the drug you found it to be a very effective drug for
121: 17      your patients?
121: 18    A. Correct.
121: 19    Q. And if it had not been an effective
121: 20      drug, then you would not have prescribed it?
121: 21    A. Correct.
121: 22    Q. It also had some -- some very important
121: 23      and valuable benefits for the gastrointestinal system
121: 24      of your patients?
121: 25    A. Yes.
122: 1    Q. And that was something you considered
122: 2      very important?
122: 3    A. Yes.
122: 4    Q. And an added benefit of a drug like
122: 5      Vioxx over traditional NSAIDs?
122: 6    A. Correct.
122: 7    Q. Okay. And provided you something you
122: 8      could prescribe patients who -- particularly those that
122: 9      had gastrointestinal problems?
122: 10    A. Correct.
122: 11    Q. So during the time Vioxx was on the
122: 12      market, you prescribed it because you as a doctor felt
122: 13      it was a good drug?
122: 14    A. I did.
122: 15    Q. And you felt that it was beneficial to
122: 16      your patients?
122: 17    A. I did.
122: 18    Q. And you felt, at the time you prescribed
122: 19      it, the benefits of the drug outweighed any of the
122: 20      risks that you were aware of?
122: 21    A. Correct.

181   **123:9   -   124:17**   Grefer, Michael 2006-07-27      00:01:17
123: 9    Q. Doctor, during Mr. Wright's questions
123: 10      earlier today he -- he talked about some different
123: 11      substudies like -- remember the name 090?
123: 12    A. Uh-huh.
123: 13    Q. And other studies that you have never
123: 14      seen and are not familiar with.
123: 15    A. That's correct.
123: 16    Q. He also mentioned to you statements
123: 17      about Merck statisticians, did he not?
123: 18    A. He mentioned some things about that,

*[Handwritten note in right margin:]* overruled This is a 403 problem but this is a treater & it goes into explaining why he prescribed. So on balance the probative balance tips toward admission ✓10 [signature]

| | Objections | Responses |
|---|---|---|

123: 19          yes.
123: 20    Q.  And went on to talk about what Merck
123: 21          statisticians and consultants may have told Merck at
123: 22          some given time?
123: 23    A.  Okay.
123: 24    Q.  Do you recall that?
123: 25    A.  I don't remember the particulars, but I
124: 1          do remember that type of situation.
124: 2     Q.  He also showed -- showed you a chart
124: 3          that he said it was from the Shapiro memo.  Do you
124: 4          remember that?
124: 5     A.  I believe so.
124: 6     Q.  And you couldn't remember if you had
124: 7          ever seen that chart or not?
124: 8     A.  Correct.
124: 9     Q.  And it was marked as Plaintiff's
124: 10         Exhibit 7?
124: 11    A.  Correct.
124: 12    Q.  Now, this internal documents at -- at a
124: 13         pharmaceutical company and what their consultants may
124: 14         or may not be saying to them at any given point in
124: 15         time, is that the type of information you typically
124: 16         make prescribing decisions from?
124: 17    A.  I never have it.  The answer's no.

182   124:22   -   124:25   Grefer, Michael 2006-07-27                     00:00:09
124: 22    Q.  You look to the FDA-approved labeling --
124: 23    A.  I do.
124: 24    Q.  -- and information you gather from your
124: 25         experience and from studies to make your decisions?

183   125:2   -   125:5   Grefer, Michael 2006-07-27                       00:00:11
125: 2     A.  Correct.
125: 3     Q.  You typically do not look to internal
125: 4          company documents and dialogue between the FDA and
125: 5          companies, to make prescribing decisions?

184   125:7   -   126:14   Grefer, Michael 2006-07-27                      00:01:27
125: 7     A.  Correct.
125: 8     Q.  Now, it would be important -- if you did
125: 9          look to a substudy or what a Merck statistician may
125: 10         have said or done at any given point in time, would it
125: 11         be important for you to understand the totality of
125: 12         those circumstances before you answered important
125: 13         questions based upon what that statis-- statistician
125: 14         may have said or done at some point in time?
125: 15    A.  Yes.
125: 16    Q.  You would want to know all information
125: 17         about the subject rather than just bits and pieces?
125: 18    A.  Correct.
125: 19    Q.  When Mr. Wright referenced a study
125: 20         called 090 and said that it had a certain result, he
125: 21         didn't tell you about all the studies that had a
125: 22         different result than that one, did he?
125: 23    A.  No.
125: 24    Q.  He didn't tell you the size of the
125: 25         study, did he?
126: 1     A.  No.
126: 2     Q.  Or that it was not statistically
126: 3          significant, did he?
126: 4     A.  No.
126: 5     Q.  And that is the type of information
126: 6          you'd like to have about that study and any other study
126: 7          if you're going to answer important questions about
126: 8          them?
126: 9     A.  Correct.
126: 10    Q.  If you're going to answer questions
126: 11         about what someone within Merck, whether it's a
126: 12         consultant or a statistician, knew or said to Merck at

|  |  | Objections | Responses |
|---|---|---|---|

126: 13    any given point in time, you'd want to know everything
126: 14    about those circumstances?

**126:16    -   127:8**   Grefer, Michael 2006-07-27       00:00:38
126: 16    A. Yes.
126: 17    Q. Particularly before you answered
126: 18      important questions about whether that would impact
126: 19      your prescribing decision?
126: 20    A. Well, it would be -- I would like to
126: 21      know as much information that's available before I made
126: 22      any decision about whether I would prescribe or not.
126: 23    Q. And are you aware that all of these
126: 24      people that Mr. Wright has referenced have given
126: 25      depositions in this litigation?
127: 1    A. No.
127: 2    Q. And you haven't seen any of that, have
127: 3      you?
127: 4    A. No.
127: 5    Q. And you wouldn't want to comment on
127: 6      what -- how some-- what somebody said or did at Merck,
127: 7      how that would impact you, without seeing the full
127: 8      totality of their testimony, too?

**186   127:10    -   127:11**   Grefer, Michael 2006-07-27       00:00:08
127: 10    Q. Would that be fair?
127: 11    A. Yes.

_Overruled)_ (handwritten, in Objections column)

**187   127:18    -   132:11**   Grefer, Michael 2006-07-27       00:09:14

| | | **Re: 127:18-128:4**<br>**Def Obj:**<br>Leading a non-hostile witness; counsel testifying "[reps] that come to you to sell or convince you to buy their drugs…"; 403 | |

127: 18    Q. With regard to your prescribing
127: 19      decisions for Vioxx or other medications that you
127: 20      prescribe, do you or do you not rely upon the
127: 21      representatives from that company that come to sell you
127: 22      or convince you to buy their drugs or to prescribe
127: 23      their drugs, do you or do you not rely upon those
127: 24      representatives to tell you both the good information
127: 25      that they have about their drug and the potential
128: 1      hazards that their company knows about their drug?
128: 2    A. The answer to your question is yes, I
128: 3      would expect them to give me all the relevant
128: 4      information that they have.

| | | **Re: 128:5-128:24**<br>**Def Obj:**<br>Leading<br>**128:5-129:14:** Counsel testifying; multiple questions; leading a non-hostile witness; assumes facts not in evidence; 403 | **Re: 128:5-128:24**<br>**Pltf Resp:**<br>Question is not leading |

128: 5    Q. All right. And specifically with regard
128: 6      to the VIGOR study, I understood you to say that the
128: 7      Merck representatives told you their position why the
128: 8      VIGOR studies did not show an important cardiovascular
128: 9      risk, and that reason that they gave you was because
128: 10      naproxen had a cardio-protective effect.
128: 11      Is that or is that not the general gist
128: 12      of what the Merck representatives told you in
128: 13      discussing the VIGOR studies?

128: 15    A. The -- the Merck representatives told me
128: 16      that while it looked like there was cardiovascular
128: 17      problems with Vioxx, the situation was unclear and it
128: 18      was muddied by the fact that the study was flawed and
128: 19      that some people may have been taken off aspirin that
128: 20      were taking it, and there could have been a
128: 21      cardiovascular effect for the positive with naproxen.
128: 22      They said that they were just -- that -- that --
128: 23      that -- I -- I can truly tell you that nobody from
128: 24      Merck gave me any bad news about Vioxx.

_Sustained_ (handwritten, in Objections column)

128: 25    Q. Is it fair to say or is it not fair to
129: 1      say -- well, let me rephrase the question.
129: 2      In that regard, did the Merck sales
129: 3      representatives ever tell you that there was a
129: 4      scientific theory that Vioxx may cause blood clots, be
129: 5      prothrombotic? Did the Merck sales representatives
129: 6      ever tell you that they were aware, that Merck was
129: 7      aware that there was a potential for Vioxx to be
129: 8      prothrombotic, and that they were aware of that

**Objections**   **Responses**

| Line | Text |
|---|---|
| 129: 9 | potential? |
| 129: 10 | MR. SKIDMORE: I need to object to the |
| 129: 11 | multiple questions in one, the multifarious |
| 129: 12 | questions, as well as leading. |
| 129: 13 | MR. WRIGHT: All right. I'll rephrase |
| 129: 14 | it. |
| 129: 15 | BY MR. WRIGHT: |
| 129: 16 | Q. In that regard, Doctor, in any of the |
| 129: 17 | discussions that you had with the Merck sales |
| 129: 18 | representatives, do you remember them ever disclosing |
| 129: 19 | to you that there was a scientific theory that some |
| 129: 20 | Merck scientists had discussed with Merck that Vioxx, |
| 129: 21 | because of its nature, may be prothrombotic? In other |
| 129: 22 | words, may be prone to causing blood clots? |
| 129: 23 | A. No. |
| 129: 24 | MR. SKIDMORE: Same objection as before. |

Re: 129:16-129:23
**Def Obj:**
Leading; multifarious question (see, e.g., 129:10-12)

Re: 129:16-129:23
**Pltf Resp:**
Question is not leading or multifarious

*Overruled*

| Line | Text |
|---|---|
| 129: 25 | Q. Now -- now, is it or is it not fair to |
| 130: 1 | say that when Merck discussed the VIGOR findings with |
| 130: 2 | you -- I'm turning to this -- I'm going to read you a |
| 130: 3 | statement from the FDA warning letter that we |
| 130: 4 | discussed, which is Exhibit Number 4. This is a letter |
| 130: 5 | from the FDA to Merck, September 17th. |
| 130: 6 | Quote, You have engaged in a promotional |
| 130: 7 | campaign for Vioxx that minimizes the potentially |
| 130: 8 | serious cardiovascular findings that were observed in |
| 130: 9 | the Vioxx gastrointestinal outcomes research (VIGOR) |
| 130: 10 | study, and thus, misrepresents the safety profile for |
| 130: 11 | Vioxx. |
| 130: 12 | Let me ask you, Doctor, from your |
| 130: 13 | experience with the Merck representatives, did you or |
| 130: 14 | did you not perceive them to be, in their presentation |
| 130: 15 | to you, minimizing the potentially serious |
| 130: 16 | cardiovascular findings in the VIGOR study? |
| 130: 17 | MR. SKIDMORE: Objection. Lack of |
| 130: 18 | foundation and to leading. Foundation based |
| 130: 19 | upon the use of this letter in that question. |
| 130: 20 | A. I guess the answer to your question is |
| 130: 21 | never did a Vioxx representative tell me that the |
| 130: 22 | cardiovascular risks over other NSAIDs was a big deal, |
| 130: 23 | because it was unclear. |

129:25-130:23: Counsel testifying; lack of foundation (Warning Letter); leading

*Sustained*

| Line | Text |
|---|---|
| 130: 24 | Q. Final two questions. With regard to the |
| 130: 25 | discussion of the VIGOR study, is it or is it not fair |
| 131: 1 | to say that that's essentially the only study that the |
| 131: 2 | Merck sales representatives ever discussed with you |
| 131: 3 | regarding Vioxx and cardiovascular safety, to the best |
| 131: 4 | of your recollection? |
| 131: 5 | A. To the best of my recollection, there |
| 131: 6 | was a lot of literature, there was a lot of stuff put |
| 131: 7 | in front of me over the several years that we dealt |
| 131: 8 | with this situation, but it seemed to me that always it |
| 131: 9 | came down to VIGOR as the named study and as the -- |
| 131: 10 | kind of the Bi-- the Bible of the whole deal. But, |
| 131: 11 | again, I don't -- I don't recall ever seeing any of the |
| 131: 12 | other particular studies. |

130:24-131:12: Leading

*Overruled*

| Line | Text |
|---|---|
| 131: 13 | Q. If there had been other studies that |
| 131: 14 | Merck was aware of that also showed a cardiovascular or |
| 131: 15 | heart attack risk for Vioxx in addition to the VIGOR |
| 131: 16 | study and showed the same kind of risk that was shown |
| 131: 17 | in the VIGOR study for other NSAIDs or for placebo -- |
| 131: 18 | against placebo, would or would not that, in your mind, |
| 131: 19 | have caused you to have more cardiovascular concerns |
| 131: 20 | for Vioxx before October of 2002? |
| 131: 21 | MR. SKIDMORE: Objection. Foundation. |
| 131: 22 | Leading. |
| 131: 23 | A. Well, sure. Had -- had I seen other |
| 131: 24 | studies that showed me that there was more |
| 131: 25 | cardiovascular risk than was apparent then, for any of |
| 132: 1 | the medications, I would have had more concern about |
| 132: 2 | prescribing them. |

Re: 131:13-132:11
**Def Obj:**
Leading; lack of foundation (602); calls for speculation

Re: 131:13-132:11
**Pltf Resp:**
Question is not leading; witness's own actions and reactions to information are not speculation

|  |  | Objections | Responses |
|---|---|---|---|

132: 3    Q.   Is that the kind of information that, if
132: 4      the company has, that you would expect the company
132: 5      representatives and like for the company
132: 6      representatives to share with you so that you can make
132: 7      proper prescribing decisions for your patients?
132: 8    A.   I would expect that any company would
132: 9      give me whatever information they have about their
132: 10      drug, to help me to discern whether I would prescribe
132: 11      it or not.

---

**188  132:18  -  133:1**  Grefer, Michael 2006-07-27     00:00:20

132: 18    Q.   Now, in your brief meetings with sales
132: 19      reps, they would often hand you materials?
132: 20    A.   Very frequent.
132: 21    Q.   And this is -- would be -- if it was
132: 22      a -- a drug you were interested in or had some
132: 23      questions about, it was material that you would
132: 24      generally read?
132: 25    A.   I -- I read almost all of the stuff that
133: 1      they give me.

**Re: 132:18-133:13**
**Pltf Obj:** Foundation; assumes facts not in evidence; 403

*Sustained*

**Def Resp:** Dr. Grefer has personal knowledge about what materials the sales reps gave him

---

**189  133:7  -  133:13**  Grefer, Michael 2006-07-27     00:00:18

133: 7      Are you aware that professional sales
133: 8      representatives at Merck and other pharmaceutical
133: 9      companies are limited to what is in the labeling as to
133: 10      what they can discuss with you about a drug?
133: 11      MR. WRIGHT: Object to the form.
133: 12    A.   No, I was not aware of that in
133: 13      particular.

---

**190  133:20  -  134:4**  Grefer, Michael 2006-07-27     00:00:22

133: 20    Q.   Yeah.  Let me ask it better.
133: 21      We talked about the fact that, did we
133: 22      not, that after -- after VIGOR came out, you had a lot
133: 23      of discussions with sales reps and reviewed -- reviewed
133: 24      different material about VIGOR?
133: 25    A.   Yes.
134: 1    Q.   And then we went over the label, and the
134: 2      VIGOR information, there was a significant amount of
134: 3      VIGOR information contained in the label.
134: 4    A.   Yes.

---

**191  134:6  -  134:9**  Grefer, Michael 2006-07-27     00:00:08

134: 6    Q.   And that information in the label is the
134: 7      same type of information that the sales reps talked to
134: 8      you about?
134: 9    A.   Yes.

*Overruled*

---

**192  134:11  -  134:23**  Grefer, Michael 2006-07-27     00:00:37

134: 11    Q.   Now, the sales reps are typically not
134: 12      physicians, are they?
134: 13    A.   I don't know of one that is.
134: 14    Q.   So -- and you -- you understand that?
134: 15    A.   Sure.
134: 16    Q.   And you expect the sales reps to provide
134: 17      you information, but you as the physician take the
134: 18      information you have, along with your experience and
134: 19      qualifications, and -- and with that you make decisions
134: 20      based upon the science as you understand it rather than
134: 21      what a sales rep might tell you anyway about a drug?
134: 22    A.   With -- with the information that I have
134: 23      available to me, yes.

**Re: 134:11-134:15**
**Pltf Obj:**
Foundation; calls for an improper expert medical opinion outside the scope of the witness' treatment of Mr. Smith

**Re: 134:11-134:15**
**Def Resp:**
Foundation is personal knowledge; does not call for expert opinion