**Smith v. Merck & Co., Inc.**
**Deposition Designations for David Graham**

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

1  **33:23 - 34:1**   Graham, David 2006-05-09   00:00:09
  33: 23   BY MR. KLINE:
  33: 24   Q:  Dr. Graham, good morning.
  34: 1   A:  Good morning.

2  **35:13 - 38:1**   Graham, David 2006-05-09   00:01:52
  35: 13   I would like to know who you
  35: 14   are, sir. What is your current title and
  35: 15   position at the FDA?
  35: 16   A:  I'm a medical officer and
  35: 17   the associate director for science and
  35: 18   medicine in the Office of Drug Safety.
  35: 19   Q:  What does that job involve,
  35: 20   sir?
  35: 21   A:  I'm the senior scientific
  35: 22   adviser for the office. I mentor the
  35: 23   scientific staff. I advise the office
  35: 24   director on all scientific and medical
  36: 1   matters. I oversee intramural and
  36: 2   extramural research programs within the
  36: 3   office and serve as a resource to the
  36: 4   center, the Center For Drug Evaluation on
  36: 5   epidemiologic matters as well.
  36: 6   Q:  You are an epidemiologist,
  36: 7   sir?
  36: 8   A:  Yes, I am.
  36: 9   Q:  And you're also a physician?
  36: 10   A:  That's correct.
  36: 11   Q:  So, you hold an M.D. degree
  36: 12   as well; is that correct?
  36: 13   A:  Yes.
  36: 14   Q:  And you're a long-time
  36: 15   employee of the FDA?
  36: 16   A:  Yes.
  36: 17   Q:  How many years, sir?
  36: 18   A:  About 22.
  36: 19   Q:  This deposition is about
  36: 20   many of your public statements.
  36: 21   One you made on November 18,
  36: 22   2004 to the United States Senate Finance
  36: 23   Committee. You said, to quote you,
  36: 24   'Vioxx is a terrible tragedy and a
  37: 1   profound regulatory failure. I would
  37: 2   argue that the FDA as currently
  37: 3   configured is incapable of protecting
  37: 4   America against another Vioxx. We are
  37: 5   virtually defenseless.' Did you make
  37: 6   that statement?
  37: 7   A:  Yes, I did.
  37: 8   Q:  You also made a statement on
  37: 9   November 18 before the United States
  37: 10   Senate where you said, 'Vioxx is the
  37: 11   single greatest drug safety catastrophe
  37: 12   in the history of this country.' Did you
  37: 13   make that statement, sir?
  37: 14   A:  Yes, I did.
  37: 15   Q:  Do you stick by that

*Overruled* (handwritten)

Re: 36:19-38:1
Def Obj: 801, 802, 403

Overruled.  602, 612 & 613

|  |  | Objections | Ruling in Barnett |
|--|--|-----------|-------------------|

37: 16    statement, sir?
37: 17    A: I do.
37: 18    Q: You also said, 'The FDA, its
37: 19    Center for Drug Evaluation and Research,
37: 20    are broken.' Did you make that
37: 21    statement, sir?
37: 22    A: Yes, I did.
37: 23    Q: Do you believe that and do
37: 24    you stick to it today?
38: 1    A: Yes, I do.

**3   39:8 - 40:2**    Graham, David 2006-05-09      00:00:48
39: 8    Sir, within the FDA, to what
39: 9    have you devoted your entire professional
39: 10    activities and professional life?
39: 11    A: Post-marketing drug safety
39: 12    and public health.
39: 13    Q: What is post-marketing
39: 14    safety, sir?
39: 15    A: It's examining the safety of
39: 16    drug products once they've been approved
39: 17    for marketing.
39: 18    Q: Do you have any interest of
39: 19    any kind in the Vioxx litigation, sir?
39: 20    A: No.
39: 21    Q: Do you have any financial
39: 22    interest in any drug company or any other
39: 23    kind of conflict that you can think of
39: 24    that you would disclose here?
40: 1    A: I have none that I can think
40: 2    of.

**4   40:20 - 41:13**    Graham, David 2006-05-09      00:00:27
40: 20    You have a Bachelor's Degree
40: 21    from Johns Hopkins; is that correct?
40: 22    A: Yes.
40: 23    Q: In what year, sir?
40: 24    A: 1976.
41: 1    Q: You graduated Phi Beta
41: 2    Kappa?
41: 3    A: Correct.
41: 4    Q: Meaning?
41: 5    A: That's a scholastic honorary
41: 6    society that's awarded to people who
41: 7    graduate in the top of their class.
41: 8    Q: Then you went to medical
41: 9    school where, sir?
41: 10    A: Johns Hopkins University.
41: 11    Q: You graduated second in your
41: 12    class?
41: 13    A: That's correct.

**5   41:18 - 41:21**    Graham, David 2006-05-09      00:00:04
41: 18    Q: You then went on to get a
41: 19    Master's Degree in public health, is that
41: 20    correct?
41: 21    A: Yes.

**6   42:17 - 43:1**    Graham, David 2006-05-09      00:00:14
42: 17    Q: You're a career FDA person
42: 18    then?
42: 19    A: Yes.

|  |  | Objections | Ruling in Barnett |
|--|--|------------|-------------------|

| 42: 20 | Q: You did an internship and |
| 42: 21 | residency at Yale first; is that correct? |
| 42: 22 | A: Yes. |
| 42: 23 | Q: Then you did a residency in |
| 42: 24 | neurology? |
| 43: 1 | A: Correct. |

**7   43:12  -  44:22   Graham, David 2006-05-09       00:01:12**

| 43: 12 | Q: A second residency? |
| 43: 13 | A: Yes. |
| 43: 14 | Q: That second residency being |
| 43: 15 | at the University of Pennsylvania? |
| 43: 16 | A: Correct. |
| 43: 17 | Q: So, you have an internship |
| 43: 18 | at Yale, residency at Penn in neurology |
| 43: 19 | and then your training in epidemiology? |
| 43: 20 | A: Right. |
| 43: 21 | Q: Your epidemiology training |
| 43: 22 | was three years? |
| 43: 23 | A: Three years. |
| 43: 24 | Q: What is the -- and if you |
| 44: 1 | could be precise, what is the study of |
| 44: 2 | epidemiology? |
| 44: 3 | A: Epidemiology, I think, is |
| 44: 4 | the study of the causes and distribution |
| 44: 5 | of diseases in populations. And in the |
| 44: 6 | area of drug epidemiology, it is looking |
| 44: 7 | at the distribution and causes of |
| 44: 8 | drug-induced injuries, but you could also |
| 44: 9 | be looking for the patterns of the way |
| 44: 10 | drug products are used in the population. |
| 44: 11 | Q: Okay. |
| 44: 12 | How have you used |
| 44: 13 | epidemiology during your entire |
| 44: 14 | professional life? |
| 44: 15 | A: It's been in the practice of |
| 44: 16 | pharmacoepidemiology or drug safety. |
| 44: 17 | Q: And what is |
| 44: 18 | pharmacoepidemiology, sir? |
| 44: 19 | A: It's a fancy word for drug |
| 44: 20 | safety epidemiology, 'pharmaco' referring |
| 44: 21 | to drugs, 'epidemiology,' study of the |
| 44: 22 | distribution and causes of disease. |

**8   47:8  -  47:19   Graham, David 2006-05-09       00:00:20**

| 47: 8 | Q: Along the way, sir, in your |
| 47: 9 | career at the FDA, have you received many |
| 47: 10 | different awards? |
| 47: 11 | A: Yes, I have. |
| 47: 12 | Q: As well as honors? I think |
| 47: 13 | it's called in your curriculum vitae |
| 47: 14 | honors and awards; is that correct? |
| 47: 15 | A: Correct. |
| 47: 16 | MR. KLINE: I'm going to |
| 47: 17 | mark your curriculum vitae as |
| 47: 18 | Exhibit 1 so we have it as part of |
| 47: 19 | this record. |

**9   48:9  -  48:11   Graham, David 2006-05-09       00:00:06**

| 48: 9 | Would you confirm that |
| 48: 10 | indeed that's your curriculum vitae? |
| 48: 11 | A: Yes, it is. |

|  |  |  |  | Objections | Ruling in Barnett |
|---|---|---|---|---|---|

**10**  **60:9  -  60:13**   Graham, David 2006-05-09   00:00:07

```
60: 9      BY MR. KLINE:
60: 10     Q:  I would ask you, sir, do you
60: 11     consider yourself an expert in drug
60: 12     safety?
60: 13     A:  Yes, I do.
```

**11**  **61:5  -  63:7**   Graham, David 2006-05-09   00:01:56

```
61: 5      BY MR. KLINE:
61: 6      Q:  In what areas of FDA do you
61: 7      consider yourself expert?
61: 8      A:  I am an expert in areas of
61: 9      post-marketing drug safety. I am an
61: 10     expert in areas of interaction between
61: 11     the reviewing divisions, the preapproval
61: 12     side of FDA and the postapproval side of
61: 13     FDA. I'm an expert on the culture of
61: 14     FDA, on the ways that science is used
61: 15     within FDA for -- as it relates to drug
61: 16     safety in particular, but also as it
61: 17     relates to efficacy. I'm an expert in
61: 18     the personnel practices of FDA in the
61: 19     ways that it treats its medical officers,
61: 20     and there's probably a host of other
61: 21     areas that relate to life working within
61: 22     FDA that I've become expert in.
61: 23     Q:  You're a lifer there?
61: 24     A:  Thus far, yes.
62: 1      Q:  Let me -- do you have any
62: 2      current intention of leaving the FDA?
62: 3      A:  No, not unless I'm forced to
62: 4      leave. I love the work that I do.
62: 5      Q:  Let me ask you some
62: 6      questions about your public statements.
62: 7      You testified before the
62: 8      United States Senate, Senate Finance
62: 9      Committee Hearing on drug safety and the
62: 10     worldwide withdrawal of Merck & Company,
62: 11     Inc. of Vioxx, November 18, '04; is that
62: 12     correct?
62: 13     A:  Yes.
62: 14     Q:  You appeared on 60 Minutes
62: 15     on February 16, '05; is that correct?
62: 16     A:  Yes.
62: 17     Q:  You appeared on February 17,
62: 18     '05 before the joint meeting of the
62: 19     Arthritis Advisory Committee of the Drug
62: 20     Safety and Risk Management Advisory
62: 21     Committee of the FDA; is that correct?
62: 22     A:  Yes.
62: 23     Q:  On the Today Show with Katie
62: 24     Couric on December 21, '05 you were
63: 1      interviewed?
63: 2      A:  Was it '05 or '04?
63: 3      Q:  '04. I'm sorry. '04?
63: 4      A:  Yes.
63: 5      Q:  On Good Morning America with
63: 6      Diane Sawyer on November 19, '04?
63: 7      A:  Yes.
```

Overruled (handwritten)

**Re: 62:5-63:18**   Overruled.  602, 613
**Def Obj:** 401, 402, 403
MIL #4;  Fact that
Graham announced his
personal views in
congress or on T.V.
after withdrawal has no
probative value and any
such value is
substantially
outweighed by danger
of unfair prejudice

**12**  **63:15  -  64:1**   Graham, David 2006-05-09   00:00:18

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|
| | 63: 15 | Did you also appear on ABC | | |
| | 63: 16 | Nightline with Ted Koppel on December 3, | | |
| | 63: 17 | '04? | | |
| | 63: 18 | A:  Yes, I did. | | |
| | 63: 19 | Q:  And in many other forums | | |
| | 63: 20 | relating to Vioxx, the withdrawal of | | |
| | 63: 21 | Vioxx; is that correct? | | |
| | 63: 22 | A:  Yes. | | |
| | 63: 23 | Q:  Do you believe Vioxx is an | | |
| | 63: 24 | unsafe drug, sir? | | |
| | 64: 1 | A:  Yes I, do. | | |
| 13 | **64:5  -  64:16** | Graham, David 2006-05-09 | 00:00:23 | |
| | 64: 5 | Q:  Should it ever have been on | | |
| | 64: 6 | the market in the first place? | | |
| | 64: 7 | A:  It is my professional | | |
| | 64: 8 | opinion, based on the evidence that I've | | |
| | 64: 9 | looked at, that Vioxx should not have | | |
| | 64: 10 | been approved at the time that it was | | |
| | 64: 11 | approved, that there were substantial | | |
| | 64: 12 | areas of concern relating to | | |
| | 64: 13 | cardiovascular safety that should have | | |
| | 64: 14 | been explored more fully and more | | |
| | 64: 15 | thoroughly prior to consideration of an | | |
| | 64: 16 | approval. | | |
| 14 | **70:11  -  70:14** | Graham, David 2006-05-09 | 00:00:04 | |
| | 70: 11 | Q:  Is it your mission, sir, to | | |
| | 70: 12 | help the public? Is that your view of | | |
| | 70: 13 | it? | | |
| | 70: 14 | A:  Yes. | | |
| 17 | **82:18  -  82:22** | Graham, David 2006-05-09 | 00:00:12 | |
| | 82: 18 | Q:  What does OND largely rely | | |
| | 82: 19 | upon in approval of drugs? | | |
| | 82: 20 | A:  It relies on documents | | |
| | 82: 21 | supplied to it by a drug company seeking | | |
| | 82: 22 | approval of its drug. | | |
| 18 | **133:12  -  133:19** | Graham, David 2006-05-09 | 00:00:10 | |
| | 133: 12 | THE WITNESS:  In my view, | | |
| | 133: 13 | that is an alarming circumstance, | | |
| | 133: 14 | one that demands intensive | | |
| | 133: 15 | scrutiny and attention. | | |
| | 133: 16 | BY MR. KLINE: | | |
| | 133: 17 | Q:  Did that happen here in the | | |
| | 133: 18 | Vioxx story? | | |
| | 133: 19 | A:  Yes, it did. | | |
| 19 | **134:3  -  137:23** | Graham, David 2006-05-09 | 00:03:28 | |
| | 134: 3 | BY MR. KLINE: | | |
| | 134: 4 | Q:  Now, I want to do a topic, | | |
| | 134: 5 | efficacy versus benefit. I'd like you to | | |
| | 134: 6 | explain to the members of the jury in | | |
| | 134: 7 | brief terms why efficacy, which is what | | |
| | 134: 8 | we sometimes hear, a drug is efficacious, | | |
| | 134: 9 | is different than benefit, and how those | | |
| | 134: 10 | two either equate, in your opinion, or | | |
| | 134: 11 | don't equate and what the significance | | |
| | 134: 12 | is, please. | | |
| | 134: 13 | A:  Okay. Efficacy is, does the | | |
| | 134: 14 | drug have a biological effect. So, if | | |
| | 134: 15 | the drug is supposed to treat high blood | | |

|  | Objections | Ruling in Barnett |
|---|---|---|

134: 16    pressure, the efficacy will be, does it
134: 17    reduce your blood pressure. So, it's
134: 18    reducing a body measurement. That's the
134: 19    effect. And if it does that, we say that
134: 20    it has efficacy.

134: 21    Effectiveness is whether or
134: 22    not that drug taken on a regular basis
134: 23    will actually give you a health benefit
134: 24    long-term. If the drug lowers your blood
135: 1    pressure, but doesn't prevent you from
135: 2    having heart attacks, strokes, kidney

135: 3    failure or dying at a young age, well,
135: 4    then, you've spent a lot of money to have
135: 5    a lower blood pressure number, but have
135: 6    derived no benefit from it. So, what you
135: 7    want is, really, when you talk about
135: 8    benefit/risk, is you want to look at what
135: 9    is sort of the health benefits, the real
135: 10    certifiable health benefit that you're
135: 11    deriving from a drug versus what are the

135: 12    real risks.
135: 13    But what FDA frequently
135: 14    does, almost always does, is it takes the
135: 15    efficacy -- when it says benefits exceed
135: 16    the risks, what it's really saying is in
135: 17    our estimation, the FDA's estimation, the
135: 18    efficacy should lead to a benefit, and we
135: 19    say that benefit exceeds the risk. But
135: 20    FDA has never done a formal benefit
135: 21    analysis on any drug product to my
135: 22    knowledge. It certainly did not do one
135: 23    with Vioxx when it said that the benefits
135: 24    exceeded the risks.
136: 1    Q: Why is it important in the
136: 2    Vioxx story to understand that the FDA
136: 3    did no risk/benefit analysis as you've
136: 4    just said?
136: 5    A: It's because I think if you
136: 6    look at the VIGOR study, you're
136: 7    confronted with what at least in my read
136: 8    is a startling revelation that for every
136: 9    complicated perforated ulcer or bleed
136: 10    that Vioxx prevented, there were almost
136: 11    two thrombotic cardiovascular events that
136: 12    were caused by the drug. And so if
136: 13    you're talking about benefits and risks,
136: 14    here we have a ratio of almost two to one
136: 15    where the risks exceed the benefits.
136: 16    Now, let's look at what the
136: 17    case fatality rates are. Nationally,
136: 18    about five percent of people with GI
136: 19    bleeds die. And I learned that by going
136: 20    to the National Centers For Health
136: 21    Statistics and looking at death
136: 22    certificate data and then going to the
136: 23    National Hospital Discharge Survey and
136: 24    looking at how many hospitalizations
137: 1    there are for GI bleed. So, you have a
137: 2    five percent death rate from GI bleeding.

|  | | Objections | Ruling in Barnett |
|---|---|---|---|

137: 3    In other words, you can have a GI bleed,
137: 4    that's a pretty serious thing, you get
137: 5    hospitalized for it, but most of the time
137: 6    you're not going to die. With heart
137: 7    attack, it's about a 40 percent chance
137: 8    that you're going to die. So, if what
137: 9    we're really interested in is sort of
137: 10    benefit/risk, and let's take it to what's
137: 11    the most important thing, and that's do I
137: 12    live or do I die, in my view, the scales
137: 13    are tilted greatly against Vioxx in terms
137: 14    of safety versus benefit.
137: 15    Q: Okay.
137: 16    That risk/benefit analysis
137: 17    was or was not done by FDA?
137: 18    A: It was not done by FDA.
137: 19    Q: In your opinion, had it been
137: 20    done, it would have come out the way you
137: 21    suggested if it had been correctly and
137: 22    diligently and honestly done?
137: 23    A: Yes.

20  **138:3 - 141:6**  Graham, David 2006-05-09       00:02:51
138: 3    BY MR. KLINE:
138: 4    Q: I'm reminded to ask, was
138: 5    that risk/benefit done by the company, by
138: 6    Merck?
138: 7    A: To my knowledge, it was not.
138: 8    And I could cite as evidence of that the
138: 9    VIGOR study. And in the VIGOR study,
138: 10    there's no real mention of weighing the
138: 11    benefits and the risks in that study.
138: 12    It's kind of implied that the benefits
138: 13    exceed the risks, but there's no formal
138: 14    analysis of it.
138: 15    And it's also very curious
138: 16    that in that paper, the most likely
138: 17    explanation for the finding wasn't
138: 18    addressed, which is the effect of Vioxx
138: 19    on prostacyclin, which is the chemical
138: 20    made by the body that causes blood
138: 21    vessels to dilate and keeps platelets
138: 22    from clotting. And what Vioxx does is,
138: 23    it blocks the production of prostacyclin
138: 24    and makes it more likely that a heart
139: 1    attack can happen. And in that VIGOR
139: 2    study, which was published in the New
139: 3    England Journal of Medicine and got a lot
139: 4    of press, there's not a single word or
139: 5    mention or reference to this
139: 6    pharmacologic fact that was well known
139: 7    throughout the medical community by this
139: 8    time and was published in the literature.
139: 9    And it was well known to the FDA medical
139: 10    officer in her NDA review which preceded
139: 11    the publication of the VIGOR study.

139: 12    Q: Was it all the more
139: 13    significant as to Vioxx, and I know
139: 14    you've talked about this, sir, the fact
139: 15    that there were, I think it's in your
139: 16    article, the fact that there were 106
139: 17    million prescriptions of Vioxx during the

| | Objections | Ruling in Barnett |
|---|---|---|



139: 18   lifetime of Vioxx from '99 to '04?
139: 19   A: In the United States,
139: 20   correct.
139: 21   Q: What is the significance --
139: 22   and used by how many people to your
139: 23   understanding?
139: 24   A: Estimates that I've seen
140: 1    range to about 20 million in the United
140: 2    States.
140: 3    Q: What is the significance of
140: 4    this story -- in this story, we're going
140: 5    to go into this in detail in a moment.
140: 6    What's the significance in terms of all
140: 7    of that usage, both premarketing and then
140: 8    after the drug was marketed, the fact
140: 9    that it was going to be used by --
140: 10   A: Well --
140: 11   Q: -- literally over a hundred
140: 12   million prescriptions?
140: 13   A: Right. The fact that the
140: 14   drug was going to be used widely and that
140: 15   it was used widely means that the
140: 16   exposure to potential harm was very large
140: 17   at a population level. So, at a
140: 18   population level, if we were saying, oh,
140: 19   only 1,000 people or 10,000 people got
140: 20   this drug, well, the number of people who
140: 21   could be injured as a result, that
140: 22   absolute number, would be relatively
140: 23   small. But when you give a drug to 20
140: 24   million people, you multiply the numbers
141: 1    of people who can be affected. So,
141: 2    that's -- from a public health
141: 3    perspective, that is why I considered
141: 4    this to be a public health catastrophe.
141: 5    Q: Was it indeed -- was Vioxx
141: 6    indeed a public health catastrophe?

21  **141:8  -  143:10**  Graham, David 2006-05-09    00:01:48

141: 8    THE WITNESS: Yes.
141: 9    BY MR. KLINE:
141: 10   Q: Why, sir?
141: 11   A: Vioxx, in my opinion, was a
141: 12   public health catastrophe because, A, it
141: 13   was a toxic drug that had severe
141: 14   cardiovascular effects raising --
141: 15   increasing the risk of heart attack.
141: 16   Two, heart attack is like
141: 17   one of the leading causes of death in the
141: 18   United States, so, the rate of it is
141: 19   pretty high. If I have a drug that
141: 20   increases the rate of something that
141: 21   already happens at a high rate, I'm
141: 22   multiplying two high numbers by each
141: 23   other, and that's going to mean that lots
141: 24   of people will probably have heart
142: 1    attacks.
142: 2    Three, the typical person
142: 3    with osteoarthritis or rheumatoid
142: 4    arthritis who was going to get Vioxx is
142: 5    somebody who is older. And older people
142: 6    have other risk factors for heart
142: 7    disease. If your typical Vioxx user is

**Re: 141:5-8**
**Def Obj:** 401, 402, 403
Any probative value of
Graham's personal
opinion is substantially
outweighed by danger
of unfair prejudice

Overruled

*Overruled* (handwritten)

8

| | Objections | Ruling in Barnett |
|---|---|---|

142: 8    somebody in their 60s, well, if they are
142: 9    male, they've got their gender is a risk
142: 10   factor for heart attack, their age is a
142: 11   risk factor for heart attack, and if you
142: 12   look nationally at statistics on health
142: 13   of Americans, they will also have at
142: 14   least one of the following: they'll have
142: 15   high blood pressure, high cholesterol,
142: 16   diabetes or they'll smoke. So, right off

142: 17   the bat, this drug is going to be
142: 18   marketed -- your typical patient that is
142: 19   getting this drug is going to be somebody
142: 20   who has two or three risk factors for
142: 21   heart disease already. So, you put all
142: 22   these things together and then you
142: 23   multiply it by the fact that I'm giving
142: 24   it to 20 million people, and it's just
143: 1    simple mathematics that you've got a
143: 2    formula for disaster.
143: 3    Q:  Sir, you have actually
143: 4    quantified what you believe to be the
143: 5    formula in your study paper -- your
143: 6    Kaiser study paper published in Lancet.
143: 7    Is Lancet a highly respected journal?
143: 8    A:  Yes.
143: 9    Q:  Published in Britain?
143: 10   A:  Yes.

22  143:16  -  143:18   Graham, David 2006-05-09      00:00:02
143: 16   BY MR. KLINE:
143: 17   Q:  What is it the equivalent of
143: 18   in the United States?

23  143:20  -  152:10   Graham, David 2006-05-09      00:07:30
143: 20   THE WITNESS:  It's the
143: 21   equivalent of the New England
143: 22   Journal of Medicine or the Journal
143: 23   of the American Medical
143: 24   Association.
144: 1    BY MR. KLINE:
144: 2    Q:  You stated there, '88,000 to
144: 3    140,000 excess cases of serious coronary
144: 4    heart disease probably occurred in the
144: 5    United States over the market life of
144: 6    Vioxx.' Did you make that statement?
144: 7    A:  Yes, I did.
144: 8    Q:  Is that a true statement?
144: 9    A:  Yes, it is.
144: 10   Q:  Tell us why '88,000 to
144: 11   140,000 excess cases of serious coronary
144: 12   heart disease probably occurred in the
144: 13   United States over the market life of
144: 14   Vioxx.'
144: 15   A:  It occurred because Vioxx is
144: 16   unsafe at any dose. In other words, all
144: 17   doses of Vioxx can cause increased heart
144: 18   attack risk. Vioxx was used widely --
144: 19   Q:  How about the timing of it?
144: 20   A:  The timing begins with the
144: 21   first dose, and there is lots of evidence
144: 22   now that points to that. In fact, on the
144: 23   APPROVe study, which we used to help

Re: 144:2-18
Def Obj: MIL #4
No foundation or
methodology that
supports this opinion.
Excluded in Irvin
because Dr. Ray could
not lay necessary
fundamental predicate;
403

Overruled. He explains his methodology - p/155 l.13, or p.154 l.d - it was published in Lancet perhaps the most or certainly one of the most respected med. journals which publications its methodology was reviewed by people expert in the field + approved by them. Otherwise it would not be published.

| | | Objections | Ruling in Barnett |
|---|---|---|---|

144: 24    formulate our estimate of heart attacks,

145: 1    was a study performed by Merck of
145: 2    patients with colon polyps, and they were
145: 3    giving them the 25 milligram strength of
145: 4    Vioxx to see if they could prevent colon

145: 5    polyps. And the study found a roughly
145: 6    twofold increase in heart attack risk in
145: 7    patients who were treated with Vioxx
145: 8    compared to people who are taking a sugar
145: 9    pill, a placebo.
145: 10    Now, in the paper that the
145: 11    company published, they did what's called
145: 12    a post hoc analysis. And this is an
145: 13    analysis that's done after the fact. And
145: 14    so FDA -- if this analysis had been
145: 15    presented to FDA for an -- for some
145: 16    statement to be put in their labeling,
145: 17    FDA would have thrown it out because
145: 18    they'd say it's post hoc, which means it
145: 19    could have happened by accident. In
145: 20    clinical trials, you're supposed to
145: 21    prespecify before the trial starts what
145: 22    analyses you will do. And the
145: 23    prespecified analysis that Merck said
145: 24    they would do showed a twofold increased
146: 1    risk. And the correct interpretation of
146: 2    that is that the risk would be increased
146: 3    from the start of the drug for as long as
146: 4    you took the drug. But Merck did a post
146: 5    hoc analysis. And the post hoc analysis
146: 6    showed these two curves where they said
146: 7    that the risk didn't begin until after
146: 8    you are on the drug for 18 months. And
146: 9    as a result, there was a public
146: 10    statement, a press release from Merck
146: 11    that said that the risk doesn't begin
146: 12    until after 18 months. Newspapers put it
146: 13    up. It's in newspapers. There was just
146: 14    an editorial commentary in the Washington
146: 15    Post last week of somebody saying how on
146: 16    earth could a jury award money to a
146: 17    victim who had taken the drug for less
146: 18    than 18 months because we all know that
146: 19    Vioxx can't cause heart attacks before 18
146: 20    months.
146: 21    Well, two things. One, that
146: 22    was the approved -- that was a post hoc
146: 23    analysis, so it can't be accepted. What
146: 24    it can be used for is to raise a
147: 1    hypothesis, a question, hmm, maybe this
147: 2    is something -- maybe it only works after
147: 3    18 months. Then you have to go back to
147: 4    do a second study to prove that. If you
147: 5    look -- so, that's point one.
147: 6    Point two is, if you look at
147: 7    those two curves and you look at how many
147: 8    patients they had in the study, how many
147: 9    heart attacks they had in that study at
147: 10    the time -- let's take six months, for
147: 11    example. At six months, there were about

**Re: 146:12-146:20**    N/A
**Def Obj:** 801, 802, 403
Reference to newspaper
accounts

| | Objections | Ruling in Barnett |
|---|---|---|

147: 12 five or six heart attacks total in the
147: 13 APPROVe study. And now they don't give
147: 14 the figures in the paper, so, you've got
147: 15 to kind of make these extrapolations from
147: 16 proportions that are presented in the
147: 17 paper. Five or six. In order to show a
147: 18 relative risk of 2, which is what the
147: 19 overall study showed, they would have to
147: 20 have had --
147: 21 Q: VIGOR?
147: 22 A: No. We're talking APPROVe.
147: 23 Q: I'm sorry.
147: 24 A: This is the 18 month.
148: 1 They would have had to have
148: 2 had 95 patients, 95 heart attacks by six
148: 3 months, when all they had was five or
148: 4 six. So, the study would have had to
148: 5 have been almost 20 times larger in order
148: 6 to have a chance of finding the problem.
148: 7 As it is, with the five or six cases that
148: 8 they had at six months, all that Merck
148: 9 could say from a statistical perspective
148: 10 is the risk of heart attack with Vioxx
148: 11 can be no higher than about 200.
148: 12 Q: This is called power?
148: 13 A: This is power. And what
148: 14 we're seeing there is the absence of
148: 15 evidence is not evidence of absence.
148: 16 They're saying the truth is, we don't
148: 17 have the power. But Merck is using that
148: 18 argument to say, ha-ha, because we don't
148: 19 have the power, therefore there isn't a
148: 20 risk, therefore, anybody with a heart
148: 21 attack before then, it's their own bad
148: 22 luck.
148: 23 But I give you an analogy,
148: 24 and the analogy is, we've got those two
149: 1 curves, and if you have a picture of
149: 2 APPROVe, you could put it up and then we
149: 3 could talk from the curve. You've got
149: 4 these two curves that come together, and
149: 5 there's no power there in that first 18
149: 6 months to show a difference. And as I
149: 7 just discussed, the study would have to
149: 8 be 20 times larger in order to show a
149: 9 twofold difference. You talk about
149: 10 stacking the deck. That's a stacked
149: 11 deck.
149: 12 Here's the analogy. The
149: 13 company is saying to you, to me, to the
149: 14 jury, the moon has no craters. And they
149: 15 say, look at the APPROVe study in the
149: 16 first 18 months. I don't see a
149: 17 difference there. I look at the moon. I
149: 18 don't see any craters. I'm saying, wait
149: 19 a second, here's a pair of binoculars.
149: 20 Let's make that study 20 times bigger.
149: 21 Let me give you binoculars that raises it
149: 22 20 times. Now you look at the moon and
149: 23 you see there are craters. You look
149: 24 here, you would see this heart attack.
150: 1 Now, there had been 11

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

150: 2   published studies, observational studies.
150: 3   So, you'll never get a clinical trial
150: 4   that's that large to study this question.
150: 5   So, it has to come from observational
150: 6   studies. The preponderance of the
150: 7   evidence of observational studies, there
150: 8   are now 11 published observational
150: 9   studies. Nine of those observational
150: 10  studies found that Vioxx increases the
150: 11  risk of heart attack. Of those nine, all
150: 12  nine of them, when you look at it, you
150: 13  have to tease it out, but in the studies,
150: 14  they make it clear that the risk of heart
150: 15  attack that they found in that study
150: 16  occurred within 12 months. So, we're
150: 17  already inside 18 months. Seven of those
150: 18  studies have the evidence present within
150: 19  six months. Four of those studies have
150: 20  the evidence within the first
150: 21  prescription. So, in other words, what
150: 22  we have is evidence that Vioxx increases
150: 23  the risk of heart attack from the first
150: 24  dose on. And we have no evidence to
151: 1   suggest that the risk goes away with
151: 2   time.
151: 3   This follows precisely from
151: 4   what we believed the underlying mechanism
151: 5   is by which Vioxx and other COX-2
151: 6   inhibitors might cause heart attack. And
151: 7   that is, suppressing prostacyclin so that
151: 8   there's an excess of thromboxane.
151: 9   Thromboxane causes platelets to clot and
151: 10  can cause heart attacks. And if you
151: 11  disturb that balance, that disturbance in
151: 12  balance is going to happen within the
151: 13  first dose, and so -- the first couple
151: 14  doses. And so what you have is the
151: 15  expectation that the risk should begin
151: 16  early. The only reason people don't find
151: 17  it is because they don't have 10 million
151: 18  patients in a clinical trial on the first
151: 19  day that would let them see it.
151: 20  Q:  You found it in your study?
151: 21  A:  And we found it in our
151: 22  study.
151: 23  Q:  And was your study a large
151: 24  scale observational study?
152: 1   A:  Yes.
152: 2   Q:  And do large term
152: 3   observational studies provide an
152: 4   important -- are they an important piece
152: 5   of information in the matrix of
152: 6   information about drug safety?
152: 7   A:  Yes, they are. And in this
152: 8   situation, particularly where we're
152: 9   talking about this 18-month question, it
152: 10  is the only information available.

24  **152:21  -  153:13**   Graham, David 2006-05-09          00:00:31
152: 21  I want to go back to the
152: 22  general question that was on the table at
152: 23  the time, which was, as to your statement
152: 24  about the Kaiser study, in the Kaiser

**Re: 152:21-153:13**   Overruled
**Def Obj:** Rule 403
Lacks necessary
foundation; No

| | Objections | Ruling in Barnett |
|---|---|---|

153: 1     study that 88 to 140,000 excess cases of
153: 2     serious coronary heart disease probably
153: 3     occurred in the United States over the
153: 4     life of the drug Vioxx. And I had
153: 5     interrupted you.
153: 6     What is the answer to that
153: 7     question as to why you make that
153: 8     statement, if you haven't already
153: 9     explained it?
153: 10     A: Right.
153: 11     Q: You started off saying it's
153: 12     unsafe at any dose. It starts at the
153: 13     initial dose. Are there other factors?

*Objections (153:1–153:4):* methodology used to derive the excess event calculation; MIL #4

**25  153:18  -  155:11  Graham, David 2006-05-09**       00:01:28

153: 18     A: Just that it has wide use;
153: 19     that lower doses and higher doses
153: 20     increase the risk; that there's typical
153: 21     patients who are going to get the drugs
153: 22     have relatively high background rates for
153: 23     heart disease. And you take these
153: 24     factors together and you multiply them
154: 1     out, and you end up with large numbers.
154: 2     Q: While I don't want to do the
154: 3     exact statistical computation in front of
154: 4     the jury, have you done that to make that
154: 5     kind of statement in the peer reviewed
154: 6     medical literature?
154: 7     A: Yes, I have.
154: 8     Q: What is the construct there,
154: 9     please, just briefly?
154: 10     A: Right. Basically, what you
154: 11     do is -- what we did was, we took the two
154: 12     large published clinical trials that
154: 13     Merck conducted, the VIGOR study, which
154: 14     was at the higher doses of Vioxx, and the
154: 15     APPROVe study, which was at the lower
154: 16     doses of Vioxx, and we used those
154: 17     studies, the relative risks from those
154: 18     studies, five-fold increased risk in the
154: 19     VIGOR study, a two-fold increased risk in
154: 20     the APPROVe study for the lower dose, to
154: 21     then apply that to the U.S. population in
154: 22     terms of like about 18 percent of the
154: 23     population got the high dose and 82
154: 24     percent got the lower dose. And you can
155: 1     do a series of calculations,
155: 2     epidemiologic formulas that basically
155: 3     just give you the answer, if you know how
155: 4     long the prescriptions are, and we had
155: 5     information that told us how long each
155: 6     prescription was for.
155: 7     Q: You did that kind of
155: 8     calculation?
155: 9     A: Yes.
155: 10     Q: That was your conclusion?
155: 11     A: Yes.

**26  158:7  -  159:8  Graham, David 2006-05-09**       00:01:08

158: 7     Q: Would you give us your
158: 8     overview and your understanding of the
158: 9     Vioxx story?

*Objections (158:7–159:8):* **Re: 158:7-168:1**
**Def Obj:** Outside scope of the court's order authorizing the

*Ruling:* Overruled. *(handwritten: Overruled)*

|  |  |  | Objections | Ruling in Barnett |
|--|--|--|------------|-------------------|

| | | | |
|--|--|--|--|
| 158: 10 | A: Well, Vioxx was approved in | | deposition to be limited |
| 158: 11 | 1999. In November 2000, a study was | | to statements |
| 158: 12 | published in the New England Journal of | | Dr. Graham had made |
| 158: 13 | Medicine called VIGOR, which was a study | | publicly |
| 158: 14 | performed by Merck showing that Vioxx | | |
| 158: 15 | reduced the occurrence of perforations, | | |
| 158: 16 | ulcers and bleeds in the gastrointestinal | | |
| 158: 17 | tract compared to naproxen therapy, but | | |
| 158: 18 | also that it increased the risk of heart | | |
| 158: 19 | attack by about a factor of five compared | | |
| 158: 20 | to naproxen. | | |
| 158: 21 | At that point then, the | | |
| 158: 22 | article that got published in the New | | |
| 158: 23 | England Journal of Medicine, rather than | | |
| 158: 24 | talking about Vioxx increasing the risk | | |
| 159: 1 | of heart attack, it actually changed the | | |
| 159: 2 | way it did the analysis. And I thought | | |
| 159: 3 | that this was really a misleading aspect | | |
| 159: 4 | of the way they went about things. | | |
| 159: 5 | When you do a scientific | | |
| 159: 6 | study -- | | |
| 159: 7 | Q: 'They' being? | | |
| 159: 8 | A: 'They' being Merck. | | |

| 27 | 160:8 - 168:1 | Graham, David 2006-05-09 | 00:06:45 |
|----|---------------|--------------------------|----------|

| | |
|--|--|
| 160: 8 | Whenever you do a clinical |
| 160: 9 | trial or a study, you have what's called |
| 160: 10 | a reference group or a control group. |
| 160: 11 | Frequently in a clinical trial, that will |
| 160: 12 | be a placebo, which is a sugar pill. In |
| 160: 13 | the VIGOR study, it was naproxen, which |
| 160: 14 | is another pain reliever. When you have |
| 160: 15 | a comparator and you have an experimental |
| 160: 16 | treatment, in this case, Vioxx was the |
| 160: 17 | experimental treatment, when you do your |
| 160: 18 | analysis, you are supposed to put the |
| 160: 19 | results for the experimental treatment, |
| 160: 20 | in this case, Vioxx, in the numerator of |
| 160: 21 | a ratio, and your reference, naproxen, in |
| 160: 22 | the denominator. When the evidence was |
| 160: 23 | presented on perforations, ulcers and |
| 160: 24 | bleeds, that's the way the information |
| 161: 1 | was presented. It was presented in the |
| 161: 2 | classically accepted way, and it showed |
| 161: 3 | that the risk of ulcers, et cetera, was |
| 161: 4 | about one half, about .5, 50 percent that |
| 161: 5 | of naproxen. |
| 161: 6 | When it came to presenting |
| 161: 7 | the heart attack risks, it flipped it |
| 161: 8 | around. |
| 161: 9 | Q: 'It' being who? |
| 161: 10 | A: The company, Merck. They |
| 161: 11 | flipped it around, and they put -- and |
| 161: 12 | now in talking about heart attacks, they |
| 161: 13 | put the risk of heart attack in naproxen |
| 161: 14 | patients, which is the comparator, the |
| 161: 15 | reference group, they put that in the |
| 161: 16 | numerator, and they put Vioxx in the |
| 161: 17 | denominator, and it should have been the |
| 161: 18 | other way around. But by doing this, |
| 161: 19 | then the number that you get is .2. So, |
| 161: 20 | what they could say was, oh, the heart |

| | |
|---|---|
| 161: 21 | attack risk with naproxen is 20 percent |
| 161: 22 | that of Vioxx, rather than having to say |
| 161: 23 | the risk of heart attack with Vioxx is |
| 161: 24 | five times higher than it was with |
| 162: 1 | naproxen. |
| 162: 2 | It may seem like a minor |
| 162: 3 | point, but it's really, I think, |
| 162: 4 | fundamental, at least in my |
| 162: 5 | understanding, of the study, because by |
| 162: 6 | misrepresenting that information, it then |
| 162: 7 | flows into what I would call the naproxen |
| 162: 8 | hypothesis. And in the VIGOR study, what |
| 162: 9 | Merck proposed was that naproxen |
| 162: 10 | protected against heart attack. Even |
| 162: 11 | though Vioxx had five times higher rate |
| 162: 12 | of heart attack than naproxen, what they |
| 162: 13 | said was, is here's Vioxx, here's |
| 162: 14 | naproxen, what they said is, well, Vioxx |
| 162: 15 | is normal, there's no increased risk |
| 162: 16 | here, what it is is naproxen protects |
| 162: 17 | against heart attack. And they cited one |
| 162: 18 | reference to support that, and it was a |
| 162: 19 | study that Merck itself had done in 22 |
| 162: 20 | patients where they had given them |
| 162: 21 | naproxen, taken blood samples from them, |
| 162: 22 | and then did experiments in test tubes to |
| 162: 23 | see what effect it had on the way their |
| 162: 24 | platelets worked. |
| 163: 1 | Well, this information, |
| 163: 2 | subsequently the FDA basically said that |
| 163: 3 | doesn't prove anything because there are |
| 163: 4 | no controlled clinical trials to show |
| 163: 5 | that naproxen protects against heart |
| 163: 6 | attack. But the argument was that |
| 163: 7 | naproxen protects against heart attack. |
| 163: 8 | And that was the argument in VIGOR. |
| 163: 9 | To me, what was -- when I |
| 163: 10 | read that, there were two things that |
| 163: 11 | really sort of struck me. One was that a |
| 163: 12 | five-fold difference in heart attack risk |
| 163: 13 | is something quite high and something |
| 163: 14 | that you really have to pay attention to |
| 163: 15 | because heart attack is such a serious |
| 163: 16 | disorder, and it's so very common. |
| 163: 17 | The second thing was that |
| 163: 18 | just on the face of it, this notion of |
| 163: 19 | naproxen being protective, I was highly |
| 163: 20 | skeptical of it, and as a matter of fact, |
| 163: 21 | so were my office leadership, including |
| 163: 22 | Peter Honig, who is now at Merck, but was |
| 163: 23 | my office director then, and Marty |
| 163: 24 | Himmel, who is now at Merck, but was his |
| 164: 1 | deputy office director. We were |
| 164: 2 | skeptical of the naproxen hypothesis. We |
| 164: 3 | were skeptical for the following reasons |
| 164: 4 | -- I was skeptical for the following |
| 164: 5 | reasons: |
| 164: 6 | 1. Naproxen has been on the |
| 164: 7 | market for over 30 years. |
| 164: 8 | 2. Naproxen had been used |
| 164: 9 | in many, many, many clinical trials, and |
| 164: 10 | nobody had ever reported this phenomenal |

| | |
|---|---|
| 164: 11 | heart-protecting effect before. |
| 164: 12 | 3. There were -- and we |
| 164: 13 | talk about 100 million prescriptions or |
| 164: 14 | 106 million prescriptions for Vioxx. |
| 164: 15 | There were probably way, way more of that |
| 164: 16 | of naproxen over the 30 years that it's |
| 164: 17 | been on the market, so, there's |
| 164: 18 | widespread use. |
| 164: 19 | And then, finally, if |
| 164: 20 | naproxen had had that kind of protective |
| 164: 21 | effect that Merck was claiming in the |
| 164: 22 | VIGOR study, it would have had to have |
| 164: 23 | been about three times better than |
| 164: 24 | aspirin at preventing heart attacks. And |
| 165: 1 | aspirin has been well studied in clinical |
| 165: 2 | trials. It reduces heart attack risks |
| 165: 3 | probably on average about 25 percent, and |
| 165: 4 | that's viewed pretty much as sort of a |
| 165: 5 | wonder drug. Aspirin is a wonder drug. |
| 165: 6 | Well, here Merck comes with |
| 165: 7 | the VIGOR study and says naproxen is |
| 165: 8 | three times better than the wonder drug |
| 165: 9 | aspirin. And to me it just failed the |
| 165: 10 | straight face test and so -- |
| 165: 11 | Q: The straight face test? |
| 165: 12 | A: Yes. Does it have sort of |
| 165: 13 | face validity? Can you believe it on its |
| 165: 14 | face. And on the face, to me as the |
| 165: 15 | experienced drug safety scientist, I was |
| 165: 16 | just highly skeptical of that. |
| 165: 17 | Plus you have the underlying |
| 165: 18 | biology of how Vioxx works, that would |
| 165: 19 | lead one to expect that it might increase |
| 165: 20 | the risk of heart attack. And, in fact, |
| 165: 21 | it's really funny how the VIGOR study |
| 165: 22 | words this. You know, the argument that |
| 165: 23 | is sort of commonly in the literature |
| 165: 24 | talking about heart attack risk with the |
| 166: 1 | COX-2 inhibitors talks about prostacyclin |
| 166: 2 | being decreased by drugs like Vioxx, |
| 166: 3 | leaving thromboxane, which causes |
| 166: 4 | clotting, unopposed. So, there's an |
| 166: 5 | excess of it. There's sort of a balance, |
| 166: 6 | and now there's too much thromboxane. |
| 166: 7 | In VIGOR, Merck said, well, |
| 166: 8 | we were interested in cardiovascular |
| 166: 9 | risk, but their argument was because |
| 166: 10 | naproxen -- because Vioxx wouldn't affect |
| 166: 11 | platelet clotting and so -- but naproxen |
| 166: 12 | would. And so we thought there might be |
| 166: 13 | a difference. So, they sort of took the |
| 166: 14 | converse of what was sort of like |
| 166: 15 | obviously on everybody -- this was |
| 166: 16 | something that everybody was talking |
| 166: 17 | about, at least in the literature. And |
| 166: 18 | subsequently it became sort of a real |
| 166: 19 | focus of research. |
| 166: 20 | In any event, it was based |
| 166: 21 | on reading that study and being highly |
| 166: 22 | skeptical of it and recognizing that if |
| 166: 23 | the high doses caused heart attack at a |
| 166: 24 | five-fold increase, well, this thing |

| | |
|---|---|
| 167: 1 | called dose response, well, there's a 25 |
| 167: 2 | milligram dose and a 12-and-a-half |
| 167: 3 | milligram dose. 25 milligram dose is the |
| 167: 4 | most commonly used dose. With dose |
| 167: 5 | response, if you get an effect with a |
| 167: 6 | high dose, what dose response says is, |
| 167: 7 | well, you might also have an effect with |
| 167: 8 | the lower dose. It won't be as big an |
| 167: 9 | effect. So, the question is, is there a |
| 167: 10 | heart attack risk with lower dose. And |
| 167: 11 | that was something that wasn't even |
| 167: 12 | addressed in the VIGOR study in the |
| 167: 13 | discussion. In the discussion, it was |
| 167: 14 | something that one could have brought up, |
| 167: 15 | but it wasn't brought up. In my view, |
| 167: 16 | the discussion was unbalanced. |
| 167: 17 | In any event, taking all |
| 167: 18 | those things together, I thought that it |
| 167: 19 | was important that we try to do another |
| 167: 20 | study to examine the heart attack risks |
| 167: 21 | with Vioxx. |
| 167: 22 | Q:  And that's how you got |
| 167: 23 | involved? |
| 167: 24 | A:  And that's how I got |
| 168: 1 | involved. |

**28   169:16  -  171:23   Graham, David 2006-05-09                                   00:01:39**

| | |
|---|---|
| 169: 16 | BY MR. KLINE: |
| 169: 17 | Q:  So, you made -- you |
| 169: 18 | presented this PowerPoint at numerous |
| 169: 19 | professional meetings, correct -- |
| 169: 20 | A:  Right. This is from -- |
| 169: 21 | Q:  -- including the ISPE |
| 169: 22 | conference in 2005; is that correct? |
| 169: 23 | A:  That's correct. |
| 169: 24 | Q:  That's the International |
| 170: 1 | Society of Pharmacoepidemiologists? |
| 170: 2 | A:  Correct. |
| 170: 3 | Q:  A worldwide organization; is |
| 170: 4 | that correct? |
| 170: 5 | A:  Yes. |
| 170: 6 | Q:  And by the way, you've been |
| 170: 7 | asked to publicly appear at conferences |
| 170: 8 | like that in your professional capacity, |
| 170: 9 | correct? |
| 170: 10 | A:  Yes, I have. |
| 170: 11 | Q:  A group of your colleagues, |
| 170: 12 | international epidemiologists from all |
| 170: 13 | over the world, would hear your views |
| 170: 14 | that you're telling this jury, correct? |
| 170: 15 | A:  Correct. |
| 170: 16 | Q:  All right. |
| 170: 17 | Now, the theoretical |
| 170: 18 | concern. What have you publicly said |
| 170: 19 | about that before? |
| 170: 20 | A:  The theoretical concern was |
| 170: 21 | that Vioxx would reduce or inhibit |
| 170: 22 | prostacyclin and lead to an excess of |
| 170: 23 | thromboxane, which would result in a |
| 170: 24 | tendency for blood clots and |
| 171: 1 | theoretically cardiovascular events such |
| 171: 2 | as heart attack or stroke. |

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

171: 3   Q:  Known to Merck back in 1999?
171: 4   A:  I would assume that it had
171: 5   to have been. If it's known to the
171: 6   medical officer who did this review, it
171: 7   most certainly would have had to have
171: 8   been known to Merck.
171: 9   Q:  And you looked at the
171: 10   review, and once you got into -- you
171: 11   looked into the history of it once you
171: 12   got interested in the subject based on
171: 13   naproxen, correct?
171: 14   A:  Actually, this particular
171: 15   slide that we're looking at -- actually,
171: 16   I began looking at this subsequent. At
171: 17   the time that we were planning our study,
171: 18   this wasn't something that I had focused
171: 19   on.
171: 20   Q:  In the early period, did the
171: 21   FDA know and appreciate that there were
171: 22   high-risk patients that were excluded
171: 23   from the study?

29   **172:2  -  172:3**   Graham, David 2006-05-09
172: 2   BY MR. KLINE:
172: 3   Q:  Did Merck understand that?

30   **172:6  -  173:8**   Graham, David 2006-05-09
172: 6   THE WITNESS:  It is clear
172: 7   from the way the studies are
172: 8   described that patients at high
172: 9   risk of experiencing
172: 10   cardiovascular events were
172: 11   excluded from the study, and since
172: 12   that's written in the VIGOR study,
172: 13   I have to assume that Merck was
172: 14   fully aware and that it was
172: 15   intentional.
172: 16   - - -
172: 17   (Whereupon, Deposition
172: 18   Exhibit Graham-3, 'Rofecoxib
172: 19   Diagnosis and Treatment: What
172: 20   went wrong? Can we avoid?'
172: 21   (Graham)  PowerPoint Slides,
172: 22   DG000014 - DG000034, was marked
172: 23   for identification.)
172: 24   - - -
173: 1   BY MR. KLINE:
173: 2   Q:  I'm going to mark another
173: 3   Powerpoint which you presented to the
173: 4   International Society of
173: 5   Pharmacoepidemiologists. They had their
173: 6   conference in 2005 in Nashville,
173: 7   Tennessee, correct?
173: 8   A:  Yes.

31   **174:11  -  174:20**   Graham, David 2006-05-09
174: 11   Q:  And were Merck -- are Merck
174: 12   representatives always at the

174: 13   International Society of
174: 14   Pharmacoepidemiology?
174: 15   A:  Well, I know that at this

174: 16   particular meeting, several people from
174: 17   Merck were there because they're

00:00:02   **Re: 172:3-15**
**Def Obj:** 602; 701
Lacks foundation;

00:00:36   Improper expert opinion
to testify about what
Merck "understood" and
to "assume" that
Merck's conduct was
"intentional"

00:00:19

Overruled

*Overruled*

*The Q. as I understand
it is whether higher
risk (cardiovascular risk
(cvts) patients excluded from
the study & did Merck
know this.
The witness says
that they were &
Merck must have
known because
the study was
designed or designed &
drafted them
to exclude them or
Merck drafted or
designed the study.
The witness
says Merck had
to know because it was designed
that way*

18

|  |  |  | Objections | Ruling in Barnett |
|---|---|---|---|---|

174: 18 professional colleagues. So, we had
174: 19 conversations during the meeting, and I
174: 20 know that they attended this session.

**32 175:1 - 176:24 Graham, David 2006-05-09   00:02:06**

175: 1 Q:  Now, in it, and I just want
175: 2 to focus you on the slide that's entitled
175: 3 'VIGOR:  deja vu all over again,' what
175: 4 were you telling your fellow members of
175: 5 the International Society of
175: 6 Pharmacoepidemiologists?
175: 7 A:  Which slide number are you
175: 8 on?
175: 9 Q:  Number 24.
175: 10 A:  Oh, here what I was talking
175: 11 about was trying to make a little joke
175: 12 about Yogi Berra and deja vu, but what I
175: 13 was trying to talk about here is the
175: 14 evidence that was accruing on Vioxx and
175: 15 heart attack risks and FDA's response,
175: 16 which in my experience has been to
175: 17 downplay or ignore those risks and to let
175: 18 things get worse in a sense to, let the
175: 19 problem continue unabated. So, that's
175: 20 basically what I was, I think, trying to
175: 21 convey there.
175: 22 Q:  Understood.

175: 23 Now, if you'd go to slide
175: 24 number 29, this is something I'd like to
176: 1 display. And regardless of whether the
176: 2 display is there or not, the fact of the
176: 3 matter is that you have used and you've
176: 4 given this jury an explanation of the
176: 5 naproxen and whether it was a plausible
176: 6 explanation for the VIGOR results. That
176: 7 is what you've done so far, correct?
176: 8 A:  Correct.
176: 9 Q:  What did you call it

176: 10 publicly, sir, the naproxen --
176: 11 A:  I called it an alibi.
176: 12 Q:  What is an alibi, sir?
176: 13 A:  Well, I'm not a lawyer, but
176: 14 what I meant was, it's sort of an excuse
176: 15 to explain away an uncomfortable
176: 16 situation.
176: 17 Q:  What did you mean when you
176: 18 described -- and I assume you're talking
176: 19 about Merck's explanation later published
176: 20 in the New England Journal that naproxen
176: 21 was cardioprotective and thereby
176: 22 explained the results of the VIGOR trial.
176: 23 Is that what you were talking about?
176: 24 A:  That is correct.

**33 177:5 - 177:7 Graham, David 2006-05-09   00:00:05**

177: 5 My question is, what in that
177: 6 context did you mean by the 'naproxen
177: 7 alibi,' sir?

**34 178:13 - 178:21 Graham, David 2006-05-09   00:00:12**

178: 13 BY MR. KLINE:
178: 14 Q:  What was going on with
178: 15 labeling in that same period of time,

|  |  | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|
| | 178: 16 | sir? | | | |
| | 178: 17 | A: Nothing was happening with | | | |
| | 178: 18 | labeling, at least nothing visible. | | | |
| | 178: 19 | Q: Was it your words when you | | | |
| | 178: 20 | described it, those two years, as a wild | | | |
| | 178: 21 | goose chase? | | | |
| 35 | 178:23 - 179:6 | Graham, David 2006-05-09 | 00:00:18 | | |
| | 178: 23 | THE WITNESS: My reference | | | |
| | 178: 24 | to wild goose chase was to the | | | |
| | 179: 1 | efforts by the scientific | | | |
| | 179: 2 | community to investigate what has | | | |
| | 179: 3 | subsequently been shown, I think, | | | |
| | 179: 4 | unequivocally to be an untruth, | | | |
| | 179: 5 | which is that naproxen does not | | | |
| | 179: 6 | protect against heart attack. | | | |
| 36 | 182:6 - 182:13 | Graham, David 2006-05-09 | 00:00:14 | **Re: 182:6-13** | Overruled |
| | 182: 6 | BY MR. KLINE: | | **Def Obj:** 701; 702 | |
| | 182: 7 | Q: What is the bottom line, | | Outside all of expertise; | |
| | 182: 8 | bottom, bottom line on the science of | | Dr. Graham is not a | |
| | 182: 9 | whether naproxen is cardioprotective and | | pharmacologist or | |
| | 182: 10 | whether this was an alibi? | | cardiologist | |
| | 182: 11 | A: Naproxen is not | | | |
| | 182: 12 | cardioprotective, never was, and it | | | |
| | 182: 13 | isn't. | | | |
| 37 | 186:1 - 186:15 | Graham, David 2006-05-09 | 00:00:32 | | |
| | 186: 1 | Q: Now, did you get -- by the | | | |
| | 186: 2 | way, in 2000, I think the 2002 report, | | | |
| | 186: 3 | there's an FDA report -- I don't want to | | | |
| | 186: 4 | have to dig out the document. I hope | | | |
| | 186: 5 | I'll be indulged here. | | | |
| | 186: 6 | There's a report in which | | | |
| | 186: 7 | Vioxx was -- there was a suspect drug | | | |
| | 186: 8 | list in 2001 reported in 2002? | | | |
| | 186: 9 | A: Yes. | | | |
| | 186: 10 | Q: What drug was on the top of | | | |
| | 186: 11 | the suspect drug list? | | | |
| | 186: 12 | A: Vioxx. | | | |
| | 186: 13 | Q: And was your study conceived | | | |
| | 186: 14 | by you? | | | |
| | 186: 15 | A: Yes. | | | |
| 38 | 186:21 - 187:17 | Graham, David 2006-05-09 | 00:00:44 | | |
| | 186: 21 | A: I wasn't aware at the time | | | |
| | 186: 22 | that it was the number one drug. In my | | | |
| | 186: 23 | mind, it was the leading public health | | | |
| | 186: 24 | safety question that needed to be focused | | | |
| | 187: 1 | on. When we went to -- when we decided | | | |
| | 187: 2 | to do the study, we had a teleconference, | | | |
| | 187: 3 | videoconference with Merck that was | | | |
| | 187: 4 | attended by myself, my office director, | | | |
| | 187: 5 | Dr. Honig, his deputy, Dr. Himmel, both | | | |
| | 187: 6 | of whom are now at Merck, and then people | | | |
| | 187: 7 | from Kaiser. And we had a list of five | | | |
| | 187: 8 | or six drug safety questions that we were | | | |
| | 187: 9 | going to discuss which of these we | | | |
| | 187: 10 | thought was the most important one that | | | |
| | 187: 11 | needed to be studied. And the consensus, | | | |
| | 187: 12 | hands down, of that group was that Vioxx | | | |

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

| | | |
|---|---|---|
| | 187: 13 | needed to be studied because that issue |
| | 187: 14 | affected more lives and the impact of |
| | 187: 15 | that was potentially greater than any of |
| | 187: 16 | the other drug safety questions we talked |
| | 187: 17 | about. |
| 39 | 187:23 - 188:13 | Graham, David 2006-05-09    00:00:35 |
| | 187: 23 | Q: Now, the study. It was -- |
| | 187: 24 | tell us what you did, what you went about |
| | 188: 1 | doing. It was funded by the FDA, |
| | 188: 2 | correct? |
| | 188: 3 | A: It was funded -- this study, |
| | 188: 4 | I've been told various estimates, that |
| | 188: 5 | this study cost -- should have cost -- if |
| | 188: 6 | it was being done today, it would have |
| | 188: 7 | cost over $1 million. That's what I was |
| | 188: 8 | told by people at the DSaRM committee in |
| | 188: 9 | February 2005. FDA contributed a total |
| | 188: 10 | of $60,000, which was basically good |
| | 188: 11 | faith money, and Kaiser underwrote all |
| | 188: 12 | the other expenses associated with the |
| | 188: 13 | study. |
| 40 | 192:24 - 193:11 | Graham, David 2006-05-09    00:00:15 |
| | 192: 24 | Q: Now, you were the lead of |
| | 193: 1 | the study? |
| | 193: 2 | A: Yes. |
| | 193: 3 | Q: And it was your baby; is |
| | 193: 4 | that correct? |
| | 193: 5 | A: Correct. |
| | 193: 6 | Q: Was that known by your |
| | 193: 7 | bosses at the FDA? |
| | 193: 8 | A: Oh, yes. |
| | 193: 9 | Q: And did they know that you |
| | 193: 10 | were studying in particular Vioxx? |
| | 193: 11 | A: Yes. |
| 41 | 194:1 - 196:21 | Graham, David 2006-05-09    00:01:53 |
| | 194: 1 | Q: Now, there's a story in |
| | 194: 2 | between, but at the end of the day, was |
| | 194: 3 | this study published in The Lancet? |
| | 194: 4 | A: Yes, it was. |
| | 194: 5 | Q: It was first on line January |
| | 194: 6 | 25th of '05? |
| | 194: 7 | A: Correct. |
| | 194: 8 | Q: Was it peer reviewed by -- |
| | 194: 9 | did it go through a peer review process |
| | 194: 10 | and was it peer reviewed? |
| | 194: 11 | A: It went through peer review |
| | 194: 12 | twice. A total of ten different peer |
| | 194: 13 | reviewers from The Lancet looked at this |
| | 194: 14 | paper, five on each of two occasions. On |
| | 194: 15 | each occasion, the paper was accepted for |
| | 194: 16 | publication. |
| | 194: 17 | Q: Was that unusual, that it |
| | 194: 18 | was peer reviewed twice and by that many |
| | 194: 19 | people? |
| | 194: 20 | A: It was unusual, but it was |
| | 194: 21 | necessitated by efforts by the FDA to |
| | 194: 22 | suppress publication of the paper. |
| | 194: 23 | Q: Yes, I'm going to have you |

| | Objections | Ruling in Barnett |
|---|---|---|

| | | |
|---|---|---|
| 194: 24 | tell that story in a minute in your own | |
| 195: 1 | words. | |
| 195: 2 | At the end of the day when | |
| 195: 3 | you published the article, the article | |
| 195: 4 | was entitled 'Risk of acute myocardial | |
| 195: 5 | infarction and sudden cardiac death in | |
| 195: 6 | patients treated with...' Is that | |
| 195: 7 | correct? That's the study? | |
| 195: 8 | A: Yes. | |
| 195: 9 | MR. KLINE: And we have it | |
| 195: 10 | here. We'll mark it as the next | |
| 195: 11 | Exhibit Number, 4. | |
| 195: 12 | - - - | |
| 195: 13 | (Whereupon, Deposition | |
| 195: 14 | Exhibit Graham-4, 'Risk of acute | |
| 195: 15 | myocardial infarction and sudden | |
| 195: 16 | cardiac death in patients treated | |
| 195: 17 | with cyclo-oxygenase 2 selective | |
| 195: 18 | and non-selective non-steroidal | |
| 195: 19 | anti-inflammatory drugs: nested | |
| 195: 20 | case-control study,' (Graham, et | |
| 195: 21 | al)  The Lancet 2-5-05 Vol. 365, | |
| 195: 22 | 475-481, was marked for | |
| 195: 23 | Identification.) | |
| 195: 24 | - - - | |
| 196: 1 | BY MR. KLINE: | |
| 196: 2 | Q:  This was the result, the | |
| 196: 3 | fruits of your four-year labor; is that | |
| 196: 4 | correct? | |
| 196: 5 | A:  Correct. | |
| 196: 6 | Q:  What was your bottom line of | |
| 196: 7 | your findings, sir? | |
| 196: 8 | A:  The bottom line was that | |
| 196: 9 | Vioxx at high dose increased the risk of | |
| 196: 10 | heart attack compared to basically nonuse | |
| 196: 11 | of the drug; that, compared to Celebrex, | |
| 196: 12 | which was the other leading COX-2 pain | |
| 196: 13 | reliever on the market, that Vioxx at | |
| 196: 14 | high dose and low dose increased the risk | |
| 196: 15 | of heart attack. With low dose, it was | |
| 196: 16 | just a borderline statistical | |
| 196: 17 | significance, but the point estimate was | |
| 196: 18 | clearly there; and that naproxen did not | |
| 196: 19 | protect against heart attack, if | |
| 196: 20 | anything, it increased the risk | |
| 196: 21 | slightly. | |
| **42**  **203:14  -  205:23** | Graham, David 2006-05-09 | 00:02:00 |
| 203: 14 | Q:  And -- okay, now. If you | |
| 203: 15 | look at the Advisory Committee meeting, | |
| 203: 16 | your PowerPoint number 1 -- let's see, | |
| 203: 17 | it's 114, Page 114. We'll put it up very | |
| 203: 18 | briefly and try to work through this | |
| 203: 19 | stuff in our waning moments. | |
| 203: 20 | I see here, 'Risk of AMI | |
| 203: 21 | with Celecoxib Or Rofecoxib.' I want to | |
| 203: 22 | focus on Vioxx, rofecoxib. Okay? | |
| 203: 23 | A:  Uh-huh. | |
| 203: 24 | Q:  What you did here was to | |
| 204: 1 | collect the data from the various | |
| 204: 2 | studies, correct? | |
| 204: 3 | A:  Correct. | |
| 204: 4 | Q:  At all doses, just focusing | |

| | | Objections | Ruling in Barnett |
|---|---|---|---|

204: 5    on the 'all doses,' your study showed an
204: 6    increased risk of -- what are you showing
204: 7    increased risks of here to be clear?
204: 8    What are you characterizing it?
204: 9    A: We showed an increased risk
204: 10    of heart attack and sudden cardiac death
204: 11    as a -- sort of considering those
204: 12    together.
204: 13    Q: By the way, sir, and I hate
204: 14    to do it this way, but I forgot earlier.
204: 15    When you gave me your figures of 88,000
204: 16    to 140,000 excess cases of serious
204: 17    coronary heart disease in the life of
204: 18    Vioxx in the United States, how many of
204: 19    those -- did you do a calculation of how
204: 20    many of those were deaths?
204: 21    A: Yes. It's about 40 percent.
204: 22    So, if you multiply .4 by each of the

**Re: 204:13-205:6** — Overruled
**Def Obj:** Same objection as in MIL #4; No methodology or foundation laid for excess event calculation; 403

*Overruled. See at P. 144 & 2 supra*

204: 23    numbers, you come up with a range that's
204: 24    somewhere in the neighborhood of 40,000
205: 1    to 60,000.
205: 2    Q: 40,000 to 60,000 excess
205: 3    deaths over those that would have been
205: 4    if --
205: 5    A: Patients had not used
205: 6    rofecoxib, had not used Vioxx.
205: 7    Q: Back to the relative risks.
205: 8    If we can just focus in on all doses of
205: 9    Vioxx, we have relative risks which are
205: 10    above 1 in the Graham study, is that
205: 11    correct?
205: 12    A: Yes.
205: 13    Q: The Solomon study?
205: 14    A: Yes.
205: 15    Q: The Kimmel study?
205: 16    A: Yes.
205: 17    Q: The Ingenix study?
205: 18    A: Yes.
205: 19    Q: And the Medi-Cal study?
205: 20    A: Yes.
205: 21    Q: And you were involved in the
205: 22    Medi-Cal study as well, correct?
205: 23    A: Correct.

43   **222:11 - 222:14**   Graham, David 2006-05-09    00:00:04
222: 11    BY MR. KLINE:
222: 12    Q: In your view, did the
222: 13    benefits clearly exceed the risk or
222: 14    exceed them at all?

44   **222:16 - 222:20**   Graham, David 2006-05-09    00:00:05
222: 16    THE WITNESS: No. The
222: 17    benefits did not exceed the risks.
222: 18    BY MR. KLINE:
222: 19    Q: In fact, was it the
222: 20    opposite?

**Re: 222:19-224:1** — Overruled
**Def Obj:** Outside scope of order allowing deposition to take place; cumulative of Dr. Topol, Avorn, Moye

*Overruled*

45   **222:22 - 224:5**   Graham, David 2006-05-09    00:01:04
222: 22    THE WITNESS: This drug was
222: 23    risky. And the benefits that one
222: 24    gained at a population level for
223: 1    the risks just weren't worth it.
223: 2    The juice wasn't worth the
223: 3    squeeze, and in my view, as I said

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|
| | 223: 4 | before, I think that Vioxx was | | |
| | 223: 5 | approved prematurely, and clearly | | |
| | 223: 6 | if more work had been done, | | |
| | 223: 7 | certainly the high dose shouldn't | | |
| | 223: 8 | have been approved. And if it had | | |
| | 223: 9 | been approved, it should have been | | |
| | 223: 10 | withdrawn with the VIGOR study. | | |
| | 223: 11 | And at that point, intensive study | | |
| | 223: 12 | at the lower doses should have | | |
| | 223: 13 | been enacted with a very large | | |
| | 223: 14 | clinical trial done in a very | | |
| | 223: 15 | short space of time to nail down | | |
| | 223: 16 | the question. And I'm not talking | | |
| | 223: 17 | about an APPROVe-like study that | | |
| | 223: 18 | takes four or five years to do and | | |
| | 223: 19 | has only five or six heart attacks | | |
| | 223: 20 | in six months. I'm talking about | | |
| | 223: 21 | a really huge study that gives you | | |
| | 223: 22 | the opportunity, the power, to | | |
| | 223: 23 | answer the question definitively. | | |
| | 223: 24 | And that was not done. | | |
| | 224: 1 | BY MR. KLINE: | | |
| | 224: 2 | Q: Everything of what you just | Re: 224:2-5 | Overruled |
| | 224: 3 | said, sir, was it within the resources | **Def Obj:** Calls for | |
| | 224: 4 | and capability of Merck & Company? | speculation | |
| | 224: 5 | A: Yes, it was. | | |
| 46 | **227:8 - 227:13** | Graham, David 2006-05-09 | 00:00:14 | |
| | 227: 8 | Q: Dr. Graham, you talked a | | |
| | 227: 9 | little bit on direct examination about | | |
| | 227: 10 | your medical training as well as your | | |
| | 227: 11 | training as an epidemiologist. Do you | | |
| | 227: 12 | practice medicine now? | | |
| | 227: 13 | A: No, I do not. | | |
| 47 | **228:16 - 228:21** | Graham, David 2006-05-09 | 00:00:13 | |
| | 228: 16 | Q: So, for the last 15 years, | | |
| | 228: 17 | you have been focusing pretty much | | |
| | 228: 18 | exclusively on epidemiology and drug | | |
| | 228: 19 | safety rather than practicing medicine; | | |
| | 228: 20 | is that correct? | | |
| | 228: 21 | A: Correct. | | |
| 48 | **251:14 - 253:17** | Graham, David 2006-05-09 | 00:01:50 | |
| | 251: 14 | Q: Another subject that you | | |
| | 251: 15 | discussed on direct examination is what | | |
| | 251: 16 | you call the naproxen myth. Do you | | |
| | 251: 17 | remember that? | | |
| | 251: 18 | A: Uh-huh. | | |
| | 251: 19 | Q: And that's a phrase that you | | |
| | 251: 20 | used in a couple of these PowerPoints | | |
| | 251: 21 | that were dated from 2005, right? | | |
| | 251: 22 | A: It's possible. I mean, I | | |
| | 251: 23 | don't have them in front of me, but it's | | |
| | 251: 24 | certainly possible. | | |
| | 252: 1 | Q: Well, you had one of them in | | |
| | 252: 2 | front of you before -- | | |
| | 252: 3 | A: That said 'alibi,' not myth. | | |
| | 252: 4 | Q: Oh, I'm sorry, naproxen | | |
| | 252: 5 | alibi. I stand corrected there. | | |
| | 252: 6 | Now, when you were writing | | |
| | 252: 7 | scientific articles in 2003 and 2004 and | | |

*overruled* (handwritten)

| | | Objections | Ruling in Barnett |
|---|---|---|---|

252: 8     you discussed this hypothesis of naproxen

252: 9     being cardioprotective, you didn't call
252: 10    it an alibi then, did you?
252: 11    A: No. It's a different
252: 12    audience.
252: 13    Q: In fact, well, the audience
252: 14    that you are writing for in scientific
252: 15    publications are other scientists and

252: 16    doctors, right?
252: 17    A: Correct.
252: 18    Q: And when you were writing in
252: 19    scientific publications for other
252: 20    scientists and doctors, what you said was
252: 21    that the naproxen hypothesis was one of
252: 22    the possible explanations for the

252: 23    difference that was seen in the VIGOR
252: 24    trial between Vioxx and naproxen
253: 1     patients, isn't that right, sir?
253: 2     A: A very low possibility.
253: 3     Q: Let's look at what you
253: 4     actually said.
253: 5     - - -
253: 6     (Whereupon, Deposition
253: 7     Exhibit Graham-8, 'COX-2
253: 8     selective non-steroidal
253: 9     anti-inflammatory drugs and
253: 10    cardiovascular disease,' {Ray, et
253: 11    al) Pharmacology and Drug Safety
253: 12    2003; 12: 67-70, was marked for
253: 13    identification.)
253: 14    - - -
253: 15    BY MR. BECK:
253: 16    Q: I'll hand you what we've
253: 17    marked as Exhibit 8.

**49  253:18  -  258:7    Graham, David 2006-05-09        00:04:57**

253: 18    Is Exhibit 8 a 2003
253: 19    publication?
253: 20    A: Yes, based on a talk from
253: 21    2002.
253: 22    Q: And the first named author
253: 23    on here is Wayne Ray. Do you see that?
253: 24    A: Yes.
254: 1     Q: He, I think, was the person
254: 2     that you said you recruited to help on
254: 3     the Kaiser Permanente study that you
254: 4     headed up, right?
254: 5     A: Yes.
254: 6     Q: And then also you're listed
254: 7     as an author; is that right?
254: 8     A: Correct.
254: 9     Q: If you go over to the second
254: 10    page, I'm going to direct you down to the
254: 11    bottom of the left-hand column, and I've
254: 12    blown this up and put it on the board.
254: 13    If you want to look at it on the board,
254: 14    it might be a little easier.
254: 15    In this 2003 article of
254: 16    yours and Dr. Ray's and the others, I see
254: 17    you say that 'The VIGOR trial enrolled

254: 18    8076 patients with rheumatoid arthritis,
254: 19    who were randomly assigned to rofecoxib'
254: 20    -- that's Vioxx, right?
254: 21    A: Uh-huh.
254: 22    Q: -- '(50 milligrams...) or
254: 23    naproxen, an established non-selective
254: 24    NSAID.' And then do you say, 'MI' --
255: 1     now, first of all, what does MI stand
255: 2     for?
255: 3     A: That's myocardial
255: 4     infarction.
255: 5     Q: Is that the same thing as a
255: 6     heart attack in common language?
255: 7     A: Correct. Yes.
255: 8     Q: Okay.
255: 9     So, a heart attack 'occurred
255: 10    in .4 percent of patients receiving
255: 11    rofecoxib compared to .1 percent of
255: 12    patients receiving naproxen. These data
255: 13    may reflect an increased risk of' heart
255: 14    attack 'associated with rofecoxib;' being
255: 15    Vioxx, 'a decreased risk associated with
255: 16    naproxen; or a combination of both
255: 17    effects.'
255: 18    Do you see that?
255: 19    A: Uh-huh.
255: 20    Q: And then did you go on to
255: 21    say that there were two recent published
255: 22    studies that looked at 'whether naproxen
255: 23    has a protective effect on the risk of
255: 24    coronary heart disease'?
256: 1     A: Uh-huh.
256: 2     Q: And this thing that you
256: 3     called an alibi today, back in 2003, did
256: 4     you report that both of those studies
256: 5     that you referred to there actually
256: 6     reported a reduction in the risk of heart
256: 7     attacks for people who were using
256: 8     naproxen?
256: 9     A: Well, a couple of things.
256: 10    Q: Did you say that or not,
256: 11    sir?
256: 12    A: That is not what I said.
256: 13    This paper represented a combined
256: 14    distillation of, I guess it was four
256: 15    different talks presented at a symposium.
256: 16    And they frequently -- what they do is
256: 17    they have one session and they condense
256: 18    them into a single paper, and then they
256: 19    list everybody as an author. And this
256: 20    material was from someone other than me
256: 21    in the section that I was presenting on.
256: 22    Q: Who was it from?
256: 23    A: I'd have to go back to the
256: 24    topic headings of what the different
257: 1     people, the four different speakers had,
257: 2     what their speaking assignment was. My
257: 3     speaking assignment at this meeting was
257: 4     to talk about the association of
257: 5     high-dose rofecoxib and hypertension.
257: 6     Q: Let me ask, when your name
257: 7     is listed as an author on an article like

| | | |
|---|---|---|
| 257: 8 | this, do you have a chance to review the | |
| 257: 9 | whole article and decide whether you want | |
| 257: 10 | to be associated with the comments that | |
| 257: 11 | are made in there? | |
| 257: 12 | A:  You get copies of articles | |
| 257: 13 | like this. When I got it, I only really | |
| 257: 14 | read the section that was my purview, and | |
| 257: 15 | I really didn't read the other sections. | |
| 257: 16 | Q:  Is this the first time that | |
| 257: 17 | you understood or knew that your name was | |
| 257: 18 | on a scientific article that said that | |
| 257: 19 | heart attacks may reflect a decreased | |
| 257: 20 | risk associated with naproxen? | |
| 257: 21 | A:  Well, I mean, I knew my name | |
| 257: 22 | was on the paper. I hadn't read that | |
| 257: 23 | closely. The studies that are referenced | |
| 257: 24 | are studies that I talked about during | |
| 258: 1 | the previous part of the deposition that | |
| 258: 2 | are analyzed incorrectly and so really | |
| 258: 3 | don't show reductions in cardiovascular | |
| 258: 4 | risk with naproxen, but in any event. | |
| 258: 5 | Q:  Did you ever ask that your | |
| 258: 6 | name be removed from this article? | |
| 258: 7 | A:  No, I did not. | |

50 **258:20 - 263:21**  Graham, David 2006-05-09                          00:05:18

| | | |
|---|---|---|
| 258: 20 | Q:  Please take a look at what | |
| 258: 21 | we've marked as Exhibit 9. Is Exhibit 9 | |
| 258: 22 | a copy of a scientific article that has | |
| 258: 23 | your name on it as one of the authors? | |
| 258: 24 | A:  Yes. | |
| 259: 1 | Q:  Now, before we get into | |
| 259: 2 | Exhibit 9, is this one -- well, Dr. Ray | |
| 259: 3 | is on this one also, right? | |
| 259: 4 | A:  Correct. | |
| 259: 5 | Q:  So, a bunch of other authors | |
| 259: 6 | and you and Dr. Ray. Is this one where | |
| 259: 7 | everybody just gave speeches and you | |
| 259: 8 | didn't read it closely? | |
| 259: 9 | A:  No, no. No. This was a | |
| 259: 10 | real study. | |
| 259: 11 | Q:  This was a real study? | |
| 259: 12 | A:  Yes. | |
| 259: 13 | Q:  Okay. | |
| 259: 14 | Well, looking down then at | |
| 259: 15 | the first page of -- I'm sorry, we'll go | |
| 259: 16 | over to the fourth page of what you | |
| 259: 17 | called the real study that you and Dr. | |
| 259: 18 | Ray were both authors on. | |
| 259: 19 | This language that I've | |
| 259: 20 | blown up here from the right-hand column | |
| 259: 21 | at the bottom, did you and Dr. Ray say, | |
| 259: 22 | 'The cause of the excess of serious | |
| 259: 23 | cardiovascular events in the VIGOR trial | |
| 259: 24 | is still a matter of debate'? Is that | |
| 260: 1 | what you said in the scientific study in | |
| 260: 2 | 2004? | |
| 260: 3 | A:  Yes. | |
| 260: 4 | Q:  And it says, 'A recent | |
| 260: 5 | observational study reported a higher | |
| 260: 6 | rate of cardiovascular events in | |
| 260: 7 | high-dose rofecoxib users.' That would | |
| 260: 8 | be the 50 milligrams; is that right? | |

260: 9     A:  That's what -- well, I'm
260: 10    just looking at the reference for that,
260: 11    and that would be, I think, any dose that
260: 12    was over 25 milligrams. So, there are
260: 13    people who take 37-and-a-half milligrams.
260: 14    Q:  Okay.
260: 15    Are there very many people
260: 16    who take that?
260: 17    A:  I don't know. I don't know
260: 18    the number.
260: 19    Q:  Okay.
260: 20    Anyway, over 25.
260: 21    It says, 'A recent
260: 22    observational study recorded a higher
260: 23    rate of cardiovascular events in
260: 24    high-dose rofecoxib users compared to
261: 1     users of other NSAIDs and users of lower
261: 2     doses of rofecoxib.' It says 'To date,
261: 3     lower doses' -- that's talking about
261: 4     Vioxx, right?
261: 5     A:  Uh-huh.
261: 6     Q:  'To date,' you and Dr. Ray
261: 7     say, 'lower doses' of Vioxx 'have not
261: 8     been associated with a statistically
261: 9     significant excess of these types of
261: 10    serious events.'
261: 11    Is that what you said to the
261: 12    scientific and medical community in 2004?
261: 13    A:  It's based on the published
261: 14    literature, yes.
261: 15    Q:  And then you go on to say,
261: 16    'Since the 50 milligram dose has
261: 17    clinically significant undesirable
261: 18    effects and has not been shown to be more
261: 19    effective than lower doses' -- that's
261: 20    more effective than lower doses of Vioxx,
261: 21    right?
261: 22    A:  Uh-huh.
261: 23    Q:  -- 'chronic use of high-dose
261: 24    rofecoxib should be discouraged.'
262: 1     Do you see that?
262: 2     A:  Uh-huh.
262: 3     Q:  Now, today what you said was
262: 4     that back in 2004, you were clamoring
262: 5     that 50 milligrams should be withdrawn
262: 6     from the market. Do you remember that?
262: 7     A:  I don't remember using the
262: 8     word 'clamoring,' but...
262: 9     Q:  No. That was my word.
262: 10    You said you were urging
262: 11    that 50 milligrams -- what you said today
262: 12    was that back in 2004, Dr. Graham was
262: 13    urging that 50 milligrams should be
262: 14    withdrawn from the market, right?
262: 15    A:  I don't think I used the
262: 16    word 'urge,' but I thought that the
262: 17    50-milligram strength should come off the
262: 18    market, yes.
262: 19    Q:  But in the actual scientific
262: 20    publication that you and Dr. Ray authored
262: 21    in 2004, what you said, all you said
262: 22    about 50 milligrams was that chronic use

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

262: 23 of high-dose Vioxx should be discouraged,
262: 24 right?
263: 1 A: Well, yes, but a couple
263: 2 things. One, the paper was published
263: 3 online in July of 2003; and, two, that
263: 4 the paper was submitted in November of
263: 5 2002. And basically -- and then the
263: 6 third thing is, is I'm not the senior
263: 7 author, and so for things like this, I
263: 8 certainly couldn't disagree with the
263: 9 statement that chronic use of high-dose
263: 10 should be discouraged. I would take it a
263: 11 step further.
263: 12 Back in 2002, I think that
263: 13 the VIGOR study provided enough evidence
263: 14 to seriously question Vioxx remaining on
263: 15 the market.
263: 16 Q: But that's not what you said
263: 17 in the article that you published two
263: 18 years later in print and a year later
263: 19 online, is it, sir?
263: 20 A: No, but I'm not the first
263: 21 author.

**51** **268:8 - 269:8** Graham, David 2006-05-09     00:00:52
268: 8 This confidence interval is
268: 9 the thing that is in the parenthesis
268: 10 here, right?
268: 11 A: Correct.
268: 12 Q: And I hope that at trial
268: 13 somebody else will describe confidence
268: 14 interval because I'm not going to take
268: 15 the time to do it with you today. But
268: 16 you say it's consistent with being as
268: 17 high as 1.37?
268: 18 A: Right.
268: 19 Or as low as .76.
268: 20 Q: Or as low as .76.
268: 21 So that this confidence
268: 22 interval says that Vioxx 25 milligram, it
268: 23 might be better than not taking any
268: 24 medicine at all when it comes to heart
269: 1 attacks, or it might be a little worse
269: 2 than not taking any medicine at all.
269: 3 But, basically, the best analysis is,
269: 4 it's the same thing as not taking any
269: 5 medicine at all, right?
269: 6 A: That's the appropriate
269: 7 interpretation of that study for that
269: 8 dose.

**52** **270:23 - 272:19** Graham, David 2006-05-09     00:02:05
270: 23 Q: You mentioned before that
270: 24 you wrote a chapter in a book on -- what
271: 1 was the subject of the book?
271: 2 A: Well, it's called
271: 3 Pharmacoepidemiology.
271: 4 Q: Yeah.
271: 5 And do you know that in that
271: 6 book on pharmacoepidemiology, it is
271: 7 stated that if you have a relative risk
271: 8 of less than 2.0, that's a relatively
271: 9 weak relationship?

|  |  | Objections | Ruling in Barnett |
|---|---|---|---|

271: 10 A: It's a view that I don't
271: 11 subscribe to.
271: 12 Q: Do you know that that's the
271: 13 view that's expressed in a book that you
271: 14 wrote a chapter in?
271: 15 A: A, I haven't read a chapter
271: 16 where that view is expressed; and, B,
271: 17 that's one chapter written by one author
271: 18 in a textbook where the editor pretty
271: 19 much lets you write what your point of
271: 20 view is.
271: 21 Q: Do you know whether your
271: 22 colleague, Dr. Ray, has said under oath
271: 23 that if the relative risk is less than 2,
271: 24 then it's less likely than not for any
272: 1 particular person that Vioxx would have
272: 2 contributed to a heart attack?
272: 3 A: I'm not aware of anything
272: 4 that Dr. Ray has said under oath.
272: 5 Q: You spent a little bit of
272: 6 time on direct examination concerning the
272: 7 approval of Vioxx, as well as a

272: 8 subsequent label change. And I just
272: 9 wanted to make sure that we were clear on
272: 10 this.
272: 11 Did you have any personal
272: 12 role whatsoever in the FDA's review of
272: 13 the application that led to the approval
272: 14 of Vioxx?
272: 15 A: No.
272: 16 Q: And did you have any role
272: 17 whatsoever in reviewing proposed label
272: 18 changes for Vioxx?
272: 19 A: No.

53   **274:1 - 274:14**   Graham, David 2006-05-09          00:00:45
274: 1 And that is, is it your view
274: 2 that warning language in labels does not
274: 3 have a significant effect on the
274: 4 decisions by doctors and whether to
274: 5 prescribe the medicines that the warnings
274: 6 accompany?
274: 7 A: It's my view that warnings
274: 8 as implemented by FDA have been very
274: 9 ineffective. There are means, I believe,
274: 10 whereby labeling could be constructed in
274: 11 a fashion that it actually would
274: 12 potentially influence physician behavior
274: 13 and perhaps then find its way into
274: 14 patient behavior.

54   **274:15 - 275:10**   Graham, David 2006-05-09          00:00:48
274: 15 Q: Would that be a different
274: 16 way of going about labeling than the FDA
274: 17 currently does?
274: 18 A: It would actually just be
274: 19 more straightforward about what the
274: 20 problems are, using very bold and frank
274: 21 and plain language, not sort of using
274: 22 adjectives that kind of downplay it and
274: 23 not burying it in tremendous amounts of
274: 24 text so that when a physician looks at
275: 1 the label, they're confronted by three

|  |  | Objections | Ruling in Barnett |
|---|---|---|---|

275: 2    paragraphs of warnings, and the warning
275: 3    that really matters is kind of buried in
275: 4    the midst of it. I think that there's a
275: 5    lot of room for experimentation where
275: 6    these labeling interventions might
275: 7    actually have an effect. But as
275: 8    practiced, the way FDA implements them,

275: 9    they are not -- have not been, until now,
275: 10   effective, in my view.

**55   276:12  -  277:19   Graham, David 2006-05-09          00:01:22**
276: 12   Q:  Did you say in a written
276: 13   publication in 2002, co-authored with
276: 14   Willy, that 'The findings from this study
276: 15   are consistent with the results from
276: 16   other studies showing that product
276: 17   labeling may not meaningfully affect
276: 18   physician behavior'?
276: 19   A:  Yes.
276: 20   Q:  Did you say in a 2001
276: 21   article written by you as the lead
276: 22   author, 'This study suggests that
276: 23   labeling changes, including black box

276: 24   warnings, and instructions to monitor
277: 1    patients closely, as well as repeated
277: 2    'Dear Healthcare Professional' letters to
277: 3    physicians cannot be assumed to be
277: 4    effective means of risk management'?
277: 5    A:  Yes, I said that.
277: 6    Q:  I want to move now to the
277: 7    Kaiser study. I think you described that
277: 8    this is an epidemiological study, not a
277: 9    clinical trial, right?
277: 10   A:  Correct.
277: 11   Q:  And what that means is that
277: 12   you and your colleagues examined the
277: 13   medical records from thousands or even
277: 14   more patients from the HMO, and you could
277: 15   see what medicines they were prescribed
277: 16   and you could see what problems they had
277: 17   or didn't have in their healthcare; is
277: 18   that right?
277: 19   A:  That's correct.

**56   287:18  -  288:7   Graham, David 2006-05-09          00:01:06**
287: 18   And you described this
287: 19   morning kind of a chronology of reports
287: 20   that you made or public disclosures of
287: 21   the results of the study. And I want to
287: 22   go through those same events with you, if
287: 23   I could.
287: 24   And I've prepared a chart,
288: 1    and what I want to do is talk with you
288: 2    about different statements that you made
288: 3    in different publications about the
288: 4    significance of 25 milligrams or below,
288: 5    whether that poses a statistically
288: 6    significant increase for heart attacks,
288: 7    whether -- and whether above 25 does.

**57   290:16  -  291:6   Graham, David 2006-05-09          00:00:39**
290: 16   Q:  Dr. Graham, what I want to

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

| | | | |
|---|---|---|---|
| | 290: 17 | do now is fill in these blanks on the | |
| | 290: 18 | chart I have on the screen for the | |
| | 290: 19 | relative risk and confidence intervals in | |
| | 290: 20 | these different categories. | |
| | 290: 21 | So, with the May 2004 ACR | |
| | 290: 22 | abstract, do I have that correct that the | |
| | 290: 23 | relative risk that was reported was 1.02 | |
| | 290: 24 | for 25 milligrams or less, with the | |
| | 291: 1 | confidence intervals as I've indicated up | |
| | 291: 2 | there? | |
| | 291: 3 | A: Yes, that's correct. | |
| | 291: 4 | Q: And that is not | |
| | 291: 5 | statistically significant, correct? | |
| | 291: 6 | A: That's correct. | |
| 58 | 291:23 - 295:19 | Graham, David 2006-05-09 | 00:03:45 |
| | 291: 23 | Q: Okay. | |
| | 291: 24 | Now, after this May 2004 | |
| | | | |
| | 292: 1 | abstract, you went back and reclassified | |
| | 292: 2 | some of the patients from the Kaiser | |
| | 292: 3 | study who had been classified as low-dose | |
| | 292: 4 | patients for the purposes of the analysis | |
| | 292: 5 | that's shown in the abstract. I think my | |
| | 292: 6 | hand just snuck across the screen. | |
| | 292: 7 | Excuse me. | |
| | 292: 8 | You reclassified some | |
| | 292: 9 | patients who had been counted as low-dose | |
| | 292: 10 | patients, and then you counted them | |
| | 292: 11 | instead as high-dose patients; is that | |
| | 292: 12 | right? | |
| | 292: 13 | A: Yes. And high-dose patients | |
| | 292: 14 | who are reclassified as low dose. | |
| | 292: 15 | - - - | |
| | | | |
| | 292: 16 | (Whereupon, Deposition | |
| | 292: 17 | Exhibit Graham-12, E-mail 5-25-04 | |
| | 292: 18 | KP002153, was marked for | |
| | 292: 19 | identification.) | |
| | 292: 20 | - - - | |
| | 292: 21 | BY MR. BECK: | |
| | 292: 22 | Q: After you reclassified | |
| | 292: 23 | patients, then I'm going to show you what | |
| | 292: 24 | we marked as Exhibit 12. Did you write | |
| | 293: 1 | an e-mail which is -- I'm looking for the | |
| | 293: 2 | date. Can you help me with the date? | |
| | 293: 3 | Oh, it is also from May. Up at the top | |
| | 293: 4 | you will see your e-mail is May 25th, | |
| | 293: 5 | 2004? | |
| | 293: 6 | A: Uh-huh. | |
| | 293: 7 | Q: And then you report new | |
| | | | |
| | 293: 8 | relative risks and confidence intervals | |
| | 293: 9 | based on the reclassifications, right? | |
| | 293: 10 | A: Yes. | |
| | 293: 11 | Q: Okay. | |
| | 293: 12 | And tell me if I have it | |
| | 293: 13 | right up here. The relative risk that | |
| | 293: 14 | you reported after reclassifying people | |
| | 293: 15 | for the 25 milligrams or less was .98, | |
| | 293: 16 | correct? | |
| | 293: 17 | A: Yes. | |
| | 293: 18 | Q: With the confidence | |

|  |  | Objections | Ruling in Barnett |
|--|--|--|--|

293: 19    intervals as I've indicated there, right?
293: 20    A:  Yes.
293: 21    Q:  And that is not
293: 22    statistically significant, correct?
293: 23    A:  Correct.
293: 24    Q:  And we're talking here about
294: 1     Vioxx 25 milligrams or less compared to
294: 2     people who are not taking pain
294: 3     medication, no difference in risk, right?
294: 4     A:  Right.
294: 5     Q:  And in your analogy of
294: 6     bullets in chambers, there would be zero
294: 7     bullets in the chambers for people who
294: 8     were using 25 milligrams of Vioxx, right?
294: 9     A:  Yeah. They'd be pretty
294: 10    close to zero. There would be five or
294: 11    six, but yes.
294: 12    Q:  Well, there would be --
294: 13    A:  The P is .91. So, what that
294: 14    means is that 91 out of 100 chances that
294: 15    the answer lies between those confidence
294: 16    intervals and that that .98 -- so, it's
294: 17    the most likely answer.
294: 18    Q:  The most likely thing is --
294: 19    and when we say .98, that's actually a
294: 20    little bit lower risk than someone who's
294: 21    not taking any medicine at all. I mean,
294: 22    it doesn't -- it's so little that it
294: 23    doesn't make any difference, but we're
294: 24    talking about Vioxx 25 milligrams is
295: 1     basically indistinguishable from not
295: 2     taking any medicine at all when it comes
295: 3     to cardiovascular risk, right?
295: 4     A:  Yes.
295: 5     Q:  Okay.
295: 6     And then after this
295: 7     reclassification, the risk that you
295: 8     reported, the relative risk for higher
295: 9     dose goes up substantially, and then it
295: 10    is statistically significant, correct?
295: 11    A:  Yes.
295: 12    Q:  Now, after the e-mail, did
295: 13    you -- I think you said you did something
295: 14    called a poster, you wrote up a poster?
295: 15    A:  Right. That was in August.
295: 16    Q:  August of --
295: 17    A:  Of 2004.
295: 18    Q:  Of 2004?
295: 19    A:  Correct.

59  **295:24 - 296:13**  Graham, David 2006-05-09                  00:00:22
295: 24    (Whereupon, Deposition
296: 1     Exhibit Graham-13, 'Risk of Acute
296: 2     Myocardial Infarction and Sudden
296: 3     Cardiac Death with Use of COX-2
296: 4     Selective and Non-Selective
296: 5     NSAIDs' (Graham, et al) KP001521
296: 6     - KP001526, was marked for
296: 7     identification.)
296: 8     - - -
296: 9     BY MR. BECK:
296: 10    Q:  And I think I got it right.
296: 11    Is it the ISPE poster that you talked

| | | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | 296: 12 | about on direct examination? | | |
| | 296: 13 | A: Yes. | | |
| 60 | 298:5 - 299:5 | Graham, David 2006-05-09 | 00:01:19 | |
| | 298: 5 | Q: And all I want you to do is | | |
| | 298: 6 | confirm for me, sir, after you | | |
| | 298: 7 | reclassified people and then changed the | | |
| | 298: 8 | regression analysis, is this the relative | | |
| | 298: 9 | risk that you recorded for 25 milligrams | | |
| | 298: 10 | or less? | | |
| | 298: 11 | A: Yes, it is. | | |
| | 298: 12 | Q: And that is under | | |
| | 298: 13 | traditional approach not statistically | | |
| | 298: 14 | significant, correct? | | |
| | 298: 15 | A: It's elevated, that's | | |
| | 298: 16 | correct. | | |
| | 298: 17 | Q: Correct that it's not | | |
| | 298: 18 | statistically significant? | | |
| | 298: 19 | A: Yes, but -- yes. | | |
| | 298: 20 | Q: And then the high dose | | |
| | 298: 21 | numbers came down somewhat, but still | | |
| | 298: 22 | elevated. And after the reclassification | | |
| | | | | |
| | 298: 23 | and change in methodology, they remained | | |
| | 298: 24 | statistically significant, right? | | |
| | 299: 1 | A: Yes. | | |
| | 299: 2 | Q: Now, finally you reported | | |
| | 299: 3 | these results in The Lancet article that | | |
| | 299: 4 | you testified about, right? | | |
| | 299: 5 | A: Yes. | | |
| 61 | 300:18 - 305:6 | Graham, David 2006-05-09 | 00:05:02 | |
| | 300: 18 | So, after the | | |
| | 300: 19 | reclassification in May and the change in | | |
| | 300: 20 | methodology in August, and then the | | |
| | 300: 21 | quality control in 2005, your final | | |
| | 300: 22 | result for 25 milligrams and below was a | | |
| | 300: 23 | relative risk of 1.23 with a confidence | | |
| | 300: 24 | interval from below 1 to above 1, right? | | |
| | | | | |
| | 301: 1 | A: Yes. | | |
| | 301: 2 | Q: And under traditional | | |
| | 301: 3 | approach, that is not statistically | | |
| | 301: 4 | significant, correct? | | |
| | 301: 5 | A: Correct. | | |
| | 301: 6 | Q: And then the final numbers | | |
| | 301: 7 | for the high dose that you had were 3 | | |
| | 301: 8 | with the confidence interval as | | |
| | 301: 9 | indicated, right? | | |
| | 301: 10 | A: Yes. | | |
| | 301: 11 | Q: And that under this analysis | | |
| | 301: 12 | remains statistically significant; is | | |
| | 301: 13 | that right? | | |
| | 301: 14 | A: Yes. | | |
| | 301: 15 | Q: So, just sort of a summary | | |
| | 301: 16 | question that in all four of your reports | | |
| | 301: 17 | as to the outcome of your study, the 25 | | |
| | 301: 18 | milligrams and below, the relative risk | | |
| | 301: 19 | at all times remained under traditional | | |
| | 301: 20 | views as to statistical significance; is | | |
| | 301: 21 | that right? | | |
| | 301: 22 | A: Compared to remote use, but | | |
| | 301: 23 | not compared to -- well, compared to | | |
| | 301: 24 | remote use. | | |

302: 1   Q: Yeah. I'm asking about
302: 2   comparing it to remote use, which is --

302: 3   A: Basically nonuse.
302: 4   Q: Right.
302: 5   So, in all four at 25
302: 6   milligrams or below, there was no
302: 7   statistically significant difference
302: 8   between taking that dose of Vioxx and not
302: 9   taking any medicine at all, right?
302: 10  A: Yes.
302: 11  Q: I want to focus a bit on, a
302: 12  little bit more on how these changes came
302: 13  about from the abstract to the poster and
302: 14  also what people within the FDA were
302: 15  saying about your analysis, because I
302: 16  think you testified about that this
302: 17  morning. Do you remember that?
302: 18  A: Uh-huh.
302: 19  Q: The abstract itself, did you
302: 20  have that reviewed by anybody from the
302: 21  FDA before the abstract was published?
302: 22  A: What are we referring to?
302: 23  Q: We're referring to back up
302: 24  on the screen, May of 2004 --
303: 1   A: The ACR abstract.
303: 2   Q: -- ACR abstract.
303: 3   A: What happened with the ACR
303: 4   abstract is that David Campen at Kaiser
303: 5   was the first author, and I sent him the
303: 6   quick analysis that we had done, and he
303: 7   submitted the abstract, and I did not put
303: 8   it through FDA clearance, and that was an
303: 9   oversight on my part.
303: 10  Q: And then because there is a
303: 11  procedure that you are supposed to follow
303: 12  at FDA to show them studies and articles
303: 13  and abstracts and posters that you intend
303: 14  to have your name on, whether you're the
303: 15  first author or second, third, fourth or
303: 16  fifth, right?
303: 17  A: Yes.
303: 18  Q: Okay.
303: 19  And then when it came to the
303: 20  poster in August of 2004, after you've
303: 21  reclassified people and changed the
303: 22  methodology, did you submit that for
303: 23  review by folks from the FDA?
303: 24  A: Yes, I did.
304: 1   Q: And I think you indicated
304: 2   that your supervisor reviewed that
304: 3   poster; is that right?
304: 4   A: Yes.
304: 5   Q: And what was his name?
304: 6   A: Paul Seligman.
304: 7   Q: And at the time, was he the
304: 8   acting head of the Office of the Drug
304: 9   Safety?
304: 10  A: I think so, yes.
304: 11  Q: And you said something about
304: 12  how he suggested a change in the
304: 13  conclusion. Was your -- did your initial

| | Objections | Ruling in Barnett |
|---|---|---|

|  |  |  |
|---|---|---|
| 304: 14 | draft of the poster have a conclusion |
| 304: 15 | that the high dose of Vioxx, the 50 |
| 304: 16 | milligram dose should not be prescribed |
| 304: 17 | or used? |
| 304: 18 | A:  Let me see what this one |
| 304: 19 | says and then I can answer you. |
| 304: 20 | (Witness reviewing |
| 304: 21 | document.) |
| 304: 22 | Yes. |
| 304: 23 | Q:  Okay. |
| 304: 24 | And then I think you said |
| 305: 1 | that Dr. Seligman did not agree with that |
| 305: 2 | conclusion and said that you should take |
| 305: 3 | out the conclusion that high dose 50 |
| 305: 4 | milligrams should not be prescribed or |
| 305: 5 | used; is that right? |
| 305: 6 | A:  Correct. |

| 62 | 305:10  -  305:16 | Graham, David 2006-05-09 | 0 |
|---|---|---|---|
|  | 305: 10 | (Whereupon, Deposition |
|  | 305: 11 | Exhibit Graham-14, E-mails with |
|  | 305: 12 | attachment 'Comments on ISPE |
|  | 305: 13 | Paper' FDACDER006048 - |
|  | 305: 14 | FDACDER006049, was marked for |
|  | 305: 15 | identification.) |
|  | 305: 16 | - - - |

| 63 | 305:19  -  306:11 | Graham, David 2006-05-09 | 00:00:38 |
|---|---|---|---|
|  | 305: 19 | BY MR. BECK: |
|  | 305: 20 | Q:  Do you recognize Exhibit 14? |
|  | 305: 21 | A:  Yes, I do. |
|  | 305: 22 | Q:  What is Exhibit 14? |
|  | 305: 23 | A:  It's an e-mail from Dr. |
|  | 305: 24 | Seligman to me with his comments on the |
|  | 306: 1 | poster. |
|  | 306: 2 | Q:  All right. |
|  | 306: 3 | And then the next page are |
|  | 306: 4 | his comments, right? |
|  | 306: 5 | A:  Right. |
|  | 306: 6 | Q:  Was Mr. -- is it Dr. |
|  | 306: 7 | Seligman? |
|  | 306: 8 | A:  Dr. Seligman. |
|  | 306: 9 | Q:  Dr. Seligman, is he one of |
|  | 306: 10 | the people that you think was out to get |
|  | 306: 11 | you at the FDA? |

| 64 | 306:14  -  308:6 | Graham, David 2006-05-09 | 00:01:37 |
|---|---|---|---|
|  | 306: 14 | THE WITNESS:  Let's put it |
|  | 306: 15 | this way. Dr. Seligman ordered an |
|  | 306: 16 | illegal criminal investigation in |
|  | 306: 17 | early 2004 to identify the person |
|  | 306: 18 | or persons who spoke to the media |
|  | 306: 19 | about the fact that Dr. Andrew |
|  | 306: 20 | Mossholder, an FDA medical officer |
|  | 306: 21 | who had done a study looking at |
|  | 306: 22 | SSRI antidepressants and |
|  | 306: 23 | suicidality in children, that that |
|  | 306: 24 | had been suppressed. |
|  | 307: 1 | Dr. Seligman, under oath |
|  | 307: 2 | before the House subcommittee on |
|  | 307: 3 | investigations and oversight for |
|  | 307: 4 | FDA, admitted under oath that he |
|  | 307: 5 | had ordered that illegal criminal |

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

307: 6 — investigation to identify the
307: 7 — source of the leak and that he had
307: 8 — named me as a suspect, although he
307: 9 — had no grounds to do so, except
307: 10 — that he thought that this is the
307: 11 — kind of thing that I would do.
307: 12 — And so there is that past history
307: 13 — with Dr. Seligman to keep in mind.
307: 14 — At this point, I wasn't
307: 15 — interpreting his comments in that
307: 16 — regard except that the reason why
307: 17 — I hadn't said in the original
307: 18 — version was that high dose
307: 19 — rofecoxib should be removed from
307: 20 — the market was because I knew the
307: 21 — type of reaction it would get, and
307: 22 — toning it down a little bit still

307: 23 — elicited pretty much the same
307: 24 — response, and that's expressed
308: 1 — here.
308: 2 — BY MR. BECK:
308: 3 — Q:  Well, this morning, didn't
308: 4 — you testify, in effect, that there were
308: 5 — several people at the FDA who were out to
308: 6 — get you?

**65   308:10  -  308:18   Graham, David 2006-05-09      00:00:12**
308: 10 — THE WITNESS: No, I never
308: 11 — used those, but I can --
308: 12 — BY MR. BECK:
308: 13 — Q:  No. The terms you used were
308: 14 — that there was an 'organized and
308: 15 — orchestrated campaign to smear and
308: 16 — discredit me.' Do you remember that
308: 17 — phrase?
308: 18 — A: Yes.

**66   308:21  -  311:5   Graham, David 2006-05-09      00:02:09**
308: 21 — THE WITNESS: And we can
308: 22 — talk about that in detail if you
308: 23 — would like.
308: 24 — BY MR. BECK:
309: 1 — Q:  Okay.
309: 2 — My question right now is a
309: 3 — narrow one. Is Dr. Seligman one of the
309: 4 — people that you were referring to this
309: 5 — morning as part of this organized and
309: 6 — orchestrated campaign that you thought
309: 7 — existed to smear and discredit you?
309: 8 — A:  Yes. He would be part of
309: 9 — that group.
309: 10 — Q:  Okay.
309: 11 — So, let's look at what Dr.
309: 12 — Seligman said when you submitted the
309: 13 — poster to him. He said, 'In general an
309: 14 — excellent study and analysis of a complex
309: 15 — topic.'
309: 16 — Do you see that?
309: 17 — A:  Yes.
309: 18 — Q:  And then he says, 'As you
309: 19 — might expect, my only comment has to do

309: 20 — with the conclusion that 'higher-dose

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

309: 21 rofecoxib should not be prescribed or
309: 22 used."
309: 23 That's the conclusion that
309: 24 you and I were talking about a few
310: 1 minutes ago, right?
310: 2 A: Right.
310: 3 Q: Then he went on to explain
310: 4 why he was concerned with having a
310: 5 conclusion like that, didn't he?

310: 6 A: Yes.
310: 7 Q: And then he said, 'My
310: 8 concern is based both on the small number
310: 9 of cases (10) and the lack of information
310: 10 inherent in such a study regarding the
310: 11 'time-to-event."
310: 12 Now, small number of cases
310: 13 being ten, does that mean that there were
310: 14 only ten cases in your study of thousands
310: 15 and thousands of patients where somebody
310: 16 taking high-dose Vioxx had either a heart
310: 17 attack or sudden cardiac death?
310: 18 A: We had ten patients who were
310: 19 currently exposed to high-dose rofecoxib
310: 20 Vioxx at the time of their heart attack
310: 21 or sudden death.
310: 22 Q: And the concern expressed by
310: 23 Dr. Seligman, whether you believe him
310: 24 today or not, was that that number is
311: 1 just too small to draw a meaningful
311: 2 conclusion from, correct?
311: 3 A: That's what I think he's
311: 4 driving at here, but that's what a
311: 5 confidence interval is for.

67  **312:2 - 313:22**  Graham, David 2006-05-09                00:02:01
312: 2 Q: But in any event, Dr.
312: 3 Seligman disagreed and said the number of
312: 4 cases is just so small that you cannot
312: 5 legitimately draw such a conclusion,
312: 6 correct?
312: 7 A: Yes. But he's not referring
312: 8 to the confidence intervals, and, you
312: 9 know, if you ask him the same questions
312: 10 you're asking me, he'd have to say that
312: 11 the confidence intervals permit it.
312: 12 Q: Well, did others in the FDA
312: 13 express similar concerns that Dr.
312: 14 Seligman expressed about whether you
312: 15 could draw conclusions from such a small
312: 16 number --
312: 17 A: Yes, they did.
312: 18 Q: -- of people who used the
312: 19 high-dose Vioxx?
312: 20 A: Yes, they did.
312: 21 Q: Who is Dr. John Jenkins?
312: 22 A: He's the director of the
312: 23 Office of New Drugs.
312: 24 Q: And is Dr. Jenkins another
313: 1 one of the FDA people that you think was
313: 2 out to get you?
313: 3 A: No.
313: 4 - - -

|  |  | Objections | Ruling in Barnett |
|---|---|---|---|

313: 5        (Whereupon, Deposition
313: 6        Exhibit Graham-15, E-mails
313: 7        FDACDER011048 - FDACDER011049,
313: 8        was marked for identification.)
313: 9        - - -
313: 10       BY MR. BECK:

313: 11       Q: Let me show you Exhibit 15.
313: 12       A:   (Witness reviewing
313: 13       document.)
313: 14       Q: Exhibit 15 is an e-mail
313: 15       string. The last one appears to be dated
313: 16       August 11, 2004. They're all around that
313: 17       time frame.
313: 18       Do you see that the middle
313: 19       e-mail on Page 1 is from Dr. Jenkins?
313: 20       A: Yes, I see it. I've never
313: 21       seen this e-mail before, the best I can
313: 22       recollect.

68   315:4  -  319:7   Graham, David 2006-05-09          00:04:38
315: 4        Q: So, Dr. Jenkins here, he
315: 5        says -- I put the little red marker where
315: 6        I'm going to begin reading. Second
315: 7        paragraph, 'I would also note that I find
315: 8        the conclusions reached in the poster to
315: 9        be far in excess of the available data.
315: 10       For example, 'Rofecoxib use at a dose
315: 11       over 25 milligrams increases the risk of
315: 12       AMI or SCD' is the primary conclusion of
315: 13       the poster. This is a far too definitive
315: 14       conclusion based on the data. Similar
315: 15       language appears in other parts of the
315: 16       poster and implies that a causal
315: 17       relationship has been confirmed.'
315: 18       Now, just stopping there.
315: 19       Did you know back in 2004 that Dr.
315: 20       Jenkins was of the same view that Dr.
315: 21       Seligman expressed to you?
315: 22       A: There was one e-mail from
315: 23       sometime after this date, but in the
315: 24       teens of August, it was like a two-line
316: 1        e-mail in which Dr. Jenkins suggested
316: 2        what he thought different wording for our
316: 3        conclusions would be acceptable to him
316: 4        were, and that's pretty much the extent
316: 5        of what my knowledge of what Dr. Jenkins
316: 6        thought.
316: 7        Q: Do you see where he goes on
316: 8        to say: 'This is misleading at best and
316: 9        deceptive at worst, since what has been
316: 10       demonstrated as an association between
316: 11       the use of the drug and the events in
316: 12       question. Yes, we have some priors and

316: 13       randomized controlled clinical trials
316: 14       that suggest rofecoxib may be associated
316: 15       with an increased risk of MI, but those
316: 16       priors do not support reaching such a
316: 17       definitive conclusion about the findings
316: 18       in the study'?
316: 19       Were you aware that Dr.
316: 20       Jenkins was expressing the view that the

| | | Objections | Ruling in Barnett |
|---|---|---|---|

316: 21  conclusion that you had in your draft
316: 22  poster was misleading at best and
316: 23  deceptive at worst?
316: 24  A: Nope. No idea.
317: 1  Q:  And then he goes on to say,
317: 2  'These types of overstated conclusions
317: 3  are typical of David's writing' -- David
317: 4  is you, correct?
317: 5  A:  Correct.
317: 6  Q:  -- 'and only serve to
317: 7  undermine his credibility as an objective
317: 8  evaluator of the data at hand.'
317: 9  And then he says, 'It is
317: 10  even more ridiculous for him to make
317: 11  broad recommendations about not using the
317: 12  drug based on the data from this study,
317: 13  and such sweeping clinical/regulatory
317: 14  conclusions represent the primary reason
317: 15  for difficulties in the interactions
317: 16  between David and staff in OND.'
317: 17  That would be Office of New
317: 18  Drugs, right?
317: 19  A:  Correct.
317: 20  Q:  Then before I get to the
317: 21  last couple of sentences, when you write
317: 22  articles like you talked about this
317: 23  morning and including this poster, do you
317: 24  typically have a disclaimer on there that
318: 1  says these are not necessarily the views
318: 2  of the FDA, they're just the views of the
318: 3  author, David Graham?
318: 4  A:  Oh, we're pretty much
318: 5  required to have that disclaimer.
318: 6  Q:  And do you see here where
318: 7  Dr. Jenkins says, 'Perhaps the disclaimer
318: 8  should read that 'The views expressed are
318: 9  those of the author and DO NOT reflect
318: 10  the views of the FDA.'' And 'Also,
318: 11  perhaps, the COI statement' -- what's a
318: 12  COI statement?
318: 13  A:  I think that's probably
318: 14  conflict of interest.
318: 15  Q:  Okay.
318: 16  And I think this morning you
318: 17  said in response to questions from
318: 18  counsel that you didn't have any
318: 19  conflicts of interest.
318: 20  Do you see where Dr. Jenkins
318: 21  says that 'perhaps the conflict of
318: 22  interest statement should say 'Dr. Graham
318: 23  has no FINANCIAL conflicts of interest,
318: 24  but' systemic 'bias in his viewpoints
319: 1  cannot be excluded.'
319: 2  Were you aware that that was
319: 3  Dr. Jenkins' views as to the merits of
319: 4  the poster conclusion?
319: 5  A:  Dr. Jenkins is entitled to
319: 6  his opinions. I wasn't aware of them.
319: 7  The same could be said of the FDA.

69  **320:22  -  326:4**   Graham, David 2006-05-09          00:05:31
320: 22  BY MR. BECK:
320: 23  Q: Who is Sharon Hertz?

| | Objections | Ruling in Barnett |
|---|---|---|

320: 24   A: I think she's a deputy
321: 1    division director for the analgesic and
321: 2    anti-inflammatory reviewing division, and
321: 3    that would be the reviewing division
321: 4    responsible for NSAID drugs, both
321: 5    naproxen and drugs like Vioxx.
321: 6    - - -
321: 7    (Whereupon, Deposition
321: 8    Exhibit Graham-16, E-mails
321: 9    FDACDER006056 - FDACDER006058,
321: 10   was marked for identification.)
321: 11   - - -
321: 12   BY MR. BECK:
321: 13   Q: I'm handing you what we've
321: 14   marked as Exhibit 16, which I will put up
321: 15   on the screen. This is a document that
321: 16   you've seen before, correct?
321: 17   A: That is correct.
321: 18   Q: And it's from Sharon Hertz.
321: 19   Is it Dr. Hertz?
321: 20   A: Yes, it is.
321: 21   Q: And Dr. Hertz, and it's to
321: 22   you and your boss, Dr. Seligman, right?
321: 23   A: Correct.
321: 24   Q: And it copies Dr. Buff, who
322: 1    we just read an e-mail from, as well as
322: 2    Dr. Jenkins and some others, right?
322: 3    A: Yes.
322: 4    Q: Did Dr. Hertz say to you
322: 5    that 'There is information to suggest
322: 6    that use of aspirin may mitigate possible

322: 7    CV risk associated with COX-2
322: 8    inhibitors,' and go on to ask 'why would
322: 9    you choose to study CV risk from a
322: 10   database that does not collect
322: 11   information on something as relevant as
322: 12   aspirin use'?
322: 13   A: She said it, but she didn't
322: 14   understand the study, the methods, or why
322: 15   her question actually is not pertinent to
322: 16   the analysis that we did because we
322: 17   showed that aspirin is not a confounder
322: 18   of any association between NSAID use and
322: 19   heart attack risk. And because she
322: 20   doesn't understand epidemiology, she
322: 21   wrote this, but this is a statement
322: 22   that's coming from her lack of
322: 23   understanding of epidemiology.
322: 24   Q: And she also referred to
323: 1    your conclusion concerning high-dose
323: 2    Vioxx and the fact that that represented
323: 3    'a very small subgroup of a large
323: 4    population,' correct?
323: 5    A: She says that, but high-dose
323: 6    Vioxx represented 18 percent of all the
323: 7    Vioxx use in the country. So, it has
323: 8    public health importance.
323: 9    Q: And did she tell you that
323: 10   drawing conclusions about this subgroup
323: 11   at all is inappropriate because of the
323: 12   small size of it?

| | Objections | Ruling in Barnett |
|---|---|---|

323: 13   A: She says that, but her
323: 14   statement is incorrect, because the
323: 15   confidence intervals permit that. And it
323: 16   was stated a priori at the beginning of
323: 17   our study that we would do that analysis,
323: 18   that we would take a look as best we
323: 19   could at the effect of dose of rofecoxib,
323: 20   of Vioxx, on heart attack risk. So, she
323: 21   can use words like it's inappropriate for
323: 22   us to do that but the fact is that, she's
323: 23   mistaken. There's nothing inappropriate
323: 24   about it.
324: 1    Q: And you'll see at the bottom
324: 2    of the paragraph she said, 'This is
324: 3    simply bad science.'
324: 4    A: She's entitled to her
324: 5    opinion.
324: 6    Q: I forgot to ask you. Is
324: 7    Dr. Hertz one of the people at the FDA
324: 8    that you think was out to get you?
324: 9    A: I didn't use those terms,
324: 10   but, no, she is not one of those people.
324: 11   Q: Is she one of the people,
324: 12   who, to use your terms, was part of the
324: 13   very organized and orchestrated campaign
324: 14   to smear and discredit you?
324: 15   A: She is not a member of that
324: 16   group.
324: 17   Q: She just disagreed with you
324: 18   and thought you were using bad science,
324: 19   right?
324: 20   A: That's what she says here.
324: 21   But she's not an epidemiologist, and I'm
324: 22   not sure that she would recognize good
324: 23   epidemiology if she saw it.
324: 24   Q: And Dr. Jenkins, who we
325: 1    talked about a minute ago, who commented
325: 2    on what he thought was the invalidity of
325: 3    your analysis, do you think he knows what
325: 4    he's talking about when it comes to
325: 5    epidemiology?
325: 6    A: I think that Dr. Jenkins is
325: 7    not an epidemiologist. He's a
325: 8    pulmonologist. I think that he has broad
325: 9    responsibilities for the approval of
325: 10   drugs, and that it's his office, Office
325: 11   of New Drugs, that approved Vioxx, and
325: 12   that going back to the conflict of
325: 13   interest that we talked about before,
325: 14   that FDA has a vested interest in
325: 15   maintaining the decisions that it's made
325: 16   previously. And that their biggest
325: 17   concern here was that they had, in
325: 18   quotes, done a labeling change in 2002,
325: 19   and that solved the problem. But I
325: 20   contend that it didn't really accomplish
325: 21   very much at all.
325: 22   - - -
325: 23   (Whereupon, Deposition
325: 24   Exhibit Graham-17, E-mails
326: 1    FDACDER021810 - FDACDER021811,
326: 2    was marked for identification.)

| | | Objections | Ruling in Barnett |
|---|---|---|---|

326: 3      - - -

326: 4      BY MR. BECK:

70  **326:5 - 326:9**  Graham, David 2006-05-09      00:00:38

326: 5      Q: I'm going to hand you what

326: 6      we've marked as Exhibit 17. Have you

326: 7      seen Exhibit 17 before?

326: 8      A: No. I have never seen this

326: 9      before.

71  **326:17 - 328:20**  Graham, David 2006-05-09      00:02:25

326: 17      Q: Lourdes Villalba. Who is

326: 18      Lourdes Villalba?

326: 19      A: She was the medical officer

326: 20      who was responsible for Vioxx. She may

326: 21      have been the medical officer who

326: 22      reviewed the original Vioxx NDA, but that

326: 23      I'm not absolutely certain about, but she

326: 24      had responsibility for it as the primary

327: 1      medical officer in the reviewing division

327: 2      of the Office of New Drugs at this time.

327: 3      So, she's the one who would

327: 4      review -- well, actually, she did the

327: 5      original review that we showed on the

327: 6      slide. So, any supplements or any

327: 7      submissions from Merck regarding Vioxx,

327: 8      they would come to her desk.

327: 9      Q: Was she one of the people

327: 10      that was part of the organized and

327: 11      orchestrated campaign to smear and

327: 12      discredit you that you think existed at

327: 13      the FDA?

327: 14      A: No, she was not.

327: 15      Q: At the bottom of this e-mail

327: 16      string, Lourdes writes, 'I learned of

327: 17      this study a couple of weeks ago when

327: 18      Jonca requested my opinion about the

327: 19      abstract that was going to be presented

327: 20      in France. This study is not a good

327: 21      study to address the cardiovascular

327: 22      question. The conclusions are not well

327: 23      supported by the data.'

327: 24      Did you learn back in 2004

328: 1      that Lourdes Villalba felt that your

328: 2      conclusions were not supported?

328: 3      A: No. I was never told that,

328: 4      but I'm not surprised. This is the

328: 5      typical response of people in the Office

328: 6      of New Drugs to studies that are done in

328: 7      the Office of Drug Safety that we talked

328: 8      about earlier where -- and that would

328: 9      lead Dr. Galson to say that our office

328: 10      doesn't add value to the center.

328: 11      Q: Who is Anne Trontell?

328: 12      A: Dr. Trontell is the deputy

328: 13      director for the Office of Drug Safety.

328: 14      Q: And is Dr. Trontell one of

328: 15      the people that you were referring to

328: 16      this morning when you said that within

328: 17      the FDA there was a very organized and

328: 18      orchestrated campaign to smear and

328: 19      discredit you?

|  | | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|
| | 328: 20 | A: Yes. | | | |
| 72 | **329:4  -  329:5** | Graham, David 2006-05-09 | 00:00:04 | | |
| | 329: 4 | Q:  Please take a look at | | | |
| | 329: 5 | Exhibit 18. | | | |
| 73 | **329:24  -  333:6** | Graham, David 2006-05-09 | 00:04:04 | | |
| | 329: 24 | Q:  Do you remember whether | | | |
| | 330: 1 | you've seen this document before? | | | |
| | 330: 2 | A: No, I don't think that I | | | |
| | 330: 3 | have seen this document before. | | | |
| | 330: 4 | Q:  Do you see that Dr. Trontell | | | |
| | 330: 5 | is writing to Dr. Seligman in the e-mail | | | |
| | 330: 6 | on the top? | | | |
| | 330: 7 | A: Yes. | | | |
| | 330: 8 | Q:  Starting with the second | | | |
| | 330: 9 | paragraph, she says, 'I understand John's | | | |
| | 330: 10 | consternation, but let us all acknowledge | | | |
| | 330: 11 | the problem arose when David Graham | | | |
| | 330: 12 | overstepped the bounds of what anyone can | | | |
| | 330: 13 | conclude from a brief poster of a complex | | | |
| | 330: 14 | study. He ignored advice from multiple | | | |
| | 330: 15 | FDA sources by making a strong conclusion | | | |
| | 330: 16 | without giving enough information or time | | | |
| | 330: 17 | to others in FDA to evaluate it | | | |
| | 330: 18 | rigorously.' | | | |
| | 330: 19 | Did Dr. Trontell communicate | | | |
| | 330: 20 | those views to you even though you didn't | | | |
| | 330: 21 | see this particular e-mail? | | | |
| | 330: 22 | A: She communicated views | | | |
| | 330: 23 | similar to this. She never said that I | | | |
| | 330: 24 | overstepped my bounds, and she didn't use | | | |
| | 331: 1 | words like I ignored advice. And at the | | | |
| | 331: 2 | end of the day, the poster was cleared by | | | |
| | 331: 3 | FDA, so that they can complain all they | | | |
| | 331: 4 | want, but I didn't -- I stuck to what I | | | |
| | 331: 5 | believed based on the data, and they | | | |
| | 331: 6 | cleared it at the end of the day. So, we | | | |
| | 331: 7 | had honest disagreements about the data | | | |
| | 331: 8 | and how to interpret it. | | | |
| | 331: 9 | Q:  And as part of that | | | |
| | 331: 10 | disagreement, do you see here where she | | | |
| | 331: 11 | says that you 'subverted FDA review as | | | |
| | 331: 12 | well as the normal standards of peer | | | |
| | 331: 13 | review by stating an | | | |
| | 331: 14 | inadequately-supported conclusion based | | | |
| | 331: 15 | upon the limited data' you 'made | | | |
| | 331: 16 | available for review'? Again, did she | | | |
| | 331: 17 | express those views to you in substance? | | | |
| | 331: 18 | A: No. And that statement | | | |
| | 331: 19 | actually makes absolutely no sense to me | | | |
| | 331: 20 | as it's stated. If she's talking about | | | |
| | 331: 21 | the differences between the ACR abstract | | | |
| | 331: 22 | and the ISPE abstract, those things I | | | |
| | 331: 23 | described to both Dr. Seligman and Dr. | | | |
| | 331: 24 | Trontell between the end of May and | | | |
| | 332: 1 | August, as we came upon each of the | | | |
| | 332: 2 | problems and had to deal with them. And | | | |
| | 332: 3 | she doesn't recall that. | | | |
| | 332: 4 | We had many, many | | | |
| | 332: 5 | conversations. And I had them with Dr. | | | |
| | 332: 6 | Seligman as well. And so looking at | | | |

| | | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|

|  | 332: 7 | this, that's the only thing that I can | | | |
|  | 332: 8 | guess she is -- she's saying from that, | | | |
|  | 332: 9 | but that's just a guess. | | | |
|  | 332: 10 | Q: She says here, 'To publicize | | | |
|  | 332: 11 | findings that have not been fully vetted | | | |
|  | 332: 12 | is irresponsible and professionally | | | |
|  | 332: 13 | suspect.' | | | |
|  | 332: 14 | A: Where are you? | | | |
|  | 332: 15 | Q: If you look up on the | | | |
|  | 332: 16 | screen, I'm in the middle of the next | | | |
|  | 332: 17 | paragraph. | | | |
|  | 332: 18 | A: Uh-huh. | | | |
|  | 332: 19 | Q: Did she communicate those | | | |
|  | 332: 20 | views to you? | | | |
|  | 332: 21 | A: No. But the fact is, is | | | |
|  | 332: 22 | that I didn't communicate anything to the | | | |
|  | 332: 23 | public that hadn't been cleared by FDA. | | | |
|  | 332: 24 | So, this statement really, in my mind, is | | | |
|  | 333: 1 | inaccurate and, you know, she's using a | | | |
|  | 333: 2 | lot of pejorative terms towards me, so, | | | |
|  | 333: 3 | she can be very critical of me, but the | | | |
|  | 333: 4 | fact is, is that the document was | | | |
|  | 333: 5 | cleared, and I have the signed clearance | | | |
|  | 333: 6 | form, and so she can have her opinion. | | | |
| 74 | 337:6  -  337:20 | Graham, David 2006-05-09 | 00:00:34 | | |
|  | 337: 6 | - - - | | | |
|  | 337: 7 | (Whereupon, Deposition | | | |
|  | 337: 8 | Exhibit Graham-19, Memo 10-29-04 | | | |
|  | 337: 9 | 'Review of reports of FDA/Kaiser | | | |
|  | 337: 10 | Vioxx study: Questions about | | | |
|  | 337: 11 | Inconsistencies and Bias,' | | | |
|  | 337: 12 | FDACDER022462 - FDACDER022470, | | | |
|  | 337: 13 | was marked for identification.) | | | |
|  | 337: 14 | - - - | | | |
|  | 337: 15 | BY MR. BECK: | | | |
|  | 337: 16 | Q: I'm going to hand you | | | |
|  | 337: 17 | Exhibit 19 here, which is a memorandum | | | |
|  | 337: 18 | from Dr. Trontell to Dr. Seligman. Have | | | |
|  | 337: 19 | you seen this document before? | | | |
|  | 337: 20 | A: Yes, I have. | | | |
| 75 | 340:14  -  345:16 | Graham, David 2006-05-09 | 00:05:48 | | |
|  | 340: 14 | BY MR. BECK: | | | |
|  | 340: 15 | Q: Is a post hoc analysis where | | | |
|  | 340: 16 | somebody, after a study is conducted, | | | |
|  | 340: 17 | goes back and changes the rules of the | | | |
|  | 340: 18 | study, and the concern then is that the | | | |
|  | 340: 19 | results are invalid? I'm not asking | | | |
|  | 340: 20 | whether you did it. I'm asking whether | | | |
|  | 340: 21 | that's what the post hoc analysis is. | | | |
|  | 340: 22 | A: When people talk about a | | | |
|  | 340: 23 | post hoc analysis, what they mean is | | | |
|  | 340: 24 | they're referring to an analysis that | | | |
|  | 341: 1 | wasn't prespecified before the study | | | |
|  | 341: 2 | began or before the analysis began. | | | |
|  | 341: 3 | So, for example, in our | | | |
|  | 341: 4 | study, I know that Dr. Trontell kept | | | |
|  | 341: 5 | insisting that our comparison of Vioxx to | | | |
|  | 341: 6 | Celebrex was a post hoc analysis. But it | | | |
|  | 341: 7 | was there from the beginning of our | | | |
|  | 341: 8 | protocol. And so -- and I had explained | | | |
|  | 341: 9 | that to her multiple times. But that's | | | |

| | |
|---|---|
| 341: 10 | what a post hoc analysis is. |
| 341: 11 | Q: And data manipulation, |
| 341: 12 | again, not focusing on her concerns about |
| 341: 13 | you, but what data manipulation is |
| 341: 14 | generally is basically rigging the |
| 341: 15 | numbers to come out the way you want |
| 341: 16 | them? |
| 341: 17 | A: It's scientific misconduct. |
| 341: 18 | Q: And please turn over two |
| 341: 19 | more pages. Under, at the bottom, |
| 341: 20 | 'Recommendations,' do you see where Dr. |
| 341: 21 | Trontell says, 'The authors should |
| 341: 22 | document their methods in detail and |
| | |
| 341: 23 | respond to questions raised in this |
| 341: 24 | review in particular the noted |
| 342: 1 | inconsistencies in the study objectives, |
| 342: 2 | results and statistical findings of |
| 342: 3 | significance of their published ACR |
| 342: 4 | abstract and the August 2004 ISPE |
| 342: 5 | poster.' So, do you see there where |
| 342: 6 | she's expressing concern that you've come |
| 342: 7 | up with different conclusions and |
| 342: 8 | different methodologies between that |
| 342: 9 | original ACR abstract, and then your |
| 342: 10 | later poster, like we saw in the chart |
| 342: 11 | that I showed on the screen? Is that the |
| 342: 12 | subject that's being addressed here? |
| 342: 13 | A: Uh-huh. Yes. |
| 342: 14 | Q: And, in particular, what |
| 342: 15 | she's saying is that before you submit |
| 342: 16 | this article for publication, that you |
| 342: 17 | should address these issues and explain |
| 342: 18 | them, right? |
| 342: 19 | A: Dr. Trontell is saying that, |
| 342: 20 | but Dr. Trontell is not my supervisor. |
| 342: 21 | She wrote this to Dr. Seligman. Dr. |
| 342: 22 | Seligman, I believe, e-mailed it to me |
| 342: 23 | with basically no instructions. And so |
| 342: 24 | Dr. Trontell can have her opinions about |
| 343: 1 | what it is I should do, but she's not my |
| 343: 2 | supervisor, and, in fact, has never been |
| 343: 3 | someone who reviews any of the work that |
| 343: 4 | I do. |
| 343: 5 | Q: In any event, you submitted |
| 343: 6 | the article to the Lancet without making |
| 343: 7 | the responses that Dr. Trontell said you |
| 343: 8 | should make, right? |
| 343: 9 | A: The responses were actually |
| 343: 10 | included in the manuscript; A; B, we |
| 343: 11 | submitted the manuscript with the |
| 343: 12 | approval of my supervisors. Because I |
| 343: 13 | sent multiple e-mails to Dr. Seligman and |
| 343: 14 | to Dr. Trontell giving them my |
| 343: 15 | interpretation of FDA's clearance |
| 343: 16 | policies and asking them to instruct me |
| 343: 17 | if I had misinterpreted them in any way, |
| 343: 18 | because I was anxious to -- I wanted to |
| 343: 19 | be sure that I followed all of FDA's |
| 343: 20 | rules and procedures. And that if they |
| 343: 21 | didn't get back to me, then I would |
| 343: 22 | assume that I had interpreted them |

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

343: 23    correctly and that it is all right for me
343: 24    to submit it.
344: 1    Dr. Trontell consulted with
344: 2    the head lawyer for the Center for Drug
344: 3    Evaluation and Research, Jane Axelrod,
344: 4    who basically said to Dr. Trontell by way
344: 5    of e-mail that it was fine, that I could
344: 6    submit it. And so Anne did not have a
344: 7    written response to these questions, but
344: 8    I had -- my understanding was I had the
344: 9    permission of FDA to submit the paper.
344: 10    And it was never my understanding, quite
344: 11    honestly, that I was required to give
344: 12    written responses to these questions, and
344: 13    I tried to express that in an e-mail to
344: 14    Dr. Paul Seligman somewhere around
344: 15    November 10th or 9th or somewhere in that
344: 16    neighborhood, because I was about to go
344: 17    on a four-day weekend, because Veterans'
344: 18    Day, which is November 11th, is a Federal
344: 19    holiday, and I was going to take off the
344: 20    12th and then I would have a four-day
344: 21    weekend.
344: 22    And on the 9th, Dr. Seligman
344: 23    said that I could take leave on Friday,
344: 24    but before I left, he needed written
345: 1    responses to these questions. And I
345: 2    e-mailed back that I hadn't understood
345: 3    that that's what he wanted. And he never
345: 4    came back. He had an entire day,
345: 5    November 10th, Wednesday, the entire day
345: 6    he had to disabuse me of my understanding
345: 7    if he wanted to, and he never said to me
345: 8    that, no, I misunderstood, I really do
345: 9    want you to give a written response. And
345: 10    so I think that I acted reasonably and
345: 11    tried to get management to communicate
345: 12    with me, and management, in this case,
345: 13    did not answer my e-mails, did not come
345: 14    back to me to communicate with me in
345: 15    clear, unambiguous instructions about
345: 16    what it is that they wanted me to do.

76   **353:2 - 353:18**   Graham, David 2006-05-09     00:00:44
353: 2    Q: And who is Dr. Steven
353: 3    Galson?
353: 4    A: He is the Center director
353: 5    for CEDR.
353: 6    Q: And I think you described
353: 7    this morning that CDER, both the Office
353: 8    of New Drugs and the Office For Drug
353: 9    Safety are underneath CDER, which is the
353: 10    Center for Drug Evaluation and Research,
353: 11    right?
353: 12    A: Right.
353: 13    Q: And is Dr. Galson one of the
353: 14    people that you think is part of this
353: 15    very organized and orchestrated campaign
353: 16    to smear and discredit you?
353: 17    A: Yes, he was. He may have
353: 18    been an unwitting participant.

77   **361:23 - 363:2**   Graham, David 2006-05-09     00:01:09
361: 23    (Whereupon, Deposition

|  |  |  | Objections | Ruling in Barnett |
|--|--|--|--|--|

|  |  |  |  |  |
|--|--|--|--|--|
|  | 361: 24 | Exhibit Graham-23, E-mails, |  |  |
|  | 362: 1 | TOPOLE0000333, was marked for |  |  |
|  | 362: 2 | identification.) |  |  |
|  | 362: 3 | - - - |  |  |
|  | 362: 4 | BY MR. BECK: |  |  |
|  | 362: 5 | Q:  What's Exhibit 23? |  |  |
|  | 362: 6 | A:  It looks like an e-mail |  |  |
|  | 362: 7 | dated November 1st from me to Dr. Eric |  |  |
|  | 362: 8 | Topol at the Cleveland Clinic. And it's |  |  |
|  | 362: 9 | -- it looks like it's kind of like in |  |  |
|  | 362: 10 | response to an e-mail that he had sent to |  |  |
|  | 362: 11 | me. And there are several other e-mails |  |  |
|  | 362: 12 | that went back and forth between Dr. |  |  |
|  | 362: 13 | Topol and myself, dating back, I think, |  |  |
|  | 362: 14 | to like the end of October when he first |  |  |
|  | 362: 15 | telephoned me to ask if I knew who was in |  |  |
|  | 362: 16 | FDA he could talk to about COX-2 pain |  |  |
|  | 362: 17 | relievers and heart attack risk. And I |  |  |
|  | 362: 18 | referred him to Shari Targum, whose |  |  |
|  | 362: 19 | review I spoke about earlier. |  |  |
|  | 362: 20 | Q:  You referred to Dr. Topol as |  |  |
|  | 362: 21 | at the Cleveland Clinic. Is he still at |  |  |
|  | 362: 22 | the Cleveland Clinic? |  |  |
|  | 362: 23 | A:  My understanding is that |  |  |
|  | 362: 24 | he's now at Case Western, but I'm not |  |  |
|  | 363: 1 | really -- it's basically what I read in |  |  |
|  | 363: 2 | the newspaper. |  |  |
| 78 | 367:19  -  368:15 | Graham, David 2006-05-09 | 00:00:45 |  |
|  | 367: 19 | Now, are you saying here |  |  |
|  | 367: 20 | that you thought that Merck decided to |  |  |
|  | 367: 21 | withdraw Vioxx on September 30 because |  |  |
|  | 367: 22 | people at FDA management gave them a |  |  |
|  | 367: 23 | heads up that your article was going to |  |  |
|  | 367: 24 | be published, and Merck said we'd better |  |  |
|  | 368: 1 | get Vioxx off the market before that |  |  |
|  | 368: 2 | article was published? |  |  |
|  | 368: 3 | A:  No. I was just pointing to |  |  |
|  | 368: 4 | the coincidence of the dates. |  |  |
|  | 368: 5 | Q:  Well, you said it wasn't a |  |  |
|  | 368: 6 | coincidence, didn't you? |  |  |
|  | 368: 7 | A:  Well, I don't think it was a |  |  |
|  | 368: 8 | coincidence, but... |  |  |
|  | 368: 9 | Q:  So, that's my question. |  |  |
|  | 368: 10 | Do you think that Merck's |  |  |
|  | 368: 11 | withdrawal on September 30 was timed |  |  |
|  | 368: 12 | because people at the FDA told Merck that |  |  |
|  | 368: 13 | Dr. Graham is going to publish an |  |  |
|  | 368: 14 | article, and so Merck said we'd better |  |  |
|  | 368: 15 | get this drug off the market? |  |  |
| 79 | 368:17  -  369:1 | Graham, David 2006-05-09 | 00:00:10 |  |
|  | 368: 17 | THE WITNESS: No, I don't. |  |  |
|  | 368: 18 | BY MR. BECK: |  |  |
|  | 368: 19 | Q:  That's what you told Dr. |  |  |
|  | 368: 20 | Horton -- |  |  |
|  | 368: 21 | A:  I know that. |  |  |
|  | 368: 22 | Q:  -- though, isn't it? |  |  |
|  | 368: 23 | A:  That's what I -- and at the |  |  |
|  | 368: 24 | time, I think under the duress that I was |  |  |
|  | 369: 1 | under, that is what I believed. |  |  |
| 80 | 369:11  -  369:20 | Graham, David 2006-05-09 | 00:00:15 |  |

|  |  | Objections | Ruling in Barnett |
|---|---|---|---|

369: 11          Q:  That was kind of a wild and

369: 12          crazy charge you made to the editor of
369: 13          Lancet concerning --
369: 14          A:  No.
369: 15          Q:  -- FDA management, don't you
369: 16          agree?
369: 17          A:  It's not wild and crazy. If
369: 18          you experienced what I experienced, you
369: 19          would understand -- you would understand
369: 20          better.

81  370:14  -  374:21   Graham, David 2006-05-09          00:05:28

370: 14          Q:  Dr. Graham, as an
370: 15          epidemiologist, do you deal with the
370: 16          concept of incidence rates?
370: 17          A:  Yes, I do.
370: 18          Q:  And in a sentence or two,
370: 19          can you describe what an incidence rate
370: 20          is?
370: 21          A:  It's the occurrence of an
370: 22          outcome, a disease, in a defined
370: 23          population over a specified period of
370: 24          time. So, you might express something as
371: 1            10 per 100,000 per year would be an

371: 2            incidence rate.
371: 3            Q:  I have created a chart that
371: 4            I want to go over with you, and I want to
371: 5            look at some numbers from the Kaiser
371: 6            study that you did, and I understand that
371: 7            an adjustment was applied for a
371: 8            cardiovascular risk score that I'll get
371: 9            to later in the examination, but I want
371: 10          to look at the kind of raw numbers about
371: 11          incidence rates of heart attacks and

371: 12          sudden cardiac death for Vioxx and
371: 13          Celebrex as you saw them in your study.
371: 14          Okay?
371: 15          So, if you will take out
371: 16          Exhibit 4, which is your 2005 Lancet
371: 17          publication, and if you'll look over at
371: 18          the third page in the right column under
371: 19          'Results,' tell me if the numbers I
371: 20          filled in on the screen there for number
371: 21          of users for Vioxx of something over
371: 22          26,000, and then for Celebrex, something

371: 23          over 40,000, are those accurate numbers
371: 24          --
372: 1            A:  Yes.
372: 2            Q:  -- from your study?
372: 3            A:  Yes.
372: 4            Q:  And then if you'll look at
372: 5            Table 3 on that same page or is -- Table
372: 6            3, I guess it's the next page. If you'll
372: 7            look at Table 3, do I have it right that
372: 8            the number of heart attacks and sudden
372: 9            cardiac deaths, Vioxx was 68 and for
372: 10          Celebrex was 126?
372: 11          A:  Yes.
372: 12          Q:  And when we're talking about

|  | Objections | Ruling in Barnett |
|---|---|---|

372: 13    Vioxx here, that includes both low dose
372: 14    and high dose, right?
372: 15    A:  Correct.
372: 16    Q:  And so just taking the
372: 17    numbers that you report before the
372: 18    adjustments are made, is this correct
372: 19    that the incidence rate of heart attacks
372: 20    and sudden cardiac deaths for Vioxx would
372: 21    be about .25 percent, whereas for
372: 22    Celebrex, it would actually be a little
372: 23    higher, .31 percent?
372: 24    A:  No. That's not an incidence
373: 1    rate. That is a proportion. An
373: 2    incidence rate would take into account
373: 3    the amount of time that each of the users
373: 4    was on the drug, and so then what you'd
373: 5    end up having is years of exposure to
373: 6    Vioxx in the denominator and number of
373: 7    cases in the numerator and the same for
373: 8    Celebrex. So, these are proportions, but
373: 9    they are not incidence rates.
373: 10    Q:  Okay.
373: 11    So, proportions.
373: 12    And the proportions of
373: 13    Celebrex users who experienced heart
373: 14    attacks or sudden cardiac deaths was
373: 15    actually slightly higher than the
373: 16    proportion of Vioxx users, correct?
373: 17    A:  That is correct.
373: 18    Q:  And you said that in order
373: 19    to do an incidence rate, you'd want to
373: 20    know how long they were using the drugs,
373: 21    so you'd take into account patient years;
373: 22    is that right?
373: 23    A:  Correct.
373: 24    MR. BECK:  Let me mark for
374: 1    you, please, Exhibit 25.
374: 2    - - -
374: 3    (Whereupon, Deposition
374: 4    Exhibit Graham-25, Chart
374: 5    FDACDER005940, was marked for
374: 6    identification.)
374: 7    - - -
374: 8    BY MR. BECK:
374: 9    Q:  And this Exhibit 25, do you
374: 10    recognize this as a document or a page of
374: 11    a longer document that was created as
374: 12    part of your study?
374: 13    A:  Yes. I don't recall,
374: 14    though, at what stage in the study that
374: 15    this run was done, and so I don't know if
374: 16    it included sort of the modifications
374: 17    that we had to make because of
374: 18    eligibility problems and the like. But
374: 19    it is from our study. I'm not able here
374: 20    to read the column on the right-hand side
374: 21    because of it being smudged.

82    375:5  -  386:13    Graham, David 2006-05-09          00:11:13
375: 5    In the right-hand column,
375: 6    while we may have to struggle with the
375: 7    exact numbers, it does say, does it not,
375: 8    'Incidence rate per 1,000 patient years'?

| | Objections | Ruling in Barnett |
|---|---|---|

| 375: 9 | A:  That's what it looks like it |
| 375: 10 | says to me, yes. |
| 375: 11 | Q:  Okay. |
| 375: 12 | I mean, there's no doubt it |
| 375: 13 | says this? |
| 375: 14 | A:  Right, no. This table is |
| 375: 15 | set up to calculate incidence rates, so, |
| 375: 16 | there's no question about that. |
| 375: 17 | Q:  Okay. |
| 375: 18 | So, and then if we look down |
| 375: 19 | at rofecoxib, that's Vioxx as we know, |
| 375: 20 | correct? |
| 375: 21 | A:  Right. |
| 375: 22 | Q:  And then the rofecoxib |
| 375: 23 | number is 7. something, right? |
| 375: 24 | A:  Right. |
| 376: 1 | Q:  Again, we'll just blow it |
| 376: 2 | up. And does that look like 7.49 to you |
| 376: 3 | once it's been blown up? |
| 376: 4 | A:  Yes. When I was looking at |
| 376: 5 | this (indicating), I would have said |
| 376: 6 | 7.48, but it looks like 7.49 there |
| 376: 7 | (indicating). |
| 376: 8 | Q:  Okay. |
| 376: 9 | Well, close enough for |
| 376: 10 | government work. It's 7.48 or 7.49, |
| 376: 11 | right? |
| 376: 12 | A:  Right. |
| 376: 13 | Q:  And then if we look up at |
| | |
| 376: 14 | Celebrex, celecoxib, it is like 7.8 |
| 376: 15 | something? |
| 376: 16 | A:  Yes. It looks like 7.84 to |
| 376: 17 | me, but... |
| 376: 18 | Q:  Okay. |
| 376: 19 | Whatever it is, it's |
| 376: 20 | actually the incidence rate taking into |
| 376: 21 | account the patient years, as you said, |
| 376: 22 | the incidence rate for heart attacks and |
| 376: 23 | sudden cardiac death for Celebrex is |
| 376: 24 | actually higher than the incidence rate |
| 377: 1 | for sudden cardiac death in heart attacks |
| 377: 2 | for Vioxx, correct? |
| 377: 3 | A:  It's a crude incidence rate, |
| 377: 4 | and the number is higher. They're |
| 377: 5 | probably at this point with crude rates |
| 377: 6 | not statistically different, but Celebrex |
| 377: 7 | rate is higher than the rofecoxib or |
| 377: 8 | Vioxx rate. |
| 377: 9 | Q:  Yeah. And I didn't mean to |
| 377: 10 | suggest that there was a statistically |
| 377: 11 | significant difference, but the Lancet |
| 377: 12 | article, one of the conclusions is that |
| 377: 13 | there is a statistically significant |
| 377: 14 | difference between Vioxx and Celebrex and |
| 377: 15 | that Vioxx has a statistically |
| 377: 16 | significant higher risk of serious |
| 377: 17 | coronary heart disease, right? |
| 377: 18 | A:  Right. And that's based on |
| 377: 19 | odds ratios as opposed to incidence |
| 377: 20 | rates. |
| 377: 21 | Q:  But the incidence rates |

| | Objections | Ruling in Barnett |
|---|---|---|

| | |
|---|---|
| 377: 22 | would be basically the same? |
| 377: 23 | A: Yes. The incidence rates |
| 377: 24 | form the base of the data, but this is |
| 378: 1 | before adjustments have been done for the |
| 378: 2 | types of patients that are given these |
| 378: 3 | different drugs. |
| 378: 4 | Q: And that's what I want to |
| 378: 5 | get to now. |
| 378: 6 | So, you start out with |
| 378: 7 | actual numbers of users and how long they |
| 378: 8 | use the drug and how many of them had |
| 378: 9 | heart attacks, and Vioxx and Celebrex |
| 378: 10 | look basically identical. And then in |
| 378: 11 | your analysis, you applied adjustments to |
| 378: 12 | the Vioxx users and Celebrex users, and |
| 378: 13 | the end result of those adjustments was |
| 378: 14 | that Vioxx ended up appearing to have a |
| 378: 15 | higher risk, right? |
| 378: 16 | A: Yes. |
| 378: 17 | Q: And the person who -- first |
| 378: 18 | of all, these adjustments, at least one, |
| 378: 19 | a significant one is called a cardiac |
| 378: 20 | risk score, cardiovascular risk score, |
| 378: 21 | right? |
| 378: 22 | A: Right. |
| 378: 23 | Q: Is that the main adjustment |
| 378: 24 | that was applied? |
| 379: 1 | A: That was the main |
| 379: 2 | adjustment, and it represented basically |
| 379: 3 | a collapsing of 25 or 30 other variables |
| 379: 4 | into a single measure. |
| 379: 5 | Q: And the cardiovascular risk |
| 379: 6 | score, basically that says, well, people |
| 379: 7 | who take one type of medicine might have |
| 379: 8 | a whole bunch of other factors that make |
| 379: 9 | them prone to have heart attacks more |
| 379: 10 | than people who take a different |
| 379: 11 | medicine, and we want to take that into |
| 379: 12 | account? |
| 379: 13 | A: Right. They have to be |
| 379: 14 | differential distribution of risk |
| 379: 15 | factors. |
| 379: 16 | Q: And the person who developed |
| 379: 17 | the methodology to come up with the |
| 379: 18 | cardiovascular risk scores for Celebrex |
| 379: 19 | and Vioxx in your study was Dr. Wayne |
| 379: 20 | Ray, who you mentioned before, right? |
| 379: 21 | A: Well, actually, we reference |
| 379: 22 | him as having used it, but the use of |
| 379: 23 | this -- it's basically -- it's a |
| 379: 24 | confounder's score. The use of a |
| 380: 1 | confounder's score in case control |
| 380: 2 | studies has been well described by Jim |
| 380: 3 | Schlesselman in his textbook on case |
| 380: 4 | control studies and then by Norman |
| 380: 5 | Breslow in his textbook on case control |
| 380: 6 | studies. And so this is a technique |
| 380: 7 | that's been described before. It's a |
| 380: 8 | technique that Dr. Ray has used, but he's |
| 380: 9 | not the person who created it, developed |
| 380: 10 | it. |
| 380: 11 | Q: Well, he didn't invent the |

380: 12    idea of a cardiovascular risk score, but
380: 13    he's the one who came up with the formula
380: 14    to account for all of these variables,
380: 15    and he's the one who did the statistical
380: 16    heavy lifting in order to implement that
380: 17    idea in this case, right?
380: 18    A:  In this case, he taught me
380: 19    how to do it. I was the one who did it,
380: 20    working with him by telecon.
380: 21    Q:  And Dr. Ray and you ended up
380: 22    assigning a higher cardiovascular risk
380: 23    score to the Celebrex users to the Vioxx
380: 24    users, correct?
381: 1     A:  That's correct.
381: 2     Q:  And the result of that then
381: 3     was that even though the incidence rate
381: 4     was the same --
381: 5     A:  The crude incidence rate.
381: 6     Q:  -- when you applied the
381: 7     cardiovascular risk score that the two of
381: 8     you came up with, that's what accounts
381: 9     for the difference in your paper between
381: 10    risks of Vioxx and risks of Celebrex,
381: 11    right?
381: 12    A:  It's not just the
381: 13    cardiovascular risk score. It's
381: 14    adjusting for these risk factors. And in
381: 15    our paper, we showed that using all of
381: 16    the variables, all of the risk factors in
381: 17    our study to adjust for cardiovascular
381: 18    risk or using the cardiovascular risk
381: 19    score gave us virtually identical
381: 20    answers. But use of this confounder's
381: 21    score was a more efficient, statistically
381: 22    efficient way to deal with the data.
381: 23    Q:  And, of course, Dr. Ray was
381: 24    involved heavily in the confounder's
382: 1     score also, right?
382: 2     A:  He was the person who worked
382: 3     with me in showing me how to derive that
382: 4     score.
382: 5     Q:  Okay.
382: 6     And here I've put up on the
382: 7     screen a copy of the article, the Lancet
382: 8     article that's already been marked as an
382: 9     exhibit.
382: 10    When people write articles
382: 11    in scientific journals, are they supposed
382: 12    to disclose any financial conflicts of
382: 13    interest that they have?
382: 14    A:  They should, and I believe
382: 15    that Dr. Ray did.
382: 16    Q:  Okay.
382: 17    Let's take a look at that.
382: 18    If you'd go to Page 6. The person who
382: 19    came, who taught you how to make these
382: 20    adjustments that resulted in Vioxx
382: 21    looking like it had a higher risk than
382: 22    Celebrex, he had two significant
382: 23    conflicts of interest, didn't he?
382: 24    A:  Well, he has two potential
383: 1     conflicts of interest, and I was unaware

| | Objections | Ruling in Barnett |
|---|---|---|

383: 2    of these when I invited him to
383: 3    participate in our study, and I was
383: 4    actually unaware of them until it came
383: 5    time to do our poster, at which time then
383: 6    you need to put on it, you know, the
383: 7    conflict of interest statement, and it
383: 8    had never crossed my mind to ask people
383: 9    about it. So, that was when I learned
383: 10    about it. And --
383: 11    Q: And I want you to complete
383: 12    this, but before you do, this 'WAR,' this
383: 13    thing I have up on the screen, that's
383: 14    Wayne A. Ray, right?
383: 15    A: Yes.
383: 16    Q: And he's a consultant to
383: 17    Pfizer, it says in this disclosure,
383: 18    correct?
383: 19    A: Yes.
383: 20    Q: Who is it that makes
383: 21    Celebrex?
383: 22    A: Pfizer.
383: 23    Q: And so he's got a financial
383: 24    interest in making Celebrex look good,
384: 1    right?
384: 2    A: You could argue that he
384: 3    does, but that didn't operate in our
384: 4    study.
384: 5    Q: And then he's also -- under
384: 6    the conflict of interest, they say that
384: 7    he's a consultant to plaintiffs'
384: 8    attorneys regarding Vioxx, right?
384: 9    A: Yes.
384: 10    Q: And did you know that he's
384: 11    actually served as an expert witness in
384: 12    Vioxx trials?
384: 13    A: I learned about that only
384: 14    like within the last month or so, but I
384: 15    didn't know that beforehand.
384: 16    Q: So, anyway, here is Dr. Ray
384: 17    teaching you how to make these
384: 18    adjustments, and these adjustments were
384: 19    made by the time your poster was
384: 20    published, right?
384: 21    A: Yes.
384: 22    Q: And it wasn't until after he
384: 23    taught you how to make the adjustments
384: 24    and all the adjustments were made that
385: 1    you even found out that he was a paid
385: 2    consultant to the maker of Celebrex and
385: 3    was being paid by plaintiffs' lawyers who
385: 4    were suing Merck in Vioxx cases? Is that
385: 5    right?
385: 6    A: Yes. But that didn't impact
385: 7    the methodology that was used to derive
385: 8    this adjustment, this confounder's score.
385: 9    This is a way of adjusting for a
385: 10    difference in distribution of risk
385: 11    factors across exposure groups. And so
385: 12    he may have these associations, but that
385: 13    doesn't --
385: 14    Q: 'May have,' what do you mean
385: 15    'may have'?

|  |  | Objections | Ruling in Barnett |
|--|--|-----------|-------------------|

385: 16   A: Well, he has those
385: 17   associations. They don't affect the way
385: 18   statistics work. They don't affect the
385: 19   way, the methods of how one derives a
385: 20   confounder's score. They don't affect
385: 21   the way one does a regression model and
385: 22   what happens after the computer program
385: 23   spits out the results.
385: 24   Q: Is there a book you can go
386: 1   to or an article that says, here's the
386: 2   formula, here's the exact way to
386: 3   implement this idea of a confounder's
386: 4   score in your study, or did it require
386: 5   some judgment by Dr. Ray as to how he was
386: 6   going to implement this idea when coming
386: 7   up with a confounder's score and the
386: 8   cardiovascular risk score?
386: 9   A: It's described in
386: 10   Schlesselman's textbook and in Breslow's
386: 11   textbook. I don't recall that all the
386: 12   methods are described there, but the
386: 13   notion of how to do this is.

**83   388:14 - 400:18   Graham, David 2006-05-09          00:12:56**

388: 14   Q: And you did say that the
388: 15   fellow who taught you how to do it was
388: 16   Dr. Ray, the guy with the two conflicts,
388: 17   right?
388: 18   A: Yes, that is correct.
388: 19   Q: And I think you said this
388: 20   morning that there are 'lies, damned lies
388: 21   and statistics,' right?
388: 22   A: I said that, too. It
388: 23   doesn't apply here, but I did say that.
388: 24   Q: Let's move to another
389: 1   subject.
389: 2   We talked about how from the
389: 3   original abstract to the poster, the
389: 4   number of high-dose patients changed. Do
389: 5   you remember that?
389: 6   A: Uh-huh.
389: 7   Q: So, you had a smaller number
389: 8   of high-dose patients in the abstract
389: 9   when you said there was no statistically
389: 10   significant difference between high-dose
389: 11   Vioxx and basically no use of medicine.
389: 12   And then some people got changed, and the
389: 13   net result was that there was a larger
389: 14   number of high-dose patients when it came
389: 15   time to write up the poster. Do you
389: 16   remember that?
389: 17   A: Yes.
389: 18   Q: And we looked at Dr.
389: 19   Trontell's memo where she expressed
389: 20   concern about that. Do you recall that?
389: 21   A: Yes.
389: 22   Q: To try to save time, because

389: 23   you may remember the numbers, I suspect
389: 24   you do, in the abstract when you were
390: 1   talking about high-dose people, am I
390: 2   right that you had five people who had
390: 3   experienced -- five so-called cases and

| Line | Text |
|---|---|
| 390: 4 | seven so-called controls? |
| 390: 5 | A: Correct. |
| 390: 6 | Q: And in one sentence, what is |
| 390: 7 | a case and what's a control? |
| 390: 8 | A: A case is someone who had a |
| 390: 9 | heart attack or sudden death. And a |
| 390: 10 | control was someone who was randomly |
| 390: 11 | selected to compare to that person, who |
| 390: 12 | on that date had not, as of that date, |
| 390: 13 | had a heart attack or sudden death. |
| 390: 14 | Q: Okay. |
| 390: 15 | And then sort of going |
| 390: 16 | forward to by the time your article was |
| 390: 17 | published in The Lancet, instead of five |
| 390: 18 | cases with the same population group |
| 390: 19 | after the reclassification, you now have |
| 390: 20 | ten cases, right? |
| 390: 21 | A: Yes. |
| 390: 22 | Q: So, the number of heart |
| 390: 23 | attacks and sudden cardiac deaths that |
| 390: 24 | you were ascribing to the high-dose Vioxx |
| 391: 1 | users doubled from when you did the |
| 391: 2 | abstract to when you did the article, |
| 391: 3 | right? |
| 391: 4 | A: Correct. |
| 391: 5 | Q: And then you also, instead |
| 391: 6 | of seven controls, you had eight |
| 391: 7 | controls, right? |
| 391: 8 | A: Correct. |
| 391: 9 | Q: And was it your idea to do |
| 391: 10 | this reclassification? |
| 391: 11 | A: What I noticed when we were |
| 391: 12 | looking -- |
| 391: 13 | Q: Before you say what you |
| 391: 14 | noticed -- |
| 391: 15 | A: Yes. |
| 391: 16 | Q: -- can you answer, was it |
| 391: 17 | your idea to do the reclassification? |
| 391: 18 | A: Yes. |
| 391: 19 | Q: And then before -- I think |
| 391: 20 | this is clear, but I want to make sure. |
| 391: 21 | Before you did the |
| 391: 22 | reclassification, even the high-dose |
| 391: 23 | Vioxx users, the difference in risk |
| 391: 24 | between them and people who didn't use |
| 392: 1 | any medicine was not statistically |
| 392: 2 | significant, and then after you did the |
| 392: 3 | reclassification, then it became |
| 392: 4 | statistically significant, right? |
| 392: 5 | A: That's correct. |
| 392: 6 | Q: Now, did any of the authors, |
| 392: 7 | your co-authors, express concern about |
| 392: 8 | whether this reclassification was proper? |
| 392: 9 | A: Dr. Craig Cheetham from |
| 392: 10 | Kaiser did express reservations about the |
| 392: 11 | reclassification. His concern was |
| 392: 12 | primarily that it be adequately |
| 392: 13 | described, and that eventually was done |
| 392: 14 | to his satisfaction, and he was a |
| 392: 15 | co-author on the published paper. |
| 392: 16 | - - - |
| 392: 17 | (Whereupon, Deposition |

| | Objections | Ruling in Barnett |
|---|---|---|

392: 18  Exhibit Graham-26, E-mail
392: 19  10-23-04 KP002315, was marked for
392: 20  identification.)
392: 21  - - -
392: 22  BY MR. BECK:
392: 23  Q:  Please take a look at
392: 24  Exhibit 26. Have you seen Exhibit 26
393: 1   before?
393: 2   A:  Yes, I have.
393: 3   Q:  And this is a -- is this an
393: 4   e-mail from doctor -- how do you
393: 5   pronounce his last name?
393: 6   A:  Cheetham.
393: 7   Q:  -- Cheetham to you and other
393: 8   co-authors in the study?
393: 9   A:  Yes, it is.
393: 10  Q:  Does Dr. Cheetham say here
393: 11  in the first paragraph, 'I have never
393: 12  been comfortable with the recoding of
393: 13  Vioxx patients into the high dose
393: 14  category. However, it was done with the
393: 15  full participation of five investigators.
393: 16  The process by which this was done needs
393: 17  to be fully disclosed in the methods
393: 18  section. Therefore, the methods section
393: 19  needs to be clear on three points.' And
393: 20  then his first point is the coding 'was
393: 21  done post hoc.' Do you see that?
393: 22  A:  Uh-huh.
393: 23  Q:  And that 'post hoc,' did you
393: 24  understand that to mean that that was
394: 1   after the fact?
394: 2   A:  The fact that I think he's
394: 3   talking about here is, is that we hadn't
394: 4   planned on doing this at the start of the
394: 5   study.
394: 6   Q:  Okay.
394: 7   So, this was something that
394: 8   was not part of the original study plan,
394: 9   but then the reclassification took place
394: 10  after -- in fact, it was after you
394: 11  learned of the results reported in the
394: 12  abstract of no statistically significant
394: 13  difference, right?
394: 14  A:  That coincidence in timing
394: 15  is correct.
394: 16  Q:  Okay.
394: 17  So, you learned no
394: 18  statistically significant difference
394: 19  based on the planned classification, and
394: 20  then you changed the plan and
394: 21  reclassified, right?
394: 22  A:  We did that, and for a good
394: 23  reason, because we had misclassification
394: 24  of the exposure. And to leave that
395: 1   misclassification of exposure in the
395: 2   study would be to misrepresent the study,
395: 3   and so it became necessary -- we were
395: 4   trying to use a computerized algorithm to
395: 5   classify dose. And what we discovered
395: 6   was that just because somebody was
395: 7   getting a 50-milligram tablet didn't mean

Objections | Ruling in Barnett

| | |
|---|---|
| 395: 8 | they were taking 50 milligrams a day. |
| 395: 9 | Sometimes it was cheaper for patients to |
| 395: 10 | take the 50 milligram tablet and break it |
| 395: 11 | in half and actually take 25 milligrams a |
| 395: 12 | day or to take two 25s instead of 50. |
| 395: 13 | So, we were obligated to correct that |
| 395: 14 | misclassification once we discovered that |
| 395: 15 | it was present. |
| 395: 16 | Q:  And the second point he |
| 395: 17 | makes is, 'All five investigators |
| 395: 18 | participated.' And then he has the |
| 395: 19 | initials of the five investigators, |
| 395: 20 | including 'DG,' and that's David Graham, |
| 395: 21 | you, right? |
| 395: 22 | A:  That's right. And I was |
| 395: 23 | part of the call that this took place in, |
| 395: 24 | but I was not a voting member whose votes |
| 396: 1 | would determine whether or not |
| 396: 2 | reclassification occurred. For |
| 396: 3 | reclassification to occur, these other |
| 396: 4 | four people had to agree that based on |
| 396: 5 | the evidence that they saw about how |
| 396: 6 | Vioxx was being used, that the patients |
| 396: 7 | should be reclassified. |
| 396: 8 | Q:  And then his third point |
| 396: 9 | was, 'David Graham was not blinded to |
| 396: 10 | cases and controls when the recoding was |
| 396: 11 | done.' |
| 396: 12 | Now, you talked about cases |
| 396: 13 | being -- that's where somebody had a |
| 396: 14 | heart attack and controls being somebody |
| 396: 15 | did not have a heart attack. And when he |
| 396: 16 | says that you were 'not blinded to cases |
| 396: 17 | and controls,' does that mean that at the |
| 396: 18 | time that individual patients were |
| 396: 19 | reclassified from short-term users to |
| 396: 20 | long-term users, you had access to the |
| 396: 21 | information that would tell you whether, |
| 396: 22 | in fact, patient A had a heart attack or |
| 396: 23 | did not have a heart attack? |
| 396: 24 | A:  That's correct, and that's |
| 397: 1 | why I wasn't a voting member. |
| 397: 2 | Q:  So, what Dr. Cheetham said |
| 397: 3 | was that, fine, we made these |
| 397: 4 | adjustments, but our article needs to set |
| 397: 5 | forth what we did and how we did it and |
| 397: 6 | needs to say that it was not part of the |
| 397: 7 | original plan, that all five |
| 397: 8 | investigators, including Dr. Graham, |
| 397: 9 | participated, and when Dr. Graham was |
| 397: 10 | participating, he knew which patients had |
| 397: 11 | heart attacks and which ones didn't. |
| 397: 12 | That's what he wanted to be put forth in |
| 397: 13 | the article as published in Lancet, |
| 397: 14 | right? |
| 397: 15 | A:  That's what he says in this |
| 397: 16 | e-mail. |
| 397: 17 | Q:  And, you didn't do -- in |
| 397: 18 | fact, he says at the bottom of this |
| 397: 19 | e-mail, 'From my perspective this issue |
| 397: 20 | is not negotiable,' right? |
| 397: 21 | A:  Yes. |

|  | Objections | Ruling in Barnett |
|---|---|---|

397: 22    Q: But you did not make the
397: 23    disclosure that Dr. Cheetham felt was
397: 24    necessary, and, in fact, not even
398: 1    negotiable, did you?
398: 2    A: We placed in the methods,
398: 3    had a description of the process that we
398: 4    used to reclassify these cases. It
398: 5    didn't meet with Dr. Cheetham's -- his
398: 6    personal requirements, but the other
398: 7    co-authors were quite comfortable, and
398: 8    there's a lot of e-mail traffic about
398: 9    that.
398: 10    I will add that after this,
398: 11    I had a conversation, after we submitted
398: 12    the paper to the Lancet, with the editor
398: 13    of the Lancet, Dr. Horton, in which I
398: 14    described in detail all of these things.
398: 15    And Dr. Horton had no problem with the
398: 16    way that we had conducted this, and when
398: 17    Dr. Cheetham learned that, his
398: 18    reservations went away.
398: 19    Q: Well, when you say that it
398: 20    wasn't done exactly the way he said it
398: 21    should be done, the way that it was
398: 22    actually done, the disclosures that were
398: 23    made in the Lancet, they left you out
398: 24    when it described who did the recoding,
399: 1    isn't that true?
399: 2    A: Because I didn't vote on the
399: 3    recoding. The recoding required the
399: 4    unanimous vote to change of the four
399: 5    people listed, and if even one of them
399: 6    said that the case should not be recoded,
399: 7    it wasn't recoded. And --
399: 8    Q: Did the Lancet article
399: 9    disclose that you were the one who
399: 10    suggested the reclassification after you
399: 11    already knew which patients had heart
399: 12    attacks and which ones didn't?
399: 13    A: No. But that wasn't -- the
399: 14    editor didn't feel that that was
399: 15    necessary.
399: 16    Q: Did the Lancet article
399: 17    disclose that even though you say you
399: 18    didn't have a vote, you wrote memos to
399: 19    the other authors saying here's the
399: 20    people I think ought to be reclassified?
399: 21    A: I did send a list of patient
399: 22    IDs that I thought that there was a
399: 23    question about the reclassification, and
399: 24    each of the members of the study team
400: 1    were asked to come up with a similar
400: 2    list. And then that composite list was
400: 3    what the group voted on together, and
400: 4    there were 29 or 30 patients in that
400: 5    group that the four participants voted
400: 6    upon.
400: 7    Q: Did the Lancet article
400: 8    disclose that even though you didn't have
400: 9    a vote, that you, knowing who had heart
400: 10    attacks and who didn't, came up with a
400: 11    list of people that you wanted the others

|  |  | Objections | Ruling in Barnett |
|---|---|---|---|

|  |  |  |  |  |
|---|---|---|---|---|
|  | 400: 12 | to look at and you suggested should be |  |  |
|  | 400: 13 | reclassified? Did the Lancet article |  |  |
|  | 400: 14 | disclose that? |  |  |
|  | 400: 15 | A:  No, it didn't. But the |  |  |
|  | 400: 16 | editor was fully aware of it and believed |  |  |
|  | 400: 17 | that the process, the voting process was |  |  |
|  | 400: 18 | sufficient and stringent enough. |  |  |
| 84 | 402:20  -  403:6 | Graham, David 2006-05-09 | 00:00:30 | Re: 402:20-424:42 |
|  | 402: 20 | Q:  Before our break, Dr. |  | Conditional designation |
|  | 402: 21 | Graham, we started to discuss this |  |  |
|  | 402: 22 | estimate of yours of excess heart attacks |  |  |
|  | 402: 23 | and sudden cardiac deaths, your number of |  |  |
|  | 402: 24 | 88,000 to 139,000. |  |  |
|  | 403: 1 | And I think we covered this, |  |  |
|  | 403: 2 | but am I correct that even though you |  |  |
|  | 403: 3 | published this in your Kaiser study, the |  |  |
|  | 403: 4 | numbers did not come from the work that |  |  |
|  | 403: 5 | you did with the Kaiser information? |  |  |
|  | 403: 6 | A:  That's correct. |  |  |
| 85 | 405:19  -  406:16 | Graham, David 2006-05-09 | 00:00:45 |  |
|  | 405: 19 | Q:  Now, when you submitted your |  |  |
|  | 405: 20 | article to the FDA peer reviewers, you |  |  |
|  | 405: 21 | had a much different estimate of excess |  |  |
|  | 405: 22 | cardiovascular events than you ended up |  |  |
|  | 405: 23 | putting in the Lancet publication, |  |  |
|  | 405: 24 | correct? |  |  |
|  | 406: 1 | A:  That's correct. |  |  |
|  | 406: 2 | MR. BECK:  I'm going to mark |  |  |
|  | 406: 3 | the draft as it was submitted to |  |  |
|  | 406: 4 | the FDA reviewers. This is |  |  |
|  | 406: 5 | Exhibit 27. |  |  |
|  | 406: 6 | - - - |  |  |
|  | 406: 7 | (Whereupon, Deposition |  |  |
|  | 406: 8 | Exhibit Graham-27, Memo 9-30-04 |  |  |
|  | 406: 9 | 'Risk of acute myocardial |  |  |
|  | 406: 10 | infarction and sudden cardiac |  |  |
|  | 406: 11 | death in patients treated with |  |  |
|  | 406: 12 | COX-2 selective and non-selective |  |  |
|  | 406: 13 | NSAIDs,' FDACDER022369 - |  |  |
|  | 406: 14 | FDACDER022388, was marked for |  |  |
|  | 406: 15 | identification.) |  |  |
|  | 406: 16 | - - - |  |  |
| 86 | 407:9  -  407:13 | Graham, David 2006-05-09 | 00:00:11 |  |
|  | 407: 9 | So, this is a report to the |  |  |
|  | 407: 10 | FDA, and the manuscript reflected the |  |  |
|  | 407: 11 | same information that's in this report? |  |  |
|  | 407: 12 | A:  Right. But it had to be |  |  |
|  | 407: 13 | more concise and the like. |  |  |
| 87 | 407:19  -  408:3 | Graham, David 2006-05-09 | 00:00:43 |  |
|  | 407: 19 | And did you say in the |  |  |
|  | 407: 20 | report to the FDA, as well as the |  |  |
|  | 407: 21 | manuscript that you submitted for their |  |  |
|  | 407: 22 | review, that combining -- that when you |  |  |
|  | 407: 23 | looked at all of the data of Vioxx versus |  |  |
|  | 407: 24 | Celebrex, that you came up with the |  |  |
|  | 408: 1 | excess of adverse cardiovascular events |  |  |
|  | 408: 2 | of 27,785 cases? |  |  |
|  | 408: 3 | A:  That's correct. |  |  |
| 88 | 410:1  -  410:7 | Graham, David 2006-05-09 | 00:00:18 |  |
|  | 410: 1 | Q:  You indicated before that |  |  |

|  | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

410: 2   there were two specific FDA employees
410: 3   that you had suggested as peer reviewers,
410: 4   right?
410: 5   A: Correct.
410: 6   Q: And I think it was Dr. Bruce
410: 7   Stadel and Dr. Bob O'Neill?

**89   410:8  -  410:17   Graham, David 2006-05-09   00:00:20**

410: 8   A: Stadel, yes.
410: 9   Q: Stadel is how to pronounce
410: 10   it?
410: 11   A: Yes.
410: 12   Q: And they, in fact, looked at
410: 13   your manuscript, the one that had the
410: 14   27,000 number in it, Vioxx versus
410: 15   Celebrex, as part of their peer review,
410: 16   right?

410: 17   A: Correct.

**90   411:23  -  413:2   Graham, David 2006-05-09   00:01:06**

411: 23   BY MR. BECK:
411: 24   Q: Is this an e-mail from you
412: 1   to Dr. Seligman and Dr. Trontell of the
412: 2   FDA, as well as your co-authors dated

412: 3   October 22nd, 2004?
412: 4   A: Yes, it is.
412: 5   Q: And the very first thing you
412: 6   say is, 'I reviewed the comments of Bob
412: 7   and Bruce' -- that's Dr. Bruce Stadel
412: 8   and Dr. Bob O'Neill, right?
412: 9   A: Yes.
412: 10   Q: -- 'and discussed them with
412: 11   the co-authors. We' -- that's you and
412: 12   the co-authors, right?

412: 13   A: Right.
412: 14   Q: 'We changed the paper to
412: 15   exclude our estimate of the actual number
412: 16   of excess cases of heart attacks and
412: 17   sudden cardiac deaths, suggested by both
412: 18   Bob and Bruce,' right?
412: 19   A: Yes.
412: 20   Q: Okay.

412: 21   So, the manuscript that you
412: 22   submitted to the Lancet took out that
412: 23   27,000 estimate that the two peer
412: 24   reviewers you suggested said was
413: 1   scientifically unsound, right?
413: 2   A: That's correct.

**91   413:20  -  414:21   Graham, David 2006-05-09   00:00:57**

413: 20   (Whereupon, Deposition
413: 21   Exhibit Graham-29, E-mail with
413: 22   attachment 'Risk of Acute
413: 23   Myocardial Infarction and Sudden

413: 24   Cardiac Death in Patients Treated
414: 1   with COX-2 Selective and
414: 2   Non-Selective NSAIDs,' (Graham,
414: 3   et al)  KP001133; KP001133A -
414: 4   KP001133X, was marked for
414: 5   identification.)

|  |  | Objections | Ruling in Barnett |
|---|---|---|---|

414: 6      - - -
414: 7      BY MR. BECK:
414: 8      Q: Is Exhibit 29 a copy of an
414: 9      e-mail from you to the Lancet folks
414: 10    attaching a revised manuscript? And all
414: 11    of this is dated November 11, 2004.
414: 12    A: Yes.
414: 13    Q: Let me put that on the
414: 14    screen here.
414: 15    And so you say here on the
414: 16    first page, 'Dear Richard and Stuart,
414: 17    Attached is our revised-revised
414: 18    manuscript,' right?
414: 19    A:   (Witness nods.)
414: 20    Q: Correct?
414: 21    A: Yes.

**92**   **415:6 - 415:17**   Graham, David 2006-05-09       00:00:25
415: 6      Q: So, when Lancet says we kind
415: 7      of like that comparison that the peer
415: 8      reviewer said was scientifically unsound,
415: 9      you put it back in, but this time you
415: 10    increased it by 10,000 cases, right?
415: 11    A: That is -- I'm just trying

415: 12    to look for -- oh, it's because --
415: 13    Q: First, before you get to the
415: 14    reason why --
415: 15    A: Yes.
415: 16    Q: -- is it true?
415: 17    A: Yes.

**93**   **416:5 - 416:18**   Graham, David 2006-05-09       00:00:38
416: 5      Q: Now, did Dr. Stadel and
416: 6      Dr. O'Neill, the two peer reviewers that
416: 7      you said you trusted, and who said that
416: 8      the 27,000 figure was scientifically
416: 9      unsound, did they have a chance to review
416: 10    this 37,000 figure that you came up with
416: 11    after you submitted the manuscript to
416: 12    Lancet?
416: 13    A: No. Once a paper goes into
416: 14    a journal and you're dealing with the
416: 15    journal and its peer reviewers, what
416: 16    happens is between the author and the
416: 17    journal. So, there was no requirement
416: 18    to, and I didn't.

**94**   **417:23 - 418:4**   Graham, David 2006-05-09       00:00:21
417: 23    Q: And did you ever give your
417: 24    peer reviewers who told you that your
418: 1      27,000 number was scientifically unsound,
418: 2      did you ever give those peer reviewers
418: 3      whom you recommended the chance to take a

418: 4      look at these new comparison --

**95**   **418:6 - 419:2**   Graham, David 2006-05-09       00:00:55
418: 6      BY MR. BECK:
418: 7      Q: -- and new numbers of 88,000
418: 8      to 139,000?
418: 9      A: No. There was no
418: 10    requirement to. Lancet has a very
418: 11    extensive and exhaustive peer review
418: 12    process. Our paper was reviewed by five
418: 13    peer reviewers, which is two more than

|  |  |  | Objections | Ruling in Barnett |
|---|---|---|---|---|

418: 14    normally happens with the medical
418: 15    journal. And those peer reviewers and
418: 16    the editors of the journal didn't happen

418: 17    to agree with those two people from the
418: 18    FDA.
418: 19    Q: Just so that we're clear,
418: 20    nobody from the FDA during the peer
418: 21    review process ever got a chance to look
418: 22    at this new comparison that you did for
418: 23    the first time and the revised-revised
418: 24    manuscript, correct?
419: 1    A: That's correct, and it
419: 2    wasn't required.

**96**   **419:8 - 420:3**    Graham, David 2006-05-09      00:00:47
419: 8    Q: Can you just tell me whether
419: 9    you included the 37,000 number in the
419: 10    Lancet article?
419: 11    A: No.

419: 12    Q: And, in fact, by the time we
419: 13    finally get to the published article in
419: 14    Lancet, the only numbers that you include
419: 15    were these 88 to 139,000 numbers that you
419: 16    first came up with in the revised-revised
419: 17    manuscript, right?
419: 18    A: That's correct.

419: 19    Q: Now, I want to see if we can
419: 20    understand a little better how you came
419: 21    up with them. I think you said that you
419: 22    used the relative risks from the VIGOR
419: 23    study and the APPROVe study, right?
419: 24    A: That is correct.
420: 1    Q: And the relative risk for
420: 2    VIGOR was 5, right?
420: 3    A: Correct.

**97**   **420:11 - 420:13**    Graham, David 2006-05-09      00:00:15
420: 11    Q: And the relative risk from
420: 12    APPROVe was 2.0, right?
420: 13    A: Correct.

**98**   **421:5 - 422:11**    Graham, David 2006-05-09      00:01:36
421: 5    Q: Well, in your article, you
421: 6    state that 'The background rate for acute
421: 7    myocardial infarction among control
421: 8    groups from studies of cardiovascular
421: 9    risk and NSAID users varied from 7.9 per
421: 10    1,000 person years in CLASS,' one of the
421: 11    studies you referred to, to 12.4 per
421: 12    1,000 person years in what was called the

421: 13    TennCare study, right?
421: 14    A: Correct.
421: 15    Q: So, the background rate that
421: 16    you used when doing your calculation was
421: 17    this range of 7.9 to 12.4, right?
421: 18    A: Correct.
421: 19    Q: And by 'background rate,'
421: 20    what we mean is people who aren't taking
421: 21    any medicine at all. For every 1,000
421: 22    person years of people not taking
421: 23    medicine, 7.9 to 12.4 people are going to

|  |  | Objections | Ruling in Barnett |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 421: 24 | have an adverse cardiovascular event, | | |
| 422: 1 | right? | | |
| 422: 2 | A:  Right. Within the age | | |
| 422: 3 | groups that those populations came from, | | |
| 422: 4 | right. | | |
| 422: 5 | Q:  So, that's sort of what | | |
| 422: 6 | you'd expect from someone taking no | | |
| 422: 7 | medicine at all, is somewhere between 8 | | |
| 422: 8 | to 12 or so people per thousand are going | | |
| 422: 9 | to have heart attacks just because that's | | |
| 422: 10 | what happens in life, right? | | |
| 422: 11 | A:  That's what happens. Right. | | |

99   **424:17  -  424:24**   Graham, David 2006-05-09                                    00:00:24

| | | | |
|---|---|---|---|
| 424: 17 | Q:  So, the rate for myocardial | | |
| 424: 18 | infarctions, heart attacks -- | | |
| 424: 19 | A:  Uh-huh. | | |
| 424: 20 | Q:  -- for people who were | | |
| 424: 21 | taking the high-dose Vioxx in the VIGOR | | |
| 424: 22 | study was 7.4 per hundred -- per thousand | | |
| 424: 23 | person years, right? | | |
| 424: 24 | A:  Yes. | | |

100   **426:12  -  427:15**   Graham, David 2006-05-09                                    00:00:56

| | | | |
|---|---|---|---|
| 426: 12 | Q:  Let's now talk about | | |
| 426: 13 | APPROVe. | | |
| 426: 14 | What's the equivalent number | | |
| 426: 15 | here for the APPROVe study which involved | | |
| 426: 16 | a 25 milligram dose of Vioxx? | | |
| 426: 17 | A:  You'll have to show me the | | |
| 426: 18 | paper and we can derive that number. | | |
| 426: 19 | - - - | | |
| 426: 20 | (Whereupon, Deposition | | |
| 426: 21 | Exhibit Graham-31, | | |
| 426: 22 | 'Cardiovascular Events Associated | | |
| 426: 23 | with Rofecoxib in a Colorectal | | |
| 426: 24 | Adenoma Chemoprevention Trial,' | | |
| 427: 1 | (Bresalier, et al)  NEJM 3-17-05, | | |
| 427: 2 | 352;11:  1092-1102, was marked for | | |
| 427: 3 | identification.) | | |
| 427: 4 | - - - | | |
| 427: 5 | BY MR. BECK: | | |
| 427: 6 | Q:  Have you seen Exhibit 31 | | |
| 427: 7 | before? | | |
| 427: 8 | A:  Yes, I have read this paper | | |
| 427: 9 | before. | | |
| 427: 10 | Q:  And I'll put it on the | | |
| 427: 11 | screen. Well, let's just you and I go to | | |
| 427: 12 | Table 2 over on the fourth page. | | |
| 427: 13 | Is this a paper that deals | | |
| 427: 14 | with the APPROVe study? | | |
| 427: 15 | A:  Yes. | | |

101   **428:8  -  428:19**   Graham, David 2006-05-09                                    00:00:34

| | | | |
|---|---|---|---|
| 428: 8 | Q:  And when you did it the | | |
| 428: 9 | right way, you would come up with an | | |
| 428: 10 | event rate in APPROVe of 6.9; is that | | |
| 428: 11 | right? | | |
| 428: 12 | A:  I'll trust your arithmetic. | | |
| 428: 13 | Q:  And, again, the real life | | |
| 428: 14 | heart attack rate in both VIGOR and | | |

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | 428: 15 | APPROVe was lower than what you say is | | |
| | 428: 16 | the normal background rate for people who | | |
| | 428: 17 | are not taking any medicine at all, | | |
| | 428: 18 | right? | | |
| | 428: 19 | A:  That's correct. But | | |
| 102 | 430:16  -  432:6 | Graham, David 2006-05-09 | 00:01:12 | |
| | 430: 16 | Q:  Now, the patients involved | | |
| | 430: 17 | in the VIGOR study, these were rheumatoid | | |
| | 430: 18 | arthritis patients, right? | | |
| | 430: 19 | A:  Yes. | | |
| | 430: 20 | Q:  And rheumatoid arthritis | | |
| | 430: 21 | patients have a higher risk of heart | | |
| | 430: 22 | attack, all other things being equal, | | |
| | 430: 23 | than people who don't have rheumatoid | | |
| | 430: 24 | arthritis, right? | | |
| | 431: 1 | A:  Some studies have found | | |
| | 431: 2 | that, and other studies have found that | | |
| | 431: 3 | there's no increase in risk. | | |
| | 431: 4 | Q:  Now, you mentioned that | | |
| | 431: 5 | CLASS was one of the studies that you | | |
| | 431: 6 | used to come up with your range. Those | | |
| | 431: 7 | people had osteoarthritis, right? | | |
| | 431: 8 | A:  That's correct. | | |
| | 431: 9 | Q:  And that is not associated | | |
| | 431: 10 | with a higher heart attack risk, right? | | |
| | 431: 11 | A:  Not that we're aware of. | | |
| | | | | |
| | 431: 12 | Q:  And the other study that you | | |
| | 431: 13 | used for the background rate was | | |
| | 431: 14 | TennCare? | | |
| | 431: 15 | A:  Yes. | | |
| | 431: 16 | Q:  And that's short for | | |
| | 431: 17 | Tennessee Care, right? | | |
| | 431: 18 | A:  Right. It's a Medicaid | | |
| | 431: 19 | program. | | |
| | 431: 20 | Q:  And that's anybody who used | | |
| | 431: 21 | a prescription NSAID, regardless of what | | |
| | 431: 22 | their condition was, right? | | |
| | 431: 23 | A:  Right, but these were the | | |
| | 431: 24 | nonusers. | | |
| | | | | |
| | 432: 1 | Q:  So, these were nonusers in | | |
| | 432: 2 | Tenn Care, but they didn't have | | |
| | 432: 3 | rheumatoid arthritis or anything like | | |
| | 432: 4 | that? | | |
| | 432: 5 | A:  Some of them did, but most | | |
| | 432: 6 | of them didn't. | | |
| 103 | 432:22  -  433:1 | Graham, David 2006-05-09 | 00:00:10 | |
| | 432: 22 | Q:  But even with all of that, | | |
| | 432: 23 | VIGOR and APPROVe both had lower rates | | |
| | 432: 24 | than your background rates, correct? | | |
| | 433: 1 | A:  Yes. | | |
| 104 | 434:11  -  437:11 | Graham, David 2006-05-09 | 00:02:49 | |
| | 434: 11 | Q:  Do you know that Dr. Graham | | |
| | 434: 12 | has estimated the United States | | |
| | 434: 13 | background rate to be approximately 6 per | | |
| | 434: 14 | thousand? | | |
| | 434: 15 | A:  And that is in people who | | |
| | 434: 16 | are 15 and older. And one-third of the | | |
| | 434: 17 | population is between the ages of 15 and | | |
| | 434: 18 | 40, and the occurrence of myocardial | | |
| | 434: 19 | infarction in that group is almost zero. | | |

| | Objections | Ruling in Barnett |
|---|---|---|

434: 20    So, if you were to truncate those people
434: 21    out and then calculate what the actual
434: 22    rate is among the people who are most
434: 23    likely to get the Vioxx, the number ends
434: 24    up smack in the middle of that range.
435: 1    Q:  And I've referred to you in
435: 2    the third person. I'm sorry. I'm trying
435: 3    to get through.
435: 4    A:  I took no offense.
435: 5    Q:  I did not intend any. I was
435: 6    actually thinking of Dr. Topol when I
435: 7    referred to Dr. Graham.
435: 8    Dr. Topol, are you
435: 9    acquainted with his publication where he
435: 10    uses a placebo rate of 5.2?
435: 11    A:  Yes. And that was from
435: 12    randomized clinical trials. And
435: 13    randomized clinical trials, no matter
435: 14    what they are, they select patients who

435: 15    are healthier than the real world
435: 16    patients that get the drugs after they go
435: 17    on the market.
435: 18    Q:  And in APPROVe, as I just
435: 19    put up there, the people who took

435: 20    placebos in the APPROVe study, their rate
435: 21    was only 2.7, right?
435: 22    A:  Yes. And they were younger
435: 23    patients without cardiovascular disease,
435: 24    but yes.
436: 1    Q:  And so when you have these
436: 2    relative risks that come from VIGOR and
436: 3    APPROVe, and you are taking the VIGOR
436: 4    heart attacks number of 7.4 and you're
436: 5    comparing it with this super low number
436: 6    of naproxen, 1.5, and that's how you come
436: 7    up with the -- that's how that high
436: 8    number of relative risk of 5 is derived,
436: 9    correct?
436: 10    A:  Those are the results from
436: 11    the VIGOR study.
436: 12    Q:  And the same thing with
436: 13    APPROVe. The relative risk is 2, but it
436: 14    is not because a lot of people had heart
436: 15    attacks on Vioxx, it is because not very
436: 16    many people had them on the placebo,
436: 17    right?
436: 18    A:  That I don't know the -- I
436: 19    don't know the answer to that question.
436: 20    If you have an odd placebo group that's
436: 21    been selected that has an unusually low
436: 22    background rate, that's a possibility. I
436: 23    can't answer that question. I don't know
436: 24    the answer to that question.
437: 1    Q:  You never looked into that
437: 2    when doing your estimate?
437: 3    A:  No. Realize at the time
437: 4    that we did our estimate, what we had to
437: 5    work on were press announcements, because
437: 6    none of these data --
437: 7    Q:  If the answer is no, that's

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|

|  | 437: 8 | fine. I only have about ten minutes | | |
|  | 437: 9 | left. | | |
|  | 437: 10 | A:  Okay. | | |
|  | 437: 11 | I'm sorry. | | |
| 105 440:20 - 442:2 | | Graham, David 2006-05-09 | 00:01:24 | |
|  | 440: 20 | You talked about how you | | |
|  | 440: 21 | made a presentation in February of 2005 | | |
|  | 440: 22 | to the FDA Advisory Committee. Do you | | |
|  | 440: 23 | remember that? | | |
|  | 440: 24 | A:  Yes, I do. | | |
|  | 441: 1 | Q:  And that was one of the | | |
|  | 441: 2 | exhibits that you went over with Mr. | | |
|  | 441: 3 | Kline with some of the pages from the | | |
|  | 441: 4 | presentation that you made to the | | |
|  | 441: 5 | Advisory Committee, right? | | |
|  | 441: 6 | A:  Correct. | | |
|  | 441: 7 | Q:  Then the Advisory Committee | | |
|  | 441: 8 | made recommendations to the FDA, and the | | |
|  | 441: 9 | FDA, in turn, reached some conclusions | | |
|  | 441: 10 | concerning the safety of COX-2 | | |
|  | 441: 11 | inhibitors; is that correct? | | |
|  | 441: 12 | A:  I believe it is. | | |
|  | 441: 13 | MR. BECK:  We'll mark as | | |
|  | 441: 14 | Exhibit 32 the April 6, 2005 | | |
|  | 441: 15 | memorandum. | | |
|  | 441: 16 | - - - | | |
|  | 441: 17 | (Whereupon, Deposition | | |
|  | 441: 18 | Exhibit Graham-32, Memo 4-6-05 | | |
|  | 441: 19 | 'Analysis and recommendations for | | |
|  | 441: 20 | Agency action regarding | | |
|  | 441: 21 | non-steroidal anti-inflammatory | | |
|  | 441: 22 | drugs and cardiovascular risk,' | | |
|  | 441: 23 | (19 pages),   was marked for | | |
|  | 441: 24 | identification.) | | |
|  | 442: 1 | - - - | | |
|  | 442: 2 | BY MR. BECK: | | |
| 106 442:15 - 448:1 | | Graham, David 2006-05-09 | 00:05:15 | |
|  | 442: 15 | Is this the memorandum we've | | |
|  | 442: 16 | been talking about? | | |
|  | 442: 17 | A:  Yes, it is. | | |
|  | 442: 18 | Q:  Okay. | | |
|  | 442: 19 | And then on the bottom of | | |
|  | 442: 20 | Page 3 where it lists the different | | |
|  | 442: 21 | offices, did the division of | | |
|  | 442: 22 | anti-inflammatories participate in this | | |
|  | 442: 23 | review? | | |
|  | 442: 24 | A:  Yes, it did. | | |
|  | 443: 1 | Q:  Did the -- | | |
|  | 443: 2 | A:  They were probably the major | | |
|  | 443: 3 | participant, because they are the ones | | |
|  | 443: 4 | who ultimately regulate these products. | | |
|  | 443: 5 | Q:  Anti-inflammatories includes | | |
|  | 443: 6 | NSAIDs and COX-2 inhibitors, right? | | |
|  | 443: 7 | A:  Correct. | | |
|  | 443: 8 | Q:  And the Division of | | |
|  | 443: 9 | Over-the-Counter Drug Products also | | |
|  | 443: 10 | participated, correct? | | |
|  | 443: 11 | A:  Yes, because they're | | |
|  | 443: 12 | over-the-counter NSAIDs. | | |
|  | 443: 13 | Q:  And the Office of Drug | | |
|  | 443: 14 | Evaluation II and V participated, right? | | |

| | Objections | Ruling in Barnett |
|---|---|---|

| | |
|---|---|
| 443: 15 | A: Right. Those are the parent |
| 443: 16 | organizations of these other divisions. |
| 443: 17 | Q: And the Office of New Drugs |
| 443: 18 | participated? |
| 443: 19 | A: Right. That's the super |
| 443: 20 | office over them. |
| 443: 21 | Q: Office of Drug Safety, |
| 443: 22 | that's your office, right? |
| 443: 23 | A: Correct. |
| | |
| 443: 24 | Q: Office of Biostatistics. |
| 444: 1 | Does that include epidemiologists? |
| 444: 2 | A: No. Epidemiologists are in |
| 444: 3 | the Office of Drug Safety. The Office of |
| 444: 4 | Biostatistics is exclusively |
| 444: 5 | statisticians. |
| 444: 6 | Q: And the Office of |
| 444: 7 | Pharmacoepidemiology and Statistical |
| 444: 8 | Science participated, right? |
| 444: 9 | A: Right. That's the office |
| 444: 10 | that contains both drug safety and |
| 444: 11 | statistics. |
| 444: 12 | Q: The Office of Medical Policy |
| 444: 13 | participated? |
| 444: 14 | A: Right, yes. |
| 444: 15 | Q: And the Office of Regulatory |
| 444: 16 | Policy? |
| 444: 17 | A: Yes. |
| 444: 18 | Q: And the Office of the Center |
| 444: 19 | Director, right? |
| 444: 20 | A: Correct. |
| 444: 21 | Q: And they looked at all kinds |
| 444: 22 | of materials, including your PowerPoint |
| 444: 23 | and your, I don't know if it's testimony |
| 444: 24 | or remarks that were delivered to the |
| 445: 1 | Advisory Committee, correct? |
| 445: 2 | A: Presumably. I wasn't part |
| 445: 3 | of the internal decision-making, but |
| 445: 4 | presumably that was part of what they |
| 445: 5 | considered. |
| 445: 6 | Q: Then focusing on the first |
| 445: 7 | page here, in terms of who authored this |
| 445: 8 | memorandum from the FDA, I think you've |
| 445: 9 | already identified John Jenkins, Dr. John |
| 445: 10 | Jenkins, of the Office of New Drugs, |
| 445: 11 | right? |
| 445: 12 | A: Correct. |
| 445: 13 | Q: And then also you've |
| 445: 14 | identified your boss, Paul Seligman, |
| 445: 15 | right? |
| 445: 16 | A: Correct. |
| 445: 17 | Q: And then it says 'Through: |
| 445: 18 | Steven Galson.' What does it mean when |
| 445: 19 | it is from Drs. Jenkins and Seligman |
| 445: 20 | through Dr. Galson? |
| 445: 21 | A: What it typically means is, |
| 445: 22 | is the 'froms' have written the report. |
| 445: 23 | It goes to the 'through' person, who can |
| 445: 24 | edit it and ask for modifications and the |
| 446: 1 | like. And then after they've signed off |
| 446: 2 | on it, it is sent off to whomever the |
| 446: 3 | 'to' is. |

| | Objections | Ruling in Barnett |
|---|---|---|

446: 4   Q: All right.
446: 5   And the 'to' is the NDA
446: 6   files and has all these numbers, right?
446: 7   A: Correct.
446: 8   Q: So, if I understand it
446: 9   correctly, they got input from all these
446: 10   different groups, and then the head of
446: 11   the Office of New Drugs and the director
446: 12   of the Office of Pharmacoepidemiology and
446: 13   Statistical Science got together and
446: 14   wrote a draft that then was approved by
446: 15   the director of the entire Center for
446: 16   Drug Evaluation and Research, right?
446: 17   A: Correct.
446: 18   Q: Then I just want to go
446: 19   through with you the first five bullet
446: 20   points, and then I'll be done.
446: 21   In the executive summary
446: 22   here, do you see where the FDA says that
446: 23   'Following a thorough review of the
446: 24   available data we have reached the
447: 1   following conclusions regarding currently
447: 2   approved COX-2 selective and
447: 3   non-selective non-steroidal
447: 4   anti-inflammatory drugs and the risk of
447: 5   adverse cardiovascular events.' So
447: 6   that's their setup.
447: 7   Then the first point they
447: 8   make is: 'The three approved COX-2
447: 9   selective NSAIDS (i.e. celebrex,' Vioxx,
447: 10   and what's the third one, 'valdecoxib'?
447: 11   A:   That would be Bextra.
447: 12   Q:   So, they say that three
447: 13   COX-2 selective NSAIDs 'are associated
447: 14   with an increased risk of serious adverse
447: 15   CV events compared to placebo. The
447: 16   available data do not permit a rank
447: 17   ordering of these drugs with regard to CV
447: 18   risk.' Now, what they're saying here is
447: 19   that any one of these COX-2 inhibitors
447: 20   can increase CV risk, but there's no
447: 21   basis on which to say that one is riskier
447: 22   than another, right?
447: 23   A: What they're saying is, is
447: 24   that the absence of evidence is evidence
448: 1   of absence. They're basing --

107   **449:14  -  449:21**   Graham, David 2006-05-09          00:00:22
449: 14   Does it mean that the people
449: 15   who wrote this memo and the person who
449: 16   approved it, whether you agree with them
449: 17   or not, what they're saying is that you
449: 18   cannot draw a distinction between the
449: 19   cardiovascular risks of Vioxx versus
449: 20   Celebrex versus Bextra?
449: 21   A: That's what they are saying.

108   **450:16  -  453:17**   Graham, David 2006-05-09          00:03:13
450: 16   Q: Your article, one of its
450: 17   core conclusions, is that there is a
450: 18   difference, statistically significant
450: 19   difference between the risk of using
450: 20   Vioxx versus Celebrex, correct?
450: 21   A: Correct.

| | Objections | Ruling in Barnett |
|---|---|---|

450: 22    Q: And they disagree with you,
450: 23    right?
450: 24    A: They're saying there are no
451: 1    clinical trials to show that, and so they
451: 2    disagree.
451: 3    Q: Then the next point says,
451: 4    'Data from large long-term controlled
451: 5    clinical trials that have included a
451: 6    comparison of COX-2 selective and
451: 7    non-selective NSAIDs do not clearly
451: 8    demonstrate that the COX-2 selective
451: 9    agents confer a greater risk of serious
451: 10    adverse...events than non-selective
451: 11    NSAIDs.'
451: 12    Now, again, whether you
451: 13    disagree or agree with them, are they
451: 14    saying here that according to the
451: 15    long-term controlled clinical trials, we

451: 16    cannot say that COX-2 inhibitors have any
451: 17    different risk than traditional NSAIDs?
451: 18    A: They're saying based on the
451: 19    evidence they have from clinical trials
451: 20    that they can't distinguish the two.
451: 21    What one should recognize, however, is
451: 22    that there's virtual absence of real
451: 23    long-term data. There's relatively very
451: 24    small numbers for any of these things,

452: 1    and so if you have low power, you're not
452: 2    going to be able to show things. That's
452: 3    why observational data is needed to
452: 4    complement what is inadequate about
452: 5    controlled clinical trials.
452: 6    Q: And then on the next page,
452: 7    do they say on this first bullet,
452: 8    'Long-term placebo controlled clinical
452: 9    trial data are not available to
452: 10    adequately assess the potential for the
452: 11    non-selective NSAIDs to increase the risk
452: 12    of serious adverse CV events.' Is that
452: 13    the point you just made?
452: 14    A: Yes.
452: 15    Q: So, they recognized that,
452: 16    didn't they?
452: 17    A: Yes, they did.
452: 18    Q: The next point they say,
452: 19    'Pending the availability of the
452: 20    additional long-term controlled clinical
452: 21    trial data, the available data are best
452: 22    interpreted as being consistent with a
452: 23    class effect of an increased risk of
452: 24    serious...cardiovascular events for COX-2
453: 1    selective and non- selective NSAIDs.'
453: 2    Now, does that mean that,
453: 3    again, whether you agree or disagree,
453: 4    that they're saying that the best
453: 5    conclusion you can draw based on the data
453: 6    that's available now is that all of these
453: 7    medications, whether it's Vioxx, Celebrex
453: 8    or the nonselective NSAIDs, all have the
453: 9    same basic cardiovascular risk?

| | | Objections | Ruling in Barnett |
|---|---|---|---|

453: 10    A: They're saying that, and
453: 11    they're also saying that observational
453: 12    data is not something they're -- that
453: 13    they're willing to consider.
453: 14    Q: Where do they say that?
453: 15    A: Because there is a plethora
453: 16    of existing observational data that
453: 17    show --

**109  454:22  -  455:5**  Graham, David 2006-05-09    00:00:20
454: 22    Q: You're aware, aren't you,
454: 23    that there are six published
454: 24    epidemiological studies that find no
455: 1    difference between Celebrex and Vioxx?
455: 2    A: No. I mean, you could show
455: 3    me the articles and I'm sure I'm familiar
455: 4    with the articles, but I have not thought
455: 5    about them in that way.

**110  455:14  -  457:19**  Graham, David 2006-05-09    00:02:26
455: 14    MR. BECK: Last point.
455: 15    BY MR. BECK:
455: 16    Q: 'Short-term use of NSAIDs to
455: 17    relieve acute pain, particularly at low
455: 18    doses, does not appear to confer an
455: 19    increased risk of serious adverse CV
455: 20    events (with the exception of -- what
455: 21    was that one again?
455: 22    A: That's 'valdecoxib,' that's
455: 23    Bextra.
455: 24    Q: -- Bextra.
456: 1    So, what the authors of this
456: 2    paper and the reviewer concluded was that
456: 3    'Short-term use of NSAIDs' including
456: 4    Vioxx 'particularly at low doses, does
456: 5    not appear to confer an increased risk of
456: 6    serious adverse CV events.' Isn't that
456: 7    correct?
456: 8    A: That's what they're saying.
456: 9    But once again, they have zero
456: 10    statistical power to actually make this
456: 11    statement. What they really have is, is
456: 12    uncertainty, because they haven't
456: 13    adequately studied it.

456: 14    Q: I think you said that these
456: 15    senior people from the FDA who wrote and
456: 16    reviewed this consulted with lots and
456: 17    lots of people from the FDA, but they
456: 18    didn't consult with you, right?
456: 19    A: No. That's not what I'm --
456: 20    I wasn't part of the discussions that
456: 21    happened internally. What I would note
456: 22    is, is that people from the Office of New

456: 23    Drugs approved these drug products. And
456: 24    that if you look at the organizations
457: 1    that you have represented here, most of
457: 2    them fall into the amoeba that I
457: 3    described earlier and that are part of
457: 4    the review and approval process and that
457: 5    our own management in drug safety answers
457: 6    to the people in the Center for Drug
457: 7    Evaluation who have the controlling

| | | Objections | Ruling in Barnett |
|---|---|---|---|

457: 8   power. So, the Office of New Drugs is
457: 9   the gorilla in the room. So, in any
457: 10   event, I'm not saying that at all. I'm
457: 11   not saying that I wasn't hurt. What I'm
457: 12   saying is that in constructing this
457: 13   report, what FDA has done is, has said
457: 14   that because we don't have data from
457: 15   control trials, we can't be forced to say
457: 16   that the drugs are different, even though
457: 17   there's observational data that would
457: 18   suggest that there are some differences
457: 19   that can be made.

111  458:17  -  459:22  Graham, David 2006-05-09          00:01:19
458: 17   Q:  My question is the senior
458: 18   people at the FDA, when they asked for
458: 19   input from all of those groups that we
458: 20   saw on Page 3, including drug safety
458: 21   people, right, one person they didn't ask
458: 22   for input from was Dr. David Graham. Is
458: 23   that true or false?
458: 24   A:  They're listing offices
459: 1   here. I can't tell you who the
459: 2   individuals are that they asked for input
459: 3   in this. I was a participant in an open
459: 4   public Advisory Committee meeting, and so
459: 5   presumably that material is part of the
459: 6   record. I wrote an FDA report that I'm
459: 7   sure is part of the record. So, I would
459: 8   imagine that the work that I did was
459: 9   under consideration there. But in the
459: 10   actual writing of this memorandum, I
459: 11   can't tell you who actually was consulted
459: 12   to write it except John Jenkins and Paul
459: 13   Seligman because they're the only -- oh,
459: 14   and Steven Galson, because those are the
459: 15   only names that appear.
459: 16   Q:  Lastly, I just can't
459: 17   remember, are all three of those
459: 18   individuals included in the group that
459: 19   you think was conspiring to smear your
459: 20   name?
459: 21   A:  No. Dr. Jenkins was not
459: 22   part of that group.

112  463:2  -  463:13  Graham, David 2006-05-09          00:00:26   **Re: 463:2-478:21**
463: 2   The estimates that you have,                               **Def Obj:** MIL #4;
463: 3   88,000 to 140,000?                                        Same objections as
463: 4   A:  Yes.                                                  above regarding Excess
463: 5   Q:  First of all, are they lower                          event calculation
463: 6   than some other folks' estimates of the
463: 7   number of increased cardiovascular, both
463: 8   deaths and incidents, that have occurred
463: 9   as a result of the drug Vioxx?
463: 10   A:  Yes, they are.
463: 11   Q:  Is yours a conservative
463: 12   estimate compared to others in the
463: 13   published medical literature?

113  463:16  -  463:18  Graham, David 2006-05-09          00:00:04
463: 16   THE WITNESS:  I wouldn't say
463: 17   that it is conservative. I would
463: 18   say that it is realistic.

114  478:17  -  478:21  Graham, David 2006-05-09          00:00:04
478: 17   BY MR. KLINE:

_Sustained
asked +
answered
re stating
direct. already
covered_

72

|  |  |  | Objections | Ruling in Barnett |
|---|---|---|---|---|
| | 478: 18 | Q: Is that the highest level | | |
| | 478: 19 | that you could get? | | |
| | 478: 20 | A: That's the highest level you | | |
| | 478: 21 | can get. | | |
| 115 | 515:10 - 516:6 | Graham, David 2006-05-09 | 00:00:52 | |
| | 515: 10 | Q: Let's talk about your | | |
| | 515: 11 | testimony, sir. | | |
| | 515: 12 | In response to questions by | | |
| | 515: 13 | Mr. Beck, you said -- I want to talk | | |
| | 515: 14 | label for a minute, labeling in response | | |
| | 515: 15 | to the questions that he asked you. | | |
| | 515: 16 | First of all, sir, you testified earlier | | |
| | 515: 17 | about how labels can make a difference. | | |
| | 515: 18 | You said that a straightforward -- I | | |
| | 515: 19 | actually have from Mrs. Golkow's | | |
| | 515: 20 | transcription here today instant access | | |
| | 515: 21 | to it on real time. And it says here, | | |
| | 515: 22 | 'It would actually just be more | | |
| | 515: 23 | straightforward about what the problems | | |
| | 515: 24 | are, using very bold and frank and plain | | |
| | 516: 1 | language, not sort of using adjectives | | |
| | 516: 2 | that downplay it and not burying it in | | |
| | 516: 3 | tremendous amounts of text.' Your words. | | |
| | 516: 4 | Do you recall saying that to the jury | | |
| | 516: 5 | here today? | | |
| | 516: 6 | A: Yes, I do. | | |
| 116 | 516:7 - 517:12 | Graham, David 2006-05-09 | 00:01:22 | Re: 516:17-517:12 | Overruled |
| | 516: 7 | Q: Now, sir, can a | | **Def Obj:** MIL #4; |
| | 516: 8 | straightforward, bold, frank, plain | | Outside scope of |
| | 516: 9 | language label warning make a difference | | Court's order authorizing |
| | 516: 10 | in prescribing of drugs as you see and | | deposition; 403; |
| | 516: 11 | know and understand it? | | Cumulative of Dr. Topol, |
| | 516: 12 | A: It certainly can. In the | | Avorn, Moye |
| | 516: 13 | case of Vioxx, I think had the warning | | |
| | 516: 14 | been very clear, had it been boxed, the | | |
| | 516: 15 | number of patients exposed to the drug | | |
| | 516: 16 | would have probably been much reduced, | | |
| | 516: 17 | and this would have resulted in a | | |
| | 516: 18 | substantial reduction in the number of | | |
| | 516: 19 | people who were injured by heart attacks | | |
| | 516: 20 | or killed by heart attacks. | | |
| | 516: 21 | Q: Sir, in your testimony | | |
| | 516: 22 | before the United States Senate Finance | | |
| | 516: 23 | Committee before Senator Grassley and his | | |
| | 516: 24 | committee, you were asked the question -- | | |
| | 517: 1 | you were saying -- you were asked the | | |
| | 517: 2 | question by Senator Graham (sic): 'A | | |
| | 517: 3 | black box will catch everybody's | | |
| | 517: 4 | attention.' You said, 'As I pointed out | | |
| | 517: 5 | before, I think the most effective thing | | |
| | 517: 6 | that this black box would have done is it | | |
| | 517: 7 | would have given prominence to the heart | | |
| | 517: 8 | attack risk of Vioxx and it would have | | |
| | 517: 9 | stopped direct-to-consumer advertising.' | | |
| | 517: 10 | Do you recall making that | | |
| | 517: 11 | statement, sir, before the Congress? | | |
| | 517: 12 | A: Yes, I do. | | |
| 117 | 565:5 - 565:6 | Graham, David 2006-05-09 | 00:00:01 | |
| | 565: 5 | THE WITNESS: Nothing | | |
| | 565: 6 | whatsoever. | | |