Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS
STUDY."[10]

Critics who have focused on Dr. Scolnick's March 9, 2000 email have tended to
ignore his subsequent emails reflecting his belief based on additional data and analysis
that Vioxx was not prothrombotic.  For example, on April 14, 2000, two days after
writing the above-quoted email and reviewing additional data suggesting that a
disproportionate number of the cardiovascular adverse events occurred in high-risk
patients who should have been taking low-dose aspirin to help prevent such events, he
wrote:

> READ IT! This is the latest adjudicated events tabulation.
> My anxiety level about the drug and the class is much
> allevaited [sic] by this data.  It shows that the major major
> [sic] difference in events between Vioxx and naproxen is in
> patients who by FDA definition should have been on low
> dose aspirin!!!. . . .  With this analysis we can stem the tide
> and save the class/ ED Scolnick[11]

In February 2001, during preparations for the FDA Advisory Committee Meeting
to review the Vioxx supplemental New Drug Application that included data from the
VIGOR Trial, Dr. Scolnick sent an email to colleagues that reflected his view of Vioxx
and its cardiovascular safety as of that time:

---

[10]   4/12/00 email from E. Scolnick to A. Reicin, MRK-ABC0033809 (emphasis in original).

[11]   4/14/00 email from E. Scolnick to R. Gilmartin, D. Anstice, M. McGlynn, K. Frazier, P. Wold-Olsen
and J. Lewent, MRK-ADI0006059.  As set forth below at pages 69 and 70 and page 77, as events
developed, the subgroup analysis that Dr. Scolnick reviewed was called into question.  However, the
email evidences Dr. Scolnick's state of mind at the time about the safety profile of Vioxx.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

> We all worried to death about the CV events last Spring.
> Merck is of course always an issue.  But I was sick at the
> thought we might be doing harm to patients.  I KNOW each
> of you well enough to know you felt the same way.  with
> [sic] the data now available I am no longer worried.[12]

The strength of Dr. Scolnick's belief that Vioxx was not prothrombotic also is reflected in an internal email he sent to MRL scientists on November 8, 2001 concerning a proposed label received from the FDA that included a cardiovascular warning for Vioxx:

> twice in my life i have had to say to the FDA "That label is
> unacceptable, we will not under any circumstances accept
> it." . . . You WILL have to do that on the cardiac warning
> for Vioxx. . . . And i assure you i will NOT sign off on any
> lable [sic] that had a cardiac warning.  the data review
> yesterday convinces me that we do not have an unsafe drug
> and I am willing if needed to spend several hours one on
> one with anyone at the FDA going through the data until
> they in fact get it[.][13]

Those who argue that MRL scientists did not truly believe that the VIGOR Trial cardiovascular risk ratio was a result of the cardioprotective qualities of naproxen often point to a memorandum prepared by Dr. Thomas Musliner, an MRL scientist, more than three years before the VIGOR Trial data were unblinded (the "Musliner Memorandum"). In that memorandum, Dr. Musliner hypothesized that in any study that tested Vioxx against a traditional non-selective NSAID there would be "a substantial chance that significantly higher rates of CV [Adverse Experience] events . . . will be observed in the

---

[12]   2/4/01 email from E. Scolnick to A. Nies, A. Reicin and H. Guess, MRK-ACT0009918.

[13]   11/8/01 email from E. Scolnick to D. Greene, A. Nies and B. Goldmann, MRK-ACR0009287.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

selective Cox-2 group . . . ."[14]  What these critics often omit from their discussion is that
Dr. Musliner's hypothesis was explicitly based on the assumptions that Vioxx was
cardio-neutral and would have no effect on cardiovascular events and that traditional
NSAIDs like naproxen, because they block platelet aggregation, might well be
cardioprotective.  Accordingly, internal documents such as the Musliner Memorandum
establish simply that the theory that NSAIDs like naproxen might have cardioprotective
qualities was recognized years before cardiovascular data from the VIGOR Trial were
received and was not simply an after-the-fact creation to explain potentially damaging
data.

On the basis of our exhaustive review of the record, we have concluded that, prior
to receipt of the APPROVe Trial cardiovascular results, none of the senior scientists at
MRL believed that Vioxx was prothrombotic.  Indeed, we were told by numerous
witnesses, including Dr. Scolnick, Dr. Kim and Mr. Gilmartin, that they, or their family
members, were taking Vioxx up until the day that it was withdrawn from the market.

To say that no senior scientists at Merck believed that Vioxx was prothrombotic
before receiving cardiovascular data from the APPROVe Trial is not to endorse every
action that Merck employees took with respect to Vioxx.  For example, as explained in
Appendix K, in January 2001, Merck senior management received a letter from an
academic scientist who criticized the manner in which Merck employees had treated
other academic scientists who were critical of Merck and Vioxx.  Merck senior

---

[14]   11/21/96 memorandum from T. Musliner to B. Friedman et al., MRK-AAX0002413, at 17.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

management investigated the alleged conduct of the Merck official and took steps to
ensure that it would not be repeated.[15]

Before Vioxx was launched, certain employees in the Marketing and Sales
Departments sought to garner support for the drug among important clinicians who might
prescribe the drug and thought leaders who might influence others about the benefits of
Vioxx.  Documents prepared in connection with their efforts refer to "neutralizing"
physicians who were critical of Merck or Vioxx by offering grants or other incentives.
As discussed later in the Report and more fully in Appendix K, we found no evidence
that senior management endorsed such activities.  In addition, in late 2001 Merck
undertook, on its own initiative, a comprehensive review of sales and marketing practices
throughout the Company.  As a result, it implemented enhanced policies concerning
compliance, known internally as the "Culture of Compliance."  This initiative, which
enforced and underscored Merck's commitment to its existing policies regarding
promotional activities and physician education and training was not Vioxx-specific.  It
did, however, reinforce policies and procedures to enhance accountability and
transparency and ensure that all interactions between representatives of Merck and
physicians were appropriate.[16]

We also note that certain of the press releases that Merck issued concerning
Vioxx – including the March 27, 2000 release (announcing the preliminary VIGOR Trial

---

[15]   See Appendix K.

[16]   See Appendix K.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

results), the May 11, 2006 release (announcing preliminary results of a follow-up study

on cardiovascular data from the APPROVe Trial) and the May 30, 2006 press release

(correcting an error in the article published in the New England Journal of Medicine in

February 2005 about the APPROVe Trial cardiovascular data) – did not provide as much

context about the issues presented as might have been desirable, and the May 2006 press

releases regarding the APPROVe Trial were not as clear as they could have been.[17]

Similarly, as we explain below and in Appendix G, a promotional aid called the

Cardiovascular Card that was used by sales representatives with physicians after the

VIGOR Trial cardiovascular data were unblinded did not, standing alone, provide all of

the cardiovascular data on Vioxx.  Although used in response to questions from

physicians about the cardiovascular safety of Vioxx, the Card did not include data from

the VIGOR Trial.  The Company, however, separately provided a letter describing the

VIGOR Trial data to physicians who asked questions about them.  Finally, the Card

included data from prior clinical trials that were reflected in the label but that – like the

VIGOR Trial – were not designed to assess cardiovascular risk.

The actions of Merck's employees with respect to the development and marketing

of Vioxx must be evaluated with a recognition of three overarching facts:  (i) their belief

that Vioxx was an important drug that conferred significant clinical benefits on patients

by substantially reducing the risk of serious and sometimes fatal gastrointestinal

---

[17]  Shortly after issuing the May 11, 2006 press release, the Company posted on its website a 137-page report that it had submitted to the FDA containing data and detailed analyses from the follow-up study, as described below.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

complications associated with traditional NSAID therapy; (ii) their belief until the APPROVe Trial data were unblinded that Vioxx was not prothrombotic; and (iii) their decision to withdraw Vioxx based on their views that the APPROVe Trial cardiovascular data reflected an increased relative risk on Vioxx versus placebo.  The convictions of Merck personnel concerning the safety of Vioxx are underscored in some instances by their personal use of the drug right up until the day that it was withdrawn.  At the same time, MRL scientists understood that, given that the science was new and developing, it was impossible to know with certainty that Vioxx (or any selective Cox-2 inhibitor) posed no cardiovascular risk.

It is in this context that one must evaluate the interaction of MRL scientists with Vioxx's scientific critics and the FDA, and the Company's marketing practices.  Whether these beliefs led certain Merck officials to overreact to criticism or to ignore prudent scientific or marketing practices may be the subject of legitimate debate.  However, the extensive evidence we have reviewed has convinced us that, during the period that Vioxx was marketed, no member of Merck's senior management believed that Vioxx was prothrombotic and attempted to mislead the scientific or consuming communities.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

## VIII.

## REVIEW OF SPECIFIC CRITICISMS OF MERCK'S CONDUCT.

The allegations that have been made against the Company and its senior

management in connection with the development and marketing of Vioxx can be broadly

grouped into four categories:

- Merck's knowledge of the cardiovascular risk profile of Vioxx before Vioxx was approved by the FDA in May 1999;

- Merck's scientific response to cardiovascular data from the VIGOR Trial;

- Merck's marketing efforts; and

- Merck's analysis and reporting of cardiovascular data arising from the APPROVe Trial.

While we do not recite all of the allegations that have been made, we set forth

below each of the major criticisms within these categories followed by our findings and

conclusions with respect to each criticism.

### A.   Summary of Principal Criticisms and Findings Concerning Merck's Pre-approval Knowledge.

Central to the criticisms of Merck's conduct with respect to Vioxx is the

allegation that the Company knew, before Vioxx was approved by the FDA, that the drug

posed a serious cardiovascular risk to patients and deliberately failed to disclose that risk

to the public, the scientific community and the FDA.

Our findings regarding the allegations concerning Merck's alleged pre-approval

knowledge about the cardiovascular risks of Vioxx focus on the comprehensiveness of

- 27 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Merck's pre-clinical and clinical testing of Vioxx and Merck's response to the FitzGerald

prostacyclin hypothesis.

1.      **Allegation No. 1:  Merck Rushed Vioxx
        to Market Without Adequate Testing.**

   a.      **Summary of Allegation.**

The argument is made that "[i]n the late 1990s Merck was facing the loss of

patent protection on several top drugs and needed a big hit."[18]  According to Merck's

1996 profit plan, Merck needed to start marketing Vioxx by the fourth quarter of 1998,

after only four years of tests.  To meet that deadline, it is argued that Merck compressed

significantly the normal period for clinical trials and deliberately failed to test adequately

the cardiovascular safety of Vioxx.

   b.      **Our Findings and Conclusions.**

While it is true that Merck lost patent protection on some of its major drugs in

2000 and 2001, we found no evidence to suggest that Merck propelled Vioxx to market

without conducting necessary testing in order to replace anticipated lost profits.

All new drugs at Merck (and in the pharmaceutical industry in general) undergo

rigorous testing, beginning with a series of tolerability studies in animals, that, if

successful, are followed by Phase I through III clinical testing in humans.  These test

results must be presented to the FDA, which must be satisfied that sufficient testing has

been performed to establish both the efficacy and the safety of the drug.  There is no basis

---

[18]     Anna Wilde Mathews[*] & Barbara Martinez[*], Warning Signs:  E-Mails Suggest Merck Knew Vioxx's
         Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

to conclude that Merck attempted to shortcut the necessary testing or that the FDA did

not carefully review Merck's testing before permitting Merck to market Vioxx.

Merck's New Drug Application for Vioxx was one of the largest New Drug

Applications that Merck had ever filed – in terms of both the number of patients who

participated in Merck's clinical studies for Vioxx and the duration of their treatment with

Vioxx.[19]  The application included data from numerous trials designed to test the efficacy

and gastrointestinal safety of Vioxx, which MRL scientists and regulatory liaisons

believed supported Merck's primary regulatory goal:  to market Vioxx without the

standard NSAID-class gastrointestinal warning.  The FDA approved Vioxx for sale in the

United States but did not agree that data included in the application supported removal of

the standard NSAID-class gastrointestinal warning.

Merck's New Drug Application also provided data about Vioxx's effects on other

body systems.  The New Drug Application included analyses of (i) cardiovascular

adverse events that were "serious" (i.e., resulted in death or other serious clinical

outcome, such as hospitalization) in the Phase II/III osteoarthritis studies, and (ii) all

thromboembolic cardiovascular adverse events (including events pertaining to cardiac,

central nervous and peripheral systems) in the same group of studies.  These analyses

showed that (i) the incidence rates of serious cardiovascular adverse events were not

---

[19]  In this regard, the application exceeded by far the requirements for a new drug application of the
International Conference on Harmonisation Guidances (developed by the FDA and regulators in
Japan and the European Union), as the FDA medical reviewer who reviewed Merck's New Drug
Application acknowledged.  Transcript of 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis
Advisory Committee and the Drug Safety and Risk Management Advisory Committee, MRK-
AIU0185869, at 6106 (statement of M. L. Villalba*).

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

statistically different between Vioxx, NSAID comparators and placebo, and (ii) the

incidence rates of all thromboembolic cardiovascular adverse experiences were similar

among the treatment groups.

The FDA medical reviewer who reviewed Merck's New Drug Application for

Vioxx has stated that she was aware of the FitzGerald prostacyclin hypothesis at the time

she reviewed the application but that there was no evidence that the hypothesis had any

clinical impact on cardiovascular risk (either from Vioxx or Celebrex, which the FDA

already had approved).  The reviewer acknowledged that post-marketing data would

provide the only basis on which to answer any hypothetical question about the

cardiovascular safety of Vioxx.  The FDA did not request that Merck furnish additional

data to support its application for approval to market Vioxx, which is something the FDA

presumably would have done had there been any doubt at that time about the

completeness of the application or the safety of Vioxx.

### 2.   Allegation No. 2:  Merck Knew in 1996 that Vioxx Was Dangerous to the Heart.

#### a.   Summary of Allegation.

Some have argued that Merck did not investigate fully during the clinical

development phase the serious cardiovascular problems that Vioxx could cause despite

the fact, it is argued, that the Musliner Memorandum mentioned above shows that by

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

November 1996, MRL scientists were actively discussing Vioxx's potential

cardiovascular risks.[20]

### b.    Our Findings and Conclusions.

The Musliner Memorandum was generated in the context of discussions among

MRL scientists about the design of a large gastrointestinal clinical trial to test the primary

hypothesis that patients taking Vioxx would experience fewer gastrointestinal events than

patients taking traditional, non-selective NSAIDs.  Documents and interviews make clear

that MRL scientists confronted difficult design issues in planning that proposed trial,

including what drug or agent Vioxx should be tested against, but that they did not at any

point in the design process conclude that, or even consider whether, Vioxx was

prothombotic.  Rather, their entire discussion was predicated on the assumption –

expressly set forth in the Musliner Memorandum – that Vioxx was cardio-neutral.

The record makes clear that MRL scientists did not believe that it was ethical or

feasible to deny pain relief to patients with osteoarthritis for a lengthy period (the trial

was being planned to last approximately twelve months), so a trial testing Vioxx versus a

placebo was not an option.  In addition, a number of MRL scientists believed that, as

stated in the Musliner Memorandum, testing Vioxx against a traditional non-selective

NSAID comparator had the potential to yield a between-treatment differential in

cardiovascular events favoring the comparator because non-selective NSAIDs had

antiplatelet effects and could, by virtue of those effects, provide cardioprotection to

---

[20]   Anna Wilde Mathews[*] & Barbara Martinez[*], Warning Signs: E-Mails Suggest Merck Knew Vioxx's
Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

patients in the NSAID arm of the trial.  Thus, these scientists expressed concern that

testing Vioxx against a traditional NSAID comparator created the theoretical risk that

patients in the NSAID arm would experience fewer cardiovascular events than those in

the Vioxx arm, a result that they speculated might be misconstrued to suggest that Vioxx

had caused a higher number of cardiovascular events.

MRL scientists also discussed internally and with external experts whether or not

patients in the trial should be permitted to take low-dose aspirin.  The evidence reflects

that those involved in the discussions carefully weighed competing design considerations.

The benefits of allowing low-dose aspirin use in both the NSAID and Vioxx arms would

be (i) that it would permit usage by a broad spectrum of patients, including those

requiring the use of low-dose aspirin for cardiovascular prophylaxis, and thus would have

reflected "real world" usage of Vioxx, and (ii) that allowing all patients who might

require cardiovascular prophylaxis to receive it would lessen the likelihood that patients

taking Vioxx would have a higher incidence of cardiovascular events as compared to

those taking a non-selective NSAID.  The problem with allowing patients to take

low-dose aspirin, however, was that aspirin was known to cause gastrointestinal

problems, which would confound the study results and potentially prevent MRL from

proving its primary hypothesis that selective Cox-2 inhibitors do not cause

gastrointestinal injury.

Ultimately, MRL settled on a trial design in which 25 mg of Vioxx would be

tested against two non-selective NSAIDs, diclofenac and ibuprofen, in patients with

osteoarthritis, and in which low-dose aspirin use would not be allowed.  Merck cancelled

- 32 -

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

the proposed trial in August 1997, before the first patient was enrolled. As discussed more fully below at pages 47 and 48 in response to the assertion that MRL cancelled the trial anticipating negative cardiovascular data, the cancellation was based on a number of factors, none of which reflected a concern about cardiovascular risk. Indeed, the evidence concerning the development and design of the gastrointestinal outcomes trial reflects no concern whatsoever that Vioxx might be prothrombotic.

In sum, the evidence cited by Merck's critics to support the claim that MRL scientists believed in 1996 that Vioxx was prothrombotic is based on statements that, taken in context, evidence a belief not that Vioxx would cause heart attacks but rather that a comparator NSAID might reduce the number of heart attacks through its inhibition of Cox-1. Hindsight has demonstrated that the MRL scientists involved in the discussion were prescient in that Merck's critics have construed the VIGOR Trial data exactly as MRL scientists anticipated they might.

### 3.    Allegation No. 3:  Merck Ignored Advice From Outside Experts Concerning Possible Prothrombotic Risks of Vioxx.

#### a.    Summary of Allegation.

Merck also has been criticized for allegedly failing to heed the advice of at least two of its outside consultants, Dr. Garret FitzGerald[*] of the University of Pennsylvania and Dr. John Oates[*] of Vanderbilt University, both of whom independently urged the Company to investigate further the potential cardiovascular risks of Vioxx even before it was approved by the FDA.

Report of John S. Martin, Jr. to the Special Committee                                        September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                          Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

The consultants' recommendations were prompted by the findings of a study,

called Protocol 023, sponsored by Merck and conducted by Dr. FitzGerald[*] in 1996 and

1997. The study showed that Vioxx, like non-selective NSAIDs, suppressed urinary

excretion of a metabolite of prostacyclin – a substance in the body that dilates blood

vessels and helps to prevent blood clots by inhibiting platelet aggregation. The study

further showed that Vioxx, unlike traditional non-selective NSAIDs, did not suppress

urinary excretion of a metabolite of thromboxane, a substance in the body that constricts

blood vessels and promotes blood clots. Although very little was known at the time

about what role, if any, Cox-2 played in the production of prostacyclin in the

bloodstream, Dr. FitzGerald[*] hypothesized that the reduction in prostacyclin metabolite

in the urine meant that Vioxx decreased prostacyclin in the bloodstream and that doing so

without also decreasing thromboxane could theoretically place patients in a

prothrombotic state.

Critics argue that although the study did not prove that patients taking Vioxx

would necessarily experience an increase in the number of cardiovascular events due to a

decrease of prostacyclin in their blood, the "FitzGerald prostacyclin hypothesis" was, at

the very least, cause for immediate concern and follow-up. Critics charge that Merck

failed in 1997 to follow up on the implications raised by the study and did not adequately

investigate the cardiovascular risks of Vioxx.

It is further alleged that after Merck presented the Fitzgerald prostacyclin

hypothesis to its Board of Scientific Advisors in May 1998, the Board examined the

hypothesis and advised MRL to conduct further tests on the potential cardiovascular risks

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

of the drug. The allegation is made that just as Merck had ignored its outside consultants

when they suggested additional cardiovascular studies in 1997, Merck ignored the advice

of its Board of Scientific Advisors in 1998 and failed to conduct any of the studies

suggested by that body of experts for fear that such studies would demonstrate that Vioxx

created or enhanced cardiovascular risk.

###    b.    Our Findings and Conclusions.

####        (1)    Protocol 023 Data and Genesis
####               of the FitzGerald Prostacyclin Hypothesis

Protocol 023 was funded by Merck and designed to test the renal (or

kidney-related) effects of Vioxx as compared to indomethacin (a non-selective NSAID)

in a small, 36-subject trial. Drs. Garret FitzGerald[*] and Francesca Catella-Lawson[*] of the

University of Pennsylvania conducted the study, which showed, among other things, that

Vioxx reduced prostacyclin metabolite (PGI-M) in urine but did not decrease

thromboxane metabolite in the urine. From this finding, Dr. FitzGerald[*] hypothesized (i)

that selective Cox-2 inhibition resulted in reduced levels of prostacyclin in the

vasculature (although the source of prostacyclin metabolite in urine was not known with

any certainty), and therefore (ii) that the selective inhibition of Cox-2, which has no

effect on thromboxane, might upset the balance between prostacyclin and thromboxane in

the vasculature, which (iii) could put patients in a prothrombotic state.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### (2)   MRL Reaction to the FitzGerald Prostacyclin Hypothesis

Our investigation revealed that MRL scientists, including senior management,

learned the findings of Protocol 023 – and Dr. FitzGerald's[*] related hypothesis – in

October 1997, and had two immediate reactions.

First, they questioned Dr. FitzGerald's[*] premise that the suppression of the

urinary metabolite necessarily signaled a reduction in vascular prostacyclin. If there were

no reduction in vascular prostacyclin, MRL scientists believed, there would be no effect

on the thromboxane/prostacyclin balance in the vasculature and thus no prothrombotic

effect.

Second, they believed that the Fitzgerald prostacyclin hypothesis was undermined

by evidence suggesting that Tylenol, a widely used over-the-counter drug with a long

clinical history that had been shown to suppress the same prostacyclin metabolite in

urine, had never been shown to be prothrombotic.

### (3)   Merck's Pre-approval Investigation of the Hypothesis

Despite what the evidence suggests were genuine questions within MRL about the

premises of Dr. FitzGerald's[*] hypothesis, Merck took several affirmative steps to

investigate the hypothesis before Vioxx was approved for sale, and, in our view,

concluded in good faith that Vioxx posed no cardiovascular risk.

First, in response to the Protocol 023 data, Dr. Douglas Watson, an MRL

epidemiologist, was tasked in November 1997 with reviewing data from Merck clinical

trials to determine if there was any signal that patients on Vioxx experienced more

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

thrombotic events than those on placebo.  Because many of the clinical trials still were

blinded at that time and because there were limited data testing Vioxx against placebo,

Dr. Watson's analysis compared the overall incidence of cardiovascular events as of

December 1997 in the Vioxx clinical program (in the Vioxx and comparator groups

combined) against the incidence of cardiovascular events in the placebo arms of clinical

trials for two other Merck drugs.  This blinded comparison did not signal to MRL

scientists that there was an increased cardiovascular risk in the studies that included

Vioxx.

After the data from Vioxx trials that were ongoing at the time of Dr. Watson's

analysis were unblinded, MRL scientists analyzed the incidence of cardiovascular events

on Vioxx versus comparators in the Vioxx development program and found that the

cardiovascular incidence rate for Vioxx was similar to the incidence rate for the

comparators (non-selective NSAIDs and placebo) in the Vioxx clinical trials to date.  On

that basis, MRL management believed that there likely was no clinical significance to

Dr. FitzGerald's[*] belief that Vioxx suppressed vascular prostacyclin, even if correct.

Although MRL's analysis was not statistically powered to detect a small difference in

cardiovascular events between Vioxx and the comparators, MRL scientists were

comforted by the results.

Second, Merck Frosst, Merck's basic research facility in Montreal, Canada,

conducted an animal study to evaluate the contribution of Cox-2 to prostacyclin

production by the aortic tissue, and found that Cox-2 did not play a major role in

prostacyclin production in the rabbit aorta.  Although this did not rule out the possibility

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

that Cox-2 might be responsible for the production of prostacyclin elsewhere in the vasculature or in humans, in the minds of MRL scientists it made one of the premises of the FitzGerald prostacyclin hypothesis more doubtful.

Third, Dr. Alan Nies, head of Clinical Pharmacology at MRL, presented the FitzGerald prostacyclin hypothesis at a meeting of Merck's Board of Scientific Advisors in May 1998. This Board of approximately twenty-five outside consultants convened annually to review and discuss with MRL scientists and Merck senior management Merck's clinical drug program. The evidence reflects that the Board of outside experts, which included Dr. John Oates[*], a world-renowned expert on platelets and prostanoids (including prostacyclin and thromboxane), took the FitzGerald prostacyclin hypothesis seriously, but did not believe that it should prevent or delay the commercial distribution of Vioxx given that Merck's unblinded clinical data did not reveal any cardiovascular risk. In its written report, the Board of Scientific Advisors, which had considered the "hypothetical adverse effects" of Vioxx, concluded:

> The gain in safety achieved by the elimination of serious
> and fatal gastrointestinal toxicity will free patients from one
> of the most serious adverse effects in current drug therapy.
> Thus, there is a strong mandate for introduction of Vioxx
> into medical practice as soon as is feasible.[21]

In light of the FitzGerald prostacyclin hypothesis, and, to a lesser extent, an alternative hypothesis endorsed by some members of the Board of Scientific Advisors that Vioxx's anti-inflammatory properties might provide a cardiovascular benefit to

---

[21]   5/98 "Programmatic Review: Vioxx Program," MRK-AEI0002734, at 742.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

certain patients, the Board of Scientific Advisors recommended that Merck develop a

uniform set of criteria to collect and evaluate cardiovascular events for future analysis. In

response, MRL implemented a Cardiovascular Adjudication Standard Operating

Procedure (the "Cardiovascular Adjudication SOP") requiring that all cardiovascular

events occurring in the Vioxx clinical program be collected in a uniform manner and

assessed for a second time by an independent, blinded expert committee to ensure

consistency across diagnoses.

Merck took several additional steps to investigate the FitzGerald prostacyclin

hypothesis after Vioxx had been approved by the FDA. When Dr. Peter Kim, now

President of MRL, joined Merck in early 2001, he established a "Coxib Task Force" to

focus on important issues in the Vioxx and Arcoxia programs.[22] After hearing about

Dr. FitzGerald's* prostacyclin hypothesis and reviewing the research that Merck had

conducted in response to it, Dr. Kim directed Merck scientists to research what Dr. Kim

identified as the basic unconfirmed assumption in the prostacyclin hypothesis: whether

prostacyclin formation is catalyzed by Cox-2 in the vasculature. From Dr. Kim's

perspective, and that of other senior MRL scientists, a finding that prostacyclin exists

side-by-side (or is co-localized) with Cox-2 within cells in the vasculature would lend

credence to that assumption and would support Dr. FitzGerald's* hypothesis that

inhibition of Cox-2 could create a prothrombotic state by creating an imbalance between

---

[22]   Arcoxia is Merck's second-generation selective Cox-2 inhibitor. It has been marketed outside of the
United States, but as of the date of this Report, is not being marketing in the United States. Arcoxia is
discussed further in Appendix O.

- 39 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

thromboxane and prostacyclin.  On the other hand, a finding that Cox-2 is not

co-localized with prostacyclin in the vasculature would cast doubt on Dr. FitzGerald's[*]

assumption that Cox-2 catalyzed production of prostacylin in the vasculature, suggesting

that suppression of Cox-2 would not alter the balance between prostacyclin and

thromboxane in the vasculature and thus that Vioxx should have no prothrombotic effect.

In 2002, Merck conducted an animal study to investigate this question and found

that Cox–1 was co-localized with prostacyclin synthase in the vasculature to a greater

extent than Cox-2.  This suggested to MRL scientists that inhibition of Cox-2 alone

would not increase the risk of thrombotic events through the mechanism proposed in the

FitzGerald prostacyclin hypothesis.  It also underscored – as we were reminded

repeatedly by prominent outside experts we interviewed as well as by MRL scientists –

that Cox enzyme-related science was new and evolving during the time period covered

by our investigation.

The record makes clear that given the state of the science, Merck's clinical trial

data and the various assumptions underlying the FitzGerald prostacyclin hypothesis, it

was not unreasonable for MRL to conclude, after considering that hypothesis, that

selective inhibition of Cox-2 would not have, or was not likely to have, any clinical

cardiovascular implication.  It is worth noting that even Dr. FitzGerald[*], who believed

that his hypothesis applied to all selective Cox-2 inhibitors, including Celebrex, did not

believe that FDA approval of selective Cox-2 inhibitors should be delayed on the basis of

his hypothesis.  A 1999 <u>Philadelphia Inquirer</u> article quoted Dr. FitzGerald[*] as saying: