Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

than in the Vioxx arm (7).[44] He found these data particularly compelling because they suggested that the antiplatelet properties of naproxen had a clinical effect in the VIGOR Trial patients, rendering them more susceptible to bleeding, as would a low-dose aspirin regimen.

Dr. Barr also requested subgroup analyses of the VIGOR Trial cardiovascular data based on patient demographics and cardiovascular risk factors, such as age, gender, history of cardiovascular disease, smoking habits and hormone replacement therapy. These analyses showed that, regardless of treatment group, patients with more cardiovascular risk factors experienced more cardiovascular events. These analyses left open the issue of whether it was Vioxx that was increasing the risk, naproxen that was decreasing it, chance, or some combination of the three.

### (iv) Review of post-marketing data

Merck's Worldwide Product Safety and Epidemiology Department tracks adverse event reports for Merck drugs – both adverse event reports from clinical trials and those spontaneously submitted by doctors or patients "post-marketing" (i.e., after a drug has been released onto the market). Soon after unblinding, senior members of the Worldwide Product Safety and Epidemiology Department provided the team of unblinded scientists who were analyzing the VIGOR Trial data with a list and descriptions of all spontaneously reported post-marketing cardiovascular adverse experiences with Vioxx

---

[44] 6/29/00 sNDA Cardiovascular Events Analysis, MRK-00420018004, at 43-44.

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

and attempted to evaluate whether the absolute incidence of such reported events indicated a safety signal.

Spontaneously reported post-marketing adverse experience data are difficult to interpret, because there are so many potentially confounding unidentifiable background variables and there is no way accurately to determine the "denominator" (that is, the total number of patients on Vioxx during the relevant period). These issues create especially substantial problems in the case of relatively common adverse experiences (such as myocardial infarctions), because it is difficult to differentiate a drug effect from the normal background incidence of such events in the patient population, especially given uneven rates of spontaneous reporting of adverse events. Based on an examination of the total numbers of spontaneously reported cardiovascular adverse events on Vioxx, MRL scientists concluded that the numbers were not "disproportionate to the numbers reported with other products which have no known associated cardiovascular risks and are indicated for treatment populations with similar age structures as VIOXX."[45]

### (b) Naproxen Cardioprotection

With regard to the second component of the VIGOR Trial that MRL scientists investigated – whether naproxen conferred cardioprotection to patients in the naproxen arm of the trial – MRL scientists came to believe, after reviewing the relevant literature and existing clinical data on aspirin and certain other non-selective NSAIDs as well as pharmacological data on naproxen, that a cardioprotective effect of naproxen was the

---

[45] 3/13/00 memorandum from P. Gruer to A. Reicin, MRK-00420018281, at 83.

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

most likely cause of the difference in the incidence of cardiovascular events in the VIGOR Trial.

First, as discussed above, MRL scientists knew that aspirin, a traditional non-selective NSAID, was cardioprotective. MRL scientists also knew that aspirin was the only traditional non-selective NSAID conclusively proven to be cardioprotective. MRL scientists were aware, however, that, in several small clinical trials, use of two non-aspirin non-selective NSAIDs (indobufen and flurbiprofen) was associated with a decreased risk of cardiovascular events, suggesting that non-aspirin, non-selective NSAIDs also might be cardioprotective.

Second, MRL scientists were aware that the mechanism for aspirin's cardioprotective effect was its suppression of the Cox-1 enzyme and its irreversible inhibition of platelet aggregation (or blood clotting) throughout the life of a platelet. MRL scientists also were aware that non-aspirin, non-selective NSAIDs (such as naproxen) inhibited Cox-1 and platelet aggregation, but did so reversibly, meaning that the effect ceased once the drug wore off. MRL scientists thus noted that there was a mechanistic basis for the hypothesis that non-aspirin NSAIDs might be cardioprotective if taken often and regularly enough to sustain their effects. (MRL scientists also knew that Vioxx, on the other hand, had no effect on Cox-1 and platelet aggregation and therefore would not be expected to confer a cardioprotective effect through such a mechanism.)

One of the questions MRL scientists asked was why, if traditional non-selective NSAIDs were cardioprotective by virtue of Cox-1 inhibition, such an effect was not

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

evident in the pre-New Drug Application osteoarthritis studies that tested Vioxx against the non-selective NSAIDs ibuprofen, diclofenac, and nabumetone. In reviewing the results of a pre-New Drug Application pharmacological study assessing the effect of several NSAIDs (including diclofenac, ibuprofen and naproxen) on Cox-1 and platelet aggregation, MRL scientists noted that naproxen was the only tested non-aspirin NSAID that inhibited platelet aggregation to a relatively high degree throughout its dosing interval. This observation suggested to them that, if taken regularly at the recommended dosing interval, naproxen (but not diclofenac and ibuprofen) would sustain its antiplatelet effect and might mimic aspirin's irreversible inhibition of platelet aggregation and therefore its cardioprotective effect.

### (c) Rheumatoid Arthritis Patient Population

MRL scientists also investigated the extent to which the patient population might have influenced the cardiovascular results in the VIGOR Trial. Their research revealed that rheumatoid arthritis patients are at increased risk for cardiovascular events generally and have preexisting high levels of thromboxane. Thus, rheumatoid arthritis patients could be more susceptible to the potential cardioprotective effects of naproxen's inhibition of thromboxane and platelet aggregation. However, to the extent that Vioxx caused a decrease in prostacyclin in the vasculature, such patients might be more susceptible to a prothrombotic effect caused by an imbalance between thromboxane and prostacyclin.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### (2) Summary of Our Findings and Conclusions

Following are our findings with respect to the arguments that have been made to support the claim that the naproxen cardioprotection hypothesis cannot explain the data, and therefore, that MRL scientists must have adopted it in bad faith.

First, although it is true that naproxen's cardioprotective qualities had not been directly tested in any large clinical outcomes trial, there was pharmacological evidence that naproxen inhibited platelet aggregation to a relatively high degree throughout its dosing interval as well as limited clinical evidence for the more general proposition that non-selective NSAIDs other than aspirin may provide cardioprotection, as described above. While MRL scientists recognized that these data standing alone did not definitively establish that naproxen was cardioprotective, MRL scientists believed that they provided a reasonable basis for the naproxen cardioprotection hypothesis and, given the absence of any significant between-treatment cardiovascular differential in Merck's other Vioxx trials, that naproxen cardioprotection was the most likely explanation for the VIGOR Trial results.

Second, critics rely on the reaction of Dr. Carlo Patrono[*], a prostaglandin expert and external consultant to MRL, to support their claim that outside scientists did not agree with the naproxen cardioprotection hypothesis. The evidence demonstrates that Dr. Patrono[*] initially believed, and so advised Merck, that the cardiovascular results of the VIGOR Trial were due to chance: He did not believe that the data supported the conclusion that Vioxx was prothrombotic or that naproxen had a cardioprotective effect. Dr. Patrono[*], however, later changed his view regarding naproxen cardioprotection (and

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

its role in the VIGOR Trial) after conducting his own clinical pharmacological study that showed that 500 mg of naproxen given twice daily could mirror the antiplatelet effect of aspirin.

In addition, MRL convened three meetings in the fall of 2000 with outside consultants – one with cardiologists, one with prostaglandin experts and one with a mixed group of experts, including rheumatologists, statisticians and nephrologists – at which cardiovascular data from the VIGOR Trial were discussed. Although external consultants recognized that without a placebo arm it was impossible to determine the cause of the disparity in the incidence of cardiovascular events between the two arms of the study, most agreed that naproxen cardioprotection was a plausible cause. They were influenced in particular, as MRL scientists had been, by the fact that there was no difference in the incidence of cardiovascular events between Vioxx and placebo or non-naproxen NSAIDs in prior and ongoing clinical trials.

Because MRL scientists and the VIGOR Trial investigators were blinded to the data throughout the trial, the trial had been monitored by a Data Safety and Monitoring Board – an external board of scientists who periodically reviewed safety data, including cardiovascular data, from the trial on a partially or fully unblinded basis – to protect patient safety. It is noteworthy that the Data Safety and Monitoring Board recognized even as data were accruing that "there is no ability in this trial to distinguish between a potentially harmful effect of Treatment A [Vioxx] and a cardiovascular protective effect

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

of Treatment B [naproxen] due to its antiplatelet effects."[46] The Monitoring Board members thus believed that the naproxen cardioprotection hypothesis was plausible, even though they did not have the benefit of reviewing cardiovascular data from the VIGOR Trial in the context of data from other trials.

Third, the fact that the naproxen label makes no claim that naproxen is cardioprotective is not surprising given the lack of economic incentive for the makers of naproxen to pursue such a claim and reflects nothing one way or the other about whether naproxen may provide cardioprotection. There are several factors that may explain why no large outcomes study had been conducted to test the cardioprotective effects of naproxen: (i) it would have been very costly to conduct a clinical trial of the size necessary to produce data to support a claim of cardioprotection in the naproxen label; (ii) aspirin, which was available in inexpensive generic formulations, had long been believed to provide cardioprotection and was proven to do so in the early 1990s, shortly before naproxen's patent was set to expire; (iii) aspirin was known to be the only non-selective NSAID that irreversibly inhibited Cox-1 throughout the life of the platelet, whereas any cardioprotective effect of naproxen would require regular dosing and a high degree of patient compliance; (iv) naproxen is known to cause gastrointestinal injury to a greater extent than low-dose aspirin, making patient retention in a clinical trial more difficult and making naproxen compare unfavorably to low-dose aspirin as a theoretical

---

[46]  Minutes of 11/17/99 Data Safety and Monitoring Board meeting, MRK-AFL0000891, at 91-92.

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

source of cardioprotection; and (v) as a result, there was no economic incentive for the makers of naproxen to sponsor a costly trial.

Fourth, with respect to the argument that MRL scientists recognized that naproxen cardioprotection could not account for the magnitude of the difference in the incidence of cardiovascular events between the Vioxx and naproxen treatment arms in the VIGOR Trial, the record reflects that MRL scientists investigated (and discussed with the external consultants) potential reasons for the magnitude of the difference. The evidence shows that they recognized that the differential might be explained by chance or by characteristics of the rheumatoid arthritis patient population tested in the VIGOR Trial that may have made them more susceptible to the cardioprotective effects of naproxen. All of the relevant data were given to the FDA.

Fifth, even after MRL scientists had concluded that naproxen cardioprotection best explained the between-treatment difference in the incidence of cardiovascular events and Merck issued a press release about the study, MRL scientists continued to analyze the data. In April 2000, MRL scientists determined that based on FDA-approved criteria (as reflected in the aspirin product circular[47]), 4% of the patient population enrolled in the VIGOR Trial should have been taking low-dose aspirin for cardiovascular prophylaxis, and thus should not have been enrolled in the trial because it was designed to exclude

---

[47] The United States product circular for aspirin states that aspirin is indicated for patients with a history of ischemic stroke, transient ischemic attack, myocardial infarction, unstable angina, and chronic stable angina. Physicians' Desk Reference. 60th ed. Montvale, NJ: Thomson PDR; 2006:1627-29 (entry for ECOTRIN®: enteric-coated aspirin); see also 6/29/00 sNDA Cardiovascular Events Analysis, MRK-00420018004, at 022 (citing U.S. product circular for aspirin).

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

patients taking (or who should be taking) low-dose aspirin for cardiovascular prophylaxis.

An analysis conducted on April 14, 2000 with all cardiovascular event data that had been adjudicated to date revealed that 31% of the cardiovascular events (including 38% of the heart attacks) observed in the VIGOR Trial occurred in these 4% of patients. When these "aspirin-indicated" patients were excluded from the analysis, the difference in the incidence of cardiovascular events between the remainder of the Vioxx and naproxen groups was not statistically significant. In the 4% of patients who were aspirin-indicated, on the other hand, the incidence of cardiovascular events was significantly higher in patients taking Vioxx than in those taking naproxen. MRL scientists felt that this analysis supported the hypothesis that, in the VIGOR Trial, naproxen had acted like aspirin and conferred cardioprotection to those patients who should have been on aspirin, while Vioxx had simply not provided such protection.

This analysis was reassuring to MRL scientists, and to Dr. Scolnick in particular. However, the analysis was repeated on April 21 and again on July 5 as additional cardiovascular events were adjudicated, and, with the addition of new data, became less compelling. After the July 5, 2000 iteration, there was a statistically significant between-treatment difference in overall cardiovascular events and a nearly significant difference in myocardial infarctions in the non-aspirin-indicated patients. As discussed in Appendix N, based on these additional data, Merck opposed inclusion of references to the aspirin-indicated subgroup analysis in its negotiations with the FDA concerning the contents of the post-VIGOR label.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Still, even with the additional data, the aspirin-indicated subgroup analysis was not in conflict with the hypothesis that naproxen cardioprotection accounted for the cardiovascular event differential in the VIGOR Trial. It remained the case that of the eight myocardial infarctions that occurred in the aspirin-indicated 4% subgroup, none were experienced by patients taking naproxen.

Sixth, we already have addressed the argument that has been made that MRL scientists, including Dr. Scolnick, did not believe the naproxen cardioprotection hypothesis. As indicated above, Dr. Scolnick believed in the cardiovascular safety of the drug and we found no senior Merck scientist who disagreed with this view. In fact, immediately upon seeing the cardiovascular data from the VIGOR Trial, Dr. Eliav Barr remarked that MRL had just successfully completed a placebo-controlled trial that demonstrated the cardioprotective effects of naproxen. Dr. Barr believed that because Vioxx had no antiplatelet effect, it was cardio-neutral, and that the other agent in the study, naproxen, which he believed had a potent antiplatelet effect, was the cause of the reduction in thrombotic events.

Finally, as explained above, although MRL scientists could not definitively rule out other reasons for the between-treatment event rate differential, over the course of a few weeks they became comfortable that naproxen's anti-platelet effects had conferred cardioprotection to patients in the naproxen arm of the VIGOR Trial. While it might have been desirable to have included in the release other possible explanations for the difference – including, for example, that the population studied may have been more susceptible to either a prothrombotic effect of Vioxx or a cardioprotective effect of

- 70 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

naproxen – the press release that was issued on March 27, 2000 set forth the consensus view within MRL: the observed effect likely was caused by naproxen's antiplatelet effects.

For all of these reasons, we have concluded that MRL scientists genuinely believed that the naproxen cardioprotection hypothesis was the best explanation for the between-treatment difference in the incidence of cardiovascular events in the VIGOR Trial.

### 9. Allegation No. 9: The Published VIGOR Trial Results Intentionally Omitted Important Cardiovascular Risk Information.

#### a. Summary of Allegation.

The allegation is made that the authors of the VIGOR Trial article that was published in the New England Journal of Medicine in November 2000 intentionally excluded important data in an effort to minimize or misrepresent the cardiovascular risk exposed by the VIGOR Trial. It is argued that the article included all gastrointestinal adverse events that occurred through the end of the trial on March 9, 2000 but included only cardiovascular adverse events reported by February 10, 2000, and that the article concealed this discrepancy.

It is further argued that, before the article was published, Merck had obtained updated cardiovascular data including all cardiovascular adverse events that occurred through March 9, 2000 but purposefully did not include them in the article. Instead, Merck relied on cardiovascular data available only through February 10, 2000, and on the basis of those incomplete data, conducted a sub-group analysis of the incidence of

- 71 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

myocardial infarctions among the 4% of VIGOR Trial patients who should have been taking low-dose aspirin for cardiovascular prophylaxis. Merck then included this sub-group analysis in the article, allegedly to convey the impression that "the patients who suffered heart attacks were at high risk of heart disease to begin with,"[48] and thus to make Vioxx appear to be safe in patients not indicated for low-dose aspirin use. Had Merck included the updated data, the argument goes, this "aspirin-indicated" subgroup analysis and the article's discussion of the VIGOR Trial cardiovascular results would have been materially altered.

Finally, it is argued that, before submitting the manuscript for publication, the authors deleted a table that contained relevant cardiovascular data to conceal those data from publication.

In November 2005, the editors of the New England Journal of Medicine published an editorial about the VIGOR Trial article that raised three principal criticisms: (i) the article did not include the updated cardiovascular data, specifically, three heart attacks that occurred in the Vioxx group of non-aspirin-indicated patients; (ii) as a result, calculations in the article (i.e., the incidence of heart attacks overall and in the non-aspirin-indicated subgroup) were incorrect and presented a misleading view of the difference in risk between Vioxx and naproxen; and (iii) cardiovascular data were deleted from the article before submission. The editors renewed their criticisms in an "Expression of Concern Reaffirmed," which the New England Journal of Medicine

---

[48] Roni Rabin*, Vioxx Was Long Under Research Microscope, Newsday, Oct. 12, 2004, at B47.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

published in March 2006. The same March edition also carried a "Response to Expression of Concern Regarding VIGOR Study" by the non-Merck authors of the VIGOR Trial article.

In sum, according to critics, the VIGOR Trial article did not present a scientifically honest view of the cardiovascular data, or the risks of Vioxx.

### b.     Our Findings and Conclusions.

The article on the VIGOR Trial, which was authored by 11 non-Merck members of the VIGOR Trial Steering Committee and two MRL scientists, Dr. Alise Reicin and Dr. Deborah Shapiro, was published in the New England Journal of Medicine in November 2000. The lead author of the article was Dr. Claire Bombardier[*], a rheumatologist at the University Health Network in Toronto, Canada. Dr. Loren Laine[*], a gastroenterologist from the University of Southern California School of Medicine in Los Angeles, California, also assumed a principal role in drafting the article, along with Dr. Reicin. The article, entitled "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis," focused on the gastrointestinal results of the VIGOR Trial, which was designed to focus on gastrointestinal outcomes, not on cardiovascular risks.

With respect to cardiovascular data, the article included percentages of patients in each group who experienced cardiovascular events, including myocardial infarctions, and set forth the 4% aspirin-indicated subgroup analysis:

> The rate of death from cardiovascular causes was 0.2 percent in both groups. Ischemic cerebrovascular events occurred in 0.2 percent of the patients in each group.

- 73 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

> Myocardial infarctions were less common in the naproxen group than in the rofecoxib group (0.1 percent vs. 0.4 percent, 95 percent confidence interval for the difference, 0.1 to 0.6 percent; relative risk, 0.2, 95 percent confidence interval, 0.1 to 0.7). Four percent of the study subjects met the criteria of the Food and Drug Administration (FDA) for the use of aspirin for secondary cardiovascular prophylaxis (presence of a history of myocardial infarction, angina, cerebrovascular accident, transient ischemic attack, angioplasty, or coronary bypass) but were not taking low-dose aspirin therapy. These patients accounted for 38 percent of the patients in the study who had myocardial infarctions. In the other patients the difference in the rate of myocardial infarction between groups was not significant (0.2 percent in the rofecoxib group and 0.1 percent in the naproxen group). When the data showing a reduction in the rate of myocardial infarction in the naproxen group became available after the completion of this trial, Merck, the manufacturer of rofecoxib, notified all investigators in ongoing studies of a change in the exclusion criteria to allow patients to use low-dose aspirin. There was no association between hypertension and myocardial infarction; only a single patient (in the rofecoxib group) had both hypertension and a myocardial infarction as adverse events.[49]

The article also stated:

> The rate of myocardial infarction was significantly lower in the naproxen group than in the rofecoxib group (0.1 percent vs. 0.4 percent). This difference was primarily accounted for by the high rate of myocardial infarction among the 4 percent of the study population with the highest risk of a myocardial infarction, for whom low-dose aspirin is indicated. The difference in the rates of myocardial infarction between the rofecoxib and naproxen groups was not significant among the patients without indications for aspirin therapy as secondary prophylaxis.

---

[49] Bombardier* C, Laine* L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343:1520-28, at 1523.

- 74 -

Report of John S. Martin, Jr. to the Special Committee  
of the Board of Directors of Merck & Co., Inc.  
Concerning the Conduct of Senior Management  
in the Development and Marketing of Vioxx

September 5, 2006  
Debevoise & Plimpton LLP

\*       \*       \*

> [O]ur results are consistent with the theory that naproxen has a coronary protective effect and highlight the fact that rofecoxib does not provide this type of protection owing to its selective inhibition of [Cox-2] at its therapeutic dose and at higher doses. The finding that naproxen therapy was associated with a lower rate of myocardial infarction needs further confirmation in larger studies.[50]

The percentages included in the article reflected data reported before February 10, 2000 – a cut-off date that MRL scientists had set before the VIGOR Trial data were unblinded. The Merck authors of the VIGOR article did not discuss with the non-Merck authors of the article or with the New England Journal of Medicine editors the fact that the cardiovascular data presented in the article were based on a pre-specified reporting cut-off date of February 10, 2000 while the pre-specified reporting cut-off date for gastrointestinal events was March 9, 2000. While it may have been prudent to state that fact in the article, we have found no evidence that the failure to do so was motivated by an intent to deceive. In addition, the facts that (i) the article as published reported a statistically significant difference in the incidence of cardiovascular events between Vioxx and naproxen, and (ii) beginning in February 2001, Merck circulated reprints of the article with a cover letter disclosing the post-cut-off data, indicate to us that the presentation of the cardiovascular data in the VIGOR article was not intended to mislead.

The documentary evidence provides a rationale for why and how the February 10 reporting cut-off date for cardiovascular events was selected and demonstrates that it was

---

[50] Bombardier* C, Laine* L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med. 2000;343:1520-28, at 1526-27.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

chosen before anyone at Merck had been unblinded to the VIGOR Trial results. In brief, MRL scientists fixed the February 10 cut-off date after the Data Safety and Monitoring Board for the VIGOR Trial (a group of five external scientists) asked Merck to create and implement a plan specifically to analyze the cardiovascular data from the VIGOR Trial (in addition to analyzing them as part of a future pooled analysis of Vioxx cardiovascular data from several studies). Although all adverse event data were routinely analyzed in clinical trials, pre-specified detailed analysis plans for specific adverse events were not the norm. Because the VIGOR Trial was a gastrointestinal safety trial, the VIGOR Trial Data Analysis Plan pre-specified an analysis plan for gastrointestinal events but there was no pre-specified plan for analyzing cardiovascular data, nor were adjudications of cardiovascular events proceeding at the same pace as adjudications of gastrointestinal events. In order to satisfy the Data Safety and Monitoring Board's request and still meet the internal deadline that Merck had set for submitting to the FDA the supplemental New Drug Application in support of its request for a label change, Merck set a reporting cut-off of February 10, 2000 for cardiovascular adverse events. This meant that all cardiovascular events reported by the cut-off would be adjudicated, analyzed, and included in the FDA submission, set for June 2000. Merck would still adjudicate and report to the FDA in periodic Safety Update Reports any cardiovascular adverse events reported after the cut-off.

When the authors of the VIGOR article first submitted a manuscript to the New England Journal of Medicine on May 18, 2000, they used the cardiovascular data reported prior to the February 10, 2000 cut-off date – the same data that Merck had used

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

in its cardiovascular analysis submitted to the FDA in support of the supplemental New Drug Application. By July 5, 2000, the cardiovascular events reported after the February 10 reporting cut-off date had been adjudicated and analyzed, and included three additional myocardial infarctions, all on Vioxx and all in patients not indicated for low-dose aspirin cardiovascular prophylaxis (the "non-aspirin-indicated" subgroup).

Based on the additional data, the percentage of patients in the Vioxx arm who experienced myocardial infarctions rose from 0.4% (17) to 0.5% (20) overall, whereas the percentage of patients in the naproxen arm who experienced myocardial infarctions remained the same. In addition, since all of the additional myocardial infarctions occurred among Vioxx patients in the non-aspirin-indicated subgroup, the between-treatment difference in myocardial infarctions in that subgroup increased from a two-fold to a three-fold difference. Still, the article's statement that there was not a statistically significant between-treatment difference in myocardial infarctions in the non-aspirin-indicated subgroup remained accurate.

The authors of the VIGOR article sent their first revised manuscript back to the New England Journal of Medicine on July 17, 2000 and continued revising the manuscript in conjunction with the New England Journal of Medicine editors through early October without, as indicated above, including the additional adjudicated data.

According to Dr. Alise Reicin, an MRL scientist and one of the two Merck authors of the VIGOR article, the cardiovascular data reported and adjudicated after the February 10 cut-off did not materially affect the conclusions stated in the article. Because she believed that the post-February data did not make a material difference to

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

the conclusion, and because the set of data presented in the article was based on a reporting cut-off date that was established before data were unblinded, Dr. Reicin did not think it was necessary to advise the other authors of the updated data, and she did not do so.

Finally, we found no evidence to suggest that the authors' decision to delete a table of cardiovascular data before submitting the manuscript was made to mislead. A draft of the manuscript created prior to its submission to the New England Journal of Medicine had included a table of cardiovascular data that listed the raw numbers of total deaths, cardiovascular deaths, myocardial infarctions, and ischemic strokes that occurred in each treatment group, as well as the percentages of the total patients within each treatment group who experienced such events. This table was deleted from the draft manuscript on May 16, 2000, two days prior to its submission to the New England Journal of Medicine. Data on all of the individual endpoints from that table were included in the text of the article in percentage form (from which the raw numbers could be derived mathematically), and none of the underlying data were "hidden." The deleted table did not include data from after the February 10, 2000 reporting cut-off date.

Neither the anonymous peer reviewers nor the editors at the New England Journal of Medicine who received drafts of the manuscript presenting the data in percentages requested that the authors include the raw cardiovascular data or insert a cardiovascular data table. The New England Journal of Medicine editors required the authors to eliminate some of their other tables and figures to meet the Journal's limit of five total tables and figures. One peer reviewer requested inclusion of the relative risk and

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

confidence interval for myocardial infarctions and these data were included in the revised manuscript and final article.

The non-Merck authors of the article collectively submitted a response on January 16, 2006 to the Journal editors' November 2005 editorial, which was published in the New England Journal of Medicine on March 16, 2006. The non-Merck authors stated that, while they had not been aware that additional adjudicated data were available before the article was published, they stood by the article as published:

> [W]e stand by our original article, which was written in line with basic clinical trial principles, specifying that data must be analyzed according to plans that are determined before unblinding. Thrombotic cardiovascular events were not deleted from the manuscript, and there is no material difference in the conclusion, that arise from the addition of the events reported after the predefined close-out date for cardiovascular events.[51]

It bears mention that had the three myocardial infarctions reported after February 10 been in the naproxen, and not the Vioxx, group, Merck quite likely would have been subject to criticism for altering the conclusions of the article to incorporate new data.

It is also worth noting that the press release that Merck issued on November 23, 2000, the same day as the article was published, did not mention the aspirin-indicated subgroup analysis. The release focused on the gastrointestinal results of the VIGOR Trial, but plainly stated that there were "significantly fewer heart attacks" in the naproxen

---

[51] Bombardier* C, Laine* L, Burgos-Vargas* R, et al. Response to expression of concern regarding VIGOR study [letter]. N Engl J Med. 2006;354:1196-98, at 98.

- 79 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

arm of the study than in the Vioxx arm, which, the release stated, was consistent with naproxen's ability to block platelet aggregation due to its suppression of Cox-1.

### 10. Allegation No. 10: Merck Recognized that Vioxx Was Prothrombotic, and Secretly Tried to Reformulate It.

#### a. Summary of Allegation.

Merck's critics have argued that despite Merck's public statements that the VIGOR Trial cardiovascular data were explained by the naproxen cardioprotection hypothesis, Merck "privately sought to reformulate Vioxx in 2000 to reduce its cardiovascular side effects."[52] Critics have further alleged that, in fact, Merck submitted a patent application for a reformulated drug while it was denying publicly that Vioxx could cause heart attacks and strokes.[53] According to the Philadelphia Inquirer, an internal company document from 2000 regarding this patent application acknowledged that "the way in which Vioxx reduces pain might also increase cardiovascular problems."[54] It is claimed that Merck executives thus understood the cardiovascular risks of Vioxx and sought a patent "for a method of combining Vioxx with another agent to lessen the risk."[55]

---

[52] Documents Show Merck Researchers Knew Risks, Miami Herald, June 23, 2005, at 11A.

[53] Thomas Ginsberg*, Merck Sought to Trim Vioxx Risk, Phila. Inq., June 23, 2005, at A1.

[54] Thomas Ginsberg*, Merck Sought to Trim Vioxx Risk, Phila. Inq., June 23, 2005, at A1.

[55] Thomas Ginsberg*, Merck Sought to Trim Vioxx Risk, Phila. Inq., June 23, 2005, at A1.