Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

**b. Our Findings and Conclusions.**

At various times from 1998 (before Vioxx was approved for sale) through September 2004, when it was withdrawn from the market, Merck, with input from external consultants including Drs. John Oates* and Garret FitzGerald*, considered combining Vioxx with various antiplatelet agents.

Throughout this period, MRL scientists recognized the potential competitive advantage to be gained from combining Vioxx with an antiplatelet agent that would provide aspirin-style cardioprotection to high-risk patients without compromising the gastrointestinal-sparing effect of Vioxx. In addition, following the release of data from the VIGOR Trial, some MRL scientists recognized that, if in fact Vioxx inhibited prostacyclin in the vasculature, such inhibition might have an as-yet unproven clinical impact in certain high-risk patients who had a preexisting imbalance between prostacyclin and thromboxane. MRL scientists theorized that combining Vioxx and an antiplatelet agent into a single drug could potentially correct any preexisting imbalance and eliminate any theoretical cardiovascular risk of Vioxx in these patients.

The Company filed two patent applications – one in 1998 and one in 2000 – covering Vioxx combination therapies, but the Company did not actively pursue the development of either combination therapy option. Rather, beginning in 2002, the Company focused on the possibility of combining Vioxx with drugs that release nitric oxide, a gastroprotective agent. Such a combination, it was hypothesized, would enable patients to take a combination of nitric oxide and Vioxx concomitantly with low-dose aspirin without any gastrointestinal side effects. This combination, if proven to be

- 81 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

effective at eliminating the gastrointestinal risk of concomitant administration of Vioxx plus aspirin, would have provided the Company with a competitive advantage in the market of Vioxx users who were also at high cardiovascular risk.

While the scientists who were involved in attempting to develop a combination therapy were aware of Dr. FitzGerald's* prostacyclin hypothesis and the debate surrounding the VIGOR Trial cardiovascular data, there is no evidence that MRL senior scientists' considerations of combination therapy options arose from an actual belief that Vioxx was prothrombotic. Indeed, an internal memorandum prepared by Dr. Mervyn Turner, the head of Merck's Worldwide Licensing and External Research Department, in September 2002 concerning a possible nitric oxide/Vioxx combination states: "We do not believe that the VIGOR study represents a true prothrombotic property of coxibs."[56]

The evidence establishes that the Merck scientists' objective in pursuing a combination therapy was to develop a new drug with properties superior to those of any other drug, including Vioxx, not to protect against a known prothrombotic effect of Vioxx.

**11. Allegation No. 11: Merck's Pooled Analyses Were Flawed.**

**a. Summary of Allegation.**

In an effort to show that the VIGOR Trial was an outlier and that other clinical data did not show that Vioxx presented a cardiovascular risk, Merck conducted a number of "pooled" or meta-analyses of its Vioxx trials. It has been argued that these pooled

---

56 9/12/02 email from M. Turner to J. Lasota, MRK-AEG0037638, at 38.

- 82 -

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

analyses are flawed for at least two reasons. First, it allegedly was improper to pool data from Merck's Phase II/III osteoarthritis trials with the VIGOR Trial data because the earlier trials involved different patient populations, involved fewer patients, and were of shorter durations.[57] Second, the composite endpoint that Merck used in its pooled analyses did not focus, as it should have, on the differences in heart attack rates between Vioxx and the comparator drugs or placebo.[58] It is argued that had Merck not used a composite endpoint, Vioxx would have been shown to be worse than the other treatments.[59]

**b. Our Findings and Conclusions.**

As discussed above, after reviewing the FitzGerald prostacyclin hypothesis and data from Merck's Vioxx clinical development program at its May 1998 meeting, Merck's Board of Scientific Advisors recommended that, although Merck's clinical data did not reveal any cardiovascular risk of Vioxx, Merck should establish a process to monitor, on a program-wide basis, the cardiovascular profile of Vioxx. The Board of Scientific Advisors noted that individual trials of Vioxx would be too small and therefore

---

57 4/8/05 expert report of R. Kronmal*, at 15 (In re Vioxx Litig., No. 619, N.J. Super. Ct. Law Div.).

58 Juni* P, Nartey* L, Reichenbach* S, Sterchi* R, Dieppe* PA, Egger* M. Risk of cardiovascular events and rofecoxib: cumulative meta analysis. Lancet. 2004;364:2021-2029, MRK-AJK0010752 (11/4/04 online [in press] copy), at 5.

59 4/8/05 expert report of R. Kronmal*, at 17 (In re Vioxx Litig., No. 619, N.J. Super. Ct. Law Div.); see also Juni* P, Nartey* L, Reichenbach* S, Sterchi* R, Dieppe* PA, Egger* M. Risk of cardiovascular events and rofecoxib: cumulative meta analysis. Lancet. 2004;364:2021-2029, MRK-AJK0010752 (11/4/04 online [in press] copy), at 5.

- 83 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

underpowered to detect any potential cardiovascular effect.[60] The Board therefore recommended that Merck plan to pool cardiovascular event data from several of its future Vioxx trials to have sufficient power to assess the effect of Vioxx on cardiovascular risk. The Board of Scientific Advisors further advised that Merck should create a uniform set of criteria by which such events would be adjudicated so as to facilitate future pooling. In accordance with these recommendations, MRL scientists devised the Cardiovascular Adjudication Standard Operating Procedure, discussed above.

It was understood that the first pooled analysis would be performed when MRL determined that there was a sufficiently large body of cardiovascular clinical trial data so that such an analysis would be statistically meaningful. In August 2000, after the VIGOR Trial data and data from several other clinical trials of Vioxx had become available, MRL scientists and biostatisticians discussed the logistics and methods for the first pooled analysis. To increase the data pool, MRL scientists determined that the pooled analysis should also include the investigator-reported (unadjudicated) data from the trials that pre-dated the Cardiovascular Adjudication SOP. In the process of devising the plan for the analysis, MRL scientists discussed how to define the endpoints of the analysis.

Two different composite endpoints were considered: (i) the Antiplatelet Trialists' Collaboration ("APTC") composite endpoint; and (ii) a composite endpoint consisting of events enumerated under the Cardiovascular Adjudication SOP (the "confirmed thrombotic endpoint"). The APTC composite endpoint consisted of cardiovascular death,

---

60 The concept of power is discussed in Exhibit 3 to the Report.

- 84 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

myocardial infarction, stroke (both ischemic and hemorrhagic), and death due to unknown cause or due to bleeding. The confirmed thrombotic endpoint included cardiac events (such as acute myocardial infarction), cerebrovascular events (such as ischemic cerebrovascular stroke), as well as peripheral vascular events (such as pulmonary embolism), but did not include unknown cause death.

MRL scientists noted that each endpoint had certain advantages and disadvantages. For example, they noted that the APTC composite endpoint had wide acceptance in the scientific community and consisted of events that had a high confirmation rate in the course of the adjudication process. The fact that it included "hard" endpoints such as myocardial infarction and stroke meant that investigators tended to diagnose these events correctly, which decreased the probability of including in the pooled analyses misdiagnosed events from the trials that pre-dated the Cardiovascular Adjudication SOP. At the same time, however, the APTC composite endpoint included non-thrombotic events, such as hemorrhagic strokes and unknown deaths, that, if included in the analysis, might dilute the power of the analysis to detect a difference in thrombotic events, or, in the case of hemorrhagic strokes, might bias the analysis in favor of Vioxx (which had no antiplatelet effect) as compared to traditional nonselective NSAIDs (which were known to increase bleeding time).

With regard to the confirmed thrombotic endpoint, MRL scientists noted that although it included only thrombotic events (thus directly addressing the issue of whether Vioxx was prothrombotic), it encompassed "soft" events that were misdiagnosed more

- 85 -

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

frequently by investigators (thus increasing the probability of including in the analysis misdiagnosed events from trials that pre-dated the Cardiovascular Adjudication SOP).

The evidence shows that MRL scientists discussed the pros and cons of each endpoint internally and with external experts. Dr. Carlo Patrono*, an expert on antiplatelet agents and a member of the Antiplatelet Trialists' Collaboration, favored using the APTC composite endpoint. In addition, the APTC composite endpoint was the most commonly accepted endpoint used in trials evaluating antithrombotic agents. MRL scientists chose the APTC composite endpoint as the primary endpoint for the analysis and the confirmed thrombotic endpoint as the secondary endpoint.

MRL submitted the results of its first pooled analysis to the FDA on January 8, 2001. The results of the analysis were also published in an article co-authored by MRL scientists and Dr. Marvin Konstam*, Chief of Cardiology at the New England Medical Center and an MRL consultant, in Circulation on November 6, 2001 (the "Konstam article"). The results of the pooled analysis showed, among other things, that patients on Vioxx had (i) a significantly increased risk of APTC composite endpoint events compared to patients on naproxen (relative risk 1.69; 95% confidence interval, 1.07 to 2.69), and (ii) a similar (and numerically decreased) risk of APTC composite endpoint events compared to patients on non-naproxen NSAIDs (relative risk 0.79; 95% confidence interval, 0.40 to 1.55) as well as to those on placebo (relative risk 0.84; 95% confidence interval 0.51 to 1.38).

Based on the results of the analysis, the Konstam article concluded that "[d]ata from >28,000 patients in 23 studies representing >14,000 patient-years at risk

- 86 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

demonstrated that rofecoxib was not associated with excess CV thrombotic events compared with either placebo or non-naproxen NSAIDs." With regard to naproxen, the article stated that "[t]he data suggest[ed], but [were] insufficient to ascertain, the cardioprotective benefits of naproxen."[61]

The data submitted to the FDA and published in the Konstam article presented the overall results, the results by individual event type, as well as the results for the separate patient populations: patients with osteoarthritis, patients with rheumatoid arthritis and patients with Alzheimer's disease. In addition, Merck provided the data from each of the individual trials broken down by event-type to the FDA in Clinical Study Reports and periodic Safety Update Reports.

As subsequent trials of Vioxx ended and more cardiovascular adverse event data became available, MRL updated its pooled analysis and submitted updated results to the FDA, including on January 19, 2001 (this time, at the FDA's request, excluding from the pooled analysis all studies of fewer than six months), in July 2001, May 2002, and March 2004. Merck published the data from its July 2001 pooled analysis in a 2003 review article by Matthew Weir* et al. (including 1,783 patient-years in addition to the data included in the Konstam article) in The American Heart Journal.[62] The results of

---

61 Konstam* MA, Weir* MR, Reicin AR, et al. Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib. Circulation. 2001;104:2280, at 87. MRK-ADY0002799.

62 Weir* MR, Sperling RS, Reicin A, Gertz BJ. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J. 2003;146:591-604. MRK-AHN0014891.

- 87 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

these subsequent pooled analyses were consistent with the results of the original pooled analysis submitted to the FDA on January 8, 2001 and published in the Konstam article.

There is no evidence to suggest that the deliberative process that Merck scientists undertook internally and with their external consultants to select a composite endpoint for the analysis was designed to hide any risk. To the contrary, the record is clear that Merck's very purpose in conducting the pooled analyses was to investigate whether Vioxx presented any cardiovascular risk to patients that individual trials were unable to detect.

### 12. Allegation No. 12: Merck Intentionally Withheld from the FDA a Meta-Analysis of Myocardial Infarctions in the Vioxx Program.

#### a. Summary of Allegation.

It has been argued that Merck intentionally withheld from the FDA data regarding the cardiovascular safety of Vioxx, including a meta-analysis of the myocardial infarction endpoint. Specifically, critics assert that Merck performed a meta-analysis in late 2000, which they allege demonstrated that Vioxx caused significantly more myocardial infarctions than NSAID comparators and placebo, but did not include it in the "Interim Cardiovascular Meta-analysis" submitted to the FDA on January 8, 2001. That submission, as discussed in response to Allegation No. 11, analyzed only the Antiplatelet Trialists' Collaboration ("APTC") composite cardiovascular endpoint, which allegedly produced more favorable results than the meta-analysis of the myocardial infarction endpoint.

- 88 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

**b. Our Findings and Conclusions.**

The evidence shows that early internal drafts of the first Vioxx cardiovascular meta-analysis that Merck planned to submit to the FDA had included a section reviewing a meta-analysis of the myocardial infarction endpoint. Neither this section nor any reference to a meta-analysis of myocardial infarctions, however, was included in the "Interim Cardiovascular Meta-analysis" provided to the FDA on January 8, 2001. As discussed above, that meta-analysis included only an analysis of the widely accepted APTC composite endpoint, which included a number of thrombotic and other cardiovascular events.

Both the APTC composite endpoint meta-analysis and the myocardial infarction meta-analysis included analyses of event rates for Vioxx as compared to (i) non-naproxen NSAIDs and placebo combined and (ii) all comparators combined (i.e., any nonselective NSAID, including naproxen, and placebo). With respect to the first comparison, neither the APTC meta-analysis nor the myocardial infarction meta-analysis showed a statistically significant difference in the event rates between Vioxx and the combined comparators, and in fact both meta-analyses showed a small numerical decrease in the event rate on Vioxx.

With respect to the second comparison, however – which included naproxen – the meta-analysis of myocardial infarctions showed a statistically significantly higher event rate on Vioxx, which did not emerge in the APTC composite cardiovascular endpoint analysis that Merck submitted to the FDA. This second comparison (between Vioxx and all comparators combined) was driven to a large extent by the Vioxx-naproxen

- 89 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

component. In addition, according to MRL scientists, the validity of this comparison was subject to question because there was not sufficient homogeneity between the blocks of data from the studies included in the comparison, meaning that they were sufficiently different that it was not appropriate to group naproxen together with all other comparators for meta-analysis purposes. This fact was noted in Merck's FDA submission of the APTC composite endpoint meta-analysis.

We have found no evidence suggesting that MRL scientists failed to include the meta-analysis of myocardial infarctions for the purpose of hiding or misrepresenting data. Rather, the "Interim Cardiovascular Meta-analysis" submitted to the FDA included data broken out by individual events for each pooled comparison (including the number of myocardial infarction events and relevant patient years), which FDA statisticians could have used to conduct a meta-analysis of myocardial infarctions. Although the FDA responded to Merck's meta-analysis of APTC composite endpoint events by asking for several additional analyses, it did not request that Merck provide a meta-analysis of myocardial infarctions.

In addition, after January 2001, Merck provided the FDA with updated meta-analyses and submitted periodic Safety Update Reports with cardiovascular (including myocardial infarction) event data. We are not aware of any evidence that Merck attempted to conceal any cardiovascular data from the FDA.

- 90 -

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### 13. Allegation No. 13: Merck Confirmed the Cardiovascular Safety of Vioxx Through Misleading Promotion.

#### a. Summary of Allegation.

Throughout 2000 and 2001, it is claimed that "'Merck issued a relentless series of publications reconfirming the drug's safety"[63] and continued to "confirm the safety profile of Vioxx" in press releases[64] and at medical conferences so that the public and physicians prescribing Vioxx would erroneously believe that it was safe. Critics rely on the fact that the FDA's Division of Drug Marketing, Advertising, and Communications (known as DDMAC) sent Merck a Warning Letter in September 2001 criticizing the Company's promotion of Vioxx as misleading and stating that it was "simply incomprehensible" that Merck would claim that Vioxx posed no cardiovascular risk.[65] In addition, DDMAC stated that the "naproxen benefit hypothesis was hypothetical and was not the only reasonable explanation for the VIGOR results."[66]

#### b. Our Findings and Conclusions.

The September 17, 2001 Warning Letter focused on three sets of events: (i) six promotional audio conferences presented on Merck's behalf by an outside speaker who

---

63 Sharon Kirkey*, Vioxx-maker Valued Sales Over Safety, The Gazette (Montreal), Oct. 7, 2004, at A12 (quoting Dr. Eric Topol*).

64 See, e.g., 4/28/00 Merck press release, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx®," MRK-ABI0002231-32; 5/22/01 Merck press release, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx®," MRK-ABI0003228-30.

65 Barbara Martinez*, Vioxx Lawsuits May Focus on FDA Warning in 2001, Wall St. J., Oct. 15, 2004, at B1.

66 Barbara Martinez*, Vioxx Lawsuits May Focus on FDA Warning in 2001, Wall St. J., Oct. 15, 2004, at B1.

- 91 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

allegedly misrepresented the safety profile of Vioxx; (ii) allegedly misleading oral representations by two sales representatives to FDA officials at two pharmacists' conferences; and (iii) a press release issued on May 22, 2001 that claimed that Vioxx had a "favorable cardiovascular profile."

Specifically, in the September 2001 Warning Letter, DDMAC asserted:

> You have engaged in a promotional campaign for Vioxx that minimized the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).[67]

DDMAC further alleged that Merck's promotional campaign failed "to disclose that [the naproxen cardioprotection hypothesis was] hypothetical, [had] not been demonstrated by substantial evidence, and that there [was] another reasonable explanation, that Vioxx may have pro-thrombotic properties."[68]

As discussed more fully in Appendix G, Merck conducted an investigation of the issues identified in DDMAC's Warning Letter and, on October 1, 2001, Mr. David Anstice, President, Human Health – The Americas, sent DDMAC a written response.[69] Mr. Anstice's letter stated that Merck strongly disagreed with DDMAC's assertion that

---

67 9/17/01 FDA Warning Letter from T. Abrams* to R. Gilmartin, MRK-AAF0007777, at 77.

68 9/17/01 FDA Warning Letter from T. Abrams* to R. Gilmartin, MRK-AAF0007777, at 77.

69 10/1/01 letter from D. Anstice to T. Abrams*, MRK-AFT0007691-99.

- 92 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Merck had "engaged in a promotional campaign for Vioxx that minimized the potentially serious cardiovascular findings that were observed" in the VIGOR Trial and its assertion that Merck's May 22, 2001 press release was false or misleading.

With regard to the six promotional audio conferences discussed in the Warning Letter, Mr. Anstice's response explained that Merck had strict policies, designed to enforce federal regulations, concerning the promotion of its products. He informed DDMAC that all outside speakers were required to sign a contract with Merck in which they agreed that they would not make any off-label claims in their presentations and would provide fair balance. Mr. Anstice acknowledged that the outside speaker cited in the Warning Letter had violated Merck's policies at these audio conferences and informed DDMAC that Merck had discontinued using the speaker.

With respect to the second issue raised in the Warning Letter – Merck's May 22, 2001 press release – Merck's response letter explained that the May 22 press release was issued "in response to media and analyst activity and was not proactively issued to promote the cardiovascular safety profile of Vioxx."[70] As explained in the letter, Merck issued the press release in response to two events: (i) an April 27, 2001 analyst's report by Richard Stover* of Arnhold & S. Bleichroeder, Inc., entitled "Cox-2 Inhibitor Outlook: Cardiovascular Safety Issues Raised in FDA Advisory Committee Meetings," which concluded, in part, that naproxen did not show a cardioprotective effect in the VIGOR Trial, and (ii) a May 22, 2001 article in The New York Times, entitled "Doubts

[70] 10/1/01 letter from D. Anstice to T. Abrams*, MRK-AFT0007691, at 94.

- 93 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

are Raised on the Safety of 2 Popular Arthritis Drugs," which cited Mr. Stover's* report questioning the cardiovascular safety of both Vioxx and Celebrex and which had been picked up by the television media.[71]

Merck's press release, entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," stated that Vioxx had a "favorable cardiovascular safety profile."[72] Mr. Anstice further stated:

> . . . the [Warning] Letter appears to create an affirmative obligation to disclose alternative explanations for data in a communication whose very purpose is to respond to and debate those same alternative explanations. . . [and] does not acknowledge the fact that substantial balance, including the existence of alternative hypotheses, was included in that press release.[73]

Merck argued that "The First Amendment protects Merck's right to respond under these circumstances with information that is truthful and not misleading, as well as the public's right to hear both sides of the story."[74] Merck's subsequent releases regarding Vioxx and the VIGOR Trial, however, were more explicit regarding alternative explanations for the VIGOR Trial results.

With respect to the third issue raised in the Warning Letter – oral representations made by sales representatives at two pharmacists' conferences regarding the

---

71 10/1/01 letter from D. Anstice to T. Abrams* attaching documents, MRK-AFT0007691, at 700-40.

72 5/22/01 Merck press release, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx®," MRK-ABI0003228, at 28.

73 10/1/01 letter from D. Anstice to T. Abrams*, MRK-AFT0007691, at 94-95.

74 10/1/01 letter from D. Anstice to T. Abrams*, MRK-AFT0007691, at 95.

- 94 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

cardiovascular safety profile of Vioxx – Mr. Anstice advised DDMAC that if Merck's investigation of the allegations revealed that sales representatives acted contrary to the "long-standing written policies that govern the activities of all field-based personnel," Merck would take appropriate disciplinary action.

After consultation with DDMAC, including teleconferences and a meeting in late October of 2001, Merck sent two DDMAC-approved "Dear Healthcare Provider" letters on November 19, 2001 to attendees of the audio and pharmacists' conferences who could have been exposed to the explanations for the VIGOR Trial cardiovascular rates that focused solely on the naproxen cardioprotection hypothesis. The letters stated that DDMAC objected to claims "that the FDA asserts were misleading about the significant cardiovascular findings in the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study."[75] The letters further stated:

> Alternative interpretation[s] have been proposed for the difference in the rates of myocardial infarctions (MI) in the Vioxx treatment group in comparison with the naproxen treatment group. Possible explanations include that Vioxx increased the MI rate or naproxen decreased the MI rate. The underlying reason for the difference has not been established in prospectively designed clinical studies.[76]

---

75 11/19/01 letter from T. Casola to T. Abrams* attaching Dear Healthcare Provider letters, MRK-AAF0007880, at 82, 89.

76 11/19/01 letter from T. Casola to T. Abrams* attaching Dear Healthcare Provider letters, MRK-AAF0007880, at 82, 89.

- 95 -

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

On January 2, 2002, DDMAC sent Merck a letter stating that based on these corrective actions, it considered the matter "satisfactorily resolved" and "closed."[77] DDMAC did not require Merck to take any corrective action concerning the press release. Merck did not receive any additional warning letters from DDMAC alleging that Merck's promotion of Vioxx was improper. In addition, as discussed at pages 116 and 117 and 120 through 121 below, in late 2001, Merck introduced a Company-wide campaign to underscore the importance of compliance, in part to ensure that Merck product promotion complied with federal regulations as well as Merck policies.

### 14. Allegation No. 14: Other Merck Studies Showed that Vioxx Was Dangerous, But Merck Ignored or Hid the Results.

#### a. Summary of Allegation.

It is alleged that cardiovascular data from the VIGOR Trial were not the only data that revealed Vioxx's cardiovascular risk. According to critics, data from other Merck clinical trials – available long before the APPROVe Trial data were unblinded – raised a red flag about the cardiovascular safety of Vioxx, but Merck chose to ignore them. A related criticism is that Merck selectively determined not to publish negative data from these trials.

First, it is argued that two twin studies conducted before Vioxx was approved for sale, Protocol 090 and Protocol 085, revealed an excess incidence of heart attacks in the Vioxx arm, but that Merck discounted the data because the studies were short.

[77] 1/2/02 letter from L. Governale* to T. Casola, MRK-AAF0007894, at 94.

- 96 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Second, it has been claimed that Merck's ADVANTAGE Trial likewise revealed an increased cardiovascular risk of Vioxx and that MRL scientist Dr. Alise Reicin tried to minimize these results by asking another MRL scientist, Dr. Eliav Barr, to alter the results to reflect that a certain death in that trial was not a heart attack.[78] In their email exchange, Dr. Reicin is alleged to have "repeatedly urged the researcher to change his views about the death 'so that we don't raise concerns.'"[79]

Third, it is claimed that although two placebo-controlled trials testing the efficacy of Vioxx both in treating and in preventing Alzheimer's disease did not indicate a difference in the incidence of cardiovascular events between the Vioxx and placebo arms, they showed that elderly people taking Vioxx were 4½ times "more likely to die than those in a placebo group."[80] According to Dr. Gurkirpal Singh*, director of the post-marketing drug surveillance program at Stanford University, the reason more patients on Vioxx were dying even though the rate of heart attacks and strokes was not higher was that "[t]hey were dying before they got a heart attack or stroke. . . ."[81] The argument continues that although interim data from the Alzheimer's trials did not reflect a

---

78 Alex Berenson*, Evidence in Vioxx Suits Shows Intervention by Merck Officials, N.Y. Times, April 24, 2005; 11/8/00 email from A. Reicin to E. Barr, MRK-NJ0124427, at 27-28.

79 Alex Berenson*, Evidence in Vioxx Suits Shows Intervention by Merck Officials, N.Y. Times, April 24, 2005.

80 Judith Graham*, FDA Knew in 2002 that Vioxx Posed Risk; Agency Chose Not to Warn Doctors, Chicago Trib., February 10, 2005, at C1; see also 9/14/05 transcript of Humeston v. Merck & Co., ATL-L-2272-03 MT, N.J. Super. Ct. Law Div., at 39-40, 70.

81 Judith Graham*, FDA Knew in 2002 that Vioxx Posed Risk; Agency Chose Not to Warn Doctors, Chicago Trib., February 10, 2005, at C1.

- 97 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

cardiovascular risk, the studies revealed an increased incidence of cardiovascular events after 18 months, a fact that MRL scientists attributed – without support – to chance.

**b. Our Findings and Conclusions.**

The evidence shows that all relevant data with respect to the studies discussed above were submitted on a timely basis to the FDA and that Merck did not "ignore" or try to "hide" allegedly negative data.

Merck's Protocols 090 and 085 were twin 6-week trials that tested the comparative efficacy of Vioxx, placebo and nabumetone (a non-selective NSAID) in relieving the pain and inflammation associated with osteoarthritis. Merck submitted the trial data from these studies – including the cardiovascular data – to the FDA on June 29, 2000 with the supplemental New Drug Application for Vioxx. In the application, Merck highlighted the fact that these trials had included low-dose aspirin to support a claim that Vioxx could be administered concomitantly with aspirin. The trials each included approximately 1,000 patients, randomized among the three arms of the study.

In Protocol 090, of the 978 patients enrolled, investigators reported that 6 patients in the Vioxx arm experienced a serious cardiovascular event (including heart attacks), versus 1 in the placebo group and 2 in the nabumetone group. The difference in the incidence of serious cardiovascular events between treatment groups in Protocol 090 was not statistically significant and MRL scientists believed that the numbers were too small to be meaningful. (After these events were adjudicated, there were 5 serious cardiovascular events in the Vioxx arm, 0 in the placebo arm, and 1 in the nabumetone arm.)

- 98 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Protocol 085 (the twin study), did not show any imbalance in serious cardiovascular events: there were 2 investigator-reported cardiovascular events in the Vioxx arm, 2 in the nabumetone arm, and 0 in the placebo arm. Dr. Maria Lourdes Villalba*, a medical reviewer at the FDA who reviewed data from Protocols 090 and 085 as well as other Vioxx trials following the VIGOR Trial, did not view these results as significant. In an internal FDA email, she stated:

> the number of events [in Protocol 090] was small and there was a twin study (085) with identical size and duration, conducted at approximately the same time, that showed no difference in CV thrombotic events as compared to placebo and nabumetone.[82]

These cardiovascular data were included in Merck's cardiovascular pooled analysis, which was published in Circulation in 2001. The data also were discussed in an article written by Dr. Eric Topol* of the Cleveland Clinic and published in JAMA in 2001. The efficacy and tolerability data from Protocol 090 (but not the cardiovascular data) were presented on a poster at the American Geriatric Society Conference in May 2001. An article including all of the Protocol 090 data, including cardiovascular data, was published in the Journal of Clinical Rheumatology in February 2006.

Data from the ADVANTAGE Trial (a 12-week trial of Vioxx versus naproxen in osteoarthritis patients that ended in April 2000) were likewise submitted to the FDA in support of Merck's supplemental New Drug Application. Dr. Barr subsequently reviewed all deaths that occurred in the course of the ADVANTAGE Trial to determine

[82] 11/8/04 email from M. Villalba* to L. Lemley* and J. Woodcock*, FDACDER 023057.

- 99 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

which ones fell within the APTC composite cardiovascular endpoint and should therefore be included in the cardiovascular meta-analysis soon to be submitted to the FDA. Both Dr. Barr and Dr. Reicin agreed that the death at issue should be counted in the meta-analysis. Their disagreement was over whether Dr. Barr should retrospectively characterize a certain death as a heart attack, which, according to Dr. Reicin, would have raised concerns about process because all heart attacks were supposed to have been adjudicated but this event had not been adjudicated since it had not been reported by the investigator as a heart attack. The data were blinded and there is no evidence that either Dr. Barr or Dr. Reicin knew which treatment, Vioxx or naproxen, this patient was taking.

In the end, this death was counted in Merck's cardiovascular meta-analysis and was listed as an "unknown cause of death" in Merck's submission to the FDA. In an article about the ADVANTAGE Trial published in the Annals of Internal Medicine in 2003, the death was included in one composite grouping of cardiovascular events (the APTC composite endpoint analysis), but not in another.[83]

With respect to critics' claims about Merck's lack of transparency with data from the long-term Alzheimer's trials, while Merck had reviewed blinded, and then unblinded, cardiovascular data during the pendency of those trials, it was not until the spring of 2001 that mortality data from Protocol 091, the first of the Alzheimer's trials to end, were examined. The data showed that there was a mortality imbalance between the Vioxx and

---

83 Lisse* JR, Perlman* M, Johannson* G, et al. Gastrointestinal tolerability and effectiveness of robecoxib versus naproxen in the treatment of osteoarthritis: A randomized, controlled trial. Ann Intern Med. 2003;139:539-46.

- 100 -