Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

placebo arms of the trial. The record establishes that based on these data, Merck unblinded mortality data from Protocols 078 and 126 and performed a combined analysis that showed 41 deaths in the Vioxx group and 24 deaths in the placebo group for the three Alzheimer's trials combined.

MRL scientists conducted analyses to investigate the data and determine whether there was a relationship between mortality and cardiovascular adverse events. These analyses showed that (i) there was a relatively equal distribution of cardiovascular events between the Vioxx and placebo groups and (ii) the mortalities were due to numerous causes. Because there was no discernable pattern to the mortalities, MRL scientists concluded that there was no causal nexus between Vioxx and the mortalities. The evidence shows that on July 12, 2001, Merck submitted a periodic Safety Update Report to the FDA, which provided safety data, including mortality data, from Protocols 078, 091 and 126. These data were incorporated into the revised Vioxx product labeling in 2002. Based on the evidence we reviewed, Merck did not hide or prevent dissemination of data from these trials.

The evidence further shows that at the time that final cardiovascular data from the Alzheimer's trials became available, MRL scientists did not believe that there was any significance to the apparent increase in the hazard rate after 18 months because, for the first 18 months, the incidence of cardiovascular events had been lower in the Vioxx group than in the placebo group. The rate of accumulating cardiovascular events in the Vioxx group began to exceed that of the placebo group after 18 months. Throughout the Alzheimer's trials, the difference in the cardiovascular event rate between the two arms

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

was not statistically significant, and the total incidence of cardiovascular events between Vioxx and placebo was almost exactly even. Therefore, MRL scientists and statisticians viewed the changes in the event rates as simply "noise" around the mean.

In addition to investigating publication of data from these trials specifically, we also reviewed Merck's policy on publishing the results of its clinical studies. The evidence showed that it had always been Merck's policy, as a general matter, to endeavor to publish the results of all Merck-sponsored clinical studies, regardless of outcome, with the exception of hypothesis-generating studies that Merck viewed as proprietary information. This guiding principle, while part of Merck's culture, was formally codified in 1999 and 2000, when Merck drafted and adopted its Code of Conduct for Clinical Trials.[84] This was precipitated by a discussion in the pharmaceutical industry about proper publication practices that arose because of a series of high profile events in the 1990s in which pharmaceutical companies other than Merck had been accused of attempting to block the publication of unfavorable data.[85] The Code of Conduct was a

---

[84] See 9/12/01 slide presentation of L. Hirsch, H. Guess, and D. Thompson to CCRC, MRK-NJ0206001, at 06-07 (discussing Merck Clinical Trial Code of Conduct). At around the same time, Merck approved a new guidance on publication practices, which was the product of a joint effort by representatives from Merck, Glaxo Wellcom, AstraZeneca, and Eli Lilly. See id.; 12/99 Guidance Document, "Good Publication Practices: Guidelines for Pharmaceutical Companies," MRK-AGV0043414-18.

[85] See 9/12/01 slide presentation of L. Hirsch, H. Guess, and D. Thompson to CCRC, MRK-NJ0206001, at 05 (mentioning, among others, dispute between Knoll Pharmaceuticals and the University of California, San Francisco regarding synthroid and dispute between Apotex Pharmaceuticals and Dr. Nancy Oliveri regarding deferipone). The Code of Conduct was also a reaction to a series of two articles published in The New York Times in May 1999 that raised questions about the practice of Merck and other pharmaceutical companies paying large sums to clinical investigators and about fraud among the clinical investigators. Kurt Eichenwald[*] and Gina Kolata[*], Drug Trials Hide Conflicts for Doctors, N.Y. Times, May 16, 1999, MRK-ABS0399414-31; Kurt Eichenwald[*] and

Case 2:05-md-01657-EEF-DEK Document 6767-6 Filed 09/08/06 Page 3 of 20

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

one-page list of key principles governing the ethical and scientific conduct of Merck-sponsored studies that was appended to the back of every study protocol.[86]

In the spring of 2001, a new department – the Medical Communications Department – was created to oversee all publication efforts. A more detailed publication policy, entitled "Merck Guidelines for Publication of Clinical Trials and Related Works," was adopted in September 2003.[87] The 2003 publication guidelines cover not only clinical trials, but also "related works," which include observational studies. The guidelines include detailed guidance on what studies should be published, what data should be included, what constitutes publication, and when studies should be published.[88]

---

Gina Kolata*, A Doctor's Drug Studies Turn Into Fraud, N.Y. Times, May 16, 1999, MRK-ABS0399398-412.

[86] See, e.g., Merck Code of Conduct for Clinical Trials attached to APPROVe Trial Protocol, MRK-ABS0326111, at 185, 197.

[87] 9/23/03 "Merck Guidelines for Publication of Clinical Trials and Related Works," MRK-AGE0000593-600.

[88] Recently, the pharmaceutical industry as a whole has tried to address the problem of selective publication of clinical studies. The National Institute of Health ("NIH") has established a national registry of clinical trials (http://www.clinicaltrials.gov) and the Pharmaceutical Research and Manufacturers of America ("PhRMA") has developed a database where the results of clinical trials can be posted and publicly viewed (http://www.clinicalstudyresults.org). Merck currently registers on the NIH registry all Phase II, III, and post-marketing trials in which treatment has been assigned and has begun posting the results of its hypothesis-testing studies on the PhRMA database as well. Merck Perspective, "Clinical Trials Registries and the Publication of Clinical Trial Results," http://www.merck.com (last updated September 2005).

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### 15. Allegation No. 15: Merck Kept the Cardiovascular Safety Information Out of the Product Label.

#### a. Summary of Allegation.

Although the VIGOR Trial data were available in March 2000, the Vioxx label was not changed to reflect those data until April 11, 2002. Critics claim that Merck deliberately prolonged negotiations with the FDA over how the VIGOR Trial and ADVANTAGE Trial cardiovascular data should be reported in the label in an effort to forestall disclosure of those data.[89] When the new label finally was approved in April 2002, the cardiovascular risk information was not reported in the "Warning" section of the label but was mentioned only in the "Precaution" section. In addition, it has been argued that Merck, on its own initiative, could have effected a change to the label to make clear the cardiovascular risks of Vioxx.

#### b. Our Findings and Conclusions.

None of the evidence we have reviewed supports a conclusion that Merck intentionally sought to delay the label negotiations. To the contrary, the record reflects that Merck sought expedited review of its supplemental New Drug Application, which was submitted on June 29, 2000, so that the FDA would approve a label with the VIGOR Trial gastrointestinal data as quickly as possible. The FDA, however, denied expedited review and set an Advisory Committee meeting for February 8, 2001 to review Merck's application.

---

[89] Anna Wilde Mathews*, Did FDA Staff Minimize Vioxx's Red Flags?, Wall St. J., November 10, 2004, at B1; Gardiner Harris*, F.D.A. Official Admits 'Lapses' on Vioxx, N.Y. Times, March 2, 2005, at A15.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Negotiations as to how the VIGOR Trial results would be characterized in the label, and where within the label they would be reported, did not begin in earnest until some months after the February 2001 FDA Advisory Committee meeting. On May 21, 2001, Merck submitted its third proposed label to the FDA. The FDA, however, did not counter-propose a label until almost five months later, on October 15, 2001. After this substantial time delay, for which there is no evidence that Merck was responsible, negotiations moved relatively quickly, with each side responding in a timely manner to the other party's proposal. From June 29, 2000 through April 11, 2002, Merck submitted a total of 12 draft label proposals to the FDA. The FDA submitted four counterproposals to Merck.

Importantly, the record reflects that the label negotiations were focused on much more than the presentation of cardiovascular data. Also of great significance to Merck was changing the standard NSAID-class gastrointestinal warning to reflect the positive results of the VIGOR Trial. To be sure, Merck and the FDA negotiated over the presentation of cardiovascular data and where within the label it should be included. MRL scientists and regulatory personnel did not believe that the Vioxx cardiovascular data supported a warning, which Merck believed should be reserved for known adverse effects. MRL scientists took the position that the VIGOR Trial cardiovascular data were explained by the naproxen cardioprotection hypothesis and not by any prothrombotic effect of the drug. The record reflects that MRL scientists, including regulatory personnel, believed that cardiovascular data from the VIGOR Trial and other Vioxx trials should be presented so that physicians could make their own risk/benefit analysis.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

The FDA's October 15 counterproposal label with its suggested cardiovascular warning led Dr. Scolnick to write:

> twice in my life i have had to say to the FDA "That label is unacceptable. We will not under any circumstances accept it." ... You WILL have to do that on the cardiac warning for Vioxx. ... And i assure you i will NOT sign off on any lable (sic) that had a cardiac warning. the data review yesterday convinces me that we do not have an unsafe drug and i am willing if needed to spend several hours one on one with anyone at the FDA going through the data until they in fact get it[90]

Merck's next proposal, which the FDA accepted, moved the cardiovascular data to the Precautions section of the label, where it remained through the final version of the label.

There is some question whether it would have been possible for Merck to add the cardiovascular data from the VIGOR Trial to the Vioxx label prior to FDA approval in April 2002 through a "changes being effected" supplement. The regulations indicate that unilateral changes may be made at the election of the drug sponsor to add important known risk information to the label in certain situations. However, in the fall of 1999, the FDA denied Merck's use of the "changes being effected" process to add language to the Vioxx label based on post-marketing adverse experience data regarding concurrent administration of Vioxx and the blood-thinning drug warfarin. Moreover, MRL scientists did not believe that Vioxx posed a known cardiovascular risk because their review of the available data persuaded them that the cardiovascular effects seen in the VIGOR Trial were the result of the cardioprotective effect of naproxen.

---

[90]  11/8/01 email from E. Scolnick to D. Greene, A. Nies and B. Goldmann, MRK-ACR0009287.

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

In hindsight, it may well be that the unilateral addition of a cardiovascular warning to the Vioxx label would have been beneficial to Merck in terms of defending against the numerous failure-to-warn products liability cases pending, but there is no basis on which to conclude that pursuing the standard FDA-approved label modification process rather than making changes unilaterally was unreasonable.

### 16. Allegation No. 16: Merck Announced – Then Cancelled – a Cardiovascular Outcomes Trial to Avoid Revealing That Vioxx Was Prothrombotic.

#### a. Summary of Allegation.

At the end of 2001, approximately 21 months after the VIGOR Trial data were unblinded, Merck announced that it would conduct a cardiovascular outcomes trial. In early 2002, Merck finally settled on a trial design, which it called the VALOR Trial. Merck established an outside Steering Committee for the VALOR Trial and began to line up investigators and sites at which patients would receive treatment. Then, on the eve of its start in March 2002, the VALOR Trial was cancelled abruptly, and without explanation. The VALOR Trial "was scheduled to produce data by March 2004 but may have provided answers about Vioxx's risks even earlier if patients had shown ill effects."[91]

It is argued that the Company's 21-month delay in scheduling the trial was inexcusable given the known risks of the drug, and that Merck only compounded the problem when it cancelled the study it had committed to conduct.

---

[91] Barry Meier*, Merck Canceled an Early Study of Vioxx, N.Y. Times, Feb. 8, 2005, at C1.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### b.   Our Findings and Conclusions.

The criticism that MRL scientists knew or feared that Vioxx was prothrombotic and canceled the planned cardiovascular outcomes trial to avoid exposing that fact is not supported by the extensive evidence we have reviewed.

The evidence reveals that Merck made a series of efforts to design a cardiovascular outcomes trial that would answer the fundamental question of whether Vioxx was prothrombotic. Following the release of the VIGOR Trial data, MRL scientists immediately began to consider designing and implementing a cardiovascular outcomes trial to answer this question. By May 2000, however, MRL scientists had strengthened their view on the basis of all of the available clinical evidence that Vioxx did not pose a cardiovascular safety problem and had come to see that it would be difficult to design an ethical and feasible cardiovascular outcomes trial. In addition, members of the Marketing Department, who subsequently supported such a trial, had concluded at the time that it was not necessary. Accordingly, MRL decided not to embark on a lengthy and expensive outcomes trial at that time.

In 2001, however, competitors and critics intensified their claims that selective Cox-2 inhibitors in general, and Vioxx in particular, put patients at increased cardiovascular risk. These claims prompted MRL scientists to reconsider conducting a cardiovascular outcomes trial in the hopes that a successful trial would quell critics and prove to the public what MRL scientists already believed to be true: that Vioxx was not prothrombotic. In a September 13, 2001 email, Dr. Scolnick described MRL's

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

prioritization of clinical studies for the following year: "For Vioxx: Only the Cv outcome study. ONLY ESSENTIAL STUDY!"[92]

By that time, MRL scientists had already begun designing such a trial, and diligent attempts to do so continued throughout the fall of 2001 and early spring of 2002. MRL scientists well understood that the cleanest way to prove that Vioxx was not prothrombotic would be to test it against placebo. FDA policy, however, provides that a placebo-controlled trial must be designed to demonstrate some benefit of the test drug (i.e., a "superiority" hypothesis), rather than that no difference exists between the test drug and the comparator (i.e., a "non-inferiority" hypothesis). Additionally, the FDA generally disfavored placebo-controlled trials testing a non-inferiority hypothesis regarding cardiovascular safety, and enrolling patients in such a trial would not be feasible. Thus, a simple Vioxx versus placebo trial, focused on cardiovascular outcomes, was precluded by FDA guidelines.

MRL scientists and outside consultants developed several other design options involving an active comparator, but the inclusion of another drug in the study design would make it difficult to determine unambiguously whether Vioxx itself was prothrombotic because any differential seen in the results could – like the VIGOR Trial results – be interpreted to have been caused either by Vioxx or by the active comparator.

The evidence shows that around January 2002, Merck decided to conduct the VALOR Trial, which was a slightly more complex version of a placebo-controlled trial,

---

[92] 9/13/01 email from E. Scolnick to D. Anstice et al., MRK-ABW0005624.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

administering Vioxx or placebo in a population of high-cardiovascular risk patients, all of whom would take low-dose aspirin. The primary hypothesis was a superiority hypothesis predicated on the notion that, because atherosclerosis was believed to be an inflammatory disease, the anti-inflammatory properties of Vioxx would confer a cardiovascular benefit to patients in the Vioxx arm. The VALOR Trial was set to begin in the second quarter of 2002.

While MRL was still developing the final protocol for the VALOR Trial, Dr. Robert Silverman from MRL Regulatory Affairs met informally with Dr. Lawrence Goldkind[*], Deputy Division Director at the FDA's Division of Anti-Inflammatory, Analgesics & Ophthalmic Drug Products, and discussed the proposed trial. Dr. Goldkind[*] expressed discomfort with the design and objective of the study and noted that any anti-inflammatory benefit Vioxx might provide was speculative and would be outweighed by greater risks. Dr. Silverman communicated Dr. Goldkind's[*] views to the VALOR Trial team, which prompted further internal discussion of the viability and ethics of such a design.

Dr. Peter Kim, then Executive Vice President for Research and Development at MRL, cancelled the trial in March 2002 for a variety of reasons, including the fact that the superiority claim of the study – that Vioxx might be beneficial to high-cardiovascular risk patients – was not strong enough in his view to justify, ethically, conducting the study. In addition, the inclusion of aspirin in the study would not produce a result that clearly answered the question of whether Vioxx alone had negative cardiovascular effects as compared to non-selective NSAIDs alone or placebo.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

By October 2002 Merck had determined that it would combine placebo-controlled data from three long-term cancer prevention studies testing the efficacy of Vioxx in reducing the risk of certain cancers and use these pooled data to further evaluate the cardiovascular profile of Vioxx. This study, called Protocol 203, was viewed by MRL scientists as equivalent to a prospectively designed cardiovascular outcomes trial, and would provide a clean answer to the question of whether Vioxx was prothrombotic, without implicating the ethical concerns raised in the VALOR Trial.

In sum, while the process of designing a cardiovascular outcomes trial was painstaking, there is no evidence that MRL intentionally delayed the process to avoid the results.

### 17. Allegation No. 17: Merck Ignored Mounting Epidemiological Evidence That Vioxx Was Prothrombotic.

#### a. Summary of Allegation.

Critics assert that from 2002 until the time that Vioxx was withdrawn from the market, there were numerous epidemiological studies that demonstrated that Vioxx caused increased cardiovascular risk to patients based on data other than from Merck's various clinical trials.

For example, it is alleged that an October 2002 study by Dr. Wayne Ray[*], an epidemiologist at Vanderbilt University, found that "Medicaid patients in Tennessee who

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

were taking high doses of Vioxx . . . had significantly more heart attacks and strokes than similar patients who were not taking high doses."[93]

It also is alleged that even a Merck-sponsored study conducted in 2003 by Dr. Daniel Solomon[*] of Harvard University "found Vioxx was associated with an elevated relative risk of heart attacks compared to use of Pfizer's Celebrex or no similar painkiller."[94] When Dr. Solomon[*] refused to change the study's conclusion, Merck removed from the article the name of one of its scientists who had collaborated on the study.[95]

In addition, nearly a year before Merck received the APPROVe Trial results, it received "preliminary results" from a separate, Merck-sponsored epidemiological study – the Ingenix Study – that, according to critics, "apparently indicated that the drug posed cardiovascular risks."[96]

### b. Our Findings and Conclusions.

Our review of the record as detailed in Appendix P demonstrates that the epidemiological evidence was by no means clear-cut: some studies found that there was no difference in the incidence rate of cardiovascular events between selective Cox-2

---

[93] Alex Berenson[*] et al., Despite Warnings, Drug Giant Took Long Path to Vioxx Recall, N.Y. Times, Nov. 14, 2004, at A1.

[94] Anna Wilde Mathews[*] & Barbara Martinez[*], Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

[95] Anna Wilde Mathews[*] & Barbara Martinez[*], Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

[96] Barry Meier[*], Earlier Merck Study Indicated Risks of Vioxx, N.Y. Times, Nov. 18, 2004, at C1.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

inhibitors and non-naproxen NSAIDs; others found that selective Cox-2 inhibitors were associated with a higher rate of cardiovascular events; some studies found that naproxen conferred cardioprotection; other studies found that it did not. In addition, the studies employed widely differing methodologies, some of which were the subject of debate and controversy within the scientific community.

Internal Company documents reflect Merck's view – which is widely held in the scientific community – that controlled clinical trials are the gold standard for studying the efficacy and safety of a drug. Epidemiological studies may be useful to identify a possible safety signal but are by no means definitive. Merck conducted and funded epidemiological studies, some of which produced results in support of naproxen cardioprotection and Vioxx's cardio-neutrality, and some of which did not. In addition, the record underscores that the science was evolving and that the limitations of epidemiological studies were widely recognized. We found no evidence to suggest that anyone at Merck disregarded a signal that he believed to be a reliable indicator that Vioxx was prothrombotic.

### 18. Allegation No. 18: Merck Withdrew its Application Seeking Approval to Market Arcoxia Because MRL Scientists Knew That it Was Not Safe and Would Invite Further Scrutiny of Vioxx's Cardiovascular Profile.

#### a. Summary of Allegation.

It has been asserted that Merck withdrew its New Drug Application for Arcoxia, its second-generation selective Cox-2 inhibitor, in 2002 based on negative clinical data

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

about its cardiovascular safety.[97] According to critics, Merck did not want the FDA scrutinizing these data at an upcoming Advisory Committee meeting because it feared that the Arcoxia data might prompt the Agency to take a harder look at Vioxx's cardiovascular safety and the Company did not want to jeopardize its existing blockbuster.[98]

### b. Our Findings and Conclusions.

Although our investigation focused on Vioxx, we also investigated whether Merck's decision to withdraw the Arcoxia New Drug Application was motivated by cardiovascular safety issues with the drug. We did not find any evidence that Merck withdrew the Arcoxia application based on a belief that Arcoxia was prothrombotic or a concern that the Arcoxia application might jeopardize Vioxx.

Merck originally submitted the New Drug Application for Arcoxia in late 2001. By March 2002, there were already three entrants into the domestic selective Cox-2 inhibitor market – Celebrex, Vioxx, and Pfizer's second selective Cox-2 inhibitor, Bextra. According to the Company's March 15, 2002 press release, Merck withdrew the application in order to better position Arcoxia in the marketplace:

> Last month, Merck announced plans to submit an expanded New Drug Application (NDA) for ARCOXIA (etoricoxib) to the FDA to include new efficacy data for ankylosing spondylitis [a rare, but chronically painful, disease of the spine] that will better position the product to compete successfully in the coxib class, where there already are

---

[97] See Geoff Dyer*, "Merck Revival Hopes Dented," Financial Times (London), March 16, 2002, at 17.

[98] Complaint in Kaufman v. Gilmartin, No. 04-5566, D.N.J., at ¶¶ 67-68.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

> three entrants. Accordingly Merck announced the withdrawal of the original U.S. NDA for the investigational medicine. Merck believes the new data, along with the data previously submitted, will provide a fuller picture of the product's efficacy and safety and will position it more favorably for approval in the United States.[99]

At the same time, the Company was engaged in discussions with the FDA concerning the safety profile of Arcoxia, which led to the Company's announcement on June 11, 2002 that the FDA had requested "additional cardiovascular safety data for ARCOXIA versus comparators other than naproxen."[100]

Merck resubmitted the Arcoxia New Drug Application on December 30, 2003 and received an approvable letter from the FDA on October 29, 2004, which stated that the application would be approved upon the submission of additional data, including cardiovascular safety data. Merck recently completed a pooled analysis of cardiovascular data from three large clinical trials that tested Arcoxia against diclofenac, a widely used non-selective NSAID. The combined data from all three trials demonstrated similar rates of cardiovascular events among those patients treated with Arcoxia and those treated with diclofenac. The Company has submitted this data to the FDA and has announced its intention to use this data to respond to the FDA's October 2004 approvable letter.[101]

---

[99] 4/18/02 Merck press release, "Merck Announces First-Quarter 2002 Earnings Per Share of 71 Cents," MRK-PRL0000251, at 54.

[100] 6/11/02 Merck press release, "Merck Plans to Refile U.S. New Drug Application for ARCOXIA™ in Second Half of 2003," MRK-ADW0081756, at 56.

[101] 8/23/06 Merck press release, "Merck Provides Preliminary Analyses of the Completed MEDAL Program for ARCOXIA™ (Etoricoxib)," MRK-I4640003746-48.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Although the Arcoxia New Drug Application is still pending in the United States, the drug has been approved and is marketed in over 40 foreign countries.

### C. Summary of Principal Criticisms and Findings Concerning Merck's Marketing of Vioxx.

Claims that Merck disseminated false information concerning the safety of Vioxx stem from the premise that MRL scientists and Company senior management understood, or at least suspected, that Vioxx caused cardiovascular events. The Company also is criticized for giving the Marketing Department an inappropriate level of influence in the setting of Merck's scientific agenda and for engaging in other improper conduct to "neutralize" Merck's critics.

Our findings regarding claims about Merck's marketing and promotion derive for the most part from our finding that MRL scientists believed that Vioxx was a safe drug. To the extent that such claims focus on the aggressiveness of some in Merck's Marketing Department, we are persuaded that senior management did not condone such conduct and that Senior Management adopted the Culture of Compliance to reinforce Merck's commitment to high ethical standards. Consistent with our mandate, we did not investigate allegations of misconduct by individuals in the Marketing Department who were separated from the Company or who were not part of senior management.

This is not to say that we endorse all of the sales and marketing practices that we reviewed. The evidence establishes that certain individuals within the Marketing and Sales Departments engaged in practices that were inconsistent with Merck's policies and at times proposed neutralizing critics through means that senior management viewed as

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

unacceptable. Such unacceptable conduct, however, was addressed Company-wide in late 2001 when senior management put in place an enhanced "Culture of Compliance." Although the initiative was not designed to address specifically any of the marketing practices discussed in this Report, the Company's renewed emphasis on compliance and training has curbed promotional activities that Merck deems unacceptable.

### 19. Allegation No. 19: Merck Attempted to Improve Vioxx's Competitive Position by "Neutralizing" Physicians Who Supported Celebrex or Were Critical of Vioxx.

#### a. Summary of Allegation.

Merck filed for FDA approval to market Vioxx in the United States on November 23, 1998, knowing that Vioxx's principal competitor, Searle/Pfizer's Celebrex, would be available beginning in early 1999. Even with the fast-track approval Merck hoped it would receive from the FDA, this meant that Merck would have to "play[] [a] game of catch-up" to reduce Celebrex's market lead and to garner support for Vioxx.[102] Critics allege that Merck therefore set out even before Vioxx was approved to "neutralize" a list of "problem" physicians who were pro-Celebrex by "offer[ing] them carrots like clinical trials, posts as consultants or [] grants."[103] Despite Merck's insistence that such activities were "educational," the "standardized form requesting payments to doctors . . . read 'Expected Outcome/Return on Investment,'" which, it is

---

[102] Barry Meier* & Stephanie Saul*, Marketing of Vioxx: How Merck Played Game of Catch-Up, N.Y. Times, Feb. 11, 2005, at A1.

[103] Barry Meier* & Stephanie Saul*, Marketing of Vioxx: How Merck Played Game of Catch-Up, N.Y. Times, Feb. 11, 2005, at A1.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

asserted, revealed an inappropriate marketing-oriented, rather than educational, purpose.[104]

### b. Our Findings and Conclusions.

Our review of the evidence shows that the market competition between Searle/Pfizer and Merck, even before either of their selective Cox-2 inhibitors was approved by the FDA, was intense and that both companies invested tremendous resources in launching their respective drugs.

When Celebrex was introduced to the market in early 1999, Vioxx was still five months away from FDA approval. During this pre-approval period, Merck's Marketing Department worked to help introduce physicians to Vioxx and to develop physicians as advocates for the product. Up until the end of 2001, some of the ways in which Merck developed advocates included: advisory board meetings and consultants' meetings at which various topics concerning Vioxx and the NSAID market generally would be discussed in a focus-group setting; a Merck-sponsored speaker program in which outside speakers would make presentations to a safety monitoring board about Vioxx; a Medical School Grant Program through which physicians could apply for grants to study Vioxx; and sponsorship of Continuing Medical Education programs. The Company also sought to develop advocates by employing physicians as clinical investigators in post-marketing Vioxx trials.

---

[104] Barry Meier* & Stephanie Saul*, Marketing of Vioxx: How Merck Played Game of Catch-Up, N.Y. Times, Feb. 11, 2005, at A1.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Merck field sales representatives whose job it was to discuss the anticipated market entry of Vioxx with physicians identified certain physicians whom the field representatives believed were anti-Vioxx (based on their understanding of Vioxx's product profile) or anti-Merck. A member of the Marketing Department compiled these physicians' names in a list of "36 Physicians to Neutralize."[105] Critics point to a column on the "36 Physicians to Neutralize" chart that includes comments regarding the means by which the physician might be converted to an advocate. Included in the column are "show me the money," "continue to support with clinical studies," "Weekend Consultants' meeting in an elegant location (New York, Hawaii) or a 5-day international meeting," and "offer medical school grant." While we do not condone such practices, we found no evidence that anyone in senior management encouraged or condoned them. Nor did we review evidence that the sales representatives' recommendations for developing the physician into an advocate were followed.

Despite the provocative sound of the word "neutralize," senior management of the Marketing Department reported that they understood the effort to "neutralize" physicians to be one in which Merck scientists would educate these targeted physicians about Vioxx, often through one of the programs mentioned above. Evidence shows that Merck management believed that if physicians were educated about the benefits of selective Cox-2 inhibitors and about Vioxx in particular, they would no longer be "anti-Vioxx" and would be more likely to become proponents of the drug. It is important to note that

---

[105] List of Physicians to Neutralize, MRK-AFI0004750-96 (attached to 7/23/99 email from S. Baumgartner to S. Johnson, MRK-AF100044569).

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

throughout the period that Vioxx was marketed, Merck expected all Company representatives to adhere to Merck's policies and procedures, which were designed to ensure compliance with federal regulations and which also, in many instances, went beyond what the law required.

All of the members of senior management in the Marketing Department whom we interviewed were unequivocal that the only travel or entertainment for doctors that was permissible had to be premised on education or market research. Merck policy – both before the Culture of Compliance and after – strictly prohibited offering weekend trips or medical school grants without a bona fide scientific or market research purpose.

Many of the programs discussed above in connection with advocate development and/or neutralizing physicians were revised in connection with the Culture of Compliance. For example, since late 2001, Merck policy has been that advisory boards and consultants' meetings may only be convened when the information sought is not available through other means. In addition, the Marketing and Sales Departments no longer have a voice in determining which physicians should participate in a clinical trial, or which physicians Merck should support through Merck's Medical School Grant Program. In addition, Merck has centralized the education programs, which makes oversight easier.

The Culture of Compliance was initiated proactively by the Company in late 2001 to ensure that all Company employees understood the policies governing marketing and sales practices and to enhance accountability. As part of the broad-based initiative, Mr. David Anstice, President, Human Health – The Americas, established an Office of