Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

First, it is argued that Merck purposefully reported in the APPROVe article the proportionality p-value based on the Linear Time Test (rather than the Logarithm of Time Test as indicated) because that method yielded a statistically significant result that allowed Merck to make the claim that the hazard ratio in the APPROVe Trial changed over time, whereas the Logarithm of Time Test yielded a result that was not statistically significant. According to critics, had the APPROVe article reported the non-significant p-value resulting from the Logarithm of Time Test, Merck would have been precluded from claiming that the assumption of the Cox proportional hazards model – that the hazard ratio is constant – did not hold. It follows, critics claim, that Merck would have been precluded from claiming that the cardiovascular event rates in the APPROVe Trial were similar for the first 18 months and diverged thereafter.

Second, the APPROVe article stated that "[a] test of the proportional-hazards assumption was specified in the cardiovascular analysis plan."[132] It is argued that this language was intended to give the impression that the method for testing the proportionality of hazards was pre-specified in the APPROVe Trial Data Analysis Plan when, in fact, the referenced "cardiovascular analysis plan" was for a separate study – Protocol 203 (the Company's planned pooled analysis of cardiovascular data from three placebo-controlled studies, one of which was the APPROVe Trial) – and did not govern the analysis of APPROVe Trial cardiovascular data standing alone. It is further argued that the authors of the APPROVe article deliberately mischaracterized the method for

---

[132] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1095.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

testing the proportional hazards assumption as pre-specified so as to lend credibility to what was really a post-hoc analysis not entitled to much weight.

Third, it is similarly argued that Merck's public statements regarding the error gave the erroneous impression that the Company's analysis of the proportionality of the hazard rates in the APPROVe Trial was pre-specified so as to lend credibility to that analysis and bolster the Company's claim that the hazard ratio in the APPROVe Trial changed over time. Critics point to language in the May 30, 2006 press release describing analyses specified in the Statistical Data Analysis Plan for Protocol 203 for testing whether the hazards ratio in the APPROVe Trial changed over time and stating that Merck conducted such analyses "[a]s specified in the analysis plan."[133] Although a subsequent section of the release states that "[t]here was no Statistical Analysis Plan . . . for the cardiovascular data from APPROVe alone,"[134] critics contend that the release conveys the impression that the Statistical Data Analysis Plan for Protocol 203 governed the APPROVe Trial analyses.

Critics also contend that an Open Letter from Dr. Peter Kim, President of MRL, that was posted on Merck's website on June 26, 2006, gives the impression that the proportionality testing conducted on the APPROVe Trial cardiovascular data was pre-specified (although the Open Letter attached an "Assessment" regarding Merck's view of

---

[133] 5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064, at 64.

[134] 5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064, at 65.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

the error that concedes that there was no specific plan for the analysis of the cardiovascular event hazard rate over time in the APPROVe Trial).[135]

Fourth, it is argued that, if in fact the analyses set forth in the Statistical Data Analysis Plan for Protocol 203 governed the APPROVe Trial standing alone, then Merck's May 30, 2006 press release was misleading because it stated that the error in the article could be corrected by substituting "linear time" for "logarithm of time" in the description of the analysis performed.

The very purpose of pre-specification is to avoid bias in analyzing the results of a clinical trial by stating in advance what statistical methods will be used to analyze the data and how the results will be interpreted. When a test is pre-specified in a statistical analysis plan, it is argued, those analyzing the data must conduct that test and accept its outcome.

The Statistical Data Analysis Plan for Protocol 203 stated that the "primary method for testing the proportional hazards assumption" was the Logarithm of Time Test and that a p-value greater than 0.05 resulting from that test "is not inconsistent with proportionality, i.e., constancy of treatment effect over time."[136] According to critics, because the p-value resulting from the Logarithm of Time Test was greater than p=0.05, the error can only be corrected by reporting the p-value for the specified Logarithm of Time Test and accepting the conclusion it requires – that the assumption of proportional

---

[135] 6/26/06 letter from P. Kim, "An Open Letter from Merck," MRK-AFO0300152, at 54.

[136] Protocol 203 Statistical Data Analysis Plan, MRK-AAD0200169, at 94.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

hazards cannot be rejected. Merck's claim in its May 30, 2006 press release that "the linear test is an appropriate method to assess changes in relative risk over time"[137] is beside the point since the Logarithm of Time Test, and not the Linear Time Test, was the specified test.

Finally, the cardiovascular analysis plan referenced in the article specified analyses of two separate composite cardiovascular endpoints – confirmed thrombotic events and APTC composite cardiovascular endpoint events. It is argued that the results for the APTC composite cardiovascular endpoint were markedly less favorable to Vioxx and less supportive of the 18-month claim than those for the confirmed thrombotic endpoint but were not reported in detail and that the article incorrectly stated that the results for the two were "similar" so as to avoid disclosing unfavorable results.

### b. Our Findings and Conclusions.

There is no evidence to support the contention that Merck purposefully misidentified the covariate used in the Cox proportional hazards model as the Logarithm of Time Test rather than the Linear Time Test in the APPROVe article. We find that the misidentification occurred because the MRL statisticians involved in drafting and reviewing the article assumed that the Logarithm of Time Test had in fact been performed and that it was that test that generated the p-value of 0.01 that was reported in the APPROVe article. The error that led to the misreporting (both in the article and in the submission to the FDA about the APPROVe Trial cardiovascular results) was made

---

[137] 5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064, at 64-65.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

months before work on the article began when the MRL statistician analyzing the data on behalf of the APPROVe Trial External Safety Monitoring Board switched the relevant statistical program from the Logarithm of Time Test to the Linear Time Test, did not document that switch, and later failed to recall that the switch had been made. In addition, given the totality of the data available at that time, we do not believe that the error in the APPROVe article materially affects any of the conclusions reached, and we find that the data and MRL scientists' post-hoc analyses supported the view that the hazard ratio in the APPROVe Trial changed over time.

As discussed below, however, we also find that Merck's public disclosures about the error lacked clarity and necessary context. The published APPROVe article stated that the analysis performed to test the assumption that the hazard ratio was constant was "specified" in the cardiovascular data analysis plan.[138] The evidence shows that the analysis performed was post-hoc and was not pre-specified. The APPROVe article and Merck's subsequent disclosures about the error – including Merck's May 30, 2006 and June 26, 2006 press releases – should, in our view, have made clear that the data analysis conducted, while consistent with good statistical practice, was not pre-specified for the APPROVe Trial alone. Alternatively, MRL statisticians could have drafted a statistical analysis plan to govern their analyses of the APPROVe Trial cardiovascular data.

---

[138] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1099.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### (1) Source of the Error

Throughout the summer and early fall of 2004, Dr. Hui Quan, the MRL statistician who worked for the APPROVe Trial External Safety Monitoring Board during the pendency of the trial, conducted numerous analyses of the APPROVe Trial cardiovascular data in preparation for the September 17, 2004 meeting of the External Safety Monitoring Board. In the course of this work, Dr. Quan noted, based on the Kaplan-Meier plots he prepared for both the confirmed thrombotic and APTC composite cardiovascular endpoints, that the hazard ratio did not appear constant but instead appeared to change at around the 18-month mark.

Dr. Quan believed that, if in fact the hazard ratio was not constant over time but instead was increasing, the External Safety Monitoring Board should be informed so that it could evaluate whether any action was appropriate.[139] To test whether the hazard ratio was non-constant, Dr. Quan's usual practice (consistent with Merck's convention) was to use the Logarithm of Time Test. Although no contemporaneous record of Dr. Quan's work exists, Dr. Quan's recollection was that the Logarithm of Time Test as applied to the data then available to him yielded a p-value above 0.05. This result struck Dr. Quan as inconsistent with other analyses he had performed, most notably the Kaplan-Meier plot, which seemed clearly to indicate a change in the hazard ratio.

---

[139] 6/8/06 email from H. Quan to J. Bolognese et al., MRK-ARQ0007271 (stating that Dr. Quan switched the covariate in the relevant computer program from Logarithm of Time to Linear Time "in order not to hide any thing [sic] from ESMB").

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Dr. Quan then ran the Linear Time Test, which (like the Logarithm of Time Test) is a standard means of testing the constancy of the hazard ratio. According to Dr. Quan, based on the data available at the time, the Linear Time Test yielded a p-value that was smaller than that generated by the Logarithm of Time Test and therefore more consistent with Dr. Quan's prior analyses (such as the Kaplan-Meier plots).

Based on Dr. Quan's review of the p-values generated by the two tests, as well as "fit statistics" included in the outputs from the tests, he concluded that the Linear Time Test covariates fit the data better than the Logarithm of Time Test covariates. (As explained in Appendix R, Dr. Jennifer Ng, another MRL statistician, was tasked later in the fall of 2004 with conducting various statistical analyses of the APPROVe Trial cardiovascular data independently of the work that Dr. Quan was doing. Dr. Ng's Memorandum about the analyses also supported the conclusion that the Linear Time Test "fit" the APPROVe Trial data better than the Logarithm of Time Test.)

In preparing the September 13, 2004 report to the APPROVe Trial External Safety Monitoring Board, Dr. Quan used the program he had modified previously. The report stated that the proportionality p-value for the confirmed thrombotic endpoint was 0.006 – a statistically significant deviation from the proportional hazards assumption, meaning that there was sufficient evidence to reject the assumption of a constant hazard ratio over time.

Dr. Quan's September 13, 2004 report to the External Safety Monitoring Board did not state whether he had obtained the p=0.006 result using the Logarithm of Time Test or the Linear Time Test. According to Dr. Quan, the switch from the Logarithm of

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Time Test to the Linear Time Test was never documented outside the program itself, which reflects which covariate (logarithm of time or linear time) was used in the Cox proportional hazards analysis.

### (2) Duplication of the Error

Work began on the article about the APPROVe Trial cardiovascular data in late October 2004. The article, which was published in the New England Journal of Medicine in February 2005, was authored by seven external scientists and five MRL scientists. The statistical analyses on which the article was based were performed by Dr. Quan as an extension of the work he had done as the unblinded statistician for the APPROVe Trial External Safety Monitoring Board. The published article used final data that became available in December 2004. The APPROVe article stated that a "test of the proportional-hazards assumption . . . was accomplished by evaluating the interaction between the logarithm of time and the assigned treatment . . ."[140] and stated further that "[t]he changing pattern of the treatment effect over time was confirmed by a failed test for proportionality of hazards (P=0.01)."[141] This p-value, as noted above, was the result based on final data using the Linear Time Test, not the Logarithm of Time Test. The result for the Logarithm of Time Test, which was not reported in the article, was p=0.07.

---

[140] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1095.

[141] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1097.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Based on the extensive record we reviewed, including numerous drafts of and correspondence about the article, we find that the error in the article with respect to the proportional hazard testing was inadvertent. A proportionality p-value was first inserted in the draft in November 2004, although there was no description of the method used to achieve this result. At that time, the p-value reported was p=0.006 based on August 2004 data analyzed by Dr. Quan. When final data became available in December 2004, the p-value of 0.01 (rounded down from p=0.014) was included instead. Both of these p-values were generated using the Linear Time Test. According to Dr. Quan and Mr. Bolognese, the two MRL statisticians who were co-authors of the article, once the program was changed to linear time at Dr. Quan's direction in the summer of 2004, it continued to generate results, including the p-value, using the Linear Time Test, although Dr. Quan did not recall that he had made the switch.

A description of the method used to test the proportional hazards assumption was first added to the draft manuscript on January 11, 2005 and subsequently changed on February 13, 2005, after reviewers at the New England Journal of Medicine asked the authors whether the test was described correctly. It is not clear whether Dr. Quan or Mr. Bolognese added the language about the statistical test, although each agreed that the language was added by one of them. At around the same time that the description of the method was revised, the authors added that the Logarithm of Time Test was "specified" in the "cardiovascular-analysis plan." Handwritten notes on galley proofs reflect that an editor thought that the February 13 description was confusing. The language that appears in the February 15 published article was then substituted.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

According to Dr. Quan and Mr. Bolognese, they assumed when the article was being drafted that the Logarithm of Time Test had been used because it is a widely accepted method to test the Cox proportional hazards assumption, is the conventional starting method at Merck, and is the method typically used by Dr. Quan. Neither Dr. Quan nor Mr. Bolognese checked the program prior to publication to confirm that assumption. In addition, both Dr. Quan and Mr. Bolognese, as well as numerous witnesses including external authors, stated that the issue of which test had been used to confirm that the assumption of proportional hazards did not hold was not an issue on which people were focused during the manuscript review process because they accepted that the hazard ratio was not constant based on the totality of the statistical analyses performed.

Based on our review of the record, we find that the erroneous description of the model used to test the proportional hazards assumption (which also was duplicated in Merck's submission to the FDA of an abbreviated Clinical Study Report, dated March 15, 2005) was inadvertent and was not made with any intent to mislead.

The error was discovered by Mr. Thomas Cook, a Merck statistician working on analyzing cardiovascular data from the APPROVe Trial follow-up study discussed below. In the course of his work, Mr. Cook ran numerous statistical tests, some of which previously had been conducted on the data from the base study, including the Logarithm of Time Test. That test, however, yielded a p-value of 0.07, not 0.01, when Mr. Cook ran it for confirmed thrombotic events. This caused him to check the covariate used in testing the proportional hazards assumption for purposes of the APPROVe article, which

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

led to the discovery that the p-value of 0.01 reported in the APPROVe article and in the abbreviated Clinical Study Report was generated by the Linear Time Test.

### (3) Import of the Error

Based on the final APPROVe cardiovascular data, the Logarithm of Time Test for confirmed thrombotic events reflects a p-value of 0.07 while the Linear Time Test, as reported in the New England Journal of Medicine, reflects a p-value of 0.01 for the same endpoint. According to critics, because the p-value generated by the Logarithm of Time Test is greater than 0.05, Merck had no basis for stating that the hazard rate changed. In fact, it is argued, Merck's own Statistical Data Analysis Plan for Protocol 203 provided that a p-value greater than 0.05 "is not inconsistent with proportionality, i.e., constancy of treatment effect over time," in other words, is not sufficient to support rejection of the proportional hazards assumption.[142]

As a general matter, tests for proportional hazards have low statistical power, especially if they are not based on a significant number of events. In the APPROVe Trial, only 72 patients experienced cardiovascular events over the course of the 3-year study: of the 1287 patients in the Vioxx arm of the study, 46 patients experienced a confirmed thrombotic event compared to 26 of the 1299 patients in the placebo group. As discussed above, under these circumstances, many biostatisticians using a Cox proportional hazards model to evaluate the constancy of the hazard ratio would deem results as high as p=0.10, in conjunction with graphical analysis, to be sufficient evidence

---

[142] Protocol 203 Statistical Data Analysis Plan, MRK-AAD0200169, at 94.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

to reject the assumption of proportional hazards and would see no meaningful difference between a p-value of 0.01 and 0.07. If the Statistical Data Analysis Plan for Protocol 203, which specified the Logarithm of Time Test as the "primary method" and set a significance level at p=0.05, were binding on this analysis of APPROVe Trial cardiovascular data, then the authors of the APPROVe article would have been required to report that the result of the Logarithm of Time Test was p=0.07 and that this result was not inconsistent with a finding that the hazard ratio is proportional over time. As discussed below, however, we find that the Protocol 203 Statistical Data Analysis Plan was not required to be followed in analyzing cardiovascular data from the APPROVe Trial alone. As a result, there is no meaningful difference in the conclusion with respect to confirmed thrombotic events.

In addition, while the test of the proportional hazards assumption is the most formal means of evaluating whether there is a change in the hazard ratio over time, other analyses may also be considered. As explained above, the Kaplan-Meier curves of the APPROVe Trial cardiovascular data appeared to reflect a clear change in the hazard rate at around the 18-month mark, as did the analysis of events in 6-month time intervals. These are all post-hoc analyses and therefore are not entitled to the same weight that would have been accorded to pre-specified analyses, but taken together, they provide reasonably strong evidence of a changing hazard ratio.

### (4) APTC Endpoint Events

In addition to analyzing confirmed thrombotic events, MRL scientists also analyzed cardiovascular events in the APPROVe Trial using the Antiplatelet Trialists'

- 152 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Collaboration ("APTC") composite cardiovascular endpoint. As discussed above at pages 84 and 85, this endpoint consisted of cardiovascular death, myocardial infarction, stroke (both ischemic and hemorrhagic), and death due to unknown cause or due to bleeding. With respect both to the confirmed thrombotic and the APTC composite cardiovascular endpoints, the APPROVe article concluded, as discussed above, that the difference between the placebo and Vioxx groups was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months. The APPROVe article stated that "[t]he changing pattern of the treatment effect over time [for the confirmed thrombotic endpoint] was confirmed by a failed test for proportionality of hazards (P=0.01)" and that "[f]indings for the APTC end point were similar."[143]

The evidence reflects that MRL scientists concluded based on the Kaplan-Meier curves and 18-month segment analyses that the hazard rate for APTC events appeared to change at approximately 18 months, like the changing hazard rate for confirmed thrombotic events. The p-value for APTC composite endpoint events based on the Linear Time Test, however, was p=0.119, a result that is not statistically significant as measured against the conventional p-value of 0.05 to measure significance, or even against the more generous p-value of 0.10 used by many biostatisticians for testing the assumption of proportional hazards.

MRL scientists believed that given the small numbers of events, the fact that the p-value was 0.119 for such events using the Linear Time Test was not particularly

---

[143] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1097.

- 153 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

meaningful, especially when viewed in the context of the totality of the cardiovascular data from the APPROVe Trial. We found no evidence that the Logarithm of Time Test was conducted on the final data for the APTC endpoint before the APPROVe article was written. It would no doubt have been better if the authors had included in the APPROVe article the proportionality p-value for APTC composite cardiovascular endpoint events as well as for confirmed thrombotic events.

### (5) Pre-specification of Data Analyses Conducted

The evidence shows that the MRL scientists' analyses of the cardiovascular events in the APPROVe Trial were post-hoc – i.e., were not dictated by any pre-specified plan. The APPROVe Trial Data Analysis Plan did not address statistical analyses of cardiovascular data in great detail and instead referred to the Cardiovascular Adjudication SOP generally, as well as to the combined analysis that would be performed pursuant to the Statistical Data Analysis Plan for Protocol 203. The Statistical Data Analysis Plan for Protocol 203 set forth analyses to be performed once the APPROVe, ViP and VICTOR Trials were completed and data from the three trials were pooled. Thus, there was not any plan in place that specified in detail how the cardiovascular data from the prematurely terminated APPROVe Trial should be analyzed on a stand-alone basis.

With respect to checking the assumption that the hazard ratio was constant, the Statistical Data Analysis Plan for Protocol 203 stated:

> Analytical and graphical methods will be employed to
> verify the proportional hazards assumption. The primary
> method for testing the proportional hazards assumption will
> be by including the factor treatment*log(time) in the
> model; nonsignificance ($p > 0.050$) of this factor is not

- 154 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

> inconsistent with proportionality, i.e., constancy of treatment effect over time.[144]

The two MRL statisticians independently analyzing the APPROVe Trial cardiovascular data, Dr. Quan and Dr. Ng, did not rely on the Statistical Data Analysis Plan for Protocol 203 in conducting their analyses. Dr. Quan, for example, in conducting analyses for the External Safety Monitoring Board, was guided by his experience as well as by requests from the External Safety Monitoring Board members. Dr. Ng similarly was not governed by a formal analysis plan and ran a series of tests and analyses suggested during brainstorming sessions with senior MRL statisticians.

The published APPROVe article stated that "[a] test of the proportional hazards assumption was specified in the cardiovascular-analysis plan."[145] It did not indicate that, in light of the premature termination of the APPROVe Trial, there was no data analysis plan that governed how the APPROVe Trial cardiovascular data standing alone should be analyzed. In our view, it would have been preferable to have included in the article a statement to the effect that, due to the unanticipated circumstances, there was no data analysis plan that dictated the analyses to be conducted on the APPROVe Trial cardiovascular data alone. The article could have reached the same conclusions and simply stated that Merck followed best statistical practices and conventions in analyzing the APPROVe Trial cardiovascular data and that those analyses were generally consistent

---

[144] Protocol 203 Statistical Data Analysis Plan, MRK-AAD0200169, at 94.

[145] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1095.

Report of John S. Martin, Jr. to the Special Committee of the Board of Directors of Merck & Co., Inc. Concerning the Conduct of Senior Management in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

with the pre-specified analyses set forth in the Protocol 203 Statistical Data Analysis Plan.

We did not find evidence as to why the authors of the APPROVe article did not include this additional context. Although analysis of the proportionality of hazards was identified in the article as having been specified, the authors, based on recommendations from New England Journal of Medicine peer reviewers, also stated that other analyses conducted, including the analysis of when the hazard ratio appeared to change, were post-hoc:

> In a post hoc analysis, the difference between the two groups in the incidence of thrombotic events was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months. . . . The changing pattern of the treatment effect over time was confirmed by a failed test for proportionality of hazards (P=0.01).[146]

The press release that Merck issued on May 30, 2006 correcting the description of the statistical method used to test the proportional hazards assumption, and the follow-up release that Merck issued on June 26, 2006, refer several times to "specified" analyses,[147] and the May 30 release attaches an excerpt from Protocol 203 regarding the "Check of [proportional hazards] Model Assumptions."[148] As indicated above, the May 30, 2006

---

[146] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1097.

[147] 5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064, at 64; 6/26/06 Merck press release, "Merck Stands Behind Original APPROVe Study Results," MRK-ASW0005632, at 33.

[148] Excerpt of Protocol 203 Statistical Data Analysis Plan, "Check of Model Assumptions," MRK-AFN0110067 (attached to 5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064).

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

press release stated in a separate section that "[t]here was no Statistical Analysis Plan . . . for the cardiovascular data from APPROVe alone."[149] Both releases nevertheless create the erroneous impression that the testing performed on the APPROVe Trial cardiovascular data was pre-specified.

A number of MRL employees involved in drafting and reviewing these press releases (the June 26 release repeats nearly verbatim three of the paragraphs from the May 30 release) stated that the intent of the drafters was to convey that Merck had a plan in place to analyze cardiovascular data and that the post-hoc analyses of the APPROVe Trial cardiovascular data were conducted in a manner that was consistent with that plan. This additional context was included in an assessment about the APPROVe Trial cardiovascular data analysis that accompanied an Open Letter from Dr. Peter Kim dated June 26, 2006:

> In the absence of a specific plan for the analysis of CV event HR [hazard rate] over time in APPROVe alone, the analysis of the proportional hazards assumption for the APPROVe CV data proceeded in a manner consistent with good statistical practice and consistent with the DAP for Protocol 203.[150]

While the releases are not as clear as they could have been, we find no basis to believe that anyone at Merck intended them to mislead the public regarding the APPROVe Trial cardiovascular data analysis. It also must be noted that whether or not

---

[149] 5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in the APPROVe Study," MRK-AFN0110064, at 65.

[150] 6/26/06 letter from P. Kim, "An Open Letter from Merck," MRK-AFO0300152, at 54.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

analyses were pre-specified, Merck withdrew Vioxx on the basis of Merck scientists' view that the APPROVe Trial cardiovascular data reflected a higher relative risk for patients using Vioxx than for those using placebo.

### 25. Allegation No. 25: New Data Collected from Patients Who Were Enrolled in the APPROVe Trial Indicate that the Relative Risk of a Cardiovascular Event on Vioxx Increases Almost Immediately – Not After 18 Months as Merck Has Claimed.

#### a. Summary of Allegation.

Vioxx was withdrawn from the market on September 30, 2004 on the basis of cardiovascular data from the APPROVe Trial consisting of cardiovascular adverse events that occurred while patients were on treatment (Vioxx or placebo) or within 14 days of having discontinued treatment. After the APPROVe Trial was terminated, the Protocol was amended to collect and analyze follow-up data on cardiovascular events that occurred more than 14 days after patients discontinued therapy in an effort to evaluate whether the increased relative risk of cardiovascular adverse events on Vioxx seen during the course of the base study would return to normal after patients stopped using the drug. MRL scientists and members of the APPROVe Trial Administrative Committee began discussing these protocol amendments less than a week after Vioxx was withdrawn from the market and finalized them in August 2005. Merck first submitted results of this follow-up study to the FDA and described them in a press release on May 11, 2006.

Critics have argued that these follow-up data, when combined with data from the base study, demonstrate that the increased risk of cardiovascular adverse events on Vioxx as compared to placebo in the APPROVe Trial emerged after only a few months of use –

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

not after 18 months of continuous use as Merck has argued publicly. Critics further allege that Merck deliberately presented these data in a confusing and incomplete manner in its May 11 press release to avoid undermining the Company's claim that there was no increased relative risk during the first 18 months of the APPROVe Trial.

Finally, critics have questioned whether Merck had these data prior to the publication of the 2005 APPROVe article and have alleged that these data were intentionally withheld from that article so as not to undermine the 18-month claim.

### b. Our Findings and Conclusions.

The APPROVe Trial Protocol specified, as was standard in all Merck trials, that data would be collected on serious adverse events, including cardiovascular events, that occurred while patients were on treatment or within 14 days after discontinuation of treatment. After Vioxx was withdrawn from the market in September 2004, MRL scientists, members of the APPROVe Trial Administrative Committee, and representatives of the FDA recognized that an important open question remained: whether patients who took Vioxx in the APPROVe Trial would continue to experience increased rates of thrombotic events compared to placebo more than 14 days after stopping use of the drug.

To answer this question, MRL scientists, in consultation with the APPROVe Trial Administrative Committee and the FDA, instituted two amendments to the APPROVe Trial Protocol in August 2005. The amendments provided for the collection and adjudication of all cardiovascular events experienced by any patient originally enrolled in the base study at any time within four years of having enrolled – i.e., within the

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

three-year duration of the base study or a fourth follow-up year – regardless of whether that patient was still enrolled in the study or on therapy at the time of the event. Data on cardiovascular events that occurred more than 14 days after discontinuation of the study drug had been only sporadically reported during the base study and therefore had not provided an adequate basis for meaningful analysis.

The Statistical Data Analysis Plan for the follow-up study specified two different analyses: (i) an analysis of cardiovascular events that occurred either during treatment or after the discontinuation of treatment among all patients randomized in the base study who had taken at least one study dose (the "Intention-to-Treat Analysis"); and (ii) an analysis of cardiovascular events occurring among these same patients fifteen days or more after the discontinuation of treatment (the "Off-Drug Analysis"). Both analyses included all relevant events that occurred during the three-year term of the base study plus a fourth follow-up year. The specified primary and secondary endpoints for both analyses, respectively, confirmed thrombotic events and APTC composite endpoint events, were the same cardiovascular endpoints analyzed following termination of the APPROVe Trial base study. Critics base their claim on the results of the Intention-to-Treat analysis, which is the focus of discussion below.

### (1) Results

On May 11, 2006, Merck reported preliminary analyses of these data to the FDA and issued a press release that set forth Merck's conclusions about the results' impact on the Company's prior analyses of cardiovascular data from the base study. The results may be summarized as follows: