# MERCK'S GENERAL OBJECTIONS TO PLAINTIFF'S DEPOSITION DESIGNATIONS FOR DR. JAMES FRIES

In the *Barnett* case, this Court properly sustained the vast majority of Mr. Barnett's designations of Dr. Fries's deposition testimony on hearsay and other grounds. The Court overruled Merck's relevancy objection in that case in large part because Dr. Fries's testimony might rebut the testimony of Dr. Stephen Epstein. Dr. Epstein testified in the *Barnett* case that Merck did not retaliate or take any inappropriate action against him after he published a study showing that MF-Tricyclic could promote atherosclerosis in mice. ***However, neither plaintiff nor Merck has designated Dr. Epstein as a witness in the Smith case. Because Dr. Fries's testimony cannot be used to rebut Dr. Epstein, the Court's rationale for allowing that testimony in Barnett does not apply here.***

Also, Dr. Fries's testimony relates to ***a phone call that occurred between Dr. Fries and Dr. Sherwood in October 2000, over two years before Mr. Smith started using Vioxx.*** Dr. Fries testified that he was satisfied with Merck's response to his letter to Mr. Gilmartin. Because Dr. Sherwood's interaction with Dr. Fries is an isolated incident that occurred over two years before Mr. Smith started using Vioxx, Dr. Fries's testimony about that incident is not probative of any consequential fact in this case. This is particularly true in this case because Mr. Smith's prescribing doctor, Dr. Grefer, testified that Merck's sales representations were courteous and professional and plaintiff cannot point to any evidence that Merck intimated Dr. Grefer before or after he prescribed Vioxx to Mr. Smith. To the extent there is any marginal probative value to Dr. Fries's testimony, it is substantially outweighed by the danger of unfair prejudice to Merck. Thus, plaintiff's designations of Dr. Fries's deposition should be excluded under Federal Rules of Evidence 401, 402, and 403.

Consistent with its rulings in the *Plunkett* trials, in *Barnett,* the Court sustained Merck's objection to the letter from Dr. Fries to Ray Gilmartin dated January 9, 2001 as hearsay and "very rambling" under Rules 801 and 403.  The Court should exclude the letter in this case for the same reasons.

In addition to these overarching objections, Merck also makes specific objections below.  Finally, Merck also includes its counter-designations.  Merck's submission of counter-designations is not a waiver of Merck's objections to the Fries designations.

# Smith v. Merck & Co., Inc.
## Deposition Designations for James Fries

|  |  |  | Objections | Ruling in Barnett |
|---|---|---|---|---|
| 1  11:8  -  14:6  Fries, James 2006-06-16 | 00:02:36 |  |  |  |

<span style="color:red">
11: 8      Q.   Could you state your name
11: 9       for the jury, please, Doctor.
11: 10     A.   James Franklin Fries.
11: 11     Q.   You are a medical doctor,
11: 12      correct?
11: 13     A.   That's correct.
11: 14     Q.   We're here at Stanford
11: 15      University to take your deposition today.
11: 16      Is this where you're currently employed?
11: 17     A.   That's right.
11: 18     Q.   And what is your current
11: 19      position here?
11: 20     A.   I'm a professor of medicine,
11: 21      emeritus active.
11: 22     Q.   Okay.
11: 23          And how long have you been a
11: 24      professor of medicine here at Stanford?
12: 1      A.   At one grade or another, a
12: 2       professor since 1971.
12: 3      Q.   Okay.
12: 4           Do you have a particular
12: 5       specialty?
12: 6      A.   I'm a rheumatologist.  I
12: 7       also do work in clinical epidemiology, in
12: 8       aging research and health public policy
12: 9       and in information technology.
12: 10     Q.   Okay.
12: 11          In terms of your specialty,
12: 12      rheumatology, have you done particular
12: 13      research in regards to NSAIDs?
12: 14     A.   Yes.  I should probably give
12: 15      you a little bit of background because it
12: 16      will be important probably for everything
12: 17      that happens.
12: 18     Q.   Sure.
12: 19     A.   30 years ago, about 30 years
12: 20      ago, I founded ARAMIS, that's
12: 21      A-R-A-M-I-S, the Arthritis, Rheumatism &
12: 22      Aging Medical Information System.  And
12: 23      we've tracked some 17,000 people in total
12: 24      from when we get ahold of them until they
13: 1       die or just say good-bye to us in another
13: 2       way.  And we follow them for everything
13: 3       that happens to them medically.  We get
13: 4       their clinical information, we go to them
13: 5       with questionnaires about health status
13: 6       each six months.  We collect information
13: 7       at that time on the drugs that they've
13: 8       taken, the disability level that their
13: 9       arthritis has inflicted on them, the pain
13: 10      they have, their use of medical care
</span>

|   |   |   |   |   | Objections | Ruling in Barnett |
|---|---|---|---|---|---|---|
| | 13: 11 | | services, the drugs they're taking and | | | |
| | 13: 12 | | any side effects that they've had for | | | |
| | 13: 13 | | those drugs, whether they're symptoms | | | |
| | 13: 14 | | side effects or side effects that cause | | | |
| | 13: 15 | | hospitalizations or that cause death. | | | |
| | 13: 16 | | We tally these and we write | | | |
| | 13: 17 | | papers with regard to the comparative | | | |
| | 13: 18 | | toxicity of different drugs.  So, this is | | | |
| | 13: 19 | | the first chronic disease databank system | | | |
| | 13: 20 | | that has existed.  It's also the longest | | | |
| | 13: 21 | | in duration.  There are about 1,000 | | | |
| | 13: 22 | | papers that have emerged from it on a | | | |
| | 13: 23 | | series of different subjects.  Probably | | | |
| | 13: 24 | | my guesstimate would be around 20 on the | | | |
| | 14: 1 | | subject that we're discussing today, | | | |
| | 14: 2 | | which are side effects of the -- side | | | |
| | 14: 3 | | effects assessment in general and side | | | |
| | 14: 4 | | effects of the nonsteroidal | | | |
| | 14: 5 | | anti-inflammatory drugs in particular, | | | |
| | 14: 6 | | so... | | | |
| 2 | 17:4 | - | 17:11 | Fries, James 2006-06-16 | 00:00:18 | | |
| | 17: 4 | | Q.   I'm going to go ahead and | | **Re: 17:4-11** | Overruled |
| | 17: 5 | | hand you what's been marked as | | **Def Obj:** 401, 402, 403. | |
| | 17: 6 | | Plaintiff's Exhibit 1.0176, which is a | | Merck believes testimony | |
| | 17: 7 | | copy of the letter on Stanford University | | relating to the Fries letter | |
| | 17: 8 | | letterhead addressed to Dr. -- or, I'm | | is irrelevant and highly | |
| | 17: 9 | | sorry, Mr. Ray Gilmartin, and you can | | prejudicial.  It also | |
| | 17: 10 | | feel free to refer to this. | | contains hearsay (801, | |
| | 17: 11 | | A.   Yeah.  Thank you. | | 802) and Dr. Fries lacks | |
| | | | | | personal knowledge (602) | |
| | | | | | relating to many of the | |
| | | | | | underlying events. | |
| | | | | | **Pltf. Resp:** Dr. Fries' | |
| | | | | | testimony is relevant to | |
| | | | | | show that Merck not only | |
| | | | | | failed to warn physicians | |
| | | | | | and patients but actively | |
| | | | | | suppressed the | |
| | | | | | communication of those | |
| | | | | | who raised serious | |
| | | | | | concerns related to Vioxx. | |
| | | | | | Conduct also proves that | |
| | | | | | Merck failed to act as a | |
| | | | | | reasonable | |
| | | | | | pharmaceutical company | |
| | | | | | in designing and | |
| | | | | | marketing Vioxx. | |
| 3 | 18:3 | - | 18:15 | Fries, James 2006-06-16 | 00:00:19 | | |
| | 18: 3 | | Q.   So, getting back, on October | | | |
| | 18: 4 | | 28, 2000, did you receive a call from Dr. | | | |
| | 18: 5 | | Sherwood? | | | |
| | 18: 6 | | A.   Yes. | | **Re: 18:3-15** | Overruled |
| | 18: 7 | | Q.   Okay. | | **Def Obj:** 401, 402, 403. | |

| | | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|
| | 18: 8<br>18: 9<br>18: 10<br>18: 11<br>18: 12<br>18: 13<br>18: 14<br>18: 15 | And at that time, did he<br>identify himself as being with Merck?<br>A.  Yes, I believe so.<br>Q.  And during that<br>conversation, where did you -- where did<br>you receive the phone call?<br>A.  Well, I received that call<br>at home. | | Phone call between Dr. Fries and Dr. Sherwood occurred over two years before Mr. Smith started using Vioxx and has no probative value whatsoever in a post-label change case.<br>**Pltf. Response**: Dr. Sherwood is a Vice President of Merck.  His statements to Dr. Fries asking Dr. Fries to curtail the comments of Dr. Singh are relevant to show that rather than warn, Merck actively pursued avenues to suppress communication of the CV dangers assocaited with Vioxx by third parties.  Relevant to Plaintiff's failure to warn claim.  Not unfairly prejudicial. | |
| 4  18:16  -  18:22 | | Fries, James 2006-06-16 | 00:00:07 | | |
| | 18: 16<br>18: 17<br>18: 18<br>18: 19<br>18: 20<br>18: 21<br>18: 22 | Q.  Okay.<br>Had you ever received a call<br>from a pharmaceutical company like that<br>at home before?<br>A.  No.<br>Q.  Did you find that unusual?<br>A.  Yes. | | **Re: 18:16-22**<br>**Def Obj:**Same Objection<br>**Pltf. Resp.:**  Same response | Overruled |
| 5  19:2  -  19:23 | | Fries, James 2006-06-16 | 00:00:54 | | |
| | 19: 2<br>19: 3<br>19: 4<br>19: 5<br>19: 6<br>19: 7<br>19: 8<br>19: 9<br>19: 10<br>19: 11<br>19: 12<br>19: 13<br>19: 14<br>19: 15<br>19: 16<br>19: 17<br>19: 18<br>19: 19<br>19: 20<br>19: 21 | Q.  Was it during the week or on<br>a weekend?<br>A.  It was on a Saturday.<br>Q.  On a Saturday.  Okay.<br>What was Dr. Sherwood<br>calling to discuss with you at that time?<br>A.  He was concerned that a<br>doctor, research associate on my staff,<br>Gurkipal Singh, had been giving talks in<br>public which were critical of Merck's<br>Vioxx, and in particular, had emphasized<br>the potential cardiovascular toxicity of<br>Vioxx.<br>Q.  In particular, what was he<br>complaining about, Dr. Sherwood?<br>A.  He believed that the talks<br>in question were unbalanced and that this<br>was something that I, as his immediate<br>supervisor, should know about and take<br>some action.  And he also contacted the | | **Re: 19:2-23**<br>**Def Obj:**Same Objection  And also, **19:6-14** is the witness speculating about what concerned a Merck employee.    **Pltf. Resp.:** Same response | Overruled |

3

| | | | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|---|
| | 19: 22 | | chairman of the department and the | | | |
| | 19: 23 | | chairman of our division. | | | |
| 6 20:9 | - 20:12 | | Fries, James 2006-06-16 | 00:00:10 | | |
| | 20: 9 | | What did Dr. Sherwood say at | | **Re: 20:9-12** | Overruled |
| | 20: 10 | | that time?  Did he imply to you any | | **Def Obj:**Same Objection And leading. | |
| | 20: 11 | | consequences if -- or what did he want | | **Pltf. Resp.:** Same response | |
| | 20: 12 | | you to do in regards to Dr. Singh? | | | |
| 7 20:18 | - 20:20 | | Fries, James 2006-06-16 | 00:00:06 | | |
| | 20: 18 | | A.   Yeah.  He wanted Dr. Singh | | | |
| | 20: 19 | | to stop making the kinds of statements | | | |
| | 20: 20 | | that he had been making -- | | | |
| 8 20:22 | - 21:11 | | Fries, James 2006-06-16 | 00:00:25 | | |
| | 20: 22 | | A.   -- and he wanted, you know, | | **Re: 20:18-21:11** | Overruled |
| | 20: 23 | | me to assist him in that task. | | **Def Obj:**Same Objection | |
| | 20: 24 | | Q.   Okay. | | **Pltf. Resp.:** Same response | |
| | 21: 1 | | And did he indicate to you | | | |
| | 21: 2 | | that there would be any kind of | | | |
| | 21: 3 | | consequences if you didn't or if Dr. | | | |
| | 21: 4 | | Singh did not? | | | |
| | 21: 5 | | A.   Well, he did, and I wrote | | | |
| | 21: 6 | | up, when I was much closer to the time, | | | |
| | 21: 7 | | some of the things that he said, that Dr. | | | |
| | 21: 8 | | Singh would flame out if he didn't change | | | |
| | 21: 9 | | his behavior and that there would be | | | |
| | 21: 10 | | consequences for Stanford, and he implied | | | |
| | 21: 11 | | that there might be consequences for me. | | | |
| 9 21:13 | - 21:23 | | Fries, James 2006-06-16 | 00:00:21 | | |
| | 21: 13 | | At that time, did you take | | **Re: 21:13-23** | Overruled |
| | 21: 14 | | that to mean that Stanford or yourself | | **Def Obj:**Same objection Also, the witness directly states in 21:17 that Dr. Sherwood never said anything about Stanford or Dr. Fries losing research funding. The witness should not then be allowed to speculate about what is "sort of an implied thing."  **Pltf. Resp.:** Dr. Fries is aware that Merck funds research at Stanford.  His testimony is not speculative.  He is testifying to his understanding of what Dr. Sherwood was communicating to him. | |
| | 21: 15 | | would not be receiving research funds if | | | |
| | 21: 16 | | that didn't stop? | | | |
| | 21: 17 | | A.   Well, that was never stated. | | | |
| | 21: 18 | | Q.   Is that what you -- | | | |
| | 21: 19 | | A.   And it's always a question, | | | |
| | 21: 20 | | sort of an implied thing.  When you say | | | |
| | 21: 21 | | how would it be bad for Stanford, I guess | | | |
| | 21: 22 | | it would be bad for Stanford if the | | | |
| | 21: 23 | | research funding dried up. | | | |

| | | | | | **Objections** | **Ruling in Barnett** |
|---|---|---|---|---|---|---|
| 10 | 22:12 | - | 23:21 | Fries, James 2006-06-16        00:01:29 | | |
| | 22: 12 | | | After that conversation with | | |
| | 22: 13 | | | Dr. Sherwood, did you contact Dr. Singh? | | |
| | 22: 14 | | | A.   Yes.  I took this the same | | |
| | 22: 15 | | | way that I think anybody should who hears | | |
| | 22: 16 | | | about it.  You want to determine if it's | | |
| | 22: 17 | | | true or not.  And so I did ask Dr. Singh, | | |
| | 22: 18 | | | and I told Dr. Sherwood that I would do | | |
| | 22: 19 | | | this, that I would ask Dr. Singh what had | **Re: 22:12-23:21** | Overruled 401-403, |
| | 22: 20 | | | transpired and I would check out.  And if | **Def Obj:** 801, 802. | 801-802 objections are |
| | 22: 21 | | | there was action that was required, I | Dr. Fries' conversation | new |
| | 22: 22 | | | would take the action.  And I did that. | with Dr. Singh is hearsay | |
| | 22: 23 | | | Q.   When you say you "did that," | and should be excluded. | |
| | 22: 24 | | | did you actually review the -- or did you | Also irrelevant and | |
| | 23: 1 | | | talk to Dr. Singh specifically about his | prejudicial. | |
| | 23: 2 | | | presentation? | **Pltf. Resp.:** Testimony . | |
| | 23: 3 | | | A.   I talked with him about the | is relevant to Dr. Fries' | |
| | 23: 4 | | | presentation.  He felt that it was a | investigation that he | |
| | 23: 5 | | | balanced presentation.  That's what he | undertook prior to putting | |
| | 23: 6 | | | maintained.  And I said, well, can I see | Merck on notice with the | |
| | 23: 7 | | | the slides?  And so I looked at the | letter to Mr. Gilmartin | |
| | 23: 8 | | | PowerPoint slides that he had.  There | of the inappropriateness | |
| | 23: 9 | | | were, I don't remember, maybe 30 of them. | of Dr. Sherwood's and | |
| | 23: 10 | | | I counted up the ones which were pro -- | other Merck employees' | |
| | 23: 11 | | | much of the talk was on -- much of his | actions.  Relevant to | |
| | 23: 12 | | | talks were on GI NSAID safety in general | Plaintiff's failure to warn | |
| | 23: 13 | | | not connected with a particular product. | claim.  Dr. Singh's | |
| | 23: 14 | | | But there was mention of both the VIGOR | statements are not | |
| | 23: 15 | | | trial and the CLASS trial and of | hearsay as they are | |
| | 23: 16 | | | celecoxib and of rofecoxib during that | not offered for the truth | |
| | 23: 17 | | | talk.  And I counted the slides for | of the matter asserted | |
| | 23: 18 | | | rofecoxib and for celecoxib, and there | but to Dr. Fries' state | |
| | 23: 19 | | | were the same number, and they were both | of mind | |
| | 23: 20 | | | from similar studies and were really | | |
| | 23: 21 | | | quite parallel. | | |
| 11 | 24:9 | - | 25:8 | Fries, James 2006-06-16        00:00:51 | | |
| | 24: 9 | | | Q.   Did you find the | **Re: 24:9-25:8** | Overruled 401-403, |
| | 24: 10 | | | presentation to be balanced? | **Def Obj:** Same objections | 801-802 objections are |
| | 24: 11 | | | A.   It looked to me to be | **Pltf. Resp.:** same | new |
| | 24: 12 | | | reasonably balanced.  You can't tell by | response | |
| | 24: 13 | | | looking at a set of slides what someone | | |
| | 24: 14 | | | is saying when they have those slides on. | | |
| | 24: 15 | | | So, I went a little bit further and I | | |
| | 24: 16 | | | checked with three people who had been in | | |
| | 24: 17 | | | the audience of the most offending of | | |
| | 24: 18 | | | these, and none of them were particularly | | |
| | 24: 19 | | | offended or thought it particularly | | |
| | 24: 20 | | | unbalanced. | | |
| | 24: 21 | | |                So, it was a funny | | |
| | 24: 22 | | | situation, because the data that were of | | |
| | 24: 23 | | | interest were on something that would | | |
| | 24: 24 | | | almost automatically unbalance a balanced | | |

|   |   |   |   | Objections | Ruling in Barnett |
|---|---|---|---|---|---|
|   | 25: 1<br>25: 2<br>25: 3<br>25: 4<br>25: 5<br>25: 6<br>25: 7<br>25: 8 | presentation, because there was negative<br>information on one product of different<br>degrees of certainty, and there wasn't<br>any balancing information.  So, if you<br>really were explaining things at that<br>point, one would tend to probably<br>overemphasize or emphasize more the Vioxx<br>data. |   |   |   |
| 12 26:22 - 26:24 | | Fries, James 2006-06-16 | 00:00:08 | | |
|   | 26: 22<br>26: 23<br>26: 24 | When you say the American<br>College of Rheumatology or ACR, when was<br>that?  Was that in November of 2000, | | | |
| 13 34:4 - 35:1 | | Fries, James 2006-06-16 | 00:00:47 | **Re: 34:4-35:1**<br>**Def Obj:** 801, 802. Hearsay (testifying about what other doctors said and thought).<br>**Pltf. Resp.:** Testifying to his knowledge about Merck's attempt to influence academic debate not to the statements of others | |
|   | 34: 4<br>34: 5<br>34: 6<br>34: 7<br>34: 8<br>34: 9<br>34: 10<br>34: 11<br>34: 12<br>34: 13<br>34: 14<br>34: 15<br>34: 16<br>34: 17<br>34: 18<br>34: 19<br>34: 20<br>34: 21<br>34: 22<br>34: 23<br>34: 24<br>35: 1 | Q.   Okay.  All right.<br>You also reference in these<br>-- or during that time of the ACR<br>meeting, did it also come to your<br>attention that other doctors had<br>complaints of Merck contacting either<br>themselves or their bosses in an effort<br>to intimidate them?<br>MR. RABER:  Objection to<br>form.<br>THE WITNESS:  Yes.  It was<br>kind of at that time that the<br>rumor mill was going, and once<br>people started talking about this,<br>there were other people that had<br>similar experiences.  And they<br>reported them, and a number of<br>them had the same reaction that I<br>did, that this was a way of<br>influencing academic debate, which<br>was not appropriate and could not<br>continue. | | | |
| 14 35:20 - 36:1 | | Fries, James 2006-06-16 | 00:00:13 | **Re: 35:20-36:1**<br>**Def Obj:** 401, 402, 403. Phone call between Dr. Fries and Dr. Sherwood occurred over two years before Mr. Smith started using Vioxx and has no probative value whatsoever in a post-label change case.  **Pltf. Resp:** Relevant to show Merck's notice of Dr. Fries' assertions that it was inappropriately attempting to suppress the statements of physicians attempting to warn about the CV | Overruled |
|   | 35: 20<br>35: 21<br>35: 22<br>35: 23<br>35: 24<br>36: 1 | Did you actually talk with<br>Dr. Sherwood about these different<br>allegations prior to writing your letter?<br>A.   Yes.  But my recollection is<br>that was a telephone call after the<br>meetings. | | | |

| | | | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|---|
| 15 **36:3** | - | **36:20** | Fries, James 2006-06-16 | 00:00:42 | dangers associated with Vioxx. | |
| | 36: 3 | | Tell me about that telephone | | | |
| | 36: 4 | | call. | | **Re: 36:3-20** | Overruled |
| | 36: 5 | | A.  We'd gone backwards and | | **Def Obj:** same objections | |
| | 36: 6 | | forwards and got a connection, and then | | **Pltf' Resp.:** Same | |
| | 36: 7 | | we discussed these issues much as they're | | response | |
| | 36: 8 | | laid out there.  I put some quotes in | | | |
| | 36: 9 | | that letter that were not recorded | | | |
| | 36: 10 | | quotes, but they were ones that I had | | | |
| | 36: 11 | | remembered from the -- from one | | | |
| | 36: 12 | | discussion. | | | |
| | 36: 13 | | One ironic one was that he | | | |
| | 36: 14 | | had said that the side effects didn't | | | |
| | 36: 15 | | occur at all, they had internal data to | | | |
| | 36: 16 | | indicate that they didn't occur, but that | | | |
| | 36: 17 | | anyway it was only at high doses.  I | | | |
| | 36: 18 | | thought that that was an interesting way | | | |
| | 36: 19 | | to put an affirmation and a denial into | | | |
| | 36: 20 | | the same sentence. | | | |
| 16 **37:9** | - | **37:17** | Fries, James 2006-06-16 | 00:00:22 | | |
| | 37: 9 | | So, after having the phone | | **Re: 37:9-17** | Overruled |
| | 37: 10 | | conversation on October 28, 2000, seeing | | **Def Obj:** 401, 402, 403. | |
| | 37: 11 | | Dr. Sherwood at the ACR meeting, seeing | | **Pltf. Resp.:** same | |
| | 37: 12 | | the VIGOR posters at the ACR meeting, | | response | |
| | 37: 13 | | talking with Dr. Sherwood again on the | | | |
| | 37: 14 | | phone, you then wrote this letter on | | | |
| | 37: 15 | | January -- or sent the letter on January | | | |
| | 37: 16 | | 9, 2001, correct? | | | |
| | 37: 17 | | A.  Yes. | | | |
| 17 **37:19** | - | **38:9** | Fries, James 2006-06-16 | 00:00:18 | | |
| | 37: 19 | | And you wrote this letter to | | **Re: 37:19-38:9** | Overruled |
| | 37: 20 | | Mr. Raymond Gilmartin, correct? | | **Def Obj:** 401, 402, 403. | |
| | 37: 21 | | A.  Yes. | | **Pltf. Resp:** Same | |
| | 37: 22 | | Q.  Had you ever met Mr. | | response | |
| | 37: 23 | | Gilmartin before? | | | |
| | 37: 24 | | A.  No. | | | |
| | 38: 1 | | Q.  He is the -- or at the time | | | |
| | 38: 2 | | was the Chief Executive Officer of Merck, | | | |
| | 38: 3 | | correct? | | | |
| | 38: 4 | | A.  Yes. | | | |
| | 38: 5 | | Q.  Okay. | | | |
| | 38: 6 | | Had you ever written a | | | |
| | 38: 7 | | letter to the CEO of a pharmaceutical | | | |
| | 38: 8 | | company before? | | | |
| | 38: 9 | | A.  No. | | | |
| 18 **38:11** | - | **38:14** | Fries, James 2006-06-16 | 00:00:09 | | |
| | 38: 11 | | Had you ever written a | | **Re: 38:11-14** | Overruled |
| | 38: 12 | | letter with these kind of allegations in | | **Def Obj:** 401, 402, 403. | |
| | 38: 13 | | them to a pharmaceutical company before? | | **Pltf. Resp:** Same | |
| | 38: 14 | | A.  No. | | response | |
| 19 **54:21** | - | **55:21** | Fries, James 2006-06-16 | 00:00:43 | | |
| | 54: 21 | | The contact that you had | | **Re: 54:21-55:21** | Overruled |
| | 54: 22 | | from Dr. Sherwood and from Merck in | | **Def Obj:** Leading | |

7

| | | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|
| | 54: 23 | regards to Vioxx, did you feel that was | | question, also 401, 402, 403, irrelevant and prejudicial. | |
| | 54: 24 | at all appropriate? | | | |
| | 55: 1 | MR. RABER:  Objection to | | | |
| | 55: 2 | form. | | | |
| | 55: 3 | THE WITNESS:  I felt that | | **Pltf. Resp.:** Same response to relevance objection.  Not a leading question | |
| | 55: 4 | belief in the scientific | | | |
| | 55: 5 | marketplace where you have freedom | | | |
| | 55: 6 | of expression on all sides without | | | |
| | 55: 7 | overt intimidation, let alone this | | | |
| | 55: 8 | kind of thing, really was a threat | | | |
| | 55: 9 | to academic freedom.  And I saw it | | | |
| | 55: 10 | and phrased my position in terms | | | |
| | 55: 11 | of the academic freedom issues, | | | |
| | 55: 12 | not in terms of is it toxic or is | | | |
| | 55: 13 | it not toxic issues.  That was | | | |
| | 55: 14 | irrelevant to the question that | | | |
| | 55: 15 | they would come down on people | | | |
| | 55: 16 | that said something they didn't | | | |
| | 55: 17 | like.  And if everybody did that, | | | |
| | 55: 18 | we would not have a scientific | | | |
| | 55: 19 | process.  So, I became incensed on | | | |
| | 55: 20 | academic freedom issues, and that | | | |
| | 55: 21 | was my real motivating factor. | | | |
| 20 **59:17** - **60:17** | | Fries, James 2006-06-16 | 00:00:39 | | |
| | 59: 17 | Let me just very quickly ask | | **Re: 59:17-60:17** | Overruled |
| | 59: 18 | you one question backing up. | | **Def Obj:** 401, 402, 403.  Phone call between Dr. Fries and Dr. Sherwood occurred over two years before Mr. Smith started using Vioxx and has no probative value whatsoever in a post-label change case.  Document referenced at 60:12-17 is an earlier draft of the Fries letter, which is irrelevant and prejudicial. | |
| | 59: 19 | During the conversation of | | | |
| | 59: 20 | October 28, 2000 with Dr. Sherwood, did | | | |
| | 59: 21 | he ever tell you that the data that Dr. | | | |
| | 59: 22 | Singh was relying upon or presented by | | | |
| | 59: 23 | Dr. Singh was incorrect? | | | |
| | 59: 24 | MR. RABER:  Object to form. | | | |
| | 60: 1 | THE WITNESS:  No, I don't | | | |
| | 60: 2 | believe so. | | | |
| | 60: 3 | - - - | | | |
| | 60: 4 | (Whereupon, Deposition | | | |
| | 60: 5 | Plaintiff's Exhibit Fries.0008, | | | |
| | 60: 6 | "Merck Damage Control Activities | | | |
| | 60: 7 | Confidential Draft Document" | | **Pltf. Resp:** This testimony is relevant for all of the reasons outlined previously | |
| | 60: 8 | 11-17-00 FRI0000075 - FRI0000077, | | | |
| | 60: 9 | was marked for identification.) | | | |
| | 60: 10 | - - - | | | |
| | 60: 11 | BY MR. RAFFERTY: | | | |
| | 60: 12 | Q.   I'm going to show you a copy | | | |
| | 60: 13 | of what's been identified or marked as | | | |
| | 60: 14 | Fries 0008, and if you would look at the | | | |
| | 60: 15 | third full paragraph.  This appears to be | | | |
| | 60: 16 | a "Confidential Draft Document", it says | | | |
| | 60: 17 | at the top, November 27th? | | | |
| 21 **68:19** - **69:15** | | Fries, James 2006-06-16 | 00:00:39 | | |
| | 68: 19 | Why did you write Ray | | **Re: 68:19-69:15** | Overruled |
| | 68: 20 | Gilmartin a letter? | | **Def Obj:** 401, 402, 403. | |
| | 68: 21 | A.   I was concerned with some | | **Pltf. Resp**: Testimony as stated above is relevant to Plaintiff's failure to warn claim | |
| | 68: 22 | internal practices at Merck which I felt | | | |
| | 68: 23 | infringed on academic freedom, and I felt | | | |
| | 68: 24 | it was not in Merck's interest to | | | |

| | | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|
| | 69: 1 | continue those.  I attempted to make that | | | |
| | 69: 2 | case to them, and it concerned, in | | | |
| | 69: 3 | particular, a lot of allegations around | | | |
| | 69: 4 | the Vioxx drug. | | | |
| | 69: 5 | Q.   Had you had some | | | |
| | 69: 6 | interactions with Merck at this point? | | | |
| | 69: 7 | A.   No.  Prior to the Sherwood | | | |
| | 69: 8 | call, I had no interactions whatsoever | | | |
| | 69: 9 | with Merck. | | | |
| | 69: 10 | Q.   Now, by "Sherwood call," are | | | |
| | 69: 11 | you talking about Louis Sherwood? | | | |
| | 69: 12 | A.   Yes. | | | |
| | 69: 13 | Q.   The Merck vice president? | | | |
| | 69: 14 | A.   Yes.  He was vice president | | | |
| | 69: 15 | for medical affairs or some such title. | | | |
| 22 **80:12** - **81:2** | | Fries, James 2006-06-16 | 00:00:21 | **Re: 80:12-81:2** **Def Obj:** 401, 402, 403. **Pltf. Resp:** Testimony relevant to failure to warn and negligence claims. | Overruled |
| | 80: 12 | Q.   Did you go to a lot of care | | | |
| | 80: 13 | to make sure it was accurate? | | | |
| | 80: 14 | A.   Yes. | | | |
| | 80: 15 | Q.   Did you write it and rewrite | | | |
| | 80: 16 | it and rewrite it? | | | |
| | 80: 17 | A.   Yes. | | | |
| | 80: 18 | Q.   How long did it take you to | | | |
| | 80: 19 | finally get that in final form? | | | |
| | 80: 20 | A.   Well, we saw a draft a | | | |
| | 80: 21 | little while ago which was back in | | | |
| | 80: 22 | November I think, and then it came out on | | | |
| | 80: 23 | January 9. | | | |
| | 80: 24 | Q.   About six weeks? | | | |
| | 81: 1 | A.   So, I'd say six weeks or so, | | | |
| | 81: 2 | yes. | | | |
| 23 **81:9** - **82:5** | | Fries, James 2006-06-16 | 00:00:44 | **Re: 81:9-82:5** **Def Obj:** 401, 402, 403. **Pltf. Resp:** Same response | Overruled |
| | 81: 9 | Q.   I want you to focus on that | | | |
| | 81: 10 | for a minute because I want to ask you, | | | |
| | 81: 11 | did you get a followup phone call or two | | | |
| | 81: 12 | from people at Merck after you sent your | | | |
| | 81: 13 | letter? | | | |
| | 81: 14 | A.   Yes. | | | |
| | 81: 15 | Q.   Do you remember anything at | | | |
| | 81: 16 | all about those conversations and what | | | |
| | 81: 17 | was said? | | | |
| | 81: 18 | A.   Yes, a little bit.  One was | | | |
| | 81: 19 | from a vice president who offered to show | | | |
| | 81: 20 | me any data that I wanted to see.  That | | | |
| | 81: 21 | wasn't my major thing.  I knew the data | | | |
| | 81: 22 | would come out, so, I had other things to | | | |
| | 81: 23 | do, so, I declined that. | | | |
| | 81: 24 | A. second one was from Dr. | | | |
| | 82: 1 | Anstice, and he told the -- of a | | | |
| | 82: 2 | four-part plan that Merck had to remedy | | | |
| | 82: 3 | the problem and that they were taking | | | |
| | 82: 4 | action in terms of changing their | | | |
| | 82: 5 | internal operations -- | | | |
| 24 **82:9** - **83:17** | | Fries, James 2006-06-16 | 00:00:46 | **Re: 82:9-83:17** | Overruled |
| | 82: 9 | Q.   -- first of all, there is a | | | |

| | | | | Objections | Ruling in Barnett |
|---|---|---|---|---|---|
| | 82: 10 | David Anstice who is the head at the time | | **Def Obj:** 401, 402, 403. Additionally, Mr. Lanier's comments about the backgrounds of Mr. Gilmartin and Mr. Anstice are prejudicial and argumentative.<br>**Pltf. Resp:** Relevant to failure to warn and negligence claims. Plaintiff's counsel merely corrected Dr. Fries' misstatement that Mr. Gilmartin is a doctor. Permissible to ensure that the record is not unclear | |
| | 82: 11 | of Merck health, the whole Merck health | | | |
| | 82: 12 | end. | | | |
| | 82: 13 | A.   Yes. | | | |
| | 82: 14 | Q.   He's not actually a doctor, | | | |
| | 82: 15 | though, so when you say Dr. Anstice, you | | | |
| | 82: 16 | may have assumed he was a doctor -- | | | |
| | 82: 17 | A.   I may have assumed that -- | | | |
| | 82: 18 | Q.   All right. | | | |
| | 82: 19 | That's the same David | | | |
| | 82: 20 | Anstice? | | | |
| | 82: 21 | A.   It is the same person. | | | |
| | 82: 22 | Q.   Okay. | | | |
| | 82: 23 | Now, David Anstice has | | | |
| | 82: 24 | testified in this case, and David Anstice | | | |
| | 83: 1 | has said that he was charged with | | | |
| | 83: 2 | investigating your letter by Ray | | | |
| | 83: 3 | Gilmartin. | | | |
| | 83: 4 | A.   Yes. | | | |
| | 83: 5 | Q.   Are you aware of that? | | | |
| | 83: 6 | A.   Well, Dr. Gilmartin said | | | |
| | 83: 7 | that he was going to do that in his | | | |
| | 83: 8 | letter to me. | | | |
| | 83: 9 | Q.   I don't mean to interrupt | | | |
| | 83: 10 | you, but you call him Dr. Gilmartin, and | | | |
| | 83: 11 | I know he's the head of all of Merck, but | | | |
| | 83: 12 | he wasn't a doctor, either.  He's an | | | |
| | 83: 13 | M.B.A. from Harvard in the business -- | | | |
| | 83: 14 | MR. RABER:  Objection to | | | |
| | 83: 15 | form. | | | |
| | 83: 16 | THE WITNESS:  Yes, I am | | | |
| | 83: 17 | positive you are correct. | | | |
| 25 89:1   -   89:9 | | Fries, James 2006-06-16 | 00:00:17 | | |
| | 89: 1 | Q.   Well, by the way, are you | | | |
| | 89: 2 | the Dr. Fries who is behind the longest | | | |
| | 89: 3 | running, largest arthritis study there | | | |
| | 89: 4 | is, the ARAMIS study? | | | |
| | 89: 5 | A.   Yes. | | | |
| | 89: 6 | Q.   How many people in that | | | |
| | 89: 7 | study? | | | |
| | 89: 8 | A.   In the various data banks, | | | |
| | 89: 9 | about 17,000. | | | |
| 26 89:12   -   89:14 | | Fries, James 2006-06-16 | 00:00:03 | | |
| | 89: 12 | Q.   How long has that been going | | | |
| | 89: 13 | on? | | | |
| | 89: 14 | A.   30 years. | | | |
| 27 89:15   -   92:8 | | Fries, James 2006-06-16 | 00:02:00 | | |
| | 89: 15 | Q.   30 years.  A lot of those | | **Re: 89:15-92:8**<br>**Def Obj:** 401, 402, 403, 602, 701, 702, calls for speculation.  This testimony regarding Naproxen is irrelevant and prejudicial.  There was no foundation laid | Overruled |
| | 89: 16 | people take naproxen? | | | |
| | 89: 17 | A.   Yes. | | | |
| | 89: 18 | Q.   Have you written up any | | | |
| | 89: 19 | papers or anybody else written up any | | | |
| | 89: 20 | papers from the largest, longest running | | | |
| | 89: 21 | study that says naproxen is five times | | | |
| | 89: 22 | better than aspirin at stopping heart | | | |

| | Objections | Ruling in Barnett |
|---|---|---|
| 89: 23  attacks?<br>89: 24          MR. RABER:  Object to form.<br>90: 1            THE WITNESS:  Our research<br>90: 2       is not -- the data banks aren't<br>90: 3       set to answer that specific<br>90: 4       question.  But we have studied the<br>90: 5       general overall toxicities, and<br>90: 6       certainly nothing jumped out with<br>90: 7       regard to cardiovascular events<br>90: 8       being protective.  Internally at<br>90: 9       what was then Syntex, who had<br>90: 10      developed naproxen --<br>90: 11   BY MR. LANIER:<br>90: 12   Q.   Syntex is a company?<br>90: 13   A.   Syntex was a company which<br>90: 14       is now, if I'm correct, it has, in a<br>90: 15       series of big fish eating littler fish,<br>90: 16       arrived as a part of Pfizer.<br>90: 17   Q.   Oh, okay.  All right.<br>90: 18          So, the company that started<br>90: 19       naproxen, go ahead.<br>90: 20   A.   Yes, yes.<br>90: 21   Q.   What happened with them and<br>90: 22       naproxen?<br>90: 23   A.   Well, Syntex.  Well, they<br>90: 24       were looking for indications of it, and<br>91: 1        one obvious indication was that you could<br>91: 2        prevent heart attacks, because the then<br>91: 3        theory of how aspirin prevented heart<br>91: 4        attacks, which was known, was that it was<br>91: 5        an action on the platelets.  And the<br>91: 6        action of the platelets by aspirin is<br>91: 7        irreversible, so that for the entire life<br>91: 8        of the platelet, it --<br>91: 9    Q.   Will never clump.<br>91: 10   A.   -- will never clump.  Okay.<br>91: 11       And naproxen has a similar effect on the<br>91: 12       platelet, but it lasts only while the<br>91: 13       drug is still circulating in the<br>91: 14       bloodstream, not for the life of the<br>91: 15       platelet.  So, it's called reversible<br>91: 16       inhibition of cyclooxygenase in the<br>91: 17       platelets.  Okay.<br>91: 18          But nevertheless, because<br>91: 19       it's longer acting, one could make the<br>91: 20       case that it would prevent heart attacks,<br>91: 21       and so they did a lot of internal<br>91: 22       speculation because it would be a big<br>91: 23       market if they could make the case that<br>91: 24       it prevented heart attacks, and they<br>92: 1        never could make that case.  And the<br>92: 2        studies both before and after, if you<br>92: 3        take them in the aggregate, indicate that<br>92: 4        this is not the case.<br>92: 5    Q.   Naproxen is not the --<br>92: 6    A.   It does not prevent heart<br>92: 7        attacks to any degree which is measurable | that any of Dr. Fries's studies were set up to determine whether Naproxen is cardio-protective. Plaintiff's counsel seeks to use this misleading set of questions and answers to mislead the jury into thinking Dr. Fries has actually studied whether Naproxen is cardioprotective. This should not be allowed. Additionally, at 90:23 the witness begins speculating about what went on internally at Naproxen-maker Syntex, despite the fact that he has no personal knowledge and no foundation was laid.<br><br>Finally, the witness gives his personal opinion, not backed up by any study or supported by a foundation, that Naproxen does not prevent heart attacks to any measurable degree. This is improper expert testimony, speculation, and lacks foundation.<br>**Pltf. Resp:** Dr. Fries' testimony regarding naproxen is relevant to dispute Merck's claim that naproxen is cardioprotective. Dr. Fries is testifying to his personal knowledge of whether naproxen has proven to be cardioprotective when persons tracked by the ARAMIS database took naproxen for arthritis. Furthermore, Dr. Fries' opinion that naproxen is not cardioprotective is based on his 40 years as a practicing physician. | |

|  |  |  |  | Objections | Ruling in Barnett |
|---|---|---|---|---|---|
| | 92: 8 | in any studies. | | | |
| 28 94:21 - 95:10 | | Fries, James 2006-06-16 | 00:00:30 | **Re: 94:21-95:10** **Def Obj:** 801, 802 - hearsay statements. Also 401, 402, 403.  **Pltf. Resp:** This testimony is relevant to Plaintiff's claim that Merck actively sought to intimidate physicians so they would not communicate their concerns about the safety profile of Vioxx to the public or other physicians | Overruled 401-403, hearsay objections are new |
| | 94: 21 | Q.  In fact, when he said -- | | | |
| | 94: 22 | when you specifically told him -- or did | | | |
| | 94: 23 | you specifically tell him that you had | | | |
| | 94: 24 | never heard of harassment of | | | |
| | 95: 1 | investigators through their institutions | | | |
| | 95: 2 | before this, what was his response to | | | |
| | 95: 3 | you? | | | |
| | 95: 4 | A.  Well, it was clear that his | | | |
| | 95: 5 | response was that he believed this to be | | | |
| | 95: 6 | an appropriate action.  And at the | | | |
| | 95: 7 | closing sentence of that telephone | | | |
| | 95: 8 | conversation, I said, "Lou, you ought to | | | |
| | 95: 9 | be ashamed of yourself," and then hung | | | |
| | 95: 10 | up. | | | |
| 29 99:7 - 99:7 | | Fries, James 2006-06-16 | 00:00:01 | | |
| | 99: 7 | Q.  Good afternoon, Dr. Fries. | | | |
| 30 99:13 - 100:4 | | Fries, James 2006-06-16 | 00:00:44 | | |
| | 99: 13 | I want to follow up on | | | |
| | 99: 14 | questions about your reasons for writing | | | |
| | 99: 15 | the letter to Mr. Gilmartin.  I think you | | | |
| | 99: 16 | said that you wanted to deal with some | | | |
| | 99: 17 | things in a private way? | | | |
| | 99: 18 | A.  That's right.  I started, | | | |
| | 99: 19 | and I tried to indicate in the letter my | | | |
| | 99: 20 | great approval of Merck as a company, and | | | |
| | 99: 21 | I followed it over the years with, you | | | |
| | 99: 22 | know, top five respected companies in the | | | |
| | 99: 23 | United States and so forth.  And I | | | |
| | 99: 24 | respected a lot of the things that they | | | |
| | 100: 1 | did, respected their previous chairman | | | |
| | 100: 2 | immensely, who I now know a little bit, | | | |
| | 100: 3 | Roy Vagelos, who did extraordinary things | | | |
| | 100: 4 | for Merck from the scientific side. | | | |
| 31 100:21 - 101:13 | | Fries, James 2006-06-16 | 00:00:38 | | |
| | 100: 21 | Q.  You received a letter from | | | |
| | 100: 22 | Mr. Gilmartin in response to your letter? | | | |
| | 100: 23 | A.  Yes. | | | |
| | 100: 24 | Q.  What was your reaction to | | | |
| | 101: 1 | receiving that letter? | | | |
| | 101: 2 | A.  Well, I think any of us -- I | | | |
| | 101: 3 | was pleased that rather promptly a | | | |
| | 101: 4 | response had come which had taken the | | | |
| | 101: 5 | letter seriously and which had promised | | | |
| | 101: 6 | some action.  I recognized that it was -- | | | |
| | 101: 7 | that I was going to be running into | | | |
| | 101: 8 | damage control types of activities, so, I | | | |
| | 101: 9 | interpreted that and subsequent | | | |
| | 101: 10 | conversations as having in part some | | | |
| | 101: 11 | degree of damage control.  People wanted | | | |
| | 101: 12 | me to be happy with the actions that were | | | |
| | 101: 13 | being taken. | | | |

|  |  |  |  | Objections | Ruling in Barnett |
|---|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 32 **102:20** - **103:2** | Fries, James 2006-06-16 | 00:00:16 | | |
| 102: 20 | Were you satisfied with | | | |
| 102: 21 | Merck's response to your concerns? | | | |
| 102: 22 | A.  Yes.  And I thought about -- | | | |
| 102: 23 | I mean, they didn't say specifically what | | | |
| 102: 24 | they were going to do with Dr. Sherwood, | | | |
| 103: 1 | but they said that something was going to | | | |
| 103: 2 | happen. | | | |
| 33 **104:6** - **104:24** | Fries, James 2006-06-16 | 00:00:47 | | |
| 104: 6 | Q.  Sir, did you receive the | | | |
| 104: 7 | data relating to Vioxx that you had | | | |
| 104: 8 | requested? | | | |
| 104: 9 | A.  I didn't request data per se | | | |
| 104: 10 | for me.  I requested the data be made | | | |
| 104: 11 | available to others.  I wasn't | | | |
| 104: 12 | specifically studying -- | | | |
| 104: 13 | Q.  Were you satisfied that | | | |
| 104: 14 | Merck made that data available to others? | | | |
| 104: 15 | A.  I believe so, yes. | | | |
| 104: 16 | Q.  Is it fair to say then that | | | |
| 104: 17 | as of about March of 2001, as far as you | | | |
| 104: 18 | were concerned, the matter was closed? | | | |
| 104: 19 | A.  My job here was done. | | | |
| 104: 20 | Q.  Dr. Fries, I take it that | | | |
| 104: 21 | Merck chose not to rebut the points in | | | |
| 104: 22 | your letter, but, rather, to address your | | | |
| 104: 23 | concerns.  Is that a fair assessment? | | | |
| 104: 24 | A.  That's true. | | | |
| 34 **105:24** - **106:9** | Fries, James 2006-06-16 | 00:00:21 | | |
| 105: 24 | Q.  Dr. Fries, I want to talk to | | | |
| 106: 1 | you a little bit about, you referred to | | | |
| 106: 2 | an investigation that you did into things | | | |
| 106: 3 | that you had heard in the rumor mill.  Do | | | |
| 106: 4 | you remember that? | | | |
| 106: 5 | A.  Yes. | | | |
| 106: 6 | Q.  I take it that you didn't | | | |
| 106: 7 | have firsthand knowledge about the | | | |
| 106: 8 | matters that you've testified about in | | | |
| 106: 9 | your letter.  Is that fair to say? | | | |
| 35 **106:12** - **107:7** | Fries, James 2006-06-16 | 00:00:46 | | |
| 106: 12 | THE WITNESS:  I believe | | | |
| 106: 13 | that's probably true.  That was | | | |
| 106: 14 | one reason I tried to be as | | | |
| 106: 15 | careful and as balanced as I | | | |
| 106: 16 | could, because I was getting | | | |
| 106: 17 | dangerously toward what I would | | | |
| 106: 18 | even call hearsay if I got too | | | |
| 106: 19 | far. | | | |
| 106: 20 | BY MR. RABER: | | | |
| 106: 21 | Q.  And, of course, you can't be | | | |
| 106: 22 | expected to have firsthand knowledge of | | | |
| 106: 23 | all these things with the different | | | |
| 106: 24 | doctors that you were writing about, | | | |
| 107: 1 | right? | | | |

|  |  |  | Objections | Ruling in Barnett |
|---|---|---|---|---|

```
        107: 2         A.   That's right.
        107: 3         Q.   And is it fair to say that
        107: 4         certain doctors and Dr. Singh told you
        107: 5         things, and then you relayed that
        107: 6         information to Merck?
        107: 7         A.   Yes.

36 115:10  -  115:17   Fries, James 2006-06-16                00:00:26
        115: 10        Q.   Okay.
        115: 11              Let me go back to your
        115: 12        letter.  You've told us that you relied
        115: 13        on what you were told by doctors and Dr.
        115: 14        Singh.  Did you talk to any third parties
        115: 15        to confirm or verify what you had been
        115: 16        told by any of those doctors?
        115: 17        A.   No.

37 149:6   -  149:14   Fries, James 2006-06-16                00:00:24
        149: 6         Q.   And you talk about in your
        149: 7         letter, it was your experience that
        149: 8         certainly your mindset in 2001 was that
        149: 9         the COX-2 inhibitors looked like a
        149: 10        significant "medical advance" for dealing
        149: 11        with the serious GI problems from
        149: 12        traditional pain relievers?
        149: 13        A.   Yes.  I even took credit for
        149: 14        having created them.

38 150:6   -  150:6    Fries, James 2006-06-16                00:00:02
        150: 6         Q.   Sir, at the time --

39 150:9   -  150:21   Fries, James 2006-06-16                00:00:26
        150: 9         Q.   -- though, if you look at
        150: 10        Page 3 of your letter, in the middle of
        150: 11        the page you say, "These drugs should on
        150: 12        balance, save a substantial number of
        150: 13        lives."
        150: 14        A.   Yeah, that was actually my
        150: 15        mindset.  That's fair.
        150: 16        Q.   Okay.
        150: 17              Back in 2001.
        150: 18        A.   Yes.
        150: 19        Q.   And some of what you're
        150: 20        saying today --
        150: 21        A.   Yeah.

40 155:4   -  155:16   Fries, James 2006-06-16                00:00:27
        155: 4         Q.   Dr. Fries, we've put in
        155: 5         front of you Defense Exhibit 245.  Can
        155: 6         you identify this?
        155: 7         A.   Yes.  We've spoken to this
        155: 8         before.  This is a letter from Mr.
        155: 9         Gilmartin to me.
        155: 10        Q.   Dated January 23rd, 2001?
        155: 11        A.   Yes.
        155: 12        Q.   And I think this is the
        155: 13        letter that you've described as a
        155: 14        "thoughtful" and positive letter?
```

14

|   |   |   |   | Objections | Ruling in Barnett |
|---|---|---|---|---|---|
| | 155: 15 | A. Yes, it was a response to my | | | |
| | 155: 16 | letter of January 9th. | | | |
| 41 156:4 - 156:17 | | Fries, James 2006-06-16 | 00:00:30 | | |
| | 156: 4 | Q. Dr. Fries, I'm putting in | | | |
| | 156: 5 | front of you a document marked as Defense | | | |
| | 156: 6 | Exhibit 264. Can you tell us what that | | | |
| | 156: 7 | is? | | | |
| | 156: 8 | A. It's a letter to me from | | | |
| | 156: 9 | David Anstice, the copy to Doug Greene. | | | |
| | 156: 10 | Q. Dated February 16th, 2001? | | | |
| | 156: 11 | A. February 16th, 2001. | | | |
| | 156: 12 | Q. And is this the letter that | | | |
| | 156: 13 | came with the data that you received from | | | |
| | 156: 14 | Merck? | | | |
| | 156: 15 | A. Yes. I don't remember | | | |
| | 156: 16 | receiving any data. There must have been | | | |
| | 156: 17 | some. There are attachments noted here. | | | |
| 42 157:5 - 158:6 | | Fries, James 2006-06-16 | 00:00:52 | | |
| | 157: 5 | And by this time, there had | | | |
| | 157: 6 | been an Advisory Committee concerning | | | |
| | 157: 7 | Vioxx and Celebrex. Do you recall that | | | |
| | 157: 8 | in February of 2001? | | | |
| | 157: 9 | A. Yeah. As I say, | | | |
| | 157: 10 | reconstructing these dates and what order | | | |
| | 157: 11 | they are is really hard for me, but there | | | |
| | 157: 12 | was one roughly around there. Yeah. So, | | | |
| | 157: 13 | these data had already in that interval | | | |
| | 157: 14 | been, I guess, released pretty generally. | | | |
| | 157: 15 | Q. And have you been on FDA | | | |
| | 157: 16 | Advisory Committees before? | | | |
| | 157: 17 | A. Yes. | | | |
| | 157: 18 | Q. And has it been your | | | |
| | 157: 19 | experience that data from studies before | | | |
| | 157: 20 | the Advisory Committee are discussed at | | | |
| | 157: 21 | those meetings? | | | |
| | 157: 22 | A. The data are discussed, yes, | | | |
| | 157: 23 | at the meeting. I don't recall the exact | | | |
| | 157: 24 | details. Sometimes it's long, and | | | |
| | 158: 1 | sometimes it's short. | | | |
| | 158: 2 | Q. Has it been your experience | | | |
| | 158: 3 | that members of FDA Advisory Committees | | | |
| | 158: 4 | are respected scientists in the relevant | | | |
| | 158: 5 | fields? | | | |
| | 158: 6 | A. Yes, for the most part. | | | |
| 43 168:13 - 168:22 | | Fries, James 2006-06-16 | 00:00:23 | | |
| | 168: 13 | Q. Are you familiar, just in | | **Re: 168:13-22** | Overruled |
| | 168: 14 | your 40 years of medicine, with the idea | | **Def Obj:** 401, 402, 403, | |
| | 168: 15 | of drug companies choosing to neutralize | | 602, 611(c). At 168:1- | |
| | 168: 16 | and discredit doctors? | | 10, witness admits he has | |
| | 168: 17 | A. I was amazed earlier when we | | never seen a document | |
| | 168: 18 | saw something that said somebody was | | relating to neutralizing | |
| | 168: 19 | going to control me as part of -- that's | | doctors. Then Mr. Lanier | |
| | 168: 20 | hard to do. So, no, I've never seen | | proceeds to ask a | |
| | 168: 21 | anything like this. This is really | | question related to that. | |
| | | | | Also, assumes facts not | |

| | | | Objections | Ruling in Barnett |
|---|---|---|---|---|
| 168: 22 | unprecedented in my experience. | | in evidence, and Dr. Fries' opinions about this issue are irrelevant and prejudicial.<br>**Pltf. Resp:** Question is not leading. Dr. Fries is being shown a document that lists many of the same physicians listed in his letter to Mr. Gilmartin and indicating that Merck has a comprehensive plan to "neutralize" them. Document is relevant. Though Dr. Fries had not previously seen document, Dr. Fries has personal knowledge of the subject matter. | |
| 44 **170:23   -   171:6** | Fries, James 2006-06-16 | 00:00:23 | | |
| 170: 23 | Q.  You believe in safety first? | | | |
| 170: 24 | A.  No.  I believe that you have | | | |
| 171: 1 | a balance with pharmaceutical treatments | | | |
| 171: 2 | between the good and the harm that they | | | |
| 171: 3 | do.  Things that do a whole lot of good, | | | |
| 171: 4 | they can do quite a bit of harm.  And you | | | |
| 171: 5 | still would say that on balance, they're | | | |
| 171: 6 | good drugs.  So, it's a balance issue. | | | |