Benedict Lucchesi, M.D., Ph.D.

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

_____

IN RE: VIOXX                    )    MDL DOCKET

PRODUCTS LIABILITY              )    NO. 1657

LITIGATION                      )    SECTION L

This document relates to:       )

Case No. 2:06-CV-00810;         )    JUDGE FALLON

CHARLES LARON MASON v.          )    MAG. KNOWLES

MERCK & CO., INC.,              )

_____


    DEPONENT:    BENEDICT LUCCHESI, M.D., Ph.D.

        DATE:    Thursday, September 7, 2006

        TIME:    8:09 a.m.

    LOCATION:    615 East Huron Street

        CITY:    Ann Arbor, Michigan

    REPORTER:    RENE L. TWEDT, RPR/CRR/CSR-2907

## Benedict Lucchesi, M.D., Ph.D.

Page 2

1  APPEARANCES:
2
3  J. SCOTT NABERS
4  Blizzard, McCarthy & Nabers, L.L.P.
5  440 Louisiana
6  Suite 1710
7  Houston, Texas 77002
8  (713) 844-3750
9      Appearing on behalf of the Plaintiff.
10
11  TAREK ISMAIL
12  Bartlit, Beck, Herman, Palenchar & Scott, L.L.P.
13  54 West Hubbard Street
14  Suite 300
15  Chicago, Illinois 60610
16  (312) 494-4400
17      Appearing on behalf of the Defendant.
18
19  ALSO PRESENT:
20  Glenda Grainger, R.N.
21
22
23
24

Page 3

1          C O N T E N T S
2  WITNESS                           PAGE
3  BENEDICT LUCCHESI, M.D., Ph.D.
4  Examination by Mr. Ismail              46
5
6
7  EXHIBITS         IDENTIFICATION       PAGE
8  Number 1  Curriculum Vitae            86
9  Number 2  Expert Report               26
10 Number 3  References and Material Reviewed    127
11 Number 4  Additional References           127
12 Number 5  Deposition Notice           130
13 Number 6  APPROVe Publication         194
14 Number 7  Egan Publication            160
15 Number 8  Medical Records and Handwritten Notes   237
16 Number 9  Expert Report and Supporting Materials  238
17
18
19
20
21
22
23
24

Page 4

1  Ann Arbor, Michigan
2  Thursday, September 7, 2006
3  8:09 a.m.
4          *   *   *
5      BENEDICT LUCCHESI, M.D., Ph.D.,
6  was called as a witness herein, and after having
7  first sworn or affirmed to testify to the truth,
8  was examined and testified.
9          *   *   *
10     MR. ISMAIL:  Good morning, Doctor.
11     THE WITNESS:  Good morning.
12     MR. ISMAIL:  Before I begin the
13 questioning, I want to note that I received word
14 that there was a Cross Notice issued out of the
15 California State Court proceedings for today's
16 deposition.  I haven't seen the Notice, but that's
17 what I was told.
18     We're taking the deposition pursuant to
19 the Federal Rules today in the Mason case, and
20 inasmuch as this is Merck's first deposition on
21 Dr. Lucchesi's new and expanded report, we would
22 object, in California, to the extent someone tries
23 to use this deposition as a trial deposition, if
24 one of the Plaintiffs tried to do so, and that

Page 5

1  inasmuch as Dr. Lucchesi has case-specific opinions
2  in Mr. Mason's case, I have no doubt that I will
3  not be able to cover all the material in his
4  report today, and that Merck reserves the right at
5  some point, to -- in the event Dr. Lucchesi does
6  appear in California, to seek additional time.
7      And I'll also note for the record, no
8  one from California appeared today on behalf of
9  the Plaintiffs, no one contacted me about setting
10 up a telephone hookup, and I assume no one has
11 contacted you, Scott, from California?
12     MR. NABERS:  They have not.
13     MR. ISMAIL:  And Dr. Lucchesi, has
14 anyone from California asked you to appear at
15 trial in November?
16     THE WITNESS:  Pertaining to which case?
17     MR. ISMAIL:  Vioxx.  There's a group
18 of cases that are potentially being tried in
19 California this November.  Has anyone asked you
20 to appear in Los Angeles at trial in November?
21     THE WITNESS:  I'm not aware of any right
22 now.
23     MR. ISMAIL:  Okay.  With that preamble,
24 we can begin with the questioning.

2 (Pages 2 to 5)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 6

1        Doctor, I'm going to go ahead and mark
2   your curriculum vitae as Exhibit 1, a copy that we
3   received attached to your expert report in this
4   case.
5        (Marked for Identification:
6        Deposition Exhibit No. 1.)
7        *   *   *
8        EXAMINATION
9   BY MR. ISMAIL:
10       Q.  Now, Doctor, you and I have met before
11  and I have taken your deposition.  It was probably
12  almost a year ago this month that I last took your
13  deposition, is that correct?
14       A.  At least two times.
15       Q.  At least two times.
16       Is there any new academic appointments
17  that you have had since you and I have last
18  chatted that you can tell me about?
19       A.  No.
20       Q.  Any new publications that you have made
21  that bear on any of the issues that relate in the
22  Vioxx litigation since the last time we chatted?
23       A.  Possibly only one, which we presented in
24  2005 at the annual meeting of the American Heart

Page 7

1   Association, which is an abstract.  The paper has
2   been submitted, but it hasn't been published yet.
3        Q.  And which journal published the abstract?
4        A.  It's the journal, Circulation, which is
5   the main -- one of the main journals of the
6   American Heart Association.
7        Q.  And what was the title of that?
8        A.  You'll find it in my CV.  It's one under
9   the abstract list, probably pretty close to the
10  end of the list, if not at the end of the list.
11  The first author was Booth, B-o-o-t-h.
12       Q.  There's a Number 288 and a Number 289.
13       A.  That sounds close.
14       Q.  Both of them say Booth.
15       A.  It's -- okay, apparently, it's not
16  listed here, but it should be listed.  I guess
17  it's not listed here.  It should be, but --
18       Q.  What was the title of the abstract?
19       A.  It has to do -- I can't remember the
20  exact title, but it has to do with -- the other
21  last two abstracts you see are having to do with
22  estrogen receptor, the role of female hormone in
23  cardioprotection and the use of a COX-2 inhibitor,
24  which in this case was a drug called Nimesulide,

Page 8

1   which many people are using today as a COX-2
2   inhibitor, and it's marketed in Europe as a COX-2
3   inhibitor, and the use of a COX-2 inhibitor
4   negates the positive, beneficial effects of
5   estrogen hormone.
6        So that's why we're interested in this,
7   because many women who are in a menopausal period
8   who are on estrogen replacement therapy, if they
9   take a COX-2 inhibitor at the same time, they are
10  negating the beneficial effects of the estrogen
11  hormone.
12       Q.  And that work, was that in an animal
13  model?
14       A.  It's an animal model, yes, sir.
15       Q.  And the abstract you say was published
16  in Circulation, is that correct?
17       A.  In Circulation, yes.
18       Q.  And the full article, is that in process
19  of publication?
20       A.  As far as I can recall, the full article
21  has been submitted for review to the journal, and
22  as of yet we haven't had any feedback from the
23  editor.
24       Q.  When did you submit the article, to the

Page 9

1   best of your recollection?
2        A.  This is, what, September?  Probably
3   sometime around July.
4        Q.  Other than the one abstract relating
5   to Nimesulide and estrogen replacement and the
6   subsequent article that's in process for that same
7   research, is there any other publications you have
8   to your credit since the last time you and I spoke
9   that relate to the issues in this litigation?
10       A.  Yes.  You'll see those listed in the CV.
11  Anything that says 2006, and there are three of
12  them, and just one yesterday got accepted for
13  publication, which of course is not listed there.
14  You will see a few in 2005, so the last time we
15  spoke was sometime in 2005.
16       Q.  Let me make sure my question is clear.
17       Other than the abstract and subsequent
18  publication on Nimesulide and hormone replacement,
19  do you have any other articles since the last time
20  you and I spoke that relate to the issues in this
21  litigation?
22       A.  No.
23       Q.  Do you have any articles in the
24  pipeline, so to speak, presently, other than the

Benedict Lucchesi, M.D., Ph.D.

Page 10

1   article you have submitted on Nimesulide and
2   hormone replacement?
3       A.  No.
4       Q.  Have you lectured in the past year --
5   and when I say in the past year, since the last
6   time you were deposed -- on any of the issues
7   relevant to this litigation?
8       A.  Yes, I have.
9       Q.  And when and where was that?
10      A.  I organized a symposium last year --
11  let's see, was it last year, this year -- this
12  year, 2006, which was held in San Francisco at the
13  Annual Meeting of Experimental Biology, and the
14  symposium had a title to the effect of, COX-2
15  Inhibition on the Cardiovascular System, and I
16  chaired that symposium, and we had five or six
17  speakers who deal in this area of research speak
18  at that symposium and I was one of the speakers.
19      Q.  And did you prepare a slide show or an
20  article of any sort that was presented at that
21  meeting?
22      A.  Well, everybody used slides to
23  illustrate their talks, certainly.
24      Q.  Did you retain copies of the slides you

Page 11

1   presented?
2       A.  I probably have a file that's labeled
3   San Francisco, and 2005 or 2006, it would be.
4       Q.  I take it you didn't bring that file
5   today?
6       A.  No.
7       Q.  Any objection to producing to us the
8   slides you used at that talk?
9       A.  I could send it to you.
10          MR. NABERS:  I'll make a note of it.
11  I'll keep a list for you.
12  BY MR. ISMAIL:
13      Q.  And do you recall who the other speakers
14  were?
15      A.  Dr. FitzGerald was one of them.
16      Q.  Garret FitzGerald?
17      A.  Garret FitzGerald.
18          Yeah, there was -- the fellow, my
19  co-chair, did not show up, because he came from
20  New Orleans and his house was swept away, so he
21  could not show up, but I'm trying to think of --
22  I'm sorry, I just can't recall the names now, but
23  there had to be at least four or five people, five
24  or six people on the program.

Page 12

1       Q.  Do you -- did the other speakers on the
2   same program upon which you spoke have any
3   handouts that accompanied their talks?
4       A.  No handouts, no, they are not allowed to
5   have handouts at the symposiums.
6       Q.  Did any of the talks get -- sometimes at
7   these conferences all the talks eventually get
8   bound together in a handout or something that
9   people can have at the end of the conference.
10      A.  No, this was not published.
11      Q.  Did any of the speakers -- withdrawn.
12          Other than the conference in San
13  Francisco that you just told me about, is there
14  any other lectures that you have had in the past
15  year that relate to the issues in this litigation?
16      A.  Well, I do teach classes in
17  cardiovascular pharmacology.  I'm sure I have
18  discussed -- not given a particular lecture
19  on this subject, but I'm sure in passing, I
20  do instruct the students about the action of
21  COX-2 inhibition on the cardiovascular system.
22      Q.  Aside from your talks to students in the
23  University and your conference in San Francisco,
24  any other lectures in the past year on the areas

Page 13

1   at issue in this case?
2       A.  Not that I can recall.
3       Q.  Now, is it still the case that you're
4   not licensed to practice medicine, sir?
5       A.  That's correct.
6       Q.  Still the case that you have not ever
7   cared for a patient as that patient's treating
8   physician?
9       A.  As that patient's treating physician?
10      Q.  Yes.
11      A.  Under the supervision of other
12  physicians, I have.
13      Q.  Well, you have never been licensed to
14  practice medicine, correct?
15      A.  That's right.
16      Q.  So you have never been licensed, been
17  allowed to care for a patient as that patient's
18  primary treating physician, correct?
19      A.  I have testified to that before, yes.
20      Q.  And that's still the case, right?
21      A.  Pardon me?
22      Q.  That's still the case, correct?
23      A.  Still the case, yes.
24      Q.  And it's still the case that you have

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

## Benedict Lucchesi, M.D., Ph.D.

1    never prescribed the medicine yourself, correct?
2        A.   That's correct.
3        Q.   And is it still the case, sir, that you
4    have never published anything on Vioxx?
5        A.   That is still the case.
6        Q.   And you have published one article on
7    Celebrex, correct?
8        A.   Yes, sir.
9        Q.   And you have the one abstract on
10   Nimesulide?
11       A.   Yes, sir.
12       Q.   Any other publications having to do with
13   COX-2 inhibitors?
14       A.   Not yet.
15       Q.   Have you ever done your own laboratory
16   research on Vioxx?
17       A.   Yes.
18       Q.   Have you written up any of that
19   research?
20       A.   Not for publication.
21       Q.   Are you relying upon your own laboratory
22   research on Vioxx for your opinions in this case?
23       A.   In part.
24       Q.   Do you have that data and analysis to

1    turn over to Merck in this case?
2        A.   No, I do not.
3        Q.   Are you willing to do so?
4        A.   No, I'm not.
5        Q.   Now, you have obviously been retained in
6    Mr. Mason's lawsuit against Merck, is that correct?
7        A.   Yes, sir.
8        Q.   Any other Vioxx-related lawsuits in
9    which you have been retained since the last time
10   you testified, other than Mr. Mason's case?
11       A.   I can't recall when I was retained, but
12   I have been retained on other cases, yes.
13       Q.   And do you recall, what cases are those?
14       A.   There's one in Florida that I know of.
15   There's one with Gofrank & Lewis in Houston.
16   Those are the two, with respect to Vioxx.
17       Q.   Have you been retained in any other
18   litigation since the last time you and I spoke?
19       A.   With respect to Vioxx?
20       Q.   With respect to anything.
21       A.   I have been retained by a California
22   firm, but it has to do with Celebrex.
23       Q.   Which firm retained you?
24       A.   I don't recall the name.  It's a joint

1    venture, a number of firms.
2        Q.   Have you prepared a report in your
3    Celebrex case?
4        A.   No.
5        Q.   Do you --
6        A.   Oh, wait a minute.  The Celebrex case?
7        Q.   Yes, sir.
8        A.   Yes, I did prepare a report, yes.
9        Q.   And has that report been issued?
10       A.   It was sent to the law firm.
11       Q.   Have you been deposed in the Celebrex
12   cases?
13       A.   No.
14       Q.   Other than your one retention in
15   California for Celebrex, have you been retained by
16   any other attorneys for Celebrex?
17       A.   Not that I can think of.
18       Q.   Have you been retained in any Bextra
19   cases?
20       A.   I think the Celebrex case also covers
21   Bextra.
22       Q.   And did you issue opinions about
23   Celebrex and Bextra?
24       A.   Yes, I did.

1        Q.   In your opinions in the Celebrex
2    cases -- withdrawn.
3            With regard to the question of
4    whether -- the rank ordering of cardiovascular
5    risk with Vioxx, Celebrex and Bextra, have you
6    formed an opinion as to whether those medicines
7    can be ranked in terms of cardiovascular risk?
8        A.   Yes, I have.
9        Q.   And what is your opinion in that regard?
10       A.   Well, it depends on the patient
11   population you're dealing with.
12           And if you take Bextra, I think it's
13   the simplest one to discuss.  The clinical trials
14   with Bextra were done in a population that had
15   been subjected to cardiopulmonary bypass
16   procedures, and thus, these were critically ill
17   patients who received Bextra or the injectable
18   form of Bextra, Parecoxib, and ultimately received
19   Bextra, which is Valdecoxib, by the oral route,
20   and the adverse events occurred within a
21   relatively short period of time.  And I mean by
22   relatively short, I mean days, 24 hours, or a few
23   days more.
24           So the rapid onset of thrombotic events

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 18

1  that occurred in those cases illustrate very
2  nicely, unfortunately for the patients, but very
3  nicely the fact that a diseased vascular bed is
4  going to be exquisitely subjected -- subjective to
5  an adverse thrombotic event on inhibited COX-2.
6  So that's an extreme case, where these drugs are
7  used for pain management in critically ill
8  patients.
9        With Celebrex, I think the adenoma polyp
10  study, the APC study, demonstrated quite nicely
11  a dose/response relationship; that is, as you
12  increase the dose, you increase the risk, which is
13  pharmacology is the -- is the crucial test of a
14  drug, and if you can show a response to the dose,
15  that's a clear indication that the drug is causing
16  an effect.  And in this instance, as the dose of
17  Celebrex was increased, the adverse event incident
18  was increased.
19        Celebrex is a slightly different drug
20  from Vioxx, both in chemical structure and in
21  activity.  It's a relatively weak COX-2 inhibitor,
22  but then again, all of the actions of these drugs
23  not related to COX-2 inhibition we now know that
24  there are other actions of these drugs, and

Page 19

1  Celebrex differs significantly from Vioxx with
2  respect to those other actions.
3        Q.  I believe you have stated in your report
4  that the cardiovascular risks associated with
5  Vioxx can be considered a class effect of all
6  COX-2 inhibitors, is that a correct statement?
7        A.  That is a correct statement, yes.
8        Q.  And are you aware of pronouncements from
9  the U.S. Food and Drug Administration that the
10  COX-2 inhibitors cannot be ranked in order of
11  cardiovascular risk, have you seen that statement?
12        A.  I have seen that, but then again,
13  depends on what they are talking about,
14  cardiovascular risk.
15        Q.  Do you believe that the risk of
16  thrombotic events, cardiovascular and
17  cerebrovascular thrombotic events, is a class
18  effect amongst all COX-2 inhibitors?
19        A.  It's a class effect as far as COX-2
20  inhibition is concerned, that's what we mean by
21  class effect.  COX-2 inhibition, they all inhibit
22  COX-2.
23        Q.  And are you aware that the Food and Drug
24  Administration has stated that the risk of adverse

Page 20

1  thrombotic events that -- with respect to those
2  risks, that one cannot rank Bextra, Celebrex and
3  Vioxx in terms of the risk of those types of
4  outcomes?
5        A.  I think I just indicated that Bextra is,
6  I would almost say, quite unique in its actions in
7  terms of -- it's because of the condition under
8  which it was used, so you have to look at the
9  substrate or the patient population you're dealing
10  with.
11        So if you want to rank things with
12  respect to risk, you have to study them all in the
13  same subject patient population.  So if you want
14  to do patients with cardiopulmonary bypass and
15  test all of the COX-2 inhibitors in that setting,
16  I'm pretty convinced that you would see the same
17  result with all of them.
18        So that's the trouble with clinical
19  trials, you're dealing with a mixture of patients,
20  and no two trials are the same, so how do you
21  rate, how do you rank risk, and that's the problem
22  the FDA has.  And I'm not faulting them, but
23  that's what they have to deal with.
24        Q.  So if I understand your opinions

Page 21

1  correctly in this area, you view the clinical
2  trial data with Bextra in post-bypass patients as
3  being one of -- that showed an extreme risk, but
4  that may just relate to the testing parameters in
5  which that study was conducted?
6        A.  That relates, yes, very closely to the
7  testing conditions under which it was tested, but
8  then again, as I indicated, I believe that any
9  COX-2 inhibitor would have produced the same
10  outcome.
11        Q.  And Vioxx and Celebrex, with regard to
12  the APC trial and the APPROVe trial, were similar
13  patient populations, correct?
14        A.  Well, one was colorectal polyps, the
15  regression, the other was the prevention.  The
16  APC trial was the prevention of the new polyps
17  formation.
18        Q.  And Celebrex and Vioxx had similar
19  results in the APC and the APPROVe trials,
20  correct?
21        A.  Yes, which is quite interesting, because
22  that definitely demonstrates beyond any question
23  that we're dealing with a class effect, because
24  the drugs do differ in chemical structure.  The

6 (Pages 18 to 21)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 22

1  one thing they do have in common is the COX-2
2  inhibition. And they differ in other respects,
3  as well.
4      Q. And have you seen pronouncements from
5  the FDA that the adverse cardiovascular thrombotic
6  risks are a class effect of all NSAIDs?
7      A. To different degrees. The fact that
8  they all produce COX-2 inhibition, they all expose
9  one to a risk of thrombosis, the question is what
10  is the degree of risk, and the NSAIDs are less
11  likely, although quite capable, under the right
12  setting.
13      And I think we have to understand right
14  from the outset here what we're dealing with is
15  patients with serious vascular disease. That's
16  an entirely different picture than when you're
17  dealing with patients who are free of vascular
18  disease. So if you expose someone with serious
19  vascular disease to an NSAID, you can expect an
20  incidence of adverse events. It may not be as
21  great as what you see with Vioxx or with Bextra,
22  but it will be there.
23      Q. Okay. Let me make sure I understand
24  what you're saying. You would agree that the risk

Page 23

1  of thrombotic events is a class effect of all
2  NSAIDs, just taking that as a basic principle,
3  correct?
4      A. Yes, sir.
5      Q. And you believe that non-selective
6  NSAIDs perhaps have a lower degree of risk than
7  selective COX-2 inhibitors?
8      A. Yes, sir.
9      Q. Are you aware that the Food and Drug
10  Administration has stated that one cannot conclude
11  that nonselective NSAIDs have any lower risk than
12  selective COX-2 inhibitors with regard to
13  cardiovascular risk?
14      A. They are entitled to their opinion on
15  that. So am I.
16      Q. You're aware that that has been the
17  official position of the FDA, correct?
18      A. I'm also aware that they don't do research.
19  They look at data, clinical data. I do research.
20      Q. All right. So let me just make sure we
21  come to an agreement what the history is.
22      You're aware that the FDA has made the
23  pronouncement that one cannot conclude that
24  traditional NSAIDs have any lower cardiovascular

Page 24

1  risk than selective COX-2 inhibitors?
2      A. That might be the FDA's conclusion, but
3  I bring to this table my experience, my knowledge,
4  my experimental results.
5      Q. So you're aware that's the FDA's
6  conclusion, but you disagree with it, is that fair
7  to say?
8      A. No, I agree with their conclusion,
9  because it's based on what they know, but I also
10  agree with my conclusion based upon what I know,
11  and that's what I bring to this table, my
12  expertise.
13      Q. All right. Any other lawsuits or
14  litigation in which you have been retained other
15  than the Celebrex/Bextra litigation that we have
16  just been talking about?
17      A. Any other litigation besides dealing
18  with COX-2 inhibitors?
19      Q. Yes, sir.
20      A. Nothing else with respect to COX-2
21  inhibitors.
22      Q. Anything with respect to any litigation
23  in the past year?
24      A. I have reviewed other documents

Page 25

1  pertaining to other drug effects, but nothing
2  pertaining to COX-2 inhibitors.
3      Q. Anything relating to NSAIDs?
4      A. No.
5      Q. Anything relating to cardiovascular
6  disease?
7      A. Oh, yes.
8      Q. What medicines have you reviewed in a
9  litigation setting in the past year other than
10  COX-2 inhibitors?
11      A. Well, I have looked at medical/legal
12  cases dealing with the use of anticoagulants.
13      Q. Which ones?
14      A. Heparin, Plavix, things of that nature.
15      Q. Have you prepared any expert reports in
16  those other cases?
17      A. No.
18      Q. By the way, do you have any testimony
19  scheduled to be given in the Celebrex case?
20      A. There's no testimony that I know that's
21  scheduled.
22      MR. ISMAIL: I'm going to mark my
23  version of your expert report and we will
24  substitute this with the other.

7 (Pages 22 to 25)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 26

1       MR. NABERS:  We can do that.
2       (Discussion held off the record.)
3       (Marked for Identification:
4       Deposition Exhibit No. 2.)
5  BY MR. ISMAIL:
6       Q.  Now, Doctor, you certainly recognize
7  Exhibit 2 as your expert report in this case?
8       A.  Yes, I do.
9       Q.  And does Exhibit 2 contain all the
10 opinions you intend to offer at trial?
11      A.  At the present time.  I do reserve the
12 right to change my opinions as things progress and
13 new information becomes available.
14      Q.  As you sit here today, are you aware
15 of any change in your opinions that need to be
16 reflected in Exhibit 2?
17      A.  I think this is about as updated as it
18 can be.
19      Q.  Is there any opinion that, as you sit
20 here today, that you believe you're going to be
21 offering at trial that's not contained in Exhibit 2?
22      A.  Not that I am aware of right now.
23      Q.  Have you been asked to do additional
24 work in any area that is not otherwise described

Page 27

1  in Exhibit 2?
2       A.  Well, I don't have to be asked to do any
3  work.  This is my work.  I research this on a
4  daily basis.
5       Q.  Have the Plaintiff Counsel asked you to
6  look at any additional documents other than those
7  that you have discussed in Exhibit 2?
8       A.  The only additional documents were the
9  ones that -- I think that were already forwarded
10 to you.  I was asked to -- a few days ago to
11 provide any new references, and I think there were
12 about three or four or five or six references that
13 I did provide.
14      MR. ISMAIL:  And let me go ahead and
15 mark, then, as Exhibits 3 and 4 -- first Exhibit 3
16 and then Exhibit 4.
17      (Marked for Identification:
18      Deposition Exhibit Nos. 3, 4.)
19 BY MR. ISMAIL:
20      Q.  Now, Doctor, I believe Exhibit 3 is the
21 list of references and materials reviewed that was
22 served along with your report, originally, a few
23 weeks ago, is that correct?
24      A.  I'm just looking through this to see

Page 28

1  what Exhibit 3 is all about.  I notice there in
2  Exhibit 3 somehow my publications got included in
3  this, which have nothing to do with the case we're
4  discussing, on the subject we're discussing.
5  These are all my publications or what's in my CV.
6       Q.  I see.  Okay.  Let me try to break this
7  down.  In the References 1 through 76, those are
8  the footnoted references to your report of the
9  literature cited in your report, correct?
10      A.  I'm trying to locate that.
11      Q.  The very first five or six pages.
12      A.  The first five or six pages.  Yes,
13 that's right, yes.
14      Q.  And then somehow or another, a list of
15 some of your publications snuck into here, and
16 then that proceeds.  Then we get to a section that
17 says documents reviewed by yourself, correct?
18      A.  Yes.
19      Q.  And then that proceeds for several pages
20 and then we're back to your abstracts?
21      A.  Those are not my abstracts, these are
22 the literature abstracts.
23      Q.  Actually, they are yours.
24      MR. NABERS:  Well, you're looking at two

Page 29

1  different things.  He is looking at the back.  I
2  think you're still in the middle.
3       MR. ISMAIL:  I see.  Okay.  And then, so
4  this is what I'm going to do.
5       MR. NABERS:  The goal here was to try to
6  give you everything that he would rely on in terms
7  of a bibliography.  It would have included his
8  publications and abstracts, as well as what he has
9  reviewed from the literature, and as well as those
10 contained in his expert report, but it's kind of
11 all bound into one document.
12 BY MR. ISMAIL:
13      Q.  Well, since Exhibit 4 is much shorter
14 and easier, let's identify that.
15      Is Exhibit 4 the list of new references
16 you provided a few days ago?
17      A.  Yes, sir.
18      Q.  Other than what was originally listed in
19 your -- as appended to your expert report last
20 month and what is listed in Exhibit 4, are there
21 any other materials upon which you're relying in
22 this case?
23      A.  Not at the present time.  I think this
24 is the most recent literature search that I

Benedict Lucchesi, M.D., Ph.D.

Page 30

1    conducted.
2        Q.   Are you waiting on any documents that
3    you have requested from Plaintiff's Counsel that's
4    not discussed in Exhibits 3 and 4?
5        A.   I have not requested any.
6        MR. ISMAIL:  Let me mark the Notice for
7    today's deposition as Exhibit 5.
8        (Marked for Identification:
9        Deposition Exhibit No. 5.)
10   BY MR. ISMAIL:
11       Q.   By the way, Doctor, do you have any
12   objection to producing to us the report you
13   prepared in the Celebrex --
14       A.   I don't think I'm at liberty to do that.
15       Q.   The -- but you do have a copy, correct?
16       A.   Not a paper copy.
17       Q.   You have an electronic copy?
18       A.   Yes, sir.
19       Q.   The Notice for today's deposition
20   includes a request for certain documents.
21       A.   Which, incidentally, I never received.
22       Q.   Okay.  That was going to be my first
23   question.
24           Have you issued any invoices relating

Page 31

1    to Vioxx litigation since the last time you
2    testified?
3        A.   I have not issued any invoices, but
4    invoices that I have issued in the past are
5    finally being paid.
6        Q.   Okay.  So you have -- with respect to
7    the work that you did to issue a new report in
8    your review of Mr. Mason's case; in particular,
9    have you kept track of the time that you have
10   spent on that?
11       A.   Yes, sir.
12       Q.   Have you invoiced, yet, Plaintiff's
13   Counsel for that?
14       A.   No, sir.
15       Q.   Did you receive a retainer at the start
16   of your work?
17       A.   I did.
18       Q.   And how much was that?
19       A.   $5,000.
20       Q.   And have you exceeded the time that
21   would be eaten up by that $5,000?
22       A.   I'm ashamed to say, many times over.
23       Q.   And do you intend to issue an invoice
24   for the time you have spent?

Page 32

1        A.   I will.
2        Q.   And how much time have you spent or at
3    least that which will be reflected on an invoice
4    for the balance?
5        A.   Well, as you can see from the size of
6    that document, a lot of it is new, in particular,
7    the literature search.  I have spent a tremendous
8    amount of time, but that's not the amount of time
9    I'm going to bill, because part of this is
10   education for me, it's part of my work, so I'm
11   still contemplating how best to be fair in issuing
12   such an invoice.
13           As I think I have indicated to you
14   before, I don't do this for the money, I do it
15   because it's part of my responsibilities, and I
16   enjoy doing it, I enjoy learning, and this is
17   one of the ways I learn.
18       Q.   Have you -- are there any other
19   Plaintiffs' firms other than Mr. Nabers' firms
20   for whom you need to prepare invoices?
21       A.   No.
22       Q.   Is there any other specific Plaintiff
23   files, and by that I mean as opposed to your
24   general opinions about the medicine, that you are

Page 33

1    currently working on for Vioxx?
2        A.   Not for Vioxx, no.
3        Q.   For Celebrex?
4        A.   Not for Celebrex.
5        Q.   So do you have an estimate, as you sit
6    here today, about how much additional funds you
7    will be invoicing Mr. Mason's Counsel for?
8        A.   I have not, really.  I would like to
9    talk to Mr. Nabers about this at some point as to
10   how to be equitable about this, and as a matter of
11   fact, I mentioned it to him yesterday, that I
12   was -- I have put in a lot of time, a lot of time,
13   but then again, that's my responsibility, to do a
14   thorough job.
15       Q.   The last time you and I spoke, and I
16   believe you were alluding to this fact a moment
17   ago, that you had funds owed to you by various
18   different Plaintiff firms that had not yet been
19   paid?
20       A.   Well, I think they are all paid off now.
21       Q.   Do you have an estimate as to how much
22   in total you have been paid in the Vioxx cases?
23       A.   In Vioxx cases?
24       Q.   Yes, sir.

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 34

1      A.  Since the beginning of the year?
2      Q.  Well, in total, if that's -- if you're
3   able to do that.
4      A.  Last year, I think my additional income
5   from these cases, probably somewhere in the
6   neighborhood of $50,000.  I should add that a good
7   part of the money that I earned was not given to
8   me directly, that it went into my University
9   research fund to support my research.
10     Q.  And so when you say last year, you mean
11  2000-- calendar year 2005?
12     A.  2005.
13     Q.  And how much have you been paid by
14  Plaintiff lawyers in 2006?
15     A.  In 2006, I have received back payments
16  that were due, it's about $25,000, $30,000.
17     Q.  Do you have any correspondence with any
18  Plaintiff Counsel in the Vioxx cases since last
19  time you were deposed?
20     A.  Correspondence in Vioxx cases, not that
21  I'm aware of.
22     Q.  Any e-mails?
23     A.  I do not keep my e-mails, I trash them
24  after I read them, but I get an occasional e-mail

Page 35

1   from a patient who wants information concerning
2   Vioxx, and I answer those e-mails.
3      Q.  How about the Plaintiff lawyers who have
4   retained you?
5      A.  Plaintiff lawyers, the only ones that
6   have -- I would say 2006, Mr. Nabers' firm,
7   Ms. Glenda, we will send e-mails back and forth;
8   we have a meeting tomorrow, have you seen this
9   last publication, things of that nature.
10     Q.  And have you retained any of those
11  e-mails?
12     A.  No.
13     Q.  Do you have any notes of Mr. Mason's
14  case or his medical files or charts that you have
15  prepared or other work product relating to him?
16     A.  I have what was provided to me by the
17  law firm, which is his medical history, his
18  hospital records.
19     Q.  Those are -- do you understand those to
20  be the original medical records?
21     A.  Yes.
22     Q.  Copies of the original?
23     A.  Copies, yes.
24     Q.  Have you prepared anything on your own

Page 36

1   to sort of make notes about his medical history or
2   background?
3      A.  I have a couple pages of handwritten
4   notes, yes.
5      Q.  And do you have those today?
6      A.  I do.  His medical records and my
7   handwritten notes.
8      Q.  Do you have anything on your computer
9   where you prepared any charts of his laboratory
10  tests or anything of that sort?
11     A.  Whatever is on my computer, you have
12  before you in paper form.
13     Q.  Anything you have by way of notes or
14  that you have made in the margin of any medical
15  records or any of the publications?
16     A.  It would be right there.
17     Q.  How about in the -- sort of the medical
18  literature, do you ever summarize for yourself
19  just sort of a cheat sheet of clinical studies
20  done and what the protocols of the studies, that
21  kind of thing?
22     A.  No.
23     Q.  I'm going to keep this and we're going
24  to go over it in a little bit, but if you don't

Page 37

1   mind, I'm just going to hold onto it for now.
2          Have you reviewed any depositions given
3   by any experts in the Vioxx cases?
4      A.  Not with -- not with respect to this
5   case, but I have, of course, in the past looked at
6   witnesses' deposition, yes.
7      Q.  When you say in the past, you're
8   referring to before other lawsuits, other trials?
9      A.  Other cases, sure.
10     Q.  So have you reviewed any depositions of
11  Mr. Mason's doctors?
12     A.  No.
13     Q.  Have you reviewed Mr. Mason's
14  deposition?
15     A.  No.
16     Q.  Any other witnesses that were specific
17  to Mr. Mason?
18     A.  Not that I know of.
19     Q.  Have you reviewed any of the depositions
20  given by any of the experts on Mr. Mason's case in
21  particular?
22     A.  Sorry, here's the rest of his hospital
23  record.
24         Apparently, that's it.

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

## Benedict Lucchesi, M.D., Ph.D.

Page 38

1    Q.  Okay.  So to the best of your knowledge,
2  you have never reviewed a deposition given by any
3  experts specific to Mr. Mason, right?
4    A.  Not that I can recall right now, unless
5  somebody can clarify that point for me.
6    Q.  Have you reviewed any expert reports
7  submitted by any of the other experts retained by
8  Mr. Mason?
9    A.  No.
10    Q.  Okay.  If you, sir, could -- let me ask
11  that differently.
12       You make reference in your expert report
13  at times to internal Merck documents, is that
14  correct?
15    A.  Yes, sir.
16    Q.  Are all the internal Merck documents
17  that you have reviewed and are relying upon for
18  your opinions in this case listed in exhibits --
19  Exhibit 3 or otherwise noted in your expert
20  report?
21    A.  I can't guarantee that they are all
22  listed, because I can say I have reviewed so much
23  material over the last, what, since 2000, that
24  it's hard to remember what I've reviewed, but I

Page 39

1  did my best to provide what I did have available
2  in form for listing, but I received, you know,
3  just lots of CDs with internal documents, most of
4  them I couldn't even open, so I can't say I have
5  listed everything.
6    Q.  All the internal Merck documents that
7  you have reviewed were selected by the Plaintiff's
8  Counsel to send you, right?
9    A.  Oh, not -- well, yes, yes, provided to
10  me, yes.
11    Q.  And out of the universe of materials
12  that Merck has made available in these cases, it
13  is the Plaintiff lawyers who decided what internal
14  materials you would be reviewing and which you
15  wouldn't be reviewing, right?
16    A.  I made the decision on what I would
17  review.  I mean, I received a lot of documents
18  that I just cast aside because they really were
19  not relevant to the science.
20    Q.  Let me restate my question.
21       All the Merck, internal Merck documents
22  that you have been provided with, that was
23  available for you to review, were selected by the
24  Plaintiff's Counsel to send to you, correct?

Page 40

1    A.  Well, obviously, because they are the
2  only ones with access to those.  I don't have
3  access to those documents.
4    Q.  Have you reviewed any internal Merck
5  documents since the last time you testified?
6    A.  Just what I had at my disposal at the
7  time that I testified before.
8    Q.  All right.  So you may have re-reviewed
9  materials provided years ago, but nothing new in
10  the past year, correct?
11    A.  That's right, yes.
12    Q.  Now, you know what an investigational
13  new drug application is, correct?
14    A.  Yes, sir.
15    Q.  Can you tell me what your understanding
16  is of that submission?
17    A.  Well, what do you mean by my
18  understanding of the submission?
19    Q.  What is an investigational new drug
20  application?
21    A.  Well, the drug company feels that
22  they have sufficient information to institute a
23  clinical trial.  They will provide information to
24  the FDA concerning their research that they have

Page 41

1  done up to that point, basic information, and they
2  are requesting the opportunity and the right to go
3  to the next step to conduct studies in humans.
4    Q.  In the drug development process, at
5  least to conduct human clinical testing in the
6  United States, the FDA has to grant someone
7  permission to do that, correct?
8    A.  That is correct.
9    Q.  And the IND is the process by which that
10  occurs?
11    A.  That's one of the steps that they have
12  to go through, where you provide the FDA with
13  enough data that the FDA can make a decision that
14  this is safe and worthy of pursuing the study in
15  humans and addresses an important problem for
16  which there are a few drugs that -- in some cases,
17  the only drug -- that meets these criteria or has
18  exceptional properties; therefore, they consult
19  with the company, the company consults with the
20  FDA, it's a two-way process, where they then draw
21  up a clinical protocol that they propose and they
22  go forward with the clinical trial.
23    Q.  And so the IND includes the laboratory
24  and animal testing that demonstrates that a new

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 42

1    medicine is safe enough to test in humans,
2    correct?
3        A.  Well, it doesn't say it's safe to test
4    in humans, because that's where the phase one
5    clinical trial comes in, where you look for
6    safety, you look for adverse side effects, as best
7    as you can determine.  These studies are usually
8    done among volunteers, except if you're doing a
9    study for a serious disease like, say, cancer,
10   where you may use cancer patients rather than
11   subject a normal individual to a drug that could
12   be harmful.  Most -- many cancer drugs are harmful
13   to normal tissue.
14           In this particular instance, I would
15   assume that the new drug, the IND contains data,
16   primarily toxicology data, that's the important
17   one.  There's a lot of data with respect to the
18   synthesis of the drug, the FDA will review.
19   Pharmacokinetic data, that's important.  All of
20   this is based on preclinical studies.
21           Based upon this, the FDA has to make a
22   judgment, is this safe enough, do we have enough
23   information to guarantee the safety of the
24   subjects who are going to be exposed to the drug.

Page 43

1        Q.  And the FDA has scientists who are
2    there at the agency to review INDs and make that
3    assessment regarding the potential safety of the
4    medicine to test in humans, right?
5        A.  They have qualified people to make these
6    assessments.  Whether or not those people have the
7    time to make a thorough assessment is another
8    question.
9        Q.  And obviously, this -- withdrawn.
10          The IND typically contains basic science
11   and other type of animal pharmacology studies that
12   you yourself do outside of litigation, correct?
13       A.  That's right.
14       Q.  And obviously, the process of an IND was
15   followed with respect to the Vioxx development,
16   right?
17       A.  I would hope so.
18       Q.  You did not review any portion of the
19   Vioxx IND, correct?
20       A.  Not that I can recall.
21       Q.  Now, you then discussed something, you
22   mentioned in one of your prior answers, something
23   called a phase one clinical trial?
24       A.  Yes, sir.

Page 44

1        Q.  And that is a trial that -- sort of the
2    first step in the clinical development of a new
3    medicine, right?
4        A.  Yes, sir.
5        Q.  Have you reviewed any of the phase one
6    clinical trial data done on Vioxx?
7        A.  No, but I did review some of the
8    published data in humans which would pretty much
9    replicate what a phase one study would be.
10       Q.  You know what a new drug application is,
11   correct?
12       A.  Yes, sir.
13       Q.  Can you tell me in a few sentences what
14   you understand that application to be?
15       A.  Well, this is where they are requesting
16   to get approval for marketing of the drug, they
17   submit a new drug application, and they provide
18   all the clinical data that they have acquired in
19   their clinical testing, and the FDA then makes a
20   decision, based upon a review committee that looks
21   at the data and says that this should be approved
22   or should not be approved.  The FDA usually goes
23   along with the recommendation of the committee.
24       Q.  The new drug application contains not

Page 45

1    just the clinical data, but all the laboratory and
2    animal data generated?
3        A.  Yes.  It's a complete compendium, yes.
4        Q.  And the new drug application includes
5    analyses, not just the raw data, of all that
6    pharmacology and clinical data?
7        A.  Yes, sir.
8        Q.  And the FDA has medical doctors and
9    scientists specifically trained to review and
10   assess safety based on the data submitted in a new
11   drug application, correct?
12       A.  I would assume that, yes.
13       Q.  And the FDA scientists take several
14   months to review any new drug application, right?
15       A.  Several months would not be enough time
16   to review these drug applications.
17       Q.  The FDA scientists take several months
18   to review the data and the new drug application,
19   correct?
20       A.  They take a long time.
21       Q.  And it's not just one individual, you
22   understand that the FDA has specialists in various
23   fields who review an NDA, right?
24       A.  Yes, sir.

12 (Pages 42 to 45)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

1    Q.  And an NDA is not just dropped on
2  someone's desk, the pharmacology material is sent
3  to the pharmacologist, the toxicology is sent to
4  the toxicologist, the clinical data is sent to the
5  medical doctors, right?
6    A.  It's a very serious attempt to do a
7  thorough job, yes, sir.
8    Q.  And that process obviously was followed
9  with regard to Vioxx, correct?
10    A.  Yes, sir.  But there was also an
11  individual at the FDA who objected to the approval
12  of these drugs, objected vehemently.
13    Q.  Who is that, sir?
14    A.  I think you know who I'm referring to.
15    Q.  I don't.
16    A.  Maybe I'll recall his name.
17    Q.  Okay.  So going back to my question, the
18  process that you have just described as a very
19  serious attempt by the doctors and scientists at
20  FDA to review all the clinical and laboratory data
21  on a new medicine was followed with regard to
22  Vioxx, correct?
23    A.  Uh-huh.
24    Q.  Yes?

1    A.  Yes, sir.
2    Q.  And you have not reviewed any portion of
3  the Vioxx new drug application, correct?
4    A.  I can't say I haven't reviewed any
5  portion.  I have reviewed a lot of material.
6  Whether I received it through Counsel -- not this
7  Counsel, but previous Counsel -- whether I have
8  received it through reading the literature, maybe
9  portions of it, discussions of it, so I can't say
10  I haven't reviewed any of it, I haven't seen any
11  of it.
12    Q.  You certainly cannot recall reviewing
13  any of the new drug application for Vioxx,
14  correct?
15    A.  Well, I did have some internal
16  documents, which I think would contain a lot of
17  what's in the FDA document -- not a lot, it's some
18  of the important data -- and I think there was a
19  document in there I have which was sent to the
20  Advisory Committee, the FDA Advisory Committee,
21  which contained a lot of the discussion of the
22  preclinical data, didn't have the numbers and so
23  forth, but had a lot of discussion of it, and the
24  animal data that I remember vividly was the green

1  monkey study, because that was patterned exactly
2  after my study.
3    Q.  You understood the green monkey study
4  was not in the -- was conducted after the NDA,
5  right?
6    A.  The green monkey study was conducted
7  in a hurry, yes, to try to answer some of the
8  questions which unfortunately looked worse than
9  they anticipated, and actually, the green monkey
10  study, the publication of that study was withdrawn
11  at the last moment on the orders of Alise Reicin,
12  my former colleague, post-doctoral fellow, who was
13  part of that study, and Robert Gould was the head
14  of that study, and the data were not complimentary
15  to Vioxx, and they had submitted this publication
16  to the American Heart Association for presentation
17  in November of 2005 and were ordered to withdraw
18  it from publication.
19    Q.  Going back to my question, you certainly
20  cannot recall reviewing any portion of the Vioxx
21  NDA, correct?
22    A.  I recall reviewing that portion of the
23  document.
24    Q.  When you say that portion, you're

1  talking about the green monkey --
2    A.  Reviewing the application.
3    Q.  -- the green monkey study?
4    A.  Yes, sir.
5    Q.  That green monkey, sir, was conducted
6  after the new drug application was submitted.
7    A.  But it was submitted to the FDA's --
8  they had to submit it to the FDA.
9    Q.  Yes, sir, it was submitted to the FDA,
10  but I'm talking about the Vioxx new drug
11  application submitted in 1998.
12    A.  Well, I think anything a drug company
13  discovers either before or after the testing of a
14  drug is subject to review by the FDA.
15    Q.  And certainly the FDA did have the green
16  monkey study to review, correct?
17    A.  From what I saw, yes, they did.
18    Q.  Okay.  So let's go back to my question.
19    You did not review any portion of the
20  Vioxx new drug application that was submitted for
21  the initial approval of the medicine, correct?
22    A.  I can't say any portion.  As I
23  indicated, I may have come across comments in the
24  literature in which they talked about it, but I

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 50

1    can't cite the source.  There are bits and pieces
2    of information that come out.  Some of that
3    information comes from the internal document.
4        Q.  All right.  So if I understand you
5    correctly, you may have reviewed some data or some
6    study in a secondary publication of that data that
7    may also be contained in the new drug application,
8    but you have no recollection of actually sitting
9    down and reviewing a section of the new drug
10   application?
11       A.  I think you have said that much better
12   than I said it, yes.
13       Q.  Now, a new drug application has a
14   pharmacology section, correct?
15       A.  Yes.
16       Q.  And you did not review that, correct?
17       A.  No.
18       Q.  And the new drug application
19   pharmacology section is reviewed by
20   pharmacologists at the FDA, right?
21       A.  I don't know who reviews it, whether
22   they are pharmacologists or clinicians.
23       Q.  You understand that there is a
24   pharmacology review done by the FDA?

Page 51

1        A.  I understand that, but I can't say that
2    they are all pharmacologists.
3        Q.  Let me make sure I got an answer to my
4    revised question.
5            You understand that the FDA produces a
6    pharmacology review of any new drug application?
7        A.  Yes.
8        Q.  And you did not review the pharmacology
9    review prepared by the FDA on the Vioxx new drug
10   application, correct?
11       A.  That's correct.
12       Q.  In fact, you have not reviewed any of
13   the reviews prepared by the FDA doctors and
14   scientists about the Vioxx new drug application,
15   correct?
16       A.  I guess so, yes.
17       Q.  Now, you referred a few minutes ago to
18   the concept that any new drug application or
19   request to market a medicine is sent to a
20   committee.  Do you recall saying that?
21       A.  Yes.
22       Q.  And you're referring to an Advisory
23   Committee?
24       A.  This is the FDA Advisory Committee,

Page 52

1    they will select experts in a particular field
2    pertaining to the actions and use of that drug and
3    they will make a decision based upon the data
4    presented to them and whether or not this is
5    worthy of approval for therapy.
6        Q.  And the -- you have never served on an
7    Advisory Committee, correct?
8        A.  No, sir.
9        Q.  Am I correct?
10       A.  Not on an FDA Advisory Committee.
11       Q.  And the Advisory Committees are
12   typically made up of doctors and scientists
13   respected in their field, correct?
14       A.  That's correct.
15       Q.  And in 1999, the FDA Advisory Committee,
16   an FDA Advisory Committee reviewed material and
17   determined that Vioxx was safe and effective and
18   that the medicine should be approved, correct?
19       A.  Apparently so, because it was approved,
20   yes.
21       Q.  And that was a unanimous vote of the
22   1999 Advisory Committee, correct?
23       A.  I don't know what the vote was, but they
24   approved it.

Page 53

1        Q.  You did not review any of the materials
2    that were submitted to or by FDA or Merck that was
3    the subject of the Advisory Committee vote in
4    1999, correct?
5        A.  Well, that's not exactly correct.  I
6    think some of that material was presented in
7    Congressional hearings and I did look at that.
8        Q.  Did you review the transcript of the
9    1999 Advisory Committee?
10       A.  No, sir.
11       Q.  You understand that in May of 1999, the
12   FDA doctors and scientists who reviewed the Vioxx
13   new drug application determined that the medicine
14   was safe and effective, correct?
15       A.  As I indicated, that's apparently so,
16   because the drug was marketed.
17       Q.  And the FDA scientists reviewed much
18   more data on Vioxx than you have, correct?
19           MR. NABERS:  Objection to the form.
20       A.  The FDA scientists reviewed much more
21   data?
22       Q.  On Vioxx than you have.
23       A.  I don't know what data they had, because
24   there were very few animal data provided upon

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

1 which they could make an assessment. The clinical
2 data that they were provided has been subject to
3 question as of late. So they made a decision
4 based upon what they had. What they had was very
5 little in the way of animal data, number one, and
6 I'm talking in vivo animal data, and very little
7 was presented in terms of clinical data that was
8 complete and honest.
9       Q. How do you know what animal data was
10 submitted to the FDA if you didn't review the
11 submission?
12      A. Because at one of the trials, Judge
13 Higbee ordered the Defense to present me with the
14 data, the animal data. It consisted of four
15 pages; three in vitro studies and the green monkey
16 study.
17      Q. And you think -- so your understanding
18 of what happened in the Humuston trial was that
19 you were shown all the in vivo animal data
20 generated on Vioxx before the approval of the
21 medicine?
22      A. There were in vivo animal data done,
23 but not with the idea of looking at prothrombotic
24 events. That only came to light when my paper was

1 submitted to the journal for publication, and one
2 of the reviewers consulted Merck, informed Merck
3 of my study, after which I received a phone call
4 from Merck asking the details of the study, and
5 that's when they embarked upon the monkey, green
6 monkey study. That's all documented in the
7 e-mails.
8       Q. I'm trying to focus my questions,
9 Doctor, on the material submitted and reviewed
10 pursuant to the FDA's original approval of the
11 medicine, okay?
12      A. When Judge Higbee ordered them to show
13 me the animal data, what I got was four pages;
14 three in vitro studies and the green monkey study.
15      Q. All right. So let me go back to my
16 question and make sure I understand what you think
17 happened.
18       You, as you sit here today, you believe
19 that the totality of the animal data Merck has
20 done on Vioxx consists of four pages of material?
21      A. This is -- when the Judge asked then if
22 they had the animal data, they said yes. "Where
23 is it?" "It's in the hotel room." "Go get it."
24 They came back with the animal data. She insisted

1 on having the animal data. If they presented me
2 with four pages, that's it.
3       Q. So as you sit here today, you think four
4 pages consists of --
5       A. No, obviously there are more, but I
6 wasn't shown it.
7       Q. All right. Well, let me go back to my
8 question.
9       You understand that there were reams of
10 animal data submitted to the FDA pursuant --
11      A. There are toxicology -- I'm sorry.
12      Q. Let me finish.
13       You understand that there were reams of
14 animal data submitted to the FDA pursuant to the
15 original approval of Vioxx, correct?
16      MR. NABERS: Objection.
17      A. Those data, the required data, would be
18 data such as pharmacokinetic data, metabolism
19 studies, toxicology studies, are a big part of the
20 animal data. Those are done with every drug, but
21 the pharmacodynamic, the pharmacodynamic data were
22 not presented, were not even conducted, as far as
23 I know.
24      Q. All right. But you have not actually

1 reviewed the materials submitted by Merck to the
2 FDA, the animal data submitted by Merck to the FDA
3 for the FDA's original approval of the medicine,
4 correct?
5       A. I would gladly review the data, if you
6 could provide it to me.
7       Q. Have you reviewed it, sir?
8       A. How can I get it, Mr. Ismail? Let us
9 not play games here.
10      Q. You can ask Plaintiff's Counsel for a
11 copy of the IND. Have you done that?
12      A. It's up to Plaintiff to -- Plaintiff's
13 Counsel to give it to me.
14      Q. All right. So you have not asked the
15 Plaintiff lawyers for a copy of the IND, correct?
16      A. I'm not going to learn much from the
17 IND. I know more about Vioxx and COX-2 inhibition
18 than most people at Merck.
19      Q. Is that -- and the answer to my question
20 is what, sir?
21      A. Your question was?
22      Q. Have you asked the Plaintiff lawyers for
23 a copy of the IND?
24      A. I will ask them right now.

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 58

1    THE WITNESS:  Please send me a copy of
2  the IND.
3  BY MR. ISMAIL:
4    Q.  Have you asked -- so you formed your
5  opinions in this case without having reviewed the
6  IND, right?
7    A.  I don't need the IND to make any
8  opinions in this case.
9    Q.  Yes or no, sir?
10    A.  All I have to know is the pharmacology
11  and the patient condition.
12    Q.  You have --
13    A.  And the pathology.
14    Q.  You have formed your opinions in this
15  case without having reviewed the IND, right?
16    A.  I have formed my position without
17  reviewing the IND, as have many other people who
18  write in the literature about their opinions on
19  Vioxx.
20    Q.  And you have -- have you asked the
21  Plaintiff lawyers for the animal data and
22  pharmacology data submitted in the new drug
23  application for Vioxx?
24    A.  I haven't asked them for that.  If they

Page 59

1  choose to send that to me, that would be fine.
2    Q.  And you have formed your opinions in
3  this case without having reviewed the animal and
4  pharmacology data Merck submitted in the new drug
5  application, correct?
6    MR. NABERS:  Objection to the form.
7    A.  I already indicated I do not have access
8  to these data, so how could I review them?
9    Q.  And you formed your opinions without
10  having reviewed the pharmacology and animal data
11  in the Vioxx new drug application?
12    A.  My opinions do not depend upon having
13  reviewed those data.
14    Q.  Yes or no, sir, the answer to my
15  question?
16    A.  The answer to your question, I have not
17  reviewed those, those data.
18    Q.  And you have not reviewed the clinical
19  data that was submitted to the FDA in the new drug
20  application, correct?
21    A.  I reviewed the published clinical data,
22  which is -- which I assume is the same, but
23  unfortunately, it's not.
24    Q.  You understand that the submissions that

Page 60

1  go to the FDA are far more voluminous than could
2  ever be published in any journal, correct?
3    A.  They can be summarized and presented in
4  publications, as they were.
5    Q.  You understand that clinical data
6  submitted to the FDA is far more voluminous than
7  that which could be published in any journal?
8    MR. NABERS:  Objection to form.
9    Q.  The answer?
10    A.  Yes, I do.
11    Q.  You have not reviewed the clinical data
12  that Merck submitted to FDA in support of the
13  Vioxx new drug application, correct?
14    A.  That's correct.
15    Q.  You have not reviewed any pharmacology
16  study done by Merck on Vioxx prior to the approval
17  of the medicine, correct, other than to the extent
18  you reviewed the medical literature, right?
19    A.  Where would I get such data prior to the
20  approval of the drug?
21    Q.  No, as you sit here today, you have
22  never reviewed any pharmacology study done by
23  Merck on Vioxx other than the extent you have seen
24  something in the published literature, correct?

Page 61

1    MR. NABERS:  Objection to the form.
2    A.  How could I review it if it's not made
3  available?
4    Q.  You can ask one of the people sitting
5  next to you for a coy of it.
6    A.  Prior to the approval of the medicine, I
7  wasn't dealing with Counsel.
8    Q.  Here, let me make sure you understand
9  the time frame of my question, okay?
10    As you sit here today, in preparation
11  for your opinions in this case, you have never
12  gone back to review any pharmacology study done
13  by Merck on Vioxx prior to the approval of the
14  medicine, correct?
15    MR. NABERS:  Objection to the form.
16    A.  Well, I obviously have to answer that
17  that's correct, but the point is, that I'm trying
18  to make is, I do not have access to that material.
19    Q.  You have not requested --
20    A.  So don't -- I'm sorry, go ahead.
21    Q.  You have not requested from the
22  Plaintiff lawyers access to any of the
23  pharmacology studies done by Merck prior to the
24  approval of the medicine, correct?

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 62

1      A.  I have not.
2          MR. NABERS:  Hey, do you mind if we take
3  a little break since we have been going about an
4  hour and fifteen?
5          MR. ISMAIL:  Okay.
6          (Recess taken from 9:17 to 9:21 a.m.)
7  BY MR. ISMAIL:
8      Q.  Switching topics, Doctor, you have made
9  some comments in your expert report regarding the
10 marketing of Vioxx, is that correct?
11     A.  Yes, sir.
12     Q.  Have you ever reviewed the FDA's
13 regulations regarding marketing of
14 pharmaceuticals?
15     A.  Very, very briefly.
16     Q.  When you say briefly, can you describe
17 what that was?
18     A.  Well, I recall reading a -- what I
19 think was an eight-page letter chastising Merck
20 for its marketing practices and the way it was
21 advertising, and in there they enumerated the
22 dos and the don'ts with respect to promoting
23 pharmaceutical agents to the public, and as well
24 as to the physicians, and from that letter I

Page 63

1  easily get the impression that Merck was somewhat
2  below the standards.
3      Q.  All right.  So just so I'm clear about
4  what you did and didn't review, you have not
5  reviewed the FDA regulations regarding the
6  pharmaceutical marketing themselves, correct?
7      A.  This is one of a lot of things I haven't
8  reviewed, just because of time, and it's not my
9  area of interest.  I rely upon summations of a lot
10 of things, just as all scientists do.  We read the
11 literature, we make opinions based upon what we
12 read, and you're asking about specific documents.
13 We're just wasting time here, because you know
14 that this is not my area of interest and I would
15 not be reviewing these things.  Why not talk about
16 the things in my document?
17     Q.  Pharmaceutical marketing is in your
18 document, correct?
19     A.  Pharmaceutical what?
20     Q.  Marketing is in your document, right?
21     A.  I discuss the advertising of the drug.
22     Q.  Okay.
23     A.  And I discuss the FDA's reaction to
24 that.  That's what I discuss.  That's all public

Page 64

1  information.
2      Q.  All right.  So pharmaceutical -- you
3  would agree, certainly, that you're not an expert
4  in pharmaceutical marketing, right?
5      A.  I'm not an expert in a lot of things,
6  but I am an expert in what I do.
7      Q.  Can you answer my question, please, sir?
8          You're not an expert in pharmaceutical
9  marketing, right?
10     A.  Depends to what degree of expertise you
11 want.
12     Q.  You have not -- let's go back to the
13 question you didn't answer a moment ago.
14         You have not reviewed the FDA
15 regulations regarding pharmaceutical marketing,
16 correct?
17     A.  Not in completeness.
18     Q.  Have you reviewed any portion of the FDA
19 regulations on pharmaceutical marketing?
20     A.  I just indicated that the eight-page
21 letter spelled out some of the dos and don'ts in
22 advertising, and based upon that I can see that
23 Merck was deficient in its approach to marketing
24 the drug.

Page 65

1      Q.  Other than reviewing this letter from
2  FDA to Merck that you have been referring to, you
3  have not reviewed anything from FDA regarding the
4  standards for pharmaceutical marketing, correct?
5      A.  If you're asking me if I reviewed the
6  actual FDA document, the answer is no, I have not
7  reviewed the document in completeness.
8      Q.  That's not what I'm asking.  I asked you
9  a moment ago if you reviewed the FDA regulations
10 regarding marketing and you said you made
11 reference to this eight-page letter.
12     A.  Yes.
13     Q.  Right?
14     A.  Yes.
15     Q.  So you have not reviewed the regulations
16 themselves, correct?
17     A.  That's correct.
18     Q.  Other than reviewing this letter from
19 FDA to Merck, you have not reviewed anything that
20 discusses the standards of pharmaceutical
21 marketing, correct?
22     A.  I rely upon the FDA's commentary that
23 Merck was deficient.
24     Q.  Doctor --

17 (Pages 62 to 65)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 66

1  A.  Merck was in violation of the
2  regulations.
3  Q.  You understand --
4  A.  Why must I have to go review the
5  document when the FDA has already told me that
6  they are in violation?
7  Q.  Doctor, you understand I'm entitled to
8  know what you have reviewed and what you haven't
9  reviewed, you understand how that process works,
10  correct?
11  A.  But you're also attempting to put me in
12  a bad light.
13  Q.  I'm not.  I'm asking the question,
14  Doctor, have you reviewed anything on the
15  standards for pharmaceutical marketing other than
16  this eight-page letter from FDA to Merck, yes or
17  no?
18  A.  The answer to that question is, I have
19  not reviewed the FDA document, now I have said it.
20  Q.  Okay.  Have you conducted any -- have
21  you ever published anything in the area of
22  pharmaceutical marketing?
23  A.  You have my CV.
24  Q.  And the answer to my question is?

Page 67

1  A.  You have my CV and you know I have not.
2  Q.  You have never published anything
3  regarding marketing regardless of the industry,
4  correct?
5  A.  Regarding the what?
6  Q.  Regardless of the industry, correct?
7  My prior question was related to
8  pharmaceutical marketing.  My next question, you
9  have not reviewed anything in marketing, in
10  general?
11  A.  Why would I?
12  Q.  You have never published regarding what
13  influences consumer behavior, correct?
14  A.  Why should I?
15  Q.  You have never published anything
16  regarding what influences physician prescribing
17  behavior, correct?
18  A.  This is not my area of interest.
19  Q.  You have never commented, outside of
20  litigation, on the marketing of prescription
21  medicines, correct?
22  A.  That's not true.
23  Q.  Where have you done that, sir?
24  A.  I comment to students.

Page 68

1  Q.  Okay.  Other than your comments, you
2  have never commented in any published paper,
3  outside of litigation, anything to do with
4  pharmaceutical marketing, correct?
5  A.  No, but I do teach.
6  Q.  You have never actually participated in
7  a marketing campaign for prescription medicines,
8  correct?
9  A.  How do you mean that?
10  Q.  Have you ever advised a pharmaceutical
11  company on the standards for marketing of
12  prescription drugs?
13  A.  On the standards?
14  Q.  Yes.
15  A.  I have advised pharmaceutical companies
16  on many things --
17  Q.  And in response to my question?
18  A.  -- leading to the marketing of drugs.
19  Q.  You have?
20  A.  Yes.
21  Q.  What drugs?
22  A.  Well, let's take it from the beginning,
23  all right?
24  I was instrumental in development of

Page 69

1  beta-blocking agents.  I did a lot of the basic
2  research on that.  I discussed that with the
3  pharmaceutical companies.  I promoted that drug to
4  physicians, by educating them on the scientific
5  aspects of the applications.  I can go down the
6  list of many, many drugs.  This is how I make my
7  living, by studying drugs.
8  Q.  Let me rephrase my question.
9  Have you ever worked on any direct-to-
10  consumer advertising of pharmaceutical drugs?
11  A.  Direct-to-consumer, no.  Direct-to-the-
12  physician advertising.
13  Q.  Have you ever participated in the
14  drafting of any sales aid used with physicians?
15  A.  That's not my job.
16  Q.  Have you systematically reviewed the
17  marketing of Vioxx?
18  A.  Systematically reviewed?
19  Q.  The marketing of Vioxx, and by that
20  I mean, did you request and review all the
21  submissions to the FDA regarding the marketing?
22  A.  Well, I reviewed the dodge ball Vioxx
23  document.  I reviewed the cardiovascular cards
24  that Merck had.  These are marketing instruments,

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 70

1    aren't they?
2        Q.  I understand you reviewed a document
3    here or there, but my question was more general.
4        Have you done a review of the marketing
5    material that Merck submitted to the FDA for
6    approval?
7        A.  Not necessary.  I don't do that kind of
8    work.
9        Q.  You have not reviewed the direct-to-
10   consumer advertising in a comprehensive way
11   regarding Vioxx, correct?
12       MR. NABERS:  Objection to the form.
13       A.  I have not reviewed that, but I do know
14   Merck was in violation of the standards and were
15   reprimanded many times by the FDA for their
16   practices.
17       Q.  Many times?
18       A.  Yes, many letters.
19       Q.  Many.  How many?
20       A.  Well, at least three or four.
21       Q.  Really?
22       A.  But it only takes one, you know.
23       Q.  So you think you have seen three or four
24   letters from FDA to Merck reprimanding Merck for

Page 71

1    its marketing of Vioxx?
2        A.  Well, when the FDA scolds you and it
3    takes eight pages to do it, there must be
4    something wrong with your approach.
5        Q.  But you think there are three or four
6    such letters, right?
7        A.  Oh, I know there are.
8        Q.  And do you think they relate to direct-
9    to-consumer advertising?
10       A.  Some of them do.  Some of them relate to
11   the physician advertising.
12       Q.  So going back to my question,
13   direct-to-consumer, you have not reviewed the
14   direct-to-consumer advertising in a comprehensive
15   way to Vioxx, correct?
16       MR. NABERS:  Objection to the form.
17   Asked and answered.
18       A.  I do have a daytime job, sir.
19       Q.  And the answer is?
20       A.  I have to use my time in a very
21   efficient manner, and reviewing documents that
22   don't pertain to anything having to do with this
23   case, I am here to discuss the science.
24       Q.  Sir, you include direct-to-consumer

Page 72

1    advertising pictures in your expert report.  I
2    wouldn't ask you the questions, if it's not in
3    your report.
4        A.  They speak for themselves.
5        Q.  Very good.  Then let's understand what
6    you haven't reviewed.  You have not reviewed, in
7    a comprehensive way, the direct-to-consumer
8    advertising of Vioxx, correct?
9        A.  Let's speak to the exact page that
10   you're referring to.  Let's look at the
11   advertising that I have portrayed in this document
12   and let's discuss it.
13       Q.  Can you answer my question, please?
14       A.  I am answering your question.  Let us
15   stick to the document.
16       Q.  You have not reviewed, in a
17   comprehensive way, the direct-to-consumer
18   advertising on Vioxx, correct?
19       MR. NABERS:  I think you have answered
20   his question, but if you have --
21       THE WITNESS:  Many times, I have
22   answered the question.
23       MR. NABERS:  If you have anything to
24   add, you may do so.

Page 73

1    BY MR. ISMAIL:
2        Q.  You told me you have a day job, you
3    have told me it's not your area of interest or
4    expertise, but you haven't told me yes or no to
5    my question.
6        MR. NABERS:  I think he has answered
7    in sum.
8        A.  It's obvious I have not reviewed
9    documents that are out of my area of interest.
10       Q.  And pharmaceutical marketing is out of
11   your area of interest, right?
12       A.  Pharmaceutical marketing is not out of
13   the area of my interest.  The document is not in
14   the area of my interest.
15       Q.  When you say --
16       A.  I can see an advertisement for a drug
17   and I can tell whether or not it's complete,
18   whether or not it's telling the truth, whether or
19   not it includes all of the information that's
20   essential for the physician and for the consumer
21   to know and I can comment on that.
22       Q.  You have not --
23       A.  I don't have to read the Federal
24   document stipulating what's a do and what's a

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 74

1   don't.
2        Q.  You also have some comments in your
3   report about drug pricing.  Can we agree that
4   you're not an expert in the pricing of
5   pharmaceutical medicines?
6        A.  Here we go again.  I'm not an expert in
7   pharmaceutical pricing.
8        Q.  Thank you.
9        A.  I did work as a pharmacist for many
10  years.  I did have to price prescriptions, as I
11  dispensed them, so I have a little knowledge about
12  how that goes.  I know the cost of the drug
13  retail, and I know what it is wholesale, and I
14  know that some drugs are markedly overpriced, and
15  this is one of them.
16       Q.  You worked as a pharmacist when, sir?
17       A.  When?
18       Q.  Yeah.
19       A.  Oh, from about 1952, before I got my
20  pharmacy license, that is, and then thereafter
21  through 1957, from '55, '57, I was a licensed
22  pharmacist.
23       Q.  So for the last 49 years you have had
24  nothing to do with pharmaceutical pricing, right?

Page 75

1        A.  It doesn't change.
2        Q.  So is the answer to my question yes?
3        A.  You mean I haven't priced a
4   prescription, no, I haven't.
5        Q.  And when I asked you a moment ago,
6   you're not an expert in pharmaceutical pricing,
7   you made reference to your work as a pharmacist
8   50 years ago, right?
9        A.  That's right.
10       Q.  Other than your work as a pharmacist
11  50 years ago, you are not an expert in
12  pharmaceutical pricing, right?
13       A.  I'm not an expert in pharmaceutical
14  pricing.
15       Q.  Thank you, sir.
16           Now, you have reviewed the peer-reviewed
17  literature regarding the randomized controlled
18  clinical trials on Vioxx, right?
19       A.  Yes, sir.
20       Q.  You certainly understand that there --
21  prior to the APPROVe study in September of 2004,
22  no randomized controlled clinical trial with Vioxx
23  showed a statistically significant increased risk
24  of cardiovascular events, correct?

Page 76

1            MR. NABERS:  Objection to the form.
2        A.  You're referring to the VIGOR study?
3        Q.  No.
4        A.  The APPROVe study?
5        Q.  I said --
6        A.  Which study are you referring to?
7        Q.  The APPROVe.  Let me restate and make
8   sure I got -- I think my prior question was
9   misstated, so let me restate it.
10       A.  I'm sorry, what?
11       Q.  My prior question was misstated, so let
12  me start with a new one, okay?
13           Prior to the APPROVe study results
14  being available in September of 2004, no
15  randomized controlled placebo study done on Vioxx
16  had showed a statistically significant increased
17  risk of cardiovascular events?
18       A.  Okay.  Placebo control, that is right.
19  There was no placebo control study prior to that.
20  The VIGOR study was the first published study.
21  There were other studies that were not published,
22  it was small studies.
23       Q.  Well, there were very many other placebo
24  control studies done on Vioxx.

Page 77

1        A.  There were small.  They were small.
2   They were not powered sufficiently to draw a
3   conclusion, and they did not address the specific
4   question of thrombotic events.
5        Q.  Let me make sure we can at least agree
6   on what the facts are.
7            Prior to the APPROVe study, there were
8   not placebo controlled randomized studies that
9   showed an increased -- statistically significant
10  increased cardiovascular risk of Vioxx, correct?
11       A.  No published.
12       Q.  How about unpublished?
13       A.  There were -- as I indicated, there were
14  small trials done that were not published.
15       Q.  What study do you believe wasn't
16  published?
17       A.  Oh, there was one study done in children
18  on dental, dental procedures and post-procedure
19  pain, a single dose was administered, that wasn't
20  published, as far as I know.  There were other
21  small studies that were run.  Mostly, there were
22  pilot studies, but they were -- they were so
23  small, so few patients, that you just can't draw
24  any conclusions from those studies.

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 78

1    Q.  Other than the single dose pilot studies
2  done on Vioxx, you certainly are aware of many
3  other placebo control trials that were done before
4  APPROVe, correct?
5    A.  Many?
6    Q.  Yes, sir.
7    A.  You ought to show them to me.
8    Q.  Are you aware of any?
9    A.  I know I have reviewed a lot of those
10  studies, not in detail, but summarized, summaries
11  of them, so I know they did exist.
12    Q.  All right.  Well, let me go back to my
13  question and let me modify it slightly and I think
14  you and I will agree.
15       Prior to the APPROVe study results in
16  September of 2004, no placebo controlled clinical
17  trial done on Vioxx, whether published or not,
18  showed a statistically significant increased risk
19  of cardiovascular events, correct?
20       MR. NABERS:  Objection to the form.
21    A.  Placebo controlled?
22    Q.  Yes, sir.
23    A.  All right.  I'll agree to that.
24    Q.  Prior to the APPROVe results becoming

Page 79

1  known in September of 2004, no randomized
2  controlled clinical trial, either published or
3  not, showed any statistically significant
4  increased risk at 25 milligrams, correct?
5    A.  Placebo controlled?
6    Q.  Placebo or not.
7    A.  Oh, no, I don't agree with that.  The
8  VIGOR study.
9    Q.  That was 50 milligrams, right, sir?
10    A.  That was 50 milligrams, yes.
11    Q.  All right.  So let me go back to my
12  question.
13       Prior to the APPROVe results becoming
14  known in September of 2004, no randomized
15  controlled clinical trial, whether published or
16  not, showed any statistically significant
17  increased risk of cardiovascular events at Vioxx
18  25 milligrams, correct?
19    A.  You didn't say 25 milligrams before.
20    Q.  I did.  I'm just reading it off the
21  screen.
22    A.  Okay.
23    Q.  And the answer is?
24    A.  At 25 milligrams, placebo controlled?

Page 80

1    Q.  Whether placebo controlled or not.
2    A.  All right.  The answer is no.
3    Q.  You agree with my statement?
4    A.  Yes.
5    Q.  No randomized clinical trial, whether
6  published or not, has ever shown a statistically
7  significant increased risk of cardiovascular
8  events at 12.5 milligrams, correct?
9    A.  No randomized --
10    Q.  Controlled clinical trial, whether
11  published or not, has ever shown a statistically
12  significant increased risk with Vioxx at 12.5
13  milligrams, correct?
14    A.  I'll have to pass on that one.
15    Q.  Do you have one in mind or you just
16  can't remember its name or what causes you --
17    A.  I can't remember the details.
18    Q.  As you sit here today, you're certainly
19  not aware of any 12.5 milligram studies that
20  showed an increase in --
21    A.  12.5?
22    Q.  Yes, sir.
23    A.  Oh, I think in that case, there are
24  probably no such studies.

Page 81

1    Q.  That showed an increased risk, right?
2    A.  12.5, yeah.
3    Q.  You agree with my statement?
4    A.  Yes.
5    Q.  All randomized controlled clinical
6  trials done on Vioxx prior to the VIGOR study
7  showed no increased cardiovascular risk, correct?
8    A.  Prior to the VIGOR study?
9    Q.  Yes, sir.
10    A.  Were they published?
11    Q.  Whether published or not.
12    A.  Well, how would I know what the details
13  are, if they are not published?
14    Q.  Well, they were published, but you gave
15  me that proviso a moment ago, that's why I'm
16  making my question as broad as possible.
17    A.  Where were they published?
18       MR. NABERS:  Well, maybe if we just
19  identified them.
20       THE WITNESS:  Yeah, why don't you
21  identify the studies?  Is this a guessing game?
22  BY MR. ISMAIL:
23    Q.  It's not a guessing game.  Let me -- let
24  me restate my question and see if you can answer.

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 82

1        As you sit here today, sir, are you
2   aware of any clinical trial done on Vioxx prior to
3   the VIGOR study which showed any increased risk of
4   cardiovascular events with Vioxx?
5        A.  Well, whether I'm aware of them or not
6   doesn't say whether they happened or not.
7        Q.  Are you aware of any?
8        A.  I can't put my hands on one right now,
9   but if you have it there, I would be glad to look
10  at it.
11       Q.  There are none, that's why I'm asking
12  the question.
13       A.  Well, if there are none, it's a trick
14  question, isn't it?
15       Q.  No, there are -- there are certainly
16  many studies, but none of them showed an increased
17  risk, right, Doctor?  You know that.
18       A.  Well, there you go.
19       Q.  Okay.  So --
20       A.  So you're asking me to guess.
21       Q.  I'm not asking you to guess.  Sir, you
22  have spent --
23       A.  Why don't you document the study you're
24  talking about, then we can have a nice discussion.

Page 83

1        Q.  All studies done on Vioxx prior to the
2   VIGOR study showed no increased cardiovascular
3   risk, correct?
4        MR. NABERS:  And here's the thing, if
5   you -- if some of the clinical trials that you
6   have reviewed, if you don't recall whether they
7   occurred before or after VIGOR, you can tell him
8   that.
9        THE WITNESS:  That's the problem.
10  BY MR. ISMAIL:
11       Q.  What studies do you believe have shown
12  an increased risk, randomized controlled clinical
13  trials that have shown an increased risk on Vioxx?
14       A.  Well, when you review all these
15  documents, and you have got an 088, an 090, an
16  092, it's pretty hard to keep those all together.
17  Show me the actual documents and I can tell you.
18       Q.  Doctor, you know, you have spent four
19  years in this litigation, and you have told me
20  before you do a literature review every single
21  day, right?
22       A.  Yes, sir.
23       Q.  You know, sir, that there have only been
24  two clinical trials that have ever shown a

Page 84

1   statistically significant increased risk with
2   Vioxx, right?
3        A.  Very good.  So now why don't we just
4   stop there and consider those trials.
5        Q.  We have VIGOR and APPROVe, right?
6        A.  Why don't we just consider those trials?
7        Q.  You know that's a true fact, right,
8   Doctor?
9        A.  Yes, sir.
10       Q.  So every other clinical trial done on
11  Vioxx showed no increased cardiovascular risk
12  other than VIGOR and APPROVe, right?
13       MR. NABERS:  Objection to form.
14       A.  But you see, you're confusing the issue,
15  because those trials were not powered, were not
16  intended for determining cardiovascular events.
17       Q.  Can you answer my question?
18       A.  I did.
19       Q.  Every other clinical trial done on Vioxx
20  other than VIGOR and APPROVe showed no increased
21  cardiovascular risk with Vioxx, correct?
22       A.  They weren't intended to show an
23  increased cardiovascular risk.
24       Q.  Is my statement correct, sir?

Page 85

1        MR. NABERS:  If you can add anything to
2   your answer, you may answer.
3        MR. ISMAIL:  You have not answered the
4   question, Doctor.
5        MR. NABERS:  And he doesn't have to
6   answer it the way you want him to answer.  He can
7   answer it the best he can.
8        THE WITNESS:  The way your question
9   is being asked, it leads one to take my answer as
10  meaning the drug doesn't have any cardiovascular
11  risk.  Now, what you should ask is, prior to VIGOR
12  or APPROVe are there any studies that were
13  conducted to determine cardiovascular risk that
14  showed a statistical difference.  That's the way
15  you should ask the question.  I shouldn't have to
16  tell you how to ask the questions, because you're
17  the lawyer, and I'm the one who is being confused.
18       Q.  So the answer is?
19       MR. NABERS:  If you can add anything.
20       A.  The way you asked your question, the
21  answer has to be no.
22       Q.  I think --
23       A.  Or I have to agree with it, the way
24  you're asking your question.  It doesn't mean what

Benedict Lucchesi, M.D., Ph.D.

Page 86

1  you're asking is reflecting the truth.
2      Q.  Now, the --
3      MR. NABERS:  Take just five seconds?  I
4  just need to answer this.
5      (Recess taken from 9:43 to 9:46 a.m.)
6  BY MR. ISMAIL:
7      Q.  Doctor, have you heard of a clinical
8  trial done on Vioxx called VIP?
9      A.  VIP, yes.
10     Q.  Are you aware that that study showed no
11 increased cardiovascular risk of Vioxx?
12     A.  Was it supposed to?  Was that the intent
13 of the study?
14     Q.  Do you know the answer to my question,
15 sir?
16     A.  I think you just gave it to me.
17     Q.  So we can agree that the VIP study
18 showed no increased cardiovascular risk of Vioxx,
19 correct?
20     A.  So you state, no.
21     Q.  And you know the Victor study, have you
22 heard of that?
23     A.  Uh-huh.
24     Q.  Yes?

Page 87

1      A.  Yes.
2      Q.  And you understand that the Victor study
3  showed no statistically significant increased
4  risks of cardiovascular events?
5      A.  It wasn't designed to do that.
6      Q.  Is that a true statement, sir?
7      A.  It's a true statement, but it wasn't
8  designed to show that.
9      Q.  Have you heard of studies done with
10 Vioxx on Alzheimer's patients?
11     A.  Yes.
12     Q.  You understand those were placebo
13 controlled?
14     A.  Yes.
15     Q.  And you understand those were long-term
16 studies?
17     A.  Yes, sir.
18     Q.  You understand that the Alzheimer's
19 study showed no increased cardiovascular risk of
20 Vioxx?
21     A.  It wasn't designed to do that.
22     Q.  Is my statement true?
23     A.  Your statement is true.
24     Q.  Are you aware that Vioxx was studied in

Page 88

1  osteoarthritis patients?
2      A.  Yes.
3      Q.  You understand that every single
4  osteoarthritis study ever done on Vioxx showed no
5  statistically significant increased risk?
6      A.  The study was not designed to address a
7  specific problem.  You would not expect it to show
8  the outcome that you're referring to.
9      Q.  Is my statement true, sir?
10     A.  Your statement is true.
11     Q.  And taking all the osteoarthritis trials
12 together shows no statistically significant
13 increased risking with Vioxx, right?
14     A.  Those trials are so varied in their
15 duration and in their patient population, it
16 doesn't reflect the real-world situation, so your
17 statement is true as you state it, but it doesn't
18 influence me one way or the other.
19     Q.  I want to go ahead, and first thing I
20 want to do, actually, is refer, sir, to your
21 report on Page 53, if you don't mind.
22     A.  My report?
23     Q.  Yes, sir.
24     And I want to refer you to the paragraph

Page 89

1  below the block quote that begins, "It is
2  important to note," and your sentence there is,
3  "It is important to note that the entry criteria
4  required the patients enrolled in the study did
5  not have evidence of cardiovascular disease and
6  would have been considered to be a low risk for an
7  adverse cardiovascular event."
8      Do you see that?
9      A.  Yes.
10     Q.  Now, which study are you talking about?
11     A.  The one above it.
12     Q.  Well, you make reference to both VIGOR
13 and APPROVe in the preceding paragraph and I'm not
14 sure which study you're talking about.
15     A.  I'm talking about -- this is Topol's
16 article in the New England Journal of Medicine,
17 and that these were patients who were supposedly
18 at low risk, and yet, Topol is referring here to
19 the APPROVe study and the fact that they were at
20 low risk, and the low risk is determined on the
21 basis of subject interview when you enroll them.
22     Q.  So in your sentence about an entry
23 requirement, criteria requiring patients did not
24 have evidence of cardiovascular disease, you're

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 90

1    referring to the APPROVe study?
2        A.  That's what the article above here is
3    discussing.  The clinical trials sponsored by
4    Merck, adenomatous polyp prevention of Vioxx,
5    APPROVe study, enrolled subjects who do not have
6    clinically evident cardiovascular disease.  The
7    study examined the effects of Vioxx versus
8    placebo.  The study results revealed a 3.5 percent
9    incidence in the Vioxx treatment group of
10   myocardial infarction or stroke.  This represented
11   a significant increase over the control group at
12   1.9 percent incidence, and were similar to the
13   findings in the VIGOR clinical trial, which was
14   not a placebo controlled.
15       Q.  That --
16       A.  The observation resulted in the Data
17   Safety Monitoring Board recommending suspension
18   of the clinical trial.  In his publication in the
19   New England Journal, Eric Topol, a world-renowned
20   cardiologist, made the following statement, and he
21   goes on --
22       Q.  I just wanted to identify the study so
23   we could talk about it, okay?
24       A.  Yeah.

Page 91

1        Q.  Your statement about that the study
2    entry criteria limited the study to patients who
3    did not have evidence of cardiovascular disease,
4    you're referring to --
5        A.  Based upon the enrollment questionnaire,
6    yes.
7        Q.  Have you seen the protocol for the
8    APPROVe study?
9        A.  As a matter of fact, I did.
10       Q.  And have you seen the enrollment
11   questionnaire for the APPROVe study?
12       A.  I did not see the questionnaire, but I
13   did review the enrollment criteria.
14       Q.  What do you mean when you say the entry
15   criteria for the APPROVe study required that the
16   patients did not have evidence of cardiovascular
17   disease?
18       A.  They did not have chest discomfort on
19   exercise, they did not have prior myocardial
20   infarction, they did not have hypertension, they
21   did not have thrombotic events, so forth.
22       Q.  You think that was an entry requirement
23   for the APPROVe study?
24       A.  Pardon me?

Page 92

1        Q.  You think that was an entry requirement?
2        A.  Those were some of the requirements,
3    yes.
4            Did not have evidence of.
5        Q.  Say again, sir?
6        A.  Did not have evidence of.
7        Q.  Would a history of symptomatic
8    atherosclerotic cardiovascular disease be evidence
9    of cardiovascular disease?
10       A.  Yes, sir.
11       Q.  A history of hypertension?
12       A.  Yes, sir.
13       Q.  A history of high cholesterol, would
14   that be evidence of cardiovascular disease?
15       A.  Just high cholesterol, not necessarily.
16       Q.  How about cigarette use, would that be a
17   history of cardiovascular disease?
18       A.  Not necessarily.  It's a risk factor,
19   but not necessarily a history of cardiovascular
20   disease.
21       Q.  Would you consider patients who have
22   either -- would you agree that patients are at
23   high risk for cardiovascular disease if they
24   have some combination of hypertension, high

Page 93

1    cholesterol, diabetes or cigarette use?
2        A.  That's increasing the risk, yes.
3        Q.  And do you believe such patients were
4    not studied in the APPROVe study?
5        A.  Well, such patients eventually turned up
6    in the APPROVe study that have those particular
7    clinical characteristics, but they were not
8    available -- they were not obvious on entry into
9    the study.
10       Q.  When you say not obvious upon entry, so
11   you think the study was -- for APPROVe was trying
12   to exclude people who were cigarette smokers or
13   what is it that you're looking at, sir?
14       A.  I think on the questionnaire --
15       Q.  Let me stop.  Let me withdraw my
16   question.  What is it that Mr. Nabers just showed
17   you?
18           MR. NABERS:  The same table you're
19   looking at.
20       A.  The same thing you're looking at.
21       Q.  So you're looking at the APPROVe study?
22       A.  Yeah.
23       Q.  So let me go back to my question.
24           Do you think the APPROVe study excluded

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 94

1    people who used cigarettes?
2        A.  Well, when they entered the patients in
3    the study, and I have conducted clinical trials
4    and I have had patient questionnaires, patients
5    don't always realize the fact that they have
6    hypertension, that they have diabetes.  They will
7    tell you they are a cigarette smoker, that becomes
8    obvious, but things you find out during the study,
9    that by the way, this patient has high glucose
10   and they have diabetes, or by the way, this
11   patient is experiencing chest pain, and subsequent
12   examination you find out that they have coronary
13   artery disease.
14              MR. ISMAIL:  Let's mark the publication
15   as Exhibit -- whatever we're up to, 8, 7?
16              (Marked for Identification:
17              Deposition Exhibit No. 6.)
18   BY MR. ISMAIL:
19       Q.  Sir, you're looking at Exhibit 6, the
20   APPROVe publication document?
21       A.  Yes, sir.
22       Q.  You're looking at Table 1?
23       A.  Yes, sir.
24       Q.  You understand that's baseline

Page 95

1    characteristics, right?
2        A.  These were not determined at the time
3    of enrollment.  This is what they found out
4    afterwards when they classified all of these
5    patients and they stratified them between two
6    groups.
7        Q.  Baseline characteristics is before they
8    start the study, right, sir?
9        A.  If the entry criteria say they should
10   not have evidence of cardiovascular disease, these
11   patients didn't belong in that study.
12       Q.  So let me make sure I understand what
13   you understand.
14              Baseline characteristics in Table 1 of
15   the APPROVe publication are the characteristics of
16   the study group prior to beginning the study,
17   right?
18       A.  But when the patients were asked at the
19   time of enrollment, they did not exhibit any signs
20   or symptoms of these diseases.
21       Q.  Can you answer my question?
22       A.  Restate it.
23       Q.  The baseline characteristics in Table 1
24   of the APPROVe publication are the characteristics

Page 96

1    of the study group prior to beginning the study,
2    right?
3        A.  Prior to beginning the study, but
4    obviously, discovered during the study.
5        Q.  Why do you say that?
6        A.  Because they would not have been entered
7    had they stipulated these clinical problems on
8    interview.
9        Q.  So you believe that had a patient given
10   a medical history upon enrollment of hypertension
11   or diabetes or cigarette use, they would have been
12   bounced from the study?
13       A.  They should have been eliminated from
14   the study, yes, according to the criteria for
15   enrollment.
16       Q.  And that's what you understand the
17   criteria for enrollment to the APPROVe study to
18   be?
19       A.  Yes, sir.
20       Q.  If you would turn to Figure 2, I
21   believe, I think you have this figure in Figure 3
22   in your report.
23       A.  Yes, sir.
24       Q.  Now, you know what a Kaplan-Meier curve

Page 97

1    is?
2        A.  I'm looking at two of them, right here.
3        Q.  And you know what one is, right?
4        A.  Yes.
5        Q.  And a Kaplan-Meier curve, sometimes
6    referred to as a time-to-event curve?
7        A.  Yes.
8        Q.  And a Kaplan-Meier curve is a common
9    statistical tool to see the risks of a medicine
10   over time?
11       A.  Yes, sir.
12       Q.  And Figure 2 is a plot of the confirmed
13   serious thrombotic events with Vioxx and with
14   placebo over time in the APPROVe study, correct?
15       A.  Well, it's the plot that they show here,
16   but it's not the true plot.
17       Q.  And why do you say that?
18       A.  Because this has been the subject of
19   many publications within the last few months in
20   which the data were omitted, and you know the
21   story about the curve, the editor of the New
22   England Journal, of how he's come out and
23   expressed concern over this publication.
24       Q.  I'm talking about APPROVe, not VIGOR,

Benedict Lucchesi, M.D., Ph.D.

Page 98

1    sir.
2        A.  This is APPROVe.
3        Q.  Right.  You think the expression of
4    concern has to do with APPROVe?
5        A.  Of course, it does.  Am I on the moon?
6        Q.  Yes.
7            MR. NABERS:  Well, and I think you all
8    are talking somewhat -- the New England Journal of
9    Medicine expression of concern was about VIGOR,
10   but what you're talking about is what has been in
11   the newspaper about the 18-month --
12           THE WITNESS:  Yes, exactly.
13   BY MR. ISMAIL:
14       Q.  So we can agree, the expression of
15   concern has nothing to do with VIGOR, right?
16       A.  I'm talking about this figure.
17       Q.  So you think the data in Figure 2 has
18   changed?
19       A.  Yes, sir.
20       Q.  And where -- on what basis do you think
21   it has changed?
22       A.  It's changed because we now know that
23   these events occur much earlier.
24       Q.  No, I'm talking about the actual -- you

Page 99

1    understand Figure 2 is a plot of data, that's all
2    it is, right?
3        A.  I understand that the investigator's
4    report does not show this figure.  The
5    investigator's report shows an entirely different
6    figure.
7        Q.  When you say the investigator's report,
8    what are you referring to?
9        A.  The data submitted by the investigator.
10       Q.  The clinical investigators?
11       A.  Yes, sir.
12       Q.  You think that's a different report, a
13   different figure?
14       A.  The data come out differently.
15       Q.  And how do you come to that
16   understanding, Doctor?
17       A.  Because I think I have it in my report,
18   do I not?
19           I can't find it right now.  Let's go
20   back to this.  As I stated, more recent data show
21   that events are occurring prior to 18 months.  In
22   fact, 60 days, 90 days, are some of the more
23   recent reports.
24       Q.  Well, Figure 2 shows events are

Page 100

1    occurring prior to 18 months, right?
2        A.  Figure 3 shows it even better.
3        Q.  Figure 2 shows events occurring before
4    18 months, right?
5        A.  Yes.
6        Q.  And you understand Figure 2 is a plot of
7    the -- all the events with Vioxx and placebo that
8    meet the definition of confirmed serious
9    thrombotic events, right?
10       A.  All right, yes.
11       Q.  And that data has not changed, has it,
12   Doctor?
13       A.  I'm looking for a paper by Furberg.
14       Q.  Why don't I withdraw my question.  I
15   don't want to spend the time going through your
16   stack here.
17           Doctor?
18       A.  Go ahead.
19       Q.  I am going to start with a new question.
20           The Kaplan-Meier curve, Figure 2, the
21   data that's reflected there, shows no difference
22   between Vioxx and placebo through 18 months of
23   use, correct?
24           MR. NABERS:  And can I just clarify one

Page 101

1    thing?  When we talk about data, are we talking
2    about the curve itself or the underlying data that
3    makes up the curve?
4            MR. ISMAIL:  Let's talk about the curve
5    itself.
6            MR. NABERS:  Okay.  The curve itself is
7    what we're focusing on.
8            THE WITNESS:  Okay.  Here's the paper
9    I'm talking about, and this is by Curt Furberg.
10   BY MR. ISMAIL:
11       Q.  Okay.  So the answer to my question?
12       A.  Well, the answer to your question is
13   that these are not the true data.  When you replot
14   them, you get the true data and they look like
15   this.  Six months, you're already seeing a marked
16   increase in the Rofecoxib 25 milligram group
17   compared to the placebo group.  It doesn't take
18   18 months.
19       Q.  You're referring to a letter to the
20   editor by Curt Furberg?
21       A.  Curt Furberg is an outstanding
22   epidemiologist.
23       Q.  You're referring to a letter to the
24   editor by Curt Furberg?

Benedict Lucchesi, M.D., Ph.D.

Page 102

1      A.  That is correct.
2      Q.  And you're referring -- that's obviously
3  not peer reviewed, right?
4      A.  Then he is lying?
5      Q.  It's obviously not peer reviewed, right?
6      A.  Then he is lying?
7      Q.  Can you answer my question, sir?
8      A.  It doesn't matter whether it's peer
9  reviewed or not, this is a gentleman of extreme
10  recognition throughout the world.  I don't think
11  he would tell a mistruth.
12      Q.  And the answer to my question, sir?
13          MR. NABERS:  If you know.
14      A.  I can't say it's not peer reviewed.  The
15  editor reviews these.  He is a peer.
16      Q.  Do you know what the peer review process
17  relates to?
18      A.  The peer review process can be a lot
19  of different things.  It can be a single person,
20  an editor reviewing a journal article and
21  accepting it.
22      Q.  You're really going to fuss with me that
23  a letter to the editor is peer review, sir?
24      A.  In the New England Journal?

Page 103

1      Q.  Yeah.
2      A.  I'll bet it is.  I'll bet it's reviewed
3  by the editor.
4      Q.  What do you think Dr. Furberg is showing
5  in that letter to the editor?
6      A.  Right there.
7      Q.  What do you think that data is?
8      A.  He is showing that there is an increase
9  in incidence of the cumulative incidence,
10  according to the APTC events, that's the platelet
11  trial, Europe, they have established certain
12  criteria for thromboembolic events or adverse
13  events.
14      Q.  Do you believe the APTC end point is a
15  proper end point to use when considering the
16  cardiovascular safety of Vioxx?
17      A.  It's a good one.
18      Q.  Where do you think the data came from
19  that Dr. Furberg is purportedly showing there?
20      A.  My guess, it came from the actual data
21  that the investigators provided, and how those
22  data were adjudicated is another question, who did
23  the adjudication.
24      Q.  So you believe Dr. Furberg is plotting,

Page 104

1  in his letter to the editor to the New England
2  Journal, investigator-reported data that was then
3  adjudicated to form Figure 2 in the APPROVe
4  publication?
5      A.  The data had to come from somewhere,
6  other than he did -- this is -- I'm sorry, this is
7  Nissen's data.  Furberg wrote the letter to the
8  editor here.
9      Q.  Well, Nissen's is a letter to the
10  editor.
11      A.  This is Nissen's data.
12      Q.  Nissen's is a letter to the editor, too,
13  right?
14      A.  Nissen's letter to the editor, yes, and
15  Furberg is responding, as well.
16      Q.  All right.  So let's go back to my
17  question.
18      A.  As is Dr. Bressler, all of them coming
19  up with the same conclusion, that APPROVe showed a
20  significant increase long before 18 months.
21      Q.  Let's go back to my question.
22          You believe that the figure as shown by
23  Dr. Nissen in his letter to the editor is plotting
24  investigator-reported data that was adjudicated to

Page 105

1  form the plot of Figure 2 in the publication?
2          MR. NABERS:  Objection to the form.
3      A.  Somewhere, he had to get the data.
4      Q.  Is that what you think it is?
5      A.  I'll say that's what it is.
6      Q.  So you believe that data that Dr. Nissen
7  has there was the data that was available to the
8  study authors when the publication was originally
9  made in the APPROVe publication?
10          MR. NABERS:  Objection to the form.
11      A.  Well, these data, according to the
12  intention-to-treat principle, maybe that's where
13  the difference is occurring.
14      Q.  So the answer to my question is what,
15  sir?
16      A.  These data had to come from somewhere.
17  They had to come from the investigators initially.
18      Q.  Can we agree that you do not know the
19  data set that Dr. Nissen used to plot the
20  Kaplan-Meier curve in his letter to the Meyer --
21  to the New England Journal?
22      A.  He doesn't state it here, as far as I
23  can tell.
24      Q.  So you don't know, right?

27 (Pages 102 to 105)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 106

1    A.  I don't know.
2    Q.  And --
3    A.  But I can read the summary, I can read
4  the conclusions.
5    Q.  And even Dr. Nissen's plot of the data
6  from the APPROVe study shows no statistically
7  significant difference in Vioxx and placebo after
8  twelve months, right?
9    A.  The curves diverge.  Whether they are
10  statistically significant or not doesn't matter to
11  me, it's the eyeball test that matters.
12    Q.  Can you answer my question?
13    A.  Well, they are not statistically
14  significant, because the data overlap.
15    Q.  Do you -- do you believe Dr. Nissen's
16  curve demonstrates a changing cardiovascular risk
17  of Vioxx over time?
18    A.  Oh, yes.
19    Q.  That there was an increasing risk over
20  time?
21    A.  Certainly looks like there is an
22  increased risk over placebo.
23    Q.  So the concept that the relative risk of
24  Vioxx versus placebo with regard to cardiovascular

Page 107

1  events changing over time is supported by even
2  Dr. Nissen's data, right?
3    A.  If you're talking about cardiovascular
4  disease, which is a progressive disease, over
5  time, it does change on its own.
6    Q.  I'm talking about the plot of events,
7  APTC events that Dr. Nissen reflects in his letter
8  to the editor.
9    A.  There is a change in --
10    Q.  I'll go back to my question.
11    The concept that the relative risk of
12  Vioxx versus placebo with regard to cardiovascular
13  events changing over time is supported by even
14  Dr. Nissen's data, right?
15    A.  The relative risk increases with Vioxx.
16    Q.  My question is different.  My question
17  was over time.
18    A.  Over time.
19    Q.  So do you agree with my statement?
20    A.  I didn't --
21    Q.  Do you agree with my statement?
22    A.  Relative risk increases over time with
23  respect to placebo, yes.
24    Q.  You can put that aside, Doctor.

Page 108

1    MR. NABERS:  Let's just -- I think you
2  all still miscommunicated.  I think his testimony
3  is --
4    MR. ISMAIL:  Scott.
5    MR. NABERS:  No, I'm not going to let
6  you do that.
7    MR. ISMAIL:  I'm not -- what am I doing?
8    MR. NABERS:  Well, I don't think -- I
9  think what he's trying to tell you, and you
10  correct me if I'm wrong, is that you're saying
11  that the relative risk in the Vioxx patient group
12  as compared to the placebo group is increasing
13  over time.
14    THE WITNESS:  Yes.
15    MR. NABERS:  That's what I think the
16  testimony is, but that was not what the answer
17  was, so I want to be real careful about that,
18  because I don't want to see that again, and if
19  that's not right, I want you to correct it on the
20  record.
21    THE WITNESS:  Let's put it this way:  If
22  I had my choice of the placebo or the Rofecoxib, I
23  would take the placebo.
24  BY MR. ISMAIL:

Page 109

1    Q.  Going back to my questions, Doctor, have
2  you done a literature review of the observational
3  studies done on Vioxx?
4    A.  There are many observational reviews and
5  the one that really made an impact was the one
6  that came out of Denmark at the time of the
7  American Heart Meeting 2005.  I was there and
8  heard the presentation and it created a lot of
9  interest.
10    Q.  So have you actually reviewed the
11  observational studies done on Vioxx?
12    A.  I read the paper that was published in
13  Circulation, yes.
14    Q.  The paper published in Circulation, I
15  was asking more general.  My question was, have
16  you done a literature review on the many
17  observational studies published on Vioxx?
18    A.  Oh, yes, the -- Weymer Hayes published
19  on it, the gentleman from the FDA whose name is
20  alluding me right now.  I know it very well.
21    MR. NABERS:  Graham.
22    THE WITNESS:  What?
23    MR. NABERS:  Graham?
24    THE WITNESS:  Graham, yeah, David

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 110

1    Graham.  We actually met personally.
2    BY MR. ISMAIL:
3        Q.  By the way, is that the fellow that you
4    think objected to the approval of Vioxx, you
5    mentioned that a while ago?
6        A.  He objected to the approval of COX-2
7    inhibitors.  He warned against the prothrombotic
8    events, the potential for prothrombotic events
9    long before the events happened, and he was
10   censured by his superiors.  He was essentially
11   demoted, ostracized.
12       Q.  That's your understanding of the David
13   Graham story, that he was a long-time critic of
14   COX-2 inhibitors?
15       A.  Look, I talked to David Graham,
16   personally.  He was here, he gave a lecture.
17       Q.  I'm sure he did.
18       Doctor, have you seen observational
19   studies which showed no increased cardiovascular
20   risk of Vioxx?
21       A.  There are very few.
22       Q.  Have you seen them?
23       A.  Yes, I have.
24       Q.  And you do not discuss them in your

Page 111

1    expert report, correct?
2        A.  They are so few.
3        Q.  You believe that the majority of
4    observational studies have demonstrated an
5    increased risk with Vioxx?
6        A.  The majority of the observational
7    studies have shown an increase, not only of Vioxx,
8    but the fact that Vioxx has a greater potential
9    than drugs like Celebrex, has a greater potential
10   than traditional NSAIDs.
11       All these observational studies cannot
12   be wrong, and plus the fact the observational
13   studies, in contrast to the clinical trials, the
14   observational studies represent the real-world
15   situation where patients who take these drugs have
16   all sorts of comorbidities that impact along with
17   the drug to produce the potential for adverse
18   events.
19       When you're doing a clinical trial
20   and you limit your patient population to those
21   with adenomatous polyps and no evidence of
22   cardiovascular disease, that doesn't represent
23   the real world.
24       There are many patients with adenomatous

Page 112

1    polyps who do indeed have cardiovascular disease,
2    as you saw in that table in the APPROVe study, and
3    they eventually turned up having risk factors, and
4    if you do a subgroup analysis where you look at
5    those who are at highest risk, you will see they
6    have the highest mortality or the highest
7    incidence of adverse events.
8        Now, don't ask me to cite specific
9    papers that show this, because this is a total sum
10   accumulation of the data, of the knowledge base.
11   If you want to stick to exact documentations of
12   each point, we will be here for a long time.
13       Q.  No observational study published on
14   Vioxx showed an increased risk at 25 milligrams
15   and below, prior to September of 2004, correct?
16       A.  It doesn't matter whether prior to 2004,
17   it's what is happening right now, what's the
18   real-world and what's the science.
19       Q.  Can you agree with my statement, sir?
20       A.  No, I do not agree with your -- well,
21   prior -- if you want to set those limits, that
22   doesn't matter to me.  Your statements as being
23   correct only -- only obscures the facts, and that
24   this is what irritates me somewhat.  Why not speak

Page 113

1    the science and speak the truth?  Why not look at
2    the whole picture and not just what happened prior
3    to 2004?
4        Q.  Can you answer my question?
5        A.  Restate the question.
6        Q.  No observational study published on
7    Vioxx showed an increased risk at 25 milligrams
8    and below prior to September of 2004, correct?
9        A.  What studies are you referring to?
10       Q.  None showed an increased risk prior to
11   September 2004.
12       A.  Which ones are you referring to which do
13   not show a risk?
14       Q.  Are you aware of any that showed an
15   increased risk at 25 milligrams and below before
16   September 2004?
17       A.  Name the study and I'll tell you if I'm
18   aware of it.
19       Q.  I don't believe there are any, Doctor,
20   and I'm asking you to confirm that fact.
21       A.  You honestly swear that there are none?
22       Q.  You're the one who says you have done a
23   literature review of the observational studies,
24   right?

29 (Pages 110 to 113)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 114

1    A.  Yes.
2    Q.  Are you aware of any observational study
3  done before September 2004 which showed an
4  increased risk at 25 milligrams and below?
5    A.  If you show me the studies, I'll tell
6  you whether they show a risk.
7    Q.  Are you aware of any, sir?
8    A.  I can't put my finger on one right now.
9    Q.  Thank you.
10         If you would go to Page 54 of your
11  report.  Do you see that chart there, that graph
12  there?
13    A.  Yes.
14    Q.  Is that something you prepared?
15    A.  This comes from Mukherjee's paper.
16    Q.  Well, that's what I'm confused about,
17  because your reference there says Mukherjee and
18  APPROVe, and Mukherjee was published in 2001, so I
19  don't understand what you're plotting here, and
20  you're also talking colon polyps, which was not
21  available when Mukherjee was published.
22    A.  That's the way the paper -- the article
23  appeared in the publication.
24    Q.  So this is not your chart, right?

Page 115

1    A.  Not my chart.
2    Q.  And you're not sure where the data comes
3  from, right?
4    A.  Well, this is Mukherjee's statement that
5  Vioxx -- Mukherjee/Topol's statement, Vioxx is
6  clearly a defective product as demonstrated in the
7  APPROVe trial results in which the drug was
8  studied a placebo-treated group of equally
9  matched patients.  Merck had no recourse than to
10  remove the drug from the market.
11         And it comes from Topol's publication.
12  That article comes from Topol's publication.  The
13  accompanying articles of the same issue of the New
14  England Journal of Medicine by FitzGerald, a
15  leading authority in the field of prostaglandins
16  who acknowledges receiving research support from
17  Merck, as well as serving as a consultant to the
18  company, makes the following statement.  And --
19    Q.  Doctor, I'm just trying to understand
20  where the chart comes from.
21    A.  Maybe this chart was relabeled
22  inappropriately.
23    Q.  Okay.  We can move on.
24         Page 56 you make reference to a

Page 116

1  presentation by Dr. Graham in August of 2004.
2    A.  Page 66?
3    Q.  56.
4    A.  Page 56.  Okay.  Kaiser Permanente
5  study.
6    Q.  Have you ever made a calculation of
7  excess events like Dr. Graham has done here?
8    A.  No, I rely on Dr. Graham's statements in
9  his paper.
10    Q.  Do you know how Dr. Graham made that
11  estimate of 27,000?
12    A.  Well, obviously, he did some
13  calculations.  I don't know the exact manner in
14  which he did it.  I recognize that the figure is
15  quite high.  Whether or not it's an accurate
16  figure or not, you know, I can't tell.  Neither
17  can anyone else, I guess.
18    Q.  Okay, but you're not --
19    A.  It's an estimate.  It's a guesstimate,
20  at best.
21    Q.  That's how you view Dr. Graham's
22  calculations of excess events, right?
23    A.  I'm just quoting what was said in the
24  published literature.  You're always asking me if

Page 117

1  I read this and read that and --
2    Q.  Let's see if we can agree.
3         You have not independently confirmed
4  Dr. Graham's guesstimate of excess events, right?
5    A.  Why would I do that?
6    Q.  Yes or no, sir?
7    A.  You know I would not do that.
8    Q.  And you do not know what methodology
9  Dr. Graham followed to come up with his estimate
10  of excess events, right?
11    A.  No, but I depend upon the peer review
12  process to look into that.  I'm sure statisticians
13  reviewed that paper and were happy with the
14  figure.
15    Q.  Now, I want to turn, Doctor, to the
16  discussion of prostacyclin, if I could.
17    A.  Good.
18    Q.  You have given the opinion that COX-2
19  inhibitors decrease vascular prostacyclin and
20  create this imbalance between prostacyclin and
21  thromboxane, correct?
22    A.  That's one of the things it does,
23  correct.
24    Q.  In normal, healthy vessels is COX-2

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 118

1   responsible for the production of any
2   prostacyclin?
3       A.  You're talking about the Long paper?
4       Q.  No, I'm asking in the normal, healthy
5   vessels, COX-2 two is responsible for the
6   production of any prostacyclin?
7       A.  Normal, healthy vessels, there is very
8   little COX-2 present.
9       Q.  So in normal, healthy vessels, COX-2
10  does not produce prostacyclin, right?
11      A.  There is very little prostacyclin being
12  synthesized via COX-2 in normal, healthy vessels.
13      Q.  Does COX-1 produce prostacyclin in
14  normal, healthy vessels?
15      A.  In healthy vessels, COX-1 does produce
16  prostacyclin, but COX-1 in normal vessels is
17  constituentive; that's means it's always there.
18  That means the level of production like fixed.
19      Q.  So a COX-2 inhibitor like Vioxx would
20  have -- would not cause a decrease in vascular
21  prostacyclin in a healthy individual, correct?
22      A.  In a normal, healthy individual,
23  COX-2 is producing a small amount of prostacyclin.
24  COX-1 is likewise producing a small amount of

Page 119

1   prostacyclin. Given a COX-2 inhibitor, and as
2   shown by the McAdams study, you will decrease
3   the overall production of prostacyclin in a
4   normally -- normal, healthy individual.
5       Q.  And is that -- you're referring to
6   a McAdams study of a prostacyclin metabolite
7   measured in the urine?
8       A.  Yes, sir.
9       Q.  And the -- some of the work upon which
10  you're relying for your opinions in this case are
11  those urinary metabolite studies, right?
12      A.  Yes, sir.
13      Q.  And the metabolite is PGIM?
14      A.  Yes, sir.
15      Q.  And in normal, healthy individuals,
16  do you expect a reduction in PGIM upon the
17  administration of a COX-2 inhibitor?
18      A.  Yes, you will see a reduction, but not
19  all of that COX-2 -- not all of that prostacyclin
20  is coming from the endothelium, there is some
21  coming from the kidney, small amount.
22      Q.  Would you expect to see the same amount
23  of reduction in PGIM in, say, 25-year-old women
24  versus 60-year-old men upon the administration of

Page 120

1   a COX-2 inhibitor?
2       A.  If the -- if the older patient is above
3   normal? The 25-year-old. And what was the other,
4   a 65-year-old?
5       Q.  A 60-year-old man.
6       A.  They are both normal?
7       Q.  As far as we know.
8       A.  No disease?
9       Q.  Would you expect there to be greater
10  prevalence of cardiovascular disease in the
11  60-year-old male group or the 20-year-old women
12  group?
13      A.  Probably with age, the deterioration of
14  the endothelial function, which means the COX-1
15  component of PGI, would be decreased. The age,
16  there's probably some underlying vascular
17  alterations which would lead to an increased
18  up-regulation of COX-2 and more PGI to metabolite
19  in the urine, but all of these -- I mean, the way
20  you're asking your questions, if I don't know the
21  status of the individuals you're referring to,
22  whether or not they are normal or have underlying
23  diseases, it's hard to answer the question.
24      Q.  McAdams was a study in older patients,

Page 121

1   right?
2       A.  Older patients? No. These were young,
3   normal, healthy individuals.
4       Q.  What was the mean age, as far as you
5   recall?
6       A.  Don't ask me for the exact number,
7   because I don't recall it, but these were normal
8   individuals.
9       Q.  Less than 60?
10      A.  I'm sure they were less than 60.
11      Q.  No human pharmacology study has ever
12  demonstrated any reduction of vascular
13  prostacyclin upon the administration of a COX-2
14  inhibitor, correct?
15      A.  I thought McAdams study said that.
16      Q.  That was a urine metabolite study,
17  right?
18      A.  Sure.
19      Q.  My question was different.
20          No human study has demonstrated a
21  reduction in vascular prostacyclin?
22      A.  Could you tell me how that's done?
23      Q.  Are you aware of any studies that have
24  measured prostacyclin in the blood?

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 122

1      A.  You can't do it.
2      Q.  Are you aware of any?
3      A.  You cannot do it.
4      Q.  Are you aware of any in vivo animal
5  studies which have done -- have measured that?
6      A.  You cannot do it.
7          Now, are you talking about in vivo blood
8  or ex vivo blood?
9      Q.  In vivo blood.
10     A.  You can't do it.
11     Q.  Are you aware of any --
12     A.  Wait a minute.  Wait a minute.  Don't
13  ask am I aware.  I'm telling you, you can't do it.
14  You have to ask me why.
15     Q.  Are you aware of any studies, Doctor,
16  that -- withdrawn.
17         We discussed a moment ago that PGIM is
18  a urinary metabolite of prostacyclin, right?
19     A.  PGIM --
20     Q.  Is a urinary --
21     A.  -- is excreted into the urine, it's not
22  a urinary metabolite, total body metabolite, yes.
23     Q.  So PGIM is a breakdown of total or
24  systemic prostacyclin, right?

Page 123

1      A.  Yes.
2      Q.  PGIM by itself does not delineate what
3  the source of prostacyclin is?
4      A.  Exactly.
5      Q.  There are -- PGI2 is the prostacyclin
6  that is --
7      A.  PGE2?
8      Q.  PGI2 is the prostacyclin that's present
9  in the vascular system, right?
10     A.  Yes, and elsewhere.
11     Q.  And elsewhere.
12         PGI2 breaks down at various steps along
13  the way before PGI2 breaks down to PGIM, correct?
14     A.  Yes.
15     Q.  Are you aware of -- withdrawn.
16         You certainly agree that measurements of
17  breakdown products further up the chain closer to
18  PGI2 is a better measure of what's actually
19  happening in vascular prostacyclin, right?
20     A.  Well, I know people have attempted to
21  measure prostacyclin metabolites in coronary
22  science blood, for instance, by putting a catheter
23  and drawing the blood.  You cannot do it.  I mean,
24  you can do it, but it doesn't mean anything.  The

Page 124

1  minute, the minute the blood hits the catheter,
2  everything changes.
3      Q.  So all the --
4      A.  This is why you have to do urinary
5  metabolites.
6      Q.  So you think urinary metabolites is the
7  best you can do on measuring the effects of COX-2
8  inhibitors on vascular prostacyclin?
9      A.  It's the only way you can do it.
10     Q.  That's your view, right?
11     A.  No, no, that's FitzGerald's opinion.  He
12  stated that.
13     Q.  Now, that's --
14     A.  This is why he does it the way he does
15  it.  I mean, if you can measure it in blood, it
16  would be a much easier thing to do, take a needle,
17  stick it in the arm, draw the blood.
18     Q.  You're aware that other folks,
19  scientists, have disagreed with the assessment
20  that urinary metabolites is the best or only way
21  to test the effect of COX-2 inhibitors on the
22  vascular system?
23     A.  No, they -- they have objected to --
24  well, they contest the point that all of this

Page 125

1  comes from the vasculature, but the majority comes
2  from the vasculature.  In a normal individual, the
3  majority comes from the vasculature.  In a normal
4  individual, the kidney is not very dependent on
5  prostacyclin.
6      Q.  You are aware that scientists have
7  measured directly the impact of COX-2 inhibitors
8  on vascular prostacyclin in the blood?
9      A.  How do you distinguish -- how do you
10  distinguish between the vascular prostacyclin
11  versus the kidney prostacyclin versus the
12  prostacyclin that's coming from monocytes?
13     Q.  You know those studies have been done on
14  blood, right?
15     A.  Ex vivo blood.
16     Q.  And you know those --
17     A.  I do those studies.
18     Q.  And you believe those studies are not --
19  are less reliable than urinary metabolites, right?
20     A.  Ex vivo blood.
21     Q.  Is that your view?
22     A.  No, no.  Let me describe the experiment,
23  then, okay.  Where you take blood, two tubes,
24  one you let clot, the other one you add a

32 (Pages 122 to 125)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 126

1  lipopolysaccharide to it, okay. The one that you
2  let clot, you measure thromboxane. The one to
3  which you add the lipopolysaccharide, you measure
4  PGE2. The one that clots, that's a reflection of
5  COX-1. The one that you add lipopolysaccharide
6  to, that's a reflection of COX-2.
7       If you give the patient a dose of a
8  COX-2 inhibitor, and now you take the blood, you
9  will see that the COX-2 inhibitor doesn't affect
10 the one that produces the thromboxane, but it
11 reduces the production of PGE2, a measure of
12 COX-2. You can measure PGI2, as well, except it's
13 far more expensive to do that, so you measure
14 PGE2. So there's ex vivo studies on whether or
15 not a COX-2 inhibitor affects COX-2 products in
16 the blood and there is the in vivo study in which
17 you collect the urine. Now, which ones are you
18 talking about?
19      Q. The blood study.
20      A. You cannot measure, in human blood,
21 directly taken from the body, PGI2 metabolites and
22 get a meaningful measurement.
23      Q. And you understand there are scientists
24 who disagree with your assessment on that, right?

Page 127

1       A. I understand that those scientists would
2  not get the paper published, or if they did, the
3  reviewer doesn't know what they are talking about.
4  And look, I have submitted grants on this subject,
5  and I have had the reviewers come back and say you
6  can't do it that way.
7       Q. If you go to Page 26 of your report,
8  you have a quote there at the bottom from the
9  publication by Dr. Capone.
10      A. Okay.
11      Q. Now, you have obviously read that paper,
12 correct?
13      A. Yes.
14      Q. And you believe that was a well-done
15 study?
16      A. I think it's an acceptable study, yes.
17      Q. Dr. Capone is a respected scientist?
18      A. I think he is a good scientist.
19      Q. And the study done by Dr. Capone was to
20 look at the degree to which Naproxen inhibits
21 platelet aggregation, correct?
22      A. Well, they were looking at the role of
23 Naproxen, yes.
24      Q. And that was a pharmacology study,

Page 128

1  right?
2       A. Well, dealing with drugs, it was a
3  pharmacology study, yes.
4       Q. And what Dr. Capone and colleagues
5  discovered was that Naproxen mimics the effect of
6  the aspirin?
7       A. It does not mimic the effects of
8  aspirin.
9       Q. Do you understand that was the findings
10 of Dr. Capone?
11      A. I understand that.
12      Q. And the quotation you have here was
13 Dr. Capone's observation that Naproxen's ability
14 to mimic aspirin is highly dependent on dose and
15 dosing interval, correct?
16      A. Yes.
17      Q. And that it's only in controlled
18 settings where a patient takes a medicine, takes
19 Naproxen, 500 milligrams twice a day, does
20 Naproxen mimic the effects of aspirin, right?
21      A. It doesn't mimic the effects of aspirin,
22 no.
23      Q. That was Dr. Capone's conclusion, right?
24      A. That's his conclusion.

Page 129

1       Q. And the quotation here was that perhaps
2  in non-controlled settings where patients aren't
3  taking a high dose of Naproxen twice a day, that
4  may explain why Naproxen, in observational
5  studies, hasn't shown always a protective effect,
6  correct?
7       A. There is lots of reasons why Naproxen
8  may not show a protective effect. Naproxen does
9  not prevent thrombosis. It delays the time to
10 thrombosis. It does not prevent it.
11      Q. I'm referring to the conclusions of
12 Capone that you have put in your expert report.
13      A. Those are his conclusions.
14      Q. And his conclusion was that the
15 protective effects of Naproxen depend on dose and
16 dosing interval, right?
17      A. Yes.
18      Q. 500 milligrams twice a day?
19      A. Yes.
20      Q. In Dr. Capone's view, 500 milligrams
21 twice a day mimics the effects of aspirin, right?
22      A. Well, that's what he says.
23      Q. Okay.
24      A. But the effect of aspirin are quite

33 (Pages 126 to 129)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 130

1   different.
2        Q.  Well then, in -- I just wanted to
3   understand what Dr. Capone has published in the
4   peer-reviewed literature, and I have stated it
5   correctly, right?
6        A.  Uh-huh.
7        Q.  Yes?
8        A.  Yes.
9        MR. ISMAIL:  Now, I'm going to turn to a
10  new topic. I don't know if anyone needs a break,
11  but --
12       MR. NABERS:  How you doing?
13       THE WITNESS:  I'm doing okay.
14       MR. NABERS:  Do you want a break?
15       THE WITNESS:  No, no.
16       MR. NABERS:  You're fine?  Okay.
17       (Discussion held off the record.)
18  BY MR. ISMAIL:
19       Q.  I want to talk about your opinion that
20  COX-2 inhibitors can accelerate atherosclerosis.
21       A.  Yes.
22       Q.  You have stated that in your report,
23  correct?
24       A.  Yes, sir.

Page 131

1        Q.  And you believe that is true of the
2   other COX-2 inhibitors, right?
3        A.  Yes, sir.
4        Q.  Now, first of all, no human pharmacology
5   study has ever shown that to be true, right?
6        A.  There are a lot of things that we
7   haven't shown in humans that we now understand and
8   believe.
9        Q.  Let me make sure my question was
10  specific. No human study has ever shown that any
11  COX-2 inhibitor accelerates atherosclerosis,
12  correct?
13       A.  I don't know of any human study that can
14  be designed to demonstrate that and do it
15  ethically.
16       Q.  My statement is correct, right?
17       MR. NABERS:  If you have anything to
18  add, you can add it.
19       A.  Your statement is correct, but it
20  doesn't mean anything.
21       Q.  You understand that studies have been
22  done with statins to show changes in
23  atherosclerosis over time, right?
24       A.  Because the data, the basic information,

Page 132

1   demonstrates that this is a very possible effect.
2        Q.  Well, you understand that the studies
3   can be done to show changes in atherosclerosis
4   over time in humans, right?
5        A.  With the statin.
6        Q.  It can be done with any medicine, right?
7        A.  No, what can be done and what's legal
8   and what's appropriate is two different things.
9        Q.  You understand that studies, serial
10  angiography studies have been done, right?
11       A.  Yes, but go ahead.
12       Q.  And they have been done with statins,
13  right?
14       A.  Yes.
15       Q.  And they have been published by
16  respected scientists in peer-reviewed journals to
17  demonstrate that statins can actually slow down or
18  retard atherosclerosis?
19       A.  This is an FDA-approved trial?
20       Q.  Yes, sir.
21       A.  So the FDA had to have preliminary data.
22       Q.  Do you understand that that's true?
23       A.  What's true?
24       Q.  That the --

Page 133

1        A.  We just went through before, how do you
2   get an indication to do a clinical trial. The FDA
3   has to review the data first, the basic data, to
4   suggest that this is a safe trial to do in humans,
5   okay?
6        Now you're asking me about statins.
7   Statins are safe, as far as we know, in the right
8   individual, and the observations in animal data
9   suggest that this is anti-inflammatory, they go to
10  man, and they see similar results.  That's based
11  on basic information.
12       Now let's take the COX-2.  There
13  are animal data showing that COX-2 inhibitors
14  accelerate the progression of atherosclerosis,
15  that removal of COX-2 in a knock-out mouse
16  accelerates the production of atherosclerosis.
17  The FDA, having those data in hand, would never
18  approve a human trial to demonstrate regression
19  of atherosclerosis.
20       Q.  You understand that many respected
21  scientists have published and continue to publish
22  today that COX-2 inhibitors can actually slow down
23  the progression of atherosclerosis?
24       A.  They predict that, but the data do not

34 (Pages 130 to 133)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 134

1  support that.
2      Q.  You understand that that's true, right?
3      A.  One of my colleagues was promoting such
4  a study until I stopped him.
5      Q.  And your colleague was?
6      A.  I won't name him.
7      Q.  You understand that Dr. Topol from 2001
8  through 2004 was publicly stating that COX-2
9  inhibitors can be potentially useful in slowing
10  down atherosclerosis, right?
11     A.  That is correct, a lot of people
12  believed that since they are anti-inflammatory,
13  inflammation is a bad thing, and I spent a lot of
14  time talking about Gilroy, I spent a lot of time
15  talking about other authors who have published
16  just reams and reams of information saying
17  inflammation is part of the healing process.
18     Q.  I want to go back to my question.  You
19  understand that while Vioxx was on the market from
20  2001 to 2004, Dr. Topol was publicly recommending
21  and stating that a study should be done, because
22  he believed it possible that Vioxx could protect
23  the heart, right?
24         MR. NABERS:  Objection to the form.

Page 135

1      A.  He believed that and other people
2  believed that.
3      Q.  And Dr. Topol's idea was that
4  atherosclerosis is an inflammatory condition.
5      A.  That wasn't his idea, that was Peter
6  Libby, and before him others from Washington,
7  University of Washington-Seattle, had already
8  promoted that idea.
9      Q.  Let me restate.
10         Doctor -- the basis for Dr. Topol's
11  public comments was that atherosclerosis is an
12  inflammatory condition?
13     A.  Yes, sir.
14     Q.  And you certainly agree with that
15  characterization?
16     A.  Oh, I lectured on that many times.
17     Q.  And that the idea was and still is that
18  an anti-inflammatory could perhaps reduce the
19  inflammation in the vessel and thereby slow down
20  the development of atherosclerosis, correct?
21     A.  That is no longer the current belief.
22     Q.  That was the idea that was the basis for
23  the calls by Dr. Topol and others to study Vioxx
24  in that setting, right?

Page 136

1      A.  That was the idea, but it was based on a
2  misunderstanding of the role of inflammation.
3      Q.  And you know that Dr. Topol was publicly
4  suggesting that Vioxx be studied in patients with
5  acute coronary syndrome, right?
6      A.  That was the idea, but once again,
7  misinformed.
8      Q.  And Dr. Topol and others were -- and
9  just so everyone is clear, acute coronary syndrome
10  are those patients after they have had a heart
11  attack or unstable angina or bypass, right?
12     A.  Doesn't have to be after a heart attack,
13  it could be the first signs of a heart attack.
14     Q.  Right.  Even acutely while they are
15  having an event, right?
16     A.  Just like Mr. Mason.
17     Q.  So Dr. Topol thought that -- was
18  suggesting a cardiovascular outcome study where
19  half of the group in the study who are having --
20  either in the midst of a heart attack or right
21  after a heart attack or bypass receive Vioxx on
22  the hope that Vioxx could be beneficial, right?
23     A.  That was the idea.
24     Q.  And you think that was a terrible idea?

Page 137

1      A.  I know it's a terrible idea.
2      Q.  And you know that Merck did not follow
3  up on Dr. Topol's recommendation for a
4  cardiovascular outcome study, right?
5      A.  For good reason, because they already
6  knew what the outcome would be.
7      Q.  You know, you certainly agree with
8  Merck's decision not to accept and follow up on
9  Dr. Topol's idea for cardiovascular outcome study?
10     A.  Merck knew well in advance in the
11  mid-1990's that COX-2 inhibition would lead to
12  thrombosis.
13     Q.  Can you answer my question, sir?
14     A.  I just did.
15     Q.  You certainly agree with Merck's
16  decision not to accept and follow up on
17  Dr. Topol's idea for a cardiovascular outcome
18  study?
19     A.  And I gave you the reason why, because
20  they knew thrombosis would be more likely to
21  occur.
22     Q.  I want to under -- see whether you agree
23  with Merck's decision.
24     A.  I agree with that decision, yes.

35 (Pages 134 to 137)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 138

1     Q.   And you understand that even today,
2  Dr. Nissen is suggesting that COX-2 inhibitors
3  could be beneficial in reducing atherosclerosis,
4  right?
5     A.   I don't think he would give it to his
6  mother, if she were one of the patients.
7     Q.   You understand that that's Dr. Nissen's
8  publicly-stated view?
9     A.   Dr. Nissen may be a clinician, but he is
10 not a true scientist.  And I don't mean that in a
11 derogatory way.  Dr. Nissen makes his living by
12 doing clinical trials.
13    Q.   And you know Dr. Nissen has publicly
14 suggested and sponsored a clinical trial with
15 Celebrex in acute coronary patients?
16    A.   Yeah.
17    Q.   Yes?
18    A.   Yes.
19    Q.   And you understand that even today
20 respected scientists and clinical trialists are
21 recommending that COX-2 inhibitors can be useful
22 in the slowing down of atherosclerosis, right?
23         MR. NABERS:  Objection to the form.
24    A.   Well, with Celebrex, there may be a

Page 139

1  reason for considering such a trial, because
2  Celebrex is somewhat different than Vioxx when it
3  comes to thrombosis.
4     Q.   You believe Celebrex accelerates
5  atherosclerosis, right?
6     A.   We're not talking about atherosclerosis,
7  we're talking about thrombosis.
8     Q.   Well, I want to talk about
9  atherosclerosis and we will talk about thrombosis
10 in a minute.
11    A.   Okay.  Well, as far as I know, there are
12 no good data to suggest whether or not Celebrex
13 affects experimental atherosclerosis.  The data I
14 referred to before were done in knock-out animals
15 by Garret FitzGerald, in particular.  The Japanese
16 before that had done some studies, long before
17 FitzGerald, showing in knock-out animals that you
18 accelerate atherosclerosis in such animals,
19 suggesting that COX-2 is an important factor in
20 controlling the rate of atherosclerosis.
21    Q.   Basically -- I'm sorry, were you done?
22    A.   So I would assume that giving a COX-2
23 inhibitor, whether it be Celebrex or Vioxx or
24 any other COX-2 inhibitor, the potential for

Page 140

1  accelerating atherosclerosis is real.
2         Now, what about thrombosis?  Celebrex is
3  going to be less likely to lead to thrombosis than
4  is Vioxx, but they still -- it's still going to
5  carry a risk.
6         Now, clinical trials, just the fact that
7  somebody has put together a clinical trial doesn't
8  prove anything.  We have known a lot of clinical
9  trials that have hit the dust real fast because of
10 adverse events occurring, but just because they
11 propose it and they start one doesn't mean it's
12 correct.
13    Q.   Let me restate it this way.
14         Dr. Nissen is recommending today
15 a clinical trial with Celebrex slowing down
16 atherosclerosis that is very similar to the study
17 that Dr. Topol suggested for Vioxx back in 2001 to
18 2004, correct?
19    A.   He has been suggesting that, as have
20 others, yes.
21    Q.   Now, I want to go to the studies that
22 were done in animals on atherosclerosis.  No
23 study, no animal study ever done on Vioxx has ever
24 shown progression of atherosclerosis, correct?

Page 141

1     A.   Well, it's hard to do an animal study
2  with a drug like Vioxx where you have to feed the
3  animal the drug.  It takes a long time to do that.
4  So people today resort to knock-out animals.
5         But removing the COX-2, they show
6  progression of atherosclerosis by inhibiting the
7  production of thromboxane, they show the reduction
8  of atherosclerosis, so you take the scientific
9  facts and it looks like this balance between
10 COX-1, COX-2, really has importance.
11    Q.   I will talk about each group of studies
12 separately, but I need to do them separately,
13 otherwise the questions and answers don't make any
14 sense, okay?
15    A.   Okay.
16    Q.   You understand that scientists have
17 looked, in an animal model, on the effect of Vioxx
18 on the progression of atherosclerosis, correct?
19    A.   Yes.
20    Q.   And you understand that every single
21 study done with Vioxx has demonstrated that Vioxx
22 does not accelerate atherosclerosis in an animal
23 model, correct?
24    A.   If that's what the studies show, then

36 (Pages 138 to 141)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 142

1    it's correct.
2        Q.  You certainly cite some in your own
3    reports.
4        A.  Yes.
5        Q.  So you're personally aware that the
6    scientists who have studied Vioxx's potential
7    effect on atherosclerosis in an animal model have
8    shown that Vioxx does not accelerate that
9    condition?
10       A.  Which study are you referring to in my
11   report?
12       Q.  Well, you -- well, you know that to be
13   true, right?
14       A.  Which study are you referring to, then
15   I'll tell you if it's true.
16       Q.  Well, as you sit here now, can you tell
17   me whether that's a true statement?
18       A.  Which -- some studies will say
19   otherwise.
20       Q.  What study has said otherwise, sir?
21       A.  I don't know.  Let's see which one
22   you're talking about.
23       Q.  Go to -- go to Page 41 of your report,
24   sir.

Page 143

1            Do you see your sentence,
2    "Rofecoxib-treated LDL-receptor knock-out mice
3    develop significantly less atherosclerosis than
4    their controls," right?
5        A.  Yes.
6        Q.  So you're actually aware of an animal
7    study which shows that Vioxx slows down
8    atherosclerosis, right?
9        A.  In that particular -- this is a
10   knock-out, an LDL receptor knock-out mouse.
11       Q.  Okay.  So you understand that study
12   has been done and showed that Vioxx not only fails
13   to accelerate, but actually slows down
14   atherosclerosis?
15       A.  If you take out the LDL receptor.
16       Q.  Do you understand that to be true?
17       A.  Yeah.
18       Q.  Okay.  So do you believe that -- and
19   your reference is to the Number 45 and that's
20   Dr. Burley's study, right?
21       A.  Uh-huh.
22       Q.  Yes?
23       A.  Yes.
24       Q.  And that's a study on which John Oates

Page 144

1    participated?
2        A.  Yes.
3        Q.  And Drs. Burley and Oates are well
4    respected scientists?
5        A.  Very well.  Oh, Dr. Oates is also an
6    employee of Merck.
7        Q.  He is not an employee of Merck, sir.
8        A.  He certainly is.
9        Q.  You think Dr. Oates is an employee of
10   Merck?
11       A.  Yes, I do.  Now, wait a minute, you're
12   going to challenge me on that?
13       Q.  Yes, sir.
14       A.  Well, you're wrong.
15       Q.  Dr. Oates is a professor of pharmacology
16   at Vanderbilt.
17       A.  No longer.
18       Q.  At the time of this publication.
19       A.  No longer.  I just made a statement,
20   just like you're making a statement.  He is an
21   employee of Merck.
22       Q.  Doctor, do you believe --
23       A.  You said no.
24       Q.  Do you believe Dr. Burley's study that

Page 145

1    you cite in your report at Page 41 was a well-done
2    study?
3        A.  As well as one could do such a study,
4    yes.
5        Q.  Was it a good model for analyzing
6    Vioxx's potential on atherosclerosis?
7        A.  Not really.  If you're taking out
8    the LDL receptor, this -- where you had LDL
9    receptors, that's very important.  Now, why am I
10   mentioning that?  Because Vioxx has the potential
11   to oxidize LDL and produce a pro-inflammatory
12   event, so he has distorted the basic physiology,
13   so you get what you want in such a study.  You
14   have to interpret the data accordingly.  You can't
15   just say this applies to humans.
16       Q.  All right.  Are you aware of other
17   animal studies --
18       A.  Why don't we read the rest of the
19   statement there.
20       Q.  Sure.
21       A.  "The animal studies examining the
22   effects of coxibs on atherogenesis reveal
23   conflicting results."
24       Q.  Let me stop you right there.  What study

37 (Pages 142 to 145)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 146

2      A.  Let me finish.
3      Q.  Okay.
4      A.  "They may reflect differences in the
5  animal models or the expandable protocols,
6  however, evidence accumulates that COX-2 may play
7  a proatherogenic role, particularly during the
8  early phase of atherosclerosis, suggesting a
9  potential benefit of coxib in this particular
10 setting."
11          Now, somewhere in this document I go
12 through this discussion where, in the early phases
13 of atherosclerosis, in the early phases of the
14 inflammatory response, COX-2 is playing a
15 pro-inflammatory role, however, that is very
16 short-lived, and then it switches over to an
17 anti-inflammatory role, and it's essential for
18 the healing, and this is why I discuss the work
19 of Derrick Gilroy extensively.
20     Q.  Now, we --
21     A.  Let me finish.
22     Q.  Go ahead.
23     A.  The inflammatory monocytes that enter
24 the inflammatory lesion of the atherosclerotic

Page 147

1  lesion, they undergo a natural cell death.  We
2  call it apoptosis.  It's programmed.  The cell is
3  programmed to die after a certain period of time.
4          It is well known now, according to
5  Gilroy's studies, that COX-2 inhibition prevents
6  that cell death, so the monocyte which becomes a
7  macrophage continues to promote that inflammatory
8  event.
9          Now you get the acceleration of this
10 atherosclerotic process.  Not only does COX-2
11 inhibition interfere with the healing in this
12 inflammatory lesion in the blood vessel, it
13 interferes with healing elsewhere in the body.
14         One of the new references I give you is
15 Bone and Drugs, and it shows that COX-2 inhibitors
16 inhibit the healing of bone fractures.  It shows--
17 the literature shows COX-2 inhibitors inhibit the
18 healing of a skin incision.  Today's surgeons are
19 somewhat fearful of giving COX-2 inhibitors
20 post -- for post-operative pain, because it
21 interferes with the healing process.
22         So you have to look at the total
23 picture, you just can't take an isolated
24 statement.

Page 148

1      Q.  All right.  Are you done?
2      A.  I hope you're done, because I'm trying
3  to -- I'm trying to get over a lot of this
4  questioning that is not going anywhere.
5      Q.  Okay.  Can we go back to your report,
6  sir?
7      A.  Go ahead.
8      Q.  You write, "Animal studies examining
9  the effect of coxibs on atherogenesis reveal
10 conflicting results."  Do you see that?
11     A.  Yes.
12     Q.  What study with a coxib has revealed any
13 result on the progression of atherogenesis that
14 suggests that coxibs can accelerate the process?
15 Name one.
16     A.  I refer to Gilroy's studies.
17     Q.  That wasn't done using COX-2 inhibitors.
18     A.  I refer to Mason's studies.
19     Q.  Mason's didn't study the -- examine the
20 progression of atherosclerosis.
21     A.  But he provides the concepts.
22     Q.  All right.  Well, let me go back to --
23 let me go back to the -- first of all, you do not
24 cite in your report a single animal study that

Page 149

1  suggests that COX-2 inhibitors can accelerate
2  atherosclerosis, correct, actually done with COX-2
3  inhibitors, right, can we agree on that?
4      A.  We agree.
5      Q.  And in fact, scientists in many
6  different laboratories have examined whether, in
7  animal models of different types, whether COX-2
8  inhibitors can accelerate atherosclerosis,
9  correct?
10     A.  Yes.
11     Q.  You cite three of them in your own
12 report and you know there are many others, right?
13     A.  Yes.
14     Q.  And every single one that has actually
15 measured the progress of atherosclerosis with
16 COX-2 inhibitors has found that COX-2 inhibitors
17 do not accelerate that process, correct?
18     A.  We will say yes to that right now.
19     Q.  Now, what do you believe -- do you
20 believe that there is a better model than the one
21 Dr. Burley used that is cited at Reference 45 to
22 examine, in an animal model, whether COX-2
23 inhibitor can accelerate atherosclerosis?
24     A.  You have to look at animal models of

38 (Pages 146 to 149)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 150

1  atherosclerosis with a very, very cautious eye.
2  None of them reflect the human disease.  Animals
3  do not develop atherosclerosis in a normal
4  process.  They have to be manipulated to do so,
5  unlike humans.
6        So what does an animal model really tell
7  us?  Very limited information.  You have to put
8  all the facts together.  If I understand that
9  COX-2 inhibition interferes with the healing
10 process, I can conclude from that that it's more
11 likely to accelerate atherosclerosis.  If I
12 understand the healing, if I understand the
13 inflammatory process as being one of inflammation
14 initially and one of healing next, then I have to
15 look at the animal studies.  What's the duration
16 of exposure here?  Has the healing process
17 converted over?  Has the inflammatory process
18 converted over to the healing process?  Have they
19 stopped the study prematurely and failed to see
20 the healing effect?  These are things that are
21 not considered when people do these studies.
22       Q.  All right.  Your opinion that Vioxx
23 can accelerate atherosclerosis is based on
24 Dr. Gilroy's studies and Dr. Walters' study,

Page 151

1  is that correct?
2        A.  Dr. Sirhan, Dr. Gilroy, yes.
3        Q.  And Doctor --
4        A.  And -- go ahead.
5        Q.  Am I correct?
6        A.  Go ahead.
7        Q.  And Dr. Gilroy's and Dr. Sirhan's
8  studies are not even animal studies, they are test
9  tube studies, right?
10       A.  They provide the concept, sir.
11       Q.  Am I correct?
12       A.  You're correct.
13       Q.  All right.  So your opinion is based on
14 test tube studies that didn't even involve COX-2
15 inhibitors, right?
16       A.  They did involve COX-2 inhibitors.
17       Q.  Dr. Gilroy's study involved COX-2
18 inhibitors?
19       A.  Well, they are looking at the enzyme
20 activity, yes.
21       Q.  Let me be specific.
22       When I say COX-2 inhibitors, I mean the
23 class of medicines known as COX-2 inhibitors,
24 Vioxx, Celebrex, Bextra, Nimesulide, using that --

Page 152

1        A.  Dr. Gilroy showed that COX-2 was
2  essential for the production of PGJ2, which is
3  essential for the healing process.  If you prevent
4  that, the deductive reasoning leads you to
5  conclude that by inhibiting PGJ2 production, you
6  inhibit the healing process.
7        Q.  Can we agree that Dr. Gilroy's studies
8  upon which you're relying for your atherosclerosis
9  opinion did not actually study COX-2 inhibitors?
10       A.  Okay.
11       Q.  You agree with that?
12       A.  Yeah, okay.
13       Q.  And Dr. Walters and Dr. Mason, these are
14 the LDL oxidation studies?
15       A.  Yes.
16       Q.  Now, those studies were also in vitro,
17 right?
18       A.  In vitro, yes, with Vioxx and with
19 Celebrex.
20       Q.  So now at least Dr. Mason and
21 Dr. Walters have studied COX-2 inhibitors, but
22 they have done it in an in vitro test tube model,
23 right?
24       A.  Yes.

Page 153

1        Q.  And what they are looking at is the
2  propensity for LDL oxidation, correct?
3        A.  Yes.
4        Q.  But you know, Doctor, that other
5  scientists have actually studied LDL oxidation
6  with coxibs in human and animal models, right?
7        A.  Yes.
8        Q.  And you know every single study --
9        A.  I don't know every single study.
10       Q.  You know every single -- every single
11 study that you are aware of that has studied Vioxx
12 in a human or animal model has shown Vioxx has no
13 adverse effects of LDL oxidization, you know
14 that's true, right?
15       A.  I don't know that that's true.
16       Q.  Can you name one?
17       A.  I'm naming Mason's study where he
18 studies the actual reaction.
19       Q.  In a test tube?
20       A.  A test tube.
21       Q.  Right.  So my question is actually on
22 those studies, and you know there are many of
23 them, which have studied both in animals and in
24 humans, the effect of Vioxx on LDL oxidation.

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 154

1      A.  And how are you going to prove in an
2  animal study that LDL oxidation is taking place?
3      Q.  The scientists who have conducted the
4  studies on animal and human models have concluded
5  and published in the peer-review literature that
6  Vioxx does not have any adverse effects on LDL
7  oxidation, isn't that true, Doctor?
8      A.  Well, I don't know if it's true.  How do
9  you study that?
10      Q.  Has that been the conclusions in the
11  peer-reviewed literature by every scientist who
12  has studied this in an animal model?
13      MR. NABERS:  Object to the form.
14      A.  It's not something you can measure in an
15  animal model.
16      Q.  Well, I understand you disagree with
17  whether the models are good ones for the study
18  of LDL oxidation and you may disagree with the
19  conclusions of the authors, but let's just
20  understand what is out there in the peer-reviewed
21  literature, okay?
22      On the one hand, you have got test tube
23  studies, right, Dr. Walters and Dr. Mason, on LDL
24  oxidation, is that correct?

Page 155

1      A.  Yes.
2      Q.  And then on the other hand, you have
3  every single study in a human and animal model
4  done with Vioxx and those studies and that
5  peer-reviewed literature has concluded Vioxx has
6  no adverse effect on LDL oxidation, you know
7  that's true, right?
8      A.  They have conducted studies, but whether
9  or not it has an effect on LDL oxidation, I'm
10  asking you, how do you do that?
11      Q.  You understand that was the conclusion
12  of those scientists who have done those studies?
13      A.  In other words, they can't be wrong?
14      MR. NABERS:  Object to the form.
15      Q.  I just want to know where we are on
16  the peer-reviewed literature here.  So you can
17  disagree all you want, but I want to get your
18  agreement that every single publication that
19  you're aware of that has studied Vioxx's effect in
20  human or animal models has shown that Vioxx has no
21  adverse effect on LDL oxidation, true?
22      A.  I don't know how you would study it, but
23  if they did attempt to do that and they came up
24  with a negative result, then it's true, but you

Page 156

1  cannot, in my estimation, you can't study it that
2  way.
3      Q.  And you're not aware of any study done
4  in a human or animal model which has shown that
5  Vioxx has any adverse effect on LDL oxidation,
6  correct?
7      A.  Okay.
8      Q.  Is that correct?
9      A.  Yes.
10      Q.  All right.  So your support for your
11  atherosclerosis opinion is based on Gilroy and
12  Walters and Mason's test tube studies, right?
13      A.  Yes.
14      Q.  And is contrary to the findings of --
15  in animal models which have actually studied the
16  progression of atherosclerosis with Vioxx,
17  correct?
18      A.  Uh-huh, yes.
19      Q.  And is contrary to the studies in animal
20  and human models on the effect of Vioxx on LDL
21  oxidation, correct?
22      A.  Yes.
23      Q.  Okay.
24      A.  And that's why we have disagreement

Page 157

1  in the literature, and that's why there is
2  uncertainty, so when there is uncertainty, you
3  take the safest course.
4      Q.  Now, you -- I just wanted to make sure
5  I understand a comment here on Page 41 of your
6  report.
7      Do you see the semi-colon that says,
8  however, about three lines up before the image
9  in the middle of the page?  I'm looking at the
10  carryover paragraph that ends --
11      A.  Yes, okay.
12      Q.  "However, evidence accumulates that
13  COX-2 may play a proatherogenic role --"
14      A.  Yes.
15      Q.  "-- particularly during the early phase
16  of atherosclerosis --"
17      A.  Yes.
18      Q.  "-- suggesting a potential benefit
19  of coxibs in this particular setting."
20      A.  That's exactly what I referred
21  to before.  In the early stages it plays a
22  pro-inflammatory event that switches over to an
23  anti-inflammatory event, and Gilroy has published
24  papers saying COX-2 and anti-inflammatory, okay.

40 (Pages 154 to 157)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 158

1      Q.  All right.
2      A.  COX-2 and anti-inflammatory, not COX-2
3  inhibitor and anti-inflammatory.
4      Q.  I understand your view of Dr. Gilroy's
5  research, but I want to make sure I understand
6  your statement here.
7          Your statement here in your expert
8  report is that a COX-2 inhibitor like Vioxx would
9  have a potential benefit of slowing down the
10  progression of atherosclerosis in the early phase
11  of that condition, right?
12      A.  No.  In the early phase of the condition
13  it's pro-inflammatory.
14      Q.  What is pro-inflammatory?
15      A.  COX-2.
16      Q.  So COX-2 inhibition in the early phase
17  is a good thing?
18      A.  In the early phase.
19      Q.  Okay.  So let me restate my question and
20  make sure I understand your statement, okay?
21  Allow me to do that, please.
22      A.  Go ahead.
23      Q.  Your statement in your expert report is
24  that a COX-2 inhibitor like Vioxx could be a

Page 159

1  potential benefit in slowing down the early phase
2  of atherosclerosis?
3      A.  Yes.
4      Q.  Thank you, sir.
5      A.  But we're not going to talk about the
6  later phase?  It doesn't stop there.
7      Q.  I understand your view that COX-2 then
8  becomes a good actor in the later phases of
9  atherosclerosis, correct?
10      A.  And if you inhibit it, that's bad.
11      Q.  Okay.  And that would be true with
12  traditional NSAIDs, right?
13      A.  It would be.
14      Q.  So any traditional --
15      A.  But --
16      Q.  But?
17      A.  COX-2, NSAIDs, NSAIDs also block the
18  production of thromboxane, and if you take the
19  data from FitzGerald, a Merck consultant, okay,
20  where he shows increased thromboxane increases the
21  progression of atherosclerosis, so the NSAID is a
22  little different, now, isn't it?  It's blocking
23  the production of thromboxane.  It's not the same.
24          MR. ISMAIL:  How are we doing?  I was

Page 160

1  going to keep going.
2          (Discussion held off the record.)
3  BY MR. ISMAIL:
4      Q.  Page 40, in the bottom of your -- of
5  that page, Doctor, you write about double
6  knock-out mice.
7      A.  Yes.
8      Q.  And inhibition of COX-2 is associated
9  with morphologic changes consistent with plaque
10  destabilization, right?
11      A.  Yes, sir.
12      Q.  And then you cite to a Reference 41
13  there.  And that's Dr. Egan's publication from
14  2005, correct?
15      A.  Right.
16          MR. ISMAIL:  I want to make sure I get
17  the right thing.
18          And you -- let's go ahead and mark that.
19          (Marked for Identification:
20          Deposition Exhibit No. 7.)
21  BY MR. ISMAIL:
22      Q.  Doctor, the court reporter has handed
23  you what's been marked as Exhibit 7.  Is Exhibit 7
24  a copy of the reference you give for the statement

Page 161

1  that inhibition of COX-2 is consistent with
2  morphologic changes consistent with plaque
3  destabilization in your expert report?
4      A.  Yes.
5      Q.  So you obviously read Exhibit 7, right?
6      A.  Yes.
7      Q.  Do you believe Exhibit 7 is a good
8  study?
9      A.  I think it's an interesting study.  I
10  think it --
11      Q.  Is that distinguished from a good one?
12      A.  It provides a lot of basic information
13  that people can dwell on and begin to advance on.
14      Q.  Is Dr. Egan's animal model for studying
15  these concepts a good one, in your view?
16      A.  It's an animal model.  It's a good
17  animal model, but whether it reflects the human
18  event is always a question.
19      Q.  And Exhibit 7 contains some -- is
20  authored by some respected researchers, right?
21      A.  Very respected, yes.
22      Q.  Now, in this study of Dr. Egan's that
23  you cite, they were -- some of the mice were given
24  a COX-2 inhibitor called MF tricyclic.

41 (Pages 158 to 161)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 162

1    A.  Which one?
2    Q.  MF tricyclic?
3    A.  Which COX-2 inhibitor?
4    Q.  MF tricyclic, or am I misremembering?
5  Yes, MF tricyclic.
6    A.  Where do you see that?
7    Q.  Well, what COX-2 inhibitor do you think
8  is being used in Exhibit 7?
9    A.  I'm trying to find it here in the paper.
10   Q.  It's in the abstract.
11   A.  In the abstract where?
12   Q.  Methods and results.
13   A.  In the methods and results, that's where
14 it should be.
15   Q.  If you want to go to the methods section
16 of the paper, Page 335.
17   A.  There it is.  It's S18886.  Is that the
18 one you're referring to?
19   Q.  Let me just refer you to what I'm
20 referring to.
21   A.  There they give the chemical name.
22   Q.  That's fine.  But do you know the COX-2
23 inhibitor that was being used here was called MF
24 tricyclic?

Page 163

1    A.  Where is that?
2    Q.  If you go to Page 335, second page of
3  the article.
4    A.  Yes.
5    Q.  Methods section.
6    A.  Okay.
7    Q.  Six lines up.  "The drug loading in the
8  chow was MF tricyclic."
9    A.  Six lines up from where?
10   Q.  The bottom right-hand column.
11   A.  The bottom right-hand column?
12      "The drug loading in the chow was
13 0.0075 percent weight weight MF tricyclic which is
14 equivalent to a daily dose of 15 milligrams per
15 kilogram if one assumes the mouse weight of 25
16 grams and each mouse consumes five grams of feed
17 per day."  Okay.
18   Q.  So the COX-2 inhibitor being studied was
19 MF tricyclic, right?
20   A.  All right.
21   Q.  That's not Vioxx, right?
22   A.  No, it's not Vioxx.
23   Q.  Okay.  And so some of the mice got
24 MF tricyclic, correct?

Page 164

1    A.  Yes.
2    Q.  And the mice that got the COX-2
3  inhibitor only had no adverse changes to the
4  atherosclerotic plaque, correct?
5    A.  All right.
6    Q.  Is that a correct statement?
7    A.  Okay.
8    Q.  Yes or no?
9    A.  Yes.
10   Q.  And it was only when a COX-2 inhibitor
11 was administered with a thromboxane receptor
12 antagonist did there occur any morphologic changes
13 in the plaque, correct?
14   A.  A beneficial change.
15   Q.  No, there was deleterious change.
16   A.  Well, TP is the thromboxane receptor,
17 and SS -- S18886 is a thromboxane receptor
18 antagonist.
19      You go down on page 341, the left-hand
20 column, the last sentence, "Experience in this
21 model suggests that the clinical use of TP
22 antagonist --" that's thromboxane receptor
23 antagonist --
24   Q.  Yes, sir.

Page 165

1    A.  "-- would be expected to be useful in
2  the earlier stages of disease, rather than in
3  reversing accumulated plaque burden in patients
4  with diffuse established atherosclerosis."
5      So what they are saying is if you
6  eliminate the thromboxane you get the beneficial
7  effect.
8    Q.  No, you're -- I want to go to your
9  statement about the morphologic changes consistent
10 with plaque destabilization.  The COX-2 inhibitor
11 administered alone had no destabilized plaque,
12 correct?
13   A.  Yes.
14   Q.  And only when the COX-2 inhibitor was
15 administered with the thromboxane receptor
16 antagonist were there adverse effects to the
17 characterization of the plaque, right?
18   A.  Spontaneous atherogenesis that develops
19 in the chow diet in this model or to augment the
20 beneficial impact of the thromboxane receptor
21 antagonist.  If you go to the right-hand column.
22   Q.  Of?
23   A.  Of the second line.
24   Q.  Of which page, sir?

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 166

1    A.  "Even early intervention with the
2  selective inhibitor of COX-2 failed to modulate
3  the modest spontaneous atherogenesis that develops
4  on a chow diet in this model or to augment the
5  beneficial impact of the thromboxane receptor
6  antagonist."  So the COX-2 inhibitor did not
7  do any good.
8    Q.  Didn't do any bad, sir.
9    A.  It didn't do any good.
10    Q.  Well, let's be clear.  The study you --
11  first of all, the COX-2 inhibitor administered
12  alone did not increase atherosclerosis, that's a
13  study found by Dr. FitzGerald and others in
14  Exhibit 7, right?
15    A.  Okay.
16    Q.  And the COX-2 inhibitor administered
17  alone didn't cause any plaque destabilization,
18  right?
19    A.  Okay.
20    Q.  And the COX-2 inhibitor didn't have a
21  benefit of slowing down atherosclerosis, right?
22    A.  All right.
23    Q.  Okay.  So the COX-2 inhibitor in that
24  regard was neutral as to atherosclerosis and

Page 167

1  plaque destabilization, correct?
2    A.  That's why I say there are conflicting
3  results.
4    Q.  Okay.  So this is Dr. -- this is
5  Dr. Egan's study, which you cited in your report,
6  correct?
7    A.  The basis for this study was S18886,
8  the study that I -- the drug that I have studied
9  extensively now, and what they are looking at
10  is the role of thromboxane as a promoter of
11  atherogenesis by inhibiting the receptor, you
12  take away the influence of thromboxane.
13    Q.  Which has nothing to do with that
14  selective COX-2 inhibitor, right?
15    MR. NABERS:  Objection to the form.
16    A.  Well, when you inhibit COX-2, you leave
17  thromboxane unopposed.
18    Q.  But this study found that the inhibition
19  of COX-2 alone had no adverse effects on the
20  plaque, either progression or stabilization,
21  right?
22    A.  But you're taking away the prostacyclin
23  which counteracts the thromboxane, so the question
24  is, does thromboxane impact on this to cause an

Page 168

1  acceleration of atherosclerosis.
2    Q.  Can you agree with my statement that
3  the administration of the COX-2 inhibitor in
4  Dr. Egan's study, which you cite in your report,
5  showed no adverse effect by the COX-2 inhibitor
6  on either progression of the plaque or in the
7  destabilization of the plaque?
8    A.  I agree with your statement, but you are
9  misinterpreting the object of this study, the
10  objective of this study.
11    Q.  Now, by the way, on this question of LDL
12  oxidation, will you at least agree that the theory
13  that Vioxx has an adverse effect on LDL oxidation
14  is a theoretical one that has not been generally
15  accepted in the scientific community?
16    A.  Well, I think whenever you have basic
17  information that is generated by a well-recognized
18  method, one that I myself have used, you have to
19  consider this in the total picture, what does this
20  mean in a human situation or are you going to
21  study this further to see if it has beneficial or
22  detrimental effects.  Many of the things are not
23  able to be studied in animal model and you have
24  to go with the basic information and make a best

Page 169

1  guess at the way, at the present time, the way it
2  looks.
3    If you look at all of the many, many
4  studies, you are at greater risk taking a COX-2
5  inhibitor, whether it be Rofecoxib or Celebrex
6  or Bextra, you are at greater risk of a
7  thromboembolic event.
8    Now, that's assuming we're only dealing
9  with atherogenesis.  We're also dealing with the
10  blood clotting mechanism.  We're also dealing with
11  the platelet interactions.  We're also dealing
12  with a lot of factors that we don't thoroughly
13  understand, like the inflammatory process and the
14  healing that follows.
15    MR. ISMAIL:  Did you find any such
16  e-mails, Scott?
17    MR. NABERS:  Yeah, but I'm trying to go
18  back and find Carrie's specifically.  I'm having
19  to go through about 800 of them.
20    MR. ISMAIL:  I believe that to be true,
21  but I don't think you're going to find one that
22  you're describing.
23    MR. NABERS:  Yeah, I am, and we're done,
24  it doesn't matter, because we did have the

43 (Pages 166 to 169)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 170

1  agreement.
2          MR. ISMAIL:  Scott, there is no way that
3  there was an agreement that we were going to limit
4  to four hours a 112-page report.
5          MR. NABERS:  You have deposed him five
6  times over 35 hours of deposition.
7          MR. ISMAIL:  He has already told us
8  how new all this material is.  He has got this
9  extremely --
10         THE WITNESS:  No, sir, excuse me, but --
11         MR. ISMAIL:  I don't want to waste our
12 time debating.
13         MR. NABERS:  Yeah, I agree, we don't
14 need to waste the time.
15         MR. ISMAIL:  We're going to have this
16 discussion at some point.
17         MR. NABERS:  Let's keep going.
18 BY MR. ISMAIL:
19     Q.  Doctor, on Page 42 of your report, you
20 have this discussion of thrombomodin?
21     A.  Thrombomodulin.
22     Q.  That's what I wanted to say.
23     A.  Yes.
24     Q.  And you have this discussion here about

Page 171

1  the potential for COX-2 inhibitors as being a bad
2  actor in that environment?
3      A.  Yes.  This is becoming a very important
4  area of research right now.
5      Q.  Now, the -- can you agree -- is it
6  thrombomodulin?  Give me the pronunciation again.
7      A.  Thrombomodulin.
8      Q.  Thrombomodulin.
9          None of the studies that you cite in
10 your report on thrombomodulin dealt with COX-2
11 inhibitors, correct?
12     A.  Wrong.
13     Q.  Which ones?
14     A.  The one in which Carston Shore is one of
15 the authors.  The first author's name starts with
16 R, Rauchbach or something like that.
17     Q.  Rauchbach?
18     A.  Yeah.  Look at Number 53.  I don't have
19 the reference list in front of me.
20     Q.  The reference 53 is Hirsch.  Raubauch?
21     A.  Raubauch, right.
22     Q.  Regulation of Thrombomodulin Expression
23 in Human Vascular Smooth Muscle Cells by COX-2
24 Derived Prostaglandins?

Page 172

1      A.  Yes.
2      Q.  You believe that study involved the
3  administration of a COX-2 inhibitor?
4      A.  I'm pretty sure it did.
5      Q.  Would you agree, sir, that your
6  discussion of thrombomodulin in your expert report
7  relates to a theoretical concern of COX-2
8  inhibitors that has not been generally accepted by
9  the scientific community?
10     A.  What do you mean, not generally accepted
11 by the scientific community?
12     Q.  That -- well, what I mean, that it's
13 merely a theoretical concern that has not been
14 sufficiently proven in basic scientific studies to
15 be true.
16     A.  Well, let me just say that we understand
17 the blood clotting mechanism much better than we
18 understand other things, and we understand the
19 role of thrombomodulin.  The literature on this
20 is just unbelievable.
21         Thrombomodulin provides a negative
22 feedback mechanism whereby thrombosis is
23 prevented.  When you interfere with that process,
24 you accelerate thrombosis.  We have genetic

Page 173

1  defects that replicate this situation.  So we know
2  the mechanism is there.  We know that COX-2
3  inhibition interferes with the activation, with
4  the ability of thrombin to activate
5  thrombomodulin, and that this leads to thrombosis.
6          This is what I stated earlier.
7  We're dealing with more than just prostacyclin,
8  thromboxane, directions, we're dealing with the
9  blood clotting mechanism, as well, and this has
10 not been thoroughly explored.
11         And where I'm going with this report is
12 that Merck did not take the time to thoroughly
13 investigate the pharmacodynamic properties of
14 COX-2 inhibition, neither did Searle, neither did
15 the other drug manufacturers who developed COX-2
16 inhibitors.  There is more to COX-2 inhibition
17 than just inhibiting inflammation of a joint.
18     Q.  You -- I want to turn to Mr. Mason for
19 a minute.
20         You are giving or have given the opinion
21 that Vioxx contributed to Mr. Mason's July 2003
22 heart attack, correct?
23     A.  I think more likely than not, the Vioxx
24 was a contributing factor.  Mr. Mason had a

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 174

1 thrombus.
2    Q.  The -- I just want to make sure, there's
3 no other adverse event that you believe Vioxx
4 caused Mr. Mason other than this July 2003 heart
5 attack?
6    A.  I think had it not been for Vioxx,
7 Mr. Mason more likely than not would not have had
8 his heart attack at that point in time.
9    Q.  I just want to make sure that you don't
10 think there's another silent MI out there or some
11 period of angina that does not relate to this July
12 '03 event that you're going to say at trial Vioxx
13 caused.
14    A.  There is something in his history that
15 was suggestive of that, but I don't believe that
16 this was significant, and that this goes back many
17 years before the thrombotic event, but what I'm
18 trying to stress in this, as well as my research,
19 is the role of COX-2 inhibition in affecting the
20 potential of blood to undergo clotting, whether it
21 be platelet aggregation or clotting.  These are
22 two different events, by the way, although they
23 do activate simultaneously, and what we're trying
24 to point out with this thrombomodulin is that we

Page 175

1 now have a platelet-independent mechanism for
2 producing thrombosis.
3    Q.  Doctor, I had a very simple question.  I
4 just want to make sure at trial you're not going
5 to show up and say that you think sometime in 2004
6 or 2002 Mr. Mason had some cardiac event that
7 you're going to say Vioxx caused him some silent
8 MI.
9    A.  2003?
10    Q.  No, no.  I want to make sure there is no
11 other sort of event out there other than the 2003
12 heart attack that you say Vioxx caused.  It's a
13 simple question.
14    A.  Well, you know, the recent writings have
15 suggested that the effects of Vioxx go on for a
16 long time.
17    Q.  Are you aware of any adverse event
18 Mr. Mason has suffered other than the July 2003
19 heart attack that you say Vioxx contributed to?
20    A.  I do know that Mr. Mason was taking
21 Vioxx at the time he had his heart attack.  The
22 day after he had his heart attack, they still
23 continued to give him Vioxx.
24    Q.  Can you answer my question?

Page 176

1    A.  And subsequently he was put on Celebrex.
2    Q.  Can you answer my question?  It was very
3 simple, sir.
4    A.  I'm getting there.
5        And he was starting to have chest
6 discomfort while on Celebrex.  Well, that's no
7 surprise.  He has a diseased vascular system, and
8 you are only making it worse.
9        So that's how I'm answering your
10 question.  Will he have an event later on --
11    Q.  I did not ask that, sir.
12        Is there any event that he had other
13 than the July 2003 heart attack that you say was
14 caused by Vioxx, yes or no?
15    A.  Any other event that he had?
16    Q.  Yes, sir.
17    A.  His blood pressure was elevated --
18    Q.  Any other event?
19    A.  -- as of a result of -- I think the
20 heart attack was good enough.
21    Q.  Now, you have never diagnosed a cause of
22 a heart attack in any patient you have treated, is
23 that correct?
24        MR. NABERS:  He has been asked that

Page 177

1 before.
2    A.  Are you kidding?  Of course, I have
3 diagnosed heart attacks.
4    Q.  As a patient's treating physician?
5    A.  I was in training.  I was in treating
6 the physician.  I was in charge of that -- well, I
7 was taking care of that physician, under
8 supervision.
9    Q.  Under that patient, we're talking about?
10    A.  I had to make the diagnosis.  I had to
11 go sit in the conference room and give my
12 findings.
13    Q.  This is when you were in medical school?
14    A.  Yes.
15    Q.  All right.  You have not diagnosed the
16 cause of a heart attack as a treating physician in
17 over 40 years, correct?
18    A.  I can still do it today.
19    Q.  Am I correct?
20    A.  You're correct.
21        Oh, wait a minute.  Wrong.  Wrong.
22 Two of my colleagues who came to me on different
23 occasions saying, I'm having this discomfort, and
24 they related their story to me, and I said, we're

45 (Pages 174 to 177)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 178

1    going to the heart station, and because of that, I
2    think I saved both of their lives.  They were
3    having heart attacks.  Did I make a diagnosis?
4    You're darn right.
5        Q.  Did you diagnose the cause of their
6    heart attack?
7        A.  The cause of the heart attack?
8        Q.  Yes, sir.
9        A.  In their particular case, it was nature.
10       Q.  So other than you telling your two
11   colleagues to go to the heart center, and your
12   training in medical school over 40 years ago, you
13   have never diagnosed the cause of a heart attack,
14   correct?
15           MR. NABERS:  Objection to the form,
16   asked and answered.
17       A.  I don't agree with that statement.  I
18   have had -- whenever somebody in my department is
19   having a medical problem that they think is
20   related to the heart, they come to me.
21       Q.  You're not allowed in any state in the
22   country to diagnose the cause of any patient's
23   heart attack?
24       A.  To diagnose?

Page 179

1        Q.  As a treating physician, correct?
2        A.  I can suggest to the person that I think
3    you're having a heart attack, I think you better
4    go see your cardiologist, and I arrange
5    immediately to get them to see their cardiologist.
6    I actually refer them to the cardiologist.
7        Q.  Right.  Your ability to do that is no
8    more and no less than any person on the street,
9    right?
10       A.  If they have the education, the
11   background to make that diagnosis.  You don't need
12   a license to make a diagnosis, you know.
13       Q.  You have never met Mr. Mason, right?
14       A.  No.
15       Q.  You have never met his doctors?
16       A.  No.
17       Q.  You did review the angiograms in this
18   case?
19       A.  Yes.
20       Q.  Did you review the nuclear imaging in
21   this case?
22       A.  I reviewed the report of the imaging.
23       Q.  Not the images themselves?
24       A.  Not the images themselves.

Page 180

1        Q.  You obviously don't review clinical
2    angiograms in your work outside of litigation,
3    right?
4        A.  I don't review angiograms?
5        Q.  Yes, sir.
6        A.  Well, we do angiograms in our research.
7    I look at those.
8        Q.  On animals?
9        A.  Same thing.
10       Q.  Have you -- you don't review angiograms
11   on humans outside of litigation, right?
12       A.  Publications, I look at them.  New
13   England Journal of Medicine has a quiz every week
14   where they show you an angiogram and state, what's
15   the diagnosis.
16       Q.  Other than reading publications, you
17   don't review human angiograms outside of
18   litigation, right?
19       A.  It's like reading law books, that's
20   where you learn.
21       Q.  Is that correct, sir, am I correct?
22       A.  You're right.
23       Q.  Thank you.
24           Now, you tell me the process by which

Page 181

1    you concluded that Vioxx was a substantial factor
2    in Mr. Mason's 2003 heart attack.
3        A.  Well, it fits the picture.  Here's a man
4    who has absolutely no symptoms, according to his
5    testimony or the doctor's report, as I read the
6    medical history, the medical record.  He develops
7    chest discomfort, ten months of taking Vioxx, and
8    he was smart enough to go to the hospital.  The
9    people at the admitting hospital, the initial
10   hospital, did an excellent job of making the
11   diagnosis, starting his therapy before
12   transporting him to Latter Day Saints.
13          They found a thrombus in the left
14   anterior descending coronary artery, which was
15   just distal to a branch point, which also had a
16   small thrombus in it.  There was minimal
17   atherosclerosis throughout and there was some
18   narrowing of the vessel, obviously, because of a
19   plaque that was in that vessel, but a plaque that
20   was not a vulnerable plaque, that is not one that
21   was ready to rupture.  They did an angioplasty and
22   installed a -- implanted a stent and he did well.
23          The question is, why did he develop a
24   thrombus.  Well, my conclusion on that is that in

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 182

1  the presence of a narrowed vessel, you have what's
2  called shear stress. As the blood flows under
3  high pressure at a very rapid velocity, at a very
4  high velocity, the platelets in particular undergo
5  a shearing effect where they activate.
6      Now, that's happening all the time in
7  all of us, particularly as we grow older and we
8  have diseased vessels and we aren't affected,
9  however, if you take a COX-2 inhibitor and you
10 subject it to the shear stress, you're producing a
11 lot of thromboxane at the time when you can't
12 produce prostacyclin, which is going to -- which
13 is counteracting the thromboxane in the absence of
14 the COX-2 inhibitor and you develop a thrombus.
15     So when you see the picture of a
16 thrombus forming in a vessel that has minimal
17 disease, you have to ask yourself why now, what
18 helped to promote this. And I come to the
19 conclusion that had it not been for Vioxx or a
20 COX-2 inhibitor, this would not have happened.
21     Q.  Do you believe --
22     A.  And this fits, this fits the literature
23 which says patients who are at risk, and you might
24 conclude that he has some risk because of his

Page 183

1  narrowing of the vessels, that we have only
2  increased that risk dramatically by inhibiting
3  COX-2.
4      Q.  Do you believe Mr. Mason had a rupture
5  of his atherosclerotic plaque.
6      A.  I don't think he had a ruptured
7  atherosclerotic plaque.
8      Q.  Do you believe that the thrombus formed
9  because the -- there was an up-regulation of
10 thromboxane caused by the shear stress of blood
11 passing through a narrowed vessel and that --
12     A.  I believe it was a down-regulation of
13 PGI2 and an up-regulation of thromboxane, which
14 upset the balance, plus the fact, by inhibiting
15 thrombomodulin, and I might say, by preventing the
16 release of tissue factor pathway inhibitor, which
17 you didn't address in my report at all, you set
18 the stage for multiple events which are not
19 dependent upon platelets, but which all sum
20 together to produce thrombosis. In other words,
21 he was placed at greater risk with the presence of
22 Vioxx.
23     Q.  Do you -- are you intending to give the
24 opinion that Vioxx accelerated Mr. Mason's

Page 184

1  atherosclerosis?
2      A.  I don't have to state that. All I have
3  to do is focus on the thrombus.
4      Q.  Well, I want to know whether or not you
5  do plan to state that.
6      A.  I might state that, depending upon what
7  evolves in the literature between now and then.
8      Q.  Let's see if we can agree on this: You
9  cannot state to a reasonable degree of medical
10 probability that Vioxx accelerated Mr. Mason's
11 atherosclerosis, correct?
12     A.  I can say that Vioxx has a potential
13 role in accelerating atherosclerosis based upon
14 what I understand about the inflammatory process
15 and the importance of COX-2 in this process.
16     Q.  But specific to my question, you cannot
17 state to a reasonable degree of medical
18 probability that Vioxx accelerated Mr. Mason's
19 atherosclerosis, correct?
20     A.  Just as your expert witness cannot say
21 that it did not accelerate.
22     Q.  But you cannot -- my statement is
23 correct, right?
24     A.  I say, based on the literature, I can

Page 185

1  say so.
2      Q.  You can say what, sir?
3      A.  That it has the potential to accelerate
4  the process of atherosclerosis.
5      Q.  I am -- I want to get away from the
6  discussion we had on the sort of potential based
7  on the test tube studies we discussed, okay? I
8  want to put those aside and I want to focus on
9  the individual. You understand that -- well,
10 withdrawn.
11     Focusing on the individual, Mr. Mason,
12 you cannot state to a reasonable degree of medical
13 probability that Vioxx accelerated Mr. Mason's
14 atherosclerosis, correct?
15     A.  I would say there's good probability
16 that it did.
17     Q.  Good probability?
18     A.  Yes.
19     Q.  More likely than not?
20     A.  More likely than not.
21     Q.  Okay.
22     A.  Based on the evidence. Based on the
23 scientific evidence.
24     Q.  The test tube studies?

47 (Pages 182 to 185)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 186

1    A.  I don't care if they are test tube, the
2  data fit.
3    Q.  Now, you're talking about the -- first
4  of all, are you giving the opinion that Vioxx
5  accelerated atherosclerosis in every individual
6  who took the medicine?
7    A.  Vioxx has that potential to do it.
8  Every individual differs, obviously.
9    Q.  Well, certainly --
10   A.  You --
11   Q.  I'm sorry, sir, go ahead.
12   A.  There are some individuals who, because
13 of genetic differences, do not handle Vioxx in the
14 same way.  So if you say every individual, no, I
15 can't say every individual, but I think
16 individuals who -- an individual who is at risk is
17 going to be at increased risk in the presence of
18 Vioxx.
19   Q.  Obviously the vast majority of patients
20 who took Vioxx did so with no adverse
21 cardiovascular effects, correct?  You have
22 testified to that previously.
23   A.  You know I have stated that before,
24 but I also qualified my statement.  It is the

Page 187

1  obligation of the drug manufacturer to determine
2  which risk factors should be considered when
3  prescribing a drug like Vioxx, which risk factors
4  should indicate, do not give this patient Vioxx.
5    And why do I state that with respect to
6  Merck?  Because Merck, in the early 1990's, and
7  even before, knew about the potential for COX-2
8  inhibition to produce thrombosis.
9    Q.  I'm trying to focus on --
10   A.  Merck -- let me finish.
11   Merck knew well in advance that patients
12 with arthritis are at greater risk for coronary
13 events, they are at greater risk for heart
14 attacks.  Merck had all of the basic information
15 at their fingertips.  Merck even filed patents on
16 how to obviate and avoid such an occurrence in the
17 presence of Vioxx.  They had all this information,
18 they knew what the potential was, and yet, they
19 spent many years disguising the fact with a
20 Naproxen hypothesis and so forth, and it wasn't
21 until VIGOR -- it wasn't until APPROVe, a
22 double-blind placebo-controlled study that they
23 had no way out.  They had to withdraw the drug
24 from the market.  Merck knew.  Merck put people at

Page 188

1  risk.  Merck put Mr. Mason at risk.
2    Q.  Can we go back to my questions, please?
3    A.  I think I have summarized my case.  My
4  position, I should say.
5    Q.  Nevertheless, can we go back to my
6  questions?
7    I'm trying to focus on what possible
8  basis you could have to opine that Mr. Mason, in
9  particular, Vioxx caused an acceleration of his
10 atherosclerosis.  So that's the topic I want to
11 now ask my questions on, okay?
12   First of all, at the time he started
13 Vioxx, you have no idea to what degree Mr. Mason
14 had atherosclerosis, correct?
15   A.  Nobody did, except God.
16   Q.  Well, if anybody does, it's not you,
17 right?
18   A.  It's not you, either.
19   Q.  But you don't know, can we agree?
20   A.  So we're on an even lane, plane.
21   Q.  And at the time Mr. Mason had his heart
22 attack in July of 2003, you understand that the
23 doctors noted in the catheterization report that
24 he had a 90 percent blockage in the LAD, correct?

Page 189

1    A.  Yes.
2    Q.  And you reviewed the angiogram, you
3  said?
4    A.  I reviewed the report of the angiogram,
5  the drawing that they made.
6    Q.  Oh, okay.  Let me go back to make sure I
7  clarify that.
8    You did not actually review the
9  angiogram film itself?
10   A.  No.
11   Q.  You have no basis to agree or disagree--
12 withdrawn.
13   You have no basis to disagree that the
14 blockage in the LAD was 90 percent in Mr. Mason,
15 correct?
16   A.  Yes, no reason to disagree, correct.
17   Q.  And you don't know what relative portion
18 the clot contributed to that 90 percent versus
19 plaque, right?
20   A.  That is correct.
21   Q.  And so you have no basis to opine that
22 Mr. Mason had any acceleration of atherosclerosis
23 between September of 2002 and July 2003, correct?
24   A.  I said the potential is there.

48 (Pages 186 to 189)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 190

1     Q.  I don't want to talk about potential,
2  I want to talk about the individual.  We have
3  already discussed some of the potential concepts,
4  all right?  I want to talk about Mr. Mason.
5         You have no basis to opine that
6  Mr. Mason had any acceleration of atherosclerosis
7  between September of 2002 and July of 2003,
8  correct?
9     A.  Well, it's a progressive disease,
10  obviously, and if you accelerate that progression
11  with the presence of Vioxx, maybe in 2002, when
12  he started taking Vioxx, he had minimal or no
13  disease, and by 2003, July 25, he had more, more
14  extensive progression of that disease.
15         Now, did Vioxx contribute to that, and
16  then it led to a blood clot on top of all that?
17     Q.  I want to get away from the maybes and
18  ifs in your last answer and I want to get back to
19  what you're able to opine to a reasonable degree
20  of medical and scientific probability, okay?
21     A.  I would say it's more likely than not,
22  and I have said my degree of probability, more
23  likely than not, had it not been for Vioxx, he
24  would not have had his thrombus at that point in

Page 191

1  time.
2     Q.  And I get to ask questions about that
3  opinion.
4         Now, you have no basis to say Mr. Mason
5  had any acceleration of atherosclerosis between
6  September of 2002 and July of 2003, correct?
7     A.  Nobody has any basis for that --
8         MR. NABERS:  Object to form.
9     A.  -- because they don't know what happened
10  in 2002, what the situation was in 2002, they only
11  know at 2003 he had his heart attack.
12     Q.  And so because you don't even know
13  whether he had any acceleration at all during the
14  time he was taking Vioxx, you certainly cannot
15  opine to a reasonable degree of medical and
16  scientific probability that Vioxx caused any
17  acceleration of Mr. Mason's atherosclerosis,
18  correct?
19         MR. NABERS:  Objection to form, asked
20  and answered.
21     A.  Based on scientific data, I could
22  suggest that there's a good possibility, a good
23  probability, that Vioxx contributed to whatever
24  degree of atherosclerosis that was present,

Page 192

1  contributed to, okay.
2     Q.  You stated a moment ago that
3  atherosclerosis is a naturally-progressing
4  process?
5     A.  That's right.
6     Q.  And particularly when a patient is not
7  controlling his risk factors, right?
8     A.  We all have risk factors, yes.
9     Q.  And Mr. Mason was not doing anything to
10  control his risk factors between September of 2002
11  and July of 2003, right?
12         MR. NABERS:  Objection to the form,
13  assumes fact not in evidence.
14     A.  Mr. Mason was seeing his physician on
15  a regular basis because of his other medical
16  problems and there was no reason for him to engage
17  in controlling risk factors other than his
18  smoking, which he did quit.  His physicians never
19  suggested that to him, other than, well, perhaps
20  his weight, which didn't fluctuate all that much.
21         Interestingly enough, his lipid profile
22  is a very interesting one, and his lipid profile
23  is one that suggests that he should not be subject
24  to atherosclerosis, which I find very fascinating,

Page 193

1  because there are a group of patients who have a
2  profile just like Mr. Mason who are totally free
3  of atherosclerosis, but he did have a narrowing
4  of his vessels, so he had some degree of
5  atherosclerosis there, but he wasn't necessarily
6  a very high risk patient. It's the Vioxx that
7  triggered him or tipped him over the edge to
8  become a high-risk patient.  When you have an LDL
9  of 77, a lot of people would love to have an LDL
10  of 77.
11     Q.  Can you go to Page 78, please?
12     A.  78?
13     Q.  Yes, sir.
14     A.  Okay.
15     Q.  In your -- in the paragraph there, you
16  describe Mr. Mason as a 61-year-old with no family
17  history of premature cardiovascular disease?
18     A.  That's correct.
19     Q.  What is the criteria for determining
20  whether someone has a family history of premature
21  disease?
22     A.  Well, you ask family members, you ask
23  the patient, do you have any family members who
24  died of coronary artery disease, had a heart

Benedict Lucchesi, M.D., Ph.D.

Page 194

1   attack or such and such, and they will say yes, or
2   my sister died of a heart attack, and that's what
3   Mr. Mason said, or someone from his family said
4   that his sister died of a heart attack.
5          So now you have to question, well, why
6   does this guy have a heart attack?  Well, she was
7   50-something years old.  The autopsy shows,
8   besides atherosclerosis or coronary artery
9   disease, something to that effect, the question
10  is, what else was she doing.
11      Q.  You have seen an autopsy report on his
12  sister?
13      A.  No, I haven't seen the autopsy.  Have
14  you?
15      Q.  Well, you just made reference to an
16  autopsy report.
17      A.  No, I said -- did I say autopsy?  I
18  meant the death certificate.
19      Q.  Oh, okay.  So you know that Mr. Mason
20  had a sister who died of a heart attack secondary
21  to atherosclerosis in her fifties?
22      A.  Well, I don't know if it's secondary to
23  atherosclerosis, no, sir, that's what the
24  autopsy -- that's what the death certificate says.

Page 195

1       Q.  Do you have any basis to disagree?
2       A.  Yes.
3       Q.  Why?
4       A.  I think she may have had other
5   circumstances that impacted upon her heart attack.
6       Q.  And what are those?
7       A.  Show me the autopsy report and I'll tell
8   you.
9       Q.  I don't have the autopsy report.
10      A.  You do so.
11      Q.  I don't have an autopsy report.
12      A.  You don't?
13      Q.  Do you?
14      A.  No, I don't.
15      Q.  Okay.  So what are the other -- on what
16  basis do you have to disagree that Mr. Mason's
17  sister had a heart attack in her fifties?
18      A.  The death certificate over here lists
19  her age, I believe, doesn't it?
20      Q.  Fifty-five?
21      A.  Fifty-five?  Yeah, okay.  Did I say that
22  she is in her fifties?
23      Q.  Yeah, you and I agree, she is in her
24  fifties.

Page 196

1       A.  Okay.  And here's the death certificate.
2   And it says, oh, look at this, what it says,
3   phenylpropalamine intoxication.  Wonderful.
4       Q.  Wonderful; what does that mean?
5       A.  Phenylpropalamine?  You know what it
6   means.
7       Q.  I know what that is, but what do you
8   mean by wonderful?
9       A.  It produces coronary constriction.
10      Q.  So you --
11      A.  Elevation in blood pressure.
12      Q.  In your view, you have ruled out -- you
13  have determined that Mr. Mason does not have a
14  family history of premature cardiovascular disease
15  because you have determined that his sister died
16  at age 55 due to a PPH intoxication?
17      A.  Yes.
18      Q.  And you do that all from the death
19  certificate?
20      A.  That's what the report says and I know
21  the pharmacology of phenylpropalamine.
22      Q.  And you do all that from the death
23  certificate, that's what you do from the death
24  certificate?

Page 197

1       A.  I would not say the primary cause of her
2   death was atherosclerosis.  It's phenylpropalamine
3   intoxication, that's what it say, and the
4   physician is quite right who signed that report.
5       Q.  She certainly had a history of
6   cardiovascular disease, that's also in the death
7   certificate?
8       A.  And it's like taking Vioxx when you
9   superimpose phenylpropalamine upon that.
10      Q.  Mr. Mason's sister, at age 55, had a
11  history of cardiovascular disease, correct?
12      A.  And phenylpropalamine intoxication, a
13  big dose of phenylpropalamine.
14      Q.  Whether that was, in your view, the
15  trigger of her heart attack or not, you know she
16  had a history of cardiovascular disease?
17      A.  Sir, I know, I am an expert in this
18  area, so don't contest me on this, that
19  phenylpropalamine is the -- is the path to sudden
20  death.
21      Q.  Do you -- do you -- if you actually
22  would turn to Page 81 of your report.
23          Actually, I meant 96, I'm sorry.  You
24  have this graph there, multiple risk factors for

50 (Pages 194 to 197)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 198

1  atherothrombosis.
2      A.  Just a second here.  Where are you
3  reading?
4      Q.  Page 96, I have this graph or this
5  diagram at the top.
6      A.  Your Page 96, 95.
7      Q.  All right.  You have Page 95.  We're on
8  the same page, literally, right?
9      A.  Okay.  With the diagram.
10     Q.  We have the diagram.  And this comes
11  from this Circulation publication, right?
12     A.  Yes.
13     Q.  And do you believe this is a well-done
14  description of the risk factors for
15  atherothrombosis?
16     A.  Yes, this is a very good investigator.
17  He's more an epidemiologist type.
18     Q.  So first of all, when we're talking
19  about atherothrombosis, in part, we're talking
20  about the risk of a heart attack, correct?
21     A.  Yes, or stroke.
22     Q.  So one of the risks is genetic traits
23  and obviously male gender is a risk, correct?
24     A.  Yes.

Page 199

1      Q.  And what is PIA2, right under gender?
2      A.  Yeah, I'm trying to remember what that
3  signifies.  I didn't know what PIA2 means.
4      Q.  And generalized -- and obviously,
5  Mr. Mason is a male, right?
6      A.  Uh-huh.
7      Q.  And then generalized disorders, age and
8  obesity, correct?
9      A.  Okay.
10     Q.  And those are generalized risk factors
11  for heart attack, correct?
12     A.  Yes.
13     Q.  Mr. Mason is in the at-risk age,
14  correct?
15     A.  Yes.
16     Q.  And he was, at the time of his heart
17  attack, correct, sir?
18     A.  Yes.
19     Q.  And he was obese, right?
20     A.  Well, I don't know if he was obese.  He
21  was somewhat heavy, but I wouldn't say he was
22  obese.
23     Q.  Do you understand his doctors had
24  described him as obese?

Page 200

1      A.  He was over weight.
2      Q.  Have you seen pictures of Mr. Mason?
3      A.  No, I have not.
4      Q.  Have you seen descriptions of his weight
5  at the time of his heart attack?
6      A.  I have seen his weight at his heart
7  attack, yes.
8      Q.  5'9", 220, 230, that's not obese to you?
9      A.  It's heavy.  I wouldn't say he was
10  morbidly obese.
11     Q.  His weight was a risk factor for heart
12  attack, right?
13     A.  Uh-huh.
14     Q.  Yes?
15     A.  Yes.
16     Q.  And you know he was a former smoker?
17     A.  But he had given up smoking.
18     Q.  Do you believe that smoking causes
19  permanent damage to the endothelium?
20     A.  It's reversible.
21     Q.  You believe at the time of his heart
22  attack he had no ill effects from his prior
23  smoking?
24     A.  I believe by the time the heart attack

Page 201

1  occurred, by the time he was abstaining from
2  cigarette use, it was probably reversible.
3      Q.  And do you know Mr. Mason -- the other
4  one here listed here is diet, correct?
5      A.  Yes.
6      Q.  And you know Mr. Mason followed a poor
7  diet by his own description, correct?
8          MR. NABERS:  Objection to the form.
9      A.  We have no information on that.
10     Q.  You haven't reviewed his deposition,
11  right?
12     A.  No.
13         MR. NABERS:  Objection to the form.
14     Q.  And lack of exercise, do you have any
15  basis to determine that Mr. Mason engaged in
16  cardiovascular exercise?
17     A.  I have no way of knowing that.
18     Q.  Hypertension, do you believe Mr. Mason
19  had any degree of hypertension prior to starting
20  Vioxx?
21     A.  If he did, the Vioxx only made it worse.
22     Q.  Do you believe Mr. Mason had any degree
23  of hypertension prior to starting Vioxx?
24     A.  I have no information on that.

Benedict Lucchesi, M.D., Ph.D.

Page 202

1    Q.  And so you have no way to characterize
2  his hypertension before Vioxx as normal, labile,
3  prehypertensive or none of the above?
4    A.  Well, looking at his blood pressure
5  recordings, as few as they are, even at the time
6  of his heart attack, it wasn't all that out of
7  line.
8        Considering the fact that he was on
9  Vioxx, I would not be surprised if it was out of
10 line and there was a slight elevation in his blood
11 pressure on Vioxx, which then reversed when they
12 took him off the Vioxx.
13   Q.  A slight elevation relative to when?
14   A.  Through -- after they took him off.
15   Q.  So you don't know what his blood
16 pressure was before he had a heart -- before he
17 started Vioxx?
18   A.  No, I don't.
19   Q.  So you have no way to assess whether or
20 not that was a risk factor for the development of
21 heart disease of Mr. Mason?
22   A.  Elevated blood pressure is a risk
23 factor --
24   Q.  But in Mr. Mason?

Page 203

1    A.  -- particularly if you -- elevated blood
2  pressure is a risk factor and becomes even more a
3  risk factor when you're on Vioxx, because it
4  elevates the blood pressure even more.
5    Q.  Vioxx doesn't increase blood pressure in
6  every patient that takes it, right, sir?
7    A.  Are you kidding?
8    Q.  No, I'm not.
9    A.  Vioxx is the greatest offender.
10   Q.  Vioxx does not increase blood pressure
11 in every patient who takes the medicine, right,
12 sir?
13   A.  Not every patient responds the same way
14 to Vioxx, but once again, more likelihood that it
15 would produce an elevation of blood pressure in
16 the vast majority of individuals.
17   Q.  Have you seen any blood pressure
18 readings on Mr. Mason when he was on Vioxx?
19   A.  No, because the only records I have are
20 when he started -- when he had his heart attack
21 and went to the hospital and thereafter.
22   Q.  So he had a blood pressure taken in the
23 emergency room when he was in the midst of a heart
24 attack, right?

Page 204

1    A.  Uh-huh.
2    Q.  Yes?
3    A.  Yes.
4    Q.  And that's your baseline for determining
5  whether or not Vioxx increased his blood pressure?
6    A.  It's a poor baseline, because under the
7  stress of a heart attack, a blood pressure reading
8  such as that can't really be interpreted.  You
9  take it for what it is and you work from there.
10   Q.  Right.  So you have no reliable clinical
11 evidence that Vioxx actually increased Mr. Mason's
12 blood pressure, right, sir?
13   A.  I have an abundance of literature
14 documenting the fact that Vioxx increases blood
15 pressure.  The package insert says it increases
16 blood pressure, the medical community knows it
17 increases blood pressure.  Why should I doubt in
18 his case that it did not increase his blood
19 pressure?
20   Q.  Can you answer my question?  Let me
21 restate it.
22       You have no clinical evidence on
23 Mr. Mason in particular that Vioxx increased his
24 blood pressure, correct?

Page 205

1    A.  Well, maybe you could ask the question a
2  different way.
3    Q.  Can you answer my answer, then we will
4  go to --
5    A.  Vioxx increases blood pressure.
6    Q.  That's not the question.
7    A.  I know it's not the question, because
8  you don't want to hear the answer.
9    Q.  No, because that's not even relevant,
10 sir.
11   A.  It's not relevant to his heart attack?
12   Q.  Do you have any clinical evidence that
13 Vioxx increased Mr. Mason's heart attack, yes or
14 no?
15       MR. NABERS:  And you have told him the
16 blood pressure.
17       MR. ISMAIL:  No, he has not given me --
18 he said it has the propensity in some patients.
19 I'm talking about Mr. Mason.
20 BY MR. ISMAIL:
21   Q.  If you don't want to give an opinion on
22 Mr. Mason, just tell me.
23   A.  Okay.  I won't give an opinion.
24       MR. NABERS:  Let's do it this way:  You

Benedict Lucchesi, M.D., Ph.D.

Page 206

1 have told him about the blood pressure at the time
2 of the heart attack. If you have anything to add
3 to that, you may do so. That's what he is asking.
4          THE WITNESS: That's it.
5 BY MR. ISMAIL:
6     Q. And you already told me that's not a
7 reliable baseline for determining blood pressure,
8 right?
9          MR. NABERS: That's not what he said.
10 Object to the form.
11          MR. ISMAIL: Let him answer.
12     A. I say you can't interpret that in an
13 appropriate manner. You have to wait and see what
14 happens after you take him off the Vioxx.
15     Q. But your only -- but your baseline to
16 see what happens when he is off Vioxx is the blood
17 pressure reading he had in the emergency room
18 having a heart attack?
19     A. But is that his normal blood pressure.
20     Q. Which is what?
21     A. Is that his normal blood pressure or is
22 that the blood pressure under the influence of
23 Vioxx, under the influence of the stress of having
24 a heart attack or going through a heart attack?

Page 207

1 It's the only baseline I have.
2     Q. You don't know whether any changes in
3 his blood pressure from the day he had his heart
4 attack to any time thereafter was due to some --
5 to the fact that the blood pressure reading in the
6 hospital was elevated due to the stress of the
7 event, right?
8          MR. NABERS: Objection to the form.
9     A. I think I stated that.
10     Q. Right. So you don't have any clinical
11 evidence with Mr. Mason in particular that Vioxx
12 increased his blood pressure, right?
13     A. Based upon what I know about Vioxx, and
14 what I know about the control of blood pressure,
15 I'm going to say without any doubt in my mind that
16 the chance of Vioxx elevating his blood pressure
17 is real. It is more likely than not.
18     Q. Based on the generalized population data
19 on Vioxx, right, that's your basis for your
20 opinion for Mr. Mason?
21     A. Based on many, many documented studies,
22 based on many patients who have been reported to
23 have marked elevations, sudden elevations in blood
24 pressure on Vioxx, how do I know that these things

Page 208

1 did not happen to Mr. Mason? I have to assume
2 that these things are possible and probable and
3 could have contributed to his event.
4     Q. Doctors, when they are assessing whether
5 a patient has a high blood pressure or not,
6 actually look at blood pressure readings on that
7 patient, right?
8     A. Over many readings, not just one
9 reading.
10     Q. Right. And a doctor who is assessing
11 whether a patient has high blood pressure would
12 not rely on a single reading in the hospital taken
13 while a patient was having a heart attack, right?
14     A. That is correct, you would not rely --
15 and let me indicate this: That if you start out
16 with a high blood pressure and you have your heart
17 attack, the blood pressure usually lowers.
18     Q. The -- the -- going down in the list
19 here, on the chart on Page 96, you have
20 hyperlipidemia, right?
21     A. Uh-huh.
22     Q. Yes?
23     A. Yes.
24     Q. Mr. --

Page 209

1     A. He did not have that.
2     Q. Mr. Mason had below-normal HDL, correct?
3     A. That's good.
4     Q. That is?
5     A. Yeah, because he had very low LDL's.
6     Q. You have described Mr. Mason's LDL as
7 being in the 70's, correct?
8     A. 77.
9     Q. And you believe that is the accurate
10 laboratory reflection of Mr. Mason's LDL
11 cholesterol?
12          MR. NABERS: As of what time?
13     A. Well, he had --
14          MR. ISMAIL: I don't know. He has told
15 me he has got below -- some magical condition of
16 below-normal LDL.
17          THE WITNESS: He had repeated readings
18 of very low LDL's, and one reading where the LDL
19 was elevated to 124, I believe it was. That was
20 in the emergency room when the specimen was taken,
21 or right after his heart attack, and it's known
22 that a stressful situation will produce a rise in
23 your LDL.
24 BY MR. ISMAIL:

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 210

1    Q.  So if another expert in this case has
2  testified that Mr. Mason, before he ever started
3  taking Vioxx, was positive for the risk factor of
4  abnormal lipids, you would disagree with that?
5    A.  Was positive?  What does he mean by
6  abnormal lipids, high or low?
7    Q.  Abnormally low HDL.
8    A.  Well then, that individual expert
9  doesn't know about A-1 melano.
10   Q.  So you disagree with that expert, right?
11   A.  Yes, if he is calling that a risk
12  factor.
13   Q.  No indication that Mr. Mason suffered
14  any fluid retention or edema from Vioxx, right?
15   A.  Not that was reported, but we know
16  that -- well, why don't you just read the package
17  insert.  You know that it causes edema, fluid
18  retention.
19   Q.  No basis in Mr. Mason in particular that
20  Vioxx caused him edema or retention, right, edema
21  or fluid retention, right?
22   A.  I didn't see anything in the medical
23  history that suggested that he had, but then
24  again, it takes a lot of fluid before you start to

Page 211

1  see edema.  Doesn't mean he wasn't accumulating
2  fluid, wasn't accumulating salt, and doesn't say
3  whether his blood pressure was increasing because
4  of salt accumulation.  All of these things are
5  known effects of COX-2 inhibition and NSAID
6  inhibition.  They're stated in the package insert.
7  They would not be in that package insert if they
8  were not real things.  So why are you saying that
9  there's no possibility of this?
10   Q.  Do you believe Mr. Mason had coronary
11  artery disease before he ever took Vioxx?
12   A.  At his age, we all have coronary artery
13  disease, to some extent, or at least the vast
14  majority of us, but it wasn't symptomatic.  It was
15  something that precipitated this into becoming
16  symptomatic.
17   Q.  The cardiologists generally consider
18  that plaque blockages below 70 percent will be
19  asymptomatic, correct?
20   A.  Good guess, yes, 70 percent is fair.
21   Q.  That's what is sort of textbook
22  cardiology, right?
23   A.  Yes, but remember now, and what you're
24  forgetting, or would not like to discuss, is the

Page 212

1  fact that when you give a COX-2 inhibitor, and
2  there is a nice paper that just got published from
3  New York State University in Valhalla by Dr. Gabor
4  Kaley.  You may want to look that one up.  Gabor
5  Kaley, K-a-l-e-y.  I just got it yesterday, so,
6  you know, I don't have it here.  I just saw it
7  yesterday, published in the American Journal of
8  Physiology.
9       And he shows, which I have known for
10  many, many years, because it's one of my first
11  studies, if you inhibit the production of
12  prostacyclin, the coronary artery is under
13  constriction, so the narrowing of the coronary
14  artery doesn't have to be due to the plaque
15  itself, but a narrowing that superimposes upon the
16  plaque that further increases the shear pressure
17  really, now, exposes you to thrombosis, because of
18  COX-2 inhibition, and nobody wants to discuss
19  that, but I will, in court.
20   Q.  And even plaques greater than 70 percent
21  can be asymptomatic, correct?
22   A.  And a plaque of 70 percent can be
23  converted to an obstruction of 90 percent or
24  100 percent by the vessel constricting down on

Page 213

1  what's already a narrowed lumen.
2    Q.  But my question, the answer to my
3  question is what, sir?  What's the answer to my
4  question?
5    A.  That a plaque of 70 percent can be
6  asymptomatic.
7    Q.  I said even greater than 70 percent.
8    A.  Greater than 70 percent can be
9  asymptomatic, yes.
10   Q.  And so to the extent Mr. Mason did not
11  have symptoms of heart disease prior to starting
12  Vioxx, it wouldn't allow anyone to conclude
13  anything other than that he likely didn't have a
14  plaque of 70 percent or greater, right?
15   A.  The likely -- say that again.
16   Q.  The fact that Mr. Mason was asymptomatic
17  before starting Vioxx, the most you can say from
18  that clinical observation is that he did not have
19  a plaque of 70 percent or greater?
20   A.  When you look at Mr. Mason, and you see
21  that he had total occlusion of his LAD distal to
22  that side branch, and that side branch itself had
23  a thrombus in it, and his EKG showed ST segment
24  depression, it's amazing, this is the major vessel

54 (Pages 210 to 213)

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 214

1   to the heart, and he is only showing ST segment
2   depression. Why isn't he showing ST segment
3   elevation and why isn't he developing massive
4   damage to the heart through and through the vessel
5   wall? Because Mr. Mason has collateral
6   circulation. Nobody addressed that issue.
7   Mr. Mason was kept alive because of his native
8   collateral vessels, which don't appear in
9   everybody. Depends upon your genetic makeup.
10      Q. Where do you see proof that Mr. Mason
11  had collaterals?
12      A. In his EKG.
13      Q. His EKG to you shows collaterals, why is
14  that?
15      A. Because the EKG is a reflection of the
16  electrical activity of the heart.
17      Q. Do you see --
18      A. And when --
19      Q. I'm sorry, aren't collaterals usually
20  depicted on an angiogram?
21      A. No, you can only see them -- depends on
22  their size and how much you can visualize.
23      Q. No doctor treating Mr. Mason ever
24  described the presence of collaterals, correct?

Page 215

1       MR. NABERS: Objection to the form.
2       A. Did they do the right studies to look
3   for them?
4       Q. Did they ever describe them?
5       A. I did not see that in any report, but
6   I'm saying based upon his EKG, with a total
7   occlusion of his LAD, he should have had ST
8   segment elevation.
9       Q. Where did he have a total occlusion of
10  his LAD?
11      A. It was a massive thrombus sitting in the
12  LAD.
13      Q. How do you know it was massive?
14      A. Because they described it.
15      Q. They described it as massive?
16      A. Well, when you get a 90 percent
17  occlusion of the vessel, isn't that massive?
18      Q. Depends how much plaque you have there,
19  doesn't it?
20      A. The thrombus superimposed upon the
21  plaque gave a 90 percent occlusion.
22      Q. None of the doctors who actually read
23  EKGs for a living ever described Mr. Mason as
24  having developed collaterals, correct?

Page 216

1       A. Well then, let them explain why he only
2   had ST segment depression, not -- something was
3   feeding blood to his heart.
4       Q. Nothing -- none of the doctors who
5   actually read angiograms for a living ever
6   described the presence of collaterals, correct?
7       MR. NABERS: Objection to the form.
8       A. And none of the doctors realized that
9   giving him Vioxx after his heart attack was
10  dangerous.
11      Q. The process that you have described --
12  withdrawn.
13      Do you characterize Mr. Mason as having
14  moderate risk of having a heart attack as of the
15  time he started taking Vioxx?
16      A. I would say prior to taking Vioxx,
17  Mr. Mason had probably the same degree of risk as
18  any male his age, which, with the same lesion,
19  which was quite minimal.
20      Q. You described Mr. Mason's risk of a
21  heart attack before Vioxx as minimal?
22      A. Yes.
23      Q. And anyone who described his risk as
24  moderate wouldn't know what they were talking

Page 217

1   about?
2       MR. NABERS: Objection to the form.
3       A. It's all a degree. We could argue on
4   it, the extent of the degree of difference.
5       Q. Do you believe that depression is a risk
6   factor for the development of heart disease?
7       A. It's not a direct risk factor. You can
8   do studies or look at studies where depressed
9   patients have a higher incidence of heart disease,
10  but the cause and effect relationship is not
11  clear. It's not something you can point to saying
12  this is the reason why depression causes
13  atherosclerosis.
14      Q. Certainly the medical literature
15  reflects a great deal of research concluding that
16  depression is a risk factor for heart disease,
17  correct?
18      A. Well, I can find a lot of people who
19  are depressed and don't have heart disease. I
20  can think of a fellow sitting in a penitentiary
21  for twenty years, must be depressed, doesn't
22  necessarily die from heart disease. I can think
23  of some GI in Iraq who has been sitting there for
24  five years wanting to go home as being depressed

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 218

1  and under stress and they are not dying of heart
2  disease.
3       Look, you are taking a clinical entity
4  like depression and making a big thing out of it.
5  How do you say that this contributes to heart
6  disease, other than the fact that patients who
7  have depression may have coronary artery -- but
8  not all of them do, so there is not a direct link.
9       Q.  The -- there's a great deal of medical
10  literature concluding that stress and anxiety are
11  risk factors of the development of heart disease,
12  correct?
13       A.  You want to see stress?
14       Q.  Is that an answer to my question?
15       A.  Look at the Normandy Landing, that's
16  stress.  They didn't die of heart disease.
17       Q.  What's the answer to my question,
18  Doctor?
19       A.  Rephrase it again.
20       Q.  There is a great deal of medical
21  literature concluding that stress and anxiety are
22  risk factors for the development of heart disease,
23  correct?
24       MR. NABERS:  Objection to the form.

Page 219

1       A.  Stress and anxiety also lead to patients
2  overeating and becoming overweight.  Stress and
3  anxiety also lead to patients being sedentary, so
4  you're adding risk factors to risk factors.  Did
5  Mr. Mason have all of that?  I don't know.
6       Q.  Stress also can be an acute trigger of a
7  heart attack, correct?
8       A.  Stress can be an acute trigger of a
9  heart attack, but once again, a lot of people
10  under stress that don't have heart attacks.
11       Q.  Stress and anxiety and physical activity
12  activate platelets, right?
13       A.  The catecholamines released activate
14  platelets -- or I should say, they make platelets
15  more likely to activate.  They prime the platelet
16  and the platelet is more likely, then, to respond
17  to thromboxane.
18       In other words, if you release a lot
19  of norepinephrine or epinephrine into your
20  circulation, your platelets become primed, and
21  this is nature's defense mechanism, because this
22  is the fight or flight reaction.  If an animal has
23  to defend itself, it has to augment its nervous
24  system to release a lot of catecholamine, so that

Page 220

1  if the animal does become injured, or the human,
2  they are going to clot.  So this is nature's way
3  of enhancing the clotting mechanism.
4       Q.  Do you --
5       MR. NABERS:  We have got about five
6  minutes and we will wrap it up.
7       MR. ISMAIL:  Well, I'm going to keep it
8  open, so if you want to walk out, that's up to
9  you.  You never found an e-mail, right?
10       MR. NABERS:  Yeah, I did.
11       MR. ISMAIL:  Where is it?
12       MR. NABERS:  It's on my Blackberry.
13       MR. ISMAIL:  Can I see it?
14       MR. NABERS:  No, because it's got stuff
15  in it about the case, unfortunately, but it is to
16  Carrie, so you can check with her.
17       MR. ISMAIL:  It's an e-mail to Carrie?
18       MR. NABERS:  It is an e-mail to Carrie.
19       MR. ISMAIL:  And so why can't I see an
20  e-mail sent to my colleague?
21       MR. NABERS:  Because it's stuck in the
22  middle of a chain of e-mails.  I can't find the
23  single one to show you.
24       MR. ISMAIL:  And you think it has to do

Page 221

1  with Dr. Lucchesi in particular?
2       MR. NABERS:  And Dr. Sander.  It's an
3  e-mail that pertains to both.
4       THE WITNESS:  If it helps to settle
5  this, I was informed days ago that this would
6  terminate after four hours.
7       MR. ISMAIL:  It wouldn't help, because I
8  don't believe that to be true.
9       THE WITNESS:  I'm lying?  Are you
10  saying that I'm lying?
11       MR. ISMAIL:  That may be true, but there
12  was no agreement to limit this to four hours.
13  BY MR. ISMAIL:
14       Q.  Do you believe sleep apnea is a risk
15  factor for the development of heart disease?
16       A.  His sleep apnea was being managed.
17       Q.  Is that a yes or a no?
18       A.  Under his conditions, I would say that
19  it's less of a concern, because it was being
20  managed.
21       Q.  The -- Mr. Mason, Mr. Mason's doctors
22  diagnosed him as having a non-Q-wave heart attack,
23  correct?
24

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 222

1    Q.  And do you agree with that
2  characterization?
3    A.  Oh, yes.  I read the EKG.
4    Q.  And Mr. Mason's doctors described him as
5  having a non-transmural heart attack?
6    A.  That's exactly what I said, ST segment
7  depression.
8    Q.  And you agree with that
9  characterization, correct?
10    A.  Yes.  The question is why, with that
11  degree of blockage of his LAD, why did he not have
12  ST segment elevation?
13    Q.  The folks who actually practice
14  cardiology for a living would say that non Q wave,
15  non-transmural heart attacks are associated with
16  better outcomes for patients than Q wave or
17  transmural heart attacks, right?
18        MR. NABERS:  Objection to the form.
19    A.  Well, it all depends on what you call an
20  outcome.  They are at greater risk for sudden
21  death.
22    Q.  Do you believe Mr. Mason has a good
23  prognosis following his heart attack?
24    A.  Mr. Mason is at risk, just as the result

Page 223

1  of having a heart attack.  As a result of the
2  heart attack, he has some tissue damage.  Because
3  he has tissue damage, he is at risk of arrhythmic
4  events.  I don't know when, and I don't know how,
5  except he is at higher risk.  His cardiac output
6  has been somewhat decreased as a result of the
7  tissue damage.  He is not as well as he was before
8  the heart attack.
9    Q.  What evidence is there that Mr. Mason
10  has decreased cardiac output?
11    A.  I think at the time of his
12  catheterization, they described the cardiac output
13  as something -- a stroke volume 60 percent or
14  something like that.
15    Q.  You understand --
16    A.  Which is a good stroke volume, don't get
17  me wrong, but it could have been better.
18    Q.  Stroke volume -- withdrawn.
19        You understand the concept of ejection
20  fraction?
21    A.  Oh, yeah.  That's the stroke volume.
22    Q.  And Mr. Mason's ejection fraction has
23  been absolutely normal even considering the day of
24  his heart attack right up to today, right?

Page 224

1    A.  Yeah, because -- and he has also been in
2  a training program.
3    Q.  And even on the day of his heart attack,
4  the ejection fraction was normal, right?
5    A.  Because he had subendocardial
6  infarction.
7    Q.  The -- and a normal ejection fraction is
8  that above 55 percent, correct?
9    A.  Fifty percent is even an acceptable
10  figure.
11    Q.  And you think Mr. Mason has something
12  less than an optimal ejection fraction?
13    A.  No, I said it was pretty good.
14    Q.  Right.  But you said it could be better?
15    A.  Could be better.
16    Q.  What's better?
17    A.  Could have been 70 percent.
18        Now that's a resting cardiac output,
19  okay, or ejection fraction.  What does he do on
20  exercise?
21    Q.  Well, that's been tested, right?
22    A.  There we go.
23    Q.  And he has been normal in that, right?
24    A.  I don't know how much he is exercising.

Page 225

1    Q.  On his exercise stress test the ejection
2  fractions were normal, correct?
3    A.  Of course, the heart improves as you do
4  that and it improves above the baseline if the
5  heart was preconditioned prior to the event.
6    Q.  Mr. Mason's functional capacity was
7  greater after his heart attack than it was before
8  his heart attack?
9    A.  I know where you're going with this, but
10  I'm talking, he is at greater risk because of the
11  scarring of his heart which can lead to a sudden
12  death experience.
13    Q.  Mr. Mason, from a functional standpoint,
14  has fully recovered from his heart attack,
15  correct?
16    A.  From a functional standpoint, but he has
17  scarring of the heart, which can lead to a sudden
18  death event.  Now, you have to understand how
19  arrhythmias and lethal arrhythmias occur.  Once
20  again, this is my area of expertise, and if you
21  have scarring of the heart, you are not the person
22  you were before.
23    Q.  The -- have you reviewed -- withdrawn.
24        Since his heart attack, do you believe

Golkow Litigation Technologies - 1.877.DEPS.USA

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 226

1    all of Mr. Mason's EKGs have been normal?
2        A.  I have only seen the EKGs that are in
3    that report.  The subsequent ones, to me, look
4    pretty good.  The record says they are pretty
5    good, within normal range.
6        Q.  If Mr. Mason's doctors have described
7    him as having a good prognosis following his heart
8    attack, would you agree with that?
9        A.  I think considering his age, that helps,
10   to say he has a favorable prognosis, but once
11   again, the scarring is there, the scarring can
12   lead to a lethal arrhythmic event, and no one can
13   predict that.
14       Q.  Do you believe Mr. Mason has received
15   good medical care since his heart attack?
16       A.  I think I stated that in my document
17   here, where both the admitting hospital and the
18   Latter Day Saints Hospital Emergency Room
19   physicians did an excellent job.
20           I was somewhat dismayed by the fact that
21   Mr. Mason was given Vioxx at the -- on the day of
22   his heart -- the day after his heart attack.  He
23   had already taken his dose the day of the heart
24   attack.  The nurse practitioner who subsequently

Page 227

1    was seeing Mr. Mason gave him Celebrex.  To me,
2    this -- we're talking about 2003 now, and
3    beyond, and this tells me that these medical
4    practitioners -- I'm not degrading them, now --
5    these medical practitioners were not informed, and
6    I don't know if you have taken their depositions
7    or not, but I'm sure if you asked them if they
8    were informed, they would say no, and why,
9    because Merck was not telling the truth.
10           And that's why I'm here today, to
11   discuss Merck's behavior, not whether this
12   clinical study shows that or the next thing, I'm
13   discussing Merck's behavior, and I start out my
14   document with that, and I wish you had focused
15   on that.
16       Q.  The -- what was my question, anyway?
17           The -- by the way, you said in your last
18   answer, Mr. Mason took Vioxx on the day of his
19   heart attack, correct?
20       A.  Yes.
21       Q.  I first need to figure out where in the
22   time line you point to his heart attack.  You
23   understand that he had some period of chest pain
24   before the time he went to the hospital, correct?

Page 228

1        A.  Yes.
2        Q.  Some period of four or five days?
3        A.  He was having on-and-off-again chest
4    pain, yes.
5        Q.  At one point in time during that time
6    line you believe he had his heart attack?
7            MR. NABERS:  Objection to the form.
8        A.  Well, in the emergency room when they
9    asked him what drugs are you taking, he said
10   Vioxx.
11       Q.  My question was different.  When during
12   that Monday to Friday period do you think
13   Mr. Mason had his heart attack?
14       A.  I think he was taking it daily.  That's
15   what the prescription instructions were.
16       Q.  When during that period of Monday to
17   Friday do you believe Mr. Mason had his heart
18   attack?
19           MR. NABERS:  He wants you to try to
20   pinpoint it, if you can.
21       A.  I can't pinpoint it.
22       Q.  Was it on Monday, Tuesday, Wednesday,
23   Thursday, Friday?
24       A.  It was the 25th of July.  Do you want me

Page 229

1    to get my Palm Pilot out, what day that was?
2        Q.  So he didn't have his heart attack, in
3    your view, prior to the time -- prior to the day
4    he admitted to the hospital?
5        A.  He was having unstable angina prior
6    to the time he was admitted to the hospital.
7    He recognized the symptoms.  He made the right
8    decision to go to the emergency room, fortunately.
9    Unfortunately, he should have done it sooner, but,
10   you know, that's just, don't worry about it.
11       Q.  What was causing, in your view,
12   Mr. Mason's unstable angina?
13       A.  Good question.  Very good question.
14       Q.  All right.
15       A.  Unstable angina occurs when you have
16   intermittent obstruction of blood flow to the
17   heart, and these are usually caused -- oh, always,
18   almost always caused by intermittent aggregation
19   of platelets which then break loose and flow
20   downstream.  These are repeated events.
21           Now, this is very important, because
22   many patients have unstable angina or angina
23   pectoris, as we call it, but they have
24   intermittent interruption of blood flow to the

58 (Pages 226 to 229)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 230

```
1   heart.  But why is this so important to Mr. Mason?
2   Because he is on a COX-2 inhibitor.
3            Now, intermittent ischemic events,
4   nature has given us a protective mechanism which
5   we call preconditioning, and these intermittent
6   preischemic events before the big time actually
7   protect the heart against severe damage, and
8   if you're on a COX-2 inhibitor, you eliminate
9   nature's protective effect.  You're more likely
10  now to have a much more damaging heart attack.
11  So Mr. Mason was placed at risk in more ways
12  than one.
13       Q.  You stated earlier that you thought
14  Mr. Mason's plaque was not a vulnerable plaque,
15  do you recall saying that?
16       A.  Yes.
17       Q.  On what basis do you make that
18  statement?
19       A.  Well, number one, they didn't state
20  there was a vulnerable plaque, they did not see --
21  they saw a thrombus.  The thrombus was sitting on
22  top of that plaque.  They put their balloon
23  catheter down there, they opened the vessel, did
24  an angioplasty.  They gave him TPA first in the
```

Page 231

```
1   emergency room, which was the right thing to do --
2   not -- yeah, they gave him TPA, and that opened
3   the thrombus, that got rid of the blood clot, that
4   restored blood flow to the heart.  They did a good
5   job of managing him.
6        Q.  Right.  But I wasn't talking about
7   management at this point.  I was asking about what
8   basis you had to say Mr. Mason's plaque was not a
9   vulnerable plaque.
10       A.  I didn't see any evidence in the report
11  of a ruptured plaque.
12       Q.  Okay.  The -- there was a reference in
13  the -- Mr. Mason did not receive a thrombolytic in
14  the hospital, correct?
15       A.  He received a thrombolytic in the first
16  hospital.
17       Q.  The --
18       A.  That's the standard of care.  He
19  received aspirin and a thrombolytic in the first
20  hospital.
21       Q.  Now, for the -- you have described
22  earlier that Mr. Mason had a narrowed lumen that
23  increased the shear forces, in your view, correct?
24       A.  Yes.
```

Page 232

```
1        Q.  And in your view, and we're talking now
2   about principally the left anterior descending
3   artery, right?
4        A.  Yes, sir.
5        Q.  And do you believe that that was the
6   culprit lesion or vessel that caused his heart
7   attack?
8        A.  Well, he also had a side branch off the
9   LAD in which there was a thrombus, and what he was
10  experiencing is what I call the prodrome; before
11  the heart attack is this coming and going of
12  platelet aggregates that finally culminated in a
13  full-blown thrombus that obstructed the vessel
14  blood flow to the point where his heart suffered,
15  and that's what they saw, when he got his
16  thrombolytic therapy, that restored the blood flow
17  momentarily.
18           When they took him to the cath lab,
19  the thrombus were reforming, you know, after
20  thrombolytic therapy, and they had an antiplatelet
21  agent they administered to him, Tirofiban.  If I
22  could see my notes there, that you have --
23           MR. NABERS:  Yeah, do you want to -- are
24  you going to mark those, because I'm going to end
```

Page 233

```
1   it, so I just -- I know you're going to want to
2   say your piece on the record, but if you want to
3   mark those, so that you may certainly do that.
4            MR. ISMAIL:  Previously Dr. Lucchesi has
5   not taken kindly to marking his originals, so I
6   don't know if he is going to feel differently
7   today.
8            MR. NABERS:  Well, we can certainly make
9   you a copy.
10           MR. ISMAIL:  I just tread carefully
11  here.
12           MR. NABERS:  I appreciate it.
13           THE WITNESS:  Maybe I was wrong about
14  the thrombolytic therapy.  I see tirofiban here,
15  which is a platelet antagonist, aspirin, and they
16  gave him Cutorolac (phonetic), which is bad news,
17  for pain, Lovenox, morphine sulfate.  I guess he
18  did not have a thrombolytic.  He did not have a
19  thrombolytic, unless I'm missing it here.
20           MR. NABERS:  Do you want to attach it?
21           MR. ISMAIL:  I would like his notes
22  produced to me.  Whether you mark that original or
23  not is up to the witness, in my view.
24           MR. NABERS:  Do you have a problem if
```

59 (Pages 230 to 233)

e697ff34-633e-47d4-9d6f-a47801d4f3b4

Benedict Lucchesi, M.D., Ph.D.

Page 234

1    what we do is, after the deposition, I'll make you
2    a copy of his yellow pages and then I can give
3    them back and you can mark them as the next
4    exhibit?
5           MR. ISMAIL:  That's fine.
6           MR. NABERS:  Okay.  All right.  Do you
7    want to say your piece about not having enough
8    time and --
9           MR. ISMAIL:  Sure.
10          MR. NABERS:  Go ahead.
11          MR. ISMAIL:  In discussions, part
12   of which were on the record and off the record,
13   Mr. Nabers has indicated he is terminating, from
14   his perspective, the deposition today.  I'm
15   keeping the deposition open.  I did not agree to
16   anything less than the Federal Rules of seven
17   hours for Dr. Lucchesi's deposition.  We have been
18   on the record, give or take, four hours today.
19   I believe I'm entitled to more time.  There's
20   definitely material that is new to his report and
21   specific to Mr. Mason that I did not have time to
22   review.
23          Scott, do you want to say your piece?
24          MR. NABERS:  Sure.  My piece would

Page 235

1    simply be that I believe that I had an agreement
2    with Carrie Jablonski with regard to the
3    depositions of Dr. Weiner, which lasted four
4    hours, the deposition of Dr. Sander, which lasted
5    four hours, and the deposition of Dr. Lucchesi,
6    which has lasted four hours, and I feel like I
7    have met my obligation and the agreement that I
8    made, and that's the reason for Plaintiffs ending
9    the deposition at this time.
10          But I also would point out for the
11   record that Mr. Lucchesi has been deposed five
12   times, somewhere in the neighborhood of 30 to
13   32 hours worth of deposition testimony, he
14   has given.  He has actually appeared in three
15   different trials where he has given hours worth
16   of trial testimony where Merck has had more than
17   ample opportunity to discuss his opinions or to
18   cross examine him.
19          In addition, he has provided multiple
20   expert reports and affidavits with regard to his
21   opinions in the Vioxx litigation, and in this
22   particular case, he has also provided an expert
23   report with regard to the opinions that he holds,
24   both of a general nature and as of a case-specific

Page 236

1    nature with regard to Mr. Mason, and so I believe
2    that his opinions have been clearly delineated,
3    and not only in his deposition testimony, but also
4    in his expert reports.
5           With that said, I think that we have met
6    our obligation, but I would also point out that
7    I have been told that Merck's position is that
8    with regard to its experts, Dr. Arrowsmith-Sloan,
9    Dr. Kim, Dr. Flavenhaven (phonetic), who is also
10   a pharmacologist that the Plaintiffs are not
11   entitled to take their depositions whatsoever,
12   nor are they entitled to take the deposition of
13   corporate witnesses who have been taken at least
14   once in the MDL, and with regard to Dr. Pratt,
15   they are trying to limit the deposition to two
16   hours, which obviously I have not agreed to,
17   either, but such as it may, that's the position
18   we're in, and if we just need to take it up with
19   the Court, we will do so at the appropriate time.
20          MR. ISMAIL:  And I'll further state that
21   to the extent this deposition was noticed in other
22   jurisdictions, all of whom have longer time frames
23   to allow for depositions, I understand Mr. Nabers
24   is not representing those Plaintiffs who have

Page 237

1    noticed the deposition, but now we have sort of
2    this additional dilemma where we have additional
3    jurisdictions who are attempting to make use of
4    this witness and this deposition, and obviously,
5    we haven't had time under those jurisdictional
6    rules to examine the witness.
7           I'm not going to respond in detail
8    to Mr. Nabers' comments other than that Mr. --
9    Dr. Lucchesi has a greatly expanded report, both
10   general and case specific, and we haven't had
11   sufficient time, and so I'm not ending the
12   deposition and I've not passed the witness, and
13   we will just take it up.
14          MR. NABERS:  Okay.  And just before we
15   end, we want to mark those last -- his notes as
16   Deposition Exhibit Number 8, right?
17          MR. ISMAIL:  His notes as Deposition
18   Exhibit Number 8, yes, sir.
19          MR. NABERS:  Okay.
20          (Marked for Identification:
21          Deposition Exhibit No. 8.)
22          (Discussion held off the record.)
23          MR. ISMAIL:  Exhibit 9, we're going
24   to mark the handwritten copy -- start over.

Benedict Lucchesi, M.D., Ph.D.

Page 238

```
 1            Exhibit 9 is a hard copy of
 2   Dr. Lucchesi's report and supporting materials
 3   that were served and we are going to mark it
 4   as Exhibit 9, because the version served
 5   electronically had some missing diagrams and we're
 6   going to go ahead and make this Exhibit 9 in the
 7   deposition.
 8            If you don't mind, let me put that here.
 9            (Marked for Identification:
10            Deposition Exhibit No. 9.)
11            (Deposition adjourned at 12:29 p.m.)
12            (Signature of the witness was not
13            requested by the parties hereto.)
14                   *   *   *
15
16
17
18
19
20
21
22
23
24
```

Page 240

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3   _____
 4   IN RE:  VIOXX         )   MDL DOCKET
 5   PRODUCTS LIABILITY    )   NO. 1657
 6   LITIGATION            )   SECTION L
 7   This document relates to:   )
 8   Case No. 2:06-CV-00810;   )   JUDGE FALLON
 9   CHARLES LARON MASON v.    )   MAG. KNOWLES
10   MERCK & CO., INC.,        )
11   _____
12
13            Having read the foregoing transcript
14   consisting of my testimony at the stated
15   time and place, I do hereby attest to both
16   the correctness and truthfulness of the
17   transcript.
18
19            _____
20            BENEDICT LUCCHESI, M.D., Ph.D.
21
22            _____
23            Date
24
```

Page 239

```
 1            E R R A T A   S H E E T
 2
 3   PAGE          CORRECTION
 4   _____    _____
 5   _____    _____
 6   _____    _____
 7   _____    _____
 8   _____    _____
 9   _____    _____
10   _____    _____
11   _____    _____
12   _____    _____
13   _____    _____
14   _____    _____
15   _____    _____
16   _____    _____
17   _____    _____
18   _____    _____
19   _____    _____
20   _____    _____
21   _____    _____
22   _____    _____
23   _____    _____
24   _____    _____
```

Page 241

```
 1   STATE OF MICHIGAN   )
 2                       ) SS
 3   COUNTY OF OAKLAND   )
 4            CERTIFICATE OF NOTARY PUBLIC
 5            I do hereby certify, the witness
 6   whose attached testimony was taken in the
 7   above-entitled matter was first sworn to tell
 8   the truth, the testimony contained herein was
 9   reduced to writing in the presence of the witness
10   by means of stenography, afterwards transcribed,
11   and is a true and complete transcript of the
12   testimony given by the witness.
13            I further certify I am not connected
14   by blood or marriage with any of the parties, nor
15   their attorneys or agents, and I am not financially
16   interested in the matter of controversy.
17            In witness whereof, I have hereunto
18   set my hand this day at Bloomfield Hills, Michigan,
19   County of Oakland, State of Michigan.
20
21            _____
22            RENE L. TWEDT, RPR/CRR/CSR-2907
23            Notary Public, Oakland County, Michigan
24            My Commission expires: 07/02/13
```

61 (Pages 238 to 241)