

12064146

Aug 14 2006
10:36AM

# Dr. Benedict Lucchesi



PLAINTIFF'S
EXHIBIT
D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISANA,
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE VIOXX PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | **MDL DOCKET No. 1657** |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| ALL ACTIONS | ) | |
| | ) | |

| | | |
|---|---|---|
| **Charles Laron Mason** | Plaintiff, | * |
| *-vs-* | | * |
| | | * |
| **MERCK & CO., INC.,** | Defendant | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## REPORT OF BENEDICT R. LUCCHESI, M.D., Ph.D., M.S., F.A.H.A.

My name is Benedict Robert Lucchesi. The Law Firm of Blizzard, McCarthy & Nabers, L.L.P. has retained me as an expert witness in the case of Charles Laron Mason vs. Merck & Co., Inc. I have been asked to provide a scientific opinion concerning the propensity of selective COX-2 inhibition, and specifically in the context of Merck's product Vioxx® (rofecoxib), and its likelihood of causing thromboembolic events in healthy and in particular at risk patients. The opinions expressed in this affidavit are stated to a reasonable degree of medical probability and are based upon a review of Mr. Charles Mason's medical records, the relevant basic and clinical scientific literature pertaining to basic and clinical pharmacology of cyclooxygenase-2 (COX-2) inhibitors as well as my own research involving various members of the class of COX-2 inhibitors (i.e. rofecoxib (Vioxx®), celecoxib (Celebrex), valdecoxib (Bextra™), bromfenac (Xibrom™), and nimesulide.

### I.      Background

My educational back ground includes the following: I attended St. John's University in New York City where I received my Bachelor of Science degree in Pharmacy in 1955 (*summa cum laude*), and a Masters degree in Physiology in 1957. I was then accepted at the University of Michigan Medical School where I obtained a

doctorate (Ph.D.) in Pharmacology in 1961 and a Medical Degree (M.D.) in 1964. I was appointed to the faculty of the University of Michigan Medical School in 1961 as an instructor while attending medical school. I have been engaged in teaching students, postdoctoral fellows, and physicians as well as conducting basic scientific and clinical investigations in the area of cardiovascular pharmacology for the better part of four decades. Currently I am a tenured professor of pharmacology, and I have served on the medical school faculty for 44 years. I have served as the Interim Director of the Upjohn Center for Clinical Pharmacology, as well as Director of Research of the Diabetes Research and Training Center.

Attached to this report, as **exhibit "A" is** my *curriculum vitae*, which more particularly sets out my educational background, appointments, honors and awards, editorial advisory boards, professional accomplishments publication history.    To highlight some aspects of the history documented in my curriculum vitae, I received the honor of serving as chairperson for the American Society of Pharmacology and Experimental Therapeutics, **(ASPET)** Division of Cardiovascular Pharmacology, 2001-2002 and continue to serve on the Division's Executive Committee. In 2001 I was the recipient of the Torald Sollmann Award, given by the American Society of Pharmacology and Experimental Therapeutics. I served as the organizer and Chairperson for, Annual Meeting of the International Society of Heart Research (ISHR) North American Section, May 1989 and August 1998. I was co-organizer of the ASPET Colloquium on *Pharmacological Intervention in Thrombosis and Thrombolysis,* held at the University of Michigan, 1995; Co-organizer of the ASPET, Colloquium on *Role of Adhesion Molecules in Cardiovascular Pharmacology,* held at the University of Michigan, June 1994. I received the *Merck Award in Pharmaceutical Chemistry,* 1955. In 1985 I was selected by Karolinska Institutet, Stockholm, to receive the *Gustav Nylin award and to present the Gustav Nylin Lecture,* in recognition for my studies on free radical mediated tissue injury and inflammation in myocardial reperfusion injury. Since its inception, I have been a member of the Executive Committee of the University of Michigan Cardiovascular Center.

I have been appointed to Study Sections for the National Institutes of Health and served for thee years on the *Cardiology Advisory Committee of the National Institutes of Health, Heart, Lung and Blood Institute.* In June of 2006, I received the *Coeur d'Esprit*

Mason *v* Merck                                                                                                    3

*Award for Distinguished Achievement from the American Heart Association.* In 1989 I received the *ASPET Award for Experimental Therapeutics*. In addition to having received research support from national and international pharmaceutical companies, my *research in Cardiovascular Pharmacology* was supported for 38 consecutive years by the *National Institutes of Health, Heart, Lung and Blood Institute* (NIH-HLBI) including 10 years of funding as a Merit Award for my studies on antiarrhythmic drugs, including the studies that led to the introduction of propranolol as the first member of its class into clinical medicine.  To this day propranolol and related members of the class are primary drugs for the prevention of sudden cardiac death in patients with coronary artery disease.

My laboratory published the first in vivo study that called attention to the role of oxygen free radicals as mediators of myocardial reperfusion injury that led to new approaches for cardiac revascularization. My studies demonstrated the role of oxygen free radicals and inflammation as the underlying mechanism leading to the lethal "stone heart" phenomenon that occurred in patients who were undergoing cardiopulmonary bypass operations.

In the mid-sixties, along with my colleagues at the University of Michigan, we provided the first evidence demonstrating the ability of nicotine to produce a state of physical dependence (addiction) in human tobacco smokers.  This finding led to the development of therapeutic interventions (nicotine patch, nicotine chewing gum, etc.) for smoking cessation programs.

I was elected as a Fellow of the American Heart Association, a Fellow of the International Society for Heart Research and a Fellow of the International Academy of Cardiovascular Sciences.

.       I have served, and presently serve, on the editorial boards of numerous peer-reviewed medical and scientific journals.  A complete list of the journals upon whose editorial boards I currently or have formerly served is included in my curriculum vitae, however a partial list includes the following: The American Journal of Physiology: Heart and Circulatory Physiology, 1993-Present; British Journal of Pharmacology, (Editor 2000-2004); Circulation, 1977-1980; 1994-present; Circulation Research, 1986-2000; Journal of Cardiovascular Pharmacology, 1977-Present; Journal of Cardiovascular Pharmacology and Therapeutics, 1995-Present; Journal of Molecular and Cellular Cardiology, 2000-2003; and the Journal of Pharmacology and Experimental

Therapeutics, 1996-Present (Specific Field Editor in Cardiovascular Pharmacology, 1978-1981, 1987-1988 and 1994-1999).

In addition to my academic appointment and work, the professional and scientific writing I have contributed to, and the editorial boards outlined in my curriculum vitae, I have likewise served as a consultant to major pharmaceutical companies in the United States, Europe and Japan. During the past 45 years, a significant portion of my research support is derived from pharmaceutical industry sponsored research under contract with the University of Michigan Division for Research Development and Administration. The industry-supported programs have involved the investigation of potential drug candidates designed to prevent sudden cardiac death, protection of the ischemic myocardium and drugs for induction of thrombolysis and prevention of arterial thrombosis. The data generated under pharmaceutical industry sponsored research is subject to review by regulatory agencies (e.g. United States Food and Drug Administration) as well as similar regulatory agencies in foreign countries. As a result of my collaborative efforts with the pharmaceutical industry, a number of new and novel therapeutic agents entered into human clinical trials and were approved by for clinical use in the United States and abroad.

Aside from my Medical School appointment in the Department of Pharmacology, I served as Interim Director of the Upjohn Center for Clinical Pharmacology as well as Director for Research in the Diabetes Research and Training Center.

The following is a list of agents in which my laboratory has contributed in a significant way leading to their final approval for human use.

---

**Antiarrhythmic Agents for Prevention of Sudden Cardiac Death**
Propranolol (Inderal)
Sotalol (Betapace)
Bretylium*
Amiodarone (Pacerone)*
Flecainide   (Tambocor)#

**Agents for the Management of Patients Coronary Artery Disease**
Nitroglycerin Patch*
Intravenous Nitroglycerin
Amlodipine (Norvasc)

Ranolazine (Ranexa)

**<u>Antithrombotic – Antiplatelet Agents</u>**
Abciximab      (ReoPro)*
Anagrelide     (Agrylin)**
C69931MX     (Cangrelor)
Alfimeprase***

*Indicates that I contributed to both the basic and clinical studies
** My laboratory was the first to report the proarrhythmic potential associated with the drug tambocor at least two years before it was removed from the Cardiac Arrhythmia Suppression Trial where it was noted that the drug produced lethal arrhythmias in patients who had experienced a previous heart attack. (See J Am Coll Cardiol. 1987 Feb; 9(2): 359-65.
*** Provided the initial data to demonstrate the unique fibrinolytic actions of alfimeprase – introduced the lytic agent to Amgen, which is undergoing clinical trials jointly by Nuvelo and Bayer.


Alfimeprase is in Phase III Clinical Trial and has been granted fast track designation by the U.S. Food and Drug Administration (FDA) for the treatment of acute peripheral arterial occlusion (PAO), or "leg attack." Fast track designation, which was mandated by the FDA Modernization Act of 1997, can potentially facilitate development and expedited review of Biologics License Applications (BLA).

I am a member of many scientific associations more particularly outlined in my *curriculum vitae, exhibit "A".* I have published, articles, reports, and book chapters, and I have made presentations to scientific conferences regarding the cardiovascular risks of numerous outside agents. I have been a peer reviewer for several scientific journals, including those previously mentioned herein, and more particularly set out in my *curriculum vitae, exhibit "A".*

**II.**      In connection with formulating my opinions, and more particularly with the preparation of this report, I have reviewed the materials set out in the attached exhibit "B". Additionally, I have reviewed the following:

**III.      Review of Documents**

A. In connection with formulating my opinions, and more particularly with the preparation of this report, I have reviewed the following:

a. Medical Records of Mr. Charles Laron Mason from the LDS Hospital 7-25-03

b. Medical Records of Mr. Charles Laron Mason from Sandy Family Practice

c. Plaintiff's Prescription Records from Sav-On Pharmacy 10/09/2000 to 03/17/05

B.  As a result of my previous testimony in cases related to the Vioxx litigation, I have examined the following documents, which have been discussed and described in my prior testimony:

   *i. The Data Safety Monitoring Board minutes for the Vigor Trial for the months of October, November and December 1999*

   *ii. Merck Internal documents including Email correspondence between employees/physicians within Merck & Company, Inc., and with others internal and external to Merck.*

   *iii. Hennan JK, Huang J, Barrett TD, et al.  Effects of selective cyclooxygenase-2 inhibition on vascular responses and thrombosis in canine coronary arteries. Circulation 2001; 104:820-825.*

   *iv. Mukherjee D, Nissan SE, Topol EJ et al.  Risk of cardiovascular events associated with selective COX-2 COX-2 inhibitors.  JAMA 2001; 286:954-959.*

   *v. Marvin M. Konstam, et al.  "Cardiovascular Thrombotic Events and Controlled Clinical Trials of Rofecoxib", Circulation, 2001; 104: 2280-2288.*

   *vi. Crofford LJ, Oates JC, McCune WJ, Gupta S, et al. Thrombosis in patients with connective tissue diseases treated with specific cyclooxygenase-2 inhibitors.  A*

Mason *v* Merck                                                                            7

report of four cases.  *Arthritis Rheum 2001; 44:1891-1896.*

vii.   *Ray WA, et al., Non-steroidal anti-inflammatory drugs and risks of serious coronary heart disease; An observational cohort study, Lancet 2002; 359: 2002.*

viii.  *Ray WA, Stein CM, Daugherty JR et al., COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. Lancet 2002; 360:1071-1073.*

ix.   *Ray W, MacDonald TM, Solomon DH et al.  COX-2 selective non-steroidal anti-inflammatory drugs and cardiovascular disease.  Pharmacoepidemiol Drug Saf 2003; 12:67-70.*

x.   *Eagan KM, Lawson JA, Fries S et al. COX-2-derived prostacyclin confers atheroprotection on female mice. Science 2004; 306:1954-1957.*

xi.   *Juni P, Nartey L, Reichenbach S, et al. Risk of cardiovascular events and rofecoxib, cumulative meta-analysis Lancet 2004; 364:2021-2029.*

xii.  *Solomon DH, Schneeweiss S, Glynn RJ et al. Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults. Circulation 2004; 109:2068-2073.*

xiii.    Rabausch K, Bretschneider E, Sarbia M, Meyer-Kirchrath J, Censarek P, Pape R, Fische JHW, Schror K, Weber AA. *Regulation of thrombomodulin expression in human vascular smooth muscle cells by COX-2-derived prostaglandins.* Circ Res 2005; 96:el-6. Epub 2004 Dec 9.

xiv.    Walter Mf, Jacob RF, Day CA et al. Sulfone COX-2 inhibitors increase susceptibility of human LDL and plasma to oxidative modification: comparison to sulfonamide COX-2 inhibitors and NSAIDs. Atherosclerosis 2004; 177:235-243.

xv.    Egan KM, Wang M, Lucitt MB et al. Cyclooxygenase, thromboxane, and atherosclerosis. Plaque destabilization by cyclooxygenase-2 inhibition combined with thromboxane receptor antagonism. Circulation 2005; 111:334-342.

xvi.    Bresalier RS, Sandler RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemopre-vention trial. N Engl J Med 2005; 352:109201102.

xvii.    Levesque L, Trophy JM, Zhang B. The risk of myocardial infarction with cyclooxygenase-2 inhibitors: A population study in elderly adults. Ann Int Med. 2005; 142:481-489.

xviii.  Nissen SE.  *Adverse cardiovascular effects of rofecoxib. N Engl J Med. 2006; 355:203-205.*

xix.  *Levesque LE, Brophy JM, Zhang B.    Time variations in the risk of myocardial infarction among elderly users of COX-2 inhibitors. CMAJ. 2006; 174:1563-1569.  Epub 2006 May 2.*

xx.  *Furberg CD. Adverse cardiovascular effects of rofecoxib. N Engl J Med. 2006 Jul 13; 355(2): 204; author reply 204-5.*

xxi.  *Curfman GD, Morrissey S, Drazen JM. Expression of concern reaffirmed.  N Engl J Med 354; 1193, 2006.*

xxii.  *Solomon DH, Avorn J, Sturmer T, et al. Cardiovascular outcomes in new users of coxibs and nonsteroidal antiinflammatory drugs:  High-risk subgroups and time course of risk.  Arthritis Rheum 2006; 54:1378-1389.*

xxiii.  *Fraunfelder FW, Solomon J, Mehelas TJ.  Ocular adverse effects with cyclooxygenase-2 inhibitors. Arch Ophthalmol 2006; 1124:277-279.*

xxiv.  *Preston Mason R,  Walter MF, McNulty HP et al. Rofecoxib increases susceptibility of human LDL and membrane lipids to oxidative damage:  A mechanism of cardiotoxicity.   J Cardiovasc Pharmacol 2006; 47(Suppl 1): S7-S14.*

Mason *v* Merck                                                                10

xxv.   *Steffel J, Luscher TF, Ruschitzka F, Tanner FC.*
*Cyclooxygenase-2 inhibition and coagulation. J*
*Cardiovasc Pharmacol 2006; 47(Suppl 1): S15-S20.*

xxvi. *Bombardier C, Laine L, Reicin A, Shapiro D, Ruben*
*Burgos-Varga PH, Davis B,    Day R,    Bosi Ferraz M,*
*Hawke CJ, Hochberg MC, Kvien TK, Schnitzer TJ for The*
*VIGOR Study Group. Comparison of upper gastrointestinal*
*toxicity of rofecoxib and naproxen in patients with*
*rheumatoid arthritis. N Engl J Med. 2000;343:1520-8.*

xxvii. *Bombardier C, Laine L, Burgos-Vargas R, Davis B,*
*Day R, Ferraz MB, Hawkey CJ, Hochberg MC, Kvien TK,*
*Schnitzer TJ, Weaver A. Response to expression of concern*
*regarding VIGOR study. N Engl J Med.*
*2006;354(11):1196-9.*

xxviii. *Bresalier RS, Sandler RS, Quan H, Bolognese JA,*
*Oxenius B, Horgan K, Lines C, Riddell R, Morton D, Lanas*
*A,     Konstam     MA,     Baron     JA.*
*Cardiovascular Events Associated with Rofecoxib in a*
*Colorectal Adenoma Chemoprevention Trial (Adenomatous*
*Polyp Prevention Trial on Vioxx (APPROVe) Trial).   N*
*Engl J Med. 2005;352:1092-1102.*

As part of my professional activities and interest in basic and clinical
pharmacology, I conduct a daily survey of the scientific and medical literature
related to pharmacology of autocoids and their role in the control of the
cardiovascular system (heart, blood vessels and blood cellular components).
Furthermore, I provide instruction to medical, pharmacy, and nursing students at
the University of Michigan in courses that relate to the use of therapeutic
interventions in the management of diseases of the cardiovascular system. The
following is a partial listing of the topics covered in my annual teaching
assignments:

Autonomic Nervous System and β-Blocking Agents

> Nitrates and Calcium Channel Blockers
>
> Angiotensin-Converting Enzyme Inhibitors
>
> Digitalis, Inotropes, Dilators.  Acute and Chronic Heart Failure
>
> Drugs and the Failing Heart
>
> Antihypertensive Drugs
>
> Antiarrhythmic Drugs and Treatment Strategies
>
> Antithrombotics: Platelet Inhibitors, Anticoagulants, and Fibrinolytics
>
> Lipid-Lowering and Anti-atherosclerotic Drugs
>
> Cardiac Electrophysiology
>
> The Electrocardiogram
>
> Supraventricular Arrhythmias Electrophysiology / Pharmacology
>
> Atrial Fibrillation--Chronic & Acute Treatment
>
> Anti-Ischemic Drugs
>
> Pharmacological Interventions in the Patient with Stable-Unstable Angina Pectoris
>
> Ischemic Myocardial Injury-Basic Concepts Involving Mediators of Inflammation
>
> Cardiovascular Effects of COX-2 Inhibition

I have, additionally, contributed to medical and scientific publications directly on point with this issue, to wit:

J. Hennan, et al., "Effects of Selective Cycloxygenase-2 Inhibition on Vascular Responses in Thrombosis in Canine Coronary Arteries" *(Circulation 2001; 820-825)*.  The impetus for this study derived from my close association with Leslie Crofford, MD, who published one of the first accounts of patients who developed acute cardiovascular events soon after the administration of a COX-2 inhibitor.   Dr. Crofford's observations were published in August 2000.   (L. Crofford, et al., "Thrombosis in Patients with Connective Tissue Disease Treated with Specific Cyclooxygenase-2 Inhibitors," Arthritis and Rheumatism" 2000; 43: 1891-1896).

As part of my work at the University of Michigan I have studied major areas of cardiovascular pharmacology in the laboratory. These investigations are focused on the cellular and electrophysiological mechanisms in the genesis of cardiac arrhythmias and sudden cardiac death, as well as developing pharmacological approaches in the prevention of lethal arrhythmias. Studies are conducted at the cellular and whole organ level with final evaluation in intact animal models of disease. Significant emphasis is placed on an integrated approach to the study of pharmacological interventions for the purpose of understanding physiological and cellular mechanisms in drug actions related to ischemic heart disease.

Research is focused in areas involving cellular and electrophysiological mechanisms involved in the genesis of reentrant arrhythmias in the ischemic heart; the assessment of pharmacological interventions for the prevention of ventricular fibrillation or sudden coronary death; the study of pharmacological interventions that can protect against irreversible ischemic myocardial injury; as well as the study of drugs that prevent arterial and venous thrombosis, which by their nature can result in a myriad of thromboembolic events, including myocardial infarction and cerebral vascular accidents.

Critical to the latter area of research is a better knowledge of physiological, biochemical and pathologic events causing abnormal interactions among cellular elements in the blood and vasculature. In the arterial circulation blood platelets adhere and aggregate in response to vascular, endothelial wall injury. Thrombosis formation in the venous circulation differs from that in arteries. In the venous system, fibrin deposition forms the basis of clot formation, whereas in the arterial circulation, enhanced platelet reactivity in response to endothelial vessel wall changes and the subsequent platelet aggregation results in the development of an occlusive thrombus and tissue or

organ ischemia.  <u>A major goal of our research effort is to identify pharmacological agents for the prevention of obstructive lesions (thrombi or blood clots) in the arterial and venous vascular beds.</u>  The studies involve the use of platelet specific interventions to prevent formation of occlusive arterial lesions, or specific antagonists of the coagulation cascade for prevention of arterial or venous thrombosis in experimental models.   Based upon data developed in my laboratory under a contract with a pharmaceutical company, I provided the major pre-clinical data upon which subsequent clinical trials were developed leading to the FDA approval of ReoPro™ (abciximab), the first monoclonal antibody introduced into clinical medicine, which today serves as a major adjunctive agent in patients undergoing coronary artery angioplasty or thrombolytic therapy.  ReoPro™ inhibits platelet aggregation and thus prevents arterial thrombus formation, the major precipitating factor in the development of a myocardial infarction ("heart attack") or ischemic stroke ("brain stroke").

I have published in excess of 380 peer-reviewed articles.  I have received various awards for my professional work, such as the 2002 Bennett J. Cohen Educational Leadership Award in the field of cardiovascular pharmacology; the 1989 ASPET Award for Experimental Therapeutics and the 2001 Torald Sollmann Award.  Most recently, I received the Esprit de Coeur (Spirit of the Heart) Award for Distinguished Achievement for 2006 from the American Heart Association – Greater Midwest Affiliate.

I have the distinction of having been supported by the longest, uninterrupted National Institutes of Health-HLBI Award (1961-1999), including ten years of funding as a MERIT Award.  In 1984, I as selected to receive the Gustav Nylin Award from the Karolinska Institutet, Stockholm, Sweden, for my studies on free radical-induced myocardial reperfusion injury.

I have conducted many studies with the funding and support of the pharmaceutical industry, and have conducted laboratory experiments when serious medical questions required additional basic research. Among my work, and the work of others at the University of Michigan, has been research specific to the study of aspirin, non-steroidal anti-inflammatory drugs (NSAIDs) and selective inhibitors of cyclooxygenase (COX), including celecoxib (Celebrex™), rofecoxib (Vioxx® ) valdecoxib (Bextra™) and nimesulide. In addition, I have published on the subject of COX-2 inhibition and was the first to provide scientific proof demonstrating that COX-2 inhibition could increase the potential for arterial thrombosis. In addition, I have done numerous studies that focus on the development of pharmacological prevention of thrombosis that involve the study of pharmacological agents that prevent the formation of platelet dependent thrombi as well as potential therapeutic agents that inhibit the coagulation cascade (antithrombin (hirudin) and inhibitors of factor Xa formation). Included among my papers is the article "Effects of Selective Cycloygenase-2 Inhibition on Vascular Responses and Thrombosis in Canine Coronary Arteries" that appeared in the journal *Circulation* and represents the first demonstration of COX-2 inhibition leading to the increased potential for arterial thrombosis. The abstract from my publication is presented below:

*Background*—Prostanoid synthesis via the action of cyclooxygenase-2 (COX-2) is a component of the inflammatory response. Prostacyclin, a product of COX-2 in vascular endothelium, has important physiological roles; such as increasing blood flow to injured tissues, reducing leukocyte adherence, and inhibiting platelet aggregation. We examined the possibility that selective COX-2 inhibition could suppress the protective effects of prostacyclin, resulting in an alteration of the hemostatic balance and vascular tone.

*Methods and Results*—Circumflex coronary artery thrombosis was induced in dogs by vascular electrolytic injury. Orally administered celecoxib (COX-2 inhibition) or high-dose aspirin (HDA) (COX-1 and COX-2 inhibition) did not alter time to occlusive thrombus formation compared with controls (celecoxib 77.767.2 minutes, HDA 72.0618.5 minutes, control 93.0621.8 minutes). Oral HDA with an endothelial recovery period (HDA-ER) (COX-1 inhibition) produced a significant increase in time to vessel occlusion (257.0641.6 minutes). The observed increase in time to occlusion was

abolished when celecoxib was administered to animals dosed with HDA-ER (80.7620.6 minutes). The vasomotor effect of endothelium-derived prostacyclin was examined by monitoring coronary flow during intracoronary administration of arachidonic acid or acetylcholine. In celecoxib-treated animals, vasodilation in response to arachidonic acid was reduced significantly compared with controls.

*Conclusions*—The results indicate important physiological roles for COX-2–derived prostacyclin and raise concerns regarding an increased risk of acute vascular events in patients receiving COX-2 inhibitors. The risk may be increased in individuals with underlying inflammatory disorders, including coronary artery disease. **(*Circulation*. 2001;104:820-825.**

The above study, supported entirely by discretionary funds, is of significance since it is the first to call attention to the potential adverse cardiovascular effects of COX-2 inhibition and to present scientific support for the mechanisms by which arterial thrombosis is facilitated through disturbing the balance between COX-1 derived thromboxane A2 (TXA2) and COX-2 derived prostacyclin (PGI2). Since the introduction of the selective COX-2 inhibitors into clinical medicine, I have investigated the effects of COX-2 inhibition on coronary artery blood flow and vasomotor activity as well as their effects on tissue injury in the heart subjected to myocardial ischemia (decreased blood flow) and reperfusion. The hypothesis that we are testing is that the risk of an adverse cardiovascular event (thrombosis) will be increased in the presence of an underlying inflammatory disorder, including coronary artery disease and autoimmune diseases connective tissue disorders.

In relation to the present matter I was asked to review pertinent materials and formulate opinions relating to the efficacy and safety of the prescription drug Vioxx® (Rofecoxib), and the conduct of Merck & Co. Inc. relating to its testing, research and marketing of Vioxx®. In furtherance of this task, I have reviewed available documents produced in the present case. Additionally I have reviewed available portions of the public record that includes such items as the warning letters to Merck, as well as relevant literature. I have also reviewed pertinent national and international patent applications

filed by Merck and others related to the vascular safety of COX-2 inhibitors. I understand document production and discovery are ongoing, and I reserve the right to supplement any and all of my opinions as new information becomes available.

I also want to point out that before any involvement in the litigation concerning the adverse effects of rofecoxib, I conducted my own research and laboratory experiments with my colleagues related to the vascular safety of COX-2 inhibitors (14). I was further generally aware of and saw advertisements directed to the public relating to Vioxx®. Because of the importance of the subject area and clinical medicine in pharmacology, my associates and I conducted basic investigations to better understand the full biological significance and physiological impact of selectively inhibiting cyclooxygenase-2 under normal and pathophysiological conditions. Our basic investigations are NOT supported by external sources of funding, and we did not – and do not – have a stake in any of the agents under study.

Based upon my review of available materials and literature as well as my some 46 years of personal experiences in the areas of basic and clinical research and techniques I have formed opinions as they relate to the safety and efficacy of Vioxx®, and the conduct of Merck & Co. Inc., related to Vioxx®. In forming opinions expressed herein I have relied upon published literature, textbooks in medicine, pharmacology and personal research in relevant areas of science. I have employed the same academic/scientific rigors in forming these opinions as I utilized in my every day practice as a research physician/scientist and a specialist in *Cardiovascular Pharmacology*. I have summarized my opinions below:

> *a.* A review of the patent literature, indicates, as early as the mid 1990s, that Merck was either actually aware of or should have been aware based on

Mason v Merck                                                                                    17

available scientific literature[1], of the potential vascular and hemostatic (prothrombotic) responses associated with the inhibition of cyclooxygenase-2 by agents such as rofecoxib (Vioxx®) before placing this product on the market.

b.     It is evident from the series of e-mails last dated February 26, 1997, from B. Daniel to E. Ehrich, T. Simon, B. Morrison and E. Reicin, that Merck was in fact actually aware of this risk, and in fact predicted its occurrence in its clinical study.  Thus, it was incumbent upon Merck, the product manufacturer, to undertake and or sponsor the necessary basic and clinical investigations to determine the vascular responses of their drug before they put the drug on the market.

c.     Merck did not conduct the necessary testing and its failure to do so was contrary to industry standards and good clinical practice.  Merck's actions in this regards render Vioxx® defective and unreasonably dangerous.

d.     Specifically, well before the initial marketing of Vioxx® it was known that prostaglandins (PGs) regulate a number of important physiologic functions including gastrointestinal motility, vascular tone, mucosal protection, and immune responsiveness and above all platelet reactivity (Eberhart and DuBois 1995).   Cyclooxygenase (COX) is of major importance in the synthesis of PGs from arachidonic acid.  Two isoforms of the enzyme are known.   COX-1 is expressed in most cells

---

[1] The work of Dr. John Vane and colleagues that began in the mid 1970s up to recent times provided sufficient words of caution regarding the potential to alter hemostasis by interfering with the COX enzymes. (Sir) John Vane shared the 1982 prize, for Physiology and Medicine, with Sune Bergstrom and Bengt Samuelsson (see Studies of Biochemical Mechanism to Novel Biological Mediators: Prostaglandin Endoperoxides, Thromboxnes, and Leukotrienes.  Biosci. Rep. 3: 791 813, 1983).  It was the work of Vane and colleagues that has been referred to erroneously as the "FitzGerald Hypothesis."

constitutively, while COX-2, in addition to being expressed constitutively, albeit at a low level of activity, is a readily inducible isoform produced in response to inflammatory stimuli (Feng et al. 1993). Thus, scientists and marketing personnel at Merck should have known that COX-2 also is expressed constitutively in the vascular endothelium as well as in the kidney. Furthermore, it is essential for maintaining important physiologic mechanisms in the vascular endothelium for normal control of the vascular bed and renal function, as well as modulating platelet reactivity by which the potential for arterial thrombus formation is prevented or reduced.

e.   Of importance is the failure of Merck to recognize that prostacyclin (PGI2) is the major "defense" mechanism for prevention of platelet dependent arterial thrombosis. Thus, Vioxx® induced inhibition of COX-2 deletes the body's major defense against the development of platelet aggregates and occlusive thrombus formation. The disturbing fact is that the role of COX-2 derived prostacyclin (PGI2) was well know as far back as the mid 1990s and is discussed in the internal Merck documents. Documents reflect that scientists at Merck were well aware of the "anti-thrombotic" properties of prostacyclin. Knowing that a COX-2 inhibitor would decrease the production of prostacyclin (PGI2), Merck scientists frequently discussed the need to counter the potential prothrombotic effects of thromboxneA2 (TXA2) and embarked upon a research program to develop thromboxane receptor antagonists, thromboxane synthase inhibitors or direct thrombin inhibitors.

Mason *v* Merck                                                                    19

f.      Steven Nichtberger, a Merck employee, filed a patent having an
        International Filing Date of 9-March-1998. The invention claimed in the
        Nichtberger patent as well as those subsequently submitted by other
        Merck employees (Dr. Jules Shafer and Dr. Edward Scolnick, in which
        each describe a method for preventing platelet dependent arterial
        thrombosis in patients being treated with a COX-2 inhibitor. The details
        of the patents are discussed in a later section. A reading of the inventions
        indicates that Merck was attempting to develop one or more adjunctive
        agents to be used in combination with a COX-2 inhibitor to prevent
        arterial thrombus formation. (See Appendix B for face pages of the
        respective patents).

g.      In March 2001, Merck filed a patent application for a combination of a
        COX-2 inhibitor (e.g. rofecoxib) with a thromboxane synthase inhibitor,
        which theoretically would prevent the synthesis of platelet-derived
        thromboxane (TXA2). The latter is one of the most effective activators of
        the blood platelet and constrictor of blood vessels thereby having the
        potential to induce an occlusive arterial thrombus (blood clot). In the
        description of the patent, the inventor, Dr. Edward Scolnick, former
        Director of Merck Research Laboratories states, *"The present invention
        concerns a method for treating patients <u>with COX-2-mediated condition[2]s
        and who are also at risk of developing thromboembolic events."* The
        description continues to state, *"For patients who are taking COX-2
        selective inhibitors and who may benefit from the cardiovascular*

---

[2] A way of saying "COX-2 mediated thrombosis." See Exhibit B

Mason *v* Merck                                                                  20

> *protective effect of aspirin, there remains a need for a cardiovascular*
> *protective treatment that does not expose them to increased risk for*
> *gastrointestinal side effects."*

h.        Therefore, the wording in the patent indicates that Merck scientists were well aware of the important role of aspirin (an inhibitor of platelet derived thromboxaneA2), which is used to prevent primary and secondary platelet dependent arterial thrombosis in patients at risk of a cardiovascular event (heart attack and/or stroke).

i.        Furthermore, a reading of the patents indicates that Merck scientists were aware that a COX-2 inhibitor would reduce the production of prostacyclin (PGI2), a substance that prevents aggregation of platelets and prevents thrombus formation in addition to dilating (relaxing) blood vessels. The description of the invention mentions that the reduction in the synthesis of prostacyclin (PGI2) would change the body's ratio of prostacyclin to thromboxane. The latter is a highly effective constrictor of blood vessels and can cause clotting, and the result might be an increased risk of cardiac and cerebral adverse events. It is evident that the Merck scientists and leaders were attempting to develop, and patent a method of combining a COX-2 inhibitor (e.g. rofecoxib) with another medication to possibly lessen cardiovascular risks. A letter in the year 2000 written by Dr. Garret Fitzgerald from the University of Pennsylvania and Merck consultant, who had studied rofecoxib for Merck, had proposed a similar approach as indicated in the patents. It is important to note, that a Merck scientist, Dr. Steven Nichtberger, submitted a related patent in 1998.

j.      Considering the fact that the preparation of a patent requires considerable effort and investment of time, it is apparent that Merck was concerned about the potential for a COX-2 inhibitor to induce thrombus formation well before the year 1998.   The patents, as well as internal communications call into question Merck's often stated assertion that it acted *responsibly and in the best interest of patients* at all times including withdrawing the drug.

k.      Merck scientists and executives ignored the writings of Sir John Vane (1982 Nobel Laureate) who published and spoke extensively on the importance of prostacyclin (PGI2) as a regulator of platelet reactivity. (Vane JR, Anggard EE, Botting RM. Regulatory functions of the vascular endothelium (N Engl J Med 1990; 323: 27–36).

l.      The latter is especially important in the presence of inflammatory conditions (rheumatoid arthritis, osteoarthritis, atherosclerosis, lupus erythematosus, vasculitis, etc.) in which the elevated local production of platelet derived-thromboxane is counteracted by the increased endothelial expression of the COX-2 enzyme and its associated production of prostacyclin (PGI2).   The results of the VIGOR trial, sponsored and coauthored by Merck, clearly presented evidence of a prothrombotic effect associated with the administration of rofecoxib.

m.      Evidence of a prothrombotic effect of rofecoxib (VIOXX) was apparent in the VIGOR trial.   Merck officials, however, insisted and convinced medical practitioners as well as the public through direct advertising, that the VIGOR results did not suggest an increase in cardiovascular events

Mason *v* Merck                                                                22

and attributed the findings to the ability of naproxen to decrease the risk of myocardial infarction. The "cardioprotective" effect of naproxen was attributed to its ability to inhibit platelet COX-1 thereby inhibiting the platelet-derived production of thromboxane (TXA2). The explanation was without scientific support and subsequently was demonstrated to be incorrect.

n.   The removal of rofecoxib (VIOXX) from the market could no longer be avoided, as the adverse events could no longer be disguised when the data from the "placebo controlled" APPROVEe trial were made public. The data showing an increase in cardiovascular events dispelled all possibility of a "chance happening", or a "cardioprotective effect of naproxen" thereby leading to only one "scientifically valid" conclusion that Vioxx® has the potential to increase the risk of thromboembolic events.

o.   In a memo dated March 9, 2000, Dr. Edward Scolnick states his concern that the higher risk of heart attacks and strokes was *"mechanism based."*[3] The latter (mechanism based) refers to the firmly established scientific fact that inhibition of prostacyclin (PGI2) synthesis would increase the potential for thrombus (blood clot) formation, especially in the patient who was predisposed to thromboembolic events (hypertension, diabetes, rheumatoid arthritis and related inflammatory conditions).

p.   Prostanoid synthesis via the action of COX-2 is recognized as a component of the inflammatory response. There is evidence however that

---

[3] "Mechanism based" refers to the mechanism of action of rofecoxib as an inhibitor of COX-2 inhibitor therefore suggesting that all COX-2 inhibitors would achieve the same end-result, i.e. a prothrombotic effect.

COX-2 is expressed constitutively in many tissues including the vascular endothelium and kidney where it serves important physiological functions. Prostacyclin or PGI2, a product of COX-2 in vascular endothelium, has important physiological roles such as increasing blood flow to injured tissues (vasodilatation), reducing leukocyte adherence and inhibiting platelet aggregation as well as leading to disaggregation of platelet thrombi. Basic studies resulted in concerns regarding an increased risk of acute vascular events in patients receiving COX-2 selective inhibitors.

q.      It is important to note the publication by McAdam et al. (Proc Nat Acad Sci 1999; 96:272-277) in which the authors conclude that COX-2 is a major source of systemic prostacyclin (PGI2) biosynthesis in healthy humans. This finding was reported before completion of the VIGOR Clinical Trail as well as the APPROVe trial and should have alerted Merck to the potential adverse cardiovascular events secondary to the inhibition of COX-2. The observations by McAdam et al. support the opinion that the risk may be increased in individuals with underlying inflammatory disorder (lupus, scleroderma, rheumatoid arthritis and coronary artery disease as suggested in the case report by Crofford et al. (2000) and the Cleveland Clinic Study (2001). Selective COX-2 inhibitors decreased production of prostacyclin, but not thromboxane and therefore have a prothrombotic effect (Fitzgerald and C Patrono, N Engl J Med 2001; 345 433), a conclusion supported by *in vivo* experimental data from my laboratory at the University of Michigan Medical School (Circulation 2001, 104:820-825).

**Figure 1** illustrates the biochemical pathways by which COX-1 and COX-2

metabolize arachidonic acid, which COX-1 and COX-2 metabolize arachidonic acid.



**Figure 1:** The conversion of PGG2 and PGH2 undergo metabolism to prostacyclin (PGI2) and thromboxane (TXA2), which then act upon their respective receptors, IP and TP to elicit tissue specific responses

**Table 1** summarizes the actions of both TXA2 and PGI2 on the blood vessels and the blood platelet. Upon activation the blood platelet the enzymatic action of platelet COX-1 converts, arachidonic acid to TXA2. The latter is both a vasoconstrictor and a platelet activator. Thus, TXA2 leads to the formation of a platelet aggregate and/or a platelet rich arterial thrombus. In contrast, COX-2, which is constitutively present in the vascular endothelium and can be induced, further by inflammatory mediators that will convert

Mason *v* Merck                                                                            25

arachidonic acid to prostacyclin (PGI2) an anti-aggregator, which can prevent thrombus

formation by inhibition of platelet aggregation and lead to vasodilation.

| Table 1 | |
|---|---|
| Source and Actions of Prostacyclin and ThromboxaneA2 | |
| **Prostacyclin (PGI2)** | **Thromboxane-A2 (TXA2)** |
| Derived from the enzymatic conversion of arachidonic acid by COX-2 in the arterial endothelial cells. | A product of Cox-1 enzymatic activity in the blood platelet leading to the synthesis of thromboxane-A2. |
| Effective vasodilator resulting in relaxation of vascular smooth muscle. | Produces intense vasoconstriction in the coronary vasculature and peripheral vascular system. |
| Highly effective antiplatelet action capable of preventing formation of platelet dependent arterial thrombi also has the capacity to disaggregate platelet thrombi. | Produces platelet aggregation. The platelet production of TXA2 can be prevented by acetylsalicylic acid. |

The DSMB minutes in the **VIGOR** trial show that Merck had actual knowledge

before November of 1999 that vascular risks were present in Vioxx® users.  Merck's

conduct as it relates to these data is questionable and put consumers as well as patients

enrolled in the clinical trials at unnecessary risk.  Many well-known industry examples

support the need to have stopped the study and to inform prescribing physicians and the

public of the vascular risks.  Two examples include the *Cardiac Arrhythmia Suppression*

*Trial (CAST)*[4], and certain *Hormone Replacement Therapy* trials.  The extent to which

Merck failed to break the code and stop the study was below the standard of care and put

---

[4] The authors conclude as follows: *We conclude that neither encainide nor flecainide should be used in the treatment of patients with asymptomatic or minimally symptomatic ventricular arrhythmia after myocardial infarction, even though these drugs may be effective initially in suppressing ventricular arrhythmia.  N Engl J Med. 1989 Aug 10;321(6):406-12.*

It is significant to note, that a publication (J Am Coll Cardiol. 1987 Feb; 9(2):359-65) from my laboratory two years earlier concluded:  *"These findings suggest that flecainide acetate may not possess pharmacologic properties useful in managing ventricular tachycardia or in preventing ischemic ventricular fibrillation in the presence of recent myocardial damage."*  This is a clear demonstration that argues against the often-made statement, "basic animal research has little value in predicting clinical outcome."

Mason *v* Merck                                                                          26

many persons at risk for adverse vascular events.[5]  It further delayed the reporting of

vascular risks associated with Vioxx®.   Merck knowingly ignored statistical data

revealed by their own clinical studies.  Informing prescribing physicians or the consumer

public would have negatively influenced Merck's marketing position and profits.

Merck's failure to report vascular events to the physicians and consumer public falls well

below the standard of care and the existence of this risk renders Vioxx® defective and/or

unreasonably dangerous.  Merck's theoretical position that naproxen is cardio-protective

is without basis, and even if true would not explain the increased risk of thromboembolic

events noticed in its VIGOR Trial.


Although naproxen has an antiplatelet effect, due to inhibition of COX-1 thereby

suppressing the formation of platelet-derived prostacyclin (PGI2), the inhibition is

reversible. Furthermore, recent documentation demonstrates the incorrectness of Merck's

attempt to describe naproxen as being cardioprotective. What Merck failed to mention is

that naproxen also inhibits the macrophage synthesis of PGE2 and the endothelial

synthesis of PGI2.  My own experimental data, as well as that of others, clearly show that

non-selective NSAIDs in therapeutic doses may blunt the activity of the blood platelet,

but they do not "prevent" arterial thrombus formation in response to vessel wall injury.

A subsequent publication by Capone et al. (11) concludes as follows:

> *In conclusion, the present study demonstrates the pharmacodynamic*
> *plausibility of a COX-1–dependent cardioprotective effect of naproxen*
> *and contributes to the interpretation of the VIGOR cardiovascular*
> *findings. Although our results are mechanistically informative of what*
> *may happen under the best-case scenario of a randomized clinical*

---

[5] I have served and presently serve on Data Safety Monitoring Boards as well as having served on the NIH-HLBI Cardiology Advisory Board and am familiar with the manner in which a DSMB oversees the progress of a clinical trial and the obligation of the DSMB members to represent the interests of the patients enrolled in the trial.

Mason v Merck                                                                             27

> *trial of regular, prolonged use of a high-dose reversible COX*
> *inhibitor, practicing physicians should not assume that the same holds*
> *true in the less-than-ideal circumstances of real-life use of these drugs,*
> *which is neither regular nor continuous nor necessarily at high doses.*

Additional confirmation of the conclusions expressed above comes from studies by

Garcia Rodriguez et al (12).  The authors provide a precise estimate of the effect, in a

broad study base, of non-aspirin NSAIDs on the occurrence of acute myocardial

infarction (AMI) and death from coronary heart disease and to evaluate whether this class

of drugs interferes with the cardioprotection offered by aspirin[6].  The authors conclude as

follows:

> *The results of our study confirm that NSAIDs lack the protective*
> *effect against MI afforded by aspirin.  Even if we consider that*
> *naproxen had a true effect of an approximately 10% to 20%*
> *reduction on the incidence of MI, there would be no place for this*
> *drug in the therapeutic armamentarium for cardioprotection given*
> *the worse risk/benefit profile of naproxen compared with low-dose*
> *aspirin, the current standard therapy.  In addition, we found little*
> *evidence for a noticeable clinical interaction that would affect the*
> *cardioprotection provided by aspirin when concurrently taking an*
> *NSAID.*

The study results presented by Ray et al. (13) provide conclusive data demonstrating a

lack of cardioprotection by non-steroidal anti-inflammatory agents (e.g. naproxen). The

findings are summarized as follows:

> **BACKGROUND:** Non-aspirin, non-steroidal anti-inflammatory drugs
> (NANSAIDs) have complex effects that could either prevent or promote
> coronary heart disease.  Comparison of the NANSAID rofecoxib with
> naproxen showed a substantial difference in acute myocardial infarction
> risk, which has been interpreted as a protective effect of naproxen.  We
> did an observational study to measure the effects of NANSAIDs,
> including naproxen, on risk of serious coronary heart disease.

---

[6]  Aspirin, unlike non-selective NSAIDs, produces a irreversible inhibition of platelet COX-1 thereby
rendering the circulating platelet incapable of producing thromboxaneA2 (TXA2) for its entire life-span of
approximately seven days.  As new platelets are formed and released into the blood steam, they too become
inhibited.  Thus, once a steady state is established (3-5 days) the anti-platelet action of low-dose (81
mg/day) aspirin is continuous.

**METHODS**: We used data from the Tennessee Medicaid program obtained between Jan 1, 1987, and Dec 31, 1998, to identify a cohort of new NANSAID users (n=181 441) and an equal number of non-users, matched for age, sex, and date NANSAID use began.  Both groups were 50-84 years of age, were not resident in a nursing home, and did not have life-threatening illness.  The study endpoint was hospital admission for acute myocardial infarction or death from coronary heart disease.

**FINDINGS:** During 532,634 person-years of follow-up, 6362 cases of serious coronary heart disease occurred, or 11.9 per 1000 person-years. Multivariate-adjusted rate ratios for current and former use of NANSAIDs were 1.05 (95% CI 0.97-1.14) and 1.02 (0.97-1.08), respectively.  Rate ratios for naproxen, ibuprofen, and other NANSAIDs were 0.95 (0.82-1.09), 1.15 (1.02-1.28), and 1.03 (0.92-1.16), respectively.  There was no protection among long-term NANSAID users with uninterrupted use; the rate ratio among current users with more than 60 days of continuous use was 1.05 (0.91-1.21).  When naproxen was directly compared with ibuprofen, the current-use rate ratio was 0.83 (0.69-0.98).

**INTERPRETATION:** Absence of a protective effect of naproxen or other NANSAIDs on risk of coronary heart disease suggest that these drugs should not be used for cardioprotection.

Further confirmation of the above findings is provided by the report of Graham et al. (14) that is summarized as follows:

**BACKGROUND:** Controversy has surrounded the question about whether high-dose rofecoxib increases or naproxen decreases the risk of serious coronary heart disease.  We sought to establish if risk was enhanced with rofecoxib at either high or standard doses compared with remote non-steroidal anti-inflammatory drug (NSAID) use or celecoxib use, because celecoxib was the most common alternative to rofecoxib.
**METHODS:** We used data from Kaiser Permanente in California to assemble a cohort of all patients age 18-84 years treated with a NSAID between Jan 1, 1999, and Dec 31, 2001, within which we did a nested case-control study.  Cases of serious coronary heart disease (acute myocardial infarction and sudden cardiac death) were risk-set matched with four controls for age, sex, and health plan region.  Current exposure to cyclooxygenase 2 selective and non-selective NSAIDs was compared with remote exposure to any NSAID, and rofecoxib was compared with celecoxib. FINDINGS: During 2302029 person-years of follow-up, 8143 cases of serious coronary heart disease occurred, of which 2210 (27.1%) were fatal.  Multivariate adjusted odds ratios versus celecoxib were: for rofecoxib (all doses), 1.59 (95% CI 1.10-2.32, p=0.015); for rofecoxib 25 mg/day or less, 1.47 (0.99-2.17, p=0.054); and for rofecoxib greater than

25 mg/day, 3.58 (1.27-10.11, p=0.016).   For naproxen versus remote
NSAID use the adjusted odds ratio was 1.14 (1.00-1.30, p=0.05).

**INTERPRETATION:**  Rofecoxib use increases the risk of serious
coronary heart disease compared with celecoxib use.  Naproxen use does
not protect against serious coronary heart disease.

The several studies cited above leave little doubt that the rationalization provided by

Merck to explain the results of the VIGOR trial were not only unsupported by scientific

evidence, but were incorrect and served to mislead the prescribing physicians and to

prolong the exposure of the consumer to a drug having the potential to inflict harm and

death.  Instead of concluding that Vioxx had the potential to produce thromboembolic

events (heart attacks and/or stroke), Merck said the VIGOR study showed naproxen was

"cardioprotective," despite the lack of evidence to support their claim and issued news

releases in both April 2000 and May 2001 saying Vioxx had cardiovascular benefits.

r.       Vioxx® was designed to be used in the limited instances where patients

had prior serious gastrointestinal disorders or risk factors and Merck should have

educated physicians on the basic pharmacology of the new drug and the ability to

assess new uses knowing the basic pharmacology.  Examples of this practice

include the implementation into the market of the new class of drugs known as

beta-blocking agents and calcium channel blockers.  When dealing with Vioxx®,

involving an enzymatic mechanism so vital in many areas of the animal and

human organism, Merck should have avoided direct to consumer marketing.

Instead, Merck should have engaged in direct physician educational programs

designed to inform physicians about this new class of drugs and the effects and

potential vascular effects of Vioxx®, especially in patients with cardiovascular

disease.  The advertising approach taken by Merck resulted in overuse of Vioxx®