

The endothelial cells line the inner surface of the blood vessel and under normal conditions provide a smooth surface for the flowing blood, which is coursing through the vessel at a high velocity and under an extreme pressure that varies from 120 to 70 mm Hg and which contains cellular elements that consist of red blood cells, neutrophils, monocytes, leukocytes, and blood platelets. The cellular components are driven to the outside of the blood stream and are in intimate contact with the endothelium.



Endothelial injury occurs most frequently at branch points in the vessel and results in exposure of the surface below the endothelium. This is the start of the inflammatory response that leads to the formation of an atherosclerotic plaque. Plaque formation can be accelerated in the presence of abnormal concentrations of cholesterol in the blood, especially LDL, the so called bad cholesterol. In response to the injury of the endothelial surface, inflammatory cells, neutrophils and monocytes will accumulate in the region and will begin the process of removing damaged, dying and dead cells, a process that converts the monocytes into

macrophages.  In the presence of high LDL plasma concentrations, the monocytes engulf the lipid particles and begin to grow in size and are transformed into 'foam cells' or lipid laden cells.  The entrapped LDL undergoes oxidation within the foam cells.  The oxidized LDL is an inflammatory stimulus and promotes and helps to sustain the inflammatory process.

In the case of Mr. Mason, he may have had a limited degree of endothelial cell injury that led to the formation of a plaque in his left anterior descending coronary artery as well as in one of the side branches of the vessel.  Due to the fact that his blood lipid profile was such that his LDL was low, he did not go on to have a continuous inflammatory process and a process of resolution occurred, which stabilized the plaque and reduced the risk of having a myocardial infarction.

Mr. Mason was administered the drug Vioxx for 10 months commencing 9-10-02, which activates the inflammatory process  in stabilized or dormant plaque due to the suppression of COX-2 activity and the absence of PGI2 synthesis (PGI2 is anti-atherogenic).  Once reactivated, the inflammatory process leads to the growth of the atherosclerotic plaque as monocytes continue to enter and transform into macrophages and continue to imbibe LDL and form more of the inflammation promoting oxidized LDL.

As the plaque increases in size, it begins to compromise the size lumen of the blood vessel and disrupts the flow of blood which is no longer flowing over a smooth surface.  The uneven surface of the vessel causes the blood flow to become turbulent and the cellular-elements, especially the platelets, are subjected to 'shear forces' as they are forced to flow through a narrow vessel lumen. The turbulence and the shear forces cause the platelets to be activated and it is at this point the patient begins to experience transient

episodes of chest discomfort known as angina pectoris which is due to transient decreases

in blood flow (ischemia) to a region of the heart.  The underlying mechanism for the

transient ischemic episodes is the aggregation of activated platelets that interrupt blood

flow in a vessel in which the lumen is already reduced in size by the presence of an

atherosclerotic plaque.  Added to the physical obstruction of the vessel by a platelet

aggregate is the further narrowing of the vessel by the formation of thromboxane (TXA2)

derived from the activated platelet.     The blood platelet contains the enzyme COX-1.

When      activated      by     shear     forces     and/or     turbulent     blood     flow,



platelet COX-1 converts arachidonic acid to TXA2, which is a highly effective

vasoconstrictor and a promoter of platelet aggregation.  Once the process of platelet

activation occurs, the platelets  adhere to  the vessel wall and the process of aggregation

is initiated and becomes self-propagating.  The major physiological defense mechanism

against the vasoconstrictor and platelet aggregatory actions is prostacyclin (PGI2) derived

from COX-2 conversion of arachidonic acid. In the absence of COX-2 inhibition sufficient PGI2 is generated at the site of the atherosclerotic plaque, the aggregated platelet mass will undergo disaggregation, the vessel will relax due to the vasodilator actions of PGI2, blood flow will be restored and the patient's chest discomfort will be relieved and the heart muscle will not be subjected to permanent damage. Unfortunately, Mr. Mason was subjected to prolonged COX-2 inhibition which prevented generation of sufficient PGI2 and contributed to the thrombotic cardiovascular event which occurred on July 25, 2003.

The episodes of angina pectoris or transient episodes of decrease blood flow to a region of the heart may be considered as "Natures" way of protecting the heart from tissue damage during prolonged periods of blood flow depravation – by a process known as 'ischemic preconditioning' that has been demonstrated by Bolli and colleagues to occur in experimental animals as well as in humans. It is important to recognize, that ischemic preconditioning is dependent upon the presence of COX-2 activity. COX-2 inhibitors prevent transient ischemic episodes from inducting the phenomenon of preconditioning which would lead to a greater extent of heart muscle damage at the time of a myocardial infarction.

Over a period of less than a week, Mr. Mason experienced more frequent episodes of angina pectoris that lasted longer and produced a more intense discomfort. The disease process was becoming more unstable and was leading to the development of a heart attack (myocardial infarction). The latter is the result of a blood vessel in the heart becoming totally occluded by a thrombus or 'blood clot', which deprives a region of the heart from receiving blood flow so that the tissue becomes 'ischemic' a term that means lack of blood flow. The heart muscle is critically dependant upon a continuous flow of

blood and heart muscle cells begin to die if flow is not restored within 45-60 minutes, with progressive loss of heart muscle occurring as the period of ischemia is extended.

At this point, it is important to understand the role of COX-2 inhibition in the sequence of events described.  Endothelial COX-2 activity is essential for the production of PGI2 -- a vasodilator and antiplatelet agent.  The inhibition of COX-2 by VIOXX would  prevent the formation of PGI2, thereby upsetting the balance in favor of TXA2 that is being produced by the blood platelets as they flow over the uneven surface of the blood vessel and undergo activation.

**How does COX-2 inhibition affect the progression of the atherosclerotic process?**

Atherosclerosis is a progressive process that begins from the moment of birth and, in most individuals, increases gradually during a life span of 75+ years.  The rate of progression is influenced by many  factors -- genetic, dietary, hypercholesterolemia, blood pressure, diabetes, gender, physical  activity,  tobacco use, etc.

In the case of Mr. Mason, he did not have many risk factors and for the most part was most likely at a low risk for an adverse cardiovascular event.  The situation was

altered by the superimposition of a COX-2 inhibitor (VIOXX) which greatly increases the risk of a cardiovascular event. As reported by Gilroy and colleagues, COX-2 and the production of PGI2 and especially PGJ2, also a product of COX-2 activity, is essential for resolution of the inflammatory process in the atherosclerotic plaque.   Inhibition of COX-2 or the absence of PGI2 and PGJ2 production leads to an uninterrupted inflammatory process which leads to the weakening of the plaque surface, which will rupture and release its contents into the flowing blood stream.   The material released from the plaque will lead to activation of the blood platelets, formation of an occlusive platelet aggregate and subsequent activation of the blood clotting mechanism. The latter will stabilize the intracoronary thrombus and increase its size leading to a 'heart attack' as blood flow to a region of the heart is interrupted.



The diagram below summarizes the major risk factors for atherothrombosis.



Merck and its scientists knew about the physiological roles of COX-2 and its products. Vioxx entered the market in the latter part of 1999 at a period when a great amount of information existed concerning the importance of COX-2 activity in the normal physiologic state as well as its importance in certain pathophysiological conditions. In particular, there was sufficient knowledge concerning the role of COX-2 and its product PGI2 as being critical for the prevention of arterial thrombus formation, especially in the presence of vascular disease.

Merck and its scientists knew or should have known of the potential risks of thrombus formation due to COX-2 inhibition.

I am of the opinion that Merck and its scientists, especially Dr. Edward Scolnick, were in fact well aware of the potential for formation of arterial thrombi as a result of COX-2 inhibition.

I base the above stated opinion on the fact that Merck scientists were actively engaged in an effort to develop a thromboxane synthase inhibitor or a thromboxane receptor antagonist to be administered in conjunction with a COX-2 inhibitor (VIOXX®) with the anticipation that the potential for thrombus formation would cease to exist. One cannot deny this conclusion as it is clearly stated in several patent applications awarded to Merck and which bear the signature of Dr. Edward Scolnick. As stated by Dr. Alise Reicin, Merck was willing to go forward in spite of the 'science' and take a chance that the incidence of thrombotic events would be so low that it would not be recognized.

In my opinion, Merck produced a defective product capable of doing significant harm to the patients exposed to this drug. Merck should have withdrawn the drug from the market long before September 30, 2004.

On February 25, 1997, an internal Merck e-mail warns that if a proposed Merck trial was carried out "you will get more thrombotic events" - more blood clots - "and kill [the] drug." In response, Dr. Alise Reicin, a Merck vice president for clinical research, said in an e-mail that the company was in a "no-win situation." She went on to propose that people with high risk of cardiovascular problems be kept out of the study so the difference in the rate of cardiovascular problems between the Vioxx patients and the others "would not be evident."

A Nov. 21, 1996 memo by a Merck official shows the company wrestling with the issue of Vioxx's (rofecoxib) involvement in increased cardiovascular events. Merck wanted to conduct a trial to prove Vioxx® was 'gentler' on the stomach than older pain killers. But to show the difference most clearly, the Vioxx® patients could not take any aspirin as it would increase the incidence of gastric ulceration. In such a trial, "there is a

substantial chance that significantly higher rates" of cardiovascular problems would be seen in the Vioxx® group, as stated in the memo Nov. 21, 1996.

On March 9, 2000, Merck's research chief, Dr. Edward Scolnick, e-mailed colleagues that the cardiovascular events ***"are clearly there"*** and stated ***"it is a shame but it is a low incidence and it is mechanism based as we worried it was."*** Worried about the affect on Vioxx®, Dr. Scolnick wrote that he wanted other data available before the results were presented publicly so "it is clear to the world that this" was an effect of the entire COX-2 class, not just Vioxx. Despite the awareness of Merck's research chief and others at Merck of the CV events occurring in people ingesting Vioxx®, the company's public statements that same month rejected the link between Vioxx® and increased intrinsic risk.  Merck also failed to disclose to physicians and consumers that the study found a "mechanism based" connection between Vioxx® and the statistically significant increase in cardiovascular events.

Despite being confronted with sound scientific data that correlated with previously anticipated results, Merck continued to try to discredit academic researchers critical of Vioxx and persisted in claiming it to be free of adverse cardiovascular events. In addition, one training document from Merck listed potentially difficult questions about the drug and stated in capital letters, "DODGE!"

Merck prepared a training document entitled "Dodge Ball Vioxx" which consists of 16 pages. Each of the first 12 pages lists one "obstacle," apparently representing statements that might be made by a doctor.  Among them are, "I am concerned about the cardiovascular effects of Vioxx" and "The competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than Celebrex." Each of the final four pages contain a single word in capital letters: "DODGE!"  The Merck sales

representatives were trained to respond to questions in a manner that avoided the correct and truthful answer while at the same time giving the misleading impression of providing useful and truthful information.

On May 22, 2001, despite the mounting evidence of the strong association of Vioxx to strokes and heart attacks, Merck issued a press release entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx", claiming Vioxx has a "… favorable cardiovascular safety profile."

In August 2001, the concerns arising out of the VIGOR study were crystallized by Debabrata Mukherjee, Steven Nissen, and Eric Topol in JAMA in their review paper specifically highlighting the cardiovascular side-effect profile of COX-2 inhibitors.

Merck was aware of Vioxx's increased potential to cause heart attacks before it began marketing the drug. Merck however urged consumers to "ask your doctor" about a prescription. Meanwhile, Merck also was marketing its drug to physicians, mollifying their anxiety and misleading them about the side effects of the drug.

Considering the fact that Merck and its scientists were well aware of the prothrombotic potential of COX-2 inhibition, the outcome of the VIGOR study was a "WARNING" signal confirming what Merck had already anticipated as evidenced by the patent documents. This cannot be denied! Rather than face up to the issue and disclose the true risk, Merck chose to confuse the matter by suggesting that naproxen was "cardioprotective"[14] and Vioxx® was neutral. There was no scientific evidence to support the concept that naproxen had a "cardioprotective" effect. Although there were published data indicating that naproxen could inhibit platelet COX-1 production of thromboxane, the anti-thrombotic action of COX-1 inhibitors including naproxen was

---

[14] The term "cardioprotective" was meant to suggest an anti-platelet effect due to naproxen's ability to inhibit COX-1 thereby preventing platelet derived production of thromboxane (TXA2).

Mason *v* Merck                                                                 100

simply a delay in the time to vessel occlusion.  Furthermore, naproxen also inhibits COX-2 and prevents the production of prostacyclin (PGI2), which would be counter-productive in terms of preventing thrombus formation.  Perhaps the greatest flaw in the suggestion that naproxen was "cardioprotective" is that the inhibition of TXA2 synthesis, in itself, is not sufficient to prevent thrombus formation.  TXA2 is one of several endogenous substances capable of inducing platelet aggregation.  On the other hand, when platelets are activated, multiple mechanisms for platelet aggregation are initiated to promote thrombus formation as shown in the following figures that depict the sequence of events involved in arterial thrombosis.

## REGULATION OF PLATELET AGGREGATION



Balance of anti-aggregatory forces on the left and pro-aggregatory forces on the right. These promote or inhibit platelet activation, dependent on an increased platelet calcium level, which results in platelet aggregation and thrombosis.  The pro-aggregatory forces

are set in motion by endothelial and platelet injury.  It is important to note that naproxen would inhibit the production of COX-1 derived TXA2, but would not affect the aggregating activity of ADP, serotonin, norepinephrine, etc.  Thus, platelets would still be capable of aggregating and forming an occlusive thrombus.  Furthermore, by suppressing the action of endothelial derived PGI2, the anti-thrombotic action of naproxen would be decreased.

A-II = angiotensin II; Ca2+ = calcium, NE = norepinephrine, TXA2 = thromboxane A2, VWF = von Willebrand factor.

**The "Birth of a Thrombus"** ..................

QuickTime™ and a
TIFF (Uncompressed) decompressor
are needed to see this picture.

Factors protecting against coagulation directly of indirectly depend on an intact endothelium.  tPA= Tissue plasminogen activator.  (From Opie 2005)



Figure 2. **Activating Effect of LDL Infiltration on Inflammation in the Artery.**
In patients with hypercholesterolemia, excess LDL infiltrates the artery and is retained in the intima, particularly at sites of hemodynamic strain. Oxidative and enzymatic modifications lead to the release of inflammatory lipids that induce endothelial cells to express leukocyte adhesion molecules. The modified LDL particles are taken up by scavenger receptors of macrophages, which evolve into foam cells.

Mason *v* Merck                                                                                              103



**Figure 3. Role of Macrophage Inflammation of the Artery.**
Monocytes recruited through the activated endothelium differentiate into
macrophages. Several endogenous and microbial molecules can ligate pat-
tern-recognition receptors (toll-like receptors) on these cells, inducing activa-
tion and leading to the release of inflammatory cytokines, chemokines, oxy-
gen and nitrogen radicals, and other inflammatory molecules and, ultimately,
to inflammation and tissue damage.



Figure 4. **Effects of T-Cell Activation on Plaque Inflammation.**

Antigens presented by macrophages and dendritic cells (antigen-presenting cells) trigger the activation of antigen-specific T cells in the artery. Most of the activated T cells produce Th1 cytokines (e.g., interferon-γ), which activate macrophages and vascular cells, leading to inflammation. Regulatory T cells modulate the process by secreting antiinflammatory cytokines (such as interleukin-10 and transforming growth factor β).

Mason *v* Merck                                                                105



**Figure 5. The Cytokine Cascade.**

Activated immune cells in the plaque produce inflammatory cytokines (interferon-γ, interleukin-1, and tumor necrosis factor [TNF]), which induce the production of substantial amounts of interleukin-6. These cytokines are also produced in various tissues in response to infection and in the adipose tissue of patients with the metabolic syndrome. Interleukin-6, in turn, stimulates the production of large amounts of acute-phase reactants, including C-reactive protein (CRP), serum amyloid A, and fibrinogen, especially in the liver. Although cytokines at all steps have important biologic effects, their amplification at each step of the cascade makes the measurement of downstream mediators such as CRP particularly useful for clinical diagnosis.



The figure presents a microscopic view of a cross sectional area of a coronary artery showing a lipid-rich core in an atherosclerotic plaque.  The surface of the plaque has ruptured and the contents of the plaque have been extruded into the blood stream thereby causing platelet activation and thrombus formation.  The occlusive thrombus is composed mostly of aggregated platelets along with entrapped cellular components in the blood and held firmly in place by being entwined by a network of fibrin strands, much like a 'fishing net.'  The deposition of fibrin around the thrombus is derived from activation of the blood clotting system.



Figure illustrates the events involved in activation of the platelets in response to vessel wall injury.  Note that adhesion is both reversible and irreversible and need not result in an occlusive thrombus.  Intermittent vessel occlusion by platelet aggregates are involved

Mason *v* Merck                                                                107

in unstable angina that may go on to form a total and persistent obstruction to blood flow thereby leading to a myocardial infarction.

I have included the text from a talk delivered by Dr. Alan Nies, a former Merck employee who was the head of Clinical Pharmacology as further evidence that Merck was well aware of he prothrombotic effects of COX-2 inhibition long before the drug entered clinical trails.  In particular, I call attention to the underlined section in Paragraph 6.



SUCCESS STORIES

**Alan S. Nies, M.D.**
**2005 Award in Excellence of Clinical Pharmacology**

1. Dr. Alan Nies received the BS degree (Chemistry) from Stanford, the MD degree from Harvard, and an Internal Medicine residency at the University of Washington.  A Clinical Pharmacology fellowship at the UCSF with Ken Melmon completed his formal training. In San Francisco, Dr. Nies developed an interest in cardiovascular pharmacology. In 1968 he went into the US Army where he was Chief of the section on Clinical Pharmacology at Walter Reed Army Institute of Research where he worked on the development of antimalarial drugs for drug-resistant malaria that was endemic in Viet Nam. The drug mefloquin came out of this program.

2. In 1970 he joined the Clinical Pharmacology unit at Vanderbilt University that was headed by John Oates. Rising through the ranks from assistant professor to professor at Vanderbilt, Dr. Nies pursued his interest in the clinical pharmacology of the cardiovascular and renal systems. He was particularly interested in the role that the circulation had on pharmacokinetics and particularly how hepatic blood

flow influenced a drug's kinetics. Working with David Shand and later with Bob Branch and Grant Wilkinson, Dr. Nies developed and tested a physiological, clearance-based system of pharmacokinetics that has been extremely useful in understanding and predicting the influence of diseases on kinetics. This effort was greatly aided by the theoretical work of Malcolm Rowland who had been a fellow with Dr. Nies in San Francisco and had published on clearance as a concept in pharmacokinetics. It was during these investigations that the concept of presystemic elimination was developed with propranolol as a model compound. Also the term "intrinsic hepatic clearance" was coined to describe the ability of the liver to metabolize drugs when blood flow was not rate limiting.

3. Also it was at Vanderbilt that Dr. Nies became introduced to arachidonic acid and its metabolites. Dr. Nies was particularly interested in the cardiovascular and renal implications of this system. Using infusions of arachidonic acid to stimulate prostanoid production and using the non-steroidal antiinflammatory drugs to inhibit prostanoid production, Dr. Nies and colleagues produced evidence that the kidney is particularly vulnerable to changes in this system, particularly when there is volume depletion.

4. In 1977 Dr. Nies was recruited to head the Division of Clinical Pharmacology at the University of Colorado. The studies on prostaglandins continued with the collaboration of John Gerber. They discovered that prostaglandins were extremely important in modulating the influence of renal vasoconstrictors on the renal blood flow. If the production of prostaglandins was blocked, the vascular effects of norepinephrine, angiotensin and other endogenous vasoconstrictors were markedly enhanced that could result in renal failure. This discovery lead to the understanding of a major adverse effect of the NSAIDs. Additionally, prostaglandin production was found to be of major importance in renal renin production.

5. Another adverse effect of the NSAIDs was an increase in gastric ulcers. We found that prostaglandins are very important in the stomach to modulate acid

production and to couple an increase in gastric acid secretion with an increase in gastric blood flow. Our findings that blocking the production of prostaglandins increased acid production while reducing gastric blood flow gives one explanation for this adverse effect.

6. In 1992, Dr. Nies was recruited to Merck Research Laboratories to head their Clinical Pharmacology Department. During his 10 years at Merck, Dr. Nies' responsibility for clinical development increased to include all of clinical research performed worldwide. This experience at a major pharmaceutical company emphasizes the importance of Clinical Pharmacology rigor and expertise in all aspects of clinical drug development. During Dr. Nies' tenure at Merck, some of the important drugs developed were alendronate (Fosamax), montelukast (Singulair), aprepitant (Emend), ezetemibe (Zetia) and rofecoxib (Vioxx). The work with Vioxx was of particular interest because of the relationship to Dr. Nies' previous interests with prostaglandins and their influence on gastric and renal function. Early on in its development we established that rofecoxib had no effect gastric prostaglandin synthesis or on platelet function or thromboxane production. However, we were surprised to find that the effects on the kidney were similar to non-selective NSAIDs. Additionally, we found that all COX-2 inhibitors had a major effect on prostacyclin production, which had previously been thought to be under control of COX-1. This raised the possibility that inhibitors selective for COX-2 might disturb the balance at the blood, endothelium interface. Unfortunately, this seems to have been more than a theoretical concern and Vioxx has been withdrawn from the market.

I ask a simple question; Where was the 'voice' of Dr. Alan Nies at the time when the VIGOR results were being discussed? Where was Dr. Nies' thoughts on the APPROVe trial results when the 18 month explanation was fabricated? Since, Dr. Nies in his speech, and Dr. Scolnick in his patent applications, clearly stated that COX-2 inhibition could result in platelet mediated thrombosis, why was it that the outcomes of both the VIGOR and the APPROVe trials were a surprise. Did they not owe it to the clinical investigators as well as to the patients enrolled in the trial

to be more forthright about the hazards associated with COX-2 inhibition?  How many patients would have agreed to enroll in the studies if they were informed that they could  experience a heart attack or a stroke.  Or did they believe, as stated byß Dr. Alise Reicin, "the incidence would be so low that it would not be recognized."

7.  Following his retirement from Merck Research Laboratories, Dr. Nies has been consulting on drug development issues for several companies and has been appointed to the Board of Directors for a Lexicon Genetics, a biotech company in Houston.   During his career, Dr. Nies has participated in many national and international committees and organizations and has received a number of honors including the Harry Gold award and the Oscar B. Hunter award.  Dr. Nies received a PhRMA Foundation Faculty Award in Clinical Pharmacology in 1971.

I am continuing to review information as it is made available and expressly reserve my right to change or add to my opinions based upon new information.  I also understand Merck has or will retain experts and I reserve the right to respond directly to any opinions set forth by such experts independently or in response to my opinions stated herein.

Mason *v* Merck                                                                      111

In the past five years, I have testified by deposition or in court in the matters listed on the attached pages.

**My fee schedule for services is a follows:**

Review of Documents............................................................. $ 500/hr

Depositions .................................................................. $ 700/hr

Court Testimony .............................................................. $ 700/hr

Time Away from Home ....................................................... $1,000/day

Dated this the August___11th___ day of August___ 2006

By: ___

Benedict R. Lucchesi, M.D., Ph.D., F.A.H.A.