U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED   9-15-06
LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| | Section L |
| | Judge Eldon E. Fallon |
| | Magistrate Judge Daniel E. Knowles, III |

THIS DOCUMENT RELATES TO:
   *Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379

The following deposition testimony was presented to the jury:

Videotaped deposition of Dr. Edward Scolnick.

___ Fee_____
___ Process_____
 X  Dktd_____
___ CtRmDep_____
___ Doc. No._____

ID:          Scolnick 1-30-03

ID:          ES 10217
Page Range: 102:17-102:22

102:17               Merck Research Labs publishes the Merck
102:18 Manual, does it not?
102:19     A.     The Merck Manual is published by a group
102:20 of people who publish the Merck Manuals, and I'm not
102:21 certain at this point, organizationally, where that
102:22 group actually sits.


ID:          ES 10402
Page Range: 104:2-106:3

104: 2     Q.     Doctor, I asked before we broke if you
104: 3 were familiar with the Merck Manual.
104: 4     A.     Yes, I am.
104: 5     Q.     Okay.  And are you familiar with
104: 6 Dr. Robert Berkow?
104: 7     A.     I was familiar with Dr. Robert Berkow.
104: 8     Q.     Is Dr. Berkow -- is Dr. Berkow passed
104: 9 away?
104:10     A.     I believe he's retired.
104:11     Q.     He's retired?
104:12     A.     Many years since he was head of the
104:13 Merck Manual.  I don't recall the exact time, how
104:14 many.
104:15     Q.     Okay.  What was -- prior to his
104:16 retirement, what was Dr. Berkow's position at Merck
104:17 Research Labs?
104:18     A.     To the best of my recollection, he was
104:19 in charge of the publication of the Merck Manual, and
104:20 that was his primary role.
104:21     Q.     Okay.  Is your -- in your position --
104:22 well, let me back up.
104:23               Did he retire from Merck Research Labs
104:24 after you took over as president of Merck Research
104:25 Labs?
105: Page 105
105: 1     A.     Yes, I believe that he did.
105: 2     Q.     Okay.
105: 3     A.     Yes.
105: 4     Q.     How much overlap was there?
105: 5             Do you know when he retired?
105: 6     A.     I don't recall exactly when he retired.
105: 7 There were several years of overlap.
105: 8     Q.     Okay.
105: 9             Did you -- did you have interaction with
105:10 him while he was with Merck Research Labs?
105:11     A.     A few occasions, very few.
105:12     Q.     As a president of Merck Research Labs,
105:13 did you have any oversight on the Merck Manual?
105:14     A.     No, none whatsoever.
105:15     Q.     Did you have any input at all?

```
105:16      A.     No, not to the best of my recollection.
105:17      Q.     To your recollection -- your
105:18 recollection, did you and Dr. Berkow ever speak about
105:19 anything at Merck -- anything, at any time, about the
105:20 Merck Manual or the publication or inclusion of
105:21 information in the Merck Manual?
105:22      A.     I don't recall any conversations with
105:23 Dr. Berkow about the content of any specific item
105:24 published in the Merck Manual.
105:25      Q.     Okay.
106: Page 106
106: 1             Let me review with you the foreword of
106: 2 that book, and I want to ask you just some general
106: 3 questions first about the -- about the manual.
```

ID:       ES 10703
Page Range: 107:3-107:10

```
107: 3             I will represent that Exhibit Number 3
107: 4 is a copy of the front cover the book, the
107: 5 publisher's page, the list of contributors of the
107: 6 Merck Manual, Sixteenth Edition, publish date 1992,
107: 7 Library of Congress catalog card number, 1-31760, and
107: 8 that all pages that are stapled together as Exhibit
107: 9 Number 3 came directly from the Sixteenth Edition of
107:10 the Merck Manual.
```

ID:       ES 10716
Page Range: 107:16-108:10

```
107:16      Q.     Let me go to the foreword with you,
107:17 Doctor.
107:18      A.     Uh-huh, yes.
107:19      Q.     First of all, have you ever used the
107:20 Merck Manual as a reference?
107:21      A.     I can't say that I've never used it, but
107:22 it's been rare that I've ever looked at it.
107:23      Q.     But it's not disputed that Merck
107:24 Research Labs and Merck & Company puts this out for
107:25 use by physicians, nurses or by the general public?
108: Page 108
108: 1 It's sold to the general public, is it not?
108: 2      A.     I believe it's sold to the general
108: 3 public.
108: 4      Q.     Okay.
108: 5             I want you to follow down with me about
108: 6 four lines before the end of the first paragraph,
108: 7 okay, where it starts the sentence, "Today."
108: 8             Tell me if I read this correctly.
108: 9 "Today, the manual is one of the most widely used
108:10 medical texts in the world."
```

ID:       ES 10906
Page Range: 109:6-109:19

```
109: 6      Q.      Okay.  Tell me if I read this correctly.
109: 7              "Today, the manual is the most widely
109: 8 used medical text in the world.  While the book has
109: 9 grown to about 2800 pages, its primary purpose
109:10 remains the same, to provide useful clinical
109:11 information to practicing physicians, medical
109:12 students, interns, residents and other health care
109:13 professionals."
109:14      A.      You've accurately read it.
109:15      Q.      Okay.
109:16              And as a publication from the company
109:17 that you're with, is this -- do you -- can I take
109:18 this to be a statement from the company that this is
109:19 what they're claiming this book to be?


ID:        D ES 10920
Page Range: 109:20-109:21

109:20              MR. MAYER:  You're asking him about this
109:21 1992 edition?


ID:        ES 10922
Page Range: 109:22-110:9

109:22              MR. MICELI:  Well, I'm going to go in
109:23 and talk about the 1999 one in a bit, but this is all
109:24 we're talking about right now.
109:25      A.      Well, the Merck -- the group that
110: Page 110
110: 1 publishes the Merck Manual is part of Merck &
110: 2 Company.
110: 3              I can't go beyond that in my statement
110: 4 with regard to Merck's guaranteeing or endorsing what
110: 5 is in the Merck Manual.  Merck is a company.
110: 6      Q.      I'm not asking for any guarantees, but
110: 7 what I'm -- you, as a former executive, and now
110: 8 you're the president --
110: 9      A.      Emeritus.


ID:        D ES 11010
Page Range: 110:10-110:21

110:10      Q.      -- emeritus of Merck Research Labs
110:11 and -- do you still have your Board position with
110:12 them?
110:13      A.      No, I am no longer a Board member.
110:14      Q.      And are you any longer an executive vice
110:15 president?
110:16      A.      No, no.
110:17      Q.      You're now devoting your entire time to
110:18 the research and development of drugs to treat -- is
110:19 it Alzheimer's?
110:20      A.      Neuropsychiatric illnesses.
```

110:21        Q.    Neuro.  Okay.


ID:        ES 11022
Page Range: 110:22-111:2

110:22                The Merck Manual is produced by Merck &
110:23 Company and/or Merck Research Laboratories, and
110:24 presents itself to be an authoritative treatise to
110:25 practicing physicians, medical students, interns,
111: Page 111
111: 1 residents and other health care professionals,
111: 2 doesn't it?


ID:        ES 11109
Page Range: 111:9-113:7

111: 9        A.    Yes.  I really can't answer the question
111:10 the way you're phrasing it.
111:11                The Merck Manual was published by the
111:12 group that oversees its publication.
111:13                It has an Editorial Board, which is
111:14 designated on the frontage page of the 1992 edition,
111:15 which reviews the chapters in the manual that are
111:16 written by the persons who are part of the group that
111:17 publishes the Merck Manual, and that review group
111:18 interacting with the group who publishes the manual
111:19 are responsible for being accurate in the manual, and
111:20 that's the way I've always viewed this manual.
111:21        Q.    Okay.
111:22                In your research, have you ever had the
111:23 opportunity to consult this manual?
111:24        A.    As I said, I don't recall ever having
111:25 consulted the manual.
112: Page 112
112: 1                It's possible I looked at it once or
112: 2 twice for something, but I certainly didn't use it as
112: 3 a reference book.
112: 4        Q.    Okay.  I want to go to the second
112: 5 paragraph.  I'm just going to read the first
112: 6 sentence, and tell me if I read this correctly,
112: 7 because I want to make sure I understand it.
112: 8                "Fewer physicians now attempt to manage
112: 9 the whole range of medical disorders that can occur
112:10 in infants, children and adults, but those who do
112:11 must have available a broad spectrum of current and
112:12 accurate information."
112:13                The second sentence says, "Specialists
112:14 require precise information about subjects outside
112:15 their areas of expertise," and the last two lines,
112:16 and I know that I'm splitting a sentence here -- I'll
112:17 just read it -- the last sentence.
112:18                "Keeping up with the rapid and
112:19 extraordinary advances in cellular and molecular
112:20 biology, molecular genetics and medical technology is
112:21 more challenging than ever, but the Merck Manual

```
112:22 continues to try to meet these needs, addressing only
112:23 details --" excuse me "-- excluding only details of
112:24 surgical procedures."
112:25        A.      Again, that's what it says, yes.
113: Page 113
113: 1        Q.      Okay.
113: 2                Let me go to the second page of that
113: 3 foreword.
113: 4                I want you to read the first full
113: 5 paragraph to yourself, and let me know when you're
113: 6 done, and we'll want to talk to you about a few
113: 7 things in it.
```

ID:        ES 11308
Page Range: 113:8-113:20

```
113: 8        A.      I've read the first paragraph.
113: 9        Q.      Okay.
113:10        A.      The first full paragraph.
113:11        Q.      Right.  The statement in this paragraph,
113:12 I'm just going to pull out a couple of key statements
113:13 that I see.
113:14                "Sections of that book were then sent
113:15 out -- sent to outside experts, who had nothing to do
113:16 with its preparation, to solicit their most candid
113:17 criticism."
113:18                That sounds to me like the beginning of
113:19 the peer-review process.
113:20                Would you agree with that?
```

ID:        ES 11322
Page Range: 113:22-114:11

```
113:22        A.      I think that is a form of peer review.
113:23        Q.      Okay.
113:24                Dropping down a few lines, it says,
113:25 "Their manuscripts were painstakingly edited by our
114: Page 114
114: 1 inhouse staff to obtain every valuable morsel of
114: 2 knowledge while eliminating sometimes elegant but
114: 3 unneeded words."
114: 4        A.      I can read what you're reading.
114: 5        Q.      Sir, and is that again more of the
114: 6 distillation process of peer-reviewing, taking the
114: 7 most candid criticisms and distilling down those
114: 8 things that are most needed and cutting out those
114: 9 things that are -- trying to think how we put
114:10 that -- eliminating sometimes elegant but unneeded
114:11 words?
```

ID:        ES 11414
Page Range: 114:14-115:7

```
114:14        A.      That part of the process is the
```

```
114:15  Editorial Board's opinion about the comments they're
114:16  getting back from the reviewers, yes.
114:17       Q.       Certainly.
114:18                And then the last two sentences or three
114:19  sentences, it says, "The authors then rework, modify
114:20  and polish their manuscripts.  Almost all of the
114:21  manuscripts were revised at least six times.  15 to
114:22  20 revisions were not uncommon.  We believe that no
114:23  other medical text undergoes as many reviews and
114:24  revisions as the Merck Manual does."
114:25                And I read that correctly, didn't I?
115: Page 115
115: 1       A.       Yes, you did.
115: 2       Q.       And that -- those segments of that
115: 3  paragraph that I've pulled out basically characterize
115: 4  and describe what at least the editors of this book
115: 5  published by the company you were aligned with, or
115: 6  worked with, believed it to be the most peer-reviewed
115: 7  and distilled piece of medical text in the world.


ID:          ES 11510
Page Range: 115:10-116:3

115:10       A.       Yeah.  I think the paragraph says that
115:11  this is a highly peer-reviewed book that tries to be
115:12  clear and accurate in what it represents to people
115:13  who would read it.
115:14                I think that's how I understand this
115:15  paragraph.
115:16       Q.       And it explains the mechanisms of how
115:17  that is done by saying that sometimes six revisions,
115:18  but even, at times, 15 to 20, if necessary?
115:19       A.       The statement that you read says,
115:20  "Almost all of the manuscripts were revised at least
115:21  six times.  15 to 20 revisions were not uncommon."
115:22       Q.       Yes.  And in your professional
115:23  experience, the purpose for doing that, those
115:24  revisions, the sending it back to the editor, the
115:25  rewriting it 10, 15 times, maybe 20, is so that you
116: Page 116
116: 1  can weed out either bad science, improper opinions,
116: 2  or maybe something that's been disproven by recent
116: 3  scientific discovery?


ID:          ES 11608
Page Range: 116:8-117:21

116: 8       Q.       I'm not saying the reason that is done.
116: 9  I'm saying that is the reason that we have peer
116:10  review, so that we can have some, albeit
116:11  confidential, discourse between professionals to get
116:12  to the very heart of the scientific issues.
116:13       A.       I would like to separate in my answer
116:14  peer review in general, which you're discussing and
116:15  we've discussed before --
```

```
116:16        Q.      Yes, sir?
116:17        A.        -- and at least my understanding of the
116:18 Merck manual's aim.
116:19                As you pointed out, The Merck Manual is
116:20 read widely and is even available to lay persons
116:21 without a special medical background, and I believe
116:22 that The Merck Manual, in its various revisions and
116:23 reviews, that a significant part of the purpose of
116:24 those reviews was to try to get language and
116:25 expression of the wide variety of complex fields that
117: Page 117
117: 1 you've noted, so that it was clearly written and
117: 2 understandable to a wide audience.
117: 3                That's a slightly different purpose than
117: 4 a technical peer review journal.
117: 5        Q.      Well, I understand.
117: 6        A.      Okay.
117: 7        Q.      And for that reason, Merck publishes
117: 8 about four or five different Merck manuals, don't
117: 9 they?
117:10        A.      They publish four or five different
117:11 Merck Manuals because the audience and the content of
117:12 those manuals is somewhat different, and at this
117:13 point, I can't recall exactly what manuals cover
117:14 what.
117:15        Q.      Okay.
117:16                But there is a Merck Manual for
117:17 diagnosis and therapy, which is what we have in front
117:18 of you.  A portion of it is in front of you.
117:19        A.      I don't see the rest of the title --
117:20        Q.      Okay.
117:21        A.        -- but that -- I assume you're correct.


ID:        ES 11802
Page Range: 118:2-118:14

118: 2        Q.      Okay.  It's on this page, Doctor, that
118: 3 says, "Sixteenth Edition, Merck Manual of Diagnosis
118: 4 and Therapy."
118: 5        A.      Okay.  Thank you.
118: 6        Q.      Okay?  And there's a Merck Manual for
118: 7 geriatrics?
118: 8        A.      Yes.  I believe so.
118: 9        Q.      And there's a Merck Manual for household
118:10 use, so that when they're writing to the audience of
118:11 people like myself, who don't have medical training,
118:12 we can understand it.
118:13        A.      There's a manual that's written for a
118:14 broader audience.  That's correct.


ID:        ES 11820
Page Range: 118:20-119:4

118:20                If you could turn to the copy of page
118:21 2664.
```

```
118:22     A.     Yes.
118:23     Q.     Under the subheading, "Hematologic
118:24 Effects."  This is from a section, I'll represent to
118:25 you, in the book.
119: Page 119
119: 1     A.     Yes.
119: 2     Q.     There's prostaglandins, thromboxanes
119: 3 and -- I can't pronounce that last word --
119: 4 leukotrines?
```

ID:        ES 11911
Page Range: 119:11-119:20

```
119:11     A.     "Prostaglandins, Thromboxanes and
119:12 Leukotrines."
119:13     Q.     Trines.  Okay.  I'd like to go back to
119:14 2664.
119:15            We've already covered some of this, but
119:16 there's a reason for me doing this in this context.
119:17            If you look at the last sentence of
119:18 the -- well, if you'll just read the first paragraph
119:19 to yourself, please.
119:20     A.     The first paragraph?
```

ID:        ES 11924
Page Range: 119:24-121:12

```
119:24     A.     I've completed reading that paragraph.
119:25     Q.     And that paragraph ends with something
120: Page 120
120: 1 we've already discussed, and that is that
120: 2 prostaglandins or  -- excuse me.  Thromboxane A2 is a
120: 3 potent platelet aggregator and vasoconstrictor and is
120: 4 synthesized primarily in the platelets or by the
120: 5 platelet?
120: 6     A.     That's correct.
120: 7     Q.     Okay.
120: 8     A.     That's what the paragraph says.
120: 9     Q.     And that is a correct -- it would be a
120:10 correct statement to say thromboxane is a potent
120:11 platelet aggregator, independently of the rest of it.
120:12 Correct?
120:13     A.     That would be correct.
120:14     Q.     It would be correct to say independently
120:15 of this statement that thromboxane A2 is a potent
120:16 vasoconstrictor as well.  Correct?
120:17     A.     I can't attest to its potency as a
120:18 vasoconstrictor.  It is a vasoconstrictor.
120:19     Q.     Okay.
120:20     A.     And since 1992, there are many other
120:21 vasoconstrictors and vasodilators, and I don't know,
120:22 today, whether thromboxane A2 would be characterized
120:23 exactly that way, so --
120:24     Q.     We're going to get to that in just a
120:25 bit.
```

```
121: Page 121
121: 1              At the bottom of the -- at the bottom of
121: 2 the page going one, two, three, four lines up, and
121: 3 one word with the sentence that starts with "This."
121: 4              Now, you can read the whole section if
121: 5 you'd like.  I don't want to take things out of
121: 6 context, but I don't want to --
121: 7      A.      Do you want me to read that?
121: 8      Q.      Yes.  You don't have to read it out
121: 9 loud, but I just want you -- if you want to read the
121:10 whole "Hematologic Effects" section so we know in
121:11 what context we're talking about.
121:12      A.      Okay.  I've read it.  Thank you.


ID:        ES 12113
Page Range: 121:13-121:17

121:13      Q.      Okay.
121:14              Would it be fair to say that that short
121:15 section describes the relationship that prostacyclin
121:16 and thromboxane A2 play in both platelet aggregation
121:17 and in vasoconstriction?


ID:        ES 12124
Page Range: 121:24-122:20

121:24      A.      The paragraph describes a relationship
121:25 between thromboxane A2 and prostacyclin, yes.
122: Page 122
122: 1      Q.      Okay.  And vasoconstriction and platelet
122: 2 aggregation?
122: 3      A.      That's what the paragraph discusses,
122: 4 yes.
122: 5      Q.      In lay terms, what is platelet
122: 6 aggregation?
122: 7      A.      Platelet aggregation is the clumping
122: 8 together of platelets, in -- an early step in the
122: 9 formation of clots.
122:10      Q.      Okay.
122:11      A.      It can be reversible.  It cannot be
122:12 reversible.
122:13      Q.      Okay.
122:14              What is vasoconstriction in lay terms?
122:15      A.      Vasoconstriction, in lay terms, is
122:16 narrowing of small -- usually, small vessels in the
122:17 arterial tree.
122:18              That would be generally what
122:19 vasoconstriction would mean.  It can also apply to
122:20 veins.


ID:        D ES 12221
Page Range: 122:21-123:1

122:21      Q.      Okay.
```

```
122:22                What is -- well, could the -- and this
122:23 is -- let me -- the relationship between platelet
122:24 aggregation and vasoconstriction is -- plays an
122:25 important role in hemodynamic -- in hemodynamic
123: Page 123
123: 1 integrity.  Correct?
```

ID:        D ES 12304
Page Range: 123:4-123:10

```
123: 4       A.    I'm not sure that I would describe it
123: 5 exactly that way, no.
123: 6       Q.    Okay.
123: 7             If you have platelet aggregation coupled
123: 8 with vasoconstriction, would you agree with me that
123: 9 the likelihood of an occlusive event, be it a heart
123:10 attack or a stroke, is greater?
```

ID:        D ES 12313
Page Range: 123:13-123:17

```
123:13       A.    I wouldn't be able to draw any
123:14 conclusion about what was going on in a given animal
123:15 or a person's vascular tree based on just those two
123:16 comments.
123:17             I think that's too incomplete.
```

ID:        ES 12318
Page Range: 123:18-124:13

```
123:18       Q.    Well, there are many factors that can go
123:19 into whether a person has a stroke or a heart attack,
123:20 and I understand that.
123:21             What we're talking about, when we talk
123:22 about platelet aggregation, we're talking about the
123:23 beginning of platelets clumping together to form a
123:24 clot.
123:25             Correct?
124: Page 124
124: 1       A.    That's correct.
124: 2       Q.    And vasoconstriction is the inability of
124: 3 an artery or a vein to expand, but instead stay
124: 4 constricted or become smaller.  Right?
124: 5       A.    That is also correct.
124: 6       Q.    And there are enzymes within our body
124: 7 that regulate the dilation or the constriction of
124: 8 arteries and veins?
124: 9       A.    There are many enzymes and hormones that
124:10 regulate that process, in addition to, included in
124:11 that group are thromboxane and prostacyclins.
124:12             There are many other factors that affect
124:13 that process.
```

ID:          D ES 12414
Page Range: 124:14-124:16

   124:14        Q.     There are, and that's not -- I'm not
   124:15 here to argue that point with you.
   124:16        A.     Right.


ID:          ES 12417
Page Range: 124:17-124:20

   124:17        Q.     But we do know that thromboxane A2 and
   124:18 prostacyclin affect vasoconstriction and platelet
   124:19 aggregation?
   124:20        A.     That's correct.


ID:          ES 12501
Page Range: 125:1-125:10

   125: 1               Let me show you what I'm going to mark
   125: 2 as Deposition Exhibit Number 4, and I'm going to make
   125: 3 my same representation.
   125: 4               This is The Merck Manual, Seventeenth
   125: 5 Edition, which was published, by the second page of
   125: 6 that exhibit, in 1999, and you can flip through and
   125: 7 review all of the pages if you'd like.  It has the
   125: 8 same general foreword, although somewhat cut, but I
   125: 9 want to draw your  -- ultimately draw your attention
   125:10 to the last page of that exhibit.


ID:          ES 12608
Page Range: 126:8-126:15

   126: 8        Q.     If you look at that index at page 2818
   126: 9 with me, and you may want to, just for your own
   126:10 benefit, have the Sixteenth Edition at hand if you'd
   126:11 like.
   126:12               But if -- and I'll represent to you that
   126:13 this -- that I went back to the -- if you look at the
   126:14 Sixteenth Edition side by side, the last page of the
   126:15 document --


ID:          D ES 12616
Page Range: 126:16-126:18

   126:16        A.     The very last page that you've stapled
   126:17 together?
   126:18        Q.     Yes.  The index.


ID:          ES 12623
Page Range: 126:23-127:1

   126:23               On the Sixteenth Edition, page 2834,

126:24 between thrombotic, thrombocytopenic purpura and
126:25 thrush is where you find thromboxane discussed.
127: Page 127
127: 1 Correct?


ID:           ES 12711
Page Range: 127:11-127:18

    127:11      A.      Yes, it appears in the alphabetical
    127:12 listing in the index --
    127:13      Q.      Okay.
    127:14      A.      Between thrombotic thrombocytic purpura
    127:15 and thrush.
    127:16      Q.      And in the Seventeenth Edition, between
    127:17 thrombotic, thrombocytopenic purpura and thrush, what
    127:18 is -- is there an entry for thromboxanes?


ID:           ES 12722
Page Range: 127:22-128:19

    127:22      A.      The index in the Seventeenth Edition has
    127:23 thrombotic thrombocytopenic purpura-hemolytic-uremic
    127:24 syndrome, glomerulonephritis and then thrush.
    127:25              I see no comment on this page about
    128: Page 128
    128: 1 thromboxane.
    128: 2      Q.      Between the publication of the Sixteenth
    128: 3 Edition in 1992 and the publication of the
    128: 4 Seventeenth Edition in 1999, was there any
    128: 5 ground-breaking research that was done with regard to
    128: 6 whether or not thromboxane was a potent
    128: 7 vasoconstrictor and vasodilator -- or excuse me --
    128: 8 vasoconstrictor and platelet aggregator?
    128: 9      A.      I can't answer your question.
    128:10      Q.      All right.
    128:11      A.      I don't know.
    128:12      Q.      It's my understanding, correct me if I'm
    128:13 wrong, from the FDA regs that govern how
    128:14 pharmaceutical companies -- I'm not trying to make a
    128:15 legal statement here, but it's my understanding that
    128:16 it's the obligation of the company to keep up with
    128:17 the medical literature that impacts upon the drugs
    128:18 that your company markets and manufactures.
    128:19              Is that a generalization?


ID:           ES 12903
Page Range: 129:3-129:19

    129: 3      A.      I can't answer your question.  I
    129: 4 would -- I would make the comment that the page in
    129: 5 the Seventeenth Edition that is not handed out here
    129: 6 by you is the page in the Sixteenth Edition, which
    129: 7 goes through the many external peer reviews that the
    129: 8 Sixteenth Edition went through.

```
129: 9              To the best of my knowledge, The Merck
129:10  Manual is still peer-reviewed by many external
129:11  experts.
129:12       Q.    Oh, I -- that wasn't my question.
129:13       A.    It's not simply published by Merck &
129:14  Company.  It's reviewed by external experts, as you
129:15  so nicely pointed out in the Sixteenth Edition.
129:16       Q.    Certainly.  I'm trying to point out
129:17  though, and I'm just trying to find out, there's
129:18  obviously a reason why the prostacyclin thromboxane
129:19  section was removed between 1992 and 1999 --
```

ID:       ES 13006
Page Range: 130:6-130:10

```
130: 6  what I want to know is, are you aware of
130: 7  any -- of any research, ground-breaking research that
130: 8  would change the correctness of what is stated in the
130: 9  Sixteenth Edition about thromboxanes and
130:10  prostacyclins and prostaglandins?
```

ID:       ES 13016
Page Range: 130:16-131:12

```
130:16       A.    The only answer that I can give you to
130:17  the general question you've asked about, but not the
130:18  way you've phrased the question, is that to the best
130:19  of my recollection, very, very little research or
130:20  attention in the medical literature has been paid to
130:21  thromboxane and prostacyclin since the mid-'80s and
130:22  early '90s.
130:23              In fact, probably very -- I would -- I
130:24  don't know for certain, but I believe that the topic
130:25  had received very little attention between 1992 and
131: Page 131
131: 1  1999 in the medical literature.
131: 2       Q.    Okay.
131: 3       A.    Because its importance was not clear in
131: 4  the medical literature.
131: 5       Q.    Okay.
131: 6       A.    And --
131: 7       Q.    Would you --
131: 8       A.    And in your terms, no new discoveries
131: 9  had been made which gave it prominence.
131:10       Q.    Right.  I understand.
131:11              Do you believe that that's the reason
131:12  why it was removed from the Sixteenth Edition?
```

ID:       ES 13115
Page Range: 131:15-132:2

```
131:15       A.    I have no idea why it was removed from
131:16  the Seventeenth Edition compared to the Sixteenth
131:17  Edition index.
```

```
131:18      Q.      Okay.
131:19      A.      I have no idea why it was removed.
131:20      Q.      Okay.
131:21      A.      I have never heard anything about why it
131:22 was removed.
131:23      Q.      Okay.
131:24              But you would agree with the accuracy of
131:25 the statements of what thromboxane and prostacyclin
132: Page 132
132: 1 are, and what they do in our vascular system as it is
132: 2 stated briefly in the Sixteenth Edition?
```

```
ID:         ES 13206
Page Range: 132:6-132:7
```

```
132: 6      A.      My comments earlier on that paragraph
132: 7 remain accurate.
```

```
ID:         ES 13301
Page Range: 133:1-133:8
```

```
133: 1              I want you to just review it to
133: 2 yourself, and I want to make sure that we can agree
133: 3 that the book that's published by Merck & Company
133: 4 that we're looking at, or the portion that we're
133: 5 looking at, is factually and scientifically accurate,
133: 6 although it may be brief and there may be other
133: 7 exquisite points that we haven't discussed, but what
133: 8 is stated is accurate.
```

```
ID:         ES 13310
Page Range: 133:10-134:23
```

```
133:10      A.      What I would answer to your question is
133:11 the paragraph that you and I discussed together
133:12 beginning with the words "Following" and where the
133:13 word "thromboxane" and "PGI" are discussed is a
133:14 generally accurate paragraph.
133:15      Q.      What about the preceding paragraph that
133:16 starts with "PGI 1"?
133:17              Is that a generally accurate paragraph?
133:18      A.      The paragraph before that begins with
133:19 "PGE-1"?
133:20      Q.      "PGE-1," the first paragraph below
133:21 "Hematologic Effects."
133:22      A.      Yes.
133:23      Q.      Is that a generally accurate paragraph?
133:24      A.      I think, in 1992, this was generally
133:25 true.
134: Page 134
134: 1              I'm not sure every word in the paragraph
134: 2 is accurate, but it's generally true.
134: 3      Q.      Okay.  And, in 1992, Naproxen was being
134: 4 used -- was widely used as an NSAID, was it not?
```

134: 5        A.      I think Naproxen was available.  I -- I
134: 6 don't know exactly how widely used it was.  It was
134: 7 certainly used as an NSAID.
134: 8        Q.      Fair enough.
134: 9                In the bottom or the last paragraph
134:10 three lines up states:  "Low-dose aspirin
134:11 administration, 81 to 325 milligrams, is widely used
134:12 for preventive therapy in patients with angina,
134:13 post-myocardial infarction or stroke and in patients
134:14 with incipient risks for these catastrophes --"
134:15        A.      Yes.
134:16        Q.      "-- abnormal plasma, lipid, smokers,
134:17 positive family history," et cetera.  Correct?
134:18        A.      That is correct.
134:19        Q.      Okay.
134:20                And in 1992, when The Merck Manual was
134:21 published, it didn't want to tell anybody -- it
134:22 didn't publish to the world that aspirin and Naproxen
134:23 are used for that prophylactic purpose?


ID:        ES 13425
Page Range: 134:25-135:2

134:25        A.      There's no commentary about Naproxen in
135: Page 135
135: 1 this paragraph in the 1992 edition of The Merck
135: 2 Manual.  There is a commentary on aspirin.


ID:        Scolnick Part 1 (3-22-05)

ID:        Scolnick 1505
Page Range: 15:5-15:7

15: 5        Q.      Are you Dr. Ed Scolnick?
15: 6        A.      Yes, I'm Dr. Edward
15: 7 Scolnick.


ID:        Scolnick 2213
Page Range: 22:13-22:18

22:13        Q.      Are you the Edward M.
22:14 Scolnick, President of Merck Research
22:15 Labs and then the Executive Vice
22:16 President Science and Technology for
22:17 Merck & Company?
22:18        A.      Yes, I am.


ID:        Scolnick 47.2-48.2
Page Range: 47:2-48:2

47: 2        Q.      Well, let me suggest it to
47: 3 you if you'll look at Exhibit Number 4.
47: 4                I'll bet you've seen this

```
47: 5    e-mail lately getting ready for your
47: 6    deposition, haven't you?
47: 7          A.    I don't recall seeing this
47: 8    e-mail before right now.
47: 9          Q.    You don't recall seeing this
47:10    e-mail before?
47:11          A.    I do not recall seeing this
47:12    e-mail before.
47:13          Q.    All right.  Well, if you'll
47:14    look down at your message dated December
47:15    5th, 2001, it's about an analyst who is
47:16    going to stand up in public and say
47:17    something negative about Vioxx.  And
47:18    you're the fellow who wrote, "David if he
47:19    says this I will boil him in oil at the
47:20    meeting."  That's what you said, isn't
47:21    it?
47:22          A.    That is the e-mail you're
47:23    referring to, yes.
47:24          Q.    Does that mean, yes, you
47:ESQUIRE DEPOSITION SERVICES
48: 48
48: 1    said it?
48: 2          A.    That is my e-mail.
```

ID:        Scolnick 49.1-49.10
Page Range: 49:1-49:10

```
49: 1                So, you were saying you were
49: 2    going to boil this fellow in oil because
49: 3    this was an analyst who was going to
49: 4    stand up and suggest that maybe Vioxx
49: 5    causes CV events, heart attacks, strokes,
49: 6    things like that; right?
49: 7          A.    I don't recall the details
49: 8    of his report.  I have not seen this
49: 9    e-mail, and I don't recall the details of
49:10    this at all.
```

ID:        Scolnick 52.2-52.21
Page Range: 52:2-52:21

```
52: 2          Q.    Well, if you'll look behind
52: 3    you'll see what it is that upset you.
52: 4    It was this fellow named somebody, hang
52: 5    on, his name is at the end, Richard
52: 6    Stover, who prepared a reanalysis of
52: 7    Merck's meta-analysis.  Do you see where
52: 8    it says that?
52: 9          A.    That is the title for the
52:10    article that you're referring to.
52:11          Q.    Now, those are a lot of big
52:12    words for nonscientist people.  But just
52:13    between you and me, what this really is
52:14    is it's a stock analyst, someone who
```

```
52:15    advises the investment community on
52:16    whether to buy or sell stock, and he's
52:17    basically examining some of what you guys
52:18    had been telling people about the safety
52:19    of your drug, isn't he?
52:20            A.    He's talking about the VIGOR
52:21    study and Vioxx, yes.
```

ID:          Scolnick 58.17-58.24
Page Range: 58:17-58:24

```
58:17            Q.    Okay.  And that's why you
58:18    said "David if he says this I will boil
58:19    him in oil at the meeting."  You didn't
58:20    want that kind of talk out there, did
58:21    you?
58:22            A.    I didn't want -- having read
58:23    this memo, I didn't want an inaccurate
58:24    statistical analysis of our data.
```

ID:          Scolnick 6803
Page Range: 68:3-68:4

```
68: 3            Q.    I want to show you Scolnick
68: 4    Exhibit Number 7.  We're going to come
```

ID:          Scolnick 6811
Page Range: 68:11-68:18

```
68:11            Q.    Do you see your June 1, 1998
68:12    e-mail?
68:13            A.    Yes, I do.
68:14            Q.    You did threaten to quit,
68:15    didn't you?
68:16            A.    I was upset with a
68:17    particular marketing person.  I was --
68:18    and that is the thrust of this e-mail.
```

ID:          Scolnick 69.01-69.15
Page Range: 69:1-69:15

```
69: 1            Q.    Well, when you said "If you
69: 2    lose I will leave, because I will not be
69: 3    able to have any respect for this
69: 4    company," that's threatening to quit,
69: 5    isn't it?
69: 6            A.    The e-mail is accurate.
69: 7            Q.    No.  That wasn't my
69: 8    question.
69: 9            I said, when you say in your
69:10    e-mail, "If you lose I will leave,
69:11    because I will not be able to have any
69:12    respect for this company," you're
```

69:13   threatening to quit, aren't you?
69:14         A.   I accept that
69:15   interpretation.


ID:         Scolnick 069.23-070.12
Page Range: 69:23-70:12

69:23         Q.   You're saying "Merck
69:24   marketing for once has to compete and
69:ESQUIRE DEPOSITION SERVICES
70: 70
70: 1   win.  If you do not beat Pfizer," which
70: 2   is who Searle was at the time; right?  If
70: 3   you don't beat Celebrex, that's what it
70: 4   means; right?
70: 5         A.   Yes, that's correct.
70: 6         Q.   "If you do not beat PFIZER
70: 7   2/1 MERCK should throw in the towel and
70: 8   just give up and hand the company over to
70: 9   someone else.  If YOU," all capitals,
70:10   "lose I will leave, because I will not be
70:11   able to have any respect for this
70:12   company."  You didn't threaten them to


ID:         Scolnick 070.13-071.12
Page Range: 70:13-71:12

70:13   boil them in oil, but you were pretty
70:14   upset with them, weren't you?
70:15         A.   It is a pointed e-mail.
70:16         Q.   Because you were upset;
70:17   weren't you?
70:18         A.   That is correct.
70:19         Q.   You were upset also because
70:20   of some study issues, research issues;
70:21   weren't you?
70:22         A.   I don't recall what you're
70:23   referring to.
70:24         Q.   Look at what it says at the
70:ESQUIRE DEPOSITION SERVICES
71: 71
71: 1   start.  You're saying that the reason
71: 2   y'all were three months behind Searle,
71: 3   the reason you were losing the race is
71: 4   because people in marketing "demanded a
71: 5   label that said we cause no ulcers."
71: 6   And then the budgets were so high that
71: 7   nobody could get the money that they
71: 8   needed for the study.  And that's why
71: 9   y'all were behind?  That's what you say;
71:10   isn't it?
71:11         A.   That is what the memo says,
71:12   yes.

```
ID:          Scolnick 7807
Page Range: 78:7-78:12

    78: 7          Q.    Bottom line is, you were
    78: 8    saying marketing needs to stop their
    78: 9    demands and just get out there and
    78:10    compete and win for once; right?
    78:11          A.    That's what my memo
    78:12    indicates.


ID:          Scolnick 7906-7911
Page Range: 79:6-79:11

    79: 6          Q.    Sir, y'all weren't ready to
    79: 7    go to market with your product, with
    79: 8    Vioxx, when Celebrex hit the market?
    79: 9    Y'all got beat; right?
    79:10          A.    Celebrex got to the market
    79:11    first.  That is correct.


ID:          Scolnick 9623
Page Range: 96:23-97:5

    96:23          Q.    Well, we looked at an
    96:24    exhibit a few minutes ago, the 1998 one
    96:ESQUIRE DEPOSITION SERVICES
    97: 97
    97: 1    where you said that y'all were killing
    97: 2    basic research again at Merck, once
    97: 3    again.  That's because y'all needed more
    97: 4    money.  You didn't have enough money in
    97: 5    the budget; right?


ID:          Scolnick 9803
Page Range: 98:3-98:9

    98: 3          Q.    All right.  So, now you'll
    98: 4    agree with me in 1998 y'all didn't have
    98: 5    enough money in your budget to do all the
    98: 6    research you wanted to do.    True?
    98: 7          A.    That is true.  That is
    98: 8    always true of any really productive
    98: 9    research laboratory.


ID:          Scolnick 10113
Page Range: 101:12-101:20

    101:12    BY MR. LANIER:
    101:13          Q.    Well, sir, you weren't in
    101:14    marketing yourself, were you?
    101:15          A.    No.
    101:16          Q.    Well, why did you keep
    101:17    dabbling in the marketing end?  Why were
```

```
101:18      you sending broadside e-mails to people,
101:19      because y'all were too slow on the
101:20      marketing?
```

```
ID:         Scolnick 10123
Page Range: 101:23-102:3
```

```
101:23              THE WITNESS:  I was
101:24         competitive, and we had a terrific
101:ESQUIRE DEPOSITION SERVICES
102: 102
102: 1         drug, and I wanted the company to
102: 2         present that drug well to
102: 3         physicians.
```

```
ID:         Scolnick 11503
Page Range: 115:3-115:10
```

```
115: 3         Q.    So, you had all the
115: 4      resources you needed to do the right
115: 5      studies, and if the studies weren't done,
115: 6      it was your fault for not doing them
115: 7      because you had the money.  Is that what
115: 8      you're telling me?
115: 9         A.    We had sufficient resources
115:10      to study Vioxx.
```

```
ID:         Scolnick 11805
Page Range: 118:5-118:11
```

```
118: 5         Q.    If you thought that there
118: 6      was an issue that needed debunking, you
118: 7      certainly knew how to order to get a
118: 8      study immediately to debunk the issue and
118: 9      destroy credibility, didn't you?
118:10         A.    And to find out if we were
118:11      wrong.
```

```
ID:         Scolnick 11818
Page Range: 118:18-119:3
```

```
118:18         Q.    That wasn't my question,
118:19      sir.  I said, you could have done a
118:20      study, and you could have ordered one to
118:21      be done with speed on the issue of
118:22      cardiovascular problems, heart attacks
118:23      and strokes, couldn't you?
118:24         A.    There was no reason to do
118:ESQUIRE DEPOSITION SERVICES
119: 119
119: 1      such a study before Vioxx went to market
119: 2      based on all of the data, huge NDA, over
119: 3      5,000 patients studied.
```

ID:          Scolnick 11910
Page Range: 119:10-119:23

```
119:10    question.  My question is simple.  You
119:11    certainly could have ordered a study for
119:12    risks of heart attacks and strokes before
119:13    you put the Vioxx drug on the market,
119:14    couldn't you?
119:15         A.    If there had been a reason
119:16    to do that, I could have done that.
119:17         Q.    By the same token, any day
119:18    that Vioxx had been on the market, the
119:19    second it occurred to you that there
119:20    might be a problem with heart attacks and
119:21    strokes, you could have ordered
119:22    immediately a speed study to be done;
119:23    couldn't you?
```

ID:          Scolnick 12002
Page Range: 120:2-120:5

```
120: 2              THE WITNESS:  I could have
120: 3         asked or ordered a study to be
120: 4         done if I had thought there was a
120: 5         cardiovascular risk with Vioxx.
```

ID:          Scolnick 12023
Page Range: 120:23-121:23

```
120:23    to justify selling the drug.  I'm asking
120:24    you, did you ever order a specific study
120:ESQUIRE DEPOSITION SERVICES
121: 121
121: 1    about heart attacks and strokes?
121: 2         A.    I did not order a specific
121: 3    study.  I urged the group to come up with
121: 4    study designs after VIGOR to further
121: 5    examine the question that was raised by
121: 6    the VIGOR study.
121: 7         Q.    Well, sir, what about VALOR,
121: 8    did you have anything to do with talk
121: 9    about doing the VALOR study?
121:10         A.    VALOR?
121:11         Q.    Yes, sir.
121:12         A.    I don't recognize the term.
121:13    I'm sorry.
121:14         Q.    Did you know that your
121:15    company at one point contemplated and
121:16    actually went pretty far in designing the
121:17    idea of doing a study specifically to
121:18    look at heart attack, strokes, CV risks?
121:19         A.    Yes.  Several study designs
121:20    were considered.
```

```
121:21              Q.    And one of them had approval
121:22  and was about to be done when it was
121:23  cancelled.  Did you know that?
```

```
ID:          Scolnick 12201
Page Range: 122:1-122:3
```

```
122: 1                    THE WITNESS:  One of the
122: 2            studies that I'm aware of was not
122: 3            given final approval.
```

```
ID:          Scolnick 12205
Page Range: 122:5-122:9
```

```
122: 5              Q.    Why not?
122: 6              A.    Because when the study was
122: 7  reviewed, several people objected to the
122: 8  design of the study, that it was not a
122: 9  good scientific study to do.
```

```
ID:          D ES  12210
Page Range: 122:10-122:15
```

```
122:10              Q.    So, you had the need for the
122:11  study, you just didn't design a good one.
122:12  Is that fair to say?
122:13              A.    We considered many study
122:14  designs before the approved design was
122:15  conceptualized.
```

```
ID:          Scolnick 12801
Page Range: 128:1-128:22
```

```
128: 1              Q.    Well, the truth is, the
128: 2  essential study that needed to be done
128: 3  for Vioxx was an outcomes study for heart
128: 4  attacks and strokes; right?
128: 5              A.    The study that would
128: 6  measure, as a predefined endpoint, heart
128: 7  attacks and strokes was an important
128: 8  study for Vioxx.
128: 9              Q.    Not an important.  It was,
128:10  at least in the world of things back in
128:11  2001, the only essential study for Vioxx,
128:12  wasn't it?
128:13              A.    It was an essential study to
128:14  do for Vioxx.
128:15              Q.    That wasn't my question.
128:16              The only essential study;
128:17  true?
128:18              A.    It wasn't the only essential
128:19  study to do.  It was --
128:20              Q.    That's what you said.
```

```
128:21          A.     It was a very important
128:22    study.
```

ID:          Scolnick 13609
Page Range: 136:9-136:12

```
136: 9          Q.     Well, certainly by the year
136:10    2000 you knew that there was an issue
136:11    about heart attacks and strokes, weren't
136:12    you?
```

ID:          Scolnick 13615
Page Range: 136:15-136:17

```
136:15                 THE WITNESS:  The VIGOR
136:16    study was available in the year
136:17    2000.
```

ID:          Scolnick 14109
Page Range: 141:9-142:7

```
141: 9                 MR. LANIER:  We're marking
141:10          that as Exhibit Number 13.
141:11    BY MR. LANIER:
141:12          Q.     If you'll look down at the
141:13    third question, that's the one I want you
141:14    to look at.
141:15          A.     Uh-huh.
141:16          Q.     "Why did Merck undertake
141:17    the," APPROVe, "trial?"
141:18          A.     Uh-huh.
141:19          Q.     Merck prepared an answer to
141:20    that.  Nowhere in that answer does it say
141:21    to see if people are having heart attacks
141:22    and strokes, does it?
141:23          A.     The answer to the question
141:24    does not refer to the cardiovascular
141:ESQUIRE DEPOSITION SERVICES
142: 142
142: 1    outcome part of the study.
142: 2          Q.     I'm sorry.  That's a long
142: 3    answer.  Are you just saying, yes, you're
142: 4    right, it doesn't say heart attacks and
142: 5    strokes?
142: 6          A.     There's nothing about heart
142: 7    attacks and strokes in that answer.
```

ID:          Scolnick 14602
Page Range: 146:2-146:5

```
146: 2                 You, Dr. Scolnick, knew
146: 3    Vioxx was causing heart attacks and
146: 4    strokes by the time of March 2000; true?
```

146: 5          A.    Not true.

ID:       D ES 14606
Page Range: 146:6-146:10

146: 6          Q.    Well, we at least know that
146: 7     you're getting reports of it, that you're
146: 8     having summarized out of thousands of
146: 9     reports, right, Exhibit 10?
146:10          A.    Again, I've --

ID:       D ES  14613
Page Range: 146:13-147:4

146:13               THE WITNESS: -- tried to
146:14          explain to you the fact that when
146:15          a drug goes on the market, adverse
146:16          experience reports are reported on
146:17          every drug, including Vioxx.  And
146:18          the challenge for analyzing those
146:19          reports is to try to figure out
146:20          whether they're happening by
146:21          chance associated with the drug or
146:22          whether the drug is actually
146:23          causing the adverse experiences
146:24          reported in the reports.
146:ESQUIRE DEPOSITION SERVICES
147: 147
147: 1               And we did this -- we did
147: 2          this routinely and very, very
147: 3          carefully for every drug we ever
147: 4          brought on the market.

ID:       Scolnick 14707
Page Range: 147:7-147:12

147: 7     jury, as of March 2000, you, Edward
147: 8     Scolnick, knew that the CV events, the
147: 9     heart attacks and strokes, were clearly
147:10     there, and you, Edward Scolnick, knew
147:11     that they were mechanism-based with
147:12     Vioxx?

ID:       Scolnick 14716
Page Range: 147:16-147:21

147:16          Q.    True?
147:17          A.    That was my very first
147:18     reaction when I saw the data from the
147:19     VIGOR trial.
147:20          Q.    You knew it from the get-go.
147:21     It was your first reaction; right?

```
ID:          Scolnick 14724
Page Range: 147:24-148:2

   147:24                THE WITNESS:  It was my
   147:ESQUIRE DEPOSITION SERVICES
   148: 148
   148: 1            first reaction before other data
   148: 2            was available.


ID:          Scolnick 14817
Page Range: 148:17-148:24

   148:17            Q.    Sir, it is in March of 2000;
   148:18  isn't it?
   148:19            A.    Yes, it is.
   148:20            Q.    And you said to everybody,
   148:21  Alan Nies, Alise Reicin and Deborah
   148:22  Shapiro certain things, didn't you?
   148:23            A.    I did.  It says, "I just
   148:24  received and went through the data."


ID:          Scolnick 14908
Page Range: 149:8-150:2

   149: 8            Q.    And you don't step out and
   149: 9  say something unless you know it's true
   149:10  and right.  Do you remember that?
   149:11            A.    I don't remember saying what
   149:12  you've just quoted me as saying.
   149:13            Q.    I think your exact words
   149:14  were, you hold yourself to a very high
   149:15  standard.  Do you remember that?
   149:16            A.    Yes, I do remember that.
   149:17            Q.    And so you sent this e-mail
   149:18  to everybody, and you said that you
   149:19  received and you went through the data;
   149:20  right?
   149:21            A.    Uh-huh.  That's what it
   149:22  says.
   149:23            Q.    And I'm sure you did that
   149:24  thoroughly.  You didn't do a half slop
   149:ESQUIRE DEPOSITION SERVICES
   150: 150
   150: 1  job; did you?
   150: 2            A.    I don't think so.


ID:          Scolnick 15105
Page Range: 151:5-151:12

   151: 5                THE WITNESS:  Excuse me.  If
   151: 6  I can just look at the memo for
   151: 7  one second.  "Pubs" in this
   151: 8  context is talking about
```

```
151: 9          perforations, ulcers and bleeds
151:10          associated with the study.
151:11  BY MR. LANIER:
151:12          Q.   Okay.  Thank you.
```

ID:        Scolnick 15113
Page Range: 151:13-151:22

```
151:13              "There is no doubt about
151:14  the" perforations, ulcers and bleeds
151:15  "data."  Then look at your next sentence.
151:16  "The CV events are," what's that word?
151:17          A.   The sentence reads, "The
151:18  cardiovascular events are clearly there."
151:19          Q.   They're clearly there.  That
151:20  was your choice of words; wasn't it?
151:21          A.   This is my e-mail.  That is
151:22  correct.
```

ID:        Scolnick 15123
Page Range: 151:23-152:16

```
151:23          Q.   So, after you studied the
151:24  data, you went through it, you sent a
151:ESQUIRE DEPOSITION SERVICES
152: 152
152: 1  memo out to everybody, even though you
152: 2  hold yourself to a high standard, telling
152: 3  everybody that the CV events are clearly
152: 4  there, and that was March of 2000, wasn't
152: 5  it?
152: 6          A.   Yes, it is.
152: 7          Q.   And you never sent out an
152: 8  order at that point in time for a CV
152: 9  outcomes study, did you?
152:10          A.   We -- I did not send out an
152:11  order for a CV outcomes study.  We took
152:12  many immediate actions to try to
152:13  understand the cardiovascular events,
152:14  since we couldn't conclude what was going
152:15  on in the trial because there was no
152:16  placebo in the trial.
```

ID:        Scolnick 15607
Page Range: 156:7-156:10

```
156: 7              1999, I wrote, "Push Vioxx
156: 8  to market by May 22nd or" Merck will be
156: 9  "'a different company.'"  That's what you
156:10  said in 1999; right?
```

ID:        Scolnick 15613
Page Range: 156:13-156:19

```
156:13                THE WITNESS:  It accurately
156:14          reflects our earlier discussion.
156:15   BY MR. LANIER:
156:16          Q.    Then also in 1999 you sent
156:17   out the e-mail that said if we can't beat
156:18   Celebrex two to one, you're going to quit
156:19   or leave the company.   True?
```

```
ID:          Scolnick 156.21-156.23
Page Range:  156:21-156:23
```

```
156:21                THE WITNESS:  You reflected
156:22          my e-mail and some of my
156:23          sentiments in that e-mail.
```

```
ID:          Scolnick 157.10-157.14
Page Range:  157:10-157:14
```

```
157:10                The drug Vioxx did go to
157:11   market in 1999, and y'all marketed it
157:12   before the VIGOR study was finished;
157:13   true?
157:14          A.    Yes, that's correct.
```

```
ID:          D ES  15715
Page Range:  157:15-158:14
```

```
157:15          Q.    You couldn't afford to wait
157:16   for that VIGOR study to get done; could
157:17   you?
157:18          A.    No, that's not true.  That
157:19   was a study that was planned for being
157:20   done after the drug was approved and was
157:21   going to provide additional data about
157:22   gastrointestinal safety for the drug.
157:23          Q.    But, sir, the VIGOR study,
157:24   you could not afford to wait until it was
157:ESQUIRE DEPOSITION SERVICES
158: 158
158: 1   over to market your drug, because if you
158: 2   waited, Merck would be a different
158: 3   company.  You never would have made May
158: 4   22nd of '99; right?
158: 5          A.    The VIGOR study was not
158: 6   required to market the drug.
158: 7          Q.    I'm not asking did the FDA
158: 8   require it.  I'm talking about, did you
158: 9   market the drug before you got the VIGOR
158:10   results in?
158:11          A.    Yes, we did.  The VIGOR
158:12   trial was never planned as part of the
158:13   very large NDA for the initial approval
158:14   of Vioxx.
```

```
ID:        D ES  15918
Page Range: 159:18-159:20

  159:18          Q.    Then also in the year 2000,
  159:19   you never ordered or had done a CV
  159:20   specific study; true?


ID:        D ES  15923
Page Range: 159:23-160:6

  159:23                THE WITNESS:  We
  159:24   immediately, upon having the VIGOR
  159:ESQUIRE DEPOSITION SERVICES
  160: 160
  160: 1    results, did many additional data
  160: 2    analyses on studies that we had to
  160: 3    try to interpret the meaning of
  160: 4    the VIGOR results.  And we did, in
  160: 5    the end, come up with a study to
  160: 6    measure cardiovascular outcomes.


ID:        Scolnick 16010
Page Range: 160:10-160:13

  160:10          Q.    I said, very simple
  160:11   question, sir.  It's a simple note.
  160:12   2000, you never did a CV specific study;
  160:13   true?


ID:        Scolnick 16016
Page Range: 160:16-160:23

  160:16                THE WITNESS:  We did not do
  160:17   a study where cardiovascular
  160:18   outcomes were a primary endpoint.
  160:19   We did do a study where
  160:20   cardiovascular outcomes were a
  160:21   predefined endpoint in our studies
  160:22   to gather additional
  160:23   cardiovascular outcomes data.


ID:        Scolnick 16120
Page Range: 161:20-161:23

  161:20          Q.    Okay.  That's my point.  So,
  161:21   you never did, never, one single study
  161:22   where the primary outcome was, does it
  161:23   cause heart attacks or strokes; right?


ID:        Scolnick 16202
```

Page Range: 162:2-162:3

```
162: 2                THE WITNESS:  You're
162: 3          correct.
```

ID:       Scolnick 16223
Page Range: 162:23-163:8

```
162:23          Q.   Sir, simple question.  Did
162:24   you change your warning label and tell
162:ESQUIRE DEPOSITION SERVICES
163: 163
163: 1   people about the VIGOR results in the
163: 2   year 2000?  Yes or no?
163: 3          A.    We told people about the
163: 4   VIGOR results immediately after they
163: 5   became available to us.
163: 6          Q.    Okay.
163: 7          A.    And we submitted an NDA to
163: 8   the FDA to change our label.
```

ID:       Scolnick 22606
Page Range: 226:6-226:10

```
226: 6          Q.    Do you have Exhibit 18 in
226: 7   front of you?
226: 8          A.    Yes, I do.
226: 9          Q.    It's the day before your "to
226:10   do" list, isn't it, the 13th?
```

ID:       Scolnick 22615
Page Range: 226:15-226:17

```
226:15                THE WITNESS:  Yes.  It's the
226:16          day before this memo on the "to
226:17          do" list.
```

ID:       Scolnick 22707
Page Range: 227:7-227:9

```
227: 7          Q.    Four days away from your
227: 8   initial conclusion that Vioxx was causing
227: 9   heart attacks and strokes; right?
```

ID:       Scolnick 22711
Page Range: 227:11-228:14

```
227:11                THE WITNESS:  Four days from
227:12          my initial memo with my initial
227:13          conclusion, yes.
227:14   BY MR. LANIER:
227:15          Q.    All right.
```

```
227:16                Now, already by four days
227:17   later, you have got Ms. Reicin scouring
227:18   the medical literature trying to find a
227:19   study somewhere that indicates that
227:20   NSAIDs helped your heart; right?
227:21        A.    That was one of the
227:22   questions that I asked the team when they
227:23   suggested that NSAIDs could be
227:24   cardioprotective.
227:ESQUIRE DEPOSITION SERVICES
228: 228
228: 1        Q.    And the only study she was
228: 2   able to find -- by the way, it is
228: 3   singular, there was only one study she
228: 4   could find; true?
228: 5        A.    That's what the e-mail says,
228: 6   yes.
228: 7        Q.    In fact, why don't you read
228: 8   that sentence where I've highlighted
228: 9   "Only study."
228:10        A.    "Alan and Ed:  Below is
228:11   attached the abstract from the only study
228:12   I could find which assessed the potential
228:13   cardioprotective effects of an NSAID.
228:14   Alise."
```

```
ID:          Scolnick 22902
Page Range: 229:2-229:8
```

```
229: 2        Q.    Did it occur to you that
229: 3   people were taking the drug that could be
229: 4   having these heart attacks, or is that
229: 5   what you meant when you said it's sad or
229: 6   it's a shame, but it's a low incidence,
229: 7   you just didn't figure there would be
229: 8   that many of them?
```

```
ID:          Scolnick 22911
Page Range: 229:11-229:19
```

```
229:11                THE WITNESS:  As I've
229:12        stated, my initial conclusion was
229:13        that Vioxx was causing heart
229:14        attacks in patients.  After
229:15        discussions of this article and
229:16        extensive other data that we had
229:17        available to ourselves in our own
229:18        trials, I concluded that I was not
229:19        correct in my initial conclusion.
```

```
ID:          Scolnick 23021
Page Range: 230:21-230:23
```

```
230:21        Q.    I'm going to hand you a
```

```
230:22    document marked Exhibit 19.  Do you have
230:23    it in front of you?


ID:          Scolnick 23120
Page Range: 231:20-233:5

231:20          Q.     First of all, this
231:21    well-respected Carlo Patrono said that he
231:22    does not think that you can attribute the
231:23    increase in heart attacks and strokes to
231:24    the fact that the other people were
231:ESQUIRE DEPOSITION SERVICES
232: 232
232: 1    taking naproxen, and it must be good for
232: 2    your heart.  Fair to say?
232: 3          A.     That's what he writes, yes.
232: 4    That's what the person reflects on his
232: 5    comments.
232: 6          Q.     And then there are a number
232: 7    of reasons given why it can't be that
232: 8    naproxen is good; right?
232: 9          A.     What it says is, he
232:10    questions whether the magnitude of the
232:11    effects seen in VIGOR is consistent with
232:12    naproxen being cardioprotective.
232:13          Q.     Well, he said, first of all,
232:14    "There is a weak pharmacological basis."
232:15    Do you see where it said that?
232:16          A.     Yes, I do.
232:17          Q.     What that means to you and
232:18    me and folks who read this stuff more
232:19    than we probably should is that there's
232:20    really not a good medical science
232:21    pharmacy reason for saying it's naproxen.
232:22    That's what that means, doesn't it?
232:23          A.     It refers to the
232:24    pharmacology of the drug, and that's his
232:ESQUIRE DEPOSITION SERVICES
233: 233
233: 1    interpretation.
233: 2          Q.     And then it says, "No
233: 3    epidemiological evidence."  Do you see
233: 4    where it says that?
233: 5          A.     Yes, I do.


ID:          Scolnick 23314
Page Range: 233:14-234:3

233:14          Q.     Well, do you see the word
233:15    "no"?
233:16          A.     I do see that.
233:17          Q.     How many are there, if it
233:18    says there's no evidence?  How much
233:19    evidence is there?
233:20          A.     I see his comment.  I don't
```

```
233:21    know the details of his review that he
233:22    refers to here.
233:23          Q.    Well, when he says there's
233:24    no evidence, don't you think that means
233:ESQUIRE DEPOSITION SERVICES
234: 234
234: 1    zero?
234: 2          A.    I think that's a plausible
234: 3    explanation, yes.
```

```
ID:          Scolnick 23404
Page Range: 234:4-234:18
```

```
234: 4          Q.    Otherwise you think he'd use
234: 5    the word "some" or "a little" or "few" or
234: 6    "lots"?
234: 7          A.    He's talking about
234: 8    conventional nonsteroidals as part of his
234: 9    sentence.  And we actually agree with
234:10    that except for naproxen.
234:11          Q.    So, but you agree with the
234:12    statement even for naproxen, that there's
234:13    no epidemiological evidence that naproxen
234:14    is safe; right?  I mean, not safe, good
234:15    for the heart?
234:16          A.    There had been no prior data
234:17    to suggest that naproxen was
234:18    cardioprotective.
```

```
ID:          Scolnick 23420
Page Range: 234:20-235:5
```

```
234:20    next sentence.  He says, "Additionally"
234:21    which I guess means another reason, yet
234:22    another reason; right?
234:23          A.    Yes.
234:24          Q.    "Additionally the magnitude
234:ESQUIRE DEPOSITION SERVICES
235: 235
235: 1    of the effect," in other words, how many
235: 2    more heart attacks you were causing,
235: 3    "would not be plausible even if" you'd
235: 4    been comparing it to aspirin.  He says
235: 5    that; doesn't he?
```

```
ID:          Scolnick 23507
Page Range: 235:7-235:17
```

```
235: 7                THE WITNESS:  He talks about
235: 8          the aspirin, yes, the comparator
235: 9          to aspirin.
235:10    BY MR. LANIER:
235:11          Q.    He says, "In fact,
235:12    in...three different trials, aspirin has
```

```
235:13        shown no effect on the primary prevention
235:14        of stroke, while we have seen a 50% lower
235:15        incidence of stroke in the naproxen arm
235:16        of VIGOR"; right?
235:17             A.    That's what he says.
```

```
ID:           Scolnick 23613
Page Range: 236:13-236:23
```

```
236:13             Q.    Well, you were hoping
236:14        naproxen helped the heart just like
236:15        aspirin did; right?
236:16             A.    We weren't hoping anything.
236:17        We were concluding based on this study
236:18        that you've referred to and all the other
236:19        analysis versus placebo and other NSAIDs,
236:20        that except for this naproxen study,
236:21        there was no evidence for an imbalance of
236:22        cardiovascular events attributable to
236:23        Vioxx.
```

```
ID:           Scolnick 23703
Page Range: 237:3-237:7
```

```
237: 3             Q.    Sir, what y'all were putting
237: 4        forth there as an idea was that naproxen
237: 5        helps the heart just like aspirin does;
237: 6        right?
237: 7             A.    Or -- yes, that's correct.
```

```
ID:           D ES 23708
Page Range: 237:8-239:3
```

```
237: 8             Q.    But the truth be told, even
237: 9        aspirin, if you'd used aspirin, even
237:10        aspirin couldn't help the heart as much
237:11        as naproxen would have to to come up with
237:12        these results; right?
237:13             A.    Aspirin, to my knowledge,
237:14        had never been studied in this kind of
237:15        patient population.
237:16             Q.    That wasn't my question,
237:17        sir.
237:18             My point is, y'all had so
237:19        many more heart attacks and strokes in
237:20        your Vioxx group than the naproxen, that
237:21        if the real reason why is because
237:22        naproxen was helpful, that naproxen would
237:23        have to be two, three, four times better
237:24        for you than even aspirin; right?
237:ESQUIRE DEPOSITION SERVICES
238: 238
238: 1             A.    I can't conclude that.
238: 2        Aspirin has not been studied in patients
```

```
238: 3    with rheumatoid arthritis in this kind of
238: 4    trial.  There was no way to make that
238: 5    quantitative comparison.
238: 6            Q.    Well, naproxen hadn't been
238: 7    studied in any other trials to show that
238: 8    it was cardioprotective.  It never had
238: 9    been shown that in any of the testing
238:10    ever done; true?
238:11            A.    That is true, and I've tried
238:12    to explain to you why that study could
238:13    not have been done.
238:14            Q.    Well, sir, that study is
238:15    going to be an end result of every study
238:16    with naproxen.  You're always going to --
238:17    when you study naproxen, you're going to
238:18    compare the favorable outcomes on a
238:19    cardio basis with those that don't;
238:20    right?
238:21            A.    Not compared to placebo to
238:22    really be able to answer that question.
238:23            Q.    Fine.  Compared to other
238:24    NSAIDs; true?
238:ESQUIRE DEPOSITION SERVICES
239: 239
239: 1            A.    If naproxen had been studied
239: 2    that way, then some day it could have
239: 3    been achieved.


ID:          Scolnick 268.13-268.17
Page Range: 268:13-268:17

268:13            Q.    Just make sure we're on the
268:14    same page.  If we look at Exhibit 23, you
268:15    even sent a memo to this to the CEO and
268:16    to the president of Merck back in January
268:17    of 2001, didn't you?


ID:          Scolnick 26901a
Page Range: 269:1-269:21

269: 1            A.    Yes.
269: 2            Q.    You said you "want to point
269: 3    out to all of you at one time that, 1.
269: 4    there is no way to prove that in patients
269: 5    with rheumatoid arthritis that ALL of the
269: 6    difference between Vioxx and naproxen is
269: 7    due to the benefit of naproxen."  That's
269: 8    what you said, isn't it?
269: 9            A.    That's right.  And all is
269:10    capitalized.
269:11            Q.    And then you capitalize this
269:12    whole next phrase.  "IT IS IMPOSSIBLE TO
269:13    PROVE THIS."  Didn't you?
269:14            A.    That's what the e-mail says.
269:15            Q.    That's what you said, isn't
```

```
269:16    it?
269:17          A.    Yes, it is.  It is.
269:18          Q.    Then you capitalize for
269:19    emphasis this next sentence.  "IT IS
269:20    IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."
269:21          A.    That's exactly what I said.
```

ID:        Scolnick Part 2 (4-29-05)

ID:        Scolnick 1014
Page Range: 10:14-10:16

```
10:14          Q.      You retired from Merck Research Labs
10:15    in 2003; correct?
10:16          A.      That is correct.
```

ID:        Scolnick 2714a
Page Range: 27:14-27:17

```
27:14                  In the late '80s and early '90s, you
27:15    were also the president of Merck Research Labs;
27:16    right?
27:17          A.      Yes.
```

ID:        Scolnick 2824
Page Range: 28:24-29:2

```
28:24          Q.      At that point in time you did have
28:25    some concerns about what the prospects would be for
28:ESQUIRE DEPOSITION SERVICES
29: Confidential - Subject to Protective Order   29
29: 1    Merck in the late '90s and 2000 as several drugs
29: 2    were coming off patent; right?
```

ID:        Scolnick 2904
Page Range: 29:4-29:6

```
29: 4                  THE WITNESS:  I had concerns.  It was
29: 5    a way off, but, yes, I certainly remember vague
29: 6    thoughts about that.
```

ID:        Scolnick 2913
Page Range: 29:13-29:16

```
29:13          Q.      You have to anticipate that drugs
29:14    would be coming off patent maybe ten years down the
29:15    road and seek to have new drugs to fill the drugs
29:16    that were once proprietary of the company?
```

ID:        Scolnick 2918a
Page Range: 29:18-30:4

```
29:18                    THE WITNESS:  That is correct.
29:19    BY MR. BUCHANAN:
29:20         Q.        Because once a drug becomes generic
29:21    or goes off patent, then other competitors can enter
29:22    the market and seek to take market share; correct?
29:23         A.        That's correct.
29:24         Q.        Okay.  So, in the early '90s you knew
29:25    that beginning in 2000 and 2001, Merck would have
29:ESQUIRE DEPOSITION SERVICES
30: Confidential - Subject to Protective Order  30
30: 1    several drugs going off patent; correct?
30: 2         A.        The one that comes to mind
30: 3    immediately is Mevacor, but I don't recall the other
30: 4    drugs at this point.


ID:         Scolnick 3213
Page Range: 32:13-33:20

32:13                    All these drugs were significant
32:14    drugs for Merck?
32:15         A.        Yes.
32:16         Q.        Several of these were blockbuster
32:17    drugs for Merck; right?
32:18         A.        They were large selling drugs, yes.
32:19         Q.        Well, "blockbuster" has a meaning or
32:20    a connotation in the industry, doesn't it?
32:21         A.        "Blockbuster" means usually a very
32:22    large drug, very large sales drug.
32:23         Q.        Traditionally it meant more than a
32:24    billion dollars in sales; true?
32:25         A.        That is one interpretation given to
32:ESQUIRE DEPOSITION SERVICES
33: Confidential - Subject to Protective Order  33
33: 1    it.
33: 2         Q.        So, several of these drugs were
33: 3    blockbuster drugs.  You'd agree with that?
33: 4         A.        Yes.
33: 5         Q.        Okay.
33: 6                    Several of these drugs, even if you
33: 7    can't remember all of them, were going off patent in
33: 8    2000, 2001, 2002; correct?
33: 9         A.        I'm not sure which ones, but some
33:10    drugs were going off patent at that point.
33:11         Q.        Well, you recall being concerned
33:12    about what the future will hold in 2000/2001 when
33:13    all these drugs were going off patent; correct?
33:14         A.        Yes.
33:15         Q.        You were concerned about that in the
33:16    early '90s?
33:17         A.        Yes.
33:18         Q.        And you were trying to design new
33:19    drugs to fill the void that would be left by these
33:20    drugs when they went off patent?
```

```
ID:           Scolnick 3324
Page Range: 33:24-33:25

   33:24                   THE WITNESS:  We were trying to
   33:25       develop and discover new drugs that would do that.


ID:           Scolnick 3408a
Page Range: 34:8-34:17

   34: 8            Q.      One of the drugs that was going to be
   34: 9       filling the void left by these other drugs when they
   34:10       went off patent was Vioxx; true?
   34:11            A.      Vioxx was going to fill the void, but
   34:12       in the early '90s, Vioxx -- I believe Vioxx was not
   34:13       even on the Merck radar screen.  I don't even think
   34:14       we had thought of the project at that point.  I
   34:15       don't -- I don't recall the date when the Vioxx
   34:16       project started.
   34:17                              -  -  -


ID:           Scolnick 3613a
Page Range: 36:13-36:18

   36:13            Q.      There's a reference to Dr. Peppi
   36:14       Prasit.  Do you see that?
   36:15            A.      Dr. Peppi Prasit.
   36:16            Q.      Prasit.  He was a scientist at your
   36:17       labs in Montreal; correct?
   36:18            A.      Yes, a chemist.


ID:           Scolnick 3711
Page Range: 37:11-37:18

   37:11            Q.      You see the date referenced here.
   37:12       It's July 1992; correct?
   37:13            A.      Yes, I do.
   37:14            Q.      Does that refresh your recollection
   37:15       as to when Merck started considering investigating
   37:16       selective NSAIDs?
   37:17            A.      Yes, it does.  I had not recalled we
   37:18       started this project this early.


ID:           Scolnick 4206
Page Range: 42:6-42:9

   42: 6                    So, you put a lot of resources within
   42: 7       Merck Research Labs onto this particular project;
   42: 8       correct?
   42: 9            A.      Yes, that is correct.


ID:           Scolnick 43.11
Page Range: 43:11-43:19
```

```
43:11          Q.       And you encouraged Dr. Prasit and his
43:12   staff to pursue the Vioxx project with all resources
43:13   that were available at Merck Frosst; true?
43:14          A.       That is correct.
43:15          Q.       Okay.
43:16                   You knew how important this drug
43:17   could be for the company; right?
43:18          A.       I knew that this could be a very
43:19   important project, yes.
```

ID:         Scolnick 47.06
Page Range: 47:6-47:8

```
47: 6          Q.       You wanted to be the first to market
47: 7   with this selective COX-2 inhibitor; correct?
47: 8          A.       Yes.
```

ID:         Scolnick 8703
Page Range: 87:3-87:9

```
87: 3          Q.       All right, sir.  I want to get back
87: 4   to something.  I want to turn back to 1998.  I want
87: 5   to talk about the period prior to the time when
87: 6   Merck had Vioxx approved.  Okay?  Do you remember
87: 7   when Vioxx was approved?
87: 8          A.       I believe it was late 1999, middle of
87: 9   1999.
```

ID:         Scolnick 9806
Page Range: 98:6-98:10

```
98: 6                   For the record, it is an e-mail from
98: 7   you to a series of individuals, Alan Nies, Beth
98: 8   Seidenberg, Tom Simon, Robert Silverman.  Sir, are
98: 9   all of those people Merck employees?
98:10          A.       Yes, they were.
```

ID:         Scolnick 9922a
Page Range: 99:22-100:13

```
99:22          Q.       So, what you did here was you sent
99:23   these folks on your Vioxx development team and some
99:24   regulatory personnel an analyst report; correct?
99:25          A.       That appears to be correct.
99:ESQUIRE DEPOSITION SERVICES
100:Confidential - Subject to Protective Order 100
100: 1          Q.       Okay.
100: 2                   You sent it with high importance?
100: 3          A.       That's what it's marked.
100: 4          Q.       It was real important they saw this
100: 5   analyst report?
100: 6          A.       It's marked high importance.
```

```
100: 7            Q.      Do you make it a practice, sir, to
100: 8    send Wall Street analyst reports to employees who
100: 9    are on projects within Merck?
100:10            A.      I sent a variety of information to
100:11    them, sometimes analyst reports which had relevant
100:12    information, sometimes scientific articles.  I send
100:13    a variety of things to my employees.
```

ID:         Scolnick 11222
Page Range: 112:22-112:24

```
112:22                    So, it is, in fact, accurate to state
112:23    that in 1998 Merck had declining sales in several of
112:24    its key franchises; correct?
```

ID:         Scolnick 11301
Page Range: 113:1-113:13

```
113: 1                    THE WITNESS:  I've answered your
113: 2    question.
113: 3    BY MR. BUCHANAN:
113: 4            Q.      I would like you to answer that
113: 5    question, please.
113: 6            A.      Some of its franchises had declining
113: 7    sales.
113: 8            Q.      And they were key franchises?
113: 9            A.      And some of them were key.
113:10            Q.      Okay.
113:11                    You also had several drugs going off
113:12    patent in the near future; right?
113:13            A.      Correct.
```

ID:         D ES  11512
Page Range: 115:12-115:16

```
115:12            Q.      Well, when you sent this, were you
115:13    sending it as a scientist, sir?
115:14            A.      Yes, because it was in my capacity as
115:15    head of the research laboratories to these people
115:16    who reported to the research laboratories.
```

ID:         Scolnick 11517a
Page Range: 115:17-116:11

```
115:17            Q.      You thought it was important to tell
115:18    your employees that Merck's base business was
115:19    eroding?
115:20            A.      Yes.
115:21            Q.      You thought it was important to tell
115:22    them that Merck had several products going off
115:23    patent?
115:24            A.      They knew that.  This was to
115:25    reemphasize that.
```

```
115:ESQUIRE DEPOSITION SERVICES
116: Confidential - Subject to Protective Order 116
116: 1            Q.        You thought it was important to tell
116: 2    them that several of the recently launched products
116: 3    had not been as successful as anticipated?
116: 4            A.        I wanted to provide them the
116: 5    information in this document, yes, that's correct.
116: 6            Q.        You thought it was important to tell
116: 7    them that several of the recently launched products
116: 8    weren't as successful as you anticipated they'd be;
116: 9    right?
116:10           A.        That's what's in here, and I wanted
116:11   to provide them that information.
```

```
ID:            Scolnick 11718
Page Range: 117:18-118:3
```

```
117:18           Q.        They are the people who you would
117:19   hope would be able to facilitate a speedy approval
117:20   of your drug; correct?
117:21           A.        That is part of their responsibility.
117:22   Part of their jobs, yes.
117:23           Q.        And that's part of why you provided
117:24   this e-mail to them; right?
117:25           A.        Yes.
117:ESQUIRE DEPOSITION SERVICES
118: Confidential - Subject to Protective Order 118
118: 1           Q.        You wanted them to know how important
118: 2    it was that this drug proceed quickly through the
118: 3    regulatory approval process; right?
```

```
ID:            Scolnick 11806
Page Range: 118:6-118:9
```

```
118: 6                     THE WITNESS:  Yes.
118: 7    BY MR. BUCHANAN:
118: 8           Q.        It was essential to the financial
118: 9    success of the firm; right?
```

```
ID:            Scolnick 11811
Page Range: 118:11-118:18
```

```
118:11                    THE WITNESS:  It was essential to
118:12   Merck.  It was important to Merck, yes.
118:13   BY MR. BUCHANAN:
118:14           Q.        Okay.
118:15                     And, in fact, it was not only
118:16   essential, but Vioxx's success was necessary to
118:17   preserve Merck and Merck Research Labs period;
118:18   correct?
```

```
ID:            Scolnick 11821
Page Range: 118:21-118:22
```

```
118:21                   THE WITNESS:  That is what I said in
118:22      my e-mail.


ID:         Scolnick 11824
Page Range: 118:24-119:1

118:24          Q.       That's true; right?
118:25          A.       I believe it is an exaggeration, but
118:ESQUIRE DEPOSITION SERVICES
119: Confidential - Subject to Protective Order 119
119: 1      it has some truth.


ID:         Scolnick 12217
Page Range: 122:17-123:7

122:17                   Well, at this point in time, October
122:18      1998, what did you know about Vioxx's potential to
122:19      cause cardiovascular risks or cardiovascular
122:20      problems?
122:21          A.       I don't recall exactly what we knew
122:22      at this point.  There was no evidence at all in the
122:23      Vioxx development program at this point that Vioxx
122:24      caused cardiovascular risks.
122:25          Q.       What do you mean by that, "caused
122:ESQUIRE DEPOSITION SERVICES
123: Confidential - Subject to Protective Order 123
123: 1      cardiovascular risks"?
123: 2          A.       There was no evidence to say that
123: 3      Vioxx caused a cardiovascular risk.
123: 4          Q.       Well, you're not saying that in
123: 5      individual trials preapproval that you didn't see
123: 6      imbalances between cardiovascular risks in Vioxx and
123: 7      the comparator drugs, are you?


ID:         Scolnick 12309a
Page Range: 123:9-123:14

123: 9                   THE WITNESS:  Before the drug was
123:10      approved?
123:11      BY MR. BUCHANAN:
123:12          Q.       Yes.
123:13          A.       I don't recall any such data.  So, if
123:14      it was there, I certainly don't recall it.


ID:         D ES  12911
Page Range: 129:11-129:21

129:11                   THE WITNESS:  No, actually, that is
129:12      not the conclusion that anyone drew or was certain
129:13      of.  The question was raised as to what the source
129:14      of that metabolite was in the source of the
129:15      prostacyclin and whether it was systemic or whether
```

```
129:16      it was not systemic.
129:17      BY MR. BUCHANAN:
129:18          Q.      I see.  So, if it was systemic, that
129:19      would mean that prostacyclin that was produced
129:20      ordinarily in the vasculature was being suppressed
129:21      by Vioxx; true?
```

```
ID:         D ES  12923
Page Range: 129:23-130:3
```

```
129:23                  THE WITNESS:  I don't think anyone
129:24      had any evidence nor felt that prostacyclin was
129:25      produced in the vasculature.  No one really knew
129:ESQUIRE DEPOSITION SERVICES
130: Confidential - Subject to Protective Order 130
130: 1      where prostacyclin was produced exactly, in what
130: 2      organs, and the relationship of any of that to the
130: 3      metabolite in the urine.  None of that was known.
```

```
ID:         Scolnick 13005
Page Range: 130:5-130:11
```

```
130: 5          Q.      But you did conduct a clinical trial
130: 6      in 1997 with an individual named Garret FitzGerald;
130: 7      correct?
130: 8          A.      Yes.
130: 9          Q.      And he ran a clinical trial that
130:10      showed that Vioxx suppressed the urinary metabolites
130:11      of prostacyclin; correct?
```

```
ID:         Scolnick 13013
Page Range: 130:13-130:17
```

```
130:13                  THE WITNESS:  Yes.
130:14      BY MR. BUCHANAN:
130:15          Q.      One of the conclusions that was drawn
130:16      by your consultants was that Vioxx was suppressing
130:17      systemic prostacyclin; correct?
```

```
ID:         Scolnick 13020a
Page Range: 130:20-130:22
```

```
130:20                  THE WITNESS:  I don't believe they
130:21      drew that conclusion.  I think they raised that
130:22      question.
```

```
ID:         Scolnick 13109
Page Range: 131:9-131:11
```

```
131: 9                  And if that was happening, there was
131:10      a risk that Vioxx could cause thrombotic events in
131:11      humans; true?
```

```
ID:        Scolnick 13113a
Page Range: 131:13-131:20

  131:13               THE WITNESS:   There was a theory that
  131:14    that could occur with no evidence ever garnered to
  131:15    substantiate or refute that theory.
  131:16    BY MR. BUCHANAN:
  131:17         Q.       Now, that theory was put forth after
  131:18    the drug was marketed or before the drug was
  131:19    marketed?
  131:20         A.       Long before Vioxx ever existed.


ID:        Scolnick 14123
Page Range: 141:23-142:1

  141:23         Q.       You weren't allowed to go out and
  141:24    tell doctors through your sales representatives that
  141:25    Vioxx reduced the serious clinical side effects
  141:ESQUIRE DEPOSITION SERVICES
  142: Confidential - Subject to Protective Order 142
  142: 1    associated with traditional NSAIDs; right?


ID:        Scolnick 14205
Page Range: 142:5-142:9

  142: 5               THE WITNESS:   Serious
  142: 6    gastrointestinal side effects?
  142: 7    BY MR. BUCHANAN:
  142: 8         Q.    Yes.
  142: 9         A.    That is correct.


ID:        Scolnick 15117
Page Range: 151:17-152:4

  151:17         Q.       If you had conducted a CV outcomes
  151:18    trial in 1998, started it in 1998, that would have
  151:19    slowed down the approval process for the drug; true?
  151:20         A.    That is true.
  151:21         Q.       If you had told the FDA, we're
  151:22    concerned, we may have a potential cardiovascular
  151:23    issue with the drug, we'd want to do a CV safety
  151:24    study, that would have slowed down the approval
  151:25    process?
  151:ESQUIRE DEPOSITION SERVICES
  152: Confidential - Subject to Protective Order 152
  152: 1         A.       That would have.  We gave the FDA all
  152: 2    of the data, including Garret FitzGerald's data, in
  152: 3    the NDA and all the other analyses we did
  152: 4    preapproval.


ID:        D ES  15205
```

Page Range: 152:5-152:9

```
152: 5              Q.      You didn't give him the result of a
152: 6    CV outcomes trial preapproval; right?
152: 7              A.      We gave them an analysis of all the
152: 8    cardiovascular events in our NDA, which showed no
152: 9    evidence that Vioxx caused CV events.
```

ID:         Scolnick 15212
Page Range: 152:12-152:13

```
152:12              Q.      You didn't give them the results from
152:13    a CV outcomes trial preapproval, did you?
```

ID:         Scolnick 15215a
Page Range: 152:15-152:24

```
152:15                      THE WITNESS:  There was no -- we did
152:16    not do a separate CV outcomes trial preapproval.
152:17    BY MR. BUCHANAN:
152:18              Q.      So, you couldn't give them the data
152:19    from such a trial?
152:20              A.      I've answered your question.
152:21              Q.      You couldn't give them the data from
152:22    such a trial?  Could you answer that?
152:23              A.      Yes.
152:24              Q.      Thank you.
```

ID:         Scolnick 17405
Page Range: 174:5-174:17

```
174: 5    what's the Data Safety Monitoring Board, sir, in
174: 6    general terms?
174: 7              A.      In general terms, it's an external
174: 8    group that monitors the safety of the Merck trials,
174: 9    for all trials or many trials.
174:10              Q.      And you have a different group for
174:11    each trial or the same group for all trials?
174:12              A.      I think it's a different group for
174:13    each trial because the clinical expertise is --
174:14    different clinical trials, different clinical
174:15    expertise.
174:16              Q.      Did the VIGOR trial have a DSMB?
174:17              A.      Yes, it did.
```

ID:         Scolnick 17421
Page Range: 174:21-175:9

```
174:21              Q.      To be clear in the DSMB's function,
174:22    the DSMB has access to unblinded data during the
174:23    conduct of clinical trials if they want it; correct?
174:24              A.      Yes, I believe that's true.
174:25              Q.      Because their function is to ensure
```

```
174:ESQUIRE DEPOSITION SERVICES
175: Confidential - Subject to Protective Order 175
175: 1     the safety of patients in those clinical trials, at
175: 2     least one of their functions; true?
175: 3            A.     Yes.
175: 4            Q.     Okay.
175: 5                   Do you recall that the DSMB in the
175: 6     VIGOR trial sent a letter to Merck stating that they
175: 7     wanted the cardiovascular events in the VIGOR trial
175: 8     separately analyzed as compared to other safety
175: 9     analyses the company was doing?
```

```
ID:          Scolnick 17516a
Page Range:  175:16-175:17
```

```
175:16                   THE WITNESS:  I became aware of that
175:17     memo long after it was sent to people at MRL.
```

```
ID:          Scolnick 17804
Page Range:  178:4-178:7
```

```
178: 4            Q.     When you saw that letter from Dr.
178: 5     Weinblatt to Dr. Reicin, did that letter suggest to
178: 6     you that Merck may have a cardiovascular issue with
178: 7     Vioxx?
```

```
ID:          Scolnick 17809a
Page Range:  178:9-178:13
```

```
178: 9                   THE WITNESS:  When I saw that letter,
178:10     I wondered what had been in Dr. Weinblatt's mind
178:11     when he sent the letter, and that's what I wondered.
178:12     I hadn't seen the letter.  I don't know what was in
178:13     his mind.
```

```
ID:          Scolnick 17902
Page Range:  179:2-179:12
```

```
179: 2            Q.     You've never spoken to him?
179: 3            A.     I don't recall speaking to Dr.
179: 4     Weinblatt.
179: 5            Q.     Never called him up after you got the
179: 6     results of the VIGOR trial and asked what concerned
179: 7     you and the data you were looking at during the
179: 8     conduct of the trial?
179: 9            A.     No, I never called Dr. Weinblatt.
179:10            Q.     Never asked Dr. Weinblatt why you
179:11     allowed the trial to continue in the face of the
179:12     cardiovascular events in the trial?
```

```
ID:          Scolnick 17914
Page Range:  179:14-179:16
```

```
179:14                    THE WITNESS:  No.  I didn't.  I
179:15    didn't know what data he had.  I never dealt
179:16    directly with DSMBs.


ID:        Scolnick 20322
Page Range: 203:22-204:20

203:22         Q.       Before our break, we were talking
203:23    about -- at least a few moments before our break we
203:24    were talking about your March 9, 2000 e-mail.  Do
203:25    you recall that testimony?
203:ESQUIRE DEPOSITION SERVICES
204: Confidential - Subject to Protective Order 204
204: 1         A.       Yes, I do.
204: 2         Q.       That was the e-mail where you
204: 3    identified that the CV events were "clearly there."
204: 4    Right?
204: 5         A.       Yes.
204: 6         Q.       That it appeared to be "mechanism
204: 7    based" as you "worried it was."  Right?
204: 8         A.       That's what the e-mail says, yes.
204: 9         Q.       And you said it was also "real."
204:10    Right?
204:11         A.       Yes.
204:12         Q.       Then we talked about what Merck and
204:13    you did in response to your initial concerns about
204:14    the CV issues with Vioxx; right?
204:15         A.       Yes.
204:16         Q.       Now, over a period of weeks, you
204:17    reached the conclusion, contrary to your March 9th
204:18    e-mail, that it wasn't Vioxx that was causing the
204:19    problems, it was naproxen that was protecting
204:20    against the problems; is that right?


ID:        Scolnick 20422
Page Range: 204:22-205:10

204:22                    THE WITNESS:  That's correct.
204:23    BY MR. BUCHANAN:
204:24         Q.       You reached that conclusion in, what,
204:25    18 days?
204:ESQUIRE DEPOSITION SERVICES
205: Confidential - Subject to Protective Order 205
205: 1         A.       Within that period of time.
205: 2         Q.       Well, Merck issued a press release to
205: 3    the public on March 27, 2000 letting them know about
205: 4    the CV events in the trial as well as the GI events
205: 5    in the trial; correct?
205: 6         A.       Yes.
205: 7         Q.       And you stated at that point in time
205: 8    that you believed that the explanation for the
205: 9    difference between the two arms was the
205:10    cardioprotective effect of naproxen; correct?
```

ID:          Scolnick 20517
Page Range: 205:17-205:18

205:17                    THE WITNESS:  Yes, that's basically
205:18      what the press release said.


ID:          Scolnick 20706
Page Range: 207:6-207:8

207: 6             Q.      So, within 18 days, you had made a
207: 7      complete 180 in your view as to the cause of the CV
207: 8      events in the VIGOR trial; right?


ID:          Scolnick 207.12-207.15
Page Range: 207:12-207:15

207:12             A.      Yes.  I thought the explanation which
207:13      best explained the results was naproxen's
207:14      cardioprotective activity based on data analysis,
207:15      literature analysis, as I've stated.


ID:          Scolnick 20908
Page Range: 209:8-209:11

209: 8             Q.      Did you bring in anybody who wasn't
209: 9      on the Merck payroll to look at the data from the
209:10      VIGOR trial before you reached the decision that
209:11      naproxen was cardioprotective?


ID:          Scolnick 20914a
Page Range: 209:14-210:3

209:14                    THE WITNESS:  As I've stated, I
209:15      didn't bring in an outside consultant.  I do not
209:16      know who the team might have consulted as outside
209:17      investigators.
209:18      BY MR. BUCHANAN:
209:19             Q.      But you're pretty sure, though, if
209:20      you had told your team, I want to get this data
209:21      looked at by somebody independent of Merck, they
209:22      could have done that; right?
209:23             A.      They could have done it.  I don't
209:24      know whether -- I don't that they didn't do it.
209:25             Q.      But you do know you didn't tell them
209:ESQUIRE DEPOSITION SERVICES
210: Confidential - Subject to Protective Order 210
210: 1      to do it?
210: 2             A.      I did not.  I did not, that is
210: 3      correct.


ID:          D ES  23104

Page Range: 231:4-231:8

```
231: 4              Q.       Sir, did you ever just do a
231: 5      calculation to figure out what the implication to
231: 6      the public could be that were using your drug if
231: 7      your drug really was cardiotoxic, as you thought on
231: 8      March 9?
```

ID:         D ES  23112
Page Range: 231:12-231:15

```
231:12                       THE WITNESS:  The answer to your
231:13      question, I didn't make that calculation.  I
231:14      considered patient safety, as I always have, and all
231:15      the data supported our hypothesis.
```

ID:         Scolnick 231.17
Page Range: 231:17-232:4

```
231:17              Q.       Did you consider the implications to
231:18      the sales of the drug if your initial conclusion was
231:19      the final conclusion?
231:20              A.       Of course.  And that was not part of
231:21      my reason for reaching my conclusion.
231:22              Q.       What was the implication to sales of
231:23      the drug if your initial conclusion was, in fact,
231:24      the final conclusion?
231:25              A.       Sales of the drug would be
231:ESQUIRE DEPOSITION SERVICES
232: Confidential - Subject to Protective Order 232
232: 1      significantly curtailed.  The sales of the drug
232: 2      would be curtailed.  Even with the publicly
232: 3      available information, sales of the drug would be
232: 4      curtailed.
```

ID:         D ES  23205
Page Range: 232:5-232:7

```
232: 5              Q.       So, you knew --
232: 6              A.       And we made all of the data available
232: 7      instantly anyway.
```

ID:         Scolnick 23208
Page Range: 232:8-232:11

```
232: 8              Q.       Did you ever tell the public your
232: 9      initial conclusion?
232:10              A.       I did not because I thought it was an
232:11      error.
```

ID:         D ES  23212
Page Range: 232:12-232:14

```
232:12          Q.      Did you ever send an e-mail out to
232:13     the people on this e-mail list and let them know,
232:14     guys, I think I made a mistake?
```

ID:        D ES  23216
Page Range: 232:16-232:19

```
232:16              THE WITNESS:  Substantial period of
232:17     time later with even more analysis, I told them that
232:18     I thought they had done a great job and that I was
232:19     confident in the safety of the drug.
```

ID:        Scolnick 23221a
Page Range: 232:21-233:9

```
232:21          Q.      Did you ever send an e-mail at the
232:22     end of March 2000 saying, boy, I was way off on
232:23     this --
232:24          A.      No, I did --
232:25          Q.      -- I feel very comfortable with the
232:ESQUIRE DEPOSITION SERVICES
233: Confidential - Subject to Protective Order 233
233: 1     data now?
233: 2          A.      I did not send that in an e-mail like
233: 3     that, no.
233: 4          Q.      In fact, at the end of March, you
233: 5     were still worried, weren't you?
233: 6          A.      Yes, I was, even though I had reached
233: 7     what I thought was the right conclusion.  I always
233: 8     worried about the safety of our drugs, and I
233: 9     continued to worry about it.
```

ID:        D ES  23310
Page Range: 233:10-233:19

```
233:10          Q.      But you weren't so worried to tell
233:11     the FDA, were you?
233:12          A.      The FDA had all the data.  The FDA
233:13     has competent scientists and can judge the data for
233:14     themselves.  They knew that this was a new finding
233:15     potentially for naproxen.  They could interpret the
233:16     data for themselves, and had they been concerned,
233:17     they would have expressed that to us and told us if
233:18     they were that concerned with the aggregate of data,
233:19     do something differently.
```

ID:        Scolnick 23323
Page Range: 233:23-234:2

```
233:23          Q.      Did you tell the FDA you were
233:24     worried?
233:25          A.      I didn't speak to the FDA, and I
```

```
233:ESQUIRE DEPOSITION SERVICES
234: Confidential - Subject to Protective Order 234
234: 1     don't know what the regulatory affairs people told
234: 2     the FDA.
```

ID:           Scolnick 23523
Page Range: 235:23-236:1

```
235:23                  You don't think the FDA or the
235:24     medical community would have been interested in what
235:25     you, Ed Scolnick, were worried about with respect to
235:ESQUIRE DEPOSITION SERVICES
236: Confidential - Subject to Protective Order 236
236: 1     Vioxx?
```

ID:           Scolnick 23603
Page Range: 236:3-236:8

```
236: 3                  THE WITNESS:  If the FDA had wanted
236: 4     to ask me, they would have asked me, and I
236: 5     communicated with members of the medical community
236: 6     in consultants' meetings.  I don't know what the
236: 7     medical community as a whole or the public as a
236: 8     whole would have liked to know.
```

ID:           Scolnick 23618
Page Range: 236:18-236:24

```
236:18          Q.     So, you're saying that if the FDA had
236:19     wanted to figure out what you were thinking in terms
236:20     of concerns about Vioxx, they could have asked you?
236:21     Is that it?
236:22          A.     The FDA could have asked me any time
236:23     if they wanted to.  They had all the data available
236:24     to them.
```

ID:           D ES  23625
Page Range: 236:25-237:5

```
236:25          Q.     And if they asked you, you would have
236:ESQUIRE DEPOSITION SERVICES
237: Confidential - Subject to Protective Order 237
237: 1     told them you were worried?
237: 2          A.     I would have told them my concerns,
237: 3     what we did, what conclusions we reached.
237: 4          Q.     Would you have told them you were
237: 5     worried?
```

ID:           D ES 23709
Page Range: 237:9-237:10

```
237: 9                  THE WITNESS:  I would have told them
```

```
237:10     my concerns --


ID:        D ES  23713
Page Range: 237:13-237:18

237:13                 THE WITNESS:  -- or my worries and
237:14     what the data was and what our conclusions were and
237:15     had a dialogue with them if they had asked me.  My
237:16     regulatory affairs people routinely have discussions
237:17     like that with the FDA.  They are my instrument for
237:18     dealing with the FDA.


ID:        Scolnick 23720b
Page Range: 237:20-238:8

237:20            Q.     Well, ultimately there was an
237:21     Advisory Committee held in February 2001; right?
237:22            A.     I think that date is correct.
237:23            Q.     And it was to consider certain of the
237:24     clinical trial data from VIGOR; right?
237:25            A.     Yes.
237:ESQUIRE DEPOSITION SERVICES
238: Confidential - Subject to Protective Order 238
238: 1            Q.     And in particular, GI safety; right?
238: 2            A.     Yes.
238: 3            Q.     As well as CV safety; true?
238: 4            A.     Correct.
238: 5            Q.     GI being gastrointestinal?
238: 6            A.     Yes.
238: 7            Q.     CV being cardiovascular?
238: 8            A.     Correct.


ID:        Scolnick 24004a
Page Range: 240:4-240:9

240: 4            Q.     You never told the FDA at any point
240: 5     in time to the best of your knowledge that your
240: 6     initial conclusion was that the CV events seen in
240: 7     the VIGOR trial were mechanism based and
240: 8     attributable to Vioxx?
240: 9            A.     I never told them that.


ID:        Scolnick 24218
Page Range: 242:18-242:21

242:18            Q.     Merck submitted a proposed label to
242:19     FDA sometime in 2000; right?
242:20            A.     Yes.  I believe within three months
242:21     of having the VIGOR data.


ID:        Scolnick 24322
Page Range: 243:22-244:14
```

```
243:22                    So, at the end of March of 2000,
243:23    Merck issues a press release and tells the world the
243:24    favorable properties of Vioxx found in the VIGOR
243:25    trial as it relates to GI effects; correct?
243:ESQUIRE DEPOSITION SERVICES
244: Confidential - Subject to Protective Order 244
244: 1         A.       That is correct.
244: 2         Q.       Also discloses that there's an
244: 3    increased number of -- excuse me -- a decreased
244: 4    number of cardiovascular effects in the naproxen arm
244: 5    of the VIGOR trial; right?
244: 6         A.       That's correct.
244: 7         Q.       You didn't tell the public that there
244: 8    was an increased number of cardiovascular events in
244: 9    the Vioxx arm; right?
244:10         A.       The press release was not worded that
244:11    way, that is correct.
244:12         Q.       Okay.  Because that would have
244:13    suggested that Vioxx had actually increased the
244:14    risk; right?
```

ID:             Scolnick 24416
Page Range: 244:16-244:17

```
244:16                    THE WITNESS:  It might have suggested
244:17    that, and we didn't believe that.
```

ID:             D ES 24419
Page Range: 244:19-244:25

```
244:19         Q.       You were trying to convey to people
244:20    that it was, in fact, naproxen that was reducing the
244:21    risk?  That's why you reported the numbers that way?
244:22         A.       We were -- had concluded that it was
244:23    naproxen which had lowered the risk, and the press
244:24    release expressed our view, and it stated this was a
244:25    new finding for naproxen.
```

ID:             Scolnick 24504
Page Range: 245:4-245:7

```
245: 4         Q.       You were trying to convey to people
245: 5    that it was, in fact, naproxen that was reducing the
245: 6    risk of cardiovascular events in the VIGOR trial;
245: 7    true?
```

ID:             Scolnick 24509
Page Range: 245:9-245:10

```
245: 9                    THE WITNESS:  True.  That's the way
245:10    the press release was worded, as I stated before.
```

```
ID:          Scolnick 24517
Page Range: 245:17-245:25

245:17            Q.       Doctor, before we go on, even two
245:18     weeks after you issued the press release, you,
245:19     Merck, issued the press release announcing the VIGOR
245:20     results, Dr. Ed Scolnick was still personally
245:21     worried about what the results from VIGOR really
245:22     meant; true?
245:23            A.       That's correct.
245:24            Q.       And you were worried that Vioxx was
245:25     actually causing cardiovascular events; true?


ID:          Scolnick 24602
Page Range: 246:2-247:19

246: 2                     THE WITNESS:  I was worried that we
246: 3     couldn't exclude an effect of Vioxx, although the
246: 4     major effect, I was convinced, was due to naproxen.
246: 5     BY MR. BUCHANAN:
246: 6            Q.       And you actually told your staff that
246: 7     you personally were actually in minor agony over the
246: 8     issue; true?
246: 9            A.       True.
246:10            Q.       And you told your staff that we're
246:11     not going to know the answer until we do an outcomes
246:12     trial; right?
246:13            A.       That we were not going to know -- we
246:14     were not going to be able to exclude an effect of
246:15     Vioxx until we did an outcomes trial.
246:16            Q.       You told your staff, your project
246:17     team, we will not know for sure what is going on
246:18     until we do an outcomes trial; true?
246:19            A.       True.
246:20            Q.       And you wanted to do a big outcomes
246:21     trial; right?
246:22            A.       Yes.  That's correct.
246:23            Q.       Not some pooled analysis; right?
246:24            A.       That's correct.
246:25            Q.       You wanted to do a 10,000 patient
246:ESQUIRE DEPOSITION SERVICES
247: Confidential - Subject to Protective Order 247
247: 1     study on Vioxx, 10,000 people on a comparator agent;
247: 2     true?
247: 3            A.       True.  That's correct.
247: 4            Q.       You were advocating using Tylenol as
247: 5     the comparator agent; right?
247: 6            A.       That was my idea, yes.
247: 7            Q.       You wanted to do a 20,000 person
247: 8     study in April of 2000 to evaluate the
247: 9     cardiovascular safety of Vioxx; right?
247:10            A.       Correct.
247:11            Q.       It was going to be a head-to-head
247:12     trial, Tylenol on one arm, Vioxx on the other;
247:13     right?
```

```
247:14              A.      That's correct.
247:15              Q.      And when did you run that trial?
247:16              A.      The project team told me that was a
247:17    trial that could not be done because patients
247:18    couldn't be kept on Tylenol who had osteoarthritis
247:19    for that long a period of time.


ID:         D ES  24720
Page Range: 247:20-248:9

247:20              Q.      Is that right?
247:21              A.      That's what --
247:22              Q.      You can't --
247:23              A.      Tylenol is not sufficient as a
247:24    painkiller to patients with osteoarthritis, and,
247:25    therefore, the trial could not be done, and I had to
247:ESQUIRE DEPOSITION SERVICES
248: Confidential - Subject to Protective Order 248
248: 1    accept that because they felt that way unanimously,
248: 2    very strongly, that you couldn't do the trial, and
248: 3    if the alternative was to do it against another
248: 4    comparator nonsteroidal, it might not give as clear
248: 5    an answer.  And so we were in a conundrum about what
248: 6    trial to do at that point.
248: 7              Q.      Well, you were the boss; right?
248: 8              A.      I never asked them to do a trial that
248: 9    they thought was undoable.


ID:         Scolnick 25209a
Page Range: 252:9-253:18

252: 9                      Let's look at this e-mail, then, from
252:10    April 12, 2000 from you to Dr. Reicin.  You wrote
252:11    this late at night; right?
252:12              A.      Yes.  It's dated 10:42 p.m.
252:13              Q.      You sent it with high importance;
252:14    true?
252:15              A.      True.
252:16              Q.      And you wrote:  "Hi Alise.  I have
252:17    been trading e-mails with Doug Greene in real time."
252:18    Who is Doug Greene?
252:19              A.      Doug Greene at the time was head of
252:20    the clinical, regulatory and statistics department
252:21    at Merck, which is usually referred to as
252:22    development.
252:23              Q.      "We all are online too late.  I will
252:24    tell you my worry quotient is high.  I actually am
252:25    in minor agony."  Do you see that?
252:ESQUIRE DEPOSITION SERVICES
253: Confidential - Subject to Protective Order 253
253: 1              A.      I do.
253: 2              Q.      You wrote that?
253: 3              A.      I did.
253: 4              Q.      You meant it?
253: 5              A.      I did.
```