```
253: 6          Q.        "What I really want to do is a 10000
253: 7    versus 10000 patient study in mild - moderate OA
253: 8    Tylenol versus Vioxx with PRN" -- is that
253: 9    preventative?
253:10          A.        No.  It means use if you need.
253:11          Q.        "With PRN low dose ASA."  Is that
253:12    aspirin?
253:13          A.        Yes.
253:14          Q.        "For those judged to need it."
253:15                    Sir, are you telling me that you
253:16    couldn't do a long-term study in patients with even
253:17    mild osteoarthritis, Tylenol versus Vioxx?
253:18          A.        That's what my team told me.
```

```
ID:         Scolnick 25325
Page Range: 253:25-254:4
```

```
253:25          Q.        You continue.  "WE WILL NOT KNOW FOR
253:ESQUIRE DEPOSITION SERVICES
254: Confidential - Subject to Protective Order 254
254: 1    SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY.
254: 2    PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC
254: 3    MEETING."  You wrote that in all caps; right?
254: 4          A.        I did.
```

```
ID:         D ES  25405
Page Range: 254:5-254:8
```

```
254: 5          Q.        When did you do a CV outcomes study
254: 6    of any design comparing Vioxx to a comparator agent
254: 7    with the primary endpoint being cardiovascular
254: 8    events?
```

```
ID:         D ES  25410
Page Range: 254:10-254:18
```

```
254:10                    THE WITNESS:  After debating many
254:11    protocols, we decided that we wanted -- the only way
254:12    we would answer any lingering doubt was to do it
254:13    against placebo and finally came up with a protocol
254:14    for doing that.
254:15    BY MR. BUCHANAN:
254:16          Q.        Right.  You didn't design a specific
254:17    trial with a predetermined endpoint to monitor
254:18    cardiovascular events, though; did you?
```

```
ID:         D ES  25420
Page Range: 254:20-254:23
```

```
254:20                    THE WITNESS:  We did not do that.  We
254:21    aggregated three large trials with a predefined
254:22    endpoint to be cardiovascular mortality with an
254:23    ample power to look for cardiovascular events.
```

```
ID:          Scolnick 26323
Page Range: 263:23-264:8

263:23            Q.      Sir, I'm passing you over what we
263:24    just marked as exhibit, I think it's 7, to your
263:25    deposition.  It's entitled, "VIOXX Outcomes Study
263:ESQUIRE DEPOSITION SERVICES
264: Confidential - Subject to Protective Order 264
264: 1    Potential Designs."  For the record, it is
264: 2    MRK-ABT0014818 to 827.  Do you recognize this as a
264: 3    slide set, sir?
264: 4            A.      That's what it looks like it is.
264: 5            Q.      Okay.  It's entitled, "VIOXX Outcomes
264: 6    Study Potential Designs."  It is a PowerPoint
264: 7    printout.  Is that what it looks like to you?
264: 8            A.      More or less.


ID:          Scolnick 26421
Page Range: 264:21-265:13

264:21            Q.      This document summarizes several
264:22    different outcomes studies concerning cardiovascular
264:23    issues that were being considered in or around April
264:24    of 2000; true?
264:25            A.      Yes.
264:ESQUIRE DEPOSITION SERVICES
265: Confidential - Subject to Protective Order 265
265: 1            Q.      One of the outcomes studies that was
265: 2    being considered was the Vioxx versus Tylenol study;
265: 3    true?
265: 4            A.      Yes.
265: 5            Q.      There's some pros and cons listed
265: 6    there; right?
265: 7            A.      Yes.
265: 8            Q.      One of the pros is, "This study
265: 9    directly addresses the question of the CV safety of
265:10    COX-2 inhibitors."  Do you see that?
265:11            A.      Yes.
265:12            Q.      I read that right; correct?
265:13            A.      Yes.


ID:          Scolnick 26625
Page Range: 266:25-267:17

266:25            Q.      Okay.  There's two cons that are
266:ESQUIRE DEPOSITION SERVICES
267: Confidential - Subject to Protective Order 267
267: 1    listed here; right?
267: 2            A.      Yes.
267: 3            Q.      One is, "Demonstration of a CV
267: 4    difference would likely be due to a COX-2 CLASS
267: 5    effect but would put VIOXX at extreme disadvantage
267: 6    to celebrex and negate existing OA and Alzheimers
```

```
267: 7     data."  Do you see that?
267: 8          A.      I do.
267: 9          Q.      The next point was there was a
267:10     possibility that you detect "small differences from
267:11     Tylenol in GI safety," and that would be of concern;
267:12     true?
267:13          A.      That's what it says.
267:14          Q.      Okay.  You were concerned that if you
267:15     went head-to-head Vioxx versus Tylenol, you might
267:16     highlight some favorable GI safety properties of
267:17     Tylenol.  Isn't that right?
```

ID:        Scolnick 26719
Page Range: 267:19-268:1

```
267:19                    THE WITNESS:  That's what this says.
267:20     I wasn't concerned about that.  That's what this
267:21     says.
267:22     BY MR. BUCHANAN:
267:23          Q.      Okay.
267:24                    There was also a possibility that you
267:25     might be wrong, and the cardiovascular effects seen
267:ESQUIRE DEPOSITION SERVICES
268: Confidential - Subject to Protective Order 268
268: 1     in VIGOR was really due to Vioxx; right?
```

ID:        Scolnick 26803b
Page Range: 268:3-268:4

```
268: 3                    THE WITNESS:  That's what this says
268: 4     as a con for the study.
```

ID:        Scolnick 26816
Page Range: 268:16-268:21

```
268:16                    So, it wouldn't have been unethical
268:17     to do a trial of Vioxx versus Tylenol?
268:18          A.      What I said is it would be undoable
268:19     based on other input people gave me because Tylenol
268:20     would not relieve pain enough to be monotherapy in
268:21     such a trial.
```

ID:        D ES  26822
Page Range: 268:22-269:10

```
268:22          Q.      So, someone was speculating that if
268:23     you did Vioxx versus Tylenol, people may fall out of
268:24     the Tylenol arm over time because it was
268:25     ineffective; is that right?
268:ESQUIRE DEPOSITION SERVICES
269: Confidential - Subject to Protective Order 269
269: 1          A.      Yes.  Not speculating, but saying it
269: 2     just as in -- the same manner as on this slide, that
```

```
269: 3    was another point brought up many times during the
269: 4    discussion.
269: 5         Q.     Well, that's what I'm wondering.   I
269: 6    don't see it on this slide.  Do you see that point
269: 7    raised on this slide, sir?
269: 8         A.     I do not, but it was something people
269: 9    talked about.  Not all points of meetings are on our
269:10    slides.
```

```
ID:          Scolnick 27002a
Page Range:  270:2-270:17
```

```
270: 2               Now, apart from just asking your
270: 3    internal folks and thinking about yourself what type
270: 4    of CV study could be done, you actually consulted
270: 5    with some people from outside Merck; right?
270: 6         A.     Several.
270: 7         Q.     Okay.  You asked them whether a CV
270: 8    study could be designed to evaluate the
270: 9    cardiovascular safety of Vioxx, didn't you?
270:10         A.     I asked them what kind of study could
270:11    be designed, yes.
270:12         Q.     You actually spoke with a John Oates
270:13    about whether a trial could be done to test the CV
270:14    safety of Vioxx; right?
270:15         A.     I don't remember all the people that
270:16    our group talked to.  Dr. Oates was one of our
270:17    consultants on our board of advisors.
```

```
ID:          Scolnick 27110
Page Range:  271:10-271:24
```

```
271:10         Q.     Wasn't it Dr. Oates' view right after
271:11    the VIGOR data was released that you had to do
271:12    another trial comparing Vioxx with aspirin and
271:13    naproxen to see whether Vioxx was cardiotoxic?
271:14         A.     I don't remember.  I really don't
271:15    remember.
271:16         Q.     Do you remember that study design
271:17    being proposed?
271:18         A.     I remember that among several study
271:19    designs, yes.
271:20         Q.     Did you ever do that study?
271:21         A.     That study was not done.
271:22         Q.     You never did a study like that;
271:23    right?
271:24         A.     That study was not done.
```

```
ID:          Scolnick 27521
Page Range:  275:21-275:25
```

```
275:21         Q.     Do you remember Merck dealing with
275:22    Dr. Topol in 2001 concerning the design of a CV
275:23    outcome trial?
```

```
275:24           A.       I believe Merck research scientists
275:25     dealt with Dr. Topol, yes.


ID:            Scolnick 27606
Page Range:    276:6-276:11

276: 6           Q.       You'd agree he's a respected
276: 7     cardiologist?
276: 8           A.       He has a significant reputation in
276: 9     cardiology.
276:10           Q.       He's a respected cardiologist, sir?
276:11           A.       He has a significant reputation.


ID:            Scolnick 27620
Page Range:    276:20-276:22

276:20           Q.       Do you respect Dr. Topol?
276:21           A.       I think there are some things he's
276:22     done in science which have not held up to be true.


ID:            D ES 27702
Page Range:    277:2-277:3

277: 2           Q.       Do you respect Dr. Topol?  Yes or no?
277: 3           A.       I think he --


ID:            D ES 27707
Page Range:    277:7-277:17

277: 7           Q.       Can you answer my question yes or no,
277: 8     sir?
277: 9           A.       I have mixed thoughts about his
277:10     publication record, so, I can't answer your
277:11     question.
277:12           Q.       Did you have mixed thoughts about his
277:13     publication record back in 2001?
277:14           A.       I can't recall.
277:15           Q.       Did you only have a mixed view of his
277:16     publication record after he started to publish
277:17     articles negative to Vioxx?


ID:            D ES  27719
Page Range:    277:19-278:2

277:19                    THE WITNESS:  No.  No.
277:20     BY MR. BUCHANAN:
277:21           Q.       Well, what are you referring to then
277:22     concerning Dr. Topol's mixed publication record?
277:23           A.       I'm referring, one, to his
277:24     meta-analysis of the Vioxx data, which was, I've
277:25     been told by statisticians I respect, a completely
277:ESQUIRE DEPOSITION SERVICES
```

```
278: Confidential - Subject to Protective Order 278
278: 1    flawed analysis, and some of his genetics work which
278: 2    has been proven to be wrong.


ID:          Scolnick 27804
Page Range: 278:4-278:6

278: 4                    So, one of the things that you based
278: 5    your mixed view of Dr. Topol on is the negative
278: 6    study he published concerning Vioxx; correct?


ID:          Scolnick 27808a
Page Range: 278:8-279:5

278: 8                    THE WITNESS:  Base it not on the
278: 9    negative study, base it on the methods which he used
278:10    to do the methods -- the negative study.
278:11    BY MR. BUCHANAN:
278:12          Q.       Let's be clear about what we're
278:13    talking about.
278:14                    In August of 2001, Dr. Topol
278:15    published a study in the Journal of the American
278:16    Medical Association; true?
278:17          A.       True.
278:18          Q.       That study was raising caution about
278:19    the potential for COX-2 inhibitors like Vioxx and
278:20    Celebrex to cause cardiovascular events; true?
278:21          A.       That's what that study claimed to
278:22    have shown.
278:23          Q.       And you're saying that you have
278:24    spoken to statisticians that challenge the work of
278:25    Dr. Topol in terms of its statistical rigor.  Is
278:ESQUIRE DEPOSITION SERVICES
279: Confidential - Subject to Protective Order 279
279: 1    that what you're saying?
279: 2          A.       That's exactly what I'm saying.
279: 3          Q.       Did you tell Dr. Topol that?
279: 4          A.       I've never discussed anything
279: 5    directly with Dr. Topol.


ID:          Scolnick 27910
Page Range: 279:10-279:12

279:10          Q.       Well, did you know that some of your
279:11    scientists went out to talk to Dr. Topol about that
279:12    article even before it was published?


ID:          Scolnick 27914a
Page Range: 279:14-279:23

279:14                    THE WITNESS:  I believe that Dr.
279:15    Reicin told me that she and Dr. Demopoulos, who was
279:16    a cardiologist by training, were going out to see
```

```
279:17      him to discuss the article.
279:18      BY MR. BUCHANAN:
279:19           Q.      And they went out to see him before
279:20      the article in the Journal of the American Medical
279:21      Association was published; right?
279:22           A.      I believe they did.  I believe that's
279:23      what Dr. Reicin told me.
```

ID:           Scolnick 28009
Page Range: 280:9-280:14

```
280: 9           Q.      And the objective was that Dr. Topol
280:10      would not publish the article in the form it
280:11      currently existed because that was negative to
280:12      Vioxx; true?
280:13           A.      Because it was inaccurately done
280:14      statistically.
```

ID:           Scolnick 28202
Page Range: 282:2-282:16

```
282: 2           Q.      Well, the Journal of the American
282: 3      Medical Association has editors; right?
282: 4           A.      Yes, it does.
282: 5           Q.      I mean, Dr. Topol just didn't just
282: 6      publish this article in JAMA by himself; right?
282: 7           A.      That is correct.
282: 8           Q.      There were editors at JAMA who
282: 9      reviewed the article; right?
282:10           A.      I don't know who reviewed the
282:11      article.
282:12           Q.      Well, in your experience, sir, in the
282:13      peer-reviewed medical literature, there are editors
282:14      at medical journals; true?
282:15           A.      There are, but I don't know how that
282:16      article was reviewed or who reviewed it.
```

ID:           Scolnick 28301
Page Range: 283:1-283:5

```
283: 1           Q.      You would agree, sir, that it would
283: 2      be unusual for a journal like JAMA not to have an
283: 3      article like that peer reviewed?
283: 4           A.      It would be unusual, but I don't know
283: 5      what they did.
```

ID:           Scolnick 28311
Page Range: 283:11-283:13

```
283:11              In fact, Merck actually issued a
283:12      press release preemptively to challenge the results
283:13      from that JAMA article, didn't they?
```

ID:          Scolnick 28316a
Page Range: 283:16-283:17

```
283:16                    THE WITNESS:  I don't recall at all
283:17    whether that was done.
```

ID:          Scolnick 28405
Page Range: 284:5-284:17

```
284: 5    if we can get that out.  The peer-reviewed medical
284: 6    literature is the vehicle through which -- is a
284: 7    vehicle through which scientific opinion is
284: 8    exchanged; true?
284: 9             A.      Correct.
284:10             Q.      And the standard way of responding to
284:11    scientific opinion expressed in scientific
284:12    literature is to respond in scientific literature to
284:13    that particular issue raised; true?
284:14             A.      True.
284:15             Q.      It is not standard practice to
284:16    respond to an opinion in a medical article with a
284:17    press release disparaging an article; true?
```

ID:          Scolnick 28420
Page Range: 284:20-285:15

```
284:20                    THE WITNESS:  That's not the usual
284:21    practice.  I don't recall what Merck did.
284:22    BY MR. BUCHANAN:
284:23             Q.      Is that a practice you endorse?
284:24             A.      Absolutely not.
284:25             Q.      The appropriate way to respond is in
284:ESQUIRE DEPOSITION SERVICES
285: Confidential - Subject to Protective Order 285
285: 1    the medical journal itself; true?
285: 2             A.      That is an appropriate way to
285: 3    respond.
285: 4             Q.      You could write a letter to the
285: 5    editor; right?
285: 6             A.      Yes, correct.
285: 7             Q.      You can submit your own article?
285: 8             A.      Correct.
285: 9             Q.      Or you can publish a competing
285:10    article in another journal; right?
285:11             A.      Correct.
285:12             Q.      But one of the things that you think
285:13    would be unusual is to issue a press release to
285:14    respond to an article in the medical literature;
285:15    true?
```

ID:          Scolnick 28517
Page Range: 285:17-285:20

```
285:17                    THE WITNESS:  It would be unusual.
285:18   BY MR. BUCHANAN:
285:19          Q.     And just not right?
285:20          A.     It would be --
```

ID:        Scolnick 28522
Page Range: 285:22-286:1

```
285:22                    THE WITNESS:  It is not a standard
285:23   way of doing it.
285:24   BY MR. BUCHANAN:
285:25          Q.     And certainly nothing you'd endorse?
285:ESQUIRE DEPOSITION SERVICES
286: Confidential - Subject to Protective Order 286
286: 1          A.     That is correct.
```

ID:        Scolnick 29311
Page Range: 293:11-293:20

```
293:11          Q.     But May of 2001, you were still
293:12   interested in a trial to evaluate the CV safety of
293:13   Vioxx; true?
293:14          A.     That is true.  I constantly wanted to
293:15   garner additional data to what we already had to
293:16   further prove what we had concluded.
293:17          Q.     And nobody had come up with an idea
293:18   by 2001 of a CV study that could be done to evaluate
293:19   the cardiovascular safety of Vioxx?  That's your
293:20   testimony?
```

ID:        Scolnick 29323
Page Range: 293:23-294:2

```
293:23                    THE WITNESS:  As the discussions
293:24   evolved, what everybody focused on was a study
293:25   versus placebo, and no placebo-controlled trial had
293:ESQUIRE DEPOSITION SERVICES
294: Confidential - Subject to Protective Order 294
294: 1   yet been brought forth that people were satisfied
294: 2   with the design on.
```

ID:        Scolnick 29608
Page Range: 296:8-296:9

```
296: 8          Q.     Do you remember the VALOR trial, sir?
296: 9          A.     I don't remember that name, no.
```

ID:        Scolnick 29625
Page Range: 296:25-297:19

```
296:25          Q.     Dr. Scolnick, I just passed you over
296:ESQUIRE DEPOSITION SERVICES
```

```
297: Confidential - Subject to Protective Order 297
297: 1    what we marked as Exhibit 10 to your deposition.  It
297: 2    is Bates stamped MRK-ABA0003490 to 3491.  It is a
297: 3    letter from a Carlo Patrono; correct?
297: 4           A.      Yes.  It's from Dr. Patrono.
297: 5           Q.      Ever seen this before?
297: 6           A.      I don't recall.
297: 7           Q.      Who is Dr. Braunwald?
297: 8           A.      Braunwald is a well-known
297: 9    cardiologist at Peter Bent Brigham Hospital.
297:10          Q.      Here in Massachusetts?
297:11          A.      Yes.
297:12          Q.      That's affiliated with Harvard; is
297:13    that right?
297:14          A.      Yes, it is.
297:15          Q.      Merck was actually speaking to
297:16    Dr. Braunwald about running a VALOR trial; right?
297:17          A.      That's what this letter suggests.  I
297:18    remember Dr. Braunwald making suggestions, but I
297:19    don't remember the details involved.
```

```
ID:          Scolnick 29824
Page Range: 298:24-299:11
```

```
298:24          Q.      Well, do you recall at the end of
298:25    2001 there was increased urgency to do a
298:ESQUIRE DEPOSITION SERVICES
299: Confidential - Subject to Protective Order 299
299: 1    cardiovascular study; true?
299: 2           A.      There was, because a number of
299: 3    people, scientists and others, still were
299: 4    questioning whether Vioxx had been a contributor in
299: 5    the VIGOR trial as opposed to naproxen being
299: 6    beneficial.
299: 7           Q.      People were still worried about
299: 8    whether Vioxx was causing cardiovascular events;
299: 9    true?
299:10          A.      There were some people who still were
299:11    raising that question.
```

```
ID:          Scolnick 30012
Page Range: 300:12-301:10
```

```
300:12                  I may have asked you this, but did
300:13    you run the VALOR trial?
300:14          A.      No, I don't think the VALOR trial was
300:15    run.
300:16          Q.      Why not?
300:17          A.      I don't remember why the VALOR trial
300:18    wasn't run.  This sounds like a pretty complicated
300:19    trial to me, and I don't remember why it wasn't run.
300:20          Q.      Was money an issue?
300:21          A.      I don't remember why the VALOR trial
300:22    wasn't run.  As I said, this seems like a fairly
300:23    complicated paragraph here from Dr. Patrono to Dr.
```

```
300:24     Braunwald, so, I'm not able to figure this out
300:25     quickly.
300:ESQUIRE DEPOSITION SERVICES
301: Confidential - Subject to Protective Order 301
301: 1            Q.        Do you see the third paragraph?  It
301: 2     reads, "I have serious reservations about the role
301: 3     of the Sponsor."  The sponsor would be Merck?
301: 4            A.        Presumably.
301: 5            Q.        "I have serious reservations about
301: 6     the role of the Sponsor in monitoring and
301: 7     termination of the study, as well as in the
301: 8     statistical analysis of the results."  Do you see
301: 9     that?
301:10            A.        I do.
```

```
ID:          Scolnick 30515a
Page Range:  305:15-305:19
```

```
305:15                     Following the Advisory Committee in
305:16     2001, a series of negotiations took place with FDA
305:17     concerning the label for Vioxx; right?
305:18            A.        Yes, a very long time before we
305:19     actually got a label from them.
```

```
ID:          Scolnick 31121
Page Range:  311:21-313:3
```

```
311:21            Q.        I want to pass you over what we just
311:22     marked as Exhibit 11 to your deposition.  It's an
311:23     e-mail dated January 31st, 2001 from you to Mr.
311:24     Gilmartin and Mr. Anstice.  The subject is "Monday
311:25     MC."  Do you see that?
311:ESQUIRE DEPOSITION SERVICES
312: Confidential - Subject to Protective Order 312
312: 1            A.        Yes.
312: 2            Q.        "MC" refers to management committee?
312: 3            A.        Yes.
312: 4            Q.        It is Bates stamped MRK-ACR0008985.
312: 5                      You write, I guess it's the second
312: 6     sentence or so:  "The Vigor meeting is next
312: 7     thursday.  On Monday I will show you the essence, an
312: 8     update, of the data that supports Vioxx is safe in
312: 9     the Cv sense.  But I want to point out to all of you
312:10     at one time that 1. there is no way to prove that in
312:11     patients with rheumatoid arthritis that," and you
312:12     put this in all caps, "ALL of the difference between
312:13     Vioxx and naproxen is due to the benefit of
312:14     naproxen."  Do you see that.
312:15            A.        I do.
312:16            Q.        Then you continue.  "IT IS IMPOSSIBLE
312:17     TO PROVE THIS."  That's all caps; right?
312:18            A.        Yes.
312:19            Q.        And you continue further.  "IT IS
312:20     IMPOSSIBLE TO KNOW THIS WITH CERTAINTY."  That's
312:21     what you wrote; right?
```

```
312:22          A.      I did.
312:23          Q.      And that was -- that was your feeling
312:24    as of January 31st, 2001?
312:25          A.      Yes.  That's just what I've just told
312:ESQUIRE DEPOSITION SERVICES
313: Confidential - Subject to Protective Order 313
313: 1    you again.
313: 2          Q.      A week before the Advisory Committee?
313: 3          A.      Yes.


ID:         Scolnick 31325a
Page Range: 313:25-314:15

313:25          Q.      You continue, "Knowing what is about
313:ESQUIRE DEPOSITION SERVICES
314: Confidential - Subject to Protective Order 314
314: 1    to happen, managing the short term fall out, and
314: 2    facing and managing any longer term consequences."
314: 3    "Short term fall out," what are you thinking about
314: 4    there?
314: 5          A.      When all the data is presented again,
314: 6    people will raise questions whether we can prove the
314: 7    negative completely and, therefore, will question
314: 8    whether they should use Vioxx or not.
314: 9          Q.      "Short term fall out" also refers to
314:10    potential impact on Merck stock; right?
314:11          A.      I don't know.  I think I had in mind
314:12    just the effects on Vioxx.
314:13          Q.      Well, the effects of Vioxx would
314:14    include decreased sales of Vioxx; true?
314:15          A.      Yes.


ID:         Scolnick 31511
Page Range: 315:11-315:24

315:11          Q.      Well, did you think that negative
315:12    labeling for Vioxx would have an adverse effect on
315:13    Vioxx sales?
315:14          A.      Certainly.
315:15          Q.      Did you think that if there was a CV
315:16    warning for Vioxx, that that would have a negative
315:17    effect on Vioxx sales?
315:18          A.      Certainly, but I didn't expect a CV
315:19    warning based on the data.
315:20          Q.      Did you think that if there was a CV
315:21    warning on Vioxx, that would also have an effect on
315:22    Merck stock?
315:23          A.      Certainly.  But as I've said, I did
315:24    not expect a CV warning.


ID:         Scolnick 32206
Page Range: 322:6-325:17

322: 6          Q.      And you really thought it was a
```

```
322: 7      challenge in your team to convince the FDA and the
322: 8      Advisory Committee that Vioxx didn't have a
322: 9      cardiovascular problem; true?
322:10           A.      We had all the data which said that
322:11      we didn't have a problem, and we wanted to make sure
322:12      we could present all that data, sure.
322:13           Q.      But it wasn't just a challenge, it
322:14      was almost impossible; right?
322:15           A.      It was impossible to prove the
322:16      negative, which I pointed out in my e-mail note.  It
322:17      was possible to present all the data which supported
322:18      our position.
322:19           Q.      Well, the Advisory Committee went
322:20      well from your perspective; true?
322:21           A.      Yes.  Quite well.
322:22           Q.      Your team did a fantastic job; true?
322:23           A.      Yes.
322:24           Q.      And they made the FDA look like
322:25      "grade d high school students."  Isn't that what you
322:ESQUIRE DEPOSITION SERVICES
323: Confidential - Subject to Protective Order 323
323: 1      said?
323: 2           A.      I did in an e-mail note, yes.  I
323: 3      regret those words, but we did a good job.
323: 4           Q.      You meant them when you wrote it?
323: 5           A.      It was -- I meant them.  It was an
323: 6      allusion to something that had happened a few years
323: 7      ago, but I did write those words.
323: 8           Q.      This is the same FDA that you
323: 9      respect?
323:10           A.      Yes.
323:11           Q.      This is the same FDA that's
323:12      responsible for the public safety?
323:13           A.      That's correct.
323:14           Q.      This is the same FDA that's
323:15      responsible for evaluating the cardiovascular data
323:16      concerning your drug?
323:17           A.      Yes.
323:18           Q.      And you were proud that your team
323:19      made the FDA look like grade D high school students;
323:20      true?
323:21           A.      I wrote those words.  I regret the
323:22      choice of words.  I wrote those words.
323:23              MR. BUCHANAN:  Let's mark as Exhibit
323:24      12, I think, the e-mail you were referring to, sir.
323:25              -   -   -
323:ESQUIRE DEPOSITION SERVICES
324: Confidential - Subject to Protective Order 324
324: 1              (Whereupon, Deposition Exhibit
324: 2              Scolnick-12, E-mails, MRK-ACT0018064,
324: 3              was marked for identification.)
324: 4              -   -   -
324: 5              THE WITNESS:  Yes.
324: 6      BY MR. BUCHANAN:
324: 7           Q.      Dr. Scolnick, I just passed you over
324: 8      Exhibit 12 to your deposition.  It is an e-mail, two
324: 9      e-mails, the earliest of which is an e-mail from you
```

```
324:10      to several folks, subject, "Today."  It's Bates
324:11      stamped MKR-ACT0018064.  It's dated Thursday,
324:12      February 8, 2001, 9:10 p.m. is the time.  Do you see
324:13      that?
324:14           A.      Yes, I do.
324:15           Q.      You wrote this the day of the
324:16      February 2001 Advisory Committee?
324:17           A.      I don't remember the date of the
324:18      meeting.
324:19           Q.      You wrote "To ALL" --
324:20           A.      It looks like it is the same day.
324:21           Q.      "To ALL:  I bit my nails all day."
324:22      You're referring to you listening to the Advisory
324:23      Committee?
324:24           A.      Either listening or being there.  I
324:25      don't remember whether I was there or I viewed it.
324:ESQUIRE DEPOSITION SERVICES
325: Confidential - Subject to Protective Order 325
325: 1           Q.      If you didn't go, you did listen?
325: 2           A.      Yes.
325: 3           Q.      You said, "You all were FANTASTIC."
325: 4      You wrote that in all caps; right?
325: 5           A.      Yes.
325: 6           Q.      You then wrote that "You made them
325: 7      look like grade d high school students."  Right?
325: 8           A.      That's what the memo says.
325: 9           Q.      You say, "and you won big huge and
325:10      completely."  True?
325:11           A.      That's what I said.
325:12           Q.      You wrote that?
325:13           A.      Yes.
325:14           Q.      You note at the end of this that your
325:15      team should, "enjoy and bask in the warmth of having
325:16      done an impossible job superbly."  Is that right?
325:17           A.      That's what I wrote.


ID:          Scolnick 32607
Page Range:  326:7-326:10

326: 7                  You agree it is not very flattering
326: 8      to refer to the agency responsible for protecting
326: 9      the public health as it relates to drugs as "grade d
326:10      high school students."


ID:          Scolnick 32612a
Page Range:  326:12-326:16

326:12                  THE WITNESS:  No, it is not
326:13      flattering.  As I said, it came from an allusion to
326:14      an earlier event related to the crux of an Advisory
326:15      Committee meeting, and it was inappropriate in this
326:16      context.


ID:          Scolnick 32910a
```

Page Range: 329:10-329:24

```
329:10          Q.      So, after this Advisory Committee in
329:11  February of 2001, you got a letter from the FDA
329:12  saying that they were conditionally approving
329:13  Merck's supplemental new drug application; right?
329:14          A.      At some point we got a letter back
329:15  from them, yes.
329:16          Q.      You didn't like the tone of the
329:17  letter, though, did you?
329:18          A.      We didn't like the tone, and we
329:19  didn't like the content.  As I said earlier, they
329:20  ignored all the GI data.  They completely left it
329:21  out.  They left out the Alzheimer's data, and they
329:22  had a warning, despite what had happened at the
329:23  Advisory Committee, where no warning was suggested
329:24  based on all the data, or voted for.
```

ID:             Scolnick 33112
Page Range: 331:12-331:18

```
331:12          Q.      For the record, Dr. Scolnick, I've
331:13  just passed you what we've marked as Exhibit 13 to
331:14  your deposition.  It's a two-page series of e-mails
331:15  Bates stamped MRK-ACR0009151 to 9152.  Doctor, you
331:16  are, in fact, an author and recipient on several of
331:17  these e-mails; true?
331:18          A.      Yes.
```

ID:             Scolnick 33209
Page Range: 332:9-332:25

```
332: 9          Q.      You didn't like the tone of the
332:10  approvable letter you got from Merck's supplemental
332:11  NDA; true?
332:12          A.      That's correct.  I don't remember
332:13  what was in it at this point, so, it's very hard to
332:14  respond to your question.
332:15          Q.      I'll just read the first sentence.
332:16  "To ALL:  I am sure you imagine my reaction to the
332:17  tone of the letter.  The open ended request for
332:18  safety updates is a filibuster."  Do you see that?
332:19          A.      Yes.
332:20          Q.      What's a filibuster?
332:21          A.      It's a delaying tactic.
332:22          Q.      So, you thought the FDA was trying to
332:23  delay approval of your supplemental NDA request to
332:24  get safety information?
332:25          A.      That's what I wrote.
```

ID:             Scolnick 33311
Page Range: 333:11-334:12

```
333:11          Q.      You viewed this is as a delay tactic
```

```
333:12    by the FDA?  Is that your testimony?
333:13         A.       That's what I was worried about.
333:14         Q.       Then you state, "When will you find
333:15    out what they have done for our competitor?  If by
333:16    any chance they get a better label now and we are
333:17    asked for this much more data, I will be in Janet's
333:18    office the next day."  Do you see that?
333:19         A.       Yes.
333:20         Q.       Your competitor would be Celebrex?
333:21         A.       Yes.
333:22         Q.       The manufacturer of Celebrex?
333:23         A.       Yes.
333:24         Q.       Okay.
333:25                  You were concerned that the
333:ESQUIRE DEPOSITION SERVICES
334: Confidential - Subject to Protective Order 334
334: 1    manufacturers of Celebrex were going to get an
334: 2    approved label before Vioxx was going to get an
334: 3    approved label?
334: 4         A.       For GI outcomes, yes, that's what I
334: 5    think I was concerned about.
334: 6         Q.       And if that happened, you were going
334: 7    to go down there to the FDA and see Janet the next
334: 8    day; is that right?
334: 9         A.       That is what I said in the memo.
334:10         Q.       Who is Janet?
334:11         A.       Janet was Janet Woodcock, who was, I
334:12    believe, the head of the drug part of the FDA.


ID:          Scolnick 33420
Page Range: 334:20-334:24

334:20         Q.       So, you felt you could go down there
334:21    to Janet's office, and you could tell her to
334:22    straighten things out and make sure that Merck's
334:23    label got approved on the terms you wanted it
334:24    approved on?


ID:          Scolnick 33501
Page Range: 335:1-335:4

335: 1                  THE WITNESS:  I don't know exactly
335: 2    what I was thinking.  I certainly wanted to advocate
335: 3    on Merck's behalf if this were to happen.  That's
335: 4    what this memo says.


ID:          Scolnick 33512
Page Range: 335:12-335:15

335:12         Q.       Sir, is that the way it's supposed to
335:13    work, when you want to address a labeling request
335:14    with the FDA, you go down, and you go into Janet
335:15    Woodcock's office to address it?
```

ID:         Scolnick 33518
Page Range: 335:18-335:25

335:18              THE WITNESS:  The head of the drug
335:19    office can be involved in labeling negotiations.
335:20    BY MR. BUCHANAN:
335:21              Q.      Is that who Janet Woodcock was?
335:22              A.      I believe at the time she was head of
335:23    the drug approval part of the FDA as opposed to
335:24    vaccines and other parts of the FDA, I believe, but
335:25    I'm not certain.


ID:         Scolnick 33601a
Page Range: 336:1-336:8

336: 1              Q.      So, in other words, if the FDA
336: 2    perchance decided to give the Celebrex manufacturers
336: 3    the label they had sought before you got it, you
336: 4    were going to go down to the, what's this, the head
336: 5    of drug approval and complain?  Is that your
336: 6    testimony?
336: 7              A.      That was -- that's what this note
336: 8    implies.


ID:         Scolnick 34024
Page Range: 340:24-341:5

340:24              Q.      You said that you weren't just going
340:25    to stop with Janet; right?
340:ESQUIRE DEPOSITION SERVICES
341: Confidential - Subject to Protective Order 341
341: 1              A.      That's what this says.
341: 2              Q.      You said you'd go beyond if you
341: 3    needed to with other contacts you'd made in HHS;
341: 4    right?
341: 5              A.      That's what this says.


ID:         Scolnick 34117
Page Range: 341:17-341:20

341:17                      So, you'd go over Janet's head if you
341:18    needed to?
341:19              A.      In order to make scientific points
341:20    which I felt strongly about.


ID:         D ES  34121
Page Range: 341:21-342:5

341:21              Q.      I understand.
341:22                      If you felt strongly and Janet didn't
341:23    give you the answers you wanted, you would go above
341:24    Janet's head; right?

```
341:25           A.       I would argue the science that we
341:ESQUIRE DEPOSITION SERVICES
342: Confidential - Subject to Protective Order 342
342: 1     based our -- particularly, I think, talking about
342: 2     the GI labeling of the drug.  We had pristine data
342: 3     about the GI safety -- the improved GI safety of
342: 4     Vioxx which had not been acknowledged in the
342: 5     approvable letter, to the best of my knowledge.
```

```
ID:           Scolnick 34301
Page Range: 343:1-343:11
```

```
343: 1                    I see the last sentence here you say,
343: 2     "I have never seen being nice to the FDA-except on
343: 3     rare occasions-pay off."  You wrote that?
343: 4           A.       Yes.
343: 5           Q.       You meant it?
343: 6           A.       Yes.
343: 7           Q.       It's a true statement?
343: 8           A.       It was my feeling.
343: 9           Q.       True statement when you wrote it,
343:10     sir?
343:11           A.       It is my feeling when I wrote it.
```

```
ID:           Scolnick 35312a
Page Range: 353:12-353:25
```

```
353:12           Q.       Then you say, "One cannot deal with
353:13     them in a rational way."  Right?
353:14           A.       That's what I said.
353:15           Q.       And rational way was your way; right?
353:16           A.       No.  Rational way was the way we had
353:17     been trying to deal with them when we submitted the
353:18     supplemental NDA, with all of the data that was
353:19     supported at the Advisory Committee meeting.
353:20           Q.       Right.
353:21                    To be clear, what the FDA was asking
353:22     for was additional safety information in their
353:23     approvable letter; true?
353:24           A.       That's what the memo implies.  I do
353:25     not know nor recall what was in that request.
```

```
ID:           Scolnick 35415
Page Range: 354:14-354:19
```

```
354:14     BY MR. BUCHANAN:
354:15           Q.       The bottom line is that the FDA,
354:16     looking for additional data on Vioxx in connection
354:17     with your supplemental NDA request, jeopardized your
354:18     ability to get the label you wanted in the
354:19     marketplace; true?
```

```
ID:           Scolnick 35421
```

Page Range: 354:21-355:5

354:21                    THE WITNESS:  They were retarding the
354:22    process in my opinion.
354:23    BY MR. BUCHANAN:
354:24         Q.        And you needed that process to move
354:25    quickly; right?
354:ESQUIRE DEPOSITION SERVICES
355: Confidential - Subject to Protective Order 355
355: 1         A.        That was our goal.  We wanted it to
355: 2    move quickly.  We had submitted our application very
355: 3    quickly, and it still had been almost a year after
355: 4    the application was submitted, and we didn't yet
355: 5    have a label back.


ID:        D ES  35506
Page Range: 355:6-355:8

355: 6         Q.        Because you were concerned that in
355: 7    the COX-2 market, the drug with the better label
355: 8    would sell more drug; true?


ID:        D ES  35510
Page Range: 355:10-355:13

355:10                    THE WITNESS:  We had substantially
355:11    better gastrointestinal safety data than our
355:12    competitor, and I wanted that to be represented in
355:13    our label.


ID:        Scolnick 35516
Page Range: 355:16-355:19

355:16                    You were concerned that in the COX-2
355:17    market, the company that had the better label for
355:18    its drug would sell more of that drug; true?
355:19         A.        True, if the data supported that.


ID:        Scolnick 35523a
Page Range: 355:23-356:10

355:23         Q.        You did get a label at some point in
355:24    time in connection with your supplemental new drug
355:25    application for Vioxx; true?
355:ESQUIRE DEPOSITION SERVICES
356: Confidential - Subject to Protective Order 356
356: 1         A.        Yes.
356: 2         Q.        You got that in the fall of 2001?
356: 3         A.        I don't recall the exact date.  It
356: 4    was certainly after this in 2001.
356: 5         Q.        Had a CV warning?
356: 6         A.        Yes.
356: 7         Q.        CV means cardiovascular; right?

```
356: 8          A.      Yes.
356: 9          Q.      In the warnings section of the label?
356:10          A.      Yes.
```

ID:             Scolnick 35704
Page Range: 357:4-357:17

```
357: 4          Q.      The label you got from the FDA had a
357: 5  cardiovascular warning in the warnings section;
357: 6  true?
357: 7          A.      I believe so.
357: 8          Q.      You thought it was ugly?
357: 9          A.      I did.
357:10          Q.      You thought it was ugly cubed?
357:11          A.      I did.
357:12          Q.      That's ugly times ugly times ugly;
357:13  right?
357:14          A.      Ugly cubed is exactly what you've
357:15  stated.
357:16          Q.      Ugly three times over; right?
357:17          A.      Right.
```

ID:             Scolnick 36022
Page Range: 360:22-361:4

```
360:22          Q.      Sir, I'm going to pass over what
360:23  we've just marked as Exhibit 14 to your deposition.
360:24  It is a series of e-mails, three of them in
360:25  particular, from October 2001.  For the record, it
360:ESQUIRE DEPOSITION SERVICES
361: Confidential - Subject to Protective Order 361
361: 1  is Bates stamped MRK-ABW0004799.
361: 2          Sir, you've seen this document
361: 3  before; right?
361: 4          A.      Yes, I have.
```

ID:             Scolnick 36114
Page Range: 361:14-362:12

```
361:14          Q.      It is from October 15th, 2001?
361:15          A.      Yes.
361:16          Q.      You said --
361:17          A.      October 16th.
361:18          Q.      You said, "David."  That's David
361:19  Anstice; right?
361:20          A.      Yes.
361:21          Q.      He's the president of U.S. human
361:22  health?
361:23          A.      Yes.
361:24          Q.      That was the group within Merck
361:25  responsible for all the marketing of Vioxx?
361:ESQUIRE DEPOSITION SERVICES
362: Confidential - Subject to Protective Order 362
362: 1          A.      The domestic marketing of Vioxx.
```

```
362: 2          Q.      You told him, "Be assured we will not
362: 3    accept this label." Right?
362: 4          A.      That's what my memo says.
362: 5          Q.      David was concerned about this label;
362: 6    right?
362: 7          A.      Yes.
362: 8          Q.      Okay.
362: 9          Thought it put you at a competitive
362:10    disadvantage; right?
362:11          A.      Yes.  And it didn't accurately
362:12    reflect our data.
```

```
ID:          Scolnick 36213
Page Range: 362:13-363:2
```

```
362:13          Q.      You were telling David that I'm going
362:14    to do what I can to make sure we don't get that
362:15    label; right?
362:16          A.      Yes.
362:17          Q.      I'm going to do what I can to make
362:18    sure there's no CV warning in the Vioxx label;
362:19    right?
362:20          A.      That isn't what this says.  It says,
362:21    "We will not accept this label" and "if we need to
362:22    we will go to an Advisory Committee meeting" to get
362:23    them to review what our label should look like, a
362:24    scientific process to resolve the potential -- a
362:25    potential disagreement between the FDA and Merck.
362:ESQUIRE DEPOSITION SERVICES
363: Confidential - Subject to Protective Order 363
363: 1          Q.      So, you rejected the label you got
363: 2    from the FDA that had the CV warning; true?
```

```
ID:          Scolnick 36304a
Page Range: 363:4-363:18
```

```
363: 4                  THE WITNESS:  We rejected this label
363: 5    in its totality.  It had a CV warning, and it
363: 6    ignored the GI data that we had garnered in VIGOR.
363: 7    BY MR. BUCHANAN:
363: 8          Q.      David responded to you, "We knew it
363: 9    would be UGLY and it is." Right, he said that to
363:10    you?
363:11          A.      Yes.
363:12          Q.      He also said, "We'll fight back and
363:13    see where we get." Right?
363:14          A.      Yes.  That's what he said.
363:15          Q.      And he again said, we'll "ask for an
363:16    advisory committee" if we can't make headway with
363:17    the FDA; right?
363:18          A.      That's what he said.
```

```
ID:          Scolnick 36412
Page Range: 364:12-365:12
```

```
364:12           Q.       You then say here in the final one,
364:13   your final e-mail from October 16, 2001, "It is ugly
364:14   cubed."  Right?
364:15           A.       Yes.
364:16           Q.       You say, "thye," that should be they;
364:17   right?
364:18           A.       Yes.
364:19           Q.       "Thye are bastards."  True?
364:20           A.       That's what the e-mail says.
364:21           Q.       That's what you wrote?
364:22           A.       That's what I wrote.
364:23           Q.       You meant it when you wrote it?
364:24           A.       I was very upset when I wrote the
364:25   e-mail.
364:ESQUIRE DEPOSITION SERVICES
365: Confidential - Subject to Protective Order 365
365: 1           Q.       So, this particular group within the
365: 2   FDA was devious and antagonistic; true?
365: 3           A.       That's what I wrote.
365: 4           Q.       They were bastards?
365: 5           A.       That reflected my emotional
365: 6   unhappiness with their label.
365: 7           Q.       They had the ability of grade D high
365: 8   school students; true?
365: 9           A.       That's what I wrote.
365:10           Q.       And if you wanted to get anything
365:11   done with them, you couldn't treat them with
365:12   respect; true?


ID:       Scolnick 36514
Page Range: 365:14-365:22

365:14                    THE WITNESS:  I wrote all of these
365:15   things, and I felt that we were not getting a fair
365:16   process from this division.
365:17   BY MR. BUCHANAN:
365:18           Q.       The FDA was pretty insistent this
365:19   drug needed a cardiac warning, weren't they?
365:20           A.       They presented this label to us, so,
365:21   they must have felt that way.  This division felt
365:22   that way.


ID:       Scolnick 36603
Page Range: 366:3-366:9

366: 3           Q.       You took from that that the FDA at
366: 4   least was concerned about the potential
366: 5   cardiovascular implications of your drug; true?
366: 6           A.       Yes.
366: 7           Q.       And they wanted to warn the American
366: 8   public about the potential cardiovascular
366: 9   implications of Vioxx; true?
```

ID:          Scolnick 36611b
Page Range:  366:11-366:13

366:11                    THE WITNESS:  Yes, despite the
366:12       Advisory Committee meeting, which had not felt that
366:13       way.

ID:          Scolnick 37115a
Page Range:  371:15-371:23

371:15                    Dr. Scolnick, I just passed you what
371:16       we marked as Exhibit 15 to your deposition.  It's a
371:17       three e-mail sequence from November 8, 2001.  The
371:18       subject here says "History lesson."  Do you see
371:19       that?
371:20            A.       Uh-huh, yes, I do.
371:21            Q.       It's an exchange between initially
371:22       from you to Doug Greene and Bonnie Goldmann; true?
371:23            A.       Yes.

ID:          Scolnick 37218
Page Range:  372:18-373:3

372:18            Q.       You said, "Doug and Bonnie twice in
372:19       my life I've had to say to FDA 'That label is
372:20       unacceptable, we will not under any circumstances
372:21       accept it.'"  Do you see that?
372:22            A.       Yes, I do.
372:23            Q.       You continue there and you say, "You
372:24       WILL," in all caps, will, "have to do that on the
372:25       cardiac warning for Vioxx.  I assure you that you
372:ESQUIRE DEPOSITION SERVICES
373:  Confidential - Subject to Protective Order 373
373: 1       will."  That's what you wrote; right?
373: 2            A.       I did.  You skipped an intervening
373: 3       sentences.

ID:          Scolnick 37312a
Page Range:  373:12-374:2

373:12            Q.       Paragraph continues where I was
373:13       before, "You WILL," in all caps will, "have to do
373:14       that on the cardiac warning for Vioxx.  I assure you
373:15       that you will."  Did I read that right?
373:16            A.       Yes, you did.
373:17            Q.       You put "will" in emphasis to these
373:18       people; right?
373:19            A.       Yes, I did.
373:20            Q.       And these were the people who were
373:21       dealing with the FDA in connection with the label
373:22       negotiations; right?
373:23            A.       Yes.
373:24            Q.       You told them, "And I assure you I
373:25       will NOT," and again in all caps, "NOT sign off on

```
373:ESQUIRE DEPOSITION SERVICES
374: Confidential - Subject to Protective Order 374
374: 1    any label that had a cardiac warning."  True?
374: 2           A.     That's what the e-mail says.


ID:         Scolnick 37610
Page Range: 376:10-376:15

376:10           Q.     So, you negotiated with the FDA over
376:11    this label concerning cardiac and GI warnings from
376:12    October of 2001 until April of 2002; true?
376:13           A.     That's correct.  Because we believed
376:14    that the drug did not justify having a cardiac
376:15    warning based on our data.


ID:         D ES  37616
Page Range: 376:16-376:24

376:16           Q.     Does the drug justify a cardiac
376:17    warning today?
376:18           A.     No.
376:19           Q.     It doesn't?
376:20           A.     It does not justify a cardiac warning
376:21    based on this data.  And the new data that you're
376:22    referring to is in very different context and
376:23    completely consistent with all the data we had here
376:24    where we didn't believe it justified a warning.


ID:         Scolnick 381.11-382.02
Page Range: 381:11-382:2

381:11           Q.     Doctor, I passed you over what we
381:12    marked as Exhibit 16 to your deposition.  It is a
381:13    relatively brief e-mail, Bates stamped
381:14    MRK-ACR0009297 dated February 25th, 2002 from you
381:15    again to this same team of people working on the
381:16    negotiations over the Vioxx label; true?
381:17           A.     Yes.
381:18           Q.     You wrote, "To ALL:  If you can get
381:19    this label it will be an Al Michaels quote:  'Do you
381:20    believe in miracles?'"  What are you referring to
381:21    there?
381:22           A.     I'm referring to Al Michael's quote
381:23    when the U.S. Olympic team beat the Russians in
381:24    whatever year it was in ice hockey.
381:25           Q.     It was like an impossible task;
381:ESQUIRE DEPOSITION SERVICES
382: Confidential - Subject to Protective Order 382
382: 1    right?
382: 2           A.     It certainly appeared to be.


ID:         Scolnick Part 3 (5-17-05)
```

```
ID:          Scolnick 41512
Page Range: 415:12-415:15

   415:12              Q.      Sir, passing over what we just marked
   415:13        as Exhibit 18 to your deposition.  For the record,
   415:14        it's a January 28, 2001 e-mail from yourself to Eve
   415:15        Slater.


ID:          Scolnick 41524
Page Range: 415:24-416:1

   415:24              Q.      Okay.  Do you see your e-mail at the
   415:25        top?
   416: page 416
   416: 1              A.      Yes, I do.


ID:          Scolnick 416.06-416.12
Page Range: 416:6-416:12

   416: 6              Q.      Then you continue, "This Fries
   416: 7        incident is a disaster for Merck."  Do you see that?
   416: 8              A.      Yes, I do.
   416: 9              Q.      You wrote that?
   416:10              A.      I did.
   416:11              Q.      You believed it at the time?
   416:12              A.      I did.


ID:          Scolnick 41621
Page Range: 416:21-417:5

   416:21              Q.      Then you continued.  "Worse than
   416:22        Vigor results themselves."  Do you see that?
   416:23              A.      Yes.
   416:24              Q.      The VIGOR results were also a
   416:25        disappointment for Merck; true?
   417: page 417
   417: 1              A.      Some of them were surprising, as you
   417: 2        know, and some of them were excellent.
   417: 3              Q.      Okay.
   417: 4                      And the ones that were surprising
   417: 5        were the cardiovascular effects of Vioxx; true?


ID:          Scolnick 41708
Page Range: 417:8-418:6

   417: 8                      THE WITNESS:  The difference between
   417: 9        naproxen and Vioxx was surprising in the VIGOR
   417:10        results.
   417:11        BY MR. BUCHANAN:
   417:12              Q.      Well, you said, "Worse than Vigor
   417:13        results themselves."  That's what you wrote; right,
   417:14        sir?
   417:15              A.      I did.
```

```
417:16              Q.      You were implying that the VIGOR
417:17     results were disappointing in some way; true?
417:18              A.      I was implying that the difference
417:19     between the Vioxx and naproxen arms were surprising
417:20     and created an issue which we had dealt with and
417:21     come up with what we thought was the best
417:22     explanation based on all the other data.
417:23              Q.      Well, sir, you didn't write "more
417:24     surprising" than the VIGOR results themselves when
417:25     you wrote this e-mail, did you?
418: page 418
418: 1              A.      No, I did not.
418: 2              Q.      You wrote, "Worse than VIGOR
418: 3     results"?
418: 4              A.      That's what I wrote.  It's a very
418: 5     short e-mail.  That's what I wrote.
418: 6              Q.      I understand.
```

ID:        Scolnick 46512
Page Range: 465:12-465:22

```
465:12              Q.      You'd agree with me, sir, wouldn't
465:13     you, that if you were wrong in your final conclusion
465:14     about Vioxx, and the problem was mechanism based,
465:15     that there could have been horrible public health
465:16     consequences to the folks who were taking Vioxx in
465:17     the general population; true?
465:18              A.      If we had been wrong, there would
465:19     have been serious consequences, yes.
465:20              Q.      Tens of thousands of people in the
465:21     general population taking Vioxx could have suffered
465:22     heart attacks as a result of your drug; true?
```

ID:        Scolnick 46601
Page Range: 466:1-466:3

```
466: 1                      THE WITNESS:  If we had been wrong,
466: 2     there would have been negative consequences for
466: 3     public health.  We did not believe we were wrong.
```

ID:        D ES  46612
Page Range: 466:12-466:22

```
466:12                      THE WITNESS:  I've read newspaper
466:13     reports of those.  I do not have any independent way
466:14     of assessing that evidence or the validity of those
466:15     reports.
466:16     BY MR. BUCHANAN:
466:17              Q.      Well, you've seen the FDA reports as
466:18     well; right?
466:19              A.      I've seen newspaper reports of the
466:20     FDA reports of incidences in trials.  I don't
466:21     understand the calculations made from those based on
466:22     the data I've seen.
```

ID:            Scolnick 46722
Page Range: 467:22-467:25

467:22          Q.      Merck has the skilled employees
467:23      necessary to estimate what the public health
467:24      consequences could be of a drug that it made that
467:25      caused cardiovascular side effects; true?


ID:            Scolnick 46802
Page Range: 468:2-468:9

468: 2                  THE WITNESS:  Merck can estimate what
468: 3      the consequences would be if the drug were thought
468: 4      by Merck to cause cardiovascular consequences.
468: 5      BY MR. BUCHANAN:
468: 6          Q.      And in March of 2000, no such
468: 7      analysis was done?
468: 8          A.      Correct.  Because we didn't believe
468: 9      the drug caused those events.


ID:            Scolnick 46915
Page Range: 469:15-469:18

469:15                  You agree with the decision by Merck
469:16      not to analyze the potential public health
469:17      consequences to continuing to sell Vioxx in March of
469:18      2000?


ID:            Scolnick 46921
Page Range: 469:21-469:22

469:21                  THE WITNESS:  Yes, I do, because we
469:22      believed the drug was safe.


ID:            Scolnick 47101a
Page Range: 471:1-472:11

471: 1          Q.      Sir, I just passed you a document we
471: 2      marked as Exhibit 19 to your deposition.
471: 3                       -  -  -
471: 4                  (Whereupon, Deposition Exhibit
471: 5                  Scolnick-19, "Vioxx Preliminary
471: 6                  Cardiovascular Meta-Analysis," Slide
471: 7                  Set, 10-18-00 (Shapiro), MRK-NJ0070364 -
471: 8                  MRK-NJ0070397, was marked for
471: 9                  identification.)
471:10                       -  -  -
471:11      BY MR. BUCHANAN:
471:12          Q.      For the record, it's a document by
471:13      Deborah Shapiro.  Who is Deborah Shapiro?
471:14          A.      Deborah Shapiro was a statistician in

471:15          the Merck Research Laboratories.
471:16               Q.        She was the unblinded statistician in
471:17     the VIGOR trial; right?
471:18               A.        Yes, she was.
471:19               Q.        She's the statistician you contacted
471:20     to get an early look at the VIGOR data; right?
471:21               A.        To look at the data first when the
471:22     trial is completed.  That is correct.
471:23               Q.        For the record, the document is
471:24     entitled "Vioxx Preliminary Cardiovascular
471:25     Meta-Analysis," and it is Bates stamped
472: page 472
472: 1     MRK-NJ0070364 through 397.
472: 2                         So, your testimony is that the
472: 3     company conducted a meta-analysis preapproval?  That
472: 4     was the first time; right?
472: 5               A.        Yes.
472: 6               Q.        In March of 2000; right?
472: 7               A.        Yes.
472: 8               Q.        And then again in October of 2000;
472: 9     correct?
472:10               A.        As I said, I don't remember the dates
472:11     of all the other meta-analyses.


ID:        Scolnick 47322
Page Range: 473:22-474:16

473:22               Q.        Okay.  I would like to direct your
473:23     attention to Page NJ0070394.
473:24               A.        (Witness reviewing document.)
473:25                         Yes.
474: page 474
474: 1               Q.        This is a "meta-analysis" that
474: 2     describes the "Relative Risk of MIs," that's heart
474: 3     attacks?
474: 4               A.        Yes.
474: 5               Q.        The "MI Endpoint with 95% CI."
474: 6     What's "CI" mean?
474: 7               A.        Confidence interval.
474: 8               Q.        What does confidence interval
474: 9     represent, sir?
474:10               A.        It's a term that describes the bounds
474:11     in which to analyze statistical significance.
474:12               Q.        And if the confidence interval is
474:13     greater than 1 or if the confidence -- if the
474:14     confidence interval doesn't encompass 1, it
474:15     indicates that the finding is statistically
474:16     significant; true?


ID:        Scolnick 47419a
Page Range: 474:19-474:19

474:19                         THE WITNESS:  I believe that's true.

ID:         Scolnick 47512
Page Range: 475:12-476:13

```
475:12                  At the bottom of the page it says
475:13      "Total Cohort."  Do you see that?
475:14          A.      Yes, I do.
475:15          Q.      What's a cohort?
475:16          A.      A cohort is a group of patients
475:17      that's been studied in this meta-analysis.
475:18          Q.      And then to the right it says "2.02."
475:19      Do you see that?
475:20          A.      Uh-huh.
475:21          Q.      That's the relative risk --
475:22          A.      Yes, I do, I'm sorry.
475:23          Q.      That's the relative risk of heart
475:24      attacks among all studies for NSAIDs versus Vioxx;
475:25      true?
476: page 476
476: 1          A.      That is, I think, what this plots,
476: 2      non-naproxen and naproxen NSAIDs.
476: 3          Q.      That's right.
476: 4                  And the confidence interval, again,
476: 5      is what, sir?
476: 6          A.      The confidence interval for 2.0?
476: 7          Q.      For the 2.02.
476: 8          A.      Is 1.14 to 3.55.
476: 9          Q.      And the fact that the confidence
476:10      interval does not go below 1 indicates that the 2.02
476:11      relative risk is statistically significant; true?
476:12          A.      Yes.  This, I believe, aggregates
476:13      both naproxen and non-naproxen NSAIDs.
```

ID:         Scolnick 47618
Page Range: 476:18-477:5

```
476:18          Q.      What does statistical significance
476:19      refer to, sir?
476:20          A.      That 95 times out of 100, the result
476:21      is an accurate one and not by chance.  There's only
476:22      a 5 percent chance that the result is a fluke.
476:23          Q.      Okay.
476:24                  And a relative risk of 2.02 in this
476:25      total cohort indicates a doubling of the risk of
477: page 477
477: 1      heart attacks among all of Merck's studies --
477: 2          A.      What you --
477: 3          Q.      -- comparing NSAIDs to Vioxx; true?
477: 4          A.      Comparing all NSAIDs including
477: 5      naproxen to Vioxx.  That's what this plots, yes.
```

ID:         Scolnick 47707
Page Range: 477:7-477:18

```
477: 7                  If you'd turn the page, sir, you see
477: 8      an additional chart.  Again, "MI Endpoint," that's
```

```
477: 9          heart attack endpoint; right?
477:10               A.     Yes.
477:11               Q.     It says "Rofecoxib versus NSAIDS."
477:12          Vioxx is rofecoxib; right?
477:13               A.     Yes.
477:14               Q.     And again reflects 2.02 being the
477:15          relative risk for all patients compared rofecoxib to
477:16          NSAIDs; true?
477:17               A.     To all NSAIDs.  As I've said,
477:18          naproxen and non-naproxen.
```

ID:         Scolnick 47821a
Page Range: 478:21-478:25

```
478:21               Q.     Well, sir, would you endorse a
478:22          decision not to give an MI-only meta-analysis to the
478:23          FDA?
478:24               A.     That should be part of any
478:25          submission.
```

ID:         Scolnick 48009
Page Range: 480:9-480:18

```
480: 9               Q.     And you wouldn't endorse a decision
480:10          not to give unfavorable safety data to the FDA,
480:11          would you?
480:12               A.     I would endorse that all of the data
480:13          be submitted to the FDA.
480:14               Q.     Did you become aware of the results
480:15          of Merck's meta-analysis?
480:16               A.     I was shown summaries of
480:17          meta-analyses, yes, but I don't recall the details
480:18          of what was in those summaries at this point.
```

ID:         Scolnick 48115
Page Range: 481:15-482:8

```
481:15               Q.     Okay.  Sir, let me pass over to you
481:16          what we just marked as Exhibit 20 to your
481:17          deposition.
481:18                              -  -  -
481:19                      (Whereupon, Deposition Exhibit
481:20               Scolnick-20, Letter 1-8-01, with
481:21               attachment, "IND 46,894: VIOXX
481:22               (rofecoxib)" "Interim Cardiovascular
481:23               Meta-Analysis," MRK-NJ0267715 -
481:24               MRK-NJ0267777, was marked for
481:25               identification.)
482: page 482
482: 1                              -  -  -
482: 2          BY MR. BUCHANAN:
482: 3               Q.     For the record, sir, I just passed
482: 4          you what we've marked as Exhibit 20 to your
482: 5          deposition.  It's a January 8, 2001 letter from a
```

```
482: 6          Robert Silverman, Senior Director of Regulatory
482: 7          Affairs to somebody at the FDA; is that right, sir?
482: 8               A.     Yes, correct.


ID:        Scolnick 48301
Page Range: 483:1-483:9

483: 1               Q.     It's a transmittal of information to
483: 2          the FDA?
483: 3               A.     Yes, it is.
483: 4               Q.     Transmittal of information to the FDA
483: 5          concerning Vioxx?
483: 6               A.     Yes.
483: 7               Q.     Transmittal of the "Interim
483: 8          Cardiovascular Meta-Analysis" for Vioxx; true?
483: 9               A.     Yes.  Yes, that's correct.


ID:        Scolnick 48517
Page Range: 485:17-487:4

485:17               Q.     Is there an MI meta-analysis in the
485:18          submission to the FDA?
485:19               A.     The meta-analysis done in this
485:20          document I do not see in this document.  I do see,
485:21          and it is important to point out, all of the data on
485:22          the four pages I cited to you.
485:23               Q.     And what you're trying to highlight,
485:24          sir, is that certain MI information was encompassed
485:25          within the APTC endpoint; right?
486: page 486
486: 1               A.     That is what I'm trying to point out,
486: 2          yes.
486: 3               Q.     But Merck did a specific analysis
486: 4          looking at the incidence of heart attacks across all
486: 5          of its trials; true?
486: 6               A.     That is indicated in this document,
486: 7          in the first document that you showed me in this
486: 8          discussion.
486: 9               Q.     That document is Exhibit 19; right?
486:10               A.     Yes, it is.
486:11               Q.     Merck did an MI meta-analysis in
486:12          October 2000; true?
486:13               A.     Yes, that's true.
486:14               Q.     And didn't give it to the FDA in
486:15          January 2001; true?
486:16               A.     The specific figures are not included
486:17          in the submission to the FDA.  The data is included.
486:18               Q.     Well, not only the figures, sir, the
486:19          MI meta-analysis is not in that submission to the
486:20          FDA; correct?
486:21               A.     That is correct.
486:22               Q.     There might be some heart attack data
486:23          in that submission to the FDA; right?
486:24               A.     There is heart attack data in this
486:25          submission.
```

```
487: page 487
487: 1            Q.       But there's not an MI meta-analysis
487: 2      in Exhibit 20; right?
487: 3            A.       Not that I could find, no.  It does
487: 4      not -- it's not there.
```

ID:         Scolnick 48712
Page Range: 487:11-487:20

```
487:11      BY MR. BUCHANAN:
487:12            Q.       Is it your testimony that you were
487:13      never consulted by regulatory within Merck Research
487:14      Labs as to whether to give the MI meta-analysis or
487:15      not to give it to the FDA?
487:16            A.       That is my testimony.  I was never
487:17      consulted on that point.
487:18            Q.       Do you endorse the decision not to
487:19      give that MI meta-analysis to the FDA in January
487:20      2001?
```

ID:         Scolnick 48723a
Page Range: 487:23-487:25

```
487:23                     THE WITNESS:  I would have had no
487:24      objection to their submitting all of the
487:25      meta-analyses.
```

ID:         Scolnick 48903
Page Range: 489:3-489:14

```
489: 3            Q.       So, if your group didn't consult --
489: 4      if your group didn't submit this information to the
489: 5      FDA, they disregarded your standard operating
489: 6      procedure?
489: 7            A.       The standard operating procedure in
489: 8      the labs is to submit all data to the FDA.  All the
489: 9      data is in here.  The specific meta-analysis is not
489:10      included in this document.
489:11            Q.       You say all the data is in there,
489:12      sir, but there's not an MI meta-analysis in that
489:13      document; right?
489:14            A.       That is correct.
```

ID:         Scolnick 49006
Page Range: 490:6-490:9

```
490: 6            Q.       Yeah, but the one thing we can agree
490: 7      is, there's not an MI meta-analysis reflected in
490: 8      that particular document, the January 2001
490: 9      submission to the FDA; right?
```

ID:         Scolnick 49012

Page Range: 490:12-490:17

```
490:12                THE WITNESS:  There's no -- there's
490:13    no MI meta-analysis that I can find in the January
490:14    8th document.
490:15    BY MR. BUCHANAN:
490:16        Q.        And you didn't give it to the
490:17    Advisory Committee in February 2001 either, did you?
```

ID:        Scolnick 49021
Page Range: 490:21-491:2

```
490:21                THE WITNESS:  I don't recall what was
490:22    in the presentation.  I don't recall ever having
490:23    seen this first document, Exhibit 19, and I don't
490:24    recall ever having seen the second document which
490:25    was submitted.  I had an excellent group, and they
491: page 491
491: 1    handled the submissions to the FDA and the
491: 2    preparation for the Advisory Committees.
```

ID:        Scolnick 49918a
Page Range: 499:18-499:25

```
499:18                The company ultimately published a
499:19    meta-analysis concerning cardiovascular events in
499:20    the peer-reviewed literature, didn't it?
499:21        A.        Yes.  I believe it did in Circulation
499:22    or another cardiovascular journal.
499:23        Q.        Fall of 2001.  Does that sound right?
499:24        A.        Sounds approximately right.  I don't
499:25    remember the date.
```

ID:        Scolnick 50011
Page Range: 500:11-500:22

```
500:11        Q.        Dr. Scolnick, I just passed you over
500:12    what we marked as Exhibit 21 to your deposition.  Is
500:13    this the publication of the meta-analysis you were
500:14    just referring to?
500:15        A.        I think it was the one you were just
500:16    referring to.  It is one of the ones I recall.  It
500:17    is one I recall.  I don't recall whether others were
500:18    published.
500:19        Q.        And to be clear, this is an October
500:20    2001 article published in the journal Circulation;
500:21    correct?
500:22        A.        Yes.  Correct.
```

ID:        Scolnick 50716
Page Range: 507:16-507:18

```
507:16        Q.        So, you were testing the drug in
```

```
507:17      Alzheimer's patients; right?
507:18            A.      Yes.
```

ID:          Scolnick 50902b
Page Range: 509:3-509:10

```
509: 3            Q.      When your team was before the
509: 4      Advisory Committee that was convened to evaluate the
509: 5      safety of Vioxx in February 2001, that team cited
509: 6      the Alzheimer's data as data that was reassuring on
509: 7      the safety of the drug; true?
509: 8            A.      Yes.  The Advisory Committee was
509: 9      convened to go over the gastrointestinal data, and
509:10      as part of that, all of the data on Vioxx.
```

ID:          Scolnick 51607a
Page Range: 516:7-516:12

```
516: 7            Q.      Sir, I'm passing you over what we
516: 8      just marked as Exhibit 22 to your deposition.  For
516: 9      the record, it's Bates stamped MRK-ABP016650.  It
516:10      runs through Page 677.  It is a document entitled
516:11      "Vioxx AD Program."  Do you see that heading, sir?
516:12            A.      Yes, I do.  Yes.
```

ID:          Scolnick 51907
Page Range: 519:7-519:8

```
519: 7            Q.      "AD" is Alzheimer's disease?
519: 8            A.      Yes.
```

ID:          Scolnick 52302
Page Range: 523:2-523:11

```
523: 2            Q.      Now, if the company had a drug that
523: 3      would prevent the onset of Alzheimer's disease, that
523: 4      would be a significant medical discovery.  You would
523: 5      agree with that?
523: 6            A.      Yes, it would.
523: 7            Q.      And a significant revenue opportunity
523: 8      for the company; correct?
523: 9            A.      They would go together.  It would be
523:10      a magnificent discovery for medical and for
523:11      patients.
```

ID:          Scolnick 52914
Page Range: 529:14-529:21

```
529:14            Q.      Okay.  That's the APPROVe trial
529:15      that's being referenced there, isn't it?
529:16            A.      Yes, I believe so.
529:17            Q.      You'd agree with me, sir, that those
```

```
529:18        three paragraphs don't say anything about that trial
529:19        being conducted to test the cardiovascular safety of
529:20        Vioxx?
529:21            A.      Yes, I'd agree with that.
```

ID:        Scolnick 53020
Page Range: 530:20-531:2

```
530:20            Q.      Sir, the page continues and it
530:21        discusses the Alzheimer's disease trials; true?
530:22            A.      Yes.
530:23            Q.      Okay.
530:24                    Merck is telling its shareholders
530:25        here that it is in the process of testing Vioxx in
531: page 531
531: 1        Alzheimer's patients; true?
531: 2            A.      Yes.
```

ID:        D ES  53109
Page Range: 531:9-531:10

```
531: 9        saying that we're studying it.  It really doesn't
531:10        state whether it will or won't work.  It outlines
```

ID:        Scolnick 53113a
Page Range: 531:13-531:20

```
531:13            Q.      Okay.
531:14                    And just getting back now to where we
531:15        were, a treatment for Alzheimer's disease presented
531:16        a significant revenue opportunity for Merck if Vioxx
531:17        was able to demonstrate a reduction in the incidence
531:18        of Alzheimer's disease; true?
531:19            A.      Yes.  And as we said, an important
531:20        medical finding.
```

ID:        Scolnick 53815
Page Range: 538:15-538:16

```
538:15            Q.      Okay.  Let's take a step forward and
538:16        understand the death data in the Alzheimer's trials.
```

ID:        Scolnick 53901a
Page Range: 539:1-539:9

```
539: 1            Q.      Sir, I'm passing over what we just
539: 2        marked as Exhibit 24 to your deposition.  It is a
539: 3        multi-page memo to you from a Dr. Gilbert Block.
539: 4                    For the record, it is Bates stamped
539: 5        MRK-NJ0333225 to 35.  I don't know if I indicated
539: 6        this, but it is dated March 21st, 2001?
539: 7                    Doctor, have you seen this before?
```

```
539: 8              A.      I don't recall seeing it.  It is
539: 9     addressed to me.


ID:         Scolnick 54308
Page Range: 543:8-543:18

543: 8              Q.      I think what we're looking at here,
543: 9     sir, right, is that 14 people died on Vioxx, 3 died
543:10     in placebo in this trial; true?
543:11              A.      Yes, that's true.
543:12              Q.      And 95 times out of 100, when you ran
543:13     this trial, you'd get the same result; right?
543:14              A.      That's what statistical significance
543:15     implies, yes.
543:16              Q.      So, 95 out of 100 times, if you reran
543:17     this trial, 14 would die on Vioxx, 3 would die on
543:18     placebo?


ID:         Scolnick 54324
Page Range: 543:24-544:6

543:24              Q.      So, in this particular trial, 11
543:25     people died on Vioxx more than died on placebo;
544: page 544
544: 1     true?
544: 2              A.      Yes, that's correct.
544: 3              Q.      Did you tell old people around the
544: 4     country who were taking this drug, we have this
544: 5     trial, 11 excess deaths were found in this trial,
544: 6     sir?


ID:         Scolnick 54408a
Page Range: 544:8-544:9

544: 8                      THE WITNESS:  I don't recall what
544: 9     information was disseminated on the trial.


ID:         Scolnick 54604
Page Range: 546:4-546:7

546: 4              Q.      So, the 11 patients who died
546: 5     unnecessarily in protocol 091 as compared to the
546: 6     placebo arm, died and they got no benefit from Vioxx
546: 7     in this trial; true?


ID:         Scolnick 54610
Page Range: 546:10-546:13

546:10                      THE WITNESS:  There were 11 patients
546:11     who died in the trial more than in placebo.  The
546:12     aggregate group did not benefit from Vioxx based on
546:13     the statistical efficacy of the trial.
```

ID:          Scolnick 55115
Page Range: 551:15-552:15

```
551:15                    Apart from the 091 trial, we also
551:16    know there was a second progression trial, that's
551:17    the 126 trial.  We established that this morning;
551:18    right?
551:19             A.    Yes.
551:20             Q.    Okay.
551:21                   There was also an Alzheimer's disease
551:22    prevention trial; true?
551:23             A.    Yes.
551:24             Q.    Okay.
551:25                   The folks in Merck Research Labs
552: page 552
552: 1    looked at the incidence of death in that trial, too,
552: 2    didn't they?
552: 3             A.    I don't recall the categories they
552: 4    looked at.  Death would be collected in any trial.
552: 5             Q.    Well, you see in the memo we were
552: 6    just looking at from Dr. Block, it says, "All deaths
552: 7    in the ongoing prevention trial...and the terminated
552: 8    second progression trial...will be unblinded and
552: 9    evaluated."  Do you see that?
552:10             A.    Yes, I do.
552:11             Q.    Okay.
552:12                   So, it's your understanding that the
552:13    deaths in the other trials were also looked at;
552:14    true?
552:15             A.    That's what this implies.
```

ID:          Scolnick 55304a
Page Range: 553:4-553:5

```
553: 4             Q.    Sir, I've just passed you over what
553: 5    we have marked as Exhibit 25 to your deposition.
```

ID:          Scolnick 55321
Page Range: 553:21-556:14

```
553:21                    Do you agree with me, sir, that this
553:22    document is a combined intention to treat and
553:23    on-drug analysis of the death data in both protocol
553:24    091 and protocol 078?
553:25             A.    Yes, that's what the summary document
554: page 554
554: 1    -- the summary page on the front page states, yes.
554: 2             Q.    Okay.
554: 3                   If you'd turn to the next page, sir,
554: 4    it identifies the mortality analysis or the death
554: 5    analysis for the 091 and 078 trials on an
554: 6    intent-to-treat basis.  Do you see that at the
554: 7    bottom of the first page?
```

```
554: 8           A.      It does it for both protocols, yes.
554: 9           Q.      Number of deaths on Vioxx, 13.  Do
554:10  you see that?
554:11           A.      Yes.
554:12           Q.      Number of deaths on placebo, 3?
554:13           A.      Yes.  That's the trial we were
554:14  looking at.
554:15           Q.      Okay.
554:16                   It is about what, four times as high,
554:17  a little more than four?
554:18           A.      Yes.
554:19           Q.      Okay.  Go down to the ITT analysis
554:20  for protocol 078.  Do you see that below it?
554:21           A.      Yes.
554:22           Q.      Okay.
554:23                   Number of deaths on Vioxx, 21; right?
554:24           A.      Yes.
554:25           Q.      Number of deaths on placebo, 9;
555: page 555
555: 1   right?
555: 2           A.      Yes.
555: 3           Q.      And there's a rate next to each of
555: 4   those numbers; right?
555: 5           A.      There is.
555: 6           Q.      And the rate for Vioxx is what, a
555: 7   little under two-and-a-half times greater than the
555: 8   rate for placebo?
555: 9           A.      Yes.
555:10           Q.      And what that means is that
555:11  two-and-a-half times as many people died taking
555:12  Vioxx in the 078 trial as of this point in time as
555:13  compared to placebo; true?
555:14           A.      Yes.
555:15           Q.      Okay.
555:16                   If you'd turn to Page 755, internal
555:17  numbering, 4, Bates number, 755.
555:18           A.      Just a moment, please.
555:19           Q.      Feel free.
555:20           A.      (Witness reviewing document.)
555:21                   Okay.  Thank you.
555:22                   Where do you want me to turn, 755?
555:23           Q.      I'm sorry.  756.
555:24           A.      Excuse me, I want to look at one
555:25  other thing.
556: page 556
556: 1           Q.      There's calculations of something
556: 2   called a "hazard ratio."  Do you see that?
556: 3           A.      Just a moment.
556: 4                   (Witness reviewing document.)
556: 5                   On 756.  756?
556: 6           Q.      Yeah.  There's a paragraph in between
556: 7   the charts.  It says, "From the mortality frequency
556: 8   and incident rate charts for protocol 091."  Do you
556: 9   see that?
556:10           A.      Yes, yes.
556:11           Q.      And there's a hazard ratio
556:12  calculation in the last sentence for the 091 trial.
```

```
556:13      Do you see that?
556:14            A.    Yes, I do.


ID:         Scolnick 55707
Page Range: 557:7-558:2

557: 7                  4.43 would be the relative increased
557: 8      risk of death on Vioxx compared to placebo; true?
557: 9            A.    The relative increase in risk, yes.
557:10            Q.    Okay.
557:11                  So, folks on Vioxx in the 091 trial
557:12      were 4.4 times more likely to die compared to those
557:13      on placebo; true?
557:14            A.    It's a hazard ratio.  I think that's
557:15      true.
557:16            Q.    Okay.
557:17                  If you'd turn the page, sir, you look
557:18      at the results for the 078 trial, paragraph
557:19      beginning, "From the mortality frequency and
557:20      incident rate charts for protocol 078."  Do you see
557:21      that?
557:22            A.    Yes.
557:23            Q.    Then it says at the end, "After
557:24      adjusting for Age and Gender, the hazard ratio
557:25      between" Vioxx "and placebo was 2.55."  Do you see
558: page 558
558: 1      that sentence?
558: 2            A.    Yes.


ID:         Scolnick 558.9-558.22
Page Range: 558:9-558:22

558: 9            Q.    That indicates that folks on Vioxx
558:10      were 2.55 times more likely to die than patients on
558:11      placebo; true?
558:12            A.    Yes.
558:13            Q.    Okay.  So, let me understand, sir.
558:14      As of this point in time, April 8, 2001, the company
558:15      has two independent placebo-controlled trials
558:16      demonstrating a statistically significant increase
558:17      in the risk of death; true?
558:18            A.    Yes.
558:19            Q.    Okay.  In the one trial, 091, there
558:20      was a four times greater risk of death on Vioxx
558:21      compared to placebo; true?
558:22            A.    Yes.


ID:         Scolnick 56025
Page Range: 560:25-561:13

560:25                  Well, you'd agree that mortality data
561: page 561
561: 1      is important; right?
561: 2            A.    Yes, it is.
```

```
561: 3              Q.       That's the kind of data that a
561: 4      physician should know; right?
561: 5              A.       Yes, they should.
561: 6              Q.       Any doubt in your mind that
561: 7      physicians would like to know whether your drug,
561: 8      Merck's drug, increased the risk of death?
561: 9              A.       It's data that should have -- a
561:10      physician should know.
561:11              Q.       Any doubt that the FDA would have
561:12      wanted to know right after you knew this that Vioxx
561:13      increased the risk of death?
```

ID:           Scolnick 56118
Page Range: 561:18-561:20

```
561:18                      THE WITNESS:  I don't know when -- I
561:19      don't know that this data was not submitted to the
561:20      FDA.  I don't know what was done with this data.
```

ID:           Scolnick 56221
Page Range: 562:21-562:25

```
562:21                      The conclusions that were reached
562:22      within Merck concerning the statistically
562:23      significant increased risk of death should have been
562:24      shared with FDA no later than 15 days after this
562:25      analysis; right?
```

ID:           Scolnick 56302
Page Range: 563:2-563:13

```
563: 2                      THE WITNESS:  That's the usual
563: 3      reporting time for data like this.
563: 4      BY MR. BUCHANAN:
563: 5              Q.       Did Merck send out a "Dear Doctor"
563: 6      letter telling physicians around the country that
563: 7      we've got these two trials, and we've got a
563: 8      statistically significant increased risk of death?
563: 9              A.       I don't recall them sending out a
563:10      "Dear Doctor" letter, no.
563:11              Q.       Did Merck issue a press release
563:12      telling doctors the same information?
563:13              A.       I don't recall a press release.
```

ID:           Scolnick 56316
Page Range: 563:16-564:2

```
563:16                      Did Merck publish a letter in the New
563:17      England Journal of Medicine telling physicians about
563:18      the findings from these two trials?
563:19              A.       I don't recall such a letter.
563:20              Q.       Publish a letter anywhere in the
563:21      medical literature to get word out promptly that old
```

563:22      people are at a substantially increased risk of
563:23      death on the drug?
563:24              A.      I don't recall a letter being written
563:25      about these trials in the way you're asking the
564: page 564
564: 1      question.
564: 2              Q.      This was all on your watch; right?


ID:          Scolnick 56404
Page Range: 564:4-565:4

564: 4                      THE WITNESS:  This occurred while I
564: 5      was president of research, yes.
564: 6      BY MR. BUCHANAN:
564: 7              Q.      Right.  And the responsibility for
564: 8      communicating the scientific messages learned from
564: 9      clinical trials in Merck Research Labs was
564:10      ultimately yours; true?
564:11              A.      Yes.  I was not shown this data.
564:12              Q.      Is that your position now, you were
564:13      not shown this data?
564:14              A.      I don't recall having seen this data.
564:15              Q.      Are you disavowing you had any
564:16      knowledge of the statistically significant increased
564:17      risk in death in the 078 and 091 trials in April of
564:18      2001?
564:19              A.      I don't recall anything about 078.
564:20      What I've told you I recall about 091 is what I've
564:21      said, that there was an imbalance of events and that
564:22      they weren't due to cardiovascular -- an excess of
564:23      cardiovascular events.  That is all I recall about
564:24      the Alzheimer's data.
564:25              Q.      Well, the one thing we do know and
565: page 565
565: 1      you know now looking at this memo is that there were
565: 2      statistically significant increased numbers of
565: 3      deaths on Vioxx compared to placebo as of April
565: 4      2001; true?


ID:          Scolnick 56506
Page Range: 565:6-565:10

565: 6                      THE WITNESS:  The analyses that are
565: 7      here indicate that, yes.
565: 8      BY MR. BUCHANAN:
565: 9              Q.      And you don't think that was due to
565:10      chance?


ID:          Scolnick 56515
Page Range: 565:15-565:17

565:15              A.      It was statistically significant.
565:16              Q.      And you don't think that was due to
565:17      chance?

ID:          Scolnick 56519a
Page Range: 565:19-565:20

```
565:19                   THE WITNESS:  Therefore, it was not
565:20       likely due to chance.
```

ID:          Scolnick 56612
Page Range: 566:12-566:21

```
566:12            Q.       Sir, I'm passing you over what we
566:13       just marked as Exhibit 26 to your deposition.  It's
566:14       an e-mail, a series of e-mails beginning with an
566:15       e-mail to you from Dr. Gilbert Block.  Do you see
566:16       that?
566:17            A.       Where are we?  We are starting at the
566:18       bottom?
566:19            Q.       Starting at the bottom.  That would
566:20       be the earliest in time e-mail; correct?
566:21            A.       Yes.
```

ID:          Scolnick 56806
Page Range: 568:6-568:9

```
568: 6            Q.       And you wrote, "Doug, When I read
568: 7       this note about 30 minutes ago I tried to call you
568: 8       at home."  Do you see that?
568: 9            A.       I do.
```

ID:          Scolnick 56818
Page Range: 568:18-568:22

```
568:18            Q.       You were upset that Dr. Block shared
568:19       this information before a committee meeting before
568:20       he shared it with you; isn't that right?
568:21            A.       I don't remember what I was upset
568:22       about.
```

ID:          Scolnick 56912
Page Range: 569:12-570:7

```
569:12                   You then get a response from Dr.
569:13       Greene; right?
569:14            A.       Yes.
569:15            Q.       He notes in the middle of his
569:16       response that you're going to be before the FDA on
569:17       April 11th to discuss labeling issues; right?
569:18            A.       Yes.
569:19            Q.       He then notes, "I expect that we will
569:20       need to inform them of this in some way since we
569:21       have included the CV events from the AD trials."  Do
569:22       you see that?
```

```
569:23                A.      Yes.
569:24                Q.      CV events are cardiovascular events?
569:25                A.      Yes.
570: page 570
570: 1                Q.      And the AD trials, that's Alzheimer's
570: 2      disease again; right?
570: 3                A.      Yes.
570: 4                Q.      And what he's saying is, you're going
570: 5      to have to talk to the FDA about the mortality data;
570: 6      right?
570: 7                A.      He says cardiovascular events, yes.
```

```
ID:          Scolnick 57123
Page Range:  571:23-572:3
```

```
571:23                        Well, sir, is it your testimony that
571:24      the folks in regulatory who went down to talk to the
571:25      FDA on April 11th about labeling issues would not
572: page 572
572: 1      have checked with you before going to determine what
572: 2      message should be communicated about Alzheimer's
572: 3      data?
```

```
ID:          Scolnick 57206
Page Range:  572:6-572:19
```

```
572: 6                        THE WITNESS:  Yes.  They wouldn't
572: 7      necessarily have discussed with me the details of
572: 8      what they talked to with FDA.
572: 9      BY MR. BUCHANAN:
572:10                Q.      So, if the folks from Merck who went
572:11      down and talked to FDA on labeling issues on April
572:12      11th didn't disclose any of the mortality data, that
572:13      was their decision and not yours?  That's what
572:14      you're saying?
572:15                A.      I don't know what they disclosed, but
572:16      I did not give them any instructions, to the best of
572:17      my recollection, on what to disclose or not to
572:18      disclose to the FDA.  And I think most of the
572:19      content of this e-mail indicates that.
```

```
ID:          Scolnick 57304
Page Range:  573:4-574:7
```

```
573: 4                Q.      Sir, I'm going to pass you over what
573: 5      we're marking as Exhibit 27 to your deposition.  For
573: 6      the record, it's a document titled, "FDA - MRL
573: 7      Meeting."  "MRL," that's Merck Research Labs?
573: 8                A.      Yes.
573: 9                Q.      Okay.
573:10                        Then it's got an NDA number.  That's
573:11      the NDA number for VIGOR?
573:12                A.      That's what it seems to indicate.
573:13                Q.      Okay.
```

```
573:14                  April 11, 2001.  Do you see that?
573:15          A.      Yes, I do.
573:16          Q.      That's the date Doug Greene was
573:17    stating that you were going to be -- excuse me,
573:18    Merck was going to be before the FDA to discuss
573:19    labeling issues; right?
573:20          A.      Yes.
573:21          Q.      Take a quick look at the document,
573:22    sir.  Do you see any reference to two trials
573:23    demonstrating statistically significant increased
573:24    rates of death in the report of this particular
573:25    meeting?
574: page 574
574: 1          A.      (Witness reviewing document.)
574: 2                  I don't see a comment about that in
574: 3    this summary.
574: 4          Q.      So, folks from Merck Research Labs
574: 5    and the regulatory group within Merck went down to
574: 6    the FDA on April 11, 2001 to talk about labeling for
574: 7    Vioxx; true?
```

```
ID:        Scolnick 57410
Page Range: 574:10-574:15
```

```
574:10                  THE WITNESS:  There was a meeting on
574:11    labeling of Vioxx on April 11th, yes.
574:12    BY MR. BUCHANAN:
574:13          Q.      That was the meeting where Doug
574:14    Greene suggested we should report this Alzheimer's
574:15    death data from the 091 trial; right?
```

```
ID:        Scolnick 57418
Page Range: 574:18-575:2
```

```
574:18                  THE WITNESS:  I haven't had a chance
574:19    to read his e-mail to me, so, he says in the e-mail,
574:20    "I expect that we will need to inform them of this
574:21    in some way since we have included the CV events
574:22    from the AD trials."  Yes, I think he is suggesting
574:23    that.
574:24    BY MR. BUCHANAN:
574:25          Q.      Well, did you tell him not to do
575: page 575
575: 1    that?
575: 2          A.      Absolutely not.
```

```
ID:        Scolnick 57512
Page Range: 575:11-575:15
```

```
575:11    BY MR. BUCHANAN:
575:12          Q.      Do you endorse the decision not to
575:13    disclose two trials that have statistically
575:14    significant doubling in the rates of death to the
575:15    FDA?
```

```
ID:        Scolnick 57520
Page Range: 575:20-575:21

  575:20                  THE WITNESS:  I do not endorse that
  575:21     decision, if that's what was done.


ID:        Scolnick 59501
Page Range: 595:1-595:14

  595: 1             Q.     Dr. Scolnick, we're going to shift
  595: 2     gears a little bit.  I want to talk about your role
  595: 3     in the marketing of Vioxx.  Okay?
  595: 4             A.     Uh-huh.
  595: 5             Q.     You did have a role in the marketing
  595: 6     of Vioxx; correct, sir?
  595: 7             A.     Not a direct role, no.
  595: 8             Q.     You assisted the marketing function
  595: 9     within Merck in connection with the marketing of
  595:10     Vioxx; true?
  595:11             A.     Only in the initial data discussions
  595:12     with marketing about what the data was in the file.
  595:13     I did not prepare marketing information or approve
  595:14     it or see it before it was used.


ID:        Scolnick 59614
Page Range: 596:14-597:12

  596:14                  Well, the document I just passed you
  596:15     and we marked as Exhibit 30 to your deposition is a
  596:16     memo from Wendy Dixon to you dated May 8th, 2000;
  596:17     right?
  596:18             A.     Yes.
  596:19             Q.     Bates stamped MRK-ABI0002126 to 2128.
  596:20     I take it you've seen this before, sir?
  596:21             A.     I don't remember.  Perhaps.  I don't
  596:22     specifically recall it.
  596:23             Q.     Well, sir, do you have any reason to
  596:24     doubt that you received the memo from Wendy Dixon
  596:25     from May of 2000 that was sent to your attention and
  597: page 597
  597: 1     your attention alone?
  597: 2             A.     No, I don't have any reason to doubt
  597: 3     it, but I don't recall at the moment, except I'm
  597: 4     reading it now.
  597: 5             Q.     The subject line of this particular
  597: 6     memo is, "Renal and Cardiovascular Issues for
  597: 7     VIOXX." True?
  597: 8             A.     Yes.
  597: 9             Q.     Okay.
  597:10                  In fact, Wendy Dixon was in charge of
  597:11     the marketing effort for Vioxx; true?
  597:12             A.     Yes, I believe that's true.
```

```
ID:          Scolnick 59802
Page Range: 598:2-598:10

  598: 2              Q.      Well, if you'd turn to the last page
  598: 3      of the document, sir, it's Bates stamped ABI
  598: 4      0002128.  Do you see the paragraph beginning, "David
  598: 5      mentioned"?
  598: 6              A.      Last page?  Oh, yes, I do.
  598: 7              Q.      In fact, you offered to Mr. Anstice
  598: 8      to assist in developing responses to the competitive
  598: 9      messages that were out on the market concerning
  598:10      Vioxx and Celebrex; true?


ID:          Scolnick 59812
Page Range: 598:12-598:13

  598:12                      THE WITNESS:  That's what the memo
  598:13      says, yes.


ID:          Scolnick 59910
Page Range: 599:10-599:24

  599:10                      In particular, you were going to
  599:11      assist in responding to the cardiovascular issues
  599:12      being addressed by Pfizer as it related to Vioxx;
  599:13      true?
  599:14              A.      That's what she requests at the
  599:15      beginning of the first page of the memo.
  599:16              Q.      If you'd look at the third numbered
  599:17      paragraph on Page 2 -- well, let me take a step
  599:18      back.
  599:19                      This document is describing in
  599:20      particular the steps that are being taken by Wendy
  599:21      Dixon on behalf of the marketing department of Merck
  599:22      to respond to the competitive challenges that are
  599:23      being raised by Pfizer against Vioxx; true?
  599:24              A.      That's what it appears to be.


ID:          Scolnick 60018
Page Range: 600:18-601:18

  600:18                      So, she's telling you what materials
  600:19      the sales force has to respond to the cardiovascular
  600:20      issues concerning Vioxx; right?
  600:21              A.      Yes.
  600:22              Q.      The third item there is "A
  600:23      cardiovascular card to handle the thromboembolic
  600:24      events issue."  Do you see that?
  600:25              A.      Yes, I do.
  601: page 601
  601: 1              Q.      It says, "It compares cardiovascular
  601: 2      thromboembolic AEs for VIOXX comparator NSAIDs...and
  601: 3      placebo."  Do you see that?
```

```
601: 4              A.    Yes.
601: 5              Q.    And then a bunch of the NSAIDs that
601: 6     are compared across the nine osteoarthritis trials
601: 7     are referenced there; right?
601: 8              A.    Correct.
601: 9              Q.    You've seen that cardiovascular card,
601:10     haven't you?
601:11              A.    I don't recall it.
601:12              Q.    Okay.  Well, the next paragraph says,
601:13     "Copies of the renal card, cardiovascular card, and
601:14     the Rossat paper are attached."  Do you see that?
601:15              A.    I do.  I still don't recall.
601:16              Q.    Any reason to doubt that Ms. Dixon
601:17     was telling the truth when she said she was giving
601:18     you these things for your review?
```

ID:            Scolnick 60120
Page Range:  601:20-601:25

```
601:20                    THE WITNESS:  She was giving them to
601:21     me.  I don't think I was given them for review.  I
601:22     think she says in the paragraph that the
601:23     representatives already have this information.  I
601:24     don't recall these cards, and I don't recall
601:25     discussing the cards with her at all.
```

ID:            Scolnick 63216
Page Range:  632:16-632:20

```
632:16                    Q.    Mortality information, total
632:17     mortality information is important information that
632:18     should have been included in the CV card that was
632:19     used by sales representatives to respond to
632:20     physician inquiries concerning the drug; true?
```

ID:            Scolnick 63222a
Page Range:  632:22-633:5

```
632:22                    THE WITNESS:  I think a CV card
632:23     should have contained all cardiovascular-related
632:24     information from the variety of data sources Merck
632:25     has, and --
633: page 633
633: 1     BY MR. BUCHANAN:
633: 2              Q.    Would --
633: 3              A.    -- if there was mortality data
633: 4     associated with those trials, each of the trials and
633: 5     what the data was in each of the trials.
```

ID:            Scolnick 69925
Page Range:  699:25-700:9

```
699:25              Q.    Okay.  I want to start with you a
```

```
700: page 700
700: 1        section on the labeling of the drug and the
700: 2        progression of the labels of the drug.  You were
700: 3        intimately involved in that process; correct, sir?
700: 4              A.      I certainly knew what was going on,
700: 5        yes.
700: 6              Q.      When the drug was first brought on
700: 7        the market, it had a standard NSAID GI warning;
700: 8        correct?
700: 9              A.      I believe that's correct.
```

```
ID:           Scolnick 70221
Page Range:  702:21-703:9
```

```
702:21                        Now, here we have a label which
702:22        appears to me anyway to be Merck's proposal to the
702:23        FDA post-VIGOR.  Am I correct that that's what this
702:24        document represents, Exhibit 39, sir?
702:25              A.      What's the date of this?
703: page 703
703: 1              Q.      It says, "Original Label Submission."
703: 2        I'm working with documents that were produced by
703: 3        Merck, so, I can tell you Bates Numbers and I can
703: 4        tell you what it says, and it says "Original Label
703: 5        Submission for VIGOR."
703: 6              A.      Well, if that's what it says, I
703: 7        assume it is the original submission for VIGOR.  The
703: 8        VIGOR study is referenced in this label, so, that's
703: 9        probably what it is.
```

```
ID:           Scolnick 70322
Page Range:  703:22-704:1
```

```
703:22                        There's no cardiovascular warning
703:23        that's given on the drug relative to risks of
703:24        cardiovascular events or increase of risk of
703:25        cardiovascular events as was proven in the VIGOR
704: page 704
704: 1        study; correct, sir?
```

```
ID:           Scolnick 70406
Page Range:  704:6-704:9
```

```
704: 6                        THE WITNESS:  The VIGOR study, as I
704: 7        told you, we did not believe indicated Vioxx
704: 8        increased CV events and, therefore, there was no
704: 9        warning in this label.  That is correct.
```

```
ID:           Scolnick 70417
Page Range:  704:17-704:18
```

```
704:17              Q.      When the FDA got this proposal, was
704:18        that their view of the data?
```

ID:        Scolnick 70425
Page Range: 704:25-705:13

```
704:25                  THE WITNESS:  The data was presented
705: page 705
705: 1     in an Advisory Committee.  That was their view of
705: 2     the data.  It was Merck's view of the data.  And the
705: 3     FDA chose, I think in their first resubmission to
705: 4     us, to take a different interpretation, yes.
705: 5     BY MR. KLINE:
705: 6          Q.     They did.
705: 7                 Did they suggest that there be a
705: 8     warning on the drug, sir, based on the VIGOR data?
705: 9          A.     Yes, they did.
705:10          Q.     And did Merck say, certainly we're
705:11     interested in public safety, and a warning would be
705:12     a good idea on a drug where there might be a
705:13     problem?  Is that what Merck said, sir?
```

ID:        Scolnick 70516
Page Range: 705:16-705:19

```
705:16                  THE WITNESS:  Merck did not believe
705:17     there was a cardiovascular risk associated with
705:18     Vioxx, and as this warning indicates, there is
705:19     cardiovascular risk, we objected to that label.
```

ID:        Scolnick 76802
Page Range: 768:2-768:5

```
768: 2                  THE WITNESS:  If they were looking
768: 3     only at the label?
768: 4     BY MR. KLINE:
768: 5          Q.     Yes.
```

ID:        Scolnick 76713
Page Range: 767:13-767:24

```
767:13          Q.     Well, do you know, I can only ask you
767:14     what you know today, do you know of any label change
767:15     that was made between March of 2000 and April of
767:16     2002 reporting the VIGOR results in a label to the
767:17     prescribing physicians of this country and around
767:18     the world?
767:19          A.     No, I do not.
767:20          Q.     So, prescribing physicians who were
767:21     going by the label of your drug between March of
767:22     2000 and April of 2002, they're just looking at the
767:23     label, they wouldn't know anything about the VIGOR
767:24     results; correct?
```

```
ID:         Scolnick 76807
Page Range: 768:7-768:14

    768: 7                   THE WITNESS:  I don't know what they
    768: 8   would be thinking.  The label was not changed on
    768: 9   VIGOR until, as you pointed out, April 2002.
    768:10   BY MR. KLINE:
    768:11        Q.      There is an obligation by a
    768:12   responsible pharmaceutical company to keep the label
    768:13   both clear and accurate and to timely update it;
    768:14   correct?


ID:         Scolnick 76816
Page Range: 768:16-768:16

    768:16                  THE WITNESS:  Yes.


ID:       Scolnick Part 4 (8-16-05)

ID:         Scolnick_8-16_1138.3-1138.8
Page Range: 1138:3-1138:8

    1138: 3        Q.      You said in writing, sir, in an
    1138: 4   e-mail that for Vioxx, the CV outcomes study is the
    1138: 5   only essential study, and you were saying that as of
    1138: 6   September 17, 2001, long after the VIGOR results
    1138: 7   were known; correct?
    1138: 8        A.      That is correct.  And a study to get


ID:         Scolnick 124912
Page Range: 1249:12-1250:9

    1249:12        Q.      Did Merck Research Labs or Merck ever
    1249:13   do a study to evaluate adverse events of most
    1249:14   concern, heart attacks and unstable angina, prior to
    1249:15   approval, where they gave people aspirin?
    1249:16        A.      I'm not aware that that study was
    1249:17   done.
    1249:18        Q.      Why didn't you do it?
    1249:19        A.      I'm unaware of this data, I don't
    1249:20   know why, and so the suggestion never came up, and
    1249:21   so I can't answer your question.
    1249:22        Q.      Did you ever do it?
    1249:23        A.      Did we evaluate Vioxx in the presence
    1249:24   of aspirin?
    1249:25        Q.      Yes.
    1250: Page 1250
    1250: 1        A.      Yes, we did endoscopy studies with
    1250: 2   that.
    1250: 3        Q.      When?
    1250: 4        A.      After the VIGOR trial.
    1250: 5        Q.      You did it after approval; right?
    1250: 6        A.      Yes.
    1250: 7        Q.      Prior to approval, you didn't let
```

```
1250: 8 people take aspirin in your endoscopy studies, did
1250: 9 you?
```

```
ID:        Scolnick_8-16_1250.11-1250.17
Page Range: 1250:11-1250:17
```

```
1250:11              THE WITNESS:  No.  Because we thought
1250:12 aspirin would cloud the results of the endoscopy
1250:13 studies --
1250:14 BY MR. BUCHANAN:
1250:15      Q.    It was worse --
1250:16      A.    -- because aspirin is gastric
1250:17 irritative.
```

```
ID:        Scolnick_8-16_1250.25-1251.02
Page Range: 1250:24-1251:2
```

```
1250:24 BY MR. BUCHANAN:
1250:25      Q.    You didn't want to give people
1251: Page 1251
1251: 1 aspirin because you knew it would eliminate the GI
1251: 2 benefit to the drug?
```

```
ID:        Scolnick 125104
Page Range: 1251:4-1251:7
```

```
1251: 4              THE WITNESS:  We did not think --
1251: 5 certainly I didn't think that it would eliminate the
1251: 6 complete GI benefit of the drug.  It would simply
1251: 7 make the studies very complicated to interpret.
```

```
ID:        Scolnick 126623
Page Range: 1266:23-1267:9
```

```
1266:23      Q.    Well, let's go through this then,
1266:24 sir.
1266:25              It continues, "Yet, the possibility
1267: Page 1267
1267: 1 of increased CV events is of great concern."  Do you
1267: 2 see that?
1267: 3      A.    Yes, I see her comments, yes.
1267: 4      Q.    Then it states, "(I just can't wait
1267: 5 to be the one to present those results to senior
1267: 6 management!)"  She gave us another exclamation
1267: 7 point, didn't she?
1267: 8      A.    Yes, she did.
1267: 9      Q.    That's you?
```

```
ID:        Scolnick_8-16_1267.12-1267.17
Page Range: 1267:12-1267:17
```

```
1267:12              THE WITNESS:  I am a member of senior
```

```
1267:13 management, yes.  I'm one of senior management.
1267:14 BY MR. BUCHANAN:
1267:15          Q.      It wouldn't have made you happy to
1267:16 have an outcomes trial that showed that Vioxx
1267:17 increased the rate of CV events, would it?
```

```
ID:          Scolnick_8-16_1267.19-1268.01
Page Range: 1267:19-1268:1
```

```
1267:19                  THE WITNESS:  Obviously not.  If I
1267:20 had known -- obviously, not.  No one wanted to see a
1267:21 result where -- a question whether Vioxx elevated or
1267:22 naproxen lowered the rate of events.
1267:23 BY MR. BUCHANAN:
1267:24          Q.      So, we have a solution, right, in the
1267:25 next sentence?  She says how we solve this dilemma,
1268: Page 1268
1268: 1 doesn't she?
```

```
ID:          Scolnick_8-16_1268.04-1268.15
Page Range: 1268:4-1268:15
```

```
1268: 4          Q.      Do you see the next sentence, sir?
1268: 5          A.      I see the next sentence.
1268: 6          Q.      What's she say?
1268: 7          A.      "What about the idea of excluding
1268: 8 high risk CV patients - ie those that have already
1268: 9 had MI, CABG or PTCA?  This may decrease the CV
1268:10 event rate so that a difference between the two
1268:11 groups would not be evident.  The only problem would
1268:12 be - Would we be able to recruit any patients?"
1268:13 That's the rest of the paragraph.
1268:14          Q.      Her solution is to exclude high risk
1268:15 CV patients, isn't it?
```

```
ID:          Scolnick_8-16_1268.17-1269.12
Page Range: 1268:17-1269:12
```

```
1268:17                  THE WITNESS:  That's correct, so they
1268:18 wouldn't require low-dose aspirin.
1268:19 BY MR. BUCHANAN:
1268:20          Q.      So you wouldn't see a CV effect?
1268:21          A.      So there wouldn't be a
1268:22 cardioprotective effect of the NSAID that was going
1268:23 to be compared to because it blocked COX-1 and Vioxx
1268:24 did not because aspirin blocks COX-1.  That's what
1268:25 she's talking about.
1269: Page 1269
1269: 1          Q.      Why don't we look at the document,
1269: 2 sir?
1269: 3          A.      That's what she's talking about.
1269: 4          Q.      "This may decrease the CV event rate
1269: 5 so that a difference between the two groups would
1269: 6 not be evident."  Do you see that?
```

```
1269: 7        A.      Yes, I do, and I understand what she
1269: 8 meant by that.
1269: 9        Q.      So, what you're doing here is you're
1269:10 excluding aspirin so that you can see a GI benefit
1269:11 from your outcomes trial; true?
1269:12        A.      That is correct.


ID:        Scolnick_8-16_1271.04-1271.07
Page Range: 1271:4-1271:7


1271: 4        Q.      I'm asking you, sir, that in
1271: 5 aspirin-using patients, the results from the VIGOR
1271: 6 trial don't present a GI benefit that extends to
1271: 7 them; isn't that right?


ID:        Scolnick_8-16_1271.09-1273.14
Page Range: 1271:9-1273:14

1271: 9                THE WITNESS:  You cannot extrapolate
1271:10 the magnitude of the benefit from the nonlow-dose
1271:11 aspirin-using population to a low-dose aspirin
1271:12 population.  That is correct.
1271:13 BY MR. BUCHANAN:
1271:14        Q.      In fact, you actually did do a test,
1271:15 Vioxx plus aspirin, compared to traditional NSAIDs
1271:16 after the VIGOR trial, didn't you?
1271:17        A.      We did.  We did an endoscopy study.
1271:18        Q.      It didn't show any benefit, did it?
1271:19        A.      The study showed that using aspirin
1271:20 in the presence of Vioxx elevated the rate over
1271:21 aspirin alone, that subsequent studies showed that
1271:22 that rate was still lower than standard NSAID used
1271:23 with low-dose aspirin.
1271:24        Q.      Sir --
1271:25        A.      It still showed a benefit, although
1272: Page 1272
1272: 1 not as great a benefit as in the absence of aspirin.
1272: 2                - - -
1272: 3                (Whereupon, Deposition Exhibit
1272: 4                Scolnick-66, E-mails, MRK-ACR0009295 -
1272: 5                MRK-ACR0009296, was marked for
1272: 6                identification.)
1272: 7                - - -
1272: 8 BY MR. BUCHANAN:
1272: 9        Q.      Sir, I'm passing you over what we
1272:10 just marked as Exhibit 66.  I would like you to look
1272:11 at the earliest in time e-mail.  This is November
1272:12 19, 2001, the bottom of the first page.
1272:13        A.      Yes.
1272:14        Q.      It's from you to, who is that to?
1272:15        A.      Raymond Gilmartin and David Anstice.
1272:16        Q.      Okay.
1272:17                Mr. Gilmartin is your boss; right?
1272:18        A.      Yes, he was.
1272:19        Q.      You sent it with high importance?
```

```
1272:20 You will see it on the next page.
1272:21        A.      Okay.  Yes.
1272:22        Q.      It says, "Ray" and it says "dn" you
1272:23 meant "and"?
1272:24        A.      Yes.  I don't type well.
1272:25        Q.      "Ray and David.  Not a good result.
1273: Page 1273
1273: 1 Low dose aspirin and Vioxx equal almost ibuprofen."
1273: 2 That's Advil; right?
1273: 3        A.      Yes.
1273: 4        Q.      "Higher than ASA alone"?
1273: 5        A.      Yes.
1273: 6        Q.       "It is clear why their class study
1273: 7 failed now."  That's with the Celebrex study; right?
1273: 8        A.      Yes.
1273: 9        Q.      What you're saying here is in the
1273:10 Celebrex study, the manufacturers of Celebrex
1273:11 allowed aspirin users in their study; right?
1273:12        A.      Yes, I believe that's true.
1273:13        Q.      And they showed no GI benefit in
1273:14 terms of PUBs in that outcomes study; right?


ID:         Scolnick_8-16_1273.16-1274.25
Page Range: 1273:16-1274:25

1273:16                THE WITNESS:  I think they showed a
1273:17 quantitative benefit, but they did not get
1273:18 statistical significance.
1273:19 BY MR. BUCHANAN:
1273:20        Q.      And if they don't have statistical
1273:21 significance, that's not good enough for the FDA, is
1273:22 it?
1273:23        A.      It will not allow them to make a
1273:24 conclusion that the PUBs are reduced.  That is
1273:25 correct.
1274: Page 1274
1274: 1        Q.      So, what you're saying here is the
1274: 2 reason why they didn't show a statistically
1274: 3 significant benefit on PUBs is because they allowed
1274: 4 aspirin users in; right?
1274: 5        A.      That was how I interpreted their
1274: 6 results seeing our result in this endoscopy study.
1274: 7        Q.      Then you continue and say: "I do not
1274: 8 think we should announce the CV outcomes study now
1274: 9 since now I am not at all sure what the design
1274:10 should be."  Do you see that?
1274:11        A.      I do.
1274:12        Q.      How do they tie together, sir?
1274:13        A.      I'm not sure what I was thinking
1274:14 because -- I don't know what the design was at this
1274:15 time.  I really can't remember what I was thinking
1274:16 at this point because we went through many, many
1274:17 discussions about different trial designs.
1274:18        Q.      What you were concerned about, sir,
1274:19 is if you did what you wanted to do in your CV
1274:20 outcome trial and allowed aspirin in that trial,
```

```
1274:21 there would be a Merck-sponsored clinical trial that
1274:22 would show that Vioxx, in fact, does not prevent
1274:23 PUBs in a population of high risk CV users using
1274:24 aspirin?  That's what you were concerned about,
1274:25 isn't it?
```

```
ID:          Scolnick_8-16_1275.02-1275.10
Page Range: 1275:2-1275:10
```

```
1275: 2               THE WITNESS:  I am not sure what I
1275: 3 was thinking because I don't know what trial designs
1275: 4 were being considered.
1275: 5 BY MR. BUCHANAN:
1275: 6      Q.     Well, you'd agree, sir, that if you
1275: 7 were considering a CV outcome trial that was going
1275: 8 to allow aspirin users, that would also have a
1275: 9 potential negative effect of revealing that Vioxx
1275:10 did not prevent the incidence of PUBs?
```

```
ID:          Scolnick_8-16_1275.12-1275.20
Page Range: 1275:12-1275:20
```

```
1275:12               THE WITNESS:  No.  I think that the
1275:13 data without aspirin would show what the maximal
1275:14 potential benefits of Vioxx would be, and that in
1275:15 the presence of aspirin, what the diminution of
1275:16 those benefits would be, and in the subsequent
1275:17 endoscopy studies we did, the magnitude of the ulcer
1275:18 incidence was still less than it was if you used
1275:19 aspirin with another drug, another nonsteroidal that
1275:20 was not selected.
```

```
Total Length - 02:38:12
```