U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED 9-16-06
LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657<br><br>Section L<br><br>Judge Eldon E. Fallon<br><br>Magistrate Judge Daniel E. Knowles, III |

**THIS DOCUMENT RELATES TO:**
*Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379

The following deposition testimony was presented to the jury:

Videotaped deposition of Ned Braunstein.

___ Fee___
___ Process___
X  Dktd___
___ CtRmDep___
___ Doc. No.___

```
ID:         Braunstein

    ID:         NB01623
    Duration:   00:00:12.9

        16:23       Q.   Would you please state your
        16:24 full name for the record.
        17: Page 17
        17: 1       A.   Ned Stephen Braunstein.
        17: 2       Q.   Are you currently employed,
        17: 3 Dr. Braunstein?
        17: 4       A.   Yes.
        17: 5       Q.   By whom are you employed?
        17: 6       A.   I'm employed by Merck &
        17: 7 Company.


    ID:         NB01713
    Duration:   00:00:11.3

        17:13       Q.   What's your current position
        17:14 at Merck?
        17:15       A.   I'm executive director,
        17:16 medical and scientific E-communications.
        17:17       Q.   How long have you been doing
        17:18 that?
        17:19       A.   About a month.


    ID:         NB02005
    Duration:   00:02:18.4

        20: 5            Now, you gave me your
        20: 6 current position.  Could you just briefly
        20: 7 recount for me your educational and
        20: 8 professional background since you
        20: 9 graduated from high school.
        20:10       A.   Sure.  I was accepted from
        20:11 high school into the six-year honors
        20:12 program in medical education at
        20:13 Northwestern University.  So, that means
        20:14 that from high school I was accepted both
        20:15 to undergraduate and to medical school.
        20:16 I completed my undergraduate and medical
        20:17 education in six years in 1980.
        20:18            From my medical education, I
        20:19 then went to Columbia Presbyterian
        20:20 Hospital in New York, which is the major
        20:21 teaching hospital of Columbia University,
        20:22 and there I did an internal medicine
        20:23 internship and residency and also
        20:24 clinical rheumatology fellowship.
        21: Page 21
        21: 1            After completing my clinical
        21: 2 training in medicine, in internal
        21: 3 medicine and rheumatology, I then went to
```

```
21: 4  the National Institutes of Health where I
21: 5  did a postdoctoral fellowship in research
21: 6  immunology, both immunology and molecular
21: 7  biology.  There I spent four years.
21: 8          Q.    When was that?
21: 9          A.    In 1983 through 1987.
21:10                And after completing my
21:11  internal medicine -- I'm sorry.
21:12                After completing my
21:13  postdoctoral training, I then obtained an
21:14  assistant professorship at Columbia
21:15  University, and I was faculty at Columbia
21:16  University, first as an assistant
21:17  professor, and then promoted to associate
21:18  professor around 1995.
21:19                And after that, I joined
21:20  Merck in 1999, first as a director in the
21:21  editing and labeling group, was then --
21:22  accepted a position in the regulatory
21:23  affairs department.
21:24          Q.    Can you give me dates here?
```

ID:        NB02218
Duration:  00:01:12.5

```
22:18          A.    Right.  I joined Merck in
22:19  1999 as director of editing and labeling.
22:20  I remained in that department until
22:21  approximately the end of 2001.  In the
22:22  fall of 2001 I began a transition when I
22:23  was both in that department and in the
22:24  domestic regulatory affairs department.
23: Page 23
23: 1  That's the department that has
23: 2  responsibility for interacting with the
23: 3  FDA.  I remained in the regulatory
23: 4  affairs group, both doing domestic and
23: 5  then also global regulatory affairs at
23: 6  times and was promoted to a senior
23: 7  director in approximately August of 2002.
23: 8                In -- I remained in that
23: 9  group until 2004, when I took a new
23:10  assignment as the head of a new group,
23:11  the special projects group, and remained
23:12  in that job until about June of this
23:13  year, 2006, when I accepted a new
23:14  position as executive director in medical
23:15  and scientific e-communications.
```

ID:        NB02910
Duration:  00:00:11.7

```
29:10          Q.    Now, Doctor, at some point
29:11  you went to regulatory affairs, you said,
29:12  correct?
```

```
   29:13        A.    Yes.
   29:14        Q.    And that was in what year?
   29:15        A.    That was in -- that was the
   29:16 end of 2001.


ID:        NB03019
Duration:  00:00:46.6

   30:19        Q.    Then at some point your
   30:20 position in regulatory affairs changed
   30:21 again; is that correct?
   30:22        A.    While I was senior director,
   30:23 there was a position that was a global
   30:24 position that I held while I was also
   31: Page 31
   31: 1 doing the -- some of the U.S. work, and
   31: 2 that was for a brief period of time.
   31: 3        Q.    For what period was that?
   31: 4        A.    That was early in 2002 until
   31: 5 about the beginning of 2003.
   31: 6        Q.    What was your global
   31: 7 position?
   31: 8        A.    The global position was
   31: 9 called senior director of global
   31:10 strategic regulatory development, and
   31:11 that was in the end of 2002 to '03.


ID:        NB03320
Duration:  00:00:07.4

   33:20        Q.    Were there times where Vioxx
   33:21 was taking up the overwhelming majority
   33:22 of your time?
   33:23        A.    Yes.
   33:24        Q.    When was that?


ID:        NB03401
Duration:  00:00:18.1

   34: 1        A.    In the period since 2004,
   34: 2 Vioxx was taking up the majority of my
   34: 3 time.
   34: 4        Q.    What were you doing with
   34: 5 respect to Vioxx since 2004 and after the
   34: 6 February 2005 FDA Advisory Committee
   34: 7 meeting?


ID:        NB03410
Duration:  00:00:50.8

   34:10              THE WITNESS:  It's a long
   34:11        period of time, so, I need to
   34:12        break that up.  Again, what -- can
```

```
34:13          I hear -- what exact time frame
34:14          were you interested in?
34:15 BY MR. SIGELMAN:
34:16          Q.   After February 2005 when you
34:17 were apparently working on special
34:18 projects, is that correct?
34:19          A.   Yes.  Is that the period
34:20 that you want me to answer about?
34:21          Q.   Yes.  Yes.  What were you
34:22 working on with respect to Vioxx?
34:23          A.   After 2000 -- after the 2005
34:24 Advisory Committee, my job was to serve
35: Page 35
35: 1 as the primary scientific person in the
35: 2 Merck Research Labs to provide scientific
35: 3 information to other groups at Merck who
35: 4 needed them, and, therefore, facilitate
35: 5 the flow of information.
35: 6          Q.   What was the ultimate
35: 7 objective there?


ID:        NB03511
Duration:  00:00:04.9

   35:11          Q.   Was it to see if you could
   35:12 get Vioxx back on the market?


ID:        NB03515
Duration:  00:00:12.2

   35:15                 THE WITNESS:  My
   35:16          objective -- I can't speak to
   35:17          other's objectives.  I can only
   35:18          speak to what my objective was,
   35:19          which was to provide scientific
   35:20          information to the other groups
   35:21          that needed that information.


ID:        NB03607
Duration:  00:00:29.8

   36: 7          Q.   A supplemental new drug
   36: 8 application for the remarketing of Vioxx
   36: 9 in the United States.
   36:10          A.   I was asked to -- I was
   36:11 asked to look at pieces of that document,
   36:12 in that context, yes.
   36:13          Q.   That was part of your
   36:14 special project work?
   36:15          A.   I was asked to do that
   36:16 because of my expertise and to the extent
   36:17 that was in my job, yes.
```

```
ID:         NB51114a
Duration:   00:00:05.1

  511:14        Q.    Doctor, you've been handed
  511:15 what's been marked as Exhibit 24.


ID:         NB51120
Duration:   00:01:03.1

  511:20        Q.    Do you recognize Exhibit
  511:21 Number 24, sir?
  511:22        A.    Yes.
  511:23        Q.    And is this something that
  511:24 you wrote?
  512: Page 512
  512: 1        A.    Yes, it is.
  512: 2        Q.    Is this your handwriting?
  512: 3        A.    Yes.
  512: 4        Q.    Did you write this in the
  512: 5 ordinary course of business at Merck?
  512: 6        A.    Yes.
  512: 7        Q.    And this was written on
  512: 8 October 13, 2004, correct?
  512: 9        A.    Yes.  Well, there are two
  512:10 pages, the second one on the 14th.
  512:11        Q.    Okay.
  512:12              And this particular document
  512:13 involved a conversation that you had; is
  512:14 that right?
  512:15        A.    Yes.
  512:16        Q.    With a Brian Harvey?
  512:17        A.    Yes.
  512:18        Q.    And who is he?
  512:19        A.    Dr. Harvey at the time was
  512:20 the acting director of the FDA office for
  512:21 anti-inflammatory and analgesia drugs.
  512:22        Q.    Okay.
  512:23              And would you just please
  512:24 read for me what you wrote up to, if you
  513: Page 513
  513: 1 look at the screen for a minute, where
  513: 2 it's been highlighted on the screen, just
  513: 3 read for the jury so that we know what
  513: 4 your handwriting says.


ID:         NB51315a
Duration:   00:00:27.7

  513:15              THE WITNESS:  "Brian Harvey,
  513:16         October 13th.
  513:17              "Point 1.  Bob Meyer will
  513:18         head office including analgesia
  513:19         and arthritis, currently head of
  513:20         ODE 2."
  513:21              Then it says, "Biotech from
```

```
513:22         ODE 6 and most of 550 goes to ODE
513:23         2."


ID:        NB51401
Duration:  00:02:17.4

514: 1         Q.   That's Office of Drug
514: 2 Evaluation?
514: 3         A.   Office of -- ODE is Office
514: 4 of Drug Evaluation.
514: 5         Q.   All right.
514: 6              At the FDA?
514: 7         A.   At the FDA.
514: 8         Q.   All right.
514: 9         A.   "Sharon will be continuing
514:10 in new division.  Brian moving on."  It
514:11 says, "Need to start working with Sharon
514:12 as contact person."
514:13         Q.   All right.
514:14              Now, why don't you now
514:15 continue to the end of this first page.
514:16         A.   The next item is "Brian
514:17 suggests an official rebuttal on Graham."
514:18 I then have written -- there's something
514:19 crossed out, which I don't know what was
514:20 crossed out, so, I can't read that.
514:21              And then it says, "Questions
514:22 on rigor of the methodology.  This is
514:23 becoming a big issue.  If do then, cc up
514:24 the chain.  Galson, Dan Troy? et cetera."
515: Page 515
515: 1              Then it says, "ACR, Janet
515: 2 Woodcock."
515: 3              Then I have, "Brian,
515: 4 opportunity to get message out on Graham,
515: 5 et al."
515: 6              Underneath, "Suggests we
515: 7 provide journalists a copy of our
515: 8 critique on Graham."
515: 9         Q.   And Graham, was that David
515:10 Graham, an epidemiologist at the FDA?
515:11         A.   That's the Graham.
515:12         Q.   All right.
515:13              And Janet Woodcock, she was
515:14 in what position at this time at FDA?
515:15         A.   I think she was associate
515:16 commissioner at that time.
515:17         Q.   All right.
515:18              And Brian was making
515:19 suggestions to you; is that correct?
515:20         A.   It's a complex conversation.
515:21         Q.   I'm just asking, was Brian
515:22 Harvey making suggestions to you?
515:23         A.   He was making a suggestion
515:24 about how we could -- how we could
516: Page 516
```

```
516: 1 respond.
516: 2         Q.    Respond to Dr. Graham?
516: 3         A.    Like I said, these are sort
516: 4 of brief notes from a conversation.
516: 5         Q.    My question is just simply,
516: 6 to Dr. Graham?  Yes or no?
516: 7         A.    Yes.  Brian was suggesting
516: 8 that amongst our options we might
516: 9 consider an official response.


ID:          NB51610
Duration:    00:00:55.9

516:10         Q.    And he was saying that you
516:11 had the opportunity to get the message
516:12 out on Dr. Graham, correct?  Is that what
516:13 you wrote here?
516:14         A.    He was saying that if we had
516:15 concerns, which was something we had
516:16 discussed, my concerns about this, that
516:17 he wanted to know if we would be
516:18 discussing that at the ACR meeting.  This
516:19 was in the context of they and us -- at
516:20 the ACR meeting, there was going to be a
516:21 presentation about Vioxx and about the
516:22 APPROVe study.  Janet Woodcock was their
516:23 presenter.  And Brian was asking if we
516:24 would be talking about Dr. Graham's
517: Page 517
517: 1 study, he pointed out it would be an
517: 2 opportunity, if we chose to, for us to
517: 3 get our comments out.  He was aware that
517: 4 we had criticisms.


ID:          NB52003
Duration:    00:00:09.1

520: 2         Q.    Let's move on.
520: 3               And by the way, ACR, what is
520: 4 that organization?
520: 5         A.    That's the American College
520: 6 of Rheumatology.  There was a meeting in
520: 7 October of 2004.


ID:          NB52014
Duration:    00:01:16.3

520:14         Q.    Just please read the entire
520:15 page.  "BJ," is that BJ Gould?
520:16         A.    Gould.
520:17         Q.    Gould, of the FDA?
520:18         A.    Yes.
520:19         Q.    She was a --
520:20         A.    Barbara J. Gould.
```

```
520:21        Q.    Was she a consumer safety
520:22 officer --
520:23        A.    Yes.
520:24        Q.    -- at the FDA?
521: Page 521
521: 1        A.    Yes.
521: 2        Q.    All right.
521: 3              She was a frequent contact
521: 4 that you had at the FDA?
521: 5        A.    Yes.
521: 6        Q.    Okay.
521: 7        A.    She was our primary contact.
521: 8        Q.    All right.
521: 9              Please go on.
521:10        A.    "October 14th.  Move telecom
521:11 from 12:30 to 1:30.  RE:  Tomorrow's
521:12 t-conference."  Item 1:  "Follow up on"
521:13 -- I think what I wrote here was "Follow
521:14 up on action items."  There seems to be a
521:15 little squiggle in between, but that's
521:16 the way I read that.
521:17              Next, "Postpone Graham until
521:18 following week."
521:19              Third was "Provide timeline
521:20 of submission to IND/NDA of key data
521:21 something like we do in annual report
521:22 (back to when NDA was submitted)."
521:23              Then I say, "Then Friday,
521:24 October 22nd from 10 to 11," that seems
522: Page 522
522: 1 to be a reference to a subsequent
522: 2 teleconference, and then I have, "Ed
522: 3 Hill," who worked with me.


Total Length - 00:13:12
```