UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to<br>Case No. 06-0810 | * | |
| | * | MAGISTRATE JUDGE<br>KNOWLES |
| CHARLES L. MASON, | * | |
| Plaintiff, | * | |
| v. | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK")
TO EXCLUDE TESTIMONY OF ISAAC WIENER, M.D.**

**(EXPERT CHALLENGE NO. 1)**

One of plaintiff's cardiologists, Dr. Isaac Wiener, intends to opine that Vioxx® increases the risk of thrombotic events such as heart attack and strokes, and that Mr. Mason's 10-month ingestion of 25 mg Vioxx "was a significant contributing factor" to Mr. Mason's heart attack. (Expert Report of Isaac Wiener, M.D. ("Wiener Rpt.") at ¶¶ 10, 18, attached hereto as Ex. A.) Dr. Wiener's own testimony, however, demonstrates that he is not qualified to proffer such opinions and that his opinions are not based on reliable scientific evidence under Federal Rule of Evidence 702.

This Court has ruled – not once, but *twice* – that a causation "expert" who has little to no experience prescribing Vioxx, diagnosing Vioxx as the cause of a cardiac event, or conducting clinical research related to Vioxx, and who fails to demonstrate a clear understanding of the

relevant scientific literature, is not qualified to opine about whether Vioxx can or did cause a particular cardiac event.  First, in *Plunkett v. Merck*, this Court held that the plaintiff's cardiologist, Dr. Thomas Baldwin, "lacks the skill, training, and education to testify as [an] expert regarding the role Vioxx played in Mr. Irvin's death." (Dec. 3, 2005 *Plunkett v. Merck* Order & Reasons regarding Dr. Baldwin at 6.)  The Court explained:

> As a cardiologist, Dr. Baldwin certainly has the skill, training, and education to testify that Mr. Irvin died of a myocardial infarction.  In addition, he has the skill, training, and education to testify regarding the nature of the fatal clot or thrombus, its location, and explain its role in causing Mr. Irvin's death.  *As a cardiologist with no other skill, training, education, or experience with Vioxx or any Cox-2 inhibitor, however, Dr. Baldwin is not qualified to testify regarding the specific role that Vioxx played in producing the clot.*

(*Id.* (emphasis added).)

Similarly in *Plunkett II*, the Court excluded Dr. Michael Graham's testimony about both general causation and specific causation:

> Dr. Graham is not qualified to opine on either general causation or specific causation.  Furthermore, his methodology is not scientifically reliable . . . *By self-admission, Dr. Graham . . . has never done any research on NSAIDs or COX-2 inhibitors prior to becoming an expert for the Plaintiff; is not qualified to analyze and interpret clinical and epidemiological data concerning Vioxx; has never prescribed Vioxx or any other COX-2 inhibitors to a patient; has never determined that Vioxx was a contributing cause of a death; and has never written an article on sudden cardiac death related to plaque rupture.*
>
> . . .
>
> To compensate for his lack of education, experience, and training, Dr. Graham spent approximately eight hours reviewing sixty-seven scientific medical articles, nine depositions, four expert reports, and three days worth of trial transcripts – far less than this Court or any attorney in this case has spent reviewing Vioxx related materials.

(Feb. 2, 2006 *Plunkett v. Merck* Order & Reasons re Dr. Graham at 10-11 (emphasis added).)

Like Drs. Baldwin and Graham, Dr. Wiener is similarly unqualified to opine on either general causation or specific causation.  Dr. Wiener has virtually no experience with Vioxx or

2

COX-2 inhibitors.  And it is plain that Dr. Wiener failed to use a proper scientific methodology in reaching the opinions he hopes to offer here.  For these reasons, as explained in detail below, the Court should preclude Dr. Wiener from offering any Vioxx-related testimony.

I.      **LEGAL STANDARD.**

To prove medical causation under Utah law, a plaintiff must present the testimony of a medical expert qualified to opine that the defendant's actions were a substantial contributing factor to the plaintiff's injuries.  *See Fitz v. Synthes*, 990 P.2d 391, 393 (Utah 1999) (plaintiff failed to establish causation where plaintiff's surgeon and defendant's expert opined that in plaintiff's individual case his failed spinal fusion likely caused defendant's spinal screws to break, and not the converse; plaintiff's medical engineering expert was precluded from testifying on specific medical causation); *see also* RESTATEMENT (SECOND) OF TORTS § 431 (1965) ("The actor's negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in bringing about the harm . . . .").

Federal Rule of Evidence 702 governs the admissibility of expert testimony in this Court. As a threshold matter, Rule 702 requires exclusion of testimony beyond a witness's area of expertise.  *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (trial court properly excluded property appraisal testimony since witness not a licensed appraiser or real estate broker and lacked training or formal schooling in appraisal methods).  If the proponent of evidence proves that the offered testimony is within the expert's actual expertise, he or she must then establish that the expert testimony to be offered is based on sufficient facts or data and must "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable."  *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

Determination of whether proposed expert testimony is reliable is governed by the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), and by Rule 702 as amended in the wake of that decision. In *Daubert*, the Court made clear that the district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable. The Court identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony in the course of carrying out its role as gatekeeper: (i) whether the expert's theory can be or has been tested; (ii) whether the theory has been subject to peer review and publication; (iii) the known or potential rate of error of a technique or theory when applied; (iv) the existence and maintenance of standards and controls; and (v) the theory or technique's degree of acceptance in the scientific community. *Daubert*, 509 U.S. 593-94; *Moore*, 151 F.3d at 275; *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 605-06 (E.D. La. 2003). *In Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), the Supreme Court further explained that the objective of Daubert's gate keeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

**II.     DR. WIENER IS NOT QUALIFIED TO OPINE ON GENERAL CAUSATION.**

Dr. Wiener is a cardiologist, but his professional training and experience do not qualify him to speak about whether use of 25 mg Vioxx for less than eleven months increases cardiovascular risk. Nor has he undertaken the study required to provide a reliable scientific basis for any such opinion testimony. Dr. Wiener's general causation "opinions" are merely speculation, as they rely on unproven assumptions and on a selected subset of the scientific literature that does not support his hypothesis.

### A.     Dr. Wiener Lacks The Necessary Skill, Training, Experience And Education To Opine On General Causation.

Dr. Wiener's lack of expertise concerning Vioxx is stark.  By his own admission, he has essentially no experience with Vioxx.  Dr. Wiener *has not even read a Vioxx label*.  (Aug. 24, 2006 Deposition of Isaac Wiener, M.D. ("Wiener 8/24/06 Dep.") at 21:1-3, attached hereto as Ex. B.)  Not surprisingly, his Report contains only *one page* of Vioxx-related analysis.  And his opinions expressed there are conclusory and unsupported by the facts or science.

Like Drs. Baldwin and Graham, Dr. Wiener's deposition testimony is wrought with critical admissions that illustrate he is not qualified to testify about general causation in this case:

- He has never done any research on anti-inflammatory medications.  (*Id.* at 19:1-4.)

- He has never done any research in the area of COX-2 inhibitors or Vioxx.  (*Id.* at 19:10-14.)

- He has never published anything on COX-2 inhibitors.  (*Id.* at 19:21-22.)

- He did not begin reviewing the medical literature about Vioxx until after he was contacted by a plaintiff's attorney to serve as an expert in the litigation (*Ernst*).  (*Id.* at 22:16-19.)

- He is a "pure cardiologist."  (*Id.* at 20:8.)  He is not an epidemiologist or a biostatistician.  (*Id.* at 36:2-4.)  Nor is he an expert in study design.  (*Id.* at 48:5-6.)

If anything, Dr. Wiener's testimony demonstrates that he knows even *less* about Vioxx than Drs. Baldwin and Graham.

In addition, plaintiff cannot seriously argue that Dr. Wiener has the necessary qualifications to offer such an opinion based upon his limited review of Vioxx-related literature. Dr. Wiener has spent less than twenty-six hours in total preparing for this case (*id.* at 12:13-14) – a case with well over a thousand pages of plaintiff's medical records, over seventeen hundred articles citing Vioxx, numerous diagnostic data, depositions, and other related materials.  Dr.

5

Wiener's testimony shows that he has not even skimmed the surface of the relevant Vioxx literature:

- He admitted that he that he has only really considered APPROVe, VIGOR, and Juni in forming his opinions. (*Id.* at 92:2-13.)

- He admitted that he has not reviewed the data from the VICTOR study (*id.* at 70:5-17), and that he is not familiar with the findings of the ViP study – both placebo-controlled clinical trials of Vioxx (*id.* at 71:8-14).

- He admitted that has not relied on or searched the peer-reviewed publications of the osteoarthritis studies regarding Vioxx. (*Id.* at 79:17-23.)

- He admitted that he has not reviewed any of the basic science studies about Vioxx:

    Q: When you mentioned earlier this biological plausibility of the prostacyclin thromboxane imbalance, are you relying on any particular study to form that biological plausibility opinion?

    A: *I haven't reviewed the primary studies.* You know, that hypothesis and that theory is – is discussed in the APPROVe trial. It's – it's discussed in all the clinical trials as a possible mechanism.

    Q: *So you haven't reviewed any of the actual basic science studies; correct*?

    A: *Absolutely not. I try as hard as I can not to read the basic science studies.*

    (*Id.* at 173:17-174:5 (emphasis added).)

- He admitted that he has not carefully reviewed any observational studies or considered them as a basis for his opinions. (*Id.* at 90:10-15.)

- He admitted that he did not review any of the clinical trial data about Vioxx, including the published Alzheimer's studies, except for VIGOR, and APPROVe. (*Id.* at 91:3-15.) In fact, he admitted that he "did not read" the Alzheimer's studies. (*Id.* at 73:6-7.)

- He admitted that he is aware that some studies have shown no increased cardiac risk but he has not looked at them:

    Q: Are you aware of clinical studies that have demonstrated no increased cardiovascular risk of Vioxx?

    A: I am aware of some of the short-term studies, and I am aware that all the studies aren't completely uniform, yeah.

    Q: . . . [A]re you aware of any long-term studies that have demonstrated no increased cardiovascular risk of Vioxx?

6

>A: There – there may be some.  Again, I – I haven't looked at every individual original study.

(*Id.* at 82:8-19.)

In fact, Dr. Wiener chose to ignore published studies that undercut his conclusions without even reading them first. (*Id.* at 74:24-25 (stating "I haven't read any of the Alzheimer's studies directly.").)  When asked why he chose to ignore two published placebo-controlled randomized trials of Vioxx in Alzheimer's patients, he replied, "They were not in journals that I subscribed to, I am virtually certain . . . [M]y understanding of the studies is that there was – as I understand it, there was *not a difference in infarcst, whatever*, but there was a higher mortality in the Alzheimer's groups.  And it – *it just seemed like it wasn't something that was going to be relevant to my opinion*."  (*Id.* at 75:8-22 (emphasis added).)

Even if Dr. Wiener had conducted an adequate review of the Vioxx literature – and he plainly did not – that would not qualify him to opine on whether Vioxx played a role in Mr. Mason's heart attack.  Federal Rule of Evidence 702 categorically forbids the admission of expert testimony unless the expert "has applied the principles and methods reliably to the facts of the case."  *See Daubert*, 509 U.S. at 591-93.  This mandate means that an expert cannot satisfy the requirements of Rule 702 and *Daubert* merely by professing to have relied on available scientific literature.  *See, e.g.*, *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (upholding exclusion of handwriting expert "even though he had reviewed the literature in the field of questioned document examinations"); *Smith v. Rasmussen*, 57 F. Supp. 2d 736, 766-67 (N.D. Iowa 1999) (holding that expert's literature review "is an insufficient basis or methodology on which to render a reliable expert opinion" and confirming that "[c]ourts are suspicious of purported expertise premised solely or primarily on a literature review"); *Wade-Greaux v. Whitehall Labs., Inc.,* 874 F. Supp. 1441, 1476 (D. Vi. 1994) (witness educated as a

7

pediatrician, pharmacologist, and toxicologist was not qualified to testify regarding the cause of birth defects merely because he reviewed selected literature on the subject for purposes of litigation). Instead, the expert, at a minimum, must *understand* and *explain* how the literature applies to the facts of the case and why it supports the expert's opinions. *Daubert*, 509 U.S. at 591-93 (scientific testimony is relevant only if expert's "reasoning" can be applied to facts at issue); *Moore*, 151 F.3d at 278 (upholding exclusion of expert who failed to explain why article involving level and duration of exposure greater than plaintiff's was helpful in forming causation opinion).

Dr. Wiener has failed to offer that necessary explanation. As noted above, his expert report contains only about one page of conclusory statements regarding the alleged cardiovascular risks associated with Vioxx. And his deposition testimony confirms that he lacks a basic understanding of the Vioxx literature, much less the ability to explain how it is relevant to this case and his opinions.

Based on Dr. Wiener's demonstrated failure to review and understand the pertinent scientific literature, the Court should preclude him from opining that Vioxx could have caused Mr. Mason's heart attack. Such a result would be fully consistent with the Court's previous decisions to exclude similar testimony from Drs. Baldwin and Graham. (*See, e.g.*, Dec. 3, 2005 *Plunkett v. Merck* Order Regarding Dr. Baldwin at 6 ("In his deposition, Dr. Baldwin displayed a fundamental lack of understanding of the relevant scientific literature . . . [H]is reliance on the relevant scientific literature was completely undermined by his inability to firmly understand this literature.").)

> **B.     Dr. Wiener's Speculative General Causation Opinions Are Not Supported By The Scant Scientific Literature On Which He Relies.**

Federal Rule of Evidence 702 forbids the admission of expert testimony that is not based on "sufficient facts or data." In pharmaceutical cases, the dose and duration at which a plaintiff is exposed to a drug are among the most critical data in any causal analysis. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005) (holding that dose-response relationship is "the hallmark of basic toxicology" and that "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect" (internal citations and quotation marks omitted)). Courts, then, consider whether an expert's opinion is based on incomplete or inaccurate dosage or duration data in assessing the scientific reliability of expert testimony in pharmaceutical cases. (Nov. 18, 2005 *Plunkett v. Merck* Order & Reasons ("11/18/05 Order") at 6-7 (citing *Christophersen v. Allied-Signal Corp.*, 939 F2d 1106, 1114 (5th Cir. 1991)).) The only scientific support Dr. Wiener offers in support of his opinions in this case is the Juni meta-analysis, VIGOR. and APPROVe, and subsequent corrections relating to those publications. (Wiener 8/24/06 Dep. at 81:3-8.) None of those articles, however, supports his conclusion that 25 mg Vioxx taken for less than eleven months is capable of causing a heart attack.

> 1.     <u>Juni does not support Dr. Wiener's opinions.</u>

Dr. Wiener relies on a 2004 meta-analysis by Juni. This analysis, however, is of no help and is, in fact, *directly contrary* to Dr. Wiener's conclusions for multiple reasons. First, after examining pooled clinical trial data by dose, Juni found that, when compared against placebo or NSAID comparators, Vioxx at the 25 mg dose – *i.e.*, the only dose at issue in this case – neither doubled the risk for heart attacks nor resulted in a statistically significant increased risk (RR =

9

1.37, CI = 0.52-3.61).[1]  *LeBlanc v. Merrell Dow Harms., Inc.*, 932 F. Supp. 782, 783 & n.3 (E.D. La. 1996) (study not statistically significant if confidence interval includes 1.0 or below).  Dr. Wiener admitted this fact at his deposition:

> Q:   In the Juni meta-analysis –
>
> A:   Yeah.
>
> Q:   – neither the 12.5 milligram nor the 25-milligram dose showed a significantly increased risk of myocardial infarction for Vioxx; correct?
>
> A:   That's true.

(Wiener 8/24/06 Dep. at 233:24-234:4.)  Second, even when Juni compared Vioxx at all doses against placebo, he again found that Vioxx neither doubled the risk of heart attacks nor resulted in a statistically significant increased risk (RR = 1.04, CI = 0.34-3.12).[2]

In short, the Juni study does *not* show that Vioxx taken at the 25 mg dose is capable of causing thrombotic cardiovascular events like heart attacks.  It cannot, therefore, support Dr. Wiener's conclusion that ingestion of 25 mg Vioxx for less than eleven months is associated with an increased risk of heart attacks.

### 2.   VIGOR does not support Dr. Wiener's conclusions.

The VIGOR study also fails to support Dr. Wiener's opinions for several reasons.  First, VIGOR involved patients regularly taking 50 mg Vioxx – twice the dose at issue here.  Because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," *McClain*, 401 F.3d 1233 at (internal citations and quotation marks omitted), the results of VIGOR cannot and do not provide a generally accepted scientific basis for concluding that the use of 25 mg Vioxx increases cardiovascular risk.  Additionally,

---

[1] Juni P. Nartey et al., *Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis*, www.thelancet.com, Nov. 5, 2004, http://image.thelancet.com/extras/04art10237/3b.pdf at 4.
[2] Juni P. Nartey et al., *Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis*, www.thelancet.com, Nov. 5, 2004, http://image.thelancet.com/extras/04art10237/3b.pdf at 4.

VIGOR did not compare Vioxx against placebo; it compared Vioxx with naproxen. It is, therefore, impossible to determine based upon the results of VIGOR whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to a cardiovascular risk associated with high-dose Vioxx, a cardio-protective effect associated with naproxen, or chance.

Finally, VIGOR involved an elderly population with rheumatoid arthritis, a condition that put the study's patients at increased risk of cardiovascular problems.[3] Here, Mr. Mason did not have rheumatoid arthritis. Accordingly, the required "fit" between the results of the VIGOR study and Mr. Mason's medical history is lacking. *Daubert* at 591, 596. For these reasons, Dr. Wiener's reliance on this study is improper.

        3.      <u>APPROVe does not support Dr. Wiener's conclusions.</u>

Dr. Wiener also relies on the APPROVe study to support his opinions in this case. But as discussed in Motion of Merck to Exclude Expert Testimony that Short-Term Vioxx Use Increases Cardiovascular Risks, filed concurrently herewith and incorporated herein by reference, APPROVe similarly fails to support his conclusions.

    **C.**    **Dr. Wiener Has No Reliable Scientific Evidence To Support The Hypothesized Mechanism By Which Vioxx Supposedly Could Cause A Heart Attack.**

To establish causation in a pharmaceutical case, an expert must offer a "reliable explanation" of the physiological process by which the agent causes the alleged harm. *McClain*, 401 F.3d at 1242; *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999). When assessing the scientific reliability of expert testimony, the courts should therefore consider whether the

---

[3] *See* Wolfe F et al., *The mortality of rheumatoid arthritis*. ARTHRITIS RHEUM. 1994 Apr;37(4):481-94; *see also* Myllykangas-Luosujarvi RA et al., *Mortality in rheumatoid arthritis*. SEMIN ARTHRITIS RHEUM. 1995 Dec;25(3):193-202.

11

expert has identified "the specific mechanism by which the drug supposedly causes the alleged disease." (11/18/05 Order at 6); *see also In re Propulsid*, 261 F. Supp. 2d at 617.

Dr. Wiener's Report is silent about the mechanism by which 25 mg Vioxx could have allegedly increased the risk of heart attacks. At his deposition, Dr. Wiener admitted that he has neither investigated nor formed an opinion about the issue:

> Q: How did Vioxx contribute to Mr. Mason's myocardial infarction of July of 2003?
>
> A: I – *I think you're asking for a specific mechanism, and I haven't formed an opinion on that*. I believe there's clinical evidence that Vioxx increases the risk of myocardial infarction. There are plausible mechanisms. We don't know the clinical mechanism specifically, or at least I'm – *I haven't investigated those*, but I'm familiar with good possibilities. *And I think it – to answer your question, it contributed by the fact that he was taking it*.

(Wiener 08/24/06 Dep. at 129:12-24 (emphasis added).) Moments earlier, Dr. Wiener stated bluntly: "I have not researched the literature on mechanisms. I am not going to base my testimony on mechanisms." (Id. at 129:6-8.)[4]

Thus, though even Dr. Wiener "think[s] mechanisms are important" (*id.* at 129:3), he takes the position in this case that it is incidental. If Dr. Wiener is unprepared to explain how 25mg Vioxx ingested for less than eleven months can increase cardiovascular risk, the Court should not allow him to tell the jury that it does.

### III. DR. WIENER DOES NOT HAVE A RELIABLE BASIS TO OPINE ON SPECIFIC CAUSATION.

As with his general causation opinions, Dr. Wiener's specific causation opinions do not pass muster under Federal Rule of Evidence 702 and *Daubert*. As a clinical cardiologist, Dr.

---

[4] Dr. Wiener stated, "There is evidence that Vioxx suppresses prostacyclin and leaves thromboxane unopposed. But I am not going to – you know, I have not researched the literature on mechanisms." (Wiener 08/24/06 Dep. at 129:4-7.) Scientific issues aside, Dr. Wiener is in no position to discuss the issue for the simple fact that he has not researched it.

12

Wiener may be qualified to opine about heart attacks generally, but such opinions are categorically different from an opinion that Mr. Mason's use of Vioxx contributed to the development of his heart attack through a specified mechanism. As to the latter subject, Dr. Wiener's own deposition testimony makes clear that he is no expert on the subject and that he does not and cannot hold any such opinion to a reasonable degree of medical certainty.

### A. Dr. Wiener Has No Scientifically Reliable Basis For Opining About The Mechanism By Which Vioxx Supposedly Caused Mr. Mason's Heart Attack.

Before an expert can opine to a reasonable degree of medical certainty that exposure to a drug caused an individual's disease, the expert must identify the specific mechanism by which the agent allegedly had that effect. (*See supra* at pp. 5-6.) As noted above, Dr. Wiener, cannot identify the specific mechanism by which Mr. Mason's exposure to 25 mg Vioxx for less than eleven months supposedly resulted in his heart attack. The absence of such threshold data precludes a finding of specific causation in this case. *See, e.g., Moore*, 151 F.3d at 278. Accordingly, Dr. Wiener's specific causation opinion is not based on a scientifically reliable methodology and it is thus inadmissible.

### B. Dr. Wiener Failed To Perform A Scientifically Reliable Differential Diagnosis.

Dr. Wiener's opinion regarding specific causation is also scientifically unreliable because he failed to perform a proper differential diagnosis in reaching his conclusions. Before an expert will be allowed to testify that an individual's exposure to an agent resulted in injury, the expert first must rule out alternative explanations of the injury. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987); *Propulsid*, 261 F. Supp. 2d at 618; (*see also* 11/18/05 Order at 6 (in assessing admissibility of expert testimony, trials courts should consider whether the expert has adequately accounted for alternative explanations)).

13

Dr. Wiener identified several risk factors that may have *independently* caused plaintiff's heart attack, yet he failed to rule them out. For example, Mr. Mason's age (61) and sex (male) alone put him at an increased risk for a heart attack. (Wiener 08/24/06 Dep. at 131:4-13.) In addition, Mr. Mason is obese, a former smoker, has an abnormal HDL count and evidence of a family history of heart disease. (*See generally id.* at 121-124.) Dr. Wiener also testified that he saw a "severe blockage" on Mr. Mason's July 2003 angiogram (*id.* at 107:5-6) and that Mr. Mason had coronary artery disease at the time of his heart attack (*id.* at 94:7-10). Mr. Mason also has a history of erectile dysfunction (*id.* at 160:7-10), which Dr. Wiener knows can be indicative of coronary artery disease. (*Id.* at 160:6-12.) But none of these risk factors was properly considered. In fact, they were essentially ignored by Dr. Wiener, as evidenced by his own description of how he conducted a "differential diagnosis":

> Q:   Okay. Describe the differential diagnosis you did for Mr. Mason's myocardial infarction.
>
> A:   We just went through, you know, the other possible contributing factors. And after – after weighing those factors, I believe Vioxx was a significant contributing factor.
>
> Q:   And so Mr. Mason had other explanations for his myocardial infarction; correct?
>
> A:   I don't know about other explanations. He had some other contributing factors, as he had his age and his sex as contributing factors.
>
> Q:   How did you rule Vioxx in as one of the contributing factors with respect to Mr. Mason?
>
> A:   Based on my training, experience, clinical judgment, and – and the literature, particularly the APPROVe study.

(*Id.* at 130:22-131:13.) Based on these facts, the Court cannot conclude that Dr. Wiener reliably ruled out Mr. Mason's naturally-occurring coronary artery disease or any of the other pre-existing risk factors as the cause of Mr. Mason's heart attack. Consequently, Dr. Wiener's

14

opinion that Vioxx was a substantial contributing factor in causing Mr. Mason's heart attack is scientifically unreliable and thus inadmissible.

### C. Dr. Wiener's Methodology For Determining Specific Causation Necessarily Leads To False Positive Diagnoses.

Dr. Wiener's methodology for determining specific causation wrongly assumes that every heart attack experienced by a Vioxx user is attributable to Vioxx, and it thus results, as a matter of course, in false positive diagnoses. According to Dr. Wiener, based on APPROVe, anybody who takes Vioxx is at an increased risk of experiencing a heart attack. (*See* Wiener 08/24/06 Dep. at 86:7-10, 130:22-131:13.) In fact, Dr. Wiener's deposition testimony suggests that he is willing to opine that Vioxx was a significant contributing factor to *any* heart attack experienced by a person taking Vioxx:

> Q: And am I correct that the only two people in the world for whom you've ever concluded that Vioxx played any role in the cardiovascular events are Mr. Mason and Mr. Ernst?
>
> A: Well, those are the only two cases that I've been retained as – as an expert, yeah.

(Wiener 8/24/06 Dep. at 28:9-14; *see also id* at 129:12-24 (". . . it contributed by the fact that he was taking it.").) Dr. Wiener's methodology is patently unscientific. For this reason, in *Plunkett II,* the Court precluded Dr. Ray from testifying that Mr. Irvin's heart attack was caused by Vioxx simply based on his conception of the attributable risk of Vioxx. As this Court made clear in the *Plunkett* trial, the attributable risk concept may not be used as a basis for testifying that the individual plaintiff's heart attack was caused by Vioxx. (December 1, 2005 *Plunkett v. Merck* Tr. at 705:25-706:22, attached hereto as Ex. C.)

### IV. CONCLUSION.

For the foregoing reasons as well as the reasons articulated in Merck's prior briefing on these issues, Merck respectfully requests that the Court exclude any testimony from Dr. Wiener

15

about whether Vioxx is capable of causing thrombotic cardiovascular events, such as heart attacks, and about whether Vioxx did, in fact, cause plaintiff's heart attack.

Dated:  September 19, 2006                                        Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Tarek Ismail
Shayna Cook
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum in Support of Motion to Exclude Testimony of Isaac Wiener, M.D. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 19th day of September, 2006.

>  */s/ Dorothy H. Wimberly*
> Dorothy H. Wimberly, 18509
> STONE PIGMAN WALTHER
> WITTMANN L.L.C.
> 546 Carondelet Street
> New Orleans, Louisiana  70130
> Phone:  504-581-3200
> Fax:     504-581-3361
> dwimberly@stonepigman.com
>
> Defendants' Liaison Counsel