taking rofecoxib had a 3.6 mm increase in systolic blood pressure compared with naproxen users. This translated into a 9.7% rate of hypertension as an adverse event in subjects randomized to rofecoxib compared with 5.5% in those randomized to naproxen. This observation further substantiates the opinion that serious life threatening events can occur sooner, rather than later, as claimed by Merck who insist that adverse cardiovascular events do not begin to occur until after 18 months of continued use. Merck's 18-month exposure theory was based on the data obtained from the APPROVe trial. The followup data from the APPROVe trial however has refuted that theory. In addition, the data published by Levesque et al (72) provides important support for the opinion that the cardiovascular risk occurs with short term exposure. These authors conclude that a small proportion of patients using rofecoxib for the first time had their first myocardial infarction shortly after starting the drug. This risk returned to baseline shortly after treatment was discontinued, which is evidence that Vioxx was the cause of the increased risk seen during ingestion. These authors indicate that more research is needed to identify those most susceptible to cardiotoxicity mediated by COX-2 inhibitor therapy. In fact, Merck documents reflect knowledge of the patient population at risk and attempts to design their clinical trials, specifically the VIGOR trial, to exclude those patients from the study population to intentionally minimize the occurrence of adverse events they knew were likely to occur in those patients if exposed to Vioxx.

The latter findings strengthen the concept that the pro-thrombotic action observed with each of the chemically distinct Coxibs, represents a "class effect", which would suggest that all Coxibs, albeit differing in there chemical structure, are capable of inhibiting the COX-2 enzyme and producing similar adverse cardiovascular events. Since each of the Coxibs is a unique molecule, they may differ in one or more

M007221543

characteristics that include how firmly they target COX-2 while sparing COX-1. Thus,
as newer agents are introduced, it may be found that they do not demonstrate a consistent
class effect. The observed differences in thrombotic risk among the COX-2 inhibitors
may be due to trial design or their distinct physio-chemical properties. In particular,
rofecoxib is a sulfone with relatively poor tissue distribution while celecoxib is a
sulfonamide that is charged at physiologic pH and has extensive tissue distribution.
These chemical properties may also contribute to the distinct effects that have been
reported for these agents on endothelial function, a major indicator of vascular risk and
for their effects on hemostasis. Specifically, celecoxib, but not rofecoxib, produced
marked improvement in endothelial-dependent vasodilation and reduced markers of
oxidative stress in human and animal studies (20-22). On the other hand, COX-2
inhibition prevents the thrombin-induced release of TFPI-2 thus suggesting that
prostaglandins are involved with the blood clotting mechanism that is independent of
blood platelets.

Waltera and co-workers (23) compared the effects of various COX inhibitors on
susceptibility of human plasma, isolated LDL, and membrane lipids to peroxidation.
Oxidative modification of LDL and membrane lipids contributes to foam cell formation,
endothelial dysfunction and destructive inflammatory processes associated with plaque
instability and thrombus formation. In patients, levels of oxidized LDL correlate with
severity of acute coronary syndromes and plaque instability. To test this objective, the
non-enzymatic effects of selective and non-selective COX inhibitors on oxidative stress
mechanisms were evaluated by spectroscopy approaches in various biological
preparations. The results of the studies are summarized below:

Clinical investigations have demonstrated a link between use of the
sulfone cyclooxygenase-2 (COX-2) inhibitor, rofecoxib, and increased

M0072721544

risk for atherothrombotic events. This increased risk was not observed for a sulfonamide COX-2 inhibitor (celecoxib), indicating a potential non-enzymatic mechanism for rofecoxib. To test this hypothesis, we compared the independent effects of COX-2 inhibitors on human LDL oxidation, an important contributor to atherosclerotic cardiovascular disease. The results showed that rofecoxib (100 nM) significantly decreased (>40%, $p < 0.001$) the lag time for LDL conjugated diene formation and increased levels of thiobarbituric-acid-reactive-substances (TBARS) in vitro. The pro-oxidant activity of rofecoxib was dose-dependent and attenuated by 70% ($p < 0.001$) with the antioxidant, Trolox. Rofecoxib and etoricoxib (100 nM) also caused a marked increase (>35%, $p < 0.001$) in non-enzymatic generation of isoprostanes, as measured by mass spectroscopy. Addition of rofecoxib to fresh human plasma reduced the oxygen radical antioxidant capacity (ORAC) by 34% ($p < 0.0001$). By contrast, other selective (celecoxib, valdecoxib, meloxicam) and non-selective COX inhibitors (ibuprofen, naproxen, diclofenac) had no significant effect on LDL oxidation rates or plasma ORAC values, even at supra-pharmacologic levels. X-ray diffraction analysis showed that sulfone COX-2 inhibitors interact differently with membrane phospholipids, suggesting a physico-chemical basis for the pro-oxidant activity. These results demonstrate that sulfone COX-2 inhibitors increase the susceptibility of biological lipids to oxidative modification through a non-enzymatic process. These findings may provide mechanistic insight into reported differences in cardiovascular risk for COX-2 inhibitors.



Chemical structures of representative sulfone (rofecoxib)
and sulfonamide (celecoxib) COX-2 selective inhibitors.

Schematic illustration of a two-step membrane-binding pathway for COX-2 inhibition. Enzyme binding is

preceded by partitioning of the drug into the lipid bilayer followed by diffusion to the hydrophobic active site of the membrane-bound COX-2 protein.(From Waltera et al.)

The essential finding in the study by Waltera et al.(23) was that the sulfone COX-2 inhibitors, etoricoxib and rofecoxib, exhibited **pro-oxidant** activity in human plasma samples and isolated LDL. The pro-oxidant effects of these agents were unrelated to COX-2 inhibition as they were reproduced in pure lipid vesicles enriched with arachidonic acid. Additionally, the authors did not observe changes in lipid peroxidation rates with sulfonamide COX-2 selective inhibitors (celecoxib and valdecoxib), other NSAIDs (naproxen, ibuprofen, diclofenac), or even other sulfone-containing compounds (methyl phenyl sulfone). The lack of activity for celecoxib was observed even at supra-pharmacologic doses. By contrast, the pro-oxidant effects of rofecoxib were concentration-dependent. Thus, in addition to its ability to inhibit COX-2 and shift the balance towards a pro-thrombotic state, rofecoxib in contrast to celecoxib, would have an additional mechanism by which it could perturb endothelial cell and/or platelet membranes leading to the release of arachidonic acid. The latter would serve as a substrate for platelet thromboxane synthase leading to the synthesis of thromboxane-A2, a platelet aggregator and vasoconstrictor, thus augmenting the potential for vasoconstriction and thrombus development at a time when endothelial COX-2 is inhibited rendering the endothelium incapable of synthesizing both PGE2 and PGI2, that are both vasodilators and anti-platelet agents.

The recognition of cardiovascular risk has been apparent for some time and Merck's vigorous misrepresentations that the explanation for the VIGOR Trial results was that the comparator drug, naproxen, reduced the incidence of adverse events served to mislead physicians and consumers and misrepresented the safety profile of Vioxx. The

M007221546

dangers associated with rofecoxib were probable, given the available basic and clinical scientific data, and it should not have been left to a small trial (24) (i.e., APPROVe) to reveal the true relationship between COX-2 inhibition and adverse cardiovascular events. The physiological role of endothelial derived PGI2 and platelet derived thromboxane A2 were well known before the introduction of COX-2 inhibitors and was reviewed in detail by Sir John Vane in 1982 and in the Nobel Lecture which details the development of prosaglandin research from the early 1970s to the present (25).

Bioscience Reports, Vol. 24, Nos 4/5, August/October 2004 (© 2005)
DOI: 10.1007/s10540-005-2734-7

*NOBEL LECTURE*                                              *8 DECEMBER, 1982*

## Adventures and Excursions in Bioassay: The Stepping Stones to Prostacylin

J. R. Vane[1]

This knowledge, by itself should have alerted the scientific community at Merck to question the wisdom of inhibiting COX-2 especially in the presence of vascular disease. The fact that Merck scientists including, Steven Nichtberger, Jules Shafer, PhD, and Edward Scolnick, M.D. and associates, filed multiple patents in which the claimed invention as described is the 1998 patent by Dr. Nichtberger is as follows:

*"The invention provides a method for treating, preventing, or reducing the risk of developing a condition selected from the group consisting of acute coronary ischemic syndrome, thrombosis, thromboembolism, thrombotic occlusion and reocclusion, restenosis, transient ischemic attack, and first or subsequent thrombotic stroke, in a patient, comprising administering to the patient a therapeutically effective amount of an antiplatelet agent in combination with a therapeutically effective amount*

M007221547

*of a COX-2 inhibitor."[11]*

The patent described above, has a priority date of 13 March 1998, prior to the sale of Vioxx in the U. S. market. Assuming that finalization of a patent application and gaining acceptance by the US Patent Office requires at least 12 months, Merck scientists must have been concerned with the potential for COX-2 inhibition to result in an adverse thromboembolic event; an event that was predictable as dictated by the scientific data readily available to all basic and clinical investigators.

The importance of COX-2 inhibition in the presence of vascular injury was made

apparent in the report by Crofford et al. (25) and summarized as follows:

*Specific inhibitors of cyclooxygenase 2 (COX-2) have been approved for the treatment of osteoarthritis and rheumatoid arthritis. Unlike nonsteroidal anti-inflammatory drugs, specific COX-2 inhibitors do not inhibit platelet activation. However, these agents significantly reduce systemic production of prostacyclin. As a result, theoretical concerns have been raised that specific COX-2 inhibitors could shift the hemostatic balance toward a prothrombotic state. Patients with connective tissue diseases (CTD), who may be predisposed to vasculopathy and thrombosis, often have arthritis or pain syndromes requiring treatment with antiinflammatory agents. Herein we describe 4 patients with CTD who developed ischemic complications after receiving celecoxib. All patients had a history of Raynaud's phenomenon, as well as elevated anticardiolipin antibodies, lupus anticoagulant, or a history compatible with antiphospholipid syndrome._ It was possible to measure a urinary metabolite of thromboxane A2 in 2 of the patients as an indicator of in vivo platelet activation, and this was markedly elevated in both. In addition, the patients had evidence of ongoing inflammation as indicated by elevated erythrocyte sedimentation rate, hypocomplementemia, and/or elevated levels of anti-DNA antibodies. The findings in these 4 patients suggest that COX-2 inhibitor-treated patients with diseases that predispose to thrombosis should be monitored carefully for this complication.*

---

[11]International Publication Number WO 99/45913. International Application Number: PCT/US99/05063, US Filing Date:  9 March 1999; Priority Date: 13 March 1998. Title: COMBINATION THERAPY AND COMPOSITION FOR ACUTE CORONARY ISCHEMIC SYDROME AND RELATED CONDITIONS. Inventor: NICHTBERGER, Steven. 126 East Lincoln Avenue, Rahway, NJ 07065

M007221548

An important issue concerns the pharmacokinetic properties of each Coxib.
Consideration must be given to the duration of action of each drug or how long the drugs
remain in the body and whether or not there is the formation of active or inactive
metabolites and how each of the parent compounds or their respective metabolites
interact with the cell membrane.

It is conceivable that despite the similar mechanism of action (i.e. inhibition of
COX-2) among the Coxibs, there may be subtle difference in their respective
pharmacodynamic properties that determine the duration of exposure before the
development of an adverse event expressing itself as occlusive vascular thrombosis.

Attention should be given to the study results reported by Waltera et al. (23),
which are presented below in abstract form.

*Clinical investigations have demonstrated a link between use of the
sulfone cyclooxygenase-2 (COX-2) inhibitor, rofecoxib, and increased risk
for atherothrombotic events. This increased risk was not observed for a
sulfonamide COX-2 inhibitor (celecoxib), indicating a potential non-
enzymatic mechanism for rofecoxib. To test this hypothesis, we compared
the independent effects of COX-2 inhibitors on human LDL oxidation, an
important contributor to atherosclerotic cardiovascular disease. The
results showed that rofecoxib (100 nM) significantly decreased (>40%, p
< 0.001) the lag time for LDL conjugated diene formation and increased
levels of thiobarbituric-acid-reactive-substances (TBARS) in vitro. The
pro-oxidant activity of rofecoxib was dose-dependent and attenuated by
70% (p < 0.001) with the antioxidant, Trolox. Rofecoxib and etoricoxib
(100 nM) also caused a marked increase (>35%, p < 0.001) in non-
enzymatic generation of isoprostanes, as measured by mass spectroscopy.
Addition of rofecoxib to fresh human plasma reduced the oxygen radical
antioxidant capacity (ORAC) by 34% (p < 0.0001). By contrast, other
selective (celecoxib, valdecoxib, meloxicam) and non-selective COX
inhibitors (ibuprofen, naproxen, diclofenac) had no significant effect on
LDL oxidation rates or plasma ORAC values, even at supra-
pharmacologic levels. X-ray diffraction analysis showed that sulfone
COX-2 inhibitors interact differently with membrane phospholipids,
suggesting a physio-chemical basis for the pro-oxidant activity. These
results demonstrate that sulfone COX-2 inhibitors increase the
susceptibility of biological lipids to oxidative modification through a
non-enzymatic process. These findings may provide mechanistic insight
into reported differences in cardiovascular risk for COX-2 inhibitors.*

M007221549

As early as 1998 and continuing up to the present, a series of studies by Derek W. Gilroy and co-workers provided evidence to suggest a beneficial role of COX-2 described as being able to regulate the inflammatory response (26-34). A recent review by Colville-Nash and Gilroy (29) calls attention to a heretofore-unrecognized "anti-inflammatory" benefit derived from the upregulation of the COX-2 enzyme as summarized below.

> *The synthesis of bioactive prostanoids is controlled, in part, by the action of the cyclooxygenase (COX; prostaglandin H synthase; prostaglandin endoperoxidase) family of enzymes. Inhibition of these enzymes underlies the therapeutic action of the nonsteroidal antiinflammatory drugs (NSAIDs) and also leads to the adverse side effects, such as gastrointestinal ulceration, associated with these drugs. Interest in the therapeutic targeting of this system as a means of controlling inflammation was further expanded by the demonstration in the early*

> *1990s of the existence of a second, inducible, isoform of COX, COX-2. Originally, it was believed that this isoform was expressed at sites of inflammation but not in noninflamed tissue, where a constitutively expressed isoform, COX-1, was thought to be responsible for the physiological production of eicosanoid mediators. This presented the opportunity to develop novel "super aspirins," which could selectively inhibit the inducible isoform, exert potently antiinflammatory effects and, importantly, be largely devoid of the deleterious side effects of conventional NSAIDs. However, it is now being increasingly accepted that COX-2 is also expressed in chronic inflammatory diseases and is seen during the resolution of inflammatory reactions and in areas undergoing wound healing. Inhibition of this isoform in these situations has revealed potential, previously hidden, pitfalls associated with COX-2 inhibition. This article examines the roles of the COX enzymes in inflammation, with emphasis on the emerging role of COX-2 during inflammatory resolution, as well as discussion of some future directions for antiinflammatory therapy that this research has suggested.*

In a subsequent publication (34), Gilroy and colleagues present experimental data that provides an explanation as to why COX-2 inhibition may lead to progression of an

M007221550

inflammatory lesion (e.g. atherosclerotic plaque). The abstract of the publication is

presented below:

*Failure of acute inflammation to resolve leads to persistence of the
inflammatory response and may contribute to the development of chronic
inflammation.* Thus, an understanding of inflammatory resolution will
provide insight into the etiology of chronic inflammation. In an acute
pleurisy, polymorphonuclear leukocytes (PMNs) were found to
predominate at the onset of the lesion but decreased in number by
undergoing apoptosis, the principal mechanism by which PMNs died in
this model. PMNs were progressively replaced by monocytes, which
differentiated into macrophages. *As with PMNs, macrophages also
underwent programmed cell death leading to an abatement of the
inflammatory response and eventual resolution. It was found that
apoptosis of both these inflammatory cell types was mediated by pro-
resolving cyclooxygenase 2-derived 15deoxyDelta12-14PGJ2, which is
uniquely expressed during active resolution.* Although PMN programmed
cell death is well understood, the observation that macrophages apoptose
during resolution of acute inflammation is less well described. These
results provide insight into the mechanisms that switch off acute
inflammation and prevent complications of wound healing and potentially
the development of immune-mediated chronic inflammation.

Two isoforms of cyclooxygenase (COX) have been identified and
characterized. In general, COX 1 is constitutively expressed in most
tissues, where it synthesizes prostaglandins (PGs) in an immediate manner

at low levels to maintain physiological functions. COX 2, on the other
hand, is highly inducible in response to proinflammatory stimuli, resulting
in delayed, but exaggerated PG release, leading to the suggestion it
contributes significantly to the development of an inflammatory response.
*However, recent studies have suggested that COX 2 may also be
protective in wound healing and tissue injury. We have previously shown
that COX 2 mediates acute inflammatory resolution in a rat carrageenin-
induced pleurisy through the generation of anti-inflammatory PGs, PGD2,
and 15-deoxy-□[12-14]PGJ2.* In the current paper we uncover the
mechanism by which COX 2 and its fatty acid metabolites bring acute
inflammation under control and mediate resolution.*

Originally, it was thought that macrophage clearance in self-limiting

inflammatory lesions was *via* lymphatic drainage. The study by Gilroy and colleagues

(31) provides evidence that apoptosis is an additional route by which macrophages

undergo removal from an inflammatory site. Macrophages can damage tissues by the

M007221551

release of histotoxic enzymes and proinflammatory cytokines and initiate an immune response by the presentation of antigens to T cells. Through the sustained release of TGFß1, macrophages can also contribute significantly to fibrosis, collagen, and fibronectin synthesis as well as granulation tissue formation. Whereas macrophages are essential to remove cells and debris from a region of tissue injury, their persistence at an inflammatory site must be tightly controlled in order to prevent the development of chronic inflammation. Gilroy et al. (31) show that macrophages undergo apoptosis locally at the end phase of an acute resolving inflammatory lesion. The authors suggest that COX-2 mediated macrophage apoptosis may represent an important endogenous means of preventing the transition from acute inflammation to chronic non-resolving inflammatory diseases as would be the case with inhibition of COX-2. The study demonstrates that apoptosis of both neutrophils and macrophages is mediated by COX-2 derived 15-deoxy$^{12\text{-}14}$PGJ2. In short, COX-2 inhibition prevents resolution of the inflammatory response to injury thus leading to progressive tissue demolition.

Since their approval by the FDA in 1999, the first two Coxibs, celecoxib and rofecoxib, to be introduced into clinical use were used throughout the world for the relief of pain associated with rheumatic diseases. Concern has been expressed that COX-2 inhibition may in fact have a number of potential, previously hidden, pitfalls. It has been demonstrated that COX-2 induction is not exclusively associated with the onset of an inflammatory reaction, with expression limited to inflammatory sites. In fact, COX-2 is expressed more chronically, and is also seen during the resolution of inflammation and in areas of wound healing. The application of COX-2-selective inhibitors during these periods has been shown to be deleterious in that resolution of inflammation is delayed,

M007221552

gastric ulcer healing is delayed and, in some patients, ulcers have been shown to progress further to perforation and severe bleeding (35). The suggestion was made that, in these situations, COX-2 may help resolve the pathology, perhaps by generating alternative series of prostaglandins such as the cyclopentenone prostaglandins. The finding that these prostaglandins can affect proteins by direct chemical modifications as well as having their own receptor families rekindled debate on the deleterious and beneficial effects of prostanoids, and the implications of inhibiting the production of these mediators, in the body. Therefore, Gilroy and colleagues, through their series of studies have presented valuable insights with respect to the role of COX-2 in inflammation and the potential adverse effects of its inhibition.

While cyclooxygenase-2 (COX-2) inhibitors were introduced to the U.S. market with the promise of less gastrointestinal (GI) toxicity than nonselective nonsteroidal anti-inflammatory drugs (NSAIDs), additional research was needed to examine this outcome in the naturalistic setting. The study by Stockl and colleagues examined whether use of COX-2 inhibitors is associated with reduced risk of GI bleed in a managed care population. This study provides insight into the rates of GI bleeding among a large population of managed care patients initiated on COX-2 inhibitors or nonselective NSAIDs. Patients using a COX-2 inhibitor did not have a reduced risk of a GI bleed compared with patients with similar baseline characteristics who were using nonselective NSAIDs.

In summary, I had previously held the opinion that inhibition of COX-2, under specific clinical situations involving vascular pathology, would increase the potential for platelet dependent occlusive thrombus formation. My opinion was based upon clinical events as described by my former colleague Dr. Leslie Crofford (see reference #25) and later confirmed in an experimental model of arterial thrombosis (see reference #14). Before submitting my manuscript for publication, I felt obligated to send the paper to

M007221553

Monsanto/Searle for their comments. Shortly thereafter, I was asked to present my data
before a group of scientists at the Monsanto/Searle Pharmaceutical Company in St. Louis.
The meeting took place in St. Louis on October 10-11, 2000. Despite severe criticism of
my work by the staff at Monsanto/Searle, the manuscript was accepted for publication in
the journal *Circulation*. The study was funded entirely by discretionary funds
(Cardiovascular Research Fund, University of Michigan Medical School) and made use
of celecoxib (Celebrex™) obtained from commercial sources. The results demonstrated
an enhancement of thrombus formation in the presence of COX-2 inhibition in arterial
vessels subjected to injury. The experimental observations served to confirm my
opinions regarding the potential of COX-2 inhibition to enhance the potential for
thrombus formation under certain pathophysiological states. My opinions were in
agreement with subsequent clinical events as reported in the clinical trials, some of which
have been documented in this Disclosure. I have continued to conduct basic
investigations on the subject of COX-2 inhibition in which I have examined rofecoxib,
celecoxib, ibuprofen, naproxen and acetaminophen in animal models of thrombosis and
myocardial infarction. As mentioned above, my studies related to the pharmacology of
COX-2 inhibitors are funded by discretionary funds. I do not have any conflicts of
interest or relationships with pharmaceutical companies at this time.

**Review of Plaintiff Medical History and Hospitalization:**

**A. Mr. Charles L. Mason's Medical History**

In reviewing the medical history of Mr. Charles L. Mason, I have noted the
following:

Date of Birth: 12/12/41

Hospital admission date: 7/25/03

M007221554

Mason *v* Merck                                                    72

Hospitial discharge date: 7/27/03

Admit Type: URGENT

| | |
|---|---|
| Admitting Physician: | James S. Zebrack |
| Diagnosis: | Intermediate Coronary Syndrome (Unstable Angina) |
| Discharge Diagnosis: | Acute Subendocardial Infarction, Initial Episode of Care |
| Current Medications: | sertraline ( Zoloft) |
| | Hydrocodone |
| | VIOXX (rofecoxib) |
| | Coronary atherosclerosis of native vessel |
| | Depression disorder |
| | Osteoarthrosis |
| | Hyperlipidemia |

| | |
|---|---|
| Laboratory | Troponin......... 9.2 H  (0.3-2.0 ng/ml) |
| | CK................ 287 H  (20-269 U/L) |
| | CKMB............. 23.9H  (0.0-0.5 ng/ml) |
| ECG | Normal Sinus Rhythm, Non-specifie T-wave inversion. |
| Procedures on 7/25/03 | Insertion of a drug sirolimus eluting stent |
| | Single vessel percutaneous transluminal coronary |
| | angioplasty (PTCA). |
| | Injection/Infusion of platelet GpIIb/IIIa receptor inhibitor |
| | (tirofiban; Aggrasat™)) |
| | Coronary arteriography using two catheters. |
| | Aspirin (low dose Baby Aspirin) |

Metoprolol  Beta-adrenergic receptor antagonist

Ketoroloac (Toradol™) – analgesic

Morphine sulfate

Lovenox 100 mg sc.

Nitropaste 1"

## B Mr. Mason's Myocardial Infarction

HISTORY OF PRESENT ILLNESS:

Charles L. Mason, a 61 year old Caucasian male, presented to the Emergency Room with a chief complaint of pre-cordial chest discomfort that he had been experiencing for about one week and had become progressively worse over this period. He described the discomfort as a "sharp pain" directly beneath his sternum, which was relieved when he took a deep breath and held it (most likely do to a Valsalva maneuver and a slowing of the heart rate)  He had no prior history indicative of cardiac pathology.

It is significant to note that the pain, which was intermittent, lasted longer and increased in intensity and frequency.

Mr. Mason entered Alta View Hospital Emergency Room where he received prompt attention and was administered aspirin and the topical application of nitroglycerin past (1"), which did not provide relief from the pre-cordial pain symptoms. He was given 4 mg of morphine sulfate by injection, which was followed by a reduction on the chest discomfort.

The decision was made to transfer Mr. Mason to LDS Hospital. While en-route to the hospital there was a return of the pre-cordial discomfort and his blood pressure was

recorded to be in the 90s/50s which precluded further application of nitroglycerin and morphine sulfate.

Upon arrival at the LDS Hospital, Mr. Mason was admitted the Coronary Intensive Care Unit (CICU) and soon thereafter was moved to the catheterization laboratory for immediate intervention. Of note, is the laboratory report indicating that his serum troponin level that initially was 9.2 had increased to 15 ng/ml. The CKMB was 23.9. Both values are well above the normal value and indicative of irreversible myocardial injury and support the provisional diagnosis of acute coronary syndrome and myocardial infarction.

**Past Medical History:** Significant for osteoarthritis and depression. Sleep apnea – mild – use of CPAP

**Family History:** Father diabetes. Mother Hypertension. No history of early coronary artery disease.

**Social History:** Former user of tobacco – quit over 35 years ago. No alcohol or illicit drug abuse.

**Review of Systems:** Non-contributory

**Physical Examination:**

Vital Signs: Blood pressure 97/56, Heart Rate 62 bpm; Resp. 16/min

Temp 36.7; oxygen saturation 98% on 2 L nasal oxygen.

M00722155?

**General:**  Well-developed, well-nourished, no acute distress, alert and oriented times three.

**Neck:**  No jugular venous distension.  No adenopathy.  No carotid bruits.

**Cardiovascular:**  Sinus rhythm, no murmurs, rubs or gallops.  Normal S1 and S2

**Pulmonary:**  Clear to auscultation bilaterally with good air exchange.

**Abdomen:**  Soft, non-tender, and non-distended.  Normoactive bowel sounds.

**Extremities:**  No edema.  Peripheral pulses intact, radial pulses and pedal.

**Current Medications:**  Zoloft, Hydrocodone, **VIOXX 25 mg qd**[12].

**Laboratory Data** 26 July 2003:        Triglycerides 124 mg/dL

                                         Cholesterol  130  mg/dL

---

[10] **IMPORTANT NOTE:**  A review of prescription records indicates that Mr. Mason was first prescribed VIOXX on 9/11/02 and the last refill was dispensed on 6/23/03 approximately one month before his heart attack.  The record indicated that Mr. Mason took VIOXX 25mg each day on a continuous basis and each refill was for 30 doses. Records reflect ingestion of Vioxx on the morning of the MI, 7/25/03.

M007221558

Mason *v* Merck                                                                 76

|        |     |        |
|--------|-----|--------|
| HD (L) | 28  | mg/dL  |
| LDL    | 77  | mg/dL  |
| VLDL   | 25  | mg/dL  |

Diagnostic Assessment: A 61 yo male transported by ambulance from Alta View Hospital. Elevated troponin, normal ECG and history of classic anginal chest discomfort commencing one week prior to admission and becoming more frequent, lasting longer, and becoming more intense.

**Diagnostic Plan:** Immediate transport to the cardiac catheterization laboratory for secondary elevated troponin and history of classic anginal symptoms to define his coronary anatomy and for possible intervention at this time.

The plan post intervention was to use Aggrastat (tirofiban) to prevent platelet aggregation and post-procedure thrombosis. Metoprolol and aspirin will be added to the treatment regimen. Nasal oxygen will be continued. Lansoprazole (Prevecid™) prophylaxis for stress ulcer prevention. Plan to discharge on the next day.

**Coronary Artery Angiography:**

Right coronary artery normal

Left Main Anterior Descending Coronary Artery.................NORMAL

Mid-Left Anterior Descending Coronary Artery..................90% occl

Anterior Descending Coronary Artery First Diagonal Branch...70% occl

Right Coronary Artery ...............................................NORMAL

M007221559

Occlusive thrombus present in the Anterior Descending Coronary Artery, flow restored by balloon angioplasty followed by the use of Aggrastat (platelet inhibitor) with a 90% narrowing of the Anterior Descending Coronary Artery noted and corrected with placement of a drug eluting Cypher stent.

A Cypher drug eluting (Sirolimus) stent placed in the Mid-Left Anterior Descending Coronary Artery- 0% residual stenosis

Balloon angioplasty performed in the first diagonal branch of the Anterior Descending Coronary Artery.

Type A lesion of distal LAD

Major branch involved

Pre-stenosis:  90%

Final stenosis:  0%

Initial Rx  Stent

Lesion success:  Residual stenosis of <= 50% after intervention

Occlusive thrombus present before intervention

Type B1 lesion of the proximal first diagonal branch;

Pre-stenosis  70%

Final stenosis 10%

Initial Rx PTCA - ACS Highsail

**Page 28 Progress note – entered by Dr. LA Thompson.**

**Written orders for the following medications;**

Lansoprazole (Prevacid)...............30  mg    PO QD

M007221560

| ROFECOXIB (VIOXX) | ............25 | mg | PO QD[13] |
|---|---|---|---|
| Sertraline (Zoloft) | .....................100 | mg | PO QD |
| Carvedilol (Coreg) | ....................3,125 mg | | PO BID |
| Clopidogral (Plavix) | ...................75 | mg | PO QD |
| Aspirin | ................................325 | mg | PO QD |

Mr. Charles Mason was 61 years old with no family history of premature cardiovascular disease. He is a former smoker, does not use alcohol or engage in the use of illicit drugs. Mr. Mason's Lipid Profile on the day of admission indicated that the values for total cholesterol, HDL, LDL and plasma triglycerides did not suggest that he was at risk of developing atherosclerotic coronary artery disease. Review of prior records reports borderline low levels of HDL (39 on 9-10-02) and normal LDL with the exception of 9-10-02 when his LDL was noted to be 124. Records do not reflect whether or not this was a fasting level. Prior LDL levels were within normal to low range. While his HDL (the good cholesterol) levels were low, his LDL (the bad cholesterol) at the time of his MI was exceptionally low which would offset any adverse influences of having a low HDL level. His LDL level was recorded as 77 mg/dL on 7-26-03. A recent publication by Cannon et al. (New England Journal of Medicine 2004; 350: (Apr 8): 1495-1504) concludes as follows:

*The National Cholesterol Education Program and European guidelines currently recommend that the goal of treatment in patients with established coronary artery*

---

[13] Attention is called to the observation that VIOXX was prescribed for Mr. Mason one day after undergoing coronary angioplasty. It is surprising that the treating physician was not aware of the prothrombotic potential of VIOXX especially in an injured coronary artery. This constitutes clear evidence that the medical community was not informed of the cardiovascular risks associated with the use of VIOXX and is counter to Merck's repeated claims of having informed the medical community of the cardiovascular risks as late as July 24, 2003.

*disease should be an <u>LDL cholesterol level of less than 100 mg per deciliter.</u>*
*Although our data provide support for the use of this approach, given the*
*substantially lower LDL cholesterol levels achieved in the group given 80 mg of*
*atorvastatin daily (median, 62 mg per deciliter), our results suggest that after an*
*acute coronary syndrome, the target LDL cholesterol level may be lower than that*
*recommended in the current guidelines.*

The report by Cannon et al. highlights the importance of a low LDL level below that recommended as the treatment goal by the National Cholesterol Education Program and the European guidelines. It is important to note that Mr. Mason had an LDL level of 77 mg/dL which would have made him less likely to be at risk for the development of atherosclerosis and would have countered the somewhat low serum HDL levels.

It is important to note, that prior to his heart attack on July 25, 2003, Mr. Mason did not exhibit signs or symptoms of coronary artery disease. Therefore, he was asymptomatic suggesting that the degree of atherosclerosis was not life threatening at this point. The exposure to Vioxx upset the physiological balance (prostacyclin / thromboxane) in addition to altering the hemostatic properties by interfering with the anti-thrombotic actions of Protein C and increasing the release of tissue factor, so as to favor increased platelet reactivity and arterial thrombus formation.

## C. Diagnosis of Myocardial Infarction.

Charles Mason suffered a myocardial infarction or heart attack on July 25, 2003. He was initially treated at Alta View Hospital Emergency Department by Dr. Jeffrey McNally.

M007221562

Charles Mason's medical records demonstrate that he had a myocardial infarction. At Alta View Hospital Emergency Department, Mr. Mason presented with chest pain, with onset noted about one week prior and occurring more frequently and with greater intensity over the ensuing days. The description of his symptoms at the time he arrived at Alta View Hospital is consistent with that of acute coronary syndrome (ACS). Mr. Mason had several important biological markers for an acute myocardial infarction including elevated troponin and CKMB enzymes. These elevated enzyme levels are again consistent with an acute myocardial infarction and reflect death of myocardial cells and damage to the myocardium. The evidence clearly points to Mr. Mason having had a subendocardial myocardial infarction.

### D  Opinion and Reasoning:

My opinions are based on my education, training, experience, the medical records as well as my knowledge of pathophysiology of coronary artery disease, myocardial infarction, the pharmacology of COX-2 inhibitors such as Vioxx, my own experimental studies on COX-2 inhibitors and the pharmacology of prostanoids and how they alter platelet function, blood coagulation and the resolution of the inflammatory process and healing. Furthermore, I have studied the role of cyclooxygenase system as it relates to atherosclerosis and arterial thrombus formation as well as its role in the presence of underlying atherosclerotic disease thereby increasing the relative risk for occlusive thrombus formation when administered to patients with unrecognized, asymptomatic vascular pathology.

Upon careful consideration of the scientific facts presented in this affidavit and a review of Mr. Charles L. Mason's medical history and hospital records, I have formed

M007221563

my conclusion, based on reasonable medical probability, that the use of rofecoxib
(Vioxx®) more likely than not contributed significantly to the plaintiffs' adverse
cardiovascular event that culminated in an acute myocardial infarction on July 25, 2003.
Thus, but for the ingestion of Vioxx, Mr. Mason would not likely have experienced an
acute myocardial infarction at that time.

I base my conclusion on the scientific evidence cited throughout this affidavit,
including that which indicates that COX-2 inhibition interferes with the resolution of an
inflammatory response thereby accelerating the progression of atherosclerotic plaque
formation and pathology of the coronary vascular bed, events that enhance the potential
for occlusive thrombus formation. The latter is the mechanism that leads to the onset of a
heart attack.

Mr. Mason was 61 years of age at the time of his heart attack. Aside from being a
male and slightly overweight, he had minimal risk factors for coronary artery disease.
His lipid profile at the time of his heart attack was of interest in that his LDL levels were
in the 70s range, which is extremely low. There is a genetic polymorphism that leads to
an abnormal form of LDL (A1 Milano). Individuals with this genetic polymorphism
exhibit exceptionally low HDL and LDL levels. Thus, apolipoprotein A-I (Milano)
(AIM), a natural variant of human apolipoprotein A-I, confers to carriers a significant
protection against vascular disease. Mr. Mason's lipid profile at the time of his MI is
consistent with this polymorphism in which case his low LDL level countered the low
level of HDL thereby conferring upon him a degree of protection that would delay or
prevent the progression of coronary atherosclerosis. Unfortunately, Mr. Mason was put
on medical management for his osteoarthritis and was treated with Vioxx for a lengthy

M007221584

period of approximately ten months as determined by a review of his prescription records.

Mr. Mason exercised excellent judgment by seeking medical assistance soon after the onset of symptoms that were characteristic of an impending heart attack. The Emergency Department medical staff at Alta View Hospital and LDS Hospital acted rapidly and appropriately, making the correct diagnosis of acute myocardial infarction and performing PTCA and stent placement which, along with the use of adjunctive antiplatelet therapy, restored blood flow to that region of the heart perfused by the left anterior descending coronary artery and its first diagonal branch.   Mr. Mason underwent coronary artery catheterization at which time Dr. Edward Ganellen and Dr. David Jessup placed a drug eluting Sirolimus stent in the left anterior descending coronary artery and dilated the first diagonal branch.   Subsequent follow-up examinations and further assessment of cardiac function indicate that Mr. Mason had experienced permanent cardiac damage.

**Significance of Rofecoxib (VIOXX) in the Sequence of Events Leading to Mr. Mason's Heart Attack**

a) **Background**

It is important to recognize the Mr. Mason was not diagnosed with signs or symptoms related to coronary artery disease prior to having an onset of angina pectoris (acute coronary syndrome) of increasing frequency and intensity days before being admitted to the Alta View Emergency Department on July 25, 2003. Mr. Mason was considered to be in relatively good health except for the presence of osteoarthritis of long standing duration for which he was prescribed VIOXX, which he took regularly each day from September 11, 2002 until July 26, 2003, a period of ten months.

M007221565

### b) Significance

Since the mid-1970s, the publications of John Vane (later Sir John Vane) and colleagues systematically elucidated the multiple enzymatic events involved in the metabolism of arachidonic acid and the pharmacodynamic effects of the many derived eicosanoids for which he and his associates were awarded the Nobel Prize in Medicine and Physiology in 1982. The resulting publications by Vane and colleagues stressed the importance of prostacyclin (PGI2) as essential for prevention of platelet aggregation and arterial thrombus formation. Furthermore, Merck scientists were well aware of the physiological importance of PGI2 and the need to preserve its physiological actions. This fact is indisputable as demonstrated by Merck's efforts to counter the prothrombotic effects of COX-2 inhibitors (e.g. VIOXX) by combining a thromboxane receptor antagonist or a thromboxane synthase inhibitor along with a COX-2 inhibitor. The support for this conclusion derives from several patents applied for by Merck and its scientists in which they describe the purpose of the invention and clearly state the fact that COX-2 inhibitors have the potential to be prothrombotic.

There is no doubt that Merck and its scientists were aware of the potential adverse cardiovascular events secondary to the inhibition of COX-2 as evidenced from internal e-mails in which there were discussions related to the use of aspirin in the clinical trials as a means of inhibiting platelet derived thromboxane synthesis. The discussions centered on the use of low dose aspirin to counteract the potential of VIOXX to increase the incidence of prothrombotic events, e.g. heart attacks and/or ischemic stroke. The concern was that aspirin would increase the incidence of gastric ulcers and perforations, thereby negating the primary benefit to be derived from VIOXX which was designed to be safer than conventional NSAIDs (e.g. naproxen), used as the comparator treatment in the

M007221566

Mason v Merck                                                                    84

VIGOR clinical study.  Therefore, the decision makers at Merck were in a bind as is

noted in the e-mail communication sent at 4:44:12 AM on 1997-02-26 to Thomas Simon,

Eliot W. Ehrich, Briggs Morrison, and Alise C. Reicin. A reproduction of the e-Mail

correspondence is shown below.

M00721567

Mason *v* Merck                                                                                      85

```
To:        Simon, Thomas; Ehrich, Elliot W.; Morrison, Briggs; Reicin, Alise S.
From:      Daniels, Brian F.
Cc
Bcc:
Date:      1997-02-26 04:44:12
Subject:   RE. GI OUTCOMES TRIAL PROTOCOL
```

Alise,

I have left hard copy with comments on your desk.

150 mg of diclofenac is upper limit or OA. In fact ome labels indicate it's for acute use of this dose only.
I would throw in the hand you have nothing to lose

One month prohibition for steriod you are not evaluating efficacy with respect to a study joint, There is no need
for a 3 month wait

Ahhh...ASA I feel that you are using an inflated estimate of the rate of PUBs with 75 mg of ASA. What ever the
rate it is always lower than the doses of NSAID we are using. It is clear to me that the program will be severly
hurt if the megatrial shows a win in PUBs and a loss in MI/CVA. That is what we are setting up by not allowing
ASA. And I a sure no one wants to bear the practical concerns of significantly inhibited patent enrollment.

From: Reicin, Alise S.
To: Simon, Thomas; Daniels, Brian F.; Ehrich, Elliot W.; Morrison, Briggs
Subject: RE: GI OUTCOMES TRIAL PROTOCOL
Date: Tuesday, February 25, 1997 10:39PM

Briggs:

Thanks for your input here are some answers:
1. My impression is that the doses of ibuprofen and diclofenac are felt to be equipotent. In fact diclofenac is
approved in doses up to 200 mg for RA. The label is a little unclear about OA but implies that 100-150 is the
suggested range. BRIAN and ELLIOT-am I correct?

2. We will alow acetominophen users maybe I should make that explicitly clear.
3. I discussed this with Brian, Eliot and a consultant- the feeling was that hand OA is unlikely to require chronic
NSAIDS, and back "OA" is too diverse a group. Your idea about the X-ray is interesting. Theres still some
discussion about wether we should loosen the criteria to "clinical diagnosis of OA". The criteria I used are
modified ACR criteria.

4. Beth felt we should try to get patients at a somewhat stable baseline. Remember all we want to show with
efficacy here is that patients on 955 don't get much worse. They should be comparable to NSAIDS. Remeber
patients can always be rescreened after a month-Do you all allow rescreening in the phase III OA studies? In the
asthma studies if patient didn't meet entry criterion, they could be rescreened at a different time-but we were
explicit in the protocol that they needed to have a different baseline number on the second try.

5.Low Dose Aspirin- I HEAR YOU! This is a no win situation! The relative risk of even low dose aspirin may be
as high as 2-4 fold. Yet, the possibility of increased CV events is of great concern- (I just can't wait to be the one
to present those results to senior management!). What about the idea of excluding high risk CV patients- ie
those that have already had an MI, CABG, or PTCA,? This may decrease the CV event rate so that a difference
between the two groups would not be evident. The only problem would be -Would we be able to recruit any
patients?

6. I am waiting for GI input on this one.
7.
8. Good idea-we probably can cut it out of the two week visit. Maybe leave it in the 6 week visit since some
studies suggest risk of bleeding is increased in the first month of therapy.
9.No data on the MEDCO card-its my untested hypothesis
13. ECG- I think that for sure we would want a baseline ECG on file before patients enter the study- esp given
our discussion of aspirin above. Maybe you are correct that we don't need to repeat it at V3- But remember this
```

The e-mail communication leaves little doubt that Merck and senior management had

deep concerns and were contemplating means of *'masking'* the number of potential

M007221568

adverse thrombotic related events by excluding high risk subjects from enrollment in the clinical trial. Further evidence of this is found in item #5 in the e-mail response of 1997/02/26 shown below that was written by Dr. Alise Reicin.

5.Low Dose Aspirin- I HEAR YOU! This is a no win situation! The relative risk of even low dose aspirin may be as high as 2-4 fold. Yet, the possibility of increased CV events is of great concern- (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients- ie those that have already had an MI, CABG, or PTCA.? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be -Would we be able to recruit any patients?

Regarding Dr. Reicin's comment: "What about the idea of excluding high risk CV patients – i.e., those that have already had an MI, CABG, or PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be – Would we be able to recruit any patients?":

This comment made by Dr. Reicin to her colleagues indicates she, and perhaps others at Merck, were aware that patients with underlying cardiovascular risk factors would be at greater risk for an adverse event. There is no other possible interpretation or conclusion. Merck knowingly placed the public at risk and withheld vital information from the prescribing physicians. Furthermore, when the outcome of the VIGOR trial provided clear evidence of adverse cardiovascular events (myocardial infarction, stroke), Merck continued to obscure the truth by insisting that VIOXX® was neutral and that the comparator treatment decreased the rate of thrombotic events, an explanation that was without scientific support and subsequently was demonstrated to be false.

The placebo controlled APPROVe trial exposed the truth when it was noted that a greater number of adverse cardiovascular events occurred in patients taking VIOXX® as compared to those receiving a placebo. It now was no longer possible for Merck to obscure the truth about potential adverse cardiovascular events associated with the use of the COX-2 inhibitor, VIOXX®. On September 30, 2004, Merck 'voluntarily' withdrew VIOXX® from the market.

M007221569

It is important to note that a similar prothrombotic outcome was observed in a clinical trial in which the COX-2 inhibitor, Celebrex™, was studied in a patient population similar to that in the APPROVe trial. The authors of the study report summarized the outcome of the Adenoma Prevention with Celecoxib (APC) Study as follows:

> "*Celecoxib use was associated with a dose-related increase in the composite end point of death from cardiovascular causes, myocardial infarction, stroke, or heart failure. In light of recent reports of cardiovascular harm associated with treatment with other agents in this class, these data provide further evidence that the use of COX-2 inhibitors may increase the risk of serious cardiovascular events.*"

It is not a coincidence that two separate trials, similar in design and enrolling patients without evidence of cardiovascular disease, demonstrate identical outcomes. The pharmacology of COX-2 inhibition, whether it involves VIOXX® or Celebrex, will have the same outcome as dictated by inhibition of the COX-2 enzyme, therefore indicating that the observed cardiovascular events are due to a *'class effect.'* Although the two drugs differ in chemical structure, they both share the same pharmacodynamic action whereby they inhibit the COX-2 enzyme and prevent the synthesis of PGI2, an event known to predispose to platelet aggregation and thrombus formation. "The science does not lie."

In a further effort to obscure the facts, Merck's representatives explained the outcome of the APPROVe trial by stating that VIOXX® does not increase the potential of 'thrombotic' events in patients who take VIOXX® for less than 18 months. The figure that appears in the New England Journal of Medicine shows the trend in 'thrombotic' events in the VIOXX® treated group and the placebo treated group in which the two curves begin to diverge at about 18 months.

M007221570