
Page 957:

1 therapy, did I?
2    A.   No, sir.
3    Q.   You've also had some arthritis during this
4 time, haven't you?
5    A.   Yes, sir.
6    Q.   You're not disputing that, are you?
7    A.   No, sir.
8    Q.   Why haven't you told Dr. Addison that you've
9 had muscle pain? Are you hiding things from him?
10   A.   No, sir, not really hiding things from him.
11 At the time I went to Dr. Addison, the pain wasn't -- I
12 wasn't hurting.
13            BY MR. WILKINS: Can I have just a
14            moment, your Honor? I'm trying to find a
15            document.
16 (PAUSE IN PROCEEDINGS)
17 BY MR. WILKINS: (Continuing)
18   Q.   Ms. Hardy, do you remember looking at the
19 very first document Mr. Johnson asked you about, the
20 very first document where it said your chief complaint?
21 Do you recall that when you first went to physical
22 therapy?
23   A.   I can't remember that first document that
24 he --
25   Q.   -- okay.
26            BY MR. WILKINS: Your Honor, could I
27            take just a moment?
28            BY THE COURT: Yes.
29            BY MR. WILKINS: Thank you.

Page 958:

1 (PAUSE IN PROCEEDINGS)
2 BY MR. WILKINS: (Continuing)
3    Q.   I want to put up 1038 that you were asked
4 about by Mr. Johnson. Can you see up at the top?
5 We'll highlight and blow that up, the chief complaint
6 section.
7    Ms. Hardy, what were your chief complaints on
8 January 23, 2001 to Dr. Rigsby at Mississippi Central
9 Rehab? Can you read that?
10   A.   Arthritis and leg and left knee.
11   Q.   Okay. You had three complaints?
12   A.   Yes, sir.
13   Q.   Okay. Your arthritis, your legs and your
14 left knee; is that right?
15   A.   Yes, sir.
16   Q.   And what medicine -- you were taking Baycol
17 January 23, 2001; is that right?
18   A.   Yes, sir.
19   Q.   And is that what that says down there at the
20 bottom of that document?
21   A.   Yes, sir.
22   Q.   Ms. Hardy, you were on physical therapy the
23 first round from January to May 2001; is that right?
24   A.   Yes, sir.
25   Q.   What, if anything, did Dr. Holland Addison
26 tell you about the dangers of Baycol during that time?
27   A.   He did not tell me anything.
28   Q.   What, if anything, did the Bayer defendants
29 or Bayer AG or Glaxosmithkline tell you about the

Page 959:

1 dangers of Baycol during that time?
2    A.   No, sir.
3    Q.   Nothing?
4    A.   Nothing.
5    Q.   Okay. What, if anything, did Dr. Rigsby tell
6 you from January to May of 2001 about the dangers of
7 Baycol at that time?
8    A.   Nothing.
9    Q.   And you finished in the summer of 2000 with
10 this first round, didn't you?
11   A.   Yes, sir.
12   Q.   And none of those defendants told you that
13 there were 31 deaths associated with Baycol at that
14 time?
15            BY MR. JOHNSON: Your Honor, I object --
16   A.   -- no, sir.
17            BY MR. JOHNSON: -- to leading and
18            cumulative.
19            BY THE COURT: Sustained. Don't answer
20            the question, Ms. Hardy, when there is an
21            objection.
22            BY MR. WILKINS: That's all.
23            BY THE COURT: You may step down.
24 (WITNESS EXCUSED)
25            BY MR. WILKINS: Your Honor, the
26            plaintiff calls Dr. Laura Plunkett.
27 DR. LAURA PLUNKETT,
28 called as a witness on behalf of the Plaintiff, having
29 first been duly sworn, was examined and testified as

Page 960:

1 follows, to-wit:
2 DIRECT EXAMINATION BY MR. PLEZIA:
3    Q.   Could you please state your name for us.
4    A.   My name is Laura Plunkett.
5    Q.   And can you tell us a little bit -- where are
6 you from?
7    A.   I currently reside in Houston, Texas.
8    Q.   Okay. And are you a doctor?
9    A.   Yes. I have a Ph.D. in pharmacology.
10   Q.   Okay. We've asked you to come down here
11 today in order to provide some expert testimony?
12   A.   That's correct.
13   Q.   And currently you charge for your time. How
14 much?
15   A.   I charge $250.00 an hour for preparation for
16 any case, and $350.00 for testimony time.
17   Q.   Okay. You've testified for plaintiffs
18 before?
19   A.   Yes, I have.
20   Q.   You've also testified for defendants before?
21   A.   Yes, I have.
22   Q.   We have provided you -- we, being the
23 plaintiffs, have provided you some materials in which
24 to review?
25   A.   Yes, you have.
26   Q.   Okay. Would those include hard copies of
27 documents from Bayer and Glaxosmithkline?
28   A.   Yes, many, many thousands of pages of
29 documents.

1  company in Houston that was the drug company that was
2  going to be developing a product and we went in and did
3  a mock GLP, good laboratory practice inspection, as
4  well as a just in mock inspection in general of the
5  records systems they were keeping for the regulations
6  they had to comply with.
7     Q.  Well, that's a mock exercise. You've never
8  done the real thing for the FDA, have you?
9     A.  Since I haven't worked for the FDA, I
10 couldn't have done it for the FDA, that's correct.
11    Q.  Have you ever been on any FDA advisory
12 committee?
13    A.  No, I have not.
14    Q.  And you have never been the person primarily
15 responsible for the preparation and submission of an
16 IND or an NDA to the FDA, have you, Dr. Plunkett?
17    A.  I've been a person responsible for writing
18 parts of a submission and getting it ready for
19 submission but I've never been the regulatory affairs
20 staff person at a company that would then sign off on
21 everything and send it in. That's correct.
22    Q.  And since you've never worked for the FDA,
23 you've never been responsible for reviewing an NDA, a
24 new drug application, at the FDA to make a final
25 determination about the safety and efficacy of any
26 compound, have you?
27    A.  Again, since I haven't worked for the FDA, I
28 could not have done that. That's correct.
29    Q.  And since you've never worked for the FDA,

1  you've never had the responsibility for making the
2  ultimate judgement about whether a drug product should
3  be approved for sale on the market in the United
4  States, have you?
5     A.  Again, not the having worked for the FDA, I
6  could not have done that.
7     Q.  You have never drafted a label for a
8  prescription drug, have you?
9     A.  I've never drafted an entire label. That's
10 correct.
11    Q.  Have you ever consulted with a pharmaceutical
12 company that has approved drugs on the market on the
13 content of the labeling on their products?
14    A.  Not drugs. As I said, I have worked with
15 companies that are getting ready to develop a product
16 and then I've also worked with medical device companies
17 that have products on the market.
18    Q.  But not for a pharmaceutical company?
19    A.  No, that's correct, as I stated.
20    Q.  And you have never worked with the FDA in any
21 capacity to prepare labeling for a prescription drug,
22 have you?
23    A.  If you mean as part of regulatory affairs
24 staff at a pharmaceutical company, that's correct. No.
25    Q.  You have never been in the position of
26 recommending a labeling change to the FDA as an
27 employee of a pharmaceutical company, have you?
28    A.  No. Again, as I have not been an employee of
29 a pharmaceutical company, I could not have done that.

1     Q.  And you've never been in a position to
2  implement a label change?
3     A.  Are you asking as an employee of a
4  pharmaceutical company?
5     Q.  Yes, I am.
6     A.  No, again, since I haven't been an employee
7  of that company. No, I could not have done that.
8     Q.  You have never evaluated a prescription drug
9  label to make the ultimate determination of whether it
10 should be approved for use in the United States, have
11 you?
12    A.  Are you asking me as a member of the staff at
13 the FDA?
14    Q.  Or as an employee of a pharmaceutical
15 company.
16    A.  Again, since I've not been a member of the
17 staff of the FDA or an employee of a pharmaceutical
18 company, I could not have done that.
19    Q.  Has the FDA, Dr. Plunkett, ever called you up
20 and asked for your advice or for your opinion on
21 whether it, the FDA, should approve or modify or reject
22 the labeling for a prescription drug product?
23    A.  No. And I don't know of any other
24 consultants like myself that would have been called up
25 that way.
26    Q.  Mr. Plezia talked with you briefly about your
27 curriculum vitae?
28    A.  Yes.
29    Q.  You have a bachelor of science in zoology?

1     A.  That's correct.
2     Q.  As I look at your CV, it seems to me that you
3  have authored one publication since 1989. Would that
4  be about right?
5     A.  No. I should have -- well, in what area are
6  you asking? I have a publication more recent than that
7  in the nineties on children's health and related to
8  lead toxicity.
9     Q.  That was in 1999 according to your CV?
10    A.  Yes.
11    Q.  Lead as a case study to current FIFRA
12 guideline tests, protect infants and children?
13    A.  That's correct.
14    Q.  And the most recent published article before
15 that, according to my copy of your CV, was in 1989?
16    A.  In a peer review publication. That's
17 correct. I have a book chapter in '92 and, of course,
18 numerous abstracts.
19    Q.  Have you practiced as a clinical
20 pharmacologist for the past 12 or 13 years?
21    A.  Will you define what you mean by clinical
22 pharmacologist?
23    Q.  How would you define it?
24    A.  Well, clinical pharmacology can mean
25 different things to different people. There is
26 actually a specialty among medical doctors, for
27 example, that consider themselves to be clinical
28 pharmacologists based upon their medical training.
29 There is -- clinical pharmacology to me can also be the

something that is in the labeling where a doctor can read it and see that he is being warned that this could happen.

An unlabeled event is one that is not in the label because no one knows to look for it yet. It's an unexpected adverse event, something that occurs after the drug is put on the market that nobody knew about.

And so the difference between those two is important for adverse event reporting because, first off, they're classified differently. One called unlabeled and labeled, and you have different reporting requirements depending on that.

But, more importantly, the adverse event reporting system that FDA supervises or has set up focuses first on the unlabeled -- analysis of the unlabeled events. In this case with Baycol this was a labeled event that we were looking at.

BY MR. GOODMAN: Your Honor, I object. Now the witness is giving labeling expert opinion testimony, and it is outside her area of expertise.

BY THE COURT: Sustained.

BY MR. GOODMAN: For the reasons previously stated.

BY THE COURT: I'm going to ask you not to give any opinion until he asks you for one. You keep rambling on, and then you give an opinion and nobody can object to it. It's out of your mouth.

1085

---

A. Okay. I'm sorry. I'll try to be shorter.

BY MR. PLEZIA: (Continuing)

Q. First, I want to talk about the difference between labeled and unlabeled. Are there different regulations for a labeled event as opposed to an unlabeled event?

A. It's not that there's different regulations. Same regulation, but they're defined differently, and you have to look at them as individual events.

Q. When you're talking about an unlabeled event, what are you talking about?

A. I'm talking about something that is not listed currently in the labeling for the drug that has occurred.

Q. Okay.

A. So it's an adverse event that is being recognized for the first time.

Q. All right. And a labeled event would be something that would have occurred that was in the label; is that right?

A. Yes. That's correct.

Q. The exact opposite?

A. Well, yes.

Q. All right. Is rhabdomyolysis a labeled event in the Baycol label?

A. Yes.

Q. Okay. And if rhabdomyolysis is a labeled event, do you have an opinion as to whether or not that's treated differently at the FDA?

1086

---

BY MR. GOODMAN: Your Honor, I object. It calls for speculation. She's never worked at the FDA. She's not a labeling expert. It's outside the scope of her expertise.

BY THE COURT: I'll sustain.

BY MR. PLEZIA: May we approach.

(BENCH CONFERENCE).

BY THE COURT: We're going to take a 10 minute break.

(FOLLOWING THE BRIEF RECESS, THE TRIAL CONTINUED AS FOLLOWS:)

BY THE COURT: Are y'all ready?

BY MR. WILKINS: Yes, sir, your Honor.

BY THE COURT: All right. Invite the jury back in.

(THE JURY RETURNED TO THE COURTROOM AND THE FOLLOWING PROCEEDINGS WERE HAD IN THE PRESENCE AND HEARING OF THE JURY:)

BY MR. PLEZIA: (Continuing)

Q. Let me move over to a little bit of pharmacology. First, were you able to identify whether or not Baycol was more toxic than the other statins?

A. Yes, based on the information I reviewed. Yes.

Q. Okay. And what information did you review in order to come to that opinion?

A. That would be the -- well, first generally the basic toxicological profile which was consistent with all the statins to start. But then when you look

1087

---

out and dig out those individual events, looking at the reporting rates as they differed between cerivastatin, or Baycol in particular, and some of the other statins it was compared to.

Q. How did the reporting rates tell you or indicate to you that Baycol is more toxic?

A. Well, the reporting rates were in the range of anywhere from in some cases two to threefold to as much as 20, 30-fold higher for end points like rhabdomyolysis for Baycol as compared to other statins. In particular the comparison I was most interested in was the comparison to atorvastatin.

Q. Okay. And why was the comparison to atorvastatin interesting to you?

A. Atorvastatin had been approved for marketing only about six months or so before Baycol was approved. And one of the limitations to analysis of data for an adverse event reporting system is you need to look at the time on the market because the time on the market can affect the rate at which things are reported. So you want to pick a comparator when you're comparing that has similar time on the market so that you get rid of that bias or try get rid of that confounding factor in your analysis.

Q. In looking at Baycol, then, do you take toxicity as one of the risks of a particular drug?

A. Well, toxicity is essentially the risk I was looking at. That's exactly right.

Q. And when you do a risk benefit analysis, do

1088

NO. 17-189980-01

| | |
|---|---|
| BETTY STRONG, Individually and on behalf of the Estate of GERALD E. STRONG, Deceased, Plaintiffs, | IN THE DISTRICT COURT |
| VS. | |
| BAYER, A.G., a foreign corporation; BAYER CORPORATION, a wholly-owned subsidiary of BAYER A.G.; BAYER PHARMACEUTICAL DIVISION- NORTH AMERICA; a Division of Bayer Corporation; GLAXOSMITHKLINE PLC; SMITHKLINE BEECHAM d/b/a GLAXOSMITHKLINE; TODD COWAN, M.D.; WHITTEN RIDGLEA DRUG; PACIFICARE HEALTH SYSTEMS, INC.; PACIFICARE OF TEXAS INC.; SECURE HORIZONS, a Division of PacifiCare of Texas, Inc., and PACIFICARE, a Division of PacifiCare of Texas, Inc., Defendants. | TARRANT COUNTY, TEXAS |
| | 17TH JUDICIAL DISTRICT |

VIDEOTAPED AND ORAL DEPOSITION OF
LAURA PLUNKETT
March 27, 2003

Reported by: SHANNA BROWN-KORENEK
JOB #40333

---

INDEX

| | PAGE |
|---|---|
| Appearances | 4 |
| Examination by Mr. Anielak 10:04 a.m. - 12:15 p.m. | 8 |
| Examination by Ms. Meadors | 305 |
| Examination by Mr. Grayson | 306 |
| Further Examination by Mr. Anielak | 307 |
| Signature and Changes | 310 |
| Reporter's Certification | 311-312 |
| Reporter's Further Certification | 313 |

EXHIBITS

| NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Notice of Deposition | 7 |
| 2 | Select Summaries and Records of Gerald Strong | 10 |
| 3 | Oral Deposition of Todd Cowan | 12 |
| 4 | Chronology of Cerivastatin | 14 |
| 5 | Medical Reports | 18 |
| 6 | Three Letters to Laura Plunkett from Mark Clore Dated 12-23-02, 1-7-03 and 1-8-03 | 25 |
| 7 | Billing Summaries | 61 |
| 8 | Letter to Laura Plunkett from Mark Clore Dated 1-10-03 | 83 |
| 9 | Designation | 83 |
| 10 | Printout Reports | 86 |

---

EXHIBITS CONTINUED

| NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 11 | Printout Reports | 86 |
| 12 | Scientific Evidence Consulting Service Agreement | 108 |
| 13 | Bayer's Expert Witness Designation and Supplemental to Plaintiff's Request for Disclosure; Smithkline's Designation of Experts and Second Supplemental Response to Plaintiff's Request for Disclosure | 117 |
| 14 | Baycol Chronology Summary, Deposition Summaries, DVD of Documents | 117 |
| 15 | Curriculum Vitae | 118 |
| 16 | Power Point Presentation | 141 |
| 17 | Handwritten Notes of Deposition of Roger Celesk | 141 |
| 18 | Handwritten Notes of Deposition of Paul McCarthy | 141 |
| 19 | Medical Officer's Review of NDA | 176 |
| 20 | Center for Drug Evaluation and Research Medical Review | 191 |
| 21 | Medical Officer Review | 218 |
| 22 | Adverse Event Reporting System Dated 10-18-99 | 240 |
| 23 | Numerous CD roms and DVDs | 308 |

* * * * *

---

VIDEOTAPED AND ORAL DEPOSITION of LAURA PLUNKETT, produced as a witness at the instance of the Defendant, Bayer Corporation, and duly sworn, was taken in the above-styled and numbered cause on the 27th of March of 2003, from 9:15 a.m. to 5:15 p.m. before SHANNA BROWN-KORENEK, CSR in and for the State of Texas; reported by stenographic means, at the offices of Williams Bailey Law Firm, L.L.P.; 8441 Gulf Freeway, Suite 600; Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated in the record or attached hereto.

* * * * *

APPEARANCES

COUNSEL FOR THE PLAINTIFF:
Mr. Mark D. Clore
CLORE, PENA & BERRY, L.L.P.
440 Louisiana, Suite 1900
Houston, Texas 77002
Phone: (713) 223-4200    Fax: (713) 223-4777
Email: Markeclorepenaberry.com

Mr. Robert A. Schwartz
WILLIAMS BAILEY LAW FIRM, L.L.P.
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Phone: (713) 230-2200    Fax: (713) 643-6226
Email: Bschwartz@williamsbailey.com

example. It can lead to heart attack, it can lead to stroke. There's a number of sequelae that you can get with high lipids. Some of it is anecdotal or associational and some of it is true, been proven cause and relationship.

Q   And those are serious or can be serious conditions?

A   They can be, yes.

Q   Life-threatening conditions?

A   They can be, yes.

Q   You don't have any formal education in the ethics of pharmaceutical companies, right?

A   I have experience in working with pharmaceutical companies; but I haven't taken an ethics course in a college, if that's what you're asking, no.

Q   No formal education in pharmaceutical labels?

A   Again, there is -- as far as I know, there is no such degree in pharmaceutical labels.

Q   But no formal education in what you did in your undergraduate or Ph.D. program on pharmaceutical labels as a class?

A   Well, not quite correct. I trained at a pharmacy school and part of the courses I took were the same kinds of courses that pharmacists take; so,

125

certainly label was discussed in some of the courses I took --

Q   No, formal -- I'm sorry.

A   -- and what is required in a label. The issue we would be discussing as a pharmacist, where to look for important information for your patient, what labels look like, what kinds of things go into them.

Q   No formal education how to draft a pharmaceutical label?

A   I did take a course -- I took a course and I don't know if you call this formal education. I took a course -- this is what I've remembered when people have asked me this question before. FDLI, the Food, Drug and Law Institute, gives courses where you can go sign up and take and I know that one of the food, drug and law courses I took had to do with labeling.

Q   How long ago was it when you took that class?

A   It was when I was with ENVIRON; so, that would have been in the early 90s.

Q   Anybody can go sign up and take that class? It's kind of a night school thing or something like that?

A   No, you have to pay money. It's a course you pay for. It's usually during the day. The one I took was during the day. I don't know if they're offered

126

at night. It's usually lawyers and then people like myself, people that were interested on FDA regulatory issues or regulatory affairs.

Q   Do you know how long that class lasted?

A   Several days, but I don't know and I don't think I have any of the materials still, but they publish books of their courses.

Q   No formal education in interpreting spontaneous adverse event reports, how to do that?

A   That would have been things I would have learned while I worked with ENVIRON.

Q   But no formal education in that area? That is my question.

A   Again, other than it may have been discussed in one of these food, drug and law courses. Certainly those -- I mean, the courses that I took was an overview of drug law and I believe I also took one on medical device law and they cover the CFR, you know, throughout all the sections and they talk about the things that are required and the regulations and what you do.

Q   But as far as the information on your CV, those courses didn't have any formal education about how to interpret spontaneous adverse event data?

A   You mean during my Ph.D. or my B.S.?

127

Q   Right.

A   No.

Q   And the two-day class that you took dealt with CFR provisions which would be contained in 21CFR? Is that what the two days covered, those types of regulations?

A   They would have covered the regulations in here and then they usually had their own -- the people that would speak tended to be lawyers, food and drug law lawyers, and they would have their own notes or things they would put up on the screen.

Q   So I assume in two days, they can only provide probably a pretty general overview about all of those regs?

A   Well, I don't know if it was only two days. I can't remember that. I know it was several days. It may have been a week. I just don't know. You'd have to go back and look at the syllabus. I think you can go on-line and see how often they normally last and they normally cover throughout these books the general provisions, the different things that are required premarket and postmarket. They don't usually cover the enforcement regs. They usually cover mainly the things that are required for registration or development. Or at least the parts that I attended, I

128

1    Q    (By Mr. Anielak) I'm handing you what the
2    court reporter has marked as Deposition Exhibit No.
3    16. It's a set of slides that you brought with you.
4    What are those?
5    A    These are the -- a copy of the Power Point
6    presentation I presented in Istanbul, Turkey, last
7    fall -- no, I'm sorry. Well, you know what, this says
8    University of Houston Clear Lake; but this is the
9    exact same talk I gave in Istanbul. I just realized
10   that, when I printed it out, we didn't print the right
11   cover page for you.
12   Q    Had anybody else given that talk with you or
13   in conjunction with you?
14   A    No, this is my talk.
15   Q    How many times have you given that talk?
16   A    This particular talk, twice. I used the same
17   slides twice. I've given talks on these general areas
18   actually more broadly. This talk that I gave at the
19   University of Houston in November and then also in
20   Turkey in October of this last year. This is November
21   2001. I gave the Turkey talk in October of 2002.
22   Those two talks were on specifically the FDA
23   regulations dealing or regulations dealing with
24   biotechnology, which would be pharmaceuticals, foods,
25   the entire gamut of how you could use that technology

1    to develop a product.
2    Q    What else would be included in there, drugs,
3    medical devices, food?
4    A    Foods. Those are the main three that I was
5    talking about.
6    Q    Cosmetics?
7    A    Could be cosmetics. You could talk about
8    that, yes, but cosmetics are not regulated in the same
9    way; so, it would be a little shorter talk.
10   Q    You've never been employed by the FDA, right?
11   A    No.
12   Q    You've never been an FDA approved officer,
13   right?
14   A    No.
15   Q    You never worked in conjunction with the
16   FDA's pharmacovigilance office?
17   A    I've never worked for the FDA, that's
18   correct.
19   Q    You've never worked for that office in any
20   way?
21   A    You mean as an outside consultant?
22   Q    Yeah, with the FDA's pharmacovigilance
23   office?
24   A    No.
25   Q    Have you ever been responsible for evaluating

1    a drug company's postmarketing surveillance system who
2    is marketing drugs?
3    A    For a drug company, no. As I told you
4    before, I've done some of that in the medical device
5    area but not with the drug.
6    Q    You've never written any kind of report
7    evaluating a drug company's method for reporting
8    spontaneous reports, right?
9    A    Written a formal report, no.
10   Q    Consulted about a drug company's method of
11   reporting spontaneous reports?
12   A    I've talked with some of these small
13   companies about issues related to what you have to
14   report when you set up such a system; so, in
15   conjunction with some of the smaller companies or in
16   talks I've given where I've talked to people about it,
17   I've talked about there's an adverse event reporting
18   system, there's certain requirements, things like
19   that, in general terms, exactly.
20   Q    You haven't consulted with a drug
21   manufacturer about its labeling for marketed products?
22   A    For a marketed product, no.
23   Q    You've never been on an FDA advisory
24   committee, right?
25   A    No.

1    Q    You haven't worked for a pharmaceutical
2    company as an employee, right?
3    A    That's correct.
4    Q    You've never been the person primarily
5    responsible for preparing or submitting an NDA?
6    A    Primarily responsible, no, that's correct.
7    Q    You haven't been primarily responsible for
8    submitting an IND on behalf of a pharmaceutical
9    product, right?
10   A    No. I've written sections on both of those,
11   but I've not ever been the one responsible for
12   submitting it, that's correct.
13   Q    And those sections have been the pharmacology
14   toxicology type sections?
15   A    Well, the IND of course are basic
16   pharmacology toxicology studies and then I've written
17   the reports on the phase 1 clinicals for Zonagen,
18   which would have been submitted as part of their NDA,
19   I guess. Well, I assume they went into the NDA.
20   That's what I did the data analyses for.
21   Q    Do you even know if that got filed in the
22   NDA?
23   A    Well, it should have. By law it should have
24   been filed because it was a study used to support the
25   later clinical trials.

### Page 149

1  have to do; but I've not been the person who's
2  implemented it at the company.
3      Q   You've never been responsible to evaluate
4  adverse event reports for a marketed drug or have any
5  input as to decisions related to labels or withdrawal
6  or anything like that, right?
7      A   I've done some of that for devices but not
8  for drugs, that's correct.
9      Q   You haven't drafted a label for a marketed
10 pharmaceutical drug, right?
11     A   I think I already answered that. That's
12 correct.
13     Q   What are the regulatory issues of the 483
14 warning letter, just in general, that you dealt with
15 with regard to the Transpontation Research?
16     A   Well, I don't think I should share the
17 specifics.
18     Q   I don't want the specifics.
19     A   I think it's public information.
20     Q   Right, I think it's public information.
21     A   It had to do with -- it had a couple of
22 issues brought up on the letter. It had to do, some
23 of it, with manufacturing and some of it with adverse
24 event reporting.
25     Q   What about the inspection 483 for the New

### Page 150

1  Jersey firm?
2      A   It covered a lot of different things. They
3  had some real problems. It covered things such as
4  manufacturing and tracking, how they were -- the
5  quality, the quality control issues, essentially, for
6  their product. They had some -- I think some things
7  related to sterilization. They had some things
8  related to postmarket surveillance. They had things
9  related to just a general lack of standard operating
10 procedures across the board for their entire device.
11 I mean, it was a big problem.
12     Q   For their marketed products?
13     A   For their marketed products, exactly.
14     Q   Did they bring in other consultants as well,
15 besides yourself?
16     A   They brought another consultant, they brought
17 myself and they brought the attorney that I was
18 working with in. There were three of us.
19     Q   And another consultant?
20     A   Yes. The other consultant was somebody who
21 was going to do a mock audit for them after it was
22 finished; so, the attorney and I were talking with
23 them about how to respond, helping them draft sections
24 to respond, and then the third person they brought in
25 was a specialist in doing mock audits. So she was

### Page 151

1  going to do a mock audit so that when the FDA came
2  back in, hopefully they would have taken care of all
3  of those issues.
4      Q   And the Transpontation Research, did they
5  bring in any other consultants in as well to help them
6  in that?
7      A   No. Well, we had an attorney. I'm sorry.
8  We had an attorney involved there; so, is that a
9  consultant?
10     Q   Could be, I guess.
11         Outside of your work for plaintiffs'
12 attorneys in litigation, have you ever been in a
13 position to evaluate the overall risk/benefit of a
14 marketed drug?
15     A   Yes. Outside of plaintiffs' attorneys, yes.
16     Q   Let's say outside of litigation, have you had
17 the opportunity to evaluate the overall risk/benefit
18 of a marketed drug?
19     A   Well, I do that every day for myself; but
20 outside of a personal thing that I might do for
21 myself, the other example that I've had have been
22 working with defense in litigation.
23     Q   Outside of litigation, have you had the
24 opportunity or responsibility, other than trying to
25 determine whether or not you're going to take a

### Page 152

1  certain prescription, of evaluating the risk/benefit
2  of a prescription marketed drug?
3      A   Some of the products that I worked with at
4  ENVIRON dealt with risk/benefit of compounds when we
5  were preparing documents; so, as I was telling you, we
6  would go on behalf of a client. So some of that is
7  relevant to that because we would have to review
8  pieces of data and talk about how that impacted on the
9  risk/benefit overall for the drug; so, yes, I guess I
10 have done it because that was in the either
11 preapproval phase or postmarketing product stewardship
12 phase. So I've done some of that, yeah.
13     Q   And that would be with pharmacology
14 toxicology type issues while you were at ENVIRON?
15     A   Yes, acting as a scientist looking at
16 different kinds of data that were available on a
17 particular issue or compound.
18     Q   Animal studies or the toxicology studies?
19     A   Could be human, but animal, human. Could be
20 cell studies, could be mechanistic studies, could be
21 theoretically, how should we design studies and things
22 like that.
23     Q   And that was your piece while you were at
24 ENVIRON would be focused on those types of issues?
25     A   The projects might have been more complex and