No Transmission Information Available    in  on line [0] for KD09594 * Pg 2/24
May.24. 2006  9:48AM                                                    No.4232   P. 2/24

**Expert Statement of**

**LAURA M. PLUNKETT, Ph.D., DABT**

### I.        Qualifications

1.   I am a pharmacologist, toxicologist, United States Food and Drug Administration (FDA) regulatory specialist, and principal of a consulting company known as Integrative Biostrategies, LLC.  Integrative Biostrategies is a consulting firm that works at the interface of the biological sciences, regulatory affairs, and business decisions to provide its clients with science-based solutions to issues associated with product development and stewardship. Prior to becoming a partner in Integrative Biostrategies, I was head of Plunkett & Associates, a health and environmental sciences consulting firm based in Houston, Texas.  I have over twenty years of experience in the areas of pharmacology and toxicology and have worked in both government and academic research and have taught pharmacology and toxicology at the undergraduate and postgraduate levels.

2.   I received a B.S. degree in 1980 from the University of Georgia, and a Ph.D. in pharmacology from the University of Georgia, College of Pharmacy, in 1984.  My doctoral research was focused in the area of cardiovascular pharmacology and specifically dealt with delineating mechanisms responsible for the cardiac toxicity of digitalis glycosides.

3.      From June of 1984 through August of 1986, I was a Pharmacology Research Associate Training (PRAT) fellow at the National Institute of General Medical Sciences, Bethesda, Maryland.  I worked in a neurosciences laboratory of the National Institute of Mental Health.  My research also focused on the role of the autonomic nervous system in control of cardiovascular function.

4.      I am board-certified as a Diplomate of the American Board of Toxicology.  I am a member of several professional organizations, and have authored or co-authored numerous scientific publications.

1

MODEL14657

5.  From September 1986 to June 1989 I was an Assistant Professor of Pharmacology and Toxicology in the medical school at the University of Arkansas for Medical Sciences, Little Rock, Arkansas where I performed basic research in the areas of neuropharmacology and toxicology as well as cardiovascular pharmacology and toxicology.  I taught courses for both medical students and graduate students in pharmacology and toxicology as well as the neurosciences.

6.  From December of 1989 to August 1997 I worked for ENVIRON Corporation, first in the Arlington, Virginia office and then in the Houston, Texas office.  At ENVIRON, I worked specifically within the health sciences group and most of my projects dealt with issues surrounding products or processes regulated by the FDA.  During my consulting career at ENVIRON, while with Plunkett & Associates, and now at Integrative Biostrategies, I have worked on a variety of projects dealing with the regulation of products by the FDA including, human drugs, veterinary drugs, biologics, medical devices, consumer products, dietary supplements, and foods.  I have advised my clients on regulatory strategies for their products, designed preclinical and clinical studies for both efficacy and safety, advised clients on issues related to statements regarding efficacy and warnings for their products based on the current labeling regulations, and generally acted as a regulatory affairs staff for small companies in the early stages of product development.  Details on some of these projects are outlined in my curriculum vitae, a true and correct copy of which is attached hereto as Exhibit P-1.

## II.    Information Reviewed

7.  In the course of my work on this case, I have reviewed and/or will rely on the following materials in relation to the claims:

a)  scientific literature relating the pharmacology and toxicology of non-steroidal anti-inflammatory drugs (NSAIDs) in general and rofecoxib (Vioxx®) in particular;

b)  labeling for Vioxx as provided in the Physician's Desk Reference;

2

M00EI14658

c)  the regulations of the U.S. Food and Drug Administration (FDA) relating to the development, approval, labeling, and marketing of prescription drug products;

d)  internal company documents (Merck & Co, Inc. documents) relating to the development, regulatory status and marketing of Vioxx;

f) FDA documents relating to the development, approval and marketing of Vioxx as well as information available on the FDA website related to Vioxx;

h) depositions of various Merck employees; and

g) reports and testimony of various expert witnesses involved in the Vioxx litigation and various cases including but not limited to Dr. Lucchesi and Dr. Ray.

A list of the references and documents I have reviewed and/or relied on in forming my opinions in this case is attached here as Exhibit P-2.

## III.    Summary of Opinions
## A.     Background

8.  Rofecoxib, marketed in the U.S. under the trade name of Vioxx, was a widely prescribed prescription drug product that was approved by the FDA in May of 1999.  The pharmacological basis for the effects of Vioxx was its activity to inhibit eicosanoid synthesis through selective inhibition of an enzyme known as COX-2.  Vioxx is also a member of a category of drugs known as NSAIDs.  Before it was removed from the market on September 30, 2004, the drug was labeled for the treatment of pain and inflammation as symptoms of osteoarthritis, rheumatoid arthritis, dysmenorrhea, or migraine.  Vioxx was removed from the market after an interim analysis of an ongoing clinical trial, the Adenomatous Polyp Prevention on Vioxx (APPROVe) trial, showed that patients taking 25 mg of Vioxx had a nearly 3-fold increased risk of serious coronary heart disease (myocardial infarction, sudden cardiac death, unstable angina).

3

MODEI14659

No Transmission Information Available    in  on line [0] for KD09594 * Pg 5/24
May.24. 2006  9:48AM                                              No.4232   P. 5/24

9.      Eicosanoids are a group of compounds that are synthesized from arachidonate, a ubiquitous cell membrane lipid, in cells and tissues throughout the body. In response to the activity of a hormone or other stimulus, the cell membrane phospholipid structure is attacked and arachidonate is released. Arachidonate is the precursor molecule for a family of compounds referred to as eicosanoids. Eicosanoids are a family of potent biological signaling molecules that act as short range messengers, or local messengers, affecting tissues near the cells where they are produced. Eicosanoids include prostaglandins, prostacyclin, thromboxane $A_2$, and leukotrienes. These signaling molecules are involved in a variety of physiological processes including inflammation, maintenance of smooth muscle tone, hemostasis, thrombosis, parturition, and gastrointestinal secretion. Several classes of drugs currently marketed, including aspirin and NSAIDs, produce their therapeutic effects through blocking the formation of various eicosanoids.

10.      The biology of eicosanoids have been known for decades and are discussed in almost all human physiology, biochemistry, and medical textbooks. A Nobel Prize was awarded in 1982 to three researchers (Bergstrom, Samuelsson and Vane) based on their work that led to the link of inhibition of prostaglandin synthesis to the therapeutic effects of aspirin and NSAIDs. The therapeutic effects of both aspirin and NSAIDs have been attributed to their ability to inhibit the activity of a specific family of enzymes, known as the COX enzymes. COX enzymes have two types of activity, as cyclooxygenases and as hydroperoxidases. Cyclooxygenase activity is responsible for the first step in the eicosanoid biosynthetic pathway, converting arachidonic acid to $PGG_2$. Hydroperoxidase activity by COX enzymes then convert $PGG_2$ to $PGH_2$. It is $PGH_2$ that is the precursor molecule for the bioactive compounds including thromboxane $A_2$, prostacyclin, and the prostaglandins (*e.g.*, $PGE_2$, $PGF_{2\alpha}$, $PGD_2$). Reviews of eicosanoid biosynthesis are available in many textbooks (see for example Smyth et al. 2006. In: *Goodman & Gilman's The Pharmacological Basis of Therapeutics*, 11[th] edition, Brunton et al. (Eds), McGraw-Hill: New York, chapter 25). Two distinct isoforms of COX are present in mammalian tissues and are denoted as COX-1 and COX-2. COX-1 is expressed constitutively in most cells

4

MDGE14660

while COX-2 is expressed in response to stimuli such as growth factors, shear stress and cytokines, with a lower level of constitutive expression in tissues as compared to COX-1.

11.     Once COX enzyme activity has formed $PGH_2$, the formation of the various eicosanoids is dependent on the cell type within which they are synthesized and the tissue-specific enzymes found within that cell. Vascular smooth muscle cells, leukocytes, endothelial cells and platelets all express the enzyme PGE synthase and thus are capable of generating the inflammatory compound $PGE_2$. However, platelets also express thromboxane synthase and produce large amounts of the prothrombotic, vasoconstrictive compound thromboxane $A_2$. Endothelial cells, including those on interior surface of blood vessels, express PGI synthase and synthesize the anti-thrombotic, vasodilatory compound $PGI_2$, also known as prostacyclin. The complexity of the eicosanoid biosynthetic system in tissues throughout the body is an important physiological response system that affects functioning of many body systems including the cardiovascular system, the respiratory system, the gastrointestinal system, the kidney, the central nervous system, and the immune system.

12.     It is generally accepted that the principal therapeutic effects of both aspirin and NSAIDs are attributable to the inhibition of COX enzyme activity, thus inhibiting the local synthesis of various eicosanoids in body tissues (Smyth et al. 2006. In: *Goodman & Gilman's The Pharmacological Basis of Therapeutics*, 11th edition, Brunton et al. (Eds), McGraw-Hill: New York, chapter 25). For example, the anti-inflammatory effects of both aspirin and NSAIDs are linked to their ability to reduce formation of the pro-inflammatory eicosanoids, which would include the prostaglandins and the leukotrienes. In addition to being linked to the therapeutic effects of aspirin and NSAIDs, however, the inhibition of COX enzymes is also linked a variety of unwanted side effects, side effects that can be serious and even life-threatening. One of the most common side effects of COX enzyme inhibitors is the development of bleeding ulcers. This is believed to occur because of the inhibition of the production in the stomach of two compounds, $PGE_2$ and prostacyclin, compounds that increase mucous secretion, reduce gastric acid secretion and reduce pepsin content, all effects that are protective to the lining of the

5

MODEI14661

stomach. In fact, a prostaglandin $E_1$ ($PGE_1$) analog, misoprostol, is approved by the FDA for treatment of gastric ulcers.

13.      Much of the development of NSAIDs in the 1980's was driven by the search for more effective anti-inflammatory and analgesic agents, well-established pharmacological properties of the drug class. In the case of aspirin, however, its unique ability to irreversibly inhibit the activity of COX in platelets was used as a basis for exploring additional therapeutic uses. Inhibition of COX activity in platelets inhibits formation of thromboxane $A_2$, an eicosanoid that promotes platelet aggregation. Therefore, researchers explored the use of aspirin in the treatment or prophylaxis of diseases associated with platelet hyperaggregability, such as coronary artery disease, myocardial infarction and deep vein thrombosis. By the late 1990's, low dose aspirin had become an accepted therapy for cardioprotection in patients with a history of, or the risk of, myocardial infarction and stroke (see various sources such as Isselbacher et al. 2001. *Harrison's Principles of Internal Medicine*, 13th edition, page 1813, McGraw Hill: New York; website for the American Heart Association, www.americanheart.org).

14.      With the discovery in the early 1990's of two isoforms of COX, COX-1 and COX-2, the isoforms were also identified as having potentially different roles in various biological processes because of their differing expression profiles and locations in tissues and cells. For example, platelets were identified as expressing only COX-1 (Antman, E.M. et al. 2005. *Circulation* 112:759-770), and the cardioprotective effects of aspirin were attributed to the COX-1 inhibiting activity which reduces the production of thromboxane $A_2$ and reduces platelet aggregation. COX-1, with its constitutive expression in cells of all types, was shown to be a target for aspirin as well as all of the known NSAID drugs. COX-2, however, exhibits a different expression profile, its constitutive activity being at a lower level. Most of its activity is thought to be induced or up-regulated by inflammatory cytokines, although it is also expressed in normal endothelial cells exposed to shear stress (Antman, E.M. et al. 2005. *Circulation* 112:759-770). It was this apparent difference between the isoforms that led to the search for compounds that were selective inhibitors of COX-2, based on the premise that COX-2 inhibition was

6

MODEL14662

responsible for the anti-inflammatory effects of the non-selective inhibitors, while COX-1 effects in platelets were partly responsible for the gastrointestinal bleeding seen with non-selective COX inhibitors.  Vioxx is one of the class of compounds referred to as selective COX-2 inhibitors.

**B.     Pharmacological and Toxicological Profile of Vioxx: Implications for Cardiovascular Safety**

15.     It has been established through collection of *in vitro* data, *in vivo* animal data, human clinical data, and epidemiologic data that the toxicological profile for Vioxx includes a variety of adverse cardiovascular events including increased blood pressure, myocardial infarction, peripheral edema, and stroke.  Although it is impossible to define the exact molecular mechanisms responsible for these events in humans, several mechanisms have been advanced and supported by a variety of scientific data.

16.     Vioxx was under development by Merck in the 1990's.  During that time, the developing science of COX-2 inhibitors established a firm basis for the potential vascular and prothrombotic responses as well as the adverse cardiovascular effects (increased blood pressure and edema) that have now been associated with Vioxx.  This basis was in fact established before Vioxx was placed on the market in 1999.  The evidence that established a basis for Vioxx's adverse cardiovascular effects include:

- As early as the 1970's, and as reviewed in the 1982 Nobel lecture of Dr. Vane, the roles of endothelial-derived prostacyclin and platelet-derived thromboxane $A_2$ to affect thrombosis were known.  This early work established the biological basis for the proposition in later years that unchecked activity of thromboxane could enhance thrombosis locally.  Local thrombosis would be a risk factor for events such as myocardial infarction and stroke.

7

MOO6E14663

No Transmission Information Available   in   on line [0] for KD09594 * Pg 9/24
May.24. 2006  9:49AM                                                              No.4232   P. 9/24

- In 1989, an article was published specifically linking the marked reduction of prostacyclin seen after administration of an analgesic/anti-inflammatory drug (acetaminophen) with potential adverse cardiovascular toxicity (Green et al. 1989. *Prostaglandins* 37:311-315). In the study, the authors reported that a single dose of acetaminophen caused marked reductions in prostacyclin synthesis but no effect on thromboxane synthesis *in vivo* in healthy volunteers. As stated in the article:

  > "*Our previous studies have clearly demonstrated an involvement of both thromboxane and prostacyclin in several pathological conditions such as acute myocardial infarction, deep vein thrombosis and following insertion of synthetic surfaces into the circulation (12). The marked inhibitory effect of acetaminophen on prostacyclin synthesis might very well be of clinical importance since inhibition of prostacyclin, a potent vasodilating and platelet anti-aggregating compound, should be disadvantageous for patients suffering from cardiovascular disorders.*" [see pages 313-314]

  Therefore, this paper provided specific statements about the potential for adverse cardiovascular consequences when a drug causes a decrease in prostacyclin, without a concomitant decrease in thromboxane.

- In a textbook published by Merck in 1992 (*The Merck Manual, 16th edition*, 1992. Berkow and Fletcher (eds.), Merck Research Laboratories: Rahway, NJ), the company provided a review of the state of the science in 1992 as it applied to eicosanoids. In the manual it is stated that prostacyclin is synthesized in blood vessel walls and that the balance of clot formation in blood vessels is dependent on the relative amounts of prostacyclin as opposed to thromboxane $A_2$. Therefore, Merck was clearly aware as early as 1992 of the biology of the eicosanoids as they related to thrombosis and, therefore, risk of adverse cardiovascular events if the synthesis of these agents was affected locally.

8

MODE114664

- In a 1995 review article, the state of the science on eicosanoid biology was discussed, including the well-known effects of eicosanoids on platelet reactivity, as well as the differential effects of COX-1 versus COX-2 on thrombotic events (Eberhart, C.E. and R.N. Dubois. 1995. *Gastroenterology* 109:285-301). Therefore, the relationship of altered platelet function and inhibition of COX enzymes was established.

- In patent applications filed by Merck scientists, with patent rights assigned to Merck, the combined use of an anti-platelet agent with a COX-2 selective inhibitor was promoted as a way to reduce the risk of thrombotic cardiovascular disease in patients. It is clear from review of the patent applications (U.S. Patent No. 6,136,804 filed March 12, 1999 with a priority date of March 13, 1998; U.S. Patent Application No. 2002/0016342 A1, filed May 21, 2001) that the risks of cardiovascular events associated with thrombosis were well known and could be reduced by use of an anti-platelet agent, such as aspirin. The patent applications clearly distinguish the effects on platelets from the anti-inflammatory effects, with an emphasis on the anti-platelet effects. This is further supported by a description of the invention found in a Statement of Invention document (MRK-AEE0000552 to 558) where it is stated:

  > *"The invention covers the combination of Refecoxib (VIOXX) and other COX-2 inhibitors in combination with either a thromboxane receptor antagonist or a thromboxane synthase inhibitor or a dual blocker (receptor antagonist/enzyme inhibitor) and any other method of blocking platelet function. This is achieved by co-administration of therapeutic doses of a selective COX-2 inhibitor with a thromboxane receptor antagonist or a thromboxane synthase inhibitor or a dual blocker. The aim is to achieve the therapeutic benefit of COX-2 inhibitors with the additional benefit of reducing the risk of cardiac and cerebral adverse*

9

MODEE14665

> *effects, including but not limited to myocardial infarction, other thromboembolic events and stroke, for at risk populations. COX-2 inhibitors reduce prostacyclin urinary metabolites. This may reflect reduced prostacyclin in vivo. This may result in an altered ratio of prostacyclin to thromboxane $(TX)A_2$. The increase in thromboxane relative to prostacyclin may cause increased risk of cardiac and cerebral adverse events. Treatment with a thromboxane receptor antagonist or a thromboxane synthase inhibitor or a dual receptor blocker (receptor antagonist/enzyme inhibitor) would reduce this risk by inhibiting thromboxane synthesis or thromboxane action."*

Therefore, the patent filings and associated documents demonstrate that Merck was aware of the potential toxicity that could be associated with use of drugs that promote thrombosis.

- In a 1998 review paper, Mitchell and Evans (1998. *Inflamm. Res.* 47:S88-S92) reported that COX-2 expression in smooth muscle cells of blood vessels suppresses inflammatory events, a protective mechanism. In their conclusions section they state:

> *"It is clear that COX-2 induction at the site of inflammation contributes to swelling and pain, and that its inhibition by new selective inhibitors will have therapeutic benefit. However, our data suggest COX-2 can produce anti-inflammatory mediators, and produce the same beneficial effects as COX-1. Therefore, it may be that the highly selective (>1000 fold) COX-2 inhibitors could have important side effects, particularly in the cardiovascular system."*

Therefore, these authors have raised the concern and have provided evidence for the risk of significant adverse cardiovascular effects occurring in patients

10

MODEI4666

administered selective COX-2 inhibitors such as Vioxx, where the selectivity of the drug was more than 1000-fold.

- In a May 1998 meeting of Merck scientific advisors (see document MRK-AEI0002734 through 2746 dated May 3-6, 1998), the Merck advisors identified significant risks that could arise with use of selective COX-2 inhibitors, such as Vioxx. They outlined possible effects of COX-2 inhibition on three separate processes that can lead to coronary ischemic events: 1) promotion of the development of lipid-rich coronary plaques; 2) destabilization of the cap of plaques by inflammatory cells, making the plaques prone to rupture; and 3) thrombotic occlusion of blood vessels at the site of plaque rupture with ensuing consequences of ischemia. The advisors informed Merck that more information was needed to address these issues and the question of the effects of selective COX-2 inhibitors on morbidity and mortality due to cardiac events. Therefore, Merck had been warned by its own advisors of the potential for cardiovascular toxicity with use of the selective COX-2 inhibitors, specifically Vioxx, as well as being advised of several potential mechanisms for induction of adverse cardiovascular events.

- In 1999, McAdam and colleagues (McAdam, B.F. et al. 1999. *Proc. Natl. Acad. Sci. USA* 96:272-277) reported that COX-2 activity is a major source of systemic prostacyclin production in healthy humans and that the selective COX-2 inhibitor celecoxib significantly decreased prostacyclin production. The article discusses how Vioxx was reported to have similar effects on prostacyclin production in humans. Most importantly, the authors reported that the decreased prostacyclin production was not accompanied by a reduction in thromboxane-induced platelet aggregation. These data provided evidence that the use of the selective COX-2 inhibitors may be associated with a increase in the activity of thromboxane that is

11

MDGEI14667

unopposed by prostacyclin, again indicating that there may be adverse cardiovascular effects associated with use of this class of compounds.

- Supporting the findings of McAdam and colleagues, Catella-Lawson et al. (1999. *J. Pharmacol. Exp. Ther.* 289:735-741) demonstrated that Vioxx had the same effects as celecoxib on systemic prostacyclin production. Vioxx administration in an elderly human study group (50 mg) resulted in a decreased production of prostacyclin but no effect on serum thromboxane, an index platelet function. Therefore, these data provided additional evidence for the potential adverse cardiovascular consequences of administration of selective COX-2 inhibitors.

- In a paper published just after the approval of Vioxx in 1999, Belton and colleagues (Belton, O. et al. 2000. *Circulation* 102:840-845) reported that COX-2 inhibition was associated with a selective reduction in prostacyclin levels. In the discussion section of this paper, the authors raise the issue of the cardiovascular risks posed by use of selective COX-2 inhibitors. They state:

    *"Thus, the reduction in PGI2 formation seen with a COX-2 inhibitor in the presence of normal TXA2 formation may place patients at an increased risk of thrombosis."*

    Again, researchers provided evidence for the potential adverse cardiovascular consequences of use of selective COX-2 inhibitors.

Considered together, the published scientific data and the well-established pharmacological activity of NSAIDs and COX-2 selective inhibitors established the potential for COX-2 selective inhibitors to produce adverse cardiovascular effects, including a propensity for thrombosis. Therefore, scientists at Merck should have been aware of the potential adverse cardiovascular effects of Vioxx (*i.e.*, hypertension, peripheral edema, myocardial infarction, stroke, congestive heart failure) before the drug was approved for marketing in 1999.

MDOEI14668

17.    In fact, several Merck company documents provide evidence that scientists within the company were aware of the risk of prothrombotic effects of Vioxx, and even predicted their occurrence in clinical studies as early as 1996.

- In a memo dated 11/21/1996, a Merck scientist (Musliner) states that a 25% increase in adverse cardiovascular events could be expected with Vioxx if a study were undertaken to examine the consequences of NSAID use in humans.

- In a memo dated 9/12/1996, an internal Merck memo directed to the Vioxx team members summarized the minutes of a team meeting (see MRK-NJ0000862 through 869). In those minutes the results of a Phase IIa pilot study of rheumatoid arthritis is discussed. It is stated that another serious adverse event, unstable angina, was reported in the extension to the rheumatoid arthritis study, and that such vascular adverse events are expected since COX-1 is not inhibited. This memo again shows that the company was aware of the potential risk of inhibiting COX-2 selectively.

- In a letter dated 10/27/1997 (MRK-NJ015620 through 15623) addressed to a Merck employee (Alan Nies) from an outside advisor, Dr. Oates, the company is warned again of the potential problems with use of Vioxx on cardiovascular endpoints. The advisor suggests studies to be done to address the issue, studies that focused on the effect of Vioxx on prostacyclin synthesis. Similar advice on study designs was provided in an e-mail from Dr. Fitzgerald, another Merck outside advisor (see MRK-NJ0051533 to 51534).

- An internal analysis by Dr. Watson of Merck was undertaken in early 1998 with the focus on analyzing the incidence of serious cardiovascular events in the Phase IIb/III Vioxx osteoarthritis trials (see MRK-NJ272249 through 272272). On page 4 of that document, the incidences of serious cardiovascular events seen would

13

MODEI14669

have constituted a signal for the company based on the incidence of such events mainly in the Vioxx-treated groups.

- In an internal memo from Dr. Watson dated 5/20/1998 that outlines the minutes of the COX-2 cardiovascular surveillance task force meeting, it is again revealed that Vioxx may put patients at risk of thrombotic cardiovascular events.

- In another letter from an outside advisor to Merck (Dr. Patrono) dated 9/9/1998, the advisor warns of the potential cardiovascular toxicity issue with Vioxx and selective COX-2 inhibition, also suggesting tests that could be performed.

It is clear from review of these documents that before the approval to market Vioxx, Merck was aware of the potential risks posed by the drug as they related to adverse cardiovascular events.

18.     Once Vioxx was approved in 1999, the concerns about its potential to produce adverse cardiovascular effects did not cease. Although the exact mechanism for the prothrombotic effects of Vioxx are not known, the most likely mechanism involves the basic pharmacological effects of Vioxx as a selective COX-2 inhibitor. It is thought that Vioxx's effects as a highly selective COX-2 inhibitor create an imbalance in the local physiology of the vascular system by differentially suppressing the synthesis of thromboxane $A_2$ and prostacyclin (Fitzgerald, G.A. 2004. *NEJM* 351:1709-1711). By suppressing synthesis of prostacyclin but not thromboxane, thrombogenesis would promoted locally in coronary arteries, the risk of hypertension would be increased, and atherosclerosis would be promoted. As stated by Fitzgerald:

> *"Thus, a single mechanism, depression of prostaglandin $I_2$ formation, might be expected to elevate blood pressure, accelerate atherogenesis, and predispose patients receiving coxibs to an exaggerated thrombotic response to the rupture of an atherosclerotic plaque." (Fitzgerald, G.A. 2004. NEJM 351:1709-1711).*

It is interesting to note that recent data from Dr. Fitzgerald's laboratory further supports the role of local prostacyclin suppression in the production of adverse cardiovascular effects by Vioxx (Cheng, Y. et al. 2006. *J. Clin. Invest.* doi:10.1172/JCI127540). The effects of Vioxx on local

14

MODEI14670

prostacyclin production, however, may not be the only molecular mechanism that is involved. Other potential mechanisms include a destabilization of atherosclerotic plaque due to increased blood pressure, as well as acceleration of atherogenesis (Antman, E.M. et al. 2005. *Circulation* 112:759-770). In fact, it is the acceleration of atherogenesis that is the likely mechanism involved in the recently identified increases in cardiovascular risk that are seen even after discontinuation of use of Vioxx for 1 year.

Another basic science study supportive of the potential for adverse cardiovascular effects of Vioxx is the paper by Hennan and colleagues (Hennan, J.K. et al. 2001. *Circulation* 104:820-825). In this paper, the authors reported that COX-2-derived prostacyclin has important physiological roles in the vascular endothelium. Further, they state that their results *"raise concerns regarding the increased risk of acute vascular events in patients receiving COX-2 inhibitors. The risk may be increased in individuals with underlying inflammatory disorders, including coronary artery disease."*

19.     Apart from data on the basic mechanism of action of Vioxx and other selective COX-2 inhibitors, there are clinical data available that provided Merck with evidence of the risks to patients as early as 1999. In 1998 memos (Watson memo dated 2/2/1998, MRK-NJ0272249 through 272272 and MRK-NJ0281185 through 281208; Watson memo dated 5/20/1998, MRK-AFO0023534 through 23536), a Merck scientist identified a signal of adverse cardiovascular effects in the Phase IIb/III Vioxx Osteoarthritis clinical trials. The most convincing evidence for the real risks posed to patients administered Vioxx came with the results of a clinical trial known as the Vioxx Gastrointestinal Outcomes Research Study or VIGOR. November 1999 documents show that Merck had knowledge of the vascular risks posed by Vioxx from data collected in VIGOR (see minutes of the Drug Safety Monitoring Board, DSMB MRK-NJ0080219; MRK-NJ0120246 through 120248). Therefore, the clinical data developed with Vioxx made it apparent that the predicted risks of Vioxx were real risks to patients, and that these risks were identified by Merck before December of 1999.

MODEI14671

20.    The VIGOR study was one of several studies designed and performed by Merck to examine the risks of gastropathy in patients taking Vioxx as compared to other commonly used NSAIDs.  The rationale for development of selective COX-2 inhibitors such as Vioxx was that such drugs would provide patients with safer NSAIDs, ones with a lower risk of gastrointestinal bleeding and gastropathy.  When it was originally approved in May 1999, the Vioxx label contained the standard language of NSAIDs warning of the risks of gastropathy.  Such label language was required for Vioxx until such time as clinical trials were performed that demonstrated Vioxx conferred a lower risk of clinically significant gastropathy.  Thus, the VIGOR study was undertaken in order to address the issue of risk of gastropathy in Vioxx users as compared to another NSAID compound, naproxen.[1]

21.    The VIGOR study recruited patients with rheumatoid arthritis and randomized patients to receive either 50 mg Vioxx or 1000 mg naproxen daily.  Patients in the study were not allowed to take aspirin because even the low doses that are used to prevent coronary artery disease can cause gastropathy, potentially confounding the results and making it more difficult to discern any possible gastrointestinal benefits due to Vioxx.  In fact, any drug that might have been linked to gastropathy was an exclusion criteria for the study.  Another exclusion criteria of importance for the study was patients with a high risk of cardiovascular disease, as determined by a history of cerebrovascular events, myocardial infarction or coronary bypass surgery.  Although the results showed that Vioxx users had a lower incidence of clinically diagnosed adverse gastrointestinal events (2.1 per 100 patient years versus 4.5 per 100 patients years with naproxen, $p < 0.001$; Bombardier et al. 2000. *NEJM* 343:1520-1528), the results also showed that there was a substantially increased risk of serious coronary heart disease, myocardial infarctions and serious cardiovascular disease in patients using Vioxx as compared to naproxen

---

[1]    Naproxen is a commonly used NSAID that is available as both a prescription drug and an over-the-counter medication.  It is a *non-selective* COX inhibitor, having activity to inhibit both COX-1 and COX-2 activity.

MODEI14672

(see Targum memo dated February 1, 2001; Mukherjee et al. 2001. *JAMA* 286:954; report of Dr. Ray dated September 21, 2005).

22.    Again, review of Merck company documents demonstrates that the company was not only aware of the risks posed by Vioxx due to its effects on the cardiovascular system, but also that the company knew that these effects by Vioxx were predictable based on the pharmacology of the drug (*e.g.,* MRK-ABH0016219; MRK-NJ0189508).

23.    In response to the findings of an increased risk of adverse cardiovascular consequences with Vioxx use in the VIGOR trial, Merck attempted to explain the results by focusing on the potential beneficial cardiovascular effects of the comparator drug naproxen, rather than on the established prothrombotic effects of Vioxx.  The proposed "protective effects" of naproxen were put forth as an explanation of the more than 100% increased risk (some endpoints as high as 500%) of cardiovascular toxicity seen in patients exposed to Vioxx as compared to those exposed to naproxen.  As was pointed out to Merck by some of its advisors, however, this large increase in risk of serious cardiovascular events would not be explained by a cardioprotective effect of naproxen (see MRK-NJ-189508; MRK-ADL0082197), an effect that would not be expected to exceed the known effect of aspirin (no more than a 30% decrease in risk).  An e-mail between two Merck employees confirms that not everyone in the company was convinced of the protective effects of naproxen as being the reason for the results seen in VIGOR (e-mail from Scolnick, MRK-ABC0033809).

24.    There is in fact no data that supports the view that the increased risks associated with use of Vioxx in the VIGOR study could be attributed solely to an effect of naproxen to reduce the risks of heart disease.  To the contrary, recent analyses of the potential protective effects of naproxen have shown that naproxen lacks the level of beneficial effects attributed to aspirin (*e.g.,* Ray, W.A. et al. 2002. *Lancet* 360:1071-1073;  Graham, D.J. et al. *Lancet* 365:475-481; Garcia-Rodriguez, L.A. et al. 2001. *Clin. Exp. Rheumatol.* 19:S41-S44).

25.    Clearly, with the results of the VIGOR study in hand in the early months of 2000, Merck was aware of direct human clinical evidence of the risks posed to patients by Vioxx.

MODEI14673

These risks included development of a variety of serious cardiovascular events including but not limited to myocardial infarction, stroke, ischemic heart disease, and sudden death. It should be remembered, however, that the results of VIGOR only confirmed what had already been predicted to occur before Vioxx was marketed.

26.      In addition to the data gathered in the VIGOR study, various other studies and analyses were undertaken to determine if the results of VIGOR could be replicated in another population or were apparent in other datasets. These studies provided support for the findings in the VIGOR study, and the predicted cardiovascular toxicity of Vioxx.

- Merck performed a meta-analysis of its own immediately after the results of VIGOR were reported. In this analysis they compared the relative risk of serious cardiovascular events after use of Vioxx in the various clinical trial datasets available. These included studies in osteoarthritis patients, rheumatoid arthritis, and colon cancer, as well as other conditions. The results showed a 2.02 relative risk (CI: 1.14, 3.55) when myocardial infarction was the endpoint considered, confirming the results of VIGOR (see MRK-NJ007-394). Interestingly, this finding from the meta-analysis was not provided to the FDA (MRK-NJ0070364 through 70416; MRK-NJ0267715 through 267777; Scolnick deposition).

- In a June 2000 presentation at the European United League Against Rheumatism (EULAR), it was reported that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction.

- Mukherjee and colleagues (Mukherjee, D. et al. 2001. *JAMA* 286:954-959) performed a meta-analysis of various available datasets and reported that there was an increased risk of cardiovascular events in patients administered Vioxx. These data were again consistent with the results of VIGOR.

- Ray and colleagues (Ray, W.A. et al. 2002. *Lancet* 360:1071-1073) performed a retrospective chart study of patients in the Tennessee medicaid program. They reported that there was an increased risk of serious coronary heart disease in

18

MODEL4674

No Transmission Information Available   in  on line [0] for KD09594 * Pg 20/24
May.24. 2006  9:51AM                                                    No.4232   P. 20/24

patients on high doses of Vioxx (> 25 mg), again results consistent with the findings in VIGOR.

- Solomon and colleagues (Solomon, D.H. et al. 2004. *Circulation* 109:2068-2073) reported the results of an matched case-control study of patients over 65 years of age identified from medicaid databases in New Jersey and Pennsylvania. Consistent with the results of VIGOR, they stated that there was an increased risk of myocardial infarction in patients on Vioxx as compared to those administered either celecoxib or non-NSAID drugs. In another study by this same research group (Solomon , D.H. et al. 2005. *Arthr. Rheumat.* 54:1378-1389), it was reported that there was an increased rate of adverse cardiovascular events in patients using Vioxx as compared to other NSAIDs, an increase that was evident within the first 60 days of use and that persisted.

- Bresalier and colleagues (Bresalier, R.S. et al. 2005. *NEJM* 352 at www.nejm.org) reported the results of another clinical trial performed by Merck called the Adenomatous Polyp Prevention on Vioxx (APPROVe) trial. In this trial, Merck confirmed the results of VIGOR in a different patient population; there was an increased risk of cardiovascular events with Vioxx use (relative risk of 1.92). The results of this study led to the removal of Vioxx from the market in 2004.

27.     Several aspects of the toxicological profile of Vioxx that have received less attention, but could have important consequences, include the propensity for the drug to induce significant increases in blood pressure, as well as peripheral edema. There are also data indicating that Vioxx may be associated with an increased risk of congestive heart failure. These adverse cardiovascular consequences were demonstrated through results of clinical trials conducted with Vioxx (*e.g.*, VIGOR study data; Whelton, A. et al. 2002. *Am. J. Cardiol.* 90:959-963; Schwartz, J.l. et al. 2002. *Clin. Pharmacol. Ther.* 72:50-61; Sowers, R.S. et al. 2005. *Arch. Intern. Med.* 165:161-168; Bresalier, R.S. et al. 2005. *NEJM* 352:1092-1102).

M00EI14675

28.    Although Merck now has recognized that use of Vioxx is associated with adverse cardiovascular events, the company has contended that the increased risk is related to duration of use. The company has relied on the results of the APPROVe study to suggest that there is no increased risk unless the drug has been used for at least 18 months. This position is totally without support and in fact is inconsistent with a large body of available data. First and foremost, the 18 month threshold for effects asserted by Merck is not biologically plausible. All of the data discussed above in this report that deals with mechanism of the toxicological effects of Vioxx are related to pharmacological effects that occur immediately upon exposure to Vioxx. Therefore, the mechanistic data suggest that risk of adverse cardiovascular effects of Vioxx could be present immediately after first exposure to the drug and would not require cumulative effects of exposure. Moreover, data from Vioxx clinical trials indicate that the 18 month hypothesis is incorrect. For example, in the VIGOR study, patients were shown to be at increased risk and yet had only been exposed for an average of 9 months, with maximum exposure at 13 months. Additional evidence is provided by independent analyses of the VIGOR data such as the one conducted by Richard Kronmal where the time-to-event curves for myocardial infarction diverged by two months. Finally, recent epidemiological studies also indicate that short durations of use of Vioxx are associated with an increased risk of adverse cardiovascular events (Solomon, D.H. et al. 2005. *Circulation* 109:2068-2073; Solomon, D.H. et al. 2005. *Arthr. Rheumat.* 54:1378-1389; Johnson, S.P. et al. 2004. *Arch. Int. Med.* 165:978-984). Therefore, it is not scientifically defensible to assert that there is no increased risk with Vioxx use unless exposure has exceeded 18 months.

29.    The adverse cardiovascular effects of Vioxx are related not only to the basic pharmacological profile of the drug, a highly selective COX-2 inhibitor, but also to the dose administered. Further, the adverse cardiovascular effects appear to be linked to other drugs in the class of selective COX-2 inhibitors (Nusseier, N.A. et al. 2005. *NEJM* 352, at www.nejm.org; Solomon, S.D. et al. 2005. *NEJM* 352 at www.nejm.org). It is likely that the

20

MDGE1467b

risk of adverse cardiovascular effects within the class is related to the selectivity of the drug for COX-2 as opposed to COX-1 inhibition (Mitchell and Evans. 1998. *Inflamm. Res.* 47:S88-S92).

30.    Considering all of the available scientific data, it is clear that the adverse cardiovascular effects associated with Vioxx administration were predictable based on the known pharmacological profile of the drug.  It is also apparent that Merck was aware of the potential for adverse cardiovascular effects before the drug was approved in 1999, and, further, the Merck had specific clinical data on adverse cardiovascular effects due to Vioxx administration within the first year that the drug was marketed.  The adverse cardiovascular effects seen with Vioxx use were serious, often life-threatening conditions that deserved immediate action.  The actions by Merck to attempt to explain the effects seen in clinical studies as being related to cardioprotective effects of naproxen, rather than an increased risk due to Vioxx use, were without a sound basis in science and put patients at risk.

C.    **Vioxx Regulatory Issues**

31.    When Vioxx was initially approved for use in 1999, the labeling for the drug carried the same warnings as other NSAID drugs which included a warning for gastropathy. However, physicians and consumers were not provided with warnings about the real risks of adverse cardiovascular effects that were associated with Vioxx use. These risks included the potential for a variety of serious cardiovascular disorders including myocardial infarction, stroke, peripheral edema, hypertension, and congestive heart failure.

32.    FDA labeling regulations require manufacturers of prescription drug products to provide physicians and consumers with true and accurate representations of the risks and benefits associated with a drug.  Contrary to assertions by some manufacturers, FDA allows a company to strengthen a warning for a drug without prior approval by the FDA (see 21 CFR 201 and 202; Federal Register Volume 44, No. 124, June 26, 1979, *Final Rule: Labeling and Prescription Drug Advertising: Content and Format for Human Prescription Drugs*).  In particular, in the Final Rule, it is stated:

MODEI14677

May.24. 2006  9:52AM          No Transmission Information Available   in  on line [0] for KD09594 * Pg 23/24          No.4232   P. 23/24

*"The Commissioner also advises that these labeling regulations do not prohibit a manufacturer, packer, relabeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with use of the drug are discovered. The additional to labeling and advertising of additional warnings, as well as contraindications, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., "Dear Doctor" letters containing such information) is not prohibited by these regulations. As stated above, the act and FDA regulations require a warning in drug labeling as soon as a hazard is associated with the use of a drug. In ths case of a drug subject to an approved NDA, 314.8(d) (21 CFR 314.8(d)) permits the addition to the drug's labeling or advertising of information about a hazard without advance approval of the supplemental application by FDA."*

Therefore, Merck had the ability under the current FDA regulations to update their labeling as soon as they results of the VIGOR study showed that there was an increased risk of adverse cardiovascular events with use of Vioxx.

33.     It is interesting to note that once the results of VIGOR were known to Merck in 1999, rather than warn physicians and patients of the identified risks, the company promoted the safety of the drug (MRK-PRL0000122 through 123). In fact, in September 2001, Merck received notice from the FDA to stop misleading physicians about the effects of Vioxx on the cardiovascular system (MRK-ABA0003277 through 3284). However, it was not until 2002 that the company made efforts to warn of the adverse cardiovascular risks associated with Vioxx use through a labeling change, where a statement relating to the VIGOR study was placed in the "Precautions" section of the label but not in the "Warnings" section.

34.     Most importantly, it is clear from the review of the available scientific data on both efficacy and safety of Vioxx that the risks of adverse cardiovascular events, ones that can be life-threatening, far outweigh the benefits of the drug, especially when there are many alternative NSAID drugs that are available both by prescription and over-the-counter.

22

MODEI14678

**D.      Conclusions**

35.      Based on a review of all of the available evidence, including my scientific training and expertise in pharmacology, toxicology and risk assessment, it is clear that Vioxx use is associated with an increased risk of adverse cardiovascular events including myocardial infarction, stroke, increased blood pressure, peripheral edema and congestive heart failure. These effects of Vioxx were predictable based on the pharmacological profile of the drug as a highly selective COX-2 inhibitor.  Although the risks posed by Vioxx increase as the dose increases, the available data do not define a safe dose of the drug.  Further, adverse cardiovascular events could be produced with even short term use of the drug, less than a few weeks of use.   All of the opinions expressed in this report are opinions that are based on a reasonable degree of scientific probability.

**E.      Compensation**

36.      My compensation on this case is $250.00 per hour for all work excluding deposition and trial testimony which is charged at $350.00 per hour.  Attached as Exhibit P-3 is a list of my testimony over the last 5 years.


_____

LAURA M. PLUNKETT, Ph.D., DABT

23