UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED 9-18-06
LORETTA G. WHYTE
CLERK

| | |
|---|---|
| In re: VIOXX PRODUCTS LIABILITY LITIGATION | MDL No. 1657 |
| | Section L |
| | Judge Eldon E. Fallon |
| | Magistrate Judge Daniel E. Knowles, III |

THIS DOCUMENT RELATES TO:
*Robert G. Smith v. Merck & Co., Inc.*, Case No. 2:05-CV-04379

The following deposition testimony was presented to the jury:  on 9-18-06

Videotaped deposition of Tom Cannell.

___ Fee___
___ Process___
_X_ Dktd___
___ CtRmDep___
___ Doc. No.___

```
ID:            Cannell

ID:            TC 903
Page Range:    9:3-9:5

     9: 3    Q.    Do you want to state your name for the
     9: 4 record, please.
     9: 5    A.    My name is Tom Cannell.


ID:            TC 1120
Page Range:    11:20-12:5

    11:20    Q.    And at one time you were the executive
    11:21 marketing director for Vioxx for Merck?
    11:22    A.    That's right.
    11:23    Q.    At what time period were you the executive
    11:24 marketing director for Merck on Vioxx?
    11:25    A.    From approximately mid February of 2001 to
    12: Page 12
    12: 1 December of 2002.
    12: 2    Q.    What were your duties as the executive
    12: 3 marketing director for Vioxx on behalf of Merck?
    12: 4    A.    I was responsible for our direct to consumer
    12: 5 promotion and for our physician promotion.


ID:            TC 1707
Page Range:    17:7-17:12

    17: 7    Q.    Now, Exhibit Number 1 is Merck's code of
    17: 8 conduct, which is a booklet created by Merck regarding
    17: 9 their values and standards, correct?
    17:10    A.    That's correct.  Can I just take one moment
    17:11 to --
    17:12    Q.    Yeah.  Go ahead and read it.  Have you read


ID:            TC 1713
Page Range:    17:13-17:17

    17:13 it?
    17:14    A.    I glanced through it, yes.
    17:15    Q.    You are familiar with the Merck code of
    17:16 conduct, correct?
    17:17    A.    I am familiar with this.


ID:            TC 1818
Page Range:    18:18-20:2

    18:18    Q.    Do you see there is a section entitled honest
    18:19 communication?
    18:20    A.    (Nodding head.)
    18:21    Q.    And first of all, let me ask you this.  As
    18:22 the executive marketing director for Vioxx and as a vice
    18:23 president, related to sales duties and marketing duties
    18:24 for Vioxx, did you follow this practice of honest
    18:25 communication?
    19: Page 19
```

```
19: 1     A.     Yes. We did and I did.
19: 2     Q.     And looking at the first sentence under
19: 3 honest communication does it say, "Lives depend not only
19: 4 on the quality of our products and services but also on
19: 5 the quality of the information we provide to the medical
19: 6 community and general public"? Did I read that right?
19: 7     A.     Yes, you did.
19: 8     Q.     Then does it say, "Information furnished to
19: 9 our customers about our products and services including
19:10 availability and delivery must be useful, accurate,
19:11 supported by scientific evidence where relevant and
19:12 presented honestly, fairly and by proper means"? Did I
19:13 read that right?
19:14     A.     Yes, you did.
19:15     Q.     And is there a term used in sales and
19:16 marketing in your business called a fair comment or a
19:17 fairness in communication?
19:18     A.     Fair balance is --
19:19     Q.     Fair balance?
19:20     A.     Yes, there is.
19:21     Q.     What does that refer to, for the jury's sake?
19:22     A.     When we discuss a product with a customer,
19:23 the basis for that discussion is the package insert or
19:24 package circular. And the expectation of the FDA and the
19:25 expectation of Merck is that there be a balanced
20: Page 20
20: 1 discussion where we not only talk about the benefits of
20: 2 the product but also safety and tolerability information.


ID:              TC 2015
Page Range:      20:15-20:18

   20:15     Q.     Now, when you communicated to doctors and to
   20:16 consumers about Vioxx, did you also have a duty to tell
   20:17 the consumers about the cardiovascular risks which
   20:18 included heart attacks and strokes?


ID:              TC 2212
Page Range:      22:12-22:16

   22:12               THE WITNESS: When we through promotion
   22:13 talked to consumers or talked to physicians, talked to
   22:14 doctors about Vioxx, we were obligated to give a balanced
   22:15 presentation of Vioxx based on the package circular of
   22:16 the brand.


ID:              TC 3214
Page Range:      32:14-32:20

   32:14     Q.     Is there any letter that you ever received
   32:15 from the FDA that said you cannot discuss the VIGOR
   32:16 results with treating doctors and prescribing doctors
   32:17 pending a new label?
   32:18     A.     I don't recall that letter.
   32:19     Q.     There was no letter, correct?
   32:20     A.     Not that I am aware of.
```

```
ID:            TC 4718
Page Range:    47:18-48:5

    47:18    Q.     Okay.  Let's move on here.  So this is
    47:19 Exhibit Number 6.  And for the record, it begins at Bates
    47:20 number MRK ADG 0057776, correct?  That's the Bates
    47:21 number?
    47:22    A.     Are you asking me?
    47:23    Q.     7776?
    47:24    A.     Yes.  That's correct.
    47:25    Q.     Just for the record, this is a Tom Cannell
    48: Page 48
    48: 1 Power Point, right?
    48: 2    A.     This is a presentation with my name.  I'm not
    48: 3 sure if this is Power Point or not.
    48: 4    Q.     It's a presentation?
    48: 5    A.     Yeah.


ID:            TC 5008
Page Range:    50:8-50:16

    50: 8    Q.     And let's back up to 7793.  So your core
    50: 9 messages are tied to marketing strategy, correct?
    50:10    A.     That's correct.  That's what it says here.
    50:11    Q.     Attributes known to impact prescribing,
    50:12 ensures consistency of promotional campaign, allows for
    50:13 refreshed reasons to believe.  Continuing on, powerful
    50:14 pain relief, chronic efficacy for OA and RA, proven GI
    50:15 risk reduction, elderly safety data.  Does that complete
    50:16 your core messages?


ID:            TC 5018
Page Range:    50:18-50:24

    50:18              THE WITNESS:  I don't recall them.  That
    50:19 is what's on this document.
    50:20 BY MR. ROBINSON:
    50:21    Q.     And nowhere in your core messages is there
    50:22 mention of the potential for cardiovascular risks,
    50:23 correct?
    50:24    A.     That's correct.


ID:            TC 5111
Page Range:    51:11-51:12

    51:11    Q.     Isn't it true that you actually looked at the
    51:12 cardiovascular risks as an obstacle to sales?


ID:            TC 5114
Page Range:    51:14-51:24

    51:14              THE WITNESS:  I don't -- I don't recall
    51:15 characterizing that -- Physicians had questions about
    51:16 cardiovascular data for Vioxx and we would answer those
    51:17 questions.  This is after the label change.  So now we
```

```
51:18 are answering them completely using the VIGOR data that's
51:19 in the package circular.
51:20 BY MR. ROBINSON:
51:21      Q.    But Merck and you as executive director of
51:22 marketing looked at the cardiovascular risk issues and
51:23 questions from prescribers as, quote, obstacles, end
51:24 quote, correct?


ID:              TC 5201
Page Range:      52:1-52:3

  52: 1                 THE WITNESS:  I don't recall using that
  52: 2 term.  But the fact is there were questions being raised
  52: 3 by doctors.


ID:              TC 5210
Page Range:      52:10-52:17

  52:10     Q.    Let's take a look here.  We will stay on
  52:11 Exhibit Number 6 but I want you to look at Exhibit Number
  52:12 7.  Here is Exhibit Number 7.  Exhibit Number 7 is an
  52:13 e-mail from you to Antonia Sisti, correct?
  52:14     A.    That's correct.
  52:15     Q.    And copies going to Maureen Christiano and
  52:16 Tyrus Barker, right?
  52:17     A.    That's correct.


ID:              TC 5309
Page Range:      53:9-53:22

  53: 9     Q.    Let's read what your e-mail says, which is
  53:10 Exhibit Number 7.  You say, "I think three, two, one, go
  53:11 would work."  Did I read that right?
  53:12     A.    Yes, you did.
  53:13     Q.    And then you say, "Three are the strengths we
  53:14 have; one, efficacy; two, proven GI outcomes; and three,
  53:15 cost."  Did I read that right?
  53:16     A.    Yes, you did.
  53:17     Q.    And then you say, "Two are the obstacles we
  53:18 need to be able to handle confidently; one, CV; and two,
  53:19 hypertension."  Did I read that right?
  53:20     A.    Yes, you did.
  53:21     Q.    And by CV, that's cardiovascular risk,
  53:22 correct?


ID:              TC 5324
Page Range:      53:24-54:2

  53:24                 THE WITNESS:  CV stands for cardiovascular
  53:25 questions.
  54: Page 54
  54: 1 BY MR. ROBINSON:
  54: 2     Q.    You looked at that as an obstacle, correct?


ID:              TC 5404
```

```
Page Range:     54:4-54:5

   54: 4                 THE WITNESS: Right. We use the term
   54: 5 obstacle and question interchangeably.


ID:             TC 6014
Page Range:     60:14-60:24

   60:14    Q.    Has somebody discussed with you the idea that
   60:15 maybe you should change the word obstacle to question
   60:16 before we sat here for this deposition?
   60:17    A.    I have never heard anyone say that.  I can
   60:18 tell you that since I started with Merck in 1987,
   60:19 question and obstacle were always used interchangeably.
   60:20    Q.    Well, I mean, there were questions regarding
   60:21 efficacy, correct, of the drug?
   60:22    A.    There were -- There was a lot of discussion
   60:23 about efficacy.
   60:24    Q.    But you don't call that an obstacle, do you?


ID:             TC 6101
Page Range:     61:1-61:2

   61: 1                 THE WITNESS: As you saw, efficacy is
   61: 2 actually referred to as a core message in this document.


ID:             TC 6204
Page Range:     62:4-62:4

   62: 4    Q.    It's not an obstacle?


ID:             TC 6206
Page Range:     62:6-62:6

   62: 6                 THE WITNESS: It's a core message.


ID:             TC 6310
Page Range:     63:10-63:11

   63:10    Q.    I want to go back to this presentation.
   63:11                 MR. ROBINSON: I think that's Exhibit 6.


ID:             TC 6321
Page Range:     63:21-63:25

   63:21    Q.    Yes.  In your core messages regarding Vioxx,
   63:22 you talk about marketing strategy.  You talk about
   63:23 powerful pain relief, chronic efficacy, proven GI risk,
   63:24 elderly safety data.  But you do not talk about the
   63:25 cardiovascular issue, correct?


ID:             TC 6402
Page Range:     64:2-64:5
```

```
64: 2              THE WITNESS:  The core messages do not
64: 3 reference cardiovascular.  However, the expectation is
64: 4 that representatives would deliver a balanced discussion
64: 5 consistent with the PI.


ID:             TC 6424
Page Range:     64:24-64:25

64:24     Q.    But one of your messages was elderly safety
64:25 data, right?


ID:             TC 6501c
Page Range:     65:1-65:2

65: 1     A.    Elderly safety data is one of the four
65: 2 messages in this draft deck.


ID:             TC 6510
Page Range:     65:10-65:16

65:10     Q.    Are you aware from your work at Merck or from
65:11 your reading of any literature on MIs and strokes that
65:12 older people are at a higher risk for heart attack and
65:13 stroke than younger people?
65:14     A.    Yes.  I believe -- It's my understanding that
65:15 older people are sometimes at an increased risk of
65:16 certain cardiovascular events than younger people.


ID:             TC 8020
Page Range:     80:20-81:4

80:20     Q.    Now let's go to Bates number MRK ADG 57804.
80:21 Let's go back to -- Let's go back to 802.  So this is
80:22 going to be for the sales reps, right?
80:23     A.    This is a draft of a deck that I used in
80:24 presentations to either sales representatives or
80:25 managers.  I don't recall what level.
81: Page 81
81: 1     Q.    But you're telling them at page 802 -- you're
81: 2 saying, "Product knowledge.  Know the PIs," which is the
81: 3 package insert, right?
81: 4     A.    That's correct.


ID:             TC 8201
Page Range:     82:1-82:3

82: 1     Q.    And then what you're doing is you're telling
82: 2 them to discern between the different parts of the FDA
82: 3 labeling guidelines, right?


ID:             TC 8205
Page Range:     82:5-82:12
```

```
82: 5                THE WITNESS:  What we did here is we
82: 6 actually took excerpts from the FDA Web site that
82: 7 describe the different sections of the label.
82: 8 BY MR. ROBINSON:
82: 9     Q.    So what's going on here is this, is you
82:10 have -- For example, 57803 is sort of a portion of the
82:11 definition of contraindications; is that right?
82:12     A.    From the FDA Web site.  That's correct.


ID:            TC 8308
Page Range:    83:8-84:2

83: 8     Q.    Well, for example, I'm reading from your own
83: 9 presentation under contraindications.  You say,
83:10 "Contraindications.  Description of situations in which
83:11 the drug should not be used because the risk of use
83:12 outweighs any possible benefit."  Did I read that right?
83:13     A.    Yes, you did.
83:14     Q.    Then for warnings you say to the sales reps
83:15 and marketing managers, "Description of serious adverse
83:16 reactions and potential safety hazards, subsequent
83:17 limitation in use and steps that should be taken if they
83:18 occur."  Did I read that right?
83:19     A.    Yes, you did.
83:20     Q.    Then under precautions you say, "Information
83:21 regarding any special care to be exercised for the safe
83:22 and effective use of the drug includes general
83:23 precautions and information for patients on drug
83:24 interactions, carcinogenesis, mutagenesis, pregnancy
83:25 rating, labor and deliver, nursing mothers and pediatric
84: Page 84
84: 1 news."  Did I read that right?
84: 2     A.    Yes, you did.


ID:            TC 8801
Page Range:    88:1-88:7

88: 1     Q.    Yeah.  In other words, what you are telling
88: 2 your salespeople is that they should know the difference
88: 3 between precautions, warnings and contraindications
88: 4 sections of the label to point out to the doctors that
88: 5 the FDA only required some language about VIGOR in the
88: 6 precautions section and not the warnings or the
88: 7 contraindications section, correct?


ID:            TC 8809
Page Range:    88:9-88:13

88: 9                THE WITNESS:  No, that's not correct.  I
88:10 mean, we're teaching our representatives to use the
88:11 label, the package circular as the basis for their
88:12 discussions regarding Vioxx, which is what we have been
88:13 talking about this morning.


ID:            TC 9008
Page Range:    90:8-90:11
```

```
90: 8      Q.      The -- I want to make it clear now.  You are
90: 9 saying that you agree that the cardiovascular risk VIGOR
90:10 language was not in the contraindication or warning
90:11 section of the April 2002 label?


ID:             TC 9013
Page Range:     90:13-90:21

90:13               THE WITNESS:  I'm saying Vioxx did not
90:14 increase the risk, the cardiovascular risk.  I'm saying
90:15 there was cardiovascular data from VIGOR in at least the
90:16 clinical studies section as well as the precaution
90:17 section.
90:18 BY MR. ROBINSON:
90:19      Q.      But it wasn't in the contraindication or
90:20 warnings section, right?
90:21      A.      Not that I recall.
```

Total Length - 00:14:01