Page 1604

1  BREAK WAS SHOULD LOW-DOSE ASPIRIN BE ALLOWED IN THE TRIAL OR
2  NOT FOR THE GI OUTCOMES STUDY; IS THAT RIGHT?
3  A. THAT'S CORRECT.
4  Q. CAN YOU REMIND US WHY THAT WAS AN IMPORTANT ISSUE?
5  A. AGAIN, IF YOU ALLOW ASPIRIN INTO THE TRIALS SO THAT
6  EVERYBODY IS ALLOWED TO BE ON ASPIRIN, THE BACKGROUND RATE OF
7  ULCERS OR PERFORATIONS OR BLEEDS WILL BE HIGHER. IF YOU
8  ELIMINATE ASPIRIN FROM THE TRIAL, THEN THE DIFFERENCE BETWEEN
9  VIOXX, WHICH HAS NO EFFECT ON PLATELETS, AND NSAIDS, WHICH
10 INHIBIT PLATELETS, YOU COULD SEE A DIFFERENCE IN CARDIOVASCULAR
11 EVENTS BECAUSE THE NSAID PATIENTS WOULD BE PROTECTED.
12 Q. I'M GOING TO SHOW YOU A SECTION OF THIS PROTOCOL THAT HAS
13 THIS CONCEPT HERE CALLED "EXCLUSION CRITERIA." DO YOU SEE
14 THAT?
15 A. WHAT PAGE ARE YOU ON, 11?
16 Q. I AM ON PAGE 11.
17 A. YES. EXCLUSION CRITERIA.
18 Q. CAN YOU EXPLAIN TO THE JURY WHAT AN EXCLUSION CRITERIA IS
19 IN A CLINICAL TRIAL?
20 A. THERE ARE TWO THINGS THAT GO TOGETHER, INCLUSION AND
21 EXCLUSION. SO THE INCLUSION CRITERIA ARE WHAT THE PATIENTS
22 HAVE TO HAVE IN ORDER TO BE INCLUDED. THE EXCLUSION CRITERIA
23 ARE IF THEY HAVE ONE OF THESE, THEY ARE EXCLUDED.
24 Q. THEN THIS SECTION CARRIES TO THE NEXT PAGE, AND I WANT TO
25 ASK YOU ABOUT A PARTICULAR PARAGRAPH HERE, PARAGRAPH F.

Page 1605

1  A. YES.
2  Q. IN THIS PARAGRAPH, DR. REICIN TALKS ABOUT THE DEBATE YOU
3  WERE HAVING AT MERCK REGARDING WHETHER OR NOT TO ALLOW LOW-DOSE
4  ASPIRIN; IS THAT RIGHT?
5  A. CORRECT.
6  Q. I WANT TO ASK YOU TO COMMENT ABOUT A SECTION OF THIS
7  THAT'S IN THE DRAFT PROTOCOL. SHE WRITES, "DO WE WANT TO ALLOW
8  HIGH-RISK PATIENTS IN THE STUDY GIVEN THE RISKS WE HAVE
9  DISCUSSED? I THINK THIS WILL DEFINITELY MAKE ENROLLMENT MORE
10 DIFFICULT, BUT I'M STILL CONCERNED THAT THE NSAID GROUP," AND
11 THEN WHAT DOES SHE SAY?
12 A. "DO WE WANT TO ALLOW HIGH-RISK PATIENTS IN THE STUDY GIVEN
13 THE RISKS WE HAVE DISCUSSED? I THINK THIS WILL DEFINITELY MAKE
14 ENROLLMENT MORE DIFFICULT, BUT I'M STILL CONCERNED THAT THE
15 NSAID GROUP WILL BE GETTING CARDIOPROTECTION, THAT THE 966" --
16 THAT'S THE VIOXX GROUP -- "WILL NOT. I SENT YOU AND ALAN AN
17 ARTICLE ON FLURBIPROFEN. GIVEN AFTER PTCA, IT DECREASED THE
18 REOCCLUSION RATE COMPARED TO PLACEBO, NO COMPARISON TO
19 ASPIRIN."
20 Q. OKAY. SO THE 966 GROUP IS REFERRING TO WHAT GROUP OF
21 PATIENTS?
22 A. THOSE ON VIOXX.
23 Q. THEN SHE SAYS, "I AM STILL CONCERNED THAT THE NSAID GROUP
24 WILL BE GETTING CARDIOPROTECTION."
25 A. THAT'S CORRECT.

Page 1606

1  Q. WHAT DID YOU UNDERSTAND THAT TO REFER TO WHEN YOU RECEIVED
2  THIS DRAFT PROTOCOL?
3  A. THAT'S THE SAME TOPIC WE'VE BEEN DISCUSSING THAT WAS IN
4  DR. MUSLINER'S MEMO, AS WELL, THAT THE ASSUMPTION WAS THAT
5  PEOPLE ON NSAIDS, THE NSAIDS WILL INHIBIT THE PLATELETS AND
6  THEY WILL GET CARDIOPROTECTION JUST LIKE PATIENTS ON ASPIRIN.
7  Q. THEN SHE ALSO SAYS, "AND THAT THE 966 GROUP WILL NOT."
8  WILL NOT GET WHAT, GET CARDIOPROTECTION?
9  A. WILL NOT GET CARDIOPROTECTION, BECAUSE WE KNEW AT THIS
10 POINT THAT IT DID NOT INHIBIT PLATELETS.
11 Q. DOES THAT SUGGEST IN ANY WAY THAT THE FOLKS GETTING VIOXX
12 WILL BE AT INCREASED RISK RELATIVE TO NOT TAKING ANY MEDICINE
13 AT ALL?
14 A. NO. IT'S THE SAME CONCEPT. 966 IS NEUTRAL, BUT THE
15 PEOPLE ON NSAIDS WILL GET CARDIOPROTECTION.
16 Q. NOW, DO YOU RECALL WHETHER OR NOT YOU RESPONDED TO
17 DR. REICIN'S PROPOSAL AND THE COMMENTS AND QUESTIONS SHE HAD IN
18 IT?
19 A. I DID.
20 Q. THIS IS BACK IN EXHIBIT 1.0004.
21 A. YES. I SEE IT.
22 Q. DO YOU SEE WE HAVE AN E-MAIL FROM YOU? CORRECT?
23 A. YES.
24 Q. THEN YOU'RE SENDING IT TO THE TEAM THAT'S WORKING ON THE
25 PROTOCOL FOR THE GI OUTCOME TRIAL?

Page 1607

1  A. THAT'S CORRECT.
2  Q. THEN IT LOOKS LIKE YOU COMMENT ON A NUMBER OF TOPICS; IS
3  THAT RIGHT?
4  A. THAT'S CORRECT.
5  Q. THE ONE I WANT TO ASK YOU ABOUT IS PARAGRAPH 5. LET'S SEE
6  IF I CAN MAKE THAT BIGGER. IT'S KIND OF TOUGH TO READ. FIRST
7  OFF, DID YOU HAVE AN OPINION AT THE TIME AS TO -- WHERE DID YOU
8  FALL ON THIS QUESTION OF WHETHER OR NOT TO ALLOW LOW-DOSE
9  ASPIRIN?
10 A. I FELL ON THE SIDE THAT WE SHOULD INCLUDE IT. THE REASON
11 THAT I THOUGHT WE SHOULD INCLUDE IT IS THAT PATIENTS WHO HAVE
12 OSTEOARTHRITIS TEND TO BE OLDER. THERE WILL CLEARLY BE SOME
13 PATIENTS WITH OSTEOARTHRITIS WHO HAVE TO TAKE ASPIRIN. AND IT
14 SEEMED TO ME -- AND AGAIN, AN OUTCOMES TRIAL IS TRYING TO GET A
15 SENSE OF WHAT WOULD IT BE LIKE IN THE GENERAL PRACTICE OF
16 MEDICINE. IT SEEMED TO ME, IN THE GENERAL PRACTICE OF
17 MEDICINE, THERE ARE GOING TO BE PEOPLE WHO ARE ON ASPIRIN, AND
18 THEIR DOCTOR HAS TO MAKE A DECISION. "THEY'RE ALREADY ON
19 ASPIRIN. I NEED TO TREAT THEIR PAIN OR INFLAMMATION. SHOULD I
20 GIVE THEM VIOXX OR SHOULD I GIVE THEM AN NSAID?" SO I THOUGHT
21 IT WAS A CLINICAL QUESTION THAT THE DOCTORS WOULD WANT TO KNOW
22 THE ANSWER TO IN AN OUTCOMES KIND OF WAY.
23 Q. DID YOU EXPRESS THAT VIEW IN THIS E-MAIL?
24 A. I DID. I SAID, "I WOULD ALLOW LOW-DOSE ASPIRIN."
25 Q. YOU SAY, "I KNOW THIS HAS BEEN DISCUSSED TO DEATH. BUT THE

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M00554374S

Page 1608

1 REAL WORLD, EVERYONE IS ON IT."
2 A. YEAH. SO MY COMMENTS ARE OBVIOUSLY A BIT EXAGGERATED. WE
3 HAD DISCUSSED THIS A LOT. YOU COULD TELL BACK IN 1996, UNDER
4 TOM'S MEMO, IT STARTED THE DISCUSSION, AND THERE WERE A LOT OF
5 CONVERSATIONS ABOUT THIS QUESTION. SO I'M EXAGGERATING A BIT.
6 I SAID, "IT'S BEEN DISCUSSED TO DEATH," AND THEN I SAY, "IN THE
7 REAL WORLD, EVERYONE IS ON IT," AGAIN EXAGGERATING. NOT
8 EVERYONE IN THE REAL WORLD IS ON IT. I IMAGINE MOST PEOPLE IN
9 THIS COURTROOM ARE NOT ON IT. BUT THE FACT IS THERE ARE
10 CLEARLY A SUBSTANTIAL NUMBER OF PEOPLE WITH OA WHO ARE ON IT.
11 Q. THEN YOU WRITE, "SO WHY EXCLUDE N WITHOUT COX-1
12 INHIBITION? YOU WILL GET MORE THROMBOTIC EVENTS AND KILL
13 DRUG." DO YOU SEE THAT?
14 A. I DO.
15 Q. WHAT WERE YOU COMMUNICATING THERE?
16 A. I WAS COMMUNICATING, AGAIN, MY CONCERN THAT I HAD SEEN IN
17 ALISE'S AVERSION TO THE PROTOCOL THAT WE HAD ALL TALKED ABOUT.
18 WITHOUT THE ABILITY TO ALLOW PATIENTS WHO WERE ON ASPIRIN, YOU
19 WOULD POTENTIALLY SEE MORE THROMBOTIC EVENTS ON THE 966 GROUP
20 THAN ON THE NSAID GROUP. AGAIN, SORT OF EXAGGERATING A BIT, MY
21 CONCERN WAS THAT PEOPLE WOULD MISINTERPRET THAT RESULT AND
22 INAPPROPRIATELY NOT USE VIOXX IN THEIR PATIENTS WHO NEEDED
23 VIOXX BECAUSE THEY WOULD INAPPROPRIATELY ATTRIBUTE THE
24 DIFFERENCE TO SOME HARMFUL EFFECT OF VIOXX. SO I WAS AFRAID
25 THAT PEOPLE WOULD MISINTERPRET A RESULT LIKE THAT AND THE DRUG

Page 1609

1 WOULDN'T BE USED FOR PEOPLE WHO NEEDED IT.
2 Q. YOUR E-MAILS IS IN RESPONSE TO DR. REICIN'S PROTOCOL.
3 WHEREIN SHE WRITES SHE'S WORRIED THAT ONE GROUP IS GOING TO GET
4 CARDIOPROTECTION AND THE 966 GROUP WAS NOT?
5 A. THAT'S CORRECT.
6 Q. NOW, YOU HEARD THE OPENING BY MR. BIRCHFIELD IN WHICH, I
7 BELIEVE, HE HIGHLIGHTED THIS E-MAIL. HE READ IT TO THE JURY
8 AND SUGGESTED THAT YOUR E-MAIL WAS A PREDICTION, SOMEHOW, OF
9 INCREASED CARDIOVASCULAR RISK WITH VIOXX. DID HE HAVE IT RIGHT
10 OR WRONG?
11 A. IT WAS NOT A PREDICTION THAT THERE WOULD BE AN INCREASED
12 CARDIOVASCULAR RISK WITH VIOXX. WHAT IT WAS – AND I THINK
13 YOU'VE SEEN NOW A LOT OF DOCUMENTS – THAT WE WERE ALL
14 CONCERNED ABOUT THAT THE NSAID GROUP WOULD BE PROTECTED; NOT
15 THAT VIOXX WOULD CAUSE ANYTHING, BUT THAT THE NSAID GROUP WOULD
16 BE PROTECTED.
17 Q. NOW, DID DR. REICIN RESPOND TO YOUR E-MAIL?
18 A. YES, SHE DID.
19 Q. YOU HAD A NUMBER OF PARAGRAPHS IN YOUR E-MAIL. IT LOOKS
20 LIKE SHE RESPONDED TO EACH OF THEM. THIS IS HER RESPONSE HERE;
21 IS THAT RIGHT?
22 A. THAT'S CORRECT.
23 Q. THEN WITH RESPECT TO PARAGRAPH – YOUR PARAGRAPH 5, WHICH
24 WAS THIS QUESTION OF ASPIRIN; IS THAT RIGHT?
25 A. YES.

Page 1610

1 Q. SHE WRITES, "LOW-DOSE ASPIRIN. I HEAR YOU. THIS IS A
2 NO-WIN SITUATION. THE RELATIVE RISK OF EVEN LOW-DOSE ASPIRIN
3 MAY BE AS HIGH AS TWO TO FOUR-FOLD." WHAT DID YOU UNDERSTAND
4 THAT TO MEAN WHEN YOU RECEIVED THIS E-MAIL?
5 A. I UNDERSTOOD HER TO BE REFERRING TO THE RELATIVE RISKS OF
6 PERFORATIONS, ULCERS, AND BLEEDS FROM LOW-DOSE ASPIRIN. SHE IS
7 SAYING THAT IT'S ABOUT TWO TO FOUR-FOLD INCREASED RISK. SO
8 THAT MEANS, IF YOU ALLOW ASPIRIN IN, YOU'RE DEFINITELY GOING TO
9 INCREASE THE BACKGROUND RATE FOR PERFORATIONS, ULCERS, AND
10 BLEEDS BY TWO TO FOUR-FOLD BECAUSE THAT'S WHAT LOW-DOSE ASPIRIN
11 DOES.
12 Q. THEN SHE WRITES, "YET THE POSSIBILITY OF INCREASED CV
13 EVENTS IS OF GREAT CONCERN." WHAT DID YOU UNDERSTAND THAT TO
14 MEAN WHEN YOU RECEIVED IT?
15 A. SAME TOPIC. THE POSSIBILITY THAT YOU WOULD SEE MORE
16 EVENTS ON VIOXX COMPARED TO THE NSAID, BECAUSE THE NSAID IS
17 PROTECTING YOU FROM CARDIAC RISK AND VIOXX IS NOT.
18 Q. THEN SHE WRITES IN THIS PARENTHETICAL, "I JUST CAN'T WAIT
19 TO BE THE ONE TO PRESENT THOSE RESULTS TO SENIOR MANAGEMENT."
20 WHAT DID YOU UNDERSTAND THAT TO MEAN WHEN YOU RECEIVED IT?
21 A. AS I SAID, IT'S A – WE WERE TALKING ABOUT HOW DO WE
22 DESIGN A CLINICAL TRIAL, AND ALISE WAS CONCERNED THAT HE WOULD
23 DO THIS TRIAL AND END UP WITH MORE EVENTS IN VIOXX THAN IN THE
24 COMPARATOR INCIDENT GROUP BECAUSE THE NSAID GROUP PROTECTED,
25 BUT NONETHELESS YOU ONLY HAVE TWO GROUPS IN THE STUDY. SOMEONE

Page 1611

1 COULD MISINTERPRET THAT.
2 Q. DOCTOR, IN TERMS OF WHAT WAS KNOWN AT THE TIME REGARDING
3 THE CLINICAL IMPACT OF COX-2 INHIBITION, WE TALKED EARLIER
4 TODAY ABOUT YOUR STUDY WITH DR. FITZGERALD THAT FIRST
5 IDENTIFIED THE REDUCTION IN THE BREAKDOWN PRODUCT TO
6 PROSTACYCLIN. DO YOU RECALL THAT DISCUSSION?
7 A. YES, I DO.
8 Q. DO YOU RECALL WHEN THAT EXPERIMENT WAS FIRST DONE?
9 A. THE RESULTS WERE AVAILABLE IN ABOUT OCTOBER OF '97.
10 Q. THIS E-MAIL EXCHANGE THAT YOU'RE HAVING WITH YOUR
11 COLLEAGUES AT MERCK WAS OCCURRING IN WHAT TIME PERIOD?
12 A. IN FEBRUARY OF '97.
13 Q. IF YOU REMEMBER, WHAT DID YOU TELL THE JURY WAS YOUR STATE
14 OF MIND AND, IN FACT, THE CONSENSUS SCIENTIFIC VIEW REGARDING
15 WHICH COX ENZYME PRODUCED PROSTACYCLIN?
16 A. OUR UNDERSTANDING AT THAT TIME, THAT IT WAS DUE TO COX-1.
17 THE TIME THAT WERE HAVING THIS E-MAIL CONVERSATION, THERE IS
18 NO SUGGESTION THAT COX – THERE WAS NO THOUGHT THAT COX-2 WAS
19 GOING TO AFFECT PROSTACYCLIN.
20 Q. DOCTOR, LOOKING BACK IN THAT TIME PERIOD, FEBRUARY OF
21 1997, WERE YOU AWARE OF ANY EVEN THEORETICAL RISK OF INHIBITING
22 COX-2 THROUGH A DRUG LIKE VIOXX WOULD HAVE ON THE
23 CARDIOVASCULAR SYSTEM?
24 A. NO.
25 Q. WAS THERE, IN FACT, A GI OUTCOMES TRIAL THAT WAS DONE WITH

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M0055437d6

## Page 1612

1 VIOXX?

2 A. YES.

3 Q. THAT WAS THE VIGOR TRIAL THAT WE DISCUSSED, RIGHT?

4 A. THAT'S CORRECT.

5 Q. WAS THAT A PLACEBO TRIAL OR WAS THAT A COMPARATOR TRIAL?

6 A. AGAIN, IT WAS A COMPARATOR TRIAL. IN AN OUTCOMES TRIAL,

7 YOU'RE TRYING TO FIGURE OUT WHAT'S THE RISK-BENEFIT RATIO FOR

8 PATIENTS ON VIOXX VERSUS A COMPARATIVE NSAID. THAT'S WHAT

9 PRACTICING DOCTORS NEEDED TO KNOW.

10 Q. WAS ASPIRIN USE ALLOWED IN THAT TRIAL?

11 A. NO. IT WAS NOT.

12 Q. THE JURY KNOWS WELL THE RESULTS OF THAT TRIAL SHOWED FEWER

13 EVENTS WITH NAPROXEN; IS THAT RIGHT?

14 A. THAT'S CORRECT.

15 Q. NAPROXEN IS A TRADITIONAL NSAID?

16 A. IT IS A TRADITIONAL NSAID. IT INHIBITS PLATELET FUNCTION.

17 I WOULD SAY AT THE TIME, IN '97, WE WERE WORKING ON THIS

18 PROTOCOL, THE CURRENT STATE OF KNOWLEDGE WAS THAT ALL NSAIDS

19 INHIBITED PLATELETS. THAT WAS OUR WORKING KNOWLEDGE. IN FACT,

20 THE STUDY THAT DR. REICIN WAS TALKING ABOUT OR YOU WERE TALKING

21 ABOUT USING DICLOFENAC AND IBUPROFEN, WE WEREN'T TALKING ABOUT

22 USING NAPROXEN. LATER ON, AS THE PHARMACOLOGY OF THESE DRUGS

23 BECAME BETTER UNDERSTOOD, IT BECAME CLEAR THAT NAPROXEN WAS

24 ACTUALLY WAS QUITE DIFFERENT THAN ALL THE OTHER NSAIDS.

25 Q. DOCTOR, WHEN DID YOUR TIME ON THE VIOXX PROJECT END?

## Page 1613

1 A. AROUND THE TIME THAT THE DRUG WAS LAUNCHED IN -- IT CAME

2 TO MARKET IN 1999. I STILL DID GIVE SOME SCIENTIFIC TALKS

3 THROUGHOUT '99 AND 2000, BUT I WAS NOT A MEMBER OF THE PROJECT

4 TEAM.

5 Q. I BELIEVE YOU TOLD US THIS MORNING THAT YOUR MEDICAL

6 TRAINING WAS IN ONCOLOGY; IS THAT RIGHT?

7 A. THAT'S CORRECT.

8 Q. THAT IS THE CARE AND TREATMENT OF PATIENTS WITH CANCER?

9 A. THAT'S CORRECT.

10 Q. HOW WAS IT THAT A CANCER DOCTOR ENDED UP ON A COX-2

11 DEVELOPMENT TEAM?

12 A. SO YOU'VE HEARD A LOT ABOUT THE DISCOVERY OF COX-2, AND I

13 DON'T KNOW THAT ANYBODY HAS ACTUALLY EXPLAINED HOW SOMEBODY

14 FOUND COX-2. ONE OF THE VERY FIRST DESCRIPTIONS OF COX-2 WAS

15 BY A CANCER RESEARCHER. SO A CANCER RESEARCHER WAS TRYING TO

16 LOOK FOR THINGS THAT ARE IN CANCER CELLS THAT AREN'T IN NORMAL

17 CELLS, AND THE LOGIC THERE BEING IF I CAN FIND AN ENZYME OR

18 SOME FUNCTION IN A CANCER CELL THAT'S NOT IN A NORMAL CELL,

19 THEN MAYBE I CAN MAKE A DRUG AGAINST THAT, AND THAT WOULD

20 SELECTIVELY TREAT CANCER WITHOUT HURTING THE NORMAL CELLS.

21 THIS CANCER RESEARCHER WAS LOOKING FOR THESE THINGS, AND HE WAS

22 ONE OF THE FIRST PEOPLE TO FIND COX-2. SO ONE OF THE VERY

23 FIRST DISCOVERIES OF COX-2 WAS THAT IT'S PRESENT IN CANCER

24 CELLS. BUT IT'S NOT GENERALLY PRESENT IN NORMAL CELLS.

25     SO VERY EARLY ON -- IN FACT, WHEN I CAME TO MERCK,

## Page 1614

1 THERE WAS INTEREST IN UNDERSTANDING IS THIS FINDING THAT COX-2

2 IS IN CANCER CELLS AND NOT IN NORMAL CELLS AND THAT'S SOMETHING

3 THAT A COX-2 INHIBITOR WOULD ALSO BE USED FOR TO EITHER TREAT

4 OR PREVENT CANCER. AS TIME WENT ALONG, WE WERE DOING STUDIES

5 IN THE BASIC RESEARCH LABS AT MERCK, AND A COLLEAGUE OF MINE

6 AND I ENDED UP ACTUALLY WITH A PATENT FOR THE USE OF VIOXX TO

7 PREVENT PROSTATE CANCER.

8 Q. WERE YOU INVOLVED, DOCTOR, IN THE DEVELOPMENT OF ANY

9 CLINICAL TRIALS TO INVESTIGATE THE USE OF VIOXX IN CANCER

10 PREVENTION OR CANCER TREATMENT?

11 A. YES, I WAS.

12 Q. WHAT TRIAL WAS THAT?

13 A. ONE I WAS MOST INVOLVED WITH WAS WHAT'S KNOWN AS THE

14 VICTOR TRIAL. THE VICTOR TRIAL WAS A LARGE OUTCOMES TRIAL

15 DONE -- IT WAS PROPOSED TO US BY A GROUP IN THE UK AT THE

16 UNIVERSITY OF BIRMINGHAM, THEN AT OXFORD. THE STUDY DESIGN WAS

17 TO TAKE PEOPLE WHO HAD HAD CANCER OF THE COLON, WHO HAD ALREADY

18 HAD SURGERY AND CHEMOTHERAPY. THESE PEOPLE, DESPITE HAVING

19 SURGERY AND CHEMOTHERAPY, ARE AT RISK FOR HAVING THE CANCER

20 COME BACK.

21     SO I WORKED WITH A GROUP AT OXFORD TO SET UP THE

22 VICTOR TRIAL, WHICH WAS TESTING -- AFTER THEY HAD ALL THIS

23 OTHER THERAPY, THEY WERE RANDOMIZED TO PLACEBO VERSUS VIOXX,

24 AND THE QUESTION WAS WOULD VIOXX DELAY THE REOCCURRENCE OF

25 THEIR CANCER. IN FACT, THE PRIMARY ENDPOINT OF THE TRIAL WAS

## Page 1615

1 SURVIVAL.

2 Q. AFTER SETTING UP THE TRIAL, HAVE YOU BEEN INVOLVED IN THE

3 ANALYSIS OF ANY DATA OF THAT TRIAL?

4 A. NO. I HAVEN'T.

5 Q. DOCTOR, THIS CANCER PREVENTION TRIAL, TREATMENT TRIAL,

6 THAT YOU JUST DESCRIBED, WAS THAT ONGOING AT THE TIME OF

7 WITHDRAWAL?

8 A. TO MY UNDERSTANDING, YES.

9 Q. WAS THAT TRIAL TERMINATED, ALONG WITH ALL THE OTHER

10 ONGOING TRIALS, WHEN THE DRUG WAS WITHDRAWN?

11 A. MY UNDERSTANDING, YES.

12 Q. PRIOR TO THE WITHDRAWAL OF THE MEDICINE, CAN YOU

13 CHARACTERIZE THE LEVEL OF SCIENTIFIC INTEREST AND EXCITEMENT IN

14 THE USE OF COX-2 INHIBITORS IN CANCER TREATMENT AND PREVENTION?

15 A. I WOULD SAY THE LEVEL OF INTEREST WAS VERY HIGH, BOTH FOR

16 VIOXX AND CELEBREX. I HAD SET UP THIS TRIAL WITH THE GROUP IN

17 THE UK. I HAD BEEN INVITED BY ONE OF THE LARGE BREAST CANCER

18 GROUPS IN PITTSBURGH TO TALK TO THEM ABOUT DOING A TRIAL. AT

19 THE CANCER MEETINGS THERE WERE SYMPOSIUMS TALKING ABOUT THE

20 COX-2 INHIBITORS. SO I'D SAY THE LEVEL OF INTEREST WAS VERY

21 HIGH IN THE CANCER COMMUNITY THAT THIS MIGHT BE -- COMPARED TO

22 THE TRADITIONAL CANCER THERAPIES THAT WE HAD, THIS WOULD BE A

23 VERY SAFE WAY OF EITHER PREVENTING OR TREATING CANCER.

24     MR. ISMAIL: THANK YOU, YOUR HONOR. I PASS THE

25 WITNESS.

42 (Pages 1612 to 1615)

DAILY COPY

M005543747

Page 1616

1    THE COURT: ANY CROSS?
2    MR. BEASLEY: YES, SIR.
3         CROSS-EXAMINATION
4    BY MR. BEASLEY:
5    Q.  GOOD AFTERNOON, DR. MORRISON.
6    A.  GOOD AFTERNOON, MR. BEASLEY.
7    Q.  LET ME MAKE SURE I UNDERSTOOD CORRECTLY. A FEW MINUTES
8    AGO, WHEN YOU WERE TRYING TO EXPLAIN AN E-MAIL TO THIS JURY,
9    YOU TOLD THE JURY THAT A THROMBOSIS, IF I REMEMBER CORRECTLY –
10   WHICH IS A BLOOD CLOT; AM I CORRECT?
11   A.  A THROMBOSIS IS A BLOOD CLOT, YES.
12   Q.  IF YOU HAD THAT CAUSE HEART ATTACKS, THAT COULD
13   POTENTIALLY KILL THE DRUG, YOU TOLD THE JURY THAT YOU WERE
14   EXAGGERATING; DO YOU RECALL THAT?
15   A.  YES, I DO.
16   Q.  NOW, I'M GOING TO ASK YOU A FEW QUESTIONS. I WANT TO KIND
17   OF GET INTO SOME POINTS YOU JUST FINISHED TO MAKE SURE I
18   UNDERSTAND CORRECTLY. DO I UNDERSTAND CORRECTLY TODAY THAT
19   YOUR TESTIMONY IS THAT PROSTACYCLIN IS PRODUCED PRIMARILY BY
20   COX-1? "YES" OR "NO." IS THAT YOUR TESTIMONY?
21   A.  PROSTACYCLIN IN BLOOD VESSELS IS FROM COX-1. PROSTACYCLIN
22   IN OTHER PARTS OF THE BODY IS CLEARLY FROM COX-2.
23   Q.  IN BLOOD VESSELS, YOU'RE SAYING COX-1?
24   A.  THAT'S CORRECT.
25   Q.  DO YOU KNOW DR. – I DON'T SAY KNOW HIM, BUT YOU CERTAINLY

Page 1617

1    KNOW WHO DR. CARLO PATRONO IS, DON'T YOU?
2    A.  YES, I DO.
3    Q.  DO YOU KNOW WHAT HIS POSITION IS ON YOUR POSITION?
4    A.  NO, I DON'T KNOW WHAT HIS POSITION IS ON MY POSITION.
5    Q.  HAVE YOU READ THE DECEMBER 1, 2005 ARTICLE IN THE
6    NEW ENGLAND JOURNAL OF MEDICINE, SIR?
7    A.  IF YOU GIVE ME A COPY, I –
8    Q.  I WANT TO ASK YOU IF YOU READ IT FIRST.
9    A.  I'M NOT SURE WHAT ARTICLE YOU MEAN. MAY I TAKE A LOOK AT
10   IT?
11   Q.  WELL, IT'S THE ONE, "LOW-DOSE ASPIRIN FOR THE PREVENTION
12   OF ATHEROTHROMBOSIS."
13        THE COURT: DO YOU NEED TO SEE THE ARTICLE BEFORE YOU
14   CAN TELL?
15        THE WITNESS: THAT WOULD BE HELPFUL.
16        THE COURT: GIVE IT TO HIM, PLEASE.
17        MR. ISMAIL: DO YOU HAVE A COPY FOR ME, AS WELL?
18        MR. BEASLEY: I HAVEN'T MADE A COPY. WE JUST GOT
19   THAT.
20        THE COURT: DO YOU WANT TO TAKE A LOOK AT IT FIRST?
21        MR. BEASLEY: I'LL SHOW IT TO HIM FIRST, YOUR HONOR.
22        THE COURT: LET HIM SEE IT FIRST.
23        MR. BEASLEY: I DO NOT INTEND TO INTRODUCE IT. IT'S
24   SIMPLY TO CROSS THE WITNESS.
25        THE WITNESS: NO, I HAVEN'T READ THIS ARTICLE, BUT

Page 1618

1    I'LL BE HAPPY TO MAKE COMMENTS ABOUT IT.
2        MR. BEASLEY: WOULD YOU LIKE TO SEE IT?
3        MR. ISMAIL: YES.
4    BY MR. BEASLEY:
5    Q.  THE JURY, I'M SURE, PROBABLY REMEMBERS EXACTLY WHO
6    DR. CARLO PATRONO IS. BUT AM I CORRECT THAT HE IS A
7    WORLD-RENOWN MEDICAL DOCTOR?
8    A.  HE'S A PHARMACOLOGIST, YES.
9    Q.  IN FACT, HE'S A PHARMACOLOGIST AND HE'S A CONSULTANT FOR
10   MERCK; AM I CORRECT?
11   A.  THAT'S CORRECT.
12   Q.  WOULD YOU BE SURPRISED TO KNOW HE DISAGREES WITH YOUR
13   OPINION ON PROSTACYCLIN PRODUCTION IN THE ARTERY, SPECIFICALLY?
14   TO MAKE SURE THAT I DON'T MISPRONOUNCE A WORD OR SAY IT WRONG,
15   READ WHAT DR. PATRONO WROTE IN THE NEW ENGLAND JOURNAL OF
16   MEDICINE CONCERNING YOUR OPINION. I'LL MARK THAT FOR YOU.
17   WOULD YOU LIKE ME TO READ IT TO THEM, DOCTOR?
18   A.  NO, I WILL ONCE I TAKE A LOOK. SO WHAT CARLO WRITES IS
19   THAT, "ALTHOUGH THROMBOXANE IS A PROSTANOID LARGELY DERIVED
20   FROM COX-1, MOSTLY FROM PLATELETS, AND ITS BIOSYNTHESIS IS
21   HIGHLY SENSITIVE TO INHIBITION BY ASPIRIN, VASCULAR PGI2 IS
22   DERIVED PRIMARILY FROM COX-2 AND IS LESS SUSCEPTIBLE TO
23   INHIBITION BY LOW-DOSE ASPIRIN." HE GIVES REFERENCES THERE
24   WHICH ARE REFERENCES TO THE URINE STUDIES THAT WE TALKED ABOUT.
25   Q.  IN FACT, NOT ONLY DOES HE DO THAT, HE REFERENCES

Page 1619

1    DR. FITZGERALD'S ARTICLE, AM I CORRECT ON THAT, THAT YOU NOW
2    SAY IS INVALID?
3    A.  I DIDN'T SAY DR. FITZGERALD'S ARTICLE WAS INVALID.
4    Q.  WHO IS DR. KONSTAM?
5    A.  DR. KONSTAM, MY UNDERSTANDING, IS A CARDIOLOGIST IN
6    BOSTON.
7    Q.  ARE YOU FAMILIAR WITH AN ARTICLE HE WROTE PROMOTING YOUR
8    NAPROXEN THEORY SAYING THAT IT WAS CARDIOPROTECTIVE?
9    A.  I'M NOT SURE WHICH ARTICLE YOU'RE REFERRING TO.
10   Q.  WELL, LET ME ASK YOU THIS. YOU'VE BEEN SITTING HERE
11   DURING THIS ENTIRE TRIAL. ISN'T IT TRUE THAT YOUR POSITION IN
12   THIS CASE, MERCK'S POSITION, IS THAT NAPROXEN IS
13   CARDIOPROTECTIVE, AND DR. KONSTAM WAS THE MAN WHO WAS THE LEAD
14   DOG ON THAT THEORY? DON'T YOU KNOW THAT, DOCTOR?
15   A.  WELL, I DO BELIEVE THAT THE CLINICAL TRIAL DATA SHOWS THAT
16   NAPROXEN IS CARDIOPROTECTIVE. AND I THINK THAT DR. KONSTAM HAS
17   WORKED WITH US TO ANALYZE DATA AND LOOK AT THAT QUESTION, YES.
18   Q.  ARE YOU TELLING THE JURY YOU DON'T KNOW THAT HE WROTE AN
19   ARTICLE PROMOTING THAT THEORY FOR MERCK?
20   A.  I DON'T BELIEVE HE WROTE AN ARTICLE PROMOTING THAT THEORY.
21   I THINK HE WAS INVOLVED IN THE SCIENTIFIC ANALYSIS OF SOME OF
22   OUR DATA.
23   Q.  DO YOU KNOW WHAT HIS POSITION IS TODAY ON THAT THEORY?
24   A.  I DO NOT.
25   Q.  YOU NEVER READ WHAT HE TESTIFIED TO BEFORE THE FDA? Y'ALL

43  (Pages 1616 to 1619)

DAILY COPY

M0055437.4B

## Page 1620

1  HAVE BEEN TALKING ABOUT THIS ADVISORY BOARD COMMITTEE FOR THE
2  FDA THIS YEAR. DO YOU RECALL THAT?
3  A. I DO.
4  Q. NOBODY HAS EVER TOLD YOU WHAT DR. KONSTAM'S POSITION IS
5  NOW ON THE NAPROXEN DEFENSE THAT YOU'RE USING IN THIS CASE?
6  A. NO.
7  Q. HOW ABOUT TAKING A LOOK AT THIS? YOUR LAWYERS NEVER
8  SHOWED THAT TO YOU?
9     MR. ISMAIL: WHAT IS IT?
10    MR. BEASLEY: IT'S DR. KONSTAM'S TESTIMONY BEFORE THE
11  FDA'S ADVISORY COMMITTEE WHERE HE OBJECTED TO THE THEORY IN
12  THIS CASE.
13    MR. ISMAIL: CAN I HAVE A COPY, PLEASE?
14    THE COURT: LET HIM SEE A COPY FIRST.
15    MR. BEASLEY: THEY HAVE IT, YOUR HONOR. I THINK
16  Y'ALL HAVE A COPY. IN FACT, IT'S THEIR EXHIBIT 351,
17  YOUR HONOR, WHICH IS IN EVIDENCE.
18  BY MR. BEASLEY:
19  Q. DOES THAT REFRESH YOUR MEMORY?
20  A. PERHAPS YOU CAN GIVE IT BACK TO ME.
21  Q. SIR?
22  A. NO, I'VE NEVER SEEN IT. SO IF YOU'D LIKE ME TO —
23  Q. WELL, YOU JUST READ IT.
24  A. I GLANCED AT IT. I DIDN'T READ IT. I'LL BE HAPPY TO READ
25  IT.

## Page 1621

1  Q. LET ME JUST ASK YOU THIS: WOULD IT SHOCK YOU TO LEARN
2  THAT DR. KONSTAM, THE MAN THAT Y'ALL HAVE BEEN PROMOTING AS THE
3  DEFENDER OF THIS VIOXX BY SAYING IT'S CARDIOPROTECTIVE, HAS NOW
4  REJECTED IT AND SAYS IT'S NO LONGER HIS OPINION?
5     THE COURT: DO YOU WANT HIM TO READ SOMETHING,
6  COUNSEL?
7     MR. BEASLEY: HE WANTED TO READ IT.
8     THE WITNESS: HE SAYS, "WE STILL DON'T KNOW, AND I
9  THINK WE KNOW A LOT MORE TODAY THANKS TO THE APPROVE STUDY,
10  BUT AT THAT POINT IN TIME, IF YOU LOOK AT ALL OF THE
11  PLACEBO-CONTROLLED DATA THAT EXISTED, THERE WAS NOT A HINT OF A
12  PROBLEM."
13  BY MR. BEASLEY:
14  Q. THEN MR. WOODS, WHO IS DR. WOODS, ASKED HIM A QUESTION.
15  READ DR. WOOD'S QUESTION.
16  A. "SO ARE YOU STILL SAYING THAT IS YOUR POSITION?" HE SAYS,
17  "NO. NO. THAT WAS THE POSITION AT THAT TIME."
18  Q. SO THAT'S KIND OF LIKE A JOHN KERRY APPROACH. IT WAS HIS
19  POSITION, BUT IT'S NOT ANYMORE; IS THAT ABOUT THE WAY IT IS?
20    MR. ISMAIL: OBJECTION.
21    THE COURT: I SUSTAIN THE OBJECTION. LET'S JUST
22  STICK TO THIS CASE.
23  BY MR. BEASLEY:
24  Q. NOW, THEY ASKED WHY WE HAD THESE BOXES LAYING ON THE
25  TABLE. IS ALEVE NAPROXEN? THIS IS A 220-MILLIGRAM DOSE OF

## Page 1622

1  NAPROXEN; IS THAT CORRECT?
2  A. THAT'S CORRECT.
3     MR. BEASLEY: THIS IS NOT IN EVIDENCE, YOUR HONOR.
4  IT'S SIMPLY FOR DEMONSTRATIVE PURPOSES.
5  BY MR. BEASLEY:
6  Q. I HAVE CHECKED REAL CAREFULLY TO TRY TO FIND OUT IF MAYBE
7  I WAS INCORRECT. I CAN'T FIND ANYWHERE THAT BAYER, WHO
8  MANUFACTURES THIS DRUG, HAS EVER TOLD ANYBODY THAT IT WAS
9  CARDIOPROTECTIVE AT ANY LEVEL OF DOSAGE.
10  A. THAT'S CORRECT.
11  Q. TELL THE JURY WHO BAYER IS.
12  A. BAYER, I BELIEVE, IS A PHARMACEUTICAL COMPANY.
13  Q. IN FACT, THEY ARE A WELL-RECOGNIZED — THEY MAKE BAYER
14  ASPIRIN AND A LOT OF OTHER DRUGS; AM I CORRECT?
15  A. THAT'S CORRECT.
16  Q. A LEADING COMPANY IN THE INDUSTRY; AM I CORRECT ABOUT
17  THAT?
18  A. THEY ARE A PHARMACEUTICAL COMPANY.
19  Q. THEY WOULD HAVE ACCESS TO THE SAME LITERATURE THAT YOUR
20  COMPANY HAS AND THE RESEARCH AND ALL OF THE RESOURCES. DON'T
21  YOU BELIEVE THAT IF THEY THOUGHT THAT NAPROXEN, OR ALEVE, WAS
22  CARDIOPROTECTIVE, THAT THAT WOULD BE ONE OF THEIR LEADING
23  ADVERTISEMENTS ON TELEVISION?
24  A. I THINK —
25  Q. THE QUESTION IS: DO YOU BELIEVE IT? THEN YOU CAN MAKE A

## Page 1623

1  SPEECH.
2     MR. ISMAIL: YOUR HONOR, CAN THE WITNESS BE ALLOWED
3  TO ANSWER ONE QUESTION AT A TIME?
4     MR. BEASLEY: "YES" OR "NO?"
5     THE COURT: WELL, IF YOU CAN ANSWER "YES" OR "NO,"
6  ANSWER, AND THEN YOU CAN EXPLAIN. IF YOU CAN'T, JUST ANSWER
7  THE WAY YOU CAN.
8     THE WITNESS: I WOULD SAY NO. AND THE REASON IS
9  YOUR — LET'S SAY THAT WE DID ADDITIONAL CLINICAL STUDIES, OR
10  BAYER DID, AND IT SHOWED THAT NAPROXEN IS CARDIOPROTECTIVE IN
11  RANDOMIZED CONTROLLED TRIALS. WE ALREADY HAVE ASPIRIN AS SORT
12  OF THE GOLD STANDARD. LOW-DOSE ASPIRIN, WHICH YOU CAN TAKE
13  ONCE A DAY — YOU CAN EVEN MISS A DAY OR TWO BECAUSE OF ITS
14  PHARMACOLOGY — IT'S BEEN DEMONSTRATED TO BE CARDIOPROTECTIVE.
15  IT DOESN'T SEEM TO ME THAT BAYER WOULD BE ABLE TO SHOW A
16  BENEFIT OVER LOW-DOSE ASPIRIN. SO IT DOESN'T SURPRISE ME THAT
17  BAYER HASN'T PURSUED A CARDIOPROTECTION INDICATION BECAUSE THEY
18  WOULD HAVE TO SHOW THEY'RE BETTER THAN LOW-DOSE ASPIRIN, WHICH
19  IS ALREADY AVAILABLE.
20  BY MR. BEASLEY:
21  Q. HASN'T THAT BEEN Y'ALL'S POSITION, THOUGH, THAT IT IS
22  CARDIOPROTECTIVE? IN FACT, THAT'S YOUR DEFENSE IN THIS CASE.
23  A. NO. I THINK THE DATA, FIRST OFF, IS THAT, WITH SHORT-TERM
24  USE, VIOXX IS NOT HARMFUL. THAT'S, I THINK, THE MOST IMPORTANT
25  QUESTION. THE EXPLANATION FOR THE VIGOR TRIAL IS THAT NAPROXEN

44  (Pages 1620 to 1623)

## DAILY COPY

## Page 1624

1 WAS DECREASING THE RISK OF CARDIOVASCULAR EVENTS. I THINK THE
2 DATA IS ALL VERY CONSISTENT WITH THAT.
3 Q. YOU HAVE A LITTLE BOX UP THERE. THEY HAVE A WARNING
4 SECTION ON HERE, AM I CORRECT, ON THIS BOX?
5 A. YES, THEY DO.
6 Q. IF A PERSON, SPECIFICALLY A DOCTOR, SAY THEY WERE GETTING
7 DRUG, THE FIRST PLACE THEY WOULD LOOK WOULD BE WHETHER OR NOT
8 IT WAS CONTRAINDICATED FOR A PATIENT TO TAKE A DRUG; AND THE
9 SECOND PLACE THEY GENERALLY LOOK IS THE WARNINGS SECTION TO
10 MAKE SURE THERE ARE NO, AS YOU MENTIONED A WHILE AGO, SERIOUS
11 ADVERSE EFFECTS. AM I CORRECT?
12 A. THESE WARNINGS ARE FOR INSTRUCTIONS TO PATIENTS ABOUT
13 THINGS A PATIENT SHOULD BE CONCERNED ABOUT.
14 Q. Y'ALL EXPECT FOLKS TO READ THE WARNINGS, READ THE PRODUCT
15 LABELS, AND THINGS LIKE THAT ON DRUGS, DON'T YOU?
16 A. THIS IS OVER THE COUNTER. SO THIS IS WARNING FOR PATIENTS.
17 Q. NO, SIR. THAT'S NOT MY QUESTION. YOU NEED TO LISTEN A
18 LITTLE BIT TO ME.
19 A. I'M SORRY.
20 Q. THE QUESTION WAS: DO DRUG COMPANIES EXPECT DOCTORS TO
21 READ THE PRODUCT INFORMATION SHEETS AND THE LABEL ON A
22 PARTICULAR DRUG?
23 A. ABSOLUTELY.
24 Q. THE QUESTION I'M ASKING YOU IS: ISN'T THE WARNINGS
25 SECTION EXTREMELY IMPORTANT TO DOCTORS?

## Page 1625

1 A. THE ENTIRE LABEL IS EXTREMELY IMPORTANT TO DOCTORS.
2 Q. THAT'S NOT MY QUESTION. ISN'T THE WARNINGS SECTION
3 SIGNIFICANTLY MORE IMPORTANT THAN ANYTHING ELSE IN THERE
4 INSOFAR AS THE PRECAUTIONS OR THE CONTRAINDICATIONS EVEN?
5 A. NO. I DON'T THINK SO. I MEAN, I THINK CONTRAINDICATIONS
6 ARE -- IF THERE'S A PATIENT WHO'S NOT SUPPOSED TO TAKE THE
7 DRUG, CONTRAINDICATIONS ARE VERY IMPORTANT. PRECAUTIONS ARE
8 IMPORTANT. THE DOSE IS IMPORTANT. I ACTUALLY THINK THE ENTIRE
9 LABEL HAS VERY IMPORTANT INFORMATION FOR PHYSICIANS. THEY NEED
10 TO KNOW THE WHOLE THING BEFORE THEY PRESCRIBE THE DRUG.
11 Q. I TEND TO AGREE WITH YOU. THE DOCTOR IS ENTITLED TO RELY
12 ON WHAT YOU TELL THEM; AM I CORRECT?
13 A. ABSOLUTELY.
14 Q. WELL GET INTO THAT IN MORE DETAIL IN JUST A FEW MINUTES.
15 I'M GOING TO ASK YOU SOME RATHER SIMPLE BASIC QUESTIONS THAT
16 WON'T REQUIRE A LONG ANSWER. JUST "YES" OR "NO." IF YOU DON'T
17 KNOW, TELL ME YOU DON'T KNOW. YOU'VE GOT THREE CHOICES. OKAY?
18 A. SURE.
19        MR. ISMAIL: YOUR HONOR --
20        THE COURT: LISTEN TO THE QUESTION. IF YOU CAN
21 ANSWER IT, FINE. IF YOU CAN'T, YOU EXPLAIN IT.
22        THE WITNESS: YES, SIR.
23 BY MR. BEASLEY:
24 Q. I'M GOING TO ASK YOU A LITTLE BIT ABOUT WHAT
25 PHARMACEUTICAL COMPANIES HAVE INSOFAR AS DUTIES TO DOCTORS AND

## Page 1626

1 PATIENTS WHO TAKE THEIR MEDICINES. OKAY?
2 A. OKAY.
3 Q. FIRST, WHEN YOU'RE COMING OUT WITH A NEW DRUG, IT'S
4 EXTREMELY IMPORTANT TO RESEARCH THE MEDICAL LITERATURE,
5 SCIENTIFIC LITERATURE THOROUGHLY; AM I CORRECT?
6 A. YES.
7 Q. SECOND, IS IT ABSOLUTELY NECESSARY THAT A COMPANY PERFORM
8 ALL NECESSARY AND ESSENTIAL CLINICAL TRIALS?
9 A. YES.
10 Q. IS IT ALSO THEIR DUTY TO DISCLOSE ALL THE INFORMATION FROM
11 THOSE TRIALS AND STUDIES, GOOD AND BAD -- I WAS ASKING YOU
12 ABOUT DISCLOSURE NUMBER 3. DOES THE COMPANY HAVE A DUTY TO
13 DISCLOSE ALL THE INFORMATION FROM THOSE TRIALS AND STUDIES,
14 GOOD AND THE BAD, TO THE FDA?
15 A. YES.
16 Q. ALSO TO THE MEDICAL COMMUNITY?
17 A. THE STUDIES ARE GENERALLY PUBLISHED IN THE PEER-REVIEWED
18 LITERATURE AS WELL AS BEING GIVEN TO THE FDA.
19 Q. FOURTH, DO THEY HAVE A DUTY TO WARN OF KNOWN RISKS, KNOWN
20 TO THE COMPANY, WHEN A DRUG IS PUT ON THE MARKET?
21 A. I WOULD SAY SO, YES.
22 Q. DOES THAT DUTY EXTEND TO THE MEDICAL COMMUNITY, THE
23 DOCTORS WHO WILL BE PRESCRIBING THOSE MEDICATIONS?
24 A. AS I SAID, THE RESULTS OF CLINICAL TRIALS ARE SUBMITTED TO
25 THE FDA AND PUBLISHED IN THE PUBLISHED LITERATURE.

## Page 1627

1 Q. ALSO, DOES THAT DUTY EXTEND TO THE PUBLIC, THE PEOPLE WHO
2 WILL BE TAKING THE DRUGS THAT YOUR COMPANY AND OTHER COMPANIES
3 SELL?
4 A. I THINK THAT THE PRIMARY AUDIENCE FOR THE MEDICAL
5 INFORMATION ARE PHYSICIANS, BUT THERE'S ALSO PARTS OF THAT
6 INFORMATION THAT ARE PUT INTO PLAIN LANGUAGE FOR PATIENTS, AS
7 WELL, YES.
8 Q. WELL, I KNOW A LITTLE BIT ABOUT IT BECAUSE, YOU SEE, MY
9 BROTHER IS A PHARMACIST. YOU ALSO PUT PRODUCT INFORMATION
10 SHEETS ACTUALLY WITH THE DRUG THAT GOES TO THE PATIENT; AM I
11 CORRECT?
12        MR. ISMAIL: YOUR HONOR, CAN WE LEAVE THE SPEECHES
13 OUT OF THIS EXAMINATION? HE IS TESTIFYING ABOUT HIS FAMILY.
14        MR. BEASLEY: LET ME JUST REPHRASE IT.
15        THE COURT: REPHRASE THE QUESTION.
16 BY MR. BEASLEY:
17 Q. IS IT NECESSARY TO PUT THE PRODUCT INFORMATION SHEETS, THE
18 INFORMATION THAT GOES TO THE PERSON WHO ACTUALLY TAKES THE
19 DRUG, ALSO?
20 A. RIGHT. THERE IS AN INFORMATION SHEET FOR THE PATIENT.
21 CORRECT.
22 Q. AM I CORRECT THAT YOU MUST PUT ALL DATA RELATING TO THE
23 SERIOUS RISKS SUCH AS HEART ATTACK, STROKES IN THE DRUG'S LABEL
24 AS A WARNING, A SERIOUS -- LIKE A HEART ATTACK?
25 A. WELL, NOW I THINK YOU'RE GETTING --

45 (Pages 1624 to 1627)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543750

## Page 1628

1 Q. IF YOU CAN'T ANSWER THAT --

2 THE COURT: WAIT. LET HIM ANSWER. PLEASE.

3 THE WITNESS: IF YOU'RE ASKING IF THE CLINICAL TRIAL

4 RESULTS SHOW AN INCREASED RISK OF ANY PARTICULAR SIDE EFFECT,

5 SHOULD THAT BE IN THE LABEL, I WOULD AGREE. IF THERE'S NO

6 CLINICAL TRIAL RESULTS SHOWING ANY INCREASED RISK, THEN

7 OBVIOUSLY IT DOESN'T GO IN THE LABEL BECAUSE THERE'S NO

8 EVIDENCE.

9 BY MR. BEASLEY:

10 Q. IF THE COMPANY HAD CLINICAL TRIALS, INFORMATION FROM ANY

11 SOURCE, THAT LET THEM KNOW THAT YOU HAD A SERIOUS HEART ATTACK

12 OR CARDIAC OR CARDIOVASCULAR EVENT PROBLEM WITH THE DRUG, THEN

13 IT OUGHT TO GO IN THE WARNINGS SECTION. SHOULDN'T IT? A HEART

14 ATTACK IS A SERIOUS DEAL, ISN'T IT?

15 A. MY UNDERSTANDING OF THE WARNING SECTION IS THINGS THAT ARE

16 BELIEVED TO BE CAUSED BY THE DRUG. THINGS IN THE PRECAUTION

17 SECTION ARE THINGS WE DON'T REALLY KNOW IF IT'S CAUSED BY THE

18 DRUG OR SOMETHING ELSE. THOSE GO IN THE PRECAUTIONS SECTION.

19 SO THERE'S A GENERAL RULE WHAT GOES IN THE WARNINGS SECTIONS.

20 Q. DOES THE COMPANY HAVE A DUTY TO WITHDRAW ANY DRUG THAT HAS

21 CAUSED A PUBLIC HEALTH THREAT, TAKE IT FROM THE MARKET?

22 A. I CAN'T ANSWER THAT QUESTION.

23 Q. YOU CAN'T ANSWER THAT QUESTION?

24 A. IT'S A HYPOTHETICAL QUESTION. I CAN'T ANSWER IT.

25 Q. WELL, LET ME ASK IT HYPOTHETICALLY. ASSUME THAT YOU HAVE

## Page 1629

1 A DRUG THAT'S CAUSING A SERIOUS THREAT OF HEART ATTACKS, SAY A

2 500 PERCENT INCREASE, AND OTHER STUDIES BACK IT UP OR GIVE

3 CREDENCE TO THAT PROBLEM AND IT DOES, IN FACT, CREATE A PUBLIC

4 HEALTH RISK TO PEOPLE TAKING DRUGS. SHOULD THE COMPANY

5 WITHDRAW THAT DRUG FROM THE MARKET?

6 A. I THINK I CAN SPEAK MORE NOW AS A FORMER PRACTICING

7 PHYSICIAN. THERE ARE RISKS AND BENEFITS FOR ANY PRODUCT. SO

8 IF, IN A PARTICULAR PATIENT POPULATION, THE PRODUCT STILL HAS A

9 FAVORABLE RISK-BENEFIT RATIO, THEN IT MAY BE IMPORTANT TO LEAVE

10 THE PRODUCT ON THE MARKET FOR THOSE PATIENTS FOR WHOM THE

11 BENEFITS OUTWEIGH THE RISKS. SO YOU HAVE TO TAKE INTO ACCOUNT

12 THE CLINICAL CONTEXT FOR THE MEDICATIONS.

13 Q. ASSUME HYPOTHETICALLY AGAIN -- WITHOUT GOING TO BOARDS AND

14 DRAWINGS, I'M JUST GOING TO DO IT LIKE THIS. ASSUME THAT YOUR

15 RISKS OF HEART ATTACKS IS A 500 PERCENT INCREASE OVER -- JUST

16 SAY IT'S A HIGH INCREASE, AND YOUR BENEFIT FROM TAKING THAT

17 DRUG IS DOWN HERE. CAN YOU SEE THAT OKAY?

18 A. I CAN SEE YOUR HANDS.

19 Q. NOW, UNDER THAT SCENARIO, IF YOU HAD -- FOR EXAMPLE, IF --

20 LET ME ADD THIS TO IT. ASSUMING THAT THE FDA SAYS THAT YOUR

21 DRUG HAS CAUSED UP TO I THINK IT'S 160,000 HEART ATTACKS FROM

22 PEOPLE TAKING IT AND ABOUT FOUR PERCENT DEATHS THEY KNOW ABOUT

23 RELATING TO IT, OF THE TOTAL, THEN, IN YOUR OPINION, SHOULD

24 THAT DRUG BE WITHDRAWN FROM THE MARKET AS A PUBLIC HEALTH

25 SAFETY THREAT?

## Page 1630

1 A. I'LL DISAGREE WITH THE PREMISE OF YOUR QUESTION BECAUSE I

2 DON'T THINK THE DATA SHOWS WHAT YOU HAVE JUST SUGGESTED.

3 AGAIN, I WOULD SAY IF THERE ARE PATIENT POPULATIONS FOR WHOM --

4 SPECIFIC POPULATIONS WHERE THE BENEFITS OUTWEIGH THE RISKS, IT

5 WOULD BE USEFUL FOR PHYSICIANS TO HAVE THAT MEDICATION IN THEIR

6 TOOLKIT TO USE FOR THEIR PATIENTS.

7 Q. IN CERTAIN CASES, YOU MIGHT HAVE A DRUG THAT SOME PEOPLE

8 MIGHT BE AT RISK AND SHOULDN'T GET IT, AND OTHERS MIGHT NOT

9 HAVE ANY RISK AT ALL AND THEY COULD TAKE THAT PARTICULAR DRUG;

10 WOULD THAT BE A FAIR STATEMENT?

11 A. I THINK THAT'S GENERALLY TRUE FOR MANY MEDICATIONS.

12 THAT'S WHY WE HAVE THE CONTRAINDICATIONS, FOR EXAMPLE. THOSE

13 ARE PATIENTS WHO SHOULDN'T TAKE THE DRUG BECAUSE OF THE --

14 Q. THAT'S ALSO WHY IT'S SO IMPORTANT TO DISCLOSE THE

15 INFORMATION AND WARN FOLKS ABOUT RISKS; AM I CORRECT?

16 A. ABSOLUTELY.

17 Q. IF MERCK FAILED TO DO ANY OF THESE THINGS THAT YOU AGREED

18 WITH ME ON, THAT THE DUTIES THAT THEY HAD TO THE DOCTORS AND TO

19 PATIENTS, THEN THAT WOULD BE A WRONG THING FOR MERCK TO DO; AM

20 I CORRECT?

21 MR. ISMAIL: OBJECTION. ARGUMENTATIVE AND

22 SPECULATIVE.

23 THE COURT: I SUSTAIN THE OBJECTION.

24 BY MR. BEASLEY:

25 Q. NOW, I'M NOT GOING TO WANT TO GET INTO A LONG DISCUSSION

## Page 1631

1 ABOUT THIS -- YOU CAN EITHER AGREE OR DISAGREE -- BUT CERTAINLY

2 THE JURY HAS HEARD A LOT OF INFORMATION DURING NOW IN THE

3 SECOND WEEK ABOUT THE EARLY WARNINGS THAT YOUR COMPANY RECEIVED

4 ABOUT COX-2 INHIBITORS, SPECIFICALLY VIOXX. CAN WE AGREE ON

5 THAT, THAT THERE WERE SOME RED FLAGS AND WARNING SIGNALS THAT

6 EVEN CONCERNED YOU AT ONE TIME?

7 MR. ISMAIL: OBJECTION, YOUR HONOR. ARGUMENTATIVE.

8 THE COURT: YEAH. LET'S JUST ASK THE QUESTION.

9 YOU'RE MAKING A LONG COMMENT FIRST.

10 MR. BEASLEY: I'LL STRIKE THAT, YOUR HONOR, AND GO ON

11 SOMETHING ELSE.

12 BY MR. BEASLEY:

13 Q. AM I CORRECT THAT MERCK WAS IN A RACE WITH THE COMPANY

14 SEARLE, WHO IS NOW PFIZER, ON CELEBREX BACK IN THE '90S?

15 A. YES.

16 Q. THERE HAD BEEN A CHANGE IN DIRECTION AT MERCK. TELL THE

17 JURY. MR. GILMARTIN WAS NOT A MEDICAL DOCTOR, AM I CORRECT, OR

18 A SCIENTIST? HE WAS THE NEW CEO; AM I CORRECT?

19 MR. ISMAIL: OBJECTION. BEYOND THE SCOPE.

20 YOUR HONOR.

21 THE COURT: DO YOU KNOW THAT, SIR?

22 THE WITNESS: I DO KNOW WHO MR. GILMARTIN IS. ALL I

23 DO KNOW IS THAT HE WAS NOT A PHYSICIAN.

24 BY MR. BEASLEY:

25 Q. I'M NOT BEING ANY WAY DEROGATORY AT ALL WHEN I SAY THIS.

46   (Pages 1628 to 1631)

ff147213-239a-4359-81c3-ecc5412a5939

M0055437S1

Page 1632

1  HE WAS MARKETING AND SALES; AM I CORRECT? THAT WAS HIS
2  BACKGROUND?
3  A. I ACTUALLY DON'T KNOW HIS BACKGROUND. I JUST KNOW THAT HE
4  WAS NOT A PHYSICIAN.
5  Q. NOW, THAT CHANGE OF DIRECTION WOULD PLAY RIGHT INTO THE
6  FACT THAT MERCK WAS LOSING A GREAT NUMBER OF PATENTS? I'M NOT
7  GOING TO SPEND A LOT OF THE TIME ON THIS, BUT CAN WE AGREE THAT
8  MERCK WAS LOSING – THE PROSPECTS OF LOSING A GREAT DEAL OF
9  REVENUE BECAUSE YOU HAD SIX MAJOR – SOME BLOCKBUSTER – DRUGS
10  GOING OFF PATENT SCHEDULED IN 2000 AND 2001?
11      MR. ISMAIL: OBJECTION.
12      THE COURT: IF THE OBJECTION IS IT'S OUTSIDE THE
13  SCOPE OF THE DIRECT, I AGREE WITH THAT. I SUSTAIN THE
14  OBJECTION. THE PURPOSE OF THE CROSS IS TO CROSS ON WHAT WAS
15  COVERED IN DIRECT.
16  BY MR. BEASLEY:
17  Q. AM I CORRECT THAT YOU ARE FAMILIAR WITH THE VIGOR TRIAL?
18  A. YES.
19  Q. AM I CORRECT THAT VIGOR HAD NOT BEEN COMPLETED WHEN VIOXX
20  HIT THE MARKET?
21  A. THAT'S CORRECT.
22  Q. ONCE IT WAS COMPLETED, IT SHOWED A 500 PERCENT INCREASE IN
23  HEART ATTACKS AND STROKES; AM I CORRECT?
24  A. NO, THAT'S NOT CORRECT.
25      MR. BEASLEY: IF I'M GOING TOO FAR, JUDGE, I

Page 1633

1  APOLOGIZE. I DON'T THINK I AM.
2  BY MR. BEASLEY:
3  Q. YOU MENTIONED THE FDA A NUMBER OF TIMES DURING YOUR
4  TESTIMONY. DO YOU AGREE WITH DR. ED SCOLNICK – I'M JUST GOING
5  TO CALL HIM DR. ED – THAT THE FDA IS UNDERFUNDED AND
6  UNDERSTAFFED?
7      MR. ISMAIL: YOUR HONOR –
8  BY MR. BEASLEY:
9  Q. I'LL CALL HIM DR. SCOLNICK BECAUSE I DON'T WANT TO BE
10  DISRESPECTFUL. I'M NOT GOING TO CALL HIM ANY NAMES EITHER,
11  LIKE – GO AHEAD.
12  A. FROM MY OWN PERSONAL EXPERIENCES WORKING WITH THE FDA, I
13  FOUND THEIR SCIENTISTS TO BE OUTSTANDING AND I HAVE FOUND THE
14  INTERACTIONS WITH THEM TO BE PROFESSIONAL. SO I NEVER HAD ANY
15  SENSE THAT THEY DIDN'T COME PREPARED TO MEETINGS OR THAT THEY
16  WERE NOT PREPARED TO TALK.
17  Q. I KNOW THAT MOVIE WAS LONG YESTERDAY, BUT SURELY YOU
18  REMEMBER HIM SAYING THAT, DON'T YOU?
19  A. I'VE HEARD HIM SAY THAT. I JUST TOLD YOU MY PERSONAL
20  EXPERIENCES AND THE INTERACTIONS I'VE HAD WITH THE FDA.
21  Q. WELL, HE WAS THE PRESIDENT OF MERCK RESEARCH. HE WAS THE
22  BOSS, WASN'T HE?
23  A. HE WAS THE PRESIDENT OF THE RESEARCH DIVISION.
24  Q. NOW, HE ALSO TOLD US THAT THE SCIENTISTS AT THE FDA WERE
25  NOT UP TO PAR ON THE SCIENCE BECAUSE THE FDA COULDN'T COMPETE

Page 1634

1  WITH, SAY, MERCK AND OTHER PHARMACEUTICAL COMPANIES AND EVEN
2  THE UNIVERSITIES AND COLLEGES?
3      MR. ISMAIL: OBJECTION. BEYOND THE SCOPE.
4      THE COURT: SUSTAINED.
5  BY MR. BEASLEY:
6  Q. LET ME JUST ASK YOU THIS: TO THIS DAY, MERCK HAS NOT DONE
7  A STUDY WHERE HEART ATTACKS WERE REALLY THE THING THEY WERE
8  STUDYING; AM I CORRECT? WHERE IT WAS THE ENDPOINT, THE FOCUS
9  OF THE STUDY? "YES" OR "NO"?
10  A. NO, I DISAGREE WITH THAT. ADJUDICATED CARDIOVASCULAR
11  EVENTS WERE PREDEFINED ENDPOINTS IN EVERY STUDY AFTER PROBABLY
12  STARTING WITH VIGOR. SO PREDEFINED ANALYSIS OF ADJUDICATED
13  CARDIOVASCULAR EVENTS HAS BEEN GOING ON PROBABLY SINCE 1999.
14  Q. LET ME JUST ASK YOU THIS. YOU TALKED A LITTLE BIT EARLIER
15  ABOUT THE WARNINGS SECTION IN YOUR DIRECT, I BELIEVE.
16  A. RIGHT.
17  Q. MERCK WANTED THE LABEL TOTALLY DIFFERENT FROM WHAT THE FDA
18  WANTED; AM I CORRECT?
19  A. I HAVE NO KNOWLEDGE OF THAT.
20  Q. YOU'RE THE CORPORATE REP. HOW LONG HAVE YOU BEEN
21  STUDYING – IN FACT, WE TOOK YOUR DEPOSITION BACK NOT TOO MANY
22  MONTHS AGO AND YOU DIDN'T KNOW ANYTHING ABOUT MUCH OF ANYTHING.
23  DO YOU RECALL THAT?
24      MR. ISMAIL: OBJECTION, YOUR HONOR.
25      THE COURT: SUSTAINED.

Page 1635

1  BY MR. BEASLEY:
2  Q. ON YOUR DIRECT TESTIMONY, YOU WERE PRETTY UP-TO-DATE ON
3  EVERYTHING, REGARDLESS OF WHAT YOU SAID BEFORE; AM I CORRECT?
4      MR. ISMAIL: OBJECTION, YOUR HONOR.
5      THE COURT: I'LL OVERRULE THAT. IS THAT A COMMENT OR
6  A QUESTION?
7      MR. BEASLEY: QUESTION.
8      THE WITNESS: I'M HERE TO ANSWER QUESTIONS ABOUT
9  THINGS THAT I KNEW ABOUT AT THE TIME, SIR.
10  BY MR. BEASLEY:
11  Q. LET'S JUST TALK ABOUT SOME QUESTIONS, THEN. AM I CORRECT
12  THAT THE FDA EARLY ON WANTED STRONG WARNINGS ON HEART ATTACKS
13  AND STROKES IN THE VIOXX LABEL?
14      MR. ISMAIL: OBJECTION, YOUR HONOR. THIS IS TWO
15  YEARS AFTER ANYTHING THAT DR. MORRISON TESTIFIED ABOUT.
16      THE COURT: I SUSTAIN THE OBJECTION.
17  BY MR. BEASLEY:
18  Q. LET ME JUST ASK IT THIS WAY, THEN. YOU KNOW WHEN DICKY
19  DIED?
20  A. I DO.
21  Q. WERE THERE ANY WARNINGS IN THE PRODUCT INFORMATION SHEET
22  OR THE PDR, WHICH THE DOCTORS LOOK AT, OR ANY WARNING LETTERS
23  TO THE DOCTORS, THE "DEAR DOCTOR" LETTERS, ANYTHING AT ALL,
24  CONCERNING HEART ATTACKS AND STROKES AND THE RISKS THEY WOULD
25  BE FACING?

47  (Pages 1632 to 1635)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M00554375Z

Page 1636

1  A. MY UNDERSTANDING OF WHEN MR. IRVIN DIED, THE ORIGINAL
2  VIOXX LABEL WAS OPERATIVE AT THAT TIME.
3  Q. I GUESS YOUR ANSWER TO THAT WOULD BE THERE WAS NO WARNING?
4  A. THERE WAS NO WARNING, CORRECT.
5  Q. HOW WOULD YOU EXPECT A DOCTOR, AN EMERGENCY ROOM DOCTOR OR
6  A PERSON THAT'S SEEING PATIENTS ON A DAILY BASIS – THEY WOULD
7  NORMALLY GET THEIR INFORMATION FROM THE PRODUCT INFORMATION
8  SHEETS, OR REALLY THE PDR, THAT'S REALLY WHERE THEY GO,
9  GENERALLY?
10  A. I CAN ONLY ANSWER –
11  Q. YOU KNOW WHAT THE PDR IS, FIRST?
12  A. I CAN ONLY ANSWER FROM MY PERSONAL EXPERIENCE WORKING IN
13  EMERGENCY ROOMS WHERE I WORKED.
14  Q. LET ME STRIKE AND ASK YOU THIS WAY. YOU KNOW WHAT THE PDR
15  IS?
16  A. YES, I DO.
17  Q. I KNOW THE JURY KNOWS BECAUSE WE HAVE HEARD ABOUT IT ALL
18  WEEK. THEY GO TO THE PDR, THE DOCTORS THAT WRITE
19  PRESCRIPTIONS, GENERALLY, TO FIND OUT THE INFORMATION THAT THEY
20  DON'T ALREADY KNOW ABOUT A DRUG?
21  A. I CAN ONLY TELL YOU ABOUT MY OWN PERSONAL EXPERIENCE AS A
22  FORMER PRESCRIBING PHYSICIAN. I CAN'T TALK ABOUT PEOPLE IN
23  GENERAL.
24  Q. NOW, ARE YOU FAMILIAR WITH THE WARNING LETTER THAT THE FDA
25  SENT TO MERCK?

Page 1637

1      MR. ISMAIL: OBJECTION. BEYOND THE SCOPE.
2      THE COURT: SUSTAINED.
3  BY MR. BEASLEY:
4  Q. ARE YOU FAMILIAR WITH DR. JÜNI AND HIS STUDY?
5      MR. ISMAIL: OBJECTION. BEYOND THE SCOPE.
6      THE COURT: SUSTAINED.
7  BY MR. BEASLEY:
8  Q. YOU HEARD DR. SILVER TESTIFY, DIDN'T YOU?
9  A. YES, I DID.
10  Q. HE TOLD THE JURY THAT DOCTORS BELIEVE THAT FDA APPROVAL
11  GIVES THE MEDICAL COMMUNITY THE ASSURANCE THAT A DRUG IS SAFE
12  TO BE USED FOR THE APPROVED USES. I'M GOING TO ASK YOU: ISN'T
13  THAT EXACTLY WHY IT'S SO CRITICALLY IMPORTANT THAT MERCK AND
14  OTHER PHARMACEUTICAL COMPANIES SUPPLY FULL AND COMPLETE
15  INFORMATION AND DATA, BOTH TO THE FDA AND TO THE DOCTORS,
16  INCLUDING THE WARNINGS ABOUT THE HAZARDS AND THE RISKS AND THE
17  DANGERS OF TAKING A DRUG?
18  A. IT'S IMPORTANT THAT WE PROVIDE FULL AND COMPLETE DATA TO
19  THE FDA, YES, AND IN MY EXPERIENCE WE ALWAYS HAVE. WE
20  PUBLISHED THE DATA, AS WELL. YOU SAW THE PUBLICATION OF THE
21  STUDY I HAD DONE WITH GARRETT. SO I THINK WE DO PROVIDE FULL
22  AND COMPLETE INFORMATION TO THE FDA AND WE PUBLISH IT IN THE
23  PUBLISHED LITERATURE.
24  Q. I'M GOING TO SHOW YOU A SERIES OF E-MAILS THAT I WANT TO
25  ASK YOU ABOUT. I'M GOING TO ASK YOU FIRST: ARE YOU FAMILIAR

Page 1638

1  WITH THEM?
2      THE COURT: DO YOU WANT TO SHOW COUNSEL THE E-MAILS.
3      MR. BEASLEY: EXHIBIT P4.
4      THE WITNESS: THESE ARE THE SAME E-MAILS I JUST WENT
5  OVER WITH MR. ISMAIL.
6  BY MR. BEASLEY:
7  Q. I'M SORRY?
8  A. WE JUST WENT OVER THESE.
9  Q. YOU DON'T GO OVER IT ALL, DID YOU?
10  A. NO. WE DIDN'T GO OVER EVERY LINE WORD-FOR-WORD.
11  Q. LET'S START AND KIND OF GIVE THE PROGRESSION OF THIS, THE
12  EVOLUTION OF IT. SO TO SPEAK. DR. REICIN WAS THE FIRST
13  E-MAILER: AM I CORRECT?
14  A. THAT'S CORRECT.
15  Q. THEN I BELIEVE THAT YOU RESPONDED TO IT: AM I CORRECT ON
16  THAT?
17  A. THAT'S CORRECT.
18  Q. I'M NOT GOING TO SPEND A LOT OF TIME ON "KILLING THE
19  DRUG," BUT I JUST WANT TO MAKE SURE IT'S IN CONTEXT BEFORE WE
20  GET TO THE NEXT SECTION. SO THERE WON'T BE ANY QUESTION ABOUT
21  WHAT WE ARE READING LATER, "WITHOUT COX-1 INHIBITION, YOU WILL
22  GET MORE THROMBOTIC EVENTS AND KILL THE DRUG." YOU'RE TALKING
23  ABOUT CLOTS WHICH CAN CAUSE HEART ATTACKS? IF THAT INFORMATION
24  GETS OUT. IT WOULD KILL THE DRUG. WOULDN'T IT? IT WOULD KILL
25  THE SALES OF THAT DRUG: ISN'T THAT CORRECT?

Page 1639

1  A. WE ARE NOT TALKING ABOUT VIOXX CAUSING THINGS; WE ARE
2  TALKING ABOUT THE COMPARATOR NSAID PREVENTING THEM.
3  Q. LET'S GO TO THE NEXT ONE, THE RESPONSE BY DR. REICIN.
4  WHICH IS ON THE FIRST PAGE. SHE RESPONDED ON THE 25TH OF
5  FEBRUARY OF 1997. I'M SORRY. I MISSTATED THAT. IT WAS THE
6  25th, I BELIEVE. LET'S GO DOWN TO NUMBER 5. THIS IS THE
7  RESPONSE THAT CAME FROM DR. REICIN. SHE DIDN'T MUCH WANT TO
8  TALK TO EITHER DR. SCOLNICK, WHO WAS ALREADY CONCERNED, OR
9  PERHAPS DR. GILMARTIN, OR THE FOLKS THE MARKETING, DID SHE?
10  A. I DON'T THINK THERE'S ANYTHING ABOUT TALKING ABOUT
11  DR. SCOLNICK OR DR. GILMARTIN.
12  Q. SENIOR MANAGEMENT. I GUESS THAT COULD BE DR. SCOLNICK
13  CERTAINLY, COULDN'T IT?
14  A. SHE'S TALKING ABOUT A THEORETIC FUTURE PRESENTATION.
15  Q. LET'S SEE WHAT SHE SAID. SHE SAYS, "THE POSSIBILITY OF
16  INCREASED CV EVENTS" – IF WE DON'T KNOW WHAT THAT IS BY NOW,
17  THAT'S CARDIOVASCULAR EVENTS, INCLUDING HEART ATTACKS – "IS OF
18  GREAT CONCERN." SO SHE WAS CONCERNED; AM I CORRECT?
19  A. SHE WAS CONCERNED THAT THE NSAID GROUP WOULD BE PROTECTED
20  FROM CARDIOVASCULAR EVENTS AND SO YOU WOULD SEE MORE ON VIOXX
21  THAN YOU WOULD SEE ON THE COMPARATOR NSAID.
22  Q. SHE DIDN'T WANT TO BE THE PERSON TO PRESENT THOSE RESULTS
23  TO FOLKS LIKE DR. SCOLNICK AND MR. GILMARTIN: AM I CORRECT?
24  AND PERHAPS ALSO TO MR. – IS IT DAVID?
25      MR. BECK: ANSTICE.

48  (Pages 1636 to 1639)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543753

Page 1640

1   BY MR. BEASLEY:
2   Q.   ANSTICE.  HE'S THE MARKETING GUY?
3   A.   SHE SAYS "SENIOR MANAGEMENT." I DON'T KNOW WHAT SENIOR
4   MANAGEMENT SHE IS REFERRING TO.  I WOULD THINK IT WOULD BE
5   DR. SCOLNICK.
6   Q.   DID YOU SHARE THAT VIEW YOU DIDN'T WANT TO BE THE FELLOW
7   TO GIVE THE BAD NEWS TO THOSE FOLKS?
8   A.   MY EXPERIENCE IN THE MERCK RESEARCH LABS IS EVERYBODY IS
9   ALWAYS OPEN TO THE DATA, AND WE PRESENT ALL THE DATA AND WE
10  TALK ABOUT IT.
11  Q.   THERE'S ALSO SOMETHING ELSE I THOUGHT WAS PRETTY IMPORTANT
12  IN HERE THAT SAYS "EXCLUDE THESE HIGH-RISK CV PATIENTS." IN
13  OTHER WORDS, FOLKS THAT ALREADY HAD AN MI, CABG, OR PTCA.
14  WHAT'S A PTCA?
15  A.   PTCA IS A PERCUTANEOUS CORONARY ANGIOPLASTY.
16  Q.   "THIS MAY DECREASE THE CARDIOVASCULAR EVENT RATE SO THAT A
17  DIFFERENCE BETWEEN THE TWO GROUPS WOULD NOT BE EVIDENT."  IS
18  SHE TRYING TO HIDE THAT?  IS THAT WHEN SHE CAME UP WITH THIS
19  "FLIPPING THE DATA" THEORY?
20          MR. ISMAIL:  OBJECTION, YOUR HONOR.
21          THE WITNESS:  SHE IS TALKING ABOUT HOW DO WE DESIGN
22  THE TRIAL.  SO PATIENTS WHO HAVE AN MI, MYOCARDIAL INFARCTION,
23  OR A CABG, WHICH IS A BYPASS, OR PERCUTANEOUS CORONARY
24  ANGIOPLASTY, THOSE PATIENTS HAVE AN INDICATION TO TAKE ASPIRIN.
25  SO IF YOU'RE GOING TO EXCLUDE ASPIRIN FROM THE STUDY, YOU CAN'T

Page 1641

1   ALLOW THOSE PATIENTS IN BECAUSE THEY HAVE A CLEAR MEDICAL
2   INDICATION TO BE TAKING ASPIRIN.
3   BY MR. BEASLEY:
4   Q.   "DECREASE THE CARDIOVASCULAR EVENT RATE SO THE DIFFERENCE
5   BETWEEN THE TWO GROUPS WOULD NOT BE EVIDENT.  THE ONLY PROBLEM
6   WOULD BE, WOULD WE BE ABLE TO RECRUIT ANY PATIENTS?"  YOU
7   COULDN'T DO THE STUDY, COULD YOU, THAT WOULD BE A LEGITIMATE
8   STUDY?
9   A.   WELL, I DISAGREE WITH THAT.  AS I SAID, THERE ARE MANY
10  PATIENTS WHO ARE NOT ON ASPIRIN WHO TAKE NONSTEROIDAL
11  ANTI-INFLAMMATORY DRUGS FOR THEIR ARTHRITIS, AND THOSE WOULD BE
12  THE PATIENTS WHO WOULD BE ENROLLED IN THE STUDY.
13  Q.   DID YOU RESPOND TO THAT, OR WAS THAT DR. DANIELS?
14  A.   THE TOP E-MAIL HERE IS FROM DR. DANIELS.
15  Q.   WHO IS DR. DANIELS?
16  A.   BRIAN DANIELS WAS ANOTHER MEMBER OF THE PROJECT TEAM, A
17  RHEUMATOLOGIST.
18  Q.   LET'S SEE WHAT HE HAD TO SAY.  THIS IS THE PART WE HADN'T
19  HEARD YET.  LET'S GO TO THE SECOND PARAGRAPH.  READ IT FOR US.
20  A.   "ASPIRIN.  I FEEL THAT YOU ARE USING AN INFLATED ESTIMATE
21  OF THE RATE OF PUBS WITH 75 MILLIGRAMS OF ASPIRIN.  WHATEVER
22  THE RATE, IT IS ALWAYS LOWER THAN THE DOSES OF THE NSAIDS WE
23  ARE USING.  IT IS CLEAR TO ME THAT THE PROGRAM WILL BE SEVERELY
24  HURT IF THE MEGA TRIAL SHOWS A WIN IN PUBS AND A LOSS IN
25  MI/CVA."

Page 1642

1   Q.   LET ME STOP YOU THERE.  THE LAST PART OF THE E-MAIL THAT
2   THE JURY HAS NOW HEARD KIND OF COMPLETES THE PICTURE, DOESN'T
3   IT?  HE IS SAYING THAT "IF WE SHOW A WIN IN THE STOMACH WITH
4   THE PUBS, BUT A LOSS IN THE CARDIOVASCULAR PROBLEMS, MIS AND
5   THE CVAS, THEN THE PROGRAM IS GOING TO BE SEVERELY HURT." AND
6   HE GETS BACK TO WHAT YOU SAID EARLIER.  THAT WOULD KILL THE
7   DRUG, WOULDN'T IT. IF THAT INFORMATION WERE TO GET OUT TO THE
8   PUBLIC, INCLUDING THE PEOPLE WHO WRITE THE PRESCRIPTIONS?
9   A.   IF THAT'S THE RESULT, THAT'S THE RESULT, SO I DON'T THINK
10  THAT'S A QUESTION.  THE ISSUE IS HOW THAT RESULT WOULD BE
11  INTERPRETED.  IF THE PEOPLE INTERPRET THE MI AND CVS AS BEING
12  CAUSED BY VIOXX, THEN THEY WOULD POTENTIALLY NOT PRESCRIBE THE
13  DRUG.
14  Q.   I'M GOING TO DO YOU A FAVOR AND I'M GOING TO QUIT.  I
15  APPRECIATE EVERYTHING YOU TOLD ME.
16          THE COURT:  ANY REDIRECT?
17          MR. ISMAIL:  NO, SIR.
18          THE COURT:  YOU ARE EXCUSED, SIR.  THANK YOU.  CALL
19  YOUR NEXT WITNESS, PLEASE.
20          MR. ISMAIL:  YOUR HONOR, THAT WAS KIND OF AN ABRUPT
21  ENDING.  MAY WE HAVE A BREAK WHILE WE GET OUR NEXT WITNESS?
22          THE COURT:  LET'S TAKE A 15-MINUTE BREAK.
23          THE DEPUTY CLERK:  ALL RISE.
24          (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
25          THE DEPUTY CLERK:  ALL RISE.

Page 1643

1           THE COURT:  BE SEATED.  CALL YOUR NEXT WITNESS.
2           MR. ISMAIL:  YOUR HONOR, WE CALL DR. ALISE REICIN TO
3   THE STAND.
4           (WHEREUPON, ALISE REICIN, HAVING BEEN DULY SWORN,
5   TESTIFIED AS FOLLOWS.)
6           THE DEPUTY CLERK:  PLEASE STATE YOUR FULL NAME AND
7   CORRECT SPELLING FOR THE RECORD.
8           THE WITNESS:  ALISE REICIN.
9                   DIRECT EXAMINATION
10  BY MR. ISMAIL:
11  Q.   GOOD AFTERNOON, DOCTOR.
12  A.   GOOD AFTERNOON.
13  Q.   COULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY.
14  A.   I'M DR. ALISE REICIN.
15  Q.   WHERE DO YOU WORK, MA'AM?
16  A.   I WORK AT MERCK RESEARCH LABS.
17  Q.   WHAT IS YOUR CURRENT TITLE THERE?
18  A.   I'M A VICE PRESIDENT OF CLINICAL RESEARCH AT MERCK.
19  Q.   WHAT DO YOU DO AS A VICE PRESIDENT OF CLINICAL RESEARCH AT
20  MERCK?
21  A.   I'M IN CHARGE OF WHAT'S CALLED THE CLINICAL IMMUNOLOGY AND
22  ANALGESIA DEPARTMENT.  WE DO CLINICAL TRIALS ON NEW DRUGS FOR
23  THE TREATMENT OF BOTH PAIN AND INFLAMMATION.  WE DO CLINICAL
24  DEVELOPMENT.
25  Q.   DO YOU HAVE A FAMILY, MA'AM?

49  (Pages 1640 to 1643)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543754

Page 1644

1  A.  YES, I DO.
2  Q.  DO YOU HAVE KIDS?
3  A.  I HAVE THREE BOYS, AGES 9, 13, AND 15.
4  Q.  SO SIX BOYS BETWEEN YOU AND — THREE BOYS EACH, RIGHT?
5  A.  AND SIMILAR AGES, TOO.
6  Q.  WHERE DO YOU LIVE?
7  A.  I LIVE IN ENGLEWOOD, NEW JERSEY.
8  Q.  HOW LONG HAVE YOU BEEN WITH MERCK?
9  A.  I'VE BEEN WITH MERCK JUST SHY OF 10 YEARS.
10  Q.  CAN YOU PLEASE JUST BRIEFLY GIVE YOUR EDUCATIONAL
11  BACKGROUND AND YOUR MEDICAL TRAINING?
12  A.  I WENT TO COLLEGE AT BARNARD COLLEGE AT COLUMBIA
13  UNIVERSITY WHERE I GOT A DEGREE IN BIOCHEMISTRY.  FROM THERE I
14  WENT TO HARVARD MEDICAL SCHOOL.  THAT WAS FOLLOWED BY AN
15  INTERNSHIP AND A RESIDENCY IN INTERNAL MEDICINE AT COLUMBIA
16  UNIVERSITY IN NEW YORK CITY.  I THEN DID A THREE-YEAR
17  FELLOWSHIP IN INFECTIOUS DISEASES AT COLUMBIA, AND THEN I
18  JOINED THE FACULTY AT COLUMBIA.  IN 1996 I CAME TO MERCK.
19  Q.  WHEN YOU SAY YOU JOINED THE FACULTY OF COLUMBIA, IS THAT
20  THE MEDICAL SCHOOL THERE?
21  A.  THAT IS CORRECT.
22  Q.  WERE YOU EVER INVOLVED IN PATIENT CARE DURING YOUR CAREER
23  BEFORE MERCK?
24  A.  DURING MY WHOLE TIME AT COLUMBIA, I WAS INVOLVED WITH
25  PATIENT CARE AS WELL AS RESEARCH.

Page 1645

1  Q.  IN INFECTIOUS DISEASE?
2  A.  IT IS IN AIDS RESEARCH.  I WAS DOING BASIC SCIENCE AIDS
3  RESEARCH AT THE TIME.
4  Q.  AT THE TIME YOU CAME TO MERCK, YOU HAD WORKED OR BEEN A
5  PROFESSOR OR ON THE FACULTY AT COLUMBIA MEDICAL SCHOOL, HAD
6  TREATED PATIENTS AND HAD BEEN INVOLVED IN BASIC SCIENCE
7  RESEARCH IN THE AREA OF AIDS; IS THAT RIGHT?
8  A.  THAT'S CORRECT.
9  Q.  WHAT POSITION DID YOU HAVE AT MERCK WHEN YOU JOINED THE
10  COMPANY?
11  A.  I WAS AN ASSOCIATE DIRECTOR OF CLINICAL RESEARCH.
12  Q.  CAN YOU BRIEFLY DESCRIBE AND JUST GIVE THE JURY AN
13  OVERVIEW OF YOUR ROLE AND WORK ON VIOXX, WHEN YOU GOT STARTED,
14  AND WHAT YOU FOCUSED ON THROUGHOUT YOUR TIME ON THE PROJECT?
15  A.  WELL, WHEN I CAME TO MERCK, I DIDN'T INITIALLY WORK ON
16  VIOXX.  I SPENT A YEAR WORKING ON SINGULAIR, WHICH IS A DRUG
17  FOR ASTHMA.  I THEN, IN ABOUT 1997, WAS ASKED TO START WORKING
18  ON A GI OUTCOMES STUDY, WHICH WOULD BE A LARGE STUDY EVALUATING
19  WHETHER VIOXX CAUSED LESS SERIOUS GASTROINTESTINAL EVENTS THAN
20  STANDARD NSAIDS.  I SPENT SOME TIME WORKING ON THAT.  WE DIDN'T
21  DO THAT STUDY.  I THEN DID A STUDY LOOKING AT WHETHER PATIENTS
22  WHO HAD JUST HAD KNEE REPLACEMENT OR HIP REPLACEMENT GOT PAIN
23  RELIEF IF THEY USED VIOXX IN THE POSTOPERATIVE PERIOD.  I DID A
24  LITTLE BIT OF WORK WITH THE NEW DRUG APPLICATION, AND THEN I
25  DESIGNED ANOTHER LARGE GI OUTCOMES STUDY CALLED THE VIGOR.

Page 1646

1  STUDY, WHICH WE DID CONDUCT.
2  Q.  THE JURY HAS HEARD A LOT ABOUT THE VIGOR STUDY.  YOU WERE
3  ONE OF THE PEOPLE INVOLVED IN DESIGNING THAT TRIAL; IS THAT
4  CORRECT?
5  A.  THAT IS CORRECT.
6  Q.  WERE YOU ALSO AN AUTHOR OF THE PEER-REVIEWED PUBLICATION?
7  A.  YES, I WAS, IN ADDITION TO OTHER MEMBERS OF THE STEERING
8  COMMITTEE.
9  Q.  DID YOU STAY INVOLVED IN CLINICAL TRIAL DESIGN AND
10  RESEARCH WITH REGARD TO VIOXX UP THROUGH SEPTEMBER 2004?
11  A.  YES, I WAS.
12  Q.  I'M GOING TO PUT UP A TIME LINE JUST SO WE CAN STAY
13  ORIENTED TO TIME HERE.  THE JURY HAS ALREADY MET DR. NIES, AND
14  HE TALKED A LOT ABOUT THE VIOXX DEVELOPMENT.  I WILL NOT REPLOW
15  THAT GROUND HERE.  WE ARE GOING TO HAVE A HARD TIME SEEING
16  THAT, BUT LET ME — JUST SO THE JURY CAN SEE IT AND THEN STAY
17  ORIENTED ON OUR TIME LINE.  DOCTOR, DO YOU RECALL FROM YOUR
18  WORK ON THE PROJECT THAT AN IND WAS FILED WITH VIOXX IN 1994?
19  A.  THAT'S CORRECT.
20  Q.  THAT WAS ON THE BASIS OF SOME BASIC SCIENCE TESTING THAT
21  BEGAN IN 1992 WHEN THE MOLECULE WAS FIRST DISCOVERED?
22  A.  THAT IS CORRECT.
23  Q.  I BELIEVE DR. MORRISON JUST TOLD US ABOUT THE DISCOVERY OF
24  THE COX-2 ENZYME IN IN 1991.  YOU HAVE HEARD ABOUT THAT
25  DISCOVERY?

Page 1647

1  A.  YES, I HAVE.
2  Q.  DR. NIES TALKED ABOUT THE NDA FILING IN NOVEMBER '98, A
3  BOARD OF SCIENTIFIC ADVISORS MEETING IN MAY '98, AND THEN THE
4  FIRST FDA APPROVAL IN MAY '99.
5  A.  I'M FAMILIAR WITH ALL THAT.
6  Q.  NOW, JUST TO BACK UP A BIT, YOU SAID THAT ONE OF YOUR
7  FIRST PROJECTS WITH RESPECT TO VIOXX WAS SETTING UP OR
8  DESIGNING A GI OUTCOMES TRIAL WITH RESPECT TO THE DRUG?
9  A.  THAT'S CORRECT.  ONE OF THE SERIOUS TOXICITY OF NSAIDS,
10  TRADITIONAL NSAIDS, IS THAT THEY CAUSE SERIOUS GASTROINTESTINAL
11  SIDE EFFECTS.  WE WERE TRYING TO PROVE THAT VIOXX, A COX-2
12  INHIBITOR, WOULD HAVE A SIGNIFICANT REDUCTION IN THOSE SERIOUS
13  GI SIDE EFFECTS COMPARED TO TRADITIONAL NSAIDS.
14  Q.  WHAT I WANT TO TALK ABOUT, DOCTOR, IS WHAT THE STATE OF
15  SCIENCE WAS AT THE TIME THAT YOU WERE DESIGNING THIS GI
16  OUTCOMES TRIAL IN AROUND 1997.  IF THERE WAS A CLINICAL TRIAL
17  THAT PUT INTO THE ONE ARM PLACEBO AND THE OTHER ARM ASPIRIN, WHAT
18  WOULD YOU EXPECT THE CARDIOVASCULAR DATA FROM THAT TRIAL TO
19  SHOW?
20  A.  YOU WOULD SEE FEWER SERIOUS CARDIOVASCULAR EVENTS, SUCH AS
21  HEART ATTACK, IN PATIENTS WHO WERE TAKING ASPIRIN — I ASSUME
22  WE'RE TALKING ABOUT LOW-DOSE ASPIRIN — COMPARED WITH PLACEBO.
23  Q.  WOULD IT BE APPROPRIATE IN SUCH A TRIAL TO CONCLUDE THAT A
24  PLACEBO, A SUGAR PILL, WAS CAUSING AN INCREASED AMOUNT OF
25  CARDIOVASCULAR EVENTS?

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543755

Page 1648

1 A. I THINK YOU WOULD ASSUME THAT THE PLACEBO WAS NEUTRAL AND
2 THAT THE ASPIRIN WAS REDUCING THE INCIDENCE OF HEART ATTACKS.
3 IT WOULD NOT BE APPROPRIATE TO ASSUME THAT PLACEBO WAS
4 INCREASING THE RATE.
5 Q. YOU SAID ASPIRIN WOULD PROTECT THE HEART; IS THAT RIGHT?
6 A. WE COULD CALL IT CARDIOPROTECTIVE. SO IT WOULD PROTECT
7 THE HEART AND HAVE A REDUCED RATE.
8 Q. NOW, WAS THE POTENTIAL USE OF LOW-DOSE ASPIRIN IN THE GI
9 OUTCOMES TRIAL AN ISSUE THAT WAS UNDER DISCUSSION WHEN YOU WERE
10 DESIGNING THE TRIAL?
11 A. DR. TOM MUSLINER HAD ACTUALLY FIRST STARTED WORKING ON THE
12 DRAFT OF THAT PROTOCOL, AND HE HAD GIVEN THAT ISSUE QUITE A BIT
13 OF THOUGHT. THEN WHEN I TOOK OVER THE PROTOCOL FROM HIM, I
14 ALSO SPENT A LOT OF TIME THINKING ABOUT THAT AND DISCUSSING IT
15 WITH MY COLLEAGUES.
16 Q. THE JURY HAS HEARD FROM DR. MORRISON ON THIS ISSUE, BUT
17 WHAT DID YOU UNDERSTAND WAS THE DESIGN ISSUE WITH RESPECT TO
18 WHETHER OR NOT TO ALLOW LOW-DOSE ASPIRIN IN THIS TRIAL?
19 A. WELL, THE WHOLE PURPOSE OF THE STUDY WAS TO DETERMINE
20 WHETHER VIOXX, A COX-2 SELECTIVE INHIBITOR -- SO IT ONLY
21 INHIBITS COX-2 -- WOULD BE SAFER ON THE STOMACH COMPARED TO A
22 TRADITIONAL NONSELECTIVE NSAID, WHICH INHIBITS BOTH COX-1 AND
23 COX-2.
24     WE KNOW THAT ASPIRIN INHIBITS COX-1 AND ON ITS OWN
25 CAN CAUSE PATIENTS TO HAVE BLEEDING FROM THEIR GASTROINTESTINAL

Page 1649

1 TRACT. FROM THEIR STOMACH. IF YOU ALLOWED A PATIENT TO GET
2 INTO THE STUDY ON ASPIRIN, YOU WOULDN'T BE TESTING WHAT WE CALL
3 THE COX-2 HYPOTHESIS BECAUSE THOSE PATIENTS WHO WERE TAKING
4 BOTH VIOXX AND ASPIRIN WOULD HAVE NOT ONLY INHIBITION OF COX-2,
5 BUT ALSO INHIBITION OF COX-1. SO WE WOULDN'T BE REALLY TESTING
6 THE COX-2 HYPOTHESIS.
7 Q. WHEN YOU USE THE PHRASE "COX-2 HYPOTHESIS" IN THAT ANSWER,
8 WHAT ARE YOU REFERRING TO?
9 A. TO THE HYPOTHESIS THAT IF YOU ONLY HAD INHIBITION OF COX-2
10 YOU WOULD GET THE SAME EFFICACY IN A COX-2 INHIBITOR AS YOU
11 WOULD IN A NONSELECTIVE INHIBITOR, WHICH INHIBITED BOTH COX-1
12 AND COX-2, BUT WITHOUT THE SERIOUS GI SIDE EFFECTS THAT YOU GET
13 BECAUSE OF COX-1 INHIBITION.
14 Q. NOW, YOU MENTIONED THAT THERE WAS SOME PRIOR WORK DONE ON
15 THIS ISSUE BY A DR. MUSLINER; IS THAT CORRECT?
16 A. THAT'S CORRECT.
17 Q. WHEN YOU STARTED IN ON THE PROJECT TO ASSIST IN DRAFTING
18 THE PROTOCOL, DID YOU REVIEW DR. MUSLINER'S MEMO?
19 A. YES, I DID.
20 Q. I'M SHOWING YOU WHAT HAS BEEN MARKED AND RECEIVED AS
21 EXHIBIT 13. DOCTOR. THERE ARE BINDERS IN FRONT OF YOU IF YOU
22 PREFER TO LOOK AT THE PAPER. WILL YOU PLEASE TELL. US IF
23 EXHIBIT 13 IS THE MEMO FROM DR. MUSLINER WHEN YOU BEGAN WORKING
24 ON THE GI PROTOCOL?
25 A. THIS IS THE MEMO.

Page 1650

1 Q. WHAT DID YOU UNDERSTAND DR. MUSLINER TO BE EXAMINING IN
2 HIS MEMO WHEN YOU FIRST READ IT?
3 A. HE WAS EXAMINING WHAT THE EFFECT OF ALLOWING OR NOT
4 ALLOWING ASPIRIN WOULD BE IN SUCH A LARGE OUTCOME STUDY ON
5 CARDIOVASCULAR EVENTS IN PATIENTS IN THE STUDY.
6 Q. NOW. WHAT DID YOU UNDERSTAND DR. MUSLINER TO BE LAYING OUT
7 IN HIS MEMORANDUM IN TERMS OF THE DESIGN ISSUES FOR THE TRIAL?
8 A. WELL, WHAT HE WAS SAYING IS THAT THERE WERE SOME
9 THEORETICAL DATA AS WELL AS, ACTUALLY, A SMALL AMOUNT OF
10 CLINICAL DATA THAT SUGGESTED THAT NONSELECTIVE NSAIDS, BECAUSE
11 THEY INHIBIT COX-1, MIGHT BE CARDIOPROTECTIVE IN THE SAME WAY
12 THAT ASPIRIN IS AND ACTUALLY CAUSE REDUCTION IN THE NUMBER OF
13 HEART ATTACKS THAT PATIENTS MIGHT HAVE IN THE STUDY. SO WHAT
14 HE WAS SAYING IS, IF YOU TESTED VIOXX COMPARED WITH AN NSAID
15 AND YOU DIDN'T ALLOW ASPIRIN, THOSE PATIENTS ON THE NSAID GROUP
16 WOULD GET THE CARDIOPROTECTION BECAUSE OF ITS INHIBITION OF
17 COX-1. THEY WOULD HAVE A LOWER RATE OF EVENTS COMPARED TO
18 THOSE PATIENTS ON VIOXX, WHO WOULD HAVE -- BECAUSE VIOXX WOULD
19 HAVE A NEUTRAL EFFECT.
20 Q. DID DR. MUSLINER LAY OUT THOSE ASSUMPTIONS TO HIS ANALYSIS
21 APPROACH IN HERE?
22 A. YES, HE DOES. HE HAS A WHOLE SET OF ASSUMPTIONS IN HERE.
23
24 Q. ARE THOSE LAID OUT ON PAGE 4?
25 A. THAT IS CORRECT.

Page 1651

1 Q. THE JURY JUST SAW THIS PASSAGE WHEN DR. MORRISON WAS
2 TESTIFYING, BUT I WANT TO MAKE SURE YOUR UNDERSTANDING OF THE
3 ISSUE WAS THE SAME. DO YOU SEE WHERE DR. MUSLINER WRITES,
4 "ASSUMPTIONS UNDERLYING THESE NUMBERS INCLUDE THE FOLLOWING"?
5 A. YES, I DO.
6 Q. WHAT'S THE FIRST ASSUMPTION THAT DR. MUSLINER LAYS OUT?
7 A. IT WAS THAT STANDARD NSAIDS WOULD PROVIDE THE SAME
8 ANTIPLATELET EFFECTS THAT ASPIRIN WOULD AND, THEREFORE, WOULD
9 PROVIDE THE CARDIOPROTECTIVE EFFECTS THAT ASPIRIN PROVIDED.
10 Q. THESE WERE TRIALS THAT WERE DESIGNED TO BE COMPARING VIOXX
11 TO TRADITIONAL NSAIDS; ISN'T THAT RIGHT?
12 A. THAT'S CORRECT.
13 Q. IF I PUT THE NSAID OVER HERE. POORLY. DOES THAT REFLECT
14 THE FIRST ASSUMPTION?
15 A. THAT'S CORRECT. HE IS SAYING THAT AN NSAID WOULD BE
16 CARDIOPROTECTIVE IN THE SAME WAY THAT ASPIRIN WOULD BE.
17 Q. DOES HE CONTINUE?
18 A. YES. HE THEN GOES ON TO SAY THAT THE DEGREE OF REDUCTION
19 FOR THESE ASSUMPTIONS. THAT IT WOULD BE SIMILAR TO WHAT YOU SEE
20 WITH ASPIRIN.
21 Q. WHAT IS THAT CONCEPT RELATED TO?
22 A. ASPIRIN RESULTS IN ABOUT A 25 TO 30 PERCENT REDUCTION IN
23 SERIOUS CARDIOVASCULAR EVENTS. AND FOR THE PURPOSES OF DOING
24 PREDICTIONS HE WAS ASSUMING THAT WE WOULD SEE THE SAME THING
25 WITH AN NSAID.

51  (Pages 1648 to 1651)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543756

Page 1652

1  Q.  HOW ABOUT THE THIRD ASSUMPTION?
2  A.  THE THIRD ASSUMPTION WAS THAT THOSE PATIENTS ON A COX-2
3  SELECTIVE INHIBITOR LIKE VIOXX WOULD NOT GET THE
4  CARDIOPROTECTIVE BENEFIT OF COX-1 INHIBITION. THEY WOULD BE
5  NEUTRAL. YOU WOULDN'T HAVE A HIGHER RATE AND YOU WOULDN'T HAVE
6  A LOWER RATE. VIOXX WOULD BE NEUTRAL IN THIS REGARD.
7  Q.  CAN YOU READ SUBPARAGRAPH C AS DR. MUSLINER WROTE IT IN
8  1996?
9  A.  "PATIENTS TREATED WITH A SELECTIVE COX-2 INHIBITOR WILL
10  EXPERIENCE NEITHER A REDUCTION NOR AN INCREASE IN CV EVENTS
11  ASSOCIATED WITH THIS THERAPY."
12  Q.  IS THAT ANOTHER WAY OF SAYING VIOXX WOULD BE NEUTRAL?
13  A.  THAT'S CORRECT.
14  Q.  DID YOU SHARE DR. MUSLINER'S ASSUMPTIONS REGARDING THE
15  EFFECTS OF VIOXX IN COX-2 INHIBITION AND A TRADITIONAL NSAID IN
16  TERMS OF ITS CARDIOPROTECTIVE QUALITIES?
17  A.  WELL, THERE WAS NO REASON TO BELIEVE VIOXX WOULD BE OTHER
18  THAN NEUTRAL IN THIS STUDY. THERE WAS NO SCIENCE AT THAT TIME
19  THAT SUGGESTED OTHERWISE. I THOUGHT THERE WAS THE POSSIBILITY
20  THAT NSAIDS COULD BE CARDIOPROTECTIVE IN A MANNER SIMILAR TO
21  ASPIRIN.
22  Q.  DID YOU BEGIN WORK THEREAFTER ON DRAFTING A PROTOCOL FOR A
23  GI OUTCOMES STUDY FOR VIOXX?
24  A.  YES, I DID.
25  Q.  IN YOUR BINDER, THERE SHOULD BE AN EXHIBIT P-1.0004. IT

Page 1653

1  MAY BE IN YOUR SECOND BINDER IF YOU DON'T SEE IT. CAN YOU TELL
2  THE JURY WHAT THAT IS?
3  A.  THIS IS A SERIES OF E-MAILS THAT WAS SENT BETWEEN ME AND
4  MY COLLEAGUES. I HAD SENT TO MY COLLEAGUES A COPY OF THE
5  INITIAL DRAFT OF THE PROTOCOL. AND IN THAT DRAFT TO THEM I HAD
6  A SERIES OF QUESTIONS ASKING THEIR OPINION ON VARIOUS ASPECTS
7  OF THE STUDY DESIGN. THEN I HAVE SOME RESPONSES BACK. I THINK
8  THERE'S ONE FROM BRIGGS MORRISON HERE AND THEN MY RESPONSE BACK
9  TO DR. MORRISON.
10  Q.  LOOKING AT YOUR E-MAIL, WE ALL KNOW THAT A GI PROTOCOL IS
11  A GI OUTCOME TRIAL PROTOCOL?
12  A.  THAT'S CORRECT.
13  Q.  YOU ARE ATTACHING IN THIS E-MAIL THE PROTOCOL ITSELF; IS
14  THAT CORRECT?
15  A.  THAT IS CORRECT.
16  Q.  THE COPY OF THE PROTOCOL -- IF YOU CAN SEE IT ON YOUR
17  SCREEN, IT MAY BE EASIER TO FOLLOW ALONG. IS THAT A COPY OF
18  THE PROTOCOL THAT YOU CIRCULATED OR A VERSION OF THE PROTOCOL
19  THAT YOU CIRCULATED IN YOUR E-MAIL, EXHIBIT 4?
20  A.  MY UNDERSTANDING IS THIS IS THE COPY THAT I CIRCULATED.
21  ON TOP OF IT ARE A COUPLE OF COMMENTS FROM TOM SIMON, WHO WAS
22  ONE OF THE REVIEWERS.
23  Q.  DID YOU ADDRESS THIS QUESTION OF WHETHER OR NOT TO ALLOW
24  LOW-DOSE ASPIRIN IN THE TRIAL THAT WAS THE SUBJECT OF
25  DR. MUSLINER'S MEMO?

Page 1654

1  A.  YES, I DID.
2  Q.  NOW, WE SAW THIS AFTERNOON FROM DR. MORRISON THAT
3  PARAGRAPH F IS IN THE SECTION REGARDING EXCLUSION CRITERIA.
4  PICKING UP FROM THERE, FIRST CAN YOU TELL THE JURY WHAT THE
5  SIGNIFICANCE OF SOME OF THIS IN BOLD AND SOME OF IT NOT IN BOLD
6  IS IN YOUR PROTOCOL?
7  A.  THE PART IN BOLD IS MY COMMENTS AND QUESTIONS TO MY
8  COLLEAGUES THAT I WANTED THEM TO CONSIDER AS THEY WERE READING
9  THE PROTOCOL.
10  Q.  THEN YOU SAY IN THE BOLDED SECTION, "DO WE WANT TO ALLOW
11  HIGH-RISK PATIENTS IN THE STUDY GIVEN THE RISKS WE HAVE
12  DISCUSSED?" WHAT DID YOU MEAN BY "THE RISKS WE HAVE
13  DISCUSSED"?
14  A.  FIRST OF ALL, WHEN I'M TALKING ABOUT HIGH-RISK PATIENTS,
15  I'M TALKING ABOUT PATIENTS AT HIGH RISK FOR CARDIOVASCULAR
16  DISEASE. AND I'M MAKING THE ASSUMPTION THAT THOSE PATIENTS
17  WOULD BE ON ASPIRIN. SO THE RISKS THAT WE DISCUSSED ARE, IF
18  YOU ALLOW ASPIRIN INTO THE STUDY, WHICH HAS ITS OWN GI
19  TOXICITY, YOU WON'T BE ABLE TO ANSWER THE COX-2 HYPOTHESIS, AND
20  YOU MIGHT GET SOME BACKGROUND GI BLEEDING FROM THE ASPIRIN
21  ITSELF. SO THAT WOULD BE A REASON NOT TO ALLOW LOW-DOSE
22  ASPIRIN IN THE STUDY.
23     ON THE OTHER HAND, IF YOU DON'T ALLOW LOW-DOSE
24  ASPIRIN IN THE STUDY, THEN THERE'S THE POSSIBILITY THAT THE
25  NSAID GROUP WOULD GET THE CARDIOPROTECTION THAT YOU WOULD GET

Page 1655

1  WITH ASPIRIN AND THE RATE OF CV EVENTS WOULD BE LOWER THAN ON
2  VIOXX, WHICH WOULD HAVE A NEUTRAL EFFECT. YOU WOULD SEE A
3  DIFFERENCE. THE RATE WOULD BE HIGHER ON VIOXX, LOWER ON THE
4  NSAID GROUP, AND THERE WOULD BE NO PLACEBO. SO IT WOULD BE
5  VERY HARD TO TELL WHETHER THE DIFFERENCE WAS CAUSED BY VIOXX
6  BEING HIGHER OR THE NSAID GROUP BEING LOWER, AND I WAS
7  CONCERNED PEOPLE WOULD MISINTERPRET THAT DATA.
8  Q.  IF YOU CAN RELATE THE ISSUE TO THE CHART THAT WE PUT UP
9  HERE FOR THE JURY, THE 966 GROUP, WHAT WAS THAT?
10  A.  966 IS VIOXX. I WAS ASSUMING THAT VIOXX WOULD BE NEUTRAL.
11  JUST LIKE PLACEBO.
12  Q.  THE OTHER DRUGS UNDER CONSIDERATION FOR THIS PROTOCOL ARE
13  WHAT?
14  A.  AT THIS POINT WE WERE CONSIDERING IBUPROFEN, WHICH IS A
15  PRESCRIPTION-STRENGTH ADVIL, AND DICLOFENAC, OTHERWISE KNOWN AS
16  VOLTAREN.
17  Q.  WHAT DID YOU BELIEVE AT THE TIME WAS THE POTENTIAL
18  CARDIOPROTECTIVE EFFECT OF A TRADITIONAL NSAID SUCH AS
19  PRESCRIPTION IBUPROFEN?
20  A.  I THOUGHT THERE WAS THE POSSIBILITY THEY COULD BE
21  CARDIOPROTECTIVE JUST LIKE ASPIRIN.
22  Q.  NOW, I THINK YOU HAVE MENTIONED THAT DR. MORRISON
23  RESPONDED TO YOUR DRAFT PROTOCOL; IS THAT CORRECT?
24  A.  THAT IS CORRECT.
25  Q.  THAT'S BACK ON THE E-MAIL WE SAW EARLIER. WE SAW THIS

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543757

## Page 1656

1 E-MAIL EARLIER THIS AFTERNOON. WHAT DID YOU UNDERSTAND
2 DR. MORRISON'S POSITION TO BE ON THIS QUESTION OF WHETHER OR
3 NOT TO ALLOW LOW-DOSE ASPIRIN IN THE TRIAL?
4 A. HE THOUGHT WE SHOULD ALLOW LOW-DOSE ASPIRIN IN THE STUDY.
5 Q. DOES HE COMMUNICATE THAT IN HIS E-MAIL HERE?
6 A. HE DOES, WITH A LITTLE BIT OF EXAGGERATION.
7 Q. WHAT DID YOU UNDERSTAND DR. MORRISON TO BE COMMUNICATING
8 TO THE TEAM WHEN HE WRITES: "WOULD ALLOW LOW-DOSE ASPIRIN. I
9 KNOW THIS HAS BEEN DISCUSSED TO DEATH, BUT REAL WORLD IS
10 EVERYONE IS ON IT, SO WHY EXCLUDE. AND WITHOUT COX-1 INHIBITION
11 YOU WILL GET MORE THROMBOTIC EVENTS AND KILL DRUG." WHAT DID
12 YOU UNDERSTAND THAT TO MEAN WHEN YOU RECEIVED THIS E-MAIL?
13 A. THAT HE ALSO WAS CONCERNED THAT YOU WOULD HAVE A DECREASED
14 NUMBER OF EVENTS ON THE NSAID, WHICH HAS COX-1 INHIBITION;
15 VIOXX WOULD BE NEUTRAL; AND THAT, WITHOUT A PLACEBO, PEOPLE
16 WOULD MISINTERPRET THE HIGHER RATE ON VIOXX AS BEING THAT VIOXX
17 INCREASED THE RATE, EVEN THOUGH THE REAL REASON WAS THAT THE
18 NSAIDS DECREASED THE RATE. BUT WITHOUT A PLACEBO, IT WOULD BE
19 DIFFICULT TO TELL.
20 Q. WHERE DID YOU FALL ON THIS QUESTION? WE ARE NOW LOOKING
21 AT YOUR E-MAIL. WE KNOW DR. MORRISON'S VIEW WAS HE WOULD ALLOW
22 ASPIRIN. WHAT WAS YOUR VIEW WHEN YOU WERE CONSIDERING THIS
23 ISSUE IN FEBRUARY '97?
24 A. I WAS REALLY ON THE FENCE. I WASN'T SURE WHAT THE RIGHT
25 THING TO DO WAS.

## Page 1657

1 Q. DO YOU COMMUNICATE THAT FENCE-SITTING VIEW IN YOUR E-MAIL
2 BACK TO THE TEAM?
3 A. I DO WHEN I SAY, "I THINK THIS IS A NO-WIN SITUATION."
4 Q. WHAT ABOUT THE SITUATION DID YOU THINK WAS A NO-WIN
5 PROPOSITION?
6 A. WELL, I GO THROUGH EVERYTHING THAT I'VE LAID OUT. I SAY,
7 "THE RELATIVE RISK OF EVEN LOW-DOSE ASPIRIN MAY BE AS HIGH AS
8 TWO TO FOUR-FOLD." I'M TALKING ABOUT GI BLEEDING, THAT LOW
9 DOSE ASPIRIN ITSELF CAN CAUSE GI BLEEDING. "YET THE
10 POSSIBILITY OF INCREASED CV EVENTS IS OF GREAT CONCERN," AND
11 WHAT I'M TALKING ABOUT THERE IS THE DIFFERENCE THAT YOU WOULD
12 SEE IF THE NSAID ACTED AS A CARDIOPROTECTIVE AGENT.
13 Q. THEN YOU GO ON TO SAY, "I JUST CAN'T WAIT TO BE THE ONE TO
14 PRESENT THOSE RESULTS TO SENIOR MANAGEMENT." WHAT WERE YOU
15 REFERRING TO THERE?
16 A. WELL, WE WOULD DO THIS LARGE STUDY AND YOU WOULD SEE THIS
17 DIFFERENCE IN CARDIOVASCULAR EVENTS AND, WITHOUT A PLACEBO, HOW
18 COULD YOU BE SURE THAT THE TRADITIONAL OLDER DRUGS WERE
19 ACTUALLY BEING CARDIOPROTECTIVE VERSUS THIS NEWER DRUG ACTUALLY
20 CAUSING MORE EVENTS. EVEN THOUGH THERE WAS NO SCIENCE AT THAT
21 TIME TO SUPPORT THAT, I WAS CONCERNED THAT THE DATA WOULD BE
22 MISINTERPRETED.
23 Q. DOCTOR, AT THIS TIME BACK IN FEBRUARY '97, WERE YOU AWARE
24 OF ANY MEDICAL LITERATURE THAT EVEN SUGGESTED A THEORETICAL
25 RISK TO THE CARDIOVASCULAR SYSTEM FROM COX-2 INHIBITION?

## Page 1658

1 A. NO.
2 Q. HAVE YOU HEARD OF THE FITZGERALD HYPOTHESIS?
3 A. I HAVE HEARD OF THE FITZGERALD HYPOTHESIS, DEFINITELY.
4 Q. HAD THE FITZGERALD HYPOTHESIS EVEN BEEN ARTICULATED BY
5 FEBRUARY 1997?
6 A. NO. WE DIDN'T FIND THAT OUT UNTIL MANY MONTHS LATER.
7 Q. I THINK YOU TOLD THE JURY EARLIER THAT YOU PARTICIPATED IN
8 THE DESIGN OF THE VIGOR TRIAL?
9 A. THAT'S CORRECT.
10 Q. WHAT WAS THE PROTOCOL THAT YOU HELPED PUT TOGETHER FOR
11 VIGOR?
12 A. YOU'LL HAVE TO EXPLAIN YOUR QUESTION TO ME.
13 Q. DOSE, PATIENT POPULATION, DURATION OF USE, THAT KIND OF
14 THING.
15 A. IT WAS A STUDY THAT WAS DONE IN PATIENTS WITH RHEUMATOID
16 ARTHRITIS, WHICH IS A SEVERE ARTHRITIS DISEASE. WE WERE
17 STUDYING PATIENTS ON 50 MILLIGRAMS OF VIOXX. 4,000 PATIENTS ON
18 50 MILLIGRAMS OF VIOXX. 50 MILLIGRAMS IS TWO TIMES THE DOSE
19 THAT WAS RECOMMENDED FOR CHRONIC USE. THAT WAS IN COMPARISON
20 TO 4,000 PATIENTS ON NAPROXEN AT A DOSE OF 500 MILLIGRAMS TWICE
21 A DAY. THAT'S THE MOST COMMONLY USED DOSE FOR THE TREATMENT OF
22 RHEUMATOID ARTHRITIS. PATIENTS WERE ON STUDY DRUG FOR UP TO 13
23 MONTHS IN THIS STUDY, THE AVERAGE ENDED UP BEING ABOUT NINE
24 MONTHS. WE DID NOT ALLOW PATIENTS WHO WERE ON ASPIRIN TO BE IN
25 THE STUDY.

## Page 1659

1 Q. WAS THE FDA INVOLVED AT ALL IN THE REVIEW OF THE PROTOCOL
2 FOR THE VIGOR STUDY?
3 A. YES. WE SENT THE PROTOCOL DOWN TO THE FDA AND MET WITH
4 THEM TO DISCUSS IT, AND ONE OF THE STEERING COMMITTEE MEMBERS
5 ALSO CAME WITH US.
6 Q. DID THE FDA HAVE ANY CRITICISMS ABOUT THE DESIGN OF THE
7 STUDY THAT WASN'T ULTIMATELY IMPLEMENTED IN THE PROTOCOL
8 ITSELF?
9 A. I DON'T KNOW IF I CAN DESCRIBE THEM AS "CRITICISMS." WE
10 CERTAINLY HAD OPEN DISCUSSIONS ABOUT THE STUDY. I THINK THEY
11 WERE INTERESTED IN OUR SECONDARY ENDPOINT, WHICH WAS LOOKING AT
12 KIND OF THE MORE SEVERE LIFE-THREATENING GI SYMPTOMS. WE
13 TALKED ABOUT WHETHER ASPIRIN SHOULD OR SHOULD NOT BE ALLOWED IN
14 THE PROTOCOL. WE TALKED ABOUT THE DOSE OF VIOXX THAT WOULD BE
15 IN THE PROTOCOL.
16 Q. AT SOME POINT MERCK RECEIVED THE RESULTS OF THAT STUDY; IS
17 THAT CORRECT?
18 A. THAT IS CORRECT. IN MARCH OF 2000.
19 Q. WERE YOU ONE OF THE FIRST AT MERCK TO RECEIVE THE
20 UNBLINDED RESULTS OF THE TRIAL?
21 A. YES, THAT IS CORRECT.
22 Q. I THINK A LOT OF FOLKS HAVE HEARD THIS TERM, "BLINDED
23 TRIAL." WHAT IS A BLINDED TRIAL?
24 A. WELL, "BLINDED" MEANS YOU DON'T KNOW WHAT TREATMENT GROUP
25 YOU ARE ON. SO WHEN YOU DO A DOUBLE-BLIND TRIAL, THAT MEANS

DAILY COPY

ff147213-239a-4369-81c3-ecc5412a5939

Page 1660

1  THE PATIENT DOESN'T KNOW WHAT STUDY DRUG THEY ARE GETTING AND
2  THE PHYSICIAN WHO IS TREATING THEM DOESN'T KNOW WHAT STUDY DRUG
3  THEY ARE GETTING. THEN WE TALK ABOUT IN-HOUSE BLINDING, WHICH
4  MEANS THAT THOSE PEOPLE WHO ARE WORKING ON THE STUDY WITHIN THE
5  COMPANY SPONSORING THIS, IF THERE'S A SPONSOR, ALSO DON'T KNOW
6  WHAT TREATMENTS THE PATIENTS ARE GETTING.
7  Q.  SO WERE YOU AWARE AT ANY TIME PRIOR TO MARCH OF 2000 WHAT
8  THE UNBLINDED RESULTS OF THE VIGOR TRIAL HAD SHOWN?
9  A.  NO, I DID NOT KNOW THE UNBLINDED RESULTS.
10 Q.  WAS THERE ANY --
11 A.  "UNBLINDED" MEANING WHAT ARE THE RESULTS IN ONE TREATMENT
12 GROUP VERSUS THE OTHER TREATMENT GROUP.  I WAS NOT AWARE OF
13 THOSE.
14 Q.  WAS THERE A GROUP OF FOLKS WHO WERE LOOKING AT THE INTERIM
15 RESULTS OF THE TRIAL, MONITORING THE SAFETY OF THE PATIENTS WHO
16 WERE IN THE TRIAL?
17 A.  WE HAD SET UP SEVERAL COMMITTEES FOR THIS STUDY, AND ONE
18 OF THOSE WAS WHAT WE CALLED THE DATA SAFETY MONITORING BOARD,
19 DSMB.  IT WAS AN EXTERNAL GROUP OF EXPERTS -- PHYSICIANS,
20 STATISTICIANS, EPIDEMIOLOGISTS -- WHO WOULD FOLLOW THE
21 UNBLINDED SAFETY DATA AS THE STUDY WAS GOING ON.
22         THIS PARTICULAR DSMB ELECTED TO LOOK AT THOSE
23 UNBLINDED STUDY RESULTS AS TREATMENT A AND TREATMENT B.  THEY
24 DIDN'T KNOW, BUT THEY COULD SURMISE WHAT TREATMENT A OR
25 TREATMENT B WAS.

Page 1661

1  Q.  DOES THE DSMB HAVE THE POWER TO RECOMMEND THE TERMINATION
2  OF A CLINICAL TRIAL?
3  A.  YES. THEY WOULD HAVE MADE THAT RECOMMENDATION TO THE
4  ADVISORY COMMITTEE OR THE STEERING COMMITTEE, WHO THEN WOULD
5  HAVE IMPLEMENTED THE RECOMMENDATION.
6  Q.  DID ANYONE AT MERCK HAVE A RIGHT TO VOTE WITHIN THE DSMB
7  TO KEEP THE TRIAL GOING OR TO TERMINATE IT?
8  A.  NO.  THERE WAS ONE MEMBER FROM MERCK, WHAT WE CALLED THE
9  UNBLINDED STATISTICIAN, DEBORAH SHAPIRO.  SHE WOULD DO THE
10 ANALYSES AND REPORT TO THEM, TO THE DATA SAFETY MONITORING
11 BOARD, BUT SHE WAS NOT ALLOWED TO VOTE.  ONCE SHE BECAME
12 UNBLINDED TO THE RESULTS, SHE REALLY COULDN'T HAVE INTERACTIONS
13 WITH THE REST OF US ON THE TEAM.
14 Q.  DID AT ANY TIME THE DATA SAFETY MONITORING BOARD FOR THE
15 VIGOR TRIAL RECOMMEND TERMINATION OF THE STUDY?
16 A.  NO, THEY DID NOT.
17 Q.  NOW, WE TALKED ABOUT THE FACT THAT THE RESULTS WERE
18 RECEIVED IN MARCH OF 2000; IS THAT CORRECT?
19 A.  I BELIEVE IT WAS MARCH 9, 2000.
20 Q.  WHAT DO YOU RECALL THE RESULTS WERE?
21 A.  IT WAS A VERY CLEAR AND SIGNIFICANT DECREASE IN SERIOUS
22 GASTROINTESTINAL SIDE EFFECTS IN PATIENTS TAKING VIOXX COMPARED
23 WITH NAPROXEN.  THAT WAS SEEN NOT ONLY FOR THE PRIMARY
24 ENDPOINT, BUT ALSO FOR THAT SECOND ENDPOINT THAT I TOLD YOU THE
25 FDA WAS INTERESTED IN FOR THE MORE LIFE-THREATENING SERIOUS GI

Page 1662

1  SIDE EFFECTS.  IN ADDITION, THERE WAS AN IMBALANCE IN THE
2  NUMBER OF CARDIOVASCULAR EVENTS, SERIOUS CARDIOVASCULAR EVENTS,
3  ON VIOXX VERSUS NAPROXEN, WITH MORE HEART ATTACKS ON VIOXX
4  COMPARED WITH NAPROXEN.
5  Q.  WHAT WAS YOUR REACTION TO THE DATA WHEN YOU RECEIVED IT?
6  A.  WELL, I WAS VERY PLEASED WITH THE GI RESULTS.  I DON'T
7  THINK I WAS SURPRISED BY THOSE.  I REALLY DID BELIEVE THOSE
8  WERE THE RESULTS WE WOULD GET.  I WAS QUITE CONCERNED ABOUT THE
9  CARDIOVASCULAR RESULTS.
10 Q.  PRIOR TO THAT POINT WHEN THE VIGOR DATA WAS UNBLINDED IN
11 MARCH OF 2000, WERE YOU FAMILIAR WITH WHAT THE ONGOING CLINICAL
12 TRIALS FOR VIOXX HAD SHOWN WITH RESPECT TO CARDIOVASCULAR
13 SAFETY?
14 A.  I KNEW OUR PHASE IIB/III DATA WAS A LARGE DATABASE AND WE
15 HAD SPECIFICALLY LOOKED AT CARDIOVASCULAR SAFETY IN THOSE
16 STUDIES, AND WE HAD SHOWN THERE WAS NO DIFFERENCE BETWEEN VIOXX
17 AND PLACEBO, THE SUGAR PILL -- ALTHOUGH THAT DATASET WAS PRETTY
18 LIMITED -- OR VIOXX AND THE COMPARATOR NONSELECTIVE NSAIDS,
19 WHICH WERE IN THAT CASE MAINLY IBUPROFEN AND DICLOFENAC AND
20 ADVIL AND VOLTAREN.
21 Q.  HAD THERE BEEN ANY SIGNAL IN THE CLINICAL TRIALS UP UNTIL
22 THAT POINT?
23 A.  NO, THERE HAD NOT.
24 Q.  HAD BLOOD CLOT, THROMBOEMBOLIC CARDIOVASCULAR EVENTS BEEN
25 ANALYZED UP UNTIL THAT TIME?

Page 1663

1  A.  WE HAD, PRIOR TO SENDING IN THE INITIAL NEW DRUG
2  APPLICATION, DONE A SPECIFIC ANALYSIS LOOKING AT THE
3  CARDIOVASCULAR SAFETY IN PATIENTS ON VIOXX COMPARED WITH THE
4  COMPARATOR NSAIDS AND THE RATES WERE SIMILAR.
5  Q.  DID MERCK SHARE THE RESULTS OF THE UNBLINDED VIGOR DATA
6  WITH THE FDA?
7  A.  YES, WE DID.
8  Q.  DO YOU RECALL HOW SOON AFTER YOU FIRST LEARNED OF THE
9  RESULTS WAS THE FDA NOTIFIED?
10 A.  FOURTEEN DAYS.
11 Q.  I'M GOING TO ASK YOU TO LOOK AT EXHIBIT DX116.  CAN YOU
12 IDENTIFY THAT?
13 A.  I THINK THIS WAS THE DOCUMENT THAT WE SENT DOWN TO THE FDA
14 OUTLINING THE PRELIMINARY RESULTS FROM THE VIGOR STUDY.  THIS
15 WAS NOT FINAL DATA, BUT THE PRELIMINARY DATA THAT WE HAD
16 REVIEWED ON MARCH 9.
17 Q.  JUST SO WE ARE CLEAR ON THE CHRONOLOGY, THE DATA WAS FIRST
18 UNBLINDED TO MERCK ON MARCH 9, I BELIEVE; IS THAT CORRECT?
19 A.  THAT'S CORRECT.
20 Q.  THERE WAS STILL ANALYSES GOING ON OF THE DATA?
21 A.  THAT IS CORRECT.
22 Q.  YOU FOLKS SENT DOWN THE PRELIMINARY RESULTS TO THE FDA; IS
23 THAT CORRECT?
24 A.  THAT IS CORRECT.
25        MR. ISMAIL:  YOUR HONOR, WE MOVE THE ADMISSION OF

54  (Pages 1660 to 1663)

ff147213-239a-4359-81c3-ecc5412a5939

M005543759

Page 1664

1  EXHIBIT 116.
2       MR. BIRCHFIELD: NO OBJECTION.
3       THE COURT: LET IT BE RECEIVED AND MARKED.
4  BY MR. ISMAIL:
5  Q. HERE WE SHOW THE MARCH 23, 2000 SUBMISSION TO FDA; IS THAT
6  CORRECT?
7  A. THAT IS CORRECT.
8  Q. I BELIEVE IT WAS FAXED DOWN TO THE FDA THEN MAILED THE
9  NEXT DAY --
10 A. I COULDN'T TELL YOU, BUT THAT'S VERY POSSIBLE.
11 Q. SINCE MY MAGNET SAYS "FAX," SO LET'S PUT THAT UP. IT WAS
12 WITHIN A COUPLE WEEKS OF THE RESULTS OF THE DATA?
13 A. THAT'S CORRECT.
14 Q. DID YOU AND YOUR COLLEAGUES INVESTIGATE THE QUESTIONS THAT
15 WERE RAISED BY THE VIGOR TRIAL?
16 A. OH. ABSOLUTELY. I MEAN, WE TOOK THOSE RESULTS VERY
17 SERIOUSLY.
18 Q. CAN YOU PLEASE TELL US WHAT STEPS YOU AND YOUR COLLEAGUES
19 TOOK TO INVESTIGATE THIS QUESTION OF THE INCREASE IN
20 CARDIOVASCULAR EVENTS IN VIGOR IN VIOXX COMPARED TO NAPROXEN?
21 A. WELL, THE FIRST THING WE DID WAS TRY AND DO A LOT OF
22 SUBGROUP ANALYSES LOOKING AT THE VIGOR STUDY ITSELF. WAS IT
23 POSSIBLE THAT THERE WERE CERTAIN PATIENTS WHO WERE PARTICULAR
24 RISK AND COULD WE IDENTIFY THOSE. I DON'T THINK THERE WAS A
25 LOT IN THOSE FIRST SUBGROUP ANALYSES THAT WE RAN THAT WE

Page 1665

1  LEARNED FROM THAT. OF COURSE, DR. SHAPIRO, THE STATISTICIAN,
2  MADE SURE THAT ALL OF HER STATISTICAL ANALYSES WERE CORRECT.
3  SHE VALIDATED THOSE. THEN THE NEXT THING WE DID WAS WE WENT
4  BACK TO OUR OA PHASE IIB/III OA DATABASE AND WE SAID, "DID WE
5  SOMEHOW MISS SOMETHING?"
6  Q. DOCTOR, IF I COULD STOP YOU THERE, YOU USED A TERM THAT
7  MANY OF US AREN'T FAMILIAR WITH. YOU SAID "OA PHASE IIB/III
8  DATABASE."
9  A. THAT WAS THE LARGE DATABASE THAT WE SENT DOWN TO SUPPORT
10 THE ORIGINAL FILING, AND IT WAS BOTH THE EFFICACY AND SAFETY
11 DATABASE UPON WHICH THE APPROVAL FOR VIOXX WAS GIVEN TO US.
12 Q. AN OA DATABASE IS THE OSTEOARTHRITIS DATABASE?
13 A. THAT'S CORRECT.
14 Q. YOU WERE STARTING TO SAY YOU WENT BACK TO LOOK AT THAT
15 DATABASE?
16 A. WE WANTED TO MAKE SURE THAT WE HADN'T MISSING SOMETHING IN
17 THOSE ANALYSES, SO WE REDID THOSE ANALYSES AND, IN FACT, FOUND
18 SOMETHING THAT WAS VERY SIMILAR TO WHAT HAD BEEN FOUND BEFORE;
19 WHICH WAS THE INCIDENCE WAS SIMILAR ON VIOXX AND PLACEBO, THE
20 SUGAR PILL, BUT A MUCH SMALLER DATASET, AS WELL AS VIOXX AND
21 THE COMPARATOR NSAIDS.
22 Q. DID THERE COME A TIME THAT YOU AND YOUR COLLEAGUES
23 PUBLISHED THAT DATA IN THE PEER-REVIEWED LITERATURE?
24 A. YES, WE DID. OVER THE FOLLOWING YEAR, WE PUT OUT A
25 PUBLICATION WITH THOSE ANALYSES.

Page 1666

1  Q. I ASK THAT YOU LOOK TO PX-2.0104. IS THAT A COPY OF YOUR
2  ARTICLE?
3  A. I HAVE IT HERE. IT'S NOT UP ON THE SCREEN. THAT IS A
4  COPY OF THE ARTICLE.
5  Q. IS YOUR NAME LISTED THERE AS AN AUTHOR?
6  A. THAT'S CORRECT.
7  Q. WAS THIS PUBLICATION PEER-REVIEWED?
8  A. THIS IS PEER-REVIEWED PUBLICATION.
9  Q. JUST TO LOOK AT ONE OF THE RESULTS OF THAT ANALYSIS, I ASK
10 YOU TO TURN TO TABLE 2. CAN YOU EXPLAIN TO THE JURY WHAT WE
11 HAVE SHOWN HERE IN TABLE 2?
12 A. WHAT THIS IS, IT'S WHAT ARE THE PERCENTAGE OF PATIENTS WHO
13 HAD A VARIETY OF SERIOUS CARDIOVASCULAR EVENTS IN THE PHASE
14 IIB/III STUDIES AND WERE COMPARING THE FIRST COLUMN, THE
15 PERCENT OF PATIENTS ON ROFECOXIB (VIOXX) WHO HAD THOSE -- AND
16 YOU CAN SEE THERE'S ABOUT 3,300 PATIENTS IN THE VIOXX GROUP --
17 COMPARED WITH THE PERCENTAGE OF PATIENTS IN THE NONSELECTIVE
18 NSAID GROUP WHO HAD THOSE EVENTS.
19 Q. WHAT TYPE OF EVENTS ARE BEING DESCRIBED HERE IN THE TABLE?
20 A. THESE WERE SERIOUS CARDIOVASCULAR EVENTS THAT WERE
21 REPORTED BY INVESTIGATORS, SO THINGS SUCH AS HEART ATTACKS,
22 STROKES, THINGS OF THAT NATURE.
23 Q. OVERALL, WHAT WAS THE RATE OF CARDIAC EVENTS AS ANALYZED
24 IN THIS DATASET?
25 A. OVERALL CARDIAC EVENTS WAS ABOUT .5 PERCENT ON VIOXX AND

Page 1667

1  ABOUT .7 PERCENT. .8 PERCENT, ON THE NONSELECTIVE NSAIDS.
2  Q. NOW, WAS THAT DIFFERENCE STATISTICALLY SIGNIFICANT?
3  A. NO, THAT WASN'T SIGNIFICANT.
4  Q. DID YOU ALSO LOOK AT THE RATE OF HEART ATTACKS?
5  A. YES, WE DID.
6  Q. SHOULD WE USE THE MEDICAL TERM HERE, "MYOCARDIAL
7  INFARCTION"?
8  A. THAT'S CORRECT. THAT'S THE MEDICAL TERM FOR HEART ATTACK.
9  Q. WHEN YOU LOOK BACK AT THE THOUSAND OF PATIENTS IN YOUR
10 CLINICAL TRIALS UP INTO THAT POINT IN THE PREAPPROVAL CLINICAL
11 TRIALS, WHAT DID THE DATA SHOW VIOXX COMPARED TO OTHER NSAIDS
12 ON THE PERCENTAGE OF HEART ATTACKS?
13 A. THIS INCLUDED DATA UP UNTIL THE FILING AND I THINK FOUR
14 MONTHS BEYOND. AND IT WAS BASICALLY EQUAL BETWEEN TWO GROUPS:
15 ABOUT A .3 PERCENT ON VIOXX; AND ABOUT .3 PERCENT ON THE
16 NONSELECTIVE NSAIDS. YOU CAN SEE .27 VERSUS .26.
17 Q. AFTER THE VIGOR RESULTS CAME IN, YOU SENT THE RESULTS DOWN
18 TO FDA THAT MONTH. YOU WERE ANALYZING THE VIGOR DATA ITSELF,
19 AND THEN YOU SAID YOU WENT BACK AND LOOKED AT YOUR EXISTING
20 SAFETY DATABASE FOR THE PREAPPROVAL TRIALS TO SEE IF THERE'S
21 ANY SIGNAL THERE, AS WELL; IS THAT CORRECT?
22 A. THAT'S CORRECT.
23 Q. DID YOU DO ANYTHING ELSE?
24 A. THE NEXT THING THAT WE DID -- EVERYTHING THAT I'M TALKING
25 ABOUT RIGHT NOW WE DID SEND DOWN TO THE FDA WHEN WE SENT DOWN

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543760

1 THE INITIAL VIGOR RESULTS. THE NEXT THING THAT WE DID IS THAT
2 WE HAD TWO ONGOING VERY LARGE STUDIES IN ELDERLY PATIENTS WITH
3 ALZHEIMER'S DISEASE OR PRE-ALZHEIMER'S DISEASE. THE MEAN AGE
4 OF THESE PATIENTS WAS ABOUT 75, AND PATIENTS IN THESE STUDIES
5 WERE EITHER GETTING VIOXX, 25 MILLIGRAMS, OR PLACEBO. WE
6 THOUGHT THIS WOULD BE A VERY GOOD DATABASE TO LOOK AT, LARGE
7 LONG-TERM STUDIES, TO SEE WHAT THE INCIDENCE WAS OF
8 CARDIOVASCULAR EVENTS ON VIOXX COMPARED WITH PLACEBO.
9     IF WHAT WE SAW IN VIGOR WAS DUE TO VIOXX INCREASING
10 THE RATE OF CARDIOVASCULAR EVENTS, THEN WE ASSUMED THAT IN
11 THESE STUDIES WE SHOULD ALSO SEE VIOXX AT A HIGHER RATE THAN
12 THE PLACEBO. THE STUDIES WERE STILL ONGOING, BUT WE UNBLINDED
13 JUST THE CARDIOVASCULAR DATA IN THOSE STUDIES. WE FOUND THAT
14 THE RATE OF EVENTS WAS VERY SIMILAR IN THE TWO TREATMENT
15 GROUPS. I MUST TELL YOU, IT WAS VERY, VERY COMFORTING DATA TO
16 GET.
17 Q. YOU SAID THAT WAS PLACEBO-CONTROLLED DATA?
18 A. THAT IS CORRECT.
19 Q. THE ALZHEIMER'S DATABASE HAD APPROXIMATELY HOW MANY
20 PATIENTS TOTAL?
21 A. I THINK IT WAS A LITTLE OVER MAYBE 2,000 PATIENTS.
22 Q. SO YOU HAD THAT DATASET OF PLACEBO-CONTROLLED PATIENTS,
23 AND THEN YOU HAD THE THOUSANDS OF PATIENTS IN YOUR ACTIVE
24 COMPARATOR, THAT IS, COMPARING VIOXX TO ANOTHER NSAID IN THAT
25 DATABASE; IS THAT RIGHT?

1 A. RIGHT.
2 Q. DID BOTH DATABASES SHOW THAT VIOXX HAD AN INCREASED RISK?
3 A. NO. THE OA DATABASE, WE DIDN'T SEE AN INCREASED RISK
4 COMPARED WITH THE COMPARATOR NSAIDS. I SAID ALSO IT WASN'T
5 INCREASED COMPARED WITH THE PLACEBO, BUT THAT WAS A SMALL
6 DATABASE. THEN WE HAD ANOTHER LARGE DATABASE WHERE VIOXX
7 LOOKED SIMILAR TO PLACEBO. WHAT WE HAVE SEEN IN VIGOR WAS
8 BECAUSE VIOXX WAS INCREASING THE RATE OF HEART ATTACKS WE
9 SHOULD HAVE SEEN AN INCREASE IN OUR PHASE IIB/III DATABASE
10 AND/OR IN THE ALZHEIMER'S DATABASE AND WE DIDN'T.
11 Q. DID YOU ALSO CONSIDER ALTERNATIVE EXPLANATIONS FOR THE
12 VIGOR DATA ONCE YOU SAW THE ABSENCE OF ANY OTHER SIGNAL IN YOUR
13 SAFETY DATABASE?
14 A. THAT TAKES YOU BACK TO: WHY IS VIGOR DIFFERENT? WHY IS
15 THAT THE OUTLIER? WE SAID, "OKAY, COULD IT BE THAT NAPROXEN
16 WAS ACTING AS A CARDIOPROTECTIVE AGENT LIKE ASPIRIN, AS WE HAD
17 PREDICTED IT MIGHT," BUT THEN WE WERE LEFT WITH THE FACT.
18 "WELL, IF NSAIDS ARE CARDIOPROTECTIVE, THEN WHY DIDN'T WE SEE
19 THE DIFFERENCE IN OUR PHASE IIB/III DATABASE?"
20 Q. THIS GOES BACK TO DR. MUSLINER'S ORIGINAL HYPOTHESIS THAT
21 A COX-2 INHIBITOR WOULD BE NEUTRAL AND A TRADITIONAL NSAID
22 WOULD BE CARDIOPROTECTIVE?
23 A. CORRECT. SO IF WE WERE SAYING THAT NSAIDS COULD BE
24 CARDIOPROTECTIVE AND THAT WAS WHY THE RATE WAS LOWER ON
25 NAPROXEN, THEN WHY DIDN'T WE GET A LOWER RATE WITH TRADITIONAL

1 NSAIDS -- IBUPROFEN AND DICLOFENAC -- IN OUR PHASE IIB/III
2 STUDIES?
3     I WAS ACTUALLY WITH DR. GERTZ, WHO WAS A SENIOR
4 SCIENTIST AT MERCK. I WAS IN HIS OFFICE GOING THROUGH ALL THE
5 DATA, TRYING TO MAKE SENSE OF IT, HOW COULD WE EXPLAIN ALL OF
6 THE DATA, AND HE SAID, "WELL, THERE'S A REASON FOR THAT,
7 ALISE," AND HE PULLED OUT A STUDY THAT WE HAD ACTUALLY
8 SUBMITTED TO THE FDA AS PART OF THE ORIGINAL FILING, WHICH
9 SHOWED THAT NAPROXEN'S ABILITY TO INHIBIT PLATELET AGGREGATION
10 AND PLATELET CLUMPING IS VERY SIMILAR TO ASPIRIN IN TERMS OF
11 THE MAGNITUDE OF THE INHIBITION AND THE FACT THAT IT WAS
12 SUSTAINED OVER ITS WHOLE DOSING PERIOD. THE OTHER NSAIDS WE
13 HAD STUDIED, IBUPROFEN AND DICLOFENAC, WERE NOT AS POTENT IN
14 THAT REGARD AND DIDN'T HAVE SUSTAINED INHIBITION. SO WHAT WE
15 SAID IS NAPROXEN IS THE ONLY ONE THAT ACTUALLY INHIBITS
16 PLATELET AGGREGATION IN THROMBOXANE IN A MANNER SIMILAR TO
17 ASPIRIN. THE OTHER TWO DO NOT AND, THEREFORE, YOU MIGHT EXPECT
18 THAT THE OTHER ONES WOULD NOT BE CARDIOPROTECTIVE.
19 Q. WELL, LET'S TAKE A LOOK AT THAT GRAPH. IF YOU TURN TO
20 EXHIBIT DX352, I BELIEVE PAGE 13 -- I'M SORRY, PAGE 11. IS
21 THIS THE GRAPH THAT YOU WERE TALKING ABOUT?
22 A. YES.
23 Q. SO LET'S SEE IN THIS EASY-TO-FOLLOW GRAPH WHAT IS SHOWN.
24 FIRST OF ALL, WHAT'S ALONG THE HORIZONTAL AXIS?
25 A. THESE ARE HOURS POST DOSING. THESE WERE PATIENTS WHO HAD

1 BEEN DOSED WITH VARIOUS DRUGS FOR SEVERAL DAYS, AND ZERO HOURS
2 IS RIGHT -- THEY HAD TAKEN THERAPY LAST DOSE AND IT'S RIGHT
3 BEFORE THEY ARE ABOUT TO TAKE THEIR NEXT DOSE. SO FOR NAPROXEN
4 IT WAS PROBABLY ABOUT 12 HOURS AFTER THEY HAD HAD THEIR LAST
5 DOSE AND FOR IBUPROFEN AND DICLOFENAC PROBABLY ABOUT EIGHT
6 HOURS.
7 Q. THE VERTICAL AXIS, IS THAT A MEASURE OF INHIBITION OF
8 PLATELETS?
9 A. THERE'S ANOTHER GRAPH THAT SHOWS INHIBITION OF PLATELETS.
10 THIS SHOWS INHIBITION OF THROMBOXANE, BUT THE TWO GRAPHS LOOK
11 VERY SIMILAR.
12 Q. JUST TO ORIENT HERE, THE HIGHER UP THE GRAPH, WHAT DOES
13 THAT REFLECT IN TERMS OF THE POTENTIAL FOR CARDIOPROTECTION?
14 A. WELL, IT'S THE MORE PLATELET -- THE MORE INHIBITION. IT'S
15 FELT THAT, IN ORDER FOR AN AGENT TO BE CARDIOPROTECTIVE, YOU
16 NEED OVER 90 OR 95 PERCENT INHIBITION OF THROMBOXANE THROUGHOUT
17 THE ENTIRE DOSING INTERVAL.
18 Q. YOU HAVE A NUMBER OF DIFFERENT DRUGS THAT ARE ON THIS
19 GRAPH. ONE OF THEM IS NAPROXEN, CORRECT?
20 A. THAT IS CORRECT.
21 Q. HOW DID NAPROXEN DO RELATIVE TO THE OTHERS IN THIS GRAPH?
22 A. IT WAS BETTER THAN ANY OF THE OTHER DRUGS THAT WE HAD
23 TESTED IN TERMS OF INHIBITION OF THROMBOXANE. WHAT YOU CAN SEE
24 IS THAT ON DAY SIX AT -- THEY HAD BEEN DOSED FOR THREE DAYS.
25 IT MUST HAVE BEEN SIX DAYS. ON DAY SIX, ZERO HOURS -- THAT

56  (Pages 1668 to 1671)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M0D5543761

## Page 1672

1  MEANS THEY ARE AT TROUGH, RIGHT BEFORE THEY ARE ABOUT TO TAKE
2  THEIR NEXT DOSE – THEY HAVE ABOUT 95 PERCENT INHIBITION OF
3  THROMBOXANE, AND THAT IS MAINTAINED THROUGHOUT THE ENTIRE
4  DOSING INTERVAL.
5  Q.  WHAT WOULD ASPIRIN BE IF WE PUT THIS ON HERE?
6  A.  IT WOULD LOOK VERY SIMILAR TO WHAT NAPROXEN LOOKS LIKE.
7  Q.  DID ANY OTHER NSAID APPROACH THE LEVEL OF THROMBOXANE
8  INHIBITION THAT IS SHOWN BY NAPROXEN?
9  A.  NO, NEITHER IBUPROFEN OR DICLOFENAC. IBUPROFEN GOES UP
10 AND DOWN AND DICLOFENAC DOESN'T GET UP TO PEAK. NOW, THE ONLY
11 DIFFERENCE WITH ASPIRIN IS THAT YOU COULD FORGET TO TAKE
12 ASPIRIN AND YOU WOULD STILL GET THAT INHIBITION. YOU WOULD
13 NEED TO GIVE NAPROXEN TWICE A DAY IN ORDER TO GET THIS TYPE OF
14 INHIBITION.
15 Q.  A HIGH DOSE OF NAPROXEN TWICE A DAY?
16 A.  CORRECT.
17 Q.  WHAT WAS THE DOSING OF NAPROXEN IN THE VIGOR TRIAL?
18 A.  THE SAME DOSING THAT WAS USED HERE, 500 MILLIGRAMS TWICE A
19 DAY.
20 Q.  WHAT DID THE PHARMACOLOGY DATA ABOUT NAPROXEN TELL YOU
21 WITH REGARD TO HOW TO INTERPRET THE VIGOR RESULTS?
22 A.  WELL, IT TOLD US THAT IT IS DIFFERENT THAN THE OTHER
23 NSAIDS, AND WHEN YOU LOOKED AT TOTALITY OF DATA THAT THE MOST
24 LIKELY EXPLANATION WAS THAT NAPROXEN WAS ACTING AS A
25 CARDIOPROTECTIVE AGENT IN VIGOR, NOT THAT VIOXX WAS INCREASING

## Page 1673

1  THE RATE. IF VIOXX HAD BEEN INCREASING THE RATE, WE SHOULD
2  HAVE SEEN AN INCREASE IN OUR PHASE IIB/III OSTEOARTHRITIS
3  STUDIES OR IN THE ALZHEIMER'S STUDIES.
4      WE ALSO WENT AND LOOKED AT THE LITERATURE. I HAD
5  REVIEWED SOME OF THIS LITERATURE WHEN I WAS WRITING THE
6  PROTOCOL EVEN IN 1996 TO SEE IF THERE WAS EVIDENCE THAT OTHER
7  NSAIDS WERE CARDIOPROTECTIVE, AND THERE WERE A COUPLE OF
8  STUDIES THAT SUGGESTED THEY COULD BE.
9  Q.  WHICH NSAIDS, IN PARTICULAR, DID YOU SEE IN THE LITERATURE
10 HAD SHOWN CARDIOPROTECTION?
11 A.  THERE'S AN NSAID CALLED FLURBIPROFEN, WHICH ACTUALLY HAD
12 BEEN STUDIED IN FRANCE VERSUS PATIENTS TAKING A PLACEBO OR
13 SUGAR PILL, AND IT HAD A SIGNIFICANT CARDIOPROTECTIVE EFFECT.
14 PATIENTS HAD COME IN WITH A HEART ATTACK AND THEY GAVE IT TO
15 THOSE PATIENTS. NONE OF THESE PATIENTS WERE ON ASPIRIN. THE
16 PATIENTS ON FLURBIPROFEN HAD ABOUT 70 TO 80 PERCENT REDUCTION
17 IN RECURRENT HEART ATTACK OR THE NEED TO HAVE ANGIOPLASTY.
18 Q.  BASED ON HOW THESE TWO DRUGS WORKED, DID YOU BELIEVE THAT
19 THE DATA ON FLURBIPROFEN COULD HELP YOU ANALYZE THE VIGOR DATA
20 AND TO SEE THE POTENTIAL IMPACT OF NAPROXEN?
21 A.  WELL, THERE WAS OTHER CLINICAL EVIDENCE THAT NSAIDS COULD
22 BE CARDIOPROTECTIVE, AND THAT WAS ONE OF THEM. THERE WAS
23 ANOTHER DRUG CALLED INDOBUFEN, WHICH IS ALSO A NONSELECTIVE
24 NSAID, WHICH INHIBITS BOTH COX-1 AND 2. IT'S ACTUALLY MARKETED
25 IN A COUPLE COUNTRIES IN EUROPE AS A CARDIOPROTECTIVE AGENT.

## Page 1674

1  THERE WERE SEVERAL STUDIES WITH INDOBUFEN THAT SHOWED IT WAS
2  CARDIOPROTECTIVE, AS WELL.
3  Q.  ONCE YOU WERE UNBLINDED, DID YOU HAVE THE OPPORTUNITY TO
4  OBTAIN THE MINUTES OF THE DSMB THAT WE TALKED ABOUT EARLIER,
5  WHO WAS MONITORING THE RESULTS ONGOING?
6  A.  YES. SEVERAL WEEKS AFTER I WAS UNBLINDED, DEBORAH
7  SHAPIRO, WHO WAS THE STATISTICIAN, SHARED WITH ME THE MINUTES
8  FROM SOME OF THE DATA BOARD SAFETY MONITORING MEETINGS THAT HAD
9  BEEN ONGOING DURING THE STUDY.
10 Q.  I WOULD ASK YOU TURN TO PX-1.0430 IN YOUR BINDER. DO YOU
11 SEE IT?
12 A.  I DO.
13 Q.  CAN YOU TELL US WHAT IT IS?
14 A.  THESE ARE MEETING MINUTES FROM DECEMBER 22, 1999, OF THE
15 DATA SAFETY MONITORING BOARD.
16      MR. ISMAIL: I MOVE THE ADMISSION OF THIS DOCUMENT,
17 YOUR HONOR.
18      MR. BIRCHFIELD: NO OBJECTION.
19      THE COURT: LET IT BE RECEIVED AND MARKED.
20 BY MR. ISMAIL:
21 Q.  SO EVEN THOUGH THESE MINUTES ARE DATED DECEMBER '99, AM I
22 CORRECT YOU DIDN'T FIRST SEE THEM UNTIL AFTER MARCH 2000?
23 A.  THAT IS CORRECT.
24 Q.  WHO ARE THE INDIVIDUALS TO WHOM THIS MEMO IS SENT?
25 A.  THOSE ARE MEMBERS OF THE DATA SAFETY MONITORING BOARD,

## Page 1675

1  INCLUDING DEBORAH SHAPIRO, WHO IS NOT A VOTING MEMBER, AND THE
2  MINUTES ARE BEING SENT FROM DR. MICHAEL WEINBLATT, WHO IS A
3  HARVARD RHEUMATOLOGIST WHO WAS THE CHAIR OF THE DATA SAFETY
4  MONITORING BOARD.
5  Q.  NOW, THERE'S BEEN SOME SUGGESTION IN THE TRIAL THAT THIS
6  IDEA THAT NAPROXEN – THE NAPROXEN EXPLANATION FOR VIGOR WAS
7  SOMETHING THAT MERCK FOLKS CAME UP WITH FOR THE FIRST TIME OUT
8  OF THE BLUE AFTER THE VIGOR DATA CAME IN. DID YOU SEE IN THIS
9  MEMO ANYTHING TO SUGGEST THAT THAT VIEW IS INCORRECT?
10 A.  ACTUALLY – AND, OF COURSE, I DIDN'T KNOW THIS AT THE TIME
11 WE WERE ANALYZING OUR DATA – THE DATA SAFETY MONITORING BOARD,
12 WHILE THEY WERE REVIEWING THE STUDY RESULTS, THOUGHT THAT THE
13 IMBALANCE IN EVENTS WAS DUE TO THE CARDIOPROTECTIVE EFFECT OF
14 TREATMENT B, WHICH TURNED OUT TO BE NAPROXEN. OBVIOUSLY, THEY
15 HAD FIGURED OUT THAT TREATMENT B WAS THE NSAID BECAUSE THE RATE
16 OF GASTROINTESTINAL EVENTS WAS MUCH HIGHER ON TREATMENT B THAN
17 TREATMENT A.
18 Q.  NOW, AFTER REVIEWING THE CARDIOVASCULAR DATA THAT WAS
19 ONGOING IN THE TRIAL, WHAT DID THE EXTERNAL DATA SAFETY
20 MONITORING BOARD SAY, BEFORE ANYONE AT MERCK EVER SAW THE
21 UNBLINDED RESULTS, ABOUT THE POTENTIAL CARDIOPROTECTIVE EFFECT
22 OF NAPROXEN?
23 A.  THEY THOUGHT THAT THE STUDY DIDN'T NEED TO BE STOPPED, AND
24 THEY THOUGHT THAT THE REASON FOR THIS DIFFERENCE WAS BECAUSE
25 TREATMENT B IS ACTING AS A CARDIOPROTECTIVE AGENT.

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M0005543762

Page 1676

1 Q. IS THAT REFLECTED IN THE PARAGRAPH I JUST HIGHLIGHTED
2 HERE?
3 A. THAT'S CORRECT.
4 Q. DID YOU HEAR OR SEE OTHER COMMENTS OF DSMB MEMBERS, AFTER
5 THE UNBLINDING OF VIGOR, THAT WENT TO THE QUESTION OF THE
6 CARDIOPROTECTIVE EFFECT OF NAPROXEN BEING THE EXPLANATION FOR
7 VIGOR?
8 A. YES, I DID. I SPOKE WITH A FEW OF THE MEMBERS, AND THERE
9 WAS AN E-MAIL SENT BY ONE OF THE MEMBERS, AS WELL, EXPRESSING
10 THAT.
11 Q. CAN YOU TURN TO DX-114, PLEASE? DO YOU SEE THERE'S AN
12 E-MAIL THAT HAS BEEN FORWARDED TO YOU, AND IT STARTED WITH A
13 DAVID BJORKMAN?
14 A. YES.
15 Q. IS THIS THE E-MAIL THAT YOU WERE JUST REFERRING TO?
16 A. YES.
17       MR. ISMAIL: WE MOVE THE ADMISSION OF 114,
18 YOUR HONOR.
19       MR. BIRCHFIELD: NO OBJECTION.
20       THE COURT: LET IT BE ADMITTED.
21 BY MR. ISMAIL:
22 Q. DO YOU SEE THIS E-MAIL WAS AUTHORED BY DAVID BJORKMAN?
23 A. YES.
24 Q. DO YOU KNOW WHO HE IS?
25 A. DAVID BJORKMAN IS A GASTROENTEROLOGIST AT THE UNIVERSITY

Page 1677

1 OF UTAH MEDICAL SCHOOL.
2 Q. IS HE A MERCK EMPLOYEE?
3 A. HE IS NOT A MERCK EMPLOYEE, AND HE WAS A VOTING MEMBER OF
4 THE DATA SAFETY MONITORING BOARD.
5 Q. HE WAS ONE OF THESE FOLKS MONITORING THE ONGOING DATA IN
6 VIGOR TO DETERMINE WHETHER OR NOT TO ALLOW THE TRIAL TO
7 CONTINUE?
8 A. THAT'S CORRECT. THIS E-MAIL WAS WRITTEN RIGHT AFTER WE
9 HAD A CONFERENCE CALL OF ALL THE MEMBERS OF THE STEERING
10 COMMITTEE TELLING THEM OF THE VIGOR RESULTS, AND DR. BJORKMAN
11 WAS ON THAT CONFERENCE CALL.
12 Q. READ TO THE JURY WHAT HE WROTE REGARDING HOW HE SAW THE
13 VIGOR RESULTS.
14 A. "I THINK THAT THE VIGOR STUDY UNMASKS THE ANTITHROMBOTIC
15 EFFECTS OF NAPROXEN."
16 Q. WHAT WAS THE IMPACT ON YOU WHEN FOLKS EXTERNAL TO MERCK
17 WERE COMMENTING AND SUGGESTING THAT NAPROXEN WAS THE
18 EXPLANATION FOR THE VIGOR RESULTS?
19 A. IT WAS QUITE COMFORTING. BOTH THE MEMBERS OF THE DATA
20 SAFETY MONITORING BOARD THAT I SPOKE WITH, AS WELL AS THE
21 STEERING COMMITTEE, WHEN THEY SAW ALL THE DATA WE HAD PUT
22 TOGETHER -- ALZHEIMER'S DATA, PHASE IIB/III, OSTEOARTHRITIS
23 DATA -- THEY ALSO CONCLUDED THAT THE MOST LIKELY EXPLANATION
24 FOR VIGOR WAS THAT NAPROXEN WAS BEING CARDIOPROTECTIVE.
25 Q. DID YOU LOOK OUTSIDE OF THE DATA SAFETY MONITORING BOARD

Page 1678

1 FOR OTHER SCIENTISTS OUTSIDE OF MERCK TO GET INPUT ON THIS
2 QUESTION OF WHETHER NAPROXEN WAS THE EXPLANATION FOR THE VIGOR
3 RESULTS?
4 A. WE MET WITH MANY CONSULTANTS AND HAD A SERIES OF
5 CONSULTANTS MEETINGS NOT JUST TO UNDERSTAND WHETHER THEY FELT
6 NAPROXEN COULD BE CARDIOPROTECTIVE, BUT ALSO THEY ASKED THE
7 OTHER QUESTION, "DO YOU THINK THAT VIOXX IS PROTHROMBOTIC"?
8 Q. I ASK YOU TO TURN TO DX-356, PLEASE. DO YOU RECOGNIZE
9 THIS EXHIBIT AS RELATING TO ONE OF THESE MEETINGS YOU HAD WITH
10 EXTERNAL SCIENTISTS TO ADDRESS THE QUESTION OF THE VIGOR DATA?
11 A. YES, I DO SEE THAT.
12       MR. ISMAIL: I MOVE THE ADMISSION OF 356, YOUR HONOR.
13       MR. BIRCHFIELD: NO OBJECTION.
14       THE COURT: LET IT BE ADMITTED.
15 BY MR. ISMAIL:
16 Q. YOU CAN SEE HERE WE HAVE SOMETHING CALLED THE VIGOR
17 CONSULTANTS MEETING, PROSTAGLANDINS GROUP, AND THEN YOU HAVE
18 THE CONSULTANTS THAT WERE BROUGHT IN TO ADDRESS THIS QUESTION.
19 THESE ARE FOUR OUTSIDE SPECIALISTS MERCK INVITED TO TALK ABOUT
20 THE VIGOR DATA?
21 A. THAT'S CORRECT. THESE ARE ALL SPECIALISTS IN
22 PROSTAGLANDIN PHARMACOLOGY.
23 Q. I BELIEVE THE DATE OF THIS WAS OCTOBER 2000; IS THAT
24 RIGHT?
25 A. THAT'S CORRECT.

Page 1679

1 Q. HAD THE RESULTS BEEN PUBLISHED YET IN THE NEW ENGLAND
2 JOURNAL?
3 A. I'M NOT SURE THAT THE NEW ENGLAND JOURNAL ARTICLE HAD COME
4 OUT YET, BUT WE HAD SENT OUT A PRESS RELEASE IN MARCH AND WE
5 HAD PRESENTED THE RESULTS AT TWO SCIENTIFIC MEETINGS PRIOR TO
6 THIS TIME.
7 Q. SO IS IT FAIR TO SAY THAT MERCK WAS. WITHIN THE SCIENTIFIC
8 COMMUNITY, DISCUSSING THE VIGOR DATA AND ITS INTERPRETATION?
9 A. OH, ABSOLUTELY.
10 Q. NOW, THE JURY HAS HEARD A LOT ABOUT GARRETT FITZGERALD.
11 JOHN OATES, AND CARLO PATRONO. IS DESMOND FITZGERALD ALSO A
12 SPECIALIST IN THIS AREA?
13 A. EXACTLY. FROM IRELAND.
14 Q. NO RELATION?
15 A. NO RELATION. AT LEAST THAT'S MY UNDERSTANDING.
16 Q. DID YOU HAVE OTHER CONSULTANTS MEETINGS OTHER THAN THE
17 ONES INVOLVING THE FOUR EXPERTS WE JUST DISCUSSED?
18 A. WE HAD A SEPARATE CARDIOLOGY CONSULTANTS MEETING WHERE WE
19 BROUGHT IN CARDIOLOGISTS AND PHYSICIANS WHO HAD EXPERIENCE IN
20 LARGE CARDIOLOGY TRIALS. THEN WE HAD ANOTHER CONSULTANTS
21 MEETING WITH RHEUMATOLOGIST AND SOME EPIDEMIOLOGISTS.
22 Q. DO YOU RECALL WHETHER PROFESSOR RAY WAS INVITED TO ANY OF
23 THESE MEETINGS?
24 A. MY RECOLLECTION IS THAT HE WAS AT THE MEETING FOR THE
25 RHEUMATOLOGISTS.

58   (Pages 1676 to 1679)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005943763

Page 1680

1  Q.  DO YOU KNOW WHETHER A DR. CROFFORD EVER CAME?
2  A.  SHE WAS ALSO AT THE MEETING FOR THE RHEUMATOLOGISTS.
3  Q.  WHY DID MERCK LOOK TO EXTERNAL SCIENTISTS WHEN TRYING TO
4  COME TO THIS UNDERSTANDING OF THE VIGOR DATA?
5  A.  WELL, YOU KNOW, THE DATA WAS SOMEWHAT UNEXPECTED. YES, WE
6  HAD HYPOTHESIZED THAT NSAIDS MIGHT BE CARDIOPROTECTIVE, BUT
7  THEN OUR PHASE IIB/III DATA DIDN'T SHOW THAT. GARRETT
8  FITZGERALD HAD RAISED THE HYPOTHESIS THAT COX-2 INHIBITORS
9  COULD BE PROTHROMBOTIC. SO I THINK IT WAS VERY IMPORTANT THAT
10  WE UNDERSTOOD THE DATA. WE WANTED TO MAKE SURE THAT PEOPLE
11  DIDN'T THINK THERE WERE OTHER ANALYSES THAT WE NEEDED TO DO,
12  DID THEY AGREE WITH OUR INTERPRETATION OF THE DATA -- I MEAN,
13  WE WERE VERY INTERESTED IN GETTING THAT FEEDBACK.
14  Q.  WHAT IMPACT DID THE CONSULTANTS HAVE ON YOUR THOUGHT
15  PROCESS AND OTHERS AT MERCK REGARDING HOW TO INTERPRET THE
16  VIGOR DATA?
17  A.  I WOULD SAY, IN GENERAL, WE GOT CONSISTENT FEEDBACK THAT
18  PEOPLE FELT, BASED ON THE DATA WE HAD, THAT THE MOST LIKELY
19  EXPLANATION FOR WHAT WE SAW IN VIGOR WAS THAT NAPROXEN WAS
20  ACTING AS A CARDIOPROTECTIVE AGENT. THAT DOESN'T MEAN EVERYONE
21  FELT THAT; BUT I WOULD SAY, OVERWHELMINGLY, THAT WAS THE
22  MAJORITY OF WHAT WE HEARD.
23  Q.  DID THERE COME A TIME WHEN THE VIGOR DATA WAS PUBLISHED IN
24  THE NEW ENGLAND JOURNAL?
25  A.  YES, IT WAS.

Page 1681

1  Q.  EXHIBIT 586 HAS BEEN PUBLISHED PREVIOUSLY. THE DATE OF
2  THIS PUBLICATION WAS?
3  A.  NOVEMBER 23, 2000.
4  Q.  ARE YOU THE ONLY LISTED AUTHOR?
5  A.  YES, I AM.
6  Q.  DID YOU ASSIST IN THE DRAFTING OF THE PEER-REVIEWED
7  ARTICLE?
8  A.  I DID, ALONG WITH INITIALLY CLAIRE BOMBARDIER AND
9  LAUREN LANE, THE CHAIR AND COCHAIR OF THE STEERING COMMITTEE,
10  AND THEN SEVERAL OTHER MEMBERS OF THE STEERING COMMITTEE, AS
11  WELL.
12  Q.  IS DR. BOMBARDIER A MERCK EMPLOYEE?
13  A.  NO, SHE IS NOT. SHE'S AT THE UNIVERSITY OF TORONTO.
14  Q.  I WANT TO SHOW YOU THE SECTION IN THE ARTICLE THAT
15  DISCUSSES THE CARDIOVASCULAR RESULTS OF THE STUDY. FIRST OFF,
16  DO YOU RECALL WHEN IT WAS THAT THE MANUSCRIPT WAS FIRST
17  SUBMITTED TO THE NEW ENGLAND JOURNAL?
18  A.  THAT WAS IN MAY OF 2000.
19  Q.  WAS THE ANALYSIS OF THE TRIAL STILL ONGOING AT THAT TIME?
20  A.  I BELIEVE BY MAY OF 2000 WE HAD WHAT I WOULD CALL OUR
21  FINAL PRIMARY ANALYSIS DONE, I.E., THE ANALYSES THAT WE SENT
22  DOWN TO THE FDA. THE WAY THAT THIS STUDY WAS DONE, AS WE HAVE
23  DONE OTHER LARGE OUTCOME STUDIES, IS THAT WE SAY WE HAVE A
24  CUTOFF DATE FOR DATA TO BE REPORTED IN TO MERCK. WE SAID IN
25  THE DATA ANALYSIS PLAN THAT THE PRIMARY ANALYSIS OF THE DATA

Page 1682

1  WOULD BE BASED ON DATA THAT WAS REPORTED IN BY THAT CUTOFF
2  DATE. WE SAID THAT ANY DATA THAT CAME IN AFTER THAT DATE WOULD
3  BE ANALYZED, SO THAT WE WOULD BE COMPREHENSIVE, AND WE WOULD
4  SEND BACK TO REGULATORY AGENCIES. THAT'S NOT UNCOMMON THAT WE
5  DO THAT. IT'S CALLED A SAFETY UPDATE REPORT. IT'S NOT
6  UNCOMMON THAT DATA COMES IN AFTER A CUTOFF DATE.
7  Q.  WHAT WAS PUBLISHED IN THE NEW ENGLAND JOURNAL WITH RESPECT
8  TO THE CARDIOVASCULAR DATA? WAS IT THE DATA THAT WAS IN
9  EXISTENCE AT THE TIME OF THE CUTOFF?
10  A.  THAT'S CORRECT, THE DATA THAT WAS IN EXISTENCE. WHICH IS
11  WHAT WE SAID WAS THE PRIMARY ANALYSIS.
12  Q.  THE DATA THAT'S SHOWN HERE -- FIRST OFF, THERE'S A
13  DISCUSSION OF THE MORTALITY RATE?
14  A.  THAT'S CORRECT.
15  Q.  .5 FOR VIOXX; .4 FOR NAPROXEN?
16  A.  YES.
17  Q.  IS THAT STATISTICALLY SIGNIFICANT?
18  A.  NO, THERE WAS NO STATISTICAL DIFFERENCE.
19  Q.  THEN YOU HAD A FURTHER ANALYSIS OF MORTALITY FROM
20  CARDIOVASCULAR CAUSES; IS THAT RIGHT?
21  A.  THAT'S CORRECT.
22  Q.  WAS THAT .2 PERCENT IN BOTH GROUPS?
23  A.  THAT'S CORRECT.
24  Q.  THEN THERE'S A DISCUSSION OF ISCHEMIC CEREBROVASCULAR
25  EVENTS?

Page 1683

1  A.  THOSE WERE STROKES.
2  Q.  WHY WERE THEY INCLUDED IN THIS ANALYSIS?
3  A.  THE BREAKDOWN THAT WE'RE GIVEN IS SOMETHING THAT'S
4  CONSISTENT ABOUT WHAT'S CALLED AN APTC ANALYSIS, WHICH IS THE
5  TYPE OF ENDPOINTS THAT PEOPLE LOOK AT IN LARGE CARDIOVASCULAR
6  OUTCOMES STUDIES; SO CARDIOVASCULAR MORTALITY, STROKES, AND
7  HEART ATTACKS.
8  Q.  DO YOU ALSO DISCLOSE THE DIFFERENCE IN MYOCARDIAL
9  INFARCTIONS?
10  A.  YES, WE DO.
11  Q.  IS THAT HEART ATTACKS?
12  A.  THAT'S CORRECT.
13  Q.  YOU DISCLOSE HERE A .1 PERCENT VERSUS .4 PERCENT
14  DIFFERENCE. DO YOU SEE THAT?
15  A.  CORRECT.
16  Q.  THE JURY HAS HEARD THAT THERE WAS A FIVE-FOLD DIFFERENCE
17  IN HEART ATTACKS IN THE VIGOR RESULTS. WHAT EXPLAINS THE .1
18  VERSUS .4 DATA?
19  A.  AFTER THE CUTOFF DATE THAT I JUST DESCRIBED, THERE WERE
20  TWO ADDITIONAL HEART ATTACKS THAT WERE REPORTED ON VIOXX, THERE
21  WAS ONE ADDITIONAL STROKE THAT WAS REPORTED ON NAPROXEN, AND I
22  THINK THERE WERE A FEW GI EVENTS ALSO REPORTED ON NAPROXEN. SO
23  THE FINAL STUDY DATA THAT WE REPORTED AS PART OF THE SAFETY
24  UPDATE REPORT, THE PERCENT OF HEART ATTACKS ON VIOXX WAS .5
25  PERCENT, BUT EVEN .4 PERCENT VERSUS .1 PERCENT WAS

59  (Pages 1680 to 1683)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543764

1   STATISTICALLY SIGNIFICANT.
2   Q.  SO THESE TWO ADDITIONAL HEART ATTACKS, DID THAT CHANGE
3   WHAT WAS INSIGNIFICANT DATA TO SIGNIFICANT DATA?
4   A.  NO.
5   Q.  DID IT CHANGE THE DIRECTION?
6   A.  IT DIDN'T CHANGE THE DIRECTION.  IT DIDN'T CHANGE THE
7   CONCLUSION, WHICH WAS THE EVENT RATE WAS HIGHER ON VIOXX THAN
8   ON NAPROXEN.
9   Q.  YESTERDAY THE JURY SAW AN E-MAIL FROM DR. SCOLNICK.  DO
10  YOU KNOW WHO HE IS?
11  A.  YES, I DO.
12  Q.  IT'S AN E-MAIL THAT HE WROTE ON MARCH 9, 2000.  WHAT'S THE
13  SIGNIFICANCE OF THAT DATE?
14  A.  THAT WAS THE DATE THAT WE WERE UNBLINDED TO THE VIGOR
15  DATA, AND THIS WAS JUST AFTER THAT MEETING.
16  Q.  THIS IS AN E-MAIL HE WROTE AT 11:18 P.M.?
17  A.  CORRECT.
18  Q.  HE SAYS, "I JUST RECEIVED AND WENT THROUGH THE DATA." BY
19  THE WAY, YOU'RE A RECIPIENT OF THIS E-MAIL?
20  A.  YES, I AM.
21  Q.  THE JURY SAW YESTERDAY DR. SCOLNICK TALKING ON THE VIDEO
22  THAT HIS FIRST REACTION TO THE DATA WAS ONE OF CONCERN THAT
23  VIOXX WAS INCREASING THE RISKS.
24  A.  THAT IS CORRECT.  THAT WAS MY INITIAL REACTION TO THE
25  DATA, AS WELL.

1   Q.  THEN DR. SCOLNICK DESCRIBED THAT MEMBERS OF THE TEAM
2   TALKED TO HIM ABOUT ALTERNATIVE HYPOTHESES AND ADDITIONAL
3   ANALYSES THAT WERE --
4   A.  NOT ON THAT DAY, BUT OVER THE FOLLOWING DAYS AND WEEKS.
5   Q.  WERE YOU ONE OF THE FOLKS WHO WAS TALKING ABOUT TO
6   DR. SCOLNICK?
7   A.  YES, THAT'S TRUE.
8   Q.  DID YOU REVIEW WITH DR. SCOLNICK THE INVESTIGATIONS AND
9   THE ANALYSES THAT YOU TALKED ABOUT HERE TODAY, THE ALZHEIMER'S
10  DATABASE, THE EXISTING ARTHRITIS DATABASE, THE OTHER MEDICAL
11  LITERATURE WITH OTHER NSAIDS SHOWING CARDIOPROTECTION,
12  NAPROXEN'S PHARMACOLOGY. THE VIEWS OF THE CONSULTANTS? DID YOU
13  TALK ABOUT ALL THAT WITH DR. SCOLNICK?
14  A.  YES, WE DID.
15  Q.  WHAT WAS DR. SCOLNICK'S REACTION TO YOU AFTER HE SAW ALL
16  THE DATA THAT HAD BEEN DONE?
17  A.  WELL, I THINK WITHIN TWO WEEKS HIS REACTION WAS THE SAME
18  AS THE REST OF US ON THE TEAM.  IT WAS UNLIKELY THAT VIOXX WAS
19  CAUSING AN INCREASE IN HEART ATTACKS OR OTHER THROMBOTIC
20  EVENTS, AND IT WAS MUCH MORE LIKELY THAT NAPROXEN WAS ACTING AS
21  A CARDIOPROTECTIVE AGENT BECAUSE WE DIDN'T SEE A SIGNAL WITH
22  VIOXX IN OUR TWO OTHER LARGE DATABASES AND BECAUSE,
23  PHARMACOLOGICALLY, IT MAKES SENSE THAT NAPROXEN COULD BE
24  CARDIOPROTECTIVE.
25  Q.  DID DR. SCOLNICK EVER HAVE AN OPPORTUNITY TO SEND AN

1   E-MAIL TO THE SAME FOLKS WHO WERE REFLECTED HERE THAT SHARED
2   HIS VIEW OF THE SAFETY OF THE DRUG?
3   A.  SEVERAL MONTHS LATER. RIGHT BEFORE WE WERE GOING DOWN FOR
4   THE VIGOR ADVISORY COMMITTEE, AFTER WE MET WITH HIM AND HE HAD
5   SEEN ALL OF THE DATA WE WERE GOING TO SHOW THE ADVISORY
6   COMMITTEE, HE DID SEND THAT TYPE OF E-MAIL, YES.
7   Q.  CAN YOU LOOK AT EXHIBIT 186 AND TELL ME IF THAT'S THE
8   E-MAIL?
9   A.  GIVE ME THE NUMBER.
10  Q.  DX-186.
11  A.  YES, THAT IS THE E-MAIL.
12      MR. ISMAIL:  I MOVE THE ADMISSION OF EXHIBIT 186,
13  YOUR HONOR.
14      MR. BIRCHFIELD:  NO OBJECTION.
15      THE COURT:  LET IT BE ADMITTED.
16  BY MR. ISMAIL:
17  Q.  THIS IS AN E-MAIL FROM DR. SCOLNICK; IS THAT CORRECT?
18  A.  THAT'S CORRECT.
19  Q.  IT'S TO YOU AND DR. NIES AND DR. GUESS; IS THAT RIGHT?
20  A.  THAT'S CORRECT.
21  Q.  I HIGHLIGHT A SECTION AND ASK THAT YOU READ IT, PLEASE.
22  FIRST, WHAT DOES DR. SCOLNICK SAY IN THAT SENTENCE?
23  A.  "WE ALL WORRIED TO DEATH ABOUT THE CV" -- THAT'S
24  CARDIOVASCULAR EVENTS -- "LAST SPRING."
25  Q.  WHAT DID YOU UNDERSTAND DR. SCOLNICK TO BE REFERRING TO?

1   A.  THE VIGOR CARDIOVASCULAR DATA.
2   Q.  WHEN HE SAYS, "WE ALL WORRIED," TO YOUR MIND DID THAT
3   ACCURATELY CAPTURE YOUR CONCERN WHEN YOU SAW THE DATA?
4   A.  I THINK HE WAS CAPTURING OUR INITIAL CONCERN WHEN WE FIRST
5   SAW THE VIGOR DATA, THAT IS CORRECT.
6   Q.  THEN HE GOES ON TO SAY, "I WAS SICK AT THE THOUGHT WE
7   MIGHT BE DOING HARM TO PATIENTS.  I KNOW EACH OF YOU WELL
8   ENOUGH TO KNOW YOU FELT THE SAME WAY."  DO YOU AGREE WITH
9   DR. SCOLNICK WHEN HE WRITES IN HIS E-MAIL THAT THE FOLKS AT
10  MERCK WERE VERY WORRIED ABOUT THE POSSIBILITY OF INCREASED
11  RISKS WITH THE DRUG?
12  A.  ABSOLUTELY.  WE TAKE THE SAFETY OF THE MEDICATIONS WE GIVE
13  TO PATIENTS EXTREMELY SERIOUSLY.
14  Q.  THEN HE GOES ON TO SAY, "WITH ALL THE DATA NOW AVAILABLE,
15  I AM NO LONGER WORRIED." DOES THAT CAPTURE, AS WELL, YOUR
16  STATE OF MIND REGARDING THE SAFETY OF THE MEDICINE?
17  A.  IT DID.  I TRULY BELIEVED AND I BELIEVE TODAY THAT
18  NAPROXEN WAS ACTING AS A CARDIOPROTECTIVE AGENT.
19  Q.  ALTHOUGH THIS E-MAIL IS DATED IN FEBRUARY 2001, DID YOU
20  HAVE A DISCUSSION WITH DR. SCOLNICK EVEN MONTHS EARLIER WHERE
21  HE SHARED A SIMILAR VIEW?
22  A.  OH, DEFINITELY, YES.
23      MR. ISMAIL:  YOUR HONOR, THIS MAY BE A GOOD TIME FOR
24  A BREAK.
25      THE COURT:  HOW MUCH MORE DO YOU HAVE WITH THE

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543765

Page 1688

1 WITNESS?
2      MR. ISMAIL: ABOUT 30 MINUTES, MAYBE LESS.
3      THE COURT: THE COURT WILL STAND IN RECESS FOR 15
4 MINUTES.
5      THE DEPUTY CLERK: ALL RISE.
6      (WHEREUPON, THE COURT TOOK A BRIEF RECESS.)
7      THE DEPUTY CLERK: ALL RISE.
8      THE COURT: BE SEATED, PLEASE. PROCEED COUNSEL.
9 BY MR. ISMAIL:
10 Q. DOCTOR, AFTER THE RECEIPT OF THE VIGOR RESULTS, DID THERE
11 COME A TIME WHEN MERCK SOUGHT TO AMEND THE PRODUCT LABELING FOR
12 VIOXX TO INCLUDE THE CV DATA?
13 A. YES. IN JUNE OF 2000 WE SENT THE VIGOR STUDY RESULTS DOWN
14 TO THE FDA. WE HAD SENT THEM, OBVIOUSLY, THE DRAFT RESULTS IN
15 MARCH. THESE WERE THE PRIMARY RESULTS THAT I HAD TALKED ABOUT,
16 ALONG WITH AN AMENDED LABEL TO INCLUDE BOTH THE
17 GASTROINTESTINAL AND THE CARDIOVASCULAR FINDINGS FROM VIGOR.
18 Q. THAT WAS SPECIFICALLY TO INCLUDE THAT IN THE PRODUCT
19 LABELING FOR VIOXX?
20 A. THAT'S CORRECT.
21      MR. ISMAIL: YOUR HONOR, WE'RE GOING TO OFFER
22 EXHIBIT 145. MR. BIRCHFIELD AND I WILL WORK OUT -- IT'S A VERY
23 LARGE SUBMISSION. WE WILL AGREE ON WHAT PORTION OF IT SHOULD
24 BE RECEIVED INTO EVIDENCE.
25      MR. BIRCHFIELD: NO OBJECTION.

Page 1689

1      THE COURT: I'LL ALLOW IT SUBJECT TO WORKING IT OUT.
2 BY MR. ISMAIL:
3 Q. DOCTOR, DID THE FDA RESPOND TO MERCK'S SUBMISSION IN TERMS
4 OF TELLING MERCK HOW LONG IT WOULD TAKE TO REVIEW THE REQUEST
5 FOR A LABEL CHANGE?
6 A. WELL, WE ASKED FOR WHAT'S CALLED A EXPEDITED REVIEW OR
7 PRIORITY REVIEW, WHICH WOULD HAVE DECREASED THE TIME LINES FROM
8 THE STANDARD ABOUT TEN MONTHS TO SIX MONTHS. BUT THE FDA
9 DIDN'T GRANT THAT PRIORITY REVIEW. THEY TOLD US IT WOULD BE ON
10 THE STANDARD TEN-MONTH TIME LINE.
11 Q. I WOULD ASK IF YOU TURN IN YOUR BINDER TO EXHIBIT 150,
12 DX-150. DO YOU RECOGNIZE THAT DOCUMENT AS AN AUGUST 7 LETTER
13 FROM MERCK TO THE FOOD & DRUG ADMINISTRATION?
14 A. YES, IT IS.
15      MR. ISMAIL: I MOVE THE ADMISSION OF EXHIBIT 150,
16 YOUR HONOR.
17      MR. BIRCHFIELD: NO OBJECTION.
18      THE COURT: LET IT BE RECEIVED.
19 BY MR. ISMAIL:
20 Q. NOW, PRIOR TO THIS TIME, HAD MERCK SUBMITTED ITS REQUEST
21 FOR A LABEL CHANGE?
22 A. YES. WE HAD DONE THAT IN JUNE OF 2000.
23 Q. IN HERE IT SAYS THERE'S MERCK'S REQUEST FOR
24 RECLASSIFICATION AS A PRIORITY REVIEW?
25 A. THAT'S CORRECT.

Page 1690

1 Q. CAN YOU EXPLAIN THAT AGAIN?
2 A. AGAIN, WE WERE ASKING THEM TO SHORTEN THE TIME LINES FOR
3 REVIEW OF THIS AND OUR ABILITY TO CHANGE OUR LABEL FROM A
4 STANDARD TEN-MONTH REVIEW DOWN TO A SIX-MONTH REVIEW.
5 Q. THERE'S A REFERENCE HERE TO A TELECONFERENCE THAT OCCURRED
6 ON AUGUST 8. THAT WOULD BE THE FOLLOWING DAY?
7 A. THAT'S CORRECT.
8 Q. THE PARTICIPANTS IN THIS CONFERENCE, DID THAT INCLUDE
9 YOURSELF HERE?
10 A. YES.
11 Q. WHAT WAS THE FDA'S RESPONSE TO MERCK WHEN MERCK SOUGHT TO
12 SPEED UP THE INCLUSION OF THE VIGOR CARDIOVASCULAR INFORMATION
13 INTO THE LABEL?
14 A. THEY TURNED DOWN OUR REQUEST AND SAID THAT IT WOULD BE A
15 STANDARD REVIEW.
16 Q. DID THAT MEAN THAT MERCK COULD NOT GO AHEAD AND ADD THAT
17 DATA TO THE LABEL?
18 A. WE NEEDED TO HEAR FROM THEM AS TO WHAT THEY THOUGHT NEEDED
19 TO BE IN THE LABEL. AND THAT WOULD OCCUR UNDER THEIR NORMAL
20 TIME LINES.
21 Q. DID THE FDA TELL YOU AT MERCK WHAT THEY WANTED TO DO
22 INSTEAD WITH REGARD TO THE QUESTION OF THE LABELING FOR VIOXX?
23 A. I CAN'T REMEMBER IF IT WAS AT THAT MEETING OR AT A LATER
24 MEETING, BUT THEY DID TELL US THAT THEY WERE GOING TO HAVE AN
25 FDA ADVISORY COMMITTEE WHERE THEY COULD INVITE A GROUP OF

Page 1691

1 EXTERNAL EXPERTS TO REVIEW BOTH THE GI AND THE CARDIOVASCULAR
2 DATA FROM BOTH THE VIGOR STUDY AND A SIMILAR GI OUTCOMES STUDY
3 THAT HAD JUST BEEN CONDUCTED ON ANOTHER COX-2 INHIBITOR CALLED
4 CELEBREX.
5 Q. DID YOU ATTEND THE ADVISORY COMMITTEE FOR MERCK?
6 A. YES, I DID.
7 Q. DID YOU ACTUALLY PRESENT AT THAT MEETING?
8 A. I DID.
9 Q. WAS THIS IN FEBRUARY 2001?
10 A. THAT'S CORRECT.
11 Q. WHAT'S THE ROLE, AS YOU UNDERSTAND IT, OF AN ADVISORY
12 COMMITTEE IN THE FDA PROCESS?
13 A. IT'S THE FDA'S OPPORTUNITY TO CALL IN OUTSIDE EXPERTS TO
14 HEAR THEIR VIEW OF DATA THAT THEY ARE REVIEWING. THEY SAY THEY
15 DON'T HAVE TO LISTEN TO THE ADVISORY COMMITTEE. ALTHOUGH VERY
16 OFTEN THEY DO LISTEN TO THEIR RECOMMENDATIONS.
17 Q. AT ANY TIME BETWEEN JUNE 2000 AND FEBRUARY 2001, DID THE
18 FDA TELL MERCK THAT IT WAS OKAY FOR MERCK TO AMEND THE LABEL TO
19 INCLUDE THE VIGOR CARDIOVASCULAR DATA?
20 A. NEITHER THE GI NOR THE CARDIOVASCULAR DATA. THEY DID NOT
21 TELL US THAT WE COULD CHANGE THE LABEL, NO.
22 Q. NOW, DID ANYONE FROM THE ADVISORY COMMITTEE IN
23 FEBRUARY 2001 SUGGEST TO MERCK THAT THE VIGOR DATA DEFINITIVELY
24 SHOWED AN INCREASED CARDIOVASCULAR RISK OF VIOXX?
25 A. NO.

61 (Pages 1688 to 1691)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543766

Page 1692

1  Q. DID ANYONE FROM THE ADVISORY COMMITTEE SUGGEST THAT MERCK
2  WITHDRAW THE DRUG?
3  A. NO.
4  Q. WHAT WAS THE RECOMMENDATION OF THE ADVISORY COMMITTEE AS
5  YOU REMEMBER?
6  A. THAT BOTH THE GI AND THE CARDIOVASCULAR SAFETY DATA SHOULD
7  BE INCLUDED IN THE LABEL, AS WELL AS THEY WANTED A REMINDER TO
8  PHYSICIANS THAT VIOXX AND COX-2 INHIBITORS COULD NOT ACT AS A
9  SUBSTITUTE FOR ASPIRIN. WE ACTUALLY ALREADY HAD THAT IN THE
10  LABEL.
11  Q. WHAT WAS MERCK'S RESPONSE TO THAT?
12  A. IN THE HOPES OF TRYING TO EXPEDITE FINALIZING LABEL
13  CHANGES AFTER THE FDA ADVISORY, WE SENT IN ANOTHER LABEL WHICH
14  WE THOUGHT INCORPORATED SOME OF WHAT WE HAD HEARD AT THE FDA
15  ADVISORY.
16  Q. TURN TO EXHIBIT 196 AND TELL US WHETHER THAT IS THE SECOND
17  INITIATIVE OF MERCK TO AMEND THE LABEL TO INCLUDE THE VIGOR
18  DATA. DX-196.
19  A. I BELIEVE THAT'S WHAT THIS IS.
20      MR. ISMAIL: I MOVE THE ADMISSION OF 196, YOUR HONOR.
21      MR. BIRCHFIELD: NO OBJECTION.
22      THE COURT: LET IT BE RECEIVED.
23  BY MR. ISMAIL:
24  Q. SO NOW WE HAVE TWO REQUESTS BY MERCK OF THE FDA FOR
25  PERMISSION TO AMEND THE LABEL TO INCLUDE THE CARDIOVASCULAR

Page 1693

1  DATA UP TO MARCH 2001; IS THAT CORRECT?
2  A. THAT'S CORRECT.
3  Q. WHEN DID THE FDA FIRST RESPOND TO MERCK'S REQUEST WITH A
4  PROPOSAL OF ITS OWN, LABELING OF ITS OWN, TO INCLUDE THE VIGOR
5  DATA?
6  A. WE DIDN'T GET AN FDA VERSION UNTIL THE FALL OF 2001, SO IT
7  WAS EITHER SEPTEMBER OR OCTOBER.
8  Q. IF YOU WOULD TURN TO EXHIBIT 241 AND TELL ME WHETHER YOU
9  RECOGNIZE THAT AS THE FDA'S PROPOSED DRAFT LABELING FOR VIOXX?
10  A. I BELIEVE THAT'S WHAT THIS IS, YES.
11      MR. ISMAIL: I MOVE THE ADMISSION OF EXHIBIT 241,
12  YOUR HONOR.
13      MR. BIRCHFIELD: NO OBJECTION.
14      THE COURT: LET IT BE RECEIVED.
15  BY MR. ISMAIL:
16  Q. SO, DOCTOR, IF MR. IRVIN WAS PRESCRIBED VIOXX IN APRIL AND
17  PASSED AWAY IN MAY 2001, HAD THE FDA GRANTED MERCK PERMISSION
18  BY THAT POINT TO AMEND THE LABEL TO INCLUDE THE VIGOR DATA?
19  A. NO, THEY HAD NOT.
20  Q. HOW MANY ATTEMPTS HAD MERCK MADE IN TERMS OF SUBMISSIONS
21  TO FDA TO AMEND THE LABEL?
22  A. WELL, WE HAD SENT IN AT LEAST THE TWO. IT'S POSSIBLE WE
23  HAD ALSO SENT IN ONE FOUR MONTHS AFTER THE INITIAL ONE AS PART
24  OF THE SAFETY UPDATE REPORT. SO AT LEAST TWO OR THREE TIMES WE
25  HAD SENT IN AMENDED LABELING.

Page 1694

1  Q. DID THAT INCLUDE, AS WELL, A REQUEST FOR EXPEDITED REVIEW?
2  A. YES.
3  Q. NOW, YESTERDAY WHEN WE WERE WATCHING THE TV OF
4  DR. SCOLNICK'S TESTIMONY, THERE WAS A LOT OF QUESTIONING ABOUT
5  A TRIAL INVOLVING ALZHEIMER'S. ARE YOU FAMILIAR WITH THAT
6  TRIAL?
7  A. THERE WERE ACTUALLY THREE ALZHEIMER'S STUDIES, OR THERE
8  WAS ONE IN PATIENTS AS TREATMENT FOR ALZHEIMER'S AND ANOTHER IN
9  PATIENTS WITH EARLY ALZHEIMER'S.
10  Q. IN TERMS OF WHAT THOSE TRIALS SHOWED TO THE RISK OF HEART
11  ATTACK OR CARDIOVASCULAR THROMBOTIC EVENTS, WHAT DID THOSE
12  TRIALS SHOW, VIOXX VERSUS PLACEBO?
13  A. THOSE STUDIES ACTUALLY SHOWED THAT THERE WAS A SIMILAR
14  RATE OF THROMBOTIC EVENTS, INCLUDING HEART ATTACKS AND STROKES,
15  IN PATIENTS TAKING VIOXX COMPARED WITH PATIENTS TAKING PLACEBO.
16  Q. HOW ABOUT CARDIOVASCULAR MORTALITY? WAS THERE A
17  STATISTICALLY SIGNIFICANT DIFFERENCE BETWEEN VIOXX AND PLACEBO?
18  A. THERE WAS NO STATISTICALLY SIGNIFICANT DIFFERENCE IN TERMS
19  OF CARDIOVASCULAR MORTALITY; A SMALL NUMERIC IMBALANCE IN FAVOR
20  OF PLACEBO.
21  Q. MOST OF THE QUESTIONING OF DR. SCOLNICK CENTERED ON HIS
22  CONCEPT OF ALL-CAUSE MORTALITY. CAN YOU EXPLAIN THAT CONCEPT?
23  A. BASICALLY THAT'S JUST SAYING, IF A PATIENT DIED DURING THE
24  STUDY, THEY'RE INCLUDED NO MATTER WHAT THEY DIED OF. THEY ARE
25  INCLUDED IN AN ANALYSIS OF ALL-CAUSE MORTALITY. SO IT DOESN'T

Page 1695

1  MEAN THAT THE DRUG CAUSED THE DEATH; IT JUST MEANS, WHILE THE
2  PATIENT WAS BEING FOLLOWED DURING THE STUDY, THAT THEY DIED.
3  Q. SO, FOR EXAMPLE, IF A PATIENT IN A CLINICAL TRIAL
4  LITERALLY IS STRUCK BY LIGHTNING AND DIES, IS THAT INCLUDED AS
5  A STATISTIC IN THE ALL-CAUSE MORTALITY?
6  A. THAT WOULD BE INCLUDED IN THE ALL-CAUSE MORTALITY.
7  Q. DO YOU RECALL WHETHER OR NOT THERE WAS A DIFFERENCE IN
8  ALL-CAUSE MORTALITY IN ONE OF THE ALZHEIMER'S TRIALS?
9  A. IN THE ALZHEIMER'S TRIALS, THERE WAS A DIFFERENCE.
10  Q. DID YOU SEE --
11  A. IT WAS HIGHER ON VIOXX THAN IT WAS ON PLACEBO.
12  Q. DID YOU SEE DATA OR ANALYSIS SHOWING WHAT THESE PATIENTS
13  HAD DIED OF?
14  A. WHEN YOU LOOK AT MORTALITY, IT'S IMPORTANT THAT YOU NOT
15  JUST LOOK AT WHAT THE NUMBERS ARE IN EACH TREATMENT GROUP, BUT
16  YOU ALSO HAVE TO LOOK AT WHAT'S CAUSING THE MORTALITY.
17  MORTALITY -- DEATH -- IS AN OUTCOME; IT IS NOT A CAUSE. SO
18  WHEN YOU SEE AN IMBALANCE, YOU WANT TO GO TO THE NEXT LEVEL AND
19  SAY, "OKAY, WHAT'S CAUSING THIS IMBALANCE? IS THERE ONE TYPE
20  OF CAUSE OF DEATH OR IS THERE A LOT OF DIFFERENT THINGS? ARE
21  THESE DEATHS THINGS YOU THINK ARE LIKELY FOR THE DRUG TO
22  CAUSE?" SO THAT'S THE TYPE OF THING YOU DO WHEN YOU'RE LOOKING
23  AT A MORTALITY TABLE.
24  Q. WHEN YOU REVIEWED THE MORTALITY DATA OF THE ALZHEIMER'S
25  TRIALS, WHERE WAS THIS EXCESS DATA COMING FROM?

62 (Pages 1692 to 1695)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M0DSS43767

Page 1696

1 A. WELL, THERE WAS A SMALL NUMERIC DIFFERENCE IN
2 CARDIOVASCULAR MORTALITY. I THINK ON THE ORDER OF MAYBE FOUR OR
3 FIVE PATIENTS MORE DIED ON VIOXX THAN ON PLACEBO. ALTHOUGH WHEN
4 YOU LOOKED AT OVERALL CARDIOVASCULAR EVENTS THEY WERE SIMILAR.
5 THE MAJORITY OF THE DIFFERENCE ACTUALLY CAME FROM INFECTIONS
6 AND ACCIDENTAL DEATH. SO WHEN WE ARE TALKING ABOUT ACCIDENTAL
7 DEATH, WE ARE TALKING ABOUT THINGS LIKE ELECTROCUTION, OR THERE
8 WAS A PATIENT THAT ATE A BROMIDE TABLET THAT BURNED THEIR
9 ESOPHAGUS AND THEY GOT A BAD INFECTION AND DIED FROM THAT.
10      FOR THE INFECTIONS WE WENT BACK AND WE SAID, "WELL,
11 WE HAVE NEVER SEEN A SIGNAL OF VIOXX CAUSING INFECTIONS. WHAT
12 WAS THE OVERALL INFECTION RATE IN THE STUDY," AND THE OVERALL
13 INFECTION RATE WAS SIMILAR. SO YOU REALLY DIDN'T SEE A PATTERN
14 THAT SUGGESTED THAT VIOXX WAS CAUSING THE MAJORITY OF THE
15 DEATHS IN THE STUDY.
16 Q. DID YOU SHARE THIS DATA WITH FDA?
17 A. WE DID SHARE THAT DATA WITH THE FDA.
18 Q. HAS THIS DIFFERENCE IN ALL-CAUSE MORTALITY BEEN SHOWN IN
19 ANY OTHER VIOXX TRIAL?
20 A. THE ONLY OTHER DATABASE WHERE WE SAW A SIGNIFICANT
21 DIFFERENCE IN ALL-CAUSE MORTALITY WAS IN OUR PHASE IIB/III OA
22 DATABASE, WHERE ACTUALLY THERE WAS SIGNIFICANTLY FEWER DEATHS
23 ON VIOXX THAN THERE WERE ON THE NSAID COMPARATOR GROUP.
24 Q. DID ANYONE FROM FDA SUGGEST THAT THIS ALL-CAUSE MORTALITY
25 DATA NEEDED TO BE IN THE LABEL BECAUSE VIOXX WAS CAUSING

Page 1697

1 ACCIDENTAL INJURY?
2 A. MY RECOLLECTION OF THOSE DISCUSSIONS IS THAT THEY AGREED
3 WITH US THAT THERE WASN'T AN APPARENT CAUSE THAT WAS ASSOCIATED
4 WITH THEM, AND THEY FELT THAT WE PUT THE OVERALL CARDIOVASCULAR
5 DATA FROM THE ALZHEIMER'S STUDIES ON THE LABEL AND ALSO PUT THE
6 CARDIOVASCULAR MORTALITY DATA FROM THE ALZHEIMER'S STUDIES ON
7 THE LABEL.
8 Q. I WOULD LIKE TO SWITCH GEARS, DOCTOR, TO A MEETING THAT
9 YOU HAD IN APRIL 2001 WITH DR. TOPAL. DID YOU ATTEND SUCH A
10 MEETING?
11 A. YES, I DID.
12 Q. HOW DID IT COME TO BE THAT YOU CAME TO A MEETING WITH
13 DR. TOPAL?
14 A. DR. TOPAL TOLD SEVERAL MERCK EMPLOYEES THAT HE WAS WORKING
15 ON THE PAPER DESCRIBING THE CARDIOVASCULAR SAFETY OF THE VIOXX.
16 THAT CAME TO -- I CAN'T REMEMBER IF IT WAS MY ATTENTION OR
17 LAURA DEMOPOULOS' ATTENTION. LAURA DEMOPOULOS WAS HEAD OF THE
18 CLINICAL GROUP FOR CARDIOVASCULAR EVENTS. LAURA CALLED -- SHE
19 KNEW DR. TOPAL. THEY HAD WORKED TOGETHER. SHE CALLED HIM AND
20 SAID, "WOULD YOU LIKE US TO COME DOWN AND REVIEW ALL OF THE
21 DATA THAT WE HAVE SO THAT YOU CAN BE SURE THAT YOU HAVE
22 WHATEVER DATA YOU NEED IN ORDER TO WRITE THE PAPER?"
23 Q. DID YOU ATTEND THE MEETING?
24 A. BOTH LAURA AND I DID ATTEND THAT MEETING.
25 Q. WHAT DO YOU RECALL ABOUT THAT MEETING?

Page 1698

1 A. WE MET FOR ABOUT AN HOUR AND A HALF. IT WAS A VERY
2 CORDIAL MEETING. THE MAJORITY OF THE MEETING I WENT THROUGH A
3 SLIDE DECK I HAD BROUGHT DOWN THAT WAS VERY SIMILAR TO THE
4 SLIDE DECK I HAD SHOWN AT THE FDA ADVISORY COMMITTEE, WHERE I
5 WALKED HIM THROUGH ALL OF THE DIFFERENT QUESTIONS THAT PEOPLE
6 HAD RAISED: THE FITZGERALD HYPOTHESIS; THE QUESTION OF WHETHER
7 NSAIDS COULD BE CARDIOPROTECTIVE; AND ALL OF THE DATA THAT WE
8 HAD. AT THE END OF THAT, HE ACTUALLY TOLD ME THAT HE FOUND THE
9 DATA TO BE QUITE REASSURING, BUT THAT HE STILL FELT THAT THE
10 QUESTION OF VIOXX CARDIOVASCULAR SAFETY NEEDED TO BE FURTHER
11 INVESTIGATED, HE ALSO WENT OUT OF HIS WAY TO TELL ME THAT HE
12 TOOK VIOXX FOR HIS KNEE -- APPARENTLY, HE IS AN AVID BASKETBALL
13 PLAYER -- AND FOUND IT TO BE A QUITE EFFECTIVE DRUG.
14 Q. DID DR. TOPAL DISCUSS AT THAT MEETING WHAT HE VIEWED AS A
15 CLINICAL TRIAL HE WANTED TO SEE DONE WITH VIOXX?
16 A. NEAR THE END OF THE MEETING, HE SAID HE HAD AN IDEA TO DO
17 A CLINICAL TRIAL AND HE SHARED THAT WITH US. IT WAS ACTUALLY
18 TURNING THE VIOXX CARDIOVASCULAR SAFETY QUESTION ON ITS HEAD,
19 SO TO SPEAK. THE STUDY HE WAS PROPOSING WAS TO TAKE PATIENTS
20 WHO HAD JUST HAD A HEART ATTACK OR HAD SOMETHING CALLED
21 UNSTABLE ANGINA -- SO VERY HIGH-RISK CARDIOVASCULAR PATIENTS --
22 AND PUT THEM ON EITHER VIOXX PLUS ASPIRIN OR PLACEBO PLUS
23 ASPIRIN AND SEE IF ACTUALLY VIOXX COULD REDUCE THE RATE OF
24 RECURRENT HEART ATTACKS IN THESE VERY HIGH-RISK PATIENTS.
25 Q. HOW DID THE MEETING END?

Page 1699

1 A. VERY CORDIALLY. HE ACTUALLY ASKED US IF WE WOULD LIKE TO
2 HAVE AN OPPORTUNITY TO REVIEW THE PAPER -- APPARENTLY, HE HAD
3 SENT IT INTO THE JOURNAL -- IF WE WOULD LIKE TO HAVE THE
4 OPPORTUNITY TO REVIEW THAT AND COMMENT ON IT.
5      MR. ISMAIL: EXHIBIT 357 IS EITHER IN OR GOING TO
6 COME IN THROUGH DR. TOPAL'S DEPOSITION. IT'S AN E-MAIL
7 EXCHANGE FOLLOWING THE MEETING.
8      MR. BIRCHFIELD: NO OBJECTION.
9      THE COURT: LET IT BE ADMITTED.
10 BY MR. ISMAIL:
11 Q. IS THIS YOUR E-MAIL TO DR. TOPAL?
12 A. YES, IT IS.
13 Q. YOU WRITE, "IT WAS GREAT TO HAVE THE OPPORTUNITY TO MEET
14 WITH YOU IN PERSON ON TUESDAY."
15 A. CORRECT.
16 Q. THEN YOU WRITE DOWN HERE, "YOUR IDEA FOR THE STUDY WAS
17 VERY INTRIGUING." IS THAT REFERRING TO DR. TOPAL'S SUGGESTION
18 THAT VIOXX COULD ACTUALLY HELP THE HEART?
19 A. THAT'S CORRECT.
20 Q. DR. TOPAL RESPONDED, AS WELL, THAT HE ENJOYED MEETING YOU
21 AND LAURA; IS THAT CORRECT?
22 A. THAT'S CORRECT.
23 Q. DID THERE COME A TIME WHEN YOU RECEIVED A COPY OF
24 DR. TOPAL'S PAPER THAT HE WAS WORKING ON?
25 A. HE DID SEND US AN ELECTRONIC COPY OF THAT PAPER.

63 (Pages 1696 to 1699)

DAILY COPY

M0D5543768

## Page 1700

1 Q. DID YOU COMMENT ON IT?

2 A. I DID. I DID KIND OF AN INTERNAL MERCK CRITIQUE, GOING

3 THROUGH THE PAPER ALMOST LINE BY LINE. POINTING OUT AREAS WHERE

4 I THOUGHT THERE WERE SOME FACTUAL THINGS THAT WEREN'T CORRECT,

5 WHERE WE MIGHT SHARE WITH HIM SOME MORE DATA OR THINGS WHERE I

6 THOUGHT THERE WERE ISSUES WITH THE WAY THE ANALYSIS HAD BEEN

7 DONE.

8 Q. WAS IT YOUR INTENTION THAT YOUR COMMENTS ON THE PAPER

9 WOULD BE SENT TO DR. TOPAL?

10 A. NO. THOSE WERE INTERNAL. DR. DEMOPOULOS AND PETE

11 DIBATTISTE, WHO WORKS WITH HER, WERE GOING TO RESPOND AND SEND

12 HIM SOME COMMENTS. MINE, AS I SAID, WAS AN INTERNAL DOCUMENT

13 TO, IN SOME RESPECTS, GET LAURA AND PETE UP-TO-SPEED ON WHAT

14 ALL OF THE DATA WE HAD WAS.

15 Q. WERE YOUR COMMENTS, IN FACT, SENT TO DR. TOPAL?

16 A. NO. THEY WEREN'T.

17 Q. HAVE YOU EVER SPOKEN TO DR. TOPAL SINCE?

18 A. NO, I HAVE NOT.

19 Q. WHILE WE ARE ON THE SUBJECT, I WOULD LIKE TO SHOW YOU HIS

20 ARTICLE, IF I COULD. DO YOU RECOGNIZE THIS DOCUMENT AS

21 DR. TOPAL'S PUBLICATION IN JAMA?

22 A. YES, I DO.

23 Q. IN THAT PUBLICATION, WHAT DATA FROM VIOXX DOES HE DISCUSS?

24 A. HE DISCUSSES THE VIGOR DATA. HE ALSO DISCUSSES, I

25 BELIEVE, PROTOCOLS 085 AND 090, WHICH WERE TWO SIX-WEEK STUDIES

## Page 1701

1 WHERE WE STUDIED VIOXX VERSUS NABUMETONE, WHICH IS ANOTHER

2 NONSELECTIVE NSAID.

3 Q. WAS THERE OTHER DATA THAT WAS AVAILABLE FROM THE FDA THAT

4 DR. TOPAL COULD HAVE INCLUDED IN THIS DATASET?

5 A. WE HAD ALL OF OUR OTHER OA STUDIES. HE CHOSE TO ONLY TALK

6 ABOUT TWO OF THEM. IN ADDITION, WE HAD OUR ALZHEIMER'S

7 STUDIES, AS WELL.

8 Q. DR. TOPAL, IN THIS ARTICLE FOR 090 REFERENCES SIX

9 CARDIOVASCULAR EVENTS WITH VIOXX, TWO ON NABUMETONE, AND ONE ON

10 PLACEBO?

11 A. YES. SERIOUS CARDIOVASCULAR EVENTS, THAT'S CORRECT. THAT

12 WAS IN 090.

13 Q. HE SAID IN HIS TESTIMONY THAT HE HAD GOTTEN THAT DATA FROM

14 AN FDA MEDICAL REVIEWER NAMED DR. TARGUM; IS THAT CORRECT?

15 A. THAT'S CORRECT. WHEN WE SENT IN THE VIGOR DATA, WE ALSO

16 SENT IN 090 AND 085. DR. TARGUM, IN HER REVIEW OF THE VIGOR

17 DATA, ALSO REVIEWED 085 AND 090.

18 Q. IS THIS THE FEBRUARY 1, 2001, MEMO OF DR. TARGUM?

19 A. THAT'S CORRECT.

20 Q. FOR THE 090 GROUP, WE SEE THE SIX CARDIOVASCULAR EVENTS ON

21 VIOXX, THE TWO ON NABUMETONE, AND ONE ON PLACEBO?

22 A. YES, THOSE ARE ALL HERE.

23 Q. BY THE WAY, WERE THESE RESULTS STATISTICALLY SIGNIFICANT,

24 THE DIFFERENCES?

25 A. NO, THEY WERE NOT.

## Page 1702

1 Q. OBVIOUSLY, THEY WERE SHARED WITH THE FDA BECAUSE THEY END

2 UP IN AN FDA MEDICAL REVIEW?

3 A. CORRECT.

4 Q. NOW, I WANT TO SHOW YOU A CLIP OF DR. TOPAL'S TESTIMONY

5 AND ASK YOU A COUPLE QUESTIONS ABOUT IT. BEFORE I DO, I'LL

6 GIVE YOU A PEN AND SOME PAPER. DR. TOPAL, IN THIS CLIP

7 EXPLAINS WHY HE OFFERED CRITICISMS OF VIOXX IN 2004, 2005,

8 BASED ON THE 090 STUDY THAT HE ANALYZED WAY BACK IN APRIL 2001.

9 HE IDENTIFIES IN THIS CLIP DATA HE SAYS HE DIDN'T HAVE WHEN HE

10 DID HIS ANALYSIS.

11    "Q. DR. TOPAL, I'M GOING TO SHOW YOU AT PAGE 958, IN

12 THE FIRST COLUMN, SECOND FULL PARAGRAPH, YOU SAY, SECOND

13 SENTENCE, TWO SMALLER STUDIES, STUDY 085 AND STUDY 090, OF

14 VIOXX, THAT BOTH ALLOWED THE USE OF LOW-DOSE ASPIRIN, DID

15 NOT DEMONSTRATE THE SIGNIFICANT INCREASE IN CARDIOVASCULAR

16 EVENT RATES NOTED IN VIGOR. DID YOU WRITE THAT, SIR?"

17    "A. THAT WAS IN OUR PAPER, AGAIN, FROM THE WRONG

18 DATA THAT WE DID NOT HAVE ACCESS TO."

19    "Q. I WANT TO KNOW WHAT DATA YOU HAD ACCESS TO AFTER

20 THIS POINT THAT YOU DIDN'T HAVE ACCESS TO IN --"

21    "A. I'LL BE HAPPY TO GO OVER THAT IF YOU GIVE ME THE

22 OPPORTUNITY."

23    "Q. JAMA."

24    "A. PAGE 32 OF THE TARGUM REPORT."

25    "Q. THE TARGUM REPORT YOU SAW BACK IN FEBRUARY 2001,

## Page 1703

1 SIR."

2    "A. RIGHT, BUT THEN WE HAD DETAILS OF THESE

3 PATIENTS, FOR EXAMPLE, PLACEBO CORONARY OCCLUSION, AND WE

4 COULD SAY HAD NOTHING TO DO WITH A HEART ATTACK."

5    "Q. DR. TOPAL, THE TARGUM REPORT THAT YOU ARE

6 RELYING ON NOW FOR YOUR REVIEW THAT STUDY 090 WAS A SIGNAL

7 FOR CARDIOVASCULAR RISK IS THE SAME REPORT THAT YOU CITE

8 IN YOUR JAMA ARTICLE AND THAT YOU RELIED ON IN YOUR JAMA

9 ARTICLE; IS THAT TRUE?"

10    "A. AND WE HAD THE DETAILS OF EACH OF THE PATIENTS."

11    "Q. YOU HAD THAT ALSO IN FEBRUARY OF 2001?"

12    "A. I DID NOT HAVE ACCESS TO IT. THAT IS HOW THESE

13 EVENTS WERE CHARACTERIZED, CORONARY OCCLUSION, THERE IS

14 ONE CALLED ATRIAL FIBRILLATION, ONE CALLED CONGESTIVE

15 HEART FAILURE. WHEN WE LOOKED AND WENT THROUGH -- WHEN I

16 LOOKED AND OTHERS LOOKED GOING THROUGH EACH OF THESE

17 EVENTS, THEN THE NUMBERS CHANGED."

18 BY MR. ISMAIL:

19 Q. DID YOU WRITE DOWN, DOCTOR, THE THREE EVENTS DR. TOPAL

20 SAYS HE DIDN'T HAVE ACCESS TO IN APRIL 2001?

21 A. YES, I DID.

22 Q. I WOULD LIKE TO GO BACK TO THE FEBRUARY 1, 2001 TARGUM

23 REPORT. WHAT WAS THE FIRST ONE, THE FIRST CASE THAT DR. TOPAL

24 SAID HE DIDN'T KNOW WHAT THE CASE WAS ABOUT?

25 A. I WROTE DOWN CORONARY OCCLUSION, WHICH I THINK WAS ON

64   (Pages 1700 to 1703)

## DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543769

Page 1704

1 PLACEBO.

2 Q. IS IT, IN FACT, IN THE FEBRUARY 1, 2001, TARGUM REPORT?

3 A. YES, IT IS.

4 Q. WHAT'S THE SECOND CASE YOU WROTE DOWN?

5 A. ATRIAL FIBRILLATION, WHICH IS ON VIOXX.

6 Q. WAS THAT CASE ALSO IN THE FEBRUARY 1, 2001 TARGUM REPORT?

7 A. YES.

8 Q. WHAT WAS THE LAST CASE HE SAID?

9 A. CONGESTIVE HEART FAILURE.

10 Q. ON?

11 A. NABUMETONE.

12 Q. IS THAT SHOWN HERE, AS WELL?

13 A. YES, IT IS.

14 Q. DR. TOPAL, AFTER TAKING OUT THESE THREE CASES THAT WERE

15 AVAILABLE IN FEBRUARY '01, ENDED UP WITH FIVE ON VIOXX, ZERO ON

16 PLACEBO. WOULD THAT HAVE BEEN STATISTICALLY SIGNIFICANT?

17 A. I CAN'T DO THE STATISTICS RIGHT HERE, BUT I DON'T THINK IT

18 WOULD HAVE BEEN STATISTICALLY SIGNIFICANT.

19 Q. DOCTOR, DID MERCK DO THE CARDIOVASCULAR OUTCOME TRIAL

20 SUGGESTED BY DR. TOPAL?

21 A. WE DID NOT DO THAT PARTICULAR STUDY; INSTEAD, WE ELECTED

22 TO DO ANOTHER VERY LARGE PLACEBO-CONTROLLED STUDY OR STUDIES

23 THAT WE THOUGHT WOULD BETTER ANSWER THE QUESTIONS.

24 Q. WHY DIDN'T YOU DO DR. TOPAL'S STUDY IDEA?

25 A. WELL, THERE WERE SEVERAL REASONS. THE FIRST REASON, AS I

Page 1705

1 MENTIONED BEFORE, IS THAT DR. TOPAL'S STUDY WASN'T REALLY A

2 STUDY COMPARING VIOXX COMPARED WITH PLACEBO. ALL OF THE

3 PATIENTS WOULD HAVE BEEN ON ASPIRIN. SO IT WAS REALLY A STUDY

4 OF VIOXX PLUS ASPIRIN COMPARED WITH ASPIRIN ALONE.

5    DR. GARRETT FITZGERALD'S HYPOTHESIS, THE FITZGERALD

6 HYPOTHESIS, IS NOT IN PATIENTS ON ASPIRIN. HIS HYPOTHESIS IS

7 THAT A COX-2 SELECTIVE INHIBITOR WILL BE PROTHROMBOTIC COMPARED

8 TO PLACEBO; AND, IN FACT, IF YOU ADDED ASPIRIN, YOU WOULD

9 NEGATE THAT EFFECT.

10    IN ADDITION, VIGOR WAS NONASPIRIN USERS, SO THE

11 QUESTION THAT WAS RAISED BY VIGOR IS: WHAT IS THE

12 CARDIOVASCULAR SAFETY OF VIOXX IN NONASPIRIN USERS? THEREFORE,

13 WE FELT THAT IF WE HAD DONE THAT STUDY WHICH SHOWED THAT VIOXX

14 WAS SIMILAR TO PLACEBO, WE WOULD STILL HAVE PHYSICIANS SAYING,

15 "WELL, WHAT DO I DO ABOUT MY PATIENTS WHO ARE NOT TAKING

16 ASPIRIN," AND A SIGNIFICANT NUMBER OF PATIENTS AREN'T TAKING

17 ASPIRIN IF YOU TAKE VIOXX.

18    IN ADDITION — SOME OF WHAT WE HEARD FROM OUR

19 RHEUMATOLOGIST COLLEAGUES WAS, "PATIENTS WHO HAVE JUST HAD A

20 HEART ATTACK ARE NOT LIKE THE TYPICAL PATIENT THAT I SEE IN MY

21 PRACTICE. I WANT TO SEE YOU DO THE STUDY IN A PATIENT

22 POPULATION WHO ARE MORE SIMILAR TO THE PATIENTS THAT I'M

23 TREATING. PATIENTS WITH RISK FACTORS, PATIENTS WITHOUT RISK

24 FACTORS, NOT PATIENTS WHO JUST HAD A HEART ATTACK A WEEK OR TWO

25 AGO."

Page 1706

1    THE THIRD REASON IS, WHEN YOU ARE DESIGNING A

2 CLINICAL STUDY, YOU HAVE TO HAVE A BENEFIT FOR PATIENTS. WE

3 WEREN'T GOING IN ARTHRITIS PATIENTS BECAUSE YOU CAN'T GIVE

4 ARTHRITIS PATIENTS A PLACEBO SUGAR PILL FOR A PROLONGED PERIOD

5 OF TIME. THEY NEED SOMETHING FOR THEIR PAIN. INSTEAD, YOU

6 WERE GOING IN HIGH-RISK CARDIOVASCULAR PATIENTS. SO WHAT'S THE

7 BENEFIT TO THEM? WE KNEW THAT THERE COULD BE SOME RISKS. WE

8 KNOW THAT NSAIDS AND VIOXX CAN CAUSE HYPERTENSION, NOT A GOOD

9 THING TO DO IN PATIENTS WHO JUST HAD A HEART ATTACK.

10    WE ALSO HAD SOME DATA IN 2001 AND THERE WAS DATA FROM

11 THE CLASS DATA THAT SUGGESTED THAT THE GI RISK OF BLEEDING

12 COULD INCREASE IF YOU HAD PATIENTS ON VIOXX AND ASPIRIN. SO WE

13 KNEW THAT THERE WERE SOME RISKS THOSE PATIENTS WOULD BE EXPOSED

14 TO AND THE QUESTION WAS: WAS THE SCIENTIFIC LITERATURE ROBUST

15 ENOUGH TO SUGGEST THAT, IN FACT, THAT THIS CLASS OF AGENTS

16 COULD BE CARDIOPROTECTIVE? WE WEREN'T CONVINCED THAT THE

17 DATABASE WAS ROBUST ENOUGH. SO WE WENT INTO A DIFFERENT

18 PATIENT POPULATION WHERE WE FELT THERE WAS A VERY ROBUST

19 DATASET TO SUGGEST THAT, IN FACT, VIOXX COULD OFFER A BENEFIT

20 AND THAT WAS IN TRYING TO PREVENT CANCER.

21 Q. DID YOU AT MERCK DESIGN A PROTOCOL TO PROSPECTIVELY

22 ANALYZE CARDIOVASCULAR SAFETY USING THE POTENTIAL BENEFIT OF

23 CANCER TREATMENT FOR VIOXX?

24 A. THAT WAS PROTOCOL 203, WHICH WE CONSIDERED OUR

25 CARDIOVASCULAR OUTCOMES STUDY. IT WAS ACTUALLY GOING TO BE A

Page 1707

1 PRESPECIFIED POOLED ANALYSIS OF THREE STUDIES IN

2 CHEMOPREVENTION. SO TRYING TO PREVENT THERAPY. IN ALL OF THOSE

3 STUDIES, WE WERE STUDYING VIOXX COMPARED WITH PLACEBO. PATIENTS

4 BOTH ON ASPIRIN, NOT ON ASPIRIN, RISK FACTORS FOR

5 CARDIOVASCULAR DISEASE AND NO RISK FACTORS FOR CARDIOVASCULAR

6 DISEASE. PATIENTS WERE GOING TO BE FOLLOWED, HOWEVER, FOR A

7 LONG PERIOD OF TIME.

8 Q. DOCTOR, I WANT TO GET TO THE EVENTS AS THEY STOOD IN

9 SEPTEMBER 2001, BUT BEFORE I DO, WE KNOW THAT THE INITIAL

10 APPROVAL HAPPENED IN MAY '99. WERE THERE ADDITIONAL APPROVALS

11 FOR NEW THERAPIES USING VIOXX?

12 A. NEW INDICATIONS, YES.

13 Q. NEW INDICATIONS. SORRY. WAS THE FIRST IN APRIL 2002?

14 A. APRIL 2002, WHICH IS WHEN THE FDA ALLOWED US TO PUT IN THE

15 VIGOR FINDINGS. WE ALSO GOT APPROVAL FOR A NEW INDICATION FOR

16 THE TREATMENT OF RHEUMATOID ARTHRITIS.

17 Q. WAS THERE AN APPROVAL FOR A NEW INDICATION IN MARCH 2004?

18 A. IN MARCH OF 2004 VIOXX WAS APPROVED FOR THE TREATMENT OF

19 MIGRAINES.

20 Q. IN AUGUST OF 2004?

21 A. IN AUGUST OF 2004 WE WERE APPROVED FOR THE TREATMENT OF

22 JUVENILE RHEUMATOID ARTHRITIS. THAT'S A TYPE OF RHEUMATOID

23 ARTHRITIS THAT CHILDREN GET.

24 Q. IN SEPTEMBER 2004, DOCTOR, HAD THERE EVER BEEN A

25 PLACEBO-CONTROLLED TRIAL THAT SHOWED AN INCREASED

65  (Pages 1704 to 1707)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543770

## Page 1708

1 CARDIOVASCULAR RISK OF VIOXX?

2 A. NOT PRIOR TO GETTING THE RESULT OF THE APPROVE STUDY. NO.

3 Q. WHEN WERE THE RESULTS OF THE APPROVE STUDY KNOWN?

4 A. WE FOUND OUT ABOUT THOSE RESULTS AT THE END OF SEPTEMBER.

5 Q. DOES SEPTEMBER 24 SOUND RIGHT?

6 A. SOUNDS ABOUT RIGHT.

7 Q. WERE YOU INVOLVED IN THE GROUP AT MERCK WHO DISCUSSED WHAT

8 TO DO IN RESPONSE TO THIS DATA?

9 A. YES, I WAS.

10 Q. TELL US ABOUT THOSE CONVERSATIONS.

11 A. I WOULD SAY WE WERE ALL QUITE SURPRISED BY THE RESULTS,

12 COMPLETELY UNEXPECTED TO US. I THINK THERE WERE SEVERAL THINGS

13 THAT WERE UNEXPECTED, BUT WHAT THE KAPLAN-MEIER CURVE LOOKED

14 LIKE WAS UNEXPECTED TO US.

15 Q. LET ME STOP YOU RIGHT THERE. WHAT DID THE DATA FROM

16 APPROVE SHOW WAS THE RISK OF VIOXX IN USE UP TO 18 MONTHS?

17 A. IN USE UP TO 18 MONTHS, THE RISK OF CARDIOVASCULAR EVENT

18 WAS SIMILAR ON VIOXX AND PLACEBO. IT WAS ONLY BEGINNING AFTER

19 18 MONTHS OF CONTINUOUS USE THAT WE SAW A DIFFERENCE BETWEEN

20 VIOXX AND PLACEBO THAT ULTIMATELY BECAME SIGNIFICANT.

21 Q. PLEASE CONTINUE.

22 A. WHEN WE GOT THAT DATA, WE DID FURTHER ANALYSES TO BETTER

23 UNDERSTAND THE DATA. WE HAD A MEETING WITH THE STEERING

24 COMMITTEE OF THE STUDY. THEY HAD SEEN THE RESULTS, AND THEY

25 HAD SUGGESTED THAT WE STOP THE STUDY. WE ALSO HAD MEETINGS

## Page 1709

1 OVER A ONE OR TWO-DAY PERIOD WITH SEVERAL OUTSIDE CONSULTANTS

2 TO SHOW THEM THE DATA AND ASK THEM WHAT THEY THOUGHT WE SHOULD

3 DO.

4 Q. WHAT DID YOU HEAR FROM YOUR OUTSIDE CONSULTANTS?

5 A. I WOULD SAY THE OVERWHELMING MAJORITY OF THEM THOUGHT WE

6 SHOULD LEAVE VIOXX ON THE MARKET, BUT CHANGE THE LABEL TO PUT

7 THE APPROVE DATA IN THE LABEL, AS WELL AS A WARNING ABOUT

8 CARDIOVASCULAR SAFETY.

9 Q. WHAT DID MERCK DO INSTEAD?

10 A. WE ELECTED TO BE VERY CONSERVATIVE AND TO TAKE VIOXX OFF

11 THE MARKET.

12 Q. THAT HAPPENED ON SEPTEMBER 30?

13 A. YES, IT DID.

14 Q. DOCTOR, WHAT WAS THE REASONS FOR THAT DECISION AS YOU KNOW

15 IT?

16 A. WELL, AT THAT PERIOD OF TIME, THE ONLY NSAID OR COX-2

17 INHIBITOR THAT HAD A PLACEBO-CONTROLLED DATABASE THAT WAS AS

18 LARGE OR AS LONG AS THE ONE WE HAD WITH APPROVE WAS VIOXX, AND

19 SO WE DIDN'T KNOW IF THIS WAS A CARDIOVASCULAR EFFECT THAT WAS

20 UNIQUE TO VIOXX, UNIQUE TO THE COX-2 CLASS, OR SOMETHING THAT

21 WOULD BE SEEN WITH THE MAJORITY OF THE NSAID CLASS. BECAUSE WE

22 DIDN'T KNOW, BASED ON THE DATA AVAILABLE, WE FELT THE

23 CONSERVATIVE THING TO DO WAS TO VOLUNTARILY TAKE THE DRUG OFF

24 THE MARKET.

25 Q. THAT UNCERTAINTY YOU ARE REFERRING TO IS THE NEW DATA IN

## Page 1710

1 SEPTEMBER 2004 REGARDING LONG-TERM USE?

2 A. WELL, SEVERAL MONTHS AFTER WE – OR MAYBE TWO OR THREE

3 MONTHS AFTER WE TOOK VIOXX OFF THE MARKET, DATA FROM A VERY

4 SIMILAR STUDY DONE WITH CELEBREX, SAME PATIENT POPULATION, WAS

5 REPORTED. IN THAT STUDY, AS WELL, THEY HAD SEEN AN INCREASED

6 RISK OF CARDIOVASCULAR EVENTS AFTER PROLONGED USE ON CELEBREX

7 COMPARED WITH PLACEBO.

8 Q. DOCTOR, JUST A COUPLE MORE QUESTIONS. HAVE YOU EVER TAKEN

9 VIOXX?

10 A. YES, I HAVE.

11 Q. DID YOU TAKE VIOXX?

12      MR. BIRCHFIELD: OBJECTION. MAY WE APPROACH?

13      THE COURT: YES.

14      MR. BIRCHFIELD: YOUR HONOR. THIS IS THE SUBJECT OF A

15 MOTION IN LIMINE THAT YOU GRANTED. THEY APPROACHED YOU ABOUT

16 ALLOWING THIS EVIDENCE ON DR. SCOLNICK. YOU SAID YOU WOULD

17 ALLOW IT FOR HIM AND HIM ALONE. NOW THEY HAVE GONE INTO IT.

18 WE DON'T HAVE ANY MEDICAL RECORDS ON HER AND DON'T HAVE A BASIS

19 TO CROSS-EXAMINE HER.

20      MR. ISMAIL: MY UNDERSTANDING WAS YOU RULED THAT

21 PERSONAL USE WAS ALLOWABLE IN LIGHT OF THE FACT THEY OPENED THE

22 DOOR AND PUT IN THE PERSONAL USE OF THE PLAINTIFFS.

23      THE COURT: YOU WEREN'T HERE UP AT THE BENCH WHEN I

24 TOLD YOUR COLLEAGUE THAT I WAS ALLOWING IT FOR DR. SCOLNICK.

25 BUT I WAS GOING TO TREAT EACH ONE SEPARATELY. I WASN'T MAKING

## Page 1711

1 AN IN GLOBO RULING. I THINK THE PLAINTIFF IS RIGHT. I'M GOING

2 TO SUSTAIN THAT OBJECTION. LET'S GO INTO SOMETHING ELSE.

3      MR. ISMAIL: I APOLOGIZE, YOUR HONOR.

4      MR. BIRCHFIELD: CAN I GET HER MEDICAL RECORDS

5 OVERNIGHT SO I CAN CROSS-EXAMINE HER ON THIS? IT'S THE SUBJECT

6 OF A MOTION IN LIMINE, AND HE HAS ALREADY GONE INTO IT AND

7 GOTTEN AN ANSWER FROM IT.

8      THE COURT: DO YOU HAVE THEM?

9      MR. ISMAIL: I DON'T HAVE THEM.

10      MR. BIRCHFIELD: WILL YOU INSTRUCT THEM TO MAKE AN

11 EFFORT TO GET THE MEDICAL RECORDS?

12      THE COURT: I'LL DO THAT.

13      (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

14 OPEN COURT.)

15      THE COURT: LET'S TRY TO FINISH, COUNSEL. THE JURY

16 AND I HOPE YOU CAN FINISH BEFORE WE BREAK FOR TODAY.

17      MR. ISMAIL: ON THAT NOTE, I PASS THE WITNESS.

18      THE COURT: THANK YOU. YOU MAY CROSS-EXAMINE UNTIL

19 5:30, AND THEN WE WILL COME BACK TOMORROW.

20           CROSS-EXAMINATION

21 BY MR. BIRCHFIELD:

22 Q. GOOD AFTERNOON.

23 A. GOOD AFTERNOON.

24 Q. I WANT TO MAKE SURE I'M CLEAR ON ONE POINT BASED ON YOUR

25 TESTIMONY JUST NOW. IS IT YOUR TESTIMONY TO THIS JURY THAT

66   (Pages 1708 to 1711)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543771

## Page 1712

1 FOLLOWING THE VIGOR RESULTS THAT MERCK APPROACHED THE FDA AND
2 ASKED FOR AN EXPEDITED LABEL CHANGE? IS THAT RIGHT?
3 A. WE ASKED FOR A PRIORITY REVIEW OF THE NDA SUPPLEMENT,
4 WHICH WOULD HAVE RESULTED IN A LABEL CHANGE. A PRIORITY REVIEW
5 MEANS YOU ASKED FOR THAT REVIEW TO TAKE PLACE OVER SIX MONTHS
6 RATHER THAN TEN MONTHS.
7 Q. ARE YOU SUGGESTING OR TELLING THE JURY THAT THE PURPOSE
8 FOR MERCK ASKING FOR AN EXPEDITED REVIEW IS BECAUSE MERCK
9 WANTED TO ADD A CV OR HEART ATTACK RISK TO THE LABEL AS QUICKLY
10 AS POSSIBLE?
11 A. WE WANTED BOTH THE GI AND THE CARDIOVASCULAR DATA IN THE
12 LABEL. I THINK WHAT YOU HAVE TO REMEMBER IS WE DID NOT THINK
13 THAT VIOXX CAUSED HEART ATTACKS.
14 Q. LET ME MAKE SURE I'M CLEAR. YOU WANTED TO TAKE OUT THE GI
15 OR THE STOMACH WARNING THAT WAS IN THE VIOXX LABEL AT THE TIME,
16 RIGHT?
17 A. RIGHT. OUR INITIAL PROPOSAL WAS TO TAKE THAT OUT AND PUT
18 IT IN THE PRECAUTIONS SECTION.
19 Q. YOU ALSO WANTED TO ADD A WARNING, A HEART ATTACK RISK, TO
20 THE WARNINGS SECTION OF THE LABEL; IS THAT CORRECT?
21 A. NO, THAT'S NOT CORRECT. WE DIDN'T THINK THE DATA
22 JUSTIFIED A WARNING, BUT WE DID WANT TO ADD THE HEART ATTACK
23 DATA TO THE LABEL.
24 Q. YOU WANTED TO ADD IT TO THE PRECAUTIONS SECTION?
25 A. I THINK OUR INITIAL PROPOSAL WAS PUTTING IT IN THE

## Page 1713

1 CLINICAL STUDIES SECTION, AND THEN THERE WAS A CROSS REFERENCE
2 IN THE PRECAUTIONS SECTION AFTER THE FDA ADVISORY COMMITTEE,
3 AND WE PUT IT INTO THE PRECAUTIONS SECTION.
4 Q. EARLIER TODAY, DR. BRIGGS MORRISON TOLD US ABOUT THE
5 WARNING SECTION, AND HE ALSO TOLD US ABOUT A PRECAUTION SECTION
6 IN THE LABEL; IS THAT RIGHT?
7 A. I WASN'T HERE FOR HIS TESTIMONY.
8 Q. YOU UNDERSTAND THERE IS A DIFFERENCE BETWEEN A WARNING
9 SECTION IN THE LABEL AND THE PRECAUTIONS SECTION, RIGHT?
10 A. THAT IS CORRECT.
11 Q. THE WARNINGS SECTION PROVIDES A HIGHER LEVEL OF ALERT TO
12 DOCTORS ABOUT RISKS; IS THAT RIGHT?
13 A. WELL, I'M NOT A REGULATORY EXPERT, BUT MY UNDERSTANDING IS
14 THAT THE WARNINGS SECTION ARE FOR KNOWN SIDE EFFECTS; WHEREAS,
15 THE PRECAUTIONS SECTION IS FOR SAFETY INFORMATION THAT
16 PHYSICIANS SHOULD TAKE INTO ACCOUNT WHEN THEY ARE TREATING THE
17 PATIENT.
18     MR. BIRCHFIELD: YOUR HONOR, I NEED TO PUT UP THE
19 TIME LINE.
20 BY MR. BIRCHFIELD:
21 Q. DR. REICIN, IN MARCH OF 2000, THE VIGOR RESULTS WERE IN;
22 IS THAT RIGHT?
23 A. THE PRELIMINARY RESULTS.
24 Q. THERE WAS NO CHANGE TO THE VIOXX LABEL UNTIL APRIL OF
25 2002; IS THAT CORRECT?

## Page 1714

1 A. THAT IS CORRECT.
2 Q. SO THE INFORMATION THAT MERCK RECEIVED FROM THE VIGOR
3 STUDY THAT SHOWED A FIVE-FOLD INCREASE IN HEART ATTACKS -- IS
4 THAT CORRECT?
5 A. THOSE WERE THE RESULTS IN THE VIGOR STUDY, THAT'S CORRECT.
6 Q. THAT INFORMATION WAS NEVER ADDED TO THE LABEL UNTIL APRIL
7 2002, CORRECT?
8 A. THAT IS ALSO CORRECT, BUT WE DID SEND IT DOWN TO THE FDA
9 IMMEDIATELY, THEN ASKED FOR A LABEL CHANGE VERY SOON
10 THEREAFTER.
11 Q. RIGHT IN THE MIDDLE OF THAT TIME -- DO YOU KNOW WHEN
12 DICKY IRVIN DIED?
13 A. I'M NOT SURE. MAYBE YOU COULD -- I THINK IN 2001.
14 Q. MAY 15, 2001. SO FROM MARCH OF 2000, WHEN MERCK GOT THE
15 RESULTS, UNTIL APRIL 2002, THERE'S NO INFORMATION ABOUT AN
16 INCREASED RISK OF HEART ATTACKS IN THE VIOXX LABEL; IS THAT
17 CORRECT?
18 A. THAT IS CORRECT.
19 Q. IT IS YOUR TESTIMONY THAT THE REASON THAT INFORMATION IS
20 NOT IN THE LABEL IS BECAUSE THE FDA TIED YOUR HANDS?
21 A. I DON'T THINK THAT'S AN ACCURATE CHARACTERIZATION, BUT
22 WHAT I WOULD SAY IS THE FDA DID NOT ALLOW US TO CHANGE -- WE
23 HAD SENT THEM DOWN THE LABEL. WE ASKED THEM FOR A PRIORITY
24 REVIEW. THEY DID A STANDARD REVIEW. THEY THEN ASKED FOR AN
25 ADVISORY COMMITTEE. THEY THEN ASKED US FOR MORE DATA. WE

## Page 1715

1 DIDN'T GET THEIR RECOMMENDATIONS, THEIR FIRST RECOMMENDATIONS
2 FOR LABEL CHANGE UNTIL THE FALL OF 2001, AFTER THE DEATH.
3 Q. SO THE REASON FOR THIS DELAY IS BECAUSE THE FDA WAS ASKING
4 YOU FOR ADDITIONAL SAFETY DATA, CORRECT?
5 A. THERE WAS AN ONGOING REVIEW. THEY WOULD ASK US QUESTIONS.
6 AND AFTER THE ADVISORY COMMITTEE WE GOT WHAT'S CALLED AN
7 "APPROVABLE LETTER," WHICH MEANS, "WE THINK YOU WILL BE ABLE TO
8 ADD THIS INFORMATION, BUT WE WANT YOU TO GO BACK. YOU'VE
9 GOTTEN A YEAR'S MORE DATA ON ALZHEIMER'S. CAN YOU PLEASE
10 PROVIDE THAT INFORMATION TO IT? YOU'VE GOTTEN SOME MORE DATA
11 FROM YOUR PHASE IIB/III OA STUDIES. CAN YOU PROVIDE THAT
12 INFORMATION TO US?"
13 Q. IN ADDITION TO SUBMITTING THE VIGOR RESULTS, MERCK ALSO
14 SUBMITTED THE RESULTS FOR THE ADVANTAGE STUDY; IS THAT CORRECT?
15 A. THAT'S CORRECT. AT THE TIME IN MARCH OF 2000, WE
16 SUBMITTED INTERIM KIND OF PARTIALLY UNBLINDED DATA, TREATMENT A
17 VERSUS TREATMENT B, BECAUSE THAT STUDY WASN'T YET COMPLETED.
18 Q. THE ADVANTAGE STUDY WAS A STUDY THAT USED 25 MILLIGRAMS OF
19 VIOXX; IS THAT RIGHT?
20 A. CORRECT.
21 Q. THE SAME THAT DICKY WAS TAKING?
22 A. I DON'T KNOW, BUT I WILL TRUST YOU ON THAT.
23 Q. DID IT INCLUDE A PLACEBO?
24 A. NO, IT WAS ALSO VERSUS NAPROXEN.
25 Q. NOW, IT WAS A SEEDING STUDY. WASN'T IT?

67  (Pages 1712 to 1715)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543772

Page 1716

1  A.  I WOULDN'T CHARACTERIZE IT LIKE THAT, NO.
2  Q.  YOU WOULD NOT CALL THE ADVANTAGE STUDY AS A SEEDING STUDY?
3  A.  NO. NOT AS I UNDERSTAND A SEEDING STUDY.  IT WAS A
4  HYPOTHESIS-DRIVEN STUDY; IN OTHER WORDS, THERE WAS A SPECIFIC
5  SCIENTIFIC QUESTION THAT IT WAS ASSIGNED TO ADDRESS.
6  Q.  A SEEDING STUDY IS A STUDY THAT'S USED FOR MARKETING
7  PURPOSES, ISN'T IT?
8  A.  I THINK WHEN PEOPLE HAVE TALKED ABOUT A SEEDING STUDY,
9  THEY HAVE TALKED ABOUT IT IN THAT WAY, BUT -- IN OTHER WORDS, A
10  STUDY THAT DOESN'T REALLY HAVE A SCIENTIFIC BASIS TO IT.  THIS
11  ONE DID.
12  Q.  A STUDY THAT IS USED TO INVOLVE A LARGE NUMBER OF DOCTORS
13  SO YOU CAN GET THEM TO START PRESCRIBING VIOXX.  WOULD YOU CALL
14  THAT A SEEDING STUDY?
15  A.  I THINK I HAVE HEARD PEOPLE CHARACTERIZE IT LIKE THAT.
16  Q.  YOU SAY THE ADVANTAGE STUFF WAS NOT A SEEDING STUDY?
17  A.  A SEEDING STUDY DOESN'T HAVE A SCIENTIFIC BASIS OR
18  HYPOTHESIS AND THIS ONE DID.  ALL OF OUR STUDIES DO.
19  Q.  THE ADVANTAGE STUDY WAS NOT USED FOR MARKETING PURPOSES;
20  IS THAT YOUR TESTIMONY?
21  A.  IT CERTAINLY DIDN'T GO INTO OUR LABEL FOR PROMOTION.  I
22  KNOW THAT THERE ARE SOME PEOPLE WHO THOUGHT -- SOME PEOPLE IN
23  THE COMPANY MAY HAVE CHARACTERIZED IT IN THAT WAY, BUT I DON'T
24  THINK THAT WAS AN APPROPRIATE CHARACTERIZATION OF THE STUDY.
25  Q.  AFTER YOU SUBMITTED THE VIGOR STUDY TO THE FDA, IT'S

Page 1717

1  ASSIGNED TO A MEDICAL REVIEW OFFICER; IS THAT CORRECT?
2  A.  THAT'S CORRECT.
3  Q.  DO YOU KNOW THE NAME OF THE MEDICAL REVIEW OFFICER THAT
4  WAS RESPONSIBLE FOR REVIEWING THE VIGOR DATA?
5  A.  I DON'T KNOW IF SHE WAS THE ONLY ONE, BUT MARIA VILLALBA
6  MAY HAVE BEEN ONE OF THEM.
7  Q.  WHAT ABOUT DR. SHARI TARGUM?
8  A.  SHE WAS A CARDIOVASCULAR SPECIALIST FROM ANOTHER DIVISION
9  THAT WAS ALSO ASKED TO REVIEW IT.
10  Q.  AFTER SHE REVIEWED THE VIGOR DATA, DIDN'T SHE TELL MERCK
11  THAT IT WOULD BE HARD TO IMAGINE INCLUDING THE VIGOR DATA IN
12  THE LABEL AND NOT PUTTING A HEART ATTACK RISK IN THE WARNINGS
13  SECTION OF THE LABEL?
14  A.  THAT MAY HAVE BEEN HER FEELING AT THE TIME.  I DON'T
15  RECALL.  WHEN THE BACKGROUND PACKAGES FROM REVIEWERS ARE
16  POSTED, THERE IS ALSO SOMETHING SAYING THESE DON'T REPRESENT
17  NECESSARILY THE VIEWS OF THE FDA.  ULTIMATELY, THAT WAS NOT THE
18  VIEW OF THE FDA, BUT WHEN SHE REVIEWED IT THAT MAY HAVE BEEN
19  HER PERSONAL VIEW.
20  Q.  THE MEDICAL OFFICER WITH THE FDA IS THE ONE SITTING DOWN
21  WITH THE DATA THAT IS RESPONSIBLE FOR GOING THROUGH THAT FILE
22  DETAIL BY DETAIL, CORRECT?
23  A.  AS I SAID, MY UNDERSTANDING WAS THAT MARIA VILLALBA WAS
24  THE MAIN MEDICAL OFFICER.  SHARI TARGUM WAS IN THE
25  CARDIOVASCULAR DIVISION AND WAS ASKED TO REVIEW THE

Page 1718

1  CARDIOVASCULAR RESULTS.
2  Q.  DR. TARGUM REVIEWED THE VIGOR DATE FOR CARDIOVASCULAR
3  RISK; IS THAT CORRECT?
4  A.  THAT'S RIGHT.
5  Q.  SHE WENT THROUGH THE ACTUAL FILES MERCK SUBMITTED ON THE
6  VIGOR DATA?
7  A.  THAT IS CORRECT.  THAT DOESN'T MEAN SHE WAS THE ONLY ONE
8  AT THE FDA TO DO THAT.
9  Q.  SHE CONCLUDED AFTER THAT REVIEW IT WOULD BE HARD TO
10  IMAGINE INCLUDING THE VIGOR STUDY IN THE LABEL WITHOUT A HEART
11  ATTACK RISK IN THE WARNINGS SECTION, CORRECT?
12  A.  I DON'T RECALL IF THAT WAS HER CONCLUSION.  IF YOU SHOWED
13  IT TO ME, I'D BE HAPPY TO LOOK AT IT.
14  Q.  WILL YOU PUT UP PLAINTIFF'S EXHIBIT P-1.0235?  IT'S
15  ALREADY ADMITTED INTO EVIDENCE.  DO YOU SEE IN THE UPPER
16  RIGHT-HAND CORNER DR. SHARI TARGUM?  DO YOU RECOGNIZE THAT?
17  A.  I DO.
18  Q.  DO YOU SEE THE DATE, FEBRUARY 1, 2001?
19  A.  THAT'S CORRECT.  IT WAS RIGHT BEFORE THE FDA ADVISORY
20  COMMITTEE MEETING.
21  Q.  SEVERAL MONTHS BEFORE DICKY IS PRESCRIBED VIOXX?
22  A.  I DON'T REMEMBER THE DATE.  I CAN'T SEE THAT, WHEN HE WAS
23  PRESCRIBED.
24  Q.  IF YOU LOOK ON PAGE 36, DOWN AT THE BOTTOM. IT SAYS,
25  NUMBER 5, "SUGGEST LABELING THAT WOULD PROPERLY ADDRESS CV

Page 1719

1  RISKS."  DO YOU SEE THAT?
2  A.  I DO.
3  Q.  THE LAST SENTENCE SAYS, "IT WOULD BE DIFFICULT TO IMAGINE
4  INCLUSION OF VIGOR RESULTS IN THE ROFECOXIB" -- THAT'S VIOXX
5  CORRECT?
6  A.  THAT'S CORRECT.
7  Q.  -- "LABELING WITHOUT MENTIONING CARDIOVASCULAR SAFETY
8  RESULTS IN THE STUDY DESCRIPTION, AS WELL AS THE WARNINGS
9  SECTION."  IS THAT CORRECT?
10  A.  THAT IS CORRECT.  YOU CAN ALSO SEE RIGHT ABOVE THAT IT
11  SAYS, "IT IS DIFFICULT TO WRITE LABELING AT THIS POINT."
12  Q.  THAT'S RIGHT, BECAUSE THE FDA HAD BEEN ATTEMPTING TO GET
13  ADDITIONAL SAFETY DATA FROM MERCK AT THAT STAGE, CORRECT?
14  A.  NOT IN THE WAY YOU ARE CHARACTERIZING IT.  CERTAINLY,
15  THERE WAS AN ONGOING REVIEW QUESTIONS BEING SENT TO US, MORE
16  ANALYSES BEING REQUESTED.  I KNOW THEY WERE INTERESTED IN
17  SEEING THE FINAL STUDY REPORT FOR THE ADVANTAGE STUDY.  ALL OF
18  THAT WAS BEING DONE DURING THAT PERIOD OF TIME.
19  Q.  RIGHT, SO AFTER MERCK SUBMITTED THEIR LABEL AND ASKED FOR
20  AN EXPEDITED REVIEW IN JUNE OF 2000 FOLLOWING THE VIGOR
21  RESULTS?
22  A.  THAT'S CORRECT.
23  Q.  THEN THE FDA REQUESTED ADDITIONAL SAFETY DATA, RIGHT?
24  A.  IT'S NOT UNUSUAL, WHEN YOU SEND IN RESULTS, TO GET A WHOLE
25  SERIES OF QUESTIONS FROM FDA, NOTHING OUT OF THE NORMAL.

68  (Pages 1716 to 1719)

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005437773

## Page 1720

1 THAT'S CORRECT.

2 Q. SO THE FDA REQUESTED ADDITIONAL SAFETY DATA, YES?

3 A. CORRECT.

4 Q. MERCK WOULD RESPOND, "WE ARE STILL WORKING ON IT. WE ARE

5 STILL PREPARING DATA"?

6 A. FOR SOME ANALYSES WE COULD SEND THEM RIGHT AWAY, AND FOR

7 OTHERS THAT WEREN'T READY WE WOULD WORK WITH THEM TO DETERMINE

8 A DATE WHEN WE COULD SEND IT.

9 Q. SO YOU WOULD WRITE BACK SAYING, "WE ARE STILL PREPARING

10 IT." THE FDA WOULD WAIT A MONTH OR SO AND SAY, "WE STILL NEED

11 ADDITIONAL SAFETY DATA." MERCK WOULD WAIT A MONTH OR SO AND

12 SAY, "WE ARE STILL WORKING ON IT." THAT'S WHY WE HAVE THIS

13 DELAY?

14 A. NO. I THINK THAT IS A MISCHARACTERIZATION. THAT IS NOT

15 WHY WE HAVE THE DELAY.

16 Q. NOW, ADDING A CV RISK OR A HEART ATTACK RISK TO THE

17 WARNINGS SECTION OF THE LABEL, THAT'S A BIG DEAL FOR MERCK.

18 ISN'T IT?

19 A. CERTAINLY ANY MAJOR CHANGES TO OUR LABEL WOULD BE

20 IMPORTANT TO MERCK.

21 Q. WE HEARD DR. SCOLNICK TESTIFY YESTERDAY THAT ADDING A

22 HEART ATTACK RISK TO THE WARNINGS SECTION WOULD AFFECT SALES.

23 A. THAT MIGHT BE, BUT IT NEVER AFFECTED THE DECISIONS WE MADE

24 ON WHAT WAS RIGHT.

25 Q. MERCK DID A STUDY, ACTUALLY, TO DETERMINE HOW MUCH IT

## Page 1721

1 WOULD COST IN SALES IF YOU HAD TO ADD IT TO THE WARNINGS

2 SECTION, DIDN'T THEY?

3 MR. ISMAIL: OBJECTION.

4 THE WITNESS: I'M NOT FAMILIAR WITH THAT, NO.

5 BY MR. BIRCHFIELD:

6 Q. NO?

7 A. NO.

8 MR. ISMAIL: YOUR HONOR, MAY WE APPROACH?

9 THE COURT: SURE.

10 (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

11 THE BENCH.)

12 MR. ISMAIL: ARE YOU GOING TO SHOW IT NOW THAT SHE

13 SAYS SHE'S NOT FAMILIAR WITH IT?

14 MR. BIRCHFIELD: I'M NOT GOING TO SHOW IT UNTIL — I

15 MAY OFFER IT, BUT I'M NOT AT THIS STAGE. I WON'T PUT IT UP ON

16 THE SCREEN WITHOUT APPROACHING.

17 THE COURT: OKAY. YOU CAN GET TO A POINT WHENEVER

18 YOU CAN.

19 MR. BIRCHFIELD: YES, SIR.

20 THE COURT: I DON'T WANT TO INTERRUPT YOU IF YOU HAVE

21 SOMETHING GOING. LET'S GO UNTIL YOU TELL ME.

22 MR. BIRCHFIELD: OKAY.

23 (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

24 OPEN COURT.)

25

## Page 1722

1 BY MR. BIRCHFIELD:

2 Q. DR. REICIN, YOU DO UNDERSTAND THAT ADDING A HEART ATTACK

3 RISK TO THE WARNINGS SECTION WOULD HAVE A FINANCIAL IMPACT ON

4 MERCK, CORRECT?

5 A. IT CERTAINLY MIGHT HAVE, BUT THAT DIDN'T DETERMINE WHAT I

6 THOUGHT WAS RIGHT. I THOUGHT THAT NAPROXEN WAS

7 CARDIOPROTECTIVE IN THIS STUDY AND, THEREFORE, A WARNING WAS

8 NOT JUSTIFIED. IN THE END, THE FDA AGREED WITH THAT.

9 Q. MERCK KNEW THAT IT WOULD MAKE A BIG DIFFERENCE IN SALES TO

10 HAVE A HEART ATTACK RISK IN THE PRECAUTIONS SECTION VERSUS THE

11 WARNINGS SECTION, CORRECT?

12 A. AGAIN, I'M NOT FAMILIAR WITH ANY STUDIES OR ANYTHING ELSE

13 THAT WAS DONE IN THAT REGARD. IT MAY HAVE HAD AN IMPACT. IT

14 DIDN'T MATTER. WE WRITE OUR LABELING IN CLINICAL BASED ON WHAT

15 WE THINK IS RIGHT, NOT WHAT THE IMPACT IS GOING TO BE ON SALES.

16 Q. ARE YOU THE ONE THAT MAKES THE FINAL DECISION ON THE

17 LABELING AT MERCK?

18 A. THAT DECISION IS MADE BY A SENIOR MANAGEMENT GROUP, BUT I

19 CAN TELL YOU THAT IT IS DRIVEN BY CLINICAL AND BY REGULATORY.

20 MARKETING DOES NOT HAVE A CALL IN WHAT FINALLY GOES INTO A

21 LABEL.

22 Q. WHAT ABOUT ED SCOLNICK; DOES HE HAVE A CALL?

23 A. I DON'T BELIEVE THAT ED DID SIGN OFF ON THE FINAL LABEL

24 THAT WE SENT IN IN JUNE 2000, BUT HE MAY HAVE BEEN INVOLVED IN

25 SOME OF THE LABELING.

## Page 1723

1 Q. SO ED SCOLNICK DIDN'T HAVE ANY INVOLVEMENT IN THE

2 LABELING?

3 A. THAT'S NOT WHAT I SAID.

4 Q. HE IS THE BOSS AT MERCK RESEARCH LABS?

5 A. HE ABSOLUTELY IS, BUT THAT DOESN'T MEAN EVERY TIME WE

6 SUBMIT A LABEL IT GOES TO ED FOR REVIEW. BUT SOMETIMES HE IS

7 INVOLVED.

8 Q. IF HE WERE INVOLVED, HE WOULD CERTAINLY HAVE A POSITION OF

9 INFLUENCE ON THAT, WOULDN'T HE?

10 A. YES, HE WOULD.

11 Q. WHEN THE FDA MADE ITS DECISION IN APRIL OF 2002, THAT HAD

12 BEEN THE RESULT OF A FIGHT WITH MERCK; IS THAT CORRECT?

13 A. I DON'T THINK THAT'S HOW I WOULD CHARACTERIZE IT. THE

14 INITIAL LABEL THAT WE GOT TO THEM WE DIDN'T THINK WAS THE

15 APPROPRIATE LABEL, AND THEN WE SENT BACK OUR PROPOSAL TO THEM.

16 OVER THE ENSUING COUPLE OF MONTHS, WE DISCUSSED WHAT THE

17 APPROPRIATE LABEL WAS. I THINK THE LABEL THAT WE CAME OUT WITH

18 WAS THE APPROPRIATE ONE.

19 Q. SO, IN REGARDS TO THE HEART ATTACK RISK WITH THE LABELING,

20 WE HAVE DISCUSSED THAT. NOW, BUT WHAT ELSE COULD MERCK HAVE

21 DONE TO ALERT DOCTORS OF THE HEART ATTACK RISKS? WERE THERE

22 OTHER THINGS THAT COULD HAVE BEEN DONE?

23 A. WELL, CERTAINLY. WE PUT OUT A PRESS RELEASE RIGHT WHEN WE

24 GOT THE VIGOR RESULTS. WE PUBLISHED THE CARDIOVASCULAR DATA IN

25 THE NEW ENGLAND JOURNAL. WE PRESENTED IT AT SCIENTIFIC

69  (Pages 1720 to 1723)

DAILY COPY

ff147213-239a-4359-81c3-acc5412a5939

M005543774

## Page 1724

1  MEETINGS. THERE WAS A TREMENDOUS AMOUNT OF PRESS AND
2  DISCUSSION ABOUT THIS IN THE SCIENTIFIC LITERATURE AND IN THE
3  LAY LITERATURE AT THAT PERIOD OF TIME.
4  Q.  SO ONE OF THE THINGS THAT MERCK COULD DO IS A PRESS
5  RELEASE, RIGHT?
6  A.  THAT'S CORRECT.
7  Q.  IN FACT, MERCK DID ISSUE A PRESS RELEASE; IS THAT RIGHT?
8  A.  WE DID.
9  Q.  DID THE PRESS RELEASE ALERT DOCTORS THAT WE HAVE THIS
10 LARGE STUDY -- IN FACT, VIGOR WAS THE LARGEST CLINICAL TRIAL
11 THAT MERCK COMPLETED ON VIOXX; IS THAT RIGHT?
12 A.  AT THAT POINT IN TIME.
13 Q.  HAS THERE BEEN A LARGER ONE COMPLETED?
14 A.  WELL, I THINK YOU USED THE WORD "COMPLETED." THAT'S
15 PROBABLY TRUE. IT'S THE LARGEST.
16 Q.  SO YOU HAVE VIGOR, THE LARGEST CLINICAL TRIAL THAT'S
17 COMPLETED BY MERCK. IT SHOWS A FIVE-FOLD INCREASE IN HEART
18 ATTACKS, CORRECT?
19 A.  THE LARGE CLINICAL TRIAL ON VIOXX COMPLETED BY MERCK AND,
20 YES, THERE WAS A FIVE-FOLD DIFFERENCE IN HEART ATTACKS, BUT 20
21 TO 4. THE OVERALL RATES WERE QUITE LOW.
22 Q.  TO ALERT DOCTORS OF THE RESULTS OF THIS STUDY, DID YOU
23 ISSUE A PRESS RELEASE THAT SAID VIOXX HAS A FIVE-FOLD INCREASE
24 IN HEART ATTACKS?
25 A.  WHAT WE DID --

## Page 1725

1  Q.  CAN YOU ANSWER MY QUESTION WHETHER OR NOT MERCK ISSUED
2  SUCH A PRESS RELEASE?
3  A.  THE WORDING THAT YOU'RE USING WASN'T IN THE PRESS RELEASE,
4  BUT THE DATA WAS. FIRST OF ALL, WE DIDN'T HAVE -- I SHOULDN'T
5  SAY -- THE DATA WAS NOT, BECAUSE WE WERE WAITING TO PRESENT IT
6  IN SCIENTIFIC MEETING AND YOU'RE NOT ALLOWED TO PRESENT DATA
7  BEFORE YOU PRESENT AT A SCIENTIFIC MEETING. WHAT WE PUT IN THE
8  PRESS RELEASE IS THAT WE SAW A DIFFERENCE, THE RATE WAS LOWER
9  ON NAPROXEN THAN IT WAS ON VIOXX, AND WE ALSO PUT OUR
10 INTERPRETATION OF WHAT THAT DATA WAS.
11 Q.  IN YOUR PRESS RELEASE, YOU SAY THAT NAPROXEN IS
12 RESPONSIBLE FOR THE DIFFERENCE, RIGHT?
13 A.  THAT IS CORRECT, BECAUSE THAT'S WHAT WE THOUGHT, AND I
14 CONTINUE TO BELIEVE THAT.
15 Q.  YOU ISSUED THIS PRESS RELEASE WITHIN A MATTER OF DAYS
16 AFTER THE VIGOR RESULTS WERE IN; IS THAT CORRECT?
17 A.  IT WAS APPROXIMATELY TWO WEEKS AFTER WE GOT THE INITIAL
18 VIGOR RESULTS.
19 Q.  WAS THAT BEFORE OR AFTER YOU CONSULTED CARLO PATRONO, ONE
20 OF THE FOREMOST AUTHORITIES ON THIS ISSUE, ABOUT WHETHER OR NOT
21 NAPROXEN WAS AN EXPLANATION FOR THE VIGOR RESULTS?
22 A.  I CAN'T RECALL IF WE SPOKE TO CARLO DURING THAT TWO-WEEK
23 PERIOD OF TIME. WE SPOKE TO JOHN OATES DURING THAT PERIOD.
24 SOON AFTER THAT, IF IT WASN'T DURING THAT TWO-WEEK PERIOD, WE
25 DID SPEAK WITH CARLO. HIS INITIAL IMPRESSION WAS NAPROXEN WAS

## Page 1726

1  NOT CARDIOPROTECTIVE. HOWEVER, AFTER HE DID HIS OWN STUDIES,
2  HE CHANGED HIS MIND.
3  Q.  HE DID? ARE YOU SAYING NOW THAT NAPROXEN EXPLAINS THE
4  VIGOR RESULTS?
5  A.  AM I SAYING THAT?
6  Q.  YES.
7  A.  I DO BELIEVE THAT NAPROXEN EXPLAINS THE VIGOR RESULTS.
8  Q.  ONE OF THE THINGS THAT MERCK DID IS HAVE ONE OF ITS PAID
9  CONSULTANTS, DR. MARVIN KONSTAM, WRITE AN ARTICLE; IS THAT
10 CORRECT?
11 A.  DR. KONSTAM IS A CONSULTANT. HE WAS ONE OF THE
12 CONSULTANTS WE BROUGHT TO THE INITIAL CARDIOVASCULAR MEETING
13 THAT I TALKED ABOUT.
14 Q.  DID HE WRITE AN ARTICLE THAT SAID THAT NAPROXEN EXPLAINED
15 THE RESULTS OF THE VIGOR STUDY?
16 A.  THE ARTICLE THAT WE WROTE WITH DR. KONSTAM WAS ON THE
17 POOLED ANALYSIS THAT WE HAD DONE WHERE WE LOOKED AT ALL OF THE
18 DATA THAT WE HAD FROM ALL OUR CLINICAL TRIALS. THE OUTLIER IN
19 THAT ANALYSIS WAS THE DIFFERENCE BETWEEN VIOXX AND NAPROXEN.
20 WE DIDN'T SEE A DIFFERENCE BETWEEN VIOXX AND PLACEBO OR
21 NONNSAIDS.
22 Q.  IS THAT A "YES." DR. MARVIN KONSTAM DID WRITE AN ARTICLE,
23 AS A PAID CONSULTANT FOR MERCK. THAT SAID THAT NAPROXEN
24 EXPLAINED THE RESULTS OF VIGOR?
25 A.  I KNOW THAT'S WHAT HE BELIEVED. I CAN'T REMEMBER IF THAT

## Page 1727

1  WAS THE EXACT WORDING IN HIS PAPER. YOU WOULD HAVE TO SHOW ME
2  THE PAPER YOU'RE REFERRING TO.
3  Q.  ARE YOU AWARE NOW THAT DR. MARVIN KONSTAM HAS RECANTED
4  THAT POSITION BEFORE THE FDA ADVISORY COMMITTEE?
5  A.  I WAS THERE AND I'M AWARE OF WHAT HE SAID. I SPOKE TO HIM
6  AFTERWARDS, AND HE EXPLAINED IT TO ME IN A LITTLE BIT MORE
7  DETAIL.
8  Q.  YOU'RE TELLING US THAT A CONSULTANT CARDIOLOGIST TESTIFIED
9  BEFORE THE FDA THAT HE NO LONGER HOLDS THAT POSITION, THAT HE
10 NO LONGER BELIEVES THAT NAPROXEN EXPLAINS THE VIGOR RESULTS, HE
11 GETS OFF THE STAND AND THEN TELLS YOU SOMETHING DIFFERENT?
12 A.  I DON'T THINK THAT WAS THE WORDING THAT HE USED AT THE
13 FDA, IF YOU WOULD LIKE TO POINT IT OUT. I THINK WHAT HE SAID
14 THERE WAS THAT HE WASN'T OR HE DIDN'T THINK THAT NAPROXEN WAS
15 CARDIOPROTECTIVE. WHAT HE SAID TO ME WAS, GIVEN THE RESULTS
16 THAT WE HAD NOW POST APPROVE, HE COULDN'T BE SURE IF NAPROXEN
17 WOULD ACTUALLY BE LOWER THAN VIOXX -- LOWER THAN PLACEBO OR IF
18 NAPROXEN, DUE TO ITS ANTIPLATELET EFFECTS, WOULD JUST BE LOWER
19 THAN THE OTHER NSAIDS AND TAKE IT DOWN TO WHAT A PLACEBO WOULD
20 BE. IN OTHER WORDS, HE STILL BELIEVED THAT WE SAW A DIFFERENCE
21 BETWEEN NAPROXEN IN VIGOR BECAUSE NAPROXEN HAS CARDIOPROTECTIVE
22 EFFECTS.
23 Q.  THE POINT IS THAT, IN ORDER FOR NAPROXEN TO EXPLAIN THE
24 VIGOR RESULTS, IT WOULD HAVE TO BE THREE TIMES OR GREATER
25 CARDIOPROTECTIVE THAN ASPIRIN, CORRECT?

70  (Pages 1724 to 1727)

ff147213-239a-4359-81c3-ecc5412a5939

M005543775

Page 1728

1  A.  NO, THAT'S NOT ACCURATE.
2        MR. BIRCHFIELD:  YOUR HONOR, IT'S 5:30.  I THINK THAT
3  IS GOOD BREAKING POINT.
4        THE COURT:  WE WILL STOP HERE.  WE WILL RESUME AT
5  8:30 TOMORROW.  COURT WILL STAND IN RECESS UNTIL 8:30 TOMORROW.
6  YOU CAN BRING THEM OUT, MARSHAL.
7        (WHEREUPON, THE JURY WAS EXCUSED FOR THE EVENING.)
8        THE COURT:  LET ME SEE THE LAWYERS FOR LOGISTIC
9  REASONS, PLEASE.
10        (WHEREUPON, THE COURT WAS IN RECESS FOR THE EVENING.)
11              * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DAILY COPY

ff147213-239a-4359-81c3-ecc5412a5939

M005543776