# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 2:05-CV-04379 | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| ROBERT G. SMITH, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF RENEWED MOTION OF MERCK & CO., INC. ("MERCK") FOR JUDGMENT AS A MATTER OF LAW

Now that both sides have rested, the Court should enter judgment in favor of Merck.  But even if the Court disagrees, this is an excellent time to eliminate extraneous claims such as fraud and warranty that are not supported by Kentucky law or the evidence, and are not the theories upon which plaintiff has tried his case.  At a minimum, the Court should enter judgment on these claims.  Keeping them in the case only invites juror confusion and potential error with respect to the jury charge and jury interrogatories.  These claims are discussed below at pages 4 to 10.

Merck realizes that the Court's inclination is that the balance of the claims present factual issues that should be resolved by the jury.  This is, however, the first case to be tried in any

jurisdiction where both the prescribing decision and the alleged injury took place after FDA approval in 2002 of Merck's "post-VIGOR" label.  It therefore presents unique issues that warrant serious consideration of this motion.  Winning a post-VIGOR label case would be a formidable challenge for any plaintiff because that label fully and accurately disclosed the results of the VIGOR study in language approved by the FDA.  Thus, the potential risk of heart attack was disclosed.  Mr. Smith faces not only that challenge, but insurmountable additional obstacles: his prescribing physician, Dr. Grefer, was fully advised of the VIGOR study results and the debate surrounding it; Dr. Grefer continues to prescribe medicines with "black-box" cardiovascular warnings to patients who present with the same profile as Mr. Smith; and Mr. Smith's specific causation expert, Dr. Sander, testified that there is no medical basis upon which to conclude that Vioxx® caused Mr. Smith's heart attack.  (Sept. 18, 2006 Tr. at 1672:10-19.) Moreover, Mr. Smith had preexisting atherosclerosis, numerous risk factors, and a clear trigger (other than Vioxx) for his heart attack: shoveling snow.  Under the unique facts of this case, the Court should grant judgment as a matter of law, for the following reasons:

- *No Fraud Claim Under Kentucky Law.*  Plaintiff has not even attempted to try this as a fraud case, and for good reason.  Kentucky is one of many states that has adopted comment k to the Restatement (Second) of Torts, meaning that his only cognizable claim is for failure to warn.  In any event, plaintiff has not proved by clear and convincing evidence any of the traditional elements of fraud.

- *No Warranty Claims Under Kentucky Law.*  Kentucky law requires privity where liability is premised on express or implied warranty.  Because Mr. Smith did not purchase Vioxx directly from Merck, he has no such claims.  The Court should enter judgment on the implied warranty claims for the additional reason that they are not available under Kentucky law in a case involving an "unavoidably unsafe" product such as a prescription drug.

- *Insufficient Evidence That Merck Failed To Warn.*  As discussed below, the jury has no legally sufficient basis to find for plaintiff on his failure to warn claims (whether denominated as strict liability, negligence, gross negligence, or fraud claims):

  - *No Undisclosed Risk Of Heart Attack.*  Merck *did* warn of a potential risk of heart attack by including the VIGOR results in the label, publishing the

831226v.1

VIGOR article in the *New England Journal of Medicine*, and providing information about VIGOR to Dr. Grefer.  It also warned in the label of the potential risk of high blood pressure.

- *The Warning Was Adequate*.  Merck promptly provided the VIGOR results to the FDA and the medical community.  Upon approval by the FDA, Merck added the VIGOR information to the Vioxx label.  Dr. Grefer "got it."  He fully understood the VIGOR results (with all of their limitations), their implications, and the accompanying scientific debate.

- *No Proximate Or "But For" Causation*.  In order for plaintiff to prevail, he would have had to prove that Merck's alleged failure to warn was a proximate, or "but for," cause of his heart attack.  He did not do so.  Dr. Grefer knew about possible CV risks from VIGOR.  A stronger warning would not have made any difference.  Dr. Grefer continued to prescribe Celebrex and other NSAIDS – even after they had "black-box" CV warnings – to patients with Mr. Smith's profile.

- *Insufficient Evidence Of Medical Causation*.  As a predicate to prevailing on any of his causes of action, Mr. Smith also would have had to prove that his short-term use of Vioxx caused his heart attack.  That would require scientifically reliable evidence of general and specific causation.  Mr. Smith has neither.  In fact, the record reveals there is:

  - *Insufficient General Causation Evidence*.  Plaintiff's experts relied on a constellation of studies to opine that Vioxx can cause heart attacks.  The studies lack statistical significance or involve use of Vioxx at higher doses and/or longer durations than was the case with Mr. Smith.  They are insufficient – taken alone or *in toto* – to satisfy the requirement that causation be proved with sound scientific evidence.  Moreover, plaintiff did not prove his claimed mechanism of injury:  that Vioxx causes a prostacyclin/thromboxane "imbalance" in the vasculature.

  - *Insufficient Specific Causation Evidence*.  Plaintiff failed to prove specific causation by a preponderance of the evidence.  Dr. Sander testified that there is no medical basis to say whether Vioxx caused Mr. Smith's heart attack.  He instead based his specific causation opinion on a statistical concept he did not understand: "attributable risk exposed" or "ARE."  Plaintiff's biostatistics expert, Dr. Moye, explained, however, that Dr. Sander's use of ARE was mistaken.  It *cannot* be used to conclude that any particular person – including Mr. Smith – suffered a heart attack as a result of Vioxx exposure.  In addition, Dr. Sander was required to eliminate plausible alternative causes for Mr. Smith's heart attack, but failed to do so.  Mr. Smith had vascular disease well before he ever took Vioxx, as well as a host of other recognized risk factors for heart attack.  Moreover, he had an obvious trigger: shoveling snow.  Plaintiff failed to rule out the possibility – indeed the overwhelming probability – that his heart attack was caused by these other factors and not Vioxx.

831226v.1

- *Plaintiff's Claims Are Preempted.*  Plaintiff's case challenges the FDA's approval of Vioxx and the content of the post-VIGOR label approved by the FDA.  His claims are thus preempted by federal law.

In sum, because plaintiff has failed to introduce evidence raising a triable issue on any of his claims, the Court should enter judgment in favor of Merck.  In the alternative, Merck requests that the Court enter judgment on those claims plaintiff has failed to prove, including his express and implied warranty claims and his fraud claim.

## I.      THE LEGAL STANDARD.

A motion for judgment as a matter of law should be granted if, "after a party has been fully heard by the jury on an issue, 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue.'"  *Aetna Cas. & Sur. Co. v. Pendleton Detectives of Miss., Inc.*, 182 F.3d 376, 377-78 (5th Cir. 1999) (quoting FED. R. CIV. P. 50).  "[A] party has been fully heard when he rests his case."  *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 610 (5th Cir. 2004).  At that time, the court "may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated."  FED. R. CIV. P. 50(a)(1).   "A mere scintilla of evidence is insufficient to present a question for the jury."  *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999).  Instead, "[t]here must be a conflict in substantial evidence to create a jury question."  *Id.*

## II.     MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S COMMON LAW FRAUD CLAIM.

Plaintiff recognizes that this is a failure to warn case, not a fraud case, and has tried his case accordingly.  For example, during voir dire, plaintiff's counsel repeatedly stated that the plaintiff has the burden of proving his case by a "preponderance of the evidence."  (Sept. 11, 2006 Tr. at 46:18-20, 47:5-9, 47:20-21, 49:5-6, 50:1-3.)  He even sought to have jurors excused

4

for cause who indicated an initial predilection to hold plaintiff to a higher burden.  (Sept. 11, 2006 Tr. at 92:24-93:12, 93:15-18, 94:4-6.)  While the preponderance of the evidence standard applies to failure to warn claims, fraud must be proved by *clear and convincing* evidence.  *See Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. Ct. App. 1978).  Also, as discussed below, the fraud claim is not supported by substantive Kentucky law or the evidence. For these reasons, the Court should enter judgment as a matter of law on plaintiff's fraud claim.

Kentucky is a "learned intermediary" state, meaning a prescription drug manufacturer's duty to warn runs only to the prescribing physician.  *Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 761 (Ky. 2004).  Although the Kentucky Supreme Court has not yet addressed the issue, courts applying the learned intermediary rule in other jurisdictions have rejected consumer fraud claims against drug manufacturers as an improper end-run around the learned intermediary doctrine.  As one court put it, "the only valid claim in a prescription drug suit is th[at] defendants failed to adequately warn the plaintiff's prescribing physician about the drug, which caused the plaintiff's injuries."  *Hackett v. G.D. Searle & Co.*, No. A-01-CA-399-SS, 2002 U.S. Dist. LEXIS 16246, at *7 (W.D. Tex. June 25, 2002) (in a personal injury suit involving Celebrex, granting summary judgment on claims of breach of express and implied warranties, intentional and negligent misrepresentation and fraud, and intentional infliction of emotional distress on this ground).

*Burton v. American Home Products Corp. (In re Norplant Contraceptive Products Liability Litigation)*, 955 F. Supp. 700, 710 (E.D. Tex. 1997), illustrates this point.  In that case, plaintiffs brought suit against the makers of Norplant under theories of strict liability, negligence, misrepresentation, breach of implied warranty of merchantability, and alleged violations of the Texas Deceptive Trade Practices Act ("DTPA").  *Id.* at 702-03.  The court explained:

> The gravamen of all of Plaintiffs' causes of action, including misrepresentation
> and violations of the DTPA, is that Wyeth failed to adequately warn of or disclose

the severity of Norplant's side effects.   Therefore, the learned intermediary doctrine applies to all of Plaintiffs' causes of action. . . . [W]hether the failure to warn is couched as an affirmative misrepresentation or a misrepresentation by concealment, the allegation collapses into a charge that the drug manufacturer failed to warn.

*Id.* at 709.   The court reasoned, in part, that "[i]f the [learned intermediary] doctrine could be avoided by casting what is essentially a failure to warn claim under a different cause of action, then the doctrine would be rendered meaningless." *Id*; *see also, e.g., Talley v. Danek Med., Inc.*, 179 F.3d 154, 162-63 (4th Cir. 1999); *Catlett v. Wyeth, Inc.*, 379 F. Supp. 2d 1374, 1381 (M.D. Ga. 2004); *Alexander v. Danek Med., Inc.*, 37 F. Supp. 2d 1346, 1350 (M.D. Fla. 1999).

So, too, in this case.   To allow plaintiff to avoid application of the doctrine by recasting his failure to warn claim under alternate theories such as fraud would defeat the important purposes of the doctrine as articulated by the Kentucky Supreme Court:

> Three basic rationales have been articulated to support the [learned intermediary] rule.   The first and best rationale is that the prescribing physician is in a superior position to impart the warning and can provide an independent medical decision as to whether use of the drug is appropriate for treatment of a particular patient. . . .   The second rationale for the rule is that manufacturers lack effective means to communicate directly with each patient. . . . The third rationale for the rule is that imposing a duty to warn upon the manufacturer would unduly interfere with the physician-patient relationship.

*Larkin*, 153 S.W.3d at 763-65.   *See also Wyeth-Ayerst Labs. Co. v. Medrano*, 28 S.W.3d 87, 94 (Tex. App. 2000–no pet.) (applying the learned intermediary doctrine to "all of [plaintiff's] causes of action" against the manufacturer of Norplant); *Talley*, 179 F.3d at 162-63 (fraud claims barred because the learned intermediary doctrine applied);   *Catlett*, 379 F. Supp. 2d at 1381 (learned intermediary doctrine encompasses any fraud, fraudulent concealment or misrepresentation claim related to prescription drugs);   *Alexander*, 37 F. Supp. 2d at 1350 (approving of defendant's argument that failure to warn claims brought under the theories of

negligence, strict liability and fraud fail because of the application of the learned intermediary doctrine).

Even if Kentucky were to cast aside the learned intermediary rule in order to allow a fraud claim by a consumer against a pharmaceutical company for failure to warn, plaintiff could not prevail for other reasons.  To win a fraud case under Kentucky law, plaintiff "must establish six elements of fraud by clear and convincing evidence as follows: a) material misrepresentation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury."  *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  Mr. Smith has not introduced sufficient evidence to establish any of these elements, but the Court need focus only on two: whether Merck made a material misrepresentation upon which Mr. Smith relied.

The only communication from Merck to Mr. Smith was the package insert.  He did not rely on the package insert; he testified that he does not recall reading it.  (Sept. 20, 2006 Tr. at 2139:9-17.)  More important, he testified that he based his decision to take the drug solely on his doctor's recommendation.  (Sept. 20, 2006 Tr. at 2079:2-9, 2105:25-2106:8 ("If my doctor prescribes it, I take it.").)  Because Mr. Smith did not rely on the only communication he received from Merck, he has no fraud claim.  *See Clark v. Danek Med., Inc.*, 64 F. Supp. 2d 652, 655 (W.D. Ky. 1999).

Nor can Mr. Smith base his fraud claim on alleged misrepresentations or non-disclosures to others upon which he did not rely.  *Clark*, 64 F. Supp. 2d. at 656-57; *Wilson v. Henry*, 340 S.W.2d 449, 451 (Ky. Ct. App. 1960) ("The very essence of actionable fraud or deceit is the belief in and reliance upon the statements of the party who seeks to perpetuate the fraud.").  In *Clark*, the plaintiff claimed that a medical device manufacturer misrepresented facts to the FDA,

7

that as a result the FDA approved the device his doctor surgically implanted in him, and he was injured.  In dismissing the plaintiff's fraud claims under Kentucky common law, the district court noted that the plaintiff was not aware of the alleged misrepresentations and therefore never believed or relied upon them.  *Clark*, 64 F. Supp. 2d at 656-57.  Therefore, Mr. Smith cannot base his fraud claim on any alleged misrepresentations or nondisclosures by Merck to the FDA,[1] to the general public, or by Merck sales representatives to Dr. Grefer.

Because there is no evidence that Mr. Smith knew of, much less relied upon, any of the alleged misstatements of Merck – whether they might be press releases, articles, statements of sales representatives, or anything else – they cannot form the basis of common law fraud or misrepresentation claims under Kentucky law.  Accordingly, the Court should enter judgment on behalf of Merck on Mr. Smith's common law fraud claim.

## III.   THE COURT ALSO SHOULD ENTER JUDGMENT ON PLAINTIFF'S WARRANTY CLAIMS.

Because warranty also is not a theory upon which plaintiff has tried his case, and the warranty claims also are not supported by Kentucky law or the evidence, the Court should enter judgment on plaintiff's express and implied warranty claims as well.

Kentucky is a learned intermediary state, as explained above, so the manufacturer's duty runs to the prescribing physician, not the plaintiff.  Just as Kentucky would not allow plaintiff to avoid application of the learned intermediary doctrine through a fraud claim, it also would reject plaintiff's warranty claims.  *See Larkin*, 153 S.W.3d at 763-65; *In re Norplant*, 955 F. Supp. at 710.

---

[1] The United States Supreme Court subsequently held such claims are preempted by federal law. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).  Any fraud claim based on alleged misrepresentations and nondisclosures by Merck to the FDA are similarly preempted.

831226v.1

The Court need not reach that issue, however, because plaintiff's express and implied warranty claims must be dismissed under Kentucky law for the separate reason that plaintiff was required to establish he was in privity with Merck – *i.e.* that he obtained Vioxx directly from Merck, and not through an intermediary such as a doctor or pharmacy.  *See Snawder v. Cohen,* 749 F. Supp. 1473, 1481 (W.D. Ky. 1990) ("Kentucky still requires privity where liability is predicated, not on ordinary negligence or strict liability, but on warranty."); *Munn v. Pfizer Hosp. Prods. Group, Inc.*, 750 F. Supp. 244, 247-48 (W.D. Ky. 1990) (patient's breach of warranty claim barred because no privity between patient who had nail implanted in his femur by physician and manufacturer of nail); *Hardy v. Royce Labs., Inc.*, No. Civ.A. 3:97-CV-740H, 2000 WL 33960115, at *4 (W.D. Ky. Jan. 3, 2000) (granting summary judgment in a prescription drug case on plaintiff's warranty claims due to lack of vertical privity) (citing *Williams v. Fulmer*, 695 S.W.2d 411 (Ky. 1985) (breach of warranty claims require vertical privity under Kentucky law)); *see also* KY. REV. STAT. § 355.2-318.   Mr. Smith, however, received Vioxx from his prescribing physician Dr. Grefer and Walmart, not from Merck.  (Sept. 20, 2006 Tr. at 2125:1-7.)  Therefore, the Court should enter judgment as a matter of law in favor of Merck on plaintiff's express and implied warranty claims.

The Court also should enter judgment in Merck's favor on Mr. Smith's implied warranty claim for the additional reason that implied warranty claims are not available in products liability actions involving unavoidably unsafe products, because such products by definition cannot carry an implied warranty of fitness.  *See McMichael v. Am. Red Cross*, 532 S.W.2d 7, 9 (Ky. Ct. App. 1970).  Kentucky law recognizes that prescription drugs fall into the category of "unavoidably unsafe products."  *Larkin*, 153 S.W.3d at 761.  Thus, Merck cannot be subject to liability for plaintiff's breach of implied warranty.

9

## IV.   MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S FAILURE TO WARN CLAIMS.

### A.   Plaintiff Cannot Prevail On His Strict Liability Or Negligence Claims.

Although plaintiff brought claims for failure to warn under both strict liability and negligence theories, courts applying Kentucky law have recognized that in prescription drug cases the test used to evaluate warning issues is the same under either theory. *See Snawder*, 749 F. Supp. at 1476 ("theories of negligence and strict liability in failure to warn cases have been deemed to be 'functional equivalents'"). This is the rule in many jurisdictions that, like Kentucky, have adopted the Restatement (Second) of Torts § 402A, comment k. *See Larkin*, 153 S.W.3d at 761 (acknowledging that comment k applies to claims regarding prescription drugs); *see also Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 858 (4th Cir. 1980) ("[t]he standard for liability under strict liability and negligence is essentially the same: was the warning adequate?"); *Klem v. E.I. DuPont De Nemours & Co.*, 19 F.3d 997, 1003 (5th Cir. 1994); *Chambers v. G.D. Searle & Co.*, 441 F. Supp. 377, 381 (D. Md. 1975); *Basko v. Sterling Drug. Inc.*, 416 F.2d 417, 426 (9th Cir. 1969); *Feldman v. Lederle*, 479 A.2d 374 (N.J. 1984); *Smith v. E.R. Squibb & Son, Inc.*, 273 N.W.2d 476 (Mich. 1979); *Ortho Pharm. Corp. v. Champman*, 388 N.E.2d 541 (Ind. App. 1979).

Under comment k, a manufacturer of an "unavoidably unsafe" product will not be held liable if it has provided adequate warnings of potential risks that are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution. *See* RESTATEMENT (SECOND) OF TORTS § 402A, cmt. j (1965); *Carlin v. Super. Ct. (Upjohn Co.)*, 13 Cal. 4th 1104, 1112 (1996); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230-31 (4th Cir. 1984). Because comment k imports a knowledge requirement in determining liability for such products, the analysis under strict liability and negligence becomes

10

identical.  *See Werner v. Upjohn Co.*, 628 F.2d 848, 858 (4th Cir. 1980) (when comment k applies, "[t]he standard for liability under strict liability and negligence is essentially the same"); *Mazur v. Merck & Co.*, 964 F.2d 1348, 1353-54 (3d Cir. 1992) (analysis of liability under comment k is the same for strict liability and negligence).

Moreover, as noted above, the sufficiency of the warning in this case should be evaluated under the "learned intermediary doctrine." *Larkin*, 153 S.W.3d at 770 (adopting learned intermediary doctrine in prescription drug case); 2 MADDEN & OWEN ON PRODUCTS LIABILITY § 22:9 at 568 (3d ed. 2000) ("the learned intermediary doctrine has gained virtually unanimous adoption").  This doctrine recognizes the reality that doctors are in a better position than pharmaceutical manufacturers to evaluate the suitability of a drug for a particular patient.  As a result, the manufacturer's duty to warn extends only to the prescribing physician and not to the ultimate consumer.  *Id*.

As will be explained, Mr. Smith's failure to warn claims fail as a matter of law.  First, Merck has a duty to warn only of known or reasonably scientific knowable risks.  Merck *did* warn Dr. Grefer of a potential risk of heart attack by including the VIGOR results in its label and providing him with information about that study.  Second, there was no evidence that Dr. Grefer was not adequately warned or did not otherwise have sufficient information.  In fact, as explained below, Dr. Grefer admitted having knowledge of these risks, meaning that Merck's warning was adequate and any alleged failure to warn was not the proximate cause of Mr. Smith's injury.  Third, Mr. Smith failed to meet his burden of showing that Merck's alleged failure to warn proximately caused Mr. Smith's heart attack.  In fact, Dr. Grefer has continued to prescribe Celebrex and NSAIDS to patients with Mr. Smith's profile, even though they carry "black-box" cardiovascular warnings.

11

## 1.     Merck Warned Of The Potential Knowable Heart Attack Risk.

Mr. Smith claims that Merck failed to warn that Vioxx could cause heart attacks.  The post-VIGOR label, however, fully disclosed the potential risk of heart attack by including the VIGOR results.  (April 2002 Vioxx Label (Def.'s Ex. 2101); Sept. 19, 2006 Tr. at 1877:4-11, 1878:18-1889:6 (Test. of Dr. Grefer).)   In addition, Merck provided the results of the VIGOR study to the FDA and the medical community, including Dr. Grefer.  (Sept. 19, 2006 Tr. at 1905:5- 1906:6 (Test. of Dr. Grefer).)

Dr. Avorn complains that "[t]here's nothing in the label about the doubling of the death rate in the Alzheimer's study in the label."  (Sept. 12, 2006 Tr. at 388:10-18.)  But, as Dr. Moye was forced to concede during cross-examination, the so-called "excess deaths" in the Alzheimer's studies were not caused by Vioxx.  (Sept. 16, 2006 at 1501:9-1502:16.)

Also, Dr. Sander testified that Vioxx can increase the risk of heart attack by increasing blood pressure.  Merck explicitly warned of the risk of increased blood pressure in its label:

> Fluid retention, edema, and hypertension have been reported in some patients taking VIOXX.  In clinical trials of VIOXX at daily doses of 25 mg in patients with rheumatoid arthritis the incidence of hypertension was twice as high in patients treated with VIOXX as compared to patients treated with naproxen 1000 mg daily.

(April 2002 Vioxx Label (Def.'s Ex. 2101).)

## 2.     There Is Insufficient Evidence That The Warning Was Inadequate.

According to the Kentucky Supreme Court:

> An adequate warning has been defined as one sufficient to apprise the general practitioner as well as the unusually sophisticated medical man of the dangerous propensities of the drug.  It is incumbent upon the manufacturer to bring the warning home to the doctor.

*Larkin*, 153 S.W.3d at 764 (internal quotation marks and citations omitted).

Merck's warnings were sufficient to apprise physicians of the heart attack risk.  As noted

831226v.1

above, the 2002 label disclosed the significant clinical data then available. This included VIGOR, which had the highest relative risk for Vioxx of any study conducted to date. Moreover, Merck brought the warning "home" to Dr. Grefer.[2] Its sales representatives discussed it with him and provided him with information about VIGOR. (Sept. 19, 2006 Tr. at 1878:18-1889:6 (Test. of Dr. Grefer).)

It is clear that Dr. Grefer knew of the CV risk associated with Vioxx at the time he prescribed Vioxx to Mr. Smith:

> Q.    The bottom line is, back at the time you – prescribed Vioxx to Mr. Smith, you understood that VIGOR had resulted in – in an increased number of nonfatal heart attacks?
>
> A.    Correct.
>
> Q.    From the Vioxx users versus the naproxen users?
>
> A.    Correct.

(Sept. 19, 2006 Tr. at 1907:13-19.)

> Q.    We talked about the fact that, did we not, that after – after VIGOR came out, you had a lot of discussions with sales reps and reviewed – reviewed different material about VIGOR?
>
> A.    Yes.
>
> Q.    And then we went over the label, and the VIGOR information, there was a significant amount of VIGOR information contained in the label.
>
> A.    Yes.
>
> [Objection omitted]
>
> Q.    And that information in the label is the same type of information that the sales reps talked to you about?
>
> A.    Yes.

---

[2] Dr. Grefer stated that had VIGOR reported a .5% MI rate of Vioxx compared to .1% for naproxen, instead of .4 versus .1, that would not had any impact on his prescribing decision for Mr. Smith. (Sept. 19, 2006 Tr. at 1897:17-22.)

831226v.1

(Sept. 19, 2006 Tr. at 1916:24-1917:9.)

Consistent with the vote of the FDA Advisory Committee, the FDA-approved label contained a statement that the significance of the cardiovascular findings from the clinical trials was "unknown." But, Dr. Grefer was aware that the interpretation of the VIGOR results was the subject of scientific debate in the medical community, and that some questioned whether Naproxen was the appropriate explanation for VIGOR results. (Sept. 19, 2006 Tr. at 1907:20-1908:12.) Thus, Dr. Grefer understood the VIGOR results, including their limitations and possible implications.

In *Larkin*, the Kentucky Supreme Court noted with approval that several cases have found package inserts, warnings in the Physician's Desk Reference, and other literature are adequate as a matter of law. 153 S.W.3d at 764-65 (citing, *inter alia*, *Wyeth Labs., Inc. v. Fortenberry*, 530 So. 2d 688, 692 (Miss. 1988)). In *Fortenberry*, the court addressed whether the information listed in the "adverse reactions" section of the package insert was sufficient to adequately warn the physician of possible adverse reactions. One of the adverse reactions listed was Guillain-Barre syndrome (GBS). 530 So.2d. at 689. After receiving the vaccine, the plaintiff was diagnosed as having transverse myelitis which "is closely related, in etiology and pathology, to GBS." *Id*. The court held that the warning was adequate as a matter of law. *Id*. at 693. Similarly, here, Merck disclosed the CV risk in its VIGOR label, allowing the Court to conclude that the label is adequate as a mater of law.

It cannot matter that the information was not in the "warnings" section of the label. Once a physician knows the information, there is no further duty to warn. Stated simply, the common-sense rule is that "[n]o one needs notice of that which he already knows." *Lindsay v. Ortho Pharm. Corp.*, 637 F.2d 87, 92 (2d Cir. 1980) (internal quotation marks and citations omitted).

Because Dr. Grefer understood the facts, no further warning was needed. *See Odom v. G. D. Searle & Co.*, 979 F.2d at 1003 (affirming summary judgment for manufacturer in failure to warn case in part because physician had independent knowledge of the risks); *see also Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 644-45 (4th Cir. 1981) (holding that manufacturer is not liable for failure to warn when doctor knew of risk and said it was not his practice to warn); *Plummer v. Lederle Labs.*, 819 F.2d 349, 358-59 (2d Cir. 1987) (finding no causation when doctor failed to warn even though knew of risk of polio); *Kirsch v. Picker Int'l., Inc.*, 753 F.2d 670 (8th Cir. 1985) (affirming directed verdict because physician knew of cancer risk related to X-ray treatment); *Mampe v. Ayerst Labs.*, 548 A.2d 798 (D.C. App. 1988) (holding manufacturer was not liable where prescribing physician acquired knowledge of risks from a variety of other sources); *Dunn v. Lederele Labs.*, 328 N.W.2d 576 (Mich. App. 1982) (finding no proximate cause where physician had knowledge of the risks associated with a drug); *Leibowitz v. Ortho Pharm. Corp.*, 307 A.2d 449 (Pa. Super. 1973) (finding no causal nexus where physician had other sources of information).

It is difficult to understand what more Merck should have been required to put in the label. After all, Dr. Moye agrees that prior to 2004 there were no clinical trials that showed that Vioxx had a statistically significant increased risk of heart attack compared to a placebo or other comparator when the dose is 25 mg. (Sept. 16, 2006 Tr. at 1530:19-1531:7.) Mr. Smith cannot complain about a failure to warn of risks that did not harm him. *See In re Rezulin Prods. Liab. Litig.,* 331 F. Supp. 2d 196, 200 (D.N.Y. 2004) (explaining in a failure to warn case that "[w]here, as here . . . the plaintiff suffered no injury of which the manufacturer failed to warn, there is no claim"); *see also* Dobbs, THE LAW OF TORTS 1018 (2001) ("[T]he injury suffered must be within the class of injury that the warning requirement was meant to avoid."). Thus, the

fact that Merck did not warn about the all-cause mortality data in the Alzheimer's studies is irrelevant, because those studies did not show any significant increase in cardiovascular risks.

> **3.    There Is Insufficient Evidence Of Proximate Cause Or "But For" Causation.**

Even if Merck's warning were inadequate, Mr. Smith could not prevail unless he established that Dr. Grefer would have prescribed a different course of treatment if an adequate warning had been given.  *See Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) (upholding trial court's granting of summary judgment because plaintiff failed to prove that her doctor would have prescribed a different course of treatment if more drastic warnings had been given).  Dr. Grefer, however, testified that he prescribes Celebrex and other NSAIDs to patients with profiles similar to that of Mr. Smith, even though they now contain "black-box" cardiovascular warnings:

> Q.    Now, you still prescribe Celebrex today, do you not?
>
> A.    I do.
>
> Q.    And what is the patient profile that you typically look for in terms of prescribing Celebrex?
>
> A.    Well, I look for – a patient who needs that type of medication, and usually I prescribe . . . another NSAID of a more generalized nature, depending upon what the condition is, unless someone tells me that they have significant gastrointestinal problems and things like that, and – and/or if they do not tolerate a more generalized NSAID.  And then when that's the case, I do prescribe Celebrex.
>
> Q.    And do you find Celebrex to be beneficial to your patients?
>
> A.    I do.
>
> Q.    And – and I assume that for those you prescribe it, you believe the benefits of the drug outweigh the risks?
>
> A.    I do.
>
> Q.    And Celebrex carries some significant cardiovascular warnings?

16

> A.     Basically almost all the NSAIDS do now.
>
> Q.     But you still prescribe it?
>
> A.     I do.
>
> Q.     Because there's a – there is – that is – one of the decisions you have to make as a physician is weighing the benefits and the risks?
>
> A.     The risk/reward, yes, sir.

(Sept. 19, 2006 Tr. at 1908:13-1909:13.)

Thus, the alleged failure to warn (whether grounded in strict liability, negligence, gross negligence, or fraud) did not happen and did not cause Mr. Smith's injuries.  Merck is entitled to judgment as a matter of law.

## V.     MERCK IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE PLAINTIFF DID NOT PROFFER LEGALLY SUFFICIENT EVIDENCE TO PROVE MEDICAL CAUSATION.

In order to prevail on any of his claims, Mr. Smith was required to establish that the use of Vioxx at the 25 mg dose for approximately four and a half months more probably than not caused the injuries he allegedly sustained.  *See Holbrook v. Rose*, 458 S.W.2d 155, 158 (Ky. App. 1970) ("[T]he essence of the test concerning the sufficiency of plaintiff's circumstantial evidence concerning causation is that the proof must be sufficient to tilt the balance from 'possibility' to 'probability.'").  Plaintiff has failed to meet this burden.  Because there is no legally sufficient evidence to show that Vioxx was the proximate cause of Mr. Smith's alleged injuries, the Court should enter judgment in Merck's favor as a matter of law.

Proving medical causation is a two-step process: plaintiff must prove both general and specific causation.  General causation requires proof that Vioxx *can* cause heart attacks, while specific causation requires proof that Vioxx *did* cause Mr. Smith's heart attack.  *See, e.g.*, *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005).  Under Kentucky law,

17

"[m]edical causation must be proved to a reasonable medical probability with expert medical testimony." *Brown-Forman Corp. v. Upchurch*, 127 S.W.3d 615, 621 (Ky. 2004).

Although plaintiff was required to prove both general and specific causation, he proved neither. Instead, he offered the speculative and unreliable testimony of expert witnesses – Drs. Avorn, Moye, and Sander – who opined, without reliable foundation, that "it is now universally agreed the Vioxx causes heart attacks" (Sept. 12, 2006 Tr. at 424:11-20 (Test. of Dr. Avorn), that "Vioxx is a major cause of heart attacks" (Sept. 16, 2006 Tr. at 1412:19-24 (Test of Dr. Moye)), and that Vioxx is the "biggest or the most substantial factor" of Mr. Smith's heart attack (Sept. 18, 2006 Tr. at 1646:9-12 (Test. of Dr. Sander)). Yet, it is well-established that "[a] mere possibility of . . . causation is not enough, and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." PROSSER ON TORTS 245 (3d ed. 1964); *accord Fitzgerald v. Manning*, 679 F.2d 341, 348 (4th Cir. 1982). Because plaintiff proffered no legally sufficient evidence to show that Vioxx both could have and did cause his alleged injuries, all of his claims – whether grounded in strict liability, negligence, gross negligence, or fraud – necessarily fail.

A.     **The Record Contains No Legally Sufficient Evidence of General Causation.**

Plaintiff has failed to satisfy his burden to prove general causation, for two reasons. First, he has introduced no relevant and reliable studies to show that use of Vioxx at the 25 mg dose for less than five months causes heart attacks. The studies upon which his experts rely do not and cannot show a statistically significant association between Vioxx and increased risk. Second, as discussed below, plaintiff was also required to prove a biologically plausible mechanism by which Vioxx caused his claimed injury. He did not do so.

18

1.    **Plaintiff Introduced No Evidence Of A Statistically Significant Study Showing That Vioxx, At The Same Dose And Duration As Taken By Mr. Smith, Is Capable of Causing CV Events.**

Plaintiff's causation experts opine that the use of Vioxx at the 25 mg dose can cause heart attacks, but the data on which they rely do not support their opinions.  There is no reliable, statistically significant data from *any* study relied upon by plaintiff's experts that using 25 mg Vioxx for less than five months can increase the risk of CV event.

First, to be meaningful, the study must be statistically significant, meaning that the confidence interval does not include a value of 1.0 or below.  *See, e.g.*, *Brock*, 874 F.2d at 313, *modified on reh'g*, 884 F.2d 166, 167 (reversing verdict in Bendectin litigation given plaintiff's failure to present statistically significant epidemiological proof); *LeBlanc v. Merrell Dow Pharms., Inc.*, 932 F. Supp. 782, 784 (E.D. La. 1996) (granting summary judgment in Bendectin litigation given absence of "statistically significant [ ] epidemiological studies"); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 664-66 (M.D. La. 2000) (excluding expert's testimony based on absence of "statistically significant epidemiological proof").

Second, an epidemiologic study cannot establish causation unless it also shows that the drug more than doubles the relative risk of injury.  *See, e.g., Deluca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990) ("[A] relative risk of '2' means that, on the average, there is a fifty per cent likelihood that a particular case of the disease was caused by the event under investigation and a fifty per cent likelihood that the disease was caused by chance alone."); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 718-23 (Tex. 1997) (statistically significant epidemiological studies showing doubling of risk required to prove causation); REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 539.

None of the studies referenced by plaintiff's experts meet these standards, including the ones discussed below.

19

### a. VIGOR.

Although plaintiff purports to use VIGOR[3] to establish causation, VIGOR involved a 50 mg dose Vioxx – twice the dose taken by Mr. Smith. Because "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect," *McClain*, 401 F.3d at 1242 (internal citations and quotation marks omitted), the results of VIGOR, which involved the use of high-dose Vioxx, cannot and do not provide a generally accepted scientific basis for concluding that the use of Vioxx at the 25 mg dose was capable of causing Mr. Smith's alleged heart attack.

Second, VIGOR involved an elderly population with rheumatoid arthritis, a condition that put the study's patients at increased risk of CV problems. Here, Mr. Smith did not have rheumatoid arthritis and cannot be described as elderly.

Third, VIGOR did not compare Vioxx against a placebo; rather, it compared it with naproxen. Thus, it is impossible to determine based on the results of VIGOR whether the relative increase of adverse cardiovascular events seen in the Vioxx arm of the study was attributable to: (1) a cardiovascular risk associated with high-dose Vioxx; (2) a cardio-protective effect associated with naproxen; (3) chance, either in whole or in part; or (4) or some combination of these factors.

Accordingly, VIGOR cannot support a finding that Vioxx taken for less than five months at the 25 mg dose increases the risk of heart attack.

---

[3] Bombardier C, et al., *Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis*, N ENGL J MED 2000 Nov 23;343:1520-1528.

b.      **APPROVe.**

Nor can plaintiff's experts rely on the results of the APPROVe[4] study.  The study did *not* associate a statistically significant risk of heart attacks or sudden cardiac death with under five months of use of 25 mg Vioxx.   Thus, regardless of what opinions APPROVe purportedly supports concerning a longer duration of Vioxx use, its results cannot establish to a reasonable degree of medical and scientific certainty that Mr. Smith's short-term use of Vioxx was capable of causing a thrombotic cardiovascular event.  *See*, *e.g.*, *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) ("If the . . . duration of exposure to [substance is] the type[] of information upon which experts reasonably rely when forming opinions on the subject, then the district court was justified in excluding Dr. Miller's opinion that is based upon critically incomplete or grossly inaccurate . . . duration data."); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987) (expert's opinion on dioxin as source of plaintiff's illness had "insufficient factual basis" in part because expert had no knowledge of duration of exposure); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983) (usefulness of epidemiological studies was diminished based on "failure to consider either the length of time the workers were exposed to formaldehyde"); *Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1359 (S.D. Fla. 1999) (excluding opinion of expert who was not aware of any studies which define the minimum duration of exposure to benzene necessary to be toxic).

---

[4] Bresalier R, et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N ENGL J MED 2005 Mar 17;352(11):1092-1102.

c.       Solomon.

Plaintiff also identifies a retrospective, observational study conducted by Dr. D.H. Solomon in 2004, which was based on a review of patient records in a Medicare database.[5]   This study, however, does not support plaintiff's claim that his alleged four and one-half months of Vioxx use increased his CV risk.   The only short-term risk Solomon found involved a comparison between Vioxx and Celebrex, both active drugs, during the first 90 days of therapy. The risk for acute heart attacks for Vioxx versus Celebrex was nearly identical after 90 days of therapy, the only duration of therapy relevant here.[6]   Further, contrary to plaintiff's claims, the study found *no* excess risk of acute heart attacks with Vioxx versus no-NSAID use, much less a doubling of the risk.

d.       Protocol 090.

Plaintiff also purports to rely on Protocol 090.[7]   In Protocol 090, however, there was no statistically significant difference in the rate of adverse cardiovascular events in patients taking Vioxx versus placebo or Vioxx versus the comparator drug, Nabumetone.   Indeed, the study's conclusion was that "the number of patients with cardiovascular events was *too few to support any meaningful comparison*."   Accordingly, it is impossible for Protocol 090 to support plaintiff's theory of causation.

---

[5] Daniel Solomon et al., *Relationship between selective cyclooxygenase-2 inhibitors and acute myocardial infarction in older adults*, CIRCULATION 2004 May; 109:2068-2073.

[6] *Id.* at 2071.

[7] Weaver A., et al. *Treatment of Patients With Osteoarthritis With Rofecoxib Compared With Nabumetone*, J CLIN RHEUMATOL. 2006 Feb;12(1):17-25.

22

### e.      ADVANTAGE.

Although plaintiff also purports to rely upon ADVANTAGE,[8] the study itself makes clear that it does not support causation.  It provides:

> *The rofecoxib [Vioxx] and naproxen groups did not differ significantly in the number of cardiovascular events*, as defined by the combined Antiplatelet Trialists' Collaboration end points (10[0.4%] vs. 7 [0.3%]; P>0.2).  Five myocardial infarctions occurred in the rofecoxib group, and 1 occurred in the naproxen group (P>0.2).  No strokes occurred in the rofecoxib group and 6, all thrombotic, occurred in the naproxen group (P=0.015).

ADVANTAGE at 543.

### f.      VICTOR.

Finally, plaintiff purports to rely on VICTOR, a trial in patients with colon cancer that was terminated prematurely when Merck voluntarily withdrew Vioxx from the market.  Only incomplete, interim data from this study are available, which cannot provide a scientifically reliable basis for an opinion that Vioxx is capable of causing cardiovascular events.  *See, e.g., Christophersen.*, 939 F.2d at 1114 (upholding exclusion of expert opinion that was based on inaccurate and incomplete exposure data).  Moreover, the available data are not statistically significant.  There were fourteen confirmed thrombotic cardiovascular events in the Vioxx arm, versus five confirmed thrombotic cardiovascular events in the patients receiving placebo.  (*See* Pl.'s Ex. P1.1123.)  Plaintiff's own expert, Dr. Moye, acknowledged on the stand that the number of events in VICTOR was "very small."  (Sept. 16, 2006 Tr. at 1453:24-1454:18.)  According to his testimony that "you have to have enough events occur in the study" to have statistical significance (*id.* at 1440:17-1442:11), VICTOR is not sufficient to prove plaintiff's theory of causation.

---

[8] Lisse JR et al., *Gastrointestinal Tolerability and Effectiveness of Rofecoxib versus Naproxen in the Treatment of Osteoarthritis*, ANN INTERN MED 2003 Oct 7;139:539-546 ("ADVANTAGE").

23

### 2. Plaintiff Presented No Evidence Of Any Biologically Plausible Mechanism By Which Vioxx Could Cause A Heart Attack.

In a drug or toxic tort case, a statistical association between injury and exposure cannot prove causation absent proof of a biologically plausible mechanism by which exposure to the drug or suspected toxin causes injury. *See Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999). Biological plausibility "depends upon existing knowledge about *the mechanisms* by which the disease develops." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 522 (emphasis added). As the Fifth Circuit said in *Food Lion*:

> The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur. Based on such predicate knowledge, it may then be possible to fasten legal liability for a person's disease or injury.

*Food Lion*, 171 F.3d at 314. As this Court put it:

> In this case, at best, Drs. Shell and Eckberg have discovered an event, but not a cause. They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of *Daubert* and *Black*, their testimony is unreliable.

*Propulsid*, 261 F. Supp. 2d at 617; *accord McClain*, 401 F.3d at 1253 (expert must offer a "reliable explanation of the physiological process by which [the agent] causes [the alleged harm]"). Without proof of *how* an agent can cause a disease, there can be no proof that the agent in fact *does* cause the disease. *In re Phenylpropanolamine Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("'[n]ot knowing the mechanism whereby a particular agent causes a particular effect'" can be "'fatal to a plaintiff's claim'" where there is no "'sufficiently compelling proof that the agent must have caused the disease *somehow*'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1995)).

831226v.1

In this case, plaintiff's expert, Dr. Sander, proposed two theories for how Mr. Smith's Vioxx use could have caused his heart attack.  First, he testified that Vioxx "can raise blood pressure more than competing products."  (Sept. 18, 2006 at 1609:8-10, 1607:5-1608:5.)  The fact that all NSAIDs are associated with an increased risk of hypertension is an uncontroverted proposition – and one that was both well known at the time of Vioxx's approval and warned about in all Vioxx labels.  It cannot form the basis for plaintiff's failure to warn claim, as explained above.

Second, Dr. Sander testified that Vioxx "can block COX-2 and lead to heart attacks." (Sept. 18, 2006 Tr. at 1609:5-7.)  Specifically, he opined that, in a person like Mr. Smith with preexisting cardiovascular disease, the suppression of COX-2 leads to an "imbalance" in prostacylin and thromboxane in the vasculature, which in turn means any plaque rupture event is "much more likely to become more significant and more obstructive."  (Sept. 18, 2006 Tr. at 1589:12-21.)  Dr. Sander's opinion that Vioxx causes a prostacylin/thromboxane imbalance in the vasculature is scientifically unreliable and insufficient to meet plaintiff's burden to show general causation.

As the Court knows, Dr. FitzGerald hypothesized in an article published in 1999 that *if* COX-2 inhibitors reduced prostacyclin levels *in blood vessels* – a question his study could neither assess nor determine – then such drugs *might* promote increased clotting and, therefore, increased CV risks since they do not simultaneously interfere with the normal production of thromboxane, a known vasoconstrictor.[9]  But, as Dr. FitzGerald has recognized on multiple occasions since the 1999 publication, his hypothesis remains just that – a hypothesis – that

---

[9] Catella-Lawson et al., *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids*, J. PHARM. AND EXP. THERP. 1999; 289:735-741.

(<em>footnote continued next page</em>)

remains unproven.  In a follow-up article published in 2002, Dr. FitzGerald further explained that "[t]he clinical sequela of inhibiting prostacyclin activity in the absence of concomitant inhibition of [thromboxane] *are not currently clear*" and that "for the present, the *perception* of a cardiovascular hazard in humans exceeds the evidential basis for this notion."[10]

Nor is Dr. FitzGerald alone in conceding that his hypothesis remains unproven.  After observing that selective COX-2 inhibitors were associated with an increased risk of adverse CV events, the FDA confirmed this fact in April 2005:

> *It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized.*  As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (*i.e.*, ibuprofen, diclofenac) in studies of substantial size and duration.  Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible.  *Taken together, these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.*

(FDA Memo at 8 (Def.'s Ex. 338 (emphasis added)).)  Thus, the FitzGerald hypothesis remains speculative and cannot form the basis for Dr. Sander's opinion that the prostacyclin/thromboxane imbalance was capable of causing or did cause Mr. Smith's heart attack.

### B.    Plaintiff Failed to Prove Specific Causation.

Finally, plaintiff has failed to prove specific causation by a preponderance of the evidence.  There is no scientifically valid evidence for Dr. Sander's specific causation opinion that Vioxx caused Mr. Smith's heart attack.  Indeed, Dr. Sander testified that there is "no way medically" to say whether Vioxx caused Mr. Smith's heart attack.  (Sept. 18, 2006 Tr. at

---

[10]  FitzGerald, GA, *Cardiovascular Pharmacology of Nonselective Nonsteroidal Anti-inflammatory Drugs and Coxibs: Clinical Considerations*," AM J CARDIOL 2002; 89
(*footnote continued next page*)

1672:10-19.)  He agreed that Mr. Smith's heart attack is no different from the "thousands or tens of thousands" of heart attacks that Dr. Sander has seen:

> Q.     If Mr. Smith had never taken Vioxx, there is nothing about his heart attack that would strike you as the at least bit unusual, is there?
>
> A.     No
>
> Q.     In fact, it's a classic case for a heart attack; right?
>
> A.     Yes.
>
> Q.     You see it all the time; right?
>
> A.     Yes.
>
> Q.     And there is nothing about the plaque rupture itself in any of the medical records or in any of the images that you showed, there is nothing about the plaque rupture itself that can lead you to say that this particular rupture was due to Vioxx rather than other causes, is there?
>
> A.     No, not in isolation.
>
> Q.     And in fact, the plaque rupture that we see here in the medical records, images, everything else, it's no different from the thousands or tens of thousands of cases of plaque rupture that you've seen that had nothing to do with Vioxx; right?
>
> A.     Right
>
> Q.     And then after the plaque rupture, there is the clot, and there is nothing about the clot that formed here that can lead you or any other medical doctor to say that this clot was from Vioxx rather than from other causes; right?
>
> A.     Not from the specific characteristics of the clot, no.
>
> Q.     And in fact, the clot that formed in this case is no different from the thousands or tens of thousands of clots that you've dealt with with people who never laid eyes on Vioxx; right?
>
> A.     That's correct.

(Sept. 18, 2006 Tr. at 1660:22-1662:1.)

---

(suppl):26D, 32D (emphasis added).

831226v.1

Dr. Sander based his specific causation opinion on "attributable risk exposed" ("ARE"), a statistical concept he did not understand.  Not surprisingly, he conceded he is not an expert in statistics (Sept. 18, 2006 Tr. at 1674:12-19), nor could he be since he "had never used the concept in [his] life until this litigation" (*id.* at 1674:20-22).[11]  Dr. Moye explained that Dr. Sander's use of ARE was mistaken – it cannot be used to conclude that a particular person, including Mr. Smith, suffered a heart attack as a result of Vioxx exposure.[12]  (Sept. 18, 2006 Tr. at 1707:16-1708:10.)  "A physician's conclusion, without supporting medical evidence, is not enough to establish causation."  *Love v. Danek Med., Inc.*, No. CIV.A.3:95CV-706-S, 1998 WL 1048241, at *2 (W.D. Ky. Nov. 25, 1998) (after concluding that testimony of plaintiff's expert on causation was unreliable because there was no factual support for his opinion in medical device case, court granted summary judgment in favor of defendant as to plaintiff's strict liability, negligence and breach of warranty claims because there was insufficient evidence of causation).

Moreover, Merck is entitled to judgment as a matter of law because Dr. Sander failed to eliminate other possible causes of Mr. Smith's heart attack.  To establish specific causation,

---

[11] Courts should be especially cautious in dealing with expert opinions developed solely for the purpose of litigation.  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001).

[12] Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), Dr. Sander (1) is not qualified to testify about ARE, and (2) employs improper methodology to determine causation, as explained by plaintiff's expert Dr. Moye. Thus, he should not have been permitted to opine on specific causation, and his testimony should

(*footnote continued next page*)

831226v.1

plaintiff must "rule out" the possibility that his heart attack was caused by something *other* than Vioxx. *Huffman v. S.S. Mary & Elizabeth Hosp.*, 475 S.W.2d 631, 633 (Ky. 1972) (upholding directed verdict because plaintiff failed to prove that she had not contracted hepatitis from a source other then a blood transfusion); *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (upholding judgment as a matter of law because plaintiff failed to prove that decedent had not contracted hepatitis from a source other then defendant's pharmaceutical); *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1139 (D. Minn. 2003) ("Having failed to "rule out" other factors for the Plaintiff's skin cancer, the Plaintiff has not established a submissible showing of causation"); *Nat'l Bank of Commerce of El Dorado v. Associated Milk Producers, Inc.*, 22 F. Supp. 2d 942, 963 (E.D. Ark. 1998), *aff'd,* 191 F.3d 858 (8th Cir. 1999) (recognizing that an expert must "rule in" the suspected cause as well as "rule out" other possible causes); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000) (affirming grant of summary judgment in favor of defendant manufacturer where plaintiff "failed to 'rule out' all other possible causes"); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (excluding expert testimony because "[t]he defendants pointed to some likely alternative cause and the expert offered no reasonable explanation as to why he or she still believed that defendant's actions were a substantial factor in bringing about plaintiff's illness").

Plaintiff failed to carry this burden. More specifically, it is undisputed that Mr. Smith had vascular disease, multiple risk factors, and an obvious trigger – shoveling snow – that could have caused his heart attack. (Sept. 18, 2006 Tr. at 1751:23-1753:6 (Test. of Dr. Moye).) These risk factors include:

- *Age*: Mr. Smith was 52 years old at the time of his heart attack;

---

have been stricken.

831226v.1

- *Family History*:  Mr. Smith's brother had a stent placed at the age of 42, and Mr. Smith's mother died from a heart attack;

- *High Cholesterol*:  Mr. Smith suffered from hyperlipidemia;

- *Obesity:*  Mr. Smith was overweight at the time of his MI;

- *Gender*:  Mr. Smith is male; and

- *Hypertension:*  Mr. Smith had readings of high blood pressure before he took Vioxx.

It is not enough for an expert to proclaim that he has ruled out other possible causes – he must also give a "good explanation as to why his or her conclusion remain[] reliable" despite the existence of these alternative risk factors.  *Magistrini,* 180 F. Supp. 2d at 609.  Dr. Sander did not even attempt to rule out other possible causes during his testimony.  Thus, Merck is entitled to judgment as a matter of law.[13]

## VI.  PLAINTIFF'S CLAIMS ARE PREEMPTED BY FEDERAL LAW.

Plaintiff's witnesses challenge the FDA's approval of Vioxx and the content of the post-VIGOR label approved by the FDA.  Such claims are preempted by federal law.  For example, plaintiff contends Merck knew that Vioxx had serious CV risks before initial approval and withheld that information from the FDA.  (*See*, *e.g.*, Sept. 11, 2006 Tr. at 128:5-13, 131:22-132:8, 163:11-17 (Pl.'s Opening Statement).)  In addition, David Graham testified that the FDA should never have approved Vioxx (Sept. 15, 2006 Tr. at 1272:15-19), and that the FDA applies the wrong standards in approving drugs (Sept. 15, 2006 Tr. at 1274:9-1275:13).  Graham also opined that warning labels as implemented by the FDA do not have a significant effect.  (Sept. 15, 2006 Tr. at 1311:24-1312:7.)  Another witness for plaintiff, Dr. Moye, opined that the 2002 label is "inappropriate and misleading" (Sept. 16, 2006 Tr. at 1506:15-18), and yet another

---

[13] Merck filed a number of challenges to expert testimony before trial under Rule 702 and *Daubert*, as well as other grounds.  Testimony admitted in error is unreliable and does not constitute substantial evidence of causation.

30

witness, Dr. Avorn, opined that the 2002 label was inadequate because, *inter alia*, it lists all the VIGOR information in the "Precautions" section of the label instead of the "Warnings" section (Sept. 12, 2006 Tr. at 392:22-393:21).

In *Buckman Company v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), the Supreme Court recognized the importance of allowing the FDA to police its regulatory process to achieve the difficult balance between the various competing goals of the FDCA, and it held that the FDCA impliedly preempts state law tort claims alleging that a pharmaceutical company defrauded FDA or violated FDCA disclosure requirements. *Id.* at 350, 353 (preempting claims that the defendant made fraudulent statements to the FDA to obtain approval to market a medical device and that, had the misrepresentations not been made, the devices would not have been approved and plaintiff would not have been injured).[14] The federal regulatory scheme empowers the FDA to control the details of the approval process and to punish and deter fraud where it occurs. *See id.* at 348. This balance is important as "the FDA is charged with the difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals." *Id.* at 350.

In making the arguments about the 2002 label, plaintiff ignores that the contents of the label reflect the balance the FDA struck in approving the post-VIGOR label. The FDA has determined that because state-law claims like plaintiff's prevent the FDA from maintaining strict control over label content and format, they are preempted by the FDA's labeling regulations. *See* 71 Fed. Reg. at 3923-35 (preemption applies, *inter alia*, to claims like plaintiff's that are

---

[14] Although *Buckman* involved medical devices, its reasoning and holding apply with equal force to cases involving pharmaceuticals. *See, e.g., Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 812 (N.D. Ohio 2002) ("The Court does not need to engage in searching analysis of *Buckman* to determine that claims of fraud on the FDA are preempted with respect to *(footnote continued next page)*

"based on the failure to include in labeling or advertising a statement the substance of which the FDA has prohibited").  *See also Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 538 (E.D. Pa. 2006) (plaintiff's state-law failure to warn claims were preempted because the drug approval "process required that the labeling be the same as that approved for the innovator drug" and "the FDA would have deemed any post-approval enhancements 'false or misleading'"); *In re Bextra & Celebrex Mkttg. Sales Practices & Prods. Liab. Litig.*, No. M: 05-1699 CRB, 2006 WL 2374742 (N.D. Ca. Aug. 16, 2006).  For this reason too, Merck is entitled to judgment as a matter of law.

In any event, the Kentucky courts have concluded that a plaintiff may not base a claim against a prescription drug manufacturer on the contention that the manufacturer was not completely forthcoming with the FDA at the time that its label was being considered or on proof that the label was an inadequate warning when approved.  Any claim of fraud or failure to warn must be based on new information after the label was approved that bears upon the drug's risks. *Sandoz Pharms., Corp. v. Gunderson*, Nos. 2004-CA-001536-MR, 2004-CA-001537-MR, 2005 Ky. App. LEXIS 222, at *36-38 (Ky. Ct. App. Oct. 21, 2005).

## VII.   CONCLUSION.

For the reasons stated above, the Court should enter judgment in favor of Merck, pursuant to Rule 50 of the Federal Rules of Civil Procedure.  In the alternative, the Court should enter judgment on each of the causes of action plaintiff has failed to prove in his case.

---

pharmaceuticals.") (citing *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 236 (6th Cir. 2000)).

831226v.1

Dated:  September 25, 2006

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Andrew Goldman
Carrie A. Jablonski
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:      312-494-4440

Brian S. Currey
Catalina J. Vergara
Ashley A. Harrington
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:      213-430-6407

And

Douglas R. Marvin
Robert A. Van Kirk
M. Elaine Horn
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:      202-434-5029

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum in Support of Merck's Renewed Motion for Judgment as a Matter of Law has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 25th day of September, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:      504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel

831226v.1