# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| **This document relates to** | * | |
| **Case No. 06-0810** | * | |
| | * | **MAGISTRATE JUDGE** |
| **CHARLES L. MASON**, | * | **KNOWLES** |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| **MERCK & CO., INC.**, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM IN SUPPORT OF MOTION OF MERCK & CO., INC. ("MERCK") TO EXCLUDE TESTIMONY OF BENEDICT R. LUCCHESI, M.D., PH.D., M.S., F.A.H.A.

### (EXPERT CHALLENGE NO. 2)

Plaintiff has proffered Dr. Lucchesi, a pharmacologist, as an all-purpose expert who purports to have formed opinions on a host of topics ranging from medical causation to a broad array of non-scientific issues such as advertising and drug pricing.  Dr. Lucchesi's opinions on non-scientific matters fall, by his own admission, well outside his expertise and have no reliable scientific basis as required by Federal Rule of Evidence 702 and by *Daubert*.  They consist only of his inferences and conclusions drawn from documents that plaintiff hopes to offer into evidence or from his irrelevant and prejudicial personal judgments on the propriety of Merck's conduct in developing and marketing Vioxx®.  This Court has previously indicated that pejorative comments about Merck's actions or intent were not proper expert testimony from Dr.

Lucchesi or any other expert.[1]  Yet, despite this Court's ruling, Dr. Lucchesi has expanded his

report to include an array of ethical judgments on Merck's intents and motives, going so far as to

include a four-page attack on one of Merck's employees, Dr. Alan Nies.[2]  Dr. Lucchesi's

opinions on causation are likewise unreliable and inadmissible.  In *Plunkett v. Merck*, this Court

held that Dr. Lucchesi "cannot testify as to the specific cause of [the plaintiff's] death" because

Dr. Lucchesi is "neither a cardiologist or pathologist."  (Nov. 11, 2005 *Plunkett v. Merck* Order

at 39.)  For the reasons discussed in this memorandum, his testimony must be excluded.[3]

## I.    THE LEGAL STANDARD.

The legal standard for the admission of expert testimony in federal court is set forth at

pages 3-4 of Merck's Motion to Exclude the Testimony of Isaac Wiener, M.D., filed

concurrently herewith and incorporated herein by reference.

In addition to the qualifications and reliability requirements of Federal Rule of Evidence

702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), expert

---

[1] As the Court explained at the *Daubert* hearing in *Plunkett v. Merck (Plunkett I)*:

> At the same time, I don't want to hear from the plaintiff how evil and avaricious
> and all the other things that Merck is.  That's not an issue.
>
> …
>
> I don't see comments coming in about "They didn't do this because they were
> trying to make a buck," "They didn't do this because they were trying to kill
> people," "They didn't do this because they are evil."  That may or may not be
> fodder for closing argument.  That may be forensically dealt with at that stage.  I
> don't see it coming from an expert.

(Nov. 15, 2005 *Plunkett v. Merck* Tr. at 30:14-16, 30:24-31:4, attached hereto as Ex. A.)

[2] *See infra* Section III.

[3] Dr. Lucchesi's testimony in this case was prematurely terminated by plaintiff's counsel.  Merck
reserves its right to supplement this motion following this Court's ruling on Merck's pending
Motion to Compel the Deposition of Dr. Benedict Lucchesi, or in the Alternative, to Exclude
Him from Testifying at Trial, which is incorporated herein by reference.

testimony, like all evidence, must satisfy the relevant requirements of the Federal Rules of Evidence, including Rules 401 and 403.

## II.   DR. LUCCHESI'S TESTIMONY REGARDING MERCK'S PURPORTED KNOWLEDGE, THE ETHICS OF MERCK'S CONDUCT,  OR MERCK'S WARNINGS IS INADMISSIBLE UNDER RULE 702.

Dr. Lucchesi's report and deposition confirm that he seeks to offer his personal views on a breathtakingly wide variety of non-scientific topics.  These subjects range from Merck's alleged knowledge and state of mind, to whether the manner in which Merck developed and marketed Vioxx conformed with Dr. Lucchesi's personal standards of appropriate conduct, to what warnings should be given concerning Vioxx in physician prescribing information, patient information in package inserts, and even consumer advertising.

Dr. Lucchesi states that he was "asked to review pertinent materials and formulate opinions relating to the . . . conduct of Merck relating to its testing, research and marketing of Vioxx." (Expert Report of Dr. Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A ("Lucchesi Rpt.") at 15,[4] attached hereto as Ex. B.)  His report and his deposition testimony are rife with assertions of what Merck knew about the alleged cardiovascular risks associated with Vioxx and with value judgments on the propriety of "the conduct of Merck . . . related to Vioxx."  (*Id.* at 16.)  For example, he states that:

- "Merck did not conduct the necessary testing, and its failure to do so was contrary to industry standards and good clinical practice." (*Id.* at 17.)

- "The DSMB minutes in the VIGOR trial show that Merck had actual knowledge before November of 1999 that vascular risks were present in Vioxx users.  Merck's conduct as it relates to these data is questionable and put consumers as patients enrolled in the clinical trials at unnecessary risk." (*Id.* at 25.)

---

[4] Dr. Lucchesi current report, dated August 11, 2206, now contains well over one hundred pages of opinions – almost double in size from his previous reports.

- "Merck knowingly ignored statistical data revealed by their own studies. Informing prescribing physicians or the consumer public would have negatively influenced Merck's marketing position and profits." (*Id.* at 26.)

- "Merck should have avoided direct to consumer marketing." (*Id.* at 29.)

- "Vioxx should have undergone more extensive study at the basic level prior to initially marketing Vioxx, as well as during the post-marketing period." (*Id.* at 33.)

- Vioxx should have contained a "strong warning" to physicians that patients with cardiovascular disease or risk factors for cardiovascular disease may be at increased risk of a thrombotic event when taking Vioxx. There should also be "[a]n additional black box warning." (*Id.* at 44.)

- There was a "'marketing blitz' conducted via the lay press and television that encouraged the consumers to 'ask their doctor for Vioxx.'" (*Id.* at 48.)

Dr. Lucchesi's opinions in these areas have no proper place in this trial. Dr. Lucchesi is a professor of pharmacology. He is not qualified to state what Merck knew, nor is he qualified to opine on the propriety or ethics of Merck's actions with respect to Vioxx. Nor could he possibly know what data Merck "ignored." Testimony from Dr. Lucchesi on these matters would not "assist the trier of fact," as Rule 702 requires. But Dr. Lucchesi does not stop there. He proceeds to put forth statements that, independent of their improper content, use accusatory and inflammatory words. For example:

- "The removal of rofecoxib (VIOXX) from the market could no longer be avoided, as the *adverse events could no longer be disguised* when the data from the 'placebo controlled' APPROVe trial were made public." (Lucchesi Rpt. at 22 (emphasis added).)

- "It now was *no longer possible for Merck to obscure the truth* about potential adverse cardiovascular events associated with the use of the COX-2 inhibitor, VIOXX." (*Id.* at 86 (emphasis added).)

- "*In a further effort to obscure the facts*, Merck's representatives explained the outcome of the APPROVe trial by stating that VIOXX does not increase the potential of 'thrombotic' events in patients who take VIOXX for less than 18 months." (*Id.* at 87 (emphasis added).)

4

- "Where was Dr. Nies' thoughts on the APPROVe trial results when *the 18 month explanation was fabricated*?"  (*Id*. at 109 (emphasis added).)

This testimony seeks to prejudice Merck, and to substitute Dr. Lucchesi's judgment for that of the jury, usurping its proper role as a fact finder.  His testimony concerning Merck's alleged knowledge and his personal value judgments do not meet the requirements for admissibility laid down in Rule 702 and thus must be excluded.

### A.    Dr. Lucchesi Should Not Be Permitted To Testify About What Merck "Knew Or Should Have Known."

#### 1.    Dr. Lucchesi cannot testify about what Merck actually knew.

Rule 702 allows opinion testimony from a witness with "scientific, technical, or other specialized knowledge" that will "assist the trier of fact." FED. R. EVID. 702.  It does not permit "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp. 2d 603, 616 (E.D. La. 2003) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  Expert witnesses are routinely prohibited from providing testimony regarding the "intent, motives or states of mind of corporations, regulatory agencies and others," because they "have no basis in any relevant body of knowledge or expertise." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).  As one court reasoned when rejecting expert testimony regarding a pharmaceutical manufacturer's intent and state of mind:

> The witnesses are qualified in particular scientific disciplines.  These disciplines do not include knowledge or even experience in the manner in which corporations and the pharmaceutical marketplace react, behave or think regarding their nonscientific goals of maintaining a profit-making organization that is subject to rules, regulations, standards, customs and practices among competitors and influenced by shareholders or public opinion.

*In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000 U.S. Dist. LEXIS 9037, at *28-29 (E.D. Pa. June 20, 2000).   The Court should similarly exclude Dr. Lucchesi's unfounded testimony regarding Merck's knowledge or state of mind in this case.

Even were these opinions a proper subject of expert testimony, which they are not, it is clear that Dr. Lucchesi does not have a proper basis for them.   He bases his opinions on a review of cherry-picked internal Merck documents that were selected by plaintiff's counsel.   (Oct. 18, 2005 Deposition of Dr. Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A. ("Lucchesi 10/18/05 Dep.") at 164:11-165:14, attached hereto as Ex. C.)   He then summarily concludes what Merck knew at a given point in time.   For example, he opines that, as early as 1997, Merck "was actually aware" of Vioxx's alleged prothrombotic potential based solely on inferences he drew from internal Merck e-mails and certain Merck patent applications  provided to him by plaintiff's counsel.   (*Id.* at 226:1-18; *see also* Lucchesi Rpt. at 17.)   But the jury does not need Dr. Lucchesi or his pharmacology expertise to interpret intra-office emails or to draw factual inferences from the documents admitted into evidence.

In fact, to the extent he seeks to make inferences and draw conclusions from the documents about what Merck allegedly knew or its intent, Dr. Lucchesi would not properly be testifying as an "expert" at all.   Such testimony would not bring any "scientific, technical, or other specialized knowledge" to bear on an issue that would assist the jury.   Instead, he would simply be acting as a paid advocate for the plaintiff, and for this reason his state of mind testimony must be excluded.   *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 546 (excluding expert testimony addressing corporate state of mind because otherwise experts would "improperly . . . assume the role of advocates for the plaintiffs' case"); *see also Tanner v. Westbrook,* 174 F.3d, 542, 548 (5th Cir. 1999); *In re Propulsid Prods. Liab. Litig.*, 261 F. Supp.

2d 603, 616 (E.D. La. 2003); *cf. Sec. & Exch. Comm'n v. Lipson,* 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) (expert accountant was not "specially equip[ped] to divine what [defendant] truly believed" about reliability of financial reports; any opinions offered in that regard are "at worst, rank speculation" and at best, "credibility choices that are within the province of the jury").   In excluding similar testimony proffered on corporate state of mind, the *In re Rezulin* Court succinctly summed up the problem when what is actually advocacy of one party's cause is offered in the guise of expert testimony:

> A practice reminiscent of wager of law has become fashionable among some well-financed litigants – the engagement of "expert" witnesses whose intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit. These "experts" thus are loosely analogous to compurgators, also known as oath helpers, in that they lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts actually at issue.

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 538.  That is an apt description of the real nature of Dr. Lucchesi's proposed testimony on Merck's knowledge, state of mind, and the ethics of Merck's behavior concerning Vioxx.

> 2.   The Court should limit Dr. Lucchesi's testimony about what Merck should have known.

As a pharmacologist, Dr. Lucchesi may be qualified to explain the pharmacological literature, but that is not what he attempts to do in this case.  Instead he offers to "interpret" a variety of documents that have no connection to pharmacology.  The following example is illustrative:

> Q:   And I would be happy, sir, if you would confine your opinions to those that are your area of scientific interest.  But you are telling me you are intending to comment at trial on FDA regulation of pharmaceutical marketing.
>
> A:   Well, I think I can – I can simply look at this letter [from a division of the FDA to the former Merck CEO] and read the second paragraph and get a

flavor of what is happening here, and I think I – I can interpret that for a jury.

(Oct. 26, 2005 Deposition of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A. ("Lucchesi 10/26/05 Dep.") at 350:17-25, attached hereto as Ex. D.)

Such state of mind testimony is clearly outside Dr. Lucchesi's area of expertise.  Dr. Lucchesi admits that he is not an FDA marketing expert.  (Lucchesi 10/26/05 Dep. at 376:6-13.) In fact he has not even read the actual FDA regulations on pharmaceutical marketing.  (Sept. 7, 2006 Deposition of Benedict Lucchesi, M.D., Ph.D., M.S., F.A.H.A. ("Lucchesi 09/07/06 Dep.") at 65:1-17, attached hereto as Ex. E.)  The court should not allow Dr. Lucchesi to "interpret" documents outside his area of expertise.

### B.   Dr. Lucchesi's Testimony That Merck Did Not Meet His Ethical Standards Is Neither Relevant Nor Reliable And Should Be Excluded Under Rule 702.

Dr. Lucchesi repeatedly passes judgment on the ethics or propriety of a broad array of Merck's decisions and practices relating to the development, testing, and marketing of Vioxx even though he acknowledges that he is not an expert in these areas.  (Lucchesi 10/18/05 Dep. at 148:17-149:2; Lucchesi 10/26/05 Dep. at 375:12-378:6.)  For example, he asserts that "[t]he DSMB [*i.e.,* Data Safety Monitoring Board] minutes in the VIGOR trial show that Merck had actual knowledge before November of 1999 that vascular risks were present in Vioxx users," that "Merck's conduct as it relates to these data is questionable," and that Merck should have stopped the VIGOR study and that its failure to do so "was below the standard of care."  (Lucchesi Rpt. at 25.)[5]

---

[5] As other examples:

- Dr. Lucchesi asserts that the manner in which Merck advertised Vioxx led to overuse "at a significantly increased price to consumers" even though he is not an expert in advertising or drug pricing.  (Lucchesi Rpt. at 29-30; Lucchesi 10/26/05 Dep. at 386:25-388:24.)

(*footnote continued next page*)

These and all other subjective judgments by Dr. Lucchesi have no place at this trial.[6] Courts have repeatedly ruled that such personal views of a witness who has been designated as an expert are irrelevant and thus inadmissible. *See, e.g., In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 542-45  (expert testimony on subjective ethical standards was "(1) unreliable because purely speculative; (2) unhelpful to the fact-finder because irrelevant in a case where liability is premised on legal, not ethical, standards, and (3) likely to prejudice and confuse fact-finders concerning the pertinent legal standards"); *id.* at 557 (testimony on legal obligations would "usurp . . . the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it"); *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999) (admission of expert testimony was abuse of discretion when particular opinion had no apparent underlying support); *DiBella v. Hopkins*, No. 01 Civ. 11779 (DC), 2002 U.S. Dist. LEXIS 20856, at *12 (S.D.N.Y. Oct. 30, 2002) ("business ethics" expert testimony inadmissible in commercial dispute because the "dispute here is not over what is ethical . . . [r]ather, the dispute is over what happened"), *aff'd*, 403 F.3d 102 (2d Cir. 2005).

---

- Dr. Lucchesi reproduces a graph alleging to depict the number of heart attacks and strokes in the general population based on the results of the VIGOR trial, using twice the standard dose, and a theoretical exposed population of 10,000,000 to illustrate the "catastrophic outcome" of Vioxx use.  (Lucchesi Rpt. at 54.)

[6] That Dr. Lucchesi is making normative judgments about Merck's conduct on the basis of his personal (and irrelevant) ethical standards is exemplified by the following exchange:

Q:    Sir, if you're asked and allowed to testify at trial about Dodge Ball, that it reflects improper training of sales representatives, what standard of care are you, Dr. Lucchesi, applying?

A:    My standard of care what I believe to be ethical behavior.

(Lucchesi 10/18/05 Dep. at 163:9-14.)

Moreover, to be reliable under Rule 702, the "reasoning or methodology properly" must be applied to the "facts in issue." *Vogler v. Blackmore,* 352 F.3d 150, 155 (5th Cir. 2003) (citing *Daubert,* 509 U.S. at 592-93). By definition, subjective normative testimony is unreliable under *Daubert. Cf. In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, MDL 1535, 2005 WL 1868046, at *20 (N.D. Ohio Aug. 8, 2005) (Order) ("[T]he critical question for the jury in this case is whether the defendant corporations did what the law required them to do, not whether, from a societal perspective, they did what an 'ethical corporation' should have done. [The expert's] opinions regarding the latter, accordingly, will tend to misdirect the finder of fact.").

Expert testimony that is admissible under *Daubert* and Rule 702 must be based on objective, empirical, ascertainable, and verifiable bases, not on subjective notions of propriety, or morality, or appropriateness. The goal in admitting expert testimony is to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.,* 526 U.S. at 152; *see also Daubert*, 509 U.S. at 594. Subjective and normative testimony does not have the same assurances of relevance and reliability that empirically verifiable specialized knowledge provides. Expert testimony that lacks this reliability, that is not based on specialized knowledge, and that lacks supporting authority may not be admitted. *See Tanner*, 174 F.3d at 548.

### C.   Dr. Lucchesi May Not Testify Regarding The Adequacy Of The Vioxx Label Or Pharmaceutical Marketing.

#### 1.   Dr. Lucchesi may not testify to the adequacy of the Vioxx label.

Dr. Lucchesi claims that he does not expressly opine (or "comment") that the Vioxx label contained false information. However, he offers specific recommendations on the content, placement, and even the color of warnings about Vioxx aimed at physician communications, patient package inserts, and direct-to-consumer advertising. (Lucchesi 10/18/05 Dep. at 289:6-

290:7; Lucchesi Rpt. at 44-45.)  Of course, in opining on what the label *should* say, by negative implication Dr. Lucchesi would also be opining that the warning was inadequate, notwithstanding his stance that he has not done so.  But he does not stop there, and explicitly opines that the April 2002 Vioxx label was misleading.[7]  (Lucchesi Rpt. at 47 ("providers of health case, physicians, nurse practitioners, and pharmacists, were misled by Merck's representations in the April 2002 label that the caution with prescription of Vioxx should be exercised only in patients with a medical history of ischemic heart disease when, in fact, the studies demonstrate that risk is present in all patients.").)

All such testimony must be excluded.  It is fundamental that an expert witness may not testify about matters outside his area of expertise.  FED. R. EVID. 702; *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998).  By his own admission, Dr. Lucchesi is not an expert in the labeling of FDA-regulated drugs:

Q:	Are you familiar with FDA regulations on labeling?

A:	Not as well as a person who deals with labeling.

Q:	Have you ever written a drug label?

A:	You know I haven't.

Q:	And have you read FDA's regulations on labeling?

A:	I don't bother reading the regulations on labeling.  I have no interest in the regulations on labeling.  I can suggest to the FDA what the labeling should be, and many people have.

---

[7] To the extent that Dr. Lucchesi's opinions amount to either an implicit or explicit attack on the actual content of the Vioxx label that was mandated by the FDA, such claims are preempted by the FDCA.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350, 353 (2001).  Dr. Lucchesi's report contains other inflammatory statements aimed at the pharmaceutical industry and the drug approval process.  (*See, e.g.,* Lucchesi Rpt. at 55 ("The preceding comment [by Dr. FitzGerald] is a powerful indictment of pharmaceutical industry sponsored clinical trials that may place patients at risk of an adverse outcome.").)  To the extent these opinions suggest that the FDA should not have approved Vioxx, such claims are also preempted by the FDCA.

Q:      You don't have any particular expertise on writing an FDA approved label. Correct?

A:      My CV tells me where my expertise ends.  You don't have to ask me those questions.

Q:      Right.  And your CV does not reflect any expertise in FDA approved labeling.  Correct?

A:      That is right.

(Lucchesi 10/18/05 Dep. at 282:19-283:12; *see also id.* at 289:10-15.)

He therefore should not be permitted to testify at trial about any alleged inadequacy of the warning Vioxx carried or about what the content of warnings should be.[8]  Nor can any such testimony meet the requirement of reliability.  *See Moore*, 151 F.3d at 276.  Dr. Lucchesi identifies no methodology, research or standard against which the Court can assess the reliability of any opinion relating to the adequacy of warnings.  For this reason as well, his testimony on this topic is inadmissible.[9]

> 2.      Dr. Lucchesi's testimony regarding pharmaceutical marketing is inadmissible and should be excluded.

Dr. Lucchesi attempts to testify on topics outside his area of expertise when he offers opinions on pharmaceutical marketing.  His opinions encompass both direct-to-consumer ("DTC") advertising of Vioxx, as well as communications with physicians.

Again, Dr. Lucchesi is not an expert in the advertising or marketing of prescription medications.  (Lucchesi 10/26/05 Dep. at 376:6-13.)  He has never published in the area of pharmaceutical marketing.  (Lucchesi 09/07/06 Dep. at 66:20-67:11.)  He has never worked in

---

[8] *See Buckman* at 341, 350, 353.

[9] Insofar as he purports to opine on what warnings should be contained in patient inserts or direct-to-consumer advertising, moreover, Dr. Lucchesi's opinions are irrelevant.  Under the learned intermediary doctrine, it is the adequacy of the drug manufacturer's warning to the prescribing physician that is determinative.  *See Schaerrer v. Stewart's Plaza Pharmacy, Inc.,* 79 P.3d 922, 928 (Utah 2003); *Barson v. E. R .Squibb & Sons, Inc.,* 682 P.2d 832, 835 (Utah 1984).

the area of DTC advertising of pharmaceuticals.  (*Id.* at 69:8-12.)  He has never participated in drafting a sales aid used with physicians.  (*Id.*  at 69:13-15.)  Even if he had sufficient expertise in the area of pharmaceutical marketing, which he does not, he has not conducted a review of the marketing material Merck submitted to the FDA and is therefore unqualified to render an opinion.[10]  (*Id.* at 70:2-8.)

Given his lack of expertise with pharmaceutical marketing generally, and his lack of specific knowledge regarding what Merck submitted to the FDA, Dr. Lucchesi should not be allowed to testify on the topic of pharmaceutical marketing.

## III.   DR. LUCCHESI HAS NO SCIENTIFICALLY RELIABLE BASIS TO OPINE ON GENERAL CAUSATION.

Dr. Lucchesi's opinion that Vioxx "contributed significantly to the plaintiffs' [*sic*] adverse cardiovascular event that culminated in an acute myocardial infarction on July 25, 2003" (Lucchesi Rpt. at 80-81) is not supported by any reliable scientific data.  As Merck explains in its concurrently-filed Motion to Exclude Expert Testimony that Short-Term Vioxx Use Increases Cardiovascular Risk, no clinical trial or observational epidemiological study has ever demonstrated an increased risk of thrombotic cardiovascular events with Vioxx 25 mg used for less than 11 months.  Dr. Lucchesi, along with plaintiff's other experts, draw scientifically unreliable inferences from numerous studies in an attempt to bolster plaintiff's claim in this case. However, Dr. Lucchesi's and others' attempts to excuse the absence of scientific data supporting their short-term use theory falls well short of the threshold set forth by Federal Rule of Evidence 702 and *Daubert*.

---

[10] Merck will not burden the court with a detailed discussion, but to the extent that Dr. Lucchesi's opinions directly or indirectly attack an FDA-reviewed advertisement of Vioxx, his claims are preempted by the FDCA.  *See Buckman* at 341, 350, 353.

A.    **Dr. Lucchesi's Animal Data And Case Reports Are Insufficient To Establish Causation.**

Lacking reliable trial and epidemiologic data, Dr. Lucchesi seeks support from animal studies he conducted and a case report written by Dr. Leslie Crofford.  But neither amounts to reliable scientific evidence of causation.

1.    Dr. Lucchesi's animal data are insufficient to establish causation.

As an initial matter, animal studies are generally viewed as an insufficient basis for inferring causation in humans – particularly where, as here, such studies are inconsistent with data from clinical studies.  Saks *et al.*, Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 491, 494-95 (2d ed. 2005-06).   Dr. Lucchesi concedes that whether an animal model "reflects the human event is always a question."  (Lucchesi 09/07/06 Dep. at 160:14-18.)  In fact, when confronted with questions involving the toxicity of substances, the Fifth Circuit has held that animal studies have "very limited usefulness."  *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) (rejecting animal studies given high doses involved and difficulty extrapolating results to humans); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 197-98 & n.5 (5th Cir. 1996) (excluding expert opinion based in part on "inconclusive" and "unreliable" animal studies); *Gulf S. Insulation v. U.S. Consumer Prod. Safety Comm'n*, 701 F.2d 1137, 1146 (5th Cir. 1983).

In addition to the insufficiency of animal studies generally, much of Dr. Lucchesi's animal work has involved the use of a drug *other than* Vioxx, making it even more unreliable here.  (Aug. 26, 2003 Deposition of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A. ("Lucchesi 08/26/03 Dep.") at 40:15-41:1, attached hereto as Ex. F; *see also* Lucchesi 09/07/06 Dep. at 14:3-14:11.)  Dr. Lucchesi himself appears to recognize this fact, noting "there may be subtle differences in [the] respective pharmacodynamic properties [of various COX-2 inhibitors]

14

that determine the duration of exposure before the development of an adverse [cardiovascular] event . . . ." (Lucchesi Rpt. at 66.)  Indeed, numerous courts have recognized that data involving one drug cannot prove that a different drug causes harm.  *See, e.g., Joiner*, 522 U.S. at 145-46; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1246 (11th Cir. 2005) (excluding expert's opinion that ephedrine causes vasospasms based on analogy to different drug and noting that "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced") (internal citation and quotation marks omitted); *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002).

In fact, while he relies on his own work on different drugs to support his causation opinions, it is notable that Dr. Lucchesi has not even reviewed the *Vioxx* animal data contained in Merck's new drug application to the FDA and does not consider his opinions to depend on the findings of those studies.  (*See* Lucchesi 09/07/06 Dep. at 58:20-59:13.)

Simply put, animal studies involving different drugs at different dosages and for different durations are not a reliable basis on which to opine that 25 mg Vioxx taken for less than 11 months has a prothrombotic effect in humans.

### 2.     Dr. Lucchesi's case reports are insufficient to establish causation.

Similarly, Dr. Lucchesi's reliance on a case report written by Dr. Leslie Crofford, involving four patients with connective tissue disease who were taking the drug Celebrex, cannot be considered reliable evidence of causation.[11]  (Lucchesi Rpt. at 65.)  To begin with, a *Celebrex* study cannot prove that *Vioxx* causes adverse health effects.  *Joiner*, 522 U.S. at 145-46; *McClain*, 401 F.3d at 1246.  In addition, case reports are not evidence of causation.  They

---

[11] Leslie Crofford et al., *Thrombosis in patients with connective tissue diseases treated with specific cyclooxygenase 2 inhibitors. A report of four cases*, ARTHRITIS RHEUM. 2000, 43:1891-6.

describe a single individual or a series of individuals who have coincident exposure and diseases. Although they can be useful in generating testable hypotheses, case reports cannot establish a cause and effect relationship. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 650. That is because case reports do not – and cannot – control for the role of chance, bias, or confounding. *Id.* at 649.

Accordingly, in case after case courts have rejected anecdotal evidence like case reports as proof of general causation. *See, e.g., Black*, 171 F.3d at 312 & n.2 (reasoning that "case series or case reports" are "insufficient to establish causal relationships"); *McClain*, 401 F.3d at 1250, 1254 ("Uncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation. . . . Simply stated, case reports raise questions; they do not answer them."); *Newton*, 243 F. Supp. 2d at 679-80 (reliance on case reports rendered expert's opinion "well below" the "standards of scientific validity"); *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 787 (S.D. Tex. 2000); *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989-90 (8th Cir. 2001); *Haggerty v. UpJohn Co.*, 950 F. Supp. 1160, 1165-66 (S.D. Fla. 1996); *Casey v. Ohio Med. Prods., Inc.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995). Indeed, Dr. Crofford herself agrees that her case report does not and cannot establish causation: "[a] causal relationship between the initiation of treatment with a specific COX-2 inhibitor and these thrombotic events *cannot be established* on the basis of the available evidence . . . ."[12]

---

[12] Leslie Crofford et al., *Thrombosis in patients with connective tissue diseases treated with specific cyclooxygenase 2 inhibitors. A report of four cases*, ARTHRITIS RHEUM. 2000, 43:1891-6 (emphasis added).

**B.     Dr. Lucchesi's Opinions Regarding The Naproxen Hypothesis Are Inconsistent With The Studies On Which He Relies.**

Dr. Lucchesi incorrectly opines that "Merck's theoretical position that naproxen is cardio-protective is without basis." (Lucchesi Rpt. at 26.)  In fact, the very articles Dr. Lucchesi cites for his opinion directly contradict his opinion.

First, Dr. Lucchesi relies on a study by Capone et al.[13] (*Id.*)  Yet the excerpt cited by Dr. Lucchesi himself clearly states: "In conclusion, the present study demonstrates the pharmacodynamic plausibility of a COX-1-dependent *cardioprotective effect of naproxen* and contributes to the interpretation of the VIGOR cardiovascular findings." (Lucchesi Rpt. at 26 (emphasis added).)  Dr. Lucchesi's opinion is not merely a different interpretation of this publication.  His opinion is completely contrary to the conclusions of the article.

Second, Dr. Lucchesi cites a study by Ray et al.[14] as "conclusive data demonstrating the lack of cardioprotection by non-steroidal anti-inflammatory agents (e.g., naproxen)." (Lucchesi Rpt. at 27-28.)  Yet again, Dr. Lucchesi's opinion is contrary to the actual study results.  "When naproxen was directly compared with ibuprofen, the current-use rate ratio [for coronary heart disease] was 0.83 (0.69-0.98)." (*Id.* at 28.)  Hence, naproxen demonstrated a statistically significant lower risk for coronary heart disease when compared to ibuprofen (a non-NSAID).

Dr. Lucchesi's incorrect citations and mischaracterizations of the literature and study results cannot, as a matter of law, support his causation opinions.  *Propulsid*, 261 F. Supp. 2d at 616 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or

---

[13] Capone ML et al., *Clinical pharmacology of platelet, monocyte, and vascular cyclooxygenase inhibition by naproxen and low-dose aspirin in healthy subjects*, CIRCULATION. 2004 Mar 30;109(12):1468-71. Epub 2004 Mar 22.

[14] Ray WA et al., *COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease*. LANCET. 2002 Oct 5;360(9339):1071-3.

the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert")).

### C.   Dr. Lucchesi Concedes His Proposed Pharmacological Mechanisms Are Unproven.

Dr. Lucchesi not only lacks scientifically reliable evidence supporting plaintiff's general causation theory, he also cannot identify, to a reasonable degree of medical certainty, the pharmacological mechanism by which the short-term use of Vioxx supposedly is capable of causing myocardial infarctions. As the Fifth Circuit has held, knowing the mechanism by which a substance acts on the body is an essential predicate of any cause-and-effect testimony. *Black*, 171 F.3d at 314 ("The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur."); *see also In re Propulsid Prods. Liab. Lit.*, 261 F. Supp. 2d at 616 ("In this case . . . Drs. Shell and Eckberg . . . fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid. . . . They have theories but they have no proof to support those theories. . . . Under the prevailing logic of *Daubert* and *Black*, their testimony is unreliable."); *McClain*, 401 F.3d at 1253 (excluding expert testimony where plaintiffs' experts have not "offered a reliable explanation of the physiological process by which Metabolife causes heart attacks and ischemic strokes, *i.e.*, establish general causation"). Nevertheless, Dr. Lucchesi admits that each potential mechanism he proffers – *e.g.*, the FitzGerald imbalance hypothesis, plaque rupture, acceleration of atherosclerosis, and ischemic preconditioning – is unproven.[15]

---

[15] In addition, Dr. Lucchesi opines that Vioxx does not "alter TNFa-induced TF expression, suggesting a mechanism occurring independent of COX-2 inhibition." (Lucchesi Rpt. at 38.) Accordingly to Dr. Lucchesi, the expression of TF implies "a prothrombotic potential of coxibs." (*Id.* at 39.) Simply stated, Dr. Lucchesi feels that Vioxx is capable of triggering blood

*(footnote continued next page)*

> 1.   Dr. Lucchesi cannot establish the mechanism by which Vioxx supposedly has a thrombotic cardiovascular effect.

The FitzGerald hypothesis remains just that – a hypothesis.[16]  Dr. FitzGerald has stated as much on multiple occasions,[17] and Dr. Lucchesi concedes that Dr. FitzGerald's preliminary work with metabolites of prostacyclin in urine do not, and cannot, answer the question of whether Vioxx inhibits prostacyclin levels in the vasculature.  (Lucchesi 09/07/06 Dep. at 122:23-123:4, 125:6-126:22.)

Nor can Dr. Lucchesi, assuming *arguendo* that Vioxx could inhibit prostacyclin in the vasculature, estimate the degree to which it could do so, or even the level at which such inhibition would become clinically significant.  As Dr. Lucchesi admits:

> Q:   Have you ever studied the degree to which any reduction in prostacyclin synthesis, small or large, was clinically significant in patients?
>
> A:   Once again, I am not concerned with the degree.  I am concerned with the mechanism and the concept.

(Oct. 3, 2002 Deposition of Dr. Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A. ("Lucchesi 10/3/02 Dep.") at 96:7-11, attached hereto as Ex. G.)  Without knowing the level of prostacyclin

---

coagulation independent of its COX-2 inhibition.  Given Dr. Lucchesi's expansive opinions and the premature termination of his deposition in this case, Merck reserves its rights to supplement this motion following the Court's ruling on Merck's pending Motion to Compel the Deposition of Dr. Benedict Lucchesi, or in the Alternative, to Exclude Him from Testifying at Trial.

[16] Dr. Lucchesi explains that this theory stems from the work of Dr. John Vane and his colleagues and notes that he believes it "has been referred to erroneously as the "FitzGerald Hypothesis."  (Lucchesi Rpt. at 17 n.1.)

[17] As Dr. FitzGerald explained in his 2002 paper: "The clinical sequelae of inhibiting prostacyclin activity in the absence of concomitant inhibition of TXA2 are not currently clear.  The cardiovascular consequence, *if any*, of substantial suppression of prostacyclin without coincident suppression of TX by the coxibs has generated much speculation."  FitzGerald G, *Cardiovascular Pharmacology of Nonselective Nonsteroidal Anti-Inflammatory Drugs and Coxibs: Clinical Considerations.* AM J CARDIOL.  2002 Mar;89(suppl):26D-32D, at 26D, 28D (emphasis added).

inhibition that supposedly is necessary to produce a clinical result, Dr. Lucchesi cannot testify to a reasonable degree of medical certainty that Vioxx is capable of having a pro-thrombotic effect in any case. *See, e.g., Allen*, 102 F.3d at 199; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir. 1998); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987).

In April 2005, the FDA confirmed that the FitzGerald imbalance hypothesis remains unproven. After observing that selective COX-2 inhibitors were associated with an increased risk of adverse cardiovascular events, the FDA addressed the FitzGerald hypothesis:

> *It remains unclear, however, that it is the presence of, or the degree of, COX-2 selectivity that accounts for these observations, as some have hypothesized.* As noted above, in various controlled clinical trials, COX-2 selective drugs have been indistinguishable from non-selective NSAIDs (i.e., ibuprofen, diclofenac) in studies of substantial size and duration. Further, although on theoretical grounds the addition of low-dose aspirin (a COX-1 inhibitor) to a COX-2 selective drug should resolve any increased CV risk caused by COX-2 selectivity, this effect has not in fact been observed in several studies in which such comparisons are possible. *Taken together, these observations raise serious questions about the so-called "COX-2 hypothesis," which suggests that COX-2 selectivity contributes to increased CV risk.*

(April 6, 2005 FDA Memo at 8 (emphasis added), attached hereto as Ex. H.) Given this scientific uncertainty, Dr. Lucchesi should not be permitted to provide causation testimony using the Fitzgerald hypothesis as its pharmacological basis.

> 2.   Dr. Lucchesi cannot establish the mechanism by which Vioxx supposedly causes plaque ruptures.  Nor is it relevant in this case.

Dr. Lucchesi also has no basis on which to opine that Vioxx contributes to plaque ruptures. Dr. Lucchesi admits that there are no published studies establishing that Vioxx is capable of causing coronary plaque ruptures:

> Q:   Would you agree, sir, that there's not a single piece of peer-reviewed medical literature that demonstrate even in an animal model that Vioxx contributes to plaque rupture in the coronary artery?
>
> . . .

A:     There may not be today.

Q:     Are you agreeing, sir, or not?

A:     I'll agree to that because I don't know of any literature that relates to that specific point.

(Lucchesi 10/18/05 Dep. at 331:21-332:6.)  Moreover, Dr. Lucchesi admits that Mr. Mason did not suffer from a ruptured plaque:

Q:     Do you believe Mr. Mason had a rupture of his atherosclerotic plaque?

A:     I don't think he had a ruptured atherosclerotic plaque.

(Lucchesi 09/07/06 Dep. at 182:4-7.)  Plaintiff should not be permitted to present the jury a theory of general causation that plaintiff's own experts admit is completely unsupported by scientific evidence and totally irrelevant to the plaintiff's injury.

3.     <u>Dr. Lucchesi cannot establish the mechanism by which Vioxx supposedly accelerates atherosclerosis.</u>

Dr. Lucchesi has also hatched a theory that Vioxx accelerates atherosclerosis.  But he reluctantly concedes "[t]he theory is that, just theory."  (Lucchesi 10/18/05 Dep. at 318:14-23.)  For that reason alone, the Court should exclude Dr. Lucchesi's opinion on this issue.  *In re Propulsid*, 261 F. Supp. 2d at 616 (excluding expert testimony that amounts to "mere theory").  He also admits that "[n]obody has any basis" to say Mr. Mason had any acceleration of atherosclerosis between the time he started taking Vioxx and the day of his heart attack.  (Lucchesi 09/07/06 Dep. at 190:2-11.)

Moreover, Dr. Lucchesi admits that the acceleration theory has not been tested in either an animal or a human model, and that he has "never seen a peer-reviewed piece of medical literature that demonstrates that [any] selective COX-2 inhibitor [including Vioxx] accelerates the formation of plaque in a coronary artery."  (Lucchesi 10/18/05 Dep. at 299:11-17, 301:12-20,

304:9-19, 320:1-321:18.)   Instead, he bases his opinion on studies that were performed in test tubes.[18]  (*Id.* at 308:12-13; Lucchesi 09/07/06 Dep. at 184:5-185:2; Apr. 25, 2005 Deposition of Dr. Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A. ("Lucchesi 4/25/05 Dep.") at 89:1-12, attached hereto as Ex. I.)  In fact, Dr. Lucchesi admits that every single study that has actually measured the progression of atherosclerosis with COX-2 inhibitors has found that they *do not accelerate* the process:

> Q:    And every single one that has actually measured the progress of atherosclerosis with COX-2 inhibitors has found that COX-2 inhibitors do not accelerate that process, correct?
>
> A:    We will say yes to that right now.

(Lucchesi 09/07/06 Dep. at 148:14-18.)

To apply, as Dr. Lucchesi suggests, the results of *in vitro* studies to humans despite contrary results from animal studies is scientifically improper.  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 491, 494-95.   It is also legally insufficient.  The Fifth Circuit has held that *in vitro* studies generally provide no basis for opining about general causation.  As explained by the court in *Allen*, *in vitro* studies showing that a drug may have an adverse effect are "the beginning, not the end of the scientific inquiry and prove[] nothing about causation without other scientific evidence."  102 F.3d at 198; *see also Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 830 (D.C. Cir. 1988).

---

[18] Dr. Lucchesi goes as far as to say that he does not "care" if the studies were in a test tube since the data "fit" his theory.  (Lucchesi 09/07/06 Dep. at 184:5-185:2.)

4.    Dr. Lucchesi cannot establish the mechanism by which Vioxx supposedly impacts ischemic preconditioning.

Dr. Lucchesi opines in his latest report that COX-2 inhibitors annul the cardioprotective mechanism of "ischemic preconditioning,"[19] thus "increasing the extent of myocardial tissue injury and the potential for increased morbidity (heart failure) or sudden death due to an arrhythmic event." (Lucchesi Rpt. at 52.)  But, at his deposition, Dr. Lucchesi conceded that there is no reliable scientific data supporting the proposition that COX-2 inhibitors, including Vioxx, have any effect on ischemic preconditioning in humans.  Indeed, he conceded that "we do not have solid human data"; the data on this issue is "just beginning to emerge in the clinical literature"; and "it has not been definitely proven." (Lucchesi 10/26/05 Dep. at 401:14-402:9, 400:14-401:2, 402:14-22.)  These concessions demonstrate the unreliability and inadmissibility of any testimony Dr. Lucchesi may proffer regarding the potential impact of Vioxx on ischemic preconditioning.  *See, e.g., In re Propulsid*, 261 F. Supp. 2d at 615 ("The Court is aware that the future may shed more light on this matter.  Medical science may one day determine with sufficient reliability that a causal relationship exists . . . but it is not there yet and may never be. A trial court must function in the present assessing evidence that presently exists." (citation omitted)).

In fact, the only foundation Dr. Lucchesi could provide for his opinion on "ischemic preconditioning" comes from animal studies.  (Lucchesi Rpt. at 52; Lucchesi 10/26/05 Dep. at 400:14-401:2.)  As noted above, animal studies generally do not constitute the type of reliable

---

[19] "Ischemic preconditioning" is a theorized physiological process wherein "brief periods of experimental coronary artery occlusion and reperfusion before a more sustained period of occlusion result in marked reduction in the amount of necrosis that develops."  Eugene Braunwald et al., HEART DISEASE: A TEXTBOOK OF CARDIOVASCULAR MEDICINE 1144 (6th ed. 2001).  More simply, the theory is that chronic ischemia allows the heart to build up tolerance to insufficient blood flow.

scientific data necessary to support a causation opinion. *Allen*, 102 F.3d at 195, 197-98 & n.5 (excluding expert opinion based in part on "inconclusive" and "unreliable" animal studies). Moreover, these animal studies involved the use of a drug *other than* Vioxx,[20] making it even more unreliable here. As noted earlier, Dr. Lucchesi himself appears to recognize that "there may be subtle differences in [the] respective pharmacodynamic properties [of various COX-2 inhibitors] that determine the duration of exposure before the development of an adverse [cardiovascular] event . . . ." (Lucchesi Rpt. at 66.) Indeed, numerous courts have recognized that data involving one drug cannot prove that a different drug causes harm. *See, e.g., Joiner*, 522 U.S. at 145-46; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1246 (11th Cir. 2005) (excluding expert's opinion that ephedrine causes vasospasms based on analogy to different drug and noting that "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced" (internal citation and quotation marks omitted)); *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002).

Therefore, Dr. Lucchesi does not have a reliable basis for his opinions on the alleged impact of Vioxx on ischemic preconditioning, and cannot testify about these opinions.

## IV.   DR. LUCCHESI HAS NO SCIENTIFICALLY RELIABLE BASIS TO OPINE ON SPECIFIC CAUSATION.

Although he received a medical degree in 1964, Dr. Lucchesi is not a licensed physician; he has never been licensed to practice medicine; he has never treated a patient as a licensed physician; and he has never been allowed to prescribe medications. (Lucchesi 10/18/05 Dep. at 53:8-17, 62:16-63:14; Lucchesi 09/07/06 Dep. at 13:13-23.) Indeed, in *Plunkett,* the Court

---

[20] For example, one of the studies he relies on used Celebrex and an experimental coxib, NS-398 as opposed to Vioxx. *See* Shinmura K et al., *Cyclooxygenase-2 mediates the cardioprotective effects of the late phase of ischemic preconditioning in conscious rabbits.* PNAS. 2000 Aug;97(18):10197–10202 at 10198.

recognized that Dr. Lucchesi was not qualified to give an opinion on specific causation. (Nov. 11, 2005 *Plunkett v. Merck* Order at 39.) Nothing in Dr. Lucchesi's experience or training has changed in the intervening months, and there is no need for the Court to diverge from its prior ruling in this regard.

Moreover, even if he were qualified to render a specific cause opinion, which he is not, it is clear that he has not done the work necessary to render such an opinion here. He has not reviewed the medical records and other case specific information sufficiently to render an opinion as to the specific cause of Mr. Mason's heart attack. For example, he never reviewed the relevant depositions, such as those of the plaintiff and his treating physicians:

> Q: So have you reviewed any depositions of Mr. Mason's doctors?
>
> A: No.
>
> Q: Have you reviewed Mr. Mason's deposition?
>
> A: No.

(Lucchesi 09/07/06 Dep. at 37:10-15.)

Nor did he know the relevant risk factors for Mr. Mason:

> Q: And you know Mr. Mason followed a poor diet by his own description, correct?
>
> …
>
> A: We have no information on that.
>
> Q: You haven't reviewed his deposition, right?
>
> A: No.
>
> …
>
> Q: And lack of exercise, do you have any basis to determine that Mr. Mason engaged in cardiovascular exercise?
>
> A: I have no way of knowing that.
>
> …
>
> Q: Do you believe Mr. Mason had any degree of hypertension prior to starting Vioxx?
>
> A: I have no information on that.

(*Id.* at 200:6-24.)  Similarly, he has not reviewed Mr. Mason's angiogram, one of the most critical pieces of medical evidence in this case:

Q:    . . . You did not actually review the angiogram film itself?

A:    No.

Q:    And you don't know what relative portion the clot contributed to that 90 percent versus plaque, right?

A:    That is correct.

(*Id.* at 188:6-20.)  Nor did he conduct a detailed review of the medical and hospitalization records as shown by his inaccurate and incomplete recollection of them at deposition.[21]

Q:    Okay.  The – there was a reference in the – Mr. Mason did not receive a thrombolytic in the hospital, correct?

A:    He received a thrombolytic in the first hospital.

Q:    The –

A:    That's the standard of care.  He received aspirin and a thrombolytic in the first hospital.

(*Id* at 230:12-20.)    But after further questioning, and in the face of the medical records themselves, he recanted this testimony, stating, "Maybe I was wrong about the thrombolytic therapy. . . .  I guess he did not have a thrombolytic.  He did not have a thrombolytic, unless I'm missing it here."  (*Id.* at 232:13-19.)

Even assuming *arguendo* that he had the appropriate medical background and had made a detailed review of the medical records and information in this case necessary to opine on specific causation, Dr. Lucchesi concedes that he has no basis to opine that Mr. Mason's heart attack was

---

[21] The premature termination of Dr. Lucchesi's September 7, 2006 deposition deprived Merck of the opportunity to examine Dr. Lucchesi's understanding of specific cause fully, and to  establish his inadequate knowledge further.   Therefore, Merck reserves its rights to supplement this motion following this Court's ruling on Merck's pending Motion to Compel the Deposition of Dr. Benedict Lucchesi, or in the Alternative, to Exclude Him from Testifying at Trial.

caused by any of the pharmacologic mechanisms he alleges can cause such an event.  First, even if the FitzGerald imbalance hypothesis were proven, Dr. Lucchesi has no reliable scientific basis to testify that Mr. Mason actually suffered an imbalance of prostacyclin and thromboxane from Vioxx use, or even the degree of prostacyclin inhibition necessary to cause a clinically significant result.  Second, Dr. Lucchesi testified at his deposition that he does not believe Mr. Mason suffered a plaque rupture, one of his theorized mechanisms of action.  (*Id.* at 182:4-7.) Third, Mr. Mason had coronary artery disease at the time of his heart attack[22] and Dr. Lucchesi admits he cannot opine on whether Vioxx contributed to the formation of plaque in Mr. Mason's coronary arteries.  (*Id.* at 190:2-11 (admitting that "[n]obody has any basis" to say Mr. Mason had any acceleration of atherosclerosis between the time he started taking Vioxx and the day of his heart attack).)[23]  Nor does Dr. Lucchesi make one mention, in a 110 page report, of the fact that Mr. Mason had erectile dysfunction, which can be a sign of atherosclerotic vascular disease, for some time before his heart attack.[24]  Yet, despite this lack of data, Dr. Lucchesi goes on to opine that Vioxx accelerated Mr. Mason's atherosclerotic disease based solely on two test tube studies.[25]  (*Id.* at 184:5-185:2.)  Such scientific speculation does not rise to the level of

---

[22] Plaintiff's cardiology expert, Dr. Wiener, concedes that Mr. Mason had coronary disease at least as of the day of his heart attack.  .  (Aug. 24, 2006 Deposition of Dr. Isaac Wiener, M.D., F.A.C.C. ("Wiener Dep.") at 97:9-15, attached hereto as Ex. J.)

[23] Plaintiff's cardiology expert, Dr. Wiener, also conceded that he could not opine on the duration of Mr. Mason atherosclerotic disease.  (Wiener Dep. at 99:3-9.)

[24] (*See* Wiener Dep. at 160:2-25.)

[25] Despite his admission that knowing the status of Mr. Mason's atherosclerotic disease prior to his heart attack was not possible, Dr. Lucchesi purports to provide a chronology of exactly what happened inside Mr. Mason's coronary artery:

> In the case of Mr. Mason, he may have had a limited degree of endothelial cell injury that led to the formation of a plaque in his left anterior descending coronary artery as well as in one of the side branches of the vessel. Due to the fact that his blood lipid profile was such that his LDL was low, he did not go on to have a continuous inflammatory process
> (*footnote continued next page*)

reasonable medical certainty that is needed to establish specific causation.  *Moore*, 151 F.3d at 279 (improper to "leap[] from an accepted scientific premise to an unsupported one"); *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (causation opinions based on a "mere possibility" are insufficient; when matter remains one of "speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant").

Moreover, Dr. Lucchesi cannot rule out other causes of Mr. Mason's heart attack.  Both the Fifth Circuit and this Court have confirmed that it is crucial for purposes of *Daubert* that an expert witness rule out possible alternative causes of a plaintiff's injury.  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (expert cannot, in the face of multiple "potential" causes, "simply pick[] the cause that is most advantageous to [plaintiff's] claim[s]"); *Moore*, 151 F.3d at 279; *see also In re Propulsid Prods. Liab. Lit.*, 261 F. Supp. 2d at 618 (excluding experts' opinions because experts "cannot show that Propulsid caused Brock's symptoms, as they have failed to exclude other possible symptoms").  But Dr. Lucchesi cannot do that here since, as noted above, he does not have the relevant medical facts.  *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) ("reliable" causal analysis "typically is performed after 'physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests'").  Dr. Lucchesi did not have any information on Mr. Mason's blood pressure, diet, or physical activity before his heart attack.  Because Dr. Lucchesi was unaware of Mr. Mason's undisputed preexisting risk factors for a heart attack, and did not

---

and a process of resolution occurred, which stabilized the plaque and reduced the risk of having a myocardial infarction.

(Lucchesi Rpt. at 91.)

rule them out, Dr. Lucchesi's causation opinions are speculative, unreliable, and fail the *Daubert* test.

**V.      CONCLUSION.**

For all the foregoing reasons, Merck respectfully requests that the Court grant its motion to exclude Dr. Lucchesi's testimony in its entirety.

Dated:  September 19, 2006                          Respectfully submitted,


                                                   */s/ Dorothy H. Wimberly*_____
                                                   Phillip A. Wittmann, 13625
                                                   Dorothy H. Wimberly, 18509
                                                   STONE PIGMAN WALTHER
                                                   WITTMANN L.L.C.
                                                   546 Carondelet Street
                                                   New Orleans, Louisiana  70130
                                                   Phone:  504-581-3200
                                                   Fax:      504-581-3361

                                                   Defendants' Liaison Counsel

                                                   Philip S. Beck
                                                   Tarek Ismail
                                                   Shayna Cook
                                                   BARTLIT BECK HERMAN PALENCHAR
                                                   & SCOTT LLP
                                                   54 West Hubbard Street, Suite 300
                                                   Chicago, Illinois  60610
                                                   Phone:  312-494-4400
                                                   Fax:      312-494-4440

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

Attorneys for Merck & Co., Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Memorandum in Support of Motion to Exclude Testimony of Benedict R. Lucchesi, M.D., Ph.D., M.S., F.A.H.A. has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 19th day of September, 2006.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel