

12185045

Aug 25 2006
2:44PM

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX® | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| This document relates to | JUDGE FALLON |
| GERALD BARNETT and CORRINE BARNETT, | MAGISTRATE JUDGE KNOWLES |
| Plaintiffs, | |
| vs. | |
| MERCK & CO., INC., | |
| Defendant. | |
| Civil Action No. 2:06cv485 | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## RULE 26(a) (2) (B) EXPERT REPORT OF DR. JANET ARROWSMITH-LOWE

I have been asked to give an opinion regarding Merck & Co., Inc.'s ("Merck") interactions with the United States Food & Drug Administration ("FDA") with respect to Vioxx and Merck's disclosure of cardiovascular and other data about Vioxx to FDA and to the medical community. As set forth more fully below, it is my opinion that Merck acted as a reasonably prudent and responsible pharmaceutical company in interacting with FDA with respect to Vioxx and in its disclosures to FDA and to the medical community of cardiovascular and other data about Vioxx.

## Qualifications

I am an epidemiologist and a medical doctor. I am Board Certified by the American Board of Internal Medicine, a fellow of the American College of Physicians, and an elected member of the American College of Epidemiology. I was a medical epidemiologist and medical review officer at the Food and Drug Administration ("FDA") for approximately 11 years, from 1984-1996, and was acting Director of the Office of Surveillance and Biometrics, Center for Devices and Radiologic Health at FDA from 1993 through 1995. I have expertise in the regulations which govern the approval, labeling, advertising and marketing of pharmaceutical products in the United States and which are contained in Title 21 of the United States Code of Federal Regulations. I am familiar with the processes by which FDA determines efficacy and safety for new drugs approved for marketing in the United States and the issues FDA considers in the development of product labeling. A copy of my Curriculum Vitae, which includes my publications over the past ten years, is attached as Exhibit A.

I have been retained as an expert witness in a number of litigations. A list of my deposition and trial testimony over the past four years is attached as Exhibit B. In this matter, I am being compensated for my time at my standard rate of $400 per hour. For testimony, I charge $4,000 per day, $2,000 if the testimony is four hours or less.

My opinions as set forth below and this report are based on my training and experiences as a medical doctor, epidemiologist, and FDA medical review officer and acting director of Office of Surveillance and Biometrics. My opinions are also based on my knowledge of the requirements applicable to pharmaceutical manufacturers under the Federal Food, Drug, and Cosmetic Act and federal regulations pursuant to the Act; my knowledge of general FDA policies, procedures and industry practices gained through my FDA and consultant experience;

2

and my knowledge of practices in the pharmaceutical industry involving the development of innovative medicines.

      In preparing this report, I have reviewed Merck's communications with and submissions to FDA, including the relevant portions of the Investigational New Drug Applications ("IND"), New Drug Application ("NDA") and supplemental New Drug Applications ("sNDAs") for Vioxx; FDA commentary; protocols and data from Vioxx clinical studies, including clinical study reports; the minutes and the transcripts of the April 20, 1999 and February 8, 2001 Arthritis Advisory Committee Meetings; the minutes and transcripts of the February 16-18, 2005 Advisory Committee Meetings; the FDA's April 6, 2005 Decision Memorandum and the April 7, 2005 Public Health Advisory; the reports of plaintiff's designated experts Dr. Richard M. Kapit and Dr. John L. Gueriguian; and other literature and materials that I obtained on my own or which were provided to me by Merck. A list of the materials I considered in forming my opinions is attached as Exhibit C.

**Opinions**

      FDA is the United States Government Agency responsible for assuring that prescription medicines marketed in the United States are safe and effective for use as labeled, and that the labeling contains adequate directions for use. FDA is responsible for the review and approval of all new prescription medicines before those medicines can be marketed in the United States. FDA also maintains strict control over the labeling of prescription medicines and must approve the format, content and exact wording of the package insert.

      In my experience, FDA does not compromise on safety issues, does not capitulate to the wishes of industry on labeling or approval, and consistently acts on behalf of its primary and most important customer, the American public. Despite allegations to the contrary, the FDA review and approval process is rigorous, conducted according to well established scientific

3

principles, regulations and requirements; necessitates the review of thousands of pages of data and data interpretation; involves enormous effort on behalf of highly trained scientists within the FDA; may involve highly respected scientific consultants from outside the FDA; and results in the final approval of only a small percentage of candidate pharmaceutical products entering the clinical evaluative process.

### *Merck adequately tested the potential risks of Vioxx.*

Merck at all times acted properly and as a reasonably prudent pharmaceutical company in investigating the safety profile of Vioxx. Merck conducted extensive preclinical testing of Vioxx, including numerous animal studies, and then conducted extensive clinical testing in humans before submitting to FDA its initial NDA for Vioxx.

As of November 23, 1998, the date of that submission, Merck had completed more than 58 clinical trials, involving more than 10,000 patients, and collected and analyzed the cardiovascular data from every Vioxx clinical trial. Merck submitted safety and efficacy data, including data and analyses regarding cardiovascular events, from these trials to FDA in its NDA for Vioxx, in accordance with federal regulations. FDA reviewed the data provided by Merck, found Vioxx safe and effective for its intended uses, and approved the NDA for Vioxx on May 20, 1999.

Had FDA concluded that Merck had not adequately investigated the safety profile of Vioxx, including the theoretical risk of a pro-thrombotic effect according to the so-called FitzGerald hypothesis, FDA could have placed additional requirements on Merck prior to approving Vioxx. FDA was fully aware of the FitzGerald hypothesis and could have required Merck to conduct further tests before approval, required a bolded or boxed warning in the package insert, or refused to approve the NDA for Vioxx altogether. FDA did none of these.

4

Nor should it have. In my opinion, Merck adequately investigated the potential risks of Vioxx and the data supported approval of the product.

After the approval of Vioxx, Merck continued to investigate the safety of Vioxx and to disclose safety data promptly to FDA. Merck conducted more than 70 additional clinical trials involving more than 40,000 patients. Merck provided FDA with safety data, including data regarding cardiovascular events, from these trials and from post-marketing experiences in accordance with federal regulations.

FDA continued to evaluate the risk/benefit profile of Vioxx and approved Vioxx for three additional indications. In 2002, FDA approved Vioxx for the treatment of rheumatoid arthritis. In 2004, FDA approved Vioxx for the acute treatment of migraine in adults and for relief of the signs and symptoms of juvenile rheumatoid arthritis.

Following the VIGOR trial, Merck conducted prospectively designed cardiovascular safety studies of Vioxx. This took the form of a planned cardiovascular analysis of data from three long-term, appropriately powered, placebo-controlled studies in patients with or at risk for colon or prostate cancer.

### Merck adequately disclosed potential risks of Vioxx.

Contrary to the assertions of Drs. Kapit and Gueriguian, Merck properly and adequately disclosed data relating to potential risks of Vioxx to FDA and to the medical community in accordance with federal regulations. As described above, Merck timely and appropriately provided FDA with safety data from its clinical trials program. Merck also provided FDA with information from post-marketing experiences in accordance with federal regulations.

In general, the types of data and analyses that FDA expects a pharmaceutical manufacturer to submit for review do not include exploratory, incomplete or preliminary

analyses nor does FDA expect the submission of internal company emails.  I have reviewed Merck's submission of data and analyses to FDA and find that appropriate information was provided to FDA upon which it could base regulatory actions and opinions.  FDA has the authority to request additional information or additional analyses at any time during its review of an NDA or sNDA.

Merck also disclosed information about Vioxx to the medical community.  Merck periodically published findings from its studies, including data regarding cardiovascular events, in the press, and in peer-reviewed journals.  Merck also provided findings from its studies at industry forums and it directly communicated safety and efficacy information to healthcare providers, both in response to questions for such information and at professional meetings.

Furthermore, the package insert for Vioxx always adequately described the cardiovascular information then available with respect to Vioxx, in accordance with FDA regulations and policy.  The Vioxx package insert always included specified data from clinical trials regarding cardiovascular and cerebrovascular thromboembolic adverse experiences as well as cautionary language that Vioxx is not a substitute for aspirin for cardiovascular event prophylaxis.  The initial package insert for Vioxx stated that cardiovascular events have "been reported rarely (less than 0.1%) in patients taking Vioxx, regardless of causality."  Based on the scientific information available at that time it would have been inappropriate to include a stronger statement regarding cardiovascular risk in the package insert for Vioxx.  FDA concluded long ago that overstating warnings in labeling could be dangerous practice.  If drug labeling included every alleged risk regardless of the scientific merit, then the value of all precautionary language would be diluted and physicians might be discouraged from using beneficial medicines.  Once Vioxx was on the market, Merck continued to work with FDA to

include new safety data in the package insert for Vioxx, where appropriate, in a timely and appropriate manner.

> ### *Merck's disclosure of VIGOR to FDA and to the medical community was timely and appropriate.*

On March 9, 2000, Merck learned the results of the VIGOR trial, a randomized, double-blind controlled clinical trial. VIGOR was designed in consultation with FDA and compared the gastrointestinal safety of a single daily dose of 50 mg of Vioxx with 500 mg twice a day of naproxen, a traditional non-steroidal anti-inflammatory drug. Merck's efforts to understand and disclose the VIGOR results were reasonable. Following the VIGOR trial, Merck conducted an extensive review of data from completed and ongoing clinical trials of Vioxx. These data showed no indication of a statistically significant difference in the incidence of serious thromboembolic cardiovascular events between Vioxx, and placebo or comparator non-naproxen NSAIDs. Merck also reviewed the available data on naproxen, as well as clinical trial data relating to at least one other NSAID that had demonstrated a cardioprotective effect similar to aspirin. The weight of the available evidence pointed to a cardioprotective effect of naproxen as the most plausible explanation for the thromboembolic cardiovascular results in VIGOR.

Merck immediately and effectively disclosed the results of the VIGOR trial, including the cardiovascular results, directly to FDA. For example, within two weeks of the unblinding of VIGOR, Merck telephoned FDA to communicate the gastrointestinal and cardiovascular results and sent a letter to FDA that included the VIGOR study summary report. Merck then submitted the sNDA for VIGOR, which included proposed labeling on the gastrointestinal and cardiovascular results of VIGOR, to FDA on June 29, 2000.

After VIGOR, Merck amended its ongoing clinical trial protocols to permit the use of low dose aspirin when physicians concluded that it was in the best interests of their

patients to receive such therapy.  Merck sent a letter to all investigators participating in Vioxx

clinical trials informing them of the VIGOR data and of the change in the protocol.  This

information was also included in a March 27, 2000 press release that Merck issued, and a copy

of the letter was provided to FDA along with the VIGOR study summary report.

Merck promptly and effectively disclosed the results of the VIGOR trial,

including the cardiovascular results, to the medical community through press releases, at medical

conferences and in the New England Journal of Medicine.  Merck also appropriately and in a

timely manner disclosed the results of VIGOR in response to unsolicited requests for information

from healthcare providers through Professional Information Requests ("PIRs").  Merck's use of

PIRs was consistent with FDA requirements.

I am aware that the editors of the New England Journal of Medicine have

published "An Expression of Concern" and "Expression of Concern Reaffirmed" regarding the

Bombardier et al article first published in New England Journal of Medicine in November 2000.

I am disappointed that New England Journal of Medicine continues to assert that investigators

and authors were obligated to violate pre-specified data cut-off and analysis plans in a large

randomized, controlled clinical trial.

Despite the editors' assertion that the one month difference in cut-off dates for the

gastrointestinal data and the cardiovascular data "inevitably skewed the results," there were no

actual changes in the statistical significance of the cardiovascular results when the additional

three myocardial infarctions on Vioxx and the one additional stroke in the naproxen group were

included in the analyses provided to FDA in a safety update in October 2000 and presented at a

public Advisory Committee meeting convened by FDA in February 2001.   The concerns raised

by the New England Journal editors were adequately addressed by the responses of Bombardier

et al and the Merck investigators, which were published in the Journal in the February 22, 2006 edition.

In my opinion, the speed with which Merck disclosed the VIGOR data was entirely appropriate, as was the content of the disclosures.

### *The VIGOR results were properly and in a timely manner incorporated into the product circular for Vioxx.*

Merck also acted appropriately in working with FDA to incorporate the VIGOR results into the package insert for Vioxx. After learning the VIGOR results, Merck drafted new labeling to submit to FDA. FDA did not instruct Merck to do this and, in fact, on May 1, 2000, Robert DeLap, then director of Center for Drug Evaluation and Research ("CDER"), Office of Drug Evaluation V, stated he was "convinced [Vioxx] is labeled appropriately." In June 2000, Merck submitted an sNDA to FDA with a proposed package insert incorporating the results of VIGOR, approximately four months after learning of those results and requested priority review of the label changes in August 2000, which was denied by FDA.

Contrary to the suggestions by Dr. Kapit and Dr. Gueriguian that Merck should have incorporated the cardiovascular results of VIGOR into labeling for Vioxx without FDA's prior approval, this action would have been inappropriate. There are narrow circumstances in which a manufacturer is permitted to change its labeling without FDA's prior approval but those circumstances were not present here. The VIGOR trial presented a highly complex data set, involving thousands of patients, from multiple clinical sites in a patient population for which Vioxx did not yet have an approved indication and with a dose that had not yet been approved for chronic use. Indeed, had Merck attempted to submit the VIGOR label change as a "Changes Being Effected" supplement, I have no doubt that FDA would have immediately rejected the submission and required Merck to submit the VIGOR label as a "prior approval" supplement.

Similarly, any suggestion that a pharmaceutical manufacturer could submit as a "Changes Being Effected" supplement a new, Black Box warning to be incorporated into a marketed drug label is misinformed.  FDA has clearly stated that the authority for inclusion of a Black Box warning in a product label is within FDA's exclusive purview.   Unless specifically required to do so by the FDA, it would not be permissible for a manufacturer to submit a "Changes Being Effected" supplement proposing a Black Box warning.

To the extent that Drs. Kapit and Gueriguian suggest that a warning should have been added to the label for Vioxx in response to the VIGOR study, they are wrong.  When Merck unblinded the VIGOR trial, it was not clear what the significance of the results were.  In fact, when FDA approved labeling incorporating the VIGOR results, it included a statement that the significance of the VIGOR results is unknown.   Merck required the FDA's input to craft labeling that accurately and appropriately conveyed the available safety data to healthcare providers.

Numerous experts, including FDA's own experts, reviewed the Vioxx cardiovascular data from VIGOR and other studies, including placebo-controlled studies, as well as from post-marketing experience.  FDA concluded that there was insufficient evidence of cardiovascular risk associated with Vioxx to warrant a statement in the Warnings section of the package insert.  As the Precaution section of the package insert for Vioxx stated, "the significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown."  In the absence of reasonable evidence that Vioxx was associated with cardiovascular hazard, it would have been inappropriate for a cardiovascular warning to be added to the package insert for Vioxx.

Likewise, any suggestion that Merck dragged its feet in submitting or working on new labeling for Vioxx is incorrect.  In addition, any suggestion that Merck failed to comply with FDA requests for timely submission of data from additional post-marketing clinical trials, from safety update analyses and reports, or in response to FDA information requests is also incorrect.  Merck responded promptly to each request for information and complied with all safety update requirements in a timely and appropriate fashion.

FDA's process of developing new labeling involves a thorough review and analysis of the data.  The process is collaborative and often involves frequent exchanges between FDA and the sponsor.  Merck's submission of new proposed labeling within approximately four months of completion of VIGOR was entirely proper and reasonable.  Thereafter, Merck requested that FDA give a priority review to the VIGOR sNDA, but FDA assigned the sNDA a standard review.  After submitting the VIGOR sNDA, Merck cooperated fully and promptly with FDA to analyze the VIGOR data and to craft new labeling incorporating that data.

In April 2002, FDA approved a new package insert for Vioxx, which incorporated the VIGOR results.  Merck immediately issued a press release announcing the new package insert and sent copies of the new package insert to healthcare providers around the country.  Merck's conduct in working with FDA to incorporate the VIGOR results into the package insert for Vioxx was entirely appropriate and responsible, and Merck did nothing improper to delay the approval or dissemination of new labeling.  In fact, in my view, Merck unquestionably acted with due diligence in trying to move the process along.

### *Merck submitted the ADVANTAGE data in a timely manner.*

I disagree with Dr. Gueriguian's and Dr. Kapit's assertions that Merck failed to submit the entire data set from the ADVANTAGE trial in a timely manner.  The ADVANTAGE

trial was a large, multi-national, randomized trial in which Vioxx 25 mg per day was compared to naproxen 1000 mg per day in a population of approximately 5500 patients with osteoarthritis. The data from this large trial were submitted to FDA promptly. On March 23, 2000, Merck faxed to FDA the blinded safety results of ADVANTAGE as Treatment A vs Treatment B. On December 21, 2000, Merck provided FDA with a preliminary report and continued to submit data thereafter as available. Merck provided the Clinical Study Report on a rolling basis, providing the final two sections in April 2001. I see no evidence that Merck delayed these submissions; to the contrary, Merck provided the completed large data set to FDA as quickly as reasonably possible.

### *Dr. Kapit misconstrues FDA regulatory actions involving Vioxx.*

Dr. Kapit places undue emphasis on the September 2001 Warning Letter to Merck. That letter was sent by the Division of Drug Marketing, Advertising, and Communications ("DDMAC"), not the division tasked with reviewing the safety and efficacy of drugs like Vioxx. DDMAC sends Warning Letters to drug manufacturers in response to promotional activities, not safety issues raised by clinical data or by information from post-marketing adverse experiences. DDMAC uses Warning Letters to raise issues relating to promotional activity that may not be in compliance with FDA regulations and policy. Warning Letters are a tool to encourage companies to deal with potential problems voluntarily.

The September 2001 Warning Letter raised a concern about promotional statements made by a speaker during audio conferences and by Merck professional representatives at two meetings. The Warning Letter also questioned the language used in the title of a press release Merck issued regarding the VIGOR results. Merck responded to FDA by explaining its actions with respect to the press release and by taking corrective action with regard

to FDA's other allegations.  FDA took no disciplinary action against Merck, and promptly wrote to Merck that it considered the matter closed.

In my experience, the fact that FDA closed these matters without disciplinary action indicates that FDA was satisfied with Merck's explanations and actions with respect to the issues raised in the Warning Letter.  FDA found no violation of applicable laws or regulations.

### *Merck acted appropriately in response to the APPROVe interim data.*

On September 23, 2004, Merck was informed that the External Safety Monitoring Board had recommended that the APPROVe study be stopped.  The preliminary results showed a small increased risk of confirmed cardiovascular events beginning after 18 months of continuous treatment with Vioxx.  The results from the first 18 months show no increased risk, which was consistent with prior Vioxx randomized clinical trial data, including the results from two large placebo-controlled Alzheimer's studies that were in the product circular for Vioxx.  Merck provided the interim APPROVe data to FDA and on September 30, 2004 voluntarily withdrew Vioxx from the market.

In my opinion, it would have been possible to continue to market Vioxx after incorporating the APPROVe data into the label for Vioxx.  However, I understand that Merck believed it was in the best interests of patients to voluntarily withdraw Vioxx from the market. Given the availability of alternative therapies and the data known at that time, Merck acted responsibly in voluntarily withdrawing Vioxx from the market.  FDA stated in a press release, "Merck did the right thing by promptly reporting these findings to FDA and voluntarily withdrawing the product from the market."

Merck continued to act responsibly by analyzing the final APPROVe data as well as data from other clinical trials and presenting that data to FDA and to an Advisory Committee on February 16-18, 2005.  After reviewing these data and data concerning other COX-2

13

inhibitors and NSAIDs, a majority of the Advisory Committee members, by a vote of 17 to 15, concluded that the overall risk versus benefit profile for Vioxx supported marketing in the United States.

Following the February 2005 Advisory Committee Meetings, on April 6, 2005, CDER issued a Decision Memorandum providing analysis and recommendations for Agency action regarding NSAIDs and cardiovascular risk. The authors of the memorandum concluded that any cardiovascular risks associated with Vioxx are comparable to the risks associated with all other non-aspirin selective and non-selective NSAIDs, with the possible exception of naproxen. The authors of the memorandum also concluded that the short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events.

In addition to the memorandum itself, FDA issued a Public Health Advisory on April 7, 2005 entitled "Important Changes and Additional Warnings for COX-2 Selective and Nonselective Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)." In that Public Health Advisory, FDA called for Pfizer to withdraw Bextra from the market and to add a boxed warning to Celebrex. Pfizer complied shortly thereafter, withdrawing Bextra from the market and submitting to the FDA its revised labeling for Celebrex.

In addition, the FDA called for Black Box warnings to be added to prescription dosage formulations of currently marketed NSAIDs and for additional warnings to be added to currently marketed over-the-counter formulations of NSAID products. Contrary to the suggestion of Dr. Gueriguian, the manufacturers of currently marketed NSAIDs are complying with the FDA's directive. The prescription formulations of all currently marketed NSAIDs listed on the FDA's Medication Guide now have boxed warnings.

As for Vioxx, Merck has stated that it will continue to work with FDA to determine the best course of action with respect to reintroduction of Vioxx into the US market. In my opinion, in light of the data now available and the fact that Vioxx has a proven gastrointestinal advantage relative to traditional NSAIDs, as well as the desire of physicians to have it available to prescribe in appropriate patients, this is the responsible approach for Merck to take.

**CONCLUSION**

It is my opinion, based on my years of experience in the field of pharmaceutical regulation, my work with FDA, and my expertise in evaluating prescription drug safety and labeling, that Merck acted as a responsible pharmaceutical company in investigating the safety profile of Vioxx, and in disclosing information about Vioxx, including the results from VIGOR and from APPROVe, to FDA and to the medical community and in voluntarily withdrawing Vioxx from the market in response to the interim data from the APPROVe study.

I reserve my right to supplement this report.

Executed on May 30, 2006.

JANET ARROWSMITH-LOWE, M.D.

15

**Exhibit A**

CURRICULUM VITAE
JANET B. ARROWSMITH-LOWE, M.D., F.A.C.P.
May 2006

Home Address:
P.O. Box 3148
185 Eagle Creek Canyon
Ruidoso, NM 88355
(505) 336 2122 (voice)
(505)-937-3161 (cell)
email: arrowsmith@zianet.com

Office Addresses
Arrowsmith-Lowe Consulting, Inc
P.O. Box 3148
185 Eagle Creek Canyon
Ruidoso, NM 88345
(505)-336-7821(voice)
(505)-336-7920 (facsimile)

Education:
Bachelor of Arts                        Duke University           1972
Doctor of Medicine                      Tulane University         1979

Internship and Residency:
Internal Medicine                       University of Alabama at Birmingham
                                        1979 through 1982

Additional Training:
Epidemic Intelligence Service           National Centers for Disease Control and
                                        Prevention, 1984 through 1986

Licensure:
Federal Licensing Exam                  June      1979
New Mexico                              November 1996

Specialty Board Certification:
American Board of Internal Medicine,    September 1986

Professional Associations:
American College of Epidemiology        Elected April 2002
Fellow, American College of Physicians  Elected April 1994
American Medical Association
International Society of Pharmacoepidemiology
Drug Information Association
Reserve Officers Association
Lincoln County Medical Society

Professional Experience:
1999 to present
Arrowsmith-Lowe Consulting, Inc.
          * President of drug, biologic, and device consulting firm
Consultant, NIDA Division of Research and Development, National Institutes of Health
Special Emphasis Panel, National Institute of Allergy and Infectious Diseases, NIH

1998 to 1999
Internal Medicine Associates, Ruidoso, NM
          *Full time internal medicine practice with ICU privileges
          *Member, Critical Care / Cardiorespiratory Committee
          *Physician member, Infection Control Committee
          *Physician Board member, Headstart of Lincoln County
          *Ryan White provider, University of New Mexico Health Sciences Center

Janet Arrowsmith-Lowe, M.D., F.A.C.P.
Curriculum vitae
Page 2 of 8

Professional Experience, continued

1996-1998:
*Clinical Specialty Consultant*, Mescalero PHS Indian Health Service
Hospital, Mescalero, NM
  * Full time clinician in a family practice inpatient and outpatient setting
  * Consultant on Internal Medicine specialty problems
  * Member of the Quality Assurance special team
  * Co-chair of the Hospital Infection Control Committee
  * Mescalero Service Unit member of the Albuquerque Area Diabetes Team
  *Acting Clinical Director, June 1997 – November 1997


1995-1996:
*Medical Review Officer*, Division of Blood Applications, Office of Blood Research and Review, Center for
Biologics Evaluation and Research, U.S. Food and Drug Administration, Rockville, MD

  * Internal medicine clinical specialist with expertise in clinical trial design and xenograft
  transplantation
  * Primary care provider for HIV-infected persons, Whitman-Walker Clinic, Washington, DC

1993 - 1995
*Acting Director, Office of Surveillance and Biometrics,* Center for Devices and Radiological Health. U.S.
Food and Drug Administration, Rockville, MD

  * Supervised staff of 113 professional and support personnel with an annual budget of
  $2.5 million
  * Responsible for monitoring safety and effectiveness of all medical devices marketed in the
  U.S.
  * Primary care provider for HIV-infected persons, Whitman-Walker Clinic, Washington, DC

1991-1993:
*Medical Review Officer, Division of Antiviral Drug Products*, Center for Drug Evaluation and Research,
U.S. Food and Drug Administration, Rockville, MD

  * Reviewer for initial clinical trials of new drugs developed to treat HIV,
  Herpes, Varicella-Zoster and other human viral pathogens
  * Clinical consultant to the Division's laboratory for pre- and post exposure prophylaxis  to
  prevent Hepatitis B and HIV infections
  * Field reviewer for CDC's community-based programs in HIV prevention
  * Primary care provider for HIV-infected persons, Whitman-Walker Clinic, Washington, DC

Janet Arrowsmith-Lowe, M.D., F.A.C.P.
Curriculum vitae
Page 3 of 8

<u>Professional Experience, continued</u>

1990-1991:

*Senior Medical Officer (HIV),* Office of the Forum on Quality in Health Care, Agency for Health Care Policy and Research, Rockville, MD

> \* Senior Agency clinical consultant HIV-related policies
> \* Established and convened panel of clinical and community experts for the development of clinical care and treatment guidelines for HIV infection, published in 1993.
> \* Primary care provider for HIV-infected persons, Whitman-Walker Clinic, Washington, DC

1988-1990

*Deputy Director, Office of AIDS and Special Health Concerns, Office of the Commissioner*, U.S. Food and Drug Administration, Rockville, MD

> \*Directed the FDA activities for the AIDS Clinical Trials Information Service, a publicly accessible database of all clinical trials to treat HIV infection
> \*National and international representative for FDA policies on regulation of HIV-related products for diagnosis and treatment
> \* Primary care provider for HIV-infected persons, Whitman-Walker Clinic, Washington, DC

1986 to 1996
*Clinical Instructor*                          Department of Medicine
                                               Georgetown University Medical Center
                                               Washington, DC

1986-1988
*Staff Epidemiologist, Office of Epidemiology and Biostatistics*, Center for Drug Evaluation and Research, U.S. Food and Drug Administration

> \* Monitored postmarket safety and effectiveness of marketed drugs
> \* Consultant to Centers for Drug and Biologics  Evaluation and Research on epidemiologic issues and problems
> \* Special consultant to the U.S. Department of Justice
> \* Primary care, Department of Medicine, Georgetown University Medical Center, Washington, DC.

1984-1986

*Epidemic Intelligence Service Officer*, National Centers for Disease Control and Prevention, Atlanta, GA

> \* First EIS officer assigned to the FDA
> \* Participated in CDC and FDA epidemiologic investigations of problems of national and regional interest, see bibliography and abstract listings
> \* Assigned as editor <u>pro tempore</u>  <u>Morbidity and Mortality Weekly Report,</u>

Janet Arrowsmith-Lowe, M.D., F.A.C.P.
Curriculum vitae
Page 4 of 8

Professional Experience, continued
1982-1984
*Staff Physician*, Cooper Green Hospital, Birmingham AL
         * Internal Medicine attending physician with student, resident and intern teaching
         responsibilities
         * Quality Assurance review responsibilities and Chair, medical-nursing quality
         assurance program

Other Professional Activities
- Reviewer, 2006 Congress of Epidemiology abstracts
- Lincoln County Councilor, New Mexico Medical Society Council of Governors
- Editorial Consultant, ACP's PIER program
- Reviewer, American College of Physicians' (ACP)'s Physician Information and Education Resource (PIER) modules
- President, Lincoln County Medical Society, 2004-2005
- Hoofbeats Therapeutic Riding Program Board of Directors, Alto NM
- Membership Committee, American College of Epidemiology
- Volunteer physician, Bishop Stoney Camp, Episcopal Dioceses of the Rio Grande, 2004, 2005
- Reviewer, Scientific Program Committee, International Society for Pharmacoepidemiology, 2004, 2005
- Secretary/treasurer, Lincoln County Medical Society, elected December 2003
- Medical Director, Ruidoso Home Care, September 2000 to present
- Professional Advisory Group, Ruidoso Home Care, September 2000 to present
- Medical Advisor and Board , Hoofbeats Therapeutic Riding Program, Alto, NM 2001 to present
- Representative, NM Council of the American College of Physicians, 1998 - 2000
- Moderator, Pharmacoepidemiology session, Annual EIS Conference, CDC, Atlanta, GA; 4/97
- Physician Representative DC Branch of the Commissioned Officers' Association 7/75-4/96.
- Member, PHS Medical Review Board July 1991 to 1998
- Member, PHS Co-Step Board Panel January 1991 to 1998.
- FDA Representative, PHS working Group on management of occupational exposure to HIV, 2/89.
- FDA Representative, AIDS Information Service Panel, US PHS Executive Task Force on AIDS; September 1989 - September 1990.
- Editorial Board, Journal of Pharmacoepidemiology, April 1988.
- Reviewer, Annals of Internal Medicine, 1988 to present

Uniformed Services
- Captain (06) US PHS 1984 – 1998; Honorable discharge, February, 1998 at Commander (05) grade. Inactive Reserve, US PHS, 1998 to present

Bibliography
- Silverman BG, Brown SL, Kaczmarek RG, Arrowsmith-Lowe JB, Kessler DA. Reported complications of silicone breast implants: An epidemiologic review.  Ann Int Med 1995; 124:744-56.
- Ulatowski TA and Arrowsmith-Lowe J.  "Antiviral Claims for Medical Devices" . In: Proceeding from the First Workshop on Antiviral Claims for topical Antiseptics, May 31-June 1, 1994. U.S.GPO;1995-386-982:43728 ; pp 19-23.

Janet Arrowsmith-Lowe, M.D., F.A.C.P.
Curriculum vitae
Page 5 of 8

Bibliography, continued

- Arrowsmith-Lowe J. Medical Device Regulations and the Postmarket Surveillance Studies Section of SMDA '980. Jap J Medical Instrumentation 1995; 65:158-9.
- Arrowsmith JB, Gerstman BB, Fleischer DE, Benjamin SB. Results from the ASGE/FDA collaborative study on complication rates and drug use during gastrointestinal endoscopy. Gastrointestinal Endoscopy 1991; 37: 421-7.
- Arrowsmith JB. FDA contributing author. PHS Statement on management of occupational exposure to human immunodeficiency virus. MMWR 1990; 39 RR-1: 1-14.

- Arrowsmith JB. AIDS therapy and the detection of adverse drug reactions in dental practice. J Am Dent Assoc 1989; 119: 46S-48S.

- Arrowsmith JB, Faich GA, Tomita DL, et al. Morbidity and mortality among low birthweight infants exposed to an intravenous vitamin E product, Eferol. Pediatrics 1989; 83: 244-9.

- Hine LK, Arrowsmith JB, Gallo-Torres H. Monooctanoin-associated pulmonary edema. Am J Gastroenterol 1988; 1128-31.

- Spengler RF, Arrowsmith JB, Kilarski DJ, et al. Severe soft tissue injury following intravenous phenytoin: Patient and drug administration risk factors. Arch Med 1988; 148: 1329-33.

- Arrowsmith JB, Creamer JI, Bosco L. Severe dermatologic reactions reported after treatment with tocainide. Ann Int Med 1987; 107: 693-6.

- Arrowsmith JB, Kennedy DL, Kuritsky JN, Anello C, Faich GA. Trends in aspirin use and Reye syndrome reporting, United States, 1979-1985. Pediatrics; 79: 858-63.

- Nelson WL, Fraunfelder FT, Sills JM, Arrowsmith JB, Kuritsky JN. Adverse respiratory and cardiovascular events attributed to timolol ophthalmic solution, 1978-1985. Am J Ophthal 1986; 102: 606-11.

- Hoffman R. Zakonen S, Yang HH, Bruno E, LoBuglio AF, Arrowsmith JB, Prchal JT. An antibody cytotoxic to megakaryocyte progenitor cells in a patient with immune thrombocytopenic purpura, N Eng J Med 1985; 312: 1170-4.

Abstracts

- Arrowsmith-Lowe, Janet. How Do Drugs Get onto the US Market and What Happens Next? Annual Meeting NM Chapter American College of Physicians November 3 – 5, 2005 Albuquerque, NM (poster presentation)

- Arrowsmith-Lowe J, Gogel HK, Lynn R, et al. Serendipitous overdose of octreotide acetate used for variceal hemorrhage. Annual meeting NM Chapter ACP-ACIM, Albuquerque NM, 1999.

- Arrowsmith JB and Kennedy DL. National patterns of aspirin use and Reye syndrome reporting APHA Annual Meeting; New Orleans, LA. 1987

- Arrowsmith JB. Guillian-Barre Syndrome following Streptokinase Exposure : A case study in Pharmacoepidemiology, APHA Annual Meeting Washington DC 1986.

Janet Arrowsmith-Lowe, M.D., F.A.C.P
Curriculum vitae
Page 6 of 8

Abstracts, continued

- Arrowsmith JB, Kuritsky JN, Faich GA, Hsu JP.  Morbidity and mortality associated with the use of an intravenous vitamin E preparation, Eferol.  EIS Conference, CDC Atlanta, GA 1986.

- Arrowsmith JB, Kuritsky JN, Faich GA, Kennedy DL, Anello C.  Changing patterns of aspirin use, 1980-1983.  EIS Conference, CDC, Atlanta GA, 1985.

Letters
- Arrowsmith-Lowe, JB Drug safety reporting.  ACP Observer 2005;25:2.
- Tanner LA, Arrowsmith JB. Histamine type-2 receptor blockers and bradyarrythmias.  Ann Int Med 1988; 109:434-5.
- Arrowsmith JB, Dreis M.  Thrombocytopenia after treatment with danazol. N Engl J Med 1986; 315:302
- Arrowsmith JB, Kuritsky JN, Milstein JB, Murano G. Streptokinase and the Guillian-Barre syndrome. Ann Int Med 1985; 103: 302.
- Arrowsmith JB, Gams R.  Dystonia with Droperidol therapy. N Engl J Med 1981; 305: 227.

Book Chapters
- Arrowsmith-Lowe J "Post-Market Safety Surveillance for Pharmaceuticals" In: Principles and Practice of Public Health Surveillance, 2nd edition Teutsch SM and Churchill RE, eds. Oxford University Press, 2000.
- Arrowsmith JB, Anello C. Postmarketing Surveillance: A view from a regulatory agency.  In: Pharmacoepidemiology Strom BL, ed.  Churchill Livingstone, New York, 1989; revised 1994.

Other Publications
- Arrowsmith-Lowe J. Summertime and the "stomach flu".  *Apache Scout*; Mescalero NM, August 1996.
- Arrowsmith-Lowe J and Simmons D "Recognizing Sexual Abuse in Children"  *Apache Scout*, Mescalero, NM, September 1997.
- Arrowsmith J and delaHoussaye MK.  Flow of Federal Health Funds, State of Louisiana. Prepared for the Office of the Commissioner, Division of Administration , State of Louisiana, Baton Rouge LA, 1975.

Representative Presentations:
- Arrowsmith-Lowe J, Gogel HK, Lynn R, et al.  "Serendipitous overdose of octreotide acetate used for variceal hemorrhage". Annual meeting NM Chapter ACP-ACIM, Albuquerque NM, 1999.
- Medical Issues for Women Living with HIV.  Positive Women's Retreat, sponsored by Camino de Vida of New Mexico. Las Cruces NM, May 12, 2000
- Sexually Transmitted Diseases: Prevention and treatment.  Camp Sierra Blanca Juvenile Detention Center, Capitan, NM December, 1999.
- Antibiotic Resistance and Misuse of Antibiotics, Artesia, NM and Portales NM March, 1998
- Moderator, Postmarketing Surveillance Panel, Annual EIS Convention, CDC, April 1997.
- "Recognizing sexual abuse in a child"  Mescalero Headstart Program continuing education series. September, 1996; Mescalero, NM.
- "Menopause"  Federal Women's Association monthly meeting, Mescalero NM; August 1996.
- "An update on the new Medical Device Regulations" The Center of Devices and Radiological Health televised conference on postmarket issues, September 27 1994; 1:30- 2:30 pm.

Janet Arrowsmith-Lowe, M.D., F.A.C.P
Curriculum vitae
Page 7 of 8

Representative Presentations, continued
- "CDRH Executive Roundtable" at the Regulatory Affairs Professional Society Annual Meeting Washington, DC; September 1994.
- "Medical Device Reporting " Medical Devices Update 1994, The Food and Drug Law Institute, Washington, DC; June 1994.
- "Epidemiology of Blood Borne Pathogens, Including HIV" University of Texas University of Health Sciences School of Dentistry, October 1993.

Awards

- PHS Citation- 1987 epidemiology of aspirin and Reye syndrome and of the E-Ferol syndrome.
- American Medical Association's Physicians Recognition Award, July 1985 through June 1988, July 1988 through June 1991, July 1991 through June 1994, July 1994 through June 1997, July 1998 through June 2001, June 2001 through June 2003, June 2003 through June 2006..
- PHS Citation-1989 for outstanding effort in coordination of AIDS activities for the Food and Drug Administration.
- PHS Unit Commendation-1990 for extraordinary achievements in developing a toll-free accessible AIDS clinical trials database.
- PHS Unit Commendation-1991 for exemplary service in clinical guideline development.
- Whitman-Walker Clinic volunteer of the month, April 1992.
- PHS Outstanding Unit Commendation -1992 for contributions to the review and approval of ddI.
- Center for Devices and Radiological Health Certificate of Appreciation-1995 for outstanding leadership and exceptional achievement.
- US Food and Drug Administration Certificate of Appreciation-1995 for support and contribution of the FDA MedWatch Program.
- PHS Unit Commendation -1995 as a member of the corporate wide injunctions group.
- PHS Unit Commendation -1995 as a member of the Ad Hoc Committee on Total Parenteral Nutrition Issues.
- PHS Unit commendation -1995 as a member of the MedWatch Coordinating Council.
- PHS Unit Commendation -1995 as a member of the Cables and Leads Working Group.
- DHHS Secretary's Award and PHS Unit Commendation -1996 for outstanding performance addressing the problems of electrodes and patient cables and leads
- Letters of appreciation,1996, David A. Kessler, Commissioner, U.S. Food and Drug Administration; and Mary Pendergast, Deputy Commissioner, US FDA
- Certificate of Appreciation for eight years of volunteer service, presented March 1996, Whitman-Walker Medical Center, Washington, DC.
- PHS Isolated Hardship Ribbon, 1996.
- Outstanding Alumna, Louise McGhee School, New Orleans, LA March 1997.
- "Angel of Adoption" Congressional Coalition on Adoption, September, 2001

Other Activities and Associations
- Vice President, PAC, White Mountain Elementary School, 2002-2003
- Parent Advisory Council (PAC) Representative, SVP 2001-2002
- Participant, *Volunteer in Public Schools Program*, Ruidoso Municipal Schools, 1998,1999,2000,2001,2002, 2003, 2004, 2005
- Homeroom Parent and Parents' Council member, Nob Hill Early Childhood Center, Ruidoso, NM, 1999-2000
- Physician Consultant, Headstart Program of Lincoln County, NM, 1998-1999
- Lector, St. Thomas' Episcopal Parish, Washington DC 1992 -1996.

Janet Arrowsmith-Lowe, M.D., F.A.C.P
Curriculum vitae
Page 8 of 8

<u>Other Activities and Associations, continued</u>

- Alumnae Advisor, Duke University Students' Career Counseling Program, 1992 to present.
- Member, Education Committee, St. Thomas' Episcopal Parish, Washington DC 1990 to 1993.
- Member, Latin American Parents' Association, Washington Metropolitan Area, 1989 to 1996.

<u>Continuing Medical Education Activities</u>
- Poster Presentation, Annual Meeting American College of Physicians, NM Chapter, November 3, 4, 5, 2005
- Massachusetts Medical Society's Journal Watch Program, 50 credit hours per year, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005
- Drug Information Association annual Meeting, 2003, 2004
- American College of Epidemiology Annual meeting 2002
- American College of Physicians Annual Meetings 1985, 1987, 1995, 1999, 2001
- ACP Regional Meeting, Albuquerque, NM1996, 1998, 1999, 2004, 2005
- IHS Course on Gyn, Prenatal and Obstetrical Care, September 1996, Denver CO
- Basic CPR Lincoln County Medical Center, 1996, 1997, 1998, 2000, 2002, 2003, 2004, 2005
- Advanced Cardiac Life Support, Lincoln County Medical Center 1996, 1998, 2000, 2002
- Medical Response to Public Health Emergencies, Albuquerque NM,  May 2005

**Exhibit B**

## Cases in Which Dr. Janet Arrowsmith-Lowe has Testified as an Expert at Trial or by Deposition Since May 2002

Rosetta Seay v Warner-Lambert Company, Parke-Davis, Division of Warner-Lambert, et al. Civil No.00ca0002160 (Superior Court for the District of Columbia, Civil Division) (July 13, 2002)

Sherry Malbin v American Home Products Corp, et al No. \01-13337 CA 21 (11th Circuit Court, Dade County, Florida)(August 8, 2002)

Eva Card, et al v. American Home Products, et al No CV 2000-36-Ct-2 (Circuit Court of Tallahatchie County, Mississippi)(September 27, 2002)

Clara Clark v. Wyeth and Hamid Jalalli, D.O. No. B020182C(163rd Judicial District Court, Orange County, Texas)(November 6, 2002)

Rezulin Products Liability Litigation Master File No. 00CIV. 2843 (LAK) (MDL-1348) Rezulin Multi-District Litigation (United States District Court for the Southern District of New York) (November 14, 2002)

Hollis Haltom et al v Bayer Corp et al Cause N. C-0567-02-G-PT (370th Judicial District, Hidalgo County Texas) (December 23, 2002).

Josephine Garcia v American Home Products Santa Fe County, New Mexico (January, 2003)

Carroll Brown et al v Warner Lambert-Parke Davis Cause No. 348-181927-00 (348th Judicial District, Tarrant County Texas) Fort Worth, Texas, (2/6/03, 2/7/03, 2/10/03)

Hollis Haltom et al v Bayer Corp et al Cause No. 02-60165-00-0-2 (County Court at Law No. 2, Nueces County, Texas) Corpus Christi, TX (March, 2003)

Concepcion Morgado v Warner-Lambert, Parke Davis and Co and Pfizer,Inc No. 403243/01 (Supreme Court of the State of New York, County of New York) (3/31/03)

Dana Leon Lefler, et al. v. Parke-Davis Division of Warner-Lambert Company, Pfizer, Incorporated No. 2000-CI-13553 (Texas District Ct., Bexar Co.) (May 1, 2003, May 2, 2003 and May 5, 2003)

Mario Toumayan v Bayer Corporation et al No 02-C-5M (Marshall County West Virginia) (August 11, 2003).

Mary Jones v. Wyeth No. 0236 (Circuit Court, Second Judicial District of Hinds County, Mississippi) (October 14, 2003)

Hayes et Ux vs American Home Products et al (Cause no B-165,374) District Court of Jefferson County Texas 60th Judicial District; Beaumont, Texas (November 3 and 4, 2003)

Ronnie Lee Crews and Ernestine Crews vs American Home Products et al (MID-L-9881-02-MT)  Superior Court of New Jersey Middlesex County, Santa Fe, NM (November 13, 2003) (PPA)

Linda Eichmiller and Betty Horn vs. American Home Products Civil Action File No. 2002-CV-52077 Superior Court for the County of Fulton, State of Georgia, Atlanta Georgia November 19 and 20, 2003.

Baycol Products Litigation MDL No. 1431 (MJD/JGL) United States District Court District of Minnesota: New York, NY.  January 30, 2004.

Diet Drugs Product Liability Litigation MDL No. 1203  United States District Court for the Eastern District of Pennsylvania: Santa Fe, NM, March 12, 2004.

Jerry Coffey, et al vs. Wyeth, et al. Cause No. E-167,334 District Court of Jefferson County Texas 172nd Judicial District: Beaumont, Texas April 7, 13, 14, 2004.

Hazel Frances Nichols vs Bayer Corporation No.CV 01-72 Circuit Court of Crenshaw County, Alabama. Ruidoso, NM April 22, 2004.

Paul Dearman vs Bayer Corporation; SmithKline Beecham d/b/a GlaxoSmithKline; Civil Action No. C102-0423 Circuit Court of Forrest County, Mississippi. Hattiesburg, MS; April 29, 2004.

Vickie Carol Campbell-Reese et al (Lanna Nustad)  vs Wyeth-Ayerst Laboratories Company District Court of  Upshur County 115th Judicial District, Texas. Gilmer Texas, May 19 and 20,  2004.

Gaylene Davis, D. May, M. Roberts, L. Rogowski and B. Sidwell vs . Wyeth, Wyeth-Ayerst Pharmaceuticals, Inc., Wyeth-Ayerst International, Inc., and Wyeth Pharmaceuticals, Division of Wyeth; Court of Common Pleas 1st Judicial District of Pennsylvania, Civil Trial Division.  Philadelphia, Pa. August 2 and 3, 2004.

Lynette Hargrove, R. Steward, F. ford, C. Nixon vs. Wyeth, Wyeth-Ayerst Pharmaceuticals, Inc., Wyeth-Ayerst International, Inc., and Wyeth Pharmaceuticals, Division of Wyeth. ; Court of Common Pleas 1st Judicial District of Pennsylvania, Civil Trial Division.  Philadelphia, Pa. August 4, 2004.

Evangelina Rubio et al v. American Home Products et al.  No. 2002-930 (Texas District Court, El Paso County, 327th District. Santa Fe, NM  August 17, 2004

Nicole Hurley et al v. The Heart Physicians, R. Landesman, MD and Medtronic, Inc. Superior Court, State of Connecticut, Judicial District of Stamford/Norwalk at Stamford #CV 00 0177475 S.  Columbus, Ohio; August 30, 2004.

Pennsylvania Diet Drugs Litigation Annicola Bornstein, et al. vs Wyeth, et al. Civil Action Master Docket No. 9709-3162 Court of Common Pleas, Philadelphia, PA, Philadelphia, PA; September 15 and 16, 2004.

Robert and Tonya Havey vs Wyeth et al., Case No. CV-03-5083 USDC Western District of Washington at Seattle, Santa Fe, NM September 28, 2004.

Lucy A. Hansen, et al. vs. Wyeth, Wyeth-Ayerst Pharmaceuticals, Inc., Wyeth-Ayerst International, Inc., and Wyeth Pharmaceuticals, Division of Wyeth, Court of Common Pleas 1st Judicial District of Pennsylvania, Civil Trial Division.  Philadelphia, Pa. October 28, 2004.

Maria De Jesus Cabrera and spouse Antonio Cabrera v. Bayer Corporation et al Cause No. 2002-CI-15612 166th Judicial District Bexar County Texas January 11, 2005.

Warner-Lambert Company vs. LEP  Profit International, Inc. et al Civil Action No. 99-3619 United States District Court, District of New Jersey,  Albuquerque NM, June 16, 2005.

Ernst et al vs. Merck & Co, Inc Cause no. 19962*BH02 23rd Judicial District Court Brazoria County Texas Houston Texas 29 June 2005

Evelyn Irvin Plunkett vs. Merck & Co, Inc. United States District Court Eastern District of Louisiana, MDL Docket No 1657 Santa Fe, NM 28 October 2005.

Bonnie Weston v. Wyeth Inc, 03-679878 Jasper County, Circuit Court at Joplin MO, 18 January  2006.

Garza v. Merck & Co., Inc., No. DC-03-84, District Court of 229th Judicial District, Starr County, Texas Houston Texas 2 February 2006..

Evelyn Irvin Plunkett vs. Merck & Co, Inc. United States District Court Eastern District of Louisiana, MDL Docket No 1657, New Orleans, Louisiana, February 16, 2006.

Patricia Geers vs. Wyeth, et al, United States District Court, Western District of Texas, Midland Division, February 27-28, 2006.

## Exhibit C

## Materials Considered by Dr. Janet Arrowsmith-Lowe

| Produced Documents | MRK-ABY0017695 – MRK-ABY0017700 |
|---|---|
| | MRK-ABY0004972 – MRK-ABY0004978 |
| | MRK-ABK0296926 - MRK-ABK0296931 |
| | MRK-ABK0337340 – MRK-ABK0337351 |
| | MRK-ABK0336855 – MRK-ABK0336866 |
| | MRK-ADO0000738 |
| | MRK-ADX0021480 – MRK-ADX0021482 |
| | MRK-AAC0023877 - MRK-AAC0023878 |
| | MRK-ABK0389926 – MRK-ABK0389933 |
| | MRK-ABY0094590 – MRK-ABY0094598 |
| | MRK-AAC0000735 - MRK-AAC0000744 |
| | MRK-ABY0005401 – MRK- ABY0005420 |
| | MRK-AAC0001094 - MRK-AAC0001104 |
| | MRK-AAD0046265 - MRK-AAD0046270 |
| | MRK-ABY0000906 – MRK-ABY0000911 |
| | MRK-STB0000151 – MRK-STB0000159 |
| | MRK-AHN0009572 – MRK-AHN0009577 |
| | MRK-AHN0022108 – MRK-AHN0022113 |
| | MRK-AAX0006209 – MRK-AAX0006210 |
| | MRK-ABA0041662 – MRK-ABA0041667 |
| | MRK-ABS0386560 – MRK-ABS0386564 |
| | MRK-ABT0079063 – MRK-ABT0079068 |
| | MRK-ABY0079967 – MRK-ABY0079969 |
| | MRK-AHD0016547 |
| | MRK-ACO0067390 – MRK-ACO0067395 |
| | MRK-AFN0009474 – MRK-AFN0009482 |
| | MRK-ADM0114045 – MRK-ADM0114050 |
| | MRK-AAA0087359 |
| | MRK-ADY005464 – MRK-ADY005468 |
| | MRK-ABY0083278 |
| | MRK-ADY0006153 – MRK-ADY0006166 |
| | MRK-ABY0089726 – MRK-ABY0089731 |
| | MRK-AHC0002234 – MRK-AHC0002237 |

| | |
|---|---|
| | MRK-ADC0002451 – MRK-ADC0002456 |
| | MRK-AHN0007972 – MRK-AHN0007979 |
| | MRK-ACO0069031 – MRK-ACO0069040 |
| | MRK-AFN0062014 |
| | MRK-AFF0000040 – MRK-AFF0000042 |
| | MRK-ACV0035958 |
| | MRK-AHD0007502 – MRK-AHD0007505 |
| | MRK-AHC0002277 – MRK-AHC0002285 |
| | MRK-PRL0000001 – MRK-PRL0000257; MRK-PRL0000259 – MRK-PRL0000261; MRK-PRL0000262 – MRK-PRL0000469 |
| | MRK-ACS0007163 – MRK -ACS0007170 |
| | MRK-AAD0089672 - MRK-AAD0089674 |
| | MRK-AAD0046029 – MRK-AAD0046052 |
| | MRK-AAD0032419 – MRK-AAD0032467 |
| | MRK-ABF0001631 – MRK -ABF0001698 |
| | MRK-ABH0016219 |
| | MRK-ACT0009918 |
| | MRK-ABO0001809 – MRK-ABO0001810 |
| | MRK-ADW0004462 – MRK-ADW0004463 |
| | MRK-ABH0015578 |
| | MRK-AAC0013060 |
| | MRK-AAB0069330 |
| | MRK-ADL0011977 |
| | MRK-AAB0061158 |
| | MRK-ACR0008985 |
| | MRK-ACT0018064 |
| | MRK-ACR0009151 |
| | MRK-ABW0004799 |
| | MRK-AAD0111414 |
| | MRK-ACR0009287 |
| | MRK-ACR0009297 |
| | MRK-AAB0000510 - MRK-AAB0000515; MRK-AAB0000517 - MRK-AAB0000518 |

|  | MRK-ABH0020163 - MRK-ABH0020216 |
|--|--|
|  | MRK-AAR0007271 |
|  | MRK-AFT0009599 - MRK-AFT0009638;  MRK-AFT0009649 – MRK-AFT0009675 |
|  | MRK-AAD0076244 - MRK-AAD0076245 |
|  | MRK-AAB0009616 - MRK-AAB0009668 |
|  | MRK-LBL0000001 – MRK -LBL0000261 |
|  | MRK-BAR0139719 |
|  | MRK-ABK0167641 |
|  | MRK-AAF0000001 – MRK-AAF0017703 |
|  | MRK-00420000001 – MRK-00420033165 |
|  | MRK-01420019409 – MRK-01420169499 |
|  | MRK-02420000001 – MRK-02420002844 |
|  | MRK-99420000001 – MRK-99420024842 |
|  | MRK-I2220000001 – MRK-I2220005984 |
|  | MRK-I2690000001 – MRK-I2690009610 |
|  | MRK-I4190000001 – MRK-I4190004491 |
|  | MRK-I7680000001 – MRK-I7680005198 |
|  | MRK-I8940000001 – MRK-I8940105022 |
|  | MRK-N0520000001 – MRK-N0520019386 |
|  | MRK-N6470000001 – MRK-N6470007344 |
|  | MRK-OS420000001 – MRK-OS420166451 |
|  | MRK-S0420000001 – MRK-S0420112134 |
| Public Documents | Naproxen Label |
|  | Fornaro et al "Indobufen in the Prevention of Thromboembolic Complications in Patients with Heart Disease" |
|  | Bombardier et al "Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis" |
|  | *EHJ* Brochier "Evaluation of Fluribiprofen for Prevention of Reinfarction and Reocclusion after Successful Thrombolysis or Angioplasty in Acute Myocardial Infarction" |
|  | Catella-Lawson et al "Cyclooxygenase inhibitors and the antiplatelet effects of aspirin" |

| | |
|---|---|
| | Graham "Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with Cox-2 Selective and Non-selective NSAIDs" |
| | Bresalier "Cardiovascular Events Associated with Rofecoxib…" |
| | *WSJ* "Merck Documents Shed Light on Vioxx Legal Battles" |
| | *WSJ* "Merck & Co. Offers Rationale, Context for VIOXX Memos" |
| | FDA Statement on Naproxen |
| | Topol "Failing the Public Health -- Rofecoxib, Merck and the FDA" |
| | "Response to Article by Juni et al. Published in The Lancet on Nov. 5" |
| | Topol "Good Riddance to a Bad Drug" |
| | Memo from S. Targum to S. Folkendt re NDA 21-042/S-007: Review drug effects on Renal Safety |
| | Memo from S. Targum to S. Cook:  Review of Cardiovascular Safety Database |
| | Memo from M.L. Villalba to L. Goldkind re: Cardiovascular data in Alzheimer's studies |
| | 12/18/04 FDA Interim Review:  Update of Cardiovascular thrombotic events in Alzheimer's studies 078 and 091 |
| | MRL Briefing Document  - FDA Advisory Committee Background Information |
| | Medical Officer's Advisory Committee GI Briefing Document re NDA 21,042 S007 and 21,052 |
| | Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee Transcript |
| | Summary 2005 COXIB ACM Minutes |
| | FDA website, including April 6, 2005 FDA Decision Memorandum and documents relating to subsequent Agency action |
| | Revised NSAID labels |
| | FDA's Sequence of Events with Vioxx, since opening of IND |

4

| | |
|---|---|
| | ICH-E1A Guideline for Industry: The extent of population Exposure to Assess Clinical Safety: For Drugs Intended for Long-term Treatment for Non-Life Threatening Conditions |
| | 21 CFR section 201.57 |
| | 21 CFR section 314.70 |
| | Guidance for Industry "Changes to an Approved NDA or ANDA" |
| | All FDA Medical Officer Reviews for Vioxx |
| | Documents produced by FDA |
| | Dr. David Graham's Deposition Transcript |
| | Letters from FDA to Pfizer Inc. and Boehringer Ingelheim Pharmaceuticals Inc. |
| | *NEJM* "Expression of Concern: Bombardier et al., 'Comparison of Upper Gastrointestinal Toxicity of Rofecoxib and Naproxen in Patients with Rheumatoid Arthritis,' *N Engl J Med* 2000; 343: 1520-8." |
| | *NEJM* "Response to Expression of Concern Regarding VIGOR Study" |
| | *NEJM* "Expression of Concern Reaffirmed" |
| | "An Open Letter from Merck" from Peter S. Kim |
| | Federal Register, 2006 CFR Parts 201, 315, and 601, Requirements on Labeling |