Expert Report of Michael Rothkopf, M.D.

My name is Michael Rothkopf. I am a Medical Doctor. I received my undergraduate degree in Biology from Yale College in 1968. I graduated from Yale Medical School in 1972. I completed internship and residency training in the specialty of Internal Medicine at the Medical College of Virginia in 1975 and was certified by the American Board of Internal Medicine in 1975. Subsequently, I served as the Chief of Internal Medicine at Luke Air Force Base in Glendale, Arizona, from 1975 to 1977. I received additional fellowship training in cardiology at Southwestern University in Dallas, Texas, from 1977 to 1979. Since that time I have been a practicing cardiologist in Irving, Texas. I was certified by the American Board of Internal Medicine in the subspecialties of Cardiovascular Diseases in 1979 and Interventional Cardiology in 1999. I have been the Director of Cardiology Services at Baylor Medical Center of Irving, including the Cardiac Catheterization Laboratory since 1986 and the Director of the Congestive Heart Failure Clinic since 1998. During this time I have cared for thousands of patients with coronary artery disease, acute coronary syndrome, including myocardial infarction, and congestive heart failure. Although my practice is generally that of a primary treating and consultative cardiologist, I have also treated my patients for other internal medicine related problems over the years. One of the more common areas in this regard would be the prescribing of anti-inflammatory agents for treatment of musculoskeletal pain and symptoms of osteoarthritis. More specifically, I have prescribed non-steroidal anti-inflammatory agents including selective COX-2 such as rofecoxib (Vioxx) and celecoxib (Celebrex) on a regular basis in patients with coincident heart disease. Based upon my education, experience, and review of the pertinent literature, I am qualified to give expert opinions regarding the use of rofecoxib in cardiac patients and its potential for adverse cardiovascular effects in individuals who have taken this agent. Furthermore, my opinions contained in this report are made with a reasonable degree of medical certainty.

In preparing this report, I have reviewed a vast amount of literature which addresses the potential cardiovascular effects of non-steroidal anti-inflammatory drugs (NSAIDS), including COX-2 agents and specifically rofecoxib. I have also reviewed the medical records of Mr. Charles Mason as well as depositions and other materials related to the claims made by Mr. Mason. A complete listing of materials reviewed is attached for review.

This report will address the question of whether rofecoxib was the cause of an adverse cardiovascular event sustained by Mr. Mason on July 25, 2003. Before considering this question specifically, a basic review of the pathophysiology of such events and the issue of general causation of cardiovascular events as it relates to rofecoxib is necessary.

Coronary artery disease continues to be the nation's single leading cause of death. Over one million patients are diagnosed annually with acute myocardial infarction with an estimated 500,000 plus deaths per year. The pathophysiology common to almost all patients with both acute myocardial infarction and unstable angina is the development

first of cholesterol laden plaques (atheroma) in the coronary arterial wall. This is generally followed by rupture or erosion of an unstable plaque which in turn limits flow in the artery by a process of coronary thrombosis. If the artery becomes completely occluded, a myocardial infarction (heart attack) will result, which, in addition to potentially causing damage to the myocardium (heart muscle), can also in some patients cause electrical instability and sudden death (ventricular fibrillation). It has been well established that certain risk factors will increase the likelihood of progressive atherosclerosis. These include a history of smoking, gender, age, diabetes, hypertension, obesity, and hyperlipidemia. Also, genetic predisposition to atherosclerosis is noted in families where more then one member may be diagnosed with coronary artery disease. Psychosocial factors such as grief, depression, and extreme emotional stress have been associated with the onset of acute coronary events. Obesity and sleep apnea are also associated with the development of coronary atherosclerosis. Even when risk factors are not present, it is a widely held belief among clinicians that atherosclerotic plaques are quite common in the general population in western or industrialized societies where lifestyle and diet tend to be "atherogenic." Such views have been supported by numerous autopsy reports in young patients who died of non cardiac causes, but were incidentally found to have fatty streaks or signs of early plaque buildup in their coronaries.

Often such plaques may either be stable or progress slowly over time with no clinical sequelae. These plaques are comprised of a lipid-rich center enclosed by a fibrous cap. This cap prevents the lipid content of the plaque from being exposed to the blood flowing within the coronary artery. If the plaque progresses to the point of rupture or erosion, through a biologic process of oxidative stress and auto-digestion, components of the lipid center will become exposed to the blood stream. Some of these agents, such as tissue factor, are highly thrombogenic and can initiate local clotting of blood at the site of plaque rupture causing a thrombus (blood clot) to form within the artery. As these vessels are generally only 2 to 4 mm in diameter, a relatively small thrombus could either totally occlude the vessel leading to an ST elevation myocardial infarction or could partially or intermittently occlude the vessel causing a subendocardial infarct or unstable angina. Any of these events could be classified as an acute coronary syndrome. In cases where damage to the heart is severe or ventricular arrhythmia is triggered, circulatory failure and death may occur.

This process becomes relevant when considering possible cardiovascular effects of NSAIDS in general and selective COX-2 inhibitors, including rofecoxib, more specifically. NSAIDS are widely available over the counter and commonly prescribed by physicians in a variety of specialties. Although of great benefit as analgesics and as first line treatment for rheumatologic and musculoskeletal ailments, their use is associated with adverse gastrointestinal and renovascular side effects, including gastrointestinal bleeding, fluid retention and elevation of blood pressure. Both these therapeutic and adverse side effects derive from a common mechanism, inhibition of cyclo-oxygenase (COX). Two isoforms of COX have been identified. COX-1 is expressed in the gastric mucosa and provides a protective effect as far as gastrointestinal bleeding is concerned. COX-2, on the other hand, is not expressed in the gastric mucosa, but is associated with inflammatory conditions such as arthritis and rheumatism. This finding led to the

2

hypothesis that selective inhibition of COX-2 would be as effective as non selective NSAIDS (which inhibit both COX-1 and COX-2) in relieving pain while reducing gastrointestinal side effects, namely ulceration and bleeding. This hypothesis led to the development of selective COX-2 inhibitors.

Rofecoxib was one such agent developed by Merck and approved by the FDA in 1999 for use in osteoarthritis and primary dysmenorrhea and subsequently approved for use in rheumatoid arthritis, juvenile rheumatoid arthritis and acute migraine headaches. In September of 2004, the data from the APPROVe study demonstrated an association between rofecoxib and increased risk of cardiovascular events after at least 18 months of continuous use. Subsequently, Merck voluntarily withdrew rofecoxib from the market.

Before examining whether, in reasonable medical probability, rofecoxib caused an adverse cardiovascular effect in any one individual patient, it is important to review the available clinical and basic science data in this regard. Medical literature is widely varied in content and significance. For example, case reports and basic science studies are generally hypothesis generating, and rarely accepted as conclusive proof in support of a medical theory. On the other hand, placebo controlled blinded studies are generally recognized by the medical community as the highest level of evidence in establishing scientific clinical relevance. Lesser levels of evidence would be found in epidemiologic and comparator studies. Meta-analyses, where individual studies are grouped together to examine larger numbers of patients, are also considered valuable, although less so than placebo controlled studies. Physicians typically rely on the process of peer review established by well known publications in their field to vet information that is available in periodicals and texts. Whether a textbook, journal article or review, physicians would rarely consider any one source authoritative, particularly when applied to an individual case. Usually opinions regarding specific patient issues involve a synthesis of the basic science and clinical data known to the physician, tempered by his or her personal experience in treating such patients over time.

A general review of the literature related to rofecoxib would be helpful before considering the specific case of Mr. Mason. Reicin et al. (Amer J Card, 2002; 89: 204-209) reviewed data on 8 phase II/III double blind placebo and active comparator osteoarthritis trials conducted from 1995 to 1998. Cardiovascular safety was assessed in 5,453 participants who were treated for a median of 3½ months. In trials that compared rofecoxib to the nonselective NSAIDS ibuprofen, diclofenac or nabumatone, the incidence of thrombotic cardiovascular events was 1.93/100 patient years in the rofecoxib treated group compared with 2.27/100 in the NSAID group. In trials that compared rofecoxib with placebo, the incidence of thrombotic events was 2.71/100 patient years in the rofecoxib group versus 2.57/100 in the placebo group. In these initial development studies conducted by Merck there was no evidence of increased cardiovascular risk in patients treated with rofecoxib when compared to placebo and nonselective NSAIDS.

The Vioxx Gastrointestinal Outcomes Research trial, also known by the acronym VIGOR (Bombardier, et al. N Engl J Med. 2000; 343: 1520-1528), was published in November of 2000. VIGOR examined the incidence of gastrointestinal side effects of rofecoxib

compared to the non selective NSAID naproxen in 8076 patients treated for rheumatoid arthritis. In fact, gastrointestinal toxicity was found to be lower in those treated with rofecoxib (there were more than twice as many events in the naproxen group). However, in the comparison of 50 mg of rofecoxib (twice the recommended chronic dose) to 500 mg bid of naproxen, an increase in non-fatal myocardial infarction was noted in the rofecoxib patients compared to those treated with naproxen (0.4% vs. 0.1%). There was no difference in mortality in the two groups. Additional analysis of this data disclosed a cohort of patients with underlying coronary artery disease who would have qualified for low dose prophylactic aspirin therapy, but did not receive it on the basis of trial criteria, which excluded the use of aspirin in trial participants as the primary end-point of the study was GI toxicity. Although this subgroup comprised only 4% of the entire study population, they accounted for 38% of patients who actually sustained myocardial infarcts. An analysis of the data which excluded this subgroup showed no statistical difference between those patients treated with rofecoxib vs. naproxen in the incidence of myocardial infarction.

The results in VIGOR raised the question of whether the explanation for this data was found in an increased risk caused by rofecoxib, a cardioprotective effect of naproxen, the play of chance, or some combination thereof. Studies have demonstrated that naproxen inhibits platelet aggregation in similar fashion to aspirin, and thus may provide a cardio-protective effect. Van Hecken, et al, (J Clin Pharm, 2000; 40: 1109-1120) evaluated COX-1 and COX-2 inhibitory activity in rofecoxib compared to several non-selective NSAIDS including naproxen. They confirmed that rofecoxib uniquely inhibited COX-2 vs. COX-1. They also demonstrated high level sustained inhibition of thromboxane and prolonged bleeding time with clinical doses of naproxen (500 mg twice a day as employed in VIGOR), similar to the effects of aspirin via COX-1 inhibition. Capone, et al, (Circulation. 2004; 109: 1468-71) compared the effects of low dose aspirin (81 mg daily) and naproxen (500mg twice a day) in healthy human subjects on thromboxane and prostacyclin biosynthesis. They found comparably profound inhibition of platelet COX-1 activity as reflected by the decreased urinary excretion of the thromboxane metabolite, 11-dehydro-TXB 2. They also demonstrated markedly different effects of these two agents on prostacyclin biosynthesis as measured by urinary excretion of 2,3-dinor-6-keto-PGF 1 alpha, confirming that naproxen decreased urinary prostacyclin synthesis while aspirin failed to do so. Brochier (Eur Heart J. 1993 Jul; 14 (7): 951-7) studied the NSAID flurbiprofen, which has similar anti-platelet effects through COX-1 inhibition as aspirin, in patients with acute myocardial infarction. This study demonstrated decreased re-infarction rate as compared to placebo in this high risk patient group. The authors concluded that this NSAID, which had similar COX-1 effects as aspirin, provided similar protective effects in this group of patients with coronary artery disease. Leese et al (J of Clinical Pharm, 2000; 40: 124-132) studied platelet aggregation in 24 healthy subjects comparing the effects of celecoxib, naproxen and placebo. Celecoxib showed no difference compared to placebo, whereas naproxen at standard doses produced significant reduction in platelet aggregation. Leese, et al also studied platelet function (Am J Emerg Med 2002: 20 (4): 275-81) in healthy volunteers treated with valdecoxib. This COX-2 inhibitor had no effect on platelet aggregation compared to placebo. Naproxen was also evaluated in this study and did show evidence for impairment of platelet function. Tuleja

et al (Arterioscler Thromb Vasc Biol 2003; 23: 1111-1115) also showed an antithrombotic effect of naproxen as potent as aspirin in their model of microvascular injury.

The theory that NSAIDS which effectively inhibit COX-1 in general, and naproxen specifically, could demonstrate similar cardio-protective to aspirin gained additional clinical support in studies by Rahme, et al. (Arch Int Med. 2002; 162: 1111-1115) and Watson, et al. (Arch Int Med. 2002; 162: 1105-1110). These two case controlled studies demonstrated reduced risk of cardiovascular events in naproxen treated patients. Mukherjee, et al (JAMA 2001; 286: 954-959) compared the annualized rates of myocardial infarction in patients treated with rofecoxib in VIGOR with those treated with celecoxib (another widely used COX-2 inhibitor) in the CLASS study. The myocardial infarction rate for rofecoxib (0.74%) was similar to celecoxib (0.80%), yet celecoxib in the CLASS study did not show an increase of cardiovascular risk compared to the NSAIDS diclofenac and ibuprofen. Neither ibuprofen nor diclofenac possess the same degree of inhibition of thromboxane as the comparator NSAID naproxen. The authors point out that it is "difficult to assess whether the difference in cardiovascular event rates in VIGOR was due to a benefit from naproxen, or a pro-thrombotic effect from rofecoxib."

An extensive pooled analysis of all phase IIb through V trials conducted by Merck was published by Konstam, et al. (Circ, 2001: 104; 2280-2288). They found no evidence for an excess of cardiac events in patients treated with rofecoxib as compared to placebo or the non-selective NSAIDS that were studied with the exception of naproxen. Their conclusion was that "data from > 28,000 patients in 23 studies representing > 14,000 patient years at risk demonstrated that rofecoxib was not associated with excess cardiovascular thrombotic effects compared with either placebo or non naproxen NSAIDs." The outcome measure to assess adverse cardiovascular effects was the combined incidence of (1) cardiovascular, hemorrhagic and unknown death; (2) nonfatal myocardial infarction; and (3) nonfatal stroke, as defined by the Antiplatelet Trialists' Collaboration (APTC). This measure is a widely accepted endpoint in quantifying overall cardiovascular effects in clinical trials. Of particular importance are the actual numbers of fatal and non-fatal myocardial infarctions in the rofecoxib treated patients as compared to placebo and to non-naproxen NSAIDS. There were 3 fatal (0.05) and 16 non-fatal (0.25) myocardial events for rofecoxib vs. 0 fatal (0.00) and 13 (0.37) non-fatal events for placebo; and 0 fatal (0.00) and 13 (0.29) non-fatal events for rofecoxib vs.4 fatal (0.15) and 7 (0.25) non-fatal events for non-naproxen NSAIDS. Adverse cardiovascular rates were also demonstrated by Konstam to be lower in the naproxen treated patients, primarily driven by the results of the VIGOR trial, as discussed above.

Two randomized double blind studies also have studied the effect of rofecoxib in older patients with cognitive impairment. Reines, et al. (Neurology. 2004 Jan 13; 62(1): 66-71) randomized 692 patients, 705 of whom completed 12 months of the study. These patients were diagnosed with mild or moderate Alzheimer's dementia, were 50 years or older (mean age 75 to 76) and randomized to 25 mg of rofecoxib daily or placebo. There were 4 serious adverse thrombotic events in the rofecoxib group and 11 with placebo. No

increased cardiovascular risk was noted in this elderly cohort. Thal, et al. (Neuropsychopharmacology. 2005 Mar 2) randomized patients age 65 and older with mild cognitive impairment to rofecoxib 25 mg or placebo. 1457 patients were initially randomized with median duration of 94 weeks of rofecoxib treatment. Similar rates of thrombotic events (38 in the rofecoxib group and 36 in the placebo group) and fatal and non-fatal myocardial infarction were noted in the two groups (4 patients with fatal myocardial infarction and 13 with non-fatal myocardial infarction in the rofecoxib group vs. 3 and 10 in the placebo group). The authors concluded that rofecoxib did not increase cardiovascular risk in elderly patients that were treated with 25 mg of rofecoxib for up to 4 years.

Lisse, et al. (Ann Int Med. 2003; 139: 539-546) compared rofecoxib and naproxen in the treatment of osteoarthritis. Referred to as the ADVANTAGE Study Group (assessment of differences between Vioxx and Naproxen to ascertain gastrointestinal tolerability and effectiveness), they enrolled 5557 patients in randomized fashion including older patients, patients with co-morbid conditions and those using aspirin for cardiovascular prophylaxis. Subjects were randomized to a 12 week course of rofecoxib 25 mg/day or naproxen 500 mg/twice a day. Gastro-intestinal tolerability was judged superior in the rofecoxib group. Antiplatelet Trialists' Collaboration criteria and blinded adjudication of thrombotic effects were used to assess the incidence of adverse thromboembolic events during the trial. 5 myocardial infarctions occurred in the rofecoxib group vs. 1 in the naproxen group. There were no strokes in those patients randomized to rofecoxib vs. 6 thrombotic strokes in the naproxen group. There was no statistical difference in the APTC or thrombotic endpoints. In addition, there was no difference in the two groups when assessing changes in systolic and diastolic blood pressure or lower extremity edema.

Weir et al (Am Heart J 2003 Oct; 146 (4): 591-604) conducted a pooled analysis of individual patient data from participants in all Phase IIb-V rofecoxib clinical trials of greater than or equal to 4 weeks duration. This analysis combined data from 23 studies, including VIGOR, in order to assess the relative risks of cardiovascular effects as measured by the APTC combined endpoint. The relative risk was 0.84 when comparing rofecoxib to placebo, 0.79 when comparing rofecoxib to the studied non-naproxen NSAIDs, and 1.69 when comparing rofecoxib to naproxen. This pooled analysis, representing more than 14,000 patient years at risk did not demonstrate an increased risk of rofecoxib compared to placebo or non-naproxen NSAIDs.

This discussion is important when interpreting the results of the VIGOR trial. As noted, analysis of randomized clinical trials of rofecoxib vs. placebo did not show an excess of adverse cardiovascular events in the rofecoxib group. Because VIGOR used the comparator drug naproxen rather than placebo, the VIGOR Study Group reasonably proposed that naproxen may have provided aspirin like "cardio-protective," effects in their study. This seemed a plausible explanation for their findings, particularly when considering that the difference in events was primarily accounted for by the higher rate of myocardial infarction among the 4% of the study population who were considered to be at highest risk for adverse cardiovascular events. Such patients likely experienced an

6

aspirin like benefit from the comparator naproxen (500mg bid) as compared to rofecoxib. In light of these findings, the increased incidence of myocardial infarction in the rofecoxib patients as compared to the naproxen patients is likely explained, not by a harmful effect of rofecoxib, but rather by a cardioprotective effect in the naproxen group, particularly in those patients who would also be expected to benefit from aspirin therapy. Patrono, et al (Chest 2004; 126: 234S-264S) lend support to this interpretation of the VIGOR data.  They opine that "a combination of some cardioprotective effect of naproxen and the play of chance does seem to offer an explanation of these unexpected findings."

The Adenomatous Polyp Prevention on Vioxx (APPROVe) trial (N Eng J Med 352; 11: 1092-1102) was designed to evaluate the potential that 3 years of treatment with rofecoxib would reduce the risk of recurrent adenomatous polyps in patients with a history of colorectal polyps.  Potential thrombotic events were adjudicated by an independent committee and all safety data was reviewed by an independent monitoring board.  1287 patients were randomized to receive 25 mg of rofecoxib daily and 1299 to placebo.  The study was terminated prior to its planned completion at the recommendation of the safety monitoring board.  A total of 46 patients in the rofecoxib group had confirmed thrombotic events (15 events per 1000 patient years) compared to 26 patients in the placebo group (7.8 per 1000).  The difference was primarily due to an increase of myocardial infarction and stroke.  As also found in VIGOR, there was no increased all-cause mortality with 10 deaths noted in both groups.  Additionally, there was no increase in events until 18 months of treatment, with statistical significance noted at approximately 30 months.  Analysis of the data shows a total of 22 events in the rofecoxib group vs. 20 events in the placebo group for months 0-18, and 24 vs. 6 events respectively for months 19-36.  At this time, it is not clear why there is a disproportionately lower event rate in the placebo group for the last 18 months vs. the first 18 months of the study.  Although there is a materially lower number of events in the placebo arm than would be expected based upon traditional cardiovascular risk analysis, the authors do not specifically address how this finding might influence the interpretation of their data.  I have also reviewed the follow-up data in connection with the APPROVe trial and that data does not change my opinions regarding this trial.  There was no overall difference in the number of events that occurred off-drug.

Subsequently, in a communication from Merck to the FDA dated 8/22/2005 safety data was provided on two additional clinical trials, Vioxx In Colorectal Cancer Therapy (VICTOR) and Vioxx In Decreasing The Risk Of Prostate Cancer (VIP).  VICTOR was a double blind placebo controlled study randomizing patients to treatment with 25 mg of rofecoxib vs. placebo.  This study was terminated due to the withdrawal of rofecoxib from the market after assignment of 1217 patients to the treatment arm.  12 cardiac events were noted in the rofecoxib group (either during or within 14 days of treatment) vs. 3 in the placebo group (14 to 4 thrombotic events)  The VICTOR trial has not yet been finalized or published.  The VIP trial was also terminated prematurely after enrollment of a total of 4,741 patients to either 25 mg of rofecoxib or placebo in randomized blinded fashion.  14 patients in the rofecoxib group had adverse cardiovascular thrombotic events compared to 15 thrombotic events in the placebo group.  There were 2 deaths in the

rofecoxib group and 4 among the placebo cohort. In ViP, there was no evidence for increase of adverse cardiac events in patients treated with 25 mg of rofecoxib for a mean of 5 months. While the data from this trial has been finalized, it also has not yet been published. It is difficult to draw meaningful conclusions from these trials as they were stopped prematurely.

The findings in VIGOR led to additional research to evaluate the possible cardiovascular effects of COX-2 agents. Several large retrospective epidemiologic studies sought to address this question. Ray, et al (Lancet. 2002 Oct 5; 360: 1071-73) analyzed data from the Tennessee Medicaid program in 251,046 NSAID users age 50-85. Their data suggested an increased risk of adverse cardiovascular events for patients taking high doses of rofecoxib (> 25 mg) but no difference in patients taking 25 mg or less. The authors acknowledge limitations of their study, particularly that unmeasured risk factors between groups could bias results and the fact that there were only a total of 12 events in the high dose rofecoxib group.

Solomon, et al (Circ. 2004; 109: 2068-2073) evaluated a large pool of Medicare patients in a matched case control study. This study suggested an increased risk of myocardial infarction which was dose related and only seen in the first 90 days of use and not thereafter. The rofecoxib group, however, had a higher incidence of underlying coronary artery disease. The authors noted that 5% of the population had sustained a previous myocardial infarction and 13% had angina, but the highest incidence of 8.9% for myocardial infarction and 17% for angina was in the rofecoxib group. They go on to state that as a retrospective observational study, the results might be biased. The authors explained further that their results differed from the pooled analysis of rofecoxib randomized clinical trials. In this study, although the relative risk of myocardial infarction was higher in the rofecoxib group as compared to celecoxib, there was no statistically significant increase when compared to either no current NSAID use, naproxen or ibuprofen.

Graham, et al (Lancet 2005; 365: 475-81) performed a nested case control study of patients treated in the California Kaiser Permanente Program. They found an increased risk for adverse cardiovascular events primarily in patients treated with greater than 25 mg of rofecoxib as compared to celecoxib and no protective effect with naproxen. There was no increased risk with 25 mg or less of rofecoxib compared to remote use. Despite disclaimers regarding this data, including lack of statistical power in the higher dose group and in the analysis of duration of treatment, in addition to lack of control for cofounders including smoking, family history, myocardial infarction and aspirin use the authors conclude that rofecoxib increased the risk of serious coronary heart disease compared with celecoxib use.

Levesque, et al (Ann Internal Med. 2005; 142: 7) studied a cohort of 133,927 elderly patients in Quebec, Canada treated with NSAIDs. They found an increased risk of cardiovascular events in patients treated with rofecoxib which was dose related. Relative risk ratio in patients treated with >25 mg of rofecoxib was 2.36, with a lesser ratio of 1.21 for those treated with <- to 25 mg. Importantly, concomitant use of low dose aspirin

appeared to mitigate the risk when considering patients treated with lower doses of rofecoxib. Additionally, risk was associated only with contemporaneous exposure, with no ongoing risk once the drug was discontinued.

Shaya, et al (Arch Int Med;165; 181-86) used a propensity score technique in an attempt to minimize some of the bias concerns which were noted in previous cohort studies. A total of 6250 patients were studied, 1005 of whom were treated with COX-2 inhibitors. They did not find increased cardiovascular risk for patients treated with rofecoxib (or other COX-2 inhibitors) vs. non-naproxen NSAIDs. This study specifically addressed the effect of rofecoxib in high risk patients. They found no increase of adverse events in patients with high risk cardiac profiles.

Harrison-Woolrych, et al (Drug Safety 2005: 28 (5) 435-42) examined a cohort of 26,403 patients treated with rofecoxib compared to 32,446 treated with celecoxib. They considered their study representative of a "real life post marketing" population and found no significant difference in the risk of cardiovascular events in the two groups. Kasliwal, et al (Drug Safety 2005: 28 (9) 803-16) employed an observational technique to compare 15,268 patients treated with rofecoxib vs. 17,458 patients treated with celecoxib. After adjusting for risk factors in this population no difference in adverse cardiovascular events was noted in the rofecoxib and celecoxib groups. Weng-Foung Huang, et al (Drug Safety 2006: 29 (3): 261-72) studied 9602 patients who had used either rofecoxib, celecoxib or meloxicam for grater than 180 days. There was no increase of cardiovascular risk in rofecoxib users compared to celecoxib or meloxicam. In this study, the most significant predictor of an adverse event was a history of cardiovascular disease in the year preceding treatment initiation.

While there are other retrospective studies that have recently been published, in summary, it is clear that these retrospective studies lead to various and at times contradictory conclusions. The limitations of this methodology in comparison to randomized clinical trials have already been discussed.

The preceding review of the clinical literature, is representative of, and discusses the more widely referred to studies on this topic. How should the clinician integrate these somewhat diverse findings when addressing questions regarding rofecoxib's effect in specific patients? Opinions, I believe, vary widely in this regard. For example, Juni et al (published on line in Lancet, Nov 5, 2004) performed a meta-analysis of all randomized clinical trials in patient treated for musculoskeletal disorders and arthritic conditions that compared rofecoxib (12.5-50 mg daily) with other NSAIDs or placebo. 18 trials were identified which met inclusion criteria. These trials included 25,273 patients. However, Juni's analysis omitted the studies in patients with cognitive impairment an Alzheimer's disease, as discussed above. On the basis of his meta-analysis, Juni postulates that there is no evidence for a difference of rofecoxib effect related to dosage or duration of treatment. However, it is important to note that Table 2 of Juni's analysis suggests that there is no increased risk with the use of rofecoxib against placebo, non-naproxen NSAIDS, or at doses of 25mg or less.

I would agree with Juni's contention that clinical trials may not be an accurate reflection
of the situation encountered in routine clinical settings. However, to imply that the
cardiovascular risk of rofecoxib would be magnified in daily practice is not a point of
view that I would agree with. As a clinical cardiologist, I have prescribed NSAIDs in
patients with a history of coronary artery disease and myocardial infarction for the past
27 years. My pattern of prescribing such drugs is typical of what I have observed among
other practitioners treating musculoskeletal and basic arthritic ailments. First line would
be over the counter agents such as aspirin, acetaminophen and ibuprofen, followed by
prescription NSAIDs. In my experience, Cox-2 agents are often prescribed in patients
with more chronic rheumatologic conditions as they are generally well tolerated. Ridker,
et al (NEJM 1997; 336: 973-9) demonstrated that C-reactive protein (CRP), a marker for
underlying systemic inflammation is a powerful predictor for the risk of future
myocardial infarction and stroke. He also showed that the magnitude of beneficial effect
of aspirin was directly related to baseline levels of CRP with no statistically significant
benefit of aspirin in subjects with low CRP levels. These observations suggest that the
larger epidemiologic studies which showed an increased cardiovascular risk with
rofecoxib treatment may simply have been sampling populations with a higher baseline
inflammatory burden, some of whom may have been denied aspirin therapy because of
perceived contra-indications. This impression is supported by a study of 11
geographically diverse health plans studied by Rawson, et al (Ann of Pharm; 2005 April,
Vol 39). They found that patients who received COX-2 inhibitors, in fact, were more
likely to have a higher underlying disease burden and have higher inherent risk for
diabetes and cardiovascular disease. Epidemiologic studies also did not control for
concomitant use of over the counter analgesics and NSAIDs. Recent evidence suggests
that nonselective NSAIDs and acetaminophen may increase the risk of adverse
cardiovascular events (Chan, et al Circ 2006; 113: 000-010). This finding raises an
important issue that has yet to be resolved.

The totality of the relevant literature and data raises the question of whether coxibs may
increase cardiovascular risk with chronic use, but does not consistently support the theory
that rofecoxib increases the risk for adverse cardiovascular events. In fact, the majority
of the randomized clinical trials of rofecoxib vs. placebo tend to refute this contention
(especially with short term use). In the select studies that do raise the possibility of an
association between rofecoxib use and increased cardiac events (i.e., the APPROVe
study), there is a definite trend to suggest that the risk is related to duration of therapy.
The randomized clinical trials lend substantial support to the position that there should
be, in fact, no increase of risk in patients treated for less than 18 months at a dosage of
25mg or less (i.e., Alzheimer's trials and APPROVe trial). Finally, I generally agree with
the FDA's assessment of cardiovascular risk with the use of NSAIDs as described in their
memorandum of April 2005. While rofecoxib has been associated with an increased risk
of cardiovascular events (the APPROVe trial), there is no increased risk with the short
term use of NSAIDs, and the long-term use trials with rofecoxib produce inconsistent
results.

Perhaps the most important issues relate to the actual biologic mechanisms of the various
NSAIDs and how these actions might lead to certain cardiovascular effects. The most

commonly advanced hypotheses of the pharmacologic action of non-selective NSAIDs and COX-2 inhibitors is reviewed by Fitzgerald (Am J Card 2002; 89 26D-32D). Simply put, it is theorized that traditional NSAIDs inhibit COX-1 derived thromboxane and COX-2 derived prostacyclin to a similar degree. By inhibiting COX-1 and hence thromboxane, they produce the potential to inhibit platelet aggregation and thrombosis. This is the mechanism by which aspirin, which is essentially only COX-1 selective, is "cardio-protective" in reducing the incidence of adverse thrombotic events in patients. As discussed above, this mechanism has been postulated to be potentially cardio-protective with the use of certain NSAIDs, specifically naproxen, in similar fashion. Prostacyclin serves a vasodilatory and anti-thrombotic role, counteracting the effects of thromboxane, in the vasculature. It has been theorized that selective inhibition of COX-2 with concomitant reduction of this protective effect could upset the hemostatic balance normally in play between COX-1 and COX-2. This in turn could lead to unchecked activity of thromboxane, in a pathologic state, and theoretically increase the tendency to thrombosis through either increased platelet aggregation and or local vasoconstriction.

Fitzgerald has also commented that there is the suggestion that a relative deficiency of COX-2 derived prostacyclin, an anti-proliferative eicosanoid, may predispose to focal atherogenesis at sites of vascular bifurcation (where shear forces are greater and atherosclerosis is more likely to develop without this theoretical biologic protection). Fitzgerald, however, went on to point out that basic scientific evidence to support this contention is so far lacking and that "the perception of a cardiovascular hazard in humans exceeds the evidential basis for this notion." Fitzgerald, in addition, acknowledged that "the expression of COX-2 in vascular tissue can also be activated by inflammatory stimuli, and both PGE2 and prostacyclin have been suggested to play roles as pro-inflammatory mediators. Fitzgerald went on to suggest a "single" mechanism by which selective COX-2 inhibitors might increase cardiovascular risk (N Engl J Med 2004 Oct 21; 351 (17): 1709-1711). He opined that COX-2 "might" be hemodynamically induced in endothelial cells, and "if so" suppression of prostaglandin I-2 formation by the coxibs "might be expected to elevate blood pressure, accelerate atherogenesis, and predispose patients receiving coxibs to an exaggerated thrombotic response to the rupture of an atherosclerotic plaque." Although theoretically appealing, a significant body of scientific data, regarding coxibs in general and rofecoxib in particular does not necessarily support this so called single mechanism theory. The potential impact of inhibiting COX-2 on a chronic inflammatory process, such as atherosclerosis, remains controversial and the exact mechanism by which rofecoxib could potentially cause an adverse cardiovascular event in any particular individual remains elusive. Fitzgerald, himself, admits that there is little evidence in humans to suggest a prothrombotic effect of coxibs (Patrono, Fitzgerald, et al (Chest 2004; 126: 234S-264S). A review of some of the basic science data highlights this debate.

The issue of plaque progression in relation to COX-2 inhibition has also been explored in experimental models. Rott, et al (JACC; Vol 41: No 10, 2003) were able to demonstrate increased atherosclerotic plaque in apoE deficient mice treated with a selective COX-2 inhibitor (MF-tricyclic furanone) which was associated with increased CMV viral load. The authors offered that a dual role of COX-2 in inflammation and inflammation

resolution demonstrated only in rodent models could have been responsible for these findings. The findings in Rott were not duplicated in any other study. The majority of data in this regard suggest that Cox-2 inhibition does not adversely affect the progression of atherosclerosis. Pratico 2001 Mar 13; 98 (6); 3358-3363) studied the effects of COX-2 inhibition on atherogenesis in an experimental model using knockout mice. They found no evidence of progression of atherosclerosis measuring a variety of biologic markers in this case. Although one could certainly argue the validity of extrapolating this data to human subjects, the authors concluded that acceleration of atherosclerotic plaque in humans treated with COX-2 inhibitors would be unlikely. Two studies using rofecoxib showed a decrease in plaque progression. Burleigh, et al (Circ 2002; 105: 1816-1823) demonstrated significant reduction in atherosclerosis in the aorta of LDLR mice treated with rofecoxib and indomethacin. They suggested that anti-inflammatory agents such as COX-2 inhibitors could have a role in prevention of atherosclerosis. Burleigh et al (J Mol Cell Cardiol 2005; 39: 443-452) demonstrated that selective inhibition of COX-2 and elimination of COX-2 from macrophages significantly reduced early atherosclerotic lesion formation in apoE deficient mice, and opined that anti-inflammatory agents could have potential for reducing atherosclerosis. Further, Egan, et al (Circ 2005 Jan; 111: 334-442) studied COX-2 inhibition in apoE KO mice. They found no effect on atherogenesis of COX-2 inhibition in this model. Similarly, Bea et al (Cardiovascular Research 2003; 60: 198-204) showed no effect of COX-2 inhibition on advanced atherosclerotic lesions in mice. Other studies have noted potential benefit of COX-2 inhibition in acute coronary syndromes: Cipollone, et al (Circ 2001: 104(8); 921-7) and Linton and Fazio (Curr Opin Lipidol 2002; 13: 497-504).

Gross and Moore (Pharmacology 2004: 71; 135-142) examined the vasodilatory response to COX-2 inhibition in the canine circulation. COX-2 inhibition did not affect either prostacyclin or nitric oxide mediated vasodilatation in this model. Chenevard, et al (Circ 2003 Jan 28: 107 (3); 405-9) studied 14 patients with severe coronary artery disease treated with celecoxib. They noted improvement of flow mediated vasodilatation, in addition to lowering of C-reactive protein and oxidized LDL. The authors concluded that COX-2 inhibition could have potential benefit in patients with cardiovascular disease, by improving endothelial function, reducing inflammation, and moderating oxidative stress.

One might argue that such results should not be generalized specifically to rofecoxib in human subjects. Additional studies specifically looking at the effects of rofecoxib in this setting include Verma, et al (Circ 2001: 104; 2879-2882) who evaluated the effect of rofecoxib on endothelium dependent vasodilatation in healthy volunteers. No change in endothelial vasodilator response was noted. The authors pointed out that this data from healthy subjects should not necessarily be applied to those with known coronary artery disease. Title, et al (JACC 42: 10; 2003) did study the effects of rofecoxib (25 mg/day for 8 weeks) on endothelial function and inflammatory markers in 60 patients with documented coronary artery disease in double blinded placebo controlled fashion. These patients were also receiving aspirin therapy. No effects, either adverse or favorable, were noted in rofecoxib patients compared to controls.

Bogaty, et al (Circ 2004: 110; 934-939) did study the effects of rofecoxib in patients in patients with coronary artery disease on a variety of inflammatory markers, including CRP, in addition to measures of endothelial function. They found improvement in 2 of the inflammatory markers (CRP and IL-6) and no deleterious effect on endothelial function. This study was unique in studying patients who had baseline elevation of CRP (an important inflammatory marker) and in demonstrating persistent improvement in baseline in this marker up to 3 months post treatment.

Additional evidence that rofecoxib, in patients with coronary artery disease, also treated with aspirin, suppressed inflammatory mediators was presented by Monakier, et al (Chest 2004: 125 (5); 1610-15). Their study showed a beneficial effect in patients with acute coronary syndrome treated with 100 mg of aspirin plus 25 mg of rofecoxib daily. They opined that this combination had potential to reduce the incidence of coronary events in such patients. Tikiz, et al (Acta Med Okayama 2005: 59 (1); 11-17) studied patients with coronary artery disease treated with 25mg and 50mg of rofecoxib. They found no adverse or beneficial effects on CRP or vasodilator response with either dose.

These data do not support the theory that rofecoxib promotes hemostatic imbalance at the endothelial level or increases the inflammatory profile of patients with coronary artery disease. Nor do theses studies lend credence to the notion that rofecoxib somehow increases the tendency for plaque destabilization or the promotion of atherosclerosis.

Additional studies are available for review which would tend to challenge the single mechanism theory espoused by Fitzgerald and others. Wong, et al (Atherosclerosis 157; 2001: 393-402) investigated the production of vasoactive prostanoids by aortic tissue in a rabbit model of dietary cholesterol induced atherosclerosis. They found that COX-2 is induced in atherosclerotic plaques of cholesterol fed rabbits but does not significantly contribute to aortic prostacyclin production, which is mediated primarily by COX-1. Tuleja, et al (Arterioscler Thromb Vasc Biol 2003; 23: 1111-1115) employed a model of microvascular injury to assess thromboxane and prostaglandin formation in healthy subjects treated with rofecoxib, naproxen, aspirin or diclofenac. Whereas aspirin, naproxen and diclofenac decreased both thromboxane and prostacyclin production to varying degrees, blood levels of thromboxane and prostacyclin metabolites in rofecoxib treated patients were unchanged. Aspirin and naproxen shifted the ratio of prostacyclin to thromboxane production in favor of prostacyclin, whereas rofecoxib did not affect this ratio. Aspirin and naproxen decreased thrombin generation, whereas rofecoxib had no effect on this parameter. In this human vasculature model of prostacyclin production selective COX-2 inhibition appeared neutral while nonselective inhibition of COX favored prostacyclin production. This led the authors to conclude that COX-1, rather than the COX-2, was the source of prostacyclin production.

As a physician who continues to prescribe traditional and selective NSAIDs in patients with coronary artery disease, it is clear that issues regarding potential cardiovascular risks and benefits of these agents remain unresolved. Review of the data regarding rofecoxib, as well as other NSAIDs and analgesics remains, controversial. Although the so-called single mechanism or imbalance theory remains theorized, there is evidence as noted

13

which questions its validity. Ongoing research will help define potential risks and benefits of COX-2 inhibitors. Although it is virtually impossible to rule out a small, but finite cardiovascular risk attributed to long-term rofecoxib treatment, as discussed here, it is important to emphasize that thousands of patients have been treated with this drug safely and with clinical benefit, and any such long-term risk is likely to be a class effect of all NSAIDs.

Now, I will address the specific issues involving the case of Charles L. Mason. In this regard I have reviewed medical records of Mr. Mason including records of Dr. Douglas Voegler, Cottonwood Medical Center, Intermountain Sleep Disorders Center, Alta View Hospital, LDS Hospital, Heart and Lung Institute of Utah and patient pharmacy records. I have reviewed Plaintiff's First Amended Petition. I have reviewed depositions of Charles L. Mason, Douglas M. Vogeler, M.D., Gary Symkoviak, M.D., Edward W. Ganellen, M.D., Mark Keep, M.D., Karen Olson Fields, R.N. and Jay C. Grove. I have reviewed Thallium stress data from 10/22/03 and 4/12/05, in addition to CD copies of Mr. Mason's cineangiograms of 7/29/2003 and 8/13/03.

Mr. Charles Mason, at the age of 61, was diagnosed with an acute myocardial infarction after his admission to Alta View Hospital on 7/25/2003. Plaintiff's original complaint alleges that "as a direct and proximate result of the defective and dangerous design of Vioxx (rofecoxib), plaintiff has been damaged" in relation to this incident. In 1997, he was diagnosed with sleep apnea and CPAP respiratory treatment was recommended. In 1998, Mr. Mason was diagnosed with severe depression by Dr. Douglas Vogeler and Zoloft was prescribed. At that time Mr. Mason was five feet nine inches in height and weighed 221 lbs. Body mass index was 32 kg per square meter and meets the criteria for significant obesity. According to Mr. Mason, he has been between 225 lbs. and 235 lbs. for a decade. Depression and obesity are known risk factors for the development of coronary artery disease, heart attack and increased cardiac mortality. Sleep apnea is also associated with cardiac morbidity. In 2001, Mr. Mason received Celexa 40 mg daily for depression. Because of erectile dysfunction, he was switched back to Zoloft. He had a 36 pack year history of smoking which could have contributed to the development of early atherosclerosis, but would not be considered a risk factor for the acute event, as he quit sometime in the 1970's. Mr. Mason's sister died suddenly in her 50's of an apparent heart attack, and his family history is therefore considered a risk factor in this case.

On 9/10/2002, Mr. Mason was seen by Dr. Voegler's Nurse Practitioner, Karen Olson-Fields, for complaints of diarrhea secondary to irritable bowel syndrome. He also noted complaints of back pain which had been a recurrent problem dating back to 1972. It was at that time that Vioxx 25 mg daily was prescribed. According to the patient's deposition he had tried one of his son-in-law's Vioxx a few months earlier with relief of his back pain. On 9/17/02, the patient had a screening exercise tolerance test which showed mild ST changes which were non-diagnostic for myocardial ischemia, completing 7 minutes and 9 seconds of the Bruce protocol consistent with somewhat decreased aerobic capacity. The exercise test was interpreted as showing "minor ST changes which would suggest a low probability of ischemia."

14

On 7/25/03, Mr. Mason presented to the Alta View Emergency Room with chest pain. He was diagnosed with an acute coronary syndrome (non Q wave myocardial infarction). ECG showed T wave changes suggesting ischemia. Troponin was elevated at 9.2. He was transferred to LDS Hospital where cardiac catheterization showed 90% stenosis of the left anterior descending artery and 70% stenosis of the first diagonal vessel. Left ventricular ejection fraction was 60%. Successful stenting of the left anterior descending artery and angioplasty of the diagonal were performed. He was discharged from the hospital on 7/27/2003 in stable condition on medical therapy, including rofecoxib 25 mg daily. On 8/13/03, Mr. Mason was admitted to Cottonwood Hospital with chest pain. He was not noted to be on rofecoxib at that time. Emergency cardiac catheterization showed only minimal residual plaque. Left ventriculography showed a small area of anterior hypokinesis with ejection fraction of 69%. Dr. Symkoviak in his deposition notes these findings to be a good sign in that the prior blockages had essentially been fully relieved and that the heart although initially "stunned" at the time of the infarction showed improvement in the affected area, with overall normal function. Mr. Mason continued to have intermittent chest pain which he felt was aggravated by the stress of his job as a collections manager. Cardiolite stress testing was performed for further evaluation on 10/22/03. Mr. Mason showed excellent aerobic capacity, completing 11 minutes of the Bruce protocol, which was 30% higher than the predicted level of exercise for his age. He had no chest pain or ECG changes. Cardiac rhythm was normal. Left ventricular ejection fraction was normal at 55% with no discernible wall motion abnormalities. This test was interpreted as showing "no ST changes to suggest ischemia." Routine follow up stress testing was done on 4/12/05. Mr. Mason demonstrated good aerobic capacity, completing 9 minutes and 30 seconds of the Bruce protocol. No chest pain or ECG changes were noted. Resting ECG showed non-diagnostic R-wave changes. However, the follow-up ECG performed on 10/14/05 was normal, consistent with the fact that the poor R-wave progression noted on 4/12/05 was due to lead placement and thus a variation with no clinical significance. The Cardiolite scan again showed normal wall motion with an ejection fraction of 55%, and an equivocal apical defect. In all medical probability this finding, which was not seen on the first scan post-MI, was representative of an attenuation artifact (known as shadowing). These conclusions are the same as that testified to by Dr. Keep, Plaintiff's treating cardiologist, in his deposition.

The natural history of coronary artery disease is to progress over time and that is what occurred with Mr. Mason. One of the most common methods to diagnose hemodynamically significant coronary artery disease is with stress testing. Much has been written about the inaccuracies of this method, including false positive and false negative results. One method which is helpful in interpreting results is to analyze serial testing, where the patient, in essence, serves as his or her own control. In the case of Mr. Mason, the patient in all medical probability had underlying, yet to be diagnosed coronary artery disease at the time of his first stress test on 9/17/02. The fact that Mr. Mason had minor ST changes and decreased aerobic capacity at the time rofecoxib treatment was initiated, and a year after beginning rofecoxib therapy had no ST changes and excellent aerobic capacity (stress test of 10/23/03) after his coronary artery disease was diagnosed and treated, is consistent with the fact that this patient already had significant coronary artery disease, and the acute coronary syndrome which developed on

15

7/25/03 was representative of the natural history of this disease process. Usually, coronary artery disease will progress slowly over years or decades before becoming clinically manifest (Braunwald, Textbook of Cardiovascular Medicine, 6th edition; 996). Clearly, as mentioned above, this patient had significant risk factors for the potential development of coronary atherosclerosis including male sex, age of 61, chronic depression, obesity, a positive family history and sleep apnea. He was diagnosed with erectile dysfunction in 2002, which to some degree could have been related to treatment with anti-depressant agents, but is also known to be a marker for undiagnosed coronary atherosclerosis. A lipid profile at the time Mr. Mason started Vioxx showed a cholesterol of 201, LDL of 124, HDL of 39 and triglycerides of 191. Although one could argue as to whether these borderline levels should be considered an independent risk factor, it is fair to say at the very least that such values are certainly not cardio-protective and are widely acknowledged to be sufficient to cause accelerated progression of coronary artery disease in patients who already have underlying atherosclerosis. This is precisely why his physicians chose to treat him with Zocor once his coronary disease was diagnosed. What is known about the development of coronary artery disease, in general, and the medical facts of this case, specifically, would clearly indicate that Mr. Mason suffered from undiagnosed coronary atherosclerosis prior to ever receiving rofecoxib.

Mr. Mason received rofecoxib 25mg daily for 10 months prior to his heart attack. The aforementioned randomized clinical trials which studied patients treated with this dosage compared to placebo failed to show a significant association between rofecoxib and myocardial infarction. The APPROVe trial, which treated subjects with 25 mg of rofecoxib daily for up to 36 months, did not show a significant difference in the incidence of myocardial infarction at approximately 10 months of use. Moreover, there was no difference in thrombotic events in the Alzheimer's trials, which compared 25mg of rofecoxib daily compared to placebo for up to 1 and 4 years respectively. Could rofecoxib have contributed to plaque progression? The weight of the evidence reviewed in the body of this report would suggest that, if anything, rofecoxib is either neutral or, as an anti-inflammatory agent, beneficial in retarding the development of atherosclerosis.

In the case of Mr. Mason, the prevailing pathologic process that led to his acute event would be that of underlying, progressive coronary artery disease leading to atherosclerotic plaque rupture with non ST elevation myocardial infarction. According to the "imbalance theory" could rofecoxib have aggravated this process? Since it has already been well established that plaque rupture is a natural sequelae of underlying coronary disease, one would have to conclude this event would occur regardless of whether or not an individual had received rofecoxib therapy. If Mr. Mason had been in a prothrombotic state, one would have expected a major coronary event under the circumstances. The medical record from the emergency room on 7/25/03, reflects the fact that Mr. Mason was having typical symptoms of unstable angina ("of and on chest pain radiating to the arms for four days"). On catheterization, Mr. Mason had an underlying coronary stenosis of 90% in the left anterior descending artery. This often lethal lesion may cause coronary thrombosis with massive cardiac damage. The fact that, in spite of this anatomy, Mr. Mason suffered what in medical terms would be considered a minor cardiac event without total occlusion and with normal flow in the vessel at the

time of his angiogram does not support the contention that he suffered from an abnormal hypercoaguable state.

Therefore, in review of this case, in reasonable medical probability, there is no evidence to support the notion that Mr. Mason suffered "harm" from rofecoxib therapy. Two additional issues should be addressed in regard to Mr. Mason's cardiac status. The first is that of medical damages sustained from this patient's heart attack. In fact, this patient suffered what should be considered very minimal myocardial damage and no functional impairment, as confirmed by ECG, angiographic and Thallium stress testing data. Mr. Mason required a 2 day hospitalization to correct an underlying problem, which was a 90% stenosis of the left anterior descending coronary artery and a 70% stenosis of the diagonal vessel. Regardless of whether this patient had taken rofecoxib or not, Mr. Mason's potentially lethal problem, that is coronary atherosclerosis, was pre-existing and would have required appropriate therapy, including coronary angioplasty and stenting, long term medical therapy and ongoing clinical surveillance. Fortunately for Mr. Mason successful intervention was performed with no significant cardiac compromise. This opinion is borne out by the fact that follow up cardiac catheterization done on 8/13/03 confirmed an excellent angiographic result with excellent vessel patency, minimal left ventricular anterior hypokinesis and an ejection fraction which was well within the normal range. Subsequent stress testing clearly demonstrated markedly improved functional capacity as compared to the patient's status prior to this event, and showed that, in spite of this heart attack, Mr. Mason had improved from below average functional capacity to a level that would be considered better than expected even for someone who had never experienced a coronary event.

The other issues to consider are those of Mr. Mason's prognosis and any physical restrictions that may have resulted from his heart attack. The most important predictors of prognosis in patients post myocardial infarction are cardiac function, as measured by left ventricular ejection fraction, functional capacity as gauged by stress testing, atherosclerotic burden, as determined by angiographic evaluation of coronary anatomy and residual ischemia, as judged by thallium scanning. Based on all these measures, Mr. Mason's future prognosis is quite favorable, considering his pre-existing coronary disease. Recommendations regarding physical restrictions are typically based on the amount of irreversible myocardial damage suffered, the overall physical conditioning of the patient and the amount of residual ischemia following the acute event. I would agree with Mr. Mason's treating physicians who did not impose specific restrictions on him as far as general activity was concerned, and in fact encouraged him with the aid of cardiac rehab to improve his cardiovascular fitness as compared to his status prior to the heart attack. It is to Mr. Mason's credit that he was able to accomplish this goal and has worked diligently over the last few years to maintain a good level of physical activity. Mr. Mason's heart condition did not require him to take early retirement. It would not prevent him from playing with his grandchildren, hiking at altitude or playing golf if he chose to do so as testified to by Mr. Mason's treating cardiologist. Mr. Mason complains that he can no longer hunt elk in the Utah mountains at elevations of up to 10,000 feet. That would not surprise me considering the chronic back problems he has dealt with over the years in addition to his more recently diagnosed knee problem, which would making

17

wilderness hunting in mountainous terrain quite difficult. However, based on his excellent aerobic capacity as documented by the stress test done on 10/22/2003, which also demonstrated the absence of perfusion abnormalities, the absence of arrhythmias and normalization of his ejection fraction, it does not appear that the minimal cardiac damage sustained by Mr. Mason would have been a limiting factor in this regard.

In summary, in reasonable medical probability, rofecoxib should not be considered a proximate or contributing cause of Mr. Mason's heart attack. This patient's coronary artery disease and his presentation with acute coronary syndrome is typical of many male patients his age with his risk factor profile and is quite consistent with the natural history of atherosclerosis typically seen in individuals who have never taken rofecoxib. Mr. Mason suffered minimal myocardial damage from this episode and appears to have made an excellent recovery. Fortuitously, this event should be judged as a sentinel warning which allowed Mr. Mason's physicians to diagnose and successfully treat his underlying condition, (high grade left anterior descending and diagonal coronary stenoses). With ongoing risk factor reduction, medical therapy and appropriate routine surveillance, this patient's prognosis is favorable. Prior treatment with rofecoxib had no bearing on Mr. Mason's inherent coronary atherosclerosis, nor any relationship to the initial and ongoing treatment that he will require for this condition. Additionally, there is no evidence that Mr. Mason's ingestion of rofecoxib or his heart attack had any impact on his life expectancy or ability to pursue all usual activities.

I reserve the right to review additional materials should those come to my attention.

Michael Rothkopf, M.D.