IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Vioxx<br>PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>Case No. 2:06cv810<br><br>CHARLES LARON MASON v.<br>MERCK & CO., INC. | MDL DOCKET NO. 1657<br><br>Section L<br><br>Judge Fallon<br>Mag. Judge Knowles |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE ARGUMENT OR OPINION TESTIMONY THAT AN INCREASED RISK OF HEART ATTACK EXISTS ONLY AFTER 18 MONTHS OF VIOXX USE**

**(EXPERT CHALLENGE NO. 1)**

**TO THE HONORABLE JUDGE ELDON FALLON:**

Plaintiff, Charles Laron Mason, files this memorandum in support of motion to exclude argument or opinion testimony to the effect that an increased risk of heart attack exists only after 18 months of Vioxx use.

**I.
INTRODUCTION**

Plaintiff is aware that this Court has denied similar motions pertaining to this subject matter filed by the plaintiffs in *Irvin* and *Smith*. The Court concluded on those occasions that, as a gatekeeper, it must evaluate methodology, not conclusions.[1] Plaintiff challenges the reliability and relevance of the proffered opinion testimony on this issue in order to preserve his record for appeal. In addition, for purposes of this motion, Plaintiff does not attack the conclusions of Merck's 18-

---

[1] *See Plunkett v. Merck & Co. (In re Vioxx Prods. Liab. Litig.)*, 401 F. Supp. 2d 565, 597 (E.D. La. 2005); Order, *Smith v. Merck & Co.*, (Rec. Doc. 6763) (September 8, 2006).

1

month hypothesis; rather, Plaintiff attacks the *methodology* upon which that hypothesis is based.[2] Plaintiff respectfully requests that the Court reevaluate this methodology and reconsider its previous ruling on this issue.

## II.
## FACTUAL BACKGROUND

This action for personal injuries arises from Plaintiff, Charles Mason's use of Vioxx, which Plaintiff contends caused a heart attack on July 25, 2003. Mr. Mason was 59 years old when his nurse practitioner, Karen Olson-Fields, prescribed him Vioxx in September 2002. He had been taking the drug for approximately 10 months at the time of his heart attack.

A cardiologist at LDS Hospital in Salt Lake City performed a heart catheterization on Mr. Mason which showed that the left anterior descending coronary artery (LADC) was 90% blocked with plaque and one of it's branches called the 1st diagonal coronary artery was 70% blocked. The cardiologist noted in his report that there was a thrombus or blood clot at the site of both blockages. There is no dispute that Mr. Mason suffered a thrombotic cardiac event during a period of ingestion of Vioxx.

As the Court is aware, on September 30, 2004, Merck removed Vioxx from the market worldwide and reported that its long term prospective clinical trial (APPROVe)[3] resulted in statistically significant increases in confirmed thrombotic cardiac events among Vioxx users

---

[2] In addressing Merck's anticipated argument that this motion should be denied because Plaintiff bears the burden at trial on the issue of causation, Plaintiff preemptively argues that this motion has nothing to do with his burden of proof in this case. Rather, Plaintiff is challenging the *reliability and relevancy* of an expert opinion that *Merck* will undoubtedly attempt to present to the jury in this case – that an increased risk of heart attack exists only after 18 months of Vioxx use. It is irrefutable that as the party seeking to introduce opinion testimony, Merck bears the burden of demonstrating by a preponderance of the evidence that the testimony is both reliable and relevant. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

[3] "APPROVe" stands for Adenomatous Polyp Prevention On Vioxx. The principal goal of the APPROVe trial was to determine the effect of a 36 month course of Vioxx therapy on the risk of recurrent adenomatous polyps in patients at risk of colorectal adenomas or progression of colon cancer.

compared to placebo. In the resulting publication of the APPROVe data, Merck and its consultants conducted a post hoc analysis on duration of use and reported in the publication that "[i]n a *post hoc* analysis, the difference between the two groups in the incidence of thrombotic events was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months."[4] While the APPROVe authors provided a graph exhibiting the Kaplan-Meier estimate of the cumulative incidence of confirmed serious thrombotic events over time (Figure 2), the Kaplan-Meier curve for Investigator-Reported cardiac events throughout the study was withheld from the New England Journal of Medicine and was not published.[5] This data set showed the incidence of cardiac events throughout the study was similar, regardless of duration.

Despite the post hoc nature of the analysis, as well as other epidemiologic literature and clinical trials sufficiently powered to refute the post hoc 18-month subgroup analysis, Merck announced to the public and has proffered experts for the opinion that Vioxx cannot cause thrombotic cardiac events unless ingested for 18 months or longer (referred to hereafter as the 18-month hypothesis).

In the present case, Dr. Michael Rothkopf, Merck's cardiology expert, has offered the opinion that "[t]he APPROVe trial . . . did not show a significant difference in the incidence of myocardial infarction at approximately 10 months of use."[6] Dr. Donald David, Merck's gastroenterology expert, opines that the APPROVe trial showed no difference in significant cardiovascular events "until after 18 months of continuous use."[7] KyungMann Kim, Ph.D., Merck's biostatistics expert, also

---

[4] *See* Bresalier R., et al., *Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial (APPROVe Trial)*, N. ENG. J. MED., February 21, 2005, attached as Exhibit A, p. 6 (emphasis added).
[5] The result of the Kaplan Meier curve that was withheld by Merck is contained in the report of Plaintiff's expert, Douglas Zipes, M.D., Exhibit B, p. 27.
[6] Report of Michael Rothkopf, M.D., Exhibit C, p. 16.
[7] Report of Donald David, M.D., Exhibit D, p. 10.

3

concludes that the APPROVe trial "suggests long-term effects of rofecoxib on [thrombotic cardiovascular adverse] events in patients with a history of colorectal adenomous."[8]

Because the 18-month hypothesis is based upon the speculative *post hoc* subgroup analysis by Merck from the APPROVe clinical trial and is wholly without any biological plausibility, the 18-month hypothesis runs afoul of the reasoned principles for reliable opinion testimony set forth in Federal Rules of Evidence 701-703 and the line of interpretive cases. *See e.g., Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *Kumho Tire Co., v. Carmichael*, 526 U.S. 137 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

## III.
## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrel Dow Pharmaceuticals*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court held that trial courts should serve as the gatekeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id.* at 589.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Id.* at 592-93. In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id.* at 593-95. The factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the

---

[8] Report of KyungMann Kim, Ph.D., Exhibit E, p. 24.

technique; and (5) the general acceptance of methodology in the scientific community. *Id.* Whether some or all of these factors apply in a particular case depend on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

In addition to the five factors laid out in *Daubert*, a trial court may consider additional factors in assessing the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999). Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g., id.* at 313; *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991).

Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific evidence is irrelevant, however, where there is too great an analytical gap between the data and the opinion proffered. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both reliable and relevant. *Moore*, 151 F.3d at 275-76. The focus is not on the result or conclusion, but on the methodology. *Id.* The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used

5

by the expert was proper. *Id.*

The trial court is the gatekeeper of scientific evidence. *Daubert*, 509 U.S. at 596. It has a special obligation to ensure that any and all expert testimony meets those standards. *Id.* Accordingly, it must make a preliminary assessment of whether the reasoning or methodology can be properly applied to the facts in issue. *Id.* at 592-93. In making this assessment, the trial court need not take the expert's word for it. *Joiner*, 522 U.S. at 147. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it. *Moore*, 151 F.3d at 279.

## IV.
## ARGUMENT

### A.   Merck's post hoc subgroup analysis is fatally flawed.

Merck relies on the APPROVe manuscript to support its 18-month hypothesis. As the Court is aware, the APPROVe manuscript provided that "[i]n a *post hoc* analysis, the difference between the two groups in the incidence of thrombotic events was evident in the second 18 months of the study, whereas the event rates were similar for the first 18 months."[9]

A post hoc subgroup analysis is not a generally accepted methodology within the relevant scientific community and is strongly cautioned against in the relevant epidemiological literature as unreliable. The unreliability of a post hoc analysis is perhaps best explained by Dr. Douglas Zipes:

> Understanding the distinction between pre-specifying a hypothesis and deriving one post hoc is critical to understanding how randomized clinical trials embody the scientific method and achieve validity in the scientific community. Pre-specifying a hypothesis and then validating it with a clinical trial follows the scientific method and presents strong evidence that the trial designer can claim to understand a phenomenon. It is analogous to designing a specific target before throwing a rock and then hitting it with the rock. In such a case, one has reason to believe that the thrower has the skill to repeat the performance. A post hoc analysis, however, is

---

[9] Exhibit A, p. 6 (emphasis added).

6

similar to someone throwing a rock at a group of targets and hitting one of them, then claiming that it was the one he was aiming for. One is uncertain whether the thrower is just lucky or can actually hit the same target a second time. **Similarly, post hoc analysis are said to be "hypothesis generating" exercises that must be repeated in a prospective manner in order to be fully convincing.**[10]

**There is no evidence to suggest that Merck ever conducted a study to test its 18-month hypothesis.**[11]

Furthermore, *Merck agrees that a post hoc analysis is unreliable*:

It is a fundamental scientific principle that a *post hoc* analysis cannot prove a causal relationship. Instead, it is a tool to generate hypotheses for future study. "Post hoc analysis is of major importance in the generation of hypotheses. However, the hypothesis is created by the analysis and has not been proved by an 'experiment'." See Elliot H.L., *Post hoc analysis: use and dangers in perspective*, JOURNAL OF HYPERTENSION 1996, 14 (suppl 2):S21-S25 at S21 . . . . Even if it were not unreliable because of its post hoc nature and the small numbers involved, this subgroup analysis is still subject to the problem of data dredging . . . .[12]

A post hoc *subgroup* analysis is particularly susceptible to misleading interpretations. One seminal article addressing this issue was published in the Journal of the American Medical Association in 1991.[13] According to the authors, a subgroup analysis, even if relatively large, leads to comparisons concerning individual subgroups that are woefully lacking in power.[14]

---

[10] Exhibit B, p. 26 (emphasis added).
[11] It has been widely speculated that Merck failed to test this hypothesis because Merck does not want to risk losing its legal defense to claims brought by users of Vioxx for less than 18 months.
[12] Memorandum in Support of Motion of Merck & Co., Inc. for Order Excluding the Testimony of John W. Farquhar, M.D., p. 9, filed on August 14, 2006 in *Barnett v. Merck & Co., Inc.*, 2:06cv485. In this motion, Merck argued that the Court should exclude testimony offered by Dr. Farquhar that was based on Professor Jewel's *allegedly* post hoc analysis of the APPROVe data. Plaintiff Barnett denied that Professor Jewel's analysis was post hoc.
[13] Yusuf S, Wittes J, Probstfield J, Tyroler HA, *Analysis and interpretation of treatment effects in subgroups of patients in randomized clinical trials*, JAMA 1991; 266:93-98, Exhibit F.
[14] *Id.* Power refers to the probability of a statistical analysis to detect an effect. Plaintiff's epidemiologist, Dr. Lemuel A. Moyé, has also identified this problem with subgroup analysis. *See* Report of Dr. Lemuel Moyé, ¶127, attached as Exhibit G.

Merck has also identified the deficiency associated with subgroup analysis:

> Subgroup analysis often serve a useful purpose. They can be used, for example, to generate hypothesis or identify subjects of further study. As a recent New England Journal of Medicine article noted, however, overstating a subgroup analysis can misinform. *See* Lagakos S.W., *The Challenge of Subgroup Analysis – Reporting without Distorting*, NEW ENGLAND J. MED. April 2006; 354:16; 1667-1669 at 1669.[15]

Merck has previously taken the position that "expert testimony that presents a post hoc subgroup analysis as proof of causation should be excluded because that is not a scientifically valid use of such data, and because it would be confusing to the jury and unfairly prejudicial."[16]

Merck's own proffered cardiology expert, Dr. Craig Pratt, previously testified that APPROVe was not powered to answer the question of duration. Specifically, Dr. Pratt testified as follows:

> Q:   Do you believe APPROVe was adequately powered to say that there actually is a difference in cardiovascular events for usage that's less than 18 months versus usage that's greater?...
> A:   Well, I mean, certainly the trial wasn't powered to answer that question.... So, in that question – in that sense, no.[17]

Plaintiff's epidemiologist, Dr. Lemuel Moyé, has also demonstrated that subgroup analysis is scientifically unreliable.[18] Furthermore, Dr. Moyé has demonstrated that Merck's 18-month hypothesis is based upon an "improper subgroup" analysis which is even more unreliable.[19] An "improper subgroup" is different from a "proper subgroup."[20] An improper subgroup is a subgroup whose membership cannot be ascertained at baseline, such as the members of the placebo group in APPROVe who had cardiovascular events after 18 months of exposure.[21]

In addition, the error rate is unacceptably high for an underpowered subgroup analysis in

---

[15] Memorandum in Support of Motion of Merck & Co., Inc. for Order Excluding the Testimony of John W. Farquhar, M.D., p. 9, filed on August 14, 2006 in *Barnett v. Merck & Co., Inc.*
[16] *Id.* at p. 10.
[17] *See* Exhibit H, Excerpts from the Deposition Testimony of Craig Pratt, M.D., 115:2-116:2.
[18] *See* Exhibit G, Appendix D, ¶¶ 254-287.
[19] *Id.* at ¶¶ 126; 289-271.
[20] *See id.*

general. Dr. Ray, Dr. Peter Juni, and colleagues published in the medical journal, Lancet that the 18-month hypothesis by Merck had only a 20% power to detect an increased risk of 2 or greater.[22] At 20%, the hypothesis would have an only 1 in 5 chance to detect an effect and falls well short of the generally accepted methodology of a minimum power of 80% for a reliable analysis. In other words, there is an 80% likelihood that the 18-month hypothesis is simply wrong.

### B.   There is no biological plausibility to the 18-month hypothesis.

It is biologically implausible that cardiac risk from Vioxx begins at 18 months and no sooner.[23] Merck and its experts provide no scientifically reliable evidence that it is plausible that Vioxx ingestion that is pharmacologically causing the unopposed inhibition of PGI-2 within hours of ingestion takes 18 months or longer to cause cardiac events. Thus, there is too large an analytical gap between the hypothesis and the data to render the opinion reliable.

### C.   No reliable peer-reviewed literature supports the 18-month hypothesis.

The only peer-reviewed literature Merck offers to its 18-month hypothesis is the APPROVe manuscript. As the Court is aware, Merck announced this year that it performed an incorrect statistical test in its post hoc analysis of the APPROVe trial. Specifically, the analysis relied on a censoring rule that violated widely accepted intention-to-treat principles.[24] When analyzed appropriately, the APPROVe trial actually showed that cardiovascular risk was present early in

---

[21] *See id.*
[22] Juni P, et al., *Discontinuation of Vioxx*, LANCET 2005; 265(January 1, 2005):23-28, Exhibit I.
[23] Exhibit G, ¶128. Dr. Moyé explains:
   "[T]here is no plausible explanation in the literature to explain why an effect whose mechanism (differential effect on prostanoid synthesis), a effect that is observed within several half-lives of Cox-2 inhibitors should require eighteen months to manifest itself. It does not take eighteen months to observe the analgesic activity it is not biologically plausible that eighteen months would be required to observe the cardiovascular toxicity, and the idea is epidemiologically incoherent."
[24] *See* Nissen, SE, *Adverse cardiovascular effects of rofecoxib*, N. ENG. J. MED., 2006;355:203-204, attached as Exhibit J; *see also* Lagakos, SW, *Time-to-event analysis for long-term treatments: the APPROVe trial*, N. ENG. J. MED., 2006;355:113-117, attached as Exhibit K.

Vioxx use. On July 13, 2006, the New England Journal of Medicine published a correction applying appropriate statistical methods and removing all reference to an 18-month threshold for cardiovascular risk, thereby indicating that risk was increased from the start of therapy and continued through the course of the APPROVe study.[25] The correction to the APPROVe manuscript leaves Merck without any peer-reviewed support for its 18-month hypothesis. Furthermore, the statistical error committed by Merck in arriving at its 18-month hypothesis is further evidence of the unreliability of the hypothesis.

## V.
## CONCLUSION

The generally accepted and reliable methodology among the epidemiologic community relating to conducting subgroup analyses shows that the 18-month hypothesis is unreliable because it goes against standard methodological practice in the relevant scientific community, is fatally underpowered, and has an error rate as high as 80%. Accordingly, Plaintiff respectfully requests that the Court strike any opinion or fact testimony on this issue.

---

[25] *See* Correction, *Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial (APPROVe Trial)*, N. ENG. J. MED., July 13, 2006, attached as Exhibit L.

Date: September 19, 2006                    Respectfully submitted,

_____
Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL 36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY 10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799 |
|---|---|
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum has been served on Liaison Counsel Phillip Wittmann, Shayna S. Cook and Richard Krumholz by U.S. Mail, facsimile and/or e-mail; and e-mail upon all parties by electronically uploading the same to Lexis-Nexis File and Serve Advanced, in accordance with Pretrial Order No. 9, on this 19th day of September, 2006.

Phillip Wittmann
Stone, Pigman Walther, Wittmann, LLC
546 Carondelet Street
New Orleans, LA  70130-3588
Phone: (504) 581-3200
Fax: (504) 581-3361

Shayna S. Cook
Bartlit, Beck, Herman, Palechar & Scott
Courthouse Place
54 West Hubbard Street
Chicago, IL  60610
Phone: (312) 494-4400
Fax: (312) 494-4440

Richard Krumholz
Fulbright & Jaworski
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784
Phone: (214) 855-8000
Fax: (214) 855-8200

_____
Holly M. Wheeler