

12185134
Aug 25 2006
2:48PM

# Risk of Thrombotic Cardiovascular Adverse Events with Rofecoxib

A Report Prepared for

Merck & Co.

KyungMann Kim, Ph.D.

June 1, 2006

1.     **Qualifications**

I received my Ph.D. in Statistics from the University of Wisconsin-Madison in 1985. I am currently Professor of Biostatistics and Statistics and Associate Chair of the Department of Biostatistics and Medical Informatics at the University of Wisconsin-Madison and Director of Biostatistics Shared Resource and Co-director of Clinical Research Central Office at the University of Wisconsin Comprehensive Cancer Center. Prior to my current appointment, I was Assistant and Associate Professor of Biostatistics at Harvard University and Dana-Farber Cancer Institute (1988-1995), Visiting Associate Professor of Ophthalmology at Johns Hopkins University (Spring of 1995), and Associate Professor of Biostatistics at the University of Michigan and Director of Biostatistics at the University of Michigan Comprehensive Cancer Center (1995-1997).

I am an elected fellow of the American Statistical Association. Since 2000, I have been serving as an associate editor for *Biometrics*, an official journal of the International Biometric Society, which publishes many cutting-edge statistical methods for clinical trials. I also serve frequently as a referee for major statistical and clinical journals. Last year I served as a reviewer of an Institute of Medicine report on a very controversial AIDS clinical trial in Uganda. I was the chair of the Program Committee for the 27th Annual Meeting of the Society for Clinical Trials in 2006. I am very active in several professional organizations serving on student scholarship award committees.

I was a member of the Lung Cancer Concept Evaluation Panel of the Division of Cancer Treatment and Diagnosis, National Cancer Institute (NCI) (1999-2002), reviewing protocol concepts for all NCI-sponsored phase III randomized, controlled trials in lung cancer. I was a member of Subcommittee E on Cancer Epidemiology, Prevention and Control, NCI Initial Review Group (2001-2005), reviewing program project grant and large research project grant applications. I was a member of the Autoimmune Diseases Data and Safety Monitoring Board, National Institute of Allergy and Infectious Diseases (NIAID) (2000-2004) and have been serving as a member of the HIV/AIDS Therapeutic

Trials Data and Safety Monitoring Board, NIAID since 1998. I have served and am serving on a number of data monitoring committees of NIH, Department of Veterans Affairs and industry-sponsored clinical trials in cancer, autoimmune diseases, growth hormone deficiency syndrome, cardiovascular diseases including chronic heart failure, migraine, osteoporosis, and osteoarthritis, both as a member and a chair. Recently I have been appointed to serve on the Human Studies Review Board of the U.S. Environmental Protection Agency (EPA). This is a newly established Federal Advisory Committee to provide advice and recommendations to EPA on scientific and ethical issues in intentional human dosing studies for EPA regulatory purposes.

At the University of Wisconsin-Madison, I regularly teach graduate courses on statistical methods for clinical trials (Statistics 641) and for epidemiologic studies (Statistics 642), among others and supervise Statistics graduate students on their Ph.D. thesis dissertation. I have participated as a faculty in the annual Workshop on Methods for Clinical Trials Research organized jointly by the American Association for Cancer Research and the American Society for Clinical Oncology since 2004. I have given a number of short courses on sequential methods for clinical trials in the U.S. (Boston, MA, King of Prussia, PA, and St. Pete's Beach, FL) and Europe (Barcelona, Spain and Leuven, Belgium) and have participated in workshops on clinical trials methods as a faculty in the U.S., Hong Kong, Korea and Scotland. As such I am very knowledgeable about clinical trials and epidemiologic studies. In fact my entire professional career as a statistical scientist has revolved around clinical trials in a variety of diseases since 1985.

*Experience with COX-2 Inhibitors*

Of note, I initially served as a paid statistical consultant to then G. D. Searle/Pharmacia for the Adenoma Prevention with Celecoxib (APC) study during July 2000-February 2001 and as an independent statistician for the APC study in support of its data and safety monitoring board and in preparation of the primary publication during March 2001-January 2006. My effort was compensated by a subcontract to the University of

Wisconsin-Madison from the Strang Cancer Prevention Center, a New York institution with the NCI contract for the APC study. Because of this involvement, I have been following the literature on COX-2 inhibitors and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) very closely from 2000 as a statistical scientist.

In what follows, I have summarized some of the essential characteristics of randomized, controlled trials (RCTs) in drawing causal inferences regarding the effect of treatment on the observed outcomes and highlighted the strengths of RCTs and the limitations of observational studies. Also I have summarized my review of RCTs, systematic reviews and observational studies regarding the risk of thrombotic cardiovascular events associated with rofecoxib and other NSAIDs. Based on my expertise regarding statistical methods for RCTs and observational studies and on my review of the literature on rofecoxib's risk, I provide my conclusions and opinions.

I reserve the rights to revise and supplement my reviews provided in this report.

## 2. Preamble on Cause and Effects

*Randomized, Controlled Trials*

In typical research studies, scientists are interested in understanding or even establishing what may have caused the observed phenomena, i.e., an inference on a causal relationship, otherwise known as the causal inference. In clinical research setting, RCTs have been accepted as the gold standard in establishing risks and benefits of therapy, especially by regulatory agencies such as the U.S. Food and Drug Administration (FDA), the Japanese Pharmaceuticals and Medical Devices Agency, and the European Medicines Agency. In essence, randomized, controlled trials are not very different from other randomized, controlled experiments in biological, physical, and social sciences.

In order to establish a causal relationship between the suspected cause, i.e., treatment, and the effects, i.e., outcomes measured in study participants in the randomized, controlled trials, the experimenter attempts to hold all essential elements of the trials comparable between the comparison groups, including the baseline characteristics of study participants and the way the effects are measured and recorded, with the only exception of treatment given to the comparison groups being different. The treatment is assigned to the comparison groups using a randomization mechanism, in essence very much like tossing a coin, so that subjective manipulation of the treatment assignment is avoided, thus keeping the comparison groups comparable and the statistical comparison unbiased and valid. With the treatment being the only known difference between the comparison groups, it is only logical to conclude that either the nature's chance or the treatment itself has produced the observed difference in the effects between the comparison groups. The statistical hypothesis test with the observed significance level, the so-called $p$-value, is how the nature's chance of producing the observed difference in the effects is quantified using probability under the assumption that the treatment had nothing to do with the observed difference. If this probability is significantly small, generally accepted as one out of 20, the conclusion is drawn that the treatment is the cause of the observed difference in the effects rather than the nature's chance at a significance level of 0.05.

Even with the most rigorous and careful planning of a trial, there is always a possibility that a factor or factors uncontrollable by the trial investigators can produce spurious results, meaning that findings from a single trial may not be definitive. This is precisely the reason why the U.S. Food and Drug Administration often requires two independent trials before it grants marketing approval of a new biopharmaceutical product.[1]

*Relative Risk*

A relative risk is a ratio of risk of an event for one group vs the other. As such, it is a summary of the characteristics of a population rather than the characteristics of an individual. A relative risk for a population is ordinarily given in terms of a point estimate and a 95% confidence interval. There is not certainty as to what the "true" relative risk is within this confidence interval. For example, a relative risk of 1.92 with a 95% confidence interval of 1.19-3.11 (as for all thrombotic events in APPROVe) tells us only that the true relative risk could be as small as 1.19 or as large as 3.11 and does not enable us to assign a probability to either of these two possibilities.

A relative risk for a population can be used as a point estimate of the risk of an individual within that population. But the confidence interval for such an estimate becomes significantly wider for an individual than for the population of patients with those characteristics. This is a mathematical consequence of the calculation of the confidence interval for the predicted relative risk. Therefore even if a relative risk for a population is statistically significant to a 0.05 significance level, it cannot tell you whether the risk for an individual is statistically significant.

---

[1] Food and Drug Administration. Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products. May 1998.

*Study Population, Pre-specified Endpoints and Statistical Analysis Plans*

As noted above, interpretation of the statistical significance of observed effects, e.g., the relative risk for thrombotic cardiovascular (CV) adverse events (CV/T events) in patients while taking rofecoxib in comparison to controls such as placebo or other NSAIDS, is only scientifically relevant in the setting of how the trial was designed in terms of subject population, pre-specified outcome measures and statistical analysis plans. It is only natural to perform post-hoc analyses to learn as much about the disease and the treatment under investigation as possible. But the findings from these post-hoc analyses can never be interpreted definitively, particularly as a proof of causal inference as they are by definition "data-driven" and only serve as generating hypotheses at best.

Unless there is a strong biological or clinical understanding, findings from a trial in one population of patients cannot be extrapolated to another population of patients. Findings from a trial are only relevant to the study subject population in the trial. For example, findings from a trial in patients with a history of colorectal adenomas in the Adenomatous Polyp PRevention On VIOXX™ (APPROVe) study cannot be readily extrapolated to patients with Alzheimer's disease (AD) and vice versa. This is primarily because these subjects and their conditions have different etiology, which are often unknown.

Scientific interpretation of the results from a trial is most relevant to the pre-specified endpoints of the trial. For example, in discussing CV/T events as a pre-defined and pre-specified endpoint of interest, one can draw scientifically valid conclusion only on CV/T events. Picking out an endpoint from composite endpoints, say myocardial infarction (MI) or stroke from the pre-specified CV/T events, may lead to scientifically invalid and misleading conclusions. This is because the practice is "data-driven" and post-hoc, and thus lessens the statistical validity of the conclusions drawn from such an analysis. Also statistical theory known as multiple comparisons tells us that chance alone will find spurious statistical significance when one looks at each of the component endpoints that make up a composite endpoint.

Another issue critical to the definition of an endpoint is the time frame in which the endpoint is observed. According to Merck's cardiovascular standard operating procedure for CV/T events for rofecoxib, only those CV/T events that were observed within 14 days after going off treatment were considered (**R.9**).[2] Depending on the time frame, a different number of events will be reported, and subsequently different results are obtained for comparison between randomized treatment groups. By increasing the window of follow-up, one will increase the power of a study by having more events included in the analysis. However, under the assumption that the risk of CV/T events is reduced off treatment, increasing the window of follow-up attenuates the treatment effect on the risk of CV/T events, as seen in the extension results from the APPROVe study reviewed later. Therefore, extending the window of follow-up makes it more likely that an on-drug risk could be obscured.

Any analyses used to draw causal inferences should be clearly specified in a prospective manner in the statistical analysis plans for the trial before the data from the trial are unblinded. Otherwise, one can manipulate the analysis to one's liking, driven by what has been known from the data. This is precisely the reason why the US FDA requires such a statistical analysis plan before randomization is revealed.

*Intent-to-Treat Analysis*

An intent-to-treat analysis refers to a method of data analysis for randomized, controlled trials in which all patients are analyzed according to their randomization, regardless of whether or not they completed or received that treatment.[3] This is considered to be the valid analysis according to two different accounts. The first is according to the statistical

---

[2] Merck & Co. Standard Operating Procedures for the Surveillance, Monotiring, and Adjudication of Acute Thromboembolic Vascular Events in Clinical Trials of COX-2-Specific Inhibitors. September 3, 1999.

[3] Friedman LM, Furberg CD, DeMets DL. *Fundamentals of Clinical Trials*, 3rd ed. Springer: New York, 1998.

account. As noted earlier, the basis for the calculation of the observed significance, the so-called p-value, is based entirely on randomization, as Sir Fisher noted in his famous lady tasting tea example. Typical significance tests are known to be equivalent to a randomization test, which provides a basis for calculation of the observed significance, i.e., p-value. The second is based on how clinical care occurs. What the randomized, controlled trial is testing is not the treatment itself, but rather the treatment strategy intended for the study patient population. One telltale sign of an intent-to-treat analysis is that it includes all randomized subjects regardless of whether they were eligible for the study, complied with the protocol therapy, or had protocol violations. In contrast, a subgroup analysis includes only a subset of the intent-to-treat analysis population.

*Subgroup Analysis*

As the word "subgroup" implies, a subgroup analysis refers to an analysis that includes only a subset of the study's intent-to-treat analysis population, i.e., all randomized subjects in a study. For example, an analysis of subjects taking aspirin in the APPROVe study is a subgroup analysis. However, the analysis of the Kaplan-Meier estimates at month 18 in the APPROVe study is not a subgroup analysis as the Kaplan-Meier estimates are based on all randomized subjects in the APPROVe study.

Findings from subgroup analyses are known to be unreliable to draw causal inferences and are hypothesis-generating at best. It is because of the fact that chance alone can produce statistically significant results in a subgroup when there is no difference between randomized treatment groups in the intent-to-treat analysis population.

A case in point is the Prospective Randomized Amlodipine Survival Evaluation (PRAISE I) study, the primary objective of which was to assess the long-term effect of amlodipine on morbidity and mortality among patients with advanced chronic heart failure.[4] In this

---

[4] Packer et al. Effect of amlodipine on morbidity and mortality in severe chronic heart failure. *N Engl J Med* 1996:335;1107-14.

study, the randomization was stratified (thus creating subgroups prospectively) according to whether the cause of left ventricular dysfunction was coronary artery disease (ischemic) or nonischemic dilated cardiomyopathy. The study found a statistically significant etiology (ischemic vs nonischemic) by treatment interaction, a hazard ratio of 1.04 in the ischemic stratum and 0.69 in the nonischemic stratum. When a subsequent study (PRAISE II) was conducted to confirm the benefit of amlodipine in patients with nonischemic cardiomyopathy, it found a relative risk of 1.09, showing no benefit of amlodipine on morbidity and mortality whatsoever. No covariate analysis could explain lack of benefit, contrary to the findings from the subgroup analysis in the PRAISE study. The results from the PRAISE II study have not been published (a publication bias) although its results have been presented at the 49th Scientific Sessions of the American College of Cardiology in 2000.[5]

*Analysis of Long-Term Follow-up Studies*

In clinical trials in which an outcome variable is observed more or less instantaneously, the statistical information of the test statistic is proportional to the number of study subjects and it is directly related to the duration of the study in calendar time and the rate by which subjects are enrolled and randomized into the study. However, in clinical trials in which an outcome variable is observed during follow-up as time to event, the statistical information is not directly related to the number of subjects, but rather to the number of events of interest. Therefore, in clinical trials with time to event data or incidence data as the primary endpoint, statistical analysis is dictated not by the calendar time, but by the number of events specified by the experimental design of the trial protocol. Termination of a multi-center clinical trial is a complex process involving coordination of many different activities such as collecting all outstanding data from participating clinical sites, adjudication of events if pre-specified in the trial protocol, notification of clinical sites so that no additional subjects are screened for the trial and local institutional review boards

---

[5] Villareal et al. Meeting highlights: Highlights of the 49th Scientific Sessions of the American College of Cardiology. *Circulation* 2000;102:e53.

(IRBs), etc. As the time of the target number of events nears, the trial has to decide in advance when the date of data cut-off should be in order to plan and execute the trial termination process described above and when the trial database is locked for release for statistical analysis. The subsequent statistical analysis is based on this locked database according to the agreed dates. Once that date is agreed upon, it is often very difficult to change the course. Deviating from that because of late-arriving data can introduce bias in the analysis that can jeopardize the unbiased interpretation of the results and valid conclusions from the trial.

*Observational Studies*

Observational studies, such as case-control studies, cohort studies, and nested case-control studies within cohort studies, also known as case-cohort studies, are inherently deficient relative to randomized, controlled trials in investigating the causal relationship. It is primarily due to its observational nature, i.e., you work with what you access, a serious source of bias, and its inability to produce comparable comparison groups that randomization achieves, thus introducing confounders of effects.

Of course, there are situations where randomized, controlled trials cannot be conducted because of ethical reasons such as in the study of the causal relationship between alcohol use and cirrhosis of the liver. You cannot assign someone to take up drinking just to assess its effect on cirrhosis of the liver. It is unethical and thus scientific untenable.

Because of these deficiencies in observational studies, findings from observational studies cannot be relied upon on their own. They require multiple additional criteria to satisfy before becoming acceptable scientifically.[6] Epidemiological literature is replete with false leads that have baffled the lay public as well as the scientific community.[7] The controversy surrounding hormone replacement therapy is a very well known example.

---

[6] Hill AB. The environment and disease: association and causation? *Proc R Soc Med* 1965; 58:295-300.
[7] Taubes G. Epidemiology faces its limits. *Science* 1995;269:164-9.

Numerous epidemiological studies supported hormone replacement therapy for post-menopausal women, only for it to be found harmful in randomized, controlled clinical trials.[8,9]

Results from observational studies are oftentimes inconsistent and interpretation difficult due to uncontrolled residual confounding or biases inherent in the design and limitations of data in the studies. This results mainly from the choice of different study populations, outcome measures that are either different or obtained differently, or failure to include confounders to control for possible bias. The net effect of many observational studies has often been creation of more uncertainties and confusion rather than clarification of the issues.

### 3.    Review of the Rofecoxib Data

In what follows, I will summarize reported findings regarding CV/T and/or APTC events from randomized, controlled trials of rofecoxib in various indications with placebo, naproxen and other non-selective NSAIDs as controls and two FDA memoranda and one Merck update to FDA regarding rofecoxib and the risk of these events. In order to monitor and adjudicate CV/T and APTC events, Merck introduced in 1998 a standard operating procedure to evaluate and adjudicate these events in all ongoing and future rofecoxib clinical trials. The following table compares the CV/T events and the APTC events.

In addition, I will summarize findings from observational studies in the literature. The material reviewed below is in an approximately chronological order, separately for randomized, controlled trials and overview and observational studies. It is only

---

[8] Hulley et al. Randomized trial of estrogen plus progestin for secondary prevention of coronary heart disease in postmenopausal women. *J Amer Med Assoc* 1998;280:605-13.

[9] Writing Group for the Women's Health Initiative Investigators. Risks and benefits of estrogen plus progestin in healthy postmenopausal women: Principal results from the Women's Health Initiative randomized controlled trial. *J Amer Med Assoc* 2002;288:321-33.

approximate because the publication dates or the dates of reports do not necessarily match the dates of data cutoff for the reported analyses.

### Serious Adverse Events Included in the Confirmed Thrombotic Cardiovascular Serious Adverse Experience and APTC Combined Endpoints

| Adjudication Committee Categories for Cardiovascular Events | Confirmed Thrombotic Cardiovascular Event | APTC[†] Combined Endpoint |
|---|---|---|
| ***Thrombotic Events*** | | |
| **Cardiac Events** | | |
| Acute MI | √ | √ |
| Fatal: acute MI | √ | √ |
| Unstable angina pectoris | √ | |
| Sudden and/or unexplained death | √ | √ |
| Resuscitated cardiac arrest | √ | √ |
| Cardiac thrombus | √ | |
| **Peripheral Vascular Events** | | |
| Pulmonary embolism | √ | |
| Fatal: pulmonary embolism | √ | |
| Peripheral arterial thrombosis | √ | |
| Fatal: peripheral arterial thrombosis | √ | √ |
| Peripheral venous thrombosis | √ | |
| **Cerebrovascular Events** | | |
| Ischemic cerebrovascular stroke | √ | √ |
| Fatal: ischemic cerebrovascular stroke | √ | √ |
| Cerebrovascular venous thrombosis | √ | |
| Fatal: cerebrovascular venous thrombosis | √ | √ |
| Transient ischemic attack | √ | |
| ***Hemorrhagic Events*** | | |
| Hemorrhagic cerebrovascular stroke[‡] | | √ |
| Fatal: hemorrhagic cerebrovascular stroke[‡] | | √ |
| Fatal: hemorrhagic deaths of any cause | | √ |

[†] APTC = Antiplatelet Trialists' Collaboration.
[‡] These events are included as investigator-reported events but not Confirmed Thrombotic CV events.

*Randomized, Controlled Trials and Overview*

**R.1** Bombadier et al. in *N Engl J Med* 2000 (VIGOR Study in RA)

In the VIOXX™ GI Outcomes Research (VIGOR) study patients were screened and randomized between January 1999 and July 1999 to evaluate whether rofecoxib would be

associated with a lower incidence of clinically important upper gastrointestinal (GI) events than is the non-selective NSAID naproxen among patients with rheumatoid arthritis (RA). The publication was based on the data from the February 10, 2000 CV events cut-off date and the March 9, 2000 GI events cut-off date. A total of 8,076 patients who were 50 years of age or older or 40 years of age or older and receiving long-term glucocorticoid therapy and who had RA were randomized to receive either 50 mg of rofecoxib daily or 500 mg of naproxen twice daily.

After a median follow-up of 9.0 months, the study reported similar mortality (0.5% vs 0.4%) and CV death rate (0.2% vs 0.2%) between rofecoxib vs naproxen. However, it reported a crude relative risk of 4.23 (95% confidence interval (CI) of 1.42-12.6) for MI for rofecoxib (0.4%, 17 MIs) relative to naproxen (0.1%, 4 MIs).

There were three additional cases of MIs reported on rofecoxib after the date of database lock, which were provided to FDA on October 13, 2000. An FDA analysis was updated in a 2/1/01 FDA memorandum (**F.1**) based on the database as of 10/13/00. As noted earlier in this report, the reporting of a clinical trial is based on the established dates of data cut-off and of database lock. This is an unavoidable feature of any clinical trial. However, these additional events do not change the conclusions from the study qualitatively. According to this update, the incidence ratio of MI on rofecoxib 50 mg as compared to naproxen 1,000 mg is 4.25 (1.39-17.37), not different from the earlier crude incidence ratio of 4.23 (1.42-12.6).

While the authors reported the MI endpoint data (which showed a larger potential risk difference), this is a post-hoc endpoint selection. The pre-specified CV/T endpoint is the best measure from a statistical standpoint. The relative risk of CV/T events was 2.37 (1.39, 4.00), still statistically significant, as discussed below (**F.1**).

In summary, after a mean follow-up of 9 months, the risk of CV/T events for rofecoxib 50 mg daily in RA patients was significantly higher than that for naproxen 500mg twice daily.

**F.1** February 1, 2001 Memorandum from Shari L. Targum

This memorandum reports on an updated analysis of the VIGOR study with regard to the risk of cardiovascular events with the use of rofecoxib 50 mg daily in RA patients vs naproxen and two other randomized, controlled studies (studies 085 and 090 with NSAID nabumetone and placebo as controls) of rofecoxib 12.5 mg daily in patients with osteoarthritis (OA) of the knee. In addition, it provides an update on a pooled analysis of the phase IIb/III clinical program for rofecoxib in OA patients.

After an average treatment duration of approximately 9 months in the VIGOR study (**R.1**), there were 64 unadjudicated thrombotic cardiovascular serious adverse events (TCVSAEs) on rofecoxib and 32 such TCVSAEs on naproxen for a relative risk of 2.0 (1.32-3.03); 35 Antiplatelet Trialists' Collaboration (APTC) endpoints (which includes 1) CV, hemorrhagic and unknown deaths, 2) nonfatal MIs and 3) nonfatal strokes) on rofecoxib and 18 APTC endpoint events on naproxen for a relative risk of 1.96 (1.10-3.45); and 45 confirmed and adjudicated TCVSAEs on rofecoxib and 19 such TCVSAEs on naproxen for a relative risk of 2.37 (1.39-4.00).

From the 085 study, two serious CV clinical adverse experiences were reported on rofecoxib and on nabumetone for an incidence ratio of 0.97 (0.14-6.83). From the 090 study, 6, 2 and 1 serious clinical adverse experiences in the CV system were reported on rofecoxib, nabumetone and placebo, respectively, for an incidence ratio of 3.02 (0.61-14.8) for rofecoxib relative to nabumetone and of 3.02 (0.37-24.9) for rofecoxib relative to placebo.

The analysis of the phase IIb/III clinical program for rofecoxib in OA patients reports on the incidence of unadjudicated thrombotic cardiovascular serious adverse events.

According to the analysis, there were 34 pts with events after 1,657 PYR among 3,357 pts on rofecoxib and 16 pts with events after 706 PYR among 1,564 pts on non-selective NSAIDs for a relative risk of 1.09 (0.60-1.99). Also there were 9 pts with events after 363 PYR among 1,701 pts on rofecoxib and 3 pts with events after 127 PYR among 514 pts on placebo for a relative risk of 1.05 (0.27-4.02).

Qualitatively the VIGOR update does not change the conclusion from the original report by Bombardier et al. (**R.1**). The 085 study showed a minor reduction of the risk of serious CV clinical experience, whereas the 090 study showed a numerical, but statistically nonsignificant increase in the risk of clinical adverse experiences in the CV system on rofecoxib as compared to nabumetone and placebo.

**R.2** Reicin et al. in *Am J Cardiol* 2002

This is a report of an overview undertaken to compare the risk of CV/T events among 5,435 OA patients receiving rofecoxib, non-selective NSAIDs (diclofenac, ibuprofen or nabumetone) or placebo from eight phase IIB/III trials. There were 3,357 pts with 1,657 PYP and 1,564 pts on with 706 PYR in a rofecoxib vs non-selective NSAIDs comparison and 2,253 pts with 516 PYR and 711 pts with 156 PYR in a rofecoxib vs placebo comparison for a mean follow-up of 3.6-5.9 months. The major outcome measure was investigator-reported CV/T events, with the APTC endpoints as a secondary endpoint.

The relative risk of the investigator-reported CV/T events for rofecoxib was 0.87 (0.48-1.59) as compared to nonselective NSAIDs, and 1.06 (0.34-3.23) for rofecoxib relative to placebo. The relative risk of the APTC endpoints for rofecoxib was 0.69 (0.32-1.54) as compared to non-selective NSAIDs, and 0.70 (0.16-4.17) for rofecoxib relative to placebo (Table 5). There was no excess in myocardial infarctions in the rofecoxib groups compared to either non-selective NSAIDS or placebo (Tables 2 and 3).

In summary, the data reflect no difference in the cv risks between rofecoxib and NSAIDs and between rofecoxib and placebo with short-term use (3.6-5.9 months) of rofecoxib in

OA patients. Obviously the effects of the long-term (greater than 12 months) use of rofecoxib in OA patients cannot be assessed from this overview due to an average duration of treatment being mostly less than 6 months.

**R.3** Konstam et al. in *Circulation* 2001

This is a report of an overview of APTC events in 23 phase IIb to V randomized, controlled clinical trials of rofecoxib with placebo, naproxen or other non-selective NSAIDs (diclofenac, ibuprofen or nabumetone) as controls in patients with RA, OA, AD, and chronic low back pain that lasted at least four weeks. The major outcome measure for the overview was the APTC combined endpoint. This overview reports on a combined analysis of individual patient data as of September 2000 from more than 28,000 pts with more than 14,000 PYR for an average follow-up of approximately 6 months. The objective of this overview was to determine whether there was an excess of APTC events in patients treated with rofecoxib compared to those treated with placebo or non-selective NSAIDs including naproxen.

Based on a total of 6,290 pts over 2,189 PYR on rofecoxib vs 3,482 pts over 1,678 PYR on placebo for an average follow-up of 4.2-5.8 months per patient, the relative risk of the APTC endpoint for rofecoxib was 0.84 (0.51-1.38) as compared to placebo. Based on a total of 4,549 OA patients over 1,934 PYR on rofecoxib vs 2,755 OA patients over 984 PYR on non-naproxen NSAIDs for an average follow-up of 4.3-5.1 months per patient, the relative risk for the APTC endpoint of rofecoxib was 0.79 (0.40-1.55) as compared to non-naproxen NSAIDs. Based on a total of 9,083 pts over 4,622 PYR on rofecoxib (6,057 RA patients and 3,026 OA patients vs 7,870 pts over 3,742 PYR on naproxen (4,859 RA patients and 3,011 OA patients) for an average follow-up of 5.7-6.1 months per patient, the relative risk for the APTC endpoint of rofecoxib was 1.69 (1.07-2.69) as compared to naproxen.

It is of note that only three groups of studies had a longer than 18 month follow-up: a phase IIb dose finding study with 634 RA patients had a 2-year planned duration of patient follow-up; a group of phase IIb/III studies in 5,505 OA patients had a 86-week planned duration; and an AD prevention study in 1,406 pts had a 4-year planned duration. In view of the relatively short duration of planned patient follow-up in a majority of the studies, it is my opinion that the long-term (greater than 12 months) effects of rofecoxib on APTC events cannot conclusively be established from the overview. A subset analysis of studies $\geq$ 6 months in duration seems to suggest no differential relative risks as compared to all studies.

**R.4** Weir et al. in *Am Heart J* 2003

This overview reports on an updated analysis of rofecoxib and CV/T and APTC events among patients reported by Reicin et al. in *Am J Cardiol* 2002 (**R.2**) with long-term extension, an update on the pooled analysis reported by Konstam et al. in *Circulation* 2001 (**R.3**), and the interim analysis of rofecoxib and CV/T events in elderly patients with AD from on-going trials.

According to phase IIb/III OA studies including long-term extensions, the relative risk of investigator-reported CV/T events was 1.01 (0.59, 1.77) for rofecoxib as compared to non-selective NSAIDs after a mean follow-up of 7.9-8.5 months among OA patients, while the relative risk of the APTC endpoints was 0.80 (0.30-1.70). The relative risk of investigator-reported CV/T events was 1.06 (0.34-3.23) for rofecoxib as compared to placebo after a mean follow-up of 2.78-3.6 months, while the relative risk of the APTC endpoints was 0.70 (0.16-4.17).

According to an update of the published pooled analysis (**R.3**), the risk of the APTC endpoint for rofecoxib was 0.74 (0.62-1.42) relative to placebo, 0.87 (0.48-1.58) relative to non-naproxen NSAIDs, and 1.61 (1.04-2.50) relative to naproxen. However, it is of note that the increase in the risk for rofecoxib was not statistically significant relative to naproxen among OA patients with a relative risk of 1.55 (0.60-4.00).

For assessment of the risk in AD patients, three types of CV/T events were evaluated based on 1,448 pts with up to 1,461 PYR on rofecoxib and 1,451 pts with up to 1,634 PYR on placebo, for a mean follow-up of 12.1-12.7 months: 1) investigator-reported CV/T events, 2) confirmed CV/T events, and 3) confirmed APTC endpoints. The relative risk for rofecoxib as compared to placebo was 0.93 (0.63-1.37) based on investigator-reported thrombotic adverse events, 0.72 (0.42-1.21) based on confirmed thrombotic adverse events, and 0.82 (0.45-1.47) based on the confirmed APTC endpoints.

In summary, there appears to be 1) no increase in the risk of CV/T events for rofecoxib among patients with RA, OA, AD, and chronic low back pain relative to placebo with a relatively short-term use (4.8-7.2 months), 2) no increase in the risk of CV/T events for rofecoxib among OA patients relative to non-naproxen NSAIDs again with a relatively short-term use (5.4-6.5 months), and 3) a statistically significant difference in the risk for high dose of rofecoxib among RA patients relative to naproxen (in the VIGOR study), but no statistically significant increase in the risk among OA patients as compared to naproxen.

**R.5** Lisse et al. in *Ann Intern Med* 2003 (ADVANTAGE Study in OA)

Since the publication of the VIGOR study (**R.1**) in RA patients, there was a great deal of speculation about the cardioprotective effects of naproxen as compared to rofecoxib. The Assessment of Differences between VIOXX™ And Naproxen To Ascertain Gastrointestinal Tolerability and Effectiveness (ADVANTAGE) study was very similar to the VIGOR study in that the objective of the study was to assess GI tolerability and effectiveness of rofecoxib vs naproxen, but in patients with OA of the knee, hip, hand or spine and with a different dose of rofecoxib. A total of 5,557 pts from 600 study sites were randomized to receive either 25 mg of rofecoxib daily or 500 mg of naproxen twice daily. Patients were allowed to take low dose aspirin for cardioprotective purpose.

There were 2,785 on rofecoxib and 2,772 on naproxen with 12 weeks of treatment. The number of CV/T events were similar between rofecoxib and naproxen: There were 10 events (0.4%) on rofecoxib vs 7 events (0.3%) on naproxen as defined by the combined APTC endpoints for an incidence ratio of 1.42 (0.54-3.73), and 9 events (0.3%) on rofecoxib vs 12 events (0.4%) on naproxen in adjudicated confirmed CV/T events for an incidence ratio of 0.75 (0.32-1.77). There were 5 MIs on rofecoxib and 1 MI on naproxen, but 0 stroke on rofecoxib and 6 strokes, all thrombotic, on naproxen.