the burden of proof shifts. Specifically, the appearance of harm requires that the sponsor 1) look for definitive evidence of harm in an ethical way and 2) acknowledge that the risk-benefit balance is beginning to change as evidence of new risk emerges. This requires greater efficacy to offset the greater risk. The threshold of significance for harmful effects is much less extreme than that for determining efficacy.

77. Undoubtedly, exploratory analyses demonstrating harm may not be generalizable. However, the ethical credo of "First, do no harm," requires a patient protective response to this potential new hazard. An appropriate response includes but is not limited to 1) additional analyses that can, in an ethical fashion, determine if the initial finding represents a result that can be generalized to the population at large, and 2) an immediate recalibration of the risk-benefit balance, tipping this balance in the direction of greater harm.

78. The requirement of these ethical responses neutralize the assertion that exploratory analyses demonstrating harm can be ignored. The need to protect populations from harmful effects must not be blocked by concerns for statistical significance.

79. What is most convincing is the consistency of findings across the breath of studies involving rofecoxib. The repeated findings of elevations of cardiovascular thrombotic events associated with rofecoxib use, regardless of dose or duration of use strengthen the argument that rofecoxib causes these serious adverse events.

80. The identification of compounds that have an increased differential inhibition of COX-2 was heralded as a major step forward in pain control, allowing the patient to obtain effective analgesia while avoiding the difficulties long known to be associated with COX-1 inhibition. However, it was also recognized early in the development of COX-2 inhibitors that, by not inhibiting the COX-1 system, a pro-aggregatory effect might be produced.

Even though, early in vitro studies showed that the COX-2 inhibitor rofecoxib did not inhibit platelet aggregation or prolong bleeding time when administered to health volunteers, the 1998 Scientific Advisory Committee served notice to Merck that the effect of Cox-2 inhibitors on the cardiovascular system might be harmful. Findings supported the idea that the COX-2 inhibitors were not necessarily thrombogenic.

81.   However, although 800 mg of celecoxib (a COX-2 inhibitor), did not alter levels of either serum $TXA_2$ or its urinary metabolites, a modest reduction in serum $TXB_2$ (a metabolite of $TXA_2$) was observed, suggesting that COX-2's might engender a coagulable state (i.e., make the blood more likely to clot). The balance between TXA2 (a platelet aggregator promoted by COX-1) and $PGI_2$ (which counteracts platelet aggregation, modulated by COX-2) requires attention at this point. The difference can be elucidated by the effect of aspirin. COX-1 is selectively inhibited by low-dose aspirin in activated platelets.[*] However, since COX-2 activity is preserved in the presence of aspirin, and the produced $PGI_2$ decreases blood coagulability, the effect of aspirin is to shift the haemostatic balance to an antithrombotic state.

82.   Thus, inhibition of COX 2 suppresses $PGI_2$ formation, blocking the anti-aggregatory effect of $PGI_2$, making the blood more coagulable. This effect should attenuate the anti-aggregatory effect of aspirin. In mechanistic animal studies, the beneficial effect of aspirin was blocked by celecoxib. In addition, the vasodilator effect of $PGI_2$ derived from the endothelium of the coronary vessel and vasodilatory response to application of arachidonic acid was reduced significantly when compared to controls [7]. Because of these results, the authors expressed concern regarding the possibility of an increased risk of acute

---

[*] This occurs by acetylation of the hydroxyl group of a serine residue near the COX active site. Aspirin's COX-1 inhibitory action persists for the lifetime of the platelet. Recovery of the effect is strictly a function of platelet turnover.

vascular events in patients receiving COX-2 inhibitors, especially in individuals with underling inflammatory disorders, including coronary artery disease. This bolstered the theoretical argument that COX-2 inhibitors might increase the likelihood of serious thrombotic adverse events.

83. The scientific motivation for this prescient concern is clear. COX-2 inhibition would reduce the anti-thrombotic effect of PGI2. By not suppressing COX-1, the thromboxane $A_2$ activity would proceed, tipping the hemostatic balance to a procoagulation state. However, the interaction between the COX enzyme system and hemostasis is complicated by the different potencies that the COX-2 inhibitory agents have on COX- inhibition, i.e., COX-2 inhibitors can also be COX-1 inhibitors. In one study, the COX inhibitors were directly evaluated for their differential COX-1/COX-2 inhibitory activity. The main aim of this investigation was to clarify the possible effect that various COX-2 inhibitors might have on the aggregatory propensity of blood. The researchers found that the COX-2 inhibitors had widely variable selectivity for COX-1 inhibition. Rofecoxib as well as the newer agent etoricoxib have the smallest effect against COX-1. Hence they are closer to "pure COX-2 inhibitors". Alternatively, celecoxib had more COX-1 inhibitory activity, and is a less pure COX-2 inhibitor.

84. In addition an effect of platelet aggregation with possible clinical significance was suggested by observations of elevated prothrombin times and bleeding episodes with concomitant use of celecoxib and warfarin in a patient with pre-exiting cardiovascular disease [8]. In addition, there were reports of patients with connective tissue disorder who developed arterial thrombosis after initiation of celecoxib therapy [9]. An FDA assessment of the preapproval data led to their acknowledgement that there was a possibility

that COX-2 inhibitors could cause thromboembolic disease. The conclusions from these pharmacological studies and other experimental evidence lent credence to the view that selective COX-2 inhibition reduces synthesis of $PGI_2$ and may promote a pro-aggregatory state before rofecoxib was approved.

## Inadequate Testing

85. The potential cardiovascular risks of Vioxx were apparent well before the drug was approved, and Merck was aware of these dangers. Their testing program was inadequate.

86. On September 12, 1996, before rofecoxib was approved, a memo from Dr. Randall to the Cox-2 Team, on page 6 stated, "Another SAE (severe adverse event) of unstable angina was reported in extension to RA (rheumatoid arthritis) study. The vascular AE's are expected since COX-1 is not inhibited". This memo demonstrates that Merck appreciated not just that cardiovascular serious adverse events could be anticipated with rofecoxib, but that they understood the mechanism by which they would be produced. They accepted the causal link between rofecoxib and cardiothrombotic adverse events before the drug was approved.

87. On Thursday, October 10, 1996, before rofecoxib was approved, a review of protocol 017 was described (MRK-ABC0048706). In this review the following statement appears "Adverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina, rapid fall in hemoglobin and hematocrit in some subjects, and a small increase in blood pressure), documenting the potential for cardiovascular adverse effects caused by rofecoxib.

88. On November 11, 1996, before rofecoxib was approved, Dr. Musliner anticipated that there would be 25% more adverse cardiovascular events with rofecoxib (Memo: Subject-

Anticipated consequences of NSAID anti-platelet effects on cardiovascular events and effects of excluding low-dose aspirin use in the Cox-2 GI Outcomes Megatrial – Page 5.). Dr, Musliner also stated the rofecoxib-induced increased cardiovascular event rate might be expected "due to the absence of anti-platelet effect for the selective Cox-2 inhibitor," and "would create a negative aspect to the results and leave open the question (reasonable or unreasonable) whether the drug might in some other way be contributing to such events." The concern about an increased cardiovascular adverse event profile was well established years before the drug was approved, requiring adequate testing.

89.  However, rather than design a clinical trial that was designed to fully elaborate the risks and benefits of rofecoxib, Merck designed VIGOR to underestimate the true risk rofecoxib for increasing cardiovascular events. A concern about possibility of rofecoxib caused an increase in CV events and "you will get more thrombotic events and kill drug." a prescient concern that time demonstrated was the fact of the matter. Dr. Reicin in a later email that day provided an unethical solution, actively considering "the idea of excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" This was a deliberate attempt to confuse the medical community about the potential cardiovascular risk associated with rofecoxib. The only concern about this unethical thought process was not that the medical community would be mislead, but "would we be able to recruit any patients?" A following email from Brian Daniels (February 26, 1997) stated "It is clear to me that the program will be severely hurt if a mega-trial shows a win in PUB's and a loss in MI/CVA." Thus VIGOR was designed not to demonstrate the true benefits and risks of the therapy, but to understate the risks while

magnifying the benefits. VIGOR's configuration was crippled, designed to deceive the medical community.

90.  On October 24, 1997, before rofecoxib was approved, Dr. Fitzgerald emailed Dr. Nies, in which Dr. Fitzgerald made specific recommendations for further cardiovascular studies based on the concerns for the effects of Cox-2 inhibitor therapy.

91.  On October 27, 1997, in a letter from Dr Oates to Dr. Nies, Dr. Oates warned of the mechanism by which Vioxx could produce adverse events and proposed additional testing. Specifically, Dr. Oats made suggestions on how to study the effects of rofecoxib on prostacyclin biosynthesis in order to determine whether an imbalance is created between prostacyclin and thromboxane-A2.

92.  On February 2, 1998, before rofecoxib was approved, Dr. Watson's final results on the analysis of cardiovascular SAE's in the Phase IIb/III Vioxx osteoarthritis clinical trials was received. This was a detailed analysis demonstrating that rofecoxib produced more cardiovascular events in the VIOXX program This analysis demonstrated that the incidence ratio of cardiovascular serious adverse events was 19.4/1000 in men and 15.5/1000 in women. The overall incidence rate for women was elevated when compared to FOSAMAX controls with a relative risk of 2.16 and a 95% confidence interval of 1.14 – 3.94. On page 2, the description of the results of protocol 023 states, "These findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events) page 2. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's then the placebo group in protocol 010 (page 1 following executive sum-

mary). The next sentence which states there is no evidence of an increased incidence of such events ignores the findings from Table 6. This analysis revealed a signal to Merck that the thromboembolic events whose occurrence was anticipated by the understanding by which rofecoxib worked. Given the *a priori* concern about the relationship between rofecoxib and cardiovascular events, this was clear signal that Merck missed.

93. The inappropriate interpretation of the Watson report reveals a substantial, persistent inconsistency in Merck's philosophy toward rofecoxib-induced cardiovascular events. From 1996-98, there were well documented points at which Merck received advice about the likelihood that rofecoxib produces cardiovascular events. Clearly Merck absorbed this message because it was repeated by key Merck personnel. Merck's understanding of this threat to rofecoxib was complete enough for them to distort the design of VIGOR, excluding patients who were at high risk of cardiovascular events. However, when the threat becomes reality, as in the Watson report, where almost all age-gender groups manifest excess cardiovascular serious adverse events in patients taking rofecoxib, revealing the relationship that Merck has been educated to fear, its scientists turn a blind eye to the results. It is this reaction that governs Merck's perspective on the rofecoxib-CV event relationship.

94. From May 3 – May 6, 1998, the Science Advisory Committee to Merck reviewed the Vioxx program. They wrote that there were significant safety risks with Vioxx. On page 11, they stated that the possible harmful effects of Cox-2 inhibition could be produced by a combination of three mechanisms 1) development of lipid-rich plaques in the coronary arteries, 2) plaque cap destabilization, making them rupture prone, and 3) thrombotic occlusion of the vessel at the rupture site. They further warned Merck, before rofecoxib was

approved, that more information is needed to address these questions related to the possible influences of a COX-2 inhibitor on coronary morbidity and mortality.

95.   On May 20, 1998, before rofecoxib was approved, Dr. Watson convened a meeting of the Cox-2 cardiovascular SAE Surveillance Task Force. During the introduction to the meeting, he states, "these findings raised concern about the potential for VIOXX to predispose to thrombotic cardiovascular (CV events).

96.   On September 9, 1998, before rofecoxib was approved, Dr. Patrono wrote a letter to Dr. Laurenzi at Merck, in which Dr. Patrono warned of potential CV issues with rofecoxib, suggesting that more tests are required. Specifically, he said (page 1), speaking about Cox-2 inhibitor effect, "I would like to emphasize that this is likely to be but one of several facets of the potential cardiovascular implications of Cox-2 expression and inhibition." In addition, he said (page 2), "Because companies making non-selective Cox-2 inhibitors are likely to emphasize the cardiovascular implications of specific Cox-2 inhibitors, I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

97.   On September 29, 1998, before rofecoxib was approved, Dr. Nies penned a handwritten note in which he tells Dr. Oates and Dr. Patrono that Merck will not do the kinds of studies that the two experts have proposed to explore the cardiovascular risks of rofecoxib. He anticipated that the drugs would become available without the need for the safety testing Drs. Oates and Patrono warned were so necessary.

98.   This body of information demonstrates that before rofecoxib was approved, the mechanism by which it produced harmful cardiovascular events had been elucidated, and sig-

nals of cardiovascular events had occurred. Merck's pre approval testing program was incomplete.

99. On May 20, 1999, the month Vioxx was approved, the FDA Medical Officer Review reflected concern about rofecoxib's cardiovascular risk. He noted that the cardiovascular trends and that a larger databases was needed to assess CV safety. He also commented on the relatively small number of patients that Merck exposed to Vioxx prior to approval.

100. The role of statistical errors. The Appendices to this report lay out the basis of statistical errors in clinical research. Essentially, since researchers in health care cannot study entire populations but only samples from those populations, they must acknowledge that the occurrence of misleading samples can skew their research results. For example, it is possible that a population in which there is no relationship between exposure and disease can produce a sample in which a relationship exists. In this case, the positive sample results mislead the medical community. Similarly, populations in which there is no relationship between the exposure and disease can, just through the play of chance, produce a sample in which there is a relationship. Thus, researchers must understand that sampling error, or the variability of results from the population to the sample can provide misleading results.

101. Well-designed, well-executed studies tailored to produce effects for desired endpoints must therefore have adequate protection against the first error (populations with negative results producing positive findings in samples, a type I error). This protection is statistical significance. In addition, there must be protection of samples from populations which have negative results producing positive results in samples (a type II error) – this projection is provided by the statistical power of the research. Research protocols typically are designed to produce low levels of type I error (traditionally p values less than 0.05, or

high levels of statistical significance) and high values of power (typically greater than 0.80).

102. For example Protocol 090 was designed to have adequate protection against these statistical errors, but only for the pain relief component. It was not designed to be adequately powered for the cardiovascular effects. Therefore, since the study was not designed to have this adequate statistical protection, we can take no assurance from the absence of statistical significance of its findings for myocardial infarction. The relative risk of 3.0 for cardiovascular events, demonstrating increased risk of Vioxx, does not required statistical significance since the study was not designed to demonstrate this effect with statistical significance (i.e., it lacked adequate power).

103. Typically, underpowered studies that produce non-statistically significant results are termed "non-informative." However, while this is a reasonable approach for findings that produce efficacy, it is not helpful for findings that identify harm. This is because the medical community typically cannot afford to wait for the ideal study to be done in a large number of patients with appropriate protection against type I and type II statistical errors, in the meantime exposing patients to risk needlessly. Thus, small signals of harm while not statistically significant, must be taken seriously by the investigator and the sponsor.

104. In addition, statistically insignificant signals of harm in small samples can have terrible consequences for the community of patients at large. The identification of four cases of myocardial infarction in the exposed group when compared to one case in the control group out of total of less than 100 patients may be statistically insignificant. However, this four fold increase in risk when transmitted to hundreds of thousands of patients tak-

ing the drug would be a public health catastrophe. Thus, statistically insignificant signals of harm in small studies must be taken seriously.

105. In the presence of statistically insignificant signals of harm, studies with reverse findings from each other do not commit fratricide – they do not cancel each other out. The presence of sample-to-sample variability blocks our natural tendency to insist that all studies show the same result. Thus the identification of a harmful effect of Vioxx on cardiovascular findings in Protocol 090 is not negated by the presence of the reverse effect in its sister study 085. The mechanism of action by which Vioxx produced heart attacks remains the same in the two studies, however, sample to sample variability produced the reverse findings in 085. This is also the explanation for the absence of a harmful effect of Vioxx on the occurrence of strokes in the Advantage study. The epidemiologic assertion of consistency does not require that all studies show the same result – only that a number of them, carried out in different patients using different methodologies produce similar results.

## Clinical Studies

106. Clinical Studies: When considering the evidence to support or disprove a hypothesis, one must consider the quality of evidence available on the subject matter. Randomized controlled trials are generally accepted as the gold standard for assessing efficacy of medicines, a justifiable conclusion assuming that the clinical trials were well conducted and executed according to their prospective plan However, not all hazards can be identified from these types of studies, or from studies conducted before the compound receives final regulatory approval.

107. Rofecoxib was approved by the FDA based on several pivotal, short-term studies. These short-term studies followed patients for three to six months. Furthermore, these studies did not study definitive clinical endpoints (gastric ulceration that was visualized using endoscope.) Additionally, these short-term studies made no important contribution to the understanding of the long-term hazards of these drugs. In the absence of this information, large post marketing efficacy studies have become the foundation of the assessment of the long-term hazard produced by COX-2 inhibition.

108. The concern that increased cardiovascular risk may be associated with use of COX-2 inhibitors arose from two sources; case reports of patients with connective tissue disease who developed arterial thrombi after starting celecoxib, and a small clinical study (Protocol 090) which confirmed the suspicions of the 1998 Merck Scientific Advisory Panel. The presaging comments of the Scientific Advisory Panel are critical. Presence of cardiotoxic effects that appears in subsequent clinical trials carries greater weight in the presence of the prospective statement that the risk may be present. The *a priori* concerns about the possibility of risk does not permit the researcher do discard the result as a random, non-meaningful, and non-generalizable one based only on sampling error.

109. ***The VIGOR Trial***: The VIGOR trial was designed to evaluate the effect of rofecoxib versus the competing NSAID naproxen on the event rate of serious gastrointestinal disease. In the manuscript describing its results [10], the investigators examined just over 8000 patients with rheumatoid arthritis who were assigned to either of these two agents randomly. The primary endpoint for the principal analysis of the study was the combined endpoint of perforation, obstruction and severe upper gastrointestinal bleeding.

110. The evaluation of this endpoint demonstrated 121 confirmed upper gastrointestinal events in the naproxen group (3.0%) and 56 (1.4%) in the rofecoxib group, reflecting a 50% reduction, with a *p*-value < 0.001. This trial demonstrated using acceptable methodology that the COX-2 inhibitor rofecoxib could reduce the incidence of upper gastrointestinal events compared to a nonselective COX inhibitor.

111. The rate of myocardial infarction was greater in the rofecoxib group then in the naproxen group (0.4 percent to 0.1 percent, relative risk 0.2, 95 percent confidence interval 0.1 to 0.7). This bald reversal in the computation of the relative risk[*] fails to hide the fact that rofecoxib was associated with a substantially greater incidence of myocardial infarction. Additionally, thirty eight percent of these patients should have been taking aspirin based on clinical indications; this subset of patients was an increased risk of having a myocardial infarction.[†]

112. Fortunately, a separate analysis of adjudicated cardiovascular events from the VIGOR study [11] provided a detailed evaluation of the overall serious adverse events data (death, hospitalization or extension of hospitalization, and/or any life-threatening events or serious disability). This evaluation revealed that the majority of the thrombotic events were myocardial infarctions (MI) (rofecoxib 20, versus naproxen 4). This produces a relative risk of 5. Of the serious vascular adverse events meeting criteria for adjudication,

---

[*] At this juncture, it must be pointed out that the reporting of these adverse event results in VIGOR was unusually insipid. The benefit of therapy was stated in a way that was beneficial to the sponsor (i.e. relative risk for GI injury is less than 1, illustrating a benefit of rofecoxib), yet the harmful effect of rofecoxib on the myocardial infarction rate is stated not as an elevated relative risk, but again as a relative risk less than one. This is inconsistent, misleading, and produces unnecessary and predictable confusion if one tries to weigh risk vs. benefit of rofecoxib in this population. In addition, the numbers of patients with heart attacks are not reported, a frankly glaring and shocking omission in a manuscript purporting to make a contribution to the modern clinical literature. The investigators were supported by Merck (as stated on page 1527 of the manuscript) and all parties must share responibility for this singularly misleading and meretricious description of cardiovascular adverse events.
[†] Patients were permitted to take low dose aspirin when this result was revealed at the end of the study.

twice as many cases were reported for rofecoxib than for naproxen (n=65 1.6% versus 33 (0.8%). Stratification according to aspirin (indicated or not indicated) and use of the standard APTC combined endpoint revealed a higher risk of MI in the rofecoxib group when compared to naproxen (the use of combined endpoints in clinical trials is expatiated in the Appendix). Additionally, the risk of serious thrombotic events was greater in the rofecoxib group than the naproxen group. The examination of time to event was particularly revealing, demonstrating a clear divergence of the survival curves after starting treatment (within 2 months), persisting during the remainder of the study period (log rank test result not reported).

113. The conclusion of the adjudication for the VIGOR study was that a significant difference was seen in the comparison of stroke, MI and cardiac death that was unfavorable for rofecoxib vs. naproxen. The VIGOR study was designed to illuminate the relationship between the use of rofecoxib and the incidence of gastrointestinal illness, and was not planned to be a definitive evaluation of the relationship between rofecoxib and myocardial infarction. However, the demonstration of a potential public health hazard for the millions of patients taking COX-2 inhibitor therapy cannot be lightly dismissed. Thus the findings of VIGOR confirmed the findings of Protocol 90, demonstrating and computing the magnitude of the risk associated with rofecoxib.

114. It should be noted that the drug was approved in 1999 on the basis of data submitted to the FDA, the results of VIGOR were not published until November 2000, one and a half years after commercial approval had been granted. In addition, the cardiovascular data reported in that article were incomplete.

115. A clearer evaluation of the VIGOR cardiovascular results is provided in the Merck car-
diovascular update from VIGOR from Deborah Shapiro to Drs. Alise Reicin, Eliav Barr,
and Dennis Erb on July 5, 2000. In addition, Figure 1 of this document demonstrates a
clear separation in the Kaplan- Meier time to event curves for confirmed thromboembolic
cardiovascular serious adverse events in VIGOR demonstrating the increased risk of
thromboembolic events on VIGOR when compared to Naproxen occurred early in fol-
low-up (less than two months of follow-up time). Table 3 demonstrated 47 thrombotic
events in 4047 patients takes rofecoxib (1.2%) versus 20 thrombotic events in 4029 pa-
tients (0.5%), excess risk associated with rofecoxib. A review of adjudicated cardiovascu-
lar events (Table 4, revealed 45 events in 4047 patients (1.67 per 100 patient years) in pa-
tients treated with rofecoxib, 19 in 4029 patients on naproxen (0.70 per 100 patient years.
The relative risk of events in rofecoxib group to those in the naproxen group is $1/0.42 =$
$2.38$ and 95% CI is $1/0.72 - 1/0.25$. or 1.39 to 4.00, based on the Cox analysis results
from Table 4.

116. Neither the VIGOR authors nor the sponsors updated the data in the article that appeared
in the New *England Journal of Medicine* in November 2000 with the new safety data, a
critical ethical omission. Even if one accepts that the occurrence of the three additional
heart attacks did not occur before a prespecified data cut-off date, the three events were
known in August 2000, several months before the appearance of the manuscript in the
New England Journal of Medicine in November 23, 2000. It would have been easy for
the investigators to add a statement in this manuscript, acknowledging the three addi-
tional cardiovascular adverse events, and in addition, providing additional computations
for the updated risk of cardiovascular events caused by rofecoxib. *The New England*

*Journal of Medicine* was concerned enough about this omission that they published an Expression of Concern [12].

117. Since it is unethical to deliberately expose patients to risk without a clear and overwhelming expectation of benefit, other studies have to be examined for evidence of harm. The best evidence for a harmful effect must come from reproducibility, i.e. consistency of the finding. This is particularly compelling if the mechanism of harm has been clearly elucidated, as has been clearly elaborated in the preapproval evaluations of the COX-2 inhibitors.

118. The overall conclusion from this FDA report was that there was an increased risk of thromboembolic events particularly MI in patients exposed to rofecoxib compared with naproxen. Unfortunately, the absence of a placebo group precluded an assessment of the absolute risk of rofecoxib. Although only the MI result was published in the main paper, the FDA report clearly showed a higher risk of serious thrombotic cardiovascular events for rofecoxib in both aspirin indicated and non-indicated patients when compared with naproxen [13]. It is surprising that the coded cardiovascular analysis was not published in the VIGOR main paper, especially since the coding necessary for cardiovascular adjudication was available to the sponsor before VIGOR was published [14].

119. ***Possible Protective Effect of Naproxen***: One possible explanation for the findings of the VIGOR trial was that undue attention was paid to the relationship between rofecoxib and cardiovascular disease. The proponents of this thesis argue that it is not that exposure to rofecoxib increases the risk of cardiovascular disease, but that the control therapy naproxen decreases the risk of this class of illnesses.

120. However, this idea was not accepted before VIGOR in the many years during which this drug was on the market. Specifically, while data from randomized controlled trials have documented that aspirin is an effective antithrombotic agent for primary as well as secondary prevention of thromboembolic events, trials evaluating the effects of nonselective NSAIDS on the occurrence of cardiovascular disease have not affirmed there own purported benefit; the findings are inconclusive. In these trials on nonselective NSAIDS, the question of whether the degree of COX-1 selectivity (known to vary from drug to drug) translated into clinically detectable cardiovascular protection (as is achieved by aspirin with its characteristic irreversible inhibition of COX-1) have not been addressed.

121. A review of four epidemiologic studies with different designs and populations suggesting no overall effect of nonselective NSAIDS including naproxen [15]. The results of this review included prepublication material from Ray which itself was subsequently published in full [16]. The authors concluded that none of the NSAIDS included in the study should be used for cardioprotection.

122. Even though Merck argued that the cardiovascular effect in VIGOR could be explained by the beneficial effect of naproxen, and email from Dr. Reicin to Dr. Scolnick revealed that Dr. Scolnick was in "minor agony" over the issue, and that he wanted a cardiovascular study. Dr. Scolnick was not convinced that naproxen "benefits" explained the VIGOR findings. However, even after outside consultants advised Merck to do a CV study (in an email from DiBasttiste to Exposito on March 9, 2002), the study was not carried out.

123. *ADVANTAGE* : This clinical trial compared the use of rofecoxib 25 mg to naproxen 500 mg bid in patients with osteoarthritis. This twelve week controlled study recruited 2700 patients to each arm of the trial. The study showed no safety advantage of rofecoxib over

naproxen, and demonstrated a trend of excess serious cardiac thrombotic events in the ro-fecoxib group. There were five myocardial infarctions, two anginal events, and three sudden deaths in the rofecoxib group and one MI and two anginal events in the naproxen group. In addition, more patients (40 versus 21) discontinued rofecoxib then naproxen therapy for cardiovascular related adverse events. Finally, 15 versus 7 patients discontin-ued for hypertension related events, and 19 versus 12 patients discontinued therapy for edema related events. The striking increase in number of cardiovascular events is particu-larly striking since the study was only a twelve-week trial and 25 mg of rofecoxib (half the dose used in VIGOR) was used. (Villalba ML. Food and Drug Administration – Divi-sion of Anti-inflammatory, Analgesic, and Ophthalmic Drug Products HFD-550. Medical Officer Review End of Review Date 11-18-2001.

124. *VICTOR*: The VICTOR Study (Protocol 145), a study designed to determine whether ro-fecoxib could help prevent the recurrence of colon cancer, recruited and reported on 1217 patients in each of the placebo and rofecoxib groups. In Table 1 of the Overview of the Cardiovascular Events in the VICTOR Study (Reports Received by Merck as of 31-May-2005), there were 14 patients who had confirmed cardiovascular serious adverse events in the rofecoxib group and 4 patients in the placebo group. In Table 2 of the same report, when patients were classified by the occurrence of the APTC endpoint, there were 9 pa-tients who reached the APTC endpoint, and 3 in the placebo group.  Most importantly, the Kaplan-Meier curves demonstrated an early separation between the event rates of these events between the two groups.

125. *VIP*: VIP- Protocol 201 was designed to determine if rofecoxib 25 mg could help prevent prostate cancer. The study recruited 4741 patients of the anticipated 15,000-sample size.

The study was approved on May 4, 2004, but was terminated prematurely due rofecoxib's withdrawal from the market. There were 13 myocardial infarctions in this study 7 in the rofecoxib group, six in the placebo group. There were 26 vascular disorders in the rofecoxib group and 10 in the placebo group, and 19 patients in the rofecoxib group and 2 in the placebo group. When the analysis is restricted to specific drug related clinical adverse experiences (incidence $\geq 0.0\%$ in one or more treatment groups, there were 9 in the rofecoxib group and 4 in the placebo group. Five cases of coronary artery occlusion/myocardial infarction/ischemia/silent myocardial infarction occurred in the rofecoxib group. There were none in the placebo group. There were nine ATPC events in the placebo group and eight in the rofecoxib group, respectively

126. *Alzheimer studies*: The Alzheimer studies (Protocols 078, 091, and 126) revealed excess deaths in patients on rofecoxib when compared to placebo. In 078, there were 13 deaths in rofecoxib compared to 7 on placebo. (8 versus 2 cardiovascular deaths on/off drug). In protocol 091, there were 9 rofecoxib deaths to 2 placebo (6 versus 4 cardiovascular deaths on/off drug), and in protocol 126 there were 3 rofecoxib deaths versus 3 placebo (2 rofecoxib cardiovascular deaths, versus 2 placebo on/off drug).

127. *APPROVe*: The APPROVe study [17] must be set apart from VIGOR and CLASS in that the evaluation of COX-2 inhibitor exposure and cardiovascular disease was prospectively declared and the analysis prospectively planned. APPROVe was designed to provide a confirmatory and therefore more definitive evaluation of COX-2 use and cardiovascular disease.

128. The principal goal of the Adenomatous Polyp Prevention on Vioxx (APPROVe - Protocol 122) Trial was to determine the effect of a 36 month course of rofecoxib therapy on

the risk of recurrent adenomatous polyps in patients at risk of colorectal adenomas. Men and women at least 40 years of age were eligible if they had one large bowel adenoma and were not anticipated to need long-term NSAID therapy including aspirin (thus patients taking aspirin were excluded from the study). However, patients recruited after VIGOR's findings were announced were permitted to take low dose aspirin for cardiovascular protection.

129. Patient with 1) hypertension, 2) history of a myocardial infarction, 3) coronary angiography, 4) recent history of congestive heart failure (CHF), 5) bypass surgery within the previous year, or 6) stroke or TIA within the previous two years were excluded, thereby excluding patients who were at higher risk of myocardial infarction or other thromboembolic phenomena. These exclusion criteria served in the long run to protect patients from the potential thrombogenic effects of COX-2 inhibitors, but it also reduced the number of events in the study, under-powering any determination of the relationship between COX inhibition and thrombotic cardiovascular disease. The inclusion of a six-week run-in period permitted physicians to assess patient compliance with therapy. During the randomization period, 1287 patients were assigned to rofecoxib 25 mg/day, and 1299 assigned to placebo. The trial was terminated two months before its scheduled end.

130. The evaluation of the relationship between COX inhibitor therapy and thrombotic events was a prospectively declared evaluation of the study. Thrombotic events included fatal and nonfatal myocardial infarction, unstable angina, sudden death from cardiac causes, fatal and nonfatal ischemic stroke, transient ischemic attack, peripheral arterial thrombosis, peripheral venous thrombosis, and pulmonary embolus were measured. However, the endpoint used was the APTC combined endpoint (i.e., death from cardiovascular, hemor-

rhagic, and unknown causes, nonfatal myocardial infraction, and nonfatal ischemic or hemorrhagic stroke. Monitoring and analysis were prospectively declared.

131. During the trial, there were more patients discontinued from rofecoxib then placebo due to adverse events. When the trial ended, patients in the rofecoxib group had an increase risk of confirmed thrombotic events. Specifically, there were 46 patients in the rofecoxib group that had confirmed thrombotic events, versus 26 patients in the placebo group. (RR 1.92, 95% confidence interval 1.19 – 3.11, $p$ =0.008). The risk for cardiac events (RR 2.80 95% CI 1.44-5.45) and cerebrovascular events (RR 2.80, 95% CI 1.44 – 5.45) was substantially higher. Representing substantial risk

132. Even though the increased risk was seen throughout the duration of follow-up in AP-PROVe, some have posited that the harmful thromboembolic does not emerge until after patients have been followed for longer than 18 months.

133. This conclusion is epidemiologically unsound for several reasons. First, the evaluation of the putative 18-month effect is the result of a subgroup analysis. Subgroup analyses i.e., the process by which an effect in the overall cohort is adumbrated by effects in subsets of the patient has been shown to be unreliable. The findings in the ELITE trials demonstrate the misleading conclusion drawn from subgroup analyses (discussed in the Appendix of this report).

134. The "eighteen month analysis is based on an improper subgroup. A proper subgroup is a subgroup whose membership cannot be ascertained at baseline. These analyses have been debunked by Yusuf [62].

135. In addition, analyses based on a sub-cohort have a small number of events. The absence of cardiac events makes it difficult to identify an isolated effect with statistical regularity.

Thus the absence of statistical significance is not due to the lack of an effect, only due to the inability to have enough events to identify the effect. This is the heart of the admonition "the absence of evidence is not evidence of absence."

136. Third, there is no plausible explanation in the literature to explain why an effect whose mechanism (differential effect on prostanoid synthesis), an effect that is observed within several half-lives of Cox-2 inhibitors should require eighteen months to manifest itself. It does not take eighteen months to observe the analgesic activity it is not biologically plausible that eighteen months would be required to observe the cardiovascular toxicity, and the idea is epidemiologically incoherent.

137. Finally, the suggestion that the harmful cardiovascular effect requires eighteen months of exposure is inconsistent from the Sponsor's own data. The VIP trial, assessing the effect of rofecoxib in patients with prostate cancer demonstrated cardiovascular toxicity that emerged in less than one month of exposure.

138. In addition, the examination of investigator reported events demonstrates early separation of the cardiac event rates at approximately three months of follow-up (MRK-AHK0075759)

139. In addition, deeper analysis of the APPROVe data demonstrates that cardiovascular toxicity emerges early in patients who are at higher risk of cardiovascular disease. The relative risk in the rofecoxib group compared to placebo was 9.59 (95% confidence interval 1.26 to 416 for patients with a history of cardiovascular disease. It was also elevated among diabetics (6.10: 95% confidence interval 1.36 to 56.1). An evaluation of the AP-PROVe cardiovascular safety data revealed that there was early separation of the event

curves when investigator reported cardiovascular events were considered. Thus, the most robust conclusion from APPROVe is that cardiotoxicity is apparent, and appears early.

140. In addition, the rofecoxib group had a greater proportion of patients with hypertension related and edema-related events, with early separation of the curves. The relative risk of these events was 4.61 with a 95% confidence interval of 1.50 to 18.83. The risk for hypertension was 2.02 (95% confidence interval 1.71 to 2.38) and for edema was 1.57 (1.17 to 2.10). In 1998, one of the fears voiced by the Merck Scientific Advisory Panel was that Cox-2 inhibitors could accelerate atherosclerosis. This would occur by fostering the development of lipid rich plaque or the destabilization of the plaque's fibrous cap. In 2004, Dr. FitzGerald wrote an article entitled "Coxibs and Cardiovascular Disease" [18]. On page 1711 of that manuscript, he stated. "Patients in the APPROVe study should continue to be followed. This will allow some estimate of how quickly the developed risk may dissipate. Give the relatively short half-lives of these compounds, such a dissipation may occur rapidly. On the other hand, if treatment has accelerated atherosclerosis the offset of risk may be more gradual." Dr. FitzGerald stated an a priori hypothesis, recognizing that the continued follow-up of the APPROVe patients would answer the salient question he posed.

141. An initial evaluation of the follow-up analysis that Dr. FitzGerald called for became available in 2006. The follow-up analysis of the APPROVe data provided by Merck demonstrated that when patients were followed for approximately one year after the conclusion of the blinded component, the increased risk of serious cardiovascular adverse events persisted. Table E1 and E2 of the APPROVe follow-up reveals that when followed through Week 210, the relative risk of fatal/nonfatal myocardial infarction was

2.22 (95% CI 0.67-7.36) demonstrating excessive hazard associated with rofecoxib. When the censoring date was October 31, 2005, the relative risk of fatal/nonfatal myocardial infarction was 2.04 (95% CI 0.75 – 5.52).

142. This observation of prolonged elevated risk clearly answers the prospective question raised by Dr. FitzGerald and persuasively confirms the fears of the 1998 Merck Scientific Advisory Panel. Specifically, the elevated risk of cardiovascular disease seen in the AP-PROVe follow-up more likely than not stands for the proposition that rofecoxib accelerates atherosclerosis.

143. The follow-up analysis of the APPROVe data demonstrated that when patients were followed for approximately one year after the conclusion of the blinded component, the increased risk of serious cardiovascular adverse events persisted. Table E1 and E2 of the APPROVe follow-up report reveals that when followed through Week 210, the relative risk of fatal/nonfatal myocardial infarction was 2.22 (95% CI 0.67-7.36) demonstrating excessive hazard associated with rofecoxib. When the censoring date was October 31, 2005, the relative risk of fatal/nonfatal myocardial infarction was 2.04 (95% CI 0.75 – 5.52). This prolonged elevated risk might be explained by the findings of the Merck Scientific Advisory Board, which stated that COX-2 inhibitors could produce increased thrombosis, as well as accelerated atherogenesis. This, in combination with the blood pressure elevation associated with rofecoxib could explain the prolonged increased risk of fatal/nonfatal myocardial infarction. .

144. Epidemiologic studies are not the most persuasive evidence; however they do help to extend the context in which the effect of the study can be anticipated. Several observational studies were carried out to examine the effect of COX -2 inhibitor therapy on the occur-

rence of cardiovascular disease. It is difficult to draw firm conclusions from epidemi-ologic studies in many circumstances because 1) the inability to select patient exposure confuses the effect of the exposure with the reasons patients exposed themselves, 2) the requirement that many epidemiologic studies reason backward from disease to exposure, rather than reason forward from exposure to disease weakens their conclusion, and 3) the occurrence of well established biased e.g., ascertainment bias. Epidemiologic studies are the most useful when they measure a signal of effect (e.g., with an odds ratio) of the value of 3.0 or greater.

145. Solomon [19] carried out an observational study utilizing the Medicare beneficiaries who received prescription medications through the Pennsylvania Pharmaceutical Assistance Contract for the Elderly or the New Jersey Pharmaceutical Association Program for the Aged and Disabled during 1998, 1999, and 2000. Patients with a life threatening illness such as HIV/AIDS, malignance, or coagulopathy were excluded, as were patients with an AMI that was not the principal discharge diagnosis.

146. Cases were defined as acute myocardial infarction (AMI) if this diagnosis was listed as one of the first three top diagnoses in a hospitalization that was between three days and 180 days. To increase the stability of the estimate of cardiac events in the control group, four control patients were matched to each case. Date of hospitalization was the index date for each case. Controls had to have the same (or nearly the same) age, and have the same gender and month of the index date as the case to which they were matched.

147. Once cases and controls were identified, their antecedent exposure to COX-2 inhibitor therapy was ascertained.  Exposure was based on celecoxib or rofecoxib on the index date. Dose and duration categories were defined for each exposure. Covariates were

demographic and morbidity measures. Mean age of all patients was over eighty years. Thus, any findings of this study face difficulty in generalizing to younger cohorts. In addition, even after matching, patients in the COX-2 inhibitor groups older than the control cohort, an effect who potential for effect size perturbation can be modulated through statistical adjustment.

148. Rofecoxib had slightly greater risk 1.14 (95% CI:1.00-1.31) when referent group was no current use. Patients in the rofecoxib group were more likely to have an MI when compared to celecoxib 1.24 (1.05-1.46, p =0.011). In addition, rofecoxib > 25 mg was associated with higher adjusted relative risk to AMI then rofecoxib < 25 mg (1.70, 95% CI 1.07-2.71). Risk was elevated during the first 90 days of exposure, but not thereafter. This is directionally the reverse of the finding in the APPROVe study, and is most likely attributable to the random aggregation of patients within subgroups and therefore should hold no real persuasive power. The deleterious cardiovascular effects of COX-2 inhibition are most likely seen for the duration of therapy.

149. Overall, the Solomon study confirms the concept that the Cox-2 inhibitor rofecoxib is cardiotoxic.

150. Three additional retrospective studies have been carried out that examine the relationship between rofecoxib and cardiovascular events. Baneworth [20] reported on the safety profile of patients included in an open-label study conducted to evaluate the influence of non-pharmacological interventions on the outcomes of osteoarthritis in patients receiving rofecoxib. However, the authors acknowledge the highly selective nature of the cohort with its limited definition of cardiovascular risk, the absence of a control group, and the difficulties of comparing incidence rates of studies with different designs.

151. A second retrospective analysis examined investigator-reported cardiovascular adverse event data held within the osteoarthritis safety database. This was collected from several pre-marketing randomized controlled trials assessing the efficacy of rofecoxib [21]. However, the authors themselves acknowledge that the combined sample size of each treatment group, together with the low number of serious thromboembolic events reduces any illumination this study might shine on the exposure-disease relationship of interest. This is the classic underpowered environment, which forces us to discount the findings of no relationship between COX-2 inhibitor use and cardio-embolic disease in this study. Its null findings are merely uninformative.

152. The third evaluation also investigated this topic, but assessed thromboembolic events across 23 randomized controlled trials in over 28,000 patients with any of osteoarthritis, rheumatoid arthritis, Alzheimer's disease, or chronic back pain. The researchers concluded that the risk of a cardiovascular thromboembolic events was similar between rofecoxib and placebo cohorts and the non-naproxen NSIAD groups, but were significantly higher when compared to the naproxen cohort. They argue that these results support the cardioprotective effect of naproxen.

153. This cohort, completed in September 2000 has been followed and a resulting manuscript appeared describing the publication of the additional adjudicated data by Weil et. al. [22]. The pooled analyses when repeated with the new data were unchanged.

154. Population based pharmacoepidemiologic studies aim to identify and quantify adverse events from the treatment experiences of the population and examine that population for characteristic features in order to learn and inform from these experiences. Such studies usually include far more patients than randomized controlled trials, but suffer from bias

and confounding. They do not alter with the prescribing practice of the physician, nor do they require strict inclusion and exclusion criteria. Therefore they are more representative of the experience of the population. They may contribute useful information about the possible relationship between any NSAID use and the risk of TE events in patients with concurrent medical problems and or using concomitant medication.

155. The strongest evidence for a relationship between cardiovascular thromboembolic events and COX-2 inhibitor therapy comes from Ray[23]. The conclusion was that high-dose (> 25 mg rofecoxib) could be associated with an increased risk of serious CHD, whereas rofecoxib <25 mg, celecoxib, naproxen, and ibuprofen were not. However, in contrast to the randomized controlled trials presented earlier, this study did not examine all serious cardiovascular thromboembolic events or report on the proportion of patients who were prescribed aspirin use

156. Another epidemiologic study that assessed the role of Cox-2 inhibitors and cardiovascular events was the study by David Grahram. A nested case-control study was conducted at the Kaiser-Permanente clinic system in California. Appropriate covariate control was exerted, and the analysis was proper. The study demonstrated that rofecoxib increases the risk of acute myocardial infarction and sudden cardiac death above patients taking Celecoxib. The overall increase in risk was 1.59 (95% confidence interval $1.10 - 2.32$, $p = 0.015$). The risk was greater for high dose rofecoxib (3.58 fold increase) then lower dose (1.47 fold increase) when compared to celecoxib use. In addition, this study failed to reveal any cardio-protective effect of naproxen.

157. Another observational studied was conduced using administrative healthcare data from Canada [24]. The authors determined that no significant difference was observed in acute

myocardial infarction risk for new users of celecoxib, rofecoxib, naproxen, or non-naproxen NSAIDS (used continuously for more than 30 days) compared to non-users. Patients who were reported to have taken study drugs for less than 30 day were excluded. The effect of this exclusion on the relative risk of myocardial infarction in unclear.

158. Two observational studies were carried out in the United Kingdom. Users of rofecoxib, celecoxib, and melocixam were compared [25] and [26] (meloxicam is less COX-2 selective than either of rofecoxib or celecoxib. After adjusting for age and gender, these two studies revealed a statistically significant higher rate of cerebrovascular thromboembolic events for both rofecoxib and celecoxib when compared with meloxicam, but a statistically significant lower rate of peripheral venous thrombotic events for the rofecoxib cohort compared with meloxicam, but neither revealed a difference in the rate of cardiovascular thromboembolic event group.

159. A major source of information on suspected medication exposure-disease relationships is the post marketing database held by pharmaco-vigilence units, including those of the regulatory community and manufacturers. There are problems of selection and confounding by indication, as well as recall bias, and information bias. Such data provides a complimentary perspective on adverse reaction frequency with randomized controlled studies and observational studies. They are derived from national populations and operate over the timeline of the drug, include drug use in the hospital as well as the general practice and ambulatory setting. They are useful for signal generation.

160. Commonly, the data that comprises these individual cases is incomplete. The source of the information is inhomogeneous and there is no accepted a priori threshold for report-