ing. Such voluntary reporting schemes are useful in signal generation or detection, but have important limitations in science.

161. An independent study of adverse reactions primarily adverse renal effects reported for rofecoxib (n = 2720) versus celecoxib (n=8434) reported to the WHP UMC up until the middle of 2000[27]. The SOH Uppsala Monitoring Centre in Sweden maintains a database of spontaneous reports received from the national monitoring centers worldwide. Suspected adverse reactions are coded onto the WHP database. Signal score processing uses a collection of sophisticated techniques includes Bayes procedures. Although the focus was on renal events, thromboembolic disease was examined. The strength of association between rofecoxib and thromboembolic disease was greater than that for celecoxib. However, the authors concluded that there was no association. One possible explanation for these null results was that patients with renal disease are more likely to have symptomatic cardiovascular disease. However, this was an ecologically based argument and no case-by-case examination took place.

162. In Canada, spontaneous reports are submitted to the regulatory authorities, health Canada through the Canadian Adverse Drug Reaction Monitoring Program [28]. They reported that they had received by October 2001 70 cardiovascular/cerebrovascular cases out of 528 total reports) for celecoxib, and 68 out of 348 for rofecoxib. Seven of the cases reported on celecoxib were fatal. Of these, two were cerebral hemorrhage in patients also taking warfarin. However, prevalence of the thromboembolic events was not computed from those at risk, not only from all events. This does not address the relative risk of the medications in the general public.

163. Meta Analyses: The interpretation of meta-analyses is problematic. They purport to combine studies, and through the increased sample size and number of events, identify a highly reliable estimate of effect size. However, complications quickly arise to vacate many of their results. Meta analyses are rarely prospectively defined. Thus the definition of exposure is commonly not standardized across the combined studies. In addition, endpoints are rarely have a common definition across studies. This heterogeneity reduces the persuasive ability of this style of analysis. Typically, only positive studies are included in the analysis, producing a clear bias in their interpretation. Finally, the aforementioned problems with random research also complicate the interpretation of this post hoc manner of analysis. Thus, post hoc meta-analytic results are not confirmatory.

164. Nevertheless, meta-analyses have been carried out in an attempt to assess the relationship between COX-2 inhibitor therapy and thrombotic disease. One such meta-analysis has been published with the goal of evaluating the totality of the evidence on cardiovascular thromboembolic events and the cyclooxygenase-2 inhibitor. This was conducted by Mukherjee et al. [29]. The goal of this effort was to determine if the COX-2 inhibitors as a class were associated with either a protective, or a harmful effect on the risk of cardiovascular events. They compared the adjudicated cardiovascular outcomes from major trials. The control group event rate was provided externally, as reported in the placebo group of a recent meta-analysis of four aspirin primary prevention trials.

165. The authors reported that their findings suggested a potential increase in cardiovascular event rates for users of COX-2 inhibitors as a class effect, even though only data for rofecoxib and celecoxib were examined. Criticisms include the lack of consistency in displaying each trial's results. In addition, there was no over all estimate of the magnitude of

treatment difference, nor did it investigate the heterogeneity between trials or explore the robustness of the main findings with a sensitivity analyses. In addition, the contributory trials were of different designs, had different study endpoints, involved patient populations with dissimilar cardiovascular risk and they compared unequivalent doses of rofecoxib and celecoxib. The sample sizes of the studies differed widely, ensuring that VIGOR's findings would exert undue influence on the effect ascribed to the findings. Finally, a number of studies that found no relationship between rofecoxib and thrombotic events were excluded. These limitations in addition to the invocation of the random research paradigm, limit the generalizability of post hoc meta-analyses.

166. Risk-Benefit Analysis: Risk benefit analysis is the comparison of the risks of therapy to the therapy's benefits. This can be considered on the macroscopic (societal) level as well as on the microscopic (patient level). The tools used for each of these evaluations are different and thus these two perspectives must be viewed differently.

167. Risk-benefit analysis on the macroscopic scale considers the relative risks to the society when assessed against the benefits to society i.e., the population of patients taking COX-2 inhibitors. In this calculation, the benefits of COX-2 inhibitors are assessed primarily in the degree to which they reduce pain, and the degree to which these agents reduce gastrointestinal adverse effects. It is recognized that neither moderate doses of NSAIDS nor moderate doses of aspirin produce this combination of pain relieve without GI distress. Estimates are that more than 100,000 hospitalizations and 16,500 deaths each year in the United States occur as a result of NSAID use. Since is was believed that the COX-2 inhibitors avoided this extent of GI disease, it is claimed that their use provides an important societal benefit in patients with chronic pain. However, recent evidence reveals that

the Cox-2 inhibitors are associated with upper gastrointestinal illnesses. In addition, the acknowledgement that they are the producing cause of cardiovascular thrombotic disease dramatically and unfavorably tilts the risk-benefit balance.

168. This risk benefit calculus requires that one consider alternative modalities of pain relieve. Specifically, Tylenol, a well-established pain reliever, is neither habit forming nor associated with adverse gastrointestinal distress. In addition, low dose NSAID use is less damaging to the GI tract than moderate or high dose NSAIDS. Thus, the macroscopic benefits of COX-2 inhibitor therapy are less clear when compared to these latter agents and doses.

169. Furthermore, the mechanism by which COX-2 inhibitor therapy produces fewer upper GI adverse effects is speculative. Evidence suggests that both minor symptoms (e.g., dyspepsia) and endoscopically detected lesion are not good predictors of future complicated GI disease. It is also unclear whether serious GI complications such as perforations and bleeding are a consequence of COX-1 inhibition in platelets (the supposed mechanism) or a direct interaction between the NSAID and the gastric mucosa. Thus, while the macroscopic benefits of COX-2 inhibitors over high dose NSAID and aspirin use are clear in terms of GI relief, the benefits over low dose aspirin/NSAID are not. Similarly, the advantage of COX-2 inhibitors when compared to high dose Tylenol, or a combination of high dose Tylenol and low dose NSAIDS, has not been established.

170. In addition, the risk of thromboembolic disease is greater with the use of COX-2 inhibitors. The occurrence of COX-2 induced MI's and strokes with the consequent production of new deaths and hospitalizations require a complete new assessment of the risk-benefit

balance of this therapy. Neither Tylenol (at low doses or high doses), nor aspirin (at low doses or moderate doses) is associated with a greater risk of MI.

171. The microscopic consideration of risk-benefit is an assessment of the risk of COX-2 inhibitor therapy versus its benefit in the individual patient. There are no reliable models to review this; each patient-practitioner couple provides its own unique risk-benefit metric in the decision as to whether a patient should accept COX-2 inhibitor therapy. In patients with chronic arthritic pain, a combination of Tylenol (low or high dose) and low dose aspirin or NSAIDS provides substantial analgesia without GI distress. Should upper GI symptoms appear, the dosing of aspirin or NSAIDS can be reduced, or even temporarily discontinued. There is no established increased risk of thromboembolic disease with low or high dose Tylenol, or low or moderate aspirin use. Therefore the use of COX-2 inhibitor therapy confers no advantage for these patients.

172. However, the greater risk of serious thromboembolic events with COX-2 inhibitor adversely tips the risk-benefit balance. To offset this greater risk, greater benefit must be achieved when compared to therapies that 1) are not associated with thromboembolic adverse events, and 2) do not produce a significant increase in upper GI events.

173. However, implicit in the individual risk-benefit assessment that each physician-patient pair undertakes is the assumption that each of the practitioner and the patient have access to all relevant facts available on risk and benefit are available to those who must make the final decision. Patients and physicians have the right to make an independent assessment of the risk of therapy. The requisite for the discharge of this right is that they each have access to all risks and benefits of the intervention. This implies that the absence of com-

plete disclosure of the risks of a therapy produces flawed decisions about the implemen-

tation of the therapy.

## Failure to Warn

154 **FDA Expertise**: I have attended more than 20 meetings of the Cardio-Renal Advi-

sory Committee to the Food and Drug Administration (F.D.A.), and I have served for

four years on the Cardio-Renal Advisory Committee, served as an ad hoc member of

other FDA Advisory Committees, and currently serve on the FDA Pharmacy Sciences

Advisory Committee. These positions have provided me the opportunity to observe and

take part in the interplay that characterizes the relationship between the F.D.A. and the

drug sponsors.

155 As an actively serving member of this advisory committee, I have published two articles

on the deliberations of the Cardio-Renal Advisory Committee to the F.D.A. which have

appeared in the peer reviewed, public literature (30, 31).

156 My service on the F.D.A. advisory committees, as well as my service to drug manufactur-

ers, has given me specialized knowledge and experience concerning the F.D.A. policies,

procedures and regulations as well as the corresponding duties of a reasonable and prudent

drug manufacturer.

157 In addition, I have argued before the F.D.A. on behalf of sponsors on numerous occasions.

In my service on behalf of sponsors to the F.D.A., and my service to the F.D.A. at advisory

committee meetings, I have developed expertise, knowledge, training and experience in

F.D.A. matters.

158 *Role of F.D.A.* The Federal Food and Drug Administration (F. D. A.) is an organization

charged by the public through Congress to insure the effectiveness and safety of foods and

compounds produced for public consumption. Over the course of this century, the powers of the F. D. A. have expanded commensurate with their public responsibilities in a growing and increasingly complex food and drug environment.

159   The responsibilities of the F.D.A. have often placed it in perceived opposition to the pharmaceutical industries. The F.D.A. regrets this comparison and has devoted substantial effort to overcome it. The F.D.A. has encouraged the view that the relationship between it and the pharmaceutical industry is a collaborative one, and has suggested that the efforts of both the F.D.A. and the pharmaceutical industry be viewed as one of joint partnership.

160   *Modernization Act*: This emphasis can been seen in the F.D.A. Modernization Act, which provided a set of streamlined procedures for the sponsor and F.D.A. to follow, helping to insure a prompt and efficient review of a new drug application (NDA). These procedures have substantially reduced the time it took the F.D.A. to complete the review of a sponsor's application for a new drug approval.  This pivotal move to streamline the administrative review process was a direct response to complaints from both the pharmaceutical industry, and, to some extent, from segments of the public that the F.D.A. was not responsive enough to the need for the swift introduction of safe and effective medications. The F.D.A. correctly recognized that the timely delivery of these new medications was essential for maintenance of the public health.

161   *Collaboration:* In order for the F.D.A.-pharmaceutical industry collaborative process to work, the F.D.A. and the Sponsor must work together to demonstrate the efficacy and safety of the compounds.  Contrary to public perception, the F.D.A is not a central laboratory.  It generally does not carry out independent testing of the products submitted to it by the pharmaceutical industry for approval. The F.D.A. does not independently execute

clinical trials to study in an independent manner the safety and effectiveness of new compounds. The F.D.A. instead receives the crucial information about the effects of a drug from outside sources. The F.D.A. has developed skill in identifying relevant information for the effects of a drug. Several of these sources include the general medical literature, and research reports from academic investigators, and research study results which are sponsored by other institutions e.g. the National Institutes of Health, (NIH). However, the primary source of information concerning the safety and efficacy of the compound is the sponsor itself. It is the sponsor's task to provide the F.D.A. with the majority of the information concerning the effects of its compound in animals (when appropriate) and in humans. The F.D.A. reviews, scrutinizes and reanalyzes the information it receives, but it relies on its partner, the sponsor, to provide the data on which its decision ultimately rests.

162  It is therefore essential that the sponsor and the F.D.A. have a relationship, which at its foundation is truthful, honest, open, characterized by a timely and accurate communication process. The pharmaceutical company must provide accurate information describing the pharmacology (including the mechanism of the compound's action), the effectiveness of the compound (known as the efficacy), and the risk afforded by the compound (the safety). The F.D.A. must respond to this information in a timely manner, either approving the compound in a reasonable period of time, or disapproving the compound. When the compound is disapproved, the reasons for the disapproval must be clear, and the procedure to appeal the decision must be available. One of the mechanisms of appeal is the convening of an advisory committee.

163  *Advisory Committees*: The collection of advisory committees to the F.D.A. is an official body with codified rules in the Code of Federal Regulations (C.F.R.). It consists of experts

in the field in which the drug is expected to be effective. It also includes experts from the disciplines of epidemiology and biostatistics, and, in some instances, consumer advocates and representatives from the pharmaceutical industry itself.   The F.D.A. and the sponsor each provide written information to the advisory committees, and each make presentations before the committee in a session that is in general open to the public. The advisory committee provides guidance to the F.D.A. by responding to specific questions posed to it by the F.D.A. The F.D.A. considers both the content of the advisory committee's deliberations and committee's answers to the F.D.A. posed questions very seriously.   However, the advisory committee can only render its most informed and effective judgments when it is also the beneficiary of open, honest, accurate and timely reporting from both the F.D.A. and the sponsor.   To this end, the sponsor spends months preparing briefing packets for the advisory committee, and weeks in intense practice sessions preparing for the meeting.

164   *Decision Processes:* The decision process of the F.D.A. and its external advisory committees is built on a foundation of the open, accurate and timely dissemination of scientific evidence concerning the mechanism of drug action, the drug's effectiveness, and the drug's safety profile.   When this foundation is solid, the process will swiftly identify and rapidly approve drugs that are safe, effective, and meet a medical need. During this process, the public is protected from compounds that either have no efficacy or are unsafe, these inferior products being removed from further consideration.   The maintenance and promotion of the public health depend on the integrity of this system. If either the sponsor or the F.D.A. engage in dishonest or deceptive practices, the process begins to erode, and the public suffers. This occurs either through the delay in the approval of safe and effective compounds that meet a medical need, or through the publics direct exposure to inef-

fective and dangerous compounds. The F.D.A. cannot make timely, informed decisions when the sponsor denies them information.

165   *Material Information*: Embedded in this body of procedures are the channels through which accurate, relevant, and material information describing the drugs actions is promptly communicated to practicing physicians and through the physicians to their patients.   After the F.D.A. approves the drug and the drug is advertised by the sponsor to the medical community, it is the sponsor's obligation to closely monitor the use of the drug for the appearance of unanticipated adverse events.

166   *Adverse Events*: An adverse event is an undesirable effect produced by the drug.   Many adverse events are identified during the early testing phase of the drug.   These adverse effects are included in the drug label.   The drug label is the official description of the drug, which appears, with all the labels of all approved drugs in the Physicians' Desk Reference (PDR). This label describes the effect of the drug, the population in which the drug is effective, the adverse effects of the drug, and the general precautions reasonable and prudent physicians should take in prescribing the drugs. Physicians and pharmacists rely on these labels in making decisions involving the use of these drugs in their patients, and they require that the information in these drug labels be accurate and up to date. The sponsor owns the drug label. It has the responsibility for ensuring that the information in the label is accurate and up to date.   Although there are specific regulations in the C.F.R., which govern the content of the label, responsibility for guaranteeing that the information in the drug label is accurate resides with the sponsor.

167   *Labeling*. Both physicians and patients have the right to draw independent conclusions concerning the risks and benefits of a therapy. Their best and clearest recommendations

come from these considerations. Review of the Rofecoxib labels reveals several under-statements about the label. The federal regulations require that the labeling shall contain a summary of the essential scientific information needed for the safe and effective use of the drug. The essential information was lacking in the warning labels for Vioxx.

168  Drug labels are to be designed for the safe and effective use of the drug. There is no way to write an adequate label about a drug that has minimal efficacy and causes serious, life threatening side effects because such a compound cannot be used safely and effectively. By definition an adequate label cannot be written for Rofecoxib since the drug cannot be used safely and effectively. The particular defects in the Vioxx label are as follows.

169  An adequate label must contain complete statements about the effectiveness of the compound. The data for the analgesic effect of Vioxx did not state that was of the same effectiveness as standard NSAIDS.

170  21 CFR Parts 201 and 202 states, "The Commissioner also advises that these labeling requirements do not prohibit a manufacturer, packer, re-labeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The additional labeling and advertising of additional warnings, as well as contraindication, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., 'Dear Doctor' letters containing such information) is not prohibited by these regulations.

171  However, adequate warnings were not provided by Merck. On February 25, 1996 in an email from Brian F. Daniels to Thomas Simon, et. Al, regarding GI Outcomes Trial Protocol, he states, "Would allow low dose ASA real world everyone is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill drug". With

this comment, not only does Merck recognize that without COX-1 inhibition, rofecoxib will increase cardiovascular thrombotic events, but also that patients should take low dose ASA while on rofecoxib. Yet, this warning never appeared in the rofecoxib label.

172   The attitude toward the FDA, whose only mission is ensure that only safe and effective compounds are used by the public was antagonistic.  On May 14, 1999, in an email form Scholnick to Blois, Goldmann regarding the Vioxx US label, he states "I think the ONLY way to handle is to GO THERE AND INVOLVE LUMPKIN and word by word agree to the final circular by next Mon/Tue.  I DID THIS WITH TEMPLE ON VASOTEC IN 1985."

173   On March 9, 2000, email for Scolnick to Shapiro, Reicin, Nies, regarding VIGOR stated, "The CV events are clearly there. Since no obvious correlate…this is real…it is a shame, but it is a low incidence and it is mechanism based as we worried it would be." The early preapproval data demonstrated a signal of CV hazard that Merck ignored. Leadership in Merck acknowledged the hazardous effect of rofecoxib. There was no mention of a possible, scientifically unsupportable beneficial effect of naproxen as a possible explanation.

174   On March 27, 2000, Merck announced through a press release the preliminary results of GI outcome study with Vioxx (VIGOR). One day later, in an email from Alan Nies to Barry Gertz regarding Dr. Patrono on VIGOR, they state that Dr. Patrono "does not think that the CV effect that we observed can be attributed to naproxen for a couple of good reasons." Merck's consultant who correctly warned before the drug was approved that rofecoxib could produce serious cardiovascular adverse effects, also warned them that the results in VIGOR, while confirmed his own concerns, could not be explained away.

175  However, on April 28, 2000, in a press release, Merck misinforms the public by "confirm-ing a favorable CV profile.

176  On June 20, 2000, email from Laurenzie to Daniels regarding Dr. Patrono warned, "the presentation of VIGOR data must not mislead the audience into thinking that the difference in CV events could be explained by an anti-thrombotic effect of naproxen, which is not demonstrated.

177  On June 29, 2000, the Vioxx sNDA (supplemental new drug application) with Dennis Erb's letter to Central Document Room of the FDA for submission of labeling supplement to NHDA 21-042 based on VIGOR GI results. In this document, Merck argues that VIGOIR reinforces the need for concomitant aspirin use is some patients. Merck submitted protocols 085 and 090. However did not change the label adding the warning about re-quired aspirin use.

178  On July 5, 2000, a memo from the statistician Deborah Shapiro Alise Reicin revealed that Merck knew it was not publishing all of the myocardial infarctions that occurred in VIGOR in the *New England Journal of Medicine* that would not be published until No-vember 2000. They had the opportunity to update the data but refused to take it.

179  On November 8, 2000, in an email from Reicin to Barr involving a hypertensive patient, Dr. Barr believes a hypertension-related death in ADVANTAGE should have been classi-fied as an MI, stating in an email timed at 11:43AM "Common things being common, the clinical scenario is likely to be an MI." He then explained the definition of sudden death and unexplained death in an email timed at 12:58 PM.  However, Dr. Reicin challenged him, saying, "I still strongly feel that this should not be an MI-…" However, she went fur-ther than that, saying the death should be classified as "unknown". Specifically, she stated,

"...I would prefer unknown cause of death so that we don't raise concerns." This statement's egregious insensitivity to the importance of identifying appropriate safety monitories speaks for itself.

180   On October 18, 2000, Deborah Shapiro, Merck statistician carried out a preliminary meta-analysis that demonstrated an increased CV risk. Specifically, this report showed that Vioxx more than doubled the risk of MI related to all NSAIDS, and that this increase was statistically significant. This included a MI-only analysis of the Vioxx program. This report was omitted in Merck's FDA submission and in the published meta-analysis of Konstam.

181   On January 31, 2001, a national thought leader summary of the VIGOR study recommended that Merck not emphasize the "protective effect" of Naproxen as an explanation." In that same paragraph, they state that there is no supporting data to substantiate a protective effect for Naproxen.

182   On this same date, January 31, 2001, Dr. Scolnick of Merck sent an email to Mr. Anstice and Gilmartin, it which he stated, "...there is no way to prove that in patients with rheumatoid arthritis that ALL of the difference between Vioxx and naproxen is due to the benefit of naproxen. It is impossible to prove this; it is impossible to know this with certainty."

183   On February 1, 2001, Targun of the FDA wrote a memo to Cook and Villalba regarding NDA 21-042, S-007 review of cardiovascular safety database. He stated that "Despite lower dose, smaller sample size and aspirin use, the trend is against rofecoxib." He also stated "The sponsor claims that the difference in MI between the two groups is primarily due to the anti-platelet effects of naproxen. This hypothesis is not supported by any prospective placebo-controlled trials with naproxen."

184  On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory Committee in public session that there was no evidence from an examination of their Phase IIb/III database of excess cardiovascular events. A similar statement was also made on page 56. This was false. The Watson report on which that was based clearly demonstrated excess cardiovascular events in women, and in most of the age ranges examined in men. This information was withheld from both the 1999 Advisory Committee as well.

185  On September 17, 2001, the FDA sent a Warning letter from Abrams to Gilmartin regarding Vioxx. That letter stated that Merck's promotional activities were "false, lacking in fair balance or otherwise misleading." It also stated," your claim in the press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible."

186  Nevertheless, on November 6, 2001, in a draft letter to Jonca Bull regarding the Amendment to the Supplemental New Drug Application, Merck expressed strong disagreement with FDA's initial October 15, 2001 labeling proposal, which it argues is unprecedented. Merck argues for labeling information tempering any commentary on CV/T data from VIGOR.

Misleading the FDA

187  Regulation Sec. 14.171: Utilization of an advisory committee on the initiative of FDA. (f) Presentation of all relevant information about the matter will be made in open session unless it relates to an IND the existence of which has not previously been disclosed to the public as defined in Sec. 20.81 or is otherwise prohibited from public disclosure under part 20 and the regulations referenced therein. Sections 314.430 and 601.51 determine whether, and the extent to which, relevant information may be made available for public

disclosure, summarized and discussed in open session but not otherwise made available for public disclosure, or not in any way discussed or disclosed in open session or otherwise disclosed to the public.

188  Merck mislead the FDA at the FDA Advisory Committee Meeting. On April 20, 1999, the FDA Arthritis Advisory Committee met to discuss the consideration of whether Vioxx should be approved for use for pain relief. During that discussion, both efficacy and safety of Vioxx were discussed. There was a section of the presentation of the thromboembolic cardiovascular adverse experience. Beginning on page 105 of the transcript, the individual presenting on behalf of Merck states "I will now review the thromboembolic cardiovascular adverse experiences. We looked at an extensive list of adverse experiences representing peripheral, myocardial, and central nervous system thromboembolic events. The data presented on this slide is a combined analysis from all of our osteoarthritis studies. This is reported in events per 100 patient years. The event rate was low and was similar between placebo, rofecoxib, and the NSAID comparators. All deaths across all osteoarthritis studies are summarized on this slide: The events are reported again, per 100 patient years. The rates for rofecoxib, as you can see, are if anything, lower than with the NSAID group.

187  However, one year before, on February 2, 1998, Watson's Final results of an analysis of the incidence of Cardiovascular SAE's in the Phase IIb/III Vioxx Osteoarthritis Clinical Trials demonstrated a CV signal. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The overall relative risk for cardiovascular SAE for men was 1.28 and for women was 2.16, demonstrating a clear signal of increased cardiovascular risk associated with rofecoxib

therapy (Table 7). The report states that the VIOXX 125 mg and 25 mg treatment groups also had more clinical cardiovascular AE's then the placebo group in protocol 010(page 1 following executive summary). This finding was not reported to the FDA advisory committee at this meeting. These relevant tables were omitted from the Merck FDA Advisory Committee Background Information Packet for this meeting. The FDA Advisory Committee was never told about the increased cardiovascular risk associated with rofecoxib at this critical juncture in the FDA's deliberations for the approval of rofexocib.

188 On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory Committee in public session that there was no evidence from an examination of their Phase IIb/III database of excess cardiovascular events. A similar statement was also made on page 56. This was false. The Watson report on which that was based clearly demonstrated excess cardiovascular events in women, and in most of the age ranges examined in men. This information was withheld from both the 1999 Advisory Committee as well. The Merck FDA Advisory Committee Background Information Packet dated February 8, 2001 was incomplete. On page 9 of that document (Section 2.2.1.1. Rationale for the Choice of Patient Population in VIGOR), no description of the rationale for only including patients who were not at high risk for cardiovascular disease. The critical information intimated in an email on November 11, 1996 by Dr. Reicin stating the plan of "excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" was not included in the Advisory Committee Packet. This critical information that altered the VIGOR study, blocking its ability to fairly assess the risk associated with rofex-

coxib was not shared with the FDA at this critical decision point in the FDA review proc-

ess. In addition, Tables 6 and 7 of the Watson report, which demonstrated a clear signal of

the cardiovascular danger of rofecoxib was omitted from this critical document on which

the FDA reviewers relied.

189   In addition the emails dated April 6 and 7, 2001 between Dr. Greene and Dr. Scolnick re-

vealed the internal attitude of Merck to the FDA, whose only desire was to ensure that

safe and effective medications be available to the US public.

190   On April 6, 2005, John Jenkins, Director of the Office of New Drugs and Paul J. Selig-

man, Director Office of Pharmacoepidemiology and Statistical Science wrote a memo-

randum bearing the FDA's imprimatur whose subject was Analysis and recommendations

for Agency action regarding nonsteroidal anti-inflammatory drugs and cardiovascular

risk. The specific sources of the information on which the statements within this memo

are based are not revealed in the document (e.g., the findings from the Alzheimer's trials

for Vioxx, page 5). It is therefore unclear what the scientific basis for the statements and

actions recommended in the document are. Without knowing the source of the informa-

tion, it is difficult to assess the worthiness of the recommendations provided in this

document. However the basis of my conclusion that Vioxx is a dangerous compound with

unacceptable cardiovascular risks, regardless of dose or duration of exposure, are clearly

delineated in this affidavit.

191   This affidavit draft does not discuss the results of analyses yet to be produced by Merck,

nor does it discuss an evaluation of the actual APPROVe datasets that I plan to undertake.

This affidavit will be amended as additional relevant information becomes available, and,

if appropriate, upon completion of my evaluation of the SAS APPROVe datasets.

# Appendix A: Statistical Reasoning in Medicine

191   Statistical Reasoning in Medicine: Statistical reasoning in { XE "statistical reason-

ing:definition" }medicine is, at its heart, the process by which we determine if health care

research results identified in one sample apply to a much larger population. The urgent

question for a reviewer of the COX literature is whether results from all of the studies (or

any of the studies) can be generalized from the from the peer reviewed manuscript to the

population at large, and therefore be extended to a particular plaintiff. Is there a subset of

studies that contribute more to our understanding, and can therefore be extended to the

population?  The type of generalization is not automatic; in fact, commonly in science

this generalization is inappropriate. Thus, the reviewer must precisely identify the cir-

cumstances in which extension to the population is appropriate, and, alternatively, when

the research results must be firmly circumscribed by the sample from which they are ob-

tained.

192   A negative answer to this critical question does not imply that the veracity of the investi-

gator's work is in question. { XE "statistical reasoning:critical question" }The authors of

an published article did in fact find what they claimed to find in the sample; their probity

is not in question. The relevant, question is whether the sample findings translate to the

population from which the sample was obtained?  Specifically, does the examination of

the relationship between exposure and disease in the sample concisely and efficiently

capture what they would find if they examined the entire population, or, alternatively, are

the sample results merely due to the freak of chance, the vicissitudes of their inadvertent

selection of the wrong, unrepresentative sample from the population. If the former is the

case, then a whirlwind of scientific discussion is necessary and valid. However, if the re-

lationship is one that is seen only in the sample, and does not adequately depict a population finding, then any ensuring discussion is based on a fantasy. These questions are of direct relevance to the COX inhibitor literature, which is replete with studies of different designs, different sensitivities, and widely disparate results.

193   ***Sampling Error and Significance Testing*** Sample-based research is the study of a sample obtained from a population. Different samples, obtained from the same population, contain different individuals with different experiences an{ XE "p value:and sampling error" }d therefore contain different results. Sampling error is simply this sample-to-sample variability. The symbol $\alpha$, representing the type I error is the specific sample error that allows a population to generate a sample which contains a spurious relationship that is not seen in the population.

194   Clinical trial investigators recognize that there are many reasons why the positive findings of clinical experiment may be misleading. For example, they may have selected a population of patients in whom the therapy works but the inclusion and exclusion criteria of the study were too restrictive. The dose of the medication chosen may be effective, but it produces too many side effects. The blinding of the procedure may have been ineffective, leading to a more diligent search for endpoints among the subjects randomized to placebo therapy. These are all problems with the execution of the trial. They can be anticipated and the trial designed to remove them as obstacles to the trial's success. However, there is one problem that, no matter how well the clinical trial is designed, cannot be removed as the generator of false positive results — chance alone. This is an $\alpha$ error.

195   Statistical significance addresses the possibility that sampling error has produced the positive findings in the sample. If an $\alpha$ (or type I) error occurs, then there is no effect of

the therapy in the population, but the population produced a sample in which, just through chance alone, the therapy produced an effect. There is no question that the therapy worked in the sample; however, the sample results are not a reflection of the population effect, but instead were generated by the random aggregation of subjects selected for the sample.

196  The occurrence of a type I error is solely a property of the sampling process. Since sampling is necessary for the research effort, the investigators understand that they cannot remove this possible explanation of these results. They instead decide to measure the possible influence of sampling error. Investigators set the $\alpha$ error level at the beginning of the study, and compute a sample size based on the maximum acceptable type I error rate, as well as on other parameters. At the conclusion of the experiment, the investigators compute the $p$-value for the result of the study. The $p$-value is the measure of the type I error rate at the end of the study and is based on the actual research results. If the $p$-value is less than the $\alpha$ error rate that was prospectively identified (commonly set at the 0.05 level, a decision that has its sole basis in tradition), then researchers conclude that it is very unlikely that chance alone produced the findings of the study, and that the results of the study (be they clinically significant or clinically negligible) are truly reflective of what would occur in the larger population from which the sample was obtained.

197  Therefore, if (1) the systematic explanations for a spurious research finding are removed from the experiment by exceptional planning and good clinical trial execution, (2) the probability of a false finding just by chance alone is reduced to a small level (i.e., the $p$-value is less than the prospectively set $\alpha$ error rate), and (3) the magnitude of the findings are clinically important, then the medical and regulatory communities are assured that, to

a reasonable degree of certainty, the positive results of the trial represent a true popula-

tion finding.[*]

198 **Statistical Power**: Statistical power, like *p*-values, is a phenomenon of sampling error.

The circumstance in which statistical power is relevant in the interpretation of a research

program involving the investigation of COX inhibition is when the trial results are not

positive, but null; no treatment effect is seen.{ XE "power (statistical):definition" } Of

course, there are many systematic explanations for a null finding (the wrong exposure

level to the active intervention is but one of many possible circumstance). However, an-

other possible explanation is sampling error. In this circumstance, the therapy is effective

in the population. However, the population produced a sample by chance alone in which

the therapy was ineffective. This is a type II or beta error. Power is defined as one minus

the type II error. High statistical power translates into a low type II error rate.

199 Consideration of statistical power has important implications for the COX literature,

since the occurrence of a type II error makes it impossible to assess the implications of a

null finding. Specifically, if a study does not find a relationship between exposure to a

COX inhibitor and cardiovascular disease, low statistical power means that it is quite

likely that, even if there was a relationship between COX inhibition and cardiovascular

disease, the study would not have found it. Therefore the null finding must not be treated

as implying a null relationship in the population, but as a non-informative finding. This is

the justification for the creed "Absence of evidence is not evidence of absence." Specifi-

cally, this means that absence of evidence (of a relationship between COX inhibition and

cardiovascular disease) need not be evidence of absence (of this relationship existing in

---

[*] We will have much more to say about the interpretation of *p*-values..

the population). Thus null findings from underpowered evaluations of the relationship between COX inhibition and cardiovascular disease are uninformative.

200   Since the researcher does not know during the design phase of the study whether the results will be positive or null, she must plan for each possibility. Thus, she should design the study so that the type I error rate will be low (customarily no higher than 0.05) and that the power of the experiment will be high (typically, at least 80%). Each of these considerations are part of the sample size computation.

201   **Sample Size Computations**: Good clinical trials, regardless of their size, are characterized by careful planning, controlled execution, and disciplined analysis. An important component of the design of a clinical research effort is the sample size calculation. The sample size computation is the mathematical calculation that determines how many patients the trial should recruit. It is based on clinical concerns, epidemiologic determinations of event rates, and biostatistical considerations about the role sampling error may play in producing the trial's results. It can be said that the sample size computati{ XE "sample size computation:general concerns" \b }on is the forge upon which the clinical trial design is hammered.

202   Exploratory Analysis and Random Research: Exploratory analysis is the process by which the investigator allows the data to answer specific questions that the investigator did not plan to use the data to address. There are two problems with *exploratory research* or *hypothe*{ XE "exploratory analyses:definition" }{ XE "hypothesis generating analyses:definition" \t "*See* exploratory analyses" }*sis generating research*. The first is that commonly the sample is not an optimal one, since the investigator can only design a sample to answer questions that they knew to ask.

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                              8/10/2006

## Appendix B: Determining Causality in Medicine

203   Clinical investigation has been a human endeavor for over two thousand years. The most common building block in the edifice of health study is the { XE "case reports" }{ XE "case series" }case report. A case report is a summary of a single patient's findings and the communication of those findings to the medical community. A case series is a collection of case reports, linked together by a common thread (e.g., all of the patients were seen by the same doctor, or each of the patients was exposed to the same agent, e.g., quinine).

204   It is easy to understand how the growth of general medical knowledge has been propelled by the use of case reports. The delivery of healthcare has been governed by the interaction between a single, concerned, responsible provider and his patient. This relationship is private and privileged. However, it has historically been conducted in isolation, by physicians and nurses widely separated from each other. The idea of a community was well established. However, the concept of a medical community (i.e., a collection of practitioners who worked together to jointly expand their knowledge base) was one that took many generations to develop.

205   Therefore, medical care was delivered for hundreds of years by practitioners, who, working alone with incomplete knowledge, made decisions that directly affected the lives of their patients, and indirectly, their patients' families and communities. The one, natural learning tool these physicians could use was the active sharing of their experiences among themselves. This served to expand their expertise, suggest alternative approaches to healthcare, and extend their knowledge. This shared experience is at the heart of the case report.