# Correspondence

## Discontinuation of Vioxx

The analysis by Peter Jüni and colleagues (Dec 4, p 2021)[1] contravenes the basic principle of meta-analyses to combine like with like, and thus arrives at flawed conclusions. The data in the report has been analysed and published in an appropriate way by others.[2] Moreover, Jüni and colleagues ignore data included in previous analyses, available on the US Food and Drug Administation's (FDA) website (http://www.fda.gov), from large placebo-controlled studies in about 2000 patients with Alzheimer's disease. The results of these trials show no difference between rofecoxib (Vioxx) and placebo.

Jüni and colleagues assessed a subset of studies presented in previous pooled analyses of trials of rofecoxib. The conclusions of their article are inappropriately driven by their choice of method, involving pooling of results for placebo, non-naproxen non-steroidal anti-inflammatory drugs (NSAIDs), and naproxen. This approach ignores pharmacodynamic differences between naproxen and other NSAIDs, and placebo. Also ignored are data from the TARGET study[3] (the other large outcomes study of a cyclo-oxygenase 2 [COX-2] inhibitor compared with naproxen).

The difference in cardiovascular risk with rofecoxib, starting in 2000, claimed by Jüni and colleagues is driven by the comparison of rofecoxib to naproxen, and largely by the results of VIGOR.[4] To argue, as the authors and Richard Horton (p 1995)[5] have done, that this effect was not recognised ignores the facts. Findings of previous appropriate analyses[2] of these same data confirm the difference between rofecoxib and naproxen first noted in VIGOR and also show no difference between rofecoxib and either placebo or non-naproxen NSAIDs. Furthermore, the results of the APPROVe study (which led to the withdrawal of Vioxx; http://www.vioxx.com) are consistent with previously available placebo-controlled data—for the first 18 months of the study, there was no evidence of any difference in cardiovascular risk between rofecoxib and placebo. The Swedish regulatory agency, the Medical Products Agency (http://www.mpa.se), agrees with this statement.

For Horton to claim that Merck and regulatory agencies worldwide were not aware of the difference in cardiovascular risk observed between rofecoxib and naproxen, or to infer that physicians were not provided with this information, is incorrect. Data from the VIGOR study, in which this difference was first noted, were disclosed to regulatory agencies worldwide and to the public via a press release in March, 2000—the same month that Merck became aware of the preliminary VIGOR results. These data were included in the US (http://www.fda.gov) and European Union (EU; http://www.emea.eu.int) prescribing information for Vioxx. The available data for rofecoxib were updated both to regulatory agencies and to the public. Additionally, the cardiovascular safety of rofecoxib and other COX-2 selective inhibitors was comprehensively reviewed by the European Medicines Agency (EMEA) in a referral procedure from July, 2002, to April, 2004. Thus, doctors, scientists, and regulatory agencies have had the data on which to make decisions about the balance between risks and benefits since rofecoxib was first marketed.

Finally, we believe that to print a Comment in a scientific journal, criticising Merck's ethical standards on the basis of unfounded allegations printed in the lay press, without even the pretence of investigation into their accuracy or completeness, is inappropriate. Merck's activities with respect to Vioxx before its withdrawal were ethical and reflected Merck's belief in the safety of its product. The prompt withdrawal of Vioxx from the market after learning the results of APPROVe indicates Merck's commitment to place patient safety first.

Both authors work for Merck.

*Peter S Kim, *Alise S Reicin*
alise_reicin@merck.com

Merck Research Laboratories, West Point, PA 19486, USA

1  Jüni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. Lancet 2004; 364: 2021–29.
2  Weir MR, Sperling RS, Reicin A, Gertz BJ. Selective COX-2 inhibition and cardiovascular effects: a review of the rofecoxib development program. Am Heart J 2003; 146: 591–604.
3  Schnitzer TJ, Burmester GR, Mysler E, et al. Comparison of lumiracoxib with naproxen and ibuprofen in the Therapeutic Arthritis Research and Gastrointestinal Event Trial (TARGET), reduction in ulcer complications: randomised controlled trial. Lancet 2004; 364: 665–74.
4  Bombardier C, Laine L, Reicin A, et al for the VIGOR Study Group. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000; 343: 1520–28.
5  Horton R. Vioxx, the implosion of Merck, and aftershocks at the FDA. Lancet 2004; 364: 1995–96.

Peter Jüni and colleagues[1] conclude health authorities should have withdrawn rofecoxib several years before the APPROVe study[2] results were made available in September, 2004. Since we have been involved in the assessment of the cardiovascular safety of rofecoxib, by request of the Agence Française de Sécurité Sanitaire des Produits de Santé (AFSSaPS), we feel compelled to respond to what could be interpreted as an accusation of incompetence. In fact, that the available evidence proves that the risk of myocardial infarction is increased by rofecoxib compared with placebo is unclear.

First, Jüni and colleagues conclude that rofecoxib has the same deleterious cardiovascular effects when compared with placebo, non-naproxen NSAIDs, and naproxen because they did not find any significant heterogeneity (p=0.41) between these three subgroups. Notwithstanding the limited power of the heterogeneity test[3] and the use of a random-effects model (that decreases the probability of finding an interaction), their main suggestion seems to be that absence of evidence is evidence of absence, which is incorrect.

Second, Jüni and colleagues excluded from their analyses the placebo-controlled studies done in patients with Alzheimer's disease, which is not acceptable. The file submitted by Merck

A more detailed critique from Merck of the methodological flaws is available at http://www.merck.com/statement_2004_1105/lancet.pdf.

Rights were not granted to include this image in electronic media. Please refer to the printed journal.

e-mail submissions to correspondence@lancet.com

## Correspondence

by request of the French authorities, contained the results of three studies in Alzheimer's disease, which contributed 28 myocardial infarctions, compared with a total of 64 in the meta-analysis (including probably 24 from VIGOR). In these studies, the relative risk for myocardial infarction was 0·86 (95% CI 0·40–1·81). The patients in the Alzheimer's disease studies also had a much higher risk of myocardial infarction (8·2/1000 patient-years in the placebo group) than did those included in Jüni and colleagues' meta-analysis (1·45–1000 patient years in the control groups). Had these studies been included in the meta-analysis, a significant heterogeneity between placebo-controlled and treatment-controlled studies would have probably been identified (the absence of details on the included studies precludes any re-calculation of the results of the meta-analysis).

Third, the authors state that their results did not change after inclusion of VIGOR,[4] and that the presence of an external endpoint committee was the only identified interaction factor. In fact, both complementary analyses were largely confounded by treatment—in the six studies introduced into the meta-analysis after VIGOR, four were done against naproxen. Furthermore, six of the eight studies that had an external endpoint committee were done versus naproxen.

There was, therefore, no evidence of an increased risk of myocardial infarction in patients treated with rofecoxib compared with placebo before the results of the APPROVe study were published. On the contrary, as discussed by Jüni and colleagues, some pharmacological and pharmacoepidemiological arguments favour a protective cardiovascular effect of naproxen, which is a possible explanation for the adverse cardiovascular effects of rofecoxib compared with naproxen.

EA is Head of Therapeutic Evaluation at AFSSaPS and the vice chair of the Committee for Human Medicinal Products at the EMEA. The views expressed here do not represent those of either of these institutions.

*Michel Lièvre, Eric Abadie, on behalf of the French Marketing Authorization Committee
ml@upcl.univ-lyon1.fr

*Department of Clinical Pharmacology, Lyons Hospitals, Claude Bernard University, Lyons, France (ML); and AFSSaPS, Saint Denis, France (EA)

1   Jüni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. Lancet 2004; 364: 2021–29.
2   Bresalier R, Lanas A, Morton D, et al. Vioxx cardiovascular safety data from the APPROVe study. http://www.rheumatology.org/annual/press/APPROVesession_announce.asp (accessed Dec 14, 2004).
3   Hardy JR, Thompson SG. Detecting and describing heterogeneity in meta-analysis. Stat Med 1998; 17: 841–56.
4   Bombardier C, Laine L, Reicin A, et al for the VIGOR Study Group. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000; 343: 1520–28.

We share Richard Horton's view[1] that the FDA should assume some responsibility for the tardy discontinuation of rofecoxib. The case should also be considered in the context of action taken by the European regulatory authority.

Rofecoxib was approved first for use in the UK and then accepted by other EU member states, following the mutual recognition procedure. France started a referral in July, 2002, which ended in April, 2004.[2] To take almost 2 years to make a decision on whether a class of drugs used by millions is safe or dangerous is certainly too long. Fortunately, the process found that the benefit-risk balance for COX-2 inhibitors was positive, while recommending, however, that warnings in the Summary of Product Characteristics should be strengthened, emphasising particularly the risks for patients with underlying gastrointestinal or cardiovascular disease; this modification had no effect on the rising sales of COX-2 inhibitors.

Horton comments on the potential conflict of interest of the FDA, which "continues to see the pharmaceutical industry as customers". The EMEA, which is under the jurisdiction of a Directorate General of the European Commission the title of which is Enterprise not Public health also has a potential conflict of interest, surely? The EMEA depends on the fees paid by industry much more than the FDA does, and is much less transparent—of the above referral procedure, only a one-page document can be traced on the EMEA web site.[2]

We declare that we have no conflict of interest.

*Silvio Garattini, Vittorio Bertelé
Garattini@marionegri.it

"Mario Negri" Institute for Pharmacological Research, Via Eritrea, 62 20157 Milan, Italy

1   Horton R. Vioxx, the implosion of Merck, and aftershocks at the FDA. Lancet 2004; 364: 1995–96.
2   European Medicine Evaluation Agency (EMEA). Committee for Proprietary Medicinal Products (CPMP) opinion following an Article 31 referral for all medicinal products containing celecoxib, etoricoxib, parecoxib, rofecoxib, or valdecoxib. International non-proprietary name (INN), rofecoxib. Background information. http://www.emea.eu.int/pdfs/human/referral/rofecoxib/174904en.pdf (accessed Dec 14, 2004).

The results of Jüni and colleagues' meta-analysis[1] seem to make very obvious the case against Vioxx with little room for argument. Unfortunately, the statistical arguments and definitive conclusions do not take into account many conflicting signals that, considered in temporal context, actually support Merck's claim that they were being a good corporate citizen by waiting for incontrovertible scientific evidence before pulling Vioxx from the market.

The cumulative meta-analysis plot (figure 3), for example, provides clear evidence to support the claim by Jüni and colleagues that, after 2000, the harmful effects of Vioxx should have been known to all. However, what is not obvious from the plot is that the damning evidence against Vioxx is almost entirely driven by the results of VIGOR,[2] which were published in 2000. The other trial results were inconclusive; exclusion of VIGOR would, I suspect, result in another questionable result. Taken alone, Jüni and colleagues correctly state that the VIGOR results were troubling. The active control in the study, however, was naproxen. In view of the hypothesis of the protective effects of naproxen on cardiovascular events,

what would the authors have had Merck do? I believe that Merck pursued the correct course of action by awaiting the results of the now famous placebo-controlled study that led to the withdrawal of Vioxx from the market.

Another example to note is that the first set of relative risk point estimates in table 2 actually lend support to Merck's claim that naproxen had protective effects and that Vioxx was no worse than placebo. The next set of values show a U-shaped dose-response to cardiovascular disease risk. At the time, this data would have been non-supportive of a detrimental effect of Vioxx, since a U-shaped risk profile, on the surface, usually does not make sense. Finally, the higher risk attributable to shorter duration of Vioxx exposure when compared to longer durations, although troubling, suggests a mitigating long-term safety profile. In short, there is little evidence in table 2 to suggest that Vioxx should be discontinued.

The post-marketing surveillance of any drug is not as easy as Jüni and colleagues would have us believe. To produce a targeted analysis to prove a known fact is usually fairly easy. However, prospective analysis of data is never as obvious, especially when the data, except for one study with a hypothetically protective control, do not show any conclusive signals and at times contradict one another. If further evidence shows that Merck had information that should have been made public, then they should be held accountable, but this meta-analysis does not provide such evidence and is an example of retrospective data manipulation.

I declare I have no conflict of interest.

*Jack Nyberg*
Jack.Nyberg@aventis.com

Aventis Pasteur, Discovery Drive, Swiftwater, PA 18370, USA

1  Jüni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. Lancet 2004; 364: 2021–29.
2  Bombardier C, Laine L, Reicin A, et al for the VIGOR Study Group. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000; 343: 1520–28.

On Sept 30, 2004, allegedly in response to the results of the APPROVe study, Merck withdrew rofecoxib from the market. Although *The Lancet* initially praised Merck's proactive response to adverse information, this is no longer the case. On Dec 4, *The Lancet* published Jüni and colleagues' meta-analysis outcome study on rofecoxib.[1] After compiling the results of 29 observational studies, all published more than a year ago, Jüni and co-workers noted that rofecoxib use is associated with a significant increase in the relative risk of myocardial infarction. In the accompanying Comment,[2] Richard Horton leaves little doubt that the blame for marketing this unsafe drug falls squarely on Merck for its callousness and the FDA for its foot dragging. Nor is *The Lancet* alone in expressing its indignation. In October, 2004, a tsunami of articles and editorials in the medical and lay press reached the same conclusion. Topol[3] is even calling for a Congressional investigation.

Horton exonerates the medical community with a single sentence: "Why clinical investigators studying Vioxx did not do more to raise concern is a fair question that needs to be answered." Horton never mentions the culpability of the medical journals. Concerns over the toxicity of rofecoxib were first articulated in 2000.[4] However, a review of the 1032 publications on rofecoxib cited in PubMed reveals that, before Merck withdrew the drug, only a handful of articles raised concerns about its efficacy. To the contrary, before 2004, the typical commentary on rofecoxib, and COX-2 inhibitors in general, noted that there was scant evidence to support a causative link between the drug and cardiovascular events.[5] These publications conclude with the cliché that further trials (like the APPROVe study) are needed. This viewpoint changed completely in October, 2004, when an avalanche of articles asserted that rofecoxib risks were well known. This literature pirouette is all the more fascinating because Jüni and colleagues' calculations, which were worthy of early release on the internet, could have been done more than a year ago.

Editors of medical journals decide what is to be published. As an editor, I know that a few hints or suggestions to my colleagues will bring in articles I want to publish. Thus, if the medical journals really wanted to publicise the dangers of rofecoxib before Sept 30, they could have solicited meta-analyses and written editorials. So, what delayed the publication of rofecoxib's risks? Only two answers exist: the data on rofecoxib were not clear cut—in which case Merck and the FDA might not have done anything wrong—or the medical journals were blinded by the pharmaceutical industry's advertising dollars. If the latter is the case, it seems a bit disingenuous of the medical journals to have accepted the pharmaceutical industry's money in good times, and then assert that the pharmaceutical industry is callous and the FDA is incompetent when a drug is found unsafe. In short, editors of medical journals should remember Shakespeare's words: fault "lies not in our stars but in ourselves".

I declare that I have no conflict of interest.

*Thomas R McLean*
tmclean@dnamail.com

Legal Medical Perspectives, c/o EKVAHCS, Surgical Service, 4104 S Forth Street Trafficway, Leavenworth, KS 66048, USA

1  Jüni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. Lancet 2004; 364: 2021–29.
2  Horton R. Vioxx, the implosion of Merck, and aftershocks at the FDA. Lancet 2004; 364: 1995–96.
3  Eric J Topol. Failing the public health: Rofecoxib, Merck and the FDA. N Engl J Med 2004; 351: 1707–08.
4  Bombardier C, Laine L, Reicin A, et al for the VIGOR Study Group. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000; 343: 1520–28.
5  Warner TD, Mitchell JA, Vane JR. Cyclo-oxygenase-2 inhibitors and cardiovascular events. Lancet 2002; 360: 1700–01.

Richard Horton's comments[1] on Jüni and colleagues' cumulative meta-analysis[2] on the cardiovascular risks of rofecoxib summarise the wide coverage

of this issue in this and other journals, and the lay press, following the voluntary decision by Merck to withdraw rofecoxib. In essence, the message is that taking rofecoxib exposes patients to a severe health risk, and that Merck knew about this risk but tried to cover it up. To make matters worse, the FDA failed in its role as watchdog for the public interest.

In my view, science has mostly taken a backbench to marketing and legal arguments in these discussions. Drug regulators struggle every day with the reality that most safety data emerge from observational studies after approval, and that such data is hard to interpret. Even with Jüni and colleagues' meta-analysis in hand, I disagree with Horton's position. I feel the data on the cardiovascular risk of COX-2 inhibition remains inconclusive, but most scientists would agree there is a signal in the rofecoxib data that has become stronger over time. Many were irritated by Merck's relentless marketing against this signal (including incomplete disclosure), but would also agree the evidence was not so strong or unexpected that the drug had to be withdrawn as unsafe: another relabelling of the drug might have addressed the issue. Finally, most of us in practice were unhappy with the letters and visits by representatives from drug companies cautioning us to contact all our patients on rofecoxib and tell them to stop taking the drug immediately in the interest of their safety.

What seems to be forgotten is that any increase in adverse events should not be considered in isolation. For instance, the evidence that rofecoxib reduces potentially lethal ulcer bleeds and perforations is undisputed (by contrast with its competitor, celecoxib). Should we not weigh the possible increase in myocardial infarctions against the many gastrointestinal events prevented? Although the meta-analysis does not report person-years of exposure, assuming a mean trial duration of 3 months we would have about 7000 person-years. In populations at low risk—not the ideal situation to consider a COX-2 selective drug—1 year of non-selective NSAID treatment yields a risk of about 0·5% of a major gastrointestinal event. If this risk is reduced to 0·25% by rofecoxib, we get 175 events in the NSAID and 87 in the rofecoxib group. Presumably, the populations in the trials were at higher risk than this hypothetical population, so the estimate of 87 events prevented is conservative. If I read the results of the meta-analysis correctly, this finding should be offset against 16 infarctions in the NSAID group versus 37 in the rofecoxib group—an excess of 21 infarctions.

Extrapolation of the cardiovascular risks of rofecoxib to high-risk populations is speculative. For example, such patients will usually be on low-dose aspirin, changing the equation both in terms of cardiovascular risk (decrease) and gastrointestinal risk (increase).

Finally, I appreciate the outspoken tone of Horton's comments. In this instance, he has let his fury shine through inappropriately. Wording such as "the FDA's paralysis", "shoring up its tarnished reputation", "ruthless, self-serving, irresponsible self interest" are terms that I expect to read in USA Today, and when used in The Lancet, suggest a health crisis of the magnitude of the Softenon drama (where thalidamide was marketed as sleeping medication for pregnant women, and many babies with severe congenital abnormalities were born). As I have tried to show, such is not the case. Furthermore, speculation about the success of the tort lawyer mafia in the USA is not the task of a scientific journal. Let us scientists go back to the difficult job of interpreting data, indeed demanding full disclosure, and leave mud-slinging to the journalists.

MB has been reimbursed for attending conferences and advisory board meetings for Searle, Pharmacia Upjohn, Pfizer, and Novartis.

*Maarten Boers*
keb.info@vumc.nl

Department of Clinical Epidemiology and Biostatistics, VU University Medical Center, 9B-118, PO Box 7057, 1007 MB Amsterdam, Netherlands

1 Horton R. Vioxx, the implosion of Merck, and aftershocks at the FDA. *Lancet* 2004; **364:** 1995–96.
2 Jüni P, Nartey L, Reichenbach S, Sterchi R, Dieppe PA, Egger M. Risk of cardiovascular events and rofecoxib: cumulative meta-analysis. *Lancet* 2004; **364:** 2021–29.

### Authors' reply

In their critique of our cumulative meta-analysis of the cardiovascular risk of rofecoxib, Peter Kim and Alise Reicin of Merck suggest that our study was flawed because we compared rofecoxib with different control interventions. They claim that substantial differences exist in the risk of myocardial infarction between patients receiving placebo, naproxen, and other non-aspirin NSAIDs, in line with their earlier strategy of attributing a five-fold increase in risk in the VIGOR trial[1] to a cardioprotective effect of naproxen, rather than a cardiotoxic effect of rofecoxib. Convincing evidence to support this notion does not exist.[2]

In our analysis of randomised comparisons of rofecoxib with different control interventions, the only source of variation related to whether or not adverse events were examined by an external endpoint committee. As shown in the table and stated in our report, the increase in risk was similar in trials that compared rofecoxib with placebo, non-naproxen NSAIDs, and naproxen. Furthermore, the results of the observational studies not funded by Merck indicated no cardioprotective effect of naproxen (combined estimate of relative risk 0.95, 95% CI 0·85–1·06). In view of these findings, to claim that combining comparisons with different control interventions is invalid is inappropriate. With respect to their meta-analyses, we are eager to understand the reasons for the discrepant results and invite Merck to share their data. By contrast with Kim and Reicin's and Jack Nyberg's suggestion, the increased risk of myocardial infarction associated with use of rofecoxib in trials with an external endpoint committee is also evident after the exclusion of VIGOR (pooled relative risk 2·5, 95% CI 1·1–6·0).

|  | Relative risk (95% CI) | p for interaction |
|---|---|---|
| Trials with external endpoint committee |  | 0.92 |
| Rofecoxib versus placebo | 2.31 (0.49 to 10.82) |  |
| Rofecoxib versus non-naproxen NSAIDs | 2.98 (0.47 to 18.84) |  |
| Rofecoxib versus naproxen | 3.72 (1.65 to 8.39) |  |
| Trials without external endpoint committee |  | 0.61 |
| Rofecoxib versus placebo | 0.45 (0.09 to 2.18) |  |
| Rofecoxib versus non-naproxen NSAIDs | 1.15 (0.33 to 4.01) |  |
| Rofecoxib versus naproxen | 0.38 (0.03 to 4.10) |  |

Table: Relative risk of myocardial infarction, comparing rofecoxib with control, analysed separately for trials with and without external endpoint committees and stratified according to type of control

Kim and Reicin reiterate that there was no evidence for a difference in cardiovascular risk between rofecoxib and placebo during the first 18 months of the unpublished APPROVe trial, but do not acknowledge that the trial's power to detect a clinically relevant difference in rates of myocardial infarction (a relative risk of 2) during the first 18 months was 20% or less. Our analysis, which was based on a much larger number of patients and events showed an increased risk of myocardial infarction both for trials of shorter (<6 months) and longer duration.

In response to Michel Lièvre and Eric Abadie, we agree that absence of evidence does not equal evidence of absence of an effect. However, their point is inappropriate in this context. Surely, in the interest of the public's health, robust evidence from placebo-controlled randomised trials should be available to justify any interpretation that an important difference in the risk of an adverse effect is not caused by the experimental drug, but due to preventive effects of the comparator drug. Lièvre and Abadie are right when pointing out that there was some degree of confounding between type of control intervention and the presence or absence of an external endpoint committee: the table shows that the evidence for a difference in relative risk between the different control interventions is even weaker in the analysis stratified according to the presence or absence of an external endpoint committee than in the overall analysis. In multivariable meta-regression analysis, the relative risk of myocardial infarction continued to be associated with the presence or absence of an external endpoint committee (p for interaction=0.028), but was not associated with the type of control (p=0.78).

A crucial lesson that should be learned from our meta-analysis is that data on adverse events from industry-sponsored randomised trials are trustworthy only if an independent endpoints committee is involved. We are frustrated by Merck's assertion that we should have included trials in patients with Alzheimer's disease; these trials neither met our prespecified inclusion criteria, nor had the data presented on the FDA's website been reviewed by an independent endpoints committee. We included all trials in patients who had chronic musculoskeletal pain, thus reflecting the indications rofecoxib was licensed for, and the patients taking the drug in routine clinical practice. Our inclusion criteria were defined in August, 2003, with no knowledge about cardiovascular outcomes of any rofecoxib trial except VIGOR. We strongly reject Nyberg's statement that, in our analysis, retrospective data manipulation occurred.

Including the data of the three trials in patients with Alzheimer's disease and those from the APPROVe trial in patients with a history of colorectal adenomas, the risk of myocardial infarction is increased in trials with an external endpoint committee (relative risk 2.50, 95% CI 1.26–4.97), but not in trials without such a committee (0.67, 0.32–1.43, p for interaction 0.012). Finally, Maarten Boers suggests that the cardiotoxic effects of rofecoxib might be outweighed by its favourable gastrointestinal safety profile. Data from routine care populations[3,4] suggest, however, that patients using rofecoxib are considerably more likely to have a history of major cardiovascular disease than a history of major gastrointestinal bleeding. The relative risks of myocardial infarction and ulcer complications observed in the trials are therefore unlikely to translate into a favourable benefit-risk ratio in clinical practice: the estimated number needed to treat (NNT) for 1 year to cause one myocardial infarction is 70 patients[3] whereas the NNT to avoid one hospitalisation for peptic ulcer disease is 157.[4] We stand by our conclusions that based on our cumulative meta-analysis withdrawal of rofecoxib would have been appropriate several years ago. Sadly, at that time Merck's press release was entitled "Merck reconfirms favorable cardiovascular safety of Vioxx".[5]

*Peter Jüni, Stephan Reichenbach, Paul A Dieppe, *Matthias Egger*
egger@ispm.unibe.ch

*Department of Social and Preventive Medicine, University of Berne, Finkenhubelweg 11, 3012 Berne, Switzerland (PJ, SR, ME); and MRC Health Services Research Collaboration, Department of Social Medicine, University of Bristol, Bristol, UK (PJ, SR, PAD, ME)

1   Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis. N Engl J Med 2000; 343: 1520–28.
2   Jüni P, Dieppe P, Egger M. Risk of myocardial infarction associated with selective COX-2 inhibitors: questions remain. Arch Intern Med 2002; 162: 2639–40.
3   Ray WA, Stein CM, Daugherty JR, Hall K, Arbogast PG, Griffin MR. COX-2 selective non-steroidal anti-inflammatory drugs and risk of serious coronary heart disease. Lancet 2002; 360: 1071–3.
4   Smalley WE, Ray WA, Daugherty JR, Griffin MR. Nonsteroidal anti-inflammatory drugs and the incidence of hospitalizations for peptic ulcer disease in elderly persons. Am J Epidemiol 1995; 141: 539–45.
5   Merck reconfirms favorable cardiovascular safety of Vioxx. Whitehouse Station: Merck, 2001.

Merck has withdrawn rofecoxib (Vioxx) worldwide because, in a placebo-controlled trial for colon cancer progression, its use was associated with an increased incidence of thromboembolic events

Correspondence

# Correspondence

(Oct 9, p 1287).[1] As early as 1997[2] (before the clinical introduction of COX-2 inhibitors) we suggested that COX-2 was expressed at sites of vascular inflammation in blood vessels and the heart, and that it produces cardioprotective prostacyclin. We predicted that highly selective COX-2 inhibitors would lower protective prostacyclin in areas of vascular disease, such as atherosclerotic plaques, and could precipitate thromboembolic events.[2,3] Our fears were confirmed in 2000, when the first clinical trial of rofecoxib (VIGOR)[4] showed that in patients with arthritis more heart attacks or strokes arose in the rofecoxib group than in the comparator naproxen group. We suggested that this result was due to an active effect of rofecoxib. However, Merck explained the increased cardiovascular events as a "lack of anti-platelet effect"[4] of rofecoxib compared with naproxen. Those of us predicting cardiovascular side-effects of COX-2 inhibitors have seemingly been proven correct.

The important question now is will all COX-2 selective inhibitors cause cardiovascular side-effects in all patients? Before we can answer this question we must first understand the roles of COX-1 and COX-2 in the generation of prostacyclin in particular populations. We postulated that COX-2 regulates prostacyclin production at sites of inflammation. Furthermore, results of studies by Garrett FitzGerald and others[4] indicate that celecoxib and rofecoxib reduce urinary prostacyclin markers by about 50%. These findings do not, however, indicate that COX-2 predominates in the circulation. Indeed, in blood vessels, COX-1 is abundantly expressed and COX-2 sparse.[4] Preliminary data[5] show that in vessels from patients undergoing coronary artery bypass surgery, where cardiovascular disease is the obvious cause for treatment, there is no evidence of COX-2 protein but COX-1 is present and active.

We simply do not know enough about how COX-1 and COX-2 are expressed and regulated in blood and vessels. Without this information, we cannot say how rofecoxib is inducing cardiovascular events. As to whether or not other highly selective COX-2 inhibitors will cause thromboembolic events, the evidence from most large trials and observational databases have been interpreted different ways.[4] However, since COX-2 expression is clearly linked with blood vessel disease and inflammation, then if patients with cardiovascular disease continue to be excluded from trials such restrictions should also apply to the general patient population.

*Jane A Mitchell, Timothy D Warner
j.a.mitchell@ic.ac.uk

*Unit of Critical Care Medicine, National Heart and Lung Institute, London SW3 6LY, UK (JAM); and William Harvey Research Institute, St Barts and the London Medical School, London, UK (TDW)

1   The Lancet. Vioxx: an unequal partnership between safety and efficacy. Lancet 2004; 364: 1287–88.
2   Bishop-Bailey D, Pepper JR, Haddad EB, Newton R, Larkin SW, Mitchell JA. Induction of cyclooxygenase-2 in human saphenous vein and internal mammary artery. Arterio Thromb Vasc Biol 1997; 17: 1644–48.
3   Mitchell JA, Evans TW. Cyclo-oxygenase-2 as a therapeutic target. Inflammation Research 1998; 47: S88–92.
4   Warner TD, Mitchell JA. Cyclooxygenases: new forms, new inhibitors, and lessons from the clinic. FASEB J 2004; 18: 790–804.
5   Lucas R, Warner TD, Vojnovic I, Hassan K, Pepper JR, Mitchell JA. Expression of COX-1, COX-2 and COX-3 – like immunoreactivity in human blood vessels and heart. http://www.pa2online.org/scripts/wrapper.asp?html=search Vol1Issue4 (accessed Nov 30, 2004).

As a medical practitioner for nearly 30 years I have watched from the sidelines public-health scares about a range of pharmaceuticals—benzodiazepines, oral contraceptive pills, hormone replacement therapy, thioridazine, etc—that have led to sudden large changes in drug use. Last week's withdrawal of rofecoxib has allowed me to experience the issues from the user's side. I have been taking this non-steroidal for about 3 years to deal with the residual complications of an autoimmune arthritis contracted nearly a decade ago. I graduated to rofecoxib after several years of chronic indigestion on naprosyn and a few more years on nabumetone, during which I still had to avoid some foods. On rofecoxib I was able to eat normally for the first time since the start of the illness, with good relief of joint pain and stiffness on 25 mg daily.

So what now? Obviously I have to stop at some stage, since my supplies will soon run out. But, should I stop at once to reduce the cardiovascular disease risk, or slowly exhaust supplies while deciding what alternative to take? What are the risks of taking even a single further tablet? I do a "back of the envelope" calculation and estimate that an excess of cardiovascular disease events of three per 400 patient years translates to about a one in $10^5$ risk per tablet. And how does this figure compare with the risks of a stopping if there is a withdrawal reaction? These issues are complicated by the uncertainties over the cardiovascular disease risk of the COX-2 inhibitors as a class, compared with the potential dangers of chronic indigestion if I use another class of NSAIDs—will I be at risk of gastrointestinal bleeding and at more risk of oesophageal trauma leading to carcinoma?

Maybe too much learning is a dangerous thing and the non-medical user will have fewer issues than I do, but for the first time I can truly understand the problems of drug withdrawal from the side of the patient, and they are not trivial. At least in this instance the decision to stop was made by the company and not the CSM, so I have been saved the other anguish of needing to contribute to the decision on the relative risks of withdrawing a drug or not.

David J Nutt
David.J.Nutt@bristol.ac.uk

The University of Bristol, Psychopharmacology Unit, Dorothy Hodgkin Building, Bristol BS1 3NY, UK

1   The Lancet. Vioxx: an unequal partnership between safety and efficacy. Lancet 2004; 364: 1287–88.

## Department of Error

Ezzati M, Vander Hoorn S, Rodgers A, et al. Estimates of global and regional potential health gains from reducing multiple major risk factors. Lancet 2003; 362: 271–80—In this Article (July 26) in table 5, row 1 (Ischaemic heart disease), fourth column (Contributing risk factors), the figure for alcohol should be –0·2%.