## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Vioxx<br>**PRODUCTS LIABILITY LITIGATION** | **MDL DOCKET NO. 1657** |
| | Section L |
| THIS DOCUMENT RELATES TO:<br>Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v.<br>MERCK & CO., INC. | Mag. Judge Knowles |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF DR. DONALD DAVID

### (EXPERT CHALLENGE NO. 5)

**TO THE HONORABLE JUDGE ELDON FALLON:**

Plaintiff Charles Laron Mason files this Memorandum in Support of Motion to Exclude Testimony of Dr. Donald David, and in support thereof shows:

## I.
## INTRODUCTION

Merck & Co., Inc. ("Merck") has designated Donald David, M.D. ("Dr. David") as a gastroenterology expert. Plaintiff does not challenge Dr. David's opinions in the field of gastroenterology. However, Dr. David purports to offer opinions that venture well beyond his area of expertise. Dr. David's testimony demonstrates that he is not qualified to offer such opinions and/or his opinions are not based on reliable scientific data. Even if the Court concludes otherwise, the challenged opinions are duplicative of the opinions offered by Merck designated cardiologists and biostatistician and, therefore, should be excluded.

## II.
## BRIEF STATEMENT OF THE FACTS

This action for personal injuries arises from Plaintiff, Charles Mason's use of Vioxx, which Plaintiff contends caused a heart attack on July 25, 2003. Mr. Mason was 59 years old when his nurse practitioner prescribed him Vioxx in September 2002. He had been taking the drug for approximately ten (10) months at the time of his heart attack. It is Plaintiff's contention that his heart attack was caused by a clot in one of his coronary arteries which resulted from a plaque rupture as well as the acceleration of atherogenesis due to Vioxx use.

## III.
## LEGAL STANDARD

The legal standard for the admission of expert testimony in federal court is set forth at pages 4-6 of the Memorandum in Support of the Motion To Exclude Argument Or Opinion Testimony That An Increased Risk Of Heart Attack Exists Only After 18 Months Of Vioxx Use, filed on September 19, 2006 and incorporated herein by reference.

## IV.
## ARGUMENT

**A.    AS A GASTROENTEROLOGIST, DR. DAVID MAY TESTIFY ABOUT GASTROINTESTINAL ISSUES, BUT HE MAY NOT OFFER OPINIONS THE VENTURE BEYOND HIS EXPERTISE.**

Dr. David is a gastroenterologist.[1] Yet Dr. David purports to offer expert opinion testimony on the following topics:

- Interpretation of cardiovascular data from Vioxx clinical trials (VIGOR, ADVANTAGE, Protocol 085, Protocol 090, APPROVe, VICTOR, ViP, the Alzheimer's studies),[2] observational studies (Mamdani, Bannwarth, Solomon,

---

[1] *See* Report of Donald S. David, M.D. ("David Rep."), p. 1, attached hereto as Exhibit A; *see also* Deposition of Donald S. David, M.D. ("David Dep."), 44:19-45:4, attached hereto as Exhibit B.

[2] *See* David Rep., pp. 7-12. This topic is covered at length by Merck's cardiology experts, Dr. Michael Rothkopf (Rothkopf Report, pp. 3-8) and Dr. Craig Pratt (Pratt Report, pp. 3-5), and by Merck's biostatistician, KyungMann Kim, Ph.D. (Kim Report, pp. 12-28). Due to the volume of Merck's expert reports, Plaintiff is not attaching the reports as exhibits with the exception of the report of Dr. David. Should the Court wish to review the referenced reports, Plaintiff will supplement this motion with those

Levesque, Hippisley-Cox and Coupland, Helin-Salmivaara),[3] and pooled analyses (Konstam, Weir);[4]

- The alleged cardioprotective effect of naproxen;[5]

- Conclusions of the FDA and the alleged "class effect" of all NSAIDs (excluding naproxen);[6]

- Cardiovascular risk based on duration of Vioxx use;[7] and

- Risk-benefit analysis of Vioxx.[8]

1. **Testimony/Opinions Regarding Cardiovascular Data From Vioxx Clinical Trials, Observational Studies and Pooled Analyses**

Rule 702 requires exclusion of testimony beyond a witness's area of expertise. *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998). Dr. David is not a cardiologist.[9] He has not conducted any research or authored any literature in the field of cardiology.[10] Although Dr. David teaches on the topics of internal medicine and gastroenterology, he is not involved in the teaching of medical students on cardiology rotation, cardiology residents or fellows.[11]

Dr. David does not have any training in pharmacology (beyond medical school),[12]

---

reports.
[3] David Rep., pp. 14-15.  This topic is also covered by Dr. Rothkopf (Rothkopf Report, pp. 8-13) and Dr. Kim (Kim Report, pp. 28-34).
[4] *See* David Rep., pp. 12-13.  This topic is covered at length by Dr. Kim (Kim Report, pp. 17-20), Dr. Pratt (Pratt Report, p. 3) and Dr. Rothkopf (pp. 5-6).
[5] *See* David Rep., p. 8.  This topic is also covered by Dr. Rothkopf (Rothkopf Report, pp. 4-5) and Dr. Pratt (Pratt Report, p. 4).
[6] *See* David Rep., pp. 12-14.  This topic is covered by Merck's regulatory expert, Janet Arrowsmith-Lowe (Arrowsmith-Lowe Report, p. 14), Dr. Pratt (Pratt Report, p. 5), and Dr. Rothkopf (Rothkopf Report, pp. 13-14).
[7] *See* David Rep., p. 10.  This topic is also covered by Dr. Kim (Kim Report, pp. 24-25), Dr. Rothkopf (Rothkopf Report, pp. 7-10), and Dr. Pratt (Pratt Report, p. 4).
[8] *See* David Rep., pp. 15-16.
[9] *See* David Dep., 46:15-17.
[10] *See id.* at 47:24-48:3.
[11] *See id.* at 50:16-24.
[12] *See id.* at 50:25-51:3.

epidemiology or biostatistics,[13] yet he offers several opinions that venture into these fields. For example, Dr. David's report is replete with his interpretation of cardiovascular data and statistics from the clinical trials of Vioxx. Below are just a few examples:

- "There was not significant difference in the number of thrombotic cardiovascular events observed in the [ADVANTAGE] trial";[14]

- "Similar rates of thrombotic cardiovascular events were reported with rofecoxib, placebo and comparative nonselective NSAIDs (naproxen was not studied) [from a group of 8 phase IIb/III trials]";[15]

- "The APPROVe trial was the first randomized-controlled trial that showed a potential association between rofecoxib and an increased risk of cardiovascular events. This was a relatively weak association in one study in a specific patient population."[16]

- "Overall, there was no significant difference in the occurrence of serious cardiovascular events in the rofecoxib-treated group versus placebo (RR=0.84) or the use of non-naproxen NSAIDs (RR=0.79). There was, however, a higher risk of cardiovascular events when comparing rofecoxib to naproxen (RR=1.69)." (Dr. David's interpretation of the Konstam pooled analysis);[17] and

- "There was no increased risk of MI in any of the NSAID-treated subsets." (Dr. David's interpretation of the Mamdani observation study).[18]

Dr. David had no involvement in the Vioxx clinical trials.[19] He has not attended programs or given presentations on Vioxx.[20] He has not authored articles (peer-reviewed or non-peer-reviewed) on Vioxx.[21] Prior to being retained by Merck in September 2005 to serve as an expert in this case, Dr. David's "Vioxx file" consisted only of the VIGOR, "probably"

---

[13] *See* David Dep., 51:4-6; 108:9-10.
[14] David Rep., p. 9.
[15] *Id.*
[16] *Id.* at p. 10.
[17] *Id.* at pp. 12-13.
[18] *Id.* at p. 14.
[19] *See* David Dep., 31:8-11.
[20] *See id.* at 31:12-32:8; 52:25-54:3.
[21] *See id.* at 52:10-15; 54:4-6.

APPROVe and ADVANTAGE and "a few polyp studies."[22]

Dr. David is simply not qualified to interpret and opine on cardiovascular data from clinical trials, observational studies or pooled analyses related to Vioxx or other NSAIDs. Because such opinions far exceed his field of expertise, Dr. David should be precluded from offering these opinions at trial.

### 2.   Alleged Cardioprotective Effect of Naproxen

Dr. David opines that naproxen is cardioprotective.[23]  As discussed above, Dr. David is not qualified to render such an opinion.  Additionally, Dr. David has not conducted any research to verify his opinion.[24]  He acknowledges there are no prospective placebo-controlled trials demonstrating that naproxen is cardioprotective.[25] He is not aware of whether the manufacturer of naproxen claims that it is cardioprotective[26] (which it does not).  Dr. David initially testified that he did not prescribe naproxen for its cardioprotective properties;[27] however, he changed his testimony stating that he began switching patients from ibuprofen to naproxen for its cardioprotective effects *after he became involved in the Vioxx litigation.*[28]

Notably, Dr. David's opinion that naproxen is cardioprotective contradicts the opinion of Merck's cardiology expert, Dr. Craig Pratt, who previously testified as follows:

> Q.   We can agree today that it is not established that Naproxen is cardioprotective, correct?
> A.   I think that's perfectly put.
> Q.   And in 2000 and 2001, it was not established that Naproxen was cardioprotective, correct?
> A.   If it's not established now, it probably wasn't established then.[29]

---

[22] *See* David Dep., at 32:9-23.
[23] *See* David Rep., p. 8; *see also* David Dep., 85:6-8.
[24] *See* David Dep., 85:9-16; 86:14-18.
[25] *See id.* at 92:14-19.
[26] *See id.* at 92:22-25.
[27] *See id.* at 85:17-24; 86:8-13.
[28] *See id.* at 114:19-115:23.
[29] Deposition of Craig Pratt, M.D. taken on October 14, 2005, 71:21-72:2, attached hereto as Exhibit C.

\* \* \*

Q.    Okay.  You're somebody who gives more weight top placebo controlled double blinded randomized studies, correct?

A.    I hope every doctor does.

Q.    Okay.  There wasn't one back in 2000 or 2001 that showed that Naproxen was cardioprotective, correct?

A.    Well, we've already talked in every way that neither then or now has there been – then or now has there been any placebo controlled trial that has evaluated the ability of Naproxen to reduce cardiovascular events.

\* \* \*

Q.    Have you ever prescribed naproxen to a patient for primary cardioprotection.

A.    Oh, no.

Q.    Why not?

A.    Because its not established.  We agree on that.[30]

In addition to being unqualified to offer the opinion that naproxen is cardioprotective, Dr. David's opinion is not based on "sufficient facts or data."  FED.R.EVID. 702.  If the proponent of evidence proves that the offered testimony is within the expert's field of expertise, the proponent must then establish that the testimony to be offered is based on sufficient facts or data and must "demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable."  *Moore v. Ashland Chemical*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

Prior to being retained as an expert, the only studies reviewed by Dr. David that he claims support his opinion were VIGOR, Konstam, APPROVe and ADVANTAGE, all of which he acknowledges are not "naproxen studies."[31]  When questioned further, Dr. David conceded that the APPROVe study actually compared Vioxx with placebo – *not* naproxen.[32]  Thus, the APPROVe study offers no support for the "naproxen theory."  Dr. David's initial belief to the

---

[30] Exhibit C, 73:25-74:4.
[31] *See* David Dep., 87:15-88:13; 91:15-92:13.
[32] *See id.* at 90:18-24.

contrary illustrates his unfamiliarity with the scientific literature regarding Vioxx and naproxen.

Dr. David also testified, incorrectly, that there was no difference in the number of cardiovascular

events between Vioxx and naproxen in the ADVANTAGE study.   Specifically, Dr. David

testified:

> Q.   Okay.  And do you believe that ADVANTAGE stands for the proposition that naproxen is cardioprotective?
> A.   I think what ADVANTAGE stands for is that Vioxx was not, did not engender an increased risk for cardiovascular events.
> Q.   When compared to naproxen?
> A.   When compared to naproxen which is what the study is.
> Q.   That would indicate that the naproxen is not cardioprotective, wouldn't it?
> MR. YOO:  Objection to form, argumentative.
> A.   It would indicate there was no difference in that particular study, in the one study.[33]

Dr. David further testified that he "thinks" the Merck-funded Konstam pooled analysis

supports his opinion.  However, the Konstam article was authored by two Merck consultants and

five Merck employees.[34]   Such data can hardly be considered objective.   Furthermore, the

authors of the article concluded that the examined data "suggest, *but are insufficient to ascertain,*

the cardioprotective benefits of naproxen."[35]

An expert, at a minimum, must understand and explain how the scientific literature

applies to the facts of the case and supports the expert's opinions.  *Daubert*, 509 U.S. at 591-593

(scientific testimony is relevant only if the expert's reasoning can be applied to the facts at

issue); *Moore*, 151 F.3d at 278 (upholding exclusion of expert who failed to explain why article

involving level and duration of exposure greater than plaintiff's was helpful in forming causation

opinion).  Dr. David's lack of understanding of naproxen related studies is evidenced by his own

---

[33] David Dep., 90:25-91:14.  The ADVANTAGE study actually saw five myocardial infarctions, two anginal events and three sudden deaths in the Vioxx group verses one myocardial infarction and two anginal events in the naproxen group.

[34] Konstam MA, et al., *Cardiovascular thrombotic events in controlled, clinical trials of rofecoxib.* CIRCULATION 2001; 104(19):2280-8, attached hereto as Exhibit D.

[35] *Id.* at 2287.

words: "I don't know if naproxen is included in all of the studies, I don't remember, 23 studies or whatever are in it."[36]  As his testimony demonstrates, Dr. David lacks a basic understanding of the pertinent scientific literature concerning the proffered "naproxen theory."   Accordingly, Dr. David does not posses the required ability to explain how this literature forms the basis of his opinion that naproxen is cardioprotective – an opinion that Merck's own cardiologist has rejected.   Therefore, the Court should preclude Dr. David from offering the opinion that naproxen is cardioprotective.  *See* December 3, 2004 Order, *Plunkett v. Merck*, p. 6 ("In his deposition, Dr. Baldwin displayed a fundamental lack of understanding of the relevant scientific literature . . . . [H]is reliance on the relevant scientific literature was completely undermined by his inability to firmly understand this literature.").

### 3.   Results of Pooled Analyses and FDA Conclusions Regarding "Class Effect" of NSAIDs (Except Naproxen)

Dr. David testified that if there is an increased cardiovascular risk with the use of NSAIDs, the risk applies to all NSAIDs with the exception of naproxen.[37]  As discussed above, Dr. David is not qualified to offer such an opinion.  Furthermore, the available scientific data and analyses do not support Dr. David's opinion.  This issue is addressed in Plaintiff's Motion to Exclude Opinion Testimony that Vioxx is the same as All NSAIDs Regarding Cardiotoxic Effects, which Plaintiff incorporates herein by reference.  In that motion, two recently published peer-reviewed opinions which dismiss the "class effect" theory are described at length.[38]  **Although aware of their existence, Dr. David chose not to review these studies before his**

---

[36] David Dep., 89:2-4.
[37] *See id.* at 110:6-111:9.
[38] Zhang JJ, Ding EL, Song Y. *Adverse Effects of Cyclooxygenase 2 Inhibitors on Renal and Arrhythmia Events: Meta-analysis of Randomized Trials*, JAMA 2006; 296:13, and McGettigan, P, Henry, D, *Cardiovascular Risks and Inhibition of Cyclooxygenase: A Systematic Review of the Observational Studies of Selective and Nonselective Inhibitors of Cyclooxygenase 2*, JAMA 2006;296:13.

**deposition**.[39]  His failure to familiarize himself with the pertinent scientific literature addressing this subject matter is further evidence that Dr. David is not qualified and has not performed the requisite analysis of the available scientific literature to render an opinion that clearly falls outside of his area of expertise.  Therefore, the Court should preclude Dr. David from opining that naproxen is cardioprotective.

### 4.   Cardiovascular Risk Based on Duration of Vioxx Use

Dr. David opines as follows:  "The risk of significant cardiovascular events that was observed in the [APPROVe] study was approximately two-fold higher for the group that received rofecoxib versus the group that received placebo; however, the difference between the groups did not appear until after 18 months of continuous use."[40]  As previously discussed, Dr. David is not qualified to offer testimony that falls within the areas of cardiology and biostatistics. Furthermore, the available scientific data and analyses do not support Dr. David's opinion.  This issue is addressed in Plaintiff's Motion To Exclude Argument Or Opinion Testimony To The Effect That An Increased Risk Of Heart Attack Exists Only After 18 Months Of Vioxx Use, which Plaintiff incorporates herein by reference.  Therefore, the Court should preclude Dr. David from offering the opinion that the risk cardiovascular risks does not present until more than 18 months of Vioxx use.

### 5.   Risk-Benefit Analysis of Vioxx

In his report Dr. David concludes that "the benefit of rofecoxib, particularly when viewed in light of its unquestioned efficacy in the treatment of serious pain and inflammation and its impressive gastrointestinal safety record, far outweighs any potential risk."[41]  This conclusion appears to be based on the following: (1) Dr. David's clinical practice; (2) Dr. David's

---

[39] *See* David Dep., 93:15-94:24.
[40] David Rep., p. 10.
[41] *Id.* at p. 17.

experience as a member of the Pharmacy and Therapeutics Committee at the City of Hope hospital; and (3) clinical trial data.[42]

While Dr. David may be capable of performing an *individual* risk-benefit analysis for his patients, he is not qualified to opine that Vioxx *generally* does not pose a cardiovascular risk to persons who took Vioxx. Dr. David has never served on an FDA Advisory Board or been consulted by the FDA about drug safety issues.[43] He has never been asked by the FDA to perform a risk-benefit analysis.[44] Dr. David does not have any experience from either a health policy standpoint or a regulatory standpoint in making risk-benefit decisions with respect to putting a drug on a market or withdrawing it from the market.[45] Therefore, he lacks the experience, training and knowledge to opine that Vioxx was safe and effective for use by the general public.

Although Dr. David believes he spoke with colleagues about Vioxx while it was on the market, their discussions were limited primarily to their thoughts on Vioxx from a gastrointestinal standpoint – not a cardiology standpoint.[46] Despite Dr. David's clear lack of experience with Vioxx from a cardiovascular standpoint, he opines that Vioxx is safe for use by elderly patients,[47] and that he would prescribe Vioxx to his patients, even those with cardiovascular risk factors, if it were still on the market.[48] What is particularly alarming about this testimony is that Merck's own *cardiologist* acknowledges a cardiovascular risk associated with Vioxx after 18 months of use.[49] Dr. David's blind disregard for this risk provides further

---

[42] *See* David Rep., pp. 15-17.
[43] *See* David Dep., 51:9-15; 109:13-15.
[44] *See id.* at 51:16-18; 109:16-18.
[45] *See id.* at 107:23-108:10.
[46] *See id.* at 103:24-104:10.
[47] *See id.* at 82:12-18.
[48] *See id.* at 109:19-110:2.
[49] *See* Rothkopf Report, p. 14 ("*Although it is virtually impossible to rule out a small, but finite*

grounds for exclusion of his opinion that Vioxx is safe from a cardiovascular standpoint.

Dr. David has also made certain definitive statements for which he has failed to provide any support.  For example, Dr. David states that he has never witnessed a *single* occurrence of an ulcer or GI bleed or a *single* cardiovascular event in his patients who were treated with Vioxx.[50]  Due to the precise nature of this statement and the probable effect it will have on the jury, Plaintiff requested all documents supporting this statement including the *redacted* medical records of Dr. David's patients who were treated with Vioxx.[51]  Unfortunately, Dr. David did not comply with the subpoena.[52]  As such, there is no documented support for Dr. David's sweeping conclusion.

Dr. David's deposition did not provide any clarification or support.  Dr. David estimated that in any given year between 1999 and 2004, he would begin approximately 100 new patients

---

*cardiovascular risk attributed to long-term rofecoxib treatment*, as discussed here, it is important to emphasize that thousands of patients have been treated with this drug safely and with clinical benefit, and any such long-term risk is likely to be a class effect of all NSAIDs.") (emphasis added).

[50] David Rep., pp. 15-16.

[51] *See* Amended Notice of Oral Deposition of Donald S. David, M.D., attached hereto as Exhibit E.  The subpoena duces tecum that accompanied Dr. David's deposition notice requested:

> All documents which support the following opinions which can be found on pages 15-16 of Dr. David's August 25, 2006 report:
>
> "Since the introduction of COX-2 selective NSAIDs, and specifically after the addition of rofecoxib to our hospital formulary in 2001, I have noted a dramatic reduction in both the number and severity of serious gastrointestinal complications associated with NSAIDs.  In fact, I do not recall seeing a single occurrence of a peptic ulcer or a significant gastrointestinal bleed in a patient treated with rofecoxib.  Additionally, the gastrointestinal tolerability of rofecoxib was significantly better, in my clinical experience, than that of traditional NSAIDs.  Patients who were previously unable to tolerate traditional NSAIDs because of gastrointestinal intolerance were able to tolerate rofecoxib without a problem.  The efficacy of rofecoxib as a pain-reliever was impressive, and many patients found that this was the most effective pain medication that they had used.  I have not seen a single case of a cardiovascular complication associated with rofecoxib use in my clinical practice.  Based on my review of the scientific literature and my own clinical experience I have concluded that rofecoxib was safe both from a gastrointestinal and cardiovascular standpoint."
>
> This request includes all information, including medical records, pertaining to patients who were treated with Vioxx

[52] *See* David Dep., 10:20-11:22.

on Vioxx.[53]  He *guesses* that five to ten of his estimated 500 patients he saw between 1999 and 2004 suffered heart attacks.[54]  Conveniently, he has no memory of the patients who suffered these heart attacks.[55]  He also *guesses* that he saw more than 100 cases per year of ulcers or bleeds in his patients between 1999 and 2004.[56]  **Dr. David admits that he has not reviewed any medical records to determine whether any of his patients suffered cardiovascular events, ulcers or GI bleeds *while taking Vioxx*.[57]  Further, Dr. David agrees that his memory of the problems that his patients may or may not have suffered while on Vioxx is purely anecdotal.[58]**  The data supporting Dr. David's statement that he did not see a single cardiovascular event of GI complication in any of the patients he treated who took Vioxx is speculative at best.  As such, the Court should preclude Dr. David from offering such testimony.

Dr. David also bases his risk-benefit analysis on his experience as a member of the Pharmacy and Therapeutics Committee at the City of Hope hospital and that committee's conclusion that Vioxx was safe and effective.[59]  Plaintiff requested supportive documentation.[60]  Dr. David again did not provide the requested documents.[61]  Further, at the direction of the attorney for the City of Hope hospital, Dr. David refused to answer any questions related to his service on the Pharmacy and Therapeutics committee or the decisions made by the committee.[62]  Merck stipulated that Dr. David would not rely on his experience with the Pharmacy and

---

[53] *See id.* at 61:8-62:2.
[54] *See id.* at 64:22-66:1
[55] *See id.* at 66:2-6.
[56] *See* David Dep., 69:3-8.
[57] *See id.* at 62:3-23; 63:16-21.
[58] *See id.* at 69:17-23.
[59] *See* David Rep., p. 16.
[60] *See* Exhibit E ("All documents relating to the risk/benefit analysis performed by Dr. David and the other members of the Pharmacy and Therapeutics committee at the City of Hope in 2001 or any other year related to Vioxx").
[61] *See* David Dep., 11:1-22.
[62] *See id.* at 12:15-24:24.

Therapeutics committee or decisions made by the committee for trial purposes.[63]

In sum, although Dr. David may be capable of testifying about the *individual* risk-benefit analysis he performed as a prescribing physician, he should be precluded from offering testimony that Vioxx is safe and effective for use by the general public because he has no experience with public health or drug safety issues.  Dr. David should also be precluded from testifying that he has never witnessed a *single* occurrence of an ulcer or GI bleed or a *single* cardiovascular event in his patients who were treated with Vioxx because such testimony is not supported by reliable data, but rather is anecdotal and based on pure speculation.

**B.     DR. DAVID'S OPINIONS ARE DUPLICATIVE OF THOSE RENDERED BY MERCK'S OTHER EXPERTS.**

Dr. David's interpretation of cardiovascular data from Vioxx clinical trials, observational studies and pooled analysis, and his opinions regarding the alleged cardioprotective effect of naproxen, the purported class effect of all NSAIDs, and cardiovascular risk based on duration of Vioxx use are merely duplicative of the opinions offered by Merck's other experts, KyungMann Kim, Ph.D., Michael Rothkopf, M.D., and Craig Pratt, M.D.[64]  Therefore, those opinions should be excluded.

**V.**
**CONCLUSION**

For the reasons stated above, Plaintiff respectfully requests the Court grant its Motion to Exclude the Testimony of Dr. Donald David.

---

[63] *See* David Dep., 25:4-26:25.
[64] *See* footnotes 2-7.

Date:  September 25, 2006                  Respectfully submitted,


_____
Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| | |
|---|---|
| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL  36103-4160<br>PH:  (800) 898-2034<br>FAX:  (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY  10004<br>PH:  (212) 584-0700<br>FAX:  (212) 584-0799 |
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA  70013<br>PH:  (504) 581-4892<br>FAX:  (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum has been served on Liaison Counsel Phillip Wittmann, Shayna S. Cook and Richard Krumholz by U.S. Mail, facsimile and/or e-mail; and e-mail upon all parties by electronically uploading the same to Lexis-Nexis File and Serve Advanced, in accordance with Pretrial Order No. 9, on this 25th day of September, 2006.

Phillip Wittmann
Stone, Pigman Walther, Wittmann, LLC
546 Carondelet Street
New Orleans, LA  70130-3588
Phone:  (504) 581-3200
Fax:  (504) 581-3361

Shayna S. Cook
Bartlit, Beck, Herman, Palechar & Scott
Courthouse Place
54 West Hubbard Street
Chicago, IL  60610
Phone: (312) 494-4400
Fax:  (312) 494-4440

Richard Krumholz
Fulbright & Jaworski
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784
Phone: (214) 855-8000
Fax: (214) 855-8200

Holly M. Wheeler