# Exhibit B

[1: 1] – [1:25]          9/15/06          David, Donald S., M.D. (Mason)

Page 1
1   IN THE UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA
3
4   _____
                          ) MDL DOCKET NO. 1657
5   In Re: Vioxx          )
                          ) Section L
6  PRODUCTS LIABILITY          )
   LITIGATION          )
7                     )
   THIS DOCUMENT RELATES TO:  )
8   CHARLES LARON MASON v.   )
   MERCK & CO., INC.          )
9   _____)
10
11          DEPOSITION OF DONALD S. DAVID, M.D.
12              Los Angeles, California
13              September 15, 2006
14
15
16          Reported By Susan A. Sullivan, CSR No. 3522
                  PRS Job No. 118-346510
17
18
19
20
21
22
23
24
25

[10:20] – [27:1]          9/15/06          David, Donald S., M.D. (Mason)

Page 10
20   Q   BY MR. BLIZZARD:  Attached to the notice is
21  a list of documents that we requested that you bring
22  to the deposition.
23      A   Correct.
24      Q   Did you see that?
25      A   Yes, I did.

Page 11
1     Q  Did you bring those documents?
2     A  They're not in my possession.
3     Q  Which documents did you not bring to the
4  deposition that you say are not in your possession?
5     MR. YOO: Objection to form.
6     THE WITNESS: Should I go ahead and answer?
7     MR. YOO: Yes.
8     THE WITNESS: The documents that I don't have
9  and that I never had are the documents that relate to
10  the City of Hope Pharmacy and Therapeutics Committee
11  in 2001 and then there's a request, sort of a vague
12  request for medical records about patients which I
13  don't have.
14     Q  BY MR. BLIZZARD: So the --
15     A  So Items 6 and 7.
16     Q  The request that asked for City of Hope
17  committee records --
18     A  Right.
19     Q  -- are not in your possession?
20     A  No, and they never were.
21     Q  You have no control over them?
22     A  No, I don't.
23     Q  You are Chief of the medical staff there?
24     A  I am, but I'm not an employee of the
25  hospital and my role is merely -- not merely, but my

Page 12
1  role is taking care of the physician aspects of the
2  care and not the hospital.
3     Q  Right.  You testified about your role as
4  chief of the medical staff in the trial here in Los
5  Angeles, didn't you?
6     A  Yes.
7     MR. YOO: Object to form.
8     Q  BY MR. BLIZZARD: Didn't you?
9     A  Yes, I did.
10     Q  And didn't you say if there were any
11  problems that came up at the hospital, you were there
12  to solve them?
13     MR. YOO: Objection to form.
14     THE WITNESS: I deal with physician issues.
15     Q  BY MR. BLIZZARD: You don't deal with any
16  committee issues?

17     MR. YOO:  Objection to form.

18     MR. JAQUEZ:  Objection.  That question calls for

19  information that is privileged from discovery or

20  admission as evidence under Federal Rule of Evidence

21  501, California Evidence Code Sections 1156, 1156.1

22  and 1157.

23       Dr. David, at this time I would request that

24  you not answer this question or any other question to

25  the extent that your answer or opinion would divulge

Page 13

1  the nature or substance of the records of or

2  proceedings before the Pharmacy and Therapeutic

3  Committee of the City of Hope.

4     MR. BLIZZARD:  Could you read back my question,

5  please.

6       (Record read)

7     MR. BLIZZARD:  Okay.  At this time I'm going to

8  ask that the City of Hope lawyer not interfere with

9  this deposition or we will get Judge Fallon on the

10  phone because you are not a party to this deposition.

11  You are welcome to sit through the deposition, you

12  are not welcome to interfere with it.

13     MR. JAQUEZ:  Counsel is clearly raising

14  questions that are dealing with the Pharmacy and

15  Therapeutics Committee of the City of Hope.  Counsel

16  has subpoenaed these documents from City of Hope

17  directly as well.  This privilege clearly applies and

18  I think we are here and we are valid in asserting

19  these privileges where the rights and privileges of

20  the City of Hope are at stake in this deposition.

21     MR. YOO:  Just for the record, let me say this.

22  Dr. David is not testifying on behalf of the City of

23  Hope, Dr. David is serving as an expert witness.  His

24  testimony involves the fact that he is on staff at

25  the City of Hope but he has not reviewed nor is he

Page 14

1  relying on City of Hope's records.  As he stated, he

2  does not have access or authority regarding the kinds

3  of City of Hope records that have been requested.

4  And in any event, no such documents are in Dr.

5  David's possession and so none have been produced.

6     MR. JAQUEZ:  However, if -- just one

7  clarification on that.  No committee member may be

8   compelled to answer discovery questions that would
9   divulge the nature or substance of the investigative
10   or evaluative work of the committee so it is not just
11   having the documents or records themselves.  But if a
12   question being asked of you would divulge the nature
13   or substance of the records of or the proceedings
14   that were before the Pharmacy and Therapeutics
15   Committee, you don't have to answer.
16       THE WITNESS:  Okay.
17     Q   BY MR. BLIZZARD:  Have you been a member of
18   a Pharmacy and Therapeutics Committee at City of Hope
19   Hospital?
20     A   Yes.
21     Q   For how long?
22     A   13 years.
23     Q   What has been your -- what was your role in
24   that committee between 1999 and 2004?
25       MR. JAQUEZ:  Objection.  Pharmaceutical

Page 15
1   Committee privilege.  I will use that as my standing
2   objection.
3       THE WITNESS:  I was an active participant in the
4   committee.
5     Q   BY MR. BLIZZARD:  Did you ever chair the
6   committee?
7     A   Intermittently as an acting chair.
8       MR. JAQUEZ:  Objection again.
9     Q   BY MR. BLIZZARD:  When you say acting chair,
10   was there a formal chair of the committee?
11     A   Yes.  The chair -- when the chair was absent
12   sometimes I was asked to step in as the chair.
13     Q   Were you ever the formal chair of the
14   committee?
15     A   No.
16       MR. JAQUEZ:  I would like to state the standing
17   objection for all this so I don't have to keep
18   interrupting.
19       MR. BLIZZARD:  Sure you can.  Are you asserting
20   a privilege as to these questions?
21       MR. JAQUEZ:  I'm asserting the privilege on
22   anything dealing with the Pharmacy and Therapeutics
23   Committee of the City of Hope.
24     Q   BY MR. BLIZZARD:  Have you given testimony
25   about the Pharmacy and Therapeutics Committee at City

Page 16
1  of Hope in Los Angeles in a trial involving Vioxx?
2      MR. YOO:  Objection to form.
3      THE WITNESS:  It was mentioned in the way that
4  they asked me about how I came upon my opinions
5  previously about a risk-benefit analysis.
6      Q  BY MR. BLIZZARD:  Did you include
7  information about the activities of the Pharmacy and
8  Therapeutics Committee of City of Hope Hospital in
9  your expert report in this case?
10     MR. YOO:  Objection to form.
11     MR. JAQUEZ:  Objection.  I instruct you not to
12  answer.
13     THE WITNESS:  I won't answer.
14     Q  BY MR. BLIZZARD:  I'm sorry, you are not
15  going to answer it?
16     A  He informed me that I shouldn't answer.
17     Q  I don't know how to proceed.  Your expert
18  report is -- let me just show it to you.
19     A  I have seen it.
20     Q  Okay.  Do you wish to amend it in any way?
21     MR. YOO:  Objection to form.
22        Can we go off the record?
23     MR. BLIZZARD:  No.
24     MR. YOO:  Okay.
25     Q  BY MR. BLIZZARD:  Do you wish to amend your

Page 17
1  expert report?
2      MR. YOO:  Hold on.  Dr. David's expert report is
3  his expert report in this case.  I think the question
4  is argumentative and unintelligible and I'm trying to
5  see if we can resolve these issues, Ed, but the
6  witness can't answer that question.
7      MR. BLIZZARD:  All right.  Let's see if we can
8  get Judge Fallon on the phone.
9      THE REPORTER:  Off the record?
10     MR. BLIZZARD:  Yes.
11        (Recess)
12     Q  BY MR. BLIZZARD:  Doctor, can you turn to
13  Page 16 of your report.
14     A  Yeah, I see it.
15     Q  Okay.  And this section of your report
16  actually begins on Page 15, doesn't it?
17     A  It is entitled "Risk-Benefit Analysis."
18     Q  Yes.  And part of your opinion in this case,

19  as I understand it, that you intend to express is
20  that the benefits of Vioxx outweigh its risks,
21  correct?
22      A   That is definitely my feeling.
23      Q   And within the body of this section of the
24  report you state in one of the paragraphs on Page 16,
25  actually the first full paragraph there, "I first

Page 18
1  performed a risk-benefit analysis on the use of
2  rofecoxib as a member of the Pharmacy and
3  Therapeutics Committee at the City of Hope in 2001,"
4  correct?
5      A   Correct.
6      Q   Do you wish to withdraw that sentence?
7      MR. YOO:  Objection to form.
8      THE WITNESS:  The truth is I did that.
9      Q   BY MR. BLIZZARD:  Okay.  So is it a basis
10  for your opinion that the risks of Vioxx are
11  outweighed by the benefits?
12      A   No, it is not.
13      Q   So the next sentence says, "It was my
14  conclusion and the conclusion of the other committee
15  members at the time that rofecoxib was safe and
16  effective and would be a useful addition to the
17  hospital formulary," correct?
18      A   That's my feeling, yes.
19      Q   And do you wish to withdraw that sentence
20  from your report?
21      MR. YOO:  Objection to form.
22      THE WITNESS:  Am I going to be -- I don't
23  understand.
24      MR. YOO:  Let's go off the record briefly,
25  please.  Let's step outside.

Page 19
1      (Recess)
2      Q   BY MR. BLIZZARD:  I don't want to inquire
3  about your conversation with counsel for City of
4  Hope, but what conversation did you have with Merck
5  counsel out in the hallway?
6      A   I asked him what it was that you were asking
7  me, to clarify the question for me.
8      Q   Okay.  And what were you told?
9      A   That he wasn't exactly sure that -- it
10  sounded as though these were legal matters and he

11  wasn't sure exactly what you were getting at as far
12  as I was concerned.
13      I will be happy to make a statement if you
14  would let me, a statement about why I inserted this
15  information and how I relied on it or didn't rely on
16  it.
17    Q  Sure, you can make a statement if you want.
18    A  Okay.  The reason that it is there is that
19  for purposes of doing a risk-benefit analysis I had
20  been asked before is the work you have done solely
21  for this trial or have you ever in your career had
22  chances to look at it or were your opinions based
23  solely upon being retained.  And the purpose of
24  putting it this there is to indicate that this is not
25  a new opinion for me, it is not done just in regards

Page 20
1   to this trial, but this is the information I had
2   before.  I don't rely on it for any opinions I have,
3   it is just a matter of fact this occurred, and that
4   was the first time that I had a chance to look at it.
5   It is just to indicate that I'm not doing this now
6   just for the purposes of this trial, that I had
7   acquaintance with it before.
8     Q  All right.  So your position is that you and
9   the committee did a risk-benefit analysis back in
10  2001.
11      MR. YOO:  Object to form.
12      THE WITNESS:  Again, I can't comment on the
13  committee.
14    Q  BY MR. BLIZZARD:  Okay.  Did you do a
15  risk-benefit analysis as part of your committee work?
16      MR. JAQUEZ:  Objection.
17      THE WITNESS:  I do risk-benefit analyses every
18  day when I prescribe things to patients.
19    Q  BY MR. BLIZZARD:  I understand.
20      You do a risk-benefit analysis that's
21  individualized to the patient, correct?
22    A  Right.
23    Q  Would you call a decision to put a drug on a
24  formulary a risk-benefit analysis?
25    A  Again, I don't think that's something I can

Page 21
1   answer.
2     MR. JAQUEZ:  Objection.

3     Q  BY MR. BLIZZARD:  Well, were there any cost
4   issues involved in the decision to put Vioxx
5   exclusively on the formulary as the only COX-2 --
6     MR. JAQUEZ:  Objection again.
7     THE WITNESS:  Again, you are asking about
8   personal matters for the hospital.
9     Q  BY MR. BLIZZARD:  Are you refusing to answer
10  the question?
11    A  Yes.
12    Q  Merck documents indicate that they were
13  offering substantial discounts, 97 percent discounts
14  for hospitals that would put their product, Vioxx, on
15  the formulary as the exclusive COX-2, are you aware
16  of that?
17    MR. JAQUEZ:  Standing objection again.
18  Objection as to form.
19    THE WITNESS:  I will answer the question.  I'm
20  not aware of that.
21    Q  BY MR. BLIZZARD:  You are not?
22    A  No.  We are aware of the cost issues and
23  they are definitely figured in.
24    Q  So cost issues are figured into the equation
25  of what goes on a formulary?

Page 22
1     A  Right.
2     Q  So it is not purely a risk-benefit analysis,
3   is it?
4     A  Correct.  But I didn't comment about those
5   in my report.
6     Q  And you wouldn't need to actually offer
7   those as a basis for your opinion, would you?
8     MR. YOO:  Objection to form.
9     THE WITNESS:  The cost issues have nothing to do
10  with my analysis and clearly risk and benefit has
11  nothing to do with cost.  Also, again, I'm not an
12  employee of the hospital.  These committees are done
13  to weigh risk-benefit and the need in the hospital.
14  The cost issues are held, are done by people that are
15  employees of the hospital.  I'm not an employee.
16    Q  BY MR. BLIZZARD:  Okay.  Well, you actually
17  do in the committee look at some of those issues,
18  don't you?
19    MR. JAQUEZ:  Objection; Pharmacy and
20  Therapeutics --
21    THE WITNESS:  Again, it is the committee at the

22  hospital that has proceedings that are not public.
23     Q  BY MR. BLIZZARD:  You testified about some
24  of those proceedings at the trial in Los Angeles,
25  didn't you?

Page 23
1     MR. YOO:  Objection to form.
2     THE WITNESS:  To the same point that they're in
3  this report.  The reason for that again is to
4  establish that I did a risk-benefit analysis before
5  for the purposes of establishing my credentials for
6  being an expert on this case.
7     Q  BY MR. BLIZZARD:  You actually talked about
8  a monograph that was prepared on Vioxx at the time
9  that it was initially put on the formulary, correct?
10     A  We have -- every single drug that comes to
11  the Pharmacy and Therapeutics Committee comes with
12  documentation and that's typically --
13     MR. JAQUEZ:  I'm advising you not to answer.
14     MR. BLIZZARD:  I'm sorry, let's make this clear.
15  You are advising him not to answer the question or
16  complete his answer?
17     MR. JAQUEZ:  I'm requesting that -- again, my
18  standing objection and my standing request to him is
19  that if an answer or opinion would divulge the nature
20  or substance of the record of proceedings before the
21  committee, that it is privileged.
22     Q  BY MR. BLIZZARD:  Are you going to follow
23  the advice of counsel for City of Hope --
24     A  Yes.
25     Q  -- and not complete your answer?

Page 24
1     A  I suppose, yes.
2     Q  Can you tell me whether a monograph was
3  prepared for Vioxx in 2001 when you considered this
4  original risk-benefit analysis?
5     A  I don't recall.
6     Q  You indicated that part of the decision
7  about whether to put a drug on the formulary is also
8  involved in how many doctors are prescribing it?
9     A  It involves, again, how much we need it in
10  the hospital.  It is a matter of need, if it is
11  something we need.  That's how all pharmacy and
12  therapeutics committees work.  You look and see if
13  something is necessary and then you add it to the

14   formulary if you are going to use it.
15      Q   Okay.  So you look at risk-benefit, need and
16   cost, correct?
17      MR. JAQUEZ:  Standing objection.
18         Again, Dr. David, my request is if you think
19   any of the questions that are being asked of you
20   where the answer would divulge the nature or
21   substance of the nature of the proceedings before the
22   Pharmacy and Therapeutics Committee of the City of
23   Hope, these are privileged and you do not have to
24   answer these.
25      MR. YOO:  May we go off the record briefly?  Is

Page 25
1   that okay with you?
2      MR. BLIZZARD:  Sure.
3         (Discussion held off record)
4      MR. YOO:  This is a stipulation that was reached
5   by Merck and Plaintiff and as a stipulation that's
6   also satisfactory to the City of Hope.
7         The stipulation is that for purposes of the
8   Mason case, Dr. David will not refer to the work of
9   the P&T committee, the Pharmacy and Therapeutics
10   Committee at City of Hope regarding Vioxx or Dr.
11   David's work on that committee regarding Vioxx, and
12   Dr. David will not rely on the work of the P&T
13   committee regarding Vioxx for purposes of his expert
14   opinion in this case, and Plaintiff has agreed that
15   there will be no further inquiry in this case
16   regarding the activities of the P&T committee at City
17   of Hope regarding Vioxx, other COX-2 drugs or NSAIDs.
18   The stipulation should also note that this agreement
19   is conditioned on Plaintiff not opening the door to
20   these issues at the time trial.
21      THE WITNESS:  Can I ask you one thing?
22      MR. YOO:  Should Plaintiff --
23      THE WITNESS:  I just wanted to make sure of one
24   other thing.
25      MR. YOO:  Should Plaintiff open the door to

Page 26
1   these issues, then this stipulation may be modified
2   by the court.
3      MR. JAQUEZ:  There was also a further point on
4   the stipulation that Plaintiff would withdraw the
5   subpoena against the City of Hope.

6     MR. YOO:  That's correct.
7     THE WITNESS:  Right.
8     MR. BLIZZARD:  That is fine with me except this
9  statement about opening the door because that is
10  something that's in the eyes of the beholder often
11  and so I want it clear on the record that the kind of
12  door opening that we're talking about here is if I
13  directly challenge his involvement in, you know, the
14  committee work at the hospital or I ask him about his
15  committee work, not by simply inquiring about his
16  experience with Vioxx, so I don't want any challenge
17  that I make to his experience with Vioxx to be
18  claimed to open the door to his testimony about the
19  specific work of the committee.
20     MR. YOO:  This stipulation does not involve Dr.
21  David's own clinical experience or beliefs regarding
22  Vioxx at any point in time.  I think we're on the
23  same page that what we're talking about is references
24  to the work of the P&T committee at City of Hope.
25     MR. JAQUEZ:  Correct.

Page 27
1     MR. BLIZZARD:  Okay.  That's fine with me.

[31:8] – [32:23]     9/15/06     David, Donald S., M.D. (Mason)

Page 31
8  Q  When you say you've never worked for Merck
9  previously, have you never been involved in any kind
10  of clinical trials on behalf of Merck?
11     A  No.
12  Q  You have never appeared at any Merck
13  programs?
14     A  I have to think about that, but I honestly
15  could say no because the drugs that they sell are
16  drugs that I don't typically -- I mostly go to G.I.
17  programs so I don't think I have been to any of their
18  programs.
19     Q  So you have never spoken on their behalf at
20  any of their programs, correct?
21     A  Correct.  I'm not on their speaker bureau or
22  anything like that.
23     Q  And that would certainly include Vioxx,
24  correct?
25     A  Correct.

Page 32

1    Q   So you never gave any presentations on Vioxx
2   on behalf of Merck during the time that it was on the
3   market?
4    A   No, I have never given any presentations of
5   any kind for Merck.
6    Q   Have you ever given any presentations on
7   Vioxx during the time that it was on the market?
8    A   No, I have never.
9   Q   So in September of 2005 when you were
10   formally retained, as of that time did you have any
11   collection of documents about Vioxx?
12    A   I had a little file on Vioxx which just had
13   VIGOR in it at that point.
14    Q   Was there anything besides the VIGOR study
15   that was in the file?
16    A   I think it was probably ADVANTAGE and
17   probably also -- when did APPROVe come out, I can't
18   remember.  APPROVe.  I have to look at APPROVe.  I
19   don't remember the date of APPROVe.  I think it is
20   2003, so I probably had APPROVe in my files.
21    Q   Okay.
22    A   And I think also other polyp-related
23   studies, so it is in my polyp file.

[34:8] – [34:14]      9/15/06       David, Donald S., M.D. (Mason)

Page 34

8   Q   The only thing that you have not brought, as
9   I understand it, that's listed on Exhibit 1, the
10   notice to your deposition, is a copy of the
11   information related to the hospital committee and
12   that issue we have disposed of and then the second is
13   the request for patient records, correct?
14    A   That's correct.

[44:19] – [45:4]      9/15/06       David, Donald S., M.D. (Mason)

Page 44

19   Q   You have a medical degree, correct?
20    A   Yes.
21    Q   And then you did a residency in internal
22   medicine?
23    A   Yes.
24    Q   And then after that did a fellowship in
25   gastroenterology?

Page 45
1    A   Correct.
2      Q   And that has been your area of practice
3   since completing your fellowship?
4    A   Correct.

[46:15] – [46:17]      9/15/06         David, Donald S., M.D. (Mason)

Page 46
15  Q   You are not board-certified in cardiology,
16  are you?
17     A  No.

[47:24] – [47:25]      9/15/06         David, Donald S., M.D. (Mason)

Page 47
24   Q   Have you done any research in the
25   cardiovascular field?

[48:1] – [48:3]      9/15/06         David, Donald S., M.D. (Mason)

Page 48
1    A  No.
2      Q  Have you done any writing in that field?
3    A  No.

[50:16] – [51:18]      9/15/06         David, Donald S., M.D. (Mason)

Page 50
16   Q   Now do medical students also go through
17   cardiology rotations?
18     A   Yes, they do.
19     Q   And you do not have involvement in teaching
20   them when they go through cardiology, do you?
21     A   That's correct.
22     Q   You don't teach cardiology residents or
23   fellows either, do you?
24     A   That's correct.
25     Q   Now in terms of your pharmacology

Page 51
1   experience, do you have any formal education in
2   pharmacology other than your medical school class?
3    A   No, I do not.
4    Q   Do you have any formal training in

5   epidemiology or biostatistics?
6     A  No, I do not.
7     Q  Do you have any regulatory experience?
8     MR. YOO:  Objection to form.
9     Q  BY MR. BLIZZARD:  That's probably a bad
10  question.  Have you ever served on an FDA advisory
11  committee?
12    A  No, I have not.
13    Q  Have you ever been consulted by the FDA
14  about safety issues regarding drugs?
15    A  No.
16    Q  Have you ever been asked to advise the FDA
17  on risk-benefit analyses?
18    A  No.

[52:10] – [52:15]    9/15/06        David, Donald S., M.D. (Mason)

Page 52
10  Q  Did you author any peer review articles
11  about Vioxx?
12    A  No.
13    Q  Did you author any other articles that were
14  not peer-reviewed by Vioxx?
15    A  No.

[52:22] – [54:6]    9/15/06        David, Donald S., M.D. (Mason)

Page 52
22    Q  Did you ever present on Vioxx on any grand
23  rounds?
24    A  No.
25    Q  So you never actually prepared a formal

Page 53
1   presentation on Vioxx during the time it was on the
2   market?
3     A  That is correct.
4     Q  Did you ever give any lectures to colleagues
5   about Vioxx during the time that it was on the
6   market?
7     MR. YOO:  Objection to form.
8     THE WITNESS:  I may have, I don't recall
9   exactly, but I have done grand rounds intermittently
10  for the hospital on G.I. bleeding and within that
11  context I'm sure that it was mentioned.
12    Q  BY MR. BLIZZARD:  Okay.  Did you have any

13  slides that pertained to Vioxx that were used as part
14  of those grand rounds presentations?
15      A   I can't recall.
16      Q   Do you still have those slides?
17      A   No, I would have nothing from that time.
18  There probably were slides in those days.  I don't
19  think I have any PowerPoint.
20      Q   Did you lecture at any CME programs about
21  Vioxx during the time that it was on the market?
22      A   No.
23      Q   Now since it has been off the market have
24  you lectured at any CME programs about Vioxx?
25      A   No.

Page 54
1      Q   Have you presented at any grand rounds about
2   Vioxx?
3      A   No.
4      Q   Have you written any articles, peer-reviewed
5   or otherwise, about Vioxx?
6      A   No.

[55:5] – [55:16]     9/15/06       David, Donald S., M.D. (Mason)

Page 55
5   Q   Now in your report you mention your patient
6   experience with Vioxx, correct?
7      A   Correct.
8      Q   And are you relying upon your experience
9   with your own patients with Vioxx for your expert
10  opinion?
11      A   That would constitute part of my expert
12  opinion.
13      Q   Is it an essential part of your expert
14  opinion?
15      A   I think it is a very valuable part of my
16  expert opinion.

[61:8] – [62:23]     9/15/06       David, Donald S., M.D. (Mason)

Page 61
8   Q   Now in terms of your prescription of Vioxx
9   between 1999 and 2004, how many of your patients did
10  you prescribe it to?
11      A   I'd say approximately 75 to a hundred.
12      Q   Okay.  Do you think that that is a good

13   estimate or is it a guess?

14      A   It is a guess.  Again, we're talking about

15   years ago and so on.  But I think that I would guess

16   I would write about 300 prescriptions a year, to put

17   it another way.

18      Q   300 prescriptions a year to how many

19   different people?

20      A   Probably about one third would be new

21   prescriptions, two thirds would be refills.

22      Q   Okay.  So your best guess would be that in

23   any particular year you would start about a hundred

24   new patients on Vioxx, correct?

25      A   That's a guess.

Page 62

1      Q   Okay.  Can you do any better than that?

2      A   No.

3      Q   Have you gone back and looked at your

4   patient records to see whether or not any of your

5   patients who were on Vioxx had a heart attack?

6      A   I have not done any retrospective look at my

7   patients.

8      Q   Have you done any retrospective look then on

9   the issue of whether any of them had an ulcer or a

10   bleeding while on Vioxx?

11      A   No.  All retrospective work at our hospital

12   is carefully regulated, we can't just open charts and

13   start looking, but most of my patients, as I

14   mentioned, are long-term patients.

15      Q   Well, I'm just simply asking whether you

16   have actually done a formal study of your patients to

17   determine whether any of them had heart attacks or

18   bleeds while taking Vioxx.

19      A   You are asking about a formal study and that

20   would require institutional permission to do a formal

21   study, we can't just do studies.

22      Q   Okay.  So you haven't done one, correct?

23      A   I have not done a study, no.

[63:16] – [63:21]      9/15/06        David, Donald S., M.D. (Mason)

Page 63

16      Q   BY MR. BLIZZARD:  That wasn't my question.

17   My question was whether you have actually taken your

18   pen and written up any analysis of your patient

19   population as to whether they had cardiovascular

20 events or bleeds or ulcers while they were on Vioxx.
21    A  No, this is just my recollection.

[64:22] -- [66:6]    9/15/06        David, Donald S., M.D. (Mason)

Page 64
22 Q  BY MR. BLIZZARD:  Right.
23        Well, how many heart attacks did your
24 patient population experience between 1999 and 2004?
25      MR. YOO:  Objection to form.

Page 65
1      THE WITNESS:  Again, very difficult to answer.
2      Q  BY MR. BLIZZARD:  You have no idea?
3      A  It would have to be a guess.  If you want me
4  to guess, I can.
5      Q  Okay.
6      A  Perhaps five to 10.
7      Q  Okay.  Did you tell me the total number of
8  patients you had between 1999 and 2004?
9      A  I have an active patient population of
10 around 500 and some of those people come -- those are
11 the people that come regularly and that are assigned
12 to me.  There are others that come in and out all the
13 time.
14     Q  Right.
15     A  So I don't have an accurate number of how
16 many individual encounters I have, I have no way of
17 knowing exactly, just basing it on my best guess.
18 And they do have a roster that is assigned to me and
19 my roster has around 500 patients.
20     Q  Do you have any guess about the total number
21 of patients that you had during that time period?
22     A  I would have to refer to the roster.
23     Q  But your best guess about the number of
24 heart attacks that your patients had during that time
25 period would have been five to 10?

Page 66
1      A  It is my best guess.
2      Q  Do you have any memory of the people who
3  experienced heart attacks during that period?
4      A  Not particularly, although I think if I
5  thought about it I could, but at this point I
6  couldn't tell you.

[69:3] – [69:23]      9/15/06      David, Donald S., M.D. (Mason)

Page 69
3   Q   How many ulcers or bleeds did you experience
4   in your practice between 1999 and 2004?
5      A   I'd say approximately a hundred per year.
6      Q   Okay.
7      A   That's probably low.  I would say maybe more
8   than that.
9      Q   And did you ever -- have you ever gone back
10   and looked at the records to see if any of them were
11   on Vioxx at the time of their ulcer or bleed?
12      MR. YOO:  Objection to form.
13      THE WITNESS:  I'll use your language.  Again, I
14   didn't do, to make it quick, I didn't do a written
15   analysis of that, I didn't do a study where I went
16   back and looked at it.
17      Q   BY MR. BLIZZARD:  Okay.  Would you agree
18   with me that your memory of the problems that your
19   patients did or did not suffer while on Vioxx is
20   anecdotal?
21      MR. YOO:  Objection to form.
22      THE WITNESS:  I think everything outside of the
23   peer review literature is anecdotal.

[82:12] – [82:20]      9/15/06      David, Donald S., M.D. (Mason)

Page 82
12   Q   BY MR. BLIZZARD:  Was Vioxx safe for elderly
13   patients?
14      MR. YOO:  Objection to form, overly broad.
15      THE WITNESS:  Was Vioxx safe for elderly
16   patients.
17      Q   BY MR. BLIZZARD:  Yes.
18      A   Yes.
19      Q   Did it affect platelet aggregation?
20      A   I'd say it is platelet neutral.

[85:6] – [86:23]      9/15/06      David, Donald S., M.D. (Mason)

Page 85
6   Q   You have testified that you believe naproxen
7   is cardioprotective, correct?
8      A   Yes, I do.
9      Q   Did you do any research on that subject;
10   that is, whether naproxen is cardioprotective, prior

11  to the publication of the VIGOR results?
12      MR. YOO:  Can I have the question read back,
13  please.
14       (Record read)
15      THE WITNESS:  Did I do any research, no, I did
16  not.
17      Q   BY MR. BLIZZARD:  Prior to that time did you
18  prescribe naproxen to any of your patients for its
19  cardioprotective properties?
20      A   There are some patients who I would have
21  normally thought would need a baby aspirin or low-
22  dose aspirin and I felt as though they were being
23  adequately taken care of by the naproxen and wouldn't
24  have insisted that they be on it.
25      Q   So what scientific research did you base

Page 86
1  that decision on?
2      A   It is based upon my knowledge that naproxen
3  is a very potent inhibitor of platelet function and I
4  know that from personal experience of watching people
5  almost bleed to death while they were on naproxen so
6  I believe that the drug clearly prohibits platelet
7  function to a profound effect.
8      Q   You didn't specifically prescribe naproxen
9  to anybody for its cardioprotective properties, you
10  just didn't insist that those people take a baby
11  aspirin in addition to the naproxen, correct?
12      A   Correct.  I would think -- my feeling was
13  they were protected.
14      Q   Well, after the VIGOR results were published
15  did you do any research or study on the question of
16  whether naproxen was cardioprotective?
17      A   I didn't do any specific research but
18  reaffirmed my prior beliefs.
19      Q   Well, did you do any scientific reading in
20  order to make that conclusion?
21      A   I read VIGOR.
22      Q   Anything else?
23      A   Nothing particularly.

[87:13] – [94:24]       9/15/06       David, Donald S., M.D. (Mason)

Page 87
13  Q   So in November of 2000 you read VIGOR.
14      A   Correct.

15      Q   That was the first scientific study that you
16   read where you believe it showed the cardioprotective
17   effects of naproxen, correct?
18      MR. YOO:  Objection to form.
19      THE WITNESS:  You know, I have read -- well, I
20   read the conclusions of VIGOR and I felt as though
21   the conclusions were consistent with the observations
22   in the study.
23      Q   BY MR. BLIZZARD:  But that was the first
24   time you had read such a study that demonstrated in
25   some sort of controlled setting that naproxen might

Page 88
1   have cardioprotective attributes, correct?
2      A   It was my feeling that that was general
3   knowledge at least as far as I was concerned.
4      Q   I wasn't asking you about whether it was
5   general knowledge, I asked you whether you read any
6   scientific controlled study prior to VIGOR that
7   demonstrated that.
8      A   Not that I can recall.
9      Q   Okay.  So after November of 2000 did you
10   read any additional controlled scientific studies on
11   whether or not naproxen has cardioprotective
12   properties?
13      A   I read them recently.
14      Q   Okay.  So when was the first time after
15   November of 2000 that you read such studies?
16      A   I didn't really read in this area except for
17   things that I mentioned before so I read VIGOR, I
18   read the Konstam analysis when it came out, I read --
19   I looked at ADVANTAGE when it came out in 2003, I
20   looked at APPROVe.  Again, none of these are naproxen
21   studies but this was -- I had no -- I had no real
22   occasion to read those studies in between, but I did
23   read the studies that I mentioned when they came out.
24   Q   Okay.  So the Konstam has nothing to do with
25   naproxen, correct?

Page 89
1      MR. YOO:  Objection as to form.
2      THE WITNESS:  I don't know if naproxen is
3   included in all of the studies, I don't remember, 23
4   studies or whatever are in it.
5      Q   BY MR. BLIZZARD:  Does Konstam stand for any
6   proposition that naproxen is cardioprotective?

7    MR. YOO:  Feel free to refer to the study if you
8  need to refresh your recollection.  This is not a
9  memory test.
10    THE WITNESS:  I can pull Konstam if you want to
11  look at it.
12    Q  BY MR. BLIZZARD:  No, I was asking you a
13  question.  I wasn't asking to you pull out Konstam
14  but if you need to do it, you can.
15    A  I think I will because it is such a large
16  study.  I think it is in the other binder.
17    MR. YOO:  You can also refer to your report if
18  that helps you.  Just let counsel know that you want
19  to look at something to refresh your recollection.
20  You are free to look at whatever you need to look at
21  if you don't recall specifics.
22    THE WITNESS:  It is right here.  Okay, I've got
23  it.  I'm ready for you, sir.
24    Q  BY MR. BLIZZARD:  My question was whether or
25  not the data or the conclusions in Konstam stand for

Page 90
1  the proposition that naproxen is cardioprotective.
2    MR. YOO:  Objection to form.
3    THE WITNESS:  I think they would support that.
4    Q  BY MR. BLIZZARD:  And what specific finding?
5    A  The specific finding would be that there was
6  no difference in cardiovascular events for rofecoxib
7  versus placebo or any other NSAIDs with the exception
8  of naproxen.
9    Q  So you are saying that the only comparator
10  in that study that showed any increased risk for
11  Vioxx was with naproxen, correct?
12    A  Or that would show the benefit for naproxen
13  taking it the other way.
14    Q  Okay.  So when was the first time that you
15  read Konstam?
16    A  I read Konstam when it was published in
17  2001.
18    Q  So you read that, you mentioned you read
19  ADVANTAGE and APPROVe.
20    A  ADVANTAGE and APPROVe.
21    Q  Are both of those placebo-controlled studies
22  versus a study with naproxen as a comparator?
23    A  ADVANTAGE is naproxen.  APPROVe is a
24  placebo.
25    Q  Okay.  And do you believe that ADVANTAGE

Page 91
1  stands for the proposition that naproxen is
2  cardioprotective?
3     A  I think what ADVANTAGE stands for is that
4  Vioxx was not, did not engender an increased risk for
5  cardiovascular events.
6     Q  When compared to naproxen?
7     A  When compared to naproxen which is what the
8  study is.
9     Q  That would indicate that the naproxen is not
10  cardioprotective, wouldn't it?
11     MR. YOO:  Objection to form, argumentative.
12     THE WITNESS:  It would indicate there was no
13  difference in that particular study, in the one
14  study.
15  Q  BY MR. BLIZZARD:  Right.
16  So after reviewing those studies as they
17  came out, when was the first time that you did
18  additional research on the naproxen hypothesis that
19  it is cardioprotective?
20     A  I have never done research, just to be
21  clear, but the -- I looked at articles as they came
22  out and then the next occasion I had to look at them
23  was in 2003 when I was engaged by, unofficially
24  engaged by Reed Smith.  They started sending me
25  articles to see and I started looking at those again

Page 92
1  so I didn't have an official relationship with them
2  but I started reading again not nothing if they were
3  going to use me or not use me.
4     Q  To summarize, in terms of articles you read
5  on the naproxen hypothesis that it is
6  cardioprotective, you would have read VIGOR and
7  Konstam and ADVANTAGE before or at the time they came
8  out, correct?
9     A  Correct.
10     Q  And any further scientific reading that you
11  would have done on that subject would have been done
12  after you were retained as an expert, correct?
13     A  Correct.
14  Q  Are there any prospective placebo-controlled
15  trials that have ever been done that have
16  demonstrated that naproxen is cardioprotective?
17     MR. YOO:  Objection; form.

18     THE WITNESS:  Not for naproxen particularly.
19  There have been for other NSAIDs.
20     Q  BY MR. BLIZZARD:  Who makes naproxen?
21     A  Got me.  I don't know.
22     Q  Do you know whether the company that makes
23  it has ever made the claim that it is
24  cardioprotective?
25     A  I'm not sure.

Page 93
15     Q  As a matter of fact, have you read the most
16  recent studies that have been published on this
17  subject?
18     MR. YOO:  Objection; form, vague.
19     THE WITNESS:  Well, which ones are you referring
20  to?
21     Q  BY MR. BLIZZARD:  The studies that were
22  published -- actually the study on this issue that
23  was published on September 12th in the Journal Of The
24  American Medical Association.
25     A  No.

Page 94
1     Q  Have you read either of the studies that
2  were published in the Journal Of The American Medical
3  Association on September 12th regarding Vioxx?
4     A  Not yet.
5     Q  Do you plan to read those prior to the
6  trial?
7     A  Yes.
8     Q  Do you plan to offer an opinion about what
9  they show?
10     MR. YOO:  Depends on what they say.
11     THE WITNESS:  Perhaps.  I haven't really read
12  them.
13     Q  BY MR. BLIZZARD:  When did you first find
14  out about them?
15     A  Yesterday, just because somebody sent me an
16  E-mail, not from this firm but somebody that knows
17  that I'm doing this work and said, "Hey, there's
18  something new," and I said, "I haven't seen it yet."
19     Q  Okay.  Was there some reason that you did
20  not read those articles before today?
21     A  Didn't have time.
22     Q  Is there any way that you can read them
23  during a break today and offer opinions about them?

24     A   I wouldn't feel comfortable with that.

[100:6] – [101:9]     9/15/06          David, Donald S., M.D. (Mason)

Page 100
6   Q  Do you warn patients who you prescribe
7   Celebrex to that there's an increased risk of
8   cardiovascular events associated with the drug?
9      MR. YOO:  Object to form.
10      THE WITNESS:  I discuss the black box warning
11   with them and my feelings about them.
12      Q   BY MR. BLIZZARD:  So you discuss the fact
13   there is a black box warning, correct?
14      A   Correct.
15      Q   You discuss the contents of the black box
16   warning with them?
17      A   Correct.
18      Q   Do you also tell them that you don't believe
19   there's an increased risk?
20      A   I tell them that this risk if it is there
21   would apply to all drugs in this class and that
22   largely what we should choose should be based upon
23   other reasons other than their cardiovascular risk
24   status.
25      Q   So you believe that Celebrex is -- if

Page 101
1   Celebrex does have any increased risk, that it is a
2   class effect?
3      A   If there isn't a risk it would be a class
4   effect.
5      Q   That same testimony would apply to all
6   NSAIDs then, correct?
7      MR. YOO:  Objection; over broad.
8      THE WITNESS:  I would believe with the exception
9   of naproxen.

[103:24] – [104:10]     9/15/06          David, Donald S., M.D. (Mason)

Page 103
24   Q  BY MR. BLIZZARD:  And, in fact, if they
25   didn't have a discussion with Mr. Mason about

Page 104
1   cardiovascular risk of Vioxx would you agree that
2   that was typical of what most doctors were doing back

3   at that time?
4       MR. YOO:  Objection to form, calls for
5   speculation.
6       THE WITNESS:  It is hard to say because I'm not
7   sure what doctors were really doing, I didn't really
8   ask people what their opinions were from the
9   cardiovascular standpoint, I was speaking to
10   colleagues mostly about the G.I. standpoint.

[106:19] – [108:10]   9/15/06        David, Donald S., M.D. (Mason)

Page 106
19   Q   Now in terms of your risk-benefit opinion
20   that's in your report, Doctor, as I understand it,
21   you do individual risk-benefit assessments on your
22   patients on a daily basis, correct?
23      A   Correct.
24      Q   So you make recommendations to your patients
25   about treatment issues and about prescription issues

Page 107
1   based upon your opinion of whether for that
2   particular patient the risks outweigh the benefits or
3   the benefits outweigh the risks, correct?
4      A   Correct.
5      Q   And I assume that that depends on the
6   individual characteristics of those patients,
7   correct?
8      A   Absolutely.
9      Q   Now as I understand it, your professional
10   opinion, your expert opinion in this case is that
11   there is no risk that -- no risk of cardiovascular
12   events being caused by Vioxx; is that correct?
13      A   That's correct.
14      Q   So if that is your opinion that there are
15   zero risks of cardiovascular events, then any benefit
16   for the drug would cause you to be able to prescribe
17   it to a patient, correct?
18      MR. YOO:  Object to the form, argumentative.
19      THE WITNESS:  As we mentioned before, costs come
20   into the issue too so that -- you would have to
21   assume that you would have to get some reasonable
22   benefit and it would have to weigh against the costs.
23      Q   BY MR. BLIZZARD:  Okay.  And you have
24   already indicated that you don't have any experience
25   from either a health policy standpoint or from a

Page 108
1  regulatory standpoint making a decision, making
2  risk-benefit decisions with respect to putting a drug
3  on a market or withdrawing it from the market,
4  correct?
5     A   Absolutely not.
6     Q   So, again, you don't have any training in
7  making those decisions, do you?
8     MR. YOO:  I will object to the form.
9     THE WITNESS:  I have no formal epidemiology
10  training.

[109:13] – [109:25]   9/15/06       David, Donald S., M.D. (Mason)

Page 109
13  Q   So, again, you don't have a -- you have
14  never sat on an FDA advisory committee.
15     A   No.
16     Q   Never made recommendations to the FDA about
17  approving the drug or pulling a drug, correct?
18     A   Correct.
19  Q   You gave some testimony at the previous
20  trial about the fact that if Vioxx was put back on
21  the market you would prescribe it again, correct?
22     A   Correct.
23     Q   Is there any patient who you would not
24  prescribe Vioxx to if it was put back on the market?
25     A   Somebody who was allergic to it.

[110:1] – [110:2]   9/15/06       David, Donald S., M.D. (Mason)

Page 110
1     Q   Anything else?
2     A   No.

[114:19] – [115:23]   9/15/06       David, Donald S., M.D. (Mason)

Page 114
19  Q   BY MR. BLIZZARD:  Well, have you given it [naproxen] to
20  anyone else besides your father?
21     A   I have made those recommendations to people
22  who are taking other non-steroidals, typically
23  ibuprofen, and saying you may be better off by taking
24  naproxen.
25     Q   My question simply is have you prescribed it

Page 115
1  to anyone else.
2      A   Yes.
3      Q   Okay.  And how many patients have you
4  prescribed naproxen for its cardioprotective effects,
5  not because they needed a non-steroidal but because
6  you wanted them to take it for its cardioprotective
7  effects?
8      MR. YOO:  Object to the form of the question.
9      THE WITNESS:  I have been actively switching
10  people off of non-steroidals to naproxen.
11      Q   BY MR. BLIZZARD:  When did you start doing
12  that?
13      A   After I did the reading for this case.
14      Q   Which would have been when?
15      A   Around again in September of 2005.
16      Q   Okay.  So beginning at that time is when you
17  started switching patients off ibuprofen and putting
18  them on naproxen because you believe that naproxen
19  was cardioprotective?
20      A   That -- I believe that it was
21  cardioprotective before but I had additional evidence
22  that ibuprofen may have a negative cardiac effect so
23  I felt this was a good switch for them.