

11497892
Jun  9 2006
5:48PM

# EXHIBIT "A"

9 Ex A MIL 9  Humeston Trial 10-07-05

3313

SUPERIOR COURT OF NEW JERSEY ATLANTIC
COUNTY/CIVIL DIVISION DOCKET NO. ATL-L-
2272-03MT

----------------------------------x

FREDERICK HUMESTON, et al.,

      PLAINTIFFS,

     VS.            STENOGRAPHIC TRANSCRIPT
                    OF:

MERCK & CO.,INC.,

                 - TRIAL -

        DEFENDANT.

----------------------------------x

      PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
              1201 BACHARACH BOULEVARD
              ATLANTIC CITY, NJ 08401

      DATE:  OCTOBER 7, 2005

B E F O R E:

    THE HONORABLE CAROL E. HIGBEE, P.J.Cv.

TRANSCRIPT ORDERED BY:
    DIANE P. SULLIVAN, ESQUIRE
    DAVID R. BUCHANAN, ESQUIRE

A P P E A R A N C E S:

    DAVID R. BUCHANAN, ESQUIRE
    CHRISTOPHER SEEGER, ESQUIRE SEEGER, WEISS,
    LLC
ATTORNEYS FOR THE PLAINTIFFS

      DIANE P. SULLIVAN, ESQUIRE
    DECHERT, LLP
    STEPHEN D. RABER, ESQUIRE WILLIAMS AND
    CONNOLLY, LLP CHRISTY D. JONES, ESQUIRE
      BUTLER, SNOW, O'MARA, STEVENS & CANNADA,
    PLLC ATTORNEYS FOR THE DEFENDANT
     *     *     *     *     *     *
          REGINA A. TELL, CSR-CRR-RPR
          OFFICIAL COURT REPORTER
          1201 BACHARACH BOULEVARD ATLANTIC CITY, NJ
          08401

3314

Colloquy
P R O C E E D I N G S

1

2        THE COURT:  You can be seated.

3        In addition to discussing this issue of

4  Dr. Morrison's testimony on the record yesterday

9 Ex A MIL 9  Humeston Trial 10-07-05

5  counsel met with the Court, we discussed it in chambers

6  for a long period of time.  I stayed here late last

7  night reviewing the transcript, rereading the

8  transcript, rereading everything else that I have been

9  given, anything I thought might be pertinent to the

10  issue, and this morning I was given about 85 pages of

11  additional information from the defendants in

12  opposition to plaintiffs' motion to strike, and I have

13  reviewed that, and, in addition, I have reviewed the --

14  although quickly skimming it really -- the deposition

15  of Dr. Gaziano.

16       All right.  At this point, counsel, do you

17  want to make your motion for relief and they can make

18  their opposition?

19       MR. BUCHANAN:  Yes, Your Honor.  The

20  arguments have been fairly well laid out orally both

21  privately and on the record earlier yesterday.  The

22  concern, Your Honor is fundamentally whether the

23  witness -- whether we had notice of what the witness

24  was going to be testifying to in these arenas.  You

25  have seen the testimony and the highlights plaintiffs

3315

Colloquy

1  have provided in that area.  He was asked specifically

2  about what studies supported his conclusions on

3  particular issues at deposition.  None of the testimony

4  that was elicited yesterday was ever elicited in

5  response to those questions.  I'm referring

6  specifically to his deposition on December 18th, 2003,

7  Page 72, 73 where he was asked about the prostacyclin

Page 2

9 Ex A MIL 9  Humeston Trial 10-07-05

8  hypothesis and whether it had been refuted or accepted.
9  He stated that it has never been confirmed, and I would
10  suggest at least with regard to VIOXX its been refuted.
11  The witness was asked what studies refuted that
12  hypothesis.  Then he went on to highlight the clinical
13  data on VIOXX, as we have gone through the entire
14  development program has never shown at least any
15  increased thrombotic risk to patients who take VIOXX,
16  the impression clearly because the witness with respect
17  to the viability of the so-called
18  prostacyclin/thromboxane hypothesis turned on at least
19  in his eyes the reflection in the clinical trial
20  results of any increased risk of cardiovascular events.
21          That's certainly not what we heard yesterday.
22  And we didn't hear in any of his prior testimony an
23  extrapolation from animal studies in bunny hearts and
24  people that there's no COX-2 in the endothelial lining
25  of humans or that, therefore, VIOXX would not be

3316

Colloquy

1  expected to have an impact on the human vasculature.
2  We provided the specific sites to Your Honor from the
3  prior transcripts.  There's also a reference from the
4  February 16th, 2005 transcript.  We highlighted
5  yesterday -- I'll highlight it again.  Page 165 and 166
6  where there was the discussion about plaque ruptures,
7  what role plaque ruptures have in the formation of a
8  thrombus.  And he basically disqualified himself as
9  somebody knowledgeable in this area and said, again, so
10  this is not my area of expertise, so I'm giving you

Page 3

9 Ex A MIL 9   Humeston Trial 10-07-05

11    sort of what I remember from cardiovascular physiology
12    from 10 years ago.

13           He then goes on later in the same page on 166
14    and, again, talking about the formation of clots via
15    prostacyclin and thromboxane he said, again, outside my
16    area of expertise.  I don't think the jury is left with
17    the impression yesterday that any of what he was
18    talking about was beyond his area of expertise, and
19    this is right in the same area that he was examined on
20    only six months ago.

21           As Your Honor is aware, too, in our
22    conversations yesterday about this matter you know both
23    as side-bar and privately we were certainly left with
24    the impression that the particular studies he was
25    testifying to there were three animal studies that he

3317
Colloquy

1     walked through from the '98 -- maybe it was '97 but
2     '98, '99 time frame prior to approval.  We were led to
3     believe that the witness actually had personal
4     knowledge about those, and that he was not testifying
5     as an expert in this litigation that this was, in fact,
6     information that he was familiar with prior to the time
7     that he came into this court.  Of course, we were
8     surprised it hadn't been elicited in prior testimony.
9     The suggestion was we hadn't asked the right questions,
10    but --

11           THE COURT:  Mary, can you take this back to
12    Chris?  Go ahead.  I'm sorry.

Page 4

9 EX A MIL 9  Humeston Trial 10-07-05
13      MR. BUCHANAN:  That's fine, Your Honor.  We

14   heard, you know, through Your Honor's voir dire, and,

15   frankly, we were surprised to hear that the studies

16   that he highlighted, you know, the first two or three

17   of those were those that were shown to him subsequent

18   to his deposition and in preparation for testimony.

19   Um, that's expert testimony, Your Honor.  There should

20   have been an expert disclosure if they intended to use

21   even somebody who may have fact testimony, but they

22   wanted to extend him as an expert, we were entitled to

23   expert disclosure as to his opinions, and, frankly,

24   entitled to probe them of that particular witness.

25   We're entitled to know what he is going to say and the


                                              3318
                        Colloquy
1    pertinent issues to this case, and, frankly, given his

2    prior testimony we thought the scope of his knowledge

3    had been neatly confined to the preapproval period and

4    certainly not animal studies or mechanism of action

5    items that he expressly disclaimed knowledge of in his

6    deposition.

7         Your Honor, this is further complicated, I

8    think, by the fact that Mr. Morrison is highlighted in

9    defendant's opening statement as the face of Merck.  He

10   sat here for three weeks.  He is called as the first

11   witness.  They extend the first witness beyond his

12   scope of knowledge while on the VIOXX team to animal

13   studies.  They use him to expressly rebut an expert

14   which was improper.  They use him as an expert, period,

15   on areas that are beyond his area of expertise, and the

                        Page 5

9 Ex A MIL 9  Humeston Trial 10-07-05

16  prejudicial effect of it is substantial.  It shouldn't

17  have happened.  We tried to raise that, and I think,

18  Your Honor, plaintiffs, frankly, until the voir dire

19  were under the impression that he was, in fact, exposed

20  to these animal studies as part of his role in the

21  project team.  And I think we're all surprised to learn

22  that that wasn't the case.

23         He doesn't have personal knowledge.  There's

24  a 601 problem testifying as to matters that he did not

25  observe, wasn't a witness to, doesn't have personal

3319

Colloquy

1  knowledge to.  Then if you want to extend that to the

2  702 issue whether he is an expert there's been no

3  disclosure of expert opinion in the case.  There was no

4  opportunity to explore this with him and he has done

5  things, frankly, that are beyond what other witnesses

6  in the case who are pharmacologists have done.

7         So from a surprise perspective, Your Honor,

8  we took depositions, we probed into his areas of

9  expertise.  We thought we understood what the basis of

10  his views on particular issues were.  It is pretty

11  clear that his views are now different.  That's a

12  surprise.  It is also pretty clear that they have used

13  him as an expert in this case, which was improper

14  without an expert disclosure.  Now the defendants have

15  raised one other issue, and that's that, you know this

16  is lay opinion, and this may be the proper subject of

17  lay opinion.

18         Well, you know, the classic examples of lay

Page 6

9 Ex A MIL 9  Humeston Trial 10-07-05

19  opinion, Your Honor, somebody observing a speeding car,

20  well, you know, how fast do you think he was going,

21  okay, based on things that you witnessed at the time.

22  Extrapolating personal observations to an opinion based

23  on personal observations.  This, Your Honor, is taking

24  information that the witness testified to he was shown

25  three months ago in preparation for today in drawing

3320

Colloquy

1  conclusions about it.  He took animal studies even --

2  let's take the rabbit study because that's one I think

3  he said he was exposed to in 2000 or 2001.  What he did

4  yesterday was he extrapolated expressly or impliedly

5  the conclusions of that to humans.  He said that that

6  rabbit study shows an absence of COX-2 in normal

7  endothelium, and there may be some in dysfunctional

8  endothelium or endothelium that's got atherosclerosis.

9  But, in fact, when you put VIOXX in the test tubes with

10  this endothelium you don't see a result, you don't see

11  an effect.  So from that we know VIOXX doesn't affect

12  prostacyclin in the endothelium.  Then if you remember

13  at the conclusion of the morning he got up on the board

14  and he said, okay, so we're going to look at other

15  organ systems where this prostacyclin metabolite in the

16  urine must have been from, okay.  He extrapolated from

17  the rabbit study to humans to go through, and let's

18  rule out where else it is coming from.

19          Remember he had the lung, he had, I think, it

20  was the uterus or the ovaries.  He had some other organ

21  systems on the board that he was going to go to, next I

Page 7

9 EX A MIL 9   Humeston Trial 10-07-05

22   assume, after lunch, but he plainly extrapolated from

23   an animal study that he was exposed to in 2000 or 2001

24   to what Merck's next steps were in this process.  He is

25   telling the story of what Merck did when he wasn't

3321

Colloquy
1   involved in it.  That's not lay opinion.  It is not

2   proper.  It is expert testimony.  It should have been

3   in a disclosure, and his testimony should be stricken,

4   Your Honor.

5          Thank you.

6          MR. RABER:  Good morning, Your Honor, I don't

7   want to repeat everything we said yesterday or

8   everything that's in our brief, and I don't intend to

9   do that.  I want to address a couple of things that

10  Mr. Buchanan has said, however.

11         On the notice question Mr. Buchanan pulled

12  out Pages 73 and 74 from the December 18th, 2003

13  deposition and said that the witness was asked -- let

14  me make sure I get this right, he was asked

15  specifically about studies that supported the view that

16  the prostacyclin in the endothelium doesn't come from

17  COX-1, and I would like to look at what the transcript

18  actually says because the right questions were clearly

19  not asked.

20         On Page 73 this is the page Mr. Buchanan was

21  referring to, the question is, Has that hypothesis ever

22  been confirmed or refuted.  It has never been

23  confirmed, and I would suggest that at least with

24  regards to VIOXX it's been refuted.  Question, what
                    Page 8

9 Ex A MIL 9  Humeston Trial 10-07-05

25  studies have refuted that hypothesis?  Answer, all of

3322

Colloquy

1   the data.  If you combine all of the studies that have
2   ever been done with VIOXX, and he goes on and answers
3   the question that way.  Here is what's interesting.
4   Here's what's interesting on the next page.  On Page
5   74.  He said, So I would say the hypothesis that was
6   put in place at least with regards to partial
7   inhibition of prostacyclin has been refuted.  Then the
8   question is, To your knowledge has Merck designed or
9   begun conducting a study to test that hypothesis
10  specifically.  Your Honor, that's the right question.
11  That's the right question, but look what happens.  We
12  have an objection to form.  The witness says, Maybe you
13  can ask that question again, and the questioner gives
14  up.  Let me ask it a different way.  I'm kind of
15  jumping ahead, and he goes on and he never asks the
16  question.  He never asks the question that he started
17  to ask there.  And the witness clearly does not have an
18  obligation in a deposition to volunteer information.
19  He goes on and he says, Let me do it this way, and he
20  puts in front of him an exhibit, and it is Exhibit
21  Number 5, and he starts talking about something called
22  the pink sheet, changes the subject and moves on.
23          So I don't think the description of what
24  happened at that deposition is in accord with what's
25  actually in the transcript.

Page 9

9 Ex A MIL 9   Humeston Trial 10-07-05

3323

Colloquy

1        The second thing we have is this suggestion

2    that no pharmacologist could testify that as to what

3    Dr. Morrison said yesterday and that they were hearing

4    it for the first time in the trial and that they were

5    surprised.  Well, on April 1st of 2005 we deposed

6    Dr. Alan Nies, and there's no dispute that Alan Nies is

7    a pharmacologist.  He was the head of pharmacology at

8    the University of Colorado Medical School for several

9    years before he came to Merck.  He wrote sections of

10   the textbook on pharmacology that medical students like

11   Dr. Morrison studied, and Dr. Morrison, as he said

12   yesterday, learned pharmacology from Alan Nies in his

13   job.

14        Dr. Nies was asked Page 429 to 431 whether

15   Merck ever sponsored or supported any studies that were

16   along the lines of those suggested by FitzGerald, Oates

17   and Patrono he says, Well, Merck did studies.  There's

18   a lab in Montreal that was equipped to do the types of

19   measurements.  He said Merck did studies in animal

20   models in that laboratory and those were actually

21   ongoing at this time, meaning 1998, 1999.  How are

22   those studies similar or different?  He goes on to say

23   that we were trying to directly look at the blood

24   vessel to see whether the lining of the blood vessel,

25   the endothelium it is called, was the source of

3324

Colloquy

1    prostacyclin that was made by COX-2.  That's -- and he

9 Ex A MIL 9  Humeston Trial 10-07-05

2   says in animals you can actually get those blood
3   vessels and look at them directly.  He is talking about
4   the rabbit study there.  What those animal studies
5   show.  Witness says, In normal animals the major
6   source, if not the only source, of prostacyclin in the
7   endothelium is from COX-1 that was not touched by
8   VIOXX.
9         I submit, Your Honor, that is almost
10  identical to what Dr. Morrison said when he was
11  describing the results of the rabbit study.  Granted,
12  there was a question that said a hypothetical that
13  said, well, if there was a plaque rupture what effect
14  would prostacyclin -- how would prostacyclin or how
15  would VIOXX affect that, and he said there would be no
16  effect.
17        But I'll note that there was no objection to
18  that question at the time it was made, and so we're
19  faced with a situation where -- excuse me, we're in a
20  prejudicial spot, Your Honor, where having no objection
21  to that question, the jury goes home, we revisit the
22  issue, and we have gone out on this limb and to have
23  the limb cut off behind us would be extremely
24  prejudicial.
25        I would also note that when I asked to put up

3325

Colloquy

1   the specific rabbit slide I said are those results
2   summarized anywhere in Defense Exhibit 316?  That is
3   the rabbit study, and the chart that we looked at.  I

Page 11

9 Ex A MIL 9  Humeston Trial 10-07-05

4   said, Any objection to putting this on the Elmo?  I'm

5   sorry which document are you talking about?  Exhibit

6   316.  Then he says, Well, Your Honor, I have the same

7   objection to the extent it is with this witness, but,

8   you know, I'm not sure that gets resolved by putting it

9   up on the Elmo.  This study he is at least involved

10  with.  This one he isn't -- he can talk about it.

11  Defense counsel -- or plaintiffs' counsel said he can

12  talk about it.  So we put it up on the slide.  Your

13  Honor said, Is this a VIOXX study?  Yes.  I'll allow it

14  by Merck.

15          So, Your Honor, it would be extremely

16  prejudicial under these circumstances to after these

17  questions have been asked after plaintiffs' counsel has

18  said it is okay to talk about it, after it has been

19  ruled that we can talk about it to then let

20  Dr. Morrison and me walk out to the end of that limb

21  and have it sawed off behind us, and I fear that the

22  prejudicial impact would be great to us, and that there

23  clearly is no surprise.  Dr. Morrison was asked

24  questions about these issues, but there was no specific

25  follow-up to say, well, tell me about the animal

3326

Colloquy

1   studies or tell me what specific studies you're talking

2   about.  If there's any foundation question about

3   Dr. Morrison we can clearly cure that with other

4   witnesses, Dr. Gertz, for example, whose name is on all

5   those memos, who can establish that that information

6   was known to the VIOXX project team when those memos

Page 12

9 Ex A MIL 9  Humeston Trial 10-07-05

7   were done in 1998 and 1999.

8          And, finally, to the extent there's any
9   question, any question about Dr. Morrison's
10  qualifications to talk about pharmacology I think he
11  pointed out very clearly yesterday what his role is and
12  working for a pharmaceutical company that's what you
13  do, you do pharmacology.  And I would also note that
14  Dr. Morrison has a patent for a COX-2 inhibitor to
15  treat prostate cancer, and that patent clearly involves
16  and relies on the pharmacology of a COX-2 inhibitor.

17         So I think this notion that Dr. Morrison is
18  not qualified or has no knowledge of pharmacology,
19  again, is not supported by the records.  And as he
20  pointed out he did see the rabbit study
21  contemporaneously, and with regard to the other three
22  studies he said he did not see the data when it came
23  out but that he had communications and conversations
24  with the project team members at that time and knew
25  about those results.

3327

Colloquy

1          So for all those reasons, Your Honor, we
2   believe that his testimony is not expert testimony.  It
3   is permissible fact testimony about what Merck did and
4   what the information told Merck.  It comes in under
5   Rule 701 as an opinion from somebody who has personal
6   knowledge based on either conversations or looking at
7   the data, and the other side clearly had notice of this
8   issue, and it would be extremely prejudicial to

Page 13

9 Ex A MIL 9  Humeston Trial 10-07-05

9   instruct the jury in any manner to disregard any

10   portion of his testimony.

11       MR. BUCHANAN: Your Honor, just a couple more

12   points. Specifically, turning back to the December 18,

13   2003 transcript of Dr. Morrison the question that was

14   asked was, Has the hypothesis, the

15   prostacyclin/thromboxane hypothesis ever been confirmed

16   or refuted? He said, It has never been confirmed, and

17   I would suggest at least with regard to VIOXX it has

18   been refuted. He then noted what studies have refuted

19   that hypothesis, and he said, All of the data. If you

20   combine all the studies that have ever been done with

21   VIOXX which from biochemical studies we had done, okay,

22   biochemical and then he continues to talk about

23   clinical data. Not an animal study referenced in that

24   answer.

25       Counsel is criticizing a lack of follow-up.

3328

Colloquy

1   There's no reference to animal studies. That's what he

2   is saying refutes it. That's what he testified to

3   yesterday, that there's nothing in the blood -- there's

4   no COX-2 in the endothelium. Now, look, if they want

5   to call Dr. Nies, if they want to play his videotape

6   deposition testimony that's all fine, okay, it really

7   comes down to this particular witness, what his scope

8   of knowledge is, whether he had that scope of knowledge

9   from at the time, okay, not two months ago getting

10   ready for today, okay, what was in his wheel house of

11   information getting ready as an employee of Merck, not

9 Ex A MIL 9  Humeston Trial 10-07-05

12    as a corporate representative who they want to walk
13    through the whole VIOXX story.  And that's precisely
14    what they did yesterday, and it was improper.
15              And I want to highlight the comment by
16    counsel that an absence of an objection and because of
17    that now they're on a limb getting ready to be sawed
18    off.  We were all under the impression that this was
19    based on his experience in the project team in '98 and
20    '99.  We raised those objections early on.  They were
21    highlighted on several occasions.  The Court was
22    assured by representations implicitly that that was the
23    case, and it wasn't the case.  We learned that on voir
24    dire at 4:00 yesterday.  We didn't learn that in
25    chambers when we spoke for an hour and a half yesterday

3329
Colloquy

1    about it.  We learned it here from the witness.
2              I'm sure that defense counsel was aware of
3    that when the questions were being asked.  We weren't
4    aware of that, and Your Honor wasn't aware of that, and
5    now they want to use that as a basis to permit improper
6    testimony to go to the jury.  That's not the right
7    result.  It is prejudicial.  It absolutely is
8    prejudicial.  They're the only ones who knew the
9    circumstances through which he had the information he
10   did.  They exploited it on the stand with an absence of
11   knowledge on our part and Your Honor's part, and they
12   shouldn't be entitled to benefit from it now because
13   the questions have been asked and answered.

Page 15

9 Ex A MIL 9  Humeston Trial 10-07-05

14    There's one other point, I think, Your Honor.

15    The extrapolation that Dr. Morrison did yesterday from

16    particular animal studies that he may have been aware

17    of to humans, okay, and the ticking through the

18    different organ systems as they were ruling things out

19    as they were doing that there's no testimony he was

20    involved in that process at Merck for these particular

21    trials.  That's information based on studies and now he

22    is telling the story.  That is expert testimony.  It is

23    summary testimony from a witness who wasn't involved in

24    that tick list at the time.  He couldn't have been.  He

25    was off the project team at that point in time, and he

3330

Colloquy

1    was using studies that he was just shown for the first

2    time two, three months ago.  That is expert testimony,

3    not lay opinion testimony and not fact testimony.  It

4    is expert testimony, and it needed to be disclosed.

5    This isn't the right witness for it.  It should be

6    stricken.

7         MR. RABER:  Two things, Your Honor.  He did

8    have personal knowledge.  He told you although he was

9    not on the VIOXX project team after the drug was

10   approved he continued working on another COX-2

11   inhibitor and kept abreast of what was going on with

12   VIOXX, and in that context learned about and reviewed

13   the rabbit study in either 2000 or 2001.

14        And as to extrapolation to humans, you know,

15   I suppose they could infer that they could cover that

16   on cross-examination, but I did not ask him anything

Page 16

9 Ex A MIL 9  Humeston Trial 10-07-05

17    about humans.  I have gone back and looked at the
18    transcript.  It doesn't talk about humans.  It is clear
19    in the transcript he is talking about the rabbit study,
20    what the rabbit study showed, the dog study, what the
21    dog study showed.  And, you know, again, I would just
22    point out that their entire expert testimony on this
23    issue from Dr. Lucchesi comes from a doctor who has
24    never been licensed to treat any patient, any human
25    being in the world ever, and all of his studies are in

3331

Colloquy

1    dogs, so I don't understand this talk about how you can
2    object to using data from animal studies for
3    mechanistic purposes when their only expert relies
4    entirely on animal data.  They can use animal data, we
5    can't.  That doesn't make sense to me, Your Honor.
6          MR. BUCHANAN:  Your Honor, just one point.
7    I'm sorry to keep doing this, but, first of all, the
8    issue isn't Dr. Lucchesi.  He served expert reports.
9    They were offered depositions of Dr. Lucchesi on his
10    expert opinions, okay?  They had the opportunity to
11    discover what the bases were, whether they disagree
12    with them or not, they had the opportunity to explore
13    his extrapolation from animal studies to humans, okay,
14    so let's just take that off the table.
15          But the one thing that does highlight it is
16    expert testimony.  That's exactly what that highlights.
17    That testimony came in in plaintiffs' case through an
18    expert.  Here it is coming in through, quote, "a fact

Page 17

9 Ex A MIL 9  Humeston Trial 10-07-05

19  witness" which isn't proper, and I want to note, Your

20  Honor, they say he got this information through his

21  involvement on another project team in 2000, 2001.  I

22  don't think it was until April or May of this year that

23  we even got documents on another COX-2.  There was a

24  motion for a protective order, a motion to compel that

25  was filed in the summer of 2004 relating to other Merck

3332

Colloquy

1   drugs.  If we had inquired as to, well, what did you

2   learn in the other project teams in February of 2005

3   would we have gotten those answers?  It wasn't until

4   April of this year that any Arcoxia information was

5   produced.  I don't know if that's the other -- I do

6   remember he testified it was, but now we're charged

7   with not having asked questions about a subject matter

8   that was foreclosed at the time of his deposition.

9   That's not proper either.

10          MR. RABER:  Your Honor, that's just not a

11  fair characterization.

12          MR. BUCHANAN:  It is.

13          MR. RABER:  I have a Bates stamped document

14  that was produced two years ago that the subject is

15  Rabbit Aorta Prostacyclin Study dated March 16th, 1999

16  circulated to the VIOXX project team.  This document

17  was given to them in discovery more than a year ago, so

18  the idea that they say they didn't have this stuff

19  that's just not true.  It is just not true.  They had

20  it.  These documents have been on our exhibit list from

21  day one.  They have had this information.  They just

Page 18

9 Ex A MIL 9  Humeston Trial 10-07-05

22  didn't ask him the right questions about it.

23       MR. BUCHANAN:  Your Honor, the issue is not

24  the document.  Nobody takes issue with what is in the

25  medical literature.  It is his use of the document as a

3333

Colloquy

1  person who, frankly, shouldn't be using it as a

2  nonexpert extrapolating from it and telling the jury

3  what it means.

4       I mean, I appreciate counsel's statement that

5  they didn't elicit a specific question to suggest that

6  it was humans you could extrapolate to, but, come on,

7  if the word "human" didn't appear in that testimony we

8  all knew what we were talking about.  He extrapolated

9  to it, and he went through all the organ systems, we

10  could rule out the endothelium.  We could rule out

11  there's COX-2 in the rabbit's endothelium, what was the

12  next testimony?  Talking about lungs were we ruling out

13  there was COX-2 in the rabbit's lungs is the next

14  question?  They were talking about people.  It is not

15  really -- it is not really consistent with the

16  testimony to suggest that Dr. Morrison wasn't trying to

17  get the jury to infer that those rabbit findings

18  directly applied to human endothelium, which is expert

19  testimony.

20       THE COURT:  Do you have the Lucchesi -- I

21  couldn't find where you gave the documents to Lucchesi.

22  Do you have that?

23       MR. RABER:  I have some of that.  I don't

24  have -- I couldn't find in the record the listing of

Page 19

9 Ex A MIL 9   Humeston Trial 10-07-05
25   the various documents, but --

3334
Colloquy
1          THE COURT:   I just want to know if you saw
2    it.
3          MR. RABER:   Yes, but I do have where he did
4    testify a little bit about some of the studies.
5          THE COURT:   The dog studies.
6          MR. RABER:   Mr. Seeger said, I have a
7    handful of these, I'm not going to ask you about all of
8    them, I want to ask you about a couple of them.  That's
9    what the transcript says.  I have got it right here.
10          THE COURT:   I saw that.
11          MR. SEEGER:   We're not disputing --
12          THE COURT:   Yesterday you were saying I gave
13    him this and gave the number, but I didn't see it in
14    the record, but that doesn't mean it didn't happen,
15    okay.
16          MR. SEEGER:   It wasn't handed to me.  I'm not
17    disputing it is on the rabbit study.  It was not one of
18    the studies I was given.
19          MR. RABER:   I would dispute that.
20          MR. SEEGER:   I'm not going to argue about
21    that, but it was the dog studies, and if you remember
22    Dr. Lucchesi's testimony I handed him the stack and he
23    said all of these, A, don't involve VIOXX and, B, don't
24    test for thrombosis, and I had him go through the
25    studies.  Those were the ones I was given, but, again,

Page 20

3335
Colloquy

1    I'm not disputing it was on the exhibit list.  Can I
2    just say one brief statement because to the extent we
3    have a courtroom full of people and counsel continues
4    to refer to Dr. Lucchesi as somebody who never treated
5    patients, he is a man who has received 38 years of
6    continuous funding from the United States government,
7    spent 10 years as a merit award winner, I think he
8    earned his stripes in pharmacology and doesn't deserve
9    to be torn down.

10        THE COURT:  This case was filed in 2003, and
11   we have spent -- I have spent a lot of time since then
12   with the attorneys for defense and the attorneys for
13   the plaintiffs.  We have had monthly meetings with you.
14   We have gone through all of the discovery, and we spent
15   all that time up until the day of the trial because the
16   purpose of this trial was to make sure that we had a
17   fair trial under the New Jersey standards.  And the New
18   Jersey standards -- and it is not the same in every
19   state.  Some states allow a lot more than we do as far
20   as surprise, but in New Jersey everything is supposed
21   to be disclosed.  You have to identify your expert
22   witnesses.  You have to identify their reports.  You
23   have to say what they're going to testify to.  They're
24   deposed on their reports.  The other side has the
25   opportunity to hire other experts to counter expert

3336
Colloquy

1    reports.  There's very specific rules that are designed

9 Ex A MIL 9  Humeston Trial 10-07-05

2  for one purpose and one purpose only, and that is so

3  that everybody knows what everybody else is going to be

4  able to produce at trial, and there's no question that

5  that's basic.

6          In this case we have Dr. Morrison coming on

7  as the first witness.  And I have looked at the

8  information that was provided today by counsel.

9  Yesterday on the record counsel acknowledged that

10  there were -- plaintiffs' counsel said there was really

11  no expert that could address this issue.  Defense

12  counsel on the record said that they agreed that none

13  of their nine experts mentioned this issue.  This

14  morning they have shown me where one of their experts

15  did, in fact, refer to it, referred to an article about

16  it.  And that's in the volumes of stuff I got.

17          And in the millions of documents that were

18  produced these animal studies were produced along with

19  those other documents, and they were included on the

20  exhibit list with hundreds of other exhibits.  It has

21  been consistently through the case Dr. Scolnick

22  testified, plaintiffs played different people's

23  testimony, that there was a FitzGerald hypothesis, and

24  the plaintiffs and Dr. Lucchesi and their experts one

25  after another have basically said that that hypothesis

3337
Colloquy

1  came to fulfillment, and they have based their entire

2  case on that.

3          The defense has taken the position, it

4  appears to me, through everything I have seen over the

Page 22

9 Ex A MIL 9  Humeston Trial 10-07-05
5   last year and a half, that it is just a hypothesis,

6   nothing is confirmed, that it was possible but not

7   necessarily -- it wasn't proven.  It was proven -- some

8   things prove it, some things don't prove it, and they

9   can't prove that this hypothesis is true.

10         Yesterday Dr. Morrison took the stand, and it

11   was never represented at any time that he was an expert

12   witness, and, in fact, counsel for the defense

13   repeatedly told me he wasn't an expert witness.  He was

14   a fact witness.  He was the project manager for VIOXX

15   up until 1999.  He was to testify about what Merck knew

16   and didn't know about the risks of VIOXX.  He was going

17   to testify about the e-mail that he wrote and what he

18   meant by it and what he said.  And, certainly, he had

19   the right to do those things.

20         But what he did was go way beyond that, and,

21   quite frankly, I felt sick yesterday afternoon, and I

22   felt sick last night when I looked over the transcript

23   and I talked about this with counsel, and I realized

24   how I had gotten sucked into this because my job as a

25   judge is to make sure that there's a fair field here.


3338
Colloquy

1   That's all I have to do.  I have to make sure that the

2   right evidence gets in and the witnesses that are

3   called to testify within the realm of evidence and

4   within the realm of what's fair under the Court rules,

5   and I feel that I was mislead repeatedly yesterday

6   during that testimony.  And because I was mislead

7   repeatedly I allowed in things that never should have

Page 23

9 Ex A MIL 9  Humeston Trial 10-07-05

8   come in, and that really makes me -- it doesn't even
9   make me angry, it makes me sad.
10          A case where everybody supposedly wanted to
11  try this case on the science, everybody wanted to get
12  here and try this case on the facts.  Nobody, you know,
13  please, Judge, don't let in any evidence that shouldn't
14  come in, and I have been very scrupulous in trying to
15  keep out evidence that both sides wanted in, and I have
16  ruled on both sides.  I have kept out lots of things
17  that the plaintiffs wanted in, lots of things that the
18  defense wanted in that I thought weren't focused and
19  weren't on the evidence and weren't proper under the
20  rules for various reasons.  It is not a free for all.
21  You don't get to just throw in anything you want into
22  the pot.  You have to have given notice to the other
23  side, and you have to have informed the Court and your
24  adversary of what you're doing.
25          In the case of Summit Trust versus Baxt,

3339
Colloquy

1   B-A-X-T, the Supreme Court states that the mandate of
2   New Jersey court rules is that fair dealing with
3   opposing parties is an absolute requirement even in an
4   adversary system.  There has to be fair dealing.  There
5   has to be fair representations.  I have to rely on the
6   attorneys who make representations to me that they're
7   officers of the Court, that they're making true
8   representations, that they're letting me know what the
9   facts are, and that I'm making my rulings based on what

Page 24

9 Ex A MIL 9  Humeston Trial 10-07-05

10   they say to me.

11         So what happened in this case?   Mr. Morrison

12   gets called as defense's first witness.  Before he gets

13   called defendants have allowed him to be deposed.

14   Plaintiffs have taken his deposition.   In his

15   deposition, which I had not read in its entirety, he

16   had said repeatedly that he was not qualified as an

17   expert in pharmacology, that his -- that his physiology

18   training was 10 years old -- was from back when he was

19   in school basically was what he was saying, 10 years

20   ago.  He said that he wasn't qualified to give opinions

21   on things like these studies, and he talked about the

22   hypothesis, and as far as I'm concerned he was

23   specifically asked what he knew about that hypothesis,

24   what he knew about studies that didn't -- and, you

25   know, when you try to argue to me, counsel, that at one

3340

Colloquy

1   point he says all the data, well, when he took his dep

2   he didn't know about all the data.  He didn't know

3   about all the data because he had never even seen the

4   animal studies he testified to yesterday, and there was

5   no way I had a hint of that until after the jury was

6   sent home.

7         As a matter of fact, in the transcript

8   yesterday as soon as he started testifying Mr. Seeger

9   objected.  well, you know, a lot of times attorneys

10   object for a lot of reasons, so he comes over to the

11   bench, and I'm like what are you objecting to and he

12   says, I expect this witness to testify on documents.   I

Page 25

9 Ex A MIL 9  Humeston Trial 10-07-05

13  don't expect him to come in here and try to pass
14  himself off as a pharmacological expert.  They have
15  their expert witnesses.  He should limit his testimony.
16  Mr. Raber responds, He is here to testify as to what he
17  thought at the time.  Why he wrote what he did and what
18  we're talking about why he wrote what he did in the
19  nineties.  The e-mail that he wrote in the nineties.
20  He is here to testify as to what he thought at the
21  time.

22       Well, that's certainly appropriate testimony,
23  so I basically told Mr. Seeger that I wasn't going to
24  let him use the pharmacological book because he wasn't
25  an expert, so he couldn't lecture on pharmacology but

3341
Colloquy
1  that he could answer questions.

2       And Mr. Raber goes on in the next page he
3  needs to be able to testify as to what was in his mind
4  when he was writing the e-mail.  He has to say what he
5  meant.  He has to testify as to what he meant and what
6  was in his mind.  Okay.  So now I'm assuming that his
7  testimony is based on what he knew in the nineties and
8  what he was thinking in those -- at that time.  And
9  that is certainly relevant testimony, and it is
10  important testimony.

11       Then again later in the deposition he is
12  asked about studies, and Mr. Seeger says he doesn't do
13  these type of studies, he wasn't involved with that
14  Page 29.  This is the other transcript.  He wasn't
15  involved with that.  And Mr. Raber says to the witness,
Page 26

9 Ex A MIL 9 Humeston Trial 10-07-05

16  Do you have personal knowledge of the protocols that
17  were done at Merck such as bleeding time, and he says,
18  I have personal knowledge. I have reviewed all of that
19  data as I gave talks about it at Merck.
20          And then Mr. Seeger says he shouldn't be
21  allowed to give an expert opinion, and Mr. Raber says
22  I'm not asking for an expert opinion, he is just being
23  called as a fact witness to testify to the facts of
24  what Merck was considering, what it knew, what it did
25  and didn't do.

3342

Colloquy
1           And then later he is asked a question which
2   seems like an innocuous question, it is not objected
3   to. You say, without COX-1 inhibition you'll get more
4   thrombotic event and kill the drug, what are you
5   referring to there? And then he starts on a long
6   answer, and as part of that answer he says -- he goes
7   on to talk about the studies and the -- and he says
8   there's no pharmacological reason why VIOXX would cause
9   this. Later he talks about there's a number of things
10  that led me to believe what I said when I wrote the
11  e-mail. He starts criticizing what Dr. Lucchesi said.
12  And then he goes on basically to describe the studies,
13  animal studies and the rabbit study and in great detail
14  with charts and diagrams and drawings to explain to the
15  jury not only that this was only a hypothesis, but that
16  it has been absolutely proven false what the plaintiffs
17  have tried to prove and that everything that they had
18  testified to in their case is untrue based on my review

9 Ex A MIL 9  Humeston Trial 10-07-05

19  of these animal studies, the dog and rabbit studies.
20  He basically says nothing Lucchesi said is accurate, he
21  was wrong, dead wrong, and he was wrong because there
22  is no COX-2 in the endothelium.  There is no -- or
23  COX-2 isn't responsible for prostacyclin being produced
24  in the endothelium, and, as a matter of fact, he says
25  repeatedly there's no COX-2 machinery in the blood

3343

Colloquy

1  vessels.
2        And that strikes at the very heart of
3  plaintiffs' case.  It is critical information which is
4  brought which if brought out by the proper expert with
5  proper notice might be perfectly appropriate but was
6  certainly not appropriate with this witness, unless he
7  was talking about what he knew at the time and what his
8  thoughts were at the time.  And, again, on Page 74 when
9  we're nearing the end Mr. Seeger is objecting again, He
10  is not an expert in this field, judge, using this
11  article wouldn't be appropriate.  This is proper to
12  show what Merck did in response to the FitzGerald
13  theory, what they considered.  It explains their
14  conduct, Mr. Raber said to me.
15        Mr. Seeger again later they're trying to do
16  stuff with him that they can't do with an expert and
17  that's what the problem is.  And then we get to the
18  objection, and I think at this point we're actually
19  talking about the rabbit study, and he says, Mr. Seeger
20  says, You need to have an expert.  I can cross his

21    expert, but what am I going to do with him?  And Mr.

22    Raber says, This is something he looked at.  This is

23    what he did.

24            And then he was asked did Merck do any tests

25    in animals, yes.  And then he asks him, And what

3344

Colloquy

1    questions were you trying to answer about the urine

2    cup.  We were trying to figure out -- he says, We were

3    trying to figure out, now I find out he wasn't involved

4    in the studies at all, didn't do them and not only

5    didn't do them, which was really revealed during his

6    testimony, but he didn't even see them.  He had never

7    seen them in the 1990's.  He had never seen them until

8    2005 for most of them.  And for the one study he had

9    seen it when he was working on something other than

10   VIOXX.  He was the project manager for VIOXX, and these

11   animal studies were never shown to him, and these

12   animal studies were never shown to him, none of them

13   were shown while he was the project manager.

14           And I understand counsel for defense has said

15   today, Oh, he was told about them, he had conversations

16   about them.  Well, I asked the witness about that.  I

17   asked him did you ever see any documents, how were you

18   told about the studies, did you get memos about them.

19   I mean, I didn't ask him just did you see the raw data.

20   I asked him did you see the data, did you see the

21   studies, did you get anything, how did you get it.

22   Well, I had some conversations with some people who

23   told me they were doing some kind of animal studies,

Page 29

9 Ex A MIL 9  Humeston Trial 10-07-05

24   and that's a heck of a lot different than him saying he

25   knew what it was.

3345
Colloquy

1        The impression he gave -- not the impression,

2   his statements yesterday confirmed that he really had

3   never looked at these animal studies until right before

4   the trial.  And the rabbit study was something he had

5   never looked at until after he was sent over to do a

6   different COX, so it has nothing to do with what the

7   VIOXX team knew or didn't know when they were working

8   on VIOXX.

9        Did Merck do animal studies to try to answer

10   this question?  Yes, and then he goes through each of

11   the studies.  And, again,  Mr. Seeger objects.  Your

12   Honor, could he just establish that he had involvement

13   in it and I allow him to testify because I believe him

14   that he has involvement at least to the degree that if

15   he is not doing the study, which I knew he didn't do at

16   least I assume he is talking about it and has memos on

17   it and has been discussing it and has the study itself

18   and has looked at it because if this is the key study

19   that proves that VIOXX is safe wouldn't you think the

20   VIOXX project team wouldn't have known about it?  I

21   mean, he testified he didn't see it.

22        I mean, I think it was a reasonable

23   assumption for me to assume, and I don't think it was

24   just an assumption, I think I was told repeatedly that

25   he was involved.  And, again, when Mr. Seeger later

Page 30

9 EX A MIL 9 Humeston Trial 10-07-05

3346
Colloquy

1   says we need some foundation, I need to know what he
2   knows about this. Mr. Raber says, Your Honor, this
3   witness is a co-author on the paper, he is a co-author
4   on the FitzGerald paper, he is talking about the study
5   Merck did to answer the questions that were raised.
6   What more foundation do we need? And, again, that
7   leads me to believe he is talking about what he knew as
8   a fact witness at that time.

9           Repeatedly in this transcript Mr. Raber says
10  he is not an expert, we're not calling him as an
11  expert, he is a fact witness. And his ultimate opinion
12  that there's no way that VIOXX can affect this blood
13  vessel because it doesn't even have COX-2 machinery
14  appears to be far beyond anything that any expert has
15  said or any other witness has said, and I understand
16  that counsel has other quotes in here and I have read
17  them from people who -- from Nies or Nies and from
18  Gertz, but none of them have the strong language that
19  he has, the guy who didn't even see these studies. And
20  then Mr. Raber says to him after he is done talking
21  about all these studies, Okay, and when did the
22  scientists at Merck actually have this data. Early in
23  1999. Well, I guess some scientists in Merck had the
24  data in early 1999, but Dr. Morrison didn't. Dr.
25  Morrison hadn't seen any of that data in 1999. This

9 EX A MIL 9   Humeston Trial 10-07-05
3347
Colloquy

1   question certainly suggests to the jury that he had.

2        It certainly suggests to the jury that the

3   scientists at Merck working on VIOXX of which he was

4   the project manager knew about this, and, yet,

5   afterwards he admits to me, and, candidly, and I don't

6   really fault Dr. Morrison, he was shown these studies

7   and asked to testify to them.  But to try to present to

8   the jury the idea that these were known to him in 1999

9   or at least -- and that's what the implication is in

10  the testimony, and that's what the implication was to

11  me, and that's why it was allowed to go to the jury

12  because it was supposed to be what Merck factually knew

13  or didn't know at the time, and what it really was was

14  expert testimony elicited after the fact by someone who

15  was never named as an expert whose testimony was never

16  provided.

17       His testimony differs very substantially from

18  his deposition.  Referring to the Supreme Court case

19  2001 of Gerald McKenny versus Jersey City Medical

20  Center in this case a witness a defense counsel found

21  out a witness was going to change her testimony and say

22  something different than she said in deposition.  The

23  Supreme Court of our state stated as recently as 2001,

24  A party has a continuing duty to disclose the opinions

25  of its experts.  Where an attorney knows his client or


3348
Colloquy

1   a material witness, which this certainly is, intends to

9 Ex A MIL 9  Humeston Trial 10-07-05

2  deviate from his deposition testimony in a crucial way,

3  which this certainly was, the attorney has an ethical

4  obligation to convey that fact to his adversary.  New

5  Jersey's procedures for discovery are designed to

6  eliminate surprise at trial requiring a litigant to

7  disclose the fact upon which a cause of action or

8  defense is based.  The search for truth is paramount.

9  The outcome of litigation should depend on the merit --

10  on its merits in light of all the available facts, not

11  on the craftiness of the parties or the guideline of

12  their counsel.  An attorney is under a duty to apprise

13  his adversary where he obtains information upon the

14  basis of which he knows that his witness' prior dep was

15  incorrect or while it was correct will no longer be

16  true, and certainly where it is going to -- and it

17  basically talks about differing from what they were

18  going to say before.

19        I have considered the case law, I have

20  considered the transcript.  I have talked to counsel

21  for hours.  I have considered the new submissions, and

22  it is my ruling that the entire testimony of

23  Dr. Morrison will be stricken from the record, that the

24  jury will be advised that they cannot consider any of

25  his opinions and we'll proceed.  If you want to call

3349

Colloquy

1  Dr. Morrison as a witness you're going to have to play

2  his deposition.  That's the only way you'll be able to

3  present his testimony as it existed before he was shown

4  things and reviewed studies that he had never reviewed

9 Ex A MIL 9  Humeston Trial 10-07-05

5   before this case started.  The only way to be fair to

6   try to figure out how to do this I was going to

7   consider having you start over and call him back to the

8   stand.  That won't work.  You can't do that now based

9   on what's happened.  The only way you could present

10  Morrison's testimony is to produce his video

11  deposition.  If you want to play his deposition for the

12  jury then they can see every single thing that was his

13  opinion before this trial started, and that's fair.

14  They can see what defense counsel and what plaintiffs'

15  counsel knew he was going to say before he came to

16  court, which is fair.

17        What he won't be allowed to say is a bunch of

18  additional things that were not revealed to counsel,

19  that are outside the scope of his testimony, so you

20  have a choice at this point that Dr. Morrison is not

21  going to testify in this case again except by his

22  videotape.

23        So you have two choices, counselor.  You

24  either call Dr. Morrison by videotape now or you call

25  your next witness, and I'm going to take a short break

3350

Colloquy

1   so you can decide.

2         MR. RABER:  May I be  heard?

3         MS. SULLIVAN:  We would like to make a

4   record, your Honor.

5         THE COURT:  No, you may not.

6         MS. SULLIVAN:  Your Honor, we need to make a

7   record.

9 Ex A MIL 9  Humeston Trial 10-07-05

8           THE COURT: No, counselor, you don't need to

9    make a record.

10          MS. SULLIVAN: Yeah, we do, Your Honor.

11          THE COURT: You made a record for hours.

12   Counsel, you talk before I speak not after.

13          MS. SULLIVAN: Your Honor, you have permitted

14   them to testify.

15          THE COURT: You talk before I speak, not

16   after.

17          MS. SULLIVAN: You have allowed plaintiffs'

18   experts to talk about things over our objection beyond

19   the scope of their expert report. Dr. DePace talked

20   about the prostacyclin/thromboxane hypothesis --

21          THE COURT: Miss Sullivan, Miss Sullivan --

22          MS. SULLIVAN: -- over our objection, even

23   though it is outside the scope of his expert report.

24          THE COURT: Miss Sullivan, sit down and be

25   quiet.

3351

Colloquy

1           MS. SULLIVAN: Your Honor, you talk about --

2           THE COURT: Miss Sullivan, sit down.

3           MS. SULLIVAN: -- fairness and fair hearing.

4    What is going on here is not fair, and it is not right.

5           THE COURT: Miss Sullivan, sit down.

6           MS. SULLIVAN: You talk about Dr. Kronmal as

7    an expert --

8           THE COURT: Miss Sullivan, sit down.

9           MS. SULLIVAN: Dr. Kronmal talked --

Page 35

9 Ex A MIL 9  Humeston Trial 10-07-05
10          THE COURT:  Sit down.

11          MS. SULLIVAN:  -- about opinions way beyond

12    the scope of his report --

13          THE COURT:  Miss Sullivan, sit down or I will

14    have you taken out of the courtroom.

15          MS. SULLIVAN:  -- over objections.

16          THE COURT:  Sit down.  Miss Sullivan, I gave

17    you an opportunity to argue.  I gave you all the

18    opportunity you wanted.  I sat here and said tell me

19    what you want to tell me about this issue.  I looked at

20    85 pages of your submission.  I listened to you

21    yesterday for hours.  You have every right to tell me

22    anything you want and to make your record before I

23    rule.  You have no right to do it afterwards.  Once I

24    rule it is over and then you can make your record to

25    the Appellate Division.

                                                3352
                        Colloquy
1           MR. RABER:  Your Honor, I just would like to

2     address the ethical issues that were raised.

3           THE COURT:  We can address them in the back.

4           MR. RABER:  I would like to do it on the

5     record.

6           THE COURT:  You can put it on the record

7     later.

8           (Break taken.)

9           THE COURT:  You can be seated.  Counsel you

10    want to put something on the record?

11          MS. SULLIVAN:  Yes.  In light of Your Honor's

12    ruling to strike Dr. Morrison's testimony Merck with

                        Page 36

9 Ex A MIL 9  Humeston Trial 10-07-05

13   like to move for reconsideration and request that the

14   Court reconsider its ruling, given the foundation that

15   Mr. Morrison did lay.  There is no dispute that Merck

16   did these animal studies.  Dr. Morrison testified he

17   specifically reviewed the rabbit study and he was in

18   discussions concerning the other two as part of the

19   VIOXX development team as it relates to the other two.

20         We think the Court's ruling is

21   disproportionate in light of the fact that

22   Dr. Morrison -- his testimony involved matters in

23   addition to the animal studies, and to strike the

24   entirety of his testimony, including testimony about

25   e-mails and things unrelated to the animal studies is


3353

Colloquy

1   disproportional, and precluding his testimony is a

2   drastic and unfair and materially prejudice sanction,

3   so we would ask the Court to reconsider its ruling.

4         If the Court is not inclined to do that, Your

5   Honor, we would ask the Court stay its ruling so Merck

6   can take an emergent appeal to the Appellate Division

7   this afternoon or over the weekend so the Appellate

8   Division can rule whether any striking or sanction is

9   appropriate, and, if so, what the appropriate remedy

10   would be.

11         We also would ask, Your Honor, that Merck be

12   permitted to submit an offer of proof as to what

13   Dr. Morrison's additional testimony would be beyond the

14   animal studies he talked about.  We would like to put

15   Dr. Morrison back on the stand as a Merck scientist as

Page 37

16   part of a project development team, so that he can in

17   defense of the serious charges against Merck talk to

18   the jury about some of the things Merck did and what

19   Merck knew and what the science was at the time.  And

20   to prevent Merck from doing that, and to prevent Merck

21   from defending itself by putting on one of the

22   scientists involved in the VIOXX development program is

23   material prejudice, Your Honor, so we would like at

24   least to put on an offer of proof as to what

25   Dr. Morrison's testimony would have been in that

3354

Colloquy

1    regard.

2         And, Your Honor, if the Court is going the

3    refuse to reconsider and also refuse the request for

4    the stay we would like to ask for a mistrial in view of

5    the material prejudice to Merck that an instruction to

6    this jury striking the entirety at Dr. Morrison's

7    testimony presents.

8         Thank you, Your Honor.

9         MR. BUCHANAN:  Your Honor, it is, indeed, a

10   drastic remedy and an appropriate remedy.  Substantial

11   prejudice here is that the testimony was allowed to go

12   to the jury based on the explicit and implicit

13   representations that he had knowledge that he did not.

14   Then his subsequent testimony on expert issues

15   extrapolating from animal studies to human studies only

16   served to further highlight the expert nature of the

17   testimony of which plaintiffs have no knowledge at the

18   time prior to trial this testimony would be elicited

Page 38

9 Ex A MIL 9  Humeston Trial 10-07-05
19    based on both his deposition testimony and the absence

20    of any expert report on the topic.

21         The remedy is drastic.  It is appropriate.

22    There's no way to shield the jury, I think,

23    notwithstanding the instruction, from that improper

24    testimony.  Your Honor's remedy, I think, is the

25    appropriate one and really the best we can do at this

3355
Colloquy
1     point.  The plaintiffs believe we have been prejudiced.

2     We hope the curative instruction will ameliorate that,

3     but, frankly, there's no basis to soften that in any

4     way by allowing Mr. Morrison to testify to other

5     matters of which he was not present for or to the

6     extent that he was present for matters that should come

7     in through his videotaped deposition because he has

8     been, frankly, taking the VIOXX role over the last

9     several months, and that's the proper subject of expert

10    testimony not fact testimony.  The motion for

11    reconsideration should be denied.  And you have already

12    afforded the defense an opportunity to play excerpts of

13    his deposition testimony to the extent they wish to do

14    so.  That's an appropriate remedy.

15         THE COURT:  There's no question it is a

16    strong remedy, and there's no question that it took me

17    a long time to reach it, and that's why we recessed

18    yesterday, and I thought about it overnight.  There's

19    no question there's some prejudice to Merck.  I think

20    there's been more prejudice to Mr. Humeston, and that

21    in the end there's been a lot more prejudice to the

Page 39

9 Ex A MIL 9  Humeston Trial 10-07-05

22  plaintiff by the testimony than there will be to the

23  defense if the testimony is stricken.

24        And I really don't think I have any other

25  option at this point, other than to strike the

3356
Colloquy

1  testimony.  I did indicate this morning that -- and I

2  can't pick through it, I tried to try to pick sections

3  that I can tell the jury -- I don't even know how I

4  would do it.  I would have to read them the transcript

5  and say, you can remember this and then read them

6  another part and say you can't remember this.  It just

7  really wouldn't work.  I considered that.

8        The only alternative I think I have at this

9  point is to strike the testimony.  I do -- I have

10  indicated that you could play Dr. Morrison's testimony.

11  I will consider -- the only other thing that I'm

12  willing to reconsider is that, and I'm willing to

13  consider whether there's anything that's not in his

14  deposition that he needs to testify to, something

15  that's not covered by his deposition that you intended

16  to cover with him, and if that's the case I'll consider

17  what it is and how important it is and whether it can

18  be covered by other witnesses or, most important, if it

19  is not covered in his deposition, and in that case I

20  may allow him to resume the stand and tell the jury

21  that they should consider his testimony at this point

22  as part of the evidence, the testimony that they hear

23  at that point.  So I'll consider that.

24        The request for a stay is denied.  We're

Page 40

25  going to proceed.  You can certainly go to the

                                        3357
Colloquy

1  Appellate Division at the end of the day.  This is not

2  the kind of issue the Appellate Division usually deals

3  with, quite frankly, but you can certainly try.  I'm

4  not going to hold up the trial for it.  I'm going to

5  order that the testimony be stricken and that the jury

6  disregard it.  The motion for a mistrial is denied,

7  and, as I said, I'm sure you're going to need an order

8  to go to appeal.  At the next break I'll file an order,

9  and if you want to take a written appeal you can do so.

10           You can bring the jury in.

11           THE COURT:  You can be seated.  Ladies and

12  gentlemen, I apologize for the delay.  I know you have

13  been here a long time.  I hope you found -- I know you

14  enjoy each other's company, Mary tells me, so at least,

15  hopefully, you're not having a terrible time sitting in

16  there waiting for us.  There's legal issues.  It is not

17  anybody's fault.  It is just things come up, and I have

18  to spend time on them.

19           I made a legal determination about the

20  testimony yesterday of Dr. Briggs Morrison should be

21  stricken from the record.  You, therefore, are not to

22  consider any of his testimony.  Any testimony that I

23  strike from the record is not evidence.  It should not

24  be considered by you in your deliberations.  This means

25  that even though you may remember the testimony you

9 Ex A MIL 9  Humeston Trial 10-07-05

3358
Colloquy
1   should not use it in your deliberations or even in your
2   own thought process as far as analyzing what the
3   verdict should be.  You have to disregard that
4   testimony.  You shouldn't consider why.  It doesn't
5   matter.  It is a legal decision.  And you shouldn't --
6   I am trusting you'll be able to do that.  It is sort of
7   a difficult instruction to follow, obviously.  We know
8   that you can't forget something, but I believe that if
9   you're instructed by me to not consider it as part of
10  the evidence that you'll do that.  And that's my
11  instruction.
12          All right.  We'll proceed, and counsel is
13  going to call a witness at this time.
14          MS. SULLIVAN:  Yes, Your Honor.  Merck would
15  like to call Merck scientist, Dr. Alan Nies, by video.
16          (Whereupon, the video was played for the
17  jury.)
18          THE COURT:  We don't have his picture.  Is
19  this Dr. Scolnick?
20          MR. RABER:  No.
21          THE COURT:  No problem.  Take a minute and
22  deal with it.
23          (Whereupon, the videotape is played for the
24  jury.)
25          MR. RABER:  Can we stop?  This is the wrong

3359
Colloquy

9 Ex A MIL 9  Humeston Trial 10-07-05
1   document.  It may be the top of an e-mail chain.

2          THE COURT:  All right.  Why don't we take a

3   break and you can fix it.

4          (Break taken.)

5          THE COURT:  You can be seated.  You got it

6   fixed, counselor?

7          MR. RABER:  Yes.  What it was we have an

8   e-mail that has a message on top and not below.  We

9   fixed it, and we're going to start again with the

10  document.

11         THE COURT:  Okay.  You can bring in the jury.

12         MR. RABER:  And one more about scheduling, we

13  have -- there's probably only another minute left of

14  this and maybe 10 minutes of theirs, and we're at a

15  point with Scolnick where we haven't quite worked out

16  all of the things that need to go to Your Honor, so

17  given the hour, I don't know if we want to end today

18  with 10 -- the remaining 10 minutes here.  We're

19  prepared to have a live witness on Tuesday, Tuesday

20  morning.

21         THE COURT:  How long is Scolnick?

22         MR. RABER:  He is at least an hour and 15

23  minutes.

24         MR. BUCHANAN:  Probably it could take the

25  typical 20 minutes for us to work out the objections

                                          3360
                    Colloquy

1   with Your Honor and then the 10 minutes to fix the

2   tape, so, realistically, the jury wouldn't start

3   hearing it until --
                         Page 43

9 Ex A MIL 9  Humeston Trial 10-07-05

 4              MR. RABER:  4:00 probably.

 5              MR. BUCHANAN:  45 minutes from now.

 6              THE COURT:  Okay.  We'll do it Monday, I

 7  guess.  So who is your witness Monday?

 8              MR. RABER:  We're not sure exactly who, but

 9  we'll let them know 48 hours is what we have been

10  operating on before Tuesday.

11              MR. BUCHANAN:  We'll be on pins and needles

12  until Sunday morning, Your Honor.

13              THE COURT:  You can bring the jury in.

14              (The jury enters the courtroom.)

15              THE COURT:  You can be seated.

16              MR. RABER:  Okay.  We have squared away our

17  technical problem, and we're going to start with the

18  document again, Your Honor.

19              THE COURT:  Okay.

20              (Whereupon, the videotape is played for the

21  jury.)

22              MR. RABER:  Your Honor, that concludes our

23  portion.  I understand the plaintiff has some video

24  they wish to play, as well.

25              MR. SEEGER:  Your Honor, it is only about



                                                        3361
                         Colloquy

 1  four or five minutes.

 2              (Whereupon, the videotape is played for the

 3  jury.)

 4              THE COURT:  That's it?

 5              MR. SEEGER:  That is it.

                         Page 44

9 Ex A MIL 9  Humeston Trial 10-07-05

6        THE COURT:  Okay.  You can get the lights.  I
7   hate to do this, but counsel has advised me that we'll
8   have a full day on Tuesday, and we'll start with a live
9   witness on Tuesday hopefully.
10        MS. SULLIVAN:  Yes, Your Honor.
11        THE COURT:  But there's another tape that
12   they need to edit and a couple other things we have to
13   do, so I'm going to let you go for the day.  I'll ask
14   you to report on Tuesday at 9:30.  It is a long weekend
15   but I hope you enjoy it, and don't talk to anybody
16   about the case.  Enjoy your weekend.  We'll see you
17   9:30 on Tuesday.
18             (The jury leaves the courtroom.)
19        MR. RABER:  I would like a moment to address
20   a couple things from this morning.
21        THE COURT:  You can.
22        MR. RABER:  Your Honor, as Your Honor knows,
23   I was admitted especially to practice in this court
24   under the pro hac vice procedures in New Jersey, and I
25   consider it a privilege to be here.


                                              3362
                            Colloquy
1             I also want to assure Your Honor that I take
2   my duties as an Officer of the Court very seriously,
3   and I feel that some of the statements that were made
4   this morning suggesting conduct on my part, I don't
5   think there's a basis for that, Your Honor, with all
6   due respect, and the gist of it seemed to be that there
7   was somehow misleading statements about the witness'
8   personal knowledge of the events about which he

                         Page 45

9 Ex A MIL 9   Humeston Trial 10-07-05
9    testified, and, Your Honor, this morning said that

10   Dr. Morrison was the head of the VIOXX project team and

11   that it was, therefore, unusual that he wouldn't get

12   documents in that capacity.  He was not the head of the

13   VIOXX project team; Alan Nies was.  Dr. Morrison worked

14   for Barry Gertz.  He worked for Dr. Nies, and so I

15   think the suggestion that someone in Dr. Morrison's

16   position would necessarily have gotten those documents

17   I don't think is supported, Your Honor, by the position

18   that he had at that time.

19         THE COURT:  I stand corrected on that point.

20   I don't think it makes any difference in anything I

21   ruled.

22         MR. RABER:  I also note that when Your Honor

23   described the basis for Dr. Morrison's lack of personal

24   knowledge he testified yesterday that his first

25   exposure to the results were in conversations with

3363
Colloquy

1    other Merck scientists, Dr. Nies, Dr. Gertz and they

2    described to me that in follow-up to Garret's paper

3    some of the basic scientists were doing additional

4    animal experiments to understand where the urinary

5    PGI-M came from, and they explained, and, obviously, I

6    was an author on the paper.  We knew what the

7    possibilities were, and they explained to me that there

8    were scientists in the pharmacology group doing animal

9    experiments to rule out those possibilities that we had

10   hypothesized, and they conveyed to me at that point it

11   looked like those were all being ruled out.  And then

9 Ex A MIL 9   Humeston Trial 10-07-05

12    the next question they were working out is where in the

13    body does the prostacyclin come from.  So that was

14    communicated to me in day-to-day business working at

15    Merck with Dr. Gertz and Dr. Nies.

16           Your Honor, that's what the transcript says.

17    I know Your Honor has an interpretation of how strong

18    that is.  I would simply state that that is a clear

19    statement from the witness of personal knowledge based

20    on his day-to-day work at Merck, his day-to-day

21    communication with his supervisors, and the suggestion

22    that there was no factual basis for me asking him

23    questions on the grounds that he had no personal

24    knowledge I do not think is supported by the record,

25    and I can assure Your Honor that I'm here taking my

3364 Colloquy

1    duties as an officer of the Court seriously.  I will

2    contend to conduct myself in that matter, and I

3    appreciate having the opportunity to say these
things.

4           THE COURT:  Okay.  I'll see you Tuesday,
and

5    if you can do the -- if you can come back with
anything

6    on Scolnick so we can get that done that would be

7    helpful.

8           MR. BUCHANAN:  We'll come right back, Your

9    Honor.

10          (End of proceedings.)

Page 47

9 Ex A MIL 9  Humeston Trial 10-07-05

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3365

C E R T I F I C A T I O N

I, REGINA A. TELL, C.S.R., C.R.R., License Number
30X100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a true
and accurate compressed transcript to the best of my
knowledge and ability.

9 Ex A MIL 9  Humeston Trial 10-07-05

_____ 10-7-05
Regina A. Tell, CSR-CRR Official
Court Reporter Atlantic County
Courthouse
Mays Landing, New Jersey