Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

"The likelihood is, if this is a risk, it will be a small one because our experience to date does not reveal an excess of cardiovascular events."[23]

### (4)    Studies That Merck Did Not Conduct

The fact that MRL scientists decided not to conduct certain studies proposed by Drs. FitzGerald[*] and Oates[*] does not in our view suggest that Merck scientists did not take reasonable steps to test the validity of Dr. FitzGerald's[*] hypothesis.  The evidence shows that MRL scientists concluded that the studies proposed by Drs. FitzGerald[*] and Oates[*] would not answer directly or conclusively the fundamental questions posed by the findings of Protocol 023 – whether Vioxx suppressed prostacyclin production in human vasculature, and, if so, whether Vioxx increased the risk of cardiovascular events in humans – and that the way to answer those questions was by collecting clinical trial data. Moreover, as discussed above, MRL did conduct a number of studies to explore the FitzGerald prostacyclin hypothesis, a fact that cuts against the allegation that MRL failed to conduct certain studies proposed by its outside experts out of fear of what the results would reveal.

---

[23]    Stacey Burling[*], Penn Study Hints at Risks with Cox-2 Painkillers/The New Drugs May Increase a Patient's Chances of Getting a Stroke or a Heart Attack, Phila. Inq., Feb. 1, 1999 (quoting Dr. FitzGerald[*] as stating that he would "fully endorse [the FDA's] decision not to allow [the FitzGerald prostacyclin hypothesis] to retard their approval of Celebrex").

- 41 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### 4.   Allegation No. 4:  Merck Did Not Publish The FitzGerald Prostacyclin Hypothesis in a Timely Manner and Did Not Disclose it to the FDA.

#### a.   Summary of Allegation.

The results of Protocol 023 – including the data reflecting a decrease in urinary prostacyclin metabolites in patients taking Vioxx – were made available to Merck and its consultants in late 1997 but were not published until May 1999.  It is asserted that Merck did not want the FDA to know about the FitzGerald prostacyclin hypothesis at least until Vioxx was approved for sale and was concerned that publication of the article might delay approval.  For this reason, it is asserted, Merck also did not address the FitzGerald prostacyclin hypothesis in the New Drug Application it submitted for Vioxx.

#### b.   Our Findings and Conclusions.

We have discovered no evidence to suggest that any members of Merck management sought to conceal the FitzGerald prostacyclin hypothesis from the scientific community or the FDA.  Although the New Drug Application, submitted to the FDA on November 23, 1998, did not expressly refer to Dr. FitzGerald's[*] hypothesis, Merck submitted the data from Protocol 023 on which it was based, including the PGI-M (urinary metabolite) data.  The application also stated that the clinical effects of Vioxx's potential suppression of prostacyclin without a counterbalancing inhibition of thromboxane might require further study.

The New Drug Application set forth the view held by MRL scientists about the cardiovascular safety profile of Vioxx, namely, that Vioxx had no effect on platelet

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx                September 5, 2006
Debevoise & Plimpton LLP

function and that therefore, as compared to non-selective NSAIDs which inhibited

platelets, there could be a relatively increased rate of cardiovascular events on Vioxx.

In addition, Merck's Background Package submitted to the FDA for the

April 20, 1999 meeting of the FDA Arthritis Advisory Committee stated:

> It had been suggested that specific COX-2 inhibition might
> increase the risk for cardiovascular events due to the lack of
> platelet function inhibition.  It is clear that rofecoxib does
> not inhibit platelet aggregation and would not, therefore,
> convey the cardioprotective properties attributed to
> low-dose aspirin.  While this benefit is not offered by
> rofecoxib, there is no evidence, preclinically or clinically,
> to suggest that rofecoxib carries any increased risk for
> cardiovascular events.[24]

Dr. Maria Lourdes Villalba[*], the FDA medical reviewer who evaluated Merck's

New Drug Application, has stated that when she reviewed the Vioxx application in 1998,

"[t]here were theoretical concerns regarding that inhibition of prostacyclin could induce

prothrombotic events" but that "based on these data [in the application], there was not

much to say about it."  Dr. Villalba[*] further noted that "Celebrex had recently been

approved, in December '98, and Celebrex had not shown anything either."[25]  As Dr.

Villalba[*] noted, at the time that the Vioxx New Drug Application was under

consideration, the FDA already had reviewed data in support of the Celebrex New Drug

---

[24]   MRL Background Package for 4/20/99 FDA Arthritis Advisory Committee meeting,
      MRK-ACD0064939, at 5109.

[25]   Transcript of 2/16/05 Joint Meeting of the FDA Arthritis Advisory Committee and the Drug Safety
      and Risk Management Advisory Committee, MRK-AIU0185869, at 6108.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Application, including data from the McAdam study (a study similar to Protocol 023 that Dr. FitzGerald[*] conducted with Celebrex).

With respect to the article about Protocol 023, the evidence shows that Dr. FitzGerald[*] and Dr. Catella-Lawson[*] submitted a draft of the article manuscript for MRL's review in January 1998, as was the protocol for Merck-funded studies. MRL scientists Dr. Barry Gertz and Dr. Briggs Morrison engaged in lengthy discussions with Drs. FitzGerald[*] and Catella-Lawson[*] over the meaning of the data and the manner in which it should be presented in the published article. The MRL scientists believed that the article should focus on the primary objective of the trial – assessing the renal effects of Vioxx – and the data relevant to that objective, while Dr. FitzGerald[*] and his team wanted to feature prominently the FitzGerald prostacyclin hypothesis and its potential implications for selective Cox-2 inhibitors.

As described in detail in Appendix A, although the evidence shows that there were sharp differences in the opinions of the MRL scientists and the outside authors and that, as a result, the negotiations were difficult and at times heated, there is no evidence that Drs. Gertz and Morrison were motivated by a desire to hide data or prevent the dissemination of a hypothesis that they viewed as evidence of an increased cardiovascular risk on Vioxx. MRL signed off on the draft manuscript, which included the prostacyclin hypothesis, in April 1998. The publishing delay was not caused by Merck: the first journal to which the article was submitted, the New England Journal of Medicine, declined to publish the article, and it was thereafter submitted to Journal of Pharmacology

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

and Experimental Therapeutics in October 1998, accepted in January 1999, and published in May 1999.  The published article included the FitzGerald prostacyclin hypothesis.

As discussed above, the FitzGerald prostacyclin hypothesis was the main impetus for the Cardiovascular Adjudication SOP, although the hypotheses that traditional non-selective NSAIDs and/or Vioxx might be cardioprotective influenced the decision as well.  Merck submissions to the FDA varied in the extent to which they identified the FitzGerald prostacyclin hypothesis as a primary motivation for the SOP.  For instance, Merck's June 2000 submission to the FDA stated that the Cardiovascular Adjudication SOP was developed to "determine whether there [was] a difference in the degree of cardiovascular protection conferred by . . . COX-2 selective inhibitors versus nonselective COX-1/COX-2 inhibitors or placebo."[26]  Merck's Background Package for the February 8, 2001 meeting of the FDA Arthritis Advisory Committee, however, stated that the SOP had been established to investigate the hypotheses that Vioxx might be pro-thrombotic or that traditional non-selective NSAIDs might be cardioprotective.[27]

There is no evidence that Merck withheld from the FDA any evidence regarding the metabolite findings of Protocol 023 or the incidence of thrombotic events in Vioxx trials or that anyone at Merck purposefully attempted to mislead the FDA or the public about the reasons for the adjudication procedure.  Indeed, Merck notified the FDA in December of 1998 about its intent to adjudicate cardiovascular adverse events in Vioxx

---

[26]   6/29/00 sNDA Cardiovascular Events Analysis, MRK-00420018004, at 015.

[27]   MRL Background Package for 2/8/01 FDA Arthritis Advisory Committee Meeting, MRK-ABK0456845, at 859.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

trials and submitted a copy of the Cardiovascular Adjudication SOP (which expressly

referred to the FitzGerald prostacyclin hypothesis) to the FDA in May 1999.

> **5.    Allegation No. 5:  Merck Cancelled a Gastrointestinal Outcomes
> Trial in 1997 Because MRL Scientists Feared that the
> <u>Cardiovascular Results Would Be Unfavorable.</u>**
>
> **a.    Summary of Allegation.**

In 1997, as part of Merck's strategy of accelerating FDA approval and the

commercial introduction of Vioxx, MRL scientists designed a gastrointestinal outcomes

trial to prove that Vioxx caused less gastrointestinal injury than traditional non-selective

NSAIDs.  Such proof, the Company hoped, would convince the FDA that Vioxx should

be marketed without the standard gastrointestinal warning on the label of all traditional

non-selective NSAIDs, which in turn would put Vioxx at a marketing advantage over

traditional non-selective NSAIDs.

Critics claim, however, that in trying to design that trial MRL scientists

recognized that Merck was in a "no win situation" because the study would likely reveal

increased cardiovascular events in patients who took Vioxx versus those in the study who

took a non-selective NSAID comparator.[28]  Critics further allege that MRL scientists

tried to design the gastrointestinal outcomes study around this problem by excluding high

risk patients from the study in the hope that Vioxx's cardiovascular risks "would not be

evident."

---

[28]    Anna Wilde Mathews* & Barbara Martinez*, <u>Warning Signs: E-Mails Suggest Merck Knew Vioxx's
Dangers at Early Stage,</u> Wall St. J., Nov. 1, 2004, at A1.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

According to critics, Merck cancelled the planned gastrointestinal trial for fear that it would highlight the cardiovascular risks of Vioxx and, as MRL's Dr. Briggs Morrison stated in an email to Dr. Alise Reicin, "kill [the] drug."[29]  Critics further assert that Vioxx likely would not have been approved by the FDA if the study had been conducted.

### b.    Our Findings and Conclusions.

As discussed above, internal documents from 1996 and 1997 regarding the design of a gastrointestinal outcomes trial do not reflect a belief that Vioxx was, or even might be shown to be, prothrombotic.  When read in full and in context, the documents reflect a concern that the results of a trial against a non-selective NSAID with cardioprotective properties might be misinterpreted.  We are aware of no evidence indicating that the trial was cancelled in response to a belief that Vioxx might be prothrombotic.  The internal correspondence about the trial documents a thoughtful exchange among MRL scientists focused on whether to allow people in the trial to take low-dose aspirin.  Read in context, the now-famous "kill the drug" email makes clear that an important consideration in designing the trial was that, because Vioxx did not inhibit Cox-1 as did non-selective NSAIDs, patients in the Vioxx arm would be likely to experience more thrombotic events than the patients who were receiving a non-selective NSAID comparator.[30]

---

[29]    Anna Wilde Mathews[*] & Barbara Martinez[*], <u>Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage</u>, Wall St. J., Nov. 1, 2004, at A1.

[30]    As described in Appendix A, in early 1997, MRL scientists Drs. Briggs Morrison, Alise Reicin and Brian Daniels engaged in email correspondence about the design of a gastrointestinal outcomes trial and whether such a trial should exclude low-dose aspirin. Dr. Morrison wrote:  I know this has been

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

The evidence indicates that Merck decided to cancel the trial in August 1997 after

FDA representatives suggested to MRL scientists and regulatory officials that even if

data from the planned trial were favorable the FDA was unlikely to approve a label for

Vioxx without the standard NSAID-class gastrointestinal warning.

### B.   Summary of Principal Criticisms and Findings Concerning Merck's Scientific Response to VIGOR Trial Cardiovascular Data.

Based on further discussion with the FDA as well as the news that Searle/Pfizer

was planning a gastrointestinal outcomes trial for Celebrex, Merck subsequently revisited

the decision to conduct a gastrointestinal outcomes trial and planned the VIGOR Trial.

The VIGOR Trial was a gastrointestinal outcomes trial designed to prove the Cox-2

hypothesis. Data from the trial were unblinded on March 9, 2000. Although the

gastrointestinal results were favorable, the unadjudicated data available at that time

showed that among the 4,046 patients in the Vioxx group of the trial, there were 92

serious cardiovascular events, 21 of which were reported as myocardial infarctions (heart

attacks) and 15 of which were reported as strokes, and that among the 4,029 patients in

the naproxen group, there were 46 serious cardiovascular events, including 9 reported

myocardial infarctions and 7 reported strokes. (After the data were adjudicated, there

were 20 confirmed myocardial infarctions in patients who took Vioxx, and 4 confirmed

---

discussed to death, but real world is everyone is on [low-dose aspirin], so why exclude AND without
COX-1 inhibition you will get more thrombotic events and kill drug." 2/25/97 email from
B. Morrison to T. Simon, B. Daniels, E. Ehrich, and A. Reicin, MRK-LEH0058311, at 12. Dr. Reicin
responded: "Low Dose Aspirin – I HEAR YOU! This is a no win situation! . . . . What about the idea
of excluding high risk CV patients- ie those that have already had an MI, CABG, or PTCA? This may
decrease the CV event rate so that a difference between the two groups would not be evident. . . ."
2/25/97 email from A. Reicin to T. Simon, B. Daniels, E. Ehrich, and B. Morrison,
MRL-LEH0058311, at 11.

Report of John S. Martin, Jr. to the Special Committee                     September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

myocardial infarctions in patients who took naproxen.)  The manner in which MRL

scientists came to consensus about the meaning of these cardiovascular data and the

follow-up investigations they conducted have been criticized extensively.

Our conclusions with respect to these criticisms are based on our finding that,

after analyzing the VIGOR Trial data, MRL scientists developed the view that the

between-treatment difference in cardiovascular events most likely was due to the

cardioprotective effects of naproxen.  Extensive documentary evidence, which is set forth

in detail in Appendices E and F, traces the evolution of their beliefs regarding what

caused the between-treatment difference as well as the manner in which they continued to

investigate the data.  While MRL scientists recognized that it was impossible to prove a

negative, i.e., that Vioxx posed no cardiovascular risk, the dialogue in many of these

internal documents reflects a firm belief in the safety of Vioxx and an equally firm belief

that the cardioprotective effects of naproxen best explained the between-treatment

difference in the incidence of cardiovascular events in the VIGOR Trial.

### 6.    Allegation No. 6: Merck Tried to Design the VIGOR Trial in the First Instance to Avoid Creating Negative Cardiovascular Data.

#### a.    Summary of Allegation.

It is alleged that Merck attempted to design the VIGOR Trial to avoid generating

cardiovascular results that were "statistically significant" by (i) excluding from the study

patients over 55 who were more likely to have a heart attack, (ii) including more women

who are less heart attack-prone than men, (iii) eliminating from the study anyone with a

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

prior heart problem, and (iv) eliminating any aspirin users.  Critics allege that the VIGOR

Trial exposed the danger of Vioxx despite these efforts at concealment.[31]

### b.    Our Findings and Conclusions.

Based on our review of the record, it is clear that because no one at Merck

believed that Vioxx was prothrombotic at the time that the VIGOR Trial was planned,

scientists involved in the trial design were not concerned that a large clinical trial would

unmask a cardiovascular risk.

The evidence shows that certain design decisions dictated to a large extent the

VIGOR Trial's patient population.  For example, the FDA recommended that Merck test

Vioxx's gastrointestinal effects at a high dose because if the gastrointestinal outcomes

data were favorable at a high dose, they were likely to be even more favorable at the

more frequently prescribed lower dosages.  The FDA also recommended testing Vioxx at

a higher-than-recommended dose out of a concern that patients experiencing pain would

take higher-than-recommended doses in an effort to alleviate their pain more quickly and

fully – a phenomenon known as dosage creep.

The recommended doses for osteoarthritis, the principal target market for Vioxx,

were 12.5 mg and 25 mg.[32]  The record reflects that MRL scientists did not think that it

would have been ethical to test a higher-than-recommended or necessary dose of Vioxx

---

[31]    7/11/05 transcript of Ernst v. Merck & Co., No. 19961*BH02, Tex. Dist. Ct., at 72-73.

[32]    After the VIGOR Trial was planned and commenced, Vioxx was in fact approved for the treatment
and signs of osteoarthritis.  The FDA-approved label for Vioxx stated that the recommended starting
dose was 12.5 mg once daily and that "[s]ome [osteoarthritis] patients may receive additional benefit
by increasing the dose to 25 mg once daily."

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

in that population.  In addition, MRL scientists believed (although the FDA was not

convinced) that it already had proved the Cox-2 hypothesis in osteoarthritis patients.

Merck planned to seek a future indication for rheumatoid arthritis patients, and

MRL scientists and external consultants agreed that it made sense to conduct the trial in

such patients.  The dosage for such patients had not been determined at the time the trial

was being designed but was thought to be at least 25 mg, so conducting the trial with a

50 mg dose of Vioxx did not present an ethical concern.

According to Dr. Alise Reicin, the MRL scientist who drafted the VIGOR Trial

protocol, the decision made in 1997 to exclude low-dose aspirin from the trial so that the

anticipated positive gastrointestinal results would not be confounded, was equally valid

for the VIGOR Trial, which was a gastrointestinal outcomes trial.  MRL scientists also

decided to exclude from the trial patients with a recent history of cardiovascular disease

(e.g., stroke within the past two years, coronary artery surgery or heart attack within the

past year, or uncontrolled hypertension) because such patients, under FDA guidelines,

should take low-dose aspirin for cardiovascular prophylaxis.

### 7.   Allegation No. 7: The Head of MRL Acknowledged the Cardiovascular Danger of Vioxx.

#### a.   Summary of Allegation.

To support their claim that MRL scientists knew that the VIGOR Trial

cardiovascular data proved that Vioxx was prothrombotic, Merck's critics point to an

email that Dr. Edward Scolnick, the head of MRL, sent shortly after he received the

VIGOR Trial data in which he stated:  "the [cardiovascular] events are clearly there. . . .

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

it is a shame, but it is a low incidence and it is mechanism-based as we worried it was."[33]

Dr. Scolnick's March 9, 2000 email has been interpreted in the Vioxx tort litigation as

reflecting his understanding that the "mechanism-based" effect in the VIGOR Trial had

confirmed the FitzGerald prostacyclin hypothesis, which is why he told other MRL

scientists that he wanted to make "clear to the world" that this was an effect of the entire

class of selective Cox-2 inhibitors, not just Vioxx.[34]

### b.    Our Findings and Conclusions.

The most compelling evidence as to whether Dr. Scolnick believed that Vioxx

was prothrombotic are his own words, written after MRL scientists had analyzed the

VIGOR Trial data and after cardiovascular data from the placebo-controlled Alzheimer's

trials were unblinded.  Although Dr. Scolnick has testified that his first reaction to the

VIGOR Trial data – as reflected in his March 9, 2000 email – was that Vioxx was

prothrombotic,[35] the internal emails quoted above at pages 21 and 22 reflect that Dr.

Scolnick quickly came to the view that the totality of the data did not support that

---

[33]   3/9/00 email from E. Scolnick to D. Shapiro, A. Reicin, and A. Nies, MRK-ABH0016220 (quoted in
Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's
Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1); see also 9/14/05 transcript of Humeston v.
Merck & Co., ATL-L-2272-03 MT, N.J. Super. Ct. Law Div., at 42-43.

[34]   3/9/00 email from E. Scolnick to D. Shapiro, A. Reicin, and A. Nies, MRK-ABH0016220 (quoted in
Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's
Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1).

[35]   It should be noted that Dr. Scolnick was not among the MRL scientists to whom the Musliner
Memorandum was circulated.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

conclusion. In a late 2001 internal email, he was emphatic that the data did not support a cardiovascular warning for Vioxx because Vioxx was not unsafe.[36]

In addition to contemporaneous documents, we also reviewed numerous transcripts of Dr. Scolnick's deposition testimony and interviewed Dr. Scolnick for approximately ten hours. On the basis of this substantial body of information, we are persuaded that Dr. Scolnick concluded shortly after the VIGOR Trial unblinding that the most likely explanation for the cardiovascular results was that naproxen had provided cardioprotection. We also interviewed numerous MRL scientists who worked with Dr. Scolnick. While many of them indicated that Dr. Scolnick was highly demanding and sometimes difficult to work with, they were unanimous in the view that he was "data driven." Not a single MRL witness expressed any doubt about Dr. Scolnick's conviction that Vioxx was safe; indeed, not a single MRL witness believed that Vioxx was prothrombotic before the APPROVe Trial cardiovascular data were unblinded, which led to the withdrawal of Vioxx.

---

[36]   11/8/01 email from E. Scolnick to D. Greene, A. Nies, and B. Goldmann, MRK-ACR0009287.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

8.    **Allegation No. 8:  Merck's Naproxen Cardioprotection Hypothesis Was an Implausible Explanation for the VIGOR Trial Cardiovascular Data that the Scientific Community – and Even Some MRL Scientists – Recognized Did Not Explain the Between-Treatment Difference in Cardiovascular Events.**

a.    **Summary of Allegation.**

Merck did not acknowledge that Vioxx caused the cardiovascular events in the Vioxx arm of the VIGOR Trial and instead publicly stated that the most likely explanation for the between-treatment difference in the incidence of cardiovascular events was that the other agent in the study, naproxen, was cardioprotective.  It has been argued that this "naproxen cardioprotection hypothesis" was not a plausible scientific explanation and that MRL should not have propounded the theory in the first instance or continued to adhere to it after its own data disproved it.  The following reasons have been offered in support of such criticisms:

First, critics claim that there was no hard clinical evidence to support the naproxen cardioprotection hypothesis.

Second, critics allege that MRL's outside consultants told MRL senior management that the VIGOR Trial cardiovascular data also could be explained by Vioxx's prothrombotic properties, or by chance, and that "[m]any scientists outside the company found [Merck's naproxen cardioprotection] theory implausible. . . ."[37]

---

[37]   Alex Berenson*, Gardiner Harris*, Barry Meier* & Andrew Pollack*, Despite Warnings, Drug Giant Took Long Path to Vioxx Recall, N.Y. Times, Nov. 14, 2004, at A1; see also 7/14/05 transcript of Ernst v. Merck & Co., No. 19961*BH02, Tex. Dist. Ct., at 76-78.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Third, it is argued that the makers of naproxen never touted any alleged cardioprotective effects of the drug, which is something they surely would have done had it been true.[38]

Fourth, it is alleged that even scientists at MRL conceded that the alleged cardioprotective effect of naproxen could not account for the magnitude of the difference in the incidence of cardiovascular events between the naproxen and Vioxx arms of the study: the difference was even greater than would have been anticipated had the patients in the naproxen arm been taking low-dose aspirin for cardiovascular prophylaxis, which is the recognized gold standard for preventing blood clots.

Fifth, critics argue that a post-hoc subgroup analysis that Merck scientists performed to support the naproxen cardioprotection hypothesis was of questionable validity and allegedly failed to support the hypothesis. Based on a review that they conducted in mid-April 2000, MRL scientists determined that 4% of the patients enrolled in the VIGOR Trial should have been taking low-dose aspirin for cardiovascular prophylaxis based on FDA-approved criteria. Critics allege that separating out these patients conveyed the false impression that the between-treatment difference in the incidence of cardiovascular events in the VIGOR Trial was limited to patients in the 4% subgroup who needed cardiovascular protection and that those patients had received the needed cardioprotection from naproxen. In addition, it is alleged that when all the data were available, the between-treatment difference in cardiovascular events was not

---

[38]   7/14/05 transcript of Ernst v. Merck & Co., No. 19961*BH02, Tex. Dist. Ct., at 75.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

confined to this sub-group, so Merck's reliance on the analysis was misplaced and
misleading.

Sixth, critics assert that, as noted above, Dr. Scolnick recognized that the
cardiovascular events were "mechanism-based," that is, that they were caused by Vioxx's
selective blocking of the Cox-2 enzyme and prostacyclin. Thus, there was not a "lower"
incidence of cardiovascular events in the naproxen arm of the trial, but a "higher"
incidence in the Vioxx arm.

Finally, it is alleged that given the uncertainty about the cause of the difference in
event rates, the press release that Merck issued on March 27, 2000 announcing the results
of the VIGOR Trial should have identified other possibilities for the findings – including
the possibility that Vioxx was prothrombotic – and should not have focused exclusively
on Merck's naproxen cardioprotection hypothesis.

### b.  Our Findings and Conclusions.

As explained in the Introduction, the focus of our investigation was whether
senior management acted in bad faith, intentionally failed to investigate the
cardiovascular risks of Vioxx, or otherwise intentionally sought to mislead the scientific
community and general public with regard to the cardiovascular risks of Vioxx. Thus, it
is not our role to opine on whether the naproxen cardioprotection hypothesis was, or was
not, the best hypothesis to explain the VIGOR Trial cardiovascular results.

We investigated how MRL scientists analyzed the VIGOR Trial data, how they
arrived at (and maintained their belief in) the naproxen cardioprotection hypothesis, and
whether they did so in good faith. Based on the considerable evidence we reviewed, we

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

believe MRL scientists and management genuinely believed that the naproxen

cardioprotection hypothesis was the most likely explanation for the VIGOR Trial

cardiovascular results.

**(1) Overview of Post-VIGOR Analyses That Led
MRL Scientists to Conclude That Naproxen
Cardioprotection Was the Most Likely
Explanation for the VIGOR Trial Results**

Between March 9, 2000, when the VIGOR Trial data were first unblinded, and

March 27, 2000, when Merck issued a press release about the VIGOR Trial and the

cardiovascular results and publicly put forth the naproxen cardioprotection hypothesis,

MRL scientists performed numerous analyses to investigate the meaning of the data.

During this period, MRL's team of unblinded scientists gathered information relating to

the potential cardiovascular implications of the three central components of the VIGOR

Trial: (i) Vioxx generally and the 50 mg dosage used in the VIGOR Trial, in particular;

(ii) the study population – rheumatoid arthritis patients; and (iii) the comparator drug –

naproxen.

**(a) Review of Vioxx Cardiovascular Data**

With respect to the first component, the unblinded MRL scientists examined

cardiovascular data from other clinical trials that had included Vioxx, including the Phase

IIb/III osteoarthritis trials and two trials conducted to test the efficacy of Vioxx in

preventing or slowing the progression of Alzheimer's disease.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

(i)     **Review of unblinded data from
          osteoarthritis trials**

After the VIGOR Trial unblinding, MRL scientists re-analyzed the then-

unblinded data from the Phase IIb/III osteoarthritis trials, which reflected no statistically

significant difference (and very little numerical difference) in the rate of serious

cardiovascular thrombotic events between Vioxx (all doses) and the comparator non-

selective NSAIDs as a group.  The unblinded team also noted that "the absolute rate of

serious thromboembolic events was similar in patients treated with rofecoxib in both the

Phase III OA combined analyses [2.05/100 PYR] and VIGOR [2.12/100 PYR]," while

the rate of serious thrombotic events for patients on naproxen in the VIGOR Trial was

much lower (1.13/100 PYR).[39]  These data suggested to MRL scientists "that the

difference between rofecoxib and naproxen in VIGOR was driven by a reduction in

events in the naproxen group."[40]

(ii)    **Review of placebo-controlled data from
          Alzheimer's trials**

Merck's Protocol 078 tested the efficacy of Vioxx in preventing the conversion of

mild cognitive impairment into Alzheimer's disease, and Protocol 091 tested the efficacy

of Vioxx in slowing the progression of the symptoms of Alzheimer's disease.  These

---

[39]    3/23/00 preliminary VIGOR report to FDA, MRK-ABK0460838, at 47, 51, 63.  ("PYR" means
        patient years at risk.)  Some Merck documents refer to certain cardiovascular events as "thrombotic"
        and other Merck documents refer to these same events as "thromboembolic."  Although there is a
        clinical difference, witnesses and Merck internal documents used these terms interchangeably to refer
        to cardiovascular events caused by a clot, such as a myocardial infarction or stroke.  We use the term
        "thrombotic" throughout this Report.

[40]    3/23/00 preliminary VIGOR report to FDA, MRK-ABK0460838, at 63.

Report of John S. Martin, Jr. to the Special Committee                        September 5, 2006
of the Board of Directors of Merck & Co., Inc.                                Debevoise & Plimpton LLP
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

trials (collectively, the "Alzheimer's trials"), which were still blinded in March 2000,

contained a large number of patients (over 2000) who had been on either Vioxx 25 mg or

placebo for, at that point, an average of nine months.[41]

      After the VIGOR Trial unblinding, the decision quickly was made to partially

unblind the serious cardiovascular event data from these two ongoing trials into

"Treatment Group A" and "Treatment Group B" (without disclosure of treatment type) in

order to obtain placebo-controlled data on the cardiovascular effects of Vioxx.  Then, if

an imbalance were found between the treatment groups, Merck would totally unblind the

data and see if there was evidence against placebo that Vioxx was prothrombotic.

      There were 26 patients with serious thrombotic cardiovascular events in group A

versus 32 patients with such events in group B, approximately a 20% difference, though

not a statistically significant one.  However, the number of events characterized by

investigators as either "myocardial infarctions" or "acute myocardial infarctions" was

equal between the two groups (eight in each arm) as was the number of events

investigators labeled "cerebrovascular accidents," i.e., strokes (five in each arm).[42]  As a

result, Dr. Scolnick felt comfortable that the data did not show an overall imbalance

between the two groups or a prothrombotic effect in one arm, and he did not ask for the

---

[41]   Cardiovascular events from these trials were being collected pursuant to normal procedures for
       reporting and collecting all adverse events and, under the Cardiovascular Adjudication SOP discussed
       above, were being sent to an external adjudication committee.

[42]   3/23/00 preliminary VIGOR report to FDA, MRK-ABK0460838, at 55.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

data to be fully unblinded to reveal which group was which.[43]  Unblinding as to treatment group would have revealed that the group with the lower total number of patients with events, group A, was the Vioxx treatment group.

The cardiovascular data from the Alzheimer's trials were extremely important to MRL's understanding of the VIGOR Trial cardiovascular data.  Several MRL scientists, including Dr. Scolnick, recalled that it convinced them that the cardiovascular event differential in the VIGOR Trial was caused by naproxen's cardioprotective effects and not any prothrombotic effect of Vioxx.

### (iii)    Dr. Barr's analysis

Dr. Eliav Barr, an MRL antiplatelet expert working in the Vaccines division who was tapped by Dr. Scolnick to help investigate the VIGOR Trial cardiovascular data, requested additional information so that he could begin an in-depth review of the cardiovascular events in the VIGOR Trial that had been reported as of March 9, 2000. He requested adjudication packages for the adjudicated cardiovascular events and reports from the Worldwide Adverse Event System for all reported cardiovascular adverse events in the VIGOR Trial (including, but not limited to, those that had been or were to be adjudicated).  He also requested background patient demographic data.  Dr. Barr examined adverse event data on epistaxis (nose bleeds), a common side effect of antiplatelet treatment, and found significantly more nose bleeds in the naproxen arm (27)

---

[43]    3/21/05 Open Letter from E. Scolnick, "Vioxx:  Scientific Review," MRK-AFO0288987, at 993-94. The decision not to fully unblind the data was influenced by the fact that once a trial is unblinded, the trial may be considered compromised.  For that reason, during the pendency of a clinical trial, every effort is made to keep the data blinded.