Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Compliance. That office, under the leadership of Ms. Lucine Beauchard, undertook a comprehensive review of all existing Merck Marketing and Sales programs, winnowed down the number of programs (to simplify oversight and compliance and ensure that all programs furthered Merck's legitimate business purposes), clarified the written policies for each approved program, and made structural changes that further separated marketing and selling from medical and scientific activities.

The evidence shows that the initiative was aimed at the marketing and sale of all Merck products and was not specific to Vioxx. In addition, the fact that a program was discontinued or changed pursuant to the initiative did not mean that it was determined to have been abused. Rather, the focus was to underscore Merck's strong commitment to ethical business practices. Notably, the Culture of Compliance was voluntarily initiated in response to internal concerns at Merck and was not in response to any federal or state investigation of sales practices at Merck or in the pharmaceutical industry. While no set of policies can completely eliminate the risk of rogue sales representatives or other sales and marketing personnel engaging in conduct that violates Company policy, the Culture of Compliance reflected a strong desire on the part of the Company to aggressively address any such conduct and to promote high standards of ethical behavior.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### 20. Allegation No. 20: Merck's Marketing Department Unduly Influenced the Scientific Research Agenda.

#### a. Summary of Allegation.

It is argued that after the VIGOR Trial data were unblinded, "Merck allowed marketing to trump its scientists"[106] and to determine what Vioxx trials should be conducted. For example, Marketing executives purportedly "rejected pursuing a study focused on Vioxx's cardiovascular risks apparently because [they] feared it could send the wrong signal about the company's . . . confidence in Vioxx. . . ."[107] An internal Marketing presentation to senior executives states: "At present, there is no compelling marketing need for such a study . . . . Data would not be available during the critical period. The implied message is not favorable."[108] It is argued that this emphasis on marketing over science underscored Merck's desire to put profits above patient safety.

#### b. Our Findings and Conclusions.

The criticism that Merck's Marketing Department dictated the scientific research agenda is not supported by the evidence. To the contrary, documentary and other evidence underscores that all research decisions were made by MRL senior management. When Mr. Gilmartin joined the Company in 1994, he created a number of cross-disciplinary teams, including the Human Health Product Approval Committee.

---

[106] Christopher Bowe* & Simon London*, The Company's Chief Executive Faces a US Senate Hearing Today, Financial Times (London), Nov. 18, 2004, at 19.

[107] Alex Berenson* et al., Despite Warnings, Drug Giant Took Long Path to Vioxx Recall, N.Y. Times, Nov. 14, 2004, at 1.

[108] Alex Berenson* et al., Despite Warnings, Drug Giant Took Long Path to Vioxx Recall, N.Y. Times, Nov. 14, 2004, at 1.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Mr. Gilmartin believed that in a company the size of Merck, interaction between various departments was critical to ensure that the Marketing, Public Affairs and other Departments understood the scientific product profiles so that they would be better positioned to address questions and engage in strategic planning. In addition, the Human Health Product Approval Committee allowed MRL scientists to hear from members of the Marketing Department about what doctors in the field were looking for in a drug.

Critics point to a slide presentation from a May 2000 Human Health Product Approval Committee meeting which reflects that the Marketing Department sought approval of a decision not to proceed with a cardiovascular outcomes trial as evidence that the Marketing Department directed the scientific agenda. The record shows that in the immediate aftermath of the VIGOR Trial unblinding, MRL scientists discussed conducting an outcomes trial. As discussed above in response to Allegation No. 8, however, they had concluded by May 2000, based on their review and analysis of cardiovascular data from the Vioxx clinical program, that the difference in the incidence of cardiovascular events between the Vioxx and naproxen groups in the VIGOR Trial most likely was caused by the cardioprotective effect of naproxen and that Vioxx was cardio-neutral. While members of the Marketing Department were invited to express their views, it was MRL that determined that a cardiovascular outcomes trial was not necessary. Members of senior management in both MRL and the Marketing Department were unequivocal that if MRL had believed that it was necessary to conduct an outcomes trial, the views of the Marketing Department would have been irrelevant.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

While it is true that at one point in time some people in the Marketing Department thought that announcing a cardiovascular risk study of Vioxx would send a wrong message, at another time Marketing personnel thought that such a study was necessary to put to rest the competition's clam that the VIGOR Trial showed that Vioxx was prothrombotic. In the end it was the MRL scientists who determined what studies should be conducted, and when.

### 21. Allegation No. 21: Merck Went on the Offensive Against Doctors and Academics who Questioned Vioxx's Cardiovascular Safety.

#### a. Summary of Allegation.

It is alleged that when academic researchers raised questions about Vioxx's cardiovascular safety, Merck "struck back hard."[109] Merck's approach was first to try and persuade critics to change their views. If that did not work, a Merck executive would threaten and try to discredit critics. A letter to Mr. Gilmartin, Merck's Chairman and Chief Executive Officer, from Dr. James Fries*, a Stanford University Medical School doctor, sums up Merck's tactics in this regard. As explained by Dr. Fries*, Merck's Dr. Louis Sherwood met with academics and threatened them with consequences, financial and reputational, if they were not more favorable to Merck.[110] Dr. Fries'* letter

---

[109] Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.

[110] Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1.; Thomas Ginsberg*, Threats to Critics of Vioxx Alleged, Phila. Inq., June 5, 2005, at A1.

- 124 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

identified eight academic physicians he alleged were threatened or retaliated against by Dr. Sherwood or other Merck employees.

### b.  Our Findings and Conclusions.

The complete record we reviewed reflects that Dr. Louis Sherwood, a former academic Chairman and former head of the Medical and Scientific Affairs division of U.S. Human Health, was the most senior U.S. Human Health representative to meet with physicians who were identified as anti-Vioxx to educate them about Vioxx. His scientific and academic background made him, it was believed, well-suited to the job. While one can legitimately question some of the conduct attributed to Dr. Sherwood, it is clear that when complaints came to the attention of Mr. Gilmartin, he responded appropriately.

After Mr. Gilmartin received the letter from Dr. Fries[*] accusing Dr. Sherwood of intimidating and threatening professors and physicians who questioned the safety of Vioxx, Mr. Gilmartin directed Mr. Anstice, President, Human Health – The Americas, to investigate the allegations, which he did. Mr. Anstice asked Dr. Sherwood to write a memorandum responding to Dr. Fries'[*] allegations.

Dr. Sherwood's four-page, single-spaced memorandum reflects his belief, in each instance, that he was completely justified in the manner in which he contacted physicians and discussed data with them to correct their misapprehensions. Dr. Sherwood did not think that it was appropriate for academic physicians to "go out and say anything and do anything one pleases" and he stated that he intervened on an "ad hoc basis" when such individuals did not present data in a balanced manner.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Senior Merck management, including Messrs. Gilmartin and Anstice, took steps to investigate the allegations and to ensure that any behavior by Dr. Sherwood that might have been interpreted as intimidating or threatening would not be repeated. The evidence does not suggest that Dr. Sherwood's conduct was part of an orchestrated campaign by senior management to suppress scientific discourse about Vioxx. Since Dr. Sherwood retired in 2002, we saw no need to attempt to resolve the factual disputes arising from his response to the Fries letter.

### 22. Allegation No. 22: Merck Sales Representatives Used Misleading Promotional Aids to Sell More Vioxx and Were Trained to Dodge Questions About Cardiovascular Risks.

#### a. Summary of Allegation.

According to critics, internal Company documents reveal that as soon as the VIGOR Trial results were released in March 2000, Merck "trained an army of employees visiting doctors' offices to avoid discussing negative studies about Vioxx . . ."[111] and to "dodge" questions about the cardiovascular safety of Vioxx. Sales representatives were trained using a sales aid called "Dodge Ball Vioxx." It is claimed that, to win, sales representatives had to successfully dodge 12 pages of questions – called obstacles – such as, "I am concerned about the cardiovascular effects of Vioxx."[112]

---

[111] Deidra Henderson*, Merck Told Sellers to Avoid Talk of Vioxx Heart Risks, Boston Globe, May 6, 2005, at C1.

[112] Anna Wilde Mathews* & Barbara Martinez*, Warning Signs: E-Mails Suggest Merck Knew Vioxx's Dangers at Early Stage, Wall St. J., Nov. 1, 2004, at A1 (quoting document).

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

In addition, Merck's sales representatives used a promotional piece written by the Marketing Department called a "Cardiovascular Card" to attempt to allay physicians' concerns about Vioxx's safety profile.[113] It is argued that the Cardiovascular Card was misleading in that it used old data – not the data from the VIGOR Trial, or the ADVANTAGE Trial, or Protocol 090 – to try and show that Vioxx was safe. It is further argued that the Card misleadingly stated that Vioxx was eight times safer than other NSAIDs in terms of cardiovascular mortality.[114]

In addition, during the two-year period after the VIGOR Trial but before the label change, it is alleged that Merck sought to downplay the VIGOR Trial cardiovascular results by preventing sales representatives from discussing them with physicians – even in response to physician concerns or questions.

### b. Our Findings and Conclusions.

The Sales Department employed an array of sales training materials to train sales representatives regarding what the Company deemed appropriate – and inappropriate – communications with physicians, including written instructions or roadmaps, Bulletins and voicemail messages. In addition, to reinforce Company-approved responses to questions that a physician might ask, Merck also developed training games. Critics have highlighted one such training game in particular, Dodge Ball Vioxx, in support of their

---

[113] Bernadette Tansey*, How Marketing Drives the Pharmaceutical Industry, S. F. Chronicle, May 6, 2005, at A1.

[114] Deidra Henderson*, Merck Told Sellers to Avoid Talk of Vioxx Heart Risks, Boston Globe, May 6, 2005, at C1; see generally 5/5/05 memorandum from H. Waxman* to Democratic Members of the Government Reform Committee, MRK-ALE0009615-43.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

claim that Merck hid product safety information from physicians by teaching sales representatives to "dodge" physician questions, particularly about cardiovascular data.

The record is clear that representatives were not instructed to "dodge" questions or hide data. Rather, Merck policy, which was designed to reinforce FDA regulations, was that representatives could only discuss with physicians data referenced in the label and were prohibited from discussing the VIGOR Trial data until the product label was changed in April 2002.

There is evidence that Merck's competitors were informing physicians of the VIGOR Trial results and arguing that the VIGOR Trial proved that Vioxx was prothrombotic. Since, as noted above, Merck sales representatives were not to address issues not on the product label, Merck's Marketing and Medical and Scientific Affairs Departments produced a number of different materials that could be given to or shared with physicians who inquired about the cardiovascular safety of Vioxx.

First, representatives were provided with a promotional aid called a "Cardiovascular Card" that presented data from the Vioxx clinical program that were included in the product label. In response to questions about Vioxx's cardiovascular safety profile, sales representatives could show the Card, which presented cardiovascular data from the trials that were referred to in the label. The purpose of the Card appears to have been to reinforce that Vioxx was safe at the dosages (12.5 mg and 25 mg) and indication (osteoarthritis) for which it was most commonly prescribed. We note that the Cardiovascular Card was approved internally by the Vioxx Medical/Legal Review Board to ensure its accuracy before it was released to the field, and was submitted to the FDA's

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Division of Drug Marketing, Advertising, and Communications. There is no evidence that either this review board, comprising an attorney and two physicians, or DDMAC believed that the Card depicted cardiovascular data from the Phase IIb/III osteoarthritis trials anything other than accurately.

Second, if a physician asked a question about the VIGOR Trial data specifically, the sales representative could request, through a physician information request (or "PIR"), that Merck send the physician a written response letter. Merck's Medical and Scientific Affairs Department would then send these physicians letters that did refer to the VIGOR Trial results.

Third, after the article about the VIGOR Trial was published in the New England Journal of Medicine, Merck's Medical and Scientific Affairs Department provided reprints of the article to physicians who requested information on the VIGOR Trial. Starting on February 28, 2001, these reprints were accompanied by a cover letter that explained that the cardiovascular data in the article were based on a reporting cut-off date of February 10, 2000 and that provided the additional adjudicated data.

Thus, while the Cardiovascular Card standing alone did not present all the available cardiovascular data concerning Vioxx, there is no reason to believe that any responsible Merck official considered the Cardiovascular Card to be misleading in the context in which it was to be used.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### D. Summary of Principal Criticisms and Findings Concerning Merck's Post-withdrawal Analysis and Reporting of Cardiovascular Data Arising From The APPROVe Trial.

The press release that Merck issued on September 30, 2004 stated that Merck decided to withdraw Vioxx from the market based on data from the APPROVe Trial that demonstrated "an increased relative risk for confirmed cardiovascular events, such as heart attack and stroke, beginning after 18 months of treatment in the patients taking VIOXX compared to those taking placebo." According to the release, "[t]he results for the first 18 months of the APPROVe study did not show any increased risk of confirmed cardiovascular events on VIOXX. . . ."[115] The article about the APPROVe Trial cardiovascular results that was subsequently published in the New England Journal of Medicine likewise stated: "the event rates [in the Vioxx and placebo groups] were similar for the first 18 months."[116] Merck has characterized the data in this way in numerous public statements throughout the post-withdrawal period.

The principal criticisms of Merck's post-withdrawal analysis and reporting of APPROVe Trial cardiovascular data arise from this 18-month claim.

First, critics allege that the claim that the risk emerged only after 18 months of continuous use is not supported by the data from the APPROVe Trial, either singly or in combination with other data from the Vioxx development program.

---

[115] 9/30/04 Merck press release, "Merck Announces Voluntary Worldwide Withdrawal of Vioxx," MRK-AFF0000040, at 40.

[116] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1092.

- 130 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Second, Merck announced on May 30, 2006 that it had made an error in an article about the APPROVe Trial cardiovascular data published in the New England Journal of Medicine (the "APPROVe article") in identifying the test used to determine whether the cardiovascular hazard ratio was constant over time or whether it increased over time. Critics claim that the error casts doubt on Merck's claim that the cardiovascular event rates on Vioxx and placebo were similar for the first 18 months of the trial and diverged thereafter.

Third, following the termination of the APPROVe Trial, in which data were collected on adverse events that occurred while patients were on treatment or within 14-days after discontinuing treatment, Merck undertook to collect follow-up data on patients originally enrolled in that trial to determine whether and to what extent the increased cardiovascular relative risk seen in the APPROVe Trial resolved 15 or more days after patients stopped taking Vioxx. It is alleged that the results of this follow-up study establish that the hazard ratio on Vioxx increased with respect to placebo not at the 18-month mark as Merck has claimed, but rather at approximately 4 months. These allegations and our findings with respect to each are discussed more fully below.

### 23. Allegation No. 23: Merck's Claim that the Increased Risk of Cardiovascular Events on Vioxx Has Been Observed Only After 18 Months of Continuous Treatment Is Not Supported by the Data.

#### a. Summary of Allegation.

Critics allege that Merck's claim based on post-hoc analyses that the increased relative risk of cardiovascular events on Vioxx relative to placebo in the APPROVe Trial emerged after 18 months of continuous treatment is not supported by the data. Critics

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

further claim that, even when the APPROVe Trial cardiovascular data are considered together with other cardiovascular data from Merck's clinical trials of Vioxx, the data are still not sufficient to rule out the possibility of an increased risk significantly earlier than 18 months into the course of treatment.

### b. Our Findings and Conclusions.

Merck scientists developed the view that the APPROVe Trial cardiovascular data showed an increased relative risk beginning at 18 months based on a number of post-hoc statistical analyses that Merck scientists conducted on the base study data. These analyses included use of a Kaplan-Meier plot, also called a time-to-event plot, which creates curves reflecting the cumulative rate of events in each treatment group over time. As shown in the figure below, the vertical axis quantifies the cumulative rate of cardiovascular events with continuous use of each treatment (Vioxx and placebo) as measured in days along the horizontal axis. The plot that MRL scientists reviewed in September 2004 (reproduced below) appears to show that there was an increase over time in the risk of confirmed thrombotic events, and that the separation between Vioxx and placebo became apparent after approximately 18 months.[117]

---

[117] 9/13/04 Pre-Meeting Report from H. Quan to APPROVe ESMB, MRK-AEO0029517, Figure 2a at 37.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP



APPROVe Trial -- Kaplan-Meier Plot for Confirmed Thrombotic Events
(August 2004 Data)

Using the preliminary APPROVe Trial cardiovascular data that were available in the summer of 2004, an MRL statistician conducted a statistical test designed to determine whether the hazard rates were proportional over time (i.e., whether the risk of an event on Vioxx relative to placebo remained constant over the course of the trial). As fully explained in Appendix R, a common method for testing the proportionality of the hazard rates is to use a Cox proportional hazards model fitted with a covariate for the assigned treatment (here, Vioxx or placebo) and either (i) a covariate for the interaction between treatment and the "logarithm of time" (the "Logarithm of Time Test") or (ii) a covariate for the interaction between treatment and "linear time" (the "Linear Time Test"). The relevant outcome of these proportional hazards tests is a p-value of between 0 and 1.0 that indicates whether sufficient evidence exists to reject the assumption built into the Cox proportional hazards model that the hazard rates are proportional over time.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

As discussed in detail in Appendix R, many biostatisticians using a Cox proportional hazards model to test the constancy of the hazard ratio would deem results as high as p=0.10, in conjunction with graphical analysis, to be sufficient evidence to reject the assumption of proportional hazards because such tests have low power. However, Merck statisticians frequently use a p-value of 0.05 as a conventional cut-off. As explained more fully below, an MRL statistician ran both the Logarithm of Time Test and the Linear Time Test and determined that there was sufficient evidence to reject the assumption that the hazard ratio was constant over time.

Finally, another important statistical analysis of the APPROVe Trial data that Merck scientists performed before withdrawing Vioxx involved reviewing the hazard ratio between Vioxx and placebo over time broken down into 6-month increments. A table reflecting the results of this analysis is reproduced below. This analysis similarly indicated "a trend for the treatment differences for major [cardiovascular] outcomes to increase over time."[118] As illustrated below, this analysis, which was based on relatively few events in each six-month segment, indicated that there was a greater number of confirmed thrombotic events on Vioxx ("Treatment B") versus placebo ("Treatment A") in every six-month increment except for the second, and that this difference was markedly greater after the 18-month mark (540 days) than it was during the first 18 months. The results for the APTC composite cardiovascular endpoint, also reproduced below, likewise showed a marked increase in hazard ratios after the 18-month mark.

---

[118] Minutes of 9/17/04 APPROVe ESMB meeting, MRK-AFF0000124, at 24.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

APPROVe Trial (August 2004 Data)
Confirmed Thrombotic Events in 6-Month Intervals

| Relday | Treatment A | | Treatment B | | Hazard Ratio |
|---|---|---|---|---|---|
| | Number of Events | Hazard (SE) | Number of Events | Hazard (SE) | |
| 0 - 180 | 5 | 0.0040( 0.0018) | 7 | 0.0058( 0.0022) | 1.4459 |
| 181 - 360 | 7 | 0.0060( 0.0023) | 4 | 0.0037( 0.0018) | 0.6147 |
| 361 - 540 | 7 | 0.0063( 0.0024) | 8 | 0.0078( 0.0028) | 1.2490 |
| 541 - 720 | 4 | 0.0038( 0.0019) | 8 | 0.0083( 0.0029) | 2.2000 |
| 721 - 900 | 2 | 0.0020( 0.0014) | 7 | 0.0076( 0.0029) | 3.8938 |
| > 900 | 0 | 0(0) | 11 | 0.0245( 0.0074) | . |

APPROVe Trial (August 2004 Data)
APTC Events in 6-Month Intervals

| Relday | Treatment A | | Treatment B | | Hazard Ratio |
|---|---|---|---|---|---|
| | Number of Events | Hazard (SE) | Number of Events | Hazard (SE) | |
| 0 - 180 | 3 | 0.0024( 0.0014) | 6 | 0.0050( 0.0020) | 2.0672 |
| 181 - 360 | 4 | 0.0034( 0.0017) | 2 | 0.0018( 0.0013) | 0.5385 |
| 361 - 540 | 5 | 0.0045( 0.0020) | 3 | 0.0029( 0.0017) | 0.6553 |
| 541 - 720 | 2 | 0.0019( 0.0013) | 7 | 0.0072( 0.0027) | 3.8372 |
| 721 - 900 | 2 | 0.0020( 0.0014) | 6 | 0.0065( 0.0026) | 3.3241 |
| > 900 | 0 | 0(0) | 9 | 0.0199( 0.0066) | . |

In assessing the APPROVe Trial cardiovascular data, MRL scientists and outside consultants also reviewed the Kaplan-Meier plots that had been prepared in connection with analyses of cardiovascular data from two placebo-controlled trials that tested the efficacy of Vioxx in preventing or slowing the progression of Alzheimer's disease. These plots similarly reflected an apparent change in the hazard ratio at approximately the 18-month mark, but because the hazard rate on Vioxx was lower than that on placebo for the first 18 months and averaged out so that the hazard rates of both treatments were similar over a 36-month period, it previously had not been possible to draw any conclusion from the change that appeared after approximately 18 months.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

These analyses support the claims that the APPROVe Trial cardiovascular data from the base study provided reasonably strong evidence of a non-constant hazard ratio, and that the cardiovascular event rates between the two arms of the study appeared similar during the first 18 months and then diverged. We are aware of no evidence conclusively demonstrating that the divergence in hazard rates in the APPROVe Trial began before the 18-month mark, but the data cannot be characterized as providing definitive evidence that the risk of experiencing a cardiovascular adverse event was in fact equal between the Vioxx and placebo arms for the first 18 months. As Dr. Scott Zeger[*], Chair of the Department of Biostatistics at Johns Hopkins University and a member of Merck's Board of Scientific Advisors, cautioned in an email to senior Merck statisticians preparing for the post-withdrawal February 2005 FDA Advisory Committee Meeting, Merck should not "conclude that the [APPROVe] data prove there is no elevated risk until 18 months," because the "confidence intervals can not rule out [an increased relative risk of] 1.5-2.0 as early as 6 months." Dr. Zeger[*] agreed that "there is reasonably compelling evidence that the relative risk is not constant across all time."[119]

Merck has made many public statements concerning the first 18 months of the APPROVe Trial and generally has used characterizations – such as "[t]he two curves appeared to be similar"[120] or "the event rates were similar in the two groups"[121] or "[t]he

---

[119] 1/31/05 email from S. Zeger[*] to J. Bolognese, MRK-AGO0069292.

[120] 3/15/05 APPROVe Trial abbreviated Clinical Study Report, Cardiovascular Safety Report, MRK-I8940100962, at 82.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

increased relative risk became apparent after 18 months of treatment"[122] – that are consistent with, and do not overstate the import of, the underlying APPROVe Trial cardiovascular data. The Company has on occasion, however, made statements about its analyses of the hazard ratio that could be misconstrued to suggest that those data prove that there is no elevated risk during the first 18 months. For example, its September 30, 2004 press release announcing the withdrawal of Vioxx stated:

> In this study, there was an increased relative risk for confirmed cardiovascular events . . . beginning after 18 months of treatment in the patients taking VIOXX compared to those taking placebo. The results for the first 18 months of the APPROVe study did not show any increased risk of confirmed cardiovascular events on VIOXX. . . .[123]

Similarly, Merck's January 21, 2005 submission to the FDA concerning the APPROVe Trial cardiovascular data stated that "in the APPROVe study, an increased risk of CV events . . . was first seen beginning after 18 months of chronic treatment"[124] and "[data] from the APPROVe study confirm the findings of our other clinical trial databases that there is no evidence for an increase in the relative risk of sustaining a

---

[121] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1092.

[122] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1092.

[123] 9/30/04 Merck press release, "Merck Announces Voluntary Worldwide Withdrawal of Vioxx," MRK-AFF0000040, at 40.

[124] MRL Background Package for 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee, MRK-S0420050740, at 774.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

thrombotic CV event for the rofecoxib group versus placebo over the first 18 months of treatment."[125] However, this same submission to the FDA also contained statements such as "Although the frequency of [cardiovascular] events were low and did not appear to be elevated compared to placebo during the first 18 months of use, a decision was made to voluntarily withdraw rofecoxib from the marketplace"[126] and "Prior to 18 months there was no apparent difference in the cumulative incidence of these [cardiovascular] events in the two groups as evidenced by the overlapping [Kaplan-Meier] plots."[127]

We find that MRL scientists were reasonable in concluding, on the basis of all available data from the base study and the results of post-hoc analyses, that there was reasonably strong evidence that the hazard ratio in the APPROVe Trial was not constant over time and that an increase in the hazard ratio appeared to begin after approximately 18 months of continuous use of Vioxx. In addition, although Merck has in some instances described the APPROVe Trial cardiovascular data in a manner that could be misinterpreted to suggest that those data preclude the possibility of an elevated risk in the first 18 months, Merck's communications concerning the 18-month issue, when considered in the aggregate, lead us to conclude that the Company only intended to assert

---

[125] MRL Background Package for 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee, MRK-S0420050740, at 778.

[126] MRL Background Package for 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee, MRK-S0420050740, at 757.

[127] MRL Background Package for 2/16/05 – 2/18/05 Joint Meeting of the FDA Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee, MRK-S0420050740, at 773.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

that the APPROVe Trial data provided no evidence of an increased relative risk during the first 18 months.

### 24. Allegation No. 24: The Article in the New England Journal of Medicine About the APPROVe Trial Cardiovascular Results and Merck's Corrective Statements Were Purposefully Misleading.

#### a. Summary of Allegation.

In February 2005, an article concerning the APPROVe Trial cardiovascular data that was co-authored by MRL scientists and a group of outside authors was published in the New England Journal of Medicine (the "APPROVe article"). The APPROVe article stated that, in the APPROVe Trial, the cardiovascular event rates for the Vioxx and placebo groups were similar for the first 18 months of the trial and diverged thereafter and that "[t]he changing pattern of the treatment effect over time was confirmed by a failed test for proportionality of hazards (P=0.01)."[128] According to the article, the test "evaluat[ed] the interaction between the logarithm of time and the assigned treatment" (i.e., was the Logarithm of Time Test).[129]

On May 30, 2006, Merck issued a press release announcing that it had recently discovered an error in the published APPROVe article and, as a result, was "correcting its

---

[128] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1097.

[129] Bresalier* RS, Sandler* RS, Quan H, et al. Cardiovascular events associated with rofecoxib in a colorectal adenoma chemoprevention trial. N Engl J Med. 2005;352:1092-102, at 1095.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

prior description of one of the statistical methods used to analyze certain data."[130]

Specifically, the release stated:

> The reference to logarithm of time in the description of methods published in the NEJM and submitted to regulatory agencies was in error. The reported result (p-value = 0.01) came from a statistical model using linear time, not logarithm of time. Recent tests show that the result using logarithm of time has a p-value = 0.07.[131]

The release stated that the error did not change any of the conclusions about the data set forth in the APPROVe article.

In addition, the release stated that "The VIOXX cardiovascular data analysis plan called for numerous statistical and graphical methods to be used to assess whether the relative risk of VIOXX compared to placebo was constant over time or if it changed over time. . . " and that "the use of the variable, logarithm of time, was an element in the primary method specified." The Company attached to the release an excerpt from the Statistical Data Analysis Plan for Protocol 203 – its planned pooled analysis of cardiovascular data from three placebo-controlled trials, one of which was the APPROVe Trial – that pertained to proportionality testing.

These events give rise to several allegations pertaining to the APPROVe article and Merck's public statements regarding the error:

---

[130] 5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064, at 64.

[131] 5/30/06 Merck press release, "Merck Corrects Description of a Statistical Method Used in APPROVe Study," MRK-AFN0110064, at 64.