Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

- For the Intention-to-Treat Analysis (including both on-drug and off-drug data), there was a statistically significant increased relative risk of both confirmed thrombotic events and APTC composite cardiovascular endpoint events on Vioxx versus placebo over the course of the four-year study period, and there was insufficient evidence to reject the assumption of proportional hazards.[151]

- For the Off-Drug Analysis, there were more cardiovascular events in the Vioxx arm than in the placebo arm – 28 versus 16 confirmed thrombotic events, and 21 versus 12 APTC events, on Vioxx versus placebo – but the difference was not statistically significant.

The Statistical Data Analysis Plan for the follow-up study specified the use of Kaplan-Meier time-to-event plots and a test of the proportionality of the hazard rates over time. Critics claim that the follow-up data refute Merck's 18-month claim based on the appearance of the Kaplan-Meier plots and the statistically non-significant result of the proportional hazards test. With respect to the proportional hazards test, MRL statisticians ran both the Logarithm of Time Test and the Linear Time Test for both endpoints (confirmed thrombotic events and APTC composite endpoint events) in the Intention-to-Treat Analysis. All four tests resulted in p-values greater than $p=0.05$, meaning that there was not sufficient evidence in the Intention-to-Treat Analysis to reject the assumption

---

[151] In the Intention-to-Treat Analysis in the follow-up study, the relative risk for confirmed thrombotic events on Vioxx versus placebo was 1.74 (95% confidence interval, 1.19 to 2.55), and the relative risk for APTC composite cardiovascular endpoint events on Vioxx versus placebo was 1.86 (95% confidence interval, 1.19 to 2.90). 5/26/06 APPROVe Extension Statistical Package, MRK-S0420112195, at 217, 228.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

that the hazard ratio was proportional throughout the trial.[152] The Kaplan-Meier time-to-event plots for the two endpoints in the Intention-to-Treat Analysis are set forth below:



---

[152] For the confirmed thrombotic endpoint in the Intention-to-Treat Analysis, the p-values were p=0.345 for the Linear Time Test and p=0.306 for the Logarithm of Time Test. 5/26/06 APPROVe Extension Statistical Package, MRK-S0420112195, Figure B2 at 220-21. For the APTC endpoint, the corresponding p-values were p=0.748 and p=0.687, respectively. Id. Figure B6 at 231.

[153] 5/26/06 APPROVe Extension Statistical Package, MRK-S0420112195, Figure B1 at 219.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP



Patients at Risk
Rofecoxib 25 mg  1287  1220  1188  1158  1140  1125  1102  1042  1002
Placebo          1300  1249  1228  1196  1181  1165  1140  1079  1036

Finally, the Company conducted a post-hoc analysis of cardiovascular events among patients who had completed the three-year base APPROVe Trial and for whom fourth-year follow-up data had been collected. There were numerically more confirmed thrombotic events among patients assigned to the Vioxx arm (15) than among those assigned to the placebo arm (9), but this difference was not statistically significant.

(2) **Import of Follow-up Data**

Analyses based on extended follow-up data such as the Intention-to-Treat Analysis have potential benefits and potential drawbacks, as discussed more fully in Appendix R. Proponents of such analyses contend that collecting data only on adverse

---

[154] 5/26/06 APPROVe Extension Statistical Package, MRK-S0420112195, Figure B5 at 230.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

events that occur while patients are on therapy or within 14 days of discontinuing therapy may exclude drug-related events that take place more than 14 days after termination of treatment, thereby potentially introducing bias into the analyses – especially if patients discontinue due to other adverse events such as hypertension and remain at risk for subsequent cardiovascular adverse events.

Others, including Merck witnesses whom we interviewed, contend that a 14-day follow-up period is reasonably designed to capture events that are drug-related and that a longer period of follow up may tend to dilute a safety signal. Merck witnesses took the position that the Intention-to-Treat Analyses specified for the follow-up study were significantly less meaningful than the on-drug analyses arising from the base study and should be heavily discounted if not disregarded entirely because they (i) mixed data on on-drug and off-drug events and (ii) incorporated events that may have occurred, in the case of early drop-outs, long after the patient discontinued therapy, thereby potentially diluting an on-drug safety signal by the addition of events that occur in similar numbers in both arms of the study in the off-drug period.

While it is beyond our mandate to attempt to resolve this scientific debate, we note that the Intention-to-Treat Analyses – like all analyses conducted on the APPROVe Trial cardiovascular data – were secondary analyses designed and conducted on a limited number of events after the base study had already been unblinded. The Intention-to-Treat Analyses may form a useful component of scientists' overall understanding of the cardiovascular safety profile of Vioxx, and they raise the possibility that an increased relative risk of cardiovascular events on Vioxx versus placebo may appear before the

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

18-month mark. Like any post-hoc analyses, however, they do not, standing alone, provide the basis for any firm conclusions. While the Company's position with respect to these data may be overly categorical, the known data in totality neither prove nor disprove the existence of an increased cardiovascular risk on Vioxx before 18 months of continuous treatment. (The fact that a result cannot be ruled out or disproved cannot be interpreted as signaling that the opposite is true or has been proved.)

### (3) May 11, 2006 Press Release Regarding Follow-up Study

On May 11, 2006, Merck issued a press release announcing the results of the preliminary analyses of the APPROVe Trial follow-up study. The first paragraph of that press release stated as follows:

> In the off-drug follow-up period for patients in the APPROVe study, there was not a statistically significant difference in the risk of confirmed thrombotic cardiovascular events in patients who had previously taken VIOXX compared to those who had previously taken placebo, according to preliminary analyses announced today by the study sponsor, Merck & Co., Inc. This prespecified analysis included patients regardless of when they discontinued study therapy. Furthermore, in the one-year off-drug follow-up period for patients who completed approximately three years of therapy in the APPROVe study, there was not a statistically significant difference in the risk of confirmed thrombotic events in patients who had previously taken VIOXX compared to those who had previously taken placebo. In these analyses, the data were insufficient to conclude that there was an increased relative risk of confirmed thrombotic cardiovascular events following discontinuation of therapy. In the prespecified primary analysis of each patient's four-year data (that combined data from the on-drug period and the off-drug period regardless of when patients discontinued study therapy) the difference in the risk of confirmed thrombotic cardiovascular events between groups initially observed in

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

the on-drug period of the study remained statistically significant.[155]

Attached to the press release was a four-page summary of the results of the follow-up study that Merck had included in its May 11 report to the FDA. The summary set forth four "Conclusions" to be drawn from the follow-up data, the first two of which resulted from a post-hoc analysis that divided the Intention-to-Treat data set into pre- and post-18 month segments and compared them to the corresponding segments in the base study as follows:

- For the first 18 months, the relative risk of confirmed thrombotic cardiovascular events for rofecoxib compared to use of placebo in the ITT analysis was similar to that observed in the on-drug base study.

- Beyond 18 months, the relative risk of confirmed thrombotic cardiovascular events for rofecoxib compared to use of placebo in the ITT analysis was approximately half of that observed in the on-drug base study. This lowering of the relative risk was mostly due to the off-drug follow-up data observed during the period beyond month 36 and to the off-drug follow-up data in patients who prematurely discontinued study therapy.[156]

Neither the press release nor the four-page summary mentioned the results of the pre-specified Kaplan-Meier plots and analyses of the proportionality of hazards for the four-year data that critics have argued establish an increased relative risk of cardiovascular events on Vioxx well before the 18-month mark. In addition, neither the press release nor the four-page summary mentioned the results for the secondary APTC

---

[155] 5/11/06 Merck press release, "Merck Announces Preliminary Analyses of Off-Drug Extension of APPROVe Study," MRK-S0420112019, at 19.

[156] 5/11/06 APPROVe Off-Drug Extension Preliminary Analyses of Thrombotic Cardiovascular Safety, MRK-ARQ0002293, at 96.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

composite events endpoint, which were generally less favorable to Vioxx and less supportive of the 18-month claim than the reported results for the confirmed thrombotic events endpoint. Notably, the post-hoc analysis of the off-drug data showed that during the first six months after discontinuation of therapy, there was a statistically significant increase in the risk of APTC events among those patients that had previously taken Vioxx.[157]

While the press release quoted above is difficult to understand and it can be argued that other information should have been included, the fact that Merck shortly thereafter posted on its website the entire 137-page report it submitted to the FDA suggests that there was no intention to mislead.

In addition, the plots themselves, as well as the views of Drs. Furberg[*] and Nissen[*], the Company, and the authors of the published APPROVe article about the meaning of those data, have recently been fully aired in the New England Journal of Medicine and in responsive Merck-issued press releases. As a result, while it may have been preferable to set forth the results of those pre-specified analyses in the original press release for the benefit of the scientific community, any arguable lack of full and clear disclosure as of May 11 was quickly remedied.

---

[157] The relative risk for Vioxx versus placebo for this period was 3.74 (95% confidence interval, 1.04 to 13.42). 5/26/06 APPROVe Extension Statistical Package, MRK-S0420112195, Table B14 at 233. While more confirmed thrombotic events occurred among patients who had previously taken Vioxx than among those who had previously taken placebo (12 versus 5, respectively), the difference was not statistically significant (relative risk 2.44; 95% confidence interval, 0.86 to 6.94). Id. Table B7 at 233.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

### E. Summary of Principal Criticisms and Findings Concerning Financial Interests of Merck Senior Management.

Each of the criticisms discussed in this Report rests on a common premise: that Merck personnel engaged in alleged misconduct with respect to the development, testing and/or marketing of Vioxx because they were financially motivated to conceal the drug's risks so as to ensure its success in the marketplace. These allegations take on two forms: (i) allegations that sales of Vioxx had an undue influence in Merck's compensation structure; and (ii) allegations that Merck senior management sought to enrich themselves by trading Merck common stock on the basis of material nonpublic information.

Our conclusions with respect to these allegations are based on our finding that compensation for executive officers and non-executive employees at Merck was driven by formulas based on multiple operational and strategic factors. While sales of Vioxx, like those of other products, played a role in the Company's overall success, they did not have an unwarranted impact on compensation. In addition, as discussed below, we found no evidence to support the allegation that Merck's senior management traded on the basis of material nonpublic information pertaining to Vioxx's cardiovascular safety.

### 26. Allegation No. 26: Merck Senior Managers Turned a Blind Eye to the Cardiovascular Risks of Vioxx so as not to Jeopardize Their Compensation.

#### a. Summary of Allegation.

Critics argue that Merck senior management was financially motivated to downplay or ignore the cardiovascular risks of Vioxx, both before the drug was approved by the FDA and while it was on the market. Prior to approval, it is argued, the Company

- 168 -

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

needed a major drug to replace lost profits from other drugs that were going off patent. In addition, Merck's future depended on its keeping pace with other drug manufacturers like Searle/Pfizer, which had a selective Cox-2 inhibitor in the pipeline. For these reasons, critics allege that senior management did not heed the signals that Vioxx posed a cardiovascular danger.

After Vioxx was approved for sale in the United States, it is alleged that Merck senior management continued to downplay or ignore mounting data concerning the cardiovascular risks of Vioxx and put patients at risk so as not to jeopardize their compensation and the value of their equity holdings.

  b.  **Our Findings and Conclusions.**

As discussed in other parts of this Report, we found no evidence that Merck rushed Vioxx to market prematurely or before adequate safety testing was conducted. In addition, we found that MRL scientists seriously investigated the FitzGerald prostacyclin hypothesis, repeatedly pooled and analyzed cardiovascular data from Vioxx clinical trials, and believed in good faith that Vioxx was not prothrombotic. Thus, one could argue on the basis of these two findings that there was no need for us to investigate further any alleged ill motives for Merck's seeking FDA approval for Vioxx or for marketing the drug.

Critics have also alleged, however, that financial motivation played a role in Merck senior management's decision to keep Vioxx on the market in the face of alleged signals that it posed a serious cardiovascular risk. We therefore investigated the manner

Report of John S. Martin, Jr. to the Special Committee  
of the Board of Directors of Merck & Co., Inc.  
Concerning the Conduct of Senior Management  
in the Development and Marketing of Vioxx

September 5, 2006  
Debevoise & Plimpton LLP

in which Merck senior management was compensated and the effect that the profitability of the Vioxx franchise may have had on compensation.[158]

Throughout the relevant period, compensation decisions for executive officers and non-executive employees were guided by the Company's compensation philosophy. This philosophy set compensation based on Merck's performance vis-à-vis peer companies as well as individual performance. The Company sought to retain key employees by compensating them at competitive levels and to align employees' interests with those of shareholders interests through the use of long-term incentives (e.g., stock option grants). To this end, the Company utilized three forms of compensation for executives: (i) base salary; (ii) annual bonus; and (iii) equity in the form of stock option grants, and later, performance and restricted share units.

As discussed more fully in Appendix S, although the Compensation and Benefits Committee of the Board of Directors and the Chief Executive Officer had some discretion in setting executive compensation at Merck, the process was largely a formulaic one, driven by numeric calculations derived from various Company-wide and departmental performance assessments as well as personal performance and the marketplace. For example, the salary component of executive compensation was set based on the marketplace for comparable positions as well as the executive's personal performance. Similarly, the annual bonus was determined based on (i) a "Company Performance Grid" score, a multi-factor assessment of the Company's performance with

---

[158] We discuss below in the Report the specific allegations made concerning post-approval evidence of a safety problem, and our findings with respect to each such allegation.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

reference to various financial and strategic measures, and (ii) a "Division Performance Grid" score, an even more granular assessment of each division's annual objectives and achievements. Finally, the equity award component was set in light of the market but also took into account various components of the Company Performance Grid as well as the executive's personal performance.

While sales of Vioxx, like those of all of the Company's key franchise products, impacted executive bonuses insofar as they affected scores on the Company Performance Grid, we did not find that the impact was disproportionate or determinative of compensation rates. As discussed in Appendix S, the Company Performance Grid score depended upon several operational metrics (including, but not limited to, earnings per share growth versus other leading health care companies, sales growth versus other leading health companies, and return on investment in operating assets) and several strategic metrics (such as manufacturing productivity, research and development, and Human Resources initiatives). Each of the above metrics was assigned a point value that contributed to the Company's ultimate score. Earnings per share was the most significant metric in the Grid and was assigned 30 points (from 2003 on, 35 points) out of a possible 100 plan points, while sales growth, return on investment in operating assets, manufacturing productivity, and Human Resource initiatives were each assigned 10 points.

Although Vioxx played a role in the earnings per share and sales growth metrics in the Company Performance Grid, we determined, for the reasons set forth below and discussed more fully in Appendix S, that executive compensation was not

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

disproportionately influenced or dictated by Vioxx. First, while the Company has acknowledged the importance of Vioxx in its product portfolio, its earnings per share and sales growth assessments relied on four or five other key franchise products, including Zocor, Prinivil, and several other products. Second, the earnings per share and sales growth metrics were only two components of a multi-factor assessment and both were assessed in relation to the activities of Merck's peer healthcare companies. Third, the earnings per share metric is not driven solely by top-line growth in the form of sales, but rather measures the Company's structural efficiency and reflects Company expenses and costs. Fourth, based on the point values assigned to the metrics in the Grid, sales growth, return on investment in operating assets, manufacturing productivity, and Human Resource initiatives were given equal weight and therefore had an equal effect on compensation. Furthermore, several of the above mentioned metrics not directly linked to sales – i.e., return on investment in operating assets, manufacturing productivity, and Human Resource initiatives – were given in the aggregate the same or comparable weight to the earnings per share metric.

In conclusion, there is no question that senior management at Merck quite appropriately had a financial interest in the Company's success. It is also clear, however, that Vioxx was but one of several key franchises upon which Company profitability depended. In light of the multi-tiered level of review over compensation decisions, the formulaic method used to calculate compensation for executive officers and non-executive employees, and the Company's diversified product portfolio, Vioxx sales were

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

merely a factor in the Company's overall financial success and did not have an unwarranted impact on awards for executive officers or non-executive employees.

### 27. Allegation No. 27: Merck Senior Executives Traded on Material, Nonpublic Information Concerning Vioxx.

#### a. Summary of Allegation.

Various complaints filed against Merck have made broad allegations that Merck insiders traded the Company's securities on the open market based on material non-public information about Vioxx and its cardiovascular risk profile in violation of the federal securities laws.[159]

#### b. Our Findings and Conclusions.

As explained more fully in Appendix S, federal law prohibits corporate insiders from trading on the basis of material nonpublic information.[160] Most of the Company's officers and directors are subject to additional regulations that require them to report most of their transactions involving Merck stock and prohibit them from selling the Company's stock within six months of a purchase, or vice versa ("short-swing transactions").[161] Our investigation examined the Company's policies with respect to the

---

[159] See, e.g., Consolidated and Third Amended Class Action Complaint, Pringle v. Merck & Co., No. 03-3125, E.D. La., at ¶278 ("During the Class Period, a number of Defendants and other Merck insiders sold substantial amounts of Merck common stock from their personal holdings while in possession of adverse non-public information about the risks of VIOXX."). In addition, the Company's Board of Directors has received letters making similar allegations. See, e.g., 12/10/04 demand letter from J. Abraham to C. Colbert.

[160] See 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5 (prohibiting the use of a fraudulent device in connection with securities transactions); Dirks v. SEC, 463 U.S. 646, 654 (1983) ("[A]n insider will be liable under Rule 10b-5 for inside trading only where he fails to disclose material nonpublic information before trading on it and thus makes "secret profits.") (citations omitted).

[161] 15 U.S.C. § 78p.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

securities regulations as well as the trading activity of individual corporate officers and directors.

The evidence shows that the Company adopted a restrictive trading window policy, which limited the times when its senior officers and directors could trade in Merck securities to four pre-established periods each year. We find this policy to be reasonably well designed to promote compliance with the governing law. The Company opened its trading windows several days after its quarterly and annual earnings releases,[162] when a great deal of previously nonpublic material information would have been widely disseminated. Thus, the policy minimized the possibility that senior managers could profitably trade on the basis of nonpublic material information.

In addition to implementing this trading window policy, the Company regularly issued trading restriction memoranda, which advised the recipients that they were in possession of nonpublic information that could potentially be viewed as material and requested that they not trade Merck securities. Senior corporate officers and directors frequently received such memoranda, which prohibited them from trading even during window periods. The evidence shows that information relating to Vioxx was from time to time the subject of such memoranda or verbal instructions not to trade.

As part of our investigation, we reviewed the trading records of the Company's most senior officers and directors between May 1999 and December 2004. It appears that, with one inadvertent exception, all directors and senior managers complied with the

---

[162] 3/5/99 memorandum from M. McDonald to Section 16 Officers, MK-STK0000500.

Report of John S. Martin, Jr. to the Special Committee
of the Board of Directors of Merck & Co., Inc.
Concerning the Conduct of Senior Management
in the Development and Marketing of Vioxx

September 5, 2006
Debevoise & Plimpton LLP

Company's internal insider trading policies.[163] Furthermore, consistent with the Company's guidance, it appears that senior management held rather than sold the Company's equity securities granted to them.

We find no basis to support the allegation that senior managers traded on the basis of material nonpublic information concerning Vioxx's cardiovascular safety. As stated throughout this Report, there is no evidence that anyone in senior management at Merck believed that Vioxx presented an increased cardiovascular risk to patients before the APPROVe Trial cardiovascular data were unblinded in September 2004. The data were unblinded between two trading windows and promptly disclosed. According to Merck policy, corporate officers and directors could not trade in Merck stock for almost a full month after disclosure of the APPROVe Trial cardiovascular data and the decision to withdraw Vioxx.[164] Our review of senior managers' trading records indicate that no officers or directors traded prior to the public release of the APPROVe Trial results.

---

[163] As explained in Appendix S, we did identify one transaction that appears to have violated the Company's policies. This transaction was a small open-market acquisition of fewer than 90 shares by one of the Company's directors. According to Ms. Celia Colbert, Secretary of the Company, this trade occurred at the beginning of the director's tenure and was executed, without his knowledge, by one of his financial advisors. There is no evidence that the director traded on the basis of material nonpublic information.

[164] As explained in Appendix Q, the External Safety Monitoring Board recommended stopping the APPROVe Trial on September 17, 2004. This announcement followed a trading window period that ended on August 9, 2004. MK-STK0000470. Merck announced the results of the APPROVe Trial and its decision to voluntarily withdraw Vioxx from the market on September 30, 2004. 9/30/04 Merck press release, "Merck Announces Voluntary Worldwide Withdrawal of VIOXX," MRK-AFJ0008607, at 07. The next trading window did not open until October 26, 2004. 10/21/04 memorandum from N. Van Allen to Directors and Officers Subject to Section 16(b), MK-STK0000469.