IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In Re: Vioxx** | **MDL DOCKET NO. 1657** |
| **PRODUCTS LIABILITY LITIGATION** | |
| | Section L |
| THIS DOCUMENT RELATES TO: | |
| Case No. 2:06cv810 | |
| | Judge Fallon |
| CHARLES LARON MASON v. | Mag. Judge Knowles |
| MERCK & CO., INC. | |

**PLAINTIFF'S MOTION TO EXCLUDE OR, IN THE ALTERNATIVE,
MOTION IN LIMINE CONCERNING ANNUAL
DEATHS ATTRIBUTABLE TO NSAID GASTROPATHY**

**(Plaintiff's Motion in Limine No. 6)**

**TO THE HONORABLE JUDGE ELDON FALLON:**

Before voir dire examination of the jury panel, and out of hearing of the jury, Plaintiff Charles Laron Mason, by and through his undersigned counsel, respectfully moves the Court to issue an order prohibiting Merck, its attorneys, representatives, or witnesses from discussing or testifying about the annual number of deaths attributable to nonsteroidal anti-inflammatory drug (NSAID) gastrointestinal (GI) toxicity without appropriate qualifications and scientific support. In the alternative, Plaintiff Mason seeks a motion in limine requiring that Defendant first approach the bench and ask for a ruling before attempting to introduce or refer to such evidence and/or issues at trial.

**I.
INTRODUCTION**

In *Plunkett v. Merck & Co., Inc.* the Court reserved its ruling on the plaintiff's motion to limine to exclude testimony about the annual number of deaths attributable to NSAID GI toxicity

without appropriate qualifications or scientific support because there was a question of proof.[1]  In

*Barnett v. Merck & Co., Inc.*, the Court deferred its ruling on this issue, indicating there was a

question of scope of proof and relevance.[2]  In *Smith v. Merck & Co., Inc.*, the Court denied the

plaintiff's motion on the same issue, concluding there was an issue of fact.[3]  Plaintiff respectfully

requests that the Court reconsider the most recent ruling in *Smith* and grant this motion or, at a

minimum, reserve its ruling until the time of trial, as the Court did in *Plunkett* and *Barnett*, when the

testimony can be placed in context and the evidence presented can be weighed by the Court.

## II.
## DISCUSSION

In previous Vioxx trials, Merck has offered opinion testimony about the number of deaths

annually attributed to the GI toxicity of NSAIDS to support its claim that Vioxx, which was designed

to be safer for the GI tract than non-selective NSAIDS, offered a benefit to patients.  The numbers

cited by Merck bear little relation to current medical and scientific literature.  Indeed, these estimates

are typically offered without any support or citation whatsoever.  Rather, a speculative number of

events –the larger the better– is bandied about in an attempt to inflate the perceived benefit provided

by Vioxx.

A notable example of this practice occurred in the trial of *Frederick Humeston , et al., v.*

*Merck & Co., Inc., et al.,* (ATL-L-2272-03MT), when Merck employee Dr. Briggs Morrison

volunteered the following testimony:

> [I]t was understood that that side effect [GI toxicity] was common to all the NSAIDs,
> and it was estimated that somewhere between two and 4 percent of patients who take
> these medications on a chronic basis would suffer one of these events.  And it was

---

[1] *See* Order, *Plunkett v. Merck & Co., Inc.,* (Nov. 18, 2005) (Rec. Dec. 1528).
[2] *See* Order, *Barnett v. Merck & Co., Inc.,* (June 28, 2006).
[3] *See* Order, *Smith v. Merck & Co., Inc.,* (Sept. 6, 2006) (Rec. Doc. 6721).

estimated that probably in the United States alone on the order of 20,000 people a year – between 10 and 20,000 people a year die from this complication of NSAIDs.[4]

While Merck offered this testimony as evidence of Vioxx's benefit, Dr. Morrison failed to share with the jury and the court the basis of this wide-ranging estimate. He likewise failed to clarify precisely *when* it was "estimated" that 20,000 people died annually in the U.S. because of GI toxicity. He cited to no medical or scientific literature as support for this opinion and counsel for Merck made no attempt to lay any foundation.

In truth, Dr. Morrison's estimate rests closer to the category of "wild guess" than to "reasoned hypothesis." This should come as no surprise. Dr. Morrison is an oncologist by training. He is neither a gastroenterologist nor an epidemiologist. During his previous testimony at trial and in deposition, Dr. Morrison has not revealed that he has had any training in biostatistics. Dr. Morrison is unqualified to give expert opinion regarding the number of deaths secondary to NSAID gastropathy.

In the trial of this matter, Merck may once again seek to offer an inflated estimate regarding the numbers of deaths reported annually in association with NSAID GI-toxicity. To the extent that this number is offered–as it has been in the past–without any support from medical or scientific literature, and by witnesses who lack the necessary skill, training, experience and education to render such an opinion, it should be excluded by the Court.

A.    MERCK OVERESTIMATES THE NUMBER OF ANNUAL DEATHS ATTRIBUTED TO NSAID GASTROPATHY IN ORDER TO BOLSTER THE IMAGE OF VIOXX.

Dr. Morrison's previous testimony about NSAID gastropathy deaths lacks support in recent medical literature. For example, in 1997, it was estimated that the annual number of GI deaths

---

[4] Transcript of *Frederick Humeston, et al. v. Merck & Co., Inc.,* October 6, 2005, p. 3184, attached hereto as

attributed to NSAIDS in United States was 7,600 (about a third of Dr. Morrison's highest guess).[5] Notably, this estimate predates Vioxx's introduction to the U.S. market. Thus, if Dr. Morrison's conjecture about 20,000 annual deaths is accurate and current, then apparently Vioxx has contributed to a nearly three-fold *increase* in the number of deaths associated with NSAID gastropathy.

Dr. Morrison, according to previous testimony, appears to be unfamiliar with the work of Dr. James Fries of Stanford, who studied the Arthritis, Rheumatism, and Aging Medical Information System database specifically to determine how the rates of hospitalizations secondary to NSAID gastropathy have changed in the past two decades.[6]

Dr. Fries and his colleagues followed 5,598 consecutively enrolled rheumatoid arthritis patients for nearly two decades, using systematic outcome assessment protocols.[7] They sought to examine trends in the incidence of NSAID gastropathy over time.[8] Dr. Fries observed that the rate of GI-related hospitalizations first increased from 0.6% per year in 1981 to a peak of 1.5% in 1992, and then decreased to 0.5% in 2000.[9] These trends over the period of rise and the period of decline were highly statistically significant.[10]

Critically, Dr. Fries' results show that the percentage of patients with GI hospitalizations *fell 80% from 1992 to 1998*, a period time when Vioxx was not even on the market.[11] This would suggest that the 1997 estimate of 7,600 annual GI deaths related to NSAIDS decreased as well.

---

Exhibit A.
[5] *See* Tamblyn, et al., *Unnecessary Prescribing of NSAIDs and the Management of NSAID-related Gastropathy in Medical Practice*, ANNALS INTERNAL MEDICINE, 127(6):429-38 (1997), attached hereto as Exhibit B.
[6] *See* Fries, et al., *The Rise and Decline of Nonsteriodal Anti-inflammatory Drug-associated Gastropathy in Rheumatoid Arthritis*, ARTHRITIS RHEUM., 50(8):2433-40 (2004), attached hereto as Exhibit C.
[7] *Id.* at 2433.
[8] *Id.* at 2434.
[9] *Id.*
[10] *Id.*

4

Interestingly, the incidence of GI hospitalizations actually increased following the introduction of Vioxx.[12] Dr. Fries and his colleagues attribute the decrease in NSAID related GI hospitalizations to a number of factors, most of which had nothing to do with the advent of Vioxx, including: (1) decreased doses of aspirin and ibuprofen; (2) increased use of less GI-toxic NSAIDS, like nabumetone, etodolac and Arthrotec; and (3) the increased use of proton-pump inhibitors.[13]

The clear intent of offering an inflated estimate about NSAID-related deaths is to convince to the jury that Vioxx was designed and marketed specifically to address an epidemic. But not even Merck's own experts support Dr. Morrison's conjecture about the number of deaths.

Following the completion of the VIGOR trial, Merck produced a series of "video news releases" about the study. These short clips amount to little more than tightly controlled "interviews" of Merck employees and paid experts, and tout the drugs alleged GI protective effect with no mention of cardiovascular risk. During one remarkable exchange, Merck expert and investigator Dr. Loren Laine, a gastroenterologist and author of the VIGOR study, is encouraged to gloss over the fact that Merck's GI death estimate is an exaggeration.

When Dr. Laine reads through his script initially, he balks at perpetuating the Merck charade, telling the company's representative that "those numbers, by the way, are totally incorrect and they're based on just extreme totally incorrect data. Everybody uses them because they sound good. They sound good, but it's the same person that keeps putting them out."[14] Of course, the importance

---

[11] Exhibit C at 2435.

[12] *Id.*

[13] *Id.* at 2438. Merck obviously was aware that the use of proton pump inhibitors ("PPI") was superior to selective inhibition of COX-2 when dealing with the issue of NSAID gastropathy. After the withdrawal of Vioxx, a Merck researcher acknowledged that most problems caused by GI-upset secondary to NSAIDS could be avoided by using "Naproxen plus a generic PPI." *See* Plaintiff's Exhibit 1.0726, attached hereto as Exhibit D.

[14] Transcript of Video News Release Outtakes, 1889, 41:2-8, attached hereto as Exhibit E.

of making such an inflated claim is not lost on the good doctor, who observes: "There's about five different reasons why those numbers are totally bogus, but I agree.  It's out there in the common realm and everybody uses those numbers.  I know, because it's a very impressive sound byte."[15]

Undaunted, the Merck representative wondered aloud whether the clever wording in the script would protect Dr. Laine from being patently untruthful, asking: "Does it help that we're using the word associated with NSAIDs; does that sort of water it down a little bit?"[16]  But this does not entirely soothe his conscience.  "No.  I mean because the issue is – part of the issue is the – you just don't have an idea.  I'm not saying it's actually wrong.  The death rate is probably wrong.  The hospitalizations may be right.  Just the death rate is probably wrong, but anyway..." *Id*. at 42:3-11.

Eventually, though, Dr. Laine relents, and agrees to finesse the delivery so as to lend support to a number he clearly knows is wrong, because–as he himself has noted–"it's a very impressive sound byte."  "As long as we say it's estimated or reported, it's not me saying it," Dr. Laine rationalizes.[17]

Compounding Merck's misrepresentation is the fact that, whatever the number of GI-related NSAID deaths, a sizeable portion are attributable to the uses of aspirin for cardiovascular prophylaxis.  In a recent study of hospitals serving more than seven million patients, researchers concluded that as many as one third of all NSAID/aspirin related GI deaths are associated with the use of *low-dose aspirin*.[18]  Plainly, Vioxx would have no effect on these events as it is not a substitute for low-dose aspirin.

---

[15] Exhibit E at 41:16-21.
[16] *Id*. at 41:22-42:2.
[17] *Id*. at 42:14-16.
[18] *See* Lanas, et al., *A Nationwide Study of Mortality Associated with Hospital Admission Due to Severe Gastrointestinal Events and Those Associated with Nonsteroidal Anti-inflammatory Drug Use*, AM.J.GASTROENTEROL, 100(8):1685-93 (2005), attached hereto as Exhibit F.

In light of the foregoing, is it disingenuous for Merck to throw out an inflated number of GI-related deaths, suggest that Vioxx was safer, and then hope for the jury to conclude that Vioxx was a necessary, life-saving drug in the fight against fatal NSAID gastropathy.  In truth, the numbers likely were never as high as Dr. Morrison suggested, and they were decreasing significantly before Vioxx was introduced, because of cheaper and safer alternatives in pain management.  If Merck wished to present evidence about an epidemic of NSAID related fatalities, and Vioxx's benefit as an alternative to non-selective NSAIDS, it should have identified a qualified expert and provided disclosure about any opinions to be offered.  But Merck ought not be permitted to parade before the jury the conjecture of an unqualified fact witness to support claims about their product.

**B.     MERCK SHOULD BE PRECLUDED FROM OFFERING OPINION TESTIMONY ABOUT ANNUAL DEATHS ATTRIBUTED TO NSAID GASTROPATHY BECAUSE THIS OPINION HAS NOT BEEN DISCLOSED AND IS INADMISSIBLE UNDER FED.R.EVID. 702 AND *DAUBERT*.**

Dr. Morrison is unqualified to opine about the number of deaths reported annually in association with NSAID gastropathy.  But Merck should be cautioned that *no* witness will be permitted to offer expert opinions about the annual estimates of deaths unless he or she is qualified to offer an opinion, and unless this opinion has previously been disclosed to the Plaintiff.

The opinion of an expert witness is only admissible if: (1) it is based upon sufficient facts or data; (2) it is the product of reliable principles and methods; and (3) the expert has applied the principles and methods reliably to the facts of the case. *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1057 (8th Cir. 2005) (citing FED.R.EVID. 702).

The Supreme Court has construed Rule 702 as imposing on the district court a "gate-keeping" responsibility which must be performed before admitting expert scientific testimony. *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 589 (1993).  The Court performs this

function in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* Thus, before considering whether the testimony "will assist the trier of fact to understand or determine a fact in issue," a district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592-93.

The gatekeeping requirement imposed by *Daubert* is critically important. As the Supreme Court observed in *Kumho Tire*: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The district court's gate-keeping role is particularly significant because the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. "Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay . . . ." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

For reasons discussed above, Merck's assertion that there were 20,000 deaths annually attributable to NSAID GI gastropathy is both powerful and misleading. It prompts the jury to conclude that before Vioxx was marketed, there was an epidemic of NSAID related fatalities that Merck's new wonder drug was going to cure. It is precisely this kind of opinion testimony that Rule 702 was designed to exclude. In previous trials, Merck has offered this opinion without support and without first disclosing it to Plaintiff. This practice contravenes Federal rules of admissibility and evidence, and is not in keeping with the orders of this Court, which require prior notice of all expert

8

opinions. Accordingly, Merck should be precluded from offering any such opinion without first showing that it is admissible under Rule 702 and *Daubert*.

## III.
## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order precluding Defendant Merck & Co., Inc., from offering any expert testimony regarding estimates of annual deaths attributable to NSAID gastropathy from witnesses who lack the necessary expertise, where these opinions have not previously been disclosed to Plaintiff, and where they lack adequate support under the Federal Rules of Evidence and appropriate case law. In the alternative, Plaintiff Mason seeks a motion in limine requiring that Defendant first approach the bench and ask for a ruling before attempting to introduce or refer to such evidence and/or issues at trial.

Date: September 27, 2006                    Respectfully submitted,

Edward Blizzard (TBN 02495000)
Scott Nabers (TBN 14769250)
Rebecca Briggs King (TBN 24027110)
Holly M. Wheeler (TBN: 24006035)
BLIZZARD, MCCARTHY & NABERS, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 844-3750
(713) 844-3755 (fax)

**ATTORNEYS FOR PLAINTIFF
CHARLES LARON MASON**

| Andy D. Birchfield, Esq.<br>P. O. Box 4160<br>234 Commerce Street<br>Montgomery, AL 36103-4160<br>PH: (800) 898-2034<br>FAX: (334) 954-7555 | Christopher Seeger, Esq.<br>One William Street<br>New York, NY 10004<br>PH: (212) 584-0700<br>FAX: (212) 584-0799 |
|---|---|
| Leonard Davis<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 | Russ M. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Avenue<br>New Orleans, LA 70013<br>PH: (504) 581-4892<br>FAX: (504) 561-6024 |

**PLAINTIFFS' STEERING COMMITTEE**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Motion has been served on Liaison Counsel Russ Herman and Phillip Wittmann, Shayna S. Cook and Richard Krumholz by U.S. Mail, facsimile and/or e-mail; and e-mail upon all parties by electronically uploading the same to Lexis-Nexis File and Serve Advanced, in accordance with Pretrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of the Court of the Untied States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 27th day of September, 2006.

_____
Holly M. Wheeler