UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 SEP 25  PM 4: 12

LORETTA G. WHYTE
CLERK

In re VIOXX
PRODUCT LIABILITY LITIGATION

MDL NO: 1657

SECTION: L

DEBORAH S. KOWALSKY,
as the Personal Representative of
MADELINE RIEHL,

CASE NO: 2:06-CV-00404-EEF-DEK

    Plaintiff,

v.

MERCK & CO., INC.,

    Defendant.

_____/

## AMENDED COMPLAINT FOR WRONGFUL DEATH

COMES NOW, the Plaintiff, DEBORAH S. KOWALSKY, as the Personal Representative of

MADELINE RIEHL and as the Personal Representative of the Estate of MADELINE RIEHL,

individually and by and through the undersigned attorney, brings this action against the

Defendant, MERCK & CO., INC., a foreign corporation, and in support thereof, alleges:

## COUNT I
## GENERAL ALLEGATIONS

1.        This is an action for wrongful death brought pursuant to Florida Statute

768.16, also known as The Florida Wrongful Death Act and is being brought by the decedent's

personal representative, who shall recover for the benefit of the decedent's survivors and estate

all damages.

Fee_____
Process_____
X  Dktd_____
Doc. No._____

2.        This action is within the original jurisdiction of this Court by virtue of 28

U.S.C. §1332, diversity of citizenship; amount in controversy and costs.  Plaintiffs and

Defendants are citizens of different states and the amount in controversy of this action is in

excess of minimal jurisdiction requirements, exclusive of interest and costs.  Accordingly,

Plaintiffs hereby claim that jurisdiction in this matter is premised upon this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and is between citizens of different states in that the Plaintiffs are both citizens of the State of Florida and defendant Merck & Co. is a citizen of the State of New Jersey.

3.      Plaintiff DEBORAH S. KOWALSKY is the personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, of MADELINE RIEHL and duly appointed Personal Representative of the Estate of MADELINE RIEHL. Plaintiff DEBORAH S. KOWALSKY was and is a citizen of the United States, resident of Florida and is sui juris. Decedent MADELINE RIEHL was a citizen of the United States and a resident of Broward, Florida until her death.

4.      At all times relevant hereto, MERCK & CO., INC., (hereinafter "MERCK") was and is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, White House Station, New Jersey 08889.

5.      At all times relevant hereto, Defendant sold, promoted and distributed Vioxx throughout the United States and foreign countries.

### COUNT II
### FACTS COMMON TO ALL COUNTS

6.      That the Decedent, MADELINE RIEHL began taking Vioxx in March 2001 through November 2004 and continued to take the medication through November 2004. That subsequent to the taking of the medication, she suffered with heart failure, high blood pressure, chest pains, and eventually died of cardiac respiratory arrest, chronic obstructive lung disease, peripheral vascular disease and congestive heart failure.

7.      VIOXX is the brand name of Rofecoxib, one of a class of drugs called prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-inflammatory benefits to persons with, among other conditions, arthritis and muscle pain. Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid to produce prostaglandins.

8.      VIOXX is a COX-2 inhibitor, which is designed to produce prostaglandins at inflammatory sites and to produce prostacyclin, a vasodilator and an inhibitor of platelet aggregation.

9.      Defendant, MERCK , submitted an Application to Market a New Drug for Human Use ("NDA") for Rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, and the treatment of primary dysmenorrhea.  This application was denoted NDA 21-042 by the FDA.

10.      Defendant also submitted an Application to Market a New Drug for Human Use ("NDA") for Rofecoxib to the United States Food and Drug Administration ("FDA") on November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the signs and symptoms of osteoarthritis, the management of acute pain, arid the treatment of primary dysmenorrhea.  This application was denoted NDA 2 1-052 by the FDA.

11.      On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052 (hereinafter the "NLIA") for Rofecoxib, for relief of the signs and symptoms of osteoarthritis, the management of acute pain and the treatment of primary dysmenorrhea.

12.       At the time the drug was approved by the FDA the labeling for Rofecoxib stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily.  However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo."  A copy of the label is attached as Exhibit "A" hereto.

13.       The "Warnings" section of the labeling for Rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (61) Effects -- Risk of 61 Ulceration, Bleeding, and Perforation."

14.       Defendant submitted NDA-007 with the goal of establishing a gastrointestinal ("01") safety claim for Rofecoxib.  In conjunction with the NDA, the Defendant performed the VIOXX 61 Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

15.       The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking Naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

16.       In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate

4

sponsor, in June of 2000, it was shown that VIOXX use resulted in a statistically significant

increase in hypertension and stroke.  Not only did Merck do nothing to further accurately publish

these studies or warn consumers, but it denied the results with respect to hypertension in the

official publication of the American Pharmaceutical Association, Pharmacy Today, Spin War

Aside. Lessons Emerge From COX-2 Trials, in August 2000, page 3.

17.       Defendant continued to deny the ill health effects associated with VIOXX

while at the same time reaping profits obtained through its non-disclosure and concealment.

Defendant engaged in a massive advertising and sampling program and gained continued

increases in the market share, which enhanced Defendant's financial stability to the detriment of

its consumers. As a result of the Defendant's scheme, it reaped more than $2 billion in profit in

the year 2000 alone, and appropriated approximately 23 percent share of the market.

18.       Defendant continued to profit from its scheme by withholding information

from Plaintiff, the consuming public and the health care industry.  For example, in

November of 2000, the Defendant caused the publication of a study in the New England Journal

of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular

risks associated with VIOXX consumption over Naproxen consumption.

19.       On or about August 29, 2001, the Journal of the American Medical

Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland

Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing that the Defendant had

concealed that the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular

event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombosis,

resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke and transient ischemic

attacks") among VIOXX users in the Defendant s trials, including VIGOR, at a 95% confidence

interval ranged from 2.2 for event-free survival analysis, 2.38 compared to Naproxen users, and

4.89 for developing serious cardiovascular events among aspirin-indicated patients.  See

Mukhisjee, D., et al., Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors,

JAMA 286:8, 954-959, Aug. 22/29, 2001.  In addition, the annualized myocardial infarction rates

for VIOXX users compared to placebo revealed a statistically significant increase among VIOXX

users.

20.        In the JAMA study, the authors stated that by decreasing P612 production

[VIOXX] may tip the natural balance between prothrombotic thromboxane A2 and

antithrombotic P612, potentially leading to an increase in thrombotic cardiovascular events." Id.

at 957.  In a follow-up peer-reviewed study reported in the Journal of the American College of

Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and

confirmed that the Cox-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of

thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M.,

Why Do Cyclo-Oxygenase-2 Inhibitors Cause Cardiovascular Events?, J.A.C.C., 39:3, Feb. 6,

2002. This is further supported by studies completed at the University of Pennsylvania. Cheng,

Y., et al., Role of Prosta-cyclin in the Cardiovascular Response to Thromboxane 42, Journal of

Science, V. 296:539-541, Apr. 19, 2002.

21.        On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the

FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter"

to Raymond V. Gilmartin, President and CEO of the Defendant, relating to "promotional

activities and materials for the marketing of VIOXX (Rofecoxib) tablets."

6

22.　　　The Warning Letter stated that the Defendant had "engaged in a promotional campaign for VIOXX that minimizes the potentially serious cardiovascular findings that were observed in the VIOXX Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for VIOXX." The letter further states:

23.　　　Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on VIOXX were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (Naproxen).

24.　　　The eight (8) page Warning Letter outlines in detail, the conduct of the Defendant that supports the FDA s issuance of the Warning Letter, and makes the following statement:

**"Conclusions and Requested Actions:"**

> The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimize the VIOXX / Coumadin drug interaction, omit crucial risk information associated with VIOXX therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for VIOXX that misrepresented VIOXX s safety profile, contained unsubstantiated comparative claims, and lacked fair balance.
>
> Due to the seriousness of these violations, and the fact that your violative promotion of VIOXX has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.
>
> This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:
>
> > Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for VIOXX.

7

Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This proposed letter should be submitted to us for review prior to its release. After agreement is reached on the content and audience, the letter should be disseminated by direct mail to all healthcare providers who were, or may have been exposed to the violative promotion.

A written statement of your intent to comply with "1" and "2" above.

25.     On April 11, 2002, the FDA approved a supplemental application for the use of VIOXX (Rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved indications for osteoarthritis and pain. The FDA also approved new labeling, a "Dear Doctor" letter, and a new patient package insert. The labeling and the "Dear Doctor" letter contained information concerning the results of the VIGOR study.

26.     The revised labeling further states that the administration of VIOXX 50 mg, was associated with a higher incidence of gastrointestinal symptoms.

*Clinical Studies in OA and RA with VIOXX 50 MG  (Twice the highest dose recommended for chronic use)*

In OA and RA clinical trials which contained VIOXX 12.5 or 25 mg as well as VIOXX 50 mg, VIOXX 50 mg OD was associated with a higher incidence of gastrointestinal symptoms (abdominal pain, epigastric pain, heartburn, nausea and vomiting), lower extremity edema, hypertension, serious adverse experiences and discontinuation due to clinical adverse experiences compared to the recommended chronic doses of 12.5 and 25 mg (see DOSAGE AND ADMINISTRATION).

A copy of the revised labeling is attached as Exhibit "B" hereto.

27.     Further, the "Dear Doctor" letter, approved in conjunction with the revisions to the VIOXX labeling, outlines the changes to the VIOXX labeling.

8

28.          The revised "Patient Information" sheet does not add any information about the

results of the VIGOR study." A copy of the revised "Patient Information Sheet" is attached as

Exhibit "C" hereto.

29.          The "Patient Information" sheet is the only written document that is provided

to a patient for whom VIOXX is prescribed.

30.          Both the initial labeling and the revised labeling are ineffective because they

do not properly advise physicians and patients of the potential gastrointestinal side effects of

VIOXX.

31.          Despite knowledge of the ineffectiveness of the warnings, and despite

knowledge that VIOXX may cause serious gastrointestinal side effects, the Defendant has

concealed and/or downplayed the dangers associated with VIOXX, and continues to market the

drug in the United States and abroad. In its 2001 Annual Report, for example, the Defendant

states:

> The Company also noted that a number of federal and state lawsuits,
> involving individual claims as well as purported class actions, have been filed
> against the Company with respect to VIOXX. . . . The lawsuits include
> allegations regarding gastrointestinal bleeding and cardiovascular events. The
> Company believes that these Lawsuits are completely without merit and will
> vigorously defend them.

A copy of this portion of the Annual Report is attached as Exhibit "D" hereto.

32.          Further, in its January 23, 2001 8-K filing with the Securities and Exchange

Commission, a copy of which is attached as Exhibit "E" hereto, the Defendant fails to mention

the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said.
> "Our five key products, VIOXX, ZOCOR, COZAAR/HYZAAR*, FOSAMAX

and SINGULAiR, drove Merck s performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck s worldwide human health sales for 2000 and 61% for the fourth quarter. "Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. VIOXX, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, VIOXX has become the world s fastest growing branded prescription arthritis medicine, and it is already Merck s second largest-selling medicine. In the United States, VIOXX now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States. VIOXX achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter. A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which VIOXX reduced the risk of serious gastrointestinal complications by half compared to the NSAID Naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that VIOXX significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

33.     Despite the foregoing, the Defendant has continued to represent to consumers that VIOXX is safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug. The Defendant has also downplayed any potential gastrointestinal side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

34.     That at all times material hereto the Defendant, MERCK was and continues to be engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or indirectly through third parties or related entities, the pharmaceutical drug, VIOXX.

35.     VIOXX is the brand name of Rofecoxib, one of a class of drugs called prostaglandins," which work to reduce inflammation and pain by providing analgesic and anti-

inflammatory benefits to persons with, among other conditions, arthritis and muscle pain.
Prostaglandins are COX (cyclooxygenase) inhibitors; COX enzymes metabolize arachidonic acid
to produce prostaglandins.

36.        VIOXX is a COX-2 inhibitor, which is designed to produce prostaglandins at
inflammatory sites, and to produce prostacyclin, a vasodilator and an inhibitor of platelet
aggregation.

37.        Defendant, MERCK, submitted an Application to Market a New Drug for
Human Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA")
on November 23, 1998, for tablets, at doses of 12.5 mg and 25 mg, for relief of the signs and
symptoms of osteoarthritis, the management of acute pain, and the treatment of primary
dysmenorrhea.  This application was denoted NDA 21-042 by the FDA.

38.        Defendant also submitted an Application to Market a New Drug for Human
Use ("NDA") for rofecoxib to the United States Food and Drug Administration ("FDA") on
November 23, 1998, for oral suspension, at doses of 12.5 mg/mL and 25 mg/mL, for relief of the
signs and symptoms of osteoarthritis, the management of acute pain, arid the treatment of
primary dysmenorrhea.  This application was denoted NDA 2 1-052 by the FDA.

39.        On or about May 20, 1999, the FDA approved NDA 21-042 and NDA 21-052
(hereinafter the "NLIA") for Rofecoxib, for relief of the signs and symptoms of osteoarthritis, the
management of acute pain, and the treatment of primary dysmenorrhea.

40.        At the time the drug was approved by the FDA the labeling for Rofecoxib
stated, in the section entitled "Special Studies -- Upper Endoscopy in Patients with
Osteoarthritis," "Treatment with VIOXX 25 mg daily or 50 mg daily was associated with a

11

significantly lower percentage of patients with endoscopic gastroduodenal ulcers than treatment with ibuprofen 2400 mg daily. However, the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing VIOXX to placebo." A copy of the label is attached as Exhibit "A" hereto.

41.    The "Warnings" section of the labeling for Rofecoxib, at the time the drug was approved by the FDA, contains a section, "Gastrointestinal (61) Effects -- Risk of 61 Ulceration, Bleeding, and Perforation."

42.    Defendant submitted NDA-007 with the goal of establishing a gastrointestinal ("01") safety claim for Rofecoxib. In conjunction with the NDA, the Defendant performed the VIOXX 61 Outcomes Research (VIGOR) Protocol, No. 088-04, entitled "A Double-Blind, Randomized, Stratified, Parallel-Group Study to Assess the Incidence of PUBs During Chronic Treatment With MK-0966 or Naproxen in Patients With Rheumatoid Arthritis: U.S. Cohort." The VIGOR study was performed from January 6, 1999 through March 17, 2000.

43.    The objectives of the VIGOR study were to (1) "determine the relative risk of confirmed PUB (Perforation, Ulcers, Bleeding) in patients taking MK-0966 50 mg daily compared to patients in the group taking Naproxen 1000 mg/day," and (2) "study the safety and tolerability of MK-0966 in patients with rheumatoid arthritis."

44.    In industry-sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that VIOXX use resulted in a statistically significant increase in hypertension and stroke. Not only did Merck do nothing to further accurately publish these studies or warn consumers, but it denied the results with respect to hypertension in the

official publication of the American Pharmaceutical Association, Pharmacy Today, *Spin War Aside. Lessons Emerge From COX-2 Trials,* in August 2000, page 3.

45.	Defendant continued to deny the ill health effects associated with VIOXX while at the same time reaping profits obtained through its non-disclosure and concealment. Defendant engaged in a massive advertising and sampling program and gained continued increases in the market share, which enhanced Defendant's financial stability to the detriment of its consumers. As a result of the Defendant's scheme, it reaped more than $2 billion in profit in the year 2000 alone, and appropriated approximately 23 percent share of the market.

46.	Defendant continued to profit from its scheme by withholding information from Plaintiff, the consuming public and the health care industry. For example, in November of 2000, the Defendant caused the publication of a study in the New England Journal of Medicine in which it knowingly downplayed and/or withheld the severity of cardiovascular risks associated with VIOXX consumption over Naproxen consumption.

47.	On or about August 29, 2001, the Journal of the American Medical Association (JAMA) published a peer-reviewed human epidemiologic study by the Cleveland Clinic Foundation, Cleveland, Ohio, Dr. D. Mukhisjee, et al., showing that the Defendant had concealed that the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombosis, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among VIOXX users in the Defendant's trials, including VIGOR, at a 95% confidence interval ranged from 2.2 for event-free survival analysis, 2.38 compared to Naproxen users, and 4.89 for developing serious cardiovascular events among aspirin-indicated patients. *See*

Mukhisjee, D., et al., *Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors,* JAMA 286:8, 954-959, Aug. 22/29, 2001. In addition, the annualized myocardial infarction rates for VIOXX users compared to placebo revealed a statistically significant increase among VIOXX users.

48.     In the JAMA study, the authors stated that "by decreasing P612 production [VIOXX] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic P612, potentially leading to an increase in thrombotic cardiovascular events." *Id.* at *957.* In a follow-up peer-reviewed study reported in the Journal of the American College of Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor "tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events." Bing, R., & Lomnicka, M., *Why Do Cyclo--Oxygenase-2 Inhibitors Cause Cardiovascular Events?,* J.A.C.C., 39:3, Feb. 6, 2002. This is further supported by studies completed at the University of Pennsylvania. Cheng, Y., et al, *Role of Prosta-cyclin in the Cardiovascular Response to Thrornboxane 42,* Journal of Science, V. 296:539-541, Apr. 19, 2002.

49.     On September 17, 2001, Thomas W. Abrams, R.Ph., MBA, Director of the FDA Division of Drug Marketing, Advertising, and Communications, issued a "Warning Letter" to Raymond V. Gilmartin, President and CEO of the Defendant, relating to "promotional activities and materials for the marketing of VIOXX (Rofecoxib) tablets."

50.     The Warning Letter stated that the Defendant had "engaged in a promotional campaign for VIOXX that minimizes the potentially serious cardiovascular findings that were

14

observed in the VIOXX Gastrointestinal Outcomes Research (VIGOR) study, and thus,

misrepresents the safety profile for VIOXX." The letter further states:

> Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on VIOXX were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (Naproxen).

51.    The eight (8) page Warning Letter outlines in detail, the conduct of the

Defendant that supports the FDA's issuance of the Warning Letter, and makes the following

statement:

**"Conclusions and Requested Actions:"**

> The promotional activities and materials described above minimize the potentially serious Cardiovascular findings that were observed in the VIGOR study, minimize the VIOXX / Coumadin drug interaction, omit crucial risk information associated with VIOXX therapy, contain unsubstantiated comparative claims, and promote unapproved uses. On December 16, 1999, we also objected to your dissemination of promotional materials for VIOXX that misrepresented VIOXX's safety profile, contained unsubstantiated comparative claims, and lacked fair balance.

> Due to the seriousness of these violations, and the fact that your violative promotion of VIOXX has continued despite our prior written notification regarding similar violations, we request that you provide a detailed response to the issues raised in this Warning Letter on or before October 1, 2001.

> This response should contain an action plan that includes a comprehensive plan to disseminate corrective messages about the issues discussed in this letter to the audiences that received these misleading messages. This corrective action plan should also include:

>> Immediately ceasing all violative promotional activities, and the dissemination of violative promotional materials for VIOXX.

>> Issuing a "Dear Healthcare provider" letter to correct false or misleading impressions and information. This

> proposed letter should be submitted to us for review
> prior to its release. After agreement is reached on the
> content and audience, the letter should be disseminated
> by direct mail to all healthcare providers who were, or
> may have been exposed to the violative promotion.
>
> A written statement of your intent to comply with "1"
> and "2" above.

52.      On April 11, 2002, the FDA approved a supplemental application for the use

of VIOXX (Rofecoxib) for rheumatoid arthritis, adding this indication to the previously approved

indications for osteoarthritis and pain.  The FDA also approved new labeling, a "Dear Doctor"

letter, and a new patient package insert.  The labeling and the "Dear Doctor" letter contained

information concerning the results of the VIGOR study.

53.      The revised labeling further states that the administration of VIOXX 50 mg,

was associated with a higher incidence of gastrointestinal symptoms.

> *Clinical Studies in OA and RA with VIOXX 50 MG  (Twice
> the highest dose recommended for chronic use)*
>
> In OA and RA clinical trials which contained VIOXX 12.5
> or 25 mg as well as VIOXX 50 mg, VIOXX 50 mg OD was
> associated with a higher incidence of gastrointestinal
> symptoms (abdominal pain, epigastric pain, heartburn,
> nausea and vomiting), lower extremity edema, hypertension,
> serious adverse experiences and discontinuation due to
> clinical adverse experiences compared to the recommended
> chronic doses of 12.5 and 25 mg (see DOSAGE AND
> ADMINISTRATION).

A copy of the revised labeling is attached as Exhibit "B" hereto.

54.      Further, the "Dear Doctor" letter, approved in conjunction with the revisions to

the VIOXX labeling, outlines the changes to the VIOXX labeling.

16

55.      The revised "Patient Information" sheet does not add any information about the results of the VIGOR study." A copy of the revised "Patient Information Sheet" is attached as Exhibit "C" hereto.

56.      The "Patient Information" sheet is the only written document that is provided to a patient for whom VIOXX is prescribed.

57.      Both the initial labeling and the revised labeling are ineffective because they do not properly advise physicians and patients of the potential gastrointestinal side effects of VIOXX.

58.      Despite knowledge of the ineffectiveness of the warnings and despite knowledge that VIOXX may cause serious gastrointestinal side effects, the Defendant has concealed and/or downplayed the dangers associated with VIOXX and continues to market the drug in the United States and abroad.  In its 2001 Annual Report, for example, the Defendant states:

> The Company also noted that a number of federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to *VIOXX*. . . . The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these Lawsuits are completely without merit and will vigorously defend them.

A copy of this portion of the Annual Report is attached as Exhibit "D" hereto.

59.      Further, in its January 23, 2001 8-K filing with the Securities and Exchange Commission, a copy of which is attached as Exhibit "E" hereto, the Defendant fails to mention the cardiac and cardiothrombotic findings of the VIGOR study:

> "Our results reflect the strength of our growth strategy," Mr. Gilmartin said. "Our five key products, VIOXX, ZOCOR,

17

COZAAR/HYZAAR*, FOSAMAX and SINGULAiR, drove Merck's performance for the year and created a powerful platform for growth." These products accounted for 57% of Merck's worldwide human health sales for 2000 and 61% for the fourth quarter. "Each of the five medicines offers unique competitive advantages," Mr. Gilmartin said. VIOXX, a once-a-day medicine, is the only COX-2 indicated in the United States both for osteoarthritis and acute pain. Since its extraordinarily successful 1999 launch, VIOXX has become the world's fastest growing branded prescription arthritis medicine, and it is already Merck's second largest-selling medicine. In the United States, VIOXX now accounts for approximately 50 percent of new prescriptions in the COX-2 class, despite being second to market in this class in the United States. VIOXX achieved $2.2 billion in sales for the full year 2000, with $700 million in the fourth quarter. A Food and Drug Administration (FDA) Advisory Committee meeting is scheduled for Feb. 8 to review labeling changes Merck has requested based on the strong results of the VIGOR Study. This 8,000-patient gastrointestinal outcomes research study, in which VIOXX reduced the risk of serious gastrointestinal complications by half compared to the NSAID Naproxen, was published in November in THE NEW ENGLAND JOURNAL OF MEDICINE. Another study, presented in November, showed that VIOXX significantly reduced moderate-to-severe acute pain after dental surgery to a greater degree compared to codeine combined with acetaminophen.

60.        Despite the foregoing, the Defendant has continued to represent to consumers that VIOXX is safe, and that any cardiovascular and/or cardiothrombotic side effects are not associated with the drug. The Defendant has also downplayed any potential gastrointestinal side effects of the drug, promoting it as safer and more efficacious than other medications approved for treatment of similar conditions.

18

## COUNT III
## PRODUCTS LIABILITY - DEFECTIVE DESIGN

61.     That Plaintiff, DEBORAH S. KOWALSKY re-alleges all of the allegations

contained in all other paragraphs as if they were fully and completely set forth herein, and further

alleges as follows:

62.     Defendant is the researcher, developer, manufacturer, distributor, marketer,

promoter, supplier and seller of VIOXX, which is defective and unreasonably dangerous to

consumers.

63.     VIOXX is defective in its design or formulation in that it is not reasonably fit,

suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated

with its design and formulation.  VIOXX is defective in design or formulation in that it lacks

efficacy and/or it poses a greater likelihood of injury than other non-steroidal anti-inflammatory

medicines and similar drugs on the market and is more dangerous than ordinary consumers can

reasonably foresee.

64.     The defective condition of VIOXX renders it unreasonably dangerous and

VIOXX was in this defective condition at the time it left the hands of the Defendant.  VIOXX

was expected to and did reach consumers, including Plaintiff, without substantial change in the

condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted,

supplied and otherwise released into the stream of commerce.

65.     Decedent, MADELINE RIEHL was unaware of the significant hazards and

defects in VIOXX.  VIOXX was unreasonably dangerous in that it was more dangerous than

would be reasonably contemplated by the ordinary user.  During the period of March 2001

through November 2004, the Decedent, MADELINE RIEHL was taking VIOXX, the medication

19

was being utilized in a manner that was intended by Defendant. At the time Decedent, MADELINE RIEHL received and consumed VIOXX, it was represented to be safe and free from latent defects.

66. Defendant is strictly liable to Plaintiff for designing, manufacturing and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of Defendant because of the design defects.

67. Defendant knew or should have known of the danger associated with the use of VIOXX, as well as the defective nature of VIOXX, but has continued to design, manufacture, sell, distribute, market, promote and/or supply VIOXX so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by VIOXX.

68. As a direct and proximate cause of the design defect and Defendant's misconduct as set forth herein, Decedent MADELINE RIEHL suffered serious and permanent physical and emotional injuries resulting in her death. Decedent, MADELINE RIEHL has expended large sums of money for medical care, treatment and funeral services, suffered economic loss and has otherwise been physically, emotionally and economically injured.

**WHEREFORE**, the Plaintiff, DEBORAH S. KOWALSKY , prays for entry of a judgment against the Defendant, MERCK, by and through undersigned counsel demands judgement against the Defendant, MERCK together with interest, costs of suit, attorneys' fees and all such other relief as the court deems proper.

20

## COUNT IV
## PRODUCTS LIABILITY - FAILURE TO WARN

69.       That Plaintiff, DEBORAH S. KOWALSKY, re-alleges all of the allegations contained all other paragraphs as if they were fully and completely set forth herein, and further alleges as follows:

70.       Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce the pharmaceutical, VIOXX, and in the course of same, directly advertised or marketed the product to the FDA, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of VIOXX.

71.       VIOXX was under the exclusive control of the Defendant as aforesaid, and was unaccompanied by appropriate warnings regarding all possible adverse side effects and complications associated with the use of VIOXX, dangerous drug-drug interactions and food-drug interactions, and the comparative severity, duration and the extent of the risk of injury with such use.

72.       Defendant has failed to timely and reasonably warn of material facts regarding the safety and efficacy of VIOXX so that no medical care provider would have prescribed, or no consumer would have used, VIOXX had those facts been made known to such providers and consumers.

73.       Defendant has failed to perform or otherwise facilitate adequate testing in that such testing would have shown that VIOXX posed serious and potentially life-threatening side effects and complications with respect to which full and proper warning accurately and fully

21

reflecting the symptoms, scope and severity should have been made to medical care providers, the FDA and the public, including the Plaintiff.

74.    VIOXX, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by Defendant, was defective due to inadequate post-marketing warnings and/or instruction because, after Defendant knew or should have known of the risk of serious and potentially life-threatening side effects and complications from the use of VIOXX, Defendant failed to provided adequate warnings to medical care providers, the FDA and the consuming public, including Plaintiff, and continued to promote VIOXX aggressively.

75.    As a direct and proximate result of the conduct of Defendant as aforesaid, Decedent MADELINE RIEHL has suffered serious and permanent physical impairments and injuries resulting in her death; suffered mental pain and suffering; suffered loss of income loss of the capacity for the enjoyment of life, incurred medical expenses for care and treatment; has suffered economic loss and has otherwise been physically, emotionally and economically injured.

**WHEREFORE**, the Plaintiff, DEBORAH S. KOWALSKY prays for entry of a judgment against the Defendant, MERCK, by and through undersigned counsel demands judgement against the Defendant, MERCK together with interest, costs of suit, attorneys' fees and all such other relief as the court deems proper.

## COUNT V
## BREACH OF EXPRESS WARRANTY

76.    That Plaintiff, DEBORAH S. KOWALSKY, re-alleges all of the allegations contained in all other paragraphs as if they were fully and completely set forth herein, and further alleges as follows:

22

77.     Defendant placed VIOXX into the stream of commerce for sale and recommended its use to physicians, the FDA and consumers without adequately warning physicians, the FDA and consumers, including the Plaintiff, of the risks associated with the use of VIOXX.

78.     Defendant had a duty to exercise reasonable care in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promotion, sale and release of VIOXX, including a duty to:

a.     Ensure that the product did not cause the user unreasonably dangerous side effects;

b.     Warn of dangerous and potentially fatal side effects; and

c.     Disclose adverse material facts when making representations to physicians, the FDA and the public at large, including Plaintiff.

79.     When Plaintiff MADELINE RIEHL's physician(s) prescribed VIOXX and Plaintiff made the decision to use VIOXX, both Plaintiff and her physician(s) reasonably relied upon the Defendant and its agents to disclose known defects, risks, dangers and side effects of VIOXX.

80.     Decedent MADELINE RIEHL's physician(s), the FDA and/or Plaintiff had no knowledge of the falsity or incompleteness of the Defendant's statements and representations concerning VIOXX when Plaintiff's physician prescribed and/or otherwise provided VIOXX and Plaintiff purchased and used VIOXX as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by the Defendant.  Plaintiff justifiably and detrimentally relied on the warranties

and representations of Defendant in the purchase and use of VIOXX.

81.          Defendant was under a duty to disclose the defective and unsafe nature of VIOXX to physicians, the FDA, consumers and users, such as Plaintiff. Defendant had sole access to material facts concerning the defects, and Defendant knew that physicians, the FDA and users, such as Plaintiff, could not have reasonably discovered such defects.

82.          By the conduct alleged, the Defendant, its agents and employees expressly warranted to Plaintiff and Plaintiff's physician(s) that the products were merchantable and fit for the purpose intended.

83.          This warranty was breached because VIOXX was not safe and effective as a medication for arthritis and pain, as Defendant had represented, and Plaintiff was injured.

84.          As a direct and proximate cause of the design defect and Defendant's misconduct as set forth herein, Plaintiff suffered serious and permanent physical and emotional injuries resulting in her death. Decedent MADELINE RIEHL has expended large sums of money for medical care, treatment and funeral services, suffered economic loss and has otherwise been physically, emotionally and economically injured.

**WHEREFORE**, the Plaintiff, DEBORAH S. KOWALSKY prays for entry of a judgment against the Defendant, MERCK, by and through undersigned counsel demands judgement against the Defendant, MERCK together with interest, costs of suit, attorneys' fees and all such other relief as the court deems proper.

## DAMAGES PURSUANT TO FLORIDA STATUTE 768.21

85.          Plaintiff, DEBORAH S. KOWALSKY, realleges all of the allegations contained in all of the paragraphs as if they were fully and completely set forth herein, and states

24

as follows:

86.        That, based upon the above, Plaintiff seeks the following damages pursuant to

Fla. S. 768.21 which consist of the following:

(a)        In that there is no surviving spouse, Geri Ann Palermo and Angela Nacchio, as

children of the decedent are entitled to recover for lost parental

companionship, instruction, and guidance and for mental pain and suffering

from date of injury pursuant to Fla. S. 768.21(3);

(b)        Medical and funeral expenses pursuant to Fla. Stat. 768.21(6);

(c)        Loss of the prospective net accumulation of the estate which might reasonably

have been expected but for the wrongful death, reduced to present money

value, pursuant to Fla. Sta. 768.21(6)(a);

**WHEREFORE,** the Plaintiff, DEBORAH S. KOWALSKY prays for entry of a judgment

against the Defendant, MERCK, by and through undersigned counsel demands judgement

against the Defendant, MERCK together with interest, costs of suit, attorneys' fees and all such

other relief as the court deems proper.

> **LAW OFFICES OF ROBERT J. FENSTERSHEIB**
> **& ASSOCIATES, PA.**
> *Attorneys for Plaintiff*
> 520 West Hallandale Beach Blvd.
> Hallandale, Florida 33009
> Telephone: 954) 456-2488 Broward
> (305) 945-3630 Dade
> Fax: (954) 456-2588
>
> By: _____
>          ROBERT J. FENSTERSHEIB, Esquire
>          Florida Bar No. 307300