IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: VIOXX<br><br>PRODUCTS LIABILITY LITIGATION<br><br>This document relates to<br>Case No. 2:06-CV-00810<br><br>CHARLES MASON,<br><br>               Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>               Defendant. | MDL DOCKET NO. 1657<br>SECTION L<br><br>JUDGE FALLON<br><br>MAGISTRATE JUDGE KNOWLES<br><br>**MERCK'S OBJECTIONS AND<br>COUNTER-DESIGNATIONS TO<br>PLAINTIFF'S DEPOSTION<br>DESIGNATIONS FOR<br>CASE SPECIFIC WITNESSES** |

TO:    Edward F. Blizzard
        J. Scott Nabers
        Rebecca B. King
        BLIZZARD, MCCARTHY & NABERS, LLP
        440 Louisiana, Suite 1710
        Houston, Texas 77002

Merck hereby serves its objections and counter-designations to Plaintiff's affirmative deposition designations for seven (7) case-specific depositions in *Mason*.[1]

Merck has also highlighted objections that warrant special consideration. These objections are divided into three categories:

    (1) objections to designations from the deposition of Plaintiff's treating cardiologists;

    (2) objections to designations from the deposition of Plaintiff's primary care physician, Dr. Douglas Vogeler; and

    (3) objections to designations from the deposition of Jay Grove.

---

[1] Specifically, Plaintiffs affirmative deposition designations are from: Edward Ganellen, Jay Grove, Mark Keep, Bard Madsen, Gary Symkoviak, Douglas Vogeler, and James Zebrack.

### I.     Mr. Mason's Treating Cardiologists

Plaintiff has designated deposition testimony from five of Plaintiff's treating cardiologists. In addition to the specific objections noted below for each witness, Plaintiff consistently designated improper testimony in three particular areas.

First, Plaintiff asked each treating cardiologist for his understanding of why Vioxx was withdrawn. *See, e.g.,* Madsen Dep. 123:4–123:22; Zebrack Dep. 41:4–41:18; Symkoviak Dep. 33:2– 33:11; Keep Dep. 36:19–36:25; Ganellen Dep. 54:4–54:23 . None of these witnesses has any first-hand knowledge of the reasons for Vioxx's withdrawal. Each witness could only relate his understanding of what was reported in the press (several times making reference to such articles in the answers). These answers are without personal knowledge or foundation and only are informed by hearsay documents. In any event, the fact of the Vioxx withdrawal will be established through witnesses with direct knowledge and the repetition of that fact here is simply cumulative.

Second, Plaintiff asked several witnesses to comment on that witness' beliefs regarding the cardiovascular risks of Vioxx. *See, e.g.,* Zebrack Dep. 42:24–55:16; Symkoviak Dep. 32:11–33:1; Ganellen Dep. 55:7–55:13. Importantly, none of these witnesses had any connection to the prescription of Vioxx to the Plaintiff. Thus, these witnesses' beliefs regarding the medicine (particularly those formed after the Plaintiff's heart attack) are irrelevant. Further, none of the witnesses have been designated experts on causation (general or specific). Each witness confirmed that he has not investigated thoroughly the alleged cardiovascular risks with Vioxx. None of the witnesses even purported to hold himself out as an expert on Vioxx. The elicited opinions clearly are expert in nature and should not be allowed because (a) the expert opinions were not

disclosed and (b) none of the witness would be qualified under *Daubert* to offer such opinions.

Third, Plaintiff asked several witnesses whether it was possible that Vioxx was a contributing factor in Plaintiff's heart attack. *See, e.g.,* Zebrack Dep. 55:21–56:6; Keep Dep. 37:1–37:12; Ganellen Dep. 56:6–56:15. This testimony also should be excluded. Testimony about specific causation is either percipient fact testimony or expert opinion. Here, none of these witnesses are offering percipient fact testimony on causation. None of Plaintiff's treating cardiologists made a contemporaneous diagnosis that Vioxx played any role in the heart attack. Thus, any speculative testimony on specific causation necessarily is seeking to have the witness form an expert opinion he did not consider during his treatment of the Plaintiff. The designated testimony instead is expert, which neither has been properly designated nor grounded in a reliable methodology.

## II.   Douglas Vogeler

Plaintiff designated extensively from the testimony of his primary care physician, Dr. Douglas Vogeler. Plaintiff's counsel questioned Dr. Vogeler at length about internal Merck documents that Dr. Vogeler had never seen previously. For example, Plaintiff has designated his counsel questioning Dr. Vogeler about e-mails exchanged between Dr. Reicin and Dr. Scolnick, *see, e.g.,* Vogeler Dep. 394:13–397:9, and e-mails with Dr. Patrono, *see, e.g.,* Vogeler Dep. 398:7–401:2. Dr. Vogeler had never seen those documents previously, nor did he expect to. Consistent with this Court's rulings in the *Barnett* and *Smith* trials where the Plaintiffs tried similar tactics, Plaintiff's parade of internal Merck documents with treating physicians should not be received as admissible testimony.

Second, Plaintiff also questioned Dr. Vogeler extensively about DDMAC letters having nothing to do with Vioxx. *See, e.g.,* Vogeler Dep. 55:12–85:6. Plaintiff designated pages and pages of testimony in which his lawyer showed Dr. Vogeler DDMAC letters regarding Cozar, Fosamax, Zocor, and other drugs. Dr. Vogeler knew nothing about these letters or the circumstances surrounding the DDMAC's inquiry. This Court consistently has rejected previous plaintiffs' attempts to discuss these same non-Vioxx DDMAC letters. That ruling applies even more clearly here, where Plaintiff had a treating physician read into the record selected portions of letters he had never seen previously.

### III.   Jay Grove

Jay Grove is an exercise physiologist at Cottonwood Hospital who has attended to Mr. Mason's cardiac rehabilitation since 2003. Merck calls the Court's attention to two categories of testimony to which it objects.

#### 1) Statements About Mr. Mason's Nuclear Perfusion Study

Mr. Grove testifies in detail about the practices and implications of Mr. Mason's nuclear perfusion study. *See, e.g.,* Grove Dep. 25:16-25:17; 25:19-26:13; 26:19-27:3; 27:22-24; 28:1-4; 28:13-29:5; 29:7-15. A nuclear perfusion study is a test performed by cardiologists that measures a variety of cardiac functions including blood flow, functional workload, ischemia, and other measures of heart function.

Plaintiff's questioning of Mr. Grove about Mr. Mason's nuclear perfusion study and its implications for his health exceed the witness's area of expertise and personal knowledge. By his own admission, the interpretation of a nuclear perfusion study lies beyond Mr. Grove's area of expertise:

>Q: That's something you're simply not qualified to do.
>A: I don't interpret stress tests.
>Q: And so if – you've never interpreted a stress test. True?
>A. No.
>Q. Correct?
>A. Correct.

Grove Dep. 46:7-14; *see also* Grove Dep. 57:21-58:5 (Mr. Grove has to defer to cardiologists interpretations of these tests "in every case"). Plaintiff repeatedly questions Mr. Grove about what Mr. Mason's nuclear perfusion studies reveal about his health, and Mr. Grove answers these questions despite (1) never having reviewed the records of Mr. Mason's nuclear perfusion study, Grove Dep. 56:17-18, (2) having no familiarity with how Mr. Mason's cardiologists perform such tests, Grove Dep. 56:22-57:1, (3) nor even being aware or the test methodologies generally employed by local cardiologists, Grove Dep. 26:20-22.

Mr. Grove's statements about Mr. Mason's nuclear perfusion studies are without expertise, personal knowledge, or foundation.

### 2) Statements Concerning Mr. Mason's Activities

Plaintiff questions Mr. Grove about which activities Mr. Mason can participate in given his cardiac condition. First, Plaintiff questions Mr. Grove about the cardiac strain involved in elk hunting. *See* Grove Dep. 67:8-17. Mr. Grove answers the questions, but acknowledges that he must "assume" facts about the conditions of elk hunting. Grove Dep. 67:17. Similarly, Plaintiff suggests Mr. Mason is unable to play golf because of his heart condition. Mr. Grove first responds to a question about how much golf Mr. Mason can play by stating "There's no way to know that," Grove Dep. 68:25, but then speculates about how much golf Mr. Mason can play.

\* \* \*

Merck reserves the right to supplement or amend its objections and counter-designations to Plaintiff's affirmative deposition designations based upon any ruling of the Court or any other court decisions that affect the scope of evidence in this trial, including rulings on its motions *in limine* or *Daubert* motions. Merck reserves the right to also counter-designate any testimony designated by Plaintiff in the event it is not offered by Plaintiff. Merck also reserves the right to make additional completeness designations upon receipt of any Plaintiff's final designations or counter-designations. Merck reserves the right to object to Plaintiff's counter designations. Merck does not waive its right to object to and/or move to exclude any documents or testimony that Plaintiff may offer at trial. Merck reserves all such rights.

By counter-designating testimony in response to Plaintiff's otherwise objectionable designations, Merck does not intend to waive any of its objections to deposition testimony, exhibits, or other evidence or argument. If, objections by counsel are inadvertently designated, Merck reserves the right to remove them upon resolution of the objection.

Dated: October 2, 2006

Respectfully submitted,

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

*Defendant's Liaison Counsel*

Philip S. Beck, 147168
Tarek Ismail, 6225226
Shayna S. Cook, 6285959
BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP
Courthouse Place
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610
Telephone: (312) 494-4400
Telecopier: (312) 494-4440

*Attorneys for Merck & Co., Inc.*