# Dr. Jerry Avorn



PLAINTIFF'S
EXHIBIT

F

**Expert report of Jerry Avorn, M.D.**
**March 20, 2006**

## I. Credentials

I am a Professor of Medicine at Harvard Medical School and Chief of the Division of Pharmacoepidemiology and Pharmacoeconomics in the Department of Medicine at the Brigham and Women's Hospital, one of Harvard's main teaching hospitals. I attended Columbia University as an undergraduate; my medical training was at Harvard Medical School, where I received the M.D. degree in 1974. In 1977 I completed a residency in internal medicine at the Beth Israel Hospital in Boston, another Harvard teaching hospital. I have been teaching at Harvard Medical School continuously since the 1970s, and am currently responsible for most of the teaching in pharmacoepidemiology there and at the Brigham and Women's Hospital; I also lecture on that subject at the Harvard School of Public Health. I am writing the chapter on pharmacoepidemiology for the revised edition of a textbook by faculty at our university, *Principles of Pharmacology,* the text used in the course on that topic at Harvard.

The division I founded in the Department of Medicine comprises a staff of 22, including eleven faculty members. We perform research on the benefits, side effects, and cost-effectiveness of medications; the determinants and outcomes of physician prescribing choices; and the relationship between the pharmaceutical industry, the government, and physicians in shaping medication use, with particular reference to drug marketing and the communication of risk and benefit information to physicians and patients. Our division is supported from a variety of sources, primarily peer-reviewed grants from the National Institutes of Health. We have also received research grants from various pharmaceutical companies, including Merck. My research has been published in numerous medical journals, including *The New England Journal of Medicine, the Journal of the American Medical Association,* and *Circulation,* among others. I am an author of over 200 papers in the medical literature on these topics, and have been identified as one of the most highly cited authors in the field of social sciences (including epidemiology) and medicine. In 2004, my book, *Powerful Medicines: the Benefits, Risks, and Costs of Prescription Drugs,* was published by Knopf and was well reviewed in both the lay and medical press.

In addition to pharmacoepidemiologic studies measuring medication risks, a major focus of my research has been to understand how physicians evaluate the benefits and risks of alternative medications in making their prescribing decisions, and how those decisions can be improved. We have published a number of major papers in this area, and the topic forms the basis of much of my teaching at Harvard Medical School, the Harvard School of Public Health, and other institutions nationally and internationally. One component of that work involves providing physicians and patients with evidence-based, non-commercial summaries of the medical literature to help them make more accurate drug-use decisions. We have studied this approach in several settings in multi-state randomized controlled trials and reported the results of these interventions in *The New*

1



EXHIBIT
F

M006819473

*England Journal of Medicine* and several other journals. We also perform such prescribing quality-improvement activities at the Brigham and Women's hospital to educate the interns, residents, and Harvard medical students in training there, and last year my colleagues and I began a large program funded by the state of Pennsylvania to provide this kind of evidence-based medication information for practicing physicians throughout that state on an ongoing basis. In addition to my own research and educational activities in this area, I have consulted internationally on the development and evaluation of programs based on my research that are designed to provide doctors with accurate, unbiased information about drug benefits and risks in countries including Canada, Great Britain, and Australia.

Since my residency I have practiced internal medicine as well as geriatrics in the ambulatory and inpatient settings at several Harvard teaching hospitals; I presently serve as senior attending physician on the General Medicine Service at the Brigham and Women's Hospital, where I supervise and teach interns, residents, and medical students.

**II. The present assignment**

I was asked by plaintiffs' attorneys to consider the question of whether rofecoxib (Vioxx) increases the risk of cardiovascular disease, and to assess the methods by which Merck evaluated and managed this issue throughout the development and marketing of Vioxx. In performing these tasks I relied on publications from the peer-reviewed medical literature, publicly available material from the Food and Drug Administration, and other documents (including internal Merck communications) provided by counsel. I relied on these materials as well as my education, experience, and research, and I employed standard methodologies that are generally accepted in the scientific community.

**III. Available evidence prior to FDA approval of Vioxx**

Merck's withdrawal of Vioxx (rofecoxib) in September 2004 was followed by numerous statements from company officials that they were astonished at the unanticipated finding that their drug could double the risk of heart attack or stroke. But inspection of information available in the public domain and of internal company documents provides clear evidence that Merck officials had been aware of this risk for years and failed to take reasonable action to address it.

Merck consistently promoted the advantage of its selective cox-2 inhibitor as retaining the favorable effects of suppressing the "bad" cox-2 (so as to reduce pain and inflammation) without suppressing the "good" effects of cox-1 (thus maintaining the gastric mucosa). But there was evidence as early as the 1990s that this good/bad formulation was an oversimplification of reality. Early papers made it clear that a selective cox-2 inhibitor could also suppress vital functions of cox-2 (e.g., prevention of clot formation) along with the more harmful ones (pain and inflammation). Such selective suppression would leave potentially dangerous functions of cox-1 (promotion of clot formation) relatively spared, and thus imbalanced.

M00689194/4

This knowledge was clearly in place when Merck was developing Vioxx. An internal memorandum from October 1996 describes a very early clinical trial of the new drug compared to placebo (Protocol 017). Even though the trial lasted only six weeks, the committee reviewing the trial results noted that "[a]dverse events of most concern were in the cardiovascular system (e.g., MI, unstable angina...increase in blood pressure)." A plan was described to test the drug in a study in which patients would be given low-dose aspirin to protect against these cardiovascular side effects, but to my knowledge Merck never conducted any clinical trial pro-actively designed to address the crucial topic of the cardiovascular risk and safety of Vioxx in patients taking aspirin.

In 1996, Merck began planning a large-scale gastrointestinal outcomes study (which later evolved into the VIGOR trial), comparing Vioxx to a traditional NSAID. These early documents make clear that Merck anticipated an increase of cardiovascular events in patients taking Vioxx. Internal memos during this period make it clear that Merck was attempting to design a study that would demonstrate favorable results for its drug's g.i. safety, while minimizing the potential for finding more adverse cardiovascular outcomes in the Vioxx arm — whether those events were the result of Vioxx increasing cardiac risk or because Vioxx would not provide cardioprotection (having no effect on platelet function) to a population at risk for such events. A Merck scientist, Tom Musliner, wrote candidly that the new drug was likely to increase cardiac risk compared to a traditional NSAID if patients in the proposed study were not given aspirin to protect their hearts:

> there is a substantial chance that significantly higher rates of CV [cardiovascular] AE [adverse event] events (MIs, angina, strokes, TIAs, etc.) will be observed in the selective Cox-2 inhibitor group compared to the standard NSAID group, as summarized in the preceding section.

He stated the study design option starkly: "Prohibit use of low-dose aspirin and accept the risk of observing significant differences in CV rates [i.e., more heart attacks in the Vioxx group]." In the next sentence, Musliner suggested a way to obscure this problem:

> One could attempt to minimize between-group differences [in CV event rates] by excluding patients at high risk (i.e., with prior MI, angina, stroke, TIA, atrial fibrillation, valvular heart disease, peripheral vascular disease, etc.).

The company was still debating possible study designs in 1997 when Merck scientists commented on a draft protocol for what was then known as the "GI Outcomes Trial." Dr. Briggs Morrison of Merck argued that patients should be allowed to take low-dose aspirin in the trial, because "without COX-1 inhibition [that aspirin would provide] you will get more thrombotic events and kill the drug." Dr. Alise Reicin responded the same day:

3

M006919475

> Low dose aspirin – I HEAR YOU! This is a no win situation!… the possibility of increased CV events is of great concern – (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – i.e., those that have already had an MI, CABG, or PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident.

Basic principles of medical research, as well as sound science, make it clear that one should not design a clinical trial with the pre-specified intention of masking negative outcomes.

The next day, Brian Daniels responded to the same e-mail group:

> It is clear to me that the program will be severly [sic] hurt if the megatrial [VIGOR] shows a win in PUBs [gastrointestinal perforations, ulcers, and bleeds] and a loss in MI/CVA [heart attack and stroke]. That is what we are setting up by not allowing ASA [aspirin].

These 1996 - 1997 memos indicated that the Merck officials who designed the drug's clinical trial program were aware of the drug's potential for cardiovascular harm. These documents suggest that Merck knew it would be putting patients at an increased risk for cardiovascular events in the Vioxx arm of the planned study, either because of a prothrombotic effect of Vioxx or because of the prohibition of cardioprotective use of aspirin. Arthritis patients (both RA and OA) are generally at higher risk of heart disease, but Merck decided to prohibit low-dose aspirin because of concern that its use could reduce or eliminate the postulated difference in gastrointestinal bleeding rates. The final trial design served to showcase that selling-point while putting patients in the Vioxx arm at increased risk of cardiovascular events. When the study was published almost exactly four years after the Musliner memo, it indeed found an increase in cardiovascular events in the Vioxx arm as had been anticipated by its planners in 1996.

Concern about excess cardiovascular events in patients given Vioxx was not limited to studies in which it was compared to older NSAIDs. To evaluate other study results that suggested Vioxx may increase the risk of cardiovascular events, the company conducted a comprehensive internal review of its clinical trial data in February 1998. This study found a significant increase in cardiovascular events in patients enrolled in Vioxx trials, as compared to patients in other trials who had been given placebo. This was an admittedly crude study, because the Vioxx trials were still blinded and therefore included *all* study arms (including any comparator drugs as well as placebo), and compared event rates with the placebo-only arms of different trials. This is not an optimal alternative to actual randomized trial data testing the hypothesis directly, since such a cross-study design can produce differences that might not persist when more appropriately designed trials were done. But in the absence at that point of adequate information from such trials, the Watson analysis provided a comparison that the

4

M000819476

company felt was appropriate to conduct in 1998, and was one important source of information available to it at that time. Knowing what it knew then, Merck did not respond to this analysis as a potentially important signal to guide the planning of future clinical trials to determine whether this risk would be refuted or borne out. In the first instance of a pattern repeated several times in later years, company officials dismissed the findings and explained away the results of the comparisons it had requested by suggesting that the higher number of cardiovascular events occurring in patients in the Vioxx studies was not caused by an increase in these problems caused by the drug, but rather by an unusually low rate of such events in the placebo comparator patients. That reaction is a telling one, which indicates the company's response at the time to bad news about its potential blockbuster, and is more important than the subsequent re-analyses of these crude data. Of course, later findings from large randomized clinical trials – even though they had not been designed to address this question – did confirm the pattern of increased cardiovascular risk of Vioxx in relation to placebo.

In May 1998, six months before the Vioxx NDA was filed, the company sought a Programmatic Review from a board of expert scientific advisors it brought together to review the development of the new drug. The advisors' written report warned that greater inhibition of the cox-2 enzyme "could lead to adverse effects of inhibiting COX-2 that are not predictable based on experience with current NSAIDs." They drew the company's attention to three separate mechanisms through which Vioxx could cause serious cardiac complications: fostering the development of lipid-rich plaques in the coronary arteries, destabilizing those plaques and making them "rupture-prone," and the resulting thrombotic occlusion of those arteries (the mechanism causing most heart attacks). The outside panel's report went into considerable detail on how the specific pharmacology of Vioxx could cause this problem by inhibiting the anti-thrombotic effects of cox-2 (particularly by reducing levels of prostacyclin, known to reduce clot formation) while leaving the clot-producing effects of cox-1 (primarily mediated via thromboxane) relatively unaffected.

Taking the concern beyond the level of theory, Merck's external Scientific Advisory Board told the company about specific evidence already in place that made this outcome even more likely: Vioxx was known to reduce the levels of a metabolite (by-product) of prostacyclin.

> By removing this potent inhibitor of platelet aggregation
> [prostacyclin], the probability that a coronary plaque rupture would
> lead to myocardial infarction [heart attack] or ischemic ventricular
> fibrillation [potentially fatal heart rhythm disorder] is enhanced.
> More information is clearly needed to address these hypotheses and
> the other questions related to the possible influences of a COX-2
> inhibitor on coronary morbidity and mortality.

In its May 1998 report, the outside experts strongly urged Merck to evaluate these possibilities with clinical trials and other studies specifically designed to assess the

5

M008819477

possible increased risk of Vioxx in causing heart attack, noting that such research studies should be "actively pursued."

In September 1998, two months before submission of the Vioxx NDA, a letter was sent to Dr. Martino Laurenzi of Merck from Carlo Patrono, M.D., a Professor of Pharmacology at an Italian university. He wrote to follow up on a prior discussion he had had with Dr. Laurenzi about the need for the company to do further research on the potential cardiac effects of Vioxx. He noted that there were many open questions concerning "the potential cardiovascular implications of COX-2 expression and inhibition," and said that the company needed to do studies to clarify this question: "I would suggest that it would be in the best interest of Merck to look into these issues as quickly and thoroughly as possible."

Dr. Patrono's letter was passed on to Dr. Alan Nies at Merck Research Laboratories. Later that month, on September 29, 1998, Dr. Nies sent a memo to colleagues at the company about Dr. Patrono's proposed research and to "the PGIM issue," referring to the prostacyclin metabolite. The same problem had been noted by Dr. John Oates, the respected head of Clinical Pharmacology at Vanderbilt University. Concerning Dr. Patrono's letter, Dr. Nies wrote:

> His thoughts are similar to those of John Oates who called me a
> couple of weeks ago wanting to study Vioxx in patients with
> atherosclerosis/hyperlipidemia and elevated Tx [thromboxane]
> metabolite excretion. I told John we would not be doing any clinical
> studies at this time. When these drugs are available, many
> investigators will probably do such studies with or without our
> help/consent.

I am not aware that Merck ever commissioned any clinical trials to clarify the potentially crucial issue of cox-2 inhibition increasing the risk of cardiac events, even though the company considered doing such studies (see below) and then decided not to follow through on them. A variety of study designs specifically designed to address the cardiac risk issue would have been practical as well as ethical and could have been initiated as early as 2000, or even earlier. Instead, Merck's failure to conduct such studies bolstered its ongoing claims that it was not aware of sufficient clinical trial data to demonstrate this risk, right up until the day it withdrew the drug from the market.

It is widely understood that once approval has been granted, FDA has very limited regulatory authority to compel a company to begin a new clinical trial for an existing indication. However, a responsible company would have initiated its own targeted study or studies to clarify a potential risk as important as this, even if not required to do so by the government.

The NDA [21-042] submitted by the company to the FDA in November 1998 contained data that indicated a clear increase in adverse events in the "cardiovascular system" category, whether the drug was being compared to placebo or to established non-

6

M006819476

selective NSAIDs. Most prominent were higher rates of hypertension and edema caused by Vioxx, and these were noted by the FDA reviewer:

> There is an unequivocal association between [Vioxx] administration and the occurrence of cardiovascular and renal effects…Of note, in most of the studies the identified cardiovascular and renal toxicities associated with [Vioxx], when administered at a dose ranging from 25 to 50 mg daily, occur at a higher rate than with the other tested [NSAID] comparators.

I am not aware of any evidence that Merck communicated the risks identified by its own board of scientific advisors to FDA in the agency's initial review of the Vioxx application. The FDA's evaluation of the drug's potential safety problems related to selective inhibition of cox-2 makes no mention of this evidence.

When the NDA data were reviewed by FDA in May 1999, an FDA reviewer noted that of the subjects selected by the company for enrollment in its studies of patients with osteoarthritis, only 20% were 65 or older even though this condition is primarily a disease of the elderly, making it difficult to know how common such problems would be once the drug was in actual use. The reviewers also observed that assessment of such risks was complicated by the fact that Merck excluded from its studies any patients with a recent heart attack or angina or a stroke or transient ischemic attack within the prior two years. Along with the under-representation of patients over 65 in the osteoarthritis studies, this probably served to obscure the detection of cardiovascular complications. Despite this, a substantially higher number of cardiovascular thromboembolic events had been seen in patients randomized to Vioxx vs. placebo, even in relatively brief studies.

## IV. Additional clinical trial evidence of risk following FDA approval of Vioxx

### A. The VIGOR trial

The VIGOR study was a randomized controlled trial of Vioxx compared with an older non-steroidal anti-inflammatory drug, naproxen. It was designed by Merck to produce evidence that Vioxx caused less gastrointestinal toxicity than traditional NSAIDs. In light of the biological concerns noted above, when the overall plan for analyzing data from the company's clinical cox-2 trials was first being developed in late 1998 and early 1999 Dr. Douglas Watson, a Merck statistician, proposed an "Analysis Strategy for the Incidence of Serious Thromboembolic Events in the COX-2 Inhibitor Program." His memo recommended that the company track summary statistics and incidence rates of adverse cardiovascular events in each treatment group. Yet he went on to recommend that "No formal statistical hypothesis testing will be performed." This would be an odd analytical approach given the importance of the problem being studied, because such a plan would obscure rather than clarify the drug's role in causing these side effects.

7

M008819479

Watson then suggested that adverse events be divided into three plausible categories of outcomes – primary, secondary, and tertiary. The first would include fatal and non-fatal MI, unstable angina, and fatal and non-fatal ischemic stroke; this would be an appropriate set of primary outcomes in keeping with much of the clinical trial literature. The second included other reasonable categories of arterial thromboembolic events. The tertiary category was to include thrombotic events occurring in the veins, which have a different pathology from that of primary concern for the cox-2 drugs. Watson's original proposal was to study each category separately, which would have made sense in light of the different mechanisms causing arterial vs. venous thrombosis.

In the minutes of the CDOC meeting of January 6, 1999, the committee accepted his odd recommendation that no statistical testing be performed. But it rejected the idea of studying arterial and venous thrombotic events separately in the primary analysis, relegating such comparisons to a subsidiary status. Instead, it directed Dr. Watson "to exclude plans to conduct separate analyses of event types" in the main analysis. In addition to being pathologically very different from arterial thrombotic events (e.g., MI, ischemic stroke), some venous thrombotic events are quite common (e.g., deep vein thrombophlebitis), so their inclusion in the main analysis of outcomes in a drug with known potential for arterial clots would likely obscure that causal relationship.

Internal Merck documents indicate that as the VIGOR trial was being conducted, the company's scientists were aware that patients enrolled in the Vioxx arm could well have a higher rate of serious arterial embolic events. On January 9, 2000, Michael Gresser wrote a memo titled "stroke outcomes" to Elliot Ehrich, George Robertson, and Mervyn Turner. In it he warned that "if our worst fears concerning the prostacyclin business have any foundation in reality they [patients randomized to receive Vioxx] could have a higher incidence [of stroke]…." Yet despite the substantial pre-existing causes for concern about increased CV toxicity in the Vioxx arm of the study, Merck's initial plan for analysis of the trial data would have obscured rather than clarified any such relationship.

Despite the concern by many in the scientific community about a possible cox-2-thrombosis risk, on January 12 Doug Watson reported to Gresser, Ehrich, Robertson, Turner, and Alise Reicin:

> It has been decided within MRL [Merck Research Laboratories] that analyses of that data [CV serious adverse events] will be confined to descriptive analyses and calculation of incidence rates for blocks of studies, but no formal comparisons among treatments will be done. None of these analyses will be done for another year yet.

Alise Reicin responds that there was a plan for CV events to be assessed in VIGOR. But the following day (January 13, 2000) Doug Watson, who had been central to the company's prior analyses of CV events with Vioxx, writes to others at Merck:

8

MRX00681948Q

See Alise's message below. I am confused by her statement "As part
of the VIGOR DAP [data analysis plan], we plan to look at the CV
events separately. Tom Capizzi is currently writing up the type of
analyses [sic] which will be done.

Such plans have not been discussed with me previously. What
exactly are you planning and is the intent to use adjudicated events?

The following day Watson wrote to Reicin to express his confusion: "I have looked at the
VIGOR DAP and see that such an analysis is not listed as primary, secondary, or
exploratory… I don't recall this ever be [sic] discussed with me or at any meetings where
I was present. In the section on Aes [adverse events] it does not list these as a
prespecified analysis." These memos were written two months before the VIGOR data
were to be unblinded, astonishingly late for such a crucial question to remain unresolved.

On January 17, 2000, Capizzi sends a widely circulated memo in which he reports
that the VIGOR data analysis plan is "undergoing revisions":

…we received senior management approval not to pursue a CV
DAP…When the DSMB [the study's external Data Safety Monitoring
Board] was notified that there was no program wide plan, the DSMB
requested that we analyze the adjudicated CV data for VIGOR (their
request seemed to be based on the size of VIGOR and the importance of
the CV issue with respect to COX 2 agents).

Watson responds,

The idea that we would do this runs counter to the directives I had
previously received from CDOC regarding analyses of adjudicated
vascular events  As a result, the procedures in the SOP [standard
operating procedure] are not set up in such a way as to get the events
adjudicated on the kind of timeline this requires, and doing so will be
difficult at this point.

On January 17, 2000, Harry Guess, head of epidemiology at Merck, sent an urgently
worded memo to George Williams and others at the company, entitled "VIGOR
Cardiovascular Event Adjudications: Alert on a potential problem." It read, in part:

The DSMB for VIGOR decided in December [one month earlier] that
analyses should be conducted of cardiovascular events in VIGOR….
The issue about which I wanted to alert you is that we (Epidemiology)
might not be able to get the cardiovascular (CV) events adjudicated in
time to meet the VIGOR frozen file date of April 24. As of today, we
have 58 potential CV events, of which only 5 have been adjudicated.
Of the remaining 53 potential events, we have documentation in
Epidemiology on 27 of them, so we will need to get the documentation
sent in on the other 26. We estimate that by Feb 10 we might have a

9

total of about 70 CV events in both treatment groups of 088 and 09 combined. Alise has proposed Feb 10 as the cut off for this analysis. The most important problem is that it might not be feasible to get the committees to adjudicate all events by early April….We in Epidemiology are not staffed to get this volume of extra CV events processed between now and April while meting all other commitments, including keeping up with the GI PUB events [perforations, ulcers, and bleeds] on VIGOR.

On January 18, 2000, Capizzi reports on a new plan for analyzing CV events in VIGOR:

We currently have in the revised plan that the adjudicated events will be the primary assessment. I will add statement that explicitly states that no between group differences, tests or confidence intervals will be provided for the unadjudicated events in questions [sic]. This will protect us should the events not be adjudicated in time for the CSR.

Watson responds later that day that given the small number of events that will be available for analysis, "and that not all of them will be confirmed by adjudication, there will not be much precision in the analysis no matter what we do."

At the very best, the disarray and last-minute changes to the data analysis plan for such an important, expected, and potentially damaging side effect of Vioxx reflect terrible planning on the company's part for studying such a serious problem. Whether or not the company was ultimately successful in completing the adjudications on time, the plan to restrict the analysis to only those cardiac events that had been completely adjudicated, while explicitly excluding analyses of unadjudicated cases, would severely limit the number of events available for study. This in turn would curtail the analytical power of these comparisons, thus reducing the chance that a statistically significant increase in CV events could be detected in the Vioxx group. This analytic strategy was particularly problematic in light of the company's knowledge that serious difficulties were expected in getting all the cases processed in time.

The *NEJM* article describing the results of the trial, which appeared in November 2000, reported that VIGOR had achieved its main purpose. It found that while Vioxx had analgesic efficacy identical to that of naproxen, patients randomized to the Vioxx group had fewer gastrointestinal complications than those taking naproxen. Yet there was a 5-fold increase in cardiac events in the patients given Vioxx. In presenting the study results, the company took the unusual step of attributing this difference to a *reduction* of heart attacks by naproxen rather than an increase in risk caused by Vioxx. This was done despite the fact that such a supposed protective naproxen effect on the heart was primarily theoretical, and had never been demonstrated in any clinical trial. The FDA review of these data pointed out that naproxen was only a *transient* inhibitor of the clot-promoting substance thromboxane, and that the cardioprotective effect Merck claimed for it had never been demonstrated in a placebo-controlled trial. Moreover, such a dramatic effect of naproxen in preventing MIs would be far greater than that ever seen with

10

M006819482

aspirin, considered the "gold standard" agent for cardioprotection. Soon after publication of the VIGOR results my colleagues and I group conducted a very large observational study of patients taking naproxen and did not find evidence of such a huge cardioprotective effect in an enormous population of typical NSAID users; other observational studies have reached the same conclusion.

A key aspect of the company's "naproxen hypothesis" was that it was effectively replacing aspirin in the trial for patients who required it (but which the VIGOR design prohibited). Yet FDA's analysis at the time (Targum) reported an increase in CV events with Vioxx even in patients in whom aspirin was not indicated.

In fact, when one compares all serious adverse events seen in VIGOR (either gastrointestinal events or cardiovascular events), these occurred with equal frequency in both study groups. Indeed, the number of additional serious cardiac events in the Vioxx group was actually *greater* than the number of serious gastrointestinal events prevented. Clinically, this overall disadvantage of Vioxx is even more worrisome because non-fatal cardiovascular events such as MI and stroke can produce irreversible damage to the heart or brain, whereas non-fatal drug-induced gastrointestinal side effects are usually readily treated with cessation of the offending product and transfusions (if any are needed at all), and commonly do not produce lasting damage. As one FDA reviewer noted concerning the VIGOR results, in view of the overall findings "one can argue that naproxen would be the preferred drug compared to Vioxx."

My colleagues and I have conducted several studies of physicians' perception of risk vs. benefit and how these assessments shape their prescribing decisions; this has been an important theme of my unit's research work for over two decades. Fair and balanced depictions of the risk profile of Vioxx – that it is no more effective an analgesic than existing NSAIDs, and that in comparison with naproxen it will produce more serious CV events than it will prevent g.i. events – does not yield an attractive risk-benefit profile for Vioxx. Had such a balanced risk-benefit relationship been accurately presented to physicians, the drug would not have been prescribed at the blockbuster level of use which it quickly attained. Simple common sense would lead to the same conclusion. Further, the likelihood that the relative g.i. advantage of Vioxx is negated by low-dose cardioprotective aspirin use (see below) would remove even this reason for using the drug, had it been more widely known.

In its presentations of the VIGOR results, Merck adopted a clear strategy of emphasizing the gastrointestinal superiority of Vioxx while minimizing its cardiac risk. From the early phases of its cox-2 development program, the company had hoped that any increase in cardiovascular risk caused by these drugs would be offset by their capacity to reduce gastrointestinal risk. This was the entire *raison d'etre* for Vioxx, since there was never any evidence it had better analgesic efficacy than numerous NSAIDs already on the market. But if greater efficacy is not an issue, evaluation of any drug requires a careful comparison of *all* the adverse events it causes – those for which it may have an advantage over competing therapies, as well as those for which it may be worse. In the mid-1990s it was reasonable to consider the possibility that a selective cox-2

11

M000819483

inhibitor might be a useful drug to have available if its reduction of serious harm from gastrointestinal bleeding clearly outweighed the other side effects it might increase. But in its clinical trials, presentations to the FDA, and communications with prescribing physicians and with patients, Merck consistently distorted this crucial comparison by systematically minimizing the drug's cardiovascular risk while emphasizing its purported gastrointestinal advantage. A draft of the VIGOR paper initially described the increased rate of serious cardiac events as "unexpected," to which one of the co-authors added this comment in a working copy of the manuscript: "Is this unexpected? Not really…" A suggestion made by one of the co-authors of the article that the drug's g.i. benefits "be balanced against the risk of MI's" was not included in the draft submitted to the journal or the final, published manuscript.

As noted, the increased rate of heart attacks in the Vioxx group during the VIGOR study was more marked than was initially known: it was subsequently revealed that after the study report had been submitted to the New England Journal of Medicine, Merck learned of additional MIs that occurred during the study in the Vioxx arm of the trial. Even though Merck had this information months before the manuscript was published, it failed to provide this information to the journal. In addition, the originally submitted draft of the article discussed the potential for the drug to be prothrombotic, but this warning did not appear in the published version of the article.  A table depicting cardiovascular outcomes was deleted from the final manuscript; the information was instead presented in a much more low-profile way by inserting it into the text as rounded percentages of *risk differences* rather than relative risks, which diminished its impact. Finally, in a highly unorthodox decision that deviates from usual procedures for analyzing clinical trial data, late in the study Merck officials imposed an earlier data cut-off point for adverse cardiovascular events (expected to be higher in the Vioxx arm) than they used for ascertaining gastrointestinal outcomes (expected to favor Vioxx). That is, they ordered that data collection stop earlier on the anti-Vioxx outcomes than on the pro-Vioxx outcomes.

When these facts became known to the editors of NEJM, they took the unusual step of publicly chastising the authors in an editorial "Expression of Concern" published in December, 2005.  Even after receiving a response from the study authors published in March 2006, the journal's editors reiterated their concern in a second published statement that reaffirmed their belief that the study data had been handled improperly.

The first public announcement of the VIGOR results by Merck came in a press release on March 27, 2000.  It attributed the elevated rate of cardiac events seen in patients given Vioxx to "naproxen's ability to block platelet aggregation," although there was no compelling evidence for such an enormous naproxen effect. In an internal memo dated March 9, 2000, Dr. Edward Scolnick wrote,

"The CV [cardiovascular] events are clearly there.…this is real.…It is a shame but it is a low incidence and it is mechanism-based as we worried it was. Oates amd Alan and barry were right about the metabolite

12

MRK-05814484

> meanings i.e. urine Pg [prostaglandin] data....This will limit the class
> somewhat...."

To clarify the cardiac risk issue, he notes that the company could conduct "the tylenol study we discussed to further assess safety....Endpoint studies tell the truth." However, no endpoint trials were ever done that were specifically designed to determine "the truth" concerning the drug's cardiac risk.

In preparing for public reaction to announcement of the results of the VIGOR study, the company prepared a Draft Standby Statement in March 2000. A section for internal company use noted,

> The implications for the arthritis & analgesia franchises are high... We
> should (hopefully) position this as applying only to patients with RA
> [rheumatoid arthritis], only with the highest dose of Vioxx, and
> underscore the substantial benefits of Vioxx compared to traditional
> NSAIDs (Langman, JAMA; VIGOR). If possible, we should position
> things as a 'reduction in events with naproxen vs rofecoxib,' rather than
> an 'increase in CVD events with Vioxx vs naproxen.'

The 4- to 5-fold increase in heart attacks is then re-depicted as a "2-fold decrease in the risk of certain cardiovascular events" in patients taking the comparator drug. This draft document does demonstrate, however, that Merck initially intended to disclose that Vioxx could be prothrombotic. Yet this language does not appear in the press releases discussing the VIGOR study and does not appear to have been disseminated to the public or medical community at all.

A "Q&A" section appended to the draft standby statement posed several potential questions from the press and suggested answers. In response to the boldfaced question, **"What does this mean for Vioxx? How can you promote a product that increases heart attacks and strokes?"** the proposed answer contains the following misleading and incorrect statement:

> This [increased rate of cardiovascular adverse events] has only been
> seen in this one study of high-dose rofecoxib in patients with RA, who
> may be particularly suseptable [sic] to the cardioprotective effects of
> naproxen or at an increased risk of thrombotic-type events when
> treated with a COX-2 specific inhibitor, as opposed to patients with
> OA or other conditions...The clinical trials and postmarketing
> experience with VIOXX in OA and other conditions otherwise show
> no evidence of any adverse effect on CV SAEs [cardiovascular serious
> adverse events].

Additional language in the draft statement indicating that the drug could pose particular risk to patients vulnerable to coagulation problems was never, to my knowledge,

13

M000681946S

disseminated by Merck to physicians or patients in any labeling, press release, or promotional materials.

The Merck staff who prepared the draft Q&A provided a final, telling question that might be asked by the media: **"Over a year ago, scientists at the U. of Pennsylvania (Fitzgerald et al) published a report in PNAS suggesting there might be an increased risk of cardiovascular events in patients taking coxibs, due to changes in levels of certain prostaglandins. Were they right?"**

### B. Additional data of increased risk from other randomized trials

Although Merck depicted the VIGOR results as a one-of-a-kind anomaly, several other randomized controlled clinical trials conducted by the company also documented increased risk with Vioxx. Protocol 090 was conducted by Merck in 1998 and 1999, with the final study results reported internally the following year. Although the company claimed it had never observed an increase in cardiovascular events with Vioxx except in comparison with the supposedly cardio-protective naproxen, Protocol 090 enrolled 978 patients and tested Vioxx against nabumetone, a non-selective NSAID, as well as against placebo. A relatively low dose of Vioxx was used (12.5 mg), and each patient was given the drug for just 6 weeks. Yet significantly higher rates were seen with Vioxx compared to nabumetone, placebo, or both in the following categories: one or more adverse experiences; serious adverse experiences; and study discontinuation due to an adverse experience, a drug-related adverse experience, or a serious adverse experience. (Unconventionally, this calculation included events in patients in the nabumetone and placebo groups who dropped out of the study prior to randomization – an unusual way of counting that served to diminish the effect of higher event rates in the Vioxx group.)

When Merck measured side effect rates in each group among aspirin users vs. non-users, the pattern of higher adverse events with Vioxx compared to both comparison groups was found in aspirin users as well as in non-users. In all patients in Protocol 090, the rate of serious cardiovascular events was 3-fold higher in the Vioxx group as compared to either the nabumetone group or the placebo group. This included a heart attack and two strokes in the Vioxx group within the 6-week study period, and none in either of the comparison groups. To my knowledge the results of this trial have never been published.

ADVANTAGE was an even larger study of approximately 5,500 patients with osteoarthritis randomly allocated to receive either 25 mg Vioxx or 1000 mg naproxen. The initial analysis restricted the CV outcome to MI, and there is evidence of internal re-assignment by Merck employees of at least one probable cardiac death to "unknown cause." However, when FDA used a more comprehensive outcome definition of serious coronary heart disease and re-adjudicated these outcomes, it found a relative risk of 3.2 for Vioxx use. This study had lasted for only 12 weeks. Although the ADVANTAGE trial was completed at about the same time as VIGOR (early 2000), a preliminary report of its findings was not provided to FDA until December of that year, and final data was not submitted until mid-2001.

14

MDS619486

On October 18, 2000, Dr. Deborah Shapiro of Merck presented a meta-analysis of all the company's existing data on cardiovascular outcomes from its collected Vioxx clinical trials. For the outcome of myocardial infarction (heart attack), her data depict substantially increased risks seen in 4 of the 5 studies reviewed, including a tripling of risk in ADVANTAGE, a near-doubling of risk in a study labeled "RA," and a quintupling of risk (5-fold increase) in VIGOR. All in all, the summary statistic revealed a doubling of risk across all 5 groups of studies that was statistically significant. I am not aware that an analysis reporting on the endpoint of myocardial infarction was ever provided to the FDA or to the medical community.

Following the release of VIGOR, Merck had put forward several explanations for why the study's findings of increased cardiovascular risk should be discounted: the study was done in rheumatoid arthritis patients, who might be unrepresentative; subjects were prohibited from using aspirin, casting Vioxx in a worse light; the comparison drug was naproxen, which was massively cardioprotective; and Vioxx was used in a higher-than-usual dose. But in 2000, other large randomized controlled trials conducted by Merck undercut each of these proposed explanations. ADVANTAGE did use naproxen as a comparator, but studied a lower dose of Vioxx (25 mg) in patients with osteoarthritis, not RA, and aspirin use was allowed. Protocol 090 used placebo as a comparator, studied OA patients, used a low dose of Vioxx (12.5 mg), and also allowed aspirin use. Both studies showed an increase in CV risk with Vioxx. (For completeness, it should be noted that Protocol 085 did not demonstrate an increased CV risk. Nevertheless, the availability in 2000 of three other large randomized studies [VIGOR, ADVANTAGE, and 090], using a variety of doses, populations, and comparator drugs, should clearly have raised an alarm within Merck that the VIGOR findings could not be dismissed so readily.)

As our research unit was conducting its own epidemiological studies of Vioxx risk, colleagues at Merck noted on several occasions that it was unlikely that the drug caused any important cardiac risk because no such problem had been seen in several studies of Vioxx used to prevent or treat Alzheimer's disease. But in the largest of these for which outcome data are available (Protocol 078), there was substantial evidence of harm, although it was obscured in the published results (Thal et al) by a variety of unconventional and inappropriate analytic approaches. The outcome of "serious thrombotic vascular events" included venous thromboses, not usually included in analyses of cardiovascular thrombotic events (which are in the arteries, not the veins). Rather than use the universally accepted intention-to-treat approach to analysis (which had been pre-specified by Merck in the study's data analysis plan), the authors instead stopped counting adverse outcomes two weeks after a patient ended use of the drug. But a subsequent analysis of data submitted to the FDA, performed after Vioxx was withdrawn, found an increase in the risk of serious coronary heart disease in the Vioxx group compared to placebo. To my knowledge, Merck did not provide a complete and accurate account of these study outcomes to FDA until after the drug had been taken off the market.

15

MDD06819487

Of greatest concern, the mortality rate of subjects given Vioxx in Merck's Alzheimer's studies was double that seen in subjects randomized to placebo. Having practiced and taught geriatrics for many years, I am aware that ascertainment of causes of death in an elderly patient (as most of these study subjects were) can be very problematic. Older people are likely to have multiple co-existing illnesses, and it is well documented that MIs in the elderly often present "silently" – that is, without the typical pain or shortness of breath that are likely to accompany an MI in a middle-aged patient. It has been estimated that about a third of MIs may present in this manner in older patients. As a result, a serious MI may be mis-diagnosed as another condition, and a cardiac death may not be recognized as such as readily as in a younger patient. Death has been called "the clearest outcome in drug research" in that its existence need not be adjudicated. It is therefore of particular concern that a doubling of the death rate was seen in Merck's Alzheimer's studies of Vioxx, which it often cited as evidence of the safety of its drug. Re-analysis of serious cardiac event rates by those outside Merck did in fact indicate an increase risk in patients given Vioxx.

Event adjudication has been more problematic in Merck's studies of Vioxx than in any other drug evaluations I am aware of. In November 2001, FDA was reviewing the results of the ADVANTAGE study comparing Vioxx with naproxen. The agency found that it had to re-adjudicate the data the company presented on adverse cardiovascular outcomes; in 12 events (in a total of 21 patients) the FDA found that Merck had under-estimated the number of adverse cardiovascular events that had occurred in Vioxx patients and over-estimated the number of such events in the naproxen group. It found no instances in which the errors went in the opposite direction. The FDA review stated that the available evidence indicated that adding low-dose aspirin to Vioxx may not eliminate the excess cardiovascular risk seen in the study, but that it could eliminate the drug's relative advantage in reducing gastrointestinal side effects. If that were the case, it would negate virtually all of the drug's clinical and economic advantage over older NSAIDs.

A year after the publication of VIGOR, despite public statements discounting the likelihood that Vioxx caused an increase in cardiac events, internal Merck correspondence revealed that senior officials were quite aware of the problem. In a memo of November 21, 2001 circulated among senior company officials, Dr. Scolnick wrote,

> I think the question we should answer now is NOT whether Vioxx or any Coxib is safe for Cv outcomes. I think the question NOW is what is the best antiplatelet regimen to use with a Coxib. I think that is THE medical question and if we answer it, the problem will dissipate.

He then proposes two studies that would combine Vioxx with antiplatelet agents in order to negate its apparent clot-forming properties: "If you think it through this will answer the questions that are medically needed." To my knowledge, no such large-scale clinical trials were ever conducted by the company.

Coincidentally, in the same month (November 2001), Dr. Scolnick was among ten Merck scientists who received a memo describing the initial results of the Vioxx Low-

16

M000819488

Dose Aspirin Endoscopy Study (Protocol 136). This study randomized 1,200 patients to one of four groups: Vioxx plus low-dose aspirin, low-dose aspirin alone, placebo, or ibuprofen (Motrin), a non-selective NSAID. All underwent g.i. endoscopy to assess ulcer formation. After 12 weeks, the Vioxx plus low-dose aspirin group had about twice the rate of ulcer formation as the placebo or aspirin-alone groups – a rate that was virtually indistinguishable from that in the group taking the older NSAID ibuprofen (Motrin). Thus, in one large patient group in whom gastroprotection would be the most important – those who would require low-dose aspirin to prevent heart disease – the study showed Vioxx to be no better than a much older, cheaper NSAID. Despite the fact that it was negotiating revisions to the Vioxx label with FDA concerning GI safety, Merck did not disclose the results of Protocol 136 to the agency until after the revised label was approved in April 2002. This study was not published until 2003.

The APPROVe study which resulted in the eventual withdrawal of Vioxx from the Market in September 2004 had never been designed to answer the question of cardiac risk. In testing Vioxx to determine whether it slowed the progression of colonic polyps, it excluded patients with recent cardiac disease, and had a mean subject age of 59. This was far lower than the age at which cardiovascular adverse events would be most likely to be detected, and far lower than the mean age at which Vioxx was being used and heavily marketed. Nonetheless, the study did reveal a doubling of risk of heart attack or stroke even in this relatively healthy population. Even here the company's presentation of the data was distorted. Merck has consistently maintained that there was no risk evident until 18 months into the trial. (At that point, the divergence of the curves was attributed to an unusual "flattening out" of the event curve for placebo rather than to an increase in the event rate with Vioxx.)

However, inspection of event rates for all adverse cardiovascular events reveals that the curves separate much earlier, as do data for investigator-reported events. Because this was a double-blind placebo-controlled trial one would not expect such investigator-reported outcomes to be biased for or against the drug. Nevertheless, in the final editing stages of the paper a Merck representative suggested deleting mention of all investigator-reported events prior to submission of the paper to *The New England Journal of Medicine,* even though such events were specified as secondary endpoints for analysis in the study protocol. While Merck did include another secondary endpoint in the published version of the trial (APTC), it did not include the analysis of investigator-reported events which was unfavorable to the drug.

### V. VALOR: an aborted clinical trial

By 2001, Merck was in possession of a substantial number of warning signals about the cardiovascular risk of Vioxx. These included the biological evidence that the drug could inhibit a key cardioprotective substance (prostacyclin) while not inhibiting its clot-inducing counterpart (thromboxane); the data reporting increased occurrence of heart disease events in its early randomized trials; the recommendations of its own scientific advisors about the need to look into this likely complication; and the striking 5-fold increase in MI seen in VIGOR. In response to these issues, the company began to plan a

17

M008019439

study designed to address this central problem: The Vioxx Cardiovascular Outcomes Study, known as VALOR.

Senior Merck officials began considering such a study almost immediately after the problematic VIGOR MI data were unblinded. On April 12, 2000, Dr. Scolnick sent the following e-mail to Dr. Reicin:

> We are all online too late. I will tell you my worry quotient is high. I actually am in minor agony. What I really want to do is a 10,000 vs 10,000 patient study in mild-moderate OA Tylenol vs Vioxx with prn [as-needed] low dose asa [aspirin] for those judged to need it. Safety first primary endpoint and efficacy secondary or co primary. WE WILL NOT KNOW FOR SURE WHAT IS GOING ON UNTIL WE DO THIS STUDY. PLEASE THINK HARD ABOUT THE DESIGN BEFORE THE PAC MEETING. Thanks / Ed   [emphasis in original]

Plans were developed for a study designed specifically to clarify the Vioxx-CV relationship, and by February 2002 a protocol had been developed that would have enrolled 10,000 patients to be given Vioxx and 10,000 to receive placebo, and compare rates of cardiovascular ischemic events between the two groups. Study documents considered the possibility that "a 3 mmHg increase in systolic BP results in small resultant increase in CV events" in the Vioxx arm. In a Merck presentation dated February 27, 2002, the logic behind the study hypothesis was listed as follows:

> **Issues Associated with current Design and Hypothesis:**
> **Several mechanisms by which VIOXX could hypothetically be associated with elevated risk vs. placebo:**
> -- **increase in blood pressure**
> -- **reduction in prostacyclin to a greater degree than ASA [aspirin] alone**
> -- **loss of ischemic preconditioning**
> -- **increase in plaque burden**
> -- **non-COX-2 mediated mechanisms**

VALOR would have reflected typical clinical practice much better than VIGOR had, in that all patients would be given low-dose aspirin for cardioprotection, as well as a gastric acid inhibitor (omeprazole) to protect against g.i. toxicity. Merck scientists presented sound justifications for studying the drug compared to placebo: "placebo comparison provides clear assessment of CV profile of rofecoxib; answers most important clinical question; most efficient use of resources; most timely result." The company identified study centers throughout the world and brought them on-line to plan for subject recruitment. The first patients were scheduled to begin participation in June 2002, and enrollment of each subject would be for 13 months.

But the study was never begun. In March 2002 Merck announced that it "has decided to defer the VALOR Trial at the current time" and suspended further recruitment

18

M000819490

of outside researchers to enroll subjects. To my knowledge, no study designed to test the cardiovascular risks of Vioxx was ever conducted.

## VI. Observational studies of Vioxx and risk

A total of eight observational studies have appeared in the literature addressing the relationship between Vioxx and cardiovascular events, including one from our group on which I was senior author (Solomon, 2004). Ours was the one of the largest of the studies, and included over 10,000 MI outcomes. Seven of the eight published observational studies found a statistically significant increase in the risk of serious coronary heart disease events for Vioxx, ranging from a 25% increase to a 272% increase when all doses were considered. (The eighth study [Mamdani, 2002] was substantially smaller than the others and had important methodological limitations which my colleagues and I discussed at the time of its publication, including exclusion of all cox-2 or NSAID patients who did not fill two successive prescriptions, exclusion of all users who were on a study drug for less than 30 days, and inappropriate adjustment for cardiovascular disease markers that may have actually been caused by one of the study drugs.) Of the four studies which assessed risk as a function of dose, all four found a greater level of risk at a higher dose.

## VII. Inaccurate communication of risks to physicians

Despite the fact that the five-fold increase in MI risk had been found in the VIGOR study soon after the drug was marketed, the official Vioxx labeling contained no adequate warning of cardiovascular risk in for the first several years the drug was on the market. Even after the label was changed, it still did not accurately portray the risks compared to the benefits of Vioxx in a manner that would have permitted physicians or others to make an informed assessment of whether to use the drug.

Instead of providing accurate risk-benefit information to guide physicians, Merck prepared several training tools to arm its sales force against the difficult questions doctors might ask about the product. One interesting example, called "Dodgeball," taught Merck sales representatives how to overcome physician concerns about the drug's side effects. The strategy the company recommended for handling questions about heart attack seems to emphasize distraction rather than education:

> *Question: If the physician is concerned about a potential increase in the risk of MI, how would you respond?*
> *Response: Doctor, once daily VIOXX has no effect on platelet aggregation. Once daily VIOXX (R) is therefore is [sic] not a substitute for aspirin for cardiovascular prophylaxis. However, once daily VIOXX 50 mg had no effect on the anti-platelet activity of low dose (81 mg daily) aspirin.*

There is no way in which this can be construed to be a fair and helpful response to a doctor's simple question about the risk of a potentially life-threatening side effect.

19

MDCS819491

As late as September 2000, months after presenting data on elevated cardiac risk to FDA (but not to NEJM), the company was still using the lower figure of 0.4% in its official communications to physicians who inquired about this issue. This pattern of deceptive presentation of risk data to physicians is also illustrated in the "Cardiovascular Card," a sales tool prepared for Merck representatives to use with physicians concerned about the risk of cardiac events caused by Vioxx. Used from May 2000 until April 2002, the card presents known cardiac risks in a misleading manner. It presents a cardiovascular safety profile for Vioxx that appears to be similar to other NSAIDs and to placebo. However, while this "teaching aid" purported to include cardiovascular safety data from Merck's osteoarthritis (OA) trials, it apparently did not include information from other completed OA trials that contradicted this favorable profile (e.g., ADVANTAGE, 085, and 090). Further, the card suggested that the incidence of mortality with Vioxx was more favorable than for placebo, even though other studies had demonstrated a statistically significant increased risk of mortality associated with Vioxx compared to placebo.

Finally, by excluding safety data from other studies, the card fails to present or even consider critical information from the VIGOR study. Assessments of a drug's safety are best done by considering all randomized trial data available, regardless of the underlying purpose of a given study.  It is inappropriate to provide only selected, most favorable study results in response to doctor's questions about cardiovascular safety and mortality. The most complete and current information on these topics should have been provided to physicians in any "teaching tool" with this purpose. At a minimum, the Cardiovascular Card should have been recalled by Merck because it contained an incomplete and misleading safety profile. Instead, as late as August 2001, by which time considerable additional information about the drug's risk had become available, the Cardiovascular Card was formally "re-validated" by the company for continuing use in promoting Vioxx, and steps were taken by Merck to make it easier for its sales staff to order large supplies of the cards to reassure physicians about the drug's safety. In doing so, the company undercut a key component of the safe use of drugs in medical practice – the doctor's ability to fairly balance benefit and risk in making prescribing decisions.

By May 2001, in response to a New York Times article on the cardiac risk of Vioxx, Merck issued a bulletin to its sales force in which it instructed them: *"DO NOT INITIATE DISCUSSIONS ON THE RESULTS OF THE [VIGOR] STUDY, OR ANY OF THE RECENT ARTICLES IN THE PRESS ON VIOXX."* The bulletin goes on to advise the sales force to state that the incidence of MI with Vioxx is less than 0.1%, and that cardiovascular mortality caused by other NSAIDs is 8 times greater than that seen with Vioxx. It instructs Merck representatives to present the data in the "Cardiovascular Card" to physicians concerned about Vioxx risks (see above), even though it contained a highly selected and distorted depiction of the totality of that risk.

A response to a paper published in August 2001 in *The Journal of the American Medical Association* provided another opportunity for Merck to deny that there was any

20

M000819492

increased cardiovascular risk with Vioxx. In a widely circulated press release, the company stated,

> The relative risks of serious cardiovascular events were similar with Vioxx and placebo, and with Vioxx and the widely prescribed NSAIDs ibuprofen, diclofenac, and nabumetone.

Merck made this statement even though it had completed clinical trials which provided very different evidence. After noting that "Patient safety is of paramount importance to Merck," the statement goes on to dismiss the increased rate of heart attack seen with Vioxx in VIGOR by noting, "This is the first time this result has been observed" -- even though by mid-2001 the company had seen the results of several of its own trials which pointed in exactly this direction.

### VIII. Negotiations with FDA over labeling and promotion

Beginning soon after the results of VIGOR were presented to the FDA, the agency had attempted to get Merck to change the company's official labeling of the drug to more accurately reflect the growing body of data about its cardiac risk. In fact in an early review of the VIGOR data one FDA reviewer noted, *"It would be difficult to imagine inclusion of the VIGOR results in the rofecoxib labeling without mentioning cardiovascular safety results in the study descriptions as well as the Warnings sections."* Instead of proactively revising its product label to accurately and prominently reflect this problem, as concern increased about the cardiac risks of Vioxx in March 2001 the company prepared a "Public Affairs Plan" discussing the best way to frame the problem. At first glance, one slide about the campaign seems compatible with the core values of medicine, with the following precept presented first: "Do no harm." However, the rest of that bullet-point provides a very different meaning for that concept: **"refrain from proactively generating coverage that jeopardizes label negotiations and/or that links Vioxx to CV adverse events."** The slide continues: **"Vigilantly defend the brand."** This does not seem compatible with the full and open discussion of risks and benefits that physicians and patients require in order to make appropriate drug choices.

As label negotiations were proceeding with the FDA, the company appears to have had a great deal of concern about the effect of a possible label change on increasing physician awareness of the product's cardiovascular hazards. The level of risk depicted in a product's official labeling can heavily influence a drug's sales. An internal marketing graph prepared by Merck dated July 12, 2001 labeled "Upside/Downside Sales Forecast" presented company staff with three estimates of potential annual sales, in billions of dollars, depending on the outcome of negotiations with FDA about the Vioxx label. The "upside" scenario predicts a 25% increase in sales by 2006 if "CV Labeling Milder; No Prothrombotic language." However, a reduction in sales of 50% is projected by 2006 if the FDA were to require a "black box warning" about cardiovascular risk rather than a milder "precaution." The difference between the two projections on the graph is approximately $1.2 billion in annual sales. If such calculations had influenced the

21

MOO6919493

company's position in its discussions with FDA about the proper warnings to appear on the drug's labeling, that would have been inappropriate.

Merck's mis-communications to physicians about Vioxx had become so egregious that in September 2001 the company's CEO, Mr. Gilmartin, received an unusually strongly worded Warning Letter from the FDA. It read, in part:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and this, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen)...
>
> Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns. Your misrepresentation of the safety profile for Vioxx is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile... Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen.

Throughout 2001, Merck continued its intense and protracted negotiations with FDA over proposed changes to the drug's labeling. There was controversy within Merck about making the data from the ADVANTAGE study available to FDA, and it appears to have taken the company a year and a half after it obtained the study results (and multiple requests by the agency) before complete safety data from that trial were actually transmitted to FDA. In April 2001, Dr. Scolnick had expressed concern about FDA's requests for more safety data:

> The open ended request for safety updates [from FDA] is a filibuster...I have never seen being nice to the FDA – except on rare occasions – pay off....This division is devious and antagonistic. One cannot deal with them in a rational way...I think giving them [the data from] Advantage was not wise. The alzheimer's data vs placebo is helpful. Advantage is not....we will end up with bad labeling....I realize I can be paranoid and I sometimes overreact but I am not trusting of this [FDA] group.

By October 2001, FDA requested the company to add a warning that would more accurately depict the cardiac risks found in the VIGOR and ADVANTAGE studies over 18 months earlier. In my view, the warning language FDA proposed was a fair representation of the risk information that had been provided to the FDA at the time, and would have helped alert physicians to the CV risks that had become apparent.

M000819494

(Importantly, the FDA was not yet fully aware of the significant and persisting increase in mortality risk with Vioxx vs. placebo that occurred in Merck's Alzheimer's Disease trials, if results were calculated in the usual intention-to-treat method of analysis.) However, the company resolutely and repeatedly resisted having such a warning appear prominently on the Vioxx label. In a memo on October 15, 2001, reacting to the latest FDA proposal for such a label change, Dr. Scolnick wrote to David Anstice, "David Be assured we will not accept this label." Anstice responds, "We knew it would be UGLY and it is. We'll fight back, and see where we get." Around midnight, Scolnick answers: "it is ugly cubed thye [they] are bastards"

Two weeks later Scolnick writes that he will not sign off on the new label until it is acceptable to him: "we need a statement now that will be a substitute for what the fda will not relent on i.e. the unknown about CV risks." The Merck team comes up with an alternative to FDA's proposal.  In it, instead of a prominent warning the information about elevated cardiovascular risk would be placed deep in the lengthy official wording much less visibly and would read: "The basis for the difference in cardiovascular event rates with VIOXX vs. naproxen observed in VIGOR, and the lack of such a difference between VIOXX and placebo or other NSAID comparators in other studies, is not understood." Scolnick declared that this alternative language was "a good start."

As discussions about the label proceeded within the company in the fall of 2001, Scolnick wrote to Douglas Greene, Bonnie Goldmann, and Peter Kim:

> twice in my life I have had to say to the FDA 'That label is
> unacceptable, we will not under any circumstances accept it.'…You
> WILL have to do that on the cardiac warning for Vioxx. I assure you
> that you will. And I assure you I will NOT sign off on any lable [sic]
> that had a cardiac warning.

This provides a strikingly clear statement of Merck's intention at the highest levels of the company to block a change in the product description that would have presented physicians with an accurate depiction of the drug's risk. The company's position was in clear opposition to the decisions expressed in the February 2001 meeting and formal vote of the FDA Advisory Committee, whose members had voiced strong concerns that the cardiovascular risk of Vioxx be more accurately reflected in its labeling. Even in the absence of a negotiated agreement with FDA concerning the contents of its official label, there is no reason Merck could not have notified physicians or consumers about the emerging data about the risks of Vioxx. Companies are permitted to provide updated information about risk in materials for to doctors and patients without obtaining prior FDA approval, but Merck did not do so. To the contrary, it continued to use misleading depictions of risk (through the "Cardiovascular Card" and other communications noted above) to minimize a very real problem with their product.

The revised cardiac risk labeling which FDA proposed to Merck was quite fair and reasonable in light of a comprehensive review of the data available at that time, and would have provided reasonable guidance to physicians attempting to balance the drug's

M008819495

benefits and risks. By contrast, the revised label that Merck eventually produced in April 2002 continued to de-emphasize the importance of the cardiovascular risk of Vioxx in a manner that would have been misleading to a physician trying to make a reasoned prescribing decision about Vioxx vs. a traditional NSAID or other alternative. Merck's intense struggle with the FDA over this issue does not appear compatible with its public statements that the company was committed to making the most accurate information on Vioxx available to physicians and the public.

### IX. Additional material

I will also present evidence concerning the experience of my research team in its work on our Merck-funded epidemiological study of the relationship between Vioxx and heart attack that was ultimately published in the cardiology journal *Circulation* in 2004.

### X. Post-withdrawal developments

Four months after Vioxx was taken off the market, the FDA convened an Advisory Committee meeting in February 2005 to consider all the evidence it then had available concerning the cardiac risk of the cox-2 drugs and traditional NSAIDs. After lengthy discussion and review of that extensive collection of materials, committee members were asked whether they believed that Vioxx was a cause of cardiovascular disease events. Without exception, all panel members answered "Yes." The committee members were then asked whether Vioxx should be made available for use, and if so, under what circumstances. Based on their review of all the data, about half of the reviewers said it should never be used in any patients. Nearly all the others said that such use should be permitted only under restricted circumstances. Restrictions proposed by these Advisory Committee members included limiting its use to children only (who would be at reduced risk of cardiac complications), allowing only the lowest dose (12.5 mg) on the market, strengthening the warnings on the drug's label to include a "black box" highlighting its cardiovascular risk, allowing its use only as a second- or third-choice drug after safer agents had been tried, limiting its duration of use, recommending close monitoring of patients for cardiovascular complications such as elevation in blood pressure, and having patients give explicit "informed consent" before taking the drug, acknowledging their awareness of its capacity to induce cardiovascular harm. Only 2 FDA Advisory Committee members voted to allow Vioxx back onto the market with no additional restrictions. These determinations are a comprehensive reflection of the evaluation of a large number of medical experts convened by FDA to review all the information then available to the agency and to the general public.

### XI. Summary and conclusions

Taken together, the available scientific evidence makes it clear that Vioxx is an independent risk factor that increases the risk of cardiovascular disease at all commonly used doses and durations. The risk begins early after drug use starts, is higher with greater doses, and persists over time. Evidence of this risk was available prior to the initial marketing of Vioxx, and was reinforced by repeated clinical trial findings and

M006819496