plete disclosure of the risks of a therapy produces flawed decisions about the implementation of the therapy.

## Failure to Warn

154 **FDA Expertise**: I have attended more than 20 meetings of the Cardio-Renal Advisory Committee to the Food and Drug Administration (F.D.A.), and I have served for four years on the Cardio-Renal Advisory Committee, served as an ad hoc member of other FDA Advisory Committees, and currently serve on the FDA Pharmacy Sciences Advisory Committee. These positions have provided me the opportunity to observe and take part in the interplay that characterizes the relationship between the F.D.A. and the drug sponsors.

155 As an actively serving member of this advisory committee, I have published two articles on the deliberations of the Cardio-Renal Advisory Committee to the F.D.A. which have appeared in the peer reviewed, public literature (30, 31).

156 My service on the F.D.A. advisory committees, as well as my service to drug manufacturers, has given me specialized knowledge and experience concerning the F.D.A. policies, procedures and regulations as well as the corresponding duties of a reasonable and prudent drug manufacturer.

157 In addition, I have argued before the F.D.A. on behalf of sponsors on numerous occasions. In my service on behalf of sponsors to the F.D.A., and my service to the F.D.A. at advisory committee meetings, I have developed expertise, knowledge, training and experience in F.D.A. matters.

158 *Role of F.D.A.* The Federal Food and Drug Administration (F. D. A.) is an organization charged by the public through Congress to insure the effectiveness and safety of foods and

compounds produced for public consumption. Over the course of this century, the powers of the F. D. A. have expanded commensurate with their public responsibilities in a growing and increasingly complex food and drug environment.

159   The responsibilities of the F.D.A. have often placed it in perceived opposition to the pharmaceutical industries. The F.D.A. regrets this comparison and has devoted substantial effort to overcome it. The F.D.A. has encouraged the view that the relationship between it and the pharmaceutical industry is a collaborative one, and has suggested that the efforts of both the F.D.A. and the pharmaceutical industry be viewed as one of joint partnership.

160   *Modernization Act*: This emphasis can been seen in the F.D.A. Modernization Act, which provided a set of streamlined procedures for the sponsor and F.D.A. to follow, helping to insure a prompt and efficient review of a new drug application (NDA). These procedures have substantially reduced the time it took the F.D.A. to complete the review of a sponsor's application for a new drug approval. This pivotal move to streamline the administrative review process was a direct response to complaints from both the pharmaceutical industry, and, to some extent, from segments of the public that the F.D.A. was not responsive enough to the need for the swift introduction of safe and effective medications. The F.D.A. correctly recognized that the timely delivery of these new medications was essential for maintenance of the public health.

161   *Collaboration:* In order for the F.D.A.-pharmaceutical industry collaborative process to work, the F.D.A. and the Sponsor must work together to demonstrate the efficacy and safety of the compounds. Contrary to public perception, the F.D.A is not a central laboratory. It generally does not carry out independent testing of the products submitted to it by the pharmaceutical industry for approval. The F.D.A. does not independently execute

clinical trials to study in an independent manner the safety and effectiveness of new compounds. The F.D.A. instead receives the crucial information about the effects of a drug from outside sources. The F.D.A. has developed skill in identifying relevant information for the effects of a drug. Several of these sources include the general medical literature, and research reports from academic investigators, and research study results which are sponsored by other institutions e.g. the National Institutes of Health, (NIH). However, the primary source of information concerning the safety and efficacy of the compound is the sponsor itself. It is the sponsor's task to provide the F.D.A. with the majority of the information concerning the effects of its compound in animals (when appropriate) and in humans. The F.D.A. reviews, scrutinizes and reanalyzes the information it receives, but it relies on its partner, the sponsor, to provide the data on which its decision ultimately rests.

162  It is therefore essential that the sponsor and the F.D.A. have a relationship, which at its foundation is truthful, honest, open, characterized by a timely and accurate communication process. The pharmaceutical company must provide accurate information describing the pharmacology (including the mechanism of the compound's action), the effectiveness of the compound (known as the efficacy), and the risk afforded by the compound (the safety). The F.D.A. must respond to this information in a timely manner, either approving the compound in a reasonable period of time, or disapproving the compound. When the compound is disapproved, the reasons for the disapproval must be clear, and the procedure to appeal the decision must be available. One of the mechanisms of appeal is the convening of an advisory committee.

163  *Advisory Committees*: The collection of advisory committees to the F.D.A. is an official body with codified rules in the Code of Federal Regulations (C.F.R.). It consists of experts

in the field in which the drug is expected to be effective. It also includes experts from the disciplines of epidemiology and biostatistics, and, in some instances, consumer advocates and representatives from the pharmaceutical industry itself. The F.D.A. and the sponsor each provide written information to the advisory committees, and each make presentations before the committee in a session that is in general open to the public. The advisory committee provides guidance to the F.D.A. by responding to specific questions posed to it by the F.D.A. The F.D.A. considers both the content of the advisory committee's deliberations and committee's answers to the F.D.A. posed questions very seriously. However, the advisory committee can only render its most informed and effective judgments when it is also the beneficiary of open, honest, accurate and timely reporting from both the F.D.A. and the sponsor. To this end, the sponsor spends months preparing briefing packets for the advisory committee, and weeks in intense practice sessions preparing for the meeting.

164 *Decision Processes:* The decision process of the F.D.A. and its external advisory committees is built on a foundation of the open, accurate and timely dissemination of scientific evidence concerning the mechanism of drug action, the drug's effectiveness, and the drug's safety profile. When this foundation is solid, the process will swiftly identify and rapidly approve drugs that are safe, effective, and meet a medical need. During this process, the public is protected from compounds that either have no efficacy or are unsafe, these inferior products being removed from further consideration. The maintenance and promotion of the public health depend on the integrity of this system. If either the sponsor or the F.D.A. engage in dishonest or deceptive practices, the process begins to erode, and the public suffers. This occurs either through the delay in the approval of safe and effective compounds that meet a medical need, or through the publics direct exposure to inef-

fective and dangerous compounds. The F.D.A. cannot make timely, informed decisions when the sponsor denies them information.

165  *Material Information*: Embedded in this body of procedures are the channels through which accurate, relevant, and material information describing the drugs actions is promptly communicated to practicing physicians and through the physicians to their patients. After the F.D.A. approves the drug and the drug is advertised by the sponsor to the medical community, it is the sponsor's obligation to closely monitor the use of the drug for the appearance of unanticipated adverse events.

166  *Adverse Events*: An adverse event is an undesirable effect produced by the drug. Many adverse events are identified during the early testing phase of the drug. These adverse effects are included in the drug label. The drug label is the official description of the drug, which appears, with all the labels of all approved drugs in the Physicians' Desk Reference (PDR). This label describes the effect of the drug, the population in which the drug is effective, the adverse effects of the drug, and the general precautions reasonable and prudent physicians should take in prescribing the drugs. Physicians and pharmacists rely on these labels in making decisions involving the use of these drugs in their patients, and they require that the information in these drug labels be accurate and up to date. The sponsor owns the drug label. It has the responsibility for ensuring that the information in the label is accurate and up to date. Although there are specific regulations in the C.F.R., which govern the content of the label, responsibility for guaranteeing that the information in the drug label is accurate resides with the sponsor.

167  *Labeling*. Both physicians and patients have the right to draw independent conclusions concerning the risks and benefits of a therapy. Their best and clearest recommendations

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                                      8/10/2006

come from these considerations. Review of the Rofecoxib labels reveals several understatements about the label. The federal regulations require that the labeling shall contain a summary of the essential scientific information needed for the safe and effective use of the drug. The essential information was lacking in the warning labels for Vioxx.

168 Drug labels are to be designed for the safe and effective use of the drug. There is no way to write an adequate label about a drug that has minimal efficacy and causes serious, life threatening side effects because such a compound cannot be used safely and effectively. By definition an adequate label cannot be written for Rofecoxib since the drug cannot be used safely and effectively. The particular defects in the Vioxx label are as follows.

169 An adequate label must contain complete statements about the effectiveness of the compound. The data for the analgesic effect of Vioxx did not state that was of the same effectiveness as standard NSAIDS.

170 21 CFR Parts 201 and 202 states, "The Commissioner also advises that these labeling requirements do not prohibit a manufacturer, packer, re-labeler, or distributor from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered. The additional labeling and advertising of additional warnings, as well as contraindication, adverse reactions, and precautions regarding the drug, or the issuance of letters directed to health care professionals (e.g., 'Dear Doctor' letters containing such information) is not prohibited by these regulations.

171 However, adequate warnings were not provided by Merck. On February 25, 1996 in an email from Brian F. Daniels to Thomas Simon, et. Al, regarding GI Outcomes Trial Protocol, he states, "Would allow low dose ASA real world everyone is on it, so why exclude AND without COX-1 inhibition you will get more thrombotic events and kill drug". With

this comment, not only does Merck recognize that without COX-1 inhibition, rofecoxib will increase cardiovascular thrombotic events, but also that patients should take low dose ASA while on rofecoxib. Yet, this warning never appeared in the rofecoxib label.

172 The attitude toward the FDA, whose only mission is ensure that only safe and effective compounds are used by the public was antagonistic. On May 14, 1999, in an email form Scholnick to Blois, Goldmann regarding the Vioxx US label, he states "I think the ONLY way to handle is to GO THERE AND INVOLVE LUMPKIN and word by word agree to the final circular by next Mon/Tue. I DID THIS WITH TEMPLE ON VASOTEC IN 1985."

173 On March 9, 2000, email for Scolnick to Shapiro, Reicin, Nies, regarding VIGOR stated, "The CV events are clearly there. Since no obvious correlate…this is real…it is a shame, but it is a low incidence and it is mechanism based as we worried it would be." The early preapproval data demonstrated a signal of CV hazard that Merck ignored. Leadership in Merck acknowledged the hazardous effect of rofecoxib. There was no mention of a possible, scientifically unsupportable beneficial effect of naproxen as a possible explanation.

174 On March 27, 2000, Merck announced through a press release the preliminary results of GI outcome study with Vioxx (VIGOR). One day later, in an email from Alan Nies to Barry Gertz regarding Dr. Patrono on VIGOR, they state that Dr. Patrono "does not think that the CV effect that we observed can be attributed to naproxen for a couple of good reasons." Merck's consultant who correctly warned before the drug was approved that rofecoxib could produce serious cardiovascular adverse effects, also warned them that the results in VIGOR, while confirmed his own concerns, could not be explained away.

175 However, on April 28, 2000, in a press release, Merck misinforms the public by "confirming a favorable CV profile.

176 On June 20, 2000, email from Laurenzie to Daniels regarding Dr. Patrono warned, "the presentation of VIGOR data must not mislead the audience into thinking that the difference in CV events could be explained by an anti-thrombotic effect of naproxen, which is not demonstrated.

177 On June 29, 2000, the Vioxx sNDA (supplemental new drug application) with Dennis Erb's letter to Central Document Room of the FDA for submission of labeling supplement to NHDA 21-042 based on VIGOR GI results. In this document, Merck argues that VIGOIR reinforces the need for concomitant aspirin use is some patients. Merck submitted protocols 085 and 090. However did not change the label adding the warning about required aspirin use.

178 On July 5, 2000, a memo from the statistician Deborah Shapiro Alise Reicin revealed that Merck knew it was not publishing all of the myocardial infarctions that occurred in VIGOR in the *New England Journal of Medicine* that would not be published until November 2000. They had the opportunity to update the data but refused to take it.

179 On November 8, 2000, in an email from Reicin to Barr involving a hypertensive patient, Dr. Barr believes a hypertension-related death in ADVANTAGE should have been classified as an MI, stating in an email timed at 11:43AM "Common things being common, the clinical scenario is likely to be an MI." He then explained the definition of sudden death and unexplained death in an email timed at 12:58 PM. However, Dr. Reicin challenged him, saying, "I still strongly feel that this should not be an MI-..." However, she went further than that, saying the death should be classified as "unknown". Specifically, she stated,

"...I would prefer unknown cause of death so that we don't raise concerns." This statement's egregious insensitivity to the importance of identifying appropriate safety monitories speaks for itself.

180  On October 18, 2000, Deborah Shapiro, Merck statistician carried out a preliminary meta-analysis that demonstrated an increased CV risk. Specifically, this report showed that Vioxx more than doubled the risk of MI related to all NSAIDS, and that this increase was statistically significant. This included a MI-only analysis of the Vioxx program. This report was omitted in Merck's FDA submission and in the published meta-analysis of Konstam.

181  On January 31, 2001, a national thought leader summary of the VIGOR study recommended that Merck not emphasize the "protective effect" of Naproxen as an explanation." In that same paragraph, they state that there is no supporting data to substantiate a protective effect for Naproxen.

182  On this same date, January 31, 2001, Dr. Scolnick of Merck sent an email to Mr. Anstice and Gilmartin, it which he stated, "...there is no way to prove that in patients with rheumatoid arthritis that ALL of the difference between Vioxx and naproxen is due to the benefit of naproxen. It is impossible to prove this; it is impossible to know this with certainty."

183  On February 1, 2001, Targun of the FDA wrote a memo to Cook and Villalba regarding NDA 21-042, S-007 review of cardiovascular safety database. He stated that "Despite lower dose, smaller sample size and aspirin use, the trend is against rofecoxib." He also stated "The sponsor claims that the difference in MI between the two groups is primarily due to the anti-platelet effects of naproxen. This hypothesis is not supported by any prospective placebo-controlled trials with naproxen."

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                    8/10/2006

184  On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory Committee in public session that there was no evidence from an examination of their Phase IIb/III database of excess cardiovascular events. A similar statement was also made on page 56. This was false. The Watson report on which that was based clearly demonstrated excess cardiovascular events in women, and in most of the age ranges examined in men. This information was withheld from both the 1999 Advisory Committee as well.

185  On September 17, 2001, the FDA sent a Warning letter from Abrams to Gilmartin regarding Vioxx. That letter stated that Merck's promotional activities were "false, lacking in fair balance or otherwise misleading." It also stated," your claim in the press release that Vioxx has a 'favorable cardiovascular safety profile,' is simply incomprehensible."

186  Nevertheless, on November 6, 2001, in a draft letter to Jonca Bull regarding the Amendment to the Supplemental New Drug Application, Merck expressed strong disagreement with FDA's initial October 15, 2001 labeling proposal, which it argues is unprecedented. Merck argues for labeling information tempering any commentary on CV/T data from VIGOR.

Misleading the FDA

187  Regulation Sec. 14.171: Utilization of an advisory committee on the initiative of FDA. (f) Presentation of all relevant information about the matter will be made in open session unless it relates to an IND the existence of which has not previously been disclosed to the public as defined in Sec. 20.81 or is otherwise prohibited from public disclosure under part 20 and the regulations referenced therein. Sections 314.430 and 601.51 determine whether, and the extent to which, relevant information may be made available for public

disclosure, summarized and discussed in open session but not otherwise made available for public disclosure, or not in any way discussed or disclosed in open session or otherwise disclosed to the public.

188 Merck mislead the FDA at the FDA Advisory Committee Meeting. On April 20, 1999, the FDA Arthritis Advisory Committee met to discuss the consideration of whether Vioxx should be approved for use for pain relief. During that discussion, both efficacy and safety of Vioxx were discussed. There was a section of the presentation of the thromboembolic cardiovascular adverse experience. Beginning on page 105 of the transcript, the individual presenting on behalf of Merck states "I will now review the thromboembolic cardiovascular adverse experiences. We looked at an extensive list of adverse experiences representing peripheral, myocardial, and central nervous system thromboembolic events. The data presented on this slide is a combined analysis from all of our osteoarthritis studies. This is reported in events per 100 patient years. The event rate was low and was similar between placebo, rofecoxib, and the NSAID comparators. All deaths across all osteoarthritis studies are summarized on this slide: The events are reported again, per 100 patient years. The rates for rofecoxib, as you can see, are if anything, lower than with the NSAID group.

187 However, one year before, on February 2, 1998, Watson's Final results of an analysis of the incidence of Cardiovascular SAE's in the Phase IIb/III Vioxx Osteoarthritis Clinical Trials demonstrated a CV signal. In fact, risk for cardiovascular events was elevated for two of the three age groups in men and three of the four age groups in women (Table 6). The overall relative risk for cardiovascular SAE for men was 1.28 and for women was 2.16, demonstrating a clear signal of increased cardiovascular risk associated with rofecoxib

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                 8/10/2006

therapy (Table 7). The report states that the VIOXX 12.5 mg and 25 mg treatment groups also had more clinical cardiovascular AE's then the placebo group in protocol 010(page 1 following executive summary). This finding was not reported to the FDA advisory committee at this meeting. These relevant tables were omitted from the Merck FDA Advisory Committee Background Information Packet for this meeting. The FDA Advisory Committee was never told about the increased cardiovascular risk associated with rofecoxib at this critical juncture in the FDA's deliberations for the approval of rofexocib.

188 On Thursday, February 8, 2001, the FDA Arthritis Advisory Committee met to discuss the safety and efficacy of Vioxx. On Page 24 of that transcript, Merck told the Advisory Committee in public session that there was no evidence from an examination of their Phase IIb/III database of excess cardiovascular events. A similar statement was also made on page 56. This was false. The Watson report on which that was based clearly demonstrated excess cardiovascular events in women, and in most of the age ranges examined in men. This information was withheld from both the 1999 Advisory Committee as well. The Merck FDA Advisory Committee Background Information Packet dated February 8, 2001 was incomplete. On page 9 of that document (Section 2.2.1.1. Rationale for the Choice of Patient Population in VIGOR), no description of the rationale for only including patients who were not at high risk for cardiovascular disease. The critical information intimated in an email on November 11, 1996 by Dr. Reicin stating the plan of "excluding high risk cardiovascular patients, i.e., those that have already had an MI, CABG, and PTCA. This may decrease the CV event rate so that a difference between the two groups would not be evident" was not included in the Advisory Committee Packet. This critical information that altered the VIGOR study, blocking its ability to fairly assess the risk associated with rofex-

COX-2 Inhibitor Report of Lemuel A. Moyé, M.D., Ph.D.                                     8/10/2006

coxib was not shared with the FDA at this critical decision point in the FDA review process. In addition, Tables 6 and 7 of the Watson report, which demonstrated a clear signal of the cardiovascular danger of rofecoxib was omitted from this critical document on which the FDA reviewers relied.

189  In addition the emails dated April 6 and 7, 2001 between Dr. Greene and Dr. Scolnick revealed the internal attitude of Merck to the FDA, whose only desire was to ensure that safe and effective medications be available to the US public.

190  On April 6, 2005, John Jenkins, Director of the Office of New Drugs and Paul J. Seligman, Director Office of Pharmacoepidemiology and Statistical Science wrote a memorandum bearing the FDA's imprimatur whose subject was Analysis and recommendations for Agency action regarding nonsteroidal anti-inflammatory drugs and cardiovascular risk. The specific sources of the information on which the statements within this memo are based are not revealed in the document (e.g., the findings from the Alzheimer's trials for Vioxx, page 5). It is therefore unclear what the scientific basis for the statements and actions recommended in the document are. Without knowing the source of the information, it is difficult to assess the worthiness of the recommendations provided in this document. However the basis of my conclusion that Vioxx is a dangerous compound with unacceptable cardiovascular risks, regardless of dose or duration of exposure, are clearly delineated in this affidavit.

191  This affidavit draft does not discuss the results of analyses yet to be produced by Merck, nor does it discuss an evaluation of the actual APPROVe datasets that I plan to undertake. This affidavit will be amended as additional relevant information becomes available, and, if appropriate, upon completion of my evaluation of the SAS APPROVe datasets.

# Appendix A: Statistical Reasoning in Medicine

191  Statistical Reasoning in Medicine: Statistical reasoning in { XE "statistical reasoning:definition" }medicine is, at its heart, the process by which we determine if health care research results identified in one sample apply to a much larger population. The urgent question for a reviewer of the COX literature is whether results from all of the studies (or any of the studies) can be generalized from the from the peer reviewed manuscript to the population at large, and therefore be extended to a particular plaintiff. Is there a subset of studies that contribute more to our understanding, and can therefore be extended to the population? The type of generalization is not automatic; in fact, commonly in science this generalization is inappropriate. Thus, the reviewer must precisely identify the circumstances in which extension to the population is appropriate, and, alternatively, when the research results must be firmly circumscribed by the sample from which they are obtained.

192  A negative answer to this critical question does not imply that the veracity of the investigator's work is in question. { XE "statistical reasoning:critical question" }The authors of an published article did in fact find what they claimed to find in the sample; their probity is not in question. The relevant, question is whether the sample findings translate to the population from which the sample was obtained? Specifically, does the examination of the relationship between exposure and disease in the sample concisely and efficiently capture what they would find if they examined the entire population, or, alternatively, are the sample results merely due to the freak of chance, the vicissitudes of their inadvertent selection of the wrong, unrepresentative sample from the population. If the former is the case, then a whirlwind of scientific discussion is necessary and valid. However, if the re-