UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX® | * | MDL Docket No. 1657 |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | JUDGE FALLON |
| This document relates to | * | MAGISTRATE JUDGE KNOWLES |
| GERALD BARNETT and CORRINE BARNETT, | * | |
| Plaintiffs, | * | |
| vs. | * | |
| MERCK & CO., INC., | * | |
| Defendant. | * | |
| Civil Action No. 2:06cv485 | * | |

## RULE 26(a) (2) (B) EXPERT REPORT OF DR. JANET ARROWSMITH-LOWE

I have been asked to give an opinion regarding Merck & Co., Inc.'s ("Merck") interactions with the United States Food & Drug Administration ("FDA") with respect to Vioxx and Merck's disclosure of cardiovascular and other data about Vioxx to FDA and to the medical community. As set forth more fully below, it is my opinion that Merck acted as a reasonably prudent and responsible pharmaceutical company in interacting with FDA with respect to Vioxx and in its disclosures to FDA and to the medical community of cardiovascular and other data about Vioxx.

## Qualifications

I am an epidemiologist and a medical doctor. I am Board Certified by the American Board of Internal Medicine, a fellow of the American College of Physicians, and an elected member of the American College of Epidemiology. I was a medical epidemiologist and medical review officer at the Food and Drug Administration ("FDA") for approximately 11 years, from 1984-1996, and was acting Director of the Office of Surveillance and Biometrics, Center for Devices and Radiologic Health at FDA from 1993 through 1995. I have expertise in the regulations which govern the approval, labeling, advertising and marketing of pharmaceutical products in the United States and which are contained in Title 21 of the United States Code of Federal Regulations. I am familiar with the processes by which FDA determines efficacy and safety for new drugs approved for marketing in the United States and the issues FDA considers in the development of product labeling. A copy of my Curriculum Vitae, which includes my publications over the past ten years, is attached as Exhibit A.

I have been retained as an expert witness in a number of litigations. A list of my deposition and trial testimony over the past four years is attached as Exhibit B. In this matter, I am being compensated for my time at my standard rate of $400 per hour. For testimony, I charge $4,000 per day, $2,000 if the testimony is four hours or less.

My opinions as set forth below and this report are based on my training and experiences as a medical doctor, epidemiologist, and FDA medical review officer and acting director of Office of Surveillance and Biometrics. My opinions are also based on my knowledge of the requirements applicable to pharmaceutical manufacturers under the Federal Food, Drug, and Cosmetic Act and federal regulations pursuant to the Act; my knowledge of general FDA policies, procedures and industry practices gained through my FDA and consultant experience;

2

and my knowledge of practices in the pharmaceutical industry involving the development of innovative medicines.

In preparing this report, I have reviewed Merck's communications with and submissions to FDA, including the relevant portions of the Investigational New Drug Applications ("IND"), New Drug Application ("NDA") and supplemental New Drug Applications ("sNDAs") for Vioxx; FDA commentary; protocols and data from Vioxx clinical studies, including clinical study reports; the minutes and the transcripts of the April 20, 1999 and February 8, 2001 Arthritis Advisory Committee Meetings; the minutes and transcripts of the February 16-18, 2005 Advisory Committee Meetings; the FDA's April 6, 2005 Decision Memorandum and the April 7, 2005 Public Health Advisory; the reports of plaintiff's designated experts Dr. Richard M. Kapit and Dr. John L. Gueriguian; and other literature and materials that I obtained on my own or which were provided to me by Merck. A list of the materials I considered in forming my opinions is attached as Exhibit C.

**Opinions**

FDA is the United States Government Agency responsible for assuring that prescription medicines marketed in the United States are safe and effective for use as labeled, and that the labeling contains adequate directions for use. FDA is responsible for the review and approval of all new prescription medicines before those medicines can be marketed in the United States. FDA also maintains strict control over the labeling of prescription medicines and must approve the format, content and exact wording of the package insert.

In my experience, FDA does not compromise on safety issues, does not capitulate to the wishes of industry on labeling or approval, and consistently acts on behalf of its primary and most important customer, the American public. Despite allegations to the contrary, the FDA review and approval process is rigorous, conducted according to well established scientific

M006E73431

principles, regulations and requirements; necessitates the review of thousands of pages of data and data interpretation; involves enormous effort on behalf of highly trained scientists within the FDA; may involve highly respected scientific consultants from outside the FDA; and results in the final approval of only a small percentage of candidate pharmaceutical products entering the clinical evaluative process.

*Merck adequately tested the potential risks of Vioxx.*

Merck at all times acted properly and as a reasonably prudent pharmaceutical company in investigating the safety profile of Vioxx. Merck conducted extensive preclinical testing of Vioxx, including numerous animal studies, and then conducted extensive clinical testing in humans before submitting to FDA its initial NDA for Vioxx.

As of November 23, 1998, the date of that submission, Merck had completed more than 58 clinical trials, involving more than 10,000 patients, and collected and analyzed the cardiovascular data from every Vioxx clinical trial. Merck submitted safety and efficacy data, including data and analyses regarding cardiovascular events, from these trials to FDA in its NDA for Vioxx, in accordance with federal regulations. FDA reviewed the data provided by Merck, found Vioxx safe and effective for its intended uses, and approved the NDA for Vioxx on May 20, 1999.

Had FDA concluded that Merck had not adequately investigated the safety profile of Vioxx, including the theoretical risk of a pro-thrombotic effect according to the so-called FitzGerald hypothesis, FDA could have placed additional requirements on Merck prior to approving Vioxx. FDA was fully aware of the FitzGerald hypothesis and could have required Merck to conduct further tests before approval, required a bolded or boxed warning in the package insert, or refused to approve the NDA for Vioxx altogether. FDA did none of these.

M006E73432

Nor should it have. In my opinion, Merck adequately investigated the potential risks of Vioxx and the data supported approval of the product.

After the approval of Vioxx, Merck continued to investigate the safety of Vioxx and to disclose safety data promptly to FDA. Merck conducted more than 70 additional clinical trials involving more than 40,000 patients. Merck provided FDA with safety data, including data regarding cardiovascular events, from these trials and from post-marketing experiences in accordance with federal regulations.

FDA continued to evaluate the risk/benefit profile of Vioxx and approved Vioxx for three additional indications. In 2002, FDA approved Vioxx for the treatment of rheumatoid arthritis. In 2004, FDA approved Vioxx for the acute treatment of migraine in adults and for relief of the signs and symptoms of juvenile rheumatoid arthritis.

Following the VIGOR trial, Merck conducted prospectively designed cardiovascular safety studies of Vioxx. This took the form of a planned cardiovascular analysis of data from three long-term, appropriately powered, placebo-controlled studies in patients with or at risk for colon or prostate cancer.

*Merck adequately disclosed potential risks of Vioxx.*

Contrary to the assertions of Drs. Kapit and Gueriguian, Merck properly and adequately disclosed data relating to potential risks of Vioxx to FDA and to the medical community in accordance with federal regulations. As described above, Merck timely and appropriately provided FDA with safety data from its clinical trials program. Merck also provided FDA with information from post-marketing experiences in accordance with federal regulations.

In general, the types of data and analyses that FDA expects a pharmaceutical manufacturer to submit for review do not include exploratory, incomplete or preliminary

5

M006E73433

analyses nor does FDA expect the submission of internal company emails. I have reviewed Merck's submission of data and analyses to FDA and find that appropriate information was provided to FDA upon which it could base regulatory actions and opinions. FDA has the authority to request additional information or additional analyses at any time during its review of an NDA or sNDA.

Merck also disclosed information about Vioxx to the medical community. Merck periodically published findings from its studies, including data regarding cardiovascular events, in the press, and in peer-reviewed journals. Merck also provided findings from its studies at industry forums and it directly communicated safety and efficacy information to healthcare providers, both in response to questions for such information and at professional meetings.

Furthermore, the package insert for Vioxx always adequately described the cardiovascular information then available with respect to Vioxx, in accordance with FDA regulations and policy. The Vioxx package insert always included specified data from clinical trials regarding cardiovascular and cerebrovascular thromboembolic adverse experiences as well as cautionary language that Vioxx is not a substitute for aspirin for cardiovascular event prophylaxis. The initial package insert for Vioxx stated that cardiovascular events have "been reported rarely (less than 0.1%) in patients taking Vioxx, regardless of causality." Based on the scientific information available at that time it would have been inappropriate to include a stronger statement regarding cardiovascular risk in the package insert for Vioxx. FDA concluded long ago that overstating warnings in labeling could be dangerous practice. If drug labeling included every alleged risk regardless of the scientific merit, then the value of all precautionary language would be diluted and physicians might be discouraged from using beneficial medicines. Once Vioxx was on the market, Merck continued to work with FDA to

M006E73434

include new safety data in the package insert for Vioxx, where appropriate, in a timely and appropriate manner.

### *Merck's disclosure of VIGOR to FDA and to the medical community was timely and appropriate.*

On March 9, 2000, Merck learned the results of the VIGOR trial, a randomized, double-blind controlled clinical trial. VIGOR was designed in consultation with FDA and compared the gastrointestinal safety of a single daily dose of 50 mg of Vioxx with 500 mg twice a day of naproxen, a traditional non-steroidal anti-inflammatory drug. Merck's efforts to understand and disclose the VIGOR results were reasonable. Following the VIGOR trial, Merck conducted an extensive review of data from completed and ongoing clinical trials of Vioxx. These data showed no indication of a statistically significant difference in the incidence of serious thromboembolic cardiovascular events between Vioxx, and placebo or comparator non-naproxen NSAIDs. Merck also reviewed the available data on naproxen, as well as clinical trial data relating to at least one other NSAID that had demonstrated a cardioprotective effect similar to aspirin. The weight of the available evidence pointed to a cardioprotective effect of naproxen as the most plausible explanation for the thromboembolic cardiovascular results in VIGOR.

Merck immediately and effectively disclosed the results of the VIGOR trial, including the cardiovascular results, directly to FDA. For example, within two weeks of the unblinding of VIGOR, Merck telephoned FDA to communicate the gastrointestinal and cardiovascular results and sent a letter to FDA that included the VIGOR study summary report. Merck then submitted the sNDA for VIGOR, which included proposed labeling on the gastrointestinal and cardiovascular results of VIGOR,to FDA on June 29, 2000.

After VIGOR, Merck amended its ongoing clinical trial protocols to permit the use of low dose aspirin when physicians concluded that it was in the best interests of their

7

M006E73435

patients to receive such therapy. Merck sent a letter to all investigators participating in Vioxx clinical trials informing them of the VIGOR data and of the change in the protocol. This information was also included in a March 27, 2000 press release that Merck issued, and a copy of the letter was provided to FDA along with the VIGOR study summary report.

Merck promptly and effectively disclosed the results of the VIGOR trial, including the cardiovascular results, to the medical community through press releases, at medical conferences and in the New England Journal of Medicine. Merck also appropriately and in a timely manner disclosed the results of VIGOR in response to unsolicited requests for information from healthcare providers through Professional Information Requests ("PIRs"). Merck's use of PIRs was consistent with FDA requirements.

I am aware that the editors of the New England Journal of Medicine have published "An Expression of Concern" and "Expression of Concern Reaffirmed" regarding the Bombardier et al article first published in New England Journal of Medicine in November 2000. I am disappointed that New England Journal of Medicine continues to assert that investigators and authors were obligated to violate pre-specified data cut-off and analysis plans in a large randomized, controlled clinical trial.

Despite the editors' assertion that the one month difference in cut-off dates for the gastrointestinal data and the cardiovascular data "inevitably skewed the results," there were no actual changes in the statistical significance of the cardiovascular results when the additional three myocardial infarctions on Vioxx and the one additional stroke in the naproxen group were included in the analyses provided to FDA in a safety update in October 2000 and presented at a public Advisory Committee meeting convened by FDA in February 2001. The concerns raised by the New England Journal editors were adequately addressed by the responses of Bombardier

M006E73436

et al and the Merck investigators, which were published in the Journal in the February 22, 2006 edition.

In my opinion, the speed with which Merck disclosed the VIGOR data was entirely appropriate, as was the content of the disclosures.

### *The VIGOR results were properly and in a timely manner incorporated into the product circular for Vioxx.*

Merck also acted appropriately in working with FDA to incorporate the VIGOR results into the package insert for Vioxx. After learning the VIGOR results, Merck drafted new labeling to submit to FDA. FDA did not instruct Merck to do this and, in fact, on May 1, 2000, Robert DeLap, then director of Center for Drug Evaluation and Research ("CDER"), Office of Drug Evaluation V, stated he was "convinced [Vioxx] is labeled appropriately." In June 2000, Merck submitted an sNDA to FDA with a proposed package insert incorporating the results of VIGOR, approximately four months after learning of those results and requested priority review of the label changes in August 2000, which was denied by FDA.

Contrary to the suggestions by Dr. Kapit and Dr. Gueriguian that Merck should have incorporated the cardiovascular results of VIGOR into labeling for Vioxx without FDA's prior approval, this action would have been inappropriate. There are narrow circumstances in which a manufacturer is permitted to change its labeling without FDA's prior approval but those circumstances were not present here. The VIGOR trial presented a highly complex data set, involving thousands of patients, from multiple clinical sites in a patient population for which Vioxx did not yet have an approved indication and with a dose that had not yet been approved for chronic use. Indeed, had Merck attempted to submit the VIGOR label change as a "Changes Being Effected" supplement, I have no doubt that FDA would have immediately rejected the submission and required Merck to submit the VIGOR label as a "prior approval" supplement.

M006E73437

Similarly, any suggestion that a pharmaceutical manufacturer could submit as a "Changes Being Effected" supplement a new, Black Box warning to be incorporated into a marketed drug label is misinformed. FDA has clearly stated that the authority for inclusion of a Black Box warning in a product label is within FDA's exclusive purview. Unless specifically required to do so by the FDA, it would not be permissible for a manufacturer to submit a "Changes Being Effected" supplement proposing a Black Box warning.

To the extent that Drs. Kapit and Gueriguian suggest that a warning should have been added to the label for Vioxx in response to the VIGOR study, they are wrong. When Merck unblinded the VIGOR trial, it was not clear what the significance of the results were. In fact, when FDA approved labeling incorporating the VIGOR results, it included a statement that the significance of the VIGOR results is unknown. Merck required the FDA's input to craft labeling that accurately and appropriately conveyed the available safety data to healthcare providers.

Numerous experts, including FDA's own experts, reviewed the Vioxx cardiovascular data from VIGOR and other studies, including placebo-controlled studies, as well as from post-marketing experience. FDA concluded that there was insufficient evidence of cardiovascular risk associated with Vioxx to warrant a statement in the Warnings section of the package insert. As the Precaution section of the package insert for Vioxx stated, "the significance of the cardiovascular findings from these 3 studies (VIGOR and 2 placebo-controlled studies) is unknown." In the absence of reasonable evidence that Vioxx was associated with cardiovascular hazard, it would have been inappropriate for a cardiovascular warning to be added to the package insert for Vioxx.

M006E73438

Likewise, any suggestion that Merck dragged its feet in submitting or working on new labeling for Vioxx is incorrect. In addition, any suggestion that Merck failed to comply with FDA requests for timely submission of data from additional post-marketing clinical trials, from safety update analyses and reports, or in response to FDA information requests is also incorrect. Merck responded promptly to each request for information and complied with all safety update requirements in a timely and appropriate fashion.

FDA's process of developing new labeling involves a thorough review and analysis of the data. The process is collaborative and often involves frequent exchanges between FDA and the sponsor. Merck's submission of new proposed labeling within approximately four months of completion of VIGOR was entirely proper and reasonable. Thereafter, Merck requested that FDA give a priority review to the VIGOR sNDA, but FDA assigned the sNDA a standard review. After submitting the VIGOR sNDA, Merck cooperated fully and promptly with FDA to analyze the VIGOR data and to craft new labeling incorporating that data.

In April 2002, FDA approved a new package insert for Vioxx, which incorporated the VIGOR results. Merck immediately issued a press release announcing the new package insert and sent copies of the new package insert to healthcare providers around the country. Merck's conduct in working with FDA to incorporate the VIGOR results into the package insert for Vioxx was entirely appropriate and responsible, and Merck did nothing improper to delay the approval or dissemination of new labeling. In fact, in my view, Merck unquestionably acted with due diligence in trying to move the process along.

*Merck submitted the ADVANTAGE data in a timely manner.*

I disagree with Dr. Gueriguian's and Dr. Kapit's assertions that Merck failed to submit the entire data set from the ADVANTAGE trial in a timely manner. The ADVANTAGE

M006E73439

trial was a large, multi-national, randomized trial in which Vioxx 25 mg per day was compared to naproxen 1000 mg per day in a population of approximately 5500 patients with osteoarthritis. The data from this large trial were submitted to FDA promptly. On March 23, 2000, Merck faxed to FDA the blinded safety results of ADVANTAGE as Treatment A vs Treatment B. On December 21, 2000, Merck provided FDA with a preliminary report and continued to submit data thereafter as available. Merck provided the Clinical Study Report on a rolling basis, providing the final two sections in April 2001. I see no evidence that Merck delayed these submissions; to the contrary, Merck provided the completed large data set to FDA as quickly as reasonably possible.

### *Dr. Kapit misconstrues FDA regulatory actions involving Vioxx.*

Dr. Kapit places undue emphasis on the September 2001 Warning Letter to Merck. That letter was sent by the Division of Drug Marketing, Advertising, and Communications ("DDMAC"), not the division tasked with reviewing the safety and efficacy of drugs like Vioxx. DDMAC sends Warning Letters to drug manufacturers in response to promotional activities, not safety issues raised by clinical data or by information from post-marketing adverse experiences. DDMAC uses Warning Letters to raise issues relating to promotional activity that may not be in compliance with FDA regulations and policy. Warning Letters are a tool to encourage companies to deal with potential problems voluntarily.

The September 2001 Warning Letter raised a concern about promotional statements made by a speaker during audio conferences and by Merck professional representatives at two meetings. The Warning Letter also questioned the language used in the title of a press release Merck issued regarding the VIGOR results. Merck responded to FDA by explaining its actions with respect to the press release and by taking corrective action with regard

M006E73440

to FDA's other allegations. FDA took no disciplinary action against Merck, and promptly wrote to Merck that it considered the matter closed.

In my experience, the fact that FDA closed these matters without disciplinary action indicates that FDA was satisfied with Merck's explanations and actions with respect to the issues raised in the Warning Letter. FDA found no violation of applicable laws or regulations.

*Merck acted appropriately in response to the APPROVe interim data.*

On September 23, 2004, Merck was informed that the External Safety Monitoring Board had recommended that the APPROVe study be stopped. The preliminary results showed a small increased risk of confirmed cardiovascular events beginning after 18 months of continuous treatment with Vioxx. The results from the first 18 months show no increased risk, which was consistent with prior Vioxx randomized clinical trial data, including the results from two large placebo-controlled Alzheimer's studies that were in the product circular for Vioxx. Merck provided the interim APPROVe data to FDA and on September 30, 2004 voluntarily withdrew Vioxx from the market.

In my opinion, it would have been possible to continue to market Vioxx after incorporating the APPROVe data into the label for Vioxx. However, I understand that Merck believed it was in the best interests of patients to voluntarily withdraw Vioxx from the market. Given the availability of alternative therapies and the data known at that time, Merck acted responsibly in voluntarily withdrawing Vioxx from the market. FDA stated in a press release, "Merck did the right thing by promptly reporting these findings to FDA and voluntarily withdrawing the product from the market."

Merck continued to act responsibly by analyzing the final APPROVe data as well as data from other clinical trials and presenting that data to FDA and to an Advisory Committee on February 16-18, 2005. After reviewing these data and data concerning other COX-2

13

M006E73441

inhibitors and NSAIDs, a majority of the Advisory Committee members, by a vote of 17 to 15, concluded that the overall risk versus benefit profile for Vioxx supported marketing in the United States.

Following the February 2005 Advisory Committee Meetings, on April 6, 2005, CDER issued a Decision Memorandum providing analysis and recommendations for Agency action regarding NSAIDs and cardiovascular risk. The authors of the memorandum concluded that any cardiovascular risks associated with Vioxx are comparable to the risks associated with all other non-aspirin selective and non-selective NSAIDs, with the possible exception of naproxen. The authors of the memorandum also concluded that the short-term use of NSAIDs to relieve acute pain, particularly at low doses, does not appear to confer an increased risk of serious adverse CV events.

In addition to the memorandum itself, FDA issued a Public Health Advisory on April 7, 2005 entitled "Important Changes and Additional Warnings for COX-2 Selective and Nonselective Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)." In that Public Health Advisory, FDA called for Pfizer to withdraw Bextra from the market and to add a boxed warning to Celebrex. Pfizer complied shortly thereafter, withdrawing Bextra from the market and submitting to the FDA its revised labeling for Celebrex.

In addition, the FDA called for Black Box warnings to be added to prescription dosage formulations of currently marketed NSAIDs and for additional warnings to be added to currently marketed over-the-counter formulations of NSAID products. Contrary to the suggestion of Dr. Gueriguian, the manufacturers of currently marketed NSAIDs are complying with the FDA's directive. The prescription formulations of all currently marketed NSAIDs listed on the FDA's Medication Guide now have boxed warnings.

M006E73442

As for Vioxx, Merck has stated that it will continue to work with FDA to determine the best course of action with respect to reintroduction of Vioxx into the US market. In my opinion, in light of the data now available and the fact that Vioxx has a proven gastrointestinal advantage relative to traditional NSAIDs, as well as the desire of physicians to have it available to prescribe in appropriate patients, this is the responsible approach for Merck to take.

## CONCLUSION

It is my opinion, based on my years of experience in the field of pharmaceutical regulation, my work with FDA, and my expertise in evaluating prescription drug safety and labeling, that Merck acted as a responsible pharmaceutical company in investigating the safety profile of Vioxx, and in disclosing information about Vioxx, including the results from VIGOR and from APPROVe, to FDA and to the medical community and in voluntarily withdrawing Vioxx from the market in response to the interim data from the APPROVe study.

I reserve my right to supplement this report.

Executed on May 30, 2006.

_____
JANET ARROWSMITH-LOWE, M.D.

M006E73443