UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This document relates to | * | |
| Case No. 06-0810 | * | |
| | * | MAGISTRATE JUDGE |
| CHARLES L. MASON, | * | KNOWLES |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MERCK & CO., INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**OPPOSITION OF MERCK & CO., INC. ("MERCK")
TO PLAINTIFF'S MOTION "TO EXCLUDE OPINION TESTIMONY THAT
VIOXX® IS THE SAME AS ALL NSAIDS REGARDING CARDIOTOXIC EFFECTS"**

**(EXPERT CHALLENGE NO. 4)**

This Court has already denied virtually identical versions of this motion in previous cases, including *Plunkett v. Merck (Plunkett I)*, *Barnett v. Merck,* and *Smith v. Merck*.  By this motion – like all prior motions of its kind – plaintiff seeks to exclude relevant and reliable testimony that all NSAIDs have cardiovascular effects.  The issue arises because the FDA has concluded, based on a careful review of all of the existing data concerning all NSAIDs – including COX-2 inhibitors such as Vioxx® – that those data are best interpreted as being consistent with a "class effect" of a long-term increased risk of adverse cardiovascular events for *all* NSAIDs.  As the Court has already found on several occasions, the FDA's conclusion is scientifically reliable and relevant to this case.  The only "new" argument that plaintiff makes in

this motion is that "new scientific articles have been published that dismiss the theory that NSAIDs have a 'class effect.'" (Pl.'s Mot. at 1.) These articles, however, do not support plaintiff's position. For the reasons stated below, the Court should deny plaintiff's request for reconsideration.

I. **TESTIMONY REGARDING THE "CLASS EFFECT" OF ALL NSAIDS IS RELEVANT.**

Plaintiff is wrong to suggest that testimony regarding a "class effect" of all NSAIDs, a conclusion reached by the FDA in an April 6, 2005 Memorandum,[1] is irrelevant. (Mot. at 1.) The comparative safety of Vioxx to other NSAIDs is directly relevant to his claim that Vioxx was defectively designed. Merck is entitled to respond to plaintiff's allegation that Vioxx increased his risk of an adverse event compared to other NSAIDs, including by introducing evidence that plaintiff's claim is diametrically opposed to the analysis and findings of the FDA.

Testimony regarding "class effect" also is relevant to issues of medical causation, including the fact that the FDA has concluded that there are "serious questions" about the "FitzGerald hypothesis" that selective COX-2 inhibition contributes to cardiovascular risk. (FDA Memorandum at 8.) Plaintiff's experts have opined that Vioxx increased Mr. Mason's risk of cardiovascular event by selectively inhibiting COX-2, and they have speculated that the "COX-2" or "FitzGerald" hypothesis is the biological mechanism by which that may have

---

[1] More specifically, the FDA concluded: "Data from large long-term controlled clinical trials that have included a comparison of COX-2 selective and non-selective NSAIDs do not clearly demonstrate that the COX-2 selective agents confer a greater risk of serious adverse CV events than non-selective NSAIDs." (April 6, 2005 FDA Memorandum ("FDA Memorandum" or "Memorandum") at 2, attached hereto as Ex. A; *see also id*. at 2 ("the available data are best interpreted as being consistent with a class effect of an increased risk of serious adverse CV events for COX-2 selective and non-selective NSAIDs"); and *id*. at 10 ("We also believe that it is not possible to conclude at this point that the COX-2 selective drugs confer an increased risk over non-selective NSAIDs in chronic use.").)

occurred. The FDA Memorandum directly undercuts that speculation, as it observes that the available data – which has failed to detect a difference in cardiovascular risk between selective and non-selective NSAIDs, and has not shown a reduced risk when COX-2s are combined with low-dose aspirin – "raise serious questions about the so called 'COX-2 hypothesis.'" (FDA Memorandum at 8.)

Finally, the FDA's conclusion from the scientific data that there may be a "class effect" common to all NSAIDs and that warning labels should be modified accordingly is also relevant to whether Dr. Mason's prescribers would have given him something other than Vioxx for pain relief. The existence of a possible "class effect" means that a cardiovascular risk warning for Vioxx may not have differed materially from the warning the FDA now believes should have appeared on alternative pain medications. This evidence seriously undermines plaintiff's suggestion that his prescribers would not have prescribed Vioxx had it carried a different warning.

## II.  TESTIMONY REGARDING THE "CLASS EFFECT" OF ALL NSAIDS IS RELIABLE.

Plaintiff makes two arguments to support his ill-founded conclusion that testimony about the "class effect" of NSAIDs should be excluded as unreliable. Both are without merit.

### A.  The FDA Memorandum On Which Merck's Experts Base Their Testimony Is Scientifically Reliable.

Plaintiff incorrectly argues that testimony about class effect should be excluded because the "class effect hypothesis" is based upon "limited, unpublished, non-peer-reviewed data" and "has not been tested." (Pl.'s Mot. at 6.) This is wrong. The FDA April 6, 2005 Memorandum on which Merck's experts rely is based on a "*thorough review of the available data* . . . regarding currently approved COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs) and the risk of adverse cardiovascular (CV) events." (FDA Memorandum at 1

3

(emphasis added).)  It describes the large body of data the expert advisory panel reviewed in reaching its conclusions.  For example, the Memorandum states that "new data prompted the agency to conduct a comprehensive review of the available data," and that "CDER [the FDA's Center for Drug Evaluation and Research] conducted a thorough internal review of the available data regarding cardiovascular (CV) safety issues for COX-2 selective and non-selective non-steroidal anti-inflammatory drugs (NSAIDs)."  (FDA Memorandum at 3.)  The participants in the CDER review included staff from the Division of Anti-Inflammatory Analgesic and Ophthalmologic Drug Products, the Division of Over-the Counter Drug Products, the Offices of Drug Evaluation II and V, the Office of New Drugs, the Office of Drug Safety, the Office of Biostatistics, the Office of Pharmacoepidemiology and Statistical Science, the Office of Medical Policy, the Office of Regulatory Policy, and the Office of the Center Director.  (*Id.* at 3.)  This group's comprehensive review drew on materials from a wide range of sources:

> [T]he regulatory histories and the NDA [New Drug Application] and postmarketing databases of the various NSAIDs, FDA and sponsor background documents prepared for the Advisory Committee meeting, all materials and data submitted by other stakeholders to the Advisory Committee meeting, presentations made at the Advisory Committee meeting, the discussions held by the Committee members during the meeting, and the specific votes and recommendations made by the joint Committee.

(*Id*. at 3-4.)  The Memorandum itself analyzes the results of numerous clinical trials and epidemiological studies concerning various NSAIDs that the Advisory Committee reviewed in reaching its conclusion regarding a "class effect."  For example, the Advisory Committee reviewed data from a placebo-controlled clinical trial designed to determine whether Celebrex® (celecoxib), another COX-2 inhibitor, could prevent colorectal adenoma.  The study, which also examined cardiovascular endpoints in over 2,000 patients, found that persons on a long-term regimen twice daily of 400 mg Celebrex had a statistically significant increased risk of death

4

from cardiovascular causes compared to placebo.[2]  Notably, however, the Kaplan-Meier curve for composite cardiovascular deaths did not separate from placebo, much less become statistically significant, until well after six months of use.[3]

In addition to the comprehensive review of the scientific data evident from the document itself, the facts surrounding the creation, purpose, and use of the FDA Memorandum provides additional assurance of its scientific reliability.  Dr. Lisa Rarick, an expert in regulatory affairs who spent 15 years at the FDA before retiring in 2003, testified in another Vioxx matter that the FDA Memorandum's findings were created, reviewed, and agreed to by the pertinent regulators at the Agency and that, based on those findings, the FDA took several regulatory actions.  Dr. Rarick noted that the two authors of the FDA Memorandum, Dr. Jenkins (Director of the Office of New Drugs) and Dr. Seligman (Director of the Office of Pharmacoepidemiology and Statistical Science), are responsible for the approval of new drugs and post-marketing monitoring of safety concerns, respectively.  (Oct. 21, 2005 Tr. in *Humeston v. Merck*, No. 619 (N.J. Super. Ct. Law Div. filed Aug. 19, 2003) ("Rarick *Humeston* Test.") at 5026:15-5027:5, attached hereto as Ex. B.)  Additionally, the Memorandum was published through their supervisor, Dr. Steven Galson, the Acting Director of the Center for Drug Evaluation and Research, who had to review and endorse its findings.  (FDA Memorandum at 1; Rarick *Humeston* Test. at 5028:3-13.)  Nor is there any doubt that the Memorandum represented a final decision setting forth the FDA's official position on these issues.  (Rarick *Humeston* Test. at 5040:22-5041:8, 5054:4-7.)  As noted above, the FDA's own website, where the FDA published the Memorandum shortly after issuing it, refers to it as a "Decision Memo."  *See* http://www.fda.gov/cder/drug/infopage/cox2/.

---

[2] *See* Solomon et al., *Cardiovascular Risk Associated With Celecoxib in a Clinical Trial for Colorectal Adenoma Prevention,* N. ENGL. J. MED. 2005:352:1-10; FDA Memorandum at 4.

[3] Solomon et al., at 7.

It also bears noting that the FDA believed the findings and conclusions described in its Memorandum were sufficiently reliable to warrant significant regulatory action. As the FDA website describes, in the wake of the Advisory Committee meeting and Memorandum:

> The Food and Drug Administration (FDA) has issued supplemental request letters to sponsors of all non-steroidal anti-inflammatory drugs (NSAID) requesting that they make labeling changes to their products. These letters include recommended proposed labeling for both the prescription and over-the-counter (OTC) NSAIDs and a medication guide for the entire class of prescription products.
> . . . .
> Manufacturers of **non-prescription** (over-the-counter) NSAIDs are being asked to revise their labeling to provide more specific information about the potential CV and GI risks of their individual products and remind patients of the limited dose and duration of treatment of these products in accordance with the package instructions.

*See* FDA, *COX-2 Selective (includes Bextra, Celebrex, and Vioxx) and Non-Selective Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)*, http://www.fda.gov/cder/drug/infopage/cox2 (emphasis in original) (last visited Oct. 3, 2006); (*see also* Rarick *Humeston* Test. at 5038:21-5039:20). The FDA would not have taken these actions on *all NSAIDs* if it did not believe that its analysis, findings, and conclusions were based on reliable scientific evidence. Indeed, the Medication Guide that the FDA created to accompany prescription NSAIDs, which was based on the Advisory Committee's work, is required by law to be "scientifically accurate." *See* 21 C.F.R. § 208.20(a)(2); (Rarick *Humeston* Test. at 5057:13-16, 5099:16-5100:2).

### B. The Two Recent *JAMA* Articles Plaintiff Cites Do Not "Dismiss" The "Class Effect" Hypothesis Or Otherwise Support Plaintiff's Position.

Plaintiff misrepresents both the relevance and the import of two articles regarding NSAIDs published recently in the *Journal of the American Medical Association* (*JAMA*). Contrary to plaintiff's claim that these articles "dismiss the theory that NSAIDs have a 'class effect,'" nothing in these articles supports that conclusion. (Pl.'s Mot. at 4.) And even if they

6

did, the exclusion of relevant, reliable testimony based on the FDA's careful analysis of the issue is not warranted.

The McGettigan article adds virtually nothing to the analysis; it does not present new research, new science or new experiments.[4] In fact, it is nothing more than a review of existing observational studies by two authors who admit that they did not agree on their conclusions but instead resolved any "disagreements" between them "by consensus."[5] As the Court is aware, observational studies themselves have many inherent limitations not found, for example, in clinical trials. Moreover, the McGettigan article does not, as plaintiff claims, "reject[] the class effect hypothesis."  (Pl.'s Mot. at 6.)  The article reported significant increased risks associated with the nonselective NSAIDs indomethacin and diclofenac at a level similar to that of Vioxx and an increased risk for the category "any/other NSAIDs."[6] This is *consistent* with a "class effect" for all NSAIDs.

The second article plaintiff points to, the Zhang article,[7] also does not support his position.  In fact, the article has *no* relevance to this case because it is limited to an evaluation of the effects of COX-2 inhibitors on renal events and arrhythmias.  Thus, the article sheds no light on the effect of COX-2 inhibitors on thrombotic cardiovascular events – the only cardiac event at issue in this case.

---

[4] *See*, McGettigan, P., Henry, D., *Cardiovascular Risks and Inhibition of Cyclooxygenase:  A Systematic Review of the Observational Studies and Nonselective Inhibitors of Cyclooxygenase 2*, JAMA 2006; 296:13.

[5] *Id.*

[6] *Id.*

[7] *See*, Zhang et al., *Adverse Effects of Cyclooxygenase 2 Inhibitors on Renal and Arrhythmia Events:  Meta-analysis of Randomized Trials*, JAMA 2006; 296:13.

Even if it were relevant, however, the Zhang article does not support plaintiff's argument that testimony regarding "class effect" should be excluded because the conclusions presented are skewed by improper method. For example, the study did not analyze data for the 25mg dose, the only dose at issue in this case, independently.[8] Instead, the authors only state that, since Vioxx studies involved 50mg, 25mg, and 12.5mg, the median dose, *i.e.* the dose in the middle, is 25mg. By combining data at different doses, the authors violate the first rule of toxicology, that exposure – *i.e.*, dose and duration – is paramount.[9] Moreover, when analyzing the duration of the various studies, the authors use median duration, *i.e.* the duration in which half the studies were longer and half the studies were shorter, rather than the average duration of the trials.[10] The skewed result is that, even though the Vioxx studies included six trials that lasted one year or more (as compared to the other groups, none of which had more than a single study lasting a year or more), the authors reported the median duration of Vioxx studies as six weeks.[11] Their conclusions are similarly skewed by the fact that the study populations "varied in their age and sex distributions."[12]

Simply put, this meta-analysis did *not* control for exposure to COX-2 inhibition or the exposed population and cannot single-handedly disprove the body of literature reviewed by the FDA. The Zhang publication represents only one way of looking at the data presented, and thus leaves many open questions as to the reliability of its conclusions – questions that the jury should

---

[8] *Id.*

[9] Michael J. Saks et al., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE ("Reference Manual on Scientific Evidence") at 559 (2d ed. 2005-2006).

[10] *Id.*

[11] *Id.*

[12] *Id.*

decide with the benefit of all available information, including the testimony of Merck's experts. To exclude reliable testimony of class effect simply because the authors of one article interpreted a set of information in a certain way and reached a certain conclusion – particularly when that conclusion has nothing to do with the thrombotic cardiovascular event at issue in this case – would be to deprive the jury of the totality of information, impede the jury's truth-finding function, and unfairly prejudice Merck.  The Court should deny plaintiff's invitation to do so.

### III. CONCLUSION.

For the reasons stated above, the Court should deny plaintiff's Motion to Exclude Opinion Testimony That Vioxx Is The Same As All NSAIDs Regarding Cardiotoxic Effects.

Dated: October 3, 2006

Respectfully submitted,

/s/ Dorothy H. Wimberly
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361

Defendants' Liaison Counsel

Philip S. Beck
Tarek Ismail
Shayna Cook
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois  60610
Phone:  312-494-4400
Fax:     312-494-4440

9

Brian Currey
Catalina J. Vergara
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Phone:  213-430-6000
Fax:     213-430-6407

And

Douglas Marvin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  202-434-5000
Fax:     202-434-5029

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Opposition to Plaintiff's Motion to Exclude Opinion Testimony That Vioxx Is The Same As All NSAIDs Regarding Cardiotoxic Effects has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with PreTrial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657 on this 3rd day of October, 2006.

/s/ Dorothy H. Wimberly
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel