

**The Future of Drug Safety:  Promoting and Protecting the Health of the Public**

Committee on the Assessment of the US Drug Safety System, Alina Baciu, Kathleen Stratton, Sheila P. Burke, Editors

ISBN: 0-309-66600-7, 350 pages, 6 x 9,  (2006)

**This PDF is available from the National Academies Press at: http://www.nap.edu/catalog/11750.html**

Visit the National Academies Press online, the authoritative source for all books from the National Academy of Sciences, the National Academy of Engineering, the Institute of Medicine, and the National Research Council:

- Download hundreds of free books in PDF
- Read thousands of books online for free
- Explore our innovative research tools – try the "Research Dashboard" now!
- Sign up to be notified when new books are published
- Purchase printed books and selected PDF files

**Thank you for downloading this PDF.  If you have comments, questions or just want more information about the books published by the National Academies Press, you may contact our customer service department toll-free at 888-624-8373, visit us online, or send an email to feedback@nap.edu.**

**This book plus thousands more are available at http://www.nap.edu.**

Copyright © National Academy of Sciences. All rights reserved.
Unless otherwise indicated, all materials in this PDF File are copyrighted by the National Academy of Sciences.  Distribution, posting, or copying is strictly prohibited without written permission of the National Academies Press.  Request reprint permission for this book.

THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

# The Future of Drug Safety

# Promoting and Protecting the Health of the Public

Committee on the Assessment of the US Drug Safety System

Board on Population Health and Public Health Practice

Alina Baciu, Kathleen Stratton, Sheila P. Burke, *Editors*

INSTITUTE OF MEDICINE
*OF THE NATIONAL ACADEMIES*

*ADVANCE COPY*

NOT FOR PUBLIC RELEASE BEFORE

**Tuesday, September 26, 2006**
11 a.m. EDT

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

**Prepublication Copy: Uncorrected Proofs**

Copyright © National Academy of Sciences. All rights reserved.

THE NATIONAL ACADEMIES PRESS     500 Fifth Street, N.W.     Washington, DC  20001

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This study was supported by Contract No. 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, Task Order No. 23; HHSP23320042509XI, Task Order No. 3; and HHSM-500-2005-00026C between the National Academy of Sciences and the Department of Health and Human Services (the Food and Drug Administration, the Agency for Healthcare Research and Quality, the Centers for Medicaid and Medicare Services, the National Institutes of Health), and the United States Department of Veterans Affairs.  Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the view of the organizations or agencies that provided support for this project.

International Standard Book Number 0-309-XXXXX-X (Book)
International Standard Book Number 0-309- XXXXX -X (PDF)
Library of Congress Control Number: 00 XXXXXX

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, http://www.nap.edu.

For more information about the Institute of Medicine, visit the IOM home page at: **www.iom.edu.**

Copyright 2006 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America.

The serpent has been a symbol of long life, healing, and knowledge among almost all cultures and religions since the beginning of recorded history. The serpent adopted as a logotype by the Institute of Medicine is a relief carving from ancient Greece, now held by the Staatliche Museen in Berlin.

**Prepublication Copy: Uncorrected Proofs**

Copyright © National Academy of Sciences. All rights reserved.

*"Knowing is not enough; we must apply.*
*Willing is not enough; we must do."*
—Goethe



# INSTITUTE OF MEDICINE
## *OF THE NATIONAL ACADEMIES*

**Advising the Nation. Improving Health.**

**Prepublication Copy: Uncorrected Proofs**

Copyright © National Academy of Sciences. All rights reserved.

# THE NATIONAL ACADEMIES

*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy of Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Wm. A. Wulf is president of the National Academy of Engineering.

The **Institute of Medicine** was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Wm. A. Wulf are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

***Prepublication Copy: Uncorrected Proofs***

Copyright © National Academy of Sciences. All rights reserved.

## COMMITTEE ON THE ASSESSMENT OF THE US DRUG SAFETY SYSTEM

**SHEILA P. BURKE, M.P.A., R.N.,** *(Chair),* Deputy Secretary and Chief Operating Officer, Smithsonian Institution, Washington, DC

**DAVID BLUMENTHAL, M.D., M.P.P.,** Samuel O Thier Professor of Medicine and Health Policy, Harvard Medical School; Director, Institute for Health Policy, Massachusetts General Hospital/Partners Health Care System, Boston, MA

**SIR ALASDAIR BRECKENRIDGE, C.B.E.,** Chairman, Medicines and Healthcare Product Regulatory Agency, London, UK

**R. ALTA CHARO, J.D.,** Warren P. Knowles Professor of Law & Bioethics, University of Wisconsin-Madison, WI; Visiting Professor of Law, University of California, Berkeley, CA (2006)

**SUSAN EDGMAN-LEVITAN, P.A.,** Executive Director, John D. Stoeckle Center for Primary Care Innovation, Massachusetts General Hospital, Boston, MA

**SUSAN S. ELLENBERG, Ph.D.,** Department of Biostatistics and Epidemiology, Center for Clinical Epidemiology and Biostatistics, University of Pennsylvania School of Medicine, Philadelphia, PA

**ROBERT D. GIBBONS, Ph.D.,** Director, Center for Health Statistics, University of Illinois at Chicago, IL

**GEORGE HRIPCSAK, M.D., M.S.,** Professor of Biomedical Informatics, Vice Chair, Department of Biomedical Informatics, Columbia University, New York, NY

**DAVID KORN, M.D.,** Senior Vice President, Division of Biomedical and Health Sciences Research, Association of American Medical Colleges, Washington, DC

**DAVID MELTZER, M.D., Ph.D.,** Section of General Internal Medicine, University of Chicago, IL

**WOODROW A. MYERS, Jr., M.D., M.B.A.**

**MARY K. OLSON, Ph.D.,** Associate Professor of Economics and Political Economy, Tulane University, New Orleans, LA

**BRUCE M. PSATY, M.D., Ph.D.,** Professor, Medicine and Epidemiology, Co-director, Cardiovascular Health Research Unit, University of Washington, , Seattle, WA

**CHRISTOPHER H. SCHROEDER, J.D.,** Charles S. Murphy Professor of Law, Public Policy Studies Director, Program in Public Law, Duke Law School, Durham, NC

**ANDY STERGACHIS, Ph.D., R.Ph.,** Professor of Epidemiology and Adjunct Professor of Pharmacy, Interim Chair, Pathobiology, Northwest Center for Public Health Practice, School of Public Health and Community Medicine, University of Washington, Seattle, WA

**Board on Population Health and Public Health Practice Board Liaison**

**GEORGE ISHAM, M.D., M.S.,** Medical Director and Chief Health Officer, HealthPartners, Minneapolis, MN

**Study Staff**

**KATHLEEN STRATTON, Ph.D.,** Study Director

**ALINA BACIU, M.P.H.,** Program Officer

**ANDREA PERNACK ANASON, M.P.H.,** Program Officer (through September, 2005)

**AMY GROSSMAN, M.P.H.,** Senior Health Policy Associate

**RUTH KANTHULA, M.P.H.,** Senior Project Assistant (through June, 2006)

**NORMAN GROSSBLATT, ELS (D),** Senior Editor

**RENIE SCHAPIRO, M.P.H.,** Consultant

**ROSE MARIE MARTINEZ, Sc.D.,** Director, Board on Population Health and Public Health Practice

*Prepublication Copy: Uncorrected Proofs*

*v*

Copyright © National Academy of Sciences. All rights reserved.

***Prepublication Copy: Uncorrected Proofs***

*vi*

Copyright © National Academy of Sciences. All rights reserved.

# REVIEWERS

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise, in accordance with procedures approved by the NRC's Report Review Committee. The purpose of this independent review is to provide candid and critical comments that will assist the institution in making its published report as sound as possible and to ensure that the report meets institutional standards for objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the deliberative process. We wish to thank the following individuals for their review of this report:

**J. Lyle Bootman**, College of Pharmacy - Pulido Center, The University of Arizona
**John E. Calfee**, American Enterprise Institute, Washington, DC
**Dan Carpenter**, Center for Government and International Studies, Harvard University
**Ralph Edwards**, The Uppsala Monitoring Centre, World Health Organization
**David W. Feigal**, NDA Partners, LLP and Arizona Biodesign Center
**Garrett Fitzgerald**, University of Pennsylvania School of Medicine
**Henry G. Grabowski**, Department of Economics, Program in Pharmaceuticals and Health
 Economics, Duke University
**Sean Hennessy**, University of Pennsylvania School of Medicine
**Peter Barton Hutt**, Covington & Burling
**Anne Khademian**, Center for Public Administration and Policy, Virginia Tech
**Debra R. Lappin**, B&D Sagamore, Washington, D.C.
**Arthur Aaron Levin**, Center for Medical Consumers, New York, New York
**Steven M. Paul**, Lilly Research Laboratories, Eli Lilly and Company
**Richard Platt**, Department of Ambulatory Care and Prevention, Harvard Medical School
**Wayne A. Ray**, Department of Preventive Medicine, Vanderbilt University School of Medicine
**Joshua M. Sharfstein**, Health Department, City of Baltimore
**Panos Tsintis**, Unit for the Post-Authorisation Evaluation of Medicines for Human Use,  European
 Medicines Agency, London
**Eleanor M. Vogt**, School of Pharmacy, University of California, San Francisco
**Alastair J.J. Wood**, Vanderbilt University Medical School

Although the reviewers listed above have provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations nor did they see the final draft of the report before its release.  The review of this report was overseen by **Neal A. Vanselow**, Tulane University, Professor Emeritus and **Joseph P. Newhouse**, Harvard University.  Appointed by the National Research Council and Institute of Medicine, they were responsible for making certain that an independent examination of this report was carried out in accordance with institutional procedures and that all review comments were carefully considered.  Responsibility for the final content of this report rests entirely with the authoring committee and the institution.

Copyright © National Academy of Sciences. All rights reserved.

# PREFACE

This year, 2006, marks the 100th anniversary of the signing of the Pure Food and Drug Act. During that century, drug regulation at the Food and Drug Administration has evolved enormously, both in terms of statutory reforms (with major legislation in 1938, 1962, 1992, 1997, 2002) and due to internal restructuring and growth in staff. Past changes have frequently been responses to problems in the functioning of the drug regulatory process. Although the agency has gained great respect and importance as one of the world's premier regulatory bodies, recent drug safety events have called into question FDA's regulatory decision making and oversight processes, and caused the public to question its   ability to accomplish a balanced evaluation of the safety and efficacy of the drugs it reviews and after their approval, of their performance under real life conditions. In light of these developments the Institute of Medicine was asked by the Food and Drug Administration to examine in detail the system of drug safety in this country. Our Committee has, in the course of the last 15 months, undertaken this assessment.

The result of our review is a series of recommendations that we believe will improve the drug safety system by strengthening clinical and epidemiological research, and the scientific basis of regulatory action. While mindful of recent actions by the Food and Drug Administration to improve its postmarket decision making process, the Committee believes a more comprehensive response is required that acknowledges the need for vigilance throughout the life-cycle of a drug. Underlying our 25 recommendations is the fundamental view that the interests of the public are best served when safety and efficacy are considered together. However, factors including, but not limited to the current organizational culture of the Center for Drug Evaluation and Research, combined with severe resource constraints and a problematic funding mechanism have impeded the development of a system that optimally integrates the safety and efficacy assessments along a drug's lifecycle, particularly with regard to safety issues arising postmarketing. Further complicating this problem is the lack of a clearly established and consistently applied systematic process of making risk-benefit assessments, and an adequate base of human and technological resources required to meet the Center's critical responsibilities.

The Committee believes the staff of the Food and Drug Administration, and of the Center for Drug Evaluation and Research in particular, to be a dedicated and talented group of public servants who currently lack the organization and resources to address all of the challenges before them and perform their crucial role of advancing and protecting public health in an increasing complex environment.

We believe that the Congress needs to ensure that the Center for Drug Evaluation and Research is given the authority and assets (human, financial, technological, etc.) it requires. The Center's leaders have to be prepared to address the underlying cultural problems that divide and impair the optimal functioning of Center staff and effectively use the existing and new authorities and resources to achieve the Center's public health and regulatory mission. The Committee's recommendations that address these issues must be viewed as a coherent package of solutions or strategies rather than a menu of choices.

I would like to thank my colleagues on the Committee for their extraordinary efforts. They have committed countless hours over the last 15 months, in meetings, and on weekly phone calls and in a continuing stream of emails. They have passionately argued their positions, but also accommodated their colleagues, and sought responsible consensus. I thank them for all they have done. I would also like to acknowledge the contributions of the Institute of Medicine's staff team—Kathleen Stratton, Alina Baciu, Amy Grossman, Ruth Kanthula, Andrea Pernack Anason, and consultant Renie Schapiro. Their dedication, guidance, and experience were of inestimable value to us in examining the highly complex process of drug evaluation and regulation. We could not have produced this report without them. The Committee is grateful to everyone who spoke at our public meetings and who sent material for consideration. I also wish to thank the current and former staff at the Food and Drug Administration and particularly at the Center for Drug

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

*Preface*

Evaluation and Research who spoke frankly with the Committee and provided much needed insight into the workings of this agency.

Sheila P. Burke, Chair

Copyright © National Academy of Sciences. All rights reserved.

# Contents

REPORT SUMMARY...................................................................................S-1

1 INTRODUCTION............................................................................ 1-1
   Changes in the Broad Context of Drug Regulation
   Defining and Meeting the Charge

2 NATURAL HISTORY OF A DRUG.............................................................2-1
   Economic impact of drugs
   Investigational New Drug Submission and Review
   New Drug Application
   Postmarket Period

3 A CULTURE OF SAFETY....................................................................3-1
   Organizational Challenges
   The External Environment
   Proposed Solutions to CDER's Organizational Dysfunction

4 THE SCIENCE OF SAFETY..................................................................4-1
   Generating the Science
   Credibility of the Science

5 REGULATORY AUTHORITIES FOR DRUG SAFETY ....................................5-1
   History of FDA Drug Regulation
   An Aging and Inadequate Statutory Framework
   Strengthening FDA's Regulatory Authorities

6 COMMUNICATING ABOUT SAFETY.......................................................6-1

7 RESOURCES FOR THE DRUG SAFETY SYSTEM......................................7-1

APPENDIXES

A  Moving Target—the Shifting Landscape of Drug Safety in the United States
B  Acronyms
C  PDUFA Goals
D  Meeting Agendas
E  Summary, IOM Report: *Preventing Medication Errors*
F  Committee Biographies

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

x

Copyright © National Academy of Sciences. All rights reserved.

**PREPUBLICATION COPY**
**Uncorrected Proofs**

## SUMMARY

# The Future of Drug Safety

Promoting and Protecting the Health of the Public



**INSTITUTE OF MEDICINE**
*OF THE NATIONAL ACADEMIES*

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***          S-1

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

# Summary

Every day FDA works to balance expeditious access to drugs with concerns for safety, con-sonant with its mission to protect ad advance the public health. The task is all the more complex given the vast diversity of patients and how they respond to drugs, the conditions being treated, and the rage of pharmaceutical products and supplements patients use. Reviewers in the Center for Drug Evaluation and Research (CDER) at the Food and Drug Administration (FDA) must weigh the information available about a drug's risk and benefit, make decisions in the context of scientific uncertainty, and integrate emerging information bearing on a drug's risk-benefit profile throughout the lifecycle of a drug, from drug discovery to the end of its useful life. These proc-esses may have life-or-death consequences for individual patients, and for drugs that are widely used, they may also affect entire segments of the population. The distinction between individual and population is important because it reflects complex determinations that FDA must make when a drug that is life-saving for a specific patient may pose substantial risk when viewed from a population health perspective. In a physician's office, the patient and the provider make deci-sions about the risk and benefits of a given drug for that patient, whereas FDA has to assess risks and benefits with a view toward their effects on the population. The agency has made great ef-forts to balance the need for expeditious approvals with great attention to safety—as described in its mission, to protect and advance the health of the public.

In the first years of the 21st century, the issue of prescription drug safety came to the attention of the public with renewed intensity. Drug withdrawals, apparent delays in warning the public about important drug risks, a perceived rush to approve drugs without sufficient attention to safety, and press coverage of internal problems in CDER may have contributed to a deterioration of public confidence in FDA. Academics, consumer organizations, professional societies, and legislators debated the possible causes and solutions of what was seen by many as a major prob-lem (Grassley C, 2005; Shaw, 2005;Consumers Union, 2005; NCL, 2005; U.S. PIRG, 2006). FDA and the Department of Health and Human Services (DHHS) announced a series of steps to address drug safety, including asking the Institute of Medicine (IOM) to convene a committee to assess the U.S. drug safety system and to make recommendations to improve risk assessment, surveillance, and the safe use of drugs.

In its report, the committee considered the drug safety system as the sum of all activities conducted by FDA and other stakeholders to monitor, evaluate, improve, and ensure drug safety. (See the committee's Statement of Task in Box S-1.) Although much of the committee's work was focused around the drug review, safety surveillance, and related activities of CDER, the committee also reviewed some key aspects of the roles and considered the potential contributions of the pharmaceutical industry, the academic research enterprise, Congress, the health care deliv-ery system, patients and the public.

Copyright © National Academy of Sciences. All rights reserved.

*Summary*

---

**BOX S-1: The Statement of Task**

In response to growing public concern with health risks posed by approved drugs, the FDA has requested that the IOM convene an ad hoc committee of experts to conduct an independent assessment of the current system for evaluating and ensuring drug safety postmarketing and make recommendations to improve risk assessment, surveillance, and the safe use of drugs. As part of its work, the IOM committee will:

- examine the FDA's current role and the role of other actors (e.g., health professionals, hospitals, patients, other public agencies) in ensuring drug safety as part of the U.S. health care delivery system;
- examine the current efforts for the ongoing safety evaluation of marketed drug products at the FDA and by the pharmaceutical industry, the medical community, and public health authorities;
- evaluate the analytical and methodological tools employed by FDA to identify and manage drug safety problems and make recommendations for enhancement;
- evaluate FDA's internal organizational structure and operations around drug safety (including continuing postmarket assessment of risk vs. benefit);
- consider FDA's legal authorities for identifying and responding to drug safety issues and current resources (financial and human) dedicated to postmarketing safety activities;
- identify strengths, weaknesses and limitations of the current system; and
- make recommendations in the areas of organization, legislation, regulation, and resources to improve risk assessment, surveillance and the safe use of drugs.

---

Some observers believe that drug withdrawals (which are only one potential indicator of drug safety) represent de facto failures of the drug regulatory system, or that newly identified unusual and serious adverse events indicate that someone made a mistake in approving the drug. This is not so. FDA approval does not represent a lifetime guarantee of safety and efficacy, and what is newest is not always the best. For several related reasons, even the best drug safety system would not prevent adverse reactions to pharmaceuticals on the market. It is impossible to know everything about a drug at the point of approval because drugs' mechanisms of action are complex, and because the clinical testing that happens before approval is generally conducted in controlled settings in defined, carefully selected populations that may not fully represent the wide range of patients who will use the drug after approval, some chronically, and in combination with other drugs. Thus, the understanding of a drug's risk-benefit profile necessarily evolves over the drug's lifecycle. CDER staff who review regulatory submissions, such as new drug applications, must strike a delicate balance in judging the drug's risks and benefits, and whether the need for more study to increase certainty before approval warrants delaying the release of the drug into the marketplace and into the hands of health care providers and their patients.

Legitimate questions have arisen about CDER's handling of drug safety. Are safety signals recognized and addressed in a timely fashion? Is the public informed about safety problems in a clear and timely manner? Do the interactions of pre- and postmarketing Center staff facilitate effective action on drug safety? Does the Center have the mix of expertise, technology, scientific capacity, authority, and resources to achieve its share of FDA's mission, to protect and advance the health of the public?  Do the political, social, and economic aspects of the external environment and the expectations of other stakeholders affect the agency's functioning? To answer some of these questions, the committee reviewed aspects of the drug safety system that it believes can be transformed to improve the monitoring and evaluation of drug safety signals and restore public confidence in the system, including:

---

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**            S-3

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

- The organizational **culture** of CDER and its determinants, and how organizational culture may affect the Center's performance in assessing and acting on the evolving understanding of risk and benefit over the drug lifecycle;
- Key factors of regulatory **science** and processes (methods, data resources, expert advice, independence) necessary to enhance drug safety;
- The **regulatory authorities** necessary to provide for drug safety;
- The **communication** structure needed to support an effective drug safety system; and
- The financial **resources** required to enable CDER to meet its responsibilities in supporting the FDA mission.

In its information gathering, the committee became aware of multiple proposals to strengthen the drug safety system that have been made in the past and have addressed many of the areas outlined. In its work, the committee has attempted to develop a coherent and integrative approach to transforming drug safety programs that encompasses the categories described above. The committee made several overarching findings. First, there is a perception of crisis that has compromised the credibility of FDA and of the pharmaceutical industry (Harris Interactive, 2005; PricewaterhouseCoopers' Health Research Institute, 2005). Second, the committee learned that most stakeholders—the agency, the industry, consumer organizations, Congress, professional societies, health care entities— appear to agree on the need for certain improvements in the system. Third, the committee found that the drug safety system is impaired by the following factors: serious resource constraints that weaken the quality and quantity of the science that is brought to bear on drug safety; an organizational culture in CDER that is not optimally functional; and unclear and insufficient regulatory authorities particularly with respect to enforcement. Fourth, the committee found that FDA, in keeping with its public health mission, and the pharmaceutical industry, in keeping with its responsibility to the users of its products (and its shareholders), do not consistently demonstrate accountability and transparency to the public by communicating safety concerns in a timely and effective fashion.

The committee's vision of a transformed drug safety system has at its core a lifecycle approach to drug risk and benefit—not a new concept, but one that has been implemented, at best, in a limited and fragmented manner. For FDA, attention to risk and benefit over a drug's lifecycle would require continuous availability of new data and ongoing, active reassessment of risk and benefit to drive regulatory action (responsive to the accumulating information about a given drug), and regulatory authority that is strong both before and after approval. For the industry, attention to risk and benefit over the lifecycle will require increased transparency toward FDA in the process of elucidating and communicating emerging information about a drug, and acceptance of changes intended to strengthen drug safety. Importantly, FDA's credibility is intertwined with that of the industry, and a more credible drug safety system is in everyone's best interest. For the health care delivery system, a lifecycle approach to risk and benefit implies the need to heed and follow FDA communication about drug safety matters and to exercise appropriate caution in drug-related decision making (from formularies to prescribing) in recognition of the limited information available at the time of drug approval. Also, the health care delivery system would benefit from consistently basing prescribing decisions on the science, and exercising caution in regard to the industry's influence on the practice of medicine. Health care organizations and professional societies could contribute to prescribers' understanding of the evolving science behind the assessment of drug risk and benefit. The academic research enterprise could enhance its contributions of data to the assessment of risk and benefit at all points in a drug's

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**     S-4

Copyright © National Academy of Sciences. All rights reserved.

lifecycle, continue its crucial advisory relationship with FDA, and uphold the value of complete transparency in recognition of real and perceived conflicts associated with financial involvement with the industry. Other government agencies could contribute to the lifecycle approach to drug risk and benefit by collaborating with FDA and the private sector to ensure that data streams from publicly funded health care settings contribute to an improved drug safety system. The public and patients could do their part by communicating with their health care providers about the pharmaceutical products they are using, learning about and discussing with their providers drug risks and benefits in the context of their health needs and characteristics, informing their providers about side effects they experience, and calling for more useful and timelier information about drug benefits and risks associated with new drugs. The public and other stakeholders could also urge Congress to ensure and sustain adequate funding for FDA.

## RECOMMENDATIONS

### *Organizational culture*

Instability in the Office of the Commissioner has been a serious problem for FDA and CDER in particular. A large, complex, science-based regulatory agency cannot perform optimally in the absence of stable, capable leadership, and clear, consistent direction.

**3.1  The committee recommends that the FD&C Act be amended to require that the FDA Commissioner currently appointed by the President with the advice and consent of the Senate also be appointed for a 6-year term of office. The Commissioner should be an individual with appropriate expertise to head a science-based agency, demonstrated capacity to lead and inspire, and a proven commitment to public health, scientific integrity, transparency, and communication. The President may remove the Commissioner from office only for reasons of inefficiency, neglect of duty, or malfeasance in office.**

A mechanism is needed to allow the agency and CDER leadership to benefit from the advice and support of individuals experienced in changing organizational culture and leading large and complex organizations.

**3.2:  The committee recommends that an external Management Advisory Board be appointed by the Secretary of HHS to advise the FDA commissioner in shepherding CDER (and the agency as a whole) to implement and sustain the changes necessary to transform the center's culture—by improving morale and retention of professional staff, strengthening transparency, restoring credibility, and creating a culture of safety based upon a lifecycle approach to risk-benefit.**

**3.3:  The committee recommends the Secretary of HHS direct the FDA commissioner and Director of CDER, with the assistance of the Management Advisory Board, to develop a comprehensive strategy for sustained cultural change that positions the agency to fulfill its mission, including protecting the health of  the public.**

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*                     S-5

Copyright © National Academy of Sciences. All rights reserved.

The Office of Drug Safety (ODS), now the Office of Surveillance and Epidemiology (OSE), has not had a formal role in drug regulation—neither formal opportunities to learn from and participate in relevant aspects of the review process nor the authority to take action regarding post-marketing safety.

**3.4:** **The committee recommends that CDER appoint an OSE staff member to each New Drug Application review team and assign joint authority to OND and OSE for postapproval regulatory actions related to safety.**

The PDUFA mechanism that accounts for over half of CDER's funding and the reporting requirements associated with the user-fee program are excessively oriented toward supporting speed of approval and insufficiently attentive to safety.

**3.5:** **To restore appropriate balance between the FDA's dual goals of speeding access to innovative drugs and ensuring drug safety over the product's lifecycle, the committee recommends that Congress should introduce specific safety-related performance goals in the Prescription Drug User Fee Act IV in 2007.**

### Science and Expertise

FDA's Adverse Event Reporting System (AERS) is outdated and inefficient, and although CDER has begun a technological overhaul of the system, more work is needed to improve its usefulness in postmarketing surveillance.

**4.1:** **The committee recommends that in order to improve the generation of new safety signals and hypotheses, CDER (a) conduct a systematic, scientific review of the AERS system , (b) identify and implement changes in key factors  that could lead to a more efficient system, and (c) systematically implement statistical-surveillance methods on a regular and routine basis for the automated generation of new safety signals.**

In addition, CDER's ability to test drug safety hypotheses is limited.

**4.2:** **The committee recommends that in order to facilitate the formulation and testing of drug safety hypotheses, CDER (a) increase their intramural and extramural programs that access and study data from large automated healthcare databases and (b) include in these programs studies on drug utilization patterns and background incidence rates for adverse events of interest, and (c) develop and implement active surveillance of specific drugs and diseases as needed in a variety of settings.**

The report makes several recommendations (4.3, 4.5, 4.8, and 5.4 below) intended to help CDER develop a more structured way to determine the level of postmarketing scrutiny and data requirements, in other words, to match the evaluation of drugs with the way that they will be used in the population. Short term pre-approval trials do not provide adequate information about the balance of risks and benefits of drugs that are used by many people for many years.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*Summary*

Various public and private-sector organizations possess increasingly high-quality data resources and scientific capacity, and a concerted effort is needed to ensure that those resources are used efficiently and effectively in the service of drug safety.

**4.3: The committee recommends that the Secretary of HHS, working with the Secretaries of Veterans Affairs and Defense, develop a public-private partnership with drug sponsors, public and private insurers, for profit and not for profit health care provider organizations, consumer groups, and large pharmaceutical companies to prioritize, plan, and organize funding for confirmatory drug safety and efficacy studies of public health importance. Congress should capitalize the public share of this partnership.**

**4.4: The committee recommends that CDER assure the performance of timely and scientifically-valid evaluations (whether done internally or by industry sponsors) of Risk Minimization Action Plans (RiskMAPs).**

The assessment of risks and benefits is an activity that does not end at approval, and risk and benefit cannot be considered in isolation of one another.

**4.5: The committee recommends that CDER develop and continually improve a systematic approach to risk-benefit analysis for use throughout the FDA in the pre-approval and post-approval settings.**

The committee has made several recommendations to expand the data on drug risks and benefits to improve those decisions. However, in order to plan and use those data, appropriate expertise must be brought to bear. This expertise comes from the CDER staff as well as their advisory committees and other non-governmental experts. The committee believes there is a need to expand this expertise to take on the new responsibilities laid out in recommendations made in this report. CDER will need more expert staff, deeper expertise in the staff it already has, and different kinds of expertise.

With this expanded expertise and resources CDER can be a more effective steward of post-marketing safety and a more credible scientific partner with industry and academia by actively participating in defining important research questions and designing appropriate studies.

**4.6: The committee recommends that CDER build internal epidemiologic and informatics capacity in order to improve the postmarket assessment of drugs.**

Increasing the scientific sophistication of the CDER staff should not happen in isolation. Since the goal is to support good science-based regulatory decision making, a corollary goal is to support the research infrastructure of the agency. Expanded research opportunities should be linked explicitly to FDA's regulatory mission.

**4.7: The committee recommends that the Commissioner of FDA demonstrate commitment to building the Agency's scientific research capacity by:**

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

a) **Appointing a Chief Scientist in the office of the Commissioner with responsibility for overseeing, coordinating, and ensuring the quality and regulatory focus of the agency's intramural research programs.**

b) **Designating the FDA's Science Board as the extramural advisory committee to the Chief Scientist.**

c) **Including research capacity in the Agency's mission statement.**

d) **Applying resources to support intramural research approved by the Chief Scientist.**

e) **Ensuring that adequate funding to support the intramural research program is requested in the Agency's annual budget request to Congress.**

The fast pace of review does not allow CDER reviewers to solicit consistently needed input from the appropriate FDA advisory committee(s) on issues such as postmarketing safety and the need for additional studies.

**4.8:  The committee recommends that FDA have its advisory committees review all NMEs either prior to approval or soon after approval to advise in the process of ensuring drug safety and efficacy or managing drug risks.**

**4.9:  The committee recommends that all FDA drug product advisory committees, and any other peer review effort such as mentioned above for CDER-reviewed product safety, include a pharmacoepidemiologist or an individual with comparable public health expertise in studying the safety of medical products.**

FDA's credibility is its most crucial asset and recent concerns about the independence of advisory committee members (who advise CDER in its regulatory decision making), along with broader concerns about scientific independence in the biomedical research establishment, have cast a shadow on the trustworthiness of the scientific advice received by the agency.

**4.10:  The committee recommends FDA establish a requirement that a substantial major-ity of the members of each advisory committee be free of significant financial involvement with companies whose interests may be affected by the committee's deliberations.**

The committee believes strongly in the importance of increasing the availability of information about risks and benefits, whether specific study results or CDER staff analyses of concerns, to the public and to researchers. The National Library of Medicine hosts a website for registration of clinical trials, but with few exceptions, this is voluntary.  In 2002, pharmaceutical companies that are members of PhRMA committed to voluntary disclosure of the results of hypothesis-testing clinical trials for marketed and investigational drugs and in 2004 PhRMA launched a website (ClinicalStudyResults.org) for this purpose.  A review of the site shows great variability in the ease of accessibility and completeness of the information.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*Summary*

**4.11:** To ensure that trial registration is mandatory, systematic, standardized, and complete, and that the registration site is able to accommodate the reporting of trial results, **the committee recommends that Congress require industry sponsors to register in a timely manner at clinicaltrials.gov, at a minimum, all Phase 2 through 4 clinical trials, wherever they may have been conducted, if data from the trials are intended to be submitted to the FDA as part of an NDA, sNDA, or to fulfill a postmarket commitment. The committee further recommends that this requirement include the posting of a structured field summary of the efficacy and safety results of the studies.**

**4.12:  The committee recommends that FDA post all NDA review packages on the agency's Web site.**

**4:13:  The committee recommends that the CDER review teams regularly and systematically analyze all postmarket study results and make public their assessment of the significance of the results with regard to the integration of risk and benefit information.**

### Regulation

FDA lacks the clear, unambiguous authority needed to enforce sponsor compliance with regulatory requirements and instead relies on the prospect of productive negotiations with industry. Although the agency historically has made effective use of its "bully pulpit" to compel sponsor compliance, this process leaves potentially critical regulatory action vulnerable to a subjective and highly variable process of exercising individual or agency influence, and to the vicissitudes of changing politics and attitudes toward regulation. That is why FDA's authorities must be clarified and strengthened to empower the agency to take rapid and decisive actions when necessary and appropriate.

**5.1  The committee recommends that Congress ensure that the Food and Drug Administration has the ability to require such postmarketing risk assessment and risk management programs as are needed to monitor and ensure safe use of drug products. These conditions may be imposed both before and after approval of a new drug, new indication, or new dosage, as well as after identification of new contraindications or patterns of adverse events.  The limitations imposed should match the specific safety concerns and benefits presented by the drug product.  The risk assessment and risk management program may include:**

a) **Distribution conditioned on compliance with agency-initiated changes in drug labels.**

b) **Distribution conditioned on specific warnings to be incorporated into all promotional materials (including broadcast DTC advertising).**

c) **Distribution conditioned on a moratorium on direct to consumer advertising.**

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***          S-9

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

    d)  **Distribution restricted to certain facilities, pharmacists, or physicians with special training or experience.**

    e)  **Distribution conditioned on the performance of specified medical procedures.**

    f)  **Distribution conditioned on the performance of specified additional clinical trials or other studies.**

    g)  **Distribution conditioned on the maintenance of an active adverse event surveillance system.**

**5.2  The committee recommends that Congress provide oversight and enact any needed legislation to ensure compliance by both the Food and Drug Administration and drug sponsors with the provisions listed above. FDA needs increased enforcement authority and better enforcement tools directed at drug sponsors, which should include fines, injunctions, and withdrawal of drug approval.**

The agency's timely performance of the required postmarketing safety reviews could be listed as one of the goals associated with the Prescription Drug User Fee Act and reported on in the goals letter to Congress (see Chapter 3).

**5.3  The committee recommends that Congress amend the Food, Drug and Cosmetic Act to require that product labels carry a special symbol such as the black triangle used in the UK or an equivalent symbol for new drugs, new combinations of active substances, and new systems of delivery of existing drugs. The Food and Drug Administration should restrict direct-to-consumer advertising during the period of time the special symbol is in effect.**

The symbol should remain on the drug label and related materials for 2 years unless FDA chooses to shorten or extend the period on a case by case basis.

**5.4  The committee recommends that FDA evaluate all new data on new molecular entities no later than 5 years after approval.  Sponsors will submit a report of accumulated data relevant to drug safety and efficacy, including any additional data published in a peer reviewed journal, and will report on the status of any applicable conditions imposed on the distribution of the drug called for at or after the time of approval.**

## Communication

The public would benefit from more information about how drugs are studied before FDA approval, how drugs' risks and benefits are assessed, and what FDA review entails. Patients also need timely information about emerging safety concerns or about a drug's effectiveness. Such

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*    

Copyright © National Academy of Sciences. All rights reserved.

information would help patients make better decisions in collaboration with their health care providers. FDA does not have an adequate mechanism for seeking and receiving specific scientific and patient/consumer advice on communication matters.

**6.1:  The committee recommends that Congress enact legislation establishing a new FDA advisory committee on communication with patients and consumers. The committee would be composed of members who represent consumer and patient perspectives and organizations. The advisory committee would advise CDER and other centers on communication issues related to efficacy, safety, and use during the lifecycle of drugs and other medical products, and it would support the centers in their mission to "help the public get the accurate, science-based information they need to use medicines and foods to improve their health."**

**6.2:  The committee recommends that the new Office of Drug Safety Policy and Communication should develop a cohesive risk communication plan that includes, at a minimum, a review of all Center risk communication activities, evaluation and revision of communication tools for clarity and consistency, and priority-setting to ensure efficient use of resources.**

## Resources

The suite of recommendations put forward in this report—to improve the culture in CDER, attract and retain highly qualified staff, improve technological capacity, obtain and benefit from access to data and innovative scientific partnerships and so on—are all dependent on adequate resources. An agency whose crucial mission is to protect and advance the public's health should not have to go begging for resources to do its job. Also, the effect on CDER's work of CDER's overdependence on PDUFA funding with the strings that are attached hurts FDA's credibility and may affect the agency's effectiveness.

**7.1 To support improvements in drug safety and efficacy activities over a product's lifecycle, the committee recommends that the Administration should request and Congress should approve substantially increased resources in both funds and personnel for the Food and Drug Administration.**

The committee favors appropriations from general revenues, rather than user fees, to support the full spectrum of new drug safety responsibilities proposed in this report. This preference is based on the expectation that CDER will continue to review and approve drugs in a timely manner and that increasing attention to drug safety will not occur at the expense of efficacy reviews but rather it will complement efficacy review for a lifecycle approach to drugs.  Congressional appropriations from general tax revenues are a mechanism by which the public can directly, fairly, and effectively invest in the FDA's postmarket drug safety activities.  However, if appropriations are not sufficient to fund these activities and user fees are required, Congress should greatly reduce current restrictions on how CDER uses PDUFA funds.

The year 2006 marks a major milestone in FDA's history, public interest in drug safety matters has reached a high point, negotiations in advance of the September 2007 sunset of PDUFA have begun, Medicare part D has enrolled millions of senior citizens in a system that has the po-

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

tential to yield useful data about experience with drugs, and Congressional attention to drug safety issues has become intense. Now is the time to renew and transform CDER's culture, its authorities, its scientific capacity, and its ability to communicate with health care providers and the public. The committee believes that the recommendations contained in this report, implemented together and with adequate resources, will enable the Center (and the agency) to function more effectively in the present and to position itself for an even more challenging future in advancing and protecting the health of patients and the public.

Copyright © National Academy of Sciences. All rights reserved.

# REFERENCE LIST

Consumers Union. NEWS--IOM Panel Urged to Immediately Recommend that Congress Toughen Drug Safety Laws to Save Lives: Consumers Union testifies today that obvious safety problems need action now. 2005.

Grassley C. A Bill to amend the Federal Food, Drug, and Cosmetic Act with respect to drug safety, and for other purposes. S.930 : 2005:109th Congress, 1st Session, Senate.

Harris Interactive. The Public Has Doubts About the Pharmaceutical Industry's Willingness to Publish Safety Information about Their Drugs in a Timely Manner. January 18, 2005; accessed March 10, 2006. Web Page. Available at: http://www.harrisinteractive.com/news/printerfriend/index.asp?NewsID=882.

NCL. Comments of The National Consumers League to DKT. No. 2005N-0394, Communication of Drug Safety Information. 2005; accessed September 16, 2006. Web Page. Available at: http://www.nclnet.org/advocacy/health/letter_drugsafety_01062006.htm.

PricewaterhouseCoopers' Health Research Institute. Recapturing the vision: Integrity driven performance in the pharmaceutical industry. 2005.

U.S. PIRG. Drug Safety. 2006; accessed September 16, 2006. Web Page. Available at: http://uspirg.org/uspirg.asp?id2=17568&id3=US&.

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

Copyright © National Academy of Sciences. All rights reserved.

# 1

# Introduction

*" . . . [A]lmost every morning's newspaper and each evening's television newscasts include a new and more disturbing episode of pharmacological crisis and medical mayhem in the United States" (Markel, 2005).*

*". . . FDA has become synonymous with drug safety. In a sense, 'FDA approved' is the brand that the entire $216 billion U.S. drug market is founded upon. Dilute the confidence of the public in the agency, and many billions of dollars in current and potential sales vanish overnight. That's exactly what's happening right now in the wake of the biggest drug withdrawal ever" (Herper, 2005).*

The recent highly-publicized controversies surrounding the safety of some drugs have contributed to a public perception that the drug safety system is in crisis. It seems fair to say that this perception has created an opportunity for a thorough evaluation of the U.S. drug safety system. News media coverage and congressional examination of the Center for Drug Evaluation and Research's (CDER) handling of safety concerns have raised questions about the review and approval process and whether it has become so accelerated that adequate attention may not be given to safety, and about the completeness and timeliness of risk communication to the public. Questions also surfaced about the independence of the scientific expertise relied on by Food and Drug Administration (FDA) (i.e., conflict of interest on the  its advisory committees) and about the possibility of undue industry influence related to CDER's increasing dependence on Prescription Drug User Fee Act (PDUFA) funding. It would be easy to conclude that FDA's most recent troubles are just a reflection of the swinging of the pendulum from tighter to looser regulation and back again (Applebaum Anne, 2005; Geraghty LN, 2006). The committee believes that the reality is more complicated than that. The committee did not attempt to document whether or not a drug safety crisis exists, and this report should not be interpreted as commenting on that claim one way or the other. The committee also did not set out to, nor was it asked to conduct in-depth reviews of the industry and the agency's handling of safety information and data for drugs with potential safety problems. Instead, the committee examined the existing drug safety system with a view to identifying areas of vulnerability and facets of the system that could be strengthened in order to improve its overall functioning in meeting the needs of the American public.

Complaints about delayed patient access to drugs already approved in other countries and the AIDS advocacy movement of the 1980s are considered among the major factors that motivated legislative action to speed up FDA's drug approval process. However, criticism of the pace of drug approval may be traced to the early 1970s. At that time, pharmaceutical companies, scien-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

*The Future of Drug Safety*

tists, and consumer organizations argued that the 1962 Drug Amendments to the Food, Drug and Cosmetic Act, intended to strengthen the drug approval process by requiring that sponsors demonstrate efficacy, also stifled drug development and delayed drug approval, created a so-called drug lag that placed US approvals behind those of Western European nations with comparable drug development programs (Dorsen and Miller, 1978). Although the In the 1990s, FDA attributed the lag to shortages of staff and computers (FDA, 2005). Concern about the slow pace of drug review finally led to PDUFA.

The enactment of PDUFA in 1992 resulted from a potent combination of interests. Patient advocacy groups called for more rapid access to promising therapies, the industry desired a more efficient regulatory process to enable more rapid marketing of new drugs and a longer patent life, FDA needed more resources to expand its review staff to meet demand for greater regulatory expediency, and some members of Congress were concerned that new drug approvals in the U.S. lagged behind those of comparable European nations. With Congressional oversight and input, PDUFA was enacted with the goal of meeting the needs of FDA, industry, and patients. Although the 1992 PDUFA succeeded greatly in decreasing review times (FDA, 2005), its first two iterations (PDUFA I in 1992 and PDUFA II in 1997, see below) specifically prohibited the use of fees for any postmarketing drug safety activities. Also, the speeding up of the approval process highlighted potential weaknesses and limited capability in the area of postmarketing safety. By the latter part of the 1990s, various observers, including consumer groups and researchers, became concerned that the increased pace of drug approvals had unintentionally led to a neglect of, or at least insufficient attention to safety considerations, resulting in what was seen as a greater rate of drug withdrawals (Tone, 1999; Public Citizen, 1999)(Hart, 1999). Numerous journal editorials and articles by scientists, consumer advocates, and agency leadership continued the dialogue (Kleinke and Gottlieb, 1998; Wood et al., 1998; Landow, 1999; Friedman et al., 1999; Lurie and Sasich, 1999). In response to mounting unease, FDA Commissioner Jane Henney convened "a Task Force to evaluate the system for managing the risks of FDA-approved medical products" (DHHS and FDA, May 1999). Although the task force found that rates of withdrawals were low (the limitations of treating withdrawals as a safety metric are discussed below), the group identified process, resource, and statutory constraints on FDA's ability to identify adverse events and made a series of substantive recommendations to strengthen risk management. Some of the recommendations of the Task Force have been implemented, including the convening of public meetings to solicit input on drug safety and risk management from various constituencies.

Drug safety concerns have continued to emerge, as have the proposals to address them. Alosetron was withdrawn and then returned to market with restrictions and a label warning. Troglitazone, Cisapride, cerivastatin , rofecoxib  and valdecoxib have been withdrawn. Celecoxib and other non-selective non-steroidal anti-inflammatory drugs (NSAIDs) had boxed warnings added to their labels. Warnings have been added to all antidepressant labels. FDA's performance in approving drugs or monitoring their safety after approval has been questioned and criticized. Several major factors converged to create at the least the appearance of a crisis in drug safety, among them, CDER's limited resources, organizational and management challenges, seemingly long reaction times, poor external communication, questions about external influences on CDER's decision making, an ever more diverse information environment (news media, the Internet and the blogosphere, and advertising) coupled with increasing consumer awareness and engagement and growing Congressional concern.

The Committee on the Assessment of the US Drug Safety System believes that as more drugs are being approved faster with less time to intensively investigate premarketing safety data, FDA

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

does not have adequate resources or procedures for translating preapproval safety signals into effective postmarketing studies, for monitoring and ascertaining the safety of new marketed drugs, for responding promptly to the safety problems that are discovered after marketing approval, and for quickly and effectively communicating appropriate risk information to the public. The committee is aware of promising components of the current drug safety efforts at CDER and of agency improvement initiatives (see Appendix A), but it believes that neither the agency's newly enhanced postmarketing safety initiatives nor the necessary contributions of other actors in the US drug safety system are equal to the task. Major obstacles remain. They include inadequate resources, the complexity of the science and technology involved in drug development and regulation (e.g., assessing risk and benefit), a dysfunctional organizational culture, problems with credibility and public trust, and the lack of adequate communication about and limited public awareness of drug risks and benefits.

The credibility of FDA, the industry, the academic research enterprise, and health care providers has become seriously diminished in recent years. FDA's reputation has been hurt by a perceived lack of transparency and accountability to the public, a legacy of organizational changes that have not been completed or sustained, and an apparent slowness in addressing lack of sponsor compliance (Government Reform Committee , 2006). The industry's once sterling reputation has been blemished by reported compliance problems, delays in responding to safety concerns and complying with postmarketing commitments, highly publicized concerns about the effects of direct-to-consumer advertising, and the preponderance of "me-too" products, rather than truly pioneering therapies (Wall Street Journal and Harris Interactive, 2005; PricewaterhouseCoopers' Health Research Institute, 2005). The integrity of the academic research enterprise has also been questioned, as universities and scientists are increasingly dependent on industry funding for their work. The behavior of prescribers, the gatekeepers for patient access to prescription drugs, are also under public and Congressional scrutiny, as health care providers receive intense and targeted promotional ("detailing") efforts of pharmaceutical companies.

Of particular concern are the common but inaccurate perceptions that FDA approval represents a guarantee of safety, that approval is based on a high degree of clarity and certainty about a drug's risks and benefits, and that such safety actions as boxed warnings on drug labels and withdrawals reflect sponsor or agency failures.

Addressing weaknesses and missed opportunities in the drug safety system requires some fundamental changes in the organizational culture of CDER to support effective action on drug safety (Chapter 3), in the scientific approaches to drug safety (Chapter 4), in the regulations pertinent to drug safety (Chapter 5), in communication about drug safety (Chapter 6), and in the agency's funding structure (which currently leaves critical regulatory and public health functions inadequately resourced) (Chapter 7).

Some of the recommendations offered in this report echo proposals made over the last 2 decades by various groups convened by the agency or by the Department of Health and Human Services (DHHS) (Department of Health Review Panel on New Drug Regulation, 1977; DHHS and FDA, May 1999) (Joint Commission on Prescription Drug Use, 1980). It is puzzling and troubling that despite this series of reviews and recommendations, some have not been fully implemented and some issues have resurfaced repeatedly. A primary obstacle, the committee suspects, may be the chronic underfunding of core FDA activities owing to inadequate attention to resource needs by Congress and by the Office of Management and Budget. The committee asserts that the piecemeal organizational modifications and short-lived programmatic initiatives of the past and the current, seemingly fragmented and reactive initiatives to improve CDER are not suf-

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

ficient to meet the need to improve postmarket drug safety activities and protect the public health better. The present report endeavors to provide an integrative approach to transforming drug safety in FDA and in the agency's interactions with other stakeholders in five major areas: organizational culture and leadership, science, regulatory authority, communication, and the funding without which improvements in these areas would not be possible. No one in FDA, industry, or academic research enterprise would disagree with the importance of implementing a lifecycle approach to the assessment of drug risks and benefits. Nevertheless, a great deal of separation persists between premarket and postmarket activities and functions. The separation, both structural and cultural, is reinforced by user-fee funding that is predominantly devoted to premarket activities and funding from appropriations that has not kept up with need in vital areas of the agency's work, by regulatory authority that is stronger and clearer preapproval, and by data requirements that are more structured and intensive for approval than for the postmarketing period (see Chapter 3) (Department of Health Review Panel on New Drug Regulation, 1977; FDA, 2005).

The year 2006 is a good time for thoughtful attention to transforming the drug safety system to address existing areas of vulnerability, and to prepare for the challenges and opportunities of the future.  In this year of FDA's centennial,[1] public attention to drug safety matters has reached a high point, negotiations in advance of the September 2007 sunset of PDUFA have begun, Medicare part D has enrolled tens of millions of senior citizens in a system that is expected to yield a wealth of population data about experience with drugs, new research promises further progress against illness (including more targeted therapies), and congressional interest in drug safety is intense. Those are but some of the factors that make this a moment of opportunity to renew and transform CDER, to enable it to function more effectively and to position itself for a far more complex future.

### Changes in the Broad Context of Drug Regulation

Prescription drug development, regulation, and use have changed greatly since the 1962 drug amendments and continue to evolve. The scientific and demographic changes of the future will present challenges and opportunities for drug development and regulation. The promise of personalized medicine shimmers on the horizon, but considerable work remains to identify candidate measures,  validate them, and show that their use in a clinical setting improves health outcomes, reduces costs, or both. The population of the United States is aging requires more therapeutics for prevention and treatment for the chronic diseases associated with older people. Increasing ethnic and cultural diversity will require better understanding of disparities in health status and the development of appropriate means of communicating useful therapeutic and health care information to heterogeneous populations.

The science and technology that underpin drug discovery are in a process of dramatic transformation. Advances in the basic sciences have increased the number of targeted drugs, and technological advances promise to transform and expand the array of drugs available for the prevention and treatment of human disease (Gwynne and Heebner, 2001) (Cockburn, 2004). Technologic and scientific developments also promise to enhance the prediction of safety problems

---

[1] The year 2006 is technically the centennial of the 1906 Food and Drugs Act, but the FDA asserts that "the modern era of the FDA dates to 1906 with the passage of the Federal Food and Drugs Act" (CDER, 1998).

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

and opportunities earlier in the development process, but much more work is needed to actualize these promises (FDA, 2004).

The practice of drug discovery and drug development research has also changed substantially in response to scientific and technological advances. Drug discovery research is funded by both industry and government, and takes place in academe, government especially National Institutes of Health, NIH, and industry. Almost all drug development occurs in industry, but an increasing proportion of industry-funded studies is being conducted outside academic health centers by contract research organizations, and more clinical trials are being conducted abroad (Cockburn, 2004). Biomedical research accounts for 5.6% of health expenditures in the US, with 57% of the research is funded by industry, and 28% by NIH (Moses et al., 2005). Despite advances, the development of new pharmaceutical problems is facing challenges—in its "Critical Path" report (FDA, 2004), FDA asserted that the translation from the basic sciences of drug discovery to the applied sciences of drug development has become sluggish because "the development path is becoming increasingly challenging, inefficient, and costly".

The practice of medicine and the provider-patient interaction—the point where the pharmaceutical product traditionally "meets" the patient—also have undergone great transformation in the last 2 or 3 decades. First, use of prescription drugs has been increasing steadily (Ganslaw LS, July/August 2005). Physicians and other health care providers have more therapeutic options at their disposal, and both polypharmacy[2] and the chronic use of drugs have become extremely common, especially in the rapidly growing segment of the population in late middle age and older. Use of drugs to treat chronic disease risk factors such as high blood pressure and high cholesterol has expanded immensely. Second, the role of the patient has changed as part of the larger shift toward consumer empowerment in the private sector. The health care system (like other industries) places increased emphasis on consumer choice. Quality of care also has become a major issue for consumers. Pharmaceutical and health plan offerings are promoted to consumers now empowered to be decision-makers. Patients have unprecedented access to information about drugs, their benefits, and side effects. This is due in part to changes in the information environment. Promotion of drugs to patients has increased, including broadcast direct-to-consumer advertising. Access to the Internet has become widespread;  this powerful tool provides access to information that varies greatly in accuracy, quality, and completeness (Tatsioni et al., 2003). The relationship between patients and their physicians has changed as patients have become more engaged and knowledgeable. Third, a category of "lifestyle" drugs has arrived in the marketplace. Two decades ago, patients used drugs chronically for treatment for and control of serious diseases. Today, many fundamentally healthy people take drugs long-term for purposes ranging from cosmetic improvement (such as botox) to symptomatic management (such as antihistamines) to performance enhancement (such as erectile dysfunction). For people who need to take drugs for control or treatment of serious diseases, the potential of adverse drug effects may be of less concern than it is for people who take drugs for very minor issues.

---

**BOX 1-1: Some key milestones in FDA history**

The Food and Drugs Act of 1906 gave FDA's predecessor, the Bureau of Chemistry in the Department of Agriculture, its first regulatory powers. At inception, the agency's pharmaceutical regulatory work focused largely on misbranding and adulteration of drugs. In 1937, elixir sulfanilamide caused more than 100 deaths and led to the passing of the 1938 Federal Food, Drug,

---

[2] The administration of multiple drugs concurrently, with the concomitant increased risk of drug interactions.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

and Cosmetic (FD&C) Act. The act prohibited false therapeutic claims for drugs and for the first time required premarket notification of FDA by the sponsor for all new drugs. This meant that a company submitted its NDA and, if FDA did not explicitly prohibit marketing, the company was free to market the product without any type of approval after 60 days (unless FDA extended that period to 180 days), when the NDA became "effective".  Although the FD&C Act required a manufacturer to prove a drug's safety by conducting preclinical toxicity testing and gathering and submitting drug safety data, it did not require proof of efficacy (Swann JP, 1998; Stergachis and Hazlet, 2002). Some 2 decades later, thousands of children with birth defects were born to European mothers who had taken the popular sedative thalidomide for morning sickness. Marketing of thalidomide in the US had been held up in the approval process and this so-called near-miss led to the Drug Amendments of 1962. The drug amendments required companies to provide proof of efficacy of a drug for it to be considered for marketing approval, and the randomized controlled trial became established as the gold standard for demonstrating efficacy (Stergachis and Hazlet, 2002).

In the 1980s, the public health crisis of HIV/AIDS motivated a powerful advocacy movement whose aims included faster approval of drugs for patients with incurable disorders. Other consumer and patient advocacy groups began to call for changing the drug approval process to speed up the availability of potentially life-saving or life-sustaining drugs to patients in need of them. Consumer groups, regulators, the regulated industry, and others contributed to, and Congress passed the PDUFA legislation that aimed to ensure that FDA had adequate resources to expand its drug review staff and capabilities, and so to increase the pace of drug reviews. Agreements among FDA, industry, and Congress are crystallized in a series of performance goals for FDA. These are not part of the PDUFA statute, so they lack the  force of law (Tauzin B, March 6, 2002) but they reflect activities the agency considers its obligations—"The letter outlines goals that the agency must meet, which help frame the basis to judge the user fee programs success" (Tauzin B, March 6, 2002). These goals are contained in the "PDUFA Reauthorization Performance Goals and Procedures", or the PDUFA "goals letter" (a letter with enclosures), which is transmitted by the Secretary of HHS to Congress annually.

PDUFA required that FDA and specifically CDER review staff meet certain performance goals and report annually to Congress on their progress in meeting those goals. PDUFA also required that companies pay 3 types of fees to FDA, including a one-time fee submitted with each new drug application (NDA), an establishment fee, and a product fee (Food and Drug Administration, 2005; FDA, 2005).[3] Congress reauthorized PDUFA in 1997 (as part of the FDA Modernization Act) and in 2002 as part of the Bioterrorism and Preparedness and Response Act. In PDUFA I and II, funds were limited to use to the review of sponsor applications for new drugs and indications. No PDUFA funds were allocated to postmarketing drug safety activities until 2002, when limited funds were allocated for limited safety activities.  The 1992 PDUFA Amendments to the FD&C Act stipulated that PDUFA user fees must not be used in lieu of but to supplement appropriations. FDA was authorized to assess user fees only if appropriations for drug review were equal to or greater than appropriations for salaries and other FDA expenses in 1992 (Zelenay JL, 2005). PDUFA II set the trigger at 1997 levels: "Fees under subsection (a) of this section shall be refunded for a fiscal year beginning after fiscal year 1997 unless appropriations for salaries and expenses of the Food and Drug Administration for such fiscal year (excluding the amount of fees appropriated for such fiscal year) are equal to or greater than the amount of appropriations for the salaries and expenses of the Food and Drug Administration for the fiscal year 1997 (excluding the amount of fees appropriated for such fiscal year) multiplied by the adjustment factor applicable to the fiscal year involved" (21 US Code 379h(f)). The adjustment factor is based on the Consumer Price Index (Zelenay JL, 2005), and that may help

---

[3] For FY 2006, the application fee is $767,400, the establishment is $264,000, and the product fee is $42,130 (FDA, 2005).

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

explain why, although the agency has always met the trigger that allowed the collection of user funds, appropriations have grown at a much lower rate than user fees (FDA, 2005). Appropriations have not only not kept pace, but they have declined since 2003, as FDA's payroll costs have increased (FDA, 2005).

## Defining and Meeting the Charge

### *The Charge*

Given the changes outlined above and in response to growing public concern with health risks posed by prescription drugs, FDA requested that the Institute of Medicine IOM) convene an ad hoc committee of experts to conduct an independent assessment of the current system for evaluating and ensuring drug safety and to make recommendations to improve risk assessment, surveillance, and the safe use of drugs (see Box 1-2). In recognition of their roles in the drug safety system, the Centers for Medicare and Medicaid Services (CMS), the Agency for Healthcare Research and Quality (AHRQ), NIH, and the Department of Veterans Affairs are also sponsors of the report.

In responding to the charge, the committee focused much of its attention on FDA's CDER. Although the report is addressed to the FDA as a whole, a considerable proportion of the committee's discussion and recommendations pertain to CDER's structure, organization, and scientific and regulatory activities. Given the study timeframe, the committee found it difficult to accord the same level of attention (in terms of a detailed assessment and recommendations) to all other important stakeholders in the drug safety system. The roles of industry, the health care delivery system and health care providers, patients, the public, Congress, the academic research enterprise, and other government agencies are discussed in much less detail. However, the committee's recommendations have implications for those stakeholders, and are discussed in the report where appropriate.

---

**BOX 1-2**
**The Statement of Task**

In response to growing public concern with health risks posed by approved drugs, the FDA has requested that the IOM convene an ad hoc committee of experts to conduct an independent assessment of the current system for evaluating and ensuring drug safety post-marketing and make recommendations to improve risk assessment, surveillance, and the safe use of drugs. As part of its work, the IOM committee will:

- examine the FDA's current role and the role of other actors (e.g., health professionals, hospitals, patients, other public agencies) in ensuring drug safety as part of the U.S. health care delivery system;
- examine the current efforts for the ongoing safety evaluation of marketed drug products at the FDA and by the pharmaceutical industry, the medical community, and public health authorities;
- evaluate the analytical and methodological tools employed by FDA to identify and manage drug safety problems and make recommendations for enhancement;
- evaluate FDA's internal organizational structure and operations around drug safety (includ-

---

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

> ing continuing post-market assessment of risk vs. benefit);
> - consider FDA's legal authorities for identifying and responding to drug safety issues and current resources (financial and human) dedicated to post-marketing safety activities;
> - identify strengths, weaknesses and limitations of the current system; and
> - make recommendations in the areas of organization, legislation, regulation, and resources to improve risk assessment, surveillance and the safe use of drugs.

### What This Study Is Not

This report does not address the related area of medication errors. That has been the purview of the IOM Committee on Identifying and Preventing Medication Errors, whose report was released July 2006 (see Appendix E for report summary). The present report does not treat several very important issues that were not in the charge given to the committee, including: the regulation or safety of medical devices or biological products other than those regulated by CDER; pharmaceutical product abuse, overuse, or misuse; over-the-counter (OTC) drugs or the switch from prescription to OTC status; generic drugs; drug pricing; or the causes and consequences of the current challenges in pharmaceutical innovation. Finally, although the postapproval stage of a drug's life cannot be discussed in isolation from the preapproval stages, this report does not consider in any detail the complex ethical, practical, economic, and scientific issues related to the Investigational New Drug process or the clinical trial conduct in the testing of drugs.

### Study Process

The committee gathered information to address its charge through a variety of means. It held 3 information-gathering meetings and one workshop that were open to the public. The first meeting focused on obtaining background on the committee charge from a number of perspectives, including FDA's. This and all other meeting agendas can be found in Appendix D. The second meeting focused on hearing from the public on day 1, and learning about the role of FDA, AHRQ, and CMS in US drug safety activities on day 2. The committee also held a workshop on Advancing the Methods and Application of Risk-Benefit Assessment of Medicines and held a final information gathering meeting to hear opinions on proposals to improve drug safety in the US The committee met in executive sessions for deliberative discussions throughout the study process.

All the open meetings were Webcast in real time so that members of the public could listen to the proceedings and send questions to the committee by e-mail. The committee also received public submissions of material for its consideration at the meetings and by mail, e-mail, and fax throughout the course of the study. A Web site (http://www.iom.edu/drugsafety) and a listserv were created to provide information to the public about the committee's work and to facilitate communication with the committee. Many of the speakers' presentation slides from the 3 information gathering meetings and workshop are available in electronic format on the project's Web site.

A few committee members and staff visited FDA to gain a better understanding of the background and daily operations of CDER. The committee and staff also conducted discussions with over 30 discussions with present and past FDA staff, managers, and leadership. Those discus-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

sions were confidential, but a summary of the main themes and points of discussion is provided in the public access file for this project.

The committee also commissioned two papers to inform it about industry's views of drug safety in the United States (written by Hugh Tilson) and those of academe (written by Brian Strom); these papers were based in part on small meetings convened by the authors and can be found in the public access file.[4]


### Moving Target—the Shifting Landscape of Drug Safety in the United States

The committee has worked in the context of continuing change and proposals for change: modifications in the organizational structure of CDER and in the evaluation and monitoring of drug safety undertaken by FDA and to a lesser extent other stakeholders; multiple legislative proposals for changing the structure, resources, and authorities of CDER in FDA; and consumer and patient organization's calls for changes in CDER. Those efforts have, in some cases, informed the work of the committee during its deliberations. Some of these changes have closed gaps, others have raised new questions and concerns, and still others have helped to increase the knowledge base of the committee. The efforts are described in greater detail in Appendix A.


### Toward a New Vision of Drug Safety

The increasingly complex interface between innovation and regulation has been characterized by binary opposites: speed v. safety, tight pre-approval regulation v. loose post-approval regulation, active collection of data before approval v. passive surveillance after approval, and an abundance of clinical efficacy data before approval compared to much less safety data after approval. The polarity of approach and emphasis is inconsistent with the widely accepted notions that risk must be considered in the context of benefits, that understanding of the risks and benefits associated with a drug changes over a drug's lifecycle (FDA, 2004) and that the attention paid to safety and efficacy before approval must therefore be sustained as a drug enters and diffuses through the market and is used by a growing number and diversity of patients. Timely approval and attention to safety can become complementary rather than antithetical goals as postapproval surveillance becomes more effective, and regulatory authority and its exercise is commensurate with how a drug performs in real-life conditions over its lifecycle.

The approval decision does not represent a singular moment of clarity about the risks and benefits associated with a drug—preapproval clinical trials do not obviate continuing formal evaluations after approval. However, the approval decision is a critical juncture in a product's lifecycle because it releases a drug to the market, where the public will gain broad exposure to it. In a strengthened drug safety system, that juncture should mark the beginning of another important stage in the lifecycle, when regulators, sponsors, health insurers, health care providers, and

---

[4] A list of materials reviewed by the committee (in the form in which they were reviewed), including all submissions of information from the public and many items not cited in this report, can be found in the study's Public Access File, obtained from the National Academies Public Access Records Office at (202)334-3543 or http://www.national-academies.org/publicaccess.

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

independent researchers actively pursue and manage emerging knowledge about risk-benefit relationships and uncertainty and they communicate that knowledge to patients, health care providers, and health care organizations in a timely manner. Regulatory, health insurance coverage, and treatment decisions over a drug's lifecycle depend on the quality and timeliness of data collected, evaluated, and transmitted by trustworthy stakeholders in the health care system. In short, a drug safety system oriented around the new paradigm requires:

- A **culture** of safety in the Center for Drug Evaluation and Research supported by strong leadership, effective management, science-based decision making that is, in so far as possible, insulated from outside influences, and a healthy organization that encourages debate, teamwork, and independent scientific inquiry.
- **Science** that is rigorous and that through the individual and joint efforts of sponsors, academic researchers, and health care organizations describes a drug's risk-benefit profile, patterns of drug use, comparative effectiveness of drugs, behaviors of prescribers and users, and behaviors of institutions that affect prescribers and users.
- A **regulatory process** that is flexible, dynamic (e.g., proactive, responsive), and attentive to safety throughout the lifecycle of a drug and a regulatory agency that is sufficiently empowered to take actions necessary to protect the public health.
- **Communication** about safety that is timely and effective and that facilitates transparency and enhances credibility.

The committee's vision of a transformed drug safety system has at its core a lifecycle approach to drug risk and benefit—not a new concept, but one that has been implemented, at best, in a narrow and fragmented manner. For FDA, attention to risk and benefit over the life of a drug requires continuous availability of new data and ongoing, active reassessment of risk and benefit to drive regulatory action (in response to the accumulating information on a given drug), and regulatory authority that is strong both before and after approval. For the industry, attention to risk and benefit over the lifecycle will require more careful assessments of emerging information about possible new risks and timely communication of this information to FDA, and acceptance of changes intended to strengthen drug safety. FDA's credibility is intertwined with that of the industry, and a more credible drug safety system is in everyone's best interest. For the health care delivery system, a lifecycle approach to risk and benefit implies the need to heed and follow FDA communication about drug safety matters and to exercise appropriate caution in drug-related decision making (from formularies to prescribing) in recognition of the limited information available at the time of drug approval. The health care delivery system will benefit by consistently basing prescribing decisions on the science, and by exercising caution in regard to the industry's influence on the practice of medicine. Health care organizations and professional societies can contribute to prescribers' understanding of the evolving science behind the assessment of drug risk and benefit. The academic research enterprise can enhance its contributions of data to the assessment of risk and benefit at all points in a drug's lifecycle, continue its crucial advisory relationship with FDA, and uphold the value of complete transparency in recognition of real and perceived conflicts associated with financial involvement with the industry. Other government agencies can contribute to the lifecycle approach to drug risk and benefit by collaborating with FDA and the private sector to ensure that data streams from publicly funded health care settings contribute to an improved drug safety system. The public and patients can do their part by communicating with their health care providers about the pharmaceutical products they are

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

using, learning about and discussing with their providers a drug's risks and benefits in the context of their health needs and characteristics, informing their providers about side effects they experience, and calling for more useful and timelier information about drug benefits and risks associated with new drugs.

Copyright © National Academy of Sciences. All rights reserved.

1-12                                                                         *The Future of Drug Safety*

# REFERENCES

Applebaum Anne. 2005. The Drug Approval Pendulum. [Online] Available: http://www.washingtonpost.com/wp-dyn/articles/A48135-2005Apr12.html

CDER. Guideline for the Format and Content of the Clinical and Statistical Sections of an Application. 1998.

Cockburn IM. 2004. The changing structure of the pharmaceutical industry. Health Aff (Millwood) 23(1): 10-22.

Department of Health Review Panel on New Drug Regulation. 1977. Final Report . Dorsen N, Weiner N, Astin AV, Cohen MN, Cornelius CE, Hamilton RW, Rall DP,  Washington, DC.

DHHS, FDA. Managing the risks from medical product use:  Creating a Risk Management Framework. 1999.

FDA. March 2004. Innovation Stagnation:  Challenge and Opportunity on the Critical Path to New Medical Products. [Online] Available: http://www.fda.gov/oc/initiatives/criticalpath/whitepaper.html; http://www.fda.gov/oc/initiatives/criticalpath/whitepaper.pdf [accessed 10/10/2005].

FDA. White Paper, Prescription Drug User Fee Act (PDUFA):  Adding Resources and Improving Performance in FDA Review of New Drug Applications. 2005.

Food and Drug Administration. 2005. Establishment of Prescription Drug User Fee Rates for Fiscal Year 2006. Federal Register  70(146)

Friedman MA, Woodcock J, Lumpkin MM, Shuren JE, Hass AE, Thompson LJ. 1999. The safety of newly approved medicines: do recent market removals mean there is a problem? JAMA 281(18): 1728-34.

Ganslaw LS. Drug Safety:  New Legal/Regulatory Approaches. 2005:7-10.

Geraghty LN. 2006, Jan. 12. Doctors Fear Acne Drug Rules Go Too Far. The New York Times.

Government Reform Committee . 2006. Prescription for Harm: The Decline in FDA Enforcement Activity.

Hart C. 1999. Drug approvals: Safe at any speed? Modern Drug Discovery 2(5): pgs. 25-26, 28.

Joint Commission on Prescription Drug Use. Report of joint commission on prescription drug use.  Rockville, MD: 1980.

Kleinke JD, and Gottlieb S. 1998. Is the FDA approving drugs too fast?. Probably not--but drug recalls have sparked debate.[see comment]. BMJ 317(7163): 899.

Landow L. 1999. FDA approves drugs even when experts on its advisory panels raise safety questions. BMJ 318(7188): 944.

Lurie P, Sasich LD. 1999. Safety of FDA-approved drugs. JAMA 282(24): 2297-8.

PricewaterhouseCoopers' Health Research Institute. Recapturing the vision:  Integrity driven performance in the pharmaceutical industry. 2005.

Stergachis A, Hazlet T. 2002. Pharmacoepidemiology. In: Pharmacotherapy: A Pathophysiologic Approach,

Swann JP. 1998. History of the FDA. [Online] Available: http://www.fda.gov/oc/history/historyoffda/fulltext.html [accessed 0/14/2006].

Tatsioni A, Gerasi E, Charitidou E, Simou N, Mavreas V, Ioannidis JP. 2003. Important drug safety information on the internet: assessing its accuracy and reliability. Drug Saf 26(7): 519-27.

Tauzin B. Mar. 6, 2002. Reauthorization of the Prescription Drug User Fee Act. Statement at the Mar. 6, 2002 hearing of the Subcommittee on Subcommittee on Health, Committee on Committee on Energy amd Commerce . Available Online: http://energycommerce.house.gov/107/action/107-93.pdf.

Wall Street Journal, Harris Interactive. 1/18/2005. The Public Has Doubts About the Pharmaceutical Industry's Willingness to Publish Safety Information about Their Drugs in a Timely Manner. [Online] Available: http://www.harrisinteractive.com/news/printerfriend/index.asp?NewsID=882 [accessed 3/10/2006].

Wood AJ, Stein CM, Woosley R. 1998. Making medicines safer--the need for an independent drug safety board. N Engl J Med 339(25): 1851-4.

Zelenay JL. The Prescription Drug User Fee Act:  Is a Faster Food and Drug Administration Always a Better Food and Drug Administration. 2005.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

# 2

# Natural History of a Drug

This chapter describes some key steps in reviewing potential new therapies and monitoring drugs once they are in the marketplace, with an emphasis on how safety considerations are handled throughout the process. The elements of the drug regulatory system have been well described elsewhere (FDA, 2006c; Lipsky and Sharp, 2001; Meadows, 2002; Randall, 2001). The committee also reviewed some of the factors that shape how the understanding of a drug's safety and efficacy profile evolves during the lifecycle and what regulatory action is taken. Those factors include scientific uncertainty; resources at the Food and Drug Administration (FDA); statutory requirements, including both limitations in authority and deadlines that shape the timing and scope of regulatory activities; and workload and staffing.

This discussion is intended to provide a reference point for subsequent chapters that provide the committee's findings about the strengths and weaknesses of the drug safety system and recommendations for strengthening it. A number of the points addressed in this chapter are related directly to the committee's recommendations. The material in this chapter is drawn largely from Center for Drug Evaluation and Research (CDER) documents—both guidance documents for sponsors and internal manual of policies and procedures (MAPPs) that describe a wide variety of official policies—and from conversations with current and former FDA staff.

CDER reviews various types of drug applications and supplements. This chapter focuses on New Drug Applications (NDAs), although some of the processes also apply to supplemental NDAs, which are most often submitted for new indications of approved drugs. The chapter traces the work of the NDA review process in CDER's Office of New Drugs (OND) and its offices of drug evaluation (see organization chart at end of chapter) which conduct premarket reviews, and in CDER's Office of Drug Safety (ODS) (which is now called the Office of Surveillance and Epidemiology, OSE, because of a restructuring of CDER in May 2005[1]) and its Division of Drug Risk Evaluation (DDRE), which monitors postmarket risks and undertakes risk assessments. (Other divisions and offices of ODS/OSE address safety issues, such as medication errors and drug names.[2]) The chapter does not address Abbreviated NDAs for generic drugs that go through CDER's Office of Generic Drugs. Nor are drugs that are on special tracks, such as accelerated approval or orphan-drug status, specifically addressed in this general description of how a new drug moves through the system.

---

[1] For the remainder of this chapter, we will refer to this office as ODS/OSE.

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

## Economic impact of drugs

Prescription drugs play a major role in American health and economy. For example, prescription drugs for controlling blood pressure and blood cholesterol levels were partly responsible for one of the ten great public health achievements of the 20th century: the 51% decline in death rates for coronary heart disease since 1972 (CDC, 1999). Prescription drugs are among the innovations that have replaced some highly invasive measures (e.g., surgery) with less invasive preventive and health maintenance therapies (DHHS, 2002). Prescription drugs also can help reduce health care costs by decreasing hospitalization. National survey data show that 44% of Americans take at least one prescription drug in any given month (2004). In economic terms, the investment and return-on-investment of drug discovery and development are vast. Although methodologies used for estimating the cost of bringing a drug to market are a matter of some controversy, some estimates are provided here as an illustration (Epstein, 2004). The cost of drug development has been estimated at approximately $800 million and at between $500 and $2,000 million (Adams CP and Brantner VV, 2006; DiMasi JA et al., 2003). The Bain report provided estimated the cost of development at $1.7 billion (Gilber et al., 2003). In 2005, the biopharmaceutical industry spent approximately $51.3 billion in drug discovery and development (2006). A great deal is spent on prescription drugs. Due to cost-containment strategies, the rate of increase of spending on prescription drugs has slowed down, but still totaled $179.2 billion in 2003, and comprised 11% of national health spending (Smith et al., 2005; The Henry J Kaiser Family Foundation, 2005).

## THE INVESTIGATIONAL NEW DRUG

As discussed in Chapter 1 and throughout the report, FDA has initiated or is initiating many changes related to drug safety in its internal procedures and organization. Some of the changes may supersede the descriptions in this chapter. Also on the horizon is FDA's Critical Path Initiative, announced in 2004, which is intended to stimulate the development and use of new scientific tools to better assess the safety and effectiveness of drugs under study (FDA, 2004a; 2006).

### Investigational New Drug Submission and Review

The vast majority of chemical molecules and candidate drugs screened for therapeutic potential and toxicity never show sufficient promise to enter human trials (PhRMA, 2006). But when preclinical data indicate that a compound is reasonably safe for initial testing in humans, shows promising pharmacologic activity, and has commercial prospects, the sponsor submits an Investigational New Drug Application (IND) to FDA, and the agency's oversight begins (FDA, 2006c).

---

[2] Division of Surveillance, Research and Communication Support & Division of Medication Errors & Technical Support

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**          2-2

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

IND sponsors can be companies, research institutions, or individual investigators. Often the sponsor has been in frequent contact with FDA throughout the development process prior to submission of the IND, and has participated in FDA's pre-IND consultation program (FDA, 2006c). FDA produces numerous guidance documents to steer sponsors through the regulatory process. Those documents are prepared and updated continually. Some are very specific, for example, describing appropriate methods for a specific type of study; others provide more general guidance about preparing submissions to the agency (FDA and CDER, 2006). Some reflect international harmonization efforts among European, Japanese, and US regulators.

The average IND submission totals about 28 volumes of about 500 pages each—about 14,000 pages (Henderson D, 2006). It contains manufacturing and chemical information about the drug and the results of animal tests, toxicology studies, and other preclinical work. The IND also contains protocols for small phase 1 human studies intended to document the drug's metabolism and excretion, determine a safe dose, and identify acute side effects (FDA and CDER, 2006). Local institutional review boards (IRBs) must review the protocols to ensure protection of human subjects. If a sponsor has already begun human trials outside the United States, it also includes their results.

By law, FDA has 30 days from the date an IND is received to place a hold on the proposed human trials (FD&C Act, SEC. 505(i)(2)) if it deems it to be necessary. CDER can take up to about 2 weeks of that period to process the IND, assign it to a review division within OND on the basis of the drug's likely indication, and assemble a review team. The team includes a project manager and several scientific reviewers from OND and other CDER offices as required (CDER et al., 1998). The reviewers then have the remainder of the 30-day period to determine whether safety concerns justify placing a hold on the human trials. In the absence of FDA action to delay or prevent a trial, the sponsor can begin testing the compound in humans on day 31 (FDA and CDER, 2006).

FDA typically allows human trials to proceed if no serious safety concerns have surfaced (FDA and CDER, 2001a). As occurs throughout the review process, safety assessments and regulatory actions are influenced by evidence of the potential benefit of the product. For example, reviewers are likely to tolerate a higher threshold of toxicity for a drug that will be used to treat life-threatening cancer than for a new antihistamine similar to those on the market.

### Early clinical trials and related studies

The sponsor typically begins phase 1 trials by testing several increasing dosages in healthy volunteers (see Box 2.1 for definitions of all phases of clinical trials). About 20 to 80 subjects are usually involved in one or more of these trials (FDA, 2006c). Animal and other toxicology studies and phase 1 studies may be concurrent. If the initial phase 1 results do not show unacceptable toxicity, the sponsor moves to larger, phase 2, trials which involve from a few dozen to hundreds of patients who have the condition for which the drug is being studied (CDER et al., 1998; FDA, 2006c). Efficacy and safety are evaluated by continuing to test various dosages of the compound in patients (FDA, 2006c).

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**                    2-3

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

---

**Box 2-1:  Phases of clinical trials and medicine development**

**Phase 1**
Clinical Pharmacology Studies in healthy volunteers (sometimes subjects) to determine the safety and tolerability of the drug/product, other dynamic effects and the pharmacokinetic profile (absorption. distribution, metabolism and excretion – ADME). Evidence of efficacy may be gained if subjects, disease models or biomarkers are used.

**Phase 2**
Clinical Investigation studies in subjects with the target disease, to determine efficacy, safety and tolerability in carefully controlled dose-ranging studies.

**Phase 2a**
Pilot clinical trials to evaluate efficacy (and safety) in selected populations of subjects with the disease or condition to be treated, diagnosed, or prevented. Objectives may focus on dose-response, type of subject, frequency of dosing, or numerous other characteristics of safety and efficacy.

**Phase 2b**
Well-controlled trials to evaluate efficacy (and safety) in subjects with the disease or condition to be treated, diagnosed, or prevented. These clinical trials usually represent the most rigorous demonstration of a medicine's efficacy.

**Phase 3**
Formal clinical trials. Large-scale placebo controlled and active comparator studies in subjects to confirm efficacy and provide further information on the safety and tolerability of the drug or product.

**Phase 3a**
Trials conducted after efficacy of the medicine is demonstrated, but prior to regulatory submission of a New Drug/product Application (NDA) or other dossier. These clinical trials are conducted in subjects' populations for which the medicine is eventually intended. Phase IIIa clinical trials generate additional data on both safety and efficacy in relatively large numbers of subjects in both controlled and uncontrolled trials. Clinical trials are also conducted in special groups of subjects (e.g. renal failure subjects), or under special conditions dictated by the nature of the medicine and disease. These trials often provide much of the information needed for the package insert and labeling of the medicine.

**Phase 3b**
Clinical trials conducted after regulatory submission of an NDA or other dossier, but prior to the medicine's approval and launch. These trials may supplement earlier trials, complete earlier trials, or may be directed towards new types of trials (e.g., quality of life, marketing) or phase IV evaluations. This is the period between submission and approval of a regulatory dossier for marketing authorization.

**Phase 4**
Post-marketing surveillance to expand safety and efficacy data in a large population, including further formal therapeutic trials and comparisons with other active comparators.

Source: Adapted from MRA (2006)

---

Clinical trials are conducted under the sponsor's auspices by commercial, academic, or other entities in the United States or, increasingly, overseas.  In trials, an active product is compared with a placebo or occasionally with an existing drug for the condition (FDA, 2006c). Sponsors increasingly include genetic studies in the premarket period as part of a personalized-medicine approach to identifying target populations for a drug (Genetics and Public Policy Center, 2006). The developing science of pharmacogenomics is generating strong interest and attention in and outside FDA as a way to improve drug safety through predictive techniques, but any widespread use of these techniques in clinical practice is well into the future (PMC, 2006).

Sponsors develop study protocols and undertake, fund, and oversee studies. The OND review team and sponsor consult as the trials and studies are under way, new protocols are developed, and new data emerge. The review team can play a critical role in how the studies proceed. The extent of consultation varies among drugs and sponsors. The sponsor is required to notify FDA and all investigators in written safety reports of "any adverse experience associated with the use of the drug that is both serious and unexpected"

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**          2-4

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

or "any finding from tests in laboratory animals that suggests a significant risk for human subjects including reports of mutagenicity, teratogenicity, or carcinogenicity" (21 CFR 312.33). The sponsor also submits annual progress reports on the IND to FDA.

The regulators may direct the sponsor to undertake specific studies or laboratory evaluations in studies to look for possible markers of safety problems (such as liver toxicity or cardiovascular changes) on the basis of previous experience or questions about the class of drugs or the mechanism of action.

### End of Phase 2 meeting and Phase 3 trials

If the results of the early trials are promising, the sponsor and the review team typically meet for an "end of phase 2 meeting" to discuss the upcoming phase 3 trials. The phase 3 trials can involve fewer than 100 patients in some cases or many thousands in others, depending on the target population and the endpoints being evaluated (on the average, they involve about 600–3,000 patients). The drug is tested against a placebo or sometimes against another drug (FDA, 2006c). The trials are designed and powered to evaluate selected efficacy outcomes, not safety end points, although they can generate safety signals to pursue. The "end of phase 2 meeting" can be an important early point in the lifecycle of the drug to identify and track potential safety issues and to ensure that the sponsor's protocols address key questions.

### Roles of the Office of New Drugs and the Office of Drug Safety/Office of Surveillance and Epidemiology premarket period

OND is responsible for premarket reviews, makes approval decisions, and retains authority for regulatory decisions after a drug is marketed. OND clinical reviewers typically are physicians, some with epidemiology training, who are skilled in review of clinical trials. DDRE staff are mostly  pharmacists and epidemiologists whose expertise tends to be in observational studies and whose primary focus has been on monitoring and evaluating postmarket data. Traditionally, the OND review team has drawn on ODS/OSE, and particularly DDRE, as safety consultants when they determined a need for a specific safety review.

DDRE staff routinely participate in a limited number of premarket activities; they have historically functioned in a consultation capacity to OND, called on to perform specific safety reviews.  In a recent report on postmarketing drug safety, the Government Accountability Office characterized ODS/OSE as a consultant to OND in the postmarket period and described a problematic working relationship between the two offices (GAO, 2006).  In its official response to that report, FDA asserted that the "consultant" term understates the importance of ODS/OSE and referred to the agency's efforts to "foster a partnership" between ODS/OSE and OND that makes them equals in the postmarket identification and timely resolution of drug-safety issues (GAO, 2006).  FDA's recent efforts to integrate the work of the two offices better may also extend to the premarket period. Chapter 3 discusses the challenges in the OND and ODS/OSE relationship and recent efforts to address them.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**    2-5

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

One of the 17 drug-evaluation divisions (see organization chart), the Division of Neurology Products (DNP),[3] has a safety team in the unit. The safety team's role is to quantify and set priorities among potential risks posed by the drug they are reviewing. They do not make recommendations on a drug's approvability (Racoosin JA , 2006). The committee was told that discussions have occurred in FDA about including a full-time safety officer in the other ODS/ODE divisions. Two possible explanations for why that has not occurred were offered:  shortage of safety officers and the fact that some divisions do not review enough applications to support a full-time safety officer.

### *Completion of clinical trials and their limitations*

Clinical trials typically take  2 –10 years to complete (PhRMA, 2006), depending on such factors as the rate of the event of primary interest, the length of patient followup, the staging of trials, and the difficulty of accruing patients.  When data from phase 2 trials seem extremely promising, particularly in the context of serious or life-threatening diseases or conditions, an NDA may be filed without proceeding to or completing phase 3 trials.[4]  For example, Azidothymidine (AZT) was approved for treatment of HIV infection on the basis of phase 2 trials (Grassley C et al., 2004).

Only about 20% of drugs that enter phase 1 trials go on to be approved and marketed (others lower estimates have been provided by others so the true percent is unknown) (DiMasi JA et al., 2003; PhRMA, 2006). A sponsor may decide to halt trials for various scientific or commercial reasons. A recent study found that the number of clinical trials being conducted in the United States leveled off in 2000 and then started to decline in 2002. The author attributes the decline to cancellation of late-stage trials (Kaitin KI, 2005).

Even when a sponsor completes its trials and submits the resulting data in support of an NDA, important safety information about the drug is not yet available. That point is essential for an understanding of the drug-regulatory system and the incomplete safety profiles of the drugs that enter the marketplace.

The gaps in critical information, such as safety data, are due to a number of factors, including the limited number of subjects studied and the ways in which the subjects and the research setting differ from the conditions of use when the drug is marketed (CDER et al., 1998). Preapproval trials typically are too small to detect even significant safety problems if they are rare. An adverse event (even a serious one) that occurs in less than one in 1,000 patients, cannot be reliably detected except in the largest premarket trials but can pose a serious public health problem when hundreds of thousands or millions of people use the drug (1990; Okie, 2005; Racoosin JA , 2006). For example, bromfenac, a nonsteroidal anti-inflammatory drug (NSAID) marketed for 11 months in 1997 – 1998, was found to have serious and sometimes fatal liver toxicity in about one in 20,000 people who used the drug (Friedman et al., 1999); the NDA clinical trial base would have had to include 100,000 patients to detect such an effect before marketing (Friedman et al., 1999).

---

[3] DNP and the Division of Psychiatry Products were combined in the past and were separated in the 2005 reorganization of OND. They both continue to use the safety team, which now officially reports to DNP.
[4] FDA may grant accelerated approval on the basis of surrogate endpoints, but approval is conditional on sponsors' undertaking or completing validation trials.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**    2-6

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

Preapproval clinical trials also have little information on the effects of long-term exposure to the drug due to their often short duration. Furthermore, clinical trials usually do not represent the full array of patients who will use the product once it is approved. Trials often exclude patients with comorbidities or those taking other medications, although both may be common among future users of the marketed drugs. Elderly patients, ethnic and racial minorities, and the very sick are underrepresented, and pregnant women are generally excluded from trials. Drugs generally have not been tested in children as part of the NDA application, although patent-extension incentives are aimed  specifically at encouraging pediatric testing in children (Meadows M, 2003).

Those limitations are inherent in the system and cannot be changed without adding considerably to the time and expense of drug approvals, which would delay patient access to potentially beneficial drugs. It is generally understood that it is not routinely realistic to require premarket trials on tens or hundreds of thousands of subjects. Thus, inherent the fundamental design of the drug approval system is the delayed availability of important safety data until a drug is used in larger and more diverse populations after marketing. That approach means that the initial postmarket period is a critical time for developing a fuller understanding of a drug's safety profile.

Premarket clinical trials are designed primarily with efficacy, not safety outcomes, in mind. Safety issues sometimes surface, but the challenge is the possibility of unusual, unexpected, undocumented risk. If sponsors and CDER reviewers are not vigilant about identifying and pursuing safety signals in the trials, the opportunity to evaluate safety in the premarket trial period may be lost.

In the premarket period there usually a shortage of information on how a new drug compares with other treatments for the same indication. Sponsors are not routinely required to submit such comparative trials to obtain approval.  Once a drug is on the market, it can be difficult to compel sponsors or others to undertake appropriate comparative trials.  Sponsors usually do not initiate such trials unless they believe that their product has a readily identified or demonstrable advantage. A postmarket comparative trial of newer hypertension agents— Angiotensin-converting Enzyme (ACE) inhibitors—against older diuretic drugs, for example, found the older drugs to be more effective in reducing blood pressure. In addition, comparative trials are expensive, and cost-benefit considerations are not part of FDA's statutory purview. (Chapter 4 addresses this topic in greater detail.)  Thus, premarket studies typically do not answer questions of great concern to health care providers, patients, and payers: Which drug in a class works work best for most patients? Which is the best first line of treatment? Which is most cost-effective?

By definition, premarket trials do not address the implications of expansive off-label use, that is, use for conditions in which the given compound was not studied (or not approved) in tests submitted to FDA (Beck and Azari, 1998).  A recent study found that 21% of the 725 million prescriptions written in 2001 were for off-label uses (Boodman SG, 2006).

### Pre-new drug application submission meeting

As trials are completed and analyzed, the sponsor meets with the review team to go over the impending NDA submission; it is in the sponsor's and FDA's interest to anticipate issues so that the NDA is complete when submitted. For example, a 2006 report in-

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

dicated that when sponsors met with CDER staff before submitting an NDA, there was a greater likelihood that the drug was approved on the first cycle (FDA News, 2006b).

According to FDA documents, the discussions include development of strategies to manage known risks (CDER, 2005b). ODS/OSE staff sometimes participate in the meetings; it may be the first time that ODS/OSE staff become involved in the IND. (When OND is reviewing a supplemental NDA for new labeling or manufacturing, ODS/OSE may be active in reviewing available postmarket data on the approved indication.)

## NEW DRUG APPLICATION

In the last couple of years, FDA has received 110–120 NDAs per year (FDA and CDER, 2005). Most NDAs are now submitted electronically. The average size is 235 MB with 250 files, the equivalent of almost 400 volumes of 500 pages each, or about 200,000 pages (Henderson D, 2006). Often, an NDA does not arrive all at once—FDA allows gradual submission for fast track[5] studies (rolling review). Sponsors are also required to provide additional data that become available during the review process.

Data management is a critical task with a project of this size. Scientific reviewers need sophisticated knowledge of and access to programs for managing and analyzing the data. In addition, because sponsors have some leeway in how they present their summary safety and efficacy data and where in this massive file they are found, reviewers must sometimes devote considerable time to finding the critical safety data needed for the review. ODS/OSE involvement is typically limited to meeting attendance and providing consults at this point in the process. The arrival of data come in rolling basis can further complicate the process. Sponsors can submit materials for to the NDA fewer then 2 dozen times, as was the case with cinacalcet hydrochloride[6] (Meyer R, 2004), or as many as 70 (or even more) times as occurred with sibutramine[7] (Bilstad J, 1997).

### *Prescription Drug User Fee Act timetables and performance goals triggered*

When FDA receives an NDA (or at least the full clinical portion if it is not complete) the Prescription Drug User Fee Act (PDUFA) clock begins ticking (FDA, 2005f). PDUFA was enacted in 1992 and reauthorized in 1997 (PDUFA II) and 2002 (PDUFA III). It is up for reauthorization in 2007. The law provides for the pharmaceutical industry to pay user fees to FDA to be used primarily to staff and resource new drug (and biologic) review divisions, in exchange for which FDA agrees to expedite drug reviews according to specific timetables. PDUFA has also established deadlines to expedite the premarket review process, to schedule meetings requested by industry, resolve disputes,

---

[5] "Fast track is a process designed to facilitate the development, and expedite the review of drugs to treat serious diseases and fill an unmet medical need. The purpose is to get important new drugs to the patient earlier. Fast Track addresses a broad range of serious diseases" (FDA, 2006).

[6] Sponsor submitted data to FDA 19 times from September 8, 2003, through March 5, 2004.

[7] Sponsor submitted data to FDA 85 times from August 7, 1995, through November 22, 1997.

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

to respond to questions about study protocols, and develop guidances (see box 2.1 and Appendix C for the goals, and see Chapter 3 for additional discussion of PDUFA).

The PDUFA II and III goals call on FDA to review and act on 90% of standard original NDAs within 10 months and 90% of priority NDAs in 6 months.  A priority NDA review is intended for drugs that "represent significant improvements compared with marketed products" (FDA and CDER, 2005).  PDUFA has resulted in a dramatic decline in new drug review time. For standard NDA reviews, the median FDA review time was 11.9 months in 2004, down from 20.8 months in 1993 (FDA, 2005d) (CDER, 2006). For priority NDA reviews, the median review time was 6.0 months in 2004 , down from 16.3 months in 1993 (Weiss Smith S, 2006).

---

**Box 2.1: Select PDUFA Goals**

**Clinical Development**

Under PDUFA, FDA's goal is to reply to a sponsor's complete response to a clinical hold within 30 days of the Agency's receipt of the submission of such sponsor response, and do this for at least 90% of such submissions. Rapid resolution of safety issues that led to clinical hold helps ensure patient safety while enabling access to the experimental treatment.

**FDA Oversight and Review of Clinical Trial Protocols During Development**

Under PDUFA, FDA will evaluate specific questions about the sponsor's special study protocol designs for carcinogenicity, stability and Phase 3 for clinical trials that will form the primary basis of an efficacy claim.

- FDA will review scientific and regulatory requirements for which the sponsor seeks agreement.
- FDA's goal is to provide a succinct written response, within 45 days of receipt of the protocol and specific questions, and do this for at least 90 % of such submissions.

**Sponsor-Requested Meetings With FDA During Clinical Development**

Under PDUFA FDA's goal is to review all filed original NDA/BLA submissions within the following time frames:

- Review and act on 90% of priority applications within 6 months.
- Review and act on 90% of standard applications within 10 months.

**For all NDA/BLA resubmissions:**

- Review and act on 90% of Class 1 resubmissions within 2 months.
- Review and act on 90% of Class 2 resubmissions within 6 months.

**FDA Filing and Review of Submitted Marketing Applications (NDA/BLA)**

Under PDUFA FDA's goal is to review all filed original NDA/BLA submissions within the following time frames:

- Review and act on 90% of priority applications within 6 months.
- Review and act on 90% of standard applications within 10 months.

**For all NDA/BLA resubmissions:**

- Review and act on 90% of Class 1 resubmissions within 2 months.
- Review and act on 90% of Class 2 resubmissions within 6 months.

**Under PDUFA FDA's goal is to review all filed original Efficacy Supplements within the following timeframes:**

- Review and act on 90% of priority efficacy supplements within 6 months.
- Review and act on 90% of standard efficacy supplements within 10 months.

---

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**          2-9

Copyright © National Academy of Sciences. All rights reserved.

### Initial filing review

CDER does an initial review of an NDA to determine whether it is acceptable for re-view. Within 60 days, CDER informs the sponsor if there are substantive deficiencies in the file that cause FDA to "refuse to file" the application (CDER et al., 1998). That oc-curs when the NDA has such critical deficiencies that it clearly is not approvable as sub-mitted. When submitted, the NDA is also designated as a standard (10-month timetable) or priority (6-month timetable) review by the division office or office director. A minor-ity of NDAs have been designated as priority reviews. In 2004, for example, 29 of the 119 NDAs submitted were priority reviews, and the remaining 90 were standard reviews. Most priority reviews involve new molecular entities (NMEs). An NME is defined as "a medication containing an active substance that has never before been approved for mar-keting in any form in the United States" (FDA and CDER, 2001b). Of the 119 NDAs submitted in 2004, 36 were for NMEs, and 21 of these were assigned priority status. (See Table 2.1 for past NME priority and standard approval numbers.)

| Table 2.1: Numbers of Priority and Standard NME and New BLA Approvals, 1995-2004 | | | |
|---|---|---|---|
| Year | Priority | Standard | Total |
| 1995 | 10 | 19 | 29 |
| 1996 | 18 | 35 | 53 |
| 1997 | 9 | 30 | 39 |
| 1998 | 16 | 14 | 30 |
| 1999 | 19 | 16 | 35 |
| 2000 | 9 | 18 | 27 |
| 2001 | 7 | 17 | 24 |
| 2002 | 7 | 10 | 17 |
| 2003 | 9 | 12 | 21 |
| 2004* | 21 | 15 | 36 |
| 2005* | 15 | 5 | 20 |
| *Includes BLAs for therapeutic biologics. | | | |
| Source: adapted from 2004 and 2005 CDER Report to the Nation, 2004, 2005. | | | |

### Assembly of review team and beginning of review

Within about 2 weeks of receiving an NDA, CDER names a review project manager and primary scientific reviewers.  Although reviewers who were involved with the IND are strong candidates for the review, the team does not necessarily include all those in-volved earlier.  Some members of the original team may be too busy with other work, may have moved on to other positions, or may have left FDA.

Reviewers' workloads typically include premarket reviews and supplemental NDA reviews and issues arising with marketed drugs that they previously reviewed. They may also be involved in writing Guidance Documents or be participating in other CDER or FDA initiatives; in the wake of highly publicized concerns about safety, CDER has launched a number of initiatives in the last year to evaluate, articulate, and improve pro-cedures. Obstacles in hiring new staff due to a change in DHHS human resources policies have placed added strain on the workforce.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

The review team includes OND staff with expertise in various medical and scientific specialties—including clinical medicine,[8] pharmacology, and toxicology—and CDER reviewers from outside OND with expertise in such fields as chemistry, manufacturing and controls, microbiology, and statistics. In some cases, outside experts (special government employees) may participate in reviews (CDER et al., 1998) (FDA, 2006c).

In consultation with the clinical team leader and perhaps other team members, the primary clinical reviewer will ultimately be responsible for preparing and signing the written review of the NDA. The primary review summarizes and analyzes the clinical data in the NDA and provides the reviewer's assessment and conclusions regarding the effectiveness and safety data. It also sets out the reviewer's assessment of the proposed directions for use and includes a recommendation for regulatory action. The other scientific reviewers will each write and sign "discipline reviews" that evaluate the NDA from the point of view of their expertise, and the primary review includes a summary of those reviews. The team leader will sign off on the primary review, sometimes adding a memo that summarizes broader issues or professional disagreements raised by the NDA (CDER, 2004).

If the NDA is for an NME—that is, an active substance that has not been approved before—the OND office director or deputy director must sign off on the approval. When it is not for an NME, the director or deputy director of the review division in OND can sign off on the approval decision.

The NDA contains data from animal and human studies; it is illegal to exclude any pertinent data. It also has information on product manufacturing and characteristics, packaging and labeling for both physician and consumer, IND data, and the results of any additional toxicologic studies that were not included in the IND (21 CFR 314.50) (CDER et al., 1998). Data on the use of the drug outside the United States may be included in the NDA. In the early 1980s, only about 2% or 3% of new drugs were first marketed in the United States, so useful safety data on use abroad could sometimes be included (Friedman et al., 1999). By 1998, that proportion grew to 50% and the proportion of drugs launched in the United States first has increased with each reauthorization of PDUFA: I, 25.23%; II, 47.19%; and III, 50% (Okie, 2005) (FDA, 2005d).

Unlike their European counterparts who generally rely on the sponsor's summaries, FDA reviewers compile and reanalyze the data submitted by the sponsor and use the analyses, as well as the one done by the sponsor, to inform their decision about the drug.

Throughout the review process, the sponsor may be submitting amendments in response to FDA requests or to complete work identified in the pre-NDA meeting. If major amendments arrive in the last 3 months of the review, the PDUFA clock may be extended (FDA, 2002). As issues arise, the sponsor or FDA may request formal meetings during the process to resolve disputes or discuss pending concerns. The number of such meetings varies, but it is not uncommon for several meetings to be held while the application is under review.

PDUFA establishes specific timelines for FDA to respond to an industry request for a meeting, schedule the meeting, and distribute minutes from it (FDA, 2005g). The

---

[8] There are inconsistencies in CDER documents in the use of medical review or clinical review. They appear to be interchangeable terms. It has been suggested that use of clinical review indicates that a primary reviewer need not necessarily be a physician, although most of them are. In this report, we will use the more inclusive term clinical review or clinical reviewer.

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

PDUFA goals were associated with about a 33% increase in sponsor-requested meetings from FY1999 to FY2004 (FDA, 2005d). That has required FDA staff to devote many hours to planning, conducting, and following up on the meetings. Although time-consuming and resource-intensive, the meetings can clarify issues and improve the review process by reducing the risk of misunderstandings late in the review process.

### *Advisory Committees*

During the review process, a decision may be made, usually by the division director, to convene an advisory committee meeting (See Box 2.2 for deadlines to convene an advisory committee meeting). Advisory committees are used as a source of independent advice from experts outside FDA (FDA, 2006b). Chapter 4 discusses advisory committees in more detail.

---

Box 2.2: Timeline for Planning a Advisory Committee Meeting

Planning of an advisory committee meeting takes roughly four months and involves the following:

- Advisory Committee members must fill out a "Conflict of Interest Disclosure Report for SGEs" (form 3410) for each topic to be discussed.
- FDA staff (advisory committee oversight and management) must determine whether existing advisory committee members have a conflict of interest (COI) regarding the current topic and what other expertise they need (if not already on the committee, or to replace a committee member with a COI in that topic).
- 5 weeks before the meeting: Proposed waivers need to be submitted for approval. Waivers are reviewed by:
  - Committee members;
  - the executive secretary
  - the committee management specialist
  - the program officer
  - the chief of scientific advisers and consultants staff
  - the ethics specialist
  - the director of advisory committee oversight
  - the senior associate commissioner.
- The dockets office needs a few days to a week to prepare the posting for the Federal Register.
- 15 days before the meeting: FDA must post notice of the advisory committee meeting, including the topic to be discussed and any waivers obtained for the meeting on its web site (Hinchey Amendment). FDA also posts this information in the Federal Register.
- No later than the day of the meeting: If the Secretary of Health and Human Services or FDA discovers a conflict of interest less than 15 days before the advisory committee meeting, the agency must make a disclosure as soon as possible but in any event no later than the date of the meeting (Hinchey Amendment).

---

CDER has 17 topic-specific advisory committees[9], each composed mainly of clinical experts in a specific field, such as gastrointestinal or oncologic drugs (FDA, 2006a). Advisory committees roughly match the medical specialties of the review divisions in OND. In addition, the Drug Safety and Risk Management Advisory Committee provides guidance on issues related to safety and research methods (CDER, 2005a).

Typically, advisory committees are convened when applications involve new or complex technologies or to address controversies (FDA, 2006b). Sometimes, they are used to address general concerns not related to the approval of a specific product, such as the ac-

---

[9] Number of Advisory Committees in other units of FDA: CBER = 5, CDRH = 21, CFSAN = 1, CVM = 1, NCTR = 2, Office of the Commissioner = 2.

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

ceptability of a particular study design or the use of a particular endpoint as a surrogate (FDA, 2006b). Committees convened to assess an NDA may be asked to comment on whether the data support product approval; on some unique aspect of safety, effectiveness, or clinical development of the product; on whether additional studies are needed;, or on whether changes should be made in a drug's label or other action should be taken in response to new risk information after a drug is approved.

After presentations by the sponsor and agency representatives and a public comment period, the committee members usually vote on the questions posed to them by FDA staff. The votes are not binding (FDA, 2006b), but FDA decisions usually are consistent with the majority vote. The meetings can lead FDA to request additional information from the sponsors.

### Safety Tracking

As described in Chapter 1, FDA has been under pressure to speed drug reviews and get promising therapies to patients sooner (Lurie P et al., 1999) for at least two decades. PDUFA established goals for speed that, as noted, have resulted in substantial decreases in review time. However, no comparable safety goals drive the review process. Case studies of specific drugs point out both the strengths and the weaknesses of FDA's investigation of safety signals in specific instances, but there seems to be no overall metric in place comparable with measures of speed to track how safety is being monitored and assessed.

Individual drug evaluation offices in OND seem to differ in how and the extent to which they track safety issues regarding drugs that they are reviewing. The committee has been told that for the last 2–3 years OND's senior leadership has listed and tracked safety issues by office at its weekly meetings (IOM Staff Notes, 2005-2006). Difficult or controversial safety issues are sometimes discussed at "regulatory briefings", which are attended by staff from various parts of CDER and allow wider input on important questions faced by individual divisions, promote consistency in approach and decision-making, and raise awareness of emerging issues throughout CDER.

In response to congressional and public concerns, CDER has expanded its safety-oversight infrastructure over the last 2 years. In 2006, a new position of associate center director for safety policy and communications was created in CDER with responsibility for overseeing safety issues (FDA, 2006). In early 2005, the Drug Safety Oversight Board was created to increase both oversight and transparency in matters of safety (CDER, 2005c). It is too early to know whether those highly publicized initiatives will strengthen oversight of and communication about safety.

### Dispute resolution

Differences of opinion among reviewers may surface at various points during the review process or in the postmarket period. Sometimes, they reflect different professional perspectives on how to assess and weigh the types of data available and draw a conclusion. The evaluation of drugs is a team process, incorporating experts in a wide array of disciplines who must work together effectively. Furthermore, reviewers rarely have all

Copyright © National Academy of Sciences. All rights reserved.

the information they would like to have to make the required scientific determinations; in this environment of scientific uncertainty, legitimate differences of opinion on the appropriate course of action are inevitable. But a regulatory decision must be reached and must incorporate the most persuasive and compelling scientific assessments, while leaving all participants feeling that they have been heard.

Disparate views may be discussed at global assessment meetings when the whole review team tracks the review in progress or in other informal or official meetings. Where disagreement persists, upper-level supervisors have traditionally had responsibility for evaluating the options and making a decision to resolve the disagreement.

In a few high-profile cases, internal disagreements about CDER's handling of safety issues on particular drugs or in general have been aired in the mass media or in congressional hearings (Graham DJ, 2004) (Hensley S et al., 2005) (Neergaard L, 2005). Surveys of CDER staff reveal some concern about decision-making regarding postmarketing safety (DHHS and OIG, 2003). (See Chapter 3 for more information on this topic.)

In November 2004, CDER created a pilot program in the CDER ombudsman's office to provide a forum to discuss and resolve differences (MAPP 4151.2[10]). It provides for dispute resolution at the center director level. No CDER employees have used the program as of early 2006, however.

The inclination of senior management at CDER to intervene at earlier stages when disputes occur in CDER may be a function of management style and the existence of processes that make them aware of developing issues, as well as competing demands on their time. Senior managers are responsible to constituencies both in CDER and outside CDER, such as the Office of the Commissioner and Congress.

### Key Review Meetings

Reviewers, consultants, and supervisors interact throughout the review process, but the midcycle review at the end of the 5th month for standard or the 2nd month for priority drugs is a prescribed time to make a more formal assessment of findings and to raise questions about the application.

Later, the results of the various review activities are integrated during an internal "wrap-up" meeting that begins the "action phase" of the NDA. The meeting is intended to occur by the end of month 8 for standard or month 5 for priority drugs, by which time the team should have a comprehensive understanding of the safety, efficacy, and quality of the drug under review (CDER et al., 1998) (CDER et al., 2005). An FDA guidance documents states that a preliminary decision is made on the regulatory action at the meeting (CDER et al., 2005). Critical elements—such as risk management, major labeling issues, and postmarket commitments—are considered. If PDUFA deadlines are to be met, actions must be developed expeditiously and, as noted below, plans can sometimes be developed hurriedly.

---

[10] This MAPP provides a new pilot procedure for CDER staff to express their differing professional opinions concerning regulatory actions or policy decisions with substantial public health implications in instances when the normal procedures for resolving internal disputes are not sufficient. The DPO procedure provides short time frames for hearing a differing professional opinion so that it can be resolved expeditiously, review of the DPO by qualified staff not directly involved in the decisions, and evaluation of the pilot after 1 year to determine whether it adds value to the regulatory decision-making process.

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

The preapproval safety conference, held near the time of approval, is a key meeting in the safety review process. It is a time for the team to review the NDA safety base comprehensively and explore safety issues that could warrant careful monitoring after approval.  Discussions may lead the regulators to ask the sponsor to conduct additional safety studies either before or after approval. ODS/OSE staff are typically involved in this meeting.

### Risk Minimization Plans

Some approval plans for NDAs include risk minimization action plans (RiskMAPs), strategic plans developed by the sponsor to minimize known risks posed by a product while preserving its benefits (DHHS, 2005).  They go beyond the requirements for all sponsors to minimize risks through such efforts as accurate labeling and adverse event reporting. RiskMAPs apply primarily to products that "may pose a clinically important and unusual type or level of risk" (DHHS, 2005).  PDUFA (III) requires ODS/OSE to be involved in reviewing RiskMAPs.

As part of PDUFA (III), OND and ODS/OSE (and FDA's Center for Biologics) developed guidance documents for industry on how to develop RiskMAPS to assess, manage, and monitor known risks posed by a product (both before and after approval). In its guidance (FDA, 2005b), FDA notes that risk management (defined as risk assessment and minimization) is an iterative process and sets out four steps: (1) assessing a product's benefit/risk balance, (2) developing and implementing tools to minimize the risks associated with it while preserving its benefits, (3) evaluating  the effectiveness of the tools and reassessing the benefit-risk balance, and (4) making appropriate adjustments to the risk minimization tools to improve the benefit-risk balance further.  FDA calls for those four steps to be ongoing throughout a product's lifecycle, with the results of risk assessment informing the sponsor's decisions regarding risk minimization (FDA, 2005b).

RiskMAPS are relatively new and still a work-in-progress. CDER staff have challenging scientific, policy, and resource issues to work out, both in general and for specific drugs or classes of drugs.

### Post-Approval requirements and labeling

The final days of NDA review typically involve negotiations between the sponsor and the regulators about the drug label and postmarket requirements.  It is the sponsor's responsibility to develop a study protocol when it is agreed that a postmarket study will be undertaken and to draft label language; it is CDER's job to provide input and review and to comment on the sponsor's plans or suggested product labels.

Increasingly, CDER is seeking commitments from sponsors to undertake postmarket (phase 4) trials or other studies to define risks further in some populations or under some conditions of use. Despite their importance, discussion of such studies is often delayed until late in the review process, when little time is available to consider the specifics of the protocol. With FDA facing a PDUFA deadline and with approval at stake for the sponsor, agreement is sometimes reached on studies that later prove to be infeasible or unjustified for a variety of reasons. It may be because ethical concerns preclude obtaining

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

IRB approval or because of inability to recruit study subjects. Study designs may also be superseded by new treatments or findings that would undermine the value of a trial.

FDA may ask sponsors to take other actions, such as establishing a registry of patients who are taking the drug. An example is pregnancy registries, which are surveillance studies in which women who take a particular medication or have a particular condition during pregnancy answer questions before and after childbirth. There are eight registries for specific medical conditions (while taking a certain class of drugs to treat that condition), such as asthma and epilepsy (as of July 2004) and 14 for specific medicines (as of July 2003) (FDA and Office of Women's Health, 2006; Kennedy et al., 2004).

Negotiations about the wording of a drug label also come late in the process, when all the information about the drug has been pulled together. The label specifies conditions of safe use of the drug (CDER et al., 1998).  It is the official description of a drug product and includes the drug's indication; who should take it; adverse effects; special instructions for use of the drug in pregnant women, children, and other populations; and safety information for the patient. Although FDA can refuse to approve a drug if the sponsor fails to agree to what the regulators want in the label, the final label is typically a result of negotiations between regulators and sponsor.

In the case of serious safety concerns, FDA may direct the sponsor to highlight a safety warning in the label by putting a black box around it. These may be added to marketed drugs when new data become available. A recent example are antidepressant medications, which now require a black box warning describing the risk and emphasizing the need for close monitoring of suicidality of patients (FDA News, 2004).

Although the product labeling is intended to guide prescribers in use of a drug, studies show that prescribers often fail to follow the label (Public Health Newswire, 2006). For example, cisapride was contraindicated in patients at increased risk for cardiac arrhythmias, but 20% of its use was in such patients (Ray and Stein, 2006). The label for troglitazone specified that liver-function tests were required, but often they were not performed (Ray and Stein, 2006)

Some approved drugs (such as cisapride and troglitazone) have a narrow therapeutic index; that is, the toxic dose is close to the effective dose so that there is a small margin of error for triggering safety problems (the toxic dose is close to the effective dose). Such drugs make it incumbent on the sponsor and FDA to develop careful risk management strategies and incumbent on practitioners to be cognizant of proper use. The Institute of Medicine report *Preventing Medication Errors* discusses matters related to patient comprehension of and adherence to medication labeling (2006). In an effort to improve awareness of labeling directions, FDA in January 2006 announced a revision of the label format (FDA News, 2006a) (see Appendix A for more detail).

FDA requires sponsors to provide patient medication guides (known as MedGuides) for drugs with "special risk management information" (FDA and CDER, ). There are 42 medications marketed by brand name and 38 by active ingredient that have MedGuides that must accompany them when they are dispensed (CDER, 2006; Wolfe S and Public Citizen's Health Research Group, 2005) (see Chapter 6 for additional discussion).

FDA has imposed restrictions on the distribution of some new drugs (such as drugs containing isotretinoin) which are discussed in Chapter 4. But there appears to be a lack of clarity about the scope of FDA's authority under the Food, Drug, and Cosmetic Act

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

(FD&C Act) to restrict distribution. General counsels to FDA have apparently differed in their interpretation of the FD&C Act in that regard over the last decade. The statute governing medical-device regulation, which was enacted more recently than the FD&C Act, is more explicit about FDA's authority to restrict product distribution to protect the public health.

### Site inspections

Before an NDA can be approved, FDA usually inspects the facilities and manufacturing processes that will be involved in producing the product (FDA, 2006c). That process usually occurs towards the end of the NDA process and it is likely that the records of at least some of the clinical trial investigators will be inspected (Huddleston, 2006). Often sponsors continue to refine their manufacturing processes after the product is approved; those changes must approved by FDA. In fiscal year 2004, 1,610 chemical and manufacturing control supplements were submitted.

### Letter sent to sponsor

FDA may send the sponsor a "not approvable" letter that explains why an application cannot be approved on the basis of current information, an "approvable" letter stating that the product could be approved if specified additional actions were taken or, an "approval" letter indicating that the product has been approved with specified labeling and postmarket requirements (21 CFR 314.100a [2001]). The review team participates in the drafting of the letter, and it is signed by the division director or office director, depending on the product.

| Box 2.3: Current Review Elements for New Drug Approval | |
|---|---|
| • Periodic team progress check-ins<br>• Mid-cycle review meeting<br>• Team or subgroup interaction on particular issues<br>• Primary review completion<br>• Secondary (team leader or branch chief) review<br>• Review division director, or higher level, review<br>• Consult review input | • Advisory committee meetings<br>• Internal briefings for signatory authority<br>• Wrap-up (integration of review, consult, and inspection input)<br>• Pre-approval safety conference (CDER)<br>• Pre-approval facility inspections (BLAs)<br>• Labeling negotiation<br>• Issuance of action letter by PDUFA goal date |

## POSTMARKET PERIOD

Historically, drugs undergoing premarket review have received more attention in and outside FDA than drugs that are in the marketplace. There is now growing awareness that a robust drug safety system requires a lifecycle approach (Crawford LM, 2005) and that

**PREPUBLICATION COPY: UNCORRECTED PROOFS**            2-17

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

drug approval triggers a critical period for monitoring safety. The budget for postmarketing surveillance and assessment is not commensurate with FDA's growing scope.

The Division of Drug Risk Evaluation in ODS/OSE monitors marketed drugs and prepares safety reviews and risk assessments. Although DDRE staff may contribute to the development of risk management plans, it is OND that has responsibility for deciding what regulatory action to take in response to new safety information. ODS/OSE has undergone enormous change in the last decade, with numerous leaders and acting leaders, name changes, and reorganizations (GAO, 2006). In recent years, it has also assumed expanded responsibilities, and its pharmacists and safety officers are monitoring more products and conducting more assessments, relying on the array of data sources and technologies described below (FDA and CDER, 2005) (see Chapters 3 and 4 for additional discussion of ODS/OSE and OND functions and relationship).

### Drug promotion and information

The Division of Drug Marketing and Communication (DDMAC) in ODS/OSE is charged with reviewing sponsor promotional materials. The DDMAC staff of 35 reviews more than 53,000 promotional pieces every year, including print and broadcast direct-to-consumer (DTC) advertising (see Chapters 5 and 6 for detailed discussion) and materials prepared for professional conferences and for health care providers. FDA does not have the authority to review or sanction promotional material before launch or release (or to review instructions given by sponsors to their sales force); it often reviews material after it has been released or broadcast, and it can then require corrective action in letters sent to the sponsor. However, many sponsors submit their promotional material in advance to ensure that they will not encounter regulatory problems later.

Since 1997, when FDA eased rules for DTC advertising, companies have greatly expanded their use of it to promote drugs via the mass media (Gahart et al., 2003; Gilhooley M, 2005). According to a 2004 study (Brownfield ED et al., 2004), the average television viewer spends 100 minutes watching DTC advertising for every minute in a doctor's office. Typically, less is known about the safety of a new drug than of an older drug on the market, but the public is not likely to be aware of this and may simply assume that a new drug is a better drug.

### Spontaneous adverse event reporting system

The FDA's primary source for managing and monitoring new adverse effects of marketed drugs is the Adverse Event Reporting System (AERS), an automated system for storing and analyzing safety reports. DDRE has primary responsibility for AERS (FDA, 2004c).

Adverse event reports have several sources. When an adverse event is both serious[11] and unexpected (not listed in the drug product's current labeling), drug sponsors are required to report it to FDA within 15 calendar days ("15-day reports"). Sponsors must also

---

11 A serious adverse event is any untoward medical occurrence that at any dose: results in death, is life threatening, requires inpatient hospitalization or prolongs existing hospitalization, results in persistent or significant disability/incapacity, is a congenital anomaly/birth defect (CFR 312.32).

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**          2-18

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

submit periodic reports that summarize all adverse events quarterly for the first 3 years after the NDA was approved and annually over multiple years (FDA, 2005a).

Another source of spontaneous reports is FDA's voluntary reporting system, Med-Watch, which covers drugs and other FDA-regulated products. MedWatch enables health care professionals and consumers to file adverse event reports directly to FDA via tele-phone, completion of FDA Form 3500 online, or via fax or mail (FDA, 2003).

FDA receives more than 400,000 spontaneous reports each year as part of the surveil-lance system. In FY 2004, for example, ODS/OSE received 422,889 adverse event re-ports (see box 2.4 for a breakdown) (FDA and CDER, 2005). Although exact figures are not available, that is assumed to represent a small fraction of all adverse effects of drugs. The system contains 3-4 million reports accumulated from multiple years (FDA and CDER, 2005).

---

**Box 2.4: Adverse event Reporting in 2004**

**In 2004, FDA received 422,889 reports of suspected drug-related adverse events**

- 21,493 MedWatch reports directly from individuals (patients or providers).
- 162,107 manufacturer 15-day (expedited) reports.
- 89,960 serious manufacturer periodic reports.
- 149,329 nonserious manufacturer periodic reports.

Source: (FDA and CDER, 2005)

---

Most adverse event reports arrive on paper via fax. ODS/OSE has placed a high prior-ity on increasing the number of reports filed electronically to both expedite and reduce the cost of receiving and processing the report.  In FY 2004, 16% of all reports were submitted electronically, up from 10% in FY 2003 (FDA and CDER, 2005). In the EU, where electronic reporting to the European Medicines Agency (EMEA) has been manda-tory since November 2005, over 90% of adverse reactions involving European-authorized medicines have been electronically reported by manufacturers.

DDRE safety officers are expected to review the "15-day reports" when they arrive. They continually review incoming reports from MedWatch, redirecting those related to other regulated products, and contractors enter all the MedWatch reports into AERs  sys-tem. Some AEs from companies, such as those in periodic reports for drugs that have been approved for more than 3 years or those considered nonserious, are not are routinely entered into AERS.

The structure of the AERS database complies with a guidance issued by the Interna-tional Conference on Harmonisation (ICH E2B).  FDA codes AEs with a standardized international terminology, the Medical Dictionary for Regulatory Activities (MedDRA). AERS allows for the on-screen review of reports, the use of searching tools, and various output reports.  FDA is making limited use of data mining software to identify early drug safety signals in the AERS database via automated searching.

AERS is an important component of the postmarket surveillance system, particularly for identifying unexpected and rare adverse events (Rodriguez et al., 2001). For example, aplastic anemia and the rare skin disorder Stevens-Johnson syndrome have been linked to drugs through AE reporting (FDA, 1994). However, AERS is not efficient in distinguish-

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

2-19

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

ing between signal and noise from adverse events, such as heart disease, which has a high background rate in the population (see Chapter 4 for a more comprehensive discussion.) Some of the limitations of AERS data are the  lack of denominator data on number of users to delineate the frequency of an event, lack of control groups, recall bias of patients and reporters, poor case documentation in the reports (critical details that could contribute to an understanding of an event are missing), and substantial underreporting of AEs (Ahmad SR et al., 2005).

### Other postmarket data

Although AERS data may provide the initial signal of a safety problem, other studies and databases are typically needed to investigate associations. Those data include results of clinical trials and epidemiologic studies that are conducted, or whose results are available, after a drug is approved.

The sponsors' phase 4 trials are intended to expand the understanding of the safety and efficacy profile, of selected drugs. However, many of these studies are not completed (or even begun), for various reasons described above. FDA lacks the regulatory tools to adequately compel sponsors to complete appropriate studies (see Chapter 5 for more information).  According to a March 2006 report, out of 1,231 agreed-on (by the sponsor) open postmarket commitments of drugs and biologics, 797 (65%) have yet to be started[12] (Federal Register, 2006).

Another source of postmarket safety data is studies of marketed drugs designed to investigate new or expanded indications. Sponsors may include these studies in an efficacy supplement submitted to FDA seeking expanded label indications. Sometimes may yield important data. For example, the APPROVe (Adenomatous Polyp Prevention on Vioxx) trial was designed to identify a new application for rofecoxib and showed an increased risk of serious cardiovascular events with rofecoxib compared with placebo—this cardiovascular impact was a secondary consideration (FDA, 2004b).  Post-marketing safety information may also be generated by sponsors through the establishment of active surveillance systems, such as pregnancy-exposure registries (Ackermann Shiff S et al., 2006).

The National Institutes of Health (NIH) or other agencies may also sponsor trials to gain new information about marketed drugs. Examples are the NIH-funded randomized controlled primary prevention trial, the Women's Health Initiative, which reported on adverse health effects of and benefits from use of combined estrogen and progestin (Rossouw JE et al., 2002). An earlier NIH-funded study, the cardiac arrhythmia suppression trial (CAST), found that drug treatment for asymptomatic ventricular arrhythmia in patients who had a heart attack did not prevent—and in fact substantially increased the risk of sudden cardiac death. FDA had used a drug's effect on arrhythmia as a surrogate marker of efficacy, but although the drug reduced arrhythmia, it also increased cardiac death—the very health outcome it was supposed to prevent (National Heart, 2005).

Additional information on the safety of marketed drugs may come from large, automated databases. FDA purchases access to some of those databases as a resource for pharmacoepidemiologic studies designed to test hypotheses, particularly those arising

---

[12] 231 (19%) are ongoing; 28 (2%) are delayed; 3 (1%) have been terminated; 172 (14%) have been submitted.

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

from AERS. (Chapter 4 contains a more detailed discussion of relevant programs and agreements with academic research institutions.) FDA also obtains information from IMS Health, a provider of market research services to the pharmaceutical and health care industries. Among the services obtained from IMS Health are the National Disease and Therapeutic Index, which provides data on diagnoses, patients, and treatment patterns; Integrated Promotional Services, which measures professional and consumer promotional activity in the pharmaceutical industry; and the National Prescription Audit, which tracks pharmaceutical products dispensed in retail, mail-order, and long-term care channels.

Trained staff and (often expensive) supportive technology are typically needed to use some of those databases fully. CDER's limited resources for such activities have precluded taking full advantage of their potential contribution to understanding the safety of approved drugs (see further discussion in Chapter 4).

Resources also severely constrain their external research program. DDRE has about a dozen epidemiologists. They work with the safety officers (who are also referred to as safety evaluators and generally are pharmacists) on assessments, determining for example the background risk of a condition to determine whether reported rates may be above expected levels. They also oversee agency-sponsored epidemiologic research

### Identifying and evaluating spontaneous safety signals

As CDER receives new information related to a drug's safety profile, it makes risk assessments and determines how risks can best be managed. For monitoring purposes, every marketed drug is assigned to a safety evaluator, usually a pharmacist in DDRE. Generally, one safety evaluator oversees all drugs in a class, such as statins, so he or she tends to work consistently with a specific OND division that handles those drugs. AE reports on a drug are automatically forwarded by e-mail to the appropriate safety evaluator and to the OND reviewer with responsibility for that drug.

ODS/OSE employs about 25 safety evaluators, and each receives about 500-800 reports a month to monitor, including some that are designated as "serious" on the basis of criteria established by FDA. The committee was told that safety evaluators now have less time than before to keep up with their inboxes as they are spending more time on OND consultations, in developing complex postmarket risk assessments, and in such activities as RiskMAP development and assessments required by the Best Pharmaceuticals for Children Act (FDA and CDER, 2005).

Safety officers begin the process of building on initial reports either when requested by an OND reviewer to pursue a signal or on the basis of their own review of reports. Initial safety signal information is generally incomplete or uncertain; for example, a case report has few details, a patient is taking several drugs at once and a reaction could be related to the combination or to one of the drugs alone, could be related to the disease rather than to any of the drugs, or the effect may be so common in the population that it is difficult to determine whether it is associated with drug use. Only through additional investigations—including data mining searching with MedDRA codes, review of premarket studies, and analysis of available data from sources described above—might a picture begin to emerge. Increasingly, ODS/OSE is undertaking assessments not just regarding the drug that may have generated reports but regarding the class of drugs of that it belongs to.

Copyright © National Academy of Sciences. All rights reserved.

Rare is the story that builds as clearly and completely as one would like for making scientific evaluations and regulatory decisions. Adequate information to quantify risk or to compare the safety of a drug with the safety of alternative therapies in its class may not be readily available. Not uncommonly, uncertainties and professional disagreements about the significance of signals persist.

OND and ODS/OSE are expected to work together to assess risk and determine how to manage it, but OND has authority to make regulatory decisions related to the findings. A recent Government Accountability Office report noted problems in the relationship between ODS/OSE and OND staff, including lack of clarity about roles and responsibilities and communication barriers (GAO, 2006). As noted earlier, FDA's official response to those findings cited its commitment to making ODS/OSE and OND "co-equal partners in the post-market identification and timely resolution of drug safety issues" (GAO, 2006) (see discussion in Chapter 3.)

Another challenge facing FDA is to decide when to alert the public and providers of adverse event reports that are under investigation. On one hand, reporting at the earliest stages could confuse and perhaps unduly alarm patients and providers and lead patients to inappropriately avoid or stop using a drug that they need. On the other hand, waiting too long to alert providers and users about potentially serious problems with a marketed drug can put patients at risk. FDA has been criticized for waiting too long and has proposed a Drug Watch Web site that would give the public and providers information about potential problems with marketed drugs earlier than in the past. The proposed Drug Watch program has been subject to criticism from the pharmaceutical industry. One reason given by industry against the program is that it is not useful to look at one study in isolation, as would be the case in Med Watch, they would prefer that similar studies be published together giving physicians and patients the opportunity to see the data in context (Agres T, 2006). This has prompted FDA to rethink the program, so launch of that program has been delayed (FDA, 2005c; FDA, 2005e).

To help to resolve uncertainties, discuss issues publicly, or consider regulatory strategies to address a risk, an advisory committee meeting may be held. Members of the Drug Safety and Risk Management Advisory Committee (DSaRM) and the committee with expertise in the specific class of drugs are typically involved.

### *Regulatory actions*

FDA's regulatory authority is grounded in the FD&C Act and its amendments (21 U.S.C. 301). The historical origins of the act lie in the many 19th and 20th century incidents of widespread injury caused by ingestion of items that were either tainted versions of otherwise safe substances or unsafe substances marketed as something else entirely.

Fundamentally FDA's authority is limited to prohibiting the marketing of a drug that is adulterated or misbranded. With the middle-20th-century amendments came an expansion of the notion of misbranding, in which any failure to prove efficacy and safety before marketing would result in a finding of misbranding, because the marketing of the product would be a form of deception. Similarly, failure to adhere to agreed-on labeling or advertising requirements was viewed as a form of misbranding. The result is that FDA's remedies for the marketing of dangerous or mislabeled drugs is limited largely to withdrawing them from the market. The threat of such an action (although for critical or

Copyright © National Academy of Sciences. All rights reserved.

*Natural History of a Drug*

popular therapies such a threat may not be credible) and the agency's ability to use the mass media to call attention to the controversy give the agency some teeth in getting sponsors to comply with regulatory actions. Actions may include mandatory postmarketing surveillance, limitations on distribution, special education programs, or labeling changes, including use of a black box warning to call attention to serious risks. FDA also uses "Dear Health Practitioner" letters to inform providers of new information related to the safe and effective use of a marketed drug.

Such actions have been taken numerous times although enforcement activities have varied over the years. Decisions about use of enforcement tools, especially such aggressive ones as seizing products deemed to be misbranded, are not CDER's alone. The general counsel and the commissioner, both political appointees, are key to those decisions. FDA has come under criticism from some external stakeholders for not acting quickly enough or appropriately in the face of serious safety questions in specific cases (Wolfe S, 2004) (Curran J, 2005). Some surveys also indicate concerns among CDER staff respondents about how safety issues are handled (DHHS and OIG, 2003) although senior management has strongly defended controversial actions (IOM Staff Notes, 2005-2006). FDA does not routinely conduct "postmortems" of drug withdrawals as a basis for examining and possibly improving its procedures. Drugs withdrawn from the market have been reinstated by FDA for use with restrictions at the request of the sponsor, such as (see Box 2-5 for summary of this case).

---

**BOX 2-5    The story of Alosetron (Lotronex)**

November 1999 – FDA advisory committee recommends approval
February 2000 – FDA approves Alosetron for treatment of "diarrhea-predominant irritable bowel syndrome) in women
June 2000 – FDA advisory committee meeting discusses evidence of serious adverse events and votes to retain the drug on the market
November 2000 – FDA and the sponsor meet, sponsor withdraws alosetron
December 2001 – sponsor proposes returning Alosetron to market with restrictions
April 2002 – FDA advisory committee recommends return to market with restrictions
June 2002 – FDA approves Alosetron's return to market, with less rigorous restrictions than those recommended by the advisory committee

   Source: Moynihan (2002).

---

One important issue for FDA and all other stakeholders in drug safety is the limited effectiveness of these regulatory warning tools in promoting drug safety. Although changes in the information provided in a label is a key tool for responding to and communicating new safety information, studies show that many patients are at risk because providers and the patients do not consistently heed labels, including the most serious black box warnings (Archives of Internal Med, 2006).

It is worth underscoring that the fundamental design of the drug approval system described above—separate from the quality of the data that sponsors generate in compliance with it—inevitably puts drugs on the market when safety information is incomplete.

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

*The Future of Drug Safety*

The obvious corollary is that the postmarket monitoring system, as well as the premarket review processes, must be as effective and efficient as possible.

Copyright © National Academy of Sciences. All rights reserved.

# REFERENCE LIST

Ackermann Shiff S, Mundkur C, Shamp J. iPLEDGE: Isotretinoin Pregnancy Risk Management Program. *Presented to DSaRM* . 2006.

Agres T, Deputy Managing Editor. Drug Safety Reshaping FDA Monolith. 2006; accessed September 15, 2006. Web Page. Available at: http://www.dddmag.com/ShowPR.aspx?PUBCODE=016&ACCT=1600000100&ISSUE=0504&RELTYPE=PR&ORIGRELTYPE=PNP&PRODCODE=00000000&PRODLETT=AF.

Ahmad SR, Goetsch RA, Marks NS. 2005. Chapter 9: Spontaneous reporting in the United States. Strom BS, Editor. *Pharmacoepidemiology*. Fourth ed.

Beck JM, Azari ED. 1998. FDA, off-label use, and informed consent: debunking myths and misconceptions. *Food Drug Law J* 53(1):71-104.

Bilstad J. Letter to Knoll Pharmaceutical Company. 11/22/1997.

Boodman SG. Many Drug Uses Don't Rest on Strong Science. May 23, 2006; accessed July 3, 2006. Web Page. Available at: http://www.washingtonpost.com/wp-dyn/content/article/2006/05/22/AR2006052201428.html?referrer=emailarticle.

Brownfield ED, Bernhardt JM, Phan JL, Williams MV, Parker RM. 2004. Direct-to-consumer drug advertisements on network television: an exploration of quantity, frequency, and placement. *J Health Commun* 9(6):561-2.

CDER. Manual of Policies and Procedures: Clinical Review Template. 2004.

CDER. Drug Safety and Risk Management Advisory Committee (DSaRM). 2005a. Web Page. Available at: http://www.fda.gov/OHRMS/DOCKETS/AC/05/agenda/2005-4143A1_Final.htm.

CDER. Manual of Policies and Procedures. *Review Management: Risk Management Plan Activities in OND and ODS--MAPP 6700.1*. 2005b.

CDER. Manual of Policies and Procedures (MAPP): Drug Safety Oversight Board (DSB). May 4, 2005c; accessed June 20, 2005c. Web Page. Available at: http://www.fda.gov/cder/mapp/4151-3.pdf.

CDER. Medication Guides. 2006; accessed July 6, 2006. Web Page. Available at: www.fda.gov/cder/offices/ods/medication_guides.htm.

CDER, FDA, and DHHS. The CDER Handbook. March 16, 1998; accessed November 14, 2005. Web Page. Available at: http://www.fda.gov/cder/handbook/handbook.pdf.

CDER, FDA, DHHS. Reviewer Guidance: Conducting a Clinical Safety Review of a New Product Application and Preparing a Report on the Review. *Good Review Practices*. 2005.

Crawford LM, Acting Commissioner of the FDA. Speech before FDA All-Hands Briefing with New HHS Secretary Mike Leavitt. February 15, 2005; accessed February 23, 2005. Web Page. Available at: http://www.fda.gov/oc/speeches/2005/safedrugs0215.html.

Curran J. 2005, September 22. Merck fought Vioxx warning. *The Philadelphia Inquirer*.

DHHS, OIG. FDA's Review Process for New Drug Applications: a Management Review. DHHS, OIG. 2003. OEI-01-01-00590: Department of Health and Human Services, Office of the Inspector General.

DHHS, FDA CDER CBER. Development and Use of Risk Minimization Action Plans. March 25, 2005; accessed April 14, 2006. Web Page. Available at: http://www.fda.gov/cder/guidance/6358fnl.htm.

DiMasi JA, Hansen RW, Grabowski HG . 2003. The Price of Innovation: New Estimates of Drug Development Costs. *J Health Econ* 22(2):151–185.

Epstein RA. Does America Have a Prescription Drug Problem? The Perils of Ignoring the Economics of Pharmaceuticals. IPI Center for Technology Freedom; 2004:pgs. 1-16.

FDA. Clinical Therapeutics and the Recognition of Drug-Induced Disease. 1994; accessed July 12, 2006. Web Page. Available at: http://www.fda.gov/medwaTCH/articles/dig/recognit.htm.

FDA. Enclosure: PDUFA Reauthorization Performance Goals and Procedures. 2002; accessed June 21, 2006. Web Page. Available at: http://www.fda.gov/oc/pdufaIIIGoals.html.

FDA. MedWatch Reporting by Consumers. July 29, 2003; accessed May 24, 2005. Web Page. Available at: http://www.fda.gov/medwatch/report/consumer/consumer.htm.

FDA. Innovation Stagnation: Challenge and Opportunity on the Critical Path to New Medical Products. March, 2004a; accessed October 10, 2005a. Web Page. Available at: http://www.fda.gov/oc/initiatives/criticalpath/whitepaper.html; http://www.fda.gov/oc/initiatives/criticalpath/whitepaper.pdf.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

FDA. FDA Statement:  FDA Statement on Vioxx and Recent Allegations and the Agency's Continued Commitment to Sound Science and Peer Review. November 17, 2004b; accessed May 12, 2005b. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2004/NEW01136.html.

FDA. Adverse Event Reporting System (AERS). December 13, 2004c; accessed May 24, 2005c. Web Page. Available at: http://www.fda.gov/cder/aers/default.htm.

FDA. Chapter 53 - Postmarketing Surveillance and Epidemiology: Human Drugs. 2005a; accessed July 12, 2006a. Web Page. Available at: http://www.fda.gov/cder/aers/chapter53.htm.

FDA. 2005b. Guidance for Industry: Development and Use of Risk Minimization Action Plans.

FDA. Questions and Answers (Qs & As) Proposed Drug Watch Program. 2005c; accessed May 6, 2005c. Web Page. Available at: http://www.fda.gov/cder/guidance/6657qs&asext5-2.pdf.

FDA. White Paper, Prescription Drug User Fee Act (PDUFA):  Adding Resources and Improving Performance in FDA Review of New Drug Applications. 2005d.

FDA. FDA Fact Sheet: FDA Improvement in Drug Safety Monitoring. February 15, 2005e; accessed February 23, 2005e. Web Page. Available at: http://www.fda.gov/oc/factsheets/drugsafety.html.

FDA. Guidance for Review Staff and Industry Good Review Management Principles and Practices for PDUFA Products. 2005f.

FDA. Enclosure: PDUFA Reauthorization Performance Goals And Procedures. July 7, 2005g; accessed July 3, 2006g. Web Page. Available at: http://www.fda.gov/cder/news/pdufagoals.htm.

FDA. FDA Advisory Committees. 2006a; accessed July 3, 2006a. Web Page. Available at: http://www.fda.gov/oc/advisory/default.htm.

FDA. From Test Tube to Patient: Advisory Committees: Critical to the FDA's Product Review Process, 4th Edition. 2006b; accessed June 29, 2006b. Web Page. Available at: http://www.fda.gov/fdac/special/testtubetopatient/advisory.html.

FDA. From Test Tube to Patient: The FDA's Drug Review Process: Ensuring Drugs are Safe and Effective, 4th Edition. 2006c; accessed June 29, 2006c. Web Page. Available at: http://www.fda.gov/fdac/special/testtubetopatient/drugreview.html.

FDA. *Critical Path Opportunities Report*. 2006.

FDA. FDA NEWS:  FDA Names First Associate Center Director for Safety Policy and Communication in the Center for Drug Evaluation and Research FDA Centralizes Drug Safety Policy and Communication. April 18, 2006; accessed May 25, 2006. Web Page. Available at: http://www.fda.gov/bbs/topics/NEWS/2006/NEW01359.html.

FDA and CDER. Frequently Asked Questions on Drug Development and Investigational New Drug Applications. 2001a; accessed June 29, 2006a. Web Page. Available at: http://www.fda.gov/cder/about/smallbiz/faq.htm#IND.

FDA and CDER. FDA's Drug Review and Approval Time. July 30, 2001b; accessed June 16, 2006b. Web Page. Available at: http://www.fda.gov/cder/reports/reviewtimes/default.htm.

FDA and CDER. Office of Drug Safety Annual Report FY 2004. June 22, 2005; accessed June 23, 2005. Web Page. Available at: http://www.fda.gov/cder/offices/ods/annrep2004/default.htm.

FDA and CDER. Drugs@FDA Instructions.  accessed July 3, 2006. Web Page. Available at: http://www.fda.gov/cder/drugsatfda/instructionsPrint.htm.

FDA and CDER, Investigational New Drug (IND) Application Process. August 11, 2006; accessed June 29, 2006. Web Page. Available at: http://www.fda.gov/cder/regulatory/applications/ind_page_1.htm#preIND.

FDA and Office of Women's Health. Information About Pregnancy Registries. 2006; accessed July 3, 2006. Web Page. Available at: http://www.fda.gov/womens/registries/general.htm.

FDA News. FDA Launches a Multi-Pronged Strategy to Strengthen Safeguards for Children Treated With Antidepressant Medications. October 15, 2004; accessed September 15, 2006. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2004/NEW01124.html.

FDA News. FDA Announces New Prescription Drug Information Format to Improve Patient Safety . January 18, 2006a; accessed March 9, 2006a. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2005/NEW01272.html.

FDA News. Report Demonstrates Benefits of Earlier Meetings with FDA to Make Drug Review Process More Efficient. February 9, 2006b; accessed June 15, 2006b. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2006/NEW01312.html.

Federal Register. Report on the performance of drug and biologics firms in conducting postmarketing commitment studies. *FDA*. 2006;71: 42. 10978-10979.

Friedman MA, Woodcock J, Lumpkin MM, Shuren JE, Hass AE, Thompson LJ. 1999. The safety of newly approved medicines: do recent market removals mean there is a problem? *JAMA* 281(18):1728-34.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

Gahart MT, Duhamel LM, Dievler A, Price R. 2003. Examining the FDA's oversight of direct-to-consumer advertising. *Health Aff (Millwood)* Suppl Web Exclusives:W3-120-3.

GAO. *FDA Drug Review: Postapproval Risks 1976-85*. 1990.

GAO. 2006. *Drug Safety: Improvement Needed in FDA's Postmarket Decision-Making and Oversight Process*.

Genetics and Public Policy Center. ENEWS. June, 2006; accessed June 2, 2006. Web Page. Available at: http://www.dnapolicy.org.

Gilber J, Henske P, Singh A. 2003. Rebuilding Big Pharma's Business Model. *The Business and Medicine Report* 21(10):pgs. 1-10.

Gilhooley M. 2005. Heal the Damage: Prescription Drug Consumer Advertisements and Relative Choice. *Journal of Health Law* 38(1).

Graham DJ. Testimony of David J. Graham , M.D., M.P.H., November 18, 2004.  The Committee on Finance : 2004.

Grassley C, Baucus M, Graham D, Singh G, Psaty B, Kweder S, Gilmartin R. FDA, Merck and Vioxx: Putting Patient Safety First?  United States Senate Committee on Finance: 2004.

Henderson D. Doc Room Stats for IOM. E-mail to Stratton K, Henderson D, Ware J. February, 2006.

Hensley S, Davies P, Martinez B. 2005, August 22. Vioxx Verdict Stokes Backlash That Hit FDA, Manufacturers. *The New York Times*.

Huddleston, RD. FDA clinical investigator site inspections: The sponsor's role.  accessed August 1, 2006. Web Page. Available at: http://www.findarticles.com/p/articles/mi_qa3899/is_199907/ai_n8868995/print.

IOM. *Medical Errors*. 2006.  Washington, DC: National Academies Press.

Kaitin KI. 2005. Numbers of active investigators in FDA-regulated clinical trials drop . *Tufts Center for the Study of Drug Development Impact Report* 7(3).

Kennedy DL, Uhl K, Kweder SL. 2004. Pregnancy exposure registries. *Drug Saf* 27(4):215-28.

Lipsky MS, Sharp LK. 2001. From idea to market: the drug approval process. *J Am Board Fam Pract* 14(5):362-7.

Lurie P, Woodcock J, Kaitin KI. 1999. FDA Drug Review:  The Debate Over Safety, Efficacy, and Speed. *Medical Crossfire* :52-60.

Meadows M. 2002. The FDA's drug review process: ensuring drugs are safe and effective. *FDA Consum* 36(4):19-24.

Meadows M. Drug Research and Children. 2003; accessed July 12, 2006. Web Page. Available at: http://www.fda.gov/fdac/features/2003/103_drugs.html.

Meyer R. Letter to Amgen Inc and Danagher P. 03/08/2004.

MRA. Clinical Research - Glossary of commonly used terms. 2006; accessed September 15, 2006. Web Page. Available at: http://www.npicenter.com/anm/templates/DouglasKalman_MRA.aspx?articleid=11606&zoneid=73#P.

National Heart, Lung and Blood Institute NHLBI. Cardiac Arrhythmia Suppression Trial (CAST). 2005; accessed July 12, 2006. Web Page. Available at: http://www.clinicaltrials.gov/ct/show/NCT00000526.

Neergaard L. FDA Looking Into Blindness-Viagra Link. May 27, 2005; accessed May 27, 2005. Web Page. Available at: http://abcnews.go.com/Health/wireStory?id=796471.

Okie S. 2005. Safety in numbers--monitoring risk in approved drugs. *N Engl J Med* 352(12):1173-6.

PhRMA. Pharmaceutical Industry Profile PhRMA. 2006.  Washington, DC.

PMC. Personalized Medicine Coalition. 2006; accessed July 11, 2006. Web Page.

Public Health Newswire.  Drugs' Black Box Warning Violations In Outpatient Settings Putting Patients At Risk. February 16, 2006; accessed July 13, 2006. Web Page. Available at: http://www.medicalnewstoday.com/medicalnews.php?newsid=37735.

Racoosin JA . PowerPoint Presentation:  Pre-marketing Assessment of Drug Safety.  *Presented at the January 17, 2006 Meeting of the Committee on the Assessment of the US Drug Safety System*. 2006.

Randall, B. The US Drug Approval Process: A primer. June 1, 2001; accessed June 27, 2005. Web Page. Available at: http://www.thememoryhole.org/crs/more-reports/RL30989.pdf.

Ray WA, Stein CM. 2006. Reform of drug regulation--beyond an independent drug-safety board. *N Engl J Med* 354( 2):194-201.

Rodriguez EM, Staffa JA, Graham DJ. 2001. The role of databases in drug postmarketing surveillance. *Pharmacoepidemiol Drug Saf* 10(5 ):407-10.

Rossouw JE, Anderson GL, Prentice RL, et al. 2002. Risks and benefits of estrogen plus progestin in healthy postmenopausal women: principal results From the Women's Health Initiative randomized controlled trial. *JAMA* 288:321-333.

Copyright © National Academy of Sciences. All rights reserved.

Case 2:05-md-01657-EEF-DEK   Document 7651-1   Filed 10/02/06   Page 65 of 100

Weiss Smith S. Summary of Issues: January 17, 2006 IOM Workshop. *Commissioned by the IOM Committee on the Assessment of the US Drug Safety System*. 2006.

Wolfe S, Editorial in USA Today. Take drugs off the market. December 26, 2004; accessed March 8, 2005. Web Page. Available at: http://www.usatoday.com/news/opinion/editorials/2004-12-26-oppose_x.htm.

Wolfe S, Public Citizen's Health Research Group. Statement by Sidney M. Wolfe, MD Director, Public Citizen's Health Research Group Public Hearing on CDER's Current Risk Communication Strategies for Human Drugs, December 7, 2005. 2005.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

3

# A Culture of Safety

The Committee on the Assessment of the US Drug Safety System has examined three determinants of organizational culture in the Food and Drug Administration (FDA) Center for Drug Evaluation and Research (CDER): the external environment, structural factors, and management. The committee believes that cultural changes are urgently needed to support a stronger, more systematic and more credible approach to drug safety in CDER, and it recommends solutions to problems created or exacerbated by elements of CDER's management, structure, and environment. However, implementing some of these recommendations may require additional resources, as discussed in greater detail in Chapter 7.

## ORGANIZATIONAL CHALLENGES

A number of highly publicized events, including the Vioxx withdrawal and concern about other cox-2 inhibitors, and ongoing drug safety problems including those related to salmeterol, Ketek, and others have brought FDA's, and specifically CDER's, performance under the scrutiny of the American public (via the mass media) and Congress (Harris, 2006; Hendrick, 2006; Washington Drug Letter, 2006). Critics have charged that there were failures or delays in informing patients about important drug risks, inadequate postmarketing assessment of drug safety, and failures to follow up and enforce sponsors' postmarketing study commitments agreed on at the time of approval. Others have expressed concern that the recent focus on safety could reverse considerable gains in the pace of drug review and the speed of approving new therapies.

Mass media coverage of perceived organizational problems in CDER has been frequent and detailed, for example, describing an apparent lack of mutual respect and tension between preapproval review staff and postmarketing safety staff, and a work environment thought to be marginalizing dissenting voices on drug safety (Walters, February 1, 2004; Mathews, November 10, 2004; Harris, February 20, 2005; Henderson, December 6, 2005). As questions about culpability mounted, a series of organizational and programmatic problems in the Center highlighted in the mass media were also examined in government reports, including the reports of the DHHS Inspector General that surveyed CDER staff (DHHS OIG, 2003) and reviewed the state of postmarketing commitments (DHHS OIG, 2006), respectively, and the reports of the Government Accountability Office that assessed the impact of the Prescription Drug User Fee Act (PDUFA) on CDER staff's morale and workload (GAO, 2002) and examined the structure and effectiveness of CDER postmarketing decision making processes (GAO, 2006). Many observe signs of an organizational culture in crisis. It has also become apparent that drug safety events, whether indicative of or associated with organizational and cultural problems have led to diminished

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**                    3-1

Copyright © National Academy of Sciences. All rights reserved.

agency credibility among the public. Drug safety experts, members of Congress (including Senators Michael Enzi, Edward Kennedy and Charles Grassley, and Representatives Rosa DeLauro and Maurice Hinchey), consumer organizations (such as Consumers Union, Public Interest Research Group, the National Consumers League, Public Citizen), and others have called for organizational, statutory, and resource changes in the agency. Proposals have included restructuring the agency to segregate the drug review and postmarketing safety functions by creating an independent drug safety center (Grassley C, 2005; Ray and Stein, 2006; Fontanarosa et al., 2004; Consumers Union , 2005; Wolfe SM, 2006). FDA itself has undertaken a series of initiatives and changes, described in detail in Appendix A, including the commissioning of this Institute of Medicine report (see discussion in Chapter 1) (Crawford LM, 2004; Wall Street Journal and Harris Interactive, 2006).

In its discussions with current and recent FDA staff and managers, and on the basis of its review of relevant government reports, the committee found that the organizational culture in CDER confirms some of the adverse perceptions conveyed in the mass media, and that the center is an organization in urgent need of great change.

The committee found that CDER's organizational culture has both strengths and weaknesses. The positives are that science-based decision making is a clear priority that shapes CDER's culture, as does the staff's obvious awareness of the potential consequences of their decisions on the health of the public and individual patients. The negative features of the culture include a work environment that is not sufficiently supportive of staff (as evident in problems with morale and attrition), polarization between the premarketing and postmarketing review staff, and evidence suggesting insufficient management attention to scientific disagreement and differences of opinion.

Change is needed because CDER's organizational problems may affect its ability to accomplish the mission of protecting and advancing the public's health; they clearly affect public perception of the agency's performance and credibility. Every organization has its share of dysfunctions, disgruntled staff members, and internal disputes, but the committee came away from various encounters with CDER staff and management with a deep concern about CDER's organizational health.

---

BOX 3-1
Committee Information Gathering about CDER Organizational Culture

To inform its deliberations, the committee held information-gathering sessions to hear from FDA and other stakeholders (see Appendix D). A small group of committee members and Institute of Medicine (IOM) project staff visited CDER on October 11, 2005 and February 22, 2006. From November 7, 2005 to May 2006, IOM staff with rotating committee representation of one or two members also held confidential discussions with over 30 current FDA staff, including personnel from the Office of New Drugs (OND) and the Office of Drug Safety (recently renamed Office of Surveillance and Epidemiology and referred to hereafter as ODS/OSE), FDA and CDER management, and several former FDA staff and leaders.[1]

The committee's high regard for the professionals who perform CDER's preapproval and postapproval functions under considerable time and resource constraints was reinforced by these conversations. As the committee gained greater understanding of CDER's work and functioning, committee members were able to identify or confirm a number of structural and related cultural challenges, including a

---

[1] At the Committee's request, the CDER Director sent a letter to all Center staff urging them to contact IOM study staff if they wished to discuss issues related to their work and recent concerns.

Copyright © National Academy of Sciences. All rights reserved.

Case 1:05-md-01657-EEF-DEK   Document 7651-1   Filed 10/02/06   Page 68 of 100

*A Culture of Safety*

> troubling relationship between OND and ODS/OSE, insufficient management and leadership to address emerging problems and implement needed reforms, a lack of clear and consistent processes (for example, for identifying and addressing drug safety concerns both in the review process and in the postmarketing period, for determining the need for and nature of postmarketing, or phase 4, studies), overextended human and financial resources, and pressures added by the requirements of the current user-fee funding mechanism that funds about 50% of CDER's work (FDA, 2005b).
>
> The major themes that emerged from the committee's conversations are consistent with those identified in government reports on FDA and CDER. The committee also found it helpful to refer to assessments of organizational problems in other government agencies that deal with risk and uncertainty, albeit in very different contexts, such as the National Aeronautics and Space Administration and the Federal Aviation Administration (GAO, 1996; Return to Flight Task Group, 2005).

The committee approached this component of its work with special care, recognizing that structure and culture, as fundamental features of an organization, connect in complex and not easily discernible ways. Management literature shows that an organization's ability to fulfill its mission is considerably influenced by the health of its culture, the "social architecture" that determines whether excellence is promoted; whether the organization is adaptable, robust, and learning; and whether broad staff participation (in shaping the vision, making decisions, and so on) is prized and encouraged (Coffee JN, 1993; Heifetz and Laurie, 1998; Khademian, 2002). The committee was explicitly charged with assessing the structure and function of CDER, but because organizational function is linked to organizational culture, the committee had to consider CDER's culture and how it has been shaped by important changes in the policy, economic, and social environment; by structural factors, and the related policies and procedures that contribute to organizational dynamics; and by management. In the pages that follow, the committee describes the evidence and outlines the steps to be taken to align CDER's culture better with its mission "to make certain that safe and effective drugs are available to the American people".[2]

## The External Environment

Organizational culture is rooted in the external environment, and this is particularly true of government agencies, which experience the environment as "a set of constraints, expectations, and pressures" (Khademian, 2002) [p.136]. Some environmental and organizational challenges are peculiar to government agencies (Ostroff F, 2006; Claver E et al., 1999; O'Leary R, 2006). For example, their leaders are chosen for attributes that do not necessarily include a track record of organizational leadership, an ability to transform complex organizations, or an in-depth knowledge of the leadership issues routinely faced by an agency, and their time in office is usually brief. Government agency operations are less flexible than those of their private sector counterparts because of a wide array of laws and regulations and the requirement that they be responsive to the often conflicting expectations of multiple constituencies (Ostroff F, 2006).

For FDA, and specifically CDER, the environment is shaped by many factors. First, the evolution of FDA's regulatory role has been shaped by the expectations of American society, as expressed through its national legislature, in its courts, and in the influence of its patient and consumer advocacy movements. The American public desires timely access to effective and safe therapies. Legislative attention to the regulation of drugs (and other products in FDA's purview

---

[2] Source: http://www.fda.gov/cder/learn/CDERLearn/

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

has resulted in the statute that dictates FDA's role: the Food, Drug, and Cosmetic Act of 1938 and its many subsequent amendments. Another influence on FDA's work is the economic and political agenda of a powerful and influential industry, whose concerns include the potential of regulation to dampen innovation. The health care delivery system (organizations, payors, pharmacies, etc.) and health care professionals who act as intermediaries between patients and the drug development and distribution system are another factor in FDA's environment. Patients must secure a prescription from a qualified health care provider, and health care providers can only prescribe drugs that are approved by FDA. FDA actions, including findings from postmarketing surveillance, inform drug formulary and reimbursement decisions by payors. Although FDA does not regulate drug pricing, and cost-effectiveness is not a consideration, these are important issues to the health care delivery system, given financial constraints and the diverse therapeutic needs of its patients. A final crucial dimension of FDA's external environment is the potential influence exercised by the top levels of the executive branch (the White House, the Office of Management and Budget) and the legislative branch. Congress plays an oversight function and provides a forum for the push-and-pull of legislative factions concerned with consumer safety and those inclined toward spurring economic competitiveness. Congressional concern about the public's safety may be one contributing factor to what the industry and other critics have seen as the agency's historically risk-averse stance in carrying out its regulatory duties. In their view, the agency has generally been more likely to err on the side of greater caution in approving drugs than to err on the side of faster approval, perhaps in response to the fact that Congressional investigations generally focus on errors of commission (approving an unsafe drug) rather than on omission (not approving a potentially good drug) (Cohn J, 2003; Steenburg, 2006).

The multiple and often conflicting pressures of the external environment add to the complex nature of the Agency's work (science-based decision making) and the enormous medical, social, and economic impact of its regulatory decisions. FDA has a dual mission: to protect public health "by assuring the safety, efficacy, and security of human . . . drugs" and to advance public health "by helping to speed innovations that make medicines . . . more effective, safer, and more affordable". Balancing speed and safety is not always easy. Many drugs are both life-saving, motivating timely approval and release to the marketplace, and life-threatening, requiring careful monitoring of safety and rapid action to address safety risks as appropriate. The challenge in regulating prescription drugs is to weigh the available evidence of efficacy and safety in the context of the prevalence and severity of specific disorders, and the availability, safety and efficacy of other approved therapies. Although FDA and the industry share an interest in the discovery and development of beneficial products that improve health,[3] the decisions of regulators may affect the regulated industry's success in the marketplace (House of Commons Health Committee, 2005a; House of Commons Health Committee, 2005b).

Two dimensions of the external environment deserve more detailed discussion in the context of this report. These include the relationship between FDA and the industry, which has been complicated by the Prescription Drug User Fee Act (PDUFA), and FDA's relationships to Congress and to the White House.

---

[3] The Critical Path initiative is an example of FDA's interest in supporting innovation in drug discovery; it maps the way forward for applying cutting-edge science to drug discovery.

Copyright © National Academy of Sciences. All rights reserved.

*A Culture of Safety*

### The FDA–industry interface

It has become increasingly clear that the credibility of FDA is intertwined with that of the industry it regulates. If FDA is viewed as less trustworthy to make decisions that serve the public good, that may diminish the value and meaning of FDA approval, casting a shadow of doubt on FDA-approved products' reliability, quality, and most importantly, their safety and effectiveness. The concerns over drug safety described above have affected not only FDA's image, but that of the industry. In fact, the industry's integrity and its commitment to finding effective therapies for patients in need has been questioned (PricewaterhouseCoopers, 2005). Industry's credibility has been considerably affected by judicial action in response to non-compliance and by lawsuits related to how companies handled information about their products and in particular, whether they were adequately forthcoming about what they knew and when (Hensley S et al., 2005; The Henry J Kaiser Family Foundation, 2005; Wall Street Journal and Harris Interactive, 2005).

The user fee funding mechanism established in 1992 to supplement Congressional appropriations helped to expand and strengthen preapproval functions and the capabilities of the responsible CDER offices. PDUFA was renewed and revised in 1997 and 2002 and will be considered for reauthorization in 2007. The user fee program has increased considerably the resources available for drug review (see Chapter 7) and made the review process more predictable and expeditious (see Box 3-2 and Appendix C). However, it has had some drawbacks, including increasing the Agency's dependence on industry funding for its drug review activities, severely skewing CDER's focus to facilitating review and approval perhaps at the expense of other center activities, and creating an environment of intense pressure on its reviewers (Zelenay JL, 2005). A Department of Health and Human Services (DHHS) Office of the Inspector General (OIG) survey of CDER staff found that 40% of "respondents who had been at FDA at least 5 years indicated that the review process had worsened during their tenure in terms of allowing for in-depth, science-based reviews. Respondents cited lack of time as the main reason" (HHS et al., 2003).

Copyright © National Academy of Sciences. All rights reserved.

**BOX 3-2 A Short History of the Prescription Drug User Fee Act (PDUFA)**

**1992**

Use revenues from user fees to achieve certain "performance goals"

- Primary focus: decrease review times

PDUFA I Commitments:

- Complete review of priority original new drug and biologic applications and efficacy supplements (90% in 6 months)
- Complete review of standard original new drug and biologic applications and efficacy supplements (90% in 12 months)
- Complete review of priority supplements (90% in 6 months)
- Complete review of standard supplements (90% in 12 months)
- Complete review of supplements that do not require review of clinical data (manufacturing supplements) (90% in 6 months)
- Complete review of resubmitted new drug and biologic applications (90% in 6 months)

**1997**

PDUFA II was reauthorized for 5 years (FY 1998-2002) as part of Title I of Food and Drug Administration Modernization Act (FDAMA)

- Primary focus: decrease review times and shorten development times

New PDUFA II commitments:

- Complete review of resubmitted efficacy supplements (90% in 6 months)
- Respond to industry requests for meetings (90% within 14 days)
- Meet with industry within set times (90% within 30, 60, or 75 days depending on type of meeting
- Provide industry with meeting minutes (90% within 30 days)
- Communicate results of review of complete industry responses to FDA clinical holds (90% within 30 days)
- Resolve major disputes appealed by industry (90% within 30 days)
- Complete review of special protocols (90% within 45 days)
- Electronic application receipt and review (in place by the end of FY 2002)

Changes in commitments:

- Complete review of standard original new drug and biologic applications and efficacy supplements (90% in 10 months instead of 12 months)
- Complete review of manufacturing supplements that do not require review of clinical data (90% in 4 months instead of 6 months if prior approval is needed, otherwise 6 months)
- Complete review of resubmitted new drug and biologic applications (90% of class 1 in 2 months, and 90% of class 2 in 6 months instead of all in 6 months)

**2002**

PDUFA III was reauthorized for 5 years (FY 2003-2007)as part of Public Health Security and Bioterrorism Preparedness and Response Act

- Focus: expand interaction and communication in IND phase and during first cycle review
- Includes some funding for postmarket safety for 2-3 years after drug approval for drugs approved after 2002

New PDUFA III commitments:

- Discipline review letters for presubmitted "reviewable units" of new drug and biologic applications (90% in 6 months)
- Report of substantive deficiencies (or lack thereof) (90% within 15 days of filling date)

Changes to commitments:

- Complete review of resubmitted efficacy supplements (90% of class 1 in 2 months and 90% of class 2 in 6 months instead of all in 6 months)
- Electronic application receipt and review (enhanced by end of FY 2007)

Sources: (FDA, 2005e) (FDA, 1995; FDA, 2002; FDA, 2006a)

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

3-6

Copyright © National Academy of Sciences. All rights reserved.

*A Culture of Safety*

In discussions with FDA staff, the committee learned that the emphasis on timely review that is at the core of PDUFA and is linked with specific performance goals has added to reviewer workloads despite the increase in review staff. FDA must report to Congress annually about its success in reaching the performance goals. Some observers have charged that increased speed of review has led to decreased safety, in part because the time demands of PDUFA limit the ability of reviewers to examine safety signals as thoroughly as they might like (Sasich LD, 2000; Wolfe S, 2006). Performance goals with reporting requirements for actions relating to review speed, but not for other actions, such as postmarketing safety monitoring and risk communication, may lead to the assigning of higher priority to those actions that have associated performance goals.

There has been some debate about PDUFA's effect on drug safety as demonstrated by drug withdrawals. Abraham and Davis (2005) found that in the period before enactment of PDUFA the United States had 50% fewer drug withdrawals than the UK largely because of the longer periods that the FDA took to review drug applications. They suggested that US efforts to speed approval may be compromising drug safety in the PDUFA era. However, drug withdrawals are very rare occurrences in general, and the total number of withdrawals in the last 2 decades of the 20th century represents a modest figure that may not be useful for generalization. For example, in reviewing 20 drug withdrawals in 1980-2004 (nearly half of which occurred before PDUFA was enacted), the Tufts Center for the Study of Drug Development found that "no trend emerges between speed of approval and withdrawal" (Tufts Center for the Study of Drug Development, 2005). Drug withdrawals are just one indicator of drug safety; the timeliness of a withdrawal may be more important than the fact of the withdrawal. Furthermore, drug withdrawals say nothing about the safety of drugs that remain on the market and continue to affect public health. Olson (2002) makes the point that drug withdrawal data are of limited value in drawing inferences about drug safety more generally and instead focuses on adverse drug reactions among all new chemical entities approved between 1990 and 1995. The Government Accountability Office (GAO) analysis looked at withdrawals over 4-year intervals between 1985 and 2000, and found that the rate of withdrawals fluctuated from 4.39 percent in 1985-1988, to 1.96 percent in 1989-1992, to 1.56 percent in 1993-1996, and 5.34 percent in 1997-2000 (GAO, 2002). There were 15 drug withdrawals between 1985 and 2000, and in its response to GAO, FDA asserted that the variation in the withdrawal rate was probably related to the small number of withdrawals in any given year (GAO, 2002). The Berndt et al. (Berndt ER et al., 2005) analysis found that the proportion of approvals ultimately leading to safety withdrawals prior to PDUFA and during PDUFA I and II were not statistically significantly different.

The user-fee system has exacerbated concerns about the relationship between FDA and the regulated industry by creating the appearance of conflict of interest in the regulators—critics assert that PDUFA gives sponsors inappropriate leverage or influence over regulation because FDA is obliged to please sponsors, now its "clients", in return for fees for service (Wolfe S, 2006; Grassley C et al., 2004; Harris G, 2004).  Regulatory capture is a term used by regulatory scholars (such as Stigler G, 1971),  to describe successful industry pressure on regulators, and some observers actually believe that PDUFA has facilitated the capture of FDA, as discussed by (Carpenter et al., 2003; Olson, 1994). The core  problem in the relationship between industry and FDA (leading FDA to consider industry a client) may lie in the power of the industry to shape the scope and nature of PDUFA goals (Carpenter et al., 2003; Okie, 2005; Olson MK, 2002; DHHS and FDA, 2005).  In the negotiations between FDA and the industry, Congress has given the industry a considerable role in influencing what activities the user fees will fund, thus limiting regulatory discretion and independence. In particular, fee revenues only could be used to

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

support activities designed to increase the speed and efficiency of the initial review process. Fee revenues could not be used to support postmarketing safety surveillance from 1992 to 2002.  In the 2002 PDUFA reauthorization, a small amount of fee revenues (about 5%) was permitted to be used for post marketing drug safety activities; however, restrictions on when these funds could be spent (only for drugs approved after 2002, and for up to 2 years after approval, or up to 3 years for "potentially serious drugs") limited their effectiveness (Zelenay JL, 2005).  In Chapter 7, the committee discusses this troubling feature of PDUFA and suggests an alternative.

Concerns about inappropriate influence on regulatory decision making are not new, although it can be argued that PDUFA has made the connection between CDER performance and industry expectations much more explicit. In 1977, a government panel examined whether there was pressure on reviewers of new drugs to make regulatory recommendations favorable to the industry (DHEW[4] Review Panel on New Drug Regulation, 1977; Dorsen et al., 1977). The panel concluded that the problem was largely linked to poor management rather than verifiable industry influence.

> The second basic issue explored by the Panel was whether industry exerts undue influence on FDA decisions. Many current and former FDA employees and consultants had testified to Congressional committees that industry pressure caused FDA officials to approve drugs that did not meet agency safety and effectiveness standards and that those who attempted to oppose industry demands were harshly and improperly treated by senior FDA officials. From detailed investigations of these allegations by its staff, the Panel concluded that there was no widespread use of improper influence by industry representatives. It did identify several instances in which FDA supervisors unfairly disciplined dissenting employees, but these lapses were found to result from poor management rather than improper efforts of industry to control agency decision-making [Dorsen and Miller, 1979: 910].

The concerns raised or exacerbated by PDUFA have an additional dimension. The interests of industry and the public are sometimes at odds, and some critics fear that PDUFA may have increased FDA's responsiveness to one set of interests at the expense of the other set of interests, in some circumstances. It is important to note that FDA's various constituencies have mixed expectations. The public, as reflected in the goals of multiple consumer and patient advocacy groups, has a simultaneous desire for speed and safety. Although the public wants to preserve the consumer protections afforded by drug regulation in America, it also may demand earlier patient access to potentially life-saving therapies, as was so effectively exemplified in the successes of the AIDS treatment advocacy movement. The industry, while developing a product that serves the public good by providing reliable and effective therapies, has a superseding fiduciary duty to its shareholders—a duty that requires that it be profit-seeking and asset-conserving—so its expectations are for smooth review and approval processes and the fewest regulatory impediments. FDA itself is accountable to Congress, whose members represent the American people. The committee believes that FDA's most important constituency is the public and that commitment to the public good will ideally influence and check FDA's interactions with the industry.

---

[4] Department of Health, Education, and Welfare, predecessor of the Department of Health and Human Services.

Copyright © National Academy of Sciences. All rights reserved.

*A Culture of Safety*

### Structural factors, policies and procedures

*Structural factors*

External observers, from scientists to legislators, have noted that a key organizational challenge for CDER is the striking disparities between divisions responsible for premarket and postmarketing activities. There are disparities in the formal role, authority, resources, and relative institutional value conferred on the two groups of staff. Many of those issues have been confirmed by the 2006 GAO report on FDA's postmarket decision making and oversight process. The committee is not arguing that the responsibilities, resources, and other features of OND and ODS/OSE[5] must necessarily be equal in every respect. The committee did not attempt to undertake a point-by-point comparison of OND and ODS/OSE roles, capabilities, resources currently and in a perfect world), but it does assert that the formal function and resources of ODS/OSE have not been commensurate with the importance of safety or with the tasks of monitoring postmarketing drug safety. Inadequate management, discussed later in this chapter, also may contribute to the gap between ODS/OSE and OND and to the sense of interoffice tension or, at best, disharmony between the two offices. To some critics, the most concerning outcomes of the disparities between the premarketing and postmarketing activities are that authority over postmarketing safety is solely in the hands to people who did the preapproval work of reviewing and approving a drug and that safety activities appear to be secondary or subservient to the pre-market processes and the task of approving drugs for marketing (Wolfe S, 2006).

CDER's culture seems to have been influenced by how premarket and postmarketing functions have been divided historically. Randomized controlled trials are the gold standard for studies leading to drug approval. Epidemiologic, population-based studies are used after approval, when a drug is on the market and being used in real-life circumstances. Medical knowledge derives from both randomized clinical trials and epidemiologic studies (including observational studies that use automated health care databases), but the methods of the two approaches differ, as does the degree of confidence that can be accorded analytic results. Although the two approaches are complementary and can both be valuable depending on the nature of the medical problem addressed—for example, population-based studies provide different kinds of information that randomized controlled studies do not deliver before approval—recent depictions of the workings of CDER suggest that the disparate respect afforded to results of the different approaches adversely affects interactions when uncertainties about the data abound and the "call" regarding regulatory action is close. Most OND reviewers are physicians who are trained to analyze prospective, randomized controlled clinical trial data, whereas the ODS/OSE staff, including the safety evaluators and the epidemiologists, must typically work with uncontrolled or observational data. Most data bearing on safety issues generated and reviewed in the postmarketing period are from case reports and from epidemiologic studies. Recent controversies show that there is sometimes a marked difference of opinion between OND and ODS/OSE about the interpretation of such data. OND staff often view observational data as "soft" and unconvincing, whereas ODS/OSE staff see them as informative and carrying great weight in evaluating postmarketing safety questions.

The interdisciplinary tension is also an obstacle to full implementation of a lifecycle approach to drug regulation, in which the preapproval process actively and creatively involves anticipation of postapproval uncertainties and a plan for addressing them. That is a clear example

---

[5] In particular, Division of Drug Risk Evaluation epidemiologists and safety evaluators.

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

of how structure and culture can connect. A structure that provides opportunities for crosscutting discussion and methods—an interdisciplinary "team approach"—would go a long way to encouraging a collaborative culture, in which differing viewpoints and types of expertise can make a contribution.

In the last decade, there have been four major restructuring efforts in the variously named office responsible for postmarketing safety and in CDER; most recently, steps have been taken to clarify and elevate the previously ad hoc role of ODS/OSE as part of a broader effort to "sustain a multi-disciplinary, cross-center approach to drug safety" (Galson email to staff 15 May 2006; see also Appendix A). Although those efforts may reflect CDER's desire to improve the effectiveness of its safety surveillance programs, the frequency of repositioning organizational "boxes" and changing unit names raises concern that such changes are more cosmetic than functionally effective responses to public dissatisfaction with the CDER's performance. Committee discussions with CDER staff and the history of reports documenting problems in CDER suggest that previous efforts at restructuring did not fundamentally alter the characteristics of or the relationship between OND and ODS/OSE or the morale and functioning of the Center. Thus, the committee is not convinced that the recent changes will succeed without additional specific actions.

### Policies and procedures

The committee has reviewed the relevant CDER guidance documents and the numbered documents in the *Manual of Administrative Policies and Procedures* (individual documents are known as MAPPs)[6] to understand the current structure defining the roles of OND and ODS/ODE, and it reviewed various Congressional and public proposals for restructuring (CDER et al., 2005; FDA, 2005d; Grassley C, 2005; Johnson L and U.S. PIRG, 2005).[7] The committee has also discussed the technical or administrative details with the appropriate FDA staff and managers, and reviewed reports describing the many dimensions of drug regulation and its challenges(DHHS and OIG, 2003; GAO, 2002; GAO, 2006; Thaul S, 2005).

CDER constitutes teams for New Drug Applications (NDA) reviews (see Box 3-3). OND plays a formal lead role in most regulatory actions, and OND reviewers sign components of the approval package; OND managers (division directors, office directors, and the OND director) act in a final decision-making capacity in most cases. Some members of the review team, such as statisticians, work in offices other than OND. The committee has learned that there is little inte-

---

6  A description of MAPPs is available at http://www.fda.gov/cder/mapp.htm.

7 CDER has issued several guidances and MAPPs related to the preparation of the review package; several of these are mandated by the PDUFA. FDA's guidance documents include the following disclaimer: "This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance . . . FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, Guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word 'should' in Agency guidances means that something is suggested or recommended, but not required."  MAPPs, however, establish procedures to be used (with variations, as appropriate) by CDER staff.

Copyright © National Academy of Sciences. All rights reserved.

*A Culture of Safety*

gration of and a limited role for ODS/OSE staff in the premarket review process; they work in a consultative and supportive capacity and, with one exception, have no regulatory authority (FDA MAPP 6700.1; GAO, 2006). Although postapproval responsibilities for ODS/OSE have been growing, resources and a formal role have not increased.

FDA's *Guidance for Review Staff and Industry: Good Review Management Principles and Practices for PDUFA Products* (GRMP) outlines in great detail the roles and responsibilities of the team leaders and reviewers drawn from other disciplines in CDER. It also addresses so-called consults from non-team members, such as staff from ODS/OSE, the Office of New Drug Chemistry, and the Division of Drug Marketing and Communication. The guidance document describes ODS/OSE staff as consultants, not as members of the review team, and their formal responsibilities, other than participating in consults, include participation in the preapproval safety conference and review of product labeling. The only formal authority given to ODS/OSE is to grant waivers to the industry sponsors from the requirement to prepare a Risk Minimization Action Plan (FDA, 2005a).

The PDUFA deadlines, which affect mostly OND staff, may play a role in contributing to an organizational structure that limits ODS/OSE involvement. Review packages accompanying an NDA approval letter include what are called discipline reviews, often long documents written by CDER scientists reviewing material in a specific scientific discipline submitted by an applicant in support of the NDA. Discipline reviews and other documents, such as the approval letter, related to the review of a drug are made public on FDA's Web site only if an application is approved for marketing (see Chapter 4 for additional discussion). Review packages for products that are not approved are not made public. The clinical review is usually written by one OND staff person and includes summaries by the clinical reviewer of other discipline reviews.

---

**BOX 3-3**
**Composition of the NDA Review Team**

Review teams include a review project manager (RPM) and primary reviewers, who complete the discipline reviews, as needed, in the following disciplines:
- Medical/clinical[8]
- Pharmacology/toxicology
- Chemistry manufacturing, and controls
- Biometrics/statistical
- Clinical pharmacology and biopharmaceutics
- Clinical microbiology
- Bioresearch monitoring.

Source: FDA. 2005. Guidance for Review Staff and Industry:  Good Review Management Principles and Practices for PDUFA Products (GRMP, guidance #5812; FDA, 2005d).

---

A policy and procedure (MAPP 6010.3, see Box 3-4), the *Clinical Review Template* introduced in 2004, provides an opportunity for formal involvement of ODS/OSE medical officers in the review process. The purpose of the MAPP was to standardize the safety review components of an NDA and in particular the approach to postmarketing safety of the product (Racoosin JA , 2006). The MAPP suggests options for involvement of more than one OND clinical reviewer. If

---

[8] CDER documents appear to use the terms "medical review" and "clinical review" interchangeably. It has been suggested that use of the phrase "clinical review" indicates that a primary reviewer need not necessarily be a  physician, although most of them are. In this report we will use the more inclusive term "clinical review" or "clinical reviewer".

Copyright © National Academy of Sciences. All rights reserved.

*The Future of Drug Safety*

there is more than one, a lead reviewer is identified and has the responsibility for writing the overview and section 4.3, which describes how the review was prepared. Two options exist for the final review; one allows for multiple reviews by multiple authors incorporated into a single overview, and the other limits the review package to one final clinical review with sections prepared by multiple reviewers.

Although there is no formal public documentation of changes instituted by the MAPP, the committee's informal review of NDA packages approved before to July 2004 suggests that the "Recommendation on Postmarketing Actions" introduced a substantial change in the clinical review template by creating a location in the review package for a review and recommendations on postmarketing actions pertaining to the drug to be approved. Based on a review of more recent NDA packages, it appears that the new template is being used by reviewers of new drugs, but the committee believes that that responsibility would be a reasonable and appropriate function for ODS/OSE medical officers.

---

**BOX 3-4**
**Clinical Review Template – Postmarketing Actions**

In July 2004 CDER issued MAPP 6010.3, the *Clinical Review Template* (CDER, 2004a), which established procedures for documenting the primary clinical review of NDAs. The clinical review is one of the discipline reviews prepared in response to an original or supplemental NDA (or Biologic License Application reviewed by CDER), amendments in response to action letters, and efficacy supplements. The MAPP describes the format of the discipline review and the responsibilities of the reviewers, other team members, and those in the supervisory chain. The review template includes 11 sections:

1. Executive Summary
2. Introduction and Background
3. Significant Findings from Other Review Disciplines
4. Data Sources, Review Strategy, and Data Integrity
5. Clinical Pharmacology
6. Integrated Review of Efficacy
7. Integrated Review of Safety
8. Additional Clinical Issues
9. Overall Assessment
10. Appendices
11. References

Section 9.3 of the template (part of Overall Assessment) is entitled "Recommendation on Postmarketing Actions" and includes subsections on "Risk Management Activity", "Required Phase 4 Commitments", and "Other Phase 4 Requests", and a review of and recommendations for the applicant's postmarketing risk management plan.

---

## Management

There have been many opportunities for CDER and FDA leadership to acknowledge to the committee and to others that there is a culture problem in CDER. However, although agency and center leaders generally mentioned the flurry of drug safety activities being undertaken, they did not seem to recognize the tensions and other strains within the center as anything more than a minor distraction. On the basis of its discussions with current and past FDA employees (both staff and management), its review of several government reports and other relevant literature, the committee believes that CDER's organizational culture is characterized by problems in several important areas: a suboptimal work environment, a polarization between two major functions, an underestimation of and poor handling of scientific disagreement and differences of opinion, a lack of consistency across divisions, and instability and politicization at the top (in the Office of

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*A Culture of Safety*

the Commissioner). The committee believes that these issues may directly or indirectly affect CDER's optimal handling of drug safety concerns.

### (A) A suboptimal work environment

There is evidence of a persisting problem with retention, turnover, and morale in CDER. CDER's organizational culture does not seem to be based on the values of staff participation, inclusion, and empowerment (Coffee, 1993). Relevant staff members are sometimes excluded from planning of administrative and program improvements and their initiative in proposing improvements is not well-received (or "received" at all). Staff members are sometimes left out of discussion and decision making about the future of the Center, new initiatives, etc.

Two government reports provide some information suggestive of potential difficulties in the CDER work environment. A GAO report (GAO, 2002) on the rate of safety withdrawals after enactment of PDUFA found that attrition among medical officers and other relevant FDA staff from 1998 to 2000 was noticeably greater than attrition in similar disciplines at the National Institutes of Health and the Centers for Disease Control and Prevention (10.5% vs. 5.5 and 4.7, respectively). Although one explanation for the turnover is that FDA staff leave for promising opportunities in industry (that arguably leads to a propagation of competent individuals with regulatory agency experience throughout industry), it is possible that turnover is indicative of a less-than ideal organizational culture that requires attention. The GAO report attributed the turnover to reasons that included workload and decreased training opportunities. FDA data in a 2003 report on the drug review process showed that medical officers and pharmacologists had the highest attrition rates in CDER (DHHS and OIG, 2003).

The committee learned from its conversations with OND staff that their considerable workloads and time pressures exacerbated by PDUFA make it difficult for them to be as thorough as they would like in their assessments of safety after marketing. The committee's discussions with CDER staff resonated with the findings of previous assessments—reviewers of new drugs are often overwhelmed merely keeping up with the routine aspects of review, which leave little time to consider postmarketing safety plans thoughtfully, or to investigate (for example, with colleagues in other disciplines) safety signals that arise after approval (IOM Staff Notes, 2005-2006). In such circumstances, it is little wonder that professional development and internal interaction to facilitate communication and understanding among divisions and offices become luxuries. In 2005, a group of OND medical officers organized itself to identify possible causes of attrition and to make recommendations to CDER management about ways to improve retention (Medical Officer Retention Subcommittee, 2005). The group's recommendations included addressing OND reviewer workloads by hiring more staff, increasing division and office director awareness of reviewer needs, redefining the CDER vision, and in general transforming the CDER leadership philosophy. Members of that staff subcommittee expressed concern that the leadership philosophy in CDER did not encourage staff participation and input at all levels (MORS, 2005).

The failure of management to implement effective changes to address those important issues indicates that there is a problem. ODS/OSE and OND staff have reported being left out of regulatory meetings directly related to their work, and ODS/OSE staff have frequently been left out of relevant advisory committee meetings (GAO, 2006). There is evidence of a lack of consistent processes to facilitate and resolve safety issues identified by ODS/OSE and passed on to OND. The 2006 GAO report's finding that ODS/OSE consults and questions often went into a "black

Copyright © National Academy of Sciences. All rights reserved.

hole" and that initiating staff never received feedback is consistent with what this committee learned.

Some staff-generated ideas for process or culture improvements received little or no attention from management. In its 2006 report, GAO noted that in December 2004, ODS epidemiologists requested a broadening of their role to include "presenting all relevant ODS data at advisory committee meetings" but management did not respond (GAO, 2006: 22). To the best of the present committee's knowledge, CDER management also did not respond to the OND Medical Officer Retention Subcommittee's May 2005 proposal until June 2006. The committee was surprised to find out that although the DSB had been introduced to a variety of audiences (Congress, the public, etc.), CDER staff seemed uninformed about what the board was expected to accomplish and how it would affect their work.

Management scholars have identified a strong attachment to the status quo in many organizations and a tendency to commit "sunk cost" errors by pursuing a course of action because so much has already been invested in it (Edmonson et al., 200?). A panel convened by the National Aeronautics and Space Administration after the Columbia disaster identified similar organizational tendencies, noting, for example, that "once the Agency is on record as committed to a specific achievement, it becomes unpalatable to back off of that target for fear of appearing to fail" and that there was an attitude of "comfort with existing beliefs" that justified a resistance to internal or external criticism and a stifling of dissenting views (O'Leary R, 2006; Return to Flight Task Group, 2005). The perception that there are somewhat similar cultural attitudes in CDER is evident in the concerns of consumer advocates and academics and confirmed by the DHHS OIG and GAO reports that new drug reviewers feel pressured by the unstated expectations of the agency leadership (due to PDUFA goals and other reasons) to approve drugs and are unable to revise the regulatory approach to an already-approved drug.

### *(B) Interoffice polarization*

The committee has seen evidence of a divide between the premarketing and postmarketing staff in CDER (generally represented by staff in OND and staff in ODS/OSE, respectively). ODS/OSE staff has been left out of regulatory discussions and advisory committee meetings (GAO, 2006; IOM Staff Notes 2005-2006). The user-fee funding system may have also allowed (or at least exacerbated) the emergence of a major resource gap between OND and ODS/OSE (IOM, 2005) (IOM Staff Notes, 2005-2006; GAO, 2006; Zelenay, 2004) (also see Chapter 7 for a more detailed discussion of the funding and staff imbalance). Although the committee did not explore the history of this divide, conversations with CDER leadership revealed disparities in how the two offices and their contributions to the agency's work are regarded. The 2006 GAO report has also confirmed the difference in status between the two offices. Given the high profile concerns about drug safety, the fact that an office bearing the title of "Drug Safety" had a lower status than an office of "New Drugs", and agency spokespersons appeared dismissive of the work of staff in that office may have also exacerbated the perception of tension. The committee is aware that there have been repeated attempts to reorganize or restructure CDER, both by moving boxes around a chart and by developing internal policies, procedures, and guidance documents (as described above), but culture problems have persisted.

The committee has seen little historical evidence of successful initiatives to strengthen ODS/OSE capabilities or to stabilize the office, which has experienced eight changes in leadership and four reorganizations in the past 10 years (GAO, 2006). Although the committee was

Copyright © National Academy of Sciences. All rights reserved.

encouraged by the appointment of a new permanent ODS/OSE director (after much turnover in that position[GAO, 2006]) and by evidence of planning to improve communication and collaboration between OND and ODS/OSE, it remains concerned that these attempts are "too little, too late."

The committee believes that management in CDER has not done enough to cultivate an atmosphere of mutual respect and appreciation across some of the disciplines. In interactions with CDER leadership, the committee formed the impression that ODS/OSE staff habr been considered marginal players, compared with OND staff, in contributing to the work of ensuring drug safety. When the committee inquired about the apparent cultural divide in discussions with CDER leadership, it heard that ODS/OSE was not capable of a greater function in postmarketing safety because of a lack of qualified and trained staff, a lack of analytic sophistication, and inadequate understanding of the data and their weighing in the approval process. The committee also heard that problems between ODS/OSE and OND are simply a squabble, not warranting management attention. The GAO report (2006) appeared to touch a nerve when it interpreted ODS/OSE's role of consultant to OND as secondary, not well defined, and lacking clear responsibilities. In its response to GAO, FDA argued that the consultative role is important and that the GAO report did not recognize that; but the agency did little to explain specific steps it would take to clarify the role of ODS/OSE and to pay more than lip service to its contributions. The committee acknowledges that some recent changes have occurred in CDER. Some have been on ODS/OSE's own initiative—as the GAO report has acknowledged, the level of expertise and sophistication of analyses conducted by the office have evolved, and a promising new leader has been appointed to head the office (FDA, 2005f; GAO, 2006). As noted in Chapter 1 and in Appendix A, in the wake of highly publicized concern about the safety of some drugs approved by FDA, the agency and CDER announced the implementation of several strategies to improve attention to postmarketing safety and to strengthen the administrative processes that underlie drug safety work in FDA. Those strategies included two processes for dispute resolution at the staff level, and the establishment of the Drug Safety Oversight Board for interdivisional difficulties (discussed below) (CDER and FDA, 2005) (CDER, 2004b).

It does not appear that the various efforts to restructure CDER have improved interactions between review and postmarketing staff. The dispute resolution mechanism has yet to be used, and mass media reports about emerging drug safety concerns continue to give the appearance that the Center is not managing those concerns adequately. On several occasions when the findings of safety staff have been cited in the mass media, agency spokespersons have downplayed or disparaged the information as "raw" or incomplete, instead of assuring the public that the Agency takes the concerns of its staff seriously and that staff collaborate to bring such important questions to resolution. New documents to guide CDER staff have not necessarily translated into greater clarity and effectiveness at the level of interoffice relationships and procedures; in fact, there is a continuing lack of established mechanisms for communicating about and following safety signals between offices. That attitude was apparent on numerous occasions when members of this committee spoke with FDA and CDER management who described ODS/OSE as lacking in needed expertise, sophistication, and depth of experience (IOM Staff Notes, 2005-2006). That disparity in management attitudes toward OND and ODS/OSE is also suggested by information provided in the 2006 GAO report, in the comments of FDA officials to the press, and in a recent response from the CDER director to an internal group's proposal to address medical officer attrition. May and June 2006 newspaper articles about the agency's handling of drug safety concerns about an antibiotic indicated that postmarketing safety staff expressed con-

Copyright © National Academy of Sciences. All rights reserved.

cerns that were not addressed in a timely manner by CDER management. An FDA spokesperson described a safety reviewer's report of her concerns "a preliminary, raw assessment" and stated that "the final decision will be made by experts who have the full benefit of a large section of opinion and scientific fact" (Harris G, 2006).

### (C) Underestimation and poor handling of scientific disagreement and differences of opinion

Management's difficulties in addressing internal agency conflict and scientific disagreement transparently and competently, in communicating scientific uncertainty to diverse audiences effectively have played an important role in damaging the credibility of CDER and the FDA. As discussed in Chapter 4, the regulation of drugs rests on a foundation of incomplete but growing knowledge, and the risk-benefit assessment for every drug continues to evolve after approval, when use of the drug moves from the carefully controlled confines of clinical trials to the largely uncontrolled and much more complex circumstances of real-life prescribing and use. Legitimate scientific disagreement may occur at various points in the lifecycle of a drug. There may be disagreement about whether a reasonable threshold of certainty has been reached to justify approval (the absence of standard approaches to the risk-benefit assessment before approval is discussed in greater detail in Chapter 4). After approval, there may be scientific disagreement about the interpretation of adverse event signals (for example, there is no clear guidance on when a noise becomes a signal) and about what regulatory action is warranted.

The committee is concerned about information suggesting that scientific disagreement in the center is sometimes handled in ways that may create an inappropriate atmosphere of pressure or poor tolerance of disagreement. The 2003 DHHS OIG report of survey findings on 401 CDER reviewers (most in OND) stated that "18 percent of respondents indicated that they had felt pressure to approve or recommend approval for a drug, despite reservations about its safety, efficacy, or quality" (18 percent accounts for about 72 of 401 respondents to the survey). Although scientific disagreement is understandable and there are cases where a division or office director disagrees with a reviewer's recommendation on the basis of the science, having even one or two staff members who report pressure to approve or recommend approval is an entirely different and deeply troubling occurrence.[9]

In its visit and later discussions with FDA staff, the committee learned that differential valuation of disciplinary approaches affects the relationship between OND and ODS/OSE and contributes to a perception in each office that its counterpart does not have the full picture or

---

[9]  In August 2006, the Union of Concerned Scientists (UCS) and Public Employees for Environmental Responsibility (PEER) released their survey of FDA, which included the survey instrument used in the 2003 DHHS OIG survey. UCS findings echoed those reported by OIG in 2003, including the response to "Have you ever been pressured to approve or recommend approval for an NDA despite reservations about the safety, efficacy, or quality of the drug?" Of 217 CDER staff who responded to this question, nearly 19% (41) said "yes" (UCS and PEER, 2006). After the UCS release, FDA Acting Commissioner Andrew von Eschenbach met with UCS staff, acknowledged his concern about the issues related to morale identified in the survey, and also vowed to work to create "an environment where there is free, open and vigorous debate and discussion" (http://www.ucsusa.org/news/press_release/acting-fda-director-pledges.html). In the course of Senate committee questioning during the August 1, 2006, nomination hearing, Dr. von Eschenbach was asked about the UCS survey question regarding "pressure to approve . . . despite reservations." The acting commissioner stated that "no one should ever alter the data or the scientific facts" (http://help.senate.gov/Hearings/2006_08_01/2006_08_01.html).

Copyright © National Academy of Sciences. All rights reserved.

*A Culture of Safety*

does not give enough consideration to colleagues' different disciplinary perspectives. Although OND staff includes physicians, some of whom have training in statistics or epidemiology, their efforts are oriented substantially toward review of data from randomized controlled trials, and their experience with and confidence in epidemiologic studies may be slight. ODS/OSE staff, in contrast, have a greater level of comfort with epidemiologic approaches but less familiarity with randomized controlled trials and their analysis. But as mentioned above, the imbalance in formal role and authority between the new drug review staff and surveillance and epidemiology staff denotes subservience of the safety function, and a management devaluation of the latter discipline and approach.

The Drug Safety Oversight Board (DSB), which consists of staff members of several CDER offices and representatives of other FDA centers and other government agencies are established to "improve public knowledge of emerging important drug safety concerns; strengthen internal drug safety management; foster practical policy development to improve consistency and timely resolution of important drug safety concerns; and provide a standing venue for resolution of CDER organizational disputes" (Cummins, 2006). Including members drawn from CDER offices not primarily responsible for any given product or issue, and from other federal agencies, is intended to provide some independent oversight regarding emerging issues while maintaining the ability to convene quickly without conflict of interest considerations or concern about the discussion of proprietary matters. Items for discussion can be brought to the DSB by a CDER Division or by OND or ODS/OSE leaders. It is not clear whether DSB can on its own initiative address an issue of which it has become aware if it is not formally referred to them. The DSB emerged as part of the agency's response to Congressional and public concern over highly publicized drug safety problems. Because many critics called for independent external oversight of drug safety, the creation of the board was believed by some to be a solution to address that particular concern (FDA, 2005c). The composition of the board caused confusion and gave rise to criticism that the board as constituted was not independent. That confusion was furthered by FDA's silence on the board's real (and potentially useful) function, and the underlying public and legislative concern about independence was left unaddressed. Because the DSB has been in operation for only a short time, it is too early to judge its effectiveness, but some of its drug safety problem resolution, management, and policy functions seem to constitute a sensible approach. DSB is analogous to industry practices of bringing together leaders of different groups in a company to consult with a group facing a difficult problem. However, the committee believes that the external communication function of the board seems to be a vastly different and equally important set of concerns that should be in a different part of CDER (see Chapter 6). That would allow the DSB to focus its energies and resources on addressing the internal management of drug safety issues.

There has been additional confusion about the apparent overlap between the Drug Safety and Risk Management Advisory Committee (DSaRM) and DSB. CDER management has described the latter as a "venue for resolving CDER organizational drug safety disputes" and "discussing [the] need for AC [advisory committee] meetings about emerging safety information" whereas DSaRM has been described as a way to obtain public input and facilitate discussion to inform CDER decision making. The committee believes that DSaRM fulfills the function of the sought-after independent, external oversight body, in contrast with DSB, which is intended to bring serious and complex internal safety issues to resolution.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

## (D) Inconsistency

Many interactions in CDER appear to be idiosyncratic and personality-driven. The committee understands that there is great variation within and among drug classes and from one product to another and that flexibility is desired. However, there seem to be subjects on which consistency would be beneficial, for example, methods of risk-benefit analysis, preapproval decisions on postmarketing studies, handling of disagreements between offices, ODS/OSE participation in the review process, monitoring of drug safety signals after approval, responding to drug safety signals, communication of important risks to the public, and followup of postmarketing study commitments. Some best practices have not been disseminated throughout CDER. For example, one division's model for ensuring internal safety capacity by establishing its own safety team of epidemiologists has attracted interest in CDER and from drug safety advocates but has not yet been replicated in any other division (the committee has heard that this model may be expanded to other divisions).[10]

## (E) Instability and politicization at the top

The absence of stable leadership at the commissioner level and lack of consistent oversight of CDER by the commissioner may contributed to overarching management problems in CDER. Although the day-to-day work of CDER is not immediately affected by what is happening in the commissioner's office, the recurring absence of a confirmed commissioner has implications for the agency. First, the absence of stable leadership has meant much more than going without an agency figurehead. As discussed above, the external environment places great pressure on FDA and its centers, and the agency's top leadership plays a crucial role in setting the course for the agency and in mediating the effects of external pressures by representing the agency in interactions with other government agencies, Congress, the industry, and the public. An acting commissioner does not carry the same weight symbolically, and lacks the authority to articulate agency positions. PDUFA reauthorization talks in 2002 were reportedly slowed down by the lack of a commissioner (Validation Times, 2002). An individual in an acting capacity also may be unable to act decisively; such a person would likely defer making any difficult decisions or setting a new course for the agency. Furthermore, staff may be unlikely to take such a leader seriously because an acting position is by its very definition temporary (Warren, 2006) (Miller HI, 2006). In cases when an acting commissioner is also the president's nominee facing the prospect of challenging Senate hearings, making decisions on high profile issues could potentially complicate the road to confirmation. As appointing and confirming a permanent commissioner is delayed, FDA staff and the public may also conclude that their government does not consider commissioner's position important, and that may have demoralizing consequences on staff and affect the agency's credibility (Alonos-Zaldivar R, 2006) (Kaufman, 2004). In 2002, FDA staff were questioned in a Congressional hearing without the support of a Senate-confirmed commissioner (Kaufman, 2002).

Industry leaders have asserted that the lack of a leader leads to an increase in agency caution and a decrease in predictability in the eyes of companies and investors (Young, 2005). In

---

[10] That is the Neuropyschiatry Drug Products Division was recently split into two, a Neurology Products Division and a Psychiatry Products Division. The safety team currently resides in the Division of Neurology Products but supports both divisions.

Copyright © National Academy of Sciences. All rights reserved.

2002, the Biotechnology Industry Organization (BIO) petitioned President Gorge W. Bush to appoint a commissioner, arguing that the industry and the nation needed "strong leadership from an FDA commissioner with vision and experience in science, medicine and administration" (BIO, 2002). In the same year, the PhRMA president and CEO reported that the industry was challenged by the absence of agency leadership that PDUFA negotiations were slowed down by the absence of a commissioner (National Journal's *Congress Daily*, 2002; Validation Times, 2002). Former commissioner Jane Henney stated that in the absence of leadership, "industry loses because it needs predictable and strong signals about the review process, the consumers need to make sure somebody is in charge and the FDA staff needs somebody who can take the heat if necessary" (Kaufman, 2002). In the 2005 Senate committee session on the nomination of the then Acting Commissioner, Senator Enzi cited a letter from the Senate committee to the president urging the nomination of a commissioner "to provide the agency with greater clarity and certainty in its mission", and stated that a "fully confirmed Commissioner is essential to en-suring that these medical breakthroughs can be brought to the market safely and effectively. Consumers deserve to have a fully functional FDA that can oversee the industry with confidence and authority and harness the technical achievements that can improve and save lives" (Senate Executive Session, July 18, 2005).

Management literature has made it clear that organizations, including government agencies, cannot function well without effective leadership to set them and keep them on course to achieve their mission (GAO, 1996). In the last 30 years, FDA has had eight commissioners and seven acting commissioners (including the current acting commissioner) or, when the post was vacant, an acting principal deputy commissioner. The eight commissioners have served an average of 2.5 years with a range of 2 months to 6.3 years (FDA, 2006b). That instability is thought to have contributed to CDER's problems. CDER is the largest center in the agency, the center director reports to the commissioner, and the center's decisions and their repercussions are highly visible and sometimes controversial, as was the case with the Plan B over-the-counter switch application (GAO, 2005). The committee believes that turnover and instability in the commissioner's office leave the agency without effective leadership or the potential to emphasize safety as having high priority in the work of the agency. Without stable leadership strongly and visibly committed to drug safety, all other efforts to improve the effectiveness of the agency or position it effectively for the future will be seriously, if not fatally, compromised. A priority for the agency should be to regain the trust of the public while positioning itself for the future.

The controversy over the emergency contraceptive Plan B has further highlighted the power of the Commissioner. In this area, the political environment interfaces with issues of leadership. Plan B, a prescription emergency contraception drug was approved in 1999. In 2002, FDA staff met twice to discuss and prepare for the sponsor's expected application for a switch of plan B from prescription to OTC status. In April 2003, the sponsor submitted its supplemental NDA for the OTC switch, and FDA set a PDUFA goal date of February 2004 (for a total of 10 months, a typical timeline for a standard review) to reach a decision on the application. A joint meeting of the two relevant advisory committees—those for nonprescription drugs and for re-productive health drugs—concluded with a vote that overwhelmingly favored an OTC switch (GAO, 2005). However, the agency denied the application, raising questions about the basis for that decision making. In the end, it became clear that the ultimate decision was made in the Of-fice of the commissioner for reasons that were not clearly linked with a scientific rationale. The perception of political considerations overruling scientific judgment, even just in a single case, inevitably raises concerns about the legitimacy of decision-making in every case.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

## Proposed Solutions to CDER's Organizational Dysfunction

### Management

On the basis of its review of relevant government reports, conversations with present and former FDA staff and managers, and its examination of CDER guidance and policies and procedures documents, the committee finds that CDER's organizational culture is under great strain and that change is needed to ensure that the center can fulfill its components of the FDA mission. The last several years of newspaper articles about FDA and CDER specifically and relevant public opinion polls have shown a decline in FDA's credibility with the public, some scientists and academics, and others. Over the years, there have been multiple initiatives, taskforces, and panels on CDER's work and multiple government reports identifying problems and recommending solutions. The fact that many substantial changes have not been made may be a primary symptom of management failure, a lack of leadership, and of a lack of appropriate oversight by Congress.

According to management research, organizational cultures that are constructive, or healthy, are more effective in accomplishing their mission. But cultural change may take many years to implement and requires sustained and comprehensive effort (GAO, 1996; Khademian, 2002). Assessments of federal agency management have found that when federal executives reorganize agencies, organizational culture is rarely a focus of attention—it is often an afterthought or considered a nicety irrelevant to the complex and technically challenging work of many government agencies (Khademian, 2002)[11]. In that regard, FDA is no different. The consistent neglect of cultural problems in the organization betrays a lack of recognition of the importance of healthy culture. Even if FDA and CDER leaders do not see themselves as managers who stifle dissent or exclude participation from staff, that perception clearly exists (affecting agency credibility), and problems with retention and morale confirm it.

### Agency Leadership

Healthy organizations require effective and stable leadership. The committee believes that there is an urgent need for a full-time, confirmed FDA commissioner who will be visible and forceful in creating a culture of safety by facilitating a systematic, science-based approach to continually assessing and acting on risk-benefit during the lifecycle of every drug (pre- and post-approval). The commissioner's role is also to provide effective oversight of CDER, particularly given the strong external pressures on the center's work. Many observers from industry and from the scientific community have expressed concern in recent years that the commission position has remained unfilled or filled by deputy commissioners functioning as acting commissioner for long periods of time.

---

[11] In 1996, Congress asked GAO to determine whether performance problems at the Federal Aviation Administration were related to its organizational culture. GAO found that the culture impeded the agency's work. Characteristics highlighted included: a system of bureaucratic incentives that rewarded staff who preserved the status quo and punished those who identified problems (GAO, 1996). Assessments of government agency performance and examples from the management literature have shown repeatedly that organizational cultures that stifle dissent, exclude staff from decisions about the organization's vision, and allow cultural problems to linger unaddressed are not healthy cultures, and those problems interfere with their ability to achieve their goals (2001; O'Leary R, 2006; Return to Flight Task Group, 2005) (Heifetz and Laurie, 1998; Khademian, 2002) (Kotter, 2005).

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

The committee recognizes that the daily work of FDA staff may not be strongly affected by what happens in the office of the commissioner, but there is fairly widespread agreement, described above, that the absence of a commissioner has been a problem because without a legitimate, Senate-confirmed leader, it is harder for the agency to define and achieve its strategic vision.

The committee wishes to emphasize that in making the following recommendations, it does not imply that politics can or should be removed from a top scientific position, such as the FDA commissioner. However, it is important to the credibility of a science based regulatory agency that scientific evidence, not solely political considerations, prevail in cases where high-profile regulatory decisions must be made. The Plan B decision described above may have undermined the agency's credibility, as evidence emerged that the basis for decision making was not scientific, but other types of considerations (Bridges, 2006; Rockoff JD, 2006; Washington Drug Letter, 2006).

Finally, the committee believes that a fixed-term appointment for the FDA commissioner may help to lessen turnover. Reports from GAO and from the National Academy of Sciences (NAS) have found that turnover in government agency leadership is linked with a focus on short-term goals and uncertain accountability and that fixed terms for presidential appointments help to ensure stability and strengthen an agency's leadership (GAO, 1996) (GAO, 2003 – Dillingham testimony). Currently, presidential appointment with Senate confirmation (PAS) positions for fixed terms include: surgeon general of the Public Health Service, 4 years, director of the National Science Foundation (NSF), 6 years, commissioner of the Bureau of Labor Statistics, 4 years, under secretary for health in the Department of Veterans Affairs (also the Chief Executive Officer of the Veterans Health Administration), 4 years, commissioner of the Social Security Administration, 6 years, and commissioners of the Federal Communications Commission, 5 years. Another NAS committee that recommended a 6-year term for the NIH director concluded that the NSF director's 6-year term "has been a good model for creating a system of accountability and periodic review that has the possibility of transcending changes in administration" (NIH, 2003).

Fixed terms can vary in length, be renewable or not, and have more or less strict terms of removal, depending on the degree of insulation desired. In all cases, to be constitutional, the president must retain the power of removal—incumbents of term appointments should be accountable and subject to removal by the president. On the one hand, establishing a term appointment and specifying the reasons for which an appointee may be removed changes the terms of removal to some extent. It creates a presumption that individuals in these positions should stay rather than be automatically removed with every change in administration, and it requires an administration to give good reasons for such a removal. On the other hand, the use of terms also indicates that there should be periodic turnover—not for partisan reasons but to ensure new blood and fresh ideas.

**3.1:  The committee recommends that the FD&C Act be amended to require that the FDA Commissioner currently appointed by the President with the advice and consent of the Senate also be appointed for a 6-year term of office. The Commissioner should be an individual with appropriate expertise to head a science-based agency, demonstrated capacity to lead and inspire, and a proven commitment to public health, scientific integrity, transparency, and communication. The President may remove the Commissioner from office only for reasons of inefficiency, neglect of duty, or malfeasance in office.**

Copyright © National Academy of Sciences. All rights reserved.

Given the influence of the social, policy, and economic environment on CDER's work and its major structural and management challenges, the committee believes that a confirmed commissioner will need support to effect organizational change, particularly with respect to CDER. The committee believes that a mechanism to support the Commissioner is necessary because transforming an organization's culture requires relevant leadership and management expertise and sustained effort.

> **3.2: The committee recommends that an external Management Advisory Board be appointed by the Secretary of HHS to advise the FDA commissioner in shepherding CDER (and the agency as a whole) to implement and sustain the changes necessary to transform the center's culture—by improving morale and retention of professional staff, strengthening transparency, restoring credibility, and creating a culture of safety based upon a lifecycle approach to risk-benefit.**

Although the committee is not aware of entities analogous to what it is recommending, it is worth noting that NIH has an Advisory Committee to the Director, which advises the agency head on major plans and policies, including those related to resource allocation, program development, and "administrative regulation and policy" (NIH, 2006). The external Management Advisory Board to the FDA commissioner would operate under Federal Advisory Committee Act rules. The secretary of HHS should consult with an independent organization in identifying candidates to ensure that the board's composition is appropriate for the task, including familiarity with the regulatory system for drug development and FDA's role in it and proven experience in successfully managing culture or organizational change.12 (Ideally, conflict of interest concerns would be addressed by ensuring that a majority of board membership should have no substantial personal financial interest in the pharmaceutical industry, and board members should not be selected from current pharmaceutical industry representatives.) board members would serve staggered 3 year terms that may be renewed once. The board would meet no less frequently than twice a year.

The Management Advisory Board would assist FDA and CDER in their efforts to understand how organizational culture in the center is shaped by the environment, by a legacy of structural imbalance, and by management problems. The committee has learned that a variety of promising steps have been taken to improve interactions among offices, evaluate and improve internal processes, and even familiarize disciplines with one another. However, given CDER's long history of reorganizations, external studies, and fitful change initiatives, the committee is not optimistic that current efforts will be sustained without the absolute commitment of managers and of center and agency leaders to act on many different levels, with broad staff participation and input and in an atmosphere of openness, and to be "relentless" in creating, seizing, and sustaining opportunities for change (Khademian, 2022: 126). The committee believes that it is imperative that the director of CDER, with support from the commissioner and the assistance of

---

12 Two examples of independent advice in identifying members of Federal Advisory Committees: DHHS consults with the NAS on the composition of the National Vaccine Advisory Committee, and the Consumer Product Safety Commission appoints a Chronic Hazard Advisory Panel of independent scientific experts from nominations submitted by the president of the NAS.

Copyright © National Academy of Sciences. All rights reserved.

the Management Advisory Board, take immediate steps to strengthen leadership, organization, and function to create and visibly champion a culture of drug safety in the center.

> **3.3: The committee recommends the Secretary of HHS direct the FDA commissioner and Director of CDER, with the assistance of the Management Advisory Board, to develop a comprehensive strategy for sustained cultural change that positions the agency to fulfill its mission, including protecting the health of the public.**

As part of the strategy for cultural change, the director of CDER should establish an effective organizational development capability in CDER by forming a staff working group consisting of people who represent diverse disciplines, roles, and viewpoints and including one or two staff members with organizational development expertise. The group would work with and support the center director in providing meaningful opportunities for two-way communication with staff, identifying and addressing culture problems, and nurturing a culture that values disagreement and thinking outside the box.

### Structural Factors

The imbalance in authority, formal role, and resources between OND and ODS/OSE constitutes a major obstacle to a healthy organizational culture in CDER. On the basis of the rationale described above, the committee sets forth its recommendation to address the cultural challenges exacerbated by the existing structure.

The aforementioned development of MAPPs as the primary strategy to manage how OND and ODS/OSE interact and to document differences of professional opinion may indicate that using procedural modifications to mollify critics is easier than engaging in the hard work of transforming a culture to embrace scientific disagreement and dissent and handle them in a constructive and transparent manner. Organizational literature shows that the bureaucratic cultures of public organizations are frequently rigid, authoritarian, and oriented toward obeying orders rather than toward innovation and independent thought (Claver E et al., 1999; Kets de Vries MFR and Miller D, 1986; O'Leary R, 2006) (Khademian, 2002). That could explain why it is so easy to turn to policy and procedure development. However, it is important to note that the inflexibility and conformity that characterizes some government agencies are at least in part created by the requirements of Congress and the Office of Management and Budget. As described above, creating a healthy organizational culture in CDER depends on more than the efforts of management and staff—the external environment, including the top levels of the executive branch and relevant Congressional committees.

The tension between the approaches of CDER professionals who focus largely on the premarketing period of a drug's lifecycle and those who deal with the postmarketing period is not unusual (consider, for example, areas of scholarship where the practitioners of quantitative and qualitative methods come in conflict). However, the friction has often been unconstructive, particularly when the goal is to achieve close integration of the two approaches, and to facilitate an atmosphere of mutual respect and appreciation between the two sets of disciplines involved. Facilitating such a shift, from an uneasy relationship, to a collaborative and constructive one, requires skilled management and leadership.

**PREPUBLICATION COPY: UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The committee believes that a public health orientation and a lifecycle approach to understanding and minimizing the risks posed by drugs is best served by better and formal integration of the OND and ODS/OSE perspectives. The committee understands that new drug review and approval are undertaken with a matrix team approach, however it notes with concern the lack of formal participation of ODS/OSE in the review team. That might reflect a sentiment in CDER that ODS/OSE has only incidental contributions to make to the intellectual basis of new drug review and to recommendations about postapproval regulatory actions. A strengthened ODS/OSE would have much to contribute.

The committee believes that in keeping with the goal of an integrated lifecycle approach to considering drug safety, mechanisms for anticipating potential postmarketing safety issues at the time of approval can be formalized and strengthened. Although OND retains authority over approval decisions, the committee believes that ODS/OSE's role in the approval process needs to be formalized, specifically in the area of postmarketing safety.

**3.4: The committee recommends that CDER appoint an OSE staff member to each New Drug Application review team and assign joint authority to OND and OSE for postapproval regulatory actions related to safety.**

To formalize the changes recommended above, CDER's GRMP should be modified as appropriate. The ODS/OSE team member should be responsible for formal review of and comments on the clinical reviewer's "Integrated Review of Safety" (Section 7 in the *Clinical Review Template*) and for authoring the "Recommendation for Postmarketing Actions" (Section 9.3 in the *Clinical Review Template*).

Through their active and formal participation in the NDA review process, ODS/OSE staff members would develop a fuller appreciation of the risks as well as the benefits associated with a drug, which some have stated they do not now have because of their exclusive focus on postmarketing safety. That appreciation would strengthen their evaluation and advice on postmarketing safety actions, which have been described as too risk-averse and lacking in understanding of the efficacy data and clinical context, that is, the benefits of the drug to individual patients. In addition, active participation could lead to better communication and understanding between the clinical reviewers and the epidemiologists, who have been described as "speaking different languages". The committee believes that following this recommendation would help to break down cultural barriers between OND and ODS/OSE as staff work together on integrated review teams with the common goal of evaluating and ensuring drug safety and efficacy over a product's lifecycle. However, bringing the two types of staff together in teams is not sufficient to facilitate mutual understanding and appreciation. Additional efforts are needed to apply this ethos to all interactions between pre- and postmarketing, and OND and ODS/OSE staff. The committee was pleased to learn about plans in ODS/OSE to conduct a class to orient OND colleagues to the approaches and methodologies employed by ODS/OSE epidemiologists. The committee hopes that the leadership of the Center will initiate other such efforts and sustain them.

The goal of a more integrative, lifecycle approach to drug risk and benefit is to have a preapproval process in which there is more active discussion about using clinical trial data to move drugs out quickly for high-need populations while coupling the process with far greater attention to a comprehensive plan for addressing uncertainties or emerging risks when used after marketing in lower-need population. Incorporating a lifecycle approach to risk and benefit into various

Copyright © National Academy of Sciences. All rights reserved.

*A Culture of Safety*

aspects of CDER organizational culture and communicating that fact to all stakeholders could help bring speed and safety into optimal balance.

The committee is aware that consumer advocates, legislators, and others have asserted that the only solution to what, in their view, appear to be intractable problems in CDER with regard to ensuring drug safety and efficacy would be to create a separate center in FDA (or even a separate agency) to work on postmarketing safety. The committee acknowledges the legitimacy of the concerns that underlie such proposals, and it recognizes that if the full complement of recommendations made in this report fails to restore public trust in CDER's (and FDA's) credibility, competence, and appearance of independence, the secretary of DHHS and Congress may have no alternative but to mandate substantial structural changes in the agency. The committee believes, however, that if the recommendations made in this report are implemented fully and change is sustained, other, more drastic measures would be unnecessary. Safety and efficacy must always be in balance, and the ideal organizational solution is a team approach to assessing both. Achieving a balanced approach to the assessment of risks and benefits would be greatly complicated, or even compromised, if two separate organizations were working in isolation from one another. Premarket reviewers develop extensive knowledge based on years of experience of monitoring and reviewing the results of the premarket studies, and the system would stand to lose a great deal if that knowledge were excluded from postmarketing safety considerations.

### External Environment

As described above, the environment that shapes the culture of CDER and FDA is the product of societal expectations, legislative imperatives, and economic forces. PDUFA represents a convergence of these factors.

Although PDUFA has led to increases in the speed of review and has facilitated patient access to innovative drugs, it has also altered the environment in CDER, increased the pressure on reviewers to meet review deadlines, and perhaps even affected the agency's relationship with sponsors. The presence of PDUFA performance goals for review timeliness has increased agency accountability to Congress and sponsors and has contributed to the success of this reform in increasing review speed over time. However, the existing PDUFA goals relate only to speed of approval and do not also reflect goals related to safety. If PDUFA is reauthorized in 2007, the committee believes that the goals on which FDA reports to Congress need to include actionable performance goals for drug safety activities in the premarket and postmarketing periods to ensure that important agency functions receive sufficient resources. That would also help to demonstrate that timeliness and safety are valued equally, just as risks and benefits must be assessed together. There are now no explicit safety-related goals that drive CDER's work, whether or not associated with PDUFA funding. Introducing new safety goals would be consistent with the lifecycle approach to regulation.

The committee offers a series of suggested goals to assist CDER in thinking about ways to couple accountability for timeliness and safety. Such goals will ideally be quantifiable. Whether or not PDUFA is reauthorized the committee believes it is important to measure and report on achieving safety goals.

Copyright © National Academy of Sciences. All rights reserved.

**3.5: To restore appropriate balance between the FDA's dual goals of speeding access to innovative drugs and ensuring drug safety over the product's lifecycle, the committee recommends that Congress should introduce specific safety-related performance goals in the Prescription Drug User Fee Act IV in 2007.**

Those goals, independent of funding source, could include the following (organized topically):

*Expertise in preapproval evaluation:*

- Target participation rate for ODS/OSE staff involvement in drug review teams: for priority original NDA and biologic license application submissions 60% year 1, 70% year 2, 80% year 3, 90% year 4, and 100% year 5; for standard original NDA and BLA submissions 40% year 1, 50% year 2, 60% year 3, 70% year 4, and 80% year 5.
- Report annually to Congress on the number of new molecular entities (NMEs) for which data were evaluated by external advisory committees, and the proportion of all NME NDAs that that number represents.

*Monitoring of adverse drug reactions and Adverse Event Reporting System:*

- Prepare a summary analysis of the adverse drug reaction reports received for a newly approved drug, which identifies any new risks not previously identified, potential new risks, or known risks reported in unusual number not previously identified within 18 months of drug launch or after exposure of 10,000 persons, whichever is later. Reports should be publicly available and posted on the agency's Web site.
- Conduct regular (biweekly) screening of the AERS database, especially 15-day reports, to identify new safety signals
- Ensure that public access to AERS reports is updated every 6 months.

*Post marketing study commitments:*

- Review the entire backlog of postmarketing commitments to determine which commitments require revision or should be eliminated and report to Congress on these determinations. Of commitments that remain, those without start dates should have start dates associated with them to prevent perpetual "pending" status. (12 months from PDUFA IV initiation) (also see Chapter 5 for a discussion of postmarketing, or Phase IV, commitments)
- Report completion rates (by company) for (i) postmarketing studies requested prior to approval and (ii) postmarketing studies requested when a drug is already on the market and the number of delinquent studies (past the original projected completion date) in each category.
- Report on enforcement actions taken to ensure timely completion of postmarketing study commitments (for commitments that are currently required, such as those associated with accelerated approval, and for other commitments FDA will be able to require and enforce after implementation of recommendations made in Chapter 5).

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

3-26

Copyright © National Academy of Sciences. All rights reserved.

*A Culture of Safety*

- Review and propose action, if warranted, on completed postmarketing studies. (within 60 days from submission of the study for actions deemed urgent, 120 days for less urgent actions).

*Post marketing risk communication activities and risk management:*

- In the annual PDUFA performance report to Congress, include the timeliness of implementing regulatory actions[13] (from the date of the agency's initial proposed action to the date of the actual labeling change) and the number of such changes.
- In the annual PDUFA performance report to Congress, include the number of patient information sheets developed for new drugs and the proportion of new drugs approved in that year for which patient information sheets are developed. (The committee recognizes that DrugWatch and other activities of the Drug Safety Oversight Board are still under development. The final outcome could affect the relevance and usefulness of this suggestion.)
- Review an applicant's implementation of risk management plans and make the report available on the agency's Web site.
- Review and act on drug advertisements and promotional materials submitted to the agency (within 90 days in year 1, 60 days in year 2, 30 days in year 3 and beyond).

*Performance management:*

- Convene an open forum 12-18 months before renewals of the PDUFA to solicit public and industry comments on proposed and existing safety goals for FDA.
- In the annual PDUFA performance report to Congress, include the status of meeting of all agency safety goals.

Discussion among all stakeholders is needed to consider what goals would be the most valuable from a public health perspective.

---

13 Including labeling changes, black boxes, and measures leading to drug withdrawal (see Chapter 5 for discussion and recommendations on strengthening FDA's authority).

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

# REFERENCE LIST

Weick KE, Sutcliffe KM . Managing the Unexpected:  Assuring High Performance in and Age of Complexity. San Francisco: Jossey-Bass; 2001.

Alonos-Zaldivar R. 2006. Without clear leadership, the FDA is falling short. The Seattle Times.

Berndt ER, Gottschalk AHB, Strobeck MW. 2005. Opportunities for Improving the Drug Development Process: Results From a Survey of Industry and the FDA. Working Paper 11425.

Bridges A. 2006, August 1. Plan B Pill Snarls FDA Nominee Hearings. Associated Press. http://www.nexis.com [accessed August 1, 2006].

Carpenter D, Chernew M, Smith DG, Fendrick AM. 2003. Approval times for new drugs: does the source of funding for FDA staff matter? Health Aff (Millwood) Suppl Web Exclusives:W3-618-24.

CDER. Manual of Policies and Procedures:  Clinical Review Template. 2004a.

CDER. Manual of Operations and Procedures (MAPP):  Documenting Differing Professional Opinions and Dispute Resolution-Pilot Program. November 4, 2004b; accessed June 20, 2005b. Web Page. Available at: http://www.fda.gov/cder/mapp/4151.2.pdf.

CDER and FDA. Drug Safety Oversight Board Membership Center for Drug Evaluation and Research. 2005; accessed June 29, 2005. Web Page. Available at: http://www.pharmtech.com/pharmtech/article/articleDetail.jsp?id=163473.

CDER, FDA, DHHS. Reviewer Guidance:  Conducting a Clinical Safety Review of a New Product Application and Preparing a Report on the Review.  Good Review Practices. 2005.

Claver E, Llopis J, Gasco JL, Molina H, Conca FJ. 1999. Public Administration:  From bureaucratic culture to citizen oriented-culture. The International Journal of Public Sector Management :455-464.

Coffee JN. 1993. A Comparative Study of Organization Culture Change in Federal Agencies' Success Patterns of Long-Term Efforts. CA: University of Southern California.

Cohn J. Politics, Profits & Pharma. November 13, 2003; accessed September 14, 2006. Web Page. Available at: http://www.pbs.org/wgbh/pages/frontline/shows/prescription/politics/.

Consumers Union . FDA Board Told Proposed Drug Safety Reforms are Inadequate; Major Changes Needed. 2005.

Crawford LM, Acting FDA Commissioner. FDA Statement:  FDA Acts to Strengthen the Safety Program for Marketed Drugs. November 5, 2004; accessed February 23, 2005. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2004/NEW01131.html.

Cummins SK. New Drug Safety Initiatives & the Drug Safety Oversight Board 2006.

Department of Health Review Panel on New Drug Regulation. Dorsen N, Weiner N, Astin AV, Cohen MN, Cornelius CE, Hamilton RW, Rall DP. 1977. Final Report . Washington, DC.

DHHS, FDA. Prescription Drug User Fee Act (PDUFA)  FDA and Stakeholders Public Meeting. 2005.

DHHS, OIG. FDA's Review Process for New Drug Applications: a Management Review.  DHHS, OIG. 2003.  OEI-01-01-00590: Department of Health and Human Services, Office of the Inspector General.

FDA. Appendix A: PDUFA Performance Goals, FY 1993 - FY 1997. 1995; accessed June 21, 2006. Web Page. Available at: http://www.fda.gov/ope/pdufa/report95/appenda.html.

FDA. Enclosure: PDUFA Reauthorization Performance Goals and Procedures. 2002; accessed June 21, 2006. Web Page. Available at: http://www.fda.gov/oc/pdufaIIIGoals.html.

FDA. 2005a. Guidance for Industry: Development and Use of Risk Minimization Action Plans.

FDA. White Paper, Prescription Drug User Fee Act (PDUFA):  Adding Resources and Improving Performance in FDA Review of New Drug Applications. 2005b.

FDA. FDA Fact Sheet: FDA Improvement in Drug Safety Monitoring. February 15, 2005c; accessed February 23, 2005c. Web Page. Available at: http://www.fda.gov/oc/factsheets/drugsafety.html.

FDA. Guidance for Review Staff and Industry Good Review Management Principles and Practices for PDUFA Products. 2005d.

FDA. Enclosure: PDUFA Reauthorization Performance Goals And Procedures. July 7, 2005e; accessed July 3, 2006e. Web Page. Available at: http://www.fda.gov/cder/news/pdufagoals.htm.

FDA. FDA NEWS, FDA Names New Director of Drug Safety, Goals for Center for Drug Reorganization Announced. October 19, 2005f; accessed October 20, 2005f. Web Page. Available at: http://www.fda.gov/bbs/topics/news/2005/new01245.html.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

*A Culture of Safety*                                                                                                   3-29

FDA. Catalysts for enactment of PDUFA. 2006a; accessed July 11, 2006a. Web Page. Available at: http://www.fda.gov/ohrms/dockets/dockets/05n0410/05n-0410-ts00010-gottleib.ppt#269,1,Catalysts for enactment of PDUFA.

FDA. Commissioners and Their Predecessors. 2006b; accessed July 12, 2006b. Web Page. Available at: http://www.fda.gov/oc/commissioners/default.htm.

Fontanarosa PB, Rennie D, DeAngelis CD. 2004. Postmarketing surveillance--lack of vigilance, lack of trust. JAMA 292(21):2647-50.

GAO. GAO. 1996. Aviation Acquisition:  A Comprehensive Strategy Is Needed for Cultural Change at FAA. GA)/RCED-96-159.

GAO. 2002. Food and Drug Administration:  Effect of User Fees on Drug Approval Times, Withdrawals, and Other Agency Activities (GAO-02-958).

GAO. GAO. 2005. Decision Process to Deny Initial Application for Over-the-Counter Marketing of Emergency Contraceptive Drug Plan B Was Unusual. GAO-06-109.

GAO. 2006. Drug Safety: Improvement Needed in FDA's Postmarket Decision-Making and Oversight Process.

Grassley C. A Bill to amend the Federal Food, Drug, and Cosmetic Act with respect to drug safety, and for other purposes.  S.930 : 2005:109th Congress,  1st Session, Senate.

Grassley C, Baucus M, Graham D, Singh G, Psaty B, Kweder S, Gilmartin R. FDA, Merck and Vioxx: Putting Patient Safety First?  United States Senate Committee on Finance: 2004.

Harris G, The New York Times. At F.D.A., Strong Drug Ties and Less Monitoring. December 6, 2004; accessed December 6, 2004. Web Page. Available at: http://www.nytimes.com/2004/12/06/health/06fda.html.

Harris G. Halt is Urged for Trials of Antibiotic in Children. June 8, 2006; accessed June 8, 2006. Web Page. Available at: http://www.nytimes.com/2006/06/08/science/08drug.html?_r=1&n=Top%2fReference%2fTimes%20Topics%2fPeople%2fH%2fHarris%2c%20Gardiner&oref=slogin.

Harris G. 2006, July 19. Approval of Antibiotic Worried Safety Officials. The New York Times.

Heifetz RA, Laurie DL. 1998. The Work of Leadership.  Harvard Business Review on Leadership.: Harvard Business School Press. Pp. pgs. 171-199.

Hendrick B. 2006, July 21. Respiratory drugs' safety questioned. The Atlanta Journal-Constitution.

Hensley S, Davies P, Martinez B. 2005, August 22. Vioxx Verdict Stokes Backlash That Hit FDA, Manufacturers. The New York Times.

HHS, Office of Inspector General, Rehnquist J. HHS, Office of Inspector General, Rehnquist J. 2003. FDA's Review Process for New Drug Applications:  A Management Review (OEI-01-01-00590).

House of Commons Health Committee. 2005a. The Influence of the Pharmaceutical Industry Fourth Report of Session 2004-05 Volume I.

House of Commons Health Committee. 2005b. The Influence of the Pharmaceutical Industry Fourth Report of Session 2004-05 Volume II.

IOM. Meeting Two of the IOM Committee on the Assessment of the US Drug Safety System. 2005:Washington, DC.

Johnson L, U.S. PIRG. Presentation to the IOM Committee on the Assessment of the US Drug Safety System . Washington, DC: 2005.

Kets de Vries MFR, Miller D. 1986. Personality, Culture, and Organization. Acad Manage Rev  :266-279.

Khademian A. Khademian A. 2002. Working With Culture, The Way the Job Gets Done in Public Programs. Washington, D.C.: CQ Press.

Miller HI. 2006, March 22. Drug safety:  Image vs. reality. The Washington Times.

NIH. 2003. Enhancing the Vitality of the National Institutes of Health:  Organizational Change to Meet New Challenges.

NIH. Charter of the Advisory Committee to the Director. June 5, 2006; accessed September 16, 2006. Web Page. Available at: http://www.nih.gov/about/director/acd/acdcharter.htm.

O'Leary R. O'Leary R. 2006. The Ethics of Dissent:  Managing Guerrilla Government. Washington, DC: Congressional Quarterly Inc.

Okie S. 2005. What ails the FDA? N Engl J Med 352(11):1063-6.

Olson M. Regulatory Agency Discretion Among Competing Industries: Inside the FDA.  Department of Economics, Washington University, St. Louis, Missouri 63130: 1994.

Olson MK. 2002. How have user fees affected the FDA? Regulation :20-25.

Ostroff F. 2006. Change in Management in Government. Harv Bus Rev .

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

3-30                                                           *The Future of Drug Safety*

Racoosin JA . PowerPoint Presentation:  Pre-marketing Assessment of Drug Safety.  Presented at the January 17, 2006 Meeting of the Committee on the Assessment of the US Drug Safety System. 2006.

Ray WA, Stein CM. 2006. Reform of drug regulation--beyond an independent drug-safety board. N Engl J Med 354( 2):194-201.

Return to Flight Task Group. 2005. Assess the Implementation of the Columbia Accident Investigation Board Return-to-Flight Recommendations.

Rockoff JD. 2006, May 25. FDA chief took over Plan B:  In deposition, Crawford says he bypassed usual approval process. The Baltimore Sun.

Sasich LD, Public Citizen's Health Research Group. Comments before the Food and Drug Administration's Public Meeting on the Prescription Drug User Fee Act (PDUFA). 2000; accessed September 16, 2006. Web Page. Available at: http://www.citizen.org/publications/release.cfm?ID=6737.

Steenburg C. 2006. The Food and Drug Administration's Use of Postmarketing (Phase IV) Study Requirements: Exception to the Rule? Food Drug Law J 61(2):pgs. 1-91.

Stigler G. 1971. The Theory of Economic Regulation. Bell Journal of Economic and Management Science  2:2-21.

Thaul S. Drug Safety and Effectiveness:  Issues and Action Options After FDA Approval. March 8, 2005; accessed June 27, 2005. Web Page. Available at:
    http://www.law.umaryland.edu/marshall/crsreports/crsdocuments/RL3279703082005.pdf.

The Henry J Kaiser Family Foundation, The Henry J Kaiser Family Foundation. Kaiser HealthPoll Report Views on Prescription Drugs And The Pharmaceutical Industry. January, 2005-February 28, 2005; accessed September 22, 2005. Web Page. Available at: http://www.kff.org/healthpollreport/feb_2005/upload/full_report.pdf.

Tufts Center for the Study of Drug Development . Drug Safety Withdrawals in the U.S. Not Linked to Speed of FDA Approval. New Product Approval Times Do Not Correlate With Degree of SafetyTufts Center for the Study of Drug Development. 2005. Tufts Center for the Study of Drug Development Impact Report. Analysis and Insight Into Critical Drug Development Issues.

Wall Street Journal and Harris Interactive. The Public Has Doubts About the Pharmaceutical Industry's Willingness to Publish Safety Information about Their Drugs in a Timely Manner. January 18, 2005; accessed March 10, 2006. Web Page. Available at: http://www.harrisinteractive.com/news/printerfriend/index.asp?NewsID=882.

Wall Street Journal and Harris Interactive. The FDA's Reputation with the General Public is Under Assault. May 26, 2006; accessed September 16, 2006. Web Page. Available at:
    http://www.harrisinteractive.com/news/newsletters/wsjhealthnews/WSJOnline_HI_Health-CarePoll2006vol5_iss09.pdf.

Washington Drug Letter. 2006, May 29. Crawford Reverses Stance On Plan B Testimony. Washington Drug Letter. http://www.nexis.com [accessed July 26, 2006].

Wolfe S. Public Citizen: The 100th Anniversary of the FDA: The Sleeping Watchdog Whose Master is Increasingly the Regulated Industries. June 27, 2006; accessed July 11, 2006. Web Page. Available at: http://www.pharmalive.com/News/index.cfm?articleid=353196&categoryid=54.

Wolfe SM. Presentation to the IOM Committee on the Assessment of the US Drug Safety System. Public Citizan's Health Research Group2006.

Zelenay JL. The Prescription Drug User Fee Act:  Is a Faster Food and Drug Administration Always a Better Food and Drug Administration. 2005.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

# 4

# The Science of Safety

The deliberation and decisions of a science-based regulatory agency depend on the quality of the scientific data that it obtains and reviews to make valid scientific judgments.  The science underlying drug development is complex and multidisciplinary.  As Chapter 2 describes briefly, the early phases of drug development involve basic *in vitro* and *in vivo* research to characterize general attributes of a drug.  The staff of the Food and Drug Administration (FDA) Center for Drug Evaluation and Research (CDER), particularly in Office of New Drug (OND) review divisions, works with the industry sponsor of a drug to guide the design and the collection and analysis of those data. The FDA Critical Path Initiative is designed to foster the development of innovative scientific approaches to drug discovery and development.  (Critical Path also includes some effort to develop methods for predicting safety problems better, for example, biomarkers of QT prolongation and indicators of liver toxicity; see Chapter 1.)  This report of the committee on the assessment of the US drug safety system focuses on data generated and reviewed further along the development spectrum, so Critical Path will not be addressed in detail, but the committee recognizes Critical Path's importance and the potential for better tools for the prediction and early detection of the safety of pharmaceuticals as biomedical knowledge increases (FDA, 2004). Enthusiastic as the committee is about the promise of new biology and personalized medicine to contribute to the development and use of safe drugs, the promise of the "right drug for the right person at the right time" is not likely to be realized for most patients for some time.

There will always be a need for clinical trials and postmarket, population-based studies to fully understand the risks and benefits associated with drugs, especially to identify rare or unsuspected safety problems.  Controlled phase 4 studies will remain important for verifying that drugs approved on the basis of limited exposures and surrogate end points actually have health benefits and for assessing whether common adverse events can be attributed to a drug when such events (such as heart attacks in older adults) emerge as a potential safety signal. This chapter underscores the importance of generating strong science to support regulatory decision-making about the risks and benefits associated with drugs and the importance of ensuring that the decisions made throughout a drug's lifecycle are credible and transparent.

## GENERATING THE SCIENCE

### Understanding Risk and Benefit for Approval Decisions

As has been described in Chapter 2, a new drug application (NDA) and the reviews of an NDA by CDER staff contain thousands of pages of information about the effects of a drug. CDER clinical reviewers are expertly trained to analyze the efficacy and safety data from clinical

***PREPUBLICATION COPY:  UNCORRECTED PROOFS***

Copyright © National Academy of Sciences. All rights reserved.

4-2                                                                    *The Future of Drug Safety*

trials.  Individual case reports of adverse events from the trials are reviewed, as are comparisons of event rates of many safety outcomes in the overall product database, including those in uncontrolled safety studies.  The reviewers also consider the statistical methods used by the company to generate the results.  CDER has issued many guidances and documents of policies and procedures outlining the best ways to review and analyze such data (CDER et al., February 2005; HHS et al., 12/08/2005).  Clinical trials are designed to test hypotheses that are the agreed-on bases for determining efficacy.  Trials designed to test hypotheses about serious safety outcomes would in most cases require many more subjects than are needed for an efficacy endpoint.  For some conditions, the efficacy outcomes may be surrogate endpoints, which are expected to capture the information about efficacy but are usually not informative about safety.

Safety information can emerge from clinical trials, but rare events may not surface at all; if they do, it is at a rate so low that one cannot distinguish a drug-caused event from one expected by chance (background incidence). Safety information is usually limited to reports of common adverse events, the relation of which to drug exposure can be assessed by comparing rates between study treatment groups, or adverse events already predicted by results of animal studies or in connection with other drugs in the same class.  Safety information also includes abnormalities in clinical laboratory test values seen during pre-approval trials that may portend occasional clinically significant events.  That set of suspected adverse events serves as a starting point for decisions about postmarket surveillance and drug safety research.  The safety profile of a new molecular entity (NME) is especially uncertain, because of a lack of information on similar drugs already on the market.

Murglitazar, a drug for diabetes that activates both alpha- and gamma-peroxisome proliferator-activated receptors, was reviewed by FDA for approval during the committee's work.  In the preapproval trials, compared with the other arms of the trials (some compared the drug with a placebo, others with another diabetes medicine), murglitazar improved sensitivity to insulin and the control of blood lipids in patients with type 2 diabetes.  Those efficacy outcomes are examples of surrogate endpoints because they are expected to predict the occurrence of cardiovascular events.  In the same preapproval trials, however, patients randomized to murglitazar had a significantly higher incidence of the combined outcomes of death, heart attack, stroke, and heart failure.  The reason for the discrepancy between surrogate endpoints and health outcomes is not clear, but the case of murglitazar illustrates the importance of verifying the assumed health benefits of new drugs and of conducting more complete risk-benefit analyses (Nissen et al., 2005).

As described in Chapters 2 and 3, OND clinical reviewers are primarily responsible for assessing the safety information in an NDA, and interactions and involvement of the Office of Drug Safety/Office of Surveillance and Epidemiology (ODS/OSE)[1] staff vary among OND offices.  A recent time-accounting exercise by CDER reports that OND devotes 51% of total scientific and technical staff effort on safety-related activities (FDA, May 2005).  Despite that large investment of time and effort, the safety profile of a drug at the time of NDA review is necessarily uncertain at the time of approval.  The only certainty at the time of approval is that the CDER official who signed the approval letter has not identified safety problems that in his or her best judgment outweigh the potential benefit of the drug for the specific indication and population studied. However, to expect that premarket studies or FDA review of these studies can reveal all

---

[1]  In May 2006, CDER renamed the Office of Drug Safety (ODS) the Office of Surveillance and Epidemiology (OSE).  The committee will refer to this office as ODS/OSE in the report in recognition that some statements refer to actions of the office in the past and some statements refer to the present.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

the information about the risks and benefits of new drugs that is needed to make optimal treatment decisions would occasion unreasonable delay in approval.

## Reducing Uncertainty about Risk and Benefit after Approval

As described in other sections of this report, important new information about a drug's effectiveness[2] accumulates after approval, although effectiveness is extremely diffcult to assess outside the context of a randomized trial. The committee has chosen to describe the major components essential to assessment of drug safety after approval as the **generation** of hypotheses based on early safety signals, the **strengthening** of safety signals, the conduct of **confirmatory** studies to identify and quantify new or hypothesized risks and benefits, the **evaluation of risk management programs** to minimize known safety risks, and the **continuing evaluation of risks and benefits** in light of new risk or new benefit information to ensure that the known benefits of a drug continue to outweigh the known risks. The committee concludes that although CDER is involved in a variety of activities to generate and assess postmarket safety information, the current approach is not as comprehensive and systematic as is needed to serve drug safety and public health objectives optimally. The committee offers specific recommendations to CDER and other federal departments and agencies for improving post-approval assessment of drug-related risks and benefits.

*Signal Generation*

Although some safety signals are generated in laboratory tests and clinical trials conducted in the preapproval setting or from known or suspected biologic actions of a drug, the primary method by which FDA documents new adverse events in the postmarket setting is monitoring of suspected adverse drug reaction reports entered into the Adverse Event Reporting System (AERS). AERS combines the voluntary adverse drug reaction reports from MedWatch, such as direct reports from healthcare practitioners and consumers, and the required reports from manufacturers—15-day expedited reports of serious[3] and unexpected adverse events and manufacturer periodic reports. The information provided by this part-voluntary, part-mandatory system of reporting forms the basis of detection of many safety signals and has been useful in identifying rare adverse events.

Spontaneous adverse event reporting systems have many limitations, but they offer the possibility of identifying rare serious adverse events in a timely manner among all persons across the entire region to which the system applies. For example, if there is a one-in-a-million SAE applicable to those exposed to a drug used in 10 million people per year in the US, it might never be observed in a database of several hundred thousand, or even several million people in which the number exposed to the drug might be only a few thousand per year. But in the entire US it is not so unlikely that at least one such event would get reported. Even a small number of reports of events that are commonly caused by drug exposure, such as liver or kidney failure, aplastic

---

[2] Efficacy refers to effects in controlled clinical trials; effectiveness refers to effects in the "real world".
[3] A serious adverse event is any untoward medical occurrence that at any dose: results in death, is life-threatening, requires or prolongs inpatient hospitalization, results in persistent or significant disability or incapacity, is a congenital anomaly or birth defect (CFR 312.32).

*PREPUBLICATION COPY:  UNCORRECTED PROOFS*

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety: Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

anemia, anaphylaxis, Stevens-Johnson Syndrome, and so on, can constitute an important safety signal. Spontaneous reporting is subject to certain limitations, including underreporting, the influence of bias in reporting, lack of denominator data, and difficulties in attribution of association between reported event and drug exposure.

Little has been done to optimize the usage of AERS for drug safety signal detection until recently. The work of DuMouchel and others raised the real possibility of doing automated searches of AERS to identify possible associations worthy of further followup. These "data mining" techniques greatly increase the value of AERS data, and that of other spontaneous reporting systems. Developing more rigorous systems in which to investigate AERS signals or any other possible risks of interest is warranted and long overdue; such systems have the potential to improve the ability to develop safety information in a more rapid and more reliable manner. The Centers for Education and Research on Therapeutics (CERTs) are assessing the potential use of health care databases for enhanced identification of adverse drug events. But the addition of new tools such as the use of health care databases does not mean we should abandon the old, especially now that we have methods to substantially enhance the value of these older tools.

In 2004, FDA received 422,889 reports of suspected drug-related adverse events. Of those reports, 21,493 were MedWatch reports directly from individuals (about 15% of which came directly from consumers), 162,107 were manufacturer 15-day (expedited) reports, 89,960 were reports of serious events included in manufacturer periodic reports, and 149,329 were reports of other events included in manufacturer periodic reports. As described in Chapter 2, safety evaluators in ODS/OSE review case reports in their drug-class portfolios. That is necessarily very time-consuming. Electronic submission of adverse event (AE) reports makes the system more efficient and timely, although it is reported that only half of the AE reports are submitted electronically, so the AERS contractor must spend time in performing data entry before the information can be reviewed by the safety evaluators.

A safety evaluator receives about 650 electronic reports per month. Review of AE reports can sometimes identify rare or unusual events that require additional research to understand. The following are some drugs for which AEs were identified through AERS: terfenadine (torsade de pointes and sudden death), cisapride (torsade de pointes and sudden death), troglitazone (hepatic failure), infliximab (tuberculosis and opportunistic infections), and cerivastatin (rhabdomyolysis) (Wysowski and Swartz, 2005). Statistical approaches available for the analysis and display of AERS data (such as the WebVDME program) have received only limited use by CDER until recently. CDER staff have recently described how the use of a Bayesian statistical analysis would have confirmed the cerivastatin-rhabdomyolysis association after 6 months of post-approval use if it had been available (Szarfman et al., 2002). Other systematic methods of screening for AEs have also received little attention, although their use appears to be increasing. The committee is aware of the criticisms of AERS, but the committee believes that the planned update known as AERS-2 will useful. The committee supports a focused improvement in how CDER uses passive-surveillance reports as a tool in drug safety research.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.

The Future of Drug Safety:  Promoting and Protecting the Health of the Public
http://www.nap.edu/catalog/11750.html

**4.1:  The committee recommends that in order to improve the generation of new safety signals and hypotheses, CDER (a) conduct a systematic, scientific review of the AERS system[4], (b) identify and implement changes in key factors[5] that could lead to a more efficient system, and (c) systematically implement statistical-surveillance methods on a regular and routine basis for the automated generation of new safety signals.**

The committee does not intend that review of adverse event reports, whether submitted by manufacturers as mandatory under federal regulation or submitted by patients or their providers through the MedWatch program, be the primary tool used by CDER for postmarket safety analysis. The committee does not support making adverse event reporting mandatory.  Enforcing mandatory reporting is difficult and the committee's goal is to have better reporting and better use of what is reported, not to increase the workload of CDER safety evaluators with unhelpful information. The passive reporting system in place today is capable of, and has made, important contributions, and the committee hopes that CDER works to make the current system more efficient. In the next section, the committee offers recommendations for tools that will supplement and complement the AERS system and provide better data for regulatory and public health purposes.

*Signal Strengthening and Testing*

The development and implementation of a lifecycle approach to the evaluation of the risks and benefits related to drugs will require expanded efforts in signal strengthening and signal testing in the postmarket setting.  Once safety evaluators in ODS/OSE or clinical reviewers see sufficient numbers of similar case reports, they have to decide whether apparent signals are real—that is indicative of a problem—or just "noise" in the system.  That determination should begin with the application of available tools, such as sector maps and empirical Bayes reporting ratios for analyzing spontaneous reports and should continue with more active methods of evaluating signals.

Sometimes, the need for signal-strengthening studies is anticipated at the time of approval.  Just before approval, CDER negotiates about phase 4 studies that the company commits to conducting.  Chapter 2 includes information about the number of those studies that are not completed. An exception to the inability of CDER to compel the studies is the case in which a drug is approved under accelerated approval. Postmarketing studies range from simple pharmacokinetic studies through analysis of data in administrative databases to controlled trials.  The current approach, leaving the negotiations of plans for postmarket studies to the late stages of the pre-approval process is not optimal and may lead to studies that are not well designed. That is one of the reasons why a large proportion of postmarket commitments are not started or completed.  Another factor that could contribute to suboptimal design is uncertainty of OND clinical reviewers about the types and designs of postmarket studies that might be developed, particularly observational studies.  It is unusual for CDER to bring in outside experts for independent review and advice about the hypotheses and design of phase 4 studies committed to at the time of approval, but such advice might be useful.  As described in Chapter 2, input from advisory committees is often not sought because of committee meeting schedules.

---

[4] The committee is aware that CDER is beginning to undertake an information-technology upgrade of AERS.

[5] Such as data sources, coding, quantity, quality of reports, and best use of CDER staff.

**PREPUBLICATION COPY:  UNCORRECTED PROOFS**

Copyright © National Academy of Sciences. All rights reserved.